# Exhibit 2

# Calendar No. 181

| 101st Congress 1st Session | SENATE | REPORT 101–94 |
|---|---|---|

## OIL POLLUTION LIABILITY AND COMPENSATION ACT OF 1989

JULY 28, 1989.—Ordered to be printed

Filed under authority of the order of the Senate of July 27 (legislative day, January 3), 1989

Mr. BURDICK, from the Committee on Environment and Public Works, submitted the following

# REPORT

together with

## ADDITIONAL VIEWS

[To accompany S. 686]

[Including cost estimate of the Congressional Budget Office]

The Committee on Environment and Public Works, to which was referred the bill (S. 686) to consolidate and improve Federal laws providing compensation and establishing liability for oilspills, having considered the same, reports favorably thereon with amendments and recommends that the bill as amended do pass.

### GENERAL STATEMENT

The Committee on Environment and Public Works has long been concerned with the potential environmental dangers posed by the transportation, storage, and handling of oil. In 1970, extensive committee activity resulted in enactment of the Water Quality Improvement Act, which amended the Clean Water Act to establish liability for cleanup of spills of oil from facilities and vessels.

The oil pollution liability provision, section 311, was amended in 1977 to expand the geographic coverage of the law, raise the limits of liability for discharges of oil and hazardous substances, and add

29-010

restoration of damaged natural resources as an element of removal costs.

In 1978, the committee approved a bill, S. 2083, the Oil Pollution Liability and Compensation Act of 1978, to establish a liability fund and to provide for compensation for damages and cleanup costs caused by discharges of oil and hazardous substances. That portion of the bill regarding hazardous substances was modified and led to enactment of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980. The portion of the bill relating to oil pollution was not enacted. In 1986 the Committee reported S. 2799 by a vote of 15–0 which passed the Senate unanimously. The House took no action on this bill.

What the Nation needs is a package of complementary international, national, and State laws that will adequately compensate victims of oil spills, provide quick, efficient cleanup, minimize damage to fisheries, wildlife and other natural resources and internalize those costs within the oil industry and its transportation sector.

Instead, there is a fragmented collection of Federal and State laws providing inadequate cleanup and damage remedies, taxpayer subsidies to cover cleanup costs, third party damages that go uncompensated, and substantial barriers to victim recoveries—such as legal defenses, statutes of limitation, the corporate form, and the burdens of proof that favor those responsible for the spill.

*Oil pollution*

The 11-million gallon spill from the *Exxon Valdez* in Prince William Sound, Alaska, and the three spills within a 24-hour period just months later in the coastal waters of Rhode Island, the Delaware River and the Houston Ship Channel, have demonstrated that oil pollution from accidental tanker spills is a real and continuing threat to the public health and welfare and the environment.

The disaster caused by the nation's largest oil spill in Prince William Sound was exacerbated greatly by an unreasonably slow, confused and inadequate response by industry and government that failed miserably in containing the spill and preventing damage.

The responses to the spills in the waters of Rhode Island, the Delaware River and the Houston Ship Channel were more far more prompt and less chaotic than the *Exxon Valdez* effort, but they were not an unqualified success.

It took only four hours to get two booms in place around the *World Prodigy,* off the Rhode Island coast, but the booms were not successful in containing the light No. 2 oil. Within 24 hours the oil spread over a 20-mile stretch of water. One day after the spill in the Delaware River, the oil had been carried 15 miles downstream, and the Delaware Secretary of the Environment said that "the standard response failed."

The oil spills over the past five months clearly show that we are not using—or have not yet developed—technology capable of containing spills of less than a million gallons, let alone spills the size of the *Exxon Valdez.* The spills of less than one million gallons also demonstrated that any oil spill, no matter how quickly we respond to it or how well we contain it, is going to harm the environment.

3

Consequently, preventing oil spills is more important than containing and cleaning them up quickly.

Moreover, four major oil spills within a three-month period suggest that spills are still too much of an accepted cost of doing business for the oil shipping industry. At the present time, the costs of spilling and paying for·its clean-up and damage is not high enough to encourage greater industry efforts to prevent spills and develop effective techniques to contain them. Sound public policy requires reversal of these relative costs.

The Nation's continued heavy dependence on oil will result in increasing transport of oil in tankers through U.S. waters and greater offshore exploration and production in deeper waters and harsher environments. These conditions can only increase the potential for future catastrophic oil spills and the need to prevent such pollution and minimize its damage.

*Existing Federal law*

Under existing Federal law, at least five statutes deal with the issue of oil spill liability and compensation. Each is different, and each is inadequate.

The Clean Water Act, which has· jurisdiction over most large tanker and inland barge incidents, has historically provided only partial protection. The Act sets inappropriately low limits of liability for owners and operators of vessels with respect to Federal oil spill removal costs and natural damages, and provides no coverage or compensation for other damages.

As documented in a report prepared by the U.S. General Accounting Office in 1983, gross inadequacies exist in the CWA's provisions dealing with spiller responsibility for cleanup costs. Between 1971 and 1982 the United States Government obligated $124 million from the Clean Water Act's section 311(k) revolving fund, but recovered only $49 million from spillers, for a total expenditure of $75 million in national funds. In individual cases the percentage of cleanup costs expended by the government which have been recovered in courts has been even lower. Funds also are expended in the costly, time consuming litigation required to recoup cleanup expenditures. According to the GAO report, as of 1982 there were 77 cases in litigation involving United States Government efforts to recover $36.5 million.

Another problem with the Clean Water Act is that its section 311(k) revolving fund is inadequate to cover large oil spills such as the Exxon Valdez. This fund has never been funded at the authorized level of $35 million, leaving aside the fact that this amount is far too low. Moreover, since the fund is appropriated from the Treasury, it undercuts budget reduction goals and runs counter to cost internalization policies. These policies are exacerbated by the fact that courts have found the Clean Water Act to provide the only national remedy for recovering oil spill cleanup costs. These courts have ·held that the government cannot use common law maritime tort or nuisance theories to recover its excess costs.

In addition to the Clean Water Act, title III of the Outer Continental Shelf Lands Act Amendments, the Deepwater Ports Act, and the Trans-Alaska Pipeline Authorization Act, all play a role in oil spill liability and compensation. But they provide varying and

4

uneven liability standards and scope of coverage for cleanup costs and damages associated with activities covered by each individual law. Moreover, this array of narrowly defined programs can create administrative problems as well. As a result, the goal of compensating those injured may be complicated by questions of jurisdiction of the various Federal agencies. For example, when an oil spill occurs it may be necessary to track down the source of the spill before the applicable statute is applied and compensation claims presented.

Finally, the 1851 Limitation of Liability Act represents a potentially devastating bar to effective recovery of either cleanup costs or damages. Perhaps that Act had merit 135 year ago, since its purpose was to further the interests of this country's budding merchant marine by encouraging shipbuilding and employment of ships. To that end, vessel owner liability was limited to "the amount or value of the interest of such owner in such vessel, and her freight pending." Current application of that law, however, has resulted in situations where the owner pays next to nothing because the vessel and cargo are a total loss following a catastrophic incident. In two Federal cases where the owner of a vessel has invoked the provisions of this Act, courts have held that this law, where applicable, has the effect of limiting recoveries under State law, including provisions allowing unlimited liability.

In *Esta Later Charters, Inc.* v. *Ignacio* (Nos. 88–2728; 88–2730, May 17, 1989), Judge Kozinski of the Ninth Circuit Court of Appeals (on an issue of timing for petitions under the 1851 statute), wrote in dicta on the 1851 statute:

> Shortly after the close of the middle ages, many European seafaring nationals developed a rule of maritime law that limited a shipowner's liability to the value of the vessel and its cargo. The rule was first adopted in the United States in the Limitation of Liability Act of 1851 * * * and has remained part of U.S. law today, a vestige of a time gone by. * * * [at 5217]
>
> No one who has had occasion to study the * * * Act has been struck by its lucidity.
>
> Misshapen from the start, the subject of later incrustations, arthritic with age, the Limitation Act has "provided the setting for judicial lawmaking seldom equalled." * * * [T]his is an area that could profit from modern legislative attention. * * * Congress might be well advised to examine other approaches or to consider whether the rationale underlying the Liability Act continues to have vitality as we enter the last decade of the twentieth century.

