# Exhibit 5

| 101ST CONGRESS<br>*1st Session* | } HOUSE OF REPRESENTATIVES { | REPT. 101–242,<br>Part 1 |
|---|---|---|

## OIL POLLUTION PREVENTION, RESPONSE, LIABILITY, AND COMPENSATION ACT OF 1989

SEPTEMBER 18, 1989.—Ordered to be printed

Mr. ANDERSON, from the Committee on Public Works and Transportation, submitted the following

# R E P O R T

together with

## ADDITIONAL VIEWS

[To accompany H.R. 1465 which on March 16, 1989, was referred jointly to the Committee on Public Works and Transportation and the Committee on Merchant Marine and Fisheries]

[Including cost estimate of the Congressional Budget Office]

The Committee on Public Works and Transportation, to whom was referred the bill (H.R. 1465) to provide liability for damages resulting from oil pollution, to establish a fund for the payment of compensation for such damages, to improve oil pollution prevention and response, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Strike out all after the enacting clause and insert in lieu thereof the following:

SECTION 1. SHORT TITLE AND TABLE OF CONTENTS.

(a) SHORT TITLE.—This Act may be cited as the "Oil Pollution Prevention, Response, Liability, and Compensation Act of 1989".

(b) TABLE OF CONTENTS.—The contents of this Act are as follows:

Sec. 1. Short title and table of contents.

TITLE I—OIL POLLUTION LIABILITY AND COMPENSATION

Sec. 101. Definitions.
Sec. 102. Liability.
Sec. 103. Uses of the Fund.
Sec. 104. Claims procedure.
Sec. 105. Designation, notification, and advertisement.
Sec. 106. Subrogation.

Sec. 107. Financial responsibility.
Sec. 108. Litigation, jurisdiction, and venue.
Sec. 109. Relationship to other law.
Sec. 110. Regulations.
Sec. 111. Effective date.

### TITLE II—PREVENTION AND RESPONSE

Sec. 201. Authority to direct responses.
Sec. 202. Response plans.
Sec. 203. Review and revision of response capability.
Sec. 204. Computer listing of emergency response resources and availability of agency data.
Sec. 205. Vessel traffic systems.
Sec. 206. Navigational aids.
Sec. 207. Periodic gauging of plating thickness of commercial vessels.
Sec. 208. Overfill and tank level or pressure monitoring devices.
Sec. 209. Tanker personnel.
Sec. 210. Use of liners.
Sec. 211. Modifications to dredges.
Sec. 212. Tanker free zones.
Sec. 213. Superiority of Federal pilots' licenses.
Sec. 214. Research and development program.
Sec. 215. Consideration of alcohol abuse.
Sec. 216. Access to National Driver Register.

### TITLE III—IMPLEMENTATION OF INTERNATIONAL CONVENTIONS

Sec. 301. Definitions.
Sec. 302. Applicability of conventions.
Sec. 303. Recognition of International Fund.
Sec. 304. Action in United States courts.
Sec. 305. Contribution to International Fund.
Sec. 306. Recognition of foreign judgments.
Sec. 307. Financial responsibility.
Sec. 308. Regulations.

### TITLE IV—MISCELLANEOUS PROVISIONS

Sec. 401. Trans-Alaska pipeline fund.
Sec. 402. Intervention on the High Seas Act.
Sec. 403. Federal Water Pollution Control Act.
Sec. 404. Deepwater Port Act.
Sec. 405. Outer Continental Shelf Lands Act Amendments of 1978.
Sec. 406. Qualified authorizing legislation.
Sec. 407. Effective date.

# TITLE I—OIL POLLUTION LIABILITY AND COMPENSATION

**SEC. 101. DEFINITIONS.**

For the purposes of this Act—

(1) ACT OF GOD.—The term "act of God" means an unanticipated grave natural disaster or other natural phenomenon of an exceptional, inevitable, and irresistible character the effects of which could not have been prevented or avoided by the exercise of due care or foresight.

(2) CLAIM.—The term "claim" means a request, made in writing for a sum certain, for compensation for damages or removal costs resulting from an incident.

(3) CLAIMANT.—The term "claimant" means any person who presents a claim for compensation under this Act.

(4) DAMAGES.—The term "damages" means damages for injury to, destruction of, or loss of natural resources and damages for economic loss specified in section 102(a)(2) of this Act, and includes the cost of assessment of damages.

(5) DISCHARGE.—The term "discharge" means any emission (other than natural seepage), intentional or unintentional, and includes spilling, leaking, pumping, pouring, emitting, emptying, or dumping.

(6) EXCLUSIVE ECONOMIC ZONE.—The term "exclusive economic zone" means the zone established by Presidential Proclamation Numbered 5030, dated March 10, 1983.

(7) FACILITY.—The term "facility" means any structure, group of structures, equipment, or device (other than a vessel) which is used for one or more of the following purposes: exploring for, drilling for, producing, storing, handling, transferring, processing, or transporting oil. Such term includes any motor vehicle, rolling stock, or pipeline used for one or more such purposes.

(8) FOREIGN OFFSHORE UNIT.—The term "foreign offshore unit" means a facility which is located, in whole or in part, in the territorial sea or on or over the continental shelf of a foreign country.

(9) FUND.—The term "Fund" means the Oil Spill Liability Trust Fund established by section 9509 of the Internal Revenue Code of 1986.

3

(10) GROSS TON.—The term "gross ton" means tonnage measured in accordance with the provisions of the International Convention on Tonnage Measurement of Ships, 1969.

(11) GUARANTOR.—The term "guarantor" means any person, other than the responsible party, who provides evidence of financial responsibility for a responsible party under this Act.

(12) INCIDENT.—The term "incident" means any occurrence or series of occurrences having the same origin, involving one or more vessels, facilities, or any combination thereof, resulting in the discharge or substantial threat of discharge of oil.

(13) INDIAN TRIBE.—The term "Indian tribe" means any Indian tribe, band, nation, or other organized group or community, but not including any Alaska Native regional or village corporation, which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

(14) LESSEE.—The term "lessee" means a person holding a leasehold interest in an oil or gas lease on lands beneath navigable waters (as such term is defined in section 2(a) of the Submerged Lands Act (43 U.S.C. 1301(a)) or on submerged lands of the Outer Continental Shelf, granted or maintained under applicable State law or the Outer Continental Shelf Lands Act.

(15) MOBILE OFFSHORE DRILLING UNIT.—The term "mobile offshore drilling unit" means a vessel (other than a self-elevating lift vessel) capable of use as an offshore facility.

(16) NATIONAL CONTINGENCY PLAN.—The term "national contingency plan" means the national contingency plan published under section 311(c) of the Federal Water Pollution Control Act and revised pursuant to section 105 of the Comprehensive Environmental Response, Compensation, and Liability Act.

(17) NATURAL RESOURCES.—The term "natural resources" includes land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States (including the resources of the exclusive economic zone), any State or local government or Indian tribe, or any foreign government.

(18) NAVIGABLE WATERS.—The term "navigable waters" means the waters of the United States, including the territorial sea.

(19) OFFSHORE FACILITY.—The term "offshore facility" means—

(A) a facility which is located, in whole or in part, on lands beneath navigable waters (as such term is defined in section 2(a) of the Submerged Lands Act (43 U.S.C. 1301(a))) or on the Outer Continental Shelf (as defined in section 2 of the Outer Continental Shelf Lands Act); and

(B) a deepwater port licensed under the Deepwater Port Act of 1974.

(20) OIL.—The term "oil" means petroleum, including crude oil or any fraction or residue therefrom.

(21) ONSHORE FACILITY.—The term "onshore facility" means any facility (excluding any offshore facility) any portion of which is located in, on, or under any land within the United States.

(22) OWNER.—The term "owner" means any person holding title to, or in the absence of title any other indicia of ownership of (whether by lease, permit, contract, license, or other form of agreement), a vessel or facility; except that such term does not include a person who, without participating in the management or operation of a vessel or facility, holds indicia of ownership primarily to protect a security interest therein.

(23) PERSON.—The term "person" means an individual, corporation, partnership, association, Federal agency, State, municipality, commission, or political subdivision of a State, or any interstate body.

(24) PERMITTEE.—The term "permittee" means a person holding an authorization, license, or permit for geological exploration issued under section 11 of the Outer Continental Shelf Lands Act or applicable State law.

(25) PUBLIC VESSEL.—The term "public vessel" means a vessel owned or bareboat chartered and operated by the United States, or by a State or political subdivision thereof, or by a foreign nation, except when such vessel is engaged in commerce.

(26) REMOVE; REMOVAL.—The term "remove" or "removal" refers to removal of the oil from the water and shorelines or the taking of such other actions as may be necessary to minimize or mitigate damage to the public health or welfare, including damage to fish, shellfish, wildlife, and public and private property, shorelines, and beaches.

4

(27) Removal costs.—The term "removal costs" means the costs of removal taken after a discharge of oil has occurred, including all costs of completing removal and the costs to prevent, minimize, or mitigate oil pollution where there was a substantial threat of a discharge of oil including costs incurred under subsection (c), (d), (e), or (l) of section 311 of the Federal Water Pollution Control Act, the Intervention on the High Seas Act, or section 18 of the Deepwater Port Act of 1974.

(28) Responsible party.—The term "responsible party" means the following:

(A) Vessels.—In the case of a vessel, any person owning, operating, or chartering by demise the vessel.

(B) Facilities.—In the case of a facility (including a pipeline but not including any other offshore facility), any person owning or operating the facility; except that such term does not include a Federal agency, State, municipality, commission, or political subdivision of a State, or any interstate body, that, as the owner of an onshore facility, transfers possession and right to use the property to another person by lease, assignment, or permit.

(C) Offshore facilities.—In the case of an offshore facility (other than a pipeline or a deepwater port licensed under the Deepwater Port Act of 1974), the lessee or permittee of the area in which the facility is located or the holder of a right of use and easement granted under applicable State law or the Outer Continental Shelf Lands Act for the area in which the facility is located (if the holder is a different person than the lessee or permittee).

(D) Deepwater ports.—In the case of a deepwater port licensed under the Deepwater Port Act of 1974, the licensee.

(E) Abandonment.—In the case of an abandoned vessel, onshore facility, or offshore facility, the persons who were, or would have been, responsible parties immediately prior to the abandonment of the vessel or facility.

(29) Secretary.—The term "Secretary" means the Secretary of Transportation.

(30) Tanker.—The term "tanker" means a vessel constructed or adapted for the carriage of oil in bulk or in commercial quantities as cargo; except that the term does not include a non-self-propelled vessel of less than 3,000 gross tons carrying oil in bulk as cargo or in residue from cargo and operating on waters of the United States lying inside the baseline from which the territorial sea is measured or on waters outside such baseline which are part of the Gulf Intracoastal Waterway.

(31) United states; state.—The term "United States" and "State" mean the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, the Commonwealth of the Northern Marianas, and any other territory or possession over which the United States has jurisdiction.

(32) Vessel.—The term "vessel" means every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water other than a public vessel.

## SEC. 102. LIABILITY.

(a) Elements of Liability.—

(1) Joint, several, and strict liability.—Notwithstanding any other provision of law and subject to the provisions of this section, the responsible party for a vessel or a facility from which oil is discharged, or which poses a substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the waters of the exclusive economic zone is jointly, severally, and strictly liable for the removal costs specified in paragraph (2) which arise out of or directly result from such incident and for the damages specified in paragraph (2) which are proximately caused by such incident.

(2) Covered removal costs and damages.—

(A) Removal costs.—The removal costs referred to in paragraph (1)—

(i) are removal costs for removal actions taken by the United States, a State, or an Indian tribe which are not inconsistent with the national contingency plans; and

(ii) are removal costs for removal actions taken by any other person which are consistent with the national contingency plan.

Such costs shall be recoverable by any claimant.

(B) Damages.—The damages referred to in paragraph (1) are the following:

(i) NATURAL RESOURCES.—Damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss. Such damages shall be recoverable by the following: a United States trustee, a State trustee, and an Indian tribe trustee.

(ii) REAL OR PERSONAL PROPERTY.—Damages for injury to, or economic losses resulting from destruction of, real or personal property. Such damages shall be recoverable by a claimant who owns or leases such property.

(iii) SUBSISTENCE USE.—Damages for loss of subsistence use of natural resources. Such damages shall be recoverable by any claimant who so uses natural resources which have been injured, destroyed, or lost.

(iv) REVENUES.—Damages equal to the net loss of taxes, royalties, rents, fees, or net profits shares, for a period not to exceed 2 years, due to the injury, destruction, or loss of real property, personal property, or natural resources. Such damages shall be recoverable by the Government of the United States, a State, or a political subdivision thereof.

(v) PROFITS AND EARNING CAPACITY.—Damages equal to the loss of profits or impairment of earning capacity (based on prior profits and earnings) due to the injury, destruction, or loss of real property, personal property, or natural resources. Such damages shall be recoverable by any claimant who derives at least 25 percent of his or her earnings from activities which utilize such property or natural resources, or, if such activities are seasonal in nature, 25 percent of his or her earnings during the applicable season.

(3) EXCLUDED DISCHARGES.—Paragraph (1) shall not apply to any discharge authorized by a permit issued under Federal, State, or local law.

(4) LIABILITY OF THIRD PARTIES.—

(A) IN GENERAL.—In any case in which the responsible party for a vessel or facility establishes that a discharge and the resulting removal costs and damages were caused solely by an act or omission of 1 or more third parties described in subsection (b)(1)(B) (or by such an act or omission in combination with an act of God or an act of war), the third party or parties shall be treated as the responsible party or parties for purposes of determining liability under this Act.

(B) LIMITATION APPLIED.—

(i) OWNER OR OPERATOR OF VESSEL OR FACILITY.—If the third party or parties are the owner or operator of a vessel or facility which caused the incident, the liability of the third party or parties shall be subject to the limits provided in subsection (c) as applied with respect to such vessel or facility.

(ii) OTHER CASES.—In any case other than the one described in clause (i), the liability of the third party or parties shall not exceed the limitation which would have been applicable to the responsible party of the vessel or facility from which the discharge actually occurred if such responsible party were liable.

(5) DIVISION OF RESPONSIBILITY FOR DISCHARGES OF MOBILE OFFSHORE DRILLING UNITS.—

(A) TREATED FIRST AS A TANKER.—For purposes of determining the responsible party and applying this Act, a mobile offshore drilling unit which is being used as an offshore facility shall be treated as a tanker with respect to the discharge, or the substantial threat of a discharge, of oil on or above the surface of the water, except as provided in subparagraph (B).

(B) TREATED AS A FACILITY FOR EXCESS LIABILITY.—To the extent that removal costs and damages from an incident described in subparagraph (A) exceed the amount for which the responsible party is liable under subparagraph (A) (as such amount may be limited under subsection (c)(1)(A)), the mobile offshore drilling unit shall be treated as an offshore facility. For purposes of applying subsection (c)(1)(C), the amount specified in such subsection shall be reduced by the amount for which the responsible party is liable pursuant to subparagraph (A).

(b) DEFENSES TO LIABILITY.—

(1) COMPLETE DEFENSES.—Except when the responsible party has failed or refused to report the incident where required by law and the responsible party knows or has reason to know of the incident, there is no liability under subsection (a) for the incident if the responsible party establishes that the incident—

(A) resulted from an act of God, an act of war, hostilities, civil war, or insurrection; or

(B) was solely caused by an act or omission of 1 or more persons other than—

(i) a responsible party;

(ii) an employee or agent of a responsible party; or

(iii) one whose act or omission occurs in connection with a contractual relationship with a responsible party.

(2) DEFENSES AS TO PARTICULAR CLAIMANTS.—There is no liability under subsection (a)—

(A) as to a claimant, if the incident is caused, in whole or in part, by the gross negligence or willful misconduct of the claimant; or

(B) as to a claimant, to the extent that the incident is caused by the negligence of the claimant.

(c) LIMITS ON LIABILITY.—

(1) GENERAL RULE.—The total of the liability of a responsible party under subsection (a) and any removal costs incurred by, or on behalf of, the responsible party with respect to each incident shall not exceed—

(A) $500 per gross ton or $5,000,000, whichever is greater (but not to exceed $150,000,000), for any tanker;

(B) $300 per gross ton or $500,000, whichever is greater, for any other vessel; or

(C) $75,000,000 for any facility.

(2) EXCEPTIONS.—

(A) PROXIMATE CAUSE.—Paragraph (1) shall not apply if the incident was proximately caused by—

(i) willful misconduct or gross negligence within the privity or knowledge of the responsible party; or

(ii) a violation, within the privity or knowledge of the responsible party, of applicable Federal safety, construction, or operating regulations.

(B) FAILURE OR REFUSAL OF RESPONSIBLE PARTY.—Paragraph (1) shall not apply if the responsible party fails or refuses—

(i) to report the incident where required by law and the responsible party knows or has reason to know of the incident;

(ii) to provide all reasonable cooperation and assistance requested by a responsible official in connection with removal activities; or

(iii) without sufficient cause, to comply with an order issued under section 311(e) of the Federal Water Pollution Control Act.

(3) ADJUSTING LIMITS OF LIABILITY.—

(A) FACILITIES.—

(i) GENERAL RULE.—The Secretary is authorized to establish, by regulation, with respect to any class or category of facility (excluding an offshore facility but including a deepwater port, as defined in section 3 of the Deepwater Port Act of 1974) a maximum limit of liability under this section of less than $75,000,000, but not less than $8,000,000, taking into account the size, storage capacity, oil throughput, proximity to sensitive areas, type of oil handled, history of discharges, and other factors relevant to risks posed by the class or category of facility.

(ii) PERIODIC REPORTS.—The Secretary shall, within 6 months after the date of the enactment of this Act and from time to time thereafter, report to Congress on the desirability of adjusting the limits of liability specified in paragraph (1) of this subsection.

(B) VESSELS.—

(i) STUDY.—The Secretary shall conduct a study of the relative operational and environmental risks posed by the transportation of oil by vessel to deepwater ports (as defined in section 3 of the Deepwater Port Act of 1974) versus the transportation of oil by vessel to other ports. Such study shall include a review and analysis of offshore lightering practices used in connection with such transportation, an analysis of the volume of oil transported by vessel using such practices, and an analysis of the frequency and volume of oil discharges which occur in connection with the use of such practices.

(ii) REPORT.—Not later than 1 year after the date of the enactment of this Act, the Secretary shall submit to Congress a report on the results of the study conducted under this subparagraph.

       (iii) RULEMAKING PROCEEDING.—If the Secretary determines, based on the results of the study conducted under this subparagraph, that the use of deepwater ports in connection with the transportation of oil by vessel results in a lower operational or environmental risk than the use of other ports in connection with such transportation, the Secretary shall initiate, not later than the 180th day following the date of submission of the report to Congress under this subparagraph, a rulemaking proceeding to lower the limits of liability under this section with respect to vessels transporting oil to deepwater ports and with respect to such ports and may lower such limits of liability as the Secretary determines appropriate but with respect to such ports only in accordance with subparagraph (A).

(d) LIABILITY FOR INTEREST.—

   (1) GENERAL RULE.—The responsible party or his or her guarantor shall be liable to a claimant for interest on the amount paid in satisfaction of a claim under this section for the period described in paragraph (2).

   (2) PERIOD.—

      (A) IN GENERAL.—Except as provided in subparagraph (B), the period for which interest shall be paid under paragraph (1) is the period beginning on the 30th day following the date on which the claim is presented to the responsible party or guarantor and ending on the date on which the claim is paid.

      (B) EXCLUSION OF PERIOD DUE TO OFFER BY GUARANTOR.—If the guarantor offers to the claimant an amount equal to or greater than that finally paid in satisfaction of the claim, the period described in subparagraph (A) shall not include the period beginning on the date such offer is made and ending on the date such offer is accepted. If such offer is made within 60 days after the date upon which the claim is presented pursuant to section 104(a), the period described in subparagraph (A) shall not include any period before such offer is accepted.

      (C) EXCLUSION OF PERIODS IN INTEREST OF JUSTICE.—If, in any period, a claimant is not paid due to reasons beyond the control of the responsible party or because it would not serve the interest of justice, no interest shall accrue under this subsection during such period.

      (D) CALCULATION OF INTEREST.—The interest paid under this subsection shall be calculated at the average of the highest rate for commercial and finance company paper of maturities of 180 days or less obtaining on each of the days included within the period for which interest must be paid to the claimant, as published in the Federal Reserve bulletin.

      (E) INTEREST NOT SUBJECT TO LIABILITY LIMITS.—Interest under this paragraph shall be in addition to damages for which claims may be asserted under section 102 and shall be paid without regard to any limitation of liability under subsection (c) of this section. The payment of interest under this subsection by a guarantor shall be subject to section 107(e).

(e) NATURAL RESOURCES.—

   (1) LIABILITY.—In the case of an injury to, destruction of, or loss of natural resources under this section, liability shall be—

      (A) to the United States Government for natural resources belonging to, managed by, controlled by, or appertaining to the United States,

      (B) to any State for natural resources within the State or belonging to, managed by, controlled by, or appertaining to such State,

      (C) to any Indian tribe for natural resources belonging to, managed by, controlled by, or appertaining to such Indian tribe, and

      (D) in any case in which subsection (f) of this section (relating to recovery by foreign claimants) applies, to the government of a foreign country for natural resources belonging to, managed by, controlled by, or appertaining to such country.

   (2) DESIGNATION OF TRUSTEES.—

      (A) IN GENERAL.—The President, or the authorized representative of any State, Indian tribe, or foreign government, shall act on behalf of the public as trustee of the natural resources to recover damages to the natural resources.

      (B) FEDERAL TRUSTEES.—The President shall designate the Federal officials who shall act on behalf of the public as trustees for natural resources under this Act.

      (C) STATE TRUSTEES.—The Governor of each State shall designate State and local officials who may act on behalf of the public as trustee for natu-

8

ral resources under this Act and shall notify the President of such designation.

(D) INDIAN TRIBE TRUSTEES.—The governing body of any Indian tribe shall designate tribal officials who may act on behalf of the tribe or its members as trustee for natural resources under this Act and shall notify the President of such designation.

(3) FUNCTIONS OF TRUSTEES.—

(A) FEDERAL TRUSTEES.—The officials designated under paragraph (2)(B)—

(i) shall assess damages for injury to, destruction of, or loss of natural resources for purposes of this Act for the natural resources under their trusteeship;

(ii) may, upon request of and reimbursement from a State or Indian tribe and at the Federal officials' discretion, assess damages for the natural resources under the State's or tribe's trusteeship; and

(iii) shall develop and implement a plan for the restoration, rehabilitation,

replacement, or acquisition of the equivalent, of the natural resources under their trusteeship.

(B) STATE TRUSTEES.—The officials designated under paragraph (2)(C)—

(i) shall assess damages to natural resources for the purposes of this Act for the natural resources under their trusteeship; and

(ii) shall develop and implement a plan for the restoration, rehabilitation, replacement, or acquisition of the equivalent, of the natural resources under their trusteeship.

(C) INDIAN TRIBE TRUSTEES.—The officials designated under paragraph (2)(D)—

(i) shall assess damages to natural resources for the purposes of this Act for the natural resources under their trusteeship; and

(ii) shall develop and implement a plan for the restoration, rehabilitation, replacement, or acquisition of the equivalent, of the natural resources under their trusteeship.

(D) NOTICE AND OPPORTUNITY TO BE HEARD.—Plans shall be developed and implemented under subparagraphs (A)(iii), (B)(ii), and (C)(ii) only after adequate public notice, opportunity for a hearing, and consideration of all public comment.

(4) MEASURE OF DAMAGES.—

(A) IN GENERAL.—The measure of damages in any action under this section for injury to, destruction of, or loss of natural resources shall be—

(i) the costs of restoring, rehabilitating, replacing, or acquiring the equivalent of, the damaged natural resources; and

(ii) the value of the lost public uses of such resources in the period beginning on the date the damage occurs and ending on (I) the date such resources are restored, rehabilitated, or replaced or the equivalent is acquired, or (II) the date on which it is determined that such resources cannot be restored, rehabilitated, or replaced or no equivalent can be acquired.

(B) DETERMINE COSTS WITH RESPECT TO PLANS.—Costs shall be determined under subparagraph (A) with respect to plans adopted under paragraph (3)(A), (B), and (C).

(C) NO DOUBLE RECOVERY.—There shall be no double recovery under this Act for natural resource damages, including the costs of damage assessment or restoration, rehabilitation, replacement, or acquisition for the same incident and natural resource.

(5) DAMAGE ASSESSMENT REGULATIONS AND STUDY.—

(A) REGULATIONS.—Not later than 2 years after the date of the enactment of this Act, the President shall issue regulations, consistent with paragraph (4)(A), for the assessment of damages to natural resources arising out of an incident.

(B) REBUTTABLE PRESUMPTION.—Any determination or assessment of damages to natural resources for the purposes of this Act made pursuant to paragraph (4)(A)(i) by a Federal, State, or Indian tribe trustee in accordance with the regulations issued under subparagraph (A) shall have the force and effect of a rebuttable presumption on behalf of the trustee in any administrative or judicial proceeding under this Act.

(C) STUDY.—The President shall conduct a study of techniques and methods of valuing natural resource damages. Not later than 1 year after the

date of the enactment of this Act, the President shall transmit to Congress a report on the results of such study.

(6) USE OF RECOVERED SUMS.—Sums recovered under this Act by a Federal, State, or Indian tribe trustee for damages to natural resources shall be retained by the trustee for use only to reimburse or pay costs incurred by the trustee under paragraph (3) with respect to the damaged natural resources. Any amounts in excess of those required for these reimbursements and costs shall be deposited in the Fund.

(7) CIVIL PENALTY.—

(A) IN GENERAL.—Any responsible party liable under this section for damages resulting from a discharge of oil shall be subject to a civil penalty not to exceed the greater of $1,000,000 or 1/2 of the responsible party's liability under this section if the discharge results in damages to natural resources which cannot be restored, rehabilitated, or replaced and for which no equivalent can be acquired.

(B) ASSESSMENT, SETTLEMENT, AND COLLECTION.—The President or authorized representative of a State or Indian tribe, acting under this section as trustee, may request the Attorney General to bring an action in court to recover from the responsible party a civil penalty under this paragraph. In determining the amount of a civil penalty under this paragraph, the court shall consider the nature and extent of the damages to natural resources, the value of the natural resources, the degree of culpability of the person held liable for the discharge, and the nature and extent of efforts taken by the person to prevent and mitigate damages to natural resources and to restore damaged natural resources.

(C) SEPARATE LIABILITY.—Except as provided in section 302, any liability for a civil penalty under this paragraph shall be separate from and in addition to any liability for a discharge of oil under this section.

(D) PAYMENT TO TRUSTEE FOR ECOSYSTEM ENHANCEMENT.—Subject to appropriation Acts, sums received under this paragraph shall be paid to the trustee to be used for the general enhancement of the ecosystem of which the destroyed natural resources were a part for the purpose of restoring and maintaining the chemical, physical, and biological integrity of such ecosystem.

(f) RECOVERY BY FOREIGN CLAIMANTS.—

(1) IN GENERAL.—A foreign claimant may recover removal costs and damages under this Act only in accordance with this subsection.

(2) COVERED DISCHARGES.—A foreign claimant may recover only if the discharge of oil was from—

(A) a facility,

(B) a vessel in the navigable waters of the United States, or

(C) a tanker carrying oil originally received at the terminal of the pipeline constructed under the Trans-Alaska Pipeline Authorization Act for transportation to a port in the United States and the incident occurred prior to delivery to such port,

and resulted in the presence of oil in or on the territorial sea, internal waters, or adjacent shoreline of a foreign country.

(3) REQUIREMENTS.—A foreign claimant may recover only if—

(A) the claimant first seeks compensation under title III;

(B) the claimant has not been otherwise compensated for the removal costs or damages; and

(C) recovery is authorized by a treaty or executive agreement between the United States and the claimant's country, or the Secretary of State, in consultation with the Attorney General and other appropriate officials, has certified that the claimant's country provides a comparable remedy for United States claimants.

(4) EXCEPTION FOR CANADIAN CLAIMANTS RESPECTING TRANS-ALASKA PIPELINE OIL.—Paragraph (3)(C) shall not apply with respect to recovery by a resident of Canada in the case of an incident described in paragraph (2)(C).

(5) FOREIGN CLAIMANT DEFINED.—For purposes of this subsection, the term "foreign claimant" means any person residing in a foreign country, the government of a foreign country, or any agency or political subdivision of a foreign country.

(g) RECOVERY OF REMOVAL COSTS AND DAMAGES BY RESPONSIBLE PARTY.—

(1) IN GENERAL—The responsible party for a vessel or facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, may

10

assert a claim for removal costs and damages under subsection (a) only if the responsible party establishes that—

(A) the responsible party is entitled to a defense to liability under subsection (b), or

(B) the responsible party is entitled to a limitation of liability under subsection (c).

(2) EXTENT OF RECOVERY.—A responsible party who is entitled to a limitation of liability may assert a claim under paragraph (1) of subsection (a) only to the extent that the sum of the removal costs and damages incurred by the responsible party plus the amounts paid by the responsible party or by the guarantor on behalf of the responsible party for claims asserted under subsection (a) exceeds the amount to which the total of the liability under subsection (a) and removal costs and damages incurred by, or on behalf of, the responsible party is limited under subsection (c).

(h) CONTRIBUTION.—A person may bring an action for contribution against any other person who is liable or potentially liable under this section. Such an action shall be brought in accordance with section 108.

(i) INDEMNIFICATION AGREEMENTS.—

(1) IN GENERAL.—No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer any liability imposed under this section from any responsible party for any vessel or facility or from any person who may be liable for an incident under this section to any other person. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

(2) RELATIONSHIP TO OTHER CAUSES OF ACTION.—Nothing in this Act, including the provisions of paragraph (1) of this subsection, shall bar a cause of action that a responsible party subject to liability under this section, or a guarantor, has or would have, by reason of subrogation or otherwise against any person.

(j) CONSULTATION ON REMOVAL ACTIONS.—The Secretary shall consult with the affected trustees designated under section 102(e)(2) on the appropriate removal action to be taken in connection with any discharge of oil. Removal with respect to any discharge shall be considered completed when so determined by the Secretary in consultation with the Governor or Governors of the affected State or States and in accordance with the national contingency plan.

SEC. 103. USES OF THE FUND.

(a) IN GENERAL.—

(1) USES.—The Fund shall be available to the Secretary for—

(A) the payment of removal costs, and the costs of monitoring removal actions, incurred by Federal authorities;

(B) the costs incurred by Federal, State or Indian tribe trustees in carrying out their functions under section 102(e) for assessing damages to natural resources and for developing and implementing plans for the restoration, rehabilitation, replacement, or acquisition of the equivalent, of damaged resources;

(C) the payment of obligations under subsection (e) of this section;

(D) the payment of removal costs and damages resulting from the discharge, or substantial threat of discharge, of oil from a foreign offshore unit;

(E) the payment of personnel, equipment, and training costs associated with the maintenance of the strike forces authorized under section 311(c) of the Federal Water Pollution Control Act;

(F) the payment of administrative and personnel costs and expenses reasonably necessary for and incidental to the implementation and administration of this Act; and

(G) the payment of contributions to the International Fund under title III of this Act.

(2) SETTLEMENT OF CLAIMS.—The Fund shall also be available to the Secretary for the payment of otherwise uncompensated claims for removal costs and damages in accordance with section 104.

(b) DEFENSES TO LIABILITY FOR THE FUND.—The Fund shall not be available to pay any claim for removal costs or damages—

(1) to a claimant if the incident or economic loss is caused, in whole or in part, by the gross negligence or willful misconduct of the claimant; or

(2) to a claimant to the extent that the incident or economic loss is caused by the negligence of the claimant.

(c) Maximum Amount Payable From Fund.—The maximum amount which may be paid from the Fund with respect to any incident in combination with payment, if any, under the International Convention on the Establishment of an International Fund for Compensation of Oil Pollution Damage, 1984 shall not exceed $1,000,000,000. The President may increase the maximum amount with respect to the incident if the President determines that such increase is necessary and in the best interests of the United States. The authority granted the President under this subsection may not be delegated.

(d) Federal and State Officials Who May Obligate From the Fund.—The Secretary is authorized to issue regulations designating 1 or more Federal officials who may obligate money in the Fund in accordance with subsection (a) of this section or portions thereof. The Secretary shall designate the Commandant of the Coast Guard to be a Federal official who may obligate money in the Fund in accordance with subsection (a). The Secretary is also authorized to delegate authority to obligate money in the Fund or to settle claims to officials of a State with an adequate program operating under a cooperative agreement with the Federal Government.

(e) Obligation of the Fund by State Officials.—

(1) Authority.—In accordance with regulations issued under this subsection, the Governor of each State, or any appropriate State official designated by the Governor, is authorized to obligate the Fund for payment in an amount not to exceed $250,000 for removal costs not inconsistent with the national contingency plan required for the immediate response to an incident.

(2) Notification.—A Governor or designee exercising the authority granted by this subsection shall notify the Secretary within 24 hours after any obligation of a payment from the Fund.

(3) Regulations.—Not later than 6 months after the date of the enactment of this Act, the Secretary shall publish proposed regulations detailing the manner in which the authority to obligate the Fund and to enter into agreements under this subsection is to be exercised, and, not later than 3 months after the last day of the comment period on such proposed regulations, the Secretary shall issue the regulations.

(f) Rights of Subrogation.—Payment of any claim by the Fund under this Act shall be subject to the United States Government acquiring by subrogation all rights of the claimant to recover from the responsible party.

(g) Audit.—The Comptroller General shall provide an audit review team to audit all payments, obligations, reimbursements, or other uses of the Fund to assure that the Fund is being properly administered and that claims are being appropriately and expeditiously considered. The Comptroller General shall submit to Congress an interim report 1 year after the date of the establishment of the Fund. The Comptroller General shall thereafter provide such auditing of the Fund as is appropriate. Each Federal agency shall cooperate with the Comptroller General in carrying out this subsection.

(h) Period of Limitations for Claims.—

(1) Removal costs.—No claim may be presented under this section for recovery of removal costs with respect to an incident unless the claim is presented within 3 years after the date of completion of all removal action with respect to the incident.

(2) Damages.—No claim may be presented under this section for recovery of damages with respect to an incident unless the claim is presented within 3 years after the date on which the loss and its connection with the incident were reasonably discoverable with the exercise of due care or, in the case of damages to natural resources under section 102(a)(2), if later, the date on which final regulations are issued under section 102(e)(5).

(i) Limitation on Payment for Same Costs.—Where the Secretary has paid an amount out of the Fund for any costs or damages specified under subsection (a), no other claim may be paid out of the Fund for the same costs or damages.

(j) Obligation in Accordance With Plan.—

(1) In general.—Except as provided in paragraph (2), amounts may be obligated from the Fund for the restoration, rehabilitation, replacement, or acquisition of the equivalent of, natural resources only in accordance with a plan adopted under section 102(e)(3).

(2) Exception.—Paragraph (1) shall not apply in a situation requiring action to avoid irreversible loss of natural resources or to prevent or reduce any continuing danger to natural resources or similar need for emergency action.

12

**SEC. 104. CLAIMS PROCEDURE.**

(a) PRESENTATION TO RESPONSIBLE PARTY OR GUARANTOR.—Except as provided in subsection (b), all claims for removal costs or damages shall be presented first to the responsible party or the responsible party's guarantor for the source designated under section 105(a).

(b) PRESENTATION TO FUND.—Claims for removal costs or damages may be presented first to the Fund—

(1) in any case in which the Secretary has advertised or otherwise notified claimants in accordance with section 105(c);

(2) by a responsible party who may assert a claim under section 102(g);

(3) by the Governor of a State for removal costs incurred by the State; or

(4) by a United States claimant in a case in which a foreign offshore unit has discharged oil causing damage for which the Fund is liable under section 103(a)(1)(D).

(c) ELECTION.—If a claim is presented in accordance with subsection (a) and—

(1) each person to whom the claim is presented denies all liability for the claim, or

(2) the claim is not settled by any person by payment within 180 days after the date on which (A) the claim was presented, or (B) advertising was begun pursuant to section 105(b), whichever is later,

the claimant may elect to commence an action in court against the responsible party or guarantor or to present the claim to the Fund.

(d) UNCOMPENSATED DAMAGES.—If a claim is presented in accordance with subsection (a) and full and adequate compensation is unavailable, either because the claim exceeds a limit of liability under section 102 or because the responsible party and his guarantor are financially incapable of meeting or unwilling to meet their obligations in full, a claim for the uncompensated damages may be presented to the Fund.

(e) PROCEDURE FOR CLAIMS AGAINST THE FUND.—The Secretary shall issue, and may from time to time amend, regulations for the presentation, filing, processing, settlement, and adjudication of claims under this Act against the Fund.

**SEC. 105. DESIGNATION, NOTIFICATION, AND ADVERTISEMENT.**

(a) DESIGNATION OF SOURCE AND NOTIFICATION.—After receiving information of an incident, the Secretary shall, where possible and appropriate, designate the source or sources of the discharge. If a designated source is a vessel or a facility, the Secretary shall immediately notify the responsible party and the responsible party's guarantor, if known, of such designation.

(b) ADVERTISEMENT BY THE RESPONSIBLE PARTY OR GUARANTOR.—If a responsible party or guarantor does not inform the Secretary, within 5 days after receiving notification of a designation under subsection (a), of his or her denial of the designation, such party or guarantor shall advertise the designation and the procedures by which claims may be presented to such party or guarantor, in accordance with regulations issued by the Secretary. Advertisement under the preceding sentence shall begin no later than 15 days after the date of the designation made under subsection (a). If advertisement is not otherwise made in accordance with this subsection, the Secretary shall promptly and at the expense of the responsible party or the guarantor, advertise the designation and the procedures by which claims may be presented to the responsible party or guarantor. Advertisement under this subsection shall continue for a period of no less than thirty days.

(c) ADVERTISEMENT BY THE SECRETARY.—If—

(1) the responsible party and the guarantor both deny a designation within 5 days after receiving notification of a designation under subsection (a),

(2) the source of the oil discharge was a public vessel, or

(3) the Secretary is unable to designate the source or sources of the oil discharge under subsection (a),

the Secretary shall advertise or otherwise notify potential claimants of the procedures by which claims may be presented to the Fund.

**SEC. 106. SUBROGATION.**

(a) IN GENERAL.—Any person, including the Fund, who pays compensation pursuant to this Act to any claimant for costs or damages shall be subrogated to all rights, claims, and causes of action which the claimant has under this Act.

(b) ACTIONS ON BEHALF OF THE FUND.—Upon request of the Secretary, the Attorney General shall commence an action on behalf of the Fund to recover any compensation paid by the Fund to any claimant pursuant to this Act, and all costs incurred by the Fund allocable to the claim, including prejudgment and other interest, administrative and adjudicative costs, and attorney's fees. Such an action may be commenced against any responsible party or (subject to section 107(e)) guarantor,

13

or against any other person who is liable, pursuant to any law, to the compensated claimant or to the Fund, for the cost or damages for which the compensation was paid. Such an action shall be commenced against the responsible foreign government or other responsible party to recover any removal costs or damages paid from the Fund as the result of the discharge, or substantial threat of discharge, of oil from a foreign offshore unit.

SEC. 107. FINANCIAL RESPONSIBILITY.

(a) VESSELS.—

(1) REQUIREMENT.—The responsible party for—

(A) any vessel over 300 gross tons (except a non-self-propelled vessel which does not carry oil as cargo or fuel) using any port or place in the United States or the navigable waters, or

(B) any vessel using the waters of the exclusive economic zone to transship or lighter oil destined for a port or place subject to the jurisdiction of the United States,

shall establish and maintain, in accordance with regulations issued by the Secretary, evidence of financial responsibility sufficient to meet the maximum amount of liability to which, in the case of a tanker, the responsible party could be subjected under section 102(c)(1)(A) of this Act, or to which, in the case of any other vessel, the responsible party could be subjected under section 102(c)(1)(B) of this Act, in any case in which the responsible party would be entitled to limit liability under such section. If the responsible party owns or operates more than one vessel, evidence of financial responsibility need be established only to meet the maximum liability applicable to the largest of such vessels.

(2) WITHHOLDING CLEARANCE.—The Secretary of the Treasury shall withhold or revoke the clearance required by section 4197 of the Revised Statutes of the United States (46 U.S.C. App. 91) of any vessel subject to this subsection that does not have the certification required under this subsection.

(3) DENYING ENTRY AND DETAINING VESSELS.—The Secretary may (A) deny entry to any offshore facility or any port or place in the United States or to the navigable waters, or (B) detain at such a facility or port or place, any vessel which, upon request, does not produce the certification required under this subsection or the regulations issued under this subsection.

(b) OFFSHORE FACILITIES.—Each responsible party with respect to an offshore facility shall establish and maintain evidence of financial responsibility sufficient to meet the maximum amount of liability to which the responsible party could be subjected under section 102 in any case in which the responsible party would be entitled to limit liability under section 102. In any case in which a person is the responsible party for more than one facility subject to this subsection, evidence of financial responsibility need be established only to meet the maximum liability applicable to one such facility.

(c) METHODS OF FINANCIAL RESPONSIBILITY.—Financial responsibility under this section may be established by any one or any combination of the following methods which the Secretary determines to be acceptable: evidence of insurance, surety bond, guarantee, letter of credit, qualification as a self-insurer, or other evidence of financial responsibility. Any bond filed shall be issued by a bonding company authorized to do business in the United States. In establishing requirements under this section, the Secretary is authorized to specify policy or other contractual terms, conditions, or defenses which are necessary, or which are unacceptable, in establishing evidence of financial responsibility in order to effectuate the purposes of this Act.

(d) CLAIMS AGAINST GUARANTOR.—Any claim for which liability may be established under section 102 against a responsible party may be asserted directly against any guarantor providing evidence of financial responsibility for such responsible party. In defending against such a claim, the guarantor may invoke all rights and defenses which would be available to the responsible party under section 102. The guarantor may also invoke the defense that the incident was caused by the willful misconduct of the responsible party, but the guarantor may not invoke any other defense that might be available in proceedings brought by the responsible party against the guarantor.

(e) LIMITATION ON GUARANTOR'S LIABILITY.—Nothing in this Act shall impose liability with respect to an incident on any guarantor for damages or removal costs which exceeds, in the aggregate, the amount of financial responsibility required under this Act which the guarantor has provided for the responsible party for any vessel or facility which was a source or cause of the incident.

(f) CIVIL PENALTY.—

14

(1) IN GENERAL.—Any person who, after notice and an opportunity for a hearing, is found to have failed to comply with the requirements of this section or the regulations issued under this section, or with a denial or detention order issued under subsection (a)(3) of this section, shall be liable to the United States for a civil penalty, not to exceed $25,000 per day of violation.

(2) NOTICE.—The amount of the civil penalty under this subsection shall be assessed by the Secretary by written notice.

(3) FACTORS TO CONSIDER.—In determining the amount of a civil penalty under this subsection, the Secretary shall take into account the nature, circumstances, extent, and gravity of the violation, the degree of culpability, any history of prior violation, ability to pay, and such other matters as justice may require.

(4) COMPROMISE.—The Secretary may compromise, modify, or remit, with or without conditions, any civil penalty which is subject to imposition or which has been imposed under this subsection.

(5) COLLECTION.—If any person fails to pay a civil penalty assessed under this subsection after it has become final, the Secretary may refer the matter to the Attorney General for collection.

(6) JUDICIAL RELIEF.—In addition to, or in lieu of, assessing a penalty under this subsection, the Secretary may request the Attorney General to secure such relief as necessary to compel compliance with this section, including a judicial order terminating operations. The district courts of the United States shall have jurisdiction to grant such relief as the public interest and the equities of the case may require.

(g) CONTINUATION OF REGULATIONS.—Any regulation respecting financial responsibility which has been issued pursuant to any provision of law repealed or superseded by this Act and which is in effect on the date immediately preceding the effective date of this Act shall be deemed and construed to be a regulation issued pursuant to this section. Such a regulation shall remain in full force and effect unless and until superseded by new regulations issued under this section.

(h) UNIFIED CERTIFICATE.—The Secretary may issue to a responsible party one certificate of financial responsibility for purposes of meeting the financial responsibility requirements of this Act and any other law.

SEC. 108. LITIGATION, JURISDICTION, AND VENUE.

(a) REVIEW OF REGULATIONS.—Review of any regulation issued under this Act may be had upon application by any interested person only in the Court of Appeals for the District of Columbia Circuit. Any such application shall be made within 90 days after the date of issuance of such regulation.

(b) JURISDICTION.—Except as provided in subsection (a), the district courts shall have original jurisdiction, without regard to the citizenship of the parties or the amount in controversy, over any civil action under this Act, including any action under the International Convention on Civil Liability for Oil Pollution Damages, 1984 or the International Convention on the Establishment of an International Fund for Compensation for Oil Pollution Damage, 1984.

(c) VENUE.—A civil action under subsection (b) may be brought in any district in which—

(1) the incident, injury, or damages occurs; or

(2) the defendant resides, may be found, has its principal office, or has appointed an agent for service of process.

For purposes of this section, the Fund and the International Fund established under Article 2 of the International Convention on the Establishment of an International Fund for Compensation for Oil Pollution Damage, 1984, reside in the District of Columbia.

(d) SAVINGS PROVISION.—Nothing in this Act shall affect any action commenced before the date of the enactment of this Act.

(e) PERIOD OF LIMITATIONS.—

(1) DAMAGES.—Except as provided in paragraphs (3) and (4), a civil action for damages under this Act, shall be barred unless the action is brought within 3 years after—

(A) the date on which the loss and the connection of the loss with the discharge in question are reasonably discoverable with the exercise of due care, or

(B) in the case of damages described in section 102(a)(2)(B)(i), the date on which regulations are issued under section 102(e)(5), if that date is later than the date referred to in subparagraph (A).

(2) REMOVAL COSTS.—Except as provided in paragraphs (3) and (4), a civil action for recovery of removal costs under this Act shall be barred unless the

action is brought within 3 years after completion of the removal. An action may be commenced under section 102 for recovery of removal costs at any time after such costs have been incurred.

(3) CONTRIBUTION.—A civil action for contribution for any removal costs or damages shall be barred unless the action is brought within 3 years after—

(A) the date of judgment in any action under this Act for recovery of the costs or damages, or

(B) the date of entry of a judicially approved settlement with respect to the costs or damages.

(4) SUBROGATION.—A civil action based on rights subrogated pursuant to this Act by reason of payment of a claim shall be barred unless the action is commenced within 3 years after the date of payment of the claim.

### SEC. 109. RELATIONSHIP TO OTHER LAW.

(a) PREEMPTION.—

(1) ACTIONS PREEMPTED.—Except as provided in this Act, no action arising out of a discharge of oil, or a substantial threat of a discharge of oil, from a vessel or facility into or upon the navigable waters or adjoining shorelines or the waters of the exclusive economic zone (other than an action for personal injury or wrongful death), may be brought in any court of the United States or of any State or political subdivision thereof.

(2) STATE FUNDS AND ACCOUNTS.—Nothing in this Act or in sections 4611 and 9509 of the Internal Revenue Code of 1986 shall affect the authority of any State (A) to establish or continue in effect an oil spill fund or account; or (B) to require any person to contribute to that fund or account. However, if the State fund or account is supported by contributions levied upon persons who contribute to the Fund established by section 9509 of such Code, the State fund or account may not be used to compensate any person for damages under this Act.

(b) NO PREEMPTION OF PENALTIES.—Nothing in this Act or section 9509 of the Internal Revenue Code of 1986 shall affect the authority of the United States or any State or political subdivision thereof to impose, or to determine the amount of, any fine or penalty for any violation of law relating to an incident.

(c) FINANCIAL RESPONSIBILITY.—Except as provided in this Act, a responsible party for a vessel or facility who establishes and maintains evidence of financial responsibility in accordance with this title shall not be required under any State or local law, rule, or regulation to establish or maintain any other evidence of financial responsibility in connection with liability for the discharge, or substantial threat of a discharge, of oil from such vessel or facility. Evidence of compliance with the financial responsibility requirements of this title shall be accepted by a State in lieu of any other requirement of financial responsibility imposed by such State in connection with liability for the discharge of oil from such vessel or facility. A State may enforce, on the navigable waters of the State, the requirements for evidence of financial responsibility imposed under section 107 of this Act.

(d) LIMITATION OF LIABILITY ACT.—The Act entitled "An Act to limit the liability of ship owners, and for other purposes", approved March 3, 1851 (9 Stat. 635), shall not apply to removal costs which arise out of or directly result from, and damages which are proximately caused by, an incident involving the discharge or substantial threat of discharge of oil.

### SEC. 110. REGULATIONS.

The Secretary shall issue such regulations as may be necessary to carry out this title.

### SEC. 111. EFFECTIVE DATE.

(a) IN GENERAL.—Except as provided in subsection (b), this title shall apply with respect to an incident occurring after the date of the enactment of this Act.

(b) PAYMENTS FROM FUND.—Payments under section 103(a) may not be made before the commencement date (as such term is defined in section 4611(f)(2) of the Internal Revenue Code of 1986).

# TITLE II—PREVENTION AND RESPONSE

### SEC. 201. AUTHORITY TO DIRECT RESPONSES.

(a) GENERAL RULE.—In the event of a discharge of oil or a substantial threat of discharge of oil into or upon navigable waters or adjoining shorelines or the waters of the exclusive economic zone, the Secretary or the Administrator of the Environmental Protection Agency, as determined by the President, shall assume the direc-

16

tion of all Federal, State, and private activities regarding the containment, cleanup, removal, and other responses to the discharge or threat of discharge.

(b) LIMITATION ON STATUTORY CONSTRUCTION.—Nothing in this section shall be construed as affecting the assessment of liability under this Act with respect to the discharge or substantial threat of discharge of oil and shall be construed as affecting or diminishing the authority of the President under section 311(c)(1) of the Federal Water Pollution Control Act, relating to removal of discharged oil.

SEC. 202. RESPONSE PLANS.

(a) DESIGNATION.—

(1) DEADLINE.—Not later than 180 days after the date of the enactment of this Act, the Secretary or the Administrator of the Environmental Protection Agency, as determined by the President, shall designate those areas for which plans for responding to discharges and substantial threats of discharges of oil are required to be prepared under this section, the persons (including Federal, State, and local officials) who are required to prepare such plans, and the persons who are required to pay for the preparation of such plans.

(2) CONSULTATION.—In designating areas for which plans are required to be prepared under this section and the persons to be required to prepare such plans, the Secretary or the Administrator, as the case may be, shall consult concerned State officials.

(b) CRITERIA FOR DESIGNATION OF AREAS.—In determining those areas for which plans for responding to discharges and substantial threats of discharges of oil are required to be prepared under this section, the Secretary or the Administrator of the Environmental Protection Agency, as the case may be, shall consider the following:

(1) The likelihood of a discharge or substantial threat of a discharge of oil in the area.

(2) The likelihood of significant adverse effects resulting from discharges or substantial threats of discharges of oil in the area.

(3) The amount and type of oil handled, stored, or processed in the area.

(4) The presence of natural resources in the area which are likely to be damaged by a discharge of oil and the value, uniqueness, and susceptibility of such resources to damage by such discharge.

(5) The geographic, topographic, weather, and other conditions which might influence the frequency, severity, and effects of oil discharges and responses thereto.

(c) PREPARATION OF PLANS.—

(1) DEADLINE.—Not later than 180 days after the date of designation of an area under subsection (a), the persons designated under subsection (a) shall prepare and submit, in writing, to the Secretary or the Administrator of the Environmental Protection Agency, as the case may be, for approval a plan for responding to discharges and substantial threats of discharges of oil in the area. Plans approved under this section must be reviewed on a periodic basis.

(2) CONTENTS.—Each response plan prepared under this section shall include the following:

(A) A description of the general area in which response actions will be required to be taken pursuant to the plan.

(B) The responsibilities of responsible parties, State and local governments, and others in responding to discharges and substantial threats of discharges of oil.

(C) Such other matters as the Secretary or the Administrator, as the case may be, may require.

(3) CONSULTATION REQUIREMENT.—Concerned States and local governments shall be consulted in the preparation of each plan under this subsection.

(4) TECHNICAL ASSISTANCE.—The Secretary or the Administrator, as the case may be, may provide technical assistance in the preparation of a response plan under this subsection.

(d) FUNDING.—All expenses incurred by the Secretary, and all expenses incurred by the Administrator of the Environmental Protection Agency, in carrying out this section shall be paid for out of the Fund.

SEC. 203. REVIEW AND REVISION OF RESPONSE CAPABILITY.

(a) EVALUATION.—

(1) IN GENERAL.—Not later than 6 months after the date of enactment of this Act, the Secretary or the Administrator of the Environmental Protection Agency, as determined by the President, shall conduct an evaluation of the status and effectiveness of personnel and equipment for responding to dis-

charges of oil or substantial threats of discharges of oil into or upon the naviga-
ble waters and adjoining shorelines and the waters of the exclusive economic
zone. The evaluation shall determine, on a regional basis, whether or not exist-
ing personnel and equipment are sufficient for responding to such discharges or
threats in an effective and timely manner and the need for teams (including
necessary equipment, personnel, and vessels) to respond to and minimize
damage from those discharges or substantial threats of discharges occurring in
the general regions of Alaska, the Pacific Northwest, California, the Gulf of
Mexico, the Great Lakes, the North Atlantic, the South Atlantic, Hawaii, and
inland waters of the United States.

(2) REPORT.—Not later than 1 year after the date of the enactment of this Act,
the Secretary and the Administrator shall each submit a report to Congress
based on the findings of their respective evaluations conducted under this sub-
section, together with recommendations.

(b) TRAINING.—Not later than 1 year after the date of the enactment of this Act,
the Secretary or the Administrator of the Environmental Protection Agency, as de-
termined by the President, shall revise the national contingency plan issued under
section 311(c)(2) of the Federal Water Pollution Control Act and shall issue such reg-
ulations as may be necessary, to require oil response personnel to be subjected to—

(1) training approved by the Secretary or the Administrator, as the case may
be; and

(2) periodic drills, without prior notice, to demonstrate the continued effec-
tiveness and readiness of oil response teams.

(c) CERTIFICATION.—Not later than 6 months after the date of the submission of
the report under subsection (a), the Secretary or the Administrator of the Environ-
mental Protection Agency, as the case may be, shall issue regulations requiring in-
spection of equipment for responding to discharges of oil and substantial threats of
discharges of oil into the navigable waters and adjoining shorelines and the waters
of the exclusive economic zone. Such equipment includes containment booms, skim-
mers, response vessels, and buoys. The regulations shall require the submission to
the Secretary or the Administrator of such information as the Secretary or the Ad-
ministrator may require for obtaining certification by the Secretary or the Adminis-
trator not less than once every 3 years to ensure the equipment is maintained in
working condition. The Secretary and the Administrator shall each take such ac-
tions as may be necessary to make their respective certifications under this subsec-
tion and to enforce this subsection, including the regulations issued by them respec-
tively.

(d) UPGRADING OF PERSONNEL AND EQUIPMENT.—

(1) BY OWNERS AND OPERATORS.—Not later than 6 months after the date of the
submission of the report under subsection (a), the Secretary or the Administra-
tor of the Environmental Protection Agency, as the case may be, shall issue reg-
ulations which require owners and operators of vessels and facilities to take
(within 6 months after the date of the issuance of such regulations) such action
as may be necessary to ensure that sufficient personnel and equipment are
available, on a regional and collective basis, for responding to discharges of oil
and substantial threats of discharges of oil described in the first sentence of
subsection (a) in an effective and timely manner.

(2) BY THE UNITED STATES.—If owners and operators of vessels and facilities
have not taken all actions required by the Secretary or the Administrator, as
the case may be, under paragraph (1) within 6 months after the date of the issu-
ance of regulations by the Secretary or the Administrator under paragraph (1),
the Secretary or the Administrator shall take such actions as may be necessary
to ensure that sufficient personnel and equipment for responding to discharges
of oil and substantial threats of discharges of oil described in the first sentence
of subsection (a) in an effective and timely manner are available on a regional
and collective basis.

(e) FUNDING.—All expenses incurred by the Secretary, and all expenses incurred
by the Administrator of the Environmental Protection Agency, in carrying out this
section shall be paid for out of the Fund.

SEC. 204. COMPUTER LISTING OF EMERGENCY RESPONSE RESOURCES AND AVAILABILITY OF
AGENCY DATA.

(a) ESTABLISHMENT OF COMPUTER LISTING.—Not later than 1 year after the date of
the enactment of this section, the National Response Center shall (in consultation
with State officials responsible for removal of oil from navigable waters and adjoin-
ing shorelines and the waters of the exclusive economic zone) establish, maintain,
and annually revise a comprehensive nationwide computer listing of emergency re-

18

sponse resources which are available to and appropriate for use in responding to discharges and substantial threats of discharges of oil.

(b) CONTENTS OF COMPUTER LISTING.—The computer listing established under this section shall include—

(1) a continually updated description of all Federal, State, local, and private emergency response resources which are available for use, including—

(A) the locations and capabilities of the resources;

(B) specification of the suitability of each resource for use in rivers, harbors, open ocean, and calm waters; and

(C) specification of the suitability of each resource for use in fresh water and in salt water;

(2) a nationwide listing of persons having emergency response resources available for sale or lease, including—

(A) each such person's address, telephone number, and hours of business; and

(B) a description of the types and capabilities of their resources;

(3) a listing of the names, telephone numbers, and areas of expertise of persons residing in the vicinity of areas covered by the National Contingency Plan who are experts in—

(A) responding to discharges or the substantial threats of discharges of oil; or

(B) the effects of such discharges or threats.

(c) INFORMATION ACCESS.—The National Response Center shall provide continuous access to information contained in the listing established under this section to—

(1) each regional response team;

(2) each regional response center;

(3) each on-scene coordinator; and

(4) all State and local government officials responsible for directing State or local governmental response to discharges and substantial threats of discharges of oil.

(d) READY ACCESSIBILITY.—The head of each Federal agency having a representative on the National Response Team shall ensure that, during all periods of activation of the National Contingency Plan, all persons described in subsection (c) with respect to the activation have ready accessibility to all relevant data in the possession of such agency (other than classified data) regarding the geographic, oceanographic, hydrologic, natural resource, and meteorological characteristics of the navigable waters or adjoining shorelines and the waters of the exclusive economic zone for which the National Contingency Plan is activated.

(e) INTERNATIONAL INVENTORY.—The President shall take such actions as may be necessary to encourage appropriate international organizations to establish an international inventory of emergency response resources.

(f) DEFINITIONS.—For purposes of this section—

(1) EMERGENCY RESPONSE RESOURCE.—The term "emergency response resource" means all equipment, supplies (including chemical and biological agents), and personnel having special knowledge or expertise, that are particularly useful for responding to a discharge or substantial threat of a discharge of oil.

(2) NATIONAL RESPONSE CENTER, NATIONAL RESPONSE TEAM, REGIONAL RESPONSE CENTER, REGIONAL RESPONSE TEAM, AND ON-SCENE COORDINATOR.—The terms "National Response Center", "National Response Team", "Regional Response Center", "Regional Response Team", and "On-Scene Coordinator" have the meaning such terms have in the National Contingency Plan.

SEC. 205. VESSEL TRAFFIC SYSTEMS.

(a) NEEDS SURVEY.—The Secretary shall make a survey of areas of navigable waters to determine the needs for new, expanded, or improved vessel traffic systems.

(b) PRIORITY LIST.—

(1) ESTABLISHMENT.—Based on the results of the needs survey conducted under subsection (a), the Secretary shall establish, in order of priority, those areas of navigable waters which are in need of new, expanded, or improved vessel traffic systems.

(2) FACTORS TO CONSIDER.—In determining the order of priority for the list under paragraph (1), the Secretary shall consider such factors as the Secretary determines appropriate, including the nature, volume, and frequency of vessel traffic in the area and the risks of collisions, spills, and damages associated

19

with such traffic which could be reduced or eliminated by installation, expansion, or improvement of a vessel traffic system.

(c) REPORT.—Not later than 1 year after the date of the enactment of this Act, the Secretary shall submit to Congress a report containing the priority list established under this subsection and such other information as the Secretary considers appropriate.

(d) ACQUISITION, INSTALLATION, AND OPERATION.—The Secretary may acquire, install, and operate such equipment and vessel traffic systems as are necessary for making the improvements and expansions contained on the priority list established under this subsection.

(e) MANDATORY PARTICIPATION.—The Secretary shall make participation in vessel traffic systems operated by the Secretary mandatory for such vessels as the Secretary determines appropriate.

(f) VESSEL FEES.—

(1) ESTABLISHMENT.—The Secretary shall establish and collect from users of vessel traffic systems operated by the Secretary such fees as the Secretary determines are necessary to pay the cost of acquisition, installation, and operation of vessel traffic systems by the Secretary. Such fees shall be established in accordance with section 9701 of title 31, United States Code.

(2) USE OF FEES.—Fees collected by the Secretary under this subsection shall be credited and available to the Secretary, without fiscal year limitation, to pay the cost of acquisition, installation, and operation of vessel traffic systems by the Secretary.

(3) LIMITATIONS ON STATUTORY CONSTRUCTION.—Nothing in this subsection shall be construed as altering or expanding the duties and liabilities of the United States for the performance of functions or services for which fees are collected under this subsection. The collection of such fees shall not constitute an express or implied undertaking by the United States to perform any service or activity in a certain manner or to provide any service at a particular time or place.

(g) DIRECTION OF VESSEL MOVEMENT.—

(1) STUDY.—The Secretary shall conduct a study of whether or not the Secretary should be given additional authority to direct the movement of vessels upon navigable waters and should exercise such authority.

(2) REPORT.—Not later than 1 year after the date of the enactment of this Act, the Secretary shall submit to Congress a report on the results of the study conducted under paragraph (1) together with recommendations for implementing the results of such study.

SEC. 206. NAVIGATIONAL AIDS.

(a) STUDY.—The Secretary shall conduct a study to determine the areas in which navigation risks are sufficient to require tug escorts of tankers or other navigation aids to improve the safe movement of tankers.

(b) REPORT.—Not later than 1 year after the date of the enactment of this Act, the Secretary shall submit to Congress a report on the results of the study conducted under subsection (a) together with recommendations for implementing the results of such study.

(c) IMPLEMENTATION.—The Secretary shall issue such regulations and take such actions as may be necessary to implement the recommendations contained in the report submitted to Congress under this section.

SEC. 207. PERIODIC GAUGING OF PLATING THICKNESS OF COMMERCIAL VESSELS.

Not later than 1 year after the date of the enactment of this Act, the Secretary shall issue regulations—

(1) establishing minimum standards for the plating thickness of vessels transporting oil in bulk or commercial quantities, and

(2) requiring periodic gauging of the plating thickness of all vessels over 30 years old which are used to transport oil in bulk or commercial quantities upon the navigable waters or the waters of the exclusive economic zone.

SEC. 208. OVERFILL AND TANK LEVEL OR PRESSURE MONITORING DEVICES.

(a) STANDARDS.—Not later than 1 year after the date of the enactment of this Act, the Secretary shall establish, by regulation, minimum standards for devices for warning persons of overfills and tank levels of oil in cargo tanks and devices for monitoring the pressure of oil cargo tanks.

(b) USE.—Not later than 1 year after the date of the enactment of this Act, the Secretary shall issue regulations establishing requirements concerning the use of—

(1) overfill devices, and

(2) tank level or pressure monitoring devices,

20

which are referred to in subsection (a) and which meet the standards established by the Secretary under subsection (a), on vessels transporting oil in bulk or commercial quantities upon the navigable waters and the waters of the exclusive economic zone.

### SEC. 209. TANKER PERSONNEL.

(a) STUDY.—Not later than 1 year after the date of the enactment of this Act, the Secretary shall conduct a study for the purpose of determining appropriate crew sizes for tankers and qualifications of personnel on such tankers.

(b) REPORT.—Not later than 1 year after the date of the enactment of this Act, the Secretary shall submit to Congress a report on the results of the study conducted under subsection (a) together with recommendations for implementing the results of such study.

### SEC. 210. USE OF LINERS.

(a) STUDY.—The Administrator of the Environmental Protection Agency shall conduct a study to determine whether or not liners should be used as a secondary means of containment at onshore facilities used for the bulk storage of oil and located near navigable waters to prevent leaching of oil into the ground and to aid in leak detection.

(b) REPORT.—Not later than 1 year after the date of the enactment of this Act, the Administrator of the Environmental Protection Agency shall submit to Congress a report on the results of the study conducted under subsection (a) together with recommendations for implementing the results of such study.

(c) IMPLEMENTATION.—The Administrator of the Environmental Protection Agency shall issue such regulations and take such actions as may be necessary to implement the recommendations contained in the report submitted to Congress under this section.

### SEC. 211. MODIFICATIONS TO DREDGES.

(a) STUDY.—The Secretary of the Army shall conduct a study for the purpose of determining the feasibility of modifying dredges for the purpose of making such dredges usable in responding to a discharge of oil or the substantial threat of a discharge of oil.

(b) REPORT.—Not later than 1 year after the date of the enactment of this Act, the Secretary of the Army shall submit to Congress a report on the results of the study conducted under subsection (a) together with recommendations for implementing the results of such study.

### SEC. 212. TANKER FREE ZONES.

(a) STUDY.—The Secretary, in consultation with other appropriate Federal and State officials, shall conduct a study of whether or not to designate areas of the navigable waters and exclusive economic zone as zones where the movement of tankers should be prohibited or limited. If the Secretary, as a result of such study, determines that such zones should be designated, the Secretary shall also study which areas to designate as such zones, and what limitations to impose on tanker traffic in any zones so designated, taking into consideration the following: existing navigational risks based on geography, weather, and volume of traffic; potential for danger to natural resources; and availability of alternative methods for transporting oil (such as deepwater port facilities).

(b) REPORT.—Not later than 1 year after the date of the enactment of this Act, the Secretary shall submit to Congress a report on the results of the study conducted under subsection (a) together with recommendations for implementing the results of such study.

### SEC. 213. SUPERIORITY OF FEDERAL PILOTS' LICENSES.

(a) STUDY.—The Secretary shall conduct a study to determine whether or not licenses issued by the Secretary authorizing persons to serve as pilots of commercial vessels operating on the navigable waters should be legally superior to licenses issued by the States for such purposes.

(b) REPORT.—Not later than 1 year after the date of the enactment of this Act, the Secretary shall submit to Congress a report on the results of the study conducted under subsection (a) together with recommendations for implementing the results of such study.

### SEC. 214. RESEARCH AND DEVELOPMENT PROGRAM.

(a) ESTABLISHMENT.—The President shall establish a program for conducting oil pollution research and development under this section and designate appropriate Federal agencies to participate in such program.

21

(b) GENERAL PURPOSES.—The purposes of the research and development program under this section includes the following:

(1) Development of new or improved methods to contain discharges of oil from vessels and facilities. Such methods must minimize health risks to persons who will have responsibility for containing such discharges.

(2) Development of new or improved methods (including the use of dispersants and bioremediation) for oil recovery, cleanup, and disposal which are effective and protect the environment.

(3) Development of effective models to predict the effects of discharges of oil and the fate of such oil, including the development of baseline data necessary for determining such effects.

(4) Development of technologies and methods to protect public health and safety from discharges of oil (including the population directly exposed to an oil discharge and response personnel performing cleanup activities).

(5) Development of new or improved methods to ensure the health and safety of response personnel performing cleanup activities.

(6) Development of adequate worker training standards for oil discharge response personnel.

(7) Development of new or improved methods to restore and rehabilitate natural resources damaged by discharges of oil.

(8) Determination of long-term effects of discharges of oil on fish and wildlife.

(c) SPECIFIC RESEARCH AND DEVELOPMENT PROJECTS.—

(1) VESSEL DESIGN AND CONSTRUCTION CRITERIA.—Under the program established under this section, the President shall direct the Secretary to conduct research on changes in vessel design and construction criteria (such as tank size, vessel size, double hulls, and ballast sides) for the purpose of reducing the likelihood of discharges of oil.

(2) TECHNOLOGY.—Under the program established under this section, the President shall direct the Secretary and the Administrator of the Environmental Protection Agency to conduct a joint research and development program for improving technology to prevent discharges of oil and minimize the size of such discharges. The technologies examined under such research and development program shall include technologies for measuring the ullage of a vessel, preventing discharges from tank vents, preventing discharges during lightering and bunkering operations, and containing discharges on the deck of a vessel.

(d) ANNUAL REPORTS.—The President shall submit to Congress an annual report on the activities carried out under this section in the preceding fiscal year and on activities the President proposes to carry out under this section in the current fiscal year.

(e) FUNDING.—For carrying out the purposes of this section, there is authorized to be appropriated from the Fund $10,000,000 for fiscal year 1991, $10,000,000 for fiscal year 1992, $7,500,000 for fiscal year 1993, $5,000,000 for fiscal year 1994, and $5,000,000 for fiscal year 1995.

SEC. 215. CONSIDERATION OF ALCOHOL ABUSE.

(a) ISSUANCE AND RENEWAL OF LICENSES, CERTIFICATES OF REGISTRY, AND MERCHANT MARINER DOCUMENTS.—

(1) IN GENERAL.—Chapter 71 of title 46, United States Code, is amended by adding at the end the following:

"§7115. Consideration of alcohol abuse in issuing and renewing licenses and certificates of registry

"(a) LIMITATION ON ISSUANCE OF LICENSES AND CERTIFICATES.—The Secretary may not issue or renew a license or certificate of registry under this chapter for any individual who—

"(1) the Secretary determines is a current or chronic abuser of alcohol; or

"(2) fails to make available to the Secretary the information referred to in subsection (b).

"(b) DRIVING RECORD INFORMATION.—The Secretary shall require each individual applying for issuance or renewal of a license or certificate of registry under this chapter to make available to the Secretary, in accordance with section 206(b)(4) of the National Driver Register Act of 1982 (23 U.S.C. 401 note), all information contained in the National Driver Register regarding the motor vehicle driving record of such individual.

"(c) INVESTIGATIONS.—Upon receiving reliable information that an individual applying for issuance or renewal of a license or certificate of registry under this chapter has been found guilty of an alcohol-related infraction resulting in suspension or revocation of a motor vehicle operator license issued to the individual, the Secretary

may conduct such investigations as are necessary to determine if the individual is a current or chronic abuser of alcohol.".

(2) CLERICAL AMENDMENTS.—The item relating to chapter 71 contained in the table of sections for title 46, United States Code. and the chapter analysis for chapter 71 of such title are each amended by adding at the end the following:
"7115. Consideration of alcohol abuse in issuing and renewing licenses and certificates of registry ".

(b) CERTIFICATES OF REGISTRY.—Section 7107 of title 46, United States Code, is amended by striking the first sentence and inserting the following: "The Secretary shall determine the term of validity of a certificate of registry. Such a certificate may be renewed under regulations issued by the Secretary.".

(c) MERCHANT MARINER'S DOCUMENTS.—Section 7302 of title 46, United States Code, is amended by adding at the end the following:

"(c) LIMITATION ON ISSUANCE OF DOCUMENTS.—The Secretary may not issue or renew a merchant mariner's document under this chapter for any individual who—

"(1) the Secretary determines is a current or chronic abuser of alcohol; or

"(2) fails to make available to the Secretary the information referred to in subsection (d).

"(d) DRIVING RECORD INFORMATION.—The Secretary may require each individual applying for issuance or renewal of a merchant mariner's document under this chapter to make available to the Secretary, in accordance with section 206(b)(4) of the National Driver Register Act of 1982 (23 U.S.C. 401 note), all information contained in the National Driver Register regarding the motor vehicle driving record of such individual.

"(e) INVESTIGATIONS.—Upon receiving reliable information that an individual applying for issuance or renewal of a merchant mariner's document under this chapter has been found guilty of an alcohol-related infraction resulting in suspension or revocation of a motor vehicle operator license issued to the individual, the Secretary may conduct such investigations as are necessary to determine if the individual is a current or chronic abuser of alcohol.

"(f) PERIOD OF VALIDITY.—The Secretary shall determine the term of validity of a merchant mariner's document. Such documents may be renewed under regulations issued by the Secretary.".

(d) SUSPENSION AND REVOCATION OF LICENSES, CERTIFICATES, AND DOCUMENTS.— Section 7703 of title 46, United States Code, is amended—

(1) by inserting "(a)" before the first sentence; and

(2) by adding at the end the following:

"(b) SUSPENSIONS FOR ALCOHOL ABUSE.—

"(1) IN GENERAL.—The Secretary may suspend or revoke a license, certificate of registry, or merchant mariner's document issued by the Secretary to an individual if—

"(A) the Secretary determines the individual is a current or chronic abuser of alcohol; or

"(B) the individual fails to make available to the Secretary the information referred to in paragraph (3).

Any determination of the Secretary to suspend or revoke the license, certificate of registry, or merchant mariner's document of an individual under this paragraph shall be based on the severity of abuse of alcohol by the individual and the length of time necessary to control that abuse.

"(2) INVESTIGATIONS.—The Secretary may conduct such investigations as are necessary to determine if an individual who holds a license, certificate of registry, or merchant mariner's document issued by the Secretary is a current or chronic abuser of alcohol if the Secretary receives reliable information—

"(A) regarding any alcohol-related misconduct of the individual; or

"(B) pursuant to paragraph (3) that the individual has been found guilty of an alcohol-related infraction resulting in suspension or revocation of a motor vehicle operator license issued to the individual.

"(3) DRIVING RECORD INFORMATION.—The Secretary may request an individual who holds a license, certificate of registry, or merchant mariner's document issued by the Secretary to make available to the Secretary, in accordance with section 206(b)(4) of the National Driver Register Act of 1982 (23 U.S.C. 401 note), all information contained in the National Driver Register regarding the motor vehicle driving record of such individual.

"(4) LIMITATION ON SUSPENSION TERMINATIONS.—The Secretary may not terminate a suspension of a license, certificate of registry, or merchant mariner's document of an individual under paragraph (1)(A) until the individual provides sufficient proof that the individual is no longer a current or chronic abuser of alcohol.".

(e) RELIEF OF MASTER.—Section 8101 of title 46, United States Code, is amended by adding at the end the following new subsection:

"(i) RELIEF OF MASTER.—If the chief mate or equivalent and the next senior crew-member on board a vessel determine that reasonable cause exists to believe that the master or individual in command is intoxicated as a result of the use of dangerous drugs (as defined in section 7704) or alcohol and is therefore incapable of command-ing the vessel, the chief mate shall temporarily relieve the master and temporarily assume command of the vessel and shall immediately enter the details in the vessel log and report such details to the Secretary by the most expeditious means avail-able. The chief mate shall also report the circumstances in writing to the Secretary within 12 hours after the vessel arrives at its destination.".

(f) REGULATIONS.—The Secretary is authorized to issue such regulations as may be necessary to implement the amendments made by this section.

SEC. 216. ACCESS TO NATIONAL DRIVER REGISTER.

(a) IN GENERAL.—Section 206(b) of the National Driver Register Act of 1982 (23 U.S.C. 401 note) is amended—

(1) by redesignating paragraph (4) and the first paragraph (5) as paragraphs (6) and (7), respectively;

(2) by redesignating the second paragraph (5), relating to locomotive opera-tors, as paragraph (4) and moving such paragraph after paragraph (3);

(3) by inserting after the paragraph which is redesignated and moved under paragraph (2) of this subsection the following new paragraph:

"(5) SEAMAN CERTIFICATES.—Any individual who has applied for or received a license or certificate of registry in accordance with section 7101 of title 46, United States Code, or a merchant mariner's document in accordance with sec-tion 7302 of title 46, United States Code, or has applied for a renewal of such license, certificate of registry, or document, may request the chief driver licens-ing official of a State to transmit information regarding the individual under subsection (a) to the Secretary. The Secretary may receive such information and shall, prior to using such information in any adverse action regarding the indi-vidual's license, certificate of registry, or document, make such information available to the individual for review and written comment. The Secretary may not otherwise divulge or use such information, except in accordance with sec-tion 7115, 7302, or 7703 of title 46, United States Code. There shall be no access to information in the Register under this paragraph if such information was en-tered in the Register more than 5 years before the date of such request, unless such information relates to revocations or suspensions which are still in effect on the date of the request. Information submitted to the Register by States under the Act of July 14, 1960 (74 Stat. 526), or under this Act shall be subject to access for the purpose of this paragraph during the transition to the Register established under section 203(a) of this Act.".

(b) CONFORMING AMENDMENT.—Section 208 of such Act is amended by striking "an individual described" and all that follows through "title, who" and inserting "an individual described in section 206(b)(6) of this title, who".

# TITLE III—IMPLEMENTATION OF INTERNATIONAL CONVENTIONS

SEC. 301. DEFINITIONS.

For the purposes of this title—

(1) SHIP, OWNER, OIL, POLLUTION DAMAGE, AND INCIDENT.—The terms "ship", "owner", "oil", "pollution damage", and "incident" shall have the meanings provided in Article I of the Civil Liability Convention.

(2) CIVIL LIABILITY CONVENTION.—The term "Civil Liability Convention" means the International Convention on Civil Liability for Oil Pollution Damage, 1984.

(3) FINANCIAL RESPONSIBILITY.—The term "financial responsibility" has the same meaning as "financial security" under the Civil Liability Convention.

(4) FUND CONVENTION.—The term "Fund Convention" means the Internation-al Convention on the Establishment of an International Fund for Compensation for Oil Pollution Damage, 1984.

(5) INTERNATIONAL FUND.—The term "International Fund" means the Interna-tional Oil Pollution Compensation Fund established under Article 2 of the Fund Convention.

SEC. 302. APPLICABILITY OF CONVENTIONS.

During any period in which the Civil Liability Convention and the Fund Convention are in force with respect to the United States, liability relating to pollution damage arising from an incident involving a ship shall be determined in accordance with the Civil Liability Convention and the Fund Convention. Nothing in this title shall constitute a ratification of either the Civil Liability Convention or the Fund Convention.

SEC. 303. RECOGNITION OF INTERNATIONAL FUND.

The International Fund is recognized under the laws of the United States as a legal person and shall have the capacity to acquire and dispose of real and personal property and to institute and be party to legal proceedings. The Director of the International Fund is recognized as the legal representative of the International Fund. The Director shall be deemed to have appointed irrevocably the Secretary of State as the International Fund's agent for the service of process in any legal proceedings within the United States involving the International Fund. The International Fund and its assets shall be exempt from all direct taxation and payment of any customs duties in the United States.

SEC. 304. ACTION IN UNITED STATES COURTS.

(a) SERVICE OF PROCESS ON FUND.—In any action brought in a court in the United States against the owner of a ship or its guarantor under the Civil Liability Convention, the plaintiff or defendant, as the case may be, shall serve a copy of the complaint and any subsequent pleading therein upon the International Fund at the same time the complaint or other pleading is served upon the opposing parties.

(b) INTERVENTION.—The International Fund may intervene as a party as a matter of right in any action brought in a court in the United States against the owner of a ship or its guarantor under the Civil Liability Convention.

SEC. 305. CONTRIBUTION TO INTERNATIONAL FUND.

(a) PAYMENTS TO BE MADE FROM OIL SPILL LIABILITY TRUST FUND.—The amount of any contribution to the International Fund which is required to be made under Article 10 of the Fund Convention by any person with respect to oil received in any port, terminal installation, or other installation located in the United States shall be paid to the International Fund from the Oil Spill Liability Trust Fund.

(b) INFORMATION.—The Secretary may, by regulation, require persons who are required to make contributions with respect to oil received in any port, terminal, or other installation in the United States under Article 10 of the Fund Convention to provide all information relating to the oil as may be necessary to carry out subsection (a) of this section, Articles 10, 12, 13, 14, and 15 of the Fund Convention, and Article 29 of the Protocol of 1984 to Amend the International Convention on the Establishment of an International Fund for Compensation for Oil Pollution Damage, 1971.

SEC. 306. RECOGNITION OF FOREIGN JUDGMENTS.

Any final judgment of a court of any country which is a party to the Civil Liability Convention or to the Fund Convention in an action for compensation under either convention shall be recognized by any court of the United States having jurisdiction under this Act, when the judgment has become enforceable in such country and is no longer subject to ordinary form of review, except where—

(1) the judgment was obtained by fraud, or

(2) the defendant was not given reasonable notice and a fair opportunity to present its case.

SEC. 307. FINANCIAL RESPONSIBILITY.

(a) UNITED STATES DOCUMENTED SHIPS.—The owner of each ship which is documented under the laws of the United States which is subject to the Civil Liability Convention shall establish and maintain, in accordance with regulations issued by the Secretary, evidence of financial responsibility as required in Article VII of the Civil Liability Convention.

(b) OTHER SHIPS.—The owner of each ship (other than a ship to which subsection (a) applies or a ship which is a public vessel) which is subject to the Civil Liability Convention and which enters or leaves a port or terminal in the United States or uses an Outer Continental Shelf facility or an offshore facility that is or was licensed under the Deepwater Port Act of 1974 shall establish and maintain, in accordance with regulations issued by the Secretary, evidence of financial responsibility as required in Article VII of the Civil Liability Convention. Any ship which has on board a valid certificate issued in accordance with Article VII of the Civil Liabil-

25

ity Convention shall be considered as having met the requirements of this subsection. Any ship carrying only oil as cargo, fuel, or residue, which has on board a valid certificate issued in accordance with Article VII of the Civil Liability Convention shall be considered as having met the requirements of section 107 of this Act.

(c) AUTHORITY OF SECRETARY TO ISSUE.—The Secretary is authorized to issue any certificate of financial responsibility which the United States may issue under the Civil Liability Convention.

(d) WITHHOLDING CLEARANCE.—The Secretary of the Treasury shall withhold or revoke the clearance required by section 4197 of the Revised Statutes of the United States (46 U.S.C. App. 91) of any ship which does not have a certificate demonstrating compliance with this section.

(e) DENYING ENTRY AND DETAINING VESSELS.—The Secretary may (1) deny entry to any facility or to any port or place in the United States, or (2) detain at the facility or port or place in the United States, any ship subject to this section which, upon request, does not produce the certificate demonstrating compliance with this section or regulations issued under this section.

(f) CIVIL PENALTY.—Any person who, after notice and an opportunity for a hearing, is found to have violated this section, any regulation issued under this section, section 305(b), or section 308, or any denial or detention order issued under subsection (e) of this section shall be liable to the United States for a civil penalty not to exceed $25,000 per day of violation. The amount of the civil penalty shall be assessed by the Secretary in accordance with the procedures set forth in section 107 of this Act.

(g) WAIVER OF SOVEREIGN IMMUNITY.—The United States waives all defenses based on its status as a sovereign state with respect to any controversy arising under the Civil Liability Convention or the Fund Convention relating to any ship owned by the United States and used for commercial purposes.

SEC. 308. REGULATIONS.

The Secretary shall issue such regulations as may be necessary to carry out this title and all obligations of the United States under the Civil Liability Convention and the Fund Convention.

# TITLE IV—MISCELLANEOUS PROVISIONS

SEC. 401. TRANS-ALASKA PIPELINE FUND.

(a) AMENDMENTS TO SECTION 204(b).—Section 204(b) of the Trans-Alaska Pipeline Authorization Act (43 U.S.C. 1653(b)) is amended—

(1) in the first sentence by inserting after "any area" the following: "in the State of Alaska";

(2) in the first sentence by inserting after "any activities" the following: "related to the trans-Alaska oil pipeline"; and

(3) by adding at the end the following new sentence: "This subsection shall not apply to removal costs covered by the Oil Pollution Prevention, Response, Liability, and Compensation Act of 1989.".

(b) REPEAL OF SECTION 204(c).—Section 204(c) of the Trans-Alaska Pipeline Authorization Act is repealed. The repeal made by the preceding sentence shall not affect the applicability of such section to claims arising before the date of the enactment of this Act. The repeal of paragraphs (4), (6), and (8) of such section shall only become effective upon the payment by the Board of Trustees of the Trans-Alaska Pipeline Liability Fund of all claims certified under subsection (c) of this section.

(c) CERTIFICATION OF OUTSTANDING CLAIMS.—Not later than 210 days after the date of the enactment of this Act, the Board of Trustees of the Trans-Alaska Pipeline Liability Fund shall certify to the Secretary the total amount of claims outstanding against such Fund as of the date of the enactment of this Act.

SEC. 402. INTERVENTION ON THE HIGH SEAS ACT.

Section 17 of the Intervention on the High Seas Act (33 U.S.C. 1486) is amended to read as follows:

"SEC. 17. AVAILABILITY OF OIL SPILL LIABILITY TRUST FUND.

"The Oil Spill Liability Trust Fund shall be available to the Secretary for actions taken under sections 5 and 7 of this Act.".

SEC. 403. FEDERAL WATER POLLUTION CONTROL ACT.

(a) NATIONAL CONTINGENCY PLAN.—Section 311(c)(2) of the Federal Water Pollution Control Act (33 U.S.C. 1321(c)(2)) is amended—

(1) in subparagraph (C) by striking "establishment or designation of a strike force consisting" and inserting "designation, establishment, and maintenance of a strike force consisting of at least 4 teams";

(2) in subparagraph (D) by inserting "safeguard against as well as" after "surveillance and notice designed to";

(3) in subparagraph (F) by inserting "as well as research and development into methods and techniques to improve existing technology" after "removing oil and hazardous substances"; and

(4) in subparagraph (H) by striking "reimbursed from the fund established under subsection (k) of this section for the reasonable costs incurred in such removal" and inserting "reimbursed, in the case of any discharges of oil from a vessel or facility, for the reasonable costs incurred for such removal, from the Oil Spill Liability Trust Fund".

(b) CLEANUP EXPENSES.—Section 311(d) of such Act is amended by striking the last sentence.

(c) ABATEMENT ACTIONS.—Section 311(e) of such Act is amended to read as follows:

"(e) ABATEMENT ACTIONS.—

"(1) PRESIDENT'S AUTHORITY.—In addition to any action taken by a State or local government, when the President determines that there may be an imminent and substantial threat to the public health or welfare of the United States, including fish, shellfish, and wildlife and public and private property, shorelines, and beaches under the jurisdiction or control of the United States, because of an actual or threatened discharge of oil or a hazardous substance from a vessel or facility in violation of subsection (b) of this section, the President may—

"(A) require the Attorney General to secure such relief as may be necessary to abate such threat; or

"(B) after notice to the affected State, take such other action under this section, including issuing such administrative orders, as may be necessary to protect the public health and welfare.

"(2) ENFORCEMENT OF ORDERS.—If any person fails without sufficient cause to comply with an order under paragraph (1)(B), the President may request the Attorney General to bring an action in the appropriate district court of the United States to enforce such an order, to assess civil penalties of not more than $25,000 a day for each violation, and to assess 3 times the removal costs or damages incurred by the Oil Spill Liability Trust Fund as a result of the failure to comply.

"(3) DISTRICT COURT JURISDICTION.—The district courts of the United States shall have jurisdiction to grant such relief under this subsection as the public interest and the equities of the case may require.".

(d) LIMITATION ON APPLICABILITY TO PREVENT OVERLAPPING COVERAGE.—Subsections (f), (g), (h), and (i) of section 311 of such Act shall not apply with respect to any incident with respect to which section 102 of this Act applies.

(e) RECOVERY FROM 3RD PARTIES.—Section 311(i) of such Act is amended by striking "(1)" and striking paragraphs (2) and (3).

(f) OIL SPILL REVOLVING FUND.—

(1) CONFORMING AMENDMENT.—Section 311(k) of such Act is repealed.

(2) TREATMENT OF REMAINING FUNDS.—Any amounts remaining in the revolving fund established under section 311(k) of the Federal Water Pollution Control Act shall be deposited in the general fund of the Treasury.

(3) TREATMENT OF LIABILITIES.—The Fund shall assume all liability incurred by the revolving fund established under section 311(k) of the Federal Water Pollution Control Act.

(g) FUNDING OF DELEGATED AUTHORITY.—Section 311(l) of the Federal Water Pollution Control Act is amended by striking the second sentence.

(h) EVIDENCE OF FINANCIAL RESPONSIBILITY.—Section 311(p) of such Act is repealed.

(i) AVAILABILITY OF FUND.—Section 311 of such Act is amended by adding at the end thereof the following new subsection:

"(s) AVAILABILITY OF OIL SPILL LIABILITY TRUST FUND.—The Oil Spill Liability Trust Fund shall be available to carry out subsections (c), (d), (i), and (l). Any amounts received by the United States under this section shall be deposited in the Oil Spill Liability Trust Fund.".

(j) NOTICE TO STATE; INCREASED PENALTY FOR FAILURE TO REPORT.—Section 311(b)(5) of such Act is amended—

(1) by inserting after the first sentence the following: "The Federal agency shall immediately notify the appropriate State agency of any State which is, or

may reasonably be expected to be, affected by the discharge of oil or a hazardous substance."; and

(2) by striking "fined not more than $10,000, or imprisoned for not more than one year, or both" and inserting "fined in accordance with the applicable provisions of title 18 of the United States Code, or imprisoned for not more than 3 years (or not more than 5 years in the case of a second or subsequent conviction), or both".

(k) INCREASED PENALTY FOR DISCHARGES.—Section 311(b)(6)(A) of such Act is amended by striking "$5,000 for each offense" each place it appears and inserting "$25,000 for each day of such offense".

SEC. 404. DEEPWATER PORT ACT.

(a) SECTION 4(c).—Section 4(c)(1) of the Deepwater Port Act of 1974 (33 U.S.C. 1503(c)(1)) is amended by striking "section 18(l) of this Act;" and inserting "section 107 of the Oil Pollution Prevention, Response, Liability, and Compensation Act of 1989;".

(b) SECTION 18.—

(1) REPEALS.—Subsections (b), (d), (e), (f), (g), (h), (i), (j), (l), (n), and paragraphs (1) and (2) of subsection (m) of section 18 of such Act (33 U.S.C. 1517) are repealed.

(2) SUBSECTION (c)(3).—Subsection (c)(3) of such section is amended by striking "Deepwater Port Liability Fund established pursuant to subsection (f) of this section", and inserting "Oil Spill Liability Trust Fund".

(3) REDESIGNATIONS.—Subsections (c), (k), and (m) of such section (and any references thereto) are redesignated as subsections (b), (c), and (d) respectively, and paragraphs (3) and (4) of subsection (m) of such section (and any references thereto) are redesignated as paragraphs (1) and (2), respectively.

(c) SECTION 19.—Section 19(a)(1) of such Act (33 U.S.C. 1518(a)(1)) is amended by striking the period at the end of the second sentence and inserting "; except that discharges from a deepwater port or from a vessel within a deepwater port safety zone which are subject to the civil penalty provisions of section 18(a)(2) of this Act shall not be subject to the penalty provisions of any other Federal law.".

(d) DEEPWATER PORT LIABILITY FUND.—Any amounts remaining in the Deepwater Port Liability Fund established under section 18(f) of the Deepwater Port Act of 1974 shall be deposited into the Fund. The Fund shall assume all liability incurred by the Deepwater Port Liability Fund.

SEC. 405. OUTER CONTINENTAL SHELF LANDS ACT AMENDMENTS OF 1978.

Title III of the Outer Continental Shelf Lands Act Amendments of 1978 (43 U.S.C. 1811-1824) and the portion of the table of contents for such Act which relates to such title are each repealed. Any amounts remaining in the Offshore Oil Pollution Compensation Fund established under section 302 of such title shall be deposited in the Fund. The Fund shall assume all liability incurred by the Offshore Oil Pollution Compensation Fund.

SEC. 406. QUALIFIED AUTHORIZING LEGISLATION.

This Act shall be considered to be qualified authorizing legislation for purposes of section 4611(f)(2)(B) of the Internal Revenue Code of 1986.

SEC. 407. EFFECTIVE DATE.

Sections 401, 402, 403 (other than subsection (j)), 404, and 405 shall be effective on the commencement date (as such term is defined in section 4611(f)(2) of the Internal Revenue Code of 1986).

## INTRODUCTION

H.R. 1465, as reported, provides a comprehensive legislative framework to prevent the spilling of oil into the waters of the United States and to improve our preparedness and ability to respond to an oil spill should one occur. It establishes new authorities and responsibilities for the prevention of oil spills in the first instance, establishes a comprehensive response capability, and assesses significant liability upon the spiller of oil and the oil industry. It also provides for compensation to individuals and entities which suffer economic damage due to a spill.

28

The Congress has had the issue of oil spill liability compensation legislation pending before it for more than a decade. The House and Senate each have passed oil spill legislation as recently as 1986, but have been unable to resolve the differences in the legislation.

Current legislation to address oil spill cleanup is contained primarily in section 311 of the Federal Water Pollution Control Act. That law provides that a person who discharges into or upon the navigable waters of the United States, adjoining shorelines, or the waters of the contiguous zone is strictly liable, that is liable without reference to fault, to the United States for the removal costs incurred, including restoration or replacement of natural resources damaged or destroyed as a result of the spill.

Section 311 does not impose liability for economic losses and the cleanup fund is authorized at only $35 million and it is funded primarily through appropriations. Recent events indicate that a much larger fund is necessary and that is should be funded by the oil industry and not by general revenues. Such a larger, tax-supported fund was established by Public Law 99–509. Before such a tax can be collected and spent, however, comprehensive legislation such as H.R. 1465 must be enacted.

Other Federal laws which affect the liability for oil spills are the Trans-Alaska Pipeline Authorization Act, the Deepwater Port Act of 1974, and the Outer Continental Shelf Lands Act. These laws also establish liabilities for cleanup and, in addition, allow for the recovery of certain economic losses. The coverage of these Acts is, however, limited and there have not been spills of sufficient magnitude to cause expenditures to be made from their funds.

In addition to the Federal laws, nearly half the states have also enacted some form of oil spill liability and compensation legislation. These laws differ widely in their liability standards, limits of liability, and whether they include funds. For those states which include funds, they are financed by a variety of sources, primarily license fees, excise taxes, or both.

Each year over ten thousand oil spills are reported, which either pollute or threaten to pollute United States waters. Although the majority of these spills are minor and are routinely removed, or require no removal, questions remained whether the current system of Federal and state laws could provide an adequate response to a major spill.

Unfortunately, shortly after midnight on March 24, 1989, the 987-foot tank vessel *Exxon Valdez* struck Bligh Reef in Prince William Sound, Alaska, and spilled nearly 11 million gallons of oil into one of the most pristine and magnificent natural areas of our country. It quickly became apparent that the current levels of oil spill prevention, preparedness, and response were not adequate for such a major spill.

The lack of necessary preparedness for a major spill as demonstrated in Prince William Sound necessitates that improvements be made in the way the nation plans for and reacts to oil spills.

The first line of defense in any oil spill response program must be prevention of a spill in the first instance. For that reason the Committee has included several provisions designed to improve vessel safety, both in the design of the vessels themselves and in

29

vessel traffic. The bill requires the review of vessel designs for future construction and the examination of existing vessels in the interest of maintaining the integrity of the vessel. The bill also requires the examination of establishing tanker free zones, expanding vessel traffic systems, and encouraging methods to avoid the risk of spilling oil into the water. In addition, the bill requires the examination of proper crew sizes on tanker vessels and current and chronic alcohol abuse as a factor which can be used in the suspension, revocation, or the refusal to issue a license, merchant mariner's document, or certificate of registry.

The Committee's review of oil spill preparedness following the *Exxon Valdez* incident clearly demonstrates a lack of preparedness on the part of industry and government. The bill includes provisions to improve contingency planning and training of oil spill response personnel. The planning should incorporate realistic worst case scenarios and include adequate equipment and personnel for a major spill. Organizational responsibility must be clear and these realistic exercises must be a regular part of the contingency planning to be assured that capabilities outlined on paper actually can be met.

The Committee's review also revealed that there is a need for increased research concerning oil spill prevention and response and for the development of new technologies for prevention and response. Oil spill cleanup technology has been a low priority of the United States government in recent years. The bill therefore establishes a new research and development program, to be paid for out of the fund, to improve the status of our knowledge on oil spill prevention and response.

The Committee believes that H.R. 1465 is a proper and balanced response to our Nation's needs both to increase preventive measures against oil spills and to respond to a spill should it occur. In addition, adequate incentives exist to prevent spills on the part of industry through the imposition of strict liability and the enormous economic and ecological damages which could occur because of an oil spill. Finally, the bill addresses the issue of compensation for individuals injured by an oil spill by providing for an assured source of recovery and clearly delineated causes of action for economic damages.

## MISCELLANEOUS

The Committee notes that the issue has been raised whether the costs of cleanup and environmental restoration should be deductible as a business expense thereby reducing an oil spiller's tax liability. The Committee recognizes that matters pertaining to the Internal Revenue Code are the jurisdiction of the Committee on Ways and Means and therefore has not attempted to resolve this issue. The Committee requests the Committee on Ways and Means to review current tax policy of whether oil spill related costs sould continue to be deductible and thereby reduce an oil spiller's tax liability.

The Committee is concerned about a potential problem involving illegal placement of hazardous wastes and other substances into oil pipelines. Accordingly, the Committee directs the Secretary of

30

Transportation to determine the extent to which hazardous wastes or other substances have been introduced into the pipeline subject to the jurisdiction of the Hazardous Liquid Pipeline Safety Act. Specifically, the Secretary is to determine the extent to which those substances present a threat of damage or injury to individuals, to pipeline facilities, or to facilities where crude oil is refined; or are otherwise incompatible with normal petroleum refining operations.

In this determination, the Secretary should consider the types and amounts of such substances which have been introduced, the types of damage they may have caused or could cause to individuals, pipelines and refining facilities, and the conditions under which such substances have been introduced into pipelines. Among the substances to be considered are solvents, salts, metals, and chlorinated or oxygenated hydrocarbons. The Secretary should consult the Administrator of the Environmental Protection Agency and the Secretary of Energy to determine the extent such introduction is currently regulated under federal and state statutes. The Committee would expect the Secretary to report back to Congress no later than twelve months after date of enactment of the bill.

The Committee also directs the Secretary to identify the substances and quantities of those substances which the Secretary determines pose an unreasonable threat of damage or injury to individuals, pipeline facilities, or facilities where crude oil is refined, or which are incompatible with normal petroleum refining operations. This determination would not cover substances to the extent that they naturally occur in crude oil or to substances which do not pose an unreasonable threat of damage to pipeline or refining facilities and that are introduced for the purpose of facilitating the transmission of crude oil or are otherwise introduced in the normal practice of crude oil production or related field operations. The Committee expects the Secretary to report back to Congress no later than twelve months after the date of enactment of the bill.

## Section-by-Section Analysis

### Section 1—Short title and table of contents

This section provides that the act made be cited as the Oil Pollution Prevention, Response, Liability and Compensation Act of 1989. It also includes the table of contents for the bill.

#### TITLE I—OIL POLLUTION LIABILITY AND COMPENSATION

### Section 101—Definitions

This section contains the definitions of several words or phrases which appear throughout the Act.

### Section 102—Liability

This section provides that a responsible party for a vessel or a facility from which oil is discharged, or which poses a substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shoreline or the waters of the exclusive economic zone is jointly, severally, and strictly liable for the removal costs which arise out of or directly result from such incident and for the speci-

31

fied damages which are proximately caused by the incident. The Committee has included the traditional tort concept of proximate cause with regard to the determination of those damages for which recovery may be had.

Removal costs are those for removal actions taken by the United States, a State, or an Indian Tribe which are not inconsistent with the National Contingency Plan, and other actions taken by any other person which are consistent with the National Contingency Plan. The types of damages for which a responsible party is liable include natural resources damages, damages to real or personal property, loss of subsistence use, loss of revenues, and loss of profits and earning capacity.

Natural resources damages are for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss. These damages are recoverable by the appropriate trustee as provided in subsection (e).

Damages for injury to, or economic losses resulting from destruction of, real or personal property are recoverable by a claimant who owns or leases the property.

Damages for loss of subsistence use of natural resources are recoverable by any claimant who so uses the natural resources which have been injured, destroyed, or lost.

The government of the United States, a State, or a political subdivision thereof is entitled to recover damages equal to the net loss of taxes, royalties, rents, fees, or net profits shares for a period not to exceed two years, due to the injury, destruction, or loss of real property, personal property, or natural resources.

A person is also entitled to recover damages equal to the loss of profits or impairment of earning capacity, based on prior profits or earnings, due to the injury, destruction, or loss of real property, personal property, or natural resources. In order to recover such damages, the person must derive at least 25 percent of his or her earnings from the activities which utilize the property or natural resources, or, if such activities are seasonal in nature, 25 percent of his or her earnings during the applicable season.

The strict liability provisions of section 102 do not apply to any discharge which is authorized by a permit issued under Federal, state, or local law.

In the event that a responsible party for a vessel or facility can establish that a discharge and the resulting removal costs and damages were caused solely by an act of omission of one or more third parties (or solely by such an act or omission in combination with an act of God or an act of war) the third party is to be treated as the responsible party or parties for purposes of determining liability under the Act. If the third party to whom liability is transferred is the owner or operator of a vessel or facility, the third party is subject to the same liability limit that would apply to the vessel or facility. In other cases, the third party is liable to the extent that the responsible party of the vessel or facility from which the discharge actually occurred would have been liable.

Subsection (b) provides that a responsible party can establish a complete defense to liability if the incident resulted from an act of God, an act of war, hostilities, civil war, or insurrection; or, was solely caused by an act of omission of one or more persons other

than a responsible party, an employee or agent of a responsible party, or one whose act or omission occurs in connection with a contractual relationship with a responsible party. This defense to liability does not apply if a responsible party fails or refuses to report an incident. Liability to a particular claimant can be denied when an incident is caused in whole or in part by the gross negligence or willful misconduct of the claimant, or to the extent that an incident is caused by the negligence of the claimant. The Committee emphasizes that the defenses specifically enumerated are intended to be the only defenses available to a responsible party and no other defenses are allowed to the strict, joint, and several liability which is established in the bill.

Subsection (c) establishes the liability limits for vessels and facilities. These limits are: $500 per gross ton or $5 million, whichever is greater, but not to exceed $150 million, for any tanker; $300 per gross ton or $500,000, whichever is greater, for any other vessel; or $75 million for any facility.

In determining liability, a tanker is defined as a vessel constructed or adapted for the carriage of oil in bulk or in commercial quantities as cargo, excluding a non-self-propelled vessel of less than 3,000 gross tons carrying oil in bulk as cargo and operating on the inland waterways system. These inland barges are assessed liability at the rate applicable to other vessels. These limitations do not apply if the incident was proximately caused by willful misconduct or gross negligence or a violation of applicable Federal, construction or operating regulations. The limitations also do not apply if the responsible party fails or refuses to report an incident and to provide all reasonable cooperation and assistance requested by a responsible official in connection with removal activities, or refuses without sufficient cause to comply with an administrative order issued under section 311(e) of the Federal Water Pollution Control Act.

The Secretary is authorized to reduce the liability limits for facilities other than offshore facilities which are not deepwater ports to less than $75 million, but not less than $8 million. The Secretary is also directed to undertake a study of the relative operational or environmental risks posed by the transportation of oil to deepwater ports versus the transportation of oil by vessel to other ports. If the study determines that the use of deepwater ports in connection with the transportation of oil results in a lower operational or environmental risk than the use of other ports, the Secretary is to initiate a rulemaking proceeding to lower the limits of liability with respect to vessels transferring oil to deepwater ports and with respect to such ports.

Subsection (d) provides that a responsible party is liable for interest on the amount paid in satisfaction of a claim for the period beginning on the 30th day following the date on which the claim is presented and ending on the date when the claimant is paid. The making of an offer to a claimant can stop the accrual of interest if the offer is subsequently accepted. Interest is computed at the average of the highest rate for commercial and finance company paper of maturities of 180 days or less as published in the Federal Reserve Bulletin. The interest which accrues on a claim is not subject to the liability limitations which are contained in subsection (c)(1).

33

Subsection (e) establishes the methods of determining liabilities for losses of natural resources. Liability is to the United States for natural resources belonging to, managed by, controlled by, or appertaining to the United States, to a State for such resources of the State, and to an Indian Tribe for natural resources of such Indian Tribe, and to the government of a foreign country for natural resources of that country.

The President, the Governor, and the governing body of the Indian Tribe are each required to designate trustees to act on their behalf in determining the extent of damages to natural resources, developing and implementing a plan for the restoration, rehabilitation, or replacement or acquisition of the equivalent of the natural resources which were injured and which are under their respective trusteeship. Plans for the natural resources are to be developed and implemented only after adequate public notice and opportunity for hearing and consideration of all public comment. The Committee recognizes that in designating Federal trustees, the President may also choose to have EPA act as an advisor to the trustees and as a coordinator of long-term restoration efforts.

The measure of damages to natural resources is to be the cost of restoring, rehabilitating, replacing, or acquiring the equivalent of the damaged natural resources. Added to this is to be the value of the lost public uses of the resources in the period beginning on the date the damage occurs and ending on either the date such resources are restored, rehabilitated, or replaced or the equivalent is acquired or the date on which it is determined that such resources cannot be restored, rehabilitated, or replaced or no equivalent can be acquired. The subject of natural resources damages assessment has recently been addressed in the cases of *Ohio* v. *U.S. Department of the Interior, et al,* No. 86–1529 (D.C. Cir. July 14, 1989) and *Colorado* v. *U.S. Department of the Interior, et al,* No. 87–1265 (D.C. Cir. July 14, 1989). The provision in the bill regarding loss of use of natural resources is not intended to affect the ruling of the Court in that case or to address the issue of how loss of use is to be evaluated.

The provision simply recognizes loss of use as a proper component of damages to natural resources. Because more than one of the trustees could exercise jurisdiction over a particular natural resource, the bill provides that there shall be no double recovery for natural resources damages.

Determinations or assessment of damages to natural resources, other than the value of the lost public use of the resource, shall have the force and effect of a rebuttable presumption on behalf of the trustee in any administrative or judicial proceeding to enforce such an assessment. Funds recovered by a trustee for damages to natural resources are to be retained by the trustee to reimburse and pay costs incurred in the assessment of natural resource damages and developing and implementing a plan for the restoration, rehabilitation, or replacement or acquisition of the equivalent of the natural resources.

In the event that a responsible party causes damages to a natural resource which cannot be restored, rehabilitated, or replaced, or for which no equivalent can be acquired, that party is to be liable for a civil penalty not to exceed the greater of $1 million or one

34

half of the responsible party's liability under this section. Any action to recover such a civil penalty is to be brought by the Attorney General on behalf of the trustee in a court of competent jurisdiction. In determining the penalty, the court is to consider the nature and extent of the damages to natural resources, the value of the natural resources, the degree of culpability of the person held liable for the discharge, and the nature and extent of efforts taken by that person to prevent or mitigate the damages, and restore the natural resources. The liability for a civil penalty is in addition to any other liability under the Act.

Subsection (f) allows foreign claimants to recover under the Act. A foreign claimant must first seek recovery under any applicable international agreement and, except for oil which originated from the Trans-Alaska Pipeline, the recovery must be authorized by a treaty or executive agreement between the United States and the claimant's country, or it must be determined that the claimant's country provides a comparable remedy for United States claimants.

Subsection (g) provides that the responsible party for a vessel or facility from which oil is discharged may assert a claim for removal costs or damages only if the responsible party is entitled to a defense to liability or is entitled to a limitation of liability. Such a claim may be made only to the extent that responsible party's liability has been exhausted.

Subsection (h) specifically allows for a right of contribution against any other potentially liable person.

Subsection (i) provides that no indemnification or other agreement shall be effective to transfer any liability imposed under section 102 to any other person. This does not operate to bar a cause of action for subrogation.

Subsection (j) provides that the Secretary is to consult with affected natural resources trustees on the appropriate removal action to be taken in connection with any discharge of oil. Removals are to be considered complete when so determined by the Secretary in consultation with the Governor or Governors of the affected State or States.

*Section 103—Uses of the fund*

Subsection (a) provides that the Oil Spill Liability Trust Fund is available to the Secretary for the payment of removal costs, including the costs of monitoring removal actions; the costs incurred by the trustees in carrying out their functions for assessing damages to natural resources and for developing and implementing plans for the restoration, rehabilitation, replacement of damaged resources; the payment of obligations authorized by State officials; the payment of removal costs and damages resulting from a discharge of oil from foreign offshore units; the payment of personnel, equipment, and training costs associated with the maintenance of the strike forces authorized under section 311(c) of the Federal Water Pollution Control Act; the payment of administrative and personnel costs and expenses reasonably necessary for and incidental to the implementation and administration of the Act (which includes all aspects of implementing programs or studies authorized in the Act unless an alternative funding source is specifically

35

stated); and, the payment of contributions to international funds which are the liability of the United States.

The fund is not liable for costs or damages to a claimant where the incident is caused by gross negligence or willful misconduct of the claimant or to the extent the costs or damages are caused by the negligence of the claimant.

The maximum amount which may be paid from the fund with respect to any one incident is $1 billion. The President may increase the maximum amount with respect to the incident if the President determines that such increase is necessary and in the best interest of the United States. This authority to increase the limit is not delegable to another Federal official.

Subsection (d) provides that the Secretary may authorize one or more Federal officials to obligate money in the fund, one of which shall be the Commandant of the Coast Guard. The Secretary is also authorized to delegate authority to obligate money in the fund to officials of a State with an adequate program operating under a cooperative agreement with the Federal government. In the delegation of authority to a State to obligate money from the fund, and in the issuance of regulations permitting States to draw money from the fund, the Secretary should take into account the extent of State and local government participation in the preparation and implementation of response plans under section 202 of the bill, and the provisions of those plans.

Subsection (e) allows for the direct draw by State officials against the fund of up to $250,000 for removal costs not inconsistent with the National Contingency Plan. This direct draw authority is in addition to that which could be delegated by the Secretary to the officials of a State under subsection (d). In the event the Governor uses this direct draw authority the Governor must notify the Secretary within 24 hours after any obligation of a payment from the fund.

To the extent that there is a claim paid out of the fund, the United States is subrogated to all rights of the claimant to recover from the responsible party. The section also requires the Comptroller General to provide an audit review team to audit all payments or other uses of fund and to be sure that it is being properly administered.

Subsection (h) provides that claims must be presented to the fund for removal costs within three years after the date of completion of all removal action and for damages within three years after the date on which the loss and its connection with the discharge in question were reasonably discoverable. A claimant may make a claim for natural resources damages three years following the date of natural resources damage assessment regulations if that date is later than otherwise provided. There can be no double payment out of the fund for the same costs of damages.

*Section 104—Claims procedure*

Except as provided, the bill requires that claims for removal costs or damages are to be presented first to the responsible party or guarantor of the source of the spilled oil. The exceptions to this rule are: where the Secretary has advertised or otherwise notified claimants that they could claim directly against the fund; if the claim is by a responsible party; claims by the Governor of a State

36

for removal costs; or, claims by a United States claimant when a foreign offshore unit has discharged oil causing damage.

If a claim is presented to a responsible party or guarantor and such party denies liability for the claim or the claim is not settled within 180 days, the claimant may elect to commence an action in court or may present the claim to the fund. This section also provides that to the extent a claim is presented to a responsible party or guarantor and full compensation is unavailable because of liability limits or financial incapability, a claim may be presented to the fund.

Regulations are to be issued to establish procedure for making claims against the fund.

### Section 105—Designation, notification, and advertisement

Subsection (a) requires the Secretary to designate the source or sources of a discharge after receiving notice of a spill. If the source is a vessel or a facility, the Secretary is to notify the responsible party and the guarantor, if known. Unless a responsible party or guarantor notifies the Secretary of its denial of the designation, the party must advertise the designation and the procedure by which claims may be presented to such party or guarantor. Failure to advertise can result in such advertisement being undertaken by the Secretary at the responsible party's expense. If the responsible party and guarantor deny a designation or the source of the pollution was a public vessel or the Secretary is unable to designate the source, the Secretary shall advertise to potential claimants the procedure by which claims may be presented to the fund.

### Section 106—Subrogation

This section provides that any person including the fund who pays compensation shall be subrogated to all rights, claims, and causes of action that the claimant had under the Act. Actions on behalf of the fund are to be commenced by the Attorney General.

### Section 107—Financial responsibility

This section establishes financial responsibility requirements for vessels and facilities. Evidence of financial responsibility must be established, in accordance with regulations issued by the Secretary, for vessels over 300 gross tons (except a non-self-propelled vessel that does not carry oil as cargo or fuel) using any port or place in the United States or the navigable waters, and vessels using the waters of the exclusive economic zone to transship or lighter oil destined for a port or place subject to the jurisdiction of the United States. The financial responsibility demonstrated must be sufficient to meet the maximum amount of liability to which the vessel would be subject under the provisions limiting vessel owners liability. If the responsible party owns or operates more than one vessel, evidence of financial responsibility is required only to meet the maximum liability applicable to the largest of such vessels. Failure to maintain such evidence will result in the Secretary withholding or revoking clearance to call at a U.S. port, and the Secretary may deny entry or detain any such vessel.

Offshore facilities must maintain financial responsibility sufficient to meet the maximum amount of liability to which the re-

sponsible party could be subject under the Act in a case where the responsible party is entitled to limit its liability.

Financial responsibility may be established by evidence of insurance, surety bond, guarantee, letter of credit, qualification as a self-insurer, or other evidence of financial responsibility satisfactory to the Secretary.

If liability is established under the Act, the claim may be asserted directly against any guarantor providing evidence of financial responsibility. Such a guarantor may invoke rights and defenses available to the responsible party as well as the defense that the incident was caused by the willful misconduct of the responsible party, but the guarantor may not invoke any other defense that might be available in proceedings brought by the responsible party against the guarantor. No guarantor shall be liability in excess of the amount of financial responsibility which the guarantor has provided.

Any person who, after notice and an opportunity for a hearing, is found to have failed to comply with the requirements for financial responsibility shall be liable to the United States for a civil penalty not to exceed $25,000 per day of violation. In addition to the penalty, the Attorney General may secure such relief as necessary to compel compliance with this section, including a judicial order terminating operations.

This section also provides that regulations respecting financial responsibility which have been issued pursuant to any provision of law repealed or superseded by the Act shall remain in full force and effect unless and until new regulations are issued. The Secretary may issue a responsible party one certificate of financial responsibility for purposes of meeting the financial responsibility requirements of the oil spill liability legislation and any other law.

*Section 108—Litigation, jurisdiction, and venue*

This section provides that review of any regulation under the Act may be had only in the Circuit Court of Appeals of the United States for the District of Columbia, and application must be made within 90 days of the date such regulations are promulgated. All other causes of action arising under this Act shall be the jurisdiction of the United States District Courts without regard to the citizenship of the parties or the amount in controversy. Venue shall be in the district in which the incident, injury, or damages occurred, or in which the defendant resides, may be found, has its principal office, or has appointed an agent for service of process. Nothing in the Act affects any action commenced before the date of enactment.

The general period of limitations for an action for damages is three years after the date on which the loss and the connection of the loss with the discharge in question were reasonably discoverable or, if later, and for damages to natural resources, the date on which regulations are issued for natural resource damage assessment. Actions for removal costs must be commenced within three years after completion of the removal action. Such an action may be commenced at any time after such costs have been incurred.

Actions for contribution must be commenced within three years after the date of judgment for recovery of costs or damages or the

date of entry of a judicially approved settlement with respect to such costs or damages. An action for subrogation must be brought within three years after the date of the payment of the claim.

## Section 109—Relationship to other law

This section provides that except as provided in the Act, no action arising out of a discharge of oil, or a substantial threat of a discharge of oil, from a vessel or facility into or upon the navigable waters or adjoining shorelines or the waters of the exclusive economic zone (other than an action for personal injury or wrongful death), may be brought in any court of the United States or of any state or political subdivision thereof. The exception of personal injury or wrongful death includes the preservation of state worker's compensation laws. There is no intent to affect the rights or obligations established under worker's compensation statutes.

The section specifically preserves the authority of any state to establish or continue in effect an oil spill fund or account or to require any person to contribute to that fund or account. However, if the State fund or account is supported by contributions levied upon persons who contribute to the fund established by section 9509 of the Internal Revenue Code of 1986, the State fund or account may not be used to compensate any person for damages under this Act.

This section also specifically provides that nothing affects the authority of the United States or any State or political subdivision thereof to impose, or to determne the amount of, any fine or penalty for any violation of law relating to an incident.

This section also provides that a responsible party who establishes and maintains evidence of financial responsibility in accordance with the Act is not to be required under any State or local law, rule, or regulation to establish or maintain any other evidence of financial responsibility with respect to discharges of oil. A State is given the authority to enforce, on the navigable waters of the State, the requirements for evidence of financial responsibility imposed under the Act.

This section further provides that the Act of March 3, 1851, shall not apply to removal costs which arise out of or directly result from, and damages which are proximately caused by, an incident involving the discharge or substantial threat of discharge of oil. That Act could have the effect if it were to apply of reducing a vessel owner's liability below those levels which are provided in this Act.

## Section 110—Regulations

This section provides that the Secretary shall issue such regulations as may be necessary to carry out this title.

## Section 111—Effective date

This section provides that title I is to apply with respect to an incident occurring after the date of the enactment of the Act. However, payments from the fund may not be made before the commencement date for the collection of taxes for deposit into the fund (as such term is defined in section 4611(f)(2) of the Internal Revenue Code of 1986).

39

TITLE II—PREVENTION AND RESPONSE

*Section 201—Authority to direct responses*

This section provides that in the event of a discharge of oil or the substantial threat of discharge of oil into or upon navigable waters or adjoining shorelines or the waters of the exclusive economic zone, the Secretary or the Administrator of the Environmental Protection Agency, as determined by the President, shall assume the direction of all Federal, state, and private activities regarding the containment, cleanup, removal, and other responses to the discharge or threat of discharge. This section is intended to resolve questions concerning the authority of the Secretary or the Administrator to take charge of the response activities following the discharge or threat of discharge of oil. The Secretary or the Administrator has clear authority to assume the direction of all cleanup activities. The extent of the direction of cleanup efforts by the Secretary or the Administrator will depend on the circumstances of the spill, including its size, potential for causing damages, and the types of actions which are necessary to respond to the spill. For example, in the case of smaller spills, which do not present difficult cleanup problems, the immediate physical presence of Federal officials may not be required in order to adequately direct the cleanup activities.

This section also provides that the assumption of such direction of activities does not affect the assessment of liability under the Act or the authority of the President under section 311(c)(1) of the Federal Water Pollution Control Act relating to the removal of discharged oil. The Committee emphasizes that a responsible party's liability attaches at the time of the incident and the liability continues during cleanup activities, including activities at the direction of the Secretary or the Administrator. Defenses available to a responsible party are limited to those specifically enumerated in the bill. This section also is not intended to affect any duty upon a spiller of oil to respond to a spill in the first instance and to minimize damages from the spill.

*Section 202—Response plans*

This section requires the Secretary or the Administrator of EPA, as appropriate to designate those areas for which plans for responding to discharges and threatened discharges of oil are required to be prepared, the persons who are required to prepare such plans, and the persons who are required to pay for the preparation of the plans. The designation is to be made within 180 days, and is to be made in consultation with concerned state officials

The criteria for determining the areas are as follows: the likelihood of a discharge or threatened discharge of oil; the likelihood of significant adverse effects resulting from discharges or threatened discharges; the amount and type of oil handled, stored, or processed; the presence of natural resources in the area which are likely to be damaged by a discharge of oil and the value, uniqueness, and susceptibility of such resources to damage; and, the geographic, topographic, weather, and other conditions which might influence frequency, severity, and effects of oil discharges and responses thereto.

Once an area has been designated, the persons designated to prepare the plan must do so and submit in writing, to the Secretary or the Administrator, as appropriate, for approval a plan for responding to discharges and threatened discharges of oil in the area. These plans must be reviewed on a periodic basis. Each plan is to include a description of the general area in which response actions will be required, responsibilities of responsible parties, governments, and others in responding to discharges, and other matters as the Secretary or the Administrator may require. Concerned States and local governments are to be consulted in the preparation of the plans because they are familiar with the area and situation covered by the plan. The Secretary or the Administrator may provide technical assistance in the preparation of a response plan.

The purpose of the section is to provide broad flexibility in the formulation of plans to respond to potential oil spills in various areas of the country which, because of the factors mentioned in the section, lend themselves to response plans involving more than just the vessel or facility from which a spill or the threat of a spill emanates. One example would be an area in which a port or ports and unloading and loading facilities are located in the same general vicinity and would be in a position to respond to a spill from a vessel or facility in that area. The plan could include cooperative agreements for assistance on a reciprocal or reimbursable basis, the sharing of expenses for the shortage and maintenance in the area of response equipment, the training of personnel for response activities, and the like. State and local governments should also be participants in the plans. Whether or not existing contingency plans need to be changed will depend on the circumstances of each case. Plans relating to vessels and facilities may lend themselves to incorporation in new plans or may need to be only supplemented by new plans. The determining factor will be what is necessary to achieve a plan which makes the best use of resources which can be brought to bear on a spill or threat of a spill. The section provides the President with the authority and responsibility to evaluate the adequacy of existing plans and to take whatever steps are determined necessary to improve response capabilities.

The Committee recognizes that there is in place a system for reviewing local hazardous materials contingency plans at the State level by State Emergency Response Commissions (SERCs). These plans are prepared by Local Emergency Planning Committees (LEPCs) and are not limited just to hazardous chemicals, but can address oil and petroleum products. This system was established under the Emergency Planning and Community Right-to-Know Act of 1986. Any review/approval process specifically for oil spill contingency plans should be closely coordinated with the SERC/LEPC organization.

Expenses which are incurred by the Secretary or the Administrator in carrying out this section are to be paid for out of the fund.

*Section 203—Review and revision of response capability*

This section requires the Secretary or the Administrator of EPA to conduct an evaluation of the status and effectiveness of personnel and equipment responding to discharges of oil or threats of discharges of oil not later than six months after the date of enact-

41

ment. The evaluation is to determine, on a regional basis, whether existing personnel and equipment are sufficient for responding to a discharge in an effective and timely manner in the general regions of Alaska, the Pacific Northwest, California, the Gulf of Mexico, the Great Lakes, the North Atlantic, the South Atlantic, Hawaii, and inland waters of the United States. A report on the findings and respective evaluations is to be submitted within one year of enactment.

This section also requires that within one year of enactment the Secretary or the Administrator of EPA, as appropriate, is to revise the national contingency plan to require oil response personnel to be subjected to training approved by the Secretary or the Administrator and periodic drills, without prior notice, to demonstrate the continued effectiveness and readiness of oil response teams.

This section further requires that within six months after the submission of the report by the Secretary or the Administrator of EPA, they shall issue regulations requiring inspection of equipment for responding to discharges of oil and the threats of discharges of oil. Certification of the equipment must be made not less than once every three years to ensure that the equipment is maintained in working condition.

This section also requires that within six months of the report evaluating response personnel and equipment, the Secretary or the Administrator of EPA, as appropriate, must issue regulations requiring owners and operators of vessels and facilities to take such action as may be necessary to ensure that sufficient personnel and equipment are available, on a regional and collective basis, for responding to discharges of oil and threats of discharges of oil. If the owners and operators of vessels and facilities do not take all action required by the Secretary or the Administrator, the Secretary or the Administrator must take such action as is necessary to ensure the presence of sufficient personnel and equipment.

All expenses incurred by the Secretary and the Administrator of EPA in carrying out this section are to be paid from the fund.

*Section 204—Computer listing of emergency response resources and availability of agency data*

Section 204 requires the National Response Center, within one year after the date of enactment and in consultation with State officials, to establish, maintain, and annually revise a comprehensive nationwide computer listing of emergency response resources which are available to and are appropriate for use in responding to discharges and substantial threats of discharges of oil. This listing is to include a continually updated description of all government and private emergency response resources, a nationwide listing of persons having emergency response resources available for sale or lease, and a listing of the names, telephone numbers, and areas of expertise of persons who are experts in responding to discharges or threats of discharges of oil and their effects. The National Response Center is to provide continuous access to the information contained in the listing to response teams, on-scene coordinators, and all State and local government officials responsible for directing response to discharges and substantial threats of discharges of oil.

The head of each Federal agency having a representative on the National Response Team is to ensure the ready accessibility to all relevant data in the possession of each agency, other than classified data, regarding the geographic, oceanographic, hydrologic, natural resource, and meteorological characteristics of the navigable waters or adjoining shorelines and the waters of the exclusive economic zone for which the National Contingency Plan is applicable.

Finally, this section requires the President to take such actions as may be necessary to encourage appropriate international organizations to establish an international inventory of emergency response resources. The March 24, 1989 spill in Alaska demonstrated that international cooperation may be necessary in responding to very large spills.

*Section 205—Vessel traffic systems*

This section requires the Secretary to make a survey of areas of navigable waters to determine the need for new, expanded, or improved vessel traffic systems. Based on the results of the survey, the Secretary is to establish, in order of priority, those areas of navigable waters which are in need of new, expanded, or improved vessel traffic systems. Factors to be included in the determination of priority include the nature, volume, and frequency of vessel traffic in the area and the risks of collisions, spills, and damages associated with such traffic which could be reduced or eliminated by installation, expansion, or improvement of a vessel traffic system. The priority list is to be submitted to Congress within one year after enactment.

The Secretary is authorized to acquire, install, and operate such equipment in vessel traffic systems as necessary for making improvements and expansions contained on the priority list. The Secretary is also authorized to make participation in vessel traffic systems operated by the Secretary mandatory for such vessels as the Secretary deems appropriate.

To finance the additional cost of these vessel traffic systems, the Secretary is directed to establish and collect from users of the vessel traffic systems such fees as the Secretary determines are necessary. The fees must be established in accordance with section 9701 of title 31 of the United States Code, which requires fees to accurately reflect costs to the government. These fees collected by the Secretary are to be credited and available to the Secretary, without fiscal year limitation. This section shall not be construed as altering or expanding the duties and liabilities of the United States for the performance or functions of services for which fees are collected, and the collection of the fees does not constitute an express or implied undertaking by the United States government to perform any service or activity in a certain manner.

This section also requires the Secretary to conduct a study of whether the Secretary should be given additional authority to direct the movement of vessels upon navigable waters and whether such authority should be exercised, and to submit to Congress a report of the results of the study within one year of enactment.

The Committee does not intend this section to supersede the vessel traffic systems provisions contained in the Coast Guard Authorization bill for fiscal year 1990 and the Dire Supplemental Ap-

propriations Bill for fiscal year 1989. This section is a supplement to those provisions.

### Section 206—Navigational aids

This section requires the Secretary to conduct a study to determine areas in which navigation risks are sufficient to require tug escorts of tankers or other navigation aids to improve the safe movement of tankers. The Secretary is to report to the Congress in one year and is authorized to issue such regulations as may be necessary to implement the recommendations contained in the report.

### Section 207—Periodic gauging of plating thickness or commercial vessels

This section requires the Secretary to issue regulations, within one year of enactment, establishing minimum standards for the plating thickness of vessels transporting oil in bulk or commercial quantities, and requiring periodic gauging of the plating thickness of all vessels over thirty years old which are used to transport such oil.

The Committee notes the U.S. Coast Guard has not been able to inspect every vessel that enters certain harbors. In particular, the Committee notes that in New York Harbor, the Coast Guard was only able to inspect 58 percent of the foreign tank vessels entering the Harbor in one year recently. Yet of those vessels that were inspected, the Coast Guard found that 5 percent had safety or other defects that constituted a violation or received a letter of warning. It is the Committee's desire that the Coast Guard report to the Congress about its ability to conduct inspections in harbors where it deems such inspections are appropriate, what resources the Coast Guard would need to conduct those inspections and the oil spill prevention and emergency response benefits such inspections would yield.

### Section 208—Overfill and tank level or pressure monitoring devices

This section requires the Secretary, within one year of enactment, to issue regulations establishing minimum standards for devices for warning persons of overfills and tank levels of oil and cargo tanks and devices for monitoring the pressure of oil cargo tanks. Within one year of enactment the Secretary is to issue regulations establishing requirements concerning the use of overfill devices and tank level or pressure monitoring devices.

### Section 209—Tanker personnel

This section requires the Secretary, within one year of enactment, to conduct a study to determine appropriate crew sizes for tankers and qualifications of personnel on such tankers. The Secretary is to report the findings to Congress together with recommendations for implementing the results of the study.

### Section 210—Use of liners

This section requires the Administrator of EPA to conduct a study to determine whether liners should be used as a secondary means of containment at onshore facilities used for the bulk storage of oil and located near navigable waters to prevent leaching of

oil into the ground and to aid in leak detection. The administrator is to report on the study within one year of enactment and is authorized to issue such regulations as may be necessary to implement the recommendations contained in the report.

### Section 211—Modifications to dredges

This section requires the Secretary of the Army to conduct a study to determine the feasibility of making dredges usable in responding to a discharge of oil or threats of discharges of oil. A report to Congress is to be submitted within one year of the date of enactment. During the Alaska oil spill cleanup, the Army Corps of Engineers provided two dredges to assist in oil recovery operations. The Committee believes that there is a need for the Corps to explore the possibility of dredge modifications on a wider scale in order to facilitate future recovery operations.

### Section 212—Tanker free zones

This section requires the Secretary to conduct a study of whether to designate areas of the navigable waters and exclusive economic zone as zones where the movement of tankers should be prohibited or limited. If the Secretary determines that such zones should be designated, the Secretary is to study which areas to designate and what limitation should be placed on tanker traffic. Factors to be considered include existing navigational risk based on geography, weather, and volume of traffic; the potential for danger to natural resources; and, availability of alternative methods for transporting oil, such as deepwater port facilities. The report required under this section is to be submitted within one year of enactment.

### Section 213—Superiority of Federal pilot's licenses

This section requires the Secretary to conduct a study to determine whether licenses issued by the Secretary authorizing persons to serve as pilots of commercial vessels should be legally superior to licenses issued by the States for such purposes, and to report to Congress within one year of the date of enactment on the results of the study. This section is not intended to encourage a decrease in licensing requirements or to reduce licensing qualifications to any type of a lowest common denominator.

### Section 214—Research and development

This section requires the President to establish a program for conducting oil pollution research and development and to designate appropriate Federal agencies to participate in such a program.

The general purposes of the program include (1) development of new or improve methods to contain discharges of oil from vessels or facilities; (2) development of new or improved methods for oil recovery, cleanup, and disposal which are effective and protect the environment; and (3) development of effective models to predict the effects of discharges of oil and the fate of such oil, including the development of baseline data necessary for determining such effects; (4) development of technologies and methods to protect public health and safety from discharges of oil; (5) development of new or improve methods to ensure the health and safety of response personnel; (6) development of adequate worker training standards for

oil discharge response personnel; (7) development of new or improved methods to restore and rehabilitate natural resources damaged by discharges of oil; and, (8) determination of long-term effects of discharges of oil on fish and wildlife.

The program specifically requires the President to direct the Secretary to conduct research on changes in vessel design and construction criteria (such as tank size, vessel size, double hulls, and ballast sides) for the purpose of reducing the likelihood of discharges of oil, and to direct the Secretary and the Administrator of EPA to conduct a joint research and development program for improving technology to prevent discharges of oil and to minimize the size of such discharges. Such a program would include technologies for measuring the ullage of a vessel, preventing discharges from tank vents, preventing discharges during lightering and bunkering operations, and containing discharges on the deck of a vessel.

The Committee believes that research and development efforts with regard to oil spill technology development could be located at research centers which are uniquely located and qualified to conduct research in the various climates and marine environments that exist in various parts of the country.

In designating the Federal agencies participating in this program, the President should consider the program and capabilities of the Army Corps of Engineers. As demonstrated in the Alaska oil spill cleanup and as detailed in Committee hearings, The Corps has considerable expertise in a number of research areas related to oil spills and in the development of procedures to assess and remedy their impacts. For example, the Corps has experience in remote sensing and data management that would be useful in locating and tracking oil spills, oil spill motion and dispersion modeling, and habitat restoration.

The President if required to submit annual reports to Congress on the research and development program and there are authorized to be appropriated from the fund $10 million for each of fiscal years 1991 and 1992, $7.5 million for fiscal year 1993, and $5 million for each of fiscal years 1994 and 1995.

*Section 215—Consideration of alcohol abuse*

Subsection (a) amends chapter 71 of title 46 of the United States Code by adding a new section 7115 to prohibit the Secretary from issuing or renewing a license or certificate of registry for an individual who the Secretary determines is a current or chronic abuser of alcohol or fails to make available to the Secretary certain driving record information. The driving record information which is required to be available is that which would be available in accordance with section 206(b)(4) of the National Driver Registry Act of 1982. This section also authorizes the Secretary to conduct such investigations as are necessary to determine if an individual is a current or chronic abuser of alcohol, if the Secretary receives reliable information that an applicant has been found guilty of an alcohol-related infraction resulting in suspension or revocation of a motor vehicle operator license.

This section also amends section 7302 of title 46 of the United States Code prohibiting the Secretary from issuing or renewing a merchant mariners document for an individual who the Secretary

46

determines is a chronic or current abuser of alcohol or who fails to make available driving record information from the National Driver Register. The Secretary is also authorized to make investigations of the individual as for renewing licenses and certificates of registry. The Secretary is also given authority to determine the period of validity of the merchant mariners document.

Section 7703 of title 46 of the United States Code is amended to permit the Secretary to suspend or revoke a license, certificate of registry, or merchant mariner's document of an individual if the Secretary determines the individual is a current or chronic abuser of alcohol or the individual fails to make available driving record information from the National Driver Registry. The Secretary is authorized to conduct investigations to determine the validity of information on the current or chronic abuse of alcohol. Such a suspension may not be terminated until the individual provides sufficient proof that the individual is no longer a current or chronic abuser of alcohol.

This section also amends section 8101 of title 46, the United States Code, to provide that if the chief mate or equivalent and the next senior crew member on board a vessel determine that reasonable cause exists to believe that the master or individual in command is intoxicated as the result of the use of dangerous drugs or alcohol and is therefore incapable of commanding the vessel, the chief mate shall temporarily relieve the master and temporarily assume command of the vessel and shall immediately enter the details in the vessel log and report such details to the Secretary by the most expeditions means available. The chief mate is also required to report the circumstances in writing to the Secretary within twelve hours after the vessel arrives at its destination.

*Section 216—Access to national driver register*

This section amends the National Driver Register Act of 1982 to provide that any individual who has applied for or received a license or certificate of registry or a merchant mariner's document or has applied for a renewal of such license, certificate, or document, may request the chief driver licensing official of a state to transfer information regarding the individual to the Secretary. The Secretary may receive such information and shall, prior to using such information, make it available to the individual for review and written comment. Information received by the Secretary may not otherwise be used or divulged.

TITLE III—IMPLEMENTATION OF INTERNATIONAL CONVENTIONS

*Section 301—Definitions*

This section contains the definitions for specific terms used in title III so that they will have the same meaning as under the International Conventions which would be implemented by this title.

*Section 302—Applicability of Conventions*

This section provides that in any case in which the International Convention of Civil Liability for Oil Pollution Damage, 1984, and the International Convention on the Establishment of the Interna-

tional Fund for Compensation for Oil Pollution Damage, 1984, are in effect with respect to the United States, liability relating to pollution damage arising from an incident involving a ship shall be determined in accordance with those two conventions. Ratification of those conventions is currently awaiting action in the United States Senate.

### Section 303—Recognition of international fund

This section recognizes the International Oil Pollution Compensation Fund under the laws of the United States as a legal person and the director of the fund is recognized as its legal representative. The Secretary of State is deemed to have been appointed for the service of process in any legal proceedings involving the International Fund within the United States. The fund and its assets are exempt from all direct taxation and payment of customs duties in the United States.

### Section 304—Action in U.S. courts

This section provides that in an action against the owner of a ship or its guarantor under the Civil Liability Convention, the party to the litigation shall serve a copy of the complaint in a subsequent pleading upon the International Fund at the same time the complaint or other pleading is served upon the opposing parties. The International Fund may intervene as a matter of right in any action brought in a court in the United States against the owner of a ship or its guarantor under the Civil Liability Convention.

### Section 305—Contribution to international fund

This section provides that the amount of any contribution to the International Fund which is required to be made under article 10 of the Fund Convention (which outlines contribution requirements for countries which are parties to the fund) by any person with respect to oil received in any port, terminal installation, or other installation located in the United States is to be paid to the International Fund from the Trust Fund established by section 9509 of the Internal Revenue Code of 1986. This section also authorizes the Secretary to require persons required to make contributions under the international agreement to provide all information relating to that oil as may be necessary to determine the appropriate contribution and to fulfill U.S. obligations under the conventions.

### Section 306—Recognition of foreign judgments

This section provides that a final judgment of a court of any country which is a party to the Civil Liability Convention or to the Fund Convention in an action for compensation under either convention shall be recognized by any court of the United States having jurisdiction under this act, when that judgment has become enforceable in that country and is no longer subject to ordinary forms of review except where the judgment was obtained by fraud or the defendant was not given reasonable notice and a fair opportunity to present its case.

### Section 307—Financial Responsibility

This section provides that the owner of a ship documented under the laws of the United States and subject to the Civil Liability Convention is to establish and maintain evidence of financial responsibility as required in article VII of the Civil Liability Convention. These financial responsibility requirements also extend to the owners of a ship which enters or leaves a port or terminal of the United States or uses an Outer Continental Shelf facility or an offshore facility that is or was licensed under the Deep Water Port Act of 1974. Any ship carrying only oil as cargo, fuel, or residue, which has on board a valid certificate issued in accordance with article VII of the Civil Liability Convention shall be considered as having met the requirements of section 107.

The Secretary is authorized to issue any certificate of financial responsibility which the United States may issue under the Civil Liability Convention, and the Secretary must withhold or revoke the clearance required by section 4197 of the Revised Statutes of any ship which does not have a certificate demonstrating compliance with this section. The Secretary is authorized to deny entry to any facility or to any port or place in the United States any ship which does not produce the necessary certificate demonstrating compliance. Any person who fails to comply with the financial responsibility requirements or fails to provide information necessary to comply with the requirements for contribution to the International Fund, or fails to comply with any regulation issue under this title shall be liable to the United States for a civil penalty, not to exceed $25,000 per day of violation.

This section also provides that the United States waives all defenses based on sovereign immunity with respect to any controversy arising under the Civil Liability Convention or the Fund Convention relating to any ship owned by the United States and used for commercial purposes.

### Section 308—Regulations

This section authorizes the Secretary to issue such regulations as may be necessary to carry out this title and all obligations of the United States under the International Convention on Civil Liability for Oil Pollution Damage, 1984, and the Fund Convention.

### TITLE IV—MISCELLANEOUS PROVISIONS

### Section 401—Trans-Alaska pipeline fund

This section amends the liability provisions of the Trans-Alaska Pipeline Authorization Act to reflect that oil spilled into or upon the navigable waters of the United States will be covered by the provisions of the new Oil Pollution, Prevention, Response, Liability, and Compensation Act of 1989. The section restricts the coverage of the Trans-Alaska Pipeline Authorization Act liability provisions to spills in the state of Alaska for spills occurring from the pipeline. It also repeals the liability provisions for spilling of oil into the navigable waters in order to conform with the new liability provisions in the bill. The Trans-Alaska Pipeline Liability Fund is retained for the payment of claims which arise prior to the date of enactment of this Act.

The Trans-Alaska Pipeline Authorization Act established liability for damages from activities along or in the vicinity of the Alaskan pipeline right-of-way and for discharges of oil from vessels loaded at terminals of the Trans-Alaska pipeline. For a discharge from a vessel, strict liability for all claims arising out of any one incident can not exceed $100 million. The owner and operator of the vessel are liable for the first $14 million of allowed claims and the Trans-Alaska Pipeline Liability Fund, which is established by the act, is liable for the remaining claims. The Trans-Alaska Pipeline Fund is financed by a fee of fives cents per barrel of oil collected at the time the oil is loaded onto a vessel. As provided in the Act, the collection of the fee ceased when $100 million had been accumulated in the Fund. No claims have been paid from the Fund and the current balance is approximately $248 million.

There are proposals to rebate the Fund to those entities which have contributed to the Fund and also to deposit the Trans-Alaska Fund into the new oil spill Fund both with and without a credit for previous contributions to the Trans-Alaska Fund. The issue has been raised whether transferring the Trans-Alaska Fund to the new Fund could constitute a taking without just compensation in violation of the Fifth Amendment. This issue has not been resolved. The question of ownership of the Trans-Alaska Fund arises because the Fund, although created in statute, is administered by a government chartered non-profit corporation. There is also a question of whether a credit could satisfy Fifth Amendment requirements if the Trans-Alaska Fund were transferred to the new Fund and the contributors given a credit against tax payments into the Fund.

### Section 402—Intervention of the High Seas Act

This section amends section 17 of the Intervention on the High Seas Act to provide that the Oil Spill Liability Trust Fund is to be available to the Secretary for oil spill response actions taken pursuant to that Act.

### Section 403—Federal Water Pollution Control Act

This section amends section 311 of the Federal Water Pollution Control Act, the section relating to oil spill response, to require the designation, establishment, and maintenance of a strike force consisting of at least four teams of strike force personnel. It also amends the section to provide specific authority to safeguard against oil spills and to conduct research and development into methods and techniques to improve existing technology for responding to oil spills.

The authority of the President to assure abatement of actual or threatened discharges of oil is amended to authorize the issuance of such administrative orders as may be necessary to protect the public health and welfare. This is in addition to existing authority of the Attorney General to secure such relief as may be necessary to abate the threat.

Failure without sufficient cause to comply with an administrative order may result in the Attorney General bringing an action to enforce the order and to assess civil penalties of not more than $25,000 a day for each violation, and to assess three times the re-

50

moval costs or damages incurred by the fund as a result of the failure to comply.

Authority to enforce these new provisions is in the United States district courts. This section also contains several other amendments to the Federal Water Pollution Control Act which are conforming in nature reflecting the enactment of the new oil spill liability law.

Finally, the penalties in section 311 are changed to provide that the penalty for failure to report an oil spill can be punished by a fine in accordance with the applicable provision of title 18 of the United States Code or imprisonment of not more than three years, or five years in the case of a subsequent second conviction, and to increase the penalty for a discharge of oil from $5,000 for each offense to $25,000 for each day of the offense.

### Section 404—Deepwater Port Act

This section contains conforming amendments to the Deepwater Port Act of 1974 to conform with the new requirements contained in this Act. The amounts remaining in the Deepwater Port Liability Fund are transferred to the new Oil Spill Liability Trust Fund and all remaining liabilities are assumed by the new fund.

### Section 405—Outer Continental Shelf Lands Act Amendments of 1978

The section repeals title III of the Outer Continental Shelf Lands Act Amendments of 1978. It also provides that amounts remaining in the Offshore Oil Pollution Compensation Fund are to be deposited into the new Oil Spill Liability Trust Fund and such fund is to assume all liability incurred by the Offshore Oil Pollution Compensation Fund.

### Section 406—Qualified authorizing legislation

This section provides that this Act is to be considered as qualified authorizing legislation for purposes of section 4611(f)(2)(B) of the Internal Revenue Code of 1986 so that taxes on crude oil which will constitute the Oil Spill Liability Trust Fund can begin to be collected.

### Section 407—Effective date

This section provides that sections 401, 402, 403 (other than subsection (j)), 404, and 405 are to be effective on the commencement date (as such term is defined in section 4611(f)(2) of the Internal Revenue Code of 1986) that is the date on which taxes are begun to be collected to finance the new Oil Spill Liability Trust Fund.

### COMPLIANCE WITH CLAUSE 2(l) OF RULE XI OF THE RULES OF THE HOUSE OF REPRESENTATIVES

(1) With reference to clause 2(l)(3)(A) of rule XI of the Rules of the House of Representatives, the Subcommittee on Investigations and Oversight did hold hearings on National Oil Spill Contingency Planning and Response Capabilities on May 10, 1989, but findings or recommendations have not been made. The Subcommittee on

Water Resources did hold a hearing on June 28, 1989, on the subject matter of this legislation.

(2) With reference to clause 2(l)(3)(B) of rule XI of the Rules of the House of Representatives, H.R. 1465, as reported, does not provide new budget authority or increase tax expenditures, accordingly, a statement pursuant to section 308(a) of the Congressional Budget Act is not required.

(3) With reference to clause 2(l)(3)(C) of rule XI of the Rules of the House of Representatives, the Committee has received the report on H.R. 1465 prepared by the Congressional Budget Office under section 403 of the Congressional Budget Act. The Report is as follows:

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, September 14, 1989.*

Hon. GLENN M. ANDERSON,
*Chairman, Committee on Public Works and Transportation,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has prepared the attached cost estimate for H.R. 1465, the Oil Pollution Prevention, Response, Liability and Compensation Act of 1989.

If you wish further details on this estimate, we will be pleased to provide them.

Sincerely,

ROBERT D. REISCHAUER,
*Director.*

CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

1. Bill number: H.R. 1465.

2. Bill title: Oil Pollution Prevention, Response, Liability and Compensation Act of 1989.

3. Bill status: As amended and ordered reported by the House Committee on Public Works and Transportation on August 3, 1989.

4. Bill purpose: H.R. 1465 would consolidate federal oil pollution response activities into one entity, the Oil Spill Liability Trust Fund (OSLTF), which would provide for the cleanup, restoration of natural resources and compensation of economic loss from oil spills that threaten U.S. resources or occur on or near U.S. navigable waters. Monies in the OSLTF would also be available for administrative, operating and oversight expenses, including start-up and ongoing costs incurred by the U.S. Coast Guard (USCG) and other federal agencies to implement titles II and IV of this bill. Annual contributions to the International Fund (should the International Fund Convention be ratified by the United States) would also be paid from the OSLTF.

Title II of the bill would provide for enhancements and revisions in federal and private emergency preparedness efforts. The bill would require the USCG to implement the title's requirements through the promulgation of regulations and the completion of several studies. In addition, the title would require the President to establish an oil pollution research and development program. For this purpose, the bill would authorize appropriations from the

OSLTF of $10 million for each of fiscal years 1991 and 1992, $7.5 million for 1993, and $5 million a year for 1994 and 1995.

Under Title IV, the four existing oil pollution funds and compensation program would be terminated approximately 30 days after enactment of this bill. As of that date, unexpected balances in the U.S. Coast Guard's Pollution Fund (known as the "311k fund") would be transferred to the general fund of the U.S. Treasury, while expended balances of the Deepwater Port Liability (DWPF) and Offshore Oil Compensation (OOCF) funds would be credited to the OSLTF.

5. Estimated cost to the Federal Government: The OSLTF was created by Public Law 99–509, the Omnibus Reconciliation Act of 1986, which also contained amendments to the Internal Revenue Code (concerning related taxes) that would have taken effect only if suitable authorizing legislation had been enacted by September 1, 1987. The Technical and Miscellaneous Revenue Act of 1988 extended this deadline to December 31, 1990. As stated in Section 406 of the bill, H.R. 1465 is such authorizing legislation, and its enactment would therefore trigger the imposition of a 1.3 cent per-barrel tax on all crude oil received by U.S. refineries and on imported petroleum producers. Consequently, the budgetary impact of H.R. 1465 includes both revenue and spending effects, as shown in the following table.

[By fiscal year, in millions of dollars]

| | 1990 | 1991 | 1992 | 1993 | 1994 |
|---|---|---|---|---|---|
| Estimated Revenue Effects: | | | | | |
| Tax of 1.3 cents per barrel of oil— | | | | | |
| Revenue gain credited to the trust fund | 16 | 36 | 13 | | |
| Revenue gain, net of income and payroll tax offsets | 12 | 27 | 10 | | |
| Estimated Spending Effects: | | | | | |
| Estimated authorization level | 30 | 31 | 32 | 30 | 28 |
| Estimated outlays | 25 | 25 | 30 | 31 | 30 |
| Net Increase or Decrease (−) in the Deficit[1] | 13 | −2 | 20 | 31 | 30 |

[1] Outlays less net revenue gain.

The above table does not include federal outlays that may result, in the event of an oil spill, from the new coverage for third-party economic losses, because there is no basis for projecting such costs.

The costs of this bill fall within budget functions 300 and 400.

Basis of estimate: According to the provisions of Public Law 99–509, the creation of the OSLTF and the 1.3 cent-per barrel tax would become effective on the first day of the first calendar month beginning more than 30 days after enactment of such legislation (referred to as the "commencement date"). For the purposes of this estimate, CBO has assumed that H.R. 1465 will be enacted by the end of October, 1989, resulting in a commencement date for the OSLTF financing tax and expenditures from the OSLFT of December 1, 1989. As of this date, the estimated balance in the OSLTF (consisting of amounts transferred from the DWPF and OOCF) would be about $155 million. These transfers to the new fund and the transfer of 311k fund balances to the general fund would be in-

tragovernmental transactions having no net impact on the federal budget.

Revenue effects. The revenue estimates shown in the above table were prepared by the Joint Committee on Taxation (JCT). As shown in the first line of the table, the tax of 1.3 cents per barrel of oil would yield an estimated $65 million in revenues for the trust fund over the 1990–1992 period. These amounts included estimated credits that taxpayers may take against the OSLTF financing tax for amounts paid before January 1987 into the OOCF and the DWPF (plus interest on these funds). The net revenue gain to the government, including income and payroll tax offsets, is estimated to be $49 million over three years (as shown in the second line of the table). The OSLTF financing tax would be in effect from the assumed commencement date of December 1, 1989 through December 31, 1991. The tax would expire sooner if cumulative tax collections credited to the trust fund exceed $300 million. The JCT estimates that collections credited to the trust fund between December 1, 1989 and December 31, 1991 would be about $65 million.

Spending effects. The authorization level and outlays shown in the table reflect additional operating and administrative costs that would be incurred as a result of this bill's enactment, assuming appropriation of the necessary sums. These include nonrecurring start-up costs as well as additional ongoing expenses associated with the administration of a greatly expanded compensation system and the maintenance of two additional response teams under the National Contingency Plan. Also included are interim costs associated with the revision of liability regulations and financial responsibility certificates. Research and development costs have been included at the authorized level ($37.5 million over the 1991–1995 period).

Variable cleanup and oversight costs under the new bill are expected to be similar to those now incurred by the Coast Guard. Such costs are difficult to estimate because significant oil spills are rare and unpredictable. While thousands of spills may occur in any year, their total costs, including claims, would most often not be high enough to exceed the bill's specified liability limits.

At present, the vast majority of spills under the jurisdiction of the Coast Guard are cleaned up by the responsible party and require only federal oversight. For example, no spills occurring at offshore production or port facilities have required any federal expenditure at all. About 90 percent of oil spills that fall under the jurisdiction of the Federal Water Pollution Control Act (which created the 311k fund) are cleaned up by the responsible party and require only Coast Guard oversight activities at the spill site to be funded by the federal government. Federal cleanup and oversight expenditures under H.R. 1465 would be about the same as under current law. In absence of any large spills, such costs would be expected to approximate the baseline level of about $7 million annually (at 1989 price levels), of which about half would be recovered from responsible parties within two years of the spill. Because such spending would not represent any net increase in federal outlays, no amounts have been included in this estimate.

H.R. 1465 also would permit claims for third-party economic losses to be paid from the fund when responsible parties cannot be

located or do not pay or when claims exceed liability limits. Outlays for such damages are impossible to estimate because they depend on a number of unpredictable factors such as the number and size of spills as well as the particular circumstances surrounding each incident (for example, the proximity to land or fishing grounds). Even if it were possible to assess the probability of spill occurrence near high-risk areas, it would be impossible to predict the behavior of responsible parties or claimants, which is likely to be the most important determinant of claim costs.

If catastrophic spills occur, payments from the fund would be capped at $1 billion per incident. However, because claims against the OSLTF would be subject to the availability of funds, actual federal outlays probably would be much less. Under the provisions of Public Law 99–499, federal liability is limited at all times to the OSLTF balance, which may be augmented by up to a total of $500 million in repayble advances from the Treasury. Assuming that the fund is used for all of the purposes authorized in Section 103, CBO estimates that less than $150 million would be available in the OSLTF at any time to finance a major spill. Therefore, even with advances at the maximum authorized level, total fund expenditures for a major spill could not exceed $650 million. Given the financing levels provided in Public Law 99–499, the fund would be unable to repay advances of any significant amount.

Finally, H.R. 1465 would provide that, if and when the International Convention on Civil Liability for Oil Pollution Damage, 1984, and the International Convention on the Establishment of an International Fund for Compensation for Oil Pollution Damage conventions are ratified by the United States, annual contributions to the International Fund due from U.S. interests would be paid from the OSLTF. Annual contributions would depend on actual spill experience and cannot be estimated precisely. However, based on past USCG analyses, CBO estimates that the U.S. annual contribution would be about $10 million a year by 1993, if the International Convention is ratified by that time.

6. Estimated cost to State and local governments: None.

7. Estimate comparison: None.

8. Previous CBO estimate: On September 12, 1989, the Congressional Budget Office transmitted a cost estimate for H.R. 3027, the Oil Pollution Prevention, Response, Liability and Compensation Act of 1989, as ordered reported by the House Committee on Public Works and Transportation on August 3, 1989. The CBO cost estimate for H.R. 1465 is identical to that estimate for H.R. 3027.

9. Estimate prepared by: Deborah Reis and Eric Nicholson.

10. Estimate approved by: James L. Blum, Assistant Director for Budget Analysis.

(4) With reference to clause 2(l)(3)(D) of rule XI of the Rules of the House of Representatives, the Committee does not have oversight findings and recommendations from the Committee on Government Operations on H.R. 1465.

## Cost of Legislation

Clause 7(a) of rule XIII of the Rules of the House of Representatives requires a statement of the estimated costs of the United

55

States which would be incurred in carrying out H.R. 1465 as reported, in fiscal year 1989, and each of the following five years. However, under paragraph (d) of Clause VII, its provisions do not apply when the Committee has received a timely report from the Congressional Budget Office.

## COMMITTEE ACTION AND VOTE

The Committee, in compliance with rule XI(2)(l)(2)(A) of the Rules of the House of Representatives, reports favorably the bill, H.R. 1465, as amended. The Committee ordered the bill reported by voice vote.

## ADDITIONAL VIEWS OF HON. DOUGLAS APPLEGATE

The passage of a strong oil spill liability is vital if we hope to protect our natural resources and guarantee the safe transportation of oil products. I believe that the premise of this legislation will achieve these goals. I am pleased that this Committee has worked diligently to produce a piece of legislation which will provide greater assurances that shipments of oil products are moved on our waters in the safest methods available. The Committee's bill addresses almost every possible concern, including the structure of the vessels, the training of the personnel, the establishment of a trust fund, and increase penalties for violators. While I strongly endorse this bill, I do believe that without alterations in the tax code, the penalties and intent of the legislation may be lost.

Currently, when an oil company is involved in the spilling of oil into our nation's water, the structure of our tax code actually rewards them for the cost of clean-up and environmental restoration. This is the case in any accident, be it the result of negligence or an act of God. Oil Companies may incur costs for economic harm or environmental damage, but, these costs are then written off as a cost of doing business and their overall tax liability is reduced. As a result, the American taxpayer must foot the bill for the loss of natural resources and for the overall cost of clean-up. This is simply an outrage.

I have introduced legislation that would prohibit oil companies from including the cost of any clean-up into the cost of doing business. The costs of a clean-up should be paid by the company and the stockholders, not the American taxpayer. Perhaps if our tax structure was revised, and the cost of clean-up no longer reduced their tax liability companies would be more diligent in guaranteeing the safe transportation and storage of oil products. If the legislation that I have introduced was enacted oil companies would be put on notice that all fines, clean-up costs and economic compensation, for acts of negligence, would come from their profits and dividends, not the American tax payer. I urge the Ways & Means Committee to seriously review this current policy of forcing the American tax payer to pay for the mistakes of large oil companies. Any effective oil spill liability legislation must include revisions in our tax structure.

DOUGLAS APPLEGATE.

## ADDITIONAL VIEWS OF HON. BENJAMIN L. CARDIN TO H.R. 1465

I am a strong supporter of the oil spill liability, compensation, prevention, and response legislation crafted by the Public Works and Transportation Committee. The Committee's leadership deserves special commendation for taking a comprehensive approach to the problems so sadly highlighted by the disastrous spill in Alaska this spring. In one significant area, however, I believe the Committee's action will interfere with the opportunity for efficient and comprehensive responses to similar tragedies in the future.

Following discussions with a wide range of interested parties prior to the Committee's mark-up, I was prepared to offer an amendment, based on the Administration's proposal to Congress, that would have eliminated the unnecessary preemption of states' rights from the bill. This is a contentious issue that has not been taken up by the Public Works and Transportation Committee in years. Indeed, it has blocked passage of comprehensive federal oil spill legislation for at least fourteen years.

My proposal would allow for application of state liability laws and establishment of oil spill funds for purposes states deem necessary. After watching the inept early response of the oil industry and federal government to the disastrous spill in Alaska, how can we now turn over all responsibilities for future spills to the same industry and federal agencies while denying state officials the full right to respond? The Clean Water Act does not preempt; Superfund does not preempt; and federal oil pollution laws—including those governing the OCS, the Trans-Alaskan pipeline, and deepwater ports—do not preempt; what is the unique justification in this case?

There is no overriding public need to deny states and local communities, fishermen, beachfront property owners, and water dependent businesses the right to provide for their own protection; the right to establish higher standards; the right to account for local priorities and needs. Connecticut, Florida, Maine, Maryland, New Hampshire, New Jersey, New York, North Carolina, Texas, Virginia, and Washington all have substantial funds in place. There is no overriding public need to curtail their efforts. My language has the support of virtually every coastal state government, and environmental and fishing groups. In fact, on August 1, 1989, in Chicago, the National Governors Association went even further—opposing any preemption whatsoever, even that necessary to implement international oil pollution protocols.

I am concerned that the legislation the committee has reported to the House does not adequately address these crucial issues. I did not offer my amendment on this issue, in order to permit the bill to progress toward floor action. My action was based upon a commitment of committee support for the opportunity to offer my

58

amendments on the floor when the bill is considered by the Rules Committee. I look forward to that opportunity on the floor and the support of many of my committee colleagues.

BEN CARDIN.

Changes in Existing Law Made by the Bill, as Reported

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

# TITLE 46, UNITED STATES CODE

\* \* \* \* \* \* \*

# Subtitle II—Vessels and Seamen

\* \* \* \* \* \* \*

## PART E—MERCHANT SEAMEN LICENSES, CERTIFICATES, AND DOCUMENTS

### CHAPTER 71—LICENSES AND CERTIFICATES OF REGISTRY

7107.   Issuing and classifying licenses and certificates of registry.

\* \* \* \* \* \* \*

*7115.   Consideration of alcohol abuse in issuing and renewing licenses and certificates of registry.*

\* \* \* \* \* \* \*

## PART E—MERCHANT SEAMEN LICENSES, CERTIFICATES, AND DOCUMENTS

### CHAPTER 71—LICENSES AND CERTIFICATES OF REGISTRY

Sec.
7101.   Issuing and classifying licenses and certificates of registry.

\* \* \* \* \* \* \*

*7115.   Consideration of alcohol abuse in issuing and renewing licenses and certificates of registry.*

\* \* \* \* \* \* \*

### § 7107. Duration of certificates of registry

[A certificate of registry issued under this part is not limited in duration.] *The Secretary shall determine the term of validity of a certificate of registry. Such a certificate may be renewed under regulations issued by the Secretary.* However, the validity of a certificate issued to a medical doctor or professional nurse is conditioned

60

on the continuous possession by the holder of a license as a medical doctor or registered nurse, respectively, issued by a State.

\*       \*       \*       \*       \*       \*       \*

### § 7115. Consideration of alcohol abuse in issuing and renewing licenses and certificates of registry

(a) *Limitation on Issuance of Licenses and Certificates.*—The Secretary may not issue or renew a license or certificate of registry under this chapter for any individual who—

(1) the Secretary determines is a current or chronic abuser of alcohol; or

(2) fails to make available to the Secretary the information referred to in subsection (b).

(b) DRIVING RECORD INFORMATION.—The Secretary shall require each individual applying for issuance or renewal of a license or certificate of registry under this chapter to make available to the Secretary, in accordance with section 206(b)(4) of the National Driver Register Act of 1982 (23 U.S.C. 401 note), all information contained in the National Driver Register regarding the motor vehicle driving record of such individual.

(c) INVESTIGATIONS.—Upon receiving reliable information that an individual applying for issuance or renewal of a license or certificate of registry under this chapter has been found guilty of alcohol-related infraction resulting in suspension or revocation of a motor vehicle operator license issued to the individual, the Secretary may conduct such investigation as are necessary to determine if the individual is a current or chronic abuser of alcohol.

## CHAPTER 73—MERCHANT MARINERS' DOCUMENTS

\*       \*       \*       \*       \*       \*       \*

### § 7302. Issuing merchant mariners' documents and continuous discharge books

(a) \* \* \*

\*       \*       \*       \*       \*       \*       \*

(c) LIMITATION ON ISSUANCE OF DOCUMENTS.—The Secretary may not issue or renew a merchant mariner's document under this chapter for any individual who—

(1) the Secretary determines is a current or chronic abuser of alcohol; or

(2) fails to make available to the Secretaary the information referred to in subsection (d).

(d) DRIVING RECORD INFORMATION.—The Secretary may require each individual applying for issuance or renewal of a merchant mariner's document under this chapter to make available to the Secretary, in accordance with section 206(b)(4) of the National Driver Register Act of 1982 (23 U.S.C. 401 note), all information contained in the National Driver Register regarding the motor vehicle driving record of such individual.

(e) INVESTIGATIONS.—Upon receiving reliable information that an individual applying for issuance or renewal of a merchant mariner's document under this chapter has been found guilty of an alco-

61

hol-related infraction resulting in suspension or revocation of a
motor vehicle operator license issued to the individual, the Secretary
may conduct such investigations are necessary to determine if the
individual is a current or chronic abuser of alcohol.

(f) PERIOD OF VALIDITY.—The Secretary shall determine the term
of validity of a merchant mariner's document. Such documents may
be renewed under regulation issued by the Secretary.

\*        \*        \*        \*        \*        \*        \*

## CHAPTER 77—SUSPENSION AND REVOCATION

\*        \*        \*        \*        \*        \*        \*

### §§ 7703. Bases for suspension or revocation

(a) A license, certificate of registry, or merchant mariner's docu-
ment issued by the Secretary may be suspended or revoked if,
when acting under the authority of that license, certificate, or doc-
ument the holder—

> (1) has violated or failed to comply with this subtitle, a regu-
> lation prescribed under this subtitle, or any other law or regu-
> lation intended to promote marine safety or to protect naviga-
> ble waters.
>
> (2) has committed an act or incompetence, misconduct, or
> negligence.

(b) SUSPENSIONS FOR ALCOHOL ABUSE.—

> (1) IN GENERAL.—The Secretary may suspend or revoke a li-
> cense, certificate of registry, or merchant mariner's document
> issued by the Secretary to an individual if—
>
>> (A) the Secretary determines the individual is a current
>> or chronic abuser of alcohol; or
>>
>> (B) the individual fails to make available to the Secre-
>> tary the information referred to in paragraph (3).
>
> Any determination of the Secretary to suspend or revoke the li-
> cense, certificate of registry, or merchant mariner's document of
> an individual under this paragraph shall be based on the sever-
> ity of abuse of alcohol by the individual and the length of time
> necessary to control that abuse.
>
> (2) INVESTIGATIONS.—The Secretary may conduct such investi-
> gations as are necessary to determine if an individual who
> holds a license, certificate of registry, or merchant mariner's
> document issued by the Secretary is a current or chronic abuser
> of alcohol if the Secretary receives reliable information—
>
>> (A) regarding any alcohol-related misconduct of the indi-
>> vidual; or
>>
>> (B) pursuant to paragraph (3) that the individual has
>> been found guilty of an alcohol-related infraction resulting
>> in suspension or revocation of a motor vehicle operator li-
>> cense issued to the individual.
>
> (3) DRIVING RECORD INFORMATION.—The Secretary may re-
> quest an individual who holds a license, certificate of registry,
> or merchant mariner's document issued by the Secretary to
> make available to the Secretary, in accordance with section
> 206(b)(4) of the National Driver Register Act of 1982 (23 U.S.C.
> 401 note), all information contained in the National Driver

62

*Register regarding the motor vehicle driving record of such individual.*

*(4) LIMITATION ON SUSPENSION TERMINATIONS.—The Secretary may not terminate a suspension of a license, certificate of registry, or merchant mariner's document of an individual under paragraph (1)(A) until the individual provides sufficient proof that the individual is no longer a current or chronic abuser of alcohol.*

\*     \*     \*     \*     \*     \*     \*

# PART F—MANNING OF VESSELS

## CHAPTER 81—GENERAL

\*     \*     \*     \*     \*     \*     \*

### § 8101. Complement of inspected vessels

(a) * * *

\*     \*     \*     \*     \*     \*     \*

*(i) RELIEF OF MASTER.—If the chief mate or equivalent and the next senior crewmember on board a vessel determine that reasonable cause exists to believe that the master or individual in command is intoxicated as a result of the use of dangerous drugs (as defined in section 7704) or alcohol and is therefore incapable of commanding the vessel, the chief mate shall temporarily relieve the master and temporarily assume command of the vessel and shall immediately enter the details in the vessel log and report such details to the Secretary by the most expeditious means available. The chief mate shall also report the circumstances in writing to the Secretary within 12 hours after the vessel arrives at its destination.*

\*     \*     \*     \*     \*     \*     \*

———————

THE NATIONAL DRIVER REGISTER ACT OF 1982

TITLE II—NATIONAL DRIVER REGISTER

\*     \*     \*     \*     \*     \*     \*

ACCESSIBILITY OF REGISTER INFORMATION

SEC. 206. (a)(1) * * *

(b)(1) The Chairman of the National Transportation Safety Board and the Administrator of the Federal Highway Administration, for purposes of requesting information regarding any individual who is the subject of any accident investigation conducted by the Board or Bureau of Motor Carrier Safety, may request the chief driver licensing official of a State to obtain information under subsection (a) of this section regarding such individual. The Chairman and Administrator may receive any such information.

(2) Any individual who is employed as a driver of a motor vehicle or who seeks employment as a driver of a motor vehicle may request the chief driver licensing official of the State in which the individual is employed or seeks employment to transmit informa-

63

tion under subsection (a) of this section to his employer or prospective employer. An employer or prospective employer may receive such information regarding any such individual, and shall make that information available to the affected individual. There shall be no access to information in the Register under this paragraph if such information was entered in the Register more than three years before the date of such request.

(3) Any individual who has applied for or received an airman's certificate may request the chief driver licensing official of a State to transmit information regarding the individual under subsection (a) of this section to the Administrator of the Federal Aviation Administration. The Administrator of the Federal Aviation Administration may receive such information and shall make such information available to the individual for review and written comment. The Administrator shall not otherwise divulge or use such information, except to verify information required to be reported to the Administrator by an airman applying for an airman medical certificate and to evaluate whether the airman meets the minimum standards as prescribed by the Administrator to be issued an airman medical certificate. There shall be no access to information in the Register under this paragraph if such information was entered in the Register more than 3 years before the date of such request, unless such information relates to revocations or suspensions which are still in effect on the date of the request. Information submitted to the Register by States under the Act of July 14, 1960 (74 Stat. 526), or under this Act shall be subject to access for the purpose of this paragraph during the transition to the Register established under section 203(a) of this Act.

[(5)] (4) Any individual who is employed by a railroad as an operator of a locomotive, or who seeks employment with a railroad as an operator of a locomotive, may request the chief driver licensing official of a State to transmit information regarding the individual under subsection (a) of this section to his or her employer or prospective employer, or to the Secretary. There shall be no access to information in the Register under this paragraph which was entered in the Register more than three years before the date of such request, unless such information relates to revocations or suspensions that are still in effect on the date of the request. Information submitted to the Register by the States under Public Law 86–660 (74 Stat. 526) or under this title shall be subject to access for the purpose of this paragraph during the transition described under section 203(c) of this title.

(5) SEAMAN CERTIFICATES.—Any individual who has applied for or received a license or certificate of registry in accordance with section 7101 of title 46, United States Code, or a merchant mariner's document in accordance with section 7302 of title 46, United States Code, or has applied for a renewal of such license, certificate of registry, or document, may request the chief driver licensing official of a State to transmit information regarding the individual under subsection (a) to the Secretary. The Secretary may receive such information and shall, prior to using such information in any adverse action regarding the individual's license, certificate of registry, or document, make such information available to the individual for review and written comment. The Secretary may not other-

64

wise divulge or use such information, except in accordance with section 7115, 7302, or 7703 of title 46, United States Code. There shall be no access to information in the Register under this paragraph if such information was entered in the Register more than 5 years before the date of such request, unless such information relates to revocations or suspensions which are still in effect on the date of the request. Information submitted to the Register by States under the Act of July 14, 1960 (74 Stat. 526), or under this Act shall be subject to access for the purpose of this paragraph during the transition to the Register established under section 203(a) of this Act.

[(4)] *(6)* Any individual, in order (A) to determine whether the Register is providing any data regarding him or the accuracy of any such data; or (B) to obtain a certified copy of data provided through the Register regarding him, may request the chief driver licensing official of a State to obtain information regarding him under subsection (a) of this section.

[(5)] *(7)* Any request made under this subsection shall be made in such form, and according to such procedures, as the Secretary shall establish by regulation.

\*    \*    \*    \*    \*    \*    \*

### CRIMINAL PENALTIES

Sec. 208. (a) Any person, other than an individual described in section 206(b) [(5)] *(6)* of this title, who receives under section 206 of this title information specified in section 205(b) (1) or (3) of this title (the disclosure of which is not authorized by section 206 of this title), and who, knowing that disclosure of such information is not authorized, willfully discloses such information, shall be fined not more than $10,000 or imprisoned for not more than one year, or both.

(b) Any person who knowingly and willfully requests or under false pretenses obtains information specified in section 205(b) (1) or (3) of this title from any person who receives such information under section 206 of this title shall be fined not more than $10,000 or imprisoned for not more than one year, or both.

\*    \*    \*    \*    \*    \*    \*

---

### SECTION 204 OF THE TRANS-ALASKA PIPELINE AUTHORIZATION ACT

#### LIABILITY

Sec. 204. (a) \* \* \*

(b) If any area *in the State of Alaska* within or without the right-of-way or permit area granted under this title is polluted by any activities *related to the trans-Alaska oil pipeline* conducted by or on behalf of the holder to whom such right-of-way or permit was granted, and such pollution damages or threatens to damage aquatic life, wildlife, or public or private property, the control and total removal of the pollutant shall be at the expense of such holder, including any administrative and other costs incurred by the Secretary or any other Federal officer or agency. Upon failure

65

of such holder to adequately control and remove such polutant, the Secretary, in cooperation with other Federal, State, or local agencies, or in cooperation with such holder, or both, shall have the right to accomplish the control and removal at the expense of such holder. *This subsection shall not apply to removal costs covered by the Oil Pollution Prevention, Response, Liability, and Compensation Act of 1989.*

〔(c)(1) Notwithstanding the provisions of any other law, if oil that has been transported through the trans-Alaska pipeline is loaded on a vessel at the terminal facilities of the pipeline, the owner and operator of the vessel (jointly and severally) and the Trans-Alaska Pipeline Liability Fund established by this subsection, shall be strictly liable without regard to fault in accordance with the provisions of this subsection for all damages, including clean-up costs, sustained by any person or entity, public or private, including residents of Canada, as the result of discharges of oil from such vessel.

〔(2) Strict liability shall not be imposed under this subsection if the owner or operator of the vessel, or the Fund, can prove that the damages were caused by an act of war or by the negligence of the United States or other governmental agency. Strict liabilty shall not be imposed under this subsection with respect to the claim of a damaged party if the owner or operator of the vessel, or the Fund, can prove that the damage was caused by the negligence of such party.

〔(3) Strict liability for all claims arising out of any one incident shall not exceed $100,000,000. The owner and operator of the vessel shall be jointly and severally liable for the first $14,000,000 of such claims that are allowed. Financial responsibility for $14,000,000 shall be demonstrated in accordance with the provisions of section 311(p) of the Federal Water Pollution Control Act, as amended (33 U.S.C. 1321(p)) before the oil is loaded. The Fund shall be liable for the balance of the claims that are allowed up to $100,000,000. If the total claims allowed exceed $100,000,000 they shall be reduced proportionately. The unpaid portion of any claim may be asserted and adjudicated under other applicable Federal or state law.

〔(4) The Trans-Alaska Pipeline Liability Fund is hereby established as a non-profit corporate entity that may sue and be sued in its own name. The Fund shall be administered by the holders of the trans-Alaska pipeline right-of-way under regulations prescribed by the Secretary. The Fund shall be subject to an annual audit by the Comptroller General, and a copy of the audit shall be submitted to the Congress.

〔(5) The operator of the pipeline shall collect from the owner of the oil at the time it is loaded on the vessel a fee of five cents per barrel. The collection shall cease when $100,000,000 has been accumulated in the Fund, and it shall be resumed when the accumulation in the Fund falls below $100,000,000.

〔(6) The collections under paragraph (5) shall be delivered to the Fund. Costs of administration shall be paid from the money paid to the Fund, and all sums not needed for administration and the satisfaction of claims shall be invested prudently in income-producing securities approved by the Secretary. Income from such securities shall be added to the principal of the Fund.

66

〔(7) The provisions of this subsection shall apply only to vessels engaged in transportation between the terminal facilities of the pipeline and ports under the jurisdiction of the United States. Strict liability under this subsection shall cease when the oil has first been brought ashore at a port under the jurisdiction of the United States.

〔(8) In any case where liability without regard to fault is imposed pursuant to this subsection and the damages involved were caused by the unseaworthiness of the vessel or by negligence, the owner and operator of the vessel, and the Fund, as the case may be, shall be subrogated under applicable State and Federal laws to the rights under said laws of any person entitled to recovery hereunder. If any subrogee brings an action based on unseaworthiness of the vessel or negligence of its owner or operator, it may recover from any affilate of the owner or operator, if the respective owner or operator fails to satisfy any claim by the subrogee allowed under this paragraph.

〔(9) This subsection shall not be interpreted to preempt the field of strict liability or to preclude any State from imposing additional requirements.

〔(10) If the Fund is unable to satisfy a claim asserted and finally determined under this subsection, the Fund may borrow the money needed to satisfy the claim from any commercial credit source, at the lowest available rate of interest, subject to approval of the Secretary.

〔(11) For purposes of this subsection only, the term "affiliate" includes—

〔(A) Any person owned or effectively controlled by the vessel owner or operator; or

〔(B) Any person that effectively controls or has the power effectively to control the vessel owner or operator by—

〔(i) stock interest, or

〔(ii) representation on a board of directors or similar body, or

〔(iii) contract or other agreement with other stockholders, or

〔(iv) otherwise; or

〔(C) Any person which is under common ownership or control with the vessel owner or operator.

〔(12) The term "person" means an individual, a corporation, a partnership, an association, a joint-stock company, a business trust, or an unincorporated organization.〕

---

Section 17 of the Intervention on the High Seas Act

〔Sec. 17. The revolving fund established under section 311(k) of the Federal Water Pollution Control Act shall be available to the Secretary for Federal actions and activities under section 5 of this Act.〕

*SEC. 17. AVAILABILITY OF OIL SPILL LIABILITY TRUST FUND.*

*The Oil Spill Liability Trust Fund shall be available to the Secretary for actions taken under sections 5 and 7 of this Act.*

67

SECTION 311 OF THE FEDERAL WATER POLLUTION CONTROL ACT

OIL AND HAZARDOUS SUBSTANCE LIABILITY

SEC. 311.(a) * * *
(b)(1) * * *

\*         \*         \*         \*         \*         \*         \*

(5) Any person in charge of a vessel or an onshore facility or an offshore facility shall, as soon as he has knowledge of any discharge of oil or a hazardous substance from such vessel or facility in violation of paragraph (3) of this subsection, immediately notify the appropriate agency of the United States Government of such discharge. *The Federal agency shall immediately notify the appropriate State agency of any State which is, or may reasonably be expected to be, affected by the discharge of oil or a hazardous substance.* Any such person (A) in charge of a vessel from which oil or a hazardous substance is discharged in violation of paragraph (3)(i) of this subsection, or (B) in charge of a vessel for which oil or a hazardous substance is discharged in violation of paragraph (3)(ii) of this subsection and who is otherwise subject to the jurisdiction of the United States at the time of the discharge, or (C) in charge of an onshore facility or an offshore facility, who fails to notify immediately such agency of such discharge shall, upon conviction, be 〖fined not more than $10,000, or imprisoned for not more than one year, or both〗 *fined in accordance with the applicable provisions of title 18 of the United States Code, or imprisoned for not more than 3 years (or no more than 5 years in the case of a second or subsequent conviction, or both.* Notification received pursuant to this paragraph or information obtained by the exploitation of such notification shall not be used against any such person in any criminal case, except a prosecution for perjury or for giving a false statement.

(6)(A) Any owner, operator, or person in charge of any onshore facility or offshore facility from which oil or a hazardous substance is discharged in violation of paragraph (3) of this subsection shall be assessed a civil penalty by the Secretary of the department in which the Coast Guard is operating of not more than 〖$5,000 for each offense〗 *$25,000 for each day of such offense.* Any owner, operator, or person in charge of any vessel from which oil or a hazardous substance is discharged in violation of paragraph (3)(i) of this subsection, and any owner, operator, or person in charge of a vessel from which oil or a hazardous substance is discharged in violation of paragraph (3)(ii) who is otherwise subject to the jurisdiction of the United States at the time of the discharge, shall be assessed a civil penalty by the Secretary of the department in which the Coast Guard is operating of not more than 〖$5,000 for each offense〗 *$25,000 for each day of such offense.* No penalty shall be assessed unless the owner or operator charged shall have been given notice and opportunity for a hearings on such charge. Each violation is a separate offense. Any such civil penalty may be compromised by such Secretary. In determining the amount of the penalty, or the amount agreed upon in compromise, the appropriateness of such penalty to the size of the business of the owner or operator charged, the effect on the owner or operator's ability to continue in

68

business, and the gravity of the violation, shall be considered by such Secretary. The Secretary of the Treasury shall withhold at the request of such Secretary the clearance required by section 4197 of the Revised Statutes of the United States, as amended (46 U.S.C. 91), of any vessel the owner or operator of which is subject to the foregoing penalty. Clearance may be granted in such cases upon the filing of a bond or other surety satisfactory to such Secretary.

* * * * * * *

(c)(1) * * *

(2) Within sixty days after the effective date of this section, the President shall prepare and publish a National Contingency Plan for removal of oil and hazardous substances, pursuant to this subsection. Such National Contingency Plan shall provide for efficient, coordinated, and effective action to minimize damage from oil and hazardous substance discharges, including containment, dispersal, and removal of oil and hazardous substances, and shall include, but not be limited to—

(A) * * *

* * * * * * *

(C) [establishment or designation of a strike force consisting] *designation, establishment, and maintenance of a strike force consisting of at least 4 teams* of personnel who shall be trained, prepared, and available to provide necessary services to carry out the Plan, including the establishment of major ports, to be determined by the President, of emergency task forces of trained personnel, adequate oil and hazardous substance pollution control equipment and material, and a detailed oil and hazardous substance pollution prevention and removal plan;

(D) a system of surveillance and notice designed to *safeguard against as well as* insure earliest possible notice of discharges of oil and hazardous substances and imminent threats of such discharges to the appropriate State and Federal agencies;

* * * * * * *

(F) procedures and techniques to be employed in identifying, containing, dispersing, and removing oil and hazardous substances *as well as research and development into methods and techniques to improve existing technology;*

* * * * * * *

(H) a system whereby the State or States affected by a discharge of oil or hazardous substance may act where necessary to remove such discharge and such State or States may be [be reimbursed from the fund established under subsection (k) of this section for the reasonable costs incurred in such removal.] *reimbursed, in the case of any discharges of oil from a vessel or facility, for the reasonable costs incurred for such removal, from the Oil Spill Liability Trust Fund.*

* * * * * * *

(d) Whenever a marine disaster in or upon the navigable waters of the United States has created a substantial threat of a pollution

69

hazard to the public health or welfare of the United States, including, but not limited to, fish, shellfish, and wildlife and the public and private shorelines and beaches of the United States, because of a discharge, or an imminent discharge, of large quantities of oil, or of a hazardous substance from a vessel of the United States may (A) coordinate and direct all public and private efforts directed at the removal or elimination of such threat; and (B) summarily remove, and, if necessary, destroy such vessel by whatever means are available without regard to any provisions of law governing the employment of personnel or the expenditure of appropriated funds. ⟦Any expense incurred under this subsection or under the Intervention on the High Seas Act (or the convention defined in section 2(3) thereof) shall be a cost incurred by the United States Government for the purposes of subsection (f) in the removal of oil or hazardous substance.

⟦(e) In addition to any other action taken by a State or local government, when the President determines there is an imminent and substantial threat to the public health or welfare of the United States, including, but not limited to, fish, shellfish, and wildlife and public and private property, shorelines, and beaches within the United States, because of an actual or threatened discharge of oil or hazardous substance into or upon the navigable waters of the United States from an onshore or offshore facility, the President may require the United States attorney of the district in which the threat occurs to secure such relief as may be necessary to abate such threat, and the district courts of the United States shall have jurisdiction to grant such relief as the public interest and the equities of the case may require.⟧

(e) ABATEMENT ACTIONS.—

(1) PRESIDENT'S AUTHORITY.—In addition to any action taken by a State or local government, when the President determines that there may be an imminent and substantial threat to the public health or welfare of the United States, including fish, shellfish, and wildlife and public and private property, shorelines, and beaches under the jurisdiction or control of the United States, because of an actual or threatened discharge of oil or a hazardous substance from a vessel or facility in violation of subsection (b) of this section, the President may—

(A) require the Attorney General to secure such relief as may be necessary to abate such threat; or

(B) after notice to the affected State, take such other action under this section, including issuing such administrative orders, as may be necessary to protect the public health and welfare.

(2) ENFORCEMENT OF ORDERS.—If any person fails without sufficient cause to comply with an order under paragraph (1)(B), the President may request the Attorney General to bring an action in the appropriate district court of the United States to enforce such an order, to assess civil penalties of not more than $25,000 a day for each violation, and to assess 3 times the removal costs or damages incurred by the Oil Spill Liability Trust Fund as a result of the failure to comply.

(3) DISTRICT COURT JURISDICTION.—The district courts of the United States shall have jurisdiction to grant such relief under

*this subsection as the public interest and the equities of the case may require.*

       \*       \*       \*       \*       \*       \*       \*

[(i)(1) In any case where an owner or operator of a vessel or an onshore facility or an offshore facility from which oil or a hazardous substance is discharged in violation of subsection (b)(3) of this section acts to remove such oil or substance in accordance with regulations promulgated pursuant to this section, such owner or operator shall be entitled to recover the reasonable costs incurred in such removal upon establishing, in a suit which may be brought against the United States Government in the United States Claims Court, that such discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party without regard to whether such act or omission was or was not negligent, or of any combination of the foregoing clauses.

[(2) The provisions of this subsection shall not apply in any case where liability is established pursuant to the Outer Continental Shelf Lands Act, or the Deepwater Porter Act of 1974.

[(3) Any amount paid in accordance with a judgment of the United States Claims Court pursuant to this section shall be paid from the funds established pursuant to subsection (k).]

       \*       \*       \*       \*       \*       \*       \*

[(k)(1) There is hereby authorized to be appropriated to a revolving fund to be established in the Treasury such sums as may be necessary to maintain such fund at a level of $35,000,000 to carry out the provisions of subsection (c), (d), (i), and (l) of this section. Any other funds received by the United States under this section shall also be deposited in said fund for such purposes. All sums appropriated to or deposited in, said fund shall remain available until expended.

[(2) The Secretary of Transportation shall notify the Congress whenever the unobligated balance of the fund is less than $12,000,000, and shall include in such notification a recommendation for a supplemental appropriation relating to the sums that are needed to maintain the fund at the level provided in paragraph (1)]

(l) The President is authorized to delegate the administration of this section to the heads of those Federal departments, agencies, and instrumentalities which he determines to be appropriate. [Any moneys in the fund established by subsection (k) of this section shall be available to such Federal departments, agencies, and instrumentalists to carry out the provisions of subsections (c) and (i) of this section.] Each such department, agency, and instrumentality, in order to avoid duplication of effort, shall, whenever appropriate, utilize the personnel, services, and facilities of other Federal departments, agencies, and instrumentalities.

       \*       \*       \*       \*       \*       \*       \*

[(p)(1) Any vessel over three hundred gross tons, including any barge of equivalent size, but not including any barge that is not self-propelled and that does not carry oil or hazardous substances as cargo or fuel, using any port or place in the United States or the

71

navigable waters of the United States for any purpose shall establish and maintain under regulations to be prescribed from time to time by the President, evidence of financial responsibility of, in the case of an inland oil barge $125 per gross ton of such barge, or $125,000, whichever is greater, and in the case of any other vessel, $150 per gross ton of such vessel (or, for a vessel carrying oil or hazardous substances as cargo, $250,000), whichever is greater, to meet the liability to the United States which such vessel could be subjected under this section. In cases where an owner or operator owns, operates, or charters more than one such vessel, financial responsibility need only be established to meet the maximum liability to which the largest of such vessels could be subjected. Financial responsibility may be established by any one of, or a combination of, the following methods acceptable to the President: (A) evidence of insurance, (B) surety bonds, (C) qualification as a self-insurer, or (D) other evidence of financial responsibility. Any bond filed shall be issued by a bonding company authorized to do business in the United States.

[(2) The provisions of paragraph (1) of this subsection shall be effective April 3, 1971, with respect to oil and one year after the date of enactment of this section with respect to hazardous substances. The President shall delegate the responsibility to carry out the provisions of this subsection to the appropriate agency within sixty days after the date of enactment of this section. Regulations necessary to implement this subsection shall be issued within six months after the date of enactment of this section.

[(3) Any claim for costs incurred by such vessel may be brought directly against the insurer or any other person providing evidence of financial responsibility as required under this subsection. In the case of any action pursuant to this subsection such insurer or other person shall be entitled to invoke all rights and defenses which would have been available to the owner or operator if an action had been brought against him by the claimant and which would have been available to him if an action had been brought against him by the owner or operator.

[(4) Any owner or operator of a vessel subject to this subsection, who fails to comply with the provisions of this subsection or any regulation issued thereunder, shall be subject to a fine of not more than $10,000.

[(5) The Secretary of the Treasury may refuse the clearance required by section 4197 of the Revised Statutes of the United States, as amended (4 U.S.C. 91), to any vessel subject to this subsection, which does not have evidence furnished by the President that the financial responsibility provisions (1) of this subsection have been complied with.

[(6) The Secretary of the Department in which the Coast Guard is operated may (A) deny entry to any port or place in the United States or the navigable waters of the United States, to, and (B) detain at the port or place in the United States from which it is about to depart for any other port or place in the United States, any vessel subject to this subsection, which upon request, does not produce evidence furnished by the President that the financial re-

72

sponsibility provisions of paragraph (1) of this subsection have been complied with.]

\*      \*      \*      \*      \*      \*      \*

*(s) AVAILABILITY OF OIL SPILL LIABILITY TRUST FUND.—The Oil Spill Liability Trust Fund shall be available to carry out subsection (c), (d), (i), and, (l). Any amounts received by the United States under this section shall be deposited in the Oil Spill Liability Trust Fund.*

———————

DEEPWATER PORT ACT OF 1974

\*      \*      \*      \*      \*      \*      \*

LICENSE FOR THE OWNERSHIP, CONSTRUCTION, AND OPERATION OF A DEEPWATER PORT

SEC. 4. (a) \* \* \*

\*      \*      \*      \*      \*      \*      \*

(c) The Secretary may issue a license in accordance with the provisions of this Act if—

(1) he determines that the applicant is financially responsible and will meet the requirements of [section 18(1) of this Act;] *section 107 of the Oil Pollution Prevention, Response, Liability, and Compensation Act of 1989;*

\*      \*      \*      \*      \*      \*      \*

LIABILITY

SEC 18. (a) \* \* \*

[(b) Any individual in charge of a vessel or a deepwater port shall notify the Secretary as soon as he has knowledge of a discharge of oil. Any such individual who fails to notify the Secretary immediately of such discharge shall, upon conviction, be fined not more than $10,000 or imprisoned for not more than 1 year, or both. Notification received pursuant to this subsection, or information obtained by the use of such notification, shall not be used against any such individual in any criminal case, except a prosecution for perjury or for giving a false statement.]

[(c)] *(b)* (1) Whenever any oil is discharged from a vessel within any safety zone, from a vessel which has received oil from another vessel at a deepwater port, or from a deepwater port, the Secretary shall remove or arrange for the removal of such oil as soon as possible, unless he determines such removal will be done properly and expeditiously by the licensee of the deepwater port or the owner or operator of the vessel from which the discharge occurs.

(2) Removal of oil and actions to minimize damage from oil discharges shall, to the greatest extent possible, be in accordance with the National Contingency Plan for removal of oil and hazardous substances established pursuant to section 311(c)(2) of the Federal Water Pollution Control Act, as amended.

(3) Whenever the Secretary acts to remove a discharge of oil pursuant to this subsection, he is authorized to draw upon money available in the [Deepwater Port Liability Fund established pursuant to subsection (f) of this section] *Oil Spill Liability Trust Fund.*

Such money shall be used to pay promptly for all cleanup costs incurred by the Secretary in removing or in minimizing damage caused by such oil discharge.

〔(d) Notwithstanding any other provision of law, except as provided in subsection (g) of this section, the owner and operator of a vessel shall be jointly and severally liable, without regard to fault, for cleanup costs and for damages that result from a discharge of oil from such vessel within any safety zone, or from a vessel which has received oil from another vessel at a deepwater port while located in the safety zone, except when such vessel is moored at a deepwater port. Such liability shall not exceed $150 per gross ton or $20,000,000, whichever is lesser, except that if it can be shown that such discharge was the result of gross negligence or willful misconduct within the privity and knowledge of the owner or operator, such owner and operator shall be jointly and severally liable for the full amount of all cleanup costs and damages.

〔(e) Notwithstanding any other provision of law, except as provided in subsection (g) of this section, the licensee of a deepwater port shall be liable, without regard to fault, for cleanup costs and damages that result from a discharge of oil from such deepwater port or from a vessel moored at such deepwater port. Such liability shall not exceed $50,000,000 except that if it can be shown that such damage was the result of gross negligence or willful misconduct within the privity and knowledge of the licensee, such licensee shall be liable for the full amount of all cleanup costs and damages.

〔(f)(1) There is established a Deepwater Port Liability Fund (hereinafter referred to as the "Fund") as a nonprofit corporate entity which may sue or be sued in its own name. The Fund shall be administered by the Secretary.

〔(2) The Fund shall be liable, without regard to fault, for all cleanup costs and all damages in excess of those actually compensated pursuant to subsections (d) and (e) of this section.

〔(3) Each licensee shall collect from the owner of any oil loaded or unloaded at the deepwater port operated by such licensee, at the time of loading or unloading, a fee of 2 cents per barrel, except that (A) bunker or fuel oil for the use of any vessel, and (B) oil which was transported through the trans-Alaska pipeline, shall not be subject to such collection. Such collections shall be delivered to the Fund at such times and in such manner as shall be prescribed by the Secretary. These collections shall cease after the date of enactment of the Deepwater Port Act Amendments of 1984, unless there are adjudicated claims against the Fund to be satisfied. The Secretary may order the collection of the fee to be resumed when the unobligated balance of the Fund as reduced by the unliquidated debts to the United States Treasury is less than $4,000,000. Any collection of fees ordered by the Secretary under the preceding sentence shall cease whenever the unobligated balance of the Fund as reduced by the unliquidated debts to the United States Treasury exceeds $4,000,000. The Fund may borrow from the United States Treasury at an interest rate to be determined by the Secretary of the Treasury amounts sufficient to maintain the available balance in the Fund at $4,000,000, but only to such extent and in such amounts as are provided in advance in appropriation Acts. Such

74

amounts shall remain available until expended. Whenever the money in the Fund is less than the amount the Secretary determines is needed to draw upon under subsection (c)(3) of this section or the claims for cleanup costs and damages for which it is liable under this section, the Fund shall borrow the balance required to pay such claims from the United States Treasury at an interest rate determined by the Secretary of the Treasury. Costs of administration shall be paid from the Fund only after appropriation in an appropriation bill. All sums not needed to draw upon under subsection (c)(3) of this section or for administration and the satisfaction of claims shall be prudently invested in income-producing securities issued by the United States and approved by the Secretary of the Treasury. Income from such securities shall be applied to the principal of the Fund.

〖(g) Liability shall not be imposed under subsection (d) or (e) of this section if the owner or operator of a vessel or the licensee can show that the discharge was caused solely by (1) an act of war, or (2) negligence on the part of the Federal Government in establishing and maintaining aids to navigation, in addition, liability with respect to damages claimed by a damaged party shall not be imposed under subsection (d), (e), or (f) of this section if the owner or operator of a vessel, the licensee, or the Fund can show that such damage was caused solely by the negligence of such party.

〖(h)(1) In any case where liability is imposed pursuant to subsection (d) of this section, if the discharge was the result of the negligence of the licensee, the owner or operator of a vessel held liable shall be subrogated to the rights of any person entitled to recovery against such licensee.

〖(2) In any case where liability is imposed pursuant to subsection (e) of this section, if the discharge was the result of the unseaworthiness of a vessel or the negligence of the owner or operator of such vessel, the licensee shall be subrogated to the rights of any person entitled to recovery against such owner or operator. In that event, the owner and operator of the vessel are jointly and severally liable for cleanup costs and damages resulting from that discharge in the same manner and to the same extent as under subsection (d) of this section.

〖(3) Payment of compensation for any damages pursuant to subsection (f)(2) of this section shall be subject to the Fund acquiring by subrogation all rights of the claimant to recover for such damages from any other person. When the Fund under this subsection is subrogated to the right of any person entitled to recovery against the owner or operator of a vessel, that owner and operator are jointly and severally liable for cleanup costs and damages resulting from that discharge in the same manner and to the same extent as under subsection (d) of this section.

〖(4) The liabilities established in this section shall in no way affect or limit any rights which the licensee, the owner, or operator of a vessel, or the Fund may have against any third party whose act may in any way have caused or contributed to a discharge of oil.

〖(5) In any case where the owner or operator of a vessel or the licensee of a deepwater port from which oil is discharged acts to remove such oil in accordance with subsection (c)(1) of this section,

such owner or operator or such licensee shall be entitled to recover from the Fund the reasonable cleanup cost incurred in such removal if he can show that such discharge was caused solely by (A) an act of war or (B) negligence on the part of the Federal Government in establishing and maintaining aids to navigation.

〔(i)(1) The Attorney General may act on behalf of any group of damaged citizens he determines would be more adequately represented as a class in recovery of claims under this section. Sums recovered shall be distributed to the members of such group. If, within 90 days after a discharge of oil in violation of this section has occurred, the Attorney General fails to act in accordance with this paragraph, to sue on behalf of a group of persons who may be entitled to compensation pursuant to this section for damages caused by such discharge, any member of such group may maintain a class action to recover such damages on behalf of such group. Failure of the Attorney General to act in accordance with this subsection shall have no bearing on any class action maintained in accordance with this paragraph.

〔(2) In any case where the number of members in the class exceeds 1,000, publishing notice of the action in the Federal Register and in local newspapers serving the areas in which the damaged parties reside shall be deemed to fulfill the requirement for public notice established by rule 23(c)(2) of the Federal Rules of Civil Procedure.

〔(3) The Secretary may act on behalf of the public as trustee of the natural resources of the marine environment to recover for damages to such resources in accordance with this section. Sums recovered shall be applied to the restoration and rehabilitation of such natural resources by the appropriate agencies of Federal or State government.

〔(j)(1) The Secretary shall establish by regulation procedures for the filing and payment of claims for cleanup costs and damages pursuant to this Act.

〔(2) No claims for payment of cleanup costs or damages which are filed with the Secretary more than 3 years after the date of the discharge giving rise to such claims shall be considered.

〔(3) Appeals from any final determination of the Secretary pursuant to this section shall be filed not later than 30 days after such determination in the United States Court of Appeals of the circuit within which the nearest adjacent coastal State is located.〕

〔(k)〕*(c)* (1) This section shall not be interpreted to preempt the field of liability or to preclude any State from imposing additional requirements or liability for any discharge of oil from a deepwater port or a vessel within any safety zone.

(2) Any person who receives compensation for damages pursuant to this section shall be precluded from recovering compensation for the same damages pursuant to any other State or Federal law. Any person who receives compensation for damages pursuant to any other Federal or State law shall be precluded from receiving compensation for the same damages as provided in this section.

〔(l) The Secretary shall require that any owner or operator of a vessel using any deepwater port, or any licensee of a deepwater port, shall carry insurance or give evidence of other financial re-

76

sponsibility in an amount sufficient to meet the liabilities imposed by this section.⟧

⟦(m)⟧ *(d)* As used in this section the term—

⟦(1)⟧ "cleanup costs" means all actual costs, including but not limited to costs of the Federal Government, of any State or local government, of other nations or of their contractors or subcontractors incurred in the (A) removing or attempting to remove, or (B) taking other measures to reduce or mitigate damages from, any oil discharged into the marine environment in violation of subsection (a)(1) of this section;

⟦(2)⟧ "damages" means all damages (except cleanup costs) suffered by any person, or involving real or personal property, the natural resources of the marine environment, or the coastal environment of any nation, including damages claimed without regard to ownership of any affected lands, structures, fish, wildlife, or biotic or natural resources;⟧

⟦(3)⟧ *(1)* "discharge" includes, but is not limited to, any spilling, leaking, pumping, pouring, emitting emptying, or dumping into the marine environment of quantities of oil determined to be harmful pursuant to regulations issued by the Administrator of the Environmental Protection Agency; and

⟦(4)⟧ *(2)* "owner or operator" means any person owning, operating, or chartering by demise, a vessel.

⟦(n)(1) The Attorney General, in cooperation with the Secretary, the Secretary of State, the Secretary of the Interior, the Administrator of the Environmental Protection Agency, the Council on Environmental Quality, and the Administrative Conference of the United States, is authorized and directed to study methods and procedures for implementing a uniform law providing liability for cleanup costs and damages from oil spills from Outer Continental Shelf operations, deepwater ports, vessels, and other ocean-related sources. The study shall give particular attention to methods of adjudicating and settling claims as rapidly, economically, and equitably as possible.

⟦(2) The Attorney General shall report the results of his study together with any legislative recommendations to the Congress within 6 months after the date of enactment of this Act.⟧

### RELATIONSHIP TO OTHER LAWS

Sec. 19. (a)(1) The Constitution, laws, and treaties of the United States shall apply to a deepwater port licensed under this Act and to activities connected, associated, or potentially interfering with the use or operation of any such port, in the same manner as if such port were an area of exclusive Federal jurisdiction located within a State. Nothing in this Act shall be construed to relieve, exempt, or immunize any person from any other requirement imposed by Federal law, regulation, or treaty⟦.⟧*; except that discharges from a deepwater port or from a vessel within a deepwater port safety zone which are subject to the civil penalty provisions of section 18(a)(2) of this Act shall not be subject to the penalty provisions of any other Federal law.* Deepwater ports licensed under this

77

Act do not possess the status of islands and have no territorial seas of their own.

\*       \*       \*       \*       \*       \*       \*

———————

THE OUTER CONTINENTAL SHELF LANDS ACT AMENDMENTS OF 1978

\*       \*       \*       \*       \*       \*       \*

[TITLE III—OFFSHORE OIL SPILL POLLUTION FUND

[Sec. 301. Definitions.
[Sec. 302. Fund establishment, adminstration, and financing.
[Sec. 303. Damages and claimants.
[Sec. 304. Liability.
[Sec. 305. Financial responsibility.
[Sec. 306. Notification, designation, and advertisement.
[Sec. 307. Claims settlement.
[Sec. 308. Subrogation.
[Sec. 309. Jurisdiction and venue.
[Sec. 310. Relationship to other law.
[Sec. 311. Prohibition.
[Sec. 312. Penalties.
[Sec. 313. Authorization of appropriation.
[Sec. 314. Annual report.
[Sec. 315. Effective dates.]

\*       \*       \*       \*       \*       \*       \*

[TITLE III—OFFSHORE OIL SPILL POLLUTION FUND

[DEFINITIONS

[SEC. 301. For the purposes of this title, the term—

[(1) "Secretary" means the Secretary of Transportation;

[(2) "Fund" means the Offshore Oil Pollution Compensation Fund established under section 302 of this title

[(3) "person" means an individual, firm, corporation, association, partnership, consortium, joint venture, or governmental entity

[(4) "incident" means any occurrence or series of related occurrences, involving one or more offshore facilities or vessels, or any combination thereof, which causes or poses an imminent threat of oil pollution

[(5) "vessel" means every description of watercraft or other contrivance, whether or not self-propelled, which is operating in the waters above the Outer Continental Shelf (as the term "outer Continental Shelf" is defined in section 2(a) of the Outer Continental Shelf Lands Act (43 U.S.C. 1331(a))), or which is operating in the waters above submerged lands seaward from the coastline of a State (as the term "submerged lands" is described in section 2(a) of the Submerged Lands Act (43 U.S.C. 1301 (a)(2))), and which is transporting oil directly from an offshore facility

[(6) "public vessel" means a vessel which—

[(A) is owned or chartered by demise, and operated by (i) the United States, (ii) a State or political subdivision thereof, or (iii) a foreign government; and

[(B) is not engaged in commercial service;

〔(7) "facility" means a structure, or a group of structures (other than a vessel or vessels), used for the purpose of transporting, drilling for, producing, processing, storing, transferring, or otherwise handling oil;

〔(8) "offshore facility" includes any oil refinery, drilling structure, oil storage or transfer terminal, or pipeline, or any appurtenance related to any of the foregoing, which is used to drill for, produce, store, handle, transfer, process, or transport oil produced from the Outer Continental Shelf (as the term "outer Continental Shelf" is defined in section 2(a) of the Outer Continental Shelf Lands Act (43 U.S.C. 1331(a)))), and is located on the Outer Continental Shelf, except that such term does not include (A) a vessel, or (B) a deepwater port (as the term "deepwater port" is defined in section 3(10) of the Deepwater Port Act of 1974 (33 U.S.C. 1502));

〔(9) "oil pollution" means—

〔(A) the presence of oil either in an unlawful quantity or which has been discharged at an unlawful rate (i) in or on the waters above submerged lands seaward from the coastline of a State (as the term "submerged lands" is described in section 2(a)(2) of the Submerged Lands Act (43 U.S.C. 1301(a)(2))), or on the adjacent shoreline of such a State, or (ii) on the waters of the contiguous zone established by the United States under Article 24 of the Convention on the Territorial Sea and the Contiguous Zone (15 UST 1606); or

〔(B) the presence of oil in or on the waters of the high seas outside the territorial limits of the United States—

〔(i) when discharged in connection with activities conducted under the Outer Continental Shelf Lands Act (43 U.S.C. 1331 et seq.); or

〔(ii) causing injury to or loss of natural resources belonging to, appertaining to, or under the exclusive management authority of the United States; or

〔(C) the presence of oil in or on the territorial sea, navigable or internal waters, or adjacent shoreline of a foreign country, in a case where damages are recoverable by a foreign claimant under this title;

〔(10) "United States claimant" means any person residing in the United States, the Government of the United States or an agency thereof, or the government of a State or a political subdivision thereof, who asserts a claim under this title;

〔(11) "foreign claimant" means any person residing in a foreign country, the government of a foreign country, or any agency or political subdivision thereof, who asserts a claim under this title;

〔(12) "United States" includes and "State" means the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Canal Zone, Guam, American Samoa, the United States Virgin Islands, the Commonwealth of the Northern Mariana Islands, the Trust Territory of the Pacific Islands, and any other territory or possession over which the United States has jurisdiction;

79

〔(13) "oil" means petroleum, including crude oil or any fraction or residue therefrom;

〔(14) "cleanup costs" means costs of reasonable measures taken, after an incident has occurred, to prevent, minimize, or mitigate oil pollution from such incident;

〔(15) "damages" means compensation sought pursuant to this title by any person suffering any direct and actual injury proximately caused by the discharge of oil from an offshore facility or vessel, except that such term does not include cleanup costs;

〔(16) "person in charge" means the individual immediately responsible for the operation of a vessel or offshore facility;

〔(17) "claim" means a demand in writing for a sum certain;

〔(18) "discharge" means any emission, intentional or unintentional, and includes spilling, leaking, pumping, pouring, emptying, or dumping;

〔(19) "owner" means any person holding title to, or in the absence of title, any other indicia of ownership of, a vessel or offshore facility, whether by lease, permit, contract, license, or other form of agreement, or with respect to any offshore facility abandoned without prior approval of the Secretary of the Interior, the person who owned such offshore facility immediately prior to such abandonment, except that such term does not include a person who, without participating in the management or operation of a vessel or offshore facility, holds indicia of ownership primarily to protect his security interest in the vessel or offshore facility;

〔(20) "operator" means—

〔(A) in the case of a vessel, a charterer by demise or any other person, except the owner, who is responsible for the operation, manning, victualing, and supplying of the vessel; or

〔(B) in the case of an offshore facility, any person, except the owner, who is responsible for the operation of such facility by agreement with the owner;

〔(21) "property" means littoral, riparian, or marine property;

〔(22) "removal costs" means—

〔(A) costs incurred under subsection (c), (d), or (l) of section 311 of the Federal Water Pollution Control Act, and section 5 of the Intervention on the High Seas Act; and

〔(B) cleanup costs, other than the costs described in subparagraph (A);

〔(23) "guarantor" means the person, other than the owner or operator, who provides evidence of financial responsibility for an owner or operator;

〔(24) "gross ton" means a unit of 100 cubic feet for the purpose of measuring the total unit capacity of a vessel; and

〔(25) "barrel" means 42 United States gallons at 60 degrees Fahrenheit.

80

FUND ESTABLISHMENT, ADMINISTRATION, AND FINANCING

〖SEC. 302. (a) There is hereby established in the Treasury of the United States an Offshore Oil Pollution Compensation Fund in an amount not to exceed $200,000,000, except that such limitation shall be increased to the extend necessary to permit any moneys recovered or collected which are referred to in subsection (b)(2) of this section to be paid into the Fund. The Fund shall be administered by the Secretary and the Secretary of the Treasury as specified in this title. The Fund may sue and be sued in its own name.

〖(b) The Fund shall be composed of—

〖(1) all fees collected pursuant to subsection (d) of this section; and

〖(2) all other moneys recovered or collected on behalf of the Fund under section 308 or any other provision of this title.

〖(c) The Fund shall be immediately available for—

〖(1) removal costs described in section 301(22);

〖(2) the processing and settlement of claims under section 307 of this title (including the costs of assessing injury to, or destruction of, natural resources); and

〖(3) subject to such amounts as are provided in appropriation Acts all administrative and persnnel costs of the Federal Government incident to the administration of this title, including, but not limited to, the claims settlement activities and adjudicatory and judicial proceedings, whether or not such costs are recoverable under section 308 of this title.

The Secretary is authorized to promulgate regulations designating the person or persons who may obligate available money in the Fund for such purposes.

〖(d)(1) The Secertary shall levy and the Secretary of the Treasury shall collect a fee of not to exceed 3 cents per barrel on oil obtained from the Outer Continental Shelf, which shall be imposed on the owner of the oil when such oil is produced.

〖(2) The Secretary of the Treasury, after consulting with the Secretary, may promulgate reasonable regulations relating to the collection of the fees authorized by paragraph (1) of this subsection and, from time to time, the modification thereof. Any modification shall become effective on the date specified in the regulations making such modification, but no earlier than the ninetieth day following the date such regulation is published in the Federal Register. Any modification of the fee shall be designed to insure that the Fund is maintained at a level of not less than $100,000,000 and not more than $200,000,000. No regulation that sets or modifies fees, whether or not in effect, may be stayed by any court pending completion of judicial review of such regulation.

〖(3)(A) Any person who fails to collect or pay any fee as required by any regulation promulgated under paragraph (2) of this subsection shall be liable for civil penalty not to exceed $10,000, to be assessed by the Secretary of the Treasury, in addition to the fee required to be collected or paid and the interest on such fee at the rate such fee would have earned if collected or paid when due and invested in special obligations of the United States in accordance with subsection (e)(2) of this section. Upon the failure of any person so liable to pay any penalty, fee, or interest upon demand, the At-

torney General may, at the request of the Secretary of the Treasury, bring an action in the name of the Fund against that person for such amount.

〔(B) Any person who falsifies records or documents required to be maintained under any regualtion promulgated under this subsection shall be subject to prosecution for a violation of section 1001 of title 18, United States Code.

〔(4) The Secretary of the Treasury may, by regulation, designate the reasonably necessary records and documents to be kept by persons for who fees are to be collected pursuant to paragraph (1) of this subsection, and the Secretary of the Treasury and the Comptroller General of the United States shall have access to such records and documents for the purpose of audit and examination.

〔(e)(1) The Secretary shall determine the level of funding required for immediate access in order to meet potential obligations of the Fund.

〔(2) The Secretary of the Treasury may invest any excess in the Fund, above the level determined under paragraph (1) of this subsection, in interest-bearing special obligations of the United States. Such special obligations may be redeemed at any time in accordance with the terms of the special issue and pursuant to regulations promulgated by the Secretary of the Treasury. The interest on, and the proceeds from the sale of, any obligations held in the Fund shall be deposited in and credited to the Fund.

〔(f) If at any time the moneys available in the Fund are insufficient to meet the obligations of the Fund, the Secretary shall issue to the Secretary of the Treasury notes or other obligations in the forms and denominations, bearing the interest rates and maturities, and subject to such terms and conditions as may be prescribed by the Secretary of the Treasury. Redemption of such notes or other obligations shall be made by the Secretary from moneys in the Fund. Such notes or other obligations shall bear interest at a rate determined by the Secretary of the Treasury, taking into consideration the average market yield on outstanding marketable obligations of comparable maturity. The Secretary of the Treasury shall purchase any notes or other obligations issued under this subsection and, for that purpose, he is authorized to use as a public debt transaction the proceeds from the sale of any securities issued under the Second Liberty Bond Act. The purpose for which securities may be issued under that Act are extended to include any purchase of such notes or other obligations. The Secretary of the Treasury may at any time sell any of the notes or other obligations acquired by him under this subsection. All redemptions, purchases, and sales of the Secretary of the Treasury of such notes or other obligations shall be treated as public debt transactions of the United States.

### 〔DAMAGES AND CLAIMANTS

〔SEC. 303. (a) Claims for economic loss, arising out of or directly resulting from oil pollution, may be asserted for—
　　〔(1) removal costs; and
　　〔(2) damages, including—

82

〔(A) injury to, or destruction of, real or personal property;

〔(B) loss of use of real or personal property;

〔(C) injury to, or destruction of, natural resources;

〔(D) loss of use of natural resources;

〔(E) loss of profits or impairment of earning capacity due to injury to, or destruction of, real or personal property or natural resources; and

〔(F) loss of tax revenue for a period of one year due to injury to real or personal property.

〔(b) A claim authorized by subsection (a) of this section may be asserted—

〔(1) under paragraph (1), by any claimant, except that the owner or operator of a vessel or offshore facility involved in an incident may assert such a claim only if he can show—

〔(A) that he is entitled to a defense to liability under section 304(c)(1) or 304(c)(2) of this title; or

〔(B) if not entitled to such a defense to liability, that he is entitled to a limitation of liability under section 304(b), except that if he is not entitled to such a defense to liability but is entitled to such a limitation of liability, such claim may be asserted only as to the removal costs incurred in excess of that limitation;

〔(2) under paragraphs (2) (A), (B), and (D), by any United States claimant if the property involved is owned or leased, or the natural resource involved is utilized, by the claimant;

〔(3) under paragraph (2)(C), by the President, as trustees for natural resources over which the Federal Government has sovereign rights or exercises exclusive management authority, or by any State for natural resources within the boundary of the State belonging to, managed by, controlled by, or appertaining to the State, and sums recovered under paragraph (2)(C) shall be available for use to restore, rehabilitate, or acquire the equivalent of such natural resources by the appropriate agencies of the Federal Government or the State, but the measure of such damages shall not be limited by the sums which can be used to restore or replace such resources;

〔(4) under paragraph (2)(E), by any United States claimant if the claimant derives at least 25 per centum of his earnings from activities which utilize the property or natural resource;

〔(5) under paragraph (2)(F), by the Federal Government and any State or political subdivision thereof;

〔(6) under paragraphs (2)(A) through (E), by a foreign claimant to the same extent that a United States claimant may assert a claim if—

〔(A) the oil pollution occurred in or on the territorial sea, navigable waters or internal waters, or adjacent shoreline of a foreign country of which the claimant is a resident;

〔(B) the claimant is not otherwise compensated for his loss;

〔(C) the oil was discharged from an offshore facility or from a vessel in connection with activities conducted

under the Outer Continental Shelf Lands Act (43 U.S.C. 1331 et seq.); and

〔(D) recovery is authorized by a treaty or an executive agreement between the United States and the foreign country involved, or the Secretary of State, in consultation with the Attorney General and other appropriate officials, certifies that such country provides a comparable remedy for United States claimants;

〔(7) under paragraph (1) or (2), by the Attorney General, on his own motion or at the request of the Secretary, on behalf of any group of United States claimants who may assert a claim under this subsection, when he determines that the claimants would be more adequately represented as a class in asserting their claims.

〔(c) If the Attorney General fails to take action under paragraph (7) of subsection (b) within sixty days of the date on which the Secretary designates a source under section 306 of this title, any member of a group described in such paragraph may maintain a class action to recover damages on behalf of that group. Failure of the Attorney General to take action shall have no bearing on any class action maintained by any claimant for damages authorized by this section.

〔LIABILITY

〔Sec. 304. (a) Subject to the provisions of subsections (b) and (c) of this section, the owner and operator of a vessel other than a public vessel, or of an offshore facility, which is the source of oil pollution, or poses a threat of oil pollution in circumstances which justify the incurrence of the type of costs described in section 301(22) of this title, shall be jointly, severally, and strictly liable for all loss for which a claim may be asserted under section 303 of this title.

〔(b) Except when the incident is caused primarily by willful misconduct or gross negligence, within the privity or knowledge of the owner or operator, or is caused primarily by a violation, within the privity or knowledge of the owner or operator, of applicable safety, construction, or operating standards or regulations of the Federal Government, the total of the liability under subsection (a) of this section incurred by, or behalf of, the owner or operator shall be—

〔(1) in the case of a vessel, limited to $250,000 or $300 per gross ton, whichever is greater, except when the owner or operator of a vessel fails or refuses to provide all reasonable cooperation and assistance requested by the responsible Federal official in furtherance of cleanup activities; or

〔(2) in the case of an offshore facility, the total of removal and cleanup costs, and an amount limited to $35,000,000 for all damages.

〔(c) There shall be no liability under subsection (a) of this section—

〔(1) if the incident is caused solely by any act of war, hostilities, civil war, or insurrection, or by an unanticipated grave natural disaster or other natural phenomenon of an exceptional, inevitable, and irresistable character, the effect of which

84

could not have been prevented or avoided by the exercise of due care or foresight; or

〔(2) if the incident is caused solely by the negligent or intentional act of the damaged party or any third party (including any government entity).

〔(d) Notwithstanding the limitations, exceptions, or defenses of subsection (b) or (c) of this section, all costs of removal incurred by the Federal Government or any State or local official or agency in connection with a discharge of oil from any offshore facility or vessel shall be borne by the owner and operator of the offshore facility or vessel from which the discharge occurred.

〔(e) The Secretary shall, from time to time, report to Congress on the desirability of adjusting the monetary limitation of liability specified in subsection (b) of this section.

〔(f)(1) Subject to the provisions of paragraph (2) of this subsection, the Fund shall be liable, without any limitation, for all losses for which a claim may be asserted under section 303 of this title, to the extent that such losses are not otherwise compensated.

〔(2) Except for the removal costs specified in section 301(22), there shall be no liability under paragraph (1) of this subsection—

〔(A) as to a particular claimant, where the incident or economic loss is caused, in whole or in part, by the gross negligence or willful misconduct of that claimant; or

〔(B) as to a particular claimant, to the extent that the incident or economic loss is caused by the negligence of that claimant.

〔(g)(1) In addition to the losses for which claims may be asserted under section 303 of this title, and without regard to the limitation of liability provided in subsection (b) of this section, the owner, operator, or guarantor of an offshore facility or vessel shall be liable to the claimant for interest on the amount paid in satisfaction of the claim for the period from the date upon which the claim is presented to such person to the date upon which the claimant is paid, inclusive, less the period, if any, from the date upon which such owner, operator, or guarantor offers the claimant an amount equal to or greater than the amount finally paid in satisfaction of the claim to the date upon which the claimant accepts such amount, inclusive. However, if such owner, operator, or guarantor offers the claimant, within sixty days of the date upon which the claim is presented, or of the date upon which advertising is commenced pursuant to section 306 of this title, whichever is later, an amount equal to or greater than the amount finally paid in satisfaction of the claim, the owner, operator, or guarantor shall be liable for the interest provided in this paragraph only from the date the offer is accepted by the claimant to the date upon which payment is made to the claimant, inclusive.

〔(2) The interest provided in paragraph (1) of this subsection shall be calculated at the average of the highest rate for commercial and finance company paper of maturities of one hundred and eighty days or less obtaining on each of the days included within the period for which interest must be paid to the claimant, as published in the Federal Reserve Bulletin.

〔(h) Nothing in this title shall bar a cause of action that an owner or operator, subject to liability under subsection (a) of this

85

section, or a guarantor, has or would have, by reason of subrogation or otherwise, against any person.

〔(i) To the extent that they are in conflict or otherwise inconsistent with any other provision of law relating to liability or the limitation thereof, the provisions of this section shall supersede such other provision of law, including section 4283(a) of the Revised Statutes (46 U.S.C. 183(a)).

〔FINANCIAL RESPONSIBILITY

〔SEC. 305. (a)(1) The owner or operator of any vessel (except a non-self-propelled barge that does not carry oil as fuel or cargo which uses an offshore facility shall establish and maintain, in accordance with regulations promulgated by the President, evidence of financial responsibility sufficient to satisfy the maximum amount of liability to which the owner or operator of such vessel would be exposed in a case where he would be entitled to limit his liability in accordance with the provisions of section 304(b) of this title. Financial responsibility may be established by any one, or any combination, of the following methods, acceptable to the President: evidence of insurance guarantee, surety bond, or qualification as a self-insurer. Any bond filed shall be issued by a bonding company authorized to do business in the United States. In any case where an owner or operator owns, operates, or charters more than one vessel subject to this subsection, evidence of financial responsibility need be established only to meet the maximum liability applicable to the largest of such vessels.

〔(2) The Secretary, in accordance with regulations promulgated by him, shall—

〔(A) deny entry to any port or place in the United States or to the navigable waters to; and

〔(B) detain at the port or place in the United States from which it is about to depart for any other port or place in the United States,

any vessel subject to this subsection which, upon request, does not produce certification furnished by the President that such vessel is in compliance with the financial responsibility provisions of paragraph (1) of this subsection.

〔(3) The Secretary, in accordance with regulations promulgated by him, shall have access to all offshore facilities and vessels conducting activities under the Outer Continental Shelf Lands Act, and such facilities and vessels shall, upon request, show certification of financial responsibility.

〔(b) The owner or operator of an offshore facility which (1) is used for drilling for, producing, or processing oil, or (2) has the capacity to transport, store, transfer, or otherwise handle more than one thousand barrels of oil at any one time, shall establish and maintain, in accordance with regulations promulgated by the President, evidence of financial responsibility sufficient to satisfy the maximum amount of liability to which the owner or operator of such facility would be exposed in a case where he would be entitled to limit his liability in accordance with the provisions of section 304(b) of this title, or $35,000,000, whichever is less.

〔(c) (1) Any claim authorized by section 303(a) may be asserted directly against any guarantor providing evidence of financial responsibility for any owner or operator of an offshore facility or vessel as required under this section. In defending such claim, the guarantor shall be entitled to invoke all rights and defenses which would be available to such owner or operator under this title. Such guarantor shall also be entitled to invoke the defense that the incident was caused by the willful misconduct of such owner or operator, but shall not be entitled to invoke any other defense which such guarantor might be entitled to invoke in proceedings brought by such owner or operator against such guarantor.

〔(2) The total liability of any guarantor in a direct action suit brought under this section shall be limited to the aggregate amount of the monetary limits of the policy of insurance, guarantee, surety bond, letter of credit, or similar instrument obtained from the guarantor by the person subject to liability. Nothing in this subsection shall be construed, interpreted or applied to diminish the liability of any person under this Act or other applicable law.

〔(d) The President shall conduct a study to determine—

〔(1) whether adequate private oil pollution insurance protection is available on reasonable terms and conditions to the owners and operators of vessels, onshore facilities, and offshore facilities; and

〔(2) whether the market for such insurance is sufficiently competitive to assure purchasers of features such as a reasonable range of deductibles, coinsurance provisions, and exclusions.

The President shall submit the results of his study, together with his recommendations, within one year after the date of enactment of this title, and shall submit an interim report on his study within three months after such date of enactment.

〔(e) Any owner or operator of an offshore facility may enter into an indemnity, hold harmless, or similar agreement with any person holding a lease on the Outer Continental Shelf with respect to any liability arising under this title. Notwithstanding the provision of this subsection, any such indemnity, hold harmless, or similar agreement shall not relieve such owner, operator, or person from liability arising under this title. Nothing in this subsection shall be construed to alter or in any way affect the financial responsibility requirement imposed under this section.

〔NOTIFICATION, DESIGNATION, AND ADVERTISEMENT

〔SEC. 306. (a) The person in charge of a vessel or offshore facility which is involved in an incident shall immediately notify the Secretary of the incident as soon as he has knowledge thereof. Notification received pursuant to this subsection or information obtained by the exploitation of such notification shall not be used against such person or his employer in any criminal case, other than a case involving prosecution for perjury or for giving a false statement.

〔(b)(1) When the Secretary receives information pursuant to subsection (a) of this section or otherwise of an incident which involves oil pollution, the Secretary shall, where possible, designate the

source or sources of the oil pollution and shall immediately notify the owner and operator of such source and the guarantor of such designation.

⟦(2) When a source designated under paragraph (1) of this subsection is a vessel or offshore facility and the owner, operator, or guarantor fails to inform the Secretary, within five days after receiving notification of the designation, of his denial of such designation, such owner, operator, or guarantor, as required by regulations promulgated by the Secretary, shall advertise the designation and the procedures by which claims may be presented to him. If advertisement is not made in accordance with this paragraph, the Secretary shall, as he finds necessary, and at the expense of the owner, operator, or guarantor involved, advertise the designation and the procedures by which claims may be presented to such owner, operator, or guarantor.

⟦(c) In a case where—

⟦(1) the owner, operator, and guarantor all deny a designation in accordance with paragraph (2) of subsection (b) of this section;

⟦(2) the source of the discharge was a public vessel; or

⟦(3) the Secretary is unable to designate the source of sources or the discharge under paragraph (1) of such subsection (b),

the Secretary shall advertise or otherwise notify potential claimants of the procedures by which claims may be presented of the Fund.

⟦(d) Advertisement under subsection (b) of this section shall commence no later than fifteen days after the date of the designation made under such subsection and shall continue for a period of no less than thirty days.

## ⟦CLAIMS SETTLEMENT

⟦SEC. 307. (a) Except as provided in subsection (b) of this section, all claims shall be presented to the owner, operator, or guarantor.

⟦(b) All claims shall be presented to the Fund—

⟦(1) where the Secretary has advertised or otherwise notified claimants in accordance with section 306(c) of this title; or

⟦(2) where the owner or operator may recover under the provisions of section 303(b) (1) of this title.

⟦(c) In the case of a claim presented in accordance with subsection (a) of this section, and in which—

⟦(1) the person to whom the claim is presented denies all liability for the claim, for any reason; or

⟦(2) the claim is not settled by any person by payment to the claimant within sixty days from the date upon which (A) the claim is presented, or (B) advertising is commenced pursuant to section 306(b), whichever is later,

the claimant may elect to commence an action in court against the owner, operator, or guarantor, or to present the claim to the Fund, that election to be irrevocable and exclusive.

⟦(d) In the case of a claim presented in accordance with subsection (a) of this section, where full and adequate compensation is unavailable, either because the claim exceeds a limits of liability in-

voked under section 304(b) of this title or because the owner, opera-tor, and guarantor to whom the claim is presented are financially incapable of meeting their obligations in full, a claim for the un-compensated damages may be presented to the Fund.

〔(e) In the case of a claim which is presented to any person, pur-suant to subsection (a) of this section, and which is being presented to the Fund, pursuant to subsection (c) or (d) of this section, such person, at the request of the claimant, shall transmit the claim and supporting documents to the Fund. The Secretary may, by regula-tion, prescribe the documents to be transmitted and the terms under which they are to be transmitted.

〔(f) In the case of a claim presented to the Fund, pursuant to subsection (b), (c), or (d) of this section, and in which the Fund—

〔(1) denies all liability for the claim, for any reason; or

〔(2) does not settle the claim by payment to the claimant within sixty days after the date upon which (A) the claim is presented to the Fund, or (B) advertising is commenced pursu-ant to section 306(c) of this title, whichever is later,

the claimant may submit the dispute to the Secretary for decision in accordance with section 554 of title 5, United States Code. How-ever, a claimant who has presented a claim to the Fund pursuant to such subsection (b) may elect to commence an action in court against the Fund in lieu of submission of the dispute to the Secre-tary for decision, that election to be irrevocable and exclusive.

〔(g)(1) The Secretary shall promulgate regulations which estab-lish uniform procedures and standards for the appraisal and settle-ment of claims against the Fund.

〔(2) Except as provided in paragraph (3) of this subsection, the Secretary shall use the facilities and services of private insurance and claims adjusting organizations or State agencies in processing claims against the Fund and may contract to pay compensation for those facilities and services. Any contract made under the provi-sions of this paragraph may be made without regard to the provi-sions of section 3709 of the Revised Statutes (41 U.S.C. 5) upon a showing by the Secretary that advertising is not reasonably practi-cable. The Secretary may make advance payments to a contractor for services and facilities, and the Secretary may advance to the contractor funds to be used for the payment of claims. The Secre-tary may review and audit claim payments made pursuant to this subsection. A payment to a claimant for a single claim in excess of $100,000, or two or more claims aggregating in excess of $200,000, shall be first approved by the Secretary. When the services of a State agency are used in processing and settling claims, no pay-ment may be made on a claim asserted by or on behalf of such State or any of its agencies or subdivisions unless the payment has been approved by the Secretary.

〔(3) To the extent necessitated by extraordinary circumstances, where the services of such private organizations or State agencies are inadequate, the Secretary may use Federal personnel to process claims against the Fund.

〔(h) Notwithstanding subsection (b) of section 556 of title 5, United States Code, the Secretary is authorized to appoint, from time to time for a period of not to exceed one hundred and eighty days, one or more panels, each comprised to three individuals, to

hear and decide disputes submitted to the Secretary pursuant to subsection (f) of this section. At least one member of each panel shall be qualified to conduct adjudicatory proceedings and shall preside over the activities of the panel. Each member of a panel shall possess competence in the evaluation and assessment of property damage and the economic losses resulting therefrom. Panel members may be appointed from private life or from any Federal agency except the staff administering the Fund. Each panel member appointed from private life shall receive a per diem compensation, and each panel member shall receive necessary traveling and other expenses while engaged in the work of a panel. The provisions of chapter 11 of title 18, United States Code, and of Executive Order 11222, as amended, regarding special Government employees, shall apply to panel members appointed from private life.

〔(i)(1) Upon receipt of a request refer a decision from a claimant, properly made, the Secretary shall refer the dispute to (A) an administrative law judge appointed under section 3105 of title 5, United States Code, or (B) a panel appointed under subsection (h) of this section.

〔(2) The administrative law judge and each member of a panel to which a dispute is referred for decision shall be a resident of the United States judicial circuit within which the damage complained of occurred, or, if the damage complained of occurred within two or more circuits, of any of the affected circuits, or, if the damage occurred outside any circuit, of the nearest circuit.

〔(3) Upon receipt of a dispute, the administrative law judge or panel shall adjudicate the case and render a decision in accordance with section 554 of title 5, United States Code. In any proceeding subject to this subsection, the presiding officer may require by subpena any person to appear and testify and produce books, papers, documents, of tangible things at a hearing or deposition at any designated place. Subpenas shall be issued and enforced in accordance with procedures in subsection (d) of section 555 of title 5, United States Code, and rules promulgated by the Secretary. If a person fails or refuses to obey a subpena, the Secretary may invoke the aid of the district court of the United States where the person is found, resides, or transacts business in requiring the attendance and testimony of the person and the production by him of books, papers, documents, or any tangible things.

〔(4) A hearing conducted under this subsection shall be conducted within the United States judicial district within, or nearest to which, the damage complained of occurred, or, if the damage complained of occurred within two or more districts, in any of the affected districts, or if the damage occurred outside any district, in the nearest district.

〔(5) The decision of the administrative law judge or panel under this subsection shall be the final order of the Secretary, except that the Secretary, in his discretion and in accordance with regulations which he may promulgate, may review the decision upon his own initiative or upon exception of the claimant or the Fund.

〔(6) Final orders of the Secretary made under this subsection shall be reviewable pursuant to section 702 of title 5, United States Code, in the district courts of the United States.

〔(j)(1) In any action brought pursuant to this title against an owner, operator, or guarantor, both the plaintiff and defendant shall serve a copy of the complaint and all subsequent pleadings therein upon the Fund at the same time such pleadings are served upon the opposing parties.

〔(2) The Fund may intervene in any action described in paragraph (1) of this subsection as a matter of right.

〔(3) In any action described in paragraph (1) of this subsection to which the Fund is a party, if the owner, operator, or guarantor admits liability under this title, the Fund upon its motion shall be dismissed therefrom to the extent of the admitted liability.

〔(4) If the Fund receives from either the plaintiff or the defendant notice of an action described in paragraph (1) of this subsection, the Fund shall be bound by any judgment entered therein, whether or not the Fund was a party to the action.

〔(5) If neither the plaintiff nor the defendant gives notice of an action described in paragraph (1) of this subsection to the Fund, the limitation of liability otherwise permitted by section 304(b) of this title shall not be available to the defendant, and the plantiff shall not recover from the Fund any sums not paid by the defendant.

〔(k) In any brought against the Fund under this title, the plaintiff may join any owner, operator, or guarantor, and the Fund may join any person who is or may be liable to the Fund under any provision of this title.

〔(l) No claim may be presented, nor may an action be commenced for economic losses recoverable under this title, unless such claim is presented to, or such action is commenced against, the owner, operator, or guarantor, or the Fund, as to their respective liabilities, within three years after after the date of discovery of the economic loss for which a claim may be asserted under section 303(a) of this title, or within six years of the date of the incident which resulted in such loss, whichever is earlier.

### 〔SUBROGATION

〔SEC. 308. (a) Any person or governmental entity, including the Fund, who pays compensation to any claimant for an economic loss, compensable under section 303 of this title, shall be subrogated to all rights, claims, and causes of action which such claimant has under this title.

〔(b) Upon request of the Secretary, the Attorney General may commence an action, on behalf of the Fund, for the compensation paid by the Fund to any claimant pursuant to this title. Such an action may be commenced against an owner, operator, or guarantor, or against any other person or governmental entity, who is liable, pursuant to any law, to the compensated claimant or to the Fund, for economic losses for which the compensation was paid.

〔(c) In any claim or action by the Fund against any owner, operator, or guarantor, pursuant to the provisions of subsection (a) or (b), the Fund shall recover—

〔(1) for a claim presented to the Fund (where there has been a denial of source designation) pursuant to section 307(b)(1) of this title, or (where there has been a denial of liability) pursuant to section 307(c)(1) of this title—

〔(A) subject only to the limitation of liability to which the defendant is entitled under section 304(b) of this title, the amount of the Fund has paid to the claimant, without reduction;

〔(B) interest on such amount, at the rate calculated in accordance with section 304(g)(2) of this title, from the date upon which the claim is presented by the claimant to the defendant to the date upon which the Fund is paid by the defendant, inclusive, less the period, if any, from the date upon which the Fund offers to the claimant the amount finally paid by the Fund to the claimant in satisfaction of the claim against the Fund to the date upon which the claimant accepts that offer, inclusive; and

〔(C) all costs incurred by the Fund by reason of the claim, both of the claimant against the Fund and the Fund against the defendant, including, but not limited to, processing costs, investigating costs, court costs, and attorneys' fees; and

〔(2) for a claim presented to the Fund pursuant to section 397(c)(2) of this title—

〔(A) in which the amount the Fund has paid to the claimant exceeds the largest amount, if any, the defendant offered to the claimant in satisfaction of the claim of the claimant against the defendant—

〔(i) subject to dispute by the defendant as to any excess over the amount offered to the claimant by the defendant, the amount the Fund has paid to the claimant;

〔(ii) interest, at the rate calculated in accordance with section 304(g)(2) of this title, for the period specified in paragraph (1)(B) of this subsection; and

(iii) all costs incurred by the Fund by reason of the claim of the Fund against the defendant, including, but not limited to, processing costs, investigating costs, court costs, and attorneys' fees; or

〔(B) in which the amount the Fund has paid to the claimant and is less than or equal to the largest amount the defendant offered to the claimant in satisfaction of the claim of the claimant against the defendant—

〔(i) the amount which the Fund has paid to the claimant, without reduction;

〔(ii) interest, at the rate calculated in accordance with section 304(g)(2) of this title, from the date upon which the claim is presented by the claimant to the defendant to the date upon which the defendant offered to the claimant the largest amount referred to in this subparagraph, except that if the defendant tenders the offer of the largest amount referred to in this subparagraph within sixty days after the date upon which the claim of the claimant is either presented to the defendant or advertising is commenced pursuant to section 306 of this title, the defendant shall not be liable for interest for that period; and

92

[(iii) interest from the date upon which the claim of the Fund against the defendant is presented to the defendant to the date upon which the Fund is paid, inclusive, less the period, if any, from the date upon which the defendant offers to the Fund the amount finally paid to the Fund in satisfaction of the claim of the Fund to the date upon which the Fund accepts that offer, inclusive.

[(d) The Fund shall pay over to the claimant that portion of any interest the Fund recovers, pursuant to subsection (c)(1) and (2)(A), for the period from the date upon which the claim of the claimant is presented to the defendant to the date upon which the claimant is paid by the Fund, inclusive, less the period from the date upon which the Fund offers to the claimant the amount finally paid to the claimant in satisfaction of the claim to the date upon which the claimant accepts such offer, inclusive.

[(e) The Fund is entitled to recover for all interest and costs specified in subsection (c) of this section without regard to any limitation of liability to which the defendant may otherwise be entitled under this title.

### [JURISDICTION AND VENUE

[SEC. 309. (a) The United States district courts shall have original and exclusive jurisdiction of all controversies arising under this title, without regard to the citizenship of the parties or the amount in controversy.

[(b) Venue shall lie in any district wherein the injury complained of occurred, or wherein the defendant resides, may be found, or has his principal office. For the purposes of this section, the Fund shall reside in the District of Columbia.

### [RELATIONSHIP TO OTHER LAW

[SEC. 310. (a) Any person who receives compensation for damages or removal costs pursuant to this title shall be precluded from recovering compensation for the same damages or removal costs pursuant to any other State or Federal law. Any person who receives compensation for damages or removal costs pursuant to any other State or Federal law shall be precluded from receiving compensation for the same damages or removal costs under this title.

[(b) No owner or operator of an offshore facility or vessel who establishes and maintains evidence of financial responsibility in accordance with this section shall be required under any State law, rule, or regulation to establish any other evidence of financial responsibility in connection with liability for the discharge of oil from such offshore facility or vessel. Evidence of compliance with the financial responsibility requirement of this section shall be accepted by a State in lieu of any other requirement of financial responsibility imposed by such State in connection with liability for the discharge of oil from such offshore facility or vessel.

[(c) Except as otherwise provided in this title, this title shall not be interpreted to preempt the field of liability or to preclude any State from imposing additional requirements or liability for any

discharge of oil resulting in damages or removal costs within the jurisdiction of such State.

### 〔PROHIBITION

〔SEC. 311. The discharge of oil from any offshore facility or vessel, in quantities which the President under section 311(b) of the Federal Water Pollution Control Act (33 U.S.C. 1321(b)) determines to be harmful, is prohibited.

### 〔PENALTIES

〔SEC. 312. (a)(1) Any person who fails to comply with the requirements of section 305 of this title, the regulations promulgated thereunder, or any denial or detention order, shall be subject to a civil penalty of not to exceed $10,000.

〔(2) The civil penalty described in paragraph (1) of this subsection may be assessed and compromised by the President or his designee, in connection with section 305(a)(1) of this title, and by the Secretary, in connection with section 305(a)(3) and section 305(b) of this title. No penalty shall be assessed until notice and an opportunity for hearing on the alleged violation have been given. In determining the amount of the penalty or the amount agreed upon in compromise, the demonstrated good faith of the party shall be taken into consideration.

〔(3) At the request of the official assessing a penalty under this subsection, the Attorney General may bring an action in the name of the Fund to collect the penalty assessed.

〔(b) Any person in charge who is subject to the jurisdiction of the United States and who fails to give the notification by section 306(a) of this title shall, upon conviction, be fined not more than $10,000 or imprisoned for not more than one year, or both.

### 〔AUTHORIZATION OF APPROPRIATIONS

〔SEC. 313. (a) There is authorized to be appropriated for the administration of this title $10,000,000 for the fiscal year ending September 30, 1979, $5,000,000 for the fiscal year ending September 30, 1980, and $5,000,000 for the fiscal year ending September 30, 1981.

〔(b) There are also authorized to be appropriated to the Fund, from time to time, such amounts as may be necessary to carry out the purposes of the applicable provisions of this title, including the entering into contracts, any disbursements of funds, and the issuance of notes or other obligations pursuant to section 302(f) of this title.

〔(c) Notwithstanding any other provision of this title, the authority to make contracts, to make disbursements, to issue notes or other obligations pursuant to section 302(f) of this title, to charge and collect fees pursuant to section 302(d) of this title, or to exercise any other spending authority shall be effective only to the extent provided, without fiscal year limitation, in appropriation Acts enacted after the date of enactment of this title.

### 〔ANNUAL REPORT

〔SEC. 314. Within six months after the end of each fiscal year, the Secretary shall submit to the Congress (1) a report on the ad-

94

ministration of the Fund during such fiscal year, and (2) his recommendations for such legislative changes as he finds necessary or appropriate to improve the management of the Fund and the administration of the liability provisions of this title.

### EFFECTIVE DATE

〔SEC. 315. (a) This section, subsection (e) of section 304, subsection (d) of section 305, and all provisions of this title authorizing the delegation of authority or the promulgation of regulations shall be effective on the date of enactment of this title.

〔(b) All other provisions of this title, and rules and regulations promulgated pursuant to such provisions, shall be effective on the one hundred and eightieth day after the date of enactment of this title.〕

O

| 101ST CONGRESS | HOUSE OF REPRESENTATIVES | REPT. 101-242 |
| 1st Session | | Part 2 |

# OIL POLLUTION PREVENTION, REMOVAL, LIABILITY AND COMPENSATION ACT OF 1989

SEPTEMBER 18, 1989.—Ordered to be printed

Mr. JONES of North Carolina, from the Committee on Merchant Marine and Fisheries, submitted the following

# REPORT

together with

## ADDITIONAL VIEWS

[To accompany H.R. 1465 which on March 16, 1989, was referred jointly to the Committee on Merchant Marine and Fisheries and the Committee on Public Works and Transportation]

The Committee on Merchant Marine and Fisheries, to whom was referred the bill (H.R. 1465) to establish limitations on liability for damages resulting from oil pollution, to establish a fund for the payment of compensation for such damages, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Strike out all after the enacting clause and insert the following:

SECTION 1. SHORT TITLE AND TABLE OF CONTENTS.

(a) SHORT TITLE.—This Act may be cited as the "Oil Pollution Prevention, Removal, Liability, and Compensation Act of 1989".

(b) TABLE OF CONTENTS.—The contents of this Act are as follows:

Sec. 1. Short title and table of contents.

TITLE I—OIL POLLUTION LIABILITY AND COMPENSATION

Sec. 101. Definitions.
Sec. 102. Liability.
Sec. 103. Uses of the Fund.
Sec. 104. Claims procedure.
Sec. 105. Designation and advertisement.
Sec. 106. Subrogation.
Sec. 107. Financial responsibility.
Sec. 108. Litigation, jurisdiction, and venue.
Sec. 109. Relationship to other law
Sec. 110. Effective date.

TITLE II—CONFORMING AMENDMENTS

Sec. 201 Trans-Alaska pipeline fund.

21-721

2

Sec. 202. Intervention on the High Seas Act.
Sec. 203. Federal Water Pollution Control Act.
Sec. 204. Deepwater Port Act.
Sec. 205. Outer Continental Shelf Lands Act Amendments of 1978.
Sec. 206. Notice to State; increased penalties for failure to report.
Sec. 207. Qualified authorizing legislation.
Sec. 208. Effective date.

TITLE III—IMPLEMENTATION OF INTERNATIONAL CONVENTIONS

Sec 301. Definitions.
Sec. 302. Applicability of conventions.
Sec. 303. Recognition of International Fund.
Sec. 304. Action in United States courts.
Sec. 305. Contribution to International Fund.
Sec. 306. Recognition of foreign judgments.
Sec. 307. Financial responsibility.
Sec. 308. Regulations.

TITLE IV—PREVENTION AND REMOVAL OF OIL AND HAZARDOUS SUBSTANCE DISCHARGES

SUBTITLE A—GENERAL

Sec. 401. Definitons.

SUBTITLE B—PREVENTION

Sec. 411. Review of alcohol and drug abuse and other matters in issuing licenses, certificates of registry, and merchant mariner's documents.
Sec. 412. Term of Certificates of registry and merchant mariner's documents.
Sec. 413. Suspension and revocation of seamen's licenses, certificates of registry, and merchant mariner's documents for alcohol and drug abuse.
Sec 414. Removal of master or individual in charge for intoxication.
Sec. 415. Access to national driver register.
Sec. 416. Manning standards for foreign tank vessels.
Sec. 417. Vessel traffic service systems.
Sec. 418. State authority to require state pilotage for tankers.
Sec. 419. Great Lakes pilotage.
Sec. 420. Study on tanker navigation safety standards.
Sec. 421. Dredge modification study.
Sec. 422. Use of liners.

SUBTITLE C—REMOVAL

Sec. 431. Federal removal authority.
Sec. 432. Contingency plans.
Sec. 433. Oil and hazardous substances strike teams.
Sec. 434. Coast Guard vessel design
Sec. 435. Equipment inventory.
Sec. 436. Oil pollution research and development program.

SUBTITLE D—PENALTIES

Sec. 411. Increased penalties.

TITLE V—PRINCE WILLIAM SOUND OIL SPILL REMOVAL

Sec 501. Short title.
Sec. 502. Definitions.
Sec. 503. Tank vessel requirements.
Sec 504 Vessel traffic service system
Sec. 505. Equipment and personnel requirements.
Sec. 506. Use of local services.
Sec. 507. Authority of the State of Alaska.
Sec 508 Environmental assessment.
Sec. 509. Report.

TITLE VI—MISCELLANEOUS

Sec. 601 Conforming amendments to title 46
Sec. 602. Statutory waivers
Sec. 603. Studies and reports as administrative expenses
Sec. 604. Savings clause.

# TITLE I—OIL POLLUTION LIABILITY AND COMPENSATION

## SEC. 101. DEFINITIONS.

For the purposes of this Act, the term—

(1) "act of God" means an unanticipated grave natural disaster or other natural phenomenon of an exceptional, inevitable, and irresistible character the effects of which could not have been prevented or avoided by the exercise of due care or foresight;

(2) "claim" means a request, made in writing for a sum certain, for compensation for damages or removal costs resulting from an incident;

(3) "claimant" means any person who presents a claim for compensation under this Act;

3

(4) "damages" means damages for injury to, destruction of, or loss of natural resources and damages for economic loss specified in section 102(a)(2) of this Act, and includes the cost of assessment of damages;

(5) "discharge" means any emission (other than natural seepage), intentional or unintentional, and includes, but is not limited to, spilling, leaking, pumping, pouring, emitting, emptying, or dumping;

(6) "exclusive economic zone" means the zone established by Presidential Proclamation Numbered 5030, dated March 10, 1983,

(7) "facility" means an onshore facility and an offshore facility;

(8) "foreign offshore unit" means a structure or group of structures which is located, in whole or in part, in the territorial sea or on or over the continental shelf of a foreign country and is or was used for one or more of the following purposes: exploring for, drilling for, producing, storing, handling, transferring, processing, or transporting oil produced from the seabed beneath the foreign country's territorial sea or from the foreign country's continental shelf;

(9) "Fund" means the Oil Spill Liability Trust Fund, established by section 9509 of the Internal Revenue Code of 1986;

(10) "guarantor" means any person, other than the responsible party, who provides evidence of financial responsibility for a responsible party under this Act;

(11) "incident" means any occurrence or series of occurrences having the same origin, involving one or more vessels, facilities, or any combination thereof, resulting in the discharge or substantial threat of discharge of oil;

(12) "lessee" means a person holding a leasehold interest in an oil or gas lease on lands beneath navigable waters (as such term is defined in section 2 of the Submerged Lands Act (43 U.S.C. 1301)) or on submerged lands of the Outer Continental Shelf, granted or maintained under applicable State law or the Outer Continental Shelf Lands Act;

(13) "mobile offshore drilling unit" means a vessel (other than a self-elevating lift vessel) capable of use as an offshore facility;

(14) "national contingency plan" means the national contingency plan published under section 311(c) of the Federal Water Pollution Control Act or revised pursuant to section 105 of the Comprehensive Environmental Response, Compensation, and Liability Act;

(15) "natural resources" includes land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States (including the resources of the exclusive economic zone), any State or local government, or any foreign government;

(16) "navigable waters" means the waters of the United States, including the territorial sea;

(17) "offshore facility" means—

(A) a facility of any kind (other than a vessel, a public vessel, or a self-elevating lift vessel) which is located, in whole or in part, on lands beneath navigable waters (as such term is defined in section 2(a) of the Submerged Lands Act (43 U.S.C. 1301)) or on the Outer Continental Shelf and is or was used for one or more of the following purposes: exploring for, drilling for, producing, storing, handling, transferring, processing, or transporting oil produced from lands beneath navigable waters or the Outer Continental Shelf; and

(B) a deepwater port licensed under the Deepwater Port Act of 1974;

(18) "oil" means petroleum, including crude oil or any fraction or residue therefrom;

(19) "onshore facility" means any facility (including, but not limited to, motor vehicles and rolling stock) of any kind, any portion of which is located in, on, or under, any land within the United States other than submerged land;

(20) "owner" means any person holding title to, or in the absence of title, any other indicia of ownership of, whether by lease, permit, contract, license, or other form of agreement, except that such term does not include a person who, without participating in the management or operation of a vessel or a pipeline, holds indicia of ownership primarily to protect his security interest therein;

(21) "person" means an individual, corporation, partnership, association, Federal agency, State, municipality, commission, or political subdivision of a State, or any interstate body;

(22) "permittee" means a person holding an authorization, license, or permit for geological exploration issued under section 11 of the Outer Continental Shelf Lands Act or applicable State law;

4

(23) "public vessel" means a vessel owned or bareboat chartered and operated by the United States, or by a State or political subdivision thereof, or by a foreign nation, except when such vessel is engaged in commerce;

(24) "remove" or "removal" refers to removal of the oil from the water and shorelines or the taking of such other actions as may be necessary to minimize or mitigate damage to the public health or welfare, including, but not limited to, damage to fish, shellfish, wildlife, and public and private property, shorelines, and beaches;

(25) "removal costs" means the costs of removal taken after a discharge of oil has occurred, including all costs of completing removal and the costs to prevent, minimize, or mitigate oil pollution where there was a substantial threat of a discharge of oil including costs incurred under subsection (c), (d), (e), or (l) of section 311 of the Federal Water Pollution Control Act, the Intervention on the High Seas Act, or section 18 of the Deepwater Port Act of 1974;

(26) "responsible party" means the following:

(A) VESSELS.—In the case of a vessel, the responsible party is any person owning, operating, or chartering by demise, the vessel.

(B) FACILITIES.—In the case of a facility (including a pipeline but not including any other offshore facility), the responsible party is any person owning or operating the facility except that this term does not include a Federal agency, State, municipality, commission, or political subdivision of a State, or any interstate body, that, as the owner of an onshore facility, transfers possession and right to use the property to another person by lease, assignment, or permit.

(C) OFFSHORE FACILITIES.—In the case of an offshore facility (other than a pipeline or a deepwater port licensed under the Deepwater Port Act of 1974, and except as provided in section 102(a)(4)), the responsible party is the lessee or permittee of the area in which the facility is located, or the holder of a right of use and easement granted under applicable State law or the Outer Continental Shelf Lands Act for the area in which the facility is located (where the holder is a different person than the lessee or permittee).

(D) DEEPWATER PORTS.—In the case of a deepwater port licensed under the Deepwater Port Act of 1974, the responsible party is the licensee.

(27) "Secretary" means the Secretary of the department in which the Coast Guard is operating;

(28) "tanker" means a vessel constructed or adapted for the carriage of oil in bulk or in commercial quantities as cargo; except that the term does not include a non-self-propelled vessel of less than 3,000 gross tons carrying oil in bulk as cargo or in residue from cargo and operating on waters of the United States lying inside the baseline from which the territorial sea is measured or on waters outside such baseline which are part of the Gulf Intracoastal Waterway; and

(29) "territorial sea" means the belt of seas measured from the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters, and extending seaward a distance of 12 miles;

(30) "United States" and "State" mean the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, the Commonwealth of the Northern Marianas, and any other territory or possession over which the United States has jurisdiction; and

(31) "vessel" means every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water other than a public vessel.

SEC. 102. LIABILITY.

(a) ELEMENTS OF LIABILITY.—

(1) JOINT, SEVERAL, AND STRICT LIABILITY.—Notwithstanding another law and subject to the provisions of this section, the responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the waters of the exclusive economic zone is jointly, severally, and strictly liable for the removal costs and damages specified in paragraph (2) that arise out of or directly result from such incident.

(2) COVERED REMOVAL COSTS AND DAMAGES.—

5

(A) REMOVAL COSTS.—The removal costs referred to in paragraph (1) are removal costs reasonably consistent with the national contingency plan or applicable State laws, which shall be recoverable by any claimant.

(B) DAMAGES.—The damages referred to in paragraph (1) are the following:

(i) NATURAL RESOURCES.—Damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing the injury, destruction, or loss, which shall be recoverable by a United States trustee or a State trustee.

(ii) REAL OR PERSONAL PROPERTY.—Damages for injury to, or economic losses resulting from destruction of, real or personal property, which shall be recoverable by a claimant who owns or leases the property.

(iii) SUBSISTENCE USE.—Damages for loss of subsistence use of natural resources, which shall be recoverable by any claimant who so uses natural resources which have been injured, destroyed, or lost.

(iv) REVENUES.—Damages equal to the loss of taxes, royalties, rents, fees, or net profits shares, for a period not to exceed one year, due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by the Government of the United States, a State, or a political subdivision thereof.

(v) PROFITS AND EARNING CAPACITY.—Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant who derives at least 25 percent of his or her earnings from the activities which utilize such property or natural resources, or, if such activities are seasonal in nature, 25 percent of his or her earnings during the applicable season.

(3) EXCLUDED DISCHARGES.—Paragraph (1) does not apply to any discharge permitted by a permit issued under Federal, State, or local law.

(4) DIVISION OF RESPONSIBILITY FOR MODU DISCHARGES ON OR ABOVE THE WATER.—

(A) TREATED FIRST AS A TANKER.—For purposes of determining the responsible party and applying this Act, a mobile offshore drilling unit which is being used as an offshore facility shall be deemed to be a tanker with respect to the discharge, or the substantial threat of a discharge, of oil on or above the surface of the water, except as provided in subparagraph (B).

(B) TREATED AS A FACILITY FOR EXCESS LIABILITY.—To the extent that removal costs and damages from any incident described in subparagraph (A) exceed the amount for which the responsible party is liable under subparagraph (A) (as such amount may be limited under subsection (c)(1)(A)), the mobile offshore drilling unit shall be deemed to be an offshore facility. For purposes of applying subsection (c)(1)(C), the amount specified in such subsection shall be reduced by the amount for which the responsible party is liable under subparagraph (A).

(5) LIABILITY OF THIRD PARTIES.—

(A) IN GENERAL.—(i) Except as provided in clause (ii), in any case where the responsible party can establish that a discharge and the resulting removal costs and damages were caused solely by an act or omission of one or more third parties in accordance with subsection (b)(1)(B) (or solely by such an act or omission in combination with an act of God or an act of war), such third party or parties shall be liable under this section.

(ii) A third party is not liable for removal costs or damages, other than personal injury or wrongful death, if returned or directed by the President under sections 311(c)(1)(B) or 311(c)(1)(C) of the Federal Water Pollution Control Act, unless the third party is grossly negligent or engages in willful misconduct.

(B) LIMITATION APPLIED.—

(i) OWNER OR OPERATOR OF VESSEL OR FACILITY.—If such third party or parties are the owner or operator of a vessel or facility which caused the incident, the liability of the third party or parties shall be subject to the limits provided in subsection (c), as applied with respect to such vessel or facility.

(ii) OTHER CASES.—In any other case, the liability of such third party or parties shall not exceed the limitation which would have been applicable to the responsible party of the vessel or facility from which the discharge actually occurred if such responsible party were liable.

(b) DEFENSES TO LIABILITY.—

6

(1) COMPLETE DEFENSES.—Except when the responsible party has failed or refused to report the incident where required by law and the responsible party knows or has reason to know of the incident, there is no liability under subsection (a) if the responsible party establishes that the incident—

(A) resulted from an act of God, an act of war, hostilities, civil war, or insurrection; or

(B) was solely caused by an act or omission of one or more persons other than—

(i) a responsible party;

(ii) an employee or agent of a responsible party; or

(iii) one whose act or omission occurs in connection with a contractual relationship with a responsible party.

(2) DEFENSES AS TO PARTICULAR CLAIMANTS.—There is no liability under subsection (a)—

(A) as to a particular claimant, where the incident is caused, in whole or part, by the gross negligence or willful misconduct of that claimant; or

(B) as to a particular claimant, to the extent that the incident is caused by the negligence of that claimant.

(c) LIMITS ON LIABILITY.—

(1) GENERAL RULE.—The total of the liability of a responsible party under subsection (a) and any removal costs incurred by, or on behalf of, the responsible party with respect to each incident shall not exceed—

(A) $500 per gross ton or $5,000,000, whichever is greater (but not to exceed $60,000,000), for any tanker;

(B) $300 per gross ton or $500,000, whichever is greater, for any other vessel; or

(C) $75,000,000 for any facility.

(2) EXCEPTIONS.—

(A) PROXIMATE CAUSE.—Paragraph (1) does not apply if the incident was proximately caused by—

(i) willful misconduct or gross negligence within the privity or knowledge of the responsible party; or

(ii) a violation, within the privity or knowledge of the responsible party, of applicable Federal safety, construction, or operating regulations.

(B) FAILURE OR REFUSAL OF RESPONSIBLE PARTY.—Paragraph (1) does not apply if the responsible party fails or refuses—

(i) to report the incident where required by law and the responsible party knows or has reason to know of the incident;

(ii) to provide all reasonable cooperation and assistance requested by a responsible official in connection with removal activities; or

(iii) to comply with an order issued under section 311(e) of the Federal Water Pollution Control Act, in which case the responsible party may be liable to the United States for punitive damages in an amount up to three times the removal costs and damages incurred by the Fund as a result of the failure to comply.

(3) ADJUSTING LIMITS OF LIABILITY.—

(A) FACILITIES.—The Secretary may establish by regulation, with respect to any class or category of facility (other than an offshore facility which is not a deepwater port) a maximum limit of liability under this section of less than $75,000,000, but not less than $8,000,000, taking into account the size, storage capacity, oil throughput, proximity to sensitive areas, type of oil handled, history of discharges, and other factors relevant to risks posed by the class or category of facility.

(B) PERIODIC REPORTS.—The Secretary shall, within six months of the enactment of this Act, and from time to time thereafter, report to Congress on the desirability of adjusting the limits of liability specified in paragraph (1) of this subsection.

(d) LIABILITY FOR INTEREST.—

(1) GENERAL RULE.—The responsible party or his or her guarantor is liable to the claimant for interest on the amount paid in satisfaction of a claim under this section for the period described in paragraph (2).

(2) PERIOD.—

(A) IN GENERAL.—Except as provided in subparagraph (B), the period for which interest shall be paid under paragraph (1) is the period beginning on the date on which the claim is presented to the responsible party, or guarantor, and ending on the date on which the claimant is paid, inclusive.

7

(B) EXCLUSION OF PERIOD DUE TO OFFER BY GUARANTOR.—If the guarantor offers to the claimant an amount equal to or greater than that finally paid in satisfaction of the claim, the period described in subparagraph (A) shall not include the period beginning on the date such offer is made and ending on the date such offer is accepted. If the offer is made within 60 days after the date upon which the claim is presented order section 104(a), the period described in subparagraph (A) does not include any period before such offer is accepted.

(C) EXCLUSION OF PERIODS IN INTEREST OF JUSTICE.—The period described in paragraph (A) shall not include any period—

(i) during which a claimant is not paid due to reasons beyond the control of the responsible party; and

(ii) if it would not serve the interest of justice to include such period.

(D) CALCULATION OF INTEREST.—The interest paid under this subsection shall be calculated at the average of the highest rate for commercial and finance company paper of maturities of 180 days or less obtaining on each of the days included within the period for which interest must be paid to the claimant, as published in the Federal Reserve Bulletin.

(E) INTEREST NOT SUBJECT TO LIABILITY LIMITS.—Interest under this paragraph is in addition to damages for which claims may be asserted under section 102 and shall be paid without regard to any limitation of liability under subsection (c)(1) of this section. The payment of interest under this subsection by a guarantor is subject to section 107(e).

(e) NATURAL RESOURCES.—

(1) LIABILITY.—In the case of an injury to, destruction of, or loss of natural resources under this section, liability shall be—

(A) to the United States Government for natural resources belonging to, managed by, controlled by, or appertaining to the United States,

(B) to any State for natural resources within the State or belonging to, managed by, controlled by, or appertaining to such State, and

(C) when subsection (f) of this section applies, to the government of a foreign country for natural resources belonging to, managed by, controlled by, or appertaining to such country.

(2) DESIGNATION OF TRUSTEES.—

(A) IN GENERAL.—The President, or the authorized representative of any State or of the foreign government, shall act on behalf of the public as trustee of such natural resources to recover for such damages.

(B) FEDERAL TRUSTEES.—The President shall designate the Federal officials who shall act on behalf of the public as trustees for natural resources under this Act.

(C) STATE TRUSTEES.—The Governor of each State shall designate State and local officials who may act on behalf of the public as trustee for natural resources under this Act and shall notify the President of such designations.

(3) FUNCTIONS OF TRUSTEES.—

(A) FEDERAL TRUSTEES.—The officials designated under paragraph (2)(B)—

(i) shall assess damages for injury to, destruction of, or loss of natural resources for purposes of this Act for the natural resources under their trusteeship;

(ii) may, upon request of and reimbursement from a State and at the Federal officials' discretion, assess damages for the natural resources under the State's trusteeship; and

(iii) shall develop and implement a plan for the restoration, rehabilitation, or replacement or acquisition of the equivalent of the natural resources under their trusteeship.

(B) STATE TRUSTEES.—The officials designated under paragraph (2)(C)—

(i) shall assess damages to natural resources for the purposes of this Act for the natural resources under their trusteeship; and

(ii) shall develop and implement a plan for the restoration, rehabilitation, or replacement or acquisition of the equivalent of the natural resources under their trusteeship.

(C) NOTICE AND OPPORTUNITY TO BE HEARD.—Plans shall be developed and implemented under subparagraphs (A)(iii) and (B)(ii) only after adequate public notice and opportunity for hearing and consideration of all public comment.

(4) MEASURE OF DAMAGES.—

(A) IN GENERAL.—The measure of damages in any action under this section for injury to, destruction of, or loss of natural resources is the cost of restoring, rehabilitating, replacing, or acquiring the equivalent of the damaged natural resources, and the value of the interim lost public uses of those resources.

(B) DETERMINE COSTS WITH RESPECT TO PLANS.—Costs shall be determined under subparagraph (A) with respect to plans adopted under paragraph (3) (A) and (B).

(C) No DOUBLE RECOVERY.—There shall be no double recovery under this Act for natural resource damages, including the costs of damage assessment or restoration, rehabilitation, replacement, or acquisition for the same incident and natural resource.

(5) DAMAGE ASSESSMENT REGULATIONS.—

(A) REGULATIONS.—Not later than 2 years after the date of enactment of this Act, the Under Secretary of Commerce for Oceans and Atmosphere, in consultation with other Federal natural resource trustees, shall promulgate regulations, consistent with paragraph (4)(A), for the assessment of damages to natural resources arising out of an incident.

(B) REBUTTABLE PRESUMPTION.—Any determination or assessment of damages to natural resources for the purposes of this Act made by a Federal or State trustee in accordance with the regulations promulgated under subparagraph (A) shall have the force and effect of a rebuttable presumption on behalf of the trustee in any administrative or judicial proceeding under this Act.

(6) USE OF RECOVERED SUMS.—Sums recovered under this Act by a Federal or State trustee for damages to natural resources shall be retained by the trustee, without further appropriation, for use only to reimburse or pay costs incurred by the trustee under paragraph (3) with respect to the damaged natural resources. Any amounts in excess of those required for these reimbursements and costs shall be deposited in the Fund.

(7) CIVIL PENALTY.—

(A) IN GENERAL.—A person liable under this Act for damages resulting from a discharge of oil is also liable to the United States Government for a civil penalty of not more than the maximum amount for which the person may be held liable for that discharge under section 102 of this Act, if the discharge results in damages to natural resources that cannot be fully restored, replaced, or rehabilitated and for which no equivalent can be acquired.

(B) ASSESSMENT, SETTLEMENT, AND COLLECTION. The penalty shall be assessed in writing by the Secretary, in consultation with the appropriate natural resource trustees. In determining the amount of a civil penalty under this paragraph, the Secretary shall take into account the nature and extent of the damages to natural resources, the degree of culpability of the person held liable for the discharge, and the nature and extent of efforts taken by that person to prevent the damages to natural resources. The Secretary may compromise, modify, or remit, with or without conditions, any civil penalty which is subject to imposition or which has been imposed under this paragraph. If any person fails to pay an assessed civil penalty after it has become final, the Secretary may refer the matter to the Attorney General for collection.

(C) SEPARATE LIABILITY.—Except as provided in section 302, any liability for a civil penalty under this paragraph shall be separate from and in addition to any liability for a discharge of oil under section 102.

(D) DEPOSIT INTO FUND.—Sums received under this paragraph shall be deposited in the Fund.

(f) RECOVERY BY FOREIGN CLAIMANTS.—

(1) IN GENERAL.—A foreign claimant may only recover removal costs and damages under this Act in accordance with this subsection.

(2) COVERED DISCHARGES.—A foreign claimant may recover only if the discharge of oil was from—

(A) a facility,

(B) a vessel in the navigable waters, or

(C) a tanker carrying oil originally received at the terminal of the pipeline constructed under the Trans-Alaska Pipeline Authorization Act for transportation to a port in the United States, the incident having occurred prior to delivery to that port,

9

and resulted in the presence of oil in or on the territorial sea, internal waters, or adjacent shoreline of a foreign country.

(3) REQUIREMENTS.—A foreign claimant may only recover if—

(A) the claimant first seeks compensation under title III;

(B) the claimant has not been otherwise compensated for the removal costs or damages; and

(C) recovery is authorized by a treaty or executive agreement between the United States and the claimant's country, or the Secretary of State, in consultation with the Attorney General and other appropriate officials, has certified that the claimant's country provides a comparable remedy for United States claimants.

(4) EXCEPTION FOR CANADIAN CLAIMANTS RESPECTING TRANS-ALASKA PIPELINE OIL.—Paragraph (3)(C) shall not apply with respect to recovery by a resident of Canada in the case of an incident described in paragraph (2)(C).

(5) DEFINITION OF FOREIGN CLAIMANT.—For purposes of this subsection, the term "foreign claimant" means any person residing in a foreign country, the government of a foreign country, or any agency or political subdivision thereof.

(g) RECOVERY OF REMOVAL COSTS AND DAMAGES BY RESPONSIBLE PARTY.—

(1) IN GENERAL.—The responsible party for a vessel or facility from which oil is discharged, or which posed the substantial threat of a discharge of oil, may assert a claim for removal costs and damages under subsection (a) only if the responsible party can show that—

(A) the responsible party is entitled to a defense to liability under subsection (b), or

(B) the responsible party is entitled to a limitation of liability under subsection (c).

(2) EXTENT OF RECOVERY.—A responsible party who is entitled to a limitation of liability, may assert a claim under paragraph (1) of subsection (a) only to the extent that the sum of the removal costs and damages incurred by the responsible party plus the amounts paid by the responsible party or by the guarantor on behalf of the responsible party for claims asserted under subsection (a) exceeds the amount to which the total of the liability under subsection (a) and removal costs and damages incurred by, or on behalf of, the responsible party is limited under subsection (c).

(h) CONTRIBUTION.—A person may bring an action for contribution against any other person who is liable or potentially liable under this section. Such an action shall be brought in accordance with section 108.

(i) INDEMNIFICATION AGREEMENTS.—

(1) IN GENERAL.—No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer the liability imposed under this section from the responsible party or from any person who may be liable for an incident under this section to any other person. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

(2) RELATIONSHIP TO OTHER CAUSES OF ACTION.—Nothing in this Act, including the provisions of paragraph (1) of this subsection, shall bar a cause of action that a responsible party subject to liability under this section, or a guarantor, has or would have, by reason of subrogation or otherwise against any person.

(j) CONSULTATION ON REMOVAL ACTIONS.—The Secretary shall consult with the affected trustees designated under section 102(e)(2) on the appropriate removal action to be taken in connection with any discharge of oil. Removal with respect to any discharge shall be considered completed when so determined by the Secretary and the Governor or Governors of the affected State or States, in accordance with the national contingency plan and applicable State laws.

SEC. 103. USES OF THE FUND.

(a) IN GENERAL.—

(1) DIRECT USES.—The Fund shall be directly available to the Secretary for—

(A) the payment of removal costs incurred by Federal authorities;

(B) the costs incurred by Federal or State trustees in carrying out their functions under section 102(e) for assessing damages to natural resources and for developing plans for the restoration, rehabilitation, or replacement of damaged resources;

(C) the payment of obligations under subsection (e) of this section;

(D) the payment of removal costs and damages resulting from the discharge, or substantial threat of discharge, of oil from a foreign offshore unit;

## 10

(E) the payment of personnel, equipment, and training costs associated with the maintenance of the strike force authorized under section 311(c) of the Federal Water Pollution Control Act;

(F) the payment of administrative and personnel costs and expenses reasonably necessary for and incidental to the implementation and administration of this Act including the studies and reports required under sections 420, 421, 422, and 509 of this Act;

(G) the payment of contributions to the International Fund under title III of this Act;

(H) the payment of Federal expenses under section 311(j) of the Federal Water Pollution Control Act;

(I) the preparation of regulations required under section 102(e)(5); and

(J) the research and development program authorized under section 311(t) of the Federal Water Pollution Control Act.

(2) SETTLEMENT OF CLAIMS.—The Fund shall also be available to the Secretary for the payment of otherwise uncompensated claims for removal costs and damages in accordance with section 104.

(b) DEFENSES TO LIABILITY FOR THE FUND.—The Fund shall not be available to pay any claim for removal costs or damages—

(1) as to a particular claimant, where the incident or damages are caused, in whole or part, by the gross negligence or willful misconduct of that claimant; or

(2) as to a particular claimant, to the extent that the incident or damages are caused by the negligence of that claimant.

(c) MAXIMUM AMOUNT PAYABLE FROM THE FUND.—The maximum amount which may be paid from the Fund with respect to any incident in combination with payment, if any, under the International Convention on the Establishment of an International Fund for Compensation of Oil Pollution Damage, 1984, shall not exceed $1,000,000,000.

(d) FEDERAL AND STATE OFFICIALS WHO MAY OBLIGATE FROM THE FUND.—The Secretary is authorized to promulgate regulations designating one or more Federal officials who may obligate money in the Fund in accordance with subsection (a) of this section or portions thereof. The Secretary shall designate the Commandant of the Coast Guard to be a Federal official who may obligate money in the Fund in accordance with subsection (a). The Secretary is also authorized to delegate authority to obligate money in the Fund or to settle claims to officials of a State with an adequate program operating under a cooperative agreement with the Federal Government.

(e) OBLIGATION OF THE FUND BY STATE OFFICIALS.—

(1) AUTHORITY.—In accordance with regulations promulgated under this subsection, the Governor of each State, or any appropriate State official designated by the Governor, is authorized to obligate the Fund for payment in an amount not to exceed $250,000 for removal costs not inconsistent with the national contingency plan required for the immediate response to an incident.

(2) NOTIFICATION.—A Governor or designee exercising the authority granted by this subsection shall notify the Secretary within 24 hours of any obligation of a payment from the Fund.

(3) REGULATIONS.—Not later than six months after the date of the enactment of this Act, the Secretary shall publish proposed regulations detailing the manner in which the authority to obligate the Fund and to enter into agreements under this subsection is to be exercised, and, not later than three months after the close of the comment period on such proposed regulations, the Secretary shall promulgate the regulations.

(f) RIGHTS OF SUBROGATION.—Payment of any claim by the Fund under this Act shall be subject to the United States Government acquiring by subrogation of all rights of the claimant to recover from the responsible party.

(g) AUDIT.—The Comptroller General shall provide an audit review team to audit all payments, obligations, reimbursements, or other uses of the Fund, to assure that the Fund is being properly administered and that claims are being appropriately and expeditiously considered. The Comptroller General shall submit to the Congress an interim report one year after the establishment of the Fund. The Comptroller General shall thereafter provide such auditing of the Fund as is appropriate. Each Federal agency shall cooperate with the Comptroller General in carrying out this subsection.

(h) PERIOD OF LIMITATIONS FOR CLAIMS.—

(1) REMOVAL COSTS.—No claim may be presented under this section for recovery of removal costs unless the claim is presented within three years after the date of completion of all removal action.

11

(2) DAMAGES.—No claim may be presented under this section for recovery of damages unless the claim is presented within three years after the date on which the loss and its connection with the discharge in question were reasonably discoverable with the exercise of due care, or in the case of damages under section 102(a)(2), if later, the date on which final regulations are promulgated under section 102(e)(5).

(i) LIMITATION ON PAYMENT FOR SAME COSTS.—Where the Secretary has paid an amount out of the Fund for any removal costs or damages specified under subsection (a), no other claim may be paid out of the Fund for the same removal costs or damages.

(j) OBLIGATION IN ACCORDANCE WITH PLAN.—

(1) IN GENERAL.—Except as provided in paragraph (2), amounts may be obligated from the Fund for the restoration, rehabilitation, or replacement, or acquisition of natural resources only in accordance with a plan adopted under section 102(e)(3).

(2) EXCEPTION.—Paragraph (1) shall not apply in a situation requiring action to avoid irreversible loss of natural resources or to prevent or reduce any continuing danger to natural resources or similar need for emergency action.

SEC. 104. CLAIMS PROCEDURE.

(a) PRESENTATION TO RESPONSIBLE PARTY OR GUARANTOR.—Except as provided in subsection (b), all claims for removal costs or damages shall be presented first to the responsible party or guarantor of the source designated under section 105(a).

(b) PRESENTATION TO FUND.—Claims for removal costs or damages may be presented first to the Fund—

(1) where the Secretary has advertised or otherwise notified claimants in accordance with section 105(c);

(2) by a responsible party who may assert a claim under section 102(g);

(3) by the Governor of a State for removal costs incurred by that State; or

(4) by a United States claimant in a case where a foreign offshore unit has discharged oil causing damage for which the Fund is liable under section 103(a)(1)(D).

(c) ELECTION.—If a claim is presented in accordance with subsection (a) and—

(1) each person to whom the claim is presented denies all liability for the claim, or

(2) the claim is not settled by any person by payment within 180 days after the date upon which (A) the claim was presented, or (B) advertising was begun pursuant to section 105(b), whichever is later,

the claimant may elect to commence an action in court against the responsible party or guarantor or to present the claim to the Fund.

(d) UNCOMPENSATED DAMAGES.—If a claim is presented in accordance with subsection (a) and full and adequate compensation is unavailable, either because the claim exceeds a limit of liability invoked under section 102 or because the responsible party and his or her guarantor are financially incapable of meeting their obligations in full, a claim for the uncompensated damages may be presented to the Fund.

(e) PROCEDURE FOR CLAIMS AGAINST THE FUND.—The Secretary shall promulgate, and may from time to time amend, regulations for the presentation, filing, processing, settlement, and adjudication of claims under this Act against the Fund.

SEC. 105. DESIGNATION AND ADVERTISEMENT.

(a) DESIGNATION OF SOURCE AND NOTIFICATION.—When the Secretary receives information of an incident, the Secretary shall, where possible and appropriate, designate the source or sources of the discharge. If a designated source is a vessel or a facility, the Secretary shall immediately notify the responsible party and the guarantor, if known, of the designation.

(b) ADVERTISEMENT BY THE RESPONSIBLE PARTY OR GUARANTOR.—If a responsible party or guarantor fails to inform the Secretary within five days after receiving notification of a designation under subsection (a) of his or her denial of the designation, such party or guarantor shall advertise the designation and the procedures by which claims may be presented, in accordance with regulations promulgated by the Secretary. Advertisement under the preceding sentence shall begin no later than 15 days after the date of the designation made under subsection (a). If advertisement is not otherwise made in accordance with this subsection, the Secretary shall promptly and at the expense of the responsible party or the guarantor involved, advertise the designation and the procedures by which claims may be presented to the responsible party or guarantor. Advertisement under this subsection shall continue for a period of no less than 30 days.

(c) ADVERTISEMENT BY THE SECRETARY.—If—

12

(1) the responsible party and the guarantor both deny a designation within five days after receiving notification of a designation under subsection (a),

(2) the source of the oil pollution was a public vessel, or

(3) the Secretary is unable to designate the source or sources of the oil pollution under subsection (a),

the Secretary shall advertise or otherwise notify potential claimants of the procedures by which claims may be presented to the Fund.

SEC. 106. SUBROGATION.

(a) IN GENERAL.—Any person, including the Fund, who pays compensation pursuant to this Act to any claimant for removal costs or damages shall be subrogated to all rights, claims, and causes of action that the claimant has under this Act.

(b) ACTIONS ON BEHALF OF THE FUND.—At the request of the Secretary, the Attorney General shall commence an action on behalf of the Fund to recover any compensation paid by the Fund to any claimant pursuant to this Act, and all costs incurred by the Fund by reason of the claim, including interest (including prejudgment interest), administrative and adjudicative costs, and attorney's fees. Such an action may be commenced against any responsible party or (subject to section 107) guarantor, or against any other person who is liable, pursuant to any law, to the compensated claimant or to the Fund, for the cost or damages for which the compensation was paid. Such an action shall be commenced against the responsible foreign government or other responsible party to recover any removal costs or damages paid from the Fund as the result of the discharge, or substantial threat of discharge, of oil from a foreign offshore unit.

SEC. 107. FINANCIAL RESPONSIBILITY.

(a) VESSELS.—

(1) REQUIREMENT.—The responsible party for—

(A) any vessel over 300 gross tons (except a non-self-propelled vessel that does not carry oil as cargo or fuel) using any port or place in the United States or the navigable waters; or

(B) any vessel using the waters of the exclusive economic zone to transship or lighter oil destined for a port or place subject to the jurisdiction of the United States;

shall establish and maintain, in accordance with regulations promulgated by the Secretary, evidence of financial responsibility sufficient to meet the maximum amount of liability to which, in the case of a tanker, the responsible party could be subjected under section 102(c)(1)(A) of this Act, or to which, in the case of any other vessel, the responsible party could be subjected under section 102(c)(1)(B) of this Act, in a case where the responsible party would be entitled to limit liability under that section. If the responsible party owns or operates more than one vessel, evidence of financial responsibility need be established only to meet the maximum liability applicable to the largest of such vessels.

(2) WITHHOLDING CLEARANCE.—The Secretary of the Treasury shall withhold or revoke the clearance required by section 4197 of the Revised Statutes of the United States of any vessel subject to this subsection that does not have the certification required under this subsection.

(3) DENYING ENTRY TO OR DETAINING VESSELS.—The Secretary may (A) deny entry to any offshore facility or any port or place in the United States, or to the navigable waters, or (B) detain at such a facility or port or place, any vessel that, upon request, does not produce the certification required under this subsection or the regulations issued under this subsection.

(4) SEIZURE OF VESSEL AND OIL.—Any vessel subject to the requirements of this subsection which is found in the navigable waters without the necessary evidence of financial responsibility and any oil carried as cargo on such vessel shall be subject to seizure by the United States.

(b) OFFSHORE FACILITIES.—Each responsible party with respect to an offshore facility shall establish and maintain evidence of financial responsibility sufficient to meet the maximum amount of liability to which the responsible party could be subjected under section 102 of this Act in a case where the responsible party would be entitled to limit liability under that section. In cases where a person is the responsible party for more than one facility subject to this subsection, evidence of financial responsibility need be established only to meet the maximum liability applicable to one such facility.

(c) METHODS OF FINANCIAL RESPONSIBILITY.—Financial responsibility under this section may be established by any one, or by any combination, of the following methods, which the Secretary determines to be acceptable: evidence of insurance, surety bond, guarantee, letter of credit, qualification as a self-insurer, or other evi-

dence of financial responsibility. Any bond filed shall be issued by a bonding company authorized to do business in the United States. In promulgating requirements under this section, the Secretary is authorized to specify policy or other contractual terms, conditions, or defenses which are necessary, or which are unacceptable, in establishing such evidence of financial responsibility in order to effectuate the purposes of this Act.

(d) CLAIMS AGAINST GUARANTOR.—Any claim for which liability may be established under section 102 of this Act may be asserted directly against any guarantor providing evidence of financial responsibility for a responsible party liable under that section for removal costs and damages to which the claim pertains. In defending against such a claim, the guarantor may invoke (1) all rights and defenses which would be available to the responsible party under section 102, (2) any defense authorized by the Secretary in requirements promulgated by the Secretary under this section, and (3) the defense that the incident was caused by the willful misconduct of the responsible party. The guarantor may not invoke any other defense that might be available in proceedings brought by the responsible party against the guarantor.

(e) LIMITATION ON GUARANTOR'S LIABILITY.—Nothing in this Act shall impose liability with respect to an incident on any guarantor for damages or removal costs which exceeds, in the aggregate, the amount of financial responsibility required under this Act which that guarantor has provided for the responsible party for any vessel or facility that was a source or cause of oil pollution in that incident.

(f) CIVIL PENALTY.—

(1) IN GENERAL.—Any person who, after notice and an opportunity for a hearing, is found to have failed to comply with the requirements of this section or the regulations issued under this section, or with a denial or detention order issued under subsection (a)(3) of this section, shall be liable to the United States for a civil penalty, not to exceed $25,000 per day of violation. The amount of the civil penalty shall be assessed by the Secretary by written notice. In determining the amount of the penalty, the Secretary shall take into account the nature, circumstances, extent, and gravity of the violation, the degree of culpability, any history of prior violation, ability to pay, and such other matters as justice may require. The Secretary may compromise, modify, or remit, with or without conditions, any civil penalty which is subject to imposition or which has been imposed under this paragraph. If any person fails to pay an assessed civil penalty after it has become final, the Secretary may refer the matter to the Attorney General for collection.

(2) JUDICIAL RELIEF.—In addition to, or in lieu of, assessing a penalty under paragraph (1) of this subsection, the Secretary may request the Attorney General to secure such relief as necessary to compel compliance with this section, including, but not limited to, a judicial order terminating operations. The district courts of the United States shall have jurisdiction to grant such relief as the public interest and the equities of the case may require.

(g) CONTINUATION OF REGULATIONS.—Any regulation respecting financial responsibility, which has been issued pursuant to any provision of law repealed or superseded by this Act, and which is in effect on the date immediately preceding the effective date of this Act, shall be deemed and construed to be a regulation issued pursuant to this section. Such a regulation shall remain in full force and effect unless and until superseded by new regulations issued under this section.

(h) UNIFIED CERTIFICATE.—The Secretary may issue one certificate of financial responsibility for purposes of this Act and any other law.

SEC. 108. LITIGATION, JURISDICTION, AND VENUE.

(a) REVIEW OF REGULATIONS.—Review of any regulation promulgated under this Act may be had upon application by any interested person only in the Circuit Court of Appeals of the United States for the District of Columbia. Any such application shall be made within 90 days from the date of promulgation of such regulations.

(b) JURISDICTION.—Except as provided in subsection (a) of this section, the United States district courts shall have original jurisdiction over all causes of action arising under this Act (which shall be deemed to include actions under the International Convention on Civil Liability for Oil Pollution Damages, 1984, and the International Convention on the Establishment of an International Fund for Compensation for Oil Pollution Damage, 1984), without regard to the citizenship of the parties or the amount in controversy.

(c) VENUE.—Venue shall lie in any district in which the incident, injury, or damages occurred, or in which the defendant resides, may be found, has its principal office, or has appointed an agent for services of process. For the purposes of this

14

section, the Fund, and the International Fund established under article 2 of the International Convention on the Establishment of an International Fund for Compensation for Oil Pollution Damage, 1984, shall reside in the District of Columbia.

(d) SAVINGS PROVISION.—Nothing in this Act shall affect any action commenced before the date of enactment of this Act.

(e) PERIOD OF LIMITATIONS.—

(1) DAMAGES.—Except as provided in paragraphs (3) and (4), an action may not be commenced for damages under this Act, unless that action is commenced within three years after the date on which the loss and its connection with the discharge in question were reasonably discoverable with the exercise of due care, or in the case of damages described in section 102(a)(2)(B)(i), if later, the date on which regulations are promulgated under section 102(e)(5).

(2) REMOVAL COSTS.—Except as provided in paragraphs (3) and (4), an action may not be commenced for recovery of removal costs under this Act, unless that action is commenced within three years after completion of the removal action. An action may be commenced under section 102 for recovery of removal costs at any time after such removal costs have been incurred.

(3) ACTIONS FOR CONTRIBUTION.—An action may not be commenced for contribution for any removal costs or damages unless that action is commenced within three years after—

(A) the date of judgment in any action under this Act for recovery of such removal costs or damages, or

(B) the date of entry of a judicially approved settlement with respect to such removal costs or damages.

(4) SUBROGATION.—An action based on rights subrogated pursuant to this Act by reason of payment of a claim may not be commenced under this Act unless that action is commenced within three years after the date of payment of such claim.

SEC. 109. RELATIONSHIP TO OTHER LAW.

(a) PREEMPTION.—

(1) ACTIONS PREEMPTED.—Except as provided in this Act, no action arising out of discharge of oil from a vessel or facility, other than an action for personal injury or wrongful death, may be brought in any court of the United States or of any State or political subdivision thereof.

(2) STATE FUNDS AND ACCOUNTS.—Nothing in this Act, or in sections 4611 and 9509 of the Internal Revenue Code of 1986, shall affect the authority of any State (A) to establish or continue in effect an oil spill fund or account; or (B) to require any person to contribute to that fund or account. However, if the State fund or account is supported by contributions levied upon persons who contribute to the Fund established by this Act, the State fund or account may not be used to compensate any person for damages under this Act.

(b) No PREEMPTION OF CIVIL PENALTIES.—Nothing in this Act or section 9509 of the Internal Revenue Code of 1954 shall affect the authority of the United States or any State or political subdivision thereof to impose, or to determine the amount of, any fine or penalty for any violation of law relating to an incident.

(c) FINANCIAL RESPONSIBILITY.—Except as provided in this Act, a responsible party for a vessel or facility who establishes and maintains evidence of financial responsibility in accordance with this title shall not be required under any State or local law, rule, or regulation to establish or maintain any other evidence of financial responsibility in connection with liability for the discharge, or substantial threat of a discharge, of oil from such vessel or facility. Evidence of compliance with the financial responsibility requirements of this title shall be accepted by a State in lieu of any other requirement of financial responsibility imposed by such State in connection with liability for the discharge of oil from such vessel or facility. A State may enforce, on the navigable waters of the State, the requirements for evidence of financial responsibility imposed under section 107 of this Act.

(d) LIMITATION OF LIABILITY ACT.—The Act of March 3, 1851, shall not apply to removal costs and damages that arise out of or directly result from an incident involving the discharge or substantial threat or discharge of oil.

SEC. 110. EFFECTIVE DATE.

(a) IN GENERAL.—Except as provided in subsection (b), this Act shall apply with respect to an incident occurring after the date of the enactment of this Act.

(b) PAYMENTS FROM FUND.—Payments under section 103(a) may not be made before the commencement date (as that term is defined in section 4611(f)(2) of the Internal Revenue Code of 1986).

15

## TITLE II—CONFORMING AMENDMENTS

**SEC. 201. TRANS-ALASKA PIPELINE FUND.**

(a) Section 204(b) of the Trans-Alaska Pipeline Authorization Act is amended—

(1) in the first sentence, by inserting after "any area" the following: "in the State of Alaska";

(2) in the first sentence, by inserting after "any activities" the following: "related to the Trans-Alaska oil pipeline"; and

(3) by inserting at the end of the subsection the following new sentence: "This subsection shall not apply to removal costs covered by the Oil Pollution Prevention, Removal, Liability, and Compensation Act of 1989.".

(b) Subsection (c) of section 204 of the Trans-Alaska Pipeline Authorization Act is repealed. The repeal made by the preceding sentence shall not affect the applicability of that subsection to claims arising before the date of the enactment of this Act. The repeal of paragraphs (4), (6), and (8) of that subsection shall only become effective upon the payment by the Board of Trustees of the Trans-Alaska Pipeline Liability Fund of all claims certified under subsection (c) of this section and the rebate of all remaining amounts under, and the completion of all actions required to carry out, such subsection.

(c)(1) Not later than 210 days after the date of enactment of this Act, the Board of Trustees of the Trans-Alaska Pipeline Liability Fund shall certify to the Secretary the total amount of claims outstanding against that Fund as of the date of enactment of this Act. The amount of that Fund exceeding the total amount so certified shall be rebated directly, on a pro rata basis, to the owners of the oil at the time it was loaded on the vessel.

(2) After the settlement of all claims described in paragraph (1) and the completion of all actions, if any, by the Trans-Alaska Pipeline Fund for recovery of amounts paid on such claims, the remaining amounts in that Fund shall be rebated directly, on a pro rata basis, to the owners of the oil at the time it was loaded on the vessel.

(3) Whenever a rebate is made on a pro rata basis to the owners of oil under paragraph (1) or (2) of this subsection, each owner's share of the rebate shall be an amount determined by dividing the amount contributed by that owner to the Trans-Alaska Pipeline Liability Fund by the total amount contributed by all such owners of that Fund.

(d) Officers and trustees, both present and former, of the Trans-Alaska Pipeline Liability Fund shall not be subject to any liability incurred by that Fund or by the present and past officers and trustees of that Fund, other than liability for gross negligence or willful misconduct.

**SEC. 202. INTERVENTION ON THE HIGH SEAS ACT.**

Section 17 of the Intervention on the High Seas Act is amended to read as follows:

"Sec. 17. The Oil Spill Liability Trust Fund shall be available to the Secretary for actions taken under sections 5 and 7 of this Act.".

**SEC. 203. FEDERAL WATER POLLUTION CONTROL ACT.**

Section 311 of the Federal Water Pollution Control Act is amended as follows:

(1) Subsection (c)(2) is amended—

(A) in subparagraph (D) by inserting "safeguard against as well as" after "surveillance and notice designed to"; and

(B) in subparagraph (H) by striking "reimbursed from the fund established under subsection (k) of this section for the reasonable costs incurred in such removal" and inserting "reimbursed, in the case of any discharges of oil from a vessel or facility, for the reasonable costs incurred for that removal, from the Oil Spill Liability Trust Fund".

(2) Subsection (d) is amended by striking out the last sentence.

(3) Subsection (e) is amended to read as follows:

"(e)(1) In addition to any action taken by a State or local government, when the President determines that there may be an imminent and substantial threat to the public health or welfare of the United States, including but not limited to fish, shellfish and wildlife, public and private property, shorelines, beaches, habitat, and other living and nonliving natural resources under the jurisdiction or control of the United States or a State, because of an actual or threatened discharge of oil or a hazardous substance from a vessel or facility in violation of subsection (b) of this section, the President may—

"(A) require the Attorney General to secure such relief from any person, including but not limited to the owner or operator of such vessel or facility, as may be necessary to abate such endangerment; or

16

"(B) after notice to the affected State, take such other action under this section, including but not limited to, issuing such administrative orders as may be necessary to protect the public health and welfare.

"(2) If any person fails without sufficient cause to comply with an order under paragraph (1)(B), the President may request the Attorney General to bring an action in the appropriate district court of the United States to enforce such an order, to assess civil penalties of no more than $25,000 a day for each violation, and to assess three times the removal costs or damages incurred by the Oil Spill Liability Trust Fund as a result of the failure to comply.

"(3) The district courts of the United States shall have jurisdiction to grant such relief under this subsection as the public interest and the equities of the case may require.".

(4) Subsections (f), (g), (h), and (i) of section 311 of the Federal Water Pollution Control Act shall not apply with respect to any incident for which liability is established under section 102 of this Act.

(5) Subsection (i) is amended by striking out "(1)" after "(i)" and striking out paragraphs (2) and (3).

(6) Subsection (k) is repealed. Any amounts remaining in the revolving fund established under that subsection shall be deposited in the general fund of the Treasury. The Fund shall assume all liability incurred by the revolving fund established under section 311(k) of the Federal Water Pollution Control Act.

(7) Subsection (l) is amended by striking out the second sentence.

(8) Subsection (p) is repealed.

(9) Section 311 is amended by adding at the end thereof the following new subsection:

"(s) The Oil Spill Liability Trust Fund shall be available to carry out subsections (c), (d), (i), (l), and (t). Any amounts received by the United States under this section shall be deposited in the Oil Spill Liability Trust Fund.".

SEC. 204. DEEPWATER PORT ACT.

The Deepwater Port Act of 1974 is amended as follows:

(1) In section 4(c)(1) strike "section 18(l) of this Act;" and insert in lieu thereof "section 107 of the Oil Pollution Prevention, Removal, Liability, and Compensation Act of 1989,";

(2) Subsections (b), (d), (e), (f), (g), (h), (i), (j), (l), (n), and paragraphs (1) and (2) of subsection (m) of section 18 are deleted.

(3) Paragraph (3) of subsection (c) of section 18 is amended by striking "Deepwater Port Liability Fund established pursuant to subsection (f) of this section", and inserting "Oil Spill Liability Trust Fund".

(4) Subsections (c), (k), and (m) of section 18 are redesignated as subsections (b), (c), and (d) respectively, and paragraphs (3) and (4) of subsection (m) are redesignated as paragraphs (1) and (2), respectively.

(5) Paragraph (1) of subsection (a) of section 19 is amended by striking the period at the end of the second sentence and inserting "except that discharges from a deepwater port or from a vessel within a deepwater port safety zone which are subject to the civil penalty provisions of section 18(a)(2) of the Deepwater Port Act of 1974 shall not be subject to the penalty provisions of any other Federal law."

(6) Any amounts remaining in the Deepwater Port Liability Fund, established under section 18(f) of the Deepwater Port Act of 1974, shall be deposited in the Fund. The Fund shall assume all liability incurred by the Deepwater Port Liability Fund.

SEC. 205. OUTER CONTINENTAL SHELF LANDS ACT AMENDMENTS OF 1978.

Title III of the Outer Continental Shelf Lands Act Amendments of 1978 is hereby repealed. Any amounts remaining in the Offshore Oil Pollution Compensation Fund established under section 302 of that title shall be deposited in the Fund. The Fund shall assume all liability incurred by the Offshore Oil Pollution Compensation Fund.

SEC. 206. NOTICE TO STATE; INCREASED PENALTIES FOR FAILURE TO REPORT.

(a) Section 311(b)(5) of the Federal Water Pollution Control Act is amended by inserting after the first sentence the following: "The Federal agency shall immediately notify the appropriate State agency of any State that is, or may reasonably be expected to be, affected by the discharge of oil.".

(b) The second sentence of section 311(b)(5) of the Federal Water Pollution Control Act is amended by striking "fined not more than $10,000, or imprisoned for not more than one year, or both" and inserting "fined in accordance with the applicable

17

provisions of title 18 of the United States Code, or imprisoned for not more than three years (or not more than five years in the case of a second or subsequent conviction), or both''.

SEC. 207. QUALIFIED AUTHORIZING LEGISLATION.

This Act shall be considered to be qualified authorizing legislation for purposes of section 4611(f)(2)(B) of the Internal Revenue Code of 1986.

SEC. 208. EFFECTIVE DATE.

Sections 201, 202, 203, 204, and 205 shall be effective on the commencement date (as that term is defined in section 4611(f)(2) of the Internal Revenue Code of 1986).

## TITLE III—IMPLEMENTATION OF INTERNATIONAL CONVENTIONS

SEC. 301. DEFINITIONS.

For the purposes of this title—

(1) "ship", "owner", "oil", "pollution damage", and "incident" shall have the meanings provided in article I of the Civil Liability Convention;

(2) "Civil Liability Convention" means the International Convention on Civil Liability for Oil Pollution Damage, 1984;

(3) "financial responsibility" has the same meaning as "financial security" under the Civil Liability Convention;

(4) "Fund Convention" means the International Convention on the Establishment of an International Fund for Compensation for Oil Pollution Damage, 1984; and

(5) "International Fund" means the International Oil Pollution Compensation Fund, established under article 2 of the Fund Convention.

SEC. 302. APPLICABILITY OF CONVENTIONS.

During any period in which the Civil Liability Convention and the Fund Convention are in force with respect to the United States, liability relating to pollution damage arising from an incident involving a ship shall be determined in accordance with the Civil Liability Convention and Fund Convention. Nothing in this title shall constitute a ratification of either the Civil Liability Convention or the Fund Convention.

SEC. 303. RECOGNITION OF INTERNATIONAL FUND.

The International Fund is recognized under the laws of the United States as a legal person, and shall have the capacity to acquire and dispose of real and personal property, and to institute and be party to legal proceedings. The Director of the International Fund is recognized as the legal representative of the International Fund. The Director shall be deemed to have appointed irrevocably the Secretary of State as the International Fund's agent for the service of process in any legal proceedings involving the International Fund within the United States. The International Fund and its assets shall be exempt from all direct taxation and payment of any customs duties in the United States.

SEC. 304. ACTION IN UNITED STATES COURTS.

(a) SERVICE OF PROCESS ON INTERNATIONAL FUND.—In any action brought in a court in the United States against the owner of a ship or its guarantor under the Civil Liability Convention, the plaintiff or defendant, as the case may be, shall serve a copy of the complaint and any subsequent pleading therein upon the International Fund at the same time the complaint or other pleading is served upon the opposing parties.

(b) INTERVENTION.—The International Fund may intervene as a party as a matter of right in any action brought in a court in the United States against the owner of a ship or its guarantor under the Civil Liability Convention.

SEC. 305. CONTRIBUTION TO INTERNATIONAL FUND.

(a) PAYMENTS TO BE MADE FROM OIL SPILL LIABILITY TRUST FUND.—The amount of any contribution to the International Fund which is required to be made under article 10 of the Fund Convention by any person with respect to oil received in any port, terminal installation, or other installation located in the United States shall be paid to the International Fund from the Fund.

(b) INFORMATION.—The Secretary may, by regulation, require persons who are required to make contributions with respect to oil received in any port, terminal, installation, or other installations in the United States under article 10 of the Fund Convention to provide all information relating to that oil as may be necessary to carry out subsection (a) of this section, articles 10, 12, 13, 14, and 15 of the Fund

18

Conventions, and Article 29 of the Protocol of 1984 to Amend the International Convention on the Establishment of an International Fund for Compensation for Oil Pollution Damage, 1971.

SEC. 306. RECOGNITION OF FOREIGN JUDGMENTS.

Any final judgment of a court of any country which is a party to the Civil Liability Convention or to the Fund Convention in an action for compensation under either convention shall be recognized by any court of the United States having jurisdiction under this Act, when that judgment has become enforceable in that country and is no longer subject to ordinary form of review, except where—

(1) the judgment was obtained by fraud, or

(2) the defendant was not given reasonable notice and a fair opportunity to present its case.

SEC. 307. FINANCIAL RESPONSIBILITY.

(a) UNITED STATES DOCUMENTED SHIPS.—Each owner of a ship which is documented under the laws of the United States which is subject to the Civil Liability Convention shall establish and maintain in accordance with regulations promulgated by the Secretary evidence of financial responsibility as required in Article VII of the Civil Liability Convention.

(b) OTHER SHIPS.—The owner of each ship (other than a ship to which subsection (a) applies or a ship which is a public vessel), which is subject to the Civil Liability Convention and which enters or leaves a port or terminal in the United States or uses an Outer Continental Shelf facility or an offshore facility that is or was licensed under the Deepwater Port Act of 1974, shall establish and maintain, in accordance with regulations promulgated by the Secretary, evidence of financial responsibility as required in article VII of the Civil Liability Convention. Any ship which has on board a valid certificate issued in accordance with article VII of the Civil Liability Convention shall be considered as having met the requirements of this subsection. Any ship carrying only oil as cargo, fuel, or residue, which has on board a valid certificate issued in accordance with article VII of the Civil Liability Convention shall be considered as having met the requirements of section 107 of this Act.

(c) AUTHORITY OF SECRETARY TO ISSUE.—The Secretary is authorized to issue any certificate of financial responsibility which the United States may issue under the Civil Liability Convention.

(d) WITHHOLDING CLEARANCE.—The Secretary of the Treasury shall withhold or revoke the clearance required by section 4197 of the Revised Statutes of the United States of any ship which does not have a certificate demonstrating compliance with this section.

(e) DENYING ENTRY AND DETAINING VESSELS.—The Secretary of the department in which the Coast Guard is operating may (1) deny entry to any facility or to any port or place in the United States, or (2) detain at the facility or port or place in the United States, any ship subject to this section which, upon request, does not produce the certificate demonstrating compliance with this section or regulations issued hereunder.

(f) CIVIL PENALTY.—Any person who, after notice and an opportunity for a hearing, is found to have violated this section, any regulation issued under this section, section 305(b), or section 308, or any denial or detention order issued under subsection (e) of this section shall be liable to the United States for a civil penalty, not to exceed $25,000 per day of violation. The amount of the civil penalty shall be assessed by the Secretary in accordance with the procedures set forth in section 107 of this Act.

(g) WAIVER OF SOVEREIGN IMMUNITY.—The United States waives all defenses based on its status as a sovereign State with respect to any controversy arising under the Civil Liability Convention or the Fund Convention relating to any ship owned by the United States and used for commercial purposes.

SEC. 308. REGULATIONS.

The Secretary may prescribe the necessary regulations to carry out this Act and all obligations of the United States under the International Convention on Civil Liability for Oil Pollution Damage, 1984, and the Fund Convention.

19

# TITLE IV—PREVENTION AND REMOVAL OF OIL AND HAZARDOUS SUBSTANCE DISCHARGES

## Subtitle A—General

SEC. 401. DEFINITIONS.

For purposes of this title, the term—

(1) "tank barge" means a non-self-propelled vessel constructed or adapted to carry oil in bulk as cargo; and

(2) "remove" or "removal" refers to the removal of oil or hazardous substances from water and shorelines; containment, dispersal, disposal, or other response actions; and the taking of other actions necessary to minimize or mitigate damage to the public health or welfare, including fish, shellfish, wildlife, and public and private property, shorelines, and beaches; and

(3) "tanker" has the same meaning the term has in section 2101 of title 46, United States Code.

## Subtitle B—Prevention

SEC. 411. REVIEW OF ALCOHOL AND DRUG ABUSE AND OTHER MATTERS IN ISSUING LICENSES, CERTIFICATES OF REGISTRY, AND MERCHANT MARINER'S DOCUMENTS.

(a) LICENSES AND CERTIFICATES OF REGISTRY.—Section 7101 of title 46, United States Code, is amended by adding at the end the following:

"(g) The Secretary may not issue a license or certificate of registry under this section unless an individual applying for the license or certificate makes available to the Secretary, under section 206(b)(4) of the National Driver Register Act of 1982 (23 U.S.C. 401 note), all information contained in the National Driver Register regarding the motor vehicle driving record of that individual.

"(h) The Secretary shall conduct a review of the criminal record of each individual who applies for a license under this section.".

(b) MERCHANT MARINER'S DOCUMENT.—Section 7302 of title 46, United States Code, is amended by adding at the end the following:

"(c) The Secretary may not issue a merchant mariner's document under this chapter unless the individual applying for the document makes available to the Secretary, under section 206(b)(4) of the National Driver Register Act of 1982 (23 U.S.C. 401 note), all information contained in the National Driver Register regarding the motor vehicle driving record of that individual.".

SEC. 412. TERM OF CERTIFICATES OF REGISTRY AND MERCHANT MARINER'S DOCUMENTS.

(a) CERTIFICATES OF REGISTRY.—Section 7107 of title 46, United States Code, is amended by striking "is not limited in duration." and inserting "is valid for 5 years, and may be renewed for additional 5-year periods.".

(b) MERCHANT MARINER'S DOCUMENTS.—Section 7302 of title 46, United States Code, is amended by adding at the end the following:

"(d) A merchant mariner's document issued under this chapter is valid for 5 years, and may be renewed for additional 5-year periods.".

(c) EFFECTIVE DATE.—The amendments made by subsections (a) and (b) of this section are effective January 1, 1990.

(d) TERMINATION OF EXISTING CERTIFICATES AND DOCUMENTS.—A certificate of registry and a merchant mariner's document issued before January 1, 1990, shall terminate on the day it would have expired as if—

(1) subsections (a) and (b) were in effect on the date it was issued; and

(2) it was renewed at the end of each 5-year perod under section 7107 or section 7302(d).

(e) CRIMINAL RECORD REVIEW IN LICENSE RENEWALS.—Section 7109 of title 46, United States Code, as amended by designating the existing text as subsection "(a)" and adding at the end the following—

"(b) The Secretary shall conduct a review of the criminal record of each holder of a license issued under this part who applies for renewal of that license under this section.".

SEC. 413. SUSPENSION AND REVOCATION OF LICENSES, CERTIFICATES OF REGISTRY, AND MERCHANT MARINER'S DOCUMENTS FOR ALCOHOL AND DRUG ABUSE.

(a)(1) AVAILABILITY OF INFORMATION IN NATIONAL DRIVER REGISTER.—Section 7702 of title 46, United States Code, is amended by adding at the end the following:

"(c) The Secretary shall request an individual holding a license, certificate of registry, or merchant mariner's document to make available to the Secretary, under section 206(b)(4) of the National Driver Register Act of 1982 (23 U.S.C. 401 note), all information contained in the National Driver Register regarding the motor vehicle driving record of that individual.

"(d)(1) The Secretary shall temporarily suspend and take possession of the holder's license, certificate, or document if—

"(A) that individual performs a sensitive function on a vessel as determined by the Secretary; and

"(B) there is probable cause to believe that the holder—

"(i) has performed the sensitive function while using alcohol or a dangerous drug;

"(ii) has been denied a motor vehicle license by a State for cause within the 5-year period immediately before the temporary suspension; or

"(iii) has been convicted of an offense for which a license, certificate, or document may be suspended or revoked under sections 7703(2) and 7703(3) of this title.

"(2) If a license, certificate, or document is temporarily suspended under this section, an expedited hearing under subsection (a) of this section shall be held within 15 days after the temporary suspension.".

(2) Section 7704(a) of title 46, United States Code, is amended by striking "section" the first place it appears and substituting "part".

(b) BASES FOR SUSPENSION OR REVOCATION.—Section 7703 of title 46, United States Code, is amended to read as follows:

"§ 7703. Bases for suspension or revocation

"A license, certificate of registry, or merchant mariner's document issued by the Secretary under this part may be suspended or revoked if the holder—

"(1) when acting under the authority of that license, certificate, or document—

"(A) has violated or failed to comply with this subtitle, a regulation prescribed under this subtitle, or any other law or regulation intended to promote marine safety or to protect navigable waters; or

"(B) has committed an act of incompetence, misconduct, or negligence;

"(2) is convicted of an offense that would prevent the issuance or renewal of a license, certificate, or document; or

"(3) is convicted of an offense described in section 205(a)(3) (A) or (B) of the National Driver Register Act of 1982 (23 U.S.C. 401 note) within the 5-year period immediately before the suspension or revocation.".

(c) TERMINATION OF REVOCATION.—Section 7701(c) of title 46, United States Code, is amended to read as follows:

"(c) When a license, certificate of registry, or merchant mariner's document has been revoked under this chapter, the former holder may be issued a new license, certificate, or document only after—

"(1) it has been decided, under regulations prescribed by the Secretary, that the issuance is compatible with the requirement of good discipline and safety at sea; and

"(2) the former holder provides satisfactory proof that the bases for revocation are no longer valid.".

SEC. 414. REMOVAL OF MASTER OR INDIVIDUAL IN CHARGE FOR INTOXICATION.

Section 8101 of title 46, United States Code, is amended by adding at the end the following:

"(i) Whenever the next two most senior members of the complement on a vessel reasonably believe that the master or individual in charge of the vessel is intoxicated as a result of the use of a dangerous drug or alcohol and is incapable of commanding the vessel because of that intoxication, the most senior officer shall—

"(1) temporarily relieve the master;

"(2) temporarily take command of the vessel;

"(3) immediately enter the details of the incident in the vessel log; and

"(4) report those details to the Secretary—

"(A) by the most expeditious means available; and

"(B) in written form transmitted within 12 hours after the vessel arrives at its next port.".

SEC. 415. ACCESS TO NATIONAL DRIVER REGISTER.

Section 206(b) of the National Driver Register Act of 1982 (23 U.S.C. 401 note) is amended by inserting the following new paragraph at the end:

"(6)(A) Any individual who holds or who has applied for a license or certificate of registry under section 7101 of title 46, United States Code, or merchant mariner's document under section 7302 of title 46, United States Code, shall request the chief driver licensing official of a State to transmit to the Secretary in accordance with subsection (a) of this section information regarding the motor vehicle driving record of the individual.

"(B) The Secretary—

"(i) shall make the information available to the individual for review and written comment before denying, suspending, or revoking the individual a license, certificate, or document based on that information or using that information in any action taken under chapter 77 of title 46, United States Code; and

"(ii) may not otherwise divulge or use that information, except for the purposes of section 7101, 7302, or 7703 of title 46, United States Code.

"(C) Information regarding the motor vehicle driving record of an individual may not be transmitted to the Secretary under this paragraph if the information was entered in the Register more than five years before the date of the request for the information, unless the information relates to revocations or suspensions that are still in effect on the date of the request. Information submitted to the Register by States under the Act of July 14, 1960 (74 Stat. 526), or under this Act are subject to access for the purpose of this paragraph during the transition to the Register established under section 203(c) of this Act.".

SEC. 416. MANNING STANDARDS FOR FOREIGN TANK VESSELS.

(a) STANDARDS FOR FOREIGN TANK VESSELS.—Section 9101(a) of title 46, United States Code, is amended to read as follows:

"(a)(1) The Secretary shall evaluate the manning, training, qualification, and watchkeeping standards of a foreign country that issues documentation for any vessel to which chapter 37 of this title applies—

"(A) on a periodic basis; and

"(B) after a casualty involving that vessel.

"(2) After each evaluation made under paragraph (1) of this subsection, the Secretary shall determine whether—

"(A) the foreign country has standards for licensing and certification of seamen that are at least equivalent to United States law or customary international law; and

"(B) those standards are being enforced.

"(3) If the Secretary determines under this subsection that a country has failed to maintain or enforce standards at least equivalent to United States law or customary international law, the Secretary shall prohibit vessels issued documentation by that country from entering the United States.

"(4) The Secretary may allow provisional entry of a vessel prohibited from entering the United States under paragraph (3) of this subsection if—

"(A) the owner or operator of the vessel establishes, to the satisfaction of the Secretary, that the vessel is not unsafe or a threat to the marine environment; or

"(B) the entry is necessary for the safety of the vessel or individuals on the vessel.".

(b) TECHNICAL AND CONFORMING AMENDMENTS.—Section 9(a) of the Ports and Waterways Safety Act (33 U.S.C. 1228(a)) is amended—

(1) in the introductory paragraph, by striking "section 4417a of the Revised Statutes, as amended," and inserting "chapter 37 of title 46, United States Code.";

(2) in paragraph (2), by striking "section 4417a of the Revised Statutes, as amended," and inserting "chapter 37 of title 46, United States Code.";

(3) in paragraph (5), by striking "section 4417a(11) of the Revised Statutes, as amended," and inserting "section 9101 of title 46, United States Code."; and

(4) in paragraph (5), by striking "international standards that are accepted by the United States" and inserting "customary international law".

(c) EFFECTIVE DATE.—Sections 9101(a) (3), (4), and (5) of title 46, United States Code, take effect on January 1, 1990.

SEC. 417. VESSEL TRAFFIC SERVICE SYSTEMS.

(a) MANDATORY VTS.—The Ports and Waterways Safety Act (33 U.S.C. 1221–1236) is amended by adding the following new section 4a after section 4:

22

"SEC. 4a. VESSEL TRAFFIC SERVICE SYSTEMS REQUIRED.

"(a) The Secretary shall require appropriate vessels in the area of a vessel traffic service system to use or comply with that system.

"(b) Except when authorized by Congress, the Secretary may not construct, improve, expand, or operate a vessel traffic service system, unless funds for construction, improvement, expansion, or operation of the system were obligated before the date of enactment of this Act.".

(b) REPEAL.—Section 4(a)(2) of the Ports and Waterways Safety Act (33 U.S.C. 1223) is repealed.

SEC. 418. STATE AUTHORITY TO REQUIRE STATE PILOTAGE FOR TANKERS.

(a) STATE PILOT AUTHORITY.—Section 8501(d) of title 46, United States Code, is amended to read as follows:

"(d) A State may not adopt a regulation or provision that requires a coastwise vessel, other than a tanker whose Federal pilot's license is not endorsed for pilotage in that state's waters, to take a pilot licensed or authorized by the laws of a State if the vessel—

"(1) is propelled by machinery and subject to inspection under part B of this subitle; or

"(2) is subject to inspection under chapter 37 of this title.".

(b) PILOT CHARGES PROHIBITED.—Subsection 8502(d) of title 46, United States Code, is amended to read as follows:

"(d) Except in the case of a tanker for which a state pilot is authorized under this chapter, a State or political subdivision of a State may not levy pilot charges on a vessel lawfully piloted by a pilot required under this section.".

SEC. 419. GREAT LAKES PILOTAGE.

(a) INDIVIDUALS WHO MAY SERVE AS PILOT ON UNDESIGNATED GREAT LAKES WATERS.—Section 9302(b) of title 46, United States Code, is amended to read as follows:

"(b) A member of the complement of a vessel that is subject to subsection (a) of this section may serve for the route being navigated as the pilot required on waters not designated by the President, if the member is—

"(1) a citizen of the United States and holds a license issued under section 7101(c)(2) of this title, or

"(2) a citizen of Canada and has a license issued under provisions of Canadian law equivalent to section 7101(c)(2) of this title.".

(b) EXEMPTED VESSELS.—Section 9302(d)(1) of title 46, United States Code, is amended to read as follows:

"(1) except for a vessel to which chapter 37 applies, the Secretary notifies the master that a registered pilot is not available; or".

(c) PILOTAGE.—Section 9303(f) is amended by adding at the end the following: "A vessel is liable in rem for charges for pilotage services under this subsection and any costs of collection.".

(d) PENALTIES.—Section 9308 is amended—

(1) in subsection (a) by striking "$500" and inserting "$25,000"; and

(2) in subsection (b) and (c) by striking "$500" and inserting "$10,000".

SEC. 420. STUDY ON TANKER NAVIGATION SAFETY STANDARDS.

(a) GENERAL.—Not later than one year after the date of enactment of this Act, the Secretary shall conduct a study to determine whether existing laws and regulations are adequate to ensure the safe navigation of vessels transporting oil and hazardous substances on the navigable waters and the exclusive economic zone.

(b) STUDY.—In conducting the study required under subsection (a) of this section, the Secretary shall—

(1) determine appropriate crew sizes on tankers;

(2) evaluate the adequacy of qualifications and training of crewmembers;

(3) evaluate the ability of crewmembers on a tanker to take emergency actions to prevent or remove a discharge of oil or hazardous substance from the tanker;

(4) evaluate the adequacy of navigation equipment on tankers;

(5) evaluate the adequacy of navigation procedures;

(6) determine and prioritize the United States ports and channels that are in need of new, expanded, or improved vessel traffic service systems by evaluating—

(A) the nature, volume, and frequency of vessel traffic;

(B) the risks of collisions, spills, and damages associated with that traffic; and

23

 (C) the impact of installation, expansion, or improvement of a vessel traffic service system:

(7) evaluate whether areas of the navigable waters and the exclusive economic zone should be designated as zones where the movement of tankers should be limited or prohibited; and

(8) evaluate vessel design and construction criteria to reduce the likelihood of a discharge including

 (A) tank capacity;

 (B) tanker tonnage;

 (C) tank barge tonnage;

 (D) double hulls and double bottoms on tankers and tank barges by—

  (i) comparing worldwide the operating and environmental safety records of tankers equipped with double hulls or double bottoms and the records of tankers without these features;

  (ii) comparing the operating and environmental safety records of tank barges operating on the navigable waters of the United States and equipped with double hulls or double bottoms and the records of tank barges without these features;

  (iii) assessing the costs and benefits to owners and operators of tankers and tank barges of double hulls or double bottoms on some or all new tankers and new tank barges engaged solely in the coastwise trade; and

  (iv) evaluating the extent to which requiring double hulls and double bottoms will prevent serious oil pollution incidents in bays, sounds, harbors, and other near-shore areas of special environmental importance; and

  (v) consulting with naval architects, tanker and tank barge operators, salvors, environmental protection organizations, economists, states, and communities along tanker and tank barge routes, and any other persons the Secretary considers appropriate;

(9) evaluate whether inspection standards are adequate;

(10) review and incorporate the results of past studies, including studies conducted by the Coast Guard the Office of Technology Assessment; and

(11) evaluate the use of computer simulator courses for training bridge officers and pilots of vessels transporting oil or harzardous substances on the navigable waters and the exclusive economic zone, and determine the feasibility and practicality of mandating such training.

(c) REPORT.—Not later than one year after the date of enactment of this Act, the Secretary shall transmit to the Committee on Merchant Marine and Fisheries of the House of Representatives and the Committee on Commerce, Science and Transportation of the Senate a report on the results of the study conducted under subsection (a) of this section, including recommendations for implementing the results of that study.

SEC. 421. DREDGE MODIFICATION STUDY.

(a) STUDY.—The Secretary of the Army shall conduct a study to determine the feasibility of modifying dredges to make them usable in removing discharges of oil and hazardous substances.

(b) REPORT.—Not later than one year after the date of enactment of this Act, the Secretary of the Army shall submit to the Congress a report on the results of the study conducted under subsection (a) of this section and recommendations for implementing the results of that study.

SEC. 422. USE OF LINERS.

(a) STUDY.—The President shall conduct a study to determine whether liners or other secondary means of contamination should be used to prevent leaking or to aid in leak detection at onshore faclities used for the bulk storage of oil and located near navigable waters.

(b) REPORT.—Not later than one year after the date of enactment of this Act, the President shall submit to Congress a report on the results of the study conducted under subsection (a) of this section and recommendations to implement the results of the study.

(c) IMPLEMENTATION.—Not later than six months after the date the report required under subsection (b) of this section is submitted to Congress, the President shall implement the recommendations contained in the report.

24

# Subtitle C—Removal

SEC. 431. FEDERAL REMOVAL AUTHORITY.

(a) REMOVAL.—Paragraph (1) of section 311(c) of the Federal Water Pollution Control Act (33 U.S.C. 1321(c)(1) is amended to read as follows:

"(c)(1)(A) The President shall ensure an effective and immediate removal of a discharge of oil or hazardous substance—

"(i) into or on the navigable waters; or

"(ii) on the adjoining shorelines to these navigable waters; or

"(iii) on the waters of the exclusive economic zone or

"(iv) that may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States;

in accordance with the National Contingency Plan, any other contingency plans prepared under subsection (j) of this section, and applcable state law.

"(B) The President may remove or arrange for the removal of a discharge, or the threat of a discharge, of oil or a hazardous substance at any time.

"(C) The President may direct all Federal, state, responsible party, and private actions to remove a discharge, or the threat of a discharge, of oil or a hazardous substance.

"(D) When the President retains or directs a person (other than a responsible party) under the authority of subparagraphs (B) or (C) of this paragraph, that person is not liable for removal costs or damages other than personal injury or wrongful death arising from his or her removal activities conducted in accordance with the direction of the President, except in the case of gross negligence or willful misconduct.

"(E) Each responsible party shall act in accordance with the National Contingency Plan, the applicable contingency plans required under subsection (j) of this section, and as otherwise directed by the President.

"(F) Nothing in this paragraph affects the liability of a responsible party under the Oil Pollution Prevention, Removal, Liability, and Compensation Act of 1989.".

(b) CONFORMING AMENDMENTS.—Section 311(a) (33 U.S.C. 1321(a)) is amended—

(1) by striking paragraph (8) and inserting—

"(8) 'remove' or 'removal' refers to—

"(A) the removal of oil or hazardous substances from water and shorelines;

"(B) containment, dispersal, disposal, or other response actions; and

"(C) the taking of other actions necessary to minimize or mitigate damage to the public health or welfare, including fish, shellfish, wildlife, and public and private property, shorelines, and beaches.".

(2) by adding two new paragraphs as follows:

"(18) 'exclusive economic zone' means the zone established by Presidential Proclamation number 5030, dated March 10, 1983; and

"(19) 'responsible party' means an owner or operator in violation of subsection (b) of this section.".

SEC. 432. CONTINGENCY PLANS.

Section 311(j) of the Federal Water Pollution Control Act (33 U.S.C. 1321(j)) is amended—

(a) in paragraph (2), by striking "paragraph (1) or";

(b) by adding at the end the following—

"(3)(A) LOCAL CONTINGENCY PLANS.—Not later than six months after the date of enactment of the Oil Pollution, Prevention, Removal, Liability, and Compensation Act of 1989, the President shall designate areas for which new or improved local contingency plans must be preapred to respond to a discharge, or threat of discharge, of oil or a hazardous substance. The President shall specify the Federal, state, and local officials required to prepare these plans.

"(B) In determining the areas to be designated under this paragraph, the President shall consult with state and local officials, and the public, and shall consider—

"(i) the likelihood of a discharge;

"(ii) the likelihood that the discharge would result in severe economic or environmental damage; and

"(iii) the adequacy of any existing local contingency plans.

"(C) Each contingency plan prepared under this paragraph shall include—

"(i) a general description of the area subject to the plan, including the identification of specific areas of special economic or environmental importance that might be damaged by a discharge;

25

"(ii) a detailed description of the responsibilities of the responsible party, and Federal, state, and local agencies, for responding to a discharge, or the threat of discharge;

"(iii) a list of equipment and personnel available to the responsible party, and Federal, state, and local agencies, to ensure an effective and immediate removal of a discharge, or threat of discharge; and

"(iv) any other information the President may require.

"(D) Not later than six months after the designation of areas under subparagraph (A), the persons identified shall prepare and submit to the President the contingency plan required by this paragraph. The President shall promptly review each plan and require amendments to any plan that does not meet the requirements of this paragraph.

"(E) Contingency plans required under this paragraph shall be reviewed periodically by the President and updated.

"(F) The President may provide technical assistance in the preparation of a contingency plan under this paragraph.

"(4)(A) VESSEL AND FACILITY CONTINGENCY PLANS.—Not later than 18 months after the date of the Oil Pollution Prevention, Removal, Liability, and Compensation Act of 1989 is enacted, the President shall require the owners or operators of certain vessels and facilities to prepare a contingency plan for each vessel and facility. This paragraph applies to—

"(i) a vessel operating on the navigable waters or the exclusive economic zone and carrying oil or a hazardous substance in bulk as cargo;

"(ii) an offshore or onshore facility that, because of its location, could reasonably discharge into or on the navigable waters, the adjoining shorelines, or the exclusive economic zone.

"(B) The contingency plans required by this paragraph shall—

"(i) be consistent, and ensure compliance by the owner or operator, with the requirements of the National Contingency Plan and any local contingency plan.

"(ii) be submitted on a timely basis to the President;

"(iii) be available for review by appropriate Federal, state, and local officials, and the public;

"(iv) identify the individual having full authority to implement a removal action and require immediate communications between that individual and the appropriate Federal official and the persons identified in clause (vi);

"(v) describe the specific actions that will be taken immediately to respond to a discharge, including the most serious potential discharge from the vessel or facility involved;

"(vi) identify and ensure, by contract with a private organization or otherwise, the availability of personnel and equipment necessary to implement any removal action under clauses (iv) and (v) of this subparagraph;

"(vii) include a program of personnel training, equipment testing, and periodic unannounced drills sufficient to ensure the effectiveness of the contingency plan;

"(viii) describe the conditions under which dispersants might be used, including the procedures to be followed for obtaining approval for dispersant use;

"(ix) include provisions for the safe disposal of any contaminated materials or oil or hazardous substance recovered during the removal; and

"(x) be updated periodically.

"(C) Beginning one year after the issuance of regulations implementing this paragraph, a vessel or facility for which the preparation of a contingency plan is required, may not handle, store, or transport oil or a hazardous substance unless—

"(i) the owner or operator has submitted a contingency plan in accordance with this paragraph;

"(ii) the contingency plan has not been rejected by the President; and

"(iii) the vessel or facility is operating in compliance with the contingency plan.

"(D) The President shall promptly review the contingency plans submitted under this paragraph and shall reject, or require amendments to, any plan that does not meet the requirements of subparagraph (B) of this subsection.

"(E) The President may provide by regulation that the requirements of this paragraph have been met by a class of vessels or facilities under other law.

"(5) Not later than one year after the date of enactment of the Oil Pollution Prevention, Removal, Liability, and Compensation Act of 1989, the President shall require—

"(A) periodic inspection of containment booms, skimmers, vessels, and other major equipment used to remove discharges of oil or a hazardous substance.

26

"(B) vessels operating on the navigable waters and carrying oil or a hazardous substance in bulk as cargo to carry appropriate removal equipment that employs the best technology economically feasible and that is compatible with the safe operation of the vessel.

"(6) The President, acting through the Secretary of the department in which the Coast Guard is operating, shall periodically conduct drills of removal capability in major port areas under local contingency plans and relevant vessel and facility contingency plans. The drills shall include participation by Federal, state, and local agencies, the owners or operators of vessel and facilities in the area, and private industry. The Secretary shall publish annual reports on these drills including an assessment of the effectiveness of the plans and a list of amendments that were made to the ineffective contingency plans.".

### SEC. 433. OIL AND HAZARDOUS SUBSTANCES STRIKE TEAMS.

Section 311(c)(2)(C) of the Federal Water Pollution Control Act (33 U.S.C. 1321(c)(2)(C)) is amended to read as follows—

"(C) establishment and maintenance of a Federal strike force including at least seven regional strike teams with personnel who are trained, equipped, and available on a continual basis to provide necessary services to carry out the Plan and any contingency plans required under subsection (j) of this section. In establishing these teams, the President shall consider existing Federal, state, local, and private sector resources that are available and that may be used to effectively remove a discharge".

### SEC. 434. COAST GUARD VESSEL DESIGN.

The Secretary shall ensure that vessels designed and constructed to replace Coast Guard oceangoing and coastal buoy tenders are equipped with oil skimming systems that are readily available, operable, and complement the primary mission of servicing aids to navigation.

### SEC. 435. EQUIPMENT INVENTORY.

Section 311(c)(2) of the Federal Water Pollution Control Act (33 U.S.C. 1321(c)(2)) is amended by—

(1) striking "and" after the semicolon at the end of subparagraph (G);
(2) striking the period at the end of subparagraph (H) and inserting "; and";
(3) inserting the following after subparagraph (G):

"(I) development and maintenance of a national computerized inventory of all public and private resources, including trained personnel and major equipment located within and outside the United States, that is available to remove a discharge of oil or a hazardous substance in the navigable waters, on adjacent shorelines, or in the exclusive economic zone.".

### SEC. 436. OIL POLLUTION RESEARCH AND DEVELOPMENT PROGRAM.

Section 311 of the Federal Water Pollution Control Act (33 U.S.C. 1321) is amended by adding at the end the following:

"(t) OIL POLLUTION RESEARCH AND DEVELOPMENT PROGRAM.—

"(1) ESTABLISHMENT OF PROGRAM.—The President shall establish a comprehensive oil pollution research and development program.

"(2) PURPOSES.—The purpose of the research and development program include—

"(A) a development of methods to prevent or minimize the discharge of oil from vessels, including methods to measure a vessel's ullage, to prevent discharges from tank vents, to prevent discharges during lightering and bunkering operations, and to contain discharges on vessel decks;

"(B) development of methods to prevent or minimize the discharge of oil from facilities;

"(C) development of methods to remove discharges of oil from vessels and facilities;

"(D) development of methods to protect public health and safety, including that of removal personnel from a discharge of oil;

"(E) development of adequate worker training standards for discharge removal personnel;

"(F) development of methods to restore and rehabilitate natural resources damaged by a discharge of oil; and

"(G) assessment of the long-term effects of a discharge of oil on natural resources.

"(3) COORDINATION.—The President shall coordinate research and development activities under this subsection with affected Federal agencies, states, other nations, industry, academia, and the private sector.

"(4) ANNUAL REPORT.—Before January 1 of each year, the President shall submit to Congress a report on the actual and planned activities carried out under this subsection.

"(5) FUNDING.—Notwithstanding another law, there is authorized to be appropriated $15,000,000 from the Fund established by section 9509 of the Internal Revenue Code of 1986 for each fiscal year to carry out the purposes of this section.".

# Subtitle D—Penalties

**SEC. 441. INCREASED PENALTIES.**

(a) PROHIBITED DISCHARGE.—Section 311 of the Federal Water Pollution Control Act (33 U.S.C. 1321) is amended—

(1) in subsection (b)(6)—

(A) in subparagraph (A), by striking "$5,000" each place it appears and inserting "$1,000" for each barrel of oil or hazardous substance that was discharged or $5,000,000, whichever is less,";

(B) in subparagraph (B)—

(i) by striking "$50,000" and inserting "$1,000 for each barrel of oil or hazardous substance that was discharged or $5,000,000, whichever is less"; and

(ii) by striking "$250,000" and inserting "$5,000" for each barrel of oil or hazardous substance that was discharged"; and

(C) by adding at the end the following:

"(F) Amounts recovered by the Federal Government for penalties assessed under this paragraph as the result of discharge of oil shall be deposited in the Oil Spill Liability Trust Fund created by section 9509 of the Internal Revenue Code of 1986."; and

(2) in subsection (j)(2) by striking out "$5,000" and inserting "$25,000".

(b) NEGLIGENT OPERATIONS.—Section 2302 of title 46, United States Code, is amended—

(1) in subsection (b), by striking "shall be fined not more than $5,000, imprisoned for not more than one year, or both.", and inserting "commits a class A misdemeanor."; and

(2) in subsection (c)—

(A) in the matter preceding paragraph (1) by striking ", shall be";

(B) in paragraph (1) by inserting "is" before "liable"; and

(C) by amending paragraph (2) to read as follows:

"(2) commits a class A misdemeanor."

(c) INSPECTIONS.—Section 3318 of title 46, United States Code, is amended—

(1) in subsection (b) by striking "shall be fined not more than $10,000, imprisoned for not more than five years, or both.", and inserting "commits a class D felony.";

(2) in subsection (c), by striking "shall be fined not more than $5,000, imprisoned for not more than five years, or both.", and inserting "commits a class D felony.";

(3) in subsection (d), by striking "shall be fined nor more than $5,000, imprisoned for not more than five years, or both.", and inserting "commits a class D felony.";

(4) in subsection (e), by striking "shall be fined not more than $10,000, imprisoned for not more than two years, or both.", and inserting "commits a class A misdemeanor."; and

(5) in subsection (f) in the matter preceding paragraph (1), by striking "shall be fined not less than $1,000 but not more than $10,000, and imprisoned for not less than two years but not more than five years,", and inserting "commits a class D felony".

(d) CARRIAGE OF LIQUID BULK DANGEROUS CARGOES.—Section 3718 of title 46, United States Code, is amended—

(1) in subsection (b), by striking "shall be fined not more than $50,000, imprisoned for not more than five years, or both.", and inserting "commits a class D felony."; and

(2) in subsection (c), by striking "shall be fined not more than $100,000, imprisoned for not more than 10 years, or both.", and inserting "commits a class C felony.".

(e) LOAD LINES.—Section 5116 or title 46, United States Code, is amended—

28

(1) in subsection (d), by striking "shall be fined not more than $10,000, imprisoned for not more than one year, or both.", and inserting "commits a class A misdemeanor."; and

(2) in subsection (e), by striking "shall be fined not more than $10,000, imprisoned for not more than two years, or both." and inserting "commits a class A misdemeanor.".

(f) COMPLEMENT OF INSPECTED VESSELS.—Section 8101 of title 46, United States Code, is amended—

(1) in subsection (e), by striking "$50" and inserting "$1,000";

(2) in subsection (f), by striking "$100, or, for a deficiency of a licensed individual a penalty of $500." and inserting "$10,000."; and

(3) in subsection (g), by striking "$500." and inserting "$10,000.".

(g) WATCHES.—Section 8104 of title 46, United States Code, is amended—

(1) in subsection (i), by striking "$100." and inserting "$10,000."; and

(2) in subsection (j), by striking "$500." and inserting "$10,000.".

(h) COASTWISE PILOTAGE.—Section 8502 of title 46, United States Code, is amended—

(1) in subsection (e), by striking "$500." and inserting "$10,000."; and

(2) in subsection (f), by striking "$500." and inserting "$10,000.".

(i) FOREIGN COMMERCE PILOTAGE.—Section 8503(e) of title 46, United States Code, is amended by striking "shall be fined not more than $50,000, imprisoned for not more than five years, or both." and inserting "commits a class D felony.".

(j) CREW REQUIREMENTS.—Section 8702(e) of title 46, United States Code, is amended by striking "$500." and inserting "$10,000.".

(k) PORTS AND WATERWAYS SAFETY ACT.—Section 13(b) of the Port and Waterways Safety Act (33 U.S.C. 1232(b)) is amended—

(1) in paragraph (1), by striking "shall be fined not more than $50,000 for each violation or imprisoned for not more than five years, or both.", and inserting "commits a class D felony."; and

(2) in paragraph (2), by striking "shall, in lieu of the penalties prescribed in paragraph (1), be fined not more than $100,000, or imprisoned for not more than 10 years, or both.", and inserting "commits a class C felony.".

(l) VESSEL NAVIGATION.—Section 4 of the Act of April 28, 1908 (33 U.S.C. 1236), is amended—

(1) in subsection (b), by striking "$500." and inserting "$5,000.";

(2) in subsection (c), by striking "$500," and inserting "$5,000."; and

(3) in subsection (d), by striking "$250." and inserting "$2,500.".

(m) INTERVENTION ON THE HIGH SEAS ACT.—Section 12(a) of the Intervention on the High Seas Act (33 U.S.C. 1481(a)) is amended—

(1) in the matter preceding paragraph (1), by striking "Any person who" and inserting "A person commits a class A misdemeanor if that person"; and

(2) in paragraph (3), by striking ", be fined not more than $10,000 or imprisoned not more than one year, or both".

(n) DEEPWATER PORT ACT OF 1974.—

(1) IN GENERAL.—Section 15(a) of the Deepwater Port Act of 1974 (33 U.S.C. 1514(a)) is amended by striking "shall on conviction be fined not more than $25,000 for each day of violation or imprisoned for not more than one year, or both." and inserting "commits a class A misdemeanor for each day of violation.".

(2) FAILURE TO NOTIFY.—Section 18(b) of the Deepwater Port Act of 1974 (33 U.S.C. 1517(b)) is amended by striking "shall, upon conviction, be fined not more than $10,000 or imprisoned for not more than one year, or both." and inserting "commits a class A misdemeanor.".

(o) ACT TO PREVENT POLLUTION FROM SHIPS.—Section 9(a) of the Act to Prevent Pollution from Ships (33 U.S.C. 1908(a)) is amended by striking "shall, for each violation, be fined not more than $50,000 or be imprisoned for not more than five years, or both.", and inserting "commits a class D felony.".

# TITLE V—PRINCE WILLIAM SOUND OIL SPILL REMOVAL

**SEC. 501. SHORT TITLE.**

This title may be cited as the "Prince William Sound Oil Spill Removal Act of 1989".

SEC. 502. DEFINITIONS.

For purposes of this title—

(1) "Arctic waters" means the navigable waters of the United States in the State of Alaska and the waters of the exclusive economic zone established by Presidential Proclamation number 5030, dated March 10, 1983, adjacent to the state of Alaska.

(2) "tank vessel" has the same meaning given that term in section 2101 of title 46, United States Code, except that it does not include an escort vessel or any other vessel used to respond to an unlawful discharge of oil.

(3) "Prince William Sound" means all state and Federal waters within the Prince William Sound, including the approach to Hinchenbrook Entrance out to and encompassing Seal Rocks.

SEC. 503. TANK VESSEL REQUIREMENTS.

Not later than six months after the date of enactment of this title, the Secretary shall require under section 3703(a)(3) of title 46, United States Code,—

(1) tank vessels transporting oil from the Trans-Alaska Pipeline within designated areas of Prince William Sound to be escorted by at least one towing vessel (as defined under section 2101 of title 46, United States Code) or other vessels considered appropriate by the Secretary; and

(2) in addition to the requirements of section 8502 of title 46, United States Code, the use of a pilot licensed by the State of Alaska who is operating under a Federal license for all tank vessels navigating between the Port of Valdez, Alaska, and a point in Prince William Sound south of Bligh Reef.

SEC. 504. VESSEL TRAFFIC SERVICE SYSTEM.

(a) PLAN.—Not later than four months after the date of enactment of this Act, the Secretary shall prepare a plan to modify the surveillance coverage for vessels in Prince William Sound. The plan shall include options for construction of new radar sites to cover all of the vessel traffic service system within Prince William Sound a review of existing vessel surveillance programs to ensure constant contact with vessel traffic when necessary, a review of radar maintenance policies to ensure that the vessel traffic service system is maintained at or above a 99.9 percent availability standard, and any proposals using other technology that will provide the same operational and availability standards.

(b) IMPLEMENTATION.—The Secretary shall implement the plan required under subsection (a) of this section not later than one year after its preparation.

SEC. 505. EQUIPMENT AND PERSONNEL REQUIREMENTS.

Not later than 18 months after the date of enactment of this title, the Secretary under section 311(j) of the Federal Water Pollution Control Act (33 U.S.C. 1321(j)), shall require—

(1) prepositioned oil spill containment and cleanup equipment in the Port of Valdez, the City of Cordova, and other locations within the geographic boundaries of Prince William Sound, including escort vessels with skimming capability, barges to receive recovered oil, heavy duty sea boom, pumping, transferring, lightering equipment, and other appropriate recovery equipment for the protection of the environment, including fish hatcheries;

(2) the establishment of an oil spill removal organization at Cordova, Tatitlek, Valdez, Chenega, or other appropriate locations in Prince William Sound, consisting of trained personnel in sufficient numbers to immediately respond to a discharge of 200,000 barrels of oil;

(3) tank vessels operating in Prince William Sound to have on board appropriate equipment or materials sufficient to respond quickly to a discharge of oil and to minimize the damage to the environment from that oil;

(4) training in oil removal techniques for local residents and individuals engaged in the cultivation or production of fish or fish products in Prince William Sound; and

(5) practice exercises not less than two times per year which test the capacity of the equipment and personnel required under this section. That equipment shall undergo periodic testing and certification as required by the Secretary.

SEC. 506. USE OF LOCAL SERVICES.

In carrying out this title, the Secretary shall—

(1) consult with local residents and significant local landowners of the Prince William Sound area; and

(2) ensure the use, whenever practicable, of local expertise and services.

30

**SEC. 507. AUTHORITY OF THE STATE OF ALASKA.**

Nothing in this title shall be construed as changing, diminishing, or affecting in any way the authority of the State of Alaska, or any political subdivision thereof, to regulate tank vessels or to provide for oil spill contingency planning in state waters.

**SEC. 508. ENVIRONMENTAL ASSESSMENT.**

(a) NOAA EXPENDITURES.—From sums appropriated for this purpose, the Under Secretary for Oceans and Atmosphere of the Department of Commerce shall expend no less than $5,000,000 in each of fiscal years 1990, 1991, and 1992, to conduct living marine resource damage assessments and to monitor the short- and long-term effects on living marine resources in Arctic waters from the discharge of oil that occurred as a result of the grounding of the EXXON VALDEZ in Prince William Sound.

(b) RECOVERED SUMS.—The Under Secretary for Oceans and Atmosphere shall, whenever possible, recover the sums expended under subsection (a) of this section from the owner or operator of the EXXON VALDEZ. These sums shall be credited to the appropriations of the National Oceanic and Atmospheric Administration.

(c) In carrying out this section, the Under Secretary for Oceans and Atmosphere shall—

(1) consult with local residents and significant local landowners of the Prince William Sound area;

(2) coordinate assessment and monitoring work with the State of Alaska and the Prince William Sound Science and Technology Institute through the establishment of an appropriate working group; and

(3) to the extent practicable, use local services and expertise.

**SEC. 509. REPORT.**

Not later than four months after the date of enactment of this title, after providing for a 60-day public comment period, the Secretary shall report to the Committee on Merchant Marine and Fisheries of the House of Representatives and the Committee on Commerce, Science, and Transportation of the Senate on—

(1) a list of oil pollution exercises conducted in the Port of Valdez and Prince William Sound during the operation of the Trans-Alaska Pipeline; and

(2) any other matters the Secretary considers important regarding oil spills in Arctic waters, including faster approval by state and Federal agencies of oil spill removal technology.

# TITLE VI—MISCELLANEOUS

**SEC. 601. CONFORMING AMENDMENT TO TITLE 33.**

Section 9(a) of the Ports and Waterways Safety Act (33 U.S.C. 1228) is amended by striking "any other applicable law or treaty; or" and substituting "any other applicable law or treaty, including section 311(j) of the Federal Water Pollution Control Act (33 U.S.C. 1321(j)); or".

**SEC. 602. STATUTORY WAIVERS.**

(a) IN GENERAL.—Section 2113 of title 46, United States Code, is amended—

(1) by inserting "(a)" before "If the"; and

(2) by adding at the end the following:

"(b)(1) Notwithstanding another law, the Secretary may waive the application of parts B, C, F (except section 8103), and H of this subtitle, if the Secretary determines that the waiver is needed in a crisis concerning—

"(A) a discharge, or threat of a discharge, of oil or a hazardous substance; or

"(B) the national defense, as determined by the Secretary of Defense.

"(2) A waiver may be issued under this section on the Secretary's own initiative or on request of the head of another department, agency, or instrumentality of the United States Government.

"(3) A waiver issued under this section shall—

"(A) state the reason for the waiver;

"(B) be for a specified period, not to exceed one year, and may not be renewed;

"(C) state which requirements of law are being waived; and

"(D) terminate when qualified individuals or vessels are available.".

(b) CONFORMING AMENDMENT.—The Act of December 27, 1950 (46 App. U.S.C. chapter 1 note) is repealed.

31

SEC. 603. STUDIES AND REPORTS AS ADMINISTRATIVE EXPENSES.

The studies and reports required under sections 420, 421, 422, and 509 of this Act and Federal expenses incurred under section 311(j) of the Federal Water Pollution Control Act shall be considered administrative expenses of the Federal Government for purposes of section 9509 of the Internal Revenue Code of 1986.

SEC. 604. SAVINGS CLAUSE

This Act does not affect—
    (1) admiralty and maritime law; or
    (2) the jurisdiction of the district courts of the United States with respect to civil actions under admiralty and maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled.

## PURPOSE OF THE BILL

The purpose of this legislation is to establish a comprehensive system of liability and compensation for damages caused by oil pollution, and to establish a comprehensive nationwide program to prevent and remove discharges of oil and hazardous substances on the navigable waters and exclusive economic zone of the United States.

## BACKGROUND AND NEED FOR LEGISLATION

This is the eighth Congress in which there has been an attempt to enact legislation to provide a comprehensive system of liability and compensation for damages caused by oil pollution. While existing laws permit the U.S. government to be compensated for certain cleanup and removal costs, there is no comprehensive legislation in place that promptly and adequately compensates those who suffer other types of economic loss as a result of an oil pollution incident.

The United States is highly vulnerable to discharges of oil and hazardous materials into the marine environment. The United States is the world's largest consumer of oil and petroleum products, and much of our supply is transported by waterborne means. More than one-half of the nation's supply of crude oil is imported by tankers. In addition, nearly one-quarter of the nation's domestic crude oil production is transported by tankers to the contiguous forty-eight states from Alaska. Thousands of inland and coastal barges and tankers move daily along our coastlines and through our waterways and port areas carrying vast supplies of crude oil and petroleum products to facilities for refining, processing, storage, distribution, and marketing.

On March 24, 1989, the *Exxon Valdez,* a 987-foot tanker, ran aground on Bligh Reef in Prince William Sound, Alaska. More than 11 million gallons of crude oil spilled into Prince William Sound, making it the largest spill in the history of the United States. Hundreds of miles of Alaskan coastline extending to Western Alaska were covered with oil. Wildlife losses were extensive: thousands of seabirds, hundreds of sea otters, nearly a hundred bald eagles, as well as other species of waterfowl and marine mammals were killed. Countless other wildlife and fisheries resources were affected. Commercial and recreational fishing industries, the lifeblood of the Prince William Sound economy, were disrupted and, in some cases, effectively closed for the season due to oil contamination of fishing areas.

32

During the extensive review of oil spill prevention and removal issues undertaken by the Committee following the catastrophic spill of March 24, 1989, it became clear that legislative action on these issues was required in addition to the oil pollution liability and compensation issues addressed by H.R. 1465. The nation's ability to avoid or clean up spills of oil and hazardous substances in the navigable waters of the United States currently depends on a network of public and private participants operating under a patchwork of Federal, state, and local laws and regulations. Several recent spills in coastal waters, especially those during the weekend of June 23–24, 1989, in Rhode Island, the Houston Ship Channel, and the Delaware River, demonstrated that the problems experienced in Prince William Sound are evident throughout the nation: prevention measures and removal capabilities are clearly inadequate to immediately and effectively clean up oil spills.

This legislation address both the issue of liability and compensation for damages caused by an oil spill, and prevention and removal of a discharge of oil or hazardous substances on the navigable waters and the exclusive economic zone of the United States.

### LIABILITY AND COMPENSATION

### (Titles I, II, and III)

Legislative consideration of liability and compensation began in the 94th Congress in response to a Ford Administration proposal for implementing two international conventions relating to oil pollution liability. These were the International Convention on Civil Liability for Oil Pollution Damage (1969) and the International Fund for Compensation for Oil Pollution Damage (1971). The Merchant Marine and Fisheries Committee tentatively rejected the notion of implementing the two Conventions, but approved instead a proposal to establish a comprehensive domestic oil pollution liability and compensation regime. That bill, H.R. 14862, was reported by the Committee in September 1976, too late in the Congress for other committees to take action.

Similar legislation was approved by both the House and the Senate during the 95th Congress, but failed to become law when an agreement could not be worked out on precise language during the second session of that Congress.

During the 96th Congress, the House again approved a bill to establish rules for liability and compensation for damages caused by oil spills. Similar legislation, the proposed Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), was approved to deal with spills of hazardous substances. Serious consideration was given to combining the two bills to cover spills of both oil and hazardous substances. That plan was dropped, however, as part of a compromise very late in the Congress to ensure the enactment of CERCLA, with coverage restricted to pollution from hazardous substances. Hazardous substances were considered to be more critical than oil at that time. Committee leaders in both the House and Senate expressed an intention at that time to make consideration of an oil pollution liability bill a "priority" in the 97th Congress.

The Committee on Merchant Marine and Fisheries thus proceeded to approve a version of this leigslation in 1981. Consideration of a companion bill in the Senate was stifled, however, by opposition from the Executive Branch. Despite this opposition, the Merchant Marine and Fisheries Committee again approved an oil pollution liability bill, H.R. 3278, early in the 98th Congress. In May, 1984, Secretary of Transportation Elizabeth Dole announced a change in the Administration's position with respect to the legislation; she testified in favor of most of the major provisions of the bill at an oversight hearing of the Subcommittee on Coast Guard and Navigation the following month.

On August 10, 1984, the House approved a comprehensive oil pollution liability bill for the third time when it accepted the text of H.R. 3278 as an amendment to H.R. 5640, the proposed Superfund Expansion and Protection Act of 1984. That legislation was referred to the Senate Committee on Finance, where no action was taken.

In February 1985, H.R. 1232 was introduced by Mr. Studds, Mr. Jones of North Carolina, Mr. Lent, and Mr. Davis of Michigan, as well as five other cosponsors. The bill moved quickly through the Committee, and was attached to two legislative vehicles, the budget reconciliation bill and the Superfund bill. Both bills passed the House.

In the Superfund conference, the House agreed to drop the oil spill legislation in exchange for a promise of Senate action. The Senate passed its version of an oil spill bill, S. 2799, and the two bodies met in conference over the reconciliation bill of 1986, H.R. 5300.

After continued discussions and in light of the approaching adjournment of the 99th Congress, the House-Senate negotiations were concluded without agreement. The House oil spill provision was deleted from reconciliation, but the financing mechanism for the Oil Spill Liability Trust Fund was included in the House Ways and Means reconcilitation submittal and upon subsequent enactment of the reconciliation bill (P.L. 99-509), remained in place until September 1, 1987, pending enactment of implementing legislation.

In March of 1987, Mr. Jones of North Carolina and Mr. Davis of Michigan, along with 15 other cosponsors, introduced H.R. 1632, a further refined version of oil spill legislation based on the experience of the 99th Congress. The Committee ordered the bill reported in May. The bill represented a blending of many aspects of previous House and Senate bills. Although the House Public Works Committee held a hearing on the bill in June of 1987, no further action was taken in the House. The legislation was added to the budget reconciliation bill and, although approved by the House as part of H.R. 3545, the fiscal year 1988 reconciliation measure, the oil spill portion was dropped out in conference. The Technical and Miscellaneous Revenue Act of 1988 did, however, extend the Oil Spill Liability Trust Fund's financing provisions until December 21, 1990.

H.R. 1465 was introduced on March 16, 1989, by Mr. Jones and Mr. Davis, as well as 42 other cosponsors. The bill, identical to the version ordered reported out of the Committee in the 100th Con-

gress, was once again referred jointly to the Committee on Merchant Marine and Fisheries and Public Works and Transportation.

Despite the failure thus far to enact legislation, the Committee believes that an overwhelming case can be made that it would be in the national interest to do so. The bill improves upon present law in the following respects:

1. It will guarantee that those suffering economic loss as the result of an oil spill from a vessel or facility will be quickly and fairly compensated for the loss, whether or not the spiller accepts liability or admits negligence in connection with the discharge of oil.

2. It will impose joint, several, and strict liability on those producing, handling, or transporting oil to encourage a high standard of care and make certain that those responsible for pollution will be held primarily responsible for the cost.

3. It will encourage prompt and complete cleanup of oil spills from vessels of facilities, including relatively chronic pollution, such as that caused by tar balls.

4. It will reduce the cost to the taxpayer of cleaning up oil spills by implementing an industry-financed Oil Spill Liability Trust Fund to be available to reimburse individuals and the government for cleanup activities not otherwise compensated.

5. It will simplify and reduce Federal administrative costs by eliminating four single-purpose oil pollution liability funds presently in existence and replacing them with a single Fund liable for costs of administering this legislation.

6. It will establish a clear and predictable legal and regulatory framework within which actual or potential claimants, spillers, and insurers will be able to make decisions relevant to oil pollution matters.

7. It will encourage efforts to improve international standards of oil pollution liability and compensation.

Approximately 8,800 oil pollution incidents occur in U.S. waters every year. Many of these spills are so small that no Federeal response is warranted, and no damages are caused. Since 1972, however, the Coast Guard has responded to approximately 158,000 spills totaling more than 177,000,000 gallons of oil.

The Coast Guard's response is authorized by the Federal Water Pollution Control Act (commonly known as the Clean Water Act). The fund created by section 311(k) of that Act consists of appropriated money used to finance cleanup activities. Theoretically, the Coast Guard can recover its expenditures by taking legal action or by negotiating informally with those responsible for the pollution. Unfortunately, cost recovery efforts have been hampered by the limits of liability which are contained in the Clean Water Act, by the unknown source of some spills, and by the delays, compromises, and procedural problems associated with most formal legal actions. Since the 311(k) fund was created, the Coast Guard has spent almost $184 million cleaning up oil spills but has been able to recover only $114 million.

The difficulty of recovering cleanup costs has led to a reluctance on the part of the Coast Guard to commit section 311(k) money to clean up oil spills in other than dramatic or emergency situations.

35

Many state officials have complained about the difficulty of getting Federal funds to assist in local cleanup operations, and several states have, as a result, developed their own revenue sources for responding to pollution incidents. Under the new legislation, Federal cleanup efforts would be reimbursed by the Fund, which is financed not by the taxpayer, but by a tax of 1.3 cents per barrel imposed on oil. If the person responsible for the spill cannot be found or is able to limit liability, the Fund, not the taxpayer, would be available to pick up the bill. Present law does not provide any assurance that those suffering economic loss as a result of an oil spill will be able to receive compensation for their loss.

Claimants other than the Federal government are now in a particularly bad position. Unless they are able to prove that the spill resulted from negligence on the part of the owner or operator, no recovery of damages is likely. Even if negligence is proven, individual claimants may not be able to recover for loss of income, and state governments may not be able to recover for damage to natural resources, due to common law interpretations of damages for which compensation may be required. In any event, prolonged legal wrangling is almost inevitable with respect to any substantial spill in which the extent of fault and the scope of damages are not clear cut.

Under H.R. 1465, all claimants, whether governmental or individual, will have the option of negotiating with the spiller or, after six months, of submitting a claim to the Fund. In all except the most extreme circumstances, a claimant will be able to recover in full for a broad list of clearly spelled out damages. He will be able to recover regardless of whether the negligence of the responsible party resulted in the oil pollution incident. There will also be a guarantee, through a requirement that a potential spiller possess adequate insurance or other evidence of financial responsibility, that the person liable for damages will have the resources necessary to compensate claimants or, by subrogation, the Fund, for damages and costs incurred.

The system established by the bill will permit claimants to have a clear understanding of their rights and a guarantee that their claims will be promptly and fairly considered. The oil cargo owners and the transportation and offshore production industries will know in advance the potential pollution liability to which they may be exposed and will be required, when appropriate, to have insurance or financial guarantees to cover the cost. Federal taxpayers will be spared administrative and pollution cleanup costs they are currently required to bear. All concerned will have the benefit of operating under uniform standards of liability, damage definitions, insurance requirements, and claims settlement procedures.

This legislation also provides for the coordination of Federal and state governmental approaches to the problem of oil spill liability. All vessels are included because of the interstate nature of the waterborne petroleum transportation trade and because spills into the navigable waters may cause damage in more than one state. In addition, facilities which operate beyond state jurisdiction on the outer Continental Shelf or pursuant to a license issued under the Deepwater Port Act of 1974 (33 U.S.C. 1501–1524) are also clearly a Federal responsibility. Retained from the 100th Congress version of

36

the bill is a provision that facilities located on land or in state waters are included within the scope of this bill.

This bill as reported from the Committee differs from its previous version in that it provides that actions arising out of discharges of oil from vessels or facilities may only be brought in accordance with the provisions of the bill. Actions for wrongful death or personal injury are not preempted. Similarly, the bill limits the uses of a state oil spill fund or account supported by contributions directly levied on persons who contribute to the comprehensive Federal Fund. Only in this instance, the Fund cannot be used to compensate any person for damages arising as a result of an oil discharge.

In return, states will receive a guarantee of greater Federal cooperation in responding to many oil spills and an enormously increased level of protection for themselves and for their citizens from pollution incidents which are either catastrophic or for which existing legal remedies are inadequate.

The bill provides limits on liability for oil spill incidents. Under H.R. 1465, the liability of vessels carrying oil in bulk as cargo (other than an inland oil barge) would be $500 per gross ton of the vessel, with a minimum of $5 million and a maximum of $60 million. The liability of any other vessel would be $300 per ton with a $500,000 minimum. The liability limit for a facility would be $75,000,000. The Secretary may establish liability limits of between $8,000,000 and $75,000,000 for any class or category of onshore facility, and for a deepwater port facility. These liability limits are designed to insure due care in transporting oil as historically all but the most catastrophic spills would be fully paid for by the spiller at these levels. The fund is designed to cover catastrophic spills.

The legislation is predicated on the assumption that oil spills will continue to occur. Inevitably, some of those spills will result in significant damage to personal property or natural resources and expense to those charged with the responsibility for removing or containing the oil.

No witness who has testified before the Committee over the years has questioned the fundamental equity of adopting a standard of strict pollution liability for those who produce, handle, and transport oil. The inadequacy of present law and the need for legislation of this type has been recognized by a broad range of groups, including the Administration, the oil industry, the shipping and barge industries, the fishing industry, most state governments, environmentalists, and the insurance industry. Disagreements persist about the precise scope and language of certain provisions in the bill, but the text of this legislation reflects compromises and understandings worked out over the course of the last decade by those convinced of the need for this type of bill. It is a bill that provides for comprehensive cleanup and compensation, while at the same time provides for the economical transport of oil by sea. Members of the Committee on Merchant Marine and Fisheries remain willing to work with other Congressional Committees, with the Administration, and with the public to guarantee the enactment of a broadly acceptable and effective comprehensive oil pollution liability bill.

37

## PREVENTION AND REMOVAL

### (Title IV)

The Coast Guard has been tasked with an increasing number of environmental responsibilities that include preventing, reducing, or cleaning up discharges of oil and hazardous substances from our waters. The Coast Guard has seen its responsibilities for enforcing our environmental laws increase dramatically in the last two decades. However, the portion of the Coast Guard's budget devoted to marine environmental protection has seriously declined.

The marine safety budget account, through which most of the Coast Guard's oil and hazardous materials response operations are funded, comprised 14.2 percent of the Coast Guard's operating budget in Fiscal Year 1980. By Fiscal Year 1983, marine safety accounted for only 7.6 percent of the operating budget. That level fell again in Fiscal Year 1986 to only 6 percent of the operating budget. During that same time period, the Coast Guard's operating budget did not keep pace with inflation. In its FY 1990 budget request, the Coast Guard projected expenditures of approximately 6.2 percent of its operating budget for marine safety, if it received the total funding proposed by the Administration.

The Coast Guard has closed or reduced the staff of several of its units charged with carrying out its environmental mandate, such as the Atlantic Strike Team and numerous Marine Safety Offices. These factors raised serious concerns in the mind of several Members of this Committee regarding the Coast Guard's ability to adequately carry out its marine and environmental safety mission.

This concern prompted Mr. Jones, Mr. Tauzin, Mr. Davis, and Mr. Young, of this Committee, to write the General Accounting Office (GAO) on February 6, 1989, requesting a study of how well the Coast Guard is carrying out its environmental responsibilities. Among the issues raised were: the effect that the reduction in the portion of the Coast Guard budget devoted to marine environmental protection has had on its ability to meet its environmental missions; the effect of the reductions in strike teams and marine safety offices; the effectiveness of Coast Guard oil and chemical spill prevention programs; the effectiveness of mitigating damages and cleaning up after a spill; and the ability of the Coast Guard to get responsible parties to clean up or pay for Coast Guard administered cleanups.

The GAO had already started its investigation of these matters when the *Exxon Valdez* ran aground on Bligh Reef in Prince William Sound, Alaska, on Mary 24, 1989. The GAO presented the results of their study, which had been expanded somewhat in scope after the *Exxon Valdez* spill, at a hearing on August 10, 1989 in Cordova, Alaska.

The Committee concurs with the GAO finding that the highest priority should be given to preventing spills in the first place. Subtitle B of title IV contains provisions aimed at preventing spills. Sections 411 through 415 are included to assure that the Coast Guard has a greater ability to provide an alcohol- and drug-free maritime environment. Section 416 seeks to ensure that foreign

tankers operating in U.S. waters have adequate manning, training, qualification, and watchkeeping standards.

The GAO concludes that vessel traffic service systems and other navigation safety requirements might need to be expanded. In section 417 the Secretary is authorized to require certain vessels to participate in a vessel traffic service system under the authority of the Ports and Waterways Safety Act. In granting the Secretary discretion, the Committee recognizes that not all vessels should be mandated to participate in a system, and that the Coast Guard has the expertise to determine which vessels ought to be required to participate in the interest of safe navigation.

Section 420 provides for a broad study of tanker navigation safety standards. A number of proposals were presented by witnesses at hearings and the Committee believes that a thorough study of these ideas ought to be conducted by the Coast Guard. With the emphasis on prevention, the Coast Guard is directed to review manning standards, analyze navigation equipment (such as communications equipment and alarms for automatic pilots); analyze navigation procedures (such as traffic separation schemes, tug escorts, vessel speeds); evaluate vessel design and construction criteria (including double hulls and double bottoms); and evaluate whether vessel inspection standards are adequate.

The GAO found that the initial response to the discharge in Prince William Sound was inadequate to deal with a spill that large. Problems ranged from a shortage of equipment and skilled personnel to inadequate communications and organizational structure. The government and industry were clearly not prepared. The GAO attributed the inadequate preparedness to a lack of Federal and state leadership. The Coast Guard testified that it lacks clear authority to ensure adequate response preparations are made for coastal spills, although it has authority, delegated to it by the President, to ensure that the cleanup is effective.

The GAO recommended that the Federal government be the leader for ensuring that adequate plans and resources are in place to respond to major spills and that those resources are properly tested to ensure a smooth removal. The Committee has adopted this recommendation in section 431 of the bill, by mandating that the President ensure an effective and immediate removal of a discharge of oil or hazardous substances.

In addition, this bill establishes a three-tiered Presidential response authority. The President may Federalize a spill; this authority exists under current law. In this case, the President conducts the cleanup operations, usually when the responsible party is unknown or incapable of removal actions. The President may also take command of cleanup operations and direct all Federal, state, and private actions, including those of the responsible party. Finally, the President may choose to monitor removal actions when the responsible party is conducting removal actions immediately and effectively. These levels of authority should ensure immediate cleanup of a spill, while giving the President the flexibility to use whatever authority is deemed necessary.

Consistent with the GAO recommendations, H.R. 1465 mandates significant new requirements for Federal, state, local, and private preparedness. An important addition to Federal law made by this

legislation is the requirment for local, vessel, and facility contingency plans, all of which must detail the equipment, personnel, and procedures that are to be utilized to respond to a spill. The plans are subject to initial and periodic Presidential review and must be amended whenever the President orders. The President is required to ensure that all contingency plans are coordinated and are consistent with the National Contingency Plan presently required under the Clean Water Act. An owner or operator of a vessel or facility is required to have a contingency plan to operate and must comply with contingency plans in responding to a spill. The Committee believes that these contingency plans provide a much needed enforcement tool and will ensure an immediate and effective response when a spill occurs.

Even with thorough contingency planning, spills are inevitable. As the spills of June 23 and 24 of this year demonstrated, existing Federal removal capacity is too easily exceeded when multiple incidents occur. The Committee believes that the Coast Guard, which has an integral role in responding to the vast majority of oil spills, should have sufficient funding and personnel to do the job. Section 433 requires that at least seven regional strike teams be established by the Coast Guard. These teams are to be trained, equipped, and available on a continual basis to provide necessary services to carry out removal actions and to implement contingency plans. In setting up these teams, the President is directed to consider existing Federal, state, local, and private sector resources that are available. The Committee does not intend that each strike team be a full complement of government-financed personnel and equipment. Rather, the Coast Guard should coordinate its equipment stockpiles and manpower with other readily available resources, including private response cooperatives, to meet the requirements of this section. Personnel in the Coast Guard should be predesignated and prepared to mobilize when needed to respond to a spill.

GAO also recommended that a effort be undertaken to improve technical capabilities for containing and recovering oil in varying environments. According to the Coast Guard, the best we can typically expect to recover from the water surface after a major spill, with current technology, is 10 to 15 percent of the oil. Notably, although response technology has not changed much since the 1970's, Federal funding for research and development has been cut back in recent years. Section 436 establishes an Oil Pollution Research and Development Program and funds the program at a level of $15 million from the Fund for each fiscal year.

The purpose of the program includes development of methods to prevent or minimize discharges of oil from vessels and facilities; to contain, recover, clean up and dispose of discharges from vessels or facilities; to protect public health and safety, including removal personnel; to adequately train removal personnel; to restore and rehabilitate natural resources damaged by a discharge; and to assess the long-term effect of a discharge. The President is directed to coordinate this research with affected Federal agencies, states, other nations, industry, academia, and the private sector, especially those that have dedicated oil or hazardous substance pollution research programs.

The Prince William Sound Oil Spill Removal Act (title V) is also a direct result of the grounding of the *Exxon Valdez*. This title contains provisions that address problems highlighted by the spill in Alaska and that are specifically applicable to Alaska. The title provides for tug escorts, a state-licensed pilot operating under a Federal license, increased removal equipment and personnel, better training in oil removal techniques, response drills for local residents and those engaged in the fishing industry, and natural resources monitoring.

The Committee wishes to recognize the people of Prince William Sound and other affected Alaskan coastal communities for their invaluable contributions to the public record and well-considered recommendations based on their experiences which are reflected in the provisions of this title and other parts of the legislation. The *Exxon Valdez* spill has generated many recommendations for improving prevention and response not only in Alaska, but throughout the nation. This bill is one indication of the Federal commitment to increase our ability to deal with oil and hazardous substance spills.

## Legislative Proposals

Several other bills have been introduced in the U.S. House of Representatives that would require greater oil spill contingency planning and removal actions by government officials, transporters, and facilities. They include: H.R. 1403, The Hawaiian Islands Protection and Pollution Response Act; H.R. 1775, The Coast Guard License Verification Act; H.R. 1781, to prohibit some tanker traffic in the Santa Barbara Channel; H.R. 2158, The Prince William Sound Oil Spill Response Act (reported from Merchant Marine and Fisheries Committee on June 21, 1989); H.R. 2291, The Clean Ocean Act; H.R. 2423, The Puget Sound Tanker Safety Act; H.R. 2872, The Narragansett Bay Protection Act; and H.R. 3003, The Great Lakes Oilspill Prevention Act.

## State and Local Government Action

The events in Alaska have also caused states and the private sector to focus on their roles in environmental protection. State and local governments, cognizant of the inadequacies of existing planning, prevention, and removal capabilities, have adopted or are proposing legislative and regulatory initiatives to improve their readiness and response programs. The Subcommittee on Coast Guard and Navigation received extensive testimony from the State of Alaska concerning initiatives it has taken to improve planning and response capabilities in Prince William Sound.

At the time of the *Exxon Valdez* oil spill, th State of Alaska and the Alyeska Pipeline Service Company had negotiated an agreement on the procedures to be followed in the event of an oil spill. Following the March 24 oil spill, the Alaska Department of Environmental Conservation issued emergency orders that placed greater requirements on Alyeska to respond to oil spills and to demonstrate its ability to remove oil spills in Prince William Sound.

Specifically, the emergency orders require Alyeska to have 30,000 linear feet of sea boom on hand; the ability to recover oil from the water at a rate of 10,000 barrels an hour; the ability to transfer oil

41

from a stricken tanker at a rate of 10,000 barrels an hour; and suf-
ficient lightering, storage and transfer equipment to accommodate
those recovery rates. The order also requires the addition of new
large-scale vessels and equipment and prescribes a response time
for personnel and equipment to be in place in specified locations.
The emergency orders also set procedurs for tanker safety and spill
prevention. They include: tug escorts for outgoing tankers to the
Hinchinbrook entrance; state-licensed pilots on out-going tankers
past Bligh Reef where the *Exxon Valdez* ran aground; an alcohol
testing program for command officers, including the captain and
chief engineer; radio contact with out-going tankers and tugs be-
tween the terminal and the Hinchinbrook entrance; a requirement
that tankers, tugs, and oil spill removal vessels notify Alyeska of
any incident or irregularity which may threaten the tanker or its
cargo; and a 24-hour, 12-person minimum oil removal crew located
at the terminal.

*Private Sector Initiatives*

Private sector interests have also offered plans to improve their
oil spill prevention and removal capabilities. Alyeska has taken ex-
tensive measures to both comply with the Alaska emergency orders
and to establish prevention and cleanup capabilities beyond those
requirements.

The American Petroleum Institute's Oil Spill Task Force has rec-
ommended that the oil industry support specific legislative initia-
tives and take actions on its own to prevent and remove spills, and
to conduct spill-related research. Some of the Task Force's recom-
mendations are similar to the provisions in this bill. For instance,
the Task Force recommended: manadatory participation in existing
U.S. Coast Guard vessel traffic service systems, with possible ex-
pansion of Federal VTSs to port and harbor areas justified by traf-
fic density or navigational hazards; expanded Coast Guard author-
ity to allow for drug and alcohol testing as a part of officer licens-
ing procedures; alarm systems for automatic pilots for all tankers;
requiring ship-specific oil spill prevention and control contingency
plans; study of tanker construction alternatives such as ballast
sides, reduced tank size, and double bottoms.

The Task Force also recommended that an industry-funded Pe-
troleum Industry Response Organization (PIRO) be established
with a Headquarters Group in Washington, D.C. and five Regional
Response Centers. The Task Force recommended that details of the
proposal be further refined by PIRO itself, but it suggested that the
Headquarters Group coordinate its activities with the Federal oil
spill response, maintain an oil spill related data bank (resources,
environmentally sensitive areas, industry response teams), partici-
pate in oil spill related research, provide training and auditing
guidance to regional offices, and coordinate a PIRO multi-region re-
sponse.

Regional Response Centers would coordinate their activities with
government's Regional Response Teams; audit and provide training
to cooperatives and industry facilities with local Coast Guard par-
ticipation; and clean up spills beyond local capability. Each center
would be staffed around the clock with trained personnel and
equipped with properly maintained containment, mechanical recov-

ery, dispersal, and shoreline cleanup equipment. Each center would have a 30,000 ton (216,000 barrels) spill removal capability. PIRO's Regional Response Centers would provisionally be located in the New York tri-state area, Norfolk, New Orleans, Long Beach, and Seattle.

The Task Force estimated that the up-front capital cost of the PIRO structure would be in the range of $70 to $100 million, with an annual cost around $30–35 million in 1989 dollars (excluding insurance costs). The Committee applauds this effort and financial commitment. The Committee encourages full participation by the industry in the PIRO program with the belief that it will be more economical for the industry to undertake this responsibility than to rely on the Federal government. In our view, consumers will be the ultimate beneficiaries of an industry-sponsored program.

The Task Force has also conducted a preliminary assessment of the research and development (R&D) opportunities related to oil spills. The needs identified span the spectrum from science (e.g., better understanding the chemistry and biological effects of spilled oil on the environment) to operations (e.g., use of containment booms in high seas). The thrust of the Task Force's proposed program is to initiate work first in those areas with the greatest potential benefits. The Task Force suggests that the bulk of the proposed R&D programs have operational objectives and should be managed by PIRO. Based on contributions from industry and others, an overall R&D program of $30–35 million with six prioritized major objectives would be executed over five years: preventing loss from ships; on-water oil recovery and treatment; preventing and mitigating shoreline impact; fate and effects of oil in the environment; wildlife preservation; and health and safety. The program outlines the types and level of R&D initiatives, with detailed guidance and peer review required as individual programs and projects progress.

*Statutory Background*

Section 311 of the Clean Water Act is the basis of national contingency planning and removal authority. Under the National Contingency Plan mandated by the Act, a three-tiered oil and hazardous substances response system was established. This system is comprised of a National Response Team (NRT), Regional Response Teams (RRT), and an On-Scene Coordinator (OSC) at each spill. The National Response Team is composed of fourteen Federal agencies charged with coordination of oil and hazardous materials planning and response efforts. The NRT, with the Environmental Protection Agency (EPA) as Chair and the Coast Guard as Vice Chair, is primarily a national planning, policy, and coordinating body and does not respond directly to oil and hazardous substance spills.

The NRT provides policy guidance prior to an incident, and assistance during an incident of national or international significance or when requested by a Regional Response Team. There are thirteen standing RRTs. Each RRT maintains a Regional Contingency Plan and has state and Federal representation. EPA and the Coast Guard serve as cochairs of the RRTs, which are also planning, policy, and coordinating bodies. The RRT provides guidance to relevant On-Scene Coordinators prior to an incident and, during an in-

43

cident, provides assistance as requested by the On-Scene Coordinator. The National Oceanic and Atmospheric Administration provides a Scientific support corrdinator to the OSC to assist in evaluating scientific aspects of a cleanup.

Depending on the location of a spill, an EPA or Coast Guard official assumes the rule of On-Scene Coordinator. The Coast Guard has jurisdiction for spills in tidal waters, the Great Lakes, and major river ports. EPA has jurisdiction over spills which threaten waters above the tidal zone. The overwhelming share of Federal oil spills on-scene coordination is handled by the Coast Guard; of the approximate 8,200 spills last year, EPA responded to only about 200 spills.

The On-Scene Coordinator is responsible for monitoring the cleanup or actually conducting the removal action when the spiller is not capable of removal actions or is not preforming adequately. The On-Scene Coordinator may use funds in the section 311(k) fund for removal actions, but the fund balance has been historically so low that the fund's resources would be inadequate to deal with a major spill resulting in very consevative cleanup efforts. The fund's authorized appropriation is only $35 million, but Exxon had spent in excess of $1 billion as of early September for compensation and removal actions in Prince William Sound. Clearly, Federal law must be amended, as H.R. 1465 does, to provide adequate funds to clean up a discharge and to recompense those who suffer economic or environmental harm.

It is also clear that section 311 of the Clean Water Act is inadequate in several respects and should be amended. First, the Committee strongly believes that prevention is far and away the most effective and desirable approach to take. Improved planning, adequate and readily available clean up personnel and equipment, and improved navigation safety procedures are the best means of protecting the marine environment from oil spills. Once oil is discharged into the marine environment, especially in catastrophic spills, our best efforts can only be to minimize impacts to wildlife, fisheries, and other natural resources, and to mitigate economic damages to individuals and communities.

COMMITTEE ACTION

H.R. 1465 was introduced on March 16, 1989, by Mr. Jones of North Carolina, Mr. Davis, Mr. Studds, Mr. Lent, Mr. Hughes, Mr. Young of Alaska, Mr. Tauzin, Mr. Hubbard, Mr. Hutto, Mr. Foglietta, Ms. Schneider, Mr. Hertel, Mr. Dyson, Mr. Lipinski, Mr. Borski, Mr. Carper, Mr. Bosco, Mr. Tallon, Mr. Ortiz, Mr. Bennett, Mr. Miller of Washington, Mr. Manton, Mrs. Bentley, Mr. Pickett, Mr. Hochbrueckner, Mr. Solarz, Mr. Coble, Mrs. Saiki, Mr. Laughlin, Mrs. Unsoeld, Mr. Goss, Mr. Fascell, Mr. Mineta, Mr. Thomas of Georgia, Mr. Akaka, Mr. DeLugo, Mr. Walgren, Mr. Dwyer, Mr. Traficant, Mr. Kennedy, Ms. Pelosi, Mrs. Boxer, Mr. Frank, and Mr. Eckart. The bill was referred jointly to the Committees on Merchant Marine and Fisheries and Public Works and Transportation.

The Merchant Marine and Fisheries Committee, through the Subcommittee on Coast Guard and Navigation, and the Subcom-

44

mittee on Oversight and Investigations has held eleven hearings including hearings on liability and compensation, oil spill contingency planning, prevention, and removal capabilities, and specific hearings on oil spills in Prince William Sound, Alaska; Narragansett Bay of Rhode Island; and in the Delaware River. In addition, the Merchant Marine and Fisheries Committee reported two bills, H.R. 1465 and H.R. 2158, which were initially approved by the Subcommittee on Coast Guard and Navigation. H.R. 2158, provisions of which are included in title V of this legislation, is an Alaska-specific oil spill prevention and removal bill addressing concerns arising out of the *Exxon Valdez* incident.

On April 6, 1989, the Subcommittee on Coast Guard and Navigation held a hearing on the *Exxon Valdez* oil spill in Prince William Sound, Alaska. The Subcommittee heard from the Honorable Samuel Skinner, Secretary of the Department of Transportation; Admiral Paul A. Yost, Commandant of the U.S. Coast Guard; Mr. L.G. Rawl, Chairman of the Board of Exxon; the Honorable Steve McAlpine, Lieutenant Governor of Alaska; the Honorable John Devens, Mayor of Valdez, Alaska; Mr. B. Kent Burton, Assistant Secretary of Commerce; Mr. James Makris, director of the EPA Office of Chemical Preparedness and Prevention and Chairman of the National Response Team; Mr. David Olsen, Acting Assistant Director for Wildlife Resources; Mr. Quinn O'Connell, TransAlaska Pipeline Liability Fund; and Mr. Pete Isleib. Written testimony was submitted by Mr. Clifton E. Curtis, executive director of the Oceanic Society, on behalf of the Oceanic Society, the Environmental Policy Institute, and Friends of the Earth.

The focus of the April 6 hearing was the impact of and response to the *Exxon Valdez* oil spill. The Subcommittee also received testimony on liability and compensation issues that are addressed in titles 1 through III of this bill. In addition, testimony on issues of contingency planning, vessel traffic service systems, pilotage, licensing, alcohol abuse, vessel construction, natural resources damages, and related matters was presented by witnesses and discussed in response to questions from Members of the Subcommittee.

On May 11, 1989 the Subcommittee on Coast Guard and Navigations held two hearings on oil spill legislation, covering H.R. 1465 and H.R. 2158. Witnesses testifying on H.R. 1465 included: the Honorable Samuel K. Skinner, Secretary of the Department of Transportation; Admiral Paul A. Yost, Jr., Commandant of the U.S. Coast Guard; Mr. Brian Hoyle, Office of Ocean Law and Policy, Department of State; Mr. Jerry Aspland, President of ARCO Marine, Inc.; Mr. Austin P. Olney, counsel representing American Waterways Operators; Mr. Thomas P. James, general counsel for the Louisiana Offshore Oil Port; Mr. Ernest C. Baynard, counsel representing TransAlaska Pipeline Liability Fund; Mr. C.G. Groat, State Geologist of Louisiana representing the Coastal States Organization; Dr. Terry Howey, Director of the Coast Management Division of the Louisiana Department of Natural Resources; and Mr. Clifton Curtis, President of the Oceanic Society. The Subcommittee also received written testimony on H.R. 1465 from Mr. Dennis Kelso, Commissioner of the Alaska Department of Environmental Conservation.

Witnesses testifying at the May 11, 1989, hearing on H.R. 2158 were: Rear Admiral Joel D. Sipes, Chief of the U.S. Coast Guard's Office of Marine Safety, Security and Environmental Protection; Mr. Charles N. Ehler, NOAA Office of Oceanography and Marine Assessment; Mr. Dennis Kelso, Commissioner of the Alaska Department of Environmental Conservation; Dr. Carl Oppenheimer, University of Texas at Austin, Department of Marine Sciences; Ms. Riki Ott, representing the Cordova District Fishermen United and the United Fishermen of Alaska; Mr. John Bobb, Academic Director of MITAGS; Captain Pat J. Neely, Jr., President of American Pilots' Association, Inc.; Mr. Ed Kelly, Marine Engineers Beneficial Association, District 2; Mr. Jerry Aspland, President of ARCO Marine, Inc.; and Mr. Ernest Corrado, President, American Institute of Merchant Shipping.

On June 16, 1989, the Subcommittee on Coast Guard and Navigation held a hearing in Seattle, Washington, on oil spill prevention and response issues. The Subcommittee heard from: Rear Admiral Robert E. Kramek, Commander of the 13th Coast Guard District; Captain Donald A. Anderson, Chief of Marine Safety Division for the 13th Coast Guard District; Ms. Christine Gregoire, Washington Department of Ecology; Ms. Lee Rees, Assistant Attorney General for the State of Washington; Ms. Sherri Tonn, Puget Sound Water Quality Authority; Mr. Bill Lokey, Pierce County and City of Tacoma Department of Emergency Management; Mr. John Weichert, Manager of Clean Sound Cooperative; Mr. Steve Scalzon, Foss Maritime Company; Mr. Tom Moody, Western States Petroleum Association; Mr. Jerry Aspland, President of ARCO Marine, Inc.; Mr. Herbert Lobdell, Vice President of Laborers International Union; Captain Dewey Soriano, President of Port Angeles Pilot Association; Mr. David Ortman, Friends of the Earth; Mr. Gary Bolster, Belairco, Inc.; Mr. Edd Perry, Executive Vice President of Trident Seafood; and, Mr. Rod Brown, Vice President of the Washington Environmental Council.

On May 25, 1989, the Subcommittee on Fisheries and Wildlife Conservation and the Environment held a hearing on the issues related to natural resources damages assessments. The subcommittee heard from Ms. Cecil Hoffman, Senior Environmental Review Officer for the Department of the Interior; Mr. Gordon Johnson, Assistant Attorney General for the State of New York; Mr. Eric Olson, Counsel to the National Wildlife Federation; Mr. Charles N. Ehler, NOAA Office of Oceanography and Marine Assessment; Ms. Lee P. Breckinridge, Assistant Attorney General for the Commonwealth of Massachusetts; and Ms. Louis Wise, EPA Office of Marine and Estuarine Protection.

On June 17, 1989, the Subcommittee on Coast Guard and Navigation held a hearing in Portland, Oregon, on oil spill planning, prevention and removal issues, focusing on the bi-state operations for the Columbia river. The Subcommittee heard from Rear Admiral Robert E. Kramek, Commander of the 13th Coast Guard District; Captain Donald A. Anderson, Chief of Marine Safety Division for the 13th Coast Guard District; Mr. Dan Silver, Special Assistant to the Governor of Washington State; Mr. Jeff Breckel, Oregon Department of Energy; Mr. Richard Reiter, Manager of Hazardous Materials Spill Response for the Oregon Department of Environ-

46

mental Quality; Mr. Robert Woodell, Executive Director of the Port of Portland; Mr. Clark Worth, Marine Fire Safety Administration; Mr. Roland E. Miller, Vice President of Riedel Environmental Services; Mr. Skip Hart, Tidewater Barge Lines; Ms. Nina Bell, Executive Director of Northwest Environmental Advocates; Dr. David Hanson, Pacific Marine Fisheries Commission; Mr. Blanchard Smith, Northwest Steelheaders; and, Mr. Steve Willie, Southwest Washington Anglers.

On July 5, 1989, the Subcommittee on Oversight and Investigations held a hearing in Newport, Rhodel Island, on cleanup efforts and the environmental consequences of the June 23, 1989, spill in Narragansett Bay. The Subcommittee heard from Mr. Ronald M. Coia, Laborers' International Union of North America Local 271; Dr. Robert A. Duce, Dean of the Graduate School of Oceanography at the University of Rhode Island; Dr. Malcolm L. Spaulding, Applied Science Associates, Inc.; Dr. Norbert A. Jawaorski, Director of the EPA Environmental Research Laboratory-Narragansett; Dr. Kenneth Sherman, Narragansett Laboratory, National Marine Fisheries Service, NOAA; and Ms. Trudy Coxe, Executive Director of Save The Bay.

On July 17, 1989, the Subcommittee on Oversight and Investigations held a hearing in Philadelphia, Pennsylvania, on contingency planning in the Delaware River area and cleanup of the *Presidente Rivera* oil spill. The Subcommittee heard from the Honorable Frank Lautenberg, U.S. Senator for the State of New Jersey; the Honorable Michael N. Castle, Governor of the State of Delaware; the Honorable Mark S. Singel, Lieutenant Governor of the Commonwealth of Pennsylvania; Rear Admiral Paul Welling, Commander of the Fifth Coast Guard District; Captain Larry A. Murdock, United States Coast Guard; Captain John H. Bates, Vice President of Sun Transportation, Inc.; Mr. James T. Leigh, Manager of the Delaware Bay and River Cooperative; Mr. Millard French, Chairman of the Executive Committee of the Delaware Bay and River Cooperative; and Ms. Lynn Frink, President of Tri-State Bird Rescue and Research, Inc.

On July 26, 1989, the Subcommittee on Coast Guard and Navigation held a hearing on general oil spill removal issues. The Subcommittee heard from Vice Admiral Clyde T. Lusk, Jr., Vice Commandant of the U.S. Coast Guard; Mr. Dennis Kelso, Commissioner of the Alaska Department of Environmental Conservation; Mr. James Makris, Chairman of the National Response Team; Mr. Douglas C. Wolcott, President of Chevron Shipping Company; Mr. Kenneth R. Dickerson, Senior Vice President of Government Affairs, ARCO; Mr. James Hermiller, Chief Operating Officer of Alyeska Pipeline Services Company; and Mr. Michael Williams, B.P. America.

On August 10, 1989, the Subcommittee on Coast Guard and Navigation held a hearing in Cordova, Alaska, on oil spill removal issues relating to the *Exxon Valdez* incident. The Subcommittee received the report from the General Accounting Office requested by Mr. Jones, Mr. Tauzin, Mr. Davis, and Mr. Young on February 6, 1989, which had been expanded after the *Exxon Valdez* spill to include a review of the circumstances and consequences of the spill and national oil spill preparedness. Witnesses for the GAO were:

Mr. Victor S. Rezendes, Associate Director of Transportation Issues; Mr. Ron Maccaroni, Assistant Director; Mr. Gary Ziebarth, evaluator; and Virgil Keith, consultant. The Subcommittee also heard from Vice Admiral Clyde E. Robbins, Commander of the Coast Guard Pacific Area and the Federal On-Scene Coordinator for the *Exxon Valdez* oil spill cleanup; Mr. Al Ewing, EPA Assistant Regional Administrator; Mr. David Kennedy, NOAA; Mr. Walter Steiglitz, Regional Director of the Fish and Wildlife Service; Mr. Dennis Kelso, Commissioner of the Alaska Department of Environmental Conservation; Mr. W.D. Stevens, President of Exxon, U.S.A.; Mr. James Hermiller, Chief Operating Officer of Alyeska Pipeline Service Company; Mr. Edgar Blatchford, Chairman of the Chugach Alaskan Native Corporation; Mr. Gerald McCune, Cordova District Fishermen United; and the Honorable Erling Johansen, Mayor of the City of Cordova, Alaska.

### SUBCOMMITTEE MARKUP—TITLES I, II AND III

On May 23, 1989, the Subcommittee on Coast Guard and Navigation met and approved titles I through II of H.R. 1465, with amendments, by a voice vote.

Mr. Tauzin offered a group of amendments en bloc. The first of the en bloc amendments clarified that when an onshore facility is located on lands owned by a Federal agency, state, municipality, commission, or political subdivision of a state, or any interstate body, liability for spills which might arise from the facility lies with the party that has leased the facility or the land for the facility from the public or governmental entity as opposed to with the public or governmental entity itself.

The second amendment of the package required that the Secretary report to Congress within six months of the date of the bill's enactment, and from time to time thereafter, on the advisability of lowering the liability limit for onshore facilities.

The third amendment closed a loophole in the Trans-Alaska Pipeline Act to ensure that spills of Alaskan crude, whether from the vessel which originally loaded the crude in Valdez, or a subsequent vessel that carries the oil to a U.S. port, are covered by the provisions of the Act.

The next amendment made it clear that the Oil Spill Liability Trust Fund, estalished by section 9509 of the Internal Revenue Code of 1986, can be used to pay for establishing and maintaining Coast Guard strike forces, the operation of vessel traffic service systems, and Federal research and development in the area of oil spill cleanup.

The fifth amendment amended the Clean Water Act to work in concert with the prior amendment to clarify that the aforenoted purposes are qualified uses of the Fund.

The sixth amendment changed the definition of "territorial sea" to conform with the 12-mile territorial sea established for international purposes under Presidential Proclamation numbered 5928 of December 27, 1988. The seventh amendment recognized the liability of a vessel that causes a spill, as well as the spilling vessel. The final amendment clarified that the issuance of a unified certificate of financial responsibility would suffice for requirements of finan-

48

cial responsibility required under any law. The en bloc amendments were agreed to by a voice vote.

Mr. Studds then offered three amendments. The first amendment clarified that the liability of vessel owners or operators for oil spills will be governed by the provisions of this Act and not by the Limitation of Liability Act of 1851. The amendment was adopted by a voice vote. Mr. Studds' second amendment specified that the Federal Fund is available to finance Federal cleanup costs, as well as Federal and state natural resource damage assessments, without first requiring the agencies to expend their own monies and then seek reimbursement. This amendment was also adopted by a voice vote. His third amendment conferred upon the President authority to issue orders or seek injunctive relief through court action to compel spillers to clean up their oil spills. This amendment was also adopted by a voice vote.

Mr. Shumway then offered an amendment that dealt with the topic of preemption of state laws. The amendment had two parts, the first specifying that actions for removal costs or damages arising out of an oil spill had to be brought only under this Act. The second part of the amendment provided that state oil spill funds could not be used to compensate claimants for removal costs or damages arising from a discharge of oil from a vessel or facility covered by the Act. The Shumway amendment was approved by a roll call vote. The bill was then ordered favorably reported to the Full Committee by a voice vote.

### FULL COMMITTEE MARKUP—TITLES I, II AND III

On June 21, 1989, the Merchant Marine and Fisheries Committee approved titles I–III of H.R. 1465, with amendments, by voice vote.

Mr. Tauzin offered an amendment to raise the per oil spill incident cap of $500 million to $1 billion, and it was approved by voice vote. Mr. Tauzin also offered an amendment to require vessels in the exclusive economic zone that transship or lighter oil to meet the financial responsibility requirements of H.R. 1465. The amendment was approved by voice vote.

Mr. Studds offered an amendment to prohibit preemption of state oil pollution liability laws and of state oil pollution compensation funds, except to the extent necessary to implement the 1984 Oil Spill Protocols. Mr. Jones, Mr. Davis, Mr. Tauzin, and Mr. Shumway offered a substitute amendment (leadership amendment) to the Studds amendment to clarify concerns expressed regarding the Shumway amendment accepted at the Coast Guard and Navigation Subcommittee markup of H.R. 1465. The leadership amendment makes clear that state actions for personal injury or wrongful death are not prompted; that states use oil spill funds financed other than by a tax on oil producers for any purpose; and that state funds financed by taxes or fees on the same persons who contribute to the Federal Oil Spill Liability Trust Fund may not be used for payment of damages, but may be used for any other purpose.

Mr. Carper offered a perfecting amendment to the leadership amendment to allow all state funds, including those financed by

49

taxes on persons contributing to the Federal Fund, to be used to pay removal costs. The Carper amendment to the leadership substitute amendment was approved by voice vote. After discussion, the leadership substitute amendment, as amended by the Carper amendment, was approved by rollcall vote. The Studds amendment, as amended by the leadership substitute amendment, was approved by voice vote.

Mr. Studds also offered an amendment to give natural resource trustees access to the Oil Spill Liability Trust Fund to pay for natural resource damage assessments; to require the National Oceanic and Atmospheric Administration to develop regulations to assess natural resource damages and specify how to measure those damages; to require that the measure of damages to natural resources include the costs of restoring, rehabilitating, replacing, or acquiring the equivalent of damaged resources and the value of lost public uses of those resources prior to the completion of those restoration, replacement, rehabilitation, and acquisition efforts; to require that sums recovered by trustees for natural resource damages should be retained by the trustee for use only to reimburse or pay costs incurred by the trustee in carrying out its responsibilities for assessing and remedying the damages to those resources, with recovered amounts in excess of those costs to be deposited into the Oil Spill Liability Trust Fund; and to establish a civil penalty that may be imposed on persons liable under H.R. 1465 when a discharge of oil results in damage to natural resources so complete that the resources cannot be restored, replaced, or rehabilitated, and for which no equivalent can be acquired. The amendment was approved by voice vote.

Mr. Young offered an amendment on behalf of Mr. Davis to clarify that fees are a type of economic damage suffered by municipalities that may be compensated under H.R. 1465. The amendment was approved by voice vote.

Mr. Hughes offered an amendment to require the Secretary of Transportation to designate the Commandant of the Coast Guard as the Federal official who may obligate money from the Fund for the purposes specified in section 103(a) of H.R. 1465. The amendment was approved by voice vote. Mr. Hughes also received unanimous consent to offer an amendment to allow compensation for removal costs reasonably consistent with the National Contingency Plan.

Mrs. Bentley offered an amendment to increase the authority of state officials to directly obligate up to $250,000 from the Fund. The amendment was approved by voice vote.

Mr. Dyson offered an amendment to require the governor of an affected state, in addition to the Secretary to determine when an oil spill removal is completed in accordance with the National Contingency Plan and applicable state laws. The amendment was approved by voice vote.

Mr. Miller offered an amendment to require the Secretary to direct all activities regarding an oil spill of more than 1,000 barrels of oil, and to allow the Secretary to direct all activities regarding an oil spill of 1,000 barrels of oil or less. Mr Tauzin received unanimous consent to amend the Miller amendment to allow, not require, the Coast Guard to direct the cleanup of an oil spill, regard-

50

less of the size of the spill, and to clarify that the Miller amendment would not relieve the spiller of the obligation to remove the oil from the environment. The Miller amendment, as amended, was approved by voice vote.

There being no further amendments, the Committee approved the Chairman's motion that the bill be amended by striking all after the enacting clause and inserting the text of the bill with the amendments approved by the Committee.

The Committee ordered the bill, as amended, reported favorably to the House.

### SUBCOMMITTEE MARKUP—TITLES IV, V, AND VI

On September 12, 1989, the Subcommittee on Coast Guard and Navigation called up a Committee Print and approved titles IV, V and VI of H.R. 1465, with amendments by a voice vote.

Mr. Manton offered an amendment to require an evaluation of computer simulator courses for training bridge officers and pilots and a determination of whether such training should be mandated.

Mr. Manton offered an amendment to require the Secretary to review the ciminal record of persons applying for issuance or renewal of license. The amendment was approved by voice vote.

Mr. Clement offered an amendment: (1) to authorize a former holder of a license, certificate or document revoked or suspended on the basis of alcohol or drug abuse, to be issued a license: certificate or document when the former holder provides satisfactory proof that the bases of suspension or revocation are no longer valid; (2) to authorize the Secretary, pending completion of an expedited hearing, to temporarily suspend and take possession of a merchant mariner's document, certificate, or license of certain individuals if there is probable cause to believe that the individual performed duties while impaired by or under the influence of alcohol or drugs, has been denied a motor vehicle license for cause within the previous five years, or has been convicted of an offense that would prevent issuance of a document, certificate or license. The amendment was approved by voice vote.

Mr. Carper offered an amendment to require parties responsible for an oil or hazardous substance spill to immediately contact response contractors in the event of a spill. The amendment was approved by a voice vote.

There being no further amendments, the Subcommittee approved the Committee Print, as amended, and ordered it reported favorably to the Merchant Marine and Fisheries Committee.

### COMMITTEE MARKUP—TITLES IV, V, AND VI

On September 14, 1989, the Committee met to mark up a Committee Print dealing with oil spill prevention and removal measures.

Mr. Jones offered two amendments, which were adopted by unanimous voice vote. The first amendment clarifies that vessel and facility contingency plans should take into account both public and private resources available to respond to a spill. It encourages but does not require owners and operators to contract with spill response organizations in advance to ensure prompt spill cleanup.

The second Jones amendment narrows the waiver of navigation and safety laws only to those specific provisions of law that stand in the way of engaging otherwise unqualified vessels in the event of crises. The amendment further clarifies that crises warranting waiver are limited to cases when there is a discharge, or threat of a discharge, of oil or hazardous substances, or in the interest of national defense.

Mr. Tauzin offered an amendment on behalf of himself, Mr. Carper, and Mr. Miller, which was adopted by unanimous voice vote. It clarifies that all contingency plans must be prepared to insure an immediate response to discharges. Because he wanted to ensure that it was absolutely clear that response to a spill should be immediate, Mr. Miller engaged in a colloquy with Mr. Tauzin to ensure that the intent of this amendment was fully understood. Mr. Miller argued that the best chance for controlling a spill occurs in the first few hours. Mr. Tauzin agreed with Mr. Miller's assessment of the President's authority under the bill that even if a spiller had adequate cleanup resources, the President could direct additional resources to the spill site, if they could reach the site faster. The Tauzin-Carper-Miller amendment makes it very clear that no delays in responding will be tolerated.

Mr. Davis offered an amendment that conforms the penalties for Great Lakes Pilotage with the increased penalties for other violations of title 46. In addition, it adds channels to the study required under section 420, which is to determine whether additional vessel traffic service systems are needed in areas such as the Santa Barbara Channel. The amendment was adopted by unanimous voice vote.

Mr. Davis offered three amendments en bloc to title V on behalf of Mr. Young, which were adopted by unanimous voice vote. The first amendment clarifies that local residents of Cordova, Tatitlek, Valdez, and Chenega will receive oil spill removal training. The second amendment adds a definition of Prince William Sound. The third amendment ensures periodic testing of removal personnel and equipment located in Alaska.

Mr. Carper offered an amendment, adopted by unanimous voice vote, which clarifies that owners or operators of vessels and facilities must communicate immediately with cleanup contractors identified in that vessel's or facility's contingency plan.

Mr. Pallone offered an amendment, which was adopted by voice vote. It requires that methods to prevent or minimize the discharge of oil from vessels be developed under the research and development program established in section 436. It is expected that methods to measure a vessel's ullage, to prevent discharges from tank vents, to prevent discharges during lightering and bunkering operations, and to contain discharges on vessel decks will be researched.

SECTION-BY-SECTION ANALYSES

*Section 1*

This section provides the short title of the bill, the Oil Pollution Prevention, Removal, Liabiity, and Compensation Act of 1989; and a table of contents.

52

TITLE I—OIL POLLUTION LIABILITY AND COMPENSATION

*Section 101*

(1) "Act of God" is defined as an unanticipated grave natural disaster or other natural phenomenon, the effects of which could not have been prevented or avoided through due care or foresight.

(2) "Claim" is the description of a demand for compensation brought directly against a responsible party, a guarantor, or against the Fund. It is distinguished from a cause of action, which is a demand for compensation pursued through the judicial system.

(3) "Claimant" refers to any person, as defined in section 101(21), who represents a claim for compensation under this Act.

(4) "Damages" is defined as injury to, destruction of, or loss of natural resources including the reasonable cost of assessment of those damages, and also damages for certain economic losses specified under section 102(a)(2) of the Act. The Committee does believe, however, that using the commercial value of these resources to determine damages may be inappropriate and could therefore result in an underestimate of the extent of the damages.

(5) "Discharge" is intended to describe any type of release of oil, other than natural seepage. It is used in connection with the definition of "incident" in subsection (11).

(6) "Exclusive economic zone" refers to the zone established by Presidential Proclamation numbered 5030, which extends 200 nautical miles from the baseline from which the breadth of the territorial sea is measured.

(7) "Facility" includes offshore and onshore facilities, as defined in subsections (17) and (19), respectively.

(8) "Foreign offshore unit" is defined as a structure or group of structures located in whole or in part in the territorial sea or on or over the continental shelf of a foreign country. The definition includes all types of units used for exploring for, producing, or transporting oil from the seabed beneath the foreign country's territorial sea or from the country's continental shelf.

(9) "Fund" refers to the Oil Spill Liability Trust Fund, established by section 9509 of the Internal Revenue Code of 1954.

(10) "Guarantor" describes any person who provides evidence of financial responsibility required for vessels and offshore facilities under section 107. This evidence is to be provided in the form of insurance, surety bonds, guarantees, letters of credit, qualifications as a self-insurer, or in other forms acceptable to the Secretary.

(11) "Incident" includes any occurrence or series of occurrences involving vessels or facilities which result in the discharge or substantial threat of discharge of oil. "Incident" includes events which directly threaten, as well as those which result in, oil pollution. An incident is the event which triggers the designation and advertisement provisions of section 105. Depending upon the event involved, an incident will also trigger the appropriate procedural requirements of section 105, as well as response action under other laws such as the Federal Water Pollution Control Act, the Intervention on the High Seas Act, or the Deepwater Port Act of 1974.

(12) "Lessee" is defined as a person holding a leasehold interest in an oil or gas lease on lands beneath the navigable waters or on

53

submerged lands of the Outer Continental Shelf, granted or maintained under the Outer Continental Shelf Lands Act.

(13) "Mobile offshore drilling unit" (MODU) is defined as a vessel other than a self-elevating lift vessel that is capable of use as an offshore facility. The definition is important for the purpose of allocating liability between the responsible party for a MODU and a lessee. This becomes significant in the event of an oil pollution incident involving the operation of a MODU on an area leased under the Outer Continental Shelf Lands Act. The allocation of liability in these circumstances is described in section 102(a)94).

(14) "National Contingency Plan" refers to the plan published under section 311(c) of the Federal Water Pollution Control Act or revised pursuant to section 105 of the Comprehensive Environmental Response, Compensation, and Liability Act. This plan provides for action to minimize damage from oil and hazardous substance discharges, including containment, dispersal, and removal of oil and hazardous substances and describes the manner in which federal officials will respond to releases of oil or hazardous substances into the environment.

(15) "Natural resources" refers to living and nonliving resources, whether or not possessing commercial value, which are within the jurisdiction of the United States government, including the resources of the exclusive economic zone, or any state, local, or foreign government.

(16) "Navigable waters" means the waters of the United States, extending seaward to the limits of the territorial sea, as defined in (29) below.

(17) "Offshore facility" includes oil handling or exploration structures or groups of structures, located on lands beneath the navigable waters, as defined in section 2(a) of the Submerged Lands Act, 43 U.S.C. 1301, on the Outer Continental Shelf, or licensed under the Deepwater Port Act. The definition includes all types of units for exploring for, drilling for, producing, or transporting oil from areas leased under the Outer Continental Shelf Lands Act, including pipelines. The definition does not include vessels (specifically excluding self-elevating lift vessels).

(18) "Oil" encompasses all petroleum, including fractions and residues of crude oil. It does not include nonpetroleum oil or products, such as whale or vegetable oil, nor does it include gases such as butane or propane, which do not pose any threat of causing oil pollution.

(19) "Onshore facility" means any facility, including motor vehicles and rolling stock, any portion of which is located in, on, or under any land within the United States other than submerged lands.

(20) "Owner" is defined to include those persons who hold title to a vessel or pipeline and those who, in the absence of holding a title, possess some equivalent evidence of ownership. It does not include certain persons possessing indica of ownership (such as a financial institution) who, without participating in the management or operation of a vessel or pipeline, hold title either in order to secure a loan or in connection with a lease financing arrangement under the appropriate laws, rules, or regulations. For example, a financial institution which holds title primarily to secure a loan but also

54

received tax benefits as the result of holding title would not be an "owner" as long as it did not participate in the management or operation of the vessel or pipeline. For purposes of assessing liability under this Act, the owner, along with the operator, is considered to be the responsible party for oil discharges from any vessel or pipeline that he owns.

(21) "Person" includes individuals and business associations and groups, as well as all other commercial, legal, or governmental entities.

(22) "Permittee" means a person entitled pursuant to the Outer Continental Shelf Lands Act to conduct geological exploration on the Outer Continental Shelf.

(23) "Public Vessel" is a subclass of vessel that performs governmental functions for federal, state, or local units of government. It is a significant definition for purposes of ascertaining liability. Public vessels are exempted from the liability provisions in section 102(a) and preexisting law continues to apply with respect to the liability of such vessels. A vessel owned and operated by a governmental entity, however, is not necessarily a public vessel under this definition. A government-owned or operated vessel engaged in commercial service is not included in the definition and would be subject to the provisions of this Act. "Commercial service" means all types of trade or business involving the transportation of goods or persons but excludes those vessels performing service as combatant vessels.

(24) "Remove" or "removal" refers to removal of the oil from the water and shorelines, or taking such other actions as necessary to minimize damage to the public health or welfare, including damage to fish, shellfish, wildlife, and public and private property, shorelines and beaches. If the injury to or destruction of, fish and wildlife resources can be averted or reduced by a coordinated mitigation effort, the Committee intends for such an effort to be undertaken as part of the removal in order to minimize or avoid the environmental damage that ultimately results from the discharge. Every removal action associated with a spill that may damage fish and wildlife resources involving multiple natural resource trustees shall include a plan to mitigate damages to such resources by the trustees. The plan is to identify those areas with high fish, wildlife, and plant values so oil removal actions are first directed at the most sensitive areas. The plan shall also include a species specific mitigation plan to reduce injury to, and destruction of, such species.

(25) "Removal costs" are those costs incurred in cleaning up or arresting substantial threats of oil pollution. These include the costs of all reasonable measures taken to remove the discharged oil and prevent oil pollution from occurring, including those costs incurred by the federal government under the Federal Water Pollution Control Act, the Intervention on the High Seas Act, or the Deepwater Port Act. Removal costs are recoverable under section 102(a)(2). The Committee intends that this provision be interpreted liberally, and that only measures which are clearly extravagant, clearly and predictably ineffectual, frivolous, or grossly out of proportion to the actual or threatened pollution should be excluded. Costs incurred by a state or local government seeking to ameliorate

pollution damage caused by tar balls washing up on a beach used for recreational purposes, for example, would ordinarily be included within this definition.

(26) "Responsible party" is the term used to identify the person or persons who themselves, or whose guarantors, may be held liable for damages caused by oil pollution. It is a term which may include more than one person. For example, it encompasses both the owner and operator of a vessel or a pipeline. With respect to a deepwater port, the reponsible party will be the licensee. With respect to an onshore facility, a distinction is made that for those which are located on lands owned by a federal agency, state, municipality, commission, or political subdivision of a State, or any interstate body. In those instances, when the owner has transferred possession and right to use the property to another person by means of a lease, assignment, permit, or other similar agreement, the responsible party is that person or persons to whom such property has been transferred by agreement. In other instances, the responsible party for an onshore facility is any person owning or operating the facility. With respect to an offshore facility (other than a deepwater port or pipeline), the responsible party normally will be the lessee or permittee of the area in which the facility is located. However, the holder of a right of use or easement granted pursuant to OCSLA for the construction or maintenance of a facility will be the responsible party for oil pollution damage when such holder is a different party from the lessee or permittee of the area in which the facility is located. Where more than one party holds an interest, other than a security interest, in a lease, permit, or right of use or easement, all such parties will, as a unit, be considered the responsible party and under Section 102 of this Act be considered strictly, jointly, and severally liable. With respect to a MODU which is being used as an offshore facility and when the pollution originates on or above the surface of the water, the responsible party will be the owner and operator of the MODU. Under certain circumstances, the lessee or permittee for whom such owner and operator is conducting drilling operations will also be the responsible party for MODU operations. For example, should an oil polluting incident cause $12 million in cleanup and damage costs, and the MODU owner or operator is subject to a maximum liability of $6 million (due to the size of the MODU involved), the lessee or permittee for whom such owner or operator is conducting operations would be responsible for the additional $6 million in costs. The proportional liability of these parties is set forth in Section 102(a)(4).

(27) "Secretary" refers to the Secretary of the department in which the coast guard is operating.

(28) "Tanker" is a subclass of vessel that carries oil in bulk as cargo. Cargo refers to oil being transported as merchandise from one place to another, including oil owned by the ship owner or operator. An oil tank vessel, whether partially loaded, in ballast, or containing residue of a recently discharged cargo of oil, continues to be treated as a tanker. When a tanker has been cleaned and is ready to carry bulk cargoes such as grain, ore, or coal, it would be subject to the provisions applicable to other vessels. Non-self-propelled oil-carrying barges operating solely on waters of the United

56

States lying inside the baseline from which the territorial sea is measured or on waters outside the baseline which are part of the Gulf Intercoastal Waterway are not classified as tankers. The definition in significant in terms of the provisions of section 102(c) relating to limits of liability.

(29) "Territorial sea" means the belt of sea measured from the line of ordinary low water along that portion of the coast in direct contact with the open sea and extending seaward a distance of 12 nautical miles. This provision decribes the territorial sea of the United States and does not define the territorial sea of a foreign country. This defination is consistant with the proclamation issued by President Reagan on December 27, 1988, and its major effect under this Act is to expand the geographic area in which a spill occurs in the U.S. for which a foreign country may file claims against.

(30) "United States" and "State" are used in a broad sense to government jurisdictions including other territories and possessions over which the United States has jurisdiction.

(31) The word "vessel" is defined to mean every dexeription of watercraft used or capable of being used as a means of transportation on water. The intent is to exclude no watercraft from the scope of the definition

### LIABILITY

*Section 102*

Subsection (a) establishes the basic statutory liability and statutory cause of action for removal costs and damages listed in section 102(a)(2). The responsible party for a vessel (other than a public vessel) or a facility from which oil is discharged, or which poses a substantial threat of a discharge of oil, is jointly, severally, and strictly liable for removal costs and damages described in section 102(a)(2).

Responsible parties are liable only for removal costs and damages which arise out of or directly result from an oil pollution incident.

The Committee intendes that liability for removal costs resulting from a threat of a discharge of oil should attach in the event that the threat is substantial. Thus liability may exist if a vessel were aground and actions were taken to preent the vessel from breaking up and spilling oil. No liability would result, however, from the presence of tanker traffic alongside waterfront property resulting in reduced property values because of the potential for a discharge of oil.

Section 102(a)(2) specifies the removal costs and damages for which compensation may be received under the Act, and the claimants who may recover those costs and damages. The Committee intends that this section will be strictly interpreted in a manner so that speculative costs and damages will not be permitted.

Subsection 102(a)(2)(A) provides that the removal costs for which recovery is available under this Act are those which are reasonably consistent with the National Contingency Plan or applicable state laws. By "reasonably," the Committee intends that recovery for removal costs will be allowed in those instances when the removal

57

action is undertaken in substanital compliance with the National Contingency Plan and that recovery should not be precluded because the removal action was not in the strictest interpretation in compliance with the National Contingency Plan. These costs may be recovered by any claimant.

Subsection (2)(B) enumerates the damages which may be compensated under the Act, and the claimants who may assert claims for these damages.

Under section 102(a)(2)(B)(i), damages for injury to, destruction of, or loss of natural resources, including the reasonable cost of assessing those damages, are recoverable by a United States or a state trustee. Subsection (a)(2)(B)(ii) permits recovery for economic loss suffered due to injury to or destruction of real or personal property by any claimant who owns or leases the property.

A separate recovery in connection with natural resources is provided under subsection (a)(2)(B)(iii) for those claimants who are unable to make subsistence use of natural resources damaged as a result of a discharge of oil.

When injury to real or personal property occurs and the injury causes a reduction in tax revenues, royalties, rents, fees, net profit shares, or other means of income derived from that property, the Federal government or a state or local government may under subsection (a)(2)(B)(iv) assert a claim for one year's loss of revenue attributable to the reduction.

The provisions of subsection (a)(2)(B)(v) allow recovery for loss of earnings due to injury to property or natural resources. A claimant who derives at least 25 percent of his earnings from economic activity which utilizes the injured property or natural resources may bring a claim under this subsection. The claimant need not be the owner of the property injured to bring a claim for lost earnings, as required by common law. This means, for example, that a worker at a coastal hotel might have standing to bring a claim for damages even though he owns no property which has been injured as a result of a discharge of oil. In addition, loss of earnings from seasonal activities is included.

Section 102(a)(3) specifically excludes discharges of oil which are authorized by a permit issued under federal, state, or local law from coverage under this Act.

Section 102(a)(4) contains provisions which apportion liability for discharges of oil on or above the water among various parties engaged in activities pursuant to the Outer Continental Shelf Lands Act. Paragraph (4)(A) sets forth the general rule that the responsible party for a MODU shall be liable for oil pollution incidents where the source of the pollution is above the surface of the water. Under these circumstances, a mobile offshore drilling unit used as an offshore facility is treated as a tanker. Under paragraph (4)(B), if the removal costs and damages from any incident described in paragraph (A) exceed the responsible party's limitation of liability, the MODU shall be treated as an offshore facility for the excess liability. The limitation of liability is reduced by the amount for which the responsible party is liable under paragraph (4)(A).

Section 102(a)(5)(A) provides that if a responsible party can establish that a discharge of oil and the resulting removal costs and damages were caused solely by an act or ommission of third party,

that third party is liable for the removal costs and damages. This section is used in connection with subsection (b)(1)(B) which provides a third party defense to liability for responsible parties. However, third parties are not liable for removal costs and damages resulting from simple negligence, where the party acted at the direction of or under contract with the President.

Section 102(a)(5)(B) provides for a limitation of liability for third parties who are liable for removal costs and damages under subsection (c)(5)(A). If a third party is the owner or operator of a vessel or facility, the third party may limit its liability in accordance with the applicable provisions of section 102(c) of the bill. In cases where the third party is not an owner or operator of a vessel or facility, the limit of liability for the third party is the limit which would have applied to the responsible party of the vessel or facility from which the discharge actually occurred.

Subsection (b)(1) exonerates the responsible party from the liability imposed by subsection (a), provided that the responsible party is able to prove that the incident resulted from an act of God, an act of war, hostilities, civil war, or insurrection. This defense is not available to a responsible party who failed or refused to report the incident where required by law in cases where he or she knew or had reason to know of the incident. The Committee expects that the standard of proof used to determine whether an incident "resulted" from a particular cause leading to a defense to liability will be that of a preponderance of the evidence. A responsible party may also escape liability if he or she can prove that the incident was solely caused by an act or omission of a person other than a responsible party, an employee or agent of a responsible party, or one whose act or omission occurs in connection with a contractual relationship with a responsible party. Failure or refusal to report an incident where required to do so will prevent a responsible party from invoking this defense.

Subsection (b)(2) exonerates a responsible party as to a particular claimant when the claimant's gross negligence or willful misconduct caused the incident, in whole or in part. A partial defense is provided to the extent that the incident is caused by the simple negligence of that claimant. Included is an implicit duty on the part of the claimant to mitigate damages.

Where the responsible party is innocent of fault, he or she may limit the imposed liability to specified levels under subsection (c). The amounts subject to limitation include the liability for removal costs and damages under subsection (a), and any removal costs incurred by or on behalf of the responsible party. The additional language referring to removal costs is included as a part of the total liability to which the responsible party is subjected. This provision will provide an incentive for the responsible party to immediately begin cleanup activities which should result in a reduction of other potential damages.

For tankers, the liability for each incident is limited to the greater of $5,000,000 or $500 per gross ton (up to a maximum of $60,000,000). In the case of other vessels, including inland barges, the liability is limited to $500,000 or $300 per gross ton, whichever is greater.

For facilities, the limit on liability is $75,000,000.

59

The limits on liability do not apply if the incident was proximately caused by either willful misconduct or gross negligence within the privity or knowledge of the responsible party, or by a violation of applicable federal safety, construction or operating regulations within the privity or knowledge of the responsible party.

The "proximate cause" requirement is particularly important regarding the violation of applicable Federal safety, construction, or operating regulations. For example, the fact that a shipboard fire extinguisher did not bear a current inspection certificate or if one of the life preservers on board was of a design which no longer met inspection requirements would not be sufficient cause to breech a vessel's limits of liability in light of the fact that neither of the foregoing examples served to be the proximate cause of the spill.

The test of "privity or knowledge" is that applied under admiralty law. Under that test, acts committed within the "privity or knowledge" when committed by persons to whom full control and authority have been given, such as in the case of a corporation, by the designation of a "managing officer." Acts of employees to whom general authority has not been designated are not attributable as within "privity or knowledge" in the absence of proof of actual knowledge. The knowledge of the "managing officer" is imputed to the responsible party.

Under section (c)(2)(B), the limits on liability do not apply if the responsible party fails or refuses to report an incident where required by law, when he or she knows or has reason to know of the incident. The limits also do not apply if the responsible party fails or refuses to provide reasonable cooperation and assistance as requested by a responsible official in ensuing cleanup activities.

Failure on the part of a responsible party to undertake cleanup activities due to a lack of financial ability to do so shall not constitute a failure to act reasonably under this paragraph, provided that the appropriate officials are promptly informed of the situation so that other cleanup options may be explored.

Under section 102(c)(3), the Secretary is authorized to adjust the limits of liability for onshore facilities and pipelines by regulation, in an amount of not more than $75,000,000 but not less than $8,000,000, taking into account the enumerated factors relevant to risks posed by these facilities. An instance when such an adjustment might be called for would be in the case of the Louisiana Offshore Oil Platform ("LOOP"), the only deepwater port presently licensed under the Deepwater Port Act of 1974. Spill history over the five years during which LOOP has been in operation (i.e., 1985—throughput of 150 million barrels, 6.7 barrels spilled, 1986—throughput of nearly 250 million barrels, 8.6 barrels spilled) appears to suggest that a reduction of the maximum liability limit for deepwater ports might be appropriate. The Committee believes that the Secretary could use the discretionary authority granted by Section 102(c)(3) to reduce maximum liability limits in situations meriting such review. The Secretary is directed to report to Congress within six months of the date of enactment of the Act, and periodically thereafter, on the desirability of adjusting these limits. The six month time frame was specified to ensure that a timely assessment be made regarding the appropriateness of these liability limits.

Subsection (d) imposes liability on responsible parties for interest over and above the limitation of liability involved under subsection (c). Under subsection (d), the responsible party or guarantor is liable for interest on the amount paid in settlement of a claim starting from the time when the claim was presented, and running to the time when the claim is paid. However, when the responsible party or guarantor offers an amount equal to, or in excess of, the amount finally settled upon, and the offer is made within 60 days of the date upon which the claim was presented, there is no liability for any interest other than for the period between the time that the offer was accepted and the time the claim was paid. For a similar offer made after the pertinent 60-day period, the responsible party or guarantor will, in addition, be liable for interest for the period between the time the claim was asserted and the time the offer was made. Paragraph (C) provides for an exclusion of liability for interest for any period during which a claimant is not paid due to reasons beyond the control of the responsible party, if it would not serve the interests of justice to include that period. The interest involved under this subsection is to be calculated at the commercial rates specified in paragraph (D).

Subsection (e) concerns liability for injury to, destruction of, or loss of natural resources. Damages for injury to and destruction or loss of natural resources may be claimed by federal, state, and foreign governments for natural resources within their respective jurisdictions. The jurisdiction of the federal government specified includes resources over which it has exclusive management authority, such as those covered by the Fishery Conservation and Management Act of 1976.

The President shall designate the federal officials who shall act as public trustees for natural resources under the Act. The Committee intends that the federal trustees of natural resources designated in the National Contingency Plan (issued pursuant to section 105 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980) or any subsequent revision also shall act as federal trustees for natural resources under this Act. The Governor of each state shall designate state and local officials who may act as public trustees for natural resources under the Act, and shall notify the President of those designations.

Federal and state trustees shall assess damages to natural resources under their trusteeship, and shall develop and not merely adopt, but implement plans for the restoration, rehabilitation, replacement, or acquisition of equivalent natural resources under their trusteeship. Federal trustees may also assess damages to natural resources under a state's trusteeship, upon request and reimbursement from the state. Plans must be developed and implemented pursuant to public notice, opportunity for a hearing, and consideration of all public comment.

Subsection (e)(4)(A) establishes the measure of damages for natural resources. The fundamental measure is the cost of restoration, replacement, or acquiring the equivalent of the damaged natural resource and the value of the interim lost public uses of those resources until restoration is completed. The basic goal is to restore the resources damaged by an oil spill. However, restoration may take several years to complete. In the meantime, society has lost

61

the use of those natural resources. These interim lost uses should be compensated, too. The Committee intends that the interim uses to be compensated are those which belong to the public generally. This is because lost private uses are otherwise eligible to be compensated under this Act. The Committee also intends that the interim uses to be compensated should be actual and known uses of the resource. Speculative and non-use values are not covered by this provision.

There is concern about the recovery of unjustified "speculative" damages, particularly with regard to lost profits and earning capacity. The Committee does not intend for such damages to be recoverable if the damages cannot be shown to be based on prior profits and earnings. This restriction relating to prior profits and earnings is similar to the prupose of the "committed use" requirement regarding documentation contained in Department of the Interior regulations, 43 CFR 11.84 (b)(2), and recently upheld in *State of Ohio v. U.S. Department of the Interior, et al.,* No. 86-1529 (D.C. Cir., July 14, 1989), regarding the measurement of lost interim public uses of damaged natural resources. Thus, some documentation of prior profits and earnings should be evidenced to support a claim. Of course, the Committee recognizes that for new businesses such information will not be available; therefore, a basis other than prior profits and earnings must be used.

Subsection (e)(5) authorizes the Under Secretary of Commerce for Oceans and Atmosphere to issue regulations for the assessment do damaged to natural resources. The Under Secretary has two years from the date of enactment of the Act to promulgate these rules. The Under Secretary is directed to consult specifically with other federal natural resource trustees on the content of these regulations. Other interested persons and state trustees should have an opportunity to participate in the rulemaking as well, as would be expected under the Administrative Procedure Act. This provision is intended to supersede, to the extent of its inconsistency section 301(c) of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.) under which the President delegated to the Secretary of the Interior the task of preparing regulations to assess damages to natural resources for both oil spills and releases of hazardous substances. This action is necessary because the measure of damages under this Act is different from the one specified by the Secretary of the Interior in the CERCLA regulations and because the Committee hopes that the Under Secretary, in issuing regulations under this Act, can avoid the controversy and litigation that has plagued the Interior Department's damage assessment regulations.

In accordance with paragraph (B) of this subsection, any assessment of damages to natural resources made by a federal or state trustee in accordance with the regulations issued by the Under Secretary is entitled to have the evidentiary effect of a rebuttable presumption on behalf of that trustee in any administrative or judicial proceeding to recover damages under this Act. If a trustee follows the procedures established by the Under Secretary, its measure of damages should be given the presumption of validity.

Subsection 102(e)(6) provides for the use of sums recovered by a federal or state trustee for damages to natural resources. The sums

are to be retained by the trustee, are available to be expended without further appropriation, and are to be expended only to pay the costs of conducting damage assessments or restoring damaged resources in accordance with paragraph (3) of this subsection. Amounts in excess of these purposes are to be deposited in the Fund. The concept that recovered moneys should be directly available to the trustees is one enumerated in section 107 of CERCLA, as amended in 1986 by the Superfund Amendments and Reauthorization Act (SARA). The purposes for which the trustees are able to retain the funds are limited to those which they are otherwise authorized to conduct under this Act. The Committee expects these monies to be retained by the trustees in separate accounts and not, in the case of federal trustees, deposited into the U.S. Treasury as general receipts or into the Fund, unless they are clearly excess. Unless the recovered money is made available to the trustees, they cannot implement their responsibilities to conduct damage assessments and perform restoration. This has been a particular problem for the trustees in implementing similar responsibilities under CERCLA and one that the Committee does not expect to be repeated in implementing this Act.

Subsection 102(e)(7) authorizes the Secretary to assess a civil penalty in those cases in which the damaged natural resource cannot be fully restored, replaced, or rehabilitated and for which no equivalent can be acquired. This approach is consistent with that recommended by the Administration and reflects the Committee's view that society is entitled to be compensated for lost or injured natural resources even, and perhaps more so, in those cases in which restoration is not possible.

The maximum amount of a civil penalty which the Secretary is authorized to assess is the maximum amount for which the person otherwise may be held liable under section 102 of this Act. For example, the maximum civil penalty that could be assessed against a tanker owner would be $60 million.

The penalty shall be assessed by the Secretary in consultation with the appropriate federal or state trustees. The bill enumerates those factors which the Secretary must take into account in determining the amount of the penalty, including the person's culpability and the extent of efforts taken to prevent the spill. The Secretary is authorized to compromise, modify, or remit any civil penalty and, if necessary, to refer the penalty to the Attorney General for collection.

Except as may be limited by the 1984 Oil Spill Protocols, the civil penalty assessed under this paragraph is separate from and in addition to any liability otherwise established under this section. The limitation of liability established by section 102(c) is waived for the assessment of a civil penalty under this paragraph.

The sums received from the assessment of civil penalties under this paragraph are to be deposited in the Fund and made available for the purposes authorized by section 103.

Under subsection (f), foreign claimants, as defined in subsection (f)(5), are given rights comparable to United States claimants, provided they meet certain conditions. A foreign claimant is a person who resides in a foreign country, the government of a foreign country, or any agency or political subdivision of a foreign country. To

63

be eligible to recover under this section, a foreign claimant must first seek compensation for damages from the international fund, when available; the claimant must not have been compensated through some other means for his loss; and recovery must be authorized by treaty or executive agreement, or the country involved must provide a comparable remedy for United States claimants in similar situations. In the case of oil being transported from the Trans-Alaska Pipeline to a port in the United States, a Canadian resident may assert a claim under specified, less stringent conditions. This provision substitutes for a similar provision in section 204(c) of the Trans-Alaska Pipeline Authorization Act, repealed by section 201 of this Act.

Foreign claimants may recover only if the discharge of oil was from a facility, a vessel in the navigable waters of the United States (which includes the 12-mile territorial sea), or from a tanker that carried oil originally received at the Trans-Alaska Pipeline terminal and the incident occurred prior to delivery to a U.S. port, resulting in the presence of oil in or on the territorial sea, internal waters, or adjacent shoreline of a foreign country.

Subsection (g) allows a responsible party to assert a claim for removal costs and damages if the responsible party can show a defense to liability under subsection (b), or if he has reached his limitation of liability under subsection (c). In the latter case, the responsible party's right to compensation is restricted to the excess cost incurred above the limitation to which he is entitled.

The purpose of this provision is two-fold. First, it removes any disincentive to undertaking the cleanup, based on the liability issue; and secondly, it serves as an encouragement to continue cleanup activities, even after the limitation of liability has been reached, by affording a basis for compensation of the cost of cleanup in excess of the limitation. A guarantor would have the same rights, as subrogee to the responsible party.

Subsection (h) authorizes causes of action for contribution for any removal costs or damages against any person who is liable or potentially liable under the Act. An action for contribution under this subsection must be brought within three years after the date a court judgment is entered for recovery of removal costs or damages, or within three years of the date of entry of a judicially approved settlement with respect to removal costs or damages.

Subsection (i)(1) provides that a responsible party may not transfer the liability imposed under this section to any other person. This subsection does not, of course, prevent any person from serving as guarantor, pursuant to this title, nor would it prevent a responsible party who is held liable from taking appropriate legal action against any person whose negligence caused or contributed to the incident which resulted in that liability. This subsection also makes it clear that the prohibition against transferring liability by agreement does not preclude agreements in which another person may agree to pay for all or part of the liability to which a responsible party may be subject.

Subsection (i)(2) preserves to responsible parties subject to liability under this Act all rights which they may have, under any other law, to proceed against any third party. This provision insures that a responsible party will not be barred from recovering against a

64

third party whose negligence actually caused the incident which resulted in liability being imposed under this Act. When a guarantor is involved, the guarantor would succeed, through subrogation, to the rights of the responsible party for whom he provided evidence of financial responsibility. Of course, third parties under the direction of the President, or under contract to the Federal government, who are involved in cleaning up a spill, may not be sued by a responsible party unless the third party was grossly negligent or engaged in willful misconduct.

Subsection (j) ensures that the Secretary will consult with the appropriate trustees on removal actions to be taken in connection with an oil pollution incident. Removal actions shall be considered complete when so determined by the Secretary and the Governors of affected states, in accordance with the national contingency plan and applicable State laws.

#### USES OF THE FUND

*Section 103*

Subsection (a) enumerates the purposes for which money can be expended from the Oil Spill Liability Trust Fund (Fund) established by section 9509 of the Internal Revenue Code. The Fund is available for two types of payments: direct uses and the settlement of claims.

The direct uses are those which can be paid from the Fund prior to the presentment and payment of a claim under section 104 of this Act. These payments include (1) the payment of removal costs incurred by federal authorities; (2) the costs incurred by federal or state trustees in assessing damages to natural resources and for developing restoration plans; (3) the payment to state officials of their removal costs up to the limits established in subsection (e); (4) the payment of removal costs and damages from oil discharged by a foreign offshore unit; (5) the payment of personnel, equipment, and training costs to maintain at least seven strike forces as authorized under section 311 of the Clean Water Act, as amended by this Act: (6) the payment of administrative and personnel costs reasonably necessary for the implementation of this Act including several studies and reports authorized by this Act; (7) the payment of U.S. contributions to the International Fund; (8) the payment of Federal expenses under section 311(l) of the Clean Water Act; (9) the preparation of new damage assessment regulations under section 102(e)(5) of the Act; and (10) the costs associated with the new research and development program under section 311(t) of the Clean Water Act.

It must be noted that in providing that the Fund can be used for the payment of removal costs, a term defined in the bill to include costs incurred under subsection (c), (d), (e), or (l) of section 311 of the Federal Water Pollution Control Act, the Committee specifically intends to permit the Fund to be used to pay for: the establishment and maintenance of at least seven Coast Guard strike teams, including the reestablishment of the Atlantic Strike Team at Elizabeth City, North Carolina; systems designed to help prevent spills such as the Coast Guard's Vessel Traffic Services; and government sponsored research and development in an effort to improve upon existing spill prevention and cleanup technology. The Committee

65

intends, by paragraph 2, to provide federal and state trustees ready access to the Fund for the reasonable costs of assessing natural resource damages and for the development of restoration plans. A major impediment to trustees carrying out their responsibilities under the existing Clean Water Act as well as the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.) has been the lack of up-front funding for damage assessments. This provision is intended to remedy that problem, at least with respect to oil spills.

Subsection (a)(2) provides that the Fund is otherwise available for the payment of claims for removal costs and damages which have not been paid in accordance with the claims procedures of section 104. Thus, if a spiller refuses or is unable to pay a cost for which it is otherwise liable under this Act, the Fund is the back-up remedy. In this way, up to the per incident cap, claimants will be made whole.

Subsection (b) recognizes certain defenses to liability of the Fund. The Fund is exonerated from liability only when the incident, as to a particular claimant, is caused by his gross negligence or willful misconduct. Further, as to a particular claimant, the liability of the Fund is reduced to the extent that the incident or loss is caused by the simple negligence of the claimant.

Under subsection (c) the maximum amount payable from the Fund in connection with any oil pollution incident, including any payment from the International Fund, is $1,000,000,000.

Under subsection (d), the Secretary may promulgate regulations designating federal officials who may obligate the Fund for authorized purposes. The Secretary may, in turn delegate the authority to obligate the Fund or to settle claims to state officials operating under a cooperative agreement with the federal Government. Subsection (e) directs the Secretary to publish proposed regulations within 6 months of enactment of this Act outlining the procedures to be used in obligating the Fund. Final regulations must be published within three months after the close of the regulatory comment period. In accordance with these regulations, the Governor of each state, or his designee, is authorized to obligate the Fund in an amount not to exceed $250,000 for removal costs, consistent with the national contingency plan, which are required for response to an oil pollution incident. The Governor or other Governor's designee must notify the Secretary within 24 hours of obligating the Fund for any payment.

Pursuant to subsection (f), the United States Government acquires, by subrogation, all rights of claimant who receives payment for removal costs and damages from the Fund to recover the payment from the responsible party.

Subsection (g) requires the Comptroller General to submit to Congress a complete audit report on the Fund one year after establishment of the Fund, and thereafter as appropriate.

Subsection (h) provides that claims against the Fund for removal costs must be presented within three years of the completion of removal action. Claims against the Fund for damages must be presented within three years of the date the loss and its connection with the discharge was reasonably discoverable, or in the case of

66

natural resource damages, the date (if later) on which final regula-tions are promulgated under section 102(e)(5) of the Act.

Subsection (i) prohibits double payment from the Fund for any costs of damages authorized to be paid from the Fund.

Finally, subsection (j) requires that any obligation of payment from the Fund be in accordance with the plan for natural resource restoration, rehabilitation, replacement, or acquisition required to be developed by trustees under section 102(e)(3). This requirement does not apply in situations requiring immediate action to preserve natural resources.

**CLAIMS PROCEDURE**

*Section 104*

Removal costs and damages may be compensated by payment from a responsible party or guarantor, or from the Fund. Subsec-tion (a) provides that claims shall be presented first to the responsi-ble party or guarantor, except in those situations described in sub-section (b). In accordance with subsection (b), claims shall be pre-sented directly to the Fund where the Secretary has advertised the claims procedure under section 105(c). This would occur under three circumstances: (1) where the responsible party and guarantor deny the source designation made by the Secretary; (2) where the discharge was from a public vessel; or (3) where the sources of the discharge is unknown. Claims may also be asserted directly against the Fund by the responsible party of the designated source if he qualified under the standing provisions of section 102(g). This means a responsible party may assert a claim for removal costs di-rectly against the Fund, either where he or she has successfully as-serted a defense to liability or where he or she is claiming removal costs which, taken with other claims, are in excess of his limitation of liability. Claims for removal costs incurred by a state may also be presented first to the Fund, as well as claims for removal costs and damages incurred by a U.S. claimant resulting from a dis-charge from a foreign offshore unit.

Subsections (c) and (d) provide for a second means of obtaining compensation. Subsection (c) allows for claims against the Fund where attempts to reach a settlement with the responsible party or guarantor were unsuccessful. The preconditions for this second means of compensation are: (1) the denial of all liability for the claims by the person to whom the claim was presented; or (2) the passage of 180 days after presentation of the claim or advertise-ment by the Secretary, whichever occurs later. At this point, the claimant may elect to commence an action in court, but once having decided to pursue the claim in court, the claimant cannot come back and assert his claim against the Fund while the legal action is still pending.

Subsection (d) also permits a claim against the Fund in those in-stances where claimants are not adequately compensated by the re-sponsible party or guarantor. Failure to receive full compensation could occur for a number of reasons. First, the responsible party or guarantor may have successfully invoked his limitation of liability under section 102(c) and the claim may exceed that limitation. The balance would be recoverable against the Fund up to the

$1,000,000,000 per incident limit. For some other reason, such as insolvency, the responsible party or guarantor may not be able to satisfy all claims. Uncompensated claims could, therefore, be brought against the Fund which serves as a backup for such situations.

Subsection (e) directs the Secretary to promulgate regulations to govern the presentation, processing, settlement, and adjudication of claims against the Fund. These regulations should prescribe documents to be transmitted to the Fund in support of a claim first presented against a responsible party and subsequently to the Fund. These regulations should also establish procedures and standards for the prompt appraisal and settlement of claims against the Fund. Since the primary purpose of this Act is to guarantee that claimants will receive rapid and equitable compensation for any economic loss suffered as the result of an oil spill, the Committee expects that the claims settlement procedures established by the Secretary will be formulated with this purpose in mind. Particular care should be taken to avoid unnecessary procedural delays or overly complicated bureaucratic processes. Claimants should be afforded from the beginning a clear idea of their rights and obligations, and the administrative process established should recognize that severe hardships may be engendered for some claimants if there are delays in the settlement of claims.

DESIGNATION AND ADVERTISEMENT

*Section 105*

This section sets out the procedure for claims that arise from an oil pullution incident. The first step in the process is the dissemination of information about the incident. The first person likely to have knowledge of an oil pollution incident is the person immediately responsible for the operation of the vessel or facility. Thus, the person in charge, or employer of the person in charge, must under existing provisions of the FWPCA, immediately notify the Secretary of Transportation of an oil pollution incident. Failure to give that notice subjects the person to the criminal penalty provided for in that law.

Upon receiving information from the person in charge or from any other source, the Secretary, under subsection (a), initiates the claims process by designating the source of the discharge and by notifying the responsible party and guarantor involved of the designation. The source designation is important, because the responsible party and guarantor of the designated source will incur certain responsibilities under subsection (b) if, within five days, he or she does not deny the Secretary's designation.

The Secretary is required to designate the source of the discharge "where possible and appropriate". This means that there may be some instances where it would not be appropriate for the Secretary to designate a discharge source and, by so doing, to set in motion the advertising requirements of this section. Those instances would occur when the nature of the discharge is such that, in the judgment of the Secretary, there is no possibility that any damages from the discharge will be sustained by any potential claimant.

68

Subsection (b) requires the responsible party or guarantor of a designated source to initiate advertisement of the designation and of the procedures by which claims may be asserted. The failure to deny a designation does not preclude a later denial of liability. It merely makes the responsible party or guarantor of the designated source responsible for setting into motion the applicable claims procedure.

Failure to carry out the advertisement properly may result in the Secretary undertaking that task, at the expense of the responsible party or guarantor.

Where there has been no denial of designation and the responsible party or guarantor advertises properly, claims may be asserted against them under this title. The purpose of subsection (c) is to provide for those instances where the Secretary must notify potential claimants of the procedures by which claims may be brought directly against the Fund. Those instances are situations where the responsible party and, where applicable, the guarantor of the designated source have denied the designation, where the Secretary has determined the source of the incident was a public vessel (as defined in section 101(23)), or where the source of the incident is unknown.

SUBROGATION

*Section 106*

This Section sets out rules of procedures that shall apply in the case of actions brought in Court.

Subsection (a) provides subrogation for anyone who compensates a claimant for costs or damages compensable under section 102. If the Fund pays a claimant for damages asserted under section 102, then the Fund will stand in the shoes of that claimant and may assert any rights that the claimant has under the Act. Very often, this will mean that the Fund will pay off a claim that is asserted against a responsible party and it will then be up to the Fund to negotiate a settlement with the responsible party or to litigate the claim. The result is to relieve a private claimant from protracted negotiations and litigation with the responsible party, and thereby expedite the compensation of an injured claimant.

Subsection (b) directs the Attorney General, at the Secretary's request, to pursue a cause of action on behalf of the Fund to recover compensation paid from the Fund, including costs incurred by the Fund in connection with the claim, interest, and attorney's fees. Actions may be brought against any responsible party, guarantor, or any other person who may be liable for the costs and damages paid from the Fund. In the case of discharges from foreign offshore units, the cause of action shall be initiated against the responsible foreign government or other responsible party.

FINANCIAL RESPONSIBILITY

*Section 107*

Another major feature of the Act is the requirement that there be adequate funds immediately available to compensate injured parties. Since the primary responsibility to compensate victims of

69

oil pollution rests with a party responsible for a pollution source, he or she is generally required to establish his or her capability to meet his potential liability.

Subsection (a) imposes on the parties responsible for vessels over 300 gross tons using U.S. waters or ports, or for vessels using the waters of the exclusive economic zone to transship or lighter oil destined for a port or place subject to U.S. jurisdiction, the requirement that they have insurance, surety bonds, qualify as self insurers or have other evidence of financial responsibility sufficient to meet their liability up to the level of the limitation available under section 102(c). This requirement to maintain evidence of financial responsibility is imposed on all these vessels (except a public vessel or non-self-propelled vessel that does not carry oil as cargo or fuel), including foreign vessels using our navigable waters or calling at offshore facilities subject to the jurisdiction of the United States, as covered by the Act. Each vessel must carry on board at all times a certificate, issued by the appropriate U.S. government agency, evidencing financial responsibility. If a responsible party has more than one vessel, evidence of financial responsibility need be established only to meet the maximum liability limit of the largest of the vessels.

Paragraphs (2) and (3) provide the necessary sanctions for enforcing the financial responsibility requirements. Failure to comply with subsection (a)(1) will result in a termination of the right to engage in trade by triggering a refusal of necessary clearances by the Secretary of the Treasury under Customs laws, and may result in the denial of entry or detention of noncomplying vessels by the Secretary of Transportation. In addition, paragraph (4) subjects any vessel and any oil carried as cargo on the vessel to seizure, if the vessel is found in the navigable waters without evidence of finiancial responsibility.

Comparable requirements to maintain evidence of financial responsibility, sufficient to meet the liability imposed under section 102(c), are placed on the responsible parties for offshore facilities. All offshore facilities, as defined in section 101, must establish the necessary evidence of financial responsibility. In cases where the responsible party is responsible for more than one facility subject to this subsection, evidence of financial responsiblity need be established only to meet the maximum liability applicable to one of the facilities.

Failure to meet the requirements of financial responsibility subjects that person to the civil penalty provided in subsection (f).

To provide claimants with a full range of options for pursuing their claims, subsection (d) authorizes direct action against anyone providing financial responsibility, as required by this section, for a responsible party. The person providing financial responsibility can assert rights and defenses that the responsible party could have asserted, and he can invoke the additional defense that the responsible party caused the incident through willful misconduct. No other defenses can be invoked by the guarantor. The effect of limiting the guarantor's defenses is that the claimant does not become involved in collateral disputes between the responsible party and the guarantor. Further, the purpose of establishing financial responsibility is to insure that innocent victims will be compensated and

70

the guarantor in providing evidense of financial responsibility declares that he is available under all circumstances to provide that compensation unless a specific exemption is provided.

Subsection (e) modifies the preceding subsection to make it clear that the liability of the guarantor under this title shall be limited to the amount that guarantor has provided as evidence of financial responsibility under this title.

Subsection (f) provides for a civil penalty not to exceed $25,000 per day of violation for failure to comply with the requirements of this section or with any orders or regulations issued under this section. The Secretary may request the Attorney General to proceed in district court to secure compliance with the requirements of this section.

To avoid undue administrative burdens, the Committee expects that wherever possible the regulations financial responsibility for vessels will be consolidated with those under other Federal statutes. In this manner, only one certificate of financial responsibility would be required for vessels under all statutes to meet the requirements for financial responsibility not only for the statutes consolidated by this Act but other pollution laws such as the FWPCA and the Comprehensive Environmental Response, Compensation, and Liability Act of 1980. This unified certificate is intended to simplify administrative procedures only. Certification under one statute by a guarantor would not necessarily result in certification under another statute.

### LITIGATION, JURISDICTION, AND VENUE

*Section 108*

This section provides that judicial review of any regulation promulgated under this Act may be had upon application by any interested person only in the Circuit Court of Appeals for the District of Columbia if the action is filed within 90 days of promulgation.

The United States District Courts have original jurisdiction controversies arising under the Act. Claimants need not assert any particular amount in controversy in order for federal jurisdiction to attach, nor do they have to assert diversity of citizenship in order to obtain federal jurisdiction. Actions brought under the Act are federal questions. Under subsection (c), the forum shall be located, unless otherwise provided in the Act, in the district either where the incident, injury, or damages occurred or where the defendant resides or is found, has its principal office, or has appointed an agent for service of process. The Fund and the International Fund, for purposes of this section, shall reside in the District of Columbia. Since the jurisdiction is not exclusive, state courts share jurisdiction over these matters.

Subsection (d) effects a savings provision in that nothing in the Act shall affect an action commenced prior to the Act's enactment.

Subsection (e) sets forth the periods of limitations under the Act. Except for actions for contribution or subrogation:

(1) actions for damages must be commenced within 3 years after the date on which the loss and its nexus with the discharge in question were reasonably discoverable with due care, or in the case of damages to natural resources, if later, the

71

date on which regulations are promulgated under section 102(e)(5) of the Act.

(2) actions for recovery of removal costs must be commenced within three years of completion of the removal action. However, an action under the Liability section of this Act (Section 102) may be commenced at any time after such costs have been incurred.

Actions for contribution for removal costs or damages must be brought within three years of either the date of judgment under this Act for recovery of such costs or damages, or the date of entry of a judicially approved settlement with respect to such costs or damages. Similarly, subrogation actions under this Act must be commenced within three years after the payment of such claim.

RELATIONSHIP TO OTHER LAW

*Section 109*

Subsection (a)(1) provides that actions arising out of discharges of oil from a vessel or facility may only be brought in accordance with the provisions of the Act. Accordingly, lawsuits to recover damages for either removal costs or damages can only be brought in accordance with the provisions set forth in the bill. On the other hand, actions for wrongful death and personal injury are exempt from this restriction and as such may be brought in any applicable court under appropriate state law. This subsection will serve to preclude a state from establishing a treble damages provision relating to oil spill incidents. It will also serve to remove ambiguity which may arise from differences in federal and state definitions of removal costs and damages.

Subsection (a)(2) provides that nothing in this Act or in sections 4611 or 9509 of the Internal Revenue Code of 1986, shall affect the ability or authority of any state to either establish or continue in effect an oil spill fund or account, or to require any person to contribute to that fund or account. The subsection does impose the restriction that if the state fund or account is supported by contributions directly levied upon persons who contribute to the federal Fund established by this Act, that fund can not be used to compensate any person for damages under this Act. By this, the Committee intends to preclude the imposition of a state tax or fee on the same persons who contribute to the Federal Fund if those state funds would be used to pay for oil spill related damages. States are of course free to use monies generated through general means as they see fit. Similarly, state funds or accounts financed by a directed tax or fee on the oil industry could be used for purposes such as the purchase and prepositioning of oil spill response equipment, the training of response personnel, and the payment of removal costs.

Subsection (b) provides for the continued authority of the United States or any state or political subdivision thereof to exact fines or penalties for any violation of law relating to an oil spill incident.

Subsection (c) provides that any party responsible for either a vessel or facility, who establishes and maintains evidence of financial responsibility in accordance with this Act, shall not be required to maintain or establish any other evidence of financial re-

72

sponsibility under state or local law, rule, or regulation insofar as liability for an oil spill incident is concerned. Furthermore, states must accept evidence of compliance with the financial responsibility requirements of this Act in lieu of any other requirement of financial responsibility which might be imposed by such state in connection with liability for the release of oil. A state may, however, enforce on the navigable waters of that state, the requirements for evidence of financial responsibility as set forth under Section 107 of the Act.

Subsection (d) serves to clarify that the liability of vessel owners or operators for oil spills will be governed by the provisions of this Act, and that the liability provisions of the Act of 1851, more commonly known as the Limitation of Liability Act, shall not apply.

### EFFECTIVE DATE

*Section 110*

Provisions set forth in Title I shall apply with respect to an incident occuring only after the date of the enactment of this Act, but in no event shall payments be made from the Fund before the commencement date as defined in Section 4611(f)(2) of the Internal Revenue Code of 1986.

### TITLE II—CONFORMING AMENDMENTS

*Section 201*

This section conforms the provisions of various other laws to the provisions of this Act.

The text makes clarifying amendments to section 204 of the Trans-Alaska Pipeline Authorization Act (43 U.S.C. 1653). Paragraph (b) of that subsection is amended to clarify the liability of pipeline holders for oil pollution. Section 204(b) currently provides that permit holders who cause oil pollution "within or without the right-of-way or permit area" shall be liable for the total cost of removing the pollutants. A literal reading of that section could suggest that a permit holder might he held liable for the total cost of removal for a spill occurring anywhere in the world. That clearly was not the intention of this section. Rather, it was intended to cover oil pollution in the vicinity of the pipeline right-of-way or permit areas. The language in this Act will make it clear that the removal liability of the permit holder extends only to activities relating directly to the Trans-Alaska Pipeline. Additional language makes the Trans-Alaska Pipeline Authorization Act removal liability provisions inapplicable in those situations where this Act applies. In all other instances, the provisions in the Trans-Alaska Pipeline Authorization Act relating to removal costs and liability remain in effect.

This section also repeals that subsection of the Trans-Alaska Pipeline Authorization Act which established liability and a compensation fund for damages caused by oil spills from vessels transporting oil from the pipeline terminus to ports elsewhere in the United States. Further, it provides for a rebate of the Trans-Alaska Pipeline Liability Fund (TAPLF) assets to the owners and operators who contributed to the fund and the payment of all costs and

73

liabilities associated with that rebate. All TAPLF officers and trustees, both private and public as well as present and former, will not be subject to liability in those capacities except for gross negligence or willful misconduct. In addition, however, the TAPLF could take any other steps necessary and proper to defray any of the lawful costs associated with office and trustee liability under this subsection, including purchasing insurance and securing releases from satisfied claimants or contributors receiving rebates. Finally, the Board of Trustees of the TAPLF must certify the amount of outstanding claims against the TAPLF. Accordingly, this section provides for the retention and disposition of monies in the TAPLF regarding claims prior to the effective date of this section.

### Section 202

This section amends the Intervention on the High Seas Act, to make available to the Secretary, for intervention procedures authorized by that Act, the Fund implemented by this Act.

### Section 203

This section amends section 311 of the Federal Water Pollution Control Act. The amendments serve numerous purposes.

The first two amendments are to subsection (c)(2) of section 311 of the Federal Water Pollution Control Act. Their effect is to modify the National Contingency Plan for removal of oil and hazardous substances, as prepared and published by the President, to include changes reflecting: (1) the continued operation and further enhancement of a system of surveillance and notice designed not only to provide notice of spills but also to help safeguard against the likelihood of spills—a system akin to the Vessel Traffic Service currently operated by the United States Coast Guard at only four sites in the U.S., a number which the Committee finds inadequate in comparison to the need for improved vessel traffic monitoring; and (2) authorizing reimbursement to states from the Fund established by this Act, for reasonable costs in removing discharges of oil pursuant to the National Contingency Plan.

Subsection (d) of section 311 is amended to delete a clause made unnecessary by the Act.

Subsection (e) of section 311 is amended to confer upon the President the authority to issue orders or seek injunctive relief through court action to compel persons to clean up oil spills. This authority is to complement the two other ways that the Act authorizes cleanup activities: voluntary cleanup activities financed by the responsible party and Fund-financed cleanups. The Act then provides that the Attorney General may bring an action to enforce a cleanup order against a responsible party, may assess a civil penalty of no more than $25,000 per day for each violation, and may assess treble damages if the responsible party refuses without sufficient cause to comply with an order. Lastly, the District Courts of the United States are given jurisdiction to grant relief under this subsection.

Subsection (f), (g), (h), and (i) of section 311 of the Federal Water Pollution Control Act are clarified to be nonapplicable with respect to any incident for which liability is established under section 102 of the Act.

Subsection (i) of section 311 is amended to delete clauses made unnecessary by this Act.

Subsection (k) of section 311 is repealed and any amounts remaining in the Fund shall be deposited in the general account of the Treasury. The newly established Oil Spill Liability Trust Fund shall assume all liability incurred by the revolving fund found in 311(k) of the Federal Water Pollution Control Act.

Subsection (l) of section 311 is amended to eliminate a sentence made unnecessary by this Act.

Subsection (p) of section 311 is repealed because it sets out liability standards for vessels that are superseded by this Act.

A new subsection (s) is added to provide that the Oil Spill Liability Trust Fund shall be available to carry out the provisions of section (c), (d), (i), (l), and (t) as those sections relate to discharges of oil.

It is important to note that following enactment of this Act, liability and compensation for petroleum oil pollution damages caused by a discharge from a vessel or facility (as defined in this Act) will be determined in accordance with this Act. The Fund implemented by this Act, however, will be available to Coast Guard and other government agencies for immediate response to spills of all types of oil from all sources in the same manner as the fund established by section 311(k) is presently available to respond to such spills. This arrangement is provided for in Section 103.

*Section 204*

This section amends the Deepwater Port Act of 1974 by repealing various subsections pertaining to oil pollution liability and compensation which are superseded by this bill. This subsection also provides that amounts remaining in the Deepwater Port Liability Fund shall be deposited in the Fund implemented by this Act. The Fund will assume all liabilities of the Deepwater Port Liability Fund.

Finally, this section makes it clear that civil penalties for discharges from a Deepwater Port or from a vessel within a Deepwater Port Safety Zone can be assessed only under Section 18 of the Deepwater Port Act, thereby eliminating overlapping and confliction coverage of deepwater ports for civil penalties.

*Section 205*

This section makes similar provisions for the assets and liabilities of the Offshore Oil Pollution Compensation Fund established under the Outer Continental Shelf Lands Act Amendments of 1978. Title III of that law (Public Law 95–372), which established the Offshore Oil Pollution Compensation Fund, is repealed in its entirety.

*Section 206*

This section amends the Oil and Hazardous Substance Liability section of the Federal Water Pollution Control Act. Section 311(b)(5) is amended to require federal agencies to immediately notify states of an oil discharge. Additionally, the penalty for failure to report an oil discharge is increased.

75

### Section 207

This section clarifies that the legislation contained in this Act is considered to be qualified authorizing legislation to implement the funding mechanism set out in section 4611(f)(2)(B) of the Internal Revenue Code of 1986.

### Section 208

This section sets the effective dates of various provisions in this title consistent with the commencement date provided in section 4611(f)(2) of the Internal Revenue Code of 1986.

#### TITLE III—IMPLEMENTATION OF INTERNATIONAL CONVENTIONS

### *Definitions*

### Section 301

This section provides that the terms defined in this Title have the same meaning as defined in the International Convention on Civil Liability, 1984. Further, the section defines Civil Liability Convention, financial responsibility, Fund Convention, and International Fund.

#### APPLICABILITY OF CONVENTIONS

### Section 302

This section states that when the Civil Liability Convention and the Fund Convention are in place, liability shall be determined in accord with those conventions.  ·

#### RECOGNITION OF INTERNATIONAL FUND

### Section 303

This section provides that the International Fund is recognized as a person under U.S. law and that the Fund Director is the legal representative of the International Fund. The Secretary of State is the Fund's agent for service of process. Lastly, the Fund and its assets are exempt from all direct taxation or assessment of duties in the United States. These exemptions have their basis in paragraphs 1 and 4 of Article 34 of the International Fund Convention.

#### ACTION IN UNITED STATES COURTS

### Section 304

This section requires that the International Fund be served a copy of any complaint and any subsequent pleading filed in any action brought in the U.S. under the Civil Liability Convention. It also entitles the Fund to intervene as a party in any such actions.

#### PAYMENT OF CONTRIBUTIONS

### Section 305

This section provides that the Fund shall be responsible for the payment of annual contributions to the International Fund. The Secretary is granted the authority to require persons who are required to make contributions to the Fund to furnish all necessary information regarding oil delivered.

76

**RECOGNITION OF JUDGMENTS**

*Section 306*

This section requires U.S. Courts to recognize decisions made under one of the International Conventions by a Court of any nation which is a party to that Convention.

**FINANCIAL RESPONSIBILITY**

*Section 307*

This section sets out the financial responsibility requirements needed to implement the Civil Liability Convention and provides sanctions for failure to observe those requirements. This section also establishes a civil penalty of up to $25,000 per day for violation of the requirements of this section. Lastly, the section provides for the waiver of U.S. rights to sovereign immunity with respect to any controversy arising under the Civil Liability Convention and relating to a ship owned by the United States and used for commercial purposes.

**REGULATIONS**

*Section 308*

This section provides the Secretary with authority to issue rules and regulations necessary to implement the two International Conventions.

**TITLE IV—PREVENTION AND REMOVAL OF OIL AND HAZARDOUS SUBSTANCE DISCHARGES**

*Subtitle A—General*

*Section 401—Definitions*

(1) "Tank barge" is defined as a non-self-propelled vessel constructed or adapted to carry oil in bulk as cargo.

(2) "Remove" or "removal" is defined as the removal of oil or hazardous substances from water and shorelines, containment, dispersal, disposal, and other response actions, and other actions necessary to minimize or mitigate damages to natural resources.

(3) "Tanker" is defined as having the same meaning the term has in section 2101 of title 46, United States Code; that is, a self-propelled tank vessel constructed or adapted primarily to carry oil or hazardous substances in bulk in the cargo spaces.

*Subtitle B—Prevention*

*Section 411—Review of Alcohol and Drug Abuse and Other Matters in Issuing Licenses, Certificates of Registry, and Merchant Mariners' Documents*

This section is intended to give the Secretary additional information on the background of applicants for licenses, certificates of registry, and merchant mariners' documents. The purpose of this section (and sections 412, 413, and 414) is to ensure that the Coast Guard has a greater ability to identify vessel personnel with motor vehicle offenses related to the use of alcohol and drugs. Abuse of

these substances may have an unsafe effect on vessel operations, leading to additional accidents and oil spills. Alcohol impairment may have played a role in the *Exxon Valdez* incident.

The Committee intends to provide an additional tool in the effort to promote a drug- and alcohol-free workplace in the maritime industry. The Committee recognizes and encourages expansion of the voluntary efforts that the industry has undertaken to improve the safety of marine transportation through testing and rehabilitation of the work force.

Subsection (a) of this section amends title 46 of the U.S. Code to require applicants for licenses or certificates of registry to provide access to information contained in the National Driver Register (NDR). Subsection (b) extends this requirement to applicants for a merchant mariner's document or endorsement.

This subsection also requires the Secretary to conduct a review of the criminal record of an applicant for a license. The Coast Guard is currently checking Federal Bureau of Investigation records. This codifies existing procedure. The Committee does not intend that the Coast Guard delay issuing a license but rather issue it pending the outcome of the criminal records check.

The NDR is a national compilation of vehicle offenses voluntarily reported by states and maintained by the Secretary of Transportation under Public Law 97–364. Under current law, locomotive operators or those seeking such a position may provide access to the NDR to a prospective employer. The Committee intends to expand and strengthen this practice for vessel personnel, given the relevancy of alcohol or drug infractions involving a motor vehicle to safe vessel navigation and the need for drug- and alcohol-free vessel operation.

### Section 412—Term of Certificates of Registry and Merchant Mariners' Documents

Subsection (a) amends section 7107 of title 46 to set a five-year term for certificates of registry, with a five-year renewal period. Subsection (b) amends section 7302 of title 46 to set a five-year term for merchant mariner's documents with a five-year renewal period. Subsection (c) sets a January 1, 1990, effective date for subsections (a) and (b). Subsection (d) sets termination dates, calculated as though the changes under this section were in effect on the date the certificate or document was issued, for existing certificates of registry and merchant mariner's documents to provide for a staggered renewal period. Providing an automatic five-year renewal period will allow the Secretary to ensure that vessel personnel are continuing to be qualified to operate a vessel safely. Subsection (e) requires the Secretary to conduct a review of criminal records of an individual who seeks to renew his or her license.

### Section 413—Suspension and Revocation of Licenses, Certificates of Registry, and Merchant Mariners' Documents For Alcohol and Drug Abuse

Subsection (a) authorizes the Secretary to request persons holding a license, certificate of registry, or merchant mariner's document to provide all information contained in the National Driver Register. This subsection also gives the Secretary new authority to

78

temporarily suspend a license, certificate, or document if the individual performs a sensitive function on a vessel and there is probable cause to believe there are grounds for suspension. The grounds include that a holder has performed the sensitive function while using alcohol or a dangerous drug; has been denied a driver's license for cause within the five-year period immediately before the temporary suspension; and has been convicted of an offense for which a license, certificate, or document can be suspended or revoked under sections 7703(2) and 7703(2) or 7703(3) of title 46. This subsection also requires an expedited hearing within 15 days of the temporary suspension.

Subsection (b) expands the basis for suspending or revoking a license, certificate, or document by adding two new grounds: (1) the individual is convicted of an offense that would prevent the issuance of the license, certificate, or document; or (2) is convicted of an offense described in the National Driver Register Act, such as driving under the influence of alcohol or dangerous drugs, reckless driving, or leaving the scene of an accident, within the five-year period immediately before the suspension or revocation.

Subsection (c) adds a new requirement to existing law for issuance of a license, certificate, or document that has been revoked. The former holder must provide satisfactory proof that the bases for revocation are no longer valid. For example, if the basis for revocation concerns abuse of a dangerous drug, the former holder must show that he or she has successfully completed a drug treatment program and is involved in a substance abusers support group.

*Section 414—Removal of Master or Individual in Charge for Intoxication*

This section establishes a procedure by which the two most senior members of the complement of a vessel may temporarily relieve the master or individual in charge of a vessel when the master or individual in charge of a vessel is intoxicated and incapable of commanding the vessel because of that intoxication. Once the master or individual in charge of a vessel is relieved, the most senior officer shall take command of the vessel, make a detailed entry in the vessel log, and report the incident by the most expeditious means available and in writing after reaching port.

*Section 415—Access to National Driver Register*

This section amends the National Driver Register Act to authorize any person holding or applying for a license, certificate of registry, or merchant mariner's document to request the chief driver licensing official of a state to send to the Secretary of Transportation current information on his or her driving record contained in the National Driver Register. It also requires the Secretary to make that information available to the individual for comment before the information can be used as a basis for denying or otherwise affecting that person's license, document, or certificate. Information more than five years old, unless relating to sanctions still imposed, may not be transmitted.

79

*Section 416—Manning Standards for Foreign Tank Vessels*

This section requires the Secretary to evaluate the manning, training, qualification, and watchkeeping standards for tank vessels of foreign countries on a periodic basis and after a casualty involving a foreign tank vessel to ensure that those standards are equivalent to those of the United States or customary international law and that the standards are being enforced. The Secretary must deny entry to the United States for any foreign tank vessel that does not meet the equivalency and enforcement requirement, except that provisional entry for such vessels may be authorized if the vessel's owner or operator satisfies the Secretary that the vessel is not unsafe or a threat to the evironment or that entry is necessary for the safety of the vessel or individuals on the vessel.

The Committee is aware that the United States has not ratified the international convention on manning, training, qualification and watchkeeping standards, although many amritime nations have adopted and are enforceing the convention. Standards under United States law are more stringent than those contained in the convention and those of many other nations. It is the view of the Committee that enforcement of standards equivalent to those of the convention should be considered as the minimum standard for meeting the rquirement of this section so long as customary international law recognizes standards less stringent than those of the United States.

According to a study recently completed for the Coast Guard, the number of foreign tankers calling at United States ports has increased by more than 50 percent in the last three years. As the United States grows more dependent on foreign sources of oil and petroleum products, the Committee believes that increased scrutiny of the increasing foreign tank vessel traffic to protect the safety and the environment of United States ports.

*Section 417—Vessel Traffic Service System*

This section amends the Ports and Waterways Safety Act to require mandatory participation in vessel traffic service (VTS) systems by appropriate vessels. It also requires specific authorization by Congress before new VTS systems are built or existing systems expanded or improved.

The *Exxon Valdez* spill demonstrated the potential usefulness of modern VTS systems in accident prevention. The Committee addressed the need to improve and expand the vessel traffic service in Prince William Sound in other legislation (H.R. 2158), the Prince William Sound Oil Spill Response Act now incorporated in part in title V of this Act). In Section 209 of H.R. 2459, the Coast Guard Authorization Act 1990, the Committee directed the Coast Guard to reestablish vessel traffic services in New York and New Orleans, the nation's two largest and busiest ports. Vessel traffic service in New york and New Orleans was eliminated in 1988 because of funding shortfalls in the Coast Guard budget.

*Section 418—State Authority to Require State Pilotage for Tankers*

The section amends subsections 8501(d) and 8502(d) of title 46, United States Code, to provide a limited exemption from the gener-

al prohibition against states requiring state pilotage and levying pilot charges on coastwise vessels. This exemption provision applies only to coastwise tankers whose Federal pilot's license is not endorsed for that state's waters; it does not include other coastwise vessels, such as barges.

Current law permits tankers and other vessels in coastwise trade, unlike foreign vessels, to operate without state pilots. These vessels instead may rely upon Federal pilots (who are also typically the masters of the vessels) to control the vessel in and out of ports of call. This section authorizes the states to require state pilots on coastwise tankers whose Federal pilot's license is not endorsed by the Secretary for that state's waters, and to levy charges for this service. This is a restatement of the status quo.

*Section 419—Great Lakes Pilotage*

Section 5109 of the Act corrects a gap in existing pilotage laws for the Great Lakes to ensure that vessels will operate safely in the largest source of fresh water in the world.

Under current law, pilots are required on all U.S. vessels operating on register and on all foreign vessels in the Great Lakes. However, the Canadian government will grant "B certificates" to operate on undesignated Great Lakes waters to masters who have only traversed the Lakes three times in a two-year period. This is a much lower standard than the United States imposes on its licensed pilots under sections 7101(c)(2) and 9303 of title 46 and not consistent with the requirement of equivalency in current law. Section 5109(a) of the Act will establish the U.S. standards as the minimum for any pilot on the undesignated waters of the Great Lakes. The Committee recognizes that the United States has been working with Canada to eliminate the use of these "B certificates", but progress has been extremely slow. Because there are only a few of these certificates outstanding at present, the Committee believes now is the time to correct this potential navigation hazard.

In addition, subsection (b) excludes tank vessels carrying oil or hazardous substances from the class of vessels for which a pilotage exemption may be granted, except where the vessel or its cargo is in distress or jeopardy. Subsection (c) indicates that a vessel can be liable in rem for the costs associated with Great Lakes pilotage service. Finally, subsection (d) increases the penalties for violations of the Great Lakes pilotage requirements consistent with other penalties under title 46, U.S. Code.

*Section 420—Study on Tanker Navigation Safety Standards*

The Committee believes a comprehensive assessment of tanker navigation safety standards is needed. This section sets out a detailed scope of review for such a study due one year after enactment of this legislation.

Subsection (a) requires the Secretary to review existing laws and regulations to determine if they are adequate to ensure safe navigation of vessels transporting oil and hazardous substances on the navigable waters and the exclusive economic zone.

Subsections (b)(1) through (b)(3) require specific examination of issues related to tanker crews. Areas to be examined include: appropriate crew sizes, qualification and training of crewmembers,

and the emergency response capabilities of crews in the event of a spill. It has been alleged that the size of the crew and fatigue of the crew following cargo loading may have contributed to the *Exxon Valdez* and *Presidente Rivera* groundings. The Committee is aware that these allegations and many others specific to the *Exxon Valdez* are under investigation by the U.S. Coast Guard and the National Transportation Safety Board. Without making a judgment on these specific allegations, the Committee believes that a thorough, industry-wide examination of crew and manning standards must be undertaken. The findings of such a study will greatly contribute to Congressional consideration of international conventions and agreements, as well as legislative and regulatory actions that may be needed to improve the safety of tanker navigation.

Subsection (b)(4) and (b)(5) require specific examination of issues related to navigation. Areas to be examined include the adequacy of navigation equipment on tankers and the adequacy of navigation procedures. The Committee is aware that satellite technology offers great potential for improving both tanker navigation and tracking of tanker movements. In the examination of navigation equipment, the Committee intends that such technological innovations be considered. On the other hand, existing tanker navigation equipment, automatic pilots for example, have been cited as potential contributing factors to tanker accidents. The Coast Guard should evaluate whether alarms for automatic pilots would be desirable. The Committee intends that potential hazards of existing equipment be examined. Navigation procedures have also been cited as potentially contributing factors to unsafe tanker operations. The Committee is particularly interested in a broad assessment of navigation procedures, including an analysis of existing requirements for personnel on the bridge, in engineering compartments, and at watch stations during pilotage transits. In addition, this study should review traffic separation schemes, tug escorts, vessel speeds, among other things.

Subsection (b)(6) requires the Secretary to determine which ports and channels are in need of new, expanded or improved VTS systems. The evaluation is to consider the volume and risks posed by vessel traffic in specific port and channel areas, the potential damages in the event of a discharge, and the impact of a VTS system. The Committee is aware of several environmentally sensitive areas that are now traversed without guidance by heavy tanker traffic, such as the Santa Barbara Channel. This area should be examined in the study mandated under this section. The Secretary is also to rank the port and channel areas in order of priority; this aspect of the study will be an important guide to the authorizing Committee in determining which new VTS systems are to be constructed, expanded or improved pursuant to the provisions of section 417 of this legislation.

Subsection (b)(7) requires an evaluation of whether certain areas of the navigable waters and exclusive economic zone should be declared "tanker free zones", areas where tanker movements should be limited or prohibited. The Committee is aware that Canada, for instance, has established "tanker free zones" to minimize the exposure of its sensitive shoreline areas to potential contamination from discharges of oil or hazardous substances. The Committee is

concerned about tankers using the channel between Montauk Point, New York and Block Island, Rhode Island and directs the Coast Guard to act expediously in evaluating whether the use of this channel by tankers should be prohibited. The Committee notes that the channel is extremely narrow and shallow and has been the site of numerous accidents. For other reasons, the Committee is concerned about tanker traffic in the Santa Barbara Channel off the coast of California and requests the Coast Guard to evaluate the advisability of declaring that channel a "tanker free zone." The Secretary should consider also whether a tanker free zone would be consistent with offshore development.

Subsection (b)(8) requires an evaluation of vessel design and construction criteria to reduce the likelihood of a discharge. The criteria to be used in making the evaluation include: tank capacity, tanker tonnage, barge tonnage, double hulls and double bottoms on tankers and barges. The Committee would also support consideration of other factors such as planting thickness to deal with ice hazards in colder climates in light of the fact that the *Exxon Valdez* veered off course to avoid ice hazards in the shipping lane. There is considerable interest in a thorough evaluation of the safety benefits and cost effectiveness of requiring double hulls or double bottoms on tankers and barges. The bill requires the study to be conducted with the consultation of naval architects, tanker operators, salvors, environmental protection organizations, economists, States and communities along tanker routes, and other appropriate persons. A requirement for a similar study of double hulls or double bottoms was included in H.R. 2459, the Coast Guard Authorization Act, 1990, reported by the Committee on June 21, 1989. The Committee is aware that the Coast Guard has already such a study underway and that its scope could be broadened to make it consistent with the requirements of this subsection.

Subsection (b)(9) requires an evaluation of the adequacy of tanker inspection requirements. The Committee believes that adequate inspection of tankers should have a high priority in preventing spills. Consequently, the Coast Guard should review inspection standards to determine if they are adequate and if the frequency of inspections ought to be increased.

The Committee notes that the Coast Guard has not been able to inspect on an annual basis every vessel that enters certain harbors. For instance, the Coast Guard was able to inspect only 58 percent of foreign vessels entering New York Harbor in one recent year. Of those foreign vessels inspected, 85 percent were found to have safety or other defects that warranted remediation.

It is the Committee's desire that the Coast Guard report to Congress about its ability to conduct annual inspections in harbors, the resources required to conduct those annual inspections, and the oil spill and emergency response benefits of the inspections.

Subsection (b)(10) requires that the comprehensive study review and incorporate the findings of past studies, including those by the Coast Guard and the Office of Technology Assessment.

Finally, subsection (b)(11) directs the Coast Guard to evaluate computerized simulators for training bridge officers and vessel pilots. These simulators are already in limited use now, and the

Committee is interested in the potential for expansion of this practice.

Subsection (c) requires the study findings, together with implementation recommendations, be transmitted to the House Merchant Marine and Fisheries Committee and the Senate Committee on Commerce, Science, and Transportation within one year of the date of enactment of this Act.

### Section 421—Dredge Modification Study

The Committee is aware that modified dredges have been used successfully in oil recovery operations both in the United States and in Europe. Section 421 requires the Secretary of the Army to study the feasibility of modifying dredges operated by the U.S. Army Corps of Engineers to make them usable in responding to discharges of oil and hazardous substances. Subsection (b) requires the study findings, together with implementation recommendations, be transmitted to the Congress within one year of enactment of this Act.

### Section 422—Use of Liners

This provision requires the President to report to Congress on the utility of liners or other secondary containment means to prevent leaks, leaching, or spills from on-land oil storage tanks. The need for secondary containment was well illustrated by the Ashland Oil Co. tank, which ruptured and spilled 700,000 gallons of diesel oil into the Monongahela and Ohio Rivers in January, 1988.

Following the completion of the study, the President must implement any study recommendations. Because oil storage facilities fall under the jurisdiction of both the Environmental Protection Agency and the Coast Guard, it is expected that the agencies would work together to develop the new requirements, if any.

### Subtitle C—Removal

### Section 431—Federal Removal Authority

Section 431(a) amends section 311 of the Clean Water Act to require the President to ensure an effective and immediate removal of oil or hazardous substances from U.S. navigable waters, adjoining shorelines, and the exclusive economic zone in accordance with the National Contingency Plan, any other contingency plans, and applicable state law. This section clarifies the President's responsibilities, and expands the President's options in responding to a spill of oil or hazardous substances. Under this section, the President may Federalize, direct, or monitor cleanup activities.

Amended section 311(c)(1)(A) requires the President to ensure an effective and immediate removal of a discharge of oil or hazardous substance on the navigable waters, its adjoining shorelines, the exclusive economic zone, or if it affects natural resources of the United States. This section makes it clear that the President has an affirmative duty to make certain that a spill is cleaned up promptly, whether it is accomplished by the Federal government or the responsible party. In addition, the section requires the President to make sure that any cleanup activity is accomplished in accordance with the National Contingency Plan, other contingency

plans required by law, such as local, vessel, and facility plans, and relevant State law.

Section 311(c)(1)(B) continues the President's authority to remove or arrange for the removal of a discharge. When the President takes charge of cleanup activities, or "Federalizes" a spill, the Oil Spill Liability Trust Fund is available to pay for the government's expenses. Then, the President may recover the Fund expenditures from the spiller. Under this provision, the President need not first wait to determine that the responsible party is conducting inadequate cleanup, but may initiate action immediately. This responds to the concerns expressed by several members of the Committee that precious time could be lost while waiting for the spiller to marshall its cleanup forces.

Section 311(c)(1)(C) authorizes the President to direct all Federal, state, and private actions to remove a discharge. The Committee recognizes that there may be instances when complete Federalization is not necessary, but it is necessary for the Federal government to play a more significant role than merely monitoring cleanup activities. In this case, the Federal government would assume command of cleanup activities and would direct and coordinate all removal activities carried out by responsible parties and others. This authority could be used in a more limited way. For example, there may be instances when the Coast Guard may need to commandeer a passing vessel to respond to an emergency.

Under section 311(a)(1)(D) the Committee allocated the primary risk of liability arising from removal and cleanup activities to the responsible party rather than to those persons responding to the spill under the direction of or retained by the Federal government. The Committee intends to ensure immediate response to oil and hazardous substance spills and believes this provision is necessary in light of the substantial financial risks and liability exposure which would otherwise deter vessel operators, spill cooperatives, and spill contractors from providing active assistance. To avoid paralysis of remedial action to spills, this paragraph provides that those persons—other than responsible parties—who are retained or directed by the President to participate in a cleanup action will not be liable for removal costs or damages as defined in this legislation, except in the case of gross negligence or willful misconduct. This limitation of liability does not affect liability for wrongful death or personal injury. Nor does it diminish the liability of those responsible for the spill nor the amount of compensation available to claimants. This limited protection will encourage individuals to assist in cleanup operations without fear of collateral attacks from responsible parties. The Committee expects that all who take part in removal actions will act responsibly and believes that the elimination of the liability except for gross negligence or willful misconduct will serve as sufficient protection.

Section 311(c)(1)(E) requires the responsible party to act in accordance with the National Contingency Plan, other applicable contingency plans, and as otherwise directed by the President. This provision is also intended to underscore the fundamental obligation that the responsible party has to be prepared at all times and to take immediate and effective action in the event of a discharge.

85

Section 311(c)(1)(F) provides that the liability of the responsible party is not affected by the Federal authorities delineated in this section. Even when the President exercises direction of cleanup actions or when a spill is Federalized, the responsible party is not excused from payment of removal costs and damages.

Section 431(b) amends the definition section 311(a) of the Clean Water Act. The definition of "remove" or "removal" in the Act is expanded to include containment, dispersal, disposal, and other response actions. Definitions of the "exclusive economic zone" as well as "responsible party " are added.

*Section 432—Contingency Plans*

Section 432 amends section 311(j) of the Clean Water Act. New section 311(j) codifies and expands requirements presently existing for local contingency plans and facility contingency plans, and institutes a new requirement for vessel contingency plans. The Committee intends that a hierarchy of contingency plans be prepared under the Clean Water Act, beginning with the National Contingency Plan, and leading down to local plans and then individual vessel and facility plans. All plans must be coordinated to ensure an immediate and effective removal of a discharge of oil or a hazardous substance. The level of detail will increase as the plans move from the general National plan to the specific vessel and facility plans. The Committee intends that the existing plans be examined and modified if necessary to comport with the new requirements of the Act, to save both time and unnecessary duplication of effort.

Section 311(j)(3)(A) mandates the President, within six months of enactment of this Act, to designate areas for which new or improved local oil and hazardous substance contingency plans must be prepared, and to specify the Federal, state, and local officials required to prepare the plans. The Committee notes that numerous spills have occurred in the Long Island Sound, New York Harbor, and Hudson River region. In light of the number of spills, and environmental and economic damage such spills cause, the President shall designate the Long Island Sound, New York Harbor, and Hudson River region as one of the areas for which a new or improved local contingency plan must be prepared. The Committee also recognizes that preparation of these plans, especially in areas where no earlier plan existed, will require time and money from all levels of government. The Committee does not intend that local governments, whose resources are generally the most limited, be forced to spend substantial amounts of money in preparing these plans. Financial burden should be shared.

Section 311(j)(3)(B) requires the President to consult with appropriate state and local officials and the public in determining the areas to be designated. The President must consider certain factors in determining designated areas, including the likelihood of a discharge, the likelihood that the discharge would result in severe economic or environmental damage, and the adequacy of existing local plans. Because state and local officials will be implementing the plans under this section, it is imperative that their input and cooperation be obtained.

86

Section 311(j)(3)(C) requires local plans under this section to include a description of the area, including areas of special economic or environmental importance that might be damaged; a description of the responsibilities of Federal, State, and local agencies, and the responsible party for responding to a discharge or threat of discharge; a list of equipment and personnel available to ensure an immediate and effective removal of a discharge; and any other information the President requires.

Section 311(j)(3)(D) requires the local plans mandated under this section be submitted to the President within six months after the local areas requiring plans are designated. The President is required to promptly review each plan and require amendments to a plan that does not meet the necessary requirements. There is no requirement that the President approve each plan, because of concerns that this could prove to be an administrative burden. In addition, if the Federal government approves a plan and an accident occurs, there is concern that a responsible party might attempt to relieve himself or herself of liability by alleging that the approved plans were inadequate.

Section 311(j)(3)(E) requires periodic review of plans by the President and updates, if necessary.

Section 311(j)(3)(F) authorizes the President to provide technical assistance in the preparation of local contingency plans.

Section 311(j)(4)(A) requires owners or operators of certain vessels and facilities to prepare contingency plans not later than eighteen months after the enactment of this Act. A plan is required for a vessel operating on the navigable waters or exclusive economic zone and carrying oil or a hazardous substance in bulk as cargo. A plan is also required for an offshore or onshore facility that could reasonably discharge into or on the navigable waters, the adjoining shorelines, or the exclusive economic zone.

Section 311(j)(4)(B) requires that vessel and facility plans be consistent, and ensure compliance by the owner or operator, with the National Contingency Plan, and any local contingency plan. The effective dates in subsections (j)(3)(A), (j)(3)(D), and (j)(4)(A) are staggered to insure that there will be an opportunity for orderly preparation and coordination of the various plans.

Section 311(j)(4)(B) also requires that contingency plans for vessel and facilities meet other important requirements. Plans must be timely submitted; be available for review by state and local officials, and the public; identify the individual having authority to implement a removal action, and to require immediate communications between that individual and the appropriate Federal official and cleanup personnel; describe the specific actions that will be taken to remove a discharge; identify and ensure the availability of personnel and equipment that will be necessary to remove a discharge; include a program of personnel training, equipment testing, and periodic unannounced drills; describe the conditions under which dispersants may be used; include provisions for the safe disposal of recovered materials and waste; and be updated periodically.

The Committee recognizes that vessels will face challenges in complying with this section given the fact of their mobility. Since vessels transit through various ports, the Committee envisions that

the owner or operator of a vessel will make available to the master or other person in charge of the vessel the necessary information concerning the resources in specific ports that can assist the vessel in complying with the requirements of this subparagraph in the event of a discharge. Therefore, it will not be necessary for the vessel to have on board all the personnel and equipment required to respond to a discharge, but the personnel aboard the vessel must immediately contact persons on shore who can respond rapidly. Private contractors will play an important part in enabling vessels to meet their responsibilities under this Act. The bill requires vessel owners and operators to ensure, by contract with a private organization or otherwise, the availability of personnel and equipment necessary to implement any removal action.

Section 311(j)(4)(C) prohibits a vessel or facility from handling, storing, or transporting oil and a hazardous substance unless a contingency plan has been submitted, has not been rejected, and the vessel or facility is operating in compliance with the plan.

Section 311(j)(4)(D) requires the President to review the plans and reject or require amendments to them as appropriate. Here again, there is no requirement for the plans to be approved because of the administrative burden and potential for lawsuits against the government.

Section 311(j)(4)(E) authorizes the President to exclude a class of vessels or facilities from preparation of a contingency plan if the requirements have been met under other law, such as the Comprehensive Environmental Response, Compensation, and Liability Act.

Section 311(j)(5) requires the President, not later than one year after enactment of the Act, to insure periodic inspection of containment booms, skimmers, vessels, and other major equipment used to remove discharges. The Committee suggests that this inspection should occur no less than once every three years. The President must also ensure that vessels operating on the navigable waters carry appropriate removal equipment that employs the best technology economically feasible which is compatible with the safe operation of the vessel. The Committee is particularly interested in an evaluation of whether oil containment booms should be carried aboard vessels and safey deployed by the crew in the event of a discharge.

Section 311(j)(6) requires the President through the Secretary to conduct periodic drills of removal capability in major ports under local contingency plans and vessels and facility contingency plans. The drills must be coordinated with Federal, state, and local agencies, the owners and operators of vessels and facilities in the area, and private industry. The Secretary is mandated to publish reports assessing these drills and detailing the changes made to remedy any shortcomings.

*Section 433—Oil and Hazardous Substances Strike Teams*

This section requires establishment of at least seven, continuously staffed oil and hazardous substance strike teams under the National Contingency Plan. The Committee requests that the President consider siting strike teams in Alaska, Hawaii, the Pacific coast, the Gulf of Mexico, the South Atlantic Coast, the North At-

88

lantic Coast, and the Great Lakes. This will provide complete and timely response capacity to all areas of the United States.

In setting up the teams, consideration is to be given to existing Federal, state, local, and private response resources available. For instance, the Committee recognizes the possibility that the Regional Response Centers, which PIRO proposes to establish, may be able to provide sufficient equipment and personnel to respond immediately and effectively to spills. If these centers are established, the Committee envisions that the Coast Guard strike team could be colocated with the PIRO center and not require a full scale Federal contingent of personnel and equipment.

### Section 434—Coast Guard Vessel Design

The Committee is aware that the Coast Guard is preparing vessel designs for a much-needed buoy tender replacement program. The existing buoy tender feet is 45 to 50 years old, expensive to operate and maintain, and inadequate for the multi-mission responsibilities they are expected to perform. The fleet has to be replaced to maintain the integrity of the Coast Guard's aids to navigation, marine safety, law enforcement, search and rescue, and marine environmental protection missions. Buoy tenders are stationed at strategic port and channel locations around the country. If properly outfitted, the replacement buoy tenders can be readily available to remove oil and hazardous substance from U.S. waters. This section requires replacement Coast Guard buoy tenders be equipped with oil skimming systems.

### Section 435—Equipment Inventory

This section amends the Clean Water Act to require a computerized inventory of all public and private oil and hazardous substances removal resources, including equipment and personnel. Such an inventory was operated by the Federal government prior to 1985, but fell victim to budget cuts. Funding for this critical tool would come from the Oil Spill Liability Trust Fund established by section 9509 of the Internal Revenue Code, as an administrative expense. The information in the inventory would be available to Federal, state, and local governments, private organizations, and responsible parties. The Secretary should use the vessel identification system under title 46, U.S. Code, to keep tract of information on vessels for this purpose.

### Section 436—Oil and Hazardous Substance Research and Development Program

This section amends the Clean Water Act to establish a comprehensive oil pollution research and development program. This program is to concentrate on oil spill prevention and minimization; improved removal techniques; removal worker safety; natural resource restoration; and long-term environmental effects of oil. The Act authorizes annual appropriations of $15,000,000 from the Oil Spill Liability Trust Fund for the R&D program. There is also a requirement that the R&D activities be coordinated with other governmental and private research efforts, such as research conducted by PIRO.

89

The Committee is aware that several Federal agencies now conduct minor oil spill research, including the National Oceanic and Atmospheric Administration, the Coast Guard, the Minerals Management Service, the Navy, and the Environmental Protection Agency. These existing programs are to be adequately funded and expanded, with care that no unnecessary duplication of effort occurs. An annual report on the R&D program is required under paragraph (4).

### Subtitle D—Penalties

#### Section 441—Increased Penalties

Section 441(a) of the Act increases the maximum penalties for the illegal discharge of oil or a hazardous substance under the Clean Water Act. The existing penalties assessed by the Coast Guard are a maximum of $5,000 per incident; the new penalties are $1,000 per barrel of oil or hazardous substance discharged, or $5,000,000, whichever is less. This same standard is applied to penalties assessed by the EPA under section 311(b)(6)(B), except in the case of willful negligence or willful misconduct, where the penalty would be $5,000 per barrel spilled with no cap. All penalties recovered by the United States would be deposited in the Oil Spill Liability Trust Fund.

Penalties for violations of section 311(j), relating to removal of discharged oil or hazardous substances, local contingency plans, discharge prevention requirements, and vessel inspections, are increased from $5,000 to $25,000.

Subsections (b) through (o) amend various sections of the United States Code to make the criminal penalty provisions consistent with the sentencing classification of offenses found in title 18 of the United States Code, and to generally increase the criminal penalties for violations of several Federal laws which affect the operation of vessels and facilities in U.S. waters.

Subsection (b) increases the penalties for gross negligence in operating a vessel, including operating the vessel while intoxicated, from $5,000 to $100,000 ($200,000 for an organization). Subsection (c) increases criminal fines for infractions involving various inspection requirements for vessels found in chapter 33 of title 46, United States Code. Subsection (d) increases fivefold the criminal penalty for willfully violating requirements imposed on vessels carrying liquid bulk dangerous cargoes to $250,000 ($500,000 for an organization). Load line requirement violations are increased from $10,000 to $100,000 ($200,000 for organizations) in subsection (e). Criminal fines relating to complements of inspected vessels, watches, coastwise pilotage, and crew requirements are increased from $500 to $10,000 in subsections (f), (g), (h), and (j), respectively. Finally, subsection (i) increases criminal fines to $250,000 for violations of foreign commerce pilotage requirements.

Penalties for criminal violations under the Ports and Waterways Safety Act are strengthened by increasing both the maximum term of imprisonment and the fine payable in subsection (k). Subsection (l) increases fines for vessel navigation requirements relating to safety in marine regattas, marine parades, use of public and volunteer private vessels, and delegation of Coast Guard authority to an-

other Federal agency. The Intervention on the High Seas Act is. amended by subsection (m) to increase fines from $10,000 to $100,000. Fines under the Deepwater Port Act are increased to $100,000 ($200,000 in the case of an organization). Finally, the Act to Prevent Pollution from Ships, which governs the implementation of the MARPOL (the International Convention for the Prevention of Pollution from Ships) Protocol, is amended by increasing the maximum probable prison term to 10 years and the maximum fine to $250,000.

Generally, these penalties have been amended to conform with the requirements of title 18, U.S. Code.

### TITLE V—PRINCE WILLIAM SOUND OIL SPILL REMOVAL

#### Section 501—Short Title

This section indicates that this title may be cited as the "Prince William Sound Oil Spill Removal Act of 1989."

#### Section 502—Definitions

This section defines the terms used in this title.

#### Section 503—Tank Vessel Requirements

Section 503 requires the Secretary within 6 months after the date of enactment of this Act, to issue regulations addressing escort vessels for tank vessels traveling within designated areas of Prince William Sound, and the use of Alaska state pilots on those tank vessels.

The Committee notes that, while reasonable discretion is given to the Secretary, the Committee intends that the Secretary issue regulations requiring the use of at least one towing vessel or other escort vessel while a tank vessel is in Prince William Sound. The Committee notes that representatives of the oil industry are now using oil supply vessels as escort vessels, with a crew trained in oil spill removal and with spill removal equipment on board. The Committee believes that the Secretary should investigate this option.

When requiring the use of pilots licensed by the State of Alaska, the Committee required that those pilots operate under their Federal licenses. This is the current situation in Prince William Sound. The Committee took this approach to ensure that the local knowledge and expertise of state-licensed pilots would be utilized. At the same time, the Committee intends that those pilots be responsbile to a Federal authority.

#### Section 504—Vessel Traffic Service System

Section 504 requires the Secretary to prepare and implement a plan modifying surveillance coverage of vessels in Prince William Sound. The Committee notes that there is a well-documented history of concern over the extent of radar coverage in the Sound, in terms of both the areas of the Sound that are covered by existing radar installations and the reliability and operational readiness of the radar units. The Committee expects the Secretary to address these problems. The plan under this section must be prepared within four months of the date of enactment of this Act, and imple-

mented within one year. This section fulfills the authorization requirements of section 504 of this Act.

*Section 505—Equipment and Personnel Requirements*

Section 505 requires that within 18 months after enactment, the Secretary of Transportation must require specific removal equipment and personnel as part of a local contingency plan prepared for Prince William Sound under section 311(j) of the Clean Water Act. As noted above, the Committee has found the existing contingency plans to be wholly inadequate, especially in light of the nearly complete breakdown of removal capability during the first few days of the *Exxon Valdez* spill. These requirements include: prepositioning of oil spill removal equipment; the establishment of an oil spill removal team in Prince William Sound; periodic oil spill removal drills; training in oil spill containment for local residents and the local fishing industry; and practice exercises to test the effectiveness of the equipment and personnel under the contingency plan.

As is the case with section 503, the Committee has provided the Secretary with a reasonable amount of discretion in issuing regulations. However, the Committee does not intend that the Secretary take unreasonable advantage of this discretion by doing nothing. The Committee expects the Secretary to act responsibly and in a timely fashion to issue regulations governing those involved in the carriage of oil on tank vessels in Prince William Sound so that the equipment, personnel, and training will be provided.

For example, the Committee expects the regulations to address matters such as ensuring that equipment is prepositioned at the most critical points of need, as addressed in contingency plans; that equipment must be ready for deployment at all times; and that the equipment be periodically inspected and tested in conjunction with oil spill removal team exercises.

In addition, the Committee recognizes the concerns expressed by tank vessel operators that deployment of oil spill removal equipment from a tank vessel by that vessel's crew is a dangerous undertaking. Therefore, while the Committee intends that oil spill removal equipment be carried on board tank vessels operating in Prince William Sound, that equipment should be used by an appropriate oil spill removal team.

*Section 506—Use of Local Services*

Section 506 requires the Secretary to consult with local residents and significant local landowners of the Prince William Sound area and, when practicable, utilize local expertise and services in carrying out the provisions of this title. As is often the case, local residents have intimate knowledge of the geography and ecology of Prince William Sound. Unfortunately, little attention often is paid to local knowledge because it does not comport with scientific theories or with the way oil spill removal operations are conducted in other areas. The Secretary should take advantage of this body of local knowledge to avoid exacerbating existing problems and to increase public support for the Secretary's activities. This is especial-

92

ly true in the case of Alaska Native Corporations, which are the significant local landowners in the Prince William Sound area.

### Section 507—Authority of the State of Alaska

Section 507 clarifies that this title does not change, diminish, or preempt any authority that the State of Alaska may have to regulate oil tankers or provide for oil spill contingency plans in State waters. This section does not provide any new authority to the State of Alaska or any of its political subdivisions; it merely emphasizes that existing authority is not affected consistent with legal precedent and court decisions.

Further, the Committee recognizes that the State of Alaska has imposed regulations on vessel operators in state waters that are similar to the requirements of this Act. In exercising responsibility under title V, the Secretary should examine those state regulations to ensure that, where possible, a single standard is imposed on vessel owners and operators.

### Section 508—Environmental Assessment

Section 508 requires the Under Secretary for Oceans and Atmosphere of the Department of Commerce to spend $15 million during Fiscal Years 1990 through 1992 to assess and monitor the effects of the *Exxon Valdez* spill on the living marine resources of Prince William Sound. This section further requires the Secretary of Commerce, when possible, to recover the amounts expended from the owner or operator of the *Exxon Valdez*. Any amounts recovered are to be credited to the appropriations of the National oceanic and Atmospheric Administration. In carrying out activites under this section, the Under Secretary is expected to consult with local residents and significant local landowners of the Prince William Sound, Alaska, area; to coordinate monitoring and assessment work with the State of Alaska and the Prince William Sound Science and Technology Institute in Cordova, Alaska; and to utilize local services and expertise. As noted above, local knowledge, especially that of Alaska Native Corporations who are significant local landowners, is often invaluable and should be used to the maximum extent practicable.

### Section 509—Report

Section 509 requires the Secretary to report on all oil pollution exercises in the Port of Valdez and Prince William Sound during the operation of the Trans-Alaska Pipeline, and any other matters the Secretary may deem appropriate. As a general matter, the Committee recognizes that several of the provisions of this title are much more specific than those in other portions of the Act. Where a conflict exists, the Committee intends that these provisions should control for Prince William Sound.

#### TITLE VI—MISCELLANEOUS

### Section 601—Conforming Amendment to Title 33

This section is simply a conforming amendment to the Ports and Waterways Safety Act to insure that a vessel operates in accordance with the requirements of the National Contingency Plan.

93

*Section 602—Statutory Waivers*

This section narrows the authority to waive navigation and safety laws. The waiver authority would be limited to part B, which deals with inspection and regulation of vessels; part C, which deals with load lines of vessels; part F (except section 8103), which deals with manning of vessels; part H, which deals with documentation of vessels.

The amendment further clarifies that crises warranting waviers are limited to those involving national defense or discharges, or threats of discharges, of oil or hazardous substances into or on the navigable waters or exclusive economic zone of the United States.

This section authorizes the Secretary to grant a waiver on his or her own initiative, or on the request of the head of another department, agency, or instrumentality of the United States Government.

A waiver granted under this section must state the reason for the waiver and state which requirements of law are being waived. In addition, the waiver must be for a specified period of time, not to exceed one year, may not be renewed, and must terminate when qualified individuals or vessels are available.

Subsection (b) is a conforming amendment that repeals the existing authority for waivers contained in the chapter 1 note of title 46, United States Code.

*Section 603—Studies and Reports as Administrative Expenses*

This section provides that the costs of conducting the studies and issuing the reports required under this Act, and the Federal expenses incurred under section 311(j) of the Clean Water Act are to be considered administrative expenses of the Federal Government for purposes of section 9509 of the Internal Revenue Code. This section of the Code establishes the Oil Spill Liability Trust Fund. The reports and studies required in sections 420 (Study on tanker navigation safety standards), section 421 (Dredge modification study), section 422 (Use of liners), section 509 (Report), and Federal expenses incurred under section 311(j) of the Clean Water Act.

*Section 604—Savings Clause*

This section clarifies that this Act does not affect admiralty and maritime law or the jurisdiction of the district courts of the United States with respect to civil actions under admiralty and maritime jurisdiction, saving to suitors in all cases other remedies to which they are otherwise entitled. Article III, clause 2, of the Constitution creates the admiralty and maritime law of the United States. This section is intended to clarify that this Act does not supercede that law, nor does it change the jurisdiction of the district courts under section 1333 of Title 28, United States Code (the codified section of the Judiciary Act of 1789). It is not the intent of the Committee on this Act or change the jurisdiction in incidents that are within the admiralty and maritime laws of the United States.

*Section 6105—Qualified Authorizing Legislation*

This section provides that this Act meets the requirements of section 4611(f)(2)(B) of the Internal Revenue Code of 1986.

94

## Compliance With Clause 7, Rule XIII

In accordance with paragraph (d) of this clause, the provisions of this clause do not apply where a cost estimate and comparison prepared by the Director of the Congressional Budget Office has been prepared and included in the report.

## Inflationary Impact Statement

Pursuant to clause a(1)(4) of rule XI of the Rules of the House of Representatives, the Committee has assessed the potential for inflationary impact and has concluded that such impact is minimal.

This legislation implements the collection of a tax of 1.3 cents per barrel on oil, but this will replace the 5-cent per barrel fee now assessed against Alaska Pipeline oil under the Trans-Alaska Pipeline Act, the 3 cents per barrel tax assessed against OCS oil under the Outer Continental Shelf Lands Act Amendments, and all of the appropriated funds now required to clean up oil spills under section 311 of the Federal Water Pollution Control Act. It will also replace the 2 cents per barrel tax on oil off-loaded at deepwater ports under the Deepwater Ports Act. The net impact of H.R. 1465 on consumers of oil, therefore, will be infinitesimal. In addition, the comprehensive nature of the legislation will eliminate some duplicative programs at the state and federal level, thereby simplfying administrative problems, and resulting in reduced demands on the bureaucracy.

## Compliance With Clause (l)(3), Rule XI

With respect to the requirements of clause 2(l)(3) of rule XI of the Rules of The House of Representatives:

(A) The Subcommittee on Coast Guard and Navigation held a hearing on the March 24, 1989, spill of over 10 million gallons of crude oil from the tanker *Exxon Valdez* into Prince Williams Sound, Alaska on April 6, 1989. The Subcommittee held a hearing on H.R. 1465, the Comprehensive Oil Spill Liability and Compensation Act of 1989 on May 11, 1989. The Subcommittee held two field hearings, one in Seattle, Washington, and one in Portland, Oregon, on June 16th and 17th, 1989, regarding oil spill response preparedness in the Pacific Northwest. The Subcommittee on Oversight and Investigations held a field hearing in Philadelphia, Pennsylvania, regarding the June 24, 1989, spill of over 300,000 gallons of refined number 6 oil from the tanker *Presidente Rivera* into the Delaware River on July 17, 1989. The Subcommittee on Oversight and Investigations held a field hearing in Newport, Rhode Island, on July 5, 1989, to review the facts surrounding the discharge of diesel oil from the *World Prodigy* on June 24, 1989. The subcommittee on Coast Guard and Navigation held a field hearing in Cardova, Alaska, on August 10, 1989, to review the ongoing cleanup of the massive oil spill from the *Exxon Valdez.*

(B) The requirements of section 308(a) of the Congressional Budget Act of 1974 are not applicable to this legislation.

(C) The Committee has received no report from the Committee on Government Operations of oversight findings and recommendations arrived at pursuant to clause 2 (b)(2) of Rule X.

95

(D) The Director of the Congressional Budget Office has furnished the Committee with an estimate and comparison of costs for H.R. 1465, as reported, pursuant to section 403 of the Congressional Report Act of 1974. That report follows:

[The Committee on Merchant Marine and Fisheries will file a supplemental report on H.R. 1465 when the Congressional Budget Office document is received.]

### DEPARTMENTAL REPORTS

Official Departmental Reports have been received from the Department of Transportation and the Department of Justice on titles I–III. Those reports follow:

THE SECRETARY OF TRANSPORTATION,
*Washington, DC, June 8, 1989.*

Hon. WALTER B. JONES,
*Chairman, Committee on Merchant Marine and Fisheries,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: The Department of Transportationa would appreciate your consideration of the Administration's views with respect to H.R. 1465, as reported by the Subcommittee on Coast Guard and Navigation, a bill "To establish limitations on liability for damages resulting from oil pollution, to establish a fund for the payment of compensation for such damages, and for other purposes."

The Administration commends the Committee for its leadership on comprehensive oil spill and legislation and the bipartisan effort embodied in H.R. 1465. Although the Administration has some differences with the Committee, overall, we believe that H.R. 1465 is a good bill and we look forward to working with the Committee to resolve our few differences.

The Administration strongly supports the framework of H.R. 1465, which provides greatly needed protection for our marine environment from oil spills by assuring fair but high levels of financial responsibility for tankers, other vessels and facilities, backed up by an industry-financed fund based on a 1.3 cents per barrel fee on oil and ratification of the 1984 Protocols to the two oil spill treaties, the 1969 Civil Liability Convention and the 1971 FUND Convention.

The Administration's comprehensive oil spill bill, H.R. 2325, differs from H.R. 1465 philospphically, in some respects, and makes what we believe are some needed improvements. The primary goal of the Administration's legislation is protection of our marine environment. To that end, we believe that the Oil Spill Liability Trust Fund should be preserved exclusively for environmental protection, for the payment of removal and restoration expenses, and should not be subject to dilution by the payment of economic damages to third party claimants. Consistent with this philosophy, the Administration supports the preemption of state liability statutes only to the extent necessary to implement the 1984 Protocols and supports the creation of a Federal cause of action whereby claimants suffering economic damages in excess of the responsible party's liability limits could sue for repayment in Federal court using their own

96

state laws. To the extent that a domestic tanker spill is covered by the Protocols, the spiller (or responsible party) and the international fund would provide up to $260 million for the payment of economic damages.

The Administration also requests the Committee's consideration of several specific amendments to H.R. 1465. First, we recommend raising the per incident level of tanker liability to $78 million. Second, when the Oil Spill Liability Trust Fund was established in section 4611 of the Internal Revenue Code of 1986, a five-year collection period was intended in order to fully finance the fund. With the passage of years without enactment of triggering legislation, the financing period has diminished. We recommend extending the period of collection of the 1.3 cents per barrel fee to the full five years in order to assure adequate financing of the fund. Both H.R. 1465 and H.R. 2325 contain direct draw provisions whereby preauthorized state representatives may make immediate draws upon the fund for emergency cleanup. We believe that $50,000 is an adequate and prudent level for the direct draw and recommend that the level in AH.R. 1465 be lowered accordingly.

We would also like to recommend a few features of H.R. 2325 that we believe would enhance H.R. 1465. Although high liability levels, the international treaties and the availability of $500,000,000 from a domestic fund provide dramatically improved compenasation over that available under current law, nevertheless, in the rare event that restoration and rehabilitation costs would exhaust even these generous levels, we believe that a Presidential waiver of the fund cap would be advisable. We also suggest inclusion in H.R. 1465 of a civil penalty provision of up to $10 million for natural resources that have been damaged so badly that they cannot be restored or replaced. Lastly, it may take many years before all of the claims resulting from the *Exxon Valdez* grounding in Prince William Sound on March 24, 1989, are settled. We recommend that the balance in the fund established under the Trans Alaska Pipeline Authorization Act be retained until all of those claims are settled, rather than rebated as under H.R. 1465.

At the Coast Guard and Navigation Subcommittee markup on May 1989, four amendments were adopted by the subcommittee, two proposals by Congeressman Studds, one proposal by Congressman Shumway and an en bloc series of amendments.

Amendment number one, offered by Congressman Studds, is intended to clarify that the Limitation of Liability Act will not apply to the responsible party's level of liability under H.R. 1465. The Administration supports this amendment. Amendment number three, offered by Congressman Studds, is intended to confer on the President the authority to issue orders and seek injunctive relief through court action and to compel parties to clean up oil spills. The intent of this amendment is similar to the enforcement authority contained in section 206 of H.R. 2325; however the approach taken is different. The Administration supports the amendment in concept.

Mr. Shumway's amendment extends the preemption provision in H.R. 1465 so that the comprehensive Federal regime established under this legislation would be the sole mechanism for recovery of removal costs and damages associated with an oil spill, specifically

`97

excluding the use of state funds for covered expenses. The Administration's position on preemption is clear. We support the preeemption of state liability laws only to the extent necessary to implement the Protocols and oppose anything less or more extensive.

Finally, a series of changes to H.R. 1465 were passed in the form of an en bloc amendment. The Administraiton is generally supportive of these changes but would like the opportunity to work with Committee staff on technical improvements.

The Administration is committed to the passage of comprehensive oil spill liability and compenation legislation in the first session of the 101st Congress. The Department of Transportation looks forward to the passage of such legislation and would welcome an opportunity to assist the Committee in any way possible.

The Office of Management and Budget has advised that, from the standpoint of the Administration's program, there is no objection to the submission of this report to the Congress.

Sincerely,

SAMUEL K. SKINNER.

———

U.S. DEPARTMENT OF JUSTICE,
OFFICE OF LEGISLATIVE AFFAIRS,
*Washington, DC, June 20, 1989.*

Hon. WALTER B. JONES,
*Chairman, Merchant Marine and Fisheries Committee,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: The Department of Justice has reviewed H.R. 1465, and would like to offer several comments to supplement those earlier offered by the Department of Transportation. We, of course, concur in those comments.

In keeping with the Administration's view that the Fund created through industry contributions should be reserved for removal and enivronmental restoration costs, we do not support the amendments accepted by the Subcommittee which significantly broaden uses of the Fund. For example, while vessel traffic systems are useful, as the Secretary has testified they are not positive control systems, and there is no firm evidence that their broader use would have averted any recent spills. Further, they are used for providing information to all vessel traffic, not merely oil tankers, and have traditionally been funded through Coast Guard appropriations. There is no compelling reason now to place that burden on an oil spill clean-up fund. Similarly, "research and development" could be a virtually unending drain on the resources of the Fund.

The Department of the Treasury has calculated that collection of the 1.3 cent tax will not bring the Fund to its authorized level in the remaining period currently authorized under H.R. 1465. However, expenditures for creation of strike teams and purchase of additional VTS radar equipment would undoubtedly begin immediately. In light of those two considerations, it is not unlikely that another major spill would find the new Fund in the same impecunious condition as that of the Clean Water Act's 311(k) fund at the time of the *Exxon Valdez* disaster. Congress can certainly author-

ize funding for maintenance of strike teams without placing these considerable immediate and on-going burdens on the Fund.

We should also note that added uses of the Fund may jeopardize the ability of the fee now set in Section 9509 of the Internal Revenue Code to cover all authorized expenditures.

While we can support in principle the amendment offered by Cong. Studds giving the President additional injunctive authority to order clean-up activities, the language contained in the Administration bill reflects more precisely and fully changes found to be desirable or necessary in the experience of the agencies charged with enforcement of the Clean Water Act. These proposed amendments to the Clean Water Act are designed to strengthen the President's authority to deal effectively with spills, and increase penalties for violators. We urge the Committee to consider them.

The Administration bill's definitions of "facility" and "public facility" make clear the exclusion of federal facilities from strict liability for oil spills. We urge the Committee to substitute them in H.R. 1465. In our judgment the Subcommittee amendment will not suffice to deal with this problem.

The eighth en bloc amendment, with a stated purpose to extend liability to vessels causing spills, does so only in part. While the change to Line 18 on Page 38 does extend liability to guarantors of vessels causing spills, the second change made by the amendment actually eliminates a cause of action presently available to the government or a spiller under the Clean Water Act against a vessel which is partially responsible for causing a spill. While we understand the Subcommittee's desire to construct through H.R. 1465 an exclusive liability regime for oil spills, we believe this particular deletion to be undesirable unless that cause of action is incorporated elsewhere in the language of the bill.

Section 107(a)(4) of H.R. 1465 gives the President authority only to seize a vessel, and no forfeiture or other disposal authority. It is likely that the authorities contained in the first three paragraphs of Section 107(a) are sufficient to enforce the financial responsibility requirements, without this paragraph.

Section 107(d) gives a guarantor the defense of willful misconduct on the part of the spiller. This would lead to the anomalous result that a spiller could act willfully and evade liability for his actions (if he has no assets) since his guarantor would not be required to pay for clean-up. A guarantor can deal with willful acts in his contract with the vessel owner.

Section 107(f)(1) should provide for a civil penalty, "not to exceed $25,000 per day of each violation . . . ." The section should also provide that judicial review of a civil penalty assessment shall be conducted only on the administrative record.

The Office of Management and Budget has advised that, from the standpoint of the Administration's program, there is no objection to the submission of this report to the Congress.

Sincerely,

JOHN P. MACKEY,
*Deputy Assistant Attorney General.*

99

CHANGES IN EXISTING LAW

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, as amended, changes in existing law made by the bill, as reported are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

43 U.S.C. 1653

### § 1653. Liability for damages

\*      \*      \*      \*      \*      \*      \*

(b) Control and removal of pollutants at expense of right-of-way holder.—If any area *in the State of Alaska* within or without the right-of-way on permit area granted under this chapter is polluted by any activities *related to the Trans-Alaska oil pipeline* conducted by or on behalf of the holder to whom such right-of-way or permit was granted, and such pollution damages or threatens to damage aquatic life, wildlife, or public or private property, the control and total removal of the pollutant shall be at the expense of such holder, including any administrative and other costs incurred by the Secretary or any other Federal officer or agency. Upon failure of such holder to adequately control and remove such pollutant, the Secretary, in cooperation with other Federal, State, or local agencies, or in cooperation with such holder, or both, shall have the right to accomplish the control and removal at the expense of such holder. *This subsection shall not apply to removal costs covered by the Oil Pollution Prevention, Removal Liability, and Compensation Act of 1989.*

[(c) Discharges of oil from vessels loaded at terminal facilities of pipeline; strict liability; limitation on liability; apportionment of liability; establishment and operation of Trans-Alaska Pipeline Liability Fund.—

[(1) Notwithstanding the provisions of any other law, if oil that has been transported through the Trans-Alaska pipeline is loaded on a vessel at the terminal facilities of the pipeline, the owner and operator of the vessel (jointly and severally) and the Trans-Alaska Pipeline Liability Fund established by this subsection, shall be strictly liable without regard to fault in accordance with the provisions of this subsection for all damages, including clean-up costs, sustained by any person or entity, public or private, including residents of Canada, as the result of discharges of oil from such vessel.

[(2) Strict liability shall not be imposed under this subsection if the owner or operator of the vessel, or the Fund, can prove that the damages were caused by an act of war or by the negligence of the United States or other governmental agency. Strict liability shall not be imposed under this subsection with respect to the claim of a damaged party if the owner or operator of the vessel, or the Fund, can prove that the damage was caused by the negligence of such party.

[(3) Strict liability for all claims arising out of any one incident shall not exceed $100,000,000. The owner and operator of

the vessel shall be jointly and severally liable for the first $14,000,000 of such claims that are allowed. Financial responsibility for $14,000,000 shall be demonstrated in accordance with the provisions of section 1321(p) of Title 33 before the oil is loaded. The Fund shall be liable for the balance of the claims that are allowed up to $100,000,000. If the total claims allowed exceed $100,000,000, they shall be reduced proportionately. The unpaid portion of any claim may be asserted and adjudicated under other applicable Federal or state law.

〔(4) The Trans-Alaska Pipeline Liability Fund is hereby established as a non-proft corporate entity that may sue and be sued in its own name. The Fund shall be administered by the holders of the trans-Alaska pipeline right-of-way under regulations prescribed by the Secretary. The Fund shall be subject to an annual audit by the Comptroller General, and a copy of the audit shall be submitted to the Congress.

〔(5) The operator of the pipeline shall collect from the owner of the oil at the time it is loaded on the vessel a fee of five cents per barrel. The collection shall cease when $100,000,000 has been accumulated in the Fund, and it shall be resumed when the accumulation in the Fund falls below $100,000,000.

〔(6) The collections under paragraph (5) shall be delivered to the Fund. Costs of administration shall be paid from the money paid to the Fund, and all sums not needed for administration and the satisfaction of claims shall be invested prudently in income-producing securities approved by the Secretary. Income from such securities shall be added to the principal of the Fund.

〔(7) The provisions of this subsection shall apply only to vesseals engaged in transportation between the terminal facilities of the pipeline and ports under the jurisdiction of the United States. Strict liability under this subsection shall cease when the oil has first been brought ashore at a port under the jurisdiction of the United States.

〔(8) In any case where liability without regard to fault is imposed pursuant to this subsection and the damages involved were caused by the unseaworthiness of the vessel or by negligence, the owner and operator of the vessel, and the Fund, as the case may be shall be subrogated under applicable State and Federal laws to the rights under said laws of any person entitled to recovery hereunder. If any subrogee brings an action based on unseaworthiness of the vessel or negligence of its owner or operator, if may recover from any affiliate of the owner or operator, if the respective owner or operator fails to satisfy any claim by the subrogee allowed under this paragraph.

〔(9) This subsection shall not be interpreted to preempt the field of strict liability or to preclude any State from imposing additional requirements.

〔(10) If the Fund is unable to satisfy a claim asserted and finally determined under this subsection, the Fund may borrow the money needed to satisfy the claim from any com-

101

mercial credit source, at the lowest available rate of interest, subject to approval of the secretary.

〔(11) For purposes of this subsection only, the term "affiliate" includes—

〔(A) Any person owned or effectively controlled by the vessel owner or operator; or

〔(B) Any person that effectively controls or has the power effectively to control the vessel owner or operator by—

〔(i) stock interest, or

〔(ii) representation on a board of directors or similar body, or

〔(iii) contract or other agreement with other stockholders, or

〔(iv) otherwise; or

〔(C) Any person which is under common ownership or control with the vessel owner or operator.

〔(12) The term "person" means an individual, a corporation, a partnership, an association, a joint-stock company, a business trust, or an unincorporated organization.〕

\*        \*        \*        \*        \*        \*        \*

INTERVENTION OF THE HIGH SEAS ACT, SEC. 17, 33 U.S.C. 1486

〔SEC. 17. The revolving fund established under section 311(k) of the Federal Water Pollution Control Act shall be available to the Secretary for Federal actions and activities under section 5 of this Act.〕

*SEC. 17. The Oil Spill Liability Trust Fund shall be available to the Secretary for actions taken under sections 5 and 7 of this Act.*

————————

33 U.S.C. 1503

§ 1503. License for ownership, construction, and operation of deepwater port

\*        \*        \*        \*        \*        \*        \*

(c) Conditions for issuance.—The Secretary may issue a license in accordance with the provisions of this Chapter if—

(1) he determines that the applicant is financially responsible and will meet the requirements of 〔section 1517(*l*) of this title;〕 *section 107 of the Oil Pollution Prevention, Removal, Liability, and Compensation Act of 1989;*

\*        \*        \*        \*        \*        \*        \*

————————

33 U.S.C. 1517

§ 1517. Liability

(a) Oil discharge; prohibition; penalty; notice and hearing; separate offense; vessel clearance; withholding, bond or surety.—

102

(1) The discharge of oil into the marine environment from a vessel within any safety zone, from a vessel which has received oil from another vessel at a deepwater port, or from a deepwater port is prohibited.

(2) The owner or operator of a vessel or the licensee of a deepwater port from which oil is discharged in violation of this subsection shall be assessed a civil penalty of not more than $10,000 for each violation. No penalty shall be assessed unless the owner or operator or the licensee has been given notice and opportunity for a hearing on such charge. Each violation is a separate offense. The Secretary of the Treasury shall withhold, at the request of the Secretary, the clearance requirement by section 91 of Title 46, of any vessel the owner or operator of which is subject to the foregoing penalty. Clearance may be granted in such cases upon the filing of a bond or other surety satisfactory to the Secretary.

〔(b) Oil discharge; notification; penalty, use of notification in criminal cases limited.—Any individual in charge of a vessel or a deepwater port shall notify the Secretary as soon as he has knowledge of a discharge of oil. Any such individual who fails to notify the Secretary immediately of such discharge shall, upon conviction, be fined not more than $10,000 or imprisoned for not more than 1 year, or both. Notification received pursuant to this subsection, or information obtained by the use of such notification, shall not be used against any such individual in any criminal case, except a prosecution for perjury or for giving a false statement.〕

〔(c)〕 *(b)* Oil removal; drawing upon Fund money for cleanup costs.—

(1) Whenever any oil is discharged from a vessel within any safety zone, from a vessel which has received oil from another vessel at a deepwater port, or from a deepwater port, the Secretary shall remove or arrange for the removal of such oil as soon as possible, unless he determines such removal will be done properly and expeditiously by the licensee of the deepwater port or the owner or operator of the vessel from which the discharge occurs.

(2) Removal of oil and actions to minimize damage from oil discharges shall, to the greatest extent possible, be in accordance with the National Contingency Plan for removal of oil and hazardous substances established pursuant to section 1321(c)(2) of this title.

(3) Whenever the Secretary acts to remove a discharge of oil pursuant to this subsection, he is authorized to draw upon money available in the 〔Deepwater Port Liability Fund established pursuant to subsection (f) of this section.〕 *Oil Spill Liability Trust Fund.* Such money shall be used to pay promptly for all cleanup costs incurred by the Secretary in removing or in minimizing damage caused by such oil discharge.

〔(d) Joint and several liability of owners and operators; limitation of liability; full amount of liability for gross negligence or willful misconduct.—Notwithstanding any other provision of law, except as provided in subsection (g) of this section, the owner and operator of a vessel shall be jointly and severally liable, without regard to fault, for cleanup costs and for damages that result from

103

a discharge of oil from such vessel within any safety zone, or from a vessel which has received oil from another vessel at a deepwater port while located in the safety zone, except when such vessel is moored at a deepwater port. Such liability shall not exceed $150 per gross ton or $20,000,000, whichever is lesser, except that if it can be shown that such discharge was the result of gross negligence or willful misconduct within the privity and knowledge of the owner or operator, such owner and operator shall be jointly and severally liable for the full amount of all cleanup costs and damage.

〔(e) Liability of licensees; limitation of liability; full amount of liability for gross negligence or willful misconduct.—Notwithstanding any other provision of law, except as provided in subsection (g) of this section, the licensee of a deepwater port shall be liable, without regard to fault, for cleanup costs and damages that result from a discharge of oil from such deepwater port or from a vessel moored at such deepwater port. Such liability shall not exceed $50,000,000, except that if it can be shown that such damage was the result of gross negligence or willful misconduct within the privity and knowledge of the licensee, such licensee shall be liable for the full amount of all cleanup costs and damages.

〔(f) Deepwater Port Liability Fund; establishment; suits; administration; liability for uncompensated cleanup costs and damages; fees and exemptions; maintenance of prescribed amount of money; loans from Treasury for payment of claims, interest; appropriation for administration costs; income form investments to principal of Funds.—

〔(1) There is established a Deepwater Port Liability Fund (hereinafter referred to as the "Fund") as a nonprofit corporate entity which may sue or be sued in its own name. The fund shall be administered by the Secretary.

〔(2) The Fund shall be liable, without regard to fault, for all cleanup costs and all damages in excess of those actually compensated pursuant to subsections (d) and (e) of this section.

〔(3) Each licensee shall collect from the owner of any oil loaded or unloaded at the deepwater port operated by such licensee, at the time of loading or unloading, a fee of 2 cents per barrel, except that (A) bunker or fuel oil for the use of any vessel, and (B) oil which was transported through the trans-Alaska pipeline, shall not be subject to such collection. Such collections shall be delivered to the Fund at such times and in such manner as shall be prescribed by the Secretary. These collections shall cease after September 25, 1984, unless there are adjudicated claims against the Fund to be satisfied. The Secretary may order the collection of the fee to be resumed when the unobligated balance of the Fund as reduced by the unliquidated debts to the United States Treasury is less than $4,000,000. Any collection of fees ordered by the Secretary under the preceding sentence shall cease whenever the unobligated balance of the Fund as reduced by the unliquidated debts to the United States Treasury exceeds $4,000,000. The Fund may borrow from the United States Treasury at an interest rate to be determined by the Secretary of the Treasury amounts sufficient to maintain the available balance in the

Fund at $4,000,000, but only to such extent and in such amounts as are provided in advance in appropriation Acts. Such amounts shall remain available until expended. Whenever the money in the Fund is less than the amount the Secretary determines is needed to draw upon under subsection (c)(3) of this section or the claims or the claims for cleanup costs and damages for which is it liable under this section, the Fund shall borrow the balance required to pay such claims from the United States Treasury at an interest rate determined by the Secretary of the Treasury. Costs of administration shall be paid from the fund only after appropriation in an appropriation bill. All sums not needed to draw upon under subsection (c)(3) of this section or for administration and the satisfaction of claims shall be prudently invested in income-producing securities issued by the United States and approved by the Secretary of the Treasury. Income from such securities shall be applied to the principal of the Fund.

〔(g) Defenses; act of war; negligence of Federal Government; negligence of claimant.—Liability shall not be imposed under subsection (d) or (e) of this section if the owner or operator of a vessel or the licensee can show that the discharge was caused solely by (1) an act of war, or (2) negligence on the part of the Federal Government in establishing and maintaining aids to navigation. In addition, liability with respect to damages claimed by a damaged party shall not be imposed under subsection (d), (e), or (f) of this section if the owner or operator of a vessel, the licensee, or the Fund can show that such damage was caused solely by the negligence of such party.

〔(h) Subrogation; joint and several liability; third party liability; recovery of reasonable cleanup cost of discharge caused by act of war or negligence of the Federal Government:—

〔(1) In any case where liability is imposed pursuant to subsection (d) of this section, if the damage was the result of the negligence of the licensee, the owner or operator of a vessel held liable shall be subrogated to the rights of any person entitled to recovery against such licensee.

〔(2) In any case where liability is imposed pursuant to subsection (e) of this section, if the discharge was the result of the unseaworthiness of a vessel or the negligence of the owner or operator of such vessel, the licensee shall be subrogated to the rights of any person entitled to recovery against such owner or operator. In that event, the owner and operator of the vessel are jointly and severally liable for cleanup costs and damages resulting from that discharge in the same manner and to the same extent as under subsection (d) of this section.

〔(3) Payment of compensation for any damages pursuant to subsection (f)(2) of this section shall be subject to the Fund acquiring by subrogation all rights of the claimant to recover for such damages from any other person. When the Fund under this subsection is subrogated to the right of any person entitled to recovery against the owner or operator of a vessel, that owner and operator are jointly and severally liable for cleanup costs and damages resulting from that discharge in the same

105

manner and to the same extent as under subsection (d) of this section.

〔(4) The liabilities established in this section shall in no way affect or limit any rights which the licensee, the owner, or operator of a vessel, or the Fund may have against any third party whose act may in any way have caused or contributed to a discharge of oil.

〔(5) In any case where the owner or operator of a vessel or the licensee of a deepwater port from which oil is discharged acts to remove such oil in accordance with subsection (c)(1) of this section, such owner or operator or such licensee shall be entitled to recover from the Fund the reasonable cleanup cost incurred in such removal if he can show that such discharge was caused solely by (A) an act of war or (B) negligence on the part of the Federal Government in establishing and maintaining aids to navigation.

〔(i) Class actions: Attorney General, member of group; notice, publication in Federal Register and newspapers; trustee's action for damages to natural resources of marine environment; restoration and rehabilitation of such resources.—

〔(1) The Attorney General may act on behalf of any group of damaged citizens he determines would be more adequately represented as a class in recovery of claims under this section. Sums recovered shall be distributed to the members of such group. If, within 90 days after a discharge of oil in violation of this section has occurred, the Attorney General fails to act in accordance with this paragraph, to sue on behalf of a group of persons who may be entitled to compensation pursuant to this section for damages caused by such discharge, any member of such group may maintain a class action to recover such damages on behalf of such group. Failure of the Attorney General to act in accordance with this subsection shall have no bearing on any class action maintained in accordance with this paragraph.

〔(2) In any case where the number of members in the class exceeds 1,000, publishing notice of the action in the Federal Register and in local newspapers serving the areas in which the damaged parties reside shall be deemed to fulfill the requirement for public notice established by rule 23(c)(2) of the Federal Rules of Civil Procedure.

〔(3) The Secretary may act on behalf of the public as trustee of the natural resources of the marine environment to recover for damages to such resources in accordance with this section. Sums recovered shall be applied to the restoration and rehabilitation of such natural resources by the appropriate agencies of Federal or State government.

〔(j) Procedures for filing and payment of claims for cleanup costs and damages; limitations; appeals.

〔(1) The Secretary shall establish by regulation procedures for the filing and payment of claims for cleanup costs and damages pursuant to this chapter.

〔(2) No claims for payment of cleanup costs or damages which are filed with the Secretary more than 3 years after the

106

date of the discharge giving rise to such claims shall be considered.

〖(3) Appeals from any final determination of the Secretary pursuant to this section shall be filed not later than 30 days after such determination in the United States Court of Appeals of the circuit within which the nearest adjacent coastal State is located.〗

〖(k)〗 *(c)* Federal preemption unintended; additional State requirements or liability; bar against multiple recoveries.—

(1) This section shall not be interpreted to preempt the field of liability or to preclude any State from imposing additional requirements or liability for any discharge of oil from a deepwater port or a vessel within any safety zone.

(2) Any person who receives compensation for damages pursuant to this section shall be precluded from recovering compensation for the same damages pursuant to any other State or Federal law. Any person who receives compensation for damages pursuant to any other Federal or State law shall be precluded from receiving compensation for the same damages as provided in this section.

〖(l) Financial responsibility.—The Secretary shall require that any owner or operator of a vessel using any deepwater port, or any licensee of a deepwater port, shall carry insurance or give evidence of other financial responsibility in an amount sufficient to meet the liabilities imposed by this section.〗

〖(m)〗 *(d)* Definitions.—As used in this section the term—

〖(1) "cleanup costs" means all actual costs, including but not limited to costs of the Federal Government, of any State or local government, of other nations or of their contractors or subcontractors incurred in the (A) removing or attempting to remove, or (B) taking other measures to reduce or mitigate damages from, any oil discharged into the marine environment in violation of subsection (a)(1) of this section;

〖(2) "damages" means all damages (except cleanup costs) suffered by any person, or involving real or personal property, the natural resources of the marine environment, or the coastal environment of any nation, including damages claimed without regard to ownership of any affected lands, structures, fish, wildlife, or biotic or natural resources;〗

〖(3)〗 *(1)* "discharge" includes, but is not limited to, any spilling, leaking, pumping, pouring, emitting, emptying, or dumping into the marine environment of quantities of oil determined to be harmful pursuant to regulations issued by the Administrator of the Environmental Protection Agency; and

〖(4)〗 *(2)* "owner or operator" means any person owning, operating, or chartering by demise, a vessel.

〖(n) Study for a uniform law for cleanup costs and damages from oil spills; adjudication and settlement of claims; report to Congress.—

〖(1) The Attorney General, in cooperation with the Secretary, the Secretary of State, the Secretary of the Interior, the Administrator of the Environmental Protection Agency, the Council on Environmental Quality, and the Administrative Conference of the United States, is authorized and directed to

study methods and procedures for implementing a uniform law providing liability for cleanup costs and damages from oil spills from Outer Continental Shelf operations, deepwater ports, vessels, and other ocean-related sources. The study shall give particular attention to methods of adjudicating and settling claims as rapidly, economically, and equitably as possible.

【(2) The Attorney General shall report the results of his study together with any legislative recommendations to the Congress within 6 months after January 3, 1975.】

---

### 33 U.S.C. 1518

#### § 1518. Relationship to other laws

(a) Federal Constitution, laws, and treaties applicable; other Federal requirements applicable; status of deepwater port; Federal or State authorities and responsibilities within territorial seas unaffected; notification by Secretary of State of intent to exercise jurisdiction; objections by foreign governments.—

(1) The Constitutions, laws, and treaties of the United States shall apply to a deepwater port licensed under this chapter and to activities connected, associated, or potentially interfering with the use or operation of any such port, in the same manner as if such port were an area of exclusive Federal jurisdiction located within a State. Nothing in this chapter shall be construed to relieve, exempt, or immunize any person from any other requirement imposed by Federal law, regulation, or treaty *except that discharges from a deepwater port or from a vessel within a deepwater port safety zone which are subject to the civil penalty provisions of section 18(a)(2) of the Deepwater Port Act of 1974 shall not be subject to the penalty provisions of any other Federal law.* Deepwater ports licensed under this chapter do not possess the status of islands and have no territorial seas of their own.

\*        \*        \*        \*        \*        \*        \*

---

### P.L. 95–372, Title III 43 U.S.C. 1812 et seq.

#### 【TITLE III—OFFSHORE OIL SPILL POLLUTION FUND

##### 【DEFINITIONS

【Sec. 301. For the purposes of this title, the term—

【(1) "Secretary" means the Secretary of Transportation;

【(2) "Fund" means the Offshore Oil Pollution Compensation Fund established under section 302 of this title;

【(3) "person" means an individual, firm, corporation, association, partnership, consortium, joint venture, or governmental entity;

【(4) "incident" means any occurrence or series of related occurrences, involving one or more offshore facilities or vessels, or any combination thereof, which causes or poses an imminent threat of oil pollution;

108

〔(5) "vessel" means every description of watercraft or other contrivance, whether or not self-propelled, which is operating in the waters above the Outer Continental Shelf (as the term "outer Continental Shelf" is defined in section 2(a) of the Outer Continental Shelf Lands Act (43 U.S.C. 1331(a))), or which is operating in the waters above submerged lands seaward from the coastline of a State (as the term "submerged lands" is described in section 2(a) of the Submerged Lands Act (43 U.S.C. 1301(a)(2))), and which is transporting oil directly from an offshore facility;

〔(6) "public vessel" means a vessel which—

〔(A) is owned or chartered by demise, and operated by (i) the United States, (ii) a State or political subdivision thereof, or (iii) a foreign government; and

〔(B) is not engaged in commercial service;

〔(7) "facility" means a structure, or group of structures (other than a vessel or vessels), used for the purpose of transporting, drilling for, producing, processing, storing, transferring, or otherwise handling oil;

〔(8) "offshore facility" includes any oil refinery, drilling structure, oil storage or transfer terminal, or pipeline, or any appurtenance related to any of the foregoing, which is used to drill for, produce, store, handle, transfer, process, or transport oil produced from the Outer Continental Shelf (as the term "outer Continental Shelf" is defined in section 2(a) of the Outer Continental Shelf Lands Act (43 U.S.C. 1331(a))), and is located on the Outer Continental Shelf, except that such term does not include (A) a vessel, or (B) a deepwater port (as the term "deepwater port" is defined in section 3(10) of the Deepwater Port Act of 1974 (33 U.S.C. 1502));

〔(9) "oil pollution" means)

〔(A) the presence of oil either in an unlawful quantity or which has been discharged at an unlawful rate (i) in or on the waters above submerged lands seaward from the coastline of a State (as the term "submerged lands" is described in section 2(a)(2) of the Submerged Lands Act (43 U.S.C. 1301(a)(2))), or on the adjacent shoreline of such a State, or (ii) on the waters of the contiguous zone established by the United States under Article 24 of the Convention on the Territorial Sea and the Contiguous Zone (15 UST 1606); or

〔(B) the presence of oil in or on the waters of the high seas outside the territorial limits of the United States—

〔(i) when discharged in connection with activities conducted under the Outer Continental Shelf Lands Act (43 U.S.C. 1331 et seq.); or

〔(ii) causing injury to or loss of natural resources belonging to, appertaining to, or under the exclusive management authority of, the United States; or

〔(C) the presence of oil in or on the territorial sea, navigable or internal waters, or adjacent shoreline of a foreign country, in a case where damages are recoverable by a foreign claimant under this title;

109

〖(10) "United States claimant" means any person residing in the United States, the Government of the United States or an agency thereof, or the government of a State or a political subdivision thereof, who asserts a claim under this title;

〖(11) "foreign claimant" means any person residing in a foreign country, the government of a foreign country, or any agency or political subdivision thereof, who asserts a claim under this title;

〖(12) "United States" includes and "State" means the several States of the United States, the District of Columbia, Commonwealth of Puerto Rico, the Canal Zone, Guam, American Samoa, the United States Virgin Islands, the Commonwealth of the Northern Mariana Islands, the Trust Territory of the Pacific Islands, and any other territory or possession over which the United States has jurisdiction;

〖(13) "oil" means petroleum, including crude oil or any fraction or residue therefrom;

〖(14) "cleanup costs" means costs of reasonable measures taken, after an incident has occurred, to prevent, minimize, or mitigate oil pollution from such incident;

〖(15) "damages" means compensation sought pursuant to this title by any person suffering any direct and actual injury proximately caused by the discharge of oil from an offshore facility or vessel, except that such term does not include cleanup costs;

〖(16) "person in charge" means the individual immediately responsible for the operation of a vessel or offshore facility;

〖(17) "claim" means a demand in writing for a sum certain;

〖(18) "discharge" means any emission, intentional or unintentional, and includes spilling, leaking, pumping, pouring, emptying, or dumping;

〖(19) "owner" means any person holding title to, or in the absence of title, any other indicia of ownership of, a vessel or offshore facility, whether by lease, permit, contract, license, or other form of agreement, or with respect to any offshore facility abandoned without prior approval of the Secretary of the Interior, the person who owned such offshore facility immediately prior to such abandonment, except that such term does not include a person who, without participating in the management or operation of a vessel or offshore facility, holds indicia of ownership primarily to protect his security interest in the vessel or offshore facility;

〖(20) "operator" means—

〖(A) in the case of vessel, a charterer by demise or any other person, except the owner, who is responsible for the operation, manning, victualing and supplying of the vessel; or

〖(B) in the case of an offshore facility, any person, except the owner, who is responsible for the operation of such facility by agreement with the owner;

〖(21) "property" means littoral, riparian, or marine property;

〖(22) "removal costs" means—

110

〔(A) costs incurred under subsection (c), (d), or (1) of section 311 of the Federal Water Pollution Control Act, and section 5 of the Intervention on the High Seas Act; and

〔(B) cleanup costs, other than the costs described in subparagraph (A);

〔(23) "guarantor" means the person, other than the owner or operator, who provides evidence of financial responsibility for an owner or operator;

〔(24) "gross ton" means a unit of 100 cubic feet for the purpose of measuring the total unit capacity of a vessel; and

〔(25) "barrel" means 42 United States gallons at 60 degrees Fahrenheit.

〔FUND ESTABLISHMENT, ADMINISTRATION, AND FINANCING

〔SEC. 302. (a) There is hereby established in the Treasury of the United States on Offshore Oil Pollution Compensation Fund in an amount not to exceed $200,000,000, except that such limitation shall be increased to the extent necessary to permit any moneys recovered or collected which are referred to in subsection (b)(2) of this section to be paid into the Fund. The Fund shall be administered by the Secretary and the Secretary of the Treasury as specified in this title. The Fund may sue and be sued in its own name.

〔(b) The Fund shall be composed of—

〔(1) all fees collected pursuant to subsection (d) of this section; and

〔(2) all other moneys recovered or collected on behalf of the Fund under section 308 or any other provision of this title.

〔(c) The Fund shall be immediately available for—

〔(1) removal costs described in section 301(22);

〔(2) the processing and settlement of claims under section 307 of this title (including the costs of assessing injury to, or destruction of natural resources); and

〔(3) subject to such amounts as are provided in appropriation Acts, all administrative and personnel costs of the Federal Government incident to the administration of this title, including, but not limited to, the claims settlement activities and adjudicatory and judicial proceedings, whether or not such costs are recoverable under section 308 of this title.

The Secretary is authorized to promulgate regulations designating the person or persons who may obligate available money in the Fund for such purposes.

〔(d)(1) The Secretary shall levy and the Secretary of the Treasury shall collect a fee of not to exceed 3 cents per barrel on oil obtained from the Outer Continental Shelf, which shall be imposed on the owner of the oil when such oil is produced.

〔(2) The Secretary of the Treasury, after consulting with the Secretary, may promulgate reasonable regulations relating to the collection of the fees authorized by paragraph (1) of this subsection and, from time to time, the modification thereof. Any modification shall become effective on the date specified in the regulation making such modification but no earlier than the ninetieth day following the date such regulation is published in the Federal Register. Any modification of the fee shall be designed to insure that the

Fund is maintained at a level of not less then $100,000,000 and not more than $200,000,000. No regulation that sets or modifies fees, whether or not in effect, may be stayed by any court pending completion of judicial review of such regulation.

〔(3)(A) Any person who fails to collect or pay any fee as required by any regulation promulgated under paragraph (2) of this subsection shall be liable for a civil penalty not to exceed $10,000, to be assessed by the Secretary of the Treasury, in addition to the fee required to be collected or paid and the interest on such fee at the rate such fee would have earned if collected or paid when due and invested in special obligations of the United States in accordance with subsection (e)(2) of this section. Upon the failure of any person so liable to pay any penalty, fee, or interest upon demand, the Attorney General may, at the request of the Secretary of the Treasury, bring an action in the name of the Fund against that person for such amount.

〔(B) Any person who falsifies records or documents required to be maintained under any regulation promulgated under this subsection shall be subject to prosecution for a violation of section 1001 of title 18, United States Code.

〔(4) The Secretary of the Treasury may, by regulation, designate the reasonably necessary records and documents to be kept by person from whom fees are to be collected pursuant to paragraph(1) of this subsection, and the Secretary of the Treasury and the Comptroller General of the United States shall have access to such records and documents for the purpose of audit and examination.

〔(e)(1) The Secretary shall determine the level of funding required for immediate access in order to meet potential obligations of the Fund.

〔(2) The Secretary of the Treasury may invest any excess in the Fund, above the level determined under paragraph (1) of this subsection, interest-bearing special obligations of the United States. Such special obligations may be redeemed at any time in accordance with the terms of the special issue and pursuant to regulations promulgated by the Secretary of the Treasury. The interest on, and the proceeds from the sale of, any obligations held in the Fund shall be deposited in and credited to the Fund.

〔(f) If at any time the moneys available in the Fund are insufficient to meet the obligations of the Fund, the Secretary shall issue to the Secretary of the Treasury notes or other obligations in the forms and denominations, bearing the interest rates and maturities, and subject to such terms and conditions as may be prescribed by the Secretary of the Treasury. Redemption of such notes or other obligations shall be made by the Secretary from moneys in the Fund. Such notes or other obligations shall bear interest at a rate determined by the Secretary of the Treasury, taking into consideration the average market yield on outstanding marketable obligations of comparable maturity. The Secretary of the Treasury shall purchase any notes or other obligations issued under this subsection and, for that purpose, he is authorized to use as a public debt transaction the proceeds from the sale of any securities issued under the Second Liberty Bond Act. The purpose for which securities may be issued under that Act are extended to include any purchase of such notes or other obligations. The Secretary of the

112

Treasury may at any time sell any of the notes or other obligations acquired by him under this subsection. All redemptions, purchases, and sales by the Secretary of the Treasury of such notes or other obligations shall be treated as public debt transactions of the United States.

〖DAMAGES AND CLAIMANTS

〖SEC. 303. (a) Claims, for the economic loss, arising out of or directly resulting from oil pollution, may be asserted for—

〖(1) removal costs; and

〖(2) damages, including—

〖(A) injury to, or destruction of, real or personal property;

〖(B) loss of use of real or personal property;

〖(C) injury to, or destruction of, natural resources:

〖(D) loss of use of natural resources;

〖(E) loss of profits or impairment of earning capacity due to injury to, or destruction of, real or personal property or natural resources; and

〖(F) loss of tax revenue for a period of one year due to injury to real or personal property.

〖(b) A claim authorized by subsection (a) of this section may be asserted—

〖(1) under paragraph (1), by any claimant, except that the owner or operator of a vessel or offshore facility involved in an incident may assert such a claim only if he can show—

〖(A)—that he is entitled to a defense to liability under section 304(c)(1) or 304(c)(2) or this title; or

〖(B) if not entitled to such a defense or liability, that he is entitled to a limitation of liability under section 304(b), except that if he is not entitled to such a defense to liability but is entitled to such a limitation of liability, such claim may be asserted only as to the removal costs incurred in excess of that limitation;

〖(2) under paragraphs (2) (A), (B), and (D), by any United States claimant if the property involved is owned or leased, or the natural resource involved is utilized, by the claimant:

〖(3) under paragraph (2)(C), by the President, as trustees for natural resources over which the Federal Government has sovereign rights or exercises exclusive management authority, or by any State for natural resources within the boundary of the State belonging to, managed by, controlled by, or appertaining to the State, and sums recovered under paragraph (2)(C) shall be available for use to restore, rehabilitate, or acquire the equivalent of such natural resources by the appropriate agencies of the Federal Government or the State, but the measure of such damages shall not be limited by the sums which can be used to restore or replace such resources;

〖(4) under paragraph (2)(E), by any United States claimant if the claimant derives at least 25 per centum of his earnings from activities which utilize the property or natural resource;

〖(5) under paragraph (2)(F), by the Federal Government and any State or political subdivision thereof;

113

〔(6) under paragraphs (2) (A) through (E), by a foreign claim-
ant to the same extent that a United States claimant may
assert a claim if—

〔(A) the oil pollution occurred in or on the territorial
sea, navigable waters or internal waters, or adjacent shore-
line of a foreign country of which the claimant is a resi-
dent;

〔(B) the claimant is not otherwise compensated for his
loss;

〔(C) the oil was discharged from an offshore facility or
from a vessel in connection with activities conducted
under the Outer Continental Shelf Lands Act (43 U.S.C.
1331 et seq.); and

〔(D) recovery is authorized by a treaty or an executive
agreement between the United States and the foreign
country involved, or the Secretary of State, in consultation
with the Attorney General and other appropriate officials,
certifies that such country provides a comparable remedy
for United States claimants:

〔(7) under paragraph (1) or (2), by the Attorney General, on
his own motion or at the request of the Secretary, on behalf of
any group of United States claimants who may assert a claim
under this subsection, when he determines that the claimants
would be more adequately represented as a class in asserting
their claims.

〔(c) If the Attorney General fails to take action under paragraph
(7) of subsection (b) within sixty days of the date on which the Sec-
retary designates a source under section 306 of this title, any
member of a group described in such paragraph may maintain a
class action to recover damages on behalf of that group. Failure of
the Attorney General to take action shall have no bearing on any
class action maintained by any claimant for damages authorized by
this section.

〔LIABILITY

〔SEC. 304. (a) Subject to the provisions of subsection (b) and (c) of
this section, the owner and operator of a vessel other than a public
vessel, or of an offshore facility, which is the source of oil pollution,
or poses a threat of oil pollution in circumstances which justify the
incurrence of the type of costs described in section 301 (22) of this
title, shall be jointly, severally, and strictly liable for all loss for
which a claim may be asserted under section 303 of this title.

〔(b) Except when the incident is caused primarily by willful mis-
conduct or gross negligence, within the privity or knowledge of the
owner or operator, or is caused primarily by a violation, within the
privity or knowledge of the owner or operator, of applicable safety,
construction, or operating standards or regulations of the Federal
Government, the total of the liability under subsection (a) of this
section incurred by, or on behalf of, the owner or operator shall
be—

〔(1) in the case of a vessel, limited to $250,000 to $300 per
gross ton, whichever is greater, except when the owner or oper-
ator of a vessel fails or refuses to provide all reasonable coop-

114

eration and assistance requested by the responsible Federal official in furtherance of cleanup activities; or

⟦(2) in the case of an offshore facility, the total of removal and cleanup costs, and an amount limited to $35,000 for all damages.

⟦(c) There shall be no liability under subsection (a) of this section—

⟦(1) if the incident is caused solely by any act of war, hostilities, civil war, or insurrection, or by an unanticipated grave natural disaster or other natural phenomenon of an exceptional, inevitable, and irresistable character, the effect of which could not have been prevented or avoided by the exercise of due care or foresight; or

⟦(2) if the incident is caused solely by the negligent or intentional act of the damaged party or any third party (including any government entity).

⟦(d) Notwithstanding the limitations, exceptions, or defenses of subsection (b) or (c) of this section, all costs of removal incurred by the Federal Government or any State or local official or agency in connection with a discharge of oil from any offshore facility or vessel shall be borne by the owner and operator of the offshore facility or vessel from which the discharge occurred.

⟦(e) The Secretary shall, from time to time, report to Congress on the desirability of adjusting the monetary limitation of liability specified in subsection (b) of this section.

⟦(f)(1) Subject to the provisions of paragraph (2) of this subsection, the Fund shall be liable, without any limitation, for all losses for which a claim may be asserted under section 303 of this title, to the extent that such losses are not otherwise compensated.

⟦(2) Except for the removal costs specified in section 301 (22), there shall be no liability under paragraph (1) of this subsection.

⟦(A) as to a particular claimant, where the incident or economic loss is caused, in whole or in part, by the gross negligence or willful misconduct of that claimant; or

⟦(B) as to a particular claimant, to the extent that the incident or economic loss is caused by the negligence of that claimant.

⟦(g)(1) In addition to the losses for which claims may be asserted under section 303 of this title, and without regard to the limitation of liability provided in subsection (b) of this section, the owner, operator, or guarantor of an offshore facility or vessel shall be liable to the claimant for interest on the amount paid in satisfaction of the claim for the period from the date upon which the claim is presented to such person to the date upon which the claimant is paid, inclusive, less the period, if any, from the date upon which such owner, operator, or guarantor offers the claimant an amount equal to or greater than the amount finally paid in satisfaction of the claim to the date upon which the claimant accepts such amount, inclusive. However, if such owner, operator, or guarantor offers the claimant, within sixty days of the date upon which the claim is presented, or of the date upon which advertising is commenced pursuant to section 306 of this title, whichever is later, an amount equal to or greater than the amount finally paid in satisfaction of the claim, the owner, operator, or guarantor shall be liable for the

115

interest provided in this paragraph only from the date the offer is accepted by the claimant to the date upon which payment is made to the claimant, inclusive.

〔(2) The interest provided in paragraph (1) of this subsection shall be calculated at the average of the highest rate for commercial and finance company paper of maturities of one hundred and eighty days or less obtaining on each of the days included within the period for which interest must be paid to the claimant, as published in the Federal Reserve Bulletin.

〔(h) Nothing in this title shall bar a cause of action that an owner or operator, subject to liability under subsection (a) of this section, or a guarantor, has or would have, by reason of subrogation or otherwise, against any person.

〔(i) To the extent that they are in conflict or otherwise inconsistent with any other provision of law relating to liability to the limitation thereof, the provisions of this section shall supersede such other provision of law, including section 4283(a) of the Revised Statutes (46 U.S.C. 183(a)).

〔FINANCIAL RESPONSIBILITY

〔SEC. 305. (a)(1) The owner or operator of any vessel (except a non-self-propelled barge that does not carry oil as fuel or cargo) which uses an offshore facility shall establish and maintain, in accordance with regulations promulgated by the President, evidence of financial responsibility sufficient to satisfy the maximum amount of liability to which the owner or operator of such vessel would be exposed in a case where he would be entitled to limit his liability in accordance with the provisions of section 304(b) of this title. Financial responsibility may be established by any one, or any combination, of the following methods, acceptable to the President: evidence of insurance, guarantee, surety bond, or qualification as a self-insurer. Any bond filed shall be issued by a bonding company authorized to do business in the United States. In any case where an owner or operator owns, operates, or charters more than one vessel subject to this subsection, evidence of financial responsibility need be established only to meet the maximum liability applicable to the largest of such vessels.

〔(2) The Secretry, in accordance with regulations promulgated by him, shall—

〔(A) deny entry to any port or place in the United States or to the navigable waters to; and

〔(B) detail at the port or place in the United States from which it is about to depart for any other port or place in the United States,

any vessel subject to this subsection which, upon request, does not produce certification furnished by the President that such vessel is in compliance with the financial responsibility provisions of paragraph (1) of this subsection.

〔(3) The Secretary, in accordance with regulations promulgated by him, shall have access to all offshore facilities and vessels conducting activities under the Outer Continental Shelf Lands Act, and such facilities and vessels shall, upon request, show certification of financial responsibility.

116

〔(b) The owner or operator of an offshore facility which (1) is used for drilling producing, or processing oil, or (2) has the capacity to transport, store, transfer, or otherwise handle more than one thousand barrels of oil at any one time, shall establish and maintain, in accordance with regulations promulgated by the President, evidence of financial responsibility sufficient to satisfy the maximum amount of liability to which the owner or operator of such facility would be exposed in a case where he would be entitled to limit his liability in accordance with the provisions of section 304(b) of this title, or $35,000,000, whichever is less.

〔(c)(1) Any claim authorized by section 303(a) may be asserted directly against any guarantor providing evidence of financial responsibility for any owner or operator of an offshore facility or vessel as required under this section. In defending such claim, the guarantor shall be entitled to invoke all rights and defenses which would be available to such owner or operator under this title. Such guarantor shall also be entitled to invoke the defense that the incident was caused by the willful misconduct of such owner or operator, but shall not be entitled to invoke any other defense which such guarantor might be entitled to invoke in proceedings brought by such owner or operator against such guarantor.

〔(2) The total liability of any guarantor in a direct action suit brought under this section shall be limited to the aggregate amount of the monetary limits of the policy of insurance, guarantee, surety bond, letter of credit, or similar instrument obtained from the guarantor by the person subject to liability. Nothing in this subsection shall be construed, interpreted or applied to diminish the liability of any person under this chapter or other applicable law.

〔(d) The President shall conduct a study to determine—

〔(1) whether adequate private oil pollution insurance protection is available on reasonable terms and conditions to the owners and operators of vessels, onshore facilities, and offshore facilities; and

〔(2) whether the market for such insurance is sufficiently competitive to assure purchasers of features such as a reasonable range of deductibles, coinsurance provisions, and exclusions.

The President shall submit the results of his study, together with his recommendation, within one year after the date of enactment of this title, and shall submit an interim report on this study within three months after such date of enactment.

〔(e) Any owner or operator of an offshore facility may enter into an indemnity, hold harmless, or similar agreement with any person holding a lease on the Outer-Continental Shelf with respect to any liability arising under this title. Notwithstanding the provision of this subsection, any such indemnity, hold harmless, or similar agreement shall not relieve such owner, operator, or person from liability arising under this subchapter. Nothing in this subsection shall be construed to alter or in any way affect the financial responsibility requirements imposed under this section.

**〖NOTIFICATION, DESIGNATION, AND ADVERTISEMENT**

〖SEC. 306. (a) The person in charge of a vessel or offshore facility which is involved in an incident shall immediately notify the Secretary of the incident as soon as he has knowledge thereof. Notification received pursuant to this subsection or information obtained by the exploitation of such notification shall not be used against such person or his employer in any criminal case, other than a case involving prosecution for perjury or for giving a false statement.

〖(b)(1) When the Secretary receives information pursuant to subsection (a) of this section or otherwise of an incident which involves oil pollution, the Secretary shall, where possible, designate the source or sources of the oil pollution and shall immediately notify the owner and operator of such sources and the guarantor of such designation.

〖(2) When a source designated under paragraph (1) of this subsection is a vessel or offshore facility and the owner, operator, or guarantor fails to inform the Secretary, within five days after receiving notification of the designation, of his denial of such designation, such owner, operator, or guarantor, as required by regulations promulgated by the Secretary, shall advertise the designation and the procedures by which claims may be presented to him. If advertisement is not made in accordance with this paragraph, the Secretary shall, as he finds necessary, and at the expense of the owner, operator, or guarantor involved, advertise the designation and the procedures by which claims may be presented to such owner, operator, or guarantor.

〖(c) In a case where—

〖(1) the owner, operator, and guarantor all deny a designation in accordance with paragraph (2) of subsection (b) of this section;

〖(2) the source of the discharge was a public vessel; or

〖(3) the Secretary is unable to designate the source or sources of the discharge under paragraph (1) of such subsection (b),

the Secretary shall advertise or otherwise notify potential claimants of the procedures by which claims may be presented to the Fund.

〖(d) Advertisement under subsection (b) of this section shall commence no later than fifteen days after the date of the designation made under such subsection and shall continue for a period of no less than thirty days.

**〖CLAIMS SETTLEMENT**

〖SEC. 307. (a) Except as provided in subsection (b) of this section, all claims shall be presented to the owner, operator, or guarantor.

〖(b) All claims shall be presented to the Fund—

〖(1) where the Secretary has advertised or otherwise notified claimants in accordance with section 306(c) of this title; or

〖(2) where the owner or operator may recover under the provisions of section 303(b)(1) of this title.

〖(c) In the case of a claim presented in accordance with subsection (a) of this section, and in which—

118

〔(1) the person to whom the claim is presented denies all liability for the claim, for any reason; or

〔(2) the claim is not settled by any person by payment to the claimant within sixty days from the date upon which (A) the claim is presented, or (B) advertising is commenced pursuant to section 306(b)(2), whichever is later,

the claimant may elect to commence an action in court against the owner, operator, or guarantor, or to present the claim to the Fund, that election to be irrevocable and exclusive.

〔(d) In the case of a claim presented in accordance with susbsection (a) of this section, where full and adequate compensation is unavailable, either because the claim exceeds a limit of liability invoked under section 304(b) of this title or because the owner, operator, and guarantor to whom the claim is presented are financially incapable of meeting their obligations in full, a claim for the uncompensated damages may be presented to the Fund.

〔(e) In the case of a claim which is presented to any person, pursuant to subsection (a) of this section, and which is being presented to the Fund, pursuant to subsection (c) or (d) of this section, such person, at the request of the claimant, shall transmit the claim and supporting documents to the Fund. The Secretary may, by regulation, prescribe the documents to be transmitted and the terms under which they are to be transmitted.

〔(f) In the case of a claim presented to the Fund, pursuant to subsection (b), (c), or (d) of this section, and in which the Fund—

〔(1) denies all liability for the claim, for any reason; or

〔(2) does not settle the claim by payment to the claimant within sixty days after the date upon which (A) the claim is presented to the Fund, or (B) advertising is commenced pursuant to section 306(c) of this title, whichever is later,

the claimant may submit the dispute to the Secretary for decision in accordance with section 554 of title 5, United States Code. However, a claimant who has presented a claim to the Fund pursuant to such subsection (b) may elect to commence an action in court against the Fund in lieu of submission of the dispute to the Secretary for decision, that election to be irrevocable and exclusive.

〔(g)(1) The Secretary shall promulgate regulations which establish uniform procedures and standards for the appraisal and settlement of claims against the Fund.

〔(2) Except as provided in paragraph (3) of this subsection, the Secretary shall use the facilities and services of private insurance and claims adjusting organizations or State agencies in processing claims against the Fund and may contract to pay compensation for those facilities and services. Any contract made under the provisions of this paragraph may be made without regard to the provisions of section 3709 of the Revised Statutes (41 U.S.C. 5) upon a showing by the Secretary that advertising is not reasonably practicable. The Secretary may make advance payments to a contractor for services and facilities, and the Secretary may advance to the contractor funds to be used for the payment of claims. The Secretary may review and audit claim payments made pursuant to this subsection. A payment to a claimant for a single claim in excess of $100,000, or two or more claims aggregating in excess of $200,000,

119

shall be first approved by the Secretary. When the services of a State agency are used in processing and settling claims, no payment may be made on a claim asserted by or on behalf of such State or any of its agencies or subdivisions unless the payment has been approved by the Secretary.

〔(3) To the extent necessitated by extraordinary circumstances, where the services of such private organizations or State agencies are inadequate, the Secretary may use Federal personnel to process claims against the Fund.

〔(h) Notwithstanding subsection (b) of section 556 of title 5, United States Code, the Secretary is authorized to appoint, from time to time for a period of not to exceed one hundred and eighty days, one or more panels, each comprised of three individuals, to hear and decide disputes submitted to the Secretary pursuant to subsection (f) of this section. At least one member of each panel shall be qualified to conduct adjudicatory proceedings and shall preside over the activities of the panel. Each member of a panel shall possess competence in the evaluation and assessment of property damage and the economic losses resulting therefrom. Panel members may be appointed from private life or from any Federal agency except the staff administering the Fund. Each panel member appointed from private life shall receive a per diem compensation, and each panel member shall receive necessary traveling and other expenses while engaged in the work of a panel. The provisions of chapter 11 of title 18, United States Code, and of Executive Order 11222, as amended, regarding special Government employees, shall apply to panel members appointed from private life.

〔(i)(1) Upon receipt of a request for a decision from a claimant, properly made, the Secretary shall refer the dispute to (A) an administrative law judge appointed under section 3105 of title 5, United States Code, or (B) a panel appointed under subsection (h) of this section.

〔(2) The administrative law judge and each member of a panel to which a dispute is referred for decision shall be a resident of the United States judicial circuit within which the damage complained of occurred, or, if the damage complained of occurred within two or more circuits, of any of the affected circuits, or, if the damage occurred outside any circuit, of the nearest circuit.

〔(3) Upon receipt of a dispute, the administrative law judge or panel shall adjudicate the case and render a decision in accordance with section 554 of title 5, United States Code. In any proceeding subject to this subsection, the presiding officer may require by subpena any person to appear and testify or to appear and produce books, papers, documents, or tangible things at a hearing or deposition at any designated place. Subpenas shall be issued and enforced in accordance with procedures in subsection (d) of section 555 of title 5, United States Code, and rules promulgated by the Secretary. If a person fails or refuses to obey a subpena, the Secretary may invoke the aid of the district court of the United States where the person is found, resides, or transacts business in requiring the attendance and testimony of the person and the production by him of books, papers, documents, or any tangible things.

120

⟦(4) A hearing conducted under this subsection shall be conducted within the United States judicial district within which, or nearest to which, the damage complained of occurred, or, if the damage complained of occurred within two or more districts, in any of the affected districts, or if the damage occurred outside any district, in the nearest district.

⟦(5) The decision of the administrative law judge or panel under this subsection shall be the final order of the Secretary, except that the Secretary, in his discretion and in accordance with regulations which he may promulgate, may review the decision under his own initiative or upon exception of the claimant or the Fund.

⟦(6) Final orders of the Secretary made under this subsection shall be reviewable pursuant to section 702 of title 5, United States Code, in the district courts of the United States.

⟦(j)(1) In any action brought pursuant to this title against an owner, operator, or guarantor, both the plaintiff and defendant shall serve a copy of the complaint and all subsequent pleadings therein upon the Fund at the same time such pleadings are served upon the opposing parties.

⟦(2) The Fund may intervene in any action described in paragraph (1) of this subsection as a matter of right.

⟦(3) In any action described in paragraph (1) of this subsection to which the Fund is a party, if the owner, operator, or guarantor admits liability under this title, the Fund upon its motion shall be dismissed therefrom to the extent of the admitted liability.

⟦(4) If the Fund receives from either the plaintiff or the defendant notice of an action described in paragraph (1) of this section, the Fund shall be bound by any judgment entered therein, whether or not the Fund was a party to the action.

⟦(5) If neither the plaintiff nor the defendant gives notice of an action described in paragraph (1) of this subsection to the Fund, the limitation of liability otherwise permitted by section 304(b) of this title shall not be available to the defendant, and the plaintiff shall not recover from the Fund any sums not paid by the defendant.

⟦(k) In any action brought against the Fund under this title, the plaintiff may join any owner, operator, or guarantor, and the Fund may join any person who is or may be liable to the Fund under any provision of this title.

⟦(l) No claim may be presented, nor may an action to commenced for economic losses recoverable under this title, unless such claim is presented to, or such action is commenced against, the owner, operator, or guarantor, or the Fund, as to their respective liabilities, within three years after the date of discovery of the economic loss for which a claim may be asserted under section 303(a) of this title or within six years of the date of the incident which resulted in such loss, whichever is easier.

⟦SUBROGATION

⟦SEC. 308. (a) Any person or governmental entity, including the Fund, who pays compensation to any claimant for an economic loss, compensable under section 303 of this title, shall be subrogated to all rights, claims, and causes of action which such claimant has under this title.

〖(b) Upon request of the Secretary, the Attorney General may commence an action, on behalf of the Fund, for the compensation paid by the Fund to any claimant pursuant to this title. Such an action may be commenced against any owner, or operator, or guarantor, or against any other person or governmental entity, who is liable, pursuant to any law, to the compensated claimant or to the Fund, for economic losses for which the compensation was paid.

〖(c) In any claim or action by the Fund against any owner, operator, or guarantor, pursuant to the provisions of subsection (a) or (b), the Fund shall recover—

〖(1) for a claim presented to the Fund (where there has been a denial of source designation) pursuant to section 307(b)(1) of this title, or (where there has been a denial of liability) pursuant to section 307(c)(1) of this title—

〖(A) subject only to the limitation of liability to which the defendant is entitled under section 304(b) of this title, the amount the Fund has paid to the claimant, without reduction;

〖(B) interest on such amount, at the rate calculated in accordance with section 304(g)(2) of this title, from the date upon which the claim is presented by the claimant to the defendant to the date upon which the Fund is paid by the defendant, inclusive, less the period, if any, from the date upon which the Fund offers to the claimant the amount finally paid by the Fund to the claimant in satisfaction of the claim against the Fund to the date upon which the claimant accepts that offer, inclusive; and

〖(C) all costs incurred by the Fund by reason of the claim, both of the claimant against the Fund and the Fund against the defendant, including, but not limited to, processing costs, investigating costs, court costs, and attorneys' fees; and

〖(2) for a claim presented to the Fund pursuant to section 307(c)(2) of this title)

〖(A) in which the amount the Fund has paid to the claimant exceeds the largest amount, if any, the defendant offered to the claimant in satisfaction of the claim of the claimant against the defendant—

〖(i) subject to dispute by the defendant as to any excess over the amount offered to the claimant by the defendant, the amount the Fund has paid to the claimant;

〖(ii) interest, at the rate calculated in accordance with section 304(g)(2) of this title, for the period specified in paragraph (1)(B) of this subsection; and

〖(iii) all costs incurred by the Fund by reason of the claim of the Fund against the defendant, including, but not limited to, processing costs, investigating costs, court costs, and attorneys' fees; or

〖(B) in which the amount of the Fund has paid to the claimant is less than or equal to the largest amount the defendant offered to the claimant in satisfaction of the claim of the claimant against the defendant—

122

⟦(i) the amount which the Fund has paid to the claimant, without reduction;

⟦(ii) interest, at the rate calculated in accordance with section 304(g)(2) of this title, from the date upon which the claim is presented by the claimant to the defendant to the date upon which the defendant offered to the claimant the largest amount referred to in this subparagraph, except that if the defendant tenders the offer of the largest amount referred to in this subparagraph within sixty days after the date upon which the claim of the claimant is either presented to the defendant or advertising is commenced pursuant to section 306 of this title, the defendant shall not be liable for interest for that period; and

⟦(iii) interest from the date upon which the claim of the Fund against the defendant is presented to the defendant to the date upon which the Fund is paid, inclusive, less the period, if any, from the date upon which the defendant offers to the Fund the amount finally paid to the Fund in satisfaction of the claim of the Fund to the date upon which the Fund accepts that offer, inclusive.

⟦(d) The Fund shall pay over to the claimant that portion of any interest the Fund recovers, pursuant to subsection (c)(1) and (2)(A), for the period from the date upon which the claim of the claimant is presented to the defendant to the date upon which the claimant is paid by the Fund, inclusive, less the period from the date upon which the Fund offers to the claimant the amount finally paid to the claimant in satisfaction of the claim to the date upon which the claimant accepts such offer, inclusive.

⟦(e) The Fund is entitled to recover for all interest and costs specified in subsection (c) of this section without regard to any limitation of liability to which the defendant may otherwise be entitled under this title.

### ⟦JURISDICTION AND VENUE

⟦SEC. 309. (a) The United States district courts shall have original and exclusive jurisdiction of all controversies arising under this title, without regard to the citizenship of the parties or the amount in controversy.

⟦(b) Venue shall lie in any district wherein the injury complained of occurred, or wherein the defendant resides, may be found, or has his principal office. For the purposes of this section, the Fund shall reside in the District of Columbia.

### ⟦RELATIONSHIP TO OTHER LAW

⟦SEC. 310. (a) Any person who receives compensation for damages or removal costs pursuant to this title shall be precluded from recovering compensation for the same damages or removal costs pursuant to any other State or Federal law. Any person who receives compensation for damages or removal costs pursuant to any other State or Federal law shall be precluded from receiving compensation for the same damages or removal costs under this title.

123

〔(b) No owner or operator of an offshore facility or vessel who establishes and maintains evidence of financial responsibility in accordance with this section shall be required under any State law, rule, or regulation to establish any other evidence of financial responsibility in connection with liability for the discharge of oil from such offshore facility or vessel. Evidence of compliance with the financial responsibility requirement of this section shall be accepted by a State in lieu of any other requirement of financial responsibility imposed by such State in connection with liability for the discharge of oil from such offshore facility or vessel.

〔(c) Except as otherwise provided in this title, this title shall not be interpreted to preempt the field of liability or to preclude any State from imposing additional requirements or liability for any discharge of oil resulting in damages or removal costs within the jurisdiction of such State.

### 〔PROHIBITION

〔SEC. 311. The discharge of oil from any offshore facility or vessel, in quantities which the President under section 311(b) of the Federal Water Pollution Control Act (33 U.S.C. 1321(b)) determines to be harmful, is prohibited.

### 〔PENALTIES

〔SEC. 312. (a)(1) Any person who fails to comply with the requirements of section 305 of this title, the promulgated thereunder, or any denial or detention order, shall be subject to a civil penalty of not to exceed $10,000.

〔(2) The civil penalty described in paragraph (1) of this subsection may be assessed and compromised by the President or his designee, in connection with section 305(a)(1) of this title, and by the Secretary, in connection with section 305(a)(3) and section 305(b) of this title. No penalty shall be assessed until notice and an opportunity for hearing on the alleged violation have been given. In determining the amount of the penalty or the amount agreed upon in compromise, the demonstrated good faith of the party shall be taken into consideration.

〔(3) At the request of the official assessing a penalty under this subsection, the Attorney General may bring an action in the name of the Fund to collect the penalty assessed.

〔(b) Any person in charge who is subject to the jurisdiction of the United States and who fails to give the notification required by section 306(a) of this title shall, upon conviction, be fined not more than $10,000 or imprisoned for not more than one year, or both.

### 〔AUTHORIZATION OF APPROPRIATIONS

〔SEC. 313. (a) There is authorized to be appropriated for the administration of this title $10,000,000 for the fiscal year ending September 30, 1980, and $5,000,000 for the fiscal year ending September 30, 1980, and $5,000,000 for the fiscal year ending September 30, 1981.

〔(b) There are also authorized to be appropriated to the Fund, from time to time, such amounts as may be necessary to carry out the purposes of the applicable provisions of this title, including the

124

entering into contracts, any disbursements of funds, and the issuance of notes or other obligations pursuant to section 302(f) of this title.

〔(c) Notwithstanding any other provision of this title, the authority to make contracts, to make disbursements, to issue notes or other obligations pursuant to section 302(f) of this title, to charge and collect fees pursuant to section 302(d) of this title, or to exercise any other spending authority shall be effective only to the extent provided, without fiscal year limitation, in appropriation Acts enacted after the date of enactment of this title.

〔ANNUAL REPORT

〔SEC. 314. Within six months after the end of each fiscal year, the Secretary shall submit to Congress (1) a report on the administration of the Fund during such fiscal year, and (2) his recommendations for such legislative changes as he finds necessary or appropriate to improve the management of the Fund and the administration of the liability of provisions of this title.

〔EFFECTIVE DATES

〔SEC. 315. (a) This section, subsection (e) of section 304, subsection (d) of section 305, and all provisions of this title authorizing the delegation of authority or the promulgation of regulations shall be effective on the date of enactment of this title.

〔(b) All other provisions of this title, and rules and regulations promulgated pursuant to such provisions, shall be effective on the one hundred and eightieth day after the date of enactment of this title.〕

---

33 U.S.C. 1321

## § 1321. Oil and hazardous substance liability

(a) DEFINITIONS.—For the purpose of this section, the term—

(1) "oil" means oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil;

\*　　\*　　\*　　\*　　\*　　\*　　\*

〔(8) "remove" or "removal" refers to removal of the oil or hazardous substances from the water and shorelines or the taking of such other actions as may be necessary to minimize to mitigate damage to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines, and beaches;〕

(8) *"remove" or "removal" refers to—*

*(A) the removal of oil or hazardous substances from water and shorelines;*

*(B) containment, dispersal, disposal, or other response actions; and*

*(C) the taking of other actions necessary to minimize or mitigate damage to the public health or welfare, including*

125

> *fish, shellfish, wildlife, and public and private property,
> shorelines, and beaches.*

*   *   *   *   *   *   *

> *(18) "exclusive economic zone" means the zone established by
> Presidential Proclamation number 5030, dated March 10, 1983;
> and*
> *(19) "responsible party" means an owner or operator in viola-
> tion of subsection (b) of this section.*

(b) CONGRESSIONAL DECLARATION OF POLICY AGAINST DISCHARGES
OF OIL OR HAZARDOUS SUBSTANCES; DESIGNATION OF HAZARDOUS
SUBSTANCES; STUDY OF HIGHER STANDARD OF CARE INCENTIVES AND
REPORT TO CONGRESS; LIABILITY; PENALTIES; CIVIL ACTIONS: PENAL-
TY LIMITATIONS, SEPARATE OFFENSES, JURISDICTION, MITIGATION OF
DAMAGES AND COSTS, RECOVERY OF REMOVAL COSTS AND ALTERNA-
TIVE REMEDIES.—

*   *   *   *   *   *   *

((6)(A) any owner, operator, or person in charge of any on-
shore facility or offshore facility from which oil or a hazardous
substance is discharged in violation of paragaph (3) of this sub-
section shall be assessed a civil penalty by the Secretary of the
department in which the Coast Guard is operating of not more
than **[**$5,000**]** *$1,000 for each barrel of oil or hazardous sub-
stance that was discharged or $5,000,000, whichever is less,* for
each offense. Any owner, operator, or person in charge of any
vessel from which oil or a hazardous substance is discharged in
violation of paragraph (3)(i) of this subsection, and any owner,
operator, or person in charge of vessel from which oil or haz-
ardous substance is discharged in violation of paragraph (3)(ii)
who is otherwise subject to the jurisdiction of the United
States at the time of the discharge, shall be assessed a civil
penalty by the Secretary of the department in which the Coast
Guard is operating of not more than **[**$5,000**]** *$1,000 for each
barrel of oil or hazardous substance that was discharged or
$5,000,000, whichever is less,* for each offense. No penalty shall
be assessed unless the owner or operator charged shall have
been given notice and opportunity for a hearing on such
charge. Each violation is a separate offense. Any such civil
penalty may be compromised by such Secretary. In determin-
ing the amount of the penalty, or the amount agreed upon in
compromise, the appropriateness of such penalty to the size of
the business of the owner or operator charged, the effect on
the owner or operater's ability to continue in business, and the
gravity of the violation, shall be considered by such Secretary.
The Secretary of the Treasury shall withhold at the request of
such Secretary the clearance required by section 91 of Title 46,
of any vessel the owner or operator of which is subject to the
foregoing penalty. Clearance may be granted in such cases
upon the filing of a bond or other surety satisfactory to such
Secretary.

(B) The Administrator, taking into account the gravity of the
offense, and the standard of care manifested by the owner, op-
erator, or person in charge, may commence a civil action

against any such person subject to the penalty under subparagraph (A) of this paragraph to impose a penalty based on consideration of the size of the business of the owner or operator, the effect on the ability of the owner or operator to continue in business, the gravity of the violation, and the nature, extent, and degree of success of any efforts made by the owner, operator, or person in charge to minimize or mitigate the effects of such discharge. The amount of such penalty shall not exceed **[**$50,000**]** *$1,000 for each barrel of oil or hazardous substance that was discharged or $5,000,000, whichever is less,* except that where the United States can show that such discharge was the result of willful negligence or willful misconduct within the privity and knowledge of the owner, operator, or person in charge, such penalty shall not exceed **[**$250,000**]** *$5,000 for each barrel of oil or hazardous substance that was discharged.* Each violation is a separate offense. Any action under this subparagraph may be brought in the district court of the United States for the district in which the defendant is located or resides or is doing business, and such court shall have jurisdiction to assess such penalty. No action may be commenced under this clause where penalty has been assessed under clause (A) of this paragraph.

(C) In addition to establishing a penalty for the discharge of a hazardous substance, the Administrator may act to mitigate the damage to the public health or welfare caused by such discharge. The cost of such mitigation shall be deemed a cost incurred under subsection (c) of this section for the removal of such substance by the United States Government.

(D) any costs of removal incurred in connection with a discharge excluded by subsection (a)(2)(C) of this section shall be recoverable from the owner or operator of the source of the discharge in an action brought under section 1319(b) of this title.

(E) Civil penalties shall not be assessed under both this section and section 1319 of this title for the same discharge.

*(F) Amounts recovered by the Federal Government for penalties assessed under this paragraph as the result of a discharge of oil shall be deposited in the Oil Spill Liability Trust Fund created by section 9509 of the Internal Revenue Code of 1986.*

(c) REMOVAL OF DISCHARGED OIL OR HAZARDOUS SUBSTANCES; NATIONAL CONTINGENCY PLAN.—**[**(1) Whenever any oil or a hazardous substance is discharged, or there is substantial threat of such discharge, into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone, or in connection with activities under the Outer Continental Shelf Lands Act [43 U.S.C.A. § 1331 et seq.] or the Deepwater Port Act of 1974 [33 U.S.C.A. § 1501 et seq.], or which may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States (including resources under the Magnuson Fishery Conservation and Management Act [16 U.S.C.A. § 1801 et seq.]) the President is authorized to act to remove or arrange for the removal of such oil or substance at any time, unless he determines such removal will be done properly by the owner or operator of the vessel, onshore facility, or offshore facility from which the discharge occurs.**]** *(1)(A) The President shall*

*ensure an effective and immediate removal of a discharge of oil or a hazardous substance—*

> *(i) into or on the navigable waters; or*
> *(ii) on the adjoining shorelines to these navigable waters; or*
> *(iii) on the waters of the exclusive economic zone; or*
> *(iv) that may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States;*

*in accordance with the National Contingency Plan, any other contingency plans prepared under subsection (j) of this section, and applicable state law.*

*(B) The President may remove or arrange for the removal of a discharge, or the threat of a discharge, of oil or a hazardous substance at any time.*

*(C) The President may direct all Federal, state, responsible party, and private actions to remove a discharge, or the threat of a discharge, of oil or a hazardous substance.*

*(D) When the President retains or directs a person (other than a responsible party) under the authority of subparagraphs (B) or (C) of this paragraph, that person is not liable for removal costs or damages other than personal injury or wrongful death arising from his or her removal activities conducted in accordance with the direction of the President, except in the case of gross negligence or willful misconduct.*

*(E) Each responsible party shall act in accordance with the National Contingency Plan, the applicable contingency plans required under this subsection (j) of this section, and as otherwise directed by the President.*

*(F) Nothing in this paragraph affects the liability of a responsible party under the Oil Pollution Prevention, Response, Liability, and Compensation Act of 1989.*

(2) Within sixty days after October 18, 1972, the President shall prepare and publish a National Contingency Plan for removal of oil and hazardous substances, pursuant to this subsection. Such National Contingency Plan shall provide for efficient, coordinated, and effective action to minimize damage from oil and hazardous substance discharges, including containment, dispersal, and removal of oil and hazardous substances, and shall include, but not be limited to—

(A) assignment of duties and responsibilities among Federal departments and agencies in coordination with State and local agencies, including, but not limited to, water pollution control, conservation, and port authorities;

(B) identification, procurement, maintenance, and storage of equipment and supplies;

[(C) establishment or designation of a strike force consisting of personnel who shall be trained, prepared, and available to provide necessary services to carry out the Plan, including the establishment at major ports, to be determined by the President, of emergency task forces of trained personnel, adequate oil and hazardous substance pollution control equipment and material, and a detailed oil and hazardous substance pollution prevention and removal plan;]

(C) establishment and maintenance of a Federal strike force including at least seven regional strike teams with personnel who are trained, equipped, and available on a continual basis to provide necessary services to carry out the Plan and any contingency plans required under subsection (j) of this section. In establishing these teams, the President shall consider existing Federal, state, local, and private sector resources that are available and that may be used to effectively remove a discharge.

(D) a system of surveillance and notice designed to *safeguard against as well as* insure earliest possible notice of discharges of oil and hazardous substances and imminent threats of such discharges to the appropriate State and Federal agencies:

(E) establishment of a national center to provide coordination and direction for operations in carrying out the Plan;

(F) procedures and techniques to be employed in identifying, containing, dispersing, and removing oil and hazardous substances;

(G) a schedule, prepared in cooperation with the States, identifying (i) dispersants and other chemicals, if any, that may be used in carrying out the Plan, (ii) the waters in which such dispersants and chemicals may be used, and (iii) the quantities of such dispersant or chemical which can be used safely in such waters, which schedule shall provide in the case of any dispersant, chemical, or waters not specifically identified in such schedule that the President, or his delegate, may, on a case-by-case basis, identify the dispersants and other chemicals which may be used, the waters in which they may be used, and the quantities which can be used safely in such waters; [and]

(H) a system whereby the State or States affected by a discharge of oil or hazardous substance may act where necessary to remove such discharge and such State or States may be [reimbursed from the fund established under subsection (k) of this section for the reasonable costs incurred in such removal] *reimbursed, in the case of any discharges of oil from a vessel or facility, for the reasonable costs incurred for that removal, from the oil spill liability trust fund; and*

(I) development and maintenance of a national computerized inventory of all public and private resources, including trained personnel and major equipment located both within and outside the United States, that is available to remove a discharge of oil or a hazardous substance in the navigable waters, on adjacent shorelines, or in the exclusive economic zone.

The President may, from time to time, as he deems advisable revise or otherwise amend the National Contingency Plan. After publication of the National Contingency Plan, the removal of oil and hazardous substances and actions to minimize damage from oil and hazardous substance discharges shall, to the greatest extent possible, be in accordance with the National Contingency Plan.

(d) VESSELS OWNED AND OPERATED BY THE UNITED STATES.—The provisions of this section and the standards and regulations promulgated hereunder apply to vessels owned and operated by the United States unless the Secretary of Defense finds that compliance would not be in the interest of national security. [With respect to vessels owned and operated by the Department of Defense,

129

regulations under the last sentence of subsection (b)(1) of this section and certifications under subsection (g)(2) of this section shall be promulgated and issued by the Secretary of Defense.]

[(e) JUDICIAL RELIEF.—In addition to any other action taken by a State or local government, when the President determines there is an imminent and substantial threat to the public health or welfare of the United States, including, but not limited to, fish, shellfish, and wildlife and public and private property, shorelines, and beaches within the United States, because of an actual or threatened discharge of oil or hazardous substance into or upon the navigable waters of the United States from an onshore or offshore facility, the President may require the United States attorney of the district in which the threat occurs to secure such relief as may be necessary to abate such threat, and the district courts of the United States shall have jurisdiction to grant such relief as the public interest and the equities of the case may require.]

*(e)(1) In addition to any action taken by a State or local government, when the President determines that there may be an imminent and substantial threat to the public health or welfare of the United States, including but not limited to fish, shellfish and wildlife, public and private property, shorelines, beaches, habitat, and other living and nonliving natural resources under the jurisdiction or control of the United States or a State, because of an actual or threatened discharge of oil or a hazardous substance from a vessel or facility in violation of subsection (b) of this section, the President may—*

>    *(A) require the Attorney General to secure such relief from any person, including but not limited to the owner or operator of such facility, as may be necessary to abate such endangerment; or*

>    *(B) after notice to the affected State, take such other action under this section, including but not limited to, issuing such administrative orders as may be necessary to protect the public health and welfare.*

*(2) If any person fails without sufficient cause to comply with an order under paragraph (1)(B), the President may request the Attorney General to bring an action in the appropriate district court of the United States to enforce such an order, to assess civil penalties of no more than $25,000 a day for each violation, and to assess three times the removal costs or damages incurred by the Oil Spill Liability Trust Fund as a result of the failure to comply.*

*(3) The district courts of the United States shall have jurisdiction to grant such relief under this subsection as the public interest and the equities of the case may require.*

\* \* \* \* \* \* \*

(i) RECOVERY OF REMOVAL COSTS.—

[(1)] In any case where an owner or operator of a vessel or an onshore facility or an offshore facility from which oil or a hazardous substance is discharged in violation of subsection (b)(3) of this section acts to remove such oil or substance in accordance with regulations promulgated pursuant to this section, such owner or operator shall be entitled to recover the reasonable costs incurred in such removal upon establishing, in

a suit which may be brought against the United States Government, in the United States Claims Court, that such discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States government, or (D) an act or omission of a third party without regard to whether such act or omission was or was not negligent, or of any combination of the foregoing causes.

〔(2) The provisions of this subsection shall not apply in any case where liability is established pursuant to the Outer Continental Shelf Lands Act [43 U.S.C.A. § 1331 et seq.], or the Deepwater Port Act of 1974 [33 U.S.C.A. § 1501 et seq.].〕

〔(3) Any amount paid in accordance with a judgment of the United States Claims Court pursuant to this section shall be paid from the funds established pursuant to subsection (k) of this section.〕

\*     \*     \*     \*     \*     \*     \*

(j) REGULATIONS; PENALTY.—〔(1) Consistent with the National Contingency Plan required by subsection (c)(2) of this section, as soon as practicable after October 18, 1972, and from time to time thereafter, the President shall issue regulations consistent with maritime safety and with marine and navigation laws (A) establishing methods and procedures for removal of discharged oil and hazardous substances, (B) establishing criteria for the development and implementation of local and regional oil and hazardous substance removal contingency plans, (C) establishing procedures, methods, and equipment and other requirements for equipment to prevent discharges of oil and hazardous substances from vessels and from onshore facilities and offshore facilities, and to contain such discharges, and (D) governing the inspection of vessels carrying cargoes of oil and hazardous substances and the inspection of such cargoes in order to reduce the likelihood of discharges of oil from vessels in violation of this section.〕 *(1)(A) LOCAL CONTINGENCY PLANS.—Not later than six months after the date of enactment of the Oil Pollution, Prevention, Response, Liability, and Compensation Act of 1989, the President shall designate areas for which new or improved local contingency plans must be prepared to respond to a discharge, or threat of discharge, of oil or a hazardous substance. The President shall specify the Federal, state, and local officials required to prepare these plans.*

*(B) In determining the areas to be designated under this paragraph, the President shall consult with state and local officials, and the public, and shall consider—*

*(i) the likelihood of a discharge;*

*(ii) the likelihood that the discharge would result in severe economic or environmental damage; and*

*(iii) the adequacy of any existing local contingency plans.*

*(C) Each contingency plan prepared under this paragraph shall include—*

*(i) a general description of the area subject to the plan, including the identification of specific areas of special economic or environmental importance that might be damaged by a discharge;*

(ii) a detailed description of the responsibilities of the responsible party, and Federal, state, and local agencies, for responding to a discharge, or the threat of discharge;

(iii) a list of equipment and personnel available to the responsible party, and Federal, state, and local agencies, to ensure an effective and immediate response to a discharge, or threat of discharge; and

(iv) any other information the President may require.

(D) Not later than six months after the designation of areas under subparagraph (A), the persons identified shall prepare and submit to the President the contingency plan required by this paragraph. The President shall promptly review each plan and require amendments to any plan that does not meet the requirements of this paragraph.

(E) Contingency plans required under this paragraph shall be reviewed periodically by the President and updated.

(F) The President may provide technical assistance in the preparation of a contingency plan under this paragraph.

(2)(A) VESSEL AND FACILITY CONTINGENCY PLANS.—Not later than 18 months after the date the Oil Pollution Prevention, Response, Liability, and Compensation Act of 1989 is enacted, the President shall require the owners or operators of certain vessels and facilities to prepare a contingency plan for each vessel and facility. This paragraph applies to—

(i) a vessel operating on the navigable waters or the exclusive economic zone and carrying oil or a hazardous substance in bulk as cargo;

(ii) an offshore or onshore facility that, because of its location, could reasonably discharge into or on the navigable waters, the adjoining shorelines, or the exclusive economic zone.

(B) The contingency plans required by this paragraph shall—

(i) be consistent, and ensure compliance by the owner or operator, with the requirements of the National Contingency Plan and any local contingency plan.

(ii) be submitted on a timely basis to the President;

(iii) be available for review by appropriate Federal, state, and local officials, and the public;

(iv) identify the individual having full authority to implement a removal action and require immediate communications between that individual and the appropriate Federal official and the persons identified in clause (vi);

(v) describe the specific actions that will be taken to immediately respond to a discharge, including the most serious potential discharge from the vessel or facility involved;

(vi) identify and ensure, by contract with a private organization or otherwise, the availability of personnel and equipment that would be necessary to implement any response action pursuant to clauses (iv) and (v);

(vii) include a program of personnel training, equipment testing, and periodic unannounced drills sufficient to ensure the effectiveness of the contingency plan;

(viii) describe the conditions under which dispersants might be used, including the procedures to be followed for obtaining approval for dispersant use;

*(ix) include provisions for the safe disposal of any contaminated materials or oil or hazardous substance recovered during the removal; and*

*(x) be updated periodically.*

*(C) Beginning one year after the issuance of regulations implementing this paragraph, a vessel or facility for which the preparation of a contingency plan is required, may not handle, store, or transport oil or a hazardous substance unless—*

*(i) the owner or operator has submitted a contingency plan in accordance with this paragraph;*

*(ii) the contingency plan has not been rejected by the President; and*

*(iii) the vessel or facility is operating in compliance with the contingency plan.*

*(D) The President shall promptly review the contingency plans submitted under this paragraph and shall reject, or require amendments to, any plan that does not meet the requirements of subparagraph (B).*

*(E) The President may provide by regulation that the requirements of this paragraph have been met by a class of vessels or facilities under other law.*

*(3) Not later than one year after the date of enactment of the Oil Pollution Prevention, Response, Liability, and Compensation Act of 1989, the President shall require—*

(A) periodic inspection of containment booms, skimmers, vessels, and other major equipment used to remove discharges of oil or a hazardous substance.

(B) vessels operating on the navigable waters and carrying oil or a hazardous substance in bulk as cargo to carry appropriate removal equipment that employs the best technology economically feasible and that is compatible with the safe operation of the vessel.

(4) The President, acting through the Secretary of the department in which the Coast Guard is operating, shall periodically conduct drills of removal capability in major port areas under local contingency plans and relevant vessel and facility contingency plans. The drills shall include participation by Federal, state, and local agencies, the owners and operators of vessel facilities in the area, and private industry. The Secretary shall publish annual reports on these drills including an assessment of the effectiveness of the plans and a list of amendments that were made to the ineffective contingency plans.

⟦(2)⟧ (5) Any owner or operator of a vessel or an onshore facility or an offshore facility and any other person subject to any regulation issued under ⟦paragraph (1) of⟧ this subsection who fails or refuses to comply with the provisions of any such regulations, shall be liable to a civil penalty of not more than ⟦$5,000⟧ $25,000 for each such violation. This paragraph shall not apply to any owner or operator of any vessel from which oil or a hazardous substance is discharged in violation of paragraph (3)(ii) of subsection (b) of this section unless such owner, operator, or person in charge is otherwise subject to the jurisdiction of the United States. Each violation shall be a separate offense. The President may assess and compromise such penalty. No penalty shall be assessed until the owner,

operator, or other person charged shall have been given notice and an opportunity for a hearing on such charge. In determining the amount of the penalty, or the amount agreed upon in compromise, the gravity of the violation, and the demonstrated good faith of the owner, operator, or other person charged in attempting to achieve rapid compliance, after notification of a violation, shall be considered by the President,

\*      \*      \*      \*      \*      \*      \*

[(k) AUTHORIZATION OF APPROPRIATIONS; SUPPLEMENTAL APPROPRIATIONS.—

[(1) There is hereby authorized to be appropriated to a revolving fund to be established in the Treasury such sums as may be necessary to maintain such fund at a level of $35,000,000 to carry out the provisions of subsections (c), (d), (i), and (l) of this section. Any other funds received by the United States under this section shall also be deposited in said fund for such purposes. All sums appropriated to, or deposited in, said fund shall remain available until expended.

[(2) The Secretary of Transportation shall notify the Congress whenever the unobligated balance of the fund is less than $12,000,000, amd shall include in such notification a recommendation for a supplemental appropriation relating to the sums that are needed to maintain the fund at the level provided in paragraph (1).]

(l) ADMINISTRATION.—The President is authorized to delegate the administration of this section to the heads of those Federal departments, agencies, and instrumentalities which he determines to be appropriate. [Any moneys in the fund established by subsection (k) of this section shall be available to such Federal departments, agencies, and instrumentalities to carry out the provisions of subsections (c) and (i) of this section.] Each such department, agency, and instrumentality, in order to avoid duplication of effort, shall, whenever appropriate, utilize the personnel, services, and facilities of other Federal departments, agencies, and instrumentalities.

\*      \*      \*      \*      \*      \*      \*

[(p) FINANCIAL RESPONSIBILITY.—

[(1) Any vessel over three hundred gross tons, including any barge of equivalent size, but not including any barge that is not self-propelled and that does not carry oil or hazardous substances as cargo or fuel, using any port or place in the United or the navigable waters of the United States for any purpose shall establish and maintain under regulations to be prescribed from time to time by the President, evidence of financial responsibility of in the case of an inland oil barge $125 per gross ton of such barge, or $125,000, whichever is greater, and in the case of any other vessel, $150 per gross ton of such vessel (or, for a vessel carrying oil or hazardous substances as cargo, $250,000), whichever is greater, to meet the liability to the United States which such vessel could be subject under this section. In cases where an owner or operator owns, operates, or charters more than one such vessel, financial responsibility need only be established to meet the maximum liability to

134

which the largest of such vessels could be subjected. Financial responsibility may be established by any one of, or a combination of, the following methods acceptable to the President: (A) evidence of insurance, (B) surety bonds, (C) qualification as a self-insurer, or (D) other evidence of financial responsibility. Any bond filed shall be issued by a bonding company authorized to do business in the United States.

[(2) The provisions of paragraph (1) of this subsection shall be effective April 3, 1971, with respect to oil and one year after October 18, 1972, with respect to hazardous substances. The President shall delegate the responsibility to carry out the provisions of this subsection to the appropriate agency head within sixty days after October 18, 1972. Regulations necessary to implement this subsection shall be issued within six months after October 18, 1982.

[(3) Any claim for costs incurred by such vessel may be brought directly against the insurer or any other person providing evidence of financial responsibility as required under this subsection. In the case of any action pursuant to this subsection such insurer or other person shall be entitled to invoke all rights and defenses which would have been available to the owner or operator if an action had been brought against him by the claimant, and which would have been available to him if an action had been brought against him by the owner or operator.

[(4) Any owner or operator of a vessel subject to this subsection, who fails to comply with the provisions of this subsection or any regulation issued thereunder, shall be subject to a fine of not more than $10,000.

[(5) The Secretary of the Treasury may refuse the clearance required by section 91 of Title 46 to any vessel subject to this subsection, which does not have evidence furnished by the President that the financial responsibility provisions of paragraph (1) of this subsection have been complied with.

[(6) The Secretary of the Department in which the Coast Guard is operated may (A) deny entry to any port or place in the United States or the navigable waters of the United States, to, and (B) detain at the port or place in the United States from which it is about to depart for any other port or place in the United States, any vessel subject to the subsection, which upon request, does not produce evidence furnished by the President that the financial responsibility provisions of paragraph (1) of this subsection have been complied with.]

\*       \*       \*       \*       \*       \*       \*

(s) The Oil Spill Liability Trust Fund shall be available to carry out subsections (c), (d), (i), (l), and (t). Any amounts received by the United States under this section shall be deposited in the Oil Spill Liability Trust Fund.

(t) OIL POLLUTION RESEARCH AND DEVELOPMENT PROGRAM.—

(1) ESTABLISHMENT OF PROGRAM.—The President shall establish a comprehensive oil pollution research and development program.

(2) PURPOSES.—*The purposes of the research and development program include—*

*(A) development of methods to prevent or minimize the discharge of oil from vessels, including methods to measure a vessel's ullage, to prevent discharges from tank vents, to prevent discharges during lightering and bunkering operations, and to contain discharges on vessel or decks;*

*(B) development of methods to prevent or minimize the discharge of oil from facilities;*

*(C) development of methods to protect public health and safety, including that of removal personnel from a discharge of oil;*

*(D) development of adequte worker training standards for discharge removal personnel;*

*(E) development of methods to restore and rehabilitate natural resources damaged by a discharge of oil; and*

*(F) assessment of the long-term effects of a discharge of oil on natural resources.*

*(3) COORDINATION.—The President shall coordinate research and development activities under this subsection with affected Federal agencies, states, other nations, industry, academia, and the private sector.*

*(4) ANNUAL REPORT.—Before January 1 of each year, the President shall submit to Congress a report on the actual and planned activities carried out under this subsection.*

*(5) FUNDING.—Notwithstanding any other provision of law, there is authorized to be appropriated $15,000,000 from the Fund established by section 9509 of the Internal Revenue Code of 1986 for each fiscal year to carry out the purposes of this section.*

---

33 U.S.C. 1228(a)

## § 1228. Conditions for entry to ports in the United States

(a) IN GENERAL.—No vessel, subject to the provisions of chapter 37 of Title 46, *United States Code,* shall operate in the navigable waters of the United States or transfer cargo or residue in any port or place under the jurisdiction of the United States, if such vessel—

(1) has a history of accidents, pollution incidents, or serious repair problems which, as determined by the Secretary, creates reason to believe that such vessel may be unsafe or may create a threat to the marine environment; or

(2) fails to comply with any applicable regulation issued under this chapter, chapter 37 of Title 46, *United States Code,* or any other applicable law or treaty; or

(3) discharges oil or hazardous material in violation of any law of the United States or in a manner or quantities inconsistent with the provisions of any treaty to which the United States is a party; or

(4) does not comply with any applicable vessel traffic service requirements; or

136

(5) is manned by one or more officers who are licensed by a certificating state which the Secretary has determined, pursuant to section 9101 of Title 46, *United States Code,* does not have standards for licensing and certification of seafarers which are comparable to or more stringent than United States standards of **[**international standards which are accepted by the United States**]** *customary international law*; or

(6) is not manned in compliance with manning levels as determined by the Secretary to be necessary to insure the safe navigation of the vessel; or

(7) while underway, does not have at least one licensed deck officer on the navigation bridge who is capable of clearly understanding English.

———————

23 U.S.C. 401 note

\*          \*          \*          \*          \*          \*          \*

"ACCESSIBILITY OF REGISTER INFORMATION

"SEC. 206. (a)(1) For purposes of fulfilling his duties with respect to driver licensing, driver improvement, or transportation safety, the chief driver licensing official of any participating State may, on and after the date of enactment of this title [Oct. 25, 1982], request the Secretary to refer electronically or through the United States mails any request for information regarding the motor vehicle driving record of any individual to the chief driver licensing official of any State of record.

\*          \*          \*          \*          \*          \*          \*

"(5) Any request made under this subsection shall be made in such form, and according to such procedures, as the Secretary shall establish by regulation.

"(5)[sic] Any individual who is employed by a railroad as an operator of a locomotive, or who seeks employment with a railroad as an operator of a locomotive, may request the chief driver licensing official of a State to transmit information regarding the individual under subsection (a) of this section to his or her employer or prospective employer, or to the Secretary. There shall be no access to information in the Register under this paragraph which was entered in the Register more than three years before the date of such request, unless such information relates to revocations or suspensions that are still in effect on the date of the request. Information submitted to the Register by the States under Public Law 86–660 (74 Stat. 526) [set out as a note under former section 313 of this title] or under this title shall be subject to access for the purpose of this paragraph during the transition described under section 203(c) of this title.

*(6)(A) Any individual who holds or who has applied for a license or certificate of registry under section 7101 of title 46, United States Code, or merchant mariner's document under section 7302 of title 46, United States Code, shall request the chief driver licensing official of a State to transmit to the Secretary in accordance with subsection (a) of this section information regarding the motor vehicle driving record of the individual.*

137

*(B) The Secretary—*
> *(i) shall make the information available to the individual for review and written comment before denying or revoking the individual a license, certificate, or document based on that information or using that information in any action taken under chapter 77 of title 46, United States Code; and*
> *(ii) may no otherwise divulge or use that information, except for the purposes of section 7101, 7302, or 7703 of title 46, United Stated Code.*

*(C) Information regarding the motor vehicle driving record of an individual may not be transmitted to the Secretary under this paragraph if the information was entered in the Register more than five years before the date of the request for the information, unless the information relates to revocations or suspensions that are still in effect on the date of the request. Information submitted to the Register by States udner the Act of July 14, 1960 (74 Stat. 526), or under this Act are subject to access for the purpose of this paragraph during the transition to the Register established under section 203(c) of this Act.*

*     *     *     *     *     *     *

---

33 U.S.C. 1232(b)

## § 1232. Enforcement provisions

(b) CRIMINAL PENALTY.—
> (1) Any person who willfully and knowlingly violates this chapter or any regulation issued hereunder [shall be fined not more than $50,000 for each violation or imprisoned for not more than five yers, or both.] *commits a class D felony.*

> (2) Any person who, in the willful and knowing violation of this chapter or of any regulation issued hereunder, uses a dangerous weapon, or engages in conduct that causes bodily injury or fear of imminent bodily injury to any officer authorized to enforce the provisions of this chapter or the regulations issued hereunder, [shall, in lieu of the penalties prescribed in paragraph (1), be fined not more than $100,000, or imprisoned for not more than ten years, or both.] *commits a class C felony.*

---

33 U.S.C. 1236

## § 1236. Penalties for violations of regulations

For any violation of regulations issued pursuant to sections 1233 to 1235 of this title the following penalties shall be incurred:
> (a) A licensed officer shall be liable to suspension or revocation of license in the manner now prescribed by law for incompetency or misconduct.

> (b) Any person in charge of the navigation of a vessel other than a licensed officer shall be liable to a penalty of [$500.] *$5,000.*

> (c) The owner of a vessel (including any corporate officer of a corporation owning the vessel) actually on board shall be liable

to a penalty of 【$500.】 *$5,000,* unless the violation of regulations shall have occurred without his knowledge.

(d) Any other person shall be liable to a penalty of 【$250.】 *$2,500.*

The Commandant of the Coast Guard is authorized and empowered to mitigate or remit any penalty herein provided for in the manner prescribed by law for the mitigation or remission of penalties for violation of the navigation laws.

---

33 U.S.C. 1481

## § 1481. Violations; penalties

(A) 【Any person who】 A person commits a class A misdemeanor if that person—

(1) willfully violates a provision of this chapter or a regulation issued thereunder; or

(2) willfully refuses or fails to comply with any lawful order or direction given pursuant to this chapter; or

(3) willfully obstructs any person who is acting in compliance with an order or direction under this chapter【, shall be fined not more than $10,000 or imprisoned not more than one year, or both】.

(b) In a criminal proceeding for an offense under paragraph (1) or (2) of subsection (a) of this section it shall be a defense for the accused to prove that he used all due diligence to comply with any order or direction or that he had reasonable cause to believe that compliance would have resulted in serious risk to human life.

---

33 U.S.C. 1514(a)

## § 1514. Remedies

(A) CRIMINAL PENALTIES.—Any person who willfully violates any provision of this chapter or any rule, order, or regulation issued pursuant thereto 【shall on conviction be fined not more than $25,000 for each day of violation or imprisoned for not more than 1 year, or both.】 *commits a class A misdemeanor for each day of violation.*

---

33 U.S.C. 1517(b)

## § 1517. Liability

(b) OIL DISCHARGE; NOTIFICATION; PENALTY; USE OF NOTIFICATION IN CRIMINAL CASES LIMITED.—Any individual in charge of a vessel or a deepwater port shall notify the Secretary as soon as he has knowledge of a discharge of oil. Any such individual who fails to notify the Secretary immediately of such discharge 【shall, upon conviction, be fined not more than $10,000 or imprisoned for not more than 1 year, or both.】 *commits a class A misdemeanor.* Notification received pursuant to this subsection, or information obtained by the use of such notification, shall not be used against any

139

such individual in any criminal case, except a prosecution for perjury or for giving a false statment.

---

### 33 U.S.C. 1908(a)

### § 1908. Penalties for violations

(a) CRIMINAL PENALTIES; PAYMENT FOR INFORMATION LEADING TO CONVICTION.—A person who knowingly violates the MARPOL Protocol, this chapter, or the regulations issued thereunder [shall, for each violation, be fined not more than $50,000 or be imprisoned for not more than 5 years, or both.] *commits a class D felony.* In the discretion of the Court, an amount equal to not more than ½ of such fine may be paid to the person giving information leading to conviction.

---

### 46 U.S.C. 2113

### *§ 2113. Authority to exempt certain vessels*

*(a) If the Secretary decides that the application of a provision of part B or F of this subtitle is not necessary in performing the mission of a vessel engaged in excursions or an oceanographic research vessel, the Secretary by regulation may—*

*(1) for an excursion vessel, issue a special permit specifying the conditions of operation and equipment; and*

*(2) exempt the oceanographic research vessel from that provision under conditions the Secretary may specify.*

*(b)(1) Notwithstanding another law, the Secretary may waive the application of the requirements of parts B, C, F (except section 8103), and H of this subtitle, if the Secretary determines that the waiver is needed in a crisis concerning—*

*(A) a discharge, or threat of discharge, of oil or hazardous substances; or*

*(B) the national defense, as determined by the Secretary of Defense.*

*(2) A waiver may be issued under this section on the Secretary's own initiative or on request of the head of another department, agency, or instrumentality of the United States Government.*

*(3) A waiver issued under this section shall—*

*(A) state the reason for the waiver;*

*(B) be for a specified period, not to exceed one year, and may not be renewed;*

*(C) state which requirements of law are being waived; and*

*(D) terminate when qualified individuals or vessels are available.*

---

### 46 U.S.C. 2302

### § 2302. Penalties for negligent operations

(a) A person operating a vessel in a negligent manner that endangers the life, limb, or property of a person is liable to the United States Government for a civil penalty of not more than $1,000.

(b) A person operating a vessel in a grossly negligent manner that endangers the life, limb, or property of a person 【shall be fined not more than $5,000, imprisoned for not more than one year, or both.】 *commits a class A misdemeanor.*

(c) An individual who is intoxicated when operating a vessel, as determined under standards prescribed by the Secretary by regulation【, shall be】—

(1) *is* liable to the United States Government for a civil penalty of not more than $1,000; or

(2) 【fined not more than $5,000, imprisoned for not more than one year, or both.】 *commits a class A misdemeanor.*

\*        \*        \*        \*        \*        \*        \*

---

46 U.S.C. 3318

## § 3318. Penalties

(a) Except as otherwise provided in this part, the owner, charterer, managing operator, agent, master, or individual in charge of a vessel operated in violation of this part or a regulation prescribed under this part, and a person violating a regulation that applies to a small passenger vessel, freight vessel of less than 100 gross tons, or sailing school vessel, are liable to the United States Government for a civil penalty of not more than $5,000. The vessel also is liable in rem for the penalty.

(b) A person that knowingly manufactures, sells, offers for sale, or possesses with intent to sell, any equipment subject to this part, and the equipment is so defective as to be insufficient to accomplish the purpose for which it is intended, 【shall be fined not more than $10,000, imprisoned for not more than 5 years, or both.】 *commits a class D felony.*

(c) A person that employs a means or device whereby a boiler may be subjected to a pressure greater than allowed by the terms of the vessel's certificate of inspection 【shall be fined not more than $5,000, imprisoned for not more than 5 years, or both.】 *commits a class D felony.*

(d) A person that deranges or hinders the operation of any machinery or device employed on a vessel to denote the state of steam or water in any boiler or to give warning of approaching danger, or permits the water level of any boiler when in operation of a vessel to fall below its prescribed low-water line, 【shall be fined not more than $5,000, imprisoned for not more than 5 years, or both.】 *commits a class D felony.*

(e) A person that alters, defaces, obliterates, removes, or destroys any plans or specifications required by and approved under a regulation prescribed under section 3306 of this title, with intent to deceive or impede any official of the United States in carrying out that official's duties, 【shall be fined not more than $10,000, imprisoned for not more than 5 years, or both.】 *commits a class A misdemeanor.*

(f) A person 【shall be fined not less than $1,000 but not more than $10,000, and imprisoned for not less than 2 years but not more than 5 years,】 *commits a class D felony if the person—*

141

(1) forges or counterfeits with intent to make it appear genuine any mark or stamp prescribed for material to be tested and approved under section 3306 of this title or a regulation prescribed under section 3306;

(2) knowingly uses, affixes, or causes to be used or affixed, any such forged or counterfeited mark or stamp to or on material of any description;

(3) with fraudulent intent, possesses any such mark, stamp, or other device knowing it to be forged or counterfeited; or

(4) with fraudulent intent, marks or causes to be marked with the trademark or name of another, material required to be tested and approved under section 3306 of this title or a regulation prescribed under section 3306.

(g) A person is liable to the Government for a civil penalty of not more than $5,000, if the person—

(1) interferes with the inspection of a nautical school vessel;

(2) violates a regulation prescribed for a nautical school vessel;

*     *     *     *     *     *     *

---

## 46 U.S.C. 3711(a)

### § 3711. Evidence of compliance by foreign vessels

(a) A foreign vessel to which this chapter applies may operate on the navigable waters of the United States, or transfer oil or hazardous material in a port or place under the jurisdiction of the United States, only if the vessel has been issued a certificate of compliance by the Secretary. The Secretary may issue the certificate only after the vessel has been examined and found to be in compliance with this [chapter and] *chapter, and section 311(j) of the Federal Water Pollution Control Act (33 U.S.C. 1321(j))* regulations prescribed under this chapter. The Secretary may accept any part of a certificate, endorsement, or document, issued by the government of a foreign country under a treaty, convention, or other international agreement to which the United States is a party, as a basis for issuing a certificate of compliance.

---

## 46 U.S.C. 3713(a)(1)

### § 3713. Prohibited acts

(a) A person may not—

(1) violate this [chapter or] *chapter, or section 311(j) of the Federal Water Pollution Control Act (33 U.S.C. 1321(j))* a regulation prescribed under this chapter;

---

## 46 U.S.C. 3714(d)

### § 3714. Inspection and examination

*(d) An inspection required under this section shall include a determination whether the vessel is being operated in compliance with the contingency plan required for that vessel by section 311(j) of the*

142

*Federal Water Pollution Control Act (33 U.S.C. 1321(j)). In making this determination, the Secretary shall ascertain that the equipment identified in the plan is in good working order and that necessary training, testing, and drills have been conducted.*

---

46 U.S.C. Chapter 1, note

### Chapter 1.—Administration of Shipping Laws

HISTORICAL NOTE

[Waiver of Compliance With Navigation and Inspection Laws; Termination Date. Act Dec. 27, 1950, c. 1155, §§ 1, 2, 64 Stat. 1120, provided that:

["The head of each department or agency responsible for the administration of the navigation and vessel-inspection laws is directed to waive compliance with such laws upon the request of the Secretary of Defense to the extent deemed necessary in the interest of national defense by the Secretary of Defense. The head of such department or agency is authorized to waive compliance with such laws to such extent and in such manner and upon such terms as he may prescribe, either upon his own initiative or upon the written recommendation of the head of any other Government agency, whenever he deems that such action is necessary in the interest of national defense.

["Sec. 2. The authority granted by this Act shall terminate at such time as the Congress by concurrent resolution or the President may designate."]

Similar Provisions. Joint Res. Mar. 31, 1947, c. 27, 61 Stat. 33, as amended July 31, 1947, c. 408, 61 Stat. 685; Feb. 27, 1948, c. 78, § 2, 62 Stat. 38; Feb. 28, 1949, c. 12, 63 Stat. 9; Joint Res. June 29, 1949, c. 281, § 1, 63 Stat. 349; June 30, 1950, c. 427, § 4, 64 Stat. 309.

Temporary Suspension of Navigation and Inspection Laws. Act Mar. 31, 1947, c. 28, 61 Stat. 33, providing for the suspension of navigation and inspection laws as applied to the Department of the Army upon the termination of section 635 of Appendix to Title 50, War and National Defense was repealed by Act Dec. 27, 1950, c. 1155, § 3, 64 Stat. 1120.

---

46 U.S.C. 3718 (b), (c)

### § 3718. Penalties

(b) A person willfully and knowingly violating this chapter or a regulation prescribed under this chapter [shall be fined not more than $50,000, imprisoned for not more than 5 years, or both.] *commits a class D felony.*

(c) Instead of the penalties provided by subsection (b) of this section, a person willfully and knowingly violating this chapter or a regulation prescribed under this chapter, and using a dangerous weapon, or engaging in conduct that causes bodily injury or fear of imminent bodily injury to an official authorized to enforce this chapter or a regulation prescribed under this chapter, [shall be

fined not more than $100,000, imprisoned for not more than 10 years, or both.] *commits a class C felony.*

---

### 46 U.S.C. 5116 (d), (e)

#### § 5116. Penalties

(d) A person causing or allowing the departure of a vessel from a place within the jurisdiction of the United States in violation of a detention order issued under section 5113 of this title [shall be fined not more than $10,000, imprisoned for not more than one year, or both.] *commits a class A misdemeanor.*

(e) A person causing or allowing the alteration, concealment, or removal of a mark placed on a vessel under section 5103(b) of this title and the regulations prescribed under this chapter, except to make a lawful change or to escape enemy capture in time of war, [shall be fined not more than $10,000 imprisoned for not more than 2 years, or both.] *commits a class A misdemeanor.*

---

### 46 U.S.C. 7101

\*        \*        \*        \*        \*        \*        \*

*(g) The Secretary may not issue a license or certificate of registry under this section unless an individual applying for the license or certificate makes available to the Secretary, under section 206(b)(4) of the National Driver Register Act of 1982 (23 U.S.C. 401 note), all information contained in the National Driver Register regarding the motor vehicle driving record of that individual.*

*(h) The Secretary shall conduct a review of the criminal record of each individual how applies for a license under this section.*

---

### 46 U.S.C. 7107

#### § 7107. Duration of certificates of registry

A certificate of registry issued under this part [is not limited in duration.] *is valid for 5 years, and may be renewed for additional 5-year periods.* However, the validity of a certificate issued to a medical doctor or professional nurse is conditioned on the continuous possession by the holder of a license as a medical doctor or registered nurse, respectively, issued by a State.

---

### 46 U.S.C. 7109

#### § 7109. Renewal of licenses

*(a)* A license issued under this part may be renewed for additional 5-year periods.

*(b) The Secretary shall conduct a review of the criminal record of each holder of a license issued under this part who applies for renewal of that license under this section.*

46 U.S.C. 7302

*     *     *     *     *     *     *

*(c) The Secretary may not issue a merchant mariner's document under this chapter unless the individual applying for the document makes available to the Secretary, under section 206(b)(4) of the National Driver Register Act of 1982 (23 U.S.C. 401 note), all information contained in the National Driver Register regarding the motor vehicle driving record of that individual.*

*(d) A merchant mariner's document issued under this chapter is valid for 5 years, and may be renewed for additional 5-year periods.*

46 U.S.C. 7701(c)

**[**(c) when a license, certificate of registry, or merchant mariner's document has been revoked under this chapter, the former holder may be issued a new license, certificate, or document only after it has been decided, under regulations prescribed by the Secretary, that the issuance is compatible with the requirements of good discipline and safety at sea.**]**

*(c) When a license, certificate of registry, or merchant mariner's document has been revoked under this chapter, the former holder may be issued a new license, certificate, or document only after it has been decided, under regulations prescribed by the Secretary, that the issuance is compatible with the requirement of good discipline and safety at sea and the former holder provides satisfactory proof that the bases for revocation are no longer valid.*

---

46 U.S.C. 7702

*     *     *     *     *     *     *

*(c) The Secretary shall request an individual holding a license, certificate of registry, or merchant mariner's document to make available to the Secretary, under section 206(b)(4) of the National Driver Register Act of 1982 (23 U.S.C. 401 note), all information contained in the National Driver Register regarding the motor vehicle driving record of that individual.*

*(d)(1) The Secretary shall temporarily suspend and take possession of the holder's license, certificate, or document if—*

*(A) that individual performs a sensitive function on a vessel as determined by the Secretary; and*

*(B) there is probable cause to believe that the holder—*

*(i) has performed the sensitive function while using alcohol or a dangerous drug;*

*(ii) has been denied a motor vehicle license by a State for cause within the 5-year period immediately before the temporary suspension; or*

*(iii) has been convicted of an offense for which a license, certificate, or document may be suspended or revoked under sections 7703(2) and 7703(3) of this title.*

*(2) If a license, certificate, or document is temporarily suspended under this section, an expedited hearing under subsection (a) of this section shall be held within 15 days after the temporary suspension.*

145

46 U.S.C. 7704

## § 7704. Dangerous drugs as grounds for revocation

(a) In this [section] *part*, "dangerous drug" means a narcotic drug, controlled substance, and marihuana (as defined in section 102 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 802)).

(b) If it is shown at a hearing under this chapter that a holder of a license, certificate of registry, or merchant mariner's document issued under this part, within 10 years before the beginning of the proceedings, has been convicted of violating a dangerous drug law of the United States or of a State, the license, certificate, or document shall be revoked.

(c) If it is shown that a holder has been a user of, or addicted to, a dangerous drug, the license, certificate of registry, or merchant mariner's document shall be revoked unless the holder provides satisfactory proof that the holder is cured.

---

46 U.S.C. 7703

## § 7703. Bases for suspension or revocation

[A license, certificate of registry, or merchant mariner's document issued by the Secretary may be suspended or revoked if, when acting under the authority of that license, certificate, or document, the holder—

    [(1) has violated or failed to comply with this subtitle, a regulation prescribed under this subtitle, or any other law or regulation intended to promote marine safety or to protect navigable waters.

    [(2) has committed an act of incompetence, misconduct, or negligence.]

*A license, certificate of registry, or merchant mariner's document issued by the Secretary may be suspended or revoked if the holder—*

    *(1) when acting under the authority of that license, certificate, or document—*

        *(A) violates or fails to comply with this subtitle, a regulation prescribed under this subtitle, or any other law or regulation intended to promote marine safety or to protect navigable waters; or*

        *(B) commits an act of incompetence, misconduct, or negligence;*

    (2) is convicted of an offense that would prevent the issuance or renewal of a license, certificate, or document; or

    (3) is convicted of an offense described in section 205(a)(3)(A) or (B) of the National Driver Register Act of 1982 (23 U.S.C. 401 note) within the 5-year period immediately before the suspension or revocation.

---

46 U.S.C. 8101

\*     \*     \*     \*     \*     \*     \*

(e) When a vessel is deprived of the service of a member of its complement without the consent, fault, or collusion of the owner,

charterer, managing operator, agent, master, or individual in charge of the vessel, the master shall engage, if obtainable a number of members equal to the number of those of whose services the master has been deprived. The replacements must be of the same or a higher grade or rating than those whose places they fill. If the master finds the vessel is sufficiently manned for the voyage, and replacements are not available to fill all the vacancies, the vessel may proceed on its voyage. Within 12 hours after the vessel arrives at its destinnation, the master shall report in writing to the Secretary the cause of each deficiency in the complement. A master failing to make the report is liable to the United States Government for a civil penalty of 【$50】 *$1,000* for each deficiency.

(f) The owner, charterer, or managing operator of a vessel not manned as required by this section is liable to the Government for a civil penalty of 【$100, or, for a deficiency of a licensed individual, a penalty of $500.】 *$10,000.*

(g) A person may not employ an individual as, and an individual may not serve as, a master, mate, engineer, radio officer, or pilot of a vessel to which this part applies or which is subject to inspection under chapter 33 of this title if the individual is not licensed by the Secretary. A person (including an individual) violating this subsection is liable to the Government for a civil penalty of not more than 【$500.】 *$10,000.* Each day of a continuing violation is a separate offense.

*    *    *    *    *    *    *

*(i) Whenever the most senior deck officer and the next most senior crewmember on a vessel reasonably believe that the master or individual in charge of the vessel is intoxicated as a result of the use of dangerous drugs (as defined in section 7704 of this title) or alcohol and is incapable of commanding the vessel because of that intoxication, the most senior deck officer shall—*

 *(1) temporarily relieve the master;*
 *(2) temporarily take command of the vessel;*
 *(3) immediately enter the details of the incident in the vessel log; and*
 *(4) report those details to the Secretary—*
  *(A) by the most expeditious means available; and*
  *(B) in written form transmitted within 12 hours after the vessel arrives at its next port.*

———

46 U.S.C. 8104 (i), (j)

## § 8104. Watches.

(i) A person violating subsection (a) or (b) of this section is liable to the United States Government for a civil penalty of 【$100.】 *$10,000.*

(j) The owner, charterer, or managing operator of a vessel on which a violation of subsection (c), (d), (e), or (h) of this section occurs is liable to the Government for a civil penalty of 【$500.】 *$10,000.* The seaman is entitled to discharge from the vessel and receipt of wages earned.

147

46 U.S.C. 8503(e)

### § 8503. Federal pilots authorized

(e) A person that knowingly violates this section or a regulation prescribed under this section [shall be fined not more than $50,000, imprisoned for not more than five years, or both.] *Commits a class D felony.*

---

46 U.S.C. 8702

### § 8702. Certain crew requirements

(e) The owner, charterer, managing operator, agent, master, or individual in charge of a vessel operated in violation of this section or a regulation prescribed under this section is liable to the United States Government for a civil penalty of [$500.] *$10,000.*

---

46 U.S.C. 8501(d)

[(d) A State may not adopt a regulation or provision that requires a coastwide vessel to take a pilot licensed or authorized by the laws of a State if the vessel—

[(1) is propelled by machinery and subject to inspection under part B of this subtitle; or

[(2) is subject to inspection under chapter 37 of this title.]

---

*(d) A State may not adopt a regulation or provision that requires a coastwise vessel, other than a tanker whose pilot's license is not endorsed for pilotage in that state's waters, to take a pilot licensed or authorized by the laws of a State if the vessel—*

*(1) is propelled by machinery and subject to inspection under part B of this subtitle; or*

*(2) is subject to inspection under chapter 37 of this title.*

---

46 U.S.C. 8502(d)

[*(d) A State or political subdivision of a State may not levy pilot charges on a vessel lawfully piloted by a pilot required under this section.*]

*(d) Except in the case of a tanker for which a state pilot is authorized under this chapter, a State or political subdivision of a State may not levy pilot charges on a vessel lawfully piloted by a pilot required under this section.*

(e) The owner, charterer, managing operator, agent, master, or individual in charge of a vessel operated in violation of this section or a regulation prescribed under this section is liable to the United States Government for a civil penalty of [$500.] *$10,000.* The vessel also is liable in rem for the penalty.

(f) An individual serving as a pilot without having a license required by this section or a regulation prescribed under this section is liable to the Government for a civil penalty of [$500.] *$10,000.*

148

46 U.S.C. 9101

## § 9101. Standards for foreign tank vessels

〖(a) The Secretary shall—

〖(1) periodically evaluate the manning, training, qualification, and watchkeeping standards prescribed by the certificating country of a foreign vessel to which chapter 37 of this title applies, that operates on the navigable waters of the United States and transfers oil or hazardous material in a port or place under the jurisdiction of the United States; and

〖(2) after each evaluation made under clause (1) of this subsection, decide whether the foreign country, whose system for licensing and certification of seamen was evaluated, has standards that are equivalent to or more stringent than United States standards or international standards accepted by the United States.〗

*(a)(1) The Secretary shall evaluate the manning, training, qualification, and watchkeeping standards of a foreign country that issues documentation for any vessel to which chapter 37 of this title applies—*

*(A) on a periodic basis; and*

*(B) after a casualty involving that vessel.*

*(2) After each evaluation made under paragraph (1) of this subsection, the Secretary shall determine whether—*

*(A) the foreign country has standards for licensing and certification of seamen that are at least equivalent to United States law or customary international law; and*

*(B) those standards are being enforced.*

*(3) If the Secretary determines under this subsection that a country has failed to maintain or enforce standards at least equivalent to United States law or customary international law, the Secretary shall prohibit vessels issued documentation by that country from entering the United States.*

*(4) The Secretary may allow provisional entry of a vessel prohibited from entering the United States under paragraph (3) of this subsection if—*

*(A) the owner or operator of the vessel establishes, to the satisfaction of the Secretary, that the vessel is not unsafe or a threat to the marine environment; or*

*(B) the entry is necessary for the safety of the vessel or individuals on the vessel.*

*(5) The Secretary shall continue any prohibition imposed under paragraph (3) of this subsection until the Secretary decides that the country has adopted, and is enforcing, standards that are at least equivalent to United States law or customary international law.*

\*       \*       \*       \*       \*       \*       \*

---

46 U.S.C. 9302(b)

〖(b) An individual of a vessel licensed for navigation on the Great Lakes under section 7101 of this title, or equivalent provisions of Canadian law, and qualified for the route being navigated,

149

may serve as the pilot required on waters not designated by the President.〗

*(b) A member of the complement of a vessel that is subject to subsection (a) of this section may serve for the route being navigated as the pilot required on waters not designated by the President, if the member is—*

> *(1) a citizen of the United States and holds a license issued under section 7101(c)(2) of this title, or*

> *(2) a citizen of Canada and has a license issued under provisions of Canadian law equivalent to section 7101(c)(2) of this title.*

---

### 46 U.S.C. 9302(d)(1)

(d) A vessel may be operated on the United States waters of the Great Lakes without a United States or Canadian registered pilot when—

> 〖(1) the Secretary notifies the master that a registered pilot is not available; or〗

> *(1) except for a vessel to which chapter 37 applies, the Secretary notifies the master that a registered pilot is not available; or*

---

### 46 U.S.C. 9303(f)

(f) The Secretary shall prescribe by regulation rates and charges for pilotage services, giving consideration to the public interest and the costs of providing the services. *A vessel is liable in rem for charges for pilotage services under this subsection and any costs of collection.*

---

### 46 U.S.C. 9308

### § 9308. Penalties

(a) An owner, charterer, managing operator, agent, master, or individual in charge of a vessel knowingly allowing the vessel to be operated in violation of section 9302 of this title is liable to the United States Government for a civil penalty of 〖$500〗 *$25,000* for each day during which the vessel is in violation. The vessel also is liable in rem for the penalty.

(b) An individual who directs the navigation of a vessel in violation of section 9302 of this title is liable to the Government for a civil penalty of 〖$500〗 *$10,000* for each day during which the violation occurs.

(c) A person violating a regulation prescribed under section 9303 of this title is liable to the Government for a civil penalty of 〖$500〗 *$10,000*.

## ADDITIONAL VIEWS

We support H.R. 1465 and believe that it would vastly improve our nation's ability to prevent and respond effectively to oil pollution incidents such as the *Exxon Valdez* disaster last March, and subsequent spills in the Delaware River, the Houston Ship Channel and off the Rhode Island coast.

Nevertheless, we believe the bill can—and must—be improved.

First, we object to the provision in H.R. 1465 that would preempt state oil pollution liability and compensation laws.

Many states have standards of liability and compensation for oil spills that are significantly stronger than those propose in H.R. 1465. A dozen states have their own oil pollution funds that are available to clean up spills and—in some cases—to compensate their citizens for damages they may suffer as the result of a spill. The public has an interest in preserving these state funds and laws, and that public interest is far more compelling to us than the oil and shipping industry's narrow interest in preempting them.

The preemptive language of H.R. 1465 violates a longstanding tradition that Federal environmental laws should not preempt state laws. For this reason, the Clean Water Act does not preempt; the Superfund law does not preempt; and Federal oil pollution laws—including those governing outer Continental Shelf, the trans-Alaska pipeline and deepwater ports do not preempt. Why now, after the the *Exxon Valdez* has exposed the shortcomings of both Federal and industry preparedness to deal with oil spills, shoud we deprive state governments of the right to protect their citizens? The preemption provisions on H.R. 1465 make no sense and should be removed.

Second, we believe that the liability limits contained in H.R. 1465 should be substantially increased.

Under the Committee bill, the liability of the the *Exxon Valdez* for all cleanup costs and damages resulting from the Alaska spill would have been limited to less than $50 million. This is despite the fact that Exxon has already spent more than $2 billion trying to clean up a fraction of the oil that was spilled. The size of the *Exxon Valdez* spill was unprecented, but there is no question that incidents like it could—and probably will—happen again. And a major oil spill off the mid-Atlantic coast or in Chesapeake Bay or Puget Sound or almost anywhere else among our coasts or inland waters could result in comparable damage. It is obvious that the liability limits contained in H.R. 1465 ($60 million for vessels and $75 million for facilities) are unrealistically low and must be increased.

Third, we believe that those responsible for shipping and storing oil should be held to a higher standard of care than that called for in H.R. 1465.

(150)

As reported, the Committee bill allows responsible parties to limit their liability except in the event of gross negligence or willful misconduct within the privity or knowledge of that responsible party. We believe this standard is far too lax. The *Exxon Valdez* had a drunken captain, and was piloted by someone not legally qualified to do so. As a result, the vessel was driven out of a clearly marked shipping lane onto a clearly marked reef.

There is no reason on earth why Exxon should be permitted to limit its liability in such a case. But under the Committee bill, Exxon could limit its liability if a similar incident were to happen in the future, unless it could be shown that the grossly negligent actions of the captain and chief mate occurred "within the privity and knowledge" of the corporate executives back in Houston. We believe that liability limits should be removed whenever the negligence or misconduct of the responsible party results in an oil spill.

Fourth, we believe that H.R. 1465 contains some unnecessary impediments to full recovery by those suffering economic loss as a result of an oil spill.

For example, under the bill, state and local governments can only recover for lost taxes or other revenues for a period of one year. But what happens to a town like Valdez or Cordova two or three years after a spill if the local fisheries do not recover?

Also under the Committee bill, fishermen and other private parties can only recover for lost income if they ordinarily derive at least 25 percent of their earnings from the resource that has been damaged by oil pollution. But in Alaska, as in many other areas of the country, coastal residents depend on part-time fishing for a portion of their income. Even if that income does not reach the 25 percent threshold, we believe that those citizens have a right to full—not partial-compensation.

Another provision of the Committee bill requires fishermen or owners of damaged beachfront property to wait 180 days before submitting a claim for compensation to the Federal oil spill fund. During this period, he or she must negotiate, instead, with the responsible party. We believe this time period is too long.

Finally, we believe that H.R. 1465 should be amended to guarantee full recovery for damages to natural resources caused by oil pollution. Current law in the area of natural resource damage recovery is reflected in a recent District Court decision that disallowed regulations developed on this subject by the Department of the Interior. Because the Court decision was handed down subsequent to Committee action, we do not fault the Committee for the language on natural resource valuation that is included in the bill. Nevertheless, we hope the House will adopt an alternative approach that reflects the court decision and which does not artificially narrow the grounds for recovery for lost or damaged natural resources.

For 14 years, our Committee has worked to develop and enact a comprehensive oil pollution liability and compensation bill. Sadly, it has taken a tragic oil spill in Alaska to awaken others to the need for this legislation. This year, at long last, the enactment of oil pollution control legislation seems certain. We believe that we should seize this opportunity, not just to pass a good bill, which

152

H.R. 1465 already is; to pass a truly strong and effective bill, which—with a few carefully drawn amendments—H.R. 1465 can easily become.

GERRY E. STUDDS.
EARL HUTTO.
BILL HUGHES.
STEPHEN J. SOLARZ.
H. JAMES SAXTON.
CLAUDINE SCHNEIDER.
JOSEPH E. BRENNAN.
FRANK PALLONE, Jr.
PORTER GOSS.
ROY DYSON.

○

101st Congress } HOUSE OF REPRESENTATIVES { Rept. 101-242
1st Session Part 3

# OIL POLLUTION LIABILITY AND COMPENSATION ACT OF 1989

September 20, 1989.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. Roe, from the Committee on Science, Space, and Technology, submitted the following

# REPORT

together with

## DISSENTING VIEWS

[To accompany H.R. 1465]

The Committee on Science, Space, and Technology, to whom was referred the bill (H.R. 1465) to establish limitations on liability for damages resulting from oil pollution, to establish a fund for the payment of compensation for such damages, and for other purposes, having considered the same, report favorably thereon with amendments and recommend that the bill do pass.

## CONTENTS

| | Page |
|---|---|
| I. Purpose of the bill | 7 |
| II. Committee actions | 7 |
| III. Background and need for the legislation | 8 |
| IV. Explanation of the bill | 18 |
| V. Sectional summary of the bill, as reported | 24 |
| VI. Congressional Budget Act information | 26 |
| VII. Committee cost estimate | 26 |
| VIII. Effect of legislation on inflation | 26 |
| IX. Changes in existing law made by the bill, as reported | 26 |
| X. Oversight findings and recommendations | 26 |
| XI. Oversight findings and recommendations, Committee on Government Operations | 26 |
| XII. Committee recommendation | 27 |

21-841

2

The amendments are as follows:

At the end of the amendment recommended by the Committee on Merchant Marine and Fisheries insert a new title VII as follows:

## TITLE VII—RESEARCH AND DEVELOPMENT

### SEC. 701. OIL POLLUTION RESEARCH AND DEVELOPMENT PROGRAM.

(a) INTERAGENCY COORDINATING COMMITTEE ON OIL POLLUTION RESEARCH..—

(1) ESTABLISHMENT.—There is established an Interagency Coordinating Committee on Oil Pollution Research (hereafter in this section referred to as the "Interagency Committee").

(2) PURPOSES.—The Interagency Committee shall coordinate a comprehensive program of oil pollution research, development, and demonstration among the Federal agencies, in cooperation and coordination with industry, universities, research institutions, and other nations, and shall foster cost-effective research mechanisms, including the joint funding of research.

(3) MEMBERSHIP.—The Interagency Committee shall include representatives from the Department of Commerce (including the National Oceanic and Atmospheric Administration and the National Institute of Standards and Technology), the Department of Energy, the Department of the Interior (including the Minerals Management Service and the United States Fish and Wildlife Service), the Department of Transportation (including the United States Coast Guard and the Maritime Administration), and the Environmental Protection Agency, a well as such other Federal agencies as the President may designate. The President shall designate a chairman of the Interagency Committee from among its members.

(4) OIL POLLUTION RESEARCH PLAN.—(A) Within 120 days after the date of enactment of this Act, the Interagency Committee shall submit to Congress a plan for the implementation of the research aspects of the oil pollution research and development program established pursuant to subsection (b). The research plan shall—

(i) identify agency roles and responsibilities;

(ii) assess the current status of knowledge on oil pollution technologies and effects;

(iii) identify significant research gaps and priorities;

(iv) review responses to oil discharges over the past 20 years, identify major technological deficiencies in those responses, and establish research priorities to address those deficiencies;

(v) estimate the resources needed to conduct the oil pollution research and development program established pursuant to subsection (b), timetables

for completing research tasks, and, to the extent feasible, expected industry, university, research institution, and foreign nation participation in the research and development program including joint funding mechanisms; and

(vi) identify a lead agency for carrying out effects research under subsection (b)(4).

(B) The agency which is represented by the Chairman of the Interagency Committee shall contract with the National Academy of Sciences to—

(i) provide advice and guidance in the preparation and development of the research plan; and

(ii) assess the adequacy of the plan as submitted, and submit a report to Congress on the conclusions of such assessment.

The National Institute of Standards and Technology shall provide the Interagency Committee with advice and guidance on issues relating to quality assurance and standards and measurements relating to its activities under this section.

(b) OIL POLLUTION RESEARCH AND DEVELOPMENT PROGRAM.—

(1) ESTABLISHMENT.—The Interagency Committee shall coordinate the establishment, by the agencies represented on the Interagency Committee, of a program for conducting oil pollution research and development, as provided in this subsection.

(2) INNOVATIVE OIL POLLUTION TECHNOLOGY.—The program established under this subsection shall provide for research, development, and demonstration of new or improved technologies which are effective in preventing or mitigating oil discharges and which protect the environment, including—

(A) development of improved designs for ships and facilities, and improved operational practices;

(B) research, development, and demonstration of improved technologies to measure the ullage of a vessel, prevent discharges from tank vents, prevent discharges during lightering and bunkering operations, contain discharges on the deck of a vessel, and otherwise contain discharges of oil from vessels and facilities;

(C) research, development, and demonstration of new or improved systems of mechanical, chemical, biological, and other methods (including the use of dispersants and bioremediation) for oil recovery, cleanup, and disposal;

(D) research, in consultation with the National Response Team, to improve the industry's and government's ability to respond quickly and effectively to oil discharges, including research to improve information systems for decisionmaking;

(E) development of technologies and methods to protect public health and safety from oil dis-

charges, including the population directly exposed to an oil discharge and response personnel performing cleanup activities;

(F) research and development of methods to restore and rehabilitate natural resources damaged by oil discharges;

(G) a demonstration to evaluate the relative effectiveness and environmental impacts of bioremediation technologies, including comparisons between bioremediation techniques that rely on the introduction of microorganisms and those that rely on the enhancement of indigenous microorganisms;

(H) research on the environmental effects of the use of technologies to prevent or mitigate oil discharges; and

(I) research on means for improving navigational systems on tankers, and a report, to be included in the first submission to Congress under subsection (e), containing an assessment of currently and potentially available navigational systems (including sonar and electronic chart display), and containing a plan with schedules to require or promote the use of appropriate systems.

(3) OIL POLLUTION TECHNOLOGY EVALUATION.—The program established under this subsection shall provide for oil pollution prevention and mitigation technology evaluation, including—

(A) the evaluation and testing of technologies developed independently of the research and development program established under this subsection;

(B) the establishment, where appropriate, of standards and testing protocols traceable to national standards to measure the performance of oil pollution prevention or mitigation technologies; and

(C) the use, where appropriate, or controlled field testing to evaluate real-world application of oil discharge prevention or mitigation technologies.

(4) OIL POLLUTION EFFECTS RESEARCH.—The program established under this subsection shall provide for research on the environmental effects of oil discharges, including—

(A) the development of improved models and capabilities for predicting the effects of oil discharges and the fate and transport of such oil;

(B) the development of methods, including economic methods, to assess damages to natural resources resulting from oil discharges;

(C) the identification and mapping of environmentally sensitive areas at particular risk to oil discharges;

(D) the collection of environmental baseline data in such areas for the determination of potential effects of oil discharges, including data on chronic oil discharges; and

(E) the development of plans for long-term monitoring of environmental effects in those areas, to be implemented in the event of a major oil discharge.

(5) SPECIAL STUDIES.—(A) The program established under this subsection shall include a 10-year comprehensive monitoring and research program by the Secretary of Commerce, in consultation with the Administrator of the Environmental Protection Agency, to determine the long-term environmental effects of the oil discharges by the Exxon Valdez into Prince William Sound and the Gulf of Alaska, by the World Prodigy into Narragansett Bay, by the Rachel B into the Houston Ship Channel, and by the Presidente Rivera into the Delaware River.

(B) The Prince William Sound study shall include related effects in the Gulf of Alaska and determine effects on the diverse marine and estuarine habitats and living marine resources, and the results of the study shall be applied to the development of methods of protecting arctic and subarctic marine and estuarine environments from oil discharges.

(6) MARINE SIMULATION RESEARCH.—The program established under this subsection shall include research on the greater use and application of geographic and ship response simulation models, including the development of additional data bases and updating of existing data bases using the resources of the National Maritime Research Center. It shall include research related to the most effective use of the geographic area and vessel simulations for—

(A) response plan evaluation and certification;

(B) response team training;

(C) tanker personnel training; and

(D) evaluation of vessel traffic control systems and vessel movement controls.

(c) GRANTS.—In carrying out the research and development program established under subsection (b), the agencies represented on the Interagency Committee may enter into contracts and cooperative agreements and make grants to universities, research institutions, and other persons.

(d) INTERNATIONAL COOPERATION.—In accordance with the research plan submitted under subsection (a)(4), the Interagency Committee shall coordinate and cooperate with other nations and foreign research entities in conducting oil pollution research and development and demonstration activities, including controlled field tests of oil discharges.

(e) ANNUAL REPORTS.—The Chairman of the Interagency Committee shall submit to Congress at the close of each fiscal year a report on the activities carried out under subsections (a) through (f) of this section in the preceding fiscal year, and on activities proposed to be carried out under subsections (a) through (f) of this section in the current fiscal year.

(f) FUNDING.—Not to exceed $25,000,000 of amounts in the Fund shall be available annually, without fiscal year limitation, to carry out subsections (a) through (f) of this section.

(g) REGIONAL CENTERS.—(1) Under the program established under this section, a minimum of 3 regional centers shall be established to address issues specific to the following geographic regions and climates:

(A) Tropical and subtropical coastal environments of Florida and the Gulf Coast.

(B) Temperate coastal environments.

(C) The Alaskan coastline and other cold water climates.

(2) Each regional center shall, in cooperation with the other regional centers as appropriate, design and implement a research program and strategy for dealing with major oil spills and related environmental damage for its region. Such research strategy and program shall, as appropriate, include the following elements:

(A) Projections of potential patterns and timing of a given spill's dispersal, taking into account size and rate of spills, time of year, weather and ocean flows, and circulation patterns.

(B) Development of improved understanding of the effects of the unique meteorology of the region on the concentration and distribution of oil pollutants.

(C) Examination of the regional specific impact of spills on coastal waters and coastline areas of the region, including subregional variations.

(D) Assessment of the physiochemical interactions between seawater and the distribution of oil pollutants in various water temperatures.

(E) Research on the effects of oil on flora and fauna, including the varying effects of location, dynamics, and type of oil spilled.

(F) The design of protocols to be followed to quantitate groundwater contamination associated with spills, including a focus on the potential impact on drinking water supplies.

(G) Coordination with appropriate Federal agencies with major oil spill research and development responsibility, including the National Oceanic and Atmospheric Administration, the National Aeronautics and Space Administration, the National Science Foundation, and the Department of Defense.

(3) At least one of the regional centers established under this subsection shall be able to demonstrate expertise and

experience in both marine and atmospheric research, as well as multidisciplinary strengths in geology and chemistry. Such center shall have ocean-going research vessel capacity and land-based remote sensing satellite utilization capacity, and should be located in the southernmost southeastern United States in closest proximity to a living coral reef.

(4) There are authorized to be appropriated for each of the fiscal years 1990, 1991, 1992, 1993, and 1994 not to exceed $1,000,000 for each regional center established under this subsection, such funds to be derived from the Fund established under this Act.

Amend the table of contents to reflect the new title VII as follows:

### TITLE VII—RESEARCH AND DEVELOPMENT
Sec. 701. Oil Pollution Research and Development Program.

### I. PURPOSE OF THE BILL

The purposes of the bill, as reported with amendments by the Committee, are:

(1) to establish a single comprehensive system of liability for damages resulting from oil pollution;

(2) to establish a fund for the payment of compensation for such damages;

(3) to improve oil pollution prevention and response; and

(4) to establish a comprehensive and coordinated program of oil pollution prevention and mitigation research, development and demonstration.

### II. COMMITTEE ACTIONS

H.R. 1465, The Oil Pollution Prevention, Removal Liability and Compensation Act of 1989, was introduced by the Hon. Walter Jones on March 16, 1989, and jointly referred to the Committees on Public Works and Transportation and Merchant Marine and Fisheries. The bill was ordered reported with an amendment in the nature of a substitute by the Committee on Public Works and Transportation on August 3, 1989, and by the Committee on Merchant Marine and Fisheries, with amendments, on September 18, 1989. The Committee on Science, Space, and Technology received a sequential referral on H.R. 1465 for September 19 and 20, 1989.

The Subcommittee on Natural Resources, Agriculture Research, and Environment held hearings on H.R. 3027 (a related bill) and oil spill technology research needs on September 7, 1989.[1] The Subcommittee received testimony from Rear Admiral Joel D. Sipes, Chief of the Office of Marine Safety, Security, and Environmental Protection, U.S. Coast Guard Department of Transportation; Erich Bretthauer, Acting Assistant Administrator, Office of Research and Development, U.S. Environmental Protection Agency ("EPA"), accompanied by Jim Makris, Director of the Chemical Emergency

---

[1] Hearings on H.R. 3027 before the Subcommittee on Natural Resources, Agriculture Research, and Environment of the Committee on Science, Space, and Technology, U.S. House of Representatives, 101st Cong., 1st Sess. (September 7, 1989) [hereinafter cited as "Hearing"].

Preparedness and Prevention Office, U.S. EPA, and the Chair of the National Response Team; John Robinson, Chief of the Hazardous Materials Response Branch, National Oceanic and Atmospheric Administration ("NOAA"), Department of Commerce; Ed Tennyson, Technology Assessment and Research Branch, Minerals Management Service, Department of the Interior, Michael Kinworthy, manager of Environmental Programs, UNOCAL, on behalf of the American Petroleum Institute; John M. Teal, Woods Hole Oceanographic Institution; F. Eugene Guest, Director, Computer Aided Operations Research Facility, Marine Safety International, National Maritime Research Facility; and Bruce R. Rosendahl, Dean and Weeks Professor, Rosenstiel School of Marine and Atmospheric Science, University of Miami.

On September 12, 1989, a quorum being present, the Subcommittee marked up H.R. 3027, adopted two amendments and forwarded the bill as amended to the Full Committee for further consideratrion on a voice vote. The Committee on Science, Space, and Technology met on September 19, 1989, and favorably reported H.R. 3027 with amendments. The Committee, having received a sequential referral on H.R. 1465 for September 19 and 20, 1989, also favorably reported H.R. 1465 with the amendment which replaces the research and development section that had been previously adopted for H.R. 3027.

### III. BACKGROUND AND NEED FOR LEGISLATION

#### A. *The oil spill problem*

According to the U.S. Coast Guard, the U.S. experienced between 9,000 and 12,100 oil spills in our nation's waters every year from 1973 to 1984. The vast majority of these spills were small and not cleaned up. Out of the approximately 10,000 oil spills reported in 1984, for example, only 3,100 cleanup operations were conducted, mostly by responsible parties or other non-government entities.

While most spills are small, the total amount of oil released into the U.S. marine environment from spills every year is significant, ranging from a low of 8.2 million gallons in 1977 to a high of 21.5 million gallons in 1975.[2] The National Research Council has estimated that waterborne transport accounts for about 28 percent of the total volume of oil spilled.[3]

While chronic, small discharges of oil into the marine environment are cause for environmental concern, the greatest economic and environmental damages are probably inflicted by large spills (defined as more than 1,200 bbl) caused primarily by tanker and barge accidents. Although large spills account for only a small fraction of the total number of spills, they account for most of the oil discharged. In 1983, for example, according to Coast Guard data, there were 19 large oil spills, which accounted for 0.2 percent of all

[2] Since the Exxon Valdez spill of about 11 million gallons alone is nearly four times larger than the previously worst single U.S. oil spill, total spill volume for 1989 is expected to be significantly higher than 1975.

[3] National Research Council, Marine Board, Commission on the Effectiveness of Dispersants, Using Oil Spill Dispersants at Sea, Washington (National Academy Press, 1988) at 11 (hereinafter, "NRC Dispersant Report".)

spills, but which accounted for 67 percent of the total volume of oil spilled.

### 1. The Exxon Valdez and other recent oil spills

On March 24, 1989, at 12:04 a.m. the supertanker, Exxon Valdez, struck Blight Reff in Prince William Sound Alaska, and spilled more than 11 million gallons of oil. This was the largest spill in U.S. history, and occurred in one of the nation's most sensitive ecosystems. The resulting contamination has adversely affected valuable natural resources in Prince William Sound and more than a thousand miles of coastline.

The oil spread from Prince William Sound into the Gulf of Alaska, Cook Inlet, and along the Kenai Peninsula to Kodiak Island. As of July 7, 1989, conservation workers counted the carcasses of 26,807 migratory birds, 843 sea otters, 93 eagles, and twelve other birds of prey. The long-term impacts on fish and wildlife are unknown. The spill has adversely affected three units of the National Park System: Kenia Fjords National Park, Aniakchak National Monument, and Katmai National Park and Preserve. An estimated 150 miles of beach have been oiled in Katmai National Park and Preserve as well as 18 to 20 miles of beach in Kenai National Park. Cleanup crews have been working in all three units.

The Alaska Department of Fish and Game closed several commercial fisheries in areas affected by the spill. Among them were salmon, herring, crab, and shrimp fisheries in Prince William Sound; salmon, herring, and shrimp fisheries in Cook Inlet, and the herring fishery at Kodiak. The Kodiak commercial salmon season was postponed several times because of oil contamination before opening on June 19, 1989.

It has recently been reported that cleanup costs have exceeded $1.3 billion,[4] which do not include direct damages to natural resources, long-term natural resource damage, loss of income due to natural resource damage, loss of tax revenue, and other effects on the local economy.

Three significant oil spills have occurred since the Exxon Valdez oil spill, all within 24 hours on June 23 and 24, 1989. The first of these additional spills occurred at 4:40 p.m. on June 23, when the 531-foot Greek registered tanker, World Prodigy, struck a rock at Brenton Reef immediately south of Newport, Rhode Island. According to the Coast Guard, approximately 290,000 gallons of No. 2 heating oil leaked into Narragansett Bay from the ruptured tanker. The appropriate pilot for those waters was not on board. Cleanup work has been completed.

The second of these spills occurred after an oil tanker, Rachel B, collided with an oil barge in the Houston Ship Channel. The tanker tore a hole in the barge, spilling an estimated 250,000 gallons of heavy slurry crude oil. Much of the oil reportedly washed ashore on beaches in an industrial area.

Finally, according to the Coast Guard, an estimated 300,000 gallons of heavy No. 6 industrial heating oil spilled into the Delaware

---

[4] Washington Post, September 10, 1989, at A-1.

10

River from a Uruguayan-registered tanker, the President Rivera. The tanker reportedly left the marked channel and ran aground.

## B. Adequacy of prevention of cleanup technology

The recent rash oil spills, and in particular the Exxon Valdez spill, has brought into sharp question the adequacy of existing oil pollution prevention and cleanup technologies. A Report to the President prepared by Transportation Secretary Skinner and EPA Administrator Reilly on the Valdez disaster concluded:

> The Exxon Valdez incident emphasized the need for greatly improved public and private research and development capabilities. Current response equipment is still inadequate in less than ideal conditions. Better mechanical, chemical, and biological strategies for cleanup are needed. The incident revealed how little we know about cold-water oil spill responses.[5]

Witnesses before the Subcommittee generally acknowledged that our present oil spill cleanup technologies are inadequate, particularly for large spills.[6] As Michael Kinworthy, the witness representing the American Petroleum Institute testified, "A realistic appraisal of the U.S. response to catastrophic spills recognizes that no effective containment of such spills has been accomplished."[7]

Oil spill pollution prevention and mitigation technologies can be divided into several areas: (1) prevention technologies; (2) mechanical containment and collection, including barriers, booms, and skimmers; (3) treatment technologies, including chemical dispersants, combustion, biodegradants, and other chemical treatment; and (4) shoreline cleanup. The Valdez disaster has illustrated the inadequacies of each of these response technologies.

### 1. Prevention technologies

The National Response Team Report to the President reaffirmed that the "avoidance of accidents remains the best way to assure the quality and health of our environment." [8] Agreeing, the American Petroleum Institute has issued a number of research and development recommendations aimed at preventing spills.[9] In particular, areas for research include the development of a shipboard oil spill response capability and the study of potential changes in vessel configuration and construction (e.g., ballast sides, smaller tank sizes, double bottoms.) Other ideas, such as pressurization which would prevent or slow the release oil from tankers, deserve further study.[10]

The development of tanker computer simulators also provides promising new opportunities for training pilots to prevent acci-

---

[5] National Response Team, The Exxon Valdez Oil Spill: A Report to the President (May 1988) at 37 (hereinafter, "NRT Report to the President").

[6] Hearing, supra, written statement of Bretthauer at 4; written statement of Robinson at 3; written statement of Teal at 1.

[7] Hearing, supra, written statement at 8.

[8] NRT Report to the President, supra, at ES–1.

[9] American Petroleum Institute, American Petroleum Institute Task Force on Oil Spills (June 14, 1989.) (Appendix A to written testimony of Michael Kinworthy.)

[10] Hearing, supra, statements by Hon. Claudine Schneider and Rear Admiral Sipes, Tr. at 44.

dents. Long proven in the aviation industry, simulators like those at the National Maritime Research Center can provide a center for research for the potential application of simulator training.[11]

### 2. Mechanical containment and collection

Booms and barriers deployed in marine spills are intended to provide physical barriers to prevent oil from spreading, permitting more efficient oil recovery and preventing pollution of beaches. Deployed immediately after a spill, booms and barriers can be quite effective in calm seas with little wind or current. It is largely acknowledged, however, that such containment devices have little utility in the open seas, where currents are frequently above one knot and waves over 2 to 3 feet.[12] In addition, booms must be deployed quickly to be effective, a condition often defeated in remote ocean spills.

Despite these limitations, there are some promising developments in containment technologies. The development of on-board containment systems that could be deployed immediately after a spill would obviate the need to airlift containment equipment from far-away ports.[13] A high pressure water jet barrier now under development has also been cited as a promising new technology.[14] Research in changes in the operation of booms, such as that successfully carried out by the Minerals Management Service, may also increase the utility of this containment technology.[15]

A wide variety of types of mechanical skimmers have been developed which are designed to separate and recover spilled oil from ocean water.[16] Some skimmer devices are small and generally portable, while others are mounted on, or are an integral part of, ships. Skimmers are generally limited by the same conditions that limit the utility of physical containment devices. Their efficacy is sharply reduced in rough seas, and recovery is most successful in the early stages of a spill when petroleum is still non-viscous and concentrated.

When oil is recovered by mechanical devices, it must be pumped from the skimmers into temporary storage containers and transported by land for ultimate disposal. A weak "link" anywhere along this cleanup chain can seriously hamper cleanup efforts. As John Robinson, Chief of NOAA's Hazardous Materials Response Branch, testified:

> The chain of events that must proceed smoothly in oil spill control—containment, transfer, storage, and disposal—suffers from several uniformly weak links. Oil spill containment operations are often hampered by poor visibility, high winds, moderate currents, and elevated sea state. Transfer operations frequently break down when oil viscosity increases beyond the design capability of avail-

---

[11] Hearing, supra, testimony of Guest, Tr. at 78–83
[12] (See, e.g., Congressional Research Service, Spill Containment and Cleanup Technology (May 19, 1989) at 3 (hereinafter cited as "CRS Oil Pollution Technology Report"); written statement of Tennyson at 6; NRC Dispersant Report, supra, at 16).
[13] Hearing, supra, testimony of Kinworthy, Tr. at 103.
[14] CRS Oil Pollution Technology Report, supra, at 3.
[15] (Hearing, supra, written testimony of Ed Tennyson at 6.)
[16] (See, e.g., CRS Oil Pollution Technology Report, supra, at 4 through 7).

able pumps. Emulsification can readily increase the volume of spilled oil beyond the capacity of available tank-age. The need for equipment that can be deployed with great speed and agility seems almost inconsistent with the requirement that it be designed to withstand oceanic forces.[17]

The Coast Guard has similarly noted the need to look at oil containment and recovery from a "systems" perspective.[18]

### 3. Treatment technologies

Several treatment technologies exist and are under development to mitigate the effects of an oil spill. Virtually all of the treatment technologies, however, are highly controversial, and there is general agreement that while such technologies are promising, significant additional research and development are needed both to prove the efficacy of the technologies in removing or degrading oil and to assess their environmental effects.

*Dispersants.*—Dispersants are chemicals which break a surface oil slick into small droplets which mix principally in the upper few meters of the water column. Dispersion accelerates natural evaporation, enhances natural biodegradation of the oil by increasing the surface area available for microbial action, and reduces the toxicity of the oil by diluting it over greater volumes of water. Given the technical difficulties of containing and recovering oil spilled in the open ocean, noted above, the oil industry has taken the view that dispersants are the most promising tool for mitigating oil spills.[19] Other countries, notably Great Britain, use dispersants as standard practice in mitigating oil spills.[20]

Questions remain, however, about the environmental effects of the dispersants themselves. Prior studies, particularly after the Torrey Canyon spill in 1967, indicate that significant environmental damage was caused both by the toxicity of the dispersant itself and by the increased oil surface to which marine organisms were exposed.[21] As a result, the use of dispersants became highly controversial. Modern dispersants are largely non-toxic; the toxic effects of these dispersants are due almost entirely to the dispersed oil. While several dispersants have been approved by the EPA, they cannot be used at a spill unless approved by the on-scene coordinator.

As the National Response Team Report to the President states, the issue of dispersants was highly controversial in the Valdez incident.[22] To be effective, dispersants must be applied almost immediately after a spill has occurred. By the time that several field tests of dispersants had been conducted at the Valdez site to resolve the concerns of the various governmental entities, however, it was too late to apply a dispersant. As the chief of NOAA's Hazardous Materials Response Branch testified, "Lack of agreement on the effec-

---

[17] Hearing, supra, written statement at 4.
[18] (Hearing, supra, written testimony of Rear Admiral Sipes at 5.)
[19] See, e.g., Hearing, supra, written testimony of Kinworthy at 8.
[20] CRS Oil Pollution Technology Report, supra, at 8.
[21] Ibid at 8; also see generally, NRC Dispersant Report, supra.
[22] See NRT Report to the President, supra, at 17–19; Hearing, supra, testimony of John H. Robinson, NOAA, Tr. at 26.

tiveness and ecological impact of dispersants has essentially removed this technology from practical application for spills in U.S. waters." [23] The Valdez incident underscores the importance of conducting credible scientific research before the need for the information arises.

In an attempt to resolve these disputes, the National Research Council of the National Academy of Sciences conducted a major study of dispersants, published in 1988.[24] While the report generally approved dispersants, finding that dispersants are generally less toxic than the oil itself, it also identified the research needed to resolve many of the remaining questions on the effectiveness and ecological implications of dispersant use.[25]

*Combustion.*—In some instances, oil slicks can be ignited, burning off the spilled oil. The Minerals Management Service of the Department of the Interior has been conducting research with Environment Canada on burning oil and appears encouraged by results to date.[26] However, concerns have been raised about the effects of air toxics released during the burning and residues produced from incomplete combustion.[27] A test burn of about 19,000 barrels of oil from the Valdez spill resulted in complaints from Prince William Sound residents.[28]

*Other treatment technologies.*—A number of other treatment technologies are in various states of development. Chemicals have been developed, for example, to sink oil to prevent it from reaching beaches. The effects of sunken oil on bottom life are not known. Other chemicals have been used to gel oil, to absorb it and to herd it.[29] But each method has serious limitations and questionable environmental effects.

Biodegradants are bacteria which degrade the hydrocarbons in petroleum products. Since such bacteria are ubiquitous in the environment, some researchers have proposed enhancing biological degradation by providing nutrients for the indigenous microbes. Other researchers have developed strains of microbes, both through genetic engineering and selection processes, which could be effective in degrading oil. However, the data is unclear on the effectiveness of biological remediation on open ocean spills.

### 4. Shoreline cleanup and restoration

There is general consensus that the technologies available for cleaning up beaches, once they have been oiled, are inadequate, expensive and may even cause more environmental harm than taking no remedial action at all.[30] With respect to chemical treatment of oiled beaches, NOAA has concluded, with respect to the Valdez spill, that "[a]fter exhaustive tests that continue through the summer, no chemical emerged the appeared in testing to hold much promise of producing results commensurate with the envi-

---

[23] Hearing, supra, written statement of Robinson at 5; see also written testimony of Teal at 3-4.
[24] NRC Dispersant Report, supra.
[25] Ibid at 5.
[26] Hearing, supra, written testimony of Tennyson at 7-8.
[27] NRC Dispersant Report, supra, at 17.
[28] CRS Oil Pollution Technology Report, supra, at 9.
[29] CRS Oil Pollution Technology Report, supra, at 10.
[30] NRC Dispersant Report, supra, at 17.

ronmental costs associated with its use." [31] The primary beach cleanup technology employed by Exxon was the "Omni-barge", which consists of high-pressure, high-temperature water blasting. Commenting on this technique, the NOAA witness at the hearing testified that

> [T]he use of increasingly aggressive measures to remove weathered oil is currently a subject of great concern. Few biological communities can withstand the high tempera- ture and pressure of the "Omni-barge" washing system. Questions center on whether treatment of this intensity will delay recovery of shoreline communities. [32]

Like other clean-up technologies, the efficacy of existing shore- line cleanup technologies wanes as the time after the spill in- creases. Over time, oil weathers and enters into subsurface shore- line sediments. If not removed, tidal action will cause the subsur- face oil to be periodically re-released into the environment, result- ing in a chronic exposure to wildlife and marine organisms.

Recognizing the inadequacies of existing shoreline cleanup tech- nologies, EPA has launched a research program on bioremediation. Working with Exxon, EPA has conducted a field trial in Prince William Sound consisting of the application of nutrients to enhance the naturally-occurring microorganisms with degrade oil. [33] Prelim- inary results are encouraging, and larger-scale field testing will be initiated. EPA has identified bioremediation as a critical area for future research and development.

*C. Technology evaluation*

A number of witnesses agreed that a more systematic program to test and evaluate oil pollution prevention and mitigation technol- ogies would be useful, and that performance standards would be useful in comparing alternative cleanup technologies. Ed Tenny- son, of the Department of Interior's Minerals Management Service, noted that there are currently more than 30 different boom designs for use on the Outer Continental Shelf, and that the lack of stand- ardized testing techniques and protocols have made it difficult to quantify the relative capabilities of the booms. [34] Private sector de- velopers who have developed what they believe to be effective cleanup technologies have been unable to have their products eval- uated for use by the federal agencies in cleanup responses. While some agencies attempt to "screen" such products, there is no co- ordinated effort to evaluate such technologies in a rational way. [35] The controversy surrounding the use of dispersants in the Valdez spill is an example of the failure to resolve scientific issues through evaluation and testing prior to the time the technologies were needed. A number of witnesses indicated the utility of controlled field-testing of cleanup technologies to verify the performance of the technologies in real-world conditions, but the use of controlled spills in the U.S. for research purposes has virtually stopped since

---

[31] Hearing, supra, written testimony of Robinson at 8.
[32] Hearing, supra, written testimony of Robinson at 10.
[33] Hearing, supra, written testimony of Bretthauer at 5–6.
[34] Hearing, supra, written statement of Tennyson at 6; see also testimony, Tr. at 33, 37.
[35] Hearing, supra, testimonmy of Bretthauer, Tr. at 55–56.

15

the shut-down of the EPA OHMSETT tank testing facility last year.[36]

*D. Environmental effects*

While much is known about the short-term acute effects on marine organisms of oil products, relatively little is known about the long-term environmental effects of large oil spills, particularly in arctic and sub-arctic ecosystems. Prior damage assessments have, in the words of the National Research Council, "been based on sweeping assumptions about natural processes and usually lack long-term environmental data." [37] As stated by Dr. John Teal, of the Woods Hole Oceanographic Institution:

> Knowledge of the effects of this oil, stored in sediments over long periods, is very poor but is essential for proper response to oil spills. . . We can do no more than speculate about their environmental consequences. Even the basic chemical methods for the analyses of these compounds are poorly developed.[38]

To understand the long-range nature of environmental effects, it is critical that planned, long-term research be conducted. However, funding has not been available for research programs beyond a few years [39] and much research undertaken immediately after a spill is hastily conducted and poorly organized.[40]

The NOAA witness acknowledged that the agencies have done a "poor job" of long-term environmental monitoring,[41] and have failed to collect environmental baseline data to provide an accurate assessment of long-term environmental damage.[42] The EPA witness acknowledged that implementation of EPA's "E-MAP" program, designed to collect and assess baseline data, would be extremely useful in determining the environmental effects of oil spills.[43]

Unofficial estimates indicate that the study of the effects of the spill of the Exxon Valdez into Prince William Sound would cost about $4 million a year, equally divided between Prince William Sound and the Gulf of Alaska, and that the studies of the effects of the spills by the World Prodigy in Narrangansett Bay, the Rachael B into the Houston ship channel, and the Presidente Rivera into the Delaware River would total $1 million a year, with the study of the spill by the Rachael B costing half as much as either of the other two studies. These estimates also indicate that it may be possible to complete the latter three studies in five years instead of ten years.

The lack of long-term follow-up studies at previous oil spill sites makes difficult the assessment of long-term damages. NOAA has

---

[36] Hearing, supra, written statement of Tennyson at 2; written statement of Kinworthy at 15; testimony of Robinson, Tr. at 27.
[37] NRC Dispersant Report, supra at 9.
[38] Hearing, supra, written testimony at 2; see also testimony of Rosendahl, Tr. at 107.
[39] Hearing, supra, written statement of Teal at 4; testimony of Rear Admiral Sipes, Tr. at 54.
[40] Hearing, supra, written statement of Robinson at 8: "It has been clear during the Exxon Valdez event that hastily conceived and executed research can contribute little to resolution of operational problems."
[41] Hearing, supra, testimony of Robinson, Tr. at 45–46.
[42] Hearing, supra, testimony of Bretthauer, Tr. at 49; Robinson, Tr. at 47.
[43] Hearing, supra, testimony of Bretthauer, Tr. at 48–49.

recommended that this be an area of "high priority" for future research.[44] Since past major spills have been located outside of U.S. waters, research on the long-term environmental effects of spills and response actions would benefit from increased international research. The National Response Team recommended strengthening existing international ties and pursuing joint research and development and information sharing agreements between nations.[45]

### E. Federal agency involvement in oil spill research and development

Federal oil spill research peaked in the late 1970's and declined significantly thereafter, with almost no spending in the last several years. (See following chart:)

FUNDING LEVELS FOR OIL SPILL RESEARCH AND DEVELOPMENT

[In thousands of dollars]

| Year | Coast Guard | MMS | USFWS | NOAA | EPA | DOE |
|------|------|------|------|------|------|------|
| 1979 | 5,500 | NA | 70 | 300 | NA | NA |
| 1980 | 6,000 | 100 | 70 | 300 | 6,000 | NA |
| 1981 | 3,190 | 200 | 70 | 300 | 6,000 | NA |
| 1982 | 3,900 | 200 | 70 | 300 | 6,000 | NA |
| 1983 | 3,000 | 200 | 70 | 300 | 6,000 | NA |
| 1984 | 2,000 | 200 | 0 | .0 | 6,000 | 0 |
| 1985 | 200 | 400 | 0 | 0 | 500 | 0 |
| 1986 | 300 | 350 | 0 | 0 | 200 | 0 |
| 1987 | 0 | 350 | 0 | 0 | 500 | 0 |
| 1988 | 300 | 350 | 0 | 0 | 0 | 0 |
| 1989 | 300 | 850 | 0 | 0 | 0 | 0 |

Most of the technology presently used was developed in the 1970's. Indeed, the only interagency research program, which used EPA's Oil and Hazardous Materials Simulated Environmental Test Tank (OHMSETT), ended in the mid-1980's and the facility closed last year.[46]

Since that time, several agencies have continued to carry out discrete areas of research, but there is no overall coordinated research effort which could identify and address priority research needs. Agency witnesses acknowledged the need to share research information and coordinate research activities.[47]

In response to the Valdez spill, the agencies are moving toward the re-establishment of coordinated interagency planning. The Coast Guard will be leading a two-day research and development planning session at the end of September, to which other federal agencies and the oil industry have been invited. The Coast Guard recognizes that "a coordinated administration research and development plan undoubtedly will consist of new initiatives which are not now included in recent budget considerations. Additional resources will be necessary to develop and implement a successful program." [48]

---

[44] Hearing, supra, written statement of Robinson at 10.
[45] NRT Report to the President, supra, at 37; see also testimony of Tennyson, Tr. at 32.
[46] An interagency research program under the National Response Team acknowledged to be in "limbo." Testimony of Rear Admiral Sipes, Tr. at 57.
[47] Hearing, supra, testimony of Robinson, Tr. at 56–57.
[48] Hearing, supra, written statement of Rear Admiral Sipes at 7.

17

Following is a summary of present and prior federal agency research and development activities;

### 1. U.S. Coast Guard

The Coast Guard is normally the first agency to arrive to the site of an oil or chemical spill on navigable waterways, and provides the Federal On-Scene Coordinator (F-OSC). As the first responder, the Coast Guard is a primary user of technologies for containing, recovering and treating spilled oil. The agency has an oil spill research facility in Groton, Connecticut, which reached the peak of its activity a decade ago. Research conducted in the past by the Coast Guard includes studies of the fate and effects of oil, containment, treatment, recovery, storage, and disposal. The Coast Guard has also been involved with improvements in ship structure, navigation, and vessel transit systems. It represents the United States in several bilateral agreements with Canada, the Soviet Union, and other countries.

### 2. National Oceanic and Atmospheric Administration (NOAA)

NOAA is by law one of the natural resource damage assessment trustees. The agency has been involved with outer continental shelf research for oil and gas development since 1974 along with the Department of Interior's Minerals Management Service. NOAA monitors contaminants, including those from petroleum products, in marine organisms. Within the framework of the National Contingency Plan, NOAA supplies scientific support to the National Response Team (NRT) by providing a Scientific Support Coordinator to the U.S. Coast Guard's Federal On-Scene Coordinator. In addition, the agency has mapped the sensitivity of all U.S. coastlines to oil spills, has developed computer models and data management systems for oil spill response, and has participated in contingency planning nationwide.

### 3. Environment Protection Agency (EPA)

EPA has concluded very little oil spill research during the last decade. One notable exception is EPA's bioremediation study in Alaska on one of the oiled beaches. Before it was closed, the EPA operated the Oil and Hazardous Materials Simulated Environmental Test Tank (OHMSETT) in Leonardo, New Jersey. The OHMSETT facility permitted environmentally safe testing of spill cleanup methods and technologies. EPA has an extensive program in pollution prevention which could be extended to the prevention of oil spills. EPA has also expressed a desire to become more involved in cleanup technologies and ecological assessment and monitoring.

### 4. Department of Interior

DOI develops natural resource damage regulations and has been investigating ways to improve the regulations for damage assessment as well as measure economic effects from resource damage. The long-term effects of recovery and restoration have also been of interest to the Department of Interior. DOI also has a number of other agencies with interests in oil spill research and development. The Fish and Wildlife Service studies acute and chronic effects of

contaminants on fish and wildlife; the Minerals Management Service has responsibility for oil spilled as a result of outer continental shelf oil drilling activities, and examines various kinds of equipment for spill control and recovery activities.

### 5. National Institute of Standards and Technology (NIST)

NIST (the nation's reference laboratory for physical sciences, engineering, and materials) has assisted DOI's Minerals Management Service in its research program and could provide an advisory role in the development of standards for measuring the effectiveness of various technologies.

### E. Industry involvement in oil spill research

Most of the large oil companies, including Exxon, have conducted ambitious research programs related to oil spills for over a decade. Recently, chief executive officers from several large oil companies belonging to the American Petroleum Institute (API) formed the Petroleum Industry Response Organization (PIRO) which has committed $35 million to oil spill research and development over the next five years.[49] PIRO has expressed interest in cooperating with federal agencies to conduct joint research.

The API has conducted its own oil-related research for over 20 years. It is one of three cosponsors, along with the Coast Guard and NOAA, of a biannual oil spill conference. API indicated at the hearing its desire to work jointly and cooperatively with the federal agencies in carrying out the next generation of oil pollution prevention and mitigation research.

### IV. EXPLANATION OF THE BILL

### A. Summary

The bill has been amended by the Committee to bring together the capabilities and expertise of the Federal agencies involved with oil spill research. As amended, the bill includes the major research provisions of both H.R. 3027, as reported by the Committee on Public Works and Transportation, and H.R. 1465 as reported by the Merchant Marine and Fisheries Committee. The amended bill includes a section on interagency coordination to ensure that each agency's activities are coordinated with an overall research program and plan.

In addition, the bill as amended contains several new sections not contained in either H.R. 3027 or H.R. 1465 as reported. For example, the amended bill includes a 10-year monitoring and research program that shall be conducted by the Secretary of Commerce to evaluate the effects of the 1989 oil discharges on Prince William Sound, Narragansett Bay, Houston Ship Channel, and the Delaware River. The bill as amended also requires the National Maritime Administration to expand its marine simulation research. The bill also authorizes the Federal agencies which are members of the Interagency Committee to provide grants for independent research and development. Finally, the bill provides for

---

[49] Hearings, supra, see generally testimony of Kinworthy, Tr. at 63–69.

the establishment of at least 3 regional oil spill response research centers.

*B. Interagency coordination*

The witnesses testifying before the Subcommittee generally acknowledged that Federal coordination for oil pollution research was essential, but lacking at this time. Erich Bretthauer, the witness testifying on behalf of the EPA stated that "Because of the wide and varied interest, future Federal research must be coordinated to prevent duplication of effort."[50] Admiral Sipes stated that the National Response Team had a research and development committee but that it was in "limbo."[51] In response to the spill by the Exxon Valdez, both industry and the Federal agencies are moving towards the re-establishment of research planning, but the coordination mechanisms that existed in the 1970's and early 1980's are no longer in place.

Fragmentation and duplication of research is wasteful and ineffective. Accordingly, section 701 of this bill as amended addresses this problem by establishing an Interagency Coordinating Committee on Oil Pollution Research (hereinafter referred to as the Interagency Committee), consisting of specified Federal agencies that traditionally have conducted oil spill research, as well as such other agencies as the President may designate. A single entity provides the Federal oil pollution research program with a centralized mechanism for ensuring that the activities of each agency are complementary and relevant to overall goals and objectives of a comprehensive research program.

While it is intended that each agency should retain its expertise in specific areas of oil pollution research and development, the Interagency Committee is intended to encourage each agency to view its own programs in the context of the total research program. In areas of overlapping responsibilities, the Interagency Committee should address agency roles and avoid duplication in the research plan.

The Interagency Committee also provides a vehicle for Federal agencies to communicate and coordinate research with industry, universities, and other nations. It is the Committee's intent that the Federal government, private sector, and university community work together as much as possible to conduct cooperative research in this area. Cooperative efforts not only leverage federal research dollars, but also avoid the controversy over scientific research that often arises when federal agencies and private industry conduct separate research programs. A jointly-funded, cooperative research program should help create the needed scientific consensus on oil spill clean-up technologies *before* the technologies are needed.

Under section 701 as amended the Chairman of the Interagency Committee will be designated by the President. By allowing for only one chairman, the Committee does not intend to imply that the research agenda of the Chair agency should be the research agenda of the plan submitted to Congress. The Committee fully anticipates that other agencies, should and will play a significant role

[50] Hearing, supra, Tr. at 23.
[51] Hearing, supra, Tr. at 57.

in the development of the Oil Pollution Research Plan. For example, the Committee notes the acknowledged expertise of the National Institute of Environmental Health Sciences in the area of human health effects caused by environmental pollution. Areas of potential oil pollution research overlap clearly exist and should be resolved by the interagency coordination mechanism established in the amended bill.

*C. Research plan*

The Interagency Committee shall submit to Congress within 120 days after the enactment of this Act a research plan that will outline the development of the Oil Pollution Research and Development Program. The research plan shall identify agency roles and responsibilities; assess the current status of knowledge on oil pollution technologies and effects; identify significant research gaps and priorities; review past responses to oil discharges and identify technological deficiencies; and estimate the resources needed to conduct the oil pollution research and development program, including timetables for completing research tasks.

Major oil spills can occur almost anywhere, in any environment, and under a variety of adverse conditions. To ensure that a wide range and variety of environments are considered, the research program shall include in the assessment of the current status of knowledge on oil pollution technologies, an analysis of the adequacy of oil pollution response to spills in both fresh and salt water resources, including major river systems, the Great Lakes, major urban harbors and bays, the Gulf stream, and areas where wetlands are present and particularly vulnerable. The research plan shall also identify environments that pose significant technological problems for adequate containment and mitigation of an oil spill and assess the current status of knowledge on oil spill response in these environments. This review should be conducted as part of an analysis of major oil spill response efforts and their technological deficiencies over the last 20 years.

Industry, university, research institution, and foreign nation participation in the development of this plan should occur whenever possible. The research plan should also identify areas where cooperative research and joint funding should be developed between the Federal Government and industry, university, research institution, or other nations.

In addressing the current state of technology, the Interagency Committee must look back to the late 1970's, when oil spill research peaked, and evaluate what was known then and compare it to what is currently known. The technologies that are addressed in the review should include mechanical, chemical, biological, thermal, and other types that have been used or tested. The status report should also include a description of the effect that these technologies have had when applied during containment, treatment, or cleanup of a spill.

The Committee is particularly concerned that research conducted during the 1970's on bioremediation technologies, both for open water and shoreline remediation, has not been applied in recent oil spill efforts. It is not clear whether the agencies are unfamiliar with such research or believe that additional research is necessary.

Therefore, the research plan should include a section which evaluates the relative effectiveness and environmental impact of existing bioremediation technologies, and identify those areas which should receive additional research.

To provide an independent review of the adequacy of the research plan, section 701(a)(4)(B) directs that the research plan be prepared with the advice and guidance of the National Academy of Sciences (Academy) and NIST. The agency from which the chairman is designated shall have the responsibility for contracting with the Academy. The Academy would provide advice and guidance in the preparation of the research plan; and assess the adequacy of the plan as submitted. The Academy would also submit a report to Congress on the conclusions of the assessment. NIST shall also provide the Interagency Committee with advice and guidance on issues relating to its development of the research plan and implementation of the oil pollution research and development program. NIST should play an important role, particularly in providing a focus for evaluating technologies for use in oil spill prevention or mitigation.

### D. Oil Pollution Research and Development Program

Section 701(b) sets out five major components of the Oil Pollution Research and Development Program.

#### 1. Innovative Oil Pollution Technology Program

The first component is the Innovative Oil Pollution Technology Program. This program shall provide for research, development, and demonstration of new or improved technologies which are effective in preventing or mitigating oil discharges. The technologies must also protect the environment and not degrade the quality of the environment. In particular, clean-up technologies which result in greater damage to the environment than that caused by the oil pollution itself should be discouraged.

This program is intended to stimulate research and development on a wide range of technologies to prevent oil spills and mitigate their effects. A technology that is developed to prevent an oil spill could include, for example, improved simulation training and preparation for tanker pilots and crew, enhanced navigational and tanker piloting systems, improved vessel design, improved loading facility design, and other similar improvements that would reduce the likelihood of an oil spill from occurring. A technology that is developed to mitigate an oil spill could include: improved response by cleanup personnel; improved containment, cleanup, and treatment methods (mechanical, chemical, biological, combustion, and other methods); enhanced information systems for decision making; improved methods to restore and rehabilitate natural resource damage; improved methods to clean oiled animals; improved technologies that would slow down the flow of oil from the vessel; and other technologies that would be useful after a spill has occurred to reduce both its effect and its presence in the environment.

This section also requires the Interagency Committee to report in its first annual report containing an assessment of currently and potentially available navigational systems (including sonar and

electronic chart display), and containing a plan with schedules to require or promote the use of appropriate systems.

It is the Committee's intent that the EPA should continue and expand its ongoing shoreline bioremediation research which shall include research on environmental restoration technology which enhances the recovery of shoreline ecosystems impaired by oil pollution including, but not limited to: evaluation, testing and field demonstration of the performance of shoreline restoration techniques; and evaluation of environmental impacts associated with restoration techniques. The Committee encourages EPA to conduct this program in cooperation with university research and private firms that have developed biological treatment technologies.

### 2. Oil Pollution Technology Evaluation Program

Section 701(b)(3) provides for oil pollution prevention and mitigation technology evaluation. There is currently no existing program that will evaluate technology "effectiveness." This program will be set up to evaluate technologies developed by the Federal Government as well as by independent inventors. Evaluation should include previously developed technologies developed by private businesses or public institutions. There should be a centralized location which can direct private sector developers to the appropriate agency for technology testing and evaluation. NIST should be involved in the development of protocols for technology evaluation. The public should be involved in this evaluation process, particularly when chemicals are being evaluated. The Federal agencies should also make use of field testing where appropriate, to evaluate real-world application of oil discharge prevention or mitigation technologies. This includes national and international field testing.

### 3. Oil Pollution Effects Research Program

Section 701(d), establishes the Oil Pollution Effects Research Program. Witnesses agreed that the long-range impacts of oil pollution are poorly understood.[52] Areas that are sensitive and at particular risk to an oil spill will be identified and mapped. Entire coastlines cannot be protected from the impacts of an oil discharge, but plans should be developed to protect those areas that are ecologically sensitive and at particular risk. Plans for long-term monitoring of environmental effects in those areas are to be developed and implemented in the event of a major oil discharge.

### 4. Special studies

This Special Studies program will include a 10-year comprehensive monitoring and research program by the Secretary of Commerce acting through NOAA and in cooperation with the EPA, to determine the long-term effects of the oil discharges by the Exxon Valdez into Prince William Sound, by the World Prodigy into Narragansett Bay, by the Rachel B into the Houston Ship Channel, and by the Presidente Rivera into the Delaware River. There was agreement by the witnesses that research at sites of past spills

---

[52] See, e.g., Hearing, supra, testimony of Rosendah at Tr. 107, Teal at Tr. 71.

would be useful in understanding the long-term environmental effects of oil pollution.

### 5. Marine simulation research

Section 701(b)(6) directs research on the greater use and application of geographic and ship response models. Research in the application of simulators to training and certification of ships was conducted by the Computer-Aided Operations Research Facility (CAORF) of Marine Safety International from 1978 to 1985. During the hearing, Dr. F. Eugene Guest, Director of CAORF, stated that "The research indicated a definite role for simulators in the training of ship officers and pilots in the dynamic training for maneuvering decision-making. That research basically is unfinished and unapplied as of the time of the Exxon Valdez." [53]

The program should continue the research that ended in 1985 and seek ways to apply what was learned. The program should also include research related to the most effective use of the geographic area and vessel simulations for: response plan evaluation and certification; response team training; tanker personnel training; and an evaluation of vessel traffic control systems and vessel movement controls. The Committee believes that the research performed by CAORF would be effective in reducing the number of oil spills that occur because of human error. The Committee encourages the Marine Administration to make greater use of this facility.

### E. Grants

The Federal agencies represented on the Interagency Committee are authorized to enter into contracts and cooperative agreements and make grants to universities, research institutions, industry and other persons to carry out the Oil Pollution Research and Development Program. This section is intended to provide the agencies with flexible authority to enter into appropriate research arrangements with the private sector and universities, including the use of joint funding where appropriate.

### F. International cooperation

The Committee encourages the Interagency Committee to coordinate and cooperate with other nations and foreign research entities in concluding oil pollution research, development, and demonstration activities, including participation in controlled field tests of oil discharges. The Committee believes that other nations have developed significant expertise in responding to oil spills and the federal agencies should expand their efforts to draw upon that experience.

### G. Annual reports

The Chairman of the Interagency Committee shall submit to Congress at the close of each fiscal year (before January 1 of the next year) a report on the activities carried out under this section in the preceding fiscal year, and on activities proposed to be carried out under this section in the current fiscal year.

---

[53] Hearing, supra, Tr. at 81.

### H. *Authorization of appropriations*

The amended bill authorizes $25 million to be appropriated annually without fiscal year limitation to carry out this section from the Oil Spill Liability Trust Fund established under Section 9509 of the Internal Revenue Code of 1986.

### J. *Regional research centers*

The Committee recognizes that the characteristics of oil spills and the types of damage that can be infected by oil pollution varies widely across the various ecosystems and climate zones of the United States. Responses to oil spills in the subarctic regions of Alaska, for example, are likely to be different than responses in tropical or subtropical areas. To address these regional oil spill response research issues in the most cost-effective manner, research needs to be coordinated on a regional basis. Regional research should also draw upon the expertise on local and regional issues existing in universities and research facilities located in those geographic regions.[54]

Accordingly, section 701(g) establishes a minimum of three regional oil spill response research centers in each of three regions: tropical and subtropical coastal environments of Florida and the Gulf Coast, temperate coastal environments, and the Alaskan coastline and other cold water climates. The regional centers shall design and implement a research program and strategy for dealing with major oil spills, taking into account the various regional elements that will affect oil spill effects and response. The centers shall coordinate with appropriate federal agencies with major oil spill research and development responsibility. The bill authorizes $1 million for each center for the fiscal years 1990 to 1994, to be derived from the Fund.

#### V. SECTIONAL SUMMARY OF THE BILL, AS REPORTED

*Section 701.*Oil Pollution Research and Development Program.

*Section (a). Interagency Coordinating Committee on Oil Pollution Research.* This section establishes an Interagency Coordinating Committee on oil pollution research to coordinate research, development, and demonstration among the Federal agencies, industry, research institutions, and other nations. The Chairman of the Interagency Committee shall be appointed by the President. A research plan will be submitted by the Interagency Committee within 120 days that will identify agency roles and responsibilities, and research priorities. The National Academy of Sciences and the National Institute of Standards and Technology will advise the Interagency Committee on the preparation and development of the research plan.

*Section (b) Oil Pollution Research and Development Program.*

*Section (b)(1). Establishment:* The Interagency Committee shall coordinate the program for conducting oil pollution research and development.

*Section (b)(2). Innovation oil pollution technology:* New or improved technologies that would be effective in preventing or miti-

---

[54] Hearing, supra, testimony of Rosendahl, Tr. at 88.

gating oil discharges and would protect the environment would be researched, developed, and demonstrated. The environmental effects of the use of these technologies to prevent or mitigate oil discharges would be researched. The research would be done in consultation with the National Response Team to enhance government and industry ability to respond quickly to oil discharges.

*Section (b)(3). Oil pollution technology evaluation:* Technologies developed for the purposes of prevention or mitigation would be evaluated for their efficacy. The use of controlled field testing (where appropriate) to evaluate real-world application of oil discharge prevention or mitigation will also be supported through this program.

*Section (b)(4). Oil pollution effects research.* Research on the short-term and long-term environmental effects of oil discharges will be performed. Improved models for predicting the fate, transport, and effects of oil discharges will be developed. Areas that are particularly sensitive and at risk to oil discharges will be identified and mapped. Baseline data will be gathered in areas sensitive and at risk to oil discharges to determine what is there before damage occurs from an oil discharge. Plans for long-term monitoring of areas sensitive and at risk are to be developed for implementation in the event of a major spill. Models will be developed for predicting the fate and effects of discharged oil.

*Section (b)(5). Special studies:* The subsection requires the Secretary of Commerce to establish a 10-year comprehensive monitoring and research program to determine the long-term effects of the oil discharged by 1989 spills in Alaska, Rhode Island, Delaware, and Texas.

*Section (b)(6). Marine simulation research:* Research shall be performed on the greater use and application of geographic and ship simulation models. This research would benefit response plan and evaluation certification; response team training; tanker personnel training; and evaluation of vessel traffic control systems and vessel movement controls.

*Section (c). Grants:* The agencies represented on the Interagency Committee may enter into contracts and cooperative agreements and make grants to universities, research institutions, and other persons.

*Section (d). International cooperation:* The Interagency Committee shall coordinate and cooperate with other nations and foreign research entities in conducting oil pollution research and development and demonstration activities, including controlled field tests of oil discharges.

*Section (e). Annual reports:* The Chairman of the Interagency Committee shall submit to Congress at the close of each fiscal year a report on the activities carried out under this section in the preceding fiscal year, and on activities proposed to be carried out under this section in the current fiscal year.

*Section (f). Funding:* Amounts in the Oil Spill Liability Trust Fund, not to exceed $25,000,000 shall be available annually, without fiscal year limitation, to carry out this section.

*Section (g). Regional centers:* A minimum of three regional oil spill response research centers shall be established to address oil spill issues relating to three different geographic regions and cli-

mates. The centers shall coordinate with appropriate Federal agencies conducting oil spill research. The bill authorizes $1 million for each of the five fiscal years beginning in 1990 for each center from the Fund.

## VI. CONGRESSIONAL BUDGET ACT INFORMATION

The bill provides for new authorization rather than new budget authority and consequently the provisions of section 308(a) of the Congressional Budget Act of 1974 are not applicable.

## VII. COMMITTEE COST ESTIMATE

In accordance with the requirements of section 252(b) of the Legislative Reorganization Act of 1970 and pursuant to Rule XIII, Clause 7 of the Rules of the House of Representatives, the Committee estimates the costs to be incurred by the Federal Government during the current and five subsequent years as a result of the enactment of this legislation as follows:

[In millions of dollars]

Fiscal year:

| | |
|---|---|
| 1989 | 25 |
| 1990 | 25 |
| 1991 | 25 |
| 1992 | 25 |
| 1993 | 25 |
| 1994 | 25 |

## VIII. EFFECT OF LEGISLATION ON INFLATION

In accordance with Rule XI, clause 2(l)(4) of the Rules of the House of Representatives, the provisions of this legislation within the Committee's jurisdiction are assessed to have no inflationary impact on prices and costs in the operation of the national economy.

## IX. CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

The provisions of the bill within the Committee's jurisdiction, as reported, make no changes in existing law.

## X. OVERSIGHT FINDINGS AND RECOMMENDATIONS

Pursuant to rule XI, clause 2(l)(3) of the Rules of the House of Representatives, and under the authority of rule X, clause 2(b)(1), and clause 3(f), the results and findings of oversight activities considered by the Committee on Science, Space, and Technology have been adopted and are incorporated in the recommendations found in the present bill and report.

## XI. OVERSIGHT FINDINGS AND RECOMMENDATIONS, COMMITTEE ON GOVERNMENT OPERATIONS

No findings or recommendations on oversight activities pursuant to Rule X, clause 2(b)(2), and Rule XI, clause 2(l)(3)(D), of the Rules of the House of Representatives have been submitted by the Committee on Government Operations for inclusion in this report.

27

## XII. COMMITTEE RECOMMENDATION

A quorum being present, the Committee favorably reported the bill H.R. 1465 as amended by voice vote, and recommends its enactment.

## DISSENTING VIEWS TO H.R. 1465, "THE OIL POLLUTION LIABILITY AND COMPENSATION ACT"

One of the charges of the Science, Space and Technology Committee should be to ensure that good scientific information is made available to decision makers. Because it is so important that this information be valid and objective, it is critical that the process to determine who will do the scientific research also be valid and objective.

Therefore, it is unfortunate that during full Committee consideration of H.R. 1465, an amendment was adopted to establish oil spill research centers without peer review or competition. Furthermore, the need for such centers was never made clear in the first place, since the bill already contains a university grant program which could have accomplished the same purpose with greater oversight and coordination. Certainly the entire concept would have benefited from additional study.

Peer review and competitive selection of research proposals are essential to preserving the integrity of the scientific process. Thus, it is important to avoid the use of selection criteria, such as those contained in this provision, which are so overly restrictive that only specific universities would qualify. Of the three centers created by this provision, it is almost certain that one would be located at the University of Miami and the other at a university in Alaska. The other 48 States would be left to fight over the single remaining center.

In fact, the priority of locating a center in a subtropical and tropical region has never been fully documented. Recent figures from the Coast Guard indicate that only 3.7 percent of the oil spilled in the U.S. was in the Gulf region, whereas 40.5 percent of it was spilled in the Atlantic, and 29.5 percent of it spilled inland or in the Great Lakes. Therefore, we are disappointed that the substitute amendment to first study the centers proposal was not adopted instead. Such a study would have provided us with necessary background information to help determine the need for or design of a centers program.

If a need for centers is established, the correct procedure for locating them is obvious: if a particular university is the best qualified to conduct the research, then it should welcome competitive review; if it is not qualified, then it should not get the money. Earmarks produce fragmented and specialized research of dubious value to decision makers as a whole. That is why it would be more appropriate to consider this amendment as part of a comprehensive review of a national centers program. Such legislation is currently pending before our Committee.

Because of problems with the centers provision, we hope that the Committee will take advantage of any opportunity that arises to correct this provision through an alternative approach.

CLAUDINE SCHNEIDER.
DON RITTER.
SHERWOOD BOEHLERT.
F. JAMES SENSENBRENNER, Jr.
DANA ROHRABACHER.
CONNIE MORELLA.
BOB WALKER.
STEVEN SCHIFF.
SID MORRISON.
RON PACKARD.
CHRISTOPHER SHAYS.
D. FRENCH SLAUGHTER, Jr.
ROBERT C. SMITH.
HARRIS W. FAWELL.
PAUL B. HENRY.
LAMAR SMITH.
JACK BUECHNER.
TOM CAMPBELL.

O