# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig<br>"Deepwater Horizon" in the<br>Gulf of Mexico, on April 20, 2010 | *<br>*<br>*<br>* | MDL No. 2179<br><br>SECTION "J" |
| **APPLIES TO:** | *<br>* | JUDGE:  BARBIER |
| CITY OF HOUSTON, TEXAS v. BP, PLC,<br>et al. | *<br>*<br>* | MAGISTRATE:  SHUSHAN |
| Civil Action No.:<br>2:13-cv-2968 | *<br>*<br>* | |

# FIRST AMENDED COMPLAINT

Plaintiff, The City of Houston, Texas (hereinafter "Houston" or "Plaintiff"), has suffered damage in the form of  lost revenues and other economic losses, including, but not limited to, loss of sales tax, property tax and hotel occupancy tax revenues as a result of the oil spill by the oil rig Deepwater Horizon in the Gulf of Mexico beginning on April 20, 2010. The Plaintiff made a presentment claim on the responsible party pursuant to the Oil Pollution Act of 1990. Ninety (90) days has expired without the responsible party responding to the presentment claim. Houston has satisfied the  mandatory condition precedent to file this  suit. The Plaintiff's complaint against the named Defendants is as follows:

# NATURE OF  ACTION

1.  On April 20, 2010, a blowout, explosion, and  multiple  fires  occurred  aboard  the mobile offshore drilling rig *Deepwater Horizon,* resulting in the sinking of the *Deepwater Horizon* and an oil spill in the Gulf of Mexico ("the Spill") that has caused, is causing, and

will continue to cause damage to the Plaintiff. This is an action for damages, penalties, and other relief by the Plaintiff against parties known to be responsible for the Spill. The Defendants named in this lawsuit collectively and individually engaged in grossly negligent, wanton, and reckless conduct in the drilling and operation of the Macondo well, the operation of the *Deepwater Horizon,* and the containment of the Spill.

2.      Defendants' actions resulted in the blowout of the Macondo well, caused the explosion, burning, and sinking of the *Deepwater Horizon* rig, and directly resulted in the release of crude oil and other pollutants into the waters of the Gulf of Mexico and of the Plaintiff. These pollutants have damaged, are damaging, and will continue to damage the Gulf, Plaintiff's coastal environment, communities, property, and economic livelihood. Businesses along the Gulf and throughout Houston continue to suffer from the effects of the Spill, and the loss of tax revenues from these businesses has, is, and will continue to negatively impact the Plaintiff.

3.      Houston is a major hub for business activity related to offshore oil exploration and support as well as Gulf Coast tourism. The City suffered significant reduction in economic activity in the aftermath of the BP oil spill. As a result of this downturn, taxable sales, property values and hotel occupancy were significantly reduced from what they would have been in the absence of the Spill. In response to the massive spill, two nationwide moratoria on deep water drilling were implemented by the Bureau of Ocean Energy Management regulation and Enforcement Agency. According to the American Petroleum Institute, the 2010 oil spill will cost the United States more than 24 Billion Dollars in lost natural oil and gas investment over the next several years. Instead of an anticipated 12 percent of global dollars being invested in crude oil and natural gas in the Gulf region, the region received about half of the global dollars it would have been likely to receive. At least 130 projects were delayed by the moratoria by at least a year and a half following their

declaration.

4.      The City of Houston collects sales and property taxes from the many companies located within its municipal boundaries that equip, supply, manufacture and provide support to Gulf related drilling and exploration activity.[1] The City has sustained a substantial loss in sales and property tax revenues in the aftermath of the spill because of the decline in exploration and drilling activity following the spill. The actual amount of losses sustained has been in the tens of millions of dollars and will be further refined as additional economic studies of the impact of the spill are undertaken.

5.      The City of Houston also is a major tourism and business center whose livelihood is an integral part of the Gulf Coast economy. The spill was a substantial contributing factor to the decline in tourist and business related activities following the spill which caused the City to suffer a loss of hotel occupancy taxes as well as other sales taxes.[2]

6.      Houston, by and through its attorneys, brings this action for compensatory, punitive, and other damages, to the fullest extent allowed by Texas and federal law.

7.      Investigation of other potential claims and assessment of damage amounts continue. Therefore, the Plaintiff reserves its rights in full to amend this Complaint by, among other things, adding new allegations, new claims, and new defendants.

_____

[1] Texas Tax Code Chapter 321.
[2] Texas Tax Code Chapter 351 and Houston Code of Ordinances article III Chapter 44.

## PARTIES, JURISDICTION, AND VENUE

8.      Plaintiff is The City of Houston, Texas (hereinafter referred to as "Houston" or "Plaintiff").

9.      Defendant BP Exploration & Production, Inc. ("BP Exploration") is a

Delaware corporation with its principal place of business in Warrenville, Illinois. BP Exploration was a lease holder and the designated operator in the lease granted by the former Minerals Management Service[1] ("MMS") allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Spill originated. BP Exploration was designated as a Guard under the Oil Pollution Act of 1990, 33 U.S.C. § 2714. BP Exploration is registered to do business in Texas, does business in Texas, and has a registered agent in Texas.

10.     Defendant BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas. BP America was the party to the Drilling Contract for the drilling of the Macondo well by the *Deepwater Horizon* vessel. BP America is registered to do business in Texas, does business in Texas, and has a registered agent in Texas.

