## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  Oil Spill by the Oil Rig *Deepwater Horizon* in the Gulf of Mexico, on April 20, 2010 <br><br> This document applies to: *All Cases* | MDL NO. 2179 <br><br> SECTION: J <br><br> JUDGE BARBIER <br><br> MAGISTRATE JUDGE SHUSHAN |

## TRANSOCEAN'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO BP "DIRECT DAMAGES" CLAIMS PURPORTEDLY ASSIGNED TO THE ECONOMIC CLASS

Transocean Offshore Deepwater Drilling Inc., Transocean Holdings LLC, Transocean Deepwater Inc., and Triton Asset Leasing GmbH (collectively "Transocean") hereby submits this Memorandum of Points and Authorities in support of its motion for partial summary judgment as to BP's claims for "direct damages" purportedly assigned by BP to the Economic and Property Damages Settlement Class ("Economic Class") pursuant to the Economic and Property Damages Settlement.  (Rec. Doc. 6430.)

Transocean's  motion is based on this Memorandum of Points and Authorities, Transocean's separate statement of undisputed material facts, the pleadings and record in this case, and any further briefing and argument the Court may hear.

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................ 1

II.   BACKGROUND ......................................................................................... 3

    A.   BP's Purported Assignment of Claims to the Economic Class ................. 3

    B.   The Drilling Contract Allocated Risks Between BP And
           Transocean .......................................................................................... 5

    C.   This Court's Indemnity Ruling ............................................................. 7

III.  STANDARD FOR SUMMARY JUDGMENT ................................................. 8

IV.   ARGUMENT .............................................................................................. 8

    A.   BP's Release of Claims Against Transocean in the Drilling
           Contract Should Be Enforced to Its Full Extent ..................................... 8

          1.   The Plain Language of the Drilling Contract Includes a
                Detailed Allocation of Risks and Mutual Release of Claims ........ 9

          2.   Public Policy Favors Enforcement of the Contractual
                Release as Written ................................................................... 11

              a.   Both General Maritime and Fifth Circuit Law
                    Protect Freedom of Contract, Particularly Between
                    Sophisticated Parties ..................................................... 11

              b.   The Drilling Contract Represents a Detailed
                    Allocation of Risk Between Sophisticated
                    Commercial Parties ....................................................... 13

               c.   The Court Is Free To Enforce the Mutual Release of
                    Claims .......................................................................... 16

          3.   If BP Is Found Grossly Negligent Its Assignee Should Not
                  Be Permitted To Escape the Plain Terms of the Drilling
                  Contract .................................................................................. 18

    B.   The Assignment Is Invalidated by the Specific Provisions of
            Article 25.3 of the Drilling Contract ..................................................... 20

    C.   Many of the Assigned Claims Are in Fact Third-Party Damage
            Claims ................................................................................................ 21

V.    CONCLUSION ......................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Agip Petrol. Co., Inc. v. Gulf Island Fabrication, Inc.*,
  56 F. Supp. 2d 776 (S.D. Tex. 1999)............................................................................. 10, 11

*APL Co. Pte. Ltd. v. UK Aerosols Ltd.*,
  C 05-0646 MHP, 2006 WL 2792875 (N.D. Cal. Sept. 28, 2006)........................................11

*Becker v. Tidewater, Inc.*,
  586 F.3d 358 (5th Cir. 2009) .................................................................................................8

*Berge Helene Ltd. v. GE Oil & Gas, Inc.*,
  896 F. Supp. 2d 582 (S.D. Tex. Sept. 30, 2012) ..................................................................11

*Chembulk Trading, LLC v. Chemex Ltd.*,
  393 F.3d 550 (5th Cir. 2004) .................................................................................................9

*Chouest Offshore Servs., LLC v. Superior Energy Servs.*,
  409 F. Supp. 2d 757 (E.D. La. 2005) ...................................................................................10

*East River S.S. Corp. v. Transamerica Delaval, Inc.*,
  476 U.S. 858 (1986) ............................................................................................................15

*F.D.I.C. v. Bledsoe*,
  989 F.2d 805 (5th Cir. 1993) ...............................................................................................18

*Fidelity & Deposit Co. of Md. v. Connor*,
  973 F.2d 1236 (5th Cir. 1992) .............................................................................................15

*Florida Bahamas Lines, Ltd. v. Steel Barge Star 800 of Nassau*,
  433 F.2d 1243 (5th Cir. 1970) .............................................................................................18

*Fontenot v. Mesa Petrol. Co.*,
  791 F.2d 1207 (5th Cir. 1986) ...............................................................................................9

*Houston Exploration Co. v. Halliburton Energy Servs., Inc.*,
  269 F.3d 528 (5th Cir. 2001) .........................................................................................16, 17

*In re Alex C Corp.*,
  Civ. A. 01-12184 DPW, 2003 WL 203078 (D. Mass. Jan. 30, 2003) .............................23, 24

*In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico*,
  MDL 2179, 2012 WL 5960192 (E.D. La. Nov. 28, 2012)....................................................25

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Ins. Co. of the West v. United States*,
    243 F.3d 1367 (Fed. Cir. 2001).............................................................20

*Int'l Erectors, Inc. v. Wilhoit Steel Erectors and Rental Svc.*,
    400 F.2d 465 (5th Cir. 1968) ..................................................... 12, 13

*La Esperanza de P.R., Inc. v. Prez y Cia. de P.R.*,
    124 F.3d 10 (1st Cir. 1997).................................................................17

*Lewis v. Timco, Inc.*,
    716 F.2d 1425 (5th Cir. 1983) .............................................................19

*Little v. Liquid Air Corp.*,
    37 F.3d 1069 (5th Cir. 1994) .................................................................8

*McKennon v. Nashville Banner Pub. Co.*,
    513 U.S. 352 (1995) .............................................................................19

*National Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp.*,
    924 F. Supp. 1436 (E.D. Va. 1996), aff'd 122 F.3d 1062, 1997 WL 560047
    (4th Cir. 1997)......................................................................................23

*Netsphere, Inc. v. Baron*,
    703 F.3d 296 (5th Cir. 2012) ...............................................................18

*Parker Plaza West Partners v. UNUM Pension and Ins. Co.*,
    941 F.2d 349 (5th Cir. 1991) ...............................................................12

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
    324 U.S. 806 (1945) .............................................................................19

*Reg'l Properties, Inc. v. Fin. & Real Estate Consulting Co.*,
    752 F.2d 178 (5th Cir. 1985) ...............................................................19

*Royal Ins. Co. v. Sw. Marine*,
    194 F.3d 1009 (9th Cir. 1999) .............................................................17

*Sander v. Alexander Richardson Invs.*,
    334 F.3d 712 (8th Cir. 2003) ...............................................................12

*Smith v. Seaboard Coast Line R.R. Co.*,
    639 F.2d 1235 (5th Cir. 1981) .............................................................12

*Strachan Shipping Co. v. Dresser Indus., Inc.*,
    701 F.2d 483 (5th Cir. 1983) .................................................................8

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Sulzer Carbomedics, Inc. v. Oregon Cardio-Devices, Inc.*,
    257 F.3d 449 (5th Cir. 2001) ................................................22

