# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C.  20005

Robert R. Gasaway
To Call Writer Directly:
(202) 879-5175
robert.gasaway@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

May 17, 2013

**By Electronic Mail**

The Honorable Sally Shushan
United States District Court
Eastern District of Louisiana
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

Re:     MDL 2179 — BP Response to United States and Transocean's Second
Joint Post-Briefing Submission (Rec. Doc. 9355)

Dear Judge Shushan:

Per the Court's April 30 and May 9, 2013 Orders, (Rec. Docs. 9592, 9486), BP writes in response to the United States and Transocean's April 17, 2013 joint submission, (Rec. Doc. 9355), regarding BP's "selection criteria" for withheld documents located in response to the January 30, 2013 motion to compel and provided to the Court for *in camera* review.

In that April 17 submission the United States and Transocean raise four issues that divide unevenly into two categories.

***First***, the April 17 submission claims, for the first time, that the January 30 motion to compel was actually a motion to re-open and expand Phase 2 discovery to include the privileged files of BP's attorneys.  This set of complaints is therefore not about "selection criteria" at all, but about documents never included in the MDL document review universe, and therefore not available for "selection."

Naturally, because the January 30 motion itself contains no request for re-opening or expanding Phase 2 discovery, this request is improperly raised and should be denied.  But even if the Court were to take up this doubly belated request — a request belatedly presented after the close of Phase 2 written discovery and even then only in a second post-briefing submission — the United States and Transocean would still fall well short of satisfying the extremely high standard for re-opening Phase 2 written discovery.

Chicago      Hong Kong      London      Los Angeles      Munich      New York      Palo Alto      San Francisco      Shanghai

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 17, 2013
Page 2

*Second*, the movants raise miscellaneous concerns about the documents BP identified. Specifically, the movants focus on (1) a supposed need to review of documents in the May 5 to May 13, 2010 date range, when none of the communications at issue could have been prepared, (2) a baseless assertion that more documents responsive to the motion to compel surely should have been logged, and (3) an alleged withholding of documents reflecting general advice about flow disclosures.

All of these concerns are easily answered as explained below.  But to the extent the Court continues to have questions on these topics, BP would be pleased to arrange for Mark Nomellini to explain *in camera* BP's approach to collecting and reviewing documents in response to this motion.

## Discussion

### I.     The Court Should Reject the United States and Transocean's Improper, Late-Raised Request To Expand Phase 2 Discovery.

The United States and Transocean did not suggest until their April 17 submission that the January 30 motion to compel the production of documents withheld as privileged during the long-agreed, long-closed MDL document production process was actually a motion to upend that long-settled process.  BP therefore cannot be reasonably faulted for failing to conduct wide-ranging and invasive discovery without even being asked to do so.  Moreover, the Court should reject the movants' late-breaking and improperly raised requests to disrupt the Phase 2 timeline.

#### A.     The United States and Transocean's Request to Re-Open and Expand Phase 2 Document Discovery Is Not Before the Court Because The Motion to Compel Sought Documents Already Collected Through MDL Discovery.

The United States and Transocean's April 17 joint submission claims that BP "failed to search attorney files for responsive documents," responsive to the motion to compel.  (Rec. Doc. 9355, at 3.)  But the United States' motion to compel did not request that BP collect and review documents never before requested in the MDL.  Nor did the motion to compel request the Court re-open and expand Phase 2 discovery to include additional discovery custodians (or search terms).  Certainly had the motion to compel contained such an invasive request, which disrupts the Phase 2 timeline and requires an exceptionally strong showing of good cause, the parties would immediately have focused on that aspect of the submission, as they focused on the original negotiations over document custodians, date ranges, and search criteria.

Instead, the United States and Transocean's motion to compel was just that — a motion to compel the production of documents previously requested but not yet produced in Phase 2 written discovery.  As such, the motion challenged BP's withholding as privileged certain

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 17, 2013
Page 3

documents "related to preparation of" five specific communications.  (Rec. Doc. 8417, at 4.)
And the motion to compel was perfectly clear about the universe of documents to which it was
aimed:

- Documents previously addressed by the Court in Dkt. 6904 and 7012,

- Documents on privilege logs (including those placed on the privilege log prior to
  the Court's rulings and those subsequently added) but not previously addressed by
  the Court, and

- Documents not required to be logged under PTO 14.

*Id.*

Documents in these categories originate from agreed document custodians.  As an
illustrative example, the United States was excused from collecting documents from the files of
custodians in the Executive Office of the President.  Documents from the files of EOP custodians
(that were not also found in the files of agreed MDL custodians) were therefore not subject to the
Court's prior rulings on the deliberative process and other privileges, nor are those documents
listed on privilege logs, nor are those files "withheld" but not logged per PTO 14.  In other
words, documents in the files of EOP custodians (and not also within files of agreed MDL
custodians) are simply not in the discovery universe.

Productions from custodial files are determined by search terms.  PTO 16 states: "The
parties will produce potentially-relevant ESI in their possession according to the agreed search
terms, custodians, and date ranges."  (PTO 16, at ¶ 13.)  And as the Court has observed, this
search-term-based approach has been discussed "in detail" at various hearings.  (May 13, 2011
WGC Tr. at 21.)

Regarding Phase 1 document productions, BP stated at the February 18, 2011 Working
Group Conference:  "So if you looked at the [search-term] chart, you would then look for the --
you look at the requests by which the incident custodians are listed and the search terms by those
incident custodians, and run those search terms for those dates, and that would generate the
universe for the data to review."  (Feb. 18, 2011 WGC Tr., at 11.)  The Court agreed with this
approach.  *Id.* at 10, 64.

In its May 12, 2011 letter to the Court and the parties, BP stated:  "Beginning in
November 2010, the parties carefully negotiated search criteria on a custodian-by-custodian and
request-by-request basis.  The negotiated search criteria chart — clearly setting forth which
search terms and date ranges should be paired with which custodians — was submitted to the
Court and the parties on February 16.…  [A]t the February 18 conference, the parties and the

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 17, 2013
Page 4

Court discussed that this chart would drive the custodial deposition process, including that certain search terms would be used for certain witnesses' deponent productions." (Attachment 1.)  At the May 13, 2011 hearing, the Court agreed with BP's position as set forth in its May 12 letter: "I do agree with BP that the search terms for custodial files was a topic that we discussed in detail and does apply to custodial files." (May 13, 2011 WGC Tr., at 21.)

Phase 2 document discovery proceeded in a similar manner.  From December 2010 through February 2011, BP negotiated search criteria with the PSC, and then circulated the negotiated search criteria to the parties on February 16, 2011, April 4, 2011, and April 21, 2011. After Mark Nomellini's July 28, 2011 letter asking for final additions for search criteria, the Court set an August 22, 2011 deadline for final additions to search criteria for BP document discovery.  (July 28, 2011 M. Nomellini Ltr. (Attachment 2); Rec. Doc. 3730, at 8-9.)  On August 25, 2011, the United States provided its requested list of additional search terms and custodians, to which BP agreed.  (Attachment 3.)  On September 1, 2011, Mark Nomellini circulated to parties (including the United States) a list of search criteria, which BP stated "will be used to generate future Phase II and Phase III custodial and non-custodial productions, subject to BP's review for privilege and relevance." (Attachment 4.)  After further comments from parties, these search criteria were finalized in 2011.

As if more were needed, the United States has itself produced documents through the extensive use of search terms, date ranges, and custodians — an arrangement memorialized in the October 19, 2011 Scheduling Order and related attachment, which lists applicable date ranges and search terms for United States document productions.  (Rec. Docs. 4364, 4365.)

Contrary to the United States and Transocean's recent claim that "BP never explain[ed] that it searched only the preexisting list of custodians," (Rec. Doc. 9355, at 4), BP's March 5 letter to the Court and parties explained this very point, not once but twice:

> As stated in BP's Opposition, BP's *in camera* submission consists of two categories of materials — (1) certain withheld documents related to the five documents sets requested in the United States' motion and (2) five separate privilege logs, each corresponding to one of those five United States' requests. These documents, and the corresponding logs, have been assembled through a good-faith reasonable search of ***withheld documents responsive to agreed MDL search criteria***, as described in Attachment C to this letter.  (Rec. Doc. 9035, at 5 (emphasis added).)

Attachment C to that March 5 letter again stated:

These documents were identified through a reasonable good-faith review, as described below, of documents previously withheld as privileged (whether logged

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 17, 2013
Page 5

or unlogged per PTO 14) *that are responsive to the agreed MDL search criteria.*
(*Id.* at Attachment C (emphasis added).)

Nonetheless, not until their April 17 joint-submission did the United States and Transocean suggest that the January 30 motion to compel sought to re-open the Phase 2 written discovery period and expand the custodian list to include attorneys.  (Rec. Doc. 9355, at 3-5.)  And not until their May 7 letter to the Court — over three months after filing their motion to compel — did the movants *actually request* (albeit obliquely) expanded Phase 2 discovery, which they misdescribed as a "*limited* adjustment to the existing Phase 2 protocols."  (T. Benson Ltr. to Court, at 3 (May 7, 2013) (emphasis in original).)

The motion to compel simply made no request for the Court to re-open and expand Phase 2 written discovery period, even though it was clear at the time that the period had long been closed and in the "done bucket."  BP cannot reasonably be faulted for "failing to search" files that were never collected during MDL discovery.

B.   **The United States and Transocean Have Not Met the Extremely High Good-Cause Standard for Re-Opening and Expanding Phase 2 Document Discovery.**

The United States and Transocean's reference in their May 7 letter to the DOE re-collection, nicely frames the weakness of this out-of-time request.  (May 7, 2013 T. Benson Ltr., at 3.)  In contrast to the movants' request for additional discovery, BP's request came in October 2011 — well before the conclusion of the written discovery period.  (*See* Attachment 5, Oct. 13, 2011 S. Himmelhoch Email to A. Albright.)  The United States rebuffed BP, then, informing us the request was not yet ripe and for BP to reserve its rights.  *Id.*  BP re-raised the issue, as requested, in March 2012 after the conclusion of then-scheduled DOE document productions, but before the conclusion of the written discovery period.

The movants' current request for additional discovery, by contrast, comes after the Court's declaration that written discovery is closed.  (Rec. Doc. 6510, at 1.)  In further contrast, BP's request for search-term discovery from DOE was squarely posed in a straightforward manner, not late-raised in a second post-briefing submission.

Setting this inapt comparison aside for even more important considerations, the United States and Transocean have failed to explain why the burdens of reopening discovery outweigh any claimed benefit of doing so, and failed to otherwise demonstrate good cause for belatedly re-opening and expanding the Phase 2 written discovery period.  Fed. R. Civ. P. 16(b)(4); Fed. R. Civ. P. 26(b)(2)(C).

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 17, 2013
Page 6

As the Court's April 30 ruling recognizes, David Rainey's involvement is a central element to the proper application of crime-fraud standard to BP's withheld documents.  Indeed, none of the documents produced to date either as part of the "Category A" production or as part of the production of documents from the April 30 order did *not* include David Rainey as a sender or a recipient.

The centrality of Mr. Rainey tracks BP's allocution, which states that BP, through a vice president, conducted certain activities.  (*See* Rec. Doc. 9592, at 2-3, n.2.)  Given that Mr. Rainey was a Phase 2 custodian, and the movants already have documents from Mr. Rainey's custodial file, it is unclear what more they need.

Significantly, although the movants have often said that BP's representations to Congress are relevant to Phase 2, it is difficult to understand why this would be true.  On the Quantification side of the case, it is hard to see why BP's contemporaneous statements to Congress would be relevant to the Court's assessment of the much more sophisticated state-of-the-art Quantification analyses submitted by BP's expert witnesses.

