```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
------------------------------------------X
In Re:  OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF
MEXICO, ON APRIL 20, 2010,

Applies to:
12-311, Cameron Int'l Corp. v. Liberty
Ins. Underwriters, Inc., a/k/a Liberty
Int'l Underwriters


------------------------------------------X


          VIDEO DEPOSITION OF JESSICA ROGIN
               New York, New York
               Friday, May 31, 2013
```

Reported by:
Rebecca Schaumloffel, RPR, CLR
Job No:   61443

EXHIBIT A

Page 54

J. ROGIN

1  insurance.
2  Q. So the other insurance provision
3  would not be relevant to that question?
4  A. Well, this particular other
5  insurance provision is still relevant because
6  of how other insurance is defined.
7  Q. So it might be relevant to other
8  insurance that might otherwise exist but not
9  for the policy that we talked about?
10 A. It might be relevant to other
11 insurance or self-insurance or
12 indemnifications but not to the policy that
13 you described as not being issued.
14 Q. Okay. So where -- let me just
15 see if I have this clear. Where Liberty has
16 two policies in front of it, the Liberty
17 policy that was issued to Cameron and a
18 policy that covers -- that applies to the
19 same loss and the other insurer denies that
20 it ever issued the policy, that particular
21 other insurance policy would not qualify as
22 other insurance as defined in the other
23 insurance provision of the Liberty policy.
24 Do I have that right?

Page 55

J. ROGIN

1  A. I guess. I guess I am not really
2  clear on your factual scenario because you
3  are saying there is a policy here but then
4  you are saying that carrier denies ever
5  issuing the policy. So I am not -- you know,
6  is there a policy or isn't there a policy?
7  Q. Fair point. Let me see if I can
8  clarify it. I am going to change the
9  scenario a little bit just to make sure I
10 have your understanding of the way the other
11 insurance provision is meant to work clear.
12     If Cameron had the Liberty policy
13 and a policy issued by a different insurer
14 that applies to the same loss as the Liberty
15 policy, and that other insurer says it does
16 not owe insurance to Cameron because under
17 the law of the relevant jurisdiction, it
18 wasn't a valid policy to begin with, would
19 that other policy still qualify as other
20 insurance as defined by the Liberty policy?
21     MR. MARTIN: Object to the form.
22 A. Well, again, subject to the fact
23 that there may be other facts and terms in
24 the scenario that affect that analysis, it

Page 56

J. ROGIN

1  raises the question of whether that is other
2  insurance that applies to the loss.
3     MR. KORN: Let's take a break.
4  We have been going about an hour.
5     THE VIDEOGRAPHER: The time is
6  10:15; we are going off the record.
7     (Whereupon, a recess was held.)
8     THE VIDEOGRAPHER: The time is
9  10:32; we are back on the record.
10 CONTINUED EXAMINATION
11 BY MR. KORN:
12 Q. Welcome back, Miss Rogin. Did
13 you work with Mr. Engel to draft a written
14 best practice manual for the adjusting of
15 claims at Liberty International?
16 A. Yes.
17 Q. When did you do that?
18 A. Well, I worked on it probably
19 from the fall of 2011 over periods of time
20 through the winter of 2012.
21 Q. Did you start preparing drafts in
22 the fall of 2011 of best practices?
23 A. I guess so. You know, I am just
24 recalling that I worked on it in bits and

Page 57

J. ROGIN

1  pieces and put it aside and then would work
2  on it in bits and pieces.
3  Q. Was it your objective --
4     THE COURT REPORTER: Off the
5  record.
6     THE VIDEOGRAPHER: The time is
7  10:33; we are going off the record.
8     (Whereupon, a recess was held.)
9     THE VIDEOGRAPHER: The time is
10 10:34; we are back on the record.
11 Q. What was your objective in
12 preparing best practices for Liberty?
13 A. Putting together uniform
14 standards for claim handling for our
15 adjusters.
16 Q. Were there no uniform standards
17 for claim handling for your adjusters at
18 Liberty prior to the development of written
19 best practices?
20 A. When I arrived in August of 2011,
21 I was not aware of there being any written
22 guidelines.
23 Q. Regardless of whether any
24 guidelines were committed to writing, were

