1

2  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF LOUISIANA
3  ------------------------------------X
   In Re: OIL SPILL BY THE OIL RIG
4  "DEEPWATER HORIZON" IN THE GULF OF
   MEXICO, ON APRIL 20, 2010,
5
6  Applies to:
7  12-311, Cameron Int'l Corp. v. Liberty
   Ins. Underwriters, Inc., a/k/a Liberty
8  Int'l Underwriters
9
   ------------------------------------X
10
11
12          VIDEO DEPOSITION OF JEFFREY ROBERTS
13                 New York, New York
14                Thursday, May 30, 2013
15
16
17
18
19
20
21  Reported by:
22  Rebecca Schaumloffel, RPR, CLR
23  Job 61442
24
25

EXHIBIT B

Page 22

```
1           J. ROBERTS
2      A.   I don't know what the exposure
3  value was.  Cameron settled it for
4  $250 million.  So a person could say that was
5  the exposure value.  It was unknown at the
6  time.
7      Q.   In fact, it's the case that
8  Cameron faced potentially billions of dollars
9  of liability, right?
10     A.   I don't know that.
11     Q.   You don't know one way or the
12 other?
13     A.   At this point, we know that
14 Cameron was -- had no liability in the case
15 based on the recent rulings.
16     Q.   You would agree the trial would
17 have a different complex if Cameron had been
18 a defendant, right?
19     A.   Cameron was a defendant in the
20 trial.
21     Q.   Was BP -- did BP have any
22 interest in the course of the trial to show
23 that Cameron had responsibility for the
24 Deepwater Horizon incident during the trial
25 in light of its settlement with Cameron?
```

Page 23

```
1           J. ROBERTS
2      A.   I don't know that.
3      Q.   In fact, you don't know one way
4  or the other, right?
5      A.   Know one way or the other what?
6  What BP was thinking?
7      Q.   Correct?
8      A.   No, I don't know what BP was
9  thinking.
10     Q.   You don't know how the trial,
11 what evidence would have been presented at
12 trial had Cameron not settled with BP?
13     A.   No, that's purely speculative.
14     Q.   Let's go back to the best
15 practices we mentioned before.  Do you know
16 when they were written, the written
17 guidelines?
18     A.   Spring of last year.
19     Q.   So that would be spring of 2012?
20     A.   Correct.
21     Q.   Are you familiar with the content
22 of the guidelines that were issued?
23     A.   Yes.
24     Q.   What do you understand LIU's best
25 practices to be?
```

Page 24

```
1           J. ROBERTS
2         MS. BARRASSO:  Object to the
3      form.
4      A.   Can you clarify that?
5      Q.   Sure.  There were written
6  guidelines that were issued in the spring of
7  2012, is that your testimony?
8      A.   Yes.  Best practices were put
9  forth.
10     Q.   Were they different from how you
11 were doing business prior to the spring of
12 2012?
13     A.   They had some new changes to
14 them.  Different time frames, reporting
15 requirements, things like that.  But they
16 generally fit with industry standard best
17 practices.
18     Q.   When you adjusted Cameron's
19 claim, did you try to do so consistent with
20 the industry standard of best practices?
21     A.   Yes.
22     Q.   Is it your testimony that when
23 you adjusted Cameron's claim, that you did so
24 consistently with the best practices that
25 Liberty issued in the spring of 2012?
```

Page 25

```
1           J. ROBERTS
2         MS. BARRASSO:  Object to the
3      form.
4      A.   Well, you can't -- the best
5  practices issued in 2012, the claim happened
6  in 2010.  So I can't have adhered to
7  guidelines that weren't in place.  They were
8  similar.  They are similar -- similarities,
9  but there may be days I would have to look at
10 them and go through the file to see if the
11 timing frame may have not been achieved or
12 something.
13     Q.   Would it be helpful to have a
14 copy of the guidelines to go through them and
15 see to what extent you deviated or didn't
16 deviate from them when you adjusted Cameron's
17 claim?
18     A.   I don't know if I can do that
19 today.
20     Q.   But would it be helpful if you
21 had the guidelines in front of you to look at
22 them and see whether you acted consistently
23 with them?
24     A.   Sure.
25     Q.   In fact, that's the only way you
```

Page 26

```
 1            J. ROBERTS
 2   would know if you had them in front of you to
 3   look at them and see, you know, this is a
 4   guideline that I complied with and this is a
 5   guideline that I didn't, correct?
 6       A.   Correct.
 7       Q.   Do you plan to testify at trial
 8   that you acted consistently with Liberty's
 9   best practices?
10       A.   Yes.
11       Q.   Do you plan to testify at trial
12   that when you adjusted Cameron's claim, that
13   you acted consistently with Liberty's best
14   practices?
15            MS. BARRASSO: Objection.
16       That's the same question.
17       A.   That's the same question that I
18   answered previously. I can't -- at some
19   points in time, I did not -- there were not
20   best practices in place to adjust Cameron's
21   claim under it. So they were -- the claim
22   was adjusted and handled under what you would
23   call industry guidelines or industry best
24   practices.
25       Q.   And how did you know what the
```

