UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

---------------------------------------X

In Re: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010,

Applies to:
12-311, Cameron Int'l Corp. v. Liberty Ins. Underwriters, Inc., a/k/a Liberty Int'l Underwriters

---------------------------------------X

VIDEO DEPOSITION OF JAMES ENGEL
New York, New York
May 29, 2013

Reported by:
Rebecca Schaumloffel, RPR, CLR
Job No. 61441

EXHIBIT C

PENGAD-Bayonne, N. J.

Page 38

J. ENGEL

A. That's correct. For firsthand knowledge I would have had to have been there.

Q. All you know is what Mr. Roberts told you, fair?

A. That's correct.

Q. All right. I would like to speak a little bit generally about how Liberty goes about adjusting claims. I take it you are familiar with that process?

A. I hope so.

Q. Do you have any role in designing the process by which Liberty adjusts claims or was that set before you arrived on the scene at Liberty International?

A. I have a very significant role in setting the rules, the procedures, the best practices about how we handle claims.

Q. In your answer, you refer to rules, procedures, and best practices about how we handle claims. Is the we in that answer LIU?

A. Yes.

Q. Could you describe for me, as

Page 39

J. ENGEL

completely as you can, the rules, the procedures and the best practices about how Liberty International handles claims?

A. It is a really, really broad question.

MR. MARTIN: I object to the form I was about to say. Could you narrow it down with reference to time for him as well?

MR. KORN: That's fair.

Q. I would like to focus on the period in 2010 and 2011. Is that fair?

A. That's fair. It's fair, though, it is still very broad.

Q. We will get into the details, I am sure, but in your answer, you referred to rules, procedures, and best practices, and I would like to just understand what you were referring to when you used those terms.

A. So first of all, you need to understand that when I arrived at LIU in September of 2010, the company did not have written rules, procedures, and best practices. And those were developed later on

Page 40

J. ENGEL

under my direction.

Q. And when were they developed?

A. The first best practice documents were distributed on or around September or October of 2011, and they dealt only with managing litigation. In other words, controlling our legal spend. The balance of our best practices were written and distributed to the organization in the April, May of 2012 timeframe. Some may have been a little later than that for certain lines of business because they were line of business specific.

Q. What is the line of business that Liberty policy falls within at LIU?

A. Casualty.

Q. Was there a set of written best practices distributed sometime in or after April, May of 2012 for casualty at LIU?

A. Yes.

Q. Do you know when that was?

A. It was in the April, May timeframe. I don't know exactly the date.

Q. So did LIU not have best

Page 41

J. ENGEL

practices prior to that time for casualty?

A. It didn't have written best practices. The company relied on the experience of the individuals in claim handler positions and management positions and some of those people were extremely experienced and well qualified.

Q. If you were to ask -- had asked in the 2011 time period what the Liberty International best practices were of any particular claims handler, would they give you a different answer?

A. Sorry?

Q. Would they give you different answers?

A. Sure. I think even today, with written best practices, people, when asked, would play it back differently. Though they would be more consistent today than they were prior to when they had written best practices.

Q. Prior to the time when there were written best practices, would you characterize the claims handlers at LIU in

Page 42

J. ENGEL

casualty as inconsistent with each other?

A. At times. Generally, people followed sets of practices that they brought with them from other companies because that's where they developed their experience and knowledge, and so a person from AIG and a person from Excel and a person from Zurich would approach their claims handling in a similar fashion. But would describe their own claim handling practices more akin to the way they learned them at those companies.

Q. When a new employee arrived at LIU, were they handed any materials about claims handling?

A. No, because we didn't have any prior to the development of those best practices. That's part of the reason why I was hired, so that we would have a more consistent approach.

Q. When did you begin drafting the best practices for LIU?

A. Begin drafting them? The litigation management best practices were drafted in the summer and fall of 2011. The

Page 43

J. ENGEL

other claim handling best practices were drafted, I would say, in the January to March period of 2012. Some of them for some of our professional liability lines got drafted a bit later than that.

Q. Okay. So we talked earlier about how Jeff Roberts was the person at Liberty primarily responsible for handling Cameron's claim in connection with the Deepwater Horizon.

A. Yes.

Q. How did he know how to adjust claims?

A. Well, Jeff Roberts is a highly experienced casualty, excess casualty claim adjustor with more than 20 years of experience. So Jeff knows very well how to go about handling excess claims. I would say that, in fact, much of our best practices would be reflective of the way Jeff handles claims.

Q. Did Mr. Roberts collaborate with you in the development of the best practices guides?

Page 44

J. ENGEL

A. For the casualty line of business, it was myself and Jessica Rogin who drafted and built those best practices.

Q. Do you recall when Miss Rogin joined LIU?

A. I believe it was in August of 2011.

Q. And did she come knowing how to handle claims without any instruction from anybody at Liberty?

A. Yes. Jessica was highly experienced in handling and managing claim units and, in particular, casualty claim units, which is one of the reasons that attracted her to me as a candidate for the position.

Q. So it's your testimony that, prior to April or May of 2012, Liberty had no written policies or procedures for the adjusting of claims in casualty?

A. That's correct.

Q. And folks at Liberty knew how to adjust claims based solely on their experience developed over time?

Page 45

J. ENGEL

A. Yes, based solely on their experience and direction that they would receive from their supervisors after they arrived at LIU.

Q. And different folks at Liberty had different practices and procedures from other folks at Liberty because they had different experiences and there was no written guidelines?

A. There were no written guidelines; though I would say experienced people, even though they came from different companies, had similar approaches to how to handle claims.

Q. What is the first thing that a claims adjustor at Liberty is supposed to do upon -- well, withdrawn. Let me ask a different question.

When you developed the best practices for written purposes, for casualty, did you intend to reflect in those best practices the way that claims were handled prior to them being put into writing?

MR. MARTIN: Object to form.