Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF LOUISIANA
 3   ------------------------------------------X
     In Re:  OIL SPILL BY THE OIL RIG
 4   "DEEPWATER HORIZON" IN THE GULF OF
     MEXICO, ON APRIL 20, 2010,
 5
 6   Applies to:
 7   12-311, Cameron Int'l Corp. v. Liberty
     Ins. Underwriters, Inc., a/k/a Liberty
 8   Int'l Underwriters
 9
     ------------------------------------------X
10
11
12        VIDEO DEPOSITION OF JESSICA ROGIN
13              New York, New York
14             Friday, May 31, 2013
15
16
17
18
19
20
21   Reported by:
22   Rebecca Schaumloffel, RPR, CLR
23   Job No:   61443
24
25
```

EXHIBIT A

Page 54

J. ROGIN

insurance.
Q. So the other insurance provision would not be relevant to that question?
A. Well, this particular other insurance provision is still relevant because of how other insurance is defined.
Q. So it might be relevant to other insurance that might otherwise exist but not for the policy that we talked about?
A. It might be relevant to other insurance or self-insurance or indemnifications but not to the policy that you described as not being issued.
Q. Okay. So where -- let me just see if I have this clear. Where Liberty has two policies in front of it, the Liberty policy that was issued to Cameron and a policy that covers -- that applies to the same loss and the other insurer denies that it ever issued the policy, that particular other insurance policy would not qualify as other insurance as defined in the other insurance provision of the Liberty policy. Do I have that right?

Page 55

J. ROGIN

A. I guess. I guess I am not really clear on your factual scenario because you are saying there is a policy here but then you are saying that carrier denies ever issuing the policy. So I am not -- you know, is there a policy or isn't there a policy?
Q. Fair point. Let me see if I can clarify it. I am going to change the scenario a little bit just to make sure I have your understanding of the way the other insurance provision is meant to work clear.
    If Cameron had the Liberty policy and a policy issued by a different insurer that applies to the same loss as the Liberty policy, and that other insurer says it does not owe insurance to Cameron because under the law of the relevant jurisdiction, it wasn't a valid policy to begin with, would that other policy still qualify as other insurance as defined by the Liberty policy?
        MR. MARTIN: Object to the form.
A. Well, again, subject to the fact that there may be other facts and terms in the scenario that affect that analysis, it

Page 56

J. ROGIN

raises the question of whether that is other insurance that applies to the loss.
        MR. KORN: Let's take a break. We have been going about an hour.
        THE VIDEOGRAPHER: The time is 10:15; we are going off the record.
        (Whereupon, a recess was held.)
        THE VIDEOGRAPHER: The time is 10:32; we are back on the record.
CONTINUED EXAMINATION
BY MR. KORN:
Q. Welcome back, Miss Rogin. Did you work with Mr. Engel to draft a written best practice manual for the adjusting of claims at Liberty International?
A. Yes.
Q. When did you do that?
A. Well, I worked on it probably from the fall of 2011 over periods of time through the winter of 2012.
Q. Did you start preparing drafts in the fall of 2011 of best practices?
A. I guess so. You know, I am just recalling that I worked on it in bits and

Page 57

J. ROGIN

pieces and put it aside and then would work on it in bits and pieces.
Q. Was it your objective --
        THE COURT REPORTER: Off the record.
        THE VIDEOGRAPHER: The time is 10:33; we are going off the record.
        (Whereupon, a recess was held.)
        THE VIDEOGRAPHER: The time is 10:34; we are back on the record.
Q. What was your objective in preparing best practices for Liberty?
A. Putting together uniform standards for claim handling for our adjusters.
Q. Were there no uniform standards for claim handling for your adjusters at Liberty prior to the development of written best practices?
A. When I arrived in August of 2011, I was not aware of there being any written guidelines.
Q. Regardless of whether any guidelines were committed to writing, were

Page 58

J. ROGIN

there any uniform standards for claim handling for your adjusters at Liberty prior to the development of the written best practices?

A. Well, I am not aware of there being any uniform standards if they weren't in writing.

Q. Did you give direction to the claims adjusters as to how to adjust claims after you arrived?

A. On an individual basis, generally, on claims -- claim-by-claim basis, yes.

Q. Did you prepare any documents for the claims adjusters that reported to you that discussed generally how to adjust claims?

A. No.

Q. How long after you arrived at Liberty did you start drafting the best practices?

A. I can't tell you exactly. I drafted the litigation management best practices first and that was in September and

Page 59

J. ROGIN

October of 2011.

Q. Did you go through any orientation upon your hiring at Liberty?

A. Yes.

Q. Did you receive any training materials in connection with that orientation?

A. Can you be more specific as to training materials?

Q. What materials did you receive when you arrived at Liberty for purposes of orienting you to how Liberty did business?

A. I received materials related to HR. I received materials related to the organization, related to the history of the corporation. I was required to take a series of online various classes from Liberty Mutual.

