## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig | ) | MDL No. 2179 |
| "Deepwater Horizon" in the | ) | |
| Gulf of Mexico, on April 20, 2010 | ) | SECTION: J |
| | ) | |
| | ) | Judge Barbier |
| | ) | Mag. Judge Shushan |
| This Document Relates to: 2:13-cv-01518 | ) | |
| | ) | FIRST AMENDED |
| | ) | COMPLAINT  FOR DAMAGES |
| | ) | JURY TRIAL DEMANDED |
| | ) | |

**NOW COMES PLAINTIFF,** Charlotte County, Florida, through undersigned counsel, who does allege as follows:

### NATURE OF THE ACTION

1.     On or about April 20, 2010, a well blowout on the vessel *Deepwater Horizon* in the Gulf of Mexico marked the beginning of what would become one of the most pervasive and devastating environmental disasters in the United States.   The blowout and subsequent explosions, fire and sinking of the vessel resulted in an oil spill of unprecedented proportions (the "Oil Spill").   Over 200 million gallons of crude oil were released from the Macondo Well in Mississippi Canyon Block 252 on the Outer Continental Shelf (the "Macondo Well"), damaging, depleting and destroying offshore, marine, and coastal environments in the Gulf of Mexico, Louisiana, Mississippi, Alabama, Texas, and Florida.

2.     Plaintiff has suffered economic injury, damage and/or losses as a direct and foreseeable result of the Oil Spill and its devastating impact on the offshore, marine and coastal environments.

3.      Given the nature of the Oil Spill, and its uncertain impact on nature and the environment, the full extent of the Oil Spill's impact is not yet known, and Plaintiff reserves its rights in full to amend this Complaint by, among other things, adding new claims and new defendants.

4.      Plaintiff reserves any rights it may have with respect to claims whose prosecution is currently restrained by the Second Amended Order Directing Claimants to File and Make Proof of Claims, Directing the Issuance of Monition, and Restraining the Prosecution of Claims, Rec. Doc. 130-1 in Civil Action No. 4:10-cv-1721 (filed in S.D. Tex. on June 11, 2010).

## PARTIES

5.      Plaintiff, Charlotte County, Florida (hereinafter "Plaintiff" or the "County"), is a political subdivision of the State of Florida.  The County is located on the west coast of Florida, on the Gulf of Mexico and the bay of Charlotte Harbor.  The County is coextensive with the Punta Gorda Metropolitan Statistical Area and lies immediately south of Sarasota County.  The County includes a unique combination of barrier islands and mangrove forests, as well as one of the world's largest protected marine estuaries, which spans 270 square miles with 219 miles of natural shoreline.  The County's natural amenities include some 28 miles of beaches, more than 70 parks and preserves, and an incredible variety of aquatic species.  The local and natural setting of Plaintiff, as well as historical and community development, provide the foundation for a significant tourism industry in the County, and tourism is a primary economic driver for the County.  Charlotte Harbor is often referred to as the "Tarpon Capital of the World," and the County boasts some of the best saltwater fishing in the world, as well as freshwater quarry.  In addition, SAIL Magazine named Charlotte Harbor one of the top 10 places to sail in the United States.  More generally, the County describes itself as Florida's premier eco-tourism destination.

Tourists and visitors are drawn to the its serene beaches, sport-fishing, and opportunities for sailing, boating, paddling, birding, golf, sporting events, charter cruises, cultural opportunities, dining, spas, and nightlife, as well as a variety of accommodations.  Plaintiff suffered economic injury, damages and/or losses as a result of the Oil Spill and due to the Oil Spill's environmental devastation and impact on local tourism as well as its economic impact on local business.

6.     Defendant BP Exploration & Production, Inc. ("BP Exploration") is a Delaware corporation with its principal place of business in Warrenville, Illinois.  BP Exploration was a lease holder and the designated operator in the lease granted by the former Minerals Management Service ("MMS")[1] allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Spill originated.[2]  BP Exploration was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution of 1990, 33 U.S.C. § 2714.  This Court has personal jurisdiction over BP Exploration, because BP Exploration is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

7.     Defendant BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas.  BP America was the party to

---

[1] The MMS, a federal entity that divides the Gulf of Mexico's seafloor into rectangular "blocks," and then auctions the rights to drill for oil and gas beneath those blocks of seafloor, was reorganized as the Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE) on June 18, 2010; however, it shall be referred to as the MMS throughout this document.

[2] Non-parties Anadarko Petroleum Corporation Co., Anadarko E&P Company LP, and MOEX Offshore 2007 LLC were signatories to an Operating Agreement for Macondo Lease 252.  On or about October 1, 2009, BP Exploration, as the Operating Party, and MOEX Offshore, as a Non-Operating Party, entered into the Operating Agreement.  On or about December 17, 2009, BP Exploration, MOEX Offshore, Anadarko, and Anadarko E&P executed a "Joinder" of the Operating Agreement.  Subsequently, the parties to the Operating Agreement held the following working interest ownership percentages in the lease of the Macondo Prospect: BP Exploration, 65%; MOEX Offshore, 10%; Anadarko E&P, 22.5%; and Anadarko, 2.5%.

the Drilling Contract with Transocean Ltd. for the drilling of the Macondo Well by the *Deepwater Horizon* vessel.  This Court has personal jurisdiction over BP America, because BP America is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

8.     Defendant BP p.l.c. is a British public limited company with its corporate headquarters in London, England.  BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo.  BP p.l.c. operates its various business divisions, such as the "Exploration and Production" division within BP Exploration and BP America, through vertical business arrangements aligned by product or service groups.  BP p.l.c.'s operations are worldwide, including in the United States.  Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Louisiana and the U.S. more generally.

9.     BP p.l.c. states that it is the leading producer of oil and natural gas in the United States and the largest investor in U.S. energy development.  A sampling of BP p.l.c.'s contacts with the U.S. are as follows: (a) BP p.l.c.'s American Depository Shares are listed on the New York Stock Exchange ("NYSE") and BP p.l.c. is the largest non-U.S. company listed on the NYSE; (b) roughly 40% of BP's shares are owned by U.S. individuals and institutions; (c) BP p.l.c. files annual reports with the U.S. Securities and Exchange Commission; (d) approximately 60% of BP p.l.c.'s fixed assets are located in the U.S. or the European Union; and (e) BP p.l.c. reports having 2,100 U.S.-based employees in non-Exploration & Production, non-Refining & Marketing BP entities.

10.     This Court has general jurisdiction over BP p.l.c. pursuant to Louisiana's long-arm statute's general jurisdiction provision (La. Rev. Stat. Ann. § 13:3201(B)), in combination

with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure.  BP p.l.c. does business in Louisiana, has had continuous and systematic contacts with Louisiana (and the U.S. more generally), and BP p.l.c. will be served with a summons and this Complaint and has been served with a summons on the original B1 Bundle Master Complaint.

11.     Alternatively, if BP p.l.c. contests that it is subject to jurisdiction under Louisiana's long-arm jurisdiction statute, then this Court may exercise personal jurisdiction over BP p.l.c. pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure, the federal long-arm jurisdiction provision, because claims in this action arise under federal law, the exercise of jurisdiction over BP p.l.c. is consistent with the United States Constitution and laws, and BP p.l.c. will be served with a summons and this Complaint and has been served with a summons on the original B1 Bundle Master Complaint.

12.     This Court also has specific jurisdiction over BP p.l.c. pursuant to Louisiana's long-arm specific jurisdiction provision (La. Rev. Stat. Ann. § 13:3201), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure.  Plaintiff's causes of action arise out of wrongful conduct committed by BP p.l.c., directly or indirectly by its agents, which caused injury or damage in Louisiana by an offense or quasi-offense committed through an act or omission outside of Louisiana, and BP p.l.c. regularly does or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in Louisiana.  These acts or omission took place both before the blowout resulting in the Oil Spill and in the negligent conduct of BP p.l.c. after the blowout in attempting to contain the catastrophic damage caused by the Oil Spill.  In addition, BP p.l.c. will be served with a summons and this Complaint and has been served with a summons on the original B1 Bundle Master Complaint.

13.     In addition, this Court also has personal jurisdiction over BP p.l.c. under agency principles because BP p.l.c.'s agents, BP America and BP Exploration, do business in Louisiana. In BP p.l.c.'s Annual Report for 2009, in which it presents a consolidated financial statement that includes BP America and BP Exploration, BP p.l.c. states that it "controls" both BP America and BP Exploration, among other subsidiaries, meaning that it has "the power to govern the financial and operating policies of the [subsidiary] so as to obtain benefit from its activities . . . "

14.     BP p.l.c.'s direct, joint and/or assumed responsibility and/or liability for safety and well control, both before and/or after the explosions and blowout on April 20, 2010, is further evidenced by the announcement of the Macondo Project on the BP website hosted and copyrighted by BP p.l.c., the publication of information concerning the casualty and spill on the BP website hosted and copyrighted by BP, the express and/or implied acceptance of responsibility for safety of BP operations in North America and the Gulf of Mexico in statements by officers of BP p.l.c., the presence (upon information and belief) of a BP p.l.c. officer or employee on the *Deepwater Horizon* for the celebration that occurred shortly before the explosions and fire, the direct participation of BP p.l.c. employees in the post-casualty investigation, the direct participation of BP p.l.c. officers and employees in the governmental post-casualty investigations, the direct participation of BP p.l.c. officers and employees in the post-casualty well-control efforts, and the direct participation of BP p.l.c. in the establishment and/or funding of the Escrow Fund and/or Gulf Coast Claims Facility.

15.     Unless otherwise specified, BP Exploration, BP America, and BP p.l.c. are referred to herein collectively as the "BP Defendants" or "BP."

16.     Defendant Halliburton Energy Services, Inc. ("HESI") is a Delaware corporation with its principal place of business in Houston, Texas.  HESI is registered to do and does

business in the State of Louisiana.  HESI provided engineering services, materials, testing, mixing, and pumping for cementing operations on board the *Deepwater Horizon*, as well as onshore engineering support for those operations.  HESI was responsible for the provision of technical advice about the design, modeling, placement, and testing of the cement that was used in the Macondo Well.  At and before the time of the blowout, HESI was engaged in cementing operations to isolate the hydrocarbon reservoirs and seal the bottom of the well against the influx of hydrocarbons like gas and oil.

17.     Defendant Sperry Drilling Services (formerly Sperry Sun Drilling Services) (hereinafter, "Sperry") is a division of HESI and was responsible for mudlogging personnel and equipment on the *Deepwater Horizon*, including downhole drilling tools.  Sperry mudlogging personnel were partially responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, and pressure fluctuations.

18.     Unless otherwise specified, Halliburton Energy Services, Inc. and its Sperry division are referred to herein collectively as "Halliburton."

19.     Defendant Transocean Offshore Deepwater Drilling, Inc. ("Transocean Offshore") is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Offshore is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.

20.     Defendant Transocean Holdings, LLC ("Transocean Holdings") is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district.  Transocean Holdings is a wholly-owned subsidiary of Transocean Offshore.  Transocean Holdings is an owner, managing

owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon* and participated in the *Deepwater Horizon*'s offshore oil drilling operations at the Macondo prospect, where the Spill originated.  More specifically, Transocean Holdings is a party to the contract with BP regarding the lease of the *Deepwater Horizon* for drilling operations in the Gulf of Mexico.  On April 28, 2010, the U.S. Coast Guard named Transocean Holdings as a "Responsible Party" under the Oil Pollution Act for the surface oil spill resulting from the blowout by the *Deepwater Horizon*.

21.     Defendant Transocean Deepwater, Inc. ("Transocean Deepwater"), is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district.  Transocean Deepwater is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.

22.     Defendant Transocean Ltd. ("Transocean Ltd.") is a Swiss Corporation that maintains substantial U.S. offices in Houston, Texas and that at all pertinent times was doing business in the State of Louisiana and within this district.  According to its Complaint and Petition for Exoneration from or Limitation of Liability, Transocean Ltd. was an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.

23.     Defendant Triton Asset Leasing GmbH ("Triton") is a Swiss limited liability company with its principal place of business in Zug, Switzerland.  Triton is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.  Triton is believed to have had a place of business and/or to have been doing business within this District and within the jurisdiction of this Court with respect to the matters sued upon and actions of Triton have had direct impacts within the State of Louisiana and within this District.

24.     Unless otherwise specified, Defendants Transocean Offshore, Transocean Holdings, Transocean Deepwater, Transocean Ltd., and Triton are hereinafter referred to

collectively as "Transocean."  At the Macondo site, Transocean provided the *Deepwater Horizon* vessel and personnel to operate it.  At all times relevant to the Spill, Transocean, subject to BP's inspection and approval, was responsible for maintaining well control equipment, such as the blowout preventer and its control systems.  Transocean also provided operational support for drilling-related activities on board the *Deepwater Horizon*, as well as onshore supervision and support for those drilling activities at all times relevant to the Oil Spill.

**JURISDICTION/VENUE**

25.     Jurisdiction is proper in this Court and under 28 U.S.C. § 1332(a) because complete diversity exists among the parties and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interests and costs.

26.     Jurisdiction also exists before this Court over claims against BP and Transocean pursuant to the Oil Pollution Act ("OPA"), 33 U.S.C. § 2717(b).

27.     In addition, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

28.     In addition, to the extent that any claims do not give rise to jurisdiction under 28 U.S.C. § 1331 and/or 33 U.S.C. § 2717(b), this Court also has supplemental jurisdiction under 28 U.S.C. § 1367.

