Rough Transcript

Page 1

1

2   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF LOUISIANA
3   ------------------------------------X
    In Re:  OIL SPILL BY THE OIL RIG
4   "DEEPWATER HORIZON" IN THE GULF OF
    MEXICO, ON APRIL 20, 2010,
5
6   Applies to:
7   12-311, Cameron Int'l Corp. v. Liberty
    Ins. Underwriters, Inc., a/k/a Liberty
8   Int'l Underwriters
9
    ------------------------------------X
10
11
12          VIDEO DEPOSITION OF JAMES ENGEL
13                New York, New York
14             Wednesday, May 29, 2013
15
16
17
18
19
20
21  Reported by:
22  Rebecca Schaumloffel, RPR, CLR
23  Job No: 61441
24
25

**EXHIBIT A**

Rough Transcript

## Page 10

1  J. ENGEL
2  A.  I would say approximately 2009.   09:30AM
3  Q.  Did you retain any copies of the   09:31AM
4  materials that you developed for that case?   09:31AM
5  A.  No.   09:31AM
6  Q.  Were you working as an employee   09:31AM
7  of Liberty International at the time that you   09:31AM
8  rendered your testimony?   09:31AM
9  A.  No.   09:31AM
10  Q.  Where were you working at that   09:31AM
11  time?   09:31AM
12  A.  I was self-employed.   09:31AM
13  Q.  Did some research on the web and   09:31AM
14  we came up with Engel Dispute Resolution LLC.   09:31AM
15  Was that your company?   09:31AM
16  A.  Yes.   09:31AM
17  Q.  Was that the company that you   09:31AM
18  were employed by when you say you were   09:31AM
19  self-employed?   09:31AM
20  A.  Yes.   09:31AM
21  Q.  What business was Engel Dispute   09:31AM
22  Resolution LLC in?   09:31AM
23  A.  I was -- I provided arbitration   09:31AM
24  services, expert witness and claims   09:31AM
25  consulting.   09:32AM

## Page 11

1  J. ENGEL
2  Q.  Did you ever provide services to   09:32AM
3  insurance while you were working at Engel   09:32AM
4  Dispute Resolution LLC?   09:32AM
5  A.  To insureds?   09:32AM
6  Q.  Yes.   09:32AM
7  A.  Yes.   09:32AM
8  Q.  Were any of those insureds in the   09:32AM
9  oil and gas industry?   09:32AM
10  A.  No.   09:32AM
11  Q.  Are there any certification   09:32AM
12  requirements that you must maintain as a   09:32AM
13  claims officer at Liberty?   09:32AM
14  A.  No.   09:32AM
15  Q.  Do you have continuing education   09:32AM
16  requirements --   09:32AM
17  A.  No.   09:32AM
18  Q.  -- that you must satisfy?   09:32AM
19  A.  No.   09:32AM
20  Q.  What qualifies you to be the   09:32AM
21  chief claims officer at Liberty?   09:32AM
22  A.  My experience.   09:32AM
23  Q.  For how long have you worked in   09:33AM
24  the insurance industry?   09:33AM
25  A.  43 years.   09:33AM

## Page 12

1  J. ENGEL
2  Q.  I am going to mark as Engel   09:33AM
3  Exhibit 1, a one-page document.   09:33AM
4  (Whereupon, Engel Exhibit 1,   09:33AM
5  Biography of J. Engel experience was   09:33AM
6  marked for identification as of this   09:33AM
7  date by the Reporter.)   09:33AM
8  Q.  Do you have Engel Exhibit 1 in   09:33AM
9  front of you, sir?   09:33AM
10  A.  Pardon?   09:33AM
11  Q.  Do you have Engel Exhibit 1 in   09:33AM
12  front of you?   09:33AM
13  A.  I do.   09:33AM
14  Q.  Do you recognize this exhibit?   09:33AM
15  A.  I do.   09:33AM
16  Q.  Could you please tell the jury   09:33AM
17  what it is?   09:33AM
18  A.  It is a biography of my   09:33AM
19  experience.   09:33AM
20  Q.  You see how -- there is a logo   09:33AM
21  underneath your picture that says Arias U.S.   09:33AM
22  Do you see that?   09:34AM
23  A.  Yes.   09:34AM
24  Q.  What is Arias U.S.?   09:34AM
25  A.  It's an insurance and reinsurance   09:34AM

## Page 13

1  J. ENGEL
2  organization that promotes arbitration to   09:34AM
3  resolve disputes.   09:34AM
4  Q.  Were you affiliated with this   09:34AM
5  organization?   09:34AM
6  A.  I am.  I am a dues-paying member   09:34AM
7  and I am certified as an arbitrator.   09:34AM
8  Q.  How many times have you served as   09:34AM
9  an arbitrator?   09:34AM
10  A.  Three or four.   09:34AM
11  Q.  Were they coverage matters?   09:34AM
12  A.  Yes.   09:34AM
13  Q.  This biography does not, as far   09:34AM
14  as I can tell, identify your employment at   09:34AM
15  Liberty.  Is that because this was prepared   09:34AM
16  prior to your employment at Liberty?   09:34AM
17  A.  That's correct.   09:35AM
18  Q.  When did you first join Liberty   09:35AM
19  International?   09:35AM
20  A.  September 2010.   09:35AM
21  Q.  Were you hired as the chief   09:35AM
22  claims officer at Liberty International in   09:35AM
23  September 2010?   09:35AM
24  A.  Yes, I was.   09:35AM
25  Q.  And you've served in that role   09:35AM

