# KIRKLAND & ELLIS LLP
### AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C.  20005

Robert R. Gasaway
To Call Writer Directly:                              (202) 879-5000                                             Facsimile:
(202) 879-5175                                                                                                        (202) 879-5200
robert.gasaway@kirkland.com                        www.kirkland.com

June 17, 2013

**By Electronic Mail**

The Honorable Sally Shushan
United States District Court
Eastern District of Louisiana
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

      Re:     MDL 2179 — Motion to Strike Expert Testimony and to Adjust Expert
              Deposition Schedule

Dear Judge Shushan:

       BP and Anadarko write in response to your email request from Friday, June 14, 2013, that BP and Anadarko specify the relief they seek in light of any improper withholding of scientific analysis in the United States' rebuttal reports served June 10, 2010.

       As described below, we believe that the best way to manage the situation while doing least violence to the Court's schedule, is to strike the specific sections of the June 10 United States reports that —

- are initial, rather than rebuttal opinions and that could have and should have been served on March 22; and/or

- fundamentally alter, as opposed to defend, analysis presented on March 22.

       BP and Anadarko set forth the testimony to be struck in the summary table below and in the highlighted versions of the United States expert reports to be submitted in conjunction with this letter.

Chicago       Hong Kong       London       Los Angeles       Munich       New York       Palo Alto       San Francisco       Shanghai

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 17, 2013
Page 2

| Subject of Improper "Rebuttal" Testimony | Proposed Remedy: Strike These Related Portions of Report | BP/Anadarko Discussion |
|---|---|---|
| Pore Volume Compressibility | **Roegiers**: Entire Report<br>**Huffman**: pp. 12, 36-40, 75<br>**Kelkar & Raghavan**: pp. 5 (6th Bullet), 15 ¶ 4 - p. 16.<br>**Pooladi-Darvish**: p. 28 | BP/A June 13 letter, Part 1, pp. 2-4<br>BP/A June 17 letter, Part II, pp. 4-8 |
| "Monte-Carlo" calculation of new, higher flow number | **Kelkar & Raghavan**: pp. 6, 11 ¶ 3, 24-27 | BP/A June 13 letter, Part 2, p. 5<br>BP/A June 17 letter, Part II.B.1, p. 8 |
| Aquifer Support of Flow | **Kelkar & Raghavan**: Appendix C | BP/A June 17 letter, Part II.B.1, p. 8 |
| Ocean-Separator Method of Converting to Surface Volume | **Zick:** pp. 13-17<br>**Kelkar & Raghavan**: p. 5 (second bullet), p. 12 ¶ 2 | BP/A June 13 letter, Part 2, p. 4<br>BP/A June 17 letter, Part II.B.1-.2, pp. 8-10 |
| Correction of "Systemic" Error | **Pooladi-Darvish**: pp.8, 9, 11, 18, 23 | BP/A June 13 letter, Part 2, pp. 4-5<br>BP/A June 17 letter, Part I pp. 4-5; Part II.B.3, p. 10 |
| Response to BP Expert Dr. Marchand (withdrawn) | **Huffman**: pp. 11-12, 44-75 | BP/A June 13 letter, Part 2, p. 7<br>BP/A June 17 letter, Part II.A, p. 7 |

(Note that, in the event the Court should decide not to strike parts of the testimony identified in this chart, BP and Anadarko respectfully request below that they be allocated additional time for re-direct examinations of experts to be identified by BP and Anadarko in order to respond to these improper rebuttal opinions and analysis.)

So long as the Court strikes improper rebuttal testimony and makes appropriate scheduling adjustments as described below, the Court and parties should be able to manage expert discovery and maintain the September 16 Phase 2 trial date with the modest accommodation of adding one additional week (the first full week August 5-9) to the expert deposition schedule.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 17, 2013
Page 3

## Background

After discussion with the parties, the Court ordered that expert discovery would proceed in traditional stages — initial expert reports, responsive reports, rebuttal reports. The United States, as the party bearing the burden of proving the size of the discharge, was thus obliged to put forward on March 22, 2013, all opinions and material on which its quantification experts would rely to estimate the cumulative volume of oil discharged.  The Court's structure did not permit the United States to defer until the rebuttal stage its analysis of quantification issues long at the center of the case.

