

**U.S. Department of Justice**

Environment and Natural Resource Division

---

*P.O. Box 7611*
*Washington, DC 20044*
*202-616-6537*
*Aristide.Chakeres@usdoj.gov*

June 17, 2013

**BY ELECTRONIC MAIL**
United States District Court
Eastern District of Louisiana
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

      Re:    MDL 2179 — Response to Motion to Strike Expert Testimony and Adjust Expert Deposition Schedule

Dear Judge Shushan:

      The United States writes in response to the letter from BP and Anadarko seeking to strike certain expert testimony and adjust the expert deposition schedule. For the reasons stated below, the rebuttal expert reports served by the United States are entirely appropriate, and the relief requested by BP and Anadarko should be denied in its entirety.[1]

      In a nutshell, the Court ordered an expert disclosure schedule in which the United States had to go first, but retained opportunity to disclose rebuttal reports after seeing Defendants' reports. Defendants served ***16*** quantification experts reports (including two reports tucked away as appendices to a third report). As expected, Defendants are aligned against the United States on this issue. In response, the United States served rebuttal from its six original experts, along with rebuttal from six newly-disclosed experts – each of whom deals with a specialty topic raised in Defendants' 16 reports, and in some cases deals with a method of estimation used by Defendants different from those used in the opening reports of the United States.

      The United States responded to Defendants' 16 reports with a reasonable number of rebuttal reports, and should be allowed to present that evidence at trial. As Judge Duval has explained, "An opening expert report is an early salvo in the process of defining issues for trial,

---

[1] The United States submitted a letter brief on June 14, 2013 regarding the deposition of Dr. Mehran Pooladi-Darvish. The arguments contained in that letter brief are not repeated here, although the United States reserves the right to respond to any additional arguments that BP and Anadarko may present regarding that deposition.

and thus it is more understandable at the expert discovery stage that *a party may need to include significant elaboration in a rebuttal report to challenge the assertions of the opponent's expert reports.*" *In re Katrina Canal Breaches Consol. Litigation*, Civil Action Nos. 05–4182, 10–866, 2012 WL 2526980, at *1 (June 29, 2012 E.D. La.) (internal citations omitted) (emphasis added).[2] If courts adopted BP and Anadarko's apparent position that a plaintiff's initial expert reports must address in detail every potentially relevant factor, "[s]uch a rule would lead to the inclusion of vast amounts of arguably irrelevant material in an expert's report on the off chance that failing to include any information in anticipation of a particular criticism would forever bar the expert from later introducing the relevant material." *Id*.

In response to entirely predictable and appropriate rebuttal reports served by the United States, BP seeks a three-pronged set of extraordinary relief. First, BP seeks to strike "all of the improper new opinions" in the United States' rebuttal reports (without specifying the full set of what it considers improper). Second, BP seeks a *third* day of deposition for the United States' experts. Third, BP seeks leave to elicit *new opinions* from its experts at deposition. Finally, BP asserts that the deposition schedule must be revamped as a result of its requested relief.

Below, we respond to the specific allegations that BP has raised thus far. Nothing BP has presented so far, however, and indeed nothing it can present based on the facts of the situation, can begin to warrant the extraordinary relief the company seeks.

*First*, the United States' rebuttal reports are proper rebuttal in that they "contradict or rebut evidence on the same subject matter identified by another party." *Id*. That the new reports are true rebuttal can be demonstrated by the fact that they are not necessary to our case-in-chief. For instance, if BP had not decided to make a stand on compressibility – with opinions from three retained experts and the now-withdrawn Dr. Marchand – there would be no need for the United States to present the compressibility opinions of Drs. Huffman and Roegiers. If BP chooses not to address compressibility at trial, Dr. Huffman and Roegiers need not testify at all on that topic.

*Second*, giving BP a third day of deposition of the United States' experts is not necessary and would only further complicate scheduling the depositions. Two days is more than enough to explore the full set of the experts' opinions. If a third day was contemplated, it would be more appropriate for some of BP's experts, such as Dr. Blunt, who set forth more than 150 pages of opinion on a variety of topics. The fact that United States' experts provided two reports – with much less total rhetoric – does not merit a third day.

