# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C.  20005

Robert R. Gasaway
To Call Writer Directly:
(202) 879-5175
robert.gasaway@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

June 18, 2013

**By Electronic Mail**

The Honorable Sally Shushan
United States District Court
Eastern District of Louisiana
500 Poydras Street
New Orleans, LA 70130

Re:     MDL 2179 — Supplemental Brief in Support of Motion to Strike

Dear Judge Shushan:

We write to follow up our Monday afternoon conference call on the motion by BP and Anadarko to strike improper "rebuttal" opinions.  As noted on that conference call, the United States' Monday letter brief helpfully clarified the United States' grounds for opposing our motion.  BP and Anadarko hereby respond to several points in the United States' clarified arguments.

## The United States' Own Letter Confirms Improper Rebuttal Should Be Stricken

Read carefully and in context, the United States' June 17 letter strongly confirms that the United States is improperly seeking to spring a scientific analysis of pore volume compressibility and an ocean separator method for stock tank conversion for the first time in "rebuttal" reports. For this reason, the compressibility and ocean separator analysis summarized in the chart in BP's and Anadarko's June 17 letter brief should be stricken (in addition to the other improper rebuttal testimony also specified in that chart).

### Pore Volume Compressibility

The United States letter confirms that the United States' compressibility "rebuttal," as identified in the chart in our June 17 letter brief, should be stricken.

***First***, the United States' Quantification case-in-chief as embodied in expert reports requires that the United States put forward a value for "pore volume compressibility" ("PVC"). The United States cannot dispute that, as part of the United States' case-in-chief, Drs. Kelkar and Raghavan provide a "material balance analysis" that requires as an essential input a value for the pore volume compressibility of the Macondo reservoir sandstones.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 18, 2013
Page 2

*Second*, the United States does not dispute that determining the pore volume compressibility of the Macondo reservoir sandstones is ultimately a question for scientific analysis.  Pore volume compressibility is, by definition, a measure of how much pressure is required to shrink the size of the pore spaces between sandstone grains by a given volume. Determining pore volume compressibility is, therefore, a scientific question.

*Third*, the United States does not dispute that its March 22 expert reports failed to provide a scientific pore-volume compressibility analysis.  Nowhere in its June 17 letter does the United States dispute our motion's threshold contention that the United States' March reports failed to provide any such analysis to justify a doubling of the number for pore volume compressibility — from the value of 6 microsips measured by Weatherford to the number used by Dr. Hsieh and Drs. Kelkar & Raghavan, 12 microsips.  Instead, the June 17 letter contends that the United States did not need to present such analysis, because its experts were relying "on the analysis and opinions stated by BP employees during the well integrity testing period in July 2010." (U.S. June 17 letter, at 4.)

*Fourth*, Dr. Kelkar affirmatively decided to omit a scientific analysis of Weatherford's pore-volume compressibility testing from his initial report.  As mentioned on Monday's call, Dr. Pooladi-Darvish, another United States Quantification expert, uses 6 microsips in his March 22 report.  (P-D Rpt, Appendix 3, page 8. Line 5 (.pdf pg 121).)  And Dr. Kelkar himself used a 6 microsips figure in analysis for the FRTG in 2010.  (BP June 17 Letter, at 6.)  At the time Dr. Kelkar submitted his initial report, he knew that scientific evidence contradicted the pore volume compressibility value of 12 that he was using in the report, but he used a value of 12 nonetheless.

*Fifth*, the United States justifies the withholding of scientific analysis of compressibility from its March 22 expert reports by asserting (to quote the United States' argument heading) that "BP Created the Need for Compressibility Evidence by Abandoning its Position from the Response [that compressibility was allegedly 12 microsips]." (U.S. June 17 letter, at 4.)  The United States thus agrees with BP that the United States' expert case "needed" scientific analysis of compressibility, at the very least and very latest, once BP had made clear it disagreed with the United States' "position" that compressibility was 12 microsips, rendering this scientific question in dispute between the parties.

The critical question then is when, exactly, the United States was first on notice that BP had "abandoned" BP's alleged prior "position" that compressibility was 12.  At that point, according to the United States' own argument heading, scientific evidence was "needed," and omitting it from any subsequent expert reports was a knowing omission.

