# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Robert R. Gasaway
To Call Writer Directly:
(202) 879-5175
robert.gasaway@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

June 13, 2013

**By Electronic Mail**

The Honorable Sally Shushan
United States District Court
Eastern District of Louisiana
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

      Re:    MDL 2179 — Motion to Strike Expert Testimony and Adjust Expert Deposition Schedule

Dear Judge Shushan:

I write in response to the recent circulation of a draft expert deposition schedule and the impending scheduling of rebuttal expert depositions. I have been authorized to state that Anadarko respectfully joins in this submission.

Your draft expert schedule and request for comment arrived shortly after the parties received the United States' "rebuttal" expert reports at around midnight on Monday May 10, 2013. As the Court knows, the United States has the burden of proving the amount of oil discharged — a key factor in the assessment of penalties under the Clean Water Act. Accordingly, all material on which the United States' experts seek to rely in order to carry their burden as to the amount of cumulative flow should have been presented in the initial expert reports served on March 22, 2013.

Instead, as further discussed below, the United States' "rebuttal" reports have proffered page upon page of newly disclosed material that could have and should have been included (if at all) in the United States' initial reports. This is fundamentally unfair, not to mention inconsistent with the Court's scheduling and case management directives with respect to Phase 2 expert witness discovery. Moreover, by adopting this approach, the United States has thrown the expert discovery schedule — and perhaps even the Phase 2 trial schedule — into question.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 13, 2013
Page 2

Based on a preliminary review of these recently served reports, we describe below the current situation, propose potential solutions, and respectfully request that the Court promptly convene a call to discuss the situation with the United States, BP, and Anadarko.

### The United States' Withholding of Expert Analysis

BP is still reviewing the United States' recently served reports and intends to provide any other examples of improperly withheld analyses to the Court and parties no later than this coming Monday. Even at this juncture, however, we can offer several illustrative examples of the types of problems the United States has created.

**1.** *New Expert — New Material.* The United States has chosen to offer new experts who provide new material that is improper rebuttal material. This problem is most evident in the United States' improper withholding of a scientific analysis of the "pore volume compressibility" (PVC) of the sandstones found in the Macondo reservoir.

For instance, the March 22 expert report of Drs. Kelkar and Raghavan computes an estimate of cumulative flow based on a "material balance" analysis. As one input to their analysis, Drs. Kelkar & Raghavan employ an estimate of the pore volume compressibility of the Macondo sandstones. But as their basis for this PVC input, Drs. Kelkar and Raghavan cite only a single BP document for the (incorrect) proposition that their PVC number was deemed by BP to be "most likely." (*See* Expert Report, at 27 n.37, 28 n.41, 45 n.58.)

BP and Anadarko noted the omission of any scientific analysis of PVC in the United States' initial reports and promptly brought it to the attention of the Court and parties on May 1, stating as follows:

> BP and Anadarko's principal testifying expert, Professor Martin Blunt, has calculated a cumulative oil flow using a number for the compressibility of the Macondo rock based on measurements by the Weatherford Laboratory of actual rock samples. The United States' experts Hsieh and Kelkar & Raghavan have used a number for rock compressibility that is twice as high. Those experts acknowledge that, if they use a compressibility number suggested by the Weatherford measurements, then they would calculate cumulative flow of the same approximate amount as BP's expert Professor Blunt.
>
> The United States' experts do not provide a scientific analysis supporting their decision to double the number for compressibility from that obtained from the Weatherford laboratory measurements. BP is therefore unable to determine what reason, if any, the United States may seek to provide to support this doubling, other than a citation to a BP presentation that used alternative numbers for compressibility to test

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 13, 2013
Page 3

worst-case scenarios in assessing capping-stack-closure risk. The United States has therefore failed to meet its burden of proof on this particular input to its experts' calculations.

(BP and Anadarko's Phase Two Disclosures of Non-Retained Quantification Expert Witnesses Not Required to Provide Written Reports (May 1, 2013), at 2.)

