UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | * * * * | MDL NO. 2179<br><br>SECTION J |
| | * | JUDGE BARBIER |
| THIS PLEADING APPLIES TO: No. 12-311 | * * * | MAGISTRATE JUDGE SHUSHAN |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**CAMERON'S MEMORANDUM IN OPPOSITION TO LIU'S MOTION TO COMPEL CAMERON TO RESPOND TO REQUESTS FOR PRODUCTION OF DOCUMENTS AND PRODUCE A PRIVILEGE LOG**

Plaintiff Cameron International Corporation ("Cameron") respectfully submits this memorandum of law, together with the Declaration of Brad Eastman (the "Eastman Decl."), in opposition to Liberty's Motion to Compel Cameron to Respond to Requests for Production of Documents and Produce a Privilege Log ("Motion to Compel").

**PRELIMINARY STATEMENT**

Liberty filed its Motion to Compel prematurely. Cameron has either produced or agreed to produce virtually everything Liberty has requested in its Motion to Compel. The parties have narrowed the issues actually ripe for court intervention down to one: Cameron's assertion of privilege over certain of its counsel's communications involving Marsh – Cameron's insurance broker and claim representative. Specifically, Liberty is seeking Cameron's post-October 1, 2011 communications between its outside and inside attorneys and Marsh relating to Cameron's litigation with BP and this dispute with Liberty.1 In other words, Liberty is seeking the legal advice and litigation strategy of Cameron's counsel. Because such communications are

---

1    A total of 227 documents fall into this category.

1130269v1

squarely protected by the attorney-client privilege, work product doctrine, or both, Liberty's Motion to Compel should be denied.

## BACKGROUND

Marsh's role and its responsibilities to Cameron at all times relevant to this dispute are set forth in a Client Service Agreement entered into between Cameron and Marsh. (Eastman Decl. ¶ 9, Ex. 1 (Client Service Agreement By and Between Marsh USA Inc. and Cameron International Corporation, dated December 31, 2008) ("CSA").) Marsh's Client Service Agreement expressly provides that Marsh is "authorized to represent and assist" Cameron (CSA ¶ 4), stating that, among other things,

- Marsh shall "negotiate on [Cameron's] behalf with insurers and keep [Cameron] informed of significant developments in negotiations" (*id.* Appendix A, 2.(g));
- Marsh shall assist Cameron "with initial report of claims to Insurers" and help Cameron "[e]valuate coverage applicability" (*id.* Appendix A, 2.(u); and
- Marsh shall assist Cameron "with the settlement of claims with Insurers," such as Liberty, including "in the development of settlement strategies" and in "Insurer negotiations" (*id.* Appendix A, 2.(v)).

Marsh acted in this capacity – as Cameron's representative – at all times in connection with the Deepwater Horizon MDL, the BP Settlement and negotiations with Liberty. (*See* Eastman Decl. ¶¶ 3-7.) For example, Marsh was intimately involved when Cameron began discussing a possible settlement with BP. (*See id.* ¶¶ 4-5.) Indeed, Marsh communicated regularly with Cameron's outside litigation counsel, including Beck Redden LLP and Willkie Farr & Gallagher LLP, and Cameron's in-house litigation counsel, Brad Eastman, regarding the BP settlement. (*See id.*) Those counsel directed Marsh as Cameron's representative with respect to (1) keeping Cameron's insurers informed of all negotiation developments, (2) providing Cameron's insurers with all draft settlement agreements and incorporating the insurers' comments, and (3) negotiating with Cameron's insurers regarding the terms of their consent to

2

and coverage for Cameron's eventual settlement payment to BP. (*See id.*) Throughout the Cameron-BP settlement negotiations, Marsh therefore worked in conjunction with – and acted on the instructions of – Cameron's counsel in navigating the claims process on Cameron's behalf. (*See id.* ¶ 5.)

When Liberty refused to fund the BP settlement, Cameron's counsel asked Marsh to assist in helping to convince Liberty to honor its insurance policy. (See id. ¶ 6.) In that capacity, Marsh was involved in numerous communications with Cameron's counsel concerning Liberty's coverage position, advocacy for Cameron's position, and potential settlement. This was all done at the behest and direction of Cameron's counsel. (See id.)

The 227 Marsh communications that Cameron has redacted or withheld therefore reflect the legal advice and work product of Cameron's lawyers. Cameron made this clear in its privilege log. (See Eastman Decl., Ex. 2.)2 All the communications at issue either directly involve one or more of Cameron's attorneys, or reflect their legal advice and strategy, and would disclose that advice and strategy if produced. In short, by seeking to compel disclosure of these communications, Liberty seeks to invade the legal advice of Cameron's counsel – lawyers from Beck Redden, Willkie Farr, and Brad Eastman, in-house counsel on litigation matters – and expose counsel's strategy for the Deepwater Horizon MDL and this litigation.

