## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **In re:  Oil Spill by the Oil Rig** **"DEEPWATER HORIZON" in the Gulf of Mexico, on April 20, 2010** **These Pleadings apply to:  *All Cases*** (Including Nos. 10-2771 and 10-4536) | **MDL No. 2179** **SECTION: J** **JUDGE BARBIER** **MAGISTRATE SUSHAN** |

### PROPOSED FINDINGS AND CONCLUSIONS

[Phase One Limitation and Liability Trial]

Plaintiffs and Claimants-in-Limitation, including the State of Alabama and the State of Louisiana, through Plaintiffs' Co-Liaison Counsel, Coordinating Counsel for the States, the Plaintiffs' Steering Committee, and the PSC Phase One Trial Team, respectfully submit the following joint Proposed Findings and Conclusions, in accordance with the Court's Order of April 24, 2013 [Doc 9536]: [1]

## MAY IT PLEASE THE COURT:

---

[1] Consistent with the Court's Order, the Plaintiff Steering Committee, the Attorney General of Alabama and the Attorney General of Louisiana will each also be submitting a POST-TRIAL BRIEF.  Plaintiffs respectfully incorporate such POST-TRIAL BRIEFS in further support of the Proposed Findings and Conclusions set forth for the Court's consideration herein.

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS . . . . . . . . . . . i

INTRODUCTION . . . . . . . . . . . 1

FACTUAL BACKGROUND . . . . . . . . . . 4

PROCEDURAL HISTORY . . . . . . . . . . 8

PHASE ONE STIPULATIONS . . . . . . . . . 13

OVERVIEW OF ISSUES TO BE ADDRESSED . . . . . . . 17

DISCUSSION OF GOVERNING LEGAL PRINCIPLES

      Transocean's Petition for Limitation . . . . . . 19

      Unseaworthiness . . . . . . . . . 21

      Gross Negligence, Willful Misconduct, and Wanton or Reckless Disregard . . 22

      Imputation of Punitive Damages to the Defendant Companies . . . . 24

FINDINGS AND CONCLUSIONS

      Summary of Findings and Conclusions . . . . . . 27

Findings regarding Disputed Factual Issues

      Was there a "dual command" structure on the DEEPWATER HORIZON?
      If so, did it violate the ISM Code? . . . . . . 27

      Is there a conflict between the ISM Code and the MODU Code? . . . 28

      Was Captain Kuchta adequately trained and otherwise qualified to serve as the
      Master of the DEEPWATER HORIZON? . . . . . . 29

      Was Jimmy Harrell licensed to serve as the Person in Charge of the
      DEEPWATER HORIZON?  Was he licensed to serve as the OIM? . . . 30

      Did the weekly drills or other training of the DEEPWATER HORIZON Crew
      include training on EDS? . . . . . . . 31

Were the deficiencies noted in the 2009 Rig Audit (and previously) actually closed
out prior to the blowout and explosion? . . . . . . . 32

Was the battery in the Blue Pod already dead (or at least too low to function) when
it was called upon to activate the BSR at "AMF Time" or did it activate and drain
in the process? . . . . . . . . . 36

Did the General Alarm on the DEEPWATER HORIZON sound before the first
(or even the second) explosion? . . . . . . . 37

Was an acoustic trigger a reliable mechanism that could have been and should
have been added to the BOP? . . . . . . . 38

When they realized that hydrocarbons had entered the riser, did the Transocean
Crew divert to the Mud-Gas Separator, or did they divert overboard? . . 39

What was the cause, during the negative pressure test, of the 0 psi reading on
the Kill Line? . . . . . . . . . 40

Whether, how and when OMS was applied to contractor-owned rigs in the Gulf? . 40

Was there, at the time of the blowout, a "bridging document" that identified
and addressed any gaps between BP's OMS and the Transocean Safety
Management System with respect to the Macondo Well or the
DEEPWATER HORIZON? . . . . . . . 45

In determining the "Safe Drilling Margin" for MMS purposes, (and the
"Kick Margin" for Good Oilfield Practices purposes), is the operator always
allowed to rely on the measurement that is taken at the Casing Shoe, or must it
calculate from the lowest known Fracture Gradient that's found in the relevant
drilling interval or section? . . . . . . . 47

Did the "fast drilling" that occurred from October 2009 through April 9, 2010
cause or contribute to the blowout which occurred during the temporary
abandonment on April 20, 2010? . . . . . . . 49

Did the "Every Dollar Counts" culture at BP affect operations?  Did it affect safety?
Is it evidenced in the specific decisions that were made on Macondo? . . 51

Should Maximum Anticipated Surface Pressure (MASP) have been calculated
using 100% gas column to surface, (rather than 50% mud, 50% gas)? . . 55

Did the hydrocarbons enter thru the Shoe Track at the bottom of the hole,
or did they invade through a breach in the casing? . . . . 56

Was the Sperry Mudlogger, Joe Keith, monitoring the well on the evening in question?  How long was his break?  Did he review the data when he returned from break?  Did he see the data changes and disregard them, or did he fail to notice them in the first place? . . . . . . . 56

Could Sperry (and Transocean and/or BP) have placed the Flow-Out Sensors – or a second set of Flow-Out Sensors – in a location that would have allowed the Mudlogger to effectively monitor the Flow-Out even when fluids were being diverted overboard? . . . . . . . 58

Did Halliburton develop a Basis of Design for the production casing cement job? . 60

Was the cement slurry designed and formulated by Halliburton for the production casing interval stable? . . . . . . . 62

Did Halliburton intentionally conceal or destroy evidence after the event? . 63

**Findings and Conclusions regarding Unseaworthiness** . . . . . 71

**Findings and Conclusions regarding Privity** . . . . . 72

**Transocean and BP Both Exhibited Willful and Reckless Disregard in the Selection, Configuration, Modification and Refusal to Upgrade the Deficient and Defective Blowout Preventer (BOP)** . . . . . 75

Overview and Summary of BOP Failures . . . . . . 75

Failure to Assess Suitability of BOP for Macondo Well . . . . 82

Inability of BSR to Shear and Seal Off-Center Pipe . . . . . 84

Single Point of Failure – Blind Shear Ram . . . . . 85

Single Point of Failure – MUX Cables . . . . . 86

Dynamic Flow Conditions – BSR Alone ("EDS-1") vs. CSR Followed by BSR ("EDS-2") . . . . . . . 86

Transocean and BP Failed to Upgrade BOP – Summary . . . 88

Failure to Upgrade with Emergency Batteries that Could be Monitored or Recharged Subsea . . . . . . . 89

Transocean and BP Made Changes to the BOP to Make it Less Safe . . 89

Conclusion (BP and Transocean Were Willful and Reckless with Respect to the Design of the BOP)   .   .   .   .   .   .   .   .   .   .   90

**Findings and Conclusions regarding Transocean's Willful and Reckless Disregard**   .   91

Transocean Willfully and Wantonly Inhibited and Bypassed the Automated Safety System Sensors, Responses and Alarms   .   .   .   .   .   91

Transocean Willfully and Wantonly Refused to Fix Its Longstanding Failed Maintenance System   .   .   .   .   .   .   .   .   .   .   92

Transocean Willfully and Wantonly Manned the DEEPWATER HORIZON with Unqualified, Unlicensed and Under-Trained Personnel   .   .   .   .   103

Transocean Willfully and Wantonly Violated the ISM Code and Created Confusion by Establishing and Maintaining a "Dual Command" Structure   .   .   107

Transocean (and BP) Personnel Exhibited Willful and Reckless Disregard in Proceeding with the Abandonment Procedure After the Failed Negative Pressure Test   .   .   .   .   .   .   .   .   .   .   .   109

The Transocean Drill Crew Exhibited Willful and Reckless Disregard in Ignoring the Kick and Failing to Shut In Well   .   .   .   .   .   .   111

Transocean and Its Crew Exhibited Willful and Reckless Disregard in Allowing the Kick to Be Directed into the Mud-Gas Separator (MGS), rather than Diverting it Overboard   .   .   .   .   .   .   .   .   112

Transocean's Bridge Crew Exhibited Willful and Reckless Disregard in Failing to Respond to the Emergency In A Timely Manner   .   .   .   .   114

**Findings and Conclusions regarding Transocean Corporate Blameworthiness**   .   118

**Findings and Conclusions regarding BP's Willful and Reckless Disregard**   .   .   129

BP Willfully Engaged in Fast and Reckless Drilling Which Was a Significant Contributing Factor in the Blowout   .   .   .   .   .   .   130

BP Created and Recklessly Allowed a Dangerously Dysfunctional Leadership to Govern the Safety Critical Temporary Abandonment Process   .   .   .   136

BP's Willful and Reckless Temporary Abandonment Choices Guaranteed that the Defective Cement Job Would Fail   .   .   .   .   .   .   .   .   139

Long String vs. Liner   .   .   .   .   .   .   .   .   142

Lack of Adequate Number of Centralizers . . . . . 143

Refusal to Do a Full Bottoms-Up Circulation . . . . 146

Refusal to Perform a Cement Bond Log . . . . . 147

Refusal to Install Added Barriers; Displacement to 3,000 Feet
Below Mudline . . . . . . . . 148

"Sham Recycling" by BP, in Using Left-Over LCM as a Spacer . . 149

Simultaneous Operations During Displacement . . . 151

BP's Willful and Reckless Disregard in Proceeding with Displacement
after a Failed Negative Pressure Test that was conducted by BP (and Transocean)
without a Written Protocol . . . . . . 152

BP Exhibited Willful and Reckless Disregard in Preventing Necessary
Maintenance and Repairs, and Otherwise Failing to Correct Transocean's
Persistent Maintenance Failures of Safety Critical Equipment . . 155

**Findings and Conclusions regarding BP Corporate Blameworthiness**

Overview . . . . . . . . . 158

BP Management's Refused to Correct Its Acknowledged, Longstanding
Management and Process Safety Failures . . . . . 159

BP's "Every Dollar Counts" Culture . . . . . . 163

The April 14 Meeting . . . . . . . . 166

Other Evidence of Knowledge, Approval or Ratification of Willful or Reckless
Conduct or Policies by BP Officials . . . . . 168

**Findings and Conclusions regarding Halliburton's Willful and Reckless Disregard** . 170

Halliburton Exhibited Willful and Reckless Disregard in Refusing to Create a
Basis of Design or Applying a formal Management of Change . . 171

Halliburton Personnel Exhibited Willful and Reckless Disregard in Utilizing a
Cement that Was Defectively Designed and Not Properly Tested . . 174

Halliburton Personnel Willfully Concealed Failed Cement Slurry
Test Results . . . . . . . . . 177

Halliburton Personnel Exhibited Willful and Reckless Disregard by
Participating in a Cement Job That Was Contrary To Its Best Practices   .   .   178

Halliburton-Sperry Personnel Wantonly and Recklessly Ignored Signs That
the Well Was Flowing and Failed to Warn Drill Crew   .   .   .   .   180

Halliburton's Willful and Reckless Disregard is Further Evidenced by
Halliburton's Post-Incident Conduct   .   .   .   .   .   .   .   180

**Findings and Conclusions regarding Halliburton's Corporate Blameworthiness**   .   182

CONCLUSION   .   .   .   .   .   .   .   .   .   .   .   187

CERTIFICATE OF SERVICE   .   .   .   .   .   .   .   .   .   192

## Introduction

*[From the Court's Introductory Comments, Feb. 25, 2013, Transcript pp.16-20.]*

This matter concerns the April 20, 2010 blowout, explosion and fire on the mobile offshore drilling unit DEEPWATER HORIZON as it was preparing to temporarily abandon the Macondo well, an exploratory well drilled in Block 252, Mississippi Canyon, on the Outer Continental Shelf, approximately 50 miles south of Louisiana.

That catastrophe took the lives of eleven men and injured many others.

On April 22, after burning for two days, the rig sank into the Gulf of Mexico.  For roughly the next three months, oil continuously discharged into the Gulf before the well could be capped.  Later, the well was permanently sealed *via* a relief well.

There are a number of parties that participated in Phase One of the trial.  For example, the plaintiffs, or claimants, include, among others, the United States of America, the States of Louisiana and Alabama, and numerous private individuals, businesses and other entities who have filed claims in Transocean's Limitation Action.

There are also multiple defendants.

BP was the operator and leased the Macondo prospect site from the Federal Government.

Transocean owned the DEEPWATER HORIZON and was contracted by BP to drill the Macondo well.

Halliburton was contracted by BP to provide cement and related services for the Macondo well.

Cameron manufactured and sold to Transocean the DEEPWATER HORIZON's BOP, or blowout preventer, which was installed near the wellhead.

M-I was contracted by BP to provide certain drilling fluids, among other services and materials.

In August of 2010, numerous individual lawsuits stemming from these events were consolidated before this Court in what is called a Multi-District Litigation, or MDL.

This Phase One Trial concerns two of the cases within this MDL: Case Number 10-2771, which is the Transocean entities' Limitation Action, under the Shipowners' Limitation of Liability Act;  and Case Number 10-4536, the United States' action for certain damages under the Oil Pollution Act of 1990, also called OPA, and for civil penalties under Section 311 of the Clean Water Act.

Both of these cases are before the Court for all purposes including trial, as opposed to some of the other cases that were transferred here for pretrial purposes only under the MDL statute.

The Shipowners' Limitation of Liability Act is an 1851 federal statute which permits a vessel owner to file a complaint in federal court seeking exoneration from liability or, alternatively, limitation of liability equal to the post-casualty value of the vessel, plus any pending freight.

If the vessel owner complies with certain requirements, claims against the vessel owner pending in other courts are stayed, and the claims instead must be brought in the Limitation proceeding.

In this manner, all claims are marshaled together in what is called a concursus.  The vessel owner may also join third parties it believes are liable to the plaintiffs, who may likewise crossclaim against one another and/or counterclaim against the vessel owner.

This is what happened here.  Transocean filed a Limitation Complaint.  Claims were filed in the Limitation proceeding.  Transocean brought third-party claims against BP, Halliburton, Cameron, M-I and others, who then cross-claimed against one another and counterclaimed against Transocean.

A vessel owner may limit its liability only if it shows that the fault causing the loss occurred without its privity or knowledge.  Thus, the Court must determine what acts of negligence or unseaworthiness caused the casualty and whether the vessel owner had knowledge or privity of these acts.

The burden of proving negligence or unseaworthiness is on the claimants.  The burden will then shift to the vessel owner to prove lack of privity or knowledge.

It should be noted that even if Transocean is entitled to limit its liability, there would be unresolved questions about what claims are subject to the limitation, particularly with respect to claims under OPA.

Although Transocean is technically the "plaintiff" in the Limitation Action, to simplify matters, the Court will typically refer to the United States, the States and the private claimants as the "plaintiffs", and to Transocean, BP and Halliburton as the "defendants".

As noted, the United States' action brings claims under OPA and the Clean Water Act.  This action was tried with Transocean's Limitation Action because there are some overlapping issues, particularly whether BP or Transocean acted with gross negligence or willful misconduct.

This is because the Clean Water Act imposes a civil penalty for harmful discharge of oil, the maximum value of which is determined primarily by two factors, how much oil was discharged, and whether or not the discharger acted with gross negligence or willful misconduct.

Phase One of the trial addressed fault determinations relating to the loss of well control or blowout, the ensuing fire and explosion, capsizing and sinking of the DEEPWATER HORIZON, and the initiation of the release of oil from the well.

Phase One will also include issues related to Transocean's exoneration, limitation and liability defenses, as well as the issues relating to various crossclaims, counterclaims, et cetera, between the various defendants.

The particular losses or damages suffered by any one plaintiff will not be determined in this phase, nor will the Court determine the amount of any civil fines or penalties in this phase of the trial.

Also, the Court did not hear evidence relating to nor will the Court decide in this phase issues regarding the source control response efforts following the spill or the quantity of oil that escaped before the well was capped.  Those issues will be subjects of a later Phase Two Trial.

## FACTUAL BACKGROUND

The DEEPWATER HORIZON was a 396-foot dynamically positioned Mobile Offshore Drilling Unit (MODU) owned by Transocean.[2]  The DEEPWATER HORIZON was originally commissioned to be built for Transocean's corporate predecessor, R&B Falcon.[3]  In 2000, construction of the DEEPWATER HORIZON was completed at the Hyundai Shipyard in South Korea.[4]

The DEEPWATER HORIZON was a dynamically positioned vessel with GPS guided systems which directed the vessel's eight large thrusters on how to keep the vessel in position

---

[2]  TREX-07535 p.10; Shanks Report (TREX-40008), p.9; TREX-04271 at pdf pp.5, 14.
[3]  *See* PHASE ONE STIPULATIONS [Rec. Doc. 5927] Nos. 91, 94, 95; TREX-07535, p.10; Shanks Report (TREX-40008), p.9; TREX-04271 at pdf pp.5, 14.
[4]  TREX-07535, p.10.

while drilling.[5] Even when connected to the ocean floor while drilling, the vessel was considered "underway" and subject to the hazards of the sea.[6] The DEEPWATER HORIZON flew a Marshall Islands' "flag of convenience"[7] and was subject to the International Safety Organization (ISO) and its International Safety Management Code (ISM).[8] Its Port State was the United States, which subjected it to Coast Guard jurisdiction as well.[9]

Even before the construction of the DEEPWATER HORIZON was completed, BP's corporate predecessor Vastar had leased the rig from Transocean's corporate predecessor, R&B Falcon.[10] BP and Transocean selected the components of the vessel's BOP as well as how these components would be configured and the sequence in which they would be activated during an emergency.[11]

Transocean leased the DEEPWATER HORIZON to BP for nearly all of its drilling projects between 2001 and April 2010.[12] Over the course of that nine year period, neither the DEEPWATER HORIZON nor its BOP was ever brought in for dry dock maintenance and repair.[13] Over the course of this nine year period, BP, with Transocean's approval and participation, commissioned certain changes to the BOP.[14]

---

[5] Webster Testimony, pp.3748-3750.

[6] Webster Testimony, pp.3748:2-9; Mitchell Testimony, pp.9413-9414.

[7] Webster Testimony, p.3738.

[8] Webster Testimony, pp.3736-3738; Mitchell Testimony, pp.9442-9444, 9448-9449, 9466-9467.

[9] Webster Testimony, p.3739.

[10] *See* PHASE ONE STIPULATION NOS. 91, 94, 95; TREX-07535, p.10.

[11] *See generally,* PHASE ONE STIPULATION NO. 92; BP-Transocean Contract (TREX-4271) at pdf pp.79-80; Ambrose Testimony, pp.6002-6003, 6255-6260; Shanks Report (TREX-40008), pp.9-13; Perkin Report (TREX-7535) pp.11-12.

[12] Specifically, all of the wells drilled by the DEEPWATER HORIZON except for one were drilled for BP. *See generally,* Transocean Investigation Report, p.19 (TREX-3808 pdf p.12); Ezell Testimony, pp.1640-1641; R. Sepulvado Testimony, p.1919; Perkin Report (TREX-7535) pp.10, 12.

[13] TREX-929 at pdf p.93; TREX-3405; Ezell Testimony, p.1889-1891; R. Sepulvado Testimony, p.1924.

[14] *See generally,* Shanks Report (TREX-40008) pp.12-17; Perkin Report (TREX-7535) p.12; TREX-6120; TREX-1870.

The Macondo well site is located in Mississippi Canyon Block 252.[15]  BP acquired the lease for Mississippi Canyon Block 252 on March 19, 2008 at Minerals Management Service Lease Sale 206.[16]  BP's initial exploration plan for the lease was approved by the MMS on April 6, 2009.[17]  A revised exploration plan was approved on April 16, 2009.[18]

BP had the responsibility to plan and design the well.[19]  BP submitted its original Application for Permit to Drill (APD) to drill the Macondo Well to MMS on May 22, 2009.[20] The Transocean vessel MARIANAS began drilling the Macondo Well on October 6, 2009.[21] The MARIANAS drilled the well until November 8, 2009, when it was evacuated for Hurricane Ida.[22]  The MARIANAS was damaged by Hurricane Ida and was removed from the Macondo site.[23]   BP chose the DEEPWATER HORIZON to replace the MARIANAS.[24]   The DEEPWATER HORIZON arrived at the Macondo well site on January 31, 2010 and resumed drilling the well on February 6, 2010.[25]

Total depth of 18,360' was reached on April 9, 2010.[26] After logging the well, BP finalized the plans for the temporary abandonment of the well.[27]   The final cementing of the production casing was performed by Halliburton beginning at 7:30 p.m. on April 19, 2010 and ending at 12:36 a.m. on April 20, 2010.[28]  Displacement of the well with seawater began at 3:04

[15] TREX-00001 (Bly Report), p.15.
[16] PHASE ONE STIPULATION NO. 96; TREX-00001 (Bly Report), p.15.
[17] TREX-00001 (Bly Report), p.15.
[18] TREX-00001 (Bly Report), p.15.
[19] L. McKay Testimony, p.510:9-12.
[20] TREX-00001 (Bly Report), p.15.
[21] TREX-00001 (Bly Report), p.17.
[22] TREX-00001 (Bly Report), p.17.
[23] TREX-00001 (Bly Report), p.17.
[24] TREX-00001 (Bly Report), p.17.
[25] TREX-00001 (Bly Report), p.17.
[26] TREX-00001 (Bly Report), pp.17, 22. The Timeline, as reconstructed by BP's DEEPWATER HORIZON Accident Investigation Report (the "Bly Report") is contained within TREX-00001, at pp.21-29. *See also, e.g.,* Perkin Report (TREX-7535) p.13.
[27] TREX-00001 (Bly Report), p.18.
[28] TREX-00001 (Bly Report), p.23.

p.m. on April 20.[29]   Two negative pressure tests were performed by BP and Transocean employees between 4:54 p.m. and 7:55 p.m.[30]

At approximately 8:52 p.m., hydrocarbons entered the well and began to flow up towards the vessel.[31]   The flow of mud and hydrocarbons passed from the well into the riser at approximately 9:38 p.m.[32]   Hydrocarbons reached the rig floor at approximately 9:40 p.m. and shot through the derrick a minute later.[33]   Explosions occurred thereafter, beginning at approximately 9:49 p.m.[34]

Eleven men died and their bodies were never recovered.[35]   Others aboard the DEEPWATER HORIZON were injured.[36]   The DEEPWATER HORIZON burned until it finally sank at 10:22 a.m. on April 22, 2010.[37]   Oil flowed into the Gulf of Mexico for 87 days until the well was finally capped.[38]

---

[29]   TREX-00001 (Bly Report), p.24.
[30]   TREX-00001 (Bly Report), pp.24-25.
[31]   TREX-00001 (Bly Report), p.25; TREX-07401 (Emilsen Report) p.7;  Emilsen Testimony, p.7816. (*See also,* Barnhill Testimony, pp.4241-4242, 4457-4459.)
[32]   TREX-00001 (Bly Report), p.27; TREX-07401 (Emilsen Report) p.10.
[33]   TREX-00001 (Bly Report), p.28; Emilsen Report (TREX-40003) p.11.
[34]   TREX-00001 (Bly Report), p.29.
[35]   TREX-00001 (Bly Report), pp.9, 29.
[36]   TREX-00001 (Bly Report), pp.9, 29.
[37]   TREX-00001 (Bly Report), pp.9, 29.
[38]   TREX-00001 (Bly Report), pp.9, 29.

## Procedural History

On May 13, 2010, the owner of the DEEPWATER HORIZON, Transocean,[39] filed a Complaint and Petition for Exoneration from or Limitation of Liability in the United States District Court for the Southern District of Texas under the Limitation of Shipowners' Liability Act of 1851, 46 U.S.C. §30511(a) (the "Limitation Action").[40]   On August 16, 2010, the Limitation Action was transferred pursuant to Federal Rule of Civil Procedure Supplemental Admiralty Rule F(9) to the Eastern District of Louisiana, where it was assigned to this Section bearing Case No. 10-2771.[41]

On August 20, 2010, the Judicial Panel on Multidistrict Litigation (JPML) centralized in this District all spill-related federal actions, excluding shareholder suits, and assigned them to this Court for pre-trial proceedings pursuant to 28 U.S.C. §1407.  *See* Rec. Doc. 1.

The Limitation Action was consolidated with the MDL on August 24, 2010.  *See* Rec. Doc. 62.

On October 19, 2010, the Court organized the numerous cases centralized before it by creating pleading bundles for various claims brought by those claiming injury due to the explosion, the oil spill, and its aftermath.  *See* Rec. Doc. 569.  The B1 Master Complaint and Amended B1 Complaint were filed on behalf of private plaintiffs asserting economic injuries arising from the spill.[42]   The B3 Master Complaint and Amended B3 Complaint were filed on

---

[39] Specifically, the named Petitioners in Limitation include: Triton Asset Leasing GmbH, Transocean Holdings, LLC, Transocean Offshore Deepwater Drilling, Inc., and Transocean Deepwater, Inc.

[40] Action No. 4:10-cv-01721 (S.D. Tex.).

[41] Order, *In re: The Complaint and Petition of Triton Asset leasing GmbH, et al,*  No. 10-2771 [Rec. Doc. 207] (Aug. 16, 2010).

[42] *See* Rec. Doc. 879 and 1128.

behalf of private plaintiffs asserting the need for medical monitoring and/or personal injuries arising from exposure to oil and/or dispersants.[43]  These Master Complaints included a Master Answer and Claim in the Transocean Limitation Action, as well as separate claims under maritime law and (in the case of the B1 Complaint) OPA against BP, Halliburton, Cameron, M1-Swaco, and other parties.  The Court established a procedure by which people and businesses could file "Short Form Joinders" which would simultaneously assert a Claim in the Limitation Action as well as a joinder in the B1 and/or B3 Master Complaints.[44]  Individual "Bundle A" Complaints were also filed on behalf of workers and the families of workers aboard the DEEPWATER HORIZON who were injured or killed in the fire and explosion of April 20, 2010.

In the meantime, BP was formally designated as the "responsible party" for the spill under the Oil Pollution Act of 1990, 33 U.S.C. §2702, and waived the potential $75 million limitation of liability under Section 2704(a)(3). *See* Rec. Doc. 559.

On December 15, 2010, the United States filed a civil action against BP, Transocean, Anadarko and MOEX, seeking penalties under the Clean Water Act, 33 U.S.C §§1321, *et seq.,* and for a declaratory judgment with respect to the defendants' liability under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. §§2701, *et seq.*[45]

---

[43] *See* Rec. Doc. 881 and 1812.  The B3 Master Complaint also includes a breach of contract claim on behalf of clean-up workers who allege that they are owed additional compensation under their "Vessel of Opportunity" ("VoO") Charter Agreements with BP or one of its sub-contractors.  These actions have largely been settled as part of the Economic & Property Damages Class Settlement, discussed *infra.*

[44] *See* PTO Nos. 24 and 25.  Over 120,000 claims were filed in the Limitation Action, *via* Short Form Joinder or otherwise. *See generally,* USDC E.D.La. Case No. 10-2771 and Docket No. 10-8888. (*See also* Docket No. 10-9999, relating to the claims made by Local Government entities, referenced *infra.*)

[45] Case No. 10-4536.

The State of Alabama filed two civil actions,[46] as well as an Answer and Claim in the Limitation Action.[47]  The State of Louisiana also sought and was granted leave to file an Answer and Claim in the Limitation Action.[48]  The Court also established a process by which local governments could join in a Local Government Master Answer and Claim in the Limitation and Master Complaint.[49]

In the meantime, Transocean, on February 18, 2011, filed a Third-Party Complaint, in which the BP Defendants, Halliburton, Cameron, M1-Swaco were tendered to the Claimants-in-Limitation pursuant to Federal Rule of Civil Procedure 14(c).  *See* Rec. Doc. 1320.  Various different Rule 13 cross-claims, Rule 14 third-party claims, and Rule 14(c) tenders were then asserted between and among the Petitioner-in-Limitation and the various other Defendants.[50]

On August 26, 2011, the Court issued an order granting in part and denying in part various motions to dismiss the Amended B1 Complaint on August 26, 2011.  *See* Rec. Doc. 3830.  An order granting in part and denying in part motions to dismiss the Amended B3 Complaint was entered on September 30, 2011. *See* Rec. Doc. 4159.  An order granting in part and denying in part the actions of the States of Alabama and Louisiana was entered on November 14, 2011.  *See* Rec. Doc. 4578.[51]

---

[46] Nos. 10-4182 and 10-4183.

[47] No. 10-2771, Rec. Doc. 323.

[48] No. 10-2771, Rec. Doc. 462.

[49] PTO No. 33, and Rec. Doc. 1510.  (These filings were made in USDC E.D.La. Docket No. 10-9999.)

[50] *See* BP Counter-Complaint, Cross-Complaint and Third-Party Complaint against Transocean, Rec. Doc. 2074; Halliburton Cross-Claim in Limitation against Transocean, No.10-2771 Rec. Doc. 422;  Halliburton Cross-Claims against the BP Defendants, M1-Swaco and Cameron, Rec. Doc. 2086;  *see also,* BP v. Halliburton, C.A. No. 4:11cv1526 (S.D. Tex, filed April 20, 2011).

[51] Two orders regarding the interpretation and enforceability of the indemnity and release provisions of the BP-Transocean Drilling Contract and the BP-Halliburton Services Agreement were subsequently entered in January of 2012. *See* Rec. Docs. 5446 and 5493.

On September 14, 2011, the Court issued Pre-Trial Order No. 41, governing the scope and structure of the Limitation and Liability Trial.  *See* Rec. Doc. 4033.  Under the Court's original trial plan:

> Phase One ["Incident" Phase] of the Trial will address issues arising out of the conduct of various parties, third parties, and non-parties allegedly relevant to the loss of well control at the Macondo Well, the ensuing fire and explosion on the MODU DEEPWATER HORIZON on April 20, 2010, and the sinking of the MODU DEEPWATER HORIZON on April 22, 2010, and the initiation of the release of oil from the Macondo Well or DEEPWATER HORIZON during those time periods (collectively, the "Incident"). Phase One will include issues asserted in or relevant to counterclaims, cross-claims, third-party claims, and/or comparative fault defenses as appropriate.

> Phase Two ["Source Control" Phase] of the Trial will address Source Control and Quantification of Discharge issues. "Source Control" issues shall consist of issues pertaining to the conduct of various parties, third parties, and non-parties regarding stopping the release of hydrocarbons stemming from the Incident from April 22, 2010 through approximately September 19, 2010. "Quantification of Discharge" issues shall consist of issues pertaining to the amount of oil actually released into the Gulf of Mexico as a result of the Incident from the time when these releases began until the Macondo Well was capped on approximately July 15, 2010 and then permanently cemented shut on approximately September 19, 2010. Phase Two will include issues asserted in or relevant to counterclaims, cross-claims, third party claims, and/or comparative fault defenses, as appropriate.

> Phase Three ["Containment" Phase] of the Trial will address issues pertaining to the efforts by various parties, third parties, and non-parties aimed at containing oil discharged as a result of the Incident by, for example, controlled burning, application of dispersants, use of booms, skimming, etc. Phase Three of the trial will also address issues pertaining to the migration paths and end locations of oil released as a result of the Incident as carried by wind, currents, and other natural forces and as affected by efforts to contain or direct this migration. Phase Three will include issues asserted in or relevant to counterclaims, cross-claims, third party claims, and/or comparative fault defenses, as appropriate.

Pre-Trial Order No. 41 [Rec. Doc. 4033], at pp.2-3.[52]

---

[52] The Trial Plan was amended slightly on September 21, 2011. *See* Rec. Doc. 4083.

On October 18, 2011, Cameron filed a Petition for Mandamus challenging the trial plan. The Fifth Circuit took full briefing and heard oral argument on the challenge, but denied the petition. *See In re Cameron Int'l Corp.*, No. 11-30987 (5th Cir. Dec. 26, 2011).

Shortly before the February 27, 2012 trial setting, an agreement-in-principle was announced between the Plaintiff Steering Committee and BP. Ultimately, two formal proposed class action settlements were filed and preliminarily approved.[53]

After soliciting from the parties their views on the effect, if any, of the BP Class Settlements on the issues to be tried, the Court, on May 30, 2012, issued a slightly amended Trial Plan. *See* Rec. Doc. 6592. The primary changes were that Anadarko was removed from the Phase One Trial,[54] and the previously outlined Phase Three Trial was replaced with the following:

> Subsequent Proceedings and Issues. To the extent triable issues pertaining to any parties remain unresolved by Phase One, Phase Two, settlements, motion practice, or stipulation, such trials will be established pursuant to further Order of the Court following further consultation with the parties.[55]

On November 1, 2012,[56] and by amendment on January 4, 2013, the Court issued Pre-Trial Order No. 54, setting forth pre-trial procedures, and summarizing the previous Orders governing the presentation or exclusion of evidence during the trial. *See* Rec. Doc. 8173.[57]

---

[53] *See* Rec. Docs. 6418 and 6419.

[54] *See* Rec. Doc. 6592, at p.2 fn.1.

[55] *See* Rec. Doc. 6592, at p.3.

[56] Rec. Doc. 7810.

[57] *See also,* Exhibit "B" – Order Excerpts [Rec. Doc. 8173-2].

## Phase One Stipulations

The following facts were stipulated by agreement of all parties prior to commencement of the trial: [58, 59, 60]

1. The Bureau of Ocean Energy Management, and its predecessor, the Minerals Management Service, have approved long string production casing designs for certain deepwater wells in the Gulf of Mexico.

2. Between April 20, 2005 and April 20, 2010, the Minerals Management Service approved long string production casing designs for certain deepwater wells in the Gulf of Mexico.

6. The Flag State did not identify any failures in Transocean's Safety Management System's risk assessment concerning the maintenance of, or material condition of, the DEEPWATER HORIZON prior to April 20, 2010.

7. There is no evidence of any communications from the American Bureau of Shipping to Det Norske Veritas regarding possible Safety Management System deficiencies found aboard the DEEPWATER HORIZON.

24. On June 30, 2003, the DEEPWATER HORIZON performed an emergency riser disconnect using the BOP's Emergency Disconnect System ("EDS") operation during a hurricane.

25. On June 30, 2003, the Lower Marine Riser Package ("LMRP") of the DEEPWATER HORIZON BOP disconnected from the BOP stack during an EDS operation.

91. On December 9, 1998, R&B Falcon Drilling Co. ("R&B Falcon") and Vastar Resources, Inc. ("Vastar") entered into a drilling contract for the construction, use, and operation of the DEEPWATER HORIZON (hereafter "Drilling Contract").

92. In 1999, R&B Falcon issued purchase orders to Cameron concerning specified blowout preventer ("BOP") equipment for the DEEPWATER HORIZON, PO 087-00101 and PO 087-00015.

93. As of September 28, 2000, Transocean Offshore Deepwater Drilling Inc. and Cameron mutually executed a Master Service Agreement ("MSA").

---

[58] Rec. Doc. 5927 (Feb. 29, 2012).

[59] Note that the numbers assigned to the stipulations are not consecutive so as to allow reference to prior lists of proposals, modifications, and objections exchanged among the parties in the course of negotiating the stipulations.

[60] [*Note* - Plaintiffs have deleted Phase One Stipulations that relate solely to dismissed parties Dril-Quip (Nos. 136-160), Weatherford (Nos. 113, 117, 118, 124, 125), M1-Swaco (Nos. 166, 169-173, 183), and Cameron (Nos. 103-108).]

94. Transocean Holdings, LLC became and is the successor to R&B Falcon under the Drilling Contract.

95. BPAPC became and is the successor to Vastar under the Drilling Contract.

96. On March 19, 2008, BPXP acquired a lease from the United States of 5,760 acres of property on the Outer Continental Shelf comprising Mississippi Canyon Block 252 ("MC 252 lease"). The ten-year lease started on June 1, 2008.

98. BPAPC contracted with Transocean Holdings, LLC to drill the Macondo Well.

100. BPXP assigned minority working interests in the MC-252 lease.

101. On April 20, 2010, BP took steps to shut in, secure and abandon the Macondo well for potential future production by another rig before disengaging the DEEPWATER HORIZON. As part of the abandonment procedures, the rig crew used the blind shear ram of the BOP to conduct a positive pressure test. During this test, the blind shear ram closed and sealed as expected.

102. During the evening of April 20, 2010, the Macondo well blew out.

110. The AMF deadman system for the DEEPWATER HORIZON BOP system uses non-rechargeable batteries in the BOP control pods to power the system.

111. The final production interval for BP Well MC252 #1 ("Macondo Well") consisted of 7" H513 x 9 7/8" H523 x-over production casing.

112. BP owned the 9 7/8" casing with Hydril 523 threads, and purchased the 7" casing with Hydril 513 threads from Nexen Petroleum ("Nexen"), a third party operator.

114. The 7" portion of the 9-7/8" x 7" production casing installed on the Macondo Well included a reamer shoe, six centralizer subs, and a float collar manufactured by Weatherford.

115. In addition to the reamer shoe, six centralizer subs, and float collar, Weatherford manufactured and sold to BP in March 2010 cement wiper plugs. This plug set was a Weatherford 7" x 9-5/8" DWP HP N-R SSR Plug Set, part no. 13841169 (SRDWP0709HP), consisting of a top and a bottom plug with aluminum cores and wear resistant polyurethane flexible wiper fins.

116. BP hired an independent Hydril thread inspector to inspect the reamer shoe, six centralizer subs, and float collar on April 1, 2010 prior to delivery to the DEEPWATER HORIZON rig.

119. In addition to the six centralizer subs purchased by BP from Nexen in March 2010, on April 16, 2010, at BP's request, Weatherford delivered to BP's shore base 15 Weatherford 7" Single Bow Slip-On Rotating Bow Spring Centralizers with 30R bows and stop collars, part no.

01310283. Kits and material for installation were shipped with these centralizers. These 15 Slip-On centralizers came from BP's inventory with Weatherford.

120. A Weatherford service technician was flown to the DEEPWATER HORIZON rig on April 16, 2010 to help install the 15 Slip- On centralizers on the 9-7/8" x 7" production casing.

121. BP did not to use the 15 Slip-On centralizers on the Macondo Well.

122. The Weatherford reamer shoe, M45AP float collar and cement wiper plug set installed on the 9-7/8" x 7" production casing have a temporary purpose. Once the cement has had sufficient time to set, it may be necessary to drill to a deeper depth. As a result, the internal components of the reamer shoe, float collar and the wiper plugs must be capable of being "drilled-out" by the drill string.

123. The dual flapper valves in the M45AP float collar are made of cast aluminum, a metal strong enough to meet the back pressure rating of the float collar to prevent the reverse flow of wet cement slurry from the annulus back into the casing, yet soft enough to be drilled with PDC (polycrystalline diamond compact) bits, a requirement of the drilling process.

126. API RP 65 Cementing Shallow Water Flow Zones in Deep Water Wells does not list a float collar as a well control device.

127. API RP 96 states that "Float collar valves are not designed to provide a gas-tight seal."

128. Schlumberger was standing by on the DEEPWATER HORIZON on April 20, 2010, and could have performed a cement bond log on that date if requested to do so by BP.

129. The cement bond log that Schlumberger was standing by on the DEEPWATER HORIZON to perform on the cement job for the production casing on the Macondo Well has been estimated by Schlumberger to cost less than $200,000.

130. 30 CFR §250.421 requires an operator to cement the annular space at least 500 feet above the casing shoe and 500 feet above the uppermost hydrocarbon-bearing zone.

131. The 13.1 ppg sand at the 17,788' – 17,791' depth on page 54, Figure 1 of the Bly Report, is the same sand labeled as M56A on page 215 of the Bly Report.

132. Figure 1 on page 54 of the Bly Report labels the 12.6 ppg sands as the "Primary Reservoir Sands."

133. Six centralizers were utilized on the production casing in the Macondo Well.

134. The computer screens in the DEEPWATER HORIZON's driller's cabin were capable of displaying "real time information."

135. The lockdown sleeve was not set at the time of the Incident.

161. M-I L.L.C. and BP Exploration and Production, Inc. entered into the Contract for Gulf of Mexico Strategic Performance Unit Offshore Well Services, effective February 1, 2009, that governed M-I L.L.C.'s scope of work on the Macondo well.

162. M-I recommended a drilling fluids program for the Macondo well to BP based upon information provided by BP and M-I's experience drafting drilling fluids proposals. BP reviewed, revised, and approved the drilling fluids program for the Macondo well.

163. The BP/DEEPWATER HORIZON Rheliant Displacement Procedure was based upon information provided by BP and the M-I drilling fluids specialist's experience drafting such procedures on the DEEPWATER HORIZON. The BP/DEEPWATER HORIZON Rheliant Displacement Procedure was approved by BP.

164. The BP/DEEPWATER HORIZON Rheliant Displacement Procedure was provided to representatives of BP, Transocean, and Halliburton/Sperry-Sun and discussed at a pre-tour meeting before the displacement.

165. The BP/DEEPWATER HORIZON Rheliant Displacement Procedure implemented on the Macondo well was the second draft of the procedure. The first draft of the procedure did not include a step requiring the displacement to stop for BP to conduct a negative test. The step requiring the displacement to stop for BP to conduct a negative test was added to the procedure based on instructions provided by BP.

167. BP and M-I discussed using two LCM pills available on the rig in the spacer used during the displacement of the Macondo well to seawater.

168. BP approved using the two LCM pills in the spacer used during the displacement of the Macondo well to seawater.

174. The reason for the zero pressure reading on the kill line during the negative test has not been definitively established.

175. As of April 20, 2010, Curt Kuchta held a valid license issued by the Republic of the Marshall Islands as Master (No Limitations).

176. The DEEPWATER HORIZON search and rescue operations conducted by the US Coast Guard officially concluded on April 23, 2010.

177. The Fire & Gas System on the DEEPWATER HORIZON was, at the time of its installation, approved by ABS as meeting classification society, international and US Coast Guard standards.

178. Det Norske Veritas (DNV) conducted ISM compliance audits of Transocean and the DEEPWATER HORIZON as a recognized organization for the Flag State.

179. The watchstanders on the bridge of the DEEPWATER HORIZON at the time of the casualty consisted of the Senior Dynamic Positioning Operator and the Dynamic Positioning Officer.

180. The Dynamic Positioning Officer on the bridge of the DEEPWATER HORIZON at the time of the casualty was a licensed Officer in Charge of a Navigation Watch (3rd Mate/GMDSS).

181. The DEEPWATER HORIZON was built in accordance with the 1989 MODU Code; the ABS Rules for the Building and Classing of Mobile Offshore Drilling Units, 1997; the International Convention on Load Lines, 1966, regulation 10(2), Annex 1; and US Coast Guard requirements, as the DEEPWATER HORIZON was originally intended to be registered in the US.

182. ABS classified and certified the DEEPWATER HORIZON as an X A1, Column Stabilized Drilling Unit, XAMS, XACCU, XDPS-3 (the highest rating for dynamically positioned vessels).

## OVERVIEW OF ISSUES TO BE ADDRESSED

Based on the evidence submitted at trial, the Court has dismissed defendants Cameron and M1-Swaco.  *See* Rec. Docs. 8969, 9024, 9136.  Two of the three remaining defendants, Transocean and BP, have plead guilty to ordinary negligence,[61] and, as a practical matter, the ordinary negligence of the third remaining defendant, Halliburton, would likely not afford any suing plaintiff or claimant-in-limitation meaningful relief.[62]  Accordingly, the Court will focus on:

---

[61] *See* TREX-52673 (Guilty Plea Agreement entered by BP Exploration & Production Inc, BP Corporation North America Inc, and BP plc to eleven counts of Misconduct or Neglect of Ship Officers, one count of Obstruction of Congress, a violation of the Clean Water Act, and violation of the Migratory Bird Treaty Act in Case No. 2:12-cr-00292, Doc. 2, Nov. 15, 2012), *and,* TREX-63213 (Cooperation Guilty Plea Agreement entered by Transocean Deepwater Inc and Transocean Ltd to negligent discharge of oil in violation of the Clean Water Act in Case No. 2:12-cr-00001, Doc. 3, Jan. 3, 2013).

[62] As Plaintiffs note in the PSC's POST-TRIAL BRIEF, BP is strictly liable for all economic compensatory damages as the OPA "responsible party" and is further responsible for indemnifying Halliburton (and Transocean) for all compensatory damages that might be owed to Plaintiffs with *Robins Dry Dock* standing under the indemnity provisions contained within the BP-Halliburton Services Agreement (and the BP-Transocean Drilling Contract).  As a practical matter, therefore, it is likely that all compensatory damages will be paid by BP, irrespective of the ordinary negligence of Halliburton, (or Transocean, or BP).  For that reason, the Court will focus on gross negligence, willful misconduct, and wanton or reckless indifference, as further set forth herein.  Implicitly, however, the ordinary negligence of Halliburton is established by the acts and omissions outlined in these findings, (together with the stipulated negligence of both Transocean and BP).

- Whether the DEEPWATER HORIZON was unseaworthy?

- Whether Transocean established that it lacked privity and knowledge regarding the negligent acts of the crew or the vessel's unseaworthy condition?

- Whether Plaintiffs have established that the conduct of Transocean employees constitutes willful or reckless disregard? [63]

- Whether Plaintiffs have established that Transocean, through corporate policy or through officials with policy-making authority, willfully or wantonly failed to provide a seaworthy vessel, or had knowledge of, approved, or ratified the willful or reckless conduct in question? [64]

- Whether Plaintiffs have established that the conduct of BP employees constitutes willful or reckless disregard? [65]

- Whether Plaintiffs have established that BP, through corporate policy or through officials with policy-making authority, had knowledge of, approved, or ratified the willful or reckless conduct in question? [66]

- Whether Plaintiffs have established that the conduct of Halliburton employees constitutes willful or reckless disregard? [67]

---

[63] [*Note* – As set forth in Plaintiffs' POST-TRIAL BRIEFS, Plaintiffs respectfully suggest and reserve the right to argue that a less stringent standard for the imposition of punitive damages and/or the invalidation of the pre-suit contractual release can and should be applied.]

[64] [*Note* – As set forth in Plaintiffs' POST-TRIAL BRIEFS, Plaintiffs respectfully suggest and reserve the right to argue that a less stringent standard for the imputation of punitive damages to the corporate defendants can and should be applied. The Supreme Court, in *Baker v. Exxon,* recognized the state of uncertainty in the law regarding this issue, which was left unresolved by the Court. 554 U.S. at 482-484.]

[65] *See* 33 U.S.C. §1321(b)(7)(D). BP has formally waived the $75 million limitation of liability under the Oil Pollution Act, 33 U.S.C. §2704(a)(3). *See* Rec. Doc. 559.   Hence, where private plaintiffs are concerned, the Court need not focus on whether BP is guilty of "gross negligence or willful misconduct" under §2704(c)(1)(A) or "violation of an applicable Federal safety, construction or operation regulation" under §2704(c)(1)(B). Nevertheless, the Court implicitly addresses these issues in connection with the Clean Water Act violations arising out of the penalty claims brought by the United States.

[66] [*Note* – As set forth in Plaintiffs' POST-TRIAL BRIEFS, Plaintiffs respectfully suggest and reserve the right to argue that a less stringent standard for the imputation of punitive damages to the corporate defendants can and should be applied. The Supreme Court, in *Baker v. Exxon,* recognized the state of uncertainty in the law regarding this issue, which was left unresolved by the Court. 554 U.S. at 482-484.]

[67] [*Note* – As set forth in Plaintiffs' POST-TRIAL BRIEFS, Plaintiffs respectfully suggest and reserve the right to argue that a less stringent standard for the imposition of punitive damages and/or the invalidation of the pre-suit contractual release can and should be applied.]

- Whether Plaintiffs have established that Halliburton, through corporate policy or through officials with policy-making authority, had knowledge of, approved, or ratified the willful or reckless conduct in question? [68]

## DISCUSSION OF GOVERNING LEGAL PRINCIPLES

### Transocean's Petition for Limitation

Under the Limitation of Liability Act, a vessel owner may limit its liability for maritime casualties to "the value of the vessel and pending freight." 46 U.S.C. §30505(a).  However, if the vessel's negligence or unseaworthiness is the proximate cause of the claimants' loss, "the plaintiff-in-limitation must prove it had no privity or knowledge of the unseaworthy conditions or negligent acts." *In re Omega Protein, Inc.,* 548 F.3d 361, 371-372 (5th Cir. 2008); *Trico Marine Assets, Inc. v. Diamond B Marine Servs. Inc.,* 332 F.3d 779, 789 (5th Cir.2003); *Cupit v. McClanahan Contractors, Inc.,* 1 F.3d 346, 348 (5th Cir.1993); 46 U.S.C. §30505(b).

The Fifth Circuit has explained that "privity or knowledge" "implies some sort of 'complicity in the fault that caused the accident.' " *In re Omega,* 548 F.3d at 371-372; *Brister v. A.W.I., Inc.,* 946 F.2d 350, 355 (5th Cir.1991); *Nuccio v. Royal Indem. Co.,* 415 F.2d 228, 229 (5th Cir.1969).  The owner has privity "if he personally participated in the negligent conduct or brought about the unseaworthy condition." *In re Omega,* 548 F.3d at 371-372; *Trico Marine Assets,* 332 F.3d at 780; *Pennzoil Producing Co. v. Offshore Express, Inc.,* 943 F.2d 1465, 1473 (5th Cir.1991). A corporate owner is assumed to know what the corporation's managing officers knew or "should have known with respect to conditions or actions likely to cause the loss." *In re Omega,* 548 F.3d at 371-372; *Trico Marine Assets,* 332 F.3d at 789-790 ("in situations resulting

---

[68] [*Note* – As set forth in Plaintiffs' POST-TRIAL BRIEFS, Plaintiffs respectfully suggest and reserve the right to argue that a less stringent standard for the imputation of punitive damages to the corporate defendants can and should be applied. The Supreme Court, in *Baker v. Exxon,* recognized the state of uncertainty in the law regarding this issue, which was left unresolved by the Court. 554 U.S. at 482-484.]

in loss of life or bodily injury, the knowledge of a seagoing vessel's master at the commencement of a voyage is imputed to the vessel's owner"); *Pennzoil,* 943 F.2d at 1473-1474 ("a shipowner has privity if he personally participated in the negligent conduct or brought about the unseaworthy condition. Knowledge, when the shipowner is a corporation, is judged not only by what the corporation's managing officers actually knew, but also by what they should have known with respect to conditions or actions likely to cause the loss"); *In re Int'l Marine, LLC,* 614 F.Supp.2d 733, 740-741 (E.D. La. 2009) ("the privity or knowledge of the master of the vessel at or before the beginning of each voyage is deemed conclusively the privity or knowledge of the owner"); *see also, Complaint of Patton-Tully Transp. Co.,* 797 F.2d 206, 211 (5th Cir. 1986) (constructive knowledge exists where the owner should have obtained the necessary information by reasonable inspection).

A corporate owner, therefore, will not satisfy its burden by merely demonstrating ignorance. "It is charged with the knowledge of any of its managing agents who have authority over the sphere of activities in question." *The Matter of Central GulfLines,* 176 F.Supp.2d 599, 619 (E.D.La.2001). "Managing agents" are those agents who have authority over the specific sphere of activities which results in liability. *Petition of Kristie Leigh Enterprises, Inc.,* 72 F.3d 479, 481 (5th Cir.1996); *Central GulfLines,* 176 F.Supp.2d at 618. More specifically, a "managing agent" is "an executive officer, manager or superintendent whose scope of authority included supervision over the phase of business out of which the loss or injury occurred, and whose authority, 'extended to the basic business decisions made by the ... supervisors and president of the company.'" *Central GulfLines,* 176 F.Supp.2d at 618; *citing, Cupit v. McClanahan Contractors, Inc.,* 1 F.3d 346, 348 (5th Cir.1993). Whether or not the knowledge of such employees can be imputed to the corporation is a fact intensive inquiry. *In re: Hellenic Inc.,*

252 F.3d 391, 395 (5th Cir.2001). "[I]t is the 'extent of the employee's responsibility, not his title [that] determines whether" his knowledge is imputed to the vessel owner. *Continental Oil Co. v. Bonanza,* 706 F.2d 1365, 1367 (5th Cir.1983). The factors that are considered in determining whether an employee is a "managing agent" in his sphere of operations are: (1) the scope of his authority over day-to-day activities in the relevant field of operations; (2) the relative significance of this field of operations to the business of the corporation; (3) his ability to hire or fire other employees; (4) his power to negotiate and enter into contracts on behalf of the company; (5) his authority to set prices; (6) his authority over the payment of expenses; (7) whether his salary is fixed or contingent; and, (8) the duration of his authority, i.e. full-time or restricted to a specific shift. *Cupit,* 1 F.3d at 348.

In the trial of a limitation proceeding, the burden of proof is divided between the petitioner and the claimants. The claimants must first prove that the damage was caused by the negligence of the vessel owner or an unseaworthy condition of the vessel.  In that event, the burden shifts to the shipowner to demonstrate that it had no privity or knowledge of the fault.

***Unseaworthiness***

A vessel is unseaworthy when any part of the vessel is not reasonably fit for its intended purpose.  *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960); *In re Complaint of Signal International, Inc*., *supra*; *Farrell Lines, Inc. v. Jones*, 530 F.2d 7, 10, (5th Cir.1976). Failure to provide adequate safety training or training in vessel's equipment renders the vessel unseaworthy. *Trico Marine Assets, spra*, 332 F.3d at 790.  Privity and knowledge may be found where the vessel owner failed to establish and institute adequate maintenance and repair procedures to assure that the vessel's equipment was maintained in good operating condition. *In re Amoco Cadiz*, 1884 AMC 2123 (N.D. Ill., 1984), *aff'd,* 1992 AMC 913 (7th Cir. 1992).

***Gross Negligence, Willful Misconduct, and Wanton or Reckless Disregard*** [69]

As the Court has previously ruled, [70] gross negligence will invalidate a release or exculpatory clause. *Houston Exploration v. Halliburton,* 269 F.3d 528 (5th Cir. 2001); *Todd Shipyards v. Turbine Service Inc,* 647 F.3d 401, 411 (5th Cir. 1982); *Royal Ins Co v. Southwest Marine,* 194 F.3d 1009, 1016 (9th Cir. 1999); *La Esperanza de PR v. Perez Cia de Puerto Rico,* 124 F.3d 10, 19 (1st Cir. 1997) (a release is invalid as to gross negligence, reckless conduct or intentional acts).

Punitive damages may be imposed under the general maritime law against a defendant who has acted willfully and wantonly. *In the Matter of P&E Boat Rentals,* 872 F.2d 642, 650 (5th Cir. 1989); *The Complaint of Merry Shipping,* 650 F.2d 622, 626 (5th Cir. 1981). "'Willful' and 'wanton' are roughly synonymous, at least in legal effect, with each other and with 'reckless'." *In the Matter of Cameron Boat Rentals,* 683 F.Supp. 577, 585 (W.D.La. 1988); [71] *see also, Atlantic Sounding Co. v. Townsend,* 557 U.S. 404, 409 (2009) ("wanton, willful or outrageous conduct"); *Exxon Shipping Co. v. Baker,* 554 U.S. 471, 493 (2008) (conduct owing to "gross negligence," "willful, wanton, and reckless indifference for the rights of others"); *Operaciones*

---

[69] [*Note* – As set forth in Plaintiffs' POST-TRIAL BRIEFS, Plaintiffs respectfully suggest and reserve the right to argue that a less stringent standard for the imposition of punitive damages and/or the invalidation of the pre-suit contractual releases can and should be applied.]

[70] *See* ODER AND REASONS [Doc 5493] (Jan. 31, 2012), at p.13 fn.4; *and,* ORDER AND REASONS [Doc 5446] (Jan. 26, 2012), at pp.13-14.

[71] In *Cameron Boat Rentals,* the court explained that the use of the conjunctive "willful *and* wanton" did not imply two different states of mind, both of which were required. 683 F.Supp. at 585 n.11; *citing,* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (CIVIL CASES), Damages Instructions, Part 8 (1980) ("malice, willfulness or callous and reckless indifference to the rights of others"); *see also,* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS: Civil §4.10 (2006) ("A person acts willfully or wantonly if he acts in a reckless or callous disregard of, or with indifference to, the rights of the plaintiff").

*Tecnicas Marinas SAS v. Diversified Marine Services,* No.12-1979, 2012 WL 6632509 at *6 (E.D.La. Dec. 19, 2012) ("gross, willful, and wanton negligence").

Whereas ordinary negligence often includes instances of momentary lapses of inattentiveness or other failures that occur without an awareness or apprehension of the risks, the finding of "gross negligence" or "wanton and willful" or "reckless" conduct generally requires that the defendant be apprised of the risks, and yet proceed to act unreasonably in conscious disregard of a known danger. *Exxon v. Baker,* 554 U.S. at 493-494 ("the actor knows, or has reason to know … of the facts which create a high degree of risk of … harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk"); *Houston Exploration v. Halliburton,* 269 F.3d at 532 ("an act of unreasonable character in reckless disregard of the risk known to him, or so obvious that he must be taken to have been aware of it"); *Clements v. Steele,* 792 F.2d 515, 516-517 (5th Cir. 1986) (conduct that was the result of a "conscious indifference" to the rights or welfare of others);  *Merry Shipping,* 650 F.2d at 625 (the defendant has acted willfully and with "gross disregard" for the plaintiff's rights); *Operaciones v. Diversified,* 2012 WL 6632509 at *4 (E.D.La. Dec. 19, 2012) (conduct caused by the "reckless disregard" for the safety of others).

In determining whether conduct rises to the level of "gross" or "reckless" or "wanton and willful" conduct, the Court should consider the entire series of events leading to the events and injuries in question. *Clements v. Steele,* 792 F.2d 515, 517 (5th Cir. 1986) (recognizing that gross negligence may be established where the defendant's acts of ordinary negligence demonstrated that the defendant was consciously indifferent); *Kuykendall v. Young Life,* 261 F.App'x 480, 489 (4th Cir. 2008) (multiple acts of simple negligence can amount to gross negligence where the cumulative effect of the negligent acts demonstrates an utter disregard of prudence amounting to

an indifference to others' health and safety); *Water Quality Ins. Syndicate (re Barge Morris J. Berman) v. United States,* 522 F.Supp.2d 220, 228-230 (D.D.C. 2007) (it "was wrong under the statute to focus on any one occurrence, event or cause as the proximate cause of the spill. It should have looked at the 'series of occurrences' or events that together constitute the 'incident' that led to the spill.... The court in *OCEAN PRINCE* made clear that its conclusion that there was willful misconduct was based on no single proximate cause, but on an 'accumulation of acts,' 'a chain of circumstances which [were] a contributing cause even though not the immediate or proximate cause of the casualty'") (*quoting, In re OCEAN PRINCE,* 584 F.2d 1151, 1158 (2d Cir. 1978)); *Adams v. Phillips,* No.01-3803, 2002 WL 31886737 at *4, 2002 U.S. Dist. LEXIS 24888 at **9-10 (E.D.La. Dec. 19, 2002) (defendant's "pattern of brazen misconduct" and the "entirety of his actions" were grounds for imposing punitive damages); *see also,* MARTIN, *The BP Spill and the Meaning of "Gross Negligence and Willful Misconduct"* 71 La.L.Rev. 957, 998 (Spring 2011) ("The existence of gross negligence need not rest upon a single act or omission, but may result from a combination of negligent acts or omissions, and many circumstances and elements may be considered in determining whether an act constitutes gross negligence").

***Imputation of Punitive Damages to the Defendant Corporations*** [72]

Under Fifth Circuit precedent, operational gross negligence, recklessness, or willful disregard is generally insufficient to visit punitive damages upon the employer under traditional principles of *respondeat superior.*  Rather, the plaintiff must establish that the conduct emanated from corporate policy or that a corporate official with policy-making authority participated in,

---

[72] [*Note* – As set forth in Plaintiffs' POST-TRIAL BRIEFS, Plaintiffs respectfully suggest and reserve the right to argue that the facts of the *P&E Boat Rentals* case are distinguishable, and/or that a less stringent standard for the imputation of punitive damages to the corporate defendants can and should be applied.]

approved or subsequently ratified the willful or reckless conduct involved. *P&E Boat Rentals*, 872 F.2d at 652-653.

# FINDINGS AND CONCLUSIONS [73]

Based on the evidence admitted during the Phase One Trial, and as set forth further herein, the Court finds and concludes that:

1. Transocean and its employees were negligent, and such negligence was a substantial contributing cause of the blowout, explosion, fire, and initiation of the discharge of oil;

2. The DEEPWATER HORIZON was unseaworthy, and such unseaworthiness was a substantial contributing cause of the blowout, explosion, fire, and initiation of the discharge of oil;

3. Transocean, as the owner of the vessel, had privity and knowledge with respect to the negligent acts and omissions of its employees and the unseaworthy condition of the DEEPWATER HORIZON;

4. Transocean's employees' conduct was the result of gross negligence, recklessness, and willful and wanton disregard, thereby invalidating the pre-suit contractual release by BP;

5. Transocean's employees engaged in willful and wanton conduct, and such willful and wanton conduct was a substantial contributing cause of the blowout, explosion, fire, and initiation of the discharge of oil;

6. The willful and wanton conduct of Transocean employees was the result of corporate policy and/or was otherwise known to, approved by, and/or ratified by corporate officials with policymaking authority;

---

[73] [*Note* – Plaintiffs believe that a case for punitive damages – as well as ordinary negligence, unseaworthiness, privity, the invalidation of the contractual releases, and the invalidation of the OPA cap – have been established against each of the relevant Defendants under the most stringent and exacting standards. Plaintiffs have therefore, at times, framed these Proposed Findings and Conclusions or other post-trial briefing in those terms. This should not, however, be deemed as any type of concession or admission that the most stringent or exacting legal standard does, or should, apply. Plaintiffs respectfully reserve the right to argue for the application of a different or lesser legal standard to be applied to one or more of these Proposed Findings and Conclusions, or the other questions answered or issues addressed in Plaintiffs' Post-Trial Briefs. Additionally, and along the same lines, where Plaintiffs propose findings or otherwise argue that the evidence satisfies the most stringent or exacting standard, Plaintiffs implicitly propose, and respectfully reserve the argument that, such evidence also – or alternatively – satisfies any lesser standard that the Court may (for that or any other purpose) apply.]

7. BP and its employees were negligent, and such negligence was a substantial contributing cause of the blowout, explosion, fire, and initiation of the discharge of oil;

8. BP's employees' conduct was the result of gross negligence and willful misconduct, within the meaning of OPA, 33 U.S.C. §2704(c)(1)(A);

9. BP and its employees violated applicable Federal safety, construction or operation regulations within the meaning of OPA, 33 U.S.C. §2704(c)(1)(B);

10. BP's employees engaged in willful and wanton conduct, and such willful and wanton conduct was a substantial contributing cause of the blowout, explosion, fire, and initiation of the discharge of oil;

11. The willful and wanton conduct of BP employees was the result of corporate policy and/or was otherwise known to, approved by, and/or ratified by corporate officials with policymaking authority;

12. Halliburton and its employees were negligent, and such negligence was a substantial contributing cause of the blowout, explosion, fire, and initiation of the discharge of oil;

13. Halliburton's employees' conduct was the result of gross negligence, recklessness, willful and wanton disregard, and fraud, thereby invalidating the pre-suit contractual release by BP;

14. Halliburton's employees engaged in willful and wanton conduct, and such willful and wanton conduct was a substantial contributing cause of the blowout, explosion, fire, and initiation of the discharge of oil;  and,

15. The willful and wanton conduct of Halliburton employees was the result of corporate policy and/or was otherwise known to, approved by, and/or ratified by corporate officials with policymaking authority.

Before turning to these ultimate issues and conclusions, the Court believes that it would be helpful to resolve some of the key factual questions that were disputed between and among the parties at trial:

**Was there a "dual command" structure on the DEEPWATER HORIZON?  If so, did it violate the ISM Code?**

The ISM Code requires that the Captain and Master shall be the designated Person in Charge aboard the vessel, with overriding authority and responsibility, at all times.[74]  Both Plaintiffs' Expert, Geoff Webster, and BP's Expert, Captain Andrew Mitchell, testified that there was a "dual command" structure aboard the DEEPWATER HORIZON on April 20, 2010, which violated the Code.[75]

Specifically, the DEEPWATER HORIZON Operations Manual designated the Offshore Installation Manager (OIM) as the Person in Charge while on station; designated the Master as the Person in Charge while in transit; and, in an emergency, suggested that either the OIM can turn the vessel over to the Master, or the Master can assume control of the vessel from the OIM.[76]

Transocean's CEO, Steve Newman, conceded that, under the statutory framework, the Master always has overriding authority, particularly in the event of an emergency.[77]   Captain Young, who served as the Chief Mate on the DEEPWATER HORIZON at the time of the incident, also testified that, as the Captain, he has overriding authority under the ISM Code.[78] However, Newman personally approved a 2007 document addressing the integration of Global Santa Fe into the Transocean organization, in which the company specifically decided and

---

[74] TREX-50361 p.2; Webster Testimony, p.3747.
[75] Webster Testimony, pp.3747, 3779, 3963, 3972-3973; Mitchell Testimony, pp.9442-9443. *See also,* TREX-5483; Webster Testimony, pp.3778-3779 (an ISM Ship Audit Report for the DEEPWATER HORIZON dated May 2002 advised that Transocean's designation of the OIM as the primary person in charge was contrary to the designation of the Master as Person in Charge, in command and responsible for all emergency response activities).
[76] TREX-671; Webster Testimony, pp.3973-3974. *See also,* Young Testimony, pp.5828-5830 (when the vessel is in "Drilling Mode" – *i.e.* when connected to the well head, (as it was on April 20, 2010) – the OIM is the Person in Charge.  The Captain or Master becomes the Person in Charge at the time of an "emergency situation" – which is a "judgment call" by whoever decides that it is an emergency").
[77] Newman Testimony, pp.4720-4721.
[78] Young Testimony, p.5800 ln.6-7.

directed that the OIM would remain responsible.[79] Young conceded at trial that "the Person in Charge was split between the Captain and the OIM."[80]

Based on the evidence presented at trial, the Court concludes that Transocean established and maintained a "dual command" structure, and that this command structure violated the ISM Code.

## Is there a conflict between the ISM Code and the MODU Code?

Despite some suggestion by Transcoean in its cross-examination of Plaintiffs' Expert Geoff Webster that there might be a "conflict" between the ISM Code and the MODU Code, Mr. Webster explained, in response to further questioning by BP, that Mobile Offshore Drilling Units or "MODUs" include semi-submersible and jack-up rigs, as well as dynamically positioned vessels such as the DEEPWAER HORIZON. On a stationary MODU, there would only be an OIM, and not a marine Captain. Accordingly – when the ISM Code is read in conjunction with the MODU Code – the OIM would have the ultimate authority and responsibility on a semi-submersible or jack-up rig, but the Captain should maintain the ultimate authority and responsibility on a dynamically positioned MODU, such as the DEEPWATER HORIZON.[81] The Court, having observed the witnesses and reviewed the evidence, finds this explanation persuasive.

---

[79] TREX-5643 p.4; Newman Testimony, pp.4721-4722; *see also,* Webster Testimony, p.4213.
[80] Young Testimony, p.5792 ln.20-21.
[81] Webster Testimony, pp.4201-4203; TREX-44072; TREX-5033 p.2.

**Was Captain Kuchta adequately trained and otherwise qualified to serve as the Master of the DEEPWATER HORIZON?**

Based on the evidence presented at trial, the Court concludes that Captain Kutcha was not adequately trained or otherwise qualified to serve as the Master of the DEEPWATER HORIZON.

Both Plaintiffs' Expert Geoff Webster and BP's Expert Captain Andrew Mitchell testified that Captain Kutcha was not qualified to serve as the Person in Charge on the DEEPWATER HORIZON.  Mr. Webster, after reviewing the evidence, concluded that Kuchta was not trained or certified to operate the Emergency Disconnect System (EDS), nor was he properly trained with respect to the vessel's emergency response plan, the Kongsberg Fire & Gas System, nor the Emergency Shut Down (ESD) system.[82]  Captain Mitchell testified that Kutcha was "completely inadequate."[83]  Based on Mitchell's review of the evidence, there was no indication that "Captain Kuchta had received the major emergency management training, nor did he have well control certification, nor had he been assessed competent as a person in charge."[84] Captain Kuchta, in Captain Mitchell's opinion, was not fit to be Master of the DEEPWATER HORIZON.[85]

This expert testimony is supported by the eyewitness accounts of witnesses who observed Captain Kuchta on the evening in question.  BP Vice-President of Drilling & Completions, Patrick O'Bryan, testified that none of the Transocean crew ordered or attempted to activate the Blowout Preventer (BOP) before calling the DAMON BANKSTON and telling its crew to move away from the DEEPWATER HORIZON.[86]  Shortly thereafter, O'Bryan could see from the

---

[82] Webster Testimony, p.3937.
[83] Mitchell Testimony, pp.9431-9432.
[84] Mitchell Testimony, p.9436 ln.9-12.
[85] Mitchell Testimony, p.9472.
[86] O'Bryan Testimony, p.9285.

bridge that the rig floor was on fire, but Captain Kuchta was "emphatic" that he could not activate the EDS without permission from the OIM.[87]  O'Bryan described the scene on the bridge as:

> Very excited.  There was lots going on, a lot of people coming in to the bridge.  I remember Captain Kuchta saying, "What's going on?  This can't be right.  We've lost power."  It was just lots of excitement going on on the bridge. Captain Kuchta actually told us several times to stay inside on the bridge.  And at some point, as I said, out these windows on the right side of the bridge, I had – I could see people were moving out of the – below the rig onto the escape boats.  And I could tell that they were getting close to being loaded because the trickle of folks coming out was down. And I told – I looked at David and I said, "We've got to go."[88]

It appeared to Dr. O'Bryan that Captain Kuchta wasn't quite sure what to do.[89]  Transocean Chief Electrician Michael Williams observed Captain Kuchta "overwhelmed", "dazed and confused", and like a "deer in the headlights".[90]

## Was Jimmy Harrell licensed to serve as the Person in Charge of the DEEPWATER HORIZON?  Was he licensed to serve as the OIM?

While there was conflicting testimony by witnesses who seemed to be somewhat confused about who was actually in command of the DEEPWATER HORIZON at the time of the emergency, the Court concludes that Captain Kuchta was deferring to the Offshore Installation Manager (OIM), Jimmy Harrell, to make the decision regarding whether to activate the Emergency Disconnect System (EDS).[91]

---

[87] O'Bryan Testimony, pp.9286-9287.
[88] O'Bryan Testimony, pp.9287-9288.
[89] O'Bryan Testimony, p.9291.
[90] Williams Deposition, pp.191-193.  *See also, e.g.,* Brown Deposition, p.90 ("chaos and mayhem on the bridge" … "shouts, directions yelled that weren't being enacted"); TREX-5629 p.4 (discussed in Young Testimony, p.5865 and Mitchell Testimony, p.9428) (Kutcha instructs Pleasant not to activate the EDS, and Pleasant says "F* You"); TREX-4472 p.5 (Kutcha criticized Fleytas when she finally signaled Mayday, and when the power went out said "[expletive] it, let's leave"); Young Testimony, pp.5720-5721 (Kutcha told him to "put a hose on it"); TREX-5629 p.4 (Kutcha refused to EDS); Williams Deposition, pp.78, 194 (upon suggestion that they needed to abandon ship, Kutcha told Williams to "sit down and shut the [expletive] up").

[91] *See, e.g.,* Mitchell Testimony, p.9444 (Harrell was the person who was actually in command on April 20, 2010). *See also, e.g.,* Winslow Deposition, p.484 (the OIM is in charge of the vessel during normal operations); Ezell Testimony, p.1852 (the OIM was the Person in Charge).

The evidence at trial established that Mr. Harrell, however, did not have a license or certificate to command a Mobile Offshore Drilling Unit (MODU).  Both Mr. Webster and Captain Mitchell testified that Harrell was simply was not qualified to be Master or command the bridge of the DEEPWATER HORIZON.[92]  Indeed, the evidence established that Harrell was not even licensed to serve as the vessel's OIM.  As explained by Captain Mitchell, Mr. Harrell's OIM license from the Marshall Islands only authorized him to serve as the OIM on a jack-up rig or a moored semi-submersible;[93]  Harrell was not legally entitled to serve as the OIM on a self-propelled, dynamically positioned vessel like the DEEPWATER HORIZON.[94]  The Court finds this testimony both credible and persuasive, and, after considering all of the evidence, concludes that Mr. Harrell was not properly licensed to serve as the Person in Charge, the Master, or the OIM on the DEEPWATER HORIZON.

**Did the weekly drills or other training of the DEEPWATER HORIZON crew include training on EDS?**

The Court concludes, based on the evidence, that Transocean's weekly drills (or other training) of the DEEEPWATER HORIZON crew did not include either routine or sufficient training for them to understand and detect the conditions under which the Emergency Disconnect System (EDS) should be activated.

Captain Mitchell testified that he had reviewed all of the Daily Drilling Reports, including the 79 reports submitted for the DEEWATER HORIZON at Macondo, and the 81 sources identified on the Transocean Demonstrative (D-6591), and found no evidence of EDS drills being performed.[95]  When asked whether the deck crew participated in the drills identified

---

[92] Webster Testimony, p.3936; Mitchell Report, p.25 (TREX-40011 pdf p.26); *see also,* Mitchell Testimony, pp.9444-9446.
[93] Section 4.5 of MI-118 [TREX-44013 p.27].
[94] Mitchell Testimony, pp.9444-9447; TREX-44013 p.27.
[95] Mitchell Testimony, pp.9439-9441.

by Transocean (in D-6591), Captain Young could not state whether the deck crew participated in the underlying drills,[96] nor could Young personally recall whether or when the deck crew had participated in either well control drills or EDS drills.[97] Transocean Senior Toolpusher Randy Ezell conceded that the emphasis of the Daily Start Think Reports was on personal safety, not well control.[98]

BP's Drilling Expert, Dr. Bourgoyne, indicated that Transocean seemed to be lacking in "adequate emergency drills simulating high flow rate conditions."[99] The inescapable conclusion, in Dr. Bourgoyne's opinion, was that the Transocean crew "either were not trained or were disregarding their training."[100] Even Transocean's own expert, Mr. Wolfe, admitted that he had not found a document or a witness to validate the contention that EDS drills were conducted weekly on the DEEPWATER HORIZON.[101]

## Were the deficiencies noted in the 2009 Rig Audit (and previously) actually closed out prior to the blowout and explosion?

The great weight of the evidence establishes that a substantial number of material deficiencies noted in the September 2009 BP Rig Audit[102] – and previously – had not been closed out prior to the blowout on April 20, 2010. Captain Young, the vessel's First Mate, for example, specifically acknowledged that various maintenance items were still open at the time of the explosion.[103] BP Well Site Leader Ronnie Sepulvado testified that the BP auditors were recommending that Transocean "expedite overhaul" but Transocean was "challenging" the

---

[96] See, e.g., TREX-571.
[97] Young Testimony, pp.5806-5810.
[98] Ezell Testimony, pp.1901-1902.
[99] Bourgoyne Testimony, p.7586; Bourgoyne Report (TREX-8173) p.68.
[100] Bourgoyne Testimony, p.7588.
[101] Wolfe Deposition, p.266; (see also, Mitchell Testimony, pp.9441-9442).
[102] TREX-3405.
[103] Young Testimony, p.5663. Captain Young further stated that the vessel was not planned to be out of service until 2011. See Young Testimony, p.5666. With respect to the February 2010 e-mail from Mr. Dow indicating that all of the dampers needed to be replaced, (TREX-5295), Young confirmed that no dampers were replaced between February 2010 and the date of the explosion. See Young Testimony, pp.5748-5749.

recommendation.[104]  BP Well Site Leader Murray Sepulvado likewise testified that there were

still "many deficiencies which had not been corrected."[105]  Even Paul Johnson, a Transcoean Rig

Manger whose deposition testimony Transocean relied upon for the proposition that some items

had been closed out, conceded that (at least) 25 items identified in the BP 2009 Rig Audit had

not been closed out as of March 2010.[106]

    The circumstantial evidence admitted at trial further supports the conclusion that

significant issues remained at the time of the explosions and fire.   Transocean Chief Electrician

Mike Williams, for example, testified that when he discussed maintenance issues with his

supervisors, they told him to just "deal with it."[107]   Williams testified that he had been called to

the Drilling Shack to fix equipment numerous times,[108] and that preventative maintenance on the

rig was continuously behind schedule.[109]

    In October of 2009, there were a series of e-mails from Steve Bertone, the Maintenance

Supervisor on the rig, recounting the continuing history of maintenance issues, and characterized

the rig as "limping along" with equipment failures "due to lack of proper maintenance."[110]

Bertone noted that, just on the rig floor, they were experiencing issues with the drawworks

brakes, riser skate, gantry crane, rotary skid, and back slips. "The rotary skid has been an issue

for several years."[111]   Bertone also indicated that the new RMS maintenance system had an

overloaded amount of work which could not be completed even by doubling the workers on the

rig, and was causing "extreme confusion" among the crew who "struggled to grasp" how to find

---

[104] R. Sepulvado Testimony, p.2011.  Mr. Sepulvado further testified that, in the eight years he was
assigned to the vessel, it never went into dry dock. *See* R. Sepulvado Testimony, p.1924.  And that the rotary table
had been broken for two or three years. *See* R. Sepulvado Testimony, p.1928.
[105] M. Sepulvado Deposition, p.99.
[106] Johnson Deposition, pp.273-274.
[107] Williams Deposition, p.43.
[108] Williams Deposition, pp.56-57.
[109] Williams Deposition, pp.39-40.
[110] TREX-5618.
[111] TREX-5618.

the information or what to do with it.[112]   Senior Toolpusher Randy Ezell did not recall any

special effort made by anyone off the rig to address Mr. Bertone's or other concerns about the

chronic problem with maintenance issues on the DEEPWATER HORIZON.[113]

The United States' BOP Expert, Dr. Davis, testified that inadequate maintenance was

evidenced by the condition of the blue and yellow pods themselves; the dead battery, he said, is a

perfect example of a "critical check" that was missed, and should have been detected.[114]   Davis

also noted that, at the time of the Moduspec Audit in April of 2010, the BOP was subsea;   hence,

Moduspec was prevented from doing a complete and thorough evaluation of the blowout

preventer.[115]   Similarly, Mr. Neal from the MMS testified that during his 2010 inspections of the

vessel, he did not examine any records related to: periodic maintenance of the BOP; physical

inspections of the BOP or its components; servicing or repair of the BOP; or modifications of the

BOP.[116]   While Dr. Davis conceded that BP and Transocean were closing out some audit items

at the end of 2009, he testified that because there were so many issues lingering for so long, there

were omissions that didn't have a chance to be corrected.[117]

Moreover:

- The November 2009 follow-up to the September 2009 Rig Audit noted the same
  Emergency Shut Down (ESD) and Fire & Gas alarm issues that had been identified
  21 months before.[118]

- On February 21, 2010, Buddy Trahan, who was part of the Transocean Management
  Team in Houston, sent an e-mail to James Kent, the Rig Manager, requesting the

---

[112] TREX-5618. *See also, generally,* Webster Testimony, pp.3895-3902.
[113] Ezell Testimony, pp.1889-1891; TREX-5618.  *See also,* Winslow Deposition, pp.143-144 (Most maintenance periods were only "band aid fixes";  the rig had equipment that needed to be taken out of service for repair).
[114] Davis Testimony, pp.2666-2667.
[115] Davis Testimony, pp.2900-2901.
[116] R. Neal Deposition, pp.225-226.  *See also,* D. McKay Deposition, p.264 (there were maintenance tasks that were overdue, including some that were deemed "safety critical").
[117] Davis Testimony, pp.2831-2832.
[118] TREX-47221 Section 3.3.5; Webster Testimony, pp.3893-3894.

maintenance program.[119]  But there was no evidence of follow-up to address his concerns.[120]

- A February 22, 2010 e-mail string indicated that all of the dampers needed to be replaced.[121]

- The April 2010 audit noted problems in the Riser Recoil System.[122]

- On April 15, 2010, BP and Transocean agreed not to change the annular elements or the drill line until after the Nile Well was completed, (which Transocean's own expert admitted was an example of "deferred maintenance" in order to keep the rig working).[123]

- "Run it, break it, fix it" was a characterization of the Transocean maintenance program, as reflected in the Lloyd's Register Report dated July 2, 2010.[124]

Finally, the RMS II Morning Report dated April 19, 2010 documented 222 overdue maintenance tasks, requiring 2,761.5 man-hours to complete; according to that evidence, there were 115 additional jobs, including 76 "high priority" issues, that were awaiting parts.[125]  The Life Raft Annual Certificate was 139 days overdue.[126]

All of this evidence leads the Court to conclude that a significant number of material items identified in the BP 2009 Rig Audit – and, in several cases, for months and years prior to that – had not been addressed by Transocean during the seven months prior to the blowout and explosion.

---

[119] TREX-3420 ("When I started looking at this a couple of years ago, it was obvious they didn't keep track of maintenance"); Childs Testimony, pp.5319-5320.
[120] Kent Deposition, Vol. II, p.84.
[121] TREX-5295; Webster Testimony, pp.4214-4215.
[122] TREX-3285 p.45; Webster Testimony, pp.3905-3907 (and pp.3912-3913 clarifying date).
[123] Childs Testimony, pp.5321-5322; TREX-680.
[124] TREX-929, p.93; Webster Testimony, p.3932.
[125] TREX-664 p.25; Webster Testimony, pp.3957-3958; D-3098 (Summary: Significant Overdue Maintenance).
[126] TREX-664 p.9; Webster Testimony, p.3941.

**<u>Was the battery in the Blue Pod already dead (or at least too low to function) when it was called upon to activate the Blind Shear Ram at "AMF Time" or did it activate and drain in the process?</u>**

The overwhelming majority of evidence presented at trial indicates that the 27-volt battery in the Blue Pod was effectively "dead" on April 20th. This was the conclusion of BP's Bly Investigation,[127] and every expert who testified in Phase One, except for Transocean's.[128]

The United States' Expert Dr. Davis, for example, participated in the post-incident inspection and testing process, and, after looking at all of the evidence, concluded that conditions for activation of the AMF ("Deadman") were satisfied at or very shortly after the time of the explosion, but the Blind Shear Ram (BSR) did not activate due to: (i) a dead battery in the Blue Pod; and (ii) a mis-wired Solenoid in the Yellow Pod.[129] Dr. Davis opined that, had the 27-volt battery in the Blue Pod been properly charged, the BSR would have closed in the well at that time.[130]

Additional circumstantial evidence was presented which further supports the conclusion that the battery was dead at the time of the blowout. For example, Dr. Davis found no evidence that the 27-volt battery was tested before the BOP was "splashed" in February of 2010.[131] Moreover, Cameron recommends that the batteries be changed after one year of "on-time operation" – *i.e.* one year from when the batteries were first installed in the pod, (not, as Transocean seemed to suggest, one year of time when the BOP is actually functioning subsea).[132]

[127] Bly Testimony, pp.991-997.
[128] *See* Childs Testimony, p.5454; D4603A; D-3592.
[129] Davis Testimony, pp.2649-2650; *see also,* D4603A.
[130] Davis Testimony, p.2652.
[131] Davis Testimony, p.2688.
[132] Childs Testimony, pp.5326-5328; TREX-3785 p.5; TREX-36708. *See also,* Davis Testimony, pp.2843-2844.

The batteries on the Blue Pod in this case had not been changed since November of 2007, two and a half years prior to the blowout.[133]

The outlier opinion of Transocean's Expert, Mr. Childs, that the battery was sufficiently charged at the time of the event, is simply not credible. Childs is not an electrical engineer, nor is he trained in software, and hence parts of the testing were (by his own admission) "over his head".[134] Childs relied on Mr. Tolleson's notes that Transocean's counsel admitted had never been produced in this litigation; nor did Transocean produce the videotapes of its testing.[135] There appeared to be inconsistencies between the Activity Reports and Childs' Summary,[136] and the Childs Report was further called into question by an e-mail from Tolleson in which Tolleson admonished (in unusually large font) that testing "could mean the AMF did not function" – which fact was absent from Childs' Report.[137]

Based on the weight of credible evidence admitted at trial, the Court concludes that the battery was too weak to function properly on April 20.

**Did the General Alarm on the DEEPWATER HORIZON sound before the first (or the second) explosion?**

While various witnesses seemed to express vague and uncertain recollections about when, or indeed whether, the General Alarm was sounded on the evening of April 20, the Court finds Captain Young's testimony the most confident and reliable on this point. Captain Young was serving as Chief Mate on the DEEPWATER HORIZON on the evening in question, and testified that he personally sounded the General Alarm after the explosion.

---

[133] Childs Testimony, p.5326.
[134] Childs Testimony, pp.5331-5332.
[135] *See* Trial Transcript, pp.5333-5339.
[136] *See* Childs Testimony, pp.5340-5341; TREX-7708; TREX-50378. *See also,* Childs Testimony, p.5347 and TREX-7708 p.25 (conceded that data from the testing was "massaged" for use in his report).
[137] Childs Testimony, pp.5344-5346; TREX-5662.

In particular, Captain Young testified that he never ordered or heard anyone else call either a "Yellow Alert" or "Red Alert" prior to the first explosion.[138]   Young personally hit the General Alarm after there had already been at least one explosion.  He seemed certain that the alarm had not sounded prior to that point in time, (and was not completely sure that he heard the General Alarm sound thereafter).[139]   Both Young and Transocean Chief Electrician Michael Williams – who also testified that did not hear the general alarm or see blinking lights before the explosion[140] – admitted that the alarm required manual activation, as the automatic function was generally inhibited with a manual override.[141]   Indeed, Transocean's own formal investigation concluded that the General Alarm was not sounded until after the explosion.[142]

**Was an acoustic trigger a reliable mechanism that could have been and should have been added to the BOP?**

Both the Plaintiffs' BOP Expert, Gregg Perkin, and Mr. Gaude, from the Cameron Controls Group, testified that Transocean could have utilized an acoustic system that would have allowed the crew to activate the BOP stack after the MUX Cables were destroyed in the explosion.[143]

While Transocean questioned the reliability of such devices, the Court finds that an acoustic trigger could have been and should have been utilized to provide redundancy in the

---

[138] Young Testimony, pp.5768-5769.

[139] Young Testimony, pp.5785-5786.  *See also,* Young Testimony, pp.5793-5795, 5858-5859.

[140] Williams Deposition, pp.191-193.

[141] Young Testimony, pp.5769, 5771 ln.5-6; Williams Deposition, pp. 22 (was told: "The entire fleet runs on the bypass. Leave it the hell alone"), pp.137-138 (Transocean kept the general alarm in the "inhibited" mode because they didn't want to wake people up at night); TREX-3749 at pdf p.23 (DWH Bridge Procedures Guide) ("During normal operations, we override all Outputs Common from the SVC. This is to prevent false alarms"); Webster Testimony, pp.3825-3826 (alarms on the bridge were being inhibited to prevent a general alarm).

[142] Ambrose Testimony, p.6072.

[143] Perkin Testimony, pp.3348-3353; TREX-25199 p.76; D-2077; *see also,* Webster Testimony, p.3775; Perkin Report (TREX-7535) pp.7, 8, 13, 18, 19; Stevick Report (TREX-61123) pp.24-26.

event that the MUX Cables, characterized as a "single point of failure", were rendered inoperable.[144]

It was established that Transocean itself (and BP) utilized acoustic triggers on other rigs.[145]  Moreover, both Mr. Gaude and William LeNormand, a Cameron Service Representative, testified that they were not aware of complaints about or problems with the functionality of acoustic triggers by Cameron's customers.[146]

**When they realized that hydrocarbons had entered the riser, did the Transocean Crew direct to the Mud-Gas Separator, or did they divert overboard?**

Both BP's Bly Investigation and the formal Transocean Investigation concluded that the Drilling Crew directed the flow to the Mud-Gas separator (MGS), rather than diverting overboard.[147]  While Transocean elicited testimony at trial to the effect that, after the explosion, fire appeared to be coming out of the diverter line, it is not clear exactly when or why that might have occurred, and it was specifically acknowledged a relief valve for the mud-gas separator unit is located in the same area as the diverter line.[148]  Moreover, Ezell testified that the default was set to direct a kick to the Mud-Gas Separator and not the overboard diverter line.[149]  The Court,

---

[144] The foreseeability – and necessity for redundancy – was evidenced in a January 2002 DEEPWATER HORIZON Design Risk Assessment which advised Transocean to "ensure that the EH-MUX BOP control has at least one alternative operation panel that can be operated independently from the one located at the driller's workstation" and to "ensure that it is possible to operate the acoustic control system from a portable unit which can be handled by one person in the event of evacuation from the vessel." TREX-3134 p.40; Webster Testimony, pp.3774-3775.  *See also, e.g.,* TREX-5094 pdf p.5 (2000 Vastar BOP Stack Design) (recognizing that a fire or explosion in Moon Pool could destroy the MUX Cables); TREX-7581 p.3 (2003 Global Santa Fe Report warning that an explosion in the Moon Pool could destroy the cables); Perkin Report (TREX-7535), pp.7, 8, 13, 18, 19; TREX-00001 (Bly Report) p.151 ("the MUX cables were not protected against explosions or fire"); Webster Testimony, p.4180 (running both cables through the Moon Pool renders the vessel unseaworthy).

[145] *See, e.g.,* Newman Testimony, p.4660; Perkin Testimony, p.3349 (every Transocean and BP rig off the coast of Brazil and in the North Sea is equipped with an acoustic trigger).

[146] Perkin Testimony, pp.3348-3349; Childs Testimony, pp.5280-5283; LeNormand Deposition, p.95; Gaude Deposition, pp.77-78 (admitted as TREX-25199 p.3). *See also, e.g.,* LeNormand Deposition, pp.91-92, 99-100, 104-105; Gaude Deposition, pp.76-80.

[147] TREX-00001 (Bly Report) p.104; TREX-3808 pdf p.199 (Transocean Investigation Report, Vol. I, p.215); Ambrose Testimony, pp.6125-6126.

[148] Young Testimony, p.5878.

[149] Ezell Testimony, p.1787.

after considering all of the evidence, concludes that the Transocean Drilling Crew diverted the flow to the Mud-Gas Separator, rather than diverting overboard.

**What was the cause, during the negative pressure test, of the 0 psi reading on the kill line?**

While there was a dispute regarding possible explanations for the differential in pressure between the drill pipe and the kill line during the negative pressure test, (*e.g.* a valve on the kill line may have been inadvertently closed, or the kill line may have been clogged by the unconventional LCM "spacer"), the Court is convinced that the answer to this question is ultimately irrelevant.

As explained by the United States' Drilling Expert, Richard Heenan, a successful negative pressure test requires either no flow with the well open, or no pressure on the drill pipe with the well closed.  In this case, it is clear that the well was closed, but there was nevertheless pressure on the drill pipe.  Whatever happened with the kill line is irrelevant;  the 1,400 psi on the drill pipe, in and of itself, indicates that the negative pressure test was unsuccessful.[150]

**Whether, how and when OMS was applied to contractor-owned rigs in the Gulf?**

There was a lot of conflicting testimony at trial regarding the exact timing and applicability of BP's process safety system, OMS, to BP's drilling operations in the Gulf of Mexico, particularly where contractor-owned MODUs such as the DEEPWATER HORIZON were concerned.  What is clear, from all of this evidence, is that BP corporate officials decided to apply the OMS requirements differently, and at a slower pace, to drilling operations conducted by contractor-owned MODUs in the Gulf of Mexico;  and that OMS was never applied to the operations at Macondo.

---

[150] Heenan Testimony, pp.2082-2084.  (*See also, e.g.,* Ezell Testimony, pp.1674-1675, 1679-1680 (typically did the negative pressure test on the drill pipe; did not recall ever conducting a negative pressure test on the kill line, or by comparing the two); R. Sepulvado, pp.2027-2028 (performed the test on the drill pipe, not the kill line; and not a comparison between the two).)

By way of background, BP decided, after a major process safety disaster in 2005, to update its process safety practices and policies.   BP's Group Operations Risk Committee (GORC), chaired by former CEO Anthony Hayward personally, undertook the responsibility of replacing the outdated process safety systems, such as Beyond the Best (BtB) and Major Projects Common Process (MPCP), with the overarching new and improved Operating Management System called "OMS".[151]   According to the OMS Governance document dated November 2008, OMS would be the control process for "all projects, facilities, sites and operations."[152]  With respect to contractors such as Transocean, the OMS Governance document instructed that:

> Where BP relies on a contractor to carry out work, BP shall, as needed, include and apply contract provisions such that the work is carried out in a way that supports and is consistent with BP's application of OMS to BP's operating activities.  Where such contract provisions are not included in existing contract, BP shall endeavor to amend the contract as needed, immediately or on renewal.[153]

And:

> A decision by a BP Entity to deviate from the complete application of BP OMS … shall be based on a risk assessment (including defining and documenting the risk reduction measures that are to be applied) and shall be formally justified, recorded and authorized by the line Executive Vice President or Group Head of Function after consultation and approval from the Group Head of Operations.[154]

Dr. O'Bryan confirmed that this OMS Governance document refers to the "contract" between BP and the drilling company, (not the contractor's safety management system), and directed that OMS would apply, unless someone specifically documented and proved that the contractor's alternative process or procedure was sufficient.[155]

---

[151] Hayward Deposition, pp. 41, 145, 163-164, 731; *see also, e.g.,* Baxter Deposition, p.193; Guide Testimony, p.8836; O'Bryan Testimony, pp.9305-9307; TREX-1975 p.14.
[152] TREX-45006 pdf p.6; *see also,* TREX-45006 pdf p.8; TREX-45006 pdf p.15; *see also,* Bea Testimony, p.308; TREX-2352 p.2.  The OMS Manual dated January 2009 defines both "facility" and "entity" broadly, and BP Vice-President of Drilling & Completions Patrick O'Bryan testified that such definitions would encompass him, John Guide, the Wells Team Leader, the BP Well Site Leaders and the BP Drilling Engineers.  TREX-6205 pdf p.194; O'Bryan Testimony, pp.9304-9305.
[153] TREX-45006 pdf p.16.
[154] TREX-45006 pdf p.16.
[155] O'Bryan Testimony, pp.9319-9320.

BP presented essentially three different accounts of the extent to which OMS was or wasn't implemented on contractor-owned rigs in the Gulf prior to the explosion:

1. Implementation of OMS was complete on April 20th, 2010;[156]

2. Implementation of OMS was not complete, but was intended to be completed sometime after April 20th, 2010;[157] and,

3. It was never intended that OMS apply to contractor-owned rigs, as the contractor's safety management system would continue to govern.[158, 159]

On the last day of trial, BP attempted to synthesize these accounts with a demonstrative graphic presented through Dr. O'Bryan.[160] On cross-examination, Dr. O'Bryan conceded that the demonstrative (D4943) had been created by BP's counsel for trial purposes after-the-fact; it was not available to the Well Site Leaders or Drilling Engineers who would have been responsible for putting the actual policies and procedures into practice prior to the explosion.[161]

In any event, and whatever the nuances, it is clear that BP's management made the choice – despite recognizing a Macondo like blowout as one of the highest risks in the entire BP organization[162] – to apply OMS differently, and at a slower pace, on contractor-owned rigs in the Gulf of Mexico.[163]

---

[156] See L. McKay Testimony, pp.532-534; Shaw Testimony, p.8047.

[157] See Hayward Deposition, pp.154-156 (implementation "throughout BP" due to have started by the end of 2010; will be adopted "at all operations" by the end of 2010), pp.183-194 (at time of Congressional testimony "was not complete across company" … plans to include MODUs in the future), p.304 (were in the process of moving OMS into the Gulf), pp.662-664 (was "all" "applicable" in the Gulf, but he doesn't know the precise status of the date of implementation), p.788 (as of April 20, 2010, was in the middle of "company wide implementation" and on target to complete in Gulf by end of 2010), pp.793-794 (it is "undoubtedly" possible that the disaster would have been avoided had OMS been applied).

[158] See Cross-Examination of Dr. Bea, pp.402-405; Shaw Testimony, pp.8054-8056.

[159] See generally, Trial Transcript, p.9297.

[160] O'Bryan had previously testified in his deposition that: "We do not operate drilling rigs under a BP OMS. … [W]hen the rigs belong to the drilling contractor, we operate the rigs … under the drilling contractor's safety management system.  The only drilling rig that we had in our fleet that would fall under BP OMS is BP-owned rig the PDQ on the Thunder Horse." See Shaw Testimony, p.8156; O'Bryan Testimony, pp.9250-9251; D-3175.

[161] O'Bryan Testimony, pp.9324-9325.

[162] See, e.g., Hayward Depo, pp.196, 782; Baxter Deposition, pp.276-278; Bea Testimony, pp.302-304; TREX-1736 (SEEAC Brief); TREX-7192 at pdf p.19 (Blowout and Well Release Frequencies, SINTEF Database,

John Baxter, who served with Dr. Hayward and Mr. Bly on the Group Operations Risk

Committee (GORC), testified that BP Management did not implement OMS on deepwater rigs

that were owned by drilling contractors.[164]   Transocean Senior Toolpusher Randy Ezell testified

that, in nine years aboard the DEEPWATER HORIZON, he had never heard of "OMS";  that the

Transocean Well Control Handbook governed on the rig;  and that he had never received any BP

"rules" or "regulations".[165]   BP Well Site Leader Murray Sepulvado testified that he had never

participated in a risk management process with respect to the Macondo well or the

DEEPWATER HORIZON.[166]   BP Well Site Leader Ronnie Sepulvado testified that they used

Transocean's Well Control Manual.[167]

The cross-examination of the former head of the Gulf of Mexico Strategic Performance

Unit, Neil Shaw, demonstrated that the implementation of OMS was extremely gradual, and

phased, with gaps identified in December of 2008 still being discussed, but not addressed, as of

January of 2010.[168]

---

2009, p.12) (the risk of a blowout in the Gulf of Mexico was nine times higher than in other parts of the world); D-2868; D-2887; *see also, e.g.,* L. McKay Testimony, pp.506, 517-518 (a deepwater blowout is a foreseeable event; "the whole safety management system, which includes process safety, is integral in trying to prevent blowouts" like Macondo).

[163] *See generally,* Bea Testimony, pp.294-296, 304, 306-307; D-2874; Shaw Testimony, p.8156-8157 (and D-3175); *see also, e.g.,* TREX-1736 pp.1-2 (SEEAC Brief, May 2010) ("The focus … has been on the existing assets as opposed to drilling from MODUs" ….   "MODUs have not bee included in the GoM MAR analyses to date"); Hayward  Deposition, pp.183-194 (at time of Congressional testimony, OMS "was not complete across company" … plans to include MODUs in the future); Baxter Deposition, pp.175, 192, 210-211, 234-236 (discussed *infra*); *see also, e.g.,* TREX-6025.c. and TREX-6025.g. (OMS Gap Assessments); TREX-866 p.38 (GoM SPU Operating Plan) (re OMS Handbook, notes that process safety risks not well understood and procedures incomplete).

[164] Baxter Deposition, p.175 (BP did not require contractor-owned MODUs to comply with BP's OMS); *see also,* Baxter Deposition, pp.192, 210-211 (BP did not require contractor-owned MODUs to comply with BP's Integrity Management standard); Baxter Deposition, p.175 (BP did not conduct Major Accident Risk assessments on contractor-owned MODUs); Baxter Deposition, pp.234-236 (BP did not conduct Safety & Operations audits on contractor-owned MODUs).  *See also, e.g.,* O'Bryan Testimony, p.9320 (there were never any process safety audits conducted at Macondo).

[165] Ezell Testimony, pp.1643-1644, 1718.

[166] M. Sepulvado Deposition, pp.397-398.

[167] R. Sepulvado Testimony, p.2052 ln.1-5.

[168] *See generally,* Shaw Testimony, pp.8157, 8166, 8175-8178, 8195-8197; TREX-2908 p.38; TREX-2514; TREX-2919; (*including,* TREX-2514 pp.7, 9; Shaw Testimony, pp.8186-8193 (in June of 2009, the "solutions" which had been identified, after six months, were to develop a "checklist" and to have hazard recognition training

BP's Harry Thierens also conceded that the risk management program he and former Vice-President Kevin Lacy and others were discussing in June of 2009 had still not been implemented when he was transferred to London that fall – and, to his knowledge, the BP Risk Assessment Tool was never utilized with respect to Macondo.[169]  Dr. O'Bryan similarly conceded that the "Implementation Draft" for OMS within the Drilling & Completions Unit (TREX-1975) was not formally issued as of March 2010, and, to his knowledge, never.[170]  BP Wells Team Leader John Guide admitted that there was no local OMS module for Drilling & Completions prior to the explosion, and his previous deposition testimony made clear that there was no formal OMS training until 2011.[171]

BP Safety Executive Mark Bly testified – contrary to the language from the OMS Governance document quoted above[172] – that OMS generally deferred to the contractor's safety management policy on contractor-owner assets, such as MODUs, and tried to bring about changes in the event that the contractor's policies were insufficient.[173]  Mr. Bly further conceded that had OMS been applied to the Macondo project, it would have prevented the dysfunctionality among people in charge of the operations, such as Guide.[174]

---

two years later;  BP was planning, at that point, to look at 35 or 40 risk assessments in August, and then start to identify root causes; the "Solutions" were still to be decided ("TBD"))); *see also*, Bea Testimony, pp.317-319 (discussing TREX-2919 ("gaps" in major accident awareness and "insufficient identification and management of major hazard risks" caused by "inadequate/incomplete lessons learned process, inadequate RCFA, understanding lower severity process safety incidents, inadequate understanding of process safety hazards, inadequate/incomplete maintenance procedures" in January of 2010)).

[169] Thierens Deposition, pp.129-130, 148.  Thierens further confirmed that, as of October 2009, BP had no risk-based data-informed plan for safety culture. Thierens Deposition, pp.134-136; TREX-6090.

[170] O'Bryan Testimony, pp.9301-9302, 9305-9306, 9311-9312. Mr. Jassal, who was the Custodian/Owner of the Implementation Draft (TREX-1975), testified that there was still not a final draft released as of the date of his deposition, July 21, 2011. *See* Jassal Deposition, p.269.

[171] Guide Testimony, pp.8831-8836; *see also,* Guide Testimony, p.8837 (they were still operating under the old DWOP).  *See also,* Bly Testimony, pp.1021-1022, 1027-1028, 1036 (to Bly's knowledge, there was no Local OMS Manual, no OMS training, and is not familiar with identification of process safety gaps).

[172] *See* TREX-45006 pdf p.16, *supra.*

[173] Bly Testimony, pp.1185-1186.

[174] Bly Testimony, pp.1066-1067.

Former CEO Tony Hayward testified that it is "undoubtedly" possible that, had OMS been applied prior to April 20, 2010 in the Gulf of Mexico, the terrible catastrophe would have been averted.[175]

**Was there, at the time of the blowout, a "bridging document" that identified and addressed any gaps between BP's OMS and the Transocean Safety Management System with respect to the Macondo Well or the DEEPWATER HORIZON?**

While BP pointed to Section 17.1 of the 1998 Drilling Contract between Vastar (later BP) and R&B Falcon (later Transocean) for the proposition that Transocean would have primary responsibility for safety and that, in the event of conflict, the Transocean manual would prevail,[176] Section 3.1 of Amendment No. 38 to the Drilling Contract, dated September 28, 2009, requires that Transocean's safety management system be compatible with BP's safety management system;  Section 3.2 requires Transocean to perform all services in compliance with BP's management system; and Section 3.3 requires the establishment of an "Interface Document" to address any inconsistencies.[177]

Indeed, Transocean CEO Steve Newman testified that it was an "industry standard" for the operator to compare its safety management system to the contractor's safety management system, and to create a "bridging document" (or "interface document") to cure any gaps.[178]

The BP OMS Governance Document, dated November 3, 2008, provides that BP shall "include and apply contract provisions in such a way that supports and is consistent with BP's application of OMS to BP's Operating activities."[179]  Any deviation "shall be based on a risk

---

[175] Hayward Deposition, pp.793-794.  *See also,* Bly Testimony, p.1002.
[176] *See* Trial Transcript (Newman), pp.4692-4693; TREX-1356A pdf pp.22-23.
[177] TREX-1356A pdf p.429 (also TREX-1488 pdf p.21).
[178] Newman Testimony, pp.4693-494, 4698-4670; *see also,* Baxter Deposition, pp.174-175 (creation of a "bridging document" is the approach taken by operators in the Gulf of Mexico and all over the world).
[179] TREX-45006 pdf p.16.

assessment (including defining and documenting the risk reduction measures that are to be applied) and shall be formally justified, recorded, and authorized."[180]

However, the purported "bridging document" that BP contended was in place between BP and Transocean at the time of the incident,[181] is a five-page document dated September 2008, (TREX-948), which:

- Precedes the November 2008 OMS Governance Document;[182]

- Precedes the September 2009 Contractual Amendment;[183]

- Precedes the January 2010 "Implementation Draft" for BP Gulf of Mexico Drilling & Completions;[184]

- Indicates that the parties will manage the resolution of gaps, and review and implement new programs;[185]

- Is only five pages long;

- Does not reference or address anything specific to the DEEPWATER HORIZON;

- Does not reference or address anything specific to the Macondo Well;

- Does not address any specific process safety issues; and,

- Specifically addresses only a limited number of issues, which all deal with personal safety.[186]

*See generally,* TREX-948, *and,* O'Bryan Testimony, pp.9324-9330, 9353-9360; *see also,* Jackson Deposition, pp.93-95.[187]

O'Bryan, who was the BP Vice-President of Drilling & Completions for the Gulf of Mexico from late 2009 through the date of the explosion, ultimately admitted that he had never

---

[180] TREX-45006 pdf p.16; *see generally,* O'Bryan Testimony, pp.9316-9320.
[181] S*ee* D4943.
[182] *See* TREX-45006 (OMS Governance Document) (Nov. 2008).
[183] *See* TREX-1356A (also TREX-1488) (Amendment No. 38) (Sept. 2009).
[184] *See* TREX-1975 (Implementation Draft) (Jan. 2010).
[185] TREX-948 pdf p.4.
[186] TREX-948 pdf p.3.
[187] *See also, e.g.,* TREX-2523 p.7 (discussed at O'Bryan Testimony, pp.9322-9324) (January 2010 communication noting that "a majority of our bridging documents … are outdated and/or poorly understood").

seen a bridging document specific to the DEEPWATER HORIZON or to the Macondo well.[188]

Nor did any witness testify that there existed an "Interface Document" as required under Section

3.3 of the Amendment to the Drilling Contract.[189]

The Court concludes, after considering all of the evidence, that both BP and Transocean

violated both industry standards and the terms of the BP-Transocean Drilling Contract in failing

to develop a "bridging" or "interface" document identifying and addressing gaps between the BP

and Transoean safety management systems, prior to the explosion.

**In determining the "Safe Drilling Margin" for MMS purposes, (and the "Kick Margin" for Good Oilfield Practices purposes), is the operator always allowed to rely on the measurement that is taken at the Casing Shoe, or must it calculate from the lowest known Fracture Gradient that's found in the relevant drilling section or interval?**

It was established at trial that the MMS, and Good Oilfield Practices, require that the

differential between the highest Mud Weight and the weakest Fracture Gradient be at least 0.5

lbs.[190] As U.S. Expert Alan Huffman explained, "Kick Margin" is the term generally used by the

industry for this, while "Safe Drilling Margin" is the term generally used in connection with the

---

[188] O'Bryan Testimony, p.9330 ln.2-8. *See also,* O'Bryan Testimony, p.9320 (from the time he became Vice-President thru the date of the explosion, there was no process safety audit conducted on Macondo – or, to O'Bryan's recollection, on any of their operations), pp.9323-9324 (and TREX-2523 p.7) ("A majority of our bridging documents linking BP and drilling contractor safety systems are outdated and/or poorly understood"); Bly Testimony, pp.1031-1032, 1039-1040, 1072-1073 (bridging would have required someone with an understanding of OMS at BP to review, and critique, the Transocean safety management system; yet Bly is not familiar with Transocean's safety management system, and doesn't know, nor did the investigation look at, what gaps did or didn't exist within the relevant systems at the time of the explosion); Ezell Testimony, pp.1643-1644, 1718 (in nine years aboard the DEEPWATER HORIZON, he had never heard of "OMS", nor had he ever received any BP "rules" or "regulations"); Guide Testimony, p.8640; TREX-757 (the Macondo Risk Register was last updated on June 20, 2009); M. Sepulvado Deposition, pp.397-398 (had never participated in a risk management process with respect to the Macondo well or the DEEPWATER HORIZON).

[189] *See also, e.g.,* Bea/Gale Report, pp. v, xxiii, 73 (TREX-20001 at pdf pp.6, 24, 100) (there was no bridging document).

[190] *See generally,* Huffman Testimony, p.654; Douglas Deposition, p.108 (MMS has an internal policy that 0.5 is the Safe Drilling Margin); Patton Deposition, pp.94-96, 463-464 (the MMS's internal policy is a 0.5 drilling margin, with an exception of 0.3 where the operator shows that there are no hydrocarbons and no chance of hydrocarbons in the next hole section to be drilled); TREX-3732 (internal BP e-mail acknowledging that a waiver from the MMS would be required to drill with a margin of less than 0.5 ppg). *See also,* Huffman Testimony, pp.665-666; TREX-4201; Douglas Deposition, p.96.

MMS Regulations.  Maintaining this margin is a proactive requirement to prevent losing control of the well.[191]

BP suggested at trial that the operator could rely on a Casing Shoe measurement for the weakest Fracture Gradient, irrespective of the other measurements taken or information obtained during the drilling interval or section in question.[192]

However, Dr. Huffman, the United States' Expert in Regulatory Compliance, credibly explained that, while the beginning assumption is that the weakest Fracture Gradient is at the Casing Shoe, the margin (and sometimes the Mud Weight) must be adjusted when new information is learned while drilling.[193]   What the operator is looking for, in this respect, is the "weakest link".   You assume that the Casing Shoe is the weakest link;  but if you have evidence that it isn't, you use the weakest link as determined through the information gained while drilling.[194]

Dr. Huffman's testimony is supported by the then-existing MMS Regulations. Specifically, Section 250.427(a) provided that: "You must use the pressure integrity test and related hole behavior observations … to adjust the drilling fluid program and the setting depth of the next casing string."[195]  Section 250.428(a) further directs that if you "have unexpected formation pressures or conditions that warrant revising your casing design," you must "submit a revised casing program to the district manager for approval."[196]

While BP's Expert, Dr. Bourgoyne, suggested that Huffman was alone in his interpretation, Dr. Bourgoyne was confronted with the deposition testimony of Mr Trocquet,

---

[191] Huffman Testimony, pp.653-654.
[192] *See, e.g.,* Bourgoyne Testimony, pp.7620-7621.
[193] Huffman Testimony, pp.652, 656-657.
[194] Huffman Testimony, p.824. *See also, generally,* D-3554.
[195] TREX-4022.
[196] TREX-5837.

from the MMS, who testified – consistent with Dr. Huffman – that you measure from the weakest Fracture Gradient, which is only presumed to be at the shoe.[197]  Mr. Saucier, an MMS supervisor, agreed with Huffman as well.[198]    Finally, BP's own senior Regulatory Advisor testified that operators "have to use the data they have, the real hole data they have, to adjust their either drilling fluid program or where they set their casing."[199]

Not only does the Court find Dr. Huffman (not to mention the language of the MMS Regulations themselves) persuasive on this point, but the notion of a standard that would allow the operator to willfully disregard information regarding the true Fracture Gradient defies common sense.  The Court therefore finds that BP was required by both MMS Regulations and good oilfield practices to maintain a 0.5 lbs or other safe drilling margin (*i.e.* where a waiver was sought in good faith and approved) as measured between the highest Mud Weight and the weakest Fracture Gradient known to the operator, based on all of the information reasonably available.

**Did the "fast drilling" that occurred from October 2009 thru April 9, 2010 cause or contribute to the blowout which occurred during the abandonment procedure on April 20, 2010?**

The United States' Regulatory Compliance Expert, Alan Huffman, established quite convincingly that BP willfully and recklessly violated both the MMS Regulations and accepted oilfield standards and practices by generally drilling too fast from October 2009 through early April of 2010 and specifically exceeding the "Safe Drilling Margin" (or "Kick Margin") on at least four occasions.[200]

---

[197] *See* Bourgoyne Testimony, pp.7621-7623; Trocquet Deposition, pp.186, 183, 257-258.
[198] *See* Bourgoyne Testimony, pp.7624-7627; Saucier Deposition, pp.289-290, 306-307.
[199] Douglas Deposition, pp.170-171.
[200] *See generally,* Huffman Testimony, pp.663-711.

Because Total Depth had already been called, and the drilling phase had technically been completed, a question could arise as to whether such willful and reckless conduct caused or contributed to the events in question.

Dr. Huffman, on this point, testified that BP was leaving the well in such a "critical condition" and "so delicate and so fragile that anything else they did from that point forward had to be done with extreme care at the risk of losing the well completely."[201]   Cement Expert Glen Benge similarly explained that because the well was "very fragile",  BP's cement job design "was driven by the singular desire to minimize Equivalent Circulation Density (ECD)."[202] Halliburton's Drilling Expert Gene Beck also testified that the narrow margins created a wellbore that was unsuitable for the casing and cement job.[203]   The well, as drilled, was "dangerously unstable" he said.[204]

Mr. Ambrose, who headed up Transocean's Investigation, explained that BP used 7-inch casing instead of 9⅞-inch casing for the last interval, which caused them to pump the cement at a lower rate.[205]   Also contributing to the blowout, according to him, were:  reducing the cement density with nitrogen foam; using a lesser quantity of cement than that specified in the BP procedures; and deciding not to perform a complete bottoms-up before cementing.[206]

---

[201] Huffman Testimony, pp.718-719.
[202] Benge Testimony, p.2257. *See also, e.g.,* Barnhill Report, p.23 (TREX-7676 at pdf p.13) (the lack of sufficient drilling margin drove many of the decisions that ultimately played a role in the blowout); Tabler Deposition, p.316 ln.7-11 (The reason they wanted to pump at a slow rate was because they knew they had a "weak formation").
[203] *See* Beck Rebuttal Report (TREX-61117) pp.27-29 (the unreasonably narrow drilling margin is what necessitated the risky foam cement job).
[204] Beck Testimony, p.7171 (it was an "unreasonably risky" well design).
[205] Ambrose Testimony, pp.6094-6096.  *See also,* Guide Testimony, pp.8667-8668 (BP decided to call Total Depth earlier than originally planned, which required changes in the casing configuration, to accommodate the hole size).
[206] Ambrose Testimony, pp.6096-6097; TREX-3808 pdf p.196 (Transocean Investigation Report, Vol. I, p.212).

The Court concludes, after considering all of the evidence, that BP's willful and reckless drilling prior to the time that Total Depth was called on or around April 9, 2010, directly and proximately caused or contributed to the blowout eleven days later.

**Did the "Every Dollar Counts" culture at BP affect operations?  Did it affect safety?  Is it evidenced in the specific decisions that were made on Macondo?**

BP's former CEO Anthony Hayward testified that neither cost reductions generally nor the "every dollar counts" mantra at BP affected drilling operations.[207]

Former head of the Gulf of Mexico Strategic Performance Unit, Neil Shaw, however, confirmed that the "every dollar counts" culture was embraced within the SPU, and that in 2009 BP safety personnel were pulled off of the MODUs, including both the MARIANAS and the DEEPWATER HORIZON.[208]   Former Vice-President of Drilling & Completions, Kevin Lacy, testified that that there was "tremendous pressure" to cut costs, including hundreds of millions of dollars within the Gulf of Mexico Drilling & Completions organization.[209]   Bonuses at BP were tied to reductions in non-productive time (NPT), but did not reward employees for effective process safety measures or results.[210]   Lee Lambert, as a potential Well Site Leader of the Future, was graded on his commitment to cost control.[211]   And Wells Team Leader John Guide bragged

---

[207] Hayward Deposition, p.121.

[208] Shaw Testimony, pp.8052, 8075-8076, 8137-8141; TREX-5678 p.2; TREX-6020.

[209] K. Lacy Deposition, pp.773-774, 792-796; *see also, id.,* p.711 ln.4-7 ("not explicitly" told to cut costs for safety).  Indeed, the evidence strongly suggests that Lacy was fired, and Thierens transferred to London, in late 2009, because they were attempting to devote time and resources into process safety, as opposed to more immediately profitable endeavors.

[210] Bea/Gale Report, p.viii (TREX-20001 pdf p.9). *See also, e.g.,* O'Bryan Testimony, pp.9294-9297 (discussing TREX-4232) (evidencing a focus, not on safety or the environment, but reductions in non-productive time and other economic issues to BP); Perkin Testimony, p.3298 (discussing TREX-1741 at pdf p.4) (Risk Register for Macondo identifying the "event" relating to BOP stack as "NPT" (non-productive time) and "impact type" as "schedule").

[211] Lambert Testimony, pp.8288-8289; TREX-2159.

that the DEEPWATER HORIZON team had embraced the "'Every Dollar Matters' culture" in the 18 months since he had arrived.[212]

Transocean witnesses further established that BP's "every dollar counts" culture filtered down to operational activities.  Mr. McMahan, for example, testified that BP provided a performance award to Transocean employees for completion within 75 days, with a maximum bonus awarded for completion in 52 days.[213]  Mike Williams testified that there was "always" pressure to speed up operations on the well.[214]  And Paul Meinhardt, a Trasnocean Motorman, testified that Transocean rig personnel felt pressure to get the Macondo well completed as fast as possible.[215]

There was, on Macondo, every incentive to save additional time and money.  As of April 9, 2010, BP was $60 million (60-70%) over budget and 54 days behind schedule on the well.[216]  Moreover, the DEEPWATER HORIZON was under pressure to get to the Nile well, and then to the Kaskida, which BP needed to "spud" by May 16th or face losing the lease.[217]

Several of the defense experts, in fact, supported Dr. Bea's conclusions that the cost-cutting attitude driven from upper BP Management shaped decisions at the operational level on Macondo during the days and hours leading up to the blowout, including:

- Not using a sufficient number of centralizers;

- Not waiting for the foam stability test;

- Not running a cement bond log;

---

[212] Guide Testimony, p.8629; TREX-6294 p.2; *see also,* Guide Testimony, p.8632; TREX-7062 ("We have saved BP millions and no one had to tell us").

[213] McMahan Deposition, pp.153, 160-161; TREX-07098.

[214] Williams Deposition, p.51 ln.13-15.

[215] Meinhardt Deposition, pp.148-149, 301-302.

[216] Bea Testimony, pp.329–330; D-2730.  *See also,* Barnhill Testimony, p.4385 (when a vessel is on a Day Rate, you save money with each and every day you get off the well); *see also,* Bourgoyne Testimony, pp.7552-7553 (believes that rig was on cost-per-day basis).

[217] O'Bryan Testimony, pp.9293-9294; *see also,* Sims Deposition, pp.556-557; TREX-119E; Bea/Gale Report, p.71 (TREX-20001 pdf p.98).

- Using a spacer made from lost circulation material;

- Displacing the riser before setting the cement plug;

- Displacing the well to over 3,000 feet below the mud line;

- Not installing additional physical barriers during the temporary abandonment process;

- Not circulating bottoms-up prior to the cement job;

- Using long string casing instead of a liner;

- Performing simultaneous operations during displacement;

- Converting the lower ram on the BOP to a test ram.

*See* Bea Testimony, pp.326-327; D-2445; Bea/Gale Report, pp.xviii – xxi, 58, 64 (TREX-20001 at pdf pp.19-22, 58, 64).[218]  Transocean Drilling Expert, Calvin Barnhill, testified that the 35 decisions summarized in Appendix A to his report include a number of decisions made by BP based on a desire to save time and money.[219]  Halliburton Drilling Expert, Gene Beck, was shown the Bea summary,[220] and, with the exceptions of the conversion of the lower ram to a test ram (on which he expressed no opinion) and not waiting for the foam stability test, Beck agreed that the other nine decisions increased the risk of a blow-out on Macondo and, in each case, "the decision that was made did result in a time and cost savings."[221]  U.S. Regulatory Compliance Expert Alan Huffman testified that BP drilled ahead to save time and money by extending the casing string;[222]  Halliburton's Vice-President of Cement, Tommy Roth, testified that BP saved

---

[218] *See also,* Bea Testimony, pp.321-323; D-2739; D-2895; D-2896; D-2897; D-2898 (the "every dollar counts" culture at BP was embraced by people working on Macondo, including John Guide).

[219] Barnhill Testimony, pp.4385-4386; Barnhill Report, Attachment A (TREX-7685 pdf pp.53-55). Transocean's lead investigator, Mr. Ambrose, also agreed that: using fewer centralizers increased risk while saving BP time; not waiting for the foam stability test increased risk while saving BP time; not running the Cement Bond Log saved BP time and money; using spacer made from Lost Circulation Material increased risk while saving BP money; displacing the riser before setting the cement plug increased risk; not having a second barrier increased risk and saved time; not circulating a full bottoms-up increased risk while saving BP time; using a long-string casing instead of a liner increased risk while saving BP $7 to $10 million; and converting the lower ram on the BOP to a test ram was intended to save time. Ambrose Testimony, pp.6120-6123; D-2445.

[220] D-2445.

[221] Beck Testimony, pp.7181-7184; D-2445.

[222] Huffman Testimony, p.681; TREX-1337.

money by using the old Kodiak cement blend;[223] and Transocean's BOP Expert Glenn Childs conceded that the conversion of the Lower Bore Ram to a Test Ram increased risk while saving time and money.[224]

The Bly Investigation Team interview notes confirm that BP was "behind on well" and "because of culture" no Full Bottoms-Up was done.[225] With respect to the Cement Bond Log, the interview notes confirm that Guide "shut down" the test in order to save time.[226] And a formal Management of Change document confirms that BP saved $7 to $10 million by choosing the Long-String Casing over the Liner.[227]

Hayward himself, moreover, linked the concept of cost savings with operational and safety issues when he indicated that, in his opinion, the company had become "overcautious" due to previous incidents when he first took over as CEO and started talking about "slashing" management in 2007.[228] Indeed, the Macondo Risk Register identified "Cost" as the impact associated with well control risk, (including the potential for an "uncontrolled situation"), and the other major risks identified therein.[229]

The Court concludes, after considering all of the evidence presented during the trial, that BP's "every dollar counts" corporate culture and policy affected operations generally, and directly caused or contributed to the blowout, with conscious decisions that increased known risks in order to save time and money.

---

[223] Roth Testimony, p.3054.
[224] Childs Testimony, pp.5292-5294; TREX-6120.
[225] TREX-37031 p.40 (discussed in Robinson Testimony, p.7962).
[226] TREX-37031 p.39 (discussed in Robinson Testimony, pp.7958-7961).
[227] TREX-901 at pdf p.1; see also, Beck Testimony, p.7962.
[228] Hayward Deposition, pp.108-109.
[229] TREX-1741 at pdf pp.4-5 (Macondo Risk Register identifying the "impact" of all risks and events as either "Cost" or "Schedule") (discussed in Bly Testimony, pp.1058-1059).

**Should Maximum Anticipated Surface Pressure (MASP) have been calculated using 100% gas column to surface, (rather than 50% mud, 50% gas)?**

The determination of the Maximum Anticipated Surface Pressure (MASP) associated with a drilling operation is intended to ensure that the equipment, and in particular the BOP, is sufficiently rated to shut in the well in the event of a "worst case scenario." At the trial of this matter, the Plaintiffs presented evidence suggesting that Transocean and BP should have calculated MASP based on the assumption of 100% gas.

According to Plaintiffs' Expert, Gregg Perkin, the worst-case scenario is "gas column to surface."[230] The Transocean Well Control Manual indicates that MASP is determined by calculating "worst case scenario" with full evacuation of drilling fluid (*i.e.* gas column).[231] The BP DWOP similarly indicates that MASP should account for gas column to surface.[232] As does the BP Group Practice.[233]

Indeed, a BP casing design document indicated that it was important to plan for 100% gas column to surface as the worst case scenario.[234] Yet, as evidenced by an e-mail string discussing BP's Kodiak Well, a calculation of MASP, if done in the correct way, would exceed the BOP's Pressure Rating. Hence, MASP was re-calculated using 50% mud and 50% gas.[235]

While Defendants presented evidence that MMS accepted the MASP calculations submitted by BP, the Court concludes that BP and Transocean exhibited willful and reckless disregard with respect to the known risk that the DEEPWATER HORIZON BOP would not be able to handle the pressures at Macondo in the event of a worst case scenario.

---

[230] Perkin Testimony, p.3360.
[231] Perkin Testimony, pp.3369-3372; TREX-1454.
[232] Perkin Testimony, p.3372; TREX-93 Section 15.2.3 p.47.
[233] Perkin Testimony, p.3373; TREX-215 Section 6.1.3 p.10.
[234] Perkin Testimony, pp.3374-3375; TREX-1861 p.9.
[235] Perkin Testimony, pp.3377-3380; TREX-26011 ("On the MASP, for purposes of BOP test pressures, we'll only be testing to 9500 psi max (might even reduce it to 9300 psi). Even when we calculate a MASP that's higher, we have been running with the philosophy that (a) something else will break down before we ever reach that pressure, and (b), we don't want to put unnecessary wear and tear on the stack").

**Did the hydrocarbons enter through the Shoe Track at the bottom of the hole, or did they invade through a breach in the casing?**

Both the BP Bly Investigation and the formal Transocean Investigation concluded that the hydrocarbons invaded through the Shoe Track at the bottom of the hole, and entered into the centralized part of the casing.[236]  (This conclusion is potentially significant to Halliburton, in particular, in that it points to a failure of the production casing cement, as opposed to a breach in the casing.)  While Halliburton suggested at trial that the hydrocarbons might have entered through a hypothetical breach in the casing, Halliburton's own expert on this point conceded that he did not come to that conclusion until after he finalized and submitted his report.[237]

The Court concludes, after considering all of the evidence, that there was a failure in the production casing cement, which allowed the hydrocarbons to enter through the shoe track at the bottom of the wellbore.

**Was the Halliburton-Sperry Mudlogger, Joe Keith, monitoring the well on the evening in question?  How long was his break?  Did he review the data when he returned from break?  Did he see the data changes and disregard them, or did he fail to notice them in the first place?**

The Halliburton-Sperry Mudlogger, Joe Keith, admitted that he missed the pre-tower meeting on April 20, either because he was getting ready in his room or because he was sleeping.[238]  On May 4, 2010, Keith told a BP investigator that he never left his post during the entire 4-hour period that he was supposed to be on duty. That same day, Keith received a settlement.[239]  After the settlement, Keith revealed that he had taken an 8-10 minute break

---

[236] TREX-00001 (Bly Report), pp.10, 33; TREX-03808 at pdf pp.60, 197 (Transocean Investigation Report, Vol. I, pp.72, 213); Bly Testimony, pp.915-916, 934-936; Ambrose Testimony, p.6049; D-2022. *See also,* Bourgoyne Rebuttal Report (8174) p.15.
[237] Beck Testimony, pp.7142-7143.
[238] Keith Testimony, pp.3531-3532.
[239] Keith Testimony, pp.3534-3537. While Keith testified that the settlement was paid by Halliburton, the release reflected a release of BP. TREX-969.

sometime between 8:30 and 9:00.  Keith claimed that his recollection of this returned to him in therapy.[240]

According to his prior deposition testimony, Keith never observed any indication that the well was taking a kick.  He claimed at trial, however, that he noticed a few things, such as an increase in the flow-out, and made a few calls to the Rig Floor.[241]

Keith testified at trial that he noticed a 100 psi increase on the drill pipe from 9:01 to 9:08, although he had testified in his deposition that he didn't notice the increase.[242]

Keith acknowledged at trial that there was a rise in drill pipe pressure of 246 psi from 9:08 to 9:14 with the pumps turned off, but claimed that he could not see it on his monitor the night of the explosion.[243]

Under cross-examination by BP, Keith indicated that his break was as much as a half-hour: taking the break around 8:30 and returning between 8:58 and 9:08.[244]

Keith testified (again) that he saw the 100 psi increase the night of the blowout, but did not call the drill shack.[245]  He claimed that he saw the drill pipe pressure increase by 250 psi with the pumps off, but he did not call the driller's shack as it was not (in his mind) an indication of a kick.[246]  Yet, he had testified in his deposition that if he had seen the drill pipe pressure increase by 100 psi, he would have called the drill floor.[247]

---

[240] Keith Testimony p.3537.
[241] Keith Testimony, pp.3539-3540.
[242] Keith Testimony, pp.3547-3548 (it didn't "stand out" as an anomaly, (or he would have called the rig floor)).
[243] Keith Testimony, p.3549; D-2104.
[244] Keith Testimony, p.3678.
[245] Keith Testimony, p.3680.
[246] Keith Testimony, pp.3682-3683.
[247] Keith Testimony, pp.3686-3688 (he only would have reported the increase "if it would have stood out as a kick to me," but his prior deposition testimony indicated that he would have told them that he had seen a change, (if, in fact, he had noticed it), and it would have been up to the Drilling Crew to make a decision).

According to Drilling Expert Richard Heenan, Keith should have been able to detect the increase in pressure, which was a "pretty definitive" indication of inflow.[248] Mr. Heenan acknowledged that Keith testified that he checked the flow line (on the monitor) around 9:08 after the pumps were shut down, saw that it stopped flowing, and diverted. But, according to Heenan, (and based on the Court's own observations), there is other evidence which calls this account into question.[249]

BP's Drilling Expert Dr. Bourgoyne agreed with Heenan that the well started flowing at 8:30, and that the kick could have been detected between 9:01 and 9:08. Dr. Bourgoyne believes that there was strong indication of a kick between 9:08 to 9:14, as pressure was increasing even though the pumps were turned off.[250]

While it may not be clear exactly where Mr. Keith was or what he was doing during the displacement procedure, the Court concludes that Keith was not monitoring the well, as he should have been, during one of the most critical times of the entire drilling operation.[251] Mr. Keith obviously either wasn't paying attention at all, or was paying attention and ignoring what he was seeing. Either way, (and he testified both ways), this was a gross and wanton deviation from the standard of care.

**Could Halliburton-Sperry (and Transocean and/or BP) have placed the Flow-Out Sensors – or a second set of Flow-Out Sensors – in a location that would have allowed the Mudlogger to effectively monitor the Flow-Out even when fluids were being diverted overboard?**

Halliburton's defense of Mr. Keith was predicated largely on the fact that, by all accounts, the Sperry Flow-Out Sensors were placed beyond the diverter lines, such that Flow-Out could not be monitored by the mudlogger on the Sperry Insite system while fluids were

---

[248] Heenan Testimony, pp.2157-2158.
[249] Heenan Testimony, pp.2159-2160.
[250] Bourgoyne Testimony, pp.7529-7535.
[251] *See, e.g.,* Ezell Testimony, pp.1672-1673, 1784.

being diverted overboard, as occurred during the displacement operation on the evening in question.  Halliburton, however, did not seem to offer an explanation of why these sensors, or a second set of sensors, could not have been placed on the other side of the diver lines, so that Flow-Out could have been monitored even when fluids were being diverted overboard – a predictably foreseeable occurrence.[252]

Section 2.1.1 of the Sperry Sun Drilling Services Contract with BP required Sperry to provide "a complete MWD [Measurement While Drilling] system with sufficient backup equipment to ensure continuity of quality service."[253]  Section 2.1.2 additionally required Sperry to provide "two surface computer systems with necessary interfaces," including software and cabling.[254]

Halliburton-Sperry's John Gisclair, who served as the Support Service Coordinator for the Gulf of Mexico, testified in his deposition that Sperry, with Transocean's approval, decided where to place the sensors, and indicated that they could have positioned the sensor, or a second sensor, in another location.[255]  Transocean Drilling Expert Calvin Barnhill similarly testified that, in his experience, the placement of the Flow-Out Sensor would have been a joint discussion between the Sperry Mudlogger, the Transocean OIM, and the BP Well Site Leader ("company man").[256]  Mr. Barnhill agreed that the equipment should have been set up by Sperry and Transocean in a way that enabled the Mudlogger and the Drill Crew to monitor a 250 psi increase while the pumps were shut off.[257]

---

[252] This would have also likely been helpful to the Transocean Drill Crew (and the BP Well Site Leader), as the Sperry Flow-Out Sensors were more precise than the sensors associated with the Transocean Hitec system. *See* Keith Testimony, pp.3508-3509, 3517, 3640.

[253] TREX-2007 p.7; Probert Testimony, pp.3002-3003.

[254] TREX-2007 p.7; Probert Testimony, p.3003.

[255] Gisclair Deposition, pp.431-432, 530.

[256] Barnhill Testimony, pp.4394-4396.

[257] Barnhill Testimony, pp.4461-4462.

Considering all of the evidence, the Court concludes that Halliburton-Sperry should have ensured that at least one set of Flow-Out Sensors should have been placed in a location that would have allowed both the Sperry "Insite" system and the Mudlogger on duty to monitor Flow-Out even when fluids were being diverted overboard.

**Did Halliburton develop a Basis of Design for the production casing cement job?**

The BP-Halliburton contract required Halliburton to:

- Produce and update a basis of design document for the project…. to record the major decisions and their process of determination…. [Section F]

- Apply risk-based engineering processes to prepare the basis of design, individual well programs, and all associated engineering and documentation. [Section G]

- Provide solutions where conventional cement design and procedures are not suitable, such as blend and foam cement. [Section J] [258]

The Scope of Work for this Basis of Design included consideration of:

What needs to be achieved?  What objective would incur cementing NPT if not achieved? What are the design limits that need to be considered?  Fracture gradient or local legislative requirements? What engineering decisions have already been made?  Mud weight, casing size, and setting depths? What are the key risks? How can the major risks be managed? What cement design options exist? What are the best solutions for the project?[259]

Halliburton's Lead Cement Engineer Jesse Gagliano suggested at trial that this responsibility had been satisfied by an initial June 2009 Basis of Design document, which he claimed was updated along the way with various OptiCem reports.

The Court concludes, however, that a formal Basis of Design for the production casing cement job as contemplated by the BP-Halliburton Services Agreement was never prepared or

---

[258] Probert Testimony, pp.2920-2921; TREX-4477 at pdf pp.86-87 (BP-Halliburton Services Agreement, pp.B-30, B-31).
[259] Probert Testimony, pp.2921-2922; TREX-4477 at pdf pp.89 (BP-Halliburton Services Agreement, pp.B-32).

provided by Halliburton;  nor did Haliburton account for the types of risks identified over the

seven months of drilling experience, or subject the proposed or actual cement design or job

changes to a formal Management of Change.

A Halliburton presentation developed after the blowout in connection with the company's

Congressional testimony acknowledged that the Basis of Design was intended to "provide means

to continually assess fitness of purpose of cementing, recommendation by engineering

interpretation against client challenges and well hazards (red flags) encountered while drilling,"

but that: "No formal basis of design standard exists today."[260]

The Basis of Design document that Halliburton provided to BP for the Macondo well was

dated June 2009, and did not include the plans for the production casing.  Mr. Gagliano conceded

that there was never another subsequent document entitled "Basis of Design" for the Macondo

Well.[261]  Rather, what Gagliano referred to as a "Basis of Design" was simply taking information

from BP on the well design, and incorporating it into his document.  There is no evidence that

Halliburton actually changed, or updated, or assessed the risk or design of the cement or the

cement job itself.  The only risk that was identified in the OptiCem reports was the risk of gas

flow based on the number and location of centralizers.  No other risks associated with the cement

job were identified or addressed.[262]

---

[260] TREX-4357 p.5; Probert Testimony, pp.2923-2924; Roth Testimony, pp.3084-3086.  Comparing the
2010 Halliburton U.S. Land Offshore Cement Manual (TREX-989) to the 2011 Halliburton U.S. Land Offshore
Cement Manual (TREX-48008), a section was added regarding the need for Management of Change (MoC) and
Basis of Design (BoD). *See* Probert Testimony, pp.2925-2927. *See also,* Probert Testimony, p.2922 (Probert has no
knowledge of whether a Basis of Design (BoD) was prepared for the Macondo cement job prior to the explosion);
Roth Testimony, pp.3092-3094 (Roth is not aware of any); Gagliano Testimony, pp.6713-6715 (there was no formal
procedure or requirement for a formal written Management of Change (MoC);  rather, (according to Gagliano), it
would occur thru informal discussions. To the extent there was "oversight" by management, it would come through
the Testing Lab in Broussard).
[261] Gagliano Testimony, pp.6710-6712, 6716; TREX-4357 p.5; TREX-7469.
[262] Gagliano Testimony, pp.6702-6706; TREX-4357.

United States' Cement Expert Glen Benge testified that he was unable to locate a Basis of Design for the cement that was pumped on April 19th.[263]   And Halliburton's own Head of Cement, Tommy Roth, acknowledged that if Halliburton had followed the specific obligations of the contract (*i.e.* identification of risks, mitigation of risks, determining what designs should be used), there would not have been a blowout.[264]

### Was the cement slurry that Halliburton designed and formulated for the production casing interval stable?

It is clear from the evidence presented at trial that the Halliburton cement slurry was unstable.  Halliburton's own Head of Cement acknowledged at trial that the mixture had a "very low probability of success."[265]   The pre-incident testing repeatedly revealed instability.[266]   The post-incident testing conducted by Chevron, OTC, and Halliburton itself all revealed instability.[267]   Both the Transocean Investigation and BP's Bly Investigation concluded that the cement failed.[268]   Halliburton did not call an independent cement expert to opine that the cement slurry was stable.

---

[263] Benge Testimony, p.2546. *See also,* Benge Testimony, p.2338 (could find no evidence that Halliburton had any standards or procedures to ensure that minimum required testing was actually conducted).

[264] Roth Testimony, p.3089 ln.11-16. *See also,* Roth Testimony, pp.3092-3094 (had Halliburton engaged in a proper Basis of Design for the Macondo slurry, it would have analyzed the risks of using the D-Air 3000 de-foaming agent; had Halliburton followed its contractual requirements, the risks associated with the use of D-Air 3000 and SCR-100 would have been identified along with plans for mitigating those risks within the Halliburton reports).

[265] Roth Testimony, pp.3138, 3141, 3215, 3221.

[266] *See* D-4309A; Gagliano Testimony, pp.6791-6796; Benge Testimony, pp.2513-2515, 2520-2521, 2330-2332; Roth Testimony, p.3131; TREX-808 p.2; TREX-809 p.2; TREX-48195.

[267] *See generally,* D-4309A; Benge Testimony, pp.2545-2546; Roth Testimony, pp.3056, 3069, 3131, 3252-3253; Quirk Testimony, pp. 4761, 4764; Morgan Deposition, pp.20-21, 29; Garrison Deposition, pp.23-24, 28-29, 149-150, 159, 207-208 (re OTC testing for the Presidential Commission); Gardner Deposition, pp.90-95, 101-102, 110-111, 118, 123, 125, 163-164, 186, 237-238, 301; TREX-4572 pp.4-5. 9-12 (re Chevron testing in connection with BP investigation); TREX-7718 (re Haliburton's secret internal testing).

[268] TREX-00001 (Bly Report), pp.10, 33; TREX-03808 at pdf pp.60, 197 (Transocean Investigation Report, Vol. I, pp.72, 213) (the "precipitating cause" of the blowout was the failure of the cement); Bly Testimony, pp.915-916, 934-936; Ambrose Testimony, pp.6049, 6213; D-2022.

**Did Halliburton intentionally conceal or destroy evidence after the event?**

On May 11 and 12, 2010, Halliburton's President of Strategy and Corporate Development and Chief Health & Safety Officer, Timothy Probert, appeared before Congress on behalf of Halliburton.   Mr. Probert represented to Congress that Halliburton had and would continue to "fully support and cooperate with the ongoing investigations into how and why" the Macondo disaster occurred, and that it would share the results of its investigation and analysis with the Federal Government, and "use it as a basis for ensuring that the industry is safe and environmentally sound."[269]   Based on the pre-trial proceedings in this multi-district litigation and the Phase One Trial evidence, Halliburton did not live up to these promises.

*The Missing 3D Modeling*

Halliburton conducted post-incident Displace 3D Modeling, the results of which it never produced and which it now claims are "gone."[270]

*Mixing Test #1 – Duncan, OK (Not Recorded)*

About two to four weeks after the blowout, Halliburton's Technology Manager for the Gulf of Mexico, Ron Faul, contacted Lab Technician Rickey Morgan at Halliburton's Duncan, Oklahoma Lab.[271]   Faul asked Morgan "to take a look at the Macondo slurry" and give Faul his "opinion of it."[272]   Morgan got the Macondo slurry sheet (*e.g.,* the recipe for the Macondo production casing cement) from another technician in the Duncan Lab, Brian Wall, who was also

---

[269] TREX-2016 pdf pp.51, 66-67 (Hearing before Committee on Energy and National Resources, May 11, 2010, pp.47, 62-63); *see also,* Probert Testimony, pp.2939-2941, 3005; TREX-02017 (Probert Statement to Committee on Environment and Public Works, May 11, 2010) p.1 ("Halliburton has and will continue to fully support, and cooperate with, the ongoing investigations into how and why this tragic event happened"); TREX-2019 (Subcommittee Inquiry into the DEEPWATER HORIZON Gulf Coast Oil Spill, May 12, 2010) p.60 ("We will continue to work with you and your staff to collect factual data that will enable an understanding of what took place and what we can collectively do to ensure that domestic oil and gas production is undertaken in the safest, most environmentally responsible manner possible").

[270] Roth Testimony, pp.3066, 3255-3257, 3279-3280. *See also, generally,* Rec. Docs. 4799 and 4799-1 (BP's Motion for Sanctions Resulting From Halliburton's Destruction and Spoliation of Evidence).

[271] Morgan Deposition, pp.15:7-16:15.

[272] Morgan Deposition, pp.16:16-18:1.

doing testing on the Macondo slurry.[273]  Morgan testified that, after mixing the slurry, it "looked thin" (a classic sign of cement instability) and "he expected it to be thicker" – something Morgan felt was noteworthy.[274] Morgan did not record the results of this test, opting instead to give Faul the test results over the phone.[275]  Morgan did not record the test results because he did not "want to put anything in an email that could be twisted and turned" or "taken out of context" and used against the company in litigation.[276]

*Mixing Test #2 – Duncan, OK (Not Recorded)*

A week later, Halliburton Area Lab Manager Timothy Quirk called Morgan to ask him how he conditioned the slurry he had mixed for Faul.[277]  Morgan told Quirk he did not condition it.[278] Quirk then told Morgan that the Broussard Lab had conditioned the Macondo slurry during Halliburton's April 2010 pre-blowout cement tests.  Morgan conducted a second mixing test, this time conditioning the cement.[279]   The results of this test also appeared "thin", (*i.e.,* "could have issues with [] settling" and could affect cement stability).[280]  Morgan further testified that he "thought [Faul] might be [ordering the mixing test]" because he was looking into the potential cause of the blowout.[281]

*The "Brian Wall Test" – Duncan, OK (Not Recorded)*

Another Halliburton lab technician, Brian Wall, also conducted post-blowout testing at Halliburton's Duncan Lab using the Macondo recipe.[282]  Rickey Morgan testified that he asked

---

[273] Morgan Deposition, pp.18:7-20:7, 92:13-93:6.
[274] Morgan Deposition, pp. 20:8-22:9, 35:1-23; Quirk Testimony, pp.4938-4939, 4952-4953.
[275] Morgan Deposition, p.22:10-17.
[276] Morgan Deposition, pp.22:10-24:10, 69:21-71:11, 101:17-23.
[277] Morgan Deposition, pp.29:20-31:23.
[278] Morgan Deposition, pp.29:20-30:2.
[279] Morgan Deposition, pp.30:3-10.
[280] Morgan Deposition, pp.30:11-13, 35:1-23.
[281] Morgan Deposition, pp.36:12-37:8.
[282] Morgan Deposition, pp.18:7-20:7, 77:21-78:13, 92:13-93:6.

Wall if he ran testing on the Macondo slurry to which he replied, "yes."[283]  He further testified that Wall's testing was done after the blowout (sometime in May 2010) "within a week or two" of the two post-blowout mixing tests that Morgan conducted.[284]  Morgan also testified that he spoke to another Halliburton lab technician from the Duncan lab named Chad Brennis who had mixed the slurry with Wall.[285]  According to Morgan, Brennis and Wall "said that they mixed the slurry and it looked thin to them, too."[286]  The only evidence of the existence of the Brian Wall testing appears to be from Ricky Morgan's deposition testimony.

*Unknown Number of Foam Stability Tests – Broussard, LA (Not Recorded)*

After the post-blowout mixing tests were conducted at the Duncan Lab, Faul called Quirk to request foam stability testing.[287]  Faul advised Quirk about the Duncan Lab results, and requested Quirk to perform comparative foam stability testing at Halliburton's Broussard, LA lab.[288]  He also instructed Quirk not to report the results in Halliburton's Viking database.[289]  Instead, Quirk verbally communicated these test results to Faul, and got rid of his handwritten notes.[290]

At trial, Quirk testified that he could not remember what the test results were.[291]

In addition to the foam stability tests, Faul asked Quirk to perform four or five contamination tests in order to see what effect varying levels of mud contamination would have on foam stability.[292]  As with the other tests he conducted, Quirk did not save any notes.[293]

---

[283] Morgan Deposition, pp.78:7-13.
[284] Morgan Deposition, p.79: 1-10.
[285] Morgan Deposition, pp.79:14-80:15.
[286] Morgan Deposition, pp.128:18-130:3.
[287] Quirk Testimony, pp.4757-4760, 4764.
[288] Quirk Testimony, pp.4757-4764, 4938-4939, 4952-4952; Morgan Deposition, p.35:1-23; Benge Testimony, pp.2514, 2536-2538.
[289] Quirk Testimony, pp.4766-4767; Faul Deposition, pp.387:1-17, 387:25-388:8.
[290] Quirk Testimony, pp.4764:12-4770:22.
[291] Quirk Testimony, pp.4768-4769.
[292] Quirk Testimony, p.4770.

Quirk, Halliburton's Area Lab Manager for the Gulf of Mexico, testified that it was not his habit to perform cement tests, and that it "could have been" years since he last ran one.[294]  He also acknowledged that Faul had never before asked him to personally perform a cement test.[295]  At trial, Quirk acknowledged that he thought "it was a little unusual" that Faul requested "off the side" foam stability testing.[296]

*Late May 2010 Static Gel Strength/Transition Time Testing – Broussard, LA (Recorded)*

After Faul called Quirk requesting post-blowout foam stability testing, Quirk received a call from Halliburton Technology Director, Simon Turton, and Strategic Business Manager, Anthony Badalamenti, requesting Quirk to run static gel strength/transition time testing.[297]  At trial, Quirk acknowledged that he accessed the Cement Weigh-Up Sheet in the Viking database associated with Gagliano's final pre-job test in order to reconfigure "the slurry that was pumped."[298]

These post-spill static gel strength/transition time tests indicated transition times of 1:46, 1:29, and 2:00.[299]  However, Halliburton's Lab Results sheets for the May 28 test only reported a transition time of 1:29.[300]  Faul testified that if Halliburton was "using static gel strength as a primary mechanism for gas migration control" at Macondo, the "ideal or target number" for

---

[293] Quirk Testimony, p.4770.
[294] Quirk Testimony, pp.4764-4765.
[295] Quirk Testimony, p.4764-4765.
[296] Quirk Testimony, p.4769-4770.
[297] Quirk Testimony, p.4770-4771.
[298] Quirk Testimony, p.4771.
[299] TREX-05593 at pdf p.4 (5/28/2010-5/29/2010 Cement Lab Weigh-Up Sheets).  (*Note:* This TREX also includes an attached Weigh-Up Sheet dated 5/20/2010.  Mr. Quirk explained at trial that the 5/20/2010 date on this particular Weigh-Up Sheet was actually for the Weigh-Up Sheet for the 4/16/2010 tests (TREX-00811) (*e.g.,* Gagliano's last test using the higher .09 gal/sk SCR-100L concentration) .  The 5/20/2010 date on its face is simply the day Quirk printed the Weigh-Up Sheet from the Viking database.  This is why the engineer is listed as "Gagliano" and why the "request date" is dated 16 days prior to the Macondo blowout.)
[300] TREX-03117 (5/28/2010 Halliburton Lab Results); Faul Deposition, pp.391:1-392:9, 392:12-393:5.

transition time "is 45 minutes or less,"[301] admitting that, "if I was going to use static gel strength and transition time as a primary mechanism for controlling gas flow, then yes, I would have redesigned [the Macondo production casing cement]."[302]

At trial, Halliburton suggested that none of its post-blowout tests have probative value because actual cement and additive samples from the rig itself were not used therein. However, the evidence clearly indicates that all of Halliburton's post-blowout tests were conducted using the final Macondo production casing cement recipe. Further, no party to this litigation was in a better position to recreate the Macondo recipe than Halliburton.

*Withholding of the Base Blend*

On April 30, 2010, Tony Angelle instructed Quirk to put everything he could find from the HORIZON rig in his office for preservation.[303] Quirk made a list of these materials.[304] However, between April 30, 2010 and July 20, 2010, a 5-gallon cement bucket with the words "Kodiak" and "Transocean rig" (that was included on Quirk's original April 30, 2010 list) disappeared from the closet and was placed in Halliburton's warehouse. The 5-gallon bucket, which Quirk recorded as being half-full, contained a cement blend with the identical ingredients in the identical ratios as the Macondo blend, and the same Lab Sample ID (No. 63981) as the sample listed on the March 7, 2010 Weigh-Up Sheet for the Macondo cement job.[305] At trial, Quirk testified that Angelle told him to remove from the closet anything that was not labeled "Macondo."[306] Accordingly, Quirk transferred the Kodiak cement bucket to Halliburton's

---

[301] Faul Deposition, pp.391:1-392:9, 392:12-21, 697:12-19. *See also,* Morgan Deposition, pp.162:12-163:23 (generally, "you want short transition times" typically "30 minutes or less").
[302] Faul Deposition, 393:6-18.
[303] Quirk Testimony, pp.4756:8-15, 4801:8-12.
[304] TREX-48002 (Ledger memorializing the "Materials currently in lab for BP, Transocean Horizon Rig," dated 4/30/2010)
[305] TREX-05595 (3/7/2010 Cement Weigh-Up Sheet); Quirk Testimony, p.4800:9-16.
[306] Quirk Testimony, pp.4802:9-12, 4805:17-25.

warehouse, and then made another list on which the bucket labeled "Kodiak" no longer appeared.[307]

For nearly three years, the Kodiak (Macondo) cement bucket remained in Halliburton's warehouse.  It was only after a comparison of Quirk's lists during Mr. Probert's testimony at trial that Halliburton disclosed, in an e-mail to the Court on March 13, 2013, that it was in the possession of Kodiak #2 cement used at Macondo.[308]  Needless to say, that cement blend has degraded and is now useless for purposes of post-blowout testing.[309]  Yet, Halliburton has insisted that "only foam, stability, and other tests conducted on actual rig cement have any relevance."[310]

*May 2010 Testing of the SCR-100L Additive used at Macondo*

Halliburton periodically takes actual samples of the cement additives stored aboard the rig, brings them back to the lab, and keeps them in the lab so that they can be used for future testing.  This process allows the lab to conduct multiple tests over a short period of time without having to travel to the rig to take a sample every time a test is ordered.

Halliburton, according to practice, identifies and records the actual additive samples taken from the rig with a Sample ID number and the manufacturer's Lot Number.   Samples are also identified by the date they are collected from the vessel.   By looking at the lab Weigh-Up Sheets associated with a particular test, one can determine the specific samples that were tested.[311]

---

[307] TREX-03110 (Ledger memorializing the "Materials currently in locked cabinet for BP, Transocean Horizon Rig," dated 7/20/2010).

[308] Rec. Doc. 8977-3 (March 13, 2013 e-mail from D. Godwin to Judge Shushan, et al); *see also,* Rec. Doc. 8977-4 (March 18, 2013 e-mail from Jenny Martinez to Judge Shushan, et al) (confirming that the bucket had traveled with the DEEPWATER HORIZON from the Kodiak #2 well to the Macondo well on January 31, 2010, and was then sent to the Halliburton lab on February 23, 2010).

[309] Benge Testimony, p.2530; Quirk Testimony, p.4806.

[310] *See, e.g.,* Halliburton Opening Statement, pp.183:16-17.

[311] Roth Testimony, pp.3121-3128.

At trial, the Weigh-Up Sheets from pre-incident tests were compared with Weigh-Up Sheets from Quirk's May 28-29 tests, and demonstrate that the SCR-100L samples were all taken from the HORIZON on the same date, October 22, 2009.[312] In addition, the Lot Nos. are the same (Lot No. 6264) and the Sample ID Nos. are the same (Sample ID No. 54573). Quirk, who claimed to be "confused"[313] on the stand, effectively admitted that he tested (*i.e.,* destroyed) some of this very specific and very small amount (about 1-quart)[314] of surviving SCR-100L sample used for Macondo, ultimately conceding that "there is a missing piece to this puzzle."[315]

Halliburton apparently takes the position that Quirk's testing of this surviving Macondo SCR-100L sample is irrelevant because it was not taken from the actual production casing cement pumped at Macondo. This misses the point. Halliburton at least recklessly, if not intentionally, disregarded its preservation obligations. The sample tested was a Macondo sample, taken from the rig. In terms of attempting to determine whether the Macondo slurry was stable, this was the specific SCR-100L that Mr. Gagliano believed to be most relevant and reliable for pre-job testing, and the specific (and limited quantity) of SCR-100L that Mr. Quirk believed to be the most relevant and reliable in trying to re-create the slurry after the blowout.

*Additional Post-Incident Conduct*

Additional evidence establishes that:

- Halliburton's Gulf of Mexico Insite Support Service Coordinator John Gisclair destroyed the notes he made in re-creating logs that were lost in the fire.[316]

---

[312] Quirk Testimony, pp.4773-4782; TREX-4566; TREX-5593 pp.3, 5. *See also,* Roth Testimony, pp.3120-3124.

[313] Quirk Testimony, pp.4780:21-4781:8.

[314] TREX-3110 at pdf p.2 (Quirk's 7/20/2010 ledger of "Materials Currently in locked cabinet for BP, Transocean Horizon Rig") (*Note* - The SCR-100L sample in question bears a sample date of "10/22/2010." This is clearly a typo (it should properly read "10/22/2009") as the rig had been on the bottom of the Gulf for six months on 10/22/2010.)

[315] Quirk Testimony, pp.4773-4782; TREX-4566; TREX-5593 pp.3, 5. *See also,* Roth Testimony, pp.3120-3124.

[316] Gisclair Deposition, p.171.

- Halliburton made misrepresentations were made to Congress and the public about pre-incident testing.[317]

- Halliburton made misrepresentations to Congress and to the public regarding its experience with similar foam cement jobs.[318]

- Halliburton made misrepresentations to Congress and to the public regarding the slurry's conformance to industry, BP and Halliburton Best Practices.[319]

- Halliburton's internal investigation, (despite its representations to Congress), was cloaked behind attorney-client privilege.[320]

- Halliburton's key witness, Jesse Gagliano, invoked the Fifth Amendment and refused to testify until after every other Phase One fact witness had already testified and every Phase One expert had already issued his or her report.[321]

- Critical custodial documents were not produced until after the custodian's deposition, despite the fact that such documents had been turned over to Halliburton's in-house legal department months before.[322]

With respect to the issue of intent, the Court is extremely troubled by the number and nature of suspicious post-incident misrepresentations and mishandling of the evidence. The Court is particularly troubled by an e-mail from Halliburton's CFO dated April 27, 2010, which directed that "we should not comment on what caused the accident; but, instead, need to say that Transocean and BP are conducting the investigation into what happened and we don't know anything further."[323] Halliburton, at that time, was in exclusive possession of materials and information that would have been at the very least helpful, if not necessary, for its drilling partners, the oil and gas industry, the government, and ultimately the Court, to determine what

---

[317] Roth Testimony, pp.3249-3251, 3260-3262, 3266-3267; TREX-982; TREX-48098; D379, D-4309A.
[318] Probert Testimony, pp.3025-3026, 3236-3238, 3043; TREX-2013; TREX-75074; TREX-7491A.
[319] Roth Testimony, p.3263; Benge Testimony, pp.2483-2486; TREX-982.
[320] Probert Testimony, pp.3007 ln.14-15, 3029.
[321] *See, e.g.,* Benge Testimony, p.2334.
[322] Roth Testimony, pp.3252, 3280-3281.
[323] Probert Testimony, pp.3022-3023; TREX-1897.

happened, and why[324] – not only to assign legal responsible for the Macondo disaster, but to prevent a similar tragedy from ever happening again.[325]

Whether Halliburton's conduct in concealing or destroying evidence after the incident was intentional or not, it certainly points to a broken corporate culture that ratified the willful and reckless pre-incident acts of its employees and lacked an appropriate level of commitment to the public, the environment, the government, and the industry.  The Court considers this to be compelling evidence that the pre-incident failures on the part of Halliburton which led to the blowout were the result of a willful and reckless disregard for public health and safety.

## FINDINGS AND CONCLUSIONS REGARDING UNSEAWORTHINESS

The Court finds that the DEEPWATER HORIZON was unseaworthy in multiple ways, which played a significant contributing role in the blowout, explosions, fire, sinking of the vessel, and the deaths, injuries, economic and environmental damages resulting therefrom, including, for example, and as further set forth in these Findings and Conclusions:

- The crew of the DEEPWATER HORIZON was not adequately qualified and trained.

- The Drill Crew was not adequately and effectively trained and knowledgeable regarding conducting and interpreting the negative pressure test.

- The Drill Crew was not adequately and effectively trained and knowledgeable regarding monitoring the well for kicks and taking timely and appropriate steps to shut in the well.

- The Drill Crew was not adequately and effectively trained in diverting a kick overboard.

- The Bridge Crew was not properly and adequately trained to deal with emergencies of the kind which occurred on April 20, 2010, (*i.e.* relatively rare but very serious accidents).

---

[324] Probert Testimony, p.3023.
[325] *See, e.g.,* Probert Testimony, pp.2939-2941, 3005; TREX-2016 pdf pp.51, 66-67 (Hearing before Committee on Energy and National Resources, May 11, 2010, pp.47, 62-63); TREX-02017 (Probert Statement to Committee on Environment and Public Works, May 11, 2010) p.1; TREX-2019 (Subcommittee Inquiry into the DEEPWATER HORIZON Gulf Coast Oil Spill, May 12, 2010) p.60.

- Neither the Bridge Crew nor the Drill Crew were adequately trained, drilled and knowledgeable regarding the proper use of safety equipment including EDS, ESD and IACS.

- The Captain and DPA (Designated Person Ashore) were inadequately qualified and trained.

- The OIM was not adequately licensed.

- Transocean had an inadequate maintenance system.

- The DEEPWATER HORIZON and its safety critical equipment, including its BOP, was not properly configured or maintained. Specifically:

  ° The BOP's yellow and blue pod batteries and solenoids were not properly maintained;

  ° The intake Dampers and Rig Savers were not adequately maintained;

  ° The BOP, as designed, configured, modified, and programmed, was not reasonably fit for its purpose on the Macondo well;

  ° The MUX Cables were routed through the hazardous Moon Pool area; and

  ° The automated alarm and safety systems of the DEEPWATER HORIZON were overridden, by-passed, disarmed and disabled.[326]

## FINDINGS AND CONCLUSIONS REGARDING PRIVITY

As set forth in the factual findings above, and as implicitly included within the willful and reckless findings below, the Court summarizes Transocean's acts and omissions of negligence for the purpose of addressing the limitation issue as follows:

---

[326] *See generally,* Webster Testimony, pp.4014-4016 (The DEEPWATR HORIZON was a "grossly unseaworthy" vessel on April 20, 2010, and for several years prior, due to lack of maintenance and lack of training, and was in direct violation of the ISM Code for years prior to the explosion; the vessel was in "gross neglect" and Transocean Management had to be aware of the maintenance, training, equipment and other issues).

- Proceeding with the abandonment procedure in the face of the failed negative pressure test;

- Ignoring the kick and failing to shut in the well;

- Directing the blowout to the mud-gas separator, rather than diverting overboard;

- Inhibiting the automatic safety systems, sensors and alarms;

- Manning the DEEPWATER HORIZON with unqualified, unlicensed and under-trained personnel;

- Creating confusion and delay during the emergency by establishing and maintaining a "dual command" structure;

- Selecting, configuring, modifying and refusing to upgrade the BOP such that it would be sufficient and appropriate for use on the Macondo Well; and,

- Failing to address the longstanding maintenance and repair issues on the DEEPWATER HORIZON.

The Court finds that Transocean's Management at the highest levels, including CEO Steve Newman and Vice-President of Performance Larry McMahan, had actual knowledge of Transocean's ongoing systemic safety management and training failures that led to this disaster.[327]

Transocean managerial agents and other shore-based personnel also had actual knowledge of the configuration of the BOP on the DEEPWATER HORIZON and the repeated and continuing failures to complete necessary maintenance and repairs.[328]  These unseaworthy and other deficient conditions on the DEEPWATER HORIZON directly caused or contributed to

---

[327] *See, e.g.,* Newman Testimony, pp.4606-4608, 4613-4615, 4617-4628, 4721-4722; McMahan Deposition, pp.210-233, 263-269, 301-304; TREX-2189; TREX-2194; TREX-2195; TREX-26032; TREX-26035 p.4; TREX-36070 pp.7, 13; *see also,* Webster Testimony, p.4213.

[328] *See, e.g.,* Winslow Deposition, pp.44, 123-124; Trahan Deposition, pp.54-55, p.60, 208-209; Sannan Deposition, pp.37-38; Canducci Deposition, pp.55-56, 118-119; Johnson Deposition, pp.43-44, 47, 173; Kent Deposition, pp.38-39, 46-47; TREX-5619; TREX-7037; *see also,* Webster Testimony, pp.3737, 3743-3744, 3882-3883, 4016.

the blowout, explosions, fire, sinking of the vessel, and the deaths, injuries, economic and environmental damages resulting therefrom.

Shore based Rig Managers Paul Johnson and James Kent had daily "morning meetings" with BP's Well Team Leader, BP Well Site Leaders and Engineers, as well as the Transocean Crew, during which past and projected activities aboard the rig were discussed in detail.[329]   Mr. Johnson further testified that he communicated with Operations Manager Daun Winslow daily.[330]

Transocean was aware of the bypassing of the automated alarm system: in fact, this had been intentionally requested and approved by Transocean's Management.[331]   As had the "dual command" structure.[332]   Transocean shore based Rig Managers were certainly aware of the ongoing maintenance and maintenance system failures because of BP and other audits which had brought these matters to its attention.[333]   The Master of the Vessel, as well as shore based managers, knew of the lack of qualifications and training of the bridge crew, and their failure to have appropriate EDS drills and other necessary training.

---

[329] Johnson Deposition, pp.46-47; Kent Deposition, pp.47-48; ; *see also, e.g.,* Ezell Testimony, pp.1797-1798 (Rig Manager Paul Johnson participated in the April 20 morning meeting by phone).

[330] Johnson Deposition, pp.345-347.

[331] *See, e.g.,* McMahan Deposition, p.113; Transocean Investigation Report, p.184 (TREX-03808 at pdf p.171); Williams Deposition, p.22; TREX-3749 at pdf p.23.

[332] *See, e.g.,* TREX-5643.4.1; Newman Testimony, pp.4721– 4722.

[333] *See, e.g.,* TREX-80 (2005 ModuSpec Audit) pp.15-16, 24; TREX-6166 (2008 BP Rig Audit) at pdf p.6; TREX-3405 (2009 BP Rig Audit) p.3; TREX-251 (2010 Moduspec Audit), pp.47-48, 51-52; Webster Testimony, pp.3873-3874.

**TRANSOCEAN AND BP BOTH EXHIBITED WILLFUL AND RECKLESS DISREGARD
IN THE SELECTION, CONFIGURATION, MODIFICATION AND REFUSAL TO UPGRADE
A DEFICIENT AND DEFECTIVE BLOWOUT PREVENTER (BOP) [334]**

A Blowout Preventer (BOP) is a series of mechanical valves attached to the well-head, on Macondo, 5000 feet below the ocean surface. The BOP is connected to the rig by flanged pipes known as the riser. In a well control event, the BOP's function is to shut off the flow from the reservoir and ensure that hydrocarbons do not get to the rig floor. The BOP was a safety critical piece of DEEPWATER HORIZON vessel equipment – owned and maintained by Transocean. Because the BOP is "the main barrier protecting human life, capital equipment and the environment, it must function without fail."[335]

On the DEEPWATER HORIZON BOP, there were two annular elements (the upper and lower). Below the annular elements are five different BOP elements, called "rams". The bottom ram element was converted to a test ram and had no ability to seal the well from reservoir flow. Two of the lower elements, called Variable Bore Rams (VBRs), are a type of "pipe ram", that is, they close around a pipe and, if successful, will seal the well annulus. While the VBRs would seal the annulus, they will not seal any influx through the interior of the drill pipe.

Between the VBRs and the annulars are two components designed to function as shearing rams. One is the Blind Shear Ram (BSR), a large mechanical valve that is designed to shear a tubular and to simultaneously seal the well. Immediately below the blind shear ram is the Casing Shear Ram (CSR), which is designed to shear any tubular across it. However, the CSR does not have the ability to seal the well.

---

[334] This section is intended to focus primarily on the design and configuration of the BOP. Further discussion of additional maintenance issues, training issues, and operational failures, are discussed *infra*.
[335] TREX-03186.

The DEEPWATER HORIZON BOP was manufactured by Cameron International which designed its component parts.[336]   Transocean and BP participated in the design of the BOP by way of the selection, configuration and sequencing of the rams and other equipment.[337] Transocean and BP were both sophisticated buyers and users of BOPs,[338] and alone determined what BOP operational policy would be.   During BP's extended use of the DEEPWATER HORIZON over the nine years between its construction and the April 20, 2010 accident, BP and Transocean jointly controlled BOP modifications, and decisions whether to upgrade it, or not.[339] Both Transocean and BP acknowledged, and proceeded in the face of, known risks, in this regard.

In October of 2004, for example, BP and Transocean executed a Letter Agreement amending the Drilling Contract with respect to the conversion of a Lower Ram to a Test Ram. BP formally acknowledged that the conversion "will reduce the built-in redundancy of the BOP, thereby increasing the Contractor's risk profile," and agreed to compensate Transocean for any out-of-service time should the MMS or other failures require replacement of the Variable Bore Rams or other repairs.[340]   Similarly, in April of 2010, BP and Transocean were discussing whether to change out the annulars prior to commencing operations on the Nile.   BP indicated

---

[336] Based on its argument that the alleged defects in the BOP resulted from choices made by Transocean and BP, Cameron was dismissed. (*See* Rec. Doc. 8969, 9024 9136.)

[337] *See generally,* PHASE ONE STIPULATION NO. 92; BP-Transocean Contract (TREX-4271) at pdf pp.79-80; Ambrose Testimony, pp.6002-6003, 6255-6260; Shanks Report (TREX-40008) pp.9-17; Perkin Report (TREX-7535) pp.11-12; TREX-6120; TREX-1870; Turlak Deposition, p.281; TREX-4620 pp.2-3; TREX-04271 p.79.

[338] Childs Testimony, p.5260:5-16.

[339] *See generally,* Shanks Report (TREX-40008) pp.12-17; Perkin Report (TREX-7535) pp.11-12; BP-Transocean Contract (TREX-4271) at pdf pp.79-80; TREX-6120; TREX-1870 (Transocean approval of BP request to convert Lower Annular to Stripping Annular).

[340] TREX-6120.

that it would "accept responsibility if both annulars were to fail and the stack had to be pulled."[341]

In reaching its conclusions, the Court has considered, in addition to other evidence, the expert testimony of Rory Davis, Gregg Perkin, Earl Shanks, Glen Stevick, Greg Childs and Arthur Zatarain.

The Court finds that BP and Transocean are jointly responsible for the BOP's failure to function as it should have on April 20, 2010 and thereafter. Had the BOP been properly designed and configured for this well and properly operated in response to the kick, the BOP would have successfully prevented the blowout. Even with activation after the explosions, had the BOP been properly configured and maintained, it would have saved the rig and prevented almost all of the pollution. The times and circumstances surrounding the BOP's use during the kick and eventual blowout shows that operational errors and defects in BOP configuration and equipment prevented it from sealing the well.

After the kick entered the riser, Transocean personnel made two attempts to activate the BOP and, shortly after the explosion, the BOP's automatic AMF ("Deadman") feature should have activated the BOP and sealed the well. On all three occasions, the BOP was prevented from working because of operational errors, equipment or configuration defects, or both.

The first effort to close the BOP was at 9:41 p.m., the time when the mud reached the rig floor, three minutes after the hydrocarbons had passed the BOP, and around eight minutes before the first explosion.[342] A Transocean drill team member attempted to close only the BOP's upper

---

[341] TREX-7037 at pdf p.2. *See also, e.g.,* TREX-3338 (Jan. 2010 E-Mail string, in which BP and Transocean agree to defer a connector change-out until after Macondo).
[342] TREX-00001 (Bly Report), p. 28.

annular, causing drill pipe pressure to rise in response to its closure.[343]  Since the upper annular is primarily an elastomeric element, erosion of the drill pipe in the area of the upper annular occurred quickly,[344] creating a flow path where hydrocarbons could bypass the VBRs and reach the rig floor.[345]

In closing the upper annular at 9:41 p.m., the Transocean drill team was following BP and Transocean policy to "close the annular and wait."[346] Even in the wake of six previous riser unloading events, Transocean's "close the annular and wait" BOP policy had not changed or even been reevaluated.[347]  BP's BOP Expert Earl Shanks conceded that the policy of "close the annular and wait" was inadequate in a blowout situation where mud was overflowing onto the rig floor and shooting through the crown.

> Q.   That's what I understand you to say? You would want to use a more the robust components you have to shut in a well where the mud is hitting the derrick [and] ground; do I understand you correctly?
>
> A.   Me, personally?
>
> Q.   Yep.
>
> A.   I would use everything I had.[348]

Even with some hydrocarbons in the riser at this point (9:41), if the VBRs had been closed instead of only the upper annular, and the gas sent to the overboard diverter instead of the Mud-Gas Separator, the well would have likely sealed and the disaster completely averted.[349]

---

[343] TREX-00001 (Bly Report) p.28; D-2106; Shanks Testimony, p.9141:8-10; TREX-07006.143; TREX-07005.079; Breazeale Deposition, pp.131:18-132:20.

[344] Shanks Testimony, pp.9141:20-9142:10; Stevick Testimony, pp.6929:24-6930:4

[345] Stevick Testimony, pp.6914:2-6915:6.   As the upper annular closed, flow velocity "orders of magnitude" greater than that needed to erode steel developed (Bly Report, TREX 00001, p.148); once the drill pipe at the upper annular had a "hole", then, even if the VBRs sealed the annulus, flow could reach the rig floor by going through the drill pipe, enter the riser through the "hole" in the drill pipe at the upper annular, and rise through the riser to the rig.  To complicate matters further, the upper annular closed on a portion of a tool joint. See Stevick Testimony, pp.6928:21 -6929:4; Shanks Testimony, pp.9020:10 – 9021:24; D-4328.

[346] Stevick Testimony, p.6914:2-6; Breazeale Deposition, pp.131:18-132:20; TREX-01454.081-082; TREX-7006.143; TREX-7005.079.

[347] Newman Testimony, pp.4620:20-4621:25; TREX-36070.

[348] Shanks Testimony, p.9147:1-23.

The second effort to seal the well with the BOP came at about 9:46 p.m., around three minutes before the explosion, when a Transocean drill crew member closed the BOP's VBRs.[350] However, because of erosion of the drill pipe, the VBRs failed to seal.[351]  Although the VBR's may have created a temporary seal, that seal was lost when the drill pipe at the upper annular eroded creating a flow path which bypassed the VBRs. Instead of using the VBRs alone, all systems, including the BSRs should have been used at this time, or, to use the words of Earl Shanks, "use everything [they] had."[352]

If the BOP components had been properly used and sequenced (*i.e.* the Casing Shear Ram (CSR) followed by the Blind Shear Ram (BSR)), the BOP would have sealed the well.[353] Using the CSR first would have centered and then severed the drill pipe.  With the drill pipe severed, the BSR would have been protected from any explosive decompression effect.[354] Further, the CSR would have protected the BSR elastomers from the erosive flow of the hydrocarbons until the BSR had time to cut the pipe and seal the well.[355]

There were several ways that the CSR/BSR activation could have been accomplished, the most direct being for the driller or member of the bridge crew to have manually hit the "EDS-2" buttons on the BOP control panel.[356] As is addressed elsewhere in these findings, the Court finds that the Master or other authorized member of the bridge crew should have activated EDS 2 (at

---

[349]  Stevick Testimony, p.6914:2-12;  Ezell Testimony, pp.1785:25-1786:3, 1786:24-1787:24; TREX-01454.81; Bourgoyne Testimony, p.7580:3-12; TREX-08173.67.

[350] TREX-00001 (Bly Report) p.28.

[351] Stevick Testimony, p.6914:2-12.  The VBRs probably created a temporary seal, since the drill pipe pressure went up at that time.  *See* D-2106; TREX-00001 (Bly Report) p.148.  Given the heavy erosion on the drill pipe at the upper annular, however, the VBR seal of the annulus did not seal the well permanently.

[352] Shanks Testimony, p.9147:1-23.

[353] Perkin Testimony, pp.3333:24-3335:7; Stevick Testimony, pp.6911:22-6913:4; Shanks Testimony, p.9139:8-16; TREX-01454 pp.81-82;  TREX-05094.

[354] Davis Testimony, pp.2808:22 – 2809:8;  Perkin Testimony, pp.3333:24-3335:7.

[355] TREX-04423; TREX-04114; TREX-05094; Perkin Testimony, pp.3333:24-3335:7.

[356] Perkin Testimony, pp.3449:9 – 3451:2; 3338:5-18.  "EDS" stands for "Emergency Disconnect System" – with "EDS-2", the BOP was programmed to close the Casing Shear Ram (CSR) first, then the Blind Shear Ram (BSR). *See, e.g.,* TREX-05173.

the latest) between 9:41 and 9:49 which, the Court finds, would have sealed the well and averted the disaster.[357]   While there would have been hydrocarbons in the riser at this point, proper use of the overboard diverter (as opposed to the Mud-Gas Separator) would have diverted those hydrocarbons away from the rig.[358]

The third opportunity for the BOP to have successfully sealed the well was at or shortly after the 9:49 p.m. explosion which destroyed both sets of MUX cables.[359]  The MUX cables connected the rig's BOP controls to the subsea BOP; once destroyed, the crew lost all ability to manually activate the BOP.[360]   The explosions and consequent loss of electronic and hydraulic power to the BOP should have activated the BOP's backup emergency feature, the AMF ("Deadman").[361]  However, as explained above, the 27-volt battery in the Blue Pod was dead and the solenoids in the Yellow Pod had been mis-wired;  the AMF ("Deadman"), therefore, could not and did not transmit the emergency signal to activate the BOP and seal the well.[362]   Had the AMF fired at this time, configured with CSR/BSR, the well would have been sealed.[363]

The final opportunity to seal the well before the rig sank came on April 22, 2010 at 7:35 a.m. when an ROV attempted to use the BOP's Autoshear emergency function by cutting the

---

[357] Mitchell Report (TREX-40011) p.19;  Mitchell Testimony, p.9418:21-23.

[358] TREX-8173 p.67; Bourgoyne Testimony, p.7580:3-12; Ezell Testimony, pp.1785:25 – 1786:3; 1786:24 – 1787:24.  Automatic or manual activation of the Emergency Shut Down (ESD) and Fire & Gas Systems (coupled with the adequate maintenance of the Rig Savers and Dampers) would have further protected the vessel and its crew from the explosions and fire, as set forth more fully herein.

[359] Perkin Report (TREX-7535) p.13; Trial Testimony G. Childs, p. 5097:16-22; Trial Testimony R. Davis, pp. 2686:25 – 2687:5.

[360] As is discussed elsewhere in these findings, members of the Bridge Crew attempted to manually activate the BOP's Emergency Disconnect Sequence (EDS) after the explosions. By that time, however, the MUX cables had been destroyed preventing the EDS from activating the BOP. Pleasant Deposition, p.332:17-25; Trial Testimony R. Davis, pp.2686:25 – 2687:5; Perkin Testimony, pp. 3348:5-16, 3348:5-16.

[361] Davis Report (TREX-7660), p.3.

[362] Davis Testimony, pp.2650:11-19; 2871:5-8; Stevick Testimony, pp.6991-6992; TREX-03619.03; TREX-01164.061-65; TREX-3605.

[363] Some experts opined that even if it was solely the BSR that fired at approximately 21:50, the well would have sealed.  Shanks Testimony, pp.9026, 9094; Stevick Testimony, p.6991:18-21; Davis Testimony, pp.2873, 2880-2881, 2652. Trial Testimony of Rory Davis, p. 2652:4-12; Trial Testimony of Earl Shanks, p. 9026:16-19.

Autoshear pin which triggered the BOP's Blind Shear Ram (BSR) to close.[364]  This fired the BSR, (and only the BSR), but did not seal the well, due to a combination of factors: the BSR was unable to shear off-center pipe;[365] and the dynamic flow had eroded the BSR's elastomeric components.[366] Therefore, in addition to the maintenance and operational issues, the BOP's design and configuration was defective in the following ways, which played a significant contributing role in the failure of the BOP to seal the Macondo well:

A. All emergency BOP functions (including AMF, Autoshear and EDS-1) were dependent on the success of a single component, the Blind Shear Rams, for shearing the pipe and sealing the well.

B. Relying on the BSR, and only the BSR, for emergencies, left the BOP vulnerable to multiple failure modes, including:

   1. Off-Center Pipe

      a. All BOP experts agreed that the drill pipe was off-center when the BSRs fired;

      b. All BOP experts agreed that off-center pipe was, at least, a contributing factor to the BSR failure;

      c. All BOP experts agreed that off-center pipe was a well-known, foreseeable circumstance before April 20, 2010;

      d. Yet, nothing was done to plan for off-center pipe, or to configure the BOP to handle off-center pipe, or to prevent off-center pipe from being across the BOP;  such as:

         i. Utilizing a Casing Shear Ram / Blind Shear Ram sequence;

         ii. Adding a second Blind Shear Ram (BSR);[367] or

         iii. Using Double-V (DVS) rams which had better centering (and shearing) capability.

---

[364] TREX-01164, p.151; TREX-03975; TREX-00001 (Bly Report), p.29.
[365] *See, e.g.* Shanks Testimony, p.9115:6-22.
[366] TREX-01164, pp.91-94; McWhorter Deposition, p.308:2-11.
[367] TREX-02390. BP in its criminal plea, agreed to have at least two blind shear rams (BSRs) on any Gulf of Mexico well going forward. TREX-52673 pp.32-33.

2. Erosion

    a. The physical evidence overwhelmingly showed erosion of the BSR elastomers;[368]

    b. The weight of the evidence showed that erosion in flowing conditions was a known, foreseeable circumstance;[369]

    c. No one disputed that closing a lower element (a CSR or a second BSR) would have helped protect a higher sealing element;[370] and

    d. Yet, neither BP nor Transocean implemented this solution, or even discussed it, trained for it, or instructed their employees about it.[371]

C. The supposedly "redundant" Blue and Yellow MUX cables, (the only way the crew could directly control BOP function), were run through a single point, the Moon pool, where a single explosion could (and did) destroy both cables and thus the ability of the crew to control the BOP.

These weaknesses in the design, configuration and sequencing of the BOP components was demonstrated by the following evidence:

*Failure to Assess Suitability of BOP for Macondo Well*

As the owner of the vessel, Transocean was (along with BP) required to assess the suitability of its BOP for the Macondo well and, if it concluded that the BOP was unfit, was obligated to either change the BOP or not drill the well.[372] Transocean's Well Control Handbook highlighted the known importance of the BOP's ability to handle the maximum anticipated pressure and temperature conditions for any well where it was to be used.[373] The

---

[368] TREX-01164 pp.91-94; TREX-01165.

[369] TREX-04423; McWhorter Deposition, p.308:2-11.

[370] McWhorter Deposition, pp.225-226.

[371] *See, e.g.,* TREX-02097; Campbell Deposition, pp.16-17 (BOP training for BP employees was sketchy); . Winslow Deposition, pp.556-557;  Stringfellow Deposition, pp.441-442 (Transocean never tested the Blind Shear Ram to see whether it could shear and seal under dynamic flow conditions).

[372] Childs Testimony, pp.5251:1-25; Turlak Deposition, pp.286-287.

[373] TREX-1454, p.11; Childs Testimony, p.5251:1-25; TREX-674, p.11; Stringfellow Deposition, pp.426-427.  Transocean's WCM specifically required Transocean to evaluate the BOP and well based on "worst possible case", even if the customer (BP) used a more lenient standard.  TREX-1454; TREX-26011.

MMS also placed responsibility on BP to assess and submit information regarding MASP and the BOP's shearing capacity.[374]

Transocean's BOP Expert conceded that he was unable to find any evidence that Transocean had performed an evaluation of the Blind Shear Ram (BSR) shearing capacity at the time of his report.[375]

BP and Transocean knew that the BSR was limited in the hydraulic pressure that could be supplied to the ram blocks (*i.e.,* shearing force).[376]  If Maximum Anticipated Surface Pressure (MASP) were calculated at the "worst case scenario", then the BOP would not have had enough hydraulic force available to successfully shear and seal even the smaller 5½" drill pipe that was across the BOP at the time of the emergency.[377]  But even at pressures less than "worst case" MASP, the BOP did not have the hydraulic power necessary to shear and seal the 6⅝" drill pipe that was used for the majority of the drilling operation at Macondo, (and had been used for drilling operations by the DWH from about 2005 forward).[378]  All BOP shearing experts conceded that the BOP BSR was not capable of shearing and sealing 6⅝", including Transocean's own expert.[379]

---

[374] *See generally,* Douglas Deposition, pp.38-39, 52, 64, 69, 285-286; Powell Deposition, pp.195-196.
[375] Childs Testimony, p.5252:1-17.  (At trial, Childs claimed that he had later been shown a document which indicated that such an assessment had been done. Childs Testimony, p.5252:1-17.)
[376] TREX-21789; TREX-4100
[377] Perkin Appendices (TREX-7536) p.78.
[378] *See, e.g.,* Childs Testimony, pp.5255–5256; Davis Report (TREX-7660), pp.11-16.  *See also, e.g.,* Stevick Testimony, p.6903 (and TREX-7046 p.3) (BP was asking the question, in 2005, whether the BOP could shear a 6⅝" drill string, and no one knew the answer).  The 4000 psi limit of the BOP accumulators was insufficient to shear pipe at pressures at Macondo, which ranged up to 8000k-8500 psi.  *See, e.g.,* TREX-1895; Abbassian Deposition, pp.99-102; TREX-00001 (Bly Report), pp.156-158; TREX-01194 p.1 ("…can't cut it with the SBR shear rams, but can cut – with the casing shears….  Although 50.4 S135, 6 5/8" pipe is not listed, 40.91 is, and this is already out of the pressure range for the SBR's.  Note, the Horizon has 4,000 psi available to both the casing shears and SBR's if required").
[379] Childs Testimony, pp.5255-5256.

The blind shear ram is the only BOP component that could both cut and seal the well, and the only device that the BOP utilized for all BOP emergency functions (EDS-1, the AMF "Deadman", and Autoshear). Thus, it represents a single point of failure.[380]

Nevertheless, BP and Transocean intentionally calculated MASP at 50% gas, and 50% mud, (rather than a "worst case scenario" of 100% gas column to surface);  knew that the pressure ratings were based on static, rather than dynamic flow conditions;  and knew that the Blind Shear Ram would have difficulty shearing off-center pipe.  BP and Transcoean willfully and recklessly disregarded the known risks of failure under actual conditions, and the Blind Shear Ram was predictably useless and ineffectual during the emergency.[381]

### Inability of BSR to Shear and Seal Off-Center Pipe

All four BOP Experts who testified (Davis, Perkin, Shanks and Childs) agreed that the Blind Shear Ram failed to shear and seal the drill pipe because the pipe was off-center.[382] Members of the oil and gas industry, including BP and Transocean, knew for many years that drill pipe can be off-center in the hole,[383] and that drilling crews frequently confront situations where the blind shear rams will encounter off-center pipe.[384]  In addition, the industry knew that a single BSR did not extend across the entire wellbore, and therefore could not completely cut off center pipe.[385]

Both BP and Transocean were aware of alternative rams available at the time the DEEPWATER HORIZON was constructed that had better centering capacity (*i.e.* Double-V or

---

[380] Childs Testimony, 5252-5255.; D-3096.
[381] Davis Report (TREX-7660), pp.11-15; Davis Testimony, pp.2662-2664.
[382] Childs Rebuttal Report (TREX-7688), p.8 (chart showing opinions of experts on BOP issues); Childs Testimony, pp.5257:23 – 5258:15;  TREX-07536 p.38;  Shanks Testimony, 9115:6-22.
[383]  Trial Testimony G. Childs, p. 5259:1-11.
[384]  Stevick Report (TREX-61123), p.21; Davis Report (TREX-07660), p.13.
[385]  Trial Testimony G. Childs, p.5261:5-9.

"DVS" Rams).[386]   In addition, the Double-V (DVS) rams would have provided 20% cutting efficiency and could cut larger diameter pipe.[387]   Even though the DVS rams were quoted to BP and Transocean as a part of the original package, BP and Transocean chose the less safe alternative.[388] Transocean and BP rejected DVS rams and chose a single BSR although the better cutting blades were available, cheap and easily installable.[389]

### Single Point of Failure – Blind Shear Ram

BP and Transocean designed and configured the BOP such that *all* of the BOP's emergency functions (AMF, Autoshear and EDS) required the successful use of the BOP's Blind Shear Ram (BSR).[390] This represented a "single point of failure" such that if, for whatever reason, the BSR failed to function, then *all* of the BOP's emergency functions were rendered helpless.[391]   BP and Transocean's corporate predecessors (Vastar and R&B Falcon) knew by at least 2000 that the BSR in this design represented a single point of failure, yet chose not to eliminate this dangerous design flaw. An April 2000 Risk Assessment of the DEEPWATER HORIZON BOP stated:   "The major contributor to the failure likelihood associated with the BOP control system results from the selected stack configuration.   With only one shear ram capable of sealing the well in, it is extremely difficult to remove all of the single failure points from the control system."[392]

When the DEEPWATER HORIZON BOP was originally configured, there were alternative designs, including the use of two Blind Sheer Rams, that would have eliminated this

---

[386]  Trial Testimony G. Childs, pp. 5262:24-5263:10; 5263:16-5264:13.
[387]  Trial Testimony G. Childs, pp. 5264:14-5265:2.
[388]  Trial Testimony G. Childs, p. 5265:3–19.
[389]  TREX-7001; McWhorter Deposition, pp.110-111.
[390]  Perkin Testimony, p.3332:6-9; Childs Testimony, pp.5254:17-5255:7; Ambrose Testimony, p.6258:22-25; D-3096; Perkin Report (TREX-07535), p.20; Stevick Report (TREX-61123), pp.15-16. *See also*,   Abbassian Deposition, pp.635-637; TREX-4120 at pdf pp.41-42;  Erwin Deposition, p.64.
[391]  Childs Testimony, pp.5254:17-5255:7; Perkin Testimony, p.3332:6-9; D-3096.
[392]  TREX-04120, p.39; TREX-4275, p.42; *see also* Stevick Report (TREX-61123), p.15; Childs Testimony, pp.5266:4 – 5268:11; Webster Testimony, pp.3768-3769.

design flaw.[393]   Even as double Blind Sheer Rams were becoming more prevalent by 2009 and 2010,[394] Transocean chose not to upgrade.

Transocean's own BOP Expert testified that a second Blind Shear Ram would have probably helped the BOP work, to avoid the Macondo disaster.[395]   Tellingly, a condition of BP's guilty plea requires that BP "use and require its contractors to use subsea BOPs equipped with no fewer than two blind shear rams and a casing shear ram on all drilling rigs under contract to [BP] for deep water drilling operations in dynamic positioning mode."[396]

### Single Point of Failure  - MUX Cables

Transocean and BP knew of the potential danger of running the MUX cables through a single hazardous area but willfully chose not to take steps to correct it.[397]   As discussed *supra,* the Court finds that Transocean could have and should have upgraded the BOP with an acoustic trigger.   Transocean could have also run the cable through a location less hazardous than the Moon Pool area.[398]

### Dynamic Flow Conditions – BSR Alone (EDS-1) vs. CSR Followed by BSR (EDS-2)

Transocean knew that a BOP's shearing capacity rating was based on static conditions, and of the potential for BOP failure under dynamic flow conditions, (*i.e.,* when hydrocarbons are

---

[393]  TREX-07001.06; Trial Testimony R. Davis, pp. 2662:15-2664:2.
[394]  Erwin Deposition, pp.401, 403.
[395]  Trial Testimony of Greg Childs, pp. 5273:5 – 5274:23.
[396]  TREX-52673 (BP Guilty Plea) at pdf p.32.
[397]   *See, e.g.,* TREX-3134 (January 2002 DEEPWATER HORIZON Design Risk Assessment) at p.40 (advised Transocean to "ensure that the EH-MUX BOP control has at least one alternative operation panel that can be operated independently from the one located at the driller's workstation" and to "ensure that it is possible to operate the acoustic control system from a portable unit which can be handled by one person in the event of evacuation from the vessel"); Webster Testimony, pp.3774-3775; TREX-5094 pdf p.5 (2000 Vastar BOP Stack Design) (recognizing that a fire or explosion in Moon Pool could destroy the MUX Cables); TREX-7581 p.3 (2003 Global Santa Fe Report warning that an explosion in the Moon Pool could destroy the cables); Perkin Report (TREX-7535), pp.7, 8, 13, 18, 19; Stevick Report (TREX-61123) p.10; TREX-00001 (Bly Report) p.151 ("the MUX cables were not protected against explosions or fire").
[398]   *See* Webster Testimony, p.4180 (running the MUX Cables through the Moon Pool area rendered the DEEPWATER HORIZON unseaworthy).

flowing through the BOP at the time it is activated).[399]   Transocean and BP nevertheless chose an emergency disconnect sequence (EDS-1, rather than EDS-2),[400] which significantly diminished the chances that the BOP could seal the well during such conditions.

The EDS is an emergency feature of the BOP which, when activated, disconnects the rig from the BOP and riser and allows it to float away from the site and the danger from the flowing well. There are two ways in which the EDS feature disconnects the rig from the BOP: fist using only the BSR to shear the drill pipe and seal the well (usually referred to as "EDS-1") and, second, by using the casing shear ram followed by the BSR (usually called "EDS-2").

EDS can be activated in two ways. First, it can be activated manually through the BOP panels on the rig. If the operator wanted the BSR only (EDS-1), he would press a button called "normal". If he wanted to activate the casing shear ram followed by the BSR (EDS-2) he would press a button marked "casing".[401]   The decision whether to use EDS-1 or EDS-2 is made under that scenario at the time by the person activating it.[402]

Additionally, the EDS is activated automatically when one of the other emergency features, AMF ("Deadman") or Autoshear function is activated.[403]   Unlike manual activation of EDS, the decision regarding whether EDS-1 or EDS-2 is chosen is made "very early on"[404] and is a decision "programed and decided at the design of the BOP stack" by someone onshore and by someone "up the chain of command."[405]

In the case of the BOP on the DEEPWATER HORIZON, the automatic EDS function had been programmed to trigger EDS-1 (BSR only) rather than EDS-2 (CSR followed by BSR).

---

[399]  Winslow Deposition, pp.588-591; TREX-4423.
[400]  Perkin Report (TREX-7535) p.12; *see also,* Childs Testimony, pp.5277:16 - 5278:1.
[401]  Trial Testimony G. Childs, p. 5274:24 – 5275:9.
[402]  Trial  Testimony G. Childs, p. 5275:10-14.
[403]  Trial Testimony G. Childs, p. 5277:2-22
[404]  Trial Testimony G. Childs, p. 5278:5-9
[405]  Trial Testimony G. Childs, pp. 5277:16 – 5278:4.

The Court finds persuasive the opinions of Experts Gregg Perking and Glen Stevick who testified that, given the foreseeability of the BOP being called upon to seal the well as hydrocarbons were blowing through it, Transocean and BOP were negligent in choosing EDS-1 rather than EDS-2 for use in its emergency features.[406]   Had AMF and Autoshear been programmed to use EDS-2 rather than EDS-1, the CSR would have protected the BSR from the flow of the well and allowed it to seal.[407]   Had EDS-2 been used, it would have given the BOP a better chance of closing and sealing the well.[408]

*Transocean and BP Failed to Upgrade BOP - Summary*

Over the course of its life, alternative designs became available which could have made the BOP safer but, in each instance, Transocean and BP chose not to improve the BOP's safety. These included, potentially: **(i)** replace the Blind Shear Ram with Double-V or DVS Rams (for better centering, better shearing); **(ii)** adding a second Blind Shear Ram; **(iii)** Casing Shear Ram then Blind Shear Ram (EDS-2) sequencing; **(iv)** upgrading to 5,000 psi ram bonnets; **(v)** adding an acoustic trigger; and **(vi)** utilizing a rechargeable battery system with real-time monitoring.[409] Transocean and BP chose not to add any of these features.

---

[406] *See* Stevick Report (TREX-61123) p.31 ("BP and Transocean failed to implement BAST by using EDS-1 instead of EDS-2"); Stevick Testimony, p.6991:18-21 (if the crew had activated EDS-2 prior to the first explosion, the BOP would have successfully sealed the well in). *See also,* Shanks Testimony, pp.9133, 9136 (conceding that the use of EDS-2 is "industry practice" for rigs with BOPs that have casing shears). *See also, e.g.,* Perkin Testimony, pp.3332-3335; Stevick Testimony, pp.6911-6913; Stevick Rebuttal Report (TREX-61124), pp.7, 29, 31; Childs Report (TREX-7687), pp.23, 28.

[407] Davis Testimony, pp.2808-2809; Perkin Testimony, pp.3333-3334; Childs Testimony, pp.5278-5279.

[408] Childs Testimony, pp.5278:21-5279:16.

[409] *See generally,* D-3267; Childs Testimony, pp.5288-5291; Stevick Report (TREX-61123) pp.24-26.  *See also, e.g.,* TREX-21789 (in 2009, it was recommended that Transocean upgrade from a 4,000 psi system to a 5,000 psi system); TREX-2390; TREX-52673 (BP Guilty Plea) pdf pp.32-33 (BP, in its criminal plea, agrees to have at least two blind shear rams (BSRs) on any Gulf of Mexico well going forward).

*Failure to Upgrade with Emergency Batteries That Could Be Monitored or Recharged Subsea*

As early as 2005, Transocean was concerned about the inability to monitor or recharge batteries subsea and requested help from Cameron.[410]   But in January of 2009, when Cameron offered to sell to Transocean a new battery system for use on the DEEPWATER HORIZON (*i.e.* the "Mark III") which could monitor the health of the batteries and solenoids subsea and, recharge the batteries without bringing the BOP to the surface, Transocean refused to buy it.[411] Notably, by contrast, BP upgraded the BOP on its own THUNDERHORSE rig with the Mark III system.[412]

*Transocean and BP Made Changes to the BOP Which Made It Less Safe* [413]

BP and Transocean made changes to the BOP that made the defective design even worse. In 2004, the bottom Variable Bore Ram was converted to a Test Ram.[414]   This was done to save BP time and money,[415] while making the BOP less safe by eliminating redundancy and lowering the safety profile.[416]   Also, during this conversion, the stab port for ROV activation was not re-routed, which was a serious mistake.[417]

In 2006, BP and Transocean converted the Lower Annular to a Stripping Annular.[418] This decreased the annular's capacity to exert pressure from 10,000 psi to 5,000 psi.[419]

---

[410] Childs Testimony, p.5288:8-15
[411] TREX-4277, pdf p.4; Childs Testimony, pp.5284-5287.  *See also, generally,* Zatarain Report (TREX-40009) p.49.
[412] Coronado Deposition, p.567.
[413] *See generally,* D-3266.  (*See also,* Childs Testimony, pp.5300-5301.)
[414] TREX-6120; Childs Testimony, p.5292:1 – 5294:15
[415] Childs Testimony, p.5292:5 – 5293:2
[416] Indeed, BP specifically acknowledged the lowering of the safety profile in its Letter Agreement for the Conversion. *See* TREX-6120; Childs Testimony, pp.5293:6 – 5294:15. *See also, e.g.,* Thierens Deposition, pp.29-30 (was surprised to learn of the corrosion found post-blowout).
[417] Childs Testimony, pp.5294:20 – 5295:17.  The fact that the test ram conversion and the ROV hot stab "misplumbing" was not discussed until 2010 also conclusively demonstrates the inadequacy of the BOP testing and training regimes. *See, e.g.,* Thierens Deposition, pp.28-30.
[418] Childs Testimony, pp.5295:18 – 5297:4; D-3266.
[419] Childs Testimony, pp.5296:4 – 5297:4.

These changes, which lowered the BOP safety profile, along with no changes that improved the BOP safety profile, reinforce the conclusion that material risks were ignored.

*Conclusion: BP and Transocean Were Willful and Reckless with Respect to the Design of the BOP*

The BOP is a safety critical piece of equipment that must be able function in the environment in which it is expected to be used. Because it is the "last line of defense"[420] against a blowout that can cause death, injuries and major environmental pollution, it "must function without fail."[421] But it did fail and that failure is a direct and proximate result of Transocean and BP's original choices regarding the BOP's components, their configuration and their sequencing. Furthermore, during the life of the BOP, BP and Transocean negligently refused to upgrade the BOP to make it safer, while making changes to the BOP that, while saving BP time and money, made it less safe.  In 2007, for example, Wild Well did a risk assessment suggesting that the BOP be upgraded.[422]  But Transocean and BP disregarded these risks, and continued to use the BOP in a substandard condition.   Mr. Stevick, in this regard, discussed the concept of a Reliability Safety Factor, which can be applied to a variety of systems and machinery, such as autos and airplanes.   According to Mr. Stevick, the "absolute minimum" Reliability Safety Factor is a 1.3.  Indeed, the piping on the DEEPWATER HORIZON is rated with a Reliability Safety Factor of 3 to 4.   Yet, the DEEPWATER HORIZON'S BOP had a Reliability Safety Factor of less than 1.0.[423]   The Court finds that (in addition to the maintenance, training and operational issues discussed *infra*), BP and Transocean exhibited a willful and reckless disregard with respect to the selection, configuration, modification and refusal to upgrade the BOP.

---

[420] Perkin Testimony, pp.3299-3303.
[421] TREX-3186.
[422] Stevick Testimony, p.6905.
[423] Stevick Testimony, pp.7047-7048; D-8204.

# FINDINGS AND CONCLUSIONS
## REGARDING TRANSOCEAN'S WILLFUL AND RECKLESS DISREGARD

*Transocean Willfully and Wantonly Inhibited and Bypassed Automated Safety System Sensors, Responses and Alarms*

The Integrated Alarm and Control System (IACS) aboard the DEEPWATER HORIZON was designed to control a number of critical safety functions automatically upon detection of combustible gas: **(i)** the sounding of a General Alarm; **(ii)** the activation of an Emergency Shutdown (ESD) system; and **(iii)** the activation of Fire and Gas (F&G) safety systems.[424]

When activated, the ESD would stop gas from entering the engines (the major potential source of gas ignition) by: **(i)** closing dampers, and **(ii)** shutting down over-speeding engines by activating what the crew called "Rig Savers" – as well as sounding audible alarms.[425]

Marine Safety Expert Geoff Webster testified that the Master of the DEEPWATER HORIZON was required by ISM to know the condition of the alarms and to ensure that they are in working order.[426]

Transocean, however, intentionally inhibited the IACS, so as to require human intervention.[427]   In addition, many sensors, which served as the initiation point for signaling an influx of gas, were placed into the passive mode and thereby removed from service.[428]

---

[424]   Simonsen Deposition (KMI 30(b)(6)), pp.34, 55-56.
[425]   TREX-3808 pdf pp.165-173 (Transocean Investigation Report, Vol. I, p.178-186); Keplinger Deposition, pp.55-58.
[426]   Webster Testimony, pp.3879-3880.
[427]   *See, e.g.,* Webster Report (TREX-22700), p.4 ("Transocean overrode the several automatic mode functions [of the IACS], thereby requiring human intervention to activate the shutdown system. Transocean also placed [the] gas detectors in the inhibited mode to prevent sounding alarms. By doing so, Transocean defeated the purpose of the IACS and created an unreasonably dangerous work place on its vessel..."); *see also,* Webster Report, p.11; Keplinger Deposition, pp.54, 58-59, 67-69; TREX-1109 p.12; TREX-3749 p.23; Williams Deposition, pp.132, 149-152, 191-192.
[428]   TREX-04140.

The inhibition of the IACS system was Transocean's company policy.[429] While several purported justifications were given, Mr. Williams testified that it was done primarily to avoid waking people up at night.[430]

Whatever the reason, it is clear that the risks presented to the vessel and the crew were well known.   BP's September 2009 audit of the DEEPWATER HORIZON, for example, admonished that "Control of alarms and defaults and by-passes [were] not well managed, in fact no single person could account for [what] alarms etc. were overridden or indeed for what [purpose]."[431]

The inhibiting or disabling of the automatic operation of the IACS was also a violation of the ISM Code.[432]

BP's Bly Investigation observed that the fire and gas detection system, which was specifically designed to detect and respond to flammable gas or fire aboard the vessel, did not prevent the explosions and fire aboard the DEEPWATER HORIZON.[433]

The Court finds that Transocean's policy of inhibiting the automatic features of the IACS while disarming or bypassing the gas and fire sensors was willful and wanton, consciously placing the rig at "tremendous disadvantage" and putting the crew in "tremendous danger."[434]

*Transocean Willfully and Wantonly Refused to Fix Its Longstanding Failed Maintenance System*

Plaintiffs' Expert Geoff Webster was qualified in the fields of marine engineering, naval architecture, vessel condition and maintenance, marine safety, and marine regulatory

---

[429]  *See, e.g.,* McMahan Deposition, p.113; TREX-3808 pdf p.171 (Transocean Investigation Report, Vol. I, p.184).
[430]  Williams Deposition, p.138:11-20.
[431]  TREX-3405 (BP Sept. 2009 Rig Audit) at pdf p.13; *see also,* Williams Testimony, p.159:5-23.
[432]  Webster Testimony, p.3765:13-23.
[433]  Bly Testimony, pp.987-989; TREX-00001 (Bly Report), p.11.
[434]  Webster Testimony, p.3878:22-24.

compliance; his report was admitted as TREX-22700.[435]   Consistent with the testimony and other admissions by Transocean's Operations & Production Manager Daun Winslow, Transocean Chief Engineer and Maintenance Supervisor on the DEEPWATER HORIZON Steve Bertone, Chief Electrician on the DEEPWATER HORIZON Michael Williams, and Chief Mechanic on the DEEPWATER HORIZON Douglas Brown, as well as multiple audits of Transocean's maintenance system generally and with respect to the DEEPWATER HOZION in particular, Webster testified in detail regarding Transocean's long and uninterrupted practice of substandard maintenance,[436] which he described as one of "***reckless neglect.***"[437]

Chief Mechanic Doug Brown described the reality of Transocean's "condition based" maintenance as "run it till it breaks."[438]   This is nearly identical to a comment made by a Transocean crewmember in connection with the Lloyd's Register Report of March 2010: "[r]un it, break it fix it. That's how they work and the drilling department should be more accountable."[439]   The predictable result of this broken maintenance system was that, as of April 20, 2010, the DEEPWATER HORIZON was in "gross neglect", in violation of the ISM code, and "grossly unseaworthy".[440]

Transocean's maintenance system had been audited on multiple occasions and found to be deficient.  Yet, Transocean never corrected major deficiencies.[441]   Transocean's May 1, 2009 Asset Reliability Project was candid:  "The current Maintenance processes and systems within Transocean are not best in class and do not properly support customer expectations…. Personnel

---

[435]  Webster Testimony, pp.3735-3736.
[436]  *See generally,* Webster Testimony, pp.3873-3912.
[437]  Webster Testimony, p.3885:5-8 (emphasis added).
[438]  Brown Deposition, p.155.
[439]  TREX-929 p.93; Webster Testimony, p.3932.
[440]  Trial Testimony G. Webster, pp. 4014-4015.
[441]   TREX-05638 p.3; TREX-01351 p.4; TREX-81 at PSC pdf p.2 (ModuSpec 2005 Audit, p.11); TREX-44032 pp.4-7; TREX-3404 at PSC pdf p.7 (BP Rig Audit, May 2007, p.31); TREX-04680 p.9; TREX-01887 pp.2, 12, 19, 24, 32.

at a Division level stated that 'we often have such a focus on saving money in the short term [that] it affects the philosophy of looking after our equipment and following our policies.'"[442]

In August of 2009, the results of a BP audit of Transocean's Health Safety Security & Environment Management Systems was so poor that Transocean was only "conditionally approved (YELLOW) to work for Gulf of Mexico Strategic Performance Unit."[443]

In violation of the ISM Code, the DEEPWATER HORIZON had not been in for dry dock inspection, maintenance and repair during the entire nine years of its working life.[444] This was "reckless and inexcusable."[445]

On October 28, 2009, some six months before the DEEPWATER HORIZON exploded and sank into the Gulf, Steve Bertone, Maintenance Supervisor on the DEEPWATER HORIZON, wrote to his supervisor, Rig Manager Paul Johnson, and advised:

> "The issue that the DEEPWATER HORIZON is currently experiencing in my opinion is a lack of proper maintenance on the equipment for many years, the drive behind this has been from a performance induced stand point..."
>
> "When the rig does receive maintenance time that time is generally taken up by repairing the equipment that was broke."
>
> "Once again limping along with equipment failures…."
>
> "There is just too much equipment in need of repairs or maintenance performed and not enough personnel or time to throw at it…."
>
> "The rig is also fighting the new maintenance system RMS, which has an overloaded amount of work that could not be completed even by doubling the amount of workers on the rig…."
>
> "The engineering department has been going down for some time now due to lack of knowledge, motivation, and supervision."

---

[442] TREX-05638 (Transocean Asset Reliability Project, May 1, 2009), pp.3, 34.

[443] TREX-00954.

[444] Webster Testimony, p.4120; Williams Deposition, pp.103-104; Ezell Testimony, p.1889-1891; R. Sepulvado Testimony, p.1924; *see also,* Webster Report (TREX-22700) pp.8-11. *See also,* ISM Code, Section 10.1 – 10.4 (TREX-938 pdf p.23, TREX-50361 p.3).

[445] Webster Report (TREX-22700), p.10.

"…something is going to have to give." [446]

Not only did multiple audits show that Transocean was not properly maintaining the DEEPWATER HORIZON, but they also showed that Transocean and its personnel were ignoring audit findings and claiming to perform maintenance and repair items when, in fact, they were not. For example, a BP audit in January 2005 criticized the "….practice by maintenance personnel to close out maintenance work orders even though not all tasks are completed."[447] DNV warned Transocean in June 2005 that "it was not possible to verify systematic follow up of, and corrective action arising from, findings from previous Internal Audits."[448] A January 2008 BP audit found: "Although raised during previous audits, there is still a tendency to close out maintenance routines even though not all tasks or sometimes no tasks have been completed."[449]  Yet some twenty-one months later, in September of 2009, a BP audit found that this situation was unchanged:  "Closing out of the last audit recommendations had no apparent verification by BP. Consequently, a number of the recommendations that Transocean had indicated as closed out had either deteriorated again or had not been suitably addressed in the first instance."[450]

It is clear from other audits that this was a company-wide practice at Transocean. In an April 2005 ISM Certification, DNV issued a non-conformity to Transocean because its Safety Management System did not effectively ensure "that non-conformities, accidents and hazardous situations are reported to the Company, investigated, and analyzed," citing several instances where Transocean OIMs simply rejected official findings of prior ISM Code Audits as the basis

---

[446] TREX-5618 (Bertone E-Mail, Oct. 28, 2009).
[447] TREX-44017 pp.5-6
[448] TREX-01777, p. 9
[449] TREX-06166, pdf p.9. Transocean's BOP expert Greg Childs admitted this reflects that "people in the maintenance department are saying they did stuff they didn't do." Childs Testimony, p.5314:8-20.
[450] TREX-3405 pdf p.2; Webster Testimony, pp.3889-3891.

for this determination.[451] DNV later issued Transocean a Major ISM Code Non-Conformity in April 2009, after finding that corrective actions arising from prior ISM Code Audits had been closed out in Transocean's maintenance tracking system even though "the corrective action had not been implemented as reported."[452]

Mike Williams testified that maintenance on the DEEPWATER HORIZON was continuously behind schedule.[453] On April 20, 2010, Williams' to-do list contained 50-70 items, and other Transocean maintenance workers had lists longer than his.[454] The condition of the rig was such that there was simply not enough time to repair all the items that needed repair, and "based on the way the rig was currently operating," maintenance workers "knew that our workload was only going to always increase and never decrease."[455] Every time Williams fixed something, he would find "layers of repairs and band-aids, and it was a – sort of a mystery novel to get to the bottom and find the real underlying issue."[456]

Transocean Operations and Production Manager for North America Daun Winslow agreed that the DEEPWATER HORIZON did not get enough planned maintenance and most maintenance periods were only "band-aid" fixes.[457] When Williams complained to his supervisor about his department's inability to keep up with the maintenance and repair issues, he was told to "deal with it."[458] He testified that the condition of the vessel was so bad that it was driving workers to leave the DEEPWATER HORIZON.[459]

---

[451] TREX-1764, p.6.
[452] TREX-1768, p.5.
[453] Williams Deposition, pp.39:24 – 40:2; 44:3-5.
[454] Williams Deposition, pp.167:5-21. Williams testified that other maintenance engineers aboard the DEEPWATER HORIZON had the same "big problems" that he did. *See* Williams, pp.42:23 – 43:15.
[455] Williams Deposition, p.103:7-17.
[456] Williams Deposition, p.224:3-6.
[457] Winslow Deposition, pp.143-144; *see also,* TREX-1351 p.4. (Winslow testified that none of the BOPs on the rigs he oversaw had been completely overhauled. Winslow Deposition, pp.303-304)
[458] Williams Deposition, p.43:16-24
[459] Williams Deposition, p.103:1-17.

One of the worst equipment problems Williams dealt with was the driller's chair and associated driller's data computer screen which he described as his "trouble child."  The computers would lock up and the screen would either show erroneous data or go blank and lose all data.  This condition became known as the "blue screen of death."[460]

Safety critical Fire & Gas protection equipment was in constant disrepair on the DEEPWATER HORIZON.  In its initial acceptance audit of the rig in September 2001, BP found numerous anomalies in the fire and gas detection system, including several critical alarms that failed to activate and faulty conditions on "practically every fire or gas sensor" that was tested.[461] BP expressed concern about "the reliability of the fire and gas system, including the possibility that the long-term repeatability and robustness of the system may be suspect," noting "there is a distinct possibility that the condition of this crucial system will deteriorate further."[462] The 2005 ModuSpec survey issued a critical safety recommendation to "repair the fire detection system,"[463] and the Supplemental Audit indicated that there was a "major" problem with the Gas Detection System.[464]  A May 2007 BP Audit found a number of problems with the engine room ESDs, including "defective rig savers", "significant number of fire dampers in the engine rooms and other machinery spaces found non-operational", "poor robustness of the damper actuators and dampers".[465] The audit noted that rig integrity generally and fire integrity issues in particular were called into question by the "reliability of fire dampers" and noted the presence of other deficiencies that, when taken together, "may exacerbate an ongoing emergency situation."[466]  On February 22, 2010 the Maintenance Supervisor on the DEEPWATER HORIZON sent an email

---

[460] Williams Deposition, pp.40:7-41:13, 57:8-25; 207:9-211:13, 333:20-25.  *See also,* Ezell Testimony, p.1746.

[461] TREX-06164, p.5

[462] TREX-06164, p.5

[463] TREX-81 at PSC pdf p.2 (ModuSpec 2005 Audit, p.11).

[464] Webster Testimony, pp.3790-3792; TREX-75 at pdf p.2 (ModuSpec Supplemental Report, 2005, p.13).

[465] TREX-3404 at PSC pdf pp.2, 3, 4, 6 (BP Rig Audit, May 2007, pp.4, 5, 20, 23).

[466] TREX-3404 at PSC pdf p.2 (BP Rig Audit, May 2007, p.4).

to the rig's Chief Mate about fire dampers, asking "could you give me a list of dampers that need to be replaced?" The Chief Mate replied, "The short answer is: all of them".[467]

The RMS II Morning Report for April 19, 2010, (the last such report generated before the blowout), showed that outstanding work items as of that date included 222 maintenance tasks overdue and 115 additional jobs (including 76 "high priority" jobs) awaiting parts.[468] Webster testified that this too demonstrated Transocean's "gross neglect" of the DEEPWATER HORIZON.[469] Transocean's Bill Ambrose claimed that many of these were "low priority items" and only ten percent were "critical".[470] However, there is no indication that any of the tasks under the "Jobs Awaiting Parts – Greater Than 150 Days" or "Overdue Jobs" headings were either complete or awaiting paperwork.[471] The Report identifies 120 overdue maintenance jobs as "High Priority", 60 as "Medium Priority" and only 26 as "Low Priority".[472] It also identifies 96 overdue maintenance jobs as "Corrective Maintenance", as opposed to 91 identified as "Planned Maintenance".[473] On average, the tasks listed in the RMS II Morning Report were overdue by over 110 days.[474]

Included in the list of overdue High Priority Corrective Maintenance tasks at the time of the blowout were repairs to the Rig Saver on Engine #6, which was overdue by 166 days,[475] and repairs to governor actuators on the Wartsila Engines, overdue by 78 days.[476] Also included as a High Priority Corrective Maintenance task was replacement of regulators in dampers, which was

---

[467] TREX-05295
[468] TREX-664; Webster, pp.3957-3958. *See also,* D-3098 (Summary: Significant Overdue Maintenance). Webster Testimony, pp.3955:23-3958:22.
[469] Webster Testimony, pp.3957-3958.
[470] Ambrose Testimony, pp.5998-6001
[471] TREX-00664
[472] TREX-00664
[473] TREX-664. Out of the 120 High Priority Maintenance Tasks outstanding on April 20, 65 were identified as "Corrective Maintenance" whereas only 44 were identified as "Planned" Maintenance.
[474] TREX-00664
[475] TREX-00664, p.14
[476] TREX-00664, p.16

453 days overdue.[477]  Had this equipment functioned properly on April 20, 2010, it would have shut down the engines on the DEEPWATER HORIZON and prevented the rig from blowing up.[478]

The court finds that Transocean's longstanding, flagrant, and willful disregard of its duty to maintain the rig was a substantial contributing cause of the explosions and fire on the DEEPWATER HORIZON, as well as the oil spill that initiated upon the demise of the vessel.

Perhaps the most significant casualty of its "broken" maintenance system was the BOP, a safety critical piece of the DEEPWATER HORIZON equipment for which Transocean bore primary responsibility.[479]

Multiple audits advised Transocean that the BOP was out of certification, in violation of regulatory and industry standards.[480]  A 2005 Modu-Spec audit revealed, among other deficiencies, that the BOP was beyond original equipment manufacturer's (OEM) recommended interval for major service and the certificate of compliance would soon be out of date.[481]  A January 2008 audit found that Transocean could not produce evidence of the BOP's required 5 year recertification.[482]  A 2009 BOP audit reported that the BOP's ram bonnets were out of OEM (Cameron) and API 5-year certification,[483] which is required by the MMS.[484]  Rather than have

---

[477] TREX-00664, p.21

[478] Webster Testimony, p.3673.

[479] *See, e.g.,* TREX-01356A (BP-Transocean Drilling Contract), pp.19-20; McWhorter Deposition, p.287; Newman Testimony, pp.4694-4695, 4658-4660.

[480] *See generally,* Webster Testimony, pp.3873-3874.  In particular, *see* TREX-01168 (maintenance must meet or exceed API RP 53); TREX-03286 p.68 (API RP 53).  BP's Norman Wong believed that in order to comply with 30 CFR 250.466, Transocean had to comply with API RP 53 by disassembling and inspecting the BOP every 3 to 5 years.  *See* Wong Deposition, pp.209-212.  Transocean Subsea Supervisor William Stringfellow admitted that the DEEPWATER HORIZON's BOP did not comply with 30 CFR 250.466's requirements. *See* Stringfellow Deposition, p.178.  *See also, e.g.,* TREX-80 (2005 Moduspec Audit), pp.15-16, 24; TREX-251 (2010 Moduspec Audit), pp.47-48, 51-52; TREX-3405 (BP 2009 Rig Audit) pdf p.3.

[481] TREX-80, p.15; Webster Testimony, pp.3873-3874.

[482] TREX-06166 at pdf p.6.

[483] TREX-03405, pdf p.3; Webster Testimony, pp.3873-3874.

[484] Webster Testimony, p.3874.  Nor could Mr. Webster find evidence that the ram bonnets had ever been recertified. *See* Webster Testimony, p.3874.

them re-certified, Transocean challenged the audit's findings and recommendations.[485]  Indeed, Webster found no evidence that the BOP stack had ever been subject to inspection or certification."[486]

On February 21, 2010, two months before the incident, Buddy Trahan, part of Transocean's Rig Management team, wrote to DEEPWATER HORIZON Rig Manager James Kent:

> The last couple of years, there seems to be an increasing trend of problems on the BOP of the DEEPWATER HORIZON. I want to know the maintenance program for the pod valves, hoses, bonnets, etc. We do not want to wait until failures to react. When I started looking at this a couple of years ago, it was obvious they didn't keep track of maintenance.[487]

Kent admitted that he does not recall Transocean doing anything specifically to address Trahan's complaint.[488]

Plaintiffs contend that Transocean's "reckless neglect" of the BOP is directly responsible for the BOP's AMF ("Deadman") failure to activate shortly after the explosion, when it could have and should have saved the rig and millions of gallons of oil from polluting the Gulf of Mexico.  As discussed *supra,* the Court agrees that the 27-volt battery in the blue pod was dead (or at least too weak to activate the Blind Shear Ram) when called upon.  Further, the Court finds this to be the direct result of Transocean's failed maintenance system:

- If Transocean had followed the recommended replacement policy, the depleted battery would have been replaced;[489]

- Transocean could have and should have tested the battery when it was on the surface, before being placed subsea at Macondo;[490]

---

[485] R. Sepulvado Testimony, pp.2011-2012.
[486] Webster Testimony, p.3880.
[487]  TREX-03420. BP's Bly Investigation also concluded that BOP "maintenance records were not accurately reported in the [Transocean] maintenance management system." TREX-00001 (Bly Report), p.48. *See also,* Childs Testimony, pp.5319-5320.
[488] Kent Deposition, Vol. II, p.84.
[489] Davis testimony, p.2652.
[490] Davis Testimony, p.2653:2-8.

- Transocean could have and should have tested the AMF sequence to make sure that the batteries worked, but, in the entire life of the BOP, never did so.[491]

- Transocean could have and should have made sure that this safety critical battery was charged by upgrading its BOP emergency battery system with a rechargeable battery that could have been monitored continuously from the surface when the BOP was sub-sea.[492]

The two mis-wired solenoids in the yellow pod, one of which (103y) prevented the yellow pod from activating the AMF ("Deadman") following the explosion was also the result of poor maintenance on the part of Transocean.[493]   When Transocean's own expert Childs was asked whether these mis-wired solenoids was reflective of a poor maintenance system, he responded that "it is reflective of something that was missed in testing…. yes, they missed this."[494]  Childs also established that there were tests that could have been performed which would have caught the mis-wired solenoid.[495]   Had Transocean performed the recommended tests on the repaired/replaced solenoids, the mis-wired solenoid would have been discovered well before the events in question.[496]   BP BOP Expert Arthur Zatarain testified that the battery and solenoid issues could have, and should have, been anticipated and prevented.[497]

These failures, the Court concludes, were not the result of mere negligence.  Particularly with the MUX Cables routed through the Moon Pool, and Transocean's rejection of the acoustic trigger, the batteries and solenoids became even more critical.   Transocean knew, and disregarded, questions regarding the reliability of both of these elements prior to the explosion. In 2005, a Transocean Supervisor acknowledged that batteries should be replaced even more frequently (approximately every three months) than the Cameron recommendations (once a

---

[491] Davis Testimony, p.2653:9-12; Childs Testimony, p.5322.
[492] Davis Testimony, p.2653:13-21; Childs Testimony, pp.5285-5287; TREX-4277 p.4.
[493] Davis Testimony, pp.2653:22-2655:1.
[494] Childs Testimony, p.5322:13-23.
[495] Childs Testimony, pp.5322-5323.
[496] Davis Report (TREX-7660) p.7.  *See also, e.g.,* Webster Report (TREX-22700) p.15.
[497] Zatarain Testimony, p.8474:5-23.

year),[498] and yet they had not been changed for two and a half years prior to the explosion.[499] Transocean was also aware of, yet disregarded, issues with the solenoids, since August of 2009.[500]

Contributing to the poor maintenance of the BOP was a documented history of poor record keeping.[501]  With respect to the batteries in particular, Transocean knew that its records seriously flawed and unreliable,[502] and yet Transocean chose not to improve its record keeping system.[503]

The Court finds that had the batteries and solenoids been properly maintained by Transocean, the AMF emergency feature would have functioned properly to seal the well. (Likewise, had BP audits discovered the problem and required correction, the problem might have been avoided.[504]) Dr. Davis gave the following opinion, which the Court accepts:

Q.     If the 27 volt battery in the blue pod had functioned at the time of AMF, do you believe the blind shear ram would have closed?

A.     Yes, I do. If that 27-volt battery had been sufficiently charged - - I know the AMF function was activated, and it should have went ahead and commanded the blind shear ram. *It would have closed; it would have cut the whole pipe and bent over the top of it and sealed the well...*[505]

In conclusion, it is the opinion of this Court that the dangerously poor condition of the DEEPWATER HORIZON on April 20, 2010, including the poor condition of both the safety critical Fire & Gas system and the safety critical BOP, was the result of Transocean's

---

[498] TREX-5155.

[499] Childs Testimony, p.5326.

[500] TREX-598 (solenoids regularly giving "break" conditions).

[501] Childs Testimony, pp.5317:20-5318:11

[502] *See, e.g.,* TREX-3405 (BP 2009 Rig Audit) at pdf pp.10, 11, 39, 42; TREX-88 p.57; TREX-6166 pp.9, 23; TREX-5618 at pdf p.2.   *See also,* Bly Testimony, pp.996:22–997:3 (BP's Investigation concluded that "Maintenance records were not accurately reported in the [Transocean] maintenance management system").

[503]   TREX-01887, p.12.

[504] Davis Report (TREX-7660 at pdf pp. 4, 7, 10); Davis Testimony, pp.2667-2671, 2669:2-13 ("a lack of battery info is a perfect example").

[505] Davis Testimony, p.2652:4-12. *See also,* Shanks Testimony, p.9026:16-19.

longstanding failed maintenance system, and that failure was a direct, proximate, and substantial contributing cause of damages sustained on and after April 20, 2010.

*Transocean Willfully and Wantonly Manned The* DEEPWATER HORIZON *with Unqualified, Unlicensed and Under-Trained Personnel*

It is the opinion of this Court that Transocean knew for years that its personnel were not being adequately trained to recognize and shut in gas kicks, especially riser unloading events, in circumstances like those involved in the Macondo disaster.   Transocean never specifically trained any member of the drill crew, including the OIM, Toolpusher, Driller or Assistant Driller on how to interpret a negative pressure test.[506]   Neither Transocean's formal training, its training materials, nor its Well Control Handbook, covered or discussed negative pressure tests.[507]   As noted *supra,* the crew was not adequately trained to recognize the circumstances under which the EDS should be activated.   And there was no competence assurance system in place aboard the DEEPWATER HORIZON.[508]

In March of 2009, the summary of findings from the M.G. HULME incident acknowledged that: "Well control training and well control manual does not adequately cover the procedures for closing in a well during a blowout situation; also, the use of a diverter is not adequately covered."[509]   Transcoean acknowledged that its Well Control Manual and training must be updated.[510]   While Mr. Newman testified at trial that he believed the Manual was revised prior to April 20, 2010, he had indicated in his deposition that the Manual was not revised prior to the blowout.[511]   A document with a pre-blowout revision date was displayed by Transocean's

---

[506] McMahan Deposition, pp.123-124;  Winslow Deposition, p.387; Ezell Testimony, p.1680.
[507] Pleasant Deposition, p.531;  McMahan Deposition, pp.124-125.
[508] TREX-3405 (2009 BP Rig Audit) at pdf pp.7, 18.
[509] TREX-5650 pp.10, 14; Newman Testimony, pp.4619-4620.
[510] TREX-5650 p.19; Newman Testimony, p.4620.
[511] Newman Testimony, p.4621.

counsel during the trial, but the Court does not believe that any Transocean witness attested to whether or when such version was formally adopted and provided to the drill crews.  Randy Ezell, for example, testified that he had "limited exposure" to information about what happened on the M.G. HULME, that the discussions he had were not with Transocean Management, and that he was not familiar with any specific Lessons Learned.[512]  The Court, therefore, is not convinced that the Manual was formally revised and put into effect prior to the explosion.

Yet, even assuming that the Well Control Manual had been updated, the ultimate responsibility for what Drilling Expert Richard Heenan called a "gross and extreme departure from the standards of Good Oilfield Practice"[513] rests with the knowing failure of Transocean Management to *effectively* train their employees in how to perform these safety critical functions.[514]  BP Drilling Expert Dr. Bourgoyne, for example, testified that an adequately trained Drill Crew and Toolpusher would not have missed the kick on April 20 and failed to seal in the well.[515]  This ongoing failure to properly train Transocean personnel was known to top executives, and was a direct and contributing cause of the blowout, explosions, fire and sinking of the vessel.

The failure to man the DEEPWATER HORIZON with qualified and trained personnel extended to the Bridge Crew as well as the Drill Crew, and the Court concludes that this failure rendered the vessel unseaworthy.[516]

---

[512] Ezell Testimony, pp.1694-1695.
[513] Heenan Report (TREX-22694), pp. 4, 16, 30 (referring to the negative pressure test).
[514] Transocean produced well control and other certificates for its drill crew, (*see, e.g.,* TREX-52658), but, as demonstrated by the numerous well control and riser unloading events preceding the DEEPWATER HORIZON disaster, there is a difference between training and *effective* training. As is evident from the findings of Transocean's previous post-incident investigations as well as the Transocean drill crew's disregarding the negative pressure test and missing a kick and blowout of unprecedented size, Transocean's drill crews, including that on the DEEPWATER HORIZON, were not being *effectively* trained.
[515] *See* Bourgoyne Testimony, p.7581.
[516] Webster Testimony, p.3904:10-18.

ISM Section 4 requires Transocean to appoint a "Designated Person Ashore" who has responsibility for safety and pollution prevention and has "access to the highest level of management,"[517] including CEO Steve Newman.[518]   Gerald Canducci was Transocean's DPA for the DEEPWATER HORIZON.  Based on the evidence presented at trial, Mr. Canducci "was not minimally competent for [the] job."[519]  His total training consisted of a three-day course and neither he nor the other DPA for the DEEPWATER HORIZON had ever been on the vessel,[520] (an obviously "bad practice").[521]

As discussed above, the Master of the DEEPWATER HORIZON, Curt Kuchta, was "woefully undertrained in the SMS" (Safety Management System) of the vessel despite the ISM requirement that he be in charge of implementing it.[522]  He had never been trained or certified in the operation of the vessel's EDS (emergency disconnect system),[523] a fact which would prove to have fateful consequences.

This was not unique. According to Rig Manager John Keeton, "it is common that Captains do not know how to disconnect the wellhead," that "some longterm Captains do not know how to disconnect the BOP," and "well control and training with the Captains needs to be addressed."[524]  As noted by Captain Mitchell, "There was no evidence that Captain Kuchta had received the major emergency management training, nor did he have well control certification, nor had he been assessed competent as a person in charge, which was a position which he had

---

[517]  TREX-50361 (Designated Persons, Section 4) at pdf p.2; Webster Testimony, p.3745.
[518]  Mitchell Testimony, pp.9445-9457.
[519]  Webster Report (TREX-22700), p.6.
[520]  Webster Report (TREX-22700), p.6; Webster Testimony, p.3745.
[521]  Webster Testimony, p.3745.
[522]  Webster Report (TREX-22700), p.7;  Webster Testimony, pp.3926:25 – 3937:3.
[523]  Webster Testimony, p.3937:4-6. Transocean's expert, Jeff Wolfe, agreed that Kuchta had no EDS training. Wolfe Deposition, p.193:3-7.
[524]  TREX-4361 pp.3, 7.

clearly been assigned on the organization chart."[525]   Transocean's own expert, Jeff Wolfe, admitted that Kuchta did not have Emergency Management Certification.[526]

Captain Kuchta had not been trained to be the Person In Charge (PIC) of the vessel or in the implementation of the vessel's emergency response plan.[527]   He was promoted directly from Third Mate to Master,[528] and had not been trained on how to operate the Kongsberg fire and gas detection system or the Emergency Shut Down (ESD) system.[529]  In sum, Kuchta was not properly trained to respond to a severe well blowout or emergency.[530]

BP expert Captain Andrew Mitchell agreed: "I concluded that the captain of the DEEPWATER HORIZON was young; furthermore, he was inexperienced. He didn't fully understand his responsibilities nor his overriding authority as captain of the DEEPWATER HORIZON."[531]  Mitchell found Kuchta to be unfit to be master of the DEEPWATER HORIZON.[532] The Court agrees.

Moreover, as discussed *supra,* the Court finds that Offshore Installation Manager (OIM) Jimmy Harrell's certificate did not allow him to legally act as either OIM or Person In Charge (PIC) on the self-propelled DEEPWATER HORIZON.

Senior Dynamic Positioning Officer (DPO) Yancy Keplinger was not properly trained to be a competent deck officer,[533] nor was he properly trained or certified in the use of the EDS system or in well control.[534]  Neither he nor DPO Andrea Fleytas were trained on how to operate

---

[525] Mitchell Testimony, p.9436:9-13.
[526] *See* Wolfe Deposition, pp.196:15-197:3 (does not believe that Kuchta attended the Transocean course on emergency management).
[527] Webster Testimony, p.3937:7-14.
[528] Mitchell Testimony, pp.9436-9437.
[529] Webster Testimony, p.3937:15-21.
[530] Webster Testimony, p.3938:22-25.
[531] Mitchell Testimony, p.9443:13-21.
[532] Mitchell Testimony, p.9472:17-20.
[533] Webster Testimony, p.3939:9-12.
[534] Webster Testimony, p.3939:13-18.

the Kongsberg Fire & Gas System, respond to a scenario involving contemporaneous and simultaneous gas alarms, when to activate the Emergency Shutdown (EDS) system, or how to respond to a severe well blowout or emergency.[535]

The Court concludes that Transocean Management willfully and recklessly hired an untrained or undertrained, unlicensed, and unqualified Bridge Crew.  It then failed to provide adequate credentialing and training.  The Court finds that this overarching failure constitutes willful and wanton conduct which directly contributed to the events leading to the blowout, explosions, deaths and loss of the DEEPWATER HORIZON.

## _Transocean Willfully and Wantonly Violated the ISM Code and Created Confusion by Establishing and Maintaining a "Dual Command" Structure_

Marshall Islands law, the Safety of Life at Sea (SOLAS) Convention, and the ISM Code require that the Master be in charge of a vessel at all times.[536]

Yet, as found _supra,_ Transocean Management created a confusing "dual command" structure in which the Master of the DEEPWATER HORIZON did not have overriding authority and responsibility to take the decisive action he needed to take to protect the crew, the vessel, and the environment. This constituted a major non-conformity with the ISM code,[537] and contributed significantly to the tragic events of April 20, 2010.  As stated by BP's Expert Captain Andrew Mitchell: "The result…was that Captain Kuchta waited for Jimmy Harrell, the OIM, to arrive on the bridge…. did not exercise his overriding authority and responsibility as captain, nor did he take the last clear chance…to save his ship, his crew and to preserve the environment."[538]

---

[535] Webster testimony, pp.3937-3938; Durken Deposition, pp.15, 42-50; Keplinger Deposition, 91, 124; TREX-1122.
[536] Wolfe Deposition, pp. 205:21-25; 209:1-9.
[537] TREX-50361 (Master's Responsibility and Authority, Section 5) at pdf p.2;  Webster Testimony, p.3747;  Mitchell Testimony, pp.9442-9443.
[538] Mitchell Testimony, 9443:23 – 9444:3.

Transocean's own expert, Jeff Wolfe, acknowledged that Captain Kuchta did not order activation of the EDS and, in fact, delayed its activation.[539]

Transocean Management had been warned about this ISM non-conformity since the first days of the DEEPWATER HORIZON's operation.  In the initial ISM Code certification of the DEEPWATER HORIZON, the Det Norske Veritas (DNV) audit identified that the authority and responsibilities of the Master and the OIM were in conflict and raised an ISM code non-conformity issue, requiring action to be taken by August of 2002.[540]  In 2009, DNV cautioned Transocean that this was a company-wide problem, stating that "as previously observed…there is no clear and absolute indication of the Master's overriding authority and responsibility" as required by the ISM Code.[541]  The company was requested to address this.[542]  For seven years, this critical problem had been known to Transocean Management, but Transocean still had not corrected the situation as of April 20, 2010.

As discussed previously, Transocean CEO Steve Newman personally approved a 2007 Memorandum directing that, on all rigs, the OIM (not the Master) "will remain overall responsible."[543]  Evidently, this is the directive that Kuchta was following while waiting for OIM Jimmy Harrell to activate the EDS.

The same confusion and dysfunction existed with respect to the Code of Federal Regulations requirement that Transocean designate a "Person in Charge".  Transocean's own

---

[539] Wolfe Deposition, pp.328:5-14; 344:7-22.
[540]  TREX-05483; Mitchell Report, p.20 (TREX-40011 p.21).
[541]  TREX-01768 p.9.
[542]  TREX-943 (2009 DNV ISM Audit, No. 8).
[543]  TREX-5643.4.1; Newman Testimony, pp.4721:12 – 4722:24.

expert, Jeff Wolfe, admitted that Transocean's manuals and documentation made the OIM the Person in Charge,[544] a clear violation of Federal Regulations.[545]

As discussed *supra,* the Court finds that Transocean's intentional creation of this confusing "dual command" structure and long-term failure to ameliorate it to be in violation of the ISM Code, and constitutes willful and reckless disregard of the known risks that underlie the governing legal and regulatory standards.  This, coupled with the willful and reckless manning of the vessel with unqualified, unlicensed and untrained crew caused or contributed to the events on April 20, 2010, by creating confusion, indifference, and delay.

### *Transocean (and BP) Personnel Exhibited Willful and Reckless Disregard in Proceeding with the Abandonment Procedure after the Failed Negative Pressure Test*

Following the final cement job, a negative pressure test was performed "in order to confirm the integrity of the cement outside the casing, the cement in the shoe track and the valves in the float collar, thus determining if the hydrocarbons in the 'pay zone' [would] have the ability to enter into the casing and potentially cause a blowout."[546] It was the last diagnostic test before placing the well in an underbalanced condition and was therefore "safety critical."[547]

The proper performance and interpretation of the negative pressure test was a shared responsibility between BP and Transocean.[548]  Neither Transocean nor BP had written policies or

---

[544]  Wolfe Deposition, pp.221:6 – 222:17; 226:1-24; TREX-5299; TREX-5033; Winslow Deposition, p.484 (the OIM was in charge of the vessel during normal operations); Ezell Testimony, p.1852 (the OIM was the Person in Charge).
[545]  Mitchell Report (TREX-40011), pp.12-13; 46 C.F.R. ¶109.107; 33 C.F.R. ¶146.5.
[546]  Heenan Report (TREX-22694), p.10.
[547]  Heenan Report (TREX-22694) p.4; Beck Report (TREX-8140) p.9; M. Sepulvado Deposition, pp.196:22 – 197:19.  *See also,* Ezell Testimony, p.1672 (Transocean OIM Jimmy Harrell knew that the negative pressure test was significant, based on a prior incident).
[548]  Bourgoyne Testimony, pp.7557-7558.  BP's role in the formulation, performance and interpretation of the negative pressure test is discussed in more detail, *infra.*

procedures for conducting or interpreting negative pressure tests.[549]  And both Transocean and BP personnel disregarded the clear signs that the test had failed, and the cement was unstable; proceeding with the displacement of the heavy drilling mud with lighter sea water.[550]

All experts and investigations agreed that the test indicated that it was unsafe to go forward with displacement.[551]  U.S. Drilling Expert Richard Heenan described this as a "gross and extreme departure from the standards of Good Oilfield Practice."[552]

The purported explanation for this gross and extreme departure was a mythical "bladder effect" attributed by BP after the incident to Transocean Toolpusher Jason Anderson.[553] Yet, every witness stated unequivocally that there is no such phenomenon. Drilling Expert Gene Beck called the "reckless disregard" of the negative pressure test "totally inappropriate."[554]  BP Drilling Expert Adam Bourgoyne testified that even a minimally competent and trained drill crew would have known that there was no such thing as "bladder effect."[555]

Presumably, the members of the drilling crew did not "*know*" that the negative pressure test showed that the cement had not set, in the sense that they believed that a blowout was certain to occur;  but they proceeded in the face of a *known risk and danger* that the 1,400 psi on the drill pipe was a cause for concern.[556]  Obviously, the crew (along with BP personnel) felt the

---

[549] Ambrose Testimony,  pp.6123:25 – 6124:3; Ezell Testimony, p.1673; *see also,* Ezell Testimony, p.1680 (no training on how to do a negative pressure test).

[550] *See generally,* TREX-63213 (Transocean Criminal Plea); TREX-52673 (BP Criminal Plea); Ambrose Testimony, p.6124:4-6; Barnhill Report (TREX- 7676), p.36; Heenan Report (TREX-22694), pp.13-14.

[551] *See* Beck Rebuttal Report (TREX-61117), p.20 fns. 42, 43 (collecting and summarizing the expert opinions and investigation conclusions on this issue); TREX-00001 (Bly Report), pp.10, 31; TREX-3808 pdf p.198 (Transocean Investigation Report, Vol. I, p.214); Barnhill Report p.32 (TREX-7676 pdf p.40); Calvert Report p.12 (TREX-7836 pdf p.14); Bourgoyne Report (TREX-8173) p.62; Bly Testimony,  p.961.

[552] Heenan Report (TREX-22694), pp. 4, 30.

[553] L. Lambert Testimony, pp.8280-8281.

[554] Beck Testimony, p.7176:3-24.

[555] Bourgoyne Testimony, pp.7573-7574.

[556] *See, e.g.,* Beck Testimony, pp.7176-7178 (a blowout was a serious and foreseeable risk from "reckless disregard" of the Negative Pressure Test).

need to come up with some explanation for the anomaly (*i.e.* the "bladder effect"),[557] and BP Well Site Leader Don Vidrine reported to investigators after the incident that he had shared his concerns about the differential in pressure with the Transocean Drill Crew, and "they (TO toolpusher etc) found it kind of humorous that I talked about it for a long time."[558]

     After considering the evidence presented at trial, the Court finds that the Transocean Drill Crew acted willfully and wantonly in proceeding with the displacement procedure in reckless disregard of the known risks of an influx, with potentially serious consequences, to which they had been alerted.

### *The Transocean Drill Crew Exhibited Willful and Reckless Disregard in Ignoring the Kick and Failing to Shut in the Well*

     All concede that Transocean had the primary duty for kick detection and well control.[559] Transocean's own standards consider a kick of over <u>20</u> barrels to be in the "red zone".[560]  The evidence suggests that, by 9:41 p.m., when mud shot through the derrick, the total influx was approximately <u>1,000</u> barrels.[561]  By 9:49, when the first explosion occurred,[562] there had been an influx of <u>2,000</u> barrels.[563]

---

[557] Transocean Senior Toolpusher Randy Ezell, for example, testified that it was a situation that he had not ever seen before. *See* Ezell Testimony, p.1680.

[558] TREX-192, pp.2-3.

[559] TREX-1453 (DEEPWATER HORIZON Emergency Response Manual, Vol. I Section 7.2), at pdf p.73 ("Detection of the kick (intrusion of liquid or gas into the wellbore) is the responsibility of the Driller. The Driller and his crew will continuously monitor…for signs of a kick. Upon detecting a kick, the Driller is trained to shut the well in quickly. In fact, the speed with which this is accomplished will determine the severity of the situation"); *see also,* TREX-01452 (Transocean Field Operations Handbook, Section 3, sub-section 1.3) at pdf pp.77-81; TREX-01454 (Transocean Well Control Handbook), at pdf pp.14-19; Beck Report (TREX-08140), pp.105-106.

[560] TREX-36071 (Transocean's Annual Well Control Event Report 2010), p.15.

[561] TREX-00001 (Bly Report), pp. 28, 106.  Transocean's Investigation reported that the well had flowed 500 barrels by the time the kick was detected. *See* Ambrose Testimony, p.6124:22-25.

[562] TREX-00001 (Bly Report), p.29.

[563] Emilsen Testimony, p.7802.

As early as 6:40 p.m., the pressure differential between the drill pipe and kill line signaled a well integrity problem.[564]  Between 8:00 p.m. and 9:41 p.m., a period of an hour and forty-one minutes, the well was flowing, with "increasing signs that should have been visible."[565]

Drilling Expert Richard Heenan characterized Transocean's failure to respond to these signs of an influx and timely shut in the well as "individually and collectively … grossly outside the accepted standards of Good Oilfield Practice under nearly any circumstances."[566]  Other experts, including Transocean's own expert, Calvin Barnhill, agreed that Transocean's failure to catch and control the kick was negligent.[567]  It seems clear that if Transocean had properly monitored the well, the well could have been shut in and the blowout averted.[568]

Particularly when coupled with the red flags raised during the negative pressure test, and the other operational and geological issues encountered, the Court finds that Transocean's disregard of the pressure increases and other signs of influx to be wanton and reckless.

### *Transocean and Its Crew Exhibited Willful and Reckless Disregard in Allowing the Kick to Be Directed into the Mud-Gas Separator (MGS), rather than Diverting it Overboard*

The Mud Gas Separator is a low-pressure system used to separate small amounts of gas from drilling mud and is not designed or intended to handle large volumes of gas or gas under high pressure.[569]  It was well known to Transocean that the drilling company and its crews

---

[564] Bly Testimony, p.977:5-11.  (The Bly Report's Timeline of events is found in TREX-00001, at pp.21-29.)

[565] Bly Testimony, p.981:20-24. *See also,* Bly Testimony, p.982:4-5 ("it would certainly be expected that that would be observed and reacted to").

[566] Heenan Report (TREX-22694), p.5.

[567] Barnhill Report (TREX-7676), pp.39-41; Bourgoyne Report (TREX-8173), pp.11,64-68; Bourgoyne Testimony, pp.7529-7535, 7586.

[568] Transocean admitted that Transocean's failure to shut in quickly was a contributing factor in the blowout.  Ambrose Testimony, p.6125:8-19.

[569] Webster Report (TREX-22700), pp.3-4; TREX-04248 p.164.

should use the overboard gas diverter system, and not the Mud-Gas Separator, in the event of a well control event requiring diversion of large amounts of gas, like the one on April 20, 2010.[570]

However, the DEEPWATER HORIZON crew intentionally directed the kick to the Mud-Gas Separator, rather than diverting it overboard. The system was quickly overwhelmed and the entire vessel was engulfed in flammable gas.[571] The head of Transocean's Investigation, Bill Ambrose, admitted that, by diverting the kick to the Mud-Gas Separator, the Transocean crew "created an unsafe situation."[572]

This was not a one-time mistake by a well-trained drill crew that found itself in an emergency situation. Rather, the default was intentionally set to direct flow to the Mud-Gas Separator instead of the overboard diverter,[573] and a lack of adequate training in the proper use of the diverter system was a chronic problem that was known to senior management but remained uncorrected. Indeed, as noted, the summary of findings from the M.G. HULME incident in March of 2009 advised Transocean Management that there was insufficient direction and training regarding the proper use of diverters.[574] Moreover, the Moduspec Audit conducted in March of 2010 revealed "discrepancies" within the diverter system, which were 4-5 years past due, (an ISM Code violation).[575]

In fact, Transocean and its crew could have, and should have, but did not set up the diverter on the DEEPWATER HORIZON so as to *automatically* rout the gas overboard at an appropriately low threshold of pressure.[576] BP's Drilling Expert Dr. Bourgoyne established that

---

[570] *See, e.g.,* TREX-00596 p.162; TREX-01454 p.162; Ambrose Testimony, pp.6125:20 – 6126:6. BP's GoM Deepwater Well Control Guidelines also says this. TREX-2210 p.17.
[571] Webster Report, p.31 (TREX-22700 pdf p.21); TREX-00001 (Bly Report), p.10.
[572] Ambrose Testimony, pp.6126:24 – 6127:9.
[573] Ezell Testimony, p.1787.
[574] TREX-05650, pp.10, 14; Ambrose Testimony, pp.6138-6139; Newman Testimony, pp.4593-4594.
[575] Webster Testimony, pp.3910-3912.
[576] Bourgoyne Testimony, pp.7581 – 7582 (such a safety system has been available since 1989 and is "feasible and practical to use" and "not cost prohibitive").

"There have been accidents in the past because things weren't automatic."[577] Furthermore, Bourgoyne testified that he would have expected that Transocean would have, before displacement began, lined up the existing system to divert overboard.[578] Transocean did not.

In sum, the Court concludes that, particularly given the number of serious well control events experienced by Transocean, the company's failure to assure that a kick would be automatically diverted overboard; the company's failure to train the crew properly; and the crew's decision on the evening of April 20; evidence not only and gross and extreme departure from Good Oilfield Practice, but further stem from a willful and reckless disregard of the known risks and dangers of overloading the Mud-Gas Separator with a significant flow.

### *Transocean's Bridge Crew Exhibited Willful and Reckless Disregard in Failing to Respond to the Emergency in a Timely Manner*

The Transocean rig crew recklessly failed to timely and properly respond to the emergency on the DEEPWATER HORIZON. Had the BOP EDS been activated timely and properly (*i.e.* before the hydrocarbons entered the riser), the explosions and fire aboard the DEEPWATER HORIZON would have been avoided with no loss of life, no loss of the vessel, and no pollution. Activating the EDS at any time prior to the explosion, while perhaps not (in and of itself) preventing the fire, injuries, and deaths aboard the vessel, would have at least sealed in the well, preventing economic damages and damage to the environment.[579]

Unqualified and untrained members of the bridge crew, combined with Transocean's dysfunctional dual command structure, resulted in the crew not attempting to activate the EDS

---

[577] Bourgoyne Testimony, pp.7581:25 – 7582:1.
[578] Bourgoyne Testimony, pp.7583:15-18.
[579] Mitchell Report (TREX-40011), p.19; Mitchell Testimony, p.9418:21-23; *see also, e.g.,* Davis Testimony, p.2652:4-12 (if BOP had fired at AMF time, the well would have sealed).

until Jimmy Harrell finally arrived on the bridge[580] – after the explosions had destroyed the ability of the rig crew to activate the BOP through the MUX cables.[581]

In addition, (and as discussed *supra*), the crew did not sound the general alarm until after (at least) the first explosion, too late to warn those killed in the blast.

Although Transocean had intentionally inhibited the automatic function of the ESD, had Captain Kuchta and other members of the Bridge Crew been properly qualified and trained, they could have *manually* activated the ESD and the General Alarm, saving lives and potentially the rig itself.  Further, Captain Kuchta could have activated the EDS.

However, what happened on the bridge was a state of paralysis and confusion, recounted in detail by Captain Mitchell using trial and deposition testimony and statements of those who were present on the bridge.[582]  Mitchell characterized Kuchta's response to the emergency as "completely inadequate."[583]  The Court agrees.

There was "chaos [and] mayhem" on the bridge,[584] "…shouts, directions [were being] yelled that weren't being enacted."[585]  Captain Kuchta had a "deer in the headlights look," "was overwhelmed," "dazed and confused," and "didn't know what was happening and why."[586]

When the cascading alarms did sound, DPO Andrea Fleytas failed to announce that "this was not a drill" because she was too "nervous."[587]  Even worse, the more senior DPO Yancy Keplinger failed to intervene, and allowed this to happen.[588]  Indeed, Keplinger later testified, "I

---

[580] Mitchell Report (TREX-40011), pp.14-19.
[581] Davis Testimony, pp. 2686:25-2687:5;  Childs Testimony, p.5097:16-22.
[582] Mitchell Testimony, pp.9422:16 – 9431:23.
[583] Mitchell Testimony, pp.9431:25 – 9432:4.
[584] Brown Deposition, p.90.
[585] Brown Deposition, p.90.
[586] Williams Deposition, pp.192-193.
[587] Keplinger Deposition, pp.98-100.
[588] Webster Report (TREX-22700), p.13.

haven't been trained for a situation" like April 20, 2010.[589]   Neither had Fleytas, who said that "many colors lit up the panel (screen), including pastels and other colors that [I] had never seen before."[590]

When told by Fleytas that they had lost power and "could not start anything," Kuchta replied:  "[Expletive] it. Let's leave."[591]   When Fleytas finally activated Mayday and GMDSS alarms, Kuchta "turned to her and cursed and said 'Did I give you authority to do that?'"[592] Despite two explosions and a raging fire on the rig, Kuchta told his Chief Mate David Young to "put a hose on it."[593]   Young had to take Kuchta by the hand outside the bridge to show him the extent of the ongoing emergency, which Captain Mitchell found "quite inconceivable."[594]   Even after the second explosion, when Chris Pleasant entered the bridge and asked for Kuchta's approval to activate the EDS, the Captain refused.[595]   When Mike Williams told Kutcha the engines had been lost and the crew needed to abandon ship, the Captain told him to "sit down and shut the [expletive] up."[596]

By all accounts, there were approximately *eight minutes* between the time mud hit the rig floor and the time of the first explosion.[597]   During this critical time, Captain Kuchta could have activated the EDS;  but, under the then-existing dual command structure, he was prevented from doing so until OIM Harrell arrived and gave his approval.[598]   Captain Mitchell testified:

---

[589] Keplinger Deposition, p.89.
[590] TREX-04472, p.5; Webster Testimony, pp.4001:22 – 4003:5.
[591] TREX-04472, p.5; Webster Testimony, p. 4003:6-10.
[592] TREX-04472, p.5; Mitchell Testimony, pp.9426-9427.
[593] Young Testimony, pp.5720-5721 (quoted during questioning of Captain Andrew Mitchell, pp.9430:12 – 9431:7).
[594] Mitchell Testimony, p.9431:9-23.
[595]  TREX-05629 (Chris Pleasant Interviewing Form), p.4.
[596] Williams Deposition, pp.78, 194.  *See also,* TREX-5629 p.4 (discussed in Young Testimony, p.5865 and Mitchell Testimony, p.9428) (Kutcha instructs Pleasant not to activate the EDS, and Pleasant says "F* You").
[597] Mitchell Testimony, pp.9416:18 - 9418:20.
[598] Mitchell Report (TREX-40011), pp.14-19.

Q.      During this time frame, what should have [sic] the marine crew, in particular Captain Kuchta, have done during those critical minutes?

A.      Unequivocally, activated the EDS system.[599]

Marine Safety Expert Geoff Webster agreed. As mud flowed onto the floor, "the vessel and its crew were in extreme danger."[600]   At that point, there was a "dire emergency" and the Captain should have activated the EDS system.[601]   Had he done so, the well would have been shut in.[602]

The Court concludes that the conduct of the Bridge Crew was the result of a willful and reckless disregard of known risks by the company in failing to properly man the vessel and train the crew, as well as a willful and reckless disregard of the known risks by Captain Kuchta and the other members of the crew in responding (and, particularly, in failing to respond) to the emergency.  With respect to the reluctance to activate the EDS in particular, the Court finds significant Mr. Webster's observation that it is primarily a "commercial" issue, as it takes time and money to re-connect.[603]

---

[599]  Mitchell Testimony, p.9418:21-23. Indeed, Mitchell testified that Kuchta had "no option but to unequivocally operate the EDS  to save his ship, to protect his crew and to safeguard the environment." Mitchell Testimony, p.9432.

[600] Webster Testimony, p.4007:9-12.

[601] Webster Testimony, p.4005:7-18.

[602] Webster Testimony, pp.4007-4008. *See also,* Mitchell Report (TREX-40011), p.19.

[603] Webster Testimony, p.4012.

**FINDINGS AND CONCLUSIONS REGARDING TRANSOCEAN CORPORATE BLAMEWORTHINESS** [604]

Much of the willful and reckless conduct described herein was the direct result of Transocean corporate policy or with the knowledge, approval or ratification of corporate officials with policymaking authority. Evidence of this includes, for example, the following:

- The establishment of the "dual command" structure; [605]

- The move to 21-day hitches; [606]

- Modifications to, and refusals to upgrade, the BOP; [607]

- The responsibility, yet failure, to establish a "bridging" or "Interface Document" under the company's contract with BP; [608]

- The failure to have any corporate policy, procedure or protocol regarding the proper conduct and interpretation of the critical negative pressure test; [609]

- Chronic maintenance issues that were known, recognized, and ignored; [610]

---

[604] [*Note* – As set forth in Plaintiffs' POST-TRIAL BRIEFS, Plaintiffs respectfully suggest and reserve the right to argue that the *P&E Boat Rentals* case is distinguishable and/or that a less stringent standard for the imputation of punitive damages to the Transocean corporate defendants can and should be applied.  The Supreme Court, in *Baker v. Exxon,* recognized the state of uncertainty in the law regarding this issue, which was left unresolved by the Court. 554 U.S. at 482-484.]

[605] *See, e.g.,* TREX-5643.4.1; Newman Testimony, pp.4721– 4722.

[606] Ezell Testimony, pp.1720-1721; TREX-929 p.97; *see also,* Webster Testimony, pp.3933-3934; Bea Testimony, pp.455-458; TREX-4261.  (At the time of the blowout, Assistant Driller Clark was on Day 20, Assistant Driller Curtis was on Day 19, and Driller Rivette was on Day 20. *See* Ezell Testimony, pp.1722-1723; TREX-687.)

[607] *See, e.g.,* BP-Transocean Contract (TREX-4271) at pdf pp.79-80; TREX-6120; TREX-1870; TREX-4620, pp.2-3; Childs Testimony, pp.5277-5278; Ambrose Testimony, pp.6002-6003, 6255-6260; Shanks Report (TREX-40008), pp.9-17; Perkin Report (TREX-7535) pp.11-12.

[608] TREX-1356A pdf p.429 (also TREX-1488 pdf p.21); *see also,* Newman Testimony, pp.4693-4694, 4698-4670.

[609] *See, e.g.,* McMahan Deposition, pp.123-125 (Vice-President of Performance confirms that there is no policy, procedure, manual or training for drill crews on how to interpret negative pressure tests). *See also, e.g.,* Bea/Gale Report, p.xviii (TREX-20001 at pdf p.19) (discussing management's failure to have a standard protocol and detailed procedure for performing and interpreting the critically important negative pressure test); *see alo, e.g.,* TREX-00001 (Bly Report) p.182 (recommending the development of a standard procedure for the performance and interpretation of the negative pressure test).

[610] *See, e.g.,* Webster Testimony, pp.3737, 3743-3744, 3882-3883 (discussing TREX-50361) (under Section 4 of the ISM Code, the Designated Person Ashore would be a direct line of communication between the vessel and the highest level of management); Webster Testimony, p.4016 (given the number of audits, etc., corporate must have known); *see, e.g.,* TREX-7037 (decision to put off changing the annulars coming from "upper management"); Winslow Deposition, pp.44, 123-124 (Operations Manager for rigs in the Gulf was aware at the time of the Rig Audit in September 2009 that 300-400 deficiencies had been identified, and that there were BOP certification issues, with no attempt to certify or re-certify before mobilizing the vessel for Macondo); Trahan Deposition, pp.54-55 (Operations Asset Manager for multiple rigs was aware of struggles, difficulties in getting

- Safety management issues generally, and lack of training and vigilance regarding well control in particular, that were known, and recognized, but ignored;[611]

- The "close the annular and wait" policy;[612] and,

- Running the entire fleet on manual override.[613]

The Lloyd's Register Survey that was conducted within weeks of the Macondo incident on the DEEPWATER HORIZON (among other Transocean vessels) concluded that many of the primary issues associated with Transocean's broken safety culture could be "traced back to practices and policies that originate at the Divisional and/or Corporate levels,"[614] and identified

---

maintenance done in 2008), p.60 (and TREX-5619) (recognized "increasing trend of problems on the BOP on the DWH" in February of 2010), pp.208-209 (expressed misgivings about the conditions-based maintenance program to the Technical Field Support Director for North America); Sannan Deposition, pp.37-38 (General Manager of North America received a summary of the daily morning reports, including the DEEPWATER HORIZON, each morning, as well as periodic verbal reports from Mr. Winslow); Canducci Deposition, pp.55-56, 118-119 (Designated Person Ashore for the DEEPWATER HORIZON confirms that audit findings are communicated to Transocean management, and it is company management's responsibility to establish and enforce the maintenance procedures with respect to the BOP); Johnson Deposition, pp.43-44, 47, 173, 345-347 (Rig Manager, who had some financial control with respect to training and personnel expenses, had morning calls with the senior Transocean Rig Personnel, and was responsible for the 2009 Rig Audit issues, which he discussed with his "Transocean Offshore supervisors"; communicated with the Operations Manager, Daun Winslow, daily); Kent Deposition, pp.38-39, 46-47 (Rig Manager confirmed that there were weekly Maintenance, Procurement and Inventory (MPI) meetings to discuss audit issues with both the rig team and the "onshore management team").

[611] *See, e.g.,* McMahan Deposition, pp.301-304 (Vice-President of Performance confirmed that Transocean management recognized in March of 2010 that drillers needed to have a "heightened vigilance" during underbalanced operations, but did not communicate that to the DEEPWATER HORIZON crew), pp.210-233 (discussing TREX-2189) (in March of 2008, what was happening with loss of well control was "very concerning" and if they didn't change the way they operated, thy would continue to have "train wrecks"), pp.263-269 (discussing TREX-2194 and TREX-2195) (Transocean could not get the "basics" right; in May 2009, McMahan writes: "So now I am supposed to develop a new Driller Training Program? Fine, I can do this but first I would lay a $100 bill down and bet that we are not even doing what is already in our Company Management System as required for Driller training"). *See also, e.g.,* TREX-5695 (and Shaw Testimony, pp.8220-8221) (observing that Transocean's issues were "cultural"); TREX-2523 (and O'Bryan Testimony, pp.9322-9324) ("drilling contractor supervisors have a poor understanding of their own SMS [safety management system]"); TREX-5680 (Shaw Testimony, pp.8217-8218) (concerns in May 2009 that "Transocean's small incidents are building to something big"; "lack of hazard / risk recognition … is shocking to me").

[612] *See, e.g.,* Stevick Testimony, p.6914; Breazeale Deposition, pp.131-132; TREX-01454.081-082; TREX-7006.143; TREX-7005.79; *see also,* Newman Testimony, pp.4620-4621; TREX-36070.

[613] *See* Williams Deposition, p.22 (told by Transocean Senior Subsea Supervisor Mark Hay not to put into automatic mode; "The entire fleet runs on the bypass. Leave it the hell alone"); *see also, e.g.,* TREX-3749 at pdf p.23 (DWH Bridge Procedures Guide) ("During normal operations, we override all Outputs Common from the SVC. This is to prevent false alarms"); McMahan Deposition, p.113; Transocean Investigation Report, p.184 (TREX-03808 pdf p.171).

[614] TREX-929 (2010 Lloyd's Register Survey), at p.12

the Corporate level of Transocean as a driving factor behind 26 of the 28 underlying causes listed in the survey.[615]

Proceeding in the face of the negative pressure test, failing to catch the kick and shut in the well, failing to divert the flow overboard, refusing to timely EDS, and failing to timely activate the fire & gas safety system as well as the general alarm, are all emblematic of Transocean's ongoing system-wide training and management failures.  A recurring pattern of accidents, deaths and loss of well control events presaged the events of April 20, 2010, and can be traced back to the willful and ongoing refusal of Transocean Management to effectively confront a failed and broken training program.

Transocean's CEO, Steve Newman, in addition to personally approving and directing the confusing "dual command" structure in 2007,[616] was acutely aware of the hazard that ultimately culminated in the Macondo disaster at least seven months before.  As of September 25, 2009, (if not before), Newman and the company knew that "it was vital to act decisively and quickly" to avoid further riser unloading events, deaths, and other "high potential incidents we are experiencing across our fleet."[617]   Bob Long, the previous CEO, also participated in these discussions, and a steering committee of senior executives was established; according to Mr. Newman, there was no excuse for delay.[618]   Newman was aware of the Transocean Well Control Events and statistics, which demonstrated that, in the 18 months leading up to Macondo, there were at least six previous riser unloading events.[619]   Yet, rather than acting "decisively and quickly" – in terms of providing additional direction, training, and a sense of urgency regarding

---

[615] TREX-929 (2010 Lloyd's Register Survey), at pp.29-48
[616] *See* TREX-5643 p.4; Newman Testimony, pp.4721-4722; *see also,* Webster Testimony, p.4213.
[617] Newman Testimony, pp.4606-4608; TREX26032; TREX-26035 p.4.
[618] *See* Newman Testimony, pp.4613-4615.
[619] *See generally,* Newman testimony, pp.4617-4628; TREX-36070 (Well Control Events and Statistics, 2008-2009) at pp.7, 13 ("The frequency of riser unloading events is the biggest concern with six separate instances recorded….   [They are] particularly hazardous due to the uncontrolled release of mud and gas through the rotary table and the potential for ignition").

fundamental well control – Transocean simply commissioned a survey, which, after six months, told them what they already knew (*i.e.,* that there was a serious problem with the safety management system, due to practices and policies originating at the divisional and corporate levels (*i.e.,* those same divisional and corporate levels who discussed, and then brushed to the side, the alarm bells that were sounding seven months before the blowout)).[620]  And, tellingly, after three years, neither Mr. Newman nor Transocean had learned any lessons from Macondo regarding management failures that would help to prevent another such incident from happening again.[621]  Indeed, Transocean Management effectively ratified the conduct of the DEEPWATER HORIZON Crew, including the Captain, the OIM, the Maintenance Supervisor and the Toolpusher with incentive-based bonuses "based on safety, safety performance, individual performance, cash flow, value added, daily operating spend" and downtime, following the loss of the vessel.[622]

As far back as 2005, Transocean knew it was failing to effectively manage safety risks, and in May of 2009, roughly a year before the loss of the DEEPWATER HORIZON, a company-wide risk management and task planning survey showed that Transocean still had the same management problems in 2009 that had been identified four years earlier.  As stated by Transocean's Corporate Director of Operations Performance:

> I had a moment of deja vu while listening to each of you provide feedback in these areas….  In late 2004, we carried out a survey with the OIM's related to these very same topics. Bob Scott and Steven Newman at the time were frustrated with our results and we recognized the difficulties we were experiencing with Task Planning and Risk Management….  The results of this 2004 survey were the topic of a Division Manager's meeting

---

[620] *See generally,* Newman Testimony, pp.4630-4637; TREX-5482 (Lloyd's powerpoint, March 2010); TREX-929 (Lloyd's Register Survey, July 2010), at p.12.

[621] See Newman Tesimony, pp.4638-4642.

[622] McMahan Deposition, pp.139-140, 146-147.  *See also,* TREX-1470 at pdf p.2 (Transocean 2010 Annual Report, p.P-35) (*see* TREX-1470.49.1.PSC and TREX-1470.49.2.PSC) (awarding base salary increases, cash award bonuses and multi-million dollar executive officers "in recognition of …significantly improving the Company's safety record" and declaring that "we recorded the best year in safety performance in our Company's history").

earlier in 2005. I thought I would share these results with you today in 2009 since the recent Q1 PMAA results resonated to me many of the same results noted in 2005.... The definition of Insanity – Doing the same things over and over and expecting a different result.[623]

A December 2009 Transocean Engineering HSEE powerpoint presentation stated: "…we have lost our safety culture..."[624]

Transocean's ongoing refusal to correct known safety problems is exemplified by a number of earlier well control events aboard Transocean vessels that were remarkably similar to that which led to the explosions and loss of the DEEPWATER HORIZON, and, as Transocean investigations revealed, their root causes were the same.[625]

In August of 2004, a blowout and fire occurred aboard Transocean's semi-submersible THE JIM CUNNINGHAM.  Transocean's investigation concluded that:

- "Procedures were not set up to effectively detect kicks."[626]

- "Team did not heed warnings in drilling program…."[627]

- "Team did not use disciplined, coordinated procedures to monitor for well influxes:"[628]

- "Key personnel did not provide leadership and competent oversight and guidance to ensure all parties fulfilled their respective responsibilities.  This put personnel at extreme risk, and is considered gross negligence."[629]

Similar to the DEEPWATER HORIZON incident, THE JIM CUNNINGHAM investigation found that "alarms were routinely turned off",[630] "team had a low perception of risk",[631]

---

[623] TREX-5479, p.1; Ambrose Testimony, pp.6133:22-6134:18.
[624] TREX-5486, p.17.
[625] *See generally,* D-3100.
[626] TREX-7134, p.12; Ambrose Testimony, p.6135:1-7; *see also, e.g.,* TREX-26009.b.
[627] TREX-7134, p.16; Ambrose Testimony, p.6135:8-13.
[628] TREX-7134, p.16; Ambrose Testimony, p.6135:14-18.
[629] TREX-26009.b, at p.1.
[630] TREX-26009.a
[631] TREX-7134, p.17

"emergency response command and control was weak",[632] and "OIM did not attend MEM training".[633]

By March 2008, the situation had deteriorated such that Larry McMahan, Transocean's Vice-President of Performance, wrote an e-mail to management teams about a series of recent loss of control type events, including as an example, loss of well control:

- "we cannot ignore what has happened in the area of Loss of Control.  This is very concerning to me."

- "The problem is that we are having events at a rate that is overwhelming."

- "There are lessons to be learned from each of these incidents, for the most part the lessons are only reminders as the events are not completely unique."

- "We would be better off investing that time in the prevention side and more effective risk assessment, as well as adherence to procedure."

- "…if we do not change the way we operate we will continue to have these train wrecks."[634]

On June 4, 2008, less than three months after McMahan's "train wreck" e-mail, Transocean experienced a serious well control event at Shell Nigeria in which mud was ejected above the rotary table onto the rig floor.[635]  The next day, McMahan sent an e-mail addressing this and other critical safety incidents.  He wrote: "This must stop today."[636]

Several months later, in February of 2009, another serious loss of well control event occurred aboard the M.G. HULME, JR.  Transocean's investigation revealed that:

- "No Task Risk Assessment (TRA) was performed..."

- "Management of Change was not adequately addressed..."

- "Well Control training and Well Control manual does not adequately cover the

---

[632] TREX-26009.a, p.2
[633] TREX-7134, p.20.
[634] TREX-2189, pp.1, 3; McMahan Deposition, pp.210-213.
[635] McMahan Deposition, p.234.
[636] McMahan Deposition, pp.230-232.

procedures for closing in a well during a blowout situation; also the use of the diverter is not adequately covered"

- "the use of the diverter is not adequately covered…"

- "No specific training given for handling a kick in the riser and a lack of explanation about the proper use of the diverter."[637]

The M.G. HULME investigation further found that the rig's shore-based managers did not "challenge the rig team to ensure that all systems necessary to perform critical tasks were operational,"[638] and that Transocean's fleet lacked "specific competency of drillers."[639] Transocean identified the potential consequences of this incident as "total loss of rig", "Serious Injury Cases/Fatalities" and "Major Environmental Damage".[640]

Another well control event, this one in July of 2009 aboard the DEEPWATER EXPEDITION, once again demonstrated Transocean Management's failure to correct fundamental safety issues including the inadequacy of crew training.[641]  It involved:

- Multiple failures to shut in the well when influxes were clearly detected;

- Multiple influxes allowed into the well bore; and

- Not shutting in the well during an influx.

According to Transocean's investigation, the drill crew allowed the well to flow due to an unproven assumption that it was "ballooning".[642]   The investigation found this to be "unacceptable" and "completely contrary to standard accepted well control practice."[643]

These dangerous practices were seen again in 2009 during the riser unloading event on the Transocean SEDCO 702.  Transocean's crew on that rig again ignored kick indicators on the

---

[637] TREX-5650, pp.10, 13-14.
[638] TREX-5650, pp.13-14
[639] TREX-5650, p.14
[640] TREX-5650, p.7
[641] TREX-26025.a, p.4.
[642] TREX-26025.a, p. 6
[643] TREX-26025.a, p. 6

mistaken assumption that the well was "ballooning".[644]   Consequently, "an influx entered the well bore and was circulated above the BOP and into the riser."[645]   Transocean identified the causes of the incident as:

- "Complacency on the part of Transocean personnel";

- "Failure by Transocean personnel to ensure adequate well control planning";

- "Supervisors not fully aware of program, different crew, lack of DWOP and lessons learned communication"; and,

- "No shut-in action despite kick indicators."[646]

In 2009, separate from these well control incidents, Transocean had four fatalities on four different Transocean rigs in fewer than four months.   On October 21, 2009, Transocean's top executives, Steven Newman and Bob Long, sent an e-mail bulletin to all employees of Transocean that included the following statements:

- …something's not right.  We're clearly not executing our safety processes as well as we once thought – and we need to find out why.

- It is vital that we learn from these recent experiences so that no one else is injured or killed.

- We must learn why we cannot seem to operate without serious incidents and injury to our people.[647]

In December of 2009, a well control incident occurred aboard Transocean's SEDCO 711 rig in which there was "an uncontrolled release of hydrocarbons on the drill floor" due to the Transocean crew's "failure to notice kick indicators."[648]   Transocean identified the following as primary root causes:

- "Lack of clear well control procedures";

---

[644] TREX-7115, p.23
[645] TREX-7115, p.23
[646] TREX-7115, p.23
[647] TREX-26052. *See also,* Ambrose Testimony, pp. 6144:5-6145:8.
[648] TREX-01760, p. 2.

- "Risk assessment weakness in planning and execution"; and,

- "failure to monitor and identify the influx".[649]

This incident was, in the words of U.S. Drilling Expert Richard Heenan, "eerily" similar to what would happen on the DEEPWATER HORIZON.[650]

Transocean's investigation of this incident revealed prophetically that the Transocean "mindset is certainly less vigilant regarding well control preparedness during the completion phase as compared to the drilling phase."[651]   Although the investigation made the recommendation that Transocean's Well Control Handbook add a section on performing fluid displacements under controlled conditions, this was not done until after the April 20, 2010 catastrophe.[652]

Additionally, an advisory incorporating the Lessons Learned was issued on April 5th, but Transocean Management in North America did not review it until after the Macondo blowout and did not provide it to drilling rigs in the Gulf until late September or October of 2010.[653]

In its Annual Well Control Event Report for 2009, Transocean Management recognized:

- "the increasing trend seen in 2009 of drilling risers being either partially or completely evacuated (or unloaded) due to gas being circulated above subsea BOP stacks."

- "From December 2008 until year-end 2009, this type of event [riser unloading] occurred 6 times on Transocean rigs."

- "It is particularly hazardous due to the uncontrolled release of mud and gas through the rotary table and the potential for ignition…"

- "Riser unloading events can be avoided through the application of fundamental well control practices such as treating every positive

---

[649] TREX-1760, p.2; TREX-3505, p.25.
[650] Heenan Report (TREX-22694) pp.5-6.
[651] TREX-3505, p.1; Ambrose Testimony, pp.6141:18-6142:12.
[652] *See* TREX-5774; TREX-5781.
[653] Sannan Deposition, pp.151-156, 236-258; Hart Deposition, pp.241-243, 253; TREX-1523; TREX-3793, TREX-5749.

indicator as a kick, shutting in quickly and taking returns through the choke whenever in any doubt whatsoever."[654]

Transocean's 2009 Year End Fleet Performance Summary showed increasing well control events, most associated with an influx.[655] According to Transocean's Well Control Events & Statistics, 2005-2009, "the frequency of riser unloading events is the biggest concern."[656] The report reinforced the knowledge and the recognition that these "can be avoided through the application of fundamental well control practices such as treating every positive indicator as a kick, shutting in quickly and taking returns through the choke whenever in any doubt whatsoever."[657] Yet, there is no evidence of Transocean Management taking any affirmative steps to ensure that drill crews were be advised, trained and otherwise directed in the importance and the tenets of fundamental well control.

The April 20, 2010 tragedy was at least the seventh riser unloading that a Transocean rig experienced in the previous seventeen months.[658]

The DEEPWATER HORIZON itself was not exempt from these failings. Randy Ezell, Transocean's Senior Toolpusher aboard the DEEPWATER HORIZON, recalled "several" declared well control events where hydrocarbons made it past the BOP and to the bottom of the rotary table on the drill floor[659] – events that had the potential to endanger life and the environment.[660]

On March 8, 2010, some five weeks before April 20 catastrophe, the Transocean crew on the DEEPWATER HORIZON failed to catch a gas kick for some 35-40 minutes, again demonstrating that the lack of training and performance in fundamental well control was no

---

[654] TREX-36070 (Transocean Well Control Events and Statistics, 2005-2009) p.13; *see also,* p.42.
[655] TREX-4659, p.19; Keeton Deposition, p.506.
[656] TREX-5649, p.7; Braniff Deposition, pp.239-241.
[657] TREX-5649, p.7
[658] TREX-36070 (Transocean Well Control Events and Statistics, 2005-2009), p.13.
[659] Ezell Testimony, pp.1691-1697.
[660] Ezell Testimony, pp.1691-1697.

isolated incident but, rather, was a chronic problem allowed by Transocean Management to go uncorrected.   There is no evidence, for example, that Transocean took any steps on the DEEPWATER HORIZON to prevent further well control incidents at Macondo or otherwise following the March 8th kick, nor did Transocean change any of its BOP activation procedures or sequencing.[661]

Lloyd's Register, as noted, performed an assessment in March of 2010 of Transocean's safety management and safety culture.   Among the comments of Transocean supervisors recounted in the report were the following ominous indications of training failures:

- "The workforce was not always aware of the hazards they were exposed to, relating to both their job and to other jobs in the same/adjoining work areas";

- "The risks posed by identified hazards were not fully understood, and the subsequent control measures were not always appropriate";

- "Emerging hazards during task execution, and hazards with a changing risk level were not always detected or fully appreciated"; and,

- "They don't know what they don't know."[662]

The report advised that "this clearly demands attention" and, as noted, concludes that most of the failures can be "traced back to practices and policies that originate at the Divisional and/or Corporate levels."[663]

In summary, the longstanding failure of Transocean drill crews to know and follow basic well monitoring, kick detection and shut in procedures, was well known to upper level management for years but continued unabated and uncorrected.   This chronic problem ultimately

---

[661] Newman Testimony, p.4621:1-25.
[662] TREX-929, p.9.
[663] TREX-929, at pp.9, 12; *see also,* pp.29-48 (the Transocean Corporate Level is a driving factor behind 26 of the 28 underlying causes).

led to the disaster of April 20, 2010, which Larry McMahan, Transocean's Vice President, Operations and Performance, agreed was a "train wreck of the largest magnitude."[664]

For the above and foregoing reasons, the Court finds that Transocean Management itself exhibited a willful and reckless disregard to the serious and ongoing training issues across the company and the maintenance issues on the DEEPWATER HORIZON, and that the willful and wanton conduct of Transocean managerial and other personnel stemmed from corporate culture and policy, or was otherwise known to, approved by, or subsequently ratified by corporate officials with policymaking authority.

## FINDINGS AND CONCLUSIONS REGARDING
## BP'S WILLFUL AND RECKLESS DISREGARD

BP Management and personnel exhibited willful and reckless disregard for public health and safety which directly and proximately caused and contributed to the blowout, explosions, fire, and sinking of the DEEPWATER HORIZON.  Such willful and reckless disregard caused, contributed to, and is evidenced by, among other things:

- Engaging in fast and reckless drilling, with little or no regard to the drilling margin, despite multiple kicks, and in violation of the MMS Regulations requiring a Safe Drilling Margin;

- Creating, maintaining and largely ignoring a dangerously dysfunctional leadership team, which embraced the corporate culture of cutting costs and maximizing profits;

- Proceeding with the cement job without a set of reliable test results confirming the slurry's stability;

- Proceeding with the displacement despite a failed negative pressure test;

---

[664] McMahan, p.214:5-11.

- Selecting, configuring, sequencing, modifying, and refusing to upgrade the safety critical BOP, which was not sufficient or appropriate for the Macondo well;  and,

- Knowingly refusing to correct Transocean's persistent maintenance failures of safety critical equipment on the DEEPWATER HORIZON.

*BP Willfully Engaged in Fast and Reckless Drilling Which Was A Significant Contributing Factor in the Blowout*

The Court has considered, in addition to other evidence on this issue, the expert opinions of Andrew Hurst, Alan Huffman, Gene Beck, Richard Strickland and Ted Bourgoyne. It is the conclusion of the Court that, especially given the very high risk associated with the area in which BP was drilling, BP's drilling of this well was reckless and some of the information provided to the MMS was intentionally inaccurate, misleading and incomplete.

Dr. Andrew Hurst, professor of petroleum geology and geoscience at the University of Aberdeen, testified that the Mississippi Canyon area of the Gulf of Mexico is very fragile,[665] has abundant seismic activity (including a 2006 earthquake in the area),[666] and has anomalously low fracture gradients of leak off pressures.[667]  The result is that "extreme caution" is required when designing drilling programs.[668]

- Q. Does this area, particularly in the knowledge of an earthquake in relative recent occurrence, call for a particularly high degree of care in developing the wellbore?

- A. I would say a *very high degree of caution*.[669]

The Macondo well formation was under 5,000 feet of water and another 13,000 feet of earth in a formation known for being a high pressure, high temperature, and most importantly, an

---

[665] Hurst Testimony, p.1531:8-12.
[666] Hurst Testimony,  pp.1529:13-1531:7; 1536:23-1537:3; 1543:2-16.
[667] Hurst Testimony,  pp.1538:20 - 1541:15.
[668] Hurst Testimony,  pp. 1543:2-6 (emphasis added).
[669] Trial Testimony A. Hurst, p. 1552:20-23.

unstable, no-salt formation.  As Jonathan Bellow, a BP Operations Geologist for DEEPWATER HORIZON confirmed:

- Wells without a thick sequence of salt require more casing for a given depth than those that penetrate salt.

- The drilling window between the Pore Pressure and the Frac Gradient is generally narrower in no salt wells, which requires more casing.

- BP had "drilled wells with no salt previously," but "it had just been a few wells."[670]

A Macondo-type blowout had been identified as one of the highest risks across the entire BP organization.  According to the evidence presented, the risk of a blowout in the Gulf of Mexico was nine times higher than in other locations.[671]

Despite the known fragility and volatility of the formations through which BP was drilling, BP did not drill with "extreme caution."  Quite the opposite.  According to one of BP's Geologists on the Macondo well, BP drilled "like a bat out of hell."[672]  BP drilled so fast that BP's "Tiger Team" of geophysicists could not provide their analysis of real-time data fast enough to allow for the maintenance of a Safe Drilling Margin.[673]  Consequently, there were over a dozen well control events at Macondo, including four kicks and ten incidents of lost returns, resulting in the astounding loss of approximately 15,926 barrels (668,892 gallons) of

---

[670]   Bellow Deposition, pp.82, 190.
[671]   *See, e.g.,* Hayward Depo, pp.196, 782; Baxter Deposition, pp.276-278; Bea Testimony, pp.302-304; TREX-1736 (SEEAC Brief); TREX-7192 at pdf p.19 (Blowout and Well Release Frequencies, SINTEF Database, 2009, p.12) (the risk of a blowout in the Gulf of Mexico was nine times higher than in other parts of the world); D-2868; D-2887.
[672]   TREX-01072.
[673]   TREX-00214, discussed in more detail *infra*.

drilling fluids.[674]  By drilling in this way, BP created the "nightmare well," the "crazy well," the "well from hell." [675]

Dr. Alan Huffman is a highly credentialed and experienced geophysicist with 23 years of industry experience in designing wells.[676]  Part of the service he provides to his drilling clients is to give operational guidance when they encounter narrow drilling margins.[677]  Dr. Huffman testified that MMS regulations are based on decades of drilling experience, in both onshore and offshore environments, and generally require the operator to employ the best and safest technology to keep the well under control "at all times," "not just when drilling."[678]

In the industry, the Safe Drilling Margin is typically 0.5 pounds per gallon (ppg),[679] and BP's original Application for Permit to Drill (APD) for Macondo set 0.5 ppg as the Safe Drilling Margin for each interval.[680]

Dr. Huffman's review of the records revealed that BP repeatedly violated the Safe Drilling Margin (in some cases proceeding ahead with no margin at all), and consistently gave false or misleading reports to the MMS.[681]  It was Dr. Huffman's opinion that, on at least four separate intervals, BP violated drilling margins and failed to act as a prudent operator.[682]  "BP played it fast and loose with their pressure integrity tests, and yet when they had hole behavior

---

[674]  TREX-1035, p.4; D-2150.
[675]  *See, e.g.,* TREX-126; D-3126; Corser Deposition, p.288; Taylor Deposition, pp.44-45; Cunningham Deposition, pp.223-224; *see also,* Keith Testimony, pp.3716-3718; Ambrose Testimony, pp.6113-6114; D-2150.
[676]  Dr. Huffman's report was admitted as TREX-07510 and his Rebuttal Report was admitted as TREX-07511.  Huffman Testimony, pp.647-648.  Dr. Huffman's credentials are set forth more fully at pp.1-4 of TREX-07510.
[677]  Huffman Testimony, pp.647-649.
[678]  Huffman Testimony, pp.649, 660-661.
[679]  Huffman Testimony, p.654:20-22; *see also,* Douglas Deposition, p.108 (MMS has an internal policy that 0.5 is the Safe Drilling Margin); Patton Deposition, pp.94-96, 463-464 (the MMS's internal policy is a 0.5 drilling margin, with an exception of 0.3 where the operator shows that there are no hydrocarbons and no chance of hydrocarbons in the next hole section to be drilled); *see also,* TREX-3732 (internal BP e-mail acknowledging that a waiver from the MMS would be required to drill with a margin of less than 0.5 ppg).  *See also,* Douglas Deposition, p.96 (the MMS Regulations require that "if you can't maintain that margin, you can't drill ahead until you fix it").
[680]  TREX-04201; Huffman Testimony, pp.665-666.
[681]  Huffman Testimony, p.664; TREX-07510, p.27.
[682]  Huffman Testimony, p.669:18-670:7.

observations that were clearly valid, they tended to discount them and continue to drill ahead without a safe margin."[683] In three of the four intervals, Dr. Huffman found BP's conduct "totally unsafe and dangerous, not just regulatory violations here, unsafe from any industry practice that I'm aware of."[684] He found BP's conduct "egregious beyond anything I have seen in my career."[685] The Court has carefully considered the evidence on this issue, and finds Dr. Huffman's opinions to be credible, reliable, and consistent with the weight of surrounding evidence.

In the late October 2009 interval,[686] Dr. Huffman found "blatant violations" of the Safe Drilling Margin, including BP's drilling with no margin at all.[687] "It's beyond any standard that I can think of."[688]

In order to get a waiver of the 0.5 Safe Drilling Margin, BP falsely reported test data on its submission to the MMS.[689] Even if one gives BP the benefit of the doubt and accepts the 10.25 Fracture Gradient it contends existed, the drilling margin would have been only 0.15, less than the 0.3 ppg variance approved by the MMS.[690] BP drilled ahead anyway, and took a kick at 8,970 feet. The Court finds that this conduct was knowing and willful.

Following the October 2009 kick, BP Geologist Bobby Bodek created a powerpoint in which he set forth BP's two basic choices at that point: set casing or drill ahead.[691] If BP were to set casing, it would effectively lose an interval, leading to a smaller hole in the reservoir; on the other hand, if BP drilled ahead with no margin, it risked a "potentially uncontrollable well

---

[683] Huffman Testimony,  p.720:9-12.
[684] Huffman Testimony, p.670:8:15 (emphasis added).
[685] Huffman Testimony, p.671:12-17 (emphasis added).
[686] Discussed in detail at TREX-07510, pp. 27-33.
[687] Huffman Testimony,  p.672:6-8.
[688] Huffman Testimony,  p.672:9-14.
[689] TREX-1336 (Oct. 2009 Application for Permit to Drill (APD)); TREX-3727; TREX-7510 p.32; Huffman Testimony,  pp.673-676.
[690] Huffman Testimony,  p.677.
[691] TREX-1337; *see also,* TREX-7510 p.31; Huffman Testimony, pp.679-681.

control event."[692]   As Dr. Huffman states in his report: "The decision, then, was one of safety versus economics. BP chose economics...."[693]

"[D]rilling ahead in this environment was, not only unsafe, it violates every standard I can think of in how wells are drilled in the deep water and elsewhere in our industry. It is truly egregious to drill that extra 100 feet knowing that you could potentially lose the well in the process."[694]

BP's misrepresentations to the MMS continued. In BP's application of October 29, 2009, BP falsely reported fracture gradients in four separate places,[695] and BP never disclosed that it had drilled ahead without any margin.

The March 8, 2010 kick is another example of BP's fast and reckless drilling. Significantly, the kick was reported to Harry Thierens in London.[696]   An internal investigation was begun, and, as a part of the investigation, BP Tiger Team geologist Jonathan Bellows sent out a March 12, 2010 e-mail to various BP employees requesting "thoughts and help" about how to avoid a recurrence.[697]   BP Geologist Stuart Lacy replied with remarkable understatement: "drilling like a bat out of hell in these PP [Pore Pressure] narrow window wells is perhaps not wise."[698]

By March 18, 2012, BP Tiger Team geologist Robert Bodek had created a "Lessons Learned" which included a finding that "the accelerated rate of penetration and the resulting 'onslaught' of drilling indicators exceeded the ability of team members to effectively recognize, properly communicate and decisively act upon available data.…   In wells with narrow drilling

---

[692]   TREX-01337.
[693]   TREX-7510 p.26.
[694]   Huffman Testimony, p.681:1-7.
[695]   TREX-7510 p.32.
[696]    Thierens Deposition, p.60; TREX-6091 (March 10, 2010 E-mail from Rich to Thierens with Daily Report from 3/8/10).
[697]   TREX-1072, p.1.
[698]   TREX-1072, p.1.

margins, drilling techniques such as drilling at reduced ROP [Rate of Penetration] ... should be employed."[699] Bodek admitted: "I had a concern that we were drilling too fast. That's documented."[700]

In response to the Lessons Learned, Tiger Team Member Kate Paine stated: "After deciding to drill ahead, we encountered losses. We were aware of the upper limit ECD and exceeded it because we didn't believe the MWD LOT numbers. I'm not sure it was a lack of communication as much as a 'we can get away with this' attitude."[701]  Further, and perhaps of greater significance, Ms. Paine commented:

> I'm sorry to push back on lessons learned. I know you've got to get something out there to make it look like we won't do this again. But without obvious indicators and with the real push to make hole and skip the contingency liner, I don't see us really learning.[702]

Process Safety Expert Robert Bea stated that Paine's email demonstrates the end product of the serious process safety failures BP continued to have:  "It identifies that risks were being taken in an effort to obtain the prize of a faster, cheaper drilling method;  it makes clear that risks were not being assessed despite knowing they existed;  it admits that key drilling indicators were being ignored in an effort to achieve the goal of quickly finishing the well;  it admits that the attitude of 'getting away with it' was placed above known harm;  and it concedes that lessons are not going to be learned from this event."[703]  The Court agrees, concluding that the above conduct constitutes, and the above comments evidence, a willful and reckless disregard.

---

[699]  TREX-214, p.4 (the Lessons Learned included a recommendation that the "rate of penetration is such that all the aforementioned indicators can be adequately evaluated in 'real time'"); *see also,* Albertin Deposition, pp.155-157 (in layman's language, "slow down the drilling process" because "what you want to do in a well is not get into a place where you out-drill the indicators";  "giving us more time to analyze the data would be good").

[700]  Bodek Deposition, p.205:8-13.

[701]  TREX-1136 at pdf p.1.

[702]  TREX-1136 at pdf p.1.  A similar attitude was evidenced by BP's GoM Drilling Engineering Manager who referred to a process safety lessons learned received from lower level BP employees as "clutter."  *See* TREX-786 at pdf p1.

[703]  Bea/Gale Report, p.i (TREX-20001 at pdf p.2).

As BP neared the end of drilling, the formation instability and resulting narrow Pore Pressure gradient so deeply concerned BP Geologist Robert Bodek, that he told his boss in a March 27 e-mail, if BP continued to total depth "it'll all be in God's hands."[704]

But BP continued drilling.

Two days later, on March 29, just twenty-two days before the Macondo blowout, Bodek told his boss that if they really believed that the Pore Pressure could be as high as projected, then "we need to start having some serious discussions about pulling the plug early."[705]  BP drilled ahead.

Although total depth was declared on April 9, 2010, (some 11 days before the blowout), BP's fast and reckless drilling created a well condition that, as the Court found *supra,* led directly to the catastrophe. "At the very least, BP should have been on high-alert and exercised extreme caution."[706]

However, reflective of BP's process safety failures at the highest levels, neither extreme care nor even due care was exercised.  Each of BP's critical decisions made during the final temporary abandonment stage, from cement to displacement, recklessly and needlessly increased risk in order to save time and money.[707]  In sum, the Court finds that BP's drilling operations were conducted willfully and wantonly, and played a significant contributing role in the blowout.

*BP Created and Recklessly Allowed its Dangerously Dysfunctional Leadership to Proceed With the Safety Critical Temporary Abandonment Process*

As BP entered the critical temporary abandonment phase, BP's Macondo Wells Team leadership was in crisis. Three days before the April 20 explosion, the on-shore BP Operations

---

[704] Bodek Deposition, p.269; TREX-01087.
[705] Bodek Deposition, p.282.
[706] Beck Rebuttal Report (TREX-61117) p.7; *see also,* Huffman Testimony, pp.718-719.
[707] Bea/Gale Report, p.xix (TREX-20001 at pdf p.20); D-2445 (Key Macondo Decisions); Beck Report (TREX-8140), pp.26-29; Beck Rebuttal Report (TREX-61117), pp.13-15.

Manager David Sims received an e-mail from the BP Wells Team Leader John Guide reflecting the dysfunction of the Macondo Wells Team and some of very real ramifications this was having on the temporary abandonment plans for the well:

> David, over the past four days there has been so many last minute changes to the operation that the WSLs [Well Site Leaders] have finally come to their wits end.  The quote is 'flying by the seat of our pants'. ... Everybody wants to do the right thing, but, this huge level of paranoia from engineering leadership is driving chaos.  This operation is not Thunderhorse.  Brian has called me numerous times trying to make sense of all the insanity.... The operation is not going to succeed if we continue in this manner.[708]

In this ongoing battle between Wells Team Leader John Guide and his boss David Sims, Sims had sent Guide an e-mail following the March 8th kick:

> We cannot fight about every decision…I will hand this well over to you in the morning and then you will be able to do whatever you want. I would strongly suggest for everyone's sake, that you make logical decisions based on facts after weighing all the opinions.[709]

In a second e-mail that Sims drafted to Guide but did not send, Sims accused Guide of blaming everyone else on the rig without seeming to realize that he (Guide) was responsible for everything that happened on the rig.[710] When questioned about the e-mail at trial, Guide agreed that he would not want to turn over the well to someone like the person Sims describes.[711]

BP Drilling Engineer Brian Morel separately expressed his concern about the "insanity" and "chaos" when he wrote fellow BP employee Richard Miller that "...this has been a nightmare

---

[708] TREX-1694; TREX-1144.
[709] TREX-1126; Guide Testimony, pp.8659-8662.
[710] TREX-1127. The Court notes that this description is consistent with the Court's observations of Mr. Guide's general attitude and demeanor at trial.
[711] Guide Testimony, pp.8799-8804.  *See generally,* D-3618 (referencing "Flying by the seat of our pants.' … huge level of paranoia from engineering leadership driving chaos" (TREX-1144), "A 'we can get away with this attitude' … I don't see us really learning" (TREX-1136), "?????????????????????..." – Patrick O'Bryan re the "bladder effect" (TREX-759); "I will hand this well over to you in the morning and then you will be able to do whatever you want. I would strongly suggest, for everyone's sake, that you make logical decisions, based on facts, after weighing all the opinions. Taking an action just because the WSL's want to do it, when there is strong argument against and multiple contrary opinions is not advised" (TREX-1127), "Knew the cement design was on the ragged edge" (TREX-37031), "Drilling like a bat out of hell" (TREX-1072), "Everything is someone else's fault" (TREX-1127), "Thought we were going t get a shitty cement job" (TREX-4451), and "But who cares, it's done, end of story, will probably be fine…." (TREX-1367)).

well that has everyone all over the place," to which Miller replied: "We have flipped design parameters around to the point where I got nervous."[712] Senior Drilling Engineer Mark Hafle chimed in that "This has been a crazy well for sure."[713]  Both Morel and Hafle refused to testify on Fifth Amendment grounds.[714]

Transocean Rig Manager Paul Johnson testified that BP gave Transocean the temporary abandonment plan "late" and at the "last minute" although Transocean needed it sooner in order to prepare.[715]  BP Engineering Team Leader Greg Walz was also "concerned about last minute changes" because he wanted an "adequate opportunity to ask more detailed questions about the design issues."[716]

Halliburton drilling expert Gene Beck testified that BP's last minute flurry of changes were made "on the fly"[717] and "rendered the well a high risk and dangerous well."[718] Transocean's investigation agreed, and supports the report and testimony of Dr. Bea that these changes "contained unnecessary risk and contributed to the cause of the incident."[719]  The Court agrees and accepts these opinions.

There were five different temporary abandonment plans between Aril 12 and April 20, 2010.[720] BP did not use "risk assessment procedures or prepare[] Management of Change documents for these decisions, or otherwise address[] these risks and the potential adverse effects on personnel and process safety."[721] Moreover, the final temporary abandonment plan selected

---

[712]   TREX-126.
[713]   TREX-126.
[714]   *See, e.g.,* Morel Deposition, p.7:19-21 (invoking Fifth Amendment on issue); Hafle Deposition, pp.12-13 (invoking Fifth Amendment on issue).
[715]   Johnson Deposition, pp.99-101.
[716]  Walz Deposition, pp.230:24 - 231:5; TREX-1260, p.6.
[717]  Beck Testimony, p.7172:16-19.
[718]  Beck Testimony, p.7175:2-23.
[719]  TREX-3808 at pdf pp.67-68 (Transocean Investigation Report, Vol. I, pp.79-80).
[720]  TREX-3808 at pdf pp.6 (Transocean Investigation Report, Vol. I, p.10).
[721]  TREX-3808 at pdf pp.6 (Transocean Investigation Report, Vol. I, p.10).

by BP "contained unnecessary risks that were not subject to a formal risk assessment"[722] and "did not have the required approval by the MMS."[723] Each component of the temporary abandonment plan will be addressed separately.

### BP's Willful and Reckless Temporary Abandonment Choices Guaranteed That the Defective Cement Job Would Fail

The final production casing cement was safety critical because it was to serve as the primary barrier to an influx and blowout.  The BP and Transocean investigations as well as the reports and testimony of all expert witnesses on the subject agree that the cement was defective,[724] did not isolate the hydrocarbons in the formation, and allowed hydrocarbons to enter the well bore at the shoe track at the bottom of the hole, where they made their way to the DEEPWATER HORIZON and ignited.[725]

As discussed *supra,* the Court agrees.  Further, the Court agrees with the BP Investigation Report's Key Finding Number 1: "The annulus cement barrier failed to prevent hydrocarbons from entering the wellbore" as a result of "interactions between BP and Halliburton and shortcomings in the planning, design and execution and confirmation of the cement job."[726]

After considering all of the evidence presented, the Court finds that BP's temporary abandonment decisions were made with the knowledge that they would increase the risk of a

---

[722] Ambrose Testimony, p.6107:22-25.
[723] TREX-3808 at pdf p.6 (Transocean Investigation Report, Vol. I, p.10).
[724] *See generally,* Bly Testimony, pp.915-916; TREX-1 (Bly Report) p.33; Ambrose Testimony, pp.6049, 6213; D-4309A; Benge Testimony, pp.2545-2546; Roth Testimony, pp.3056, 3069, 3131, 3252-3253; Quirk Testimony, pp. 4761, 4764; Morgan Deposition, pp.20-21, 29; Garrison Deposition, pp.23-24, 28-29, 149-150, 159, 207-208 (re OTC testing for the Presidential Commission); Gardner Deposition, pp.90-95, 101-102, 110-111, 118, 123, 125, 163-164, 186, 237-238, 301; TREX-4572 pp.4-5. 9-12 (re Chevron testing in connection with BP investigation); TREX-7718 (re Haliburton's secret internal testing).
[725] TREX-00001 (Bly Report), pp.10, 33; TREX-03808 at pdf pp.60, 197 (Transocean Investigation Report, Vol. I, pp.72, 213) (the "precipitating cause" of the blowout was the failure of the cement); Bly Testimony, pp.915-916, 934-936; Ambrose Testimony, p.6049; D-2022.
[726] TREX-00001 (Bly Report) p.33;  Bly Testimony, pp.915-916.

blowout, to save BP time and money.[727]   The Court finds that this willful and reckless disregard was the result of systemic process safety failures, and a corporate culture and policy to cut costs and save money.

The cement used at Macondo was foam cement, known by BP to present risks and potential complications not found in conventional cement, thus requiring additional expertise and care.[728]  Erick Cunningham, BP's top cementing official for the Western Hemisphere, as well as Houston-based engineers, Greg Walz, Mark Hafle and Brian Morel, participated with Halliburton cement specialist Jesse Gagliano in cement slurry design decisions.[729]

Despite BP's knowledge of the increased risk of the foam cement, BP failed to conduct a proper risk assessment of the cement design, which might have prevented the tragedy.[730]

Prior to April 20, 2010, both Halliburton and Gagliano had histories of problems with modeling inputs and timeliness.[731] BP engineers voiced serious questions about competency.[732] In fact, BP Drilling Engineer Team Leader Greg Walz believed that the decision had already been made to fire Gagliano from his embedded position at BP's Houston office.[733]  By April 20, 2010, BP Engineer Brian Morel was not even on speaking terms with his Halliburton point of contact.[734]  Yet despite these misgivings, BP continued to rely on Mr. Gagliano and Halliburton for safety critical decisions.

---

[727] *See, e.g.* Bea/Gale Report, pp.xviii – xvix (TREX-20001 at pdf pp.19-20).
[728] Cunningham Deposition, p.124; TREX-625, p.1.
[729] Walz Deposition, pp.192:24 - 193:17; TREX-1260 p.2.
[730] Bly Testimony, pp.941, 944-945.
[731] Cocales Deposition, p.88; Walz Deposition, pp.324, 469-470.
[732] *See, e.g.,* Walz Deposition, pp.318-331, 326-327, 468-470, 625-627; Cocales Deposition, pp.84-88; Faul Deposition, pp.153-154, 336-337; Roth Testimony, pp.3235-3239.
[733] Walz Deposition, pp.328:4-13; 326:11 - 327:3.
[734] *See, e.g.,* Gagliano Testimony, pp.6595-6598 (discussing friction and tension between him and others, including Morel).

Because the cement was intended to act as a barrier to hydrocarbon flow, it was important for the cement to be tested to insure its stability before it is pumped into the well.[735] It was equally important that BP, as the operator, know that the cement had been tested and found stable.[736]  Despite this, and although BP could have required it,[737] there was no protocol requiring BP to review complete and reliable test results before pumping the cement.[738]  (As a condition of the sentence in BP's guilty plea, BP must now have an independent third party test the cement and confirm its stability before beginning a cement job.[739])

Although Halliburton (as discussed both *supra* and *infra*) developed the defective cement design, BP willfully and recklessly made temporary abandonment choices that dramatically increased the chances that the defective cement would fail. Although these choices increased risk, they saved BP time and money. Including:

- using long string casing rather than liner;

- using too few centralizers;

- refusing to do a full bottoms-up circulation;

- refusing to conduct a cement bond log;

- displacing the well to over3000 feet below the mud line;

- displacing the riser before setting the cement plug;

- not installing additional barriers during temporary abandonment;

- the use of left-over lost circulation material (LCM) as a spacer; and,

---

[735] Walz Deposition, pp.195:14-18; 197:5-15.
[736] Walz Deposition, pp. 197:15-198:12.
[737] Walz Deposition, p.204:5-12.
[738] Walz Deposition, p.206:19-23.
[739] TREX-52673 (BP Guilty Plea) at pdf pp.28-29.

- performing simultaneous operations during the displacement procedure.[740]

The Court will address each of these decisions separately.

*Long String v. Liner*

BP had two basic choices for the production casing it would install during the temporary abandonment: long string (which extends continuously from the sea floor to the bottom of the well) or liner (casing which is run only a short distance from the bottom of the well to a selected height in the well and is then "tied back" to the surface with another length of production liner).[741] As established by Halliburton Drilling Expert Gene Beck, a prudent operator would have chosen a liner/tie-back because:

- use of the long string increased the risk of cement contamination;

- use of the long string required higher equivalent circulating densities (ECDs) in the fragile formations; and

- the long string only provided one potential independently tested barrier to annular flow.[742]

Each of the foregoing factors increased the risk of a blowout.[743]  BP even conceded that using long string could result in lost circulation and create further complications during cementing.[744]  Yet, after changing course on this issue three times in three days,[745] BP chose the riskier course in order to save $7 to $10 million dollars.[746]

---

[740] *See generally,* Bea Testimony, pp.326-327; D-2445; Bea/Gale Report, pp.xviii – xxi, 58, 64 (TREX-20001 at pdf pp.19-22, 58, 64). The head of the Transocean Investigation Team agreed that all but the last two items increased risk but saved BP time and money. *See* Ambrose Testimony, pp.6120-6123.  Similarly, Halliburton Drilling Expert Gene Beck agreed that 9 of the 11 items listed saved BP time or money, but materially increased the risk of a blowout. *See* Beck Testimony, pp.7180 – 7184.

[741] Beck Report (TREX-8140), p.40; *see also,* Beck Rebuttal Report (TREX-61117), pp.34-35.

[742] Beck Testimony, p.7087; Beck Report (TREX-8140), pp.40-45.

[743] Beck Report (TREX-8140), pp.40-48.

[744] TREX-901; Beck Report (TREX-8140) p.46.

[745] Walz Deposition, p.230:8-12.

[746] Beck Report (TREX-8140), p.46; TREX-2659; TREX-1692 pp.7-9; TREX-1693, p.20; TREX-1134.

Transocean's Investigation reached the same conclusion as Mr. Beck: listing six separate advantages of liner over long string which would have reduced risk.[747] "The use of long string design... drove other departures that ultimately increased the risk and contributed to the incident."[748]

*Lack of Adequate Number of Centralizers*

Having the casing centered by using the proper number of centralizers is crucial to the success of the safety critical cement job because if the casing is off-center, it increases the chance of channeling (creating paths through which pressurized hydrocarbons can flow through and severely compromise the cement job), higher equivalent circulating density (ECD) (which increases the pressure on the formation), and gas flow potential.[749] A primary way of determining the proper number of centralizers to use for a given cement job is through computer modeling.[750]

Halliburton's computer modeling program was called "Opti-Cem." On April 15, 2010, Jesse Gagliano provided BP engineers with an Opti-Cem report showing that the use of 10 centralizers would create a higher ECD and increase the risk of channeling.[751] This started "a lot of discussion later in the day among Jesse [Gagliano], Mark Hafle and Brett Morel about ECD's spiking at 14.8 ppg - the model was predicting channeling."[752]

---

[747] TREX-3808 pdf p.34 (Transocean Investigation Report, Vol. I, p.46).
[748] TREX-3080 pdf p.35 (Transocean Investigation Report, Vol. I, p.47); Ambrose Testimony, pp.6115:18 – 6116:1.
[749] Walz Deposition, pp.111:4-112:5; Beck Report (TREX-8140), pp.54-61.
[750] Walz Deposition, pp.173:20-174:6.
[751] TREX-1260 pp.2-3; TREX-1684 p.2; TREX-1685 p.1; Walz Deposition, pp.123:12-124:3, 135:11-136-8, 165:8-24.
[752] TREX-1260 pp.2-3; TREX-1685 p.1.

According to BP Engineering Teams Leader Greg Walz, "the team was working the issue and concluding that the easiest solution was to add more centralizers."[753] Mr. Walz told Brett Cocales to find more centralizers and, at about 3:00 p.m. that day, Cocales told Walz he could get an additional 15 centralizers.[754] Walz then asked Gagliano to run the model with 21 centralizers to see if it would take care of the problem.[755] The Opti-Cem model run with 21 centralizers showed that it would be sufficient.[756]

Walz and Cocales tried to reach BP Wells Team Leader John Guide both by phone and e-mail to discuss the issue but could not reach him.[757] They then consulted with Guide's boss David Sims, and they jointly decided it would be wise to "honor the model" and go with 21 centralizers.[758] However, when Guide returned, he changed the plan, due to logistical concerns.[759]

BP asked Gagliano to model the use of only seven centralizers. When he did, on April 18, 2010, it showed severe gas flow potential and an increased risk of higher ECDs because of channeling.[760] On April 19, 2010, Walz spoke to Gagliano who discussed with him these ominous findings.[761] Nonetheless, BP chose to use not 21, not 10, not 7, but 6 centralizers.[762]

---

[753] TREX-01260, p.3.

[754] TREX-01260, p.3.

[755] TREX-01260, p.3; Walz Deposition, p.127:16-22.

[756] Walz Deposition, pp.127:16-22, 132:1-11, 166:1-6; TREX-630 pp.15-17 (April 15, 2010 Opti-Cem Report showing that 21 centralizers would reduce any gas flow potential to a "minor problem"); TREX-630 p.17 (would also reduce the chance of channeling).

[757] TREX-1685 p.1. The reason that Walz could not reach Guide is that he had been sleeping for 20 hours. *See* TREX-1686 p.1.

[758] TREX-01685, p.1; Walz Deposition, pp.138:22-139:18; 187:3-11.

[759] TREX-01687; TREX-1260 p. 4.

[760] TREX-00186, pp.16-18; Walz Deposition, pp.183:21-184:25.

[761] Walz Deposition, pp.183-185, 628-633.

[762] TREX-203; Walz Deposition, pp.169-172.

Transocean's investigation concluded that "[c]entralization above the production formation was poor and, therefore, gave an increased probability of channeling contamination."[763]

While BP now contends that Gagliano put inaccurate data into the Opti-Cem model,[764] it is clear that BP was questioning the accuracy of the models when they were being run,[765] and yet did not insist that Halliburton correct the model by inputting what BP considered to be more accurate data.  Rather, without subjecting the decision to a formal Management of Change, BP asked Brian Morel to create, without computer modeling, his own plan using 6 centralizers.[766] Walz admitted that BP could have asked Halliburton to model the 6 centralizer plan, that it would have cost BP no money, and that there would have been no downside to doing so.[767] Yet, BP consciously and recklessly chose not to model for 6 centralizers.

The Court finds that BP's conduct in selecting 6 centralizers was willful and reckless.

BP's Greg Walz admitted that had BP sent the right kind of centralizers to the rig, they would have been used.[768] Thus, BP's decision to use too few centralizers was a procurement and logistics decision, not an engineering one. BP's reckless attitude is illustrated by Brett Cocales' comment to fellow BP engineer Brian Morel: "But, who cares, it's done, end of story, will probably be fine…."[769]

---

[763]  TREX-03808 pdf p.35 (Transocean Investigation Report, Vol. I, p.47).
[764]  Gagliano Testimony, pp.6852-6853.
[765]  TREX-01685, p. 1; TREX-25026 Deposition G. Walz, p. 138:7-21.
[766]  TREX-203;  Walz Deposition, pp.168-172, 199.
[767]  Walz Deposition, pp.168-169; 199:6-15.
[768]  TREX-25026 Deposition G. Walz, p. 313:3-7.
[769]  TREX-203 p.2; TREX-1367, p.1.

*Refusal by BP to Do a Full Bottoms-Up Circulation*

The Court finds that BP failed to follow good oilfield practice and Halliburton cement recommendations when it willfully chose to forego bottoms-up circulation at the Macondo well.[770]

Circulating bottoms-up twice before the cement job (*i.e.* circulating the full annular volume twice) is intended to establish that there is not a kick in the well following a long period after casing is run and, secondly, serves to condition (*i.e.* clean) both the drilling fluid and the wellbore to ensure good cement placement and a sound cement job.[771]

BP disregarded Halliburton's on-site recommendation to do full bottoms-up.[772]  The vast majority of experts in this case concluded that it was unreasonable for BP to not do at least one full bottoms-up at Macondo, especially given the dangerous condition of the well: Gene Beck,[773] Glen Benge,[774] Calvin Barnhill,[775] Bea/Gale.[776]  In addition, Bill Ambrose who headed the Transocean Investigation, concluded that not doing full bottoms-up increased risk and saved BP time and money.[777]  The Court finds this conduct was willful and wanton and played a material role in what happened.

---

[770] TREX-737; Chaisson Testimony, pp.6292-6294; Beck Report (TREX-8140), p.12.
[771] Beck Report (TREX-8140), pp.78-79.
[772] TREX-737;  Chaisson Testimony, pp.6292-6294.
[773] TREX-08140 Beck Revised Report, pp. 31, 78-79; TREX-61117 Beck Rebuttal Report, pp. 35-37.
[774] Benge Testimony, pp.2379-2380;  Benge Report (TREX-5990), pdf pp.27-28; TREX-634 p.19.
[775] Barnhill Report (TREX-7676), pdf p.28.
[776] Bea/Gale Report, p.xviii (TREX-20001, pdf p.19).
[777] Trial Testimony B. Ambrose, p. 6122:13-17.

*Refusal to Perform a Cement Bond Log*

A Cement Bond Log (CBL) is a tool to evaluate the quality, success and stability of the safety critical cement job done as a part of the temporary abandonment process.[778] It provides information about the general quality of zonal isolation achieved by the cement and the cement's effectiveness as a barrier to flow.[779] Additionally, it allows the operator to accurately determine Top of Cement (TOC).[780]  It is for these reasons that BP's written policies state that a cement bond log should be run in all instances where top of cement is less than 1,000 feet above the shallowest hydrocarbon bearing zone, as was the Macondo well.[781]

Despite the fact that a Schlumberger crew was on the DEEPWATER HORIZON to perform the cement bond log,[782] BP willfully chose to incur the increased risk of not running it.[783] BP sent the Schlumberger crew home,[784] saving BP between $535,000 and $725,000.[785] As stated by Halliburton's Drilling Expert Gene Beck, "The need to evaluate the effectiveness of the cement placement is obvious. BP chose to cancel the cement bond log to save time and money, once again placing time to production ahead of safety."[786] The Court agrees and finds BP's conduct in this regard to be willful, wanton and needlessly reckless.

---

[778] Beck Report (TREX-8140), p.88; Walz Deposition, p.209:2-20. It also helps determine whether there is channeling in the cement. Walz Deposition, p.209.

[779] TREX-08140 Beck Revised Report, p. 88.

[780] TREX-08140 Beck Revised Report, p. 88; Trial Testimony N. Chaisson, p. 6323:18-22.

[781] TREX-00184 (DWOP, Section 26), pp.2-4; TREX-00184 p.10 (ETP GP 10-60, Zonal Isolation Requirements During Drilling Operations and Well Abandonment and Suspension, Sections 5.3.1 and 5.3.3); Beck Report (TREX-8140), pp.30, 88.

[782] Walz Deposition, p.211:1-11; PHASE ONE STIPULATION NO. 129.

[783] TREX-08140 Beck Revised Report, pp. 30, 88.

[784] The decision to cancel the cement bond log and send the Schlumberger crew back to shore was made by BP's John Guide and Greg Walz. *See* Walz Deposition, p.212:5-20.

[785] Walz Deposition, pp. 213:9-214:10; TREX-1690.

[786] Beck Report (TREX-8140) p.89; *see also,* Kellingray Deposition, pp.51, 55-56.

BP is alone in suggesting that a cement bond log was unnecessary.[787] Transocean's Drilling Expert Calvin Barnhill agrees that a CBL would have provided useful information[788] as do Plaintiffs' Experts Bob Bea and William Gale.[789]  Kevin Lacy, the former BP Vice-President of Drilling & Completions, testified that the failure to run a CBL was one of the primary causes of the Macondo disaster.[790]

Had the cement bond log been performed and channeling discovered, a remedial "squeeze job" (repair of the cement barrier) could have been performed prior to displacement, and zonal isolation achieved.[791]  Because a CBL was not performed, the failed cement job went undetected and allowed the flow of hydrocarbons into the well bore, leading to the catastrophe.

*Refusal by BP to Install Additional Barriers During Temporary Abandonment, and Displacement of Well to Over 3,000 Feet Below the Mudline*

Transocean's Investigation Report concluded that the most significant deficiency in BP's final plan was the cumulative lack of barriers to flow.[792]  BP's plan removed the drilling mud before setting the surface cement plug. As a result, the Court finds that no secondary barrier was in place during the negative pressure test and displacement, which needlessly increased the risk of an uncontrolled blowout.

Moreover, the final plan required displacing the drilling mud to 8,367' (about 3,300' below the mud line) and setting the cement plug in seawater at that level.[793] This was much

---

[787] Beck Rebuttal Report (TREX-61117), p.37.

[788] Barnhill Report, p.21 (TREX-7676 pdf p.29);  Barnhill Testimony, pp.4426:16 – 4427:4.

[789] Bea/Gale Report, p.xviii (TREX-20001 pdf p.19).

[790] K. Lacy Deposition, pp.132-133, 141, 171, 223-224, 242-243, 284-285; TREX-02921.  (Lacy also noted two other significant factors were failure to ensure independent mechanical barriers and no full time real-time monitoring from Houston.)

[791] Walz Deposition, pp.215:14 – 216:17.

[792]  TREX-3080  pdf p.198 (Transocean Investigation Report, Vol. I, p.214). *See also, e.g.,* K. Lacy Deposition, pp.124, 132-133, 141, 171, 223-224, 242-243, 284-285; TREX-02921.

[793] TREX-3080 pdf p.198 (Transocean Investigation Report, Vol. I, p.214); Bea/Gale Report (TREX-20001 pdf p.20).

greater than the normal displacement depth of between zero and 1,000 feet.[794]  BP Well Site Leader Murray Sepulvado testified that, in his entire career, he had never seen a plug set so deep.[795]  Similarly, Mudlogger Joe Keith said that, in his 18 years of working offshore, he had "never seen a well displaced during a temporary abandonment procedure to a depth of 8,300' or anything close to that."[796]

The Court finds that displacement at that depth caused multiple safety hazards. First, the underbalance created by BP's plan was "magnified significantly by the decision to place the plug 3,300 feet below the mud line."[797]  In other words, by removing so much mud from the wellbore, "it greatly reduced the amount of balancing pressure that the mud column exerted on the hydrocarbon zone."[798]  Second, because so much mud was being displaced and replaced by seawater, there was an inadequate number of tanks on the rig to hold the mud, necessitating diversion of the mud to the M/V DAMON BANKSTON during displacement.[799]  This, in turn, rendered the Sperry Flow-Out Sensors unable to measure the volume of fluids that were rising up through the well.[800]  The Court finds that this conduct was wanton and reckless, and played a significant role in the blowout.

*"Sham Recycling" by BP, in Using Left-Over Lost Circulation Material (LCM) as a Spacer*

During displacement, a "spacer" is used to separate the drilling mud from the seawater. Rather than use a conventional spacer during the displacement aboard the DEEPWATER

---

[794] TREX-3080 pdf p.198 (Transocean Investigation Report, Vol. I, p.214).  *See also, e.g.,* Barnhill Report (TREX-7676) at pdf p.32 (had never been done before).
[795] Sepulvado Deposition, p.176:3-7.
[796] Keith Testimony, p.3529:8-18.
[797] TREX-3080 pdf p.67 (Transocean Investigation Report, Vol. I, p.79).
[798] M. Sepulvado Deposition, p.176:8-14.
[799] Lindner Deposition, pp.131-132; 440-451; Keith Testimony, pp.3529:19 – 3520:2.
[800] Keith Testimony, pp.3529:19 – 3520:2, 3523:21 – 3526:18. (This issue is discussed in more detail in the section of these findings considering the issue of simultaneous operations *infra.*)

HORIZON, BP chose to use left-over Lost Circulation Material (LCM) (sometimes called a "pill") that is normally used to plug fractured formations. This is highly unconventional.

BP Well Site Leader Murry Sepulvado testified that he had never used LCM as a spacer and, in fact, in his many years in the offshore oil industry, had never even heard of it being used as such.[801]   According to the testimony, the "higher-ups" at BP approved this,[802] and the only testing done to determine its suitability as a spacer was to mix the two LCMs in a mixing cup on board the DEEPWATER HORIZON and to see whether there was a reaction.[803]

The evidence shows that BP did this to save money in two ways:  BP did not have to buy material specifically designed for this use as a spacer and, at the same time, BP avoided environmental laws and the expense of transporting the material to shore for commercial waste disposal.[804] One BP employee referred to the unprecedented use of LCM as a spacer in order to avoid costly waste disposal requirements as "sham recycling".[805]

Halliburton Drilling Expert Gene Beck called this "uncommon" use of Lost Circulation Material "inappropriate" and opined that because it "likely narrowed or clogged the kill line used during the negative pressure test," it "likely led to the misinterpretation of the negative pressure test."[806] Transocean drilling expert Calvin Barnhill agreed. "The location of the unorthodox spacer in the BOPs and the top of the wellbore created a situation that confused and confounded the negative pressure test, either through plugging or hydrostatic pressure effect. The use of the unorthodox spacer also quite possibly confounded and confused certain critical events which

[801] M. Sepulvado Deposition, pp.223:18 – 224:20.
[802] Lindner Deposition, pp.61, 75-76, 78-79, 405-406.
[803] Lindner Deposition, pp.92-93.
[804]  *See generally,* M. Sepulvado Deposition, pp.223-226; Barnhill Testimony, p.4397; Lindner Deposition, pp.406-407.
[805] TREX-1019 p.2.
[806] Beck Report (TREX-8140), p.102.

followed the negative test."[807]   The head of Transocean's Investigation, Bill Ambrose, agreed that the use of this LCM pill as a spacer both increased risk and saved BP time and money.[808] The Court agrees with these conclusions, and believes that this conduct further evidences willful and reckless disregard, irrespective of whether or not it was directly contributory to the events in question.

*BP's Willfull and Reckless Conduct of Simultaneous Operations During Displacement*

In a rush to complete the temporary abandonment at Macondo so the rig could move on to its next assignment, BP ordered that "multiple simultaneous and non-standard actions [be performed] without regard for safety or even [BP's] own standard operating procedures."[809] These simultaneous operations included:

- diverting lost circulation material to the M/V DAMON BANKSTON;
- transferring mud to the M/V DAMON BANKSTON;
- pumping seawater into the well from an unmonitored sea chest;
- cleaning and emptying several mud pits;
- draining trip tanks;
- draining unmonitored sand traps;
- conducting crane activities; and
- changing the pit which would receive well returns.[810]

Joe Keith, the Halliburton Sperry Mudlogger charged with monitoring the well during displacement, testified that, in his 18 years of working offshore, he had never seen so many

---

[807] Barnhill Report, p.28 (TREX-07676 pdf p.36).
[808] Ambrose Testimony, pp.6120-6121 (referring to D-2445).  *See also* Barnhill Testimony, p.4397 (was done to avoid hazardous waste regulations).
[809] Beck Report (TREX-8140), p.109.
[810] Beck Report (TREX-8140), pp.109-110;  Keith Testimony, pp.3511-3513; D-8167.

simultaneous operations (sometimes referred to as "SIMOPS") during displacement.[811] "Nine out of ten times, BP would cease all other activities because [displacement] is a safety critical activity."[812]

These simultaneous operations were apparently ordered by BP without performing any risk assessment,[813] and, among other things, hindered the Mudlogger's ability to monitor the well's flow-in, flow-out and pit gains, (two of the three "gold standard" ways in which a mudlogger monitors the well for a kick),[814] and likely contributed to the Transocean Drill Crew's inexplicable failure to recognize and respond to the kick in advance of the first explosion.

### *BP's Willful and Reckless Disregard in Proceeding with Displacement after a Failed Negative Pressure Test that was conducted by BP (and Transocean) without a Written Protocol*

A negative pressure test is "safety critical", as discussed in more detail above.  BP (like Transocean) had no standardized written procedure for performing the test and no requirements that its personnel receive formal training in how to perform or interpret the test on April 20, 2010.[815]

The negative pressure test that was ultimately performed on April 20, 2010 was not the one approved by the MMS and BP did not seek MMS approval for that test or a deviation from the approval MMS had given.[816]

Expert Gene Beck stated that "Given all the risks created by BP in the well and all the problems BP encountered with the well, BP should have been extra vigilant in ensuring that the

---

[811] Keith Testimony, pp.3511-3512.

[812] Keith Testimony, pp.3511-3512.

[813] Keith Testimony, pp.3511-3514;. *see also,* TREX-93 p.96; TREX-1575 (ETP GP 10-75, Simultaneous Operations); TREX-6121 p.90.

[814] Keith Testimony, pp.3511-3514.

[815] M. Sepulvado Depositon, pp.63:11-24, 198:18–199:10;  TREX-4 (Don Vidrine Statement) p.2.  *See also, e.g.,* TREX-00001 (Bly Report) p.182 (recommending the development of a standard procedure for the performance and interpretation of the negative pressure test).

[816] Barnhill Testimony, pp.4329-4330. (*See* TREX-570 (BP's April 16, 2010 Application for Permit to Modify).)

negative pressure test confirmed well integrity; instead, BP did the opposite."[817] All experts and all investigations agree that the negative pressure test was not a success.[818]  To proceed with the displacement was described by Drilling Expert Richard Heenan as a "gross and extreme departure from the standards of Good Oilfield Practice."[819]  Beck called the acceptance of the test results as successful was "incomprehensible" and "reckless."[820]

The purported explanation for this "gross and extreme departure" was a mythical "bladder effect" attributed by BP after the incident to Transocean toolpusher Jason Anderson.[821] The Court, on this point, has a question about whether Mr. Anderson or anyone else actually used the term "bladder effect" on the DEEPWATER HORIZON at the time of the displacement, or whether the term was coined by BP as a possible explanation after the disaster.  For example, Mr. Lambert, when his deposition was taken in May of 2011, described the hypothesis as "what is being coined the bladder effect *now*."[822]  Additionally, the post-incident e-mail string among BP employees culminating in the hundreds of  ??????s  from Patrick O'Bryan began with a communication from BP Well Site Leader Bob Kaluza to John Guide, Don Vidrine, and Keith Daigle, in which he asked them to: "Please consider this suggestion in the analysis about how this happened."[823]  This language suggests that the idea was being posed as a hypothesis, rather than a factual statement about what was discussed or believed at the time.  Kaluza further said "*I*

---

[817] Beck Report (TREX-8140), p.103.
[818] *See* Beck Rebuttal Report (TREX-61117), p.20 fns. 42, 43 (collecting and summarizing the expert opinions and investigation conclusions on this issue); TREX-00001 (Bly Report), pp.10, 31; TREX-3808 p.198 (Transocean Investigation Report, Vol. I, p.214); Barnhill Report p.32 (TREX-7676 pdf p.40); Calvert Report p.12 (TREX-7836 pdf p.14); Bourgoyne Report (TREX-8173) p.62; Bly Testimony,  p.961.
[819] Heenan Report (TREX-22694), p.4 (emphasis added).
[820] Beck Report (TREX-8140), pp.97, 120;  Beck Testimony, pp.7175-7178. *See also,* Beck Report (TREX-8140), p.103 ("All of the poor decisions made on the Macondo well pale in comparison to BP's decision to ignore the results of the negative pressure test").
[821] L. Lambert Testimony, pp.8280-8281.
[822] L. Lambert Testimony, p.8293 (emphasis supplied). *See also, e.g.,* Ezell Testimony, p.1803 (never heard anyone use the term "bladder effect").
[823] TREX-759.

*believe* there is a bladder effect…."[824] (Not that Jason Anderson suggested that there was such effect.)  And concludes with: "Something to consider in our analysis…."[825]  When Daigle passed the message along, he characterizes the explanation provided as: "Bob Kaluza's *thoughts around* 'bladder effect'".[826]  (As opposed to a recitation of what had purportedly been discussed on the evening in question.)

Nevertheless, and in any event, Drilling Expert Gene Beck characterized the "reckless disregard" of the negative pressure test "totally inappropriate."[827]

BP Well Site Leader Don Vidrine (a managerial agent of BP who invoked the Fifth Amendment) had concerns about the pressure differential, and told investigators: "When I first went to the rig floor we talked about the 1400 psi for a long time - they (TO toolpusher etc) found it kind of humorous that I talked about it for a long time."[828]  Vidrine called BP Senior Engineer Mark Hafle at 8:52 p.m. (ironically, and significantly, at the very time the kick had begun) to express his concerns about the negative pressure test results.[829]  At that time, Hafle had Insite real-time data before him in Houston and could have reviewed the data directly.[830]  Hafle clearly recognized that something was wrong, telling Vidrine: "You can't have pressure on the drill pipe and zero pressure on the kill line in a test that's properly lined up."[831]  Yet neither Hafle nor Vidrine stopped the displacement.  Vidrine went back to rig floor, and Hafle went home.

---

[824] TREX-759 (emphasis supplied)
[825] TREX-759.
[826] TREX-759 (emphasis supplied).
[827] Beck Testimony, p.7176:3-24.
[828] TREX-192, pp.2-3.
[829] Heenan Testimony, pp.2094-2095, 2102-2104; Bly Testimony, pp.1116-1124, 1343-1345; TREX-192 p.2; TREX-296 p.6; *see also,* Vidrine Deposition, pp.26-33 (invoking the Fifth Amendment on the issue).
[830] TREX-50964.3.1.TO; Barnhill Testimony, pp.4342-4343; Heenan Testiimony, pp.2100-2101.
[831] TREX-296 p.6; *see also,* TREX-192 p.2 (Vidrine's Interview Notes reflects a question, "if we have 1400 psi on the drill pipe we should see it on the kill line").  *See also,* Heenan Testimony, pp.2124-2125 (Hafle didn't need to understand the full context to understand – as he clearly did – that what was being reported to him could not be correct).

The Court agrees with Dr. Bea that BP's failure to have a standard protocol for performing and interpreting critically important negative pressure tests, was due to "BP Management's knowing failures of policy and practice…"[832]

BP Engineers had actual knowledge that the negative pressure test was questionable at best, and yet they proceeded with conscious disregard to the significant risk of foreseeable danger.

*BP Exhibited Willful and Reckless Disregard in Preventing Necessary Maintenance and Repairs, and Otherwise Failing to Correct Transocean's Persistent Maintenance Failures of Safety Critical Equipment*

Multiple BP audits of the DEEPWATER HORIZON showed that Transocean was not properly maintaining the vessel and also showed that Transocean personnel were claiming to have performed maintenance and repair items when, in fact, they had not.[833]

The BP Chief of Auditing could not establish that BP had a process to ensure that audit items were closed out timely after being identified.[834]   The audit team did not audit process safety, nor the implementation of the OMS system.[835]   In the September 2009 Rig Audit, members of the BP Gulf of Mexico Management Team did not respond to the audit department after being contacted about the results.[836]   John Guide, BP's Wells Team Leader, refused to talk

---

[832] Bea/Gale Report, p.xviii (TREX-20001 pdf p.19).

[833] TREX-6166, p.9 (Jan. 2008 BP Rig Audit) ("Although raised during previous audits, there is still a tendency [for Transocean] to close out maintenance routines even though not all tasks or sometimes no tasks have been completed"); TREX-3405 (Sept. 2009 BP Rig Audit) pdf p.2 (discussed at Webster Testimony, p.3868-3872) ("Closing out of the last audit recommendations had no apparent verification by BP. Consequently, a number of the recommendations that Transocean had indicated as closed out had either deteriorated again or had not been suitably addressed in the first instance"); *see also,* Childs Testimony, p.5314:16-20 (conceding that the audit reflected that "people in the maintenance department are saying they did stuff they didn't do").

[834] *See, e.g.,* Wong Deposition, pp.33-35 (only identified issues; was not his responsibility to close out); TREX-07002 (no process to close out items on the DEEPWATER HORIZON).

[835] *See, e.g.,* TREX-3405 (Sept. 2009 BP Rig Audit).

[836] TREX-06142.

to the BP audit department after the September 2009 audit,[837] and Brett Cocales refused to allow the BP audit team to re-inspect the DEEPWATER HORIZON.[838]   Norman Wong, the head of the BP team that conducted the audit could not recall a single instance where a BP employee had been reprimanded, disciplined or fired for failing to close out audit items.[839]

With respect to the BOP, BP bore the primary responsibility to assess the capabilities of the BOP to ensure that it was adequate to perform its role should there be a blowout.[840] Every time BP chartered the DEEPWATER HORIZON to drill a well, BP was required to determine the adequacy of the vessel to drill its, including operational requirements such as the adequacy of the BOP.[841]   Multiple audits warned that the BOP was out of certification, in violation of both regulatory and industry standards.[842]

BP, in this regard, employed a classification system that classifies audit findings into four different classes, including Class 1 - "items that do not comply with BP policies or standards," and Class 2 - "items that are outside API, legislation, or rig owner policy; have high safety or environmental impact potential; or are necessary for project to start."[843]   BP's May 2007 Audit

---

[837] Wong Deposition, pp.138:18-139:8; TREX-6142; TREX-1951.
[838] TREX-6142; Wong Deposition, pp.140-142.
[839] Wong Deposition, p.56:2-14.
[840] Childs Testimony, p.5246:4-10; Perkin Report (TREX-07535) p.6;  TREX-7536 pp.27-31.
[841]   TREX-01721 (BP GP 10-40 Drilling Rig Audits and Rig Acceptance Group Practice, June 2008), pp.2, 10-11; Little Deposition, pp.109-110.
[842] *See, e.g.,* TREX-80 (2005 ModuSpec Audit) p.15 (among other deficiencies, that the BOP was beyond the OEM recommended interval for major service and the certificate of compliance would soon be out of date); TREX-6166 (2008 BP Rig Audit) at pdf p.6 (Transocean could not produce evidence of the required 5-year recertification); TREX-3405 (2009 BP Rig Audit) p.3 (BOP ram bonnets were out of API 5-year certification)   *See also, generally,* Webster Testimony, pp.3873-3874.  In particular, *see* TREX-01168 (maintenance must meet or exceed API RP 53); TREX-03286 p.68 (API RP 53).  BP's Norman Wong believed that in order to comply with 30 CFR 250.466, Transocean had to comply with API RP 53 by disassembling and inspecting the BOP every 3 to 5 years.  Wong Deposition, pp.209-212.  Transocean Subsea Supervisor William Stringfellow admitted that the DEEPWATER HORIZON's BOP did not comply with 30 CFR 250.466's requirements. *See* Stringfellow Deposition, p.178.  *See also, e.g.,* TREX-80 (2005 Moduspec Audit), pp.15-16, 24; TREX-251 (2010 Moduspec Audit), pp.47-48, 51-52; TREX-3405 (BP 2009 Rig Audit) pdf p.3.
[843] TREX-01721, p.12  (where there is a Class I or Class 2 issues, "Rig is not considered operable until requirements are met, defect/shortcoming rectified, or risk assessment has been undertaken and put into effect").

of the DEEPWATER HORIZON identified five Class 1 Findings and 33 Class 2 Findings.[844] BP's January 2008 Audit identified eight Class 1 Findings and 61 Class 2 Findings.[845]  BP's September 2009 Audit identified eleven Class 1 Findings and 55 Class 2 Findings.[846]

Nevertheless, BP kept chartering and using the DEEPWATER HORIZON – keeping the vessel at sea when BP knew it should have been taken to a ship yard for repairs. BP made conscious decisions to delay needed maintenance to keep the rig working. For example, on April 15, 2010, John Guide wrote Transocean Rig Manager Paul Johnson. "Paul, I concur with not changing the annular elements [of the BOP] prior to starting the Nile well. BP accepts responsibility if both annulars were to fail and the stack had to be pulled to repair them. I also concur with waiting to change the drill line until after the Nile well is complete knowing there is a possibility it may have to be done during the well."[847]

The ongoing but uncorrected problems with the driller's chairs, and the associated "blue screen of death," could not be permanently fixed, said Williams, because BP would not shut the rig down long enough to make repairs.[848]

When BP was asked by one of its lease partners if needed repairs to the DEEPWATER HORIZON would slow down drilling, BP's operations Engineer in Houston, Brett Cocales responded by e-mail,  " … don't worry about this small stuff ….  We are not going to tear anything else apart unless absolutely necessary and we are ready to kick some serious arce!  …. Don't worry – Be happy!"[849]

---

[844] *See generally,* TREX-3404
[845] TREX-04680
[846] TREX-03405
[847] TREX-7037, at pdf p.2.  *See also, e.g.,* TREX-3338 (Jan. 2010 E-Mail string, in which BP and Transocean agree to defer a connector change-out until after Macondo).
[848] Williams Deposition, pp.40:10 – 41:13, 59:20 – 60:4.
[849]  TREX-6168 p.1.

BP knew about the design and maintenance problems of the DEEPWATER HORIZON and especially the BOP.[850]   Despite this, in late 2009, BP chartered the DEEPWATER HORIZON to finish the Macondo well.

The Court finds that BP was complicit in and, partly responsible for, the dangerously poor condition of the DEEPWATER HORIZON on April 20, 2010. The Court previously addressed its finding that Transocean's poor maintenance resulted in the BOP not functioning when it could have sealed the well and, at the very least, prevented most of pollution from occurring. BP's conduct was also wanton and reckless in this regard.

## FINDINGS AND CONCLUSIONS REGARDING BP CORPORATE BLAMEWORTHINESS [851]

Much of the willful and reckless conduct described herein was the direct result of BP corporate policy or with the knowledge, approval or ratification of corporate officials with policymaking authority. BP's Executive Management assumed direct responsibility for the implementation of process safety across the organization, and made the decision not to adopt OMS on contractor-owned rigs in the Gulf prior to the explosion.  Moreover, the "Every Dollar Counts" culture driven from top management directly affected the reckless decisions that were made to disregard known risks in order to save the company time and money.  Significantly, there was a meeting between and among the entire BP Macondo Management Team on April 14, 2010, at which time they considered all of the options, and made the decision to proceed with the

---

[850] Wong Deposition, pp.229-231 (2009 audit indicated unseaworthiness);  TREX-3405 (BP 2009 Rig Audit).

[851] [*Note* – As set forth in Plaintiffs' POST-TRIAL BRIEFS, Plaintiffs respectfully suggest and reserve the right to argue that the *P&E Boat Rentals* case is distinguishable and/or that a less stringent standard for the imputation of punitive damages to the BP corporate defendants can and should be applied.  The Supreme Court, in *Baker v. Exxon,* recognized the state of uncertainty in the law regarding this issue, which was left unresolved by the Court. 554 U.S. at 482-484.]

reckless cement job.  Additional evidence of corporate complicity in the decisions and failures made by BP personnel are further outlined below.

### *BP Management's Refused to Correct Its  Acknowledged, Longstanding Management and Process Safety Failures*

The Court has reviewed the extensive evidence on this issue and concludes that the conduct, activities, and individual acts and omissions which led to the loss of the DEEPWATER HORIZON flowed from a broader failure of BP's corporate approach to and design of process safety. BP's Executive Management directly controlled and monitored risk management and safety for the entire company through its Board of Directors *via* the specially appointed Safety, Ethics and Environment Assurance Committee (SEEAC), its Chief Executive Officer Tony Hayward, and through its Group Operations Risk Committee (GORC).[852]

The refusal of BP's Executive Management to timely correct BP's longstanding process safety and risk management failures with respect to contractor-owned MODUs in the Gulf of Mexico led directly to the Macondo disaster.[853]  The process safety and management system in place on the Macondo project was the same one which had been in place and responsible for BP's earlier major catastrophes, described as "a primitive risk assessment and management system that could not pass muster in terms of requirements today for a process safety system that would enable management of a very hazardous system such as Macondo."[854]  BP's decision not

---

[852] *See generally,* Hayward Deposition, pp.41, 183-194, 223, 664-665, 731; Bly Testimony, pp.883-887, 893-894; TREX-8018 at pdf p.14; Bea/Gale Report, p.vi (TREX-20001 pdf p.7); *see also,* Bea/Gale Report, p.19 (TREX-20001 pdf p.46) (chart depicting organization); D-2670; D-2675.  *See also, e.g.,* Shaw Testimony, pp.8135-8136 (members of Senior Management were going directly to the facilities to observe and address issues).

[853] *See, e.g.,* Bea Testimony, pp.-332-333 ("BP management's process safety failures caused the Macondo blowout";  "a classic failure of management and leadership in BP…. the root causes were firmly imbedded in the severely imbalanced system, protection and production, that was being driven by BP corporate management and leadership").

[854] Bea Testimony, p.331:21-24.  *See also,* O'Bryan Testimony, pp.9305-9307 (recognized after prior incidents that Beyond the Best and Common Practices were outdated); TREX-1975 pdf p.14 (provide limited direction).

to implement OMS on the Macondo project contributed to the succession of critically bad decisions that caused or allowed the blowout to occur.

BP has implicitly recognized and conceded this, by: **(i)** intentionally excluding an investigation of management or system failures from the purview of the Bly Investigation;[855] **(ii)** confirming that each and all of the different failures identified in the "Swiss Cheese Model" combined to cause the disaster on April 20;[856] **(iii)** representing to Congress that OMS had been applied;[857]   and **(iv)** agreeing, in its criminal guilty plea, to a number of process safety measures.[858]   Moreover, the Bly Report, though having excluded system and management causes from its purview, recommends that the company establish "leading and lagging indicators for well integrity, well control and rig safety critical equipment" and "require drilling contractors to implement an auditable integrity monitoring system."[859]   Bly conceded that, had OMS been applied, it would have prevented the disfunctionality among people in charge of the operations, such as Guide.[860]   Hayward testified that it "undoubtedly" may have prevented the disaster.[861]

BP was aware, through a variety of sources, of its systemic safety problems and what needed to be done to correct them. A multitude of government, industry, internal and "blue

---

[855] *See* Bly Report, p.193 (TREX-00001 at pdf p.194); Baxter Deposition, pp.309-310, 317; TREX-06253 p.2; (and Hayward Deposition, 38-49, and L. McKay Testimony, pp.545-547, 551) (Bly Investigation Team specifically directed to exclude systemic root causes and the "overarching management process"). (*Contrast with,* TREX-6001 at pdf pp.67-68, 89 (and Hayward Deposition, pp.25-27) (testimony to Congress that BP's "Bly Investigation" of the Macondo disaster was "full and comprehensive" and would "cover everything"); L. McKay Testimony, pp.543-544 (testimony to Congress that BP was conducting an investigation into the root causes of the accident so that the industry could benefit from the lessons learned).)  *See also,* Bea Testimony, pp.290-291.

[856] Bly Testimony, pp.1092-1093, 1411.

[857] *See* Hayward Deposition, p.183; L. McKay Testimony, pp.540-541; TREX-7346 at pdf p.63 (Energy and Natural Resources Committee Hearing, May 11, 2010, p.59).

[858]   TREX-52673 at pdf p.20 (agreeing that the company would have a process safety monitor and institute safety and environmental management safety audits). (*See also,* L. McKay Testimony, pp.557–562; Bly Testimony, 1073-1074).

[859] *See* Bly Report, p.184 (TREX-00001 pdf p.185) (Process Safety Performance Management); *see also,* TREX-00001 (Bly Report) pp.36, 78 (recommending "improved technical assurance, risk management and management of change" regarding well integrity and zonal isolation).

[860] Bly Testimony, pp.1066-1067. *See also,* Bly Testimony, p.1002.

[861] Hayward Deposition, pp.793:23-794:8. (*See also,* Bea Testimony, p.332:2-17; D-2873.)

ribbon" committees had investigated BP's earlier major accidents and made detailed findings as to how and why the accidents had happened. More importantly, these investigations made specific recommendations as to how BP could fix these problems.  Yet, the "organizational and systemic causes of [three previous] … major accidents are virtually identical to the systemic and organizational causes of the Macondo blowout."[862]

For example, following a major disaster in 2005, BP appointed a Blue Ribbon Committee to investigate the causes of the accident. The report of that committee made three key findings:

Q.    Dr. Bea, did that report state: "BP has not provided effective process safety leadership"?

A.    Yes

Q.    "BP has not adequately established process as a core value"?

A.    Yes.

Q.    "BP's management system does not effectively translate its corporate expectations into measurable criteria for the management of process risk"?

A.    Yes.

Q.    In your opinion, based on your study of the events in this case, has BP changed in any respect with respect to these three points?

A.    No.[863]

BP's then head of safety John Mogford predicted in 2006 that if BP did not improve its process safety, it was going to have another disaster "every 10-15 years."[864]  In fact, it only took four.

Process safety, as opposed to personal safety, is a "disciplined, highly organized set of approaches and strategies whose goal is the prevention of catastrophic failures involving complex engineered human-based systems."[865]

---

[862] Bea/Gale Report, p.29 (TREX-20001 at pdf p.56).
[863] Bea Testimony, p.502.
[864] TREX-98 p.6 (Safety: The Number one Priority, *The BP magazine,* Issue 3, 2006); Bea/Gale Report, p.45 (TREX-20001 pdf p.72).
[865] Bea Testimony, p.281:18-21.

Tony Hayward and BP Management knew the highest risk BP faced was a blowout, and that the most likely place that could occur was in the Gulf of Mexico.[866]  Yet, as the direct result of decisions made by corporate officials with policymaking authority:

- There was no one person in charge of process safety at Macondo;[867]

- There were no process safety audits conducted at Macondo;[868] and,

- BP's Risk Assessment Tool was not used to identify or manage risks at Macondo;[869]  and,

- Despite known issues with Transocean's safety management systems and history of incidents,[870] there was, as the Court concluded *supra,* no formal identification or bridging of the OMS requirements and recommendations to the safety management system that was ostensibly in effect on the DEEPWATER HORIZON, the Macondo Well, or Transocean generally.

Dr. Bea described the failure to implement OMS as "tragic, egregious."[871]  Despite the lessons it should have learned from past disasters (including specific advice from Dr. Bea himself, at BP's request), BP continued to place profit over safety.

---

[866] *See, e.g.,* Hayward Depo, pp.196, 782; Baxter Deposition, pp.276-278; Bea Testimony, pp.302-304; TREX-1736 (SEEAC Brief); TREX-7192 at pdf p.19 (Blowout and Well Release Frequencies, SINTEF Database, 2009, p.12) (the risk of a blowout in the Gulf of Mexico was nine times higher than in other parts of the world); D-2868; D-2887; *see also, e.g.,* L. McKay Testimony, pp.506, 517-518 (a deepwater blowout is a foreseeable event; "the whole safety management system, which includes process safety, is integral in trying to prevent blowouts" like Macondo).

[867] Guide Testimony, p.8835; Rich Deposition, pp.613-614 (at the time of the blowout, "there was no individual in charge of process safety for the Macondo well"); *see also,* Shaw Testimony, pp.8137-8141 (in 2009, BP safety personnel were pulled off of the MODUs, including both the MARIANAS and the DEEPWATER HORIZON).

[868] O'Bryan Testimony, p.9320.

[869] O'Bryan Testimony, pp.9301-9302, 9311-9312; Jassal Deposition, p.269; *see also,* Theirens Deposition, pp.129, 130, 148 (is not aware of BP's Risk Assessment Tool being applied to Macondo).

[870] *See, e.g,* O'Bryan Testimony, pp.9322-9324 (discussing TREX-2523) ("Transocean is at the top of the list" …. "Drilling contractor supervisors have a poor understanding of their own company SMS [Safety Management System]…. A majority of our bridging documents linking BP and drilling contractor safety systems are outdated and/or poorly understood….  Low value realized from HSE [Health Safety & Environment] advisers by both BP and key contractors due to poorly defined roles"); TREX-5680 (discussed in Shaw Testimony, pp.8217-8218) ("Transocean's small incidents are building to something big" … their "lack of hazard / risk recognition … is shocking to me"); TREX-5695 (and Shaw Testimony, pp.8220-8221) (observing that Transocean's issues were "cultural").

[871] Trial Testimony R. Bea, p. 315:12-15.

*BP's "Every Dollar Counts" Culture*

Despite the company's repeated promises to change,[872] BP continued to place profit over safety. For many years, BP had what one BP officer called a "culture of non-compliance,"[873] or, in the words of Dr. Bea, "production over protection."[874]   Indeed, one employee described the organizational units as "motivated by greed and fear."[875]   Halliburton Drilling Expert Gene Beck testified that "BP engaged in a pattern of conduct on the Macondo well whereby it repeatedly prioritized cost and time ahead of safety concerns. This pattern was consistent with BP's 'every dollar counts' philosophy and rendered the Macondo well a high-risk and dangerous well that was described by BP's own engineers as a 'nightmare.'"[876]

One of the significant decisions made by BP upper management in advance of the Macondo incident was the dismissal of Kevin Lacy.  Prior to joining BP, Lacy spent twenty-six years at Chevron, where he created a global drilling technical organization from scratch.[877]   He served as BP's head of Drilling & Completions in the Gulf, taking the Unit from 15th to 1st in three years.[878]   At the same time, Lacy led an effort to integrate process safety practices and procedures into the Drilling & Completions organization.[879]   In December 2008, he conducted a risk review assessment, which concluded that "process safety major hazards and risks are not fully understood by engineering or line operating personnel."[880]   Thereafter, Lacy and Harry Thierens began work on a standard risk assessment practice to be applied across Drilling &

---

[872] *See, e.g.,* TREX-6318; Hayward Deposition, pp. 41, 223, 731.
[873] Armstrong Deposition, pp.341-348, 371-373, 389-391.
[874] Bea/Gale Report, p.5 (TREX-20001 pdf p.32).
[875] TREX-4235 pdf p.3.
[876] Beck Rebuttal Report (TREX-61117), pp.14-15.
[877] K. Lacy Deposition, pp.19-20, 28-29.
[878] K. Lacy Deposition, p.804.
[879] K. Lacy Deposition, pp.295, 333-334.
[880] K. Lacy Deposition, pp.90; TREX-02908, pp. 1, 38.

Completions.[881]  In November 2009, Lacy and Thierens made a series of safety presentations.[882] Significantly, Lacy was one of the main proponents of the implementation of OMS to the Gulf of Mexico.[883] Although superficially lauded for his "passion and commitment to safety," Lacy was fired within days, and Thierens was transferred out of the organization.[884]  Lacy suspected (as it turns out, correctly) when he was fired that his replacement and others in BP Management would sacrifice safety in order to save money, and that the changes he was advocating would not be made.[885]

As discussed *supra,* the Court concludes that the "Every Dollar Counts" culture and associated policy directives to cut costs did have an effect on operations generally, and on the decisions that were made to disregard known risks in order to increase profits on the Macondo well particularly.

In 2007, BP's new CEO, Tony Hayward, was told that he had two years to turn the company's financial performance around.  At that time, there was a gap of about $8 billion between BP and its competitors, which became a "rallying cry" driving through BP.[886]

At the Annual Meeting in 2008, Hayward announced a new agenda to "change the company culture" and reduce overhead by 15-20%.[887] From 2008 to 2009, BP Management slashed costs by $4 billion with plans to cut another $1.4 billion in 2010.[888]  "Every Dollar

---

[881] K. Lacy Deposition, pp.92, 171, 295, 351, 563.
[882] K. Lacy Deposition, pp.92, 171-73, 295, 618.
[883] Bea Testimony, p.496:11-23.
[884] K. Lacy Deposition, pp.141, 171, 284-285, 296; TREX-2921 p.1.  *See also, e.g.,* Newman Testimony, pp.4651-4652 (Newman knows Lacy; agrees that Lacy was committed to safety; was aware that Lacy departed BP several months before the blowout, but doesn't know why).
[885] K. Lacy Deposition, pp.289-292, 770-771.
[886] Hayward Deposition, pp.103-104; TREX-6000 p.20.
[887] Hayward Deposition, pp.110-111; TREX-6015 p.3.
[888] TREX-06017, p.3; Bea/Gale Report, p.25 (TREX-20001 pdf p.52).

Counts" was the mantra.[889]  At the 2010 Annual Meeting on April 15, 2010, Hayward noted that "The drive to increase efficiency and reduce costs remains a key focus for everyone at BP."[890]

While Hayward testified in his deposition, and Mr. Shaw testified at trial, that the cost-cutting efforts were directed at clerical and administrative issues, and did not affect either safety or operations, Hayward himself had linked the concept of cost savings to operational and safety issues by indicating that, in his opinion, the company had become "overcautious" due to previous incidents.[891]

Because BP's production was down in 2010,[892] BP did not have the cash to fund its commitment to pay dividends to its stockholders.[893]  BP calculated E&P's portion of the amount needed to pay the dividend to be $7 billion.[894]  In order to raise this $7 billion and meet its 4-5% profit growth commitment to shareholders,[895] BP E&P was under pressure to raise these dollars by driving efficiency in a year where production was lower.[896]  It chose to do so by spending "fewer days" to complete the drilling of its wells.[897]

In addition to these institutionalized pressures to cut costs, the Macondo project was severely over budget and over schedule. As of April 9, 2010, BP was $60 million (60-70%) over budget and 54 days behind schedule with excessive non-productive time.[898]  Furthermore, BP had committed the DEEPWATER HORIZON to drill the Nile and Kaskida wells within a short

---

[889] Hayward Deposition, p.116; TREX-6016 p.5.
[890] TREX-6012 p.3; Hayward Deposition, pp.118-119.
[891] Hayward Deposition, pp.108-109.
[892] Armstrong Deposition, pp.325-326.
[893] Armstrong Deposition, pp.293-299; TREX-3877.
[894] Armstrong Deposition, pp.293-299; TREX-3877.
[895] Armstrong Deposition, pp.319, 325.
[896] Armstrong Deposition, pp. 333-334.
[897] TREX-3884 p.27; Armstrong Deposition, pp.319-321; *see, e.g.,* Barnhill Testimony, p.4385 (when a vessel is on a Day Rate, you save money with each and every day you get off the well); *see also,* Bourgoyne Testimony, pp.7552-7553 (believes that rig was on cost-per-day basis).
[898] Bea Testimony, pp.329:7 – 330:8; D-2730.

time or risk losing the millions of dollars BP had paid for the Kaskida lease.[899] BP was under

"very, very significant financial pressures to wrap up this damn well as quickly as possible."[900]

As noted, BP provided a performance award to Transocean employees for quicker

completion.[901]   Mike Williams testified that there was "always" pressure to speed up operations

on the well,[902]  and Meinhardt testified that Transocean rig personnel felt pressure to get the

Macondo well completed as fast as possible.[903]   BP Wells Team Leader John Guide bragged

that the DEEPWATER HORIZON team had embraced the "'Every Dollar Matters' culture" in

the 18 months since he had arrived.[904]

The Court concludes that this corporate culture and policy directly influenced the willful

and reckless decisions that were made by the Macondo Management Team and resulted in the

blowout, explosions, and fire of April 20, 2010.


_The April 14 Meeting_

On April 14, 2010, there was a meeting among all of the leaders in the GoM SPU

responsible for Macondo, as well as Erik Cunningham, the company's top official on cement for

the Western Hemisphere, to discuss the path going forward.[905]  By this point in time, they had

experienced over a dozen well control events at Macondo, including several kicks and ten

---

[899] O'Bryan Testimony, pp.9293-9294; _see also,_ Sims Deposition, pp.556-557; TREX-119E; Bea/Gale Report, p.71 (TREX-20001 pdf p.98).
[900] Bea Testimony, p.330:6-8. _See also_ Bea/Gale Report, p.71 (TREX-20001 pdf p.98); Sims Deposition, pp.556-557.
[901] McMahan Deposition, pp.153, 160-161; TREX-07098.
[902] Williams Deposition, p.51 ln.13-15.
[903] Meinhardt Deposition, pp.148-149, 301-302.
[904] Guide Testimony, p.8629; TREX-6294 p.2; _see also,_ Guide Testimony, p.8632; TREX-7062 ("We have saved BP millions and no one had to tell us").
[905] Robinson Testimony, pp.7949-7952; Guide Testimony, p.8824; Gagliano Testimony, pp.6772-6773; _see also,_ TREX-37031 p.60.

incidents of lost returns, resulting in the loss of approximately 15,926 barrels (668,892 gallons) of drilling fluids.[906]

Mr. Hafle (prior to invoking the Fifth Amendment)[907] gave an interview to the Bly Investigation Team, in which he discussed the meeting.  The interview notes reflect that:

- The well was "planned as a keeper".

- They discussed "drilling problems",  acknowledged fracture gradient issues and lost returns.

- "Economically" the long-string was chosen over a liner.

- "Hafle was the lone voice on P&A [Plug & Abandon] well."[908]

Based on the evidence, there was a lot of discussion at that meeting about whether to use about a Long String casing or a Liner.  Despite concerns about channeling, it was projected that 18 hours of rig time would have been required to put in a line with a tie-back, and BP made operational decisions, (as opposed to engineering decisions), motivated by the desire to save time (and therefore money).[909]

Proceeding with the temporary abandonment process, including a risky foam cement job, and the use of a long string casing, were known to and approved by officials with policymaking authority.

---

[906]   TREX-1035, p.4; D-2150; *see also, e.g.,* Ambrose Testimony, pp.6113-6114; Keith Testimony, pp.3716-3718; TREX-126.

[907]   Indeed, several of the BP officials who attended this April 14th meeting have invoked the Fifth Amendment, including not only Senior Drilling Engineer Mark Hafle, but also Well Site Leader Don Vidrine, and Drilling Engineer Brian Morel.

[908]   TREX-37031 pp.38-39.  Mr. Robinson clarified that "P&A" means "Plug & Abandon".  Robinson believes that Mr. Sprague also had an opinion on that issue, but did not recall what it was. Robinson Testimony, pp.7952-7957.  *See also,* Guide Testimony, pp.8823-8824 (confirming that Mr. Sprague presented a powerpoint which set forth three options, one of which was Plug & Abandon).

[909]   *See* TREX-37031 p.39 (discussed in Robinson Testimony, pp.7958-7961); *See, e.g.,* TREX-901 (The Management of Change dated April 14, 2010 regarding the use of Long String casing, instead of a Liner, reflected a savings of $7 to $10 million); *see also,* Beck Testimony, pp.7085-7087 (a liner is a lower risk design than a long string, because it allows you to place additional barriers and to test them more completely).

_Other Evidence of Knowledge, Approval or Ratification of Willful or Reckless Conduct or Policies by BP Officials_

Additional evidence of knowledge, approval or ratification by corporate officials with policy-making authority includes, for example:

- The March 8th kick was reported to Harry Thierens in London;[910]

- Concerns about the losses on Macondo were relayed to Andy Inglis, who was the CEO of BP Exploration & Production and a member of the Board of BP plc, on April 6, 2010;[911]

- Member of the Board and Chairman of the Safety Ethics and Environmental Assurance Committee (SEEAC) William Castell testified that, although the Board and the Committee recognized a Macondo type blowout as a "high risk", they did not allocate resources because they considered it to be a low probability;[912]

- BP made corporate applications, submissions and other filings to MMS containing representations (and misrepresentations) by the corporation;[913]

- BP's top corporate official in the area of cement confirmed, as a matter of policy, that BP had no requirement that the Wells Team confirm foam stability prior to commencement of the cement job;[914]

- The failure to have any corporate policy, procedure or protocol regarding the proper conduct and interpretation of the critical negative pressure test;[915]

---

[910] Thierens Deposition, p.60; TREX-06091 (March 10, 2010 E-mail from Rich to Thierens with Daily Report from 3/8/10).

[911] Inglis Depo, pp.578-581; TREX-6321.

[912] _See_ Castell Deposition, pp.41, 49, 553; _see also, e.g.,_ Castell Deposition, pp.53-56, 553 (framing in terms of risk "to our business" (or "to the company") and identifying the highest risk as "the license to operate").

[913] The Regulations in effect at the time of the drilling provided that the "lessee" and the "operator" are "jointly and severally responsible" with "the person actually performing the activity" "for complying with the regulation." 30 C.F.R. ¶250.146(c).   In addition, Ms. Douglas was the Senior Regulatory Advisor for BP, and was "the authority with respect to the MMS Drilling Regulations" (_see_ Douglas Deposition, p.89);  and, therefore, was the company's official with policymaking authority. _See also, e.g.,_ Thierens Deposition, pp.75-77 (as Director of Wells, was not familiar with specific MMS regulatory requirements, was not aware of anyone with the responsibility of verifying that information provided to the MMS was accurate, and could not say whether the information provided to MMS was correct).

[914] Kellingray Deposition, pp.400-404.  _See also, e.g.,_ TREX-52673 at pdf pp.28-29 (BP Guilty Plea) (requiring cement testing to be conducted or witnessed by a competent BP engineer or an independent expert); M. Sepulvado Deposition, pp.183-186, 193-194 (confirming that it should have been the policy); Ambrose Testimony, pp.6098-6099 (was "unacceptable").

[915] _See, e.g.,_ Bea/Gale Report, p.xviii (TREX-20001 at pdf p.19) (BP Management knowingly failed in "not having a detailed procedure for conducting the critically important negative pressure tests, interpreting the results from the tests, and taking appropriate corrective action"); TREX-00001 (Bly Report) p.182 (recommending the development of a standard procedure for the performance and interpretation of the negative pressure test).

- The Vice-Presidents of Drilling & Completions were directly involved in the implementation (and delayed implementation, and non-implementation) of OMS, risk assessment, and audits, to wells like and including Macondo;[916]

- Members of Senior Management were going directly to the facilities to observe and address issues;[917]

- The responsibility, yet failure, to establish a "bridging" or "Interface Document" under the company's contract with Transocean;[918]

- The Vice-President of Drilling & Completions confirmed that John Guide had been delegated the authority to take action regarding the well by BP;[919]

- Decisions regarding the charter of the DEEPWATER HORIZON, the scheduling of the DEEPWATER HORIZON, whether or how to configure or modify or upgrade the BOP, and whether or when to take the DEEPWATER HORIZON out of operation to conduct maintenance or repairs;[920]

- BP's Vice-President of Drilling & Completions, Patrick O'Bryan, was actually on the rig at the time of the events in question;[921]

- BP is organized globally, by function;[922] and,

- The corporate parent in London, BP plc, is a signatory to the criminal guilty plea.[923]

---

[916] *See, e.g.,* O'Bryan Testimony, pp.9301-9313; TREX-1975; TREX-2953 (2009 GoM D&C Performance Summary – VP D&C Kevin Lacy) (including TREX-002953.3.5.BP).

[917] Shaw Testimony, pp.8135-8136.

[918] *See* TREX-1356A pdf p.429 (also TREX-1488 pdf p.21) (Section 3.3 to Amendment No. 38 of the BP-Transocean Drilling Contract, requiring the establishment of an "Interface Document" to address any inconsistencies in the process safety management systems). *See also, e.g.,* O'Bryan Testimony, pp.9322-9324 (discussing TREX-2523) ("Transocean is at the top of the list" …. "Drilling contractor supervisors have a poor understanding of their own company SMS [Safety Management System]…. A majority of our bridging documents linking BP and drilling contractor safety systems are outdated and/or poorly understood…. Low value realized from HSE [Health Safety & Environment] advisers by both BP and key contractors due to poorly defined roles"); TREX-5680 (discussed in Shaw Testimony, pp.8217-8218) ("Transocean's small incidents are building to something big" … their "lack of hazard / risk recognition … is shocking to me"); TREX-5695 (and Shaw Testimony, pp.8220-8221) (observing that Transocean's issues were "cultural").

[919] *See* O'Bryan Testimony, pp.9343-9344 (Mr. Guide was appointed by BP and delegated the authority by Mr. O'Bryan as Vice-President to manage the well, and that when "Mr. Guide takes action on that well, he's acting pursuant to authority delegated to him by a vice president of BP").

[920] *See, e.g.,* Crammond Deposition, p.294; O'Bryan Testimony, pp.9231-9232, 9235; TREX-2285; Perkin Testimony, p.3404; Wong Deposition, pp.70-73.

[921] *See* O'Bryan Testimony, p.9226.

[922] L. McKay Testimony, p.537.

[923] TREX-52673 (BP Guilty Plea Agreement) at pdf p.12; *see also,* Order, p.19 ¶38 [TREX-52673 at pdf p.38] ("This Order shall be applicable to the defendant, and to the extent specified herein, to BP plc and Affiliates"); Resolutions of the Board of Directors of BP plc [TREX-52673 at pdf pp.54-56]; *see also,* Order, pp.1-2 ¶1.a.

# FINDINGS AND CONCLUSIONS REGARDING
## HALLIBURTON'S WILLFUL AND RECKLESS DISREGARD

Halliburton was contractually responsible to BP for the design, testing, and execution of the cement to be used at Macondo, including the production casing cement job.[924]  Its contractual obligations included sole responsibility for the pressure testing and pumping of the cement as well as a safety leadership role.[925]  In short, Halliburton was required to design, test and provide a cement slurry capable of achieving zonal isolation.

At the same time, Halliburton, through it's wholly-owned subsidiary, Sperry Sun, was under contract with BP to provide a complete Measurement While Drilling (MWD) system, with Mudlogging services, and a computer monitoring system, (*i.e.* the Sperry "Insite" system), which could be viewed in real time, not only by the Halliburton-Sperry Mudlogger, but also by the Transocean Driller on the vessel, and the BP on-shore engineering team in Houston.[926]  Mudloggers were responsible to continuously monitor the well and notify the drill crew and BP's well site leader "of any irregularities or anticipated problems."[927]

In sum, and as further described herein, Halliburton-Sperry personnel exhibited a willful and reckless disregard to known risks in:  failing to develop a formal Basis of Design or apply a formal Management of Change;  recommending and using a left-over cement blend which included defoaming agents for a foam cement job;  failing to properly staff or equip its testing

---

[TREX-52673 at pdf pp.20-21] (Retention of Process Safety Manager applies to "any entity controlled, directly or indirectly, by BP plc that participates in deepwater drilling in the Gulf of Mexico");  Order, p.9 ¶11.a. [TREX-52673 at pdf p.28] (cement Design and Competency applies to "the defendant, BP plc, or the Affiliates").

[924] TREX-4477 at pdf pp.81-245 (BP-Halliburton Services Agreement, pp.31-195).

[925] TREX-4477 at pdf pp.90-91 (BP-Halliburton Services Agreement, pp.40-41).

[926] *See generally,* Probert Testimony, pp.3002-3003; Keith Testimony, p. 3488; TREX-5182, p.4; TREX-2007 p.7.  (It was established at trial that the Sperry Flow-Out Sensors associated with the Sperry "Insite" system were more precise than the sensors associated with the Transocean Hitec system. *See* Keith Testimony, pp.3508-3509, 3517, 3640. )

[927] TREX-5182 at pdf p.7; Keith Testimony, p.3490:9-21; Heenan Testimony, p.2193.

lab;  failing to run tests on the cement slurry;  failing to disclose material pre-job test results indicating instability;  failing to place flow-out sensors where the fluids could be monitored even when being diverted;  either abandoning the Mudlogger's post or completely ignoring the well conditions during the critical displacement procedure;  and concealing or destroying material evidence and information following the explosion.

*Halliburton Exhibited Willful and Reckless Disregard in Refusing to Create a Basis of Design or Applying a formal Management of Change*

Among Halliburton's contractual obligations to BP was the obligation to provide a robust, written Basis of Design ("BoD") document to BP for each and every cement job to be performed on the Macondo well.[928]   Among other things, the agreement required Halliburton to:

- Produce and update a basis of design document for the project…. to record the major decisions and their process of determination…. [Section F]

- Apply risk-based engineering processes to prepare the basis of design, individual well programs, and all associated engineering and documentation. [Section G]

- Provide solutions where conventional cement design and procedures are not suitable, such as blend and foam cement. [Section J] [929]

The Scope of Work for this Basis of Design included consideration of:

What needs to be achieved?  What objective would incur cementing NPT if not achieved? What are the design limits that need to be considered?  Fracture gradient or local legislative requirements? What engineering decisions have already been made?  Mud weight, casing size, and setting depths? What are the key risks? How can the major risks be managed? What cement design options exist? What are the best solutions for the project?[930]

---

[928] TREX-4477 at pdf pp.86, 89 (BP-Halliburton Services Agreement, pp.36, 39).
[929] Probert Testimony, pp.2920-2921; TREX-4477 at pdf pp.86-87 (BP-Halliburton Services Agreement, pp. B-30, B-31).
[930] Probert Testimony, pp.2921-2922; TREX-4477 at pdf p.89 (BP-Halliburton Services Agreement, p.B-32).

As discussed *supra,* the Court concludes that a formal Basis of Design for the production casing cement job as contemplated by the BP-Halliburton Services Agreement was never prepared or provided by Halliburton.

Mr. Gagliano and Halliburton Management willfully and recklessly ignored information regarding the down hole conditions that was gained over months of drilling experience, nor did they make any to develop and provide a design for the production casing cement job that identified and assessed for example: (1) the risk of recycling the Kodiak #2 blend, which had aged and was not designed for use in a foam cement system; (2) the risk of including a known defoaming additive, D-Air 3000, in a foam cement slurry;  (3) the risk of including a dispersant, KCL, in a foam cement slurry;  (4) the risk of using SCR-100L, a liquid retarder additive, in the slurry;  (5) the risk of increasing the SCR-100L concentration from .08 gal/sk to .09 gal/sk, particularly without running a full suite of tests on the final slurry;  (6) the risk of pumping the cement job at a low pump rate;  (7) the risk of pumping a low cement volume;  (8) the risk of conducting a limited pre-job circulation clean of the wellbore instead of full bottoms-up circulation;  (9) the risk of pumping super-light base oil ahead of spacer in a heavier-weighted mud system;  or (10) the risk of using synthetic oil-based mud in a foam cement environment. The evidence establishes that these are all known risks that were disregarded by Halliburton in terms of developing and providing a formal Basis of Design.

Indeed, the evidence demonstrates that the company did not even have a Basis of Design standard at the time.[931]

---

[931] TREX-4357 p.5; Probert Testimony, pp.2923-2924; Roth Testimony, pp.3084-3086.  Comparing the 2010 Halliburton U.S. Land Offshore Cement Manual (TREX-989) to the 2011 Halliburton U.S. Land Offshore Cement Manual (TREX-48008), a section was added regarding the need for a Basis of Design (BoD). *See* Probert Testimony, pp.2925-2927.

Nor did Halliburton have any standard for a formal Management of Change (MoC).[932] There is no evidence to suggest that, with respect the Macondo well, anyone at Halliburton was making an effort to "continually assess fitness of purpose of cementing recommendations … against client challenges and well hazards (red flags)" "identified during well construction" or "encountered while drilling" and, upon concluding that such well challenges or hazards "reduce probability of success of cementing service recommendation to unacceptable level," ensure that "formal MOC action be taken and documented."[933]

The Court concludes that Halliburton exhibited a gross and wanton disregard for its contractual obligations, good engineering practices, the unique risks associated with its own cement mixture, and the unique hazards posed by the Macondo well – which was a substantial contributing cause of the blowout on April 20, 2010.  Indeed, Halliburton's own Head of Cement, Tommy Roth, acknowledged, in retrospect, that if Halliburton had followed the specific obligations of the contract (*i.e.* identification of risks, mitigation of risks, determining what designs should be used), there would not have been a blowout.[934]

---

[932] TREX-4357 p.5; Probert Testimony, pp.2923-2924; Roth Testimony, pp.3084-3086.  Comparing the 2010 Halliburton U.S. Land Offshore Cement Manual (TREX-989) to the 2011 Halliburton U.S. Land Offshore Cement Manual (TREX-48008), a section was added regarding the need for Management of Change (MoC). *See* Probert Testimony, pp.2925-2927. *See also,* Gagliano Testimony, pp.6713-6715 (there was no formal procedure or requirement for a formal written Management of Change (MoC);  rather, (according to Gagliano), it would occur thru informal discussions. To the extent there was "oversight" by management, it would come through the Testing Lab in Broussard).
[933] *See* TREX-4357 p.5.
[934] Roth Testimony, p.3089 ln.11-16.

*Halliburton Personnel Exhibited Willful and Reckless Disregard in Utilizing a Cement that Was Defectively Designed and Not Properly Tested*

As discussed *supra,* the evidence presented at trial establishes that the Halliburton cement slurry was not stable.[935]   However, there were a number of warning signs that were actually known to Mr. Gagliano and disregarded prior to the time that the cement was provided to BP and pumped into the well.  First and foremost, the use of a known defoaming agent in a foam cement.

Foam cement is known to present increased risks and potential complications not found in conventional (unfoamed) cement.[936]   Indeed, two out of the five previous Halliburton deepwater foam cement jobs in the Gulf of Mexico where D-Air 3000 was used had failed to achieve zonal isolation.[937]   In designing the specific foam cement for Macondo, moreover, Halliburton used left-over cement from the Kodiak #2 well.  The Kodiak #2 base blend was a conventional cement design that was not intended to be foamed.[938]   (It also arrived on the DEEPWATER HORIZON in November of 2009, and had therefore aged and degraded for at least five months at the time of use.[939])  In particular, the Kodiak blend contained "D-Air 3000", a defoamer, (as well as KCL, as dispersant), that is incompatible with foam cement.[940]  Hallburton generally, and Mr. Gagliano in particular, were well aware of this fact, having designed the Kodiak #2 blend for BP as well.[941]

---

[935] *See generally,* Roth Testimony, pp.3138, 3141, 3215, 3221 (conceding that the slurry had a "very low probability of success"); TREX-00001 (Bly Report), pp.10, 33; TREX-03808 at pdf pp.60, 197 (Transocean Investigation Report, Vol. I, pp.72, 213); Benge Testimony, pp.2513-2515, 2520-2521, 2330-2332, 2545-2546.

[936] Cunningham Deposition, pp.124-125.

[937] Gagliano Testimony, pp.6746-6747; TREX-7491A.

[938] Benge Testimony, p. 2270:3-11.

[939] Roth Testimony, pp. 3052-3053; Benge Testimony, p.2530; Quirk Testimony, p.4806.

[940] *See, e.g.,* D-4381; Benge Testimony, pp.2501-2502; Roth Testimony, pp.3092-3094, 3130, 3195; Stelly Deposition, p.71; Richard Deposition, p.25:4-8; Quirk Testimony, p.4787:18-22; TREX-4347 pdf p.1848 (Halliburton's Global Laboratory Best Practices, p 3-49); TREX-4348 pdf pp.292-294 (Halliburton's Cementing Technology Manual, pp.9-3 – 9-5); TREX-745 at pdf pp.15-16 (Halliburton Foam Cement Operations Manual, pp.3-4).

[941] Gagliano Testimony, pp.6619, 6621-6622.

Indeed, Gagliano admitted that he was aware of the risks of using D-Air 3000 in a foam slurry, but decided to disregard them, claiming that ZoneSealant 2000, a surfactant (or, "foamer"), could be used to counteract the effects of the defoamer.[942]  This claim is belied by: Halliburton's Technology Bulletin for ZoneSealant 2000;[943]  Mr. Gagliano's own previous e-mail to BP on the subject;[944]  and the fact that the level of ZoneSealant 2000 used by Halliburton for the Macondo slurry was not greater (and in at least one case even less) than the concentration of ZoneSealant used in other foam slurries which didn't have a defoamer to be counter-acted.[945] The Court finds this last point significant, in that: even assuming *arguendo* that Mr. Gagliano were correct that a defoamer could be used in a foam slurry if properly managed, Mr. Gagliano exhibited a wanton and reckless disregard for attempting to manage that known risk – particularly when coupled with the utter failure to conduct appropriate laboratory testing on the proposed slurry.[946]

The BP-Halliburton Services Agreement and Halliburton's own Best Practices required the company to conduct a full suite of tests, including: settlement, fluid loss, rheology, static gel, zero gel time, and compressive strength testing [947] – which were not all performed on the

---

[942] Gagliano Testimony, p. 6720:15-20; 6721:16-6722:25.

[943]  TREX-5570 at pdf p.3 (Halliburton Bulletin on Zonesealant 2000) (D-Air is incompatible with ZoneSealant as D-Air will "destabilize the foam").

[944] TREX-7489 (12/7/2009 e-mail from Gagliano to Hafle, Morel, et al) ("This cement cannot be used when foaming because of the D-Air 3000 in the blend").

[945] Gagliano Testimony, pp.6726-6727 (Haliburton used .11 concentration of ZoneSealant, which was set initially and never adjusted, for Macondo;  but also used .11 on two of the previous foam jobs, and .14 on the third, even though none of those blends had the D-Air 3000 defoamer to be counter-acted); *see also,* Benge Testimony, pp.2503-2504.

[946] *See, e.g.,* Benge Testimony, pp.2244-2245 ("Given that the slurry was admittedly never intended to be foamed, the need for complete testing was all the more critical").

[947] *See generally,* TREX-4477 at pdf p.243 (BP-Halliburton Services Agreement, p.193); TREX-4347 at pdf p.1796 (Halliburton's Best Practices, p."2-51"); Benge Report, pp.2, 20-21, 28-32 (TREX-5990 at pdf pp.8, 26-27, 34-38); Benge Testimony, pp.2368-2371; *see also,* TREX-632 (BP Cementing Manual, Nov. 2009), p.6.

Macondo foam slurry; indeed, eight of the nine tests were not conducted on the slurry that was actually pumped into the well.[948]

There is no question, in this regard, that Halliburton never conducted foam stability testing on the slurry that was actually pumped, which contained .09 gal/sk of SCR-100L, a retarder additive that extended the thickening time for the slurry.  SCR-100L is an extremely powerful additive;  by increasing its concentration by just .01 gal/sk, the thickening time increased by almost fifty percent.[949]  Testing the slurry that contained a higher concentration of retarder was critical because lengthening the time that the slurry remained in liquid form created a greater risk of gas movement and slurry destabilization.[950]  Despite this increased risk, Mr. Gagliano instructed the Broussard Lab to cancel the crush compressive strength and foam stability testing on the .09 slurry.[951]

Significantly, moreover, the final testing conducted on the .08 gal/sk slurry, which Halliburton suggests shows the slurry was stable, was not provided to BP before the blowout.[952] The Court finds both Halliburton's Gagliano and BP's Management Team willful and reckless in commencing a foam cement job that was known to be risky without adequate testing confirming the reliability of the slurry.

Halliburton's conduct, however, is even more egregious, as there were additional test results that were concealed from BP.

---

[948] *See generally,* D-6630; *see also,* D-4309A; Benge Testimony, p.2371.

[949] Benge Testimony, p.2267:4-16.

[950] Benge Testimony, p.2268:4-10.

[951] TREX-984 at pdf p.6 (Cement Lab Weigh-Up Sheets, April 13-17, 2010); Gagliano Testimony, pp. 6793:10-6794:3.

[952] TREX-1510 (e-mail from Gagliano to Cocales dated April 26, 2010); D-4269A.  *See also, e.g.,* TREX-4477 at pdf p.100 (BP-Halliburton Services Agreement, p.50) (Halliburton required to provide test results to BP at least 24 hours prior to running the production casing); TREX-5801 (Morel E-Mail dated April 1, 2010) (stressing to Halliburton's Jesse Gagliano the importance of getting test data in advance of the job).

*Halliburton Personnel Willfully Concealed Failed Cement Slurry Test Results*

Halliburton performed cement testing on February 12, February 17, April 13 and April 18, 2010. At trial, Halliburton's Head of Cement, Tom Roth, acknowledged that these tests clearly showed that the cement slurry was unstable.[953]

The February 12 and February 17 tests were pilot tests, to determine whether the Kodiak #2 blend could be used at Macondo.[954] The Weigh-Up Sheet for the February 12 testing noted failure of both the foam stability and compressive strength testing.[955] The February 16, 2010 testing showed that the slurry was significantly heavier than the target density of 14.5ppg and, therefore, indicated instability.[956]

The tests conducted in April were the pre-job tests. Unlike the pilot tests, the purpose of the April pre-job testing was to confirm that the production casing cement design would perform successfully upon job execution. The April 13 testing resulted in an unacceptable deviation in density[957] – an indication of instability.[958] The April 16 test was cancelled.[959] A "repeat" of the April 13th test was performed on April 17, which ultimately showed a density of 15.0 ppg – higher than the maximum 14.5 ppg ECD threshold BP's engineers had calculated the well could withstand. Even assuming *arguendo* that Halliburton is correct that this April 17 test nevertheless shows stability and was "successful" – it is uncontested that (as noted above) BP did not receive these results until six days after the explosion.

---

[953] Roth Testimony, p.3131:7-25.
[954] Gagliano Testimony, p.6646:16-25 (the Kodiak #2 blend "had been on location for a very long time" and he "wanted to make sure the cement was still good and had not been contaminated or moisture-damaged")
[955] TREX-00808 (Cement Lab Weigh-Up Sheet dated 2/12/2010); Quirk Testimony, pp. 4938:23-4939:3. At trial, Mr. Gagliano claimed that the first test was "invalid" However, the alleged mistake in measurement that he claims rendered the test invalid was not discovered until after the blowout. *See* Gagliano Testimony, pp.6741-6742.
[956] TREX-00809 (2/16/2010 Cement Lab Weigh-Up Sheet); Benge Testimony, p. 2453:2-9.
[957] TREX-00984 at pdf p. 2 (4/13/2010, 4/15/2010, 4/16/2010 and 4/17/2010 Cement Lab Weigh-Up Sheets); Gagliano Testimony, p. 6743-6744.
[958] Benge Testimony, pp. 2509-2511.
[959] D-3177 (Macondo Foam Stability Testing).

It is also undisputed that Halliburton did not provide the February 12th test results, the April 13th test results, or the complete set of February 16 test results to BP.[960]

While it is not clear exactly what Mr. Gagliano's motive was, the Court concludes that it is willful, reckless, wanton and egregious in light of the fact that the cement mix was known to contain destabilizing ingredients.   While BP was reckless itself to proceed without final test results, BP may have proceeded with more caution had Mr. Gagliano advised that all three sets of tests which had been conducted on the slurry gave indications of instability.[961]

### *Halliburton Personnel Exhibited Willful and Reckless Disregard by Participating in a Cement Job That Was Contrary To Its Best Practices.*

While the evidence suggests that BP was ultimately making the decisions about how the cement job would be completed, Halliburton was aware that the operation was to be performed in a manner that was unsafe and not consistent with best practices.

Because the cement job involved procedures that were "irregular" (*e.g.*, not conducting a full bottoms-up circulation), Mr. Gagliano should have at least notified his superiors before allowing the job to go forward.[962]   He did not do so.[963]

Halliburton acted recklessly in participating in a cement job that included:

- **The use of foam cement in a synthetic oil-based mud environment**.  Foamed cement should not have been used in the Synthetic Oil-Based Mud (SOBM) environment that was present at the Macondo well. The destabilizing effects on

---

[960] *See generally,* D-4309A; *see also, e.g.,* Gagliano Testimony, pp.6663-6664 (did not provide the February 12th tests to BP), p.6827 (only provided some of the February test results); Benge Testimony, p.2512 (Halliburton did not provide foam stability test results to BP between April 1st and April 26th), pp.2520-2521 (is not aware of Halliburton ever informing BP that the April 13th tests had failed).

[961] The Court concludes that this constitutes "fraud" for the purpose of invalidating the contractual pre-suit release by BP, and – when coupled with Halliburton's failure to develop and provide a formal Basis of Design with appropriate Management of Change – constitutes a "core breach" of the BP-Halliburton Services Agreement, whose primary cause and consideration, from BP's point of view, is the securing of a stable cement slurry that is suited to the particular geological and engineering elements and limitations.

[962] Dugas Deposition, pp.209, 215-216. (*See generally* TREX-2133 (Halliburton - US Land-Offshore Cementing Work Methods).)

[963] Gagliano Testimony, pp.6687-6688.

foamed cement by SOBM are severe and can lead to a job failure.[964]   Halliburton knew that placing the lighter synthetic based mud at the bottom of the column under the tail cement created a risk of inversion or swapping.[965]   Despite this knowledge, it went forward with the cement job without warning BP of this danger.

- **Limited cement volume**.  Halliburton knew that BP's cement design called for a low cement volume.  The low volume of cement was an added risk that required extraordinary care.[966]   While the Top of Cement was such that a lower volume was necessary, it makes the job more complex and difficult, and requires a heightened degree of care.[967]

- **Limited pre-job circulation**.  The inadequate pre-job circulation did not allow for breaking up of gels in the mud or circulation out of the formation any fluids that may have entered the mud while the casing was being run. Coupled with poor centralization, this lack of circulation eliminated opportunities to maximize the circulatable volume of mud in the wellbore.[968]  Pre-job circulation also allows observation of the condition of the mud that has been sitting static at the bottom of the well for several days to determine whether it has deteriorated or if there is debris in the mud.[969]

- **Low pump rates**.  Halliburton knew that BP's design called for a low pump rate. The job design was inadequate for the cement to be properly placed in the well. Low pump rates, combined with poor centralization, the use of base oil pre-flush, limited pre-job circulation virtually assured the cement integrity would be compromised.[970]

- **Too few centralizers.**  While BP was certainly aware of this issue, and made the decision to proceed in the face of a known risk, this should have (at the very least) prompted the Halliburton personnel to exercise even greater caution regarding the other elements of the job, the testing, and the cement design.

- **Not performing a full bottoms-up circulation**.  Halliburton knew that BP had decided not to perform a full bottoms-up circulation, which is a best practice and is identified as such throughout the cement industry.[971]  Halliburton did nothing to stop the cement job from proceeding.[972]

---

[964] Calvert Testimony, pp.2619-2622; *see also,* Benge Report, pp.13, 15-16 (TREX-5990 at pdf pp.19, 21-22).

[965] Chaisson Testimony, p.6338-6339.

[966] Benge Report, p.19 (TREX-5990 at pdf p.25).

[967] Benge Testimony, p.2316:10-20.

[968] Benge Report, pp.21-22, 25 (TREX-5990 at pdf pp.27-28, 31).

[969] Benge Testimony, p.2314:9-25.

[970] Benge Report, p.25 (TREX-5990 at pdf p.31).

[971] Benge Report, p.21 (TREX-5990 at pdf p.27); Benge Testimony, p.2315:3-4.

[972] Benge Testimony, p.2315:1-2.

The foregoing known risks and hazards, particularly when combined with the risky foam slurry, virtually guaranteed that the cement job would fail to achieve zonal isolation.  Halliburton should have recognized, and communicated to BP in a serious and forceful way, that the cement job was going to fail, before BP commenced on April 19.[973]  By going forward with BP under these circumstances, Halliburton disregarded known risks that played a significant contributing role in the disaster.

### *Halliburton-Sperry Personnel Wantonly and Recklessly Ignored Signs That the Well Was Flowing and Failed to Warn Drill Crew*

As discussed *supra,* it is not clear exactly where Halliburton-Sperry Mudlogger Joe Keith was or what he was doing during the displacement procedure.  Mr. Keith was either away from his post, not paying attention at all, or paying attention but ignoring the red flags as they appeared.  This was one of the most critical steps in the entire drilling process.[974]  With no ability to monitor the flow-out, Mr. Keith should have been even more attentive to the pressure readings and other signs of the well.  Instead, the evidence suggests that he completely abandoned his post.  This was a gross and wanton deviation from the standard of care.

### *Halliburton's Willful and Reckless Disregard is Further Evidenced by Halliburton's Post-Incident Conduct*

It is undisputed that Halliburton conducted post-incident testing at its Duncan, Oklahoma lab without documenting the results.[975]  It is undisputed that Halliburton conducted post-incident testing at its Broussard, Louisiana lab, but "off the side" and throwing the notes into the trash.[976]

---

[973] *See, e.g.,* Roth Testimony, pp.3215, 3221 (Mr. Gagliano should have realized prior to April 19th that the slurry had a low probability of success).

[974] *See, e.g.,* Ezell Testimony, pp.1672-1673, 1784.

[975] Roth Testimony, pp.3060, 3255-3257; Quirk Testimony, pp.4763-4764; Morgan Deposition, pp.22-23; D-4309A, D379.

[976] Roth Testimony. pp.3060, 3265; Quirk Testimony, pp.4766-4767, 4769-4770; Faul Deposition, p.705; D-4309A, D379.

It is undisputed that Halliburton conducted post-incident 3-D modeling without documenting the results.[977]  It is undisputed that John Gisclair destroyed the notes he made in re-creating logs that were lost in the fire.[978]  Halliburton concedes that it made misrepresentations to Congress and the public about the pre-incident testing.[979]  Halliburton concedes that it made misrepresentations to Congress and to the public regarding its experience with similar foam cement jobs.[980]

Halliburton concedes that it made misrepresentations to Congress and to the public regarding the slurry's conformance to industry, BP and Halliburton Best Practices.[981]   Halliburton concedes that it did not comply with the *subpoena* from the U.S. Department of Justice, failing to turn over left-over samples of cement and additives that were used on Macondo.[982]  Halliburton concedes that – despite its representations to Congress,[983] and despite industry best practices and corporate policies regarding an investigation of root causes and lessons learned to prevent other incidents of this kind[984] – any such investigation was cloaked behind attorney-client privilege.[985]  It is clear that Halliburton's key witness, Jesse Gagliano, invoked the Fifth Amendment and refused

---

[977] Roth Testimony, pp.3066, 3255-3257, 3279-3280.

[978] Gisclair Deposition, p.171.

[979] Roth Testimony, pp.3249-3251, 3260-3262, 3266-3267; TREX-982; TREX-48098; D379, D-4309A.

[980] Probert Testimony, pp.3025-3026, 3236-3238, 3043; TREX-2013; TREX-75074; TREX-7491A.

[981] Roth Testimony, p.3263; Benge Testimony, pp.2483-2486; TREX-982.

[982] Quirk Testimony, pp.4796-4806, 4826-4841, 4926-4927, 4965-4966; TREX-48002 pp.1-2; TREX-5595; TREX-3110; D-3257.  BP also had difficulty obtaining information and samples from Halliburton after the blowout. *See* Bly Testimony, pp. 917, 924-929; D-4269A; Benge Testimony, pp.2514-2515; TREX-48195; TREX-47541; TREX-47549.  *See also,* Probert Testimony, pp.2956, 3029-3030; TREX-4477, p.B-36.

[983] Probert Testimony, pp.2939-2941, 3005; TREX-2016 pdf pp.51, 66-67 (Hearing before Committee on Energy and National Resources, May 11, 2010, pp.47, 62-63) ("we will of course share any information" gained from Halliburton's own investigation "and hopefully use it as a basis for ensuring that the industry is safe and environmentally sound…into the future"); *see also,* Probert Testimony, pp.2939-2941, 3005; TREX-02017 (Probert Statement to Committee on Environment and Public Works, May 11, 2010) p.1 ("Halliburton has and will continue to fully support, and cooperate with, the ongoing investigations into how and why this tragic event happened"); TREX-2019 (Subcommittee Inquiry into the DEEPWATER HORIZON Gulf Coast Oil Spill, May 12, 2010) p.60 ("We will continue to work with you and your staff to collect factual data that will enable an understanding of what took place and what we can collectively do to ensure that domestic oil and gas production is undertaken in the safest, most environmentally responsible manner possible").

[984] Probert Testimony, pp.2951-2954; TREX-5277 p.2.

[985] Probert Testimony, p.3007 ln.14-15, 3029. *See also, e.g.,* TREX-1897 (E-Mail from CFO dated April 27, 2010) (discussed in Probert Testimony, pp.3022-3023) ("we should not comment on what caused the accident; but, instead, need to say that Transocean and BP are conducting the investigation into what happened and we don't know anything further").

to testify until after every other Phase One fact witness had already testified and every Phase One expert had already issued his or her report.[986]  And it is clear that critical custodial documents were not produced until after the custodian's deposition, despite the fact that such documents had been turned over to Halliburton's in-house legal department months before.[987]

Whether Halliburton's conduct in concealing or destroying evidence after the incident was intentional or not, it certainly points to a broken corporate culture lacking an appropriate level of commitment to the public, the environment, the government, and the industry.  The Court considers this to be compelling evidence that the pre-incident failures on the part of Halliburton which led to the blowout were also the result of a corporate willful and reckless disregard for public health and safety.

### FINDINGS AND CONCLUSIONS REGARDING HALLIBURTON'S CORPORATE BLAMEWORTHINESS [988]

The Court finds that Mr. Gagliano was a Halliburton official with managerial and policymaking authority in connection with the Halliburton policies and other recommendations associated with the drilling of the Macondo well.   Even if Mr. Gagliano were not considered a corporate official with policymaking authority, however, the Court additionally finds that the willful and reckless conduct of Mr. Gagliano, Mr. Keith and other Halliburton-Sperry personnel was the direct result of Halliburton corporate policy or with the knowledge, approval or ratification of corporate officials with policymaking authority.  Evidence of this includes, for example, the following:

---

[986] *See, e.g.,* Benge Testimony, p.2334.
[987] Roth Testimony, pp.3252, 3280-3281.
[988] [*Note* – As set forth in Plaintiffs' POST-TRIAL BRIEFS, Plaintiffs respectfully suggest and reserve the right to argue that the *P&E Boat Rentals* case is distinguishable and/or that a less stringent standard for the imputation of punitive damages to the Halliburton-Sperry corporate defendants can and should be applied.  The Supreme Court, in *Baker v. Exxon,* recognized the state of uncertainty in the law regarding this issue, which was left unresolved by the Court. 554 U.S. at 482-484.]

- Halliburton Management knew that its testing lab was understaffed and ill-equipped to handle the necessary testing;

- The responsibilities to provide a Basis of Design, with appropriate Management of Change, was a corporate contractual responsibility;

- Halliburton's Management itself exhibited a reckless disregard as to whether or how its services were (or were not) being provided;

- There was evidence that complaints regarding Mr. Gagliano's competence were made to his superiors;

- Halliburton-Sperry Mudloggers had a history of incompetence that was known to the company;

- Halliburton Management effectively ratified its employees' pre-incident conduct by concealing the evidence after the incident.

It is significant to note that Halliburton was not compensated under the BP Services Agreement for specific tests or technical support.[989]  Therefore, while using the left-over Kodiak Blend may have saved BP money with respect to the materials, Halliburton presumably had an incentive to avoid the testing and other engineering services that would have been required to formulate a new blend from scratch.  Based on the evidence presented, this general disincentive to spend time and money on testing services permeated the Halliburton culture.

For example, a January 2010 audit of Halliburton's Broussard, Louisiana, Testing Lab (where the Macondo cement was tested) showed significant problems:  the lab was overworked; there was no procedure in place to ensure that all lab cement and additive samples were reflective of current bulk plant or offshore rig inventories; there were no uniform published testing protocols;  current versions of the Global Lab Best Practices were not available in the lab;

---

[989] *See* Dubois Deposition, p.355; Roth Testimony, p.3275 (no matter how many tests Halliburton had to run, there would be no additional cost to BP).

the lab had no way to validate whether chemical additive samples should be held in their inventory or discarded.[990]

There was further evidence that the Broussard Lab was understaffed and unable to keep up with cement testing demands during the spring of 2010.  Halliburton's Lab Manager for the Gulf of Mexico, Tim Quirk, wrote to Halliburton's Gulf of Mexico Regional Manager For Cementing, Richard Vargo, after the incident, confirming that they had been "very rarely" able to keep up with the testing demands during that time period.[991]  Quirk noted that, between January and June of 2010, the lab averaged 108 tests per day, and that it was "very common to have 30 to 40 tests waiting in line" during this time.[992]

Halliburton further demonstrated corporate and willful disregard for the performance or non-performance of its corporate contractual and professional responsibilities.  Jesse Gagliano, the cement engineer "embedded" in BP's Houston office, was inept, indifferent, and lacked the experience necessary to handle the Macondo job.[993]  Indeed, in the weeks leading up to the blowout, BP engineers voiced serious questions about his competency as it affected the timeliness and quality of his reports to BP.[994]  They complained that he was not "cutting it."[995] BP Drilling Engineer Team Leader Greg Walz received multiple complaints from BP engineers

---

[990] *See generally,* Dubois Deposition, pp.64-66, 126-130; TREX-3769 at pdf pp.4, 7, 10 (2010 Cementing Reliability Audit, Question Nos. 2.03, 3.05, 6.01); *see also,* Quirk Testimony, p.4964 (the lab did not keep a list of their current inventory of chemicals, and there was no way for the lab to assess the age or suitability of the cement and additive samples in its possession); *see also, e.g.,* M. Sepulvado Deposition, pp.159-161 (had trouble getting test results from the Halliburton Lab in a timely manner).

[991] TREX-5569 (Quirk Nov. 8, 2010 E-Mail) at pdf p.2; *see also,* Quirk Testimony, pp.4950:3-4951:19.

[992] TREX-5569 (Quirk Nov. 8, 2010 E-Mail) at pdf p.2; *see also,* Quirk Testimony, pp.4950:3-4951:19.

[993] *See, e.g.,* Cocales Deposition, pp.84-88; Walz Deposition, pp.326-327, 468-470, 625, 627; Roth Testimony, pp.3138:17-3139:2.

[994] TREX-1390 (Morel E-Mail dated April 17, 2010) at pdf p.2 ("Jesse isn't cutting it anymore.…  I asked for these lab tests to be completed multiple times early last week and Jesse still waited until the last minute as he has done throughout this well.  This doesn't give us enough time to tweak the slurry to meet our needs"); TREX-5801 at pdf p.1 (Morel E-Mail dated April 1, 2010) (stressing to Halliburton's Jesse Gagliano the importance of getting test data in advance of the job); Roth Testimony, pp.3212-3213; *see also* Walz Deposition, pp.318-331.

[995] TREX-1390 (Morel E-Mail dated April 17, 2010) at pdf p.2

concerning Gagliano's lack of timeliness, and believed that the decision to transfer Gagliano from his position on the Macondo team had been made.[996]

Mr. Guide testified that he shared his concerns regarding Mr. Gagliano with Halliburton's Durrell Bernard.[997]

It should be noted, in this regard, that the Halliburton's responsibilities under the BP-Halliburton Services Agreement to develop and provide a formal Basis of Design, with appropriate Management of Change, is a corporate obligation. Yet Halliburton Management exhibited its own indifference and disregard as to whether Mr. Gagliano was or was not providing these or other services to BP.

The evidence suggests that Halliburton provided absolutely no management oversight of Gagliano's work from the time he began the design of the production casing slurry through the time of the blowout.[998] Roger Dugas, who was Mr. Gagliano's supervisor thru April 16, 2010, was a Sales Manager, who had no engineering experience.[999] Mr. Faul, who became Gagliano's supervisor on April 16, has expertise in design, testing and execution of cement jobs. Yet, during that four-day period, Mr. Faul never came to Gagliano to review his work or otherwise discuss the Macondo design.[1000]

Halliburton knew that Gagliano lacked the experience and reliability necessary for the Macondo project and that his performance as its cement engineer was deficient with BP, yet it vested in him with unfettered control over all slurry design and testing decisions.[1001] The

---

[996] Walz Deposition, pp.324, 326-327.
[997] Guide Testimony, p.8901.
[998] *See* Gagliano Testimony, p.6691 (Halliburton did not require Gagliano to submit his design decisions or recommendations to anyone at Halliburton before he provided them to the BP well team); *see also, e.g.,* Dugas Deposition, p174; Faul Deposition, pp.107-108, 330-331.
[999] Gagliano Testimony, pp.6686-6687.
[1000] Gagliano Deposition, pp.6687-6688.
[1001] Gagliano Testimony, pp. 6685-6692; Roth Testimony, pp. 3187-3192, 3248; Quirk Testimony, pp. 4810-4811, 4908, 4936-4937.

company's reckless disregard of its contractual responsibilities, as well as the design, testing, and formulation of the cement itself led directly to the failure to achieve zonal isolation.

Halliburton-Sperry also had chronic problems with incompetence among its mudloggers throughout the Macondo project. In October of 2009, while the MARIANAS was drilling Macondo, BP told Halliburton that one of its mudloggers was "not getting the job done" and "was not getting the basics right."[1002] After one of BP's Macondo well site leaders "asked for a replacement,"[1003] Halliburton agreed to pull him from the job.[1004] On March 8, 2010, another Halliburton-Sperry mudlogger assigned to the DEEPWATER HORIZON, Nick Malczewsky, failed to detect the signs of the 34-40 barrel kick, for a period of 25-30 minutes.[1005] The BP Well Site Leader "ran him off"[1006] for safety reasons.[1007] Following this kick, Halliburton did no "lessons learned" investigation, and did not provide Joe Keith or its other Mudloggers with any additional guidance, direction, or training.[1008]

Finally, the Court believes that Halliburton Management effectively ratified its employees' pre-incident conduct by attempting to conceal the evidence after the incident.

For all of these reasons, the Court finds that the willful and wanton conduct of Halliburton-Sperry personnel stemmed from corporate policy and culture, or was otherwise known to, approved by, or subsequently ratified by corporate officials with policymaking authority.

---

[1002] TREX-01047 (10/14/2009 Email from Halliburton to several BP engineers re: Sperry mudlogger Alex Voltaire's incompetence working aboard the MARIANAS at Macondo).

[1003] Clark Deposition, p. 45:11-21.

[1004] TREX-01047 (10/14/2009 E-Mail from Halliburton to several BP engineers re: Sperry mudlogger Alex Voltaire's incompetence working aboard the MARIANAS at Macondo).

[1005] M. Sepulvado Deposition, pp. 127:7-11; 729:1-5; 733:5-9; Keith Testimony, p. 3551:13-20, 24-25; Guide Testimony, p. 8653:8-22; TREX-153 at pdf p. 12 (BP Incident Investigation Team – Notes of Interview with John Guide, p.12).

[1006] Keith Testimony, p.3552:10-13.

[1007] Clark Deposition, pp.45:11-21, 66:25-67:7, 210:14-211:8 (Sperry Mudlogger Nick Malczewsky asked to leave by BP Macondo Well Site Leader after failing to identify the March 8th kick).

[1008] Keith Testimony, p.3552:14-19.

# <u>Conclusion</u>

Based on the evidence admitted during the Phase One Trial, and as outlined in the above and foregoing, the Court finds and concludes that:

1. Transocean and its employees were negligent, and such negligence was a substantial contributing cause of the blowout, explosion, fire, and initiation of the discharge of oil;

2. The DEEPWATER HORIZON was unseaworthy, and such unseaworthiness was a substantial contributing cause of the blowout, explosion, fire, and initiation of the discharge of oil;

3. Transocean, as the owner of the vessel, had privity and knowledge with respect to the negligent acts and omissions of its employees and the unseaworthy condition of the DEEPWATER HORIZON;

4. Transocean's employees' conduct was the result of gross negligence, recklessness, and willful and wanton disregard, thereby invalidating the pre-suit contractual release by BP;

5. Transocean's employees engaged in willful and wanton conduct, and such willful and wanton conduct was a substantial contributing cause of the blowout, explosion, fire, and initiation of the discharge of oil;

6. The willful and wanton conduct of Transocean employees was the result of corporate policy and/or was otherwise known to, approved by, and/or ratified by corporate officials with policymaking authority;

7. BP and its employees were negligent, and such negligence was a substantial contributing cause of the blowout, explosion, fire, and initiation of the discharge of oil;

8. BP's employees' conduct was the result of gross negligence and willful misconduct, within the meaning of OPA, 33 U.S.C. §2704(c)(1)(A);

9. BP and its employees violated applicable Federal safety, construction or operation regulations within the meaning of OPA, 33 U.S.C. §2704(c)(1)(B);

10. BP's employees engaged in willful and wanton conduct, and such willful and wanton conduct was a substantial contributing cause of the blowout, explosion, fire, and initiation of the discharge of oil;

11. The willful and wanton conduct of BP employees was the result of corporate policy and/or was otherwise known to, approved by, and/or ratified by corporate officials with policymaking authority;

12. Halliburton and its employees were negligent, and such negligence was a substantial contributing cause of the blowout, explosion, fire, and initiation of the discharge of oil;

13. Halliburton's employees' conduct was the result of gross negligence, recklessness, willful and wanton disregard, and fraud, thereby invalidating the pre-suit contractual release by BP;

14. Halliburton's employees engaged in willful and wanton conduct, and such willful and wanton conduct was a substantial contributing cause of the blowout, explosion, fire, and initiation of the discharge of oil;  and,

15. The willful and wanton conduct of Halliburton employees was the result of corporate policy and/or was otherwise known to, approved by, and/or ratified by corporate officials with policymaking authority.

This 21st day of June, 2013.


Respectfully submitted,


   /s/   Stephen J. Herman

**Stephen J. Herman**, La. Bar No. 23129
**HERMAN HERMAN & KATZ LLC**
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581-4892
Fax. No. (504) 569-6024
Email: sherman@hhklawfirm.com
*Plaintiffs Liaison Counsel*

    /s/ James Parkerson Roy

**James Parkerson Roy**, La. Bar No.11511
**DOMENGEAUX WRIGHT ROY**
   **& EDWARDS, LLC**
556 Jefferson Street, Suite 500
Lafayette, Louisiana 70501
Telephone: (337) 233-3033
Fax No. (337) 233-2796
E-Mail: jimr@wrightroy.com
*Plaintiffs Liaison Counsel*


## PLAINTIFFS' STEERING COMMITTEE

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office:  (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY  10003
Office:  (212) 558-5802
Telefax: (212) 344-5461
E-Mail:  rgreenwald@weitzlux.com

Jeffrey A. Breit
BREIT, DRESCHER & IMPREVENTO
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, Virginia 23451
Office: (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Office: (415) 956-1000
Telefax: (415) 956-1008
E-Mail: ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA &
TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Office: (504) 394-9000
Telefax: (504) 394-9110
E-Mail: pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL 36660
Office: (251) 471-6191
Telefax: (251) 479-1031
E-Mail: rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail: mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office: (334) 269-2343
Telefax: (334) 954-7555
E-Mail: rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU LLP
501 Broad Street
Lake Charles, LA 70601
Office: (337) 439-0707
Telefax: (337) 439-1029
E-Mail: mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA 70801-1910
Office: (225) 344-3735
Telefax: (225) 344-0522
E-Mail: mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA 70130
Office: (504) 588-1500
Telefax: (504) 588-1514
E-Mail: sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Office: (214) 521-3605
Telefax: (214) 599-1172
E-Mail: ssummy@baronbudd.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101

Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

Maison Grand Caillou
Houma, Louisiana 70360
Office: (985) 876-7595
Fax No. (985) 876-7594
E-Mail: duke@williamslawgroup.org

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office: (843) 216-9159
Fax No. (843) 216-9290
E-Mail: jrice@motleyrice.com

## ADDITIONAL PSC PHASE ONE TRIAL TEAM MEMBERS

Johnny deGravelles
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail:  jdegravelles@dphf-law.com

Walter J. Leger, Jr.
LEGER & SHAW
600 Carondelet St., 9th Floor
New Orleans, LA 70130
Phone: (504) 588-9043
Fax: (504) 588-9980
E-Mail: wleger@legershaw.com

Jimmy Williamson
WILLIAMSON & RUSNAK
Texas State Bar No. 21624100
4310 Yoakum Blvd.
Houston, TX 77006
Phone: (713) 223-3330
Fax: (713) 223-0001
E-Mail: Jimmy@JimmyWilliamson.com

Tom W. Thornhill
THORNHILL LAW FIRM, APLC
1308 Ninth Street
Slidell, Louisiana 70458

Phone: (985) 641-5010
Fax: (985) 641-5011 fax
E-Mail: tom@thornhilllawfirm.com

Anthony Irpino
IRPINO LAW FIRM
2216 Magazine Street
New Orleans, LA 70130
Tel: (504) 525-1500
Fax: (504) 525-1501
E-Mail: airpino@irpinolaw.com


## THE STATE OF ALABAMA

The Honorable Luther Strange
*Attorney General*
Corey L. Maze
*Special Deputy Attorney General*
Winfield J. Sinclair
*Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, AL  36130
Phone: (334) 353-4336
E-Mail: cmaze@ago.state.al.us

*Counsel for the State of Alabama, and*
*Coordinating Counsel for the States*


## THE STATE OF LOUISIANA

The Honorable James D. "Buddy" Caldwell
*Attorney General*
James Trey Phillips
*First Assistant Attorney General*
Megan K. Terrell
*Assistant Attorney General*
*Section Chief –Environmental*
P.O. Box 94005
Baton Rouge, LA 70804-9005
Telephone: (225) 326-6708

Allan Kanner
Elizabeth B. Petersen

Douglas R. Kraus
Allison M. Shipp
KANNER & WHITELEY, LLC
701 Camp Street
New Orleans, LA 70130
Telephone: (504) 524-5777

T. Allen Usry
USRY, WEEKS, & MATTHEWS, APLC
1615 Poydras St., Suite 12
New Orleans, LA 70112
Telephone: (504) 592-4641

Henry T. Dart
Grady J. Flattmann
HENRY DART, ATTORNEYS AT LAW P.C.
510 N. Jefferson St.
Covington, LA 70433
Telephone: (985) 809-8093

*Counsel for the State of Louisiana, and
Co-Coordinating Counsel for the States*

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing Proposed Findings & Conclusions
have been served on All Counsel by electronically uploading the same to Lexis Nexis File &
Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed
with the Clerk of Court of the United States District Court for the Eastern District of Louisiana
by using the CM/ ECF System, which will send a notice of electronic filing in accordance with
the procedures established in MDL 2179, on this 21st day of June, 2013.

s/  James Parkerson Roy and Stephen J. Herman