UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | : | MDL No. 2179 |
| "DEEPWATER HORIZON" IN THE GULF | : | |
| OF MEXICO, ON APRIL 20, 2010 | : | SECTION J |
| | : | |
| THIS DOCUMENT RELATES TO: | : | JUDGE BARBIER |
| | : | |
| CIVIL ACTION NO. 10-4536 | : | MAGISTRATE JUDGE SHUSHAN |
| | : | |

......................................................................................................................................

**PROPOSED FINDINGS OF FACT BY THE UNITED STATES**

# Contents

FINDINGS OF FACT .......................................................................................................... 1

I.   "PARANOIA, CHAOS, AND INSANITY" -- BP'S DYSFUNCTIONAL
     MANAGEMENT OF THE MACONDO WELL. .......................................................... 4

     A.   BP's Macondo Well Corporate Management Structure. ................................. 4

     B.   A Culture of Corporate Recklessness. ............................................................ 6

II.  THE FINAL 100 FEET OF THE MACONDO WELL: "BP HAD NO
     PERMISSION TO CONTINUE TO EXPLORE THE OUTER CONTINENTAL
     SHELF OF THE UNITED STATES." ..................................................................... 15

     A.   The Purpose of a "Safe Drilling Margin." ..................................................... 15

III. THE PRODUCTION CASING CEMENT JOB: "HOW BAD CAN IT BE AND
     STILL BE OKAY?" ................................................................................................ 23

     A.   The Purpose of the Production Casing Cement Job. ...................................... 23

     B.   Overview ........................................................................................................ 24

     C.   Failure of Design. .......................................................................................... 25

     D.   The Macondo Well Slurry Design. ................................................................ 27

     E.   BP Pumped the Cement Job Without a Successful Foam Stability Test. ....... 28

     F.   BP's Engineering Design and Operational Decisions Increased the Risk of a
          Cementing Failure. ........................................................................................ 29

          1.   Centralization. ...................................................................................... 29

          2.   Bottoms-Up Circulation. ...................................................................... 31

          3.   Base Oil. ................................................................................................ 32

          4.   Volume. .................................................................................................. 33

          5.   Pump Rate. ............................................................................................ 33

     G.   Pre-Cement Job Anomalies: Float Collar Conversion and Low Circulating
          Pressure ......................................................................................................... 34

     H.   BP Did Not Wait for the Cement to Set Before Conducting the Negative
          Pressure Test. ................................................................................................ 35

IV.  THE "TEMPORARY ABANDONMENT PLAN" AND EVENTS LEADING UP
     TO THE NEGATIVE PRESSURE TEST. ............................................................... 39

     A.   The Purpose of the Temporary Abandonment Plan. ..................................... 39

|  | B. | BP's Changing Temporary Abandonment Plans. ............................................. 40 |
|---|---|---|
|  | C. | BP Deviated from the Approved APM and Did Not Notify MMS or Seek Approval for the Change. ................................................................................. 44 |
| V. | | THE FAILED NEGATIVE PRESSURE TEST. ........................................................ 45 |
|  | A. | The Purpose of the Negative Pressure Test. ..................................................... 45 |
|  | B. | The Simple "Pass-Fail" Criteria for Approval of a Negative Pressure Test: "No Pressure, No Flow." .................................................................................. 46 |
|  | C. | BP's Performance and Approval of the Negative Pressure Test. ................... 47 |
|  | D. | The Hafle-Vidrine Telephone Call at 8:52-9:02 p.m. ...................................... 57 |
| VI. | | BP's FAILURE TO DISCHARGE ITS DUTY TO MONITOR THE WELL AND PREVENT THE BLOWOUT FOLLOWING THE 8:52-9:02 P.M. CALL. ............ 65 |
|  | A. | BP's Further Breach of 30 C.F.R. § 250.401. ................................................. 65 |
|  | B. | BP Complicated And Confused Well Monitoring Efforts by Directing Simultaneous Operations  (SIMOPS) During Displacement. ......................... 69 |
| VII. | | BLOWOUT PREVENTER (BOP) ......................................................................... 70 |
|  | A. | Even On Technology Designed To Ensure Safety, BP Made Safety a Low Priority. ............................................................................................................... 70 |
|  | B. | BP Chose Money Over Safety in Its BOP Decisions. ...................................... 72 |
|  |  | 1. To Save Money, BP Utilized an Inferior Blind Shear Ram. ............... 73 |
|  |  | 2. BP Chose to Use Just One Blind Shear Ram. ........................................ 75 |
|  |  | 3. BP Compounded Its Blind Shear Ram Errors and Doomed It to Failure. ...................................................................................................... 77 |
|  | C. | Having Put in Place an Inadequate BOP, BP Ignored Safety Risks and Failed to Maintain It. ................................................................................................... 78 |
|  |  | 1. BP's Audits Exposed Serious Problems with the BOP. ........................ 78 |
|  |  | 2. In Light of the Audit Findings, BP Experts Recommended That the Deepwater Horizon Be Pulled from Service. ......................................... 80 |
|  |  | 3. Despite Crystal-Clear Warnings, BP Did Not Follow up on the Audit Findings, but Put the Deepwater Horizon Back into Service. ............ 80 |
|  | D. | BP Exercised Control Over the BOP and Was in a Position to Prevent Improper Maintenance. ..................................................................................... 82 |
|  | E. | On April 20, the Deepwater Horizon's BOP Failed Because BP Had Failed to Maintain It. ...................................................................................................... 84 |

ii

VIII.   THE RELEVANCE OF PROCESS SAFETY – AND THE IRRELEVANCE OF
        BP'S SMOKE AND MIRRORS RESPONSE. ................................................. 88

        A.      BP Failed to Implement Process Safety Management on the Macondo Well.
                ..................................................................................................................... 88

        B.      "Personal Safety" Is Not "Process Safety." ...................................... 89

                1.      What Process Safety Is. ............................................................ 89

                2.      What Process Safety Is Not. ..................................................... 90

        C.      Smoke and Mirrors: BP's Process Safety Systems Did Not Apply to the
                *Deepwater Horizon.* .......................................................................... 91

        D.      A Cost-Cutting Culture and "We Can Get Away With It" Attitude Led to
                Risk-Taking Without Assessment of Cumulative Effects. ............... 94

IX.     TRANSOCEAN MANAGED, DIRECTED AND CONDUCTED OPERATIONS
        SPECIFICALLY RELATED TO CONTROLLING THE WELL, CONTROLLING
        THE RELEASE OF/AND PREVENTION OF THE RELEASE OF
        HYDROCARBONS INTO THE ENVIRONMENT AND THUS WAS AN
        OPERATOR OF THE MACONDO WELL. ................................................. 97

The United States respectfully submits the following proposed findings of fact for the use and consideration of the Court in making its independent findings.

**FINDINGS OF FACT**

1.      On the night of April 20, 2010, oil and gas blew out onto the MODU *Deepwater Horizon* as it was preparing to temporarily abandon the "Macondo Well."  Eleven men died in the resulting explosions and fire, and many others were injured.  On April 22nd, the rig sank into the Gulf of Mexico.  Over the next three months, millions of barrels of oil flowed through the well and were discharged into the Gulf of Mexico.  Rec.Docs. 3830, 4209 (Orders on Motions to Dismiss B1 and B3 Bundles, respectively).

2.      The Phase One bench trial took place over nearly two months and addressed "issues arising out of the conduct of various parties allegedly relevant to the loss of well control at the Macondo Well, the ensuing fire and explosion on the MODU *Deepwater Horizon* on April 20, 2010, and the sinking of the MODU *Deepwater Horizon* on April 22, 2010, and the initiation of the release of oil from the Macondo Well or *Deepwater Horizon* during those time periods (collectively, the 'Incident')."  Rec.Doc. 4033 ("Pretrial Order No. 41 [Case Management Order No. 3]"), as amended by Rec.Docs. 4083, 6592.

3.      According to an "Internal Investigation" prepared by BP and related testimony by its lead author, Mark Bly, BP affirmatively claims that "a complex and interlinked series of mechanical failures, human judgments, engineering design, operational implementation, and team interfaces came together to allow the initiation and escalation of the accident."  TREX-00001 (BP Internal Investigation, also referred to as the "Bly Report") at 11.[1]

---

[1] BP's internal investigation was led by Mark Bly, who was chosen for that role by Tony Hayward, BP's then CEO.  BP's internal investigation also became known as the "Bly Report."  Bly 903:6-904:20.  The Bly Report was admitted in evidence as TREX-00001.

4.      In explaining the foregoing, Bly elaborated at trial:

It was our way of summarizing … the fact that there were eight mechanical or procedural barriers that were penetrated here, that there were a variety of people involved at different stages of that, and that there were a number of things that went wrong both mechanically, human judgments, as it says here, to allow the accident to happen.

Bly 1197:21-1198:2; TREX-00001 (Bly Report) at 32, 181 ("Swiss cheese" accident model); D-3584.

5.      The Court agrees with BP's candid admission that the tragedy was caused by an "interlinked series" of actions and events.[2]  However, the circumscribed list of causal elements acknowledged by BP in its accident model is not complete, and the causal factors listed were not equal in relative importance, though some are clearly more obvious than others.  *See, e.g.*, the negative pressure test findings in Section V below.

6.      Indeed, BP's own written policies for accident investigations required it to perform a "root cause" analysis of the deeper systemic and management causes of accidents.  TREX-01742 (BP's Group Defined Practice for Incident Investigation) at 19, 21; Bea 287:3-292:1; D-2771 and D-2772 (graphics explaining in simple terms the principles of "root cause" analysis).

7.      Moreover, Tony Hayward, BP's CEO at the time of the April 20th blowout, testified before Congress that BP was "conducting a full and comprehensive investigation" and that the investigation "is covering everything."   Hayward Group 1 Bundle 001, 25:10-27:6;

---

[2] The relationship of the interlinked series of causal events to the legal standard of willful misconduct, *see, e.g., In re Tug OCEAN PRINCE*, 584 F.2d 1151 (2d Cir.1978), *Water Quality Insurance Syndicate v. United States ("WQIS 2007")*, 522 F.Supp.2d 220 (D.D.C. 2007), shall be discussed in a separate filing dealing with legal issues and conclusions of law.

2

Hayward Group 1 Bundle 001, TREX-06001 (Hayward Congressional testimony transcript) at 27, 67-69, 89.[3]

8.      In spite of these statements and requirements, BP's investigation and the Bly Report intentionally ignored any investigation of systemic causes that potentially could focus on management's role in causing the tragedy.  Bea 290:14-292:1.

9.      Instead, BP's investigation and the Bly Report, as well as its accident model, focused almost exclusively on events that occurred onboard the *Deepwater Horizon*. Specifically, BP's management curtailed the investigation so that it was limited to certain "systems" causes (Bly 1005:15-1007:6), such as those dealing with equipment failures and with decisions made on the rig.  D-3584 ("Swiss cheese" accident model); Castell Group 1 Bundle 003, 166:1-5; 166:9-13; 166:18-168:2.[4]

10.     One of BP's Senior Directors, Sir William Castell, who "debated" BP's decision to circumscribe the investigation and ignore root causes that could implicate BP management, conceded that BP limited the investigation's scope.  Castell Group 1 Bundle 003, 180:20-25; 182:4-11; 184:15-18; 184:20-185:5; 501:15; 505:1; 505:3-507:3; Castell Group 1 Bundle 003, TREX-06250 at 3.

---

[3] Numerous trial and deposition exhibits had different page numbering protocols. For the Court's convenience, we have hyperlinked the exhibits cited in these proposed findings. For the sake of consistency, we cite to the page numbers in the hyperlinked exhibits by using the page number of the "pdf" version of the whole document as hyperlinked, regardless of the numbering on the original document.   As an example, the cited reference to the second page of a hyperlinked "pdf" version shall be cited as "page 2," even if that second page was the first page of an "index" and was numbered as "page i" in the original document. For further ease, if a citation is to a specific page of a multiple-page document, the hyperlink will go directly to the cited page.

[4] Page and line citations to deposition testimony only include the portions of transcripts included in the deposition bundles in evidence.  Pursuant to the Court's pre-trial instructions, counsel colloquy and other material was not designated as part of the bundled transcripts.

11.     Castell ultimately admitted that the reason for not investigating root causes that would include BP's management was, quoting from TREX-06250, "any unprivileged reports on [BP] culture would expose BP to more litigation."  Castell Group 1 Bundle 003, 182:13-184:11; 184:15-18; 184:20-24; Castell Group 1 Bundle 003, TREX-06250 at 3.

12.     As a result of this decision, the company's own investigation ignored or understated the role of critical actions, decisions, and failures of BP management that led directly to the blowout, fire, and explosions on April 20th, and the Gulf-wide disaster that followed.

I.      **"PARANOIA, CHAOS, AND INSANITY" -- BP'S DYSFUNCTIONAL MANAGEMENT OF THE MACONDO WELL.**

   A.      **BP's Macondo Well Corporate Management Structure.**

13.     There is no dispute that BP was a "lessee" and an "operator" of the Macondo Well (TREX-00001 at 9), or that BP was an "owner" of the well.  Rec.Doc. 5809 (Order and Reasons re Cross-Motions for Partial Summary Judgment Regarding Liability under the CWA and OPA) at 2.[5]

14.     Likewise, there is no dispute that BP, through its Well Site Leaders, was a "person in charge" of the well.  *See, e.g.*, Murry Sepulvado, Group 8 Bundle 119, 207:4-17 ("BP has the final say" in approving a negative pressure test).

15.     BP's Macondo Well operation was overseen by a Houston-based management team.  At the time of the Incident, John Guide was the "Wells Team Leader" of the Macondo Well.  Guide reported to David Sims as Operations Manager, and Sims reported to David Rich as

---

[5] The Court's Order on Summary Judgment in Rec.Doc. 5809 is the subject of an interlocutory appeal initiated by Anadarko Petroleum Corporation ("APC").  Fifth Circuit No. 12-30883.  BP has not disputed, however, its status as a co-owner of the well and, accordingly, that issue is not a subject of the appeal.  As a result of various settlements involving one co-lessee (MOEX) and a stipulation and related Orders involving Anadarko, BP's co-lessees and co-owners were not involved in the Phase One trial.  *See, e.g.*, Rec.Doc. 5930 ("Stipulation and Order Involving Anadarko Entities") and Rec.Doc. 6592 (Second Amended PTO 41) at 2, fn. 1.

Wells Manager.  Senior Operation Engineer Brett Cocales worked directly under Guide. D-4800.  All of these men worked under the authority of Drilling and Completions ("D&C") Vice-President Patrick O'Bryan, *id.*, and all worked at BP's corporate headquarters in Houston. O'Bryan 9338:25-9340:25.

16.     BP's "Well Site Leaders (WSLs)," also referred to as the "Company Men," were the highest level BP authorities aboard the *Deepwater Horizon* and reported directly to Guide. D-4800 (BP organization chart); O'Bryan 9343:16-21.  On April 20th, the two BP WSLs aboard the rig were Donald Vidrine and Robert Kaluza.  McKay 627:10-23.

17.     As Wells Team Leader, Guide was responsible for management and execution of BP's operation of the Macondo Well.  He was accountable for both safety and operations on the rig, and it was imperative for there to be good communication between Guide and the WSLs. O'Bryan 9341:12-25; 9343:3-15; 9351:11-18.

18.     On the engineering side, Senior Drilling Engineer Mark Hafle and Drilling Engineer Brian Morel reported to Engineering Team Leader ("ETL") Greg Walz.  Walz reported to Engineering Manager Jonathan Sprague, who reported to Vice-President O'Bryan.  D-4800.

19.     BP entrusted extensive corporate authority and power to Guide and the BP Macondo Well Team he oversaw.  As of the time of the blowout, BP acknowledges that the Well Team had spent $150 million on drilling the well – $54 million more than anticipated in the Macondo Well's original $96 million "Approval for Expenditure."  Rainey, Group 6 Bundle 083, TREX-02370 at 2; Beirne, Group 8 Bundle 124, TREX-01921 at 3; Bea 329:7-330:8; D-2730.

20.     Indeed, Guide himself was neither a mere functionary nor a low level BP employee.  Far to the contrary, the decisions made by Guide in operating the Macondo Well

were made by him with the express corporate and management authority delegated to him by

BP's Vice-President, Patrick O'Bryan.  O'Bryan 9343:7-9344:25.  As BP's O'Bryan testified:

> Q.   And I think you just said that was your job, your job as the vice president for that area to delegate that authority and you did.  In fact, you did to Mr. Guide; correct?
>
> A.   That was part of the delegation, yes.
>
> Q.   No dispute about that, is there?
>
> A.   No.

O'Bryan 9344:16-21.

### B.   A Culture of Corporate Recklessness.

21.     Within the two years preceding the Macondo Well blowout, BP twice reorganized

the corporate structure it would use to lead and manage the construction of the Macondo Well

(Drilling and Completions' Exploration and Appraisal group) – once in April 2008 and again in

April 2010, just before the blowout.  As part of the April 2010 reorganization, a number of BP

managers and specialists responsible for the Macondo Well construction changed jobs or saw

changes in their lines of reporting (or both), including: BP Wells Operations Team Leader John

Guide, BP Engineering Team Leader Greg Walz, Drilling & Completions Operations Manager

David Sims, BP Wells Manager David Rich, BP Drilling & Completions Vice-President Patrick

O'Bryan, and BP Engineering Manager Jonathan Sprague.  D-4780 (relevant BP D&C reporting

structure in 2009 and 2010); c*ompare* Beirute Group 9 Bundle 140 TREX-04861 at 1, 12, 23

*with* Rich Group 5 Bundle 067, TREX-02515 at 1, 6, 14, 17; Rich Group 5 Bundle 067, 50:24-

51:06; 16:16-17:02; Sims Group 1 Bundle 009, 592:1-593:4; Cocales Group 2 Bundle 25, 74:17-

20; Sprague Group 2 Bundle 027, 22:7-14; 24:7-26:22.

22.     BP's Macondo Well management structure did not function well.  As already

noted, the Macondo Well Team was already $54 million over its original budget allocation of

$96 million for the well.  Moreover, for *each* additional day the *Deepwater Horizon* remained at the Macondo Well, BP lost approximately another $1 million.  Bly 1085:14-1086:1.

23.     By March 2010, BP risked being late in moving the *Deepwater Horizon* to BP's "Nile Well" for a relatively short amount of work, after which it was to move to BP's "Kaskida" project.  O'Bryan 9294:3-9294:20.  Under the lease governing BP's right to drill Kaskida, BP was required to "spud" (begin) the well by May 16, 2010.  Absent compliance with the deadline, BP could lose its lease, its investment, and its ability to produce oil (and generate profits) from that well.  *Id*.

24.     Against this backdrop, and in the midst of drilling the Macondo Well, David Sims became Wells Team Leader Guide's immediate boss in early March 2010, just weeks before the explosion and fire on the *Deepwater Horizon*.  D-4780; D-4800; Sims Group 1 Bundle 009, TREX-00763; Sims Dep. Group 1, Bundle 009, 66:8-17; 67:2-21; 68:16-69:13; 312:6-19; 593:1-4.

25.     Soon into Sims's tenure, during an email exchange between the two, Sims drafted an e-mail to Guide.  The following are excerpts of what Sims wrote about the Wells Team Leader to whom BP's Vice-President had delegated his corporate authority for managing and operating the Macondo Well:

> I did not hear the Wells Team Leader take charge of the discussion, weigh the FACTS and the opinions, and then offer a logical, fact based decision. I value our WSL's opinions immensely. I do not always blindly follow them when they have no basis, only gut feel and ignore the facts. …
>
> … The WSLs are not well control experts. They are fantastic drillers - the best in the SPU, if not the industry. However, they do not circulate out kicks for a living, especially 1200' off bottom with many unknowns.
>
> I also heard you say disgustedly that we can't take forever to make a decision after a few second pause while everyone was thinking. Also heard, 'I had to go

outside to save my family from being killed' apparently randomly during the call. I'm sure nobody had a clue what you were talking about. …

You seem to love being the victim. Everything is someone else's fault. You criticize nearly everything we do on the rig but don't seem to realize that you are responsible for everything we do on the rig.

You seem to think that running is more important than well control. Left to go run in the middle of trying to pull the stuck logging tool free. …

You can't sit in a meeting and listen to others' opinions without arguing them. You think when somebody has an opinion that they are demanding action. You complain that a bunch of young engineers are throwing out all kinds of wild ideas and that it is driving you crazy. You don't listen. You key on a random word or phrase and then you fixate on that and don't hear anything else. You are always defensive and the victim. You seem to not want to make a decision so that you can criticize it later.

TREX-01127.

26.     In the context of the corporate authority and power that BP gave to its Macondo Wells Team Leader, and the decisions made by him and the Macondo Well Team that he oversaw, the closing paragraph of the draft message is incredible and beyond comprehension:

I will hand this well over to you in the morning and then you will be able to do whatever you want.  I would strongly suggest, for everyone's sake, that you make logical decisions, based on facts, after weighing all the opinions. Taking an action just because the WSLs want to do it, when there is a strong argument against and multiple contrary opinions is not advised.

TREX-01127.

27.     Sims did not send the draft email, but instead wrote, "I have a much longer response typed, but I'm not going to send it until I'm back and we can talk. We need to talk. We cannot fight about every decision." TREX-01126.

28.     At trial, when Guide was asked if he would turn over the well to a Wells Team Leader such as the one Sims described in the draft email, he answered:

Q.  He has all of this to say, and then he says he's turning the well over to you in the morning, is that right?

8

A.  Yes, that's what it said.

Q.  Would you turn a well over to somebody if all of things we just read were true about the person you were turning the well over to?

A.  Would I personally?  No.

Guide 8804:17-22.

29.     Tensions continued in the weeks that followed.  On April 15th, five days before the blowout, Sims e-mailed Guide and asked him to attend an early morning meeting the following day.  Guide's written response, contained in the same document, was to ask point blank: "Are you going to fire me."  TREX-01129.  The Wells Team Leader was not fired.

30.     On April 17th, only three days before the blowout, another extraordinary exchange occurred between Macondo's Wells Team Leader and his boss.  In the April 17th e-mail, Wells Team Leader Guide wrote to Sims:

> David, over the past four days there has [sic] been so many last minute changes to the operation that the WSL's have finally come to their wits end.  The quote is 'flying by the seat of our pants.'[6]  …  Everybody wants to do the right thing, but this huge level of paranoia from engineering leadership is driving chaos.  …  Brian [Morel] has called me numerous times trying to make sense of all the insanity.  …  This morning Brian called me and asked my advice about exploring opportunities both inside and outside of the company…
>
> What is my authority?  With the separation of engineering and operations I do not know what I can and can't do.  The operation is not going to succeed if we continue in this manner.

TREX-01144.

31.     Despite words like "paranoia," "chaos," and "insanity," and phrases like "have finally come to their wits end," "flying by the seat of our pants," and "the operation is not going

---

[6] Donald Vidrine, referred to extensively in the section below concerning the negative pressure test, was the Well Site Leader who stated to Guide that that the *Deepwater Horizon* WSLs were "flying by the seat of [their] pants."  Guide 8709:15-25.

to succeed," the Wells Team Leader later claimed that the e-mail, which dealt with a deepwater well that three days later literally exploded in flames, sank, and caused eleven deaths and the largest oil spill in the nation's history, had "nothing to do with safety."  Guide 8788:12-8793:15.

