UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig | : | MDL NO.  2179 |
| "Deepwater Horizon" in the Gulf | : | |
| of Mexico, on April 20, 2010 | : | SECTION:  J |
| | : | |
| This Document Relates to: | : | JUDGE BARBIER |
| | : | |
| *Civ. No.* 10-4536 | : | MAG. JUDGE SHUSHAN |

. .  . .  . .   . .  . .  . .  . .  . .  . .  . .  . .   . .  . .  . .  . .  . .  . .   . .  . .  . .   . .  . .  . . . . . .

## CONCLUSIONS OF LAW RELATED TO PHASE ONE ISSUES

## FOR UNITED STATES v. BP, et al., 10-4536

These Conclusions of Law relate only to *United States of America v. BP Exploration & Production, Inc., et al.*, 2:10-cv-04536 (E.D. La.). The case is consolidated for pre-trial purposes with the multi-district litigation ("MDL 2197").  PTO # 1 ¶ 3.  The consolidated cases all arise from the April 20, 2010 explosion, fire, and sinking of the DEEPWATER HORIZON mobile offshore drilling unit ("MODU"), which resulted in the release of millions of gallons of oil into the Gulf of Mexico before it was finally capped approximately three months later.  This case is being tried in several phases. Pretrial Order No. 41 (Case Management Order No. 3) (Rec. Doc. 4033), *as amended by* Rec. Docs. 4083, 6592.  The trial of "Phase One" of *U.S. v. BP* was joined, under Fed. R. Civ. P. 42(a), with the Phase 1 trial of Transocean's limitation action (Civ. 10-2771).

Phase One of this matter came on for trial before the Court, sitting without a jury, from February 25, 2013 through April 17, 2013. At the conclusion of testimony, the Court established deadlines for the filing of post-trial memoranda, and thereafter the Court took the matter under submission.  Having considered the testimony and exhibits at trial, the credibility of the

witnesses, the memoranda of counsel, and applicable law, the Court, in accordance with Federal Rule of Civil Procedure 52(a), issues these Conclusions of Law.[1]

## I.     Procedural Posture.

1.     In the matter of *United States v. BP*, there are two Claims for Relief in the Complaint: (1) the first claim for relief seeks civil penalties under Section 311(b) of the Clean Water Act ("Clean Water Act" or "CWA"), 33 U.S.C. § 1321(b); (2) the second claim for relief seeks a declaratory judgment of liability under the Oil Pollution Act ("OPA"), 33 U.S.C. § 2701 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201.  The United States of America filed suit against, *inter alia*, BP Exploration & Production, Inc. ("BP") and four Transocean defendants ("Transocean").[2]

2.     On February 22, 2012, the Court issued an "Order and Reasons [As to the United States', Transocean's, and Anadarko's Cross-Motions for Partial Summary Judgment Regarding Liability under the CWA and OPA]" [Doc. 5809] ("*SJ Order*"). The Court also entered a Consent Decree regarding the liability of Transocean for civil penalties under the Clean Water Act.  [Doc. 8608].

3.     Because of the settlement and the *SJ Order*, the issues remaining in Phase One have been reduced substantially. Thus, the Phase One trial in *United States v. BP* now largely relates to BP's penalty exposure under the CWA for gross negligence or willful misconduct.[3] (There are two other issues related to Transocean, discussed below.)

---

[1] To the extent these conclusions of law are more properly classified as findings of fact, they should be so considered.

[2] The Transocean Defendants are: Transocean Deepwater Inc., Transocean Offshore Deepwater Drilling Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH.

[3] Other matters to be tried later are set out in PTO # 41.  At some later time in this case, the Court will be called on to assess a specific amount of civil penalties, and evidence related to certain of the penalty

4.      The United States requested and the Court ordered that the Court separate the issues related to gross negligence, willful misconduct, and violations of laws into a trial separate from the trial of the other issues in 10-4563, and "join" the Phase I trial in 10-4563 with the Phase I trial in Transocean's limitation action, 10-2771.  Thus, there is substantial overlap between the evidence in the Limitation case and the evidence in *US v. BP*, although the legal issues and standards are not the same. The remainder of the United States' case – such as the amount of civil penalty – is not consolidated or joined for trial purposes with 10-2771. CMO #3.

