UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | : | MDL No. 2179 |
| "DEEPWATER HORIZON" IN THE GULF | : | |
| OF MEXICO, ON APRIL 20, 2010 | : | SECTION J |
| | : | |
| THIS DOCUMENT RELATES TO: | : | JUDGE BARBIER |
| | : | |
| CIVIL ACTION NO. 10-4536 | : | MAGISTRATE JUDGE SHUSHAN |

..........................................................................................................................................

**UNITED STATES OF AMERICA's
POST-TRIAL BRIEF FOR PHASE ONE:**

**GROSS NEGLIGENCE, WILLFUL MISCONDUCT, AND VIOLATIONS
OF FEDERAL REGULATIONS BY BP**

**and**

**OPA LIABILITY OF TRANSOCEAN**

**Table of Contents**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    Procedural Matters:  How Gross Negligence, Willful Misconduct, and Violations of
       Regulations Relate to the Claims of the United States in the Phase One Trial     . . . . . . . . 3

III.   Legal Standards: Responses to the Court's Seven Questions  . . . . . . . . . . . . . . . . . . . . . 4

              1.     Legal Definitions for Gross Negligence and Willful Misconduct . . . . . . . 4

                     a.     Meaning of Gross Negligence  . . . . . . . . . . . . . . . . . . . . . . . . . . 5

                     b.     Gross Negligence Has a Different Meaning from Willful
                            Misconduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

                     c.     Meaning of Willful Misconduct  . . . . . . . . . . . . . . . . . . . . . . . . . 7

              2.     Neither the General Maritime Law for Punitive Damages Nor State Law
                     Applies to the CWA Case  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

              3.     Gross Negligence or Willful Misconduct Can Be Proven by Showing
                     Either a Single Act or Omission, an Accumulation of Acts or Omissions,
                     or Both  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

              4.     Causation:  The United States Need Only Prove That the Violation of the
                     CWA "Was the Result of" An Accumulation of Acts; There is No
                     Requirement That Each Act or Omission Be a Cause of the Violation . . 13

              5.     There Is No Legal Requirement that Corporate Management Must Be
                     Involved in Any of the Acts or Omissions  . . . . . . . . . . . . . . . . . . . . . . 16

              6 & 7.  BP Violated Certain Applicable Regulations and Industry Standards; the
                     Fact that BP Complied with Some Other Regulations or Standards Is No
                     Defense  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

IV.    Argument:  BP's Violation of the CWA Was the Result of Gross Negligence, Willful
       Misconduct, and the Violation of Regulations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

       A.     Immediate Causes (the Single-Act Approach): The Negative Pressure Test Is the
              Epitome of Gross Negligence, Is Causal, and On-Shore Management
              Knew About It . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

B.  System Causes (the Swiss Cheese Approach):  the Violation of the CWA Was the Result of an Accumulation of Acts and Omissions by BP's On-shore and Rig-based Personnel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    1.  BP Violated the Safe Drilling Margin Regulation, Misled MMS, and Ended up with a "Fragile" Well . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    2.  BP's Risky Decisions on the Cement Job Were Driven by Concerns About the Fragile Well, and by the Need to Save Time and Money . . . . . . . . 29

    3.  Constant Change: the Final Two Weeks of Operations, the Temporary Abandonment Plan, Well Testing  and Monitoring . . . . . . . . . . . . . . . . . 31

    4.  BP Selected the Deepwater Horizon's BOP for this Fragile Well, Knowing That It Was Not Outfitted with Safer Duel-Centering BSRs, and Knowing That Maintenance of the BOP Was Questionable . . . . . . . . . . . . . . . . . 32

C.  Systemic Underlying Causes of the Blowout: BP's Corporate Culture (The Entire Block of Cheese) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    1.  BP Should Have Implemented Basic Principles of Process Safety Management: Systematic Analysis of Major Risks, and Management of Accumulating and Changing Risks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    2.  Instead of Using Process Safety Management, BP Had a "We Can Get Away with It" Culture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

V.  Housekeeping . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    A.  Transocean's OPA Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    B.  Additional Bases for BP's CWA "Operator" Liability . . . . . . . . . . . . . . . . . . . . 39

VI.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## Table of Authorities

FEDERAL CASES

*Bayer Corp. v. British Airways,*
 *PLC*, 210 F.3d 236 (4th Cir. 2000) ............................................................7

*Houston Exploration Co. v. Halliburton Energy Servs., Inc.*, No. 98-1302, 2000
 WL 423909 (E.D. La. April 28, 2000)........................................................11

*Houston Exploration Company, v. Halliburton Energy Services, Inc.*, 269 F.3d
 528 (5th Cir 2001)......................................................................................11

*Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527 (1995) ...................................9

*Jerman v. Carlisle*, 559 U.S. 573 (2010) ............................................................8

*Milwaukee & St. P.R. Co. v. Arms*, 91 U.S. 489 (1875) .................................5, 8

*Resolution Trust Corp. v. Diamond*, 45 F.3d 665 (2nd Cir. 1995) ....................10

*Saba v. Compagnie Nationale Air France*, 78 F.3d 664 (D.C. Cir. 1996) .....................7, 8

*Safeco v. Burr*, 551 U.S. 47 (2007)...............................................................8, 9

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001)..........................................................6

*In re Tug Ocean Prince, Inc.,*
 584 F.2d 1151 (2nd Cir. 1978)............................................................. *passim*

*United States v. Bestfoods*, 524 U.S. 51 (1998) ................................................38

*United States v. Citgo Petroleum Corp.,*
 No. 08-893, slip op. (W.D. La. Sept. 29, 2011)........................................11

*United States v. Coastal States Crude Gathering Co.,*
 643 F.2d 1125 (5th Cir. 1981) .................................................................18

*United States v. General Motors Corp.*, 403 F. Supp. 1151 (D. Conn. 1975)...................17

*United States v. Healy-Tibbets Construction Co.*, 713 F.2d 1469 (9th Cir. 1983)............17

*United States v. Lambert*, 915 F. Supp. 797 (S.D.W.Va. 1996) ........................18

*United States v. LeBeouf Bros. Towing Co.,*
 621 F.2d 787 (5th Cir. 1980) ..................................................................19

*United States v. Ortiz*, 427 F.3d 1278 (10th Cir. 2005) ........................................................5

*United States v. Pruett*, 681 F.3d 232 (5th Cir. 2012) ............................................................9

*United States v. Smithfield Foods*, 972 F. Supp. 338 (E.D. Va. 1997) .............................17

*United States v. Tex-Tow Inc.*, 589 F.2d 1310 (7th Cir. 1978) .........................................15

*United States v. Texas Pipe Line Co.*, 528 F. Supp. 728 (E.D. Okla. 1978)
    *aff'd*, 611 F.2d 345 (10th Cir. 1979)....................................................................14, 17

*Water Quality Insurance Syndicate v. United States*,
    522 F. Supp. 2d 220 (D. D.C. 2007) ................................................................. *passim*

*Water Quality Insurance Syndicate v. United States*, 632 F. Supp. 2d 108 (D.
    Mass. 2009)........................................................................................................ *passim*


STATE CASES

*Rosenblaths, Inc. v. Baker Industrial, Inc.*,
    634 So. 2d 969 ( La. App. 2 Cir. Mar. 30, 1994) ..................................................11, 12


FEDERAL STATUTES

33 U.S.C. § 1321.....................................................................................................................15

33 U.S.C. § 1321(a)(7)...........................................................................................................17

33 U.S.C. § 1321(b)(3) ............................................................................................................4

33 U.S.C. § 1321(b)(7)(A)....................................................................................................4, 16

33 U.S.C. § 1321(b)(7)(D) ............................................................................................. passim

33 U.S.C. § 1321(b)(8) .....................................................................................................15, 23

33 U.S.C. § 1321(t)..................................................................................................................11

33 U.S.C. § 2701 ....................................................................................................................15

33 U.S.C. § 2701(17)..............................................................................................................15

33 U.S.C. § 2704(c) ..................................................................................................................3

33 U.S.C. § 2704(c)(1) ..............................................................................6, 14

33 U.S.C. § 2704(c)(1)(B) ........................................................................20, 40

33 U.S.C. § 2704(c)(3) .................................................................................39

33 U.S.C. § 2716(f)(1)(C) ..............................................................................6

33 U.S.C. § 1321(t) .......................................................................................11

43 U.S.C. § 1331 ............................................................................................4

43 U.S.C. § 1333(a) ......................................................................................11

## FEDERAL REGULATIONS

30 C.F.R. § 250.102 ......................................................................................20

30 C.F.R. § 250.105 ......................................................................................20

30 C.F.R. § 250.107(a)(1) .............................................................................25

30 C.F.R. § 250.146(a) .................................................................................20

30 C.F.R. § 250.400 ......................................................................................20

30 C.F.R. § 250.401 .........................................................................21, 24, 28, 40

30 C.F.R § 250.420(a)(2) ..............................................................................30

30 C.F.R. § 250.427 ......................................................................................25

30 C.F.R. § 250.427(a) .............................................................................28, 29

30 C.F.R. § 250.427(b) .............................................................................27, 28

30 C.F.R. § 250.428(a) .................................................................................28

30 C.F.R. § 250.442(e) .................................................................................25

30 C.F.R. § 250.446 ................................................................................33, 39

## OTHER AUTHORITIES

*Kuroshima Shipping S.A. Act of God Def. and Limit of Liability Analysis*, 2003
    AMC 1681 (2003) ...........................................................................................5

W. Page Keaton, *et al., Prosser and Keaton on the Law of Torts* 34
    (5th ed. 1984)……………………………………………………..……5, 6, 7

*Restatement (Third) of Torts § 2* (2010) ................................................1, 2, 5, 7

## I.      <u>Introduction</u>

At trial the United States proved either BP's gross negligence, willful misconduct, or both. Gross negligence simply means "negligence that is especially bad." *Restatement (Third) of Torts (Physical and Emotional Harm)* § 2 cmt. a (2010). Willful misconduct is an act "done in such a way as to allow an *inference* of a reckless disregard of the probable consequences." *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1163 (2nd Cir. 1978) (emphasis added). Under either standard, the Court may look to a single act or to a series of accumulated acts that collectively evince gross negligence or willful misconduct. *Water Quality Ins. Syndicate v. United States*, 522 F. Supp. 2d 220, 230, 2008 A.M.C. 284, 293 (D.D.C. 2007) ("*WQIS (2007)*").

