**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | § | MDL-2179 |
|     "DEEPWATER HORIZON" in the | § | |
|     GULF OF MEXICO, on | § | |
|     APRIL 20, 2010 | § | SECTION "J" |
| | § | |
| THIS DOCUMENT RELATES TO: | § | JUDGE BARBIER |
| | § | MAG. JUDGE SHUSHAN |
|     *10-cv-3059 and 11-cv-0516* | § | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**<u>STATE OF LOUISIANA'S POST-PHASE ONE TRIAL BRIEF</u>**

**NOW INTO COURT,** comes Plaintiff, the State of Louisiana through Attorney General James D. "Buddy" Caldwell ("Louisiana" or "State"), who hereby submits this Post-Phase One Trial Brief.  Louisiana has coordinated its filing with the PSC and focuses here on the BP Defendants'[1] institutional willfulness,[2] which warrants an award of punitive damages under general maritime law,[3] as well as the highest possible award under the Clean Water Act ("CWA").[4]  Louisiana will also address the misconduct of the Transocean Defendants ("TO")[5] and Halliburton ("HESI") that warrants the imposition of punitive damages upon them as well.

## I.    Introduction

The purpose of imposing punitive damages is to punish the defendant for willfull and wanton conduct and to deter future wrongdoing.[6]  BP's willful misconduct is found in its (1) full awareness of the risks associated with deepwater drilling, (2) decision to continue drilling at the Macondo well despite numerous warnings and red flags indicating serious problems from the *Deepwater Horizon* ("*DWH*") crew, (3) repeated decisions to ignore rules prohibiting continued drilling in too narrow margins, and (4) its decision to keep drilling operations going elsewhere after April of 2010, even when it did not understand the cause of the *DWH* disaster.

Here, BP admitted its pre-disaster awareness of the potentially profound social, economic and ecological consequences of an uncontrolled deepwater blowout.  With full awareness of the risks, BP continued to plow ahead with drilling the Macondo well to save money, despite

---

[1] The BP Defendants include BP Exploration & Production, Inc., BP p.l.c., BP America Production Company, and BP North America Products, Inc.

[2] "Institutional willfulness" refers to conspicuous corporate policy and practices, such as those adopted by Defendants here.

[3] In general, admiralty punitive damages are available for willful or wanton misconduct.  *See Atl. Sounding Co., Inc. v. Townsend*, 557 U.S. 404 (2009); *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008).

[4] Under the RESTORE Act, Pub. L. No. 112-141, §1601, 126 Stat. 404, 588 (2012), 80% of any Clean Water Act recovery will be allocated among the Gulf Coast States.

[5] The Transocean Defendants include Triton Asset Leasing GmbH, Transocean Holdings LLC, Transocean Offshore Deepwater Drilling Inc., and Transocean Deepwater Inc.

[6] *See Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 432 (2001).

illegally ignoring drilling margins.  Further, former BP CEO Tony Hayward continuously spoke of the importance of safety while slashing hundreds of millions of dollars from the safety budget. In other words, BP's philosophy put profits ahead of safety, and in its mind, the occasional disaster is just part of the cost of engaging in a very lucrative business.

An important question in any case where there is substantial dispute about who breached what duty of care (or circular finger-pointing combined with claims of lack of sufficient knowledge) is to ask:  What did the defendant do once there was no doubt that there was a problem?  Post-disaster conduct sheds light on an alleged bad actors' state of mind.[7]  Here, when the known potential consequences of deepwater drilling materialized, and no one could explain why, what did BP do?  It kept drilling, even as it prepared a toothless internal investigation. BP's continued drilling post-disaster demonstrates willfulness on an institutional level.

TO consistently acted from the top down with a reckless disregard for the consequences at the Macondo well, through actions prior to the spudding of the well and continuing to the date of the blowout.  TO has for years operated with a conscious disregard for its personnel and equipment in a manner that foreshadowed this tragedy.  BP and TO were complicit in their willful misconduct, most particularly in their disregard for the known risks of drilling in the Gulf of Mexico.  Both BP and TO consciously valued time and money over safety.

Like TO, HESI also allowed BP to continue with actions that it knew posed a probability of great harm to human life and the environment, but never warned or even recommended that BP stop its reckless activities. What is worse is that HESI placed a person in a position with decision-making authority that HESI knew to be unqualified for that role and exercised no oversight over his actions.  These decisions were not of a lone low-level HESI employee, but reflected those of HESI as a company.

---

[7] Some post-disaster conduct, however, is done simply to protect stock prices and mitigate potential penalties.

The misconduct that led to the *DWH* disaster warrants the imposition of punitive damages upon each of the Defendants.  The willful and wanton disregard for safety and the environment, which resulted in damages that continue to be realized to this day, must not be tolerated, but rather discouraged in order to prevent a disaster of such magnitude from recurring.

## II.    Legal Standard

Punitive damages are available under general maritime law for "tortious acts of a particularly egregious nature."[8] The Fifth Circuit has held that "punitive damages are available under the general maritime law where a defendant is shown to have engaged in willful and wanton conduct."[9]  Further, the Supreme Court noted that "action taken or omitted in order to augment profit represents an enhanced degree of punishable culpability. . . ."[10]

There are three standards that may be applied in holding a corporation liable for punitive damages based on the actions of its employees[11]:

> Under the majority approach, punitive damages are treated indistinguishably from compensatory ones, and traditional respondeat liability attaches.  Principals are held accountable for their agents' misdeeds that occur within the scope of employment.  In contrast, a significant minority of courts follow the strict complicity rule of *Lake Shore & M.S.R. Co. v. Prentice*, 147 U.S. 101 (1983), which limits principal liability to those acts participated in, authorized or ratified.  Finally, the *Restatement* rule incorporates the *Lake Shore* limitation but extends liability, regardless of authorization or ratification, to acts committed by a managerial agent within the scope of employment.[12]

The Supreme Court is equally divided on the issue.[13]

---

[8] *Atl. Sounding Co., Inc. v. Townsend*, 557 U.S. 40; *see also Exxon Shipping Co. v. Baker*, 554 U.S. 471, 493 (2008) (finding that punitive damages are available "in cases of . . . 'enormity,' where a defendant's conduct is 'outrageous,' owing to 'gross negligence,' 'willful, wanton, and reckless indifference for the rights of others,' or behavior even more deplorable") (internal citations omitted).

[9] *Matter of P&E Boat Rentals, Inc.*, 872 F.3d 642, 649 (5th Cir. 1989).

[10] *Exxon Shipping Co. v. Baker*, 554 U.S. at 494.

[11] These standards apply to punitive damages under both common law and general maritime law.

[12] *CEH Inc. v. F/V Seafarer*, 70 F.3d 694, 703 (1st Cir. 1995) (internal citations omitted).

[13] *See Exxon Shipping Co.*, 554 U.S. at 484.

The Fifth Circuit adopted the *Lake Shore* approach in *Matter of P&E Boat Rentals, Inc.*, which held that "punitive damages may not be imposed against a corporation when one or more of its employees decides on his own to engage in malicious or outrageous conduct."[14] A majority of courts, however, follow a lesser standard of vicarious liability for punitive damages, either applying traditional *respondeat superior* or the Restatement's managerial capacity approach. Under the managerial capacity approach, a corporation may be held liable for punitive damages caused by the conduct of an employee if the employee possessed "managerial capacity" in the dealings at issue.[15]   One with managerial capacity is described as one who has discretionary or policy-making authority.[16]  As described by one court:

> A key determination in determining whether an agent acts in a managerial capacity is to look at the nature of what the agent is authorized to do by the principal and whether the individual has discretion regarding both what is done and how it is done.  Job titles, in and of themselves, are not necessarily dispositive.[17]

The managerial capacity approach has been adopted by numerous federal circuit courts, as well as a majority of state courts.[18]  This approach serves three important functions in modern tort cases, specifically: (1) deterring employment of unfit persons for important positions, (2) encouraging supervision of persons in important positions, and (3) preventing large corporations from unfairly escaping liability for their wrongdoings because of their size.

---

[14] 872 F.3d at 652.

[15] RESTATEMENT (SECOND) OF TORTS §909 ("Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if . . . (c) the agent was employed in a managerial capacity and was acting in the scope of employment.").

[16] *See, e.g., Albuquerque Concrete Coring, Co. v. Pan Am World Servs., Inc.*, 879 P.2d 772 (N.M. 1994) (describing one with managerial capacity as one who "formulates, determines and effectuates his employer's policies, one with discretion or authority to make ultimate determinations independent of company consideration and approval of whether a policy should be adopted").

[17] *Id.; see also Egan v. Mut. of Omaha Ins. Co.*, 620 P.2d 141, 148 (Cal. 1979) (finding that "the determination whether employees act in managerial capacity, however, does not necessarily hinge on their 'level' in the corporate hierarchy.  Rather, the critical inquiry is the degree of discretion the employees possess in making decisions that will ultimately determine corporate policy").

[18] *See, e.g., Protectus Alpha Navigation Co. v. N. Pac. Grain Growers, Inc.*, 767 F.2d 1379 (9th Cir. 1985); *CEH Inc. v. F/V Seafarer*, 70 F.3d 694 (1st Cir. 1995).

4

In adopting the more restrictive rule enumerated in *Lake Shore*, the Fifth Circuit reasoned that the rule was "more faithful to the teaching of the Supreme Court in *The Amiable Nancy* and *Lake Shore*," and it was consistent with the notion that "[p]unitive damages are imposed to punish the wrongdoer and deter others from engaging in similar conduct in the future."[19] Today, however, more than thirty years after the Fifth Circuit's ruling and after much change in corporate culture, this reasoning now supports the adoption of a lesser standard such as the managerial capacity approach rather than that set forth in *Lake Shore*.

First, as discussed by the First Circuit in *CEH Inc. v. F/V Seafarer*, *The Amiable Nancy*[20] and *Lake Shore* courts did not consider "the more modern concerns reflected in the contrary caselaw and, indeed, the [Supreme] Court has indicated that *Lake Shore* may have been unduly restrictive even for its own time."[21] Further, the First Circuit noted that most courts outside of the maritime context do not follow the *Lake Shore* decision, and there is "no reason . . . why vicarious liability should be treated differently on sea than on land."[22]

Second, the "managerial capacity" rule is consistent with the purposes behind the imposition of punitive damages that are: "intended to punish the defendant and to deter future wrongdoing."[23] As stated above, "imposition of corporate punitive damages based upon the theory of managerial capacity tends to deter the employment of unfit persons for important positions . . . and encourage their supervision."[24] Further, applying the managerial capacity standard to impose punitive damages prevents large corporations from unfairly escaping liability

---

[19] *P&E Boat Rentals,* 872 F.2d 642, 652 (5th Cir. 1989).
[20] 16 U.S. (3 Wheat) 546 (1818).
[21] 70 F.3d 694, 704 (1st Cir. 1995) (citing *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556 (1982) ("[T]he Court may have departed from the trend of late 19th-century decisions when it issued *Lake Shore*. . . .")).
[22] *Id.*
[23] *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 432 (2001).
[24] *Albuquerque Concrete Coring, Co. v. Pan Am World Servs., Inc.*, 879 P.2d 772 (N.M. 1994) (internal citations omitted); *see also Smith v. Wade*, 461 U.S. 30, 45-46 n.12 (1983).

for their wrongdoings.   "A corporation can act only though its agents and employees."[25] "In the modern world of multinational corporations, corporate control must be delegated to managing agents who may not possess the requisite upper-level executive authority traditionally considered necessary to trigger imposition of corporate liability for punitive damages."[26]  Given the requisite managerial structure of corporations, it is unreasonable to distinguish between the guilt of a manager acting on behalf of the corporation and the corporation.[27]   To do so would provide corporations with the opportunity to unfairly escape corporate liability by insulating executives and officers from daily, hands-on management.[28]   Here, Defendants must not be given that opportunity.   Accordingly, this Court should adopt a less stringent standard for imposing punitive damages upon a corporation based on the acts of its employees.[29]  If, however, the Court chooses to follow the Fifth Circuit's current approach, imposing punitive damages would still be appropriate against BP, TO, and HESI under the circumstances of this case.

## III.   Evidence of Willful and Wanton Misconduct

---

[25] *Protectus Alpha Navigation Co. v. N. Pac. Grain Growers, Inc.*, 767 F.2d 1379 (9th Cir. 1985).

[26] *Albuquerque Concrete Coring, Co. v. Pan Am World Services, Inc.*, 879 P.2d 772 (N.M. 1994); *see also Goddard v. Grand Trunk Ry.*, 57 Me. 202, 222-23 (1869) ("A corporation . . . has no mind but the mind of its servants; it has no voice but the voice of its servants; and it has no hands with which to act by the hands of its servants. . . . All attempts, therefore, to distinguish between the guilt of the servant and the guilt of the corporation; or the malice of the servant and the malice of the corporation; or the punishment of the servant and the punishment of the corporation, is sheer nonsense; and only tends to confuse the mind and confound the judgment.").

[27] *See Doralee Estates, Inc. v. Cities Serv. Oil Co.,* 569 F.2d 716 (2d Cir.1977) ("To hold that punitive damages may not be imposed unless there is participation in the tortfeasing decision by the highest corporate executives is unrealistic given the giant size corporations. . . .").

[28] *See Gen. Motors Acceptance Corp. v. Froelich*, 273 F.2d 921 (D.C. Cir. 1959) ("A contrary rule [shielding a corporation from liability for punitive damages in the absence of explicit authorization or ratification of the particular conduct] would permit punitive damages against smaller concerns . . . but not against a large corporation whose size and ramifications make express authorization by the top executives of tortious acts of its working-level agents highly unlikely."); *Protectus Alpha Navigation*, 767 F.2d at 1386 ("It seems obvious that no corporate executive or director would approve the egregious acts to which punitive damages would attach, and therefore, no recovery for more than compensatory damages could ever be had against a corporation if express authorization or ratification were always required.");  *CEH Inc. v. F/V Seafarer*, 70 F.3d 694, 705 (1st Cir. 1995).

[29] Federal courts "may decline to enforce the ancient rule of the common law under conditions as they now exist." *Funk v. United States*, 290 U.S. 371, 382 (1933).

### a.  BP

BP's Mark Bly, Executive Vice President of Safety and Operational Risk tasked with BP's internal investigation of the *DWH* disaster, testified that this tragic incident was preventable.[30] In addition to it being preventable, Mr. Bly also admitted that this incident was predictable as indicated in BP's Risk Matrix for the Gulf of Mexico drilling operations.[31] The Risk Matrix predicted a worst-case outcome that included greater than 200 acute or chronic injuries, environmental impact greater than 100,000 barrels of oil, financial loss and affecting international legislation.[32] Mr. Bly testified that the purpose of BP's internal investigation was in part to identify the specific issues that would help BP as a company change its conduct from lessons learned. Despite this, BP willfully made a conscious decision to continue drilling exploratory wells while the investigation related to the Bly Report was ongoing and prior to the issuance of the investigation results and lessons learned.[33]  This is not the action of a company that cares about safety; it is the action of a company that puts profits ahead of safety as BP did during all operations at the Macondo well.

BP recklessly neglected to correct its dysfunctional management and process safety systems, which it had known for years to be broken and ineffective at the highest corporate levels. Prior to April 20, 2010, as a result of industrial accidents of tragic proportions, BP was put on notice that its safety management system was not preventing the loss of life and risk to the environment as it was ostensibly designed to do. As a result, BP created a new safety management system, the Operating Management System ("OMS"), but inexplicably and inexcusably elected not to implement it at Macondo. The failure to implement OMS at Macondo

---

[30] Trial Tr. Mark Bly, 1141.
[31] *Id.* at 1142; TREX 2701.
[32] TREX 2701.
[33] Trial Tr. Mark Bly, 1149.

facilitated a series of shortsighted and reckless decisions that resulted in the blowout, loss of life and the resulting pollution of the Gulf of Mexico. Former BP CEO Tony Hayward acknowledged that had BP implemented OMS on the *DWH* before April 20, 2010, it "undoubtedly" could have avoided the disaster.[34]

Plaintiffs' process safety expert, Dr. Robert Bea, opined that BP was previously put on notice that placing an emphasis on short-term benefits of savings related to money and time could cause major loss of life and property.[35] Dr. Bea further noted that cost-cutting, failing to invest in process safety and the emphasis on production from BP's management, impaired the company's process safety performance.[36] Despite having been made aware from multiple sources, including government, industry, internal and external sources, such as Dr. Bea, of its systemic safety problems and what needed to be done to correct them, BP did little in the way of change. Dr. Bea explained that "the organizational and systemic causes of [BP's 3 previous] . . . major accidents are virtually identical to the systemic organizational causes of the Macondo blowout."[37] The record is clear, and there is no assertion to the contrary, that BP excluded MODUs like the *DWH* from OMS, its safety audits and its Major Accident Risk assessments.[38] Dr. Bea characterized this failure to implement OMS as "tragic, or egregious."

BP's total disregard for process safety and its corporate culture can be exemplified by a February 3, 2009, press release from Tony Hayward wherein he stated that the mantra of "every dollar counts" was to be embedded in the Gulf of Mexico Strategic Performance Unit Operating OMS Handbook.[39]   Although BP argues that this philosophy was only about eliminating

---

[34] TREX 25001 (A. Hayward Dep., 793:23-794:8).
[35] TREX 20001 (Bea/Gala Report, at 33).
[36] *Id.*
[37] *Id.* at 29.
[38] TREX 25001 (A. Hayward Dep., 180-181, 154-156, 182-194, 304, 662-663, 774, 793 and 794).
[39] *Id.* at 24.

unnecessary costs such as payment for unused equipment, the record shows that this philosophy permeated all aspects of BP's operations and was fully embraced by Macondo's Well Team Leader John Guide. In fact, Mr. Guide noted in his 2009 evaluation that "[t]he Horizon team has embraced the Every Dollar Matters" culture.[40] This risk-tolerant culture led to a series of decisions that were designed to save BP money but ultimately had tragic results.

BP's willful misconduct can also be seen in the reckless manner in which it drilled the Macondo well, which was characterized by its own geologist, Stuart Lacy, as "like a bat out of hell."[41] BP drilled so fast that its "Tiger Team" of geophysicists could not provide their analysis of real-time data fast enough to allow the drill team to maintain a safe drilling margin.[42] Because of this reckless pace the Tiger Team's ability to give meaningful pore pressure and fracture gradient predictions was out run, and the result was multiple well control events including a number of kicks and loss in circulation.[43]

The United States' geophysicist expert, Dr. Allan Huffman, opined and testified that his review of BP's drilling of the Macondo well revealed that BP repeatedly violated the safe drilling margin, and in some cases, drilled ahead with no margin at all. He further found that BP consistently provided false reports, or wholly failed to report critical information to what was formerly known as the Mineral Management Service ("MMS").[44] It is Dr. Huffman's opinion that BP violated safe drilling margins at four separate intervals and failed to act as a prudent operator.[45] He testified that "BP played it fast and loose with their pressure integrity test, and yet when they had hole behavior observations that were clearly valid, they tended to discount them

---

[40] TREX 6294, at 2; Trial Tr., J. Guide, 8629.
[41] TREX 1072.
[42] TREX 214.
[43] TREX 1035 at BP HZN 2179 MDL 00452101.
[44] Trial Tr. A. Huffman, 664; TREX 7510, AT 22.
[45] Trial Tr. A. Huffman, 669:18-670:7.

and continued to drill ahead without a safe drilling margin."[46] In three intervals, Dr. Huffman stated that BP's conduct was "totally unsafe and dangerous, not just regulatory violations here, unsafe from any industry practice that I'm aware of."[47]  Dr. Huffman found BP's actions in this regard "egregious beyond anything I have seen in my career."[48]

BP's reckless drilling is demonstrated by its conduct following a kick experienced at the Macondo well on October 26, 2009. BP's Bobby Bodek created a PowerPoint setting forth two options for BP for going forward: set casing or drill ahead.[49] If BP chose to set casing, it would lose a string of casing resulting in a smaller hole in the reservoir interval. If it chose to drill ahead with no margin in an over-pressurized zone, it risked "a potentially uncontrollable well control event."[50] Dr. Huffman noted in his report that the decision was one of safety versus economics. Consistent with its reckless behavior at Macondo, BP chose economics and drilled ahead.[51]

Likewise, Frederick "Gene" Beck, HESI's drilling engineering expert, was of the opinion that BP's failure to maintain a safe drilling margin violated MMS requirements. He further stated that BP created a situation that was "dangerously unstable" and "unreasonably risky."[52] Mr. Beck noted that BP's reckless drilling left an unreasonably narrow drilling margin in an open hole section of the well below the bottom-most casing shoe, which necessitated lowering the density of the cement. He further opined that if BP managed its drilling margin more effectively, it could have avoided the necessity of using foam cement.[53]

In addition to the challenges in the cement design caused by BP's reckless drilling speed, several last-minute changes in the safety critical temporary abandonment procedure guaranteed

---

[46] *Id.* at 720:9-12.
[47] *Id.* at 670:8-15.
[48] *Id.* at 670:12-17.
[49] TREX 1337; Trial Tr. A. Huffman, 681-683.
[50] TREX 1337.
[51] TREX 7510, at 26.
[52] TREX 61117 (Beck Rebuttal Report, 18); Trial Tr. G. Beck, 7171.
[53] TREX 61117 (Beck Rebuttal Report, 27).

the failure of the Macondo well operations. BP created five different temporary abandonment plans between April 14 and April 20, 2010.[54]  BP's Well Team Leader, John Guide, wrote his boss David Sims on April 17, 2010, that:

> [O]ver the past four days there has been so many last-minute changes to the operation that the WSLs [Well Site Leaders] have finally come to their wits end. The quote is "flying by this seat of our pants." . . . The operation is not going to succeed if we continue in this manner.[55]

Gene Beck testified that BP's last-minute flurry of changes were made "on the fly," were made in violation of BP's own internal standards, and "rendered the well a high risk and dangerous well."[56] Dr. Bea concluded likewise, as did TO, concluding that these changes "contained unnecessary risk and contributed to the cause of the incident."[57]  BP did not use risk assessment procedures or prepare management-of-change documents for these decisions, nor did it otherwise evaluate and address the risks and the potential adverse effects on personnel and process safety.[58] Making a number of changes over such a short period of time without performing a formal risk assessment resulted in the final temporary abandonment plan containing unnecessary potential negative outcomes.[59] Further, the final temporary plan used by BP did not have the required approval of MMS.[60]

BP's reckless actions and willful misconduct are possibly best exemplified by its decision to use only 6 centralizers. HESI's Gene Beck opined that BP's drilling engineer Brian Morel's use of 6 centralizers, as opposed to the 21 recommended by HESI, violated BP's written practice requiring at least 30 meters (100 feet) of centralized pipe above the distinct permeable zone.[61]

---

[54] *Id.* at 10.
[55] TREX 1694; TREX 1144.
[56] Trial Tr. G. Beck, 7175:2-23.
[57] TREX 3808 (Transocean Investigation Report, Vol. I, 79-80).
[58] *Id.*
[59] *Id.*
[60] *Id.*
[61] TREX 8140 (Beck Revised Report, 30 (citing TREX 184 at BP-HZN-2179MDL 00269667)).

BP's recklessness is further evidenced by the statement made by Brett Cocales to Brian Morel, wherein Cocales wrote, "[b]ut, who cares, it's done, end of story, will probably be fine and we'll get a good cement job."[62] The United States' cement expert Glen Benge opined that the lack of centralization caused by BP's decision to use only 6 centralizers contributed to the cement's failure to isolate the hydrocarbon zones and the failure of the shoe track cement, which was a contributing factor that led to the blowout.[63]

Another factor dooming the cement job was BP's defiance of its own recommended practice (as well as HESI's) to perform a full bottoms up.[64] Almost all experts that testified regarding the matter, including Gene Beck,[65] Glen Benge,[66] Calvin Barnhill,[67] and Dr. Bea,[68] agreed that it was unreasonable for BP to not perform at least one full bottoms up at Macondo, especially given all of the other decisions made by BP complicating the well and the cement job. Bill Ambrose, head of TO's investigative efforts, concluded that not performing a full bottoms up increased risk at Macondo but saved BP time and money.[69] Consistent with BP's reckless behavior and willful misconduct, BP again chose money.

In light of the above, it defies reason and good drilling practice that BP failed to perform a cement bond log ("CBL") on the cement at the Macondo well. BP's written policies state that a CBL should always be run where the top of cement is less than 1000 feet above the shallowest hydrocarbon bearing zone, as it was at the Macondo well.[70] Despite this as well as the fact a

---

[62] TREX 203, at 2; TREX 1367.
[63] Trial Tr. G. Benge, 2307.
[64] Trial Tr. N. Chaisson, 6292-6294.
[65] TREX 8140 (Beck Revised Report,  31, 78-79); TREX 61117 (Beck Rebuttal Report, 35-37).
[66] TREX 5990 (Benge Report, 22); Trial Tr. G. Benge, 2379-2380.
[67] TREX 7676 (Barnhill Report, 20).
[68] TREX 20001 (Bea/Gale Report, at xviii).
[69] Trial Tr. B. Ambrose, 6122:13-17.
[70] TREX 184, at 2-4, DWOP, Section 26; TREX 184, ( ETP GP 10-60, at 10, "Zonal Isolation Requirements During Drilling Operations and Well Abandonment and Suspension, Sections 5.3.1 and 5.3.3); TREX 8140 (Beck Revised Report, 30, 88).

Schlumberger crew was on board the *DWH* and available to perform a CBL, BP willfully and recklessly chose to incur the increased risk of not running the test.[71] Gene Beck opined that the need to evaluate the effectiveness of the cement job in this case was obvious, but "BP chose to cancel the cement bond log to save time and money. . . ."[72] Had a CBL been performed and channeling discovered, a remedial squeeze job repairing the cement barrier could have been performed and zonal isolation achieved.[73] BP's intentional and reckless choice not to perform a CBL is causative of hydrocarbons entering the wellbore, the blowout, and resulting damages.

BP again acted with a reckless disregard for safety when it decided to use a loss circulation material ("LCM") as a spacer in the displacement of the Macondo well. This decision saved BP money in two ways: BP did not have to buy material specifically designed for use as a spacer, and avoided the application of certain environmental laws and the resulting expense of transporting the LCM to shore for commercial waste disposal.[74] BP's own investigation referred to the use of the LCM as "sham recycling."[75] Other Defendants' experts opined that (1) this use of the LCM was "inappropriate" because it likely narrowed or clogged the kill line used during the negative pressure test leading to the misinterpretation of the test;[76] (2) the use of the LCM as a spacer "confused and confounded the negative pressure test;"[77] and (3) the use of the LCM as a spacer increased risk but saved BP money.[78] Not surprisingly, BP once again knowingly and intentionally sacrificed safety to save a few dollars.

---

[71] TREX 8140 (Beck Revised Report, 30, 88).
[72] *Id.* at 89.
[73] TREX 25096 (G. Walz Dep., 215:14- 216:17).
[74] TREX 25134 (M. Sepulvado Dep., 225-226); TREX 25195 (L. Lindner Dep, 406-407.
[75] TREX 1019, at 2.
[76] TREX 8140 (Beck Revised Report, 102).
[77] TREX 7676 (Barnhill Report, 28).
[78] Trial Tr. B. Ambrose, 6120.

### b.  Transocean

There may be no more agreed-upon example of TO's willful and wanton misconduct than its refusal to fix its long-standing broken and dysfunctional maintenance system. In August of 2009, only 7 months prior to the blowout of the Macondo well, BP performed an audit of TO's Health Safety Security & Environment Management Systems, the results of which were so alarming that TO was only "[c]onditionally approved (YELLOW) to work in the Gulf of Mexico Strategic Performance Unit – must close all audit findings within 12 months or face being removed from the list of approved contractors."[79]  In disregard of the ISM Code, the *DWH* had not been in for dry docking inspection, maintenance and repair during her entire nine-year life.[80] Geoff Webster, plaintiffs' maritime expert, characterized TO's maintenance and repair of the *DWH* as "reckless and inexcusable."[81]

Further evidence of TO management's dysfunctional maintenance system can be seen in internal communications between Steve Bertone, Maintenance Supervisor on the *DWH*, and his supervisor, Rig Manager Paul Johnson. On October 28, 2009, less than 6 months before the tragedy at issue, Mr. Bertone wrote as follows:

> The issue that the Deepwater Horizon is currently experiencing in my opinion is a lack of proper maintenance on the equipment for many years, the drive behind this has been from a performance induced standpoint. . . .When the rig does receive maintenance time that time is generally taken up by repairing the equipment that was broke… Once again limping along with equipment failures. . . . There is just too much equipment in need of repairs or maintenance performed and not enough personnel or time to throw at it. . . .  The rig is always fighting the maintenance system RMS, which has an overloaded amount of work that could not be completed even by doubling the amount of workers on the rig.[82]

---

[79] TREX 954.
[80] ISM Code Section 10.1-10.4; TREX 20004 (Webster Report); TREX 25242 (M. Williams Dep., 103-104).
[81] TREX 20004 (Webster Report, 10).
[82] TREX 5618.

Mr. Webster testified regarding the RMS II Morning Report for April 19, 2010, the last generated before the blowout. It contained 222 overdue maintenance items/tasks and 115 additional jobs (including 76 "high-priority" jobs) awaiting parts.[83] Mr. Webster characterized TO's actions in this regard as "gross neglect" of the *DWH*.[84]

TO's reckless neglect in the maintenance of the *DWH*'s BOP is directly causal to the sinking of the rig and the extensive spill resulting therefrom. All experts agree (except TO's Greg Childs) that when the electrical and hydraulic power through the MUX cables was lost, a depleted battery in the BOP's blue pod and the mis-wired solenoid in the yellow pod prevented the AMF/Deadman emergency feature from activating the blind sheer ram.[85] The dead 27 volt battery was the direct result of TO's failed maintenance system. As it related to this safety critical piece of equipment, TO egregiously did not follow the manufacturer's replacement policy of replacing the battery every year.[86] The depleted battery on the *DWH* was 2.5 years old on the date of the blowout.[87] TO also failed to test the battery when it was brought to the surface and moved to the Macondo well site.[88] During the life of the BOP, TO never tested the AMF sequence to make sure the batteries and the system were functioning properly, another example of TO's callous disregard for the safety of those aboard the rig and the environment.[89]

Further, the batteries and the yellow pod that contained 2 mis-wired solenoids, one of which prevented the yellow pod from activating the AMF/Deadman.[90] All testifying experts agree, including TO's, that this resulted from TO's poor maintenance and was avoidable had TO

---

[83] TREX 664; Trial Tr. G. Webster, 3955:23-3958:22.
[84] Trial Tr. G. Webster, 3958:16-22.
[85] Trial Tr. R. Davis, 2649-2652; *see also* TREX 23067 & D3268.
[86] Trial Tr. R. Davis, 2652.
[87] *Id.*
[88] *Id.* at 2653:2-8.
[89] *Id.* at 2653:9-12; Trial Tr. G. Childs, 5322.
[90] Trial Tr. R. Davis, 2653:22-2655:1.

performed related testing.[91]   BP's expert, Arthur Zatarain, testified that the battery/solenoid issues could and should have been anticipated and resolved prior to the BOP's failure.[92]

TO intentionally and recklessly disarmed and inhibited the *DWH*'s Integrated Alarm and Control System, which was specifically designed to control a number of critical safety functions automatically and without human intervention.[93] Upon the detection of gas, the system was designed to sound the general alarm and activate the Emergency Shutdown system and control the activation of the Fire and Gas safety systems.[94] TO's Chief Electronics Technician, Michael Williams, testified that when he complained to his superiors about inhibiting the general alarm, he was told do it anyway.[95] Williams also testified that many sensors, which served as the initiation point for signaling an influx of gas, were placed into passive mode and removed from service.[96] Although TO provided various excuses for this willful misconduct, including the risk of losing power aboard the rig and alarm fatigue, Williams stated that it was simply done to avoid waking people up at night.[97] Geoff Webster testified that the Master of the *DWH*, Curt Kuchta, was required by ISM to note the condition of the alarms and to insure that they were in proper working order.[98] TO failed to comply with the ISM Code in this regard. Webster also testified that in overriding the automatic mode functions of the IACS, TO defeated the purpose of the system and "created an unreasonably dangerous workplace on its vessel."[99] TO's conduct cannot be characterized as anything other than intentional, meeting the requirements of any standard for the imposition of punitive damages.

---

[91] Trial Tr. G. Childs, 5322-5323.
[92] Trial Tr. A. Zatarain, 8474:5-23.
[93]TREX 4141; TREX 7566 (Y. Kepplinger Dep., 54, 68-69; TREX 25205 (D. Young Dep., 58-61); TREX 22700 (Webster Report, 11).
[94] TREX 25143 (KMI 30(b)(6) Simonsen Dep., 34, 55-56).
[95] TREX 25242, 135:5-22.
[96] TREX 4140; TREX 25242 (M. Williams Dep., 169-174).
[97] TREX 25242 (M. Williams Dep., 138:11-20; 239:19-240:17); TREX 25205 (D. Young Dep., 141-142).
[98] Trial Tr. G. Webster, 3879.
[99] TREX 7672 (Webster Report, 4).

In another blatant disregard of the ISM Code, TO maintained a confusing dual command structure in which the Master of the *DWH* did not have overriding authority and responsibility to take necessary actions on behalf of his crew.[100] All testifying experts agreed that the Master was not in charge of the vessel at all times.[101] Geoff Webster and Andrew Mitchell, BP's maritime expert, both testified that Captain Kuchta's lack of authority constituted a major non-conformity with the ISM code as well as a significant contributing factor to the sinking of the rig and resultant spill.[102]  The problematic and confusing dual command structure resulted in a situation where on April 20, 2010, Captain Kuchta waited for Jimmy Harrell, the OIM, to arrive on the bridge rather than exercising his overriding authority and immediately activating the emergency disconnect system (EDS). In failing to do so, Captain Kuchta failed to take his last clear chance to save his ship, his crew and to preserve the environment.[103] Mr. Webster opined that had the EDS been activated immediately before the fire, the well would have been shut in and the vessel would have drifted off location.[104] Even TO's maritime expert Jeff Wolfe acknowledged that Captain Kuchta did not timely activate the EDS, and to the contrary, delayed activation.[105]

TO management had been on notice of this ISM non-conformity as early as 2002 when Det Norske Veritas' ("DNV") initial ISM Code certification identified that the authority and responsibilities of the Master and the OIM were in conflict and required that action be taken to remedy the non-conformity by August of 2002.[106]  TO was again put on notice of this problem by DNV in 2009, when it told TO "as previously observed…there is no clear and absolute indication of the Master's overriding authority and responsibility" as required by the ISM

---

[100] Trial Tr. G. Webster, 3747, 3959; Trial Tr. A. Mitchell, 9442-9443; TREX 22668 (J. Wolfe Dep., 236:12-16).
[101] Trial Tr. G. Webster, 3747, 3959.
[102] TREX 50361, Section 5; Trial Tr. G. Webster, 3747; Trial Tr. A. Mitchell, 9442-9443.
[103] Trial Tr. A. Mitchell, 9443:23-9444:3.
[104] Trial Test. G. Webster, 4007:25-4008:4.
[105] TREX 22668 (J. Wolfe Dep., 328:5-14; 344:7-22).
[106] TREX 5483; TREX 22695 (Mitchell Report, 20).

Code.[107] For 7 years TO's management willfully and intentionally violated the ISM Code with knowledge that its failure to rectify this problem could result in exactly the type of situation that occurred on April 20, 2010.   The dual command structure was endorsed and approved by TO CEO Steve Newman in 2007 in connection with TO's acquisition and integration of Global Santa Fe. Newman personally approved a 2007 memorandum which stated that on all rigs, the OIM, as opposed to the Master, was responsible "for the health, safety, and welfare of all persons and all activities conducted on their respective rig.[108] By maintaining the dual command structure, TO failed to act in a manner that could have saved lives and prevented the spill.

Additionally, TO management knowingly and intentionally increased its risk profile in an attempt to save money by changing its rig crew's work schedule from 14 days on, 14 days off to 21 days on, 21 days off. A Lloyd's Register survey of the rig crew indicated that the schedule resulted in "a perception that risks were increasing in relation to human fatigue, mainly relating to changes in hitch patterns".[109] Steve Newman admitted that this was done in the pursuit of keeping costs down.[110] This cost-cutting measure contributed to the rig crew's inability to properly monitor the well on the evening of April 20, 2010, as shown by the fact that Assistant Drillers Donald Clark and Dewey Revette were on day 20 of a 21 day hitch, and Assistant Driller Steven Curtis was on day 19 of a 21 day hitch.[111]

### c.  Halliburton

HESI knowingly embedded a cement engineer, Jesse Gagliano, at BP's Houston offices that lacked the required experience and skills to handle the Macondo well. In the weeks

---

[107] TREX 1768.
[108] TREX 5643.4.1 ("The OIM is authorized and obligated to take whatever actions he considers necessary to prevent injury, loss of life, damage to equipment/structure, and/or loss of rig and well operation integrity."); Trial Tr. S. Newman, 4721:12-4722:24.
[109] TREX 929.
[110] Trial Tr. Steve Newman, 4663-4666.
[111] Trial Tr. Randy Ezell, 1722-1723; TREX 687.

preceding the incident at issue, BP engineers voiced concern about the quality of Gagliano's work.[112] There were questions regarding his competency and the timeliness in which Gagliano was performing his tasks and specifically, the reports he was providing to BP related to cement jobs.[113] Indeed, 3 days prior to the blowout and only 2 days prior to the cement being pumped on the production casing at Macondo, BP drilling engineers stated that Mr. Gagliano was not "cutting it."[114] BP Drilling Engineer Team Leader Greg Walz received multiple complaints about Gagliano's timeliness.[115] Walz believed that the decision to fire Gagliano from his position at BP had been made prior to the blowout.[116] Despite this, HESI and BP allowed Mr. Gagliano to remain in his position and relied upon him to provide services related to the cement job on the production casing at Macondo. This decision satisfies any standards to impose punitive damages.

HESI exacerbated the problem by failing to provide Gagliano the technical support, supervision and structure he so clearly needed in performing his tasks for BP.[117] Gagliano was not required to submit his cement designs or recommendations to anyone at HESI prior to providing them to BP.[118] HESI's continued refusal to provide Gagliano, whom they knew to be unqualified and lacking of skill, support and supervision in the circumstances of the Macondo well was willful. This decision led to the failure of the cement pumped on the production casing at Macondo to provide zonal isolation, which was a proximate cause of the blowout.

---

[112] TREX 25025 (B. Cocales Dep, 84-88); TREX 25026 (G Walz Dep., 326-327, 468-470, 625, 627); TREX 25026 (R. Faul Dep., 253-254, 336-337); Trial Tr. T. Roth, 3138:17-3139:2.
[113] TREX 1390, at BP HZN 2179MDL 00315388; TREX 5801, at HAL-000-8628; Trial Tr. T. Roth, 3212-3213; TREX 25026 (G. Walz Dep., 318-331).
[114] TREX 1390, at BP HZN 2179 MDL 00315388.
[115] TREX 25026 (G. Walz Dep., 324).
[116] *Id.* at 318-331.
[117] TREX 25026 (R. Dugas Dep., 174); TREX 20526 (R. Faul Dep., 107-108, 311, 330-331); Trial Tr. J. Gagliano, 6691:1-7.
[118] Trial Tr. J. Gagliano, 6691:6-16.

Additionally, HESI had no standardized basis of design ("BoD") prior to the Macondo incident.[119] Therefore, whatever document that was to serve as a BoD for the work at Macondo was left up to the discretion of Mr. Gagliano. HESI acknowledged that Mr. Gagliano never provided risk assessments in any of the documents that HESI purports to be BoD documents related to Macondo.[120] HESI also failed to perform 8 of the 9 required tests on the slurry that was actually pumped, as required by the contract between HESI and BP and BP's Best Practices.[121] Shockingly, these reckless omissions include HESI's failure to perform a foam stability test on the .09 gps retarder concentration foam cement slurry that was actually pumped on the production casing at Macondo, and the testing that was actually completed on the .08 gps slurry was never provided to BP before the blowout.[122] All tests that were performed by HESI showed that the cement design used on the production casing at the Macondo well was clearly unstable.[123] Despite this indication of instability, no warning was ever provided to BP.  HESI stood idly by while BP went full steam ahead in what HESI knew to be a train wreck.

## IV.   Conclusion

Louisiana respectfully requests that this Court find that BP, TO, and HESI each, at both the corporate level and through the actions of their employees, engaged in willful and wanton conduct that resulted in the *DWH* disaster that continues to oil Louisiana's shoreline.

---

[119] Trial Tr. T. Probert, 2923- 2924; TREX 4357, at  5.
[120] Trial Tr. J. Gagliano, 6682:2-3.
[121] Trial Tr. G. Benge, 2371:22-25; TREX 4477; TREX 634; TREX 2703.
[122] TREX 984, HAL-DOJ-0000043; Trial Tr. J. Gagliano, 6745-6746, 6793:10-6794:3; TREX 984, at 6.
[123] Trial Tr. T. Roth, 3131:7-25.

Dated this 21st day of June, 2013.


Respectfully submitted,


JAMES D. "BUDDY" CALDWELL
LOUISIANA ATTORNEY GENERAL

James Trey Phillips
First Assistant Attorney General
Megan K. Terrell
Assistant Attorney General
Section Chief –Environmental
State of Louisiana
P.O. Box 94005
Baton Rouge, LA 70804-9005
Telephone: (225) 326-6708


HENRY DART,
ATTORNEYS AT LAW P.C.

/s/ Henry T. Dart
Henry T. Dart
Grady J. Flattmann
510 N. Jefferson St.
Covington, LA 70433
Telephone: (985) 809-8093
**Special Counsel for Plaintiff**
**Attorney General, State of Louisiana**


SHOWS, CALI, BERTHELOT &
WALSH, LLP

/s/ E. Wade Shows
E. Wade Shows
628 St. Louis Street
Baton Rouge, LA 70802
Telephone: (225) 346-1461
**Special Counsel for Plaintiff**
**Attorney General, State of Louisiana**


KANNER & WHITELEY, LLC

 /s/ Allan Kanner
Allan Kanner
Elizabeth B. Petersen
Douglas R. Kraus
Allison M. Shipp
701 Camp Street
New Orleans, LA 70130
Telephone: (504) 524-5777
**Special Counsel for Plaintiff**
**Attorney General, State of Louisiana**


USRY, WEEKS, &
MATTHEWS, APLC

/s/ T. Allen Usry
T. Allen Usry
1615 Poydras St.
Suite 12
New Orleans, LA 70112
Telephone: (504) 592-4641
**Special Counsel for Plaintiff**
**Attorney General, State of Louisiana**


MARTEN LAW, PLLC

/s/ Bradley M. Marten
Bradley M. Marten
Linda R. Larson
1191 Second Avenue
Suite 2200
Seattle, WA 98101
(206) 292-2600
**Special Counsel for Plaintiff**
**Attorney General, State of Louisiana**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Post-Phase One Trial Brief has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 21st day of June, 2013.

Kanner & Whiteley, L.L.C.

_/s/ Allan Kanner_____
Allan Kanner
a.kanner@kanner-law.com