# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  Oil Spill by the Oil Rig *Deepwater Horizon* in the Gulf of Mexico, on April 20, 2010 | MDL No. 2179 |
| | SECTION: J |
| This document applies to: *All Cases* | JUDGE BARBIER |
| | MAGISTRATE SHUSHAN |

## TRANSOCEAN'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Brad D. Brian
Michael R. Doyen
Luis Li
Daniel B. Levin
Susan E. Nash
MUNGER, TOLLES & OLSON LLP
355 So. Grand Avenue, 35th Floor
Los Angeles, CA 90071
Tel:  (213) 683-9100
Fax:  (213) 683-5180
Email:  brad.brian@mto.com
        michael.doyen@mto.com
        luis.li@mto.com
        daniel.levin@mto.com
        susan.nash@mto.com

John M. Elsley
ROYSTON, RAYZOR, VICKERY & WILLIAMS LLP
711 Louisiana Street, Suite 500
Houston, TX 77002
(713) 224-8380

Steven L. Roberts
Rachel Giesber Clingman
Sean D. Jordan
SUTHERLAND ASBILL & BRENNAN LLP
1001 Fannin Street, Suite 3700
Houston, Texas 77002
Tel:  (713) 470-6100
Fax:  (713) 354-1301
Email:  steven.roberts@sutherland.com
        rachel.clingman@sutherland.com
        sean.jordan@sutherland.com

Kerry J. Miller
FRILOT, LLC
110 Poydras St., Suite 3700
New Orleans, LA 70163
Tel:  (504) 599-8194
Fax:  (504) 599-8154
Email:  kmiller@frilot.com

*Counsel for Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH*

# TABLE OF CONTENTS

**Page**

PROPOSED FINDINGS OF FACT ........................................................................ 1

I.    PHASE ONE PROCEEDINGS ............................................................... 1

    A.    Proceedings Leading To Phase One Trial ............................................ 1

    B.    Phase One Parties ................................................................................ 3

    C.    Summary of Findings .......................................................................... 6

II.    BP, AS OPERATOR, DIRECTED DECISION-MAKING FOR THE MACONDO WELL ............................................................................... 11

    A.    BP Was The Operator And Primary Leaseholder On Macondo ...................... 11

    B.    BP Was Responsible For Designing The Well And Implementing The Drilling Plan ....................................................................................... 12

    C.    BP Hired And Directed The Work Of The Other Contractors At Macondo ....... 12

    D.    BP Considered The Deepwater Horizon The "Best Rig" In Its Fleet ................. 14

III.    THE DEEPWATER HORIZON DRILL CREW WAS WELL-TRAINED AND EXPERIENCED ...................................................................... 17

    A.    Transocean Provided State-Of-The-Art Training .................................. 17

    B.    Transocean Training Complied With BP's Policies ............................. 25

    C.    The Drill Crew Aboard The Deepwater Horizon on April 20, 2010, Was Experienced And Respected ................................................................ 27

    D.    BP Considered the Horizon Crew "The Best In The Business" ....................... 28

    E.    The Crew Had Successfully Handled A Prior Kick On Macondo ..................... 29

IV.    TRANSOCEAN AND THE DEEPWATER HORIZON WERE COMMITTED TO SAFE OPERATIONS ................................................................... 32

    A.    Transocean Implemented A Strong Safety Culture On The Deepwater Horizon .............................................................................................. 32

    B.    Transocean Maintained A Corporate Structure To Manage Safety ................. 33

    C.    Transocean Implemented Specific Processes On Its Rigs Designed To Ensure Safety ...................................................................................... 34

    D.    Transocean Shut Down The Fleet And Hired The Lloyd's Register To Make Sure Its Safety Culture Functioned Properly ............................. 37

    E.    The Lloyd's Survey Found That The Leadership On  The Deepwater Horizon "Put Safety First" ................................................................... 39

    F.    Transocean And The Deepwater Horizon Had Received Widespread Recognition For Safe Operations ........................................................ 40

# TABLE OF CONTENTS
(continued)

**Page**

V.      BP'S RISKY PLANNING SET THE STAGE FOR LATER BP DECISIONS THAT CAUSED THE BLOWOUT ................................................................. 42

      A.    Deepwater Drilling Requires The Operator To Maintain A Delicate Balance Between Controlling The Well And Fracturing The Formation ........... 42

      B.    BP Failed To Maintain A Safe Drilling Margin At Macondo ............................ 43

      C.    BP Adopted An Unsafe Temporary Abandonment Plan ...................................... 49

VI.     BP AND HALLIBURTON DESIGNED AND IMPLEMENTED A CEMENT JOB DOOMED TO FAIL ................................................................................ 55

      A.    BP And Halliburton Were Responsible For The Cement Job ............................ 55

      B.    The Cement Design Was Driven By The Narrow Drilling Margins .................. 56

      C.    BP And Halliburton Used An Unstable Cement Slurry ...................................... 57

      D.    BP Knew That Gagliano Was Not "Cutting It Anymore" ................................. 59

      E.    BP And Halliburton Failed To Test The Cement Prior To Pumping It .............. 60

      F.    BP Proceeded Without Resolving Whether The Float Collar Had Converted ....................................................................................................... 61

      G.    BP And Halliburton Failed To Comply With Industry Practice Regarding Wait on Cement Time ............................................................... 63

      H.    BP Compounded The Risks To The Cement Job By Violating Numerous Industry And Recommended Practices ................................. 65

      I.    The BP Wells Team And Halliburton Knew Or Should Have Known That The Cement Was Likely To Fail ..................................................... 69

      J.    In Violation Of Its Own Policy, BP Failed To Perform A Cement Bond Log ................................................................................................................. 70

VII.    BP DESIGNED AND IMPLEMENTED A FLAWED NEGATIVE TEST THAT IT THEN CALLED A SUCCESS ................................................... 71

      A.    BP Was Responsible For Designing, Supervising And Approving The Negative Test ................................................................................................ 71

      B.    In Violation Of Its Own Policies, BP Had No Standard Written Procedure For Conducting Negative Pressure Testing ..................................... 73

      C.    In The Days Leading Up To April 20, BP Made Multiple Revisions To Its Negative Pressure Testing Procedures ..................................... 73

      D.    The Negative Testing Procedure Ultimately Implemented At Macondo Did Not Comply With The Procedure Approved By The MMS ........................ 75

## TABLE OF CONTENTS
(continued)

Page

E.   As A Result Of The Frequent Changes To The Negative Pressure Testing Procedures, BP's Well Site Leaders Were Confused About The Procedures On The Morning Of April 20th ........................................................ 76

F.   BP Failed To Identify Key Parameters And Conditions For Success In The Written Negative Pressure Testing Procedures Ultimately Implemented At Macondo ................................................................................................................ 76

G.   BP's Use Of Unprecedented And Untested Lost Circulation Materials As A Spacer In The Setup Of The Negative Test May Have Confounded The Negative Test Results .............................................................................................. 77

H.   The Transocean Crew Identified And Investigated Anomalies Encountered During The Negative Pressure Testing ................................................................. 79

I.   The BP Well Site Leaders Interrupted A Proper Negative Test On Drill Pipe And Insisted The Test Be Conducted On The Kill Line ............................. 81

J.   The BP Well Site Leaders Declared The Negative Test A Success .................... 82

K.   The Record Does Not Support A Finding That The BP Well Site Leaders Relied On A Drill Crew Explanation Of The "Bladder Effect" ......................... 84

L.   The Transocean Drill Crew Worked For Several Hours Attempting To Understand The Anomalies Encountered During Negative Testing .................. 86

VIII.   THE DRILL CREW, WITHOUT FULL INFORMATION AND OPERATING UNDER AN UNSAFE DISPLACEMENT PROCEDURE DICTATED BY BP, MISSED THE FIRST ANOMALIES DURING DISPLACEMENT, AS DID BP AND HALLIBURTON ............................................................................................... 88

A.   The BP Well Site Leader Ordered Displacement To Continue After Declaring The Negative Pressure Testing A Success .......................................... 88

B.   Transocean Displaced The Well Pursuant To BP's Final Displacement Procedures .......................................................................................................... 89

C.   Monitoring The Well Is A "Team Operation" ................................................... 89

D.   The Crew Commenced Displacement Of The Riser .......................................... 91

E.   The Well Became Underbalanced At Approximately 8:52 P.M ........................ 92

F.   The First Anomaly, At Approximately 9:00 P.M., Was Subtle And Missed by All ................................................................................................................... 92

G.   BP's Onshore Engineer Told The Well Site Leader On The Rig That The Negative Test Results Were Impossible .......................................................... 93

H.   BP Well Site Leader Vidrine Returned To The Drill Floor For The Sheen Test But Failed To Notify The Crew Of BP Engineer Hafle's Concerns ............ 96

# TABLE OF CONTENTS
(continued)

Page

I.     A Flow Check At 9:08 P.M. Appeared To Show That The Well Was Under Control .................................................................... 97

J.     The Second Anomaly, Between 9:08 and 9:14 P.M., Was Missed By All .......... 98

K.     The BP Well Site Leader Instructed The Crew To Proceed With Final Displacement ........................................................... 99

L.     The Drill Crew Investigated A 9:17 P.M. Pressure Spike ................ 100

M.    The Drill Crew Investigated An Anomaly At 9:30 p.m. .................. 101

IX.   THE DRILL CREW TRIED TO SHUT IN THE WELL ........................... 105

    A.    The Drill Crew Activated The BOP ........................................ 105

    B.    The Drill Crew Diverted The Flow .......................................... 106

    C.    The Drill Crew Alerted Others ............................................... 107

X.    THE BRIDGE CREW PROPERLY RESPONDED TO THE EMERGENCY AND SUCCESSFULLY EVACUATED THE RIG ................................... 108

    A.    The Bridge Crew Was Trained To Respond To A Blowout ............ 108

    B.    The Deepwater Horizon's Command Structure Complied With Regulatory And Industry Standards ....................................... 114

    C.    The Deepwater Horizon's Alarm Systems Were Properly Configured ............. 121

    D.    The Emergency Shutdown System Was Properly Configured For A Dynamically Positioned Rig .............................................. 124

    E.    The Bridge Crew Had Only Minutes To React Between The Time The Gas Alarms Sounded And The Explosion ............................... 127

    F.    The Bridge Crew Acted Properly In Not Attempting To EDS While The Drill Crew Tried To Shut In the Well ................................. 133

    G.    Because of the Deepwater Horizon Crew's Emergency Response Efforts, Every Survivor Of The Explosions Was Able To Evacuate The Rig ............... 141

XI.   THE BOP FUNCTIONED AS INTENDED BUT COULD NOT SHUT IN THE WELL BECAUSE THE PIPE WAS FORCED OFF CENTER BY THE EXTREME FLOW FROM THE WELL ............................................. 147

    A.    DNV Conducted Post-Incident Analysis And Testing Of The BOP ............... 147

    B.    The BOP Annulars And Rams Functioned In Accordance with Their Design ........................................................................ 148

    C.    The BOP Failed to Seal the Well Because the Drill Pipe Was Off Center ........ 149

# TABLE OF CONTENTS
(continued)

Page

D.   The Force Of The Blowout Lifted And Buckled The Drill Pipe When The Drill Crew Closed The Upper Annular ............................................................. 150

E.   There Was Sufficient Flow And Pressure From The Blowout To Buckle The Drill Pipe When the Crew Closed The Variable Bore Rams at 9:47 P.M. .................................................................................................................. 152

F.   The BOP's Inability To Shear Off-Center Drill Pipe Did Not Result From Transocean's BOP Maintenance ..................................................................... 154

G.   The Separation of the Drill Pipe Above the BOP Eliminates the "Force From Above" Theories ................................................................................... 155

H.   It Is Unlikely that the Force of the Blowout Kept the Drill Pipe Buckled Until April 22 ................................................................................................ 159

XII.   THE CONTROL PODS WERE CAPABLE OF FUNCTIONING THE BLIND SHEAR RAMS THROUGH THE AMF SYSTEM ON APRIL 20 ............................ 161

A.   The Control Pods Were Redundant And Were Designed To Operate Independently ............................................................................................... 162

B.   DNV's Post-Incident Testing Demonstrated That The Yellow Pod Solenoid Could Have Functioned on April 20 .................................................. 164

C.   Post-Incident Analysis Demonstrated That The Blue Pod 27 Volt Battery Was Not Dead On April 20 ............................................................................ 169

D.   The 27-Volt Battery Was Unlikely To Have Been Drained By Age Or Use Prior To The Incident ................................................................................... 172

E.   Transocean Properly Replaced And Tested Solenoid 103Y ............................ 175

F.   The Deepwater Horizon Crew Properly Maintained The Blue Pod Batteries ...................................................................................................... 180

G.   The Deepwater Horizon BOP was tested in accordance with regulatory requirements and passed all required tests ..................................................... 183

XIII.   THE BOP WAS CONFIGURED IN ACCORDANCE WITH INDUSTRY PRACTICE AT THE TIME OF THE INCIDENT ..................................................... 184

A.   BP Was Responsible For The Original Configuration Of The BOP And Could Have Required It To Be Changed At Any Time .................................... 184

B.   The Configuration Of The BOP Complied With MMS Regulations At The Time Of The Incident ................................................................................... 185

C.   None Of The BOP Upgrades Or Modifications Was Required By Industry Practice At The Time Of The Incident ........................................................... 187

# TABLE OF CONTENTS
(continued)

**Page**

XIV.  THE DEEPWATER HORIZON WAS WELL-MAINTAINED, SEAWORTHY
AND FIT FOR SERVICE ............................................................................ 193

    A.  The Rig Maintenance Issues Raised At Trial Had No Causal Relationship
To the Blowout And Were Unsupported On The Merits.................................. 193

    B.  Transocean Provided Both Rig-Based And Shore-Based Resources For
Rig Maintenance ........................................................................................ 195

    C.  Transocean Performed Preventive And Other Maintenance On The
Deepwater Horizon On An Ongoing Basis ...................................................... 198

    D.  Transocean Performed Major Equipment Maintenance During Out-Of-
Service Periods In Accordance With The MODU Code And Other
Industry Standards ...................................................................................... 201

    E.  Transocean Required Extensive And Ongoing BOP Maintenance,
Reviewed And Approved By BP ..................................................................... 202

    F.  Frequent Third Party Inspections Verified That The Deepwater Horizon
Was Seaworthy And In Compliance With All Regulations............................... 205

    G.  BP Determined That The Deepwater Horizon Was Fit To Be Returned To
Service After Its September 2009 Audit ......................................................... 217

    H.  The April 2010 ModuSpec Survey Confirmed That The Rig Was In Good
Condition.................................................................................................... 232

    I.  No Outstanding Maintenance Issues Had Any Causal Relationship To The
Incident...................................................................................................... 236

CONCLUSIONS OF LAW........................................................................................ 239

I.  REMAINING CLAIMS AGAINST TRANSOCEAN ENTITIES............................. 239

    A.  Private Party Claims (PSC) ......................................................................... 239

    B.  States and Local Governments .................................................................... 240

    C.  United States.............................................................................................. 240

    D.  Cross-Claims / Third-Party Claims by Remaining Phase One Defendants ....... 241

II.  MOST OF THE REMAINING CLAIMS AGAINST TRANSOCEAN FAIL AS
A MATTER OF LAW.......................................................................................... 241

    A.  Transocean Is Not Liable for Damages for the Subsurface Discharge of
Oil .............................................................................................................. 242

    B.  Economic Class Members' Purportedly Reserved Punitive Damages
Claims Must Be Dismissed .......................................................................... 243

    C.  The Purportedly Assigned Claims Must Be Dismissed ................................... 245

# TABLE OF CONTENTS
(continued)

Page

III.  LIMITATION OF LIABILITY ACTION ..................................................... 247

    A.  The Shipowners' Limitation of Liability Act .................................. 247

    B.  Timeliness of Limitation Action ..................................................... 248

    C.  Limitation Notice ............................................................................ 249

    D.  The Limitation Fund ....................................................................... 249

    E.  Vessel "Owners" May Limit ........................................................... 250

IV.  THE PETITIONING TRANSOCEAN ENTITIES ARE ENTITLED TO
    LIMITATION OR EXONERATION ......................................................... 252

    A.  Two-Step Burden Shifting Procedure .............................................. 252

    B.  Step One: Negligence and Seaworthiness ....................................... 253

    C.  Step Two: Transocean Has Carried Its Burden to Prove Lack of Privity or
        Knowledge ...................................................................................... 258

V.  NO GROSS NEGLIGENCE OF ANY TRANSOCEAN ENTITY CAUSED THE
    MACONDO SPILL AND NO PUNITIVE DAMAGES MAY BE AWARDED ........ 263

    A.  The Availability of Punitive Damages ............................................ 263

    B.  Plaintiffs Must Satisfy a High Standard for Any Award of Punitive
        Damages .......................................................................................... 264

    C.  No Transocean Entity Was Grossly Negligent ................................ 272

    D.  The Doctrine of Superseding Cause Does Not Apply to the Blowout ............. 277

    E.  Even If the Court Were to Make a Finding of Gross Negligence, No
        Punitive Damages Could Be Assessed at This Time ........................ 279

VI.  BP MUST INDEMNIFY, RELEASE, AND DEFEND TRANSOCEAN FOR
    POLLUTION CLAIMS ............................................................................ 284

    A.  Indemnity and BP's Release of Claims Must Be Enforced ............. 284

    B.  BP Must Pay Transocean's Defense Costs for All Indemnified Claims ........... 288

VII.  BP, NOT TRANSOCEAN, BREACHED THE DRILLING CONTRACT ................ 289

    A.  BP Breached Its Warranty of Safe Port and Berth ......................... 289

    B.  Transocean Did Not Breach the Drilling Contract .......................... 292

VIII.  TRANSOCEAN'S OPA LIABILITY ......................................................... 293

    A.  Transocean Was Not an Owner or Operator of the Macondo Well for
        Purposes of Removal Cost Liability Under OPA § 2704(c)(3) ........................ 293

**TABLE OF CONTENTS**
(continued)

**Page**

B.      Transocean Did Not Commit Gross Negligence or Willful Misconduct, or
        Violate Any Statute or Regulation That Would Implicate the Exceptions to
        OPA's Liability Limits in OPA § 2704(c)(1)....................................................300

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Admiral Towing Co. v. Woolen,*
   290 F.2d 641 (9th Cir. 1961) ................................................................. 250

*AGIP Petroleum Co., Inc. v. Gulf Island Fabrication, Inc.,*
   56 F. Supp. 2d 776 (S.D. Tex. 1999) ................................................. 286

*AGIP Petroleum Co., Inc. v. Gulf Island Fabrication, Inc.,*
   920 F. Supp. 1330 (S.D. Tex. 1996) ................................................. 287

*Alcorn County, Miss. v. U.S. Interstate Supplies, Inc.,*
   731 F.2d 1160 (5th Cir. 1984) ........................................................... 242

*Allison v. Citgo Petroleum Corp.,*
   151 F.3d 402 (5th Cir. 1998) ............................................................. 244

*Amchem Prods., Inc., v. Windsor,*
   521 U.S. 591 (1997) ........................................................................... 245

*Atl. Sounding Co., Inc. v. Townsend,*
   557 U.S. 404 (2009) ........................................................................... 264

*B&B Insulation, Inc., v. OSHRC,*
   583 F.2d 1364 (5th Cir. 1978) ........................................................... 272

*Baker v. Raymond Int'l, Inc.,*
   656 F.2d 173 (5th Cir. 1981), cert. denied, 456 U.S. 983 (1982) ....... 261

*Baker v. S/S Cristobal,*
   488 F.2d 331 (5th Cir. 1974) ...............................................271, 272, 274

*Barber v. Texaco, Inc.,*
   720 F.2d 381 (5th Cir. 1983) ............................................................. 265

*Becker v. Tidewater, Inc.,*
   586 F.3d 358 (5th Cir. 2009) ...............................265, 273, 276, 285

*Belala v. Coastal Towing Co.,*
   No. 01-3137, 2002 WL 31729491 (E.D. La. Dec. 3, 2002) ............... 264

*Bienvenu v. Texaco, Inc.,*
   164 F.3d 901 (5th Cir. 1999) ............................................................. 284

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Birmingham Se., LLC v. M/V Merch. Patriot,*
    124 F. Supp. 2d 1327 (S.D. Ga. 2000) ................................................................. 251, 262

*BMW of N. Am., Inc. v. Gore,*
    517 U.S. 559 (1996) ................................................................................................. 279

*Bohnsack v. Varco, L.P.,*
    668 F.3d 262 (5th Cir. 2012) ................................................................................... 288

*Bragdon v. Abbott,*
    524 U.S. 624 (1998) ................................................................................................. 298

*Brister v. A.W.I., Inc.,*
    946 F.2d 350 (5th Cir. 1991) ................................................................................... 259

*Calkins v. Graham,*
    667 F.2d 1292 (9th Cir. 1982) ................................................................................. 252

*Chembulk Trading LLC v. Chemex Ltd.,*
    393 F.3d 550 (5th Cir. 2004) ................................................................................... 293

*Cia Maritima Del Nervioni v. James J. Flanagan Shipping Corp.,*
    308 F.2d 120 (5th Cir. 1962) ................................................................................... 271

*Cimino v. Raymark Indus., Inc.,*
    151 F.3d 297 (5th Cir. 1998) ................................................................................... 281

*City Nat'l Bank v. United States,*
    907 F.2d 536 (5th Cir. 1990) ........................................................................... 265, 266

*Clements v. Steele,*
    792 F.2d 515 (5th Cir. 1986) ........................................................................... 266, 277

*Coats v. Penrod Drilling Corp.,*
    61 F.3d 1113 (5th Cir. 1995) (en banc) .................................................................. 281

*Colletti v. Tiger Tugz, LLC,*
    No. 10-1099, 2011 WL 6337457 (W.D. La. Dec. 16, 2011) ................................. 260, 261

*Cont'l Oil Co. v. Bonanza Corp.,*
    706 F.2d 1365 (5th Cir. 1983) ......................................................................259, 262, 263

*Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.,*
    532 U.S. 424 (2001) ................................................................................................. 279

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Coryell v. Phipps*,
  317 U.S. 406 (1943) ........................................................................................... 259

*Cupit v. McClanahan Contractors, Inc.*,
  1 F.3d 346 (5th Cir. 1993) ......................................................................259, 262, 263

*Daughdrill v. Ocean Drilling & Exploration*,
  665 F. Supp. 477 (E.D. La. 1987) ...................................................................... 284

*Deepwater Horizon. Fireman's Fund Ins. Cos. v. M/V Vignes*,
  794 F.2d 1552 (11th Cir. 1986) ......................................................................... 255

*Diamond Offshore Co. v. A&B Builders, Inc.*,
  302 F.3d 531 (5th Cir. 2002) ............................................................................ 248

*Dick v. United States*,
  671 F.2d 724 (2d Cir. 1982) .............................................................................. 250

*Domingue v. Offshore Serv. Vessels, LLC*,
  No. 08-4668, 2009 WL 3254147 (E.D. La. Oct. 7, 2009) .................................. 255

*Donaghey v. Ocean Drilling & Explor. Co.*,
  974 F.2d 646 (5th Cir. 1992) ...................................................................... 256, 278

*Drabik v. Stanley-Bostitch, Inc.*,
  997 F.2d 496 (8th Cir. 1993) ............................................................................ 272

*Durgin v. Crescent Towing & Salvage, Inc.*,
  No. 00-1602, 2002 WL 31365365 (E.D. La. Oct. 18, 2002)............................... 246

*Dusenbery v. United States*,
  534 U.S. 161 (2002) .......................................................................................... 280

*Exxon Co. Inc. v. Sofec, Inc.*,
  517 U.S. 830 (1996) .......................................................................................... 267

*Exxon Shipping Co. v. Baker*,
  554 U.S. 471 (2008) ...............................................................................243, 264, 280

*F.D.I.C. v. Bledsoe*,
  989 F.2d 805 (5th Cir. 1993) ............................................................................ 247

*F.D.I.C. v. Philadelphia Gear Corp.*,
  476 U.S. 426 (1986)........................................................................................... 298

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Farrell Lines, Inc. v. Jones,*
530 F.2d 7 (5th Cir. 1976) ...................................................................... 253, 258

*Flink v. Paladini,*
279 U.S. 59 (1929) .............................................................................................. 250

*Florida Bahamas Lines, Ltd. v. Steel Barge Star 800 of Nassau,*
433 F.2d 1243 (5th Cir. 1970) ............................................................................ 247

*Fontenot v. Mesa Petroleum Co.,*
791 F.2d 1207 (5th Cir. 1986) .................................................................. 248, 291

*Forrester v. Ocean Marine Indem. Co.,*
11 F.3d 1213 (5th Cir. 1993) .............................................................................. 251

*Foster Wheeler Energy Corp. v. An Ning Jiang MV,*
383 F.3d 349 (5th Cir. 2004) ............................................................................. 285

*Freeman v. City of Dallas,*
242 F.3d 642 (5th Cir. 2001) .............................................................................. 280

*Frescati Shipping Co. v. CITGO Asphalt Ref. Co.,*
__ F.3d __, 2013 WL 2099746 (3d Cir. May 16, 2013) .............................. 289, 290, 291, 292

*Gibboney v. Wright,*
517 F.2d 1054 (5th Cir. 1975) ........................................................................... 258

*Gideon v. Johns-Manville Sales Corp.,*
761 F.2d 1129 (5th Cir. 1985) ........................................................................... 270

*Grabinski v. Blue Springs Ford Sales, Inc.,*
203 F.3d 1024 (8th Cir. 2000) ........................................................................... 282

*Grand Isle Shipyard, Inc. v. Seacor Marine, LLC,*
589 F.3d 778 (5th Cir. 2009) ............................................................................. 248

*Gutierrez v. Waterman S.S. Corp.,*
373 U.S. 206 (1963) ............................................................................................ 254

*Harris v. Oil Reclaiming Co.,*
94 F. Supp. 2d 1210 (D. Kan. 2000) ................................................................ 295

*Hartford Accident & Indem. Co. v. S. Pac. Co.,*
273 U.S. 207 (1927) ............................................................................................ 248

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Houston Exploration Co. v. Halliburton Energy Servs., Inc.*,
  269 F.3d 528 (5th Cir. 2001) ..................................................................... 265, 266

*Huss v. King Co., Inc.*,
  338 F.3d 647 (6th Cir. 2003), cert. denied 541 U.S. 1015 (2004) ...................... 260

*In re Am. Milling Co.*,
  409 F.3d 1005 (8th Cir. 2005) ............................................................................ 250

*In re B.F.T. No. Two Corp.*,
  433 F. Supp. .......................................................................................................... 252

*In re B.F.T. No. Two Corp.*,
  433 F. Supp. 854 (E.D. Pa. 1977) ...................................................................... 251

*In re Barracuda Tanker Corp.*,
  281 F. Supp. 228 (S.D.N.Y. 1968) ...................................................................... 250

*In re Chesapeake Shipping*,
  803 F. Supp. (S.D.N.Y. 1992) ............................................................................ 252

*In re Complaint of Messina*,
  574 F.3d 119 (2d Cir. 2009) .........................................................253, 255, 261

*In re Cooper/T. Smith*,
  929 F.2d 1073 (5th Cir. 1991) ............................................................................ 256

*In re Deepwater Horizon*,
  844 F. Supp. 2d 746 (E.D. La. 2012) ........................................................ 294, 295

*In re Great Lakes Dredge & Dock Co.*,
  624 F.3d 201 (5th Cir. 2010) .............................................................................. 256

*In re Hellenic Inc.*,
  252 F.3d 391 (5th Cir. 2001) ...................................................................... 253, 259

*In re Houseboat STARSHIP II*,
  2006 A.M.C. 1335 (M.D. Tenn. 2005) ............................................................... 252

*In re Kristie Leigh Enters., Inc.*,
  72 F.3d 479 (5th Cir. 1996) .........................................................254, 259, 260

*In re Lloyd's Leasing Ltd.*,
  764 F. Supp. 1114 (S.D. Tex. 1990) .........................................253, 254, 256, 261

# TABLE OF AUTHORITIES
(continued)

Page(s)

*In re Merry Shipping, Inc.*,
   650 F.2d 622 (5th Cir. 1981) ............................................................................ 264

*In re Ocean Runner, Inc.*,
   No. 04-530, 2006 WL 950115 (E.D. La. Apr. 10, 2006) .................................... 257

*In re Omega Protein, Inc.*,
   548 F.3d 361 (5th Cir. 2008) ...........................................................255, 259, 282

*In re P&E Boat Rentals*,
   872 F.2d 642 (5th Cir. 1989) ...........................................................269, 270, 276

*In re Petition of the United States*,
   259 F.2d 608 (3d Cir. 1958) ............................................................................ 252

*In re Port Arthur Towing Co.*,
   42 F.3d 312 (5th Cir. 1995) ............................................................................. 253

*In re Shell Oil*,
   780 F. Supp............................................................................................................ 251

*In re Shell Oil Co.*,
   780 F. Supp. 1086 (E.D. La. 1991) ............................................................ 250, 251

*In re Signal Int'l, LLC*,
   579 F.3d 478 (5th Cir. 2009) ...........................................................253, 258, 262

*In re TMI*,
   67 F.3d 1103 (3d Cir. 1995) ............................................................................ 271

*In re Waterstand Marine, Ltd.*,
   1991 A.M.C. 1784 (E.D. Pa. 1988)................................................................... 248

*Jamaica Commodity Trading Co. v. Barge Hercules*,
   No. 90-186, 1995 U.S. Dist. LEXIS 17995 (S.D. Ala. Nov. 7, 1995)................ 256

*Johnson v. Offshore Express, Inc.*,
   845 F.2d 1347 (5th Cir. 1988), cert. denied, 488 U.S. 968 (1988)............. 254, 256

*Karim v. Finch Shipping Co.*,
   265 F.3d 258 (5th Cir. 2001) ........................................................................... 248

*Kerr-McGee Corp. v. Law*,
   479 F.2d 61 (4th Cir. 1973) ............................................................................. 260

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Koons Buick Pontiac GMC, Inc. v. Nigh,*
    543 U.S. 50 (2004) ............................................................................................... 298

*Kuroshima Shipping S.A. Act of God Defense and Limit of Liability Analysis,*
    2003 A.M.C. 1681 (2003) ................................................................................... 301

*LaChance v. Erickson,*
    522 U.S. 262 (1998) ............................................................................................ 280

*Landry v. Oceanic Contractors, Inc.,*
    731 F.2d 299 (5th Cir. 1984) ............................................................................. 257

*Lane v. R.A. Sims, Jr., Inc.,*
    241 F.3d 439 (5th Cir. 2001) ..................................................................... 271, 274

*Larsen v. Northland Transp. Co.,*
    292 U.S. 20 (1934) .............................................................................................. 248

*Lewis v. Lewis & Clark Marine, Inc.,*
    531 U.S. 438 (2001) ............................................................................................ 248

*Lloyd's Leasing Ltd. v. Bates,*
    902 F.2d 368 (5th Cir. 1990) ............................................................................. 245

*Lorenz v. Celotex Corp.,*
    896 F.2d 148 (5th Cir. 1990) ............................................................................. 270

*Lorillard v. Pons,*
    434 U.S. 575 (1978) ............................................................................................ 298

*Loughman v. Consol-Pa. Coal Co.,*
    6 F.3d 88 (3d Cir. 1993) ..................................................................................... 281

*Mac Towing, Inc. v. Am. Commercial Lines,*
    670 F.2d 543 (5th Cir. 1982) ............................................................................. 259

*Manderson v. Chet Morrison Contractors, Inc.,*
    666 F.3d 373 (5th Cir. 2012) ............................................................................. 255

*Martin v. Texaco, Inc.,*
    726 F.2d 207 (5th Cir. 1984) ............................................................................. 268

*Matheny v. Tenn. Valley Auth.,*
    557 F.3d 311 (6th Cir. 2009) ..................................................................... 253, 258

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Maxey v. Freightliner Corp.*,
665 F.2d 1367 (5th Cir. 1982) ................................................................. 265, 272

*McAleer v. Smith*,
57 F.3d 109 (1st Cir. 1995) ......................................................................... 260

*McManus v. Fleetwood Enters., Inc.*,
320 F.3d 545 (5th Cir. 2003) ....................................................................... 245

*Miles v. Melrose*,
882 F.2d 976 (5th Cir. 1989) ....................................................................... 264

*Mills v. Mitsubishi Shipping Co.*,
358 F.2d 609 (5th Cir. 1966) ....................................................................... 255

*Mitchell v. Trawler Racer, Inc.*,
362 U.S. 539 (1960) .................................................................................... 254

*Montauk Oil Transp. Corp. v. Tug El Zorro Grande*,
54 F.3d 111 (2d Cir. 1995) .......................................................................... 299

*Morissette v. United States*,
342 U.S. 246 (1952) .................................................................................... 301

*Nat'l Shipping Co. of Saudi Arabia (NSCSA) v. Moran Mid-Atl. Corp.*,
924 F. Supp. 1436 (E.D. Va. 1996),
*aff'd*, 122 F.3d 1062 (4th Cir. 1997) ..................................................243, 297, 301

*Neal v. Barisich, Inc.*,
707 F. Supp. 862 (E.D. La. 1989) ........................................................ 242, 244

*Nissan Fire & Marine Ins. Co. v. M/V Hyundai Explorer*,
93 F.3d 641 (9th Cir. 1996) ........................................................................ 255

*O'Neil v. Electrolux Home Prods., Inc.*,
No. 06-10433-DPW, 2008 WL 2066948 (D. Mass. May 14, 2008)................... 272

*Ondimar Transportes Maritimos v. Beatty St. Props.*,
555 F.3d 184 (5th Cir. 2009) ....................................................................... 246

*Orduna S.A. v. Zen-Noh Grain Corp.*,
913 F.2d 1149 (5th Cir. 1990) ............................................................. 289, 291

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Parr v. Theriot, Inc.*,
  No. 89-3295, 1990 WL 66380 (E.D. La. May 16, 1990)................................................... 244

*Petition of Republic of France*,
  171 F. Supp. 497 (S.D. Tex. 1959),
  *rev'd on other grounds*, 290 F.2d 395 (5th Cir. 1961),
  *cert. denied*, 369 U.S. 804 (1962).................................................................................... 252

*Picou v. D & L Towing, Inc.*,
  No. 09-2810, 2010 WL 2696468 (E.D. La. July 2, 2010)................................................. 261

*Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life Activists*,
  422 F.3d 949 (9th Cir. 2005) .......................................................................................... 282

*Poullard v. Turner*,
  298 F.3d 421 (5th Cir. 2002) .......................................................................................... 279

*Randall v. Chevron USA Inc.*,
  13 F.3d 888 (5th Cir. 1994) ............................................................................................ 284

*Reed v. Tiffin Motor Homes, Inc.*,
  697 F.2d 1192 (4th Cir. 1982) ........................................................................................ 272

*Richard v. City of Harahan*,
  6 F. Supp. 2d 565 (E.D. La. 1998).................................................................................. 244

*Richards v. Michelin Tire Corp.*,
  21 F.3d 1048 (11th Cir. 1994) ........................................................................................ 272

*Royal Ins. Co. of Am. v. Sw. Marine*,
  194 F.3d 1009 (9th Cir. 1999) ........................................................................................ 265

*Ryland Group, Inc. v. Payne Firm, Inc.*,
  492 F. Supp. 2d 790 (S.D. Ohio 2005)............................................................................ 296

*S. Pac. Co. v. United States*,
  72 F.2d 212 (2d Cir. 1934) ............................................................................................. 253

*S. Port Marine, LLC v. Gulf Oil Ltd. P'ship*,
  234 F.3d 58 (1st Cir. 2000) ............................................................................................ 263

*S&H Riggers & Erectors, Inc. v. OSHA*,
  659 F.2d 1273 (5th Cir. 1981) ........................................................................................ 272

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Safeco Ins. Co. of Am. v. Burr*,
  551 U.S. 47 (2007) ................................................................................... 301

*Smith v. Lightning Bolt Prods., Inc.*,
  861 F.2d 363 (2d Cir. 1988) ..................................................................... 281

*Smith v. Trans-World Drilling Co.*,
  772 F.2d 157 (5th Cir. 1985) .................................................................... 255

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003) ........................................................................... 279, 281

*Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM*,
  447 F.3d 360 (5th Cir. 2006) ............................................................. 277, 278

*Suzuki of Orange Park, Inc. v. Shubert*,
  86 F.3d 1060 (11th Cir. 1996) .................................................................. 258

*Taylor v. Lloyd's Underwriters of London*,
  972 F.2d 666 (5th Cir 1992) ..................................................................... 284

*Taylor v. Texaco, Inc.*,
  814 F.2d 231 (5th Cir. 1987) .................................................................... 268

*Tidewater Marine, Inc. v. Sanco Int'l, Inc.*,
  113 F. Supp. 2d 987 (E.D. La. 2000) ........................................................ 278

*Torch, Inc. v. Alesich*,
  148 F.3d 424 (5th Cir. 1998) ............................................................. 260, 261

*Trico Marine Assets, Inc. v. Diamond B Marine Servs. Inc.*,
  332 F.3d 779 (5th Cir. 2003) ............................................................. 258, 259

*Trico Marine Operators, Inc. v. Falcon Drilling Co.*,
  116 F.3d 159 (5th Cir. 1997) .................................................................... 291

*Tug Ocean Prince, Inc. v. United States*,
  584 F.2d 1151 (2d Cir. 1978), cert. denied, 440 U.S. 959 (1979) ....................... 254, 267, 302

*Union Oil v. M/V Point Dover*,
  756 F.2d 1223 (5th Cir. 1985) ......................................................... 248, 257, 260

*United States v. Am. Commercial Lines, LLC*,
  No. 11-2076, 2013 WL 1182963 (E.D. La. Mar. 21, 2013) ................................ 263

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Bestfoods,*
    524 U.S. 51 (1998) ............................................................................. 295, 296

*United States v. Cooper,*
    135 F.3d 960 (5th Cir. 1998) ................................................................... 242

*United States v. Jones,*
    267 F. Supp. 2d 1349 (M.D. Ga. 2003) .................................................. 295

*United States v. Lowe,*
    29 F.3d 1005 (5th Cir. 1994) ................................................................... 299

*United States v. Qwest Corp.,*
    353 F. Supp. 2d 1048 (D. Minn. 2005) .................................................. 296

*United States v. Reliable Transfer Co.,*
    421 U.S. 397 (1975) ................................................................................. 281

*United States v. Texarkana Trawlers,*
    846 F.2d 297 (5th Cir. 1988) ................................................................... 287

*United States v. Viking Res., Inc.,*
    607 F. Supp. 2d 808 (S.D. Tex. 2009) .................................................... 294

*Usner v. Luckenbach Overseas Corp.,*
    400 U.S. 494 (1971) ................................................................................. 255

*Venore Transp. Co. v. Oswego Shipping Corp.,*
    498 F.2d 469 (2d Cir. 1974) .................................................................... 290

*Walker v. Braus,*
    995 F.2d 77 (5th Cir. 1993) ..................................................................... 251

*Water Quality Ins. Syndicate v. United States,*
    522 F. Supp. 2d 220 (D.D.C. 2007) ................................................ 267, 302

*Water Quality Ins. Syndicate v. United States,*
    632 F. Supp. 2d 108 (D. Mass. 2009) .................................................... 301

*Weaver v. Mo. Pac. R.R. Co.,*
    152 F.3d 427 (5th Cir. 1998) ................................................................... 270

*Weeks v. Alonzo Cothron, Inc.,*
    466 F.2d 578 (5th Cir. 1972) ................................................................... 254

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Woolard v. Mobil Pipe Line Co.*,
    479 F.2d 557 (5th Cir. 1973) ........................................................................................ 268

**STATE CASES**

*Burk Royalty Co. v. Walls*,
    616 S.W.2d 911 (Tex. 1981) .................................................................................. 265, 266

*Gryc v. Dayton-Hudson Corp.*,
    297 N.W.2d 727 (Minn. 1980) ..................................................................................... 272

*S. Gen. Ins. Co. v. Holt*,
    416 S.E.2d 274 (Ga. 1992) ........................................................................................... 244

*Taliesen Corp. v. Razore Land Co.*,
    135 Wash. App. 106, 144 P.3d 1185 (2006) ................................................................. 296

*Thrall Car Mfg. Co. v. Lindquist*,
    495 N.E.2d 1132 (Ill. App. Ct. 1986)........................................................................... 244

**FEDERAL STATUTES**

33 U.S.C. § 2701.................................................................................................................. 240

33 U.S.C. § 2701(26)(A)(ii) ............................................................................................... 295

33 U.S.C. § 2702(b) ............................................................................................................ 297

33 U.S.C. § 2704................................................................................................................. 243, 298

33 U.S.C. § 2704(a) ........................................................................................................... 300

33 U.S.C. § 2704(b) ...................................................................................... 242, 243, 297, 300

33 U.S.C. § 2704(c)(1)....................................................................................... 297, 300, 301, 303

33 U.S.C. § 2704(c)(3) .................................................................................................. passim

33 U.S.C. § 2709................................................................................................................ 243

33 U.S.C. § 2710(a) .......................................................................................................... 299

33 U.S.C. § 2710(b) .......................................................................................................... 299

33 U.S.C. § 2716(f)(1) ...................................................................................................... 302

# TABLE OF AUTHORITIES
## (continued)

Page(s)

42 U.S.C. § 9601(20)(A)(ii) ................................................. 295

46 U.S.C. § 30501 ................................................250, 251, 252

46 U.S.C. §§ 30501–30512 .......................................... 247

46 U.S.C. § 30505(a) ......................................... 247, 249

**FEDERAL RULES**

Fed. R. Civ. P. 52(c) ................................................. 241

FED. R. CIV. P. SUPP. R. F(1) ........................................ 248

FED. R. CIV. P. SUPP. R. F(2) ........................................ 249

FED. R. CIV. P. SUPP. R. F(4) ........................................ 249

**STATE RULES**

Rule 23(b)(2) ......................................................... 245

Rule 23(b)(3) ......................................................... 245

**FEDERAL REGULATIONS**

30 C.F.R. § 250.105 ................................................. 298

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 101-653 (1990) (Conference Report), *reprinted in* 1990 U.S.C.C.A.N. 779 ...... 297

**TREATISES**

1 SCHOENBAUM, ADMIRALTY & MARITIME LAW  (1987) ........................................ 254

2 THOMAS J. SCHOENBAUM, ADMIRALTY & MARITIME LAW § 11-3 (4th ed. 2004) .......... 251, 290

**OTHER AUTHORITIES**

BLACK'S LAW DICTIONARY (9th ed. 2009) ................................. 265, 266

BLACK'S LAW DICTIONARY 1185 (4th ed. 1968) ................................. 265

Cooke et al., *Voyage Charters* ¶ 5.137 (3d ed. 2007) ............................. 290

**[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Transocean Offshore Deepwater Drilling Inc., Transocean Holdings LLC, Transocean Deepwater Inc. and Triton Asset Leasing GmbH (collectively, Transocean), respectfully submit these Proposed Findings of Fact and Conclusions of Law with respect to the Phase One trial held from February 25, 2013 to April 17, 2013.

## PROPOSED FINDINGS OF FACT

I.   **PHASE ONE PROCEEDINGS**

    A.   **Proceedings Leading To Phase One Trial**

1.   This litigation arose out of the April 20, 2010 blowout of the Macondo well and the resulting explosion and fire on the Mobile Offshore Drilling Unit (MODU) *Deepwater Horizon* as it was preparing to temporarily abandon the well.  Macondo was an exploratory well drilled in Block 252, Mississippi Canyon, on the Outer Continental Shelf (OCS) approximately 50 miles south of Louisiana.  *See In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico*, 808 F. Supp. 2d 943, 947 (E.D. La. 2011). Eleven men died in the explosion and many others were injured.  *Id.*  On April 22, after burning for two days, the *Deepwater Horizon* sank into the Gulf of Mexico.  *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico*, 844 F. Supp. 2d 746, 748 (E.D. La. 2012).  Oil flowed from the Macondo well into the Gulf until July 15, 2010, when the well was capped.  *Id.*

2.   The four Transocean entities commenced this action by filing a Limitation action under the Shipowner's Limitation of Liability Act, 46 U.S.C. §§ 30501, *et seq.* (the "Act").  Rec. Doc. 1, 2:10-cv-02771-CJB-SS.  Under the Act, each of the Transocean entities seeks to limit its liability to the value of the vessel, *i.e.*, the *Deepwater Horizon*, or the owner's interest in the vessel and/or to be exonerated from liability.

1

3.     Although Transocean is technically the plaintiff in the Limitation action, for ease of reference these findings and conclusions will typically identify the United States, the States, and the private plaintiffs as the "Plaintiffs," and will identify Transocean, BP and Halliburton as the "Defendants."

4.     Pursuant to court orders directing that all persons claiming damages for any losses, injuries, or destruction of property occasioned by the voyage of the MODU *Deepwater Horizon* be filed in the Limitation proceeding, Rec. Docs. 9-10, 2:10-cv-02771-CJB-SS, numerous claims were filed in this action.  *See, e.g*., Rec. Docs. 288-300, 2:10-cv-02771-CJB-SS.

5.     In August 2010, the Judicial Panel on Multidistrict Litigation also consolidated before this Court numerous individual lawsuits stemming from the April 20, 2010 oil spill.  *In re: Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010*, 731 F. Supp. 2d 1352, 1353 (J.P.M.L. 2010).  The lawsuits included claims for the deaths of the 11 individuals, numerous claims for personal injury, and various claims for environmental and economic damages.  *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico*, 808 F. Supp. 2d at 947.

6.     On December 15, 2010, the United States filed a complaint in this Court asserting two claims for relief against the BP Defendants[1], Anadarko E&P Company L.P. and Anadarko Petroleum Corp. (collectively, Anadarko), MOEX Offshore 2007 LLC (MOEX), and Transocean.  The first claim seeks civil penalties against all Defendants under Section 311(b) of the Clean Water Act (CWA), 33 U.S.C. § 1321(b), based on the discharge of oil.  The second claim seeks a declaratory judgment that all Defendants are jointly and severally liable under the Oil Pollution Act (OPA), 33 U.S.C. § 2701 *et seq*.,

---

[1] *See* Finding #10, *infra*.

2

without limitation, for the removal costs and damages in this action and any later-filed actions.  *See* Rec. Doc. 1, No. 2:10-co-4536 (E.D. La. Dec. 15, 2010).

7.      This Court ordered the litigation to be tried in three Phases.  The Phase One trial concerned two of the cases within this MDL: Case Number 10-2771, Transocean's Limitation action; and Case Number 10-4536, the United States' CWA/OPA action.  *See* Rec. Doc. 6592 (Second Amended Pretrial Order No. 41).  Both of these cases are before the Court for all purposes including trial; certain other cases were transferred for pretrial purposes only under the MDL statute.

8.      Phase One was tried as a bench trial before this Court beginning on February 25, 2013, and concluding on April 17, 2013.  The Phase One trial proceedings included issues related to Transocean's exoneration, limitation and liability defenses, as well as the issues relating to the various cross-claims, counterclaims, and third-party claims among the Defendants.  *See* Rec. Doc. 6592 (Second Amended Pretrial Order No. 41).

### B.      Phase One Parties

9.      The Phase One Plaintiffs included the United States, the States of Louisiana and Alabama, and numerous private individuals, businesses, or other entities who have filed claims in Transocean's Limitation action.  Rec. Doc. 6592 (Second Amended Pretrial Order No. 41).

10.      The BP Defendants include BP Exploration, BP America and BP p.l.c., and are collectively referred to herein as "BP."  BP was the primary leaseholder of the Macondo site.  Rec. Doc. 5927 (Agreed Stipulations), ## 96, 100.

11.     The Transocean Defendants include Triton Asset Leasing GmbH (Triton), Transocean Holdings LLC (Holdings), Transocean Offshore Deepwater Drilling Inc. (TODDI), and Transocean Deepwater Inc. (TDI).

12.     Triton:  Triton was the registered or legal owner of the *Deepwater Horizon* on April 20, 2010.  TR. 5922:17-21 (Ambrose); TR. 4518:21-22 (Newman); TREX 52536.57 (8/17/09 Asset Sale of *Deepwater Horizon* to Triton); TREX 52536.70 (8/17/09 Assignment of Bareboat Charter to Triton Asset Leasing (hereafter, Bareboat Charter)).

13.     Holdings:  On August 17, 2001, Triton's predecessor (Transocean Offshore International Ventures Limited) transferred possession, command, and control of the *Deepwater Horizon* to Holdings' predecessor (R&B Falcon Drilling Co.) through a bareboat/demise charter.  TREX 52536.2, .20, .26, .28, .57.  Under the Bareboat Charter between Triton and Holdings, Holdings was granted "the exclusive right to possession and control of the Rig."  TREX 52536.6 (Bareboat Charter, art. 4.2).  Holdings was also given "the full use of the Rig" and retained the right to "employ the Rig throughout the world for any legal purpose . . . ."  TREX 52536.6 (Bareboat Charter, art. 4.1).

14.     Under the Bareboat Charter, Holdings assumed the obligation to "man, victual, navigate and operate, supply, fuel, maintain and repair the [*Deepwater Horizon.*]" The possession, use, operation and maintenance of the *Deepwater Horizon* was at the sole risk of Holdings until future re-delivery of the *Deepwater Horizon* to Triton.  The Master, officers and crew of the *Deepwater Horizon* were deemed to be engaged and employed exclusively by Holdings and were to remain Holdings' servants, navigating and working the *Deepwater Horizon* solely on behalf of and at the sole risk of Holdings. Holdings further assumed the sole obligation to provide such equipment, outfit, tools,

spare and replacement parts as may be required for the use and operation of the *Deepwater Horizon*.  TREX 52536.6 (Bareboat Charter, art. 4.2).

15.     The Bareboat Charter required Holdings to maintain and preserve the rig in accordance with good commercial maintenance practices and to maintain the rig's classification and certification.  TREX 52536.7 (Bareboat Charter, art. 5.1).  Holdings was further obligated to "comply with all applicable laws and regulations and with the applicable provisions and conditions of all licenses, permits, consents and approvals of any governmental authority having jurisdiction over the Rig."  TREX 52536.6 (Bareboat Charter, art. 4.1).

16.     Holdings was the contracting party with BP for the drilling of the Macondo well.  TR. 4518:18-20 (Newman); Rec. Doc. 5927 (Agreed Stipulations), # 98.

17.     <u>TODDI</u>:  TODDI employed the *Deepwater Horizon*'s supervisory and managerial employees onshore that had the overall responsibility for maintenance of the *Deepwater Horizon* and the supervision of her crew.  TR. 5922:13-16, 5922:4-5932:3 (Ambrose); TR. 4518:15-16 (Newman); D-6729 (Transocean Organization Chart).

18.     <u>TDI</u>:  TDI is the employer of the crew of the *Deepwater Horizon*.  TR. 4518:20-22 (Newman); D-6729 (Transocean Organization Chart).

19.     For simplicity, these findings generally refer to Triton, Holdings, TODDI and TDI collectively as "Transocean."  However, each of these entities had different functions and roles.  Where relevant, such as for purposes of the Limitation of Liability Action, the Court makes specific findings as to each entity.

20.     Defendant Halliburton Energy Services, Inc. (Halliburton), contracted with BP to provide mud logging and cementing services, including the engineering,

materials, testing, mixing, and pumping for cementing operations on board the *Deepwater Horizon*, as well as onshore engineering support for those operations.  TREX 4477 (BP-Halliburton contract).

21.     Defendant M-I L.L.C. (M-I) provided mud products on the *Deepwater Horizon*, including drilling fluids and spacers, engineering services, and mud supervisory personnel, such as mud engineers and drilling fluid specialists, to manage the properties of those fluids in the Macondo well.  *See* Rec. Doc. 5927 (Agreed Stipulations), ## 161, 162, 163.

22.     Defendant Cameron International Corporation (Cameron) manufactured, designed, and supplied the *Deepwater Horizon*'s subsea emergency well-closure device known as a blowout preventer (BOP).  *See* Rec. Doc. 5927 (Agreed Stipulations), # 92.

**C.     Summary of Findings**

23.     BP was the operator of the Macondo well and had overall responsibility for designing the well and implementing the drilling plan.  BP supervised the work of the contractors hired to help construct the well and had the ultimate authority to make decisions.  Through its Well Site Leaders and onshore team, BP oversaw the Macondo operations.  *See* Parts II-A to II-C, *infra*.

24.     BP chose Transocean's *Deepwater Horizon* to continue drilling at Macondo after the Transocean *Marianas* was damaged in a hurricane.  BP had used the *Deepwater Horizon* and its crew to drill over 50 wells, including some of the most challenging wells in the world.  BP considered the *Deepwater Horizon* to be the best in its world-wide fleet in performance and safety.  *See* Part II-D, *infra*.

25.     The drill crew on the *Deepwater Horizon* had received state-of-the-art training and had years of experience.  The drill crew was part of a rig and corporate

culture that was committed to safe operations.  The *Deepwater Horizon* had won widespread recognition for its safety record.  BP considered the *Deepwater Horizon* crew to be the "best in the business."  *See* Parts III-IV, *infra*.

26.     Deepwater drilling requires careful balancing between the weight of drilling mud needed to prevent the well from flowing and the ability of the geologic formation to withstand the pressure exerted by the mud.  As the Operator, BP was required to maintain a safe drilling margin.  BP repeatedly violated regulations promulgated by the Minerals Management Service (MMS) as to the required drilling margin, making a successful cement job especially difficult to achieve.  *See* Parts V-A, V-B, *infra*.

27.     On April 12, 2010, BP began planning the temporary abandonment (TA) of the well, *i.e.*, the process by which the well was to be sealed with cement and tested before the drilling rig moved off site.  In the days leading up to the blowout, BP repeatedly made changes to the TA plan for Macondo that increased the risk of the operation.  BP ultimately adopted a TA plan that exposed the well to a much higher degree of underbalance, unnecessarily increasing the pressure on the bottomhole cement plug; reduced the barriers in place during the final displacement of the well; and reduced and then compromised the remaining tests of those barriers.  BP implemented a final plan that differed from the plan approved by the MMS, failed to do the formal risk assessment required by BP policies, and failed to communicate the known risks to the Transocean drill crew.  As implemented over the days leading up to the blowout, the TA plan frustrated and confused both the BP team onshore and the BP Well Site Leaders on the rig.  *See* Part V-C, *infra*.

28.     BP and Halliburton then designed a cement job for the bottomhole plug that focused on the narrow drilling margin at the expense of cement failure.  The cement slurry pumped at Macondo was not tested in accordance with BP and Halliburton policies and industry standards, was not stable, and had likely not set by the time BP's displacement plan put pressure on the cement.  BP's onshore engineering team expected that the cement job would not be successful but did not communicate this information to the Transocean crew or perform the testing that could have addressed this risk.  *See* Part VI, *infra.*

29.     The last stages in the temporary abandonment of the well were a negative pressure test and final displacement of the drilling mud.  BP was responsible for designing, implementing, and determining the success of the negative pressure test.  BP conducted the negative pressure test on the day of the blowout, deviating from the procedure approved by MMS four days earlier.  BP failed to provide the Transocean drill crew with the information necessary to evaluate the negative test results, confounded the results by inappropriately using leftover lost-circulation materials as an unprecedented and untested "spacer," and interrupted the drill crew's efforts to conduct a proper test on the drill pipe, instructing the crew to switch to conducting the test on the kill line.  Likely as a result of being plugged by the inappropriate spacer material, the kill line exhibited "no flow" during the negative pressure test, which the BP Well Site Leaders declared successful despite the anomalous and unexplained pressure readings on the drill pipe. *See* Part VII, *infra.*

30.     After BP declared the negative pressure test a success, it instructed the drill crew to proceed to displace the heavy drilling fluids from the well and the riser.  An

hour later, the BP Well Site Leader shared his continuing concerns over the negative pressure test results with the onshore BP engineer. The onshore engineer immediately deduced that something was wrong with the test, but neither man took action. Instead, immediately after the call, the Well Site Leader returned to the drill floor, said nothing about the concern raised by the onshore engineer, and instructed the crew to continue removing heavy drilling fluids from the riser. During the last hour on the rig, subtle signs of the well coming in were missed by all; in the last half hour, the drill crew saw and responded to anomalies, but they did so without the full information available to BP as to the likely failure of the cement and the negative pressure test. *See* Part VIII, *infra*.

31. At about 9:41 p.m., the crew conducted a flow check and determined the well was flowing. They activated the BOP at about 9:42 p.m. In accordance with their training and industry standards, the crew closed the Upper Annular and the Upper and Middle Variable Bore Rams. They also diverted the flow. At 9:47 p.m., for two minutes, it appeared they had succeeded in shutting in the well. At 9:49 p.m., there was a massive explosion. The drill crew was concerned at all times with safety; they worked to the end to control the well as best they were able. *See* Part IX, *infra*.

32. Like the drill crew, the bridge crew received extensive emergency training. The rig's alarm systems were properly configured and operational; the alarms went off that evening. The bridge crew had two to three minutes to react between the first notice that something was wrong and the major explosion and blackout. Per their training, the bridge crew investigated the anomalies and alarms, communicated with the drill crew and the engine room, warned the vessel alongside the rig, the *Damon Bankston*, to move off, sounded the general alarm and gave directions to muster and the order to

abandon ship.  As a result, the crew successfully evacuated all of the 115 people who survived the explosion.  *See* Part X, *infra.*

33.     The BOP was recovered after the incident and tested at Port Michoud by Det Norske Veritas (DNV).  The analysis of several different experts and the forensic evidence, submitted to this Court in the form of photos and models based on DNV laser scans, established that (i) the BOP failed to shut in the well because the drill pipe was off-center, (ii) the extreme flow forced the pipe off center shortly before the explosion, and (iii) in such circumstances, the BOP's Blind Shear Rams could not shear the pipe or shut in the well even if all systems functioned perfectly.  *See* Part XI, *infra.*

34.     Because the inability of the Blind Shear Rams to shut in the well was not related to maintenance, this Court need not address the issues raised concerning the BOP control pods.  In any event, the evidence established that the Yellow Pod solenoid functioned when tested in actual operating conditions and that the condition of the Blue Pod battery, when tested a year after the accident, could not have been representative of its condition at the time of the accident.  Moreover, Transocean had appropriate replacement policies for solenoids and batteries.  *See* Part XII, *infra.*

35.     The inability of the Blind Shear Rams to shut in the well was also not due to an improper design; the configuration of the BOP was specified by BP when the *Deepwater Horizon* was commissioned and conformed to industry practice at the time of the incident.  *See* Part XIII, *infra.*

36.     Finally, the issues raised at trial as to the seaworthiness and overall condition of the rig were (i) not causally related to the blowout and (ii) not supported on the merits.  The evidence established that Transocean properly maintained the rig, that

the rig was inspected and audited and found fit for service by numerous third parties --

including an extensive 2-week audit of the entire rig two weeks before the blowout -- and

that routine outstanding maintenance items at the time of the incident had no effect on the

safe operation of the rig that day.  *See* Part XIV, *infra*.

## II.    BP, AS OPERATOR, DIRECTED DECISION-MAKING FOR THE MACONDO WELL

### A.    BP Was The Operator And Primary Leaseholder On Macondo

37.    On March 19, 2008, BP acquired a lease from the United States of 5,760

acres of property on the Outer Continental Shelf comprising Mississippi Canyon Block

252 (MC-252).  Rec. Doc. 5927 (Agreed Stipulations), # 96.

38.    On February 23, 2009, BP filed an exploration plan to drill wells in MC-

252.  TREX 3377.3 (BP's "Pre-Drill Data Package" for Macondo).  The MMS approved

BP's application for a permit to drill the Macondo well on May 22, 2009.  TREX 4000.7

(BP's Application for Permit to Drill a New Well for Macondo: "Well Design

Information"); TREX 4000.2 (Approved Application for Permit to Drill).

39.    As the primary leaseholder and as the "Operator" under the Operating

Agreement and MMS regulations, BP directed and controlled the project.  TREX 1243.28

(Macondo Prospect Offshore Deepwater Operating Agreement, art. 4.1); 30 C.F.R.

§ 250.105 (2003).  The Operator's responsibilities included assessing the geology of the

site, engineering the well design, obtaining regulatory approvals for well operations,

retaining and overseeing the project's contractors, and working on various aspects of the

well and drilling operations.  TR. 510:9-12 (L. McKay); TR. 774:21-775:10, 793:13-

794:1 (Huffman); Saucier Depo. 91:10-15 (MMS Inspector) (BP, as the lessee and

operator, submitted the application for permit to drill); Rose Depo. 705:20-706:5, 706:8-

10, 706:12-707:20 (Transocean Vice President/Quality, Health Safety and Environment) ;

TR. 1976:5-22 (R. Sepulvado) (BP writes up the drilling plan); TREX 20001.50 (Bea

expert report) (BP had key decision-making authority in various areas, including well

design and completion).

40.     BP held the primary share (65 percent) of the lease rights to Macondo.

The additional shares were held by Anadarko (25 percent) and MOEX (10 percent).

TREX 1243A (Ratification and Joiner of Operating Agreement - Macondo Prospect).  BP

and its leasehold partners were to receive the revenue from any oil extracted from the

Macondo well.  TR. 510:1-4 (L. McKay).

**B.     BP Was Responsible For Designing The Well And Implementing The Drilling Plan**

41.     BP's shore-based engineering team was solely responsible for designing

the Macondo well and specifying how it would be drilled.  TR. 8634:14-8638:25 (Guide)

(describing BP's well design and execution process); Walz Depo. 571:24-572:7 (BP

Drilling Engineer Team Leader) ("The engineering design would be me as the drilling

engineering team leader."); Winslow Depo. 34:23-25, 35:21-22 (Transocean had no input

into the well design); TR. 4644:23-25 (Newman).

**C.     BP Hired And Directed The Work Of The Other Contractors At Macondo**

42.     In its role as the Operator on Macondo, BP hired and coordinated the

activities of various contractors to help construct the Macondo well.  TR. 1719:13-18

(Ezell).

43.     BP chose Transocean as the drilling contractor.  Pursuant to the Drilling

Contract, BP was responsible for specifying how the well would be constructed,

completed and abandoned.  *See* TREX 1356A (Drilling Contract) (Article 13 – BP

specified the depth of the well; Article 15.5 – BP specified the casing program; Article 15.6 – BP specified the requirements for the mud program; Article 15.7 – BP specified the plan for completion and abandonment). Transocean was required to follow these specifications, *see id.*, and to provide the drilling rig and related equipment. *See, e.g.*, *id.* at Article 14.1, 15.1. Under the contract, Transocean was paid on a day-rate basis; its income was not based on how much oil the well would produce. TR. 4532:8-21 (Newman); Winslow Depo. 32:10-20, 32:24-33:2.

44. BP contracted with Halliburton to provide cementing services and expertise and to support the BP teams onshore and on the *Deepwater Horizon*. Halliburton's responsibilities included providing technical advice about the design, modeling, placement and testing of the cement used in the Macondo well. TREX 4477 (BP-Halliburton contract); TR. 2918:17-24, 2919:11-21 (Probert); TR. 3190:17-3191:2, 3191:13-3193:1 (Roth).

45. Other contractors included M-I SWACO, Sperry Drilling Services, Inc., Schlumberger, Weatherford International, and Tidewater Marine. TREX 8140.21 (Beck expert report); TREX 4248.11 (Transocean Investigation Report, Vol. I).

46. BP stationed two fulltime Well Site Leaders (sometimes called "Company Men") on the rig to oversee operations on a day-to-day basis. *See* TR. 8672:7-13 (Guide); TR. 1921:10-24 (R. Sepulvado) (Well Site Leaders are BP's "eyes and ears" on the rig); TR. 5943:22-5944:1 (Ambrose). The BP onshore team also stayed in constant contact with Transocean's onshore management and the rig crew. TR. 1969:14-23 (R. Sepulvado) ("At 7:30 in the morning every day, we'd have a meeting with town. And in that meeting on the rig side would be the OIM, myself, the Toolpushers, and somebody—

at least one guy from each of the third parties.  And in town, they'd have John Guide, geologists, the engineers, and then sometimes they'd have Transocean in there and some of the people from the third party."); TR. 1776:16-21 (Ezell); Kent Depo., Vol. I, 198:5-199:3.

47.     "[U]ltimately BP had the responsibility for the decisions made on the rig." TR. 775:4-10 (Huffman); Rainey Depo. 420:16-20 (BP Vice President of Exploration for the Gulf of Mexico SPU) (as Operator BP was "responsible for the day-to-day activities of and decisions executed by personnel on the rig"); Burgess Depo. 118:8-19 (*Deepwater Horizon* Driller).

### D.      BP Considered The *Deepwater Horizon* The "Best Rig" In Its Fleet

48.     BP originally chose Transocean's *Marianas* rig to drill the Macondo well. The MMS approved the use of the *Marianas* on May 22, 2009.  TREX 4000.4 (Approved Application for Permit To Drill: Rig Information).  The *Marianas* began operations on Macondo on October 6, 2009.  TREX 32039.1 (Form MMS-133 Well Activity Report for MC 252: "Operation Start Date").

49.     The *Marianas* drilled Macondo to 9,090 feet.  On November 9, 2009, damage from Hurricane Ida prevented the rig from continuing work.  TREX 46062.2 (11/10/09 Daily Operations Report: "Operations Summary").

50.     BP brought in the *Deepwater Horizon*, a self-propelled, dynamically positioned, semi-submersible, column-stabilized MODU, to continue drilling the Macondo well.  BP, through its predecessor, Vastar Resources, Inc., had originally commissioned "the construction, use and operation" of the *Deepwater Horizon* on December 9, 1998, in a contract with Transocean's predecessor, R&B Falcon Drilling

Co.  Rec. Doc. 5927 (Agreed Stipulations), # 91; TREX 1356A (Drilling Contract); TREX 50003.4 (Wolfe expert report); TR. 4253:7-12 (Barnhill).

51.     The *Deepwater Horizon* was built in accordance with the 1989 MODU Code; the ABS Rules for the Building and Classing of Mobile Offshore Drilling Units, 1997; the International Convention on Load Lines, 1966, regulation 10(2), Annex 1; and U.S. Coast Guard requirements, as the rig was originally intended to be registered in the United States.  Rec. Doc. 5927 (Agreed Stipulations), # 181.  ABS classified and certified the *Deepwater Horizon* as an X A1, Column Stabilized Drilling Unit, XAMS, XACCU, XDPS-3 (the highest rating for dynamically positioned vessels).  *Id.*, # 182.

52.     BP extended its contract to use the *Deepwater Horizon* in September 2009.  TREX 1488 (September 2009 Drilling Contract Extension).

53.     The *Deepwater Horizon* was capable of drilling up to 35,000 feet at a water depth of 10,000 feet in harsh environments.  TREX 50003.4 (Wolfe expert report). The *Deepwater Horizon* "had drilled some of the most technologically challenging and advanced wells that have ever been drilled," including a well drilled in 9,700-plus feet of water.  Only a handful of rigs in the world have drilled wells of that depth.  TR. 4267:20-4268:6 (Barnhill).

54.     In 2009, the *Deepwater Horizon* drilled the deepest well in the world, the Tiber well, to 35,050 feet.  Immediately prior to Macondo, the rig successfully drilled the Kodiak well to a depth of 28,761 feet.  TREX 7676.15 (Barnhill expert report); TREX 52647 (Operating History of the *Deepwater Horizon*); TR. 1767:10-24 (Ezell); D-4341 (BP & *DWH* Have Extensive Experience Drilling Deepwater Wells in the Gulf of

Mexico); D-6569 (Wells Drilled by the *Deepwater Horizon* and Her Crew); TR. 4581:8-11 (Newman).

55.     With the exception of one well drilled for BHP Billiton in 2005, the *Deepwater Horizon* worked exclusively under contract with BP throughout the rig's existence. TR. 1640:11-1641:7 (Ezell); TREX 52647 (Operating History of the *Deepwater Horizon*). In total, BP used the *Deepwater Horizon* successfully to drill more than 50 wells. TREX 52647 (Operating History of the *Deepwater Horizon*); TR. 1767:10-16 (Ezell); TR. 8596:20-8598:14 (Guide) (BP Wells Team Leader) (in his three years working with the *Deepwater Horizon*, each and every well was drilled successfully).

56.     By the time of the incident, BP considered the *Deepwater Horizon* "the best performing rig in the BP fleet globally from a performance and safety perspective." TR. 9361:2-3 (O'Bryan). MMS shared this view. *See* E. Neal Depo. 131:7-12 (MMS Inspector) (*Deepwater Horizon* was "one of the best rigs" in terms of safety and performance).

57.     MMS granted BP's application for permission to use the *Deepwater Horizon* to finish drilling the Macondo well on January 14, 2010. TREX 4008 (Application for Revised New Well for Macondo). The *Deepwater Horizon* arrived at Macondo on January 31, 2010 and began drilling in early February. TREX 4278.1 (1/31/10 Daily Operations Report); TR. 807:22-24 (Huffman).

III.   **THE *DEEPWATER HORIZON* DRILL CREW WAS WELL-TRAINED AND EXPERIENCED**

   A.   **Transocean Provided State-Of-The-Art Training**

58.   The drill crew of the *Deepwater Horizon* was appropriately trained to respond to well control events.  Transocean's well control training complied with the standards set by federal agencies, industry experts, and BP.  TR. 4240:19-4241:1, 4267:14-19 (Barnhill) (Transocean well control training met or exceeded industry standards).  During their time aboard the rig, the crew participated in regular, frequent well control drills and audits, consistent with government requirements and BP's and Transocean's policies.  Transocean regularly incorporated lessons learned from other well control events and alerted its fleet with ongoing advisories.  No evidence was introduced at trial that any drilling contractor provided a better or more comprehensive training program.  *See* Finding ## 59-99, *infra.*

   (1)   **Transocean's drill crew was well-trained under the industry-standard IADC WellCAP program**

59.   Transocean's Gulf of Mexico well control training program is accredited by the International Association of Drilling Contractors Well Control Accreditation Program (IADC WellCAP).  TR. 1752:24-1753:1-2 (Ezell); *see* McMahan Depo. 482:24-483:4 (Transocean personnel receive internal IADC-certified training); Hart Depo. 230:24-231:4, 231:6-20 (Transocean personnel are required to complete certified training courses from IADC WellCAP or the International Well Control Forum).  The IADC's WellCAP program is an industry-accepted training standard and accreditation system developed by international operators, drilling contractors, professional trainers, and well control specialists.  *See* TR. 7698:6-7699:2 (Bourgoyne) (IADC well control training is

17

the industry standard); TR. 4259:17-19 (Barnhill) (IADC is a broad, overarching international organization, and IADC WellCAP certification is industry standard).

60.     The WellCAP program includes Introductory, Fundamental and Supervisor Level Courses.  Offshore Installation Managers, Senior Toolpushers, Toolpushers and Drillers must complete the Supervisor Level course every two years. TREX 41008.21 (Transocean Well Control Handbook, Section 1.4 "Well Control Procedures and Responsibilities: Training Requirements"); TR. 4259:1-19, 4265:10-17 (Barnhill).  The Supervisor Level course is a 5-day program of classroom instruction and simulations in which students practice shutting in the well and circulating out kicks.  TR. 1753:3-14 (Ezell); TR. 4260:3-15 (Barnhill).

61.     All of the senior members of the *Deepwater Horizon* drill crew on April 20, 2010 held current Well Control Certifications at the Supervisor Level.  The senior drill crew included Offshore Installation Manager (OIM) Jimmy Harrell; Senior Toolpusher Miles ("Randy") Ezell; Toolpushers Jason Anderson and Wyman Wheeler; and Drillers Micah ("Brandon") Burgess and Dewey Revette.  Assistant Drillers Donald Clark, Patrick Morgan, and Allen Seraile also held certifications at the Supervisor Level. TREX 52658 (Summary: Training of Well Control and Bridge Crewmembers Aboard the *DWH* on April 20, 2010); TR. 1753:20-1754:2 (Ezell).[2]

---

[2] *See also* TREX 2184 (Compendium Training List Profile of various *DWH* personnel); TREX 50132.16 (Jimmy Harrell WellCAP Certificate); TREX 50133.3 (Miles "Randy" Ezell WellCAP Certificate); TREX 1450.2 (Micah Burgess WellCAP Certificate); TREX 50136.11 (Donald Clark WellCAP Certificate); TREX 50137 (Stephen Curtis WellCAP Certificate); TREX 3464.33 (Patrick Morgan WellCAP Certificate); TREX 4804.2 (Allen Seraile WellCAP Certificate).

18

(2) **Transocean's handbooks complied with industry standards**

62.    Transocean's well control materials were consistent with applicable

industry standards.  *See* TREX 8173.15 (Bourgoyne expert report) (Well Control

Handbook and driller's responsibilities set forth in Field Operations Handbook are

consistent with industry standard expectations); TR. 4261:2-21, 4262:4-4264:25

(Barnhill) (Transocean well control materials mirror industry standard for well

monitoring, determining whether the well is flowing, identifying gas in the riser, and

diverting).  BP expert Dr. Ted Bourgoyne described Transocean's training materials as

"appropriate and of a high quality."  TREX 8173.68 (Bourgoyne expert report); TR.

7702:20-24 (Bourgoyne).[3]

63.    Transocean's IADC-accredited WellCAP course used Transocean's Well

Control Handbook as its curriculum.  TR. 4260:3-15 (Barnhill); TR. 1753:3-14 (Ezell).

The Well Control Handbook served as a reference and a guide for the *Deepwater Horizon*

drill crew.  TR. 1643:18-25 (Ezell).  Transocean drillers are expected to understand and

follow the Well Control Handbook.  Braniff Depo. 153:17-23 (Transocean Well

Operations Manager); *see* TR. 1826:2-13 (Ezell) (Transocean's well control schools

cover "in fairly great detail" the Well Control Handbook and crew members are tested so

they are familiar with the manual).

(3) **The crew received extensive on-the-job and additional training**

64.    In addition to the IADC WellCAP certified well control school,

Transocean provided extensive On-the-Job Training (OJT) modules for each rig position.

---

[3] Dr. Bourgoyne opined in his report that "what *may* have been lacking were adequate emergency drills simulating high flow rate conditions," noting, however, that "training intensity for dangerous but very rare events is always hard to maintain."  TREX 8173.68 (Bourgoyne expert report) (emphasis added).  At trial, Dr. Bourgoyne testified that he does not know whether that type of training was lacking.  TR. 7704:23-7705:20 (Bourgoyne).

*See* TREX 52658 (Summary: Training of Well Control and Bridge Crewmembers Aboard the *DWH* on April 20, 2010) (listing training courses completed by key *Deepwater Horizon* personnel); TREX 3581 (Transocean Training Matrix of OJT Modules required for different positions); *see* D. McKay Depo 247:11-14 (DNV auditor) (Transocean is "very dedicated to making sure that the crew has taken the . . . company-specified mandatory training").

65.     The OJT modules were self-paced, task-based and generally tailored to specific positions on the rig.  As part of an OJT module, the crewmember had to answer or perform a mandatory list of questions or tasks to the satisfaction of his supervisor. Once the supervisor was satisfied that the crewmember was proficient in all tasks required on the list, the crewmember was required to pass a computer-generated test.  TR. 4549:25-4551:2 (Newman); McMahan Depo. 87:2-23; TR. 1752:16-17, 1755:1-1759:5 (Ezell) (describing the Driller OJT Module training process).

66.     Transocean requires all drillers to successfully complete the Driller OJT Module.  TREX 3581(Transocean Training Matrix); TR. 1755:8-11 (Ezell).  The Driller OJT Module requires demonstration of competency in the following: understanding of the main components of the blowout prevention system, including the rated capacity of each component; understanding the use and operation of each function on the driller BOP control panel; and understanding how to perform a flow check, divert the well, and operate emergency disconnect procedures.  TREX 41255.9-13 (Driller OJT Module); TR. 1757:4-1759:14 (Ezell).

67.     Jason Anderson, Dewey Revette, and Randy Ezell had all passed the Driller OJT Module and were qualified to train other personnel.  TR. 1759:15-18 (Ezell).

They and other crewmembers had also completed numerous additional OJT modules and training courses, including Petrofac's Major Emergency Management course. *See* TREX 52658 (Summary: Training of Well Control and Bridge Crewmembers Aboard the *DWH* on April 20, 2010) (listing OJT Modules and training courses completed by key *DWH* personnel).

### (4)   The *Deepwater Horizon* crew's training included frequent well control training drills and audits

68.   Transocean reinforced its well control training with weekly drills and audits.  In compliance with MMS regulations, the crew conducted weekly unscheduled well control drills, including "kick drills." TREX 41008.57-60 (Transocean Well Control Handbook, Section 4.2); 30 C.F.R. § 250.462 (2003).  Additionally, the crew conducted scheduled, weekly well control audits (also known as drills).  TR. 1974:21-1975:8 (R. Sepulvado) (each crew would conduct weekly well control audits addressing various topics in well control).

69.   In the 11 weeks from January 31, 2010 to April 19, 2010, the *Deepwater Horizon* crew conducted at least 24 scheduled well control drills/audits and 36 unscheduled well control drills.  TREX 52661 (Summary: Well Control and Marine Safety Drills Conducted on the *DWH*); *see* TREX 7676.15 (Barnhill expert report); TR. 1974:21-1975:8 (R. Sepulvado).  The drills included detecting and responding to a kick while tripping or drilling.  TR. 1777:3-13, 1779:1-1781:4 (Ezell) (crew conducted trip drills, pit drills, D5 (well kill or choke) drills, and EDS drills).

70.   Drills frequently focused on the tasks the crew would be performing in the coming days.  For example, one of the last drills conducted on board the *Deepwater Horizon*, on April 18, 2010, simulated a well "lost due to improperly designed cement

21

slurries and spacers." TREX 571.13 (4/18/10 Safety Drill Report). As the cement plug was to be installed on Macondo the following day, this drill reminded the crew to be vigilant to well control situations arising as a result of cementing operations. TR. 4599:1-4 (Newman). Jason Anderson, Daniel Barron III, Stephen Curtis, Randy Ezell, Jimmy Harrell, Caleb Holloway, and Dewey Revette were among those crewmembers in attendance for the April 18 drill. TREX 571.13 (4/18/10 Safety Drill Report).

71.     The *Deepwater Horizon* crew also conducted regular Function Diverter Drills. During the *Deepwater Horizon*'s time at Macondo, the crew conducted at least 11 such drills. TREX 52661 (Summary: Well Control and Marine Safety Drills Conducted on the *DWH*); TR. 1777:9-10, 1780:9-12 (Ezell).

### (5)     Ongoing incorporation of lessons learned

72.     As part of its efforts to monitor and improve training, Transocean tracked well control events in its Global Management System (GMS) and published an annual report of well control events and statistics from the prior year. *See* TREX 1452.29-32 (Transocean Field Operations Handbook, Section 2.3 "Operational Event Reporting"); TR. 4581:20-4583:6, 4584:9-15 (Newman); *see, e.g.*, TREX 5649 (2009 Annual Report). In this report, Transocean categorized various well control events (from precautionary shut-ins to kicks) and tracked their severity. TREX 5649.12-16. Kick volume is one factor of kick severity, with Transocean's goal being to detect kicks and shut in the well within 20 barrels.[4] TR. 4586:2-5 (Newman).

73.     Transocean investigated well control events, took appropriate action, and incorporated lessons learned from those events into its training procedures on an ongoing

---

[4] In the period from 2005 to 2009, Transocean crews successfully detected and shut in 84% of the kick events within 20 barrels. D-6732 (Transocean 2009 Annual Report).

basis.  Transocean issued advisories or alerts based on lessons learned from well control events or incidents.  TR. 4587:25-4589:2 (Newman); Canducci Depo. 169:24-171:16; 173:10-174:14; Braniff Depo. 86:3-10.  Transocean also revised the Well Control Handbook as a result of lessons learned.  TR. 4589:3-9 (Newman).  Changes in policy or practice were communicated via Transocean's Intranet—available to personnel on the *Deepwater Horizon*—via email distribution, and via updates to the Well Control Manual and training.  TR. 4595:17-4597:15 (Newman); Cameron Depo. 125:20-126:6.

74.     Transocean investigated and took actions based upon lessons learned from the prior well control events mentioned at trial, including the *Jim Cunningham* incident from 2004.  Based on the results of that investigation (and with the concurrence of the operator), Transocean took disciplinary action against supervisors responsible for the incident, including terminating the night Toolpusher.  *See* TREX 7134 (*Jim Cunningham* power point presentation); TREX 26009.b (Letter to Night Toolpusher); TR. 4589:10-4592:22 (Newman).

75.     Transocean also investigated and issued a report regarding a riser unloading event in February 2009 on the *MG Hulme.*  Based on the results of that investigation (again with the concurrence of the operator), Transocean revised the March 31, 2009 version of the Well Control Handbook dealing with riser unloading events and the use of the diverter.  TREX 5650.19.1.TO (3/26/09 EAU Incident Investigation Report for *MG Hulme* Incident); TR. 4592:23-4595:10, TR. 4744:25-4747:15 (Newman); D-6726 (additions to 2009 Well Control Handbook based on lessons from *MG Hulme* incident).[5]

---

[5] Randy Ezell, Dewey Revette, and Stephen Curtis received their IADC WellCAP training subsequent to these revisions, and thus were taught based on the March 31, 2009 edition.  TREX

76.     A well control event occurring on the *Sedco 711* rig during the completions process resulted in a fleetwide advisory on April 5, 2010.  The advisory stated, "[D]o not be complacent because the reservoir has been isolated and inflow tested. Remain focused on well control and maintain good well control procedures."  TREX 1523.1 (4/5/10 Well Operations Group Advisory); TR. 4595:17-4597:15 (Newman).

77.     Although email distribution of the *Sedco 711* advisory had not yet reached the *Deepwater Horizon* crew on April 20,[6] the same message was part of the crew's fundamental well control training.  *See* Cameron Depo. 310:12-18, 312:1-4, 313:6-15 (Transocean only sent an advisory out following the incident onboard the *Sedco 711*, rather than an alert because "the Well Control Handbook clearly covered the monitoring of wells, so an advisory was raised to reinforce that and clarify the monitoring of wells"); McMahan Depo. 25:7-18; 28:12-25 ("Failure to monitor well fluids is known and documented within our company policies and procedures. We did not feel that this would be new information to the operating field. … The recognition that underbalanced operations require high vigilance is identified in the well control handbook, and it is part of the well control training."); *id.* at 29:2-12 ("The advisory is to reiterate what exists in

---

52658.4, .12, .16 (Summary: Training of Well Control and Bridge Crewmembers Aboard the *DWH* on April 20, 2010); TR. 4747:16-4749:8 (Newman).

[6] On April 5, 2010, Transocean posted this advisory to the company's Intranet ("e-Doc" system). TR. 4598:2-8 (Newman); McMahan Depo. 31:9-16.  Barry Braniff, Well Operations Manager, also emailed the advisory to managers worldwide, including the General Manager of Transocean's North American Division, Bill Sannan.  TREX 4906A (email string including April 5, 2010 email from Braniff).  Mr. Sannan was away on vacation at the time and did not review the advisory before April 20, 2010.  Sannan Depo. 249:6-250:21.

Moreover, as Mr. Ambrose testified, the *Deepwater Horizon* drill crew likely would not have thought the advisory was applicable to their drilling operations on April 20, 2010, as the *Sedco 711* event occurred during a completion operation and resulted from a mechanical valve failure. TR. 6140:13-6141:10 (Ambrose).

our company policies, procedures and handbooks and training, and a reminder that mechanical barriers do fail.")

78.     The *Sedco 711* advisory's reminder to "remain focused on well control and maintain good well control procedures" after the reservoir has been tested was also replicated in the crew's April 18, 2010 Safety Drill, which reinforced the need to be vigilant to well control situations during cementing because "well[s] have been lost due to improperly designed cement slurries and spacers." *Compare* TREX 1523.1 (4/5/10 Well Operations Group Advisory), *with* TREX 571.13 (4/18/10 Safety Drill Report); TR. 4598:12- 4599:7 (Newman). *See generally* TR. 1695:5-14 (Ezell) (while lessons learned are important, they often involve "basic well control concepts that [Ezell's] crew [would have been] fully aware of and understood").

79.     Transocean's response to well control incidents was summarized at trial by CEO Steven Newman: "If we have an incident or we experience something that highlights to us that we could improve our system, we will improve our system. We'll amend and modify and update the system. That's what you do. That's how you get better." TR. 4589:6-9 (Newman).

80.     No evidence was offered at trial to show that other drilling contractors or operators required a different or superior training program at the time of the incident.

**B.      Transocean Training Complied With BP's Policies**

81.     In compliance with MMS regulations, BP's well control training plan required contractors' employees to have a valid and recognized well control certificate and recognized the IADC as a valid well control certification authority. TREX 215.9 (BP GP 10-10 Well Control Group Practice).

82.     In 2009 BP audited Transocean's well control training policies and found that (1) Transocean's training program followed the IADC's WellCAP curriculum; (2) Transocean instructors were qualified; (3) Transocean had adequate procedures and drills in place to ensure retention of knowledge and skills; and (4) Transocean complied with BP's training standards.  TREX 937.37-40 (10/30/09 email from Marco Tulio to Jerry Canducci attaching the results of BP's 8/3/09 Transocean Inc. HSSE Audit).

83.     BP viewed Transocean's IADC-certified well control school as providing "good well control training" in accordance with "the industry standard."  *See* TR. 7698:5-7699:2 (Bourgoyne); Shaughnessy Depo. 206:17-207:21 (BP Technical Authority) (IADC WellCAP provided proper well control training and was in compliance with BP's policies).

84.     BP's policies required that all well control drills be performed to the satisfaction of the BP Well Site Leader.  TREX 93.47 (BP Drilling and Well Operations Practice, DWOP) ("Kick detection, diverter, circulating, stripping, and shut-in drills shall be held regularly until the designated company representative is satisfied that each crew demonstrates suitable BP standards"); TREX 1876.6 (BP Well Control Gulf of Mexico DW STP, GP 10-10); TR. 7708:1-22 (Bourgoyne).  The BP Well Site Leaders on the *Deepwater Horizon* participated in the rig's weekly well control drills.  TR. 1975:15-21 (R. Sepulvado); TREX 571 (compendium of Safety Drill Reports showing attendance by BP Well Site Leaders); TREX 7676.15 (Barnhill expert report).  There was no evidence or allegation at trial that the BP Well Site Leaders were dissatisfied with the *Deepwater Horizon* drill crew's performance during any of these drills.  *See* TR. 4266:23-4267:5 (Barnhill).

### C. The Drill Crew Aboard The *Deepwater Horizon* on April 20, 2010, Was Experienced And Respected

85. The *Deepwater Horizon* crew on tour on April 20 had many years of experience, individually and working as a team. At the time of the incident, Senior Toolpusher Randy Ezell had worked with Transocean for nearly 26 years, including nine years on the *DWH*. TR. 1633:5-11, 1634:8-10 (Ezell). Mr. Ezell received the Transocean First Excellence Award—the highest honor awarded to personnel demonstrating that they went "above and beyond." TR. 1733:13-21 (Ezell); *see* TR. 4540:16-4541:15 (Newman) (award recognizes employees who put safety first). BP commended Mr. Ezell "for his leadership in helping the team become one of the best performing rigs within BP." TREX 7774A (BP letter commending Ezell for Excellence Award); TR. 1734:4-22 (Ezell).

86. Toolpusher Jason Anderson had worked 14 years with Transocean, including 10 years on the *Deepwater Horizon*. *See* TREX 50134 (Anderson training records and certificates). At the time of the incident, Mr. Anderson had just received a promotion to Senior Toolpusher. TR. 1740:15-20 (Ezell). Mr. Ezell, his supervisor, credibly testified that Mr. Anderson was "highly motivated" and "wanted to constantly improve himself, so he had a lot of training." TR. 1737:15-1738:2 (Ezell). Mr. Anderson also held an OIM license. *Id.* Mr. Anderson's annual review, a few months before the incident, reflected the highest possible marks for competency. TREX 52649.1-4 (noting that Mr. Anderson "makes quality decisions on a constant basis" and "Jason has always been one of the rocks that the *Deepwater Horizon* was founded on"); TR. 1738:21-1740:17 (Ezell).

87.     Driller Dewey Revette had worked with Transocean 23 years, including eight years on the *Deepwater Horizon*.  TR. 1741:2-8 (Ezell).  Mr. Ezell credibly testified that, based on his personal experience with Mr. Revette, Mr. Revette understood how to actively monitor the well, including how to conduct a flow check and perform shut-in procedures.  TR. 1750:18-1752:12 (Ezell); *see also id.* 1729:24-1730:3 (Revette was a "good driller and he was competent").  Numerous other witnesses confirmed that Mr. Revette was a safety-conscious driller.  *See* M. Sepulvado Depo. 532:15-533:12 (Revette was onboard with Transocean's safety-first culture); Holloway Depo. 143:10-144:25 (Revette was safety-conscious and safety was a priority for him); Watson Depo. 167:16-22 (Revette was a safety-conscious and by-the-book driller); Winslow Depo. 626:19-23 ("Revette was a very safe worker. Conscientious, knowledgeable."); D. Johnson Depo. 194:2-10 (Revette looked out for safety of the crew, the rig, and the environment).

### D.       BP Considered the *Horizon* Crew "The Best In The Business"

88.     One month before the Macondo incident, BP completed a Service Quality Appraisal Report of the *Deepwater Horizon*'s performance and scored the Transocean crew's "Training and Crew Competence" as a nine out of ten, which BP considered "[e]xcellent."  TREX 5751. 4 (3/31/10 Service Quality Appraisal Report).

89.     The BP Well Site Leaders who worked with Transocean's *Deepwater Horizon* crew around the clock believed that the crew was well qualified.  *See* TR. 1919:18-20, 1968:13-1969:2, 2027:6-10 (R. Sepulvado) (based on his eight years as Well Site Leader, he thought the drill crew was competent to perform their jobs); M. Sepulvado Depo. 530:22-531:3 (for OIM Harrell, "safety was always number one"); *id.* at 531:4-9 (Ezell was "one of the best toolpushers" he had ever worked with); *id.* at 531:23-532:1 (Jason Anderson was "an excellent toolpusher"); TR. 8301:9-14 (Lambert)

(the Transocean drill crew "took their jobs very seriously"); P. Earl Lee Depo. 383:21-384:17 (Transocean drill crew was experienced, professional, hard-working, and demonstrated a high level of skill); Price Depo. 138:3-6 (comfortable with the competency of the Transocean rig crew).

90.     When BP Well Site Leader Murry Sepulvado was asked if, even after the blowout and knowing everything he now knew, he "could turn back the clock and . . . work on a rig with [the *Deepwater Horizon* crew] again," Mr. Sepulvado responded, "it would be my pleasure."  M. Sepulvado Depo. 536:6-11.

91.     As the BP Wells Team Leader for the *Deepwater Horizon*, John Guide had worked with the *Horizon* crew for three years.  TR. 8852:1-13 (Guide).  According to Mr. Guide, BP viewed the *Deepwater Horizon* crew as "the best in the business."  TR. 8596:1-3, 8851:15-19, 8852:23-25 (Guide); *see* Cocales Depo. 487:18-488:11 (BP Drilling Engineer) (crew was trained and competent to handle necessary operations at Macondo).

### E.     The Crew Had Successfully Handled A Prior Kick On Macondo

92.     On March 8, 2010, the Transocean drill crew detected a kick and timely shut in the well.  TR. 4268:21-4269:12 (Barnhill).  The Transocean drill crew on duty at the time of the March 8 kick was the same crew on duty on April 20, 2010.  TR. 4268:17-20 (Barnhill).

93.     The drill crew observed an unusual gain in pit volume after approximately 10-12 barrels.  TREX 657.2.TO (3/8/10 IADC Daily Drilling Report); TR. 1761:19-23 (Ezell) (Transocean driller "caught it in the early stages, which is 10 to 12 barrels"); TR. 4268:21-4269:8 (Barnhill).

94.    Because pit volume measurements can move approximately 25 barrels due to the swaying motion of the vessel, a small or slow gain in pit volume can be difficult to detect.  TR. 1765:5-14 (Ezell); TREX 4447.7.TO (BP investigators' notes of Hafle interview) ("pit volumes can move on the order of 25 bbls, due to vessel motion, so unless a gain exceeds that rate it will not be easy to detect").

95.    At the time the crew observed the pit volume gain on March 8, the crane was in operation.  Crane operations cause the vessel to move and can affect pit volume measurements.  The Transocean drill crew ordered the crane to be cradled so they could carefully monitor fluid volumes in the well.  M. Sepulvado Depo. 355:15-357:1.

96.    The drill crew then shut in the well and notified BP Well Site Leader Murry Sepulvado of the kick.  M. Sepulvado Depo. 354:16-21 ("When they called me, they already had it shut in.").

97.    The well control actions that the Transocean drill crew took in response to the kick on March 8 were those mandated by Transocean's Well Control Handbook.  D-6641 (comparing Transocean Well Control Handbook instructions to actions taken on March 8).

98.    BP's internal investigation report later criticized the Transocean crew for supposedly allowing the March 8 kick to go "unnoticed for approximately 33 minutes" and allowing "a total gain of 35 bbls to 40 bbls . . . before shutting in the well."  *See* TREX 1.107 (Bly Report).  In fact, as set out above, the kick was detected after approximately 10-12 barrels and then shut in once the crew confirmed that the increase was not caused by other factors.  TREX 657.2.TO (3/8/10 IADC Daily Drilling Report); TR. 4268:21-4269:8 (Barnhill).  The BP Well Site Leaders believed at the time that the

drill crew responded appropriately on March 8.  M. Sepulvado Depo. 540:15-25 (on-duty BP Well Site Leader felt that Transocean driller's response to seeing the unusual increase in fluid was "appropriate"); *id.* at 732:2-11 (the crew did a "good job" in catching and shutting in the kick); P. Earl Lee Depo. 387:23-388:17 (off-duty BP Well Site Leader on the rig felt the Transocean driller acted "appropriately"); P. Johnson Depo. 407:16-408:23 (BP Wells Team Leader John Guide told Transocean Rig Manager Paul Johnson that he was "fine" with the drill crew's response).  The evidence showed that, prior to the incident, BP's only criticism concerning the March 8 kick focused on the failure of *BP's personnel* to properly assess the drilling margin and thereby prevent the kick from occurring.[7]

99.     On March 28, 2010, the crew's routine weekly well control drill addressed the circumstances of, and appropriate response to, the March 8 kick.  The drill reminded the crew that an increase in pit volume is a positive indicator of a kick in progress. TREX 571.37.TO (3/28/10 Safety Drill Report) ("[an] increase in flow rate and/or pit volume is a positive indicator that a kick is occurring").

---

[7] BP Wells Team leader John Guide believed that BP's Tiger Team, which was responsible for modeling predicted pore pressures, had become "complacent."  TREX 60051.12.3.TO (BP investigators' notes of Guide interview) ("John said that he was concerned that the team had gotten 'too comfortable' with itself"); TREX 37031.89.2.TO (BP investigators' notes of Guide interview) ("Believes the onsite P[ore]P[ressure] detection team complacent.").  The Tiger Team subsequently issued a "Lessons Learned" memorandum criticizing BP's speed of drilling and its communication.  In particular, the memo noted that "the accelerated rate of penetrations and the resulting 'onslaught' of drilling indicators exceeded the ability of all team members to effectively recognize, properly communicate, and decisively act upon available data."  TREX 1074.3.1.TO (BP "Lessons Learned" Memorandum); TREX 1076 (3/18/10 Bodek email string re "Lesson Learned - Plan forward: Macondo).

## IV.   TRANSOCEAN AND THE *DEEPWATER HORIZON* WERE COMMITTED TO SAFE OPERATIONS

### A.   Transocean Implemented A Strong Safety Culture On The *Deepwater Horizon*

100.   The evidence showed that the crew of the *Deepwater Horizon* had established a strong safety culture on the rig.  *See* TR. 1771:19-1772:6 (Ezell) ("Q: What was Transocean's company goal with respect to safe operations? A:  Safe operations everywhere, all the time.  Q:  Did you have processes on the rig to identify risks and avoid hazards? A:  We did.  Q:  How would you describe the safety culture onboard the *Deepwater Horizon*?  A:  Well, in all of my years on working on drilling rigs, it was the best safety culture, in my mind, that I had ever seen.").  Mr. Ezell's testimony reflected Transocean's goal fleetwide:  "an incident free workplace.  All the time, everywhere." TREX 925.19.1.TO (Transocean Company Management System manual); TR. 4530:25-4531:6 (Newman).

101.   The testimony of the rig crew, rig management and other on-board personnel corroborated Mr. Ezell's experience.  *See* Odenwald Depo. 190:10-191:14 (safety processes were "engrained in the employees from day one"); Meche Depo. 176:5-17 (Transocean was a safety-conscious company and the *Deepwater Horizon* crew made safety a priority); D. Johnson Depo. 172:24-173:15, 173:17-174:4 (safety was the single most important thing on the *Deepwater Horizon* and safety was always first); Holloway Depo. 142:10-14 ("Q. Did Transocean stress to you the importance of safety in your activities …? A. Yes Sir."); TR. 6356:24-6357:6 (Chaisson) ("every [safety] drill that I've taken part in has been taken seriously"); TR. 3620:22-24 (Keith) (safety was a priority on the *Deepwater Horizon*); P. Johnson Depo. 559:16-560:12 ("pushed tirelessly on safety … it was the start of our conversations, it was the start of our meetings, it was

32

in the forefront of everything we did"); Keeton Depo. 638:18-639:13, 639:15-18, 639:20 (safety was a "core value" and "part of [his] day all day … I talk about safety on the way to work, safety on the way home"); TR. 1962:22-1963:1 (R. Sepulvado) (*Deepwater Horizon* was "very safe"); M. Sepulvado Depo. 533:5-8 (BP Well Site Leader) ("It was a big Transocean culture out there for safety first . . . and everybody supported it.").

### B. Transocean Maintained A Corporate Structure To Manage Safety

102.    At the corporate level, Transocean's Quality, Health, Safety, and Environment (QHSE) department, headed by an executive officer, is responsible for providing support and setting "goals and strategies to achieve the vision of incident-free operations."  Rose Depo. 14:8-15:9 (Transocean QHSE Vice President).  Divisional QHSE departments include "safety advisors that [Transocean] sends to rigs to help as subject matter experts to help them implement and monitor their execution of the safety management system."  Canducci Depo. 584:19-585:6.

103.    Transocean assigns a Rig Safety and Training Coordinator (Safety Coordinator) to each rig on a full time basis.  The Safety Coordinator's "sole responsibility is to follow up with safety training."  D. McKay Depo. 247:17-19; *see* TR. 1772:6-1773:2 (Ezell); Hadaway Depo. 165:22-167:8 (Safety Coordinator was on board *Deepwater Horizon* to help develop safety culture); TREX 3585 (Transocean Job Listing for RSTC detailing the position's primary function).

104.    The *Deepwater Horizon*'s Safety Coordinator was responsible for making sure the crew applied Transocean's safety processes, as well as keeping up with safety statistics and training.  Hadaway Depo. 9:25-10:23, 187:23-188:5; TR. 1772:6-1773:2 (Ezell).  The Safety Coordinator prepared daily reports on safety activities that were then

shared with BP.  *See* TR. 1775:14-25, 1776:11-24 (Ezell); TREX 3591.b (Daily

START/THINK report).

### C.   Transocean Implemented Specific Processes On Its Rigs Designed To Ensure Safety

105.    Transocean's safety management system includes a number of specific

programs designed to enhance rig safety, including "Time Out for Safety," THINK, and

"See, Think, Act, Reinforce, and Track" (START).  TR. 4539:15-4540:10, 4541:21-

4542:14, 4545:20-4546:14 (Newman); TREX 4942.165-67, 275-76 (Transocean Health

and Safety Policies and Procedures Manual §§ 4, subsections 2.1, 5.1).

106.    Transocean's Time Out For Safety policy empowered anyone on the

*Deepwater Horizon* to stop work at any time if the operation appeared unsafe.  TR.

4539:18-25 (Newman) ("[I]f you see something that seems out of place, if you

recognized a change, you not only have the right but the obligation to call a time-out").

Encouraging crewmembers to call a Time Out for Safety is part of Transocean's "highest

level policy."  Rose Depo. 112:3-13.  Transocean instituted its "I Made a Difference"

campaign to recognize employees who exercised their stop work authority.  TR. 4539:20-

4540:10 (Newman).

107.    Transocean managers on the *Deepwater Horizon* made sure that members

of the rig crew knew they could and should call a Time Out for Safety.  *See* TR. 1775:6-

1775:13 (Ezell) ("Well, time out for safety was something that we were making sure that

the guys understood it's okay to take a time out for safety . . . . So, you know, we were

definitely reinforcing the value that take a time out for safety whenever required.  You

think you need it, take it."); Keeton Depo. 316:6-317:8, 317:10-21, 318:2-12 (former

*Deepwater Horizon* Rig Manager) (Transocean encouraged crew to challenge and stop any activity or work they felt was unsafe).

108.    The crew of the *Deepwater Horizon* could and did stop work when they identified a possible risk.  TR. 1774:15-1774:19 (Ezell) ("Q: Have you ever seen Jason Anderson and Dewey Revette call time out for safety?  A:  Yes, they have.  We all have as individuals on the rig at some point or another."); Keplinger Depo. 175:24-176:7 ("It was my obligation to stop the job."); Odenwald Depo. 189:14-190:9 (Time Out for Safety is "engrained in the employees from day one"); D. Johnson Depo. 196:8-17; 196:19-22; 196:24-197:3; 197:5 (Transocean would reward crewmembers for calling Time Outs for Safety); Albers Depo. 41:13-24 (BP Subsea Project Manager) (everyone on rig understood their authority to call a Time Out for Safety to stop a job if they observed anything unsafe); TR. 5595:18-5596:9 (D. Young) (anyone on the rig could call a Time Out for Safety and "time out for safety was something that you were expected to use"); Williams Depo. 270:14-21 (always felt comfortable calling a Time Out for Safety); Burgess Depo. 313:19-314:6 (used his stop work authority many times); Meinhart Depo. 173:15-174:18 ("Q.  . . . did you ever call a time-out for safety, you personally? A. All the time."); Holloway Depo. 94:18-95:8, 150:10-151:12 (he had stop work authority, was comfortable calling Time Outs for Safety, and believed he was supported by supervisors in doing so); TR. 3622:7-24 (Keith) (Halliburton mudlogger) (understood he had stop work authority and was comfortable exercising that authority if necessary); TREX 5959.2-3 (2008 BP Safety Pulse Check on the *Deepwater Horizon*) (finding stop the job culture was very strong among all 146 personnel interviewed).

109.     Transocean's THINK process, a pre-task planning process used to identify and manage risks, was in place on the *Deepwater Horizon*.  *See* TREX 4942.165 (Transocean's Health and Safety Policies and Procedures Manual § 4); TR. 5598:21-5600:18 (D. Young); TREX 5959.4 (BP 2008 Safety Pulse Check on the *Deepwater Horizon*: "There seems to be good participation of everyone involved in the job."). THINK drills were carried out before every job and included a listing of all the procedures, responsibilities, and expected hazards for the job.  TR. 1971:24-1973:10 (R. Sepulvado); *see* Watson Depo. 172:2-17 (THINK drills were expected by rig leadership and were carried out all the time); Breland Depo. 60:18-61:21 (before starting work, he was required to conduct a THINK drill, which would identify expected hazards).

110.     The *Deepwater Horizon* crew was also trained to follow Transocean's START policy, an observation and monitoring process that Transocean expects its rig crews to use as they carry out tasks.  TR. 4545:15-4546:14 (Newman); TREX 4942.275-76 (Transocean Health and Safety Policies and Procedures Manual § 4).

111.     Consistent safety meetings were built into the crew's schedule.  The *Deepwater Horizon* crew held pre-tour meetings every 12 hours (one for each hitch) with every department head and the BP Well Site Leaders to focus on safety and activity coordination.  Mansfield Depo. 67:4-68:20; Wolfe Depo. 292:13-23 (two safety meetings held every day); TR. 6369:225-6370:17 (Chaisson) (BP and contractor representatives attended the morning meetings).  Transocean rig management and BP, both onshore and offshore personnel, participated in a morning call every day to talk about safety on the rig.  Keeton Depo. 638:18-639:8; P. Johnson Depo. 70:18-71:8; Wolfe Depo. 293:11-24; 293:4-10.  In addition, the *Deepwater Horizon* crew held weekly meetings dedicated to

safety issues.  TR. 1973:17-1974:17 (R. Sepulvado); Wolfe Depo. 292:13-23; D. Johnson Depo. 174:2-176:3.

112.    The *Deepwater Horizon* had an exceptional safety record.  As of April 20, 2010, the *Deepwater Horizon* had gone seven years without a "lost time incident," *i.e.*, an injury that prevents the injured person from working the next shift.  TR. 8603:13-8604:4 (Guide) ("we had just got to the seven years in a row" without having "someone [] injured to the point where they actually would have to miss work"); TR. 1776:1-4 (Ezell). Senior Toolpusher Randy Ezell testified, "I've never seen anywhere that had had seven years without a lost time incident" other than the *Deepwater Horizon*.  TR. 1771:25-1772:5 (Ezell); *see also* Sannan Depo. 31:14-32:5 (*Deepwater Horizon* had very good safety performance and ranked very high in safety performance statistics).

### D.    Transocean Shut Down The Fleet And Hired The Lloyd's Register To Make Sure Its Safety Culture Functioned Properly

113.    In 2009, Transocean experienced four fatalities over a 3-month period. These incidents related to dropped objects and similar personal safety issues.  TR. 4563:17-4564:2 (Newman).

114.    None of the four fatalities related to well control.  TR. 4563:25-4564:6 (Newman) ("Q.  Were any of these fatalities the result of a well control incident or blowout?  A.  No . . . Mirza and Balwant and Dontray died as a result of material handling operations, you know, crane operations.  And Stuart Hepburn died conducting a rig induction tour.").

115.    The company's correspondence about these and similar personal safety incidents showed that management was committed to, and concerned about, making the operations as safe as possible.  *See* TREX 5653 (1/16/09 Newman email) (discussing

company leadership's responsibility for setting expectations, tracking compliance with expectations, and improving); TREX 48144A.2 (10/5/09 B. Long email) (challenging company's management team to think about and recommend processes and solutions to have the operations teams focus on safety); TREX 48144A.1 (10/10/09 P. Smith email) ("To effect this change, we will have to insist on complete compliance and implement a strong accountability culture ... Accountability (both positive and negative) must be swift, sure, and substantial."); TREX 2191.5 (6/6/08 Wink (West Africa Division Operations Manager) email to Rig Managers, forwarding 6/5/08 Saltiel (Executive Vice President, Performance) email following dropped object incident) ("let's draw a line under these events right now and ensure that our Drillers in all of the Units are competently performing their duties").

116.     Emails from Vice President of Operations Larry McMahan -- expressing in sometimes colorful terms his view that the company had to do better -- were similarly focused on rig personal safety issues such as dropped objects, not safety issues related to the monitoring of wells. *See, e.g.*, TREX 2189.3.1.TO (3/18/08 McMahan email) ("My bottom line is that we are better tha[n] what these incidents reveal and if we do not change the way we operate we will continue to have these trainwrecks.").  Although Mr. McMahan titled this email "Loss of Control," only one of the approximately 30 events described in the email related to a loss of well control, on a jack-up rig in the Far East. *See id.*

117.     Moreover, Transocean management took appropriate and immediate action in response to the four deaths on its rigs -- including suspending operations for the entire Transocean fleet to emphasize the importance of safety procedures.  TR. 4565:23-

4566:13 (Newman); TREX 52651.1.1.TO (10/28/09 Sannan email re "Safety Stand Up").

Transocean told its "people to shutdown and not to go back to work until they were

comfortable, comfortable to go back to work." TR. 4566:10-20 (Newman). Transocean

received no revenue from its customers while the shutdown was in effect. *See* TR.

4568:1-4 (Newman) ("When we shutdown our rigs, when we're not working for our

customers, they are not paying us.").

118.    In addition, Transocean hired an independent third party, Lloyd's Register,

to review Transocean's safety management system, in order to get a fresh perspective and

to find areas for improvement. TR. 4577:18-25 (Newman). Transocean "wanted to have

an independent review, totally independent[,] from a recognized industry expert as to the

perceptions aboard our rigs of our safety culture and climate and an independent review

of the robustness, tone and clarity of our Safety Management System." Rose Depo.

117:15-118:7. Plaintiffs' safety expert agreed that engaging Lloyd's was a good idea and

would be helpful for the company. TR. 456:11-14 (Bea).

### E.    The Lloyd's Survey Found That The Leadership On The *Deepwater Horizon* "Put Safety First"

119.    The *Deepwater Horizon* was one of four drilling rigs in the Gulf of

Mexico selected to participate in the Lloyd's Register review of Transocean's safety

culture. TREX 929.6 (Transocean Safety Management and Safety Culture/Climate

Review: North America Division Summary Report). Lloyd's reviewed the *Deepwater

Horizon* Safety Management System from March 12 to March 16, 2010. TREX 44049.4

(Transocean Safety Management and Safety Culture/Climate Reviews: North America:

*Deepwater Horizon*).

120.     Lloyd's Register found the *Deepwater Horizon* to have an exceptional safety culture, above the norm:   "The strong team culture onboard *Deepwater Horizon* and the levels of mutual trust evident between crews means that the rig safety culture was deemed to be robust, largely fair, and inclusive…."  TREX 929.87.  "[L]eadership was identified as one of the strongest areas …[and] [t]he Rig Performance Manager and rig based management were seen in a very positive light."  *Id*.  Transocean leadership "put safety first, and [did] this by providing the resources and time to conduct the job safely."  *Id*.  Rig crewmembers praised their supervisors and indicated that the supervisors "support[ed] …legitimate safety concerns."  *Id*.  "This included trust in Supervisors, rig based management and the *Deepwater Horizon* Rig Managers at Division."  TREX 929.88.  Lloyd's Register found that the *Deepwater Horizon* had a "culture of responsibility [that] was led from the top…."  *Id*.

**F.     Transocean And The *Deepwater Horizon* Had Received Widespread Recognition For Safe Operations**

121.     The *Deepwater Horizon*'s reputation as a safe rig, and Transocean's commitment to safety, were recognized by third parties.  DNV Regional Chief Surveyor David McKay, who audited the rig's safety management system, testified that "the crew are enthusiastic about safety management and pollution prevention, and they take the duties required by the ISM Code very seriously."  D. McKay Depo. 20315:7-14.  In Mr. McKay's view, "Transocean as a company is pretty committed to safety training, and they put a lot of time, effort and money into it."  D. McKay Depo. 247:24-248:2.[8]

---

[8] As discussed in part XIV-F(4), *infra*, DNV certified that Transocean's corporate safety management system was in compliance with the ISM Code.  D. McKay Depo. 300:25-301:5; 301:10-21; TREX 938.17 (2010 ISM Code at § 1.1.5); TREX 20044 (2007 Document of Compliance for Transocean); TR. 4024:4-24 (Webster); TREX 953 (4/21/10 DNV Document of Compliance showing DNV's Certification for 2008-2010); Canducci Depo. 634:3-19.

122.    MMS chose the *Deepwater Horizon* as a finalist for its 2009 Safe Rig of the Year Award.  TR. 8604:6-11 (Guide); TR. 8233:6-8234:14 (Shaw) (BP Head of GofM SPU).

123.    BP repeatedly made clear that it considered the *Deepwater Horizon* a "good performing" and "very safety oriented" rig -- one of the "leaders of the pack." Daigle Depo. 215:25-216:4; *see also* TREX 5959.3.1.BP (BP 2008 Safety Pulse Check on the *Deepwater Horizon*) ("Strong performance and safety culture is embedded); Rodriguez Depo. 144:11, 144:13 (rig management was safety conscious); TR. 8616:13-17 (Guide) (Transocean "had a very rigorous safety management system" in place that emphasized safety).

124.    On the afternoon of April 20, 2010, BP Vice President of Drilling & Completions for the Gulf of Mexico, Pat O'Bryan, and BP Operations Manager David Sims flew out to the *Deepwater Horizon* to commend the crew for their past safety performance.  TR. 6044:6-20 (Ambrose).  Mr. O'Bryan testified that he chose to go to the *Deepwater Horizon* because the rig was "what good looks like" and he wanted to apply the "lessons learned from [the *Deepwater Horizon*] and make sure we apply those to other rigs."  TR. 9264:16-9265:14 (O'Bryan); *see also* TREX 51134.3.TO (BP's talking points for *Horizon* Rig Visit: *Horizon* team shows "[g]enuine concern for health, safety and environment -- not just ticking the box"); TREX 51350.1 (4/4/10 Sims email: "I feel proud, honored, and very lucky to be associated with such a high performing rig.").

125.    No party offered evidence of another rig anywhere in the world with a better reputation or a better safety record.

---

# V.   BP'S RISKY PLANNING SET THE STAGE FOR LATER BP DECISIONS THAT CAUSED THE BLOWOUT

## A.   Deepwater Drilling Requires The Operator To Maintain A Delicate Balance Between Controlling The Well And Fracturing The Formation

126.   To extract hydrocarbons from an offshore deepwater reservoir, the operator drills and reinforces a hole from the seafloor into the reservoir zone.  This hole is called the wellbore.  During drilling operations, a column of drilling mud is used to exert downward hydrostatic pressure and prevent hydrocarbons in the reservoir from entering the wellbore.  TR. 620:1-4 (L. McKay); TR. 921:15-22, 972:3-6, 1469:4-16 (Bly); TR. 1826:17-24 (Ezell).

127.   Deepwater drilling requires a delicate balance between the amount of pressure needed to keep the well under control, *i.e.*, the weight of the mud, and the ability of the formation to withstand that pressure.  This balance is consistently monitored and adjusted by the operator.  If the mud weight is insufficient, the pressure exerted by hydrocarbons and other fluids in the pore space of rock, known as the pore pressure, can flow into the well.  This influx is called a kick.  TR. 649:23-652:10, 655:1-20, 661:5-22 (Huffman).

128.   If the mud weight is too heavy, the geologic formation will fracture.  The "fracture gradient" is the point at which the pressure exerted by the drilling mud weight will begin to fracture the formation rock, resulting in the loss of the drilling mud into the formation (known as "lost returns") and a corresponding reduction of hydrostatic head. TR. 652:6-10 (Huffman); Albertin Depo. 219:11-22, 219:24-220:16, 220:18, 220:20-221:2, 221:4-9; Vinson Depo. 332:16-22.

129.   The difference between the mud weight used to drill in the open hole and the "weakest fracture gradient in the open hole" is called the "drilling margin."  TR. 662:4-9, 662:24-663:7 (Huffman).  Maintaining a safe drilling margin is critical because the mud weight must be heavy enough to overbalance the pore pressure and prevent hydrocarbons from entering the well, but light enough so as not to fracture the open hole formation. TR. 649:23-652:10 (Huffman).  For example, if an unexpected increase in pore pressure results in an influx or kick, the drilling margin should provide a "safety cushion" that allows the driller to increase the mud weight to overbalance the kick without fracturing the formation and losing mud returns.  TR. 653:1-23 (Huffman).

**B.     BP Failed To Maintain A Safe Drilling Margin At Macondo**

130.   Federal regulations required BP to maintain a "safe drilling margin" of at least 0.5 ppg between its drilling mud weight and the formation fracture gradient.  30 C.F.R. § 250.427 (2009); TR. 654:2-23, 661:23-662:14, 665:18-666:1, 666:9-667:8 (Huffman); TREX 4021 (Application for Permit to Drill, May 13, 2009) (defining the safe drilling margin for the Macondo well as 0.5 ppg at each drilling interval); TREX 7510.9, .11, .21-27 (Huffman expert report); TR. 7619:13-7620:2 (Bourgoyne); Saucier Depo. 117:14-22, 118:7-15, 290:16-291:25 (If the 0.5 ppg margin cannot be maintained, 30 C.F.R. § 250.427(b) requires that operations be suspended, and if you continue drilling, you are violating the regulation); Douglas Depo. 208:10-15, 208:18-209:14 (BP's regulatory specialist understood that MMS policy was to maintain a 0.5 ppg margin.); Vinson Depo. 31:23-33:13 (Tiger Team Leader Vinson was aware that a dispensation was required to go below the 0.5 ppg safe drilling margin); Patton Depo. 195:14-20 (An incident of non-compliance (INC) would be issued if an operator went below the 0.5 ppg drilling margin without prior approval).

131.    In the pre-drill Application for Permit to Drill (APD), BP specified and MMS approved the safe drilling margin as 0.5 ppg for each Macondo drilling interval.[9] TR. 665:11-666:8 (Huffman); TREX 4021 (5/13/09 APD) (defining the safe drilling margin for Macondo as 0.5 ppg drilling margin for each drilling interval).

132.    As the operator of the Macondo well, BP had the sole responsibility to manage the drilling margin, pore pressure, and fracture gradient issues and to comply with regulatory requirements.  TR. 733:5-734:4, 793:16-794:1 (Huffman) ("BP was the responsible party that was making the decisions on the rig . . . [T]he oil company operator is calling the shots while drilling is going on, and the drillers are taking directives from them."); TR. 7619:13-7620:11 (Bourgoyne) (BP as operator had responsibility to propose its safe drilling margin of 0.5 ppg in its Applications for Permit to Drill or to persuade MMS to approve a departure from the safe drilling margin); Saucier Depo. 280:24-281:16, 281:18-282:2, 282:4-8, 10-22, 24 (BP submits the drilling applications to MMS, and MMS relies on the representations in the applications); Patton Depo. 289:14-17, 292:2-14.

133.    As the drilling contractor, Transocean was not involved in or responsible for managing any of the drilling margin, pore pressure, or fracture gradient issues. TR. 793:16-794:1 (Huffman); Alberty Depo. 397:15-397:19 (BP's Segment Engineering Technical Authority on pore pressure prediction and detection knows of no one from Transocean involved in the pore pressure detection or prediction at Macondo); Bellow Depo. 201:24-202:5 (real-time pore pressure data was not transmitted to Transocean); TR. 1668:4-9 (Ezell) (Senior Toolpusher on the *Deepwater Horizon* was not informed of

---

[9]  The drilling interval is the amount of formation that is drilled between the setting of casing points.  *See* TREX 4021 (5/13/09 APD).

the issues BP faced regarding narrow drilling margins); Bodek Depo. 475:24-476:9

(never told anyone from Transocean when BP ran out of drilling margin).

134.    Even a small variation below the approved safe drilling margin requires a

regulatory waiver.  *See* TREX 3732.1.1.US (3/14/10 Cocales email) ("Our FIT

[formation integrity test[10]] is 12.55 pounds per gallon and our TDMW [total depth mud

weight] will be 12.1 ppg which falls just short of the 0.5 ppg margin.  Maybe it is close

enough for them but we would have to ask them for a waiver as they require us to

maintain a 0.5 pound per gallon, unless a waiver is granted, and that would technically be

a 12.6 pound per gallon shoe test."); Saucier Depo. 287:3-11, 287:13-288:2, 288:4-10,

288:12-289:4, 289:6-24, 290:1-13, 290:15292:15, 292:17 (0.5 ppg margin must be

maintained under federal regulation or a waiver must be requested; if safe drilling margin

cannot be maintained, drilling must stop, and MMS must be notified).

135.    BP went below the 0.5 ppg drilling margin in four different drilling

intervals.  TR. 663:10-14, 669:10-670:15 (Huffman) ("BP, in drilling this well,

repeatedly violated the safe drilling margin, in some case drilling with no margin at all.");

Paine Depo. 209:5-12, 261:11-14, 261:18-19, 269:11-20 (drilling margin was 0.1 to 0.27

at points during drilling at Macondo); Albertin Depo. 416:12-14, 416:16-20, 416:24-

417:1, 417:4-9, 417:12-14 (drilling margin for production interval was not 0.5 ppg but

instead somewhere between 0.1 and 0.2 ppg.); Trocquet Depo. 255:10-257:18, 257:20-

25, 258:2-6, 258:8-259:7, 259:9-12, 259:14-15 (If BP thought it had run out of drilling

---

[10] A formation integrity test, similar to a leak-off test, is a type of pressure integrity test that
assists in the identification of the fracture gradient in the interval.  TR. 655:21-656:7 (Huffman);
Vinson Depo. 257:19-258:17; Albertin Depo. 38:2-17,368:2-7, 368:9-369:2, 14-13, 369:24-
370:08, 370:10-15.

margin, it should have stopped drilling and contacted the MMS.  It was a violation of federal regulations if the safe drilling margin was not maintained).

136.    The narrow drilling margin resulted in numerous instances of lost returns at Macondo.  TREX 1236 (2/23/10 Hafle email re Feb. 2010 lost returns while drilling); TREX 1234 (3/18/10 Paine email on March 2010 lost returns prior to March 8 kick); TR. 711:7-714:21 (Huffman); TREX 1220 (4/13/10 Bodek email on loss of full returns in April 2010 at 18,260 feet); TREX 4533.44-.49 (Macondo 8 1/2 x 9 7/8 Hole Section PowerPoint by BP's Randall Sant on April 2010 lost circulation events).

137.    For example, as discussed above, on March 8, 2010, while drilling at 13,304 feet, the Macondo well experienced a lost return event and subsequent kick. TREX 577 (3/9/10 Rich email) (Macondo Well took a kick and the well was shut in); TREX 1234 (3/18/10 Paine email on lost returns prior to March 8 kick).  The crew recognized the kick and shut in the well, but during the response to the kick, the drill pipe got stuck and had to be severed.  BP decided to "sidetrack" the well and drill around the severed pipe.  TR. 8651:23-8653:2 (Guide).

138.    Maintaining the safe drilling margin at Macondo was particularly critical in the final production interval[11] because of the presence of hydrocarbons and the resulting blowout potential if the hydrostatic head was lost.  TR. 707:6-710:18 (Huffman).  In fact, in hydrocarbon-bearing formations like the Macondo production interval, the MMS does not typically grant waivers or otherwise approve drilling margins

---

[11] The final production interval is the last interval drilled through which the hydrocarbons will be produced, i.e. hydrocarbons flow from the formation into the well, up through the casing, and to the surface.  TREX 4047 (3/26/10 Application for Revised Bypass); TR. 667:19-668:7, 669:17-23, 737:20-739:1, 751:20-22 (Huffman) (The final interval drilled is the production interval.); TR. 2551:17-2552:8 (Benge) (production casing goes down to the reservoir and hydrocarbon fluid travels through the production casing during production of the well).

less than 0.5 ppg.  Saucier Depo. 287:24-288:2, 288:4-10 (It is less likely that the MMS would approve a dispensation to drill with a 0.3 ppg margin in a production interval containing hydrocarbons).

139.    BP nonetheless failed to maintain the 0.5 ppg drilling margin in the Macondo production interval.  In fact, BP's drilling margin was only 0.15 ppg or 0.2 ppg. TREX 8186.1.1.US (4/4/10 Daily PPFG Report); TREX 1967.1.1.US (4/5/10 Daily PPFG Report); TR. 707:6-710:18 (Huffman).  This "minimal, if any, drilling margin" violated MMS regulations and was "unsafe from any industry practice."  TREX 1220 (4/13/10 Bodek email); TR. 669:10-670:15 (Huffman).

140.    At a drilling depth of 18,260 feet, BP experienced a loss of full returns, meaning mud pumped into the well was not returned to the rig because it was being lost into the formation.  TR. 711:18-714:9 (Huffman); TREX 1220 (4/13/10 Bodek email).

141.    The most prudent option at that point would have been for BP to stop drilling, plug the well with cement, and run casing.  TR. 747:13-749:15 (Huffman). Alternatively, BP could have stopped drilling, notified the MMS that the 0.5 ppg drilling margin could not be maintained and awaited further instructions from the regulator.  TR. 660:10-17 (Huffman).

142.    BP chose neither option; instead, BP drilled ahead with "minimal, if any, drilling margin" and did not notify the MMS.  TR. 667:12-669:9, 710:3-713:4, 748:7-750:22 (Huffman); TREX 1220 (4/13/10 Bodek email).  On April 9, 2010, BP finally called total depth at 18,360 feet, short of the originally planned depth of 20,200 feet. TREX 4021 (5/13/09 Application for Permit to Drill); TREX 4047 (3/26/10 Application

for Revised Bypass); TREX 1257 (4/13/10 Bodek email); TREX 4046.3 (4/9/10 Daily Drilling Report); TREX 1.64 (Bly Report).

143.    When BP called total depth at 18,360 feet, the well was in a "critical condition" and "could have failed at any moment." TR. 715:14-719:2 (Huffman). BP had "simply run out of drilling margin." TREX 4530 (Bodek 4/13/10 email).

144.    The well's unstable condition meant that the upcoming cementing and temporary abandonment procedures would be both difficult and risky. TR. 715:14-719:2 (Huffman); TR. 2257:3-25 (Benge) ("This is a very fragile well"). On April 18, BP understood the condition of the well and knew that mud, cement, and other fluids would have to be pumped at low volumes and low rates in order to minimize the pressures, *i.e.*, the "equivalent circulating densities" (ECD),[12] to avoid breaking down the formation. TR. 715:14-719:2 (Huffman); TR. 2257:3-25 (Benge). These requirements increased the risk of failure of the cement job.

145.    BP also knew that, as a result of the narrow drilling margin, the design and implementation of the cement job would be particularly challenging. *See* TR. 2257:3-25 (Benge) ("You didn't have a whole lot of room between pore pressure and frac gradient. And it was a very, very difficult and challenging cement job."); TREX 1.34 (Bly Report) ("Due to the narrow margin between pore pressure and fracture gradient, the accuracy of the cement placement was critical."). Narrow margins created an extremely unstable

---

[12] ECD is a measure of the downhole pressure at a specific depth that is exerted by the mud or cement weight when the pumps are on and the fluid is circulating through the well. The ECD is typically a higher value than the surface weight because of (1) the compressible nature of synthetic oil based mud under downhole pressures and (2) the frictional forces associated with the movement of mud through the casing and formation. Bodek Depo. 163:13-164:10; Patton Depo. 330:2-21. By contrast, equivalent static density (ESD) is a measure of the downhole pressure at a specific depth that is exerted by the mud or cement weight when the pumps are off and the fluid is not being circulated. Bodek Depo. 243:16-244:2. The surface weight is the weight of the mud or cement at atmospheric conditions. *Id.* 163:16-164:10.

wellbore that was unsuitable for the placement of cement.  TR. 7169:19-7171:21,
7082:19-7083:16 (Beck).  Knowledge of this narrow margin drove BP's end-of-well
planning.

### C.   BP Adopted An Unsafe Temporary Abandonment Plan

#### (1)   BP's last minute changes to the temporary abandonment plan increased the risks of a blowout

146.   Temporary abandonment (TA) is the process whereby a well is left in a
secured, semi-completed state, the BOP and riser are removed, and the drilling rig moves
away from the well site.  BP planned to have the *Deepwater Horizon* temporarily
abandon the Macondo well and to bring in another rig to complete the well construction
process.  TREX 7676.30 (Barnhill expert report); TR. 4243:14-19 (Barnhill).

147.   BP was responsible for planning the temporary abandonment of the
Macondo well.  Little Depo. (6/30/11) 53:22-54:11 (temporary abandonment procedure
"would be developed . . . by the -- the Engineering Team and the Wells Team, that would
be issued to the rig"); TR. 8762:3-6 (Guide) (BP Drilling Engineer Brian Morel drafted
the temporary abandonment procedures for Macondo); TREX 7676.30 (Barnhill expert
report); *see also* Little Depo. (6/30/11) 128:12-139:3 (BP's 30(b)(6) witness not aware of
any involvement by Transocean in drafting or revising temporary abandonment plan);
TREX 20001.86 (Bea expert report) ("Transocean was not included in many of the
decisions made by BP's onshore well team that increased the risk of failures at the
Macondo well.").

148.   In the days leading up to April 20, BP repeatedly modified its temporary
abandonment procedures.  Each version switched the order of key steps.  TREX 8140.90
(Beck expert report) (BP "chang[ed] temporary abandonment plans at least four times");

TREX 7676.30 (Barnhill expert report) ("BP generated at least five TA procedures between April 12th and April 20th .").

149.   In its April 14 temporary abandonment plan, BP planned to set a 300-foot surface cement plug with the drilling mud still in the well; next to test the cement plug by applying weight to it from above, followed by a negative test; and then displace the well to seawater to a depth of 6,000 feet and set the lockdown sleeve (LDS).[13]   TREX 537.1 (4/14/10 Morel email to J. Wilson and R. Sepulvado); TREX 7676.31 (Barnhill expert report).  Had BP followed this procedure, the risk level would have been greatly reduced, compared to the plan BP ultimately adopted.  TREX 7676.31 (Barnhill expert report) (this procedure was "the lowest risk of any of the TA procedures prepared by BP").

150.   BP then made two key changes to the initial temporary abandonment plan that increased the risk of a blowout: (1) BP decided to displace the drilling mud in the riser with seawater before setting the cement plug; and (2) BP decided to displace the well to more than 3,000 feet below the mud line.  *See* D-2445 (listing key aspects of the temporary abandonment plan).

151.   First, so that the surface cement plug could be set in seawater,[14] BP chose to displace a substantial volume of heavy drilling mud in the well with seawater *before* setting the surface cement plug.  The surface cement plug is a critical second barrier to

---

[13] A lockdown sleeve locks the casing in the wellhead.  It is "typically installed to prevent casing movement while the well is in production."  To set the LDS used at Macondo, per the manufacturer's procedure, 100,000 pounds of weight had to be applied.  BP chose to supply this weight using drill pipe, which was readily available on the rig, and hanging it below the LDS. This decision meant that BP's TA plans had to accommodate the length of drill pipe required to achieve 100,000 pounds below the wellhead.  TREX 7676.30-31 (Barnhill expert report).

[14] BP did not need to set the surface cement plug in seawater; plugs are routinely set in drilling mud.  TREX 7676.32 (Barnhill expert report) ("cement plugs are routinely successfully set in drilling mud"); M. Sepulvado Depo. 570:20-571:13 ("It really doesn't matter either way.  The cement will set up in mud or water.").

hydrocarbons.  TREX 547.1 (BP's April 20 "ops note"); D-2174 (depicting BP's planned temporary abandonment procedure); D-4940 (same).  The decision to displace all the mud *before* setting the surface plug "exposed the well to an underbalanced state prior to the installation of a secondary cement barrier."  TREX 3808.66 (Transocean investigation report); TREX 8140.94 (Beck expert report) ("BP did not provide for two independently tested barriers along each potential flow path.").

152.    Because the cement plug was not set before the final displacement, the only barrier to a blowout during the displacement to seawater was the cement at the bottom of the well.  This decision increased the risk of a blowout.  TREX 20001.20 (Bea expert report); *see* TR. 7611:9-22, 7612:9-7613:13 (Bourgoyne) (recognizing that setting cement plug first may have reduced risk).

153.    Displacing the mud with only one barrier also violated BP policy, which required that there be two independently tested barriers in place during temporary abandonment.  TREX 93.91 (BP Drilling and Well Operations Practice) ("Two temporary barriers are required for isolation of moveable hydrocarbon bearing or overpressured permeable sections from surface/seabed."); TREX 8140.30 (Beck expert report); TREX 93.91 (BP Drilling and Well Operations Practice); TR. 6119:6-6120:14 (Ambrose).

154.    Second, BP changed the planned depth of the cement plug from 933 feet below the mudline to 3,000 feet below the ocean floor.  BP's rationale was that the greater depth was needed to set the LDS last in the temporary abandonment procedure.  TREX 547.1 (4/20/10 "ops note"); D-2174 (depicting BP's planned temporary abandonment procedure); D-4940 (same).

155.    This decision meant there would be an "unusually deep" displacement of drilling mud with seawater.[15]  Walz Depo. 560:1-7; TREX 8140.92 (Beck Report).  The BP Wells Team had never before used a procedure requiring such a deep displacement. Sprague Depo. (3/22/11) 783:20-24; *see* M. Sepulvado Depo. 175:15-176:2 (the displacement "placed more stress on the bottomhole cement than any [he] had ever seen before").

156.    "Because BP [planned to] set the cement plug 3,000 feet below the mud line, the well was exposed to a much higher degree of underbalance . . . the consequences of which were a greater chance of failing a barrier and inducing a kick."  TREX 8140.92 (Beck expert report); TREX 3808.67 (Transocean investigation report) ("The underbalance was magnified significantly by the decision to place the plug 3,300 ft. below the mud line."); TREX 7676.31 (Barnhill expert report) (explaining why BP chose to set the cement plug 3,000 feet below the mudline).[16]

157.    The substantial risks that BP incorporated into its temporary abandonment plan were not communicated to Transocean.  P. Johnson Depo. 122:19-21, 122:24-123:2, 123:4-9, 123:13-16, 123:19-21, 123:23-124:05, 148:3-149:4, 149:7-150:4, 150:7-9, 150:12-17, 150:20-21.

---

[15] BP had a variety of options to avoid this "unusually deep" displacement and its associated risks.  TREX 8140.89 (Beck expert report) (proposing additional abandonment steps that would have mitigated risk); TREX 7676.33 (Barnhill expert report) ("[O]ther options could have been explored that would have significantly reduced the risk").

[16] Alternative temporary abandonment procedures were available that would not have required the surface cement plug to be set 3,000 feet below the mudline.  *See* TREX 7676.31 (Barnhill expert report) (describing alternate methods of setting the lockdown sleeve that would not have required the cement plug to be set so deeply); Cocales Depo. 845:17-846:5, 846:15-19 (same); Skidmore Depo. 79:12-80:20 (same); Albers Depo. 283:5-12, 15-21 (same).

(2)   **The constant changes left the BP Macondo team "flying by the seat of our pants"**

158.   The multiple changes in the temporary abandonment plan created confusion within the BP Wells Team.  The onshore team had just undergone an organizational restructuring as part of a mandated reduction of expenses and staffing in BP's Gulf of Mexico operations.  K. Lacy Depo. 184:03-08, 184:11-25; 801:6-8; Dupree Depo. 25:15-27:10; TREX 5677.3 (12/18/07 email from Neil Shaw regarding "Organisation Design"); TR. 8141:24-8143:25 (Shaw).

159.   BP Wells Team Leader John Guide believed that, as a result of the restructuring, "the operations and engineering teams were not working smoothly yet." TR. 7973:25-7974:4 (Robinson); TREX 151C.7-8 (BP investigators' notes of Guide interview) ("In [Guide]'s opinion, it was not a good idea to have a structure where Ops and Engineering only came together at the VP level. . . . [T]he structure made the decision-making flow more difficult, took decision-making authority away from a smaller, focused team with both operations and engineering capabilities."); TR. 7974:12-18 (Robinson); *see also* TR. 8714:3-23 (Guide); TREX 20001.62, .96 (Bea expert report) (as a result of reorganization, responsibility was "incohesively and ineffectively spread throughout the team").

160.   On April 17, 2010, Mr. Guide spoke to BP Well Site Leader Don Vidrine and BP Drilling Engineer Brian Morel.  Both expressed frustration with the decision-making process by the onshore team.  TR. 8708:12-8710:16 (Guide) (Morel expressed "dissatisfaction" with the "waffling that was going on with his boss"; Vidrine said that "trying to put all this stuff together made him fell like he was flying by the seat of his pants").

161.    Mr. Guide then reported to his direct superior, David Sims, that "over the past four days there has been so many last-minute changes to the operation that the WSLs have finally come to their wits' end. The quote is flying by the seat of our pants."  TREX 96.2 (4/17/10 Guide email).

162.    Mr. Guide explained to Mr. Sims that, "With the separation of engineering and operations I do not know what I can and can't do."  TREX 96.2 (4/17/10 Guide email).

163.    In Mr. Guide's view, the "huge level of paranoia from engineering leadership is driving chaos." TREX 96.2 (4/17/10 Guide email).  Mr. Guide warned that "[t]he operation is not going to succeed if we continue in this manner."  *Id.*

164.    BP did not disclose its internal disorganization or the chaos within the onshore team to Transocean.  *See* Sims Depo. 473:22-474:5, 474:6-10, 474:13-14; TR. 1771:6-12 (Ezell); P. Johnson Depo. 122:19-21, 122:24-123:2, 123:4-9, 123:13-16, 123:19-21, 123:23-124:05, 148:3-149:4, 149:7-150:5, 150:7-9, 150:12-17, 150:20-21 ("[n]one of that was rela[y]ed to [Transocean]").

### (3)    In violation of its own policies, BP did not do a formal risk assessment prior to temporary abandonment

165.    BP's policies required it to engage in a formal risk management process prior to implementing the final temporary abandonment plan.  *See* TREX 93.22 (BP Drilling and Well Operations Practice § 3.4.1) (drilling and completions operations must undergo "documented and auditable risk management process"); Little Depo. (6/30/11) 115:24-116:23 (BP Wells Manager) (DWOP requires a formal risk management process for temporary abandonment procedures).

166.    BP has conceded that it failed to perform the required risk assessment on the final temporary abandonment plan at Macondo.  Frazelle Depo. 458:25-459:12, 546:19-24 (admitting, as a Rule 30(b)(6) witness for BP, that BP failed to perform the required documented risk assessment on the April 16 temporary abandonment plan); Little Depo. (6/30/11) 115:13-17 (knows of no formal risk assessment on the final temporary abandonment procedure); Cowie Depo. 383:16-384:3 (BP investigator) ("Was there anything documented? I don't know.").

167.    BP's failure to follow its procedures meant that "no one involved with the TA procedures ever stepped back and looked at the net effect that a series of changes was having on the operation."  TREX 7676.33 (Barnhill expert report).

## VI.    BP AND HALLIBURTON DESIGNED AND IMPLEMENTED A CEMENT JOB DOOMED TO FAIL

168.    BP's plan for "unusually deep" displacement without a second cement barrier in place and its failure to do a formal risk assessment made it absolutely critical that the bottomhole cement was properly tested, placed and allowed to set completely. M. Sepulvado Depo. 176:22-177:3 (because of the deep displacement, "the strength, stability and integrity of the bottomhole cement [was] even more important than it otherwise would be"); TR. 6121:25-6122:3 (Ambrose); TREX 8140.81-82 (Beck expert report).

### A.    BP And Halliburton Were Responsible For The Cement Job

169.    BP, as the operator, and Halliburton, as the cement contractor, were responsible for designing and implementing the cement job on Macondo.  Halliburton's equipment was used on the *Deepwater Horizon* to mix and pump the cement downhole. *See* TREX 640 (BP-Halliburton contract stating the parties' general duties); TR. 2344:24-

2345:7, 2359:1-9, 2468:18-25, 2476:12-2479:22 (Benge); TR. 3186:4-193187:18-23, 3190:5-3192:20, 3220:9-12 (Roth).

170.     Transocean, as the drilling contractor, had no responsibility for designing and testing the cement.  Tabler Depo. 533:20-534:1, 534:14-535:1, 535:6-536:8, 538:2-538:14 (Halliburton cementer) (Transocean not involved in designing or testing cement); TR. 510:9-12 (McKay); TR. 2246:14-17, 2273:23-2274:5 (Benge).

### B.     The Cement Design Was Driven By The Narrow Drilling Margins

171.     The purpose of the final cement job was to achieve zonal isolation, *i.e.*, to isolate the hydrocarbon-bearing zones in the formation and prevent the hydrocarbons from migrating into the well.  TR. 2345:24-2346:3, 2383:24-2384:14 (Benge); TR. 3010:3-13 (Probert); TR. 6609:24-6610:23 (Gagliano).  If zonal isolation had been achieved, the blowout would not have occurred.  TR. 7792:1-7 (Bourgoyne).

172.     Because of the narrow drilling margins encountered in the final production interval, BP decided on a cement job design using a "foam cement, light weight spacer, and a small base oil spacer, along with low pump rates."  TREX 51165.1 (4/15/10 Management of Change); TR. 752:1-753:15 (Huffman).  BP's decisions concerning the cement were "driven by the singular desire to minimize equivalent circulation density." TR. 2257:11-25 (Benge); TREX 1.34 (Bly Report) ("The Halliburton and the BP Macondo well team's technical reviews of the cement slurry design appeared to be focused primarily on achieving an acceptable equivalent circulating density during cement placement to prevent lost returns.  Other important aspects of the foam cement design, such as foam stability, possible contamination effects and fluid loss potential did not appear to have been critically assessed in the pre-job reviews.").

173.     As set forth below, the focus on minimizing circulation density addressed one risk (fracturing the formation) while ignoring others.

**C.     BP And Halliburton Used An Unstable Cement Slurry**

174.     Conventional cement is foamed when a foamer is added and the slurry is injected with nitrogen bubbles.  The foaming reduces the density of the cement, and, therefore, the downhole weight and ECD.  TR. 2240:13-2241:16, 2257:11-25, 2348:6-2349:8 (Benge).

175.     Foamed cements can become unstable in certain circumstances.  An unstable foam cement is unlikely to achieve zonal isolation because it contains gaps, air or nitrogen pockets, or "bubbles" in the cement that allow hydrocarbons to migrate through the cement.  TR. 2453:13-24, 2471:6-12, 2493:22-2494:3 (Benge).

176.     The cement slurry used at Macondo was created from a dry cement blend left over from the Kodiak well that BP and the *Deepwater Horizon* had drilled prior to Macondo.  TR. 6621:7-6622:9 (Gagliano).  This leftover blend was not designed to be foamed.  In fact, it contained a defoamer additive known as D-Air 3000.  TR. 2245:2-6, 2272:25-2273:12, 2355:3-6 (Benge); TR. 6623:12-6624:1, 6624:24-6625:2 (Gagliano).  Use of this defoamer destabilized the Macondo foam cement.  TR. 3195:10-15; 3239:5-3240:2 (Roth).

177.     Multiple Halliburton manuals and best practices warn against using D-Air or other defoamers in foam cement systems.  D-4381 (showing three Halliburton manuals that state not to use D-Air or defoamers in a foamed cement system); TREX 5219.1 (Halliburton Zonesealant Technology Bulletin) ("Do not use defoamers . . . D-AIR defoamers . . . These materials will destabilize the foam.").

178.    Halliburton was aware of the risks associated with using D-Air 3000 in the Macondo foamed cement system.  TR. 3091:21-3094:8 (Roth).

179.    The BP Wells Team also knew that the D-Air 3000 defoamer should not be used in a foam cement system.  TR. 2581:17-2583:2 (Benge); TREX 7489.1 (12/7/09 Gagliano email to Mark Hafle and Brian Morel notifying them that D-Air could not be used in a foam cement system).

180.    The foam cement was further destabilized because BP drilled the Macondo well with synthetic oil-based mud (SOBM).  An SOBM environment can cause the nitrogen gas in foam cement to "break out" and destabilize the slurry.  TR. 2280:3-19 (Benge); TREX 1.55 (Bly Report) ("If foamed cement is contaminated by synthetic oil-based mud (SOBM) . . . it can become unstable, resulting in nitrogen breakout.  Nitrogen breakout not only degrades the nitrified foam cement properties, but it can also degrade the placement and properties of cap and tail cement.").  Mr. Benge testified that use of foam cement in an SOBM environment was not "an acceptable risk and [he] ha[s] not ever recommended a foam in a synthetic mud environment . . . ."  TR. 2280:21-2281:7 (Benge).

181.    The Macondo well did not require the use of a foam cement; BP and Halliburton could and should have designed a conventional cement that met the tight drilling margin and ECD requirements.  TR. 2352:13-24 (Benge).  Alternative cement slurries without a defoamer additive were readily available to BP and Halliburton, and could have been shipped to Macondo within a few days.  TR. 3217:22-3219:11 (Roth) ("a week would be reasonable estimate"); TR. 2351:3-2352:17 (Benge).

### D.    BP Knew That Gagliano Was Not "Cutting It Anymore"

182.    The cement slurry used on Macondo was designed by Halliburton's Jesse Gagliano.  TR. 6593:5-7, 6609:24-6610:6, 6622:16-21, 6642:10-13 (Gagliano).  By the time of the Macondo bottomhole cement job, the BP Wells Team had become dissatisfied with the timeliness and quality of Mr. Gagliano's work.  TR. 2278:21-2279:21 (Benge).

183.    On April 17, 2010, BP Drilling Engineer Brian Morel reported his problems in getting cement test results from Gagliano to his boss, BP Senior Drilling Engineer Mark Hafle:  "Jesse [Gagliano] isn't cutting it anymore . . .  I need help next week dealing with Jesse.  I asked for these lab tests to be completed multiple times early last week and Jesse still waited until the last minute as he has done throughout this well."  TREX 1396.1-3 (4/17/10 email chain among Morel, Hafle, Walz, Cocales, and Guide); *see* TREX 296.2 (BP investigators' notes of Hafle interview) ("Mark further noted that this was 'pretty late in the game' with data rolling in at the last minute, which in Mark's view, was consistent with his experience with Jesse.").

184.    BP engineers complained to the head of the team, BP's Gregg Walz, that Gagliano failed to deliver tests when requested, did not understand the cement modeling he was doing, and did not provide accurate results.  Walz Depo. 468:06-469:19, 469:25-471:12, 472:1-475:11, 476:11-476:15, 477:05-478:14; TREX 1698.75 (Walz's handwritten notes re Gagliano, dated April 18) ("Lack of understanding of the modeling. Lab results – last minute . . . Having to QC . . . Asking 5 times w/o info").  BP did nothing to address these concerns or to make sure that Gagliano delivered the required tests.  Walz Depo. 478:24-479:2, 482:03-483:01.

### E.   BP And Halliburton Failed To Test The Cement Prior To Pumping It

185.   The applicable BP-Halliburton contract required that a minimum suite of cement tests be performed prior to commencing cementing operations.  TREX 640.16-17 (BP-Halliburton contract listing testing requirements).  BP's and Halliburton's internal requirements emphasized the importance of performing such tests on the *actual* slurry to be pumped downhole.  TR. 2359:10-2360:12 (Benge); TREX 3773.6 (BP's Drilling and Completion Cementing Manual) ("Laboratory testing is a critical element in successful well cementing."); TREX 989.294 (Halliburton's U.S. Land Offshore Cementing Work Methods) ("Following the test type, are the minimum lab tests that need to be run to ensure success on the job.").

186.   The fact that the leftover Kodiak blend was to be used on the well increased the importance of testing the cement to ensure it would succeed in achieving zonal isolation.  TR. 2244:20-2245:6 (Benge).

187.   Halliburton failed to perform, and BP failed to mandate, the following procedurally and contractually required cement tests on the actual slurry pumped into the well:  (1) static gel strength transition time; (2) zero gel time; (3) crush compressive strength; (4) free fluid; (5) rheology; (6) foam stability; and (7) fluid loss.  TR. 2366:12-2372:16 (Benge); TR. 3205:11-3207:1, 3224:18-3225:1, 3278:13-15 (Roth); TR. 1379:14-20 (Bly); TREX 640.16-17 (BP-Halliburton contract listing testing requirements); TREX 634.39 (BP GoM SPU Manual listing BP's testing requirements); TREX 42045.265 (Halliburton's U.S. Land-Offshore Cementing Work Methods listing Halliburton's testing requirements); D-6330 (testing requirements of BP-Halliburton contract and BP's internal testing requirements).

188.     Pre-incident cement tests performed by Halliburton and post-incident cement tests performed by third parties such as Oilfield Testing & Consulting (OTC), Chevron, and CSI Laboratories showed that the cement was unstable.  TR. 2277:12-20, 2508:19-2509:2 (Benge); TR. 6212:5-18, 6213:10-15 (Ambrose); D-4309A (stability-related tests performed by Halliburton); TREX 5937 (OTC test results); TREX 2702 (Chevron test results); TREX 2 (Appendix K to the Bly Report: CSI test results); TREX 1.34 (Bly Report) (These third party test results suggest that the foam cement slurry used for the Macondo well was likely unstable, resulting in nitrogen breakout.").

### F.     BP Proceeded Without Resolving Whether The Float Collar Had Converted

189.     Before the cement job, the BP Wells Team encountered difficulties converting the float collar.  The float collar is a "check valve" in the well that, once converted, prevents cement from flowing or "U-tubing" back above the float collar.  TR. 2309:11-21 (Benge).

190.     Weatherford, which supplied the float collar, recommended that drilling mud be circulated at 5 to 8 bpm at 500 to 700 psi in order to convert the float collar. TREX 2562.1 (Weatherford Float Equipment instructions); TREX 1810.6 (TA Procedure by Morel dated April 15, 2010) ("Continue to circulate and slowly increase pump rates greater than 8 bpm to convert the float equipment (~500-700 psi) per Weatherford recommendation."); Clawson Depo. 59:25-60:6, 96:3-15, 249:12-25, 399:13-400:9; TR. 7109:12-25 (Beck).

191.     Because of its concern over the narrow drilling margins, the BP Wells Team made nine attempts to convert the float collar by circulating at only 1 to 2 bpm (less than Weatherford's recommendation) and at 1800 to 3142 psi (more than

Weatherford's recommendation).  TR. 7110:5-8 (Beck); TREX 1425.3-4 (4/19/10 Daily

Operations Report); TREX 8140.70-71 (Beck expert report).

 192. Circulation finally "broke" on BP's ninth attempt to convert the float

collar at 3142 psi.  TR. 7114:7-17 (Beck).  At that point the BP Wells Team was aware

that it "blew" something, but was not sure if the float collar converted or the float valves,

casing and/or shoe track had been damaged.  TREX 2586.1-2 (4/19/10 Morel email)

("Yah we blew it at 3140 [psi], still not sure what we blew yet."); TREX 4457.1 (4/19/10

Hafle email) ("Shifted at 3140 psi.  Or we hope so."); TR. 2310:8-25 (Benge), 7115:5-16

(Beck); TREX 7676.53 (Barnhill expert report, Attachment A) ("Problems with Float

Collar confirmation:  a.  Possible damage or lack of conversion . . . After possible FC

conversion . . . :  Possible float valve issues; Possible damage to casing shoe track;

Possible casing damage.").

 193. If the float collar did not convert or the float valves were damaged, then

the cement could move back up the casing before it had time to set up, leaving

insufficient mud covering the hydrocarbon-bearing zones and resulting in a failure to

achieve zonal isolation.  7115:5-7116:25 (Beck); TR. 6164.2-19 (Ambrose); Walz Depo.

765:22-766:8.

 194. Without resolving the issues, BP decided to move forward after the

attempted float collar conversion: BP Wells Team Leader John Guide told BP Well Site

Leader Bob Kaluza to "pump cement."  TR. 2312:21-23 (Benge); TREX 5.1 (BP

investigators' notes of Kaluza interview) ("Called town – John Guide – because float

collar was supposed to convert at 700-800psi but had to go higher.  Got permission to

3000, wouldn't go.  Permission to 3500, went off at 3124psi . . . Guide said to pump

cement."). Consequently, when the BP Wells Team pumped the cement downhole, it did

not know where in the well the cement and other fluids were ultimately placed. TR.

2311:6-14 (Benge).

### G.   BP And Halliburton Failed To Comply With Industry Practice Regarding Wait on Cement Time

195.    After pumping the cement, the BP Wells Team failed to allow an adequate

Wait on Cement (WOC) time before resuming downhole operations. TR. 2331:21-

2332:3 (Benge); TREX 5990.39-40 (Benge expert report); TREX 8140.82 (Beck expert

report). WOC time allows the cement to gain compressive strength. TR. 6359:7-11

(Chaisson). Expert testimony established that the "prudent and common" standard was

"to allow a WOC time of at least 24 hours to ensure that the cement was properly set."

TREX 8140.81 (Beck expert report); TR. 7167:16-19, 7197:6-14 (Beck).

196.    There are two kinds of compressive strength tests that allow an operator to

determine how long the WOC time should be for a particular slurry. In a crush

compressive strength test, a foamed cement slurry is poured into molds, which are then

physically crushed after different time periods. The crush compressive strength tests that

Halliburton ran on the Macondo slurry indicated that the cement would have zero

compressive strength after 24 hours. TREX 717.3.1.TO (Halliburton cement test results

attached to 4/18/10 Gagliano email).

197.    In an ultrasonic cement analyzer (UCA) test, a device sends ultrasonic

waves through a cement sample, allowing for continuous evaluation of how the sample

develops compressive strength. TREX 983.102.1.TO (excerpt of Halliburton Deepwater

Primary Cementing: Beyond the Shallow Water Flows manual). Both BP and

Halliburton manuals make clear that to obtain an accurate UCA compressive strength

evaluation, as for any testing, the cement sample must be tested under conditions as similar to actual wellbore conditions as possible. *See* TREX 2133.92 (HESI US Land-Offshore Cementing Work Methods) ("The following best practices should be followed when designing and executing a High Pressure – High Temperature well cement job . . . BHCT is critical for success of the job.  Conventional API methods may be insufficient for determination of BHCT for many HP-HT applications."); TREX 2133.280-81 (recommending the use of WellCat temperature modeling for "All GOM Deepwater Applications"); TREX 978.33 (HESI Tuned Solutions – Foam for Reduced Density Cementing) ("Perform all tests under as realistic conditions as possible."); TREX 3058.9 (BP Deepwater Cementing Guidelines) ("For Deepwater operations, the API Temperatures are inadequate . . . ."); TREX 6233.5 (BP E&P Segment Recommended Practice Drilling and Completions Cementing Manual – Cement Laboratory Testing Section) ("Do not rely on API ramping schedules and use a ramping schedule simulating the expected field cementing operations."); TREX 6233.8 ("For Deep Water, HPHT, Artic [sic] wells and where measured depth > twice the true vertical depth determine the BHCT by a temperature simulation using a BP approved model (e.g. WellCat / Cemcade / Welltemp).")

198.    Halliburton's UCA test for the Macondo well did not simulate actual wellbore conditions, but instead used temperatures hotter than actual bottomhole conditions, as well as a standardized four-hour temperature ramp-up that was faster than actual bottomhole conditions.  TR. 2326:20-2327:12 (Benge); TR. 6774:14-6777:23, 6778:18-22, 6797:2-6802:6 (Gagliano); TREX 6233 (BP's Recommended Practice).

199.    Because they were not representative of actual downhole conditions, the UCA test results were not reliable.  TR. 2427:24-2429:3 (Benge) (UCA tests performed by OTC using a temperature ramp that more closely represented downhole conditions had values of time to 500 PSI of 16:33 and 17:42, while UCA test performed by Halliburton on the slurry used on Macondo had a value of time to 500 PSI of 8:40).

200.    Despite the crush compressive strength test results, which showed *zero* compressive strength after 24 hours, the BP Wells Team chose to rely on the cement barrier only 16 hours later when performing the negative pressure test.  TR. 2331:13-2332:3 (Benge).

### H.    BP Compounded The Risks To The Cement Job By Violating Numerous Industry And Recommended Practices

201.    BP compounded the risks of the unstable cement by failing to mitigate several acknowledged risks during the cement job itself and by failing to evaluate the effect of those cumulative risks.  These shortcuts increased the likelihood of cement failure.  TR. 2244:16-2245:12 (Benge).

202.    One of those risks was the decision by the BP Wells Team to use an insufficient number of centralizers on the production casing string.  TR. 2254:12-16 (Benge).  Centralizers are designed to keep the casing in the center of the wellbore to distribute cement evenly downhole and prevent channeling.  TR. 2285:1-2286:24 (Benge).  Halliburton's Jesse Gagliano recommended that BP use 21 centralizers. Gagliano explicitly warned the BP Wells Team that the use of seven or fewer centralizers could lead to a "SEVERE GAS FLOW problem."  TR. 2967:10-15 (Probert); TR. 3136:9-11 (Roth); TR. 6602:6-6604:23 (Gagliano); TREX 4575.18.TO (4/18/10 Production Casing Design Report).

203.    Six centralizers were delivered to the rig as part of BP's purchase of the 7-inch casing string in March 2010.  TREX 1.35 (Bly Report); Rec. Doc. 5927 (Agreed Stipulations), ## 118-119.  On April 16, 2010, at BP's request, Weatherford delivered 15 additional centralizers to the rig and flew a Weatherford service technician to the rig to install them.  TR. 1987:7-14 (R. Sepulvado); Rec. Doc. 5927 (Agreed Stipulations), ## 119-120; TR. 2967:10-15 (Probert); TR. 3136:9-11 (Roth).  However, the BP Wells Team "erroneously believed that they had received the wrong centralizers" and decided not to use the 15 additional centralizers, despite Halliburton's warning that this would create a "SEVERE gas flow problem."  TR. 1420:16-1421:7 (Bly); TREX 1.23, .35 (Bly Report) ("Date:  April 16 . . . Decision made not to run bow spring centralizers . . . The BP Macondo well team erroneously believed that they had received the wrong centralizers."); Rec. Doc. 5927 (Agreed Stipulations), ## 121, 133 ("Six centralizers were utilized on the production casing in the Macondo Well"); TREX 4575.18 (4/18/10 Production Casing Design Report); TR. 2301:2-13, 2357:12-2358:10 (Benge).

204.    BP Drilling Engineer Brett Cocales dismissed the potential consequences: "Even if the hole is perfectly straight, a straight piece of pipe even in tension will not seek the perfect center of the hole unless it has something to centralize it.  But who cares?  It's done.  End of story, will probably be fine and we'll get a good cement job.  I would rather have to squeeze than get stuck above the WH.  So Guide is right on the risk/reward equation."  TREX 1367.1 (4/16/10 Cocales email to BP Wells Team).

205.    Neither BP nor Halliburton warned the Transocean crew that Halliburton's final cement model predicted a "SEVERE GAS FLOW."  P. Johnson Depo. 106:6-21 (not aware prior to incident of any modeling done on Macondo).

206.    The BP Wells Team also failed to perform even one full bottoms-up prior to pumping the cement downhole.  TR. 2379:3-6 (Benge).  A bottoms-up is a full circulation of drilling mud through the wellbore and is typically performed prior to pumping cement downhole to clean the wellbore of any cuttings or debris and to break up any gelled mud, all of which can contaminate and destabilize the cement.  TR. 2413:3-25 (Benge).  The industry standard is to circulate mud at least one full bottoms-up.  BP's internal standards required at least two full bottoms-up.  TR. 2379:13-2380:25 (Benge); TREX 634.19 (BP GoM SPU Cementing Manual).

207.    Because of the narrow drilling margin and focus on maintaining a low ECD, the BP Wells Team pumped the cement at an exceedingly low rate to prevent fracturing the formation.  TR. 2318:25-2319:11, 2349:9-2350:17 (Benge); TR. 6783:8-6784:9 (Gagliano); TR. 716:15-717:1, 752:13-753:12 (Huffman); TREX 51165.1 (4/16/10 Management Of Change).  Pumping the cement at such low rates increased the risk of destabilizing and contaminating the cement due to the intermixing of the SOBM, spacer and cement.  TR. 2318:25-2319:11 (Benge); TR. 6783:8-6784:9 (Gagliano).

208.    The risk of contamination and poor displacement was also increased by the use of a lightweight base oil spacer to displace the heavier mud in the well and a lightweight foamed cement behind the heavier cap cement.  TREX 1.61-62 (Bly Report) ("The use of a lightweight base oil spacer (6.7 ppg) to displace heavier fluids (14.17 ppg) could have caused poor displacement.  In the experience of the investigation team, a lighter density fluid would not normally be used to displace a heavier fluid . . . The use of lightweight nitrified foam cement slurry (14.5 ppg) behind heavier cap cement slurry (16.74 ppg) could have resulted in the mixing of the two slurries or poor displacement.").

209.    BP also failed to follow industry practice to place mud in the "rathole" (the space at the bottom of the well below the shoe track) that is heavier than the cement that will be pumped.  Heavier mud is less likely to "swap" with the cement.  TREX 1718.15 (API Recommended Practice 65) ("If casing is not to be run to bottom, the 'rat hole' should be filled with a higher weight mud.  This is to prevent cement from falling into the rat hole and displacing rat hole fluid into the cement column, compromising the cement's properties.  The fluid should be of adequate density and properties that there will not be a tendency for the fluid to swap with the cement as it is being placed."); TREX 22761.21-22 (Calvert expert report); Maxie Depo. 197:15-198:17; Quizau Depo. 543:17-22.  Swapping can result in a failure of zonal isolation due to cement contamination, channeling, and/or the failure of the cement to be placed in the designed locations in the annulus and shoe track (because gravity may cause the cement to migrate to the shoe track instead).  TR. 2621:22-2622:3 (Calvert); TREX 22761.21-22 (Calvert expert report); *see also* Maxie Depo. 197:22-198:6.

210.    In the Macondo production interval, BP designed the mud in the rathole to be lighter than the cement pumped downhole, again because of its concern that heavier mud could fracture the formation.  TR. 2620:17-2621:9 (Calvert).  This decision likely resulted in the contamination and failure of the shoe track cement and provided a pathway for hydrocarbons to flow up the wellbore.  TREX 7676.25 (Barnhill expert report); TREX 1.37, .60 (Bly Report) ("The investigation team identified the following possible failure modes that may have contributed to the shoe track cement's failure to prevent hydrocarbon ingress: . . . Swapping of the shoe track cement with the mud in the rat hole . . . Nitrogen breakout and migration would have also contaminated the shoe

track cement and may have caused the shoe track cement barrier to fail."); TREX 1810.3 (4/15/10 BP TA procedure) ("Do not need to set 16.5 ppg mud in rat hole as volume is only ~4 bbls and a large volume may cause issues with the cement job or breaking down the formation.").

211.    The BP Wells Team also pumped a much lower volume of cement (60 barrels) than it had on the last three foamed cement jobs it performed in the Gulf of Mexico -- Isabella (244 barrels), Nakika (135 barrels), and King South (99 barrels).  TR. 2318:12-19, 2381:1-2382:8 (Benge); D-6631 (bar graph of cement volumes pumped on the four wells).  This low volume of cement "increased the potential for contamination and nitrogen breakout."  TREX 1.34 (Bly Report) ("The investigation team identified cement slurry design elements that could have contributed to a failure of the cement barrier, including the following: . . . A small slurry volume . . . could have increased the potential for contamination and nitrogen breakout.").

212.    The low volume of cement meant that there was no margin of error in the cement placement: any incorrect placement would detract significantly from the integrity of the cement job as a whole.  TR. 2382:9-2384:14 (Benge).

**I.      The BP Wells Team And Halliburton Knew Or Should Have Known That The Cement Was Likely To Fail**

213.    Prior to drilling the Macondo well, the BP Wells Team recognized the risk of a poor production interval cement job and the resulting failure to achieve zonal isolation.  TR. 2250:5-2251:6, 2251:20-24, 2252:2-18, 2255:13-25 (Benge); TREX 4160.2 (3/12/10 BP Drilling & Completions Risk Register) ("Risk Name:  Zonal isolation and well integrity . . . Cause Description:  Poor primary cement job . . . Event:  Potential loss of containment"); TREX 45036.1 (6/20/09 BP Risk Register for Macondo)

69

("Risk/Opportunity Name:  Zonal isolation . . . Event Description/Impact:  Risk of a good cement job on the 9-7/8 [inch] Production String . . . Owner:  Mark Hafle").

214.    The multiple, cumulative risks taken by BP "virtually assured that the cement would not form a barrier in the well" and achieve zonal isolation.  TR. 2585.1-12 (Benge).  Thomas Roth, Halliburton's Vice President of Cementing Products Service Line at the time of the incident, agreed: "[t]here was a low probability that zonal isolation would be delivered through the [cement] design" because "it would take perfect conditions for a successful cement job."  TR. 3045:12-14, 3137:17-3138:9, 3141:4-8, 3215:8-16 (Roth) (it "would be reasonable" to expect Halliburton's Gagliano to have realized the low probability of a successful cement job before April 19).

215.    The BP Wells Team understood the likelihood that the cement job would fail.  In the words of onshore engineer Mark Hafle, the team "thought we were going to get shittie cement job."  TREX 4451.3 (BP investigators' notes of Hafle interview).

216.    Without alerting the Transocean crew, the BP engineering team proceeded on the theory "that remedial cementing work could be done at a later date."  TR. 2249:15-2251:24 (Benge); TREX 1367.1 (4/16/10 Cocales email to BP Wells Team: "I would rather have to squeeze than get stuck above the WH.  So Guide is right on the risk/reward equation.").

**J.      In Violation Of Its Own Policy, BP Failed To Perform A Cement Bond Log**

217.    One way to determine if a cement job is successful is to perform a Cement Bond Log (CBL).  A CBL tests the integrity of the cement after it is pumped downhole. TR. 2242:24-2243:16 (Benge); TR. 6097:7-9 (Ambrose).  BP's internal best practices required that it perform a CBL on Macondo.  TR. 939:21-941:2 (Bly); TR. 7127:12-

7128:14, 7175:17-19 (Beck); TREX 1.36 (Bly Report); TREX 184 (BP Group Practice) ("To accurately assess [Top of Cement] and zonal isolation, cement sonic and ultrasonic logs should be used.").

218.    Despite the known risks of this particular cement job and BP's own requirements, BP failed to perform a CBL.  TR. 939:21-941:2 (Bly); TR. 2323:5-6 (Benge); TR. 2967:22-2968:6 (Probert).  As stipulated by the parties, "Schlumberger was standing by on the *Deepwater Horizon* on April 20, 2010, and could have performed a cement bond log on that date if requested to do so by BP."  Rec. Doc. 5927 (Agreed Stipulations), # 128.  The estimated cost of the CBL was less than $200,000.  *Id.*, # 129.

219.    The CBL could have alerted BP and Halliburton to potential indicators that the cement failed to achieve zonal isolation, like channeling or insufficient cement coverage.  TR. 2967:25-2968:6 (Probert); TR. 6612:9-13, 6856:13-23 (Gagliano); TR. 6323:18-22 (Chaisson); TR. 6157:10-18 (Ambrose).  BP cancelled the CBL and sent the Schlumberger personnel back to shore.  TR. 6097:14-18 (Ambrose); TREX 8140.37 (Beck expert report).

## VII.    BP DESIGNED AND IMPLEMENTED A FLAWED NEGATIVE TEST THAT IT THEN CALLED A SUCCESS

### A.    BP Was Responsible For Designing, Supervising And Approving The Negative Test

220.    A negative pressure test is a means of testing whether the cement barrier will hold once the drilling mud is removed and the rig has moved off location.  TREX 7676.37 (Barnhill expert report) ("The purpose of a negative test is to test the well's integrity in the direction of flow.").

221.    BP was responsible for designing the procedures to be used to set up and conduct the negative pressure test.  Shaughnessy Depo. 156:20-22, 156:24, 157:1-9 (BP's

Technical Authority for Well Control) ("Usually it would be the drilling engineer [that would] write it, probably in consultation with other engineers."); TR. 9352:7-18 (O'Bryan) (BP "put together the procedure"); LeBleu Depo. 573:1-573:7 (BP Wells Team was "in charge of what kind of negative test was performed and how it should be interpreted"); TR. 4328:10-16 (Barnhill); Hay Depo., Vol. I, 33:1-2, 33: 5-7, 33:11-20; Roller Depo. 45:11-46:4, 46:7-13, 46:15-47:3; Keeton Depo. 653:2-14, 653:16-19; Mazella Depo. 220:3-14; *see* TR. 7203:22-25 (Beck) (BP responsible for describing procedures in submissions to MMS).

222.    As BP admitted in its criminal Guilty Plea Agreement with the United States Department of Justice, BP, through its Well Site Leaders, was also responsible for supervising the negative pressure test.  "On the night of the explosion, BP had two Well Site Leaders on the *Deepwater Horizon*, who were BP's employees, agents and highest-ranking representatives on the rig.  The Well Site Leaders were responsible for supervising the negative pressure test conducted by Transocean."  Guilty Plea Agreement, Exhibit A at 1, *United States of America v. BP Exploration & Production, Inc.*, No. 2:12-cr-00292-SSV-DEK (E.D. La. Nov. 15, 2012).

223.    The BP Well Site Leaders "have ultimate responsibility" for determining whether the negative pressure test was a success.  TR. 2115:20-23 (Heenan); TR. 4328:5-9 (Barnhill) ("The ultimate authority would have rested with BP.  They would have made the call whether to accept or reject the test and move forward."); TR. 7204:1-19 (Beck) (BP was responsible for "making the final determination" of whether the test had passed); M. Sepulvado Depo. 207:4-17 (BP has "final say" on negative pressure test success); TR. 9380:8-12 (O'Bryan); TR. 1677:6-17 (Ezell); TR. 4521:12-4522:1 (Newman); Cameron

Depo. 85:1-9; Emmerson Depo. 172:5-12; Roller Depo. 45:11-46:4, 46:7-13, 46:15-47:3;
P. Earl Lee Depo. 197:24-198:5; Keeton Depo. 653:2-14, 653:16-19; Clark Depo. 207:9-
18; Tabler Depo. 343:14-18, 343:21-24.

### B.    In Violation Of Its Own Policies, BP Had No Standard Written Procedure For Conducting Negative Pressure Testing

224.    In violation of its own policies, BP had no standard written procedure for
conducting or interpreting a negative test.  Wal. Guillot Depo. 11:21-12:6; TR. 8007:8-
22, 8009:8-22 (Robinson); *see* TREX 94.10 (BP Group Practice § 7.2.1) ("B[usiness]
U[nit]s shall: . . . "Produce written procedures for critical operational tasks"); Wal.
Guillot Depo. 82:18-83:1 (admitting that BP violated Group Practice § 7.2.1); Breazeale
Depo. 187:5-14 (responsibility of BP's shore-based management to generate and publish
a uniform written procedure on how to conduct and interpret a negative pressure test).

### C.    In The Days Leading Up To April 20, BP Made Multiple Revisions To Its Negative Pressure Testing Procedures

225.    In the days leading up to April 20, BP made multiple revisions to the
negative testing procedures to be used at Macondo.  *See* D-6579 ("Negative Pressure Test
Flip-Flops"); D-6629 ("Negative Testing Procedures: April 12-April 20, 2010"); TR.
2112:19-2113:7 (Heenan); TREX 22694.11 (Heenan expert report); TR. 4313:7-20
(Barnhill).

226.    On April 12, BP Drilling Engineer Brian Morel circulated a temporary
abandonment plan that did not include a negative test at all.  TREX 836 (4/12/10 Morel
email to Sepulvado et al.); TR. 2113:8-15 (Heenan); D-6579 ("Negative Pressure Test
Flip-Flops"); D-6629 ("Negative Testing Procedures: April 12-April 20, 2010").  On
April 13, BP Well Site Leader Ronnie Sepulvado reminded Mr. Morel that "we need to

do a negative test before displacing."  TREX 1991.1 (4/13/10 Sepulvado email to Morel et al.).

227.    On April 14, Mr. Morel circulated a revised temporary abandonment plan that included a negative test.  TREX 537 (4/13/10 Morel email to Wilson et al.); TR. 2113:16-22 (Heenan); D-6579 ("Negative Pressure Test Flip-Flops"); D-6629 ("Negative Testing Procedures: April 12-April 20, 2010").

228.    On April 16, four days before the blowout, BP revised the negative testing procedures for its submission to the MMS.  This submission specified that there would be two separate negative pressure tests.  BP would first conduct a negative test with "seawater gradient equivalent for 30 min[utes] with kill line" prior to displacing the well to seawater.  A second negative test would be conducted after the well was displaced with seawater to 8,367 feet.  TREX 570.3.1.TO (Form MMS-124: Application for Permit to Modify (APM), April 16, 2010); TR. 2114:1-20 (Heenan); TR. 4329:3-21 (Barnhill) (procedure outlined in APM included two separate negative tests); D-6579 ("Negative Pressure Test Flip-Flops"); D-6629 ("Negative Testing Procedures: April 12-April 20, 2010").

229.    MMS approved the April 16 plan to conduct two separate negative tests. TREX 7392 (4/16/10 email from Heather Powell to Hafle attaching MMS-approved Application for Permit to Modify); Trocquet Depo. 151:13-19, 151:21-22 (MMS District Manager) (MMS-approved APM called for two negative tests); TR. 2113:23-25 (Heenan).  However, on April 18, two days before the blowout, BP Wells Team Leader John Guide changed the procedure again.  Instead of conducting two separate negative tests, as had been approved by the MMS, Mr. Guide decided that only one test would be

run.  TREX 1816.1.1.TO (4/18/10 Guide email to Morel, instructing that only one negative test be conducted); TR. 4329:25-4330:2 (Barnhill); TREX 37031.42.1.TO (BP investigators' notes of Hafle interview) ("John Guide made decision").

      **D.**      <u>**The Negative Testing Procedure Ultimately Implemented At Macondo Did Not Comply With The Procedure Approved By The MMS.**</u>

230.      On April 20, 2010, BP Drilling Engineer Brian Morel's circulated an "ops note" with the final temporary abandonment plan.  The procedure outlined in the "ops note" and ultimately implemented at Macondo included only one negative test, to be conducted after partial displacement of the well to seawater.  TREX 547.1 (4/20/10 ops note); TR. 2114:21-2115:5 (Heenan); TR. 8896:18-8897:4 (Guide).  The "ops note" procedure did not comply with the plan that had been approved by the MMS four days earlier.  TR. 2115:6-19 (Heenan); TR. 4329:22-4330:2 (Barnhill).

231.      Federal regulations require that any material change to the temporary abandonment procedure be submitted to the MMS for approval.  Douglas Depo. 174:9-18, 174:21-25, 175:1-2:2.  MMS District Manager David Trocquet testified that he would have expected the changes in the negative pressure testing to be submitted to the MMS for review.  Trocquet Depo. 53:17-23, 53:25-55:22; *see also* Sprague Depo. (3/22/11) 602:9-11, 602:14-17 ("if we have an approved procedure and we make changes, that is a good idea to go back to the MMS with those changes").

232.      BP Wells Team Leader Guide decided that deviation from the MMS-approved procedure did not require MMS approval.  *See* TREX 37031.42 (BP investigators' notes of Hafle interview) ("Who indicated MMS doesn't need to be called? John Guide.").  BP did not seek or receive approval from MMS or otherwise notify it of the change to the procedure.  TR. 4329:22-4330:2 (Barnhill); Powell Depo. 118:5-119:16

(BP Regulatory Advisor, responsible for filing APM with MMS, does not recall being notified of changes to temporary abandonment plan).

**E.    As A Result Of The Frequent Changes To The Negative Pressure Testing Procedures, BP's Well Site Leaders Were Confused About The Procedures On The Morning Of April 20th**

233.    As a result of the last-minute changes, as late as the morning of April 20, the BP Well Site Leaders were still confused as to the negative testing plan.  BP Well Site Leader Bob Kaluza asked M-I SWACO Mud Engineer Leo Lindner that morning how to set up for a negative test.  Lindner Depo. 119:11-120:10.  BP Drilling Engineer Brian Morel called Mr. Lindner that morning to ask the same question.  Lindner Depo. 167:18-169:12.

234.    At the pre-tour meeting at 11:00 am on April 20, the BP Well Site Leader failed even to mention a negative test as part of the day's planned operations.  The evidence showed that Transocean OIM Jimmy Harrell insisted that a negative pressure test be performed.  TR. 1671:4-25 (Ezell); TR. 4363:7-22 (Barnhill).

**F.    BP Failed To Identify Key Parameters And Conditions For Success In The Written Negative Pressure Testing Procedures Ultimately Implemented At Macondo**

235.    The final negative testing procedure outlined in the April 20 "ops note" "did not provide detailed steps and did not specify expected bleed volumes or success/failure criteria."  TREX 1.41B.TO (Bly Report); TREX 547.1 (BP April 20 "ops note"); P. Earl Lee Depo. 341:7-14; TR. 1325:6-14 (Bly); TR. 8897:5-15 (Guide) ("ops note" did not include expected bleed back volumes, criteria for success/failure, and predicted pressures); Wal. Guillot Depo. 176:11-16, 176:20, 176:23-177:3, 177:6 (Transocean rig crew was not given criteria on evaluating negative test); Sprague Depo.

(3/22/11) 597:10-24 (no success/failure criteria in final negative testing procedure outlined in April 20 "ops note").

236.    BP's investigators identified five deficiencies with BP's negative testing procedures for April 20: 1. "Inadequate negative test procedure design"; 2. "Minimum expectations were not clearly defined"; 3. "Procedure was not aligned with industry standards"; 4. "Procedure did not have adequate definition of pass/fail"; and 5. "Procedure was not robust enough for well conditions."  TREX 7316.112 (BP investigator notes).

237.    According to experienced BP Well Site Leaders Murry and Ronnie Sepulvado, prior to the negative pressure testing, the BP Well Site Leader should have calculated: (a) the expected pressures that would be present when the annular preventer was closed for the test; and (b) the expected volumes of fluid that should have bled back when the drill pipe was bled to 0 psi.  M. Sepulvado Depo. 209:3-213:6; TR. 1947:12-1950:6 (R. Sepulvado).  The failure to provide this information left the drill crew with inadequate criteria with which to evaluate the negative pressure test results.

   G.    **BP's Use Of Unprecedented And Untested Lost Circulation Materials As A Spacer In The Setup Of The Negative Test May Have Confounded The Negative Test Results**

238.    BP decided to use two previously prepared "pills" of lost circulation material (LCM)—Form-A-Set AK and Form-A-Squeeze—as a spacer between the seawater and the drilling mud during the final displacement of the well.  Billon Depo. 377:21-378:8, 436:4-8; Rec. Doc. 5927 (Agreed Stipulations), # 168 ("BP approved using the two LCM pills in the spacer used during the displacement").  Form-A-Set AK and Form-A-Squeeze are viscous materials manufactured by M-I SWACO for the purpose of plugging cracks in geologic formations.  Billon Depo. 304:1-305:2.

239.    As a result of federal environmental regulations, unless the LCM was circulated through the well as part of operations, it would have to be transported to shore for disposal as hazardous waste.  Billon Depo. 73:24-74:6; LeBleu Depo. 217:6-21 (BP Drilling Fluids Engineer).  The decision to use the LCM as a "spacer" saved BP both time and money.  Billon Depo. 188:6-10; 398:19-399:3.

240.    BP's decision to use lost circulation material as a spacer was unprecedented and inappropriate.  None of the drilling experts and practitioners who testified in this case had ever seen or heard of either of the lost circulation materials, let alone a combination of the two, being used in such a manner.  *See, e.g.*, Maxie Depo. 117:17-20, 129:13-17, 129:19-20 (M-I SWACO Project Engineer) ("It was not marketed for a spacer, it had never been used before as a spacer"); TR. 7364:12-22 (Beck); Billon Depo. 188:2-5, 304:21-305:15, 379:22-380:2 (M-I had not used or marketed either of the two materials, or combination of the two, as spacer before); S. Johnson Depo. 121:13-21 (M-I SWACO Drilling Fluids Specialist); LeBleu Depo. 248:10-13; TR. 7202:10-15 (Beck) (use of LCM "inappropriate"); TREX 8140.102.3.TO (Beck expert report) (same).

241.    The evening before the displacement, on his own accord, Mr. Lindner mixed a small quantity of the materials together to "see what happens," and specifically to see if they reacted to each other.  Lindner Depo. 569:24-570:6.  He attempted to determine the rheology of the mixture but could not get a measurement because its viscosity was off the chart.  Lindner Depo. 251:13-24.  Mr. Lindner decided, based on the mixture's visual appearance, that "it looked fine."  Lindner Depo. 93:13-94:2, 101:12-20.  Other than Mr. Lindner's test, no other testing was done as to the suitability of the LCM, either alone or in combination, as spacer.  Maxie Depo. 196:21-25, 385:11-386:9.

242.     Prior to the incident, M-I SWACO alerted BP that the LCM pills could plug small restrictions in the wellbore assembly: "[I]f there are any small restrictions in the assembly this [plugging] would be a risk." TREX 7614.1 (4/16/10 Maxie email to LeBleu et al.); Maxie Depo. 236:19-237:10. BP did nothing to assess this risk. The presence of this heavy LCM spacer across the BOP during the negative test may have plugged the kill line and led to a kill line reading of 0 psi. TR. 4364:25-4365:5 (Barnhill); TR. 2120:25-2121:3 (Heenan). In the opinion of Halliburton expert Dr. Gene Beck, such plugging was "likely." TREX 8140.102.3.TO (Beck expert report); TR. 7207:15-18 (Beck). BP's expert Dr. Bourgoyne agreed that the spacer may have plugged the kill line. TR. 7610:17-7611:9, 7729:14-18 (Bourgoyne); *see also* TR. 4338:1-4339:1 (Barnhill) (the alternate explanation for the lack of pressure on the kill line—an inadvertently closed valve—is "unlikely").

**H.     The Transocean Crew Identified And Investigated Anomalies Encountered During The Negative Pressure Testing**

243.     Pursuant to BP's instructions, the Transocean drill crew began the negative pressure testing by pumping seawater into the well until the heavy LCM spacer was placed above the annular element of the BOP. TR. 2073:24-2074:7 (Heenan); D-3561 (depicting this process at 0:20-0:40). The rig crew then attempted to bleed the pressure on the drill pipe to 0 psi but could not: each time the drill pipe was shut in, the pressure built back up. TR. 2116:6-10 (Heenan); D-3561 (depicting these attempts at 0:50-1:45).

244.     During the negative pressure test, the BP executives and Transocean managers who had flown out earlier that day visited the drill shack as part of a rig tour. TR. 1799:14-17 (Ezell); Winslow Depo. 147:3-155:2. Daun Winslow, the Transocean

Operations Manager, saw what appeared to be a "very in-depth discussion" among the drill shack personnel about the operations.  Winslow Depo. 453:24-454:9.  Mr. Winslow instructed OIM Jimmy Harrell and Senior Toolpusher Randy Ezell – the most experienced drilling people that Transocean had on the rig – to stay in the drill shack rather than continue on the tour so that they could provide whatever assistance was needed for the ongoing discussion.  Winslow Depo. 448:20-449:10, 450:4-7, 450:11-16, 450:20-22.

245.     Upon investigating the unusual buildup of pressure on the drill pipe, the crew saw the fluid level in the riser dropping, indicating that the fluid was leaking past the annular.  TR. 2116:6-25 (Heenan); D-3561 (depicting this leakage at 1:45-2:03).  In response, OIM Harrell instructed the drill crew to increase the annular closing pressure.  TR. 1869:1-10 (Ezell); D-3561 (depicting this response at 2:04-2:10).

246.     It was an "appropriate" and "standard" response for the drill crew to investigate the source of the drill pipe pressure and to then tighten the annular.  TR. 2117:7-15 (Heenan).  Heavy fluid leaking past the annular would cause pressure on the drill pipe and render it impossible to bleed the drill pipe pressure to 0 psi.  TR. 2117:20-2118:5 (Heenan) ("Quite likely it [leaking spacer] was the cause of those numbers"); M. Sepulvado Depo. 332:7-333:20.[17]

---

[17] The suggestion by Plaintiffs' counsel at trial that the fluid flowing past the Lower Annular during the negative pressure test proved it had not been maintained, and also accounted for why it failed to seal the well when the crew activated the BOP at approximately 9:42, was doubly mistaken.  TR. 9142:11-20 (Shanks).  The crew used the Lower Annular to conduct the negative test.  Hay Depo. 130:4-9.  As discussed in part IX, *infra.*, when the crew activated the BOP at approximately 9:42 they closed the *Upper* Annular.  TR. 2758:9-13 (Davis); TR. 5106:9-12 (Childs); TR. 6923:11-16 (Stevick); TR. 9140:11-9141:1 (Shanks).  Moreover, there was nothing wrong with the Lower Annular.  The annular preventers are not designed to withstand pressure from heavy fluids *above* the BOP -- an unusual situation that occurs during the negative test; they are designed to withstand pressure from below.  That the Lower Annular would need to be

247.    Even after closing the annular, the crew was unable to bleed the drill pipe down to 0 psi.  D-3561 (depicting this attempt at 2:10-2:40).  In light of the continuing difficulties, at approximately 6:00 pm, Transocean Senior Toolpusher Randy Ezell instructed Jason Anderson to "stop the job and have a good safety meeting with everybody, [to] make sure everybody was on the same page" before testing resumed.  TR. 1680:19-25 (Ezell).

## I.    **The BP Well Site Leaders Interrupted A Proper Negative Test On Drill Pipe And Insisted The Test Be Conducted On The Kill Line.**

248.    Up until this point, the negative pressure test had been conducted by monitoring on the drill pipe, as was the preferred practice of the *Deepwater Horizon* drill crew.  TR. 2119:3-6 (Heenan) (test was begun on the drill pipe); TR. 4369:10-19 (Barnhill) ("They [the Transocean rig crew] were obviously comfortable using the drill pipe."); TR. 2027:22-23 (R. Sepulvado) (his method was to test on the drill pipe).

249.    BP Well Site Leader Don Vidrine interrupted the test and instructed the Transocean drill crew to instead monitor the test on the kill line.  TREX 5.2.1.TO (BP investigators' notes of Kaluza interview) ("Don insisted that it must be done down kill line."); TR. 7206:10-7207:6 (Beck); TR. 1328:7-1329:13 (Bly)

250.    Mr. Vidrine reportedly "decided to re-test using the kill line" because in his opinion "the kill line was specified in the procedure approved by MMS."  TREX 8173.61 (Bourgoyne expert report); TREX 5.2.1.TO (BP investigators' notes of Kaluza interview) ("Don insisted that it must be done down kill line.  Permit was for down kill line").  Mr. Vidrine was wrong.  The MMS-approved APM only required the pre-

---

tightened to a greater extent to withstand the pressure created by the unusually large quantify of lost circulation material BP flushed down the well prior to the negative test is not surprising.  TR. 9141:14-17 (Shanks).

displacement negative pressure test (which BP did not do) to be conducted on the kill line; MMS did not indicate where the post-displacement negative pressure test should have been monitored.  TREX 570.3.1.TO (Form MMS-124: Application for Permit to Modify (APM), April 16, 2010) ("1.  Negative test casing to seawater gradient equivalent for 30 min. with kill line . . . 3.  Displace to seawater.  Monitor well for 30 min."); TR. 4335.22-4336:1 (Barnhill) (APM did not require any particular method of monitoring the negative pressure test once the well had been partially displaced).

251.    Around this time, Mr. Vidrine also instructed Mr. Kaluza call the onshore engineers in Houston and inform them a second negative test would be conducted.  Mr. Kaluza returned to the rig floor a short time later, saying "I told them" and "they want me to come up and help you."  Pleasant Depo. 256:9-257:2.

252.    As they were obligated to do, the Transocean drill crew complied with BP's instruction to switch to the kill line.  TR. 1801:25-1802:12 (Ezell); TR. 7725:12-17 (Bourgoyne); TR. 7208:3-7 (Beck).  The drill crew opened and monitored the kill line for 30 minutes and saw no flow.  TR. 2120:8-12 (Heenan); D-3561 (depicting this portion of the testing at 3:30-3:34).  Fourteen hundred psi of pressure remained on the drill pipe. TREX 8173.61 (Bourgoyne expert report); D-3561 (depicting this discrepancy at 3:45).

J.    **The BP Well Site Leaders Declared The Negative Test A Success**

253.    Despite the continuing pressure on the drill pipe, BP Well Site Leader Don Vidrine declared the negative test a success.  TREX 51133.2 (Signed statement of Don Vidrine and Bob Kaluza) ("Successful negative test monitored at kill line."); TREX 4447.6.1.TO (BP investigators' notes re Hafle interview) ("Don told Mark that he was fully satisfied that the rig crew had performed a successful negative test.").

254.    In declaring the test a success, Mr. Vidrine ignored "the clear danger signal from the well." TREX 22694.16 (Heenan expert report). The continuing pressure on the drill pipe despite zero pressure on the kill line should have alerted Mr. Vidrine that the test was not a success. TR. 4336:17-4337:2 (Barnhill) (a negative test "isn't baseball, the tie doesn't go to the runner, the tie goes to the failed test"); TR. 7151:1-23 (Beck) (negative pressure test "clearly failed" and should not have been accepted).

255.    The proper procedure, given the discrepancy between the pressure on the drill pipe and no pressure on the kill line, would have been to re-do the negative test on the drill pipe. TR. 7725:15-23 (Bourgoyne). Indeed, as BP's well control expert Dr. Bourgoyne testified, had the Transocean drill crew been allowed to continue negative pressure testing by monitoring the drill pipe, they would have gotten the "correct result." TR. 7725:6-11 (Bourgoyne); *accord* TR. 2119:3-21, 2121:7-22 (Heenan) (if the BP Well Site Leaders had not insisted that the test be switched to the kill line, there would never have been two different pressures to compare and no resulting confusion from that discrepancy).

256.    As BP admitted in its criminal Guilty Plea Agreement, Mr. Vidrine's incorrect evaluation of the negative test was a proximate cause of the blowout, the explosion, the deaths of 11 men, and the resulting pollution. Guilty Plea Agreement, Exhibit A at 15, *United States of America v. BP Exploration & Production, Inc.*, No. 2:12-cr-00292-SSV-DEK (Nov. 15, 2012); TR. 606:15-607:3 (L. McKay) (confirming Guilty Plea).

257.    Transocean Deepwater Inc. has acknowledged that the Transocean crewmembers aboard the *Deepwater Horizon* should have conducted additional

investigation rather than accept or agree with the assessment of the BP Well Site Leaders that the negative pressure test was successful despite the fact that the test showed 1,400 psi on the drill pipe.  *See* TREX 52676.12.1.TO (Guilty Plea Agreement) (TDI agreed that "BP and defendant Transocean did not take further steps to investigate the source of the abnormal drill pipe pressure, which was neither correctly explained nor remediated."); TR. 4518:20-25, 4519:1-4522:1 (Newman).

258.    If BP had instructed Transocean to re-perform the negative testing at any point, the Transocean drill crew would have shut in the well with the BOP; that action almost certainly would have prevented the blowout.  TR. 2094:15-2096:17 (Heenan).

**K.    The Record Does Not Support A Finding That The BP Well Site Leaders Relied On A Drill Crew Explanation Of The "Bladder Effect"**

259.    BP has asserted that its Well Site Leaders' decision to call the negative pressure test a success was influenced by an explanation put forward by Transocean Driller Jason Anderson that a "bladder effect" or "annular compression" theory explained the continuing pressure on the drill pipe.  *See, e.g.*, TREX 8173.62 (Bourgoyne expert report).  This claim was not supported by the evidence.

260.    In a signed statement recounting the incident generated immediately after the incident, neither Mr. Kaluza nor Mr. Vidrine mentioned the "bladder effect," "annular compression," or any efforts of the Transocean crew to convince them to ignore the continuing pressure on the drill pipe.  TREX 51133 (Signed statement of Kaluza and Vidrine); TR. 9376:13-9379:16 (O'Bryan) (confirming that he asked Vidrine and Kaluza to prepare the signed statement and that it contains no mention of the "bladder effect").

261.    Following the incident, Mr. Kaluza sent an email to colleagues speculating that the "bladder effect" was responsible for the anomalies experienced during the

negative pressure testing.  TREX 759 (4/25/10 Kaluza email to Guide et al.).  The explanation of the "bladder effect" contained in that email is far more detailed than the explanation that Mr. Lambert remembers hearing that night.  TR. 8305:12-17 (Lambert).  The email did not attribute the "bladder effect" theory to the drill crew.

262.    BP and Transocean employees who had worked with Mr. Anderson for years prior to the Macondo incident testified that they had never heard him use the term "bladder effect."  TR. 1945:9-16 (R. Sepulvado); TR. 1803:7-9 (Ezell) (in all the years working and training with Jason Anderson, Ezell had never heard Anderson refer to a bladder effect); Burgess Depo. 303:7-18; M. Sepulvado Depo. 217:1-219:21; Holloway Depo. 202:8-11; Hay Depo. 38:14-16.

263.    Transocean employees in the drill shack during the negative pressure testing testified that they never heard the term "bladder effect" or "annular compression." TR. 1803:1-4 (Ezell); Roller Depo. 57:11-25 ("[T]he only place that the [Transocean investigation] team saw this ["bladder effect"] noted was in the BP internal investigation notes from one of the well site leaders. . . .").  While Lee Lambert, a Well Site Leader Trainee present in the drill shack at the time, believes he heard the term "bladder effect," he is not sure who initially used it.  TR. 8292:20-8293:23 (Lambert).  Halliburton cementer Vincent Tabler testified that Mr. Revette said the explanation came from Don Vidrine.  Tabler Depo. 492:2-10 ("he [Dewey Revette] had said that Don Vidrine was calling it a – a successful test because of a bladder effect"); Tabler Depo. 492:2-10, 492:22-493:2 ("[Revette] said they, so I'm – I was taking it that they as Mr. Bob [Kaluza] and Mr. Don [Vidrine] being up there.").

264.    Even if Transocean employees had advanced this "bladder effect" theory, the BP Well Site Leaders bore ultimate responsibility for interpreting the test and should have had the experience and knowledge to understand this was not a viable explanation for the anomalies.  TR. 7176:20-7178:17 (Beck); TREX 7676.40 (Barnhill expert report) (if the Well Site Leaders relied on the "bladder effect" explanation from the crew, "this illustrates too much reliance on the drill crew").

**L.      The Transocean Drill Crew Worked For Several Hours Attempting To Understand The Anomalies Encountered During Negative Testing**

265.    The Transocean drill crew worked for three hours to complete the negative pressure testing and to understand the anomalies they were encountering during that testing.  TR. 4327:25-4328:5 (Barnhill) (negative testing began at approximately 5 p.m. and concluded at approximately 8 p.m.); TR. 8277:9-20 (Lambert) ("[T]here was a lot of discussion about where the pressure was coming from.").

266.    A negative pressure test does not usually take three hours.  During this time, "the men on the rig were trying to get this right, trying to understand it, and were trying to move forward accordingly."  TR. 4339:21-4340:1 (Barnhill); TR. 2123:3-19 (Heenan) (crew worked for three hours to get it right); TR. 7570:2-8 (Bourgoyne) (The "crew was trying to get to the right answer.  They were all working together.").

267.    "[T]here was discussion the entire time while the pressure was building and bleeding off."  TR. 8280:8-16 (Lambert).  Transocean Operations Manager Daun Winslow, who toured the rig floor as part of the visit with the BP executives, observed the crew having a "very detailed discussion" about the test.  Winslow Depo. 448:20-449:10.  BP's Pat O'Bryan observed everyone in the drill shack working "seriously" on the negative test.  TR. 9367:21-24 (O'Bryan).

268.     The only person to suggest that the drill crew was not taking the negative pressure testing seriously was BP Well Site Leader Vidrine, in a self-serving statement after the fact.  *See* TREX 37031.15 (BP investigators' notes of Vidrine interview) ("Transocean guys had dismissed it as anything serious and somewhat joked about his concern.")  Mr. Vidrine's statement was directly contradicted at trial by the testimony of BP Well Site Trainee, Lee Lambert:  "Q.:  [During the discussions between crew and Mr. Vidrine of the negative pressure test,] the crew was taking their job very seriously, weren't they, sir?  A.  Always, yes, sir."  TR. 8306:15-17 (Lambert).

269.     The Transocean drill crew had every incentive to get it right.  "[E]very member of the team had everything to lose and nothing to gain by making the mistake" in interpreting the negative pressure testing.  TR. 7728:22-23 (Bourgoyne); TR. 2222:22-2223:15 (Heenan) (the Transocean crew would not have intentionally put their lives in danger).  There is no evidence that any of the men involved in the negative test were trying to get the wrong results or acting indifferently towards safety in conducting that testing.  TR. 7367:22-7368:14 (Beck) (has seen no evidence that the Transocean crew was acting indifferently to the safety of themselves or others); TR. 7728:15-7729:8 (Bourgoyne) (Transocean crew's mistake in the negative pressure testing "does not justify a conclusion of willingly and knowingly proceeding with disregard for safety").

## VIII. THE DRILL CREW, WITHOUT FULL INFORMATION AND OPERATING UNDER AN UNSAFE DISPLACEMENT PROCEDURE DICTATED BY BP, MISSED THE FIRST ANOMALIES DURING DISPLACEMENT, AS DID BP AND HALLIBURTON

### A. The BP Well Site Leader Ordered Displacement To Continue After Declaring The Negative Pressure Testing A Success

270. After declaring the negative pressure testing a success despite the anomalous pressure on the drill pipe, Mr. Vidrine "made the decision to move forward." TR. 4482:7-19 (Barnhill). He instructed the crew to proceed with displacement. *Id.* The BP Well Site Leaders were the only individuals on the rig with the authority to order displacement to continue after the negative pressure testing was complete. TR. 7727:19-23 (Bourgoyne); TR. 4481:19-23 (Barnhill); TR. 7204:5-7, 15-19 (Beck) ("The decision to proceed with the displacement to seawater despite the failed negative pressure test was BP's and BP's alone to make.").

271. In light of the discrepancy between the pressure on the kill line and drill pipe, BP's decision to proceed with displacement was "totally wrong." TR. 7209:1-7 (Beck); TR. 8938:9-8939:5 (Guide); Wal. Guillot Depo. 40:5-17.

272. With the BOP open as required for the displacement operations, the drilling mud was the only remaining barrier to a blowout. TR. 4482:7-19, 4429:9-14, 4253:19-4254:15, 4315:17-4316:14 (Barnhill). "[B]y proceeding with the displacement of mud from the riser, it was just a matter of time until the well began flowing again." TREX 8173.64 (Bourgoyne expert report).

273. Murry Sepulvado, the regular Well Site Leader, testified that his practice was to remain in the drill shack during displacement operations. M. Sepulvado Depo. 829:2-830:5. ("To complete displacement, you need to be there."). Mr. Vidrine went back to his quarters. TREX 302.2. TO (BP investigator notes of Vidrine interview).

88

B.     **Transocean Displaced The Well Pursuant To BP's Final Displacement Procedures**

274.     M-I-SWACO Mud Engineer Leo Lindner had drafted a final displacement plan for BP earlier on April 20, at the request of BP Well Site Leader Bob Kaluza. TREX 567.1.TO (BP/*Deepwater Horizon* Rheliant Displacement Procedure); TR. 7721:17-7722:1 (Bourgoyne).  BP approved the final displacement procedure.  TR. 7721:17-7722:1 (Bourgoyne); Billon Depo. 103:2-6; TR. 4326:16-21 (Barnhill); Rec. Doc. 5927 (Agreed Stipulations), # 163.

275.     Pursuant to Mr. Vidrine's instructions, at approximately 8:00 p.m., the Transocean rig crew began the final displacement of the well to seawater in accordance with BP's displacement plan.  TREX 567.1.TO (BP/*Deepwater Horizon* Rheliant Displacement Procedure).

C.     **Monitoring The Well Is A "Team Operation"**

276.     Transocean, Halliburton and BP each had responsibilities with respect to well control.  "[W]ell control is a team operation."  TR. 2193:20-22 (Heenan).

(1)     **Transocean's Responsibility**

277.     The Transocean drill crew had responsibility to monitor the well at all times.  TR. 6226:7-6227:6 (Ambrose); McMahan Depo. 271:4-8, 271:10-20, 271:22-272:9, 272:12-14 (driller has day-to-day responsibility for monitoring the well); TR. 7528:15-7529:5 (Bourgoyne) ("primary responsibly to monitor the well" rests with driller; mud logger "provides that secondarily line of defense").

(2)     **Halliburton's Responsibility**

278.     Joseph Keith, the mudlogger on duty, had the obligation to act as a "second pair of eyes" in monitoring the well.  TR. 3489:19-22, 3490:9-21, 3504:1-5

(Keith); TREX 8154.30 (Beck expert report, App. C); TR. 7215:5-7 (Beck); TR. 2192:7-19 (Heenan) (BP contracted with Sperry Sun to "provide mud loggers to monitor all operations during the drilling of the Macondo well").

### (3) BP's Responsibility

279. All of the contractors, including Transocean, "operated under the control of BP as the operator of the well." TR. 7201:7-14 (Beck). BP "was the only party fully aware of the flow potential of the subsurface hydrocarbon-bearing formations." TR. 7201:10-13 (Beck); TREX 8140.16 (Beck expert report) ("As the owner and operator, BP was the only party fully aware of the flow potential of the subsurface hydrocarbon bearing formations…. BP failed to ensure that the well was adequately monitored during the critical displacement to seawater."); TREX 2386.25 (BP's Well-Control Response Guide (WRCG) ("the BP [Well Site Leader] is responsible for the well, escaping effluent (oil, gas, and water), and the effects of that effluent on third parties and the environment on and away from the site" in the event of a well control event); Mazella Depo. 165:12-166:8, 170:14-20, 170:23-171:4.

280. The BP Well Site Leaders had access to Sperry Sun and Hi-Tec well monitoring data and could monitor the well from their office. TR. 1938:1-8 (R. Sepulvado) (Well Site Leader had six monitors in office and could see what drill crew could see on drill floor); Bement Depo. 98:10-17; Williams Depo. 347:15-348:9 (Williams installed Hi-Tec feed in Company Man's office; Company Man could see more than driller in the driller's chair). The BP Well Site Leaders also had access to Sperry and Hi-Tec well monitoring data in their staterooms. P. Earl Lee Depo. 73:15-23; 74:16-75:5, 77:18-19, 77:22-78:4 (real-time display of data was available in Lee's office and bedroom).

281.    BP's onshore engineers could also monitor the well with real-time data from the rig.  TR. 1353:16-1355:8 (Bly); TR. 3133:4-20 (Roth) (real-time feed from Sperry Sun system was available to Halliburton and BP onshore); Sims Depo. 622:14-623:23 (real-time data available to Guide, Hafle, Cocales, Morel and Walz).

### D.    The Crew Commenced Displacement Of The Riser

282.    As set out above, the crew began the final displacement around 8:00 p.m.  TREX 7676.41 (Barnhill expert report); TREX 22694.20 (Heenan expert report).  As would be expected, pump pressure initially increased as the pumps were brought on line and then steadily decreased as lighter seawater replaced heavier drilling mud.  TREX 22694.20 (Heenan expert report); TREX 620 (Post-incident Sperry data chart).  The displacement procedure continued without any indication of a problem for nearly an hour.  TREX 7676.41-42 (Barnhill expert report); TR. 4275:8-4276:6 (Barnhill); TREX 8154.49-53 (Beck expert report, App. C); TR. 7776:12-24 (Bourgoyne) (First indicator after 8:00 p.m.).

283.    Other tasks were also underway as the displacement proceeded (*e.g.*, emptying sand traps, flushing the trip tanks, staggering the rig pumps and transferring mud between pits).  These were ordinary operations; Halliburton's mudlogger Joseph Keith testified that these tasks did not affect his ability to monitor the well.  *See* TR. 3527:20-3528:6, 3539:1-12, 3579:6-3581:8, 3625:2-7 (Keith) (nothing on the night of April 20 affected his ability to "fully and capably" perform his job); Bement Depo. 137:10-138:7, 234:17-235:4 (VP Sperry Drilling) (during temporary abandonment on evening of April 20th, mudlogger's only duty was to monitor the well); *see* Burgess Depo. 348:25-349:9 (a driller continuously monitors the well).

284.    Because the display modes on the *Deepwater Horizon* panels were customizable by the crew, it is not possible to know exactly what parameters the drill crew was monitoring at a given time on the evening of April 20.  TR. 2130:12-23 (Heenan); TREX 22694.21 (Heenan expert report) (drill crew, mudlogger, and Well Site Leader could select scales and display modules appropriate for monitoring the well); TR. 6058:5-14 (Ambrose) ("[W]e don't have any idea what they were looking at.  Those records were lost with the rig.").

285.    Displays of the Sperry data used in post-incident analysis are not representative of the data actually viewed by drillers on the rig.  TR. 6057:23-6058:11 (Ambrose).  Post-incident charts created from Sperry data can be distorted by changing the scale and slope of the data.  TR. 1352:2-1353:4 (Bly).

**E.    The Well Became Underbalanced At Approximately 8:52 P.M.**

286.    Post-incident modeling shows that the well became underbalanced around 8:52 p.m.  TR. 2195:2-12 (Heenan); TR. 4359:13-4360:15 (Barnhill).

287.    Analysis of post-incident Sperry data shows that the drill crew slowed the rig pumps shortly after 8:50 p.m.  TREX 620 (Post-incident Sperry data chart).  At about the same time, the drill pipe pressure stopped decreasing and "we see a flattening."  TR. 4279:1-4280:3 (Barnhill).  This change in pressure coincided with the initial slowing of the pumps and would have appeared normal.  TREX 7676.41 (Barnhill expert report).

**F.    The First Anomaly, At Approximately 9:00 P.M., Was Subtle And Missed by All**

288.    Expanded post-incident Sperry Sun data shows a subtle drill pipe pressure increase of 100 psi at approximately 9:00 p.m.  TREX 7676.42 (Barnhill expert report).

289.     The change in drill pipe pressure coincided with the crew slowing the pumps in anticipation of the spacer reaching the surface.  TREX 7676.41 (Barnhill expert report).  The 100 psi increase was probably too subtle to be noticed by the driller, Dewey Revette, or others monitoring the well and too slight to alert the crew that something was wrong.  TR. 4278:8-4280:3 (Barnhill); Gisclair Depo. 324:7-12, 395:21-397:5.

290.     Like Mr. Revette, Mr. Keith either did not see the slight increase of 100 psi around 9:00 p.m. or did not see it as a sign of a kick.  TR. 3547:18-3548:16 (Keith); *see* TREX 1.92 (Bly Report) (the increase in drill pipe pressure would have been visible to the mudlogger).  Mr. Keith did not mention the increase to the drill crew.  TR. 3542:18-3543:5, 3539:24-3540:22 (Keith) (Keith saw no indications of a kick during this entire shift); TR. 7219:19-7221:11 (Beck).

291.     BP's Senior Drilling Engineer Mark Hafle was watching the real time InSite data while working in his BP office in Houston that night.  TREX 50964.3.1.TO (BP investigators' notes of Hafle interview) ("Mark [Hafle] had InSite up."); Corser Depo. 393:25-395:6 (confirming that Mr. Hafle could see real time Sperry-Sun data through InSite, including pressure and flow data); TR. 2100:17-2101:2 (Heenan).  There is no evidence that Mr. Hafle or either of the BP Well Site Leaders on board the rig saw any anomalies around 9:00 p.m. or alerted the crew to any anomalies at this time.

### G.     BP's Onshore Engineer Told The Well Site Leader On The Rig That The Negative Test Results Were Impossible

292.     At approximately 8:52 p.m., about the same time the well became underbalanced and started to flow, BP Drilling Engineer Mark Hafle called BP Well Site Leader Don Vidrine.  The call lasted about ten minutes.  TREX 7318.8 (call log reflecting call placed by Hafle to "Horizon-Company Man" with a duration of 609 seconds); TREX

50964.3.TO (BP investigators' notes of Hafle interview) ("Don called Mark at 8:52 p.m."); Cowie Depo. 312:11-313:12.

293.    Mr. Hafle and Mr. Vidrine discussed the anomalies encountered during the negative pressure testing, and in particular the continuing 1400 psi pressure on the drill pipe.  TREX 4447.6.1.TO (BP investigators' notes of Hafle interview).

294.    At the time of this phone conversation "there was something niggling in the back of his [Mr. Vidrine's] mind" about the continuing pressure on the drill pipe during the negative test and "he was trying to understand that."  Cowie Depo. 315:5-10.

295.    Mr. Vidrine told Mr. Hafle that the negative testing results looked "squirrely."  TREX 49.3 (BP investigators' notes of Vidrine interview).  Mr. Vidrine informed Mr. Hafle that "the crew had zero pressure on the kill line, but that they still had pressure on the drill pipe."  TREX 4447.6.1.TO (BP investigators' notes of Hafle interview).

296.    In response, Mr. Hafle told Mr. Vidrine, "you can't have pressure on the drill pipe and zero pressure on the kill line in a test that's properly lined up."  TREX 4447.6.1.TO (BP investigators' notes of Hafle interview); *see also* TREX 37031.95 (BP investigators' notes of Hafle interview) ("[Vidrine] said pressure on D[rill] P[ipe] - Mark [Hafle] said you can't have that").

297.    Mr. Hafle told Mr. Vidrine that he "might consider whether he had trapped pressure in the line or perhaps he didn't have a valve properly lined up."  TREX 4447.6.1.TO (BP investigators' notes of Hafle interview).

298.    During this conversation, Mr. Hafle had the real time InSite data displayed on his computer screen in Houston, including real-time pressure and flow data from the

well.  Finding # 281, *supra*.  Mr. Hafle also had access to the InSite data stored on his

computer from the negative pressure test itself.  TR. 2101:3-8 (Heenan); TR. 4342:20-

4343:6 (Barnhill); *see also* Sprague Depo. (3/22/11) 614:2-5 (real time data from rig

available in BP's Houston office; negative pressure testing could have been monitored

remotely).

299.    There is no evidence that Mr. Hafle reviewed the negative pressure test

data available to him or took any action to investigate the anomalies described by Mr.

Vidrine after the phone call ended.  TR. 7986:6-11 (Robinson) ("I didn't see any

evidence after the phone call of Mr. Hafle following up any more."); TR. 2101:15-22

(Heenan) (no evidence that Mr. Hafle took any action to have the negative test repeated

after talking to Mr. Vidrine).

300.    In a post-incident interview with BP investigators, Mr. Hafle defended his

inaction by stating: "*it wasn't clear to him* whether Don [Vidrine] was talking about the

first or second negative tests."  TREX 4447.6.1.TO (BP investigators' notes of Hafle

interview) (emphasis added).

301.    BP's investigation report failed to include evidence of this conversation

between Mr. Hafle and Mr. Vidrine.  BP's Bly Report states: "The investigation team has

found no evidence that the rig crew or well site leaders consulted anyone outside their

team about the pressure abnormality."  TREX 1.89 (Bly Report). In fact, prior to

releasing the Bly Report, multiple BP investigators were aware of the conversation

between Mr. Hafle and Mr. Vidrine regarding the pressure abnormalities.  *See* D-6619

(comparison of BP investigators' notes with BP investigator report); TR. 7939:10-7940:6

(Robinson) (testifying that the Bly Report did not include this conversation because it

was not "causal").  Mr. Bly testified that the report did not mention the conversation

between Mr. Hafle and Mr. Vidrine because it was considered to be "after-the-fact" --

even though it occurred 47 minutes *before the blowout*.  TR. 1343:3-11 (Bly).

302.    As every witness to consider the matter agreed, if either Mr. Hafle or Mr.

Vidrine had any uncertainty about the negative test results• and it appears that both men

were uncertain• they should have stopped the displacement and ordered the negative

pressure test to be redone.  TR. 8900:6-9 (Guide); TR. 2103:25-2104:14 (Heenan)

(Vidrine had obligation to tell the driller to redo the negative pressure test); TR. 7208:8-

7209:7 (Beck) ("[Hafle] should have made the call that something was anomalous, and he

should have stopped operations right there"; Vidrine's instruction to crew to continue

with displacement after the call was "totally wrong"); TR. 4347:10-20 (Barnhill).  That

simple course of action would have prevented the blowout.

### H.     BP Well Site Leader Vidrine Returned To The Drill Floor For The Sheen Test But Failed To Notify The Crew Of BP Engineer Hafle's Concerns

303.    Shortly after his call with Mr. Hafle, Mr. Vidrine went to the drill floor for

the sheen test.  *See* TREX 302.2.TO (BP investigators' notes of Vidrine interview) ("Got

the pumps lined up.  Told them to let me know when the pill comes up so that we could

do a sheen test.  I then went to the office and checked what calls I had.  They called to

say the pill was back so I went to the rig floor"); TREX 3.2.1.TO (BP investigators' notes

of Vidrine interview) ("call to say pill was back, went to rig floor, everything fine"); TR.

4285:19-4286:20 (Barnhill).

304.    BP agreed that Mr. Vidrine went to the drill floor but initially denied that

Mr. Vidrine actually went inside the drill shack during the sheen test.  *See* TR. 1360:2-8

(Bly).  There was no reason, however, for Mr. Vidrine to go to the drill floor other than to

go to its nerve center: the drill shack. TR. 4285:19-4286:4 (Barnhill) ("[I]f you're going to the rig floor and these are the operations that are being conducted, that's where you're going. . . . You're going to the drill shack."). And BP's lead investigator Mark Bly conceded at trial that Mr. Vidrine "probably went inside" the drill shack during this time. TR. 1361:24-3 (Bly); *see also* D-6595 (animation depicting the rig floor and drill shack); TR. 4284:20-4285:8 (Barnhill) ("Company man was on the rig floor at the time"; "he was in the driller's shack looking at the information").

I.    **A Flow Check At 9:08 P.M. Appeared To Show That The Well Was Under Control**

305.    At the time Mr. Vidrine returned to the drill floor, the crew had shut down the pumps to conduct the sheen test pursuant to BP's displacement procedure. TREX 567 (BP/*Deepwater Horizon* Rheliant Displacement Procedure); TR. 4282:19-4284:5, 4284:6-4285:18 (Barnhill); TREX 7676.42 (Barnhill expert report). "The purpose of the sheen test was to determine if the spacer was free of [drilling mud] and could be pumped overboard into the Gulf of Mexico." TREX 7676.42 (Barnhill expert report).

306.    As part of the sheen test, mudlogger Joseph Keith conducted a flow check via his TV screen, which would have shown any mud coming out of the well. TR. 3568:4-21; 3570:9-3571:4 (Keith); TR. 7217:16-7218:10 (Beck). Mr. Keith watched the flow line until the gate was closed. TR. 3568:4-21; 3570:9-3571:4 (Keith); TR. 4284:20-25 (Barnhill).

307.    A flow check is the gold standard for determining if the well if flowing. TR. 7206:10-7207:6 (Beck); TR. 2140:25-2141:4 (Heenan) (flow out is one of two primary gold standard kick indicators).

308.    Mr. Keith did not see any flow during the flow check.  TR. 3568:4-21, 3570:9-3571:5 (Keith); TR. 7217:16-7218:10 (Beck).  The lack of flow indicated to Mr. Keith that the well was static.  TR. 3587:9-21 (Keith).

309.    Mr. Vidrine also confirmed that a flow check was done at this point and that indications were that "everything was fine."  TREX 192.2 (Bly investigation notes of Vidrine interview) ("They called to say the pill was back so I went to the rig floor. Everything was fine, check for flow and it was ok."); TREX 3.2.1.TO (BP investigators' notes of Vidrine interview) ("call to say pill was back, went to rig floor, everything fine").

## J.    The Second Anomaly, Between 9:08 and 9:14 P.M., Was Missed By All

310.    According to post-incident Sperry data analysis, during the sheen test between 9:08 and 9:14 p.m., while Mr. Vidrine was in the drill shack, the drill pipe pressure increased by approximately 200 psi.  TREX 7676.42 (Barnhill expert report); *see* D-6652.8 (Sperry demonstrative); TREX 620 (post-incident Sperry data).

311.    Mr. Vidrine reviewed data on the screen and either did not see this pressure increase or did not register its significance.  TREX 620.1A.TO; TR. 1358:9-1361:14, 1360:24-1361:4 (Bly); TREX 3.2A.1.TO ("Don on panel (didn't know exact #)"); TREX 49.3.1.TO (BP investigators' notes of Robinson interview); TR. 5039:23-5041:1 (Barnhill); TR. 2129:7-11 (Heenan) (increase was either missed or significance not understood by Company Man).

312.    Joseph Keith, Halliburton's mudlogger, either did not see the pressure increase or did not realize its significance.  TR. 3549:12-24, 3629:6-20 (Keith); TR.

98

7221:13-7222:8 (Beck); TR. 2128:21-2129:6 (Heenan) (mudlogger either doesn't see or understand the significance of the increase).

313.    Likewise, the Transocean drill crew either did not see this increase or did not register its effect. *See* TR. 2128:12-2129:11 (Heenan) ("I don't believe it was noticed by anybody"); TR. 4280:4-4282:18 (Barnhill) (no one monitoring that evening in real time noticed this increase).  Although various experts have since opined that the drill crew should have caught the increase, the fact that none of those responsible for monitoring the well noticed it suggests that the increase was too subtle to detect in real time as trends were developing.  TR. 4366:21-25 (Barnhill); Gisclair Depo. 85:8-17 (easy to look back on data and label things significant, but to monitor in real time an increase of this nature would not have necessarily caused panic and could have been explained by minor rig activities).

### K.    The BP Well Site Leader Instructed The Crew To Proceed With Final Displacement

314.    At approximately 9:14 p.m., Mr. Vidrine instructed the drill crew to proceed with displacement.  TREX 3.2.1.TO (BP investigators' notes of Vidrine interview) ("call to say pill was back, went to rig floor, everything fine"); *see also* TREX 58.2.1 (BP investigators' notes of Vidrine interview) ("gave okay to start dumping"); TR. 4286:21-4287:7 (Barnhill); TR. 1369:13-23 (Bly) (agreeing that Vidrine ordered the crew to "continue displacing").

315.    Mr. Vidrine understood that the well was underbalanced at that time, as the heavy drilling mud had been removed.  TREX 3.2A.1.TO (BP investigators' notes of Vidrine interview) ("sheen test passed, expected 800-900 psi underbalance to reservoir; they were comfortable with test, he told them to get everyone in place to start dumping").

316.     The continued displacement further reduced the hydrostatic pressure in the well, and "dramatically" increased the risk of a blowout.  TREX 8140.103 (Beck expert report); TR. 7178:21-7179:20 (Beck); TR. 4343:15-4344:18 (Barnhill).

317.     Mr. Vidrine had just finished his telephone call with Mr. Hafle.  *See* TREX 7318.8 (call log).  He had an obligation to tell the crew what he had just learned from BP's onshore engineer• that the negative test could not have been successful.  TR. 2103:25-2104:14 (Heenan).  This information was critical in assisting the drill crew in troubleshooting anomalies that could result from trouble downhole.  TR. 2135:14-2136:16 (Heenan).

318.     Mr. Vidrine failed to tell the Transocean rig crew, either when he returned to the drill shack or any time that night, about his conversation with Mr. Hafle.  TR. 6060:19-23 (Ambrose) (Transocean investigation team found no evidence that Vidrine relayed Hafle's concerns to Transocean rig crew).  This was the "most critical piece of information" withheld from the rig crew leading up to the blowout.  TR. 4345:7-22 (Barnhill).

319.     In accordance with the express terms of BP's final displacement procedure and Mr. Vidrine's instruction, after the sheen test, the Transocean drill crew diverted the returning fluid overboard.  TREX 567.1.TO (BP/*Deepwater Horizon* Rheliant Displacement Procedure: "9. If static sheen is an apparent pass, discharge remaining spacer and seawater down overboard line"); TREX 295.21.TO (Bly handwritten notes of Vidrine interview: "21:10-21:18 --> Sheen test passed --> Gave OK for Oboard dump").

**L.     The Drill Crew Investigated A 9:17 P.M. Pressure Spike**

320.     The crew turned the pumps back on to continue displacement following the sheen test.  At approximately 9:17 p.m., a pressure spike occurred on the number two

pump.  TR. 4287:8-4288:11 (Barnhill); D-6652.9 (Sperry data demonstrative); TR. 3605:20-3606:3, 3607:3-4 (Keith).

321.    The crew responded immediately by turning off three pumps (pumps 2, 3, and 4).  TR. 4287:21- 4288:7 (Barnhill) (shutdown of pumps reflects that driller is paying attention).

322.    A crewmember was sent to the pump room to investigate; the problem was determined to be a pop-off valve on the number two pump.  TR. 3605:20-3606:16, 3607:3-4 (Keith) (Keith called Curtis after seeing the spike in standpipe pressure. According to Keith, Curtis said "we blew a pop-off, and we're sending a crew down there"); TREX 2620.24 (Transocean internal investigation: Holloway interview form) ("Dewey called on the radio and said he needed one of them to go to the pump room."); TR. 4288:2-3 (Barnhill).

323.    Mr. Keith noticed the unusual activity on his monitors and called the drill floor to inquire; the drill crew advised him of what had happened.  TR. 3603:22-3606:5; 3630:7-3634:1 (Keith); TR. 4288:8-11 (Barnhill).

324.    Having determined that the problem was a relief valve on the number 2 pump, the crew then turned pumps number 3 and 4 back on.  TR. 4288:12-22 (Barnhill); *see* D-6652.11 (Sperry data demonstrative ending at 9:31 p.m.).  No party has contended that this anomaly was a sign that the well was insecure or that the crew's response was inappropriate.  *See* TR. 3633:23-3634:1 (Keith) (spike was not indicative of well blowing out or well control event).

### M.    The Drill Crew Investigated An Anomaly At 9:30 p.m.

325.    At approximately 9:30 p.m. the drill crew recognized an anomaly related to an increase in the kill line pressure not matched by the pressure on the drill pipe.  TR.

5702:19-5706:23 (D. Young); TR. 4289:20-4292:20 (Barnhill); TREX 22694.24 (Heenan expert report).  The pressure response signals at this point were complicated and "virtually impossible to figure out."  TR. 7299:17-7300:11 (Beck).  The crew shut down the pumps and stopped the displacement operation to investigate.  TREX 7676.8 (Barnhill expert report); TREX 22694.24 (Heenan expert report).

326.    At about this time, Chief Mate David Young went to the drill shack to check on the status and schedule for upcoming tasks; he heard Mr. Revette and Mr. Anderson discussing what they called a "differential pressure."  TR. 5702:19-5706:23, 5754:5-5755:8 (D. Young); TREX 22694.24 (Heenan expert report).  The crew appear not to have interpreted the anomaly as an indication of instability in the well; Chief Mate Young characterized Mr. Revette's and Mr. Anderson's demeanor as "[n]othing that was overly concerning."  TR. 5704:19-5705:19 (D. Young).

327.    Transocean's expert in well control, Calvin Barnhill, testified that the crew should have performed a flow check at this time, per Transocean's training materials. TR. 4432:12-4435:15 (Barnhill).  Transocean's Well Control Handbook required the Driller to conduct flow checks "at any time the Driller has a doubt about the stability of the well."  TREX 41008.70.1.TO.  Other experts agreed.  TR. 2160:24-2161:1, 2161:12-14 (Heenan); TREX 8154.5 (Beck expert report) (a flow check is done by the drill crew when a kick indicator is detected).

328.    The pressure anomalies seen in the Sperry Sun data at this time are not classic kick indicators.  TREX 7528.23 (Heenan expert report) (drill pipe pressure anomalies are "not certain indicators of an influx or 'kick' as they may be caused by something else"); TREX 8154.28 (Beck expert report) ("Standpipe pressure can be

influenced by a number of factors … and is therefore a less accurate metric for determining potential well flow."); TREX 8154.41 (Beck expert report) ("Standpipe pressure changes are, at best, an ambiguous kick indicator, and are not a direct indicator of hydrocarbons flowing into the wellbore"); Gisclair Depo. 324:3-12 ("you would expect to see the stand pipe pressure drop" when taking a kick).  Not every potential kick indicator automatically justifies shutting in the well.  TR. 2130:24-2131:5 (Heenan).  Upon seeing indicators, the appropriate action for the driller is to "investigate and determine the cause."  TR. 2131:15-18 (Heenan); TREX 22694.23 (Heenan expert report).

329.    The crew attempted to diagnose and troubleshoot the anomaly by bleeding off the pressure; this can be seen in the post-incident data as a drop in drill pipe pressure. TR. 2132:24-2134:13 (Heenan) (drop in pressure consistent with drill crew taking action such as bleeding pressure, possibly to troubleshoot); TR. 1361:18-1362:25 (Bly); TR. 6058:22-6060:14 (Ambrose); TREX 1.98, 1.101 (Bly Report) (crew may have conducted bleed off when they were "investigating the 'differential pressure'"); TREX 2620.24 (Transocean internal investigation: Holloway interview form) ("Dewey asked him to bleed off the pressure.").

330.    Around 9:39 p.m. the drill pipe pressure started to decline.  Apparently regarding this as a classic kick indicator, the drill crew conducted a flow check.  TR. 5033:21-5036:21 (Barnhill).

331.    When the crew saw flow from the flow check, they activated the BOP and diverted the flow.  TR. 5033:21-5036:21 (Barnhill).  *See* Findings ## 335-342, *infra*.

332. The evidence shows, as Mr. Barnhill testified, that when the crew saw an anomaly, they responded to it. TR. 4298:12-17 (Barnhill); TR. 1689:19-1690:9 (Ezell) ("[T]he guys were doing everything within their power to keep the well under control." "[T]hey [gave] every last measure of their training to shut the well in and try to prevent it."). However, the drill crew's attempt to diagnose what they were seeing was fatally hampered by BP's failure to inform them about the true condition of the well, *i.e.*, that the untested cement was likely to fail and that the negative pressure test had likely not been properly conducted. TR. 4435:21-4436:5 (Barnhill).

333. If Mr. Vidrine had told the crew about his conversation with Mr. Hafle, it is likely that they would have closed the BOP earlier and circulated out the kick safely. TR. 2104:15-2105:1 (Heenan).

334. Good oil field practice required Mr. Vidrine "to give that information to the driller, so that when he's troubleshooting he has everything he can get to help him understand what he was dealing with." TR. 2136:6-13 (Heenan). Providing information is considered good oil field practice precisely because giving the driller that information "might just save his life." TR. 2136:13-16 (Heenan); *see* TR. 1711:19-1712:4 (Ezell) (expected BP Well Site Leader to share lifesaving information with driller or OIM); TR. 7201:19-7202:4 (Beck) ("critical" and "good oil field practice" for the operator "to provide accurate and full information to its contractors so they can perform their services").

IX.   **THE DRILL CREW TRIED TO SHUT IN THE WELL**

    A.   **The Drill Crew Activated The BOP**

    335.   The drill crew performed the flow check around 9:41 p.m.  After seeing that the well was flowing, the drill crew activated the Upper Annular.  TR. 5033:21-5036:21 (Barnhill).

    336.   DNV found the Upper Annular in a closed position when the BOP was recovered post-incident.  TREX 43093.45.1.TO (DNV Report callout).  The experts uniformly agreed that the Upper Annular was closed by the drill crew sometime around 9:42 p.m. on April 20.  *See* TR. 2758:9-13 (Davis); TR. 5106:9-12 (Childs); TR. 6923:11-16 (Stevick); TR. 9140:11-9141:1 (Shanks).  Closing the Upper Annular takes approximately one to one and half minutes.  TR. 5034:5-15 (Barnhill).  It was reasonable for the drill crew to watch the pressure responses during this period to determine whether the attempt to shut in the well had been successful before trying another well control measure.  TR. 5034:16-5036:11 (Barnhill).

    337.   The drill crew next activated the Upper and Middle Variable Bore Rams.  TR. 5034:20-5038:20 (Barnhill).  These rams were found closed after the incident.  TREX 43093.45.1.TO (DNV Report callout).  The experts uniformly agreed that the Upper and Middle Variable Bore Rams must have been closed by the drill crew at about 9:46 p.m. and that they were fully closed by about 9:47 p.m.  *See* TR. 2758:18-20 (Davis); TR. 5114:8-12 (Childs); TR. 6923:7-10 (Stevick); TREX 61107.29 (Shanks expert report).

    338.   The pressure response to the closing of the Variable Bore Rams would have indicated to the drill crew that the Variable Bore Rams had successfully sealed the well.  TR. 4297:11-4298:11, 5037:25-5039:11 (Barnhill); TREX 40003.11 (add energy

report) (BP's flow modeling expert concluded that pressure readings at that time "correspond[ed] to a shut-in pressure with hydrocarbons in the wellbore up to the BOP and drill pipe full of seawater").

### B.      The Drill Crew Diverted The Flow

339.     While they were attempting to get the well under control, the drill crew activated the diverter system, which is designed to prevent mud and gas from flowing onto the drill floor.  The precise time of the diversion is not recorded and cannot be determined.  TR. 4309:11-21 (Barnhill).

340.     In accordance with BP's standing instructions, the diverter was set to send the returns to the mud gas separator.  Pleasant Depo. 325:9-12.  BP's default position for the diverter arose from a concern about discharging oil-based mud into the Gulf. Pleasant Depo. 615:11-616:11, 624:5-23, 625:1-3, 625:6; TR. 1787:6-22 (Ezell); *see* TREX 2210.17 (BP NAX-DW Gulf of Mexico Deepwater Well Control Guidelines, Section 4.1.13) (drill crews should "attempt to keep flow going through the gas buster – as opposed to over board lines – to minimize synthetic oil mud going into the Gulf, but be prepared to divert"); TR. 4310:12-4311:3 (Barnhill).[18]

341.     BP's instruction to line up the diverter to go to the mud gas separator was consistent with BP's guidelines that when the influx is above the BOP and into the riser, the drill crew should "[c]lose the diverter and direct fluid through the riser gas buster." TREX 2210.17.1.TO (BP NAX-DW Gulf of Mexico Deepwater Well Control Guidelines, Page 16, Section 4.1.4); TR. 4310:12-4311:3 (Barnhill).

---

[18] "Gas buster" refers to the mud gas separator.  TR. 4310:19-20 (Barnhill).

342.    The Transocean Well Control Handbook instructs the drill crew to divert flow overboard if there is expanding gas in the riser.  TR. 4263:23-4264:8 (Barnhill); TREX 41008.207.1.TO (Transocean Well Control Handbook).  Whether -- and if so, when -- the crew became aware that gas was expanding in the riser could not be established from the evidence.  There was evidence that the crew diverted the flow overboard at some point.  Toolpusher Randy Ezell and Chief Mate David Young saw fire coming out of the starboard diverter line, indicating that the drill crew had switched from the mud gas separator to the overboard diverter.  TR. 1706:15-23, 1812:19-1813:14 (Ezell); TR. 5878:7-5879:7 (D. Young).[19]

### C.    The Drill Crew Alerted Others

343.    The drill crew called the BP Well Site Leader and told him they were getting mud back, closing in the well, and diverting the flow.  TR. 4295:16-4296:9 (Barnhill); TREX 51133.3 (Signed statement of Don Vidrine and Bob Kaluza) ("Later got call from toolpusher informed he started getting mud at surface and had closed annular and diverted returns to gas buster").

344.    The drill crew called the Bridge and told them they were dealing with a well control situation.  TREX 4472.5 (Transocean investigation team: Fleytas interview form).

345.    The drill crew also called Transocean Senior Toolpusher Randy Ezell and told him that they were shutting in the well, that the mud had shot to the top of the derrick, that they could not see out the windows, and that they needed his help.  TR.

---

[19] In these circumstances, the record does not support the opinion by PSC expert Geoffrey Webster that diversion to the mud gas separator constituted "panicked decision making."  TR. 4181:20-4182:17 (Webster).  Mr. Webster is not a well control expert and had no well control training.  TR. 4182:6-23 (Webster).

1697:1-19, 1807:24-1809:2 (Ezell) (Assistant Driller Stephen Curtis called to say there

was a problem and they needed help; "Jason's shutting it in now.").

346.     The first explosion occurred at approximately 9:49 p.m., within two

minutes after the Variable Bore Rams shut in the well.  Transmissions from the rig ended

at this point.  TREX 7676.45 (Barnhill expert report) ("The Sperry Sun data transmission

to shore was lost at 21:49 hours based on the Sperry Sun real time data chart.  The post

incident investigations have concluded that the explosions were occurring around this

time and were responsible for the loss of signal.").

347.     Allegations that the drill crew should have employed the Emergency

Disconnect Sequence during their well control efforts were not supported at trial.  As

discussed in part X-F, *infra*, EDS is a last resort not used when other well control options

are still available, as it cuts off those options.  TR. 4312:1-13 (Barnhill).  The crew

thought it had shut in the well, and it still had the Blind Shear Rams and Casing Shear

Rams available.  TR. 4297:24-4298:4 (Barnhill); D-6667 (schematic of BOP).  The speed

at which events were unfolding left the drill crew with little opportunity to do more than

they did.  TREX 8140.16 (Beck expert report); TREX 50381.11-12 (Wolfe rebuttal

expert report).  No evidence was introduced at trial of any well control policy anywhere

in the world requiring a drill crew to EDS in these circumstances.

## X.    THE BRIDGE CREW PROPERLY RESPONDED TO THE EMERGENCY AND SUCCESSFULLY EVACUATED THE RIG

### A.    The Bridge Crew Was Trained To Respond To A Blowout

#### (1)    The bridge crew had extensive emergency training

348.     Transocean used a combination of training methods to prepare the bridge

crew, from the Dynamic Positioning Operator (DPO) up to the Master, to deal with

emergency situations.  These methods included formal training, OJT modules, and regular drills.  TR. 5651:20-5652:11, 5696:14-25 (D. Young).

349.    A bridge crewmember seeking to move up had to complete the OJT module for that position.  A supervisor signed off on sections in the module after the crewmember showed competency in those sections.  TR. 5652:24-5653:5, 5653:13-16 (D. Young).  OJT is not unique to Transocean's bridge crews; it is also employed by the U.S. Navy and the U.S. Coast Guard.  TR. 5652:12-15 (D. Young).

350.    Transocean's OJT module for DPOs included responding to fire alarms, operating the Emergency Shutdown System (ESD), and activation of the Emergency Disconnect Sequence (EDS).  TR. 5653:6-12, 5656:19-22, 5576:21-5577:4 (D. Young); McMahan Depo. 69:23-70:4; TREX 4459.4, .31 (DPO OJT module).  The OJT module for DPOs specifically trained DPOs on "[w]hat actions you would take in the event of a combustible gas release" and how to respond to gas alarms for both combustible gas and hydrogen sulfide.  TREX 4459.6; TR. 5655:23-5656:18 (D. Young).

351.    As of April 20, 2010, Captain Curt Kuchta, Chief Mate David Young, Senior DPO Yancy Keplinger, and DPO Andrea Fleytas had all completed the OJT module for DPOs and were thus all trained in the activation of the Emergency Disconnect System.  TREX 52658.20 (Summary of Training for Curt Kuchta); TREX 52658.22 (Summary of Training for David Young); TREX 52658.24 (Summary of Training for Yancy Keplinger); TREX 52658.26 (Summary of Training for Andrea Fleytas); TR. 5656:23-5657:6 (D. Young).

352.    Captain Kuchta's emergency training also included Advanced Fire Fighting, Bridge Resource Management, International Safety Management, Health Safety

and Environment OJT, Offshore Survival Craft Leaders Upgrade, Proficiency in Survival Craft, Deepwater Drilling Leadership Training, Safety Leadership Foundations, and Environmental Leadership Training. TREX 52658.20-21 (Summary of Training for Curt Kuchta).

353. Senior DPO Keplinger's emergency training included Safety Management, Hazardous Communications, Health Safety and Environment OJT and Additional Rig Based Training, International Safety Management, Advanced Fire Fighting, Deepwater Drilling Leadership Training, Emergency Procedures, Environmental Leadership Training, and Safety Leadership Foundations. TREX 52658.24-25 (Summary of Training for Yancy Keplinger).

354. DPO Fleytas's emergency training included Training for Optimum Performance, International Safety Management, Health Safety and Environment OJT and Additional Rig Based Training, Safety Leadership Foundations, International Safety Management, and Environmental Leadership Training. TREX 52658.26 (Summary of Training for Andrea Fleytas).

355. As a master mariner, Captain Kuchta was trained and licensed to respond to a major emergency onboard a vessel under his command. *See* Rec. Doc. 5927 (Agreed Stipulations, # 175 ("Curt Kuchta held a valid license issued by the Republic of the Marshall Islands as Master (No Limitations)"); TREX 52658.20-21 (Summary of Training for Curt Kuchta); TREX 40011.25 (Mitchell report) (Captain Kuchta was "certificated to be Master" by Coast Guard and Republic of Marshall Islands); Kuchta Depo. 91:4-8, 20; TREX 3751 (Master Mariner credential).

356.    At trial BP expert Andrew Mitchell and PSC expert Geoffrey Webster criticized Captain Kuchta for not yet taking Petrofac's Major Emergency Management (MEM) course.  Transocean's training matrix requires its senior rig personnel to complete the MEM course.  *See* TREX 3581 (Transocean training matrix).[20]  Neither the U.S. Coast Guard nor the Republic of the Marshall Islands requires that mariners or personnel working on offshore drilling rigs take MEM.  TR. 9502:8-11 (Mitchell).

357.    Neither Captain Mitchell nor Mr. Webster offered any evidence that Petrofac's MEM course covers topics different than those addressed in the formal training required for Captain Kuchta to obtain his master mariner's license or that MEM training would have resulted in any different conduct by Captain Kuchta on the night of the incident.  TR. 3936:25-3927:3 (Webster); TR. 9436:14-16 (Mitchell).  The evidence established that, at the time of the incident, BP believed that Captain Kuchta was well-trained for an emergency, *see* TR. 8854:12-15 (Guide), and put "safety first."  M. Sepulvado Depo. 535:1-9 (BP Well Site Leader).

### (2)    The bridge crew conducted EDS drills and exercises

358.    The bridge crewmembers also received hands-on, real-time training on operation of the Emergency Disconnect System (EDS).  A full EDS drill was conducted prior to splashing the BOP at Macondo, on January 31, 2010.  TREX 51219.2 (Safety Drill Report) ("On Transit from Miss. Canyon block 727 to Miss. Canyon Block 252.  Perform BOP maintenance, subsea an accumulator drills, *EDS drill* and tested the auto shears, split LMRP from BOP, pull opening bonnets on BOP") (emphasis added).

---

[20] At the time of the incident, five of the *Deepwater* Horizon crew had completed the MEM course (OIM Jimmy Harrell, Senior Toolpusher Randy Ezell, Toolpusher Jason Anderson, Driller Dewey Revette, and Driller Micah Burgess).  TREX 52658 (Summary: Training of Well Control and Bridge Crewmembers Aboard the *DWH* on April 20, 2010).

359. Once the BOP is latched up to the wellhead, it is not possible to do a complete EDS drill: hitting the EDS button on the BOP panel would literally detach the rig from the wellhead and would be "catastrophic" if done "just for a drill." TR. 1780:15-1781:4 (Ezell).

360. Consequently, when the BOP was subsea, the bridge crew did "tabletop exercises when [they] would have emergency disconnect drills for the DPOs" and "run through the time frame it takes for each disconnect sequence." TR. 5788:20-5789:10 (D. Young). The bridge crew practiced EDS responses during these tabletop exercises for a "drive-off scenario," *i.e.*, "where the DP system thought it was at a different location than it actually was, and you are driving away from the wellhead." TR. 5601:12-25 (D. Young); TREX 5340.1 (Task Specific Think Procedure for drive-off). The crew would be given the drive-off rate and have to determine how much time was available to "actually function" the EDS. TR. 5789:11-5790:4 (D. Young).

361. EDS is primarily used on dynamically positioned drilling rigs to protect the wellhead in case of a drive-off or a loss of power. Wolfe Depo. 332:8-12, 332:16-20. Members of the *Deepwater Horizon* crew had successfully disconnected in the past. *See* P. Earl Lee Depo. 393:15-24 (crew successfully used EDS during 2009 Hurricane Ida); Rec. Doc. 5927 (Agreed Stipulations), # 24 (*Deepwater Horizon* performed EDS operation during hurricane in 2003).

362. The bridge crew also participated in the drill crew's well control drills. "[C]ertain portions of the well control and emergency disconnect functions . . . were practice daily or weekly. It just depended on what aspect it was." TR. 5843:14-23 (D. Young); Hackney Depo. 110:25-111:8 ("standard" that DPOs and Senior DPOs would

participate in well control safety drills); *see also* TREX 1453.73 (Transocean's *DWH*

Emergency Response Manual) (describing responsibilities and duties of various

personnel during a well control emergency).

### (3)   The crew and other on-board personnel participated in regular emergency drills

363.   The bridge crew led the entire *Deepwater Horizon* crew and any other on-

board personnel in weekly fire, emergency and abandon ship drills.  TR. 5696:14-

5700:23 (D. Young); TREX 50003.13-14 (Wolfe expert report); *see* TREX 50335

(*Deepwater Horizon* Safety Drill Report for April 2010); S. Johnson Depo. 106:17-

107:15; J. Owen McWhorter Depo. 52:13-21.  From January 31, 2010 to April 19, 2010,

the *Deepwater Horizon* crew conducted at least 32 marine safety drills, each focusing on

different potential emergencies.  TREX 52661 (Summary: Well Control and Marine

Safety Drills Conducted on the *DWH*).

364.   The weekly marine safety drills included training on the proper use of

different types of life saving equipment, mustering at lifeboats and other designated

locations, and loading the lifeboats evenly and safely.  TR. 5697:14-5700:21 (D. Young).

The drills were taken seriously, involved near-full participation by on-board personnel,

and "helped prepare people for the events on the 20th."  TR. 5700:24-5701:2 (D. Young);

TR. 6356:24-6357:3 (Chaisson) ("every drill that I've taken part in has been taken

seriously"); *see* TREX 50335.4 (participation list for April 17, 2010 abandon ship drill);

TREX 50335.8 (participation list for April 18, 2010 fire drill).

365.   The U.S. Coast Guard confirmed during its annual inspections that the

weekly fire and abandon ship drills were conducted.  The Coast Guard concluded that the

*Deepwater Horizon* crew were "well trained" to respond to emergency situations.  Odom

Depo. 146:4-147:1, 150:4-8, 150:10-19, 163:11-14, 163:18-24 (Coast Guard Lieutenant Commander) (*Deepwater Horizon* crew were "well trained" in their emergency drills"; the crew's knowledge of emergency equipment and emergency response was "expert" and "exceptional").

366.    BP's John Guide was the designated company representative responsible for ensuring that emergency disconnect contingency plans were in place prior to running the BOP stack, that drive-off drills were conducted at regular intervals and documented, and that rig personnel were trained and competent.  *See* TREX 1376.21.1.TO (BP Drilling and Well Operations Practice, Section 6); TR. 8853:1-24 (Guide).  Mr. Guide and BP were satisfied that the regular emergency response training drills were comprehensive, careful, and well done and that the Transocean crew were well-trained to perform an emergency response if necessary.  TR. 8853:1-8854:2-15 (Guide); TREX 5751.1-2 (BP Service Quality Appraisal Report) (rating "quality of safety drills, emergency preparedness" and "emergency drills" on the *Deepwater Horizon* as "very good" and meeting performance expectations).

### B.    The *Deepwater Horizon*'s Command Structure Complied With Regulatory And Industry Standards

#### (1)    Dual command was required by the Flag State and an "industry norm" for dynamically positioned MODUs in the Gulf of Mexico

367.    The *Deepwater Horizon* had both a Master and an OIM.  This command structure was required by the minimum manning standards set by its Flag State, the Republic of the Marshall Islands.  *See* TREX 50381.5 (Wolfe rebuttal expert report).

368.    As seaworthiness expert Jeff Wolfe explained, having both a Master and OIM aboard a dynamically-positioned MODU "makes sense because an individual with a

114

Master's qualifications is needed to supervise the station-keeping and marine operations of the MODU while an individual with an OIM's qualifications is needed to supervise the drilling operations of the MODU. It would be impractical and unreasonable for a single person to be expected to adequately supervise the myriad of simultaneous marine and drilling activities that occur when the rig is on location." TREX 50381.5 (Wolfe rebuttal expert report); *see* TR. 5624:9-12 (D. Young) (explaining that the dual-command structure is not unusual because of the differing skill sets of Masters and OIMs).

369.    The U.S. Coast Guard regularly inspected the *Deepwater Horizon* and was aware of the specific command structure. Lieutenant Commander Michael Odom, one of the Coast Guard examiners during the July 2009 inspection of the rig, testified that the OIM was "the person who would be ultimately in charge of what's going on on that vessel while it is attached to the seafloor with the riser," and that "[w]hile the vessel is underway, then the captain would be the person that was ultimately in charge." Odom Depo. 11:1-17, 216:22-217:9.

370.    The Coast Guard reviewed the licenses of the individuals aboard and determined that they met the required criteria and experience necessary for their positions. TREX 5580.2 (U.S. Coast Guard Activities Summary Report for Certificate of Compliance Examination on *Deepwater Horizon* conducted on July 27, 2009) ("Reviewed all applicable licenses . . . no discrepancies noted"); *see* TREX 50381.6 (Wolfe rebuttal expert report) (*Deepwater Horizon*'s "formal designation [of persons in charge] would be reviewed each time the *Deepwater Horizon* was boarded by the Coast Guard").

371. The American Bureau of Shipping (ABS), which visited and inspected the *Deepwater Horizon* more than 20 times in the five years preceding the incident, also verified that crewmembers held appropriate licenses and that the vessel was manned by a crew with the proper qualifications. TR. 5936:3-23 (Ambrose); *see, e.g.*, TREX 50330, Parts D and E (12/09 ABS Report of Safety Inspection) (ABS reviewed and approved the vessel Minimum Safe Manning Certificate and certified that rig personnel met the requirements of the Minimum Safe Manning Certificate, that the persons on board possessed the appropriate Seafarer's I.D. books, and that the number of qualified persons required by the Minimum Safe Manning Certificate were on board).

372. As the Flag State, the Marshall Islands regularly inspected the rig and determined that the crew met required criteria. TREX 3076.2-3 (Republic of the Marshall Islands Report of Safety Inspection for December 17, 2009 inspection). The Marshall Islands confirmed after the accident that "[a]t the time of the explosion that occurred on April 20, 2010, the *Deepwater Horizon* was properly manned under national and international standards for a DPV Unit despite the clerical error on the [Minimum Safe Manning Certificate] by the Maritime Administrator that referred to the *Deepwater Horizon* as a Self-Propelled MODU instead of a DPV unit." TREX 50394.2 (Letter from Marshall Islands); TREX 50381.6 (Wolfe rebuttal expert report).

373. BP was aware of the *Deepwater Horizon's* "Master OIM structure." TR. 8864:18-21 (Guide) (understood during the three years he worked with the *Deepwater Horizon* that it had "both a captain and an OIM"); Cramond Depo. 14:2-6, 336:16-20. BP's Marine Authority for the Gulf of Mexico, Neil Cramond, had "no information that would lead [him] to see that as an improper structure," and never "raise[d] any concern to

anyone at BP, to anyone at Transocean, to any governmental agency, concerning that OIM master structure."  Cramond Depo. 331:25-332:6, 336:21-337:2; *see also* TREX 44046.14 (BP September 2009 CMID) (Transocean Health and Safety Policies and Procedures Manual adequately addressed "OIM's Master's or Barge Master's responsibility and authority").

374.    Mr. Cramond testified that the *Deepwater Horizon*'s dual-command structure was "the industry norm"  in the Gulf of Mexico.  Cramond Depo. 331:13-24. BP's expert Captain Mitchell found that over one third of DP MODUs in the Gulf of Mexico used a dual-command structure like the *Deepwater Horizon*.  TREX 40011.114.TO (Mitchell expert report); *see also* TR. 9497:8-14 (Mitchell) (agreeing that Noble Drilling has more DP MODUs with a Master/OIM structure than Transocean); TR. 9496:20-9497:7 (Mitchell) (unaware of any MODUs with a dual-command structure having their ISM certificates revoked as a result of that structure during ISM compliance inspections).

375.    On this record, the evidence established that the *Deepwater Horizon*'s operating structure was in accordance with industry standards and complied with applicable international, Flag State, and U.S. laws and regulations.  TREX 50003.8 (Wolfe expert report); TREX 50381.3 (Wolfe rebuttal expert report).

### (2)    As required by the ISM Code, the *Deepwater Horizon* Master retained "overriding authority" during emergencies

376.    ISM Code section 5.2 states that "[t]he Company should establish in the safety management system that the master has overriding authority and the responsibility to make decisions with respect to safety and pollution prevention and to request the

Company's assistance as may be necessary."  TREX 40011.104 (Mitchell expert report) (App. 3: 2002 ISM Code).

377.    This "ability for the captain or the master to take charge at any time and make the decisions that concern the safety of the vessel, the crew, and the environment" is referred to as "overriding authority."  TR. 5623:14-21 (D. Young).

378.    Consistent with the ISM Code, regardless of who is the person-in-charge of operations at a given time, the Master of the *Deepwater Horizon* retained overriding authority to take whatever action was required for the safety of the crew, vessel, and protection of the environment.  TREX 671.47 (*Deepwater Horizon* Operations Manual); TR. 4720:21-4721:2 (Newman); Winslow Depo. 612:8-17 (Master has overriding authority consistent with the ISM Code); Canducci Depo. 474:3-11 ("[T]o me it is clear that the master's overriding authority is sacrosanct and, in fact, it has always been entirely clear to me that that is the case"; "as far as my dealings, our crews understand that.").[21]

---

[21] Criticisms by the PSC and BP experts of the operating structure on the rig were based on the "flawed premise that designation as a PIC means the person so designated has assumed a Master's responsibilities under international, flag state (Marshall Islands) and U.S. law applicable to MODUs such as the *Deepwater Horizon*."  TREX 50381.3 (Wolfe rebuttal expert report).  This issue was raised in DNV's first inspection of the *Deepwater Horizon* out of the shipyard in 2002; DNV reported as a non-conformity that "certain responsibilities and authorities were not fully defined and documented" in the rig's safety management system.  TREX 5483.1, .4 (2002 DNV Non-Conformity and Finding Note).  A "non-conformity" is "[a]n observed situation where objective evidence indicates the non-fulfillment of a specified requirement," as distinct from a "major" non-conformity that "poses a serious threat to personnel or ship safety or a serious risk to the environment."  *See* TREX 5483.1.  After giving Transocean time to correct the finding, DNV certified that the *Deepwater Horizon* complied with ISM Code.  TREX 1774 (2002 Safety Management Certificate).  After the 2002 audit, DNV reviewed Transocean's response to previous audits; DNV never again found the rig's authorities and responsibilities were not properly defined or documented.  *See* TREX 44007, TREX 1776 (DNV Safety Management Certifications for 2005 and 2007); TREX 1778.4 (2007 Ship Audit Report) ("Corrective actions from previous audits were verified.").

379.     The *Deepwater Horizon*'s Operations Manual explicitly recognizes that although the OIM "is the most senior onboard manager, he shall be aware that the master is assigned the legal requirement to hold overriding authority in situations involving safety and pollution prevention."  TREX 671.50 (*DWH* Operations Manual).

380.     The Master can override the OIM, or even the CEO of Transocean, should the circumstances require him to do so.  TR. 5623:22-25 (D. Young); Winslow Depo. 611:13-612:11 ("At anytime that the -- the master feels that the safety, welfare of the crew is jeopardized or anything that he   doesn't think is right, he -- he takes over the operations.  Shuts it down"); Hackney Depo. 228:17-229:13 ("no doubt whatsoever" that the Master had authority in an emergency on the *Deepwater Horizon*).

381.     The Master's authority during emergencies was set forth on the station bill for the *Deepwater Horizon*, which was posted in numerous locations on the rig.  The station bill identified the Master at the top of the chain of command during emergencies, followed by the Chief Mate, and OIM.  D-6588 (*Deepwater Horizon* Station Bill); TR. 5621:4-24, 5622:23-5623:7 (D. Young); TREX 50003.11 (Wolfe expert report).  The Master's authority was communicated to visitors to the rig through the station bill and an orientation program.  TREX 50003.19 (Wolfe expert report); TREX 50381.7 (Wolfe rebuttal expert report); Canducci Depo. 689:1-13; TR. 1909:25-1910:22 (Ezell) (if there was any question about chain of authority, Ezell "would look on our station bill, which was posted all around the rig").

382.     The station bill is included in the *Deepwater Horizon*'s Emergency Response Manual.  TREX 22306.357 (*Deepwater Horizon* Emergency Response Manual). This Manual was reviewed and approved by BP.  TREX 44046.16 (BP

September 2009 CMID) (confirming that the *Deepwater Horizon*'s emergency response plan includes an "[e]ffective management structure in the event of an Emergency"); TREX 1776.1 (ISM Safety Management Certificate).

383.    As the emergency unfolded on April 20, 2010, rig crewmembers recognized the Master as the person in charge of the emergency situation.  TR. 5623:11-13 (D. Young) (did not witness any confusion among the crew as to who was in charge); TR. 5720:16-23 (D. Young) (Captain Kuchta was "in charge of the scene on the bridge" during the "last moments"); Keplinger Depo. 112:7-12 ("[T]he Captain was in charge."); Meinhart Depo. 127:25-128:16 (Captain "was in control," handling the situation, and directing people); Taylor Depo. 179:4-7; Wolfe Depo. 367:7-17 (no evidence of confusion).

### (3)    OIM Jimmy Harrell was properly licensed

384.    PSC expert Webster and BP expert Mitchell asserted at trial that OIM Jimmy Harrell was not properly licensed by the Marshall Islands.  TR. 3936:10-15 (Webster); TR. 9445:5-9:447:9 (Mitchell).  Each had a different theory for this charge. Mr. Webster asserted that Mr. Harrell was the de facto Master and not licensed for that role; as explained above, the dual command structure was common in the Gulf of Mexico and the Captain retained overriding authority as required by the ISM Code.

385.    Captain Mitchell asserted that regulations by the Flag State prohibited Mr. Harrell from serving on a self-propelled rig like the *Deepwater Horizon*.  TR. 9445:5-9:447:9 (Mitchell).  Captain Mitchell's regulatory interpretation was not supported by the evidence.  As described above, the Marshall Islands confirmed after the incident that the rig was properly manned, including the stationing of an OIM.  TREX 50394.2; *see* TREX 3802 (Harrell license).  ABS and the U.S. Coast Guard regularly reviewed the licenses of

crewmembers during their inspections of the *Deepwater Horizon* and found that all were in order. *See, e.g.*, TREX 50330, Parts D and E (12/09 ABS Report of Safety Inspection) (ABS reviewed and approved the vessel Minimum Safe Manning Certificate and certified that rig personnel met the requirements of the Minimum Safe Manning Certificate, that the persons on board possessed the appropriate Seafarer's I.D. books, and that the number of qualified persons required by the Minimum Safe Manning Certificate were on board); TREX 5571.4 (7/27/09 U.S. Coast Guard Certificate of Compliance for *Deepwater Horizon*) (showing that Coast Guard reviewed "all applicable licenses").

C. **The *Deepwater Horizon*'s Alarm Systems Were Properly Configured**

(1) **The rig's gas alarms were in proper working order**

386. The *Deepwater Horizon*'s alarm system included more than 500 automatic sensors and manual fire alarm stations throughout the rig, including detectors for heat, smoke, flame, toxic gas (hydrogen sulfide), and combustible gas. TR. 5606:19-5607:5 (D. Young); TREX 1118.4-7 (*Deepwater Horizon* Safety System Design Philosophy); TREX 50003.27 (Wolfe expert report); D-6725 (sensors on the *Deepwater Horizon*).

387. The fire and gas system on the *Deepwater Horizon* was approved by the ABS as meeting classification society, international and U.S. Coast Guard standards. Rec. Doc. 5927 (Agreed Stipulations), # 177.

388. The alarm system could be controlled and monitored from Simrad Vessel Control (SVC) operator stations located on the bridge, in the engine control room, and in the drill shack. TR. 5589:9-14, 5593:8-17 (D. Young); TREX 50003.32 (Wolfe expert report).

389. PSC expert Geoff Webster opined that the gas alarm system failed to immediately detect the presence of combustible gas on April 20, 2010 because certain gas

sensors were inhibited.  TR. 4136:5-19 (Webster).  The weight of the evidence was to the

contrary.  *See* TR. 5640:25-5641:6 (D. Young).

390.    On occasion, individual detectors would be placed in "passive mode" or

"inhibit mode."  In "passive mode," a single detector would be effectively taken out of

the system so the crew could work on or replace that detector.  TR. 5630:10-25 (D.

Young).  A detector in "inhibit mode" would still function, and still produce an alarm on

the SVC operator stations, but it would not automatically function the outputs associated

with that detector.  TR. 5631:1-13 (D. Young).  Specific detectors would be inhibited for

a number of reasons, including welding operations in tight spaces and weighing mud in

the sack room, which would trigger alarms on the bridge.  TR. 5631:17-5632:11 (D.

Young).  The bridge would check back with those spaces each time they got an alarm

until the space was clear.  *Id.*

391.    The bridge kept track of which detectors were in passive or inhibited in "a

written log on the bridge that you would put the tag number for the sensor and the

location of it and the person responsible for the inhibit on that sensor, so you could track

which detectors were inhibited."  TR. 5632:12-19, 5638:25-5639:6 (D. Young).

Schneider Depo. 349:6-9, 349:12-15 (ModuSpec Inspector found that the *Deepwater

Horizon* had a system in place to track inhibit sensors in April 2010, and was "satisfied"

with that system).  The binder containing the inhibit register apparently sank with the rig.

TR. 5632:20-5633:1 (D. Young).

392.    During its annual inspections of the rig, Coast Guard investigators

conducted spot-checks of the alarm system, verifying that the crew received alarms on

the bridge and checking the crew's response.  TR. 5639:7-5640:24 (D. Young).  The

Coast Guard issued a Certificate of Compliance after its most recent inspection of the *Deepwater Horizon* in July 2009. TREX 5571 (7/27/09 Coast Guard Certificate of Compliance). During Chief Mate David Young's time on the *Deepwater Horizon*, he never heard any complaints from the Coast Guard about the configuration of the alarm system. TR. 5639:7-5640:24 (D. Young).

393.   An independent surveyor, ModuSpec, inspected the fire and gas detection systems during an April 2010 Rig Condition Assessment. TREX 88.91, .93 (2010 ModuSpec Rig Condition Assessment). ModuSpec specifically reported that "there were no detectors either in fault or inhibited condition other than the units being serviced." TREX 88.93; Schneider Depo. 349:1-5, 412:6-14.

394.   ModuSpec's "review of maintenance indicated the gas detector and alarm system being regularly tested and calibrated with excellent work order notes being recorded. The equipment was in good condition." TREX 88.94 (2010 ModuSpec Rig Condition Assessment).

395.   On April 13, 2010, seven days before the accident, *Deepwater Horizon* electronics technician Gene Frevele verified the calibration of the gas alarms. TREX 4140.1-2 (work order for gas detection function test); TR. 5669:1-5670:5 (D. Young). Maintenance records show that Mr. Frevele "tested and calibrated all the [combustible gas] sensors on board, he inspected them for corrosion and water tightness. Logged dates of calibration in Gas Log Book." TREX 4140.2 (work order for gas detection function test); *see* TR. 5670:8-16 (D. Young) (any assertion that any gas sensors were in passive mode or functionally removed from service would be "[i]ncorrect," and "[i]nconsistent" with Transocean's own maintenance records from a week before the incident).

396.    The evidence established that the alarm system worked as designed by detecting the presence of hydrocarbon gases on the rig and alerting the bridge team and personnel in the engine control room.  TREX 50003.36 (Wolfe expert report); *see* Part X-E, *infra*.

### (2)    The general alarm properly required manual activation

397.    The *Deepwater Horizon*'s rig-wide "general alarm" was configured to require manual activation. The purpose of the manual configuration was to avoid false alarms.  TR. 5637:21-5638:6 (D. Young).

398.    Configuration of the general alarm to require manual activation complied with Coast Guard, 1989 MODU Code, and SOLAS Convention requirements: "The general alarm must only be initiated manually and is intended to be sounded by the person on watch or other responsible member of the crew only after the determination has been made that an emergency situation exists which warrants mustering the crew and passengers (if any)."  TREX 1119.1-2 (U.S. Coast Guard Navigation and Vessel Inspection Circular No. 2-89); TREX 50003.34 (Wolfe expert report); TR. 5635:21-5636:10, 5641:7-9 (D. Young); Keplinger Depo. 70:8-19.

399.    During its annual inspection the Coast Guard required the crew to sound the general alarm.  TR. 5691:11-5692:2 (D. Young).

### D.    The Emergency Shutdown System Was Properly Configured For A Dynamically Positioned Rig

400.    The *Deepwater Horizon*'s fire and gas detection system included an Emergency Shutdown System (ESD) designed to initiate certain shutdown actions, such as closing the fire dampers and fire doors and stopping or starting ventilation fans. TREX 50003.35 (Wolfe expert report); TREX 1111.12 (*Deepwater Horizon* Fire & Gas

System Manual); TREX 1118.13 (*Deepwater Horizon* Safety System Design

Philosophy); TR. 5637:4-20 (D. Young).

401.   Certain of these shutdown functions would occur automatically upon the

detection of fire and gas; others, such as the engines and engine room ventilation,

required manual activation of the ESD.  D-6722 (Demonstrative - "What is override?");

TR. 5636:11-5637:20 (D. Young); TREX 1118.10 (*Deepwater Horizon* Safety System

Design Philosophy) ("F&G Automatic HVAC Actions"); TREX 50003.35 (Wolfe expert

report); TREX 1.46 (Bly Report) (describing automatic vs. manual functions).  This

configuration complied with the MODU Code.  *See* TREX 1118.1 (*Deepwater Horizon*

Safety System Design Philosophy) (stamp showing that American Bureau of Shipping

approved *Deepwater Horizon*'s Safety System Design Philosophy as in compliance with

MODU Code on September 13, 2000); TR. 4176:13-20 (Webster) (before a MODU can

be classed, its safety system design philosophy must be approved by ABS for compliance

with the MODU Code).

402.   The requirement of manual ESD activation with respect to the rig engines

was both proper and practical: A powerless rig loses its position-keeping ability and

could drift off location, posing serious hazards to personnel on board and on nearby

vessels.  TREX 50003.35 (Wolfe expert report).  A drifting rig can "have significant

environmental consequences if the drifting rig pulls against the BOP through the riser

(e.g., breaking the riser, or topping or damaging the BOP)." *Id.*  The rig also needs to

maintain power for as long as possible in order to drive away from the well or change

heading.  TR. 5645:16-21 (D. Young) ("You would want to be able to maintain power

and drive off location or change heading to make it better -- safer for the rig."); TR.

5642:20-23, 5645:3-21, 5647:1-15 (D. Young); D-6724 (ESD diagram); TREX 50003.35 (Wolfe expert report); TREX 1.46 (Bly Report); *see* TR. 4175:10-19 (Webster) (agreeing that ESD responses for a dynamically positioned MODU "[a]re different from the ESD philosophy employed on MODUs that are not dynamically positioned").

403.    On April 20, 2010, the bridge crew acted properly by first trying to contact the drill crew before manually operating the Emergency Shutdown System.  TREX 50381.11 (Wolfe rebuttal expert report).  "If the bridge crew activated the ESD, they would have shut down the engines and left the rig powerless, without the ability to drive away from the well and without key emergency systems such as the fire pumps.  Based on these considerations, prematurely activating the ESD without sufficient information and understanding of the situation from the drill crew would have inappropriately limited the options available to deal with the emergency situation.  For example, if the bridge had initiated the ESD immediately, the bridge crew could have been unable to disconnect from the well and safely drive away."  *Id.*

404.    In addition to the ESD system, each engine on the *Deepwater Horizon* was equipped with "Rig Savers," which are air cut-off devices to prevent the engine ingestion and ignition of combustible gas.  Individual engines would shut down automatically if combustible gas made it to the intake of a particular engine.  TREX 50003.38-39 (Wolfe expert report); TR. 5645:10-15 (D. Young).

405.    There was no evidence that the Rig Savers failed to function on April 20 or that any failure to shut down the engines or close the engine room dampers contributed to the explosion and fire.  The evidence established that an enormous cloud of gas that enveloped the rig and there were multiple potential ignition sources.  *See* TREX 1.130

(Bly Report) ("The extent of electrically classified areas on *Deepwater Horizon* appeared to be consistent with normal industry practices; however, for gas release events beyond the drill floor, multiple ignition sources could have existed."); TREX 1.138 (Bly Report) (concluding that "multiple ignition sources could have existed" because "vapor dispersion modeling shows a flammable mixture quickly enveloping large areas of the rig"); TREX 50003.39 (Wolfe expert report) (the "vast cloud of combustible gas that enveloped the vessel resulted in numerous potential ignition sources in the vicinity of the engines and all across the rig").

     **E.**     **The Bridge Crew Had Only Minutes To React Between The Time The Gas Alarms Sounded And The Explosion**

406.     The events on the bridge were not recorded in a way that was preserved on shore after the event.  However, post-incident analysis of the objective data that is available, together with the testimony of the individuals on, or in contact with, the bridge that evening, shows that the bridge crew had at most 2-3 minutes to react between the first indication something was wrong and the major explosion and resulting fire.  TREX 50003.12 (Wolfe expert report).

407.     Stress Engineering conducted a hydraulic analysis of the Macondo well after the incident.  Stress determined that, after the crew closed the Upper Annular, the crew routed the surface flow through the mud gas separator.  The flow overwhelmed the mud gas separator sometime between 9:45 and 9:46 p.m, causing the mud to spray out of the vent lines.  TREX 50150.113 (Stress Engineering Hydraulic Analysis of Macondo # 252 Well Prior to Incident of April 20, 2010) ("Stress Engineering Report").

408.     Stress concluded "with a high degree of confidence" that "[h]ydrocarbon gas reached the rig surface (emerging from the mud gas separator vent outlets) at 21:46:40."  TREX 50150.146-47 (Stress Engineering Report).

409.     BP expert Morton Emilsen, of add energy, performed flow modeling simulations of Macondo and reached a similar conclusion: gas arrived at the surface "at about 21:46 hrs and rapidly increases in rate . . . .  The arrival time supports the possibility of gas alarms going off about this time and the explosion occurring at about 21:49 hrs."  TREX 40003.11 (add energy report).

410.     The last recorded data transmission from the rig occurred at 9:49 p.m. CDT.  TREX 50150.4 (Stress Engineering Report).  According to the objective data from both Stress and add energy, the bridge crew would have had no more than 140-180 seconds between the time the gas alarms alerted them to a possible well control situation and the time of the explosion.

411.     First-hand accounts of this time period further established that the crew had very little time to react to the situation:

### (1)     Yancy Keplinger, Senior DPO

412.     On the evening of April 20, Senior DPO Yancy Keplinger was on the bridge with Captain Kuchta, Buddy Trahan, David Sims, and Pat O'Bryan.  Keplinger Depo. 72:5-9.  Trahan, Sims and O'Bryan had come up to the bridge after dinner, continuing their tour of the rig.  TR. 9278:3-9279:22 (O'Bryan).  Keplinger was showing the group around the bridge and helping them try out the DPO simulator.  Keplinger Depo. 73:5-73:14.

413.     The first time Keplinger noticed a problem "was while we're doing the simulations with - I think it was Pat was the second one, but I'm not sure, with one of the

128

BP VI - either Pat or David.  The Captain asked what that noise was, and that's when I - I noticed the high pressure hissing noise."  Keplinger Depo. 75:14-20.

414.     As set out above, Stress concluded that flow exceeded the capacity of the mud gas separator sometime between 9:45 p.m. and 9:46 p.m.  TREX 50150.113 (Stress Engineering Report).  The gas hissing noise occurred at the same time that gas was discharged from the vents of the mud gas separator, *i.e.*, 9:46 p.m.  TREX 1.28, .103 (Bly Report).

415.     Keplinger saw "mud spraying out of the - I think it was the diverter pipe" through the rig's CCTV system.  Keplinger Depo. 77:1-8.  Keplinger was zooming in on the pipe with the CCTV camera "when we heard and felt the first explosion."  Keplinger Depo. 78:8-14.

416.     "It was seconds" between the time Keplinger first saw mud coming out of the pipe on the starboard side and the first explosion.  Keplinger Depo. 80:5-9.

417.     After the first explosion, the bridge "started receiving gas alarms all over the place."  Keplinger Depo. 80:10-12.

418.     Keplinger did not know the rig was in a well control situation "until the drill floor had called and said 'we were in a well control situation.'"  Keplinger Depo. 144:14-145:16 (did not know they were in a well control situation when he first heard the hissing sound or when he saw mud coming out the diverter line).

419.     Keplinger called the nearby support vessel, the *Damon Bankston* and told them to move off because of a well control situation.  TREX 5032.3 (Transocean investigation team: Keplinger interview form); TREX 4373.8 (Meinhart sworn statement).

420.     Keplinger and DPO Andrea Fleytas "started pulling up the fire and gas systems to see where these detectors were.  I noticed the shale shakers - all the detectors - gas detectors in the shale shakers were going off. . . .  So I called down there to see if anybody was there, because if they were there, I wanted them to get out and close the door behind them.  Nobody answered.  After five or six rings, nobody answered." Keplinger Depo. 86:16-87:12.

421.     "[A]s soon as [Keplinger] hung up the phone and started making [his] way around, that's when [they] had the first major explosion that blacked out the rig." Keplinger Depo. 86:16-87:12.

### (2)     Andrea Fleytas, DPO

422.     DPO Andrea Fleytas was also on the bridge that evening.  She "felt a jolt; she thought perhaps the thrusters were having problems.  Yancy turned the CCTV around and they saw mud spewing over the side."  TREX 4472.5 (Transocean investigation team: Fleytas interview form).

423.     Alarms on the bridge "came up as soon as Yancy turned the TV around." The time between the jolt until the first alarms was "approximately one minute."  TREX 4472.5 (Transocean investigation team: Fleytas interview form).

424.     "One of the crewmembers from the Drill Floor called and said 'we have a well control issue' and hung up. . . .  Andrea tried to call the Drill Floor back, but no one answered.  She received another call saying 'well control situation' and hung up. . . .  She tried calling back but never got an answer."  TREX 4472.5 (Transocean investigation team: Fleytas interview form).

425.     "As Andrea remembered, the rig blacked out at that time."  TREX 4472.5 (Transocean investigation team: Fleytas interview form).

### (3)   Pat O'Bryan, BP VP of Drilling and Completions for the Gulf of Mexico SPU

426.   BP's Pat O'Bryan first noticed that something was wrong when, "all of a sudden, the rig started shaking violently."  According to Mr. O'Bryan, "Captain Kuchta walked over to a door that's on the left side of the bridge . . . .  and you could actually - there was a supply boat that was moored up to the - to the rig and you could see mud showering over the rig and - over the boat."  TR. 9282:16-9283:3 (O'Bryan).

427.   Like Senior DPO Keplinger, Mr. O'Bryan reported a hissing noise: Captain Kuchta "closed the door. And shortly thereafter, there was an explosion. You could actually hear a hissing noise, and then there was an explosion. And within seconds, the way I would describe it is that you could hear just a big sucking sound, and there was a second, much larger explosion."  TR. 9283:4-8 (O'Bryan).  "And at that time when the second explosion occurred, the lights went out on the bridge . . . ."  TR. 9283:15-16 (O'Bryan).

428.   The hissing sound and first explosion occurred "very shortly" after Mr. O'Bryan first felt the shaking.  TR. 9370:14-17 (O'Bryan).  And "certainly, the time frame between the first and the second [explosions] was really quick."  TR. 9370:18-23 (O'Bryan).

### (4)   David Young, Chief Mate

429.   Chief Mate David Young also heard a loud noise that sounded like a release of pressure from the subsea office, located just below the bridge.  TR. 5711:1-15, 5854:7-19 (D. Young).  It sounded to Young like the "tensioners bleeding off."  TR. 5711:1-3 (D. Young).

430. Young went immediately to the bridge, where Captain Kuchta "was working with the DPOs," Andrea Fleytas and Yancy Keplinger. "[T]hey were looking at different screens," including the SVC consoles. TR. 5711:25-5712:18 (D. Young).

431. Outside the starboard window, Young saw debris and mud coming down on the rig. He also heard "a lot of alarms." TR. 5712:19-24 (D. Young).

432. When Young was looking out the starboard window, he saw the explosion that blacked out the rig. "It was just kind of a big ball of fire came out of the starboard forward side, from where I was looking. Then that initial explosion kind of backed up, and it just went into a fire in the derrick." With that, "we lost power on the rig." TR. 5713:15-5714:4 (D. Young)

433. It was "[l]ess than a minute. Seconds," between the time Young first heard the hissing noise, and the time of the explosion and blackout. TR. 5714:5-10 (D. Young).

### (5) Paul Meinhart, Motorman

434. On the evening of April 20, Transocean Motorman Paul Meinhart was in the engine control room. TREX 4373.6 (Meinhart sworn statement).

435. Like the bridge, the *Deepwater Horizon*'s engine control room contains an SVC operator station that will produce audible and visual alarms when combustible gas is detected. TR. 5606:23-5607:24 (D. Young).

436. Meinhart "observ[ed] a high-gas alarm [on the SVC panel], then heard our bridge call over to the supply vessel next to the rig and made a statement to move off as we were in a well control situation. At that same time, more alarms started going off for high - for combustible gas. Three - three to four different alarms in different areas had started going off is when I noticed." TREX 4373.8 (Meinhart sworn statement).

437. Thirty to forty seconds after hearing the first gas alarm, Meinhart said he "heard what I think was an engine beginning to speed up. At that time, just a second or two, all the lights went out." TREX 4373.9 (Meinhart sworn statement).

438. At trial BP's expert, Captain Mitchell, testified that "mud shot up through the derrick" and the crew diverted the flow at approximately 9:41 p.m. TR. 9416:21-9417:15 (Mitchell). Captain Mitchell based his testimony on a timeline set out in the Bly Report. *See* D-4967 (BP timeline citing TREX 1.103-04 (Bly Report)). The Bly timeline does not cite any evidentiary support. *See* TREX 1.103 (Bly Report chart).

439. Captain Mitchell conceded at trial that there was no evidence the bridge crew saw mud at 9:41 p.m. and acknowledged that BP's Pat O'Bryan testified that the first time he saw mud from the bridge was when Captain Kuchta opened the door on the bridge. Captain Mitchell further conceded that there was no evidence that anyone else on the bridge saw mud any time before that point. TR. 9512:5-9513:4 (Mitchell).

440. The gas alarms could not have sounded until some point after the gas reached the rig at 9:46:40. The post-incident modeling and the witness testimony established that the alarms went off occurred only seconds after the first indication on the bridge of a problem with the well. The bridge crew therefore had at most 2-3 minutes to react to the emergency prior to the explosion and blackout.

F. **The Bridge Crew Acted Properly In Not Attempting To EDS While The Drill Crew Tried To Shut In the Well**

(1) **The bridge crew must communicate with the drill crew before employing the Emergency Disconnect System**

441. In the short time the bridge crew had, they visually assessed the situation, investigated alarms at the SVC panel, called the *Damon Bankston* to move off, received two calls from the drill floor, attempted to call the drill floor two times, and attempted to

call the shaker house. TR. 5711:25-5712:18 (D. Young); Keplinger Depo. 86:16-87:12;
TREX 4472.5 (Transocean investigation team: Fleytas interview form).

442.    Plaintiffs' expert Webster and BP's expert Captain Mitchell asserted that,
in this same time period, the bridge crew should simply have pushed the button initiating
the Emergency Disconnect Sequence.  These experts opined that EDS should be
employed as soon as the bridge becomes aware of a problem with the well, without
knowing what steps were being taken on the drill floor.  TR. 4005:7-18 (Webster); TR.
9432:13-22, 9514:15-17 (Mitchell).

443.    Neither Mr. Webster nor Captain Mitchell is a well control expert, and
neither has any experience as a crewmember on a DP MODU.  *See* TR. 4182:6-23
(Webster); TREX 22700.24-29 (Webster expert report:  App. B - Curriculum Vitae); TR.
9479:1-2, 9479:7-9 (Mitchell); TREX 40011.94-98 (Mitchell expert report: App. I -
Experience Profile of Captain Andrew Mitchell).  As set forth herein, their opinions
regarding immediate initiation of the EDS were not supported by the evidence and are
contrary to good oil field practice.

444.    Both Transocean and BP policies require the bridge crew and the drill
crew to communicate in a well control situation.  *See* TREX 4644.78-79, 276-77
(*Deepwater Horizon* Emergency Response Manual) (re EDS procedure, "[t]here is
redundant communication in the Drillers Console and in the CCR to insure that the
Driller and the CCR can communicate in any case of any emergency."); TREX 2389.37-
38 (BP Well Control Manual) ("even the most well-conceived well control procedures
can go badly wrong if communication before and during the operation is not properly

organized and effective"; two-way communication between the marine crew and drill floor is a "major" line of communication during a well control operation).

445.    This communication is necessary so that the bridge crew understands what steps are underway to shut in the well. TR. 4354:14-19, 4296:6-9 (Barnhill) ("The bridge needs to understand what's going on, what the operations are at the time in relationship to the vessel itself as to what the relationship between the well and the vessel is."); *see* TR. 1788:18-1789:8 (Ezell) ("Communication is key.").

446.    Communication between the bridge and drill crews is essential because of the terminal nature of the EDS operation. The EDS separates the lower marine riser package from the BOP, rendering the drill crew unable to perform any further well control operations with the BOP. As Mr. Barnhill explained, "The rig floor is where the well control operations are being conducted. . . . EDS'ing is a terminal operation. Once you do that, I mean, you're going to disconnect from that BOP stack with that LMRP, you're going to lose that functionality. If that well is not spaced out appropriately or if you haven't worked through all you well control sequences, you're going to cut off those possibilities." TR. 4312:1-13 (Barnhill); *see id.* 4313:2-6, 4354:14-19 (Barnhill) (decision by bridge crew to EDS without knowing the status of drill crew's efforts would have interrupted ongoing well control operations and eliminated ability of drill crew to shut in the well).

447.    To make sure this communication occurs, the *Deepwater Horizon* alarm system included yellow and red alerts, which were signals to prepare for the drill floor to operate the disconnect. TR. 5742:16- 5743:8 (D. Young); *see also* TREX 3749.51 (*Deepwater Horizon* Bridge Procedures Guide) (listing criteria for issuing alerts); TREX

4644.274 (*Deepwater Horizon* Emergency Response Manual) (same).  During a Yellow

Alert, "[c]ommunication is established between the Dynamic Positioning Operator (DPO)

and the Driller indicating a degradation of position.  Preparations are made for

disconnect, this situation **may *or* may not** result in final disconnect."  TREX. 4644.276

(*Deepwater Horizon* Emergency Response Manual) (emphasis original).  "[F]or the

DPO's standpoint, that would mean that the drill floor would be preparing to -- basically

preparing to go to a full disconnect, which we'd hang off and get to the best location

possible for a disconnect procedure."  TR. 5742:16-5743:8 (D. Young).  "The DPOs

would initiate a Red Alert by functioning the -- there was a knob on the console that

would alert the drill floor that a Red Alert was there."  At that point, "a Red Alert would

be issued and a disconnect sequence would be started."  TR. 5744:1-10 (D. Young).  "At

Red Alert the Driller is <u>obligated</u> to press EDS 1 Disconnect."  TREX 4644.276

(*Deepwater Horizon* Emergency Response Manual) (emphasis original).  Yellow and

Red Alerts could be issued by either the drill floor or DPOs.  TR. 5841:14-5842:12 (D.

Young).

448.    Here, the drill crew was attempting to shut in the well from 9:42 p.m. until

the explosion and blackout.  *See* Part IX, *supra*.  During this period, the drill crew had

multiple well control options available.  *See* TR. 5033:21-5034:4, 5036:12-21 (Barnhill);

D-6652.12 (Sperry-Sun Data for the last 30 minutes).  Neither Transocean's nor BP's

well control manual recommends operating the EDS prior to exhausting other well

control options.

449.    The evidence showed that the drill crew had notified the bridge crew of a

"well control event."  *See* Keplinger Depo. 144:14-145:16; TREX 4472.5 (Transocean

investigation team: Fleytas interview form).  From these calls the bridge crew would understand that the drill floor was actively trying to shut the well in; the bridge crew would not know that these efforts would be unsuccessful and that the end result would be a blowout.  In fact, the drill crew had just closed the Variable Bore Rams at about 9:47 p.m. and it appeared that the well was successfully shut in.  *See* TREX 40003.11 (add energy report) (BP's flow modeling expert concluded that pressure readings at that time still "correspond[ed] to a shut-in pressure with hydrocarbons in the wellbore up to the BOP and the drill pipe full of seawater").

450.   A decision by the bridge crew to initiate EDS without input from the drill floor can have other negative consequences if, for example, the tool joint is located in the Blind Shear Rams.  The tool joint has a wider diameter than the drill pipe and, if located across the Blind Shear Rams, can prevent the rams from fully sealing in the well.  *See* TR. 1790:19-25 (Ezell) ("if that tool joint was in the wrong location, they could be destroying their blind shear rams and not effectively sealing the well"); TR. 5648:24-5649:5, 5649:17-23 (D. Young) (bridge crew must know status of well and location of tool joint and equipment before shutting in).

451.   A unilateral decision to EDS by the bridge crew can also result in injury or death to rig personnel.  The riser, which is under tension when connected to the BOP, recoils when the Lower Marine Riser Package is disconnected from the BOP stack.  This recoil can pose additional safety hazards.  The *Deepwater Horizon*'s Emergency Response Manual therefore instructs the drill crew, when activating the EDS, to "ensure that no one enters the rig floor area, and clear[s] persons out of the moon pool area."  TREX 4644.295 (*Deepwater Horizon* Emergency Response Manual).  The bridge crew

137

must communicate with the drill crew prior to an EDS to make sure these areas are cleared.

452.    For these reasons, while Captain Kuchta had authority to order an EDS, the drill crew had primary responsibility for an EDS operation.  Winslow Depo. 487:16-18; 489:11-12, 489:16-19, 489:23-25, 490:5-6; TR. 1830:5-7, 17-23 (Ezell) ("bridge would be the secondary" EDS panel).

453.    DPO Fleytas was attempting to contact the drill floor to find out the status when the major explosion and blackout occurred.  TREX 4472.5 (Transocean investigation team: Fleytas interview form).

454.    Captain Mitchell's opinion that the drill crew's well control actions during the last critical minutes were "completely irrelevant" and "don't even count" in the decision to EDS was unsupported.  TR. 9514:15-9515:7 (Mitchell).  No evidence was introduced at trial as to any policy of Transocean, BP, any other driller, regulatory agency, or any third party, that the bridge crew should disconnect the rig before the drill crew had exhausted its well control options and without notifying the drill crew that it was engaging the EDS.

### (2)    An immediate EDS operation would not have prevented the explosion

455.    While it is impossible to know what would have happened if different steps had been taken in a different order, there is no reason to believe that immediate EDS activation would have prevented the explosion.  By about 9:47 p.m., the *Deepwater Horizon* had a riser full of hydrocarbons.  *See* TREX 40003.11 (add energy report) ("Gas arrives at surface at about 21:46 hrs and rapidly increases in rate to above 160 mmscfd."); TREX 50150.4 (Stress Engineering Report) ("Hydrocarbon gas reached the rig

surface . . . at 21:46:40."). Because the EDS disconnects the rig at the sea floor, the rig

would still have been attached to the riser full of expanding gas. TR. 5038:21-5039:11

(Barnhill) ("Even if you EDS at that point, whatever is in that riser is going to come with

you. It's not going to stay behind.").

> **(3)** **By the time the bridge crew learned a well control event was underway, the Blind Shear Rams, if activated by the EDS, could not have shut in the well**

456. The bridge crew learned of the well control event at almost the same time

as the drill crew was closing the Variable Bore Rams. *See* Finding ## 337, 413-414,

*supra*. As described in Part XI, *infra*, the extreme flow from the well had by this point

forced the drill pipe off center and pinned it to the side of the wellbore, rendering the

Blind Shear Rams incapable of shutting in the well. An EDS attempt at this point would

therefore have been futile.

457. Neither Mr. Webster nor Captain Mitchell offered any evidence that

activation of the EDS at this time would have resulted in a different outcome.

> **(4)** **The circumstances of the EDS attempt after the explosion and blackout are irrelevant as the EDS function could not have shut in the well**

458. All parties agreed that an attempt to activate the EDS was made from the

bridge after the major explosion and blackout. Given the extreme circumstances, the

witness accounts of the precise sequence and conversations understandably vary.

459. The Court need not resolve any conflicts in this testimony or the question

whether there was a delay in the decision after the explosion. Any such delay is

irrelevant: once the blackout occurred and power was lost, the rig lost the ability to

communicate with the BOP via the EDS function. TREX 22700.3 (Webster expert

report) ("The resulting damage from the explosions, disabled the vessel's emergency

disconnect system (EDS) and vessel-BOP MUX communication cables."); TR. 994:19-25 (Bly); *see also* Williams Depo. 287:23-288:21 (any delays resulting from the EDS discussions after the blackout did not cause the rig to catch fire, explode, or sink). Activation of the EDS after the explosion and blackout did not and could not have shut in the well.

460.     Radio operator Carl Taylor recalls that Subsea Supervisor Chris Pleasant had come up to the bridge and asked the Captain for permission to EDS.  The Captain responded, "Hit it."  Pleasant hit the EDS button but nothing happened.  Taylor Depo. 177:25-128:6, 178:13-129:3, 179:12-24.

461.     Motorman Paul Meinhart remembers Captain Kuchta asking Pleasant "if they had done the EDS."  Pleasant said they had and that, as far as he could tell, the EDS had functioned.  Meinhart Depo. 127:4-9.  Meinhart recalls "the Captain . . . going around taking assessment, and he was in control," "very calm and direct."  *Id.* at 127:25-128:7.

462.     Keplinger remembers Pleasant coming onto the bridge and asking the Captain if Pleasant could hit the EDS button.  TREX 5032.6 (Keplinger interview form). After Pleasant asked a third time, Captain Kuchta responded "yes."  Keplinger Depo. 111:22-112:6; *see also* Pleasant Depo. 333:12-15 (Pleasant hit the EDS button "[t]wo seconds" after arriving on the bridge").

463.     BP's Pat O'Bryan testified that Captain Kuchta said they could not EDS without permission from the OIM and that Jimmy Harrell then arrived on the bridge and said "'hit it.'"  TR. 9286:15-9287:7 (O'Bryan).  Harrell's account was that EDS had already been initiated by the time he arrived.  TREX 30025.2 (Transocean internal

investigation: Harrell interview form) ("As I entered the Central Control Room Chris the sub sea Supervisor was at the BOP panel and confirmed that the diverter and a BOP Annular had activated, but the EDS was unable to function as the panel went inactive about that time."); *see also* Williams Depo. 202:23-203:7, 206:10-14 (Captain Kuchta "made a direct request" to Chris Pleasant to EDS before OIM Jimmy Harrell arrived; Harrell told Pleasant to EDS "[a]s soon as he could get the words out of his mouth upon arriving on the dri -- on the bridge").

464.    Daun Winslow recalls Captain Kuchta asking either "should we EDS or could we EDS," Pleasant responding that he had already done so and the EDS had not functioned, and Harrell saying "yes, disconnect."  Winslow Depo. 190:15-191:16. Winslow recalled telling Captain Kuchta if he had not already EDS-ed, to do so.  *Id.* 494:15-495:6.

465.    BP's David Sims recalled a "quick discussion to disconnect."  Everyone was "professional and calm - shouting and talking but not hysterical."  TREX 37031.7 (BP investigators' notes of Sims interview).

**G.**    **Because of the *Deepwater Horizon* Crew's Emergency Response Efforts, Every Survivor Of The Explosions Was Able To Evacuate The Rig**

466.    After the explosions the bridge crew moved quickly to alert and evacuate the crew and on-board personnel.  The crew's actions resulted in the successful evacuation of all of the 115 persons believed to have survived the explosion.  TR. 4184:6-8 (Webster) (agreeing that the bridge crew "oversaw the evacuation of every single person who survived the explosion); TR. 9522:22-9523:5 (Mitchell) (Mitchell not aware of anyone who dies that night who was not killed in the initial explosion); TREX

50003.15 (Wolfe expert report) ("[A]ll 115 survivors of the initial blast abandoned the rig").

467.    The evidence showed that Fleytas, Keplinger and Chief Mate Young all hit the general alarm.  TREX 4472.5 (Transocean investigation team: Fleytas interview form); Keplinger Depo. 98:6-11 ("[T]he general alarm was sounded."); TR. 5715:1-7, 17-25 (D. Young).  The sounding of the general alarm was confirmed by post-incident interviews and testimony.  *See* D-6748 (witness statements re alarm sounding); TR. 6016:17-24 (Ambrose); TR. 1702:2-3 (Ezell); TR. 8283:6-18 (Lambert) (heard alarm in his cabin); Breland Depo. 157:21-158:6.

468.    Senior DPO Keplinger announced through the rig's PA system "that this was not a drill and for [rig personnel] to report their -- report to their Emergency Stations and musters at Lifeboat 1 and 2."  Keplinger Depo. 98:12-20; TREX 4472.5 (Transocean investigation team: Fleytas interview form); Breland Depo. 157:21-158:6; Taylor Depo. 64:1-10.

469.    After the general alarm was sounded, the majority of the 115 men and women aboard mustered to their designated emergency stations and ultimately evacuated the rig in lifeboats.  TREX 50003.15 (Wolfe expert report).  The crew taking a muster "were trying to maintain control" and were "doing all they possibly could."  They waited at the lifeboat station "as long as possible to make sure as many people as possible could evacuate the rig."  Skidmore Depo. 296:13-297:11.

470.    Four crewmembers jumped into the water before lifeboats were launched. "It is a true testament to the crew's training and safety culture that only these individuals

jumped prior to any lifesaving appliance being launched." TREX 50003.15 (Wolfe expert report).

471.    Seven crewmembers evacuated the rig in a life raft after the lifeboats departed for the *Bankston*.  The delay by these crewmembers resulted primarily from their heroic efforts to evacuate injured crewmembers.  TREX 50003.15 (Wolfe expert report).

472.    Chief Mate Young was gathering firefighting equipment when he got word that the crane operator, Dale Burkeen, had been thrown to the deck in the explosion. Young made his way over to Burkeen's body.  TR. 5716:9-5717:11 (Young) (Burkeen lay "right over next to the starboard crane, so there was some tanks and stuff that were over there.  There was a lot of fire right there in the immediate area.  The fire was over our head where we were.  There was debris flying around.  It wasn't the best situation").

473.    Young was unable to move Burkeen's body and went for help.  He "ran into Mike Mayfield, who was going to come assist [him] in getting Dale Burkeen." Young and Mayfield suited up in fire gear, but by that point the area near Burkeen was obstructed with "[f]ire and damage.  You couldn't get close to the area." TR. 5717:12-5718:5 (Young).

474.    Mayfield had to physically restrain Young from going back to get Burkeen.  *See* TR. 5718:6-19 (D. Young) ("Mike Mayfield basically pulled me back and threw me on the deck and basically pointed out to me that I couldn't get there.  I kind of had tunnel vision because I thought I was still going to get to him; but once I saw what Mike Mayfield was seeing, there was no way we were going to get back there.").

475. Senior Toolpusher Randy Ezell was about to leave his quarters to assist the drill crew when the explosion and blackout occurred. Ezell was covered in "a substantial amount" of ceiling and wall debris. Ezell "shoved for all [he] could shove and [he] got out from underneath of the stuff that was on top of [him]." Ezell testified that he was crawling out into the hallway "when I put my hand on a body, and that body was Wyman Wheeler. And he let out some noise when I did and wanted to know who it was. We couldn't see each other. So ended up finding where his head was. That was a task, just finding his head, because he had stuff all on top of him, too." TR. 1809:5-1810:5 (Ezell).

476. Chief Mate Young and others found Ezell and Wheeler and started removing the debris. TR. 5718:20-5720:5 (D. Young); TR. 1809:5-1811:22 (Ezell). At that point they realized that Buddy Trahan had also been injured and covered with rubble. Ezell "could tell by [Trahan's] injuries that he was the one that needed to leave the living quarters first, so he was the one that got the first stretcher," and made it onto a lifeboat. TR. 1810:18-20 (Ezell). Young helped crewmembers get Trahan out and taken to a muster station on a stretcher. TR. 5718:20-5720:5 (D. Young) (he and others got Trahan onto a stretcher and took him to muster station).

477. Ezell stayed behind with Wheeler. Ezell thought he could pick Wheeler up and walk out, but "didn't know how many broken bones he [Wheeler] had at the time." According to Ezell, Wheeler "couldn't support his weight. And he asked me to set him down. And I said, 'You don't understand. If you don't come with me now, I mean, we're going to die.' And he said, 'No, you don't understand. I can't go.' He said, 'Save

yourself.' And that's why I told him, 'I am not going to leave you in here. I'm not leaving you here.'" TR. 1810:16-1811:4 (Ezell).

478.   Ezell and Wheeler waited, "it seemed like forever, but it was probably like five minutes and another stretcher appeared." They were able to load Wheeler into the stretcher. Ezell's memory as to who was waiting for him and Wheeler was "not really clear. I guess it was traumatic, but the captain and a couple of the DPO, dynamic position operators, were there with him." He also recalled seeing David Young and Maintenance Supervisor Stephen Bertone. "But there was still a pretty good host of people that was going to assist us in getting the stretcher into the life raft." TR. 1811:5-22 (Ezell).

479.   Chief Electrician Chad Murray and Electronic Supervisor Stanley Carden searched for injured crewmembers and assisted in rescuing Trahan and Wheeler. TREX 5425.3 (Transocean internal investigation: Carden interview form); TREX 5732.8 (Transocean internal investigation: Murray interview form). Stephen Bertone assisted injured crewmembers on the bridge, and tried unsuccessfully to get the standby generators and fire pumps running. TREX 3339.6-7 (Transocean internal investigation: Bertone interview form).

480.   DPO Andrea Fleytas "really thought she was going to die," but she "was one of the last ones remaining on the rig" and, one last time, she "got on the PA and said 'abandon rig' for everyone else to hear who might be on the rig." TREX 4472.5-6 (Transocean investigation team: Fleytas interview form).

481.   By that point, both lifeboats had gone. TR. 5719:21-5720:5 (D. Young). Young and Keplinger deployed a life raft. Young and Ezell got in the raft and helped

145

load Wheeler and his stretcher.  Keplinger and Captain Kuchta assisted getting Wheeler into the raft.  Young grabbed Andrea Fleytas "by the life jacket and pulled her in."  TR. 5721:19-5722:24 (D. Young).

482.    Young, Fleytas, Ezell, Wheeler, Bertone, Carden, and Murray departed in the life raft.  TREX 50003.15-16 (Wolfe expert report).  The last two men on the *Deepwater Horizon*, Captain Kuchta and Senior DPO Keplinger, jumped 75 feet down to the water.  TR. 5722:25-5723:7 (D. Young); TREX 5032.4 (Transocean internal investigation: Keplinger interview form); Keplinger Depo. 121:14-122:8.

483.    Once in the water, the raft remained tied to the rig.  Ezell explained, "we were connected to the rig by like a quarter-inch rope, a lanyard. And we were getting extremely hot, we were cooking. And we couldn't locate our knife at the moment with all the heat and all; and it popped, and we just thought the line popped due to the heat.  But the captain, when he jumped in, he saw we were connected to the rig, he swam to a *Damon Bankston*, fast rescue boat, and got a knife, because Transocean was knife-free, came back and cut that lanyard. That allowed us to escape from the rig."  TR. 1912:1-13 (Ezell); TR. 5723:15-21 (D. Young) ("[T]he guys from the rescue boat passed a knife over to Captain Kuchta who cut the raft free.").

484.    When the crew from the life raft arrived at the *Damon Bankston*, they "were the last people to be included on the muster.  They had already mustered the rest of the people that were there" from the life boats.  5724:12-20 (D. Young).

485.    The *Deepwater Horizon*'s emergency training saved lives that night.  The crew's actions during these events were consistent with the station bill and "consistent with their training."  TR. 5726:6-16 (D. Young); *see* Breland Depo. 111:25-113:10 (rig

146

emergency drills conducted on April 17 and April 18, 2010 prepared him for responding

to incident on April 20); Winslow Depo. 365:1-13 ("Had it not been through [the crew's]

training -- and bravery, for some people, I'm sure some other people might not have

made it off there.").

## XI.   THE BOP FUNCTIONED AS INTENDED BUT COULD NOT SHUT IN THE WELL BECAUSE THE PIPE WAS FORCED OFF CENTER BY THE EXTREME FLOW FROM THE WELL

486.     As set out in Finding ## 490-531, *infra*, the *Deepwater Horizon*'s blowout

preventer functioned as designed, but could not seal the well because the force of the

blowout pushed the drill pipe off center and outside the cutting blades of the Blind Shear

Rams.  The Blind Shear Rams' inability to shear the off-center pipe was not related to the

maintenance of the BOP.  The parties' contentions about Transocean's BOP maintenance

are addressed in Finding ## 507-510, 532-618, *infra*.  The parties' contentions about the

configuration of the BOP are discussed in Finding ## 619-641, *infra*.

### A.     DNV Conducted Post-Incident Analysis And Testing Of The BOP

487.     As part of an investigation conducted by a Joint Investigative Team of the

United States Departments of the Interior and Homeland Security, Det Norske Veritas

(DNV) was retained to conduct a forensic examination, investigation, testing and

scientific evaluation of the BOP and associated components.  Kenney Depo. 10:20-12:13

(DNV Lead Investigator).

488.     The BOP was recovered from the ocean floor in September 2010 and

transferred to the NASA-Michoud facility in New Orleans, LA, for the forensic

examination.  Kenney Depo. 10:20-12:13, 11:17-12:6.

489.     On January 26, 2012, this Court ruled that Joint Investigation testimony,

Volumes I and II of the DNV Report are excluded as evidence in this case.  Rec. Doc.

5448.  The Court's order did not "prevent the admission of evidence existing

independently of the Joint Investigation or that likely would have been created absent the

investigation."  *Id.*  In addition, as clarified in the Court's order dated February 2, 2012,

the parties are permitted "to use data, videos, and photographs from the testing performed

by DNV."  Rec. Doc. 5572.[22]

> ### B.   The BOP Annulars And Rams Functioned In Accordance with Their Design

490.    The Upper Annular was found in a closed position when the BOP was

recovered post-incident. TREX 43093.45.1.TO (DNV Report callout).  The experts

agreed that the Upper Annular must have been closed by the drill crew sometime around

9:42 p.m. on April 20.  *See* TR. 2758:9-13 (Davis); TR. 5106:9-12 (Childs); TR.

6923:11-16 (Stevick); TR. 9140:11-9141:1 (Shanks).

491.    The Upper and Middle Variable Bore Rams were also found closed.

TREX 43093.45.1.TO (DNV Report callout).  The experts agreed that the Upper and

Middle Variable Bore Rams must have been closed by the drill crew at about 9:46 p.m.

and were fully closed by about 9:47 p.m.  *See* TR. 2758:18-20 (Davis); TR. 5114:8-12

(Childs); TR. 6923:7-10 (Stevick); TREX 40008.29 (Shanks expert report).

492.    The Blind Shear Rams were found in a partially closed position after the

incident.  TREX 43093.45.1.TO (DNV Report callout).  The Blind Shear Rams did not

fully shear the pipe and failed to shut in the well.  *See, e.g.*, TR. 2751:16-2752:1 (Davis);

TR. 6962:13-18 (Stevick).

493.    As set out above, after the explosion and blackout, the EDS could not

activate the Blind Shear Rams.  *See* TREX 22700.3 (Webster expert report); TR. 994:19-

---

[22] In accordance with this Order, the DNV Report callouts cited herein, as distinguished from the entire DNV Report, were admitted at trial.

25 (Bly).  Consequently, as the experts again agreed, the Blind Shear Rams must have closed either (1) upon activation of the *Deepwater Horizon*'s Automatic Mode Function (AMF or "deadman")  system, shortly after the explosion on April 20; or (2) upon activation of the Autoshear, via a Remote Operated Vehicle (ROV) on the morning of April 22.  TR. 2758:21-2759:2 (Davis); TR. 5143:21-24 (Childs); TREX 61123.28, fn. 83, 84 (Stevick expert report); TR. 9011:24-9012:5 (Shanks).  Although the AMF and Autoshear functions are explained more fully below, the Court need not resolve the method by or date on which the Blind Shear Rams were operated, as the force of the blowout had already pushed the drill pipe off center and rendered the Blind Shear Rams incapable of shutting in the well by the time the rig exploded.

### C.    The BOP Failed to Seal the Well Because the Drill Pipe Was Off Center

494.    The forensic evidence conclusively established that the Blind Shear Rams failed to seal the well because the drill pipe was forcibly held off center when the Blind Shear Rams closed.  TREX 43093.118A.TO (laser scans of drill pipe and BSR blocks); D-6660 (model of ram blocks); D-6700 (model of ram blocks).  All of the BOP experts agreed on this point.  TREX 7688.9 (Childs rebuttal expert report) (all parties "support the scenario that the blind shear rams did not shear and seal the wellbore because the drill pipe was forced to the side of the well and partially outside the shearing surface, preventing the rams from fully closing"); TREX 61124.16.1.TO (Stevick rebuttal expert report) ("Prior to [the Variable Bore Rams'] complete closure, the drill string is already in its buckled state, forced to a position near the bore wall (kill side) in the BSR."); TR. 6962:8-18 (Stevick); TR. 9115:6-17 (Shanks) (drill pipe "was held off center, and so the shear blades could not cover the full pipe diameter and part of the pipe was left outside

the shear blades"); TR. 5085:19-5086:4 (Childs); TREX 7661.15 (Davis rebuttal expert

report) ("There is clear physical evidence that the drill pipe was off-center at the time of

the BSR shearing."); TR. 3391:22-3392:6 (Perkin) (drill pipe "was far enough off to the

side that the pipe was actually partially outside the cutting blades of the ram").

### D.   The Force Of The Blowout Lifted And Buckled The Drill Pipe When The Drill Crew Closed The Upper Annular

495.   The drill pipe in the wellbore on April 20 had a diameter of 5.5 inches.

TR. 5106:25-5107:4 (Childs).  Lengths of this pipe were joined together with "tool

joints."  The tool joints are substantially thicker than the drill pipe.  *See id.*

496.   The evidence showed, upon activation by the drill crew, the Upper

Annular closed partially on a tool joint and partially on 5.5-inch drill pipe.  *See* D-6659;

TR. 2756:1-25, 2757:7-10 (Davis); TR. 5111:5-5112:15 (Childs); TR. 6928:11-6929:7

(Stevick).

497.   The standard practice of a drill crew is to position the drill pipe in the well

such that the tool joint is below the annular.  *See, e.g.*, TR. 4992:10-19 (Barnhill) (the

crew would have "an idea of what their space out would be" if they had to close the

BOP); TR. 5107:5-11 (Childs) (it is good practice to "place the tool joints out of the

sealing elements, out of the BOP, so that when you close the BOPs, they can close on

slick or plain pipe").

498.   The evidence established, as Dr. Stevick testified, "that while the annular

was closing the force of this blowout [was] lifting the tool joint up into the annular."  TR.

6927:19-22 (Stevick); *see* TREX 7536.90A.TO (Perkin expert report) ("[f]low from the

well apparently lifted the drill string upwards such that it forced a tool joint into the upper

annular BOP before it fully closed"); TR. 5105:16-5105:2 (Childs) ("The action of the extreme flow pushed the tool joint partially into the upper annular BOP.").

499.    The hook load data recorded by Sperry Sun supports the conclusion that the flow of the well was sufficient to begin lifting the drill pipe and moving the tool joint into the Upper Annular area as the Upper Annular closed.  *See* TREX 61124.15.2.TO (Stevick rebuttal expert report); TR. 6926:19-6927:18 (Stevick); TR. 5107:5-5109:19 (Childs).  The hook load data measures the weight of the drill string.  Although the weight should have remained relatively constant, the hook load data in fact declined from the time the crew activated Upper Annular around 9:42 p.m. until the Variable Bore Rams closed at 9:47 p.m.  This decline indicates that there was a substantial upward force acting on the drill string at this point.  TREX 50150.112.1.TO (Stress Engineering Report); TR. 5109:1-11 (Childs) (the extreme flow resulted in a "continued lifting of the drill pipe, which is lessening the load on the hook"); TR. 6926:19-6927:18 (Stevick) (the 50,000 to 60,000 decline in the hook load is "confirmation . . . for why the pipe is offside, it's experiencing this extraordinarily large force with the force of this blowout literally lifting the pipe").  No party offered an alternative explanation for the decline in the hook load during this period.

500.    The partial closure of the Upper Annular on the tool joint pinned the drill pipe at the level of the Upper Annular, arrested its upward movement, and contributed to the buckling of the drill pipe below the Upper Annular.  TR. 6928:21-6929:4, TR. 6931:5-8 (Stevick); TR. 5113:14-5114:5 (Childs).

E.    **There Was Sufficient Flow And Pressure From The Blowout To Buckle The Drill Pipe When the Crew Closed The Variable Bore Rams at 9:47 P.M.**

501.    The evidence established that the flow from the well was sufficient to lift and buckle the pipe by the time the Variable Bore Rams were closed at approximately 9:47 p.m. on April 20.  DNV's modeling was confirmed by the independent analysis of Stress Engineering (retained by both BP and Transocean as part of their internal investigations), by Halliburton's BOP expert, Dr. Stevick, and by Transocean's BOP expert, Greg Childs.  *See* TREX 43093.167.1.TO (DNV Report callout); TREX 50150.145.2.TO (Stress Engineering Report); TREX 61124.15.2.TO (Stevick Rebuttal); TREX 7688.11 (Childs rebuttal expert report).

502.    Based on his own independent analysis, Dr. Stevick found that before the Variable Bore Rams closed, "the drill string [was] already in its buckled state, forced to a position near the bore wall (kill side) in the BSR" due to the flow of the well. TREX 61124.16.1.TO; TREX 61124.15.2.TO (Stevick rebuttal expert report); TR. 6924:8-13 (Stevick).

503.    Stress Engineering reached the same conclusion, based on its own analysis and modeling.  The Stress analysis showed that a flow of 60,000 stock tank barrels per day at the time the crew closed the Variable Bore Rams was sufficient to "creat[e] an average upward lift of 125,000 lbs."  TREX 7688.11 (Childs rebuttal expert report).  This lift was "sufficient force to remove drill pipe stretch and compress the 5.5-inch drill pipe from below" and thus buckle the pipe within the BOP.  *Id.*; TREX 50150.145.2.TO (Stress Engineering Report).

504.    BP's analysis, performed by BP's gas dispersion and flow rate expert, Morten Emilsen of add energy, showed that the flow into the wellbore before the closing

152

of the Variable Bore Rams far exceeded the 60,000 barrels that Stress Engineering found sufficient to buckle the drill pipe. *See* TREX 2.388.1.TO (Bly Report Appendices); TR. 7856:12-20 (Emilsen); TR. 7857:4-7859:21 (Emilsen) (conceding well was flowing at a rate of 80,000 barrels per day).

505.    The evidence also established that the pressure and friction created by the closing of the Variable Bore Rams locked the buckled pipe into position inside the BOP. *See, e.g.*, TR. 6931:9-19 (Stevick) (closing of the Variable Bore Rams caused "a huge rise in pressure inside the drill pipe," and this "internal pressure and pressure pushing on the end of the metal at the bottom of the pipe . . . will push [the pipe] into a buckled state as the VBRs are closing"); TR. 6932:5-14, 6931:9-19 (Stevick) (closing of the Variable Bore Rams would also have created friction on the drill pipe, "lock[ing] this buckled piece of pipe into its buckled position."); TREX 61124.16.1.TO (Stevick rebuttal expert report); TREX 43093.171.1.TO (DNV Report callout); TR. 5115:2-16, 5115:23-5116:11 (Childs).

506.    DNV analysis and modeling, relied on by BP's expert, showed that after the drill crew closed the Variable Bore Rams, "the wellbore flow was directed only through the drill pipe, resulting in the pressure within the drill pipe rapidly increasing. The pressure increased produced an upward force (axial compression load pinned at the UA) on the drill pipe. This upward force provided the forces necessary for the drill pipe to elastically buckle, forcing the drill pipe to the side of the wellbore." TREX 43093.167.1.TO (DNV Report callout).

**F.**     **The BOP's Inability To Shear Off-Center Drill Pipe Did Not Result From Transocean's BOP Maintenance**

507.    The evidence established that the inability of the Blind Shear Rams to cut off-center pipe was not related to BOP maintenance. *See* TR. 5086:15-22 (Childs); *see also* TR. 6962:19-6963:2 (Stevick); Abbassian Depo. 291:1-5, 291:8-15.

508.    As Dr. Stevick testified, because "the pipe [was] already buckled by the time the crew closes the annular and closes the VBR, then even if the AMF functions perfectly, it cannot cut the pipe and seal the well at that time." TR. 6924:3-7 (Stevick); TR. 6962:19-6963:2 (Stevick). "[G]iven the buckled state of the pipe, even if the AMF works perfectly, the pods worked perfectly, it [the Blind Shear Rams] cannot shear the pipe and seal the well." TR. 6962:19-6963:2 (Stevick). Accordingly, whether the Blind Shear Rams attempted to close at the time of the AMF on April 20 or at the time of Autoshear on April 22, they could not shear the pipe and seal the well.

509.    The evidence also established that the BOP had sufficient shearing pressure to cut the pipe had the pipe been within the shearing blades of the Blind Shear Rams. *See* TR. 2709:18-2710:3, 2713:15-2714:15 (Davis); TR. 9094:4-7 (Shanks); TR. 5389:24-5390:1 (Childs); D. McWhorter Depo. 659:4-551:15, 661:17-662:4, 665:1-13, 665:15-18, 665:20-666:4, 666:6-10, 666:12-667:10, 667:12-16, 667:18-22, 668:9-669:1, 669:3-5, 669:7-16, 669:18.

510.    The Court therefore need not resolve the issues raised by BP and DOJ as to whether the AMF was capable of functioning the Blind Shear Rams on April 20, because such issues could not be causal.

**G.** **The Separation of the Drill Pipe Above the BOP Eliminates the "Force From Above" Theories**

511. While most experts agreed that the pipe was pushed to the side of the well by the force of the blowout, two other experts (in disagreement with each other) offered different views: that the pipe was pushed or pulled off center from a force acting from above the BOP. *See* TREX 7660.14-15 (Davis expert report); TREX 7661.13-15 (Davis rebuttal expert report); TREX 40008.36-39 (Shanks expert report). For the reasons set forth herein, these theories are eliminated by the forensic evidence.

512. First, all parties agreed that the forensic evidence established conclusively that the drill pipe separated at the point of heavy erosion immediately above the Upper Annular. Adopting the numbering system employed by DNV and accepted by the experts in their reports and at trial, the separation occurred between pipe pieces 1-B-1 and 39, as labeled in D-6636 (DNV Report, Figure 55).

513. Neither "force from above" theory was consistent with the separation of the drill pipe above the BOP, and neither Dr. Davis nor Mr. Shanks offered any explanations in their reports as to how their "force from above" theories could work given the breaking of the drill pipe above the BOP.

514. Most of the experts who discussed the issue agreed that the end of pipe piece 1-B-1 bears clear evidence of severe erosion and a tensile failure, indicating that the pipe was mostly eroded away by the flow of hydrocarbons in the well and that the smaller, uneroded portion snapped as a result of tension when the rig drifted off station after the explosion. *See* D-6637 (models of 39-E and 1-B-1-E); D-6704 (photographs of 39-E and 1-B-1-E); TR. 2755:24-2757:10 (Davis); TR. 6952:24-6953:9 (Stevick); TR. 5121:20-5122:12 (Childs).

515. Most experts also agreed the separation of the drill pipe above the Upper Annular occurred within minutes of the explosions on the rig. The Bly Report concluded that by the time the traveling block fell, approximately half an hour after the explosion, "[t]he drill pipe likely had already failed at the eroded section . . . as it was being pulled upwards due to increasing vessel offset." TREX 1.165.1.TO; *see also* TREX 1.148.1.TO (Bly Report) ("the fluid velocity through a leaking annular preventer could have reached levels that were orders of magnitude greater than drill pipe steel erosion velocity"); TR. 9191:16-9192:18 (Shanks) (erosion from flow of the well sufficient to erode through 25 percent of the thickness of the pipe in less than a second).

516. The conclusion of the Bly Report on this point was supported by Dr. Stevick's testimony that the pipe separation above the Upper Annular occurred "within minutes of the closing of the variable bore rams" and "before the traveling block fell." TR. 6952:3-13, 6953:10-14 (Stevick) (once "the rig loses power, begins to drift, and the ocean currents pull on the pipe which has been greatly eroded, there's not much of the pipe," and the pipe "literally snaps off"); TREX 61124.20 (Stevick rebuttal expert report); *accord* TR. 5118:16-5119:4 (Childs) ("As the rig drifts off location, of course, added tension is being added to the drill pipe," and "[a]s it pulls on the drill pipe, it reached the tensile capacity of this pipe and breaks the pipe at Location E, right above the upper annular"); TREX 7687.14-15 (Childs expert report); TR. 5120:24-5121:1 (Childs) (separation likely "[w]ithin about 10 minutes of the explosions").

517. Neither of the two experts who advanced "force from above" theories (Dr. Davis and Mr. Shanks) offered any explanation in their reports of when or why the pipe

separated or how their theories could be reconciled with the undisputed separation of the pipe. *See* TR. 2767:23-25 (Davis); TR. 9192:9-14 (Shanks).

518.   In addition, Mr. Shanks's theory that the pipe was pushed to the side of the well by the fall of the traveling block was contrary to the physical evidence. As Dr. Stevick explained, pipe piece 39 is plastically deformed in a manner that indicates when the traveling block fell, piece 39 -- having already separated from piece 1-B-1 -- was "slammed into the top of the annular, the steel top of the annular, [which] bent the very end of [39-E], and deformed [pipe piece 39] along the axis." TR. 6955:20-6956:1, 6956:25-6957:2 (Stevick) (deformation of piece 39 was "a result of the traveling block falling."); *accord* TREX 61124.20 (Stevick rebuttal expert report); D-6696 & D-6697 (animation of traveling block falling and crumpling end of pipe piece 39); TR. 5150:20-5151:1, 5152:9-19 (Childs). Neither Mr. Shanks nor Dr. Davis offered any other plausible explanation for the condition of piece 39-B in their expert reports or at trial.

519.   Once the pipe broke above the Upper Annular, forces operating on the pipe *above* the BOP could have no impact on the drill pipe inside the BOP. TREX 61124.20 (Stevick rebuttal expert report); TR. 5156:13-19 (Childs) (the separation above the Annular removed the "connection between the pipe above and the pipe below. So anything that happens above does not affect the pipe below the annular").

520.   Dr. Davis had no explanation for how the rig could have drifted the great distances his theory required, without breaking the pipe above the BOP, rendering his theory improbable. *See* TR. 2768:20-2771:12 (Davis) (acknowledging that his report contains no analysis explaining how the drill pipe could have stayed intact until April 22 when the rig had drifted as much as 1600 feet off station). Dr. Davis agreed if the pipe

did separate above the Upper Annular before April 22 -- as other experts agree it did -- then he would "need some other explanation, other than rig drift, to explain why the pipe is still off-center on April 22nd." TR. 2766:22-2767:2 (Davis). Dr. Davis has no experience in the oil and gas industry and had never seen nor heard of a BOP before he received a call about this case and looked up pictures of BOPs on the Internet. TR. 2716:4-10, 2820:14-20 (Davis). Unlike Stress Engineering and Dr. Stevick, Dr. Davis had never before examined the issue of buckling of drill pipe in an oil well. TR. 2778:6-8 (Davis).

521.    BP's expert Mr. Shanks advanced the theory that the falling of the traveling block on April 20 bent the drill pipe above *and inside* the BOP and then held the pipe in place for the next two days until April 22. Mr. Shanks offered no explanation in his report for how his theory can work, given the breaking of the pipe immediately above the BOP. *See* TREX 40008 (Shanks expert report); TREX 40020 (Shanks rebuttal expert report).

522.    Although Mr. Shanks testified at trial that, even after the pipe broke, the separated piece *above* the BOP might somehow influence the pipe inside the BOP, he similarly offered no explanation for how that could be the case. *See* TR. 9194:25-915:5 (Shanks). Confronted with the fact that the condition of the pieces of pipe found by DNV show no contact between the pipe above the BOP and the pipe sticking out from inside the BOP, Mr. Shanks speculated that there are missing pieces of pipe that would support his theory. Such missing pieces are not in evidence and there is likewise nothing in the record to suggest that such missing pieces of pipe ever existed. *See* TR. 9195:11-9196:3 (Shanks).

158

523. In short, the "physical evidence" of the pipe separation above the Annular "eliminate[s] the rig drift and traveling block theories as to the explanation of why the pipe is off-center" when the Blind Shear Rams closed. TR. 6921:22-6922:2 (Stevick).

524. The physical evidence and the testimony and analysis of the experts, including Dr. Stevick, DNV, Stress Engineering, and Mr. Childs, established that "it was the force from below that buckled the pipe" at the time the crew activated the Variable Bore Rams and before the explosion. TR. 6959:24-6960:8 (Stevick); *accord* TR. 5085:19-5086:4 (Childs). The theory that the AMF functioned the Blind Shear Rams on April 20 but was unable to shear drill pipe forced off-center by the flow of the well "is the only theory that plausibly addresses all evidence discovered during post-incident analyses." TREX 7688.8 (Childs rebuttal expert report).

**H.    It Is Unlikely that the Force of the Blowout Kept the Drill Pipe Buckled Until April 22**

525. Dr. Stevick concluded not only that the pipe was forced off center at the time the crew closed the Variable Bore Rams *but that it stayed off center until April 22.* TR. 6960:9-13, 6962:8-12 (Stevick). Nothing turns on this point: whether the Blind Shear Rams closed on April 20 or 22 is irrelevant because, as DNV's analysis showed, the pipe had become off-center prior to either of those points and the rams could not shear the off-center pipe. TREX 43093.167.1 (DNV Report callout). In any event, as set forth in this section, it is unlikely that the necessary force existed to keep the drill pipe off center for this period of time.

526. The evidence established, and the experts who spoke to the issue all agreed, that the Upper Annular was severely eroded by the blowout -- so eroded that the tool joint initially stuck in the annular was able to pass freely through it and become

lodged above the BOP sometime before the rig sank on the morning of April 22. *See* TR. 9141:20-9142:3 (Shanks); TREX 1.148.1.TO (Bly Report); TR. 5141:9-5142:20, 5124:11-5125:8 (Childs).

527. No party provided an explanation of how, once the Upper Annular became severely eroded (at some point before the rig sank on April 22), it could continue to pin the tool joint and maintain the buckle in the drill pipe, forcing the pipe against the side of the BOP.

528. Further, it was undisputed that the ST Locks were found in the closed and locked position behind the Variable Bore Rams. *See* TREX 43093.45.1.TO. The position of the ST Locks supports the conclusion that Blind Shear Rams were activated on April 20 rather than April 22. *See* TR. 5144:13-5145:3 (Childs).

529. The ST Locks can be closed by the crew manually, but no expert report supported BP's contention at trial that the crew was likely to have closed the ST Locks. The evidence established that it was unlikely that the crew would have closed the ST Locks given standard practice. *See* TREX 41008.81.1.TO, TREX 41008.81.2.TO (Transocean Well Control Handbook, Shut In Procedures); TR. 5145:7-12 (Childs).

530. The only other possibilities are that the ST locks were closed by the activation of the AMF on April 20 or the Autoshear on April 22. TR. 5145:7-12, 5145:21-22 (Childs).

531. BP's expert and Transocean's expert both agreed that the fact that the ST Locks were found closed indicates that they were probably closed on April 20 rather than April 22. Once the explosion occurred, the loss of power, together with the flow of the well, would tend to push the Variable Bore Rams apart, making it impossible for the ST

Locks to close two days later. TR. 5144:13-23 (Childs) ("[o]nce the explosion's occurred, there's no more hydraulic pressure holding the VBRs closed. So we would have 33 hours for flow to be coming up in the well"); TR. 5144:13-5145:3 (Childs) (continued flow of the well between the explosions on April 20 and the time of Autoshear activation on April 22 likely would have loosened and opened the Variable Bore Rams sufficiently that the ST Locks could not have closed behind them); TR. 9177:21-9178:18 (Shanks) (agreeing that the ST Locks likely closed on April 20, either by AMF or crew activation, not on April 22).[23]

## XII.  THE CONTROL PODS WERE CAPABLE OF FUNCTIONING THE BLIND SHEAR RAMS THROUGH THE AMF SYSTEM ON APRIL 20

532.    The fact that the pipe had been forced off center by the flow from the well at the time conditions were met for activation of the AMF system means that the Court need not resolve whether the AMF could in fact function on April 20; at that point, the Blind Shear Rams could not shut in the well. In any event, the evidence showed that the AMF system was capable of activating the Blind Shear Rams.

---

[23] Mr. Shanks nonetheless opined that the Autoshear activated the Blind Shear Rams, asserting that, in video footage of the ROV activating the Autoshear, the BOP stack "move[d] immediately after the pin is cut." TREX 61107.50 (Shanks expert report). Mr. Shanks attributed this movement to the closing of the Blind Shear Rams at that time. *Id.* Mr. Shanks is the only expert to offer this interpretation of the ROV footage, and his interpretation is not supported by the evidence. It is undisputed that the cameras recording the video were positioned on the ROV itself. *See* Winslow Depo. 254:10-11. The ROV needed to apply pressure to cut through the Autoshear pin, a pressure that was released once the pin was finally cut through. *See* TR. 5155:7-17 (Childs). The BOP stack is 750,000 lbs and attached to the ocean floor by the wellhead. It is clear from the video footage that the motion was attributable to the movement of the ROV as it finally sheared through the pin, not to movement of the BOP stack. *See* TREX 43129 (ROV video footage).

### A.   The Control Pods Were Redundant And Were Designed To Operate Independently

533.   The *Deepwater Horizon* was equipped with three subsea control pods. The BOP employed two pods at a time; these were known as either the "Yellow Pod" or the "Blue Pod," depending on their position on the BOP.  TR. 8430:13-8431:23 (Zatarain); *see* D-6675 (animation of BOP stack with pods).  The third pod was a spare, identified as the "White Pod" and kept on the rig.  TREX 40009.17 (Zatarain expert report); TR. 8430:18-8431:8 (Zatarain).

534.   The BOP pods were interchangeable and were routinely moved from one position to another on the BOP.  TR. 8407:12-18 (Zatarain).

535.   Each of the control pods contained its own AMF system.  Either pod alone was capable of functioning the Blind Shear Rams through its AMF.  TR. 6998:3-10 (Stevick); TR. 5158:9-11 (Childs); TR. 8407:9-8408:15 (Zatarain).

536.   Each pod contained two computers, known as subsea electronic modules or SEMs.  The SEMs in each pod were referred to as SEM A and SEM B.  TR. 8407:23-25 (Zatarain); TR. 5160:6-9 (Childs).

537.   In normal operations, the control pods on the BOP received signals from the rig floor through MUX cables connecting the rig to the pods.  The pod SEMs used these signals to function the BOP.  TR. 5157:20-5158:8, 5159:2-6, 5160:17-19 (Childs); TR. 8407:10-8408:13 (Zatarain).

538.   In an emergency, *i.e.*, when the pods lost electrical and hydraulic power and communication with the rig, the AMF systems within the pods would take over.  TR. 9019:10-16 (Shanks); TR. 5159:19-24 (Childs).

539.    Like the pods themselves, the AMF systems had redundancies.  Each pod had two independent SEMs, each with its own 9-volt battery and AMF system.  The two SEMS in each pod shared a 27-volt battery.  TR. 5160:13-16 (Childs).

540.    Within each pod, when AMF conditions were met, each SEM would "boot up" its AMF card using 9-volt battery power.  TR. 8409:10-8410:2 (Zatarain).

541.    The SEMs then used the 27-volt battery to trigger a solenoid valve.  TR. 8409:25-8410:2 (Zatarain).  This valve was referred to as Solenoid 103Y in the Yellow Pod and Solenoid 103B in the Blue Pod.  *See* TR. 5162:4-7 (Childs); TREX 61123.13 (Stevick expert report).

542.    Solenoid 103 in each pod contained two coils--one coil connected to SEM A and the other coil to SEM B.  When either SEM fires its coil, the coil generates a magnetic field that shifts a movable plunger on the solenoid.  The shift of the plunger opens a flow path for hydraulic pressure.  That pressure in turn closes the Blind Shear Rams.  TR. 8408:4-13, 8408:16-8410:13 (Zatarain); TR. 5161:16-5162:20 (Childs); TREX 7660.6 (Davis expert report).

543.    In an emergency situation, the pods were designed to operate independently of each other, meaning that, when conditions were met for activation of the AMF system, both pods would signal the Blind Shear Rams to function.  TR. 8410:17-22 (Zatarain); *see* TR. 5159:25-5160:2 (Childs).  If either one or both of the pods functioned, the Blind Shear Rams would activate.  TR. 6998:3-10 (Stevick); TR. 5158:9-11 (Childs).

544.    At the time of the explosion on April 20, or shortly thereafter, conditions were met for activation of the AMF system.  TR. 2648:4-11, 2649:15-20 (Davis); TR. 8410:23-24 (Zatarain).

**B.    DNV's Post-Incident Testing Demonstrated That The Yellow Pod Solenoid Could Have Functioned on April 20**

**(1)    DNV tests established that Solenoid 103Y could operate in AMF conditions**

545.    After the incident, DNV determined that one of the two coils in Solenoid 103Y was wired in reversed polarity.  TR. 8441:4-20 (Zatarain); TR. 5162:9-13 (Childs); TREX 7660.5 (Davis expert report).  Based on this finding, the DOJ and BP experts asserted at trial that Solenoid 103Y's miswiring of one coil would have prevented it from firing the Blind Shear Rams through the AMF system on April 20.  *See* TR. 2649:21-2650:19, 2653:22-2654:18 (Davis); TR. 8404:11-16 (Zatarain).  The weight of the evidence was to the contrary.

546.    Like the two control pods themselves, the two coils incorporated into Solenoid 103Y were independent and redundant.  As a result, and as the parties agreed, the force generated by either coil was sufficient to operate the solenoid and function the Blind Shear Rams, even if the solenoid is reverse wired.  TR. 8413:21-24 (Zatarain); TR. 5162:13-15 (Childs).

547.    Post-incident testing of Solenoid 103Y by DNV confirmed that when the miswired solenoid was operated on a single coil, through only SEM A or SEM B, the solenoid functioned properly.  TR. 2790:10-12 (Davis); TR. 8496:1-21 (Zatarain) (reverse-wired solenoid functioned on only one coil worked "every time").

548.    Potential problems with a miswired Solenoid can arise when both coils are activated at the same time, *i.e.*, when SEM A and SEM B both attempt to function the

solenoid simultaneously through both coils.  If power to the two coils in a miswired

solenoid is provided through a constant direct current, the magnetic fields generated by

the coils can cancel each other out.  In that situation, the solenoid may not function.  TR.

8415:24-8416:10 (Zatarain); TREX 7660.7 (Davis expert report).

549.    However, in an actual emergency such as that on April 20, 2010, the

solenoid would be activated through the AMF system.  TR. 2799:1-6 (Davis).  Under

AMF conditions, the SEMs do not provide a constant current to the coils but instead

pulse the power on and off in a rapid sequence.  The purpose of this design -- known as

pulse width modulation -- is to save power.  TR. 8489:24-8490:13 (Zatarain).  The net

effect of pulse width modulation is that the coils do not cancel each other out, even if one

is miswired.  TR. 5162:21-23, 5467:25-5468:5 (Childs); *see* TR. 8490:14-25 (Zatarain)

(agreeing that "the net effect of that pulse width modulation coming from both sides" is

that "the timing is not the same").

550.    DNV did three tests that simulated actual operation of the miswired

solenoid on both SEMs through the AMF, "as would have occurred in the field."  TREX

61123.27 fn. 79 (Stevick expert report); TR. 6968:5-13 (Stevick); TR. 8497:15-20,

8498:5-20  (Zatarain); TR. 5163:13-5164:21 (Childs); TREX 43093.64.1 (DNV Report

callout); TREX 43093.64.2 (DNV Report callout) ("The connection from Laptop/PETU

to the Yellow Pod was removed to simulate loss of MUX communication").

551.    In all three of DNV's AMF tests, the solenoid moved down under pressure

and allowed fluid to flow across, as would be required to activate the Blind Shear Rams.

Kenney Depo. 132:18-133:22 (DNV Lead Investigator) (Solenoid 103Y functioned as

expected when tested using SEM A and SEM B simultaneously "as they do in normal operation").

552.    Most of the experts agreed that all three of DNV's AMF tests were successful. TR. 8499:6-12 (Zatarain); TR. 5164:22-23 (Childs); *see* TR. 6963:22-6964:5; 6965:1-8, 6968:5-13 (Stevick) (solenoid functioned when activated through SEM A and SEM B); TREX 61123.27 (Stevick expert report). Dr. Davis opined that the first test of Solenoid 103Y was unsuccessful but agreed that, in two of these three field tests, the solenoid "appeared to function" as it should. *See* TR. 2798:22-2799:7 (Davis); TREX 7661.18 (Davis rebuttal expert report).[24]

553.    Although agreeing that all three of DNV's AMF tests of the miswired solenoid showed that it operated, Mr. Zatarain, alone of the experts, theorized that one of the 9-volt Yellow Pod batteries used during the testing must have died after the first test. He then opined that the second and third tests must have been powered by only one SEM, not two. TR. 8460:3-5, 8466:8-17, 8499:24-8500:1 (Zatarain). Mr. Zatarain incorrectly assumed that the Yellow Pod batteries were five years old. TR. 8432:23-24 (Zatarain).

---

[24] In the first of the three DNV AMF tests, the solenoid took longer to activate than would be expected and did not complete its full 30-second cycle. It is likely that this delay was due to the length of time that the solenoid was stored by DNV and possibly the manner in which it was stored. TR. 5172:9-23 (Childs). Solenoid 103Y was first disassembled and tested over a year after it was removed from the Yellow Pod. TR. 6967:14-16 (Stevick); TR. 8515:19-23 (Zatarain). Mr. Childs testified that, over time, a solenoid can stagnate and accumulate debris if stored improperly. TR. 5173:9-23 (Childs). Mr. Zatarain did not rule out this possibility. TR. 8516:3-7 (Zatarain).

Dr. Stevick attributed the solenoid's slower activation time in the first DNV AMF test to debris in the solenoid itself and/or to dirty hydraulic fluid. TR. 6966:13-6967:12 (Stevick). It is unlikely that any such debris would have been present at the time of the incident, given that the solenoid was replaced during the rig move to Macondo. *See* Finding ##588-591, *infra*. The pod filters through which the hydraulic fluid passed were also replaced at this time. TR. 8513:4-20 (Zatarain); TREX 1195.223.2 (Subsea Departmental Activity Report: 1/31/10 entry). Rig maintenance records show that the hydraulic fluid and filters were regularly maintained after the BOP was splashed. *See* TREX 52683.787.1 (RMS entries for 1/28/10, 2/23/10, 3/19/10, 4/11/10); TR. 8513:21-8515:18 (Zatarain); TR. 6977:8-6978:9 (Stevick).

In fact, the Yellow Pod batteries were manufactured in April and May 2009 and found in good condition after the incident.  TREX 7660.29 (Davis expert report); TR. 8500:12-16 (Zatarain); TR. 2791:2-5, 2872:13-19 (Davis).  Mr. Zatarain did not include his theory regarding the Yellow Pod batteries in his report and did not explain why, if he thought DNV's tests had been affected by a dead battery, neither he nor BP ran any independent tests on a miswired solenoid.  TR. 8501:23-8502:17 (Zatarain).

554.    As Halliburton expert Stevick testified, the fact that the solenoid functioned in the three DNV AMF tests is not surprising, given the pulse width modulation effect discussed above.  *See* TR. 6965:14-23, 6967:23-6968:13 (Stevick) (because of pulse with modulation during AMF testing, it was "not a surprise" to him that Solenoid 103Y functioned).  DNV's AMF tests established that Solenoid 103Y was capable of functioning the Blind Shear Rams when activated though the Yellow Pod AMF system on April 20, 2010.

### (2)    DNV's PETU tests of Solenoid 103Y cannot be relied on as an indicator of its functionality

555.    DNV conducted numerous other tests on Solenoid 103Y using Portable Electronic Testing Units (PETUs).  The results of these tests generated significant confusion among the experts as to when and whether both coils were being activated by the PETU.  *See, e.g.*, TREX 7660.7, fn. 2 (Davis expert report); TR. 8447:22-23 (Zatarain); Finding ## 556-559, 596-597, *infra*.

556.    DOJ expert Dr. Davis relied on his own interpretation of the DNV PETU tests to argue that the miswired solenoid could not function properly at the time of the incident.  TREX 7661.18 (Davis rebuttal expert report).  Mr. Zatarain similarly re-interpreted the DNV PETU results and then asserted that the tests showed that the

solenoid could not function properly.  TREX 400092 (Zatarain expert report); TR. 8491:17-8492:4, 8493:5-17 (Zatarain); D-4897 (Zatarain reinterpretation of March 3, 2011 test results); D-4898A.1.TO (Zatarain reinterpretation of  March 4, 2011 test results).

557.    Nevertheless, even as re-interpreted, in one of the DNV PETU tests, Solenoid 103Y activated when energized by both coils at once.  *See* TREX 7660.34 (Davis expert report); D-4898A.1.TO (DNV March 4, 2011 testing); TR. 8496:22-25 (Zatarain).

558.    Both Dr. Davis and Mr. Zatarain conceded that the PETU tests did not "mimic actual field conditions."  TR. 8489:19-23 (Zatarain); *see* TR. 2799:1-7 (Davis) (in actual emergency, solenoid would be activated by AMF, not PETU or bench test unit).

559.    Because of the confusion over the DNV PETU tests and the fact that these tests do not emulate actual field conditions, these tests are not a reliable indicator of whether Solenoid 103Y could have functioned on April 20, 2010.

### (3)    Transocean's independent tests showed that a miswired solenoid could function via the AMF system

560.    Transocean also did its own testing of an intentionally miswired solenoid operated by the SEMs under battery power, as when activated through the AMF.  The miswired solenoid functioned 15 out of 15 times. TR. 5162:21-5166:8 (Childs); TREX 7670 (Transocean report on solenoid testing).

561.    No other party submitted any independent solenoid testing results to the Court. *See* TR. 2799:14-16, 2800:1-7 (Davis); TR. 5168:12-15 (Childs).[25]

562.    On this record, the weight of the evidence established that Solenoid 103Y was capable of functioning the Blind Shear Rams when activated through the AMF at the time of the incident.

## C.    Post-Incident Analysis Demonstrated That The Blue Pod 27 Volt Battery Was Not Dead On April 20

563.    Certain experts also opined that the Blue Pod 27-volt battery could not have operated the AMF system on April 20 because this battery was found dead 10 months after the incident.  *See* TREX 7660.8 (Davis expert report); TREX 61124.24 (Stevick rebuttal report); TREX 40009.16 (Zatarain).  As discussed herein, it was undisputed at trial that the battery's post-incident condition was not representative of its condition on April 20.

564.    Following the incident, the pod batteries remained subsea for four-and-a-half months until the BOP was recovered from the ocean floor.  Kenney Depo. 11:12-12:6.  They were subsequently housed at the NASA-Michoud facility in New Orleans for another four months until they were tested in February 2011.  *See* TREX 7660.3 (Davis expert report) (describing forensic investigation at Michoud).

565.    DNV's testing of the Blue Pod 27-volt battery in February 2011, measured the battery at 1.10 volts.  TREX 7660.8 (Davis expert report).  All of the experts agreed

---

[25] Cameron did an initial test of Solenoid 103Y when the Yellow Pod was recovered on May 5, 2010, shortly after the blowout.  TREX 3602 (5/5/10 Cameron daily report).  The Solenoid did not operate at that time.  Cameron's David McWhorter testified that this initial test was "too cursory and crude of an evaluation to draw a final conclusion" as to the Solenoid's functionality.  D. McWhorter Depo. 519:3-23.

that this battery was effectively dead at the time of testing.  *See* TR. 2786:3-9 (Davis);
TR. 8419:8-15 (Zatarick); TR. 6996:1-6 (Stevick); TR. 5419:1-4 (Childs).

566.   DNV's testing of the two 9-volt batteries in the Blue Pod reported voltage
measurements of 8.90 (SEM A) and 8.68 (SEM B) in February, 2011.  TREX 7660.8
(Davis expert report).  This testing showed the 9-volt batteries to be good. TR. 8423:12-
15, 8516:17-21 (Zatarain); TREX 7660.9 (Davis expert report).

567.   BP's expert Arthur Zatarain analyzed the post-incident condition of the
three Blue Pod batteries to see what that condition said about the possible state of the
batteries on April 20, 2010.  *See* TREX 40009.15 (Zatarain Chart).  Mr. Zatarain's
analysis showed that, if the 27-volt battery had been "bad" at the time of the incident, the
9-volt batteries would also have been bad.  TR. 8517:22-8519:5 (Zatarain); TREX
40009.15 (Zatarain Chart); TR. 5191:16-24 (Childs).  Mr. Zatarain explained that, if the
27-volt battery had been bad at the time of the incident, it could not have disabled the
AMF boards when they were functioned by the 9-volt batteries.  In that situation, the 9-
volt batteries would have continued to attempt AMF activation on their individual cards
until those batteries, too, were drained.  TR. 8518:5-24 (Zatarain).

568.   All of the experts agreed that, because the two 9-volt batteries were both
found in good condition 10 months after the incident, the 27-volt battery could not
possibly have been "bad" on April 20, 2010.  TR. 8519:6-19, 8424:20-23 (Zatarain)
("there is no combination where you can start with two good nines and a good 27 and end
up with two good nines and a bad 27"); TR. 2787:3-2788:2, 2788:8-25 (Davis); TR.
6973:7-11 (Stevick); TR. 5191:16-24 (Childs).

569.    The experts further agreed that, under Mr. Zatarain's analysis, the 27-volt battery was either good or weak on April 20.  TREX 40009.15 (Zatarain Chart); TR. 2789:1-4 (Davis); TR. 5191:25-5192:7 (Childs).  As a result, the 27-volt battery must have drained to some substantial degree -- either from good to bad, or weak to bad -- between the incident and the testing by DNV.  TR. 2789:1-9 (Davis); TREX 40009.15 (Zatarain Chart); TR. 5192:14-20 (Childs).

570.    Transocean offered one explanation, in its internal investigation report and in the report of Greg Childs, as to how the Blue Pod 27-volt battery could have drained post-incident.  *See* TREX 5660.7 (Transocean Internal Investigation Report, App. N); TREX 7688.4-8 (Childs rebuttal expert report).

571.    Interlink, in work done for BP, also determined other mechanisms by which the battery could have been drawn down after the incident.  TR. 519:21-5193:3 (Childs); TREX 7410, pp. 28-31 (Interlink Report).

572.    Regardless of the mechanism, there is no dispute that a significant drain of the 27-volt battery occurred after the incident.  TR. 2789:1-9 (Davis); TREX 22790.15 (Zatarain Chart); TR. 5192:14-20 (Childs).

573.    In order to function the Blue Pod solenoid, the 27-volt battery needed 15.7 volts.  TREX 7410.2 (Interlink Report) ("testing determined that the 27-volt battery would need to produce a minimum of 15.7 volts to successfully operate the AMF sequence); *see* TR. 8521:16-23 (Zatarain); TREX 40009.16 fn. 29 (Zatarain expert report).

574.    Mr. Zatarain agreed that the battery must have drained after the accident and specifically agreed that it could have drained from 15 volts to effectively zero after

the incident.  *See* TR. 8520:17-25, 8522:1-14 (Zatarain) ("As more time passes, those battery states can change"); TREX 40009.15 (Zatarain expert report) (defining a weak battery as 15 volts and agreeing that "it is possible" that battery drained from "weak" to "bad" post-incident).  Mr. Zatarain offered no explanation as to why a battery could drain post-incident from 15 volts, but not from 15.7 volts.  TR. 8522:1-10 (Zatarain).

> ### D.      The 27-Volt Battery Was Unlikely To Have Been Drained By Age Or Use Prior To The Incident

575.     The usage history of the Blue Pod 27-volt battery prior to the incident, the battery tests by BP and Cameron, and Cameron's battery replacement recommendations all support a finding that the battery was likely capable of functioning at the time of the incident.  *See* Finding ## 576-586, *infra*.

576.     Cameron recommended that the pod batteries be replaced after the first of (1) five years from the date of purchase; (2) 33 actuations in a 12-month period; or (3) one year of "on-time operation."  TREX 3329.2 (Cameron Engineering Bulletin 891D).

577.     The 9-volt batteries found in the Blue Pod were manufactured in October 2005; the 27-volt, in January 2006.  TREX 7660.29 (Davis expert report); *see* TR. 2783:3-7 (Davis).  The batteries were all installed about the same time, in November 2007.  TR. 8431:5-8, 8531:23-24; 8526:14-18 (Zatarain); TR. 5178:24-5179:1 (Childs). Regardless of whether the "date of purchase" for purposes of Cameron's 5-year "shelf life" recommendation in interpreted as the date of manufacture or the date of purchase from Cameron, the batteries were within this 5-year period at the time of the incident. *See* TREX 33273 (Cameron SEM Factory Acceptance Test reflecting November 2007 purchase).

578.     The batteries installed in November 2007 went into the spare pod, *i.e.*, the pod not in use on the BOP.  TREX 40009.17 (Zatarain expert report); TREX 61124.24 (Stevick rebuttal expert report); TR. 5183:19-24 (Childs).

579.     Cameron took the position after the incident that its recommendation for battery replacement after one year of "on-time operation" meant one year from the date the batteries were installed in the SEM, as opposed to the date the pod was installed on the BOP.  TREX 7669.1 (5/14/10 Van Lue email).

580.     Transocean expert Greg Childs testified that he would consider the pod batteries to be "out of service" while the spare pod was not on the BOP.  TR. 5183:19-24 (Childs).  The available records support Mr. Childs' view that the batteries in the spare pod were not used or drawn down prior to its installation on the BOP.  *See* TREX 50377 (pod summary document showing additional work done on spare pod to get it ready for service); TREX 3299.45 (RMS records noting that "this pod still out of service"); TREX 36711.2 (Cameron Daily Report Sheet, 12/29/08 entry, showing crew attempted to install spare pod but concluded additional work was needed on SEM modem).  No party offered any evidence or analysis showing that the pod batteries were used or actuated during the time that the spare pod was not installed on the BOP.  *See* TR. 2784:8-20 (Davis); *see* TR. 6972:9-15(Stevick); TR. 8530:3-16 (Zatarain).

581.     The spare pod was first installed in the Blue Pod position on the BOP stack and splashed with the BOP on March 14, 2009.  TREX 4617.66-67 (RMS record entry for 7/9/09); TREX 51245.199.2 (Subsea Departmental Activity Report entry for 3/14/09); TR. 5182:7-9 (Childs).

582.    BP's analysis showed that even after installation of the spare pod on the BOP, it is unlikely that there was any drain on the 27-volt battery.  As BP's expert, Mr. Zatarain, explained, a small drain on the 9-volt pod batteries would have occurred whenever the AMF was armed to monitor for AMF conditions. TR. 8523:4-10 (Zatarain); *accord* TR. 5189:13-21 (Childs).  However, even when the BOP was latched up and the AMF armed, there would have been no draw on the 27-volt battery as long as the rig had surface power.  TR. 8523:11-16 (Zatarain).  A drain on the 27-volt battery would only occur in one of the AMF circumstances, such as loss of hydraulic or electric power.  TR. 8523:19-8524:17 (Zatarain); TREX 40009.56 (Zatarain expert report) ("the 27V battery is not loaded at all until the AMF board detects loss of normal AC power").

583.    Using a similar analysis, Interlink concluded that the age of the batteries alone was not sufficient to explain the condition of the 27-volt battery after the incident. TREX 7410.29.1 (Interlink report) ("So age, though possibly a contributing factor, is not likely to be the whole explanation for the final state of the batteries.").

584.    It was undisputed at trial that Cameron's battery replacement recommendations, and specifically its recommendation for replacement after one year of "on-time operation," were conservative.  *See* TR. 8527:21-23 (Zatarain); TREX 7406.13 (Interlink Report) ("…the maintenance specifications for the AMF of one year or 33 operations is conservative"); D. McWhorter Depo. 99:8-20 (Cameron "has recommendations for battery change out and replacement that are, by any measure, extremely conservative").

585.    In pre-incident battery testing, Cameron in fact determined that the batteries would last for at least two years of "normal operations."  TREX 5154.1 (1/13/06 Cameron internal email).[26]

586.    On this record, it is likely that the 27-volt battery had not been drawn down at the time of the incident and remained capable of functioning the AMF system.

**E.    Transocean Properly Replaced And Tested Solenoid 103Y**

**(1)    Solenoid 103Y was replaced and tested during the rig move**

587.    The miswiring of Solenoid 103Y caused various experts to opine either that Transocean failed to test the Solenoid prior to splashing the BOP at Macondo, or that the test was performed incorrectly.  *See, e.g.*, TREX 40009.23 (Zatarain expert report); TREX 7660.5 (Davis expert report).  The record does not support either of these conclusions.

588.    All of the experts agreed that Solenoid 103Y was replaced and tested prior to the splashing of the Yellow Pod on the BOP at Macondo.  *See, e.g.*, TR. 2791:8-10 (Davis); TR. 8503:15-29 (Zatarain); TREX 61124.25 (Stevick rebuttal expert  report); TR. 5170:20-23 (Childs).

589.    Transocean followed a regular policy of replacing 25 percent of the BOP-related solenoids every five years.  Hay Depo. 251:18-252:21.  Solenoid 103Y was replaced as part of a routine rig move maintenance plan submitted to, and approved by,

---

[26] At trial a 2005 Cameron/Transocean email exchange was introduced, in which another Transocean rig expressed concern about battery longevity.  *See* TREX 5155.06; TR. 6895:25-6897:14 (Stevick).  This email exchange did not involve the *Deepwater Horizon* and, in any event, appears to refer to batteries made by Cameron's prior battery manufacturer, FRIWO.  TREX 40009.56 (Zatarain expert report).  The batteries at issue in this case were all made by SAFT.  *See* TREX 7660.29 (Davis expert report).  It is the SAFT batteries that Cameron, in its 2006 email, stated could last at least two years in normal operations.  TREX 5154.1 (1/13/06 Cameron email).

BP.  *See* TREX 5102.3 (rig move list calling for troubleshooting of Yellow Pod solenoids); TREX 3797.4 (1/31/10 Guidry email); TREX 3787 (*DWH* Subsea 1/1/10 email submitting work plan to BP for approval).  The replacement is reflected in the tally book of the technician who replaced it, Ron Guidry, and in the date hand-painted by Mr. Guidry on the solenoid itself (2-2-10).  TR. 2792:25-2793:21, 2794:15-21 (Davis); TR. 5170:2-23 (Childs); J. Owen McWhorter Depo. 219:23-220:6, 221:13-222:2, 374:4-375:10; TREX 4823.5-6 (Guidry tally book); TREX 4823.8 (photograph of Solenoid 103Y).  The work on the Yellow Pod solenoids was also recorded in the contemporaneous records by the Subsea Department.  *See* TREX 51245.225 (Subsea Departmental Activity Reports - 1/31/10, 2/1/10 and 2/2/10 entries showing work on Yellow Pod solenoids).

590.     At the time of the incident, both Cameron and Transocean required that a rebuilt Solenoid be tested after refurbishment.  These procedures required the solenoid to be functioned on one coil through SEM A, on the other coil through SEM B, and lastly with both coils energized through SEMS A and B simultaneously.  *See* TREX 5097.6 (Refurbishment Procedure for Cameron Solenoid Valves (1/29/04)); TREX 3798.5 (Transocean Instructions for Rebuilding Cameron Controls Solenoid Valve).

591.     Mr. Guidry tested the solenoids as he replaced them, using a Portable Electronic Testing Unit (PETU).  The records show a continual process of testing and replacing the solenoids until Mr. Guidry achieved a result of "no coil breaks, no faults, and all corresponding functions operating as they should."  TREX 3797.3 (5/9/10 Guidry email); TREX 3797.2 ("Before the pod went back onto the LMRP, with the PETU, every single function was tested, all solenoids…."); *see* TR. 2795:8-2796:7 (Davis).

176

(2)     **DNV experienced severe difficulties in detecting the miswiring**

592.    The claim that if Mr. Guidry had followed the Cameron/Transocean procedure he would have caught the miswired solenoid was not supported by the evidence.  In fact, DNV used these exact procedures and failed to detect that the wiring in the Solenoid in question was reversed.

593.    Solenoid 103Y was removed from the Yellow Pod on May 5, 2010. TREX 3602 (5/10/10 Cameron Daily Report).  It was subsequently stored by DNV at the NASA facility at Port Michoud.  *See* TREX 7660.3 (Davis expert report).  DNV began testing original Solenoid 103Y on March 3, 2011.  The fact that one of the coils was miswired was unknown at that point.  TR. 8448:12-13 (Zatarain).

594.    DNV used the Cameron testing procedure in its initial testing of Solenoid 103Y, functioning the solenoid through a PETU unit set to activate both coils through SEM A and SEM B simultaneously.  TR. 8505:16-8506:20, 8507:25-8508:4 (Zatarain); TREX 3130.40 (DNV Lab Notes); TREX 43093.64.2.TO (DNV Report callout).

595.    DNV's initial tests, using the very test procedure that the parties say Mr. Guidry should have use, showed that Solenoid 103Y *functioned* when activated on both coils.  TR. 8491:2-8492:1 (Zatarain) ("when [DNV] selected the switch that said we're testing on both coils, the solenoid activated"); TREX 43093.59 fn. 4 (DNV Report) (using Cameron testing procedure, "original Solenoid 103Y functioned as intended in accordance with the manufacturer's specifications").

596.    DNV then did additional PETU testing of the solenoid in March 2011.  All of the experts to address the issue described the results of these tests as "confused," "inexplicable" and "befuddled."  *See* TR. 2796:8-13 (Davis) (DNV initial test results were 'inexplicable"); TR. 8447:22-23 (Zatarain) (after second set of PETU tests, DNV

177

experts "were really befuddled"); TR. 5174:7-16 (Childs); TREX 7660.7 fn. 2 (Davis expert report) (interpretation of DNV results "was severely confused by initially unknown problems with how the Portable Electronic Testing Units (PETUs) actually function").

597.   DNV and the other experts eventually concluded that the PETUs had not always tested the solenoids as they were set to do.  *See* TR. 8493:5-9 (Zatarain) (PETUs used in DNV testing  "didn't function in the way that DNV thought they did while they were using them."); TR. 5173:14-20 (Childs); TREX 40009.21 (Zatarain expert report) (PETU manipulation of one SEM sometimes activates both SEMS, and vice versa).

598.   As DOJ expert Davis pointed out, it is possible that the Transocean rig worker who tested Solenoid 103Y with a PETU unit in February 2010 was confounded by the same problems as the experts at Michoud.  *See* TR. 2796:5-8 (Davis) ("we don't know what variety PETU he was using, and it may not have done every single function"). The record does not support the claim that Mr. Guidry tested the solenoid improperly; to the contrary, the record shows that the Cameron-recommended testing procedure did not always reveal that a solenoid was reverse-wired.

### (3)   Cameron modified its solenoid testing procedure after the incident in response to miswired solenoids found on another rig

599.   Several months after the incident, a Cameron customer reported solenoid problems on a non-Transocean rig.  *See* TREX 75235 (7/10/10 Field Performance Report).

600.   In response to its customer's solenoid problems, in July 2010, Cameron tested the solenoids at one of its facilities.  This testing revealed that many of the solenoids had reverse wiring.  TREX 75235.3 (7/1/10 Field Performance Report) ("7 of

the nineteen solenoids had wires crossed, reversed polarity, on coil B pins 3 and 4…"). This problem was apparently not discovered when the solenoids were initially tested and installed on the rig.  *See* TREX 75235.1.2 TO (7/10/10 Field Performance Report); TREX 40009.23 (Zatarain expert report) ("Cameron solenoids are also functionally tested after installation on a pod").

601.    As a result of the problems experienced by its customer, Cameron modified its solenoid test procedures to make sure reverse-wired solenoids would be detected in the future.[27]  TREX 5165 (9/15/10 Cameron letter); TR. 8511:16-21 (Zatarain).

602.    Cameron's modification letter noted that its existing solenoid testing procedures already specified that the solenoid function should be checked "with both coils activated."  TREX 5165.2 (9/15/10 Cameron letter) ("This step . . . was in the procedure during the assembly and testing time of the solenoids" in question).  This procedure had been insufficient to detect a miswired solenoid.  Cameron therefore *modified* the test to include "instructions to watch for a drop in pressure to 0 psi."  TREX 5165.2 (9/15/10 Cameron letter); TR. 8511:22-8512:20 (Zatarain).  Cameron went on to state: "If this happens, it is likely that the solenoid has reversed polarity so the coil termination points should be checked."  TREX 5165.2 (9/15/10 Cameron letter).

603.    Cameron made these modifications in September 2010, five months *after* the blowout.  The modified procedures would not have been available to the rig worker

---

[27] Dr. Davis erroneously described the Cameron experience as "tests . . . on the same model solenoid with intentional reverse wiring."  TR. 2654:19-2655:1 (Davis).  He conceded on cross-examination that Cameron was called in to diagnose problems with solenoids discovered on another, non-Transocean rig after the incident, and that Cameron's bulletin regarding the modification of its testing procedures was issued five months after the incident.  TR. 2797:8-24 (Davis).

who tested Solenoid 103Y prior to Macondo.  TREX 5165.1 (9/15/10 Cameron letter); TR. 8512:1617-85628513:1 (Zatarain).  There was no evidence that anyone was aware, prior to the incident, that the then-recommended Cameron test was insufficient to detect reverse-wired solenoids.

### F.   The *Deepwater Horizon* Crew Properly Maintained The Blue Pod Batteries

#### (1)   The failure to change the Blue Pod batteries was due to a computer error

604.    Transocean had a policy of changing the pod batteries every year.  Hay Depo. 358:19-22; TR. 8531:9-13 (Zatarain)*; see* TREX 3329.2 (Cameron Engineering Bulletin 891D).

605.    It was undisputed that the batteries in the other two pods had last been replaced in a timely fashion, within a year of the incident.  TR. 8532:7-12 (Zatarain); TREX 3318 (2/24/10 J. Owen McWhorter email).

606.    Until mid-2007, the rig's computerized maintenance system, known as EMPAC, contained a reminder to the subsea crew to change the AMF batteries as part of the pod's annual service.  TREX 5495.5 (Transocean internal investigation document: *DWH* SEM Battery change outs).

607.    The task of changing the pod batteries was transferred from the subsea crew to the electronic technicians some time in 2007.  TREX 5495.5 ("In mid 2007 the 365 PM [preventive maintenance] was split into Subsea and electrical"); J. Owen McWhorter Depo. 94:24-95:3 (understood the job of changing the batteries "would have fallen under the electronic technician's craft"); Canducci Depo. 112:21-24, 113:02-08 (understood that electronic technician was to change batteries and that OEM

requirements "would be put into our nest [sic] system as a periodic reminder to instigate that battery check").

608.     Although scheduled at the corporate level, it appears that the annual reminder to change the battery was then inadvertently dropped from the EMPAC system on the *Deepwater Horizon*.  TREX 5495.5 (Transocean internal investigation team document) ("Between Mid 2007 and the introduction of RMS replacing the AMF batteries was not included in the Subsea 365 Work order plan description"); *see* Tiano Depo. 78:22-79:01 ("Somebody at the corporate level is writing the procedure to do the maintenance on the BOP and the control system.  Whatever those tasks are with -- inside that maintenance system -- is -- are performed at a rig level"); *see also* TR. 8531:25-8532:2 (Zatarain) ("change in maintenance . . . may have been a problem of why [the annual battery change out] didn't transfer").  This omission explains the testimony of some rig crewmembers that they had not seen a reminder to change the batteries come up in the computerized maintenance system.  *See* J. Owen McWhorter Depo. 234:12-14 (RMS did not keep track of batteries); Hay Depo. 264:3-5 (RMS did not remind crew "once a year to change out the batteries").

609.     As discussed in part XIV-G(2), *infra*, Transocean upgraded its computerized maintenance system in 2009 to address problems with EMPAC and conflicting systems inherited as a result of the Global SantaFe merger.  The *Deepwater Horizon* adopted the new RMS system in July 2009.  TR. 1905:22-23 (Ezell); TR. 5970:24-5971:1, 5972:13-15 (Ambrose) (Transocean started designing move from EMPAC to RMS in late 2008 and implementing on *Deepwater Horizon* in July 2009); TREX 47180.2-3 (conversion of EMPAC to RMS).  The new system, RMS, once again

included the reminder to change the pod batteries as part of the annual pod service to be performed by the Subsea group.  TR. 6974:16-25 (Stevick); TREX 581.4.1.TO (RMS records: SPM-02 control pod service shows directive to "change out AMF/deadman batteries").

610.    Transocean notified the crew again of the policy to change batteries annually in February 2010, sending both the Cameron policy and a technical bulletin on battery longevity to the Subsea Supervisor.  TREX 3785 (2/16/10 Fry email).

611.    The annual service for the Blue Pod, including a reminder to change the pod batteries, was next scheduled for July 2010.  TREX 4304.382 (Transocean Internal Investigation Report, App. I) (SPM-02 control pod service scheduled for 7/11/10); TREX 581.4.1 (RMS records for SPM-02 BOP Control Pod - Services).

612.    On this record, the evidence established that any delay in changing the Blue Pod batteries was due to a computer error that had been corrected by the time of the incident.  Transocean did not authorize or ratify a departure from this policy.

### (2)    The crew understood that the spare pod had been overhauled and in actual use for less than a year at the time of the incident

613.    When the *Deepwater Horizon* crew installed the spare pod on the BOP in March 2009, the crew correctly characterized the pod as having "just been overhauled." *See* TREX 4617.66 (RMS records) ("This pod was just overhauled and put into service on 3/14/09").

614.    At the time of the incident, the Blue Pod had been in actual use -- meaning latched up to the BOP -- for a total of 349 days.  TR. 5187:10-5190:11 (Childs); D-6716; TREX 51245.216.1.TO, TREX 51245.225 (Subsea Departmental Activity Reports recording when BOP was latched up).  This evidence was not controverted at trial.  *See*

TR. 2784:17-19 (Davis) (did not look to see how long Blue Pod had been in use on BOP).

615.     The *Deepwater Horizon* was out of service for more than a month in the August-September 2009 period for general maintenance, as well as a BP audit. TREX 51245.213 (Subsea Departmental Activity Report: 8/26/09 entry) ("Unlatch stack and pull marine riser"); TREX 51245.216 (Subsea Departmental Activity Report: 10/2/09 entry: "Finished Running Bop and Latched up on Wellhead"); *see* Part XIV-G, *infra*.

616.     In these circumstances, the crew could reasonably view the Blue Pod batteries as having been in actual use for less than a year at the time of the incident.

### G.     The *Deepwater Horizon* BOP was tested in accordance with regulatory requirements and passed all required tests

617.     MMS regulations required that the BOP be regularly function- and pressure-tested while subsea. TREX 4748.9-11 (30 C.F.R. §§250.447-449 (2003)). The drill crew complied with these requirements; the BOP regularly passed these tests. *See* TREX 52664 (Summary Chart: BOP Function and Pressure Testing); TR. 5216:15-18 (Childs).

618.     The tests included a successful function test of the Blind Shear Rams on April 17, 2010, three days before the incident, and a successful pressure test of the Blind Shear Rams on the day of the incident. TREX 52664 (Summary Chart: BOP Function and Pressure Testing); TR. 5216:24-5217:13 (Childs); Rec. Doc. 5927 (Agreed Stipulations), # 101 (during positive pressure test on April 20, "the blind shear ram closed and sealed as expected").

## XIII.   THE BOP WAS CONFIGURED IN ACCORDANCE WITH INDUSTRY PRACTICE AT THE TIME OF THE INCIDENT

619.    Several experts opined that various BOP components or related equipment should have been configured differently, either when the *Deepwater Horizon* was commissioned in 2001 or through modifications or upgrades thereafter.  *See, e.g.*, TREX 7660.11, .15-16 (Davis expert report); TREX 7535.17-20 (Perkin expert report); TREX 61123.21-26 (Stevick expert report).  As set forth herein, the BOP configuration was specified by BP and was consistent with both federal regulations and industry practice. There was no evidence at trial showing that alternative configurations would have been able to shear the off-center drill pipe on April 20.

### A.    BP Was Responsible For The Original Configuration Of The BOP And Could Have Required It To Be Changed At Any Time

620.    Consistent with industry practice, BP as the Operator specified the initial configuration of the BOP in the original drilling contract between its predecessor, Vastar, and Transocean's predecessor, R&B Falcon.  TREX 4112.10-20 (Drilling Contract Excerpt); TR. 9375:17-22 (O'Bryan); D. McWhorter Depo. 62:15-21, 62:23-64:1; TR. 3404:10-14, 22-25 (Perkin); TREX 7536.27 (Perkin expert report appendices); TR. 6985:16-6986:7 (Stevick); TREX 61123.14 (Stevick expert report); TR. 5217:19-5218:16 (Childs); TR. 6002:23-6003:2 (Ambrose).

621.    Among other things, in the Drilling Contract BP/Vastar specified a 5-cavity BOP, the type of blowout preventers, the stack configuration, and the location of the MUX reels.  TREX 4112.11, .18 (Drilling Contract Excerpt); M. Byrd Depo. 366:11-21, 488:18-492:4; TREX 7535.11-12 (Perkin expert report).

622.    In the Drilling Contract, BP specifically called for the BOP to include a single Blind Shear Ram, as well as a Casing Shear Ram.  TREX 4112.12 (Drilling

Contract excerpt); *see* D. Cameron Depo. 50:19-25 (operator determines how many blind shear rams to be used on BOP).

623.    The Drilling Contract also reflected BP's decision not to employ an acoustic trigger system as part of the BOP system. *See* TREX 4112.18 (Drilling Contract excerpt listing acoustic system as "N/A").  BP made this decision after consulting an expert who raised issues with the reliability of these systems.  Byrd Depo. 595:4-18 (BP Rule 30(b)(6) witness).

624.    BP knew all of the capabilities and limitations of the *Deepwater Horizon* BOP prior to the incident.  TREX 7535.6 (Perkin expert report).

625.    As the Operator, BP could have required that the *Deepwater Horizon* BOP be modified or upgraded prior to renewing the contract and putting the rig back in service in September 2009.  *See* TREX 1488.86-98 (Drilling Contract extension); TREX 7536.27 (Perkin expert report appendices); *see* TR. 6985:25-6986:7 (Stevick); TREX 61123.14 (Stevick expert report).

626.    BP did not request any change in the BOP prior to renewing the contract in September 2009.  *Compare* TREX 1488.86-98 (Drilling Contract extension) *with* TREX 4112.10-20 (Drilling Contract excerpt).  In BP's view, the *Deepwater Horizon* met all of BP's requirements when the contract extension was executed.  Yilmaz Depo. 444:21-446:6.

**B.    The Configuration Of The BOP Complied With MMS Regulations At The Time Of The Incident**

627.    At the time of the incident, MMS regulations required a BOP to contain the following components:  one annular, two pipe rams, one blind shear ram, an

accumulator closing system and dual control pods.  TREX 4748.3 (30 C.F.R.

§ 250.442(b) (2003)).

628.    At the time of its configuration, the *Deepwater Horizon*'s BOP exceeded

these requirements, containing (1) an Upper Annular and a Lower Annular; (2) three

Variable Bore (or "Pipe") Rams (Upper, Middle and Lower); (3) a Blind Shear Ram; (4)

a Casing Shear Ram; (5) an accumulator closing system; and (6) two control pods.[28]  TR.

3440:23-3441:3 (Perkin); TR. 9107:5-18 (Shanks); TR. 5381:16-22 (Childs); D-4607

(comparing BOP to MMS requirements); D-4599 (comparing BOP components to

industry and regulation standards).

629.    The MMS approved BP's use of the *Deepwater Horizon* BOP as

configured on Macondo.  TREX 4008.13 (Revised APD for Macondo Well depicting

schematic of *Deepwater Horizon* BOP); TR. 7019:23-7020:7 (Stevick); TR. 9107:19-23

(Shanks); TR. 5381:23-5382:11 (Childs); *see generally* TREX 7540 (30 C.F.R.

§ 250.107(c) (compliance with MMS regulations is generally considered to be the use of

Best Available and Safest Technology).

---

[28] At BP's request, the Lower Annular was converted to a "stripping annular" in 2006.  TREX 1870 (Transocean Change Proposal noting "BP requests to install 18-3/4" annular stripping packer"); TREX 7536.35 (Perkin expert report appendices); Abbassian Depo. 159:09-24, 160:02-10.  This conversion allowed the drill pipe to be moved up and down while still sealing the annular space in a well control event.  TR. 2678:1-5 (Davis); TR. 9014:21-9016:10 (Shanks); .  The Lower Annular was not used as part of the well control efforts on April 20.  Also at BP's request, the lower variable bore ram was converted to a test ram in 2004.  Byrd Depo.302:13-22, 302:24-303:3, 303:6-8 (BP Rule 30(b)(6) witness).  The conversion increased safety because it allowed the crew to pressure test the BOP below that point without pulling up the drill pipe, which could cause a swab or surge kick.  TR. 9018:7-19 (Shanks).  Neither of these modifications affected the operation of the BOP on April 20.  Abbassian Depo. 406:19-407:3.

**C.    None Of The BOP Upgrades Or Modifications Was Required By Industry Practice At The Time Of The Incident**

630.    The design alternatives and/or modifications suggested at trial included (i) adding a second Blind Shear Ram; (ii) substituting a different kind of blade, either a "Double V Shearing Ram" (DVS) or "Cable Double V Shearing Ram" (CDVS) for the *Deepwater Horizon*'s Shearing Blind Ram[29]; (iii) adding tandem boosters; (iv) adding an acoustic trigger system; (v) upgrading to the Cameron Mark III control pod system; (vi) routing of the MUX cables through somewhere other than the moonpool; and (vii) programming the AMF system sequence to activate the Casing Shear Rams, followed by the Blind Shear Rams. *See, e.g.*, TREX 7660.15-16 (Davis expert report); TREX 7535.17-20 (Perkin expert report); TREX 61123.21-26 (Stevick expert report).

631.    None of the experts opining that modifications should have been made had BOP design experience. DOJ expert Rory Davis had never worked on a BOP before; the first time he even saw a picture of a BOP was after he was retained as an expert in this litigation. TR. 2641:10-12, 2715:18-2716:10 (Davis). He also had no previous oil and gas industry experience. TR. 2641:13-15 (Davis).[30] Likewise, none of the members of the team that assisted Dr. Davis had any experience with BOPs. TR. 2714:16-20 (Davis).

632.    With the exception of a short-term job that PSC expert Perkin held just out of high school involving one aspect of a BOP, Mr. Perkin similarly lacked any BOP

---

[29] The "Shearing Blind Ram" is the Cameron name for a Blind Shear Ram. Both names refer to a ram that can both shear drill pipe and shut in the well. TR. 5092:18-5093:2 (Childs).

[30] Prior to the initial Phase 1 trial date, Cameron filed objections to Dr. Davis's expert report, CV, deposition transcript, and rebuttal report. Rec. Doc. 5319. BP also filed a motion to disqualify Dr. Davis from offering any design opinions based on his lack of BOP design and industry experience. Rec. Doc. 5424. Transocean joined in BP's motion at trial. TR. 2644:12-16. The motion remains under submission.

design experience.  TR. 3410:18-3411:25 (Perkin).  He did not do any comparative analysis of the *Deepwater Horizon* BOP with BOPs used on other wells prior to offering his design opinions.  TR. 3413:1-3414:1 (Perkin).[31]

633.    Dr. Stevick, while an experienced expert on the buckling of pipes, had never worked for a BOP manufacturer or operated or installed a BOP.  TR. 6975:23-6976:16 (Stevick).  He had never designed a BOP stack or performed BOP maintenance or repairs.  *Id.*  Prior to this case, he had not assessed whether a BOP was in compliance with MMS regulations.  TR. 7010:5-8 (Stevick).

### (3)    The evidence did not establish that industry practice required the suggested modifications

634.    Second Blind Shear Ram.  The opinions that the better practice would have been to upgrade the BOP to include a second Blind Shear Ram were not supported by the evidence.  *See*, *e.g.*, TREX 7535.17 (Perkin expert report); TREX 61123.24 (Stevick expert report); TREX 61124.11-12 (Stevick rebuttal expert report).  While some newer rigs had adopted a second Blind Shear Ram at the time of the incident, 36 of the 38 BOP stacks sold by Cameron in the five years prior to the incident used only a single Blind Shear Ram and the same Shearing Blind Ram design utilized on the *Deepwater Horizon*.  TREX 7542.4 (June 2010 Cameron email); TR. 9109:7-19 (Shanks).  The *Deepwater Horizon*'s use of a single Blind Shear Ram, coupled with a Casing Shear Ram, complied with industry standards at the time of the incident.  TR. 9109:24-9111:5, 9114:15-21 (Shanks); D-4876 (BP demonstrative showing Transocean

---

[31]Prior to the initial Phase 1 trial date, BP and Cameron filed motions to disqualify Mr. Perkin from offering any design opinions on the grounds that he was not qualified as a design expert. *See* Rec. Docs. 5411, 5690, 5759, 5431, 5691, 5765.  With respect to the design issues, this Court suggested at trial that Mr. Perkin was not "qualified to opine on those matters."  TR. 3455:1-3.  The Court later reserved ruling on Mr. Perkin's qualifications.  TR. 3456:1-2.

rig shear ram configurations); D-4826 (BP demonstrative showing BOP configurations in Gulf of Mexico).

635.    Double V Shear (DVS) Rams.  The Blind Shear Ram on the *Deepwater Horizon* was the Cameron Shearing Blind Ram model.  TR. 9017:4-6 (Shanks).  Certain experts opined that this model should have been replaced with Cameron's DVS Rams. TR. 2662:15-2664:2 (Davis); TREX 7660.15 (Davis expert report); TREX 61123.22 (Stevick expert report).[32]  There was some evidence that the DVS blades may have a better ability to shear drill pipe in certain conditions.  *See* TR. 2711:9-14, 2807:14-22 (Davis).  However, the DVS Rams do not extend all the way across the wellbore.  TR. 2723:10-12 (Davis); TR. 9121:11 (Shanks).  The evidence did not establish that the DVS blades would have been able to center the pipe or shut in the well given the conditions at Macondo.  *See* TR. 3459:9-3462:10 (Perkin) (shearing pipe under conditions at Macondo would have resulted in "horribl[e] damage" to sealing elements in BOP); TR. 9204:11-14 (Shanks).  Industry practice did not require use of the DVS blades at the time of the incident.  *See* TR. 2723:13-21 (Davis) (did not review industry practice with respect to DVS configuration); TR. 9017:9-16 (Shanks) (Cameron Shearing Blind Ram model was common ram for Cameron stack at time of incident and is still in use today); TR. 5224:16-21 (Childs) (same).

636.    Cable Double V Shear Rams (CDVS).  As an alternative to both the Shearing Blind Ram and the DVS rams, Dr. Davis and Dr. Stevick opined that the *Deepwater Horizon* BOP should have been modified to use CDVS Rams.  TR. 2721:2-2722:3 (Davis); TREX 7660.15 (Davis expert report); TREX 61124.11 (Stevick rebuttal

---

[32] Mr. Perkin offered his opinion that DVS blades would have been a better design option under the mistaken impression that these blades covered the entire wellbore.  TR. 3456:22-3457:6 (Perkin).

expert report).  CDVS Rams were designed to shear wireline, not drill pipe.  TR. 5224:25-5225:10 (Childs).  CDVS Rams were under a Cameron safety alert at the time of the incident; the  pressure rating for these rams had been downgraded to 10,000 psi, well below the 15,000 psi rating of the *Deepwater Horizon* BOP.  TREX 7766 (11/11/09 Cameron Safety Alert); TR. 2722:5-19 (Davis); TR. 9125:3-16, 9204:24-9205:10 (Shanks).  No evidence was offered that any deepwater drilling rig used CDVS Rams on operations similar to Macondo at the time of the incident.  *See, e.g.*, TR. 2836:12-15, 2851:2-7 (Davis); TR. 9204:24-9205:10 (Shanks) (No knowledge of an operator that would put a component in the lower BOP stack with a lower rating than the working pressure of the BOP).

637.   Tandem Boosters.  Tandem boosters increase Blind Shear Rams' shearing force.  TREX 7535.17 (Perkin expert report); TREX 61123.23 (Stevick expert report).  Tandem boosters take up more space and would have required significant modifications on the *Deepwater Horizon*.  TR. 5226:3-16 (Childs); Boughton Depo. 121:2-122:2.  No evidence was introduced as to the feasibility of those modifications.  In any event, it was undisputed that the Blind Shear Rams had adequate force to shear the drill pipe if it had been centered.  *See* Finding # 509, *supra*.  No evidence was introduced to show that the addition of tandem boosters would have made a difference to the outcome once the drill pipe was forced off center.  *See* TR. 5226:19-5227:4 (Childs).

638.   Acoustic Trigger System.  An acoustic trigger system is an alternative method of controlling certain BOP systems by sending sound waves through the water.  TR. 3436:17-23 (Perkin).  Acoustic trigger systems have a history of reliability problems.  TREX 3298.20 (West Engineering Report for MMS); TR. 3438:2-5 (Perkin); TR.

5229:1-5230:13 (Childs); Boughton Depo. 230: 612-22.  There was no evidence at trial

that any rigs operating in the Gulf of Mexico used acoustic backup systems at the time of

the incident or that any industry group had recommended that they be used in that region.

TR. 3437:16-3438:1, 3440:12-17 (Perkin) (not aware of acoustic systems being required

or recommended for use in the Gulf of Mexico); Domangue Depo. 146:04-11, 147:07-15

(not aware of any regulation requiring acoustic systems or other operators that used

acoustic systems in Gulf of Mexico); Boughton Depo. 230:23-231:11.  In any event,

because the Blind Shear Rams could not fully shear the off-center pipe, an acoustic

trigger system to activate them would have made no difference.  *See* Finding ## 494-509,

524, *supra*.

639.    Cameron Mark III System.  Some experts opined that the *Deepwater*

*Horizon* should have upgraded to Cameron's Mark III system because it used

rechargeable batteries and single coil solenoids.  TREX 7660.11 (Davis expert report);

TREX 61123.24 (Stevick expert report).  However, at the time of the incident, the Mark

III system was under a Cameron issued safety alert due to solenoid fault issues.  TREX

3626 (2/12/09 Cameron Safety Alert noting that, if problem was not addressed, "[t]his

could result in failure of the BOP to perform its intended function"); TR. 2720:1-3

(Davis).  The Mark II system used on the *Deepwater Horizon* continued to be used by

other drilling rigs and was still considered to be a safe system at the time of the incident.

TR. 2838:25-2839:4 (Davis); D. McWhorter Depo. 408:17-409:1; TR. 5227:5-16

(Childs).

640.    MUX Cables.  Plaintiffs' BOP expert Perkin opined that the MUX cables

should have been routed through a non-hazardous area, to prevent the loss of

communication with the BOP in the event of an explosion.  TREX 7535.19 (Perkin expert report).  Mr. Perkin offered no alternative location at trial.  TR. 3412:1-9 (Perkin). The testimony was undisputed that no rig anywhere in the world routes its MUX cables anywhere other than through the moonpool.  *See* TR. 4180:11-4181:12 (Webster); TR. 5228:5-5228:23, 5388:6-18 (Childs); Emmerson Depo. 280:11-280:19.

641.   <u>AMF Sequence</u>.  Certain experts opined that the AMF should have been programmed to activate the Casing Shear Rams before the Blind Shear Rams.  TR. 6894:10-13 (Stevick); TREX 7535.12 (Perkin expert report); TREX 61123.25-26 (Stevick expert report).[33]  The decision to have the AMF function only the Blind Shear Rams in an emergency situation was a programming decision made when the BOP was configured after discussions between BP and Transocean.  *See* TREX 4115 (Vastar handwritten notes listing pros and cons of different approaches); Byrd Depo. 509:15-512:4.  BP and Transocean decided that the AMF should function only the Blind Shear Rams, finding that this approach would provide "reliability through simplicity" because "the fewer decisions the system has to make the more reliable it will be."  TREX 4114.2 (9/13/99 Vastar memo re EDS/Deadman Philosophy); TR. 9138:24-9139:7 (Shanks); Byrd Depo. 511:8-16, 511:18-20.  The alternative, functioning the Casing Shear Rams before the Blind Shear Rams, would have increased the time it would take to shut in the well in an emergency situation.  TR. 5097:4-11, 5099:1-6 (Childs); TREX 4114.2 (9/13/99 Vastar memo re EDS/Deadman Philosophy).  The decision to retain the AMF system as originally programmed was reasonable and consistent with industry practice at

---

[33] In their reports, both Mr. Perkin and Dr. Stevick confused the EDS system, which allowed the crew to choose the sequence of emergency ram closures, with the AMF, which was pre-programmed to activate only the Blind Shear Rams.  *See* TREX 7535.12 (Perkin expert report); TREX 61123.25-26 (Stevick expert report).

the time of the incident.  TR. 5099:7-11 (Childs).[34]  The crew did not have the ability to

change the AMF configuration on the night of the incident.  TR. 6988:17-21 (Stevick).

## XIV.  THE *DEEPWATER HORIZON* WAS WELL-MAINTAINED, SEAWORTHY AND FIT FOR SERVICE

### A.  The Rig Maintenance Issues Raised At Trial Had No Causal Relationship To the Blowout And Were Unsupported On The Merits

642.    The following sections address the issues raised concerning overall rig

maintenance.  While these issues took up much time at trial, the evidence failed to

establish that any of those issues had a causal connection to the incident.  The evidence

showed that Transocean devoted substantial resources to maintenance and that third-party

auditors and inspectors consistently determined the *Deepwater Horizon* was a well-

maintained and seaworthy drilling rig.

643.    At the time of the incident, the *Deepwater Horizon* had passed all of these

inspections, was current on all required Flag State statutory surveys and certifications and

possessed all requisite international, Marshall Islands, and U.S. Certificates of

Compliance.  TREX 50003.9 (Wolfe expert report); TREX 52668 (Summary:

Certifications for *Deepwater Horizon* as of April 20, 2010); TR. 5932:22-5933:6

(Ambrose); Finding ## 684-520, *infra*.

644.    In the five years preceding the incident, the rig was inspected or audited

over 150 times.  The audits and inspections were conducted by the MMS, the U.S. Coast

Guard, the ABS, and DNV.  *See* TREX 52666 (Summary: *Deepwater Horizon*

---

[34] PSC expert Perkin also opined that the EDS system should have been programmed to engage the Casing Shear Rams prior to the Blind Shear Rams.  TR. 3332:12-3333:8 (Perkin).  Later testimony established that the EDS panel in fact made both options available to the drill crew.  TR. 3337:14-23, 3448:11-3451:2 (Perkin); TREX 48102.1.2 (photograph of BOP control panel).  Further, the question as to which option the crew should have exercised -- EDS 1 or EDS 2 --  has no bearing on the issues before this Court, as the crew was unable to use EDS in either mode once the rig lost power.  *See* TR. 5097:16-22 (Childs).

Audits/Inspections/Surveys/Certifications from 2005 to 2010); TR. 5934:1-20

(Ambrose). In each of these inspections, the *Deepwater Horizon* was found in good

condition and fit for service. *See* Finding ## 684-720, *infra*.

645. In September 2009, during the rig's regularly scheduled out-of-service

period, BP conducted an audit of the *Deepwater Horizon* for the express purpose of

determining whether the rig was being maintained and operated safely. TR. 8861:8-11

(Guide); Wong Depo. 30:11-18 (BP Auditor). The audit verified that the *Deepwater*

*Horizon* had comprehensive emergency procedures and an effective safety management

system in place. TREX 44046.14, .16 (Common Marine Inspection Document Annex

(CMID)). After Transocean addressed certain marine-related items, BP put the rig back

in service, satisfied that it could operate and drill safely. *See* Finding ## 721-731, *infra*.

Concurrently with the September 2009 audit, BP demonstrated its confidence in the rig's

continued high level of performance by extending its contract to use the *Deepwater*

*Horizon* for another three years. TREX 1488 (Drilling Contract Extension).

646. Less than three weeks before the incident, Transocean voluntarily

commissioned ModuSpec to conduct a 2-week survey for the specific purpose of

identifying all maintenance items that should be addressed in the *Deepwater Horizon*'s

scheduled out-of-service period. This was an intrusive and transparent assessment and

the best and most recent measure of the rig's condition. Transocean is the only

ModuSpec client to open its records to these respected industry surveyors. ModuSpec's

conclusion -- that the *Deepwater Horizon*'s condition was equal to or better than all rigs

in the Gulf of Mexico -- provides a reliable, industry-approved assessment of the rig's

just days before the blowout. *See* Finding ## 770-781, *infra*.

647.    On the day of the incident, there were no outstanding items, either from the BP 2009 audit or as generated in the *Deepwater Horizon*'s daily maintenance report, that affected the rig's ability to operate safely or that had any causal connection to the blowout.  MMS inspectors, BP auditors and BP Well Site Leaders, each of whom had been on the rig within days of the incident, all testified that there were no safety risks and no maintenance items requiring attention beyond what is seen every day on a drilling rig.  *See* Finding ## 782-790, *infra*.

### B.    Transocean Provided Both Rig-Based And Shore-Based Resources For Rig Maintenance

648.    Transocean does not get paid under its drilling contracts if its rigs cannot work because of equipment failures.  TREX 4271.9 (*Deepwater Horizon* Drilling Contract § 2.2.5(a)).  Tracking and minimizing the "downtime" that results from such failures and assuring that rigs can operate reliably is a company priority.  TR. 4583:13-20 (Newman); TR. 5921:18-5922:6 (Ambrose).  Plaintiffs' expert Geoff Webster agreed: "When the rig is idle, it's not making money."  TR. 3932:24 (Webster).

649.    Transocean's reputation and business depend on its ability to properly maintain its equipment.  *See* TR. 5921:18-5922:6 (Ambrose) ("We have two things; we have people, and we have the equipment. … If it's [the equipment] not working, we're not – we're not a profitable business.").

650.    The evidence showed that Transocean funded maintenance on the *Deepwater Horizon* even when such funding exceeded budgeted amounts.  *See* Trahan Depo. 122:5-13 ("even after a budget is approved […] we've gone over [budget] when we had to"; "if we need to go over budget and we need[ed] to go over budget, we went over budget"); Kent Depo., Vol. II, 19:4-8 (budgetary issues never compromised rig

195

maintenance); Tiano Depo. 312:4-20 (maintenance resources were provided when needed).

651.    Like every rig in the Transocean fleet, the *Deepwater Horizon* had a dedicated maintenance crew on the rig, shore-based rig management with maintenance responsibilities, and access to a corporate maintenance group with technical experts devoted to maintenance policy.  *See* D-6735A through D-6735F (*Deepwater Horizon* maintenance organization charts).

652.    Transocean provided maintenance support at the rig level through personnel whose only tasks on the rig were maintenance-related.  The *Deepwater Horizon* maintenance crew included Motormen, Mechanics, Engineers, Welders, Electricians, Electronics Technicians, and subsea personnel who managed equipment such as the blowout preventer and surface well control equipment.  TR. 5929:2-5930:7 (Ambrose); TR. 4579:8-17 (Newman).  The maintenance crew reported to a rig-based Maintenance Supervisor.  TR. 4579:18-4580:1 (Newman); TR. 5929:10-18 (Ambrose); D-6735E (*Deepwater Horizon* maintenance organization chart).

653.    The marine crew, including Bosuns, Ordinary Seamen, Able-Bodied Seamen, and Dynamic Positioning Operators, also maintained rig systems, including lifesaving equipment, vessel systems, lifeboats, firefighting systems, and all of the marine aspects of the rig.  TR. 5930:20-5931:18 (Ambrose); TR. 5658:20-5659:15 (D. Young); D-6735F (*Deepwater Horizon* maintenance organization chart).

654.    There was no incentive for the rig crew to cut corners on maintenance, particularly safety-related maintenance.  TR. 5932:10-13 (Ambrose).  The crew lived, worked, slept, and ate on the rig, and would have been personally affected by any

shortcuts they took in maintaining the rig's equipment, including the BOP.  TR. 5930:16-19, 5932:10-13 (Ambrose); TREX 929.113-114 (Lloyd's Register's Safety Culture Review of the *Deepwater Horizon*) (more than 95 percent of the interviewed crewmembers disagreed or strongly disagreed that they would take such shortcuts).

655.    Each Transocean rig in the Gulf of Mexico also had a dedicated shore-based Rig Manager for asset management.  TR. 5926:2-9 (Ambrose); D-6735C (divisional organization chart).  The Rig Manager-Asset focuses on maintaining the rig and its equipment.  TR. 5928:10-15 (Ambrose).

656.    The Rig Manager-Asset reports to an Operations Manager-Asset, who is responsible for managing operations on multiple rigs.  TR. 5924:23-5925:4, 5925:23-5926:1, 5926:6-9 (Ambrose); D-6735D (*Deepwater Horizon* maintenance organization chart).  Buddy Trahan, who was on the rig on the night of the blowout, was the Operations Manager-Asset responsible for the *Deepwater Horizon.*  TR. 5925:1-4 (Ambrose); D-6735C (divisional organization chart); D-6735D (*DWH* maintenance organization chart).

657.    At the corporate level, Transocean's Maintenance and Technical Support Department, headed by Bill Ambrose at the time of the incident, set corporate expectations, policies, and procedures for maintenance, including standard preventive maintenance tasks to be completed across the fleet.  TR. 4580:16-22 (Newman); TR. 5915:22-5916:3, 5963:12 (Ambrose).  Within this group, 80-90 people provided technical support to rig crews in the field.  TR. 5931:19-5932:3 (Ambrose).

658.    Transocean regularly required each rig to undergo a Performance Monitoring Audit & Assessment (PMAA) to ensure that the rig is following Transocean's

procedures, including procedures for maintenance and training. TR. 5958:8-5961:23 (Ambrose) ("it's our eyes on how things are going on the rig"); TREX 927 (Transocean PMAA Manual). The most recent PMAA of the *Deepwater Horizon* took place from June 30 to July 3, 2009. The PMAA found no areas of nonconformity. TREX 5766 (PMAA Report Summary); TR. 5959:15-22 (Ambrose).

659. Transocean's Maintenance and Technical Support Department sponsors periodic surveys of rig equipment called Rig Condition Assessments. TR. 5919:4-9; 5923:9-11 (Ambrose). Transocean voluntarily engages ModuSpec to perform Rig Condition Assessments one year to 18 months before any planned out-of-service period to allow for major maintenance planning. Kent Depo., Vol. I, 355:6-356:6; 356:8-21; TR. 5989:18-5990:4 (Ambrose); Schneider Depo. 358:8-12; 358:15-22; 358:25. ModuSpec surveyors spent 14 days on the rig in April 2010, doing a top-to-bottom review of the rig's condition. The April 2010 ModuSpec Rig Condition Assessment, discussed in Part XIV-H, *infra*, is the best and most complete view of the rig's condition. TR. 5919:2-9 (Ambrose).

## C. Transocean Performed Preventive And Other Maintenance On The *Deepwater Horizon* On An Ongoing Basis

660. Keeping a rig like the *Deepwater Horizon* operational involves an enormous amount of maintenance. The *Deepwater Horizon* was essentially a "floating factory." TR. 8871:13-18 (Guide); *see* Tiano Depo. 311:22-312:3 ("you've got every part of a city floating on the water, plus a ship on top of it. So there's lots of work.").

661. Over 2,000 components, comprising 52 separate systems, were tracked and scheduled for maintenance on the *Deepwater Horizon*. TR. 5948:18-5956:2 (Ambrose); D-6753 (*Deepwater Horizon* Systems); D-6755 (*Deepwater Horizon*

Cranes); D-6761 (*Deepwater Horizon* Engines); D-6763 (*Deepwater Horizon* Thrusters); D-6725 (*Deepwater Horizon* Sensors); D-6756 (*Deepwater Horizon* Top Drive); *see also* Rodriguez Depo. 20:24-21:7 ("There are … a multitude of [marine systems]…."). Those components themselves comprised tens of thousands of parts. TR. 5955:24-5956:5 (Ambrose). In total, more 13,000 maintenance tasks were performed on the rig each year. TR. 5961:24-5962:7 (Ambrose).

662.　　Maintenance on the *Deepwater Horizon* consisted primarily of preventive maintenance, which included equipment checks and inspections, as well as more intrusive tasks intended to keep equipment in good working order. TR. 5956:16-5957:3; 5962:13-16 (Ambrose). Preventive maintenance accounts for approximately 80 percent of all rig maintenance. TR. 5962:10-12 (Ambrose).

663.　　Maintenance on the *Deepwater Horizon* also included corrective maintenance (fixing things that break unexpectedly), upgrade maintenance (making modifications to the rig), and a catchall category called "other maintenance," such as installing a new mud shack on the rig. TR. 5963:4-21 (Ambrose). Corrective maintenance tasks comprised about 14 to 18 percent of the rig's maintenance. TR. 5963:7-9; 5963:22-24 (Ambrose).

664.　　Transocean also used aspects of a condition-based maintenance philosophy. "Condition-based maintenance" refers to the process of testing and inspecting the equipment to determine its condition. TR. 5207:4-12 (Childs). Condition-based maintenance can have advantages over time-based maintenance, in that new equipment can sometimes require more maintenance and trouble-shooting than equipment that has been tested and found reliable. TR. 5208:7-5209:4 (Childs). The

purpose of condition-based maintenance is to look for failures before they happen.  TR. 5958:7-10 (Ambrose).

665.    Transocean's use of "condition-based maintenance" was consistent with standards within and outside the drilling industry.  Exxon, the U.S. Air Force, and the Coast Guard all use aspects of condition-based maintenance to maintain their equipment. TR. 5207:20-5208:6 (Childs); *see* TR. 5957:17-5958:2 (Ambrose) (condition-based maintenance is used by mining industry, major power plant facilities, and airline industry).

666.    The allegation that "condition-based maintenance" meant "run it until it breaks," Brown Depo. 155:6-16, is untrue and was disproven by the testimony and the *Deepwater Horizon*'s record of ongoing preventive and corrective maintenance.  *See* Tiano Depo. 250:16-19, 250:21-24  ("Q. Would you disagree with that characterization [of "run it until it breaks"]? A. Yes, sir I would."); Odenwald Depo. 165:20-166:1, 166:5-9; Smith Depo., Vol. II, 9:24:10-2; TR. 5921:22-5922:3 (Ambrose); Trahan Depo. 156:22-157:13; TR. 5815:11-13 (D. Young); TR. 1724:16-18 (Ezell).  Transocean employed different kinds  of maintenance depending on the needs of a particular piece of equipment.  Smith Depo., Vol. II, 9:19-11:12, 11:15-22, 11:24-13:3 ("The idea was to use the strategy which best suited the piece of equipment you were maintaining to optimize the reliability.").

667.    Transocean's program of continuous maintenance for the *Deepwater Horizon* complied with standard industry practice.  *See* Haynie Depo. 154:16-155:3, 155:6-10, 162:24-163:7 (ABS principal surveyor) (ABS inspections verified that Transocean's maintenance plan was in accordance with ABS standards).

**D.     Transocean Performed Major Equipment Maintenance During Out-Of-Service Periods In Accordance With The MODU Code And Other Industry Standards**

668.    In accordance with industry practice, major rig maintenance was planned for periods when equipment is not in use. TR. 5987:25-5988:6 (Ambrose); TR. 5665:16-5666:6 (D. Young).

669.    The MODU Code requires that a Special Periodical Survey be conducted by independent surveyors every five years.  *See* TREX 44070.124-26 (ABS Rules for Building and Classing Mobile Offshore Drilling Units, 2012 MODU Code at Part 7, Ch. 2, § 1); *see also* TREX 50432.25.1.TO (2008 MODU Code); Haynie Depo. 40:19-42:01; TR. 5983:10-20 (Ambrose).  During a Special Periodical Survey the rig is taken out of service, and Transocean uses this out-of-service period to perform major maintenance. TR. 5981:8-24 (Ambrose).  The next Special Periodical Survey for the *Deepwater Horizon* was planned for 2011.  TR. 5985:21-22 (Ambrose); D-6739 (major maintenance timeline for the *Deepwater Horizon*).

670.    For MODUs operating in salt water such as the *Deepwater Horizon*, the MODU Code requires a minimum of two Drydocking Surveys be carried out within each five-year Special Periodical Survey period, with the interval between Drydocking surveys not to exceed 36 months.  TREX 44070.125 (2012 MODU Code at Part 7-2-2, § 1.9).

671.    An underwater inspection equivalent to a Drydocking Survey may be carried out in lieu of actual drydocking (going to port and taking the rig completely out of the water) for each Drydocking Survey up to and including the fourth Special Periodical Survey (Special Survey No. 4).  TREX 44070.147 (2012 MODU Code at Part 7-2-6, § 3); TR. 5984:5-19 (Ambrose).  Such an inspection is called an Underwater Inspection in Lieu of Drydocking (UWILD).  *Id.*; *see also* TR. 3869:24-3870:12 (Webster).

672.    The MODU Code allows for UWILD surveys to be conducted for more than 20 years before an out-of-the-water drydock inspection must occur.  TREX 44070.147 (2012 MODU Code at Part 7-2-6, § 3); TREX 50432.25.1.TO (MODU Code callout; TR. 5984:5-19 (Ambrose); TR. 4128:4-10 (Webster); TREX 50381.13 (Wolfe rebuttal expert report).

673.    The ABS conducted a UWILD on the *Deepwater Horizon* in September 2009.  TR. 5985:18-20 (Ambrose); TR. 3869:2-18 (Webster); Haynie Depo. 40:19-41:22; 209:16-22.  Transocean carried out significant maintenance on the *Deepwater Horizon* during the September 2009 UWILD period, including maintenance on the blowout preventer.  TR. 5985:23-5987:12 (Ambrose); TREX 36031 (*Deepwater Horizon* UWILD maintenance plan).

674.    Allegations at trial that the rig should have gone into drydock, TR. 3869:15-3871:17 (Webster), misconstrued the applicable regulations and industry practice.  There is no difference between a UWILD and an out-of-the-water drydocking for purposes of rig inspection and maintenance.  TR. 5984:20-22 (Ambrose).  As testified to by U.S. Coast Guard Lt. Commander Michael Odom, the Coast Guard required the rig to have undergone either dry-docking *or* a UWILD.  Odom Depo. 184:10-185:1.  The Coast Guard verified that the *Deepwater Horizon* was in compliance with this requirement.  *Id.*

**E.    Transocean Required Extensive And Ongoing BOP Maintenance, Reviewed And Approved By BP**

675.    Like rig maintenance generally, Transocean's BOP maintenance involved elements of preventive maintenance, condition-based maintenance, corrective

maintenance, between-well maintenance, and five-year survey-type maintenance.  TR. 5202:2-10 (Childs); *see* TREX 1469 (Subsea Maintenance Philosophy).

676.    Most BOP maintenance is necessarily done between wells, when the BOP is on the surface.  *See* TR. 6983:24-6984:2 (Stevick).  In the five years leading up to the incident, the BOP rams and annulars were routinely disassembled and inspected.  TREX 52662A (Summary Chart: Significant BOP Maintenance 2005-2010).  Other major components of the BOP, including the control pods, failsafe valves and connectors, were regularly inspected and maintained.

677.    Prior to Macondo, as it had with other rig moves, Transocean prepared a rig move work list that included over 300 hours of BOP-related maintenance.  TREX 1193 (Macondo Rig Move Work List); *see generally* Odenwald Depo. 204:2-205:2 (subsea crew followed rig move work lists during rig moves).  Transocean submitted the maintenance worklist to BP for approval.  TREX 3787 (1/1/10 *DWH* Subsea email submitting work plan to BP for approval).  Prior to the rig's arrival on Macondo, BP approved the rig move plan.  *Id.*; TREX 3338.1 (BP emails regarding rig move schedule); TR. 5204:10-22 (Childs).

678.    During the Macondo rig move, Transocean's Subsea Support Team (also known as the SWAT team) flew out to the rig to perform much of the scheduled work.  TR. 5921:16-17 (Ambrose); TR. 6979:7-15 (Stevick); *see* TREX 3340.1 (Subsea Support Team Daily Report); Hay Depo. 109:24-110:8.

679.    The progress of the SWAT team and the Subsea Department in completing the BOP tasks undertaken during the rig move was recorded on the work list and in daily activity reports.  *See* TREX 3340 (Subsea Support Team Daily Reports);

TREX 5102 (2/13/10 Tiano email and attached rig move worklist); TREX 1125.223

(Subsea Departmental Activity Reports).  Prior to splashing the BOP at Macondo, the

SWAT team and rig crew substantially completed all of the BOP-related tasks on the BP-

approved work list.[35]  *See* TREX 3340 (Subsea Support Team Daily Reports); TREX

5102 (2/13/10 Tiano email and attached rig move worklist); TREX 1125.223 (Subsea

Departmental Activity Reports); TR. 6982:16-6984:16 (Stevick).

680.    The BOP maintenance tasks at Macondo included dry-firing the EDS,

activation of the Autoshear (which functions the Blind Shear Rams), inspection of rams

and replacement of rubber goods needed to seal the well, and changing the annular

elements.  *See* TREX 3340 (Subsea Support Team Daily Reports); TREX 5102 (2/13/10

Tiano email and attached rig move worklist); TREX 1125.223 (Subsea Departmental

Activity Reports); TR. 5212:8-25 (Childs).

681.    The BP-approved rig move list did not include testing the AMF system,

and, as pointed out at trial, there is no documentation that such a test was performed.  *See*

TR. 2653:9-12 (Davis); TR. 5322:9-12, 5446:6-16, 5471:4-22 (Childs); TREX 3787

(1/1/10 *DWH* Subsea email submitting work plan to BP for approval); TREX 3338.1 (BP

emails regarding rig move schedule).  MMS regulations at the time did not require such

testing such testing. TR. 5204:10-22 (Childs); TREX 4748.8-11 (30 C.F.R. §§ 250.446-

449 (2003)) (BOP inspection and testing requirements).  Transocean expert Greg Childs

testified that AMF testing was not the industry standard in the Gulf of Mexico at the time.

TR. 5446:6-16 (Childs).  Transocean's manual went beyond this standard and required

---

[35] One task, installing a rebuilt set of failsafe valves for the lower chokes, was put off until the
next rig move.  Hay Depo. 187:2-188:20, 189:20-190:06, 296:4-12; TREX 3290 (2/4/10 Fry
email approving postponement of failsafe valve change).  Replacement of the riser adapter was
delayed because the spare was still being worked on in the shop.  Hay Depo. 297:5-21.

such testing.  TREX 1454.303 (Transocean Well Control Handbook).  However, there was no evidence that AMF testing would have resulted in any additional maintenance being performed on the BOP during the rig move.  *See* TR. 5446:6-16 (Childs).

682.    In addition to rig move maintenance, Transocean performed ongoing, routine preventive maintenance on the BOP.  In the year preceding the blowout, the computer-based maintenance system generated 755 such tasks; 748 were completed.  TR. 5194:24-5195:12 (Childs); TREX 52665 (Summary Chart: BOP Preventive Maintenance).  None of the seven outstanding tasks had any effect on the BOP's ability to operate on April 20.  *See* TREX 7687.39 (Childs Report); TREX 4304.377, .380 (Transocean Internal Investigation Report, App. I); TR. 5195:13-19, 5196:12-19, 5196:20-23, 5197:2-12, 5199:12-5200:3, 5200:6-5201:10 (Childs); TR. 5990:20-5996:11 (Ambrose); *see* Abbassian Depo. 290:24-291:15 (Bly team "could not find a direct causal relationship" between BOP maintenance and the incident).

683.    There was no evidence that Transocean's BOP maintenance or its maintenance of the rig generally fell below industry standards or reflected an indifference to safety or that short-cuts were taken to save time or money.

### F.    Frequent Third Party Inspections Verified That The *Deepwater Horizon* Was Seaworthy And In Compliance With All Regulations

684.    Frequent audits and inspections by independent third parties verified that the crew was maintaining the *Deepwater Horizon* in accordance with Transocean policies and that the rig was fit for service.  *See* TREX 52666 (Summary: *Deepwater Horizon* Audits/Inspections/Surveys/Certifications from 2005 to 2010); TR. 5934:1-20 (Ambrose).

685.     Any of these auditors or inspectors could have shut the rig down at any time if the auditor or inspector believed the rig could not safely operate. *See, e.g.*, Odom Depo. 87:12-88:11, 188:3-10 (U.S. Coast Guard could have withheld the Certificate of Compliance and stopped operations at any time, but never found any deficiencies or discrepancies creating an unacceptable risk level); Haynie Depo. 184:12-185:2, 185:4-186:6; 187:10-188:7 (ABS could have put the *Deepwater Horizon* out of service if *Deepwater Horizon* had not met its class and statutory requirements at each inspection); R. Neal Depo. 154:24-155:19 (MMS can shut the rig down); TREX 44007.1, TREX 1777, TREX 5483 (2007, 2005, and 2002 DNV Ship Audit Reports showing that DNV never found a major nonconformity on board the *Deepwater Horizon*); TR. 4051:15-4052:2 (Webster) (conceding that DNV had the authority to suspend operations on the *Deepwater Horizon*).

686.     As demonstrated below, allegations by the Plaintiffs' expert, Geoff Webster, that the crew concealed the true condition of the rig during these multiple inspections and audits were not supported. *See* TR. 4123:7-4125:12 (Webster). To the contrary, the record established that the Transocean crew cooperated with third-party auditors and inspectors, responded to requests for information and records, and provided access to rig systems.

### (1)     MMS certified that the rig was in compliance with all regulations as of April 1, 2010

687.     The MMS regularly audited and inspected the *Deepwater Horizon* to determine compliance with federal regulations and industry standards. *See* E. Neal Depo. 25:6-28:15 (MMS inspectors used federal regulations, API's recommendations, the current application for permit to drill, and previous inspection reports during audits).

688.    The MMS inspectors who visited the *Deepwater Horizon* included a grandfather-grandson team dedicated to the family profession.  *See* E. Neal Depo. 42:25-43:9.  Both men testified that their goal in conducting the inspections was to "protect life, property, and the environment."  E. Neal Depo. 29:18-30:5; R. Neal Depo. 41:12-24.

689.    The MMS inspectors confirmed the installation and proper operation of equipment designed to prevent or ameliorate blowouts, fires, spills, or other major accidents.  E. Neal Depo. 80:5-13.  They also performed unannounced well control drills by simulating an indication of flow on the Driller's screens and observing the Driller's response time in catching the kick indicator.  TR. 5940:10-23 (Ambrose).

690.    The MMS inspections included an examination of the Driller's IADC reports, BOP test charts, casing test reports, records for gas detection, and applications for permit to drill to ensure compliance with federal regulations and MMS approvals.  E. Neal Depo. 22:6-17, 30:6-12, 80:17-21, 126:3-127:24.  The inspectors also toured the rig to verify that operations were being performed safely.

691.    The MMS inspectors also reviewed the *Deepwater Horizon*'s maintenance records.  TR. 5940:2-9 (Ambrose) (MMS reviews maintenance histories, paperwork, and computer records).  Testimony by MMS Inspector Robert Neal confirmed that the inspectors were "always given full access to any hard copies or computer records" needed and had no questions about "the accuracy or the veracity of the records" provided.  R. Neal Depo. 164:6-18; 171:17-172:14.[36]

692.    The MMS was required to inspect rigs on location at a drilling site every 30 days.  R. Neal Depo. 22:20-24.  During the short time that the *Deepwater Horizon* was

---

[36] Failure to produce maintenance records to MMS inspectors could subject BP, as the Operator, to an MMS Incident of Non-Compliance ("INC").  No such INC was ever issued.  TR. 5945:2-17 (Ambrose).

at Macondo, MMS inspected the rig three times:  February 17, March 3, and April 1,

2010.  None of these inspections resulted in the issuance of an Incident of Non-

Compliance.  E. Neal Depo. 132:20-24; Trocquet Depo. 201:23-202:19 (MMS Inspector)

(did not raise any regulatory issues with Transocean relating to the BOP or the rig);

Saucier Depo. 315:20-24 (MMS Inspector); *see* TREX 4121 (2/17/10 MMS Drilling

Inspection Report); TREX 4126 (3/3/10 MMS Drilling Inspection Report); TREX 5332

(4/1/10 MMS Drilling Inspection Report).

693.    The MMS last inspected the *Deepwater Horizon* on April 1, 2010, 19 days

before the incident.  The MMS found the rig to be in full compliance with MMS

regulations.  E. Neal Depo. 17:10-16, 20:20-23, 42:8-18.

### (2)    The U.S. Coast Guard issued a Certificate of Compliance after finding the rig fit and seaworthy in July 2009

694.    The U.S. Coast Guard examined the *Deepwater Horizon* annually to

ensure compliance with applicable U.S. and international marine safety and

environmental protection standards.  TREX 5571.5 (7/27/09 U.S. Coast Guard Certificate

of Compliance); Odom Depo. 17:13-21.

695.    During the July 2009 inspection led by U.S. Coast Guard Lieutenant

Commander Odom, the examiners "[r]eviewed all applicable licenses," reviewed

"documents, manuals, instructions and annual service reports," [e]xamined all lifesaving

gear," "tested fire pumps," "reviewed records related to PMS [Preventive Maintenance

System] and testing of shutdowns," tested "remote ventilation shutdowns," "[t]ested

OWS [Oil Water Separator] alarms and shutdown and bilge alarms," "fire and abandon

ship drills," looked at the "structural integrity of the vessel, watertight integrity" and

inspected "hazardous locations for ventilation and electrical installations."  TREX 5571.4

(7/27/09 U.S. Coast Guard Certificate of Compliance); Odom Depo. 11:22-12:17; 13:19-14:24, 194:21-195:7; *see* Sutton Depo. 79:22-80:4, 82:12-21 (Coast Guard Inspector) (inspectors reviewed emergency procedures and crew licenses and qualifications); TR. 5691:11-5692:2 (D. Young) (inspectors required the crew to activate alarms).

696.     As part of these examinations, the Coast Guard verified compliance with the ISM Code by conducting documentation checks and looking at the material condition of the vessel.  Odom Depo. 186:24-188:2.

697.     Coast Guard examinations also included a review of maintenance and other records.  Odom Depo. 152:25-153:4.  None of those records showed any deficiencies on the *Deepwater Horizon* from a safety standpoint.  Odom Depo. 152:25-153:10.

698.     During his examination, Lt. Commander Odom "had free access to the crewmembers," as well as the rig and its paperwork.  Odom Depo. 24:8-19, 101:17-102:12, 102:16-21; *see also* TR. 5932:14-18 (Ambrose) (U.S. Coast Guard commended Transocean for its transparency on reporting during inspections of rigs).

699.     The most recent Coast Guard examination of the *Deepwater Horizon* took place in July 2009.  The Coast Guard found the rig to be "fit and seaworthy."  Odom Depo. 166:19-25, 167:2-4, 167:8.  As a result of that inspection, the Coast Guard issued a Certificate of Compliance, valid through July 27, 2011, verifying that the rig was "in substantial compliance with the regulations and international regulations that are required of that vessel."  TREX 5571 (7/27/09 Coast Guard Certificate of Compliance); Odom Depo. 133:23-135:6.  Lt. Commander Odom confirmed that he had the authority not to

issue a Certificate of Compliance if he believed that the rig "posed a hazard to its crew or the environment." Odom Depo. 88:5-11.

> ### (3) ABS found that the *Deepwater Horizon* complied with the MODU Code and ABS Rules for Classification as of April 20, 2010

700. As the Flag State for the *Deepwater Horizon*, the Marshall Islands authorized the American Bureau of Shipping to conduct annual inspections on the *Deepwater Horizon* to verify compliance with the 1989 MODU Code and the ABS Rules for Classification. TREX 50003.7 (Wolfe expert report).

701. ABS also reviewed and certified the *Deepwater Horizon*'s compliance with applicable international conventions, including the SOLAS Convention, MARPOL Convention, the STCW Convention, and the Load Line Convention. TREX 50003.7 (Wolfe expert report).

702. In addition to the annual surveys, ABS conducted underwater inspections in lieu of drydock at two-and-a-half-year intervals as well as special periodic surveys at five-year intervals. Haynie Depo. 41:1-25.

703. The testimony of ABS surveyor William Haynie established that ABS rig surveys are rigorous, thorough and take multiple days to complete. Haynie Depo. 243:18-21, 243:24-244:1, 244:3-244:19. ABS used "a large check sheet" of items including lifeboats, lifesaving equipment, fire and gas systems, the heat and smoke detection systems, watertight doors, load line items, engines, and pumps to verify compliance. Haynie Depo. 193:23-194:18.

704. ABS surveyor Haynie confirmed that ABS inspections included a review of the rig's maintenance records. Haynie Depo. 154:24-155:3, 155:6-10 ("The preventative maintenance plan is usually submitted and approved by ABS and verified by

the surveyor at the annuals."); *id.* at 162:24-163:7 ("During our surveys on the *Horizon*, we look at their maintenance plan: what is due, what they've done."); *id.* at 163:21-164:4, 164:6-10, 271:9-23. ABS inspectors "would look through job orders closed in RMS. They would look at the regulatory certificates that we were required to keep onboard, minimum safe manning certificates, [and] crane inspection reports" as examples. TR. 5687:24-5690:14 (D. Young). "Sometimes it would be just a matter of sitting at the desk, and they'd ask us to open certain jobs that were closed. They could look at the computer screen and see that there were records there. Other times, they would print them, and they would hold them for records, for when they were generating their report at the end of their audit or inspection." *Id.*; *see also* TR. 5935:1-12 (Ambrose).

705. ABS surveyor Haynie did not find any deficiencies in the *Horizon's* RMS maintenance tracking system. Haynie Depo. 276:3-277:11, 277:13-14. Mr. Haynie concluded that everything surveyed on the *Deepwater Horizon* was "in satisfactory condition" and that the rig "was fit for service." Haynie Depo. 194:1-18, 223:15-17, 223:19-224:1, 224:4-6. .

706. The ABS visited and inspected the *Deepwater Horizon* more than 20 times in the five years preceding the incident. TREX 52666 (Summary: *Deepwater Horizon* Audits/Inspections/Surveys/Certifications from 2005 to 2010). In each of these inspections, ABS concluded that the *Deepwater Horizon* met its class and statutory requirements. TR. 5936:3-23 (Ambrose); Haynie Depo. 184:12-185:2, 185:4-186:6, 187:10-188:7.

707. As of April 20, 2010, the *Deepwater Horizon* was "in class," which meant that ABS found the rig in compliance with all ABS rules and applicable regulations.

Haynie Depo. 280:9-11, 280:24-25, 329:1-5; TREX 3087 (ABS Survey Status Report); TREX 3074.9 (ABS Survey Manager Survey Status) (showing ABS last visited the rig on Feb. 23, 2010 to commence the ABS annual and special surveys).

708.    The parties stipulated that there was "no evidence of any communication from the American Bureau of Shipping to Det Norske Veritas regarding possible Safety Management System deficiencies" on board the *Deepwater Horizon*.  Rec. Doc. 5927 (Agreed Stipulations), # 7.

### (4)    DNV (ISM Code Auditor) certified that the *Deepwater Horizon* was in compliance with the ISM Code

709.    Det Norske Veritas audited the rig's safety management system to certify that it complied with the ISM Code.  D. McKay Depo. 34:21-22, 39:15-40:2; Rec. Doc. 5927 (Agreed Stipulations), # 178.  Both the Republic of the Marshall Islands, as the Flag State, and the United States, as the Port State, require ISM compliance.  TR. 3738:5-3739:19 (Webster).  The Flag State also requires Transocean as a company to comply with the ISM Code.  *See* TR. 4021:21-24 (Webster).  As the Plaintiffs' expert Webster acknowledged, DNV is an internationally respected organization.  TR. 4023:4-7 (Webster).

710.    DNV inspected the *Deepwater Horizon* twice every five years.  D. McKay Depo. 30:7-23; *see also* TREX 1774 (2002 *Deepwater Horizon* Safety Management Certificate); TREX 44007 (2005 *Deepwater Horizon* Safety Management Certificate); TREX 1776 (2007 *Deepwater Horizon* Safety Management Certificate).  The next DNV audit for the *Deepwater Horizon* would have been due in May 2010.  *See* D. McKay Depo. 30:7-23; TREX 1776 (current Safety Management Certificate was valid through May 15, 2012; intermediate survey was due by May 15, 2010).

711.    DNV provided specific guidance to its ISM Code auditors as to what was expected in an auditor's review of the company and ship safety management systems. TREX 3163 (DNV Guidance for Auditors).  The required tasks included:

- interviewing the Designated Person and key personnel, TREX 3163.9, .19 (DNV Guidance for Auditors);

- interviewing officers to verify familiarization with rules and regulations (*id.* at .10);

- reviewing the condition of the ship and the qualification and competency of the crew (*id.* at .11, .16);

- reviewing internal and external audit records (*id.* at .14, .16);

- reviewing corrective and preventive maintenance records and their evaluation (*id.* at .14);

- reviewing the company's "person(s) or position(s) with the overall operational responsibility and authority relevant to safety" (*id.* at .15);

- verifying the company provides adequate resources (*id.* at .16);

- verifying safety meetings, emergency drills, and training are carried out effectively (*id.* at .17, .21, .29, .31, .38);

- interviewing the Master and verifying he understands the safety management system generally and that he understands his "overriding authority" and has exercised it, if applicable (*id.* at .24, .25);

- verifying the manning of the vessel and certification of personnel (*id.* at .28);

- reviewing the procedures for safe operations (*id.* at .34);

- reviewing the rig's emergency procedures and emergency response plan (*id.* at .36-37);

- reviewing records of non-conformities, accidents, hazardous situations, and relevant investigations and follow-up corrective actions (*id.* at .40-42); and

- reviewing maintenance procedures and verifying maintenance procedures are being implemented (*id.* at .43-45).

712.    Testimony by DNV Chief Regional Inspector David McKay established that DNV's inspections of the *Deepwater Horizon* included a safety briefing, meeting with the Master and the heads of the other departments on the rig, participation in a safety drill, a tour of the rig "to look at the general condition of the vessel and its safety arrangements," and review of documents, including maintenance records, related to safety arrangements.  D. McKay Depo. 87:6-89:15; *see* TREX 3163 (DNV Guidance for Auditors).

713.    None of DNV's inspections of the *Deepwater Horizon* resulted in the issuance of a "major non-conformity."[37]  *See* TREX 44009.1 (2007 ISM Code Certification-Ship Audit Report) (showing no major nonconformities); TREX 1777 (2005 ISM Code Certification- Ship Audit Report) (showing no major nonconformities); TREX 5483 (2002 ISM Code Certification- Ship Audit Report) (showing no major nonconformities); Rec. Doc. 5927 (Agreed Stipulations), # 6 (parties stipulated that the Flag State "did not identify any failures in Transocean's Safety Management System's

---

[37] A "major non-conformity" with the ISM Code is "an identifiable deviation that poses a serious threat to the safety of personnel or the ship or serious risk to the environment that requires immediate corrective action and includes the lack of effective and systematic implementation of a requirement of this Code."  TREX 50361.1 (ISM Code § 1.1.10).  Only "major non-conformities" with the ISM Code prevent the rig from being compliant with the ISM Code.  TR. 9465:5-8 (Mitchell) (noting that the word "violation" does not appear in the ISM Code and explaining that "to be not in compliance with [the ISM Code requires an] outstanding major nonconformity").

risk assessment concerning the maintenance or, or material condition of, the *Deepwater Horizon* prior to April 20, 2010").

### (5)   Transocean complied with the ISM "Designated Person" requirements

714.   During annual audits of Transocean's compliance with the ISM Code, DNV reviewed the roles and performance of the company's Designated Persons. *See, e.g.*, TREX 1768 (2009 DNV Audit of Transocean) (DNV reviewed "the company's two-way ship-shore and internal reporting and communication").

715.   The ISM Code requires a Designated Person Ashore with "direct access to the highest levels of management." TREX 938.20 (ISM Code). "The responsibility and authority of the Designated person or persons should include monitoring the safety and pollution-prevention aspects of the operation of each ship and ensuring that adequate resources and shore-based support are applied." *Id.*

716.   Gerald Canducci was Transocean's QHSE Manager for North America Division and acted as the Designated Person for the *Deepwater Horizon* and 11 other rigs. Canducci Depo. 14:2-11, 434:11-24. Transocean also employed a corporate-level Designated Person, Jimmy Moore, who was responsible for all Transocean rigs across all divisions. Canducci Depo. 36:2-8; 708:2-10; TREX 919.2 (Corporate ISM Designated Person(s) as of March 9, 2010). The Designated Person's job included the review of "each Incident Report for every rig daily" and looking for "trends for . . . incidents that might be happening on rigs." Moore Depo. 62:1-64:13, 65:7-10, 65:12-19, 65:24-66:5.

717.   Plaintiffs' expert Webster opined that Mr. Canducci could not properly fill the position of Designated Person Ashore because he did not have a maritime background. TR. 4069:3-19 (Webster). This contention was inaccurate: while the

Designated Person should have "knowledge and experience of shipboard operations" and "be thoroughly acquainted with the Company's system and documentation," the ISM Code "specifies neither the qualifications the [Designated Person] should have nor the position he should occupy." TREX 3163.17 (DNV Guidance for ISM Auditors). Mr. Canducci has over 30 years of offshore experience with Transocean, starting as an onboard engineer in 1981 and moving onshore as a division engineer in 1992. Canducci Depo. 221:21-223:6, 224:25-225:6. He later became a QHSE Manager for Transocean's Americas Business Division, and in 2009, he became QHSE for the North America Division. Canducci Depo. 13:314.

718.    Mr. Webster further opined that Mr. Canducci should have been involved in the actual implementation of safety processes, such as scheduling and responding to audits. TR. 3737:5-21 (Webster). This opinion was also misplaced. *See* TREX 3163.18 (DNV Guidance for ISM Auditors) (noting it is a common misconception that a Designated Person is responsible for practical implementation of safety processes). As DNV notes, "[i]t is better to think of the DP as the person responsible for ensuring such processes are in place and operating as required, a role that is more likely to be effective when separated from the practical implementation." *Id.*

719.    The evidence established that, as required by the ISM Code, Mr. Canducci acted as a link between the offshore crews and the highest levels of management at Transocean. Canducci Depo. 465:15-19, 708:11-22 (had direct access to Transocean's chief executive officer and president); TREX 838.20 (ISM Code). Mr. Canducci also monitored Transocean's implementation of its safety processes and Transocean's safety performance. *See, e.g.*, TREX 5480 (4/1/10 email regarding QHSE Incident Review).

Mr. Canducci communicated with the onshore and offshore personnel to ensure they reacted to incident reports and implemented Transocean's safety processes to improve safety performance. *Id.* (submitting division plans to improve safety and urging onshore and offshore personnel to "talk[] to one another," "[g]et really familiar with our plan," make it "important, both to yourselves and your people," and "[s]peak of it [o]ften."). Mr. Canducci also monitored vessel operations and ensured that Transocean provided adequate resources and shore-based support. *See* Canducci Depo. 507:17- 508:3 (Canducci's department has two designated safety leadership trainers to train key personnel on safety management system); *id.* at 197:18-198:1 (his department formulates schedules to ensure vessels participated in Transocean's annual internal auditing process); *id.* at 30:15-24 (Canducci ensures "Transocean has the processes or the systems in place to remedy those deficiencies that have been identified in [] internal audits").

720. As noted, DNV found no ISM "major non-conformity" in any of its reviews of the *Deepwater Horizon.* TREX 44007.1 (2007 ISM Code Certification-Ship Audit Report); TREX 1777 (2005 ISM Code Certification-Ship Audit Report); TREX 5483 (2002 ISM Code Certification-Ship Audit Report); *see* Rec. Doc. 5927 (Agreed Stipulations), # 6. On this record, there is no basis for finding that Mr. Canducci's service as Designated Person failed to meet ISM Code specifications.

### G.    **BP Determined That The *Deepwater Horizon* Was Fit To Be Returned To Service After Its September 2009 Audit**

#### (1)    **BP audited the *Deepwater Horizon* to determine whether it was seaworthy and fit for duty**

721. As the Operator, BP conducted regular audits of the *Deepwater Horizon.* The most recent BP audit occurred in September 2009, while the rig was in a scheduled out-of-service period. TR. 8861:12-17 (Guide); TREX 275.2 (BP 2009 Audit).

722.    The purpose of the audit was to ensure that the *Deepwater Horizon* was seaworthy and fit for duty as a drilling rig.  TR. 8861:8-11 (Guide); *see* Wong Depo. 30:11-18 (BP Auditor) (purpose of BP rig audits was to verify that the rig was being maintained and operated safely).

723.    The audit also verified the *Deepwater Horizon*'s compliance with internal BP standards, the MODU Code, the International Marine Contractors Association Common Marine Inspection Document, API specifications, local legislation and rules, and classification society rules.  TREX 1721.7 (BP Group Practice 10-40 § 5.4: Drilling Rig Audits and Rig Acceptance); TR. 8857:13-23 (Guide).

724.    BP deployed a team from its corporate Rig Audit Group, independent of BP's management in the Gulf of Mexico, to conduct the September 2009 audit.  Wong Depo. 15:9-13, 16:5-23.  The 4-man BP audit team included a Master Mariner and a Marine Engineer.  TREX 1721.7 (BP Group Practice 10-40 § 5.3: Drilling Rig Audits and Rig Acceptance); TREX 275.4.

725.    The BP auditors spent four days on the *Deepwater Horizon* in September 2009.  TR. 8861:18-8862:2 (Guide).  During this time the audit team interviewed *Deepwater Horizon* crewmembers, inspected the rig's equipment, and reviewed the rig's maintenance records.  TR. 8862:3-7 (Guide); *see generally* Cramond Depo. 297:14-17; 297:20-25 (audit's "assessment protocol is a thorough protocol as prescribed by the industry" and was "thorough").

726.    Among other things, the BP audit team determined that:

- The *Deepwater Horizon*'s ISM certification was current, *see* TREX
  44046.14.1.TO (CMID Annex – BP requirements for MODUs with guidance
  notes); TR. 8863:23-8864:14 (Guide);

- "The Transocean Health and Safety Policies and Procedures Manual describe
  the safety management system and adequately address" the "OIM's Master's
  or Barge Master's responsibility and authority" and "[e]mergency
  preparedness," TREX 44046.14.1.TO (CMID Annex – BP requirements for
  MODUs with guidance notes); TR. 8863:23-8864:14 (Guide);

- The rig had "specific emergency procedures covering, for example, fire,
  explosion, grounding, [and] pollution," TREX 44046.16.1.TO (CMID Annex
  – BP requirements for MODUs with guidance notes); TR. 8865:21-8866:17
  (Guide); and

- The *Deepwater Horizon*'s "procedures" were "comprehensive and cover the
  list of scenarios" including "[e]mergency disconnect" and "[e]ffective
  management structure in the event of an Emergency," TREX 44046.16.1.TO
  (CMID Annex – BP requirements for MODUs with guidance notes); TR.
  8865:21-8866:17 (Guide).

727.    At the conclusion of the audit, the BP team made a total of 188

recommendations to be implemented on the *Deepwater Horizon*.  Of these, 70 were

related to Marine items; the other 118 addressed healthy and safety, drilling and well

control, technical service, and environmental and mechanical handling issues.  (These

118 items are referred to herein as the "Non-Marine Findings".)  TREX 275.17 (BP 2009

Audit); TREX 1722 (CMID Annex); Wong Depo. 246:23-247:10.

728.     The *Deepwater Horizon*'s out-of-service UWILD period was extended by a few days to address some of the BP audit findings regarding the drill floor, planned maintenance, and marine assurance.  TREX 6139 (9/17/09 email listing audit items to be resolved prior to commencing drilling operations); TR. 8872:17-19 (Guide); P. Johnson Depo. 546:2-547:3 (the *Deepwater Horizon* was already out of service and undergoing maintenance when out-of-service period was extended); Wong Depo 70:19-71:25, 318:12-319:20; Rodriguez Depo. 152:5-10 (marine-related issues BP wanted resolved prior to start-up).

729.     Transocean concurred in the decision to keep the rig out-of-service and take the necessary steps to get the rig back into service.  TREX 1375 (9/17/09 email documenting Transocean's response to issues raised by BP Audit); P. Johnson Depo 548:1-549:4 (Transocean management supported extending the out-of-service period); TR. 8870:1-13 (Guide) (Guide and P. Johnson talked about the issues related to bringing the rig back into service).

730.     BP put the rig back in service on September 22, 2009.  TR. 8845:3-5 (Guide).  This was exclusively a BP decision.  TR. 8872:17-8873:21 (Guide).  BP could have kept the rig out of service if the relevant audit items had not been closed out to its satisfaction.  Wong Depo. 321:6-9 (BP Auditor); TR. 8872:17-8873:21 (Guide).  When BP allowed the rig to go back into service, both BP and Transocean were satisfied that the rig could operate safely.  TREX 6141 (e-mail documenting approval from BP marine for the Horizon to commence operations after delayed start-up); Wong Depo. 321:6-9 (BP convinced rig could operate safely when brought back into service); Rodriguez Depo. 152:11-20, 153:6-11 (audit issues resolved to degree that BP was satisfied the rig

could go back to work safely); P. Johnson Depo. 549:23-550:21; Cramond Depo. 301:15-303:6, 303:9-17; *see* TR. 6043:20-24 (Ambrose) (BP and Transocean would have repaired anything identified in the audit that posed a safety hazard before putting rig back in service).

731.    Following the 2009 BP audit, BP was satisfied that the rig was in safe operating condition and the crew was trained and competent to commence drilling and well operations.  Cocales Depo. 460:13-23.

### (2)    The audit found that Transocean was working to improve the quality of maintenance reporting

732.    The BP 2009 audit included a finding that computerized maintenance reporting "remains below par across all disciplines.  In many cases history was deficient in content describing the work carried out, and it was frequently not possible to determine if the required maintenance tasks had been performed."  TREX 1381, Item # 2.3.3 (12/29/09 audit tracking spreadsheet).

733.    At trial, Plaintiffs' expert Webster pointed to earlier findings by BP and others regarding Transocean's older computerized maintenance system, EMPAC, as evidence that the rig had experienced ongoing maintenance reporting issues.  *See* TR. 3793:10-3794:14, 3809:8-14, 3810:8-3811:10 (Webster).  Mr. Webster testified, incorrectly, that "the mess was never straightened out."  TR. 3794:14-15.  In fact, Transocean took affirmative steps to address the maintenance reporting problem, implementing a new computerized maintenance management system known as RMS II throughout the fleet.  TR. 5972:21-5973:6 (Ambrose) (RMS is a more flexible, easier to use system with a better user interface than EMPAC and an enhanced ability to capture notes and registers of equipment).  The *Deepwater Horizon* converted from EMPAC to

RMS II in July 2009.  TR. 1905:22-23 (Ezell); TR. 5970:24-5971:1, 5972:13-15 (Ambrose) (Transocean started designing the move from EMPAC to RMS in late 2008 and started implementing the change in the middle of 2009); TREX 47180.2-3 (conversion of EMPAC to RMS).

734.    The BP 2009 audit, conducted less than two months after the conversion to the new system, noted: "Whilst it is appreciated that attempts are being made to improve quality of maintenance reporting[,] based on observations during the audit period further effort is still required."  TREX 275.12 (2009 BP Audit).

735.    As a result of the audit finding, BP directed Transocean's Maintenance Supervisor "to produce standing instructions to effectively communicate expectations for improved maintenance history reporting."  TREX 1381, item # 2.3.3 (12/29/09 audit tracking spreadsheet).  Transocean accepted the recommendation and notified "[a]ll departments that this would not be tolerated."  *Id.*

736.    The fact that the crew was still transitioning to the RMS system did not mean that the necessary work was not getting done.  The evidence established that, while some crewmembers were still learning the computer skills necessary for RMS, rig workers were recording their work done in traditional ways, *e.g.*, through the tally books they carried on each shift.  *See* TR. 5971:2-11 (Ambrose) (rig crew tracks work in RMS, logbooks, tally books, boards, and spreadsheets); TR. 5971:12-20 (Ambrose) (moving data from worksheets and notes into RMS required a behavior change, and Transocean was early in the process of effecting that change); TR. 5170:2-13 (Childs).

(3)     **The *Deepwater Horizon* was appropriately addressing jobs
listed as "overdue" in its new maintenance tracking system**

737.     One of the Non-Marine findings in the 2009 BP audit concerned the listing

of 390 maintenance jobs in the RMS system as "overdue" by more than 30 days.  TREX

1381.4, Item # 2.3.5 (12/29/09 audit tracking spreadsheet).  The BP Audit described this

number as "excessive" and required Transocean to "[c]ommunicate [a] forward plan for

reducing high levels of overdue critical maintenance."  *Id.*

738.     In response, Transocean Rig Manager Paul Johnson explained that the

conversion to the new computer system had resulted in large-scale duplication of jobs in

the maintenance records.  *See* TREX 1375.2 (9/17/09 P. Johnson email).  The number of

"overdue" jobs on the maintenance tracking system in September 2009 also reflected the

results of the UWILD out-of-service period earlier that month, in which the rig was

extensively inspected and maintenance tasks performed or entered into the rig's

maintenance system for performance during the upcoming drydock period.  *Id.*  In

addition, the "clocks start[ed]" on the preventive maintenance tasks as of the date of the

conversion to RMS, and generated both 7-day and 30-day tasks simultaneously.  *See Id.*;

*see* TREX 1381.4, Item # 2.3.5 (Transocean Comments: "Accept – The new maintenance

system program RMS has multiple PM duplicates.  TODDI is currently reviewing the

maintenance system and making adjustments as required"). [38]

---

[38] Expecting that the switch from EMPAC to RMS would result in temporary difficulties, such as
the creation of duplicative job entries in the database, Transocean assigned an RMS specialist to
the *Deepwater Horizon* to facilitate the transition.  Trahan Depo. 214:20-216:2; TR. 5978:3-21
(Ambrose) ("And then we put out what we called a *super user* at the time of RMS on board to
make those changes … [o]ne of our team from the corporate team … we called them a *super user*
of RMS, somebody that really knows how to use it.  Because these guys [on the rig] were
learning it.  It was a new system to them.  And then he would help them reschedule based on their
records of when they last did some of those jobs, and then get the maintenance schedule going
from that point forward.").

739.   BP verified that the new system had generated duplicate overdue maintenance items and was satisfied with Transocean's plan to address the maintenance tasks listed as "overdue."  TR. 8869:3-8871:12, 8872:5-16, 8876:12-25 (Guide); Wong Depo. 343:1-11, 517:10-518:7.  The line item requiring a forward plan for the 390 overdue maintenance jobs was closed out as "100 percent" complete in October of 2009. TREX 1381.4, Item # 2.3.5.

### (4)   Transocean notified the crew that improper close-out of maintenance items would not be tolerated

740.   The BP 2009 audit found that "although not widespread," some maintenance routines had been closed out on the maintenance tracking system without the work being performed.  TREX 20845.5.3 (BP 2009 audit close-out sheet). Transocean responded to this finding to BP's satisfaction.  *See id.*; TR. 8877:1-8878:12 (Guide); *see also* TR. 5960:24-5961:18 (Ambrose) (Transocean would take action, including termination, against anyone closing out maintenance tasks without first completing the work).  There was no evidence that any maintenance task was improperly closed out after the BP audit or that any such task had any causal connection to the blowout, explosion or operation of the BOP.

### (5)   None of the issues raised in an October 2009 email by a *Deepwater Horizon* Maintenance Supervisor affected the rig's ability to operate safely or had any causal relationship to the blowout

741.   Shortly after the BP audit, Rig Manager Paul Johnson emailed the rig leadership asking them to review operational down time performance.  Mr. Johnson stated, "I know we are operating safely, and the crews are trying very hard, but we need to be smarter" and asked the team to come up with "solutions to keep the operation

moving," emphasizing that he was only interested in a "safe alternative." TREX 5618.3 (10/29/09 Johnson email).

742.     One of the Maintenance Supervisors, Stephen Bertone, responded to this email with a critique of the support and time he was being given to attend to maintenance. Mr. Bertone specifically listed problems with the "drawworks brakes, riser skate, gantry crane, rotary skid and back slips." TREX 5618.1 (10/29/09 Bertone email). He also included general complaints about the time available for preventive maintenance given that the UWILD had required "major jobs and upgrades," the "overloaded amount of work" generated by the new RMS system, and the difficulty the crew was having in closing out audit items in the allotted time frame. *Id.* On a more positive note, Mr. Bertone agreed that problems with in the engine rooms were being addressed, stating that he was "very excited about the change of philosophy and the increase in qualified licensed personnel in the engine rooms, " but that "we must try to understand that they now have a lot of catch up work to do." *Id.* Mr. Bertone also criticized what he called "continuous changes to policy and procedures" but said that a recent notification that the rig was "going back to the basics" was "a step in the right direction." *Id.* Mr. Bertone indicated that, prior to this step, he "was to the breaking point myself and was contemplating seeking employment elsewhere, when a person is fearful of there [sic] job, or when a job ceases to be enjoyable it is definitely time to relocate". *Id.*

743.     Senior Toolpusher Randy Ezell described Mr. Bertone's mood as, "as bad as I've ever seen Steve at that point in time." TR. 1906:16-24 (Ezell).

744.     After receiving Mr. Bertone's email, Rig Manager Paul Johnson spoke with Mr. Bertone by phone. Mr. Johnson then responded by email and assured Mr.

Bertone that he was "happy with [Mr. Bertone's] performance" and that Mr. Bertone

"was doing a great job." TREX 5618 (10/30/09 P. Johnson email). Mr. Johnson asked

Mr. Bertone not to "let the pressure build up to this point again" and requested that Mr.

Bertone call his managers to voice any concerns in the future. *Id.*

745. After this email exchange, as fellow crewmember, Randy Ezell, put it:

"[Mr. Bertone went] back to his normal self." TR. 1906:16-24 (Ezell). Mr. Bertone went

on to assist with the resolution and close-out of items from the BP audit. TREX 20845

(BP 2009 Audit close-out sheet showing Bertone signed off on several completion of

items); TR. 6266:12-17 (Ambrose) (Bertone signed off on close-out of audit items).

746. It appears likely that Mr. Bertone's email was motivated both by unusual

stress and by concern and indecision over his future employment. *See* TREX 5618 ("I

must say that I was to the breaking point myself and was contemplating seeking

employment [elsewhere], when a person is fearful of [their] job, or when a job ceases to

be enjoyable it is definitely time to relocate."). Mr. Bertone expressed no ongoing

concerns about the safety of the rig and continued to serve on the *Deepwater Horizon*

from October 2009 through April 2010. *See* TR. 1906:16-24 (Ezell).

747. Mr. Bertone did not identify any maintenance items that affected the rig's

ability to operate safely or contributed to the blowout six months later.

### (6) <u>Transocean was not required to "re-certify" the Variable Bore Rams or other BOP components</u>

748. The BP 2009 audit found that the Variable Bore Ram bonnets on the BOP

were original and had "not been subject to OEM inspection and recertification in

accordance with API and OEM requirements." The audit recommended that overhaul of

these bonnets be expedited. TREX 275.20, item # 1.2.1 (BP 2009 audit).

749.     Certain experts further opined that the BOP was required to be completely disassembled and overhauled every 5 years and then "re-certified" under recommendations promulgated by the American Petroleum Institute (API).  *See, e.g.*, TR. 3907:9-18 (Webster).

750.     API RP 53 recommended that "After every 3-5 years of service, the BOP stack, choke manifold, and diverter components should be reassembled and *inspected in accordance with the manufacturer's guidelines*." TREX 43120.56 (API RP 53, § 17.10.3, § 18.10.3) (emphasis added).  The API provision did not include a certification requirement.

751.     MMS regulations required BOP maintenance to "meet or exceed" the API provisions.  TREX 4748 (30 C.F.R. § 250.446 (2003)).  The MMS regulation did not include a requirement that the BOP be "re-certified."

752.     Cameron, the BOP manufacturer, viewed API RP 53 as a recommendation and "not the industry standard."  The applicable Cameron engineering bulletin stated that "it is not possible to 'certify' that any maintenance or inspection of any equipment can be 'in compliance with API RP 53.'"  TREX 7030.4 (Cameron Engineering Bulletin 902D); Erwin Depo. 378:21-379:20.

753.     BP also did not consider API RP 53 to be an industry standard.  M. Byrd Depo. 325:20-326:6; TR. 5210:13-20 (Childs).  There was no evidence at trial that other drilling contractors or operators viewed API RP 53 as a requirement.

754.     Transocean's subsea maintenance philosophy nonetheless took API recommendations into account.  *See* TREX 1469.8 (Subsea Maintenance Philosophy) ("A major survey [every 1825 days] shall include an inspection and condition evaluation with

consideration to API recommendations"); TR. 5206:19-5207:1 (Childs).  The rig's records showed ongoing maintenance, including overhaul and disassembly of multiple major BOP components in the five years preceding the incident.  TREX 52662A (Summary Chart: BOP Maintenance 2005-2010); TR. 5212:6-5215:18 (Childs).

755.    Transocean challenged the BP audit finding by pointing out that the Variable Bore Rams were "[o]verhauled on conditional [basis]" and scheduled for replacement in the upcoming 2011 out-of-service period.  TREX 1381, Item 1.2.1 (12/29/09 audit tracking spreadsheet); TR. 2010:7-2012:6 (R. Sepulvado).  BP was satisfied with this response.  TR. 2012:7-11 (R. Sepulvado) (rig continued to operate and Sepulvado had no safety concerns regarding this audit finding or Transocean's challenge to it).  It was undisputed that the Variable Bore Rams functioned at the time of the incident.  TR. 1363:4-7 (Bly); TR. 2758:18-20 (Davis); TR. 4294:7-10, 5009:7-11 (Barnhill); TR. 5100:23-5101:9 (Childs).  There was no evidence that certification under API RP 53, either of the Variable Bore Rams or any other BOP component, would have made any difference to the outcome on April 20.  *See* TR. 5211:6-10 (Childs).

### (7)    <u>Transocean and BP worked together to close out the remaining 2009 audit findings.</u>

756.    BP internal policies required the development of a formal close-out program with actions and deadlines following an audit, so that BP could be satisfied that recommendations from the audit had been addressed or were being addressed.  TREX 1721.8 (BP Group Practice 10-40 § 5.8: Drilling Rig Audits and Rig Acceptance).[39]

---

[39] To "close out" an audit finding is a term of art meaning that a recommendation has been followed or that an action plan is in place to address a particular recommendation.  Rodriguez Depo. 38:13-21.

757.    For tracking purposes, the BP audit recommendations were put into two tracking spreadsheets, one for the 70 Marine items (TREX 1722) and one for the 118 Non-Marine items (TREX 275.18-.48); TR. 8868:2-8869:2 (Guide); Wong Depo. 499:17-500:1.

758.    BP and Transocean tracked the close-out process together to confirm that the action items were completed in a time and manner that made sense to both parties. TR. 8873:22-8874:10 (Guide); P. Johnson Depo. 273:3-17 (after Transocean would complete an item, a Transocean rig supervisor would sign off, and then BP would check, verify, and accept the signoff); *see* TREX 1372.1 (10/6/09 Cocales email soliciting Transocean "input on the content and timing" of close-out process: "This is a two-way street … We are all a team in this effort.").

759.    BP Wells Team Leader John Guide had primary responsibility for the close-out process.  TREX 1721.8 (BP Group Practice 10-40 § 5.8: Drilling Rig Audits and Rig Acceptance); TR. 8858:25-8859:18 (Guide); Thierens Depo. 45:11-46:10.  BP's Gulf of Mexico Marine Authority (Angel Rodriguez, Neil Cramond, Marshall Perez, and Troy Endicott) took part in closing out the audit items.  The BP management team for the Gulf of Mexico (Harry Thierens and Ian Little) oversaw the process.  *See, e.g.*, TREX 1377 (10/6/09 Guide email to Little forwarding Rodriguez email to Endicott et al.); TREX 6118 (internal BP emails).  BP Drilling Engineer Brett Cocales also worked with the Transocean crew to close out the outstanding items.  TR. 8880:12-20 (Guide).

760.    *Deepwater Horizon* Rig Manager-Performance Paul Johnson met regularly with BP onshore representatives (including Mr. Cocales, Mr. Guide, and BP Marine Auditor Angel Rodriguez) to discuss the close-out process.  P. Johnson Depo.

46:22-47:8, 549:23-550:21, 551:19-552:23; Rodriguez Depo. 25:25-27:6.  In BP's view, Mr. Johnson and the *Deepwater Horizon* crew took the audit findings seriously and were intent on ensuring that any action items were closed out properly.  Rodriguez Depo. 110:18-21, 110:23-111:5, 140:10-19, 147:25-148:23.

761.    Emails sent during this time show that BP believed Transocean was making good progress in closing out the audit action items.  TR. 8879:5-19 (Guide); TREX 1377 (10/5/09 Rodriguez email) ("I wanted to mention that the *DW Horizon* crew have done a good job in completing the action items on this list."); TREX 1379 (10/20/09 Rodriguez email) ("As you can see the *Horizon*'s crew rigorously closing out the findings.").

762.    BP personnel went to the rig on several occasions to monitor the audit close-out process.  TR. 8875:6-15, 8876:22-8877:22, 8874:23-8876:11 (Guide); TREX 20198.1 (OIM-to-OIM Handover Report) ("John Guide signed off on several rig audit items while on board."); TR. 8879:24-8880:6 (Guide); Rodriguez Depo. 168:2-16 (Rodriguez made multiple trips to the rig to verify close-out of audit items).

763.    During the visits by BP's onshore personnel to the rig, they checked and verified the status of the audit recommendations with the BP Well Site Leaders and the Transocean crew.  TR. 8856:8-21, 8875:6-15 (Guide).  The tracking spreadsheets were then updated to reflect audit recommendations that had been closed out.  *See, e.g.*, TREX 47194.1.1.TO (9/29/09 Rodriguez email) (explaining, as an example of the close-out process, how BP Well Site Leader Murry Sepulvado confirmed action items regarding the fire dampers were completed and BP's Angel Rodriguez closed out the item on the tracking spreadsheet).

764.     The tracking spreadsheets for the BP 2009 audit reflect significant progress by BP and Transocean in addressing the audit recommendations.  TREX 1832 (3/29/10 tracking spreadsheet for marine items); TREX 1381 (12/29/09 tracking spreadsheet of non-marine items); TR. 6037:21-6043:24 (Ambrose).

765.     By the time of the incident, 156 of the 188 items flagged by the BP audit had been closed.  The remaining 32 were lower priority items that did not require immediate action.  TR. 6043:1-24 (Ambrose); D-6747 (summary of  2009 audit tracking spreadsheets); P. Johnson Depo. 45:14-19 (By March 2010, approximately 80-85 percent of the audit items had been closed out, with plan in place to address the others).

766.     Seven of the remaining items at the time of the incident were marine-related.  BP's Angel Rodriguez was satisfied that having these items unresolved did not affect the rig's seaworthiness or the rig's ability to operate safely.  Rodriguez Depo. 181:9-22; 181:24.

767.     BP considered the *Deepwater Horizon* crew's progress in closing out the audit items "commendable."  TREX 1832.1 (3/30/10 Rodriguez email); TR. 8876:22-8877:22 (Guide); *see also* Wong Depo. 327:7-18 (BP had no criticism of Transocean's efforts to close out 2009 audit items).

768.     As a result of the audit close-out process, as of March 2010, BP was satisfied that the *Deepwater Horizon* "rig equipment was in safe operating condition for the drilling and well operations" at Macondo and that the crew was trained and competent.  Cocales Depo. 487:10-24; Rodriguez Depo. 193:4-9.  BP's Service Quality Appraisal Report for the *Deepwater Horizon*, completed a month before the incident,

rated the performance, reliability and maintenance of the equipment as "very good" and meeting expectations. TREX 5751.2-.3 (3/31/10 BP Service Quality Appraisal Report).

769. The BP Well Site Leaders uniformly agreed that, as of April 20, 2010, there were no open safety critical items outstanding from the 2009 BP audit. TR. 8881:22-25 (Guide); Lee Depo. 390:15-391:12, 391:15-17 (as a BP Well Site Leader, he would have stopped work if any safety critical items from audit had not been addressed); M. Sepulvado Depo. 100:12-101:11; Price Depo. 141:15-19. There was no evidence that any of the outstanding audit items had any relationship to the blowout. *See* TR. 6043:13-16 (Ambrose).[40]

## H. The April 2010 ModuSpec Survey Confirmed That The Rig Was In Good Condition

770. The most recent evidence of the rig's condition is the Rig Condition Assessment conducted by a third party specialist, ModuSpec, between April 1 and April 14, 2010. TREX 88.1; TR. 5919:2-9 (Ambrose) (ModuSpec assessment provides the best and most complete view of the rig's condition). The ModuSpec survey was a voluntary assessment, over and above any regulatory requirements, that was commissioned by Transocean to identify and address any issues with the rig and equipment that needed to be addressed in the upcoming out-of-service period. TR. 5989:18-5990:4 (Ambrose); Schneider Depo. 356:20-357:3, 357:6-9, 357:12-13, 357:16-18, 357:21.

---

[40] There was also no showing of any causal connection between issues raised in earlier BP audits and the blowout. Moreover, the evidence established that Transocean closed out items from the earlier audits to BP's satisfaction. *See, e.g.*, TREX 6166.46-82 (2008 Technical Rig Audit, including Updated 2007 BP Audit Report Action Sheet); TREX 7088 (7/17/07 Sims email to I. Little re Update on Transocean performance) ("*Horizon* performance remains excellent with the current well. [. . .] Passed recent marine assurance audit and FMEA handily with few significant findings, all of which have been cleared up. No loss of station keeping. Culture on the *Horizon* is proactive, no victims, do it safely and efficiently, recover quickly watch out for each other. Excellent reporting, investigation, learning culture in place.").

771.    According to the ModuSpec surveyors, Transocean is the only drilling contractor in the world that engages ModuSpec to perform a "full-blown, comprehensive, intrusive assessment of their rigs."  Schneider Depo. 358:8-12, 358:15-22, 358:25. Transocean is also the only ModuSpec client that allows review of its maintenance records.  Martinez Depo. 80:10-25.

772.    The intent of the ModuSpec survey was to perform a top-to-bottom audit of the *Deepwater Horizon* and her systems (except for the hull).  TR. 5990:5-17 (Ambrose); Schneider Depo. 24:3-10 (ModuSpec's assessment was intrusive, meaning equipment was taken out of service and covers were removed to inspect equipment); Kent Depo., Vol. I, 355:6-356:21.  ModuSpec surveyors put on "detective[s'] hat[s]" to discover information about the rig and verify the condition of the equipment.  Sierdsma Depo., Vol. II, 121:21-123:16; TREX 73 (ModuSpec survey guidelines); TR. 4101:17-18 (Webster) (agreeing ModuSpec's "intrusive" survey is "good").

773.    ModuSpec sent a team of four inspectors to perform the survey, beginning on April 1, 2010.  Schneider Depo. 23:14-24:2; TREX 88 (2010 ModuSpec Rig Condition Assessment).

774.    As it was requested to do, ModuSpec identified all equipment and components that needed to be replaced or repaired in the upcoming drydock period.  *See generally* TREX 88 (2010 ModuSpec Rig Condition Assessment).  ModuSpec's Rig Condition Scorecard for all of the *Deepwater Horizon*'s systems shows that ModuSpec inspected 117 systems.  TREX 88.335-342 (April 2010 Rig Condition Scorecard). ModuSpec rated 107 out of 117 systems as being in "good" or "fair" condition.  *Id.*

775.    The ModuSpec surveyors reviewed the rig's RMS system and compared maintenance records to the equipment itself.  Martinez Depo. 43:9-44:13; Schneider Depo. 63:18-65:9, 364:1-365:9.  ModuSpec reviewed "a year's worth of history on specific equipment … [for example] well control equipment [and] would review that … history and see if there [were] … any trends in deficiencies with that equipment." Martinez Depo. 43:9-44:9; Sierdsma Depo., Vol. I, 39:5-25 (ModuSpec assessment included "large quantities" of maintenance documents); *id.* at 60:11-21, 60:25-61:10.

776.    At trial, Plaintiffs' expert Webster selectively discussed individual deficiencies identified by ModuSpec while dismissing the positive findings.  *Compare* TR. 4109:6-4112:18 (Webster), *with* TREX 88.9 (2010 ModuSpec Rig Condition Assessment) (hull structure, handrails and walkways in good condition); *id.* at .12 (drill floor in good condition); *id.* at .15 (dynamic positioning system in good condition); *id.* at .20 (top drive system in good condition); *id.* at .21 (derrick in good structural condition); *id.* at .25-26 (mud systems in good condition); *id.* at .42 (drilling instrumentation system in good condition); *id.* at .43-.46 (riser systems and slip joint in good condition); *id.* at .51-52 (BOP Rams and Annulars in good condition) [41]; *id.* at .57 (BOP control panels and MUX cables in good condition); *id.* at .58-59 (diverter and diverter control panels in good condition); *id.* at .67-69 (main engines and generators in good condition; engine shutdown systems tested and normal); *id.* at .89 (life rafts and life boats in good

─────────────────────────

[41] The ModuSpec Rig Condition Assessment reported that certain BOP components had not been certified as complying with API recommendations.  TREX 88.47, .51-52, .55, .59, .61, .184-185, .245, .305.  As discussed in Part XIV-G (6), *supra*, such "certification" was not part of standard industry practice; Cameron specifically recognized that the customer could implement its own BOP maintenance program and stated that it was "not possible" to certify compliance with a recommendation.  TREX 7030.1, .4  (Cameron Engineering Bulletin 891D).

condition); *id*. at .91-93 (fire detection and fire suppression systems in good condition); *id*. at .93-94 (gas detection system well-maintained and in good condition).[42]

777.    ModuSpec provided an overall rating of the rig using an objective measure called the ModuSpec Equipment Rating ("MER").  The MER compared the overall condition of the *Deepwater Horizon* to that of similar rigs worldwide and in the Gulf of Mexico.  The MER system "is a benchmark for the safety and maintenance standards of an individual rig against other rigs" and "is used as a risk analysis tool to proactively prevent accidents and downtime."  TR. 4103:1-9 (Webster)

778.    According to ModuSpec's Average MER rating, the *Deepwater Horizon*'s overall condition in April 2010 was right in line with similar rigs worldwide and in the Gulf of Mexico.  *See* TREX 262.1 (2010 ModuSpec Equipment Rating Charts) (*Deepwater Horizon* Average MER: 92%; Worldwide Average MER: 91%; Gulf of Mexico Average MER: 93%).

779.    ModuSpec also provided a "Detailed Critical Rating," comparing the number of critical deficiencies to the average number of critical deficiencies in the industry.  *See* TREX 262.1-4 (2010 ModuSpec Equipment Rating Charts).  On the Detailed Critical Rating scale, the lower the number, the better the condition of the equipment.  Schneider Depo. 416:9-18, 416:21-417:1.

780.    As of April 20, 2010, the *Deepwater Horizon*'s Detailed Critical Ratings for all systems were better or right in line with similar rigs worldwide and in the Gulf of Mexico.  Schneider Depo. 415:24-416:18, 416:21-417:1; TREX 262.1, 262.4.

---

[42] The riser recoil system was the only one of the ten systems that ModuSpec rated as "bad" within the rig's drilling, well control or safety systems.  TREX 88.335-342 (2010 ModuSpec Rig Condition Scorecard).  Mr. Ambrose testified that the riser recoil system had no role in the events of April 20, 2010.  TR. 5991:16-5993:1 (Ambrose).  That conclusion was not challenged at trial.

781.    ModuSpec did a "fair and accurate" assessment of the rig's condition.

Schneider Depo. 378:5-10; *see also* TR. 5919:2-15 (Ambrose).   As Mr. Webster

conceded at trial, ModuSpec concluded "the *Deepwater Horizon* compared favorably in

2010 to the rest of the industry."  TR. 4113:1-4 (Webster); *see* TREX 262 (2010

ModuSpec Equipment Rating Charts); *see also* TR. 5919:2-9 (Ambrose).[43]

## I.    No Outstanding Maintenance Issues Had Any Causal Relationship To The Incident

782.    Maintenance on a drilling rig is a constant and ongoing process; no

drilling rig operates without some maintenance issues that require attention.  *See* TR.

5965:9-5966:11 (Ambrose); TR. 8871:13-18 (Guide) (drilling rig is a "floating factory";

there is maintenance to be done "every day"); TR. 5664:4-9 (D. Young).  Like every rig,

the *Deepwater Horizon* had an active maintenance list from the moment it left the

shipyard.  TR. 5965:16-18 (Ambrose).

783.    The RMS II Morning Report for the *Deepwater Horizon* on April 19

showed 222 "overdue" maintenance items.  TREX 922 (4/19/10 RMS Morning Report).

Plaintiffs' expert Webster opined that the 222 outstanding maintenance items reflected a

"failure to maintain the rig."  TR. 3957:10-3958:3.

784.    The evidence did not support Mr. Webster's claims.  The mere fact that

maintenance is overdue does not render a mobile offshore drilling unit unfit for service or

unsafe.  TR. 5920:9-12, 5965:19-25 (Ambrose).  In fact, the "overdue" number,

compared to the total maintenance tasks performed each year, was a small percentage and

---

[43] The *Deepwater Horizon* also performed favorably to other comparable rigs when ModuSpec performed its Rig Condition Assessment in 2005.  Sierdsma Depo., Vol. I, 105:8-106:9; TREX 71.8 (2005 ModuSpec Rig Condition Assessment); TR. 4107:22-25 (Webster) (conceding that 2005 ModuSpec assessment rated the *Deepwater Horizon* "better than the rest of the industry" in "every category").

demonstrated that the crew "was keeping control of maintenance."  TR. 5964:19024 (Ambrose).

785.    The outstanding maintenance tasks must also be viewed in terms of the criticality of the particular job.  As discussed above, Transocean tracked thousands of maintenance tasks using its RMS II maintenance tracking system.  TR. 5956:6-12 (Ambrose).  RMS has a "total risk number" that provides each piece of equipment with a criticality rating of high, medium, or low.  *Id.*  5969:3-12.  The criticality rating assists rig crews in prioritizing the most important tasks.  *Id.*[44]

786.    Of the 222 outstanding items, the evidence established that approximately 50 percent were low priority, 30 percent were awaiting parts, and 10 percent had been completed but not yet closed out.[45]  TR. 5998:11-5999:17 (Ambrose).

787.    Of the remaining 10 percent, none of the outstanding tasks involved work necessary for the safe operation of the rig.  TR. 5999:2-6001:20 (Ambrose); *see* TR. 5663:14-5664:9 (D. Young) (none of the open items made the rig unsafe).  Although Mr. Webster claimed that specific outstanding tasks put the rig "at risk," he provided no evidence that safe operations were compromised on April 20 or that any of these issues had any causal connection to the blowout.  *See, e.g.,* TR. 3946:15-3947:3 (Webster) (discussing overdue maintenance of thrusters).[46]

---

[44] RMS II is configured to comply with the ISM Code, which requires that inspections be held at appropriate intervals; non-conformities be reported; corrective action taken; and records of these activities maintained.  TR. 5972:8-12 (Ambrose); TREX 938.23 (2010 ISM Code).

[45] Because storage space on a drilling rig is limited, all rigs must sometimes wait for parts.  TR. 5968:10-5969:2 (Ambrose).

[46] As an additional example, Mr. Webster asserted that, per the April 19, 2010 RMS Morning Report, the life raft certificates were overdue for renewal.  TR. 3941:15-3942:24  (Webster).  This testimony was both incorrect and irrelevant:  Chief Mate Young explained that the life rafts were

788.    The list of outstanding items on April 20 ranged from welding tasks to vacuum systems.  These were routine tasks that would be found on every drilling rig. The evidence was uncontroverted that none of the open maintenance items played a role in the incident.  TR. 5965:7-15, 6000:5-6001:23 (Ambrose); *see also* Williams Depo. 305:15-306:6; 324:14-22 (not aware of any maintenance issues that caused the incident).

789.    MMS Inspectors, BP auditors and ModuSpec all visited the *Deepwater Horizon* within three weeks of the incident; none identified any outstanding safety or maintenance issues that put the rig, its crew, or the environment at risk.  *See* E. Neal Depo. 17:10-16, 20:20-23, 42:8-19 (MMS found rig to be in full compliance with regulations on 4/1/10); Rodriguez Depo. 170:4-171:8, 181:9-24 (as BP's Marine Advisor, he was "satisfied the rig could operate safely" in March 2010); TREX 262 (ModuSpec Rig Condition Assessment).

790.    On this record, the Court agrees with the multiple experts and inspectors concluding that the *Deepwater Horizon* was seaworthy and fit for the service intended on April 20, 2010.  *See* TREX 5332 (4/1/10 MMS Drilling Inspection Report); TREX 5571 (Coast Guard Certificate of Compliance); TREX 1776 (DNV Safety Management Certificate for the *Deepwater Horizon*); TREX 50324 (ABS Certificate of Classification); TREX 50003.22 (Wolfe expert report); TREX 52668 (Summary of *Deepwater Horizon* Certifications as of 4/20/10).

---

in fact properly certified and the certificates were on board; the crew just had difficulty updating RMS to reflect the new dates.  TR. 5679:19-5680:23 (D. Young). The ModuSpec survey concluded that the life rafts and lifeboats were operational and in good order.  Schneider Depo. 406:21-407:3.

## CONCLUSIONS OF LAW

I.    **REMAINING CLAIMS AGAINST TRANSOCEAN ENTITIES**

    A.    **Private Party Claims (PSC)**

      1.    Private Plaintiffs, represented by the PSC, sought compensatory and punitive damages under the general maritime law and/or the Oil Pollution Act ("OPA").

      2.    Members of the Economic and Property Damages Class and Medical Benefits Class, both certified in connection with settlements between BP and the PSC, have agreed in the settlement agreements that compensatory damage claims against Transocean are fully satisfied, but purport to reserve general maritime law punitive damages claims.  Rec. Doc. 6430-39, ¶¶ 1.1.1, 1.1.2.2; Rec. Doc. 6430, ¶ 4.4.10.3; Rec. Doc. 6427-1, ¶¶ II.MMMM, XVI.G, XVII.A.  Private Plaintiffs who have either opted out of the classes or whose claims were excluded from the class definitions assert both compensatory and punitive damages claims against Transocean.

      3.    In the Economic and Property Damages Settlement Agreement, BP purports to assign to the "Economic Class, only as a juridical entity and not to Economic Class Members individually," with certain exceptions, BP's claims to "indemnity, contribution, or subrogation for claims paid by BP and/or the GCCF" before entry of the preliminary approval order, and all claims to "pursue reimbursement of Settlement Payment(s) under theories of indemnification, contribution, subrogation, or any other theory of recovery."  (Hereafter, the "Assigned Contribution Claims.")  Rec. Doc. 6430-39, ¶¶ 1.1.3, 1.1.3.4, 1.1.3.5.

      4.    In the same agreement, BP also purports to assign to the Economic Class BP's direct claims against Transocean for "damages related to the repair, replacement, and/or re-drilling of the MC-252 Well"; "economic damages for the loss of the MC-252

Well, including lost profits, lost hydrocarbons, and diminution in value of the leasehold";
and "costs that BP incurred to control the MC-252 Well and/or to respond to, contain,
and/or clean up the DWH Spill."  (Hereafter the "Assigned Direct Claims.")  Rec. Doc.
6430-39, ¶¶ 1.1.3.1, 1.1.3.2, 1.1.3.3.

> **B.**     **States and Local Governments**

5.      Alabama and Louisiana participated as Plaintiffs in the Phase One Trial.
Alabama and Louisiana both allege claims under OPA and general maritime law against
Transocean.  Alabama and Louisiana's state-law claims have previously been dismissed.
Rec. Doc. 4578 (dismissing State's claims under state law); *see also* Rec. Doc. 3830
(dismissing state common-law claims).

6.      Numerous local government entities have also alleged claims through the
Local Government Entity Master Complaint under OPA and general maritime law.  Rec.
Doc. 1093.  The local governments' state-law claims have previously been dismissed.
Rec. Docs. 3830, 4578.

> **C.**     **United States**

7.      The United States seeks a declaratory judgment that Transocean is liable
under OPA, 33 U.S.C. § 2701 et seq., without limitation, for removal costs and damages.
*See* Rec. Doc. 1 in No. 2:10-cv-4536 (E.D. La. Dec. 15, 2010).

8.      The United States previously sought civil penalties against Transocean
under the Clean Water Act, but that claim was resolved pursuant to a Partial Consent
Decree entered by the Court on February 19, 2013.  Rec. Docs. 8608, 8609.

9.      With respect to the United States' OPA claim, the United States moved for
partial summary judgment on a number of issues, and Transocean filed a cross-motion for
partial summary judgment on the issue of whether any Transocean entity was liable under

OPA with respect to the subsurface discharge of oil from the Macondo well.  This Court ruled that Transocean was a responsible party under OPA, but that OPA divides liability between the owner of a MODU, such as Transocean, and a leaseholder who operates offshore wells, such as BP, such that the MODU owner is not liable for damages caused by the subsurface discharge of oil.  Rec. Doc. 5809, at 5-15.

### D. Cross-Claims / Third-Party Claims by Remaining Phase One Defendants

10.    Transocean brought third-party claims against BP and Halliburton (as well as other, now dismissed defendants).  Rec. Doc. 1320, 2068.  BP and Halliburton then cross-claimed against one another and counterclaimed against Transocean.  Rec. Docs. 2074, 2076.  As set forth above, BP has purportedly assigned a number of its claims against Transocean to the Economic Class as part of its settlement with the private Plaintiffs.

11.    On March 20, 2013, this Court granted M-I's motion for judgment on partial findings under Fed. R. Civ. P. 52(c) and dismissed all claims against M-I, including third-party claims and cross-claims.  Rec. Doc. 8969.

12.    On April 3, 2013, this Court granted Cameron's motion for judgment on partial findings under Fed. R. Civ. P. 52(c) and dismissed all claims against Cameron, including third-party claims and cross-claims.  Rec. Doc. 9136.

## II. MOST OF THE REMAINING CLAIMS AGAINST TRANSOCEAN FAIL AS A MATTER OF LAW

13.    Transocean has filed four motions for partial judgment on the pleadings or partial summary judgment as to certain pending claims.  Rec. Docs. 8105, 8106, 8120, 10281.  Transocean recognizes the Court may rule separately on those motions.  For the sake of completeness, set forth below are findings as to each motion:

A.    **Transocean Is Not Liable for Damages for the Subsurface Discharge of Oil**[47]

14.    First, Transocean is not liable for compensatory damages arising from the subsurface discharge of oil.  This Court has previously ruled that OPA Section 2704(b), 33 U.S.C. § 2704(b), divides liability between a MODU, like the *Deepwater Horizon*, and a leaseholder, like BP, assigning liability for discharge below the surface of the water to the leaseholder of the well (*e.g.*, BP) and liability for discharge on or above the surface of the water to the owner of the MODU (*e.g.*, Transocean).  Rec. Doc. 5809, at 7.  OPA also displaces claims for compensatory damages under general maritime law asserted against OPA Responsible Parties.  *See* Rec. Doc. 3830, at 22.  Accordingly, because Transocean, as owner of the *Deepwater Horizon*, is an OPA Responsible Party, but is only liable as an OPA Responsible Party for damages from discharge on or above the surface of the water, Transocean is not liable for compensatory damages under OPA or general maritime law for any subsurface discharge.

15.    Second, Plaintiffs cannot seek punitive damages from Transocean for subsurface discharge because Transocean is not liable for any compensatory damages for that discharge.  A plaintiff cannot seek punitive damages from a defendant without compensatory damages liability.  *E.g.*, *Alcorn County, Miss. v. U.S. Interstate Supplies, Inc.*, 731 F.2d 1160, 1170 (5th Cir. 1984) ("Punitive damages are given as an enhancement of compensatory damages"), *abrogated on other grounds*, *United States v. Cooper*, 135 F.3d 960, 963 (5th Cir. 1998); *Neal v. Barisich, Inc.*, 707 F. Supp. 862, 873 (E.D. La. 1989) ("[I]t is generally held that punitive damages are not recoverable unless

---

[47] These conclusions of law relate to Transocean's Motion for Partial Judgment on the Pleadings as to Claims Based on Subsurface Discharge of Oil.  Rec. Doc. 8106 (Transocean motion); see also Rec. Doc. 10186 (PSC opposition); Rec. Doc. 10211 (BP opposition); Rec. Doc. 10284 (Transocean reply).

the plaintiff recovers for actual damages as well.").  Indeed, any punitive damages award based on subsurface discharge, where Transocean has no liability for compensatory damages, would violate the Supreme Court's instruction that maritime punitive damage awards not exceed a 1:1 ratio with compensatory damages.  *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 513 (2008).

16.     Third, any contribution claim under OPA, 33 U.S.C. § 2709, is subject to the liability limitations Congress dictated in 33 U.S.C. § 2704.  *See Nat'l Shipping Co. of Saudi Arabia (NSCSA) v. Moran Mid-Atl. Corp.*, 924 F. Supp. 1436, 1449 (E.D. Va. 1996) (one OPA responsible party cannot recover against another OPA responsible party in a contribution action under § 2709 an amount *greater than* the OPA liability limit that applies to that other party), *aff'd*, 122 F.3d 1062 (4th Cir. 1997) (unpublished).  Relevant here, § 2704(b) divides liability between drillers who own the MODUs and operators who own the lease for the well.  Rec. Doc. 5809, at 7.  Because Congress, in OPA, made MODU owners liable only for above-surface discharge, parties cannot use a contribution claim to circumvent that allocation of liability and to collect damages from Transocean for subsurface discharge.

**B.     Economic Class Members' Purportedly Reserved Punitive Damages Claims Must Be Dismissed[48]**

17.     The Economic and Property Damages Settlement Agreement and the Medical Benefits Settlement Agreement, Rec. Docs. 6430, 6427, provides that the settlement payments under those agreements constituted "full, complete, and total satisfaction" of the Settling Class Members' compensatory damages claims against

---

[48] These conclusions of law relate to Transocean's Motion for Partial Judgment on the Pleadings as to Punitive Damages Claims.  Rec. Doc. 8105 (Transocean motion); Rec. Doc. 10186 (PSC opposition); Rec. Doc. 10205 (Alabama opposition); Rec. Doc. 10210 (BP opposition); Rec. Doc. 10283 (Transocean reply).

Transocean.  *See* Rec. Doc. 6430-1, ¶ 4.4.10.3; Rec. Doc. 6273-1, ¶ XVII.A; *see also* Rec. Doc. 6427-1, ¶ XVII.B.2.  The Settling Class Members, however, purport to reserve their right to pursue punitive damage claims against Transocean.  *See* Economic And Property Damages Settlement Agreement, Rec. Doc. 6430-1, ¶ 10.3; Medical Benefits Settlement Agreement, Rec. Doc. 6427-1, ¶¶ II.MMMM, XVI.G.

18.     These purportedly reserved punitive damages claims fail as a matter of law.  To recover punitive damages, plaintiffs must not merely establish actual damage; they must in fact *recover* compensatory damages.  *See Richard v. City of Harahan*, 6 F. Supp. 2d 565, 576 (E.D. La. 1998) (holding that "'recovery of punitive damages must necessarily turn on the recovery of compensatory damages'") (quoting *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 418 (5th Cir. 1998)); *Parr v. Theriot, Inc.*, No. 89-3295, 1990 WL 66380, at *3 (E.D. La. May 16, 1990) (citing as one of the "traditional limits on the right to recover punitive damages" under general maritime law that "the plaintiff may not recover punitive damages absent a recovery for compensatory damages"); *Neal*, 707 F. Supp. at 873 (recognizing that "it is generally held that punitive damages are not recoverable unless the plaintiff recovers for actual damages as well").

19.     The fact that BP has compensated the Settling Class Members does not save their claims against Transocean.  *E.g.*, *Thrall Car Mfg. Co. v. Lindquist*, 495 N.E.2d 1132, 1136 (Ill. App. Ct. 1986) (where plaintiff has been "fully compensated for its actual damages" by one defendant, its punitive damages claims against the remaining defendants "cannot stand"); *S. Gen. Ins. Co. v. Holt*, 416 S.E.2d 274, 276-77 (Ga. 1992) (where plaintiff assigned her compensatory claim against insurance company to third party, reserving her punitive damages claim, she could not collect on her punitive

damages claim despite the fact that her assignee recovered on the assigned compensatory claim).

**C.**    <u>The Purportedly Assigned Claims Must Be Dismissed</u>[49]

20.     The Settlement Agreements purport to assign both BP's claims for reimbursement of payments made under the Settlement Agreement ("Contribution Claims") and BP's separate claims for spill-related damages, such as lost profits from the well ("Direct Damages Claims") to the settlement class as an undivided "juridical entity." These purportedly assigned claims fail for both procedural and substantive reasons.

21.     First, this Court has only certified a settlement class and only as to claims against BP. Plaintiffs have not sought and are not entitled to certification for litigation purposes. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). Nor could Plaintiffs pursue any class claim in this Limitation of Liability Action. *Lloyd's Leasing Ltd. v. Bates*, 902 F.2d 368, 370 (5th Cir. 1990). And even if a class could be certified and proceed herein, the creation of the settling class as a "juridical entity" under the Settlement Agreement effectively creates a mandatory Rule 23(b)(2) class, which does not allow class members to opt out, but mandatory classes are entitled to pursue only injunctive relief, not damages. *McManus v. Fleetwood Enters., Inc.*, 320 F.3d 545, 553-54 (5th Cir. 2003) (damages claims must be pursued through Rule 23(b)(3) class, not through Rule 23(b)(2)).

22.     Second, BP is not entitled to contribution here and thus cannot assign any such right to the Economic Class. A settlement by one joint tortfeasor that does not fully

---

[49] These conclusions of law relate to Transocean's Motion for Partial Judgment on the Pleadings as to Claims Assigned Under Settlement Agreement, Rec. Doc. 8120. (Transocean motion); Rec. Doc. 10186 (PSC opposition); Rec. Doc. 10203 (BP opposition); Rec. Doc. 10282 (Transocean reply), and to Transocean's Motion for Partial Summary Judgment as to BP "Direct Damages" Claims Purportedly Assigned to Settling Class Members, Rec. Doc. 10281.

extinguish the liability of all potential joint tortfeasors cannot be the basis of a contribution claim. *Ondimar Transportes Maritimos v. Beatty St. Props.*, 555 F.3d 184, 187 (5th Cir. 2009). But here the Economic Class expressly reserved its claims against Transocean and other Defendants for punitive damages, and BP never obtained the necessary complete release.

23. No contribution claim lies because the settlement payments themselves are not an appropriate measure of compensatory damages. *See Durgin v. Crescent Towing & Salvage, Inc.*, No. 00-1602, 2002 WL 31365365, at *4 (E.D. La. Oct. 18, 2002) (no contribution for voluntary payments). The settlement includes a "premium" payment by BP that "exceeds the[] claimants' true aggregate losses." Rec. Doc. 7104, at i, 39; Transcript of Final Fairness Hearing Proceedings, Nov. 8, 2012, at 60. The settlement payments include punitive components, reflect a voluntary waiver of the OPA cap on damages, and include additional voluntary payments that are unrelated to compensating particular damages to class members. In its challenges to the methodologies being used for business economic loss claims under the settlement, BP has itself argued that the settlement agreement is resulting in payment of claims of persons who, in a court of law, could not establish that they suffered damage caused by the oil discharged from the Macondo well. The difficulty of extracting the compensatory damages element of the Settlement Agreement is further complicated by BP's agreement to give up substantive defenses that could be asserted against individuals or groups of claimants. A settlement agreement cannot be enforced in a manner that deprives a nonsettling party of substantive legal rights. Finally, allowing the Economic Class to pursue BP's Contribution Claims would result in an improper double recovery for the same injuries.

24.     Third, the assigned claims for Direct Damages for BP's claims arising from the spill must be dismissed.  BP and Transocean agreed in the drilling contract to protect, *release*, defend, and *indemnify* each other for a series of specifically allocated risks.  BP and Transocean's agreement to divide certain foreseeable risks and mutually release one another from claims, even in the event of gross negligence, is enforceable and there is no basis to void that agreement on public policy grounds.  Moreover, any finding of gross negligence against BP would prevent its assignee from voiding the contractual release on the basis of Transocean's gross negligence; and the drilling contract prohibits assignment of any breach of contract claim.  Rec. Doc. 10281.

25.     Finally, to the extent members of the Economic Class may pursue any of the assigned claims, they do so in the shoes of BP.  *Florida Bahamas Lines, Ltd. v. Steel Barge Star 800 of Nassau*, 433 F.2d 1243, 1246 (5th Cir. 1970) (in maritime law, "a valid and unqualified assignment operates to transfer to the assignee no greater right or interest than was possessed by the assignor"); *F.D.I.C. v. Bledsoe*, 989 F.2d 805, 810 (5th Cir. 1993) (under common law, "[a]n assignee stands in the shoes of his assignor") (original emphasis omitted).  Accordingly, if the assigned claims could proceed, the Economic Class members would have no greater rights than BP would have had and would be subject to all defenses that could have been raised against BP.

## III.     LIMITATION OF LIABILITY ACTION

### A.     The Shipowners' Limitation of Liability Act

26.     The Shipowners' Limitation of Liability Act, 46 U.S.C. §§ 30501–30512 (the "Act"), provides that "the liability of the owner of a vessel for any claim, debt, or liability described in subsection (b) shall not exceed the value of the vessel and pending freight."  46 U.S.C. § 30505(a).  Thus, the Act "allows a vessel owner to limit liability for

247

damage or injury, occasioned without the owner's privity or knowledge, to the value of the vessel or the owner's interest in the vessel." *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 446 (2001).

27.     A primary purpose of the Act was to induce shipbuilding and investment in the marine industry, *Hartford Accident & Indem. Co. v. S. Pac. Co.*, 273 U.S. 207, 214 (1927), and the United States Supreme Court has held that the provisions of the Act should be construed liberally to effectuate their beneficent purposes, *Larsen v. Northland Transp. Co.*, 292 U.S. 20, 24 (1934).  Another principal concern of the Act is to "afford protection to the remote owner who, after the ship is underway, has no effective control over the vessel, its Master and crew." *Union Oil v. M/V Point Dover*, 756 F.2d 1223, 1228–29 (5th Cir. 1985); *see also, e.g.*, *In re Waterstand Marine, Ltd.*, 1991 A.M.C. 1784, 1793 (E.D. Pa. 1988) (noting that a second purpose of the Act is to "protect[] owners from operational fault over which they have no control").

28.     Semi-submersible drilling rigs like the *Deepwater Horizon* are considered vessels and are, therefore, encompassed by the Act.  Rec. Doc. 3830, *see also, e.g.*, *Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 543 n.12 (5th Cir. 2002) ("the *Ocean Concorde* is a semi-submersible drilling rig, which is indisputably a vessel"), *overruled in part on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 788 & n.8 (5th Cir. 2009) (en banc); *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214 n.5 (5th Cir. 1986) (concluding that a semi-submersible rig was "indisputably a vessel").

### B.     Timeliness of Limitation Action

29.     The vessel owner must file a limitation action within six months of the owner's receipt of a written notice of claim.  FED. R. CIV. P. SUPP. R. F(1); *see Karim v.*

*Finch Shipping Co.,* 265 F.3d 258, 263-64 (5th Cir. 2001).  The Petitioners complied with the Act's requisite statutory timeline by filing the limitation action within the six-month period following written notice of claim.  Rec. Doc. 1-1, 2:10-cv-02771-CJB-SS.

### C.    Limitation Notice

30.    Supplemental Admiralty and Maritime Claims Rule F(4) entitled "Notice to Claimants," provides that limitation petitioners shall publish notice of the court's monition once a week for four consecutive weeks prior to the date fixed for the filing of claims.  FED. R. CIV. P. SUPP. R. F(4).  The Rule further provides that limiting petitioners shall, not later than the day of the second publication, mail a copy of the notice to every person known to have made any claim against the vessel or to the plaintiff arising under the voyage or trip on which the claim sought to be limited arose.  *Id.*  In cases involving death, a copy of such notice "shall be mailed to the decedent at the decedent's last known address, and also to any person who shall be known to have made any claim on account of such death."  *Id.*  The Petitioners have complied with the various notice requirements of the Act.  Rec. Doc. 188 (Notice of Filing Affidavits of Publication), 2:10-cv-02771-CJB-SS.

### D.    The Limitation Fund

31.    The limitation fund consists of the value of the vessel upon conclusion of the voyage and the vessel's then-pending freight.  46 U.S.C. § 30505(a); FED. R. CIV. P. SUPP. R. F(2).  The *Deepwater Horizon*, which sank following the blowout, fire, and explosion at the Macondo well, now rests at the bottom of the sea, and had no value upon the conclusion of the voyage.  Rec. Doc. 1-2 (Affidavit of Value), 2:10-cv-02771-CJB-SS.  The then-pending freight consisting of the operating day rate accounts receivable and

accrued accounts receivable for the *Deepwater Horizon* is $26,764,083.00.  Rec. Doc. 1-3

(Affidavit of Pending Freight), 2:10-cv-02771-CJB-SS.

>     **E.**     **Vessel "Owners" May Limit**

32.     The Act provides that all "owners" of vessels may limit their liabilities,

but the Act does not define "owner," other than to permit a charterer that mans, supplies

and navigates a vessel at the charterer's own expense or by the charterer's own

procurement to limit its liability as an "owner."  46 U.S.C. § 30501.  This Court has

recognized that the term "owner" should be construed "as an 'untechnical word' which

should be given a broad construction."  *In re Shell Oil Co.*, 780 F. Supp. 1086, 1089

(E.D. La. 1991).  It has often been said that the term "owner" should be given a liberal

construction so as to achieve Congress' intent.  *See id.*; *see also, e.g.*, *Flink v. Paladini*,

279 U.S. 59, 63 (1929) ("owner" must be taken in a broad and popular sense in order not

to defeat the manifest intent of Congress); *Dick v. United States*, 671 F.2d 724, 727 (2d

Cir. 1982); *Admiral Towing Co. v. Woolen*, 290 F.2d 641, 645 (9th Cir. 1961); *In re

Barracuda Tanker Corp.*, 281 F. Supp. 228, 232 (S.D.N.Y. 1968).  As a result of the

liberal construction given to "owner," "[c]ourts have expanded the definition of owner or

charterer to encompass parties in analogous situations who exercise dominion and control

over a vessel and are therefore owners *pro hac vice* even if not technically charterers."  *In

re Am. Milling Co.,* 409 F.3d 1005, 1014 (8th Cir. 2005).  This Court has similarly

observed:

>               The term "owner" does not require a title, but rather, as a
>               general rule, one who is subjected to a shipowner's liability
>               because of his exercise of dominion over . . . [i.e., his
>               relationship to] the vessel should be able to limit his
>               liability to that of an owner.  More succinctly stated, the act
>               is designed to cover one who is a "likely target" for liability
>               claims predicated on his status as the person perhaps

ultimately responsible for the vessel's maintenance and operation.

> *The rule that emerges from all of the cases interpreting ownership pursuant to Section 183 [now Section 30501] is that if the plaintiff in limitation may be held liable because of his ownership or control of the vessel, then he can maintain a limitation action.*

*In re Shell Oil*, 780 F. Supp. at 1089–90 (emphasis added).

33.     The Court has found that Triton Asset Leasing GmbH is the registered and legal title owner of the *Deepwater Horizon*.  Finding # 12, *supra*.  Accordingly, Triton is a proper petitioning owner for purposes of the Act.  46 U.S.C. § 30501; *In re Shell Oil*, 780 F. Supp. at 1092 (title owner entitled to limit as "owner"); *see also, e.g.*, *Birmingham Se., LLC v. M/V Merch. Patriot*, 124 F. Supp. 2d 1327, 1338 (S.D. Ga. 2000) (same); *In re B.F.T. No. Two Corp.*, 433 F. Supp. 854, 872 (E.D. Pa. 1977) (same).

34.     This Court has also found that Transocean Holdings LLC is the bareboat/demise charterer of the vessel from Triton because, under the Bareboat Charter, possession, command and control of the rig were transferred from Triton to Holdings. Finding ## 13-15, *supra*.  A bareboat charter exists when "full possession and control of the vessel is transferred to the charterer."  *Walker v. Braus*, 995 F.2d 77, 81 (5th Cir. 1993); *see also, e.g.*, *Forrester v. Ocean Marine Indem. Co.*, 11 F.3d 1213, 1215 (5th Cir. 1993) ("[T]he bareboat charterer as a demise charterer is the owner *pro hac vice* of the vessel for the duration of the contract."); 2 Thomas J. Schoenbaum, Admiralty & Maritime Law § 11-3, at 7 (4th ed. 2004) ("An essential characteristic of the demise, however, is that the entire command and possession of the vessel be turned over to the charterer.  Although the owner retains legal title, the charterer is considered the temporary owner, or commonly termed the owner *pro hac vice*.").  Because Holdings is the bareboat charterer of the *Deepwater Horizon*, Holdings is a proper petitioning owner

251

for purposes of the Act.  46 U.S.C. § 30501; *see also Petition of Republic of France*, 171 F. Supp. 497, 511 (S.D. Tex. 1959) (demise charterer may limit as owner), *rev'd on other grounds*, 290 F.2d 395 (5th Cir. 1961), *cert. denied*, 369 U.S. 804 (1962).

35.     Transocean Offshore Deepwater Drilling Inc. ("TODDI") employed the onshore supervisory and managerial employees that had the overall responsibility for maintenance of the *Deepwater Horizon* and the supervision of her crew.  Finding # 17, *supra*.  TODDI is therefore a proper petitioning owner for purposes of the Act.  *Calkins v. Graham*, 667 F.2d 1292, 1294 (9th Cir. 1982) (party responsible for the maintenance of vessel may be considered an owner); *In re Petition of the United States*, 259 F.2d 608, 610–11 (3d Cir. 1958) (contractor entitled to "owner" status because it was responsible for the vessel's maintenance and condition); *In re Houseboat STARSHIP II*, 2006 A.M.C. 1335, 1339 (M.D. Tenn. 2005) (same); *In re Chesapeake Shipping*, 803 F. Supp. at 872, 873-75 (S.D.N.Y. 1992) (same).

36.     Transocean Deepwater Inc. ("TDI") is the employer of the crew of the *Deepwater Horizon*.  Finding # 18, *supra*.  Therefore, TDI is a proper petitioning owner for purposes of the Act.  *See In re Petition of United States,* 259 F.2d at 610-11 (owner status allowed where contractor manned vessel); *In re Chesapeake Shipping, Inc.*, 803 F. Supp. at 873-74 (owner status allowed where management company manned vessel); *In re B.F.T. No. Two Corp.*, 433 F. Supp. at 871–73 (same).

## IV.     THE PETITIONING TRANSOCEAN ENTITIES ARE ENTITLED TO LIMITATION OR EXONERATION

### A.     Two-Step Burden Shifting Procedure

37.     Determination of a controversy under the Act is a two-step process. Under the first step, the claimant bears the initial burden of proving liability either

through negligence or unseaworthiness. *In re Port Arthur Towing Co.*, 42 F.3d 312, 317 (5th Cir. 1995); *Farrell Lines, Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir. 1976); *S. Pac. Co. v. United States*, 72 F.2d 212, 215 (2d Cir. 1934); *In re Lloyd's Leasing Ltd.*, 764 F. Supp. 1114, 1141 (S.D. Tex. 1990). The first step is critical, because if there is no fault or negligence for the shipowner to be privy to or have knowledge of within the meaning of the statute, then there is no liability to limit, and the owner is entitled to exoneration. *In re Complaint of Messina*, 574 F.3d 119, 126 (2d Cir. 2009). Once a claimant proves that negligence or unseaworthiness caused an accident, an owner seeking limitation must show it lacked privity or knowledge of the negligent act or unseaworthy condition. *In re Signal Int'l, LLC*, 579 F.3d 478, 496 (5th Cir. 2009); *In re Hellenic Inc.*, 252 F.3d 391, 394 (5th Cir. 2001). The burden of proving negligence or unseaworthiness is on the claimant; the burden of proving lack of privity or knowledge of the negligence or unseaworthiness is on the shipowner. *Matheny v. Tenn. Valley Auth.*, 557 F.3d 311, 315 (6th Cir. 2009).

### B. Step One: Negligence and Seaworthiness

#### (1) The *Deepwater Horizon* Was Seaworthy

38. An unseaworthy condition may create liability for damages only under certain conditions. *In re Lloyd's Leasing*, 764 F. Supp. at 1141. A vessel owner petitioning for limitation of liability under the Act may be liable on the basis of unseaworthiness, but only "if a special relation exists between the vessel and those injured. This is the case when the vessel's crewmembers are injured as a result of the ship's unseaworthy condition" or "if the ship owner breaches a contractually imposed obligation." *Id.* As a result, "[a] warranty of seaworthiness exists only in favor of seamen, in certain charter agreements, and in favor of a limited class of maritime workers

who are not covered by the Longshore & Harbor Workers' Compensation Act." *Id.* (citing 1 SCHOENBAUM, ADMIRALTY & MARITIME LAW § 4-5 (1987)).

39.     The Court holds that the Petitioners do not owe a warranty of seaworthiness to the pollution claimants; indeed, the PSC has asserted no limitation claims against the Petitioners for breach of warranty of seaworthiness.  Rec. Doc. 1128. Instead, the Petitioners may only be held liable to the pollution claimants on a negligence theory, upon a showing of a duty to the claimants, a breach of that duty, proximate cause, and damages.  *In re Lloyd's Leasing*, 764 F. Supp. at 1141 (vessel owner not liable to pollution claimants because pollution claimants were not owed any warranty of seaworthiness under the general maritime law); *see also, e.g.*, *In re Kristie Leigh Enters., Inc.*, 72 F.3d 479, 481 n.2 (5th Cir. 1996) ("the duty to provide a seaworthy vessel did not extend to these claimants because they were not doing seaman's work").

40.     As for Pleading Bundle A seamen claimants who have asserted unseaworthiness claims, the Court finds that the *Deepwater Horizon* was seaworthy.  To be seaworthy, the vessel must be staunch, strong, well equipped for the intended voyage and manned by a competent and skillful master of sound judgment and discretion.  *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1155 (2d Cir. 1978), *cert. denied*, 440 U.S. 959 (1979).  The standard applied by the Fifth Circuit is that "a vessel and its appurtenances must be *reasonably suited* for the purpose or use for which they were intended."  *Johnson v. Offshore Express, Inc.*, 845 F.2d 1347, 1354 (5th Cir. 1988), *cert. denied*, 488 U.S. 968 (1988) (emphasis added) (citing *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960)); *see also Gutierrez v. Waterman S.S. Corp.*, 373 U.S. 206, 213 (1963); *Weeks v. Alonzo Cothron, Inc.*, 466 F.2d 578, 581 (5th Cir. 1972).  This standard

reflects a practical balancing of operating capabilities and anticipated operating conditions. *In re Messina*, 574 F.3d at 128; *Mills v. Mitsubishi Shipping Co.*, 358 F.2d 609, 613 (5th Cir. 1966). "[A] captain's or vessel's minor deficiencies do not necessarily add up to unseaworthiness." *In re Omega Protein, Inc.*, 548 F.3d 361, 373 (5th Cir. 2008). Furthermore, "[a]n isolated act of negligence does not establish unseaworthiness." *Domingue v. Offshore Serv. Vessels, LLC*, No. 08-4668, 2009 WL 3254147, at *4 (E.D. La. Oct. 7, 2009) (citing *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 500 (1971)).

41.     The general maritime law standard for establishing causation for an unseaworthiness claim is demanding. *Manderson v. Chet Morrison Contractors, Inc.*, 666 F.3d 373, 380 (5th Cir. 2012). To establish an unseaworthiness claim, a claimant must show: "(1) the unseaworthiness played a substantial part in bringing about or actually causing the injury and that (2) the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." *Smith v. Trans-World Drilling Co.*, 772 F.2d 157, 162 (5th Cir. 1985).

42.     The certifications issued by the classification society that the *Deepwater Horizon* was in compliance with the ABS rules, and the additional surveys and audits by DNV, the U.S. Coast Guard, MMS, and BP which followed, are strong evidence of the seaworthiness of the *Deepwater Horizon*. *Fireman's Fund Ins. Cos. v. M/V Vignes*, 794 F.2d 1552, 1556 (11th Cir. 1986) (classification society surveys alone characterized as "very strong evidence" of seaworthiness); *see also, e.g.*, *Nissan Fire & Marine Ins. Co. v. M/V Hyundai Explorer*, 93 F.3d 641, 647 (9th Cir. 1996) ("[T]he testing of the Vessel in accordance with classification society requirements is a factor tending to prove due

diligence."); *Jamaica Commodity Trading Co. v. Barge Hercules*, No. 90-186, 1995 U.S. Dist. LEXIS 17995, at *18 (S.D. Ala. Nov. 7, 1995) (surveys showing vessel to be seaworthy weigh in favor of a finding of seaworthiness); *In re Lloyd's Leasing*, 764 F. Supp. at 1126, 1134 (certificates issued by the classification society are evidence of seaworthiness).

43.     The Court has found that the *Deepwater Horizon* was seaworthy on April 20, 2010.  The vessel and its appurtenances, including the BOP, were "reasonably suited for the purpose or use for which they were intended," *Johnson*, 845 F.2d at 1354, and the master and crew were competent and trained.  Finding ## 619-790, *supra*.  Moreover, even assuming some unseaworthy condition existed on the *Deepwater Horizon*, Plaintiffs have not established that any unseaworthy condition played a substantial part in bringing about the blowout and explosion or that any injury was the direct result of any unseaworthiness.  Finding ## 486-790, *supra*.

44.     As a result of these seaworthiness findings, in order for liability to attach to any of the Petitioners, the Claimants must prove that the Petitioners were negligent.

### (2)     TDI Has Admitted Negligence in Connection with the Negative Pressure Test; the Other Transocean Entities Were Not Negligent

45.     Under the general maritime law, a party's negligence is actionable only if it is the "legal cause" of the plaintiff's injuries, which is something more than "but for" causation—the negligence must be a substantial factor in causing the injuries.  *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 213-14 (5th Cir. 2010) (quoting *Donaghey v. Ocean Drilling & Explor. Co.*, 974 F.2d 646, 649 (5th Cir. 1992)); *see also, e.g.*, *In re Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir. 1991) ("The standard for negligence under general maritime law is higher.  The plaintiff must demonstrate that

there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by plaintiff, and a causal connection between defendant's conduct and the plaintiff's injury. . . . Furthermore, the resultant harm must be reasonably foreseeable.").

46.     In conjunction with its guilty plea, TDI has acknowledged that the Transocean drilling crewmembers aboard the *Deepwater Horizon* were negligent with respect to the negative pressure test, in that they accepted the assessment of the BP well site leaders that the negative pressure test was successful despite the fact that the test showed 1,400 psi on the drill pipe.  Finding # 257, *supra*.  As TDI employed the rig crew, it is therefore liable, for purposes of limitation of liability, for the negligent acts of the crew as set forth in the factual allocution of TDI's Guilty Plea on the basis of *respondeat superior.  Landry v. Oceanic Contractors, Inc.*, 731 F.2d 299, 303 (5th Cir. 1984) (negligence of employees imputed to employer under general maritime law and Jones Act); *In re Ocean Runner*, *Inc.*, No. 04-530, 2006 WL 950115, at *3 (E.D. La. Apr. 10, 2006) (application of *respondeat superior* is well established in maritime cases). However, the imputation of the rig crew's negligence to TDI under *respondeat superior* applies only to the question of liability; for purposes of the right to limit liability under the Act, the Act requires "***actual*** fault or privity."  *Union Oil*, 756 F.2d at 1228–29 (emphasis added).  Accordingly, as explained below, the *Deepwater Horizon* crew's negligence is not imputed to TDI for "privity or knowledge" purposes, which controls the question of TDI's right to limit liability under the Act.  *Id.*

47.     The Court has found that the TDI drilling crewmembers aboard the *Deepwater Horizon* were negligent with respect to the negative pressure test, and this negligence is imputed to TDI on the basis of *respondeat superior*.  The Court has further

found that no other negligent acts or omissions of TDI, TODDI, Holdings, or Triton caused or contributed to the blowout, explosion, fire and sinking of the *Deepwater Horizon*, and resulting spill.

### C.    Step Two: Transocean Has Carried Its Burden to Prove Lack of Privity or Knowledge

48.    The vessel owner's burden of proof that it had no "privity or knowledge of the unseaworthy conditions or negligent acts" arises only if the claimant proves that the vessel's negligence or unseaworthiness was "the proximate cause of the claimant's loss." *Trico Marine Assets, Inc. v. Diamond B Marine Servs. Inc.*, 332 F.3d 779, 789 (5th Cir. 2003); *see also In re Signal Int'l*, 579 F.3d at 498; *Farrell Lines*, 530 F.2d at 10. "The shipowner's privity or knowledge is not measured against every fact or act regarding the accident; rather, privity or knowledge is measured against the specific negligent acts or unseaworthy conditions that actually caused or contributed to the accident." *Suzuki of Orange Park, Inc. v. Shubert*, 86 F.3d 1060, 1064 (11th Cir. 1996); *Matheny*, 557 F.3d at 315. Whether the vessel owner had knowledge of other acts of negligence is immaterial. *See Signal Int'l*, 579 F.3d at 500; *see also Farrell Lines*, 530 F.2d at 10 ("Knowledge or privity of *any fact* or act causing the accident is not enough for denial of limitation; it is only knowledge or privity of negligent acts or unseaworthy conditions which trigger a denial of limitation.") (emphasis added). It is not relevant that a petitioning owner may know of a risk of harm; it must participate in or have knowledge of a specific negligent act or unseaworthy condition, because the Act "speaks in terms of *acts*, not *risks*." *Matheny*, 557 F.3d at 316 (emphases in original).

49.    "Privity or knowledge" is necessarily a fact-intensive inquiry. *Gibboney v. Wright*, 517 F.2d 1054, 1057 (5th Cir. 1975). The owner has privity if he personally

participated in the negligent conduct or brought about the unseaworthy condition. *Trico Marine Assets*, 332 F.3d at 790. In the case of a corporate owner, privity or knowledge, sometimes described as "complicity in the fault," "extends beyond actual knowledge to knowledge that the ship owner would have obtained by reasonable investigation." *Cupit v. McClanahan Contractors, Inc.*, 1 F.3d 346, 348 (5th Cir. 1993) (quoting *Brister v. A.W.I., Inc.*, 946 F.2d 350, 356-58 (5th Cir. 1991)). A corporation "is charged with the knowledge of any of its managing agents who have authority over the sphere of activities in question." *In re Kristie Leigh*, 72 F.3d at 481. As a result, a corporation may only be "charged with the privity or knowledge of its employees when they are *sufficiently high on the corporate ladder*." *In re Hellenic*, 252 F.3d at 395 (emphasis added) (quoting *Cupit*, 1 F.3d at 348).

50.     The "privity or knowledge" standard does not require a vessel owner to take every possible precaution; "it only obliges the owner to select a competent master and remedy deficiencies which he can discover through reasonable diligence." *In re Omega Protein*, 548 F.3d at 374. It is well-settled that under the Act, an owner is entitled to rely upon the expertise of a competent crew. In *Coryell v. Phipps*, 317 U.S. 406 (1943), the Supreme Court held that "[o]ne who selects competent men . . . and who is not on notice . . . cannot be denied the benefit of . . . limitation," unless privity or knowledge are to become empty words. *Id.* at 412. Thus, negligence by a competent crew is not attributable to the shipowner for limitation purposes. *Mac Towing, Inc. v. Am. Commercial Lines*, 670 F.2d 543, 548 (5th Cir. 1982). No court has previously denied a corporate shipowner limitation of liability for a master's negligence at sea when the owner has exercised reasonable care in selecting the master. *See, e.g., Cont'l Oil Co.*

259

*v. Bonanza Corp.*, 706 F.2d 1365, 1377 n.15 (5th Cir. 1983) (en banc).  Thus, "[a]n employee's negligence at sea, without more, is not enough to deny limitation."  *In re Kristie Leigh*, 72 F.3d at 482.  Moreover, any crew deficiencies that have no causal connection to the damages are "not significant" for limitation purposes and are therefore irrelevant.  *Union Oil*, 756 F.2d at 1229.

51.     Where a vessel has more than one owner or owner pro hac vice, particularly where the owner has demise chartered the vessel, the privity or knowledge of each owner must be analyzed separately.  *E.g.*, *Torch, Inc. v. Alesich*, 148 F.3d 424, 427 (5th Cir. 1998) (owner of the vessel subject to bareboat charter entitled to exoneration); *Colletti v. Tiger Tugz, LLC*, No. 10-1099, 2011 WL 6337457, at *3-*4 (W.D. La. Dec. 16, 2011) (similar); *see also McAleer v. Smith*, 57 F.3d 109, 112 (1st Cir. 1995) ("In general, if there is an owner pro hac vice, the title owner will be absolved of personal liability (except for defective conditions that existed *before* the owner pro hac vice took control of the vessel).") (emphasis added).

### (1)     Triton Is Entitled to Exoneration

52.     Triton, the registered owner of the *Deepwater Horizon*, transferred the possession, command and control of the *Deepwater Horizon* to Transocean Holdings pursuant to a Bareboat Charter Party dated August 17, 2001.  Finding ## 12-15, *supra*.  When an owner of a vessel enters into a demise charter, the owner surrenders all possession and control of the vessel to the charterer.  Because the owner no longer has the right to control the use of the vessel, he is no longer charged with the duties and liabilities that arise out of ownership.  *Huss v. King Co., Inc.*, 338 F.3d 647, 652 (6th Cir. 2003), *cert. denied* 541 U.S. 1015 (2004); *Kerr-McGee Corp. v. Law*, 479 F.2d 61, 63 (4th Cir. 1973).  "Because a shipowner who has demised a vessel no longer controls it,

such an owner is not liable for unseaworthiness or negligence that comes into existence while the charter is in effect." *Picou v. D & L Towing, Inc.*, No. 09-2810, 2010 WL 2696468, at *3 (E.D. La. July 2, 2010). Although a vessel may still be liable for unseaworthy conditions that exist before the date of the bareboat charter, *Torch*, 148 F.3d at 427; *Baker v. Raymond Int'l, Inc.*, 656 F.2d 173, 183 (5th Cir. 1981), *cert. denied*, 456 U.S. 983 (1982), delivery of a vessel to a bareboat charterer terminates the owner's liability for unseaworthy conditions that arise thereafter. *Colletti*, 2011 U.S. Dist. LEXIS 145606, at *2.

53.     The employer of the crew, TDI, has admitted negligence in connection with the negative pressure test on April 20, 2010; but no evidence was introduced at trial of negligence prior to August 17, 2001, the date of the bareboat charter, let alone negligence with some causal connection to the Macondo spill. Furthermore, there is no evidence of unseaworthiness predating August 17, 2001. There is no dispute that BP specified the configuration of the BOP, and in particular, the inclusion of the single blind shear ram. Because the *Deepwater Horizon* was fit for service on August 17, 2001, the date of the bareboat charter, Triton is entitled to exoneration from liability.

## (2)     Transocean Holdings and TODDI Are Entitled to Exoneration

54.     "Liability is the threshold issue to be resolved in a limitation of liability action because the exploration as to limitation is materially relevant only if liability is established." *In re Lloyd's Leasing*, 764 F. Supp. at 1141. If there is no fault or negligence for the shipowner to be in privity with (or have knowledge of) within the meaning of the Act, there is no liability to be limited, and the owner is entitled to exoneration. *In re Messina*, 574 F.3d at 126; *In re Lloyd's Leasing*, 764 F. Supp. at 1141. TDI employed the crew of the *Deepwater Horizon*, Finding # 18, *supra*, not Holdings or

TODDI, Finding ## 13-17, *supra*; therefore, neither Holdings nor TODDI is liable under the maritime rule of *respondeat superior* for the crew's negligence as set forth in the factual allocution of Transocean's guilty plea.  No warranty of seaworthiness is owed to the pollution claimants as a matter of law.  Finding ## 38-44, *supra*.  The Court has also found that the *Deepwater Horizon* was seaworthy.  Finding ## 486-790, *supra*; Conclusion ## 34-40, *supra*.  Accordingly, Holdings and TODDI are entitled to exoneration from liability.

### (3)   TDI Is Entitled to Limit Its Liability for the Negligence of Its Crew

55.     "A denial of exoneration does not necessarily preclude a finding that the petitioners are entitled to a limitation of liability."  *Birmingham Se.*, 124 F. Supp. 2d at 1339.  A shipowner is still entitled to limit its liability "if it can prove that the loss occurred without its privity or knowledge."  *Id.*  Although the Rig crew's negligence is imputed to TDI under the maritime rule of *respondeat superior*, the Court holds that none of the members of the TDI rig crew were "managing agents" sufficiently high on the corporate ladder to allow the imputation of their acts of negligence to TDI for privity or knowledge purposes under the Act.  Moreover, No Transocean entity had privity or knowledge of the negligent acts and omissions of the TDI crew onboard the *Deepwater Horizon* as to the negative pressure test, or as to any other acts or omissions on the *Deepwater Horizon* which led to the explosion, blowout and sinking.

56.     Under the Act, the managing agent is "anyone to whom the corporation has committed the general management or general superintendence of the whole or a particular part of its business."  *In re Signal Int'l*, 579 F.3d at 497 (quoting *Cont'l Oil Co.*, 706 F.2d at 1376); *see also Cupit*, 1 F.3d at 348.  Factors considered by courts in

analyzing whether an employee is a managing agent include: (1) the scope of authority over day-to-day activities in the relevant field of operations; (2) the relevant significance of this field of operations to the business of the corporation; (3) the ability to hire or fire other employees; (4) the power to negotiate and enter into contracts on behalf of the company; (5) the authority to set prices; (6) the authority over payment of expenses; (7) whether the salary is fixed or contingent; and (8) the duration of his authority, *i.e.*, whether full time or limited to a particular shift. *See Cont'l Oil Co.*, 706 F.2d at 1376–77.

57.     After considering these factors, the Court has found that none of the Rig's crew was a "managing agent" for privity and knowledge purposes, and thus their negligent acts may not be imputed to TDI. *See Cupit*, 1 F.3d at 348 (toolpusher in charge of a drilling rig was not a managing agent for privity purposes, because his authority did not extend to the basic business decisions made by the drilling supervisors and the president of the company).

58.     TDI is entitled to limit its liability under the Shipowners' Limitation of Liability Act to the value of the vessel upon conclusion of her voyage and the vessel's then-pending freight, $26,764,083.00.

## V.     NO GROSS NEGLIGENCE OF ANY TRANSOCEAN ENTITY CAUSED THE MACONDO SPILL AND NO PUNITIVE DAMAGES MAY BE AWARDED

### A.     The Availability of Punitive Damages

59.     Transocean submits that no punitive damages are available in this case because OPA has displaced general maritime law with respect to oil spills and does not permit punitive damages. *See, e.g.*, *S. Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 65-66 (1st Cir. 2000); *see also United States v. Am. Commercial Lines, LLC*, No. 11-

2076, 2013 WL 1182963, at *4 (E.D. La. Mar. 21, 2013) (OPA displaces general maritime law). Transocean recognizes, however, that this Court has previously ruled that OPA does not displace general maritime law claims for punitive damages by Plaintiffs who could have asserted such claims before the enactment of OPA. Rec. Doc. 3830, at 225-27. Transocean respectfully renews its objection to this order, but addresses below conclusions of law with respect to punitive damages in light of the prior ruling.

### B.  Plaintiffs Must Satisfy a High Standard for Any Award of Punitive Damages

60.  Under general maritime law as interpreted in this Court's prior rulings, punitive damages are available to non-seamen "upon a showing of willful and wanton misconduct by the shipowner." *Miles v. Melrose*, 882 F.2d 976, 989 (5th Cir. 1989) (quoting *In re Merry Shipping, Inc.*, 650 F.2d 622, 626 (5th Cir. 1981)). As the Supreme Court has recently explained, punitive damages may be imposed under maritime law, as under common law, for "for wanton, willful, or outrageous conduct." *Atl. Sounding Co., Inc. v. Townsend*, 557 U.S. 404, 409, 411 (2009); *see also* Rec. Doc. 3830, at 26-27. Or as the Supreme Court recognized in *Exxon Shipping*, punitive damages are limited to cases "where a defendant's conduct is 'outrageous,' owing to 'gross negligence,' 'willful, wanton, and reckless indifference for the rights of others,' or behavior even more deplorable." 554 U.S. at 493 (citations omitted).

### (1)  There Is a Strict Standard for Gross Negligence

61.  The Fifth Circuit has set a "strict standard of gross negligence." *Belala v. Coastal Towing Co.*, No. 01-3137, 2002 WL 31729491 at *2 (E.D. La. Dec. 3, 2002) (applying general maritime law). Specifically, the Fifth Circuit has defined gross negligence as "'willful, wanton and reckless conduct,'" and further explained that

"'[m]ere inadvertence or honest mistake does not amount to gross negligence.'" *Becker v. Tidewater, Inc.*, 586 F.3d 358, 367 (5th Cir. 2009) (quoting *Houston Exploration Co. v. Halliburton Energy Servs., Inc.*, 269 F.3d 528, 531 (5th Cir. 2001)).

62.     This strict standard for gross negligence is consistent with the views of other circuit courts and federal trial practice. *See, e.g., Royal Ins. Co. of Am. v. Sw. Marine*, 194 F.3d 1009, 1015 (9th Cir. 1999) (concluding that gross negligence requires "'the intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another; such a gross want of care and regard for the rights of others as to justify the presumption of willfulness and wantonness.'") (quoting BLACK'S LAW DICTIONARY 1185 (4th ed. 1968); BLACK'S LAW DICTIONARY (9th ed. 2009) (defining "gross negligence," inter alia as "[a] conscious, voluntary act or omission in reckless disregard of a legal duty and of the consequences to another party").

63.     Gross negligence depends on the defendant's state of mind: "Gross negligence is distinguished from ordinary negligence by 'the mental attitude of the defendant,' not by the nature of the negligent act." *City Nat'l Bank v. United States*, 907 F.2d 536, 541 (5th Cir. 1990) (applying Texas law and quoting *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 922 (Tex. 1981)).  "What lifts ordinary negligence into gross negligence is the mental attitude of the defendant . . . . In other words, the plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrated that he didn't care." *Maxey v. Freightliner Corp.*, 665 F.2d 1367, 1374 (5th Cir. 1982) (en banc) (citation omitted); *Barber v. Texaco, Inc.*, 720 F.2d 381, 384 (5th Cir. 1983) (per curiam) (gross negligence "is differentiated from simple negligence by the mental

attitude of the defendant: a plaintiff must show that the defendant knew about the danger, but demonstrated by his acts or omissions that he didn't care").

64.     Gross negligence therefore requires more than some act, even if carelessly or negligently done, that results in bad consequences.  Rather, as the Fifth Circuit explained in reversing a finding of gross negligence in a gas well blowout case, one is grossly negligent only "when he has *intentionally* done an act *of unreasonable character in reckless disregard of the risk known to him*, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow."  *Houston Exploration Co.*, 269 F.3d at 532 (emphasis added and internal quotation marks omitted) (applying Louisiana law).

### (2)    An Accumulation of Negligent Acts Does Not Constitute Gross Negligence

65.     Because gross negligence requires a different state of mind than ordinary negligence—proof that a defendant showed "reckless disregard of a legal duty and of the consequences to another party," BLACKS LAW DICTIONARY (9th ed. 2009)—an accumulation of multiple separate acts of ordinary negligence does not establish gross negligence.  *See Clements v. Steele*, 792 F.2d 515, 516 (5th Cir. 1986) (recognizing, under Texas law, that proof of the defendant's "state of mind" is necessary to support a finding of gross negligence and an award of punitive damages); *accord City Nat'l Bank*, 907 F.2d at 541 (gross negligence depends on "the mental attitude of the defendant").  Thus, the Fifth Circuit has rejected the contention that "separate acts of ordinary negligence may collectively constitute gross negligence," without proof of the requisite mental state of reckless disregard of risks that characterizes gross negligence.  *Clements*, 792 F.2d at 516; *see also Burk*, 616 S.W.2d at 922 (holding that "[a]ll actions or

circumstances" may be considered to determine whether a defendant has "a state of mind amounting to conscious indifference").

66.     Consistent with this distinction, cases that have relied on a collection of negligent acts have done so only to assess whether a defendant acted with the required mental state.  Thus, for example, in *Tug Ocean Prince*, the Second Circuit found that a tug owner's failure to communicate with the mate, failure to appoint a captain, and failure to appoint a lookout on a tug operating in the Hudson River in winter, all of which contributed to the tug striking a rock and spilling oil, "warrant[ed] an inference that [the owner] acted in reckless disregard of the probable consequences."  584 F.2d at 1163.  The court concluded that the combination of acts (or failures to act) by the company indicated the company's state of mind necessary to find willful misconduct and liability to the United States for oil clean up.  *Id.* at 1164; *accord Water Quality Ins. Syndicate v. United States*, 522 F. Supp. 2d 220, 229-30 (D.D.C. 2007) (*Water Quality I*) (relying on *Tug Ocean Prince* to conclude that the "reckless disregard of the probable consequences" necessary to show willful misconduct under OPA may be proven by "a chain of circumstances which [were] a contributing cause" to incident that resulted in a discharge of oil).  These cases do not suggest, however, that multiple acts of negligence that do not establish a mental state of reckless disregard of consequences and that were not causally related to the accident can amount to gross negligence.

> ### (3)     Plaintiffs Must Show That Some Grossly Negligent Act Proximately Caused the Spill

67.     Proximate causation is an element of a maritime law negligence claim. *Exxon Co. Inc. v. Sofec, Inc.*, 517 U.S. 830, 836-39 (1996) (holding that proximate causation requirement, as ordinarily understood in tort law, applies in admiralty

negligence claims). Accordingly, a defendant's actions, even if grossly negligent, cannot be a basis for recovery when they are not a proximate cause of a plaintiff's injury. *E.g.*, *Taylor v. Texaco, Inc.*, 814 F.2d 231 (5th Cir. 1987) (no liability where Texaco's failure to comply with Coast Guard regulations for fueling operations was not a contributing factor to the accident); *Woolard v. Mobil Pipe Line Co.*, 479 F.2d 557, 563-64 (5th Cir. 1973) (even if Mobil Pipe Line was grossly negligent in maintaining equipment, Mobil was not liable when evidence did not show equipment was the proximate cause of explosion that caused plaintiff's death).

68.     To the extent a court may consider actions that are not directly causal, that consideration is limited to situations where the prior act demonstrates that a defendant had a culpable state of mind when he or she committed the action alleged to be grossly negligent. *Martin v. Texaco, Inc.*, 726 F.2d 207, 209-12 (5th Cir. 1984) (applying Texas law). Thus for example, in a case involving a mislabeled nitrogen line that caused the asphyxiation of the plaintiff, the Fifth Circuit has allowed a jury charged with determining gross negligence to consider a prior incident that also involved a mislabeled nitrogen line in order to show company management knew about risks from mislabeling a nitrogen line and knew that failing to warn employees could result in an accident. *Id.* at 211. The Court held that the plaintiffs were required to show that Texaco was "aware" of the "particular hazard that caused [the injury]"; and that it was improper to consider evidence intended to prove more general flaws in the company's overall safety program. *Id.* ("The inquiry in this case . . . does not involve an evaluation of Texaco's overall conduct. It focuses instead upon the particular hazard that caused [the plaintiff's] death. The question is not whether Texaco's *general* safety program reflected an attitude of

conscious indifference.  The relevant inquiry is whether Texaco was consciously indifferent as to the dangers presented by the use of nitrogen in the refinery [which caused the plaintiffs' death].") (emphasis in original).

### (4)    No Punitive Damages May Be Assessed Against Any Transocean Entity Based on Gross Negligence by an Employee Unless the Company Authorized or Ratified the Conduct

69.    In the Fifth Circuit, a company may not be held liable for punitive damages under general maritime law based on conduct of its agents unless "it authorizes or ratifies the wanton actions of an agent."  *In re P&E Boat Rentals*, 872 F.2d 642, 650 (5th Cir. 1989).  The Fifth Circuit has recognized that the objectives of punitive damages, "to punish the wrongdoer and deter others from engaging in similar conduct in the future," are "not achieved when courts drop the punitive damage hammer on the principal for the wrongful acts of the simple agent or lower echelon employee."  *Id.* at 652 (citing W. PROSSER, LAW OF TORTS 9 (4th ed. 1971)).  Accordingly, "punitive damages may not be imposed against a corporation when one or more of its employees decides on his own to engage in malicious or outrageous conduct."  *Id.*  "If the corporation has formulated policies and directed its employees properly, no purpose would be served by imposing punitive damages against it except to increase the amount of the judgment."  *Id.*

70.    Applying this principle in *In re P&E Boat Rentals*, the Fifth Circuit invalidated a punitive damages award against Chevron based on the "wanton acts" of two company construction foremen who had instructed the operator of a vessel to make a dangerous high speed run on the Mississippi River in a fog, resulting in a collision that killed four people.  872 F.2d at 645, 652.  Even though the evidence showed that other Chevron foremen in the area had required vessels to make such dangerous runs, the Court

vacated the punitive damages award because there was no evidence company

policymakers had sanctioned the practice.  *Id.* at 652.

71.     Thus, to award punitive damages against any Transocean entity here, the

Court must not only find some conduct that satisfies the strict standard for gross

negligence but also find that such conduct is attributable to the company under *In re P&E*

*Boat Rentals*.

72.     Even assuming that some act by the drill crew or bridge crew on the

*Deepwater Horizon* rose to the level of outrageousness that could justify a gross

negligence finding, there is no basis for this Court to hold that any Transocean entity

authorized or ratified any such conduct by any employee on the *Deepwater Horizon* in a

way that could make any Transocean entity liable for punitive damages under *In re P&E*

*Boat Rentals*.

**(5)     Compliance with Regulations and Industry Standards Is
Strong Evidence of No Gross Negligence**

73.     Compliance with government regulations is strong evidence that a

defendant exercised due care.  *Lorenz v. Celotex Corp.*, 896 F.2d 148, 150 (5th Cir. 1990)

(holding, in product liability case that "compliance with such government safety

standards constitutes strong and substantial evidence that a product is not defective")

(quoting *Gideon v. Johns-Manville Sales Corp.*, 761 F.2d 1129, 1144 (5th Cir. 1985)).

Compliance with regulations is not a legal bar to a negligence finding in all situations.

*E.g.*, *Weaver v. Mo. Pac. R.R. Co.*, 152 F.3d 427, 430 (5th Cir. 1998) (compliance with

regulations regarding locomotive safety did not preclude finding of negligence where

regulations did not address other known risks to engineers).  However, when government

regulations address a specific risk, compliance with those regulations does preclude a

negligence claim based on that same risk. *Lane v. R.A. Sims, Jr., Inc.*, 241 F.3d 439, 443-44 (5th Cir. 2001) (compliance with federally set maximum speed limits precluded negligence claim for excessive speed).  As the Fifth Circuit has observed, allowing negligence litigation in an area specifically regulated by federal law would "undermine" the uniformity of the federal regulatory scheme. *Id.* at 443-44 (in a negligence case based on excessive speed, the Fifth Circuit explained that, "allowing juries in FELA cases to find negligence based on excessive speed, even though it did not exceed that set by the FRSA regulations, would further undermine uniformity, because it would result in the establishment, through such verdicts, of varying, uncertain speed limits at different crossings, as well as different speed limits at the same crossing, depending on the time of day, traffic conditions, and other variables") (original emphasis omitted); *see also In re TMI*, 67 F.3d 1103, 1113 n.24 (3d Cir. 1995) ("It can be argued that the nuclear industry is appropriate for considering compliance [with regulations] to be conclusive proof of 'non-negligence' because Congress and the NRC have retained such close control over radiological hazards.").

74.     Similarly, although compliance with industry standards does not necessarily constitute due care in all situations, such compliance does provide persuasive evidence of due care. *Baker v. S/S Cristobal*, 488 F.2d 331, 333 (5th Cir. 1974) ("compliance with the customs and practices of an industry is not in itself due care, but it is evidence of due care") (citation and internal quotation marks omitted); *Cia Maritima Del Nervioni v. James J. Flanagan Shipping Corp.*, 308 F.2d 120, 123 (5th Cir. 1962) (same).  Compliance with industry custom is likewise "relevant evidence tending to

negate an inference of gross indifference." *Maxey*, 665 F.2d at 1376.[50]  As the Fifth

Circuit has explained:  "[T]he employer whose activity is not yet addressed by a specific

regulation and whose conduct conforms to the common practice of those similarly

situated in his industry should generally not bear an extra burden." *S&H Riggers &*

*Erectors, Inc. v. OSHA*, 659 F.2d 1273, 1277 (5th Cir. 1981) (citing *B&B Insulation, Inc.,*

*v. OSHRC*, 583 F.2d 1364, 1371 (5th Cir. 1978)); *S/S Cristobal*, 488 F.2d at 333 (reliance

on custom and practice of industry to determine lack of negligence will not be

disregarded "unless there is a particularly strong showing of the unreasonableness of the

customary practice").

76.       Treating compliance with industry standards as persuasive evidence that a

defendant has acted in conformity with the appropriate standard of care also makes sense

as a practical matter.  After all, a determination that a defendant acting in compliance

with industry practice is negligent, much less grossly negligent, impliedly condemns the

standards followed by an entire industry.

**C.       No Transocean Entity Was Grossly Negligent**

**(1)       No Transocean Entity Was Grossly Negligent in Connection**
**with Well Control**

76.       No conduct by any Transocean employee amounts to gross negligence.

Any mistakes on the part of the *Deepwater Horizon*'s drill crew or bridge crew in

---

[50] *See also O'Neil v. Electrolux Home Prods., Inc.*, No. 06-10433-DPW, 2008 WL 2066948, at
*9-10 (D. Mass. May 14, 2008) (listing compliance with voluntary industry standards as evidence
of no gross negligence); *Richards v. Michelin Tire Corp.*, 21 F.3d 1048, 1059 (11th Cir. 1994)
(compliance with federal regulations and industry practice some evidence of due care); *Drabik v.*
*Stanley-Bostitch, Inc.*, 997 F.2d 496, 510 (8th Cir. 1993) (compliance with industry standards
relevant to punitive damages inquiry); *Reed v. Tiffin Motor Homes, Inc.*, 697 F.2d 1192, 1198
(4th Cir. 1982) (compliance with industry standards relevant to determining whether punitive
damages are warranted); *cf. Gryc v. Dayton-Hudson Corp.*, 297 N.W.2d 727, 734-35 (Minn.
1980) (concluding that compliance with industry flammability test that was *proven invalid* does
not preclude punitive damages as a matter of law).

conducting or interpreting the negative pressure test, monitoring the well during the last 60 minutes before the explosions, responding to signs of a kick, operating the diverter, or not activating the EDS before the explosion, do not rise to the level of gross negligence. This is so because the Court has found no evidence that, as to any of these events, any Transocean crew member exhibited the reckless disregard of consequences necessary to show gross negligence.

77.    Although TDI has admitted that the drill crew was negligent in connection with the negative pressure test, the crew's conduct does not amount to gross negligence. As the Court has found (*supra* ¶ 257), the crew should have recognized, as BP's onshore engineer did, that there cannot be pressure on the drill pipe and no pressure on the kill line in a test that is properly lined up.  However, Transocean's conduct in performing the negative pressure test, and acquiescing in BP's instruction to proceed with displacement following the test, does not exhibit the willfulness or wantonness, or conscious indifference to or reckless disregard of risk required to find such conduct grossly negligent.  *See Becker*, 586 F.3d at 367.

78.    Nor was any conduct of the bridge crew grossly negligent.  As the Court has found (*supra* ¶¶ 348-385 ): The crew was well trained, and Transocean had policies in place that clearly stated that the master was in control in the event of an emergency. Contrary to some parties' contentions, the bridge crew was not required to activate the EDS at the first indication of mud coming from the well.  The bridge crew had no more than 2 or 3 minutes from the time the gas alarms were triggered to the time of the major explosion and blackout.  Both Transocean and BP policy, and good well control practice, required the bridge crew to communicate with the drill crew before activating the EDS.

The bridge crew was not obligated to take unilateral action without regard to consequences, nor was any action or inaction of the bridge crew a gross departure from the standard of care or any indication that the bridge crew was indifferent to safety.

79.     Moreover, even if the Court were to conclude that a crewmember was grossly negligent in his or her actions aboard the *Deepwater Horizon* on April 20, there is no basis to attribute that gross negligence to Transocean under *In re P&E Boat Rentals*. There is no evidence that any Transocean entity ratified or affirmed any grossly negligent conduct by any employee.  To the contrary, to the extent any employee deviated from the standard of care, the Court has found that the evidence shows he or she did so in the moment, reacting to rapidly unfolding events.  The Court has found that Transocean's crew was well trained, and there is no evidence that any action or inaction by the crew was the result of training failures by Transocean or placing unqualified personnel on the rig that could provide a basis for imputing a gross negligence finding to any Transocean entity.  Finding ## 58-99, 348-366, *supra*.

80.     Further, the Court's finding that Transocean's training met all regulatory and industry standards, Finding ## 58-80, 348-385, *supra*, is strong evidence that none of the Transocean entities was grossly negligent.  *Lane*, 241 F.3d at 443-44 (compliance with regulations addressed to particular risk preclude finding of negligence); *Baker v. S/S Cristobal*, 488 F.2d at 333 (compliance with the customs and practices of an industry "is evidence of due care").  Indeed, the Court has found that no party or expert identified any training program provided by any other company or agency anywhere in the world that was superior to the training program Transocean had in place on April 20, 2010.

> **(2)** **No Transocean Entity Was Grossly Negligent In Connection with the Blowout Preventer**

81.     Similarly, with respect to the blowout preventer, Transocean's conduct was not grossly negligent.

82.     First, the Court has found that the BOP functioned as designed on April 20: The blind shear rams closed, but did so on off center drill pipe, which had been pushed off center due to the force of the flow, trapping a piece of pipe between the blades and preventing them from sealing in the well.  The pipe was off center from the outset of the blowout because it buckled due to the force pushing upward on the pipe from below. Thus, regardless whether or not the AMF functioned on April 20, the BOP was by that time not capable of sealing in the well because of the off-center drill pipe.  Finding ## 494-531, *supra*.

83.     Second, the Court has found that the BOP's failure had nothing to do with maintenance:  Expert testimony established that even a perfectly functioning BOP could not have sealed the well under the conditions at Macondo.  Accordingly, any failures in maintaining the BOP, including maintenance of the Blue or Yellow Pod, cannot have been a cause of the blowout.  Finding ## 532-618, *supra*.  The lack of a causal link between any maintenance failures regarding the BOP and its inability to seal the Macondo well on April 20 necessarily precludes a finding of gross negligence regarding Transocean's maintenance of the BOP.

84.     Third, the Court has found that Transocean conducted extensive routine BOP maintenance of solenoids, batteries, and all other BOP components: The solenoid in the Yellow Pod was replaced and tested less than 90 days before the blowout in accordance with Transocean's maintenance plan; and, with respect to the Blue Pod,

Transocean had a policy to change the batteries every year, and batteries in two of the three pods had been timely changed under this policy.  Finding ## 587-616, *supra*.  Based on these findings, the fact that the battery in the blue pod was not changed does not amount to willful, wanton, or reckless conduct, nor does it otherwise demonstrate any reckless disregard of risks by Transocean's subsea employees.  *Becker*, 586 F.3d at 367.  An inadvertent mistake is not sufficient to establish gross negligence.  *Id*.

85.     Finally, even if a Transocean employee was negligent or even grossly negligent in failing to maintain the Blue or Yellow Pod, and that failure was a cause of the blowout, no Transocean entity authorized or ratified any maintenance failure with respect to the BOP.  *In re P&E Boat Rentals*, 872 F.2d at 650.  Rather, the Court has found that Transocean's battery-replacement policy, scheduling battery replacement after one year of "on time" operation was even more conservative than the manufacturer's policy, and Transocean had a sound maintenance policy in place with respect to the BOP.  Finding ## 587-616, *supra*.  Accordingly, no Transocean entity is liable for gross negligence in connection with the BOP.  *In re P&E Boat Rentals*, 872 F.2d at 642.

### (3)     No Accumulation of Acts by Transocean Amounts to Gross Negligence

86.     Plaintiffs argued that different Transocean employees, with different responsibilities, failed in various tasks at various times.  Beyond the admitted negligence in connection with the negative pressure test, Plaintiffs also allege that failures on the part of the drilling crew to perform a flow check or shut in the well sooner during the final 60 minutes, and the crew's alleged failure to activate the overboard diverter, amounted to negligence.  Plaintiffs also allege that the bridge crew was negligent by not activating the EDS sooner.  Finally, Plaintiffs have pointed to alleged failures with respect to BOP

maintenance, and more generally with respect to maintaining other aspects of the rig, as omissions amounting to negligence.

87.     Even assuming that some or all of the acts and omissions alleged by Plaintiffs amounted to negligence, they do not cumulate to gross negligence. *See Clements*, 792 F.2d at 516. In particular, the various acts identified by Plaintiffs occurred at different times and involved different people. Many of the acts—including all those following the negative pressure test—were actions by individuals acting in the moment under extraordinary conditions. Others, such as the allegations about maintaining the BOP occurred months or even over a year earlier, and involved different people. None of these acts, separately or in concert, show that any Transocean entity had the requisite state of mind to support a gross negligence finding. *Clements*, 792 F.2d at 516.

**D.     The Doctrine of Superseding Cause Does Not Apply to the Blowout**

88.     The Supreme Court has recognized the principle of superseding cause in maritime law, which applies when one defendant's negligence contributed to a party's injury, "but the injury was actually brought about by a later cause of independent origin that was not foreseeable." *Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM*, 447 F.3d 360, 367-68 (5th Cir. 2006) (citing 1 SCHOENBAUM, ADMIRALTY & MARITIME LAW 165 (2d ed. 1994)). There is no basis, however, to apply the superseding cause doctrine in this case with respect to the events relating to the blowout, explosion, and sinking of the *Deepwater Horizon.*

89.     For the doctrine of superseding cause to apply and absolve a negligent party of liability based on later negligence by a third party, "the subsequent negligence of the third party must be so extraordinary that a reasonably prudent person could not have foreseen its occurrence." *Tidewater Marine, Inc. v. Sanco Int'l, Inc.*, 113 F. Supp. 2d

987, 999 (E.D. La. 2000); *accord Donaghey*, 974 F.2d at 652-53 (to be a superseding

cause an intervening act of negligence must be "highly extraordinary"; an intervening

negligent act cannot be a superseding cause if it was foreseeable to the negligent actor or

objectively foreseeable, or is a normal consequence of the situation created by the actor's

conduct).

90.     To the extent any party has attempted to assert it here, the Court has

rejected the argument that actions by the Transocean crew during the last 60 minutes

before the explosion constitute a superseding cause to (i) BP's negligence in overseeing

all aspects of the well and instructing the Transocean drill crew to proceed with final

displacement after the negative pressure test, or (ii) Halliburton's negligence in designing

and performing the cement job.  The Court has found that BP and Halliburton decided to

use cement that they should have known was bound to fail, and that BP issued fatal

instructions to the Transocean drill crew to proceed with displacement after the negative

pressure test, despite BP's knowledge that the test was a failure.  Finding ## 126-269,

*supra*.  In light of this evidence, the Court has found that it was not "highly

extraordinary" or unforeseeable that the Transocean crew would fail to shut in the well.

*Stolt Achievement*, 447 F.3d at 367-68.

91.     Regardless, whether the crew acted negligently (or even grossly

negligently) in failing to shut in the well, the blowout was not independently caused by

the Transocean crew, and the crew's actions cannot be deemed a superseding cause,

cutting off BP or Halliburton's liability.  *See, e.g.*, *Donaghey*, 974 F.2d at 653 (the fact

that defendants "knowingly exceeded the rated capacity" of a tool for breaking a frozen

connection on a top drive, causing the tool to break and injure the plaintiff, was not a

superseding cause absolving defendant of liability for any negligence in allowing the connection to become frozen in the first place).

### E. Even If the Court Were to Make a Finding of Gross Negligence, No Punitive Damages Could Be Assessed at This Time

#### (1) Punitive Damages Are Subject to Due Process and Maritime Law Restrictions

92.     "The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003); *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 433 (2001). Punitive damage awards fall within this prohibition if they are not reasonably related to compensatory damages. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 580 (1996) ("The principle that exemplary damages must bear a 'reasonable relationship' to compensatory damages has a long pedigree."); *Poullard v. Turner*, 298 F.3d 421, 423 (5th Cir. 2002) ("It is a well-established principle that punitive damages must bear a 'reasonable relationship' to compensatory damages."). Although the Supreme Court has "decline[d] . . . to impose a bright-line ratio which a punitive damages award cannot exceed" without running afoul of the Constitution, it has held that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm*, 538 U.S. at 425.

93.     The rule in maritime law is even stricter than the due-process limit on punitive damages. After an extensive survey of maritime-law punitive damages awards and considering this constitutional standard, the Supreme Court has held that a "1:1 ratio" between actual and punitive damages "is a fair upper limit" for maritime law cases. *Exxon Shipping*, 554 U.S. at 513.

279

**(2)** **A Determination of Compensatory Damages Would Have to Precede Any Punitive Damages Award**

94.     Given that both the Constitution and maritime law require the trier of fact to consider the amount of compensatory damages awarded when evaluating the reasonableness of any punitive damage award, the Court must make a determination of compensatory damages before making any determination as to punitive damages. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002) (Due Process Clause mandates that "individuals whose property interests are at stake are entitled to notice and an opportunity to be heard") (citation and internal quotation marks omitted); *LaChance v. Erickson*, 522 U.S. 262, 266 (1998) ("The core of due process is the right to notice and a meaningful opportunity to be heard."); *Freeman v. City of Dallas*, 242 F.3d 642, 666 (5th Cir. 2001) ("Due Process . . . requires that individuals must receive notice and an opportunity to be heard before the government deprives them of property.").

95.     Accordingly, because the Court has not yet heard any evidence as to compensatory damages (or even permitted discovery as to damages), the Court cannot make any determination as to any punitive damages award at this time.

**(3)** **An Allocation of Fault Must Precede Any Punitive Damages Award**

96.     There is no joint and several liability for punitive damages. Any punitive damages award must be assessed individually against each defendant found liable for punitive damages and must be based on the individual circumstances and fault attributable to that defendant.

97.     Punitive damages serve a different purpose than compensatory damages. *E.g.*, *Campbell*, 538 U.S. at 416 ("Compensatory damages are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful

conduct," punitive damages "are aimed at deterrence and retribution.") (citation and internal quotation marks omitted). Therefore, although maritime law recognizes joint and several liability among defendants for compensatory damages, *see Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1121-39 (5th Cir. 1995) (en banc), it does not follow that joint and several liability for punitive damages may be imposed. *See, e.g.*, *Loughman v. Consol-Pa. Coal Co.*, 6 F.3d 88, 100 (3d Cir. 1993) ("It is one thing to hold a conspirator liable for all harm (compensatory damages) done by the conspiracy. It is quite another, substantial step to impose joint and several liability for the award of punitive damages, which serve a very different purpose."); *see also Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 325-27 (5th Cir. 1998) (applying Texas law and rejecting plaintiff's argument to apply joint and several liability for punitive damages); *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 374 (2d Cir. 1988) (applying New York law and reversing, *sua sponte*, district court's conclusion that two parties were jointly liable for an award of punitive damages).

98.     In light of these principles, to ensure that any punitive award does not exceed the *Exxon Shipping* 1:1 ratio between compensatory and punitive damages, not only must the Court assess the amount of compensatory damages caused by the blowout, it must also make an allocation of fault amongst the Defendants to ascertain each Defendant's proportional share of any compensatory damages. *See United States v. Reliable Transfer Co.*, 421 U.S. 397, 411 (1975) (comparative fault applies in maritime law); *In re Omega Protein,* 548 F.3d at 370 ("In admiralty cases, federal courts allocate damages based upon the parties' respective degrees of fault.").

99.     Any punitive damages award must then be assessed and measured in proportion to each defendant's allocation of fault regarding compensatory damages. Courts have thus held that the "appropriate way of calculating the ratios [between a compensatory damages award and a punitive damages award] is to divide the individual punitive damages awards by the individual pro rata shares of the actual damages." *Grabinski v. Blue Springs Ford Sales, Inc.*, 203 F.3d 1024, 1026 (8th Cir. 2000); *see also id.* (in reviewing punitive damages award, rejecting plaintiffs' proposal to "divide each individual punitive damages award by the entire actual damages award" as to all defendants to calculate the applicable ratio for excessive damages review, and concluding that plaintiffs' proposal "assumes an impossibility, . . . because it posits that each defendant will ultimately pay the full compensatory damages award"); *accord Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life Activists*, 422 F.3d 949, 961 (9th Cir. 2005) (rejecting district court's calculation of ratio between compensatory and punitive damages that compared total joint and several liability for compensatory damages to each defendant's liability for punitive damages, and instead adopting "an approach that compares each plaintiff's individual compensatory damages with the punitive damages awards against each defendant [because it] more accurately reflects the true relationship between the harm for which a particular defendant is responsible, and the punitive damages assessed against that defendant").

### (4)    It Is Premature to Make Any Fault Allocation

100.    The Court need not make any fault allocation at this time.

101.    First, the Court need not make any fault allocation for purposes of awarding *compensatory damages* to any party because the Court has ruled that BP must indemnify Transocean for compensatory damages for oil pollution claims, Rec. Doc.

5446, and that indemnity obligation applies regardless of the relative fault between BP and Transocean.

102.     Second, as set forth above, a fault allocation would be necessary before any punitive damages could be awarded.  However, the Court need not make any fault allocation for the following reasons:

103.     No fault allocation is necessary because the Court has found that no Transocean entity was grossly negligent, and there is no basis to award punitive damages against any Transocean entity.

104.     If the Court had found some Transocean entity grossly negligent and found a basis to award punitive damages, it would be necessary to allocate fault before making any punitive damages award.  However, source control facts that will be the subject of the Phase Two trial are relevant to any fault allocation.  One issue to be tried during Phase Two is the reason why it took 87 days to cap the well.  Transocean has alleged that BP's conduct relating to source control, including false statements about the flow rate, caused delay in capping the well.  Rec. Docs. 8720, 8722, 8723, 8724, 8798 (Transocean amended and supplemental answers).  These issues will affect any ultimate allocation of fault for damages caused by oil pollution.  Accordingly, the Court will defer making any allocation of fault until after the Phase Two trial.

## VI.   BP MUST INDEMNIFY, RELEASE, AND DEFEND TRANSOCEAN FOR POLLUTION CLAIMS

### A.   Indemnity and BP's Release of Claims Must Be Enforced

105.   The Court has previously found that BP owes indemnity to Transocean under the terms of the Drilling Contract between Transocean and BP.[51]  Rec. Doc. 5446. The Court determined that BP's indemnity obligations apply to claims for compensatory damages against Transocean, even if Transocean is found grossly negligent, Rec. Doc. 5446, at 18, and even if Transocean breached the drilling contract, Rec. Doc. 5446, at 24-25.  The Court also found that BP would not be obligated to indemnify any punitive damages that might arise if Transocean is found grossly negligent.[52]  Id.

106.   In its Indemnity ruling, the Court found that Article 25.1 of the Drilling Contract, which is incorporated into Article 24.2, requires BP to indemnify Transocean for pollution originating beneath the water's surface, "without regard to the cause or causes thereof, including . . . breach of representation of warranty [or] . . . breach of contract . . . ."  Rec. Doc. 5446, at 25.  The Court rejected BP's argument that a material breach of the Drilling Contract would void indemnity.  Rec. Doc. 5446, at 24-25

---

[51] The Drilling Contract was originally entered into between Vastar Resources, Inc. (predecessor to BP) and R&B Falcon Drilling Co. (predecessor to Transocean).

[52] Transocean disagrees with this ruling.  The Court relied upon *Daughdrill v. Ocean Drilling & Exploration*, 665 F. Supp. 477, 481-82 (E.D. La. 1987), which invalidated on public policy grounds an indemnification provision to the extent it applied to punitive damages.  However, more recent Fifth Circuit law supports enforcement of an express agreement to indemnify punitive damages, as found in the Drilling Contract.  TREX 4271; Rec. Doc. 5446.  In the analogous insurance situation, the Fifth Circuit subsequently held that maritime law does not prohibit recovery of punitive damages from an insurer and state law should govern when a insured seeks such recovery.  *Taylor v. Lloyd's Underwriters of London*, 972 F.2d 666, 668-69 (5th Cir 1992).  Adhering to the framework here, Louisiana law allows recovery of punitive damages under an insurance policy.  *Randall v. Chevron USA Inc.*, 13 F.3d 888, 910 (5th Cir. 1994), *overruled in part on other grounds by Bienvenu v. Texaco, Inc.*, 164 F.3d 901, 909 (5th Cir. 1999) (en banc).  There is no principled basis to say that public policy allows a company to purchase insurance for a potential liability for punitive damages but does not allow a company to enter into an enforceable indemnity agreement encompassing liability for punitive damages.

(recognizing holding in *Becker*, 586 F.2d at 368-69, that "[prior Fifth Circuit law] does not hold that breach of a contract necessitates invalidation of an indemnity agreement included therein").

107. The Indemnity ruling stated: "Perhaps it is possible that a breach of a fundamental, core obligation of the contract could invalidate this indemnity clause." Rec. Doc. 5446, at 25. The Court observed that "BP's argument appears doubtful at this stage," but it declined to resolve the issue at the time. *Id.* The Court now finds that BP's indemnity obligations are enforceable both because the agreement expressly contemplates breach of contract, and thus applies regardless of any breach (whether "core" or not), and because in any event there was no breach of any "core" or "fundamental" obligation that could invalidate the express terms of the Contract.

108. It is a cardinal rule of contract interpretation that contractual language be given its plain meaning. *E.g.*, *Foster Wheeler Energy Corp. v. An Ning Jiang MV*, 383 F.3d 349, 354-55 (5th Cir. 2004). This rule applies to maritime indemnity agreements. *Becker*, 586 F.3d at 369 ("A maritime contract containing an indemnity agreement, whether governed by federal maritime or Louisiana law, should be read as a whole and its words given their plain meaning unless the provision is ambiguous.") (citation and internal quotation marks omitted). As the Court previously found, the plain language of the indemnity agreement obligates BP to indemnify Transocean for risks that BP assumed under the contract "without regard to the cause or causes thereof, including . . . *breach of representation or warranty* [or] . . . *breach of contract*." Rec. Doc. 5446, at 25; TREX 4271.30 (Article 25.1) (emphasis added). This language applies equally to Transocean for obligations it assumed under the Drilling Contract, such as the obligation to

indemnify BP for personal injury claims of Transocean employees. TREX 4271.26 (Article 21.1). This plain language dictates that BP's indemnity obligations are enforceable regardless of any breach of contract by Transocean, and the nature of that breach (whether it can be characterized as a "core" breach or not) is immaterial to BP's indemnity obligations. Had BP intended to carve out certain types of contractual breaches that would absolve BP of its indemnity obligations, it was incumbent on BP to negotiate and obtain such an express contract term. *See AGIP Petroleum Co.*, *Inc. v. Gulf Island Fabrication, Inc.*, 56 F. Supp. 2d 776, 777 (S.D. Tex. 1999) (holding contractual consequential damages ban enforceable even for gross negligence, because party seeking consequential damages "did not negotiate for an exception to the exception of consequential damages for any particular cause; it agreed to a blanket ban").

109. Even assuming that there could be some breach that could overcome the plain terms of the Drilling Contract, it would have to rise to the level of conduct more culpable even than the gross negligence expressly contemplated in the Drilling Contract and which the Court has already recognized is covered by the indemnity provision. For example, the Drilling Contract obligated Transocean to "maintain well control equipment in accordance with good oilfield practices . . . and . . . use all reasonable means to control and prevent fire and blowouts" and, in connection with the "mud program," to "exercise due diligence to prevent the well from blowing out," TREX 4271.20-21 (Articles 15.2, 15.6), but at the same time BP expressly agreed to indemnify Transocean for pollution claims, even if caused by Transocean's breach of contract or even gross negligence. Rec. Doc. 5446. Even assuming that the drill crew breached one of these obligations (or some similar obligation), it would make no sense to declare such breach capable of voiding the

286

indemnity obligation, because BP expressly agreed to indemnify Transocean for oil pollution caused by any such breach.  TREX 4271.29-30 (Articles 24.2, 25.1).  To declare that negligence resulting in a blowout absolves BP of its indemnity obligation would rewrite the contract by rendering meaningless BP's express agreement to provide indemnity for oil pollution in that precise situation.

110.    BP might theoretically show a breach involving a level of culpability greater than even gross negligence (which the Court has already found does not excuse BP's indemnity obligation) by establishing some willful or deliberate disregard of contractual duty by Transocean, which created greater risks for BP than those contemplated in the contract.  *Cf. AGIP Petroleum Co., Inc. v. Gulf Island Fabrication, Inc.*, 920 F. Supp. 1330, 1343 (S.D. Tex. 1996) (consequential damages claims in maritime contract that included release for breach of contract and breach of warranty is enforceable unless claim "stem[med] from the willful or deliberate disregard of a contractual duty").  But BP does not seriously contend that Transocean committed a willful or deliberate breach of the Drilling Contract, and there is no evidence from which the Court could find any willful or deliberate disregard of any contractual duty by Transocean, much less a disregard of a duty so fundamental as to expose BP to risks that were not contemplated by the Drilling Contract.

111.    Alternatively, to the extent BP maintains it could rescind the Drilling Contract, thereby avoiding its indemnity obligations, on the theory that Transocean fraudulently induced BP into entering into the Drilling Contract, no evidence supports that argument.  *See United States v. Texarkana Trawlers*, 846 F.2d 297, 304 (5th Cir. 1988) ("defendant may avoid performing its obligations under any [contract] terms to

which the plaintiff has wrongfully induced the defendant to consent").  A fraudulent inducement claim would require BP "to prove a misrepresentation; that [Transocean] knew the representation was false and intended to induce [BP] to enter into the contract through that misrepresentation; that [BP] actually relied on the misrepresentation in entering into the contract; and that [BP's] reliance led [BP] to suffer an injury through entering into the contract."  *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 277 (5th Cir. 2012) (describing elements of fraudulent inducement claim).  BP has not alleged, much less proven, any such conduct, nor could the evidence support any finding of fraudulent inducement that might permit BP to escape its obligations under the Drilling Contract.

112.    Accordingly, BP is required to indemnify Transocean for damages as set forth in the Court's indemnity ruling.  Rec. Doc. 5446.

**B.    BP Must Pay Transocean's Defense Costs for All Indemnified Claims**

113.    In its indemnification ruling, the Court found that the "duties to defend and indemnify are to be treated identically," but found that any obligation to pay Transocean's defense costs for defending environmental claims had not ripened because "the extent to which Transocean is owed indemnity is not entirely clear at the moment." Rec. Doc. 5446, at 28.  The Court thus concluded that "BP's duty to defend only requires it to reimburse Transocean's defense costs after there has been a judicial determination on the merits."  Rec. Doc. 5446, at 28.

114.    Because the Court has determined that BP owes Transocean indemnity for pollution claims for subsurface pollution as set forth in the Drilling Contract, BP's coextensive obligations to pay defense costs has ripened, and BP is obligated to pay Transocean's defense costs for all claims subject to indemnity.

288

## VII.   BP, NOT TRANSOCEAN, BREACHED THE DRILLING CONTRACT

115.   As set forth above, the Court has found that the indemnity obligations in the Drilling Contract are enforceable regardless of any breach of contract by either BP or Transocean, or any negligence or gross negligence.  The Court has further found that Transocean and BP's mutual release of claims against one another in the Drilling Contract, including release of breach of contract claims and claims based on negligence or gross negligence, is likewise enforceable regardless of any breach or any negligence or gross negligence.  Because any breach of contract claim is released and would not change the parties' indemnity obligations, the Court need not make any findings with respect to breach of contract claims.

116.   Nevertheless, in the alternative, the Court finds as follows with respect BP's alleged breach of contract claims against Transocean, Rec. Doc. 2074, purportedly assigned to the Economic Class as set forth in the Economic and Property Damages Settlement, Rec. Doc. 6430-39; and Transocean's third-party breach of contract claim against BP, Rec. Doc. 2068.

### A.   BP Breached Its Warranty of Safe Port and Berth

117.   Safe port and berth warranties are integral parts of a time charter.  The Fifth Circuit has held that a time charterer's safe port warranty "imposes upon the charterer a duty of due diligence" to select a safe location.  *Orduna S.A. v. Zen-Noh Grain Corp.*, 913 F.2d 1149, 1156 (5th Cir. 1990).[53]   A port is deemed safe, for purposes

---

[53] Other circuits have held that the safe port warranty "impose[s] liability on the charterer without regard to the care taken."  *Frescati Shipping Co. v. CITGO Asphalt Ref. Co.*, __ F.3d __, 2013 WL 2099746, at *13 (3d Cir. May 16, 2013) (describing split in authority on this issue and rejecting Fifth Circuit's due diligence requirement as "deviat[ing]" from "well-established standard").  Transocean recognizes this Court is bound by *Orduna* but preserves its argument that that the safe port warranty should apply without regard to due diligence.

of the warranty, where "'the particular chartered vessel can proceed to it, use it, and depart from it without, in the absence of abnormal weather or other occurrences, being exposed to dangers which cannot be avoided by good navigation and seamanship.'" *Frescati Shipping Co. v. CITGO Asphalt Ref. Co.*, __ F.3d __, 2013 WL 2099746, at *11 (3d Cir. May 16, 2013) (quoting Cooke et al., *Voyage Charters* ¶ 5.137 (3d ed. 2007)).

118.    The safe port warranty is non-delegable. *Venore Transp. Co. v. Oswego Shipping Corp.*, 498 F.2d 469, 472 (2d Cir. 1974).

119.    The warranty applies for the benefit of the registered owner of the *Deepwater Horizon*, Triton, as well as for the benefit of the bareboat charterer, Holdings. *Frescati*, 2013 WL 2099746, at *9-11. As the Third Circuit has recently observed, "a safe berth warranty necessarily benefits the vessel, and thus benefits its owner as a corollary beneficiary." *Id.* at *10 (non-contracting owner of vessel held to be third-party beneficiary of warranty, in addition to contracting owner *pro hac vice*).

120.    Although not expressly styled as a time charter, the Drilling Contract between BP and Transocean constitutes a Charter Party because it is a contract for the lease of a vessel, the "Drilling Unit" (Art. 14.1), on a term basis (Art. 1.1.1). TREX 4271.6 ("This CONTRACT shall remain in force and effect for three (3) years (the "Initial Contract Term")). *See, e.g.*, 2 Schoenbaum, *Admiralty and Maritime Law* § 11.1 at 3 (2004) (A time charter is a contract to use a vessel for a particular period of time, and although the vessel owner provides the crew and retains possession of the vessel, the time charterer retains the right to direct the movement of the vessel during the charter period.). The Fifth Circuit has recognized that contracts for the use of a drilling vessel are in effect "charter agreement(s) for a vessel," and accordingly, have described the parties to these

agreements as "rig owner" and "rig charterer." *Trico Marine Operators, Inc. v. Falcon Drilling Co.*, 116 F.3d 159, 162 (5th Cir. 1997); *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1209 (5th Cir. 1986).

121.   The BP/Transocean Drilling Contract contains express provisions regarding the "SAFETY OF PORT," which are set forth in Articles 14.6 and 31.  Under Article 14.6, the standard warranties regarding the safety of any port, place, anchorage, etc. are modified, except as explicitly provided for in Article 31 of the Drilling Contract. Article 14.6 of the Drilling Contract provides as follows:

> 14.6   SAFETY OF PORT
>
> COMPANY [BP] does not and shall not be deemed to warrant the safety of any port, place, berth, dock, anchorage, location, or submarine line and shall be under no liability in respect thereof, *except as specifically provided for under Article 31*.

TREX 4271.20 (emphasis added).  Article 31 provides that BP's non-delegable warranties apply, however, at the "well location":

> 31.1.2  COMPANY makes no warranty or representation, express or implied, and hereby disclaims all such warranties or representations as to any conditions with respect to any port, place, dock, anchorage, access route, location, or submarine line relating to the Work**, except at the well location**.

TREX 4271.37 (emphasis added).

122.   Article 31.1.2 of the Drilling Contract therefore imposes upon the time charterer BP a due diligence warranty in favor of the vessel owner Transocean to provide a safe well location from which the *Deepwater Horizon* is to work.  *Orduna*, 913 F.2d at 1156.  Moreover, this due diligence warranty extends not just to damage to the drilling rig, but to third-party risks under OPA.  *Frescati*, 2013 WL 2099746, at *5.

123.    A well is deemed safe when a vessel may "proceed to it, use it, and depart from it without . . . being exposed to dangers." *Frescati*, 2013 WL 2099746, at \*11, *quoting*, *Coghlin*, ¶10.123.  This Court has found that BP has failed to exercise due diligence in providing a safe well location from which the *Deepwater Horizon* was to work based on BP's failure to maintain a safe drilling margin, to adopt a safe temporary abandonment plan, to plan, direct, or exercise a safe cementing program, or to safely direct and interpret the negative pressure test.   Finding ## 37-47, 126-258, *supra*.  BP is therefore liable for breach of warranty to Triton (registered owner) and Holdings (bareboat charterer and owner pro hac vice) under Article 31.1.2 of the Drilling Contract.

**B.    Transocean Did Not Breach the Drilling Contract**

124.    BP has alleged that the "[t]he Drilling Contract impose[d] a series of duties on Transocean Holdings LLC."  Rec. Doc. 2074, at 21.  These obligations include, inter alia, obligations to "maintain well control equipment in accordance with good oil field practices," to "use reasonable means to prevent fire and blowouts," and to "exercise due diligence to prevent the well from blowing out."  TREX 4271.21-22.

125.    The Court has found that Transocean Holdings LLC exercised due diligence in connection with the Macondo Well.  The contract did not require Transocean to prevent a blowout under all circumstances.  The actions of Transocean personnel on the rig demonstrated a concern for safety and good oil field practices.  Mistakes made by crewmembers are not sufficient to show a breach of contract.

126.    Nor is the admitted negligence of crew members in following BP's instructions to proceed with the negative pressure test despite the observed anomalies in the test sufficient to establish a breach of Holdings' obligation to exercise due diligence to prevent the well from blowing out.  Holdings agreed in the drilling contract to certain

obligations in connection with the "mud program," including to "exercise due diligence to prevent the well from blowing out, and to enable the efficient drilling, logging, and testing of all formations without caving or formation contamination."  TREX 4271.21. Terms in a contract must be construed in the context in which they are used.  *Chembulk Trading LLC v. Chemex Ltd.*, 393 F.3d 550, 555 & n.5 (5th Cir. 2004).  The negative pressure test, which was designed and supervised by BP, was not part of the "mud program"; rather it was intended to test the bottom-hole cement as part of the temporary abandonment procedure.  Negligence by Transocean in connection with the negative pressure test does not amount to a breach of the Drilling Contract's "due diligence" provision.

## VIII.   **TRANSOCEAN'S OPA LIABILITY**

### A.   **Transocean Was Not an Owner or Operator of the Macondo Well for Purposes of Removal Cost Liability Under OPA § 2704(c)(3)**

#### (1)   **The Owner or Operator of the Macondo Well Is Liable for Removal Costs Under OPA § 2704(c)(3) for the Discharge of Oil from the Well**

127.    Section 2704(c)(3) of OPA imposes liability for removal costs on the owner or operator of an OCS facility from which oil is discharged.  33 U.S.C. § 2704(c)(3).  Specifically, the statute provides that:

> Notwithstanding the limitations established under subsection (a) of this section and the defenses of section 2703 of this title, all removal costs incurred by the United States Government or any State or local official or agency in connection with a discharge or substantial threat of a discharge of oil from any Outer Continental Shelf facility or a vessel carrying oil as cargo from such a facility shall be borne by the owner or operator of such facility or vessel.

33 U.S.C. § 2704(c)(3).

128.    OPA defines "Outer Continental Shelf facility" as "an offshore facility which is located, in whole or part, on the Outer Continental Shelf and is or was used for one or more of the following purposes: exploring for, drilling for, producing, storing, handling, transferring, processing, or transporting oil produced from the Outer Continental Shelf." *Id.* § 2701(25).  OPA in turn defines "offshore facility" as "any facility of any kind located in, on, or under any of the navigable waters of the United States, . . . other than a vessel or a public vessel." *Id.* § 2701(22).  Finally, OPA defines "facility" as "any structure, group of structures, equipment, or device (other than a vessel) which is used for one or more of the following purposes: exploring for, drilling for, producing, storing, handling, transferring, processing, or transporting oil.  This term includes any motor vehicle, rolling stock, or pipeline used for one or more of these purposes." *Id.* § 2701(9).  "Because OPA litigants usually agree as to what constitutes the facility for a particular case . . . there is virtually no applicable case law elaborating on this definition." *United States v. Viking Res., Inc.*, 607 F. Supp. 2d 808, 816 n.24 (S.D. Tex. 2009).

129.    The Court has previously determined that the *Deepwater Horizon* was being used as an offshore facility at the time of the blowout.  *In re Deepwater Horizon*, 844 F. Supp. 2d 746, 750-51 (E.D. La. 2012).  The Court has also determined that using the water's surface as a means of apportioning liability under OPA in the MODU-as-offshore-facility context is consistent with the text and legislative history of the statute. *Id*. at 752-53.  Finally, the Court has determined that oil discharges beneath the surface of the water, or subsurface discharges, were discharged from the Macondo Well, and not the MODU.  *See id*.  The Court further determined that BP and Anadarko, as lessees of the

well, are the OPA responsible parties that bear the liability for this discharge. *See id.* at

751-52.  In the Phase One proceedings, the Court is concerned with resolving liability,

including removal cost liability under § 2704(c)(3) of OPA, for the subsurface discharge

of oil from the Macondo Well, rather than above-surface discharge from the *Deepwater*

*Horizon*.

**(2)**      **BP Is the "Operator" of the Macondo Well Under § 2704(c)(3)**

130.     OPA defines an "operator" of a facility as "any person owning or

operating such facility."  33 U.S.C. § 2701(26)(A)(ii).  There is very limited precedent

addressing the application of the term "operator" to § 2704(c)(3).  However, because the

definition of  "operator" under the Comprehensive Environmental Response,

Compensation, and Liability Act (CERCLA) is identical to OPA's definition of this term,

*compare* 33 U.S.C. § 2701(26)(A)(ii), *with* 42 U.S.C. § 9601(20)(A)(ii), courts have

applied CERCLA precedent to this OPA provision, *see United States v. Jones*, 267 F.

Supp. 2d 1349, 1353 (M.D. Ga. 2003) (applying the Supreme Court's decision in *United*

*States v. Bestfoods*, 524 U.S. 51 (1998), which addressed the CERCLA definition of

"operator," to OPA); *Harris v. Oil Reclaiming Co.*, 94 F. Supp. 2d 1210, 1213 (D. Kan.

2000) (same).

131.     In *Bestfoods*, the Supreme Court held that, "under CERCLA, an operator

is simply someone who directs the workings of, manages, or conducts the affairs of a

facility."  524 U.S. at 66.  The Court based this definition on the term's ordinary meaning

and the intent of CERCLA.  *Id.*  Looking to the purpose of CERCLA, the Court held that

"[t]o sharpen the definition for purposes of CERCLA's concern with environmental

contamination, an operator must manage, direct, or conduct operations specifically

related to pollution, that is, operations having to do with the leakage or disposal of

295

hazardous waste, or decisions about compliance with environmental regulations." *Id.* at 66–67.

132.    Notably, under *Bestfoods* the term "operator" does not refer to the entity exercising mechanical control over a facility, but rather the entity ultimately controlling and directing the operations at the site in question. *Id.* at 66; *see also Ryland Group, Inc. v. Payne Firm, Inc.*, 492 F. Supp. 2d 790, 794 (S.D. Ohio 2005) (defendant not an operator under CERCLA where other entity selected the areas defendant would rototill and depth to which it would conduct operations); *United States v. Qwest Corp.*, 353 F. Supp. 2d 1048, 1052 (D. Minn. 2005) (control of drilling activity but not site itself does not establish operator status under CERCLA); *Taliesen Corp. v. Razore Land Co.*, 135 Wash. App. 106, 128, 144 P.3d 1185, 1198 (2006) (looking to *Bestfoods* to find that mechanical control over drilling facility does not give rise to operator status under state statute).

133.    Although Transocean exercised mechanical control over the *Deepwater Horizon*, BP ultimately controlled and directed all operations at the Macondo Well, including all of the activities conducted by the *Deepwater Horizon*. *See* Finding ## 37-47, *supra* (finding that BP determined and directed all aspects of how the well would be designed and drilled, to what depth it would be drilled, the cementing process, and how and when temporary abandonment would take place). Accordingly, the Court holds that BP, and not Transocean, was the only "operator" of the Macondo Well facility under OPA § 2704(c)(3).

134.    This conclusion is consistent with the framework of OPA, which is "rooted in economic theory" and places principal responsibility for the cost of oil

pollution on those entities "benefitting the most from oil production." Rec. Doc. 5809, at 10 (citing *Nat'l Shipping*, 924 F. Supp. at 1447 n.6). Here, BP, as the lessee, stood to derive enormous benefits from the "massive profits that may be made" from the Macondo Well, but Transocean stood to receive limited and defined day-rate compensation as BP's drilling contractor. Rec. Doc. 5809, at 10. Accordingly, the Court's prior conclusion that OPA's language, framework, and legislative history confirm that, under OPA § 2704(b), BP, as the entity benefitting the most from oil production, should bear principal responsibility for damages from the subsurface discharge of oil from the Macondo Well, applies equally to removal costs associated with such discharge under § 2704(c)(3).

135.   It is true that § 2704(c)(3) uses the "owner or operator" formulation rather than the "responsible party" formulation used elsewhere in OPA. But there is no reason to believe that Congress intended liability for removal costs in connection with discharge from an offshore facility to be apportioned differently than liability for other forms of damages (such as property damage, economic loss, or natural resource damages) that, like removal costs, are recoverable under § 2702(b). Rather, it appears that Congress in reconciling the final House and Senate versions of OPA combined language from both. The Senate version, which was adopted as § 2704(c)(3) used the "owner or operator" formulation; the House version, which was adopted as §2704(c)(1) used the "responsible party" formulation. *See* H.R. Rep. No. 101-653, at 105-106 (1990) (Conference Report), *reprinted in* 1990 U.S.C.C.A.N. 779, 785 ("The Conference substitute incorporates provisions from both the Senate amendment and the House bill."). Nothing in the Conference Report suggests that Congress intended that there be any difference between

the subsections of § 2704 that used the Senate's "owner or operator" language and subsections that used the House's "responsible party" language. *See Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 63 (2004) (adopting "common sense" construction of statute and relying on lack of evidence Congress intended to alter meaning of statute through amendment to reject competing interpretation plausibly supported by statutory language).

136.    It is also relevant that BP – and not Transocean -- was the "operator" under the relevant MMS (now BOEMRE) regulations governing oil exploration on the OCS. *See, e.g.*, 30 C.F.R. § 250.105. ("*Operator* means the person the lessee(s) designates as having control or management of operations on the leased area or a portion thereof."); *id.* § 250.400 (distinguishing between "operators" (e.g., BP) and "their contractors" (e.g., Transocean).)  These regulations were in effect when Congress enacted OPA, and it is well established that Congress is presumptively aware of existing regulations, and its "repetition of a well-established term carries the implication that Congress intended the term to be construed in accordance with pre-existing regulatory interpretations." *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998); *see also F.D.I.C. v. Philadelphia Gear Corp.*, 476 U.S. 426, 437 (1986) ("[C]ongressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.") (internal quotation marks omitted); *Lorillard v. Pons*, 434 U.S. 575, 581 (1978) ("Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute").

137.    Rather than changing the identity of the party from which removal costs may be recovered to a party who would not be liable for other forms of available OPA

damages, the purpose of § 2704(c)(3), as set out in the text, is to ensure the United States and State and local governments may recover "all removal costs" "[n]otwithstanding the [monetary liability] limitations established under subsection (a) of this section [2704] and the defenses of section 2703."  33 U.S.C. § 2704(c)(3); *see also* Conference Report at 106 ("The Senate provision also requires that, notwithstanding the liability limits, the owner or operator of a facility or vessel involved in an OCS spill must pay all Federal, State, and local government removal costs.").  That purpose is served by a finding that BP—the acknowledged statutory responsible party for the Macondo well—is also the "operator" of the well within the meaning of § 2704(c)(3).

### (3)   Even If Transocean Were the "Operator," BP Owes Transocean Indemnity for OPA Removal Cost Liability Under This Court's Prior Indemnity Ruling

138.    This Court has held that BP owes Transocean broad contractual indemnity from liability related to pollution that did not originate on or above the surface of the water.  Rec Doc. 5446.  Removal costs are encompassed by this indemnification.

139.    Indemnification for removal costs is not precluded by public policy.  Rec. Doc. 5446, at 12-18, 23; *see also United States v. Lowe*, 29 F.3d 1005, 1010 (5th Cir. 1994) (holding that indemnification for government's recovery of cleanup costs under CERCLA not prohibited by public policy); *Montauk Oil Transp. Corp. v. Tug El Zorro Grande*, 54 F.3d 111, 114 (2d Cir. 1995) (distinguishing between statutory penalty and removal costs).

140.    Moreover, 33 U.S.C. § 2710(a) specifically permits contractual indemnification for liability under OPA.  Rec. Doc. 5446, at 17-18; *cf.* 33 U.S.C. § 2710(b) (providing that indemnification under OPA does not transfer liability); *see also*

Conference Report at 111 (explaining that OPA provides that no indemnification may transfer liability, but OPA allows one party to agree to pay for another's liability).

141.   Any public policy issues regarding indemnification for grossly negligent conduct are not implicated by Section 2704(c)(3) removal cost liability, as liability under Section 2704(c)(3) is unaffected by gross negligence.  *See* 33 U.S.C. § 2704(c)(3).

142.   Therefore, the Court holds that, under the indemnification agreement between BP and Transocean, BP would owe Transocean indemnification for any removal cost liability under Section 2704(c)(3) for pollution originating below the surface of the water.

> **B.   Transocean Did Not Commit Gross Negligence or Willful Misconduct, or Violate Any Statute or Regulation That Would Implicate the Exceptions to OPA's Liability Limits in OPA § 2704(c)(1)**

143.   Under the Court's prior ruling, Transocean is a responsible party under OPA.  Rec. Doc. 5809.  Transocean's liability under OPA, however, is limited to any discharge that occurred on or above the surface of the water.  Rec. Doc. 5809, at 5-14 (interpreting 33 U.S.C. § 2704(b)).  Transocean's liability under OPA for such discharge is subject to the limit that would apply for a tank vessel, and excess liability is borne by the lessee of the well.  33 U.S.C. § 2704(a), (b); Rec. Doc. 5809, at 7-8.

144.   OPA § 2704(c)(1) provides that the liability limit set forth in section 2704(a), which establishes the liability limit for a tank vessel, does not apply

> if the incident was proximately caused by--
>
> (A) gross negligence or willful misconduct of, or
>
> (B) the violation of an applicable Federal safety, construction, or operating regulation by,

> the responsible party, an agent or employee of the
> responsible party, or a person acting pursuant to a
> contractual relationship with the responsible party.

33 U.S.C. § 2704(c)(1).

145.    For this section to apply based on some conduct *by Transocean*, requires (1) proof of gross negligence, willful misconduct, or violation of an applicable federal safety or operating regulation and (2) proof that the violation proximately caused the incident that resulted in a discharge of oil.  *E.g.*, *Nat'l Shipping*, 924 F. Supp. at 1453 (section did not apply where violation of regulation did not cause the collision that resulted in a discharge).

146.    OPA does not define the terms "gross negligence" or "willful misconduct," and thus it is appropriate to look to their accepted common-law definitions. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57-58 (2007) (noting the general rule that when Congress includes a common-law term in a statute it is presumed to incorporate its common-law meaning, absent an indication to the contrary); *Morissette v. United States*, 342 U.S. 246, 263 (1952) ("And where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.").

147.    Courts addressing gross negligence under OPA have adhered to the common-law definition, stating that gross negligence requires proof of "an extreme departure from the care required under the circumstances or a failure to exercise even slight care."  *Water Quality Ins. Syndicate v. United States*, 632 F. Supp. 2d 108, 112 (D. Mass. 2009) (quoting *Kuroshima Shipping S.A. Act of God Defense and Limit of Liability*

*Analysis,* 2003 A.M.C. 1681, 1693 (2003)).  "Willful misconduct" requires proof of some intentional act or omission, taken with knowing disregard of the probable consequences. As one court has described it, willful misconduct requires "an act, *intentionally done,* with *knowledge* that the performance will probably result in injury, or done in such a way as to allow an inference of a reckless disregard of the probable consequences.  If the harm results from an omission, the omission must be *intentional*, and the actor must either *know* the omission will result in damage or the circumstances surrounding the failure to act must allow an implication of a reckless disregard of the probable consequences." *Water Quality I,* 522 F. Supp. 2d at 229 (defining willful misconduct under OPA § 2716(f)(1)) (emphasis added) (quoting *In re Tug Ocean Prince,* 584 F.2d at 1163).

148.    The Court has found that no Transocean conduct amounted to gross negligence under maritime law because there is no proof of the required state of mind of Transocean.  It is even more clear and the Court has found that no Transocean conduct qualifies as the sort of intentional act or omission, taken with knowledge of the probable risks, that could constitute willful misconduct.

149.    Nor did Transocean violate any applicable federal regulation of the type that could remove OPA's liability cap.  As the Court previously found, for this provision to apply, the regulatory violation must itself "be a 'proximate cause' of the incident." Rec. Doc. 5809, at 13.  It is not sufficient that the incident result in the violation of some regulation; the regulatory violation must *precede* and then proximately cause the discharge of oil.  *Id.*  If the regulatory violation is coextensive with the requirements of OPA itself or simply prohibits a discharge, it is not the type of regulatory violation that could satisfy the requirements for lifting the liability caps.  *Id.*  Because the Court has

found that Transocean did not violate any federal safety or operating regulations that proximately caused the spill, the Court concludes that no conduct by Transocean could justify invoking § 2704(c)(1) to lift the OPA liability caps.[54]

---

[54] Transocean, in these proposed findings, acknowledges it was in a contractual relationship with BP, another responsible party, but takes no position on whether BP's conduct constituted gross negligence, willful misconduct, or violated an applicable federal safety regulation that could result in lifting of the liability caps under § 2704(c)(1).

DATED: June 21, 2013

By:   s/ Brad D. Brian
Brad D. Brian
Michael R. Doyen
Luis Li
Daniel B. Levin
Susan E. Nash
MUNGER, TOLLES & OLSON LLP
355 So. Grand Avenue, 35th Floor
Los Angeles, CA 90071
Tel:  (213) 683-9100
Fax:  (213) 683-5180
Email: brad.brian@mto.com
       michael.doyen@mto.com
       luis.li@mto.com
       daniel.levin@mto.com
       susan.nash@mto.com

John M. Elsley
ROYSTON, RAYZOR, VICKERY &
WILLIAMS LLP
711 Louisiana Street, Suite 500
Houston, TX 77002
(713) 224-8380

Respectfully submitted,

By:   s/ Steven L. Roberts
Steven L. Roberts
Rachel Giesber Clingman
Sean D. Jordan
SUTHERLAND ASBILL & BRENNAN LLP
1001 Fannin Street, Suite 3700
Houston, Texas 77002
Tel:  (713) 470-6100
Fax:  (713) 354-1301
Email: steven.roberts@sutherland.com
       rachel.clingman@sutherland.com
       sean.jordan@sutherland.com

By:   s/ Kerry J. Miller
Kerry J. Miller
FRILOT, LLC
110 Poydras St., Suite 3700
New Orleans, LA 70163
Tel:  (504) 599-8194
Fax:  (504) 599-8154
Email: kmiller@frilot.com

*Counsel for Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc.,
Transocean Holdings LLC, and Triton Asset Leasing GmbH*

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2013, I electronically filed the foregoing with the

Court's CM/ECF system and service on all counsel of record by using the LexisNexis

File & Serve, in accordance with Pretrial Order No. 12 which will send a notice of filing

to all counsel accepting electronic notice.

  /s/ Kerry J. Miller
             Kerry J. Miller