### Section 311 of the Clean Water Act and the legal framework

The body of law already established under section 311 of the Clean Water Act is the foundation of the reported bill. Many of that section's concepts and provisions are adopted directly or by reference. This bill provides for liability and the availability of the fund to pay removal costs and compensation in the case of discharges of oil. As reported by the Committee, S. 686 raises the limits of liability established under section 311 of the Clean Water

5

Act and explicitly extends strict, joint, and several liability for compensation of third party damages.

Under section 311, as a result of the 1977 Clean Water Act Amendments, a vessel is liable up to $150 per gross ton (or $250,000 if that is more, where carrying oil or a hazardous substance as cargo); an inland oil barage is liable up to $125 per gross ton (or $125,000 if that is more), and a facility is liable up to $50 million. These amounts are only for removal costs, including restoration of natural resources damages.

The new limits of liability under the reported bill include both removal costs and compensation for damages. The limit of $500 per gross ton for tankers, for instance, may involve all damages, or all removal costs, or any combination thereof. The limits of liability provided by the reported bill in effect supercede the limits of section 311, and the distinction between inland oil barges and other oil-carrying vessels is eliminated.

Under the reported bill, removal costs will be satisfied and damaged parties will be compensated, regardless of the source of a spill of oil. Such removal costs and damages include damage to real or personal property, loss of natural resources or the use of such resources, loss of income profits, or impairment of earning capacity, and loss of taxes, royalty, rental, or revenue by governments. In addition to paying removal and damage costs, money can be appropriated from the Fund to pay for research relating to spills, equipment, overhead, enforcement, and other administrative costs.

As under existing law, owners and operators of vessels and offshore facilities are required to establish and maintain evidence of financial responsibility sufficient to meet their liability under the act. No requirement for evidence of financial responsibility for onshore facilities is contained in the bill. S 686 as reported by this Committee explicitly preserves the rights of States to enact or implement liability compensation or other statutes affecting their own citizens or resources.

*Oil spill compensation fund*

The reported bill, S. 686, establishes the Oil Spill Compensation Fund. One of the purposes of the Fund is to provide a source of money for immediate cleanup activities or damage compensation in the event a spiller does not act promptly. In such a case, the Fund would be used for removal costs and would be available for prompt damage compensation. The Fund would then be subrogated to all rights against the spiller for all expenditures up to the extent the spiller is liable, given any limits or defenses to liability.

Another purpose of the Fund is to provide a source of compensation for claims which are not settled by the spiller by virtue of a limit or a defense. This assures compensation of victims regardless of the liability of the spiller. Increased liability limits and coverage of third party damages will help fix responsibility for cleanup and damages where it belongs—on the discharger. The Fund assures that the costs associated with a spill are compensated, not just those within the spiller's limit of liability, through a mechanism which spreads these excess costs to all users of oil.

A third purpose is to provide funds ro compensation in the event the spiller cannot be identified or located, or is judgment proof.

6

Even though the 1851 Federal Limitation of Liability Law is explicitly made inoperative by this bill for claims arising under this legislation or State law, there may be cases where the assets of the owner or operator are not sufficient to meet the liability. The Fund assures compensation in such cases, with the cost borne by all owners and users of oil.

*Preemption*

The issue of Federal preemption of State laws in one that often arises during the formulation of legislation which imposes Federal environmental controls. To date, Federal legislation has affirmed the rights of States to protect their own air, water, and land resources by permitting them to establish State standards which are more restrictive than Federal standards.

Historically, the Committee on Environment and Public Works has protected the rights of States to impose more restrictive requirements or liability, particularly in the area of oil pollution law. More stringent State laws are specifically preserved in both the Clean Water Act (for cleanup of spills of oil) and in the Deepwater Port Act and title III of the Outer Continental Lands Act Amendments of 1978 (for cleanup and damages caused by spills of oil). Other environmental statues, including the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (the toxic chemical "Superfund" law) and amendment to it (the 1986 Superfund Amendments and Reauthorization Act) contain similar protections.

To date, twenty-four States have enacted comprehensive oil pollution laws covering cleanup and damages and many have established compensation funds. Some have included hazardous substances as well. This legislation, as reported by the Committee, would permit such State laws to continue and would not preclude enactment of new State laws.

The theory behind the Committee action is that the Federal statute is designed to provide basic protection for the environment and victims damaged by spills of oil. Any State wishing to impose a greater degree of protection for its own resources and citizens is entitled to do so. On the other hand, a State might feel adequately protected by the Federal statute and therefore choose not to enact additional State law. In any event, the Committee chose not to impose, arbitrarily, the constraints of the Federal regime on the States while at the same time preempting their rights to their own laws.

Similarly, a State's authority to establish a compensation fund with the same, and possibly broader, purposes as the Federal and international funds are preserved. This goes beyond "grandfathering" existing funds, recognizing State authority to establish a compensation fund if it has not already done so. States have the clear authority to finance their compensation funds by taxing oil "landings" at a rate determined by the State, or by other means. The tax rate set under Federal law to finance the Federal compensation fund would not be a ceiling for, or otherwise limit, the rate that States set.

Twelve States have oil spill funds. All 12 are available for cleanup and abatement, while some are also available for third party

damages, lost income and tax revenues, research and development, restoration of wildlife and natural resources, and associated administrative costs. These State funds have proven to be an effective means for responding to oil pollution.

Preemption of the State funds would compromise a State's ability to prevent or limit oil spill damage to the natural resources and property of its citizens. Unfortunately, situations have arisen in the past where Federal cleanup efforts have been inadequate. Preemption of State funds would make the States wholly dependent on the Federal funds and response system. The result might be a decrease in the degree of protection from oil spill damage, rather than an increase.

Of the 24 States with oil spill liability and compensation laws, 17 of them have liability without specified limits. This is based on two widely accepted principles: a polluter should pay in full for the costs of oil pollution caused by that polluter; and, a victim should be fully compensated.

It is sometimes argued that liability must be limited in order for the owner or operator to afford reasonably priced insurance coverage. Some arguments are so extreme as to suggest that tankship companies and offshore producers would not operate in an atmosphere of "unlimited" risk. But these claims are totally unfounded. Even in the 17 States without liability limits, oil shipping and producing companies are not refusing to do business. None of the testimony received by the Committee contained evidence that any shipper or producer has avoided these 17 States or has chosen to quit the business.

In order to assure a quick response to an oil spill, States will have immediate access to the domestic compensation fund to initiate expeditious cleanup and abatement. State officials, equipment, and personnel are usually located more closely than their Federal counterparts to ports, harbors, and the localities where oil spills are likely to occur. By granting direct draw authority to State officials of at least $250,000 without prior consent from Federal fund officials, as set forth in section 103(d) of the bill, the great majority of spills, many of which are almost routine in nature, would not require any Federal involvement at all. Further, a direct draw system will grant time to access the full threat of the spill. If it appeared to be catastrophic in nature, the Federal response teams could be mobilized on a large scale while the State response teams were already at the scene taking preliminary abatement actions.

Because the State teams could handle the majority of the spills, Federal expenditures would be reduced, while allowing the well-established State oil spill programs to continue.

*Federal responsibility for removal of oil and hazardous substances*

Section 311(c)(1) of the Clean Water Act allows the vessel or facility owner or operator responsible party to clean up spills and does not require federal removal. The Act allows, but does not require, federal removal unless the President determines that the spill will be cleaned up properly by the responsible party. Thus, the Act currently does not require federal removal even if the spill is not being cleaned up properly.

8

The reported bill would require the President to cleanup or arrange for cleanup of oil or hazardous substances unless the President determines that the cleanup is being done properly and promptly by the responsible party, and that the responsible party has the financial resources and technical capability to clean up. In addition, the President is authorized under the reported bill to order the owner or operator to remove, or arrange to remove, oil or hazardous substances and to continue the cleanup until the President determines that it has been removed, as defined under section 311(a).

The reported bill would require the President to coordinate and direct all public and private cleanup efforts whenever there is a substantial threat of a pollution hazard to the public health or welfare.

Section 311(c)(2) of the Clean Water Act requires the President to prepare and publish a National Contingency Plan for removal of oil and hazardous substances. The reported bill expands what must be included in the Plan under that provision.

The reported bill would amend section 311(c) by adding a new paragraph to require the Administrator, in consultation with the Secretary of Transportation, to submit a report within one year and every two years thereafter that assesses the adequacy of the National Contingency Plan and any regulations promulgated pursuant to subsection (j) of the Clean Water Act concerning oil spills.

Additionally, under section 311(d) of the Clean Water Act, whenever there is a substantial threat of a pollution hazard to the public health or welfare, the President may, but again is not required to, coordinate and direct all public and private cleanup efforts and may remove or destroy the vessel involved.

Finally, section 311 of the Clean Water Act is amended by the reported bill to add three new subsections requiring the President (1) to establish regional oil spill response teams; (2) to issue a final rule requiring owners and operators of vessels and facilities to prepare and submit for the President's approval a contingency plan for the prevention, containment and cleanup of oil spills from their vessels or facilities and for the protection of fisheries and wildlife from such spills; and (3) to establish a research and development program on the scientific and operational aspects of spill prevention, response, containment and recovery.

*Penalties*

Section 311 provides for authority for penalties for violations of the prohibition against discharge of oil (section 311(b)(3)) and for violations of notification requirements, regulations issued in support of the National Contingency Plan, and violations of requirements concerning financial responsibility.

Paragraph (6) of subsection (b) of section 311 provides for penalties for violations of the prohibition on discharge of oil or a hazardous substance to water. Subparagraph (A) of paragraph (6) provides for an administrative civil penalty of not to exceed $5,000 for each offense. No penalty is to be assessed without notice the person charged and an opportunity for a hearing. The amount of the penalty may be compromised based on factors including the gravity of the offense and the size of the business.

Subparagraph (B) of paragraph (6) provides for a judicial civil penalty of not to exceed $50,000 in cases where the "gravity of the offense" or the "standard of care manifested by the owner" warrant such action. In cases where the violation resulted from willful negligence or misconduct, the penalty may be increased to up to $250,000. Implementing agencies, however, have concluded that subparagraph (B) applies only to discharges of hazardous material and does not apply to discharges of oil (see Federal Register, Vol. 44, No. 169, page 50785).

In addition, recent court decisions have confirmed that oil is a "pollution" within the definition of the Clean Water Act and discharges of oil to the navigable waters are subject to the general penalty provisions of section 309 of the Clean Water Act (United States v. Hamel; No. 76–1478; March 10, 1987).

### MAJOR PROVISIONS

#### Creation and uses of fund

The Oil Pollution Liability and Compensation Act of 1989 builds upon section 311 of the Clean Water Act to create a single Federal law providing cleanup authority, penalties, and liability for oil pollution.

The bill creates a single fund to pay for the removal of and damages from oil pollution.

This Fund would replace those funds created under the Trans-Alaska Pipeline Act, the Deepwater Port Act of 1974, and the Outer Continental Shelf Lands Act. The new Fund also would supersede the contingency fund under section 311 of the Clean Water Act, and the balance of that fund, along with the balance in the Deepwater Port and OCS funds, would be transferred to the new Fund.

#### Availability of the fund

The Fund would be available, up to a limit of $1 billion per incident, for all removal costs and compensable damages. As reported, S. 686 would establish a simplified claims procedure for the disbursement of compensation available from the Fund.

The Fund would be available for the following:

—Cleanup costs or damages which exceed the limits of liability of the discharge where the discharger cannot be identified or there is a delay by the spiller in satisfying the claim;

—All removal costs and expenses incurred by the Federal or State governments, or any other party, under the national contingency plan;

—The costs of assessing both short-term and long-term injury to destruction of, or loss of any natural resources resulting from a discharge of oil;

—The costs of Federal or State efforts in the restoration, rehabilitation, or replacement or acquiring the equivalent of any natural resources injured, destroyed, or lost as a result of any discharge of oil;

—Subject to such amounts as are provided in appropriation Acts, the costs of providing equipment and similar overhead, related to the purposes of this Act and section 311 of the Clean Water

10

Act, and of establishing and maintaining damage assessment capability, for any Federal agency involved in strike forces, emergency task forces, or other response teams;

—The costs of a program to identify, investigate, and take enforcement and abatement action against discharges of oil, including the provisions of section 311(j)(1) (C) and (D) of the Clean Water Act;

—All administrative and personnel costs of administering the Fund and this Act.

The principal concept of this bill is to provide ready and complete compensation for any party suffering damages from discharges of oil or hazardous substances. Similarly, the Fund is to assure prompt access to sufficient sums to pay all removal costs and restoration of natural resource damages. The use of Fund moneys for removal by State or Federal agencies should not be treated as claims against the Fund, to be determined under a quasi-adversarial claims procedure, but simply and expeditiously made available. They are automatic draws against the Funds, similar to the direct draw authority.

In promulgating regulations establishing claims procedures under this legislation, the President shall observe the following principles: The Fund is to provide compensation for damage claims fully and promptly. While the Fund must require some evidence of loss and the establishment of a causal connection with oil pollution, it should not routinely contest or delay the settlement of damage claims. The Fund will sometimes be providing compensation where there is little chance of subrogation against the discharger. Even so, litigation or lengthy adjudicatory proceedings over liability, defenses, or the propriety of claims should be reserved for subrogation actions against dischargers.

The bill requires claims to be presented in the first instance to the discharger, where known. Wherever possible, the burden is to be on the discharger to first bear the costs of removal and provide compensation for any damages. The regulations must reflect this intention, providing strong incentive to the discharger to undertake removal operations at its own initiative to cooperate with Federal and State authorities, and to provide prompt compensation. Where the discharger has not satisfied a claim within the minimum time necessary for receiving and processing the claim, the regulations are to provide the immediate availability of the Fund to satisfy the claim. The right of action against the discharger acquired by subrogation should then be vigorously pursued by the Fund.

Subsection (d) clarified State access to the Federal fund and provides that the Governor of each State, or the Governor's designee, is authorized to obligate up to $250,000 in direct draw from the Fund without prior approval from the President. The only requirement that applies to the State's direct draw authority is notification to the President within 24 hours of the exercise of such authority.

In addition, this subsection clarifies that the President and the Governor of any interested State may enter into agreements providing for additional removal action or direct access for additional payments. Not later than six months after the date of enactment,

the President shall publish proposed regulations further clarifying implementation of this provision. Such regulations are to be promulgated not later than three months after the close of the comment period. In the absence of regulations promulgated under this subsection, the States have direct draw authority; such regulations are not a prerequisite to the exercise of this authority.

Under S. 686, removal costs and damages incurred in connection with previous oil spills, including, for example, those recently occurring in the Delaware River, such as the discharge on September 10, 1986, by the *Viking Osprey*, which remain uncompensated, could be covered.

### Coverage and definitions

The Oil Pollution Liability and Compensation Act of 1989 continues to rely on section 311 of the Clean Water Act as the basic law providing for cleanup authority, for penalties for spills and failure to notify of spills, and, by adopting the standard of liability under section 311 as the standard of liability under this Act, for liability of dischargers for cleanup costs for the discharge of oil. That standard of liability has been determined repeatedly to be strict, joint, and several liability. This bill adopts these standards for economic damages, as well as for removal costs and natural resource damages.

The reported bill covers all the bodies of water and resources covered by section 311, including the inland waters of the United States and the living and non-living resources of the Outer Continental Shelf and of ocean waters out to 200 miles offshore. Coverage includes all discharges of petroleum oil into the environment, defined to include the navigable waters, the waters of the contiguous zone of the United States, the ocean waters of which the natural resources are under the exclusive management authority of the United States under the Magnuson Fishery Conservation and Management Act, adjoining shorelines, and the ambient air above such waters and shorelines. Because of the definition of "natural resources" in the bill, discharges affecting all the living and nonliving resources of these areas, including the Outer Continental Shelf, are covered by the reported bill.

The definition of "discharge" in the reported bill does not contain the exclusion for routine or permitted release found in section 311. This bill, however, deals only with discharges or significant threats of discharge that require a response or that cause damages. The notification and penalty provisions of section 311 make a more limited definition of discharge appropriate in that context.

The reported bill also covers claims of foreign citizens arising from certain discharges into a territorial sea of a foreign country, such as Canada.

The bill defines "tankers" as vessels constructed or adapted for the carriage of oil in bulk or in commercial quantities as cargo. Higher liability limits then apply to tankers than apply to other vessels. When used in this definition or at other places in the reported bill, the phrase "in commercial quantities refers to those quantities of oil carried aboard a vessel for purposes other than the operation of the vessel itself.

12

A major deficiency of title III of the Outer Continental Shelf Lands Act Amendments of 1978 is corrected by the reported bill. Under that title, the owner or operator of an OCS facility is held liable. Often, that owner or operator is an independent drilling contractor and not the actual holder of the rights to produce the oil. This technical feature of the 1978 Act changed the way in which OCS leaseholders and drilling contractors had historically allocated liability, through contracts and indemnity agreements. The reported bill restores the balance among leaseholders and drilling contractors on the OCS, leaving the possibility of further adjustment in their internal allocation of liability through indemnity agreements. The bill accomplishes this by defining "owner or operator" for OCS facilities to mean the lessee or permittee of the area in which the facility is located (or the holder of the OCS rights). Where a mobile offshore drilling unit is being used as an OCS facility, and there is a discharge of oil on or above the surface of the water, the owner or operator of the unit is liable, up to the limits established by the reported bill for tankers. If costs exceed that limit, the excess costs must be borne by the lessee or permittee. If a discharge of oil from a mobile offshore drilling unit occurs below the surface of the water, the lessee or permittee is liable.

*Liability*

The reported bill imposes liability as defined under section 311 of the Clean Water Act on the owner or operator of any vessel or onshore or offshore facility discharging oil. Liability covers all removal costs, whether incurred under section 311 of the Clean Water Act, the Intervention of the High Seas Act, and section 18 of the Deepwater Port Act of 1974 or other laws or programs. Owners and operators are liable for natural resources damage claims, discussed below.

The legislation also establishes in section 102(a) that owners or operators are liable for economic damages, including injury to, destruction of, or loss of any real or personal property; any loss of use of real or personal property; any loss of income or profits or impairment of earning capacity resulting from injury to or destruction of real or personal property; and any direct or indirect loss of tax, royalty, rental, or net profits share revenue by the Federal Government or any State or political subdivision for not more than one year.

These provisions are intended to provide compensation for a wide range of injuries and are not so narrowly focused as to prevent victims of an oil spill from receiving reasonable compensation. For example, economic damages include both loss of use and loss of subsistence use of natural resources. Under this provision, fishermen, for example, would not only receive the equivalent of unemployment compensation, but would also receive compensation to prevent loss of a boat. Lost wages are of limited value if the means of earning the wages, such as a boat, go uncompensated. While setting a Federal liability standard and stating what damages are compensable, these provisions do not preclude States from adopting different standards or definitions of damages.

Defenses to liability are provided in section 102(h) in three limited circumstances: for an act of God, an act of war, or an act or

13

omission of a third party (or any combination of these). The third party defense applies to one who is not an employee or agent of the defendant or one whose act or omission does not occur in connection with a contractual relationship with the defendant, if the defendant establishes that the defendant exercised due care and took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions.

This subsection provides for third party defenses only where the third party had not entered into a contractual relationship with the defendant. This is to preclude defendants from avoiding liability by claiming a third party was responsible, when that third party had a contractual relationship with the defendant and was acting, in essence, as an extension of the defendant. As provided in subsection (f), an owner or operator may not transfer liability for any discharge or threat of a discharge, but agreements to insure, hold harmless, or indemnify are not barred. As in all other provisions under the bill, States are free to provide different defenses with respect to liability under their laws.

The limits on liability established by the reported bill in section 102 are:
—$500 per gross ton or $10,000,000, whichever is greater, for tankers carrying oil in bulk or commercial quantities as cargo, including inland and coastal barges operating in navigable waters;
—$300 per gross ton or $500,000 whichever is greater, for any other vessel;
—$100,000,000 for any Outer Continental Shelf facility;
—$100,000,000 for any deepwater port facility (including the liability of the licensee for a discharge from any vessel moored at such port, in any case where $100,000,000 exceeds $500 per gross ton of such vessel);
—$100,000,000 for any other onshore or offshore facility.

The President is authorized to establish by regulation a maximum limit of liability for such other facilities that is less than $100,000,000, but not less than $8,000,000, taking into account the size, storage capacity, oil throughput, proximity to sensitive areas, type of oil handled, history of discharges, and other factors relevant to risks posed by the class or category of facility. For example, the President may consider establishing lower limits for facilities handling very small amounts of oil.

Owners or operators are liable under section 102 for prejudgment interest on removal costs and economic damages, and such prejudgment interest is not subject to the limitations on liability.

The limits on liability provided in section 102(c) are based on existing Federal law or limits contained in the Conventions currently pending before the Senate. Under the terms of section 106 and title III, such limits are not preemptive of State liability limits. In several of the existing Federal laws on oil spills, the liability limits have not been increased in 10 years so that, in real dollars, the liability limits have been decreasing over time. In order to prevent further diminution of compensation, section 102(c)(4)(B) requires the President to adjust the limits on liability by regulation not less often

14

than every three years to take into account significant increases in the Consumer Price Index.

Liability is not limited if caused by willful misconduct or gross negligence or by a gross or willful violation of applicable safety, construction, or operating standards or regulations. For vessels, these must be federally promulgated standards. Such standards or regulations should not be trivial requirements that are unrelated to the discharge. Failure to notify appropriate officials of a discharge and failure or refusal to cooperate in cleanup activities also invalidates the liability limits.

A limit on liability is clearly of benefit to an owner or operator subject to the provisions of this legislation. Such a benefit should not be conferred, however, in instances where the conduct of the owner or operator indicates that such owner or operator is not, in good faith, attempting to comply with the applicable regulations or statutory requirements. In these instances, where compliance perhaps could have prevented or mitigated the effects of an oilspill, no such limits will apply.

Liability may not be transferred, but nothing in section 102(f) bars any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section. Nothing in the reported bill bars a cause of action that an owner or operator subject to liability under this section, or a guarantor, has or would have, by reason of subrogation or otherwise against any person.

The owner or operator of a vessel shall be liable in accordance with this section, and section 311 of the Clean Water Act, under maritime tort law, and as provided in section 106 of the reported bill, notwithstanding any provision of the Act of March 3, 1851, or the absence of any physical damage to the proprietary interest of the claimant. The 1851 statute limits liability of owners or operators to the value of the vessel and the cargo after an incident has occurred. In today's liability scheme, this approach appears dated and inconsistent with Congress' repeated statements on the appropriate liability of parties. If applied to these circumstances, the 1851 statute virtually eliminates any meaningful liability on the part of the owner or operator and would unravel the balance of liability set forth herein. Therefore this bill completely supersedes the 1851 statute with respect to oil pollution.

*Natural resource damages*

Under section 102(a) of the reported bill, an owner or operator is liable for any injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss, and for any loss of use (including loss of subsistence use) of any natural resources, without regard to the ownership or management of such resources. Section 102(d) provides that for injury to natural resources covered by section 102(a)(2)(C), liability shall be to a trustee, acting on behalf of the public. The President designates Federal officials to act as trustees for natural resources belonging to or managed by the United States, to assess damages and seek recovery. The Governor may designate State officials to act as trustees for natural resources under State trusteeship.

The reported bill requires the President, acting through the Administrator of the National Oceanic and Atmospheric Administra-

15

tion, in consultation with other agencies, to promulgate regulations for the assessment of damages.

As amended, the bill would require trustees to act on behalf of the public to assess and to recover for damage to natural resources. Section 102(d) (1) and (3) make it clear that the measure of damages in any trustee action for injury to, destruction of, or loss of natural resources includes but is not limited to the sums which can be used to restore, replace, or acquire the equivalent of such resources, plus the diminution of use and of other values of those resources, until they are fully restored. Where restoration of the resources is infeasible, the trustees will acquire equivalent resources. Similarly, when a trustee recovers for lost uses or other loss values as well as restoration or replacement, section 102(d)(1) provides that the sums recovered must be used to acquire equivalent resources.

This bill as amended is intended to be consistent with the recent unanimous decisions of the U.S. Court of Appeals for the District of Columbia Circuit in *State of Ohio* v. *Interior,* No. 86–1529, and in *State of Colorado* v. *Interior,* No. 87–1265, reversing the Interior Department's narrow market value and use value based approach to assessing damages (that had been used, for example, to put a $15 price tag on fur seals), and upholding the rules' advanced valuation provision. However, in requiring NOAA to issue new regulations, it is intended that NOAA adopt advanced techniques to assess damages consistent with the above-described measurement of damages. NOAA's rules will be applicable to all oil spills covered by the Act, and should streamline trustees' tasks in assessing and recovering full damages. The techniques need not be limited to state-of-the-art computer models (as included in Interior's rules), but may include, for example, tables estimating restoration, replacement, and lost use of other values of the lost or injured resources. The existing Interior Department rules, as amended by the court's decisions, may be used with a rebuttable presumption in the interim. The bill prohibits double recovery of damages, but is not intended to preclude state and federal trustees from conducting parallel assessments, although it is our intent that all trustees work together to minimize duplication of effort.

The bill makes it clear that forests are more than board feet of lumber, and that seals and sea otters are more than just commodities traded on the market. It would clarify that in the wake of spills like the *Exxon Valdez,* all reasonable demonstrable natural resource damages caused by a spill are paid by the responsible parties, rather than borne by the public.

A Federal trustee is authorized to retain any recovered sums and use them for these purposes without further appropriation. Any assessment of damages conducted in accordance with the regulations promulgated under this Act has the force and effect of a rebuttable presumption on behalf of the State or Federal trustee in any judicial or administrative proceeding under this Act. Assessments, of course, must be conducted by trustees, not by responsible parties.

*Financial responsibility*

Under section 104, the owner or operator of any vessel over 300 gross tons using any waters or ports of the United States or any

Outer Continental Shelf facility or deepwater port facility must maintain evidence of financial responsibility sufficient to meet the amount of potential liability established in section 102. Non-self-propelled barges that do not carry oil as cargo or fuel are exempt from the requirement. A vessel that cannot produce the required evidence can be denied entry to, or detained at, United States ports or facilities, and its cargo can be seized.

The owner or operator of any offshore facility must also establish and maintain evidence of financial responsibility sufficient to meet the liability requirements of section 102. There is no requirement for showing evidence of financial responsibility for onshore facilities.

Evidence of financial responsibility is to be established according to regulations prescribed by the President and may include insurance, surety bonds, guarantees, letters of credit, qualification as a self-insurer, or other evidence.

Claims for costs and damages may be asserted directly against any guarantor who provides evidence of responsibility for an owner or operator who is liable under the act for such costs and damages. The guarantor may invoke all rights and defenses available to the owner or operator and also the defense that the discharge was caused by the willful misconduct of the owner or operator. Liability of the guarantor is limited to the monetary limits in the instrument establishing financial responsibility.

The President is authorized to assess a civil penalty of up to $25,000 per day of violation against anyone who fails to comply with financial responsibility requirements or denial of entry or detention orders. Judicial action for relief are also authorized.

Regulations respecting financial responsibility in effect at the time of enactment of the act remain in effect until superseded by new regulations.

*Litigation jurisdiction, and venue*

Section 105 provides that review of any regulation promulgated under the Act is available only in the United States Circuit Court of Appeals for the District of Columbia and must be sought within 90 days of promulgation. Any matter which is subject to review under this provision is not subject to review in any civil or criminal proceeding for enforcement or to obtain damages or recovery of response costs.

Appropriate United States district courts are given jurisdiction over controversies arising under the Act.

Appropriate State courts are given jurisdiction over claims made under section 102, and final judgments of such courts are valid and enforceable for all purposes of sections 102 and 103.

The bill establishes time limitations for bringing actions to seek compensation for damages or to cover removal costs. An action for damages must be commenced within three years after the later of (1) the date of discovery of the loss and its connection with the discharge or, (2) with respect to the loss of use of natural resources, the date regulations for the assessment of damages are promulgated under section 102(d)(3).

Actions for the recovery of removal costs must be commenced within three years after the completion of the removal action. In a

removal action, the court is required to enter a declaratory judg-
ment on liability that will be binding on any subsequent action in-
volving the same parties. An action to recover removal costs may
be brought at any time after costs have been incurred.

Actions for contribution for removal costs or damages must be
commenced within three years of judgment or settlement, and ac-
tions based on rights subrogated by reason of payment of a claim
must be begun within three years of payment of the claim.

The rights of minors and ohter incompetents are preserved until
such time as they become legally competent or a guardian ad litum
is appointed.

*State laws and programs*

Section 106 of the reported bill explicitly preserves the authority
of any State to impose its own requirements or standards with re-
spect to discharges of oil within such State. Also explicitly pre-
served is State's authority to establish or maintain funds for clean-
up or compensation purposes and collect such fees or penalties as
they may establish.

The Committee has confronted preemption during its previous
consideration of oilspill legislation.

Preemption has been discussed by the members of the Committee
more than any other single issue. S. 686 does not embrace any pre-
emption of State oil spill liability laws, State oil spill funds, or
State fees, taxes, or penalties used to contribute to such funds. The
long-standing policy in environmental laws of not preempting State
authority and recognizing the rights of States to determine for
themselves the best way in which to protect their citizens, is clear-
ly affirmed in S. 686.

Section 106(c) authorizes States to enforce the Federal financial
responsibility requirements established under section 104 of this
Act, in or on their own navigable waters. Such enforcement would
include inspecting vessels and facilities, requiring the display of the
evidence of financial responsibility required under section 104, and
imposing fines and penalties and other sanctions for failure to
comply with the requirements of section 104. Section 106(c) does
not expand the scope of the section 104 requirements themselves.

The President is required under subsection (d) to consult with
the affected State or States on the appropriate removal action to be
taken. Removal with respect to any discharge or incident shall be
considered completed when so determined by the President and the
Governor or Governors of the affected State or States. This subsec-
tion clarifies the appropriate relationship between the Federal Gov-
ernment and the States in determining when removal is complete.
There has been a relatively good record of cooperation and agree-
ment between the States and the Coast Guard in carrying out re-
sponse authorities under existing laws. Since States, as well as the
Federal Government, are under an obligation to protect the envi-
ronment and the health of their citizens, however, this bill requires
that both the States and the Federal Government agree when re-
moval has provided such protection.

Subsection (e) clarifies that nothing in this Act, the Act of March
3, 1851, or the provisions of the Internal Revenue Code of 1954 es-
tablishing the Oil Spill Compensation Fund, shall in any affect, or

18

be construed to affect, the authority of the United States or any State or political subdivision to impose additional liability or additional requirements, or to impose, or to determine the amount of, any fine or penalty (whether criminal or civil in nature) for any violation of law, relating to the discharge, or substantial threat of a discharge of oil. This subsection reinforces the position stated clearly elsewhere that no aspect of State oil spill programs is preempted, including the authority to impose additional requirements or penalties. In addition, it clarifies that the 1851 statute does not limit liability under State or Federal oil spill laws.

*Federal responsibility*

Section 311(c)(1) and (d) of the Clean Water Act allow the responsible party to clean up spills and do not require federal removal. The Act allows, but does not require, federal removal unless the President determines that the spill will be cleaned up properly by the responsible party. Thus, the Act currently does not require federal removal even if the spill is not being cleaned up properly.

The lack of clear Federal responsibility for oil spill removal contributed to failed cleanup of the *Exxon Valdez* spill. The President did not take responsibility for removal of the oil when it was clear that the response within the first three days had failed, nor did he expressly determine that the cleanup was being conducted properly. In the case of the spill off the coast of Rhode Island, the President did decide quickly that the spill would not be cleaned up properly by the vessel owner and took over control of the spill within the first few hours and the clean up effort has been judged successful. While Federal takeover is not necessary or desirable in every case to ensure prompt and proper cleanup, it is important to clarify that the Federal Government is responsible for ensuring that such cleanup takes place.

Section 201(a) of the reported bill, therefore, would amend section 311(c)(1) to require the President to cleanup or arrange for cleanup of oil or hazardous substances unless the President finds that the cleanup is being done properly and promptly by the responsible party, and that the responsible party has the financial resources and technical capability to clean up. The language is not intended to require that the President inspect each incident where evidence is sufficient to support the determination. In addition, the President is authorized under the reported bill to order the owner or operator to remove, or arrange to remove, oil or hazardous substances and to continue the cleanup until the President determines that the material has been removed, as defined under section 311(a).

Additionally, under section 311(d) of the Clean Water Act, whenever there is a substantial threat of a pollution hazard to the public health or welfare, the President may, but again is not required to, coordinate and direct all public and private cleanup efforts and may remove or destroy the vessel involved.

Section 201(b) of the bill would amend section 311(d) to require the President to coordinate and direct all public and private clearnup efforts whenever there is a substantial threat of a pollution hazard to the public health or welfare from vessel or facility spills. The requirements of this provision are meant to apply not only to

large spills like the one from the *Exxon Valdez,* but also to smaller spills, such as those that occurred in the waters off the Rhode Island coast and in the Delaware River in June, 1989, which posed substantial threats of a pollution hazard to the public health and welfare, including fisheries and wildlife.

To ensure prompt and effective response to substantial threat of pollution hazards, the bill amends section 311(d) of the Clean Water Act to allow the President to take actions without regard to any provisions of law governing competitive bidding, the employment of personnel or the expenditure of appropriated funds.

Each Federal agency, State, owner or operator of a vessel or a facility, or other person would be required to participate in any cleanup efforts of pollution hazards, as required under the National Contingency Plan and as directed by a response director designated under that Plan. The response director would be required to consult with the trustees for natural resources designated under Title I of the bill concerning any actions taken in response to the pollution hazard.

*National contingency plan*

Section 311(c)(2) of the Clean Water Act requires the President to prepare and publish a National Contingency Plan for removal of oil and hazardous substances. The Plan is required to provide for efficient, coordinated, and effective action to minimize damage from oil and hazardous substance discharges, including containment, dispersal, and removal of oil and hazardous substances.

Section 202 of the reported bill amends section 311(c)(2) to expand what must be included in the National Contingency Plan, as follows:

(1) procedures to provide oil and hazardous substance cleanup equipment that is adequate to minimize damage, and to require that all such equipment be certified at least once every three years by the Coast Guard;

(2) provisions to assure that the Federal On Scene Coordinator takes steps within a minimum amount of time to assume control of a response to a spill or discharge, resolve State and local concerns, and implement approved procedures promptly;

(3) development and maintenance of a periodically updated international inventory of equipment and personnel to remove discharges of oil and hazardous substances;

(4) designation of a person to carry out the President's authority and to direct or coordinate all federal, state and private efforts to prepare for and respond to discharges of oil and hazardous substances;

(5) establishment or criteria and procedures to ensure prompt and proper identification of, and response to, marine disasters that create a substantial threat of a pollution hazard to the public health or welfare;

(6) establishment of standards and procedures which comply with the provisions of Title I of the bill for reimbursement of removal costs from the Fund established under that Act; and

(7) establishment of procedures to notify and inform Federal agencies, States, and others that may be involved in removal of discharges of oil and hazardous substances of each entity's

duties and rights and of the procedures each such entity will be required to follow.

*Regional oil spill response teams*

Section 311 of the Clean Water Act is amended by the reported bill to add a new subsection (s) to require the President under the National Contingency Plan to establish, operate and maintain regional oil spill response teams that are capable of promptly and properly removing oil from a worst case discharge, defined as a discharge, in poor weather conditions, of the largest vessel which is known to transit a given region. In doing so, the President may make use of existing public and private equipment and personnel to the extent consistent with providing the required capability. The President is required to establish response teams for each region of the country that the President determines to be in need of such a team, including the regions of Alaska, the Pacific Northwest, California, the Gulf of Mexico and the south Atlantic coast, New England, the mid-Atlantic coast and for inland waters.

The response teams would be required to (1) consist of full-time, dedicated and trained personnel, fully operational vessels and equipment for spill containment, recovery, dispersal, shoreline clean-up and protection and rescue of fisheries and wildlife; (2) have continuous 24-hour communications capability to assure rapid notification and coordination, to ensure that response teams are properly and immediately in use upon receiving notice of any oil spill; (3) conduct training and periodic drills, without prior notice, to demonstrate their continued effectiveness and readiness; (4) work with State and local officials to enhance the contingency planning of such officials and assure pre-planning of joint response efforts; and (5) establish and maintain an inventory of personnel and equipment, in coordination with the international inventory developed under the National Contingency Plan.

. Funding to establish, operate and maintain the regional oil spill response teams would come from the industry-financed Fund established under Title I of the reported bill.

*Oil spill contingency plan development and approval*

Section 311 of the Clean Water Act also is amended by the reported bill to add a second new subsection (t) to require the President, within one year after enactment of the bill, to issue a final rule requiring owners and operators of vessels and facilities to prepare and submit a contingency plan for the prevention, containment and cleanup of oil spills from their vessels or facilities and for the protection of fisheries and wildlife from such spills.

Contingency plans would be required to—

(1) provide full details of the method of response to a worst case oil spill, defined as a discharge, in poor weather conditions, of the largest vessel which is known to transit the area covered by the plan;

(2) if implemented, be capable of promptly and properly removing any oil spill and minimizing any damage to the environment, to the maximum extent practicable;

(3) provide a clear and precise, detailed description of how the plan relates to and is integrated into other approved contingency plans;

(4) provide procedures for early detection of oil spills and timely notification of such spills;

(5) state the number, types, operational capacity and availability of the oil spill containment equipment to be provided to implement the plan;

(6) state the number, training preparedness and fitness of all full-time, dedicated, pre-positioned personnel assigned to direct and implement the plan;

(7) incorporate periodic training and drill programs to assure that personnel and equipment to be provided under the plan are in a state of operational readiness at all times;

(8) state the means of protecting and mitigating effects on the environment, including fish, marine mammals and other wildlife, and ensure that implementation of the plan does not pose unacceptable risks to the public or the environment;

(9) provide a detailed description of equipment and procedures to be used by the crew of each vessel concerned to minimize damage, stop any spilling from the vessel, contain and clean up the spilled oil promplty and properly, and determine if and when additional equipment and personnel are needed;

(10) provide arrangements for the prepositioning of oil spill containment and cleanup equipment and trained personnel;

(11) provide arrangements for enlisting the use of additional personnel, such as commercial fishermen and other volunteers, to implement the plan; and

(12) provide for disposal of recovered spilled oil in accordance with Federal, State and local laws.

Under the reported bill, the President is required (1) to provide for regular inspection of vessels, equipment and facilities to ensure compliance with the requirements of the final rule and (2) to approve contingency plans based on—

(1) the adequacy of containment and cleanup equipment, personnel, communications equipment, response time and logistical arrangements for coordination and implementation of resonse efforts to promptly and properly remove oil spills and protect the environment;

(2) the nature and amount of vessel traffic within the area covered by the plan;

(3) the volume and type of oil being transported within the area covered by the plan;

(4) the existence of navigational hazards within the area covered by the plan;

(5) any history of prior discharges of oil within the area covered by the plan;

(6) the value and sensitivity of fisheries and wildlife and other natural resources within the area covered by the plan;

(7) the comments of potentially affected third parties; and

(8) relevant information on previous discharges contained in On Scene Coordinator reports prepared by the Coast Guard.

A plan could not be approved unless the President determines that it meets the requirements under new subsections (t) and (s) of

the Clean Water Act, and that, if implemented, it is capable of promptly and properly removing any oil spill and minimizing any damage to the environment to the maximum extent practicable.

The reported bill requires an owner or operator of a vessel or facility to immediately notify the President, in writing, of any significant change in the factors considered in approval of plans in order for the President to require changes in the plan, if needed.

The President may enter into a cooperative agreement to delegate to a State the authority to approve contingency plans consistent with the requirements of the two new subsections of section 311.

New section 311(t) established by the reported bill makes it unlawful to operate a vessel in or upon the navigable waters of the United States and the exclusive economic zone or to operate a facility that is not in compliance with a contingency plan submitted and approved under its provisions.

The provisions of contingency plans submitted to and approved by the President would be deemed to be legally binding upon those persons submitting them to the President.

The President would be required—

(1) to publish annually an up-to-date description of the contingency plans for oil spills that have been submitted and approved, and an inventory of equipment available for responding to such spills;

(2) to require practice drills under the contingency plans approved pursuant to this subsection not less than twice each year;

(3) to review and publish a report on the results of practice drills; and

(4) to require additional drills and changes in arrangements for implementing approved plans as are necessary to ensure their effective implementation.

Each contingency plan submitted to and approved by the President would be required to be kept on file and readily accessible by the oil spill response teams and other officials.

*Oil Spill Research and Development Program*

The reported bill amends section 311 of the Clean Water Act to add a new subsection (u) to require the President to establish a research and development program on the scientific and operational aspects of spill prevention, response, containment and recovery. Funding to establish and maintain this program would come from the Fund established under Title I of the reported bill.

*Study of spill prevention in restricted waters*

Section 207(a) of the reported bill requires the President to conduct a study and report its results to Congress within one year on improved methods for the prevention of oil spills in restricted waters and similar portions of bays, estuaries and near shore waters.

Section 207(b) of the reported bill amends section 311(c) by adding a new paragraph to require the Administrator, in consultation with the Secretary of Transportation, to submit a report within one year and every two years thereafter that assesses the

adequacy of the National Contingency Plan and any regulations promulgated pursuant to subsection (j) of the Clean Water Act concerning oil spills.

*Oil spill penalties*

Section 206 expands and clarifies authority for penalties for discharges of oil and hazardous substances to the navigable waters and other violations of section 311 of the Clean Water Act.

Section 206(a) expands existing authority under section 308 of the Federal Water Pollution Control Act concerning inspection and entry. The authorities of this section are expanded to include vessels and facilities in addition to point source discharges. In addition, specific new authorities for collection of information concerning potential discharges of oil are established. This provision was proposed in the Administration bill (S. 1066). This provision is not intended to in any way limit or constrain related inspection and entry provisions of other Federal laws.

Section 206(b) affirms recent court decisions to explicitly provide that violations of the prohibition on discharge of oil and hazardous substances are subject to the criminal penalties established under section 309 of the Act. These penalties are $2,500-$25,000/1 year for negligent violations, $5,000-$50,000/3 years for knowing violations, and up to $250,000 and 15 years for knowing endangerment. This amendment is intended to resolve any ambiguity concerning the intent of Congress on this question.

Section 206(c) clarifies the Clean Water Act to provide that violations of section 311 are subject to the general administrative penalty authority added to the Act by the 1987 amendments (section 309(g)). This provision effectively increases the administrative civil penalty from a maximum of $5,000 to a maximum of $25,000 in the case of a class I penalty and $125,000 in the case of a class II penalty. This subsection also clarifies that Federal enforcement actions may advance even if there is a State enforcement action.

In hearings on recent major oil spills, the Committee also heard of the large number of smaller spills (i.e. an average of over 10,000 spills per year totalling to an average of over 20 million gallons per year). The use of administrative civil penalty authority is an essential tool in an overall program to reduce to number and volume of spills.

Section 206(d) revises paragraph (6) of subsection 311(c) to establish a judicial civil penalty for discharges of oil and hazardous substances. The amendment provides for penalties of up to $25,000 per day of violation, or $1,000 per barrel, whichever is greater. In any case of willful negligence, willful misconduct, or a violation of applicable safety, construction, or operating regulations, the penalty shall be not less than $250,000. The court may consider several factors in assessing a penalty including the seriousness of the violation, the history of prior violations, and the efforts to mitigate the discharge.

Section 206(e) provides that the determination by the President of amounts of oil which may be harmful to public health or welfare be amended to include quantities which may be harmful to the environment.

Section 206(f) provides for penalties for any person who knowingly fails to provide notice of a discharge of oil or a hazardous substance. The existing penalty of a fine of not more than $10,000 or not more than one year in prison or both is revised to provide for penalties consistent with title 18 of the United States Code or not more than three years in prison or both. The amendment also provides that a person who knowingly fails to provide required notice shall not be entitled to the defenses to liability provided in the Oil Spill Liability and Compensation Act.

Section 206(g) provides that administrative, civil and criminal penalties for violations of section 311 of the Act are to be deposited in the Oil Spill Fund.

### Conforming amendments to existing oil spill laws

Title III of the reported bill conforms the provisions of various other laws to the provision of this Act.

Section 201 makes clarifying amendments to the Trans-Alaska Pipeline Authorization Act (43 U.S.C. 1653). The amendments in this Act make it clear that the removal liability of the permit holder extends only to activities relating directly to the Trans-Alaska Pipeline. Additional language makes the Trans-Alaska Pipeline Act removal liability provisions inapplicable in those situations where this Act applies. In all other instances, those provisions in the Trans-Alaska Pipeline Authorization Act relating to removal costs and liability remain in effect.

The reported bill also repeals that subsection of the Trans-Alaska Pipeline Authorization Act which established a compensation fund for damages caused by oil spills from vessels transporting oil from the pipeline terminus to ports elsewhere in the United States, effective upon the payment of any outstanding claims.

Section 202 amends the Intervention on the High Seas Act, in order to make available to the Secretary, for intervention procedures authorized by that Act, the Fund established by this Act.

Section 311 of the Clean Water Act, is amended in several ways. Subsection (c) of that section is amended by authorizing reimbursement to States from the Fund established by this Act, for reasonable costs in removing discharges of oil pursuant to the National Contingency Plan. Subsections (d), (i) and (l) are amended to delete clauses made unnecessary by this Act.

The revolving fund under subsection (k) is repealed, and the amount remaining in the fund is transferred to the Fund established under this Act. Any amounts received by the United States with respect to claims brought under section 311 after the effective date of the repeal of subsection (k) shall also be deposited in such Fund.

Subsection (p) is repealed because it sets out financial responsibility requirements for vessels that are superseded by this Act.

A new subsection (s) is added to provide that the Oil Spill Compensation Fund established in this Act shall be available to carry out the provisions of subsections (c), (d), (i), and (l) as those subsections apply to discharges of oil.

It is important to note that following enactment of this Act, liability and compensation for petroleum oil pollution damages caused by a discharge from a vessel or facility will be determined

25

in accordance with this Act. Liability and compensation procedures for spills of non-petroleum oil will continue to be determined in accordance with the Clean Water Act. The response authorities for all types of oil continue to be those under section 311. The Fund established by this Act will be available to Coast Guard and other government agencies for immediate response to spills of all types of oil from all sources in the same manner as the fund established by section 311(k) is presently available to respond to such spills.

Section 204 amends the Deepwater Port Act of 1974 by repealing various subsections pertaining to oil pollution liability and compensation which are superseded by this bill. This section also provides that amounts remaining in the Deepwater Port Liability Fund shall be deposited in the Fund established in this Act. The Fund will assume all liabilities of the Deepwater Port Liability Fund.

Section 205 makes similar provisions for the assets and liabilities of the Offshore Oil Pollution Compensation Fund established under the Outer Continental Shelf Lands Act Amendments of 1978. Title III of that law (Public Law 95–372), which established the Offshore Oil Pollution Compensation Fund, is repealed in its entirety.

## HEARINGS

The Subcommittee on Environmental Protection conducted a hearing on the oil spill in Prince William Sound, Alaska, on April 19, 1989; a hearing on the three oil spills in the coastal waters of Rhode Island, the Delaware River and the Houston Ship Channel on July 13, 1989; and a hearing on S. 686 and other pending oil pollution legislation on July 21, 1989. Testimony in these hearings was received from the Secretary of Transportation, the Administrator of the Environmental Protection Agency, the Commandant of the Coast Guard, the Governor of Alaska, Attorneys General from the States of Alaska, Maine and Washington, representatives of industry, fishermen's cooperatives and environmental organizations.

## ROLLCALL VOTES

Section 7(b) of rule XXVI of the Standing Rules of the Senate and the rules of the Committee on Environment and Public Works require that any rollcall votes taken during the Committee's consideration of this bill be announced in this report.

There were no rollcall votes taken during the Committee's consideration of this bill. The bill was ordered reported on July 27, 1989, by a unanimous voice vote.

## COST OF LEGISLATION

In the opinion of the Committee, it is necessary to dispense with the analysis by the Congressional Budget Office required by section 403 of the Congressional Budget and Impoundment Control Act of 1974, as amended, in order to expedite the business of the Senate. This estimate has been requested, but was not available at the time the Committee filed the report.

# ADDITIONAL VIEWS OF SENATORS CHAFEE, LIEBERMAN, GRAHAM, AND DURENBERGER

The bill is on balance, a great improvement over the existing law. However, we have serious concerns over an amendment adopted by the committee.

This amendment deals with the levels of liability for those who cause spills of oil on the Outer Continental Shelf. It was offered with no prior notice to the committee members, and was not available in printed form at the time the vote was taken. Superficially, it seemed reasonable and relatively minor. But on closer examination, it is neither.

### SPILLS OF OUTER CONTINENTAL SHELF OIL

Both this bill and current law limit the liability for most oil spills. Those limits are too low, as the recent catastrophe in Prince William Sound illustrates. Accordingly, this legislation would raise liability limits and create a special trust fund for cleanup.

But there is one special set of activities dealing with oil in which neither current law nor S. 686 as originally introduced would have limited liability. That is for oils spills resulting from operations on the Outer Continental Shelf. The present law, which dates back nearly 20 years to the Santa Barbara blowout, requires the owners and operators of OCS facilities, as well as vessels transporting OCS oil, to assume all of the costs of cleanup, which includes the restoration of natural resources.

There are several good reasons for maintaining one policy with respect to oil tankers and other facilities handling oil, but a different one with respect to OCS facilities.

First, spills from OCS facilities will by definition occur in areas which are environmentally sensitive, while tanker accidents may not. These oil wells and platforms are by virtue of what they are—that is, facilities located on the continental shelf—located close to shores, bays and estuaries. Indeed, many of them are visible from the beaches of Southern California, which is one of the reasons for the widespread public opposition to them in that State.

A vessel may break up on the high seas. Or, even if it is close to land, the prevailing winds may blow the oil offshore. That was the case with the *Argo Merchant*. But not so with OCS spills: they will almost invariably be within a few miles of a coast line, as in the case of the Santa Barbara blowout.

Second, like airline tragedies, although spills for OCS facilities may be infrequent, they will likely be catastrophic when they do occur. Vessels—even extremely large ones such as the *Amoco Cadiz* and the *Exxon Valdez*—carry finite supplies of oil, and usually only a portion of the cargo is lost because it is compartmentalized.

(26)

27

Such was the case with the *Exxon Valdez,* which lost only a fraction of the total amount of oils she was carrying.

OCS spills, in contrast, can involve prodigious and seemingly unlimited quantities of crude oil. The size of such spills can be enough to fill hundreds of even thousands of tankers the size of the *Exxon Valdez.*

Finally, OCS spills are often difficult to control.

Welding steel plates below the waterlines of a leaking supertanker is extraordinarily difficult. But it is much more difficult to cap a well which has blown out three miles beneath the oceans surface.

Two OCS spills illustrate the thrust of these statements.

The Santa Barbara blowout occurred on January 14, 1969 in a well 5.5 miles from shore. The lease operators had failed to install easing to the full depth of the well, so crude oil under high pressure was able to move through porous work and then through a fault line to the ocean floor. The oil was dispersed over 800 square miles of ocean and 100 miles of coastline, and while the major flow was halted in about a month, seepage was being observed as late as October 1970, according to a report prepared for the Federal Water Quality Administration.

Propably the world's most expensive oil spill was another OCS blowout, the IXTOC I, which occurred on June 3, 1989. According to a report prepared for the Bureau of Land Management, the loss of oil from this incident was over 5 million barrels—20 times as much oil as was lost in the grounding of the *Exxon Valdez,* the largest oil spill from a transit vessel in United States history. To cap the IXTOP blowout required eight months—until March 1980.

It was for these reasons that the Department of the Interior adopted a policy of requiring those engaged in OCS operations to bear the full and complete cost of cleanup. The 1969 regulations were then enacted into federal law by the Congress in the 1978 amendments to the Outer Continental Shelf Lands Act. The Members of this Committee wrote that law, which is incorporated in Title III of the OCSLA.

This bill would change all that by imposing a total liability limit of $100 million. And, while it is true that a Fund would be available up to $1 billion for a single incident, cleanup is no substitute for the prevention that is encouraged by the presence of liability.

The majority of OCS facilities are outside the 3 mile limit, and therefore are not subject to state laws.

Unlimited liability is not a question of accounting. It is a policy decision that the financial burden of a spill can deter negligence. Insulating those responsible for a spill from the full costs of their actions removes this deterrence.

The current law for OCS facilities works, and it works well. Twenty years of experience have demonstrated this truth. And the proper action is leave that law as is.

### CHANGES IN EXISTING LAW

In the opinion of the Committee, it is necessary to dispense with the requirements of section 12 of rule XXVI of the Standing Rules of the Senate in order to expedite the business of the Senate.

O