11.     Defendant BP p.l.c. is a British public limited company with its corporate headquarters in London, England. BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo. Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c.. BP p.l.c. has acknowledged that it is subject to jurisdiction in the United States. BP p.l.c. was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution Act of 1990, 33 USC 2714. BP p.l.c. is registered to do business in Texas, does business in Texas, and has a registered agent in Texas.

---

[1] The MMS, a federal entity that divides the Gulf of Mexico's seafloor into rectangular "blocks," and then auctions the rights to drill for oil and gas beneath those blocks of seafloor, was reorganized as the Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE) on June 18, 2010. It shall, however, be referred to as the MMS throughout this Complaint.

12.     BP Exploration, BP America , and BP p.l.c. are generally referred to herein collectively as "BP." As t h e  s o l e  lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations.

### *Jurisdiction*

13.     The claims presented in sub-Section I invoke the Court's jurisdiction under the Oil Pollution Act, 33 U.S.C. § 2717 (b) (the "OPA"). *See* 28 U.S.C. § 1331.

14.     The claims presented in sub-Section II invoke the Court's supplemental jurisdiction. *See* 28 U.S.C. § 1367.

### *Venue*

15.     Venue is proper in the United States District Court for the Southern District of Texas pursuant to 28 U.S.C. §§ 139l(b) and 33 U.S.C. § 2717(b).

16.     If the Plaintiff is transferred to the pending MDL, No. 2179, United States District Court, Eastern District of Louisiana, the Plaintiff reserves the right to seek a transfer of any and all issues and claims not resolved in the proceedings before the MDL Court back to the Southern District of Texas for a jury trial, as discussed in more detail *infra* at ¶¶3 17-19. The Plaintiff objects to the transfer to the MDL in the event the Defendants attempt to transfer this suit as venue is proper in the United States District Court for the Southern District of Texas.

### GENERAL ALLEGATIONS

### *The Macondo Lease, and BP's Exploration Plan and Drilling Permit*

17.     On June 1, 2008, BP acquired a ten-year lease from the MMS to search for

and exploit hydrocarbon reservoirs at the Macondo prospect site in Mississippi Canyon Block 252, a location on the Outer Continental Shelf 48 miles off the coast of Louisiana.

18.     In the process of obtaining its lease, BP represented that it had planned and prepared to conduct its proposed activities in a manner that was safe, conformed to applicable regulations and sound conservation practices, and would not cause undue or serious harm or damage to human or marine health, or the coastal environment.

19.     BP represented that it was unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities. In the event that a spill did occur, BP predicted a worst case discharge scenario of 162,000 gallons of oil per day, an amount to which it assured the MMS that it was prepared to respond. BP also claimed the well's distance from the nearest shoreline would preclude any significant adverse impacts from a spill.

20.     Based on these assurances, the MMS approved BP's Initial Exploration Plan ("EP") for the Macondo prospect on April 6, 2009, including the approval of a "categorical exclusion" from the full environmental analysis normally required under the National Environmental Policy Act.

21.     After its EP was approved, BP sought a permit from the MMS authorizing it to drill up to a total depth of 19,650 feet at the Macondo site.

### The Deepwater Horizon's Poor Safety and Maintenance Record

22.     The *Deepwater Horizon* was a dynamically-positioned, semi-submersible deepwater drilling vessel built and put into service in February 2001.

23.     At all times relevant herein, B P l e a s e d the *Deepwater Horizon* v e s s e l for drilling exploratory wells at the Macondo prospect site, pursuant to the December 9, 1998, Drilling Contract between Vastar Resources, Inc. and R&B Falcon Drilling Co. for

RBS-8D *Deepwater Horizon* ("Drilling Contract"), and later amendments to that agreement.

24.     Prior to the Spill, BP had actual and/or constructive knowledge that its safety performance during offshore drilling operations was poor. BP also had actual and/or constructive knowledge of significant problems related to the *Deepwater Horizon's* equipment and maintenance, including problems with the vessel's BOP, electronic alarm systems, ballast systems used to stabilize the vessel in the water, and other significant deficiencies that could lead to loss of life, serious injury, or environmental damage as a result of inadequate use and/or failure of equipment.

*The Macondo Well*

25.     The Macondo prospect site is in the Northern Gulf of Mexico, an area known in the industry for high temperature, high pressure, highly gaseous hydrocarbon reservoirs trapped in weak, brittle rock formations. At the Macondo site, the *Deepwater Horizon* was conducting drilling operations in excess of 18,000 feet deep. BP knew or should have known that the threat of blowouts increases as drilling depths increase, especially in an area with such troublesome geology as the Northern Gulf of Mexico.

26.     BP struggled with the Macondo well before the events of April 20, 2010. The problems included varying pressures, varying strengths of formation layers, brittle rock formations, and kicks of natural gas bursting into the well.

27.     As the drilling schedule fell farther behind due to these and other problems, BP increased the pressure on the Deepwater Horizon's crew to speed up the drilling effort at Macondo in an effort to reduce costs. BP repeatedly chose to violate industry guidelines and government regulations and ignore warnings from its own employees and contractors on the Deepwater Horizon to reduce costs and save time on the behind-

schedule and over-budget Macondo well.

*Conduct Leading Up to the*<br>*Explosion*

28.     By April 9, 2010, BP had finished drilling the last part of the well bore, after which only casing and cementing the final open-hole section remained. In its rush to complete the well, BP made reckless decisions about well design, cementing, and well integrity testing that prioritized speed and cost-savings over safety and industry best practices.

29.     BP chose a "long string" design for the Macondo well with fewer barriers against the risk of hydrocarbon blowouts because the safer "liner/tieback" option (which had been part of its original well design and was recommended by its contractors) would have taken longer to complete and would have added several million dollars in cost.

30.     BP used inferior metal well casings for the casing pipe material itself, in violation of BP's own safety policies and design standards.

31.     BP knowingly used too few centralizers on one or more pieces of casing pipe.

32.     BP failed to fully circulate the drilling mud through the entire length of the well before beginning the cementing job, thus failing to properly clean the well bore and prepare the annular space for cementing, and thus failing to take action that could have revealed other problems that contributed to the weaknesses of the Macondo well.

33.     BP knew the cementing work the *Deepwater Horizon* was performing was especially risky. BP's mid-April plan review predicted cement failure, stating "cement simulations indicated it is unlikely to be a successful cement job due to formation breakdown." However, BP made minimal efforts to contain the added risk. To save time and money, BP chose not to run a 9 to 12-hour procedure called a cement bond log to

assess the integrity of the cement seal. B P also failed to secure the wellhead with a lockdown sleeve, a critical apparatus that locks the wellhead and the casing in the seal assembly at the seafloor, before allowing pressure on the seal from below.

34.     BP had results in March 2010 showing that a very similar foam slurry design to the one actually pumped at the Macondo well would be unstable, but it did not act upon that data.

35.     In addition to increasing the risk of blowouts, deep-sea drilling also increases the failure risk of the chief blowout safety mechanisms, the BOPs. B P was aware of the risk of BOPs failing at greater depths, yet did not install a backup BOP activation system or backup BOPs. B P was also aware that the industry and government had major concerns about the reliability of BOPs like the one installed on the *Deepwater Horizon.*

36.     BP failed to ensure that the BOP present on the Deepwater Horizon possessed reasonably safe, adequate, functional technology to prevent blowouts.

37.     BP failed to ensure that the *Deepwater Horizon's* BOP had sufficient, functional, built- in redundancy to eliminate single-point failure modes.

38.     BP failed to ensure that all foreseeable repairs (if any) and foreseeable modifications (if any) to the Deepwater Horizon's BOP were performed, completed, and tested with the drilling vessel's operations shut down and the well secured.

39.     BP failed to ensure that the testing of the *Deepwater Horizon's* BOP was comprehensive, reviewed, and verified, and further failed to check and verify the BOP's entire operating and control system, including but not limited to, checking for leaks at ROV (remotely operated vehicle) connection points, and verifying the functionality of the automated mode function and/or autoshear.

40.     BP could have ensured that a BOP and/or back-up BOP with sufficient strength and reliability for deepwater drilling was present and available on the *Deepwater Horizon,* but did not do so.

41.     BP could have installed a back-up acoustic trigger to activate the *Deepwater Horizon's* BOP in the event that the main trigger failed to activate.

42.     While some testing has been completed, the investigation of the BOP retrieved from the seafloor, and other matters related to the disaster at the Macondo well is still ongoing. Thus, the Plaintiff reserves the right to amend this Complaint once further information from that and any other future investigations becomes available.

43.     The vessel's owner, from whom BP was leasing, had a history of postponing and ignoring needed maintenance on the *Deepwater Horizon.* In the weeks before the blowout, the *Deepwater Horizon* suffered power outages, computer glitches, and a balky propulsion system. In some cases, vital safety mechanisms and alarms were purposefully overridden or disabled. These events contributed to the cause of the disaster, or made it worse.

44.     BP was aware of the owner's poor maintenance of the *Deepwater Horizon* and its practice of disabling or bypassing vital safety systems and alarms, but they continued to operate the vessel and did not report the inadequacies.

45.     Upon information and belief, in addition to the examples set forth above, other non-exclusive examples of BP's misconduct, negligence and/or wantonness include:

    a.    Utilizing a defective well casing that was prone to fail when under heavy pressure;

    b.    Failing to observe dangerous and recurring problems with highly flammable gaseous compounds and instituting risky cementing and drilling procedures hours before the *Deepwater Horizon* explosion;

    c.    Failing to institute common industry protective measures necessary to detect the buildup of highly flammable gaseous compounds before and

during the cementing process;

d.    Accelerating drilling operations in an effort to save money and pressuring employees hours before the *Deepwater Horizon* explosion to drill and penetrate the continental shelf faster while ignoring risks associated with dangerous gaseous compounds in the shelfs crust;

e.    Using an improperly designed cement mixture ("slurry"), and failing to properly conduct and/or review the results of laboratory testing of the slurry;

f.    Failing to deploy a casing hanger lockdown sleeve;

g.    Displacing mud in the well with less-dense seawater before cementing had fully set;

h.    Using non-standard spacer fluid mixture and volume;

t.    Continuing to operate the Macondo Well after the well failed pressure tests;

J.    Continuing to operate the Macondo Well without repairing the blowout preventer's annular after chunks of the annular had broken off and floated to the surface, thereby significantly decreasing the blowout preventers' protective measures against a blowout;

k.    Failing to disclose or correct the fact that the battery on the blowout preventer was weak and one of its control pods was broken;

l.    Consciously electing not to install an acoustically activated remote-control shutoff valve;

m.    Ordering drillers to extract drilling mud from the well before all of the concrete plugs were put into place in order to speed up the drilling process, thereby creating high pressure instability in the well;

n.    Failing to install a deepwater valve to be placed nearly 200 feet under the sea floor;

o.    Failing to recognize that pressure and flow data from the well were warning signs of a blowout;

p.    Failing to develop sufficient well control procedures for vessel workers to handle larger influxes into the well – for a hydrocarbon influx as large as occurred, flow should have been diverted overboard, not to the mud-gas separator;

q.    Failing to properly design, install, or maintain power supply to the blow- out preventer ("BOP"), including, without limitation, the use of

only  one blind  shear ram, faulty maintenance,  faulty post-market modifications,  and other issues;

r.    Failing to properly design, install, or maintain connections from the blow- out preventer's control panel to the blow-out preventer;

s.    Failing to properly maintain and repair  the BOP: BP officials  were aware  of  the  faulty  solenoid  valve,  poor  battery  maintenance, hydraulic  fluid leaks,  and aftermarket modifications on the Deepwater Horizon's BOP  long before  the April 20, 2010, but no action was ever taken to address the problems. In addition to posing a significant safety risk, BP's choice to continue drilling with a faulty hydraulic system  violated  federal  regulations,  which  require  companies  to disclose problems to the MMS and to stop drilling if either of a BOP's two control systems is not working properly; and

t.    Failing to equip the vessel with sufficient safety equipment,  including operational gas sensors and a gas alarm system.

46.    BP knew, or should have known, of the acts and omissions outlined above, and was negligent, wanton, and reckless in continuing to drill in the face of these acts and omissions.

47.    In sum, BP knew of the dangers associated with deep water drilling, and it knew of unique problems and shortcomings in the Macondo Well and *Deepwater Horizon* vessel. However, BP failed to take appropriate measures to prevent damage to the Plaintiff and thousands of its citizens and its businesses who are dependent upon the Gulf of Mexico and its natural resources to make a living.

### *Post-Explosion  Conduct*

48.    BP's conduct after the explosion was insufficient to minimize damage and was in some cases just as negligent, wanton, and reckless as the conduct that led to the explosion.

49.    BP failed to institute proper oil disaster response plans to contain the catastrophic oil  release  resulting  from  the  *Deepwater Horizon* explosion,  and it misrepresented its capability  to  safely  conduct  offshore  drilling  operations  and  contain  oil  releases  that  might

occur in connection with such operations.

50.     BP attempted to downplay and conceal the severity of the oil spill after the explosion.   B P ' s   leak estimate of 5,000 barrels per day was found by government investigators to be a fraction of the current official leak estimate of 60,000 barrels of oil per day. In addition, the worst case scenario estimate of 100,000 barrels of oil per day is over 100 times BP's initial estimate of 1,000 barrels per day.

51.     BP was also slow and incomplete in its announcements and warnings to Plaintiff's residents and business people  about the severity, forecast, and trajectory of the Spill.

52.     Furthermore, the chemical dispersants used by B P to accelerate the dispersal of the oil has significant side-effects as well. Corexit EC9500A and Corexit EC9527A were the principal dispersants used. These dispersants are composed of several chemicals, including 2-Butoxy Ethanol, which was identified as a causal agent in the health problems experienced by cleanup workers after the 1989 *Exxon Valdez* oil spill. In  addition,  the Hazardous Substance Fact Sheet for 2-Butoxy Ethanol warns that it may be a carcinogen in humans and that "[t]here may be no safe level of exposure to a carcinogen, so all contact should be reduced to the lowest possible level." Further, the  OSHA-required  Material  Safety  Data Sheets ("MSDS") for both versions of Corexit used indicate they may have a potential to bio-accumulate in the tissues of fish or other organisms. Additionally, the MSDSs state that if the product becomes a waste, "it could meet the criteria of a hazardous waste as defined by the Resource Conservation and Recovery Act (RCRA) 40 CFR 261."

53.     Corexit EC9500A and Corexit EC9527A are more toxic and less effective than at least twelve other EPA-approved dispersants and are banned from use on oil spills in the

United Kingdom.  BP stated that it chose to use Corexit because it was available the week of the rig explosion.

54.     More than 1.84 million gallons of chemical dispersants were used by July 30, 2010, and additional dispersant use was reported by fishermen in mid-August. Dispersant use continued well after the Spill at the wellhead was stopped.  The dispersants were employed both on the surface and at the wellhead 5,000 feet below the surface.  Mixing the dispersants with the oil at the wellhead added toxicity to the spill and kept much of the oil below the surface, exposing organisms to widespread concentrations of oil.

55.     Oil, dispersants, and other pollutants released by B P remain in Gulf waters, the Gulf floor, Texas waters, and marine life, which becomes the seafood which comprises a significant part of the restaurant economy within the jurisdiction of the Plaintiff, and continue to cause damage. Oil, dispersants, and other pollutants have settled into the sediment on the Gulf floor and the bed underlying waters of Texas, where it has killed, is killing, and will continue to kill marine life and will continually discharge into, and cause damage to, the water, land, property, and resources of Plaintiff.

## CAUSES OF ACTION

### I.     The Oil Pollution Act

56.     The Plaintiff re-alleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

57.     The Oil Pollution Act, 33 U.S.C. § 2701, *et seq.* (the "OPA"), imposes liability upon a "responsible party for a ... vessel or a facility from which oil is discharged ... into or upon navigable waters or adjoining shorelines" for the damages that result from

such incident as well as removal costs. 33 U.S.C. § 2702.

58.     The Coast Guard has named BP as a responsible party for the downhole release of oil.

59.     BP is a responsible party under the OPA, and it is strictly liable pursuant to Section 2702 of the OPA for all the damages resulting from the Spill.

60.     BP is not entitled to limit its liability under Section 2704(a) of the OPA because the Spill was proximately caused by its gross negligence, willful misconduct, or violation of applicable safety, construction or operating regulations. 33 U.S.C. § 2704(c).

61.     In its "Statement Of BP Exploration & Production Inc. Re Applicability Of Limitation Of Liability Under Oil Pollution Act of 1990" filed on October 19, 2010, BP waived the statutory limitation on liability under the OPA.

62.     As a result of the Spill, the Plaintiff is entitled to damages pursuant to Section 2702(b)(2)(B), which provides for recovery of "economic losses resulting from destruction of real or personal property, which shall be recoverable by a claimant who owns or leases that property, including the diminution in the value of their property."

63.     The Plaintiff is also entitled to damages pursuant to Section 2702(b)(2)(D) "equal to the net loss of taxes, royalties, rents, fees, or net profit shares due to the injury, destruction, or loss of real property, personal property, or natural resources …."

64.     The Plaintiff is further entitled to damages pursuant to Section 2702(b)(2)(E) "for the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."

65.     The Plaintiff has satisfied the presentment requirements of 33 U.S.C. §§ 2713(a) and (b). Ninety (90) days have passed since the presentment without the Plaintiff

receiving any payment on its claim pursuant to 33 U.S.C. § 2713(c)(2). Because the full extent of the Plaintiff's damage is still unknown and the Plaintiff is presently assessing the breadth of its damages, the Plaintiff may make additional presentments to BP.

66.     Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and the OPA, 33 U.S.C. § 2717(f)(2), the Plaintiff seeks a declaratory judgment that is binding in this action and any subsequent action or actions against the BP defendants, jointly and severally and without limitation, that said defendants are liable for damages in this action and in any subsequent action or actions.

67.     The Plaintiff further seeks all damages available to it pursuant to the OPA.

## II.  Other Cause of Action

### *Fraudulent Concealment or Suppression of Material Facts*

68.     The Plaintiff realleges each and every allegation set forth m all preceding paragraphs as if fully restated here.

69.     The Plaintiff is entitled to recovery against BP for its fraudulent concealment or suppression of material facts concerning the Spill under Texas law and/or common law.

70.     After the Spill, Defendant BP attempted to downplay and conceal the severity of the Spill. BP's initial leak estimate of 1,000 barrels per day was found by government investigators to be a fraction of the actual leakage amount of 50,000 barrels of oil per day.

71.     Moreover, in the aftermath of the explosions, BP did not provide complete and timely announcements and warnings about the severity, forecast and trajectory of the Spill.

72.     In addition, BP misrepresented its capabilities to respond to the Spill. BP overstated its ability to a handle a blowout in its Exploration Plan, wherein it claimed that in the event of a blowout resulting in an oil spill, it was "unlikely to have an impact based on

the industry wide standards for using proven equipment and technology for such responses."

73.     In fact, BP did not have proven equipment and technology to respond to the Spill; instead, as stated in the letter to Attorney General Eric Holder by Members of Congress on May 17, 2010, it did not "in any way appear that there was 'proven equipment and technology' to respond to the spill, which could have tragic consequences for local economies and the natural resources of the Gulf of Mexico."  As noted further in that letter, "much of the response and implementation of spill control technologies appeared to be taking place on an ad hoc basis."

74.     BP admitted on May 10, 2010 that "all of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before."

75.     Despite its inability to respond and to control the Spill, BP resisted requests from scientists to use sophisticated instruments at the ocean floor that would have provided a more accurate picture of the amount of oil that was gushing from the well.

76.     The severity, forecast and trajectory of the Spill and BP's ability to respond to the Spill were material facts that BP had a duty to communicate because of the dire circumstances of this case and the risks attendant with the failure to disclose.

77.     BP was aware before the blowout that testing had revealed that the concrete foam used at the Macondo well was unstable, yet it concealed this material fact.

78.     BP failed to disclose, suppressed and/or concealed the foregoing material facts, and their failure to do so induced the Plaintiff to act or to refrain from acting to protect its property, the environment, economy of the Plaintiff, Its businesses, its citizens' livelihoods, and income.

79.     As a direct and proximate result of the fraudulent concealment of the

foregoing material facts by BP, the Plaintiff has and will continue to incur damage, including, but not limited to, damages to natural resources and Plaintiff's properties, lost tax and other revenues, and direct and indirect costs associated with Spill response actions.

80.    Moreover, the conscious or deliberate acts of misrepresentation, suppression, and concealment of the foregoing material facts by BP were willful, wanton, and/or in callous disregard for the safety of others and, accordingly, the Plaintiff is entitled to an award of compensatory and punitive damages.

### *Negligence*

81.    The Plaintiff incorporates and re-alleges each and every allegation set forth above herein by reference.

82.    BP owed a duty to the Plaintiff to exercise reasonable care with respect to the construction, operation, inspection, training of personnel, repair, and maintenance of the *Deepwater Horizon* and Macondo Well; with respect to the disaster's containment and prevention planning prior to the disaster; and with respect to the containment and prevention efforts following the initial oil disaster.

83.    BP had a heightened duty of care to the Plaintiff because of the great danger and environmental concerns associated with deepwater drilling for oil in the Gulf.

84.    BP, directly or through agents, breached its legal duties to the Plaintiff by failing to exercise reasonable care and were negligent in its construction, operation, inspection, training of personnel, repair, and maintenance of the *Deepwater Horizon* and the Macondo Well, and in planning and implementing oil containment and prevention activities before and after the oil disaster.

85.    Upon information and belief, the Plaintiff avers that the fire, explosion, resulting oil disaster, and damages were caused by BP's negligence in the following

non- exclusive particulars:

    i.    Failing to properly operate the *Deepwater Horizon* and Macondo Well;

    j.    Failing to install a remote control acoustic switch to prevent the discharge of crude oil into the Gulf of Mexico;

    k.    Failing to properly inspect the *Deepwater Horizon* and Macondo Well to assure that its equipment and personnel were fit for their intended purposes;

    l.    Acting in a careless and negligent manner without due regard for the safety of others;

    m.    Failing to promulgate, implement, follow, and enforce procedures, rules, and regulations pertaining to the safe operations of the *Deepwater Horizon* and Macondo Well which, if they had been so promulgated, implemented, followed, and enforced, would have averted the fire, explosion, sinking and oil disaster;

    f.    Operating the *Deepwater Horizon* and Macondo Well with untrained and/or unlicensed personnel;

    g.    Inadequately and negligently training and/or hiring personnel;

    h.    Failing to take appropriate action to avoid and/or mitigate the accident;

    i.    Negligently implementing policies and/or procedures to safely conduct offshore operations in the Gulf of Mexico;

    J.    Failing to ascertain that the *Deepwater Horizon* and Macondo Well and associated equipment were free from defects and/or in proper working order;

    k.    Failing to take reasonable precautions to prevent and timely warn of the failure of the Macondo Well or drilling rig;

    l.    Failing to timely bring the oil release under control;

    m.    Failing to provide appropriate accident prevention equipment;

    n.    Failing to undertake required tests and measurements of the Macondo Well and to observe or respond to measuring devices that indicated excessive pressures in the Macondo Well;

    o.    Failing to react to danger signs of catastrophic Macondo Well or drilling rig failure;

p.   Using defective BOPs that were improperly installed, maintained, and/or operated;

q.   Conducting well and well cap cementing operations improperly;

r.   Failing to assure that, once well control initially was lost, well control was regained by proper and adequate well control response;

s.   Failing to assure that, once well control initially was lost, well control was regained by proper and adequate surface containment and overboard discharge and diversion of hydrocarbons;

t.   Failing to prepare an adequate oil disaster response plan;

u.   Failing to marshal sufficient resources to adequately respond to the oil disaster and protect the waters, property, estuaries, seabed, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources of the Plaintiff;

v.   Failing to use BOPs appropriate for this drilling operation, and failure to test the BOPs that were used;

w.   Failing to follow plans and specifications applicable to the design and construction of the Macondo Well and its components;

x.   Failing to use safety devices adequate to arrest the flow of oil in the event of catastrophic failure of the Macondo Well or drilling rig;

y.   Failing to properly design the *Deepwater Horizon* and Macondo Well;

z.   Concealing or misrepresenting the nature, size and extent of the oil disaster;

aa.    Using dangerous chemical dispersants of an incorrect nature, type, and amount;

bb.   Acting in a manner that justifies imposition of punitive damages;

cc.   The knowing use of dangerous dispersants; and such other acts of

negligence and omissions as will be shown at the trial of this

matter.

86.   BP was also negligent in its attempts and omissions in trying to plug the Macondo Well, contain the oil, and clean-up the oil disaster on Plaintiffs waters and shores.

87.     BP knew or should have known that its negligent conduct would result in the oil disaster, causing past, present, and future damages to the waters, property, tax base, estuaries, seabed, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources of the Plaintiff.

88.     The past, present, and future injuries to the Plaintiff were also caused by or aggravated by the fact that BP failed to take necessary actions to mitigate the danger associated with its operations.

89.     In addition, the circumstances surrounding the fire, explosion, and sinking of the *Deepwater Horizon* and the resulting Spill are such that, according to common knowledge and the experience of mankind, the accident could not have occurred had the BP exercised the high degree of care imposed on it. Moreover, BP had full management and control of the instrumentalities that caused the oil spill. The Plaintiff, therefore, pleads the doctrine of *res ipsa loquitur.*

90.     As a direct and proximate result of the combining and concurring negligence of BP, the Plaintiff has and will continue to be damaged, including but not limited to, damages to natural resources and lost tax and other revenues.

91.     The Plaintiff demands judgment against all BP defendants, jointly and severally, for compensatory damages in an amount to be determined by a jury.

### *Wantonness*

92.     The Plaintiff incorporates and re-alleges each and every allegation set forth above herein by reference.

93.     BP, directly or through agents, breached its legal duties to the Plaintiff by failing to exercise reasonable care and acted with reckless, willful, and wanton disregard for the Plaintiff in the construction, operation, inspection, training of personnel, repair, and

maintenance of the *Deepwater Horizon* and the Macondo Well, and in planning   and implementing oil containment and prevention activities before and after the oil disaster.

94.     Upon information and belief, the Plaintiff avers that the fire explosion and sinking of the *Deepwater Horizon,* resulting Spill, and damages were caused by the BP's reckless, willful, and wanton conduct as more fully set forth above.

95.     BP knew or should have known that its willful, wanton, and/or reckless conduct would result in the oil disaster, causing past, present, and future damages to the waters, property, tax base, estuaries, seabed, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources of the Plaintiff and/or on which a significant part of the economy of the Plaintiff depends.

96.     As a direct and proximate result of the combining and concurring wantonness of BP, the Plaintiff has and will continue to be damaged, including but not limited to, damages to natural resources and lost tax and other revenues.

97.     BP consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the Plaintiff and its citizens.

98.     The Plaintiff demands judgment against the BP defendants, jointly and severally, for compensatory and punitive damages in an amount to be determined by a jury.

### III.   **Punitive Damages**

99.     The Plaintiff re-alleges each and every allegation set forth m all preceding paragraphs as if fully restated here.

100.     BP engaged in conduct so reckless, willful, wanton, and in such utter and flagrant disregard for the safety and health of the public and the environment in its activities leading up to and/or during the blowout, explosions, fire, and Spill, as alleged herein, that an award of punitive damages against it at the highest possible level is warranted and necessary to

impose effective and optimal punishment. The Plaintiff, society as a whole, and the environment cannot afford and should never be exposed to the risks of another disaster of the magnitude caused by BP's misconduct herein.

101.    BP focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by performing a critical well pressure test with untrained and unqualified personnel and by callously ignoring and/or misinterpreting abnormal "red flag" pressure test results.

102.    BP's corporate culture caused and allowed it to disregard the lessons it should have learned and applied from previous incidents at its facilities that resulted in extensive damage and loss of life; instead, it continued to place others at risk in the interests of cost-cutting, time-saving, and financial gain.

103.    BP focused primarily on profit while disregarding public and environmental health and safety while undertaking its ultra-hazardous activities on the *Deepwater Horizon* by using a long string well design with too few baniers to gas flow.

104.    BP focused primarily on profit while disregarding public and environmental health and safety while undertaking its ultra-hazardous activities on the *Deepwater Horizon* by failing to use a sufficient number of "centralizers" to prevent channeling during the cement process.

105.    BP focused primarily on profit while disregarding public and environmental health and safety while undertaking its ultra-hazardous activities on the *Deepwater Horizon* by failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job.

106.    BP focused primarily on profit while disregarding public and environmental health and safety while undertaking its highly dangerous activities on the *Deepwater Horizon* by using an inappropriate cement mixture for the type of rock formation surrounding the well,

and by failing to appropriately test that cement mixture prior to using it in the well.

107.    BP focused primarily on profit while disregarding public and environmental health and safety while undertaking its highly dangerous activities on the *Deepwater Horizon* by failing to run a cement bond log test to evaluate the integrity of the cement job.

108.    BP focused primarily on profit while disregarding public and environmental health and safety while undertaking its highly dangerous activities on the *Deepwater Horizon* by failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

109.    BP focused primarily on profit while disregarding public and environmental health and safety while undertaking its highly dangerous activities on the *Deepwater Horizon* by using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

110.    BP focused primarily on profit while disregarding public and environmental health and safety while undertaking its highly dangerous activities on the *Deepwater Horizon* by ignoring and/or misinterpreting abnormal, "red flag" pressure test results.

111.    BP recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill by its grossly inadequate maintenance, and reckless and improper operation and use of the BOP appurtenant to the *Deepwater Horizon.*

112.    BP recklessly, willfully and/or wantonly failed to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout.

113.    BP recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill through its collective and respective disregard for proper drilling, casing, mudding, and cementing procedures.

114.    BP willfully and/or wantonly failed to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

115.    BP recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico, and thus the economy and property of the Plaintiff.

116.    In addition, after the blowout and before the well was finally sealed, BP was aware of procedures that would immediately block the flow of oil into the Gulf, yet it delayed the implementation of any such procedures and limited its efforts to plug the well to options that would salvage the well for future use, instead of selecting procedures that would stop the flow of oil as soon as possible regardless of the well's continued functionality. As such, BP increased the magnitude of, and damage caused by, the Spill by willfully and/or wantonly and recklessly choosing its profits over the lives of the workers on the vessel, the safety of the environment, and the health, welfare, and value of the people, businesses, and property of the Plaintiff.

117.    The conduct of BP was oppressive, wanton , malicious, reckless, or grossly negligent because it:

    n.  failed to properly maintain and/or operate the *Deepwater Horizon;*

    o.  operated the *Deepwater Horizon* in such a manner that the safety and integrity of the vessel and the well were disregarded to save time and money;

    p.  ignored warnings that the integrity of the well, the cementing job, and the vessel were in jeopardy;

    q.  failed to promulgate, implement, and enforce proper rules and regulations to ensure the safe operations of the *Deepwater Horizon;*

r.   violated MMS regulations for the safe design and operation of oil wells and drilling rigs in the Gulf of Mexico;

f.   failed to take appropriate action to avoid or mitigate the accident;

g.   failed to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

h.   failed to ensure that the *Deepwater Horizon* and its equipment were free from defects, properly maintained and/or in proper working order;

i.   failed to provide appropriate disaster prevention equipment; and,

J.   failed to have an appropriate emergency spill response plan or readily available spill response equipment.

118.   The conduct of BP as described more fully hereinabove, is at the highest level of reprehensibility, warranting and necessitating the imposition of punitive damages at the highest level, because its conduct was motivated by financial gain; because it injured and endangered human and environmental health and safety; because it caused devastating damage and loss to the livelihoods, businesses, and properties of the people of Houston and the economy of the Plaintiff; because it was not isolated or accidental, but part of a culture and ongoing pattern of conduct that consistently and repeatedly ignored risks to others in favor of its financial gain; and because it has accordingly caused societal harm, moral outrage and condemnation, and the need to punish it and deter further repetition by it or others.

119.   BP consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the Plaintiff and its citizens.

120.   Accordingly, the Plaintiff is entitled to an award of punitive damages m an amount to be determined at trial.

## RESERVATION OF RIGHTS

### *Right to a Trial by Jury*

121.   The Plaintiff demands a jury trial for any and all claims pleaded herein in

which a jury trial is available by law.

122.   The Plaintiff recognizes that, as part of its duty to efficiently manage the thousands of claims arising from the *Deepwater Horizon* explosion and resulting Spill, the MDL Court has set a trial to decide common issues of limitation and liability.

123.   The Plaintiff's participation in any bench trial(s) on limitation and liability issues common to the MDL is not intended as and does not amount to a waiver of the Plaintiff's right to a jury trial. The Plaintiff cannot be forced into a Hobson's Choice. Once the MDL Court determines the common factual and legal issues regarding limitation and liability, the Plaintiff reserves its right to seek a remand of all remaining issues and claims that uniquely apply to the Plaintiff - including, but not limited to, the quantification of the Plaintiff's damages - to the originating transferor district, the Southern District of Texas, for a trial by jury.

### *Right to File Amendments*

124.   The full extent of the Plaintiff's damages is yet unknown. The Plaintiff is continuing its assessment of economic and p r o p e r t y damages. The Plaintiff reserves the right to amend this complaint and/or file additional complaints to supplement the Plaintiff's present claims or assert additional claims against BP and/or against any additional parties.

### PRAYER FOR RELIEF

WHEREFORE, Houston requests judgment against the BP defendants, jointly, severally, and solidarily, as follows:

1.   declaratory and injunctive relief;

2.   economic and compensatory damages in amounts to be determined at trial;

3.   punitive damages;

4.   pre-judgment and post-judgment interest at the maximum rate allowable by law;

5.      attorneys' fees and costs of litigation; and,

6.      such other and further relief available under all applicable state and federal laws and any relief the Court deems just and appropriate.

Date: May 21, 2013

Respectfully submitted:

//s// Dennis C. Reich
Dennis C. Reich
State Bar No. 16739600
Reich and Binstock, LLP
4265 San Felipe, Suite 1000
Houston, Texas 77027
Telephone:     (713) 622-7271
Facsimile:     (713) 623-8724

*Attorney in Charge*

//s// Jan Woodward Fox
Jan Woodward Fox
State Bar No.: 07334500
The Lyric Centre
440 Louisiana St., Suite 900
Houston, TX 77002
Telephone: (713) 623-8600
Facsimile: (713) 425-7196

//s// Norman Jolly
Norman Jolly
State Bar No. 10856920
Michael B. Jolly
State Bar No. 10856910
Hamilton G. Rucker
State Bar No. 24067850
405 Main, Suite 1000
Houston, Texas 77002
Telephone:     (713) 237-8383
Facsimile:     (713) 237-8385

**ATTORNEYS FOR THE PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on this day May 21, 2013 a copy of the foregoing First Amended Complaint was filed electronically with the Clerk of the Court using the CM/ECF system.

<u>//s// Dennis C. Reich</u>
Dennis C. Reich

BP Exploration and Production
Through their Registered Agent
CT Corporation System
5615 Corporate Blvd.
Suite 400B
Baton Rouge, LA 70808

BP America Production Company
Through their Registered Agent
CT Corporation System
5615 Corporate Blvd.
Suite 400B
Baton Rouge, LA 70808

## WAIVER OF SERVICE

Plaintiff will request the following defendants waive service pursuant to Federal Rule of Civil Procedure 4(d).

BP p.l.c.
Through Its Registered Agent of Service:
C.T. Corporation
1200 South Pine Island Road
Plantation, Florida  33324

BP America Inc
Through their Registered Agent
C T Corporation System
5615 Corporate Blvd.
Suite 400B
Baton Rouge, LA 70808

BP Corporation North America Inc.
Through their Registered Agent
The Prentice-Hall Corp. System
320 Somerulos Street
Baton Rouge, LA 70802

29