*Todd Shipyards Corp. v. Turbine Service, Inc.*,
    674 F.2d 401 (5th Cir. 1982) .......................................... 16, 17

*Twin City Pipe Line v. Harding Glass*,
    283 U.S. 353 (1931) ......................................................15

*United States v. Hyundai Merch. Marine Co.*,
    172 F.3d 1187 (9th Cir. 1999) ............................................25

*Wuliger v. Mfrs Life Ins. Co.*,
    567 F.3d 787 (6th Cir. 2009) ............................................18

**FEDERAL STATUTES**

33 U.S.C. § 2701(30) ......................................................... 24, 25

33 U.S.C. § 2701(31) ...........................................................25

33 U.S.C. § 2702(b)(1) ..........................................................22

33 U.S.C. § 2702(b)(1)(B) .......................................................25

33 U.S.C. § 2709 ......................................................... 22, 23, 24

33 U.S.C. § 2717 ...............................................................24

**STATUTES - OTHER**

La. Civ. Code Ann. art. 2004 ....................................................17

**FEDERAL RULES**

Fed. R. Civ. P. 56(a) .............................................................8

**TREATISES**

Restatement (Second) of Contracts § 317 (1981) ..................................20

**OTHER AUTHORITIES**

Daniel B. Shilliday et. al., *Contractual Risk-Shifting in Offshore Energy
    Operations*, 81 Tul. L. Rev 1579 (2007) .....................................10

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Kenneth G. Engerrand, *Indemnity for Gross Negligence in Maritime Oilfield Contracts*, 10 Loy. Mar. L.J. 319 (2012)..............................................................................12

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      INTRODUCTION

As part of the Economic and Property Damages Settlement, BP purportedly assigned to the Economic Class certain claims it has asserted against Transocean.  (Rec. Doc. 6430-39, ¶¶ 1.1.3.1-6.)  These claims include BP's claims for reimbursement of payments it made to class members under the Settlement Agreement (the "Contribution Claims") and BP's separate claims for spill-related damages, such as lost profits from the Macondo well (the "Direct Damages Claims").  This motion seeks partial summary judgment as to the Direct Damages Claims on the ground that BP released those claims in the Drilling Contract.[1]

This Court ruled in its 2012 Indemnity Order (Rec. Doc. 5446) that BP had an obligation under the Drilling Contract between BP and Transocean to *indemnify* Transocean for claims brought by third parties, even in the event of Transocean's gross negligence.  In doing so, this Court enforced the plain terms of the Drilling Contract's indemnity agreement, in which  BP and Transocean mutually agreed to "protect, release, defend, indemnify, and hold harmless," each other for certain specific risks.  For some losses, including the risk of the loss of the well or the risk of pollution below the surface of the water, BP agreed to "protect, release, defend, indemnify, and hold harmless" Transocean.   For other losses, including personal injuries to its own personnel, Transocean agreed to "protect, release, defend, indemnify, and hold harmless" BP.  For

---

[1] The validity of this assignment and the ability of the Economic Class to pursue the Contribution Claims are addressed in Transocean's Motion for Partial Judgment on the Pleadings as to Claims Assigned Under Settlement Agreement.  (Rec. Doc. 8120.)  In responding to that motion, the PSC challenged the enforceability of the release of the Direct Damages Claims.  (Rec. Doc. 10186 at 11-12.)  Transocean accordingly brings this motion to enforce the release.

yet other losses, the contract takes an even more fine-grained approach.  For example, the parties agreed that BP would bear the risk of the loss of the well itself, although, if the well were lost or damaged due to Transocean's negligence, gross negligence, or willful misconduct, Transocean would be obligated to redrill the hole for BP at a discounted rate. This allocation of liability and mutual release of claims between BP and Transocean is valid and enforceable, and the Court should grant partial summary judgment in favor of Transocean on the Direct Damages Claims.

First, the cardinal rule of contract interpretation is to enforce contracts as written, and here the parties expressly agreed to divide certain foreseeable risks and mutually release one another from claims, even in the event of gross negligence.  The PSC has suggested these plain terms should give way to a public policy against broad and unilateral releases of gross negligence claims. However, the Fifth Circuit has never applied such a public policy rationale to invalidate detailed, mutual contractual risk allocations between sophisticated parties, and it would be particularly inappropriate to invoke the principle here.  A public policy that generally disfavors broad, *unilateral* contractual releases has not and should not be applied to trump the detailed and unambiguous *mutual* division of liabilities in the Drilling Contract.

Allowing BP's assignee to invoke the Court's equitable power to invalidate the express risk allocations would also violate the doctrine of unclean hands.  If BP is found grossly negligent, then neither BP nor the Economic Class as BP's assignee should have access to the equitable remedy of rescission of the contractual allocation of liability.

Second, the Drilling Contract's anti-assignment provision constitutes an independent ground for barring the Economic Class from pursuing the assigned Direct Damages Claims.

Third, even if public policy could void BP's release of its own direct claims against Transocean (and it should not), most of the claims now asserted by the Economic Class as "direct" claims are in fact "third-party" claims, which are subject to this Court's Indemnity Order.

## II.   BACKGROUND

### A.   BP's Purported Assignment of Claims to the Economic Class

BP asserted a number of damages claims against Transocean, including claims for breach of the Drilling Contract between BP and Transocean, unseaworthiness, and negligence. *See* Rec. Doc. 2074 (BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation) at 20-26; Statement of Undisputed Material Facts ("SUF") ¶ 3. BP also asserted claims for contribution and subrogation. *Id.* at 26-28; SUF ¶ 3.

As part of the Settlement Agreement with the PSC, BP purported to assign these claims to the Economic Class "as a juridical entity."[2]  Rec. Doc. 6430-39, ¶ 1.1.3; SUF ¶ 4. The Settlement Agreement specifies the following categories of assigned claims:

> (1)   All damages related to the repair, replacement, and/or re-drilling of the MC-252 Well (Rec. Doc. 6430-39, ¶ 1.1.3.1; SUF ¶ 4(a));
>
> (2)   All economic damages for the loss of the MC-252 Well, including lost profits, lost hydrocarbons, and diminution in value of the leasehold (Rec. Doc. 6430-39, ¶ 1.1.3.2; SUF ¶ 4(b));

---

[2] The validity of this purported assignment is challenged in Transocean's Motion for Partial Judgment on the Pleadings as to Claims Assigned Under Settlement Agreement.  Rec. Doc. 8120.

(3)    All costs that BP incurred to control the MC-252 Well and/or to respond to, contain, and/or clean up the DWH Spill (Rec. Doc. 6430-39, ¶ 1.1.3.3; SUF ¶ 4(c));

(4)    All rights to indemnity, contribution, or subrogation for claims paid by BP and/or the GCCF on or before the entry of the Preliminary Approval Order (Rec. Doc. 6430-39, ¶ 1.1.3.4; SUF ¶ 4(d));

(5)    All claims or causes of action to pursue reimbursement of Settlement Payment(s) under theories of indemnification, contribution, subrogation, or any other theory of recovery (Rec. Doc. 6430-39, ¶ 1.1.3.5; SUF ¶ 4(e));

(6)    All punitive, exemplary, multiple, or non-compensatory damages (Rec. Doc. 6430-39, ¶ 1.1.3.6; SUF ¶ 4(f));

(7)    All claims and causes of action to recover the damages, losses, costs, fees, and amounts set forth in Sections 1.1.3.1-1.1.3.6 including BP's claims for breach of contract, unseaworthiness, negligence, gross negligence, willful misconduct, fraud, fraudulent concealment, and intentional torts and including BP's claims in the BP Parties' Counter-Complaint, Cross-Complaint And Third Party Complaint Against Transocean And Claim In Limitation [Rec. Doc. 2074] (Rec. Doc. 6430-39, ¶ 1.1.3.7; SUF ¶ 4(g)).

BP's purported assignment is subject to certain conditions, including that the Economic Class may not collect damages for any of the assigned claims from Transocean unless it is finally determined that Transocean cannot recover those damages through indemnity, subrogation, assignment, or any other theory from BP.   Rec. Doc. 6430-39, ¶ 1.1.2.4; SUF ¶ 5.   The Settlement Agreement also provides that the "invalidity, illegality, or unenforceability of the assignment of any or all Assigned Claims shall not operate to invalidate the Agreement . . . and shall not affect the validity or enforceability of any other provision" in the Agreement.  Rec. Doc. 6430-39, ¶ 1.1.4.6; SUF ¶ 5.[3]

---

[3] Plaintiffs have not yet sought to amend the B1 or B3 master complaints to allege the assigned Direct Damages Claims, and, as BP has observed, the Effective Date of the settlement agreements has not arrived because there are appeals pending from the Court's approval of the settlements. *See* Rec. Doc. 10210 at 6.  Transocean brings this motion now because the PSC has asserted in its consolidated opposition to Transocean's pending motions that a gross negligence finding would invalidate the mutual release of claims in the drilling contract.  Rec. Doc. 10186.

B.      **The Drilling Contract Allocated Risks Between BP And Transocean**

Any claim asserted by BP (or the Economic Class as its assignee) against Transocean must be evaluated in light of the Drilling Contract between BP and Transocean.[4]  In Articles 21 through 24 of the Drilling Contract (TREX 4271), BP and Transocean agreed to a detailed schedule of risk allocation, including:

(1)     *Personal injury or death*.  Each party assumes liability for injury or death of their own personnel.  (Drilling Contract Art. 21; SUF ¶¶ 7-8)

(2)     *Loss or damage to Transocean's equipment*.  Transocean assumes the risk of damage to its drilling unit and equipment (Drilling Contract Art. 22.1; SUF ¶ 9), except that BP assumes the risk for loss or damage to in-hole, subsea, and mooring equipment when such equipment is in the hole or in use below the surface (and when the loss is not covered by insurance) (Drilling Contract Art. 22.3; SUF ¶ 10).  BP's liability for these below-surface losses *does not include* losses caused by Transocean's *gross negligence*.  (*Id*.)  The contract includes specific provisions for damage caused by corrosive additives in drilling fluid, placing that liability on BP, except in cases of Transocean's negligence, *gross negligence*, or willful misconduct.  (*Id*.)

(3)     *Loss or damage to BP's equipment*.  BP bears the risk of loss for its own equipment.  (Drilling Contract Art. 22.4; SUF ¶ 11.)

(4)     *Loss or damage to the hole*.  BP bears the risk of loss or damage to the hole; however, if the hole is lost or damaged due to Transocean's negligence or *gross negligence*, then as Transocean's "sole liability" it is obligated to redrill the hole at a discounted rate.  (Drilling Contract Art. 23.1; SUF ¶ 12.)

(5)     *Cost of controlling a blowout or crater*.  In the event of a blowout, BP bears the expense of controlling or "killing" the well.  (Drilling Contract Art. 23.2; SUF ¶ 13.)

---

[4] The parties to the Drilling Contract, which was originally executed in December 1998, were Vastar Resources, Inc, the predecessor to BP America Production Company, and R&B Falcon Drilling Co., the predecessor to Transocean Holdings LLC.  For simplicity, this motion refers to the parties to the Drilling Contract as BP and Transocean.  (Drilling Contract, attached as Exhibit A, at 2.)

(6) *Underground damage*.  BP bears the risk of loss of oil or gas (so long as the oil or gas has not been reduced to physical possession above the surface) and the risk of damage to the formation or reservoir.  (Drilling Contract Art. 23.3; SUF ¶ 14.)

(7) *Pollution*.  Transocean bears the risk of above-surface pollution (Drilling Contract Art. 24.1; SUF ¶ 15), and BP bears the risk of all pollution not assumed by Transocean (Drilling Contract Art. 24.2; SUF ¶16).

In each instance where one party assumed some risk under the Drilling Contract that party agreed to "protect, release, defend, indemnify, and hold harmless" the other party for those risks.  Drilling Contract ¶¶ 21.1, 21.2, 22.1, 22.3, 22.4, 22.5, 23.1, 23.2, 23.3, 24.1, 24.2; SUF ¶¶ 7-16.  Article 25.1 of the Drilling Contract expressly provides that the obligation to "protect, release, defend, indemnify, and hold harmless" applies even in the event of the other party's breach of contract, strict liability, negligence, gross negligence, or the unseaworthiness of any vessel (including the drilling rig):

> EXCEPT TO THE EXTENT ANY SUCH OBLIGATION IS SPECIFICALLY LIMITED TO CERTAIN CAUSES ELSEWHERE IN THIS CONTRACT, THE PARTIES INTEND AND AGREE THAT THE PHRASE "*SHALL PROTECT, RELEASE, DEFEND, INDEMNIFY AND HOLD HARMLESS*" MEANS THAT THE INDEMNIFYING PARTY SHALL PROTECT, RELEASE, DEFEND, INDEMNIFY, AND HOLD HARMLESS THE INDEMNIFIED PARTY OR PARTIES FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES (INCLUDING REASONABLE ATTORNEYS FEES), JUDGMENTS AND AWARDS . . . INCLUDING . . . THE UNSEAWORTHINESS OF ANY VESSEL OR VESSELS (INCLUDING THE DRILLING UNIT), BREACH OF REPRESENTATION OR WARRANTY, EXPRESSED OR IMPLIED, BREACH OF CONTRACT, STRICT LIABILITY, TORT, OR THE NEGLIGENCE OF ANY PERSON OR PERSONS, INCLUDING THAT OF THE INDEMNIFIED PARTY, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, ACTIVE, PASSIVE OR GROSS . . . .

Drilling Contract ¶ 25.1 (emphasis added); SUF ¶ 17.

In addition to this broadly worded release and indemnity agreement, BP and Transocean also contracted to mutually release one another from all consequential

damages, including punitive damages, "resulting from or arising out of" the Drilling Contract.  Article 34.1 of the Drilling Contract provides:

> NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR INCIDENTAL SPECIAL, INDIRECT, STATUTORY, EXEMPLARY, PUNITIVE, OR CONSEQUENTIAL DAMAGES SUFFERED BY SUCH PARTY RESULTING FROM OR ARISING OUT OF THIS CONTRACT, INCLUDING WITHOUT LIMITATION, LOSS OF PROFITS, OR BUSINESS INTERRUPTIONS HOWEVER THEY MAY BE CAUSED.

Drilling Contract ¶ 34.1; SUF ¶ 18.

### C.    This Court's Indemnity Ruling

This Court addressed the scope of the Drilling Contract's broad indemnity agreement in its prior Order as to Transocean and BP's Cross-Motions for Partial Summary Judgment Regarding Indemnity ("Indemnity Order").  Rec. Doc. 5446.  In the Indemnity Order, the Court affirmed BP's obligation under the Drilling Contract to indemnify Transocean for all risk assumed by BP, even in the event of Transocean's gross negligence.  The Court held that "*if* Transocean committed gross negligence that caused pollution originating below the surface of the water, public policy would not bar its claim for contractual indemnity from BP."  Rec. Doc. 5446 at 18 (emphasis in original).  In so ruling, the Court discussed the distinction between "indemnity," which "determines which party to a contract will ultimately bear the risk of injury to a *third* party," and a "release," which is "a contract whereby one party agrees in advance to release the other contracting party from liability in the event the former party is damaged."  *Id.* at 11 (emphasis in original).  The Court observed that while the relevant provisions of the Drilling Contract "operate both as a release and an indemnity, what is at issue [here] is indemnity."  *Id.*  The ruling therefore did not directly address the scope of

the releases that BP and Transocean exchanged in the Drilling Contract for claims based on the risks assumed by the releasing party.

### III.   STANDARD FOR SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[S]ummary judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.  If the nonmoving party fails to meet this burden, the motion for summary judgment must be granted."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075-76 (5th Cir. 1994) (internal quotation marks and citation omitted).  Summary judgment is especially appropriate in cases involving unambiguous contracts.  Where, as here, the "agreement is clear and unambiguous," "contract interpretation is a question of law." *Strachan Shipping Co. v. Dresser Indus., Inc.*, 701 F.2d 483, 486 (5th Cir. 1983); *see also Becker v. Tidewater, Inc.*, 586 F.3d 358, 369 (5th Cir. 2009) ("The interpretation of a contractual indemnity provision is a question of law . . . .  A maritime contract containing an indemnity agreement . . . should be read as a whole and its words given their plain meaning unless the provision is ambiguous.") (internal quotation marks and citation omitted)).

### IV.   ARGUMENT

#### A.   BP's Release of Claims Against Transocean in the Drilling Contract Should Be Enforced to Its Full Extent

BP and Transocean agreed in the drilling contract to mutually "protect, *release*, defend, *indemnify* and hold harmless" each other for a series of specifically enumerated risks.  Drilling Contract ¶ 25.1, italics added.   BP's "release" of claims for these risks

should be enforced to the same extent as BP's obligation to indemnify Transocean—including in the event of Transocean's gross negligence or breach of contract, or the unseaworthiness of the *Deepwater Horizon*—for three reasons.  First, under the plain language of the Drilling Contract, BP and Transocean specifically allocated risks, expressly taking into account the possibility of gross negligence.  Second, public policy favors enforcement of the plain terms of the agreement, and there is no public policy reason to void the release.  Third, voiding the release here on public policy grounds would be inequitable if BP is found grossly negligent.

**1.      The Plain Language of the Drilling Contract Includes a Detailed Allocation of Risks and Mutual Release of Claims**

The starting point for the interpretation of any contract is its plain language.  *E.g. Chembulk Trading, LLC v. Chemex Ltd.*, 393 F.3d 550, 555 n. 6 (5th Cir. 2004); *Fontenot v. Mesa Petrol. Co.*, 791 F.2d 1207, 1214 (5th Cir. 1986).  Under the plain language of the Drilling Contract, BP unquestionably assumed the risk for certain specified losses—including the precise claims that BP asserted against Transocean and subsequently assigned to the Economic Class.  There can be no dispute that the claims for lost profits from the well, source control costs, and clean-up and removal costs that BP has purportedly assigned to the Economic Class fall squarely within these provisions.  In particular, BP assumed the risk for (1) loss or damage to the hole (Drilling Contract ¶ 23.1); (2) the cost of controlling a blowout or crater, and the cost of killing the well in the event of a blowout (*id.* ¶ 23.2); (3) the loss of oil or gas (so long as the oil or gas has not been reduced to physical possession above the surface, which is not an issue here), and the risk of damage to the formation or reservoir (*id.* ¶ 23.3); and (4) subsurface pollution, "including [the] control and removal thereof" (*id.* ¶ 24.2).  BP accordingly

9

agreed to indemnify and release Transocean for these claims.  (*Id.* ¶ 25.1.)  Under the plain terms of the Drilling Contract, these claims are subject to the release in Article 25.1, which the Court has already determined applies regardless of gross negligence or breach of contract. Rec. Doc. 5446.

In addition to the risk allocations found in Articles 21-25 of the Drilling Contract, the parties mutually agreed to release one another from all consequential damages, including punitive damages and lost profits, arising from the contract.  (*Id.* ¶ 34.1.)[5] Under admiralty law, contractual clauses disclaiming the right to recover consequential damages are valid and enforceable.  *Chouest Offshore Servs., LLC v. Superior Energy Servs.*, 409 F. Supp. 2d 757, 763 (E.D. La. 2005).   And gross negligence will not invalidate a contractual disclaimer of consequential damages.  *Agip Petrol. Co.*, *Inc. v. Gulf Island Fabrication, Inc.*, 56 F. Supp. 2d 776, 777 (S.D. Tex. 1999).  As the *Agip* court recognized:

> [C]ontracts can address types of costs, risks of loss and their allocation without reference to whether the legal cause may be negligent or intentional much less whether the negligence may be gross or ordinary.

---

[5] The term "consequential damages" is broadly interpreted:  "Consequential damages have been defined as those claimed to result as a secondary consequence to the defendant's non-performance. . . .  Listed among the most common types of consequential damages are: (1) lost profits where goods are bought for resale; (2) lost profits where goods are bought to be used to aid production in a business enterprise; (3) lost profits because of unestablished business or lost new business; (4) lost profits because of lost contemplated, but not yet established, business; (5) added expenses if not directly related to handling or caring for defective goods (labor, production, downtime); (6) loss of goodwill; (7) third-party claims because of defect (including indemnity claims); (8) loss of use for a particular purpose including rental costs of substitute goods; (9) interest and finance charges on borrowed money to finance purchase of goods and to repair them (but not pre-judgment or post-judgment interest on the damage itself); (10) attorney's fees and costs; (11) property damages (e.g., fire and water damage from defective heater, lost crops because of defective insecticide, damage to engines because of defective antifreeze, damaged food because of defective refrigerator); and (12) personal injury and mental suffering. In general this approach seems to have been adopted under Texas, Louisiana, and maritime law." Daniel B. Shilliday et. al., *Contractual Risk-Shifting in Offshore Energy Operations*, 81 Tul. L. Rev 1579, 1630 (2007).

> The purpose of a contract is to allocate responsibility. The risks of loss from particular causes and the types of recoveries for those losses are common provisions. Parties to a contract allocate risk in advance on obviously uncertain knowledge about the actual outcome; an adverse outcome is when the contract counts.

*Id*. The court accordingly enforced a release of consequential damages regardless of gross negligence. *Id.* ("Agip agreed with McDermott that neither would be liable for the other's consequential damages. Agip did not negotiate for an exception to the exception of consequential damages for any particular cause; it agreed to a blanket ban."). The plain terms of the release in Article 34.1 thus bar BP's direct claims for consequential damages.

      **2.    Public Policy Favors Enforcement of the Contractual Release as Written**

          **a.    Both General Maritime and Fifth Circuit Law Protect Freedom of Contract, Particularly Between Sophisticated Parties**

The paramount public policy at stake in contract interpretation, particularly in the case of contracts between sophisticated parties of equal bargaining power, is the freedom of contract. This goal, and thus enforcement of the terms of contracts as written, is an important policy goal under both general maritime law and Fifth Circuit law. Indeed, "maritime law is designed to protect freedom of contract and allocation of risk among commercial parties." *Berge Helene Ltd. v. GE Oil & Gas, Inc.*, 896 F. Supp. 2d 582, 599 (S.D. Tex. Sept. 30, 2012). "Under the general maritime law of contracts, freedom of contract is the norm so that rights, duties, [and] liability depend primarily upon the substance of the parties' agreement. Express contractual agreements to shift or limit liability, such as indemnity provisions, are generally enforceable in admiralty." *APL Co. Pte. Ltd. v. UK Aerosols Ltd.*, C 05-0646 MHP, 2006 WL 2792875, at *3 (N.D. Cal. Sept.

28, 2006) (internal quotation marks and citation omitted).  This is particularly true where, as here, the parties to the contract are sophisticated commercial entities with relatively equal bargaining power.  As one commentator has observed,

> The public policy concerns cited by admiralty courts and by common-law courts as a means of voiding contractual limitations of liability are not present in the context of freely negotiated indemnity agreements that provide reciprocal obligations such as those used by contractors and oil companies in the offshore energy industry. . . .  Many courts that have tackled this issue have agreed that there is a critical difference between unilateral exemptions from liability in contracts of adhesion produced from superior bargaining power in comparison to indemnity provisions that fairly allocate risks between sophisticated parties based on substantive and economic reasons.

Kenneth G. Engerrand, *Indemnity for Gross Negligence in Maritime Oilfield Contracts*, 10 Loy. Mar. L. J. 319, 355-56 (2012).  *See also Sander v. Alexander Richardson Invs.*, 334 F.3d 712, 717 (8th Cir. 2003) ("The circuits are in agreement that while exculpatory clauses were generally disfavored by admiralty courts, such clauses are routinely enforced today based on the consideration that businessmen can bargain over which party is to bear the risk of damage and set the price accordingly, thus achieving a more rational distribution of the risk and allocation of price than the law would otherwise allow." (internal quotation marks omitted)).

The Fifth Circuit is equally protective of the integrity of contracts.  "Contracts entered into freely and voluntarily are to be held sacred, and courts are not lightly to interfere with this freedom of contract."  *Parker Plaza West Partners v. UNUM Pension and Ins. Co.*, 941 F.2d 349, 352 (5th Cir. 1991) (internal quotation marks omitted) (applying Texas law).  *See also Smith v. Seaboard Coast Line R.R. Co.*, 639 F.2d 1235, 1239 (5th Cir. 1981) (referring to the "broad freedom of contract the law grants the parties"); *Int'l Erectors, Inc. v. Wilhoit Steel Erectors and Rental Svc.*, 400 F.2d 465, 470

(5th Cir. 1968) (citing "the well settled rule that courts may not rewrite a contract or interfere with the freedom of contract or substitute their judgment for that of the parties thereto in order to relieve one of the parties from the apparent hardship of an improvident bargain") (quotation marks omitted)).

Any argument asserted by the Economic Class to void BP's release of claims on public policy grounds must overcome this strong public policy in favor of enforcing contracts as written.  As set forth below, there is no basis to deviate from the detailed risk allocation and mutual release terms of the Drilling Contract.

> **b.      The Drilling Contract Represents a Detailed Allocation of Risk Between Sophisticated Commercial Parties**

The Drilling Contract involves just the sort of detailed allocation of risk between sophisticated commercial parties that drives courts to enforce contracts as written as a matter of public policy.  The contract does not universally exempt either Transocean or BP from liability.  Rather, it includes no less than five pages of risk allocation provisions.  Neither BP nor Transocean is fully released from liability; instead, the contract divides liability between the parties based on the specific risk.

The Drilling Contract's detailed, exhaustive, and mutual risk allocation provisions between BP and Transocean *specifically address the risk of gross negligence.*  First, the contract divides liability for personal injury and death claims so that each party is responsible for its own personnel.  Drilling Contract ¶ 21.  Second, it divides liability for damage to the drilling unit and equipment, such that Transocean generally assumes the risk (*id.* ¶ 22.1), except that BP assumes the risk for damage to in-hole, subsea, and mooring equipment when such equipment is in the hole or in use below the surface (and when the loss is not covered by insurance) (*id.* ¶ 22.3).   BP's liability for these below-

surface losses *does not include* losses caused by Transocean's *gross negligence*. *Id.* The contract also includes specific provisions for damage caused by corrosive additives in drilling fluid, placing that liability on BP except in cases of Transocean's negligence, *gross negligence*, or willful misconduct. *Id.* Third, after placing most of the risk for the loss of Transocean's equipment on Transocean (with the exceptions just discussed), the contract puts the risk of damage to BP's equipment on BP. *Id.* ¶ 22.4. Fourth, the contract generally assigns to BP the risk of loss or damage to the hole; however, if the hole is lost or damaged due to Transocean's negligence or *gross negligence*, then as Transocean's "sole liability" it is obligated to redrill the hole at a discounted rate. *Id.* ¶ 23.1. Fifth, the contract assigns to BP the cost of controlling or killing the well in the event of a blowout. *Id.* ¶ 23.2. Sixth, the contract assigns to BP the risk of loss of oil or gas (so long as the oil or gas has not been reduced to physical possession above the surface) and the risk of damage to the formation or reservoir. *Id.* ¶ 23.3. Finally, the contract divides the risk of pollution, such that Transocean bears the risk of above-surface pollution (*id.* ¶ 24.1), and BP bears the risk of all other pollution (i.e., below-surface pollution) (*id.* ¶ 24.2).

It would be a remarkable departure from the principles of freedom of contract to allow a competing and more narrow public policy concern disfavoring releases for gross negligence to nullify this extensively detailed and mutual division of liabilities, particularly when the contract specifically accounts for when the parties will indemnify and release gross negligence and when they will not do so (*e.g.*, loss of equipment claims) and provides specific remedies for gross negligence claims (*e.g.*, Transocean's obligation to redrill at a discounted rate if the hole is lost due to Transocean's gross

negligence).  Indeed, the Fifth Circuit has recognized "'that competent persons shall have the utmost liberty of contract'" and cautioned that, "[a]lthough contractual agreements may be invalidated on grounds of public policy, public policy opens only a narrow exception within this general rule—an exception to be applied cautiously and only in plain cases involving dominant public interests."  *Fidelity & Deposit Co. of Md. v. Connor*, 973 F.2d 1236, 1241 (5th Cir. 1992) (*quoting Twin City Pipe Line v. Harding Glass*, 283 U.S. 353, 356 (1931)).  No case endorses such a sweeping use of public policy to nullify these sorts of detailed provisions, and doing so would be inimical to the even more important public policy of enforcing specific negotiated contractual terms.  *See, e.g.*, *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 872-74 (1986) (recognizing the freedom of contracting parties to allocate risk in a maritime contract).

As to the public policy goal of deterring risky behavior, the Court has already observed:

> As to the argument that contractual indemnity for gross negligence contravenes public policy, it is significant that the Drilling Contract allocated risks to both Transocean and BP, not just BP. . . .  Given these risk allocations, a grossly negligent act by Transocean could result in liability to Transocean as easily as it could have resulted in liability to BP. In other words, the reciprocal nature of these indemnity clauses arguably created an incentive for Transocean to avoid grossly negligent conduct, or at least did not encourage Transocean to act in a grossly negligent manner. These considerations weaken the argument that the indemnity should be invalidated.

Rec. Doc. 5446 at 15.  The Court's reasoning and ultimate holding as applied to indemnity for third-party claims is sound and applies equally to the release of the Direct Damages Claims.

### c.   The Court Is Free To Enforce the Mutual Release of Claims

In the Indemnity Order, this Court discussed a line of cases stating that gross negligence may invalidate a contractual release of claims.  No court, including the Fifth Circuit, has invoked or applied this public policy outside the context of a broad undifferentiated release.  And, although the Fifth Circuit has referenced this idea, it has never held a release covering gross negligence void as a matter of public policy, let alone held that such a release is void in all circumstances.  Here, BP and Transocean agreed to detailed, mutual risk allocation terms that do not implicate the public policy concerns raised in the cases cited in the Court's Indemnity Order.

In its Indemnity Order, the Court discussed two Fifth Circuit cases and two out-of-circuit cases that address contractual releases and gross negligence.  Rec. Doc. 5446 at 11-19.  None of these cases supports invalidating the terms of the Drilling Contract.  In *Todd Shipyards Corp. v. Turbine Service, Inc.*, 674 F.2d 401, 411 (5th Cir. 1982), the Fifth Circuit observed that "[g]ross negligence, which will invalidate an exemption from liability, has been defined as harm willfully inflicted or caused by gross or wanton negligence" (internal quotation marks and ellipsis omitted)—but the court went on to hold there was no gross negligence, and thus did not actually invalidate the release.  In *Houston Exploration Co. v. Halliburton Energy Servs., Inc.*, 269 F.3d 528, 531 (5th Cir. 2001), the Fifth Circuit stated that "[u]nder Louisiana law, . . . [a]ny waiver of liability for intentional misconduct or gross negligence . . . is void."  But *Houston Exploration* is not binding here because (1) the court was interpreting a specific Louisiana statute; (2) the parties did not dispute that gross negligence would have voided the broadly-worded release of "all liability" at issue in the case; and (3) the court ultimately reversed the trial

court's gross negligence finding. *Id.* at 531-33 & nn.1 & 6 (citing La. Civ. Code Ann. art. 2004). Thus, no binding precedent in the Fifth Circuit holds that gross negligence invalidates a release under general maritime law.[6]

Nor do these cases provide a sound policy rationale to invalidate the terms of the Drilling Contract. In contrast to the division of risks found in the Drilling Contract, all of the release cases cited in the Indemnity Order involved one-sided, general releases of *all liability*. Rec. Doc. 5446 at 11-19. In *Houston Exploration*, the parties' Work Order Agreement required THEC "to defend, indemnify and hold Halliburton . . . harmless from and against any and all liability, claims, costs, expenses, attorneys' fees and damages . . . resulting from . . . [l]oss of well control." 269 F.3d at 529-30. In *Todd Shipyards*, the release in the relevant repair contract provided that "[i]n no event shall our liability for any claim arising under this contract exceed in the aggregate the sum of $300,000.00." 674 F.2d at 409 n.2. In the First Circuit's *La Esperanza* decision, the contract provided that "the yard shall in no case be held responsible for the damages resulting from any loss of use or profit of the vessel." 124 F.3d at 20. In the Ninth Circuit's *Royal Ins. Co.* decision, the relevant agreements "contain[ed] exculpatory clauses purporting to release Southwest from all liability." 194 F.3d at 1013. Moreover, none of the releases in the above-cited cases expressly contemplated gross negligence. By contrast, the Drilling Contract expressly provides that the release applies even in the

---

[6] This Court also cited in its Indemnity Order cases from the Ninth and First Circuits for the proposition that gross negligence will invalidate a release. The Ninth Circuit case appears to be the only circuit court case to have actually applied a public policy rationale to hold, under general maritime law, that a broad release of "all claims" did not cover gross negligence. *Royal Ins. Co. v. Sw. Marine*, 194 F.3d 1009, 1016 (9th Cir. 1999). The First Circuit repeated the above-referenced dicta from *Todd Shipyards*, but it then affirmed the district court's enforcement of a liability limitation in a red-letter clause after finding no gross negligence. *La Esperanza de P.R., Inc. v. Perez y Cia. de P.R.*, 124 F.3d 10, 19-20 (1st Cir. 1997).

event of Transocean's gross negligence.   Drilling Contract ¶ 25.1.   A public policy against enforcing broad releases in the event of gross negligence cannot support voiding the specific risk allocation terms in this agreement, particularly where contract specifically accounts for the risk of gross negligence.

### 3.     If BP Is Found Grossly Negligent Its Assignee Should Not Be Permitted To Escape the Plain Terms of the Drilling Contract

Finally, to the extent BP is found grossly negligent, its purported assignee, the Economic Class, should not be permitted to rely on a public policy rationale to void BP's contractual release of claims based on any gross negligence by Transocean.   To the extent the Economic Class may assert any assigned claim, it may do so only on the same terms that BP itself could have done.   *See Florida Bahamas Lines, Ltd. v. Steel Barge Star 800 of Nassau*, 433 F.2d 1243, 1246 (5th Cir. 1970) (in maritime law, "a valid and unqualified assignment operates to transfer to the assignee no greater right or interest than was possessed by the assignor");   *F.D.I.C. v. Bledsoe*, 989 F.2d 805, 810 (5th Cir. 1993) (under common law, "[a]n assignee stands in the shoes of his assignor").   Every independent observer—from the DOJ to the Presidential Commission—has determined that BP's culpability is far greater than Transocean's.   In the event of a gross negligence finding against both companies, the Court should apply the equitable doctrine of unclean hands to bar BP (and the Economic Class as BP's assignee) from the windfall that voiding the release provision of the Drilling Contract would provide.

Contract rescission—which is what the Economic Class seeks when it asks the Court to nullify the release—is an equitable remedy.   *E.g.*, *Netsphere, Inc. v. Baron*, 703 F.3d 296, 309 (5th Cir. 2012); *see also Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 797 (6th Cir. 2009) ("Rescission is an equitable remedy, and equitable claims are subject to

the defense of unclean hands."). The unclean hands doctrine, however, "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945); *see also McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 360 (1995) (citing "[e]quity's maxim that a suitor who engaged in his own reprehensible conduct in the course of the transaction at issue must be denied equitable relief because of unclean hands"); *Reg'l Properties, Inc. v. Fin. & Real Estate Consulting Co.*, 752 F.2d 178, 183 (5th Cir. 1985) ("Under the doctrine of unclean hands, he who commits inequity is not entitled to equitable relief."). Courts applying the unclean hands doctrine have a "wide range . . . of discretion in refusing to aid the unclean litigant." *Precision Instrument*, 324 U.S. at 815.

To the extent BP is guilty of gross negligence but persists in complaining—through its assignee the Economic Class—that it should be relieved of its contractual obligation due to the gross negligence of Transocean with respect to the same event, BP is "tainted with inequitableness or bad faith relative to the matter in which [it] seeks relief." *Id.* at 814. In such circumstances, the Court should deny relief to the Economic Class asserting BP's claims, "however improper may have been the behavior of" Transocean. *Id.*[7]

---

[7] To the extent the Court were to invalidate the risk allocation provisions in the contract and permit the Economic Class to pursue the Direct Damages Claims, any recovery would still be subject to comparative fault. *E.g.*, *Lewis v. Timco, Inc.*, 716 F.2d 1425, 1428 (5th Cir. 1983).

**B.**     **The Assignment Is Invalidated by the Specific Provisions of Article 25.3 of the Drilling Contract**

There is an independent reason why the PSC may not recover on the Direct Damage Claims based on any rights arising under the Drilling Contract: The assignment of those claims is prohibited by plain language of the Drilling Contract.  A contractual right may not be assigned if assignment is precluded by contract.  Restatement (Second) of Contracts § 317 (1981); *Ins. Co. of the West v. United States*, 243 F.3d 1367, 1374 (Fed. Cir. 2001) ("At common law, in general, contractual rights could be assigned unless the assignment would change or harm the position of the obligor, or was forbidden by statute, public policy, or the contract itself.").  Here, Article 25.3 of the Drilling Contract provides that "nothing in this Contract shall be construed or applied so as to permit any person or entity not a direct signatory party hereto (except for a successor or permitted assignee of such direct signatory party) to enforce or seek damages against either signatory party hereto for any breach of this Contract."

By asserting BP's direct damage claims against Transocean, the Economic Class seeks to recover damages against a signatory to the Drilling Contract, Transocean, for breach of the Drilling Contract.  This is prohibited by Article 25.3, except for successors or permitted assignees of a signatory party to the contract.  Because the PSC is not a successor to BP nor a permitted assignee of BP as envisioned by Article 30.2 of the Drilling Contract,[8] it cannot proceed on the assigned direct claims.

---

[8] 30.2   ASSIGNMENT BY COMPANY

30.2.1   COMPANY shall have the right to assign this CONTRACT to Atlantic Richfield Company, its divisions, subsidiaries (whether wholly or partially owned by Atlantic Richfield Company) and affiliates. . . .

30.2.2   Subject to Article 30.2.1, COMPANY shall have the right to assign its rights and obligations hereunder, in whole or in part, to third persons for wells within the Gulf of Mexico,

### C.     Many of the Assigned Claims Are in Fact Third-Party Damage Claims

Even if the Court were to treat BP's contractual release of BP's direct claims against Transocean differently from BP's agreement to indemnify Transocean for claims brought by third parties, and apply the indemnity but void the release, the Economic Class still would not be entitled to recover on most of the assigned claims.  Most of the claims BP purportedly assigned to Economic Class cannot properly be viewed as "direct" claims, but rather must be viewed as claims for contribution for damages for which BP was liable to third parties.  These contribution claims based on BP's liability to third parties are subject to indemnity under the Court's Indemnity Order, even in the event of gross negligence by Transocean.

BP has purported to assign to the Economic Class the following categories of claims against Transocean: (1) "[a]ll damages related to the repair, replacement, and/or re-drilling of the MC-252 Well; (2) "[a]ll economic damages for the loss of the MC-252 Well, including lost profits, lost hydrocarbons, and diminution in value of the leasehold"; (3) "[a]ll costs that BP incurred to control the MC-252 Well and/or to respond to, contain, and/or clean up the DWH Spill"; (4) "[a]ll rights to indemnity, contribution, or subrogation for claims paid by BP and/or the GCCF on or before the entry of the

---

with written consent of CONTRACTOR, and such consent shall not be unreasonably withheld. In the event of any such assignment under this Article 30.2.2 to a third party with CONTRACTOR'S written consent, COMPANY shall thereafter have no liability for any matter or operations hereunder and shall have no further responsibility to CONTRACTOR . . . .

30.2.3  COMPANY shall have the right to assign its rights and obligations hereunder, in whole or in part, to third parties for wells within the Gulf of Mexico, without the consent of CONTRACTOR.  In the event of any such assignment under this Article 30.2.3, COMPANY shall provide written notice to CONTRACTOR prior to the use of the Drilling Unit on behalf of the assignee.  In the event of such an assignment, COMPANY shall remain fully liable and responsible to CONTRACTOR for complete performance of all terms, conditions, and obligations imposed by this CONTRACT. . . .

Preliminary Approval Order…"; (5) "[a]ll claims or causes of action to pursue reimbursement of Settlement Payment(s) under theories of indemnification, contribution, subrogation, or any other theory of recovery"; and (6) "[a]ll punitive, exemplary, multiple, or non-compensatory damages."  (Rec. Doc. 6430-39, ¶¶ 1.1.3.1-6.)

Most of these purportedly-assigned "direct" claims are, in fact, claims to recover for liabilities BP incurred to third parties and thus cannot be recovered from Transocean under the Indemnity Order.  Indeed, only claim categories (1) and (2) above may be fairly characterized as alleging direct damages suffered by BP.  Categories (4) and (5) are plainly not direct damage claims, for they expressly involve reimbursement for payments made by BP to third parties.  Category (6), punitive damages, is not a separate claim at all, but at most is only a claim that could be asserted in connection with some other claim for compensatory damages.  *See Sulzer Carbomedics, Inc. v. Oregon Cardio-Devices, Inc.*, 257 F.3d 449, 461 & n.9 (5th Cir. 2001) ("an award of punitive damages is not a separate cause of action").

Category (3)—"[a]ll costs that BP incurred to control the MC-252 Well and/or to respond to, contain, and/or clean up the DWH Spill" (Rec. Doc. 6430-39, ¶¶ 1.1.3.3)—is a third-party claim as well.  BP is liable for cleanup costs under OPA, 33 U.S.C. § 2702(b)(1).  Even cleanup done directly by BP is done to mitigate OPA damages.  In no case should cleanup and response costs be considered damages suffered *by* BP that would give rise to a direct claim by BP against Transocean.  Rather, these claims must be viewed as BP's liabilities to third parties, for which, at most, BP might in certain circumstances be entitled to seek contribution.  *See* 33 U.S.C. § 2709.  BP's spending $1 million to pay a contractor to clean oil from a third-party property owner's beach should

22

be treated no differently from BP's paying the third-party property owner $1 million in damages so that the third-party can hire the contractor to clean up the beach.

Cases holding that OPA's contribution provision displaces direct claims under state or general maritime law by a responsible party to recover for cleanup costs strongly support this position.  In *National Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp.*, 924 F. Supp. 1436 (E.D. Va. 1996), *aff'd* 122 F.3d 1062, 1997 WL 560047 (4th Cir. 1997) (unpublished), NSCSA, which owned a tanker and was the responsible party for an oil spill, sought to recover removal costs from Moran, which owned the tug that had collided with NSCSA's tanker.  The district court held that the only avenue for NSCSA's claims was OPA's contribution provision, § 2709, and it rejected NSCSA's attempt to sue Moran directly for damages under state law.  *Moran*, 924 F. Supp. at 1446-49.  The Fourth Circuit, in its unpublished affirmance, explained that NSCSA had no basis to assert a direct claim against Moran to recover removal costs, but that, to the extent NSCSA had a claim, it arose only as a contribution theory under OPA.  The circuit explained that NSCSA could sue Moran under state law only "[i]f NSCSA had itself been damaged by the oil, or if it had been successfully sued by others under state law for damages relating to the spill."  1997 WL 560047, at *4 (emphasis added).   Applying this reasoning, the Fourth Circuit noted that NSCSA was not precluded from bringing a direct claim under general maritime law seeking to recover for the loss of fuel and damage to its tanker's hull, but that it could not use state law to bring a direct claim for recovery of cleanup costs.  *Id.* (quotation marks omitted).

The Massachusetts district court in *In re Alex C Corp.*, Civ. A. 01-12184 DPW, 2003 WL 203078 (D. Mass. Jan. 30, 2003), appears to have reached a similar conclusion.

After concluding that an OPA responsible party could seek contribution under OPA § 2709 from another vessel for allegedly causing a collision, *id.* at *8, the court stated that the responsible party's attempt to seek recovery of OPA removal costs and damages under state or general maritime law was "superfluous," *id.* at *11.

These OPA cases establish that any recovery of money BP spent on either cleanup or containment of spilled oil may proceed (if at all) only as OPA *contribution* claims— and are thus properly characterized as third-party rather than direct damage claims. Indeed, BP itself pleaded its claim for recovery of cleanup costs as an OPA contribution claim under § 2709.  In the suit by the United States seeking a declaratory judgment that BP and Transocean are liable as responsible parties under OPA, BP alleged in its cross-complaint only a contribution theory against Transocean seeking recovery for its OPA liability to the United States.  (*See* Rec. Doc. 2075, at ¶ 82 ["If BPXP is held liable to the United States for all or part of any monetary recovery under OPA obtained and/or to be obtained by the United States, including but not limited to the removal costs and damages alleged in the DOJ Complaint, Transocean is liable in contribution to BPXP under Sections 1009 and 1017 of OPA, 33 U.S.C. §§ 2709 and 2717."])  The fact that BP in the United States' OPA suit sought to recover only on a contribution theory strongly suggests that BP itself did not view its cleanup cost claim as a direct claim against Transocean but rather as a contribution claim.

As for the source control aspect of claim category (3), those costs fall under OPA's definition of removal costs, 33 U.S.C. § 2701(30) (removal), (31) (removal costs). Under OPA, "'removal' means containment and removal of oil or a hazardous substance from water and shorelines or the taking of other actions as may be necessary to minimize

or mitigate damage to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines, and beaches," 33 U.S.C. § 2701(30), and "'removal costs' means the costs of removal that are incurred after a discharge of oil has occurred or, in any case in which there is a substantial threat of a discharge of oil, the costs to prevent, minimize, or mitigate oil pollution from such an incident," *id.* § 2701(31).  Courts have held that costs incurred to prevent oil from spilling constitute removal costs.  *See, e.g.*, *United States v. Hyundai Merch. Marine Co.*, 172 F.3d 1187, 1189-90 (9th Cir. 1999) (costs Coast Guard incurred monitoring salvage operation where there was risk of oil spill considered OPA removal costs).  Indeed, this Court recognized in its order dismissing the B3 claims against Nalco, that "containment" is part of the National Contingency Plan, *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico*, MDL 2179, 2012 WL 5960192, at *7 (E.D. La. Nov. 28, 2012), and OPA extends removal cost liability to cost "incurred by any person for acts taken by the person which are consistent with the National Contingency Plan," 33 U.S.C. § 2702(b)(1)(B). Because BP paid for source control efforts as part of the response led by the United State under the National Contingency Plan, source control efforts undertaken as part of this response are BP liabilities incurred under OPA.  Source control costs should therefore be treated like the cleanup costs addressed above and should be viewed as contribution claims, not BP direct claims, and thus as falling within the scope of the Indemnity Order.

## V.    CONCLUSION

This Court should enforce BP's contractual release of claims against Transocean and grant judgment in favor of Transocean on all of the assigned Direct Damages Claims.

DATED: May 31, 2013

Respectfully submitted,

By: /s/ Brad D. Brian
Brad D. Brian
Michael R. Doyen
Lisa Demsky
Daniel B. Levin
Susan E. Nash
MUNGER TOLLES & OLSON LLP
355 So. Grand Avenue, 35th Floor
Los Angeles, CA 90071
Tel:  (213) 683-9100
Fax:  (213) 683-5180
Email:  brad.brian@mto.com
            michael.doyen@mto.com
            lisa.demsky@mto.com
            daniel.levin@mto.com
            susan.nash@mto.com


By:  /s/ Edwin G. Preis
Edwin G. Preis, Jr.
PREIS & ROY PLC
Versailles Blvd., Suite 400
Lafayette, LA 70501
(337) 237-6062
        *and*
601 Poydras Street, Suite 1700
New Orleans, LA 70130
(504) 581-6062

By: /s/ Steven L. Roberts
Steven L. Roberts
Rachel Giesber Clingman
Sean Jordan
SUTHERLAND ASBILL & BRENNAN LLP
1001 Fannin Street, Suite 3700
Houston, Texas 77002
Tel:  (713) 470-6100
Fax:  (713) 354-1301
Email:  steven.roberts@sutherland.com
            rachel.clingman@sutherland.com
            sean.jordan@sutherland.com

By: /s/ Kerry J. Miller
Kerry J. Miller
FRILOT, LLC
110 Poydras St., Suite 3700
New Orleans, LA 70163
Tel:  (504) 599-8194
Fax:  (504) 599-8154
Email:  kmiller@frilot.com

John M. Elsley
ROYSTON, RAYZOR, VICKERY & WILLIAMS LLP
711 Louisiana Street, Suite 500
Houston, TX 77002
(713) 224-8380

*Counsel for Defendants Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of May 2013, I electronically filed the foregoing with the Court's CM/ECF system and/or by using the LexisNexis File & Serve, in accordance with Pretrial Order No. 12 which will send a notice of filing to all counsel accepting electronic notice.

s/ Kerry J. Miller