And on the Source Control side of the case, it is difficult to see how statements made to Congress (as opposed to the Unified Command or Flow Rate Technical Group) could possibly have affected Source Control decisionmaking.  The motion to compel only implicates a single communication with the Unified Command — the May 19, 2010 flow rate note — which was sent to Admiral Allen and Admiral Landry, the two highest ranking government officials in the UC at the time.  But each has testified that the document did not play a role in response decisions.  About the May 19 note, Admiral Allen testified that he did not recall reading the document, (Allen Dep. Tr. 234:1-235:17), but that the document was "just one more bid on flow rate," (*id.* at 244:16-244:22).  Admiral Allen further elaborated, "All of God's children had a flow rate number."  (*Id.* at 244:25-245:1.)  And Admiral Landry testified that she recalled receiving the May 19 note, but that the document did not affect the response effort, testifying, "No, I didn't rely on this."  (Landry Dep. Tr. 679:23-680:17.)

The bottom line is that the additional documents the movants seek have been belatedly requested, do not involve David Rainey, and are of tangential relevance.

Finally, as if that were not enough, the United States and Transocean's description of the additional discovery they request as "limited" is not accurate.  The Court is now familiar with the document production process.  Additional custodians require additional document collections, and here, where attorney files are being collected, extensive privilege review will be required.  In the case of the United States, the collection and production process has sometimes taken over eighteen months.  In the case of BP, analogous production processes, while much more efficient, have usually still required approximately eight weeks of effort.  In light of the extensive privilege review that would be required, a realistic timetable for producing responsive, non-privileged

KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 17, 2013
Page 7

documents (if any) is three to six months.  The time required to accede to and implement the United States and Transocean's request cannot not be found within the present Phase 2 timeline.

More still, the production of responsive, non-privileged documents from attorney files (if any) will require creating extensive privilege logs for the responsive but privileged documents. And these extensive logs will likely be subject to follow-on disagreements, further extending the present Phase 2 timeline.

Likewise, any finding of a crime or fraud beyond the narrow contours of the BP allocution would, in fairness, open the door for additional discovery into the United States' own contemporaneous, post-spill flow estimates.  As the Quantification expert reports filed by BP establish, BP's estimates of the Quantification of the spill have, on the whole, proved more accurate and more scientifically reliable than the United States' estimates undertaken without the benefit of BP's input.  Accordingly, in the event the Phase 2 document discovery period were to be reopened in any fashion, discovery of what the United States knew and did not know, and revealed and did not reveal, about its historical estimates should come into play.

## II.     BP's Good Faith Review Of Withheld Documents Adequately Identified The Documents The Motion To Compel Requested.

In contrast to the improper request for new discovery discussed above, the United States' and Transocean's joint April 17 submission raised three additional issues that are properly before the Court.

Those issues concern BP's "selection criteria" for identifying withheld documents "related to preparation of" the five communications at issue.  (*See* Rec. Doc. 8417, at 4.) Specifically, the joint April 17 submission argues that: (1) withheld documents in the May 5 to May 13 date range should be reviewed, even though none of the communications at issue were being prepared during this timeframe, (2) the movants myopically expected more documents to be responsive to their motion to compel, and (3) general advice about flow disclosure, if any, should be produced.  BP responds below to these three issues against the extensive backdrop of information already provided about its good faith effort to identify withheld documents "related to preparation of" the five communications at issue.

Our March 5, 2013 letter explains BP's document review protocols.  (Rec. Doc. 9035.) BP's April 10, 2013 submission to the Court (Rec. Doc. 9254) responded to further questions raised by the movants in their March 27, 2013 post-briefing submission (Rec. Doc. 8974). Finally, also on April 10, BP responded in a meet-and-confer letter to additional questions posed by the movants in an April 4 letter to BP.  (Attachments 6 and 7.)

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 17, 2013
Page 8

Given the extensive questions the United States and Transocean have previously posed on these "selection criteria" issues, BP trusts that the movants' May 24 joint reply submission will not supply any new, late-breaking issues and that, as contemplated by the Court's May 9, 2013 Order (Rec. Doc. 9846), the discussion of "selection criteria" can be concluded.

> **A.** **BP Justifiably Did Not Review Documents From May 5 through May 13, 2010, a Period during which None of the Communications at Issue Were Being Prepared.**

BP reasonably determined that documents "related to preparation of" the five communications at issue in the motion to compel were not being prepared during this May 5 through May 13, 2010 timeframe.

As explained previously, no documents "related to preparation of" materials for the May 4, 2010 briefing would have been generated after May 4, 2010, and the preparation of the May 19 flow rate note and May 24 letter began on or after May 14, 2010.  (April 10, 2013 R. Gasaway Ltr. to Court, at 5 (Rec. Doc. 9254).)  BP reviewed approximately 6,217 documents withheld as privileged from the date ranges tailored to encompass documents "related to preparation of" the five specific communications at issue in the motion to compel.  Given the date ranges during which these five specific communications were being prepared, BP made a good-faith, common sense decision not to review withheld documents dated between May 5 and 13, 2010.  (*Id.*; March 5, 2013 R. Gasaway Ltr. to Court, at 5 and Attachment C (Rec. Doc. 9035).).

The United States and Transocean, nevertheless, argue that additional documents related to the furtherance of crimes or frauds are located during this time period.  The sole document the United States and Transocean cite to support this counterintuitive assertion is a draft of the May 24, 2010 letter containing text and a reference (both removed from the transmitted letter) to a completely separate May 10, 2010 letter to Admiral Landry.  But far from disproving the validity of BP's decision, as the movants claim, this document confirms the appropriateness of BP's determination.

As an initial matter, the motion to compel, as the Court and movants well know, did not request documents withheld as privileged "related to preparation of" the May 10, 2010 letter to Admiral Landry.  Nor does the motion allege that BP made any misstatements or omissions in that completely separate May 10 letter.  Nor could the motion so allege as BP's allocution has nothing whatever to say about this May 10 letter.  The United States and Transocean cannot seriously claim that BP's efforts to identify the requested documents were deficient because BP did not locate unspecified documents "related to preparation of" unspecified communications that were not the subject of the motion to compel.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 17, 2013
Page 9

Moreover, the United States and Transocean's joint submission completely fails to tie the May 10 letter to a misstatement or omission in the May 24 letter to Congress — an unsurprising failure for two key reasons.

***First***, the draft language from the early May 22 draft does not even appear in the final May 24 letter to Congress.  (Doc. No. 8.2, on the May 24 Log; BP-HZN-2179MDL07729555.) The May 22 draft read:

> **1.      Prior to the incident, did BP already have an estimate of the maximum amount of oil that could be expected to flow from this well under normal conditions?**



> **2.      What was the basis for this estimate?**



About this draft language, the May 22 cover email to this draft rightly stated that

Accordingly, the final May 24 response actually sent to Congressman Markey appropriately edited these responses to reflect BP's pre-incident information:

> **1.      Prior to the incident, did BP already have an estimate of the maximum amount of oil that could be expected to flow from this well under normal conditions?**

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 17, 2013
Page 10

> Prior to drilling, BP had prepared a production estimate for this well based on expected overall oil volume in place, expected reservoir properties, and the anticipated development concept. This concept included three (3) wells processed through a neighboring oil production facility. The rate associated with this initial well was 15,000 barrels per day.

> **2.  What was the basis for this estimate?**

> Prior to the drilling of the Macondo well, the estimate of the maximum amount of oil that could be expected to flow from the well under normal conditions was based on interpretation of modeling from: (1) production information from other wells in the Mississippi Canyon; (2) geological information from other wells in the Mississippi Canyon; and (3) seismic data.

The statements in the draft response to Questions 1 and 2 — which the movants erroneously claim entitles them to additional privileged documents — do not even appear in the May 24 letter transmitted to Congressman Markey. As a self-evident principle of law and logic, there can be no fraudulent misstatement where the allegedly fraudulent statement was never made.

*Second*, the United States and Transocean have never even attempted to demonstrate that any crime or fraud occurred with respect to BP's answers to Questions 1 or 2 in its May 24, 2010 letter. As set forth above, Questions 1 and 2 ask about BP's estimates "prior to the incident" of the "maximum amount of oil that could be expected to flow from the well under normal conditions" and "the basis for this estimate" — not about current estimates of post-incident flow or current estimates of worst-case discharge. Nothing in the allocution, the charging document, the SEC complaint, or the SEC consent agreement claims that BP made any misstatements or omissions in the May 24, 2010 letter to Congressman Markey with regard to Questions 1 or 2 regarding pre-incident flow estimates.

In trying to gin up additional documents from the May 5 through 13 timeframe, the United States and Transocean have compounded their legal error. The motion to compel argued that *all* documents related to *any* part of the May 24, 2010 letter are subject to the crime-fraud exception to privilege — even if related to the *truthful* portions of that letter. The Court has now correctly rejected this argument. (Rec. Doc. 9592.) For an even stronger reason, the Court should also reject the movants' more extreme argument — now made in the context of documents in this May 5 to 13 timeframe — that documents not even used in connection with drafting the truthful portions of the May 24, 2010 letter are related to the furtherance of a crime or fraud.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 17, 2013
Page 11

More still, the Court should focus on exactly what is going on here.  The United States and Transocean are sowing confusion by claiming that "everything is related."  This tactic, in addition to compounding the movants' legal error on the crime-fraud standard, is an out-of-time attempt to expand the scope of the initial motion to compel.  That motion sought withheld documents "related to preparation of" five specific communications.  BP has now explained at length the reasons and details animating its review, and BP's good faith review reasonably identified those documents.

The Court should deny the United States and Transocean's request that BP conduct a further review of withheld documents.

**B.      BP's Identification of Documents Is Plausibly Accurate — Not "Implausibly Limited" — for Reasons the Movants Likely Appreciate.**

The United States and Transocean describe as "preposterous" and "highly unlikely" the documents contained on the five voluntarily prepared privilege logs that BP prepared to aid the Court and parties in resolving this motion.  (Rec. Doc. 9355, at 8.)  There should be many more documents, the United States and Transocean claim, and they go on to accuse BP of bad faith and sloppy work.

At the outset, BP did what the motion to compel asked BP to do, which is exactly what our March 5, 2013 letter said we did.  BP reviewed the documents responsive to long-agreed MDL search criteria that were withheld for privilege for those documents "related to preparation of" the five communications at issue.

What is most surprising here is that the United States and Transocean thus far have failed to understand why various emails were not listed on the five logs provided or were not produced.  The answer is simple — the emails the movants claim should be on the log are likely not responsive to long-agreed MDL search criteria.  Tellingly, of the 58 names listed in the "Glossary" at Appendix A to the April 17 joint-submission, only 20 names, by BP's count, are MDL custodians — 18 entries are attorneys (and therefore are not MDL custodians) and the remaining 20 non-attorneys are not MDL custodians.

Rather than asserting that BP has operated carelessly or in bad faith, the United States and Transocean should plainly request what they expect the Court would rightly likely deny — a do-over for Phase 2 fact discovery.  As explained above, the Court should not re-open and expand Phase 2 fact discovery to include attorney custodians.  More so with non-attorney custodians; the movants' current desire for additional documents does little to justify the extraordinary good cause required to re-open and expand Phase 2 fact discovery to custodians who could have been included in long-ago-concluded discussions about search criteria.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 17, 2013
Page 12

In addition to general (and misplaced) criticisms of BP's good faith efforts to identify the documents the movants requested that BP identify, the United States and Transocean's April 17 joint submission makes several specific arguments, which are easily addressed. *First*, the movants claim as "highly unlikely" that there are no responses to the three April 30 emails listed on the privilege log corresponding to the SEC filings. The Court has now ruled that the United States and Transocean failed to carry their burden to establish a *prima facie* case of crime or fraud and that none of the documents "related to preparation of" the SEC filings are reasonably related to a crime or fraud. (Rec. Doc. 9592, at 40-42.) Any questions about these documents accordingly are moot.

*Second*, the movants ask why there are no emails regarding the June 25, 2010 letter to Congressman Markey dated after June 23, 2010. The potential reasons for this result are many. But, to remove any doubt, BP has re-reviewed withheld documents responsive to agreed Phase 2 search terms from this timeframe, and reports that no documents "related to preparation of" the June 25, 2010 letter to Congressman Markey were located.

*Third*, the specific examples from page 9 of the April 17 submission illustrate the point the United States and Transocean appear to overlook — that BP, as requested, reviewed documents already collected during MDL discovery to date.

**Example 1**: Doc. No. 8.0 from the May 24 log (BP-HZN-2179MDL07729544). The United States and Transocean claim three earlier emails in the chain should have been logged and produced:



Contrary to the United States' claims, this document was both produced and logged.

**Example 2**: Doc. No. 39.0 or 40.0 from June 25 log (BP-HZN-2179MDL07729636 or BP-HZN-2179MDL07729641). Again, the United States and Transocean claim three earlier emails on this thread should have been logged or produced —

KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 17, 2013
Page 13

And again, none of the recipients or senders on these emails are MDL custodians.  Documents 39.0 and 40.0 are likely responsive to MDL search criteria because the "top" email in the chain was sent to a larger distribution list that includes David Rainey — an MDL custodian — whereas the three emails the movants raise do not include David Rainey as a sender or recipient.

*Finally*, the United States and Transocean claim that "common sense" dictates that more than 3% of the withheld documents are related to these "critical … communications."  (Rec Doc. 9355, at 10.)  Perhaps the United States and Transocean find such statistics implausible because they are now singularly focused on these five communications, which have become "critical" only by virtue of the United States' interpretation of BP's guilty plea.  But at the time these "critical communications" were issued, they were among the many communications made during the response including scores of congressional responses and press releases.  Drafts of these communications would have been withheld as privileged if they contained privileged attorney comments, edits, or drafting.

Additionally, privileged documents come in many forms beyond legal advice regarding drafts of public communications.  Attorneys request information for the purpose of providing legal advice or in anticipation of litigation; potential evidence is preserved; contracts with third parties receive comments and edits; privileged work-product analysis is performed.

Nothing about the mere number of documents related to the five communications at issue suggests that BP's "selection criteria" were lacking.

C.     **BP Never Stated It Is Withholding General Advice Regarding Flow Disclosure.**

Finally, the movants' April 17 submission expresses concern that BP is withholding documents containing general legal advice regarding flow disclosure — an assertion apparently based on statements in BP's April 10, 2013 submission.  (Rec. Doc. 9355, at 11.)  But BP has said no such thing, and there does not appear to be an issue here for the Court to resolve.

As the United States and Transocean will recall, their March 21, 2013 submission asked about a hypothetical "communication from outside counsel on May 15, 2010 that provided BP with advice on what flow rate information [BP] needed to share, but which does not reference a communication specified in the United States' motion to compel."  (Rec. Doc. 8974, at 6.)  Regarding that hypothetical communication, BP responded in its April 10, 2013 letter:

> "Our MDL counsel team responding to the United States' motion does not presently know, however, of an actual document matching the description of the movants' hypothetical email.  To the best of our current knowledge, BP's

### KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 17, 2013
Page 14

> reviewers did not knowingly exclude such a hypothetical email from the five lists of relevant documents furnished to the Court and movants or the corresponding document sets provided to the Court for *in camera* review."  (Rec. Doc. 9254, at 5.)

To reiterate, our MDL counsel team responding to the United States and Transocean's motion to compel does not presently know of "a broader discussion about whether BP should include flow rate estimates in *any* external communications, as long as [that discussion] predated some or all of the crime-fraud communications."  (*See* Rec. Doc. 9355, at 11 (April 17 Joint Submission).)

BP's concern in its April 10 letter was that the United States and Transocean's March 21 submission, read a certain way, might have been interpreted to seek the production of all privileged advice in the context of flow rate communications — rather than documents related to preparation of the five specific communications.  Such a request, which the motion to compel did not make, would necessarily have improperly expanded the motion to reach broad issues regarding BP's (or any party's) legal duty to disclose flow information.  And those broad issues are not properly before the Court in the context of this motion to compel.

BP's concern has now been laid to rest.  The United States and Transocean clarified in their April 17 submission that "[m]ovants are not arguing that *all* documents related to disclosing or withholding flow information are responsive to the motion."  (Rec. Doc. 9355, at 11 (emphasis in original).)  BP is understandably mindful of the protean contours of the movants' arguments to date.  We nonetheless gratefully accept the United States and Transocean's assurance that they do not seek all privileged documents related to flow disclosure.

In sum, there does not appear to be any issue here.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 17, 2013
Page 15

*     *     *

For the foregoing reasons BP respectfully requests that the Court deny the United States and Transocean any further relief they have requested related to their January 30, 2013 motion to compel, including further Phase 2 fact discovery.

Respectfully submitted,

Robert R. Gasaway

Attachments

cc (by electronic mail):

United States' MDL Counsel
Defense Liaison Counsel
Plaintiffs' Liaison Counsel
Joel M. Gross

# Attachment 1

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

300 North LaSalle Street
Chicago, Illinois 60654

Andrew Langan
To Call Writer Directly:                    (312) 862-2000                    Facsimile:
(312) 862-2064                                                                (312) 862-2200
andrew.langan@kirkland.com                  www.kirkland.com

May 12, 2011

**VIA E-MAIL**

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court
500 Poydras Street, Room B345
New Orleans, LA 70130

        Re:    In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of
                  Mexico on April 20, 2010, MDL No. 2179

Dear Judge Shushan:

The parties have made great progress in producing documents and resolving document-related discovery issues.   We write in response to the PSC's May 11 submission and to address two related issues that have not been resolved:

- The PSC does not have adequate knowledge of what BP has produced.  This has resulted in the PSC making repeated requests to BP for documents and claiming non-production, when in fact BP has produced the documents the PSC has asked about long ago.  A wild goose chase at the behest of the PSC happened this week; another last week; and similar events have happened repeatedly over the past 4+ months.  *See* Part I, *infra*.

- Because the PSC does not have an acceptable knowledge base about what BP has produced, and does not appreciate the role of search terms in the production process, the PSC has also erroneously asserted in its May 11 submission that BP has produced certain documents "late."  While certain rolling productions are inevitable in litigation conducted at the pace of MDL 2179, the PSC's inflated "late documents" analysis is far from accurate.  *See* Part II, *infra*.

The PSC's May 11 analysis of documents that BP has allegedly produced "late" is both out-of-context and highly flawed.  For context, from the PSC alone, BP has responded to 364 Requests for Production, 59 Interrogatories, and 221 Requests for Admission, so far.  Under the parameters established by the Court for discovery leading to an early trial, the PSC has asked that BP produce within a time frame of months what would ordinarily take years, and during the same time that scores of depositions are occurring.  To date, BP has produced 2,045,216 pages of documents, in addition to extensive quantities of data produced natively.  In its production, BP

Hong Kong     London     Los Angeles     Munich     New York     Palo Alto     San Francisco     Shanghai     Washington, D.C.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 2

has so far produced custodial files for 32 witnesses, more than all of the other parties combined. For custodial deposition productions alone, BP has produced approximately 140,000 documents and over one million pages.  This is more than three times the volume of any other party.

### DOCUMENTS PRODUCED FOR DEPOSITION CUSTODIANS ALONE



As the Court knows, this litigation could have followed the pattern of many other large cases, including other MDLs, and had the parties substantially complete document production before depositions were started.  For reasons that BP understands and respects, this Court instead called for an expedited schedule and rolling document productions while launching multi-track depositions at a breakneck pace. Given these ground rules, and given the simultaneous production of witnesses and documents in this case, some production of documents after depositions is inevitable.  And even if the PSC's analysis were correct (it is not), the "late" documents would equal a tiny fraction of the documents that BP has produced overall.



# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 3

As the PSC has recently declared, "from the PSC's perspective, BP is the 'target defendant' and everybody knows it." (5/11/11 Herman letter to Hon. S. Shushan)  The PSC has not filed a discovery motion, nor written a discovery letter, targeting any party other than BP.  Thus, it is unsurprising that the PSC focuses on alleged "late" documents from BP, while ignoring the comparatively greater percentages of "late" documents by other parties.   Using the PSC's flawed methodology, Halliburton has produced 20% percent of its documents late,[1] and Transocean has produced 5% percent of its custodial documents late.[2]  Even taking all of the PSC's flawed assertions as true, the percentage of "late" documents produced by BP is lower than Halliburton or Transocean.

This is no easy business.  But the parties and the Court have moved mountains, and the PSC is complaining about specks of dust on one mountain.

In any event, the PSC's May 11 analysis of BP's "late" documents is fundamentally flawed.  The parties' differing positions boil down mainly to the role of search terms, including the PSC's contention in their May 11 submission that "BP's custodial productions should in no way be limited to 'custodian specific search terms.'"  To be sure, BP has produced hundreds of thousands of documents not responsive to search terms.[3]  But the PSC's position that search drives are not the driver of BP's custodial production process is flatly contradicted by the voluminous record of search term discussions—including at the February 18 hearing where the parties and the Court discussed these issues in detail.

---

[1]     For example, for Richard Vargo, Halliburton's 30(b)(6) witness on numerous subjects, the parties received 387 documents received on 3/30/2011, the first day of the deposition.  For John Gisclair, the parties received 4,235 documents received on 3/8/2011, six days before the deposition.  For Nathaniel Chaisson, the parties received 93 documents on 3/15/2011, the night before the deposition.  This production included internal Halliburton communications about the Macondo Well production interval and numerous Opticem Reports in a non-viewable ".adi" file format.  For Tim Quirk, the parties received 11 documents and 7 lab files received on 3/20/2011, the night before the deposition.  The production included a never-before-seen set of foam stability tests.  BP raises these examples not just in an effort to fault Halliburton, but to note that such events are expected in fast moving litigation and to provide perspective.

[2]     Ironically, the PSC has produced more "late" documents than any other entity.  The PSC was ordered to produce documents in one instance only, in connection with Texas City.  On February 25, the PSC was ordered to produce those Texas City documents by March 7.  *See* Pre-Trial Order No. 29.  In fact, no documents were produced until April 29, 52 days after the deadline.

[3]     BP produced over 500,000 pages of documents, and large volumes of data in native format, before search terms were formulated and run.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 4

Beginning in November 2010, the parties carefully negotiated search criteria on a custodian-by-custodian and request-by-request basis. The negotiated search criteria chart—clearly setting forth which search terms and date ranges should be paired with which custodians—was submitted to the Court and the parties on February 16. As discussed below, at the February 18 conference, the parties and the Court discussed that this chart would drive the custodial deposition process, including that certain search terms would be used for certain witnesses' deponent productions. The PSC's position on search terms—expressed in its May 11 letter but not advanced by the PSC at the February 18 conference—comes many months after these issues were thoroughly vetted in this Court.

A revised version of the search term chart—also showing custodians paired with search terms—was submitted to the PSC on March 29, 2011. This chart made plain which searches would be run, and which would not, against the deponents' custodial files. Since BP sent that version of the search criteria, the PSC has not made a single suggested addition or correction; the PSC has not asked that any deponent needed to be added to any of the 60+ searches or that any of the searches needed adjustments in date ranges or search terms.

For the above reasons, discussed in more detail below, BP urges that there is no justification at this late date for fundamentally reworking the existing search term process, which was the product of many months of labor and hearings before this Court, and which has worked successfully in allowing over 30 BP depositions to proceed.

## I.     The PSC Repeatedly Requests from BP Documents That Have Already Been Produced.

The PSC has repeatedly made complaints about documents allegedly "missing" from BP's production. With each complaint, the PSC has been wrong. Three specific examples-addressing five different categories of documents-follow:

**Example 1.** In an e-mail dated January 21, 2011, entitled BP "**responsive documents missing from production**," the PSC incorrectly claimed that various categories of documents had not been produced. These included the following:

- **BP's Well Control Manual** which was produced in July 2010, over six months before the PSC's e-mail incorrectly asserting that it was "missing." (Ex. 1, 1/24/11 Kavanaugh e-mail to Large)

- **BP's Drilling and Well Operations Policy (BPA-D-001)** which was produced on January 10, 2011, over a week before the PSC's e-mail incorrectly asserted that it was "missing." *Id.*

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 5

Having tracked the documents the PSC incorrectly claimed to be "missing," BP asked the PSC two questions:

- Would you please let us know what steps plaintiffs are taking to check for documents already in plaintiffs' possession before asking BP about them?  (The time it takes BP to run down these issues is time that could also be spent producing new documents to the PSC.)

- Have plaintiffs actually reviewed all the documents in BP's production?  *Id.*

The PSC has never adequately answered these questions.  Instead, the PSC has continued to request that BP find documents that BP had produced long ago.

**Example 2.** The same pattern was repeated in advance of Mr. Bellow's deposition in late April.   On April 27, the PSC asserted that it could not "find" documents that BP has produced in November 2010:

- **BP Pore Pressure Fracture Gradient ("PPFG") Reports.**  The PSC indicated on April 27, 2010 that it could "find only 12" PPFG Reports.  Upon investigation, BP found that it had produced 21 PPFG reports to the PSC on November 15, 2010, over five months before the PSC's e-mail.   The PSC could have found these documents just as easily.

- **BP Daily Geology Reports**.  The PSC also claimed that it could find "fewer than 12" Daily Geology Reports produced by BP.  In fact, BP had produced 74 Daily Geology Reports, again on November 15, 2010.

That same day, BP explained that these documents had been produced long ago:  "All the daily PPFG Reports for the MC 252#1 Macondo well and all the Daily Geological Reports for the MC #252 Macondo well were produced to the PSC on November 15, 2010 in the MDL 2179 litigation in response to Plaintiffs' Omnibus Discovery Requests on All Defendants."  (Ex. 2, 4/27/11 Langan e-mail to Sterbcow)

**Example 3.**  On May 9, 2011, the PSC wrote to BP:  "Guide testified that the MoC all have attachments such as tests, power points, etc.  We may have both the MoC and the attachments *but they were not produced as one and we have no way of knowing what docs were attached to a given MoC*."  This assertion was incorrect.  The MoC discussed at Mr. Guide's deposition was dated April 15, 2010.   BP produced the April 15, 2010 MoC, with attachments, on November 15, 2010. (Ex. 3, 5/10/11 Langan e-mail to Sterbcow)  Although BP

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 6

tracked down this information at the PSC's request, the PSC could have (and should have) located it just as easily.

These three examples covering five separate sets of documents—which are not exhaustive—illustrate a recurring phenomenon. It is easy for any party to rattle off a document request, whether in an e-mail or in a request for production. But no responding party should be forced to search for documents that have already been produced where the requesting party could do the work just as easily, particularly where the requesting party cannot show that it has been diligent in determining whether it already has received the documents.

The PSC's wild goose chases have resulted in BP repeatedly having to track down for the PSC documents that BP has already produced long ago, distracting resources from the many other important tasks BP counsel needs to address in these proceedings.

This problem has now persisted for over four months. As a remedy, BP respectfully requests that, in the event of future document requests by the PSC (whether by e-mail or by formal RFP), the PSC be required to certify simply that it has reviewed BP's existing production, and that it has determined that BP has not produced the requested documents. This certification would not be onerous, but it would make the discovery process much more efficient.

## II.   The PSC's "Late Documents" Analysis Is Fundamentally Flawed

The Court has correctly pointed out that it is challenging for the parties to produce witnesses and documents simultaneously. And, as BP has explained herein and in prior submissions and in conferences with the Court, it is inevitable that custodial documents will be produced after witnesses' depositions. This is true for three reasons:

- First, as explained in BP's February 14 e-mail to the Court, BP employs a quality control process to identify any documents that were initially coded as privileged but that BP has determined nonetheless should be produced out of an abundance of caution. BP wants to verify that documents reviewed by its contract attorneys are indeed privileged before such documents are produced with redactions or withheld. The benefits of this process were demonstrated when the Court, upon viewing a random sample of BP's privileged documents *in camera*, observed: "I was very impressed at the surgical redaction of the documents. I didn't find anything that had been redacted that I thought was not privileged, so I was really pleased with that. On the documents that had been withheld, I didn't find any documents that I found were privileged and should have been produced." (Ex. 4, 4/8/11 Tr. at 10:4-11:7) This quality control process resulted in documents being produced after following those quality assurance steps.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 7

- Second, as also explained in BP's February 14 e-mail, BP sometimes encounters technical processing and production complications from time to time that may not be resolved prior to a deposition, including things like password protected and encrypted files.  As deponents have been identified further in advance of depositions, BP has been better able to work through these technical nuances in advance.

- Third, as explained in BP's April 21 submission to the Court and herein, documents from a deponents' custodial file may not be responsive to the negotiated search criteria for that custodian, but may be produced in the future for other reasons, including that they are responsive to the global search criteria or the search criteria for a different custodian.[4]  See also Order on 4/29/11 Working Group Conference, ECF No. 2253, at 9.  Specific examples are discussed below, with respect to Mr. Bodek.  This phenomenon will continue as the parties continue to produce documents.

While there are several reasons for production of documents after depositions, BP has sought to accelerate production as much as possible:  (i) by adding more attorneys to review the documents initially and to perform quality control; (ii) by moving up the quality control process so that documents moved off the privilege logs can be produced in advance of depositions as much as possible; and (iii) by collecting, reviewing, and producing documents sooner, when deponents are identified with sufficient lead time.  All of these measures have been implemented.

**The PSC's May 11 Analysis**

Given the evidence cited above that the PSC does not have command about what documents BP has in fact produced, it is no surprise that the claims of "late documents" similarly lack substance.  Indeed, the PSC's May 11 estimates of the documents that BP has produced "late" are grossly misstated as a result of stark flaws in the PSC's analysis discussed below.  BP's responses to the PSC's arguments fit into two categories:  (A) the PSC's analysis of "late documents" produced for non-Internal Investigation Team (IIT) deponents from March 2011 to the present; and (B) the PSC's analysis of "late documents" produced for IIT deponents in January and February.

---

[4]   As explained in BP's April 21 submission, the search criteria negotiations concluded after search criteria needed to first be employed for identify documents for deponent custodial productions.  (Ex. 7)  As a result, searches for deponent custodial productions have differed from each other over time and differed from the ultimately agreed search criteria because of the following:  (1) the PSC modified certain date ranges; (2) the PSC added certain custodians; and (3) there were certain RFPs (e.g., RFPs 19 and 76) for which the PSC did not propose any custodians, meaning BP had to add them.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 8


A.      **Documents Produced in March 2011 and Beyond for Non-Internal Investigation Team Deponents**

Since early April, the PSC has been asserting that BP produced certain non-IIT documents "late."  In support of this conclusion, the PSC has provided BP with a series of "late" document spreadsheets.  As BP has pointed out flaws in the PSC's analysis, the PSC's analysis has shifted.  But the most fundamental flaws still persist.  The central defect in the PSC's analysis centers on the use of search criteria.

As the Court is aware, BP and the PSC negotiated search terms, date ranges, and custodians for BP's productions.  This process lasted from November 8, 2010 (when the Court ordered such negotiations) through well into March 2011.  The PSC's initial proposal was not a single set of terms, but rather a different sent of terms for certain of its 300+ Requests for production.  During the negotiations, the PSC took the position that the parties were not required to agree on date ranges or custodians.  BP respectfully disagreed with the PSC's position, and the issue was extensively briefed and argued before the Court.  At the February 18, 2011 conference, the Court agreed with BP's position that the parties should reach agreement on search terms, date ranges, and custodians:

> THE COURT:  We had a sort of dispute, but an amicable one, with regard to the provisions of Pretrial Order Number 16 and whether or not we needed to reach agreement on the provisions of Paragraph 13 regarding search terms, date ranges, et cetera. I sort of did anticipate that agreement would be reached, but what I hope to do today is reach agreement, so we'll put that behind us and we'll move forward. (Ex. 5, 2/18/11 Tr.  5:11-18)

With the Court's guidance, the parties proceeded in February and March to complete their negotiations of search terms, date ranges, and custodians.  These efforts were successful. Following these negotiations, BP circulated its search criteria list (including date ranges and custodians) to the PSC on March 29, and to defense counsel and government liaison counsel on April 4.   No party provided further comments on the negotiated list of search criteria.

i.      **BP and the Court Made Clear At The February 18 Conference And Elsewhere That Search Terms For Each Custodian Would Drive BP's Custodial Deposition Productions.**

The PSC now contends—five months into depositions—that custodial productions are not driven by the negotiated search terms.  The PSC's position ignores the parties' long history of search term discussions among themselves and with this Court.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 9

BP's position has consistently been that it absolutely necessary to use search criteria to guide its production.  It would not be practicable generally, and certainly not possible here given the accelerated pace of discovery, to review every single deponents' document and subjectively make a determination if that document was responsive to any of the PSC's 300+ Requests for Production.  As set forth in BP's letter to Your Honor on February 16, 2011, that is precisely why the Sedona Principles state that it is "advisable, if not necessary" to use technological means such as search criteria "when dealing with large amounts of electronic data."

At the February 18 conference and elsewhere, BP and the Court made clear that the search terms for each custodian would drive that custodian's production.  Indeed, the Court specifically urged BP to move forward with custodial productions based on Exhibit E to BP's February 16 submission to the Court, which set forth search terms for numerous other BP deponents (Exhibit E to BP's February 16 submission, Exhibit 6 hereto):

> BP's COUNSEL: Understood, Your Honor.  And one other comment I would just like to make quickly is, until we reach final agreement, because we are doing ongoing production, we would like to proceed with what is set forth in our Exhibit E.
>
> THE COURT: Please. Not only may you, but please do.
>
> BP's COUNSEL:  We will do that, Your Honor.  (Ex. 5 37:9-15)
>
> . . .
>
> BP's COUNSEL: We're running a new search. All of the parameters of the search are laid out in our Exhibit E in my letter.
>
> THE COURT: I'm with you. So that's how we're going to proceed.  Now, guys, the sooner we can agree to dates and the sooner you all can -- Bill, and the sooner you all can supplement the custodial list, the sooner Mark can get going on this new run.
>
> BP's COUNSEL: Although, Your Honor, again, to be clear, because -- because things are moving, we're going to get started with **Exhibit E now**; and, then to the extent -- you know, **for the depositions that are coming up**. And then, to the extent there are changes, we will modify the process to the extent it's agreed or Your Honor orders.  *Id.* 64:2-16

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 10

Counsel for PSC was present at the February 18 hearing and did not argue that the custodial productions for depositions should not be driven by the negotiated search term chart.

As Exhibit E and all of BP's subsequent search term charts (including the one BP provided to the PSC on March 29) make clear, not all search terms were run for all custodians. For example, Mr. Bodek (discussed below as an example for illustrative purposes) is listed as a custodian for the search terms for RFP 14 (relating to scheduling) and many others, but is not listed as a custodian for RFP 22 (relating to estimates of oil flow).  As discussed at the February 18 hearing:

> THE COURT: The only thing we need to discuss, then, are the custodial files for the nonevent custodians?
>
> PSC COUNSEL: That's correct, kind of the request-by-request proposal that you see in the [search term] spreadsheet.
>
> THE COURT: Right. So let's talk about, first, the custodial production for the events. Do we think we're proceeding apace, and there is no real problem with getting the **custodial files for those people whose depositions are going to be scheduled**, and a rolling production for those whose depositions aren't going to be scheduled?
>
> BP'S COUNSEL: That's correct, Your Honor. We will prioritize, obviously, the people of the -- the production for the people who are scheduled for deposition. I wouldn't quite say no problem. I mean, it is going to be a challenging process because we have quite a lot going on, and I think Your Honor can appreciate. We will prioritize the deposition folks. In fact, I think that a lot of them are listed as incident custodians. I'd have to check to make sure it's every one, but I think that a lot of the initial depositions are incident custodian folks.
>
> PSC'S COUNSEL: That's correct.
>
> THE COURT: So there is a lot of overlap?
>
> BP'S COUNSEL: There is a lot of overlap. **So if you looked at the chart [Exhibit E], you would then look for the -- you look at the requests by which the incident custodians[5] are listed and the search terms by those incident**

---

[5]   Mr. Bodek is one of the custodians that the PSC and BP referred to as the "Incident Custodians."

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 11

> **custodians and run those search terms for those dates, and that would
> generate the universe for the data to review**. (Ex. 5 10:8-11:4)

BP's February 16 submission (which attached the search term chart discussed at the
February 18 conference) stated:

> Following those meet-and-confer conferences, BP has set forth in letters (and
> repeats here, see Exhibit E, 2/11/11 e-mail) its approach to search criteria and
> custodial productions for depositions.   This approach sets forth in detail the
> search terms, custodians, and date ranges that BP will apply to the user-generated
> data in the active space of BP users' laptops and/or desktop computers for the
> productions in this case going forward.  If no agreement on these parameters can
> be reached before the conference with Your Honor, **BP respectfully submits that
> the proper approach is not for BP to proceed "at its own risk."  Rather, if the
> PSC has any issues with the approach that BP has described in detail, BP
> respectfully submits that now is the time to raise them so that they can be
> addressed by Your Honor**; otherwise, BP will move forward with the approach
> outlined in this letter and the attached exhibits.  (Ex. 6)

During the February 18 hearing, the PSC's counsel raised no objection to the use of the
search term chart to "generate the universe of data" to review for the "custodial files for those
people whose depositions are going to be scheduled," as discussed in detail at the February 18
hearing.  (Ex. 5) Nor did the PSC raise an objection to BP's search term chart circulated on
March 29.  *See id.*  Since March, BP's certification has stated that is made "based on a good faith
and reasonable search in accordance with their February 16, 2011 submission to Magistrate
Judge Shushan and the February 18, 2011 hearing."  (E.g. Ex. 7, 4/1/11 Langan Certification
Letter to Herman).  Furthermore, the transmittal letters for BP's productions have stated that for
volumes that include deponent custodial files, those custodial "materials are being provided
pursuant to searches of ESI consistent with the BP Parties' letter to Magistrate Judge Shushan of
February 16, 2011, the hearing before Magistrate Judge Shushan on February 18, 2011, and the
parties' negotiations concerning appropriate search criteria."  (E.g. Ex. 8, 4/1/11 Langan
Transmittal Letter to Herman)  *The PSC raised no questions about this particular certification
or transmittal letter language until this Tuesday, May 10  at the earliest.*

In its May 11 submission, the PSC contends:

> [t]he PSC has inquired about the precise meaning of 'in accordance with their
> February 16, 2011 submission ... and February 18, 2011 hearing...,' as used in
> BP's certification letters.  However, we have yet to receive a clear response.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 12


The PSC's "inquiry" about BP's certification language was made two days ago, on Tuesday, May 10, 2011.  (Ex. 9, 5/10/11 Large e-mail to Nomellini (9:25 am))  Two hours later, and before BP could respond, the PSC announced that it was done meeting and conferring and wanted to file something with the Court.  (Ex. 10, 5/10/11 Large e-mail to Nomellini (11:25 am))  In light of this timing, the PSC's suggestion that "we have yet to receive a clear response" to a question asked for the first time on May 10 is opportunistic at best and misleading at worst.  In any event, BP's February 16 submission and the transcript of the February 18 conference speak for themselves.

Finally, BP's use of the parties' negotiated search terms has not prejudiced the PSC.  To the contrary, it has ensured a more comprehensive production.  BP has far produced more per deposition custodian, on average, than either Halliburton or Transocean:

| Party | Average Number of Custodial Documents Produced Per Deponent |
|---|---|
| BP | 4,368 |
| Halliburton | 1,893 |
| Transocean | 1,656 |

**The Negotiated Search Term Chart**

Why does it matter that not all search terms were run for all custodians?  As one example, RFP 22 asks BP to "produce any documents relating to any calculations or estimates of the amount of oil spilled in the Gulf of Mexico."  To use the example of recent deponent Bodek, Mr. Bodek had no role in estimating flow rate, and thus was not listed as a custodian for RFP 22.  This means that a document which contains RFP 22 search terms and on which Mr. Bodek was copied would not have been produced before Mr. Bodek's deposition.  However, there are many other custodians listed for RFP 22, and RFP 22 documents were produced after Mr. Bodek's deposition and in connection with the global search term process.   While Mr. Bodek is a custodian of some of those documents, those documents are not "late" for Mr. Bodek's deposition because they were not responsive to the search criteria negotiated by the parties for him.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 13


How does this play out with actual documents?  On May 4, the PSC asserted that at least 146 of Mr. Bodek's custodial documents had been produced "late."  (Ex. 11, Large e-mail to Nomellini)  On the same day, BP identified examples of documents not responsive to the negotiated Bodek search terms and further asked the PSC for examples that were responsive.  BP reiterated that request on May 9.   On May 10, the PSC responded, providing what purported to be 11 Bodek documents that were responsive to search terms, and were thus "late."  Counsel had the following e-mail exchange:

> BP COUNSEL:  You indicate you have identified "many" documents from Mr. Bodek's files that were responsive to search terms and were received late.  We look forward to seeing the results of your analysis of Mr. Bodek's files, so that we can discuss it with you.
>
> . . . .
>
> PSC COUNSEL:  I have listed below eleven counter-examples for Bodek allowing for your position:
>
> BP-HZN-2179MDL01200023
> BP-HZN-2179MDL01200307
> BP-HZN-2179MDL01208057
> BP-HZN-2179MDL01209081
> BP-HZN-2179MDL01209145
> BP-HZN-2179MDL01210355
> BP-HZN-2179MDL01212469
> BP-HZN-2179MDL01213079
> BP-HZN-2179MDL01215268
> BP-HZN-2179MDL01215636
> BP-HZN-2179MDL01215670

(Ex. 10)

These 11 example documents provided by the PSC are highly illustrative.  Not a single one of them is responsive to the custodial search terms for Mr. Bodek.  Exhibit 12 shows in yellow the RFP's for which Mr. Bodek is listed as a custodian.  Exhibit 13 shows in orange the search terms and date ranges run for these RFP's.  BP has confirmed that none of the negotiated Bodek search terms and date ranges yield the examples cited by the PSC above, which are therefore erroneously included in the PSC's "late documents" analysis.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 14

Why were these Bodek documents produced when they were, after Mr. Bodek's deposition?  The reason is that the documents are responsive to the search terms for RFP 22 and 28.  (See exhibit 13, showing RFP 22's search terms and exhibit 14, consisting of the 11 Bodek examples cited by the PSC, which have had their relevant search terms highlighted.)  Mr. Bodek is not listed as a custodian for RFP 22 and RFP 28 in the search term chart.  However, the parties are using RFP 22 and 28 searches as a part of their global search term production.  But there was nothing remotely "late" about these documents:  they were not responsive to the search criteria negotiated for Mr. Bodek and laid out in detail.

The table below analyzes the 11 "examples" of allegedly "late" Bodek documents cited by the PSC:

| Doc ID'd by PSC on 5/10 as Responsive to Search Terms | Bodek Search Terms Hit? | Global RFP hit (document or parent) |
|---|---|---|
| BP-HZN-2179MDL01200023 | NO | 28 |
| BP-HZN-2179MDL01200307 | NO | 28 |
| BP-HZN-2179MDL01208057 | NO | 28 |
| BP-HZN-2179MDL01209081 | NO | 22 |
| BP-HZN-2179MDL01209145 | NO | 28 |
| BP-HZN-2179MDL01210355 | NO | 28 |
| BP-HZN-2179MDL01212469 | NO | 22, 28 |
| BP-HZN-2179MDL01213079 | NO | 28 |
| BP-HZN-2179MDL01215268 | NO | 28 |
| BP-HZN-2179MDL01215636 | NO | 28 |
| BP-HZN-2179MDL01215670 | NO | 28 |

In its May 11 submission, the PSC now contends the 11 Bodek documents above are "responsive to the search terms for RFP 88 and RFP 90."  This incorrect assertion is also illustrative.  As the chart provided to the PSC on March 29 makes clear, the search terms for RFP 88 and RFP 90 ("preventor," *etc*.) only apply to documents dated through "April 20, 2010."  The

KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 15

11 Bodek documents are all dated after April 20, 2010, and thus are not responsive "responsive to the search terms for RFP 88 and RFP 90" as the PSC claims.  Instead, for the period after April 20, the chart provided to the PSC on March 29 specifically states that BP will employ a "reasonable search"—not the search terms ("preventor," *etc*).  (Ex. 15, 3/29/11 Nomellini e-mail to Irpino)  But only one of the 11 Bodek examples cited by the PSC would be produced in response to a "reasonable search" under RFP 88 and 90.  With one exception discussed below, none of these 11 documents constitute either: (i) "studies of effective operation of blowout preventers in offshore drilling operations" (what BP agreed to conduct a reasonable search for in response to RFP 88) or (ii) "reports and presentations concerning cementing the production interval of the Macondo Well" (what BP agreed to conduct a reasonable search for in response to RFP 90).

The one noteworthy exception from the PSC's 11 Bodek examples is BP-HZN-2179MDL01200307, a Technical Memo relating to cementing the production interval.  That document is responsive to a reasonable search under RFP 90 (cementing of the production interval).  And indeed on March 13, one month before the Bodek deposition, BP produced that same Technical Memo as BP-HZN-2179MDL00703781.  The only difference between the two documents is the format and the Bates label.  (Compare Ex. 16 with Ex. 17)

In sum, the only one of the 11 Bodek examples cited by the PSC that BP even arguably had an obligation to produce before the Bodek deposition was indeed produced one month before that deposition.  But the PSC apparently did not know that it had the document.  And that is precisely the problem, and why certification by the PSC is necessary.

**"Many Other Examples"**

Each time BP demonstrates that specific "late" documents were not late, the PSC claims (as it did on May 6) that it has many other examples.  But when the PSC provides those many other examples (as it did with the 11 Bodek documents on May 10), they have been without merit.  The parties have accomplished much together.  BP respectfully submits that the parties are at their best when they work cooperatively to produce documents (and confer when there are issues), rather than seeking to create flawed analyses of "late" or "missing" documents.

**The Four Examples Raised By the PSC In Its May 11 Letter**

The PSC raises four new examples in its letter to the Court of May 11.  Three of the four examples relate to IIT depositions on or before February 10 (and thus are a red herring as discussed in Section II.B below).

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 16

The fourth document cited in the May 11 letter (the Walz handwritten journal for March and April 2010) was produced the night before his deposition. This document was already discussed at the April 29 hearing before this Court; it is a recycled example. The Walz journal consists principally of handwritten notes that were not properly scanned by BP's vendor. BP has taken steps with its vendor to prevent this from occurring in the future. Although this is the one specific example raised by the PSC that is not entirely erroneous, the fact is that the document was produced before Mr. Walz' two-day deposition, and that Mr. Walz was questioned about it extensively.

Thus, no prejudice has been shown from any of the allegedly "late" documents, other than to BP from having to track down that documents were not "missing" or "late."

**Even Setting Aside the Search Term Problem, Many of these Allegedly "Late" Documents Had Been Produced Long Before The Custodians' Deposition And Before the Certification Date.**

The PSC's analysis also suffers from a secondary problem. Setting aside the fact that hundreds of documents are not responsive to search terms for the right custodians, many other documents are simply not "late." As discussed above, the Technical Memo that the PSC claims was produced "late" for Mr. Bodek's deposition was in fact produced well in advance of the deposition.[6] As Exhibit 18 shows, the same is true for scores of other documents: even setting aside the search term issue, the PSC had the same documents before the relevant deposition, just with a different bates label. (Ex. 18, Table of Duplicate Documents). As an example of one these scores of documents, compare exhibit 19, which was produced before Mr. Corser's deposition, to exhibit 20, which was produced after Mr. Corser's deposition. Although the PSC claims the latter document is "late"; there is no difference between the two documents other than the Bates label. Exhibit 23 contains only the first 100 examples of this sort among the PSC's "late" document analysis that BP could find; BP has not the time to review all of the allegedly late documents identified by the PSC.

As these scores of examples show, the PSC's "late" documents chart crunches several numbers, but does not concern itself with the substance behind those numbers, including the many documents that had already been produced. Again, the PSC did not appreciate that it already had these scores of documents.

---

[6] BP's vendor does not necessarily exclude a document from the production if it has the same text as another document, due to technical nuances associated with gathering documents from different sources.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 17

**B.      Documents Produced in February and March 2011 For Internal
            Investigation Deponents.**

        Twelve of the deponents raised in the PSC's "late documents analysis" are Internal
Investigation Team custodians.  All but one of these custodians were deposed in January or
Feburary.   These are the custodians with by far the highest number of allegedly "late"
documents:  *e.g.,* Robinson (1254), Corser (1111), and Wetherbee (1242).[7]  The PSC's chart
shows that more recent custodians have signficantly fewer "late" documents, even under the
PSC's flawed analysis.

        The January and February IIT depositions were unique in several respects.  Pretrial Order
No. 17 (fn. 3) provides that "the parties shall work cooperatively to schedule the depositions of
witnesses who may have document intensive depositions, including custodial files, later in the
deposition schedule."  At the conference with Magistrate Judge Shushan on November 15 that
led to the issuance of Pretrial Order No. 17, the PSC acknowledged that it faced risks with
proceeding with early depositions before substantial completion of document productions:
"…there's risk to both parties. This happens in every litigation. We face the risk of deposing a
critical witness too early without all the documents, that's just a calculus we have to make…."
(Ex. 21, 11/15/10 Tr. 30)  In response, the Court then asked the PSC's counsel "[a]re you-all
going to start with the more minor witnesses so the production can catch up with the deposition
schedule?" (*Id.*) And without committing the PSC, Mr. Herman answered "We'll have that
discussion, and I'm not really the person in charge, but what I think my thinking would be is that
we try to find some witnesses who we think will be key but their testimony **won't be necessarily
document intensive**, be more, what did they see, what did they hear. And we'll try to identify
some of these witnesses first." (*Id.*) (emphasis added)

        With these Court directives in mind, during the parties' meet and confer on December 10,
2010, BP advised the PSC representatives that there might be document production issues with
the IIT deponents if the PSC pressed ahead (despite PTO 17 fn. 3) with premature depositions of
BP deponents with extensive custodial files.  BP further advised that the PSC might have
decisions to make about proceeding to depose at the early stages witnesses with large custodial
files, with all parties aware of the presumption against any re-deposing such witnesses later,

---

[7]      While the PSC claims that its chart "is slightly more conservative, and only includes volumes which were
        received after the deposition, or so close to it as to make review logistically impossible," the PSC uses a broad
        definition of "logistically impossible."  For example, the Corser deposition was February 10th.  The example
        cited by plaintiffs in their letter—BP-HZN-BLY  00139882—was produced on February 4th, one day after
        certification and six days before Mr. Corser's deposition.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 18

absent a strong showing of good cause (in the words, of the Court, cause such as the later production of "highly relevant" documents (Ex. 21, 11/15/10 Tr. 27)).

Nonetheless, BP moved rapidly to produce documents for these first IIT deponents in January and February.  Notwithstanding BP's warnings about proceeding with early depositions before documents were produced, the PSC chose to put the IIT deponents first because "their testimony won't be necessarily document intensive, be more, what did they see, what did they hear." (Ex. 21).   In light of this history, any argument that those IIT deponents should now be called back now for re-deposition is baseless and clearly the "good cause" standard for recall of PTO 17 has not been met.

*****

BP will continue to produce as many documents as possible as early as possible, consistent with the search terms negotiated by the parties.  But it is critical that the process not continue to be derailed by the PSC's requests for documents that BP has produced long ago.  BP's proposal that the PSC certify review of past BP productions is a reasonable solution.

While the PSC's "late" documents analysis is fundamentally flawed and the PSC's numbers are grossly misstated, BP's goal is the same as the PSC's:  to produce documents as early as possible, guided by the search criteria negotiated by the parties and by the parties' fruitful meet and confer process.  To that end, BP will continue to look for possible ways to improve its process, including as outlined above, and will attempt to meet and confer with the PSC early and often.

BP would be pleased to respond to any questions the Court has about this submission at the Court's convenience.

Sincerely,

J. Andrew Langan, P.C.

cc:     Plaintiffs Liaison Counsel
        Defense Liaison Counsel

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
May 12, 2011
Page 19


Mike Underhill
Hon. Attorney General Luther Strange
Cory Maze
Donald E. Godwin
James P. Roy
Stephen J. Herman
Mike O'Keefe
Robert Cunningham
Ronald S. Kravitz
Jeroen van Kwawegen
Wilber H. Boies
Mark C. Molumphy
Laurie L. Largent
Julie Reiser
Lori G. Feldman

# Attachment 2

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

300 North LaSalle Street
Chicago, Illinois  60654

Mark J. Nomellini
To Call Writer Directly:
(312) 862-2410
mark.nomellini@kirkland.com

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2200

July 28, 2011

**VIA E-MAIL**

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court
500 Poydras Street, Room B345
New Orleans, LA 70130

> Re:    In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of
> Mexico on April 20, 2010, MDL No. 2179: **Anadarko Modifications to**
> **BP Search Terms**

Dear Magistrate Judge Shushan and Liaison Counsel:

Following up on the Court's July 26 order regarding the status of Phase I discovery, we write to address the status of BP's response to Anadarko's recently proposed modifications to BP's search terms.  BP provides this submission to describe its efforts to date in responding to Anadarko and to set forth a realistic timetable for BP's document review and production.

As the Court is aware, BP negotiated search terms with the PSC in late 2010 and early 2011, and circulated the search criteria negotiated with the PSC to defense counsel and government liaison counsel on February 16, 2011, April 4, 2011, and April 21, 2011.  On April 21, 2011, BP notified the Court and the parties that:

> [T]o the extent any party seeks additional documents from BP that the party
> believes may not be covered by the search terms, BP respectfully requests that
> they directly propose modifications to the global search terms, instead of
> proposing a series of one-off requests.  This will ensure more efficient processing
> of those requests, given the search term mechanisms that have already been put in
> place.

Following this letter in April, BP did not hear from any party regarding these search criteria for several months.

On July 6, 2011 -- five months after BP first circulated negotiated search terms -- Anadarko sent BP proposed modifications to BP's search terms.  (Exhibits 1-2)  For the reasons described in BP's correspondence to Anadarko, Anadarko's initial proposed search criteria were

Hong Kong      London      Los Angeles      Munich      New York      Palo Alto      San Francisco      Shanghai      Washington, D.C.

## KIRKLAND & ELLIS LLP

July 28, 2011
Page 2

overbroad.  *See* Exhibit 3, BP Letter to Anadarko Re Overbroad Search Criteria.  However, in the interests of cooperation and moving discovery forward, BP has agreed to a subset of Anadarko's search terms, which are essentially modifications to certain search terms initially negotiated between BP and the PSC.[1]  The modified search chart and custodian list, taking into account the Anadarko-proposed changes to which BP agrees, are set forth as Exhibits 4 and 5 hereto.  (BP and Anadarko have agreed to disagree, without waiver of their respective rights, about whether those modifications were proposed on a timely basis in July, given that BP first circulated the search terms in February.)

Despite the millions of pages that have already been produced by BP in the course of this litigation, the universe of documents potentially responsive to this first set of Anadarko-proposed search-term modifications is substantial.  Considering only the modifications to which BP agrees, the number of potentially responsive documents is over 100,000.  Given the timing and the large number of potentially responsive documents at issue, BP expects that it may need until September 30, 2011 to review and produce this significant amount of additional documents.

Just this week, Anadarko asked BP to agree to a second set of search-criteria modifications, which would yield documents beyond the additional documents set forth above. BP is evaluating this second set of modifications.  But, given that it will take through September 30 for BP to respond to the first set of modifications, BP is reluctant to undertake any further changes that are unduly burdensome.  That being said, BP will continue its discussions with Anadarko on these topics.

**Further Search Term Modifications**

As discussed above, from December 2010 through February 2011, BP negotiated search criteria with the PSC, and then circulated the negotiated search criteria to the parties on February 16, 2011, April 4, 2011, and April 21, 2011.  BP sought comments from the parties, but no comments were forthcoming.  In July 2011, five months after the negotiated search criteria were circulated, Anadarko offered comments.  In light of this history, if parties other than Anadarko have additional reasonable modifications to propose with regard to BP's search criteria, now is certainly the "last call" to do so.  Although BP has produced hundreds of thousands of

---

[1] BP also contends that much of the proposed discovery is not in furtherance of Anadarko's defenses in the MDL and is instead meant to attack BP, thereby putting the discovery beyond the scope permitted by Judge Barbier's July 15, 2011 order granting BP's Motion to Stay Anadarko's claims and this Court's May 12, 2011 order granting Anadarko's Motion to Compel. In the interest of seeking compromise, BP will reserve its rights with respect to this issue and seek the compromise described herein.

## KIRKLAND & ELLIS LLP

July 28, 2011
Page 3


documents that do not hit on the search criteria, documents that do not hit on the negotiated custodians, date ranges, and search terms may not be produced.  (See Exhibit 6, showing search criteria adjusted to take into account Anadarko modifications to which BP has agreed.)  As previously discussed, these search criteria apply to all phases of the case.

BP would be pleased to respond to any questions the Court has about this submission at the Court's convenience.


Sincerely,

Mark J. Nomellini


cc:   Plaintiffs Liaison Counsel
      Defense Liaison Counsel
      Mike Underhill
      Hon. Attorney General Luther Strange
      Cory Maze
      Donald E. Godwin
      James P. Roy
      Stephen J. Herman
      Mike O'Keefe

# Attachment 3



**U.S. Department of Justice**

Environment and Natural Resource Division

_____

*P.O. Box 761*
*Washington, DC 20044*
*202-514-0180*
*Sarah.Himmelhoch@usdoj.gov*

August 25, 2011

**BY ELECTRONIC MAIL**

Mark Nomellini
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
mnomellini@kirkland.com

      Re:    MDL 2179: Additional Flow Rate Search Terms

Dear Mr. Nomellini:

      As we have discussed on several occasions, the United States does not believe that the search terms that BP used to respond to the Plaintiff Steering Committee's discovery requests are sufficient to locate documents responsive to Requests 19-30 of the United States' First Set of Requests for Production to BP served on April 29, 2011.  Attached is a list of the additional search terms we believe BP needs to run and the custodians whose files should be subject to the search.  Please review and contact me as soon as possible.

      Thank you for your attention to this matter.

                    Sincerely,

                    /s/ Sarah D. Himmelhoch

                    Sarah D. Himmelhoch

cc:    Liaison Counsel

**Supplemental Search Terms for Initial Requests for Production to BP Relating to Quantification**

Flow near10 (rate or assess% or estimate% or well or model or profile or phase or multiphase or slug% or reservoir or velocity or assurance or volume or spinner "high resolution" or "low resolution" or bopd or mbopd or temperature) and (horizon or macondo or mc252 or 252 or dwh)

Discharge near10 (rate or assess% or estimate% or model or profile or well or wcd or worst or bopd or mbopd or temperature) and (horizon or macondo or mc252 or 252 or dwh)

Pressure near5 (bop or blowout or preventer or transducer or measure% or capping or choke or kill or drop or ambient) and (horizon or macondo or mc252 or 252 or dwh)

Reservoir near5 (model or deplet% or pressure or wcd or worst) and (horizon or macondo or mc252 or 252 or dwh)

Skin and (flow or reservoir or discharge or model or estimat% or assess%) and (horizon or macondo or mc252 or 252 or dwh)

Porosity and (flow or reservoir or discharge or model or estimat% or assess%) and (horizon or macondo or mc252 or 252 or dwh)

Permeability and (flow or reservoir or discharge or model or estimat% or assess%) and (horizon or macondo or mc252 or 252 or dwh)

SIWHP or SIWP or (shut near5 well near5 pressure) or IPR or (inflow near5 performance near5 (curve or relationship)) or PIV or (particle near3 image near3 velocimetry) or GOR or (gas% near3 ratio) or PVT and (horizon or macondo or mc252 or 252 or dwh)

(Decline or decrease) near5 curve and reservoir and (horizon or macondo or mc252 or 252 or dwh)

Oil or fluid or formation and (DL or (differential near3 liberation) or cce or (constant near3 composition near3 expansion) or fvf or "oil viscosity" or bubblepoint or compressibility or saturation) and (horizon or macondo or mc252 or 252 or dwh)

Flow and (riser or kink or ram or BOP or preventer or BSR) and (obstruct% or restrict% or erosion or erode or imped%) and (horizon or macondo or mc252 or 252 or dwh)

[Note: the term %, when used above, is intended as a root expander]

**Date Range: 4/20/10 to Present**

**List of Custodians to be Searched:**

|  |
| --- |
| Ahnell, Arden |
| Al Monthiry, Wissam |
| Albertin, Martin |
| Baker, Kate |

| |
|---|
| Ballard, Adam |
| Bellow, Jonathan |
| Birrell, Gordon |
| Bondurant, Charles |
| Bowman, Michael |
| Bozeman, Walt |
| Brookes, David |
| Bush, Earnest |
| Carragher, Peter |
| Caulfield, Colm |
| Chester, Doug |
| Cecil, Chris |
| Church, Tim |
| Coelho, Gina |
| Collinson, Peter |
| Cothran, Tom |
| Cross, Iris |
| Daigle, John |
| Depret, Pierre-Andre |
| Dudley, Robert |
| Dupree, James |
| Dyer, Tracy |
| Epps, David |
| Fritz, David |
| Gallucci, Joe |
| Gansert, Tanner |
| Grant, Jim |
| Hayward, Tony |
| Hill, Andy |
| Hill, Trevor |
| Inglis, Andy |
| Johnson, Dennis |
| Jones, Brandi Carrier |
| Kercho, Debbie |
| Knox, Tom |
| Knudsen, Torben |
| Liao, Tony |
| Lockett, Tim |
| Looney, Bernard |
| Lynch, Richard |
| Mabile, Nere |
| Malone, Ryan |
| Mason, C. Mike |
| Mays, Steven |
| Mazzella, Mark |
| McAughan, Kelly |
| McDonald, Leith |
| McMullen, Norm |
| Merril, Robert |

| |
|---|
| Mix, Kurt |
| Moreno, Carlos |
| Nyholt, Jon |
| Openshaw, Graham |
| Park, Virginia |
| Patteson, Mark |
| Pattillo, Phillip |
| Peijs, Jasper |
| Pelz, Oliver |
| Ploen, Mark |
| Progler, Mark |
| Rainey, Dave |
| Ritchie, Bryan |
| Rogers, Jon |
| Rooney, Terry |
| Rygg, Ole |
| Saidi, Farah |
| Saperstein, Mark |
| Skelton, Cindy |
| Skripnikova, Galina |
| Smith, Trevor |
| Sustala, Dennis |
| Suttles, Doug |
| Thierens, Harry |
| Thomas, Larry |
| Thorseth, Jay |
| Tooms, Paul |
| Turnbull, Jon |
| Utsler, Mike |
| Wang, Yung |
| Wiltz, Gregory |
| Winfree, Bekki |
| Wood, Douglas |
| Woods, A.W. |
| Wulf, Gary |
| Yeilding, Cindy |
| York, Susan |

# Attachment 4

| | |
|---|---|
| **From:** | Nomellini, Mark J. |
| **Sent:** | Thursday, September 01, 2011 5:44 PM |
| **To:** | 'dsc2179@liskow.com'; *Mike.Underhill@usdoj.gov; *lstrange@ago.state.al.us; *airpino@irpinolaw.com; *Sarah.Himmelhoch@usdoj.gov; *dkhaycraft@liskow.com; Langan, Andrew; Kavanaugh, Brian P.; Osgood, Mike; 'Solomont, Charles L.'; 'Hedgpeth, Tiffany'; 'Saunders, Daniel A.'; 'Anderson, Jason H.'; 'Fitch, Warren Anthony'; *connie.delgado@bingham.com; *sherman@hhkc.com; *CMaze@ago.state.al.us |
| **Subject:** | In re Oil Spill from the Oil Rig Deepwater Horizon, MDL 2179 |

All:

Attached is a search criteria chart incorporating the proposed Phase II and Phase III search terms BP has recently received from Anadarko, the PSC, and the United States, per Magistrate Judge Shushan's order.  These search criteria will be used to generate BP's future Phase II and Phase III custodial and non-custodial productions, subject to BP's review for privilege and relevance.  We will make production of Phase II documents the priority.  Per Magistrate Judge Shushan's guidance at last Friday's hearing, we have tried to consolidate search criteria where there is overlap between the Anadarko, PSC, and United States proposals.  Also, to expedite matters, we are circulating these search criteria before serving our written objections; when BP does serve its formal responses, we reserve the right to object in whole or in part to the requests for production listed in the chart, including to the extent they relate to Phase I rather than Phase II or Phase III.  Finally, we reserve the right to revise any of these to the extent they return too many "hits."



2011-08-31_BP
Search Criteria ...

I will reach out to representatives of Anadarko, the PSC, and the United States to try to schedule a call regarding this.  If others would like to be involved, please send me an e-mail to let me know.

Also, below is latest version of the (previously circulated) original search criteria chart negotiated with the PSC in late 2010 and early 2011, incorporating changes proposed by Anadarko in July/August 2011.  We will be producing additional Phase I documents responsive to these search criteria (as recently modified by Anadarko) in the coming months, including a production late this week, or early next week.  The Phase II/Phase III search criteria in the chart below are re-produced in the chart above, so you can reference the chart above (2011-8-31-BP Search Criteria Post Phase I) for one-stop-shopping on Phase II/Phase III search criteria.

Regards,

Mark



2011-08-25_BP
Search Criteria ...

# Attachment 5

| From: | Himmelhoch, Sarah (ENRD) [Sarah.Himmelhoch@usdoj.gov] |
|---|---|
| Sent: | Thursday, October 13, 2011 7:23 PM |
| To: | Albright, Alexandra M. |
| Cc: | Gasaway, Robert R.; Nomellini, Mark J.; Eisert, Joseph A.; Pixton, Allan; Petrino, Michael A. |
| Subject: | RE: Draft Proposed Order and Search Terms |

The search of Secretary Chu's emails and the other "reasonable searches" have been identified by the United States in their responses since June 20, 2011.  We do not think that resolution of any disagreement BP may have with those searches should be used to delay resolution of the deadlines. If BP needs a reservation of whatever rights it has in the order, so be it, but those issues are not ripe for resolution.

With respect to the change to the search terms for RFP 57, please see my letter to Mr. Gasaway of September 21, 2011, in which I explain why we made the change and requested BP's response.  I heard no objection and therefore concluded there was none.

What specific concerns do you have regarding the adequacy of the searches of DOE records and please refer me to any correspondence relating to those concerns.

I will review the attachment you sent.

Sarah D. Himmelhoch
Senior Litigation Counsel for E-Discovery
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
202-514-0180 (phone)

---

From: Albright, Alexandra M. [mailto:aalbright@kirkland.com]
Sent: Thursday, October 13, 2011 7:19 PM
To: Himmelhoch, Sarah (ENRD)
Cc: Gasaway, Robert R.; Nomellini, Mark J.; Eisert, Joseph A.; Pixton, Allan; Petrino, Michael A.
Subject: RE: Draft Proposed Order and Search Terms

Sarah,

Thank you for your response.  We are continuing our review of the search terms included in Attachment 1 to the draft order.  Regarding the reasonable searches, I have attached a redline containing  our comments to the table presented on the first page of Attachment 1.  BP and the U.S. should be in agreement on what constitutes a "reasonable search" in each instance the U.S. undertakes such a search.  For example, as we've discussed before,  BP does not agree that the U.S.' production of only those documents from Secretary Chu that the U.S. previously collected in response to a request from the Presidential Commission constitutes a reasonable search responsive to BP's RFP 77.

Also, aside from the APC additions I mentioned to you yesterday, we noted another difference between the search terms in Attachment 1 and those contained within the U.S. Status Report.  In the searches to be conducted by the U.S. Coast Guard,  the words "OR 'BP'" have been deleted from the phrase "('Bly' OR 'BP')" in  Attachment 1.  Please research the reasoning for this deletion.

With respect to the DOE searches, we have raised concerns about certain non-search term related collections in our past meet and confers.  We plan to continue addressing these concerns in the same forum going forward.

Best regards,

Alexandra M. Albright
KIRKLAND & ELLIS LLP | 300 NORTH LASALLE STREET | CHICAGO, IL 60654
DIAL: (312)862-2489 | FAX: (312)862-2200 | EMAIL:  alexandra.albright@kirkland.com

---

**From:** Himmelhoch, Sarah (ENRD) [mailto:Sarah.Himmelhoch@usdoj.gov]
**Sent:** Wednesday, October 12, 2011 2:55 PM
**To:** Albright, Alexandra M.
**Cc:** Gasaway, Robert R.; Nomellini, Mark J.; Eisert, Joseph A.; Pixton, Allan; Petrino, Michael A.
**Subject:** RE: Draft Proposed Order and Search Terms

I'll research the APC 15 and 19 issue , it's not ringing a bell.

DOE has not been omitted.  DOE is doing a collection from agreed upon custodians of all Deepwater Horizon related information, rather than simply using search terms.

Sarah D. Himmelhoch
Senior Litigation Counsel for E-Discovery
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
202-514-0180 (phone)

---

**From:** Albright, Alexandra M. [mailto:aalbright@kirkland.com]
**Sent:** Wednesday, October 12, 2011 3:02 PM
**To:** Himmelhoch, Sarah (ENRD)
**Cc:** Gasaway, Robert R.; Nomellini, Mark J.; Eisert, Joseph A.; Pixton, Allan; Petrino, Michael A.
**Subject:** Draft Proposed Order and Search Terms

Sarah,

We have been reviewing the history of our discovery request negotiations in conjunction with our review of Attachment I of the draft order.  In Attachment I, you added APC 15 and 19 to the searches applied to the DOI agencies.  Both APC 15 and 19 appear to be absent from the U.S. Status Report, dated Sept. 6, 2011.  Can you provide the U.S.'s reason for including these searches in the current draft order?

Also, in the review process, we uncovered the inadvertent removal of the DOE from the list of agencies being searched.  This inadvertent omission appears to have commenced with the U.S.' Third Response to BP's Discovery Requests, dated June 20, 2011, or around that time and continued forward.  The searches should comprise the DOE based on our prior negotiations as well as our agreement to include DOE custodians.  Please add the DOE as one of the agencies to be searched under the following RFPs:  47 - 48, 52, 54 - 57, 62, 67 - 76, 78 - 86, and 127 - 137.  If necessary, we can be available to discuss.

Best regards,

Alexandra M. Albright
KIRKLAND & ELLIS LLP | 300 NORTH LASALLE STREET | CHICAGO, IL 60654
DIAL: (312)862-2489 | FAX: (312)862-2200 | EMAIL:  alexandra.albright@kirkland.com

---

```
*************************************************************
The information contained in this communication is
```

confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
***********************************************************

***********************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
***********************************************************

# Attachment 6



**U.S. Department of Justice**

Environment and Natural Resource Division

*P.O. Box 7611*
*Washington, DC 20044*
*202-514-5261*
*Thomas.Benson@usdoj.gov*

April 4, 2013

**BY ELECTRONIC MAIL**

Michael A. Petrino
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
michael.petrino@kirkland.com

      Re:     MDL 2179: Meet and Confer on BP's Protocol for Selecting Documents
                   Response to the United States' Crime-Fraud Motion to Compel

Dear Michael:

      This letter will respond to your April 3 email.  The United States had requested an opportunity to discuss BP's methodology for selecting documents that BP deemed to be "related to" the communications at issue in the United States' motion to compel.  This issue is particularly ripe at the moment, given that the Court has asked for briefing related to whether BP's privilege logs and *in camera* review documentation are too narrow.  *See* Doc. # 9064.

      In your email, you ask that we submit our questions in writing, and that "after seeing the questions, [BP] will get back to you on the appropriateness and timing and format of our responses, if any."  In the interest of clarifying the issues between the Parties and facilitating the briefing requested by the Court, we set forth our questions below.  In doing so, we trust that BP will indeed provide an answer well in advance of our briefing deadline; we look forward to your response no later than April 11, 2013.  If you decline to provide the requested information in the time frame set forth above, please advise immediately, so that we can request the Court's assistance, should we deem it necessary.

*Questions*

1. For the protocol described in Attachment C to Mr. Gasaway's March 5, 2013 letter ("Protocol"), please describe how the "***First***" step was performed. Specifically, please advise whether the collection of documents stemming from the first step was *all* withheld documents falling within the listed date ranges, or some subset of documents.  If a subset

1

of documents, how was that subset determined?  If all documents from the date ranges were included, how many withheld documents fell within each date range?

2.   The *"Second"* and *"Fourth"* steps of the protocol each entail an attorney review of each document to determine whether it "relate[s]" to the subjects of the United States' motion. Please describe the instructions given to those attorneys to determine whether a given document is related or not.

3.   The privilege logs provided to the Court, and later to the United States and Transocean, have asterisks by some of the names in the Author, Recipient, CC, and BCC fields.  The asterisks appear to mark the names of counsel for BP, whether in-house counsel or outside counsel.  Please confirm that is the case.

Thank you for your attention to this important matter.  We believe that receiving answers to these questions will help ensure the briefing requested by the Court is based on a mutual understanding of the underlying facts.  We look forward to receiving your response.  Please contact me if you have any questions or would like to discuss these matters.

Sincerely,

/s/ *Thomas A. Benson*
Thomas A. Benson

cc:    BP Phase 2 Team
       TO Counsel

# Attachment 7

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C.  20005

Robert R. Gasaway
To Call Writer Directly:                        (202) 879-5000                              Facsimile:
(202) 879-5175                                                                          (202) 879-5200
robert.gasaway@kirkland.com               www.kirkland.com

April 10, 2013

**By Electronic Mail**

Thomas A. Benson
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044

Re:     MDL 2179 — United States' April 4, 2013 Letter

Dear Tom:

I write in response to your Thursday, April 4, 2013 letter, seeking additional information about BP's identification of the documents "related to preparation of specified communications by BP" that the United States' motion requested.  (Mot. at 4.)

As you know, BP disagrees that documents merely "related to" the specific communications at issue — but not involving the material in BP's allocution — are fairly encompassed by the correct standard for the crime-fraud exception to privilege.  (Opp. at 2-3, 9-16, 20-25.)  BP nevertheless sought in good faith to identify the documents the United States' motion requested.

Based on the information the United States was willing to, and did, provide to date about the scope and nature of its request, BP reviewed withheld documents to identify the documents actually requested by the motion to compel.  BP's forthcoming effort has aided the Court and parties in resolving the motion to compel by focusing attention on the actual documents for which the motion challenges privilege rather than consuming further briefing discussing hypothetical documents or the legal standard divorced from facts.

In a further effort to be forthcoming, BP described the documents it reviewed and provided an overview of this workflow in Attachment C to our March 5, 2013 letter.  Certainly, BP was not obligated to provide the United States or Transocean with the information in Attachment C.  But in an effort to conclusively resolve the issues raised, BP nonetheless disclosed the procedural mechanics of its review.

Chicago        Hong Kong        London        Los Angeles        Munich        New York        Palo Alto        San Francisco        Shanghai

# KIRKLAND & ELLIS LLP

Thomas A. Benson
April 10, 2013
Page 2

BP also went out of its way to prepare five individual listings of withheld documents "related to preparation of specified communications by BP" requested in the motion. Now that the Court has resolved concerns about the improper public use of these lists, the United States and Transocean can review these confidential, voluntarily prepared, document lists.

In a continuing spirit of accommodation and transparency, BP provides the answers below to the three joint United States-Transocean questions from the United States' April 4, 2013 letter.

As you know, the Court has directed the parties to file further briefing regarding the United States' "concern[s]" on pages 5 and 6 of its March 21, 2013 post-briefing submission, and, as agreed, BP will file its submission today.  That submission may also partly answer some of the questions your April 4, 2013 letter poses.

## QUESTION NO. 1:

For the protocol described in Attachment C to Mr. Gasaway's March 5, 2013 letter ("Protocol"), please describe how the "*First*" step was performed.  [1] Specifically, please advise whether the collection of documents stemming from this step was *all* withheld documents falling within the listed date ranges, or some subset of documents.  [2] If a subset of documents, how was that subset determined?  [3] If all documents from the date ranges were included, how many documents fell within each date range?

## RESPONSE TO QUESTION NO. 1:

1.      The short answer to your first sub-question appears to be, "yes, all withheld documents," based on our reasonable investigation to date.  But in a further effort to be forthcoming and clarify the process, we again will describe how we located the documents for review.

BP started with the documents that are responsive to agreed MDL search criteria that were withheld for privilege (whether logged or unlogged per PTO 14).  (Attachment C to R. Gasaway Ltr. to Court, at ¶ 1 (Mar. 5, 2013).)

From that universe, we identified documents whose "date" fell within any of the three date ranges described — (i) April 24 to May 4, 2010, (ii) May 14 to May 24, 2010, and (iii) June 20 to June 25, 2010.  (*Id.* at ¶ 2.)  As you know, in the electronic discovery context, "date" can be defined many different ways.  As explained in Attachment C to my March 5, 2013 letter, BP used an inclusive definition of "date" to encompass any of five different date values — DOCDATE, TIMESENT, DATECRTD, DATESVD, and any date manually assigned during the privilege logging process.  (*Id.* at ¶ 3.)  (DATESVD, which is the file modified date, was

# KIRKLAND & ELLIS LLP

Thomas A. Benson
April 10, 2013
Page 3

inadvertently omitted from our description in Attachment C.)  If any of these five date values fell within the three date ranges, the document was included in our review.

Because BP's review was inclusive, we did not stop there.  We also reviewed such documents (MDL responsive, withheld for privilege, logged or unlogged) that did not fall within the three date ranges, but which had a family member (withheld or produced) for which any of the four specified date values fell within any of the three date ranges. (*Id.*)

2.      In light of the answer to Question 1, Part 1, no response is necessary to this sub-question.

3.      The total number of withheld documents located and reviewed in the manner described in Attachment C, and reiterated above, was approximately 6,217.  These documents fall within the relevant three date ranges — without any double-counting — in the following manner:

- 1,705 documents in the April 24 to May 4, 2010 range,

- 3,091 documents in the May 14 to May 24, 2010 range, and

- 1,421 documents in the June 20 to June 25, 2010 range.

Assigning these approximately 6,217 withheld documents to one of the three time periods is sometimes not a straightforward undertaking.  As we explained in Attachment C and above, BP inclusively identified documents within the three date ranges at issue by using five different date values, and by considering the date values of family members.  Using this inclusive approach, certain documents "fell within" more than one date range — for example, an email might have a TIMESENT value within one date range, but an attachment with a DATECRTD value falling within another date range.

In an effort to provide an answer to your question, and to avoid double-counting documents, we had to determine to which date range a document with more than one potential date ranged "belonged."  To do so, we selected the following reasonable methodology for assigning to only one date range those documents with more than one possible date range.

For documents with more than one possible date range, if a document had an applicable date value within the June 20 to 25 date range, that document and any withheld family members were included in the 1,421 reported for that June 20 to 25 date range, and not counted in the other ranges.  Remaining then, were those documents with an applicable date value in the May 14 to 24 range and the April 24 to May 4 range.  These documents (and any withheld family members) were counted in the May 14 to 24 range and not counted in the April 24 to May 4 range.  Other possible reasonable methodologies could be used, but the reasonable approach described produced the numbers reported above.

## KIRKLAND & ELLIS LLP

Thomas A. Benson
April 10, 2013
Page 4

**QUESTION NO. 2:**

The "*Second*" and "*Fourth*" steps of the protocol each entail an attorney review of each document to determine whether it "relate[s]" to the subjects of the United States' motion. Please describe the instructions given to those attorneys to determine whether a given document is related or not.

**RESPONSE TO QUESTION NO. 2:**

As you know, the choice to define the relevant universe of documents, without more, as those "related to preparation of specified communications by BP" (Mot. 4) was made by the United States — not by BP.  (Mot. at 4; T. Benson email to BP Counsel (Jan. 30, 2013).)  The United States then declined BP's invitation to meet and confer with BP regarding the nature and scope of the materials the United States sought with its "related to" request.  (T. Benson email to M. Petrino (Jan. 30, 2013).)  Now, months after declining to discuss the specifics of its motion, the United States (and Transocean) appear to be asking BP what BP thought (in January and February 2013) the United States meant in composing the United States' own motion to compel.

In any event, BP determined in good faith whether documents "relate to" the pertinent subject matters in light of all the facts and circumstances applicable to each document.  Based on the reasonable steps it has taken, BP does not have reason to believe that relevant documents requested by the motion to compel have been omitted from the five logs provided to the United States and Transocean.

**QUESTION NO. 3:**

The privilege logs provided to the Court, and later to the United States and Transocean, have asterisks by some of the names in the Author, Recipient, CC, and BCC fields. The asterisks appear to mark the names of counsel for BP, whether in-house counsel or outside counsel. Please confirm that is the case.

**RESPONSE TO QUESTION NO. 3:**

Confirmed.  BP's established practice is to use an asterisk in a privilege log entry to denote an attorney — as you will see by reference to log entries corresponding to documents that pre-date April 20, 2010.

## KIRKLAND & ELLIS LLP

Thomas A. Benson
April 10, 2013
Page 5

*          *          *

BP trusts that its answers above address the United States' and Transocean's procedural questions regarding BP's efforts to be forthcoming in issues relating to this pending motion to compel.

Sincerely,

Robert R. Gasaway

cc (by electronic mail):

United States MDL Counsel
Transocean MDL Counsel