Page 58

J. ROGIN

1 there any uniform standards for claim
2 handling for your adjusters at Liberty prior
3 to the development of the written best
4 practices?
5     A.   Well, I am not aware of there
6 being any uniform standards if they weren't
7 in writing.
8     Q.   Did you give direction to the
9 claims adjusters as to how to adjust claims
10 after you arrived?
11     A.   On an individual basis,
12 generally, on claims -- claim-by-claim basis,
13 yes.
14     Q.   Did you prepare any documents for
15 the claims adjusters that reported to you
16 that discussed generally how to adjust
17 claims?
18     A.   No.
19     Q.   How long after you arrived at
20 Liberty did you start drafting the best
21 practices?
22     A.   I can't tell you exactly.  I
23 drafted the litigation management best
24 practices first and that was in September and

Page 59

J. ROGIN

1 October of 2011.
2     Q.   Did you go through any
3 orientation upon your hiring at Liberty?
4     A.   Yes.
5     Q.   Did you receive any training
6 materials in connection with that
7 orientation?
8     A.   Can you be more specific as to
9 training materials?
10     Q.   What materials did you receive
11 when you arrived at Liberty for purposes of
12 orienting you to how Liberty did business?
13     A.   I received materials related to
14 HR.  I received materials related to the
15 organization, related to the history of the
16 corporation.  I was required to take a series
17 of online various classes from Liberty
18 Mutual.
19     Q.   Anything else?
20     A.   No.
21     Q.   Did you receive copies of any
22 written protocols at Liberty?
23     A.   No.
24     Q.   Did the various training

Page 60

J. ROGIN

1 materials that you received -- withdrawn.
2         Did the various materials that
3 you received give you any guidance on how
4 Liberty adjusts claims?
5     A.   No.
6     Q.   Did the various -- did the
7 various materials that you received when you
8 arrived at Liberty give you any guidance as
9 to Liberty's procedures in the -- that were
10 used in the adjustment of claims?
11     A.   No.
12     Q.   Did you receive any ethical
13 guidelines from Liberty or Liberty Mutual
14 when you arrived at Liberty?
15     A.   One of the classes online is a
16 code of conduct class, and, I mean, there are
17 about 20 classes.  So some of them -- one may
18 have been ethics.  One of them may have been
19 code of conduct but I have a feeling they
20 were related.
21     Q.   In none of the 20 classes that
22 you attended was there any discussion of
23 claims adjusting?
24     A.   No.

Page 61

J. ROGIN

1     Q.   There was no such discussion,
2 correct?
3     A.   There were no classes about claim
4 adjusting.
5     Q.   Wasn't a topic that was covered
6 at all when you were trained?
7     A.   No.
8     Q.   When you prepared the best
9 practices for Liberty International, did you
10 work with any of your colleagues to put them
11 together?
12     A.   I essentially drafted them
13 myself.  I may have circulated them for
14 comments from my direct management reports,
15 and I worked with Jim on them after they were
16 in draft form.
17     Q.   Is one of your direct management
18 reports Mr. Roberts?
19     A.   Yes.
20     Q.   When, as best as you can recall,
21 were the best practices prepared in draft
22 form?
23     A.   Are we talking about -- which
24 best practices?  The litigation management

```
                                              Page 62
 1              J. ROGIN
 2   best practices?
 3       Q.   How many best practices are
 4   there?
 5       A.   There is litigation management
 6   and there is claim handling.
 7       Q.   Let's talk about the claim
 8   handling best practices. Is that a separate
 9   book?
10       A.   It is not a book. It is just a
11   document.
12       Q.   How long is the document?
13       A.   Somewhere more than five pages
14   and probably less than ten. I am not sure
15   exactly.
16       Q.   So we have -- at Liberty, there
17   is a single document for best practices for
18   claims handling that's somewhere between five
19   and ten pages, right?
20       A.   Yes.
21       Q.   And you prepared the draft of
22   this best practice claim handling document?
23       A.   Yes.
24       Q.   When did you prepare a first
25   draft?
```

```
                                              Page 63
 1              J. ROGIN
 2       A.   Sometime in the fall of 2011. I
 3   can't tell you exactly when.
 4       Q.   In that first draft, did you
 5   endeavor to memorialize the best practices of
 6   Liberty for claim handling as you saw them?
 7       A.   Yes, that was the purpose of the
 8   document.
 9       Q.   Why did you circulate it to your
10   direct reports?
11       A.   For comment.
12       Q.   Did you circulate the first draft
13   of the best practices document for claims
14   handling, or was it a later draft that you
15   circulated?
16       A.   I don't recall exactly. If I was
17   going to guess, I would say it would have
18   been a later draft.
19       Q.   Did you circulate a draft of the
20   best practices for claims handling at Liberty
21   prior to the end of 2011?
22       A.   I can't recall specifically.
23       Q.   You may have, you may not, you
24   just don't recall?
25       A.   Exactly.
```

```
                                              Page 64
 1              J. ROGIN
 2       Q.   Did Mr. Roberts provide you any
 3   feedback on the best practices for claims
 4   handling?
 5       A.   I can't recall specifically.
 6       Q.   Do you recall any feedback that
 7   you received on the best practices for claim
 8   handling?
 9       A.   No.
10       Q.   Did Mr. Engel provide you any
11   feedback on the best practices for claim
12   handling?
13       A.   Yes.
14       Q.   What was his feedback?
15       A.   He made edits throughout the
16   document and so, you know, I can't tell you
17   what his feedback was. Throughout the entire
18   document he made some comments and edits and
19   additions.
20       Q.   Do you recall when you provided a
21   draft to Mr. Engel for comment?
22       A.   I can't recall exactly whether it
23   was at the end of 2011 or whether it was in
24   the beginning of 2012.
25       Q.   Were the claims adjusters at
```

```
                                              Page 65
 1              J. ROGIN
 2   Liberty International already adjusting
 3   claims consistent with the best practices as
 4   you memorialized them in your best practice
 5   manual for claims adjusting?
 6       A.   I would say some were and some
 7   maybe were not consistently.
 8       Q.   What about Mr. Roberts, was he
 9   already adjusting claims consistent with the
10   best practices as you memorialized them in
11   the best practices manual?
12       A.   Yeah, I would say yes, he
13   generally did so.
14       Q.   So if I wanted to understand how
15   Mr. Roberts adjusted claims in 2011, would it
16   be helpful for me to review the best
17   practices manual that you prepared?
18       A.   You know, I couldn't -- I
19   couldn't say whether it would be helpful or
20   not helpful to you. I mean, he wasn't being
21   held against any -- those standards.
22       Q.   Regardless of whether he was
23   being held against the standards that were
24   later issued, if I wanted to get an
25   understanding of what procedures he followed
```

Page 66

J. ROGIN

1  
2  to adjust claims, would it be useful for me
3  to look at the best practices that you
4  drafted sometime in the 2011 time period?
5       A.   Well, I wouldn't say so because
6  he wasn't following those procedures.  He was
7  adjusting claims based on his many years of
8  experience as an adjuster.
9       Q.   If I wanted to understand whether
10  Mr. Roberts was adjusting claims consistent
11  with what you consider to be the best
12  practices for adjusting claims, would it be
13  useful for me to review the best practices
14  manual that he drafted?
15       A.   It might provide guidance.
16       Q.   What topics did you cover in the
17  best practices manual?
18       A.   We covered investigation of
19  claims, analysis of coverage, analysis of
20  liability, analysis of damages, reserving,
21  file documentation, resolution strategy,
22  litigation management, vendor management,
23  subrogation, recovery.  There was a section
24  related to handling claims with an SIR, and
25  there was a section about best practices for

Page 67

J. ROGIN

1  
2  managers managing people.
3       Q.   If we wanted to know what LIU
4  believes is the best practices for claims
5  handling, would the best practices document
6  that you prepared be relevant?
7       A.   For the period of time since they
8  were issued, yes.
9       Q.   Would they be relevant for the
10  period of time prior to their issuance?
11       A.   I can't say because they weren't
12  -- they -- there were no best practices prior
13  to that time.
14       Q.   Were there any policies and
15  procedures for handling claims prior to the
16  time that the best practices guidelines were
17  issued?
18       A.   I already said I wasn't aware of
19  any.
20       Q.   Is it fair to say that Liberty
21  did not have best practices prior to the time
22  that you issued written guidelines?
23       A.   We didn't have any written best
24  practices prior to that time.
25       Q.   Did it have anything that it

Page 68

J. ROGIN

1  
2  considered to be best practices prior to the
3  time the written guidelines were issued?
4       A.   Well, I think it considered the
5  best practices that it had experienced out of
6  claim adjusters that were adjusting the
7  claim.
8       Q.   How would I know what best
9  practices were that they followed prior to
10  the time that the written policies were
11  issued?
12       A.   There wasn't anywhere for you to
13  find that in writing.
14       Q.   Did different claim adjusters
15  have different best practices as they
16  understood them?
17       A.   Yes, because they -- various
18  adjusters came from different companies where
19  they, in my understanding, were basically
20  following what they had learned in terms of
21  handling claims at other companies.
22       Q.   Did Liberty Mutual, the parent,
23  provide any written guidance to Liberty
24  International about how to adjust claims?
25       A.   Not that I am aware of.

Page 69

J. ROGIN

1  
2       Q.   What's the difference between the
3  claim handling best practices and litigation
4  management best practices?
5       A.   The litigation management of best
6  practices are best practices with regard to
7  managing litigation expenses, managing
8  working with outside counsel and managing
9  litigation strategy and litigation expenses
10  and the claim handling best practices are
11  what they say.  And what I just detailed, the
12  claim handling.
13       Q.   Did you describe best practices
14  for addressing other insurance situations in
15  the best practices guidelines that you
16  committed to writing?
17       A.   No.
18       Q.   Was there any internal written
19  guidance on how to interpret the other
20  insurance provision that was in the Cameron
21  policy that we talked about earlier today?
22       A.   No.
23       Q.   Are you aware of any other
24  instances in which Liberty had occasion to
25  interpret the other insurance language that

Page 70

J. ROGIN

1  was used in the Cameron policy?
2  A. I am not aware of any since I
3  have been working there.
4  Q. You are aware that that is
5  standard form language in Liberty's excess
6  insurance policies, correct?
7  A. Yes.
8  Q. And are you aware -- you're not
9  aware of any instance in which that standard
10 language has had -- been tested or assessed
11 by any claims adjuster?
12 A. I am not aware of any since I
13 have been working there.
14 Q. Was it your intent when you
15 prepared the best practices for claims
16 handling to change the way that LIU was doing
17 business?
18 A. No. I think it was our intent to
19 make the way everyone was doing business more
20 uniform and consistent.
21 Q. Some people were already
22 following best practices as reflected in the
23 document and others were not, fair?
24 A. Yes.

Page 71

J. ROGIN

1  Q. Mr. Roberts was one of the people
2  you put into the category of already
3  following the best practices as you reflected
4  them in writing, right?
5  A. Yes.
6  Q. Could you take out of the Engel
7  stack of exhibits, what I previously marked
8  as Engel Exhibit 12. Do you have this in
9  front of you?
10 A. Yes.
11 Q. This is an E-mail that Brad
12 Eastman from Cameron sent to a number of
13 people, one of whom is Jeff Roberts on
14 October 24, 2011. Do you see that?
15 A. Yes.
16 Q. And attached to this E-mail are a
17 number of documents. Do you see those
18 attachments?
19 A. Yes.
20 Q. And among the attachments are
21 marked and clean redrafts of the proposed
22 settlement agreements received from BP.
23 Do you see that?
24 A. Yes.

Page 72

J. ROGIN

1  Q. In the October 24th -- withdrawn.
2  In the late October time period,
3  were you working with Mr. Roberts on the
4  Cameron claim?
5  A. Yes.
6  Q. Were you already reviewing drafts
7  of the BP settlement agreements that Cameron
8  and BP were discussing?
9  A. I wasn't personally reviewing it.
10 Q. Do you know -- do you recall
11 whether Mr. Roberts forwarded you this
12 E-mail?
13 A. I don't recall.
14 Q. If you can flip back in the
15 document to the draft Settlement Agreement
16 that was attached to this E-mail; it begins
17 with the Bates number CLY02411.
18 A. Okay.
19 Q. You see that the title of this
20 attachment is "Confidential Settlement
21 Agreement Mutual Releases and Agreement to
22 Indemnify"?
23 A. Yes.
24 Q. Is this a draft of the BP Cameron

Page 73

J. ROGIN

1  Settlement Agreement?
2  A. It appears to be.
3  Q. How can you tell that from the
4  face of the document?
5  A. Because it says draft at the top
6  of it.
7  Q. It is a pretty big clue, right?
8  A. Yes.
9  Q. It also says "subject to further
10 revision by BP"?
11 A. Yes.
12 Q. It says "non-binding and subject
13 to board approval"?
14 A. Yes.
15 Q. It says "subject to Federal Rule
16 of Evidence 408"?
17 A. Yes.
18 Q. Those are all indications that
19 this is a draft form, correct?
20 A. Yes.
21 Q. In fact, if you look at the text
22 of the first paragraph, the date is blank,
23 there is an empty space, right?
24 A. Yes.