Page 27

```
 1            J. ROBERTS
 2   industry guidelines or industry best
 3   practices were when you adjusted Cameron's
 4   claim?
 5       A.   I had learned them when I was
 6   at AIG.
 7       Q.   So when you adjusted Cameron's
 8   claim, you were relying on the industry best
 9   practices and industry guidelines that you
10   learned ten years prior when you worked
11   at AIG?
12       A.   Correct. And through continuing
13   education classes and other things that we go
14   through to maintain licenses, et cetera.
15       Q.   Does Liberty International
16   provide continuing education classes to you?
17       A.   Seminars, I would say. You can
18   call them a class. Seminars.
19       Q.   Are these handled internally at
20   Liberty or is it outsourced where you go
21   somewhere else to attend the seminar?
22       A.   Sometimes they are in-house, in
23   our own facility. Other times we go outside
24   to a separate facility. Usually all
25   arranged. They're not done by internal
```

Page 28

```
 1            J. ROBERTS
 2   people. Law firms that we work with come in
 3   and bring classes to us, conferences that you
 4   attend or that are set up by the company
 5   for us.
 6       Q.   Have you ever led a seminar on
 7   industry best practices that are to be
 8   followed at -- in the claims adjusting
 9   process?
10       A.   No.
11       Q.   You are merely an attendee?
12       A.   Correct.
13       Q.   Did Liberty personnel, in the
14   casualty unit for claims adjusting, provide
15   any seminars of this sort?
16       A.   When you say did they provide the
17   seminar, are you saying did they --
18       Q.   I will rephrase the question.
19   That's a fair clarification. Did Mr. Glenn
20   ever deliver any seminars to you or your
21   colleagues on industry best practices?
22       A.   No.
23       Q.   Did anyone from Liberty Mutual
24   ever do that?
25       A.   No, sir.
```

Page 29

```
 1            J. ROBERTS
 2       Q.   To the best of your recollection,
 3   who provided seminars internally at Liberty
 4   that were Liberty employees on industry best
 5   practices?
 6       A.   Liberty employees did not provide
 7   seminars. Seminars were set up with outside
 8   law firms for best -- for best practices,
 9   claims handling procedures under various
10   state laws in furtherances of license
11   requirement, continuing education
12   requirements, et cetera.
13       Q.   Was one of the outside lawyers
14   who delivered this type of seminar
15   Paul Koepff?
16       A.   No.
17       Q.   You never attended a continuing
18   education seminar that was, where Mr. Koepff
19   was the presenter?
20       A.   No, sir.
21       Q.   Did Mr. Martin, counsel at
22   Liberty, ever deliver any of the seminars?
23       A.   No, sir.
24       Q.   How about Miss Barrasso?
25       A.   No.
```

Page 30

J. ROBERTS

Q. If I were to ask you to provide to me copies of documents that were sufficient to show what Liberty's policies and procedures were in the 2010 and 2011 timeframe, would you have any documents that could do that?

MS. BARRASSO: Object to the form.

A. There were no policies -- I can give you my authority letter. It would be the extent of it. We had protocols for reporting guidelines. That's the extent of any documentation or claims manual, as you would.

Q. Could you describe what the protocols for reporting guidelines said?

A. I guess any claim where there is an action filed against Liberty International should be reported in a precautionary large loss report, reserve in excess, combined reserve, so expense or indemnity combined in excess of $400,000 required a large -- precautionary large loss report. In excess of a million, it became a large loss report.

Page 31

J. ROBERTS

Those reports were to be updated upon material developments in the file or every two years, whichever was sooner.

Q. Were these written protocols for reporting guidelines?

A. Not in the beginning.

Q. So not in the beginning meaning when you joined Liberty ten years ago, right?

A. Correct.

Q. At some point were the protocols for reporting guidelines committed to writing?

A. Yes, there is a document that committed the form of the large -- the large loss report and those reporting requirements or elements.

Q. Do you recall when that written protocol was issued?

A. Not really. It was October -- somewhere around October, I don't know, 2000 -- I'm just taking a stab at it. Probably 2006, 2007. It was at some point in time when Rhesa Reven was the chief claims officer.

Page 32

J. ROBERTS

Q. Those protocols basically told you how to complete a preliminary large loss report?

A. Right. Reporting guidelines. You know, what the form should look like. You know, there was a templated form as opposed to some people would draft a letter. Some people would draft a memo. This sat a templated format for the report.

Q. Did you follow those guidelines in connection with the adjustment of the Cameron claim?

A. Yes.

Q. Was there ever any guideline, prior to the best practices that were issued in 2012, that instructed claims adjusters when and how to issue a reservation of rights letter?

A. No, sir.

Q. Did you hire new employees from time to time at Liberty International?

A. Yes.

Q. Did you have to train those employees or did they come in knowing how to

Page 33

J. ROBERTS

adjust claims at Liberty?

A. Most employees we hired had experience levels of five to seven years.

Q. And when they joined the company, you didn't have to tell them how to do their jobs at all?

A. No, we set out the reporting guidelines for them, you know, requirements, things that I, as a manager, would want to know.

Q. Other than the written protocols or written guidelines, did you hand new employees any other materials about how to do business at Liberty?

A. No.

Q. There were no training materials for new employees?

A. Not that I gave. There is a -- through human resources, when a new employee starts, there is online courses that orient people to Liberty International and its policies, procedures.

Q. Do those online courses orienting folks to LIU's policies and procedures say

Page 34

```
 1              J. ROBERTS
 2   anything about adjusting of claims?
 3        A.   I don't actually know.  When I
 4   did it, it was -- when I did it, it was very
 5   rudimentary and it did not deal with that.
 6   It's become much more sophisticated over the
 7   years, but I do not believe it deals with an
 8   individual job function.  But I don't know
 9   for sure.
10        Q.   That's because you never had to
11   take this online course because you were
12   already an employee of Liberty by the time
13   they were implemented, right?
14        A.   Correct.
15        Q.   So it is possible that the online
16   courses that orient new employees to LIU's
17   policies and procedures could implicate
18   claims adjusting, right?
19             MS. BARRASSO:  Object to the
20        form.
21        A.   It could.  I don't know that it
22   does.  But because I haven't taken it.  I
23   don't know what the contents of it are.  I
24   believe it more orients people towards the
25   company's values, codes of conduct, things
```

Page 35

```
 1              J. ROBERTS
 2   like that.
 3        Q.   Are you saying the company's
 4   values and codes of conduct have nothing to
 5   do with claims adjusting?
 6        A.   I didn't say that.
 7        Q.   You would imagine -- withdrawn.
 8             Is it fair to say that when
 9   employees at Liberty adjust claims, they are
10   expected to do so consistent with the
11   company's values?
12        A.   Correct.
13        Q.   Is it fair to say that when
14   employees at Liberty adjust claims, they are
15   expected to do so consistent with the codes
16   of conduct, right?
17        A.   Yes, sir.
18        Q.   And do you know what the
19   company's values are as described in these
20   materials?
21        A.   Yes, sir.
22        Q.   What are they?
23        A.   We treat people with dignity and
24   respect, including all stakeholders.  We take
25   into account all stakeholders'
```

Page 36

```
 1              J. ROBERTS
 2   considerations.  We treat confidential
 3   information confidentially.
 4        Q.   What do you mean by
 5   "stakeholders" in your prior answer?
 6        A.   Stakeholders?
 7        Q.   Yes.
 8        A.   Anyone who has an interest in an
 9   issue.  Cameron is a stakeholder.  It has an
10   insurance policy with Liberty International.
11        Q.   Was Liberty International also a
12   stakeholder in that sense?
13        A.   Yes, they are.
14        Q.   As a stakeholder, did you owe
15   duties to Cameron International?
16        A.   Yes, sir.
17        Q.   What were those duties?
18        A.   To adjust its claim fairly and
19   expeditiously.
20        Q.   Did you owe a duty to Cameron to
21   inform Cameron of any defenses to Cameron's
22   claim that might arise?
23        A.   If there were defenses to
24   Cameron's claim, we would notify them of it.
25        Q.   And the -- and your duty was to
```

Page 37

```
 1              J. ROBERTS
 2   do so on a timely basis?
 3        A.   Within -- yes, with material
 4   developments that indicated such.
 5        Q.   Did Liberty have a duty to inform
 6   Cameron when it believed that the policy did
 7   not attach?
 8        A.   Could you restate that?
 9        Q.   Sure.
10        A.   Or just say it again.
11        Q.   Sure.  You mentioned there were
12   certain duties that LIU owed to insureds like
13   Cameron, right?
14             You have to testify orally for
15   the Court Reporter to write that down.
16        A.   Yes, sorry.
17        Q.   The head nods don't get recorded.
18   Let me try that again.
19             You mentioned there were certain
20   duties that LIU owed to insureds like
21   Cameron, correct?
22        A.   Yes.
23        Q.   One of those duties was to adjust
24   claims fairly and expeditiously, correct?
25        A.   Correct.
```