Q. Anything else?

A. No.

Q. Did you receive copies of any written protocols at Liberty?

A. No.

Q. Did the various training

Page 60

J. ROGIN

materials that you received -- withdrawn.

Did the various materials that you received give you any guidance on how Liberty adjusts claims?

A. No.

Q. Did the various -- did the various materials that you received when you arrived at Liberty give you any guidance as to Liberty's procedures in the -- that were used in the adjustment of claims?

A. No.

Q. Did you receive any ethical guidelines from Liberty or Liberty Mutual when you arrived at Liberty?

A. One of the classes online is a code of conduct class, and, I mean, there are about 20 classes. So some of them -- one may have been ethics. One of them may have been code of conduct but I have a feeling they were related.

Q. In none of the 20 classes that you attended was there any discussion of claims adjusting?

A. No.

Page 61

J. ROGIN

Q. There was no such discussion, correct?

A. There were no classes about claim adjusting.

Q. Wasn't a topic that was covered at all when you were trained?

A. No.

Q. When you prepared the best practices for Liberty International, did you work with any of your colleagues to put them together?

A. I essentially drafted them myself. I may have circulated them for comments from my direct management reports, and I worked with Jim on them after they were in draft form.

Q. Is one of your direct management reports Mr. Roberts?

A. Yes.

Q. When, as best as you can recall, were the best practices prepared in draft form?

A. Are we talking about -- which best practices? The litigation management

Page 62

1  J. ROGIN
2  best practices?
3     Q.  How many best practices are
4  there?
5     A.  There is litigation management
6  and there is claim handling.
7     Q.  Let's talk about the claim
8  handling best practices.  Is that a separate
9  book?
10    A.  It is not a book.  It is just a
11 document.
12    Q.  How long is the document?
13    A.  Somewhere more than five pages
14 and probably less than ten.  I am not sure
15 exactly.
16    Q.  So we have -- at Liberty, there
17 is a single document for best practices for
18 claims handling that's somewhere between five
19 and ten pages, right?
20    A.  Yes.
21    Q.  And you prepared the draft of
22 this best practice claim handling document?
23    A.  Yes.
24    Q.  When did you prepare a first
25 draft?

Page 63

1  J. ROGIN
2     A.  Sometime in the fall of 2011.  I
3  can't tell you exactly when.
4     Q.  In that first draft, did you
5  endeavor to memorialize the best practices of
6  Liberty for claim handling as you saw them?
7     A.  Yes, that was the purpose of the
8  document.
9     Q.  Why did you circulate it to your
10 direct reports?
11    A.  For comment.
12    Q.  Did you circulate the first draft
13 of the best practices document for claims
14 handling, or was it a later draft that you
15 circulated?
16    A.  I don't recall exactly.  If I was
17 going to guess, I would say it would have
18 been a later draft.
19    Q.  Did you circulate a draft of the
20 best practices for claims handling at Liberty
21 prior to the end of 2011?
22    A.  I can't recall specifically.
23    Q.  You may have, you may not, you
24 just don't recall?
25    A.  Exactly.

Page 64

1  J. ROGIN
2     Q.  Did Mr. Roberts provide you any
3  feedback on the best practices for claims
4  handling?
5     A.  I can't recall specifically.
6     Q.  Do you recall any feedback that
7  you received on the best practices for claim
8  handling?
9     A.  No.
10    Q.  Did Mr. Engel provide you any
11 feedback on the best practices for claim
12 handling?
13    A.  Yes.
14    Q.  What was his feedback?
15    A.  He made edits throughout the
16 document and so, you know, I can't tell you
17 what his feedback was.  Throughout the entire
18 document he made some comments and edits and
19 additions.
20    Q.  Do you recall when you provided a
21 draft to Mr. Engel for comment?
22    A.  I can't recall exactly whether it
23 was at the end of 2011 or whether it was in
24 the beginning of 2012.
25    Q.  Were the claims adjusters at

Page 65

1  J. ROGIN
2  Liberty International already adjusting
3  claims consistent with the best practices as
4  you memorialized them in your best practice
5  manual for claims adjusting?
6     A.  I would say some were and some
7  maybe were not consistently.
8     Q.  What about Mr. Roberts, was he
9  already adjusting claims consistent with the
10 best practices as you memorialized them in
11 the best practices manual?
12    A.  Yeah, I would say yes, he
13 generally did so.
14    Q.  So if I wanted to understand how
15 Mr. Roberts adjusted claims in 2011, would it
16 be helpful for me to review the best
17 practices manual that you prepared?
18    A.  You know, I couldn't -- I
19 couldn't say whether it would be helpful or
20 not helpful to you.  I mean, he wasn't being
21 held against any -- those standards.
22    Q.  Regardless of whether he was
23 being held against the standards that were
24 later issued, if I wanted to get an
25 understanding of what procedures he followed

Page 66

1  J. ROGIN
2  to adjust claims, would it be useful for me
3  to look at the best practices that you
4  drafted sometime in the 2011 time period?
5  A. Well, I wouldn't say so because
6  he wasn't following those procedures. He was
7  adjusting claims based on his many years of
8  experience as an adjuster.
9  Q. If I wanted to understand whether
10 Mr. Roberts was adjusting claims consistent
11 with what you consider to be the best
12 practices for adjusting claims, would it be
13 useful for me to review the best practices
14 manual that he drafted?
15 A. It might provide guidance.
16 Q. What topics did you cover in the
17 best practices manual?
18 A. We covered investigation of
19 claims, analysis of coverage, analysis of
20 liability, analysis of damages, reserving,
21 file documentation, resolution strategy,
22 litigation management, vendor management,
23 subrogation, recovery. There was a section
24 related to handling claims with an SIR, and
25 there was a section about best practices for

Page 67

1  J. ROGIN
2  managers managing people.
3  Q. If we wanted to know what LIU
4  believes is the best practices for claims
5  handling, would the best practices document
6  that you prepared be relevant?
7  A. For the period of time since they
8  were issued, yes.
9  Q. Would they be relevant for the
10 period of time prior to their issuance?
11 A. I can't say because they weren't
12 -- they -- there were no best practices prior
13 to that time.
14 Q. Were there any policies and
15 procedures for handling claims prior to the
16 time that the best practices guidelines were
17 issued?
18 A. I already said I wasn't aware of
19 any.
20 Q. Is it fair to say that Liberty
21 did not have best practices prior to the time
22 that you issued written guidelines?
23 A. We didn't have any written best
24 practices prior to that time.
25 Q. Did it have anything that it

Page 68

1  J. ROGIN
2  considered to be best practices prior to the
3  time the written guidelines were issued?
4  A. Well, I think it considered the
5  best practices that it had experienced out of
6  claim adjusters that were adjusting the
7  claim.
8  Q. How would I know what best
9  practices were that they followed prior to
10 the time that the written policies were
11 issued?
12 A. There wasn't anywhere for you to
13 find that in writing.
14 Q. Did different claim adjusters
15 have different best practices as they
16 understood them?
17 A. Yes, because they -- various
18 adjusters came from different companies where
19 they, in my understanding, were basically
20 following what they had learned in terms of
21 handling claims at other companies.
22 Q. Did Liberty Mutual, the parent,
23 provide any written guidance to Liberty
24 International about how to adjust claims?
25 A. Not that I am aware of.

Page 69

1  J. ROGIN
2  Q. What's the difference between the
3  claim handling best practices and litigation
4  management best practices?
5  A. The litigation management of best
6  practices are best practices with regard to
7  managing litigation expenses, managing
8  working with outside counsel and managing
9  litigation strategy and litigation expenses
10 and the claim handling best practices are
11 what they say. And what I just detailed, the
12 claim handling.
13 Q. Did you describe best practices
14 for addressing other insurance situations in
15 the best practices guidelines that you
16 committed to writing?
17 A. No.
18 Q. Was there any internal written
19 guidance on how to interpret the other
20 insurance provision that was in the Cameron
21 policy that we talked about earlier today?
22 A. No.
23 Q. Are you aware of any other
24 instances in which Liberty had occasion to
25 interpret the other insurance language that

Page 70

1  J. ROGIN
2  was used in the Cameron policy?
3     A.  I am not aware of any since I
4  have been working there.
5     Q.  You are aware that that is
6  standard form language in Liberty's excess
7  insurance policies, correct?
8     A.  Yes.
9     Q.  And are you aware -- you're not
10 aware of any instance in which that standard
11 language has had -- been tested or assessed
12 by any claims adjuster?
13    A.  I am not aware of any since I
14 have been working there.
15    Q.  Was it your intent when you
16 prepared the best practices for claims
17 handling to change the way that LIU was doing
18 business?
19    A.  No. I think it was our intent to
20 make the way everyone was doing business more
21 uniform and consistent.
22    Q.  Some people were already
23 following best practices as reflected in the
24 document and others were not, fair?
25    A.  Yes.

Page 71

1  J. ROGIN
2     Q.  Mr. Roberts was one of the people
3  you put into the category of already
4  following the best practices as you reflected
5  them in writing, right?
6     A.  Yes.
7     Q.  Could you take out of the Engel
8  stack of exhibits, what I previously marked
9  as Engel Exhibit 12. Do you have this in
10 front of you?
11    A.  Yes.
12    Q.  This is an E-mail that Brad
13 Eastman from Cameron sent to a number of
14 people, one of whom is Jeff Roberts on
15 October 24, 2011. Do you see that?
16    A.  Yes.
17    Q.  And attached to this E-mail are a
18 number of documents. Do you see those
19 attachments?
20    A.  Yes.
21    Q.  And among the attachments are
22 marked and clean redrafts of the proposed
23 settlement agreements received from BP.
24        Do you see that?
25    A.  Yes.

Page 72

1  J. ROGIN
2     Q.  In the October 24th -- withdrawn.
3         In the late October time period,
4  were you working with Mr. Roberts on the
5  Cameron claim?
6     A.  Yes.
7     Q.  Were you already reviewing drafts
8  of the BP settlement agreements that Cameron
9  and BP were discussing?
10    A.  I wasn't personally reviewing it.
11    Q.  Do you know -- do you recall
12 whether Mr. Roberts forwarded you this
13 E-mail?
14    A.  I don't recall.
15    Q.  If you can flip back in the
16 document to the draft Settlement Agreement
17 that was attached to this E-mail; it begins
18 with the Bates number CLY02411.
19    A.  Okay.
20    Q.  You see that the title of this
21 attachment is "Confidential Settlement
22 Agreement Mutual Releases and Agreement to
23 Indemnify"?
24    A.  Yes.
25    Q.  Is this a draft of the BP Cameron

Page 73

1  J. ROGIN
2  Settlement Agreement?
3     A.  It appears to be.
4     Q.  How can you tell that from the
5  face of the document?
6     A.  Because it says draft at the top
7  of it.
8     Q.  It is a pretty big clue, right?
9     A.  Yes.
10    Q.  It also says "subject to further
11 revision by BP"?
12    A.  Yes.
13    Q.  It says "non-binding and subject
14 to board approval"?
15    A.  Yes.
16    Q.  It says "subject to Federal Rule
17 of Evidence 408"?
18    A.  Yes.
19    Q.  Those are all indications that
20 this is a draft form, correct?
21    A.  Yes.
22    Q.  In fact, if you look at the text
23 of the first paragraph, the date is blank,
24 there is an empty space, right?
25    A.  Yes.

```
 1
 2   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF LOUISIANA
 3   ------------------------------------X
     In Re:  OIL SPILL BY THE OIL RIG
 4   "DEEPWATER HORIZON" IN THE GULF OF
     MEXICO, ON APRIL 20, 2010,
 5
 6   Applies to:
 7   12-311, Cameron Int'l Corp. v. Liberty
     Ins. Underwriters, Inc., a/k/a Liberty
 8   Int'l Underwriters
 9
     ------------------------------------X
10
11
12          VIDEO DEPOSITION OF JEFFREY ROBERTS
13                  New York, New York
14                Thursday, May 30, 2013
15
16
17
18
19
20
21   Reported by:
22   Rebecca Schaumloffel, RPR, CLR
23   Job 61442
24
25
```

EXHIBIT B

Page 22

J. ROBERTS
A. I don't know what the exposure value was. Cameron settled it for $250 million. So a person could say that was the exposure value. It was unknown at the time.
Q. In fact, it's the case that Cameron faced potentially billions of dollars of liability, right?
A. I don't know that.
Q. You don't know one way or the other?
A. At this point, we know that Cameron was -- had no liability in the case based on the recent rulings.
Q. You would agree the trial would have a different complex if Cameron had been a defendant, right?
A. Cameron was a defendant in the trial.
Q. Was BP -- did BP have any interest in the course of the trial to show that Cameron had responsibility for the Deepwater Horizon incident during the trial in light of its settlement with Cameron?

Page 23

J. ROBERTS
A. I don't know that.
Q. In fact, you don't know one way or the other, right?
A. Know one way or the other what? What BP was thinking?
Q. Correct?
A. No, I don't know what BP was thinking.
Q. You don't know how the trial, what evidence would have been presented at trial had Cameron not settled with BP?
A. No, that's purely speculative.
Q. Let's go back to the best practices we mentioned before. Do you know when they were written, the written guidelines?
A. Spring of last year.
Q. So that would be spring of 2012?
A. Correct.
Q. Are you familiar with the content of the guidelines that were issued?
A. Yes.
Q. What do you understand LIU's best practices to be?

Page 24

J. ROBERTS
MS. BARRASSO: Object to the form.
A. Can you clarify that?
Q. Sure. There were written guidelines that were issued in the spring of 2012, is that your testimony?
A. Yes. Best practices were put forth.
Q. Were they different from how you were doing business prior to the spring of 2012?
A. They had some new changes to them. Different time frames, reporting requirements, things like that. But they generally fit with industry standard best practices.
Q. When you adjusted Cameron's claim, did you try to do so consistent with the industry standard of best practices?
A. Yes.
Q. Is it your testimony that when you adjusted Cameron's claim, that you did so consistently with the best practices that Liberty issued in the spring of 2012?

Page 25

J. ROBERTS
MS. BARRASSO: Object to the form.
A. Well, you can't -- the best practices issued in 2012, the claim happened in 2010. So I can't have adhered to guidelines that weren't in place. They were similar. They are similar -- similarities, but there may be days I would have to look at them and go through the file to see if the timing frame may have not been achieved or something.
Q. Would it be helpful to have a copy of the guidelines to go through them and see to what extent you deviated or didn't deviate from them when you adjusted Cameron's claim?
A. I don't know if I can do that today.
Q. But would it be helpful if you had the guidelines in front of you to look at them and see whether you acted consistently with them?
A. Sure.
Q. In fact, that's the only way you

Page 26

```
 1           J. ROBERTS
 2   would know if you had them in front of you to
 3   look at them and see, you know, this is a
 4   guideline that I complied with and this is a
 5   guideline that I didn't, correct?
 6       A.  Correct.
 7       Q.  Do you plan to testify at trial
 8   that you acted consistently with Liberty's
 9   best practices?
10       A.  Yes.
11       Q.  Do you plan to testify at trial
12   that when you adjusted Cameron's claim, that
13   you acted consistently with Liberty's best
14   practices?
15           MS. BARRASSO:  Objection.
16       That's the same question.
17       A.  That's the same question that I
18   answered previously.  I can't -- at some
19   points in time, I did not -- there were not
20   best practices in place to adjust Cameron's
21   claim under it.  So they were -- the claim
22   was adjusted and handled under what you would
23   call industry guidelines or industry best
24   practices.
25       Q.  And how did you know what the
```

Page 27

```
 1           J. ROBERTS
 2   industry guidelines or industry best
 3   practices were when you adjusted Cameron's
 4   claim?
 5       A.  I had learned them when I was
 6   at AIG.
 7       Q.  So when you adjusted Cameron's
 8   claim, you were relying on the industry best
 9   practices and industry guidelines that you
10   learned ten years prior when you worked
11   at AIG?
12       A.  Correct.  And through continuing
13   education classes and other things that we go
14   through to maintain licenses, et cetera.
15       Q.  Does Liberty International
16   provide continuing education classes to you?
17       A.  Seminars, I would say.  You can
18   call them a class.  Seminars.
19       Q.  Are these handled internally at
20   Liberty or is it outsourced where you go
21   somewhere else to attend the seminar?
22       A.  Sometimes they are in-house, in
23   our own facility.  Other times we go outside
24   to a separate facility.  Usually all
25   arranged.  They're not done by internal
```

Page 28

```
 1           J. ROBERTS
 2   people.  Law firms that we work with come in
 3   and bring classes to us, conferences that you
 4   attend or that are set up by the company
 5   for us.
 6       Q.  Have you ever led a seminar on
 7   industry best practices that are to be
 8   followed at -- in the claims adjusting
 9   process?
10       A.  No.
11       Q.  You are merely an attendee?
12       A.  Correct.
13       Q.  Did Liberty personnel, in the
14   casualty unit for claims adjusting, provide
15   any seminars of this sort?
16       A.  When you say did they provide the
17   seminar, are you saying did they --
18       Q.  I will rephrase the question.
19   That's a fair clarification.  Did Mr. Glenn
20   ever deliver any seminars to you or your
21   colleagues on industry best practices?
22       A.  No.
23       Q.  Did anyone from Liberty Mutual
24   ever do that?
25       A.  No, sir.
```

Page 29

```
 1           J. ROBERTS
 2       Q.  To the best of your recollection,
 3   who provided seminars internally at Liberty
 4   that were Liberty employees on industry best
 5   practices?
 6       A.  Liberty employees did not provide
 7   seminars.  Seminars were set up with outside
 8   law firms for best -- for best practices,
 9   claims handling procedures under various
10   state laws in furtherances of license
11   requirement, continuing education
12   requirements, et cetera.
13       Q.  Was one of the outside lawyers
14   who delivered this type of seminar
15   Paul Koepff?
16       A.  No.
17       Q.  You never attended a continuing
18   education seminar that was, where Mr. Koepff
19   was the presenter?
20       A.  No, sir.
21       Q.  Did Mr. Martin, counsel at
22   Liberty, ever deliver any of the seminars?
23       A.  No, sir.
24       Q.  How about Miss Barrasso?
25       A.  No.
```

Page 30

J. ROBERTS

1
2  Q. If I were to ask you to provide
3  to me copies of documents that were
4  sufficient to show what Liberty's policies
5  and procedures were in the 2010 and 2011
6  timeframe, would you have any documents that
7  could do that?
8       MS. BARRASSO: Object to the
9   form.
10  A. There were no policies -- I can
11 give you my authority letter. It would be
12 the extent of it. We had protocols for
13 reporting guidelines. That's the extent of
14 any documentation or claims manual, as you
15 would.
16  Q. Could you describe what the
17 protocols for reporting guidelines said?
18  A. I guess any claim where there is
19 an action filed against Liberty International
20 should be reported in a precautionary large
21 loss report, reserve in excess, combined
22 reserve, so expense or indemnity combined in
23 excess of $400,000 required a large --
24 precautionary large loss report. In excess
25 of a million, it became a large loss report.

Page 31

J. ROBERTS

1
2  Those reports were to be updated upon
3  material developments in the file or every
4  two years, whichever was sooner.
5   Q. Were these written protocols for
6  reporting guidelines?
7   A. Not in the beginning.
8   Q. So not in the beginning meaning
9  when you joined Liberty ten years ago, right?
10  A. Correct.
11  Q. At some point were the protocols
12 for reporting guidelines committed to
13 writing?
14  A. Yes, there is a document that
15 committed the form of the large -- the large
16 loss report and those reporting requirements
17 or elements.
18  Q. Do you recall when that written
19 protocol was issued?
20  A. Not really. It was October --
21 somewhere around October, I don't know,
22 2000 -- I'm just taking a stab at it.
23 Probably 2006, 2007. It was at some point in
24 time when Rhesa Reven was the chief claims
25 officer.

Page 32

J. ROBERTS

1
2   Q. Those protocols basically told
3  you how to complete a preliminary large loss
4  report?
5   A. Right. Reporting guidelines.
6  You know, what the form should look like.
7  You know, there was a templated form as
8  opposed to some people would draft a letter.
9  Some people would draft a memo. This sat a
10 templated format for the report.
11  Q. Did you follow those guidelines
12 in connection with the adjustment of the
13 Cameron claim?
14  A. Yes.
15  Q. Was there ever any guideline,
16 prior to the best practices that were issued
17 in 2012, that instructed claims adjusters
18 when and how to issue a reservation of rights
19 letter?
20  A. No, sir.
21  Q. Did you hire new employees from
22 time to time at Liberty International?
23  A. Yes.
24  Q. Did you have to train those
25 employees or did they come in knowing how to

Page 33

J. ROBERTS

1
2  adjust claims at Liberty?
3   A. Most employees we hired had
4  experience levels of five to seven years.
5   Q. And when they joined the company,
6  you didn't have to tell them how to do their
7  jobs at all?
8   A. No, we set out the reporting
9  guidelines for them, you know, requirements,
10 things that I, as a manager, would want to
11 know.
12  Q. Other than the written protocols
13 or written guidelines, did you hand new
14 employees any other materials about how to do
15 business at Liberty?
16  A. No.
17  Q. There were no training materials
18 for new employees?
19  A. Not that I gave. There is a --
20 through human resources, when a new employee
21 starts, there is online courses that orient
22 people to Liberty International and its
23 policies, procedures.
24  Q. Do those online courses orienting
25 folks to LIU's policies and procedures say

Page 34

J. ROBERTS

1 anything about adjusting of claims?
2    A.   I don't actually know. When I
3 did it, it was -- when I did it, it was very
4 rudimentary and it did not deal with that.
5 It's become much more sophisticated over the
6 years, but I do not believe it deals with an
7 individual job function. But I don't know
8 for sure.
9    Q.   That's because you never had to
10 take this online course because you were
11 already an employee of Liberty by the time
12 they were implemented, right?
13    A.   Correct.
14    Q.   So it is possible that the online
15 courses that orient new employees to LIU's
16 policies and procedures could implicate
17 claims adjusting, right?
18       MS. BARRASSO: Object to the
19    form.
20    A.   It could. I don't know that it
21 does. But because I haven't taken it. I
22 don't know what the contents of it are. I
23 believe it more orients people towards the
24 company's values, codes of conduct, things

Page 35

J. ROBERTS

1 like that.
2    Q.   Are you saying the company's
3 values and codes of conduct have nothing to
4 do with claims adjusting?
5    A.   I didn't say that.
6    Q.   You would imagine -- withdrawn.
7       Is it fair to say that when
8 employees at Liberty adjust claims, they are
9 expected to do so consistent with the
10 company's values?
11    A.   Correct.
12    Q.   Is it fair to say that when
13 employees at Liberty adjust claims, they are
14 expected to do so consistent with the codes
15 of conduct, right?
16    A.   Yes, sir.
17    Q.   And do you know what the
18 company's values are as described in these
19 materials?
20    A.   Yes, sir.
21    Q.   What are they?
22    A.   We treat people with dignity and
23 respect, including all stakeholders. We take
24 into account all stakeholders'

Page 36

J. ROBERTS

1 considerations. We treat confidential
2 information confidentially.
3    Q.   What do you mean by
4 "stakeholders" in your prior answer?
5    A.   Stakeholders?
6    Q.   Yes.
7    A.   Anyone who has an interest in an
8 issue. Cameron is a stakeholder. It has an
9 insurance policy with Liberty International.
10    Q.   Was Liberty International also a
11 stakeholder in that sense?
12    A.   Yes, they are.
13    Q.   As a stakeholder, did you owe
14 duties to Cameron International?
15    A.   Yes, sir.
16    Q.   What were those duties?
17    A.   To adjust its claim fairly and
18 expeditiously.
19    Q.   Did you owe a duty to Cameron to
20 inform Cameron of any defenses to Cameron's
21 claim that might arise?
22    A.   If there were defenses to
23 Cameron's claim, we would notify them of it.
24    Q.   And the -- and your duty was to

Page 37

J. ROBERTS

1 do so on a timely basis?
2    A.   Within -- yes, with material
3 developments that indicated such.
4    Q.   Did Liberty have a duty to inform
5 Cameron when it believed that the policy did
6 not attach?
7    A.   Could you restate that?
8    Q.   Sure.
9    A.   Or just say it again.
10    Q.   Sure. You mentioned there were
11 certain duties that LIU owed to insureds like
12 Cameron, right?
13       You have to testify orally for
14 the Court Reporter to write that down.
15    A.   Yes, sorry.
16    Q.   The head nods don't get recorded.
17 Let me try that again.
18       You mentioned there were certain
19 duties that LIU owed to insureds like
20 Cameron, correct?
21    A.   Yes.
22    Q.   One of those duties was to adjust
23 claims fairly and expeditiously, correct?
24    A.   Correct.

1

2  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF LOUISIANA
3  ---------------------------------------X
   In Re:  OIL SPILL BY THE OIL RIG
4  "DEEPWATER HORIZON" IN THE GULF OF
   MEXICO, ON APRIL 20, 2010,
5
6  Applies to:
7  12-311, Cameron Int'l Corp. v. Liberty
   Ins. Underwriters, Inc., a/k/a Liberty
8  Int'l Underwriters
9
   ---------------------------------------X
10
11
12         VIDEO DEPOSITION OF JAMES ENGEL
13              New York, New York
14                 May 29, 2013
15
16
17
18
19
20
21 Reported by:
22 Rebecca Schaumloffel, RPR, CLR
23 Job No.  61441
24
25

EXHIBIT C

Page 38

```
 1            J. ENGEL
 2      A.  That's correct.  For firsthand
 3  knowledge I would have had to have been
 4  there.
 5      Q.  All you know is what Mr. Roberts
 6  told you, fair?
 7      A.  That's correct.
 8      Q.  All right.  I would like to speak
 9  a little bit generally about how Liberty goes
10  about adjusting claims.  I take it you are
11  familiar with that process?
12      A.  I hope so.
13      Q.  Do you have any role in designing
14  the process by which Liberty adjusts claims
15  or was that set before you arrived on the
16  scene at Liberty International?
17      A.  I have a very significant role in
18  setting the rules, the procedures, the best
19  practices about how we handle claims.
20      Q.  In your answer, you refer to
21  rules, procedures, and best practices about
22  how we handle claims.  Is the we in that
23  answer LIU?
24      A.  Yes.
25      Q.  Could you describe for me, as
```

Page 39

```
 1            J. ENGEL
 2  completely as you can, the rules, the
 3  procedures and the best practices about how
 4  Liberty International handles claims?
 5      A.  It is a really, really broad
 6  question.
 7          MR. MARTIN:  I object to the
 8      form I was about to say.  Could you
 9      narrow it down with reference to time
10      for him as well?
11          MR. KORN:  That's fair.
12      Q.  I would like to focus on the
13  period in 2010 and 2011.  Is that fair?
14      A.  That's fair.  It's fair, though,
15  it is still very broad.
16      Q.  We will get into the details, I
17  am sure, but in your answer, you referred to
18  rules, procedures, and best practices, and I
19  would like to just understand what you were
20  referring to when you used those terms.
21      A.  So first of all, you need to
22  understand that when I arrived at LIU in
23  September of 2010, the company did not have
24  written rules, procedures, and best
25  practices.  And those were developed later on
```

Page 40

```
 1            J. ENGEL
 2  under my direction.
 3      Q.  And when were they developed?
 4      A.  The first best practice documents
 5  were distributed on or around September or
 6  October of 2011, and they dealt only with
 7  managing litigation.  In other words,
 8  controlling our legal spend.  The balance of
 9  our best practices were written and
10  distributed to the organization in the April,
11  May of 2012 timeframe.  Some may have been a
12  little later than that for certain lines of
13  business because they were line of business
14  specific.
15      Q.  What is the line of business that
16  Liberty policy falls within at LIU?
17      A.  Casualty.
18      Q.  Was there a set of written best
19  practices distributed sometime in or after
20  April, May of 2012 for casualty at LIU?
21      A.  Yes.
22      Q.  Do you know when that was?
23      A.  It was in the April, May
24  timeframe.  I don't know exactly the date.
25      Q.  So did LIU not have best
```

Page 41

```
 1            J. ENGEL
 2  practices prior to that time for casualty?
 3      A.  It didn't have written best
 4  practices.  The company relied on the
 5  experience of the individuals in claim
 6  handler positions and management positions
 7  and some of those people were extremely
 8  experienced and well qualified.
 9      Q.  If you were to ask -- had asked
10  in the 2011 time period what the Liberty
11  International best practices were of any
12  particular claims handler, would they give
13  you a different answer?
14      A.  Sorry?
15      Q.  Would they give you different
16  answers?
17      A.  Sure.  I think even today, with
18  written best practices, people, when asked,
19  would play it back differently.  Though they
20  would be more consistent today than they were
21  prior to when they had written best
22  practices.
23      Q.  Prior to the time when there were
24  written best practices, would you
25  characterize the claims handlers at LIU in
```

```
                                                 Page 42
 1              J. ENGEL
 2  casualty as inconsistent with each other?
 3      A.   At times.  Generally, people
 4  followed sets of practices that they brought
 5  with them from other companies because that's
 6  where they developed their experience and
 7  knowledge, and so a person from AIG and a
 8  person from Excel and a person from Zurich
 9  would approach their claims handling in a
10  similar fashion.  But would describe their
11  own claim handling practices more akin to the
12  way they learned them at those companies.
13      Q.   When a new employee arrived at
14  LIU, were they handed any materials about
15  claims handling?
16      A.   No, because we didn't have any
17  prior to the development of those best
18  practices.  That's part of the reason why I
19  was hired, so that we would have a more
20  consistent approach.
21      Q.   When did you begin drafting the
22  best practices for LIU?
23      A.   Begin drafting them?  The
24  litigation management best practices were
25  drafted in the summer and fall of 2011.  The
```

```
                                                 Page 43
 1              J. ENGEL
 2  other claim handling best practices were
 3  drafted, I would say, in the January to March
 4  period of 2012.  Some of them for some of our
 5  professional liability lines got drafted a
 6  bit later than that.
 7      Q.   Okay.  So we talked earlier about
 8  how Jeff Roberts was the person at Liberty
 9  primarily responsible for handling Cameron's
10  claim in connection with the Deepwater
11  Horizon.
12      A.   Yes.
13      Q.   How did he know how to adjust
14  claims?
15      A.   Well, Jeff Roberts is a highly
16  experienced casualty, excess casualty claim
17  adjustor with more than 20 years of
18  experience.  So Jeff knows very well how to
19  go about handling excess claims.  I would say
20  that, in fact, much of our best practices
21  would be reflective of the way Jeff handles
22  claims.
23      Q.   Did Mr. Roberts collaborate with
24  you in the development of the best practices
25  guides?
```

```
                                                 Page 44
 1              J. ENGEL
 2      A.   For the casualty line of
 3  business, it was myself and Jessica Rogin who
 4  drafted and built those best practices.
 5      Q.   Do you recall when Miss Rogin
 6  joined LIU?
 7      A.   I believe it was in August of
 8  2011.
 9      Q.   And did she come knowing how to
10  handle claims without any instruction from
11  anybody at Liberty?
12      A.   Yes.  Jessica was highly
13  experienced in handling and managing claim
14  units and, in particular, casualty claim
15  units, which is one of the reasons that
16  attracted her to me as a candidate for the
17  position.
18      Q.   So it's your testimony that,
19  prior to April or May of 2012, Liberty had no
20  written policies or procedures for the
21  adjusting of claims in casualty?
22      A.   That's correct.
23      Q.   And folks at Liberty knew how to
24  adjust claims based solely on their
25  experience developed over time?
```

```
                                                 Page 45
 1              J. ENGEL
 2      A.   Yes, based solely on their
 3  experience and direction that they would
 4  receive from their supervisors after they
 5  arrived at LIU.
 6      Q.   And different folks at Liberty
 7  had different practices and procedures from
 8  other folks at Liberty because they had
 9  different experiences and there was no
10  written guidelines?
11      A.   There were no written guidelines;
12  though I would say experienced people, even
13  though they came from different companies,
14  had similar approaches to how to handle
15  claims.
16      Q.   What is the first thing that a
17  claims adjustor at Liberty is supposed to do
18  upon -- well, withdrawn.  Let me ask a
19  different question.
20           When you developed the best
21  practices for written purposes, for casualty,
22  did you intend to reflect in those best
23  practices the way that claims were handled
24  prior to them being put into writing?
25           MR. MARTIN:  Object to form.
```