29.     Venue is appropriate in this District under 28 U.S.C. § 1391 because Defendants do business herein, a defendant resides in this district, or a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

30.     Venue is also proper pursuant to OPA, 33 U.S.C. § 2717(b), as the discharge occurred in this district.

31.     Venue is also appropriate in this District consistent with 28 U.S.C. § 1407 and the 2010 Transfer Order of the Judicial Panel on Multidistrict Litigation.  *See In re Oil Spill by the*

*Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 731 F. Supp. 1352

(J.P.M.L. 2010), and this Court's Pretrial Order No. 20 (Rec. Doc. 904), which allows plaintiffs

to directly file their complaints arising out of the Oil Spill in this District.

## FACTUAL ALLEGATIONS

32.    Plaintiff adopts and incorporates as if fully restated herein the factual allegations

raised in Paragraphs 258-543 of the Amended B1 Master Complaint, Document No. 1128 filed

in MDL No. 2179, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on*

*April 20, 2010* (the "MDL B1 Master Complaint").

33.    BP and Transocean are "responsible parties" for the Oil Spill under OPA, 33

U.S.C. § 2714.  Because of the strict liability of responsible parties for damages due to and

arising from the Oil Spill and its environmental devastation, Plaintiff does not need to set forth

factual allegations to support culpability under OPA.  Out of an abundance of caution and to

support Plaintiff's other claims, as well as any relief the Court may deem just and proper,

Plaintiff nevertheless include such allegations herein.

### BP's Macondo Lease, Exploration Plan and Drilling Permit

34.    On June 1, 2008, BP acquired a ten-year lease from the MMS to search for and

exploit hydrocarbon reservoirs at the Macondo prospect site in Mississippi Canyon Block 252,

48 miles off the coast of Louisiana.

35.    Before BP could begin operations at the Macondo site, federal regulations

required BP to submit an Exploration Plan ("EP") demonstrating that it had planned and

prepared to conduct its proposed activities in a manner that was safe, conformed to applicable

regulations and sound conservation practices, and would not cause undue or serious harm or

damage to human or marine health, or the coastal environment.  30 C.F.R. §§ 250.201, 250.202.

36.     Federal regulations required that the EP be accompanied by "oil and hazardous substance spills information" and "environmental impact analysis information."   30 C.F.R. §§ 250.212, 250.219, 250.227.

37.     Among the information required to accompany the EP was a "blowout scenario," described as follows:

> A scenario for the potential blowout of the proposed well in your EP that you expect will have the highest volume of liquid hydrocarbons. Include the estimated flow rate, total volume, and maximum duration of the potential blowout. Also, discuss the potential for the well to bridge over, the likelihood for surface intervention to stop the blowout, the availability of a rig to drill a relief well, and rig package constraints. Estimate the time it would take to drill a relief well.

30 C.F.R. § 250.213 (g).

38.     The oil and hazardous spills information accompanying the EP was required to include an oil spill response plan providing the calculated volume of BP's worst case discharge scenario (*see* 30 C.F.R. 254.26(a)), and a comparison of the appropriate worst case discharge scenario in [its] approved regional [Oil Spill Response Plan] with the worst case discharge scenario that could result from [its] proposed exploration activities; and a description of the worst case discharge scenario that could result from [its] proposed exploration activities  (*see* 30 C.F.R. 254.26(b), (c), (d), and (e)).  30 C.F.R. § 250.219.

39.     Federal regulations required BP to conduct all of its lease and unit activities according to its approved EP, or suffer civil penalties or the forfeiture or cancellation of its lease. 30 C.F.R. § 250.280.

40.     In February 2009, BP filed its 52-page Initial EP for the Macondo prospect site with the MMS.  In the Environmental Impact Analysis section, BP repeatedly asserted that it was "unlikely that an accidental surface or subsurface oil spill would occur from the proposed

activities."   In the unlikely event that a spill did occur, BP predicted a worst case discharge scenario of 162,000 gallons of oil per day, an amount it assured the MMS that it was prepared to respond to.  BP also claimed the well's distance from the nearest shoreline would preclude any significant adverse impacts from a spill.

41.     Based on these assurances, the MMS approved BP's Initial EP for the Macondo prospect on April 6, 2009, including the approval of a "categorical exclusion" from the full environmental analysis normally required under the National Environmental Policy Act.  As detailed more fully below, the MMS' approval of BP's Initial EP and the categorical exclusion from environmental analysis were predicated on BP's flagrant misrepresentations about the risk of a surface or subsurface oil spill at Macondo, and its capability to respond to such a spill.

42.     After its EP was approved, BP sought a permit from the MMS authorizing it to drill up to a total depth of 19,650 feet at the Macondo site.

### The *Deepwater Horizon*

43.     The *Deepwater Horizon* was a $560,000,000.00 ultra-deepwater, dynamically-positioned semi-submersible oil drilling rig built by Hyundai Heavy Industries Co., Ltd. of South Korea.

44.     The *Deepwater Horizon* was delivered to Transocean in February 2001.

45.     At times relevant herein, the *Deepwater Horizon* was owned by Transocean but leased to BP for a term continuing through September 2013.

46.     BP leased the *Deepwater Horizon* to drill exploratory wells at the Macondo prospect site in Mississippi Canyon Block 252 ("Macondo"), a location on the outer continental shelf in the Gulf of Mexico.  As part of its agreement with BP, Transocean provided employees, contractors, and other officials who assisted BP in its oil exploration and production activities at

the Macondo prospect.

47.    As a mobile offshore drilling unit, the *Deepwater Horizon* was utilized by the Defendants for, *inter alia*, drilling sub-sea wells for oil exploration and production in areas of depth in excess of 5,000 feet of water.

48.    The Defendants started drilling the Macondo Well on October 7, 2009, using the Marianas rig. This rig was damaged in Hurricane Ida on November 9, 2009. As a result, BP and the rig operator, Transocean, replaced the Marianas rig with the *Deepwater Horizon*. Drilling with the *Deepwater Horizon* stared on February 6, 2010.

49.    Prior to its destruction, the *Deepwater Horizon* was drilling at over 22,000 feet — 2,000 feet deeper than described in the BP Exploration Plan or allowed by any permits issued by the MMS to BP.

50.    The *Deepwater Horizon* rig was expensive. Transocean charged BP approximately $500,000 per day to lease the rig, plus contractors' fees. BP targeted drilling the well to take 51 days and cost approximately $96 million.

51.    The *Deepwater Horizon* was supposed to be drilling at a new location as early as March 8, 2010.  In fact, the Macondo well took considerably longer than planned to complete. By April 20, 2010, the day of the blowout, the rig was 43 days late for its next drilling location, which may have cost BP as much as $21 million in leasing fees alone.  It also set the context for the series of decisions that BP made in the days and hours before the blowout.

**The Process of Ultra-Deepwater Offshore Drilling**

52.    The process of ultra-deepwater offshore drilling generally involves several steps. First, seismic and/or magnetic surveys are undertaken to locate "traps," rock formations that may contain significant deposits of oil, natural gas, or other hydrocarbons.

53.     Upon locating a promising "trap," oil rigs such as the *Deepwater Horizon* are positioned on the sea surface above the proposed well site, and from there begin drilling an "exploratory" well to investigate the viability of the trap.  Once the trap is determined to be a worthwhile source of hydrocarbons, the drilling vessel performs "completion" operations to transform the exploratory well into a "production" well that will extract oil or gas from the trap. At this point, well are sometimes temporarily abandoned — sealed with cement so they are secure against any influx of hydrocarbons from the reservoirs they have penetrated  — so they can be reopened by a production vessel at some later date.  At the time of the April 20, 2010 blowout, the *Deepwater Horizon* crew was in the process of preparing the Macondo Well for temporary abandonment.

54.     Once an oil rig such as the *Deepwater Horizon* has been properly positioned to drill an exploratory well, a wide-diameter hole is drilled into the seabed, generally to a depth of about 300 to 400 feet.  This hole is known as a "pilot hole."

55.     Once drilled, the pilot hole is "cased."  "Casing" describes both the actual pipe lining a well, in addition to the act of lining the drilled hole — the well bore — with such pipe.

56.     The combination of drilling the pilot hole and casing is known as "spudding in."

57.     The casing initially lowered into the pilot hole generally anchors a safety device known as the blowout preventer, or "BOP."  The BOP is an appurtenance of the drilling vessel and a part of the vessel's equipment.

58.     The BOP is an assembly of hydraulically operated valves that sense pressure.  It is designed to prevent a blowout from reaching an oil rig.  Its valves are mounted in a direction perpendicular to the anticipated flow of oil.  The BOP is equipped with a series of different "rams" which can be utilized to close off the well in various situations, depending on the

presence or absence of the drill stem or casing in the shaft.  The BOP on this well was a 53-foot-tall steel framed stack weighing 450 tons.

59.     BOP devices generally close within 30 seconds of activation.  A BOP's rams can be manually activated from the drill rig.  Likewise, BOPs generally feature a deadman's switch, which is intended to activate the device's rams if electrical and/or hydraulic connections to the oil rig are severed.

60.     BOP devices are also able to be activated by using remotely operated vehicles, or "ROVs," at the wellhead.

61.     The risk of a blowout is one of the most dangerous and common risks in deepwater drilling, hence the installation of the BOP so early in the well drilling process.  The BOP is a crucial last line of defense for a drilling vessel and its workers if all other attempts to balance well pressure and counter an influx fail, and the well begins to flow out of control.

62.     Once the BOP is properly positioned and secured over the pilot hole, the drilling apparatus and additional casing sections are lowered down through the BOP into the well, while a pipe called a "marine riser" connects the wellhead to the drilling vessel at the surface.

63.     As the drill stem is passed through the marine riser and BOP, drilling fluid known as "mud" is pumped down the center of the drill pipe.  This "mud," a thick mixture of barite, water, clay, and chemicals, cools and lubricates the drill bit and suspends and carries drilled rock fragments and other drilling debris to the surface as it flows upwards outside of the drill stem but inside the marine riser.

64.     Drilling mud is carefully formulated so that its hydrostatic pressure[3] slightly

---

[3] Hydrostatic pressure is the pressure exerted by a fluid due to the force of gravity.  The denser a fluid, the higher its hydrostatic pressure.  Drilling mud is often very dense (12 to 16 pounds per

exceeds that of the ambient pressure conditions in the various rock formations encountered during the drilling process.  The weight of the mud pushes back against the pressure of the hydrocarbons in those formations, helping to control against the ever-present risk of kicks and blowouts in the well.

65.     As the well bore is drilled deeper and deeper, additional sections of casing are added to line each newly-drilled open hole section with pipe.  Each casing section is secured with a plug of cement.  If a well is to be temporarily abandoned before production, then when drilling reaches the hydrocarbon reservoir, the cementing contractor temporarily seals the well off from the hydrocarbon reservoir it has penetrated, isolating the oil and gas to prevent it from leaking into the well, and then places a temporary cement plug below the BOP at the top of the well.

66.     Assuming the design of the well is stable, and proper testing and analysis confirm the integrity of the cement plugs, casing string, and other well components, the drilling vessel can disconnect from the well, temporarily abandoning it until a permanent oil production platform is put into place on the sea surface above the well to begin extracting oil or gas.

**The Events Preceding the Oil Spill**

67.     In the weeks and months before the Oil Spill, the Defendants were engaged in exploring and drilling the Macondo prospect onboard and below the *Deepwater Horizon*.

68.     The Macondo prospect site is in the Northern Gulf of Mexico, an area notorious in the industry for high temperature, high pressure, highly gaseous hydrocarbon reservoirs trapped in weak, brittle rock formations.  At the Macondo site, the *Deepwater Horizon* was conducting drilling operations in excess of 18,000 feet.  Defendants knew or should have known

gallon), so it can counter the highly pressurized hydrocarbons surrounding a well.  In comparison, seawater is relatively light, only 8.6 ppg.

that the threat of blowouts increases as drilling depths increase, especially in an area with such troublesome geology as the Northern Gulf of Mexico.

69.     *Deepwater Horizon* workers reported that since drilling began on October 7, 2009, they had struggled to control the problematic well, as kicks of natural gas regularly burst into the well, halting the drilling progress.  According to a NOAA Flow Rate Technical Group report, the hydrocarbon reservoirs the Macondo well drilled through have high ratios of gas to oil.  The MMS had even warned BP that the gas buildup in this well was a concern and that BP should "exercise caution."

70.     On March 8, 2010, Defendants experienced particularly serious problems with the well, including a hydrocarbon influx into the well and loss of well control.  Upon information and belief, the March 8, 2010, influx became a "near miss" of what could have been a lethal blowout.

71.     Prior to the *Deepwater Horizon* Oil Spill, one or more of the Defendants knew that improving safety performance during offshore drilling operations was necessary.  For example, prior to the Oil Spill, Mr. Steven L. Newman, chief executive of Transocean, admitted that "we have to improve our safety performance."

72.     Furthermore, the Defendants also knew or should have known that ultra-deepwater drilling carried significant safety and environmental risks.

73.     In the weeks and months before the Oil Spill, the operations at Macondo were experiencing delays.  Upon information and belief, BP insisted that the Defendants increase the rate of their activities to expedite the placement of a permanent oil rig at the site to begin production.  This emphasis on speed over safety led to errors and omissions by the Defendants, which in turn caused and/or contributed to the initial explosion and subsequent Oil Spill.

74.     For example, on April 9, 2010, the Defendants had largely finished the initial drilling of the last section of the well.  The final section of the wellbore extended to a depth of 18,360 feet below sea level, which was 1,192 feet below the casing that had previously been inserted into the well.

75.     At this point, the Defendants had to make an important well design decision: how to secure the final 1,192 feet of the well.

76.     There were two primary options available to the Defendants.  The first option involved hanging a steel tube called a "liner" from a liner hanger on the bottom of the casing already in the well and then inserting another steel liner tube called a "tieback" on top of the liner hanger.

77.     The second option available to the Defendants involved running a single string of steel casing from the seafloor all the way to the bottom of the well.

78.     The "Liner/Tieback Casing" (first option) provides advantage over full string casing (second option) with redundant barriers to annular flow.  With a single string of casing, there are just two barriers to the flow of gas up the annular space that surrounds the casing: the cement at the bottom of the well and the seal at the wellhead.

79.     In contrast, the "Liner/Tieback" option provides four barriers to annular flow: (1) the cement at the bottom of the well, (2) the hanger seal that attaches the liner to the existing casing in the well (3) the cement that secures the tieback on top of the liner, and (4) the seal at the wellhead.  The Liner/Tieback option also takes more time to install, requiring several additional days to complete.

80.     The Defendants were aware of the risks of the single casing approach.  An undated "Forward Plan Review" that appears to be from mid-April recommended against the single

18

string of casing because of the risks.  According to this document, "Long string of casing... *was* the primary option" but a "Liner.., is now the recommended option."

81.     This Forward Review Plan noted that single string casing was risky because, *inter alia*, it could lead to the following:

a.     "Cement simulations indicate it is unlikely to be a successful cement job due to formation breakdown."

b.     "Unable to fulfill MMS regulations of 500' of cement above top HC zone;"

c.     "Open annulus to the well head, with... seal assembly as only barrier;"

d.     "Potential need to verify with bond log, and perform remedial cement job(s);" and

82.     Conversely, the Forward Review Plan noted at least four advantages to using the liner option.  These included:

a.     Less issue with landing it shallow (we can also ream it down);"

b.     "Liner hanger acts as second barrier for HC in annulus;"

c.     "Primary cement job has slightly higher chance for successful cement lift;" and

d.     "Remedial cement job, if required, easier to justify to be left for later."

83.     Despite the risks, one or more of the Defendants chose to install the single string of casing instead of a liner and tieback.  The decision to run a single string of casing was made, on information and belief, to save time and reduce costs.

84.     Defendants also made a risky choice for the casing pipe material itself, using metal well casings that raised concerns from their own engineers.  Upon information and belief, internal documents cited by federal investigators showed that as early as 11 months before the blowout, BP engineers worried that the metal casings BP wanted to use might collapse under the high pressure at the bottom of the well, and using the metal casings also violated BP's own

safety policies and design standards, but the riskier metal casings were nevertheless used after special permission was granted by BP supervisors.

85.     Moreover, one or more of the Defendants failed to ensure that appropriate "centralizer" devices were used in the casing the well.

86.     Centralizers ensure that the casing pipe is centered in the well bore; if the pipe is not centered, the cement placed around it often fails to create a secure seal against the highly-pressurized hydrocarbons surrounding the well.  The cement around the casing is intended to seal the space (the "annulus") between the rock walls of the drilled out well bore hole and the casing that runs through the well bore.  If the casing is not centered within the wellbore, the pipe can lay near or against the sides of the bore hole, creating too narrow of a space for the cement to set properly and leaving "channels" of empty space or weak areas in the cement.  Those channels and imperfections can allow hydrocarbons to escape out of the formations and into the well, causing a kick or a blowout.  An email from shore-based BP Operations Vice President Brett Cocales to rig-based BP drilling engineer Brian Morel acknowledged the importance of centralizers, noting that "[e]ven if the hole is perfectly straight, a straight piece of pipe even in tension will not seek the perfect center of the hole unless it has something to centralize it."

87.     The American Petroleum Institute's Recommended Practice 65 explains: "If casing is not centralized, it may lay near or against the borehole wall. ...It is difficult, if not impossible, to displace mud effectively from the narrow side of the annulus if casing is poorly centralized. This results in bypassed mud channels and inability to achieve zonal isolation.

88.     On or about April 5, 2010, BP notified one or more of the other Defendants that it was planning to use only six centralizers on the final casing section at the Macondo well. Halliburton engineer Jesse Gagliano spent a day running models to determine if six centralizers

would be enough to prevent channeling that gaseous hydrocarbons could seep through. Halliburton's analysis concluded that 21 centralizers was the recommended number to ensure a secure cement job; using ten would result in a "moderate" gas flow problem and using only six would result in a "severe" gas flow problem. This information was provided to BP. Additional centralizers were available on the *Deepwater Horizon*, but BP well site leaders erroneously believed they were the wrong type, and did not want to wait for more. In the same email that had recognized the risks of proceeding with insufficient centralizers, BP official Brett Cocales shrugged off using only six, flippantly concluding, "who cares, it's done, end of story, will probably be fine."

89.     Halliburton, hired for its cementing expertise, was fully aware that the number of centralizers BP chose to use was unsafe. Halliburton employee Marvin Volek had warned the BP well site team that BP's cementing plan "was against our best practices." Yet even after running the models that made it clear proceeding with only six centralizers would lead to "failure of the cement job," Halliburton did not stop work or insist that BP use additional centralizers, instead recklessly proceeding with the cement job it knew was destined to fail.

90.     Another questionable decision by one or more of the Defendants was the failure to circulate fully the drilling mud in the well before cementing. This procedure, known as "bottoms up," involves circulating drilling mud from the bottom of the well all the way to the surface. Bottoms up has several purposes: it allows workers on the rig to test the mud for influxes of gas; it permits a controlled release of gas pockets that may have entered the mud; and it ensures the removal of well cuttings and other debris from the bottom of the well, preventing contamination of the cement.

91.     The American Petroleum Institute's guidelines recommend a full bottoms up

circulation between running the casing and beginning a cementing job. The recommended practice states that "when the casing is on bottom and before cementing, circulating the drilling fluid will break its gel strength, decrease its viscosity and increase its mobility. The drilling fluid should be conditioned until equilibrium is achieved....At a minimum, the hole should be conditioned for cementing by circulating 1.5 annular volumes or one casing volume, whichever is greater."

92.     The April 15, 2010 operations plan for the *Deepwater Horizon* called for a full bottoms up procedure to "circulate at least one (1) casing and drill pipe capacity, if hole conditions allow." Nevertheless, upon information and belief, the final procedure called for circulating just 261 barrels of mud, just a small fraction of the mud in the Macondo Well.

93.     Mr. Roth of Halliburton has stated that one reason for the decision not to circulate the mud could have been a desire for speed, as fully circulating the mud could have added a much as 12 hours to the operation.

94.     Notwithstanding the Defendants' risky choices and skipped safety precautions up to this point, and despite knowing the risks of using insufficient centralizers and skipping bottoms up circulation, Halliburton began the cementing job on the Macondo Well.

95.     In a 2007 study, the MMS expressed concerns that oil rig blowouts can be caused by ineffective and/or improper cementing work. Although the study noted that the overall risk of blowouts has been declining, it suggested that blowouts related to cementing work continued with some regularity, and most frequently in the Gulf of Mexico.

96.     According to the 2007 study, cementing problems were associated with 18 of 39 blowouts that occurred between 1992 and 2006, and in 18 of the 70 blowouts that occurred from 1971 to 1991. Nearly all of the blowouts examined occurred in the Gulf of Mexico.

97.     The Defendants knew or should have known that careless, ineffective, negligent, or reckless cementing work caused an August 2009 blowout in the Timor Sea.  During that incident, which shares similarities with the *Deepwater Horizon* Oil Spill, oil leaked from the Timor Sea site for ten weeks, causing damage over 200 miles from the well site.

98.     According to the *Associated Press*, MMS has implicated the cementing process as faulty or ineffective 34 times since 1978.

99.     The cementing job was intended to fill the annulus between the casing and the well bore and seal off the hydrocarbon-filled formations, as well as plug the bottom of the casing pipe to prevent an influx.  The composition of the cement mixture ("slurry") that Halliburton chose for the task would have to allow the cement to be effectively placed and fully set within the narrow range of safe operating pressures at the bottom of the well.  During placement, the slurry would have to be light enough to avoid fracturing the brittle formations surrounding the well, but once set, the slurry would have to be strong enough to resist the intense, nearly 12,000 psi pressure of the hydrocarbon reservoirs within those formations, securely sealing the annular space between the casing and surrounding formations, isolating the hydrocarbon reservoirs from the well.  Despite these challenges, Halliburton and the other Defendants improperly designed the cement slurry and failed to thoroughly conduct and/or review the results of laboratory testing of the cement slurry stability under conditions that would be found in the Macondo well.

100.    Halliburton ultimately recommended a foamed cement mixture to seal the bottom of the Macondo well.  Foam cement is cement that has been injected with nitrogen gas to lower its density.  But high temperatures and pressures in wells like Macondo can have unpredictable effects on the nitrogen in the cement, leading to instability and weakness that prevents the cement from forming a secure seal in the well.

101.    On October 28, 2010, Fred Bartlit, Jr., the lead investigator for the presidential commission investigating the Oil Spill, reported that tests conducted by Halliburton in February 2010 on a cement slurry similar to that used to secure the Macondo well showed instability under conditions like those found at the bottom of the Macondo Well.

102.    Halliburton and BP already knew the Macondo Well was located in brittle, variable, challenging rock formations laced with volatile high temperature, high pressure, gaseous hydrocarbon reservoirs that had plagued drilling operations in the past.

103.    The presidential commission's investigators asked Halliburton to provide them with samples of materials like those used at the Macondo well; independent testing of those samples could not generate stable foam cement in the laboratory using the materials provided by Halliburton, which, according to Bartlit, strongly suggests that the foam cement used at Macondo was unstable during that cement job as well.

104.    Independent tests conducted for BP's investigation of the disaster were also unable to generate a stable slurry using a mixture as similar as possible to Halliburton's slurry in conditions like Macondo's.

105.    Prior to using its slurry mixture in the Macondo well, Halliburton conducted at least four foam stability tests on it, or on similar formulations, but the tests were incomplete and substandard, and mostly indicated the slurry would not be stable in the Macondo well.

106.    In February 2010, Halliburton conducted the first two tests on a cement slurry that was slightly different than that ultimately used; both tests indicated that this foam slurry design was unstable if used in Macondo conditions.  According to Bartlit's report, Halliburton provided the results of the February testing to BP by e-mail on March 8, 2010.

107.    Halliburton conducted two other foam stability tests in April 2010, this time using

the actual slurry mixture and design ultimately used in the Macondo Well.  On April 13, seven days before the blowout, testing indicated the foam slurry design was unstable.  Bartlit reports that the results of this test were reported internally within Halliburton by at least April 17, 2010.  In a second April test, Halliburton modified the testing procedure and the data indicated, for the first time, that the foam slurry mixture would be stable if used at Macondo.  It is not clear if BP received the results of either of the April tests from Halliburton before it allowed Halliburton to begin cementing.

108.    Oil industry expert Robert Bea told the Washington Post that drillers will often run one test on a proposed cement mixture, then a second test as a backup.  Bea considered Halliburton's four tests "unusual . . .[T]hat's telling me they were having trouble getting to a stable design."

109.    Despite the four tests Halliburton did run on the slurry mixture, the testing was not comprehensive, thorough, or consistent with industry standards.  For example, as BP's investigation team noted, Halliburton did not provide results for such commonly tested cement slurry parameters as fluid loss, free water, foam/spacer/mud compatibility, static gel strength transition time, zero gel time, or settlement.

110.    Bartlit reported to the presidential commission that, taken together, the Halliburton documents indicated that:

a.    Only one of the four tests . . . that Halliburton ran on the various slurry designs for the final cement job at the Macondo well indicated that the slurry design would be stable;

b.    Halliburton may not have had — and BP did not have — the results of that test [showing stable results] before the evening of April 20, meaning that the

cement job may have been pumped without any lab results indicating that the foam cement slurry would be stable;

c.      Halliburton and BP both had results in March showing that a very similar foam slurry design to the one actually pumped at the Macondo well would be unstable, but neither acted upon that data; and

d.      Halliburton (and perhaps BP) should have considered redesigning the foam slurry before pumping it at the Macondo well.

111.    In addition to having seen slurry test results showing the instability of Halliburton's proposed cement mixture, BP was also aware of the incomplete, substandard nature of Halliburton's tests, which failed to provide results for several commonly tested parameters.  Nevertheless, BP did not insist that Halliburton reformulate its cement slurry or perform the missing standard tests before proceeding with this tricky and important final cement job.  Indeed, in its rush to complete the well, BP likely charged ahead having only ever seen Halliburton's first three slurry test reports — all of which indicated the cement would be unstable in the well.

112.    Unstable foam cement slurry can result in nitrogen breakout, when bubbles of nitrogen create tiny holes in the cement as it is setting, leaving the cement porous and unable to form a seal against the hydrocarbon pressure.  Nitrogen breakout not only jeopardizes the foam cement itself, but can also contaminate the other types of cement it is pumped with, interfering with their proper placement and/or degrading their ability to form a secure seal.  Nitrogen breakout in the unstable foam slurry used at Macondo could have weakened the denser, non-foamed cement used to plug the very bottom of the last casing pipe, leaving it also unable to withstand the pressure of the hydrocarbons surrounding the well.

113.    In addition to the formulation of the cement mixture, the volume of cement used is another factor in ensuring a successful cement job.  Halliburton used a small volume of cement for this last section of the Macondo Well.  According to the interim report by the National Academy of Engineering ("NAE") scientists investigating the Oil Spill, the concern with using a small volume of cement is "the potential for contamination of the entire slurry volume simply because less cement is present."  This was especially relevant at Macondo, where the high gas-to-oil ratio in the hydrocarbon reservoirs surrounding the well presented a risk of gas contaminating the cement during the setting process.

114.    The NAE panel also expressed concern that the flow rate Halliburton chose to use when pumping the cement into the well was too low to achieve "turbulent flow," a condition that helps push the mud out of the annulus during the cement placement.

115.    Given the extremely narrow range of safe operating pressures Defendants were faced with in this last section of the well, it was all the more important to monitor well flow during the cementing process, to ensure there were no indications of fluid loss or fracturing of the formations around the bottom of the well.  By monitoring the flow of drilling fluid out of the well as the cement is pumped in, it can be confirmed that every barrel of injected cement is associated with a barrel of drilling fluid flowing out of the well.  These "full returns" indicate that the cement is displacing mud from the annulus as planned.  If less mud flows out of a well than the amount of cement that is pumped in, fluid is being lost, most likely into fractures in the brittle formations.

116.    Although BP claimed there were full returns during the last cementing job at Macondo, Halliburton cementer Nathaniel Chaisson testified that there was no monitoring system in place that could have confirmed full returns during cementing operations.  Moreover,

data presented to the congressional investigators by Halliburton cementer Vincent Tabler indicated that about 80 more barrels of cement were pumped into the well than barrels of mud that flowed out.  This fluid loss would indicate that the brittle formations at the bottom of the well had fractured during the cementing process, allowing fluids and cement to escape into the fissures in the rock, and ruining the cement job.  During its congressional testimony in September 2010, BP suggested that 50 barrels of the apparent fluid loss were due to compression of nitrogen in the cement.  Nevertheless, BP should have had a flow monitoring system in place during the cementing process, and any losses due to nitrogen compression should have been anticipated and compensated for during the interpretation of the flow monitoring data.

117.    One way to ensure the viability of cementing work is to conduct a "cement bond log."  A cement bond log is an acoustic test that is conducted by running a tool inside the casing after the cementing is completed.  The cement bond log determines whether the cement has bonded to the casing and surrounding formations.  If a channel that would allow gas flow is found, the casing can be perforated and additional cement injected into the annular space to repair the cement job.

118.    Tommy Roth, a Halliburton Vice President of Cementing, has stated that BP should have conducted a cement bond log.  According to Mr. Roth, "If the cement is to be relied upon as an effective barrier, the well owner must perform a cement evaluation as part of a comprehensive system integrity test."

119.    MMS regulations also appear to direct a cement bond log or equivalent test at the Macondo well. According to the regulations, if there is an indication of an inadequate cement job, the oil company must "(1) Pressure test the casing shoe; (2) Run a temperature survey; (3) Run a cement bond log; or (4) Use a combination of these techniques."  30 CFR § 250.428.

120.    One or more of the Defendants failed to perform a cement bond log test on the subject well.  This decision was contrary to BP's own original drilling plan, which included the cement bond log test.  Skipping the cement bond log test was also contrary to BP's own internal standards, which do not consider full fluid returns a "proven cement evaluation technique," and require a cement bond log test if a well's cement design provides for less than 1000 feet of cement above the highest hydrocarbon layer.  BP's Macondo plan only provided for 500 feet.

121.    The decision not to conduct the cement bond log test was, on information and belief, driven by concerns about expense and time.  The cement log would have cost $128,000 to complete.  Moreover, Mr. Roth of Halliburton estimated that conducting the test would have taken an additional 9 to 12 hours.  Remediating any problems found with the cementing job would have taken still more time.

122.    Gordon Aaker, Jr., P.E., a failure analysis consultant with the firm Engineering Services, LLP, retained by the U.S. House of Representatives Subcommittee on Oversight and Investigations, has opined that it was "unheard of ' not to perform a cement bond log on a well using a single casing approach, and he described the decision not to conduct a cement bond log as "horrible negligence."    Another independent expert consulted by the House of Representatives, John Martinez, P.E., has opined that "cement bond or cement evaluation logs should always be used on the production string."

123.    BP also failed to deploy the casing hanger lockdown sleeve that would have prevented the wellhead seal from being broken by pressure from below.  Upon information and belief, BP made this decision to save time and money.  A casing hanger lockdown sleeve ties down the seal assembly at the top of a well, providing an extra layer of protection against a blowout.  Usually the casing hanger lockdown sleeve is deployed before the heavy drilling mud

29

is pumped out of the well, so that it can offer an extra shield against any problems during and after the mud displacement process.

124.    Contrary to industry standard, BP's plan was to deploy the casing hanger lockdown sleeve *after* the heavy mud had been displaced with seawater.  A well design expert at another major oil company expressed surprise at BP's choice to displace the mud before deploying the casing hanger lockdown sleeve, saying it was "not the norm."  BP had chosen to shake the champagne bottle with only a faulty cork — Halliburton's unsound cement job — standing in the way of disaster.

125.    On the morning of April 20, 2010, the day of the blowout, BP informed M-I, LLC drilling fluid specialist Leo Lindner that the mud displacement would be more substantial than usual, displacing the top 8,367 feet of mud in the riser and drilling string, instead of the typical 300 feet.  In his congressional testimony, Lindner did not mention why BP was displacing almost 28 times the usual amount of heavy mud.

126.    Lindner calculated a mud displacement plan according to BP's specifications, including the suspension of the displacement procedure partway through to allow for pressure testing of Halliburton's recently completed cement job.  Lindner testified that he distributed copies of his mud displacement plan to BP and Transocean employees on the drilling vessel; thus some, if not all, of the Defendants were aware of and complicit in BP's plan to displace an unusually large amount of mud from the well, without the added safety of the casing hanger lockdown sleeve, and beginning before the cement had even fully set and been pressure tested.

127.    At around noon on April 20, 2010, after the completion of the positive pressure test, drilling vessel workers began the mud displacement process.  According to the mud displacement plan, the displacement would proceed until the spacer fluid had been pumped down

to a level 12 feet above the BOP, after which the displacement would be suspended for the negative pressure test.

128.    The BOP's annular preventer was closed to seal casing string for the negative test, but for some reason did not form a secure seal, which allowed about 50 barrels of spacer fluid to leak through the BOP and into the well.  This meant that dense, viscous spacer fluid was across the inlets to several small-bore pipes that were to be used for the negative pressure test, rather than the plain seawater that should have been across the pipe inlets.  Defendants were aware of this spacer fluid leakage and the potential for the viscous fluid to be blocking the small-bore pipes necessary for the negative pressure test, yet they took no steps to remedy the situation.

129.    The negative pressure tests were intended to assess the security of Halliburton's cement job at the bottom of the Macondo well.  With the casing string sealed, pressure was bled off from inside the well, "underbalancing" it by reducing the pressure in the casing until the external pressure from the hydrocarbon reservoirs surrounding the well was greater than the internal pressure within the casing itself.  If Halliburton's cement job had securely sealed the hydrocarbon reservoirs off from the well, there would be little to no fluid flow out of the well and the pressure in the casing would remain at the reduced, underbalanced level.  An increase in pressure or flow would indicate that the cement job was not secure, and was allowing hydrocarbons to flow into the well and repressurize the casing string.

130.    Defendants' two negative pressure tests on the Macondo well both yielded abnormal results.  In one instance, over four times the expected fluid returns spurted out of the well after the pressure was reduced to an underbalanced state.  In the other test, the pressure in the well *increased* from 50 psi to 1,400 psi – a highly diagnostic "red flag" result indicating that Halliburton's cement job had failed to seal off the well from the surrounding hydrocarbon

reservoirs.  The 1,400 psi pressure response and the excess fluid returns were indications that hydrocarbons were flowing into the well, re-pressurizing it after it had been underbalanced for the negative pressure test.  The pressure tests themselves may have further damaged and weakened the cement in the well.  Not only were the tests performed before the cement had a full 72 hours to set completely, but contrary to common practice, the drill string was 10,000 feet above the bottom of the well during the tests.

131.    Experts later testified that BP's interpretation of the pressure tests was not industry standard, while BP itself admitted to Congressional investigators that continuing work on the well after such alarming test results might have been a "fundamental mistake."  In May 2010, BP admitted to congressional investigators that these pressure test results were clear warning signs of a "very large abnormality" in the well.

132.    Later, in its September 8, 2010, disaster investigation report, BP concluded that the negative pressure test result of 1,400 psi was misinterpreted by Transocean and BP employees on the *Deepwater Horizon*, leading the vessel crew to the erroneous view that the test was a success and well integrity had been established.  Moreover, BP's investigation found no evidence that the drilling vessel's workers consulted anyone outside their teams on the vessel or onshore about the abnormal pressure reading, as they should have, before coming to their incorrect conclusion that the well was secure.  The well site leader should have called experts on the drilling vessel or on the beach to discuss the results, BP Vice President Steve Robinson testified in congressional hearings in December 2010.

133.    On December 7, 2011, the BSEE notified BP that its failure to conduct an accurate pressure integrity test violated 30 C.F.R. § 250.427.

134.    In their November 16, 2010, interim report, the NAE panel wrote that "it is clear

that pressure buildup or flow out of a well is an irrefutable sign that the cement did not establish a flow barrier" against the entry of hydrocarbons into the well.  At Macondo, there was both pressure buildup to 1400 psi and unexpected flow out of the well during the negative pressure tests.

135.    There was only one appropriate response to these abnormal negative pressure test results: remedial cement work to correct Halliburton's obviously-flawed cement job and shore up the seal against the highly pressurized hydrocarbon reservoirs.  Defendants, however, elected to ignore the "red flag" results of these, the only cement integrity tests they had even bothered to perform, and continue with their well completion plan as if Halliburton's cement job had been a success.

136.    During the mud displacement process, BP used an unconventional fluid mixture, and an unusually large volume of it, as "spacer" fluid.  This novel composition and amount of fluid may have interfered with negative pressure test results and/or caused damage or clogging in the BOP.

137.    In addition to the acts and omissions described above, in the days immediately prior to the onset of the Oil Spill, BP made a series of unusual, rapid-fire requests to modify operational permits regarding the *Deepwater Horizon*.  These requests were approved in an extremely expeditious fashion, one being "reviewed" and "approved" within five minutes.

138.    On April 14, 2010, one of these modifications included BP asking MMS if it could use a so-called "one-pipe" method, rather than a "two pipe" method to reach the oil and gas reservoir below the *Deepwater Horizon*.  According to *The New York Times*, BP concluded that the one-pipe option was the "best economic case" despite having "some risk" of leaving an open path for gas to travel up outside the well.  The two-pipe method, according to some experts,

is "more or less the gold standard," especially for high-pressure wells such as the one below the *Deepwater Horizon*.

139.    Upon information and belief, the two-pipe method was the safer option because it would have provided an extra layer of protection against gas traveling up the outside of the well to the surface.  However, the one-pipe method was easier and faster by about 7 days, saving BP nearly $7 million.

140.    The Defendants knew or should have known that the threat of blowouts increases as drilling depths increase.  The Defendants were drilling in 5,000 feet of water and to a total depth in excess 18,000 feet below the sea floor.  Some sources indicate that the *Deepwater Horizon* may have been drilling in excess of its permitted depth.

141.    The Defendants were also aware that ultra-deepwater drilling increases the risk and manifestation of product defects in the *Deepwater Horizon's* most critical blowout safety mechanism, the BOP.

142.    The Defendants were aware of the risk of the BOP failing at the great depths in which the *Deepwater Horizon* was operating, yet the Defendants failed to install a backup BOP activation system or a backup BOP, and to provide adequate warnings, instructions, or guidelines on permissible uses, modifications, and applications of the BOP.

143.    Moreover, a Transocean-commissioned independent audit of the vessel in April 2010, just before the blowout, again revealed a range of problems with the Deepwater Horizon's BOP, including a leaking door seal, pump parts needing replacement, error-response messages, and "extraordinary difficulties" surrounding the maintenance of the BOP's annular valves.  BP well site leader Ronald Sepulvado testified in August 2010 that he too had raised concerns about Transocean's maintenance of the BOP, reporting that several pieces of equipment

had been out of service for extended periods of time, but that Transocean "always told me that they didn't have the parts" to make the necessary repairs.

144.     Transocean had also failed to recertify the Deepwater Horizon's BOP, as required by federal regulations, because recertification would require a full disassembly of the device and more than 90 days of downtime.  In its disaster investigation, BP noted that Transocean did not record well control-related equipment maintenance, including that of the BOP, accurately or completely in the regular maintenance management system, sometimes even recording work performed on the BOP that could not possibly have taken place since the BOP was in use on the seafloor at the time of the supposed repair.

145.     After the explosions, as the *Deepwater Horizon* was burning on the surface, emergency responders sent ROVs to the sea floor to attempt to close the blind shear ram using the "hot stab" or autoshear functions.  Several hot stab attempts to close the blind shear ram failed due to insufficient hydraulic pressure.  Over the course of these events, a number of leaks were discovered in the BOP's hydraulic system, as well as incorrect hydraulic plumbing from the ROV intervention panel to the pipe rams, which was likely the result of aftermarket modifications to the BOP.

146.     Ultimately six leaks were discovered in the hydraulic system of the Macondo well's BOP.  From investigation and testimony, Defendants were aware of at least two, but likely almost all, of these leaks prior to April 20, 2010.  One leak was discovered as early as February 2010, but was never repaired or otherwise addressed by Defendants.  Vessel workers testified to awareness of other leaks during their congressional testimony.  Not least, the weekly BOP function tests should have made Defendants aware of the other hydraulic system leaks identified during the ROV intervention.

147.    Defendants' failure to properly maintain the Deepwater Horizon's BOP was also a violation of federal regulations.  On October 12, 2011, BSEE found that BP, Transocean, and Halliburton had each violated 30 C.F.R. § 250.446(a) by failing "to maintain the Deepwater Horizon BOP system in accordance to API RP 53 section 18.10.3."

148.    Defendants were also aware of the aftermarket modifications that hindered the emergency responders' ability to activate the BOP via hot stab procedures.  In addition to incorrectly installed aftermarket hydraulic plumbing, Defendants had switched out one of the Deepwater Horizon's variable bore rams with a non-functional test ram.  But after the blowout, emergency responders spent a day futilely trying to close that missing variable bore ram, not knowing it had been replaced with a useless test part, because Defendants hadn't updated the BOP's schematic diagram to reflect the aftermarket changes – a violation of 29 C.F.R. § 1910.119, which requires, *inter alia*, up-to-date process and safety system equipment drawings as a part of basic process safety management.

149.    Defendant officials were aware of the faulty solenoid valve, poor battery maintenance, hydraulic fluid leaks, and aftermarket modifications on the Deepwater Horizon's BOP long before the April 20, 2010, but no action was ever taken to address the problems, perhaps because additional delays and costs would accrue as all well work stopped and the BOP was raised from the sea floor for repairs.  In addition to posing a significant safety risk, Defendants' choice to continue drilling with a faulty hydraulic system violated federal regulations, which require companies to disclose problems to the MMS and to stop drilling if either of a BOP's two control systems is not working properly.

150.    A 2004 study by Federal regulators showed that BOPs may not function in deep-water drilling environments because of the increased force needed to pinch and cut the stronger

pipes used in deep-water drilling.  Only 3 of 74 rigs studied in 2004 had BOPs strong enough to squeeze off and cut the pipe at the water pressures present at the equipment's maximum depth. "This grim snapshot illustrates the lack of preparedness in the industry to shear and seal a well with the last line of defense against a Blowout," the study said.

151.    Moreover, approximately four weeks before the blowout and onset of the Oil Spill, the Defendants became aware of damage to the *Deepwater Horizon's* BOP.  This included the intrusion of the drill pipe into the BOP, damaging the BOP's annular seal, a rubber gasket vital to the proper functioning of the device.

152.    As a result of this failure, foreign materials including chunks of rubber broken away from the annular seal floated to the surface of the *Deepwater Horizon* and were observed by BP and Transocean.

153.    In response to the discovery of pieces of the annular seal and other evidence in the drilling fluid, BP and Transocean failed to act to prevent or mitigate risk of the Oil Spill. Halliburton was also aware of this discovery, and similarly failed to report this information to outside sources.  One or more of the Defendants acted unreasonably by ignoring this evidence and continuing drilling operations.

154.    In conjunction with their knowledge of the failure of the annular seal on the BOP device, BP and Transocean were also aware of inoperability of the pods used to control the BOP so that it could seal the oil well in the event of a blowout.  Upon information and belief, BP and Transocean were aware of failures in the BOP's battery system and power source.

155.    BP and Transocean could have ensured that a BOP and/or back-up BOP with sufficient strength for deepwater drilling were installed on the *Deepwater Horizon*, but did not do so.

156.    BP and Transocean could have installed a back-up trigger to activate the BOP in the event that the main trigger failed to activate.

157.    In fact, federal regulators at the MMS communicated to BP, Transocean, and/or Halliburton in 2000 that MMS considered a backup BOP activation system to be "an essential component of a deepwater drilling system."

158.    Despite this notice, and although the backup trigger is a common drill-rig requirement in other oil producing nations, including other areas where the BP operates, the *Deepwater Horizon* was not equipped with this backup remote BOP trigger.

159.    The *Deepwater Horizon* was also not equipped with a second BOP, as are many newer oil rigs.  Rather, the *Deepwater Horizon* only had one BOP installed, leaving the well especially vulnerable to a blowout and subsequent oil spill.

160.    Unfortunately, the BOP was not the only part of the Deepwater Horizon that was poorly maintained and in disrepair at the time of the blowout.  Transocean, the vessel's owner, had a history of postponing and ignoring needed maintenance on the Deepwater Horizon, despite concerns raised by its own employees and other vessel workers.  In the weeks before the blowout, the Deepwater Horizon suffered power outages, computer glitches, and a balky propulsion system.  In some cases, Transocean officials even purposely overrode or disabled vital safety mechanisms and alarms.  When the Macondo well blew out, the Deepwater Horizon's shoddy maintenance facilitated a cascade of failures of multiple emergency systems, exacerbating the disaster.

161.    According to testimony given before a federal panel by vessel engineers in August 2010, the Deepwater Horizon had a number of ongoing equipment problems at the time of the blowout, some of which contributed to the failure of backup generators that should have

powered safety and shutdown devices immediately after the blowout.

162.    Further, the computerized system used to monitor routine maintenance aboard the vessel was not working optimally because glitches from a recent computer system migration had not yet been resolved.  Sometimes the computer called for maintenance to be done on equipment that did not exist aboard the vessel, while some pieces of equipment that were aboard the vessel and in need of maintenance were not registered by the computer.

163.    Even worse, some key safety systems and alarms on the Deepwater Horizon had been intentionally bypassed or disabled by Transocean.  Mike Williams, a chief electronics technician working for Transocean aboard the *Deepwater Horizon*, testified that on the night of the blowout, a pressure regulator valve, which automatically cuts off gas flow at a certain pressure point and could have helped stop the blowout, was in "bypass" mode when the gaseous hydrocarbons blew out of the Macondo well.  Williams had repeatedly expressed concern about bypassed safety systems to Transocean supervisors, only to be upbraided for his efforts.  In one instance, Williams activated a gas safety valve that he thought was erroneously in "bypass" mode.  Williams testified that Transocean subsea supervisor Mark Hay reprimanded him for it, saying: "'The damn thing has been in bypass for five years.  Why did you even mess with it?' … And [Hay] said, 'As a matter of fact, the entire fleet [of Transocean drilling vessels] runs them in bypass.'"

164.    Williams said a fire alarm system on the vessel was also partially disabled at the time of the blowout, and had been for at least a year since Williams first noticed it.  The system was set to "inhibited" mode, meaning that the control panel would indicate a problem, but a general alarm would not sound throughout the vessel unless manually activated.  Transocean supervisors told Williams "they did not want people to wake up at 3 a.m. due to false alarms."

Williams testified that he complained regularly about the practice of disabling and bypassing alarms and safety systems; his most recent complaint was just three days prior to the blowout.

165.    When the *Deepwater Horizon* lost power during the blowout, none of the backup or emergency generators were working — equipment that was on board for the very purpose of providing power to alarm and safety systems in just such an emergency.  Transocean employee and Deepwater Horizon chief engineer Stephen Bertone testified that there was no general alarm, no internal communications, and no power to the vessel's engines.  "We were a dead ship." Without power, the crew was also unable to engage the EDS that would have stopped the flow of gas fuelling the fire on the vessel, and many other alarm and safety systems were rendered silent and useless.

166.    An equipment assessment commissioned by Transocean in April 2010, just before the blowout, revealed many key components on the Deepwater had not been fully inspected since 2005, and at least 36 components and systems on the vessel were in "bad" or "poor" condition, which "may lead to loss of life, serious injury or environmental damage as a result of inadequate use and/or failure of equipment."  The equipment assessment also found problems with the vessel's ballast system that they noted could directly affect the stability of the ship.  The assessment found a malfunctioning pressure gauge and multiple leaking parts, and also faulted the decision to use a type of sealant "proven to be a major cause of pump bearing failure."

167.    The findings of the Transocean-commissioned equipment assessment echoed the results of a similar BP-commissioned audit that had been conducted in September 2009, which found that Transocean had "overdue planned maintenance considered excessive — 390 jobs amounting to 3,545 man hours [of needed maintenance work]."

168.    In a confidential worker survey conducted on the Deepwater Horizon just weeks

before the blowout, Transocean employees voiced concerns about poor equipment reliability. One worker noted that the drilling vessel had not once in its nine-year career been taken to dry dock for necessary repairs: "we can only work around so much."  Another worker described Transocean's policy of running equipment to failure before making just the bare minimum repairs: "[r]un it, break it, fix it. . . .That's how they work."

169.    The other Defendants were all aware of Transocean's poor maintenance of the Deepwater Horizon and its practice of disabling or bypassing vital safety systems, and alarms, yet none of them called for work to stop until vessel safety was improved, and none of them reported Transocean's actions and inactions to the MMS.

170.    As noted in a May 25, 2010 memorandum authored by Congressmen Henry A. Waxman and Bart Stupak, Members of the House of Representatives' Committee on Energy and Commerce, in the hours and minutes immediately preceding the onset of the Oil Spill, BP, Transocean, and Halliburton were faced with clear signs that serious problems with the rig's operations were developing and manifesting.

171.    For example, as early as 5:05 p.m., almost 5 hours before the explosion, one or more of the Defendants observed an unexpected loss of fluid in the riser pipe, suggesting that there were leaks in the annular preventer in the BOP.

172.    Moreover, two hours before the explosion, during efforts to begin negative pressure testing, the system gained 15 barrels of liquid instead of the 5 barrels that were expected, leading to one or more of the Defendants to become aware of the possibility that there was an "influx from the well."

173.    The Defendants conducted this negative pressure testing initially on the drill pipe rather than the kill line, even though the drill plan specified that it would be done on the kill line.

The line was opened and pressure on the kill line was bled to 0 psi, while pressure on the drill pipe remained at 1400 psi.  Officials from BP have admitted that this was a "fundamental mistake" as this difference in psi was an "indicator of a very large abnormality."  Nevertheless, after anomalous results, the negative pressure testing was conducted on the kill line and ultimately accepted by the Defendants.

174.    Approximately 51 minutes before the explosion that began the Oil Spill, one or more of the Defendants knew or should have known that more fluid had begun flowing out of the well than was being pumped in.  This was a clear indication to one or more of the Defendants of serious problems with the drilling operation.

175.    Approximately 41 minutes before the explosion that began the Oil Spill, one or more of the Defendants was aware that although the pump was shut down for a "sheen" test, the well continued to flow instead of stopping.  Moreover, at this time one or more of the Defendants knew or should have known that the drill pipe pressure also unexpectedly increased.  These were additional, clear indicators of problems with the drilling operation.

176.    Approximately 18 minutes before the explosion that began the Oil Spill, one or more of the Defendants observed abnormal pressures and mud returns, and the pump was abruptly shut down.  This was a further, clear indicator to the Defendants of problems with the drilling operation immediately prior to the explosion and Oil Spill.

177.    Data presented by BP to the United States House of Representatives' Committee on Energy and Commerce suggests that the crew may have attempted mechanical interventions at that point to control the pressure, but soon after, the blow-out occurred, reservoir pressures became unstable resulting in massive quantities of flammable gases shooting to the surface resulting in the tragic and devastating explosion on board the *Deepwater Horizon*.

**The Explosion and Oil Spill**

178.    On or about April 20, 2010, at approximately 9:45 p.m. CST, a series of explosions occurred on the *Deepwater Horizon*.  These explosions ensued due the release of reservoir pressure and a blowout, which funneled flammable gases into the oil rig.  These explosions killed eleven (11) crew members, and injured many more.  Two days following the initial explosions, the remnants of the *Deepwater Horizon* sank to the ocean floor.

179.    Shortly before the explosions aboard the *Deepwater Horizon*, employees, agents, and/or contractors of one or more of the Defendants were participating in drilling-related activities, including cementing and mudding, to seal and plug the wellhead.  Cementing is intended to, among other things, hold back the flow of oil and hydrocarbons from the well bore.  Cementing and mudding are delicate activities, and each carries the risk of a blowout if not performed properly.  Improper or ineffective cementing work and/or mudding operations performed by one or more of the Defendants was a cause or contributing factor to the Oil Spill.

180.    Immediately after the explosion, desperate vessel workers tried in vain to activate the emergency disconnect sequence on the Deepwater Horizon's BOP.  As reports and testimony have shown, problems and failures with each of the BOP's emergency activation methods prevented the use of the Deepwater Horizon's BOP to seal the well, paralyzing its powerful shear rams that should have slammed shut, severing the drill pipe, and quelling the blowout.

181.    The Macondo well's BOP had several emergency activation methods: the high-pressure closure of the blind shear ram, the emergency disconnect sequence[4] ("EDS"), the

---

[4] The EDS disconnects the drilling vessel from the well by detaching the riser from the top of the BOP, allowing the vessel to move away from the well.  The EDS also triggers the closure of the blind shear ram to seal off the well itself.

automatic mode function[5] ("AMF"), and activation via remotely operated vehicles (ROVs) on the seafloor using the "hot stab"[6] or autoshear[7] functions.  None of these were able to activate the BOP to seal the well.

182.   Almost immediately following the explosion, oil began to discharge into the Gulf of Mexico from a depth of 5,000 feet below the *Deepwater Horizon*.

183.   Before the Oil Spill, the *Deepwater Horizon* had been connected to the wellhead at the seafloor by a 5,000 foot pipe called a "riser."   As the *Deepwater Horizon* sank to the seafloor, it pulled the riser down with it, buckling and eventually breaking the riser.  This riser was connected to a well casing that ultimately linked the *Deepwater Horizon* to an oil field located thousands of feet below the ocean floor.

184.   While crude was believed to be discharged before the *Deepwater Horizon* finally sank on April 22, 2010, the rate of discharge is believed to have increased once the *Deepwater Horizon* sank to the ocean floor.  Oil flowed out from the open end of the riser in at least two places.  The Defendants permitted, allowed, and failed to properly monitor and inspect pressure levels in the riser and the BOP valves.

185.   Each day during the Oil Spill, tens of thousands of barrels of crude oil gushed from the wellhead and broken riser, bubbling up to the surface to form a widening slick that because large enough to see from outer space and also spreading into vast subsurface plumes.  On the surface, the oil slick at times covered tens of thousands of square miles.  It spread with

---

[5] The AMF is activated when electricity, hydraulics, and communications from the drilling vessel are all severed.  Powered by hydraulic pressure from accumulators and batteries on the BOP itself, the AMF's functionality is independent from the vessel and is not affected by loss of power or hydraulics on the vessel itself.
[6] An ROV can activate certain BOP functions, such as the blind shear ram, by performing a hot stab, injecting hydraulic fluid into dedicated ports on the BOP to close the rams.
[7] An ROV can activate the autoshear function by snipping a rod on the BOP, triggering the closure of the blind shear ram.

the wind and currents, making landfall on white sand beaches and ecologically sensitive marshes and estuaries.  Underwater, huge plumes of oil and dispersant chemicals swirled through the water column and came to rest on the sea floor at different depths, damaging ecosystems and privately owned and leased sea beds.

186.   Oil flowed unchecked into the Gulf of Mexico for months.  The Oil Spill necessitated an unprecedented response effort.  During the response, massive amounts of chemical dispersants were sprayed from the air, at the surface of the Gulf and beneath the surface of the water.

187.   The Macondo Well was ultimately declared sealed on September 19, 2010.  Before that time, millions of barrels of oil had been discharged.  A large volume of dispersant chemicals had also been applied.  The full scope of the disaster is not yet known.

188.   The Defendants knew or should have known of the dangers associated with ultra-deepwater drilling and failed to take appropriate measures to prevent damage to Plaintiff and marine, coastal, and estuarine areas of the Gulf of Mexico and the states bordering the Gulf of Mexico.

189.   Moreover, additional safety mechanisms, technologies, and precautions were known and available to one or more of the Defendants but the Defendants elected not to employ them on the *Deepwater Horizon*.

190.   Upon information and belief, BP also hindered efforts to kill the Macondo Well and stop the flow of oil and gas into the Gulf waters.  Although engineers knowledgeable about blowout responses told BP how to kill the well as early as June 2010, BP, after conferring with its lease partners, chose to ignore the engineers' well-kill procedure because BP did not want to damage the well – or its chance to make a profit at Macondo.  Because BP hoped to retap the

well and profit from the large, valuable reservoirs beneath it, it ignored this expert information that could have stopped the Oil Spill many weeks earlier.

**Defendant BP Misrepresents its Oil-Spill Response Capabilities**

191.    After the onset of the Oil Spill, BP and Transocean attempted to downplay and conceal the severity of the Oil Spill in the press.  In this regard, their initial estimate was that following the blowout and Oil Spill, the well was discharging 1,000 barrels of crude oil per day.

192.    However, on or about April 28, 2010, ROVs exploring the wreckage of the *Deepwater Horizon* discovered kinks in rig's sunken, broken riser.  At this point, BP indicated that oil might be leaking at a rate of as much as 5,000 barrels (or 210,000 gallons) of oil discharged per day.

193.    On May 4, 2010, BP executives admitted to members of Congress that the rate of the Oil Spill leak could reach 60,000 barrels, or 2,500,000 gallons, per day.

194.    On or about June 20, 2010, Congressman Edward Markey released an internal BP document showing that the company's own analysis revealed that the rate of Oil Spill could reach 100,000 barrels, or 4,200,000 gallons, per day.

195.    On February 23, 2009, BP submitted a document entitled "Initial Exploration Plan Mississippi Canyon Block 252" ("Exploration Plan") to the MMS.  In the Exploration Plan, BP evaluated the potential environmental impact of a blowout at an ultra-deepwater oil well.  It also described its ability to respond to a blowout resulting from an oil spill.  Additionally, BP made misrepresentations about its capability to respond to a blowout in the Exploration Plan.

196.    In describing the impact a blowout and subsequent spill could have on essential fish habitats, BP indicated the following:

> In the event of an unanticipated blowout resulting in an oil spill, it is
> unlikely to have an impact based on the industry wide standards for using proven

equipment and technology for such responses, implementation of BP's Regional Oil Spill Response Plan which address available equipment and personnel, techniques for containment and recovery and removal of the oil spill.

197.    Likewise, BP stated in its February 23, 2009 Exploration Plan that it was "unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities," and that "due to the distance to shore (48 miles (77 km)) and the response capabilities that would be implemented, no significant adverse impacts are expected."

198.    On May 17, 2010, U.S. Senators Barbara Boxer, Ben Cardin, Frank Lautenberg, Kirsten Gillibrand, Bernie Sanders, Amy Klobuchar, Tom Carper, and Jeff Merkely contacted U.S. Attorney General Eric Holder to specifically request that the U.S. Department of Justice "open an inquiry into whether British Petroleum (BP) made false and misleading statements to the federal government regarding its ability to respond to oil spills in the Gulf of Mexico."

199.    On May 17, 2010, Senators Boxer, Cardin, Lautenberg, Gillibrand, Sanders, Klobuchar, Carper and Merkely, in a letter to Attorney General Holder noted:

> In the wake of the Deepwater Horizon oil spill, it does not in any way appear that there was 'proven equipment and technology' to respond to the spill, which could have tragic consequences for local economies and the natural resources of the Gulf of Mexico. Much of the response and implementation of spill control technologies appears to be taking place on an ad hoc basis.

200.    BP has admitted that it had no proven or tested techniques available to deal with a blowout like that seen onboard the *Deepwater Horizon* when it explained on May 10, 2010 that "[a]ll of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before."

201.    Moreover, BP p.l.c.'s chief executive officer, Anthony Hayward ("Hayward"), further admitted that BP was unprepared for an event like the Oil Spill when he stated on May 12, 2010 that it was "probably true" that BP was unprepared for an emergency of this magnitude.

202.     BP stymied efforts to gauge the scope of the disaster on land and at sea.  *The New York Times* reported on May 16, 2010 that "BP has resisted entreaties from scientists that they be allowed to use sophisticated instruments at the ocean floor that would give a far more accurate picture of how much oil is really gushing from the well."

203.     Furthermore, reports have surfaced that the oil companies, such as BP, Transocean, and/or Halliburton, were in some instances authored their own inspection reports for the MMS, which were then rubber-stamped.   As such, even if BP, Transocean, and/or Halliburton were in compliance with MMS regulations, that compliance lacks credibility and cannot establish the propriety of the Defendants' actions.

### The Economic Impact of the Oil Spill and Injuries to Plaintiff

204.     During the summer of 2010, an oil slick with a range of thousands of miles formed and could be seen from space.   Additionally, thick, voluminous plumes of oil were identified in deep waters within the Gulf of Mexico.  The Oil Spill caused this slick and these plumes to form.  Oil washed ashore from the Gulf of Mexico and coastal waters and damaged marine animals' coastal habits.

205.     The Oil Spill has impacted and continues to impact the Gulf of Mexico, and the Gulf Coast's and Florida's shorelines, threatening the livelihood and the operations of individuals and businesses, including in the County.

206.     The economic injury, damages, and losses suffered by businesses and individuals necessarily entailed a corresponding decline in the revenues of local governments from taxes and fees.  Further, governmental entities such as Plaintiff conduct government-run activities that function similarly to privately owned businesses and that were impacted by the Oil Spill in a manner the same as or similar to private businesses.

207.    The oil from the *Deepwater Horizon* Oil Spill contains benzene, toluene, polyaromatic hydrocarbons and other compounds (collectively referred to as Total Petroleum Hydrocarbons, or "TPH"), all of which are known carcinogens.  The oil from the *Deepwater Horizon* Oil Spill also contains mercury, lead and other heavy metals that are hazardous to the health of people and aquatic life.

208.    The oil released is extremely hazardous to marine life in the Gulf of Mexico and the waters of the states bordering the Gulf of Mexico.  It is especially hazardous to marine life at the bottom of the food chain, including creatures such as plankton, shrimp, and crabs.

209.    These plankton, shrimp, and other marine creatures are vital to entire marine ecosystem, and the damaged sustained by these tiny marine creatures threatens the entire marine the species regularly sought by commercial and recreational fishermen.

210.    As of July 2, 2010 and continuing for some time, the National Oceanic and Atmospheric Administration prohibited commercial and recreational fishing in an area covering 80,228 square miles or approximately thirty-three percent (33%) of the Gulf of Mexico, have been closed due to the Oil Spill.

211.    Exposure to crude oil and dispersants as a result of the *Deepwater Horizon* Oil Spill has caused and is continuing to cause environmental damages to the marine ecosystem and aquatic species for years to come.  As noted by Dr. Lisa Kaplowitz of the U.S. Department of Health and Human services in her June 15, 2010 testimony before Congress, "Oil can remain toxic in the environment for years."

212.    Moreover, chemical dispersants used by BP have been reported to be negatively impacting the health and safety of those assisting in the clean-up of the Oil Spill.  The potential lasting toxic effects of these chemicals could further endanger the ability of individuals and

entities to derive income and revenue from business operations located in the areas along the Gulf Coast and from sources tied to the seafood, fishing, and tourism industries in the Gulf region.

213.    Preliminary economic projections on the impact to the Gulf of Mexico's fishing industry alone estimated that damages could be in the billions of dollars.

214.    A study done for the U.S. Travel Association projected that the Oil Spill would result in at least $7.6 billion in lost tourism revenue in 2010 alone.  Tourism accounts for approximately 46 percent of the Gulf Coast economy annually, and damage to this core industry damages the broader economy of the Gulf Coast region as well.

215.    Upon information and belief, the Mississippi coast had a 50 percent cancellation rate on reservations generally; a May 2010 survey by the Louisiana Tourism Commission indicated that 26 percent of Americans who had planned to visit Louisiana were no longer planning to visit after the Oil Spill began; Alabama saw a dramatic drop in tourism, including a 60 percent drop in visitations and an 80 percent drop in home rentals; and, preliminary economic projections estimated that the impact to Florida's tourism economy alone could be in the billions of dollars.

216.    During the Oil Spill, the waters of the Gulf of Mexico were threatened from the coast of Texas throughout Louisiana, with threats of oil entering the loop current and continuing to the east coast of Florida.  The National Oceanic and Atmospheric Administration ("NOAA") and other agencies used modeling techniques to predict the released oil's most likely trajectory. For some time, these predictions pointed toward Florida's coast.  The pollution of the Gulf of Mexico by the Oil Spill and attendant risk of contamination to Florida's coasts necessarily informed the decision-making of travelers.  Meanwhile, the waters surrounding the Spill, the

estuaries connecting to the Gulf of Mexico, the waterways connecting to the Gulf of Mexico, and all of the land that touched the Gulf of Mexico was put into immediate and continuous threat throughout this time.

217.    Tourism suffered not only in coastal areas and counties whose shores the oil reached, but across the entire Gulf Coast, including coastal areas that risked, but did not actually experience, contamination during the Oil Spill.   An early analysis performed by Oxford Economics on behalf of the U.S. Travel Association found indicators of double-digit declines in plans to travel to the Gulf Region generally, and to cities on Florida's west coast specifically. The study further explained that losses were greatest in the areas where oil came ashore, but significant numbers of tourists shifted away from the entire Gulf region; further, many misperceptions existed regarding which areas had been oiled.

218.    Fishing, seafood, and maritime-related businesses, including those in the County also suffered losses as a result of the Oil Spill's environmental damage.   Fishermen were unable to fish in large areas of the Gulf, and consumers were leery of Gulf seafood.   Retailers and manufacturers of fishing and recreational boats incurred losses because customers were concerned about the safety of boating in the Gulf of Mexico after the Oil Spill.

219.    The Oil Spill also hurt property values.   The value of income-producing properties, including both commercial and residential properties, declined due to and as a result of the pollution from the Oil Spill.   The decline in property valuations for tax purposes necessarily entailed a decline in property tax revenues.

220.    As the Oil Spill immediately damaged the seafood harvesting and processing industry and the immediate tourist trade, the integral nature of the economy of the Gulf Coast results in damage throughout the states of Mississippi, Alabama, Louisiana, Texas, and Florida.

By way of example, when the fishermen are not able to harvest and the processors not able to sell, they are not able to make payments on their mortgages, which results in defaults in loans, and they are not able to maintain their employees, reducing the employees' income, which results in reduced spending, resulting in reduced sales at all retail establishments throughout the state. This chain of causation is continuous and not broken throughout the geographical area of the Gulf Coast.

221.    Plaintiff has suffered, and will continue to suffer, injuries and damages due to the fact that it has been unable to collect revenues and other economic benefits due to the decline in tourism and declining interest in visiting the County as a result of the pollution and damage to the Gulf region done by the Oil Spill.

222.    In addition, Plaintiff has suffered, and will continue to suffer, injuries and damages due to the loss of revenues and other economic benefits due to diminished commercial and residential property values and losses to fishing and other maritime-related industries as a result of the Oil Spill.

223.    Plaintiff has lost and will continue to lose, revenues from, *inter alia*, solid waste department operations; water and sewer operations; the local discretionary sales tax and the Local Government Half-Cent Sales Tax Program; electric franchise fees; state and local communications services taxes; local fuel taxes; tourist development taxes; and, ad valorem property taxes, including ad valorem property taxes on commercial, residential homestead, and residential non-homestead property.

224.    The County spent funds on mitigation advertising to blunt the effects of the Oil Spill on its economy. Specifically, the County diverted advertising dollars to advertise that its beaches, shores, and waters had not been impacted by the spill. Despite these efforts, the

County's reputation remained damaged by the Oil Spill, and the County pursued claims for additional funding for mitigation advertising from BP to rebuild its reputation and thereby avoid further short- and long-term economic losses.  BP denied the County's claim.

225.    Plaintiff's injuries and damages occurred as a direct and foreseeable result of the Oil Spill and due to the Oil Spill's environmental devastation.

<u>**"Presentment" Under OPA**</u>

226.    To the extent required by law, Plaintiff has satisfied all of the requirements of 33 U.S.C. §§ 2713(a) and (b) with respect to claims against BP and Transocean and certain of its claims against BP.

227.    Transocean has neither advertised nor established an OPA claims process.

228.    To the extent required by law, and/or by consent and/or stipulation by BP, Plaintiff has satisfied all of the requirements of 33 U.S.C. §§ 2713(a) and (b) with respect to claims against BP and/or Transocean by the submission of its claims to the BP OPA Claims Program, the *Deepwater Horizon* Court-Supervised Settlement Program and/or the Gulf Coast Claims Facility.

229.    In particular, on or about April 19, 2013, Plaintiff submitted a Claim, including a "sum certain" demand and a description of the claim as well as supporting documentation to BP as the "responsible party" under OPA.  The Claim and the relevant supporting documentation were submitted via both certified mail and e-mail to both the "BP Government Entity Funding Requests" program and the "BP Claims Program" established pursuant to BP's obligations under OPA.

230.    BP denied the Claim in a letter dated May 30, 2013, which Plaintiff received on or about June 3, 2013.

231.    BP did not settle the claim by payment within 90 days of presentment.

232.    On or about July 31, 201 and on or about October 19, 2010, Plaintiff presented claims for lost Tourist-Development-Tax revenue and reimbursement of the money it had invested in mitigation advertising, including "sum certain" demands and a description of the claims as well as some supporting documentation, to BP as the responsible party under OPA.  BP denied the claim for lost Tourist-Development-Tax revenue by failing to respond within 90 days and also denied the claim for reimbursement of mitigation advertising costs.  The County subsequently presented these claims to the Oil Spill Liability Trust Fund, which also denied the claims.

### The BP Exploration and Transocean Deepwater Plea Agreements

233.    BP Exploration has entered into a Guilty Plea Agreement with the U.S. Department of Justice in connection with the Oil Spill.  In an exhibit to this Plea Agreement, BP Exploration admitted that if its case were to proceed to trial, the federal government could prove beyond a reasonable doubt that BP Exploration's negligence proximately caused the deaths of eleven men on board the *Deepwater Horizon* on April 20, 2010 and also proximately caused the discharge of large and harmful quantities of oil into the Gulf of Mexico, as well as a number of related facts overlapping with those alleged in and/or relevant to the allegations of this Complaint.  *See* Exhibit A to Guilty Plea Agreement, Rec. Doc. 2-1 in Case No. 2:12-cr-00292 (E.D. La. Nov. 15, 2012).  The Court has accepted this Guilty Plea Agreement.  *See* Reasons for Accepting Plea Agreement, Rec. Doc. 65 in Case No. 2:12-cr-00292 (E.D. La. Jan. 30, 2013).

234.    Transocean Deepwater has entered into a Plea Agreement with the U.S. Department of Justice in connection with the Oil Spill.  In an exhibit to this Plea Agreement, Transocean Deepwater admitted that if its case were to proceed to trial, the federal government

would be able to prove that Transocean Deepwater, together with others, negligently discharged, or caused to be discharged, oil into the Gulf of Mexico, as well as a number of related facts overlapping with those alleged in and/or relevant to the allegations of this Complaint.  *See* Exhibit A to Cooperation Guilty Plea Agreement, Rec. 3-2 in Case No. 2:13-cr-00001 (E.D. La. Jan. 3, 2013).  The Court has entered a judgment based on this Plea Agreement.  *See* Judgment, Rec. Doc. 31 in Case No. 2:13-cr-00001 (E.D. La. Feb. 14, 2013).

## Willful, Wanton Conduct of the Defendants

235.    BP and Transocean, and/or Halliburton, emphasized profits over and safety while undertaking their ultrahazardous activities on the *Deepwater Horizon*.

236.    BP and Transocean, and/or Halliburton, recklessly, willfully and/or wantonly caused or contributed to the catastrophic Oil Spill through their collective and respective disregard for proper drilling, casing, mudding, and cementing procedures.

237.    BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Oil Spill by their tortious modifications to and/or operation and use of the BOPs.

238.    BP and Transocean, and/or Halliburton, recklessly, willfully and/or wantonly failed to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout.

239.    BP and Transocean, and/or Halliburton, recklessly, willfully and/or wantonly failed to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

240.    BP recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Oil Spill, and thereby

exacerbated and worsened the pollution of the Gulf of Mexico.

241.    BP and Transocean, and/or Halliburton, by their conscious and/or deliberate unreasonable acts and/or omissions complained of herein, and/or as the evidence may show, displayed negligence, gross negligence, reckless indifference, willfulness, and/or wantonness.

## CLAIMS FOR RELIEF

### COUNT 1
### THE OIL POLLUTION ACT ("OPA")
### (Against BP & Transocean)

242.    Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

243.    The Oil Pollution Act, 33 U.S.C. § 2701, *et seq.* (the "OPA"), imposes liability upon a "responsible party for a . . . vessel or a facility from which oil is discharged . . . into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs.  33 U.S.C. § 2702.

244.    The Coast Guard has named BP as the responsible party for the downhole release of oil and Transocean as the responsible party for the release of diesel on the surface.  Therefore, BP and Transocean are strictly liable pursuant to Section 2702 of the OPA for all the damages resulting from the Oil Spill.

245.    BP and Transocean are not entitled to limit their liability under Section 2704(a) of the OPA because the Oil Spill was proximately caused by their gross negligence, willful misconduct, or violation of applicable safety, construction or operating regulations.  33 U.S.C. § 2704(c).

246.    Moreover, in its "Statement of BP Exploration & Production Inc. Re Applicability of Limitation of Liability Under Oil Pollution Act of 1990," filed on October 19, 2010, BP

waived the statutory limitation on liability under the OPA.

247.    Plaintiff has suffered the net loss of taxes, royalties, rents, fees, and/or net profit shares due to the injury, destruction, or loss of real property, personal property, or natural resources.  More specifically, Plaintiff has suffered a net loss of revenue from, *inter alia*, solid waste department operations; water and sewer operations; the local discretionary sales tax and the Local Government Half-Cent Sales Tax Program; electric franchise fees; state and local communications services taxes; local fuel taxes; tourist development taxes; and, ad valorem property taxes, including ad valorem property taxes on commercial, residential homestead, and residential non-homestead property.

248.    Plaintiff has suffered loss of profits and/or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources.

249.    Plaintiff has suffered damages consisting of the net costs of providing increased or additional public services during or after removal activities, and these damages were caused by the Oil Spill.

250.    As a result of the Oil Spill, Plaintiff is entitled to damages pursuant to Section 2702(b)(2)(D), which provides for "[D]amages equal to the net loss of taxes, royalties, rents, fees, or net profit shares due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by the Government of the United States, a State, or a political subdivision thereof."

251.    In the alternative, as a result of the Oil Spill, Plaintiff is entitled to damages pursuant to Section 2702(b)(2)(E), which provides for "[D]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."

252.     In addition, as a result of the Oil Spill, Plaintiff is entitled to damages pursuant to Section 2702(b)(2)(F), which provides for "[D]amages for net costs of providing increased or additional public services during or after removal activities, including protection from fire, safety, or health hazards, caused by a discharge of oil, which shall be recoverable by a State, or a political subdivision of a State."

253.     The damages recoverable under OPA include the costs of assessing the damages specified in Section 2702(b), and Plaintiff is entitled to recover the costs of assessing its damages under OPA.

254.     As a result of the Oil Spill, Plaintiff has not been able to use natural resources (air and water, and potentially wetlands and other areas and spaces that have and/or may become contaminated by the spilled oil), and it is entitled to recover from BP and/or Transocean for such damages in amounts to be determined by the trier of fact, in addition to the damages as set forth above.

255.     To the extent required by law, Plaintiff has satisfied all of the requirements of 33 U.S.C. §§ 2713(a) and (b), as to its claims against BP and Transocean.

### COUNT II
### NEGLIGENCE
### (Against BP & Halliburton)

256.     Plaintiff repeats, realleges and makes a part hereof each and every allegation contained in the preceding paragraphs of this Complaint and incorporates same by reference as though fully set forth herein.

257.     All times material hereto, BP and/or Halliburton were participating in drilling operations onboard the *Deepwater Horizon* in the Gulf of Mexico.  At all times material hereto, BP and/or Halliburton were under a duty to utilize reasonable care in undertaking and carrying

out their collective and respective activities onboard the *Deepwater Horizon*.

258.    At all times material hereto the *Deepwater Horizon* was owned, navigated, manned, possessed, managed, controlled, chartered and/or operated by BP.

259.    All times material hereto, Halliburton was responsible for cementing the well that was the subject of the Oil Spill, and further was engaged in testing, analysis, and monitoring of the aforementioned well.

260.    At all times material hereto, Plaintiff had and continues to have a special interest in the use Gulf of Mexico's and Gulf Coast's marine and coastal environments, natural resources, beaches, estuarine areas.  Plaintiff derives revenues and income from the tourism industry, which is a primary economic driver for the County, and/or from seafood and maritime-related sources, and/or from property taxes assessed based on the value of property.  Plaintiff owns property on and/or near the Gulf Coast.  As a governmental entity, Plaintiff has a special interest in protecting and preserving the Gulf of Mexico and the Gulf Coast's marine and coastal environments, natural resources, beaches, and estuarine areas for the benefit of its residents and visitors.

261.    At all times material hereto, BP and/or Halliburton's onshore and offshore oil drilling and exploration operations involved locating, extracting, collecting, storing, and transporting pollutants and hazardous contaminants.

262.    At all times material hereto, BP and/or Halliburton's onshore and offshore oil drilling and exploration operations which involved locating, extracting, collecting, storing, and transporting pollutants and hazardous contaminants created an appreciable zone of risk within which the BP and/or Halliburton were obligated to protect the Plaintiff, who was within the appreciable zone of risk created by BP and/or Halliburton's activities and would foreseeably be

exposed to harm due to those risks.

263.    Plaintiff, as a local government entity and property owner at or near the coast of the Gulf of Mexico that is dependent upon the Gulf of Mexico's marine and coastal environments for, *inter alia*, tax revenue, royalties, rents, and fees was within an appreciable zone of risk and, as such, BP and/or Halliburton were obligated to protect Plaintiff.

264.    BP and/or Halliburton were under a duty of care to refrain from negligent conduct that would cause pollution of the waters, beaches, and natural resources of the Gulf of Mexico the Gulf Coast counties.

265.    BP and/or Halliburton were under a duty to exercise reasonable care while participating in drilling operations to ensure that an Oil Spill and subsequent discharge of oil did not occur.

266.    BP and/or Halliburton were under a duty to exercise reasonable care to ensure that if crude oil discharged in the event of a blowout, that it would be contained and/or stopped within the immediate vicinity of the *Deepwater Horizon* in an expeditious manner.

267.    BP and/or Halliburton knew or should have known that the acts and omissions described herein could result in damage to Plaintiff and the Gulf of Mexico's marine and coastal environments and esuarine areas.

268.    BP and/or Halliburton, respectively and collectively, failed to exercise reasonable care while participating in drilling operations, and thereby breached duties owed to Plaintiff.

269.    BP and/or Halliburton, respectively and collectively, failed to exercise reasonable care while participating in drilling operations to ensure that a blowout and subsequent Oil Spill did not occur, and thereby breached duties owed to Plaintiff.

270.    BP and/or Halliburton, respectively and collectively, failed to exercise reasonable

care to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout, and thereby breached duties owed to Plaintiff.

271.   BP and/or Halliburton, respectively and collectively, failed to exercise reasonable care to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico, and thereby breached duties owed to Plaintiff.

272.   BP and/or Halliburton were in violation of federal and/or state statutes and/or regulations.

273.   The blowout and subsequent Oil Spill was caused by BP and/or Halliburton and has resulted in an economic and ecological disaster that has directly and proximately caused injuries and damages to Plaintiff.

274.   As a result of the blowout and subsequent Oil Spill caused by BP and/or Halliburton, Plaintiff has suffered economic injury, damages and/or losses, including loss of revenue from, *inter alia*, solid waste department operations, water and sewer operations, sales taxes, electric franchise fees, state and local communications services taxes, local fuel taxes, tourist development taxes, and, ad valorem property taxes.

275.   The blowout and subsequent Oil Spill was caused by BP and/or Halliburton and has resulted in an economic and ecological disaster that has directly and proximately caused a tortious invasion that has interfered with the special interest of the Plaintiff to use the Gulf of Mexico's and the Gulf Coast's marine and coastal environments, natural resources, beaches, estuarine areas.  Plaintiff derives revenues and income from the tourism industry, which is a primary economic driver for the County, and/or from seafood and maritime related sources,

and/or from taxes based on the value of property.

276.    Prior to the blowout and Oil Spill, BP and/or Halliburton had actual and/or constructive knowledge of the facts and circumstances leading to the Oil Spill. BP and/or Halliburton knew or should have known of no less than three flow indicators from the *Deepwater Horizon*'s well in the hours and minutes before the explosion and Oil Spill, all of which were clear evidence of significant problems with the rig's drilling operations.  BP and/or Halliburton's actions and inactions were grossly negligent, reckless, willful, and/or wanton.

277.    Plaintiff is entitled to a judgment that BP and/or Halliburton are jointly and severally liable to Plaintiff for damages suffered as a result of BP and/or Halliburton's negligence, gross negligence, recklessness, willfulness or wantonness.  Plaintiff should be compensated for damages in an amount to be determined by the trier of fact, including punitive damages for BP and/or Halliburton's conduct.

## COUNT III
## NEGLIGENCE *PER SE*
## (Against BP & Halliburton)

278.    Plaintiff repeats, realleges and makes a part hereof each and every allegation contained in the preceding sections of this Action and incorporates same by reference as though fully set forth herein.

279.    BP and/or Halliburton's conduct with regard to the maintenance, and/or participation of drilling operations and oil rigs such as the *Deepwater Horizon* is governed by numerous state and federal laws, and permits issued under the authority of these laws.

280.    These laws and permits create statutory standards that are intended to protect and benefit Plaintiff, among others.  BP and/or Halliburton violated these statutory standards.  Such violations constitute negligence *per se*.

62

281.   BP and/or Halliburton's violations of these statutory standards caused Plaintiff economic injury, damages, and/or losses.

282.   BP and/or Halliburton's violations of these statutory standards proximately caused Plaintiff's injuries, warranting compensatory and punitive damages.

283.   BP and/or Halliburton had actual and/or constructive knowledge of the facts and circumstances leading to and causing this incident, which in turn caused Plaintiff's injuries, and their actions and inactions were grossly negligent, reckless, willful, and/or wanton.

284.   Plaintiff is entitled to a judgment finding BP and Halliburton liable to Plaintiff for damages suffered as a result of BP and Halliburton's negligence *per se* and awarding Plaintiff adequate compensation in an amount to be determined by the trier of fact, including punitive damages for BP and Halliburton's conduct.

## COUNT IV
## GROSS NEGLIGENCE & WILLFIL MISCONDUCT
## <u>(Against BP & Halliburton)</u>

285.   Plaintiff repeats, realleges and makes a part hereof each and every allegation contained in the preceding sections of this Action and incorporates same by reference as though fully set forth herein.

286.   BP and/or Halliburton owed and breached duties of ordinary and reasonable care to Plaintiff in connection with the maintenance of, and drilling operation on, the *Deepwater Horizon*, and additionally owed and breached duties to Plaintiff to guard against and/or prevent the risk of the Oil Spill.

287.   BP and/or Halliburton breached their legal duty to Plaintiff and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard in the negligent maintenance and/or operation of the *Deepwater Horizon*.

288.    BP and/or Halliburton knew or should have known that their wanton, willful, and reckless misconduct would result in a disastrous blowout and oil spill, causing damage to those affected by the Oil Spill.

289.    BP acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiff by, *inter alia*, failing to use a sufficient number of "centralizers" to prevent channeling during the cement process; failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job; disregarding proper drilling, casing, mudding, and cementing procedures; failing to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill into the waters of the Gulf of Mexico.

290.    BP and Halliburton acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiff by, *inter alia*, using an inappropriate cement mixture for the well; failing to appropriately test that cement mixture prior to using it in the well; failing to run a cement bond log to evaluate the integrity of the cement job; and failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

291.    BP acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiff by, *inter alia*, using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

292.    BP acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiff by, *inter alia*, recklessly maintaining and altering, and/or wantonly operating and/or using the BOP appurtenant to the

*Deepwater Horizon.*

293.    As a result of BP and/or Halliburton's gross negligence, willful misconduct, and reckless disregard and the safety and health of the environment, Plaintiff suffered economic injury, damages, and/or losses.

294.    BP and/or Halliburton's gross negligence, willful misconduct, and reckless disregard and the safety and health of the environment proximately caused Plaintiff's injuries, warranting compensatory and punitive damages.

295.    Plaintiff is entitled to a judgment finding BP and Halliburton liable to Plaintiff for damages suffered as a result of BP and Halliburton's gross negligence and/or willful misconduct and awarding Plaintiff adequate compensation in an amount to be determined by the trier of fact, including punitive damages for BP and Halliburton's conduct.

**COUNT V**
**FRAUDULENT CONCEALMENT**
**<u>(Against BP & Halliburton)</u>**

296.    Plaintiff repeats, realleges and makes a part hereof each and every allegation contained in the preceding sections of this Action and incorporates same by reference as though fully set forth herein.

297.    To the extent available under state law, Plaintiff is entitled to recovery against BP and Halliburton for their fraudulent concealment of material facts concerning the Oil Spill and BP's ability to respond to a blowout resulting in an oil spill.

298.    After the explosions, BP attempted to downplay and conceal the severity of the Spill.  BP's initial leak estimate of 1,000 barrels per day was found by government investigators to be a fraction of the actual leakage amount of 50,000 barrels of oil per day.

299.    Moreover, in the aftermath the explosions, BP did not provide complete and

timely announcements and warnings about the severity, forecast and trajectory of the Oil Spill.

300.    In addition, BP misrepresented its capabilities to respond to the Oil Spill.  BP overstated its ability to a handle a blowout in its Exploration Plan, wherein it claimed that in the event of a blowout resulting in an oil spill, it was "unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses."

301.    In fact, BP did not have proven equipment and technology to respond to the Oil Spill; instead, according to the letter to Attorney General Eric Holder by Members of Congress on May 17, 2010, it did not "in any way appear that there was 'proven equipment and technology' to respond to the spill, which could have tragic consequences for local economies and the natural resources of the Gulf of Mexico."  As noted further in that letter, "much of the response and implementation of spill control technologies appear[ed] to be taking place on an ad hoc basis."

302.    BP admitted on May 10, 2010 that "[a]ll of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before."

303.    Despite its inability to respond and control the Oil Spill, BP resisted requests from scientists to use sophisticated instruments at the ocean floor that would have provided a more accurate picture of the amount of oil that was gushing from the well.

304.    BP did not in the aftermath of the blowout or since that time provide complete or timely announcements and warnings about the severity, forecast and trajectory of the Oil Spill.

305.    The severity, forecast and trajectory of the Oil Spill, and BP's ability to respond to the Oil Spill, were material facts that BP had a duty to disclose.

306.    In addition, Halliburton misrepresented and concealed the stability of the cement

66

used at the Macondo Well, despite having performed three tests before the Spill, all of which demonstrated that the foam cement used at Macondo was unstable.

307.    The instability of the cement used at the Macondo Well and the results of the testing performed before the Oil Spill were material facts that Halliburton had a duty to disclose.

308.    Moreover, BP was aware, before the Oil Spill, that Halliburton's testing had revealed that the concrete foam was unstable, yet it concealed this material fact.

309.    Halliburton and BP failed to disclose or concealed the foregoing material facts, and their failure to do so induced Plaintiff to act or to refrain from acting to protect its property, business, livelihood and income.

310.    As a direct and proximate result of the fraudulent concealment of the foregoing material facts by Halliburton and BP, Plaintiff suffered economic injury, damages, and loss, including but not limited to lost revenues from, *inter alia*, solid waste department operations, water and sewer operations, sales taxes, electric franchise fees, state and local communications services taxes, local fuel taxes, tourist development taxes, and, ad valorem property taxes.

311.    Moreover, the acts of misrepresentation and concealment of the foregoing material facts by Halliburton and BP were willful, wanton, and/or in callous disregard for the safety of others, including Plaintiff, and, accordingly, Plaintiff is entitled to an award of punitive damages.

**COUNT VI**
**STRICT LIABILITY PURSUANT TO THE FLORIDA POLLUTANT DISCHARGE PREVENTION AND CONTROL ACT FLA. STAT. § 376.011, *ET SEQ.*
(Against BP)**

312.    Plaintiff repeats, realleges and makes a part hereof each and every allegation contained in the preceding sections of this Action and incorporates same by reference as though fully set forth herein.

67

313. At all relevant times, BP owned, leased, operated, and/or maintained the *Deepwater Horizon* and the Macondo Well. Following the April 20, 2010 explosions, fire, and ultimate sinking of the *Deepwater Horizon*, the Macondo Well began spewing crude oil into the Gulf of Mexico.

314. At all relevant times, BP had a statutory duty to Plaintiff to maintain and operate the *Deepwater Horizon* and the Macondo Well so as to not create or sustain hazardous conditions due to the discharge of pollutants as defined by the Florida Pollutant Discharge Prevention and Control Act (the "Florida Act"), Fla. Stat. § 376.031.

315. At all relevant times, BP breached its statutory duty to the Plaintiff by discharging, or allowing to be discharged, crude oil into the Gulf of Mexico and allowing the massive oil spill to migrate into Florida's marine and coastal areas, in violation of the Florida Act, Fla. Stat. §§ 376.011 -376.21.

316. Pursuant to Section 376.041 of the Florida Act, the discharge of pollutants into or upon any coastal waters, estuaries, tidal flats, beaches, and lands adjoining the seacoast of the State of Florida is prohibited. The Florida Act holds "Responsible Parties" liable for the discharge of pollutants in violation of its provisions.

317. Pursuant to Section 376.031(20)(a) and (c) of the Florida Act, BP is a "Responsible Party" and therefore liable under the Florida Act, because it was an operator of the *Deepwater Horizon* and a lessee of the area where the *Deepwater Horizon* and the Macondo Well were located. BP was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution Act of 1990, 33 U.S.C. §274.

318. At all relevant times, BP breached its statutory duty to Plaintiff by discharging, or allowing to be discharged, crude oil and other pollutants and hazardous substances into the Gulf

of Mexico and then negligently allowing or causing the massive oil spill to migrate into Florida's marine and coastal waters and shores in violation of the Florida Act.  Once present there, BP's additional tortious misconduct added chemical dispersants onto the oil, creating and enlarging the pollutant hazards and their movement into Florida territorial waters and real property.

319.    BP is liable under the Florida Act for the discharge of pollutants or hazardous substances into or upon the surface waters of the state and lands, and failing to obtain required permits before discharging pollutants and hazardous substances into the surface waters of the state and lands.  Fla. Stat. §376.302.

320.    BP is strictly liable to Plaintiff under the Florida Act, § 376.205, which provides in pertinent part:

> . . . any person may bring a cause of action against a responsible party in a court of competent jurisdiction for damages, as defined in § 376.031, resulting from a discharge or other condition of pollution covered by §§ 376.011-376.21. In any such suit, it shall not be necessary for the person to plead or prove negligence in any form or manner. Such person need only plead and prove the fact of the prohibited discharge or other pollutive condition and that it occurred.

321.    The Florida Act creates a private cause of action.  *See* Fla. Stat. § 376.205.  The Florida Act provides that "[e]ach responsible party is liable to any affected person for all damages as defined in s. 376.031, excluding natural resource damages, suffered by that person as a result of the discharge."  Fla. Stat. § 376.12(5).

322.    The private cause of action under the Florida Act is a strict liability cause of action.  Plaintiff "need only plead and prove the fact of the prohibited discharge or other pollutive condition and that it occurred."  Fla. Stat. § 376.205.  The Oil Spill constitutes a prohibited discharge within the meaning of the Florida Act and it has occurred.

323.    The immediate discharge from the Oil Spill occurred into waters outside the territorial limits of Florida; however, lands and waters within the territorial limits of Florida have

been directly affected by the discharge and are reasonably expected to continue to be so affected.

324.    The Florida Act provides that "[e]ach responsible party is liable to any affected person for all damages as defined in Section 376.031, excluding natural resource damages, suffered by that person as a result of the discharge." Fla. Stat. §376.12(5).

325.    The Florida Act defines "damage" as "the documented extent of any destruction to or loss of any real or personal property. . .including all living things except human beings, as the direct result of the discharge of a pollutant. Fla. Stat. §376.031(5).

326.    The Florida Act defines "persons" as "any individual, partner, joint venture, corporation; any group of the foregoing, organized or united for a business purpose; or any governmental entity, Fla. Stat. §376.031(4).

327.    As "persons" under the Florida Act, Plaintiff is entitled to damages for the destruction to or loss of any real or personal property.

328.    As the direct and proximate result of BP's breach of statutory duty to Plaintiff, the Oil Spill originating from the Macondo Well and the post-Oil Spill remedial efforts and use of dispersants has resulted in damage to property and natural resources and/or economic injury, damages, or loss to Plaintiff, including lost revenues from, *inter alia*, solid waste department operations, water and sewer operations, sales taxes, electric franchise fees, state and local communications services taxes, local fuel taxes, tourist development taxes, and, ad valorem property taxes..

329.    As a result of the Oil Spill, Plaintiff has sustained economic injury, damages or losses, including, *inter alia*, solid waste department operations, water and sewer operations, sales taxes, electric franchise fees, state and local communications services taxes, local fuel taxes, tourist development taxes, and, ad valorem property taxes, as a result of the post-Spill clean-up

activity, and they are entitled to recover from BP Exploration and BP America for such damages in amounts to be determined by the trier of fact.

330.    Plaintiff is entitled to such damages pursuant to Fla. Stat. § 376.031(5), which defines "damages" as "the documented extent of any destruction to or loss of any real or personal property, or the documented extent, pursuant to § 376.121, of any destruction of the environment and natural resources, including all living things except human beings, as the direct result of the discharge of a pollutant."

331.    The Florida Act contains no presentation requirement.  *See* Fla. Stat. § 376.205.

332.    The damages recoverable under the Florida Discharge Prevention and Control Act, Fla. Stat. §376.011, *et seq.*, Florida State law claims, and the General Maritime laws of the United States include, but are not limited to:

(a)    Damages or destruction to real or personal property;

(b)    Damage or destruction to all living things, excluding human beings;

(c)    Reasonable attorney's fees;

(d)    Expert witness costs;

(e)    Punitive damages.

333.    By reason of the foregoing, Plaintiff has incurred damages in an amount to be determined at trial, and are entitled to compensatory and punitive damages, reasonable attorneys' fees, and expert witness costs.

## PRAYER FOR RELIEF

334.    WHEREFORE, Plaintiff, Charlotte County, Florida, demands judgment against Defendants, jointly, severally, and solidarily, as follows:

(a)    Economic and compensatory damages in amounts to be determined at trial;

(b)     Punitive damages to the fullest extent available under the law;

(c)     Pre-judgment and post-judgment interest at the maximum rate allowable by law;

(d)     Reasonable claims-preparation expenses;

(e)     Attorneys' fees and costs of litigation; and

(f)     Such other and further relief available under all applicable state and federal laws

and any relief the Court deems just and appropriate.


### REQUEST FOR TRIAL BY JURY

Plaintiff demands trial by jury.

Dated: June 12, 2013

Respectfully submitted,

s/Kelly J. Patrick
Kelly J. Patrick, Esq.
LA Bar Roll No. 31,912
Joseph F. Rice, Esq. (*Pro Hac Vice* application to
be filed, Trial Attorney)
Motley Rice LLC
940 Gravier Street, 1st Floor, Suite D
New Orleans, LA 70112
(504) 648-1485 ext. 2485
(504) 648-1499 (fax)
kpatrick@motleyrice.com
jrice@motleyrice.com

Robert E. Turffs, Esq.
Robert E. Turffs, P.A
1444 1st Street, Suite B
Sarasota, FL 34236
(941) 953-9009
(941) 953-5736 (fax)
bturffs@sarasotatriallawyer.com

*Attorneys for Plaintiff*

72