Rough Transcript

## Page 14

```
1        J. ENGEL
2    from September of 2010 through the present?    09:35AM
3    A.  Yes.                                        09:35AM
4    Q.  Who do you report to at Liberty             09:35AM
5    International?                                  09:35AM
6    A.  David Cohen who is the chief                09:35AM
7    executive of the U.S. region.                   09:35AM
8    Q.  Anyone else?                                09:35AM
9    A.  That's it.                                  09:35AM
10   Q.  Are you familiar with the term              09:35AM
11   capacity when referring to an insurance         09:35AM
12   contract?                                       09:35AM
13   A.  Yes.                                        09:35AM
14   Q.  What does that mean?                        09:35AM
15   A.  It means how much in limits we              09:35AM
16   are willing to provide.                         09:35AM
17   Q.  Does Liberty International have a           09:35AM
18   specific capacity that it is willing to         09:35AM
19   provide?                                        09:36AM
20   A.  It is different business by                 09:36AM
21   business, line by line within the business     09:36AM
22   unit. It all depends upon the business units   09:36AM
23   risk appetite at the moment. So --              09:36AM
24   Q.  What business unit would a                  09:36AM
25   company within the oil and gas industry fall   09:36AM
```

## Page 15

```
1        J. ENGEL
2    within at Liberty International?                09:36AM
3    A.  It depends on the coverages that            09:36AM
4    they are looking for. So if it's a property    09:36AM
5    coverage, then it would fall in our first      09:36AM
6    party energy department. If it's a liability   09:36AM
7    coverage, then it would fall in our casualty   09:36AM
8    unit. If it is a marine coverage, it would     09:36AM
9    be written in our marine unit.                  09:36AM
10   Q.  You are familiar with the term              09:36AM
11   excess casualty?                                09:36AM
12   A.  Yes.                                        09:36AM
13   Q.  What does that term mean?                   09:36AM
14   A.  It's our underwriting unit that             09:36AM
15   writes excess policies, excess above primary.  09:36AM
16   Q.  Does the casualty unit within               09:37AM
17   Liberty International have a maximum capacity  09:37AM
18   that it is authorized to write for a given     09:37AM
19   company?                                        09:37AM
20   A.  I don't know. That changes all              09:37AM
21   the time and you would have to ask the         09:37AM
22   underwriters that question.                     09:37AM
23   Q.  Who at Liberty International                09:37AM
24   decides whether to pay a claim that comes in?  09:37AM
25   A.  The claim handlers, unless it is           09:37AM
```

## Page 16

```
1        J. ENGEL
2    a matter above their authority.                 09:37AM
3    Q.  Do claims handlers at Liberty               09:37AM
4    International have specific levels of           09:37AM
5    authority?                                      09:37AM
6    A.  They do.                                    09:37AM
7    Q.  Does it vary from person to                 09:37AM
8    person or is it a set amount?                   09:37AM
9    A.  Varies from person to person                09:37AM
10   depending on the individual's experience.      09:37AM
11   Q.  You are familiar with                       09:37AM
12   Jeff Roberts?                                   09:37AM
13   A.  I am.                                       09:37AM
14   Q.  And he was the claims handler at           09:37AM
15   Liberty International responsible for          09:37AM
16   monitoring and addressing Cameron's claim in   09:37AM
17   connection with the Deepwater Horizon          09:37AM
18   incident, was he not?                           09:38AM
19   A.  Yes.                                        09:38AM
20   Q.  Did he have a specific authority            09:38AM
21   for approving claims?                           09:38AM
22   A.  Of course. Everyone in the                  09:38AM
23   department does.                                09:38AM
24   Q.  Do you know what his is?                    09:38AM
25   A.  You would have to ask his                   09:38AM
```

## Page 17

```
1        J. ENGEL
2    supervisor.                                     09:38AM
3    Q.  Do you know who his                         09:38AM
4    supervisor is?                                  09:38AM
5    A.  Jessica Rogin.                              09:38AM
6    Q.  And are you Miss Rogin's                    09:38AM
7    supervisor?                                     09:38AM
8    A.  I am.                                       09:38AM
9    Q.  But differently, you are                    09:38AM
10   Mr. Roberts' boss' boss, correct?               09:38AM
11   A.  That is correct.                            09:38AM
12   Q.  You don't know what Mr. Roberts             09:38AM
13   specific authority for approving or             09:38AM
14   disapproving claims is?                         09:38AM
15   A.  I don't recall exactly, no.                 09:38AM
16   Q.  If a claims exceeds his                     09:38AM
17   authority, does it then move up the chain to   09:38AM
18   Miss Rogin for approval?                        09:38AM
19   A.  It does.                                    09:38AM
20   Q.  Does she have a specific                    09:38AM
21   authority that she can approve?                 09:38AM
22   A.  She does.                                   09:38AM
23   Q.  Do you know what Miss Rogin's               09:38AM
24   authority is?                                   09:38AM
25   A.  Sure. It is $25 million.                    09:38AM
```

Page 42

J. ENGEL
 A. At times. Generally, people followed sets of practices that they brought with them from other companies because that's where they developed their experience and knowledge, and so a person from AIG and a person from Excel and a person from Zurich would approach their claims handling in a similar fashion. But would describe their own claim handling practices more akin to the way they learned them at those companies. 10:10AM – 10:11AM

 Q. When a new employee arrived at LIU, were they handed any materials about claims handling? 10:11AM

 A. No, because we didn't have any prior to the development of those best practices. That's part of the reason why I was hired, so that we would have a more consistent approach. 10:11AM

 Q. When did you begin drafting the best practices for LIU? 10:11AM

 A. Begin drafting them? The litigation management best practices were drafted in the summer and fall of 2011. The other claim handling best practices were 10:11AM – 10:12AM

Page 43

J. ENGEL
drafted, I would say, in the January to March period of 2012. Some of them for some of our professional liability lines got drafted a bit later than that. 10:12AM

 Q. Okay. So we talked earlier about how Jeff Roberts was the person at Liberty primarily responsible for handling Cameron's claim in connection with the Deepwater Horizon. 10:12AM

 A. Yes. 10:12AM

 Q. How did he know how to adjust claims? 10:12AM

 A. Well, Jeff Roberts is a highly experienced casualty, excess casualty claim adjustor with more than 20 years of experience. So Jeff knows very well how to go about handling excess claims. I would say that, in fact, much of our best practices would be reflective of the way Jeff handles claims. 10:12AM – 10:13AM

 Q. Did Mr. Roberts collaborate with you in the development of the best practices guides? 10:13AM

 A. For the casualty line of

Page 44

J. ENGEL
business, it was myself and Jessica Rogin who drafted and built those best practices. 10:13AM

 Q. Do you recall when Miss Rogin joined LIU? 10:13AM

 A. I believe it was in August of 2011. 10:13AM

 Q. And did she come knowing how to handle claims without any instruction from anybody at Liberty? 10:13AM

 A. Yes. Jessica was highly experienced in handling and managing claim units and, in particular, casualty claim units, which is one of the reasons that attracted her to me as a candidate for the position. 10:13AM – 10:14AM

 Q. So it's your testimony that, prior to April or May of 2012, Liberty had no written policies or procedures for the adjusting of claims in casualty? 10:14AM

 A. That's correct. 10:14AM

 Q. And folks at Liberty knew how to adjust claims based solely on their experience developed over time? 10:14AM

 A. Yes, based solely on their

Page 45

J. ENGEL
experience and direction that they would receive from their supervisors after they arrived at LIU. 10:14AM – 10:15AM

 Q. And different folks at Liberty had different practices and procedures from other folks at Liberty because they had different experiences and there was no written guidelines? 10:15AM

 A. There were no written guidelines; though I would say experienced people, even though they came from different companies, had similar approaches to how to handle claims. 10:15AM

 Q. What is the first thing that a claims adjustor at Liberty is supposed to do upon -- well, withdrawn. Let me ask a different question. 10:15AM

 When you developed the best practices, for ^ CK written purposes, for casualty, did you intend to reflect in those best practices the way that claims were handled prior to them being put into writing? 10:15AM – 10:16AM

 MR. MARTIN: Object to form. 10:16AM

 Q. I will ask a different question. 10:16AM

Rough Transcript

## Page 46

J. ENGEL
2  That was a fair objection.                    10:16AM
3      You testified that the best               10:16AM
4  practices at Liberty were, for casualty, put  10:16AM
5  into writing for the first time by yourself   10:16AM
6  in the April, May 2012 timeframe, right?      10:16AM
7    A.  Yes.                                    10:16AM
8    Q.  Were these a new set of best            10:16AM
9  practices or were they reflective of how      10:16AM
10 Liberty did business prior to that time?      10:16AM
11   A.  They were built out of whole            10:16AM
12 cloth, so to speak. Meaning that there were   10:16AM
13 no prior documents for us to refer to and     10:16AM
14 build upon. So they were built on a clean     10:16AM
15 piece of paper, and they were reflective of   10:17AM
16 what Miss Rogin and I believed to be the best 10:17AM
17 practices used in the industry for handling   10:17AM
18 casualty claims. And used in the industry     10:17AM
19 means broadly by all companies. Not every     10:17AM
20 company has all of the best practices. Some   10:17AM
21 of them have some bad practices. Some of      10:17AM
22 them have good practices. And some of them    10:17AM
23 have -- are silent, and so our collaboration  10:17AM
24 was to put together what we believed to be    10:17AM
25 the best practices from around the industry   10:17AM

## Page 47

1       J. ENGEL
2  that was what we wanted our claim handlers at 10:17AM
3  LIU to be using on a go-forward basis.        10:17AM
4    Q.  Were those practices and                10:18AM
5  procedures as reflected in the best practices 10:18AM
6  the claims handling procedures that at least  10:18AM
7  you and Miss Rogin were using prior to the    10:18AM
8  time they were set forth in writing?          10:18AM
9    A.  Well, first of all, I am not a          10:18AM
10 claim handler and never have been. So as a    10:18AM
11 manager of large claims organizations, I have 10:18AM
12 been aware for more than 25 years of what     10:18AM
13 industry best practices are. And Miss Rogin,  10:18AM
14 as a senior claim person with many years of   10:18AM
15 her own experience with different companies,  10:18AM
16 is also fairly well aware of what industry    10:18AM
17 best practices are.                           10:18AM
18   Q.  Okay. That wasn't quite my              10:18AM
19 question but I will try again.                10:18AM
20   A.  I thought I answered it.                10:18AM
21   Q.  Perhaps I wasn't clear. I will          10:18AM
22 start it from a different place. You and     10:19AM
23 Miss Rogin were the two people primarily      10:19AM
24 responsible for drafting the best practices   10:19AM
25 that were issued in April or May of 2012?     10:19AM

## Page 48

1       J. ENGEL
2    A.  Yes.                                    10:19AM
3    Q.  And you and Miss Rogin supervised       10:19AM
4  personnel within the claims organization at   10:19AM
5  Liberty for a period of time prior to setting 10:19AM
6  forth best practices in writing, correct?     10:19AM
7    A.  Yes.                                    10:19AM
8    Q.  Do the -- did the best                  10:19AM
9  practices -- well, is it fair to say that the 10:19AM
10 best practices that you put in writing were   10:19AM
11 not wildly different from the way that you    10:19AM
12 were directing your employees and Miss Rogin  10:19AM
13 was supervising her employees to do business  10:19AM
14 at Liberty prior to the time they were set    10:19AM
15 forth in writing?                             10:19AM
16   A.  So, first of all, understand that       10:19AM
17 Miss Rogin joined the company in August of    10:20AM
18 2011. And so she had only been with the       10:20AM
19 company for less than six months when we      10:20AM
20 started drafting best practices. And          10:20AM
21 Miss Rogin was directing the casualty         10:20AM
22 department on a daily basis on how she wanted 10:20AM
23 claims handling -- claims handled. And some   10:20AM
24 of that direction that she provided to her    10:20AM
25 staff, because she is an experienced claim    10:20AM

## Page 49

1       J. ENGEL
2  professional and manager found its way into   10:20AM
3  the best practices.                           10:20AM
4    Q.  You wouldn't say that Liberty was       10:20AM
5  not following best practices prior to the     10:20AM
6  time it was -- those practices were set forth 10:20AM
7  in writing, would you?                        10:20AM
8    A.  No, I wouldn't say that. I              10:20AM
9  wouldn't -- I would never make that           10:21AM
10 statement.                                    10:21AM
11   Q.  Liberty -- was Liberty following        10:21AM
12 best practices prior to the time it was set   10:21AM
13 forth in writing?                             10:21AM
14   A.  Some people were following best         10:21AM
15 practices. Other people were following what   10:21AM
16 I would call good practices. In every         10:21AM
17 organization you have some people that don't  10:21AM
18 do such a great job and I would say some of   10:21AM
19 their practices weren't so hot.               10:21AM
20   Q.  You testified also that you             10:21AM
21 thought that Miss Rogin did a pretty good     10:21AM
22 job, right?                                   10:21AM
23   A.  I thought she does an excellent         10:21AM
24 job.                                          10:21AM
25   Q.  And she follows best practices in       10:21AM

Page 62

1  J. ENGEL
2  others at the company the industry best          10:48AM
3  practices that you wished claims adjusters       10:49AM
4  under your supervision, under Miss Rogin's       10:49AM
5  supervision to follow?                           10:49AM
6      A.  Yes. We wanted everybody to be           10:49AM
7  handling their claims as well as they            10:49AM
8  possibly could be handled, and we wanted to      10:49AM
9  ensure that we had consistency. So the           10:49AM
10 purpose was to write a collection of best        10:49AM
11 practices that the two of us put together to     10:49AM
12 achieve best claim handling and consistency.     10:49AM
13     Q.  Well, let me ask you this: Would         10:49AM
14 it be helpful to have a copy of those best       10:49AM
15 practices for casualty in front of you to        10:49AM
16 determine whether when Mr. Roberts adjusted      10:49AM
17 the Liberty claim that he followed best          10:49AM
18 practices?                                       10:50AM
19     A.  No. Because my expectation was           10:50AM
20 that there wasn't anyone who was following       10:50AM
21 all the best practices consistently because      10:50AM
22 those best practices, as Jessica and I wrote     10:50AM
23 them, were a collection of practices from        10:50AM
24 around the industry that we believed were the    10:50AM
25 best ways to handle claims, and we put them      10:50AM

Page 63

1  J. ENGEL
2  in writing and we wished that we could have      10:50AM
3  gotten that done earlier. But it was just        10:50AM
4  impossible with so many things to do. But --     10:50AM
5  so they were a collection of practices from      10:50AM
6  around the industry and -- that's all I can      10:50AM
7  say. Again, Jeff Roberts was not a direct        10:51AM
8  report of mine. I could imagine what Jessica     10:51AM
9  might tell you, but you would be better off      10:51AM
10 to ask her because she was Jeff's direct         10:51AM
11 supervisor.                                      10:51AM
12     Q.  You think it would be helpful if         10:51AM
13 we had a copy of the best practices to put in    10:51AM
14 front of Jessica Rogin for her -- do you         10:51AM
15 think she would be able to identify how and      10:51AM
16 to what extent Mr. Roberts deviated from         10:51AM
17 those best practices in handling Cameron's       10:51AM
18 claim?                                           10:51AM
19     A.  I guess potentially she could,           10:51AM
20 but I don't understand the purpose of it.        10:51AM
21 Because those best practices were not in         10:51AM
22 place until April or May of 2012. So at the      10:51AM
23 time when -- at the time leading up to the       10:51AM
24 Cameron BP settlement, those best practices      10:52AM
25 were not written. They were not in place.        10:52AM

Page 64

1  J. ENGEL
2  Claim handlers didn't have a solid               10:52AM
3  expectation of what LIU wanted them to do and    10:52AM
4  so I don't consider them pertinent to that       10:52AM
5  period from -- prior to their -- prior to        10:52AM
6  their publication. We didn't even -- when        10:52AM
7  measuring the performance of individuals,        10:52AM
8  retroactively apply them, and so you are sort    10:52AM
9  of asking could we go back and retroactively     10:52AM
10 evaluate people and how they followed them.      10:52AM
11 And I would say -- I don't see the point in      10:52AM
12 it. We didn't do that for performance            10:52AM
13 evaluation, so I don't see the point of doing    10:52AM
14 it in this exercise.                             10:52AM
15     Q.  I understand what you said. But          10:52AM
16 that's, with all due respect, not your job in    10:53AM
17 this. I think you testified that you tried       10:53AM
18 to memorialize industry best practices in the    10:53AM
19 best practices that you issued in April or       10:53AM
20 May of 2012; is that right?                      10:53AM
21     A.  That's correct.                          10:53AM
22     Q.  So if I wanted to see whether            10:53AM
23 Mr. Roberts was adjusting claims consistent      10:53AM
24 with industry best practices, in connection      10:53AM
25 with his work on the Cameron claim, it would     10:53AM

Page 65

1  J. ENGEL
2  be helpful to compare what he did on the --      10:53AM
3  in the Cameron claim and the best practices      10:53AM
4  that you wrote counsel, correct?                 10:53AM
5      A.  I am going to disagree with you.        10:53AM
6  Because I don't see the point in it. You can     10:53AM
7  take my best practices that I take ownership     10:53AM
8  for and take them around the industry and ask    10:54AM
9  claim handlers at any company whether they       10:54AM
10 follow those or not, and you would get a lot     10:54AM
11 of debate from people at different companies     10:54AM
12 as to whether or not they believe they are       10:54AM
13 the best practices or not. And whether or        10:54AM
14 not they should be following them or not.        10:54AM
15 And so I created those best practices and my     10:54AM
16 expectation was that, prior to the               10:54AM
17 publication, people weren't expected to          10:54AM
18 follow them. So you could take them anywhere     10:54AM
19 and compare them to any claim handler and I      10:54AM
20 am sure that you would get lots of               10:54AM
21 differences.                                     10:54AM
22     Q.  We have been speaking a bit in           10:54AM
23 the abstract about the best practices. For       10:54AM
24 casualty, how many pages would you say the       10:54AM
25 best practices comprise?                         10:54AM

## Page 66

```
1            J. ENGEL
2    A.  Six to eight pages, possibly.         10:54AM
3    Q.  And can you recollect some of the     10:55AM
4  best practices that were included in the    10:55AM
5  casualty best practices guidelines?         10:55AM
6    A.  Sure. At a high level. They           10:55AM
7  require the claim handler to promptly       10:55AM
8  acknowledge the claim when the claims are   10:55AM
9  received. To promptly get the claim         10:55AM
10 registered. To, within a fairly tight period 10:55AM
11 of time, begin their investigation. To get  10:55AM
12 the investigation done within a reasonable  10:55AM
13 amount of time. To look at the policy and   10:55AM
14 any other critical documents. To evaluate   10:55AM
15 whether or not the policy provides coverage. 10:56AM
16 Do an analysis of the liability. Do an      10:56AM
17 analysis of damages based on the facts that 10:56AM
18 they were able to gather within a reasonable 10:56AM
19 amount of time. Set the proper reserve, if  10:56AM
20 one is warranted, for indemnity, set a      10:56AM
21 reserve for allocated loss adjustment       10:56AM
22 expenses, if that's warranted. And to be    10:56AM
23 proactive in working to bring about a       10:56AM
24 resolution of the claim. Have a strategy for 10:56AM
25 the claim. Manage litigation, if litigation 10:56AM
```

## Page 67

```
1            J. ENGEL
2  is involved, so that expenses are controlled. 10:56AM
3  So -- and it goes on.                        10:56AM
4         Speaks about collecting               10:56AM
5  deductibles from the insured and ensuring    10:56AM
6  that we pay attention to subrogation matters 10:57AM
7  and other matters important in the claim     10:57AM
8  file, and so at a very high level, covers all 10:57AM
9  those aspects and all the time talking about 10:57AM
10 being timely and thorough and getting your   10:57AM
11 evaluations done and reasonable amounts of   10:57AM
12 time so that they can proactively work the   10:57AM
13 claim to a resolution.                       10:57AM
14   Q.  Is it your testimony that the          10:57AM
15 best practices that you just articulated were 10:57AM
16 followed by claims adjusters at LIU in the   10:57AM
17 2010 and 2011 time period?                   10:57AM
18   A.  No, that's not my testimony. My        10:57AM
19 testimony, I believe, was that best          10:57AM
20 practices, in my eyes, are different than the 10:58AM
21 best practices in the chief claim officer at 10:58AM
22 Excel's eyes, which are different from the   10:58AM
23 best practices of the chief claim officer at 10:58AM
24 AIG's eyes. So best practices are a          10:58AM
25 continuing industry debate about what is     10:58AM
```

## Page 68

```
1            J. ENGEL
2  best. Different companies follow different   10:58AM
3  practices. Our claim adjusters at LIU came   10:58AM
4  from different companies bringing with them  10:58AM
5  practices that they developed at those other 10:58AM
6  companies. I didn't want a conglomeration of 10:58AM
7  practices from other companies. I wanted and 10:58AM
8  want our claim people at LIU to follow what I 10:58AM
9  determine are best practices, and I want them 10:58AM
10 to follow it consistently.                   10:59AM
11   Q.  You joined LIU when?                   10:59AM
12   A.  In September of 2010.                  10:59AM
13   Q.  Why did it take you over a year        10:59AM
14 and a half to institute best practices       10:59AM
15 at LIU?                                      10:59AM
16   A.  First and foremost, the                10:59AM
17 organization needed more claim staff and my  10:59AM
18 first duties there was to evaluate the       10:59AM
19 staffing needs of the organization, build a  10:59AM
20 staffing model for the organization. At the  10:59AM
21 time that I arrived, the company, which did  10:59AM
22 not have a computer -- a claims -- didn't    10:59AM
23 have claims technology. Didn't have a claims 10:59AM
24 system, was embarking on building a new      10:59AM
25 claims system and so I spent a huge amount of 10:59AM
```

## Page 69

```
1            J. ENGEL
2  my time helping to work on the design of the 11:00AM
3  new claim system, and to reengineer all the  11:00AM
4  processes surrounding the technology so that 11:00AM
5  we can leverage that technology. I didn't,   11:00AM
6  until the -- until August of 2011, have      11:00AM
7  somebody to assist me in a senior position in 11:00AM
8  the -- as head of the casualty claim         11:00AM
9  department. So there were lots of things     11:00AM
10 occupying my time.                           11:00AM
11   Q.  Those other things were more           11:00AM
12 important than developing best practices for 11:00AM
13 adjusting claims at Liberty?                 11:00AM
14   A.  They were in my view. I had to         11:00AM
15 prioritize things. Head count issues were    11:00AM
16 first, system was second. I built an audit   11:00AM
17 program, very extensive audit program, in    11:00AM
18 that timeframe as well. And so my view was   11:00AM
19 that all those things had precedent and that 11:01AM
20 was simply my view of first priority, second 11:01AM
21 priority, and so on down the line.           11:01AM
22   Q.  Prior to the time that you issued      11:01AM
23 the best practices in April, May of 2012,    11:01AM
24 Liberty did not have any specific rules,     11:01AM
25 procedures, or best practices that Liberty   11:01AM
```

Rough Transcript

Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF LOUISIANA
 3   ------------------------------------------X
     In Re:  OIL SPILL BY THE OIL RIG
 4   "DEEPWATER HORIZON" IN THE GULF OF
     MEXICO, ON APRIL 20, 2010,
 5
 6   Applies to:
 7   12-311, Cameron Int'l Corp. v. Liberty
     Ins. Underwriters, Inc., a/k/a Liberty
 8   Int'l Underwriters
 9
     ------------------------------------------X
10
11
12        VIDEO DEPOSITION OF Jessica Rogin
13              New York, New York
14           Friday, May 31, 2013
15
16
17
18
19
20
21   Reported by:
22   Rebecca Schaumloffel, RPR, CLR
23   Job No: 61443
24
25
```

Rough Transcript

Page 62

J. ROGIN

1  exactly.  10:39AM
2  Q. So we have -- at Liberty, there  10:39AM
3  is a single document for best practices for  10:39AM
4  claims handled link that's somewhere between  10:39AM
5  5 and 10 pages, right?  10:39AM
6  A. Yes.  10:39AM
7  Q. And you prepared the draft of  10:39AM
8  this best practice claim handle link  10:39AM
9  document?  10:39AM
10 A. Yes.  10:39AM
11 Q. When did you prepare a first  10:39AM
12 draft?  10:39AM
13 A. Sometime in the fall of 2011. I  10:39AM
14 can't tell you exactly when.  10:39AM
15 Q. In that first draft, did you  10:39AM
16 endeavor to memorialize the best practices of  10:39AM
17 Liberty for claim handling as you saw them?  10:39AM
18 A. Yes, that was the purpose of the  10:39AM
19 document.  10:39AM
20 Q. Why did you circulate it to your  10:39AM
21 direct reports?  10:39AM
22 A. For comment.  10:39AM
23 Q. Did you circulate the first draft  10:39AM
24 of the best practices document for claims  10:40AM

Page 63

J. ROGIN

1  handling or was it a later draft that you  10:40AM
2  circulated?  10:40AM
3  A. I don't recall exactly. If I was  10:40AM
4  going to guess, I would say it would have  10:40AM
5  been a later draft.  10:40AM
6  Q. Did you circulate a draft of the  10:40AM
7  best practices for claims handling at Liberty  10:40AM
8  prior to the end of 2011?  10:40AM
9  A. I can't recall specifically.  10:40AM
10 Q. You may have, you may not, you  10:40AM
11 just don't recall?  10:40AM
12 A. Exactly.  10:40AM
13 Q. Did Mr. Roberts provide you any  10:40AM
14 feedback on the best practices for claims  10:40AM
15 handling?  10:40AM
16 A. I can't recall specifically.  10:40AM
17 Q. Do you recall any feedback that  10:40AM
18 you received on the best practices for claim  10:40AM
19 handling?  10:40AM
20 A. No.  10:40AM
21 Q. Did Mr. Engel provide you any  10:40AM
22 feedback on the best practices for claim  10:40AM
23 handling?  10:40AM
24 A. Yes.  10:40AM

Page 64

J. ROGIN

1  Q. What was his feedback?  10:40AM
2  A. He made edits throughout the  10:40AM
3  document and so, you know, I can't tell you  10:41AM
4  what his feedback was. Throughout the  10:41AM
5  entire document he made some comments and  10:41AM
6  edits and additions.  10:41AM
7  Q. Do you recall when you provided a  10:41AM
8  draft to Mr. Engel for comment?  10:41AM
9  A. I can't recall exactly whether it  10:41AM
10 was at the end of 2011 or whether it was in  10:41AM
11 the beginning of 2012.  10:41AM
12 Q. Were the claims adjusters at  10:41AM
13 Liberty International already adjusting  10:41AM
14 claims consistent with the best practices as  10:41AM
15 you memorialized them in your best practice  10:42AM
16 manual for claims adjusting?  10:42AM
17 A. I would say some were and some  10:42AM
18 maybe were not consistently.  10:42AM
19 Q. What about Mr. Roberts, was he  10:42AM
20 already adjusting claims consistent with the  10:42AM
21 best practices as you memorialized them in  10:42AM
22 the best practices manual?  10:42AM
23 A. Yeah, I would say yes he  10:42AM
24 generally did so.  10:42AM

Page 65

J. ROGIN

1  Q. So if I wanted to understand how  10:42AM
2  Mr. Roberts adjusted claims in 2011, would it  10:42AM
3  be helpful for me to review the best  10:42AM
4  practices manual that you prepared?  10:42AM
5  A. You know, I couldn't -- I  10:42AM
6  couldn't say whether it is would be helpful  10:42AM
7  or not helpful to you. I mean, he wasn't  10:42AM
8  being held against any -- those standards.  10:42AM
9  Q. Regardless of whether he was  10:43AM
10 being held against the standards that were  10:43AM
11 later issued, if I wanted to get an  10:43AM
12 understanding of what procedures he followed  10:43AM
13 to adjust claims, would it be useful for me  10:43AM
14 to look at the best practices that you  10:43AM
15 drafted sometime in the 2011 time period?  10:43AM
16 A. Well, I wouldn't say so because  10:43AM
17 he wasn't following those procedures. He was  10:43AM
18 adjusting claims based on his many years of  10:43AM
19 experience as an adjuster.  10:43AM
20 Q. If I wanted to understand whether  10:43AM
21 Mr. Roberts was adjusting claims consistent  10:43AM
22 with what you consider to be the best  10:43AM
23 practices for adjusting claims, would it be  10:43AM
24 useful for me to review the best practices  10:43AM

17

TSG Reporting - Worldwide    877-702-9580

Rough Transcript

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
----------------------------------------X
In Re:  OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF
MEXICO, ON APRIL 20, 2010,

Applies to:
12-311, Cameron Int'l Corp. v. Liberty
Ins. Underwriters, Inc., a/k/a Liberty
Int'l Underwriters


----------------------------------------X



VIDEO DEPOSITION OF JEFFREY ROBERTS
New York, New York
Thursday, May 30, 2013







Reported by:
Rebecca Schaumloffel, RPR, CLR
Job No: 61442

**EXHIBIT C**

Rough Transcript

### Page 22

```
 2  with Mr. Engel?                          09:31AM
 3    A.  Yes, there were.                   09:31AM
 4    Q.  How many?                          09:31AM
 5    A.  Maybe on the order of half a       09:31AM
 6  dozen or so.                             09:31AM
 7    Q.  What determined whether a claim    09:31AM
 8  was going to be discussed with Mr. Engel or  09:31AM
 9  not?                                     09:31AM
10    A.  Potential exposure, national       09:31AM
11  exposure, news type claims.              09:31AM
12    Q.  Why did Cameron's claim qualify?   09:31AM
13    A.  It was a national -- it was a      09:31AM
14  national high exposure claim. It potentially  09:31AM
15  had high dollar exposure value to it.    09:31AM
16    Q.  What was the high dollar exposure  09:31AM
17  value on the Cameron claim?              09:32AM
18    A.  I don't know what the exposure     09:32AM
19  value was.  Cameron settled it for       09:32AM
20  $250 million. So a person could say that was  09:32AM
21  the exposure value of the it was unknown at  09:32AM
22  the time.                                09:32AM
23    Q.  In fact, it's the case that        09:32AM
24  Cameron faced potentiallyLee billions of 09:32AM
25  dollars of liability, right?             09:32AM
```

### Page 23

```
 2    A.  I don't know that.                 09:32AM
 3    Q.  You don't know one way or the      09:32AM
 4  other?                                   09:32AM
 5    A.  At this point, we know that        09:32AM
 6  Cameron was -- had no liability in the case  09:32AM
 7  based on the recent rulings.             09:32AM
 8    Q.  You would agree the trial would    09:32AM
 9  have a different complex if Cameron had been  09:32AM
10  a defendant, right?                      09:32AM
11    A.  Cameron was a defendant in the     09:32AM
12  trial.                                   09:32AM
13    Q.  Was BP -- did BP have any          09:32AM
14  interest in the course of the trial to show  09:32AM
15  that Cameron had responsibility for the  09:32AM
16  Deepwater Horizon incident during the trial  09:33AM
17  in light of its settlement with Cameron? 09:33AM
18    A.  I don't know that.                 09:33AM
19    Q.  In fact, you don't know one way    09:33AM
20  or the other, right?                     09:33AM
21    A.  No one with an I or the other      09:33AM
22  what? What BP was thinking?              09:33AM
23    Q.  Correct?                           09:33AM
24    A.  No, I don't know what BP was       09:33AM
25  thinking.                                09:33AM
```

### Page 24

```
 2    Q.  You don't know how the trial,      09:33AM
 3  what evidence would have been presented at  09:33AM
 4  trial had Cameron not settled with BP?   09:33AM
 5    A.  No, that's purely speculative.     09:33AM
 6    Q.  Let's go back to the best          09:33AM
 7  practices we mentioned before. Do you know  09:33AM
 8  when they were written, the written      09:33AM
 9  guidelines?                              09:33AM
10    A.  Spring of last year.               09:33AM
11    Q.  So that would be spring of 2012?   09:33AM
12    A.  Correct.                           09:33AM
13    Q.  Are you familiar with the content  09:33AM
14  of the guidelines that were issued?      09:33AM
15    A.  Yes.                               09:33AM
16    Q.  What do you understand LIU's best  09:33AM
17  practices to be?                         09:34AM
18        MS. BARRASSO: Object to the        09:34AM
19    form.                                  09:34AM
20    A.  Can you clarify that?              09:34AM
21    Q.  Sure. There were written           09:34AM
22  guidelines that were issued in the spring of  09:34AM
23  2012, is that your testimony?            09:34AM
24    A.  Yes. Best practices were put       09:34AM
25  forth.                                   09:34AM
```

### Page 25

```
 2    Q.  Were they different from how you   09:34AM
 3  were doing business prior to the spring of  09:34AM
 4  2012?                                    09:34AM
 5    A.  They had some new changes to       09:34AM
 6  them. Different time frames, reporting   09:34AM
 7  requirements, things like that. But they 09:34AM
 8  generally fit with industry standard best  09:34AM
 9  practices.                               09:34AM
10    Q.  When you adjusted Cameron's        09:34AM
11  claim, did you try to do so consistent with  09:34AM
12  the industry standard of best practices? 09:34AM
13    A.  Yes.                               09:35AM
14    Q.  Is it your testimony that when     09:35AM
15  you adjusted Cameron's claim, that you did so  09:35AM
16  consistently with the best practices that  09:35AM
17  Liberty issued in the spring of 2012?    09:35AM
18        MS. BARRASSO: Object to the        09:35AM
19    form.                                  09:35AM
20    A.  Well, you can't -- the best        09:35AM
21  practices issued in 2012, the claim happened  09:35AM
22  in 2010. So I can't have adhered to      09:35AM
23  guidelines that weren't in place. They were  09:35AM
24  similar. They are similar -- similarities,  09:35AM
25  but there may be days I would have to look at  09:35AM
```

Rough Transcript

## Page 26

2  them and go through the file to see if the    09:35AM
3  timing frame may have not been achieved or    09:35AM
4  something.    09:35AM
5  Q. Would it be helpful to have a    09:35AM
6  copy of the guidelines to go through them and    09:35AM
7  see to what extent you deviated or didn't    09:35AM
8  deviate from them when you adjusted Cameron's    09:35AM
9  claim?    09:35AM
10  A. I don't know if I can do that    09:35AM
11  today.    09:36AM
12  Q. But would it be helpful if you    09:36AM
13  had the guidelines in front of you to look at    09:36AM
14  them and see whether you acted consistently    09:36AM
15  with them?    09:36AM
16  A. Sure.    09:36AM
17  Q. In fact that's the only way you    09:36AM
18  would know if you had them in front of you to    09:36AM
19  look at them them and she is guideline that I    09:36AM
20  complied with and this is guideline that I    09:36AM
21  didn't, correct?    09:36AM
22  A. Correct.    09:36AM
23  Q. Do you plan to testify at trial    09:36AM
24  that you acted consistently with Liberty's    09:36AM
25  best practices?    09:36AM

## Page 27

2  A. Yes.    09:36AM
3  Q. Do you plan to testify at trial    09:36AM
4  that when you adjusted Cameron's claim, that    09:36AM
5  you acted consistently with Liberty's best    09:36AM
6  practices?    09:36AM
7  MS. BARRASSO: Objection.    09:36AM
8  That's the same question.    09:36AM
9  A. That's the same question that I    09:36AM
10  answered previously. I can't -- at some    09:36AM
11  points in time, I I did not -- there were not    09:36AM
12  best practices in place to adjust Cameron's    09:36AM
13  claim under it. So they were -- the claim    09:36AM
14  was adjusted and handled under what you would    09:36AM
15  call industry guidelines or industry best    09:37AM
16  practices.    09:37AM
17  Q. And how did you know what the    09:37AM
18  industry guidelines or industry best    09:37AM
19  practices were when you adjusted Cameron's    09:37AM
20  claim?    09:37AM
21  A. I had learned them when I was at    09:37AM
22  AIG.    09:37AM
23  Q. So when you adjusted Cameron's    09:37AM
24  claim you were relying on the industry best    09:37AM
25  practices and industry guidelines that you    09:37AM

## Page 28

2  learned ten years prior when you worked at    09:37AM
3  AIG?    09:37AM
4  A. Correct. And through continuing    09:37AM
5  education classes and other things that we go    09:37AM
6  through to maintain licenses, et cetera.    09:37AM
7  Q. Does Liberty International    09:37AM
8  provide continuing education classes to you?    09:37AM
9  A. Seminars, I would say. You can    09:37AM
10  call them a class. Seminars.    09:37AM
11  Q. Are these handled internally at    09:37AM
12  Liberty or is it outsourced where you go    09:37AM
13  somewhere else to attend the seminar?    09:37AM
14  A. Sometimes they are in-house, in    09:37AM
15  our own facility. Other times we go outside    09:38AM
16  to a separate facility. Usually all    09:38AM
17  arranged. Not done by internal people. Law    09:38AM
18  firms that we work with come in and bring    09:38AM
19  classes to us, conferences that you attend or    09:38AM
20  that are setup by the company for us.    09:38AM
21  Q. Have you ever led a seminar on    09:38AM
22  industry best practices that are to be    09:38AM
23  followed at -- in the claims adjusting    09:38AM
24  process?    09:38AM
25  A. No.    09:38AM

## Page 29

2  Q. You are merely an attendee?    09:38AM
3  A. Correct.    09:38AM
4  Q. Did Liberty personnel, in the    09:38AM
5  casualty unit for claims adjusting, provide    09:38AM
6  any seminars of this sort?    09:38AM
7  A. When you say did they provide the    09:38AM
8  seminar, are you saying did they --    09:38AM
9  Q. I will rephrase the question.    09:39AM
10  That's a fair clarification. Did Mr. Glenn    09:39AM
11  ever deliver any seminars to you or your    09:39AM
12  colleagues on industry best practices?    09:39AM
13  A. No.    09:39AM
14  Q. Did anyone from Liberty Mutual    09:39AM
15  ever do that?    09:39AM
16  A. No, sir.    09:39AM
17  Q. To the best of your recollection,    09:39AM
18  who provided seminars internally at Liberty    09:39AM
19  that were Liberty employees on industry best    09:39AM
20  practices?    09:39AM
21  A. Liberty employees did not provide    09:39AM
22  seminars. Seminars were setup with outside    09:39AM
23  law firms for best -- for best practices,    09:39AM
24  claims handling procedures under various    09:39AM
25  state laws and furtherance the of license    09:39AM