Nonetheless, the United States has now stated that it will serve more than twice as many rebuttal reports (13) as initial reports (6) and that these rebuttal reports will comprise, remarkably, almost three times more pages than the United States' initial reports.  (*See* Enclosure A.)  Without remedial action by the Court, there is simply no way to accommodate this massive amount of new "rebuttal" analysis within the current Phase 2 expert deposition and trial schedule.

Specifically, as described in our last letter and further described below, United States "rebuttal" experts are now belatedly seeking to supplement or re-do are the initial reports (1) of Drs. Kelkar and Raghavan, who arrived at an estimate of cumulative flow based on, among other approaches, what they called an "industry standard material balance methodology;" (2) of Dr. Pooladi-Darvish, who arrived at a cumulative flow estimate based on two reservoir-engineering methodologies he describes as an analytical method and a numerical modeling method; and (3) of Dr. Zick, who provided a fluids analysis for converting the estimates of the number of barrels of oil spilled at the high pressures and low temperatures found at the ocean bottom into a number of barrels at stock tank conditions of sea level atmospheric pressure and 60 degrees Farenheit. The current scheduling dilemma arises from the United States' decisions not to withdraw the incomplete or flawed portions of these three initial reports, but to seek to complete, reformulate, or supplement these three reports on rebuttal — both via improper new analysis from the original authors and via improper new analysis from two newly disclosed experts (Dr. Huffman and Dr. Roegiers).

## Discussion

Because the United States' Friday letter spotlighted the issue of Dr. Pooladi-Darvish's deposition, to the exclusion of the other issues BP and Anadarko raised in our Thursday letter, we respond first to that letter.  In the subsequent two sections, we provide the requested further detail regarding the relief BP and Anadarko seek.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 17, 2013
Page 4

### I.     BP and Anadarko Reasonably Asked that Dr. Pooladi-Darvish's Deposition Be Postponed By One Week.

As the court will recall, within two hours of its request on Friday for the United States' response to BP and Anadarko's letter, the United States responded that (1) Dr. Pooladi-Darvish's long rebuttal report "consists entirely of response to arguments made by BP, HESI, and TO experts," (2) the volume of Dr. Pooladi-Darvish's [200 gigabytes of modeling runs served on June 10] is misleading", and (3) "the 'systemic error' software issue cited by BP is also a red herring."  (N. Chakeres Ltr to Court, at 1 (June 14, 2013).)

Contrary to the United States' claims, BP and Anadarko raised a legitimate request for additional time to analyze Dr. Pooladi-Darvish's rebuttal report — especially in light of the following points not discussed in the United States' Friday letter.

*First*, Dr. Pooladi-Darvish's "rebuttal" report fundamentally changes his initial report. Dr. Pooladi-Darvish's initial report used two methods to estimate cumulative flow — an "analytical" method and a "numerical" method  (P-D Rpt, at 5.)  But although Dr. Pooladi-Darvish's June 10 "rebuttal" report runs significantly longer than his initial report, this "rebuttal" effectively discards the "analytical" method and places all of the emphasis on the "numerical" method.  Dr. Pooladi-Darvish writes, "Some experts have pointed out that I used some incorrect input values (such as the value for oil compressibility) in my analytical model.  Those values were corrected in my numerical model, and thus their use in my analytical model does not affect my results."  (P-D Rebuttal Rpt, at 33 n.41.)  With this elliptical statement, Dr. Pooladi-Darvish effectively concedes that his analytical model should be ignored and dismissed.

*Second*, Dr. Pooladi-Darvish's numerical method — the method that remains after the discarding of the analytical method — is the one that contains the "systemic" problem that Dr. Pooladi-Darvish acknowledges and seeks to correct in his June 10 rebuttal report.  (P-D Rebuttal Rpt, at 8 n.3.)

*Third*, the United States' Friday letter does not dispute that Dr. Pooladi-Darvish's correction of this systemic problem is new material offered for the first time on rebuttal.

Given the above, BP and Anadarko appropriately requested additional time to confirm the scope of the admitted "systemic" problem; assess whether it has implications not addressed by Dr. Pooladi-Darvish; and investigate whether there are other, undisclosed systemic problems affecting Dr. Pooladi-Darvish's opinion located in the 37 pages of his rebuttal report and 121 pages of related appendices.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 17, 2013
Page 5

We leave to the sound discretion of the Court whether, in light of Dr. Pooladi-Darvish's discarding of one of his methods, his identification of a "systemic" problem with the other, and his submission of a rebuttal report longer than his original report, this modest request for a scheduling accommodation is reasonable.

## II.     The Most Fair and Efficient Means For Preserving The Expert Discovery Schedule Is To Strike The United States' Untimely Rebuttal Opinions.

The United States' Friday letter highlights the parties' shared desire to maintain the current expert schedule.  The best approach for preserving this complex, interdependent schedule, we respectfully submit, is to strike improper "rebuttal" where the proffered testimony could have been and should have been included in the United States' initial round of reports.  To aid the Court's review, we describe below the testimony that should be struck and provide with this letter the Roegiers, Huffman, Kelker & Raghavan, Zick, and Pooladi-Darvish opinions with the improper testimony highlighted.

If the Court does not strike this improper testimony, avoiding the unfair prejudice to BP and Anadarko will be impossible.  If some of this testimony is permitted, however, we would request a further opportunity to discuss alterations to the deposition procedure — including perhaps a third day of deposition and permitting BP and Anadarko to conduct "outside the scope" redirect examination of their experts, which would be a justifiable exception to the Court's otherwise ironclad "four-corners" rule.

### A.     The United States' Improperly Withheld Testimony Regarding Pore Volume Compressibility Should Be Struck.

As discussed in our Thursday letter, pore volume compressibility (PVC) is a key input for computing an estimate of cumulative flow based on "material balance" analysis and was extensively discussed in the Phase 2 Rule 30(b)(6) depositions well before the United States' March 22 initial expert reports.  (*See* Attachment 1, R. Gasaway Ltr. to Court (June 13, 2013) & Appendix A.)  Nonetheless, the United States failed to provide a scientific estimate of pore volume compressibility in any of its initial reports.  Now, however, apparently realizing this crucial flaw in its reports, the United States seeks to provide such analysis on rebuttal, through submissions by new experts Drs. Alan Huffman and Jean-Claude Roegiers, who seek to explain, and justify, the use of a pore volume compressibility value of 12 microsips by certain other United States experts in their initial reports.  As described immediately below, these opinions should be struck as improper rebuttal.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 17, 2013
Page 6

     ***First***, with regard to new "rebuttal" opinions regarding the procedures used by Weatherford Laboratories in making PVC measurements, the United States noticed the Weatherford Rule 30(b)(6) deposition and elicited extensive testimony at the deposition about Weatherford's compressibility testing.  Indeed, the word "compressibility" appears, by our count, approximately 45 times in the transcript.

     ***Second***, Dr. Kelkar himself analyzed the Weatherford Laboratories PVC measurements, as part of his 2010 FRTG work.  In so doing, he employed a rock compressibility of 5.61 microsips, which is in line with that of BP's experts — not the 12 microsips that he employs in his initial expert report.  (Attachment 2, Appendix to Kelkar FRTG Report, at 16-17 (select pages).)

     ***Third***, the United States knew well that it should justify whatever values its experts chose to use via independent analysis and testing, particularly if the values were calculated and used for other purposes during the response.  For example, United States expert Dr. Zick acknowledged that BP provided the United States with an Equation-of-State characterization during the response.  (Zick Rpt, at 24.)  But unlike with the important value of PVC, the United States chose to perform a fresh EOS analysis (as did BP and Anadarko's expert, Dr. Curtis Whitson) for purposes of its initial expert opinions this litigation.

     ***Fourth***, Drs. Kelkar and Ragavan cannot have been surprised to learn from BP and Anadarko's expert, Dr. Zimmerman, that 12 microsips was not, in fact, a "most likely" estimate and that the single document Drs. Kelkar and Raghavan claimed to use as the source of this 12 microsips value should not be used as a substitute for careful evaluation of the Weatherford testing data to the contrary.  (*See* Enclosure B.)

     In short, Drs. Kelkar and Raghavan chose to use an inaccurate 12 microsips figure for their report when deposition testimony elicited by the United States about the very documents cited as the source of that figure established its inapplicability.  Accordingly, the opinions about pore volume compressibility values offered in "rebuttal" by United States experts Dr. Roegiers and Dr. Huffman should be struck.  Specifically, Dr. Roegiers' report should be struck in its entirety, and Dr. Huffman's should be struck in part, as specified in the chart above.

     The Rogiers report, in brief overview, is dedicated to criticizing the Weatherford testing procedures and measurements that Dr. Kelkar previously used in his work for the FRTG.  Most egregiously, Dr. Roegiers purports to calculate his own measure of PVC by estimating a "correction factor" to apply to Dr. Zimmerman's PVC calculation and to arrive, using this "correction factor," at precisely the previously unsupported PVC value of 12 microsips used by Drs. Kelkar & Raghavan in their March 22 report.  (Roegiers Rpt, at 2.)  In addition, Dr.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 17, 2013
Page 7

Roegiers attempts to bolster the use of 12 microsips with citations to BP documents produced long before March 22, discussing subjects that were extensively probed by United States lawyers during depositions.  (*Id.* at 13-14 (citing Dep. Tr. of R. Merrill); *see also* Enclosure B; Attachment 1, R. Gasaway Ltr. at Appendix A (deposition cross-examination on subjects discussed in BP documents).)  The United States' withholding of these analyses until the rebuttal stage precludes Anadarko and BP from responding to these new approaches.

Dr. Huffman's report is not exclusively focused on PVC, but his report also provides improper opinions regarding PVC.  Like Dr. Roegiers, Dr. Huffman's opinions about PVC and Weatherford's testing could have and should have been offered in an initial report.  (Huffman Rpt, at 36-40.)  As indicated in the highlighted version of Dr. Huffman's report provided with this motion, these opinions should also be struck.

Finally, Dr. Huffman's report contains 30 pages of material provided in response to now-withdrawn BP-company-expert Dr. Marchand.  Specifically, on page 44 of his report, Dr. Huffman lays out the two paragraphs from BP's disclosure of Dr. Marchand and then states, "With the general concepts that follow this conclusion section in mind, I would like to address some of the statements made by Dr. Ann Marchand."  (Huffman Rpt, at 44.)  For the next 30 pages, Dr. Huffman proceeds to offer rebuttal to these mere two paragraphs of disclosure.  Now that Dr. Marchand is no longer testifying, this "rebuttal" testimony is extraneous. (*See* Rec. Doc. 9036, at 2 (striking testimony of Halliburton rebuttal witness Kris Ravi in similar circumstances.)

B.     **Previously Disclosed Experts Kelkar & Ragavan, Pooladi-Darvish, and Zick Offer Improper "Rebuttal" Testimony that Should Be Struck.**

Additionally, three "rebuttal" reports from previously disclosed United States experts offer new material, sometimes significantly altering their approach and increasing their estimates of cumulative flow.  These untimely revampings threatens confusion, unfairness and delay.  To preserve this schedule, the better solution is to strike the improper portions of the report.

1.     **The Court should strike Drs. Kelkar & Raghavan's use of material and analyses improperly offered on rebuttal.**

Four separate categories of new analysis should be struck from the "rebuttal" report of Drs. Kelkar and Raghavan.

*First*, as an initial matter, Drs. Kelkar & Raghavan rely on both Roegiers's and Huffman's improper "rebuttal" analysis of pore volume compressibility.  (K&R Rebuttal Rpt, at 5 (6th Bullet), 15 ¶ 4 - 16 (top), 24-25.)  Because this improper PVC analysis in both Roegiers's

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 17, 2013
Page 8

and Huffman's reports should be struck, (see Part II.A above), so too should Drs. Kelkar & Raghavan's use of that improperly offered analysis.

*Second*, the "rebuttal report" of Drs. Kelkar & Raghavan introduces a new analysis of cumulative flow using a methodology not used in their initial report. On pages 24 through 27 of their rebuttal report, Drs. Kelkar & Raghavan describe a "Monte Carlo" method of flow quantification, increasing their estimates from an original range of 4.5 to 5.5 MMstb to an estimate of 5.9 MMstb with a high range of 8.3 MMstb. (*Compare* K&R Rpt, at 8, 28 *with* K&R Rebuttal Rpt, at 6 (1st Bullet), 11 ¶ 3, 24-27.) This newly offered cumulative estimate should be struck as improper "rebuttal" testimony.

*Third*, a potential issue for reservoir-based analysis of total flow from the Macondo reservoir is whether a hypothetical aquifer near the reservoir may have been connected and supplied pressure support for flow from the reservoir into the well. Like pore volume compressibility, Drs. Kelkar & Raghavan were aware of the issue of potential aquifer support when they submitted their initial March 22 report. But their initial report assumes there is no aquifer support and contains no independent approximation of aquifer size, the location of this aquifer, or how an aquifer would impact flow rates (*see* Mar. 22 K&R Rpt, at 28),

Now, however, Kelkar & Raghavan's "rebuttal" report contains an entire appendix (Appendix C) dedicated to asserting the impact of the theoretical aquifer on cumulative flow. (K&R Rebuttal Rpt, Appendix C.) This appendix should be struck because it contains new analysis that could have and should have been explored in their initial March 22 report. (*See* Enclosures C, D.)

*Finally*, as discussed further below, Drs. Kelkar & Raghavan rely on new work offered improperly on reply by Dr. Zick. The use of and references to that improperly offered work should also be struck. (K&R Rebuttal Rpt, at 5 (2d Bullet), 12 ¶ 2.)

## 2.   The Court should strike Dr. Zick's new methodology for converting to stock tank barrels.

As part of his March 22 report, Dr. Aaron Zick presented a method for converting a given volume of oil in the reservoir to the legally relevant measure of "stock tank barrels" (the volume when the relevant oil is at 60 degrees Fahrenheit and one atmosphere of pressure (14.7 psi)). To perform this volumetric conversion, Dr. Zick's March 22 report employed data available from three laboratories that tested fluid samples taken from the Macondo well before the blowout. These testing laboratories performed certain experiments on the samples including a "four stage separator test." (Zick Rpt, at 44.) This four-stage-separator test, in essence, changes the fluid

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 17, 2013
Page 9

sample's temperature and pressure from reservoir conditions to atmospheric conditions in four separate stages.  (*Id.*)  This four-stage test, Dr. Zick claimed on March 22, was appropriate because, during normal production, companies usually separates gas from oil in multiple stages, collecting the intermediate hydrocarbons (perhaps for use), which results in more stock tank oil recovered.  (*Id.* at 14.)

Critically, a file produced with Dr. Zick's initial report indicates that he considered, but later seemingly disregarded, using an alternative method — called an ocean-separation method — to convert oil from reservoir to atmospheric volume.  (The produced modeling run "Separations.phz" contains Dr. Zick's oceanic process.)  Nonetheless, Dr. Zick did not mention the possibility of using an ocean-separation method in his March 22 report. Dr. Zick's March 22 report instead focused exclusively on a "four stage separator test."

In response to Dr. Zick's analysis, BP and Anadarko's fluids expert, Dr. Whitson, employed a similar ocean-separator method — a method that, as noted above, Dr. Zick almost certainly considered but decided not to discuss in his initial report.  (Whitson Rpt, at 16.)  As a result, Dr. Whitson produced a conversion that better models the process the oil at issue actually encountered than does Dr. Zick's report.  (*Id.* at 16-18, Appendix D.)

In his June 10 "rebuttal" report, Dr. Zick abandons the four-stage method his initial report relied on, in favor of the ocean-separator method that he had apparently had considered but chose not to discuss in developing that report.  This abandonment begins on page 8 when he declares, "I have also developed an oceanic process model to simulate how the Macondo reservoir fluid might have separated into stock tank oil and surface gas on its way to the ocean surface."  Over the next few pages, Dr. Zick opines in the following manner: "my oceanic separation process assumes that," "my oceanic process is more efficient than," "my oceanic model is very insensitive to," and so on.  By page 12, Dr. Zick concludes, "In light of the calculations presented in this section, my current recommendation is to use my oceanic separation process to make the conversions."

In sum, a file produced with Dr. Zick's expert materials demonstrates that Dr. Zick was aware of the ocean-separator method, but decided not to use it in his March 22 report.  Only on rebuttal did Dr. Zick newly disclose his own previously disregarded ocean-separator analysis and issue a "current recommendation" to use that analysis in preference to the four-stage method that he had exclusively relied on in his initial report.  Accordingly, this "current recommendation" should be struck.

**3.    Dr. Pooladi-Darvish's correction to his report's systemic error and opinions on pore volume compressibility should be struck.**

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 17, 2013
Page 10

As described above, Dr. Pooladi-Darvish admits in his rebuttal report that he attempted to fix a systemic error in his initial report. That "fix" should be struck as improper rebuttal material. All the more so, where the United States' Friday letter did not dispute, and instead acknowledged, that Dr. Pooladi-Darvish altered his opinion in between his initial and rebuttal opinions.

Additionally, Dr. Pooladi-Darvish offers new commentary about testing for PVC and opines on the "most likely" value of 12 microsips in an effort to rehabilitate that value. (P-D Rebuttal Rpt, at 28.) These opinions could have been offered in his initial report, but instead, Dr. Pooladi-Darvish there used as PVC values 2, 6, and 12 microsips with 6 microsips being a "Base Estimate." (P-D Rpt, at .pdf pg. 124.) As explained above, these new opinions on PVC should have been offered (if at all) in the United States initial March 22 reports, and should be struck from Dr. Pooladi-Darvish's rebuttal report.

## III. In Addition To Striking Testimony, Scheduling Adjustments Are Needed.

The United States' Friday letter cites the "even more compressed" Phase 1 expert deposition schedule in alleged support for moving ahead with the current schedule, unaltered by the improper presentation of new testimony on rebuttal. (N. Chakeres Ltr. to Court, at 2 (June 14, 2013).)

Tellingly, United States expert witnesses were deposed before BP expert witnesses during the Phase 1 expert deposition period because the United States, not BP or Anadarko, has the burden of proof in that Phase, just as it does in this Phase. This precedent is equally applicable in Phase 2. United States witnesses who opine on topics that were known to the United States before March 22, but on which the United States decided not to provide an opinion, should be deposed before the corresponding BP and Anadarko expert who provides an opinion on the same or a similar topic.

All told, only two currently scheduled depositions should be adjusted to accommodate United States "rebuttals" — the depositions of Dr. Pooladi-Darvish (as discussed above) and Dr. Bushnell. And the depositions of the United States' seven recently disclosed "rebuttal" expert witnesses should be calendared accordingly.

### A. Only Two Currently Scheduled Deposition Dates Need To Be Adjusted.

As stated in our letter from Thursday, the United States' rebuttal reports do not always correspond to a single corresponding report from a BP/Anadarko expert. For example, United States expert Dr. Griffiths responds to four different BP and Anadarko experts — Dr. Johnson

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 17, 2013
Page 11

(hydraulics flow estimate), Dr. Trusler (pressure measurements), Dr. Momber (cement erosion), and Dr. Nesic (metal erosion).  While there is nothing inherently wrong with having one witness opine on multiple topics, this practice confuses the presentation of expert testimony, and potentially requires further adjustments to the deposition schedule.

   ***Dr. Bushnell***.  BP and Anadarko have further reviewed the United States' expert reports, and concluded that the one adjustment needed to the current schedule, as identified in our Thursday letter, is Dr. Bushnell's deposition.  Dr. Bushnell's initial report concerned a methodology known as computational fluid dynamics, as did the report of BP's expert Dr. Simon Lo.  Appropriately then, Dr. Bushnell's deposition was scheduled to occur on July 25 and 26 before the July 29 and 30 deposition of Dr. Lo.

   Dr. Bushnell's rebuttal report, however, provides opinions that purport to rebut the opinions offered by BP's expert, Dr. Nesic, who is scheduled to be deposed on July 23 and 24.  Although Dr. Bushnell claims he is only critiquing Dr. Nesic's use of computation fluid dynamics on pages 24-32 and Appendix 6 (pages 52-54) of his report, Dr. Bushnell also addresses the substance of Dr. Nesic's erosion analysis.  (Enclosure E.)  Accordingly, these opinions should be presented before Dr. Nesic is deposed on July 23 and 24.

   ***Dr. Pooladi-Darvish***.  The second adjustment to the established schedule has already been discussed above.  BP requests that Dr. Pooladi-Darvish's deposition be moved back a week to account for the lengthy rebuttal report containing a significant departure from his prior report and the alleged correction of a "systemic" error.

   **B.     Where the Subject of a United States "Rebuttal" Expert Was Long-Known to Be at Issue in the Case, The New Opinions about that Subject Should be Stricken, Because Otherwise the Deposition of That Witness Would in Fairness Need to Be Re-Scheduled to Testify Before Corresponding BP and Anadarko Experts.**

   The remaining scheduling issues for Phase 2 expert depositions are not "adjustments" because the deposition dates have not been set.  The United States has proposed two-day date ranges for each of its seven newly disclosed expert witnesses — not the multiple ranges the Court requested — and, as noted in our Thursday letter, with six of these seven proposed dates fall either in the last regular deposition week or in the overflow week.

   As a general matter, where the United States' chose to wait until its "rebuttal" to offer expert testimony on a topic that was well-known to be at issue in this case, the United States should not be rewarded the benefit of going second.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 17, 2013
Page 12

Last Thursday, the United States proposed dates for its seven new experts, as reflected in the chart below.  As noted in our letter the same day, six of these seven proposed dates occur during the last regular deposition week or in the overflow week.

| Newly Disclosed Expert | Proposed Dates | Corresponding BP/Anadarko Expert | Confirmed Dates |
|---|---|---|---|
| Davis | July 12-13 | Nesic | July 23-24 |
| ~~Roegiers~~ | ~~July 24-25~~ | Zimmerman Blunt | July 2-3 July 25-26 |
| Larsen | July 25-26 | Gringarten | July 22-23 |
| Martinez | July 30-31 | Zaldivar | July 15-16 |
| **Huffman** | **July 31-August 1** | Zimmerman Torres-Verdin Blunt | July 2-3 July 9-10 July 25-26 |
| **Benge** | **August 1-2** | Momber | July 1-2 |
| Expert A | August 1-2 | Vaziri | July 17-18 |

As a general matter, all of the United States experts — newly disclosed or otherwise — should be scheduled before BP and Anadarko witnesses.  That simply may not be possible here, however, and BP and Anadarko wish to be reasonable and practical in addressing these scheduling issues.  Accordingly, we propose the following path forward.

*First*, BP and Anadarko recognize that some of the rebuttal reports, or portions of them, are proper, and are not challenged here.  Thus, BP and Anadarko are willing to agree that the following depositions can proceed according to the United States' proposed reversed order:  (1) **Dr. Larsen**, who responds to Dr. Gringarten; (2) **Dr. Martinez**, who responds to Dr. Zaldivar's analysis of "slug flow"; and (3) **Expert A**, who responds to Dr. Vaziri's analysis of the reservoir's sand production.  (BP respectfully requests that Expert A's deposition be scheduled some time within August 6-9 timeframe, with a preference for August 7-8.)

*Second*, Dr. Davis directly responds to Dr. Nesic's metal erosion analysis.  Metal erosion has been a well-known issue in the case, (*see* Enclosure E), and the United States views on erosion should be presented before BP and Anadarko's.  Perhaps in recognition of this fact, the United States has proposed Dr. Davis's deposition be held on July 12-13 before Dr. Nesic's July 23-24 deposition.  BP and Anadarko request that the Court calendar **Dr. Davis**'s deposition for this July 12-13 timeframe, or in any event, before Dr. Nesic's deposition.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 17, 2013
Page 13

*Third*, the United States should have offered **Dr. Roegiers** before the depositions of Drs. Blunt and Zimmerman to whom he responds.  But as explained above, Dr. Roegiers's written opinion is entirely about pore volume compressibility, which is completely improper "rebuttal" testimony, and should be struck.

*Fourth*, as also explained above, **Dr. Huffman**'s opinions on pore volume compressibility and his opinions responsive to Dr. Marchand (now withdrawn) should also be struck.  Remaining then is Dr. Huffman's seismic analysis, which purports to be responsive to Dr. Torres-Verdin, who presents his own seismic analysis, and Dr. Blunt, whose mass balance analysis relies on the work of Dr. Torres-Verdin.  The United States was fully aware of the relevance of seismic analysis because it both requested extensive amounts of seismic data in discovery and questioned BP deposition witnesses extensively on the subject of seismic analysis. (*See* Enclosure F.)  Accordingly, Dr. Huffman's deposition should be scheduled to occur before the depositions of BP and Anadarko experts Drs. Blunt and Torres-Verdin.

*Finally*, the United States has proposed that Dr. Benge, who addresses the topic of cement erosion, testify on August 1-2 a full month after the July 1-2 deposition of Dr. Mober, BP and Anadarko's expert on cement erosion.  Like metal erosion and seismic analysis, cement erosion has long been an issue in this case.  (*See* Enclosure G.)  Accordingly, the deposition of Dr. Benge should be scheduled before the deposition of Dr. Mober.

\*       \*       \*

BP and Anadarko recognize that the decision whether to strike all or part of an expert's report is an unusual one and should not be taken lightly.  But it is clearly the best option where, as here, United States lawyers and experts knew about issues and methodologies that could have and should have been presented in initial reports but instead saved them for rebuttal.  So long as the Court judiciously pares back this improper rebuttal testimony, BP and Anadarko respectfully submit that with the modest scheduling adjustments described above and the additional of an additional week to the schedule, the current Phase 2 trial date can be kept in place.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 17, 2013
Page 14

### Conclusion

For the foregoing reasons, BP and Anadarko respectfully request the Court grant the relief requested above.

Sincerely,

Robert R. Gasaway

Enclosures and Attachments

cc (by electronic mail):
United States' MDL Counsel
Plaintiffs' Liaison Counsel
Defense Liaison Counsel
Joel M. Gross