*Third*, allowing BP to elicit new opinions from *its* experts in their depositions allows BP to spring new opinions on the United States without any warning or time to prepare. This would be a dramatic departure from the practice in this case and the rules of expert litigation.

*Finally,* BP and Anadarko's complaints should not result in an overhaul of the deposition schedule. The Parties picked the current dates with the knowledge that the United States'

---

[2] Notably, Judge Duval only excluded the portion of the expert opinion that was disclosed well *after* the deadline for rebuttal reports. *Id*. at *2.

rebuttal reports would be served June 10.  Moreover, both common sense and the principle that BP previously espoused for scheduling experts (in which experts testify *after* the experts they are responding to) counsel scheduling the United States' new rebuttal experts at the end of the deposition period.

Below, we attempt to respond to the allegations that BP and Anadarko have raised so far.  We note that BP and Anadarko have promised a new round of complaints today that we will not have the opportunity to respond to in writing.  For the reasons described in this letter and our letter submitted on Friday, June 14, 2013, we believe that none of BP or Anadarko's complaints have merit, and their motion to strike and requests to overhaul the long-settled deposition schedule should be denied.

## I. THE REBUTTAL OPINIONS PRESENTED BY THE UNITED STATES ARE ALL APPROPRIATE RESPONSES TO EXPERT OPINIONS PROFFERED BY BP

In accordance with the Court's Order Regarding Phase Two Expert Document Production (Doc. No. 8907), on June 10, 2013, the United States served twelve rebuttal expert reports appropriately responding to numerous issues raised in the eleven expert reports served by the defendants.  Contrary to the defendants' assertions, the United States' rebuttal expert reports have not "proffered page upon page of newly disclosed material that could have and should have been included" in the United States' initial expert reports.

It is well established that the purpose of rebuttal expert reports is to explain, repel, counteract or disprove opinions expressed by opposing party's experts.[3]  That is exactly what the United States' rebuttal expert reports do.  It is fundamentally unfair for the defendants, who knew full well that the United States would serve rebuttal reports, on the eve of expert depositions to seek to strike certain of those experts, "adjust" the deposition schedule, and perhaps delay the Phase 2 trial.  BP's arguments are based on baseless, unsubstantiated assumptions about the nature of the inquiry undertaken by the United States experts, and are a thinly veiled attempt to insulate BP's experts from scrutiny.  Each of BP's arguments is addressed in turn, below.

**1.** *Expert Opinions Rebutting the Conclusions of BP Experts Blunt and Zimmerman Regarding Pore Volume Compressibility.*

It is ironic that BP and Anadarko claim that the United States has "sandbagged" them when in reality it is BP who is running desperately from the contemporaneous analyses and opinions of its own employees on a variety of issues from the flow rate of the oil released from the reservoir to the pore volume compressibility ("compressibility") of the sandstones found in the Macondo reservoir.

---

[3] *See e.g. Scientific Components Corp. v. Sirenza Microdevices,* 2008 WL 4911440 *2-3 (E.D.N.Y); *Long Term Capital Holdings v. U.S*, 2003 WL 21518555 *2 (D.Conn.).

3

### a. BP Created the Need for Compressibility Evidence by Abandoning its Position from the Response

The defendants ask the Court to strike the rebuttal expert reports of Dr. Roegiers and Dr. Huffman related to compressibility. Yet Drs. Roegiers' and Huffman's reports appropriately respond to the compressibility claims asserted by BP/Anadarko's experts Dr. Zimmerman and Dr. Blunt. In their expert reports, Dr. Zimmerman and Dr. Blunt present opinions on compressibility contrary to those of BP's own employees expressed during the incident.

BP also makes the puzzling claim that, because compressibility was an issue that was explored during discovery, the United States should have presented any new expert analysis on compressibility with its original expert reports. What this argument ignores is that <u>the admissions and statements gathered from BP during discovery provided Dr. Kelkar with sufficient evidence to conclude that BP believed, during the response, that 12 microsips was the best value to use.</u>

The United States had no need to perform original compressibility analyses because its experts were relying on the analysis and opinions stated by BP employees during the well integrity testing period in July 2010. During the response, BP had tremendous financial incentive to use and provide the United States with accurate information, including accurate compressibility information, during the well integrity testing period to assess the condition of the well and persuade the United States that the well could be safely closed in without catastrophic consequences. This modeling was not, as BP suggests in its letter brief, simply "worst case scenario" modeling, but was instead an attempt to model the well's pressure response as accurately as possible to determine whether the pressure response could indicate potential flow through burst disks once the well was shut in.[4]

In July 2010, BP performed a variety of simulations of reservoir pressure response and conditions.[5] Robert Merrill, then BP's Senior Advisor for Reservoir Engineering Community of Practice, was responsible for performing this reservoir modeling. Rock compressibility was one of the inputs to this modeling.[6] Weatherford rotary sidewall core tests suggested the pore volume compressibility might be 6 microsips. However, during the well-integrity testing period, Kelly McAughan, then BP's liaison with the United States science team, recommended that Mr. Merrill use a new "most likely" compressibility of 12 microsips as an input to the modeling. Mr. Merrill implemented this recommendation in a number of the simulations that he supervised or performed in July 2010.[7] At his deposition, Mr. Merrill testified that BP determined that it was "prudent" to use a compressibility value of 12 instead of 6 microsips as the recommended input for modeling purposes after an internal discussion at which David W. Schott, one of BP's reservoir engineers, presented evidence based on his experience in the Galapagos field, a field

---

[4] Merrill Deposition (36:15-39:9; 202:19-204:3).

[5] Deposition Ex. 10841; Ex. 9320; Ex. 10845; Ex. 10853.

[6] Deposition Ex. 10841; Ex. 9320; Ex. 10845; Ex. 10853.

[7] Deposition Ex. 10841; Ex. 10845; Ex. 10853.

which includes the Isabela and Santa Cruz wells, that "core volume compressibility determined from sidewall cores was lower than pore volume compressibility based on whole core."[8]

Dr. Paul Hsieh, an employee of the U.S. Geological Survey, U.S. Department of Interior, modeled reservoir depletion for the United States during the well-integrity testing period. Based on a similar recommendation from Kelly McAughan, Mr. Hsieh used a compressibility of 12 μsips as the compressibility input for his simulation.[9]

BP's recommendation to use a compressibility of 12 microsips is documented in a number of communications between July 6 and July 8, 2010 among various BP employees, including Stephen Willson, David Schott, Robert Merrill, and Kelly McAughan.[10] After an extended discussion, Ms. McAughan wrote: "How about we use 6-12-18." Mr. Willson responded: "That sounds very reasonable to me Kelly." Mr. Merrill followed by stating: "Me too."[11] The range of 6-18 microsips belies BP's puzzling claim that the use of 12 was for a "worst case scenario" – depending on what was being modeled, either 6 microsips or 18 microsips would have been an appropriate boundary case, but 12 microsips would not have given "worst case" numbers.

Given the above, in their initial expert reports, the United States' experts had every right to rely on the compressibility analysis and opinions expressed by BP's own reservoir engineers during BP's response to the blowout. The exhibits and testimony cited above were all disclosed on the Kelkar/Raghavan Considered Materials list. <u>In summary, the full universe of evidence considered by Dr. Kelkar in deciding to use the value of 12 microsips was accurately disclosed with Dr. Kelkar's original expert report.</u>[12]

### b. **Compressibility is Important in Large Part Because BP and Anadarko's Principal Analysis is Dictated by the Compressibility Value Selected**

It is important to note that pore volume compressibility is not an especially sensitive input parameter for all of the flow rate calculations presented in this case. Three United States

---

[8] Merrill Deposition (212:19-214:23; 394:20—395:10; 478:8-480:1; 486:19-488:17).

[9] Deposition Ex. 8615 (Hsieh Pre-Decisional Draft Report, at 12); Hsieh deposition at 264.

[10] Deposition Exs. 8769-8777.

[11] Deposition Ex. 8776.

[12] Similarly, if BP believes that the analysis performed by its engineers during the response was absolutely lacking in scientific validity, it is welcome to present that view at trial as well.

These internal BP documents were generated *after* Dr. Kelkar completed his work for the Flow Rate Technical Group around July 1st, 2010. Thus, it is entirely unsurprising, and beside the point, that Dr. Kelkar did not rely on them in his FRTG modeling. (Maclay Deposition at 453:15-21).

experts (Dykhuizen, Griffiths, and Pooladi-Darvish) present cumulative flow rate calculations based on methodologies that are not particularly sensitive to pore volume compressibility.

BP and Anadarko, however, have chosen Dr. Martin Blunt to be their "principal testifying expert," and Dr. Blunt has chosen to use the material balance method as the sole methodology for his estimate of the cumulative volume discharged.  Dr. Blunt's estimate is extremely sensitive to what value he chooses to use for pore volume compressibility – if he were to use the value of 12 microsips used by BP during the response, his cumulative estimate would rise from 3.26 million barrels to over 4 million barrels.

Instead, Dr. Blunt relies upon a value of 6.35 microsips that is derived from an *entirely new analysis* by Dr. Robert Zimmerman. The United States had no way to anticipate that Dr. Zimmerman would repudiate BP's own statements during the incident as to compressibility. The United States rebuttal reports of Dr. Huffman and Dr. Roegiers are entirely appropriate responses to this new analysis by Dr. Zimmerman and the use of that data by Dr. Blunt.  If BP and Anadarko were granted the relief they seek, the United States would be left entirely unable to challenge one of the key parameters underlying their principal estimate of the cumulative discharge.  There is *no basis* to deny the United States the right to challenge this number, and BP and Anadarko's request should be denied.

       **c. The Opinions of Drs. Roegiers and Huffman are Proper Rebuttal Reports to the Reports of Drs. Zimmerman and Blunt, and thus the De-Designation of Dr. Ann Marchand Is Not Cause for Them to Be Stricken**

This Court should not strike the portions of the reports of Drs. Roegiers and Huffman that address rock compressibility simply because BP has chosen to withdraw Dr. Ann Marchand as an expert witness, rather than provide a proper expert reports for her as required under Fed. R. Civ. P. 26(a)(2)(B).

Dr. Rogiers expert report addresses rock compressibility in rebuttal to the expert report submitted by Dr. Zimmerman, not the cursory two paragraph summary submitted by BP on behalf of Dr. Marchand.  Section VI of Dr. Huffman's expert report entitled "Analysis of the Compaction and Cementation State of the Macondo Reservoirs" provides an overall rebuttal to the issues of reservoir conditions (compressibility, permeability, pore pressure, stress, etc.) discussed by Drs. Zimmerman, Blunt and Marchand.  It is not merely a rebuttal to issues raised solely by Dr. Marchand.  The portion of Section VI of Dr. Huffman's report that discusses the basic physics of shales and sands in the context of compaction processes and basin evolution are directly responsive to the entire body of work of Drs. Blunt, Zimmerman and Marchand, not only the few statements made by BP on behalf of Dr. Marchand.  BP and Anadarko's request is clearly intended to carve out significant information and findings from Dr. Huffman's report that will be helpful to the trier of fact in understanding the evidence and determining material facts at issue in the Phase 2 trial.  Fed. R. Evid. 702(a).

*2. Opinion of Drs. Aaron Zick and Curtis Whitson Regarding Oceanic Separation Process*

BP next requests that a portion of the Zick rebuttal report be stricken because Dr. Zick, in responding to an argument set forth by Dr. Curtis Whitson, BP's fluid expert, states candidly that

he had earlier considered and rejected the argument, and that his position on the issue had changed as a result of reading Dr. Whitson's report. This is an entirely appropriate rebuttal opinion, as it is a response to the opinions stated by Dr. Whitson. Thus, BP and Anadarko's requested relief should be denied.

By way of background, Dr. Zick and Dr. Whitson both give opinions as to the appropriate conversion of mass flow rates to "stock tank barrels of oil." (The Clean Water Act defines barrels of oil as stock tank barrels of oil, 33 U.S.C. §1321(a)(13), so this conversion is necessary.) The Macondo reservoir fluid is a mixture of lighter and heavier hydrocarbons, and at stock tank conditions, some of the fluid will be gas, and some will be oil. The parties agree that the volume of the hypothetical liquid portion will be used for assessing the Clean Water Act penalty.

The problem is that the proportion of fluid that escapes gas versus the proportion that stays in solution as oil is dependent on the process that is used to bring the fluid to stock tank conditions. In normal oil production, the process that would be used would maximize the amount of oil recovered (and minimize the amount of gas recovered). In his original report, Dr. Zick opined that it was most appropriate to convert hydrocarbon flows to stock tank barrels using the oil fraction that would result from that normal production process – the process that BP would have used once it developed the well and began producing.

BP and Anadarko's experts, unsurprisingly, disagree with Dr. Zick. Most use an imaginary single stage separation process that would *minimize* the oil fraction. Dr. Whitson went further, and said that such an imaginary single stage separation process would come closest to approximating the actual likely flow of the hydrocarbon plume through the ocean, presenting a model of an "oceanic" separation process.

In his rebuttal report, Dr. Zick addresses Dr. Whitson's opinion about the "oceanic" separation process. Dr. Zick discusses what, in his view, is a major flaw in Dr. Whitson's "oceanic" separation analysis that results in significant underestimation of oil volumes. This type of critique is fully appropriate as rebuttal, and surely cannot be the basis for striking his opinions.

As BP and Anadarko points out, Dr. Zick also states that an oceanic separation model "could be another reasonable way of defining the stock tank oil, with the right assumptions."[13] Dr. Zick proceeds to model how an oceanic separation process would work after correcting for Dr. Whitson's erroneous assumptions.[14] This, again, is entirely appropriate in rebuttal – Dr. Whitson proposed a particular method of analysis, and Dr. Zick, while conceding that the concept is reasonable one in theory, performs calculations to point out Dr. Whitson's flaws in actually applying the concept.

---

[13] Zick Rebuttal Report at 2.

[14] Zick Rebuttal Report at 6-12.

This is miles apart from the only Phase 1 analogy BP and Anadarko could cobble up – the improper "rebuttal" opinion of Halliburton's Dr. Chemali. (Doc. No. 4738). Dr. Chemali was a petrophysicist who opined about the petrophysical analysis of the M57B sand zone. At least one Halliburton expert, Dr. Strickland, had already provided an opinion on the same topic in a report in chief. Moreover, the Chemali opinion was *not* a critique of new analysis performed by BP experts. The only BP experts whom Chemali was purported to be rebutting were a cement expert and a former MMS official (neither of whom had any petrophysical analysis in their reports).

BP and Anadarko, as with the compressibility issue, is seeking to insulate the opinions of its experts from effective critique. The unfair prejudice to the United States, should BP's relief be granted, would be enormous, and would deprive the trier of fact of relevant opinion testimony that would be helpful in assessing the assertions of BP's experts.

Because Dr. Zick's opinion is a fully appropriate rebuttal to the opinions of Dr. Whitson and BP/Anadarko's other experts, BP and Anadarko's requested relief should be denied.

## II. BP AND ANADARKO'S REQUEST REGARDING EXPERT DEPOSITION SCHEDULING RESTS ON A FAULTY PREMISE

BP and Anadarko's complaints regarding the expert deposition schedule appear to primarily be based upon the mistaken premise that United States rebuttal experts must be deposed *before* BP and Anadarko's experts. This is inconsistent with the logic of BP's preferred method of having its experts go *after* the United States experts to whom they are responding. BP and Anadarko cannot have it both ways – either they have the right to have their experts go after United States experts in chief (in which case United States rebuttal experts should go after their experts), or the order of expert depositions should not be sequential. One this issue is cleared up, it should be feasible to schedule the new United States rebuttal experts in a manner that will not require wholesale changes to the pretrial calendar. Moreover, as described in the United States' June 14 letter concerning the Dr. Pooladi-Darvish deposition, the situation is entirely of the defendants' making: BP insisted on a report schedule in which the United States went first and then provided rebuttal reports (as opposed to the Parties serving simultaneous reports), and BP insisted on the United States experts in chief being deposed before BP/Anadarko experts on corresponding topics. These two demands result in the entirely predictable consequence that BP and Anadarko will have a finite amount of time between rebuttal reports and depositions. BP and Anadarko should not be allowed to argue that the inevitable result of the schedule *they sought* compels an entirely revamped schedule.

BP and Anadarko also request that the deposition of Dr. Nathan Bushnell be moved because his rebuttal report contains opinions regarding "erosion." In reality, Dr. Bushnell carefully states in his rebuttal report that he has "limited [his] comments to the CFD modeling undertaken by Dr. Nesic…."[15] Bushnell is an expert in Computational Fluid Dynamics (CFD) modeling. Dr. Nesic, BP's "erosion" expert, uses CFD models to support his opinions regarding erosion. Dr. Bushnell does nothing more than point out the numerous modeling errors made by

---

[15] Bushnell Rebuttal Report at 32.

8

Dr. Nesic, including his lack of converged solutions, his lack of proper model validation, the poor mesh employed by Dr. Nesic, and other flaws.[16] The United States does not understand BP and Anadarko to be requesting that any of Dr. Bushnell's opinions be striken, but would categorically oppose such a request. The United States also opposes BP and Anadarko's request to move Dr. Bushnell's deposition. As stated in its letter brief regarding the deposition of Dr. Pooladi-Darvish, the expert deposition schedule has been exhaustively hammered out, and moving experts at this time is likely to have cascading effects due to limits on witness and attorney availability. Dr. Bushnell was properly listed as a CFD expert, he remains the same, and no unfair prejudice would result from his deposition going forward on its currently scheduled date.

### III. CONCLUSION

In its requests to strike expert testimony, BP and Anadarko are attempting to shield its experts from any effective critique. The United States' rebuttal reports properly "contradict or rebut evidence on the same subject matter identified by another party," and thus none of the extraordinary relief sought by BP and Anadarko is warranted. No expert opinions were improperly withheld. With respect to BP and Anadarko's requests regarding expert deposition scheduling, these requests appear to be premised on the faulty assumption that all of its experts must be deposed last in the schedule. In addition, even if BP's faulty premise were adopted, there is no need to move the deposition of Dr. Bushnell, because Dr. Bushnell is not , as BP claims, an "erosion" expert.

Respectfully submitted,

/s/ *A. Nathaniel Chakeres*

cc:   Liaison & Coordinating Counsel

Attachments:
Attachment 1 – Excerpts from Ex. 10841 (confidential)
Attachment 2 – Excerpts from Ex. 9320 (confidential)
Attachment 3 – Excerpts from Ex. 10845 (confidential)
Attachment 4 – Excerpts from Ex. 10853 (confidential)
Attachment 5 – Excerpts from Deposition of Robert Merrill
Attachment 6 – Excerpts from Ex. 8615 (confidential)
Attachment 7 – Excerpts from Deposition of Paul Hsieh
Attachment 8 – Excerpts from Exs. 8769-8777 (confidential)
Attachment 9 – Excerpt from Don Maclay Deposition

---

[16] Bushnell Rebuttal Report at 24-32.

9

Attachment 10 – Excerpts from Zick Rebuttal Report
Attachment 11 – Excerpts from Bushnell Rebuttal Report