*Sixth and most importantly*, the answer to the critical question framed in the United States' own letter brief is clear: the United States knew BP's position as early as July 2010 and could have had no doubt about it at the time it submitted its March 22 expert reports.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 18, 2013
Page 3

- Secretary of Energy Chu on July 30, 2010 told his colleagues to ███████ ███████████████████████████████████████ (Attachment 1 (Ex. 9152, at 1).)

- National Labs personnel notes from August 2010 recorded that "Paul Hsieh [says] BP preferring 6 [microsips]."  (BP/Anadarko's June 13 letter, Attachment 1 (Ex. 8628, at 7).);

- BP's Rule 30(b)(6) witness for petrophysics testified on September 19, 2012 that BP believed that compressibility was 6, not 12  (Attachment 2 (Vinson Dep. Tr. 441:21-442:5).)

- The author of the document relied on by Drs. Kelkar & Raghavan as the basis for "BP's belief" testified on January 15, 2013, that he believed that the compressibility value was 6, not 12.  (Enclosure B to BP/Anadarko's June 17 letter.)

To repeat, the critical issue, as defined in the United States' June 17 letter heading 1(a), is not what the compressibility of the Macondo reservoir rocks actually is, or even what BP actually "believed" rock compressibility to be in the summer of 2010.  The critical issue is, rather, when the United States knew that BP would reject any effort to attribute to BP a "position" that compressibility was 12.  And the critical and undeniable facts are that the United States knew long before its March 22 expert submissions (i) that BP hotly disputed that rock compressibility was 12, and (ii) that BP would present extensive evidence to establish that BP never believed (even in 2010) that rock compressibility was 12.  As of the March 22 expert deadline, then, it was incumbent on the United States under the terms of its own argument to include scientific analysis of compressibility in its expert reports if it wanted to contend, as it has, that rock compressibility is 12 microsips.  But even though it knew long before March 22 that BP disputed that rock compressibility was 12 and even disputed that BP had ever believed rock compressibility was 12, the United States and its experts chose to decline to provide any scientific analysis in their initial reports.

Simply put, the assertion made by heading 1(a) in United States' June 17 letter undermines the United States' entire opposition to our motion, and the Court should grant the motion.

**Dr. Zick's Stock Tank Conversion**

The United States' June 17 letter also confirms that the United States has improperly attempted to spring through "rebuttal" Dr. Zick's new approach to converting to the amount of oil spilled to a "stock tank" volume.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 18, 2013
Page 4

The United States' letter concedes that Dr. Zick re-did his analysis on rebuttal using a methodology he affirmatively considered and rejected before his March 22 report.  (U.S. June 17 letter, at 6-7.)  The United States says Dr. Zick changed his mind after reading the expert report of BP and Anadarko's expert Dr. Whitson.  *Id.*

This candid acknowledgment by Dr. Zick and the United States' lawyers that Dr. Zick was persuaded that Dr. Whitson's "ocean separator" method is better than Dr. Zick's own method as set forth in his March 22 report does not allow the United States to bypass the Federal Rules.  Federal Rule 26 requires that expert reports, including Dr. Zick's original report, disclose the methods an expert will use at trial.  Because the United States now admits that Dr. Zick's March 22 report nowhere mentions the use of the "ocean separator" conversion method that Dr. Zick would use as his basis for trial testimony, Dr. Zick should be withdrawn as a stock-tank conversion expert.  He does not get a "re-do" in the guise of a "rebuttal."  The Zick opinions specified in the chart in my June 17 letter therefore should be stricken.

### Dr. Huffman's Report

Dr. Huffman's opinions regarding recrystallization and compaction were presented in response to the withdrawn designation of Dr. Ann Marchand, and should therefore be stricken.

Although United States' counsel contended otherwise in our telephone conference, the summary of Section VI of the Huffman Report says explicitly that that section is presented in response to the summary of opinions by Dr. Marchand.  (*See* Huffman Report, at 44.)  The ensuing 30 pages of that report should therefore be stricken.

### <u>Striking Improper Rebuttal Is the Only Equitable and Practical Remedy</u>

The United States concedes that the contested "rebuttal" opinions "are not necessary to [its] case-in-chief."  (U.S. June 17 letter at 2.)  Accordingly, any contention that the United States' case would be fatally gutted by striking the improper rebuttal opinions is not well-taken. What is needed is the streamlining of expert discovery that striking these opinions would achieve.  As emphasized during our conference call on Monday, this is not a challenge to expert opinions based on *Daubert* that can wait until after expert depositions have been taken and reports submitted to Judge Barbier.

Indeed, the present set of challenges are the exact opposite of *Daubert* challenges.  Our objection to Dr. Zick's adoption of an "ocean separator" method, for instance, is not that his use of such a method is improper under *Daubert*. (After all, BP and Anadarko's own expert, Dr. Whitson, employs the ocean separator method).  Our objection is that there was no mention of the method in Dr. Zick's initial reports.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 18, 2013
Page 5


Likewise, our objection to United States experts' presenting scientific analysis of pore volume compressibility is not that such scientific analysis is improper under *Daubert*. (After all, BP and Anadarko's own experts employ such analysis).  It is that there was no mention of such analysis in the United States' initial reports despite the United States' knowledge at the time that pore volume compressibility was in dispute.

\* \* \* \* \*


BP and Anadarko's objections go to the heart of the Federal Rules' requirement that a party be forthcoming about its experts' opinions in a Rule 26 report.  It is clear that the United States affirmatively held back scientific justifications on which it now seeks to rely.  This tactical litigation choice is inconsistent with the Federal Rules and threatens the integrity of the expert discovery process established by this Court.  Given that expert depositions start today, and sweeping changes to the current expert discovery schedule and approach will be needed in the event this motion to strike is denied, BP and Anadarko respectfully request that the Court expedite its consideration of the motion.


Sincerely,

Robert R. Gasaway


Attachments

cc (via electronic mail):
United States' MDL Counsel
Plaintiffs' Liaison Counsel
Defense Liaison Counsel
Joel M. Gross

# Attachment 1

## Filed Under Seal

# Attachment 2

313

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL          )   MDL NO. 2179

BY THE OIL RIG             )

"DEEPWATER HORIZON" IN  )   SECTION "J"

THE GULF OF MEXICO, ON  )

APRIL 20, 2010             )   JUDGE BARBIER

                           )   MAG. JUDGE SHUSHAN


*****************

VOLUME 2

*****************


Deposition of 30(b)(6)

DEPOSITION OF BP, BY AND THROUGH GRAHAM

"PINKY" VINSON, taken at Pan-American

Building, 601 Poydras Street, 11th Floor, New

Orleans, Louisiana, 70130, on the 19th day of

September, 2012.


**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

1    PowerPoint that Steve Willson created; isn't

2    that correct?

3         A.    Yes.

4         Q.    Okay.  And in -- in the -- in

11:00  5    the bottom -- in the -- in the lower quarter

6    of the chart we see different compressibility

7    numbers listed there.  Do you see that?

8    Starting with 5 microsips all the way up to

9    40 microsips; isn't that right?

11:01  10         A.    Those are type curves.

11         Q.    And what are type curves?

12         A.    All Steve is attempting to

13    demonstrate here is if you -- if you take the

14    blue line that you see there, which is one of

11:01  15    the Macondo cores, relative to porosity

16    versus vertical effective stress, those gray

17    lines are just simulating what the slope of

18    that curve would have to be if the

19    compressibility were 10, 15, 20, 30, and 40.

11:01  20         Q.    Okay.  All right.  So let's go

21    on to the next tab, Tab 16.  I'd like to mark

22    this as the next exhibit.

23         MR. BOLES:  8776.

24         Q.    (BY MR. LEOPOLD)  And this is a

11:01  25    continuation on the e-mail that we just saw

1    from Steve Willson where Kelly McAughan

2    responds and Steve gives another response and

3    Bob Merrill gives a response.  The top e-mail

4    is from Bob Merrill to Steve and Kelly.  It's

11:02  5    the subject, Macondo rotary sidewall core PVC

6    comparison dated July 7, 2010, and this is

7    Bates Page 5755276.  Do you see that,

8    Mr. Vinson?

9         A.     I do.

11:02 10         Q.     Okay.  And let me direct your

11    attention to the third e-mail down from the

12    top, which was from Kelly McAughan to Bob --

13    Bob Merrill and Steve Willson, and she says

14    in response to Steve's prior e-mail that,

11:02 15    "How about we use 6-12-18.  Then we keep the

16    6 that we originally had" and honor -- excuse

17    me, it says, "and honors side wall data-then

18    multiple it by a factor of 2 and 3.  Is that

19    reasonable?"  Did I read that correctly?

11:03 20         A.     You did.

21         Q.     Now, when Kelly is listing those

22    numbers 6, 12, and 18, do you understand that

23    to be pore volume compressibility estimates

24    for the Macondo reservoir?

11:03 25         A.     I understand that to be the

442

1    actual value of 6 that we believe the

2    reservoir to be, 5 to 6.  12 -- again, 12 and

3    18 were assumptions for looking at risk to

4    shut in.  Nothing more than looking at

11:03  5    uncertainty ranges.

6         Q.    Okay.  But I think we've already

7    established that -- well, maybe we haven't.

8    Was BP using the number 6 microsips to

9    perform reservoir modeling?

11:03  10        A.    We had utilized a number 6 to

11    perform reservoir modeling, and we have

12    used -- Bob Merrill used the value of

13    6 microsips when we were actually looking at

14    the well for intersection reservoir

11:04  15    completion on the relief well.

16         Q.    Did -- did Bob Merrill also use

17    the number of 12 microsips?

18         MR. BOLES:  Object to the form.

19         A.    Bob Merrill had simulation runs

11:04  20    where he looked at the risk to shut in, and

21    he used assumptions looking at all

22    possibilities to potential flow rates.

23         Q.    (BY MR. LEOPOLD)  Assumptions

24    based on exercise of engineering judgment,

11:04  25    correct?

1        MR. BOLES:  Object to the form.

2        A.     The value of 12 that is in that

3    middle number is the Macondo reservoir

4    compressibility multiplied by 2.  I have

11:04   5    previously testified today that the factors

6    that were used to determine that comparison

7    from Isabela and Santa Cruz, that those,

8    quote, inherent biases that we saw on a

9    previous e-mail, those do not actually exist

11:05  10    in the rotaries at Macondo.  Again, 12 and 18

11    are assumptions.

12        Q.     (BY MR. LEOPOLD) Okay.  And

13    then there is a high of 18 that Kelly listed,

14    18 microsips.  Do you see that?

11:05  15        A.     I do.

16        Q.     Okay.  And was the reservoir

17    engineering team using 18 microsips to model

18    the Macondo reservoir?

19        A.     We were not using 18 microsips

11:05  20    to model the Macondo reservoir.  6 -- 5 to 6

21    is the compressibility of the Macondo

22    reservoir.  12 and 18 are modeling

23    assumptions looking at risk to shut in.

24        Q.     Okay.  Are you aware that Kelly

11:05  25    McAughan gave the number 12 microsips to the

444

        1    United -- reservoir model for the United

        2    States to use in his reservoir modeling

        3    efforts related to cap and containment of the

        4    Macondo well?

11:05   5            MR. BOLES:  Object to form, scope.

        6            A.     I am aware that Kelly met with

        7    the government employee that was doing the

        8    modeling.

        9            Q.     (BY MR. LEOPOLD)  You're not

11:06  10    aware of that?

       11            A.     I'm aware they had a meeting.

       12            Q.     Okay.  Are you aware that she

       13    told him to use 12 microsips as the input

       14    parameter for his reservoir modeling?

11:06  15            MR. BOLES:  Object; form, scope.

       16            A.     I'm not aware of that

       17    conversation.

       18            Q.     (BY MR. LEOPOLD)  Okay.  Are you

       19    aware of any other instances when the number

11:06  20    12 microsips was given to the government to

       21    rely on for reservoir modeling purposes?

       22            MR. BOLES:  Object; form, scope.

       23            A.     I am aware of a presentation

       24    that was made to the federal government, and

11:06  25    I -- I believe the July time frame where the

1   number 6, 12, and 18 were presented as part

2   of the presentation.

3          Q.     (BY MR. LEOPOLD)  Okay.  Is

4   it -- would -- is it BP's practice to give

11:06 5   information to government authorities that's

6   unreliable or inaccurate?

7          A.     It is not.

8          MR. BOLES:  Object; form, scope.

9          A.     That presentation that I recall

11:07 10   was titled "Risk to Shut-In."  So the purpose

11   of that document, as I stated earlier, was

12   trying to understand at what levels the well

13   could be flowing because of our obligation to

14   cap and contain with Serial No. 1 the first

11:07 15   time.  One in that type of analysis would not

16   be looking at using values of compressibility

17   that are lower than what was measured in the

18   well.  You would be looking at ranges that

19   are higher because that's where your

11:07 20   sensitivity was.

21          Q.     (BY MR. LEOPOLD)  So the value

22   that was measured on the cores of 6 microsips

23   was a low end of the range that the reservoir

24   modelers were looking at, fair enough?

11:07 25          MR. BOLES:  Object to the form, scope.

1      A.      As I testified earlier, 5 to 6

2  is our technical opinion of the

3  compressibility of the reservoir.  12 and 18

4  are used in sensitivities, looking at all

11:07  5  possibilities of risk to shut in.

6      Q.      (BY MR. LEOPOLD)  And

7  possibilities of risk to shut in, it's

8  important to -- to have a compressibility as

9  an input to model the possibilities; is that

11:08  10  fair?

11      MR. BOLES:  Object; scope.

12      A.      Compressibility is a parameter

13  you need to actually run any reservoir

14  simulation.

11:08  15      Q.      (BY MR. LEOPOLD)  Okay.  So it

16  was incumbent on BP to come up with some

17  estimate of compressibility in order to

18  perform that modeling for risk to shut in; is

19  that fair?

11:08  20      MR. BOLES:  Object; scope, form.

21      A.      We did derive a technical

22  understanding of the compressibility of the

23  Macondo reservoir.

24      Q.      (BY MR. LEOPOLD)  So you agree

11:08  25  with me?

1          MR. BOLES:  Same objection.

2          A.      Could you rephrase the question

3     before I answer that?

4          MR. LEOPOLD:  I'll have the court

11:08  5     reporter.

6                    (Page 446, line 13 through

7     line 17 were read by the reporter.)

8          MR. BOLES:  Same objections.

9          A.      Could you explain to me the

11:09  10     phrase "incumbent upon BP"?  I don't

11     understand what you mean, was it incumbent

12     upon BP.

13          Q.      (BY MR. LEOPOLD)  Can you -- can

14     you model a flow rate without having a

11:09  15     compressibility number as an input?

16          MR. BOLES:  Object; scope.

17          A.      I'm not a reservoir modeler, but

18     I'm not aware that you can do that without a

19     compressibility value.

11:09  20          Q.      (BY MR. LEOPOLD)  So that's what

21     I mean by incumbent upon BP.

22          MR. BOLES:  Object; scope.

23          Q.      (BY MR. LEOPOLD)  With that --

24     with that definition, do you agree with my

11:09  25     prior question?

1      MR. BOLES:  Same objections.

2      A.    It is my understanding as not

3  being an expert in reservoir simulation that

4  total compressibility is an input parameter

11:09   5  into any reservoir simulation.

6      Q.    (BY MR. LEOPOLD)  Okay.

7  Including the one that was performed in the

8  context of the Macondo oil spill response

9  effort, correct?

11:09  10      MR. BOLES:  Object; scope.

11      A.    We performed reservoir

12  simulation on Macondo, so total

13  compressibility would be an input parameter.

14      Q.    (BY MR. LEOPOLD)  And it was a

11:09  15  required input parameter, correct?

16      MR. BOLES:  Same objection.

17      A.    I think we're saying the same

18  thing here.  A total compressibility value

19  was used in the reservoir simulation of the

11:10  20  Macondo well.

21      Q.    (BY MR. LEOPOLD)  And you can't

22  compute a flow rate without knowing the

23  compressibility, right?

24      MR. BOLES:  Object; scope.

11:10  25      A.    I'm not a reservoir simulation

1    expert.  So if what you would like me to do

2    was go back and review all of the equations

3    that sit inside a reservoir simulation, then

4    let's do that.

11:10  5        Q.    (BY MR. LEOPOLD)  Well, I

6    understand -- I'm just asking in your

7    personal capacity here.  So, I mean, you

8    are -- you do have expertise and you have

9    knowledge based on your preparation, and all

11:10  10   I'm asking is can you run a flow rate model

11   without knowing a compressibility as an

12   input?

13       A.    What I have seen in preparation

14   for this deposition is the flow rate

11:10  15   simulations, the reservoir simulations that

16   were actually done by BP, they did include

17   compressibility values in those simulation

18   runs.

19       Q.    And I -- and they used the

11:11  20   numbers of 6, 12, and 18, correct?

21       MR. BOLES:  Object to the form.

22       A.    They used 6, 12, and 18 as a

23   range of values, with 12 and 18 being

24   assumptions looking at all possibilities and

11:11  25   risk to shut in what would be the shut-in

450

```
 1    pressure under a cap and contain system.
 2         Q.    (BY MR. LEOPOLD)  Okay.  And --
 3    but my question was can you do that analysis
 4    that they performed without having a
 5    compressibility as an input?
 6         MR. BOLES:  Object to scope.
 7         A.    It's my understanding you need
 8    compressibility as an input to do a reservoir
 9    simulation.  I don't know how to answer that
10    question any more simply.
11         Q.    (BY MR. LEOPOLD)  All right.
12    That -- that's all I'm looking for.  All
13    right.  So let's continue on -- we're still
14    looking at this exhibit here.  And then the
15    next e-mail up in the chain is a response by
16    Steve Willson on July 7th, and he says in
17    response to Kelly's e-mail about how about we
18    use 6, 12, and 18 microsips, then he says,
19    "That sounds very reasonable to me, Kelly.
20    Steve."  Do you see that?
21         A.    I do.
22         Q.    So in your conversations with
23    Steve did he have anything to say about his
24    statement there?
25         A.    What he's referring to there,
```

1   and prior testimony today, is that it was his

2   understanding that he was being asked for his

3   opinion about assumptions in terms of the

4   ranges that would be used to look at the high

11:12  5   side of what the flow rate could be looking

6   at risk to shut in.

7        Q.    And he thought the high side of

8   18 was reasonable, correct?

9        A.    As an assumption based on the

11:12  10   nearest offset well data that was contained

11   in the previous plot that we looked at.

12        Q.    Okay.  And then Bob Merrill

13   trends in, and he says, "Me too."  Do you see

14   that at the top?

11:12  15        A.    I see that.

16        Q.    So would you agree with me that

17   Bob Merrill, Steve Willson, Kelly McAughan

18   all believe that it was reasonable to use a

19   range of 6, 12, and 18 microsips to model the

11:13  20   Macondo reservoir for shut in purposes?

21        MR. BOLES:  Object to the form.

22        A.    Steve and Bob then and now

23   believed the compressibility of the Macondo

24   reservoir is 5 to 6 microsips.  The 12 and 18

11:13  25   that -- what they were agreeing to is that 12

         1    and 18 were good ranges of assumed values

         2    consistent with the nearest offset wells to

         3    look at risk to shut in.

         4         Q.    (BY MR. LEOPOLD)  So have they

11:13    5    changed their mind about the inputs that they

         6    were discussing here of 12 and 18?

         7         A.    I said earlier, Matt, Steve and

         8    Bob believe from their interpretations then

         9    and now the compressibility of the Macondo

11:13   10    reservoir was 5 to 6 microsips.

        11         Q.    So why do they list 12 and 18

        12    here?

        13         MR. BOLES:  Object to the form.

        14         A.    He -- again, Matt, I don't know

11:14   15    how to explain this any simply.  This was all

        16    around all possibilities of ranges and flow

        17    rates, what would be the shut-in pressure

        18    with a cap and contain system.  These -- the

        19    12 and 18 are assumptions, and they are

11:14   20    constrained within the available data that

        21    existed in the prior plot we looked at in the

        22    Galapagos Na Kika area.  But 12 and 18 by Bob

        23    and Steve do not represent their technical

        24    opinion as to what is the compressibility of

11:14   25    the Macondo reservoir.

1    Q.    (BY MR. LEOPOLD)  Then why did

2  they use them in -- for purposes of the

3  e-mail that's being discussed here?

4    MR. BOLES:  Object to the form.

11:14  5    A.    Again, Matt, we were modeling

6  for all possibilities and risk to shut in.

7  In doing that type of analysis one wouldn't

8  use values that were skewed toward the lower

9  end.  You would use values relative to the

11:14  10  offset wells, assumed values to make sure

11  that the system that you're going to design

12  would work the first time.

13    Q.    (BY MR. LEOPOLD)  Have they

14  gathered any more data after the shut in that

11:15  15  would indicate to them that it's not

16  reasonable to use the 12 and 18 microsips to

17  model the Macondo reservoir?

18    A.    As part of my preposition --

19  preparation for this deposition in speaking

11:15  20  to Bob and Merrill, they today believe that

21  the compressibility of the Macondo reservoir

22  is 5 to 6 microsips.

23    MR. BOLES:  I don't think that was his

24  question.

11:15  25    MR. LEOPOLD:  Yeah.  Could you read

454

```
 1    back the question.
 2                    (The last question was read by
 3    the reporter.)
 4              A.    I'm not aware of --
 5              MR. BOLES:  Object to the form.
 6              A.    (Continuing)  I'm not aware of
 7    any more information that they've gathered
 8    since then.  I didn't have those discussions
 9    with them.
10              Q.    (BY MR. LEOPOLD)  So their
11    opinion today is based on the review of the
12    same data that was available on July 7, 2010;
13    is that right?
14              A.    Their opinion today, as I stated
15    earlier, what it is, it's based on the
16    information that they have available to them.
17              Q.    Was it the same information
18    that's available -- was available to them on
19    July 7, 2010?
20              A.    The information -- I do not know
21    exactly -- if what you're asking is is there
22    any other information other than the measured
23    values of the Macondo rotary sidewall cores
24    that they had available to them once the well
25    was shut in, I don't know what that
```

455

information is.

Q.    Okay.  So I didn't really
understand your answer there.  I'm going to
try to sum it up.  You tell me if you agree
with me.  Your testimony is Bob, Steve, and
Kelly do not have any additional information
that was not available to them in -- on
July 7, 2010 in order to determine what is a
reasonable range of PVC values for the
Macondo reservoir?

MR. BOLES:  Object to the form.

A.    I do not know what information
was gleaned from the actual shut-in pressure
analysis that was done once the well was cap
and contained outside of my area of
expertise.  So the only information I am
aware of as it relates to the pore volume
compressibility of the Macondo reservoir is
related to the rotary sidewall cores.

Q.    (BY MR. LEOPOLD)  Which would --
so that was available on July 7, 2010,
correct?

A.    It was.

Q.    Okay.  And so you're not aware
of any additional information that's relevant

                1    to a PVC analysis of the Macondo reservoir

                2    that's been generated since July 7, 2010?

                3         A.    I'm not aware of any -- I don't

                4    have personal knowledge if any additional

11:18     5    information has come available.

                6         Q.    Or knowledge in -- in your

                7    capacity as BP's witness here today?

                8         A.    That would --

                9         MR. BOLES:  Object to form.

11:18    10         A.    (Continuing)  That would change

               11    the technical opinion to not be 5 and 6, I'm

               12    not aware of any existence of any

               13    information.

               14         Q.    (BY MR. LEOPOLD)  All right.

11:18    15    Okay.  I'd like you to turn to Tab 19.  All

               16    right.  I'd like to mark this as the next

               17    exhibit.

               18         MR. BOLES:  Tab 19?

               19         MR. LEOPOLD:  Yeah.

11:19    20         MR. BOLES:  That will be 8777.

               21         Q.    (BY MR. LEOPOLD)  Okay.  I've

               22    placed in front of you an e-mail from Kelly

               23    McAughan to Caren Harris and Ramsey Fisher,

               24    cc to Kevan Sincock, dated July 8, 2010.  Do

11:19    25    you see that, Mr. Vinson?