At the time BP and Anadarko noted the United States' experts' omission of scientific PVC analysis supporting Drs. Kelkar and Raghavan's cumulative flow estimate — and warned of its possible consequences — BP and Anadarko had reason to believe the omission was no mere oversight. By the time the United States omitted a scientific analysis of rock compressibility in the initial expert submissions of March 22, 2013, hundreds of pages of testimony from the Merrill, Vinson, Levitan, Hsieh, and Loos depositions had already directly addressed the issue. More still, notes from the critical July 30, 2010 meeting where the United States settled on its August 2, 2010 "ground truth" flow estimate, reflect a discussion of PVC. Specifically, United States expert Paul Hsieh, who attended the meeting, was noted as saying "BP preferring 6 [microsips]." (Attachment 1, Ex. 8628, at 7.) And also back in 2010, United States expert Dr. Kelkar analyzed the Weatherford Laboratories PVC measurements, as part of his FRTG work, and in doing so employed a rock compressibility in line with that of BP's experts. (*See* Attachment 2, Ex. 9859, at 16.) The only analysis from Dr. Kelkar available at the time of the United States' March 22 expert reports thus supported BP's PVC number, not the United States' new "rebuttal" numbers.

Dr. Kelkar, like the other United States experts, omitted referencing any of this previous analysis in the United States' March 22 round of expert reports. In furtherance of what appears to have been an expert-team-wide decision, the United States' experts eschewed analyzing rock compressibility on March 22, and then served so-called rebuttal reports on Monday attempting to present entirely new analysis of the issue. The problem with this approach is that, to the extent the United States wanted to present scientific analysis on the PVC issue, its experts could have and should have addressed the issue back in March.

In particular, reports served on Monday from United States experts Jean-Claude Roegiers and Alan Huffman present new PVC analyses covering, among other things: (i) differences between methods of taking samples for purposes of performing compressibility testing; (ii) sample preparation and transfer to Weatherford Laboratories for testing; (iii) testing practices, including reference to an internal BP memorandum discussing a different well; and (iv) a supposed "correction factor" analysis that challenges the accuracy of the Weatherford Laboratories measurements.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 13, 2013
Page 4

As demonstrated in the attached chart, however, every one of these PVC issues addressed in the United States' recent "rebuttal" reports was discussed in depositions months before the United States submitted its initial reports. (*See* Appendix A.)

In short, the United States knew the importance of pore volume compressibility throughout the Phase 2 discovery period. It knew specifically about the issues that it now seeks to present in supposed "rebuttal" analyses. Yet it still chose to withhold any scientific analysis of those issues. The United States' experts "made their bed" when they decided to use a compressibility number taken out of context from a BP document without performing independent testing or analysis. Because the decision to rely solely on an out-of-context misreading of a BP document was an affirmative one, the United States should not now be allowed to offer new scientific opinions on this subject.

**2.** *Previously Disclosed Expert — New Material*. The United States offers through its previously disclosed experts new material that should have been previously provided and is therefore improper rebuttal material.

A good example of this problem is Dr. Zick, who served an expert report on March 22 opining that a "four-stage separation" method should be used to convert spilled fluid to Stock Tank Barrels. In his rebuttal report, Dr. Zick says, "In my original report, I argued that the most appropriate conversion from reservoir fluid mass to stock tank oil volume would be ... a 4-stage separation process that BP had commissioned three different laboratories to test ...." (Zick Rebuttal Report, at 1.) Files produced at that time reveal that Dr. Zick had considered an alternative "ocean-separator" method, but he did not discuss that method in his report.

Now, however, Dr. Zick has rejected his original opinion, relying instead on a newly developed method for calculating stock tank barrels of oil: "In light of the calculations presented in this section, my current recommendation is to use my oceanic separation process to make the conversions." (Zick Rebuttal Report, at 12.) In short, Dr. Zick did limit his rebuttal report to a critique of the work of BP's experts and a defence of his original work; he instead used it to develop an entirely new theory.

A second example is found in the report of United States expert Dr. Pooladi-Darvish. Dr. Pooladi-Darvish served an initial report as a Phase 2 Quantification expert on March 22 and a "rebuttal" expert report on Monday — only 10 days before his scheduled deposition — that is 39 pages long (nearly double the length of his original report) and contains another 121 pages of appendices. In addition, the United States produced with his report over 200 gigabytes of data that was not received until yesterday. Our review and evaluation of this "rebuttal" continues. But it is already apparent that the report contains opinions and analysis that could have and should have been included in the original report, including a purported correction of "systemic"

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 13, 2013
Page 5

problems that Dr. Pooladi-Darvish identified in his original report (not responsive to any BP expert).  (Pooladi-Darvish Rebuttal Report at 8, n.3.)

As a third example, Drs. Kelkar & Raghavan, who previously offered an initial expert report, have taken the opportunity in their "rebuttal" report to use a new and unsupported pore volume compressibility number of 24.  This PVC figure purports to be grounded in the improper rebuttal reports of Drs. Roegiers and Huffman.  But neither of those experts appear to calculate this PVC value.  Nonetheless, relying on the new PVC number, Drs. Kelkar and Ragavan arrive at a new estimate of cumulative flow, employing a methodology they did not previously use, that increases their cumulative flow estimate from 5.0 to 5.9 million stock tank barrels.  (*Compare* Kelkar & Raghavan Expert Report, at 8 (stating that cumulative flow was between 4.5 and 5.5 MM stb) *to* Kelkar & Raghavan Rebuttal Report, at 7.)

   3.    *Previously Disclosed Expert - New Cross Rebuttal*.  This is a different type of category that presents potential scheduling problems.

As the Court appreciates, the expert deposition schedule contemplates that the United States, as the party with the burden of proof, will put forward its experts on certain topics before BP and Anadarko's experts are deposed on the same or a similar topic.  The United States has now offered, however, a bevy of opinions across multiple topics from multiple previously scheduled witnesses.  In some instances, this multiplicity of opinions conflicts with the established principle that the United States' expert witnesses should be deposed before BP and Anadarko's expert witnesses.  Indeed this conflict can readily be seen in Scott Cernich's email sent at around 10:15 Central this morning, asking that six of the United States' seven new experts be scheduled for deposition either in the last regular deposition week or in the overflow week.

As one example, Dr. Bushnell originally served a report attempting to calculate flow on July 14 and 15, 2010, based on a technique known as computational fluid dynamics.  Accordingly, Dr. Bushnell's deposition was scheduled to occur on July 25 and 26 before the July 29 and 30 deposition of BP's expert, Simon Lo, who also provides an opinion that employs computational fluid dynamics.  Dr. Bushnell's rebuttal report, however, is not limited to computational fluid dynamics.  The report also contains opinions on erosion that purport to rebut the opinions offered by BP's expert, Dr. Nesic.  The current expert deposition schedule has Dr. Nesic scheduled to be deposed on July 23 and 24 — *before* Dr. Bushnell's deposition.

In this way, also, the United States has significantly complicated the already difficult task of expert scheduling.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 13, 2013
Page 6

**Remedies for the United States' Withholding of Expert Analysis**

The United States' recent reports put the Court and parties in a bind. Unless Judge Barbier wants to reset trial for a later date, there is simply no time for revamping the expert discovery schedule to accommodate all of the improper expert reports recently submitted by the United States. In light of these scheduling realities, it is critical that improper rebuttal testimony not be allowed.

As a general matter, all of the improper new opinions offered in the United States' reports served this Monday should be struck as either improper "rebuttal" evidence or as an improper supplement not previously disclosed. This is both appropriate as matter of principle under the Federal Rules and sound practice where, as here, the Court has invested considerable time in fashioning interdependent solutions for managing an already expansive expert discovery process over a compressed timeframe.

Putting aside the instances such as the United States' improper omission of a scientific PVC analysis, it might be possible to accommodate certain other improper "rebuttal" testimony through changes to the expert discovery schedule and discovery procedure. In those instances, another day of deposition time for BP and Anadarko might provide adequate opportunity to explore the new opinions now improperly offered. BP and Anadarko could also be permitted to elicit affirmative testimony from their experts, as this is the first (and only) opportunity these experts will have to address before trial the new material improperly offered on "rebuttal" by the United States.

Certainly where improper "rebuttal" opinions are allowed to go forward, these changes are, in fairness, necessary. As Your Honor knows, Judge Barbier strictly enforces the "four corners" rule for expert testimony at trial. Without additional time to explore the new opinions at deposition and elicit testimony rebutting these new opinions, BP and Anadarko will be severely prejudiced at trial.

BP and Anadarko are still reviewing the United States' recently served reports, and can provide the Court on Monday with a fuller discussion of which instances may be capable of being accommodated through scheduling adjustments versus testimony that — like the manifestly improper PVC testimony — should be struck as clearly beyond the bounds of proper "rebuttal."

At a minimum, however, the Court should order the following relief on behalf of BP and Anadarko.

*First*, the United States should be asked to explain in writing by Monday June 17 why it should be allowed to submit any scientific evidence on the question of pore volume

**KIRKLAND & ELLIS LLP**

The Honorable Sally Shushan
June 13, 2013
Page 7

compressibility, given that it chose to omit such analysis from its initial reports.  The United States should specifically address each of the categories of PVC issues that were clearly joined by adverse cross-examination in depositions before the submission of the initial expert reports.  (*See* Appendix A.)  BP and Anadarko would then be able to respond by next Wednesday explaining why the Court should strike the portions of the reports of Drs. Rogiers and Huffman that address rock compressibility — especially given the withdrawal Tuesday night of Dr. Ann Marchand as a non-retained expert. (*See* R. Gasaway Ltr. to Court (June 11, 2013).)

As the Court will remember, the proposed report of Halliburton's proffered expert Roland Chemali was struck because the report was not, in fact, a rebuttal report, but was instead "clearly case-in-chief" material.  (Rec. Doc. 4738, at 2.)  Accordingly, Mr. Chemali was not permitted to testify at the Phase 1 trial.  *Id.*  Similarly, when BP expert Ron Crook did not testify at the Phase 1 trial, Halliburton's expert Dr. Kris Ravi — who provided a report in rebuttal to Mr. Crook — was not permitted to testify.  (Rec. Doc. 9036, at 2.)  The sound logic of these Phase 1 precedents is equally applicable here in Phase 2 and in the context of the withdrawal of Dr. Marchand.  In short, the United States' "rebuttal" expert testimony should be struck where there is no proffered testimony for those reports to allegedly rebut and/or where the proffered testimony could have and should have been included in the United States' initial round of reports.

***Second***, the deposition of Dr. Pooladi-Darvish, scheduled for eight days from now, should, for the reasons described above, be moved back approximately one week to allow further analysis of his "rebuttal" report.  Of course, depending on the date for which Dr. Pooladi-Darvish's deposition is rescheduled, a rescheduling of Dr. Gringarten's and/or Dr. Blunt's depositions may also be necessary.

***Third***, BP and Anadarko should be directed to provide by this Monday, June 17, a listing of the specific relief they seek to address the situation, in addition to the striking of the United States' Experts' PVC testimony.  This relief would include any deposition scheduling changes, additional deposition time, or a recognition that BP and Anadarko may conduct otherwise "outside the scope" direct examination of their expert witnesses at deposition where such examinations are necessary to rebut the extensive, late-breaking "rebuttal" contentions of the United States.

* * * * *

In the end, it is clear that the Court's expert discovery schedule, which provides less than ten days between the submission of rebuttal reports and the commencement of expert depositions, may be founded on an understandable premise that turns out to be fundamentally mistaken — an assumption that the United States has confidence in the scientific validity of its expert case.  In retrospect, that assumption appears questionable, as the United States has sought

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
June 13, 2013
Page 8

for reasons of its own to make it difficult for the parties' experts to join issue on the scientific merits of the questions in dispute.

Given the seriousness of the present situation, and the need quickly to resolve it, we respectfully request that the Court promptly convene a conference call between BP, Anadarko, and the United States.

Respectfully Submitted,

Robert R. Gasaway

Attachments

cc (via electronic mail):

United States' MDL Counsel
Plaintiffs' Liaison Counsel
Defense Liaison Counsel
Joel M. Gross