## ARGUMENT

I. **ATTORNEY-CLIENT COMMUNICATIONS ARE NOT DISCOVERABLE SOLELY BECAUSE THEY INVOLVE MARSH – A RESPRESENTATIVE OF CAMERON.**

The attorney-client privilege is "deserving of the utmost protection because it encourages full and frank communication between attorneys and their clients and thereby

---

2   For the Court's convenience, Cameron has attached a log that reflects only the Marsh Communications. These isolated entries were also provided to Liberty's counsel to help the parties narrow this dispute.

3

1130269v1

promotes broader public interests in the observance of law and the administration of justice." *Scherer v. Latter*, 1998 WL 205417, at *2 (E.D. La. Apr. 27, 1998) (internal quotations omitted). In diversity actions involving state law claims, "this Court must apply the law of the state where it sits concerning the scope and application of the claimed attorney-client privilege." *Id.* at *2.

In Louisiana, the attorney-client privilege is codified by article 506 of the Louisiana Code of Evidence. That statute expressly provides that legal communications with a representative of a client are protected by the attorney-client privilege. La. Code Evid. art. 506(B):

> A client has a privilege to refuse to disclose, and to prevent another person from disclosing, a confidential communication, whether oral, written, or otherwise, made for the purpose of facilitating the rendition of professional legal services to the client, as well as the perceptions, observations, and the like, of the mental, emotional, or physical condition of the client in connection with such a communication, when the communication is: (1) Between the client or a representative of the client and the client's lawyer or a representative of the lawyer; [or] . . . (4) Between representatives of the client or between the client and a representative of the client.

*Id.* For purposes of article 506, a "representative of the client" is "a person having authority to obtain professional legal services, or to act on advice so obtained, on behalf of the client" or "any other person who makes or receives a confidential communication for the purpose of effectuating legal representation for the client, while acting in the scope of employment for the client." *Id.* art. 506(A)(2).

The sole reason Liberty asserts that the attorney-client privilege does not extend to counsel's communications involving Marsh is that "Cameron has made no evidentiary showing whatsoever that Marsh qualified as its 'representative.'" (Rec. doc. 10334-1 at 8.) Cameron has made that showing.

There can be no dispute that Marsh at all relevant times acted as Cameron's representative for purposes of article 506. First, Marsh's Client Service Agreement establishes

4

that Marsh was authorized to act as Cameron's representative in connection with "[a]ssist[ing] in the development of settlement strategies" and "[a]ssist[ing] with Insurer negotiations." (*See* CSA, ¶ 4, Appendix A, 2.(v)). Second, the Declaration of Brad Eastman (Cameron's Deputy General Counsel) establishes that Marsh (1) was authorized to act on the advice of Cameron's lawyers and (2) made or received confidential communications for the purpose of effectuating the legal advice of Cameron's lawyers while acting in the scope of Marsh's employment for Cameron. (*See* Eastman Decl. ¶¶ 3-7.) Third, Liberty's own Chief Claims Officer, James Engel, acknowledged that Stephen Fraser (a Managing Director at Marsh who appears on the vast majority of the Marsh Communications) "is Marsh's policyholder advocate [i.e., for Cameron] for third-party claims." (*Id.*, Ex. 3 (Tr. of Deposition of James Engel, dated May 29, 2013) at 112:20-22.) Accordingly, the "evidentiary showing" necessary to support Cameron's claim that Marsh was its "representative" as defined by Louisiana Code of Evidence article 506 has been made.

There also can be no dispute that the Marsh Communications were "made for the purpose of facilitating the rendition of professional legal services" to Cameron. Liberty seeks Cameron's communications with Marsh after October 1, 2011 – precisely the time when Cameron was in serious settlement negotiations BP. Marsh then became involved in settlement and litigation strategy discussions between Cameron and its counsel. (*See* Eastman Decl. ¶¶ 3-7.) This was also the time when Marsh's counsel had discussions with Liberty about resolving the coverage dispute. Those discussions continued for months in an attempt to settle this dispute and avoid litigation. (*See id.* ¶ 7.)

Communications with counsel related to settlement proceedings – such as the Marsh Communications – are routinely recognized as protected by the attorney-client and

attorney work product privileges. *See, e.g., Akins v. Worley Catastrophe Response, LLC*, 2013 WL 796095, at *12 (E.D. La. Mar. 4, 2013) (holding that e-mail from "attorneys to their clients regarding the status of th[e] litigation and the attorneys' recommendations concerning settlement" was privileged; the mere "presence of some factual information, which is not itself privileged, does not strip the remainder of the document of its privileged character"); *Borders v. Chase Home Fin. L.L.C.*, 2010 WL 890485, at *2 (E.D. La. Mar. 5, 2010) (permitting only the production of documents related to settlement agreement "which are not protected from disclosure by the attorney-client privilege or the work-product doctrine") (Shushan, J.).

In virtually indistinguishable circumstances, this Court has held that an insurance broker acting as a "representative of the client" does not break the attorney-client privilege. *See Exxon Corp. v. St. Paul Fire & Marine Ins.*, 903 F. Supp. 1007, 1009-10 (E.D. La. 1995). In *Exxon*, Exxon argued that the attorney-client privilege was waived when St. Paul's attorney-client communications were disclosed to its insurance broker. *Id.* at 1009. Judge Jones disagreed, holding that the communications at issue were protected by the attorney-client privilege because the broker was a "representative of the client" under the Louisiana Code of Evidence. *Id.* at 1010. In particular, the court noted that the broker "was involved in the defense of the underlying cases," kept third parties "apprised of the developments in the underlying lawsuits," and "received communications . . . [as] a conduit between the lawyer, the insured and the insurer." *Id.* at 1009-10. In other words, the insurance broker in *Exxon* performed exactly the same functions as Marsh did here. (*See* Eastman Decl. ¶ 4.)

Other courts have similarly reached the conclusion that the attorney-client privilege is not waived simply by sharing a communication with a client's insurance broker. *See, e.g., Navitagors Mgmt. Co., Inc. v. St. Paul Fire and Marine Ins. Co.*, 2009 WL 465584, at *4

6

1130269v1

(E.D. Mo. Feb. 24, 2009) (extending attorney-client privilege to insurance broker where "its communications [were] made for the purpose of facilitating the rendition of professional legal services to the client"); *Tetra Tech., Inc. Sec. Litig.*, 2010 WL 1335431, at *5 (S.D. Tex. Apr. 5, 2010) (adopting the "principled reasoning in *Navitagors* and *Exxon*" and extending attorney-client privilege to insurance broker); *Atmel Corp. v. St. Paul Fire & Marine Ins.*, 409 F. Supp. 2d 1181 (N.D. Cal. 2005) (upholding privilege where broker "worked [with insured] to provide relevant information about litigation or claims to the insurers").

The cases Liberty cites support this conclusion. For example, in In re Tetra Tech., Inc. Sec. Litig., 2010 WL 1335431 (S.D. Tex. Apr. 5, 2010), the court adopted this Court's reasoning in Exxon, thereby directly supporting Cameron's privilege assertions. 2010 WL 1335431, at *5 ("This Court adopts the principled reasoning in Navitagors and Exxon. Thus, to the extent the communications [with the insurance brokers] were made to facilitate the rendition of legal services and involve an attorney, the Court holds that they fall within the attorney-client privilege and are not subject to discovery."). Similarly, in Royal Surplus Lines Ins. Co. v. Sofamor Danek Grp., Inc., 190 F.R.D. 463, (W.D. Tenn. 1999), the court recognized that the attorney-client privilege is not necessarily broken by the inclusion of an insurance broker. See 190 F.R.D. at 486 (noting that the transaction in question "undoubtedly involved a variety of matters which required [defendant] to seek legal advice," and that the court was willing "to allow [the insurance broker] to be included in these communications without destroying or waiving the privilege due to its role in facilitating the transaction"). The only category of broker communications that the Royal Surplus court acknowledged might not be privileged ("routine business communications") has no relevance here, as Cameron has already produced its routine business communications with Marsh in their entirety. Instead, Liberty is seeking Cameron's

7

communications with Marsh starting in October 2011 – over two years after the Liberty Policy was brokered – when Marsh was actively involved in Cameron's litigation with BP and shortly before Liberty refused to fund the BP Settlement, forcing Cameron into this litigation.

Finally, Liberty's Motion to Compel suggests that some of the Marsh Communications are discoverable because Marsh's interests may have been adverse to Cameron's. (See Rec. doc. 10334-1 at 7.) This wildly speculative suggestion is simply untrue. Cameron has stated in its sworn interrogatory responses that it has not made any demand to Marsh and/or its insurers in connection with Liberty's breach of its insurance obligations to Cameron. (See Eastman Decl., Ex. 4 (Cameron's Responses and Objections to Liberty's Discovery Requests) at 9.) At all times, Marsh and Cameron have worked together to persuade Liberty that its coverage position is wrong and it should pay Cameron's claim. There simply is no adversity between Cameron and Marsh. (See id. ¶ 8.)

## II. THE MARSH COMMUNICATIONS ARE ALSO PROTECTED FROM DISCLOSURE AS ATTORNEY WORK PRODUCT.

The Marsh Communications are not only protected by the attorney-client privilege, the vast majority of them are also protected as attorney work product. Under the work product doctrine, "a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3)(A). The doctrine protects against "disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning litigation." *Id.* 26(b)(3)(B). Unlike the attorney-client privilege, the work product privilege "does not exist to protect a confidential relationship, but to promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of an opponent." *Shields v. Sturm,*

1130269v1

*Ruger & Co.*, 864 F.2d 379, 382 (5th Cir. 1989). Therefore, "the mere voluntary disclosure to a third person is insufficient in itself to waive the work product privilege." *Id.*

In October 2011, Cameron was not only anticipating litigation, it was actively involved in the Deepwater Horizon MDL. (See Eastman Decl. ¶ 4.) In early November 2011, Cameron was also anticipating litigation with Liberty in light of Liberty's assertion that it did not owe Cameron any insurance coverage until Cameron's theoretical indemnity from Transocean was exhausted. (See id. ¶ 6.) Accordingly, the Marsh Communications were all geared towards pending or anticipated litigation, as they were made at a time when Cameron and its counsel were routinely consulting with Marsh concerning settlement strategy and insurer negotiations in connection with the BP settlement and Cameron's claims for coverage from its insurers. (See id. ¶¶ 3-7.) The "primary motivating purpose" behind virtually all of the Marsh Communications was indeed, therefore, to "aid in possible future litigation." See United States v. Davis, 636 F.2d 1028, 1040 (5th Cir. 1981). Moreover, many of the Marsh Communications contain the "mental impressions, conclusions, opinions, or legal theories" of Cameron's counsel, and are therefore afforded special protection from disclosure as attorney work product. Fed. R. Civ. P. 26(b)(3)(B); see also Upjohn Co. v. U.S., 449 U.S. 383, 400 (1981) ("Rule 26 accords special protection to work product revealing the attorney's mental processes.")

Accordingly, even if Marsh were considered a third party that would otherwise break attorney-client privilege (which, as demonstrated above, it is not), many of the Marsh documents that Cameron withheld or redacted would still be entitled to protection, as the work product doctrine is not waived even where the protected content is shared with a third party. Shields, 864 F.2d at 379; see also In re Grand Jury Subpoena, 220 F.3d 406, 409 (5th Cir. 2000) ("because the work product privilege looks to the vitality of the adversary system rather than

1130269v1

simply seeking to preserve confidentiality, it is not automatically waived by the disclosure to a third party"); Flex Energy, LLC v. St. Paul Surplus Lines Ins. Co., 2011 WL 2434095, at *7 (W.D. La. June 13, 2011) (same).

Liberty also says that "even if the doctrine applies, LIU has shown that it has substantial need for the materials to prepare its case and cannot obtain their substantial equivalent by other means." (Rec. doc. 10334-1 at 10.) There has been no such showing. Liberty has not explained why it needs to know Cameron's counsel's thought processes as reflected in communications with Marsh to prepare its case. The facts involved in this coverage dispute are equally available to both sides. If Liberty has a case, it can prepare it without the benefit of knowing Cameron's counsel's advice.

## CONCLUSION

For the foregoing reasons, Cameron respectfully requests that the Court deny Liberty's Motion to Compel in its entirety.

Dated:   June 21, 2013

Respectfully submitted,

　/s/ Phillip A. Wittmann　
Phillip A. Wittmann, 13625
　　pwittmann@stonepigman.com
Carmelite M. Bertaut, 3054
　　cbertaut@stonepigman.com
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
504-581-3200
504-581-3361 (fax)

1130269v1

WILLKIE FARR & GALLAGHER LLP
Mitchell J. Auslander
Jeffrey B. Korn
787 Seventh Avenue
New York, New York  10019
 (212) 728-8000
mauslander@willkie.com

*Attorneys for Cameron International Corporation*

### CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Cameron's Opposition to Liberty's Motion to Compel Cameron to Respond to Requests for Production of Documents and Produce a Privilege Log has been served on all Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 21st day of June, 2013.

*/s/ Phillip A. Wittmann*

1130269v1