32.     Sims responded by e-mail to Guide, telling him that he had to go to dance practice.  He further advised that Drilling Engineer Brian Morel should be reminded that the Macondo Well was a "great learning opportunity, it will be over soon . . . ."  Sims concluded: "I'll be back soon and we can talk.  We're dancing to the Village People!"  TREX-01144; Sims, Group 1 Bundle 009, 187:3-188:10; 189:7-189:15; 190:5-19; 191:9-16; 199:16-21.

33.     Despite the words he previously had written about the Macondo's Wells Team Leader (see ¶¶ 25-26), Sims did not follow up on the concerns that Guide raised.  For example, Sims admitted that following Guide's e-mail and his response referring to dance practice, *etc.*, he in fact never talked to the Wells Team Leader to follow up on his warnings about "paranoia . . . chaos . . . insanity . . . ," *etc.*  Sims, Group 1 Bundle 009, 249:18-250:14.

34.     Further, on April 20th, only hours before the first explosion decimated the *Deepwater Horizon*, Sims spoke face-to-face with Kaluza aboard the rig.  Kaluza, along with Donald Vidrine, was one of the two BP WSLs who, hours later, participated in and approved the negative pressure test extensively discussed in findings below.  Despite having been told days earlier that the Well Site Leaders were at "wits end" and "flying by the seat of [their] pants," Sims did not bother to ask Kaluza – or anyone else – what it was that caused Guide to use those words to describe the WSL's mental and professional state.  Sims, Group 1 Bundle 009, 251:13-252:23; 253:3-4; 253:6-20; 254:1-4; 254:6-10.

35.     Sims's failure to act on the information regarding the status of Macondo Well operations demonstrated a reckless corporate attitude regarding a project with such significant

potential for danger.  Indeed, when Sims was asked whether he and the Wells Team Leader had more responsibility for safety and blowout prevention aboard *Deepwater Horizon* than the rig's cook or even its bed maker, he refused to provide a straightforward answer.  Sims, Group 1 Bundle  009,  266:19-22;  266:25-267:4;  267:7-11;  267:13-268:1;  268:4-12;  269:23-270:15; 270:18-271:3; 271:6-271-13; 271:18-273:2; 273:5-274:7; 274:10-12; 275:4-276:2.

36.     The failure to take these concerns seriously is inexplicable in light of the evidence presented at trial.  There is no dispute that BP, and indeed all BP's contractors and their employees, had the right to exercise "Stop Work Authority," meaning that in the face of a threat to safety, everyone had the right immediately to "stop work" until satisfied that the potentially unsafe condition was rectified.  As BP's Mark Bly testified:

> Q.  Now, is it BP's philosophy that if an engineer sees something that might be terribly wrong, but isn't sure, he can just wash his hands of it and do nothing? That's not BP's philosophy, is it, sir?
>
> A.  No, it certainly isn't.
>
> *            *            *            *            *            *
>
> Q.  If anyone sees that something might be wrong, they are entitled to Stop Work until they're satisfied; isn't that right?
>
> A.  Yes, they are.
>
> Q.  In fact, you would expect them to do that, right?
>
> A.  I would.

Bly 1347:20-1348:9.

37.     Other BP employees agreed that the company's failure to stop operations at this point was difficult to explain.  While Sims admitted that the warnings about "chaos, etc." caused him "some concern," another BP Well Site Leader and Bly Report investigator, Walter Guillot, testified that he would have shut the operation down.  The BP executive's statement that the Macondo Well was a "great learning opportunity" was also not shared by Guillot, who testified

that such an approach was less than desirable.  Guillot, Group 1 Bundle 008, 101:4-8; 101:11-102:1; 102:4-7; 102:10-103:21; Sims, Group 1 Bundle 009, 188:11-25; 189:3-5; 189:7-15.

38.     BP's failure to stop work also violated its duty under 30 C.F.R. § 250.401, which includes the requirement to "…take necessary precautions to keep wells under control at all times."[7]

39.     The foregoing requirement of 30 C.F.R. § 250.401 applies to operator and contractor personnel working ashore, and not merely those on rigs.  Huffman 771:7-10; 792:19-793:6; 793:13-794:1; 861:10-12.

40.     In the context of the highly provocative words and phrases written by BP's own Macondo Wells Team Leader to an even more senior BP corporate manager regarding a deepwater well like the Macondo Well – words and phrases like "paranoia," "chaos," "insanity," "wits end," and "flying by the seat of our pants" – the failure of BP to stop the operation violated 30 C.F.R. § 250.401.

41.     The Court further finds that under the circumstances described above, the failure of BP to stop the operation and the resulting violation of 30 C.F.R. § 250.401 was a gross and extreme departure from the applicable standard of care and, additionally, was reckless.[8]

42.     The culture created by this management structure was evident in numerous decisions over the days that followed.  The tensions and attitudes displayed among BP managers pervaded the decisions of those with day-to-day responsibilities for overseeing the Macondo Well operation.  On issues including the cementing of the production casing and the approval of

---

[7] Title 30 C.F.R. § 250.401 and subsequent regulations apply to BP, as well as to its contractors, such as Transocean and Halliburton.  30 C.F.R. § 250.400 states, "The requirements of this subpart apply to lessees, operating rights owners, operators, and their contractors and subcontractors."

[8] As explained in detail in Section V below, the standard of care applied in the petroleum industry is "Good Oilfield Practice," and is reflected in regulations governing the drilling of the Macondo Well.  *See, e.g.,* 30 C.F.R. § 250.107.

the negative pressure test, the acts and omissions of BP's Houston-based Wells Team mirrored the culture created by their leadership.  By way of example only, these acts and omissions are exemplified by:

a.      Houston-based BP engineer Brett Cocales's e-mail of April 16, 2010, which responded to Guide's decision to ignore Halliburton's and his own team's recommendation for the use of additional centralizers with the cavalier and reckless statement, "But, who cares, it's done, end of story, will probably be fine and we'll get a good cement job."  Cocales, Group 02 Bundle 025, TREX-01367;

b.      Houston-based Senior Drilling Engineer Mark Hafle's admissions that prior to the blowout he believed that the cement job, which the disastrously failed negative pressure test was supposed to be testing, was on the "ragged edge," and his belief that BP would get a "shittie" cement job.  Benge 2252:2-21; TREX-37031 at 94; TREX-04451 at 3;

c.      Houston-based Guide's decision to make a material change to the fateful negative pressure test procedure – *i.e.,* to conduct only *one* negative pressure test, not the *two separate* tests required under the permit approved by MMS – and Guide's unilateral decision to refuse to seek MMS' approval for the change.  Robinson 7965:6-7967:11, 7968:10-7969:5; TREX-37031.42.1.TO (Steve Robinson Bly Investigation Interview Notebook) at 42; Trocquet Group 9 Bundle 149, 53:17-23; 53:25-54:21; Saucier, Group 8 Bundle 131, 380:5-21; 380:14-21; 381:2-6; 381:8; Patton, Group 2 Bundle 023, 346:1-23; 347:8-348:23; Wetherbee Group 6 Bundle 086, 413:12-17; Barnhill 4329:3-4330:2; Heenan 2115:6-19.

d.      Hafle's abdication of responsibility during the last hour of the *Deepwater Horizon* operations and, specifically, his actions concerning the negative pressure test, well monitoring, and well control following his conversation with Well Site Leader Vidrine between 8:52 and 9:52 p.m. on April 20th, all of which are described in detail in findings in Sections V and VI below concerning the negative pressure test, well monitoring, and well control.

43.     These and other cumulative acts and omissions of BP's shore-based corporate management were systemic causes of the tragedy.  As Sims himself wrote, describing Wells Team Leader Guide, "You . . . don't seem to realize that you are responsible for everything we do on the rig."  TREX-01127 at 2.

44.     The explosions, fire, loss of life, personal injuries, and the oil spill and related damages and injuries that followed the blowout of the Macondo Well resulted from, and were proximately caused by, separate, discrete acts and omissions of BP, such as the failure of BP to shut down or at least suspend the operation no later than April 17th.

45.     The tragedy likewise resulted from, and was proximately caused by, the *accumulation* of the foregoing series of interconnected acts and omissions, along with other acts and omissions detailed below.

//

//

## II. THE FINAL 100 FEET OF THE MACONDO WELL: "BP HAD NO PERMISSION TO CONTINUE TO EXPLORE THE OUTER CONTINENTAL SHELF OF THE UNITED STATES."[9]

### A. The Purpose of a "Safe Drilling Margin."

46.     The actions that led to the Macondo Well Incident began long before April 20th. Indeed, long before the well blew out as BP prepared to leave it, BP had abandoned basic principles of safe deepwater drilling and, in doing so, violated black-letter federal regulations.

47.     At the depths that deepwater drilling occurs, thousands of feet below the surface of the ocean and miles below the ocean floor, there are a number of dangers that must be carefully managed.  One of them involves the balance between the hydrostatic pressure from drilling fluids inside the well (primarily drilling "mud") needed to prevent dangerous "kicks" of hydrocarbons from the formation, and the risk that too much hydrostatic pressure in the well could cause the geographical formation that surrounds the well to crack.  The two key concepts in this balance are called "pore pressure" and "fracture gradient."   TREX-07510 (Huffman Expert Report) at 9.

48.     The "pore pressure" is the pressure exerted by fluids (such as hydrocarbons) in the pore spaces of the formation.  Huffman 651:23-652:5.  If that pressure exceeds the weight of the mud that the operator has pumped into the well, the fluids in pore spaces can, in a sense, overpower that mud and flow into the well and potentially cause a dangerous "kick."  Huffman 651:23-652:5; 655:1-6; TREX-08173 (Bourgoyne Expert Report) at 29-30; Bourgoyne 7630:6-16.  If an operator's only concern was ensuring that fluids did not flow uncontrollably from the formation and into the well, an operator like BP would maintain a very high degree of pressure from the mud.  But that is not the sole concern.

---

[9] Huffman 718:8-719:2.

49. The "fracture gradient" reflects the pressure at which the geological formation will crack. Huffman 652:6-10; see also, TREX-08173 (Bourgoyne Expert Report) at 21; Alberty, Bundle 101, 35:25-36:3; 36:5-20. When the fracture occurs, mud leaks out of the wellbore and into the formation (known as "losing returns") instead of circulating back up to the surface. *See,* Huffman 711:18-712:1; 714:13-18.

50. The competing forces of pore pressure and the fracture gradient mean that the "first line of defense for controlling your well is keeping the mud [weight] high enough to control the pore pressure, but low enough that the rocks will not break as you're drilling an open hole in the well." Huffman 649:21-650:8. Balancing the mud weight between the pore pressure and fracture gradient is the primary way operators "minimize the potential for the well to flow or kick." *See*, 30 C.F.R. § 250.401(a); Powell, Bundle 164, TREX-07515 at 1; Huffman 660:18-661:22; *see also*, Alberty, Bundle 101, 35:5-7, 9, 11-13, 15-17.

51. The importance of this balance is a well understood reality of deepwater drilling. MMS regulations require operators to maintain a "margin" between the mud weight and the weakest fracture gradient in any new, uncased section (or "interval") of a well. Trocquet, Bundle 149, 183:23-184:17; 184:19-22; Saucier, Bundle 131, 289:18-24; 290:1-13, 15; 294:20-24; 295:1-7, 9-12, 14; Huffman 662:24-663:4. This "safe drilling margin" is required so that operators can increase their mud weight in the event of a kick (to overpower the fluids that enter a well and thereby regain well control), but do so without fracturing the wellbore. TREX-07510 (Huffman Report) at 11.

52. Given the importance of this safe drilling margin, MMS regulations also require an operator to identify its intended margin in its permit application and, while drilling, "maintain

the safe drilling margin identified in the approved APD [Application for Permit to Drill]."  *See*, 30 C.F.R. § 250.427; Powell, Bundle 164, TREX-07515 at 4.

53.     Indeed, there is no doubt that BP itself knew that one of this well's primary risks would be the challenges presented by having a narrow margin between the "pore pressure" and the "fracture gradient."  Vinson, Group 13, Bundle 46, Vol. I 54:5-17, 19; 54:21-55:2; *see also*, Little, Bundle 126, TREX-06290 at 22; Guide 8641:9-17.

## B.     BP's Violation of Safe Drilling Margin Regulations.

54.     Against this backdrop, BP filed an APD and subsequent drilling permit applications that specified a 0.5 ppg (pounds per gallon) safe drilling margin between its mud weight and fracture gradient.  TREX-07510 (Huffman Report) at 21-26; Douglas, S., Bundle 156, 110:11–111:25.

55.     In order to ensure that it was maintaining the drilling margin specified in the resulting permits, BP would need to repeat two kinds of tests as it drilled.  First, before drilling into any new interval of a well, operators must first take a pressure integrity test (PIT) 10-50 feet ahead to test the formation strength near the top of the next interval.  *See*, 30 C.F.R. § 250.427; Powell, Bundle 164, TREX-07515 at 4; TREX-07510 (Huffman Report) at 14-16.

56.     However, because PITs only provide a measurement of a small body of rock that may or may not be representative of the other parts of the interval the operator intends to drill (Albertin, Bundle 100, 218:18-219:7), MMS regulations also require operators to evaluate other characteristics of the next interval in order to account for the interval's "weakest link" – that is, the interval's lowest fracture gradient, which may be less than the PIT result.  *See*, Saucier, Bundle 131, 289:18-24; 289:1-13, 15; 294:20-24; 295:1-7, 9-12, 14; Trocquet, Bundle 149, 183:23-184:8; 205:23-206:14; 257:21-25; 258:2-6, 8-14.

57.     To identify this weakest link, which the Court observed at trial "sounds like common sense," Huffman 824:3-824:13, operators must use "related hole-behavior observations, such as pore-pressure test results, gas-cut drilling fluid, and well kicks to adjust the drilling fluid program and the setting depth of the next casing string."  30 C.F.R. § 250.427(a); Powell, Bundle 164, TREX-07515 at 4.

58.     The PIT and weakest-link approaches are both of sufficient importance that in drilling permit applications, MMS required operators to identify the PIT result and fracture gradient for each interval, rather than just the PIT result.  *See, e.g.,* TREX-03527.10.1.US.

59.     While BP's post-blowout litigation-retained expert, Dr. Bourgoyne, spent considerable time testifying that, for purposes of reporting the well's fracture gradient to MMS, the PIT and fracture gradient essentially are one and the same (*see, e.g.*, Bourgoyne 7620:12-18; 7623:4-25; 7627:9-7628:11; 7628:15-7629:9), his testimony was unconvincing and contradicts the *pre-litigation* analyses of BP's own in-house experts, discussed below, and the documents they drafted.

60.     By the logic of Dr. Bourgoyne's argument, there would be no need for the "Bypass Application" submitted by BP to MMS (see Finding Nos. 69-70 below) to *separately* report the fracture gradient if it simply and invariably was the same number as the PIT.

61.     Moreover, Dr. Bourgoyne was, in fact, the lone expert who testified at trial that the margin at the bottom of the well was not exceedingly narrow.  *See*, Huffman 714:24-715:2; Benge 2257:3-6; 2319:2-11; Beck 7078:19-7079:3.  Dr. Bourgoyne also failed to include in his reports an estimate of the weakest fracture gradient, a kick margin for the April interval (or even a range as to what those numbers might be), or a method for calculating those figures.  See generally, TREX-08173 (Bourgoyne Expert Report) and TREX-08174 (Bourgoyne Rebuttal

Report); see also Bourgoyne 7673:21-7674:12 (claiming to have included in his reports various data that, in fact, were not cited in his reports).

62.     Because well pressures typically increase with depth, at some point when drilling deeper into an interval the mud weight needed to exceed the pore pressure will approach the weakest fracture gradient of the formation in the hole.  *See*, Huffman 657:24-659:11. Accordingly, within each interval, as BP drilled deeper, its drilling margin became smaller.

63.     The proper course to take when the drilling margin approaches the safe drilling margin identified in the APD is clear.  The MMS regulations require that when an operator can no longer maintain the safe drilling margin identified in the APD, between the mud weight and the fracture gradient, the operator as a matter of law "must suspend drilling operations and remedy the situation."  30 C.F.R. § 250.427(b); Powell, Bundle 164, TREX-07515 at 4.

64.     This requirement was well-known to BP.  BP's in-house regulatory specialist testified that, if BP could not maintain its 0.5 ppg safe drilling margin, it would be obliged to obtain a waiver from MMS before it could lawfully drill any further down the well (even five additional feet).  Douglas, S., Bundle 156, 97:6-98:7, 9-10; 100:20-101:1; 101:4-7, 10-18; 107:1-18.

65.     By early April, while BP was still drilling the Macondo Well's final interval, BP knew that it had run out of safe drilling margin.  Martin Albertin was BP's "single-point of accountability" and its in-house specialist for pore pressure/fracture gradient detection during drilling of the Macondo Well.  Albertin admitted that according to his pore pressure/fracture gradient plot, the well's margin was no more than 0.1-0.2 ppg.  Albertin, Bundle 100, 399:1-19; 414:14-415:19; 415:21-416:10, 12-14, 16-20; 416:24-417:1, 4-9, 12-14; 418:5-13, 15-19, 22-24; 419:1-14, 16-21; Vinson, Group 13, Bundle 46, Volume I 57:5-58:4.  Mr. Albertin's assessment

that the margin was no more than 0.1-0.2 ppg, and therefore a full 0.3-0.4 ppg below the legally required margin, was reflected in various BP post-well reports.  Albertin, Bundle 100, TREX-03739 at 1, 7; Albertin, Bundle 100; TREX-03533 at 1, 12; TREX-04533 at 51.  Moreover, only days before BP completed drilling the well, it measured a pore pressure of 14.15 ppg and estimated a fracture gradient of 14.35 ppg, which additionally confirmed that the margin was only 0.2 ppg – and thus a full 0.3 ppg less than the safe margin required under BP's APD.  *See*, TREX-08186.1.1.US; Albertin, Bundle 100, 382:22-383:3; Alberty, Bundle 101, 307:4-13, 15-19; 332:6-333:18.

66.    Indeed, in the April 15th Memorandum of Change (MOC) BP used internally to justify its use of the "long string liner" to case the final section of the well, BP indicated that "the FIT on the previous shoe was 16.0 ppg," but that the BP well team was "using a 14.5 arbitrary frac gradient . . . based on *actual* circulating conditions we have put the wellbore under since having losses and fixing them."  TREX-04538.1.1.US (emphasis added.)

67.    This BP document was executed by senior members of its Macondo Well Team, including Mark Hafle, John Guide, David Sims, Greg Walz, and Jonathan Sprague, and clearly recognized not only that the critical fracture gradient needed to maintain a safe well was not the same as the "FIT," but that the two numbers were in fact a massive 1.5 ppg apart.

68.    Having recognized that its safe drilling margin had disappeared, BP knew that it could have asked MMS for a waiver of the 0.5 ppg safe drilling margin it was required to maintain pursuant to its APD, given the fact it previously had sought waivers for drilling higher intervals on the same well.  *See*, Douglas, Bundle 156, TREX-03727 at 1-2.  BP did not, however, seek a waiver.

69.     Instead, on the *same* day that BP's Macondo Well management team approved its MOC to justify using the long string liner – and admitting in that closely held *internal* document that there was a full 1.5 ppg difference between the fracture gradient and the FIT – BP submitted an application to MMS ("Bypass Application") to allow the long string that BP wanted to use for casing the final section of the Macondo Well.  TREX-03527.

70.     The Bypass Application was noteworthy for two reasons.  First, BP did not disclose the actual fracture gradient – 14.5 ppg – that BP's management internally used in its MOC.  Rather, it reported to MMS that the PIT was 16.0 ppg and that the fracture gradient for the final interval was *also* 16.0 ppg.  TREX-03527.10.1.US (providing separate reporting sections for the PIT and fracture gradient, and BP's use of 16.0 ppg for both).  *See also* TREX-01220 at 1 (Bodek e-mail); TREX-00546 (indicating that the team had been trying to maintain pressures below 14.4 ppg).  This misstatement of the fracture gradient necessarily obscured BP's lack of a safe drilling margin.

71.     Second, while obscuring the correct measurements in its reporting to MMS, BP proceeded to drill the final 100 feet despite not having a safe drilling margin.  BP's lack of margin as it drilled the bottom of its well was confirmed contemporaneously – and without color of litigation-related motivations – by BP's own in-house experts.  For example, BP's operations geologist on the Macondo Well informed BP superiors that when it drilled the final 100 feet of the well, BP had "minimal, if any, drilling margin."  TREX-01220.1.2.US; *see also,* ¶¶ 65-66; Bodek, Group 1, Bundle 7, 443:8-444:17 (BP drilled despite being "out of margin").

72.     Thus, despite the well integrity and safety concerns outlined prior to the blowout by BP's own internal experts, on April 9, 2010, BP drilled ahead 100 feet to ensure that there was enough room at the well bottom ("rat hole") to evaluate the pay sands and perform

"completion procedures" necessary to turn the Macondo Well into a producing, money-making well.  TREX-01220 at 1; TREX-07510 (Huffman Report) at 43; *see also,* Bodek, Group 1, Bundle 7, 774:25-775:19.  BP drilled that final portion of the well even though it continued to lose dozens of barrels of mud to the formation, and even though it had already lost "full returns" earlier in the interval.  Huffman 858:8-859:23; TREX-01220 at 1.  According to Dr. Huffman, BP's decision to drill the final 100 feet was "one of the most dangerous things" he has seen in all his years of experience.  Huffman 750:11-19.

73.     Moreover, in drilling ahead, BP ignored pore pressure tests and loss-return incidents, which it was required to honor under the regulations whenever drilling deeper into a well.  *See*, 30 C.F.R. § 250.427(a); Powell, Bundle 164, TREX-07515 at 4 (explicitly identifying "pore pressure tests" as a type of hole-behavior observation that operators "must use" in adjusting the setting depth of their next casing string).  *See also,* 30 C.F.R. § 250.428(a).

74.     BP chose to drill ahead despite regulations that required it to "suspend drilling operations and remedy the situation" when it ran out of margin.  30 C.F.R. § 250.427(b); Powell, Bundle 164, TREX-07515 at 4.

75.     Notably, April 2010 was not the first time that BP drilled this well without the required safe drilling margin.  For example, BP's own expert admitted that BP illegally drilled ahead with no margin at all in October of 2009.  Bourgoyne 7650:18-25; 7654:5-21.  In choosing to do so, BP risked a potentially uncontrollable well control event, and did so in order to maximize its profits.  TREX-01337.10.1.US; Huffman 680:6-25; *see also*, Bodek, Group 1, Bundle 7, 140:19-141:3; 141:6-142:3; 142:18-143:11; 145:9-147:5 (identifying BP operations geologist Bobby Bodek as the BP representative who spoke of risking a "potentially uncontrollable well control event" in October); s*ee also* Huffman 680:6-25 (stating that the

October drill-ahead decision "was, not only unsafe, it violates every standard I can think of in how wells are drilled … It is truly egregious to drill that extra 100 feet knowing that you could potentially lose the well in the process.").

76.     In April of 2010, when BP drilled the final 100 feet of the Macondo Well (from 18,260 to 18,360 feet), it never checked first with MMS as to whether its margin was adequate. Worse yet, BP neither sought nor received a waiver to drill this final, ultimately deadly interval that, according to BP's own words, had "minimal, if any, drilling margin."  *See*, Huffman 713:3-4; 714:7-12; Bourgoyne 7669:24-7670:1; TREX-01220.1.2.US.  The United States' expert, Dr. Huffman, explained the significance of the absence of such permission:

> They had no permission to continue to explore the Outer Continental Shelf of the United States.  Now, I've been an explorationist my whole career.  It's part of what I do.  You don't do that.  You don't continue to drill without permission from the government.

Huffman 718:9-719:2.

## III.     THE PRODUCTION CASING CEMENT JOB: "HOW BAD CAN IT BE AND STILL BE OKAY?"[10]

### A.     The Purpose of the Production Casing Cement Job.

77.     In the oil and gas industry, a properly designed and executed cement job performs several important functions in an oil well.  The primary objective of cement during the temporary abandonment of a well like the Macondo Well is to isolate the hydrocarbons in an exposed wellbore.  Benge 2236:14-20; TREX-22761 (Calvert Expert Report) at 16.

78.     The cementing process involves pumping cement down the drill pipe inside of a casing string until it flows out the bottom of the last casing string, or "production casing," "turns the corner," and then flows into the space that surrounds the casing string, *i.e.,* between the casing string and the exposed formation in the wellbore.  D-3518; Benge 2236:21-2238:18.

---

[10] Benge 2568:7-14.

Upon hardening to full strength – but not until then – cement creates an impermeable barrier to hydrocarbon flow.

79.     In short, if a properly designed cement job is also properly executed, the hydrocarbons are sealed off, thereby preventing kicks and, as happened on the Macondo Well, uncontrolled blowouts.  TREX-22761 (Calvert Expert Report) at 7-8, 16; TREX-00001 (Bly Report) at 61; TREX-31026 at 25.

**B.     <u>Overview.</u>**

80.     The United States' cement expert, Glen Benge, as well as BP's cement expert, David J. Calvert, and even Wells Team Leader Guide, agreed that the production casing cement did not form a barrier to hydrocarbon flow.   Benge 2242:4-14; Calvert 2612:13-19; Guide 8950:17-8951:10; TREX-05990 (Benge Expert Report) at 41-42; TREX-22761 (Calvert Expert Report) at 14-15, 17.  This violated 30 C.F.R. § 250.420(a)(1) and (2), in that BP failed to cement the Macondo Well in a manner that would prevent the release of hydrocarbons through the wellbore into offshore waters.

81.     As discussed above in Section II, BP left itself almost zero drilling margin at the bottom of the well, so that it would have little ability to fight off any kick (by increasing hydrostatic pressure inside the well) without risking fracturing the surrounding formation.  The resulting extremely fragile condition of the well drove BP to make critical, fateful, and ultimately deadly decisions focused on the Equivalent Circulating Density ("ECD") of cement and other fluids pumped into the well as part of the cementing process.

82.     When fluids like cement or drilling mud are circulated into the well, the flow of the fluids across the rock formations causes additional pressures on the formation.  The Equivalent Circulating Density (ECD) is the density that acts on the well and the formation when the fluids are circulating.  In a sense, ECD is the "effective" pressure put on the formation after

downhole conditions and other factors involved in the pumping process are considered.  If the ECD is too high and exceeds the fracture gradient of the formation in an open hole, the fluids penetrate into the formation through induced fractures in the well, resulting in "lost returns" or "lost circulation."   TREX-07510 (Huffman Report) at 12-13.   In addition to impacting the cement job, the lost returns potentially cause the well to become underbalanced, resulting in an extremely dangerous kick – or worse.  *Id.*

83.     BP's focus on maintaining low ECDs, which themselves were driven by BP's self-induced fracture gradient problems, led to shortcomings in both the design *and* execution of the cement job.  Gagliano 6617:25-6618:7 (foam cement was used "because of the low frac gradient, or the tight frac gradient pore pressure window we had…"); TREX-00001 (Bly Report) at 55, 61;  Bly 1087:6-1088:1;  1440:16-1441:3;  Benge 2256:8-2257:1;  2318:25-2319:11; 2347:17-2348:5; 2350:10-2351:2; 2375:11-2376:3.  As stated by one expert:

> Q.  In this case, we've heard evidence that there is a very narrow pore pressure frac rating at the bottom, right?
>
> A.  Yes, sir, there is.
>
> Q.  In your review, everything that BP was doing to model this [cement] job was focused on controlling the ECD's at the bottom of the well, correct?
>
> A.  Yes, sir.

Benge 2641:10-16.

### C.     Failure of Design.

84.     Designing the cement job for the production casing was a collaborative process led by BP in its capacity as operator of the Macondo Well, assisted by its service contractor Halliburton.  Halliburton recommended the particular formula or "slurry" for the job, and BP approved it.  Benge 2245:13-2246:10; TREX-05990 (Benge Expert Report) at 11.

85.     BP, however, was ultimately responsible for the Macondo Well production casing cement job and cannot shift responsibility to Halliburton for its failure.   Benge 2283:20-24; 2355:7-13; 2408:14-19; Walz, Group 02 Bundle 026, 745:1-5.

86.     Indeed, both BP's recommended practices and industry standards made BP's drilling engineers responsible for all aspects of the Macondo Well's design, including cementing. Little 30(b)(6), Group 08 Bundle 126, 91:5-11; 92:7-9; TREX-00569 at 3-12.

87.     For example, BP expressly recognizes: "Cement design and execution plays a key role in the well construction process and subsequent life of well integrity.  A fundamental knowledge of how to design a cement job, coupled with an understanding of how to effectively execute a cement job is a core competency expected of any drilling engineer.  Reliance on service company expertise is unacceptable."  TREX-37005 at 11.

88.     The record demonstrates that BP closely controlled every aspect of the cement design process and repeatedly ignored the recommendations of Halliburton, as well as its own internal cementing experts, concerning the Macondo Well production casing cement slurry and job design.  Benge 2344:22-2345:7; 2487:2-8; TREX-05990 (Benge Report) at 7-8; Gagliano 6601:20-6603:15; 6608:4-14; 6671:25-6672:7; Chaisson 6293:8-23.

89.     The first step in cement design involves identifying the variables associated with the particular wellbore, and then testing various slurries based on anticipated well conditions. TREX-05990 (Benge Report) at 11; Benge 2245:13-2246:10.

90.     In designing and executing the Macondo Well production casing cement job, BP's engineers repeatedly failed to adhere to BP's recommended practices and industry standards, assuming that remedial work could always be done when another rig later would come to finish the well and put it into production mode.   BP therefore knowingly *accepted* numerous

26

*acknowledged risks* of a cement job failure.   Benge 2249:15-22; 2320:4-21; TREX-05990 (Benge Report) at 8; TREX-01367 at 1.

91.    Among the risks taken by BP were use of a leftover cement blend not suited for foamed cement, using foamed cement in a synthetic oil-based mud environment and not taking additional precautions to ensure that the foam cement did not become contaminated with that synthetic oil-based mud.   TREX-05990 (Benge Report) at 8.   BP did not follow its internal guidelines for testing cement slurries and pumped the cement job without a successful foam stability test for the slurry used on the Macondo Well.

92.    The Macondo Well cement job design was inadequate for cement to be placed properly in the well.   Poor centralization, use of the base oil pre-flush, limited pre-job circulation, and low pump rates virtually assured the cement integrity would be compromised. Lack of proper centralization of the production casing string increased the potential for channeling, leaving an uncemented flowpath in the annulus.  TREX-05990 (Benge Report) at 9.

### D.    The Macondo Well Slurry Design.

93.    The decisions that led to the blowout and resulting disaster were all interconnected, and BP's decisions regarding the drilling margin and contamination intersected with subsequent decisions to lead to the tragedy.   BP's decision to drill to the point at which it had only the narrowest of margins between the pore pressure and fracture gradient, was "the biggest risk they [BP] had identified" while planning the Macondo Well, and led BP's engineers to choose cement injected with nitrogen gas, or "foam cement."  Gagliano 6617:21-6618:7; Little 30(b)(6), Group 08 Bundle 126, 87:8-88:01; 88:03-88:06; 88:10-88:23; Corser, Group 06 Bundle 090, TREX-00153 at 10; Little 30(b)(6), Group 08 Bundle 126, TREX-06290 at 21-23; TREX-00757 at 2.

27

94.     Use of foamed cement in the Macondo Well, which contained synthetic oil-based mud and base oil added risks for destabilizing the foamed cement.  Adding a hydrocarbon or base oil to a water-based foam will break or destabilize the foam.  TREX-05990 (Benge Report) at 19-31.

95.     BP's Macondo Well team chose to use foam cement against the advice of BP's own cement experts.  BP in-house cement expert Erick Cunningham warned that because the Macondo Well's fluids program included the use of synthetic oil-based mud, which can destabilize foam cement (Benge 2280:3-19), using foam cement was ill-advised.

96.     Specifically, BP's in house expert cautioned that synthetic oil-based mud "presents some significant stability challenges for foam, as the base oil in the mud destabilizes most foaming surfactants and will result in N2 breakout if contamination occurs."  Benge 2281:8-24; Cunningham, Group 05 Bundle 069, TREX-00643.  Indeed, the destabilizing effects of synthetic oil-based mud on foam cement are severe and can lead to a cement job failure. TREX-05990 (Benge Report) at 15.

97.     BP used a leftover cement blend containing ingredients that were not appropriate for use in a foam cement.  BP was aware that it contained these constituents, but chose to use the leftover dry blend anyway.  The leftover cement blend saved both the time and money required to redesign the job using a conventional cement blend.  Benge 2244:16-2245:12; TREX-05990 (Benge Report) at 16.  However, the blend contained inappropriate additives that were not designed for use with foamed cement applications.  Benge 2270:1-11; 2443:7-18.

**E.     BP Pumped the Cement Job Without a Successful Foam Stability Test.**

98.     A critical and necessary test on a foam cement system is a foam stability test. However, contrary to BP's own recommended practices and industry standards, BP performed the cement job without testing the stability of the foam cement formulation BP used to complete

the job.  Bly 1081:24-1082:8; 1085:9-22; Quirk 4822:3-12; 4942:16-4943:4; 4951:20-23; TREX-05990 (Benge Report) at 26, 35; TREX-06233 at 6; TREX-00569.

99.     Notably, the Macondo Well Team increased the concentration of retarder (SCR-100L) from 0.08 gps (gallons per sack) to 0.09 gps the day before BP pumped the cement job.  Gagliano 6671:25-6672:7; TREX-00287; TREX-01395.  BP acknowledged this decision would allow for extra pump time, but also "added risk of having issues with the nitrogen."  Benge 2584:21-25; TREX-00287.  Although BP's engineers recognized more time was needed for testing the slurry, BP did not postpone the cement job.  TREX-00287.

100.    The only foam stability test results BP received prior to the cement job showed the foam cement slurry formulation was unstable.  Benge 2277:21-23; D-4309A.BP; Nguyen, Group 10 Bundle 155, TREX-05801 at 3-4.

**F.    BP's Engineering Design and Operational Decisions Increased the Risk of a Cementing Failure.**

101.    BP compounded the flaws in its cement design by placement of the slurry in the well in a manner that was likely to produce cement contamination.  Benge 2284:24-25; 2288:15-2289:10; 2314:7-2315:4; TREX-05990 (Benge Report) at 9, 13-25.

102.    Through a series of decisions to insufficiently centralize the production casing, limit pre-job circulation of mud, use base oil, minimize the volume of cement pumped and reduce the pump rates during the cement job, BP virtually assured the cement integrity would be compromised.  Benge 2255:6-25; TREX-05990 (Benge Report) at 9, 15-16.

**1.    Centralization.**

103.    Centralizers are designed to move the casing away from the formation wall and center the pipe in the borehole.  If the pipe is not centered in the well, the "wide" side of the well will be the path of least resistance and more fluid will flow in that area, leaving uncemented

sections or channels on the "narrow" side.   The lack of adequate centralization therefore increases the risk of channeling, increases the risk of contamination of the slurries, and increases the risk of a barrier failure in the well.  TREX-05990 (Benge Report) at 22, 24-25.

104.   BP recognized how necessary the centralizers are.  BP engineer Brett Cocales began an April 16th email by correctly recognizing the importance of adequate centralization: "Even if the hole is perfectly straight, a straight piece of pipe even in tension will not seek the perfect center of the hole unless it has something to centralize it."   Benge 2250:5-2251:24; Cocales, Group 02 Bundle 025, TREX-01367.   The Macondo Well was far from perfectly straight.

105.   BP chose to install only *six* centralizers despite Halliburton's recommendation of 21.   Gagliano 6602:6-6603:15.   BP's decision to reduce the number of centralizers, a decision made by Wells Team Leader Guide, increased the risk of contamination and channeling of the cement job and was based principally on its desire to avoid an expensive delay.   Benge 2254:12-19; 2284:24-25; Gagliano 6601:20-6602:12; 6602:16-6603:22; 6704:7-6705:15; Walz, Group 02 Bundle 026, 535:7-537:21; 539:7-541:5; TREX-05990 (Benge Report) at 25, 28; TREX-00001 (Bly Report) at 64-65; TREX-00717A at 16, 23.   As the Macondo Well's Senior Drilling Engineer (Hafle) understood – even though he took no action to counter BP's decision to use only six centralizers – BP would get a "shittie" cement job.  TREX-37031 at 94.

106.   Following Guide's decision, Cocales ignored his own clear understanding of the danger and cavalierly shrugged off BP's disregard of Halliburton's recommendation with the infamous words, "But, who cares, it's done, end of story, will probably be fine and we'll get a good cement job . . . So Guide is right on the risk/reward equation."  Cocales, Group 02 Bundle 025, TREX-01367.

2. **Bottoms-Up Circulation.**

107.    In a well-run drilling operation, mud from the bottom of the well is circulated back up to the drill rig.  This process reduces the risk of contamination that can severely compromise a cement job, but particularly the stability of foamed cement.  TREX-05990 (Benge Report) at 9, 21-23.

108.    Consistent with those practices, BP was advised to perform a full bottoms-up circulation.  Gagliano 6608:4-14; Chaisson 6293:8-6294:6; Walz, Group 02 Bundle 026, 543:20-544:8; TREX-00737 at 1.   A full bottoms-up would have been dictated by BP's own best practices.

109.    But despite BP's acknowledgement that a full bottoms-up circulation of mud back to the drill rig improves cement jobs, BP failed to circulate the Macondo Well a full bottoms-up prior to beginning the cement job.   This decision unnecessarily increased the likelihood of cement contamination.   Benge 2314:7-2316:1; Walz, Group 02 Bundle 026, 543:25-545:15; 547:24-549:19; TREX-05990 (Benge Report) at 27-28.

110.    At trial, BP asserted that the amount of mud it did circulate was sufficient to clean the wellbore.   When pressed repeatedly by BP to provide testimony that would excuse its improvident decision, the United States' cement expert, Glen Benge, responded with testimony that could sum up BP's operation of the Macondo Well:

> I am not -- I'm sorry, sir, I am not going be indelicate, but this is kind of like asking how bad can it be and still be okay.  Because bottoms up circulation is a core for cementing.  … And in BP's own deepwater document, it recommends to do this twice.
>
> *          *          *          *          *          *
>
> Well, again, sir, we're looking at cumulative risks, and I stated in my report that -- and in my testimony that you had a problem with float collar conversion that showed debris in this well.   That went unresolved and, quite frankly, was a risk.

> And so you've missed an opportunity -- I understand what you're saying about cleaning only, but that's just one thing.  I don't know if the mud that was left at the bottom of the well for several days had gas in it, what the condition of it was, the gels.  That's why you do a bottoms-up circulation is to evaluate all of that.

Benge 2568:9-14; 2569:1-9.

### 3. Base Oil.

111.    The lack of a drilling margin discussed earlier had further consequences for the cement job.  As discussed above, BP's drilling beyond its margin limits left the well at risk of fracturing the surrounding formation if too much pressure was exerted on the wellbore during cementing operations.  *See*, Section II.

112.    Because of this risk it had created, BP directed Halliburton to insert a less dense base oil substance ahead of the cement that it was pumping through the well.  By using the less dense base oil, BP hoped it could lower the pressure in the mud column, and consequently the ECD, so that they would mitigate the risks they had created with respect to fracturing the wellbore.  Benge 2257:11-25; 2375:11-25; Walz, Group 02 Bundle 026, 503:7-504:17; TREX-05990 (Benge Report) at 9, 21; Walz, Group 02 Bundle 026, TREX-01699.

113.    This decision was ill-advised in a well like the Macondo Well, where the likelihood of contamination that could damage the stability and strength of the foam cement was already unnecessarily high.  Benge 2376:4-2377:9; TREX-05990 (Benge Report) at 21-22.

114.    Notwithstanding these risks, BP directed Halliburton to add base oil to the Macondo Well's production casing.  Benge 2257:11-25; 2375:11-25; Walz, Group 02 Bundle 026, 503:7-505:1; TREX-05990 (Benge Report) at 21; Walz, Group 02 Bundle 026, TREX-01699.

4. **Volume.**

115.    In general, increasing the amount or volume of cement in a well can reduce risks, by diluting the amount of contaminant in the cement and offsetting the impact of cement placement errors.   Cunningham, Group 05 Bundle 069, 421:8-422:20; 430:14-17; 430:21-431:23; TREX-05990 (Benge Report) at 25.  Through a series of decisions, however, and despite having knowingly increased those risks, BP actually minimized the total volume of cement.

116.    For example, BP decided that the top of cement (TOC), which is the highest point the cement is expected to reach in the annulus, should be located at 17,300 feet on the Macondo Well.  Benge 2549:14-2550:14; TREX-03032 at 16.  This decision by BP, however, effectively reduced the total volume of cement that could be pumped.   Benge 2382:9-20; TREX-05990 (Benge Report) at 26.

117.    In addition, other BP decisions necessitated a reduction in the total volume of cement pumped on the Macondo Well, specifically: the short distance the well had been drilled below the pay sands and the narrow annular space between the production casing and the formation.  Benge 2549:14-2550:24; 2553:4-2554:3.

118.    The small volume of cement that was pumped on the Macondo Well as a result of these decisions increased the risks of cement contamination.   Benge 2316:9-20; 2318:12-22; Cunningham, Group 05 Bundle 069, 421:8-422:20; 430:21-431:23.

5. **Pump Rate.**

119.    In a further effort to reduce the ECD and pressure on the formation following violation of its safe drilling margin, BP pumped the production casing cement job at a low rate of four barrels per minute (bpm) in yet *another* attempt to reduce the ECDs.  Benge 2318:25-2319:11; 2350:10-17; 2554:6-23; Cunningham, Group 05 Bundle 069, 411:11-412:19; TREX-05990 (Benge Report) at 31.

33

120.   BP's decision to pump cement at such a low rate decreased the efficiency by which the cement would have displaced the mud in the well, and further increased the risk of channeling and contamination of the cement with mud.   Benge 2318:25-2319:11; Cunningham, Group 05 Bundle 069, 413:17-414:16; TREX-06230 at 6, 7.

### G.   Pre-Cement Job Anomalies: Float Collar Conversion and Low Circulating Pressure.

121.   After cement displacement stops, and while waiting on the cement to set, a mechanical device called a "float collar" was used to temporarily prevent flow-back of the wet cement.   Properly functioning float equipment prevents the flow of wet cement back up the casing string after it has been pumped into the well's annulus, allowing the cement to stay where intended while it hardens.   The process of closing the float equipment valves so they can perform their sealing function is called "converting" the float equipment and activating one-way valves. Bly 958:10-960:8; TREX-05990 (Benge Report) at 32-33; TREX-22761 (Calvert Expert Report) at 4, 8-10; TREX-00001 (Bly Report) at 70.

122.   BP attempted to convert the float equipment in the Macondo Well's production casing nine times over the course of two hours by increasing pressure through the addition of drilling mud inside the casing.   Bly 1095:1-23; Chaisson 6343:10-20; TREX-00001 (Bly Report) at 70; TREX-00718 at 6-8.

123.   Manufacturer specifications for the float collar required a flow rate of five to eight bpm to convert the float equipment.   However, BP never circulated the Macondo Well more than two bpm during the float collar conversion process due to the same concern over ECDs that drove other cementing decisions.   TREX-00718 at 8; Burgess, Group 05 Bundle 068, TREX-01425 at 3-4; TREX-02582 at 1, 6.

124.    BP finally achieved circulation on the Macondo Well at 3,142 psi (approximately five times more pressure than planned) and a flow rate of one bpm, less than one quarter of that planned.  BP nevertheless declared the float collar converted.  Chaisson 6344:15-19; 6345:5-11; TREX-00718 at 8; TREX-02582 at 1, 6.

125.    Before beginning the cement job, BP's WSL Kaluza also recognized there was low circulating pressure and stated that BP may have "blown" something in the well during the pressures exerted on the well during the attempts to convert the float collar.  Chaisson 6305:8-16; Kaluza, Group 02 Bundle 022, 23:15-26:20; 113:8-114:17; TREX-03188 at 1.

126.    BP's Drilling Engineer Brian Morel was even more explicit than Kaluza and e-mailed: "Yah we blew it at 3140, still not sure what we blew yet."  TREX-02584 at 1.

127.    Despite two BP men – WSL Kaluza and Drilling Engineer Morel – having expressed the concern that they "blew something," BP nonetheless instructed Halliburton to begin the cement job.  Chaisson 6307:8-20; TREX-02584 at 1.

128.    BP's Mark Bly, as well as other witnesses, acknowledged that if the float collar (the second "barrier" in BP's "Swiss cheese" accident model) had worked, the blowout would have been prevented.   Bly 1085:25-1090:16; 1093:4-1094:14; 1094:20-22; D-3584 ("Swiss cheese" accident model); Beck 7107:8-20; Lirette 8350:19-24.

**H.    BP Did Not Wait for the Cement to Set Before Conducting the Negative Pressure Test.**

129.    The Macondo Well production casing cement was not set at the time of the negative pressure test because BP did not allow adequate time for it to set.  In establishing the time necessary for the cement to set, BP relied on the results of strength tests that had been

conducted.[11]   However, those tests were performed at temperatures that did not accurately reflect well conditions.  Gagliano 6799:16-6801:11; Guide 8721:15-8722:15.

130.    In order to ensure that its cement job will act as an effective barrier to hydrocarbon flow, an operator must confirm the cement has hardened to full strength.  Benge 2242:3-14; 2244:7-15; TREX-05990 (Benge Report) at 7, 43.

131.    "Wait on cement" or "WOC" is the time it takes for cement to set once it has been placed in the well.  TREX-05990 (Benge Report) at 43.  Industry standards recommend an operator wait on cement until it has developed the ability to withstand a pressure of 500 psi before continuing well operations such as a negative pressure test.  Benge 2384:15-22; TREX-05990 (Benge Report) at 43.

132.    BP's own recommended practice (SRP 4.1-0003 Drilling and Completions Cementing Manual – Cement Laboratory Testing Section) specifically states that in deepwater wells, cement strength development should be tested using computer-modeled temperatures simulating expected field conditions.  TREX-05990 (Benge Report) at 38-39; TREX-06233 at 5, 8.

133.    BP's recommended practices also require its engineers to review strength development of cement slurries from UCA laboratory test results before a cement job is pumped, compare those results against the planned timeline for subsequent well operations, and discuss wait on cement time with its cement service contractor.  Cunningham, Group 05 Bundle 069,

---

[11]  Halliburton performed strength testing of the base (unfoamed) slurry using an ultrasonic cement analyzer (UCA).  The UCA is a laboratory device used for determining the strength of a cement slurry. TREX-05990 (Benge Expert Report) at 37.  The UCA passes an ultrasonic signal through the sample; as the slurry sets, the time for the signal to travel through the cement changes.  The UCA measures the transit time of the signal and mathematically correlates it to the strength of the slurry.  TREX-05990 (Benge Expert Report) at 37; Benge 2327:22-2328:14.

TREX-00631 at 4; Cunningham, Group 05 Bundle 069, 258:6-21; Kellingray, Group 01 Bundle 11, 359:4-20; 359:22-360:6; 362:25-363:8.

134.    On the Macondo Well, none of this occurred.  BP did not provide Halliburton with its recommended practice for cement laboratory testing and BP never discussed with Halliburton how long to wait for the cement to harden.  Gagliano 6774:5-13; 6777:8-19.

135.    As a result, the UCA compressive strength testing of the production casing slurry was performed at an unrealistically fast heat-up rate of four hours, which BP relied on to arrive at a wait on cement time that was too short.  Guide 8721:15-8722:15; TREX-05990 (Benge Report) at 39-42.

136.    BP then compounded the problem by failing to account for the likelihood that the cement became contaminated during placement.  Benge 2248:19-2249:3; Guide 8950:3-16; Beck 7125:24-7126:20.  That is, although contamination was likely and would delay the cement's hardening to its full strength, the UCA strength test results on which Wells Team Leader Guide relied did not account for any degree of contamination of the slurry with the particular fluids used on the Macondo Well.  Gagliano 6611:8-19; 6782:11-17.  These contamination effects were particularly likely because BP pumped a limited volume of cement at low rates behind a base oil spacer, which is a fluid that separates the cement slurry from the synthetic oil-based mud.  TREX-05990 (Benge Report) at 21, 25, 31.

137.    As a result of these misjudgments, BP did not allow the production casing cement to reach the benchmark of 500 psi strength before continuing well operations and performing the negative pressure test.  Benge 2384:15-2386:14; Beck 7167:6-7168:3; 7361:8-11; TREX-05990 (Benge Report) at 43.

138.     BP's cement expert and BP Macondo Wells Team Leader John Guide admitted that the cement was not sufficiently set at the time of the negative pressure test.  TREX-22761 (Calvert Expert Report) at 17, 19; *see also*, Benge 2242:4-14; Guide 8950:17-8951:10; TREX-05990 (Benge Report) at 41-42. .

139.     In turn, by performing the negative pressure test too soon, BP disrupted the unhardened cement and prevented it from ever achieving a complete and uniform set that could seal off the hydrocarbons.  TREX-05990 (Benge Report) at 7-9, 43.

140.     Consequently, BP should have – but did not, with ultimately disastrous results – use an extended wait on cement time before conducting the negative pressure test.   Benge 2248:19-2249:3; 2376:4-2377:9;  Gagliano 6867:8-24; TREX-05990 (Benge Report) at 7-9, 42-43.

141.     BP had the responsibility to assure that the final slurry pumped into the Macondo Well's production casing met industry standards.  Little 30(b)(6), Group 08 Bundle 126, 92:10-16;  Cunningham, Group 05 Bundle 069, 239:18-241:4; 257:23-258:10; TREX-00569 at 3. Ultimately, and contrary to Good Oilfield Practices, BP pumped the slurry without discharging its duty.  TREX-05990 (Benge Report) at 7-9.

142.     Based upon the foregoing evidence, including the testimony and credibility of the witnesses, the Court finds that BP's acts and omissions with respect to the cementing of the production casing of the Macondo Well breached the requirements of 30 C.F.R. § 250.420(a)(1) and (2).

143.     The Court further finds that the explosions, fire, loss of life, personal injuries, and the oil spill and related damages and injuries that followed the blowout of the Macondo Well

resulted from, and were proximately caused by, the foregoing acts and omissions of BP concerning the design and execution of the production casing cement job.

## IV.   THE "TEMPORARY ABANDONMENT PLAN" AND EVENTS LEADING UP TO THE NEGATIVE PRESSURE TEST.

### A.   The Purpose of the Temporary Abandonment Plan.

144.   During normal drilling operations of a well like the Macondo Well, the primary means of controlling the well and preventing kicks and blowouts is by maintaining an "over-balanced" well condition.  In simple terms, the hydrostatic pressure or the "weight" of drilling fluids, primarily drilling mud, in the marine riser, well casing, and any uncased open hole is kept greater than the pore pressures of reservoir fluids, such as oil and gas.  Conversely, if exposed pore pressures in an open hole are allowed to exceed the hydrostatic pressure of the drilling fluids, the result is an "under-balanced" well condition.   Bly 973:12-25; 971:5-8; Heenan 2075:10-2077:8; Barnhill 4344:1-18; D-3561 (Negative Pressure Test Animation).

145.   A "temporary abandonment plan" was necessary due to the fact the *Deepwater Horizon* was to leave the Macondo Well, BP having chosen to finish completion of the well at a later date.  As explained in the Transocean Investigation Report:

> Temporary abandonment is the process by which a well is secured so that the operator can safely leave the well before returning to begin completion operations. The temporary abandonment plan at Macondo involved Transocean removing the *Deepwater Horizon* blowout preventer (BOP) stack and riser once the well was secured, followed by the departure of the drilling rig.

TREX-04248 at 78.

146.   As part of the temporary abandonment procedure, approximately the topmost 3,367 feet of heavy drilling mud in the Macondo Well's well casing would be displaced to lighter seawater, thereby reducing the hydrostatic pressure that prevented hydrocarbons from entering the wellbore.  Additionally, both the drilling mud and the 5,000 feet of mud-filled

marine riser between the "mudline" (seafloor) and the rig would be taken away by the *Deepwater Horizon*, thereby removing not only the BOP and the 3,367 feet of mud in the upper well casing, but the additional 5,000 feet of mud in the riser.  In short, the well would be under-balanced and subject to a kick or, far worse, an uncontrolled blowout.  Heenan 2075:10-2077:8; Barnhill 4314:26-4316:14; TREX-00570 at 3; D-3561 (Negative Pressure Test Animation).

### B.   BP's Changing Temporary Abandonment Plans.

147.    Between April 12th and 20th, BP prepared at least five temporary abandonment procedures.  The number of changes was unusual and unprecedented; one BP Well Site Leader testified that he had never experienced so many changes in his 30 year career.  D-6579; Murry Sepulvado, Group 8 Bundle 119, 578:8-19; 783:6-784:9.

148.    As one expert stated, "The number of and variations in the procedures for pressure testing show that BP and its management did not have a clear policy on either the use of, or the procedures for, negative pressure testing.  At least as significant was the deviation of the final April 20 procedure from the permitted procedure submitted to, and approved by, the MMS four days earlier."  TREX-22694 (Heenan Report) at 11. *See also*, TREX-04248 (Transocean Report) at 78-86, detailing the changing temporary abandonment procedures and the increased risks they brought about.

149.    The first proposed temporary abandonment procedure was circulated on April 12th, following an e-mail from WSL Murry Sepulvado to BP Engineer Brian Morel.  In the e-mail, Sepulvado urged Morel to provide procedures for the upcoming operations of running casing, cementing, and temporary abandonment, commenting, "we are in the dark and nearing the end of logging operations."  TREX-00529 at 1.

150.    Later that day, Morel forwarded a written procedure for the production casing interval of the well.  Even though a negative pressure test is a standard and critical part of the

temporary abandonment procedure, Morel's temporary abandonment plan did not contain procedures for conducting this test.  Frazelle, Group 5 Bundle 076, TREX-01989; Frazelle, Group 5 Bundle 076, 32:24-33:18; Ronnie Sepulvado 1956:9-12.

151.   On April 13th, Well Site Leader Ronnie Sepulvado informed Morel that "[w]e need to do a negative test before displacing 14# mud to seawater."  Morel responded "I will add details to the program.  Currently my thoughts are negative testing with base oil to the mud line, you both okay with that?"  WSL Murry Sepulvado replied, "[b]ase oil sounds good to me." TREX-00533 at 1.

152.   After the need for inclusion of a negative test was stressed to Morel, he sent a "Forward Ops" e-mail to BP's logistics coordinator for the rig and WSL Ronnie Sepulvado, outlining a substantially revised temporary abandonment procedure.  Morel's April 14th version reshuffled the order of events and omitted the positive pressure test, which is required by MMS regulations.  TREX-00537; Ronnie Sepulvado 1957:5-23; Barnhill 4427:6-13.

153.   On April 15th, Morel forwarded an updated written procedure to the rig, noting that they were still waiting for approval to set the surface plug 3,000 feet below mud level and advising that it was the "current plan forward."  Morel's April 15th procedure provided for conducting a "[n]egative test with base oil to the wellhead (monitor for 30 min no flow)," then displacing the well to seawater to a depth of 8,367 feet; then a second negative pressure test immediately following the displacement by "monitor[ing] the well for 30 minutes to ensure no flow;" then setting the cement plug; then setting the Lockdown Sleeve ("LDS").  TREX-00545 at 9, 11; TREX-00545.GMT.1.2.BP.

154.   The next day, BP Senior Drilling Engineer Mark Hafle forwarded a temporary abandonment procedure for submission to MMS.  While this procedure was consistent with

Morel's April 15th negative pressure test because it included a negative test of the casing to seawater gradient equivalent for 30 minutes, it added the detail "with kill line."   TREX-07392; Skidmore, Group 8 Bundle 129, TREX-02236 at 4.

155.    As submitted to MMS, BP's temporary abandonment procedure therefore included two negative pressure tests - the first was at the seafloor, simulating the removal of the riser, and the second was to a lower depth.  MMS approved this procedure.  TREX-00570 at 1, 3.

156.    Although a negative pressure test was not explicitly required by then-existing regulations, once the negative pressure test was approved as part of the submission to MMS, as here, BP was required to conduct the test as a condition of the permit.  Barnhill, 4427:6-13; Trocquet Group 9 Bundle 149, 154:17-155:2.

157.    Meanwhile, on the *Deepwater Horizon*, WSL Ronnie Sepulvado was replaced by the relatively inexperienced and low-ranked Robert Kaluza.[12]  Emmerson, Group 12 Bundle 026, 113:11-25; 115:3-16; 120:25-121:18; 201:25-202:18; Guide 8891:2-19; TREX-03568.5.2.TO.

158.    Upon learning that BP intended to replace Sepulvado with Kaluza, Rig Manager Paul Johnson expressed concerns to Brett Cocales and John Guide, explaining that it was a busy time on the rig and asking that they not replace key personnel.  BP's former Wells Director for the Gulf of Mexico, Harry Thierens, testified that there could be "many" impacts on operations as a result of personnel changes during critical operations, and that such changes could increase risk.  Although Johnson continued to raise these concerns with BP, BP nevertheless made the change.  Kent Group 5 Bundle 080, TREX-03424 at 7; Thierens, Group 1 Bundle 010, 492:2-493:5; 493:15-17; 493:19-494:14; 494:17-494:22; 494:25-495:1.

---

[12] Kaluza was recognized as an individual who acted as if he had answers to problems, even when he did not.  Specifically, in a 2009 evaluation, Kaluza's manager observed that "it sometimes appears that Bob is trying too much to impress the Houston office by attempting to have all the answers to any questions that may arise.  There have been times when this clearly has not been the case."  Daigle, Group 4 Bundle 059, TREX-03555 at 4.

159.    On April 18th – two days after MMS approved BP's temporary abandonment plan and its provision for two negative pressure tests – Morel sent Guide an e-mail inquiring about negative testing:

> Plan is to do a negative test with base oil on the bottom plug.  Then we will displace (a second negative test to greater value will happen) and following that set the cement plug.  Are you ok with this, or do you think we should remove the first base oil test and just use the displacement as a negative test (shut down at the end and do a flow test)?

Without having read the temporary abandonment procedure provided to MMS, the BP Wells Team Leader responded that he would use the seawater displacement as the negative test, and shut down at the end for a flow test.  Morel responded "done."  TREX-01816; Guide, 8772:1-8; 8894:18-25.

160.    On April 20th, Morel forwarded to the rig an "Ops Note" containing the temporary abandonment plan that, contrary to the MMS permit issued to BP, called for displacement and then a single negative test.  TREX-00097; Guide 8896:18-8897:1.

161.    The same day, April 20th, Senior Drilling Engineer Hafle called the rig to go through the APM.  When Hafle realized that the plan was to do the displacement before the negative pressure test, which was not consistent with the MMS-approved APM, he instructed WSL Kaluza to talk with Morel.  The latter stated that they would do displacement before the negative test, as opposed to the procedure set out in the APM, and explained that the team had already agreed to deviate from the temporary abandonment procedure approved by MMS.  WSL Kaluza did not know why the procedure had been changed, but noted that at the end of drilling operations "they think about speeding up."  Cowie, Group 3 Bundle 37, TREX-07323 at 25; Wetherbee Group 6 Bundle 086, TREX-00045 at 5; TREX-37031 at 5.

**C.      BP Deviated from the Approved APM and Did Not Notify MMS or Seek Approval for the Change.**

162.    Pursuant to the applicable regulations, material revisions to the temporary abandonment permit required approval by MMS.  Although BP's change to the temporary abandonment procedure was indeed a material revision, BP (Guide) unilaterally decided that MMS did not have to be notified of the fact BP intended to perform only one negative pressure test, not the two tests required under the MMS-approved permit.[13]  Robinson 7965:17-7967:11; 7968:10-7969:5; TREX-37031.42.1.TO (Robinson Notebook) at 42; Trocquet Group 9 Bundle 149; 53:17-23; 53:25-54:21; Saucier, Group 8 Bundle 131, 381:2-6; 381:8-12; 381:14-17; 381:19.

163.    BP's failure to seek approval from MMS for the change to the temporary abandonment plan failed even to comply with BP's own internal policies and requirements. BP's Drilling and Wells Operating Practice (DWOP), which are engineering requirements mandated by the company for planning, designing, and drilling wells, requires that "deviations" from its practices or any "significant changes to a well programme" be "documented and approved" via a formal "Management of Change" process. TREX-00093 at 3, 5, 14, 16, 23 (A-11, section 4.4); Thierens, Group 1 Bundle 010, 169:22-25.

164.    The Management of Change policy requires that new hazards and risks be identified and analyzed before changing a process or a plan.  This helps ensure that changes do not inadvertently introduce new hazards and therefore increase risk without proper mitigation measures. TREX-20001 (Bea Expert Report) at 35; Grounds, Group 1 Bundle 005, 216:6-20 ("the intent is to manage change" . . . "identify hazards and then approve whether or not the

_____

[13] At a minimum, BP should have contacted MMS engineer Frank Patton to determine whether the changes to the temporary abandonment procedure were material enough to require a revised temporary abandonment procedure.  BP did not do this.  Trocquet, Group 9 Bundle 149, 261:8-15; 261:17-262:4; 262:6-14; 262:16.

change is going to happen."); Jassal, Group 4 Bundle 053, 323:12-15, 17-19 ("Any change we introduce needs to go through a management of change process where the change is assessed in terms of risk.")

165.   For a technical Management of Change, the Practice recommends: (a) a hazard assessment; (b) evidence of sufficient engineering to support the hazard assessment; (c) an interdisciplinary review by subject matter experts; (d) demonstration that mitigation measures are sufficient; and (e) accountability for overall impact of the change by the approving authority. Little, Group 8 Bundle 126, TREX-06291 at 9-13.

166.   BP complied with none of its internal MOC policies when it unilaterally eliminated one of the two separate negative tests required by its MMS-approved permit, thereby adding to the accumulating series of high risk decisions.

## V.   THE FAILED NEGATIVE PRESSURE TEST.

### A.   The Purpose of the Negative Pressure Test.

167.   The goal of the negative pressure test was to simulate the hydrostatic condition on the well after the *Deepwater Horizon* departed, along with its BOP, the riser, and the drilling mud in the riser and upper well casing.  Barnhill 5012:8-15; Heenan 2075:10-2077:8.

168.   The test purposely under-balanced the well in order to confirm the integrity of the cement outside the casing, the cement in the shoe track, and the valves in the float collar, thus determining if hydrocarbons in the pay zone had the ability to kick and potentially cause a blowout.  TREX-22694 (Heenan Report) at 10.

169.   If the test indicated that the well was not secure, such as due to a possible failure of the production casing cement job, the well could have been kept under control by adding back drilling mud and regaining the hydrostatic over-balance, as well as by using the BOP to prevent

hydrocarbons from entering the riser and blowing out onto the rig.  Heenan 2076:25-2077:8; TREX-22694 (Heenan Report) at 10.

**B.     The Simple "Pass-Fail" Criteria for Approval of a Negative Pressure Test: "No Pressure, No Flow."**

170.     A negative pressure test first bleeds any built up pressure out of the well casing, reducing the pressure within the casing to zero.  If the pressure thereafter builds back up, that is an indication that something, such as hydrocarbons, is flowing into what should be a closed and sealed system, thereby causing the pressure to rise from zero to some higher number.  That in turn is a clear indication that the cement barrier has failed to isolate the hydrocarbons and prevent them from kicking into the wellbore and, if unchecked, causing a blowout like the *Deepwater Horizon* disaster.  Heenan 2075:9-2087:20; D-3561 (Negative Pressure Test Animation).

171.     Once the closed system has been bled to zero, the negative pressure test can be accomplished by monitoring pressure gauges to see if they hold at zero (indicating a good test) or rise (a failed test), or even more simply by conducting a "flow check" and monitoring "flow out."  In the latter method, one or more apertures at the top of the system and on the rig (e.g., the drill pipe, the choke line, or the kill line) are left open after the pressure is bled down to zero.  If fluids thereafter flow out of the pipe opening(s) on the rig, that is a clear indication that something, such as hydrocarbons, is entering the supposedly closed system and forcing fluids to flow out at the top.  Heenan 2075:9-2087:20; D-3561 (Negative Pressure Test Animation).

172.     No party, including BP, disputes that the negative pressure test is a safety critical test.  Bourgoyne 7562:5-23; TREX-08140 (Beck Report) at 97; TREX-22694 (Heenan Report) at 4 ("The negative pressure test was a safety critical test and the last diagnostic test of the

integrity of the well prior to placing it into an under-balanced situation in which hydrocarbons could flow into the wellbore.").

173.    All witnesses are in absolute agreement that the criteria for a successful negative pressure test are easily understood in the drilling industry: once the pressure is bled down to zero, the pressure must remain at zero if the test is conducted by measuring pressure gauges; alternatively, if the test is a flow check, no fluids should overflow the top of the open aperture, *e.g.*, the drill pipe, kill line, etc.  As Transocean's expert testified, "This isn't baseball, the tie doesn't go to the runner, the tie goes to the failed test. So if it's good, it's good; if it's inconclusive or if it's bad, it's not a good test."  Barnhill 4336:17-4337:5.

174.    BP's expert likewise acknowledged that in order to have a successful negative pressure test, there cannot be either flow or pressure.  "Q. If you have either of them, the negative pressure test is a failure, right? A. That's correct. … Q. No ambiguity there? A. No ambiguity."  Bourgoyne 7567:22-7568:23.

175.    The United States' expert similarly testified that the negative pressure test is "pass-fail," a principle that is universally understood throughout the drilling industry and aboard any rig, by any crew of any nationality, and by any lease holder, any operator, or any driller. Heenan 2085:25-2086:21.

### C.    BP's Performance and Approval of the Negative Pressure Test.

176.    The negative pressure test, which should have been completed in a relatively short time (Heenan 2122:14-2123:16), instead was conducted over a nearly three hour period stretching between approximately 4:54 p.m. to 7:55 p.m. on April 20th.  TREX-00001 (Bly Report) at 24-25.

177.    The reason for the unusually long time was the fact that BP was faced repeatedly with anomalous pressure readings and other phenomena, *e.g.*, continued flow and pressure build-

ups after pressures were bled down.  Except as set out in specific findings below, it is not necessary to provide a minute-by-minute, data point by detailed data point account of the nearly three hour procedure.  Heenan 2078:24-2079:6.

178.     As explained below, this is because the critical and overriding aspect of this negative pressure test was the final decision by Well Site Leaders Kaluza and Vidrine to conclude that the test was a success under circumstances in which not a single witness or party at trial, including BP, claimed that the data warranted such a conclusion.  Bourgoyne 7567:22-7568:23;  7570:15-7571:21;  7572:2-7574:21;  Bly  1096:10-1098:18;  Barnhill  4335:8-4337:25; Heenan 2084:15-2087:21; Beck 7175:2-7178:20.

179.     Accordingly, with respect to drill pipe pressures and various other data relevant to the nearly three hours during which the negative pressure test was performed, the pressure readings and flow data set out in the Bly Report shall be generally accepted for purposes of these findings.  TREX-00001 (Bly Report) at 24-25, and 88 at "Figure 4."  See also, D-3561 (Negative Pressure Test Animation); Heenan 2067:2-2087:22.

180.     The parties agree that the negative pressure test initially was conducted by monitoring the drill pipe.  TREX-00001 (Bly Report) at 24, 85; Barnhill 4330:14-17; TREX-07676 (Barnhill Report) at 37-38; D-3561 (NPT Animation); Heenan 2075:5-9.

181.     Over the course of roughly the first hour of the test, the data showed a number of significant anomalies that should have indicated to BP that the well potentially was in communication with the reservoir and that the negative pressure test should have been declared a failure at that point. Barnhill 4332:15-4334:22; TREX-07676 (Barnhill Report) at 37-38; D-3561 (NPT Animation); Heenan 2075:5-2078:17.

182.     Instead of declaring the negative pressure test a failure, however, the Well Site Leaders concluded shortly before 6:00 p.m. that the negative pressure test needed to be conducted on the kill line, rather than the drill pipe.  TREX-07676 (Barnhill Report) at 31-32.

183.     Accordingly, Vidrine ordered Transocean's rig crew to shift monitoring of the test to the kill line.  TREX-00001 (Bly Report) at 25, 85; TREX-00005.2.1.TO (BP investigation team interview of WSL Kaluza, whereby Kaluza stated that the decision to change the test from the drill pipe to the kill line was made by Vidrine); Barnhill 4334:17-4335:7.

184.     Despite "moving" the negative pressure test to the kill line, the test was rigged up to continue measuring pressure from the drill pipe.  Indeed, there is no dispute by BP that the rig crew and BP's WSLs continued to monitor the pressure readings on the drill pipe.  By 6:35 p.m., the drill pipe pressure had risen to 1400 psi, where it remained steady and unabated throughout the monitoring of the kill line and BP's decision to call the test a "success" approximately one and one-half hours later.  TREX-00001 (Bly Report) at 25, 88; O'Bryan 9378:3-9379:7; TREX-51133 (Vidrine and Kaluza signed statement) at 2.

185.     A short time later, seawater was added to the kill line in order to assure it was full. A small volume of fluid then flowed from the kill line, after which the flow stopped.  The opened kill line was monitored for at least 30 minutes by BP and Transocean prior to conclusion of the test, and no flow was observed.   As already stated above, however, the drill pipe pressure remained at 1400 psi during that time. TREX-00001 (Bly Report) at 25, 86, 88; O'Bryan 9378:3-9379:7; TREX-51133.2.TO (Vidrine and Kaluza signed statement); Barnhill 4335:8-4337:25; D-3561 (NPT Animation).

186.     Despite the clear and obvious 1400 psi of pressure on the drill pipe, the BP WSLs declared the negative pressure test a success at approximately 7:55 p.m.  TREX-00001 (Bly

Report) at 25, 88-89; Bly 1104:7-21; TREX-51133.2.TO and TREX-51133.3.TO (Vidrine and Kaluza signed statement); Barnhill 4335:8-4337:25; D-3561 (NPT Animation); Heenan 2084:16-2086:2.

187.    The one thing that the pressure differential anomaly absolutely precluded was a determination that the negative pressure test was successful or that the well was secure and not a danger.  And yet, that is precisely what BP's WSLs concluded, with deadly results, by declaring that the lack of flow/zero pressure reading on the kill line proved that the well pressure was zero.  In fact, the opposite was true:  the 1,400 psi on the drill pipe told the true story of a flowing well, whereas the lack of flow on the kill line was the false reading.  TREX-00001 (Bly Report) at 89; Bly 969:20-970:4, 1096:9-24; D-3568 and D-3569 (Deposition clips of Bly Team investigator James Cowie), transcript at Bly 1116:17-1118:23; TREX-51133.2.TO and TREX-51133.3.TO (Vidrine statement); Robinson 7923:23-7925:1; Barnhill 4335:8-4337:25; D-3561 (Negative Pressure Test Animation); Heenan 2084:15-2086:2; Guillot, Group 1 Bundle 008, TREX-00102 at 43 (Boots & Coots "Incident Investigation of Well MC252#1, Review of 9-7/8" Casing Negative Test").[14]

188.    Some parties and witnesses have provided post-blowout theories concerning the reason for the false reading on the kill line.  One argument posits that the false reading was caused by the spacer mix that, for lack of a better term, clogged the kill line at or near the BOP and blocked the ability of the true well pressure – 1,400 psi – from reaching the surface and being read by BP's WSLs and Transocean.  TREX-08140 (Beck Report) at 102.  Another theory, also advanced by BP, is that a valve on the kill line was left in a closed position.  Bly 963:9-965:20.

_____

[14] TREX-00102 was deemed admissible against BP pursuant to Rec.Doc. 3346 ["Order and Reasons As to the Admissibility of the Boots & Coots Report"].  The Court notes that its ultimate liability findings against BP would not differ even if the exhibit had not been admitted or considered.

189.    Although these theories may have other liability implications for some parties, they are irrelevant to the underlying decision of BP to declare the negative pressure test a success.  Heenan 2081:19.

190.    Very simply, regardless of the reason for the lack of flow from the kill line, the negative pressure test should never have been declared a "success" given the anomaly between the 1400 psi of drill pipe pressure and the zero pressure/no flow on the kill line.  TREX-22694 (Heenan Report) at 15-16 ("… the reason for the discrepancy does not change the overriding fact that the negative pressure test could not be considered successful." (Emphasis in original)).  As explained by another witness:

> There is no need to over analyze the negative pressure test and attempt to explain *why* the pressures were different or of a particular magnitude. The pressures on the kill line and drill pipe were different, and the drill pipe pressure was definitely not 'zero,' both of which indicate a failed test. This was a safety critical test and the results needed to be critically assessed and honored, not rationalized away. With the difficulties of converting the float collar and potential damage to the shoe track, there was ample reason to expect well integrity to be suspect, which should have heightened attention even beyond the usual 'high alert' status required by a negative pressure test. I cannot imagine any circumstance that justified acceptance of the negative pressure test. … The negative pressure test was recklessly accepted by BP's Robert Kaluza and Don Vidrine, both BP Well Site Leaders (the company men).

TREX-08140 (Beck Report) at 97 (emphasis in original).

191.    Given the unambiguous "pass/fail" criterion of the negative pressure test, coupled with the decision of BP's WSLs to declare the test a success despite the 1400 psi of pressure on the drill pipe, the evidence supporting a finding of gross negligence against BP already would be considerable.  As one expert testified:

> Q.  And it's your opinion that you cannot imagine any circumstance that justified acceptance of the negative pressure test?

> A.  That is my opinion.

Q. And that a blowout is a known and reasonably foreseeable risk of such reckless disregard of a negative pressure test, correct?

A.  I agree with that, yes, sir.

Beck 7176:3-8.

192.    The evidence demonstrates, however, that other acts and omissions provide additional reasons to support findings of gross negligence against BP and, as discussed below concerning the 8:52 to 9:02 p.m. telephone call between WSL Vidrine and BP's Senior Drilling Engineer, willful misconduct.

193.    BP's WSLs needed to rationalize the clear and obvious pressure differential between the drill pipe and the kill line in order to declare the negative pressure test a success. TREX-22694 (Heenan Report) at 15.  According to BP's admission in the Bly Report, the negative pressure test was accepted based on the theory of a "bladder effect" or "annular compression."  TREX-00001 (Bly Report) at 89; Bly 1096:10-1098:17.  However, the Bly Report states, without equivocation, that no such phenomenon could be discovered or was even known to exist.  *Id.*

194.    Bly testified that BP's Internal Investigation was fielded with approximately 50 investigative personnel working over four to five months, and that the investigation was "fully resourced" and spent as much as $10 million – yet it still could find no evidence of the "bladder effect."  Bly 1096:10-1098:17.  He testified:

Q.  So whatever this big number was, and 50 of the best of the best in your field, BP's field, none of those people could find any evidence, any evidence whatsoever of the existence of this bladder effect?

A.  That's correct.

Bly 1097:20-24.

195.    As BP admitted in the Bly Report, TREX-00001 at p. 89, the only explanation for

the 1400 psi of pressure on the drill pipe was pressure from the reservoir:

> After discussing this concept [the bladder effect], the rig crew and the well site
> leader reportedly concluded that the explanation was plausible.  However, the
> investigation team could find no evidence that such a phenomenon is possible,
> leaving the 1,400 psi unexplained unless it was caused by pressure from the
> reservoir.

196.    Given the safety-critical importance of the negative pressure test and the history

of the Macondo Well, which even BP's own engineers described in TREX-00126 as a

"nightmare well," BP's admission that it approved the negative pressure test based upon

something that does not exist is itself extraordinary.  In fact, not a single witness at trial,

including BP's drilling expert, Dr. Bourgoyne, had ever heard of the "bladder effect" as

something that would justify interpreting the negative pressure test as successful:

> Q. In your many years in this industry, you have never heard of a bladder effect,
> have you?
>
> A. Not in this context.
>
> Q. There's no such thing, is there?
>
> A. Not in this context. …
>
> Q. In the context of anything in the world to do with a negative pressure test –
>
> A. I have never heard of it. …
>
> Q. Any minimally competent, adequately trained drill crew, well site leader,
> petroleum engineer, or pusher should have known that. Yes or no, sir?
>
> A. They should have known that, that's right.

Bourgoyne 7572:2-11, 7574:4-7.

197.    Other witnesses elaborated further on a decision that was not only contrary to

basic principles of engineering and well control, but based upon a phenomenon that simply does

not exist.  Beck 7177:12-7178:6; 7179:21-23 ("Q. …BP's decision to displace to seawater after a

failed negative pressure test, in your opinion, was also reckless? A. I agree."); Barnhill 4340:6-10 ("Q. What do you make of the bladder effect?  A. It's -- I've not heard of that term in the context that it's being used here.  So, you know, I'm not aware of the context that they've used it here.  So it's just not a term I'm familiar with in this setting."); Heenan 2091:7-2094:14.  As stated by Mr. Heenan:

> Q. …  And to Mr. Brock, my colleague's point from BP, you used the word 'gross.'  Why did you use the word 'gross' [referring to 'grossly below the standards of Good Oilfield Practice,' Heenan 2092:22-2093:1]?
>
> A. Well, I had some other words, but they're not sort of appropriate here.  They're more of the things you hear on the drill floor, so I was looking for a word that explained the level, I guess, of unbelievability.  It's incredible.  I couldn't comprehend, as I looked at this, how these decisions were made considering the evidence that was there or the information that was available to the people who were looking at it.
>
> Q. So this was your polite language, proper in a report for the Department of Justice and the Court, to describe your level of incomprehension?
>
> A.  Incomprehension is a good word.

Heenan 2094:2-14.

198.    Five days after the blowout, Kaluza attempted *post-hoc* to rationalize his and Vidrine's reliance on the fictional bladder effect as the basis for approving the negative pressure test.  His e-mailed explanation was met within BP by an e-mail, the body of which contained nothing but 560 scrolled question marks.  TREX-00759; O'Bryan 9331:11-13 ("And as I said, as I sit here today, I don't understand what Mr. Kaluza was trying to define, and this [560 question marks] is what we have in front of us.")

199.    The standard of care applied in the petroleum industry is "Good Oilfield Practice."  As one expert witness explained, the standard is generally understood as "all those things that are generally accepted as good and safe in the carrying on of exploration for

petroleum, or in operations for the recovery of petroleum, or a similar understanding."  Heenan

2087:24-2091:6; TREX-22694 (Heenan Report) at 4.

200.    30 C.F.R. § 250.107, which governs the offshore petroleum exploration and

production industry, has a similar requirement:

(a) You must protect health, safety, property, and the environment by:

(1) Performing all operations in a safe and workmanlike manner; and…

(c) You must use the best available and safest technology (BAST) whenever
practical on all exploration, development, and production operations…

201.    As stated in a previous finding, BP and its contractors, including Transocean and

Halliburton, were all subject to the requirements of 30 C.F.R. § 250.401, which states:

You must take necessary precautions to keep wells under control at all times.  You must:

(a) Use the best available and safest drilling technology to monitor and evaluate well
conditions and to minimize the potential for the well to flow or kick;…[15]

202.    The actions of BP with respect to the negative pressure test, including the

rationalization that the observed and contradictory data was caused by the non-existent bladder

effect, were "gross and extreme departures from the standards of Good Oilfield Practice."

Heenan 2087:24-2091:6; TREX-22694 (Heenan Report) at 4-5, 15-17.

203.    Based upon the evidence presented to the Court, including the testimony and

credibility of the witnesses, the Court makes the factual finding that BP's actions with respect to

the negative pressure test breached the requirements of 30 C.F.R. § 250.107 and 30 C.F.R.

§ 250.401.

---

[15] 30 C.F.R. § 250.400 makes sections 250.401, *et seq.*, applicable not only to BP, but to Transocean and
Halliburton.  30 C.F.R. § 250.400 states, "The requirements of this subpart apply to lessees, operating
rights owners, operators, and their contractors and subcontractors."

204.   BP has conceded that if the negative pressure test had been correctly interpreted, the tragedy would have been averted.   Bly 1408:25-1409:19; D-3584.001.   As BP's Dr. Bourgoyne testified at 7562:5-23:

> Q.  The negative pressure test, by your own admission, is a safety-critical test, right?
>
> A.  It is.
>
> Q.  No doubt about that?
>
> A.  No doubt about it.  That's why everybody pays so much attention to it.
>
> Q.  If you botch it, you can have a blowout; rigs can catch fire; rigs can blow up. Yes?
>
> A.  Yes.  Assuming there's some additional mistakes made along the way, but that's one of the mistakes that, by itself, won't cause that, but, you know, it could be a contributing -- without that, you wouldn't have the blowout.  You know, it's a proximate cause, I think is the word y'all use.
>
> Q.  'Proximate cause' isn't an engineering term, is it?
>
> A.  No, but it's been explained to me what it is.
>
> Q.  If the crew had not proceeded after the unsuccessful negative pressure test, it's your opinion that it's unlikely that the blowout would have occurred, correct?
>
> A.  Correct.

205.   Based upon the evidence presented to the Court, including the testimony and credibility of the witnesses who appeared at trial, the Court finds that the explosions, fire, loss of life, personal injuries, and the oil spill and related damages and injuries that followed the blowout of the Macondo Well resulted from, and were proximately caused by, BP's actions with respect to the negative pressure test.

206.   Based upon the evidence presented to the Court, including the testimony and credibility of the witnesses who appeared at trial, the Court further finds that BP's actions with respect to the negative pressure test so far exceeded the relevant standard of care as to constitute

not mere negligence, but gross negligence.  As explained below, however, this finding does not end the Court's analysis of the negative pressure test.

### D.     The Hafle-Vidrine Telephone Call at 8:52-9:02 p.m.

207.    BP does not dispute that beginning at 8:52 p.m. on April 20th, Houston-based BP Senior Engineer Mark Hafle had a ten minute telephone conversation with Well Site Leader Vidrine. TREX-00296 (BP investigation team interview of Hafle); D-3568 and D-3569 (Deposition clips of Bly Team investigator James Cowie); transcript at Bly 1116:17-1118:23; D-3571 (Deposition clip of Keith Daigle interview of Vidrine); transcript at Bly 1109:16-1112:3, 1114:11-15; O'Bryan 9339:1-9340:25 (listing BP officials, including Hafle, who worked at BP's corporate headquarters in Houston).

208.    At the time of the telephone call, Hafle was viewing the Sperry-Sun "Insite" real time data of the Macondo Well from the remote feed available to him at his computer in Houston.  As discussed in the subsequent findings concerning BP's responsibility for well monitoring and well control, Hafle could have, if he had chosen, monitored the well and determined for himself the status of the well and the fact a kick already was underway.  Kent Corser, Group 06 Bundle 090, 393:5-11; 393:25-395:6; 395:9-14.

209.    BP has admitted that hydrocarbons entered the wellbore at 8:52 p.m., which means that the call between the Vidrine (on the rig) and Hafle (ashore at BP corporate headquarters) commenced literally at the same time that the well went under-balanced and began to flow.  TREX-00001 (Bly Report) at 25; Bly 1104:22-1105:9.

210.    On July 8th, in the presence of his own attorneys, BP in-house counsel, and Bly Team investigators, BP's Senior Drilling Engineer on the Macondo Well was interviewed.  The

interview notes state in relevant part:

> Don Vidrine called Mark at 8:52 pm to talk about how to test the surface plug and whether they should apply a pressure test or a weight test.  Mark noted that Don also talked to him about the negative tests.  *Vidrine told Mark that the crew had zero pressure on the kill line, but that they still had pressure on the drill pipe. Mark said he told Don that you can't have pressure on the drill pipe and zero pressure on the kill line in a test that's properly lined up.  Mark said that he told Don he might consider whether he had trapped pressure in the line or perhaps he didn't have a valve properly lined up.*  Don told Mark that he was fully satisfied that the rig crew had performed a successful negative test. Mark said he didn't have the full context for what had transpired during the tests and it wasn't clear to him whether Don was talking about the first or second negative tests. Don told him he watched the kill line for 30 minutes and didn't see a drip come out of it; and so Mark assumed that Don had concluded that it was not a problem.

TREX-00296 at 6 (emphasis added).

211.   The foregoing BP document sets forth an exchange between the most senior BP representative on the rig and BP's Senior Drilling Engineer in Houston.  The document and related testimony establish that Hafle clearly understood that the negative pressure test could not be considered a success given the two inconsistent pressures on the kill line and drill pipe. Heenan 2094:15-2095:5 ("In other words, someone – someone on the shore side of BP said, 'This isn't right.'").

212.   Moreover, Hafle not only recognized that the test could not be considered a success, he was advising Vidrine how to "troubleshoot" the problem: "Mark said that he told Don he might consider whether he had trapped pressure in the line or perhaps he didn't have a valve properly lined up."  TREX-00296 at 6; Heenan 2097:3-2098:8.

213.   The BP document also establishes that BP's Senior Drilling Engineer expressly told Vidrine, the same Well Site Leader on the rig who had approved the negative pressure test only an hour before, that the test could not be considered a success given the two inconsistent pressures on the kill line and drill pipe.  Heenan 2094:15-2095:5; 2097:3-2098:8.

214.    The conversation ended at 9:02 p.m., ten minutes after the well began to flow. BP's Bly Report admits that the hydrocarbons did not pass the BOP and enter the riser until approximately 9:38 p.m.  TREX-00001 at 27.

215.    The time between the end of the call at 9:02 p.m. and the time at which oil and gas passed above the riser at 9:38 p.m. has great significance.  Randy Ezell was the Senior Toolpusher aboard the Deepwater Horizon.  Mr. Ezell testified that if a Transocean driller had been ordered by a BP Well Site Leader to perform a negative pressure test, the driller would have been obligated to do so.  Mr. Ezell also testified that it would take the driller less than a minute to shut in the BOP once he was ordered to do so as part of a negative pressure test.  Ezell 1714:10-1718:1.

216.    Given the end of the phone call at 9:02 p.m. and the fact that hydrocarbons did not pass above the riser until 9:38 p.m., BP had approximately 36 minutes – over a full half hour – after the conclusion of the call to close in the well through normal operation of the BOP.

217.    If anyone at BP had taken the necessary action to instruct Transocean's drilling crew to re-run the negative pressure test immediately after conclusion of the call at 9:02 p.m., or even within the next half hour, the drill crew's first actions would have been to stop the pumps and close the annular BOP in order to isolate the hydrostatic head from the riser fluids.  This action alone would have secured the well and prevented the kick from deteriorating while the crew performed the standard diagnostic procedures to resolve the discrepancy in pressure, *e.g.*, by running flow checks, circulating lines, etc.  TREX-22694 (Heenan Report) at 16.

218.    Upon determining that the well had failed the negative pressure test, the crew would have been in a position to circulate the riser and the well/drillstring back to drilling mud

and undertake the standard remedial actions needed to bring the well back under control before oil and gas blew out onto the rig.  TREX-22694 (Heenan Report) at 16.

219.    In short, the Deepwater Horizon tragedy and the Gulf Oil Spill would have been prevented.  Heenan 2104:15-2105:1; Bly 1408:25-1409:19; D-3584.001.

220.    Despite nearly two months of trial testimony, and despite over 300 depositions having been taken in the case, no evidence has been presented that either of BP's two men took any action in the 36 minutes after their call to countermand the WSL's reckless conclusion that he was "fully satisfied that the rig crew had performed a successful negative test."  See, for example, Heenan 2098:5-8; Beck 7208:8-7209:7.

221.    As Dr. Beck testified, Hafle "should have stopped operations right there."  Beck 7208:13-18.

222.    In the 36 minutes between the end of the call and the subsequent time at which hydrocarbons first passed above the BOP and into the riser, the Court finds that BP's WSL, despite having been told that the negative pressure test could not be considered a success, did absolutely nothing to rectify his and WSL Kaluza's previous gross error of approving the negative pressure test – and took no action to undertake a new test that clearly would have demonstrated that a massive kick was well underway.  Heenan 2098:5-8; Beck 7208:8-7209:7; Barnhill 4347:9-4348:17 (the information passed between Vidrine and Hafle during the call "should have been a red flag to stop the operation and, if necessary, repeat the negative test.").

223.    BP appears to contend that Hafle was not sure if Vidrine, in describing the different pressures on the drill pipe and the kill line, was describing the initial test on the drill pipe or the final "test" on the kill line, basing the contention on the following sentences from

Hafle's interview (TREX-00296 at 6):

> Mark said he didn't have the full context for what had transpired during the tests and it wasn't clear to him whether Don was talking about the first or second negative tests. Don told him he watched the kill line for 30 minutes and didn't see a drip come out of it; and so Mark assumed that Don had concluded that it was not a problem.

224. Even if Hafle "didn't have the full context" as to whether the WSL was referring to the "first or second" negative pressure test, the Court credits the common sense testimony of witnesses who stated that if the Senior Drilling Engineer didn't have all the information he needed, then he needed to get the information in order to satisfy himself. Barnhill 4347:9-22.

225. As Mr. Heenan testified, if BP's Hafle in fact "lacked context," then he only needed to ask WSL Vidrine which test he was talking about. Heenan 2100:2-4. Alternatively, Hafle could have looked at the Sperry-Sun real time data he had running on his desk computer at BP's headquarters in Houston. Heenan 2100:17-2101:8.

226. Regardless of the method BP's Senior Drilling Engineer should have used to secure "context," the requirements of 30 C.F.R. § 250.401 apply to operator and contractor personnel working ashore, and not merely those on rigs. Huffman 792:19-793:6; 861:10-12.

227. Accordingly, taking the actions required by the regulation was not optional for the Macondo Well's Senior Drilling Engineer or for its WSL. Both BP men were required as a matter of law to "take necessary precautions to keep wells under control at all times" and to "use the best available and safest drilling technology to monitor and evaluate well conditions and to minimize the potential for the well to flow or kick . . . ."

228. Senior Drilling Engineer Hafle's breach of duty is inexplicable when viewed in the context of his belief that the very cement job the negative pressure test was supposed to be

testing was, to use his own words, on the "ragged edge," and his belief that BP would get a "shittie" cement job.  Benge 2252:2-21; TREX-37031 at 94; TREX-04451 at 3.

229.   Even if it is assumed for the sake of argument that BP's Senior Engineer was unsure as to whether his WSL was referring to the "first or second" negative pressure test, and even if his failure to clarify the issue and take action did not rise to gross negligence or any other level of breach of duty, the WSL's failure to take action has no justification.

230.   WSL Vidrine did not lack "context" – he not only witnessed the negative test, but approved the final test, and did so with the full knowledge of readings showing 1400 psi on the drill pipe and zero psi on the kill line.  The WSL already had firsthand knowledge of the negative pressure test that he himself had approved an hour before.  Senior Drilling Engineer Hafle then provided him with the information he already was obligated to know as a matter of fundamental well control: "you can't have pressure on the drill pipe and zero pressure on the kill line in a test that's properly lined up."  TREX-00296 at 6; Heenan 2101:23-2105:1; 2086:19-2087:18 (the "pass-fail" criteria for the negative pressure test is "well control 101, day one.").

231.   BP's failure to redo the negative pressure test after the call between Hafle and Vidrine, as well as its failure to provide any warning to the drill crew and other personnel on the rig, must also be considered with other post-call actions.

232.   Following the call with Hafle, Vidrine went to the rig floor between 9:10 and 9:18 p.m. for the "sheen test."   Bly 1358:9:19; 1358:25-1360:1; TREX-00302.1.TO and TREX-00302.2.TO; TREX-00295.21.TO.[16]

---

[16] One witness was "under the impression," but also stated he didn't "know that for sure," that Vidrine may not have gone to the rig floor during the sheen test, but instead was overseeing the personnel performing the sheen test at another location on the rig.  *See*, Robinson 7992:1-6.  Greg Meche, who performed the sheen test, was interviewed as part of BP's internal investigation.  Meche stated as part of the Bly Report interview, "Company man was not there."  Meche Group 13 Bundle 037, TREX-03213

233.    At approximately 9:08 p.m., the pumps used to displace the drilling mud with much lighter seawater were shut off to perform the sheen test of the "spacer material."  As part of the temporary abandonment plan, BP used approximately 424 barrels of leftover and unusable LCM (lost circulation material) as a "spacer" between the seawater pumped into the upper well casing and the drilling mud displaced by the seawater.  TREX-00001 (Bly Report) at 93.

234.    Normally, such LCM material would be transported ashore where it would be classified and disposed of as hazardous waste.  However, by using the LCM as a spacer – a purpose for which it never was intended – and instead pumping it into and through the well casing as part of its temporary abandonment procedure, BP concluded that it legally could pump the material into the sea and save the time and cost of shoreside hazardous material disposal. Barnhill; 4397:9-19; LeBleu, Group 5 Bundle 073, 249:13-22; 556:12-16; Lindner, Group 9 Bundle 142, 395:8-18; Billon, Group 11 Bundle 007, 268:14-21; 304:1-305:15; 435:21-436:8; Maxie, Group 10 Bundle 158, 117:13-118:3; 126:25-127:6; 251:13-25; Cowie, Group 3 Bundle 037, 303:6-25; Little, Group 2 Bundle 029, TREX-00102 at. 9.

235.    Before the LCM spacer could be pumped overboard after being pumped out of the riser, a sheen test needed to be performed in order to determine that the LCM spacer contained no mixed-in oil-based mud, the latter of which could not be discharged into the sea.  TREX-00001 (Bly Report) at 93.

236.    The sheen test concluded at approximately 9:14 p.m. and was declared successful. TREX-00001 (Bly Report) at 26, 96.  Vidrine then ordered that the rig's pumps be brought back

---

at 6.  Meche likewise testified about the identities of the crewmen who were present at the test; Vidrine was not among them.  Meche, Group 13 Bundle 037, 165:11:18,  *See also*, Cowie, Group 3 Bundle 037, 189:4-190:14; Cowie, Group 3 Bundle 37, TREX-07323 at 16; Barnhill 4284:20-4286:20; 4343:15-16; Bly 1360:2-1361:4; TREX-00049 at 3.

up and ordered the drill crew to resume displacement of the well, after which Vidrine returned to his office.  Bly 1359:9-1360:1; Beck 7209:1-5.

237.    BP's earlier decision at 7:55 p.m. to order commencement of displacement following the negative pressure test was itself reckless. Beck 7179:7-23; TREX-08140 (Beck Report) at 103.  However, when WSL Vidrine ordered the pumps to be *restarted* and ordered that displacement should *re-continue* after conclusion of the sheen test at 9:14 p.m., he did so with the critical information that his Senior Drilling Engineer had provided to him only minutes earlier.  The BP WSL's *affirmative* conduct of restarting the pumps and continuing displacement, which further increased the already existing risks to the rig, to the crew, and to the environment, cannot be viewed as anything less than a gross and extreme departure from the applicable standard of care.

238.    Finally, the conduct of BP's WSL in returning to his office after 9:14 p.m., rather than staying on the rig floor to oversee the continued displacement, is yet an additional factor that must be considered.  Murry Sepulvado was one of the *Deepwater Horizon's* regular Well Site Leaders.  Sepulvado testified that a Well Site Leader must remain on the rig floor throughout displacement because "the well can give up at any time, once you're reducing hydrostatic.  Even though it has passed negative test, it doesn't guarantee the well's going to stay intact."  Murry Sepulvado, Group 8 Bundle 119, 829:21-830:11.

239.    Given the totality of the circumstances involving the approval of the negative test at 7:55 p.m., including reliance upon the non-existent "bladder effect," plus the information later given by BP's Senior Drilling Engineer to WSL Vidrine, the latter's decision to leave the rig floor during the remaining displacement provides further evidence of a gross and extreme breach of duty by BP and, moreover, an abdication of responsibility.

240.    Based upon these findings, the Court determines as a matter of fact that if BP had taken action to redo the negative pressure test following the end of the Hafle-Vidrine call at 9:02 p.m., the explosions, the fire, the loss of life, the personal injuries, and the oil spill and related damages and injuries would have been prevented.   Heenan 2104:15-2105:1; Bly 1408:25-1409:19; D-3584.001.

241.    The Court previously has determined that the approval of the negative pressure test by BP at 7:55 p.m., coupled with the rationale that the contradictory pressure readings could be explained by the "bladder effect," constituted not merely negligence, but gross negligence.

242.    Based upon the additional findings relevant to the foregoing phone call, the Court further determines that the explosions, fire, loss of life, personal injuries, and the oil spill and related damages and injuries that followed the blowout of the Macondo Well resulted from, and were proximately caused by, BP's failure to take any action to redo the negative pressure test following the end of the Hafle-Vidrine call at 9:02 p.m.

243.    The Court further finds that the failure of BP to take any action to redo the negative pressure test following the end of the call at 9:02 p.m. constituted not only gross negligence, but willful misconduct.

## VI.    BP's FAILURE TO DISCHARGE ITS DUTY TO MONITOR THE WELL AND PREVENT THE BLOWOUT FOLLOWING THE 8:52-9:02 P.M. CALL.

### A.    BP's Further Breach of 30 C.F.R. § 250.401.

244.    Significant portions of BP's Bly report, including its use of "OLGA well control modeling" and its sections on data concerning the negative pressure test, well monitoring, and well control, rest on the Sperry-Sun "real time" data system that was transmitted to shore and thus survived the explosions and fire.  TREX-00001 (Bly Report) at 80; Bly 1100:18-1103:13.

245.    This Sperry-Sun real time data system – the same data system that BP Houston-based Senior Drilling Engineer Hafle had up on his computer – is the same data system that BP used as the factual underpinnings for its well monitoring and well control claims against Transocean.  Heenan 2192:2-2209:2.[17]

246.    The very arguments that BP makes with respect to Transocean, *i.e.*, that its driller failed to detect and prevent the blowout based upon the well data available to him (TREX-00001, Bly Report, at 92-105), applies to BP's Vidrine (on the rig) and Hafle (on shore).  Indeed, those two exchanged critical information during their phone call related to the Sperry-Sun data: "Mark said he told Don that you can't have pressure on the drill pipe and zero pressure on the kill line in a test that's properly lined up."  TREX-00296 at 6.

247.    As BP noted throughout trial and in the Bly Report, a series of anomalies in the well data should have triggered investigation and well control actions.  TREX-00001 (Bly Report) at 92-105.  Some examples follow:

248.    From approximately 9:01 to 9:08 p.m., while the pump rate was constant, the drill pipe pressure increased by approximately 100 psi.  This pressure increase, which should have been apparent from the well data, was most likely an influx from the formation and according to BP should have been investigated. *Id.*; Bourgoyne 7532:20-7534:2; Bly 1214:5-1215:24; 1216:4-12; Heenan 2198:5-2200:23.

249.    Between 9:08 and 9:14 p.m., the pumps were turned off and, as with the previous anomaly, the drill pipe pressure increased – this time by 250 psi.  This significant anomaly was clearly detectable and missed.  BP agrees that this increase in flow should have been

_____

[17] BP makes the same arguments against Halliburton, arguing that its mudlogger, Mr. Keith, should have detected the kick based upon the Sperry "Insite" data he used aboard the rig.

investigated, and a proper flow check would have revealed flow from the well, which should have been shut in. *Id.*

250.    At the time of even this second warning sign, hydrocarbons were still below the BOP, so shutting in the well would have prevented the blowout. Bly 1217:11-1218:6; Bourgoyne 7534:3-7535:16; 7536:2-8; Barnhill 4284:6-19; 4425:19-4426:6; 4461:3-11; 5002:3-11; Beck 7296:21-7297:19; Heenan 2128:12-25; 2157:23-2158:13; 2203:7-2205:3.

251.    Fifteen minutes later, between 9:30 and 9:35 p.m, with the pumps again off, drill pipe pressure increased even more, this time in the amount of 500 psi. A "massive kick" of approximately 280 barrels was underway, and a flow check would have revealed that the well was flowing. Again according to BP and others, the well could have been – and should have been – safely shut in at this time. Bly 1220:9-1221:14; Bourgoyne 7537:24-7538:3; 7781:5-11; Barnhill 4296:10-4297:10; 4436:13-20; Heenan 2206:8-22.

252.    BP argues, and there is indeed no dispute, that the Transocean drilling crew, and its driller in particular, had the primary duty to monitor the well. Heenan, 2185:24-2186:10. As Transocean's expert, Calvin Barnhill testified:

Q:    TREX 41008.18.1.TO.  And what is this document?

A:    This is an excerpt from the [Transocean] well control handbook. This appears to be out of the general specifications and talks about the well control responsibilities. And it basically just mirrors what I just basically said, that the driller is responsible for monitoring the wells, identifying when it needs to be shut in and shutting it in quickly and efficiently.

Barnhill 4261:15-21; TREX-41008.18.1.TO.

253.    Transocean's failure to monitor the well and shut it in prior to the blowout violated 30 C.F.R. § 250.401, which applies to BP's "contractors" and "subcontractors" pursuant to the express language of 30 C.F.R. § 250.400.  However, BP operates under the same legal

duty to monitor the well and shut it in, under Section 250.400, which also imposes 30 C.F.R. § 250.401's duties on "lessees, operating rights owners, [and] operators  . . . ."

254.    Per 30 C.F.R. § 250.401, BP had a heightened duty to monitor the well and prevent the blowout, and BP had people do so aboard the rig (Vidrine) and on-shore (Hafle at BP Houston headquarters, using the Insite "real time" data system running on his computer).  Nonetheless, even following the exchange of critical information during their phone call, no BP representative shared any of this information with the Transocean driller or other rig crew.  As BP's Bly Report explains in describing Transocean's drill crew, "the rig crew's actions were inconsistent with a team that was aware the well was flowing."  TREX-00001 at 94.

255.    Had BP, through its on-the-rig WSL's or on-shore personnel like the Senior Drilling Engineer or otherwise, carried out its duty to monitor and control the well, BP would have recognized that the well was taking a massive kick.  *Cf.*, TREX-00001 (Bly Report) at 92-105.

256.    BP, by and through its WSL and its Senior Drilling Engineer or otherwise, failed to monitor the well and take appropriate well control actions, even following the 9:02 p.m. telephone call between shore and the rig.  That failure resulted in and also was a proximate cause of, the April 20, 2010 blowout aboard the *Deepwater Horizon*, and the resulting explosions, fire, loss of life, personal injuries, oil spill and related damages and injuries.

257.    Standing alone, BP's failure, by and through its WSL and its Senior Drilling Engineer or otherwise, to monitor the well and take appropriate well control actions following the end of 9:02 p.m. phone call between Hafle and Vidrine, constituted not only gross negligence, but willful misconduct.

B.    **BP Complicated And Confused Well Monitoring Efforts by Directing Simultaneous Operations (SIMOPS) During Displacement.**

258.    Drillers and mudloggers are trained and expected to monitor a number of well parameters simultaneously. The most significant parameters for kick detection (*i.e.*, the parameters that are most likely to reveal a kick) are total pit volume and "flow in" vs. "flow out." TREX-22694 (Heenan Report) at 18; Barnhill 4401:19-22.

259.    BP was responsible for ensuring that procedures on the rig allowed for the proper monitoring of the well, and BP's Well Site Leaders decided whether simultaneous operations ("SIMOPS") would be permitted during displacement. Normally, SIMOPS which could affect well monitoring are halted during sensitive operations such as well displacement. Murry Sepulvado, Group 8 Bundle 119, 768:10-17; Keith 3528:15-22; Barnhill 4408:2-20.

260.    At the Macondo Well on April 20, 2010, however, BP allowed SIMOPS during the safety-critical operation of displacement. To the extent that BP (or any party) claims these SIMOPS would have made it more difficult for Vidrine, Hafle, or others to see from the data that the well was sustaining a massive kick, then BP is also culpable for directing or allowing operations that impaired accurate monitoring of well stability. Guillot, Group 1 Bundle 008, TREX-00102 at 9; TREX-22694 (Heenan Report) at 18; Barnhill 4409:18-22.

261.    For example, BP did not insist on a closed-pit system being in place during the displacement; instead, BP permitted the rig crew to pump sea water from the sea chest (which is not part of the pit system) straight into the well, meaning no one could monitor the total balance of pit volumes. TREX-22694 (Heenan Report) at 18-19; Heenan 2149:12-22; Keith 3515:1-3516:15.

262.    Other operations also prevented the rig crew from monitoring "flow in" vs. "flow out," as the various transfers between pits (and dumping the sand traps and trip tanks) sometimes

led to increased flow across the flow line, masking flow out of the well.  Keith 3522:2-8; 3526:11-3527:24.

263.    Crane operations and resulting rig "heave" also caused flow line and pit volume fluctuations, and BP's decision to dump spacer overboard resulted in the Sperry Sun flow meters[18] being bypassed after 9:14 p.m.  Keith 3528:11-3529:6; Heenan 2147:7-9; 2149:17-19; 2152:24-2153:15.

264.    By allowing each of these kinds of operations, BP impeded the ability of the driller and mudlogger to catch a kick (Keith 3514:8-12), making each such operation inconsistent with Good Oilfield Practice.  *See, e.g.*, TREX-22694 (Heenan Report) at 18 ("The most reliable method of determining an influx, and standard operating practice on conventional drilling operations worldwide, is to operate a closed system (no fluid into or out of the system, except that going to/from the wellbore). … operational procedures on the rig rendered monitoring of this critical parameter difficult to impossible.").

265.    The April 20, 2010 blowout aboard the *Deepwater Horizon*, and the resulting explosions, fire, loss of life, personal injuries, oil spill and related damages and injuries resulted from, and were proximately caused by, the foregoing actions of BP in countenancing SIMOPS that complicated and confounded normal methods of monitoring the well and its stability.

## VII.    BLOWOUT PREVENTER (BOP)

### A.    Even On Technology Designed To Ensure Safety, BP Made Safety a Low Priority.

266.    Given the dangers of deepwater drilling, rigs like the *Deepwater Horizon* have a number of backup systems designed to prevent blowouts after actions rising to a level of conduct that is grossly negligent or even reckless.  One such system is the Blowout Preventer, or BOP.

---

[18] The Sperry flow meter was the most accurate flow out meter and the only flow out meter BP wanted Sperry Sun to monitor.  Heenan 2154:14-24.

When properly maintained and operated, the BOP is a safety critical device designed to secure the well from uncontrolled flow.  In short, if hydrostatic balance of the well cannot be maintained following a kick, the BOP is the last remaining hydrocarbon barrier and the last remaining means of preventing an uncontrolled blowout.  Shanks 9128:17-23; Guillot, Group 1 Bundle 008, 287:16-288:2; 288:5-16; 288:19-23; Bly 992:16-20; TREX-40008 (Shanks Expert Report) at 8; Erwin, Group 4 Bundle 044, 325:4-6; 325:8-12; 325:14-15.

267.    Generally speaking, a BOP sits on top of the wellhead and acts as a barrier that can be activated, either manually or automatically, to close in a well and prevent hydrocarbons from flowing up into the riser.  BOPs have different kinds of "rams" that act to close in the well. The kinds of rams and other closing mechanisms that a particular BOP utilizes, and how they are maintained and operated, can mean the difference between a successfully closed-in well and tragedy.

268.    Decisions regarding a BOP must be made carefully.  In this instance, the decision to use the *Deepwater Horizon* and its BOP to drill the Macondo Well was made by BP, which was responsible for determining that the rig and BOP were suitable for the conditions at the well. TREX-01721 at 6; Wong, Group 2 Bundle 024, 116:8-17.

269.    At the time BP made the decision to use the *Deepwater Horizon* at the Macondo Well, BP had already experienced challenges in drilling the well.  In particular, the drilling margin was extremely narrow, increasing the likelihood that the well would take kicks.  These challenges made the selection of an appropriate BOP all the more important.  TREX-07676 (Barnhill Expert Report) at 16-17; Childs 5088:5-9.

270.    BP knew that given the risks, it would be necessary to evaluate the extent to which a BOP and its components were appropriate for the job.  BP's Well Control Manual

describes it as "absolutely necessary that the BOP be capable of shearing and sealing on the main strings of drill pipe that will be used." TREX-02390 at 270; TREX-00215 at 14. The necessity of this analysis encompassed not just general decisions about the BOP, but also decisions regarding its individual components. For example, BP's Drilling and Well Operations Practice (DWOP) states, "The limitations of its [sealing shear ram] shearing capacity should be known and understood and a documented risk assessment shall be in place to address such limitations." TREX-00093 at 52.

271.     While BP acknowledged the need for careful decision-making and analyses, BP's corporate designee on "BP's efforts to ensure the suitability and proper design . . . of the BOP" could identify nothing in writing indicating that BP analyzed the suitability of the *Deepwater Horizon's* BOP for the Macondo Well. Nor could he identify a BP employee who would have performed such a task. M. Byrd (BP 30(b)(6)), Group 3 Bundle 043, 215:21-25; 272:19-273:5; Little, Group 8 Bundle 126, TREX-06288 at 5. Acknowledging the demands of deepwater drilling on the BOP, the company did not evaluate whether the BOP it utilized was the best and safest available, or even suitable. TREX-03400 at 2.

272.     After failing to analyze its BOP decisions carefully, BP chose options that were designed not for safety, but to save money. It then maintained the equipment poorly and ignored signs of safety problems. And ultimately, it put into service a BOP that would not, and did not operate in the crisis for which it should have been designed. The ultimate outcome was the likely and foreseeable result of BP's approach to safety.

**B.       BP Chose Money Over Safety in Its BOP Decisions.**

273.     While the purpose of a BOP is to prevent a disaster, BP routinely put safety second, or worse, in its decisions regarding the *Deepwater Horizon* BOP. These decisions were

the direct inheritance of BP's culture and ultimately contributed to, caused, and resulted in the April 20th disaster.

### 1.        To Save Money, BP Utilized an Inferior Blind Shear Ram.

274.     The *Deepwater Horizon's* BOP, like many BOPs, utilized (among other things) a "blind shear ram" to shut in a well.  A blind shear ram is designed to cut through drill pipe and seal the well.   Davis 2646:4-2647:8; 2647:12-2648:1; TREX-40008 (Shanks Expert Report) at 11.

275.     In order to work properly, however, the drill pipe should be carefully centered so that when the blind shear ram is activated, its shearing surfaces have maximum effect.  In the industry, it is widely understood that pipe in the wellbore can become off-center and located outside the shearing surface, impairing the ram's effectiveness.  Shanks 9130:19-22; Whitby, Group 4 Bundle 048, 586:1-6.  According to BP's own expert, off-center pipe is a particular concern for MODUs, and can be caused by numerous factors, including rig drift, ocean currents and flow in the annulus.  Shanks 9131:4-9132:1.

276.     The blind shear ram chosen for the *Deepwater Horizon* was Cameron's SBR, which consists of one flat blade and one "V" shaped blade that do not extend across the full width of the well bore.   Shanks 9118:18-9119:5; 9119:9-13; Whitby, Group 4 Bundle 048, 122:23-124:1; 347:3-17; TREX-01300 at 14.  Compared to other available rams, the SBR ram's capabilities were relatively limited.

277.     For example, one competing ram, called the DVS ram, had two "V" shaped blades, resulting in both higher shearing and centering capacity in comparison to the SBR rams, but equally robust sealing mechanisms.  The DVS ram was available both at the time the *Deepwater Horizon's* BOP was built and as a "plug and play" modification – that is, a piece that is interchangeable with other rams and did not require any alteration to the BOP itself.  Ambrose

6258:8-6259:4;  TREX  7001  at  1,  6,  13;  Davis  2660:14-2664:2;  2707:6-12;  2711:2-22;

2807:12-2808:8;  2891:12-2893:12;  Shanks  9120:7-16;  9121:24-9122:1;  Childs  5262:24-5265:2;

D. McWhorter, Group 7 Bundle 108, 107:11-21; 110:18-111:6; 141:20-142:5; Whitby, Group 4

Bundle 048, 351:22-352:6; 458:21-25.

278.    Dr. Davis, the only expert to analyze the centering capability of the DVS rams

and its wider double "V", calculated the centering capability as double that of the SBR rams.

TREX-07661 (Davis Rebuttal Report) at 17-18, 36-37; Shanks 9120:17-9123:7; Stevick

6889:18.

279.    BP could easily have utilized the more effective DVS blind shear rams.  First, it

was aware of their existence and superior effectiveness.  As early as 1999, it had received a

quote for both the SBR as well as the DVS ram, and the quote explicitly stated that the DVS has

"two 'V' blades for more effective shearing."  TREX-04276.1.1; TREX-04276.9.1; TREX-

04276.62.1; TREX-04276.63.1.  Moreover, BP uses DVS rams on another of its rigs.  Shanks

9122:2-5.

280.    Second, there was no engineering down-side to using them, and the rams could be

incorporated on a "plug and play" basis.  Shanks 9120:13-16; 9121:24-9122:1; D. McWhorter,

Group 7 Bundle 108, 110:18-111:6.  Transocean, which worked with and reported to BP on the

BOP, would change out rams at BP's request.  Cocales, Group 2 Bundle 025, 732:6-733:1;

733:21-734:13.

281.    The only real disadvantage to using the more effective DVS rams was their

$100,000 price tag – a nominal cost when considering the overall cost of the rig.  D. McWhorter,

Group 7 Bundle 108, 110:8-111:6; 112:18-113:10; 235:24-236:19; Whitby, Group 4 Bundle 048,

595:25-596:10; 597:12-24.   Given the choice between the safer blind shear rams and saving money, BP chose to save the money.

282.   Given the clear possibility of having off-center drill pipe during a blowout, BP should have installed DVS rams in the *Deepwater Horizon's* BOP.   The decision ultimately came to matter.   As experts for the United States, Halliburton and BP agreed, during the emergency well control response only days after the blowout, the blind shear ram was activated by the autoshear, but was unable to shear and seal the well completely.   The drill pipe had been pushed off-center and outside the shearing area of the blind shear rams.   Davis 2657:14-2658:13; Stevick 7003:21-7004:5; Shanks 9012:6-12; 9030:14-9031:1.

283.   Despite the crucial role played by the blind shear ram, particularly in a deepwater well with an extremely narrow to non-existent drilling margin like the Macondo Well, BP failed to ensure that the BOP used to drill the well could reliably shear the drill pipe and seal the well under conditions that were foreseeable.   Davis 2805:12-19; TREX-61123 (Stevick Amended Report) at 15.

## 2.     BP Chose to Use Just One Blind Shear Ram.

284.   Even apart from the issue of whether BP used the *right* blind shear ram, the fact it used just *one* such ram was another data point concerning the company's many choices to cut costs when it came to safety.   Even prior to the Macondo Well blowout, the drilling industry recognized that with respect to blind shear rams, there was value in having redundancy, and some operators equipped BOPs with two sets of blind shear rams. Erwin, Group 3 Bundle 044, 51:23-25; 53:13-24.   It was common knowledge that the more shear rams on a BOP stack, the better the stack.   Erwin, Group 3 Bundle 044, 52:8-16.   Transocean's expert acknowledged that two blind shear rams would probably have helped in the Macondo Well incident.   Childs 5273:1-5274:23.

285.    BP itself knew at the time of building the *Deepwater Horizon's* BOP that having just one blind shear ram was a safety risk.  A risk assessment of the *Deepwater Horizon's* BOP performed in April 2000 found "the major contributor to the failure likelihood associated with the BOP control system results from the selected stack configuration.  With only one shear ram capable of sealing the well in, it is extremely difficult to remove all the single failure points from the control system."  Prestidge Group 14 Bundle 207, TREX-04275 at 3, 42; Ambrose, Group 6 Bundle 098, 648:11-19; 648:21-649:6; Webster 3768:15-3769:9.

286.    BP's own manuals as far back as 2000 acknowledged that two blind shear rams would reduce risk of damage to the blind shear rams sealing capability, and prevent a single point of failure.  TREX-02390 at 270; Childs 5268:20-5271:25.

287.    Moreover, BP had access to numerous Transocean drilling rigs that used two blind shear rams.  According to a comparison performed by BP's expert, Forrest Earl Shanks, 11 of the 16 Transocean rigs operating off-shore in North America in 2010 had at least two blind shear rams.  TREX-40020 (Shanks Rebuttal Report) at 15; Stevick 7033:2-15; D-8226.  Six of those 16 Transocean rigs had two blind shear rams and a Casing Shear Ram.  TREX-40020 (Shanks Rebuttal Report) at 15; D-8226.

288.    Despite this knowledge, BP specified only one blind shear ram.  The *Deepwater Horizon's* BOP could have been outfitted with two sets of blind shear rams had BP requested them either at the time of configuring the BOP or, in light of their "plug and play nature," at any time thereafter.  Ambrose 6258:14-6259:4; Erwin, Group 3 Bundle 044, 73:19-22; Cameron Rsps. to BP's Interrogs, July 12, 2011 at 22; Cameron Rsps. to Plaintiffs' First RFAs, Dec. 8, 2010 at 13.  But BP used just a single blind shear ram.  When it failed, the hydrocarbons from the Macondo Well continued to flow.

### 3.   BP Compounded Its Blind Shear Ram Errors and Doomed It to Failure.

289.   Having chosen to rely on a single BOP of an insufficient design, BP could have mitigated some of the resulting risk through sound, safety-conscious operations.  For example, BP could have set its emergency control systems to close a different, related ram – called a casing shear ram – prior to triggering the blind shear ram.  BP acknowledged that closing only the blind shear ram could leave the blind shear ram susceptible to damage and would cover only "95 to 97 percent of all drilling activities," an inadequate safety factor for industry standards when life and limb are at risk.  Stevick 6891:1-6892:8; 6892:13-6893:5; TREX-04114 at 2. Nevertheless, BP did not set the emergency control system to operate in the safest manner.

290.   Similarly, BP eliminated a key backup mechanism – a lower variable pipe ram – and replaced it (or "reduce[d] the redundancy") with a "test ram" that was incapable of sealing the well, all in order to save time during tests of the BOP.  TREX-06120; Hay, Group 5 Bundle 066, TREX-03287; Childs 5293:12-5294:19; Abbassian, Group 6 Bundle 089, 155:18-21; Hay, Group 5 Bundle 066, Vol. 1, 124:7-21; 124:23-125:14; 126:14-127:6; 171:1-173:9; Vol. 2, 60:2-63:4; M. Byrd (BP 30(b)(6)), Group 3 Bundle 043, TREX-03333; M. Byrd (BP 30(b)(6)), Group 3 Bundle 043, 375:3-9.

291.   Finally, BP compounded the errors of its initial BOP decisions by allowing the Macondo Well, in direct contravention of BP's policies and procedures, to be drilled using 6 5/8" drill pipe that could not be sheared by the blind shear ram – and with no "documented risk assessment" in place to address the blind shear ram's limitation.  Perkin 3302:10-3303:8; Childs 5255:13-20; Davis 2665:20-24.

292.   Many at BP were aware since at least June 2005 that the drill strings in use on the *Deepwater Horizon* could not always be sheared by its BOP.  Stevick 6905:5-8; TREX-

77

07046.3.1.PSC; TREX-07046.3.2.PSC.   Indeed, in a risk assessment performed on the *Deepwater Horizon's* BOP on behalf of BP in 2007, the very issue of upgrading the blind shear ram to shear the type of drill pipe in use was expressly discussed.  Stevick 6905:13-17.  But once again, BP declined to take appropriate action and continued to drill using a blind shear ram and drill string that it knew could not shear and seal in the case of an emergency.  Stevick 6905:18-23.

293.    Others in BP were not so well informed.  Approximately three weeks after the blowout, John Guide, the Wells Team Leader in charge of the *Deepwater Horizon*, had no idea whether the *Deepwater Horizon* could have sheared the drill pipe in use.  M. Byrd, Group 3 Bundle 043, TREX-03187.

### C.    Having Put in Place an Inadequate BOP, BP Ignored Safety Risks and Failed to Maintain It.

294.    In addition to the risks that BP had taken in its initial decisions regarding the BOP, the company failed to ensure that the BOP was properly maintained and would function properly.   BP's rig audit group conducted a series of audits of the rig and, in particular, the BOP, that were designed to expose risks where they existed.  The audits found problems, as was to have been expected.  However, rather than fixing the problems, BP identified the same serious deficiencies over and over without adequately addressing them – and ultimately left in operation a rig that BP's own personnel thought unfit to operate.  Davis 2671:3-7; 2830:2-15; 2831:1-19.

### 1.    BP's Audits Exposed Serious Problems with the BOP.

295.    BP's audits found problems as far back at 2005.  At that time, the company's auditors determined that identified issues were not being resolved: "There is practice by maintenance personnel to close out maintenance work orders even though not all tasks are completed.  Critical checks and inspections are consequently being missed.  This was noted on

numerous occasions during review of the maintenance history files."  Furthermore, it was noted

that "Maintenance history files were generally found to be unsatisfactory  . . .  an auditable trail

of maintenance performed on equipment was often not possible from interrogation of the

maintenance history."  TREX-03400 at 5-6 (emphasis added).  These maintenance failures were

serious breaches of safety that put the rig at risk.  Webster 3781:2-3782:12; 3819:24-3121:13;

3884:6-3885:8; Mitchell 9466:11-9467:15.

296.     These findings were repeated in the years preceding the blowout.  Audits in both

2008 and 2009 included a specific finding that items were reported as closed out when no

progress could be demonstrated.  TREX-06166 at 9; TREX-03405 at 11.

297.     BP was also aware that maintenance records on the *Deepwater Horizon* were

inaccurate and incomplete at best, and sometimes, simply false.  TREX-06166 at 9; TREX-

03405 at 11; Davis 2666:5-2671:13; Webster 3884:6-3885:8.  Multiple BP audits also noted

issues with maintenance planning and overdue maintenance.  TREX-03405 at 2, 12; Webster

3810:8-3811:13; 3824:2-20; Kent Group 5 Bundle 080, TREX-03404 at 3, 31; TREX-06166 at

9.  Indeed, maintenance, including BOP testing, continued to be overdue at the time of the

disaster.  Webster 3940:4-16; 3955:5-19; 3957:16-3958:22.

298.     Collectively, these findings are not just the inevitable marks of a company trying

its best to act as safely as possible in the face of inevitable shortfalls in day-to-day operations.

To the contrary, these findings are the mark of a company that was not taking safety seriously.

They are not findings that "accidents happen"; they are findings that the company failed to take

seriously the accidents that do happen.  Indeed, despite knowledge from three audits conducted

by its own auditors that "critical checks and inspections" were "being missed" since at least

2005, BP made no effort to identify those missed items and rectify them.  TREX-03400; TREX-06166; TREX-03405; Davis 2830:5-17; 2831:13-24.

> **2.     In Light of the Audit Findings, BP Experts Recommended That the Deepwater Horizon Be Pulled from Service.**

299.   BP knew that verifying and closing out the audit findings was important, particularly since its failure to verify and close out audit items was specifically identified in a Six Point Plan that BP developed in response to a separate incident.  TREX-03405 at 18; Wong Group 2 Bundle 024, 232:11-233:3.

300.   Accordingly, as a result of the poor conditions on the *Deepwater Horizon* identified in BP's September 2009 audit, BP's audit team recommended suspending operations until at least some of the deficiencies were corrected.  TREX-03405 at 2.  On September 17, 2009, Nicholas Lirette explained the decision in an email to Senior Operation Engineer Brett Cocales, stating, "This rig is not in appropriate condition to start a well."  But he went on, "[T]he rig management in the field is getting pressure from their office to start this well and change PMs just to get back to business as usual."  Wong, Group 2 Bundle 024, TREX-06168.

> **3.     Despite Crystal-Clear Warnings, BP Did Not Follow up on the Audit Findings, but Put the Deepwater Horizon Back into Service.**

301.   Under BP policy, the responsibility for timely audit follow-up, including the decision of whether to accept or reject recommendations, lies with the Well Team; for the September 2009 *Deepwater Horizon* audit this was John Guide and Brett Cocales.  TREX-01721 at 8; Wong, Group 2 Bundle 024, 31:13-18; 32:12-14; 32:17-20; 44:19-25; Guide 8775:5-19.

302.   The 2009 audit gave ample warning of problems on the *Deepwater Horizon*. Indeed, Cocales had just been informed that the rig was not in an appropriate condition to start a well, and the audit itself found that "closing out of the last rig audit recommendations had no apparent verification by BP.  Consequently a number of the recommendations that Transocean

had indicated as closed out had either deteriorated again or not been suitably addressed in the first instance."  TREX-03405 at 2.

303.    The audit group made sure that these findings made their way to senior management.  Norman Wong, the rig audit group head, specifically raised the 2009 audit findings with the Wells Director and Wells Engineering Authority, Henry Thierens and Jonathan Sprague.  TREX-01951.  Mr. Thierens acknowledged there was "too much reliance on the contractors."  Wong, Group 2 Bundle 024, TREX-06144; Wong, Group 2 Bundle 024, 158:1-16; Guide 8982:19-8983:13.

304.    Unfortunately, however, no process was in place to ensure the Wells Team verified closeout of audit items.  Wong, Group 2 Bundle 024, 32:7-9; 32:11; 56:2-14; TREX 03405 at 5, 18.  To the contrary, Wells Team Leader Guide failed to take them seriously and characterized the findings as "throwing DW Horizon under the bus."  TREX-03405 at 5; TREX-01951; Guide 8845:14-8846:4.  Indeed, Guide declined to meet and debrief with the audit leader, and then ignored several attempts by Mr. Wong in November 2009, January 2010, and February 2010 to meet and discuss the status of the audit recommendations.  Guide 8846:13-8847:15; Wong, Group 2 Bundle 024, 139:3-10; 140:9-141:25; Wong, Group 2 Bundle 024, TREX-06142; TREX-01721 at 8.

305.    As a result, instead of pulling the rig out of service until *all* audit findings had been rectified, BP placed the rig back into service after just five days, on September 22, 2009.  Wong, Group 2 Bundle 024, TREX-06142; Wong, Group 2 Bundle 024, 71:12-72:3.

306.    This action did not mean that even BP thought the audit findings were wrong, or that the rig was sound.  Indeed, BP's Rule 30(b)(6) designee on "BP's efforts to ensure the suitability and  . . . maintenance, operation and utilization of the BOP utilized in drilling

operations at the Macondo Well" was unable to say that BP ensured the BOP was properly maintained.  M. Byrd, Group 3 Bundle 043, 169:16-170:13; Little, Group 8 Bundle 126, TREX-06288 at 5.

**D.    BP Exercised Control Over the BOP and Was in a Position to Prevent Improper Maintenance.**

307.    BP has suggested that the BOP's issues were not *its* responsibilities, but Transocean's.  But ultimately, as both a legal and operational matter, BP exercised relevant control over the BOP and its maintenance.  Its efforts to dodge responsibility here, as on many other issues, fail.

308.    As a purely legal matter, federal regulations make clear that all "lessees, operating rights owners, operators, and their contractors and subcontractors" "must maintain your BOP system to ensure that the equipment functions properly."   30 C.F.R. §§ 250.400, 250.446.  BP thus was required to ensure that the system functioned properly.

309.    As a practical matter, the ultimate responsibilities resided with BP.  BP had the authority to require a drilling contractor to provide a BOP with a specific configuration.  Dupree, Group 4 Bundle 051, 583:15-584:7; Frazelle, Group 5 Bundle 076, 577:16-18; 577:20-578:22. BP, through its predecessor Vastar (for ease of reference hereinafter BP), was deeply involved in the *Deepwater Horizon* BOP's configuration, participating in regular meetings with Cameron and Transocean.  Ambrose, Group 6 Bundle 098, 623:3-624:17; TREX-40008 (Shanks Expert Report) at 20; M. Byrd, Group 3 Bundle 043, TREX-04113; M. Byrd (BP30(b)(6)), Group 3 Bundle 043, 494:1-469:23; 496:25-497:21; 497:25-498:17; 498:19-498:24; 499:1-11.

310.    BP also specified the configuration of the BOP, including the number and type of ram preventers, the bore size and working pressure of the rams, and the stack configuration. Ambrose   6002:23-6003:25;   6252:3-6255:25;   6258:8-6260:14;   TREX-01356A.2.1.CAM;

TREX-01356A.48.1.CAM;   TREX-01356A.78.1.CAM;   TREX-01356A.79.1.CAM;   TREX-01356A.86.1.CAM; TREX-01356A.86.2.CAM; TREX-05094; M. Byrd (BP30(b)(6)), Group 3 Bundle 043, 366:11-14; 366:16-23; 487:2-493:19.   Likewise, BP specified the design of the *Deepwater Horizon* emergency control systems. TREX-04114; TREX-04115; M. Byrd (BP 30(b)(6)), Group 3 Bundle 043, 501:1-4; 501:6-16; 501:18-502:16; 502:18-25.  When BP sought modifications to the *Deepwater Horizon's* BOP after the rig was in service, Transocean accommodated BP.  Ambrose 6264:5-18.

311.   BP exercised control over maintenance of the BOP.  Transocean performed maintenance and inspection, but it was BP that determined how much maintenance time would be allowed between wells and what work would be done.  Transocean had to justify the time needed.  M. Byrd, Group 3 Bundle 043, TREX-03338; Childs 5203:11-5205:5; J. McWhorter, Group 3 Bundle 042, 243:21-245:8; 246:19-247:6; Kent, Group 5 Bundle 080, TREX-03428.  Transocean could not pull the BOP for maintenance without approval from BP.  Boughton, Group 11 Bundle 008, 66:24-67:22; Trahan, Group 9 Bundle 150, 56:25-57:13; Frazelle, Group 5 Bundle 076,  TREX-05357.

312.   Moreover, whatever work Transocean was doing, BP knew or should have known what maintenance was or was not conducted as it reviewed and approved subsea work items during rig moves, and also audited and reviewed the preventative maintenance procedures for the BOP.  J. McWhorter, Group 3 Bundle 042, 243:21-245:8; 246:19-247:6; J. McWhorter, Group 3 Bundle 42, TREX-03786; Hay, Group 5 Bundle 066, Vol. 1, 187:2-188:20; 189:20-190:6; Vol. II, 72:5-6; 72:8-13; 72:16-73:9; 73:12-15; 74:24; 76:18-24; 77:3-13; 77:15-24; M. Byrd, Group 3 Bundle 043, TREX-03338; TREX-03400 at 2.  Indeed, BP agreed that "as a prudent operator, it

makes sense for BP to keep themselves informed and aware of what Transocean does to maintain their BOPs." M. Byrd (BP 30(b)(6)), Group 3 Bundle 043, 345:20-24.

313.    In particular, BP knew that Transocean relied on a condition-based maintenance program for the *Deepwater Horizon* and its BOP, described by Transocean's rig mechanic/engineer as "run it until it breaks". M. Byrd, Group 3 Bundle 043, 326:7-327:8; 452:12-25; D. Brown, Group 7 Bundle 113, 24:13-17; 155:6-156:16. BP admitted that it failed to provide sufficient minimum direction to ensure its contractors, such as Transocean, engaged in adequate BOP maintenance and monitoring. BP was clearly aware of the inability of Transocean's maintenance department to meet its maintenance schedule, having stated months before the Incident that, "Transocean has not fully set the rig up for success in terms of maintenance management." Abbassian, Group 6 Bundle 089, 96:19-97:25; 307:25-308:22; TREX-03405 at 11.

314.    Ultimately, to whatever extent Transocean erred, BP chose to continue to rely on Transocean despite the same serious problems BP repeatedly identified. Despite all of the audit findings of maintenance issues that were unresolved, BP pressed on – and as Wells Team Leader Guide testified, as the company pressed on he made no independent assessment of the condition of the rig and the adequacy of Transocean's maintenance and repairs. TREX-03400 at 5-6; TREX-06166 at 9; TREX-03405 at 11; Guide 8981:23-8982:1; 8982:19-8983:13.

**E.    On April 20, the *Deepwater Horizon's* BOP Failed Because BP Had Failed to Maintain It.**

315.    On April 20th, years of BP's safety-last decision-making and disinterest in sound maintenance practices caught up with the company. In a properly functioning rig, a "deadman" or Automatic Mode Function (AMF) will trigger the BOP to close in the well when certain signs

of trouble are present.  The AMF should have been triggered that day, but as a direct result of BP's neglect, it failed.

316.    The AMF is triggered by two, redundant control pods, called the blue pod and the yellow pod.  Should either pod fail to activate, the other, redundant pod should cause the rams to close in the well.  Davis 2648:4-16; 2645:12-20; Childs 5158:9-11; TREX-40009 (Zatarain Expert Report) at 9-10.

317.    The blue and yellow pods that are critical to deepwater drilling safety run on battery power and electricity.  On April 20th, however, the BOP's electrical systems failed, and as a result the blind shear rams failed to close in the well.  As experts retained by the United States, Halliburton and BP all testified, the reason for the failure was that each pod had problems that prevented it from functioning as designed – namely a depleted 27-volt battery in the blue pod and a mis-wired solenoid 103 in the yellow pod.  Davis 2649:15-17; 2649:21-2650:8; Stevick 6992:1-7; Zatarain 8404:2-16; D-3592.

318.    The opinion of the only expert who disagrees, Transocean's Greg Childs, is unsupported as he relied on Transocean's own testing, which was not produced in full, rather than the Court-supervised testing at Michoud.  Even insofar as Transocean's testing, Childs ignored conflicting results.  Davis 2651:2-2652:3; 2655:2-25; 2697:7-21; Zatarain 8404:22-8405:1; 8436:25-8438:4; 8438:22-8440:11.

319.    The blue pod's battery failure, like any battery failure, was foreseeable.  Given the critical safety function played by the BOP batteries, and because the control pods in the *Deepwater Horizon* did not have a means of monitoring the battery voltage on the rig when the BOP was subsea, it was a recognized necessity that the batteries be properly maintained.  Davis 2690:19-2691:5; Stevick 6992:5-9; D. McWhorter, Group 7 Bundle 108, 103:20-104:2; Pleasant,

Group 4, Bundle 047, 114:4-25; 338:9-23; Stringfellow, Group 3 Bundle 045, 159:8-10; 159:14-15.

320.    If a company follows the simple manufacturer recommendations for battery replacement, there will be sufficient battery voltage available in the event of an emergency requiring activation of the AMF.  LeNormand, Group 7 Bundle 107 Vol. 1, 208:4-15; 208:18-22; 208:22-25; 209:3-6; 209:8-10; 209:13; 211:5-14; 211:20-212:1.    Accordingly, had proper maintenance been performed and the batteries in the blue pod been changed in accordance with manufacturer recommendations for replacement every year, there would have been sufficient voltage in the blue pod to function the blind shear ram at AMF.  Nevertheless, the batteries in BP's BOP were not replaced on schedule.  Maintenance records indicated they had not been replaced since November 2007, approximately two and a half years before the blowout.  Davis 2652:13-20; 2783:13-16; 2784:8-16; Zatarain 8431:23-25; 8433:2-8; TREX-03329.2.1; Kent, Group 5 Bundle 080, TREX-03421; TREX-07669.1.3; TREX-05138.3.1.US; Stevick 6997:12-16.

321.    Moreover, there is no evidence that any voltage measurements or other battery testing had even been performed.  Had this testing been performed prior to deployment of the BOP, it would have detected a depleted and non-functional battery.  Davis 2653:2-12; Zatarain 8435:12-21.

322.    Additionally, there was alternative technology available with rechargeable batteries and battery monitoring that could have been incorporated into the *Deepwater Horizon* BOP.  This technology would have prevented dead batteries and made it a safer and more suitable system.  D. McWhorter, Group 7, Bundle 108, 98:11-99:1; 104:20-25; 289:17-25; 500:10-14; TREX-61124 (Stevick Amended Rebuttal Report) at 12; Davis 2695:10-16; 2716:11-

14; 2718:16-21.  This alternate technology was being utilized on many drilling rigs.  According to Cameron, of the 29 control systems in Cameron's 2008 build cycle, 23 of those control systems were Mark III systems.  Gaude, Group 9 Bundle 143, TREX-05175 at 9.  Indeed, BP upgraded to the Mark III system on a different rig.  LeNormand, Group 7 Bundle 107, Vol. 2, 217:2-9; 218:13-16; 218:24-219:4.  But not on the *Deepwater Horizon*.

323.    The yellow pod's failure was no more complex.  The faulty solenoid 103Y that rendered it non-functioning could have been detected very easily, simply by following the solenoid testing protocol that Cameron and Transocean provided.  Davis 2656:20-2657:11; Childs 5323:4-8.

324.    Despite the fact these testing procedures would have detected the mis-wiring in the solenoid, there is no evidence that the proper testing was performed on solenoid 103Y. TREX-05097; TREX-05097.6.1; Coronado, Group 14 Bundle XXX, TREX-08044; Gaude, Group 9 Bundle 143, 128:4-19; 128:25-130:22; Coronado, Group 14 Bundle XXX, 184:10-18; TREX-03798; TREX-03798.5.1; Davis 2850:5-12; 2656:20-2657:11; 2849:10-25; Childs 5469:16-24; Zatarain 8472:11-8473:3.

325.    Although BP acknowledges that both problems with the Blue and Yellow Pods could have been and should have been anticipated, they were not.  Zatarain 8474:2-23.

326.    There were numerous, simple ways of ensuring that the pods would be functional, but BP did not take those steps itself, nor did it require that Transocean take them.  Davis 2652:13-15.  Had BP ensured that proper maintenance and testing was performed on solenoid 103 in the Yellow Pod or the batteries in the Blue Pod, the blind shear ram would have activated at the time of AMF and sealed the well.  TREX-61123 (Amended Stevick Expert Report) at 28-29.

327.    Had BP required that the system on the *Deepwater Horizon* be upgraded to a rechargeable battery system, the blind shear ram would have activated at the time of AMF and sealed the well.  TREX-61123 (Amended Stevick Expert Report) at 28-29.

328.    Indeed, had either the 27V battery in the blue pod or solenoid 103 in the yellow pod been operable, the AMF/Deadman system would have activated the blind shear rams immediately after the explosions, and the BOP would have sheared the drill pipe and sealed the well.  Davis 2656:13-17; Shanks 9012:15-19.

329.    But as a result of poor maintenance, neither pod was operable; the BOP failed to shear the drill pipe and, within minutes, oil and gas exploded in a fireball aboard the rig.  Had the system been operable the AMF/Deadman system would have activated the blind shear rams immediately after the explosions and the BOP would have sealed the well.  Davis 2656:13-17; Shanks 9012:15-19.

330.    Thus, BP failed to comply with 30 C.F.R. § 250.446, as it did not maintain its BOP system to ensure that the equipment functioned properly.

331.    The April 20th blowout of the Macondo Well, and the resulting explosions, fire, loss of life, personal injuries, oil spill and related damages and injuries resulted from, and were proximately caused by, the foregoing acts and omissions of BP with respect to the design, configuration, and maintenance of the BOP.

## VIII.   THE RELEVANCE OF PROCESS SAFETY – AND THE IRRELEVANCE OF BP'S SMOKE AND MIRRORS RESPONSE.

### A.     BP Failed to Implement Process Safety Management on the Macondo Well.

332.    Process safety management is a disciplined, highly organized set of approaches and strategies designed to prevent *catastrophic* failures involving complex engineered, human-based systems.  In short, it attempts to prevent, control, and mitigate major accidents, including

fires, explosions, and the uncontrolled release of toxic chemicals or hydrocarbons.[19] Bea 282:1-3; 282:15-21; K. Lacy, Group 1 Bundle 002, TREX-02947 at 39; DeFranco, Group 4 Bundle 052, 17:22-18:16; 18:24-19:3; 19:6-12; 19:14-17; 19:20-20:10; Grounds, Group 1 Bundle 005, 12:25-13:6.

333.    Ultimately, the many failures that resulted in the April 20th blowout and explosions were foreseeable.  The decisions that placed profits over safety, that turned a blind eye to signs of danger, and that resulted in and proximately caused the spill cannot be singled out as the unfortunate exceptions, but were systemic within an organization that had not properly prioritized safety.  The company surely was capable of focus.  *See, e.g*., BP's tracking of so-called, non-productive time.[20]

B.      **"Personal Safety" Is Not "Process Safety."**

1.      **What Process Safety Is.**

334.    As set out above, the goal of process safety management is the prevention of catastrophic failures of complex engineered, human-based systems like the Macondo Well.  Bea 282:1-3; 282:15-283:2; K. Lacy, Group 1 Bundle 002, TREX-02947 at 39; DeFranco, Group 4 Bundle 052, 17:22-18:16; 18:24-19:3; 19:6-12; 19:14-17; 19:20-20:10; Grounds, Group 1 Bundle 005, 12:25-13:6.

---

[19] The phrase "Integrity Management" is used interchangeably with process safety. *See* Jassal, Group 4 Bundle 053, TREX-02952 at 14 (Integrity Management and Process Safety relate to hazards that can cause or contribute to major accidents ).

[20] Non-productive time ("NPT") is any downtime a rig experiences during operations, including time when drilling cannot proceed.  Lynch Group 5 Bundle 065, 776:1-13; Walz, Group 02 Bundle 026, 19:5-14.  BP's Gulf of Mexico Drilling and Completions operation meticulously tracked 11 different categories of NPT and in 2007 and 2008 had the highest rate of NPT compared to its counterparts worldwide.  A one third reduction of NPT could save the Gulf of Mexico D&C $150 million annually.  Frazelle, Group 5 Bundle 076, TREX-02681 at 103; Bea 330:3-8; D. Rich, Group 5 Bundle 067, TREX-02544 at 5.

335.    A proper process safety management system includes components dedicated to hazard identification, risk analysis and risk management.  It seeks to understand and manage risks inadvertently introduced through changes to a plan or design, such as BP's unilateral decision, undertaken without any semblance of internal review, to eliminate the second negative pressure test required by the MMS-approved permit.  TREX-20001 (Bea Expert Report) at 5; DeFranco, Group 4 Bundle 052, 36:5-14; *see also,* Jassal, Group 4 Bundle 053, TREX-04185 at 12; Section IV(C) above.

336.    Process safety management is singularly focused on preventing catastrophic events like the Macondo Well blowout. Guide 8779:13-16; Grounds, Group 1 Bundle 005, 12:25-13:19; 14:16-20; DeFranco, Group 4 Bundle 052, 18:24-19:3; 19:7-8; Shaw 8066:21-25; Jassal, Group 4 Bundle 053, TREX-02952 at 14-15.  Such events result in (1) multiple injuries or fatalities; (2) irreparable damage to the environment; (3) catastrophic loss of the facility; and/or (4) damage to corporate reputation – the very results that true process safety regimes are designed to prevent. Mogford, Group 5 Bundle 074, TREX-06271 at 17-19; Jassal, Group 4 Bundle 053, TREX-02952 at 15-17; Yilmaz, Group 4 Bundle 056, TREX-04198 at 5;  Grounds, Group 1 Bundle 005, 14:16-20.

## 2.    What Process Safety Is Not.

337.    Process safety impacts do not include operational impacts such as cost overruns or failure to deliver a well on schedule.  Yilmaz, Group 4 Bundle 056, TREX-04198 at 5 (Section 1.4); Mogford, Group 5 Bundle 074, TREX 6272 at 10; Jassal, Group 4 Bundle 053, TREX-02952 at 22; Grounds, Group 1 Bundle 005, 104:17-105:5; Frazelle, Group 5 Bundle 076, 302:09-12 ("Q. . . . Major Accident Risk is really different than business risk? A. Yes, ma'am.").

338.    Process safety also differs from personal safety.  Whereas personal safety focuses on preventing injuries to individuals from slips, trips, and falls and is more synonymous with

occupational safety, process safety relates to hazards that can cause or contribute to "major accidents." K. Lacy, Group 1 Bundle 002, TREX-02947 at 9 (OMS manual listing Process Safety and Personal Safety as separate sub-elements of "Element 3 Risk"); Jassal, Group 4 Bundle 053, TREX-06205 at 75-78; Bea 283:16-284:5; Jassal, Group 4 Bundle 053, 22:15-19; 23:10-24:9; DeFranco, Group 4, Bundle 052, 20:14-22; 20:25-21:3. As one witness summarized, personal safety is a subset of process safety, but not *vice versa*. Bea 284:12-16.

### C. Smoke and Mirrors: BP's Process Safety Systems Did Not Apply to the *Deepwater Horizon.*

339.    Throughout trial BP conflated process safety with personal (occupational) safety.[21] BP witnesses cited personal safety statistics to create the appearance that BP properly addressed process safety risks – or as Mark Bly put it, "safety is safety." Bly 1039:17-24. K. Lacy, Group 1 Bundle 002, TREX-02947 at 9. *See e.g.*, Shaw 8037:12-8038:3 (passing off as process safety the discussion of a program to learn about "days away from work cases" and "recordable injuries").

340.    In January 2010, BP described occupational safety as something distinct from process safety, and suggested that the company's relation to process safety had been unfocused: "Historically, BP has had a sharp focus on improving occupational safety; we now need a similar focus on front line process safety hazard recognition." Hayward, Group 1 Bundle 001, TREX-06071 at 10.

341.    First, BP pointed to a document called its "Major Hazards Risk Management Policy." That policy required that hazards for each "facility," a term that included rigs, be "identified, assessed and documented in a Major Hazard and Risk Register" and be "actively

---

[21] Personal safety efforts were heralded by BP to support the proposition "you want to incentivize folks as to all kinds of safety." Neil Shaw, for example, cites declines in days-away-from-work incidents in support of improving safety in the Gulf of Mexico for 2009. Bea 420:14-23; TREX-05976; Shaw 8124:5-25. "Days-Away-From-Work" is a classic personal safety metric.

managed through . . . a program of "continuous risk reduction."  Yilmaz, Group 4 Bundle 056, TREX-04198 at 4-5.

342.   However, these policies and practices were not applied to the design, drilling, or attempt to abandon the Macondo Well.  The Risk Register developed for the Macondo Well, for example, was not a Major Hazard and Risk Register.  Cowie, Group 3 Bundle 037, 374:11-375:13; Cocales, Group 2 Bundle 025, 795:18-796:1.

343.   Indeed, in May 2010, shortly after the spill, BP explained that the company focused its process safety practices on existing assets, as opposed to drilling from Mobile Offshore Drilling Units owned and operated by contractors.  Baxter, Group 2 Bundle 016, TREX-07178 at 1, 3; Grounds, Group 1 Bundle 005, 66:1-25; 88:25-89:24; *see also*, Armstrong, Group 1 Bundle 004, 188:19-189:19; 223:9-19; 224:2-17; 467:24-469:22; 469:25-470:22; Jackson, Group 3 Bundle 033, 176:7-178:9; 178:20-179:1; 179:4-6.   Significantly, however, "existing assets" did *not* include the *Deepwater Horizon*.  TREX 2919 at 9; TREX-02908 at 14; Baxter, Group 2 Bundle 016, 173:13-174:4.

344.   Specifically, BP suggested that certain process safety principles that applied to other BP assets were effectively extended to cover the Macondo Well and *Deepwater Horizon* through BP's five-page "HSE Management System Bridging Document," in which "HSE" refers to "Health, Safety, and Environment." TREX-00948; *see also*, TREX-00948.1.1.PSC, TREX-00948.4.1.PSC, and TREX-00948.5.1.PSC.

345.   But while BP tried to suggest that "HSE" includes both "personal safety" and "process safety" (O'Bryan 9353:21-9354:2), in fact the document contains not a single example of process safety.  TREX-00948.  Indeed, BP's Vice-President for D&C in the Gulf of Mexico,

Patrick O'Bryan, who testified at trial, could find not a single example of process safety in the document.  O'Bryan 9352:19-9360:5.

346.    As readily seen in the specific provisions of the Bridging Document that BP claimed brought process safety to the Macondo Well, the focus was exclusively on personal safety – specifically fall protection, PPE (personal protective equipment), travel, boat operations, general safe working practices, and incident reporting for items such as days away from work (DAFWC).  By contrast, it contained no provisions for process safety or, for that matter, even well control.[22]  TREX-00948.

347.    Curtis Jackson, the company's director for HSSE ("Health, Safety, Security & Environment") for the Gulf of Mexico at times relevant to the *Deepwater Horizon* disaster, had purview over safety.  Jackson testified that he never had done anything with respect to process safety. He testified he had no knowledge of any effort to implement process safety principles on the Macondo Well project or, for that matter, within the Gulf of Mexico.  O'Bryan 9355:1-9358:14, quoting from the deposition of Curtis Jackson (Jackson, Group 3 Bundle 033, 93:2-9, 11-14; 94:6-95:22).

348.    Likewise, Cheryl Grounds, BP's top engineer for Process Safety and Engineering, testified that she had no process safety engineers working in the Gulf of Mexico Drillings and

---

[22] The Bridging Document contained no provisions for well control even though BP's Drilling and Wells Operation Practice (DWOP) required that a "well control interface/bridging document . . . be prepared with the appropriate contractor to ensure there is clear understanding of responsibilities and which reference documents and procedures will be used in a well control situation."  TREX-00093 at 48 (section 15.2.17); Little, Group 8 Bundle 126, TREX-00948.   Nor did the Bridging Document confer responsibility on Transocean for decisions exclusively within BP's control regarding (a) well design, (b) cement design, (c) wireline logging operations, (d) whether to run the cement bond log, (e) the number of centralizers used, (f) risk assessments on zonal isolation, (g) pumping cement prior to satisfactory lab test results, (h) selection of production casing, (i) temporary abandonment procedure, (j) misinterpreting the negative pressure test, and (k) use of LCM as spacer.  TREX-00948.

Completion unit at the time of the blowout.  Grounds, Group 1 Bundle 005, 87:3-18; 87:25-88:4; 94:17-24; 201:10-16; *see also,* Guide 8835:2-22.

349.    BP's process safety policies were not applied to the design, drilling, and abandonment of the Macondo Well.  While the Gulf of Mexico had adopted, for example, a "Major Hazards Risk Management Policy requiring that hazards for each "facility," a term that included rigs, be "identified, assessed and documented in a Major Hazard and Risk Register" and be "actively managed through . . . a program of "continuous risk reduction," no Major Hazard register was developed for the Macondo Well.  Yilmaz, Group 4 Bundle 056, TREX-04198 at 4-5.  Rather, the only the Macondo Well "Risk Register" focused exclusively on cost and schedule - not Major Hazards.[23]   Cowie, Group 3 Bundle 037, 374:11-375:13; Cocales, Group 2 Bundle 025, 795:18-796:1.

### D.    A Cost-Cutting Culture and "We Can Get Away With It" Attitude[24] Led to Risk-Taking Without Assessment of Cumulative Effects.

350.    The Macondo Well project was a month behind schedule at the time of the blowout (O'Bryan 9293:22-9294:2) and accumulating a significant amount of "Non-Productive Time."  Significantly, Non-Productive Time was 48%.  Bellow, Group 4 Bundle 055, 80:16-81:14.

351.    In addition to being behind schedule, the Macondo Well was far over budget.  At the time of the blowout, BP had spent $150 million on drilling the Macondo Well – 160% of

---

[23] The much vaunted Beyond the Best Common Process, a "Value Assurance" program focused on ensuring that wells are delivered on time and within the budget, requires a risk register.  The Macondo Well risk register identified risks in terms of cost and schedule, which is not surprising, given that the BtB defines risk in economic terms.  Frazelle, Group 5 Bundle 076, TREX-02681 at 7, 13, 54, 58, 184; TREX-00296-1 at 4-5.

[24] TREX-01136 at 1 ("I'm not sure it was a lack of communication or awareness as much as a 'we can get away with this' attitude … I'm sorry to push back on the lessons learned. I know you've got to get something out there to make it look like we wont [sic] do this again. But without obvious indicators and with the real push to make hole and skip the contingency liner, I don't see us really learning.").

anticipated in the original $96 million Approval for Expenditure.  Rainey, Group 6 Bundle 083, TREX-02370 at 2; Beirne, Group 8 Bundle 124, 663:8-18; Bea 329:7-330:8; D-2730.

352.    Against this background, BP made a series of decisions that saved time and money, but that increased the risk of a blowout.  These decisions include, but are not limited to:

a.    Exceeding the safe drilling margin and failing to report this information to MMS. Huffman 663:12-18; 667:19-670:15; 712:2-713:4; Beck 7080:21-7083:16;

b.    Failing to use the recommended number of centralizers. Benge 2252:2-2255:25; Beck 7103:9-7106:1; 7180:22-7184:1; TREX-04451 at 3; Clawson, Group 5 Bundle 077, TREX-02579; TREX-01517;

c.    Failing to wait for the foam stability test results. Benge 2277:12-2278:7, 2279:5-2280:2; 2361:9-19;

d.    Failing to conduct additional testing to ensure the float collar converted after anomalous pressure readings.  Benge 2255:13-25; 2309:2-4; 2311:6-14; 2312:13-23; Beck 7199:10-7200:11; see also Beck 7133:12-22 (noting that BP could have repaired the float collar, but chose not to);

e.    Failing to circulate a full bottoms-up prior to cement job.  Benge 2255:13-25; 2314:7-2316:5; Beck 7123:10-7127:11; 7180:22-7184:1;

f.    Not waiting for the production casing cement to set before conducting the positive and negative pressure tests. Beck 7167:2-7168:3; 7197:6-7198:7; 7181:14-7184:1; Benge 2242:4-14; Calvert 2612:13-19;

g.    Not running a cement bond log.  Beck 7131:18-7132:25; 7180:22-7184:1;

h.      Failing to provide additional physical barriers during temporary abandonment. Walz, Group 2 Bundle 026, TREX-01690 (mechanical plug would have cost $53,075.06); Beck 7180:22-7184:1; 7202:10-7203:2;

i.      Displacing the riser before setting the cement plug.  Beck 7202:10-7203:2;

j.      Installing a lock-down sleeve during temporary abandonment instead of during completion operations, and then choosing to "set" the LDS using drill pipe instead of drill collars.   Barnhill 4313:23-4319:16, Skidmore, Group 8 Bundle 129, TREX-02242;

k.      BP's unilateral elimination of one of the two negative pressure tests required under its MMS-approved temporary abandonment plan (Section V(C) above); and

l.      Failing to properly interpret the critically important negative pressure test and redo the test.  Cowie, Group 3 Bundle 037, 324:3-9; Barnhill 4336:8-4337:7; 4347:15-22; Beck 7175:24-7176:24.

353.    These decisions were made without a meaningful risk assessment, including assessment of the cumulative effects.  Benge 2244:16-2245:12 (there was a failure to evaluate the acknowledged risks that were cumulative); 2254:17-2256:4 (no evidence that anyone assessed cumulative effects of risks); 2301:2-22; 2307:23-25; 2584:18-2585:12; Barnhill 4347:15-22; Beck 7089:18-22 (no MOC for centralizers); 7182:14-7183:21; 7199:10-7200:11; 7203:3-17 (no assessment for LCM spacer); 7332:15-7334:8 (float collar MOC didn't point out certain risks); TREX-20001 (Bea Expert Report) at 85; Cowie, Group 3 Bundle 037, 377:10-14 (no formal risk assessment regarding centralizer decision).

354.    While each of these decisions saved BP time and/or money, the end result was a massive blowout stemming from the failure to identify, assess, and manage accumulating major hazards risks.    BP ignored basic process safety and risk management procedures with catastrophic results. Bea 327:1-14; Benge 2244:16-2245:12 ("[T]here was a failure to evaluate the cumulative risks that were acknowledged. So it wasn't just one risk that happened, but the cumulative risks that caused that failure."); Benge 2584:18-2585:12; 2586:5-9; Beck 7078:4-18; 7173:1-7174:1.

355.    The explosions, fire, loss of life, personal injuries, and the oil spill and related damages and injuries that followed the blowout of the Macondo Well resulted from, and were proximately caused by, the failure of BP to implement process safety systems on the Macondo Well on and prior to April 20, 2010.

## IX. TRANSOCEAN MANAGED, DIRECTED AND CONDUCTED OPERATIONS SPECIFICALLY RELATED TO CONTROLLING THE WELL, CONTROLLING THE RELEASE OF/AND PREVENTION OF THE RELEASE OF HYDROCARBONS INTO THE ENVIRONMENT AND THUS WAS AN <u>OPERATOR OF THE MACONDO WELL.</u>

356.    In addition to the legal requirements on BP, Transocean was legally required to comply with federal regulations regarding well control, including 30 C.F.R. § 250.401. Newman 4694:10-15; 4692:12-4693:9; 4695:15-4696:9. The drilling contract between BP and Transocean also stated that Transocean was responsible to "maintain well control equipment in accordance with good oilfield practices at all times" and "shall use all reasonable means to control and prevent fire and blowouts and to protect the hole and all other property of the Company [BP]." TREX-01356A, Section 15.2.

357.    In addition to the responsibilities of BP, Transocean drill crews were responsible for well control:  they monitored the well and were responsible for closing the well in to prevent hydrocarbons from flowing from the wellbore. Barnhill 4261:2-14; 4270:1-5; 4402:21-23;

4470:9-13; TREX-41008.18.1; TREX-01453; TREX-01356A, Section 15.2; Heenan 2185:24-2186:10. Transocean has itself acknowledged its responsibility stating: "Well Control. One of the more important aspects of our business and one that we are 100 percent accountable for when the . . . hits the fan . . . ." TREX-07651; Heenan 2189:21-2190:23.

358.   Again, in addition to the responsibilities of BP, Transocean crews were also responsible for performing drilling related operations, including drilling and mud circulation, cementing casing etc. TREX-02195 at 11-12. Transocean itself described the job of its senior toolpusher to include "supervise the drilling operations and associated activities . . . ." and to "ensure drilling operations are carried out in a safe, efficient and productive manner." TREX-04828; *see also*, Newman 4536:25-4538:14; 4532:5-25. Transocean's own expert has defined these activities of physically constructing the well as operations of the well. Barnhill 4232:7-14.

359.   Transocean has already agreed that it had a "duty to maintain well control," and "entailed in this duty were responsibilities related to conducting safe drilling and rig operations, ensuring the safety of personnel onboard and preventing accidents which could impact the environment." Furthermore, Transocean has agreed that its conduct "violated its duty to exercise well control in accordance with the standard of care applicable in deepwater oil exploration industry" and that this conduct was a proximate cause of the blowout, making it responsible for "negligently discharging oil into the Gulf of Mexico." TREX-52676 at 1, 10, 12-13.

360.   Transocean violated 30 C.F.R. § 250.401, which requires both lessees and operators to "take necessary precautions to keep wells under control at all times." Heenan 2091:7-14. Transocean's response to the well control event on April 20, 2010, was a proximate cause of the blowout. Had Transocean responded properly, the well would have been brought under control. Barnhill 4431:15-4432:11; Heenan 2208:23-2209:2. Like BP, Transocean also

misinterpreted the negative pressure test, thereby violating 30 C.F.R. § 250.107.  Barnhill 4481:7-13; 4482:3-6; Heenan 2091:7-14; 2092:14-2093:6; 2094:2-10; 2177:16-19; 2217:8-23; Newman 4519:12-18; TREX-52676 at 12-13 (Cooperation Guilty Plea Agreement).

361.    In light of Transocean's responsibility for  drilling and other construction of the Macondo Well, maintaining control of the well (including, *e.g.*, monitoring the well and maintaining and operating the BOP), the Court finds that Transocean is an operator not only of *Deepwater Horizon* but also of the Macondo Well.

362.    To the extent that any of the foregoing Findings of Fact constitute Conclusions of Law they shall be deemed such, and to the extent any Conclusions of Law constitute Findings of Fact, they likewise shall be so deemed.

//

//

//

//

//

//

BRIAN HAUCK
Deputy Assistant Attorney General
Civil Division

PETER FROST
Director, Torts Branch, Civil Division
Admiralty and Aviation
STEPHEN G. FLYNN
Assistant Director
MICHELLE DELEMARRE
Senior Admiralty Counsel
SHARON SHUTLER
JESSICA SULLIVAN
JESSICA McCLELLAN
MALINDA LAWRENCE
Trial Attorneys


/s/ R. Michael Underhill
R. MICHAEL UNDERHILL, T.A.
Attorney in Charge, West Coast Office
Torts Branch, Civil Division
U.S. Department of Justice
7-5395 Federal Bldg., Box 36028
450 Golden Gate Avenue
San Francisco, CA 94102-3463
Telephone:  415-436-6648
Facsimile:  415-436-6632
E-mail:  mike.underhill@usdoj.gov


DANIEL SPIRO
Senior Trial Counsel
KELLEY HAUSER
ELIZABETH YOUNG
Trial Attorneys
Civil Fraud Section, Commercial Litigation
Branch
U.S. Department of Justice
Ben Franklin Station
Washington, D.C. 20044
Telephone:  202- 616-3898
Facsimile:  202-307-3852
E-mail:  daniel.spiro@usdoj.gov

ROBERT DREHER
Acting Assistant Attorney General
Environment & Natural Resources Division

SARAH HIMMELHOCH
Senior Litigation Counsel
SCOTT CERNICH
Senior Counsel
ABIGAIL ANDRE
DEANNA CHANG
A. NATHANIEL CHAKERES
RACHEL HANKEY
Trial Attorneys


/s/ Steven O'Rourke
STEVEN O'ROURKE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone:  202-514-2779
Facsimile:  202-514-2583
E-mail:  steve.o'rourke@usdoj.gov


DANA J. BOENTE
United States Attorney
Eastern District of Louisiana
SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana
650 Poydras Street, Suite 1600
New Orleans, LA  70130
Telephone:  504-680-3000
Facsimile:  504-680-3184
E-mail:  sharon.d.smith@usdoj.gov


Attorneys for the UNITED STATES OF AMERICA

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

Date: June 21, 2013.                    /s/    R. Michael Underhill
                                         U.S. Department of Justice