## II.     **BP's Gross Negligence and Willful Misconduct under the CWA.**

### A.     **Applicable Statute.**

5.      This Court has previously addressed the elements of CWA liability in its *SJ Order* [Doc. 5809], so little discussion is needed here.  The CWA states:

> [a]ny person who is the owner, operator, or person in charge of any vessel . . . or offshore facility from which oil . . . is discharged in violation of paragraph (3), shall be subject to a civil penalty . . . .

33 U.S.C. § 1321(b)(7)(A).[4]  Person is defined to include a corporation. Further, relevant to this analysis,

> In any case in which the violation of paragraph (3) was the result of gross negligence or willful misconduct, of a person described in subparagraph (A), the person shall be subject to a civil penalty of [up to $4,300 per barrel of oil].

33 U.S.C. § 1321(b)(7)(D); 40 C.F.R. § 19.4.[5]

---

"factors" set out at 33 U.S.C. § 1321(b)(8).  While some of the evidence adduced in Phase One relates to those issues, they are not addressed herein.

[4] Section 311(b)(3) prohibits, *inter alia*, the "discharge of oil . . . into or upon the navigable waters of the United States, adjoining shorelines, . . . or in connection with activities under the Outer Continental Shelf Lands Act [43 U.S.C. § 1331 et seq.] . . . in such quantities as may be harmful . . . ." 33 U.S.C. § 1321(b)(3).

[5] Effective March 16, 2004, the civil penalty amounts under Section 311(b)(7)(A)(D) were increased to a maximum of $4,300 per barrel discharged by the Civil Monetary Penalty Inflation Adjustment Rule. *See* 40 C.F.R. § 19.4.

**B.      Legal Standards:  Definitions of Gross Negligence and Willful Misconduct.**

6.      The interpretation of the statutory terms "gross negligence" and "willful misconduct" in the Clean Water Act is a matter of federal law, based on a uniform, federal interpretation of the terms, rather than an interpretation based on the tort law of the state where the spill or conduct occurred.  *See Resolution Trust Corp. v. Diamond*, 45 F.3d 665, 671-72 (2nd Cir. 1995) (collecting cases and holding that a federal court's task of interpreting the meaning of undefined words in a federal statute "is, and always has been, a matter of federal law"); *see also Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.*, 73 F.3d 546, 565-68 (5th Cir. 1996) (interpreting the meaning of "pollutant" in Section 301 of the CWA with reference only to federal law).

7.      "Negligence" is a failure to exercise the degree of care that someone of ordinary prudence would have exercised in the same circumstance.  *United States v. Ortiz*, 427 F.3d 1278, 1283 (10th Cir. 2005) (addressing discharge without a permit under Section 301); *Water Quality Insurance Syndicate v. United States*, 632 F. Supp. 2d 108, 112 (D. Mass. 2009) *("WQIS 2009")* ("a failure to exercise the degree of care, which a person of ordinary caution and prudence would exercise under the circumstances. . . .") (OPA cost recovery claim). The standard is an objective one based on a reasonably careful person under similar circumstances.

8.      A finding of "gross negligence" under Section 311(b)(7)(D) of the Clean Water Act requires merely objective, not subjective, proof of a departure from the standard of care beyond that which would constitute ordinary negligence. "Taken at face value, [gross negligence] simply means negligence that is especially bad. Given this literal interpretation, gross negligence carries a meaning that is less than recklessness."  Restatement (Third) of Torts § 2 Recklessness, cmt. a (2010).

4

9. Most courts consider that gross negligence "falls short of a reckless disregard of the consequences, and differs from ordinary negligence only in degree, and not in kind." W. Page Keaton, *et al.*, *Prosser and Keaton on the Law of Torts* § 34, at 212 (5th ed. 1984). *WQIS (2009)* F. Supp. 2d at 112 ("[n]egligence is 'gross' when there is an extreme departure from the care required under the circumstances or a failure to exercise even slight care"). Gross negligence, as a heightened degree of ordinary negligence, is assessed based on the same objective reasonable person standard as negligence. *See, e.g.*, *WQIS (2009)*, 632 F. Supp. 2d at 112. Most simply put, gross negligence is a departure from the standard of care beyond that which would constitute ordinary negligence.

10. "Willful misconduct" includes reckless behavior, and can be proven without a showing of intent. Willful misconduct has been defined for Section 311 purposes as follows:

> an act, intentionally done, with knowledge that the performance will probably result in injury, or done in such a way as to allow an *inference* of a reckless disregard of the probable consequences. If the harm results from an omission, the omission must be intentional, and the actor must either know the omission will result in damage or the circumstances surrounding the failure to act must allow an *implication* of a reckless disregard of the probable consequences.

*Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1163 (2nd Cir. 1978) (internal citations omitted, emphasis added) (finding willful misconduct based on company's omissions that led to oil spill). Thus, the difference between "gross negligence" and "willful misconduct" is that "gross negligence" is a lesser standard that does not require a finding of recklessness, while "willful misconduct" does require a finding of recklessness. Restatement (Third) of Torts § 2 Recklessness, cmt. a (2010) ("gross negligence carries a meaning that is less than recklessness"). "Willful misconduct" is equivalent to reckless disregard, but less than intentional misconduct. *See Saba v. Compagnie Nationale Air France*, 78 F.3d 664, 667-68 (D.C. Cir. 1996) (discussing the "continuum that runs from simple negligence through gross negligence to intentional

5

misconduct" and recognizing reckless disregard as equivalent to willful misconduct, both of which are different than gross negligence).

11.     Under either standard, a greater degree of care is required when the circumstances present a greater apparent risk. *WQIS (2009)*, 632 F. Supp. 2d at 112; *see also Prosser and Keaton on the Law of Torts* § 34, at 208-09 ("As the danger becomes greater, the actor is required to exercise caution commensurate with it.").

12.     Gross negligence and willful misconduct are to be assessed based on the totality of the circumstances. *See, e.g.*, *WQIS (2009)*, 632 F. Supp. 2d at 115 (upholding finding of gross negligence upon consideration of "all of the circumstances"). Thus, several acts or omissions can cumulatively amount to gross negligence or willful misconduct, even if any one of those acts alone did not comprise gross negligence or willful misconduct. *See, e.g.*, *Ocean Prince*, 584 F.2d at 1164 ("While any one of the faults of Red Star alone . . . may not constitute 'willful misconduct,' on the entire record the various inactions and gross disregard of the potential harm amount, in our opinion, to willful misconduct within the meaning of the [CWA]."); *WQIS (2007)*, 522 F. Supp. 2d at 230.

13.     Thus, gross negligence and willful misconduct can be based on a single occurrence, but can also be based "on an 'accumulation of acts,' [or] 'a chain of circumstances which [were] a contributing cause even though not the immediate or proximate cause of the casualty.'" *WQIS (2007)*, 522 F. Supp. 2d at 230 (quoting *Ocean Prince*).

14.     Accordingly, the Court can determine that BP acted with gross negligence or willful misconduct as a result of a single act or omission. However, instead of or in addition to using a single act or omission, the Court can also determine that BP acted with gross negligence

or willful misconduct as a result of an accumulation of acts or omissions, or a totality of the circumstances.

15.     Furthermore, under the statutory language at issue, the violations need only be "the result of" gross negligence or willful misconduct. 33 U.S.C. § 1321(b)(7)(D). Accordingly, the causal link between the conduct and the violation need not be the proximate cause. Gross negligence and willful misconduct thus need not be based on a single proximate cause, but can be based "on an 'accumulation of acts,' 'a chain of circumstances which [were] a contributing cause even though not the immediate or proximate cause of the casualty.'" *WQIS (2007)*, 522 F. Supp. 2d at 230 (quoting *Ocean Prince* ). Thus, where the violation results from accumulated acts collectively, there is no requirement that the United States prove that each particular act or omission, standing alone, would have been the proximate cause.[6] *Ocean Prince*, 584 F.2d at 1164.

     **C.     Legal Standards:  Applicable Federal Regulations.**

16.     Violations of federal regulations are relevant because such violations can be part of the accumulation of acts, or totality of circumstances, that show gross negligence or willful misconduct.   Because the Macondo Well was located on the Outer Continental Shelf, the applicable federal regulations are those regulations that "govern oil . . . exploration . . . operations on the [Outer Continental Shelf]."   30 C.F.R. § 250.102.[7] (now re-codified at 30

---

[6] On the other hand, OPA -- enacted by the same Act of Congress that added the "result of" language to 33 U.S.C. § 1321(b)(7)(D) – calls for proof of "proximate cause" in order to breach the presumptive limitations on liability. 33 U.S.C. § 2704(c)(1). This demonstrates that Congress intended the "result" language to be a different standard of causation than proximate cause. *See*, Order and Reasons As to Motions to Dismiss the B1 Master Complaint [Doc. 3830] August 26, 2011 (declining to dismiss "moratorium" claims).

[7] The Court will use the regulations as they were in effect at the time of the blow out, and cite herein to the old numbers. 30 C.F.R. Part 250 (Subparts A, C & D).

7

C.F.R. § 550.102). These were MMS's regulations at the time of the Macondo Well blowout, as promulgated under the Outer Continental Shelf Lands Act ("OCSLA"). BP had certain obligations under those federal regulations based on its role as lessee and operator. 30 C.F.R. § 250.105 (lessee defined, and "you," defined to include "lessee"). The regulations, including the Subpart D regulations (Oil and Gas Drilling Operations), also apply to Transocean.  30 C.F.R. § 250.400 (subpart applies to "lessees . . . operators, and their contractors").

### D. Application of The Legal Standards to the Facts Related to BP.

#### 1. BP's Violations of Regulations.

17. Federal regulations required BP to "protect health, safety, property, and the environment by [p]erforming all operations in a safe and workmanlike manner[] and . . . use the best available and safest technology." 30 C.F.R. § 250.107. As shown in the Findings of Fact, BP violated this regulation.

18. Federal regulations required that BP "shall not create conditions that will pose unreasonable risk to public health, life, property, aquatic life, wildlife, recreation, navigation, commercial fishing, or other uses of the ocean." 30 C.F.R. § 250.300(a). As shown in the Findings of Fact, BP violated this regulation.

19. Federal regulations required BP to take needed precautions to keep the well under control at all times, and failed to minimize the opportunity for the well to flow or kick. 30 C.F.R. § 250.401. As shown in the Findings of Fact, BP violated this regulation.

20. Federal regulations required BP to accurately report its fracture gradients in drilling permit applications that BP submitted to MMS for the well. 30 C.F.R. § 250.413(b). As shown in the Findings of Fact, BP violated this regulation.

21. Federal regulations required BP to cement the well, and required that the cementing program must "[p]revent the direct or indirect release of fluids from any stratum through the wellbore into offshore waters . . . ." 30 C.F.R. § 250.420(a). As shown in the Findings of Fact, BP violated this regulation.

22. Federal regulations required BP in drilling the well to use hole-behavior observations to adjust the drilling fluid program and casing. 30 C.F.R. § 250.427(a). As shown in the Findings of Fact, BP violated this regulation.

23. Federal regulations required BP to maintain the safe drilling margin approved by MMS. 30 C.F.R. § 250.427(b). As shown in the Findings of Fact, BP violated this regulation.

24. Federal regulations required BP to "maintain your BOP system to ensure that the equipment functions properly." 30 C.F.R. § 250.446. As shown in the Findings of Fact, BP violated this regulation.

25. Federal regulations required BP, before temporarily abandoning the well, to submit an Application to MMS for a Permit to Modify, and submit the applicable information required to MMS and receive approval. 30 C.F.R. § 250.1721(a). As shown in the Findings of Fact, BP violated this regulation.

26. There may be other regulations that BP did not violate; but mere compliance with some laws does not prevent this Court from finding other violations nor from finding gross negligence or willful misconduct.

### 2. BP's Gross Negligence.

27. BP's violation of Section 311 of the CWA was the result of gross negligence.

28. As a first basis, the Findings of Fact related to the negative pressure test demonstrate that BP departed from the standard of care in a manner beyond that which would

constitute ordinary negligence. BP's acts and omissions regarding the negative pressure test violated MMS regulations, and also violated industry standards. BP's acts and omissions were also an "extreme" departure from the standard of care. These acts and omissions were also causally linked to the spill, so the BP's violation of Section 311 of the CWA was the "result of" this gross negligence.

29. As a second and separate basis, gross negligence was proven based on the totality of acts and omissions set out in the Findings of Fact. The accumulation of acts and omissions that prove BP's gross negligence include, but are not limited to: failure to keep a safe drilling margin, failures in the cement program, failures in the BOP maintenance, and failures in management including failures in the process safety management system. BP's violations of the MMS regulations (30 C.F.R. §§ 250.107, 250.300, 250.401, 250.413, 250.420, 250.427, 250.428, 250.446, and 250.1721) are also part of the accumulation of acts that show that BP acted with gross negligence. These accumulated acts and omissions were also causally linked to the spill, so the BP's violation of Section 311 of the CWA was the "result of" this willful misconduct.

### 3. BP's Willful Misconduct.

30. BP's violation of Section 311 of the CWA was also the result of willful misconduct.

31. As a first basis, the facts related to the negative pressure test demonstrate willful misconduct. These acts and omissions were also causally linked to the spill, so the BP's violation of Section 311 of the CWA was the "result of" this willful misconduct.

32. As a second and separate basis, the facts related to the totality of the circumstances evince BP's willful misconduct. These accumulated acts and omissions were also

causally linked to the spill, so the BP's violation of Section 311 of the CWA was the "result of" willful misconduct.

### 4. BP's Penalty Exposure under CWA.

33. Accordingly, BP is subject to a civil penalty of up to $4,300 per barrel of oil discharged. 33 U.S.C. § 1321(b)(7)(D), 40 C.F.R. § 19.4.

34. The number of barrels discharged is the subject of Phase Two and is not determined herein. No specific penalty is assessed, rather, the Court will hold a later Phase to apply the penalty factors of 33 U.S.C. § 1321(b)(8) and determine a specific penalty amount.

### 5. Additional Bases for BP's CWA Liability.

35. This Court already held BP liable under the CWA as "owner" of the well on Summary Judgment. *SJ Order*, Rec.Doc. 5809. In that same Order, the Court identified the applicable legal definition of "operator", *SJ Order* at 23, holding that an "operator" must "manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id*. (quoting *United States v. Bestfoods*, 524 U.S. 51, 66-67 (1998)). A "person in charge" under the CWA is a person who "has the power or capacity to (i) make timely discovery of discharges, (ii) direct the activities of persons who control the mechanisms causing the pollution, and (iii) prevent and abate damage." *Beartooth Alliance v. Crown Butte Mines*, 904 F. Supp. 1168, 1175 (D. Mont. 1995) (interpreting Section 311).

36. Applying these legal definitions of operator and person in charge, and based on the Findings of Fact, evidence at trial also showed that BP was both an "operator" and "person in charge" of the Macondo Well. BP was also an "operator" and "person in charge" of the *Deepwater Horizon* itself, in that the Well Site leaders had ultimate authority, and exercised that

11

authority, as to decisions on the rig related to drilling and well operations. Thus, BP is liable under the CWA on several grounds.

### III. Liability of Transocean under OPA.

37. As to Transocean's liability under OPA, the Order on summary judgment (the *SJ Order,* Rec.Doc. 5809) left open certain questions that can be addressed now.[8]

38. First, Transocean is an operator of the offshore facility for purposes of OPA section 2704(c)(3). Applying the definition of operator set forth above and set out in the *SJ Order* at 23, and based on the Findings of Fact, Transocean was the operator of the well within the meaning of OPA. As an operator of the offshore facility on the OCS, Transocean is liable to the United States for all removal costs, under Section 1004(c)(3) of OPA. 33 U.S.C. § 2704(c)(3).

39. Second, the Court has already ruled that Transocean is not liable with respect to subsurface discharges, and that with respect to surface discharges – if any are proved – Transocean will have the limit of a tank vessel under 33 U.S.C. § 2704(b). However, this limitation is subject to 33 U.S.C. § 2704(c)(1)(B). The evidence at trial shows that Transocean violated at least two applicable regulations that were proximate causes of the incident. As explained above and in the Findings of Fact, the well monitoring and well control response during displacement of the riser after the negative pressure test was not performed correctly, in violation of 30 C.F.R. § 250.401. Such violations were a proximate cause of the incident. Similarly, the BOP was not maintained properly, in violation of 30 C.F.R. § 250.446. Such violations were a proximate cause of the incident. Therefore, with respect to the discharges on or above the surface of the water, Transocean faces unlimited liability. 33 U.S.C. § 2704(c)(1)(B).

---

[8] The Court also found disputed facts as to whether there was a discharge of oil from the Deepwater Horizon "on or above the surface of the water." This issue is for later Phases.

Whether there were discharges on the surface will be established at a later Phase. The dollar amount of such liability is not the subject of this civil action at this time.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

Respectfully submitted,

| | |
|---|---|
| BRIAN HAUCK | ROBERT DREHER |
| Deputy Assistant Attorney General | Acting Assistant Attorney General |
| Civil Division | Environment & Natural Resources Division |
| | |
| PETER FROST | SARAH HIMMELHOCH |
| Director, Torts Branch, Civil Division | Senior Litigation Counsel |
| Admiralty and Aviation | SCOTT CERNICH |
| STEPHEN G. FLYNN | Senior Counsel |
| Assistant Director | ABIGAIL ANDRE |
| MICHELLE DELEMARRE | DEANNA CHANG |
| Senior Admiralty Counsel | A. NATHANIEL CHAKERES |
| SHARON SHUTLER | RACHEL HANKEY |
| JESSICA SULLIVAN | Trial Attorneys |
| JESSICA McCLELLAN | |
| MALINDA LAWRENCE | |
| Trial Attorneys | |

| | |
|---|---|
| /s/ R. Michael Underhill | /s/ Steven O'Rourke |
| R. MICHAEL UNDERHILL, T.A. | STEVEN O'ROURKE |
| Attorney in Charge, West Coast Office | Senior Attorney |
| Torts Branch, Civil Division | Environmental Enforcement Section |
| U.S. Department of Justice | U.S. Department of Justice |
| 7-5395 Federal Bldg., Box 36028 | P.O. Box 7611 |
| 450 Golden Gate Avenue | Washington, D.C. 20044 |
| San Francisco, CA 94102-3463 | Telephone:  202-514-2779 |
| Telephone:  415-436-6648 | Facsimile:  202-514-2583 |
| Facsimile:  415-436-6632 | E-mail:  steve.o'rourke@usdoj.gov |
| E-mail:  mike.underhill@usdoj.gov | |
| | |
| DANIEL SPIRO | DANA J. BOENTE |
| Senior Trial Counsel | United States Attorney |
| KELLEY HAUSER | Eastern District of Louisiana |
| ELIZABETH YOUNG | SHARON D. SMITH |
| Trial Attorneys | Assistant United States Attorney |
| Civil Fraud Section, Commercial Litigation Branch | Eastern District of Louisiana |
| U.S. Department of Justice | 650 Poydras Street, Suite 1600 |
| Ben Franklin Station | New Orleans, LA  70130 |
| Washington, D.C. 20044 | Telephone:  504-680-3000 |
| Telephone:  202- 616-3898 | Facsimile:  504-680-3184 |
| Facsimile:  202-307-3852 | E-mail:  sharon.d.smith@usdoj.gov |
| E-mail:  daniel.spiro@usdoj.gov | |

Attorneys for the UNITED STATES OF AMERICA

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

Date:  June 21, 2013.                             /s/     R. Michael Underhill
                                                        U.S. Department of Justice