In applying those standards to this case, the Court should look to BP's "Bly Report" (TREX-00001) which sets out the results of BP's own internal investigation of the causes of the explosions, fire, deaths, and oil spill. BP's own internal written policy for conducting such accident investigations required BP to analyze three layers of causes of this disaster: Immediate causes; System causes (*i.e.,* hardware components and human-ware components involved); and Systemic causes (*i.e.,* organizational management, incentive structure, and culture that exert dominant control over how the system behaves and over those immediate causes). Proposed Findings of Fact ("FoF") Nos. 6, 7, 9.

The simplest of the "immediate causes," is, of course, BP's conduct of the negative pressure test and its decision to proceed to displace the drilling mud in the riser with lighter seawater. This is a clear case of gross negligence. Indeed, BP has already pled guilty to negligence under the Clean Water Act ("CWA") based on the botched negative pressure test. (TREX 89052).The question before the Court is thus whether the United States also proved by preponderance that these same failings in the negative pressure test were not merely negligent

1

under the CWA, but also grossly negligent under the CWA.

BP's conduct of the negative pressure test was such an "extreme departure" from "Good Oilfield Practices" that it was gross negligence. FoF No. 173-200, 202. No witness testified that the test was done correctly. BP declared the test a success based on the supposed "bladder effect," but at trial BP admitted that no such phenomenon exists. The displacement of the riser after the test was a cause of the explosion, and no witness said otherwise. *Id.* Under the applicable legal standard, this "extreme departure" suffices to prove gross negligence, *Water Quality Ins. Syndicate v. United States*, 632 F. Supp. 2d 108, 112 (D. Mass. 2009) ("*WQIS (2009)*") (gross negligence is "an extreme departure from the care required under the circumstances."), and certainly qualifies as "negligence that is especially bad" under the *Restatement (Third) of Torts*.

Turning to the "system causes," in its Bly Report BP described those system causes (along with more immediate causes) using its "Swiss Cheese" accident model, which shows accumulated instances where BP took unnecessary risks, in an inherently highly risky endeavor, without mitigating those risks (almost always to save time or money).  Under the applicable law, "willful misconduct" (*i.e.*, "recklessness") requires no showing of intent, but is shown when an accumulation of acts or omissions collectively evince an attitude of taking unnecessary risks in a highly risky endeavor. *WQIS (2007).* Thus, BP's accumulating decisions including drilling margin, cementing, well design, selection of the *Deepwater Horizon's* BOP, the negative pressure test, and more, demonstrate a reckless disregard for the potentially disastrous consequences of the totality of these acts taken together.

But there is much more to this case. Turning finally to the "systemic causes," this Court should not ignore the corporate-culture underpinnings of this disaster. This is the story of a

corporation that focused on cost savings, on avoiding "non-productive time," and on delivering a producing well. BP's focus on cost-savings and production led it to overlook that its activities carry a substantial risk of major accident, and to overlook the basic principles of risk management (*i.e.*, "Process Safety") that are crucial to avoiding such accidents. In its papers, BP will no doubt tout examples of efforts to protect workers from personal injuries. That must not confuse the real issue: the looming risks of major accidents with catastrophic effects were not accounted for because of a focus on costs and non-productive time. Workers may indeed have worn protective gear; but the well itself was not designed and drilled safely in order to protect against *catastrophic* consequences – blowout, fire, explosions, and an environmental disaster – and in the end workers died anyway.

## II.     Procedural Matters:  How Gross Negligence, Willful Misconduct, and Violations of Regulations Relate to the Claims of the United States in the Phase One Trial.

The Court articulated the procedural reasons why the claims of the United States were tried jointly with the private party claims in limitation. *Trial Transcript* at 17 and 19-20 (February 25, 2013). In short, *United States v. BP et al.*, Civ. No. 10-4536, states claims under the Oil Pollution Act ("OPA") and the CWA. Where a discharge of oil is the result of gross negligence or willful misconduct, the maximum available CWA civil penalty escalates substantially, 33 U.S.C. § 1321(b)(7)(D), and, under OPA, where an incident is proximately caused by (*inter alia*) the violation of a federal regulation (including by a contractor), the OPA limitations on liability no longer apply. 33 U.S.C. § 2704(c). Thus, the United States came to the Phase One trial[1] to prove gross negligence, willful misconduct, and violations of regulations by

---

[1] The United States requested that the Court separate the issues related to gross negligence, willful misconduct, and violations of laws into a trial separate from the trial of the other issues in 10-4563, and "join" the Phase One trial in 10-4563 with the Phase One trial in the limitation action, 10-2771. Memorandum Re: Requested Briefing on Trial Plan. [Doc. 2671] at 12-13 ("the remainder of the United

BP for CWA purposes; and violations of regulations by Transocean for OPA purposes.[2]

### III.   Legal Standards: Response to the Court's Seven Questions.

The Court has requested briefing on seven topics (*Order Regarding Phase One Post-Trial Briefing* [Rec.Doc. 9536]), which we address in this section, using the numbering from the Court's Order.  The applicable statutory provisions are few, and are clear. Section 311(b)(7)(A) of the Clean Water Act mandates that:

> [a]ny person who is the owner, operator, or person in charge of any vessel . . . or offshore facility from which oil . . . is discharged in violation of paragraph (3), shall be subject to a civil penalty . . . .

33 U.S.C. § 1321(b)(7)(A).[3]  Further, relevant to this analysis,

> In any case in which the violation of paragraph (3) was the result of gross negligence or willful misconduct, of a person described in subparagraph (A), the person shall be subject to a civil penalty of [up to $4,300 per barrel of oil].

33 U.S.C. § 1321(b)(7)(D). With that, we address the Court's questions using the numbering from the Court's Order.

### 1.   Legal Definitions for Gross Negligence and Willful Misconduct.

Although neither the CWA nor OPA defines gross negligence or willful misconduct, courts have developed and should apply consistent interpretations of these statutory terms in the context of federal enforcement of those statutes.

---

States' case – such as the amount of civil penalty – should not be consolidated or even joined for trial purposes with 10-2771").

[2] The United States and Transocean settled the CWA claim, but the claim for declaratory judgment under OPA remains live, and is discussed at the end of this brief as a "housekeeping" matter.

[3] Section 311(b)(3) prohibits, inter alia, the "discharge of oil . . . into or upon the navigable waters of the United States, adjoining shorelines, . . . or in connection with activities under the Outer Continental Shelf Lands Act [43 U.S.C. § 1331 et seq.] . . . in such quantities as may be harmful . . . ." 33 U.S.C. § 1321(b)(3).

a.    **Meaning of Gross Negligence**.

Under CWA and OPA, a finding of "gross negligence" requires objective proof of a departure from the standard of care beyond what would constitute ordinary negligence.[4] "Taken at face value, [gross negligence] simply means negligence that is especially bad." *Restatement (Third) of Torts (Physical and Emotional Harm)* § 2 cmt. a (2010). As stated in an OPA case:

> Negligence is a failure to exercise the degree of care, which a person of ordinary caution and prudence would exercise under the circumstances. A greater degree of care is required when the circumstances present a greater apparent risk. Negligence is 'gross' when there is an *extreme departure* from the care required under the circumstances or a failure to exercise even slight care.

*Water Quality Ins. Syndicate v. United States*, 632 F. Supp. 2d 108, 112 (D. Mass. 2009) ("*WQIS (2009)*") (quoting *Kuroshima Shipping S.A. Act of God Def. and Limit of Liab. Analysis*, 2003 AMC 1681, 1693 (2003)) (emphasis supplied). "[M]ost courts consider that 'gross negligence' . . . differs from ordinary negligence only in degree, and not in kind."  W. Page Keaton, *et al.*, *Prosser and Keaton on the Law of Torts* § 34, at 212 (5th ed. 1984); s*ee Milwaukee & St. P.R. Co. v. Arms*, 91 U.S. 489, 495 (1875) ("'Gross negligence' is a relative term. It is doubtless to be understood as meaning a greater want of care than is implied by the term 'ordinary negligence;' but, after all, it means the absence of the care that was necessary under the circumstances…").

As such, gross negligence is assessed based on the same objective reasonable-person standard as ordinary negligence, and therefore requires no showing of any mental state or scienter. *See, e.g.*, *WQIS (2009)*, 632 F. Supp. 2d at 112.

---

[4] Ordinary negligence is a failure to exercise the degree of care that someone of ordinary prudence would exercise in the same circumstance. *United States v. Ortiz*, 427 F.3d 1278, 1283 (10th Cir. 2005) (CWA Section 301); *WQIS (2009,)* 632 F. Supp. 2d at 112 (OPA). The standard is objective, based on a reasonably careful person in similar circumstances.

Further, a greater degree of care is required when the circumstances present a greater apparent risk. *WQIS (2009)*, 632 F. Supp. 2d at 112; *see also Prosser and Keaton on the Law of Torts* § 34, at 208-09 ("As the danger becomes greater, the actor is required to exercise caution commensurate with it."). The amount of care needed to prevent an oil spill must be assessed in light of the totality of the circumstances. *WQIS (2009),* 632 F. Supp. 2d at 115.

### b.      <u>Gross Negligence Has a Different Meaning from Willful Misconduct</u>.

BP may argue that gross negligence requires a showing of intent or recklessness, but that is not so. Based on the plain language of Section 311(b)(7)(D), "gross negligence" and "willful misconduct" are two distinct terms that have different meanings. The use of two terms and the use of the disjunctive "or" that separates "gross negligence" from "willful misconduct" in Section 311(b)(7)(D) express clear congressional intent that the two terms have different meanings. Moreover, Congress added the term "gross negligence" to the statute in 1990, changing the text from "willful negligence or willful misconduct" to "gross negligence or willful misconduct." If Congress meant for the terms gross negligence and willful misconduct to have the same meaning, Congress would have simply removed the old term "willful negligence" and left "willful misconduct" standing alone.  Conflating their meanings would render superfluous one of the key terms of the CWA's penalty provision. Such a reading would be improper because "[i]t is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotations omitted).[5]

---

[5] The two terms also have distinct meanings in OPA. For example, OPA provides liability limits for a responsible party unless the oil spill was caused by, *inter alia*, the "gross negligence or willful misconduct of" the responsible party, 33 U.S.C. § 2704(c)(1). But OPA only allows a responsible party's "guarantor" to assert a defense if the spill was caused by "the willful misconduct of the responsible party." 33 U.S.C. § 2716(f)(1)(C). That the OPA defense for guarantors includes only "willful

Thus, gross negligence is more than ordinary negligence and different from willful misconduct. *See, e.g.,* Restatement (Third) of Torts § 2 Recklessness, cmt. a (2010) (noting "gross negligence carries a meaning that is less than recklessness"); *Bayer Corp. v. British Airways, PLC*, 210 F.3d 236, 239 (4th Cir. 2000) (holding, in spoilage of goods case under Warsaw Convention, that "[t]he cases have repeatedly held that negligence, even gross negligence, would not satisfy [the willful misconduct] standard.").

### c.      Meaning of Willful Misconduct.

As used in the CWA and OPA, the difference between "gross negligence" and "willful misconduct" is that "gross negligence" is a lesser standard that does not require a finding of recklessness, whereas "willful misconduct" does. Restatement (Third) of Torts § 2 Recklessness, CMT. a (2010); *see also Prosser and Keaton on the Law of Torts* § 34, at 212 (5th ed. 1984) ("'gross negligence' falls short of a reckless disregard"). Thus, "willful misconduct" has been defined for Section 311 purposes as follows:

> an act, intentionally done, with knowledge that the performance will probably result in injury, or done in such a way as to allow an *inference* of a reckless disregard of the probable consequences. If the harm results from an omission, the omission must be intentional, and the actor must either know the omission will result in damage or the circumstances surrounding the failure to act must allow an *implication* of a reckless disregard of the probable consequences. The knowledge required for a finding of willful misconduct is that there must be either actual knowledge that the act, or failure to act, is necessary in order to avoid danger, or if there is no actual knowledge, then the probability of harm must be so great that failure to take the required action constitutes recklessness.

*Ocean Prince*, 584 F.2d at 1163 (internal citations omitted) (emphasis added) (finding willful misconduct based on a combination of company's omissions that led to oil spill); *see also Saba v. Compagnie Nationale Air France*, 78 F.3d 664, 667-68 (D.C. Cir. 1996) (recognizing reckless

---

misconduct," but not "gross negligence," demonstrates that Congress intended the two terms to have separate meanings.

disregard as equivalent to willful misconduct, both of which are different from gross negligence).[6] In an OPA cost recovery case, the district court in *WQIS (2007)* applied *Ocean Prince's* willful misconduct and reckless disregard standard and found the responsible party's acts constituted willful misconduct. *WQIS (2007)*, 522 F. Supp. 2d at 229-30.

Consistent with *Ocean Prince*, courts also recognize that reckless disregard is "equivalent to willful misconduct" and serves as "a proxy for willful misconduct's scienter requirement." *Saba*, 78 F.3d at 667; *id*. at 668 (holding reckless disregard "lies between gross negligence and intentional harm.").

The test is an objective test, not a subjective determination, and does not require a showing of intent to do harm. And, as explained above, the Court need only find an *inference* of recklessness. These two concepts are demonstrated in *Safeco v. Burr*, 551 U.S. 47, 65-57 (2007), where the Supreme Court addressed the use of the term "willful" in another federal statute (the Fair Credit Reporting Act). The Court concluded that Congress's use of the "willful" standard encompassed "reckless" behavior, not merely intentional conduct.

The Court also noted that reckless behavior is based on an objective, *not* subjective standard: where the conduct entails an "unjustifiably high risk of harm that is either known or so obvious that it should be known," then recklessness is shown. It is "this high risk of harm, objectively assessed, that is the essence of recklessness at common law." *Id.* at 69. *See also, Jerman v. Carlisle*, 559 U.S. 573 (2010) (in the civil context the word "willful" has been used to impose a "threshold for liability that is lower, not higher, than an intentionality requirement.")

---

[6] *See Milwaukee & St. P.R. Co. v. Arms*, 91 U.S. 489, 495 (1875): "'Gross negligence' is a relative term. It is doubtless to be understood as meaning a greater want of care than is implied by the term 'ordinary negligence;' but, after all, it means the absence of the care that was necessary under the circumstances…wilful misconduct, [is] that entire want of care which would raise the presumption of a conscious indifference to consequences."

(citing *Safeco*).

>    **2.**     **Neither the General Maritime Law for Punitive Damages Nor State Law
>    Applies to the CWA Case.**

The United States, having declined to file any General Maritime Law ("GML") claims, respectfully also declines to define the legal standards for punitive damages under the GML. However, related to this issue, the United States anticipates some of BP's possible arguments. First, BP may argue that the GML standard for punitive damages requires a higher standard for establishing gross negligence than under the CWA. Second, BP may argue that the standard of gross negligence should be based on Louisiana state law. There are several reasons that the Court should reject such arguments.

*GML Does Not Apply.*  The General Maritime Law requirements for punitive damages – whatever they may be – do not apply to a CWA claim.[7] This Court has previously stated that GML punitive damages are *available* to private claimants. Order and Reasons [As to Motions to Dismiss the B1 Master Complaint] [3830] August 26, 2011. However, nothing in that Order requires the application of judicially-based GML standards to the CWA.

More importantly, there are CWA cases all across the country that do not happen to overlap, as does this case, with Article III admiralty jurisdiction;[8] there is no statutory or policy basis to apply one CWA standard for spills that fall within a court's admiralty jurisdiction, and

_____

[7] The issue concerning the underlying requirements for punitive damages under the GML will be briefed by the PSC and the States. We leave that issue for them to address given the fact the United States has not asserted punitive damage claims.

[8] The CWA applies to a wide range of cases having nothing to do with vessels and traditional maritime commerce, *e.g.*, discharge of effluent from a wastewater treatment facility, to give but one example. *United States v. Pruett*, 681 F.3d 232 (5th Cir. 2012) (discharge from wastewater treatment plant). Such cases would not even remotely comport with the Supreme Court's tests for admiralty jurisdiction. *See, e.g., Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 535 (1995) (setting forth the tests for admiralty jurisdiction).

apply yet another standard to CWA cases that do not.  The language of the CWA is clear, and the case law under the GML for punitive damages is not applicable.

*State Law Does not Control*. State law simply does not apply to this analysis. The meaning of "gross negligence" and "willful misconduct," for purposes of the CWA and OPA, is emphatically a matter of federal law, and is properly derived from uniform federal interpretation of the statutory terms; definitions should not be derived from state law. *See Resolution Trust Corp. v. Diamond*, 45 F.3d 665, 671-72 (2nd Cir. 1995) (collecting cases and holding that a federal court's interpretation of undefined words in a federal statute "*is, and always has been, a matter of federal law*") (emphasis added).[9] The Court must assess gross negligence and willful misconduct under the Clean Water Act based on a uniform, federal interpretation of those statutory terms, rather than on the tort law of the state where the spill or gross negligence or willful misconduct occurred. Consistent federal interpretation is necessary and appropriate to ensure that the enforcement of this national health and welfare statute is fair and predictable and not subjected to different, potentially conflicting outcomes based on state lines.

When articulating a federal-law definition of these terms, the Court can of course look to the laws of various sources to fashion the uniform federal law. However, this Court should not blindly follow Louisiana State law in this case. Louisiana law is inconsistent as to the definition of gross negligence, because the federal law differentiates between "gross negligence" and "willful misconduct" (as explained above), while Louisiana state law may conflate the two

---

[9] In *Diamond*, the Second Circuit was called upon to interpret the meaning of the phrase "contract or lease" in a federal statute.  Surveying Supreme Court precedent, the Court explained that the meaning of undefined words in a federal statute is discerned from "generally applicable, long-standing principles of law," rather than adherence to a particular state's interpretations. *Id*.

standards.[10] Thus, Louisiana state law is inconsistent with federal law on this specific issue.

Moreover, the civil penalties at issue will be spent not only in Louisiana, but also in the other four Gulf Coast states, and some are sent to the Oil Spill Liability Trust Fund for use in responding to oil spills anywhere in the country. 33 U.S.C. § 1321(t) (CWA amendments under the "RESTORE" Act). Similarly, OPA damages were incurred in all five Gulf States. Thus, there is no compelling policy reason to adopt Louisiana law in the face of the uniform body of federal law cited above, without raising the choice-of-law question as to why the Louisiana standard would prevail over some other state's law.

BP will likely argue that the standard from Louisiana law should apply, by citing to *Houston Exploration Co. v. Halliburton Energy Servs., Inc.*, 269 F.3d 528, 531-32 (5th Cir. 2001). *Houston Exploration* is inapposite, however, because the Outer Continental Shelf Lands Act's choice of law provision, 43 U.S.C. § 1333(a), provided that Louisiana law should specifically govern in that case. *Houston Exploration* at 532 n.5; *see, Houston Exploration Co. v. Halliburton Energy Servs., Inc.*, No. 98-1302, 2000 WL 423909, at *6 (E.D. La. April 28, 2000) (Barbier, J.). In this case federal statutory law applies and Louisiana law does not.[11]

---

[10] Even if Louisiana law were to be applied, this Court could still hold that gross negligence "requires no intent." *Rosenblath's, Inc. v. Baker Indus., Inc.*, 25685 (La. App. 2 Cir. 3/30/94); 634 So. 2d 969, 972-73. However, Louisiana law does reflect variation on this definition, sometimes seemingly conflating gross negligence with willful misconduct. *See Houston Exploration Co. v. Halliburton Energy Servs., Inc.*, 269 F.3d 528, 531-32 (5th Cir. 2001).

[11] BP will likely argue that *Houston Exploration* should apply by citing to an opinion from the Western District of Louisiana. *United States v. Citgo Petroleum Corp.*, No. 08-893 (W.D. La. Sept. 29, 2011). While *Citgo* is a case decided under Section 311(b) of the CWA, the *Citgo* court erroneously cited to *Houston Exploration* and appears to have applied Louisiana law. For the reasons stated herein, this Court should decline to follow *Citgo*. The appeal in *Citgo* is fully briefed and was argued on March 4, 2013, and one issue addressed on appeal is the standard for gross negligence.

**3.      Gross Negligence or Willful Misconduct Can Be Proven by Showing Either a Single Act or Omission, an Accumulation of Acts or Omissions, or Both.**

Both gross negligence and willful misconduct are assessed on the totality of the circumstances. *WQIS (2009)*, 632 F. Supp. 2d at 115 (OPA case upholding finding of gross negligence upon consideration of "all of the circumstances"). Thus, several acts or omissions can cumulatively amount to gross negligence or willful misconduct. *See, e.g.*, *Ocean Prince,* 584 F.2d at 1164 ("While any one of the faults of Red Star alone . . . may not constitute 'willful misconduct,' on the entire record the various inactions and gross disregard of the potential harm amount, in our opinion, to willful misconduct within the meaning of the [CWA]."). Thus, gross negligence and willful misconduct can be based on a single occurrence, but can also be based "on an 'accumulation of acts,' [or] 'a chain of circumstances which [were] a contributing cause even though not the immediate or proximate cause of the casualty.'" *WQIS (2007)*, 522 F. Supp. 2d at, 230 (quoting *Ocean Prince*). For example, in *WQIS (2007)*, the court summarized OPA's standard of "willful misconduct" by looking to the Second Circuit's decision in *Ocean Prince* (which defined willful misconduct under the closely related CWA):

> While the faulty repair of the tow line was part of the series of occurrences that led to the discharge of the oil, the agency was wrong under the statute to focus on any one occurrence, event or cause as the proximate cause of the spill. It should have looked at the 'series of occurrences' or events that together constitute the 'incident' that led to the spill.
>
> Second, the agency erred in concluding that 'willful misconduct' must be a single act 'intentionally done' and that a series of negligent acts can never constitute willful misconduct . . . . the question of the definition of 'willful misconduct' under the [CWA] was addressed by the Second Circuit in *In re Tug OCEAN PRINCE* . . . .

*WQIS (2007)*, 522 F. Supp. 2d at 228-29 (citing 584 F.2d 1151).  The court continued:

> The court in *OCEAN PRINCE* made clear that its conclusion that there was

12

> willful misconduct was based on no single proximate cause, but on an 'accumulation of acts,' 'a chain of circumstances which [were] a contributing cause even though not the immediate or proximate cause of the casualty.' *In re Tug OCEAN PRINCE,* 584 F.2d at 1158. . . . The Second Circuit reversed the trial court in *OCEAN PRINCE* and found that the series of negligent acts, rising to reckless disregard, constituted willful misconduct. *See id.* at 1163-64 . . . . Similarly, this Court is persuaded that the decision of the responsible parties in this case *knowingly* to send an unseaworthy vessel to sea, along with the accumulation of other acts that resulted in the oil spill, constitutes reckless disregard and willful misconduct, and that the agency therefore erred when it concluded that the OPA defense of willful misconduct did not apply.

*WQIS (2007),* 522 F. Supp. 2d at 230.

Accordingly, the Court certainly can find that a single act comprises gross negligence or willful misconduct. However, the Court can also – either instead of or in addition to finding a single act – find that an accumulation of acts or omissions suffices. As argued in detail below, and set out in the Findings of Fact, both tests are met in this case.

### 4.     Causation:  The United States Need Only Prove That the Violation of the CWA "Was the Result of" an Accumulation of Acts; There Is No Requirement That Each Act or Omission Be a Cause of the Violation.

As a corollary to the principle that an accumulation of acts can comprise gross negligence or willful misconduct, the Court need not find that any particular act or omission was the proximate cause of the violation.[12]

Under the statutory language at issue, the violations need only be "the result of" gross negligence or willful misconduct. 33 U.S.C. § 1321(b)(7)(D).  There is no indication that Congress intended to impose a proximate cause standard through this "result of" language in the penalty provision. Accordingly, based on the plain language of the statute, the causal link between the conduct and the violation need not be a proximate cause.

---

[12] As argued below, BP's failings related to the negative pressure test, standing alone, comprise gross negligence and are also a proximate cause of the discharge of oil. Thus, the causation question addressed here relates more to the "accumulated acts" standard.

This legal principle also follows from the cases cited above. *See Ocean Prince,* 584 F.2d at 1158 (willful misconduct was based on no single proximate cause, but on an accumulation of acts which were a contributing cause even though not the immediate or proximate cause of the casualty). Non-causal acts can be part of a totality of circumstances which, taken as a whole, inform the Court's analysis of whether a given act or omission was reasonable, or was a gross departure from reasonable care.

This Court, in this case, has also previously considered (but declined to rule on the precise contours of) causation for claims arising under similar "resulting from" language in OPA. *See*, Order and Reasons As to Motions to Dismiss the B1 Master Complaint [Doc. 3830] August 26, 2011 (declining to dismiss VoO and Moratorium claims). OPA -- enacted by the same Act of Congress that added the "result of" language to the CWA in 33 U.S.C. § 1321(b)(7)(D) – calls for proof of "proximate cause" in order to breach the presumptive limitations on liability. 33 U.S.C. § 2704(c)(1). This demonstrates that Congress intended the "result" language to be a different, and lesser, standard of causation from proximate cause. The Court noted that the parties seemed to agree that the "result" language was a standard less than proximate cause. Order and Reasons [Doc. 3830] at 33.

That third parties were involved does not absolve BP of the results of its conduct, as courts have also held that civil penalties cannot be avoided based on blaming third parties. For example, in *United States v. Texas Pipe Line Co.*, 528 F. Supp. 728 (E.D. Okla. 1978)*, aff'd*, 611 F.2d 345 (10th Cir. 1979), oil was spilled from the defendant's pipeline when the pipeline was damaged by a bulldozer operated by a third party. *Id.* at 730. The court upheld the defendant's liability and the assessment of a civil penalty, finding that "[t]he fact that a third party may have

been the sole cause of an oil discharge is no defense." *Id.* at 733. [13] *See also United States v. Tex-Tow Inc.*, 589 F.2d 1310 (7th Cir. 1978); *United States v. General Motors Corp.*, 403 F. Supp. 1151 1157 (D. Conn. 1975) ("the action of a third party is no absolute defense to the imposition of a civil penalty." BP thus cannot argue that the acts of Transocean or Halliburton somehow relieve BP for liability for gross negligence.

Finally, for purposes of *United States v. BP*, the Court can – and should -- also make factual findings as to BP's behavior, even if the Court finds that a particular act or omission does not rise to a "but for" cause of the discharges. This is so because the Court's findings in Phase One will be relied on in the "Phase Three" or "Penalty Phase" trial (yet to be scheduled), in which evidence of BP's culpability, violations, and other equitable issues can be considered. 33 U.S.C. § 1321(b)(8).[14]

By way of example, BP drilled intervals of the Macondo using drill pipe that it knew was

---

[13] Prior to the enactment of OPA, the authority to recover removal costs and natural resource damages for discharges of both oil and hazardous substances resided in Section 311(f) of the CWA. With the enactment of OPA, that authority for discharges of oil was essentially supplanted by Title I of OPA, 33 U.S.C. 2701 *et seq*. Section 2002 of OPA provides: "Subsections (f), (g), (h) and (i) of section 311 of the Federal Water Pollution Control Act (33 U.S.C. 1321) shall not apply with respect to any incident for which liability is established under section 1002 of this Act." P.L. 101-380, Section 2002 (codifed as a note to 33 U.S.C. § 1321.) Title I of OPA adopted the strict, joint, and several liability standards that obtained under 311(f) of the CWA for recovery of removal costs and natural resource damages. 33 U.S.C. 2701(17). As explained in the United States' briefing and argument related to Transocean's attempt to seek indemnity for its civil penalties, liability for civil penalties under Section 311(b) is not joint and several, but instead must be "tailored" to the specific defendant and situation; an amount appropriate for one defendant might be ineffective (or grossly excessive) for another. Order and Reasons As to Transocean and BP's Cross-Motions for Partial Summary Judgment Regarding Indemnity [Doc. 5446] at 21; cf. Order and Reasons As to the United States', Transocean's, and Anadarko's Cross-Motions for Partial Summary Judgment Regarding Liability under the CWA and OPA [Doc. 5809] at 23, n.32.

[14] This Court has already stated that it would not consider prior violations and prior conduct in determining what caused this blowout; but the Court also stated that some of that evidence could be admitted "when the Court is required to consider the quantum of punitive damages or the assessment of CWA penalties." Order and Reasons [Regarding Motions in Limine to Exclude Instances of Prior Alleged Improper Conduct and Prior Adverse Criminal, Civil or Regulatory Proceedings], February 9, 2012 [Doc. 5634] at 5 and 6.

too wide for the BOP to shear in an emergency. FoF No. 270.  By the time of the blowout, BP

had switched to smaller pipe diameter, so the previous days of drilling were not causal; but those

actions show BP's reckless attitude towards safety, and also show BP's culpability. Thus, it

behooves the Court to make factual findings as to BP's acts or omissions that relate as an

equitable matter to BP's penalty amount, even if such acts are not specifically causal.

We hasten to add that the proposed Findings of Fact filed by the United States do in fact

demonstrate proximate cause with respect to actions for which BP is culpable.  Indeed, BP

*concedes* that the "eight mechanical or procedural barriers" (quoting BP's Mark Bly) listed in

BP's "Bly Report" and "Swiss cheese" accident model were causal factors in the Macondo Well

blowout and disaster.  See, Findings Nos. 3-4 of the United States' proposed Findings of Fact.

### 5.    There Is No Legal Requirement that Corporate Management Must Be Involved in Any of the Acts or Omissions.

We start again with the statutory language at issue: in any case in which the CWA

violation "was the result of gross negligence or willful misconduct, of a person described in

subparagraph (A)" then the higher penalty amounts are available. 33 U.S.C. § 1321(b)(7)(D).

Subparagraph (A) identifies three classes of persons:  "[a]ny person who is the owner, operator,

or person in charge of any vessel . . . or offshore facility from which oil . . . is discharged. . . ."

33 U.S.C. § 1321(b)(7)(A). Significantly, "person" is defined to include a corporation. 33 U.S.C.

§ 1321(a)(7).

Reading these provisions together, where the violation was the result of gross negligence

or willful misconduct of "*any person*" who was the owner, operator, or person in charge, then

the higher penalty amounts are available.[15] The language is in the passive voice, no particular

---

[15] This Court has already found BP to be an "owner," [Doc. 5809] *SJ Order*, (on appeal).  Evidence at Phase One clearly established that BP was also an operator and person in charge. *See, infra*, Part V.B. of

16

type of person within a corporation is identified, and there is no statement that management needs to be involved. Accordingly, there is no basis whatsoever in the plain language of the statute to require the United States to prove shore-based or upper management involvement.

Corporations act through their employees, and the acts of employees in the course and scope of their employment are the acts of the corporation. A company is grossly negligent when the people who act on its behalf do so with gross negligence. BP of course has admitted under the Clean Water Act to the negligence of BP *as a corporation* arising from the actions of BP's individual Well Site Leaders. Plea Agreement (TREX 89052) at 15. BP thus confirms under the CWA that – as a corporation – it acts through its employees and is legally culpable due to the actions of those individuals. The same applies in the civil context: BP acted with gross negligence through the actions taken by its Well Site Leaders (and others), making BP civilly liable under the CWA.

In cases involving civil penalties under the CWA, courts have held the corporate owner liable, even if the owner had no direct involvement, or even if the spill was caused by a third party affiliated with the owner. For example, the Tenth Circuit upheld a civil penalty assessed under CWA Section 311 against a corporate owner of a pipeline after the landowner's bulldozer struck the pipeline. *Texas Pipe Line Co.*, 611 F.2d at 347. The court recognized that, although the defendant did not cause the resulting spill, the strict liability standard of the Act mandated assessing the penalty against the defendant. *Id.* Likewise, the Ninth Circuit affirmed the assessment of a civil penalty for violations of CWA 311(b)(3) against a barge lessee after its barge grounded and spilled oil. *United States v. Healy-Tibbets Constr. Co.*, 713 F.2d 1469, 1472 (9th Cir. 1983); *see also United States v. Smithfield Foods*, 972 F. Supp. 338 (E.D. Va. 1997)

this brief.

(discussing actions of lower level employees on which some of the violations were predicated). Thus, "the CWA imposes liability both on the party who actually performed the work and on the party with responsibility for or control over the performance of the work." *United States v. Lambert*, 915 F. Supp. 797, 802 (S.D.W.Va. 1996).

Not only is involvement of corporate management not a prerequisite, Courts have held corporations liable for CWA civil penalties under CWA 311(b) for the acts of unrelated third parties. *See, United States v. Coastal States Crude Gathering Co.*, 643 F.2d 1125 (5th Cir. 1981). There, Coastal States owned a pipeline that ruptured when an unrelated third party's vessel struck the pipeline. The court upheld the penalty even though Coastal States had no relationship at all to the third party and no involvement in the events. If a corporation is liable for acts of an unrelated third party, clearly it is liable for the actions of its *own* employees.

Results are similar when recovery of costs of responding to an oil spill are at issue under OPA. *See, e.g.*, *WQIS (2007)*, 522 F. Supp. 2d at 224, 230 (finding that, although a "shoreside manager" sent the vessel out in an unseaworthy condition, the crew's improper repair of the tow line also contributed to the ultimate spill and created corporate liability under OPA). The Court in *Ocean Prince* also found the ship owner (Red Star) civilly liable for the actions of its crew: "It is the owner's duty to use due and proper care to provide a competent master and crew and to see that the ship is seaworthy; any loss occurring by reason of fault or neglect in these particulars is within his privity." *Ocean Prince*, 584 F.2d at 1155. In that case, a last minute personnel change created confusion about who was in charge and, as a result, a captain with no experience on the Hudson River steered the ship into a known hazard. The Court held Red Star liable for the

captain's actions under Section 311 of the CWA.[16]

Thus, any legal requirement that shore-based or management personnel must be involved does not arise in the CWA or other related federal environmental statutes. Whatever the requirements for punitive damages might be under the GML, which is a body of "judge made law," those requirements do not apply to the statutory federal law analysis under the CWA, and there is no statutory or policy-based reason to import GML punitive damages principles into the CWA. Perhaps most importantly, if Congress had intended the CWA to require management-level involvement, it could have specified so in the language of the statute, or even expressly adopted GML standards. Instead, Congress made *any* owner or operator liable.

In any event, as a matter of the facts of this case, BP's on-shore personnel were involved in all the significant decisions that increased risks and resulted in the disaster. For example, regarding the negative pressure test, on-shore engineer Mark Hafle knew of the conflicting test results, yet did not call for a re-test and did not stop the displacement. FoF Nos. 207-243. Other of the "accumulated" acts that resulted in the spill – decisions about the BOP technology, audits of the BOP maintenance, statements to MMS about drilling margins, cement formulations, use of centralizers, and changes to the Temporary Abandonment plan – were made by BP's Houston-based personnel. Likewise, Section I of the United States' proposed Findings of Fact extensively detail the role of BP shore-side management in the Macondo disaster.

---

[16] Courts reach the same conclusion with contractors: the corporation is responsible for the actions of the people it hires. In *United States v. LeBeouf Bros. Towing Co.*, the defendant contracted with Marine Corporation for a tug and crew to tow a tanker barge on the Mississippi River. 621 F.2d 787, 788 (5th Cir. 1980). Defendant *LeBeouf* did not supervise the contractor's crew during the transport of the barge and was not aboard when a crewman accidentally released sixty barrels of crude into the river. *Id*. In spite of the fact that *LeBeouf* was not aboard the tug at the time of the discharge, it was found liable for cleanup costs under the CWA because "[a]lthough the tug operated as an independent contractor, LeBeouf held ultimate control over it by hiring it in the first place…." *Id*. at 789.

### 6 & 7.  BP Violated Certain Applicable Regulations and Industry Standards; the Fact that BP Complied with Some Other Regulations or Standards Is No Defense.

Violations of applicable federal regulations can be part of the "accumulation of acts" that evince gross negligence or willful misconduct under the *WQIS (2007)* and *Ocean Prince* standards (above).[17] This principle is akin to common law "negligence *per se*," *i.e.*, violations of law tend to show negligence. By way of example, in *WQIS (2009)* one of the facts that the court found relevant to the analysis of gross negligence was that the tug's master worked more than 12 hours in a 24 hour period, which violated a federal regulation. 632 F. Supp.2d at 115.

Because the Macondo Well was located on the Outer Continental Shelf, the "applicable" federal regulations, *see* OPA, 33 U.S.C. § 2704(c)(1)(B), are those regulations that "govern oil . . . exploration . . . operations on the [Outer Continental Shelf]."  30 C.F.R. § 250.102.[18] These were MMS's regulations at the time of the Macondo blowout, as promulgated under the Outer Continental Shelf Lands Act ("OCSLA"). These regulations impose duties on BP as a "lessee," 30 C.F.R. § 250.105 (lessee defined, and "you," defined to include "lessee"). The regulations, including the Subpart D regulations (Oil and Gas Drilling Operations), also apply to Transocean. 30 C.F.R. § 250.400 (subpart applies to "lessees . . . operators, and their contractors").

The factual arguments below will demonstrate that BP violated numerous of these OCSLA regulations.[19]  For example, BP violated the safe drilling margin regulation, cement and BOP related regulations, and the regulatory admonition to keep the well under control at all

---

[17] The regulatory violations also relate to OPA liability limitations.  33 U.S.C. § 2704(c)(1)(B).

[18] We rely on the regulations as they were in effect at the time of the blow out, and cite herein to the old numbers.  30 C.F.R. Part 250 (Subparts A, C & D).

[19] The violations are also listed in the proposed "Conclusions of Law."

times. *See* 30 C.F.R. § 250.401.

Evidence also showed that BP violated industry standards (*e.g.*, Mr. Heenan's testimony that the decision to proceed after the failed negative pressure test was a gross and "extreme" departure from Good Oilfield Practices. *See Heenan* at 2087:24–2091:6. FoF Nos. 197, 199, 202). As with violations of regulations, violations of industry standards can show negligence. Especially bad violations or extreme violations of industry standards can show gross negligence. Accumulated violations of industry standards show recklessness and willful misconduct.

However, while these violations of law and breaches of industry standards do evince gross negligence or willful misconduct, the converse is not true: the mere fact that BP *did* comply with some applicable laws does not negate BP's violations of other laws. Nor is it a defense that BP complied with *some* industry standards while breaching others. For example, as to the BOP, BP had the requisite number of rams required by MMS's regulations, but compliance with that regulation did not exempt BP from ensuring that those rams were properly maintained and used.

## IV.   Argument:  BP's Violation of the CWA Was the Result of Gross Negligence, Willful Misconduct, and the Violation of Regulations.

As set out above, the Court can find gross negligence or willful misconduct from a single act, or from an accumulation of acts. In this case, both tests are met.[20]

BP's erroneous conclusion that the negative pressure test, conducted and evaluated by Well Site Leaders Kaluza and Vidrine and others, was successful is a single act that comprises gross negligence. *See*, Section V of the FoFs (the decision to proceed after the failed negative

---

[20] Before proceeding to the evidence, we note that the vast majority of the witnesses did not live within the subpoena power of the Court, so for BP employees the United States was required to rely heavily on the "Bundled" deposition designations and their exhibits. BP itself, meanwhile, had the option of bringing any of its own employees. Thus, BP's witnesses included employees that BP obviously thought would help its case, while the BP employees who would help the claim of the United States were not called.

pressure test was "extremely below" Good Oilfield Practices). That single act was also the proximate cause of the discharge of oil, but at a minimum the discharge "resulted from" the grossly negligent decision to declare the negative test a success.

In addition, the "accumulation-of-acts" test – which has come to be called the "Swiss cheese" model approach – also applies in this case:

- BP drilled without a "safe drilling margin," and misreported to MMS as part of drilling design, leaving the well in a fragile condition.  FoF Nos. 44-76.

- Due to the fragile condition of the well, BP's on-shore engineers knowingly took additional risks on the Macondo cement job, including: foaming the cement (despite the presence of de-foamer) and limiting cement volume, pre-job circulation, and pump rates. FoF Nos. 75-125.

- Despite those risks, BP proceeded to pump the cement without waiting for successful foam stability test results for the cement slurry.

- BP proceeded with the cement job even after the anomalous attempts to convert the float collar showed that they "blew something." FoF Nos. 121-125.

- BP made numerous last-minute changes to the Temporary Abandonment plan without considering the accumulating risks of such changes or the already-noted risks of the fracture gradient and cement job. FoF Nos.144-163.

- BP underbalanced the well in the face of the negative pressure test results proving that the well was flowing. Section V of FoF.

- BP called for simultaneous operations during the displacement of the riser, making it more difficult to monitor for kicks. FoF Nos. 258-264.

- BP adopted all of these risks with full knowledge that the BOP was poorly maintained, and that the BOP was outfitted with old blind shear rams that did not use readily available technology with improved capacity to center the drill pipe for emergency shearing. Section VII of FoF.

Each of these acts or omissions is causally linked to the blowout, regardless of whether any given one of them, standing alone, was a proximate cause. These are the "system" causes under BP's investigation (although some of them are also "immediate" causes).

22

Thus, the Court can and should find that both the "single act" and the "accumulation of acts or omissions" tests are met in this case. These two tests are discussed below, but beyond the specifics of the Macondo Well, the Court should consider the deepest underlying causes of the blowout – the "systemic causes" that BP chose to ignore in its Bly Report.[21]

Thus, as an analytic construct, we turn to BP's own written policies for accident investigations, which required it to analyze three layers of causes: immediate causes; system causes; and systemic causes. FoF No. 6. All three are crucial.

A.      **Immediate Causes (the Single-Act Approach): The Negative Pressure Test Is the Epitome of Gross Negligence, Is Causal, and On-Shore Management Knew About It.**

Section V of the United States' proposed Findings of Fact contains a thorough summary of the evidence concerning: (a) the negative pressure test and BP's culpability for gross negligence in declaring the failed safety-critical test a "success"; (b) the role of the "bladder effect" (a phenomenon that does not even exist) in BP's approval of the botched test; and (c) the 8:52 to 9:02 p.m. telephone call on April 20th between one of BP's Well Site Leaders on the rig and BP's Senior Drilling Engineer in Houston.

As a result of BP's decisions concerning the negative pressure test, it failed to discover that the cement job had failed to seal the well from the "pay zone" of high pressured hydrocarbons. This failure led directly to the blowout when BP elected to displace the riser with seawater (*i.e.*, removed the drilling mud that is so crucial for overbalancing formation pressure), and caused the well to undergo a massive kick – a kick that went undetected and ensured

---

[21] Again, the Court should make factual findings as to BP's corporate behavior even if the Court decides, for example, that the negative pressure test suffices to prove gross negligence, because the Court's findings in Phase One will be relied on in the "Penalty Phase" under 33 U.S.C. § 1321(b)(8).

disaster. These decisions by BP are causally linked, and indeed would suffice under any traditional proximate cause test.

Given the extensive discussion of the negative pressure test in the proposed Findings of Fact, our discussion here shall be brief. Suffice it to say, neither BP's Bly Report nor even a single expert witness at trial (including BP's expert) could explain how the simple "Pass/Fail" test could have been declared a success. *See*, FoF Nos. 170-75, discussing the simple criteria for approval of the test. Witnesses at trial used words like "reckless," "unbelievable," and "incredible" to describe BP's actions concerning the test. *See, e.g.*, FoF Nos. 190-91, 197. As BP's own drilling expert admitted with respect to the sheer fallacy of the "bladder effect" as a rationale for approving the negative pressure test, any minimally competent well site leader or petroleum engineer should have known that there was no such thing. FoF. No. 196.

The United States' expert, Mr. Heenan testified that BP's conduct concerning the negative pressure test was a "gross and extreme departure from the standards of Good Oilfield Practice." FoF Nos. 197, 199-202. Neither BP nor any other party cross-examined Mr. Heenan on that conclusion in any meaningful way and, instead, BP attempted to show that Transocean likewise bore responsibility for the negative pressure test debacle.  That is *not*, however, a defense to BP's *own* culpability for gross negligence because, as one of BP's own respected Well Site Leaders (Murry Sepulvado) explained, "BP has the final say" in approving a negative pressure test.  FoF No. 14.  In short, BP's acts constitute an "extreme departure from the care required under the circumstances[,]" *WQIS (2009),* 632 F. Supp. 2d at 112, and therefore constitute gross negligence.[22]

_____

[22] BP's acts also violated numerous OCSLA regulations, *inter alia*, 30 C.F.R. § 250.401 ("You must take necessary precautions to keep wells under control *at all times*. You *must* . . . Use the best available and safest drilling technology to *monitor* and *evaluate* well conditions and to *minimiz*e the potential for the

The Court's analysis of BP's conduct concerning the negative pressure test could stop with gross negligence because this "immediate" cause of the blowout – the misinterpretation of the negative pressure test -- is truly a simple case. As the proposed Findings of Fact also establish, however, the facts underlying the 8:52-9:02 p.m. telephone call not only establish BP's gross negligence, but its willful misconduct.  *See*, Section V(D), FoF Nos. 207-243.

During the call, BP's Well Site Leader (on-rig manager Vidrine) exchanged critical information with BP's Houston-based Senior Drilling Engineer (Hafle).  The WSL told the senior man on-shore that the "drill pipe" monitored during the test had 1400 psi of pressure, but that the test was declared successful because there was no flow on the "kill line."  BP's Houston man responded by telling the on-rig manager that they couldn't have pressure on the drill pipe and zero pressure on the kill line in a test that was properly lined up.  FoF Nos. 210, 213.

As detailed in the proposed Findings of Fact, neither BP man – ashore at BP headquarters or on the rig -- took *any* action after the call to order that the negative pressure test be re-done, an action that would have saved the rig, the crew, and prevented the Gulf oil spill.  To the contrary, the Well Site Leader (Vidrine) took action *after* the call that actively worsened the rapidly deteriorating situation.

The rig's pumps had been shut down for the "sheen test" that took place between approximately 9:08 and 9:14 p.m.  FoF Nos. 232-36.  Despite the information that the Senior Drilling Engineer had provided to him only minutes earlier, WSL Vidrine ordered that the pumps be *restarted* after the sheen test and further ordered that the temporarily-halted displacement of the well should re-commence, thereby further under-balancing the well and speeding the deadly

well to flow or kick."); 30 C.F.R. § 250.107(a)(1) and (c) ("perform[] all operations in a safe and workmanlike manner. . . and use the best available and safest technology."); 30 C.F.R. § 250.427 (pressure integrity tests); and 30 C.F.R. § 250.442(e) (while displacing the riser, "maintain sufficient hydrostatic pressure . . . to maintain a safe and controlled well condition.").

flow of hydrocarbons toward their final destination: the *Deepwater Horizon*.  FoF Nos. 237.

The approval of the negative pressure test by BP at 7:55 p.m., coupled with the rationale that the contradictory pressure readings could be explained by the "bladder effect," constituted not merely negligence, but gross negligence.  However, the additional failure of BP to take action *after* the exchange of critical information during the phone call, as well as the affirmative reckless conduct of continuing the well's displacement slightly more than ten minutes after the end of the phone call, constitute both gross negligence and willful misconduct.   FoF Nos. 239-243.

### B.    System Causes (the Swiss Cheese Approach): the Violation of the CWA Was the Result of an Accumulation of Acts and Omissions by BP's On-shore and Rig-based Personnel.

BP's Bly Report (TREX-00001) traced the causes of the *Deepwater Horizon* tragedy to a series of actions summarized in its "Swiss cheese" model. BP's model serves as a useful template for examining the rig-based and well-based causes (upon which BP would have the Court focus all attention).[23] Regardless of whether this accident model is used, BP undertook a series of acts and omissions, each causing accumulating risks of a major accident.

Significant in this analysis is the timeframe. While problems began as far back as October 2009, it was during the last few weeks in April when a series of last minute changes were made, escalating risks without a full understanding of those risks and without a comprehensive mitigation of those risks. The Macondo prospect had cost BP $150 million, which was $54 million over its budget of $96 million, and BP's Houston-based management team was trying to finish the well and stem the million-dollar-per-day cost of paying for the *Deepwater Horizon* to remain at Macondo.

---

[23] The Swiss cheese model does not, however, evaluate the larger systemic causes of the Macondo disaster, which are discussed below in Section IV.C.

1.     **BP Violated the Safe Drilling Margin Regulation, Misled MMS, and Ended up with a "Fragile" Well.**

*Purpose of a Safe Margin.* During normal drilling operations of a well like Macondo, the operator must keep its mud weight above the pore pressure to control the well, but also maintain a cushion between the mud weight and the fracture gradient to be able to respond to a kick without fracturing the wellbore. This cushion is the "safe drilling margin." The MMS regulations require that when an operator can no longer maintain the safe drilling margin identified in its application submitted to MMS, the operator "must suspend drilling operations and remedy the situation."  30 C.F.R. § 250.427(b).

*BP did not Maintain a Safe Margin at Macondo.* BP's problems with this well's drilling margin began in October 2009.  FoF No. 75.  In this instance, BP actually drilled part of that interval with no margin at all, let alone the safe drilling margin identified in its submission to MMS, and thereby risked what its operations geologist referred to as "a potentially uncontrollable well control event."  *Id.*

By March 26, 2010, BP had submitted a drilling permit application to MMS demonstrating that BP would keep a safe drilling margin of 0.5 pounds per gallon (ppg) between its mud weight and the fracture gradient all the way down to total depth. FoF No. 54.  Then, in April 2010, BP drilled the well's final interval. Days before completing the drilling of this interval, BP had estimated that the weakest fracture gradient in the interval was nowhere near the fracture gradient measurement that BP had previously made near the top of the interval. In fact, BP estimated its fracture gradient at merely 0.2 ppg above the interval's highest pore pressure, thereby providing BP with far less than the 0.5 ppg drilling margin that it needed to comply with the law. FoF No. 65. Similarly, BP's "single-point of accountability" for pore pressure/fracture

27

gradient detection on this well (Mr. Albertin) has confirmed that the well's margin was no more than 0.2 ppg. Nevertheless, on April 9, BP made the decision to drill the final 100 feet of the well, despite having "minimal, if any, drilling margin."[24] FoF No. 65. According to Dr. Huffman, BP's decision to drill the final 100 feet was "one of the most dangerous things" he has seen in all his years of experience.  FoF No. 72.

*BP Deceived MMS.* One of BP's contemporaneous admissions that it had run out of margin was its April 15, 2010 Memorandum of Change (MOC), executed by senior members of its Well Team, including Mark Hafle and John Guide. FoF No.s 66-67. Despite having measured a pore pressure in the final interval at 14.15 ppg, the MOC indicated that the BP well team was using a downhole fracture gradient (14.5 ppg) "based on actual circulating conditions we have put the wellbore under since having losses and fixing them." *Id.*  But on the very same day BP submitted an application to MMS ("Application for Revised Bypass") that reported a different fracture gradient for the final interval of the well (16.0 ppg). FoF No. 69.

*BP's Defense is Unavailing.* With one exception, each expert who testified at trial regarding the drilling margin at the bottom of the well indicated that it was narrow. *See* Huffman 714:24-715:2; Benge 2257:3-6, 2319:2-6; Beck 7078:23-7079:3. The one exception was BP's expert Adam Bourgoyne, whom BP presented in response to the evidence of BP's failures to maintain a safe margin and of BP's misrepresentations in the papers it submitted to MMS.[25] Dr. Bourgoyne's central argument is that a pressure test at the top of an interval applies throughout

---

[24] BP's failure to maintain the required "safe drilling margin" violated 30 C.F.R. § 250.427(b), §250.401; §250.427(a) and §250.428(a).

[25] Dr. Bourgoyne did not estimate the weakest fracture gradient, or a kick margin for the April interval, or a method for calculating those figures. *See generally* TREX 8173 (Bourgoyne Expert Report) and 8174 (Bourgone Rebuttal Expert Report); *see also* Bourgoyne 7673:21-7674:12 (claiming to have included in his reports various data that, in fact, were not cited in his reports).  FoF No. 61.

the entire interval even if the *actual* downhole conditions clearly reveal that the interval's weakest fracture gradient was far less. Dr. Bourgoyne's argument is refuted by the language of 30 C.F.R. § 250.427(a), which requires operators to take into account "hole-behavior observations" in deciding when to stop drilling and set casing, and by the fact that MMS required operators to identify their fracture gradient separately from their pressure test result. More importantly, Dr. Bourgoyne's argument ignores common sense, as the Court itself explicitly acknowledged during the trial (when the Court noted, "what we are talking about, is this like a weakest link issue?"). FoF No. 57. Notably, in the final interval, tests at the top of the interval showed a high fracture gradient, while in actuality the bottom of the interval gave way entirely, yielding the loss of "full returns" to the formation at one point and continued losses on the very final day of drilling. FoF No. 72. It is not safe or appropriate to ignore known information about actual conditions while slavishly following results shallower in the hole. *Id.*

In the end, BP got to the bottom of the well by drilling without an adequate margin, and left the well in an unstable, "fragile" condition, which adversely impacted the final cement job.

## 2.   BP's Risky Decisions on the Cement Job Were Driven by Concerns About the Fragile Well, and by the Need to Save Time and Money.

Testimony of Glen Benge and BP's own documents show that BP knowingly took additional risks on the Macondo cement job, assuming it could perform a remedial "squeeze job" later. BP took these risks to save time and money and to deal with the fragile state of the bottom of the well resulting from the lack of drilling margin.[26] FoF Nos. 80-83. Driven by these dual concerns, BP took risks -- knowing that they were risks – knowing that they would result in a

---

[26] The BP "wells team" knew "there was a tight pour [sic] pressure frac rating to get the cement around" at Macondo. Bly 1441:2-3. When BP designed the cement job, "[e]mphasis was given to limiting ECD to prevent fluid losses [into the formation]." TREX-1 at 61.

"shittie" cement job. FoF No. 105.  Mr. Benge listed nine "accumulating risks." FoF No. 90-92. Some of those risks were "chemistry" risks related to slurry design (the slurry's ability to work, *see* FoF Nos. 90-97), while others were "physics" risks (operational risks in placing the slurry, *see* FoF Nos. 98-125). But BP barely considered these risks independently, and never examined the impact of those combined risks on the cement job as a whole. FoF No. 352.

Eventually, those accumulating risks became reality:  it is simply a fact that the cement did not set up and did not form a barrier to prevent hydrocarbons from flowing from the formation into the well. BP's own cement expert, Dr. Calvert, specifically *agreed* with the expert of the United States, Mr. Benge, on that issue. Even BP's John Guide agreed. FoF No. 80, 135. The cement job thus violated 30 C.F.R. § 250.420(a)(2) ("Your casing and cementing programs must . . . prevent the direct and indirect release of fluids from any stratum through the wellbore into offshore waters").   The cement job was also obviously causal: had the cement worked, hydrocarbons would not have flowed.

In response to Mr. Benge's testimony, BP focused its case on Halliburton. However, it was BP, not Halliburton that had final authority in the majority of the risks that BP took. FoF No. 82-88. For example, it was BP who decided to limit the pump rates and the "bottoms up" (due to the facture gradient), while Halliburton simply ran the pumps. FoF No. 107-110. It was BP who decided to pump the cement job without waiting for the complete test results from Haliburton regarding stability of the cement slurry. FoF No. 98-100. Other BP decisions were directly contrary to Halliburton's recommendation, such as BP's decision to run the casing with six centralizers, in contravention of Halliburton's advice to use more than three times that number. FoF Nos. 103-106. The proper centralizers were on the rig, and running fewer centralizers was a last-minute decision made by BP's Houston-based Wells Team Leader (Mr. Guide). BP Houston

engineer Brett Cocales − resigned to his supervisor's decision to use only six centralizers − sent this e-mail that is striking not only for its cavalier nature, but also its unfortunate *lack* of prophecy: "who cares, it's done, end of story.  Will probably be fine. . . ." FoF No. 106.

Of course, the cement never had a chance to set up: BP did not wait long enough for the cement to set before it accepted the negative pressure test and displaced the mud from the riser, thus under balancing the well and relying on the un-set cement to keep the hydrocarbons from entering thewell.Indeed, even BP's cement expert (Calvert) admitted that the cement job failed because it had not sufficiently hardened.  FoF No. 129-140.

### 3.  Constant Change:  the Final Two Weeks of Operations, the Temporary Abandonment Plan, Well Testing and Monitoring.

The process of temporary abandonment required BP to secure the well and remove the *Deepwater Horizon* BOP and riser. Another rig would later return to complete the well for production.  Unfortunately, because of the fragile state of the Well, the *Deepwater Horizon* was sitting for days on end without finishing the temporary abandonment, at a cost to BP of nearly one million dollars per day. FoF No. 22. BP needed the *Deepwater Horizon* to move on, because it was behind schedule and needed to drill other wells, including a May 16, 2010 deadline to begin a well (the  "Kaskida" project) or lose its lease, its investment, and its ability to produce oil from that well. FoF No. 23.

In this situation, BP's team made numerous last minute changes to stop the financial losses and complete the work at Macondo. Thus, in addition to the numerous last minute changes to the cement program, there was a chaotic ramp-up to the temporary abandonment of Macondo, most of which occurred between April 12 and April 20. During this period, BP produced at least five different Temporary Abandonment plans. FoF No. 147-161. Even after the Temporary

31

Abandonment plan was final, and had been approved by MMS, BP changed the plan again. FoF No. 162.

Against this backdrop, BP declared the negative pressure test a success -- despite pressure readings on the drill line -- and continued to displace the drilling mud with seawater in order to complete the temporary abandonment at Macondo and move on to the next well.  To save more time, BP then authorized simultaneous rig operations (SIMOPs) that interfered with the ability of Transocean and Sperry to monitor for kicks. Unfortunately, with the weeks of chaos preceding these decisions in the final hours, the decisions and their consequences seem almost inevitable.

### 4. BP Selected the Deepwater Horizon's BOP for this Fragile Well, Knowing That It Was Not Outfitted with Safer Duel-Centering BSRs, and Knowing That Maintenance of the BOP Was Questionable.

The BOP story is a simple one. The BOP had two emergency systems that each failed to shear the drill pipe and seal the wellbore after the explosions on the night of April 20, and thus allowed the discharge of oil to the Gulf of Mexico to continue for months.[27] FoF No. 317, 328. First, the "AMF/Deadman" system did not work due to poor maintenance. FoF No. 326, 329. Second, the "Autoshear" system did not work because the Blind Shear Ram ("BSR") was unable to center the off-centered drill pipe. BP's own experts agree that these systems failed. FoF No. 282, 317.

BP is responsible for both of these failures. FoF No. 311. BP is also responsible for selecting the *Deepwater Horizon* and its inadequately equipped BOP to complete Macondo (when another rig left the well due to hurricane damage), despite knowing of the fracture gradient issues at Macondo, knowing of maintenance issues on the BOP, and knowing of the

---

[27] This section does not relate to the BOP's functions as a well-control device, but rather to the BOP's emergency functions in the event of a loss of well control. Nor do we address the "EDS" function here.

limitations of the BSR.  FoF No. 268, 269.

*AMF*. Testimony of Rory Davis, and BP and Transocean documents, showed that maintenance of the BOP was inadequate. As a result of this poor maintenance, during the "AMF" attempt the BOP was unable to trigger the blind shear ram and it did not stop the blowout. A mis-wired solenoid and a depleted battery (which had not been replaced for two-and-a-half years despite Cameron's recommendation of annual replacement) conspired to ensure that the BSRs did not activate, let alone shear the pipe and seal the well. FoF No. 317, 320. BP's expert, Dr. Zatarain, agrees. FoF No. 317.

BP was aware of maintenance issues on the Deepwater Horizon. Numerous audits showed that maintenance records were inaccurate and incomplete at best, and at times, simply false. FoF No. 297. BP was also aware that there were many instances of overdue maintenance and critical inspections and testing that were not performed. FoF Nos. 297-298. For example, BP's September 2009 assessment of the Deepwater Horizon's rig conditions found "excessive" overdue maintenance, consisting of 390 uncompleted jobs, which would have required over 3500 man hours.  Had BP followed up on those audits, required proof that all BOP maintenance was up to date, and that critical inspections and tests had been performed, the dead 27 volt battery and the mis-wired solenoid would have been identified. FoF No. 326. BP thus violated 30 C.F.R. § 250.446 ("You must maintain your BOP system to ensure that the equipment functions properly.").

BP's selection of the *Deepwater Horizon* BOP, with knowledge of its maintenance problems, was negligent and allowed oil to continue to flow for months after the explosion.

*Autoshear*.  In addition, BP knew that the BOP was using a 10-year old blind shear ram with minimal capacity to center the drill pipe. BP was also aware that other BSRs offered better

capacity for centering the drill string for shearing during emergency disconnection. FoF No. 279. Ram blocks with dual-centering blades could be substituted with no downsides other than cost. FoF No. 281.  Ultimately, when the BSR was activated, the drill pipe was off center and the BSR in the BOP could not center and shear the pipe.[28]  FoF No. 282. BP's expert, Dr. Shanks, agrees. FoF No. 282.

Again, BP selected the *Deepwater Horizon's* BOP – equipped with a BSR that had minimal centering capacity, and poorly maintained -- for Macondo, despite knowing full well of the narrow drilling margin and fragile geology of the well.

### C.   Systemic Underlying Causes of the Blowout: BP's Corporate Culture (The Entire Block of Cheese).

Beyond the specific instances of the negative pressure test (immediate cause) and willful misconduct (the accumulation of acts and omissions of the immediate and system causes), are the over-arching systemic principles: a well-managed company would implement a quality process safety management system to minimize the risks of major accidents. BP did not do so.

The Bly Report's "Swiss cheese" shows that BP made decisions –driven by cost cutting, avoiding non-productive time, and the need to deliver the well on time – that increased risks in an already risky situation. In other words, BP's acts and omissions increased the size of the hole in each "slice of cheese," thereby increasing the likelihood that the "disaster spear" would penetrate all slices together. It was not mere chance that disaster occurred; only a company with a reckless attitude, driven by cost cutting measures, and without a functioning process safety system, would make so many risky decisions without thinking about how all the slices line up.

---

[28] The Court heard conflicting opinions on *why* the drill pipe was off center (*e.g.,* whether it was off center due to rig drift, pressure from below, or the weight of the travelling block from above); but that question is not relevant. The relevant fact is that the pipe *was* off center, and the BSR was simply unable to center and shear the pipe to stop the flow.

1.    **BP Should Have Implemented Basic Principles of Process Safety Management:  Systematic Analysis of Major Risks, and <u>Management of Accumulating and Changing Risks</u>.**

The Court heard a lot of testimony regarding safety management systems. But all of the testimony can be summarized as follows: no matter how many *personal* safety policies BP had in place, BP's Drillings and Completions unit simply was not implementing *process* safety, and within that unit were BP's engineers and operations personnel on the Macondo Wells Team. FoF No. 342, 343, 347-349. Instead, they were following procedures that focused on reducing costs and non-productive time over evaluating the real risks of major accidents. And the result was a major accident. FoF No. 349.

Dr. Bea testified that not only were BP's process safety systems were inadequate and had been for years, he had personally recommended improvements to BP. Examples of failings in process safety have been discussed throughout this brief and in the proposed Findings, because when terms such as "risk" and "change" are used, process safety is implicated. For example, Mr. Benge testified to nine risks related to the cement job, and testified that BP never analyzed the accumulating risks of these decisions.  FoF No. 352, 353. Other examples include:

- Exceeding the safe drilling margin and failing to report this information to MMS;
- Failing to provide additional physical barriers during temporary abandonment;
- Displacing the riser before setting the cement plug;
- Installing a lock-down sleeve during temporary abandonment instead of during completion operations, and then choosing to "set" the lock-down sleeve using drill pipe instead of drill collars.

FoF No. 352.

In response to evidence about failings in process safety, BP took several tacks, none of which proved that BP was implementing an appropriate process safety management system.

First, BP touted its internal *personal* safety systems, records, and awards (*e.g.*, testimony

35

of Mssrs. Shaw and O'Bryan). However, personal safety relates to slips, trips, and falls and is more synonymous with occupational safety; a proper process safety management system includes components dedicated to hazard identification, risk analysis, risk management, and management of risks introduced through changes to a plan or design. Personal safety is a subset of process safety but not vice versa. FoF No. 338.

Second, BP focused on the "bridging document," whereby the contractors' systems apply to contractor-owned rigs (in this case Transocean's "HSE" program governed on the *Deepwater Horizon*). Again, this is a red herring. Transocean's HSE systems were personal, not process safety systems. FoF No. 345, 346. Moreover, using Transocean's HSE for rig worker safety does not exempt BP -- which made all significant decisions as to design of the well – from implementing process safety procedures such as risk identification and management of change with respect to drilling and abandoning the well.  It was BP's Houston-based personnel, not the Transocean rig-based personnel, who made the decisions as to well design, cement design, whether to run the cement bond log, the number of centralizers, pumping cement prior to receiving satisfactory lab test results, selection of production casing, and the temporary abandonment procedure. FoF No. 346 fn.22, 352.

Third, BP touted myriad internal procedures that it contended would collectively amount to an appropriate process safety system. However, to the extent any of those policies addressed risks of major accidents, those policies did not apply to the BP's Gulf of Mexico Drillings and Completions unit. BP's Curtis Jackson – BP;s director for HSSE ("Health, Safety, Security & Environment") for the Gulf of Mexico -- had no knowledge of any effort to implement process safety principles in the Gulf of Mexico. FoF No. 347. Likewise, Cheryl Grounds, BP's top engineer for Process Safety and Engineering, testified that she had no process safety engineers

36

working in the Gulf of Mexico Drillings and Completions unit at the time of the blowout. FoF No. 348. Further, if such policies did apply in Drillings and Completions, BP's Macondo Wells Team did not follow those policies. As a specific example, BP's Drilling and Wells Operating Practice requires that "deviations" from its practices be approved in a formal "Management of Change process." FoF No. 163. But, at Macondo, the Wells Team reduced the number of centralizers, dropped the cement bond log, and chose to displace the riser before setting the cement plug – all changes from the plan that were not documented with a Management of Change analysis. FoF No. 352, 353.

Thus, BP's arguments as to its process safety systems do not counter the evidence that such systems were inadequate at best and non-existent at worst.

> ### 2.      Instead of Using Process Safety Management, BP Had a "We Can Get Away with It" Culture.

Within the Gulf of Mexico Drilling and Completions unit, the Macondo Team, under the leadership of Wells Team Leader John Guide, was responsible for management and execution of BP's operation of the Macondo Well.

This Team was not working well. E-mails among the team members describe "paranoia," "chaos," "insanity," and "flying by the seat of our pants." Last minute changes were greeted with "who cares . . . will probably be fine." FoF No. 41. Mr. Guide's boss told him, "You . . . don't seem to realize that you are responsible for everything we do on the rig," FoF No. 42, while Mr. Guide himself wondered:

> What is my authority?  With the separation of engineering and operations I do not know what I can and can't do. The operation is not going to succeed if we continue in this manner.

FoF No. 30. These failures in the corporate attitude, and failure to have clear lines of

authority to make decisions about risk management, are failures on a systemic level. BP chose to ignore these systemic causes in its Bly investigation, citing "litigation" concerns. FoF No. 11. The Court should not similarly ignore these causes.

**V.     Housekeeping**

      **A.      Transocean's OPA Liability.**

The Court previously approved a Consent Decree between the United States and Transocean that resolved the United States' CWA claim against Transocean, but that settlement did not resolve the Second Claim for Relief: declaratory judgment of liability under OPA. As to Transocean's liability under OPA, the Court's Order on summary judgment (the "*SJ Order*", Rec.Doc. 5809) left open certain questions that can be addressed now.[29]

First, Transocean is an operator of the offshore facility for purposes of OPA section 2704(c)(3). In ruling on summary judgment, this Court noted that whether Transocean is an operator of the offshore facility was an "open question." *SJ Order* at 11-12. The Court also identified the applicable legal definition of "operator" *SJ Order* at 23, holding that an "operator" must "manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id*. (quoting *United States v. Bestfoods*, 524 U.S. 51, 66-67 (1998)).

Based on that definition, the Court found disputed facts. But evidence at trial proved that Transocean was one of the operators of the well. Specifically, Transocean conducted well control operations, including using the BOP to shut in the well, circulating fluids, handling kicks, installing casing, and monitoring the well. FoF No. 356-359. As the entity that "managed,

---

[29] The Court also found disputed facts as to whether there was a discharge of oil from the Deepwater Horizon "on or above the surface of the water." The parties have held this issue for later phases. If Transocean addresses this in its papers, the United States will reply.

directed and conducted" the operations at the well, including operations relating to controlling the well to prevent the release of hydrocarbons into the environment, Transocean was an "operator" of the Macondo Well facility within the meaning of OPA. As an operator of the offshore facility on the OCS, Transocean is liable to the United States for all removal costs, under Section 1004(c)(3) of OPA.  33 U.S.C. § 2704(c)(3).

Second, the evidence also shows that Transocean violated at least two applicable regulations that were the proximate causes of the incident. As explained in the Findings, the well monitoring and well control response during displacement of the riser after the negative pressure test was not performed correctly, in violation of 30 C.F.R. § 250.401.  FoF No. 360. Similarly, the BOP was not maintained properly, in violation of 30 C.F.R. § 250.446. Such violations were a proximate cause of the incident. Therefore, with respect to the discharges on or above the surface of the water, Transocean faces unlimited liability.  33 U.S.C. § 2704(c)(1)(B). The dollar amount of such liability is not the subject of this civil action at this time.

### B.   Additional Bases for BP's CWA "Operator" Liability.

Again, on Summary Judgment the Court held BP liable under the CWA as "owner" of the well.  *SJ Order*.  Applying the legal definitions of "operator" and "person in charge" as set out in the *SJ Order*, evidence at trial also showed that BP was an "operator" of the Well. More importantly, BP was also an "operator" and "person in charge" of the *Deepwater Horizon* itself, in that the Well Site Leaders had ultimate authority, and exercised that authority, as to decisions on the rig related to drilling and well operations. Thus, even if the Fifth Circuit were to reverse this Court on the *SJ Order*, BP would still be liable under the CWA.

### VI.   Conclusion.

Whether the Court looks to a single bad act – the gross departure from the standard of

care regarding the negative pressure test – or a series of inter-connected failings – cementing, the negative pressure test, well monitoring, well control response, BOP failure, *etc.* – it has been demonstrated by a preponderance of the evidence that discharges of oil from the Macondo Well resulted from the gross negligence and/or willful misconduct of BP.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

40

Respectfully submitted,

BRIAN HAUCK
Deputy Assistant Attorney General
Civil Division

PETER FROST
Director, Torts Branch, Civil Division
Admiralty and Aviation
STEPHEN G. FLYNN
Assistant Director
MICHELLE DELEMARRE
Senior Admiralty Counsel
SHARON SHUTLER
JESSICA SULLIVAN
JESSICA McCLELLAN
MALINDA LAWRENCE
Trial Attorneys

/s/ R. Michael Underhill
R. MICHAEL UNDERHILL, T.A.
Attorney in Charge, West Coast Office
Torts Branch, Civil Division
U.S. Department of Justice
7-5395 Federal Bldg., Box 36028
450 Golden Gate Avenue
San Francisco, CA 94102-3463
Telephone:  415-436-6648
Facsimile:  415-436-6632
E-mail:  mike.underhill@usdoj.gov

DANIEL SPIRO
Senior Trial Counsel
KELLEY HAUSER
ELIZABETH YOUNG
Trial Attorneys
Civil Fraud Section, Commercial Litigation
Branch
U.S. Department of Justice

ROBERT DREHER
Acting Assistant Attorney General
Environment & Natural Resources Division

SARAH HIMMELHOCH
Senior Litigation Counsel
SCOTT CERNICH
Senior Counsel
ABIGAIL ANDRE
DEANNA CHANG
A. NATHANIEL CHAKERES
RACHEL HANKEY
Trial Attorneys

/s/ Steven O'Rourke
STEVEN O'ROURKE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone:  202-514-2779
Facsimile:  202-514-2583
E-mail:  steve.o'rourke@usdoj.gov

DANA J. BOENTE
United States Attorney
Eastern District of Louisiana
SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana
650 Poydras Street, Suite 1600
New Orleans, LA  70130
Telephone:  504-680-3000
Facsimile:  504-680-3184
E-mail:  sharon.d.smith@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

Date:  June 21, 2013.                           /s/  Steven O'Rourke
                                                U.S. Department of Justice