### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  **Oil Spill by the Oil Rig** *Deepwater Horizon* **in the Gulf of Mexico, on April 20, 2010**<br><br>**This document applies to:** *All Cases* | **MDL No. 2179**<br><br>**SECTION: J**<br><br>**JUDGE BARBIER**<br>**MAGISTRATE SHUSHAN** |

### TRANSOCEAN'S PHASE ONE POST-TRIAL BRIEF

Brad D. Brian
Michael R. Doyen
Luis Li
Daniel B. Levin
Susan E. Nash
MUNGER, TOLLES & OLSON LLP
355 So. Grand Avenue, 35th Floor
Los Angeles, CA 90071
Tel:  (213) 683-9100
Fax:  (213) 683-5180
Email:  brad.brian@mto.com
         michael.doyen@mto.com
         luis.li@mto.com
         daniel.levin@mto.com
         susan.nash@mto.com

John M. Elsley
ROYSTON, RAYZOR, VICKERY & WILLIAMS
LLP
711 Louisiana Street, Suite 500
Houston, TX 77002
(713) 224-8380

Steven L. Roberts
Rachel Giesber Clingman
Sean D. Jordan
SUTHERLAND ASBILL & BRENNAN LLP
1001 Fannin Street, Suite 3700
Houston, Texas 77002
Tel:  (713) 470-6100
Fax:  (713) 354-1301
Email:  steven.roberts@sutherland.com
         rachel.clingman@sutherland.com
         sean.jordan@sutherland.com

Kerry J. Miller
FRILOT, LLC
110 Poydras St., Suite 3700
New Orleans, LA 70163
Tel:  (504) 599-8194
Fax:  (504) 599-8154
Email:  kmiller@frilot.com

*Counsel for Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc.,*
*Transocean Holdings LLC, and Triton Asset Leasing GmbH*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................................................................1

STATEMENT OF FACTS...............................................................................................3

I. BP'S DECISIONS DOOMED THE CEMENT JOB.......................................3

    A.     BP, as Operator, Was Responsible for the Well......................................3

    B.     BP Engineers Expected the Cement to Fail, and It Did............................3

    C.     Chaos in the Planning for Final Displacement and Abandonment.......................5

II. CONDUCT ON THE RIG ON APRIL 20 ......................................................6

    A.     The Negative Pressure Test......................................................................6

        1.     Failed planning..............................................................................6

        2.     BP Interrupted the Crew's Conduct of a Good Test and Insisted on Conducting a Bad One ...............................................8

        3.     BP Incorrectly Declared the Test a Success .................................9

    B.     Final Displacement of the Well...............................................................9

        1.     BP Ordered the Crew to Displace the Well...................................9

        2.     BP Prepared and Approved the Procedures that Made Anomalies Harder To Detect...........................................................9

        3.     BP Determined that the Negative Test Was Incorrect—and Instructed the Crew to Proceed Anyway .................................10

        4.     Vidrine Failed to Alert the Crew.................................................11

        5.     The Crew Was Attentive and Responsive to the End ..............13

    C.     The Bridge Crew Properly Responded to the Emergency and Successfully Evacuated the Rig ...........................................................15

        1.     The Bridge Crew Had Little Time to React............................16

        2.     Activating the EDS While the Drill Crew Was Trying to Shut-in the Well Would Have Been Unsafe and Contrary to BP and Transocean Policy ..........................................18

        3.     The Bridge Crew Acted Properly During the Limited Time It Had, and Heroically Evacuated All Survivors from the Rig..........................20

    D.     The BOP Could Not Shut in the Well Because the Extreme Flow Forced the Drill Pipe Off Center ...........................................................22

        1.     The Force of the Blowout Pushed the Pipe Off Center........................23

        2.     The Outlying "Force from Above" Theories Are Physically Impossible...............................................................25

        3.     BOP Maintenance Was Neither Causal Nor Grossly Negligent.............26

        4.     Either or Both Pods Could Have Activated the Blind Shear Rams ........26

## TABLE OF CONTENTS
### (continued)

Page

5.   Transocean Properly Maintained the BOP and the Pods ........................ 29

6.   The BOP Was Routinely Maintained and Tested ................................... 30

III.  THE *DEEPWATER HORIZON* HAD A WELL-TRAINED CREW AND WAS WIDELY KNOWN FOR ITS SAFETY AND PERFORMANCE ................................. 32

A.   The *Deepwater Horizon* Crew Was Experienced and Well Trained .................. 32

1.   The Drill Crew Was Highly Trained and Competent ............................. 32

2.   The Bridge Crew Was Well-Prepared for the Emergency ...................... 34

B.   The *Deepwater Horizon* Was Seaworthy and Fit for Service ............................. 36

1.   The Rig Was Repeatedly and Successfully Inspected and Audited ......... 37

2.   No Outstanding Maintenance Issues Contributed to the Incident .......... 39

ARGUMENT ....................................................................................................... 41

I.   PLAINTIFFS FAIL TO MEET THE STRICT STANDARD FOR PUNITIVE DAMAGES AND GROSS NEGLIGENCE ..................................................................... 41

A.   Gross Negligence Requires a Mental State of Reckless Disregard of Consequences ....................................................................................... 41

B.   An Accumulation of Negligent Acts Does Not Constitute Gross Negligence ............................................................................................ 42

C.   Only Acts that Proximately Caused the Blowout Can Be a Basis for Liability ................................................................................................. 42

II.  THE EVIDENCE DOES NOT SHOW GROSS NEGLIGENCE BY THE CREW ....... 43

A.   The Drill Crew Was Not Grossly Negligent in Monitoring and Trying To Shut in the Well ..................................................................................... 43

B.   The Actions of the Bridge Crew Were Not Causal and Not Grossly Negligent ............................................................................................... 44

C.   The BOP's Operation and Maintenance Were Not Causal and Not Grossly Negligent ............................................................................................... 45

D.   Other Rig Maintenance Issues Are Irrelevant ..................................... 46

III.  THE EVIDENCE DOES NOT ESTABLISH GROSS NEGLIGENCE BY ANY TRANSOCEAN ENTITY ............................................................................... 46

A.   Punitive Damages May Not Be Assessed Against Transocean Unless the Company Authorized or Ratified Outrageous or Wanton Conduct .................. 46

B.   Transocean's Compliance With Regulations and Industry Standards Is Strong Evidence Against Gross Negligence ........................................ 47

IV.  THE TRANSOCEAN ENTITIES ARE ENTITLED TO EXONERATION OR LIMITATION IN THE LIMITATION ACTION ................................................. 48

**TABLE OF CONTENTS**
**(continued)**

Page

V.     THE INABILITY OF THE RIG AND HER CREW TO AVOID THE
        BLOWOUT CANNOT JUSTIFY SHIFTING BLAME FROM BP AND
        HALLIBURTON ......................................................................................................50

CONCLUSION ......................................................................................................................50

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Allied Chem. Corp. v. Hess Tankship Co. of Del.*,
   661 F.2d 1044 (5th Cir. 1981) ............................................................................. 50

*Atl. Sounding Co., Inc. v. Townsend*,
   557 U.S. 404 (2009) ............................................................................................. 41

*Baker v. S/S Cristobal*,
   488 F.2d 331 (5th Cir. 1974) ............................................................................... 47

*Becker v. Tidewater, Inc.*,
   586 F.3d 358 (5th Cir. 2009) ......................................................................... 41, 43

*City Nat'l Bank v. United States*,
   907 F.2d 536 (5th Cir. 1990) ............................................................................... 41

*Clements v. Steele*,
   792 F.2d 515 (5th Cir. 1986) ............................................................................... 42

*Continental Oil Co. v. Bonanza Corp.*,
   706 F.2d 1365 (5th Cir. 1983) (en banc) ............................................................ 49

*Donaghey v. Ocean Drilling & Exploration Co.*,
   974 F.2d 646 (5th Cir. 1992) ............................................................................... 50

*Exxon Shipping Co. v. Baker*,
   554 U.S. 471 (2008) ......................................................................................... 1, 41

*Firemen's Fund Ins. Cos. v. M/V VIGNES*,
   794 F.2d 1552 (11th Cir. 1986) ........................................................................... 48

*Gideon v. Johns-Manville Sales Corp.*,
   761 F.2d 1129 (5th Cir. 1985) ............................................................................. 47

*Coryell v. Phipps*,
   317 U.S. 406 (1943) ............................................................................................. 48

*Houston Exploration Co. v. Halliburton Energy Servs. Inc.*,
   269 F.3d 531 (5th Cir. 2001) ......................................................................... 41, 42

*In re Kristie Leigh Enters., Inc.*,
   72 F.3d 479 (5th Cir. 1996) ................................................................................. 48

*In re P&E Boat Rentals*,
   872 F.2d 642 (5th Cir. 1989) ........................................................................... 1, 46

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Lorenz v. Celotex Corp.*,
  896 F.2d 148 (5th Cir. 1990) ................................................. 47

*Mac Towing, Inc. v. Am. Commercial Lines*,
  670 F.2d 543 (5th Cir. 1982) ................................................. 49

*Martin v. Texaco, Inc.*,
  726 F.2d 207 (5th Cir. 1984) ................................................. 42

*Maxey v. Freightliner Corp.*,
  665 F.2d 1367 (5th Cir. 1982) (en banc) ................................ 41, 43

*Picou v. D & L Towing, Inc.*,
  No. 09-2810, 2010 WL 2696468 (E.D. La. July 2, 2010) ................ 49

*Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM*,
  447 F.3d 360 (5th Cir. 2006) ................................................. 50

*Taylor v. Texaco, Inc.*,
  814 F.2d 231 (5th Cir. 1987) ................................................. 42

*Trico Marine Assets, Inc. v. Diamond B Marine Servs. Inc.*,
  332 F.3d 779 (5th Cir. 2003) ................................................. 49

*Woolard v. Mobil Pipe Line Co.*,
  479 F.2d 557 (5th Cir. 1973) ............................................... 42, 45

**FEDERAL RULES**

Fed. R. Civ. P. 52(c) ............................................................... 49

**TREATISES**

BLACK'S LAW DICTIONARY (9th ed. 2009) ................................... 41

v

## INTRODUCTION

The Transocean crew on the *Deepwater Horizon* on April 20 worked hard to control the well and protect the rig, her crew, and the environment.  But they were working without critical information about the instability of the cement—information that BP never told the crew.  There can be no dispute that a catastrophic cement failure caused the blowout.  That failure arose from the chaos, rushed decisions, and violations of internal procedures by BP and the incompetence of Halliburton's cementing team.  The BP engineering team *expected* the cement to fail, but expressed more concern about saving time and money than about the safety of those on the rig.

The drill crew was handed a dangerously flawed well and a fatally flawed abandonment plan, without the warnings they were due—warnings that would likely have saved their lives. They were unable to avoid the blowout.  Transocean has admitted negligence in not further investigating anomalies in the negative pressure test and instead following BP's instructions to proceed with displacement.  But mistakes do not constitute gross negligence.  The crew's actions consistently demonstrated concern for safety—the opposite of the "willful, wanton, and reckless indifference for the rights of others," required to prove gross negligence.  *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 493 (2008).  BP has urged that the crew should have acted more quickly, but the Court should not cast crewmembers as *grossly negligent* for not discovering faster the dangers BP already knew.  The crew worked diligently to the end *trying* to deal with a mess that they did not create, were not warned about, and did not fully understand until it was too late.

The evidence cannot support any finding that the crew acted with reckless indifference to danger, let alone that Transocean "authorize[d] or ratifie[d]" any "wanton actions" by the crew— the essential requirement for punitive damages against the company.  *In re P&E Boat Rentals*, 872 F.2d 642, 650 (5th Cir. 1989).

Unable to show gross negligence by the crew, the PSC tried broad and unfocused attacks

1

on the company, arguing that it provided inadequate training and maintenance, or had ignored lessons from a handful of well-control events around the globe.

These attacks failed.  The Transocean drill and bridge crews were well trained and experienced.  The *Deepwater Horizon* and her crew had earned a reputation for safely and successfully drilling the deepest, most challenging wells in the world.  No party offered evidence of better training or better performance anywhere.  The PSC's reliance on prior well-control events was similarly misplaced.  Transocean crews managed such events as well or better than industry standards.  More importantly, the evidence demonstrated that Transocean investigated these events, disciplined employees who failed to live up to their duties, and identified and applied lessons from those events by revising the company's Well Control Handbook and incorporating those changes into crew training.

The attacks on the condition of the BOP and the rig in general were also misguided.  The forensic evidence demonstrated that the inability of the BOP to seal the well was due not to maintenance, but to the extreme conditions of the blowout.  That conclusion was supported by the data and analysis of Transocean, Halliburton, Stress Engineering, and DNV.  The outliers were BP and DOJ, whose theories could not be squared with the forensic evidence.  The rig is a floating factory in hostile conditions, needing—and receiving—perpetual maintenance, a fact accepted by regulators and the industry.  The evidence demonstrated attention to thousands of maintenance tasks, including an extensive, detailed schedule of BOP maintenance approved by BP and implemented the week before the BOP was installed at Macondo.  Audits as recent as April 2010—like all the many audits before that—found the rig suitable for operations.  The PSC tried to make much of a list of "overdue maintenance" items on April 20, but the list was a red-herring: Not one item was related to, or a cause of, the blowout.

This brief addresses the legal questions posed by the Court and the trial evidence as it bears on those questions. We first summarize the evidence in three parts: (1) the decisions by BP and Halliburton that doomed the cement job; (2) the conduct of the crew on April 20; and (3) conduct before April 20, including training and maintenance. We then explain why, under the governing standards, the evidence does not support gross negligence by the crew or the company and why Transocean should prevail in the limitation action.

## STATEMENT OF FACTS

## I.    BP'S DECISIONS DOOMED THE CEMENT JOB

### A.    BP, as Operator, Was Responsible for the Well

As leaseholder, BP was the "operator" of the Macondo well, responsible for designing, planning, and completing the well; hiring and supervising contractors; and implementing the drilling and completions plans. BP designed the well, oversaw the cement job, planned the temporary abandonment, and instructed and supervised the crew carrying out that plan.

### B.    BP Engineers Expected the Cement to Fail, and It Did

**1.  *Drilling Margin*.** BP repeatedly allowed the drilling margin to fall below the 0.5 ppg required by the MMS,[1] stopping only when it had "simply run out of drilling margin."[2] Getting a good cement job and safely abandoning the well thus posed an enormous challenge.[3]

**2.  *BP Failed to Obtain Required Stability Tests*.** To deal with the narrow margin, BP selected foamed cement, which protects the fragile formation, but increases the risk of failure, because it is less stable. BP and Halliburton nevertheless skipped the required and critical

---

[1] Requirement for 0.5 ppg: TR. 665-66 (Huffman); TREX 4021.1.1.US (BP's 5/13/09 APD maintains a 0.5 ppg drilling margin for each drilling interval). Repeatedly falling below 0.5 ppg: TR. 663:10-14, 669:10-670:15 (Huffman) ("BP, in drilling this well, repeatedly violated the safe drilling margin, in some cases drilling with no margin at all."); TREX 1131 (4/13/10 Bodek email); Paine Depo. 209:5-12, 259:25-261:19, 268:21-269:20 (drilling margin was 0.1 to 0.27 at points during drilling at Macondo).

[2] TREX 4530 (4/13/10 Bodek email); TR. 669:7-670:15, 716:16-719:2, 745:22-747:7 (Huffman).

[3] TR. 2257:3-6 (Benge); TREX 1.33-35 (Bly Report).

stability tests.[4]  That was wrong here, given the decision to use leftover cement mix that contained a "defoamer" additive that can create instability in foamed cement.[5]  Halliburton's written policy warned against using defoamer in foamed cement slurry.[6]

Halliburton's Jesse Gagliano had expressly warned BP that defoamer should not be used in foamed cement.[7]  Mr. Gagliano also warned, just hours before the cement was pumped, that BP's plan to use only six centralizers during the job carried the risk of a "SEVERE GAS FLOW problem."[8]  The BP engineers had concluded that Gagliano was incompetent.[9]  They ignored his warnings and did nothing to address their concerns that he failed to provide requested tests or accurate results.[10]  And they failed to alert the crew.

**3.  *BP Failed to Wait for the Cement to Set.***  Putting pressure on cement before it sets risks failure.  To address this risk, the prudent and common standard is to wait at least 24 hours for cement to set.[11]  Halliburton tests, shared with BP, showed it likely would not set within that period.[12]  BP commenced the negative test only 16 hours after the cement was pumped.

**4.  *BP Recognized the Risk of Failure but Proceeded Anyway.***  When asked what he expected of the cement job in light of all the issues, onshore engineer Mark Hafle said he

---

[4] TR. 2367:21-2372:19, (Benge); TR. 3205:11-3207:1, 3324:18-3325:1, 3278:13-15 (Roth); TR. 1379:14-20 (Bly); TREX 640.16 (BP-Halliburton contract listing testing requirements); TREX 634.39 (BP GoM SPU Recommended Practice for Cement Design and Operations); TREX 42045.59 (showing Halliburton's testing requirements); D-6330 (testing requirements of the BP-HESI contract and BP's internal testing requirements).

[5] TR. 2244:16-2245:12, 2355:3-6 (Benge); TR. 3194:7-3195:15 (Roth); D-4381 (Halliburton manual excerpts).

[6] D-4381 (Halliburton manual excerpts); TREX 5219.1 (Halliburton Zone Sealant Technology Bulletin:  "Do not use defoamers . . . D-AIR defoamers . . . These materials will destabilize the foam.").

[7] TREX 7489.1 ("This cement cannot be used when foaming because of the D-Air in the blend.").

[8] TR. 2967:10-15 (Probert); TR. 3136:9-11 (Roth), TR. 6602:6-6604:23 (Gagliano); TREX 4575.18 (4/18/10 Production Casing Design Report).

[9] TREX 1396.1-.3 (Morel email); Walz depo 321:25-322:4, 323:9-17, 324:9-23, 331:16-332:1, 334:12-16, 882:23-24, 884:9-20; TREX 1698.75 (Walz handwritten notes); TREX 296.2 (BP notes of Hafle interview).

[10] Walz Depo. 334:12-336:15, 482:3-483:1.

[11] TREX 8140.81 (Beck expert report); TR. 7167:16-19 (Beck).

[12] TR. 2331:13-2332:3 (Benge); TREX 717.3 (email from Gagliano to BP wells team attaching test results).

"thought we are going to get a shitty cement job."[13] Rather than take the time to get it right,

BP's attitude, expressed in an email four days before the blowout, was: "But who cares, it's

done"; if it didn't work, they'd just do it again, a process the engineers call a "squeeze job."[14]

Everyone who has since looked at the cement job agreed with Hafle's expectation: the multiple

risks "virtually assured that the cement would not form a barrier in the well."[15] No one at BP or

Halliburton ever told the crew that the cement was not expected to work.

  **C.**  **Chaos in the Planning for Final Displacement and Abandonment**

    In the days leading up to April 20, BP changed the temporary abandonment plan every

other day.[16] Engineers disagreed and undid each other's decisions; no one stopped to assess the

effect of the changes, the alarmingly accumulating risk, or the danger of confusing the rig crew.[17]

    The changes did not improve the plan; instead, they ratcheted up the risk. BP increased

the displacement depth from 933 feet below the ocean floor to 3,000 feet, reducing the

hydrostatic barrier and increasing the pressure on the bottom-hole cement; and BP delayed the

installation of the surface cement plug until after the crew removed all the drilling mud from the

first 3,000 feet of the well *and* from the riser.[18] A surface plug would have prevented the

blowout, but as a result of the change in plan, the well blew out before it could be installed.[19]

    In a contemporaneous email, John Guide accused the engineering team of "driving

---

[13] TREX 4451.3 (BP investigation notes of Hafle interview); TR. 2249:15-2256:16 (Benge).

[14] TREX 1367 (4/16/10 email from Cocales to Morel)

[15] TR. 2585:1-12 (Benge); TR. 3045:12-14, 3137:17-3138:9, 3141:4-8, 3215:8-16 (Roth) ( "low probability that zonal isolation would be delivered through the [cement] design").

[16] TREX 8140.90 (Beck expert report) (BP "chang[ed] temporary abandonment plans at least four times"); TREX 7676.30 (Barnhill expert report) ("BP generated at least five TA procedures between April 12th and April 20th").

[17] Frazelle Depo. 458:25-459:12, 546:19-24 (BP failed to perform the required documented risk assessment on the April 16 temporary abandonment plan); Little Depo. (6/30/11) 115:13-17 (no formal risk assessment on the final temporary abandonment procedure); Cowie Depo. 383:16-384:3 (BP investigator) ( "Was there anything documented? I don't know."); TREX 7676.33 (Barnhill expert report).

[18] D-2445 (listing key aspects of the temporary abandonment plan); D-2174 (BP's planned TA procedure); D-4940 (same); TREX 7676.30-31 (Barnhill expert report); TREX 547.1 (BP's April 20 "ops note").

[19] TREX 7676.31 (Barnhill expert report.)

chaos." There had been "so many last minute changes," he said, "that the W[ell] S[ite] L[eaders] have finally come to their wits end." "The quote," Guide reported, from his conversation with the BP leaders on the rig, was "flying by the seat of our pants." Guide predicted, "the operation is not going to succeed if we continue in this manner."[20]

## II.   CONDUCT ON THE RIG ON APRIL 20

### A.   The Negative Pressure Test

BP bore ultimate responsibility for planning,[21] supervising,[22] and interpreting the negative pressure test.[23] BP failed its responsibility by designing a flawed test; interrupting and changing the test midcourse; and then, when the BP Well Site Leader and the onshore engineer recognized the test could not be relied upon, failing to alert the crew.

#### 1.   Failed planning

BP's onshore engineering team created a series of conflicting negative test procedures.[24] The test procedure that emerged was deeply flawed.

##### a.   *The Final Test Procedure Violated BP's Representations to MMS.*   BP obtained MMS approval for its abandonment procedure by representing that it would conduct *two* negative tests, one *before* and one *after* displacement of the drilling fluids from the well.[25] The

---

[20] TREX 96.2 (4/17/10 Guide email).

[21] Shaughnessy Depo. 156:20-157:9 (BP's Technical Authority for Well Control) ("[u]sually it would be the drilling engineer [that would] write it, probably in consultation with other engineers"); TR. 9352:7-18 (O'Bryan) (BP "put together the procedure"); LeBleu Depo. 573:1-7 (BP in charge of negative test); TR. 4328:10-16 (Barnhill).

[22] Guilty Plea Agreement, Exh. A at 1, *United States of America v. BP Exploration & Production, Inc.*, No. 2:12-cr-00292-SSV-DEK (Nov. 15, 2012)).

[23] TR. 4328:5-9 (Barnhill) ("[BP] would have made the call whether to accept or reject the test and move forward."); TR. 7204:1-19 (Beck) (BP was responsible for "making the final determination" of whether the test had passed); M. Sepulvado Depo. 207:4-17; TR. 9380:8-12 (O'Bryan); TR. 1677:6-17 (Ezell); TR. 4521:12-4522:1 (Newman); Cameron Depo. 85:1-9; Emmerson Depo. 172:5-12; Roller Depo. 45:11-47:3; Earl Lee Depo. 197:24-198:5; Keeton Depo. 653:2-19; Clark Depo. 207:9-18; Tabler Depo. 343:14-24.

[24] D-6579 ("Negative Pressure Test Flip-Flops"); D-6629 ("Negative Testing Procedures: April 12-April 20, 2010"); TR. 2112:19-2113:7 (Heenan); TREX 22694.11 (Heenan Expert Report); TR. 4313:7-20 (Barnhill).

[25] TREX 570.3.1.TO (4/16/2010 Application for Permit to Modify (APM)); TR. 2113:23-2114:20 (Heenan); Trocquet Depo. 151:13-22 (APM called for two negative tests); TR. 4329:3-21 (Barnhill).

onshore engineers then decided to cut the first test and leave only the second.[26]  They did not seek approval from, or even notify, MMS.[27]

   **b.  *BP Confounded the Test by Using Inappropriate Fluids with a Known but Unassessed Risk of Clogging the BOP Lines.***  To save the expense of shipping left-over lost-circulation materials to shore for disposal as hazardous waste, BP decided to flush these materials down the well as a "spacer" before the negative test.[28]  Lost circulation materials are designed to plug holes and cracks in the geological formation[29]; they are not designed to be, and had never been, used as a "spacer."[30]

   BP was warned of the risk that these fluids could clog small lines or restrictions in the assemblies exposed to the fluids,[31] but did nothing to evaluate risk or alert the crew to it.[32]  Experts later concluded these fluids likely plugged the kill line, creating the "no flow" condition the Well Site Leaders relied upon in incorrectly concluding the negative test was successful.[33]

   **c.  *The BP Procedures Failed to Provide Crucial Details.***  BP's final investigative report conceded that the negative test procedure "did not provide detailed steps and did not specify

---

[26] TREX 1816.1.1.TO (4/18/10 email from Guide to Morel) (instructing only one negative test be conducted); TR. 4330:3-13 (Barnhill); TREX 37031.42 (Hafle interview: "John Guide made decision"); D-6579 ("Negative Pressure Test Flip-Flops"); D-6629 ("Negative Testing Procedures: April 12-April 20, 2010").
[27] TREX 37031.42 (Hafle interview) ("Who indicated MMS doesn't need to be called? John Guide"); TR. 4329:22-4330:2 (Barnhill); Powell Depo. 118:5-119:16 (BP Regulatory Advisor).
[28] Billon Depo. 73:24-74:6, 188:6-10, 398:19-399:3; LeBleu Depo. 217:6-21; Lindner Depo. 63:21-23, 63:25-64:14; Maxie Depo. 130:13-23, 131:11-13, 131:25-132:03, 132:05-06, 132:05-06, 132:08-15.
[29] Billon Depo. 304:1-305:2.
[30] Maxie Depo. 129:7-17, 19-20 ("It was not marketed for a spacer, it had never been used before as a spacer"); TR. 7364:10-22 (Beck); Billon Depo. 188:2-5, 304:21-305:15; S. Johnson Depo. 121:13-21; LeBleu Depo. 248:10-13; TR. 7202:11-14 (Beck); TREX 8140.102.3.TO (Beck expert report).
[31] TREX 7614.1 (4/16/10 email from Maxie to LeBleu et al.) ("if there are any small restrictions in the assembly this [plugging] would be a risk"); Maxie Depo. 236:19-237:10.
[32] Lindner Depo. 328:16-329:22.
[33] TREX 8140.102.3.TO (Beck report) (spacer likely plugged kill line resulting in no flow during negative test); TR. 4364:25-4365:5 (Barnhill); TR. 2120:25-2121:3 (Heenan); TR. 7207:15-18 (Beck); TR. 7610:17-7611:9, 7729:14-18 (Bourgoyne); *see* TR. 4338:1-4339:1 (Barnhill) (no flow on kill line not likely due to inadvertently closed valve).

expected bleed volumes or success/failure criteria."[34]  That omission became critically important when BP's interruption of the test produced unprecedented and anomalous results.

### 2.  BP Interrupted the Crew's Conduct of a Good Test and Insisted on Conducting a Bad One

The crew started the negative test on the drill pipe, as they usually did.  It was undisputed that, had they been permitted to complete that test, it would have revealed the cement failure.[35]

The crew understood there were anomalies.  They saw them and responded.  They looked for the source of an initial pressure anomaly—and traced it to the unusually large quantity of heavy fluids leaking past the lower annular.  They properly addressed that issue, and when pressure again rose on the drill pipe, they again started to investigate to find the cause.

The crew did not treat its responsibilities cavalierly or act recklessly.  To the contrary, while a negative test normally takes an hour; the crew here spent three hours.  Based on the evidence, there was "no doubt," the DOJ's expert conceded, the crew wanted "to get it right."[36]

The BP Well Site Leader interrupted the crew's drill-pipe test and insisted that they switch to monitoring on the kill line.[37]  The crew followed that instruction—the method of testing was BP's to choose.  They opened the kill line and watched 30 minutes for flow.  There was no flow—a classic indicator of a successful kill line test.[38]

Whether the kill line was incorrectly lined up or (more likely) plugged by the leftover

---

[34] TREX 1.41B.TO (Bly Report); TREX 547.1 (BP April 20 "ops note").

[35] TR. 2119:3-6 (Heenan); TR. 4369:10-19 (Barnhill); TR. 2027:22-23 (R. Sepulvado).

[36] TR. 2123:17-19 (Heenan).  The experts agreed: TR. 4339:21-4340:1 (Barnhill); TR. 7570:2-8 (Bourgoyne).  And so did the eyewitnesses: TR. 8280:8-16 (Lambert) ("[T]here was discussion the entire time while the pressure was building and bleeding off."); Winslow Depo. 448:20-449:10 (he saw the crew in drill shack having a "very detailed discussion" about the test); TR. 9367:21-24 (O'Bryan).  BP well site leader Vidrine stated later that the crew "joked" about his concerns.  TREX 37031.15 (BP investigation notes).  But the account of every other eyewitness contradicts Vidrine's self-serving characterization of the crew's behavior.

[37] TREX 5.2.1.TO (BP interview Kaluza) ("Don insisted that it must be done down kill line."); TR. 7206:10-7207:6 (Beck); TR. 1328:7-1329:13 (Bly).

[38] TR. 2120:8-12 (Heenan); D-3561 (depicting this portion of the testing at 3:30-3:34).

lost-circulation materials, there is no question but that the kill line produced a false and confusing result.  By contrast, allowing the crew to finish the test on the drill pipe would have led to only one, clear result: the well was not secure.[39]

### 3.     BP Incorrectly Declared the Test a Success

Ignoring the continuing pressure on the drill pipe, the BP Well Site Leaders declared the test a success and ordered the crew to displace the well.[40]  BP's suggestion that the drill crew convinced the BP Well Site Leaders that a "bladder effect" explained the continued drill pipe pressure should be rejected.  The BP Well Site Leader's signed statement and emails made no mention of the crew's view of the test or of any reliance on the crew's view.[41]  In any event, the BP Well Site Leaders were responsible for interpreting the test, and they did so incorrectly.

### B.     Final Displacement of the Well

### 1.     BP Ordered the Crew to Displace the Well

The decision "to proceed with the displacement to seawater despite the failed negative test was BP's and BP's alone to make."[42]  Accepting BP's instructions, the crew began removing the heavy drilling fluids that were, unbeknownst to them, the only barrier holding back the well. It was, in the words of BP's expert, "just a matter of time until the well began flowing again."[43]

### 2.     BP Prepared and Approved the Procedures that Made Anomalies Harder To Detect

The final steps of BP's displacement plan increased the difficulty of monitoring the well

---

[39] TR. 2121-7-22 (Heenan); TR. 7725:6-11 (Bourgoyne); *accord* TR. 2118: 25-2119: 17 (Heenan).
[40] TREX 51133.2.TO (Bly) (Signed statement of Vidrine and Kaluza) ("Successful negative test monitored at the kill line."); TREX 4447.6.1.TO (BP investigators' notes of Hafle interview) ("Don told Mark that he was fully satisfied that the rig crew had performed a successful negative test.").
[41] TREX 51133 (Signed statement of Vidrine and Kaluza) (conceding they declared the test a success, making no mention of the "bladder effect," "annular compression," or any efforts of the Transocean crew to convince them to ignore pressure on the drill pipe); TR. 9376:13-9379:16) (O'Bryan) (confirming that he asked Vidrine and Kaluza to prepare their signed statement and that statement contains no mention of  "bladder effect") .
[42] TR. 7204:5-7, 15-19 (Beck); TR. 7727:19-23 (Bourgoyne); TR. 4482:7-19 (Barnhill).
[43] TREX 8173.64 (Bourgoyne expert report).

during this critical period.[44]  BP should have prepared a pump schedule, specifying pump

pressures and bleed back volumes, which would have helped the crew to detect anomalies,[45] but

the procedures prepared by BP that night included no such specifications.[46]

BP procedure also instructed the crew to pump seawater into the well directly from the

ocean (the "sea chest") and to displace the spacer directly overboard.[47]  Both procedures—in

contrast to a so-called "closed pit system" —reduced the crew's ability to detect anomalies.[48]

### 3.    BP Determined that the Negative Test Was Incorrect—and Instructed the Crew to Proceed Anyway

At 8:52 p.m., according to post-accident simulations, the well became "underbalanced";

there were no longer enough heavy fluids in the well and riser to prevent the well from flowing.[49]

At some point the well began to flow, as seen in subtle signs detected in post-event analyses.[50]

At the same moment, 8:52 p.m., BP Well Site Leader Don Vidrine called Mark Hafle,

one of BP's onshore engineers.[51]  Vidrine had "something niggling in the back of his mind"

about that pressure on the drill pipe.[52]  Vidrine told Hafle that the test was "squirrely": there was

"zero pressure on the kill line," but "they still had pressure on the drill pipe."[53]  Hafle

immediately understood what that meant: He told Vidrine, "*you can't have pressure on the drill*

---

[44] TREX 567.1.TO (BP/*Deepwater Horizon* Rheliant Displacement Procedure); TR. 7721:17-7722:1 (Bourgoyne).
[45]  TREX 7676.6-7, 7676.36-37 (Barnhill report); TR. 4419:23-4420:24 (Barnhill); TREX 8140.14 (Beck report) ("BP should have provided its contractors with a pressure and volume schedule to aid in the detection of well anomalies").
[46] TREX 567.1.TO (BP/*Deepwater Horizon* Rheliant Displacement Procedure).
[47] *Id.* ("9. If static sheen is an apparent pass, discharge remaining spacer and seawater down overboard line").
[48] TREX 8173.65 (Bourgoyne expert report) ("pumping overboard" made it more difficult to monitor the volume of fluid returning from the well); TREX 8154.19 (Beck Report, App. C) (same); TR. 7218:2-10 (Beck).
[49] TR. 2195:2-12 (Heenan);  TR. 4359:13-4360:15 (Barnhill).
[50] Very subtle signs of flow have been identified post-incident in the data at approximately 9:00 p.m.  TR. 2195:2-12 (Heenan); TR. 4278:8-4280:3, 4359:13-4360:15 (Barnhill); TREX 7676.41-42 (Barnhill report); Gisclair Depo., 324:7-12, 395:21-397:5.
[51] TREX 7318.8 (call log shows Hafle call to "Horizon-Company Man" with duration of 609 seconds); TREX 50964.3.TO (BP notes of Hafle interview) ("Don called Mark at 8:52 pm"; Cowie Depo. 312:11-313:12.
[52] Cowie Depo. 315:5-10.
[53] TREX 49.3 (BP notes of Vidrine interview); TREX 4447.6.1.TO (BP notes of  Hafle interview).

*pipe and zero pressure on the kill line in a test that's properly lined up.*"[54]

Hafle had real-time pressure data from the well in his office.  He could check what was happening at that moment, and he could review the negative test.[55]  He did neither.

Both men had the authority *and the responsibility* to alert the crew, stop the displacement, and insist on another negative test.[56]  No one has identified any other prudent course.  Hafle, who told investigators after the fact that he expected to get a "shi\*\*\* cement job," went home.[57]  Vidrine went down to the drill floor and *instructed the crew to continue displacing the well*.

### 4.    Vidrine Failed to Alert the Crew

At 9:08 p.m., per BP's procedures, the crew shut down the pumps to conduct the "sheen test."[58]  Vidrine went down to the drill floor during the sheen test to check on the status and give the crew instructions to proceed with final displacement.[59]

BP has suggested that, by this time, there were already anomalous pressures on the drill pipe.  That is clear with the benefit of hindsight; but it was not clear in the moment.  In the words of the DOJ's expert, "well control is a team operation."[60]  And the anomalies were missed by all: By the driller, who was responsible for monitoring;[61] by the mud-logger, Joseph Keith, who was

---

[54] TREX 4447.6.1.TO (BP notes of Hafle interview); *see also* TREX 37031.95 (BP notes of Hafle interview).
[55] TREX 50964.3.TO (BP notes of Hafle interview) ("Mark [Hafle] had InSite up."); Corser Depo. 393:25-395:6 (confirming Hafle could see real time Sperry-Sun data through InSite, including pressure and flow data); TR. 2100:17-2101:2, 2101:3-8 (Heenan); TR. 4342:20-4343:6 (Barnhill); *see also* Sprague Depo. 614:2-5 (BP could monitor negative test remotely from BP's Houston office).
[56] TR. 2103:25-2104:14 (Heenan); TR. 4345:7-22 (Barnhill); TR. 8900:6-9 (Guide); TR. 7208:8-18 (Beck) (Hafle "should have stopped operations"); TREX 7676.40 (Barnhill expert report); TREX 22694.5 (Heenan expert report).
[57] TR. 7986:6-11 (Robinson); TR. 2101:13-22 (Heenan).
[58] TREX 567 (BP/*Deepwater Horizon* Displacement Procedure); TR. 4282:19-4284:5, 4284:6-4285:18 (Barnhill); TREX 7676.42 (Barnhill expert report).
[59] *See* TREX 302.2.TO (BP notes of Vidrine interview); TREX 3A.2 (BP notes of Vidrine interview); TR. 4285:19-4286:20 (Barnhill); TR. 1369:13-23 (Bly) (after test, Vidrine ordered crew to "continue displacing").
[60] TR. 2193:20-22 (Heenan).
[61] TR. 6226:7-6227:6 (Ambrose); McMahan Depo. 271:4-8, 10-20, 271:22-272:14; TR. 7528:15-7529:5 (Bourgoyne).

also responsible for monitoring;[62] and by Vidrine, who bore ultimate responsibility on the rig for the security of the well and who was in the drill shack at the time.[63]   Indeed, the crew appears to have conducted a "flow check" at this time—the "gold standard" for determining whether the well is secure.[64]   Both Vidrine and Keith recalled one.[65]

Vidrine had real-time well monitoring data in his office,[66] but was likely in the drill shack at the time of the unnoticed rise in pressure.[67]   In any event, Vidrine conceded he checked one or more of the screens, and that "everything [was] fine."[68]   Notwithstanding his troubling conversation with Hafle, and Hafle's view that the negative test had not been done correctly, Vidrine told the crew to continue removing drilling fluids from the well.[69]   BP's Murry Sepulvado testified that his practice was to remain in the drill shack during such operations.[70]   Vidrine went back to his quarters.[71]

Per Vidrine's instructions, the crew re-started pumping at 9:14 p.m.   From this point on, every barrel pumped accelerated the flow of the well.   The crew pumped fluids *overboard*, per BP's written procedures, which made a kick even harder to detect.

---

[62] TR. 3489:19-22, 3490:9-21 (Keith);  TREX 8154.30 (Beck report); TR. 7215:5-7 (Beck); TR. 2192:7-19 (Heenan).
[63] TREX 2386.25 (BP's Well-Control Response Guide) ("the BP Well Site Leader is responsible for the well, escaping effluent (oil, gas, and water), and the effects of that effluent on third parties and the environment on and away from the site" in well control event); Mazella Depo. 165:12-166:8, 170:14-20, 170:23-171:4.
[64] TR. 7206:10-7207:6 (Beck); TR. 2140:25-2141:4 (Heenan).
[65] TREX 3.2a.TO (BP notes of Vidrine interview) ("went to rig floor, everything fine / realized at that point to check flow—was not flowing as far as he knows, shaker hand and mud eng monitoring"); TR. 3568:4-21; 3570:9-3571:4 (Keith—conducted flow test during sheen test); TR. 3587:9-21 (Keith) (flow check indicated well was static); TR. 7217:16-7218:10 (Beck); TR. 4284:20-25 (Barnhill); TR. 7217:16-7218:10 (Beck).
[66] TR. 1938:1-8 (R. Sepulvado); Bement Depo. 98:10-98:17; Williams Depo. (Video) 347:15-348:09; P. Earl Lee Depo. 73:15-23, 74:16-75:5, 77:18-19, 77:22-78:4.
[67] TR. 1360:2-8 (Bly).
[68] TREX 3.2a.TO (BP notes of Vidrine interview) ("went to rig floor, everything fine . . . strokes looked okay to Don on panel").
[69] TREX 58.2.1.TO (BP notes of Vidrine interview) (after sheen test, Vidrine "gave okay to start dumping"); TR. 4286:21-4287:7 (Barnhill); TREX 295.21.TO (BP notes of Vidrine interview) ("21:10-21:18 --> Sheen test passed --> Gave OK for Oboard dump"); TR. 1369:13-23 (Bly).
[70] M. Sepulvado Depo. 829:2-830:5 ("To complete displacement, you need to be there.").
[71] TREX 302.2.TO (BP notes of Vidrine interview).

### 5.      The Crew Was Attentive and Responsive to the End

At 9:17 p.m., an anomalous spike in pressure occurred, and the crew immediately shut down three pumps to investigate.[72]  They sent a crewmember to repair the number 2 pump and resumed operations on the other pumps.[73]

Only a few minutes later, sometime around 9:28 p.m., the crew saw another anomaly: an unexplained rise in pressure on the kill line, not matched by the drill pipe, which appeared otherwise normal.[74]  The anomaly was not a classic indicator of a kick; it has not been explained to this day.[75]  Nevertheless, the crew noticed and responded immediately: They shut down the pumps to investigate.[76]  Chief Mate David Young, who went to the drill floor at this time to ask about status and schedule for upcoming tasks, reported that he saw the crew talking seriously about a "differential pressure."[77]

Unaware of the high likelihood of cement failure and of the failure of the negative test, the crew spent precious minutes investigating the likely *source* of the anomaly.  They did not immediately perform a flow check per Transocean's Well Control Handbook,[78] but they were not idle.  When they shut down the pumps, the pressure held steady for a moment, and then increased.[79]  In response, they opened the drill pipe to release the pressure (an indication they thought they were experiencing a problem at the surface), and then closed the drill pipe.[80]  When the pressure rose and then declined—a classic indication of a kick—the crew quickly lined up

---

[72] TR. 4287:8-4288:11 (Barnhill); D-6652.9 (Sperry data); TR. 4287:21- 4288:6-8 (Barnhill).

[73] TR. 3605:20-3606:19 (Keith) (Assistant Driller Curtis told him "we blew a pop-off, and we're sending a crew down there"); TR. 4288:2-3, 4288:12-22 (Barnhill); *see* D-6652.11 (Sperry data).

[74] TR. 5702:19-5706:23 (D. Young); TR. 4289:20-4292:20 (Barnhill); TREX 22694.24 (Heenan report).

[75] TR. 7299:17-7300:11 (Beck) (pressures "virtually impossible to figure out"); TREX 22694.23 (Heenan report).

[76] TREX 7676.8 (Barnhill expert report); TREX 22694.24 (Heenan report).

[77] TR. 5702:19-5706:23, 5754:5-5755:8 (D. Young); TREX 22694.24 (Heenan report).

[78] TR. 4432:12-4435:15 (Barnhill); TREX 41008.70 (Well Control Handbook).

[79] TR. 4289:20-4292:6 (Barnhill) ("we see it [pressure] kind of flatten out then start to increase again").

[80] TR. 2132:24-2134:13 (Heenan);  TR. 1361:18-1362:25 (Bly); TR. 6058:22-6060:14 (Ambrose); TREX 1.98, 1.101 (Bly Report).

the pipes for a flow check, and determined the well was flowing.[81]

At about 9:42 to 9:43 p.m., they closed the Upper Annular, the normal first response to a kick.[82] They likely determined from the pressure that the annular was unable to seal the well. Accordingly, at about 9:46 p.m., they closed the Middle and Upper Variable Bore Rams.[83] The sharp increase in drill pipe pressure shows that the well was sealed around 9:47 p.m. and remained sealed through the end of data transmission.[84] In their final minutes, the crew likely believed they had succeeded in shutting in the well and knew they had to circulate rapidly expanding gas out of the riser.[85]

To deal with the gas in the riser, the crew activated the diverter. Per BP policy, to avoid discharging mud into the Gulf, the diverter was set to send flow to the mud gas separator.[86] At about 9:46, the mud gas separator became overwhelmed. Eyewitnesses testified that they saw massive flow coming out of the overboard lines, indicating that, consistent with Transocean's Well Control Handbook, the crew switched from the mud gas separator to the overboard lines.[87]

At the same time, the drill crew made and responded to a series of calls. The crew called Vidrine and told him they were getting back mud and were closing in the well and diverting the flow.[88] They called the bridge and reported they were dealing with a well control situation.[89] In their last call, they phoned Transocean Senior Toolpusher, Randy Ezell. The Assistant Driller told Ezell they were shutting in the well; mud had shot to the top of the derrick; the windows

---

[81] TR. 5033:21-5036:21 (Barnhill).
[82] TR. 5033:21-5036:21 (Barnhill).
[83] TR. 4297:11-4298:11, 5037:25-5039:11 (Barnhill).
[84] D6652.12 (Sperry demonstrative); TR. 5037:25-5038:14 (Barnhill).
[85] TR. 5037:25-5039:11 (Barnhill).
[86] TR. 4309:11-21, 4310:12-4311:3 (Barnhill); TR. 1787:6-22 (Ezell); *see* TREX 2210.17 (BP NAX-DW Gulf of Mexico Deepwater Well Control Guidelines, p. 16, § 4.1.13); Pleasant Depo. 325:9-12; 615:11-616:11, 624:5-625:6;
[87] TR. 4263:23-4264:8 (Barnhill); TREX 41008.207.1.TO (Transocean Well Control Handbook); TR. 1706:15-23, 1812:19-1813:14 (Ezell); TR. 5878:7-5879:7 (D. Young).
[88] TR. 4295:16-4296:9 (Barnhill); TREX 51133.3 (signed statement of Vidrine and Kaluza).
[89] TREX 4472.5 (Transocean internal investigation: Fleytas interview form).

were covered with mud; and they needed his help.[90]  Ezell rushed to get his coveralls and boots, but was blown against the wall of his quarters by an enormous explosion.  Fire engulfed the rig. He never made it to the drill floor.[91]

Criticisms have been leveled against the drill crew for responding too slowly.  That is easy to say with months to study the events.  Those on the rig remember events unfolding all too quickly.  No evidence suggests that the crew was indifferent to safety or did anything other than try to understand what they were dealing with and to take the appropriate action.

Pressure anomalies do not come with calling-cards announcing their meaning.  They are inherently ambiguous.  The crew's job is to "troubleshoot"—to "investigate [and] determine the cause."[92]  The crew would have been aided immeasurably by knowing what BP knew: that the "shi*** cement job" was likely to fail and that the negative test was likely wrong.  Knowing what BP knew could have saved their lives.[93]

## C.     The Bridge Crew Properly Responded to the Emergency and Successfully Evacuated the Rig

BP's efforts to shift responsibility for the blowout to the bridge crew are without merit. The real-time well data, simulations, and the eyewitness accounts all establish that the bridge crew had two to three minutes from the first indication that something was wrong to the explosion.  In that time, the crew: (1) investigated anomalous sounds and sights; (2) responded to gas alarms; (3) warned the *Damon Bankston* to move out of harm's way; (4) communicated with the drill shack and the engine room about what was going on; and (5) sounded the general alarm. Then, in the midst of a raging inferno, the bridge crew successfully mustered the crew, took roll,

---

[90] TR. 1697:1-19, 1807:24-1809:2 (Ezell) (call from Assistant Driller Stephen Curtis); TR. 9180:10-16 (Shanks).
[91] TR. 1808:17-1809:2 (Ezell).
[92] TR. 2130:24-2131:5, 2131:15-18 (Heenan) (not every potential kick indicator justifies shutting in the well; upon seeing indicators, appropriate action for driller is to "investigate [and] determine the cause").
[93]  TR. 2136:2-16 (Heenan) (Good Oilfield Practice requires telling the driller that the negative pressure test might not be good, because knowing that information "might just save his life").

launched the life boats and life rafts, and evacuated every soul onboard who survived the explosion, including the badly injured.  The Captain and the Dynamic Positioning Officer were the last two crewmembers on board; they pushed off the last life raft, jumped 75 feet into the water, and then swam over to cut the raft free from the burning rig.

The argument advanced with great emotion at trial (by non-well control experts) that the bridge crew should have preempted the drill crew by hitting the Emergency Disconnect at the first sign of mud coming up was meritless.  Not a shred of evidence established that such a course of action or such a policy had ever been recommended, propounded, or even once followed in the history of offshore drilling.

### 1.    The Bridge Crew Had Little Time to React

BP's seaworthiness expert Andrew Mitchell, relying on a timeline from the Bly Report, assumed the bridge crew learned of the problem at 9:41 p.m. and had eight minutes to react.[94] The Bly chart cited no support and was contradicted by BP's own flow modeling and the consistent eyewitness testimony.

First, the evidence clearly established that the bridge crew's first indications of danger were when the mud gas separator became overwhelmed, spewing mud and setting off the gas alarms.  Post-event modeling showed those events occurred at 9:46.  Stress Engineering calculated that mud would have sprayed out of the vent lines from the mud gas separator between 9:45 p.m. and 9:46 p.m. and determined "with a high degree of confidence" that "gas reached the rig surface" at 9:46:40 p.m.[95]  BP's flow expert, Morten Emilsen, reached the same conclusion.[96]  Gas alarms thus could not have gone off until after 9:46:40, and the explosion and

---

[94] TR. 9416:21-9417:15 (Mitchell); D-4967 (BP timeline citing TREX 1.103-04 (Bly Report)).
[95] TREX 50150.4.
[96] TREX 40003.11 (add energy Report) (gas arrived at the surface "at about 21:46 hrs").

blackout occurred a little over two minutes later, at 9:49 p.m.[97]  There was no contrary evidence.

Second, that two-to-three-minute time frame was corroborated by eyewitnesses' testimony that the period from first indication that something was wrong until the explosion was very brief.  Senior Dynamic Positioning Officer Yancy Keplinger first knew something was wrong when he heard a "high pressure hissing noise."[98]  BP's Bly Report reasonably equates this hissing noise with the discharge of gas from the mud gas separator vents, *i.e.*, just after 9:46 p.m.[99]  Keplinger immediately went to the rig's CCTV system and saw "mud spraying out of . . . [what he thought] was diverter pipe."[100]  "It was seconds," Keplinger said, between the time he saw mud and the first explosion, after which the bridge "started receiving gas alarms all over the place."[101]  Gas alarms could have sounded no earlier than when gas reached the rig, at or after 9:46:40.  Keplinger was responding to the gas alarms—trying to alert the crew in the shaker house—when the major explosion and blackout occurred.[102]

BP's Patrick O'Bryan and Chief Mate David Young, testified to the same hissing noise and to the short duration from first indication to the explosion:  O'Bryan said he felt a shaking, Captain Kuchta opened the door and they saw mud; then Kuchta "closed the door.  And shortly thereafter, there was an explosion.  You could actually hear a hissing noise, and then there was an explosion.  And within seconds, … you could hear just a big sucking sound, and there was a second, much larger explosion."[103]  The hissing sound and first explosion occurred "very shortly" after he first felt the shaking, and "certainly, the time frame between the first and the

---

[97] TREX 1.103 (Bly Report); TREX 4248.95 (Transocean Investigation Report); D-4330A (BOP Timeline).
[98] Keplinger Depo. 75:14-20.
[99] TREX 1.28 (Bly Report).
[100] Keplinger Depo. 76:15-77:13.
[101] Keplinger Depo. 80:5-12; *see also* TREX 4472.5 (Transocean internal investigation: Fleytas interview form).
[102] Keplinger Depo. 86:16-87:12.
[103] TR. 9282:16-9284:3 (O'Bryan).

second [explosions] was really quick."[104]

Chief Mate David Young testified that the time between first hearing the hissing noise—his first indication that something was wrong—and the time of the massive explosion, was "[l]ess than a minute. Seconds."[105] The testimony of other crew members was the same.[106]

### 2. Activating the EDS While the Drill Crew Was Trying to Shut-in the Well Would Have Been Unsafe and Contrary to BP and Transocean Policy

The bridge crew must know what the drill crew is doing before making a decision to EDS. As Mr. Barnhill explained, in a well control situation, "the bridge needs to understand what's going on, what the operations are at the time in relationship to the vessel itself as to what the relationship between the well and the vessel is."[107] BP's well control manual notes that communication between the marine and drill crew is a "major" line of communication during a well-control operation and "that even the most well-conceived well control procedures can go badly wrong if communication before and during the operation is not properly organised and effective,"[108] The Transocean emergency manual *requires* the drill crew to communicate with the bridge and the bridge to keep the rig crew informed of the ongoing situation.[109]

Here, the bridge crew knew the drill crew was working to shut in the well. The bridge crew could not and should not have interfered with that process by activating the EDS at that point, particularly as the drill crew had just closed the Variable Bore Rams and shut in the well. DPO Andrea Fleytas was properly attempting to re-establish contact with the drill crew to

---

[104] TR. 9370:14-23 (O'Bryan).
[105] TR. 5714:5-10 (D. Young).
[106] TREX 4373.9 (Meinhart sworn statement).
[107] TR 4296:6-9 (Barnhill); *see also* TR. 1788:18-1789:8 (Ezell).
[108] TREX 2389.37-38 (BP Well Control Manual).
[109] TREX 4644.78-79, 276, 277 (*DWH* Emergency Response Manual) ("There is redundant communication in the Drillers Console and in the CCR [on the Bridge] to insure that the Driller and the CCR can communicate in case of any emergency.").

determine the status of the well control efforts when the rig exploded.[110]

The argument—voiced by two seaworthiness experts with no well control training—that the bridge crew should have hit the EDS when they first saw a problem, without coordinating with the drill floor, is without merit.  The EDS is a last resort, when other systems have failed; it is industry practice for the crew to try to use other BOP components to shut in the well first.[111]

EDS by the bridge crew without consulting with the drill crew can be counterproductive. The bridge crew has no idea whether a tool joint or other heavy tubular is across the Blind Shear Rams.[112]  In that situation, the Blind Shear Rams cannot shear the joint; hitting the EDS would neither seal the well nor release the vessel from the wellhead.[113]  Second, because the disconnects happens *at the seafloor*, EDS (even when successful) leaves the rig attached to a riser full of expanding gas, and will not prevent an explosion and fire.[114]  Third, operating the EDS without first warning the drill crew risks serious injury to drill crewmembers.[115]  Hitting the EDS without consultation with the drill crew would be irresponsible.

Eyewitness testimony established that Captain Kuchta was "in charge of the scene on the bridge" and "very calm and direct."[116]  And there was no showing that any action by the Captain would have actually made a difference.  The evidence demonstrated that, after 9:46, the Blind Shear Rams could not cut the pipe, which had been pushed off center.  And as Plaintiffs' expert Webster conceded, even if there was "delay" in hitting the EDS after the explosion, there was no

---

[110] TREX 4472.5 (Transocean Fleytas interview form).

[111] TR. 4312:1-13 (Barnhill) (EDS "is a terminal operation"); TR. 5033:21-5034:4, 5036:12-21 (Barnhill).

[112] TR. 1789:10-14; 1790:10-25, 1898:7-23 (Ezell); TR. 5649:17-23 (D. Young).

[113] TR. 1789:20-22, 1790:19-25 (Ezell); TREX 2389.303-04 (BP Well Control Manual).

[114] TR. 5038:21-5039:11 (Barnhill) ("if you EDS at that point, whatever is in that riser is going to come with you.").

[115] TREX 4644.295 (*DWH* Emergency Response Manual) (prior to EDS, drill crew must "ensure that no one enters the rig floor area, and clear[s] persons out of the moon pool area").

[116] TR. 5720:16-23 (D. Young); Meinhart Depo. 127:25-128:16., 279:2-11; *see also* Keplinger Depo. 112:7-10.

causation.[117]  The explosion had already severed the connection with the BOP.  That is why the EDS did not operate when the crew activated it shortly after the explosion.

It is all well and good for BP to find a retired mariner with no well control experience willing to say that *he* would have hit EDS at the first sign of trouble regardless of the consequences, and, if it was wrong, so be it.  There was no evidence at trial that activation of the EDS without regard to consequences and without consultation with the drill floor was the policy of any company or regulatory body anywhere in the world.

### 3.    The Bridge Crew Acted Properly During the Limited Time It Had, and Heroically Evacuated All Survivors from the Rig

The crew's actions from the first sign of trouble to the final evacuation demonstrated their concern for safety and the efficacy of Transocean's constant emergency drills.  When gas alarms went off, Keplinger and Fleytas began addressing those alarms and performing essential, emergency communications.  Keplinger called the *Damon Bankston* and told her to move off the port side.[118]  Fleytas "started pulling up the fire and gas systems to see where these detectors were"; after noticing gas alarms in the shaker house, Keplinger "called down there to see if anybody was there, because if they were there, [he] wanted them to get out and close the door behind them.  Nobody answered."[119]

Fleytas talked with the drill floor.  "One of the crew members from the Drill Floor called and said 'we have a well control issue' and hung up. . . .  Andrea tried to call the Drill Floor back, but no one answered.  She received another call saying 'well control situation' and hung up. . . .  She tried calling back but never got an answer"; "the rig blacked out at that time."[120]

---

[117] TREX 22700.3 (Webster expert report) (explosion "disabled the vessel's emergency disconnect system").
[118] TREX 5032.3 (Transocean Keplinger interview form); TREX 4373.8 (Meinhart sworn statement).
[119] Keplinger Depo. 86:16-87:12.
[120] TREX 4472.5 (Transocean Fleytas interview form).

Fleytas and Chief Mate Young hit the general alarm.[121]  Keplinger got on the PA and directed the crew to "report to their Emergency Stations and musters at Lifeboat 1 and 2."[122]  The overwhelming majority of the 115 men and women aboard mustered at their assigned stations and evacuated in lifeboats; six crew members stayed behind to help carry off badly injured crewmen.[123]  They rescued injured crewmembers Buddy Trahan and Wyman Wheeler from the wreckage, and got both of them onto stretchers and off of the rig.[124]  Ezell recalled that Wheeler "couldn't support his weight.  And he asked me to set him down.  And I said, 'You don't understand. If you don't come with me now, I mean, we're going to die.' And he said, 'No, you don't understand. I can't go.' He said, 'Save yourself.' And that's why I told him, 'I am not going to leave you in here. I'm not leaving you here.'"[125]

Chief Mate Young had to be physically restrained from trying to recover the body of Dale Burkeen, because of the fire and falling debris.[126]  Captain Kuchta and Keplinger "were the last off the rig"; after pushing off the last life raft, they jumped 75 feet into the water.[127]

 Randy Ezell recalled being in the life raft, still tethered to the rig:

> [W]e were getting extremely hot, we were cooking. And we couldn't locate our knife at the moment with all the heat and all; and it [the line to the rig] popped, and we just thought the line popped due to the heat.  But the captain, when he jumped in, he saw we were connected to the rig, he swam to a *Damon Bankston* fast rescue boat, and got a knife, because Transocean was knife-free, came back and cut that lanyard. That allowed us to escape from the rig.[128]

By the time the bridge crew learned of the emergency, the riser was full of gas; the drill

---

[121] TR. 5714:17-5715: -7 (Young), TREX 4472.5 (Transocean Fleytas interview form); Keplinger Depo. 98:6-11.
[122] Keplinger Depo. 98:12-20; TREX 4472.5 (Transocean Fleytas interview form).
[123] TREX 50003.15-16 (Wolfe report).
[124] TR. 1810:16-1811:22 (Ezell); TREX 5425.3 (Transocean Carden interview form); TREX 5732.8 (Transocean Murray interview form).
[125] TR. 1810:16-1811:4 (Ezell).
[126] TR. 5716:9-5717:19 (D. Young)
[127] TREX 5032.4 (Transocean Keplinger interview form).
[128] TR. 1912:1-13 (Ezell); TR. 5723:8-24 (D. Young) (same).

pipe was pushed to the side of the well by the force of the blowout. An explosion was coming

fast. And there was nothing the bridge could do to stop it. In an extreme and fast-developing

emergency, the bridge crew acted in accordance with training and Transocean policy. However

much the after-the-fact experts might pick at their decisions, there was no denying that the bridge

crew and the leadership of the rig showed at all times a selfless concern for safety. They

accomplished, at times heroically, the one great responsibility that remained to them: Getting

everyone who survived the blast off the rig and safely home.[129]

### D. The BOP Could Not Shut in the Well Because the Extreme Flow Forced the Drill Pipe Off Center

The evidence at trial revealed that DNV (Dr. Thompson), Stress Engineering (Dr.

Garrett), Transocean (Mr. Childs), Halliburton (Dr. Stevick), and, in important respects, the Bly

investigation, were all in agreement as to what happened to the BOP:

1.  The flow of the well lifted the drill pipe so that when the crew activated the BOP at

about 9:42 p.m., the Upper Annular at the top of the BOP closed partly around a tool joint and

failed to seal the well.[130]

2.  The flow pushed the pipe to the side of the well. With the Upper Annular already

closed at the top of the BOP, when the crew activated the Variable Bore Rams at the bottom of

the BOP, at approximately 9:47 p.m., the rams pinned the off-center pipe into place.[131]

3.  Thus, minutes later, when the conditions were met for activation of the Automatic

---

[129] TR. 4184:6-8 (Webster) (agreeing that the bridge crew "oversaw the evacuation of every single person who survived the explosion"); TR. 9522:22-9523:5 (Mitchell); TREX 50003.15 (Wolfe report).

[130] TR. 6927:19-22 (Stevick) ("while the annular was closing the force of this blowout [was] lifting the tool joint up into the annular."); TREX 7536.90.1.TO (Perkin) ("[f]low from the well apparently lifted the drill string upwards such that it forced a tool joint into the upper annular BOP before it fully closed"); TR. 5105:16-5105:2 (Childs) ("The action of the extreme flow pushed the tool joint partially into the upper annular BOP."); *see also* TREX 50150, Hydraulic Analysis of Macondo #252 Well Prior to Incident of April 20, 2010 (providing calculations of flow rate and the force of the well at the time the annular closed).

[131] TREX 43093.167.1.TO (DNV Report); TREX 50150.145.2 (Stress Engineering Report); TREX 61124.15.2.TO (Stevick rebuttal report); TREX 7688.9 (Childs rebuttal report).

Mode Function (AMF or "deadman")— the pipe inside the BOP was pinned to the side of the well bore.  Even if the AMF functioned perfectly, the Blind Shear Rams could not cut the off center pipe and could not seal the well.[132]

4.  The rig began to drift after the explosion took out the power.  Within minutes, the drill pipe broke apart above the BOP's upper annular as a result of fierce erosion and the tension created by the drifting of the rig.[133]

These were the conclusions of DNV, Stress, Halliburton, Transocean, and, in critical respects, the Bly investigation.  BP and DOJ were the outliers.  Their theories that forces exerted on the drill pipe from *above* the BOP after the explosion caused the pipe *inside* the BOP to be pushed up against the side of the well are indefensible.  Every expert agreed the drill pipe broke apart *above* the upper annular; forces exerted on the drill pipe from above the break could not have forced the separated piece of pipe within the BOP *below* the upper annular to the side.  DOJ's expert tried not to mention (let alone defend) his "rig drift" theory in his direct examination.  BP's expert was left defending his "falling traveling block" theory by claiming that the pieces of pipe that would prove his theory happened to be "gone" by the time DNV brought everything ashore for examination.

### 1.    The Force of the Blowout Pushed the Pipe Off Center

*All* the experts agreed that flow of the well *can* buckle drill pipe.  Four experts concluded that the force of the blowout was sufficient to buckle the pipe and push it to the side of the well bore.  The two experts who disagreed had little or no relevant experience and were not credible.

---

[132] TREX 43093.167.1.TO; TR. 6924:3-7 (Stevick) ("the pipe[ was] already buckled by the time the crew closes the annular and closes the VBR, then even if the AMF functions perfectly, it cannot cut the pipe and seal the well at that time"); TREX 43093.171.2 (DNV) ("the force needed to buckle the drill pipe was present" at the time of the blowout); TR. 5085:19-5086:4 (Childs).

[133] *See* D-6637 (models of pipe segments); D-6704 (photos of pipe segments); TREX 1.165.1.TO (Bly Report) ("[t]he drill pipe likely had already failed at the eroded section . . . as it was being pulled upwards due to increasing vessel offset"); TR. 2756:12757:10 (Davis); TR. 6952:24-6953:9 (Stevick); TR. 5121:20-5122:12 (Childs).

DNV analysis and modeling showed that the "upward force" of the flow and pressure "provided the forces necessary for the drill pipe to elastically buckle, forcing the drill pipe to the side of the wellbore" by the time the Variable Bore Rams were closed [134] Stress Engineering did its own modeling and reached the same conclusion:  By the time the crew closed the Variable Bore Rams, the flow and pressure of the well were sufficient to lift and buckle the pipe.[135]

Halliburton's expert, Dr. Stevick, also did his own calculations and similarly concluded:  By the time the crew closed the Variable Bore Rams, "the drill string [was] already in its buckled state, forced to a position near the bore wall (kill side) in the BSR" due to the flow of the well.[136] Transocean's expert, Mr. Childs agreed.[137]

Only two experts disagreed.  DOJ's rocket engine expert, Dr. Davis, had never heard of a BOP before the accident.[138]  He had no experience even thinking about the forces needed to buckle drill pipe—a subject he conceded being unfamiliar with.[139]  Dr. Davis offered no criticism of DNV's analysis, and he did not know whether Stress Engineering's calculations were consistent with established methods for calculating the forces needed to buckle drill pipe.[140]

BP's expert, Mr. Shanks, erroneously claimed that there was not enough flow to support Stress Engineering's calculation that flow buckled the pipe by the time the crew closed the BOP. Stress Engineering used a flow rate of 60,000 barrels per day.[141]  BP's own flow rate expert, Mr. Emilsen, testified that, by the time the crew functioned the BOP, the well was flowing *in excess*

---

[134] TREX 43093.172, TREX 43093.167.1.TO (DNV Report callouts).
[135] TREX 50150.145.2.TO (Stress Engineering report); TREX 7688.11 (Childs rebuttal report).
[136] TREX 61124.16.1.TO (Stevick rebuttal report); TREX 61124.15.2.TO; TR. 6924:8-13 (Stevick).
[137] TREX 7688.11 (Childs rebuttal report).
[138] TR. 2716:4-10, 2820:14-20 (Davis).
[139] TR. 2778:6-8 (Davis).
[140] TR. 2780:24-2781:10 (Davis).
[141] TREX 50150.145.2.TO; TREX 7688.11 (Childs rebuttal report).

*of 80,000 barrels per day.*[142]   Mr. Shanks conceded he had done no flow calculations or modeling of his own and had to defer to Mr. Emilsen.[143]   Moreover, in support of his claim that a sufficient force from above could buckle the pipe, Mr. Shanks simply adopted wholesale DNV's analysis and modeling—analysis that showed the pipe would have been buckled by the flow.[144]

### 2.   The Outlying "Force from Above" Theories Are Physically Impossible

Dr. Davis' and Mr. Shanks' "force from above" theories both faced an insurmountable obstacle: the undisputed fact that the drill pipe broke apart above the upper annular.  As Dr. Stevick noted, the breaking of the pipe "eliminated the rig drift and traveling block theories as to the explanation of why the pipe is off-center when the Blind Shear Rams closed."[145]   After the pipe broke, forces acting on the pipe above the break had no impact on the pipe *below the break.*

The only experts to consider the question uniformly agreed that the pipe broke "within minutes of the closing of the Variable Bore Rams" (at 9:47 p.m.) and "before the traveling block fell" (at approximately 10:30 p.m.).[146]   The Bly Investigation concurred, finding that the pipe broke within minutes of the explosion and likely before the traveling block fell.[147]   That fact rendered the "force from above" theories implausible.[148]

Dr. Davis had no opinion when the pipe broke and conceded that, if it broke shortly after the explosion (as the other experts agree it did), then he would "need some other explanation,

---

[142] TREX 2.388.1.TO (add energy report); TR. 7856:12-20, 7857:4-7859:21 (Emilsen).

[143] TR. 9165:9-22 (Shanks).

[144]  TR 9153:7-9156:13 (Shanks).

[145] TR. 6921:22-6922:16 (Stevick); TR.  6958:14-21, 6959:12-23  (Stevick); TREX 61124, at 20 (Stevick rebuttal report); TR. 5156:13-19 (Childs) (the separation above the Annular removed the "connection between the pipe above and the pipe below. So anything that happens above does not affect the pipe below the annular").

[146] TR. 6952:3-13, 6953:10-14 (Stevick) (once "the rig loses power, begins to drift, and the ocean currents pull on the pipe which has been greatly eroded, there's not much of the pipe," and the pipe "literally snaps off"); TREX 61124.20 (Stevick rebuttal report); TREX 7687.14-15 (Childs report); TR. 5118:16-5119:4 , 5120:24-5121:1 (Childs) (separation likely "[w]ithin about 10 minutes of the explosions").

[147] TREX 1.165.1.TO (Bly Investigation Report) (by the time "the top drive fell onto the rig floor . . .the drill pipe likely had already failed at the eroded section . . . as it was being pulled upwards due to increasing vessel offset")

[148] *See, e.g.,* TR. 6922:11-16 (Stevick) ( "the theories about rig drift and traveling block . . . are eliminated by the physical evidence").

other than rig drift, to explain why the pipe is still off-center . . . ."[149]   Mr. Shanks conceded that the Bly Investigation might well have been right when it concluded that the drill pipe had broken above the BOP within minutes, probably before the traveling block fell.[150]   In those circumstances, he had no explanation of how his "traveling block" theory fit the forensic evidence, except to say that the pieces of pipe that would support his theory were "gone" by the time DNV brought the BOP to the surface.[151]

> ### 3.     BOP Maintenance Was Neither Causal Nor Grossly Negligent

Other parties tried to show that the AMF system *could not* operate the Blind Shear Rams due to maintenance issues, because the Yellow Pod had a reverse-wired solenoid and the 27-volt battery in the Blue Pod was measured as dead several months after the incident.  These attacks were factually incorrect and, in the end, irrelevant.  Whether the blind shear rams were activated by the AMF on April 20 or the Autoshear on April 22, they could not shear off center pipe.  As Halliburton's expert explained, the drill pipe was already pinned against the side of the well by the force of the blowout at the time AMF conditions were met: "given the buckled state of the pipe, even if the AMF works perfectly, the pods worked perfectly, it [the Blind Shear Rams] cannot shear the pipe and seal the well."[152]

> ### 4.     Either or Both Pods Could Have Activated the Blind Shear Rams

The efforts to portray both pods as incapable of operating the AMF on April 20 were contradicted by DNV test results and the analysis of multiple experts.

> #### a.     The Evidence Demonstrated the Yellow Pod Solenoid Could Function in Actual Operating Conditions

Testing under actual operating conditions showed that the Yellow Pod solenoid could

---

[149] TR. 2766:22-2767:2 (Davis).
[150] TR. 9190:17-20 (Shanks) (conceding pipe could have separated before traveling block fell).
[151] TR. 9195:11-9196:3 (Shanks).
[152] TR. 6962:19-6963:2 (Stevick).

function and activate the Blind Shear Rams despite the reverse-wiring in one of its two coils.

DNV conducted only three tests of the solenoid in actual operation conditions.  As the opposing experts conceded, the solenoid appeared to function *in all three tests*.  Mr. Childs' testimony on this point was supported by DNV, which reported the successful results, by Dr. Davis (DOJ), and by Dr. Stevick (Halliburton).[153]

The only expert with a contrary view was BP's Mr. Zatarain, who speculated that the solenoid functioned during testing only because, *unbeknownst to DNV, one of the Yellow Pod batteries died during DNV's test*, causing current to flow only to one coil, not the other.  Mr. Zatarain based this theory on his assumption that the batteries were "five years old."[154]  But Mr. Zatarain had to concede on cross that the batteries were only one-year old, well within their expected life.  And, when DNV tested the Yellow Pod batteries *immediately after* the successful solenoid tests, the batteries all tested as having sufficient charge.[155]

Rather than rely on the tests conducted in actual operating conditions, the opposing experts purported to rely on tests DNV conducted using Portable Electronic Testing Units (PETU) —tests that were, in the words of the DOJ expert, "confusing," "confounding," and "inexplicable."[156]  DOJ and BP purported to "reinterpret" these PETU test results.  Whatever the merits of these post-hoc "reinterpretations," the experts agreed the PETU tests were not designed to, and do not, reflect actual subsea conditions; they are not a reliable indicator of how the solenoid would function actual operating conditions.  DNV's only tests of the solenoid under actual operating conditions showed it functioned.

---

[153] TR. 5162:13-15, 5163:13-5164:23 (Childs); TREX 43093.64.1 (DNV test callout); TREX 61223.27 (Stevick expert report); TR. 6963:22-6964:5, 6965:1-8 (Stevick); TR 2798:22-2799:7 (Davis); TREX 7661.18 (Davis rebuttal report) (describing the third test as having "only partial function").
[154] TR. 8459:18-8460:21, 8466:8-17, 8499:24-8500:1, 8432:23-24 (Zatarain).
[155] TREX 22740.29 (Davis report); TR. 2791:3-6, 2872:13-19 (Davis); TR. 8500:12-16 (Zatarain).
[156] *See, e.g.*, TREX 22740.7, n. 2 (Davis report); TR. 8492:5-14 (Zatarain).

b.     **The Blue Pod 27-Volt Battery Was Not Dead at the Time of the Incident**

The Blue Pod's 27-volt battery was found dead *when tested almost a year after the incident*.  All the experts agreed the battery could not have been dead *at the time of the incident*[157] and *had to have drained after the incident*.[158]  This was precisely what Mr. Childs stated in his report.[159]  The efforts to paint him as an outlier failed.

Cameron's testing of the batteries showed that, under normal operations, the batteries should last two years.[160]  The Blue Pod batteries had been in use less than one year, and, as BP's own analysis showed, the 27-volt battery likely had no draw during most of that period.[161]

Because every expert agreed the battery had drained *after the accident*, the assertion that it lacked sufficient charge to fire the Blue Pod solenoid *at the time of the accident* was nothing but speculation.  Mr. Zatarain claimed that the battery likely had a charge somewhere between 8 and 15 volts at the time of the incident[162]; but BP's own testing showed the battery needed a charge of only 15.7 volts to function the solenoid.[163]  Neither Mr. Zatarain nor any other expert offered any basis for believing that the 27-volt battery could have had a charge of 15 volts, *but not 15.7 volts*, at the time of the accident.[164]  The battery was not dead at the time of the incident,

---

[157] The experts agreed that if the 27-volt battery had been dead, the attempt to fire the AMF sequence would have drained the two 9-volt batteries, which were *not* found dead.  TR. 5191:16-5192:7 (Childs); TR. 8517:22-8519:19, 8424:20-23 (Zatarain) (not possible to start with a bad 27-volt battery and "end up with two good nines and a bad 27");TREX 22729.15 (Zatarain Chart); TR. 2787:3-2788:3, 2788:8-25 (Davis); TR. 6973:7-11 (Stevick).

[158] TR. 2789:2-10 (Davis); TR. 8520:21-25 ( (Zatarain); TREX 22790.15 (Zatarain expert report) (agreeing that "it is possible" that the 27-volt battery drained from "weak" to "bad" post-incident).

[159] TR. 5192:14-20 (Childs).

[160] TREX 5154.1 (Cameron 1/13/06 internal e-mail) ("The results were not published to the customer so as not to let them know our safety margin. The results showed that the batteries should last 77 actuations or two years of normal operation.").

[161] TR. 8523:11-8524:17 (Zatarain); *see also* TREX 7410.29 (Interlink report) ("So age, though possibly a contributing factor, is not likely to be the whole explanation for the final state of the batteries.").

[162] TR. 8520:21-25 (Zatarain) (claiming that it was most likely the 27-volt battery was merely weak); TREX 22790.15 (Zatarain expert report) (weak battery would permit it to perform functions requiring up to 15 volts).

[163] TREX 7410.2.1 (Interlink Report); *see also* TR.8521:16-20 (Zatarain).

[164] TR. 8522:1-10 (Zatarain).

28

and Cameron's testing showed it had not been used enough to have discharged.

### 5.    Transocean Properly Maintained the BOP and the Pods

**a. Solenoid Maintenance.**  Contemporaneous records and emails, and the hand-painted notation on Yellow Pod solenoid 103, showed it had been replaced and tested only three months before the accident, as part of routine scheduled testing and maintenance.[165]

BP and DOJ argued that, because the solenoid had a reverse-wired coil, Transocean either did not test the solenoid at all or failed to conduct the test recommended by Cameron.[166] The evidence, however, was uncontroverted that a Transocean electronics technician, Ron Guidry, tested the solenoids when he replaced them on February 1, 2010, and the testing showed there were "no coil breaks, no faults, and all corresponding functions operating as they should."[167]  There was no evidence that Mr. Guidry performed the tests incorrectly.  To the contrary, as BP's expert, Mr. Zatarain, conceded, when DNV conducted the required Cameron acceptance test on the very reverse-wired solenoid in question, *it passed the test.*[168]

Cameron discovered *after* the incident that several identical reverse-wired solenoids had passed its recommended acceptance test and had been installed on another customer's rig.[169] Five months *after* the accident, Cameron recommended *changes* to its testing procedure to detect

---

[165] *See* TREX 3797.4 (Guidry 1/31/10 e-mail); TREX 4823.5-6 (tally book of Ron Guidry, reflecting replacement of solenoid 103y); TREX 4828.8 (photograph of Solenoid 103Y showing date of replacement, 2/1/10); TREX 51245.225 (Subsea Departmental Activity Reports - 1/31/10, 2/1/10 and 2/2/10 entries); O. McWhorter Depo. 219:23-220:6, 221:13-222:2, 374:4-375:10; TR. 2791:8-10 ,2792:25-2793:21, 2794:15-21 (Davis); TR. 8503:15-29 (Zatarain); TREX 51124.24 (Stevick rebuttal report); TR. 5170:2-23  (Childs).

[166] *See, e.g.,* TREX 40009.23 (Zatarain report); TREX 22740.5 (Davis report). At the time of the incident, Transocean required application of Cameron's recommended test procedure, which required testing both solenoid coils simultaneously.  *See* TREX 5097.1 (Refurbishment Procedure for Cameron Solenoid Valves (1/29/04); TREX 3798.5 (Transocean Instructions for Rebuilding Cameron Controls Solenoid Valve).

[167] TREX 3797.3 (Guidry 5/9/10 e-mail); TREX 3797.2 ("Before the pod went back onto the LMRP, with the PETU, every single function was tested, all solenoids…."); *see* TR. 2795:9-2796:8 (Davis).

[168] TR. 8505:16-8505:24, 8507:25-8508:4 (Zatarain); TREX 3130.40 (DNV Lab Notes).

[169] TREX 75235.3 (7/1/10 Field Performance Report) ("7 of the nineteen solenoids had wires crossed, reversed polarity, on coil B pins 3 and 4…"); TREX 75235.1.2 (7/10/10 Field Performance Report) (problem with reverse wired solenoid not discovered when solenoid's installed); TREX 40009.23 (Zatarain report).

reverse-wired solenoids.[170]  No party at trial suggested that Transocean maintenance personnel should have figured out what Cameron did not figure out until after the accident.

**b. Battery Maintenance.**  Transocean's new computer-based maintenance system, RMS, required changing the batteries in each pod annually.[171]  The batteries in two of the three pods had been replaced less than a year before the incident.[172]

The Blue Pod 27-volt battery was not changed within a year of the incident.  Dr. Stevick and Mr. Zatarain agreed with the conclusion of Transocean's internal investigation team:  The one-year battery change instruction in Transocean's previous computer-based system, EMPAC, had been inadvertently dropped from the *Horizon* maintenance system (as part of a reallocation of some tasks from the subsea maintenance schedule to the electricians' maintenance schedule).[173]  This scheduling error was fixed when Transocean switched to the new RMS system in the fall of 2009.[174]  The RMS system scheduled the annual change of batteries for the Blue Pod for July 2010.[175]

### 6.    The BOP Was Routinely Maintained and Tested

The contemporaneous records demonstrated that Transocean performed hundreds of hours of maintenance *immediately before* the BOP was installed at Macondo, pursuant to a written maintenance plan *submitted to and approved by BP*.[176]  Transocean sent a special subsea

---

[170] TREX 5165.2 (Cameron 9/15/10 letter "To Whom It May Concern").
[171] TREX 5495.5 (DWH SEM Battery change outs); TREX 581.4.1 (RMS records showing directive to "change out AMF/deadman batteries").
[172] TR. 8532:7-12 (Zatarain); TREX 3318 (2/24/10 J. Owen McWhorter email).
[173] TREX 5495.5 ("In mid 2007 the 365 PM [preventive maintenance] was split into Subsea and electrical"); J. Owen McWhorter Depo. 94:24-95:3 (understood the job of changing the batteries "would have fallen under the electronic technician's craft"); Canducci Depo. 112:21-24, 113:02-08.
[174] TREX 5495.5 (DWH SEM Battery change outs); TR. 6974:16-25 (Stevick); TREX 581.4.1 (RMS records showing directive to "change out AMF/deadman batteries").
[175] TREX 4304.382 (Internal Investigation Report, App. I).
[176] TREX 3787 (DWH Subsea 1/1/10 e-mail submitting work plan to BP for approval); TREX 3338.1 (BP e-mails re rig move schedule); TR. 5204:10-22 (Childs).

support team to the rig to assist with that maintenance.[177]  The team's progress against each task was recorded on the BOP maintenance schedule and in the daily activity reports.[178]

Just before the BOP was splashed, the maintenance crew dry-fired the EDS, activated the Autoshear (which closes the Blind Shear Rams), inspected all the rams and replaced the rubber goods needed to seal the well, including the annular elements, which are subject to wear during normal drilling operations.[179]

The records show thousands of hours of BOP maintenance: Time and again, rams and pods were routinely disassembled, inspected, and tested.[180]  In the year before the blowout, Transocean's computer maintenance system required 755 preventive maintenance tasks on the BOP; 748 had been completed.[181]  The remainder were not related to the incident.[182]  There was no evidence this schedule was sub-standard.

The *Horizon* crew tested the BOP for function and pressure every week, meeting all regulatory requirements.  The BOP passed every test.[183]  The crew tested the Blind Shear Rams on April 17, 2010, three days before the incident. The crew closed and pressure-tested the Blind Shear Rams (checking the ability to seal the well) on the day of the accident.[184]

Transocean planning and performance of BOP maintenance showed great regard for safety.  Indeed, the undisputed evidence showed that BOP maintenance in particular, and rig

---

[177] TR. 6979:7-15 (Stevick); see TREX 3340.1 (Subsea Support Team Daily Report); Hay Depo. 109:24-110:8
[178] TREX 3340 (Subsea Support Team Daily Reports); TREX 5102 (Tiano e-mail re rig move progress and attached rig move worklist); TREX 51245.225-226 (Subsea Department Activity Reports); TR. 6982:16-6984:16 (Stevick).
[179] *Id.*
[180] *See* TR. 6983:24-6984:2 (Stevick); TREX 52662A (Significant *Deepwater Horizon* BOP Maintenance).
[181] TR. 5194:24-5195:12 (Childs); TREX 52665 (Summary Chart: BOP Preventive Maintenance).
[182] *See* TREX 7687.39 (Childs report); TREX 22342.388 (Transocean Internal Investigation Report, App. I); TR. 5196:12-19, 5196:20-23, 5197:2-12, 5199:12-5200:3, 5200:6-5201:10 (Childs); Abbassian Depo. 290:24-291:5, 291:8-15 (Bly team "could not find a direct causal relationship" between BOP maintenance and the incident).
[183] TREX 52664 (Summary Chart: BOP Function and Pressure Testing)
[184] TR. 5216:15-5217:13 (Childs).

maintenance in general, went forward even when it went over budget.[185]

## III.  THE *DEEPWATER HORIZON* HAD A WELL-TRAINED CREW AND WAS WIDELY KNOWN FOR ITS SAFETY AND PERFORMANCE

### A.  The *Deepwater Horizon* Crew Was Experienced and Well Trained

#### 1.  The Drill Crew Was Highly Trained and Competent

The competence of the *Horizon* crew was not subject to serious challenge.  The rig and her crew had successfully drilled more than 50 wells, including the deepest wells in the world.[186] Only a handful of rigs had comparable records.  The *Horizon* accomplished these feats while compiling an unparalleled safety record.[187]  For good reason, BP considered the *Horizon* "the best performing rig in the BP fleet globally from a performance and safety perspective."[188]  The MMS had the same view.[189]

##### a.  Transocean Had Sound Well Control Policies

The evidence demonstrated, without dispute, that Transocean's Well Control Handbook was thorough, consistent with industry standards, and provided the crew correct advice on their responsibilities:  Monitoring the well, conducting a flow check when there are anomalies, shutting in the well when there is any doubt, diverting expanding gas overboard.[190]  No party pointed to a higher standard or different guidance from anywhere else in the industry.

Transocean's handbook and training are not only reviewed and accredited by the

---

[185] Trahan Depo. 122:5-13(*DWH* Operations Manager-Asset) ("if we need to go over budget and we need[ed] to go over budget, we went over budget."); Kent Depo. Vol. II, 19:4-8 (budgetary issues never compromised rig maintenance); Tiano Depo. 312:4-20 (maintenance resources were provided when needed).
[186] TREX 52647 (Operating History of the *Deepwater Horizon*); D-6569 (Wells Drilled by *DWH*); D-4341 (summary of *DWH* wells); TR. 1767:10-24 (Ezell); TREX 7676.15 (Barnhill report); TR. 4581:8-11 (Newman).
[187] As of April 20, 2010, the *Deepwater Horizon* had gone seven years without a "lost time incident," *i.e.*, an injury that prevents the injured person from working the next shift.  TR. 1776:1-4,1771:25-1772:5 (Ezell).
[188] TR. 9361:2-3 (O'Bryan).
[189] E. Neal (MMS) Depo. 131:7-12.
[190] *See* TREX 8173.15 (Burgoyne report); TR. 4261:2-21, 4264:25 (Barnhill).

32

IADC,[191] they are also subject to constant updating and improvement by the Company.  The evidence established that Transocean tracks *all* well control events.[192]  Transocean investigates events that do not meet expectations to identify any concerns about competence of particular crews, or the adequacy of current policies or training.[193]  This process is taken seriously.  In some cases, personnel were disciplined, including termination; in other instances, changes were made to the Well Control Handbook and training.[194]  Changes in policy or practice are communicated via Transocean's Intranet—available to personnel on the *Horizon*—via email distribution, and via updates to the Well Control Handbook and training.[195]  These processes reflected care and attention to the ever-present risks of deep sea drilling.

### b.   Transocean Had Industry-Leading Well Control Training

Transocean provided the crew with constant training.  No party suggested that training was insufficient or that Transocean scrimped on training to save money.

The drill crew on tour on April 20 not only had all the training required for their positions by industry standards, but also the training required by Transocean.[196]  In addition to well control school every two years, Transocean required completion of on-the-job training modules for each senior rig position.[197]  Crewmembers were required to pass numerous training modules, signed

---

[191]  TR. 1752:24-1753:1-2 (Ezell); McMahan Depo. 482:24-483:4; Hart Depo. 230:24-231:20; TREX 50130 (IADC WellCap Certificate of Accreditation of Transocean Houston Training Center).
[192]  *See* TREX 1452.29-32 (TO Field Operations Handbook, Section 2.3 "Operational Event Reporting"); TR. 4581:20-4583:6, 4584:9-15 (Newman); TREX 5649 (2009 Annual Report); McMahan Depo. 425:21-426:8.
[193]  TR. 4587:25-4589:9 (Newman); Canducci Depo. 169:24-171:16; 173:10-174:14; Braniff Depo. 86:3-10.
[194]  *See* TREX 7134 (*Jim Cunningham* power point presentation); TREX 26009.b (Letter of termination); TR. 4589:12-4592:22 (Newman); TREX 5650.19 (EAU Incident Investigation Report, *M.G. Hulme*); TR. 4592:23-4595:10, TR. 4744:25-4747:15 (Newman), D6726 (lessons from the *MG Hulme* incident added to manual).
[195]  TREX 1523.1; TR. 4595:174597:15 (Newman); Cameron Depo. 125:20-126:6.
[196]  TREX 52658 (Summary: Training of Well Control and Bridge Crew Members Aboard the *DWH* on April 20, 2010); TR. 1753:20-1754:2 (Ezell); TREX 7536.53 (Perkin report appendices) ("All Transocean . . . well control personnel had current Well Control Certifications.").
[197]  TREX 3581 (Transocean Internal Training Matrix); TREX 52685 (Summary: Training of Well Control and Bridge Crew Members Aboard *DWH*).

off on by their supervisors, to qualify for promotion.[198]  The Senior Toolpusher (Ezell), the

Toolpusher (Anderson), and the Driller (Revette), had completed numerous on-the-job

modules,[199] including the Driller module, which covered operating the elements of the BOP,

performing a flow check, diverting flow, and emergency disconnect procedures.[200]

      Transocean reinforced this training with weekly drills and audits.  During unscheduled

weekly drills, senior personnel manipulated the equipment to create simulated indications of a

kick, then watched to see how long it took the crew to notice and react, and used the occasions to

reinforce well control principles.[201]  While the *Horizon* was stationed at Macondo, from January

31 to April 19, 2010, the crew participated in 24 scheduled well-control drills and 36

unscheduled drills.[202]  The crew's last drill, on April 18, 2010, two days before the failure of the

cement, focused on potential impacts of cement failures.[203]  The drill covered a basic message

contained in the *Sedco 711* advisory—that the crew should not be complacent because cement

jobs can fail.[204]  Like other drills, this one was timed to remind the crew, before an important

operation, about the particular well-control situations that can arise in such operations.[205]

      By April 19, 2010, Transocean had an outstanding global record of controlling kicks at

under 20 barrels.[206]  No driller or drill team anywhere was shown to have a better record.

## 2. The Bridge Crew Was Well-Prepared for the Emergency

      Transocean gave the bridge crew the training required by law and regulation, and more.

---

[198] TR. 4549:25-4551:2 (Newman); McMahan Depo. 69:11-71:11.
[199] TR. 1759:15-18 (Ezell); TREX 52658 (Summary: Training of Well Control and Bridge Crew Members Aboard the *DWH* on April 20, 2010).
[200] TREX 41255.9-13 (Driller OJT Module); TR. 1755:8-11, 1757:4-1759:14 (Ezell); TREX 3581.
[201] TREX 41008.57 (Transocean Well Control Manual, Section 4.2).
[202] TREX 52661 (Summary: Well Control and Marine Safety Drills Conducted on the *DWH*); *see also* TREX 7676.15 (Barnhill report); TR. 1974:21-1975:8 (R. Sepulvado) (each crew would conduct weekly well-control audits addressing various topics in well control); TR. 1777:3-9, 1779:1-1780:12  (Ezell).
[203] TREX 571.13 (Safety Drill Report).
[204] TREX 4906b.1e.TO (*Sedco 711* group advisory).
[205] TR. 4599:1-4 (Newman).
[206] D-6732 (Transocean 2009 Annual Report).

The combination of formal and on-the-job training prepared them to respond to an extraordinary emergency.[207]   Transocean Operations Manager Daun Winslow was on the rig that night and testified that "[h]ad it not been through their training and—and bravery, for some people, I'm sure some other people might not have made it off there."[208]   Chief Mate David Young, who drew on his training that night, testified that the *Horizon*'s emergency training saved lives.[209]

Each bridge crew member had extensive training for emergency situations.[210] Transocean's on-the job training module for DPOs, which had been completed by the Captain and each bridge crewmember, specifically addressed responding to fire and gas alarms, operating the emergency shutdown, and operating the EDS.[211]

The bridge performed a full EDS drill before the BOP was splashed at Macondo.[212] Because an actual EDS cannot be practiced once the rig is attached to the well, the bridge conducted EDS drills via tabletop exercises when the BOP was subsea.[213]   The bridge crew also participated in the drill crew's well-control drills, practicing different aspects of well-control responses and the emergency disconnect sequence "daily or weekly."[214]

Captain Kuchta held a master mariner's license that had required years of training in

---

[207]TREX 52658.20-26. (Summary of Training for Curt Kuchta, David Young, Yancy Keplinger, and Andrea Fleytas); TREX 3581 (Transocean Internal Training Matrix listing required for different positions).
[208] Winslow Depo. 365:1-13.
[209] TR. 5726:6-16 (Young).
[210] TREX 52658.20-26 (training summary); TREX 3581 (training matrix).
[211]  TR. 5653:6-12 , 5655:23-5656:18, 5656:19-22 (Young);  TREX 4459.4 (DPO OJT module) (fire alarms and emergency shutdown); TREX 4459.6 (combustible gas alarms); TREX 4459.31 (EDS).  Although such training is not required by regulation (TR. 9502:8-11 (Mitchell) ), Transocean arranged for crew members to attend a course in Major Emergency Management offered by a third party (Petrofac)  The Petrofac course was taken by OIM Jimmy Harrell, Sr. Toolpusher Randy Ezell, Toolpusher Jason Anderson, Driller Dewey Revette, and Driller Micah Burgess.  TREX 52658.2, .4, .9, .11 (summary of training).  Although Captain Kuchta had not completed this course, there was no evidence that it included lessons not covered in his other courses, that it covered EDS operation, or that it offered any lessons that would have made any difference on the evening of April 20.
[212] TREX 51219.2 (Safety Drill Report).
[213] TR. 5788:20-5790:4, 5843:12-23 (D. Young).
[214] TR. 5843:12-23 (D. Young); Hackney Depo. 110:25-111:8 ("standard" that DPOs and Senior DPOs would participate in well control safety drills).

responding to a major emergency.[215]  Captain Kuchta and the bridge crew led every person aboard the *Horizon* in weekly abandon-ship, fire, and emergency drills.[216]  The drills included training in using lifesaving equipment and mustering at lifeboats and other locations.  The U.S. Coast Guard characterized the crew's knowledge of emergency equipment and response as "expert" and "exceptional."[217]  The most recent safety drills were conducted on April 17 and 18.[218]  These weekly safety drills "helped prepare people for the events on the 20th."[219]

No party provided evidence of superior training offered to any bridge crew anywhere. Mr. Mitchell's adamant, but incorrect, testimony that Captain Kuchta had been promoted without coming up through the ranks underscored his lack of familiarity with the *Horizon*, her crew, her complex operations, and the industry standards for these unique, naval and industrial vessels.[220]

## B.  The *Deepwater Horizon* Was Seaworthy and Fit for Service

Transocean's assets are its equipment and its people.  Transocean devoted enormous and continuous resources to rig maintenance.  Transocean has no financial incentive to run a rig "until it breaks," because Transocean does not get paid for downtime caused when things break. Transocean's maintenance policies are designed to maintain equipment *before it breaks.*  Those policies required thousands of maintenance tasks on the *Horizon* every year; Transocean provided full-time and competent staff on the rig and on shore to get those tasks done.[221]

---

[215] Rec. Doc. 5927, #175; TREX 52658.20-21 (Summary of Training for Curt Kuchta); TREX 3751 (Master Mariner credential).
[216] TR. 5696:14-5700:23 (D. Young); TREX 50003.13-14 (Wolfe report); TREX 50335 (Deepwater Horizon Safety Drill Report for April 2010).
[217] Odom. Depo. 150:4-19, 163:11-22.
[218] TREX 50335 (Deepwater Horizon Safety Drill Report for April 2010).
[219] TR. 5700:24-5701:2 (D. Young).
[220] TR. 9436:21-9437:10 (Mitchell).
[221] TR. 5928:10-15, 5929:2-5930:7, 5931:19-5932:3 (Ambrose) (staff included Motormen, Mechanics, Engineers, Welders, Electricians, Electronics Specialists, and subsea personnel; on shore Rig Manager-Asset responsible for maintenance and equipment; and company set maintenance policies and procedures and expectations); TR. 5915:22-5916:3 (Ambrose) (Corporate Maintenance and Technical Support Department has 80 to 90 experts to provide technical support and assistance to the rigs); TR. 4579:10-17, 4580:16-22 (Newman).

There were constant inspections and audits by third parties, as well as additional inspections requested by Transocean itself.  Any of these inspectors or auditors could have shut the rig down if it was not fit for service.[222]  They never did; to the contrary, the rig was regularly commended for its condition and its crew.

## 1.    The Rig Was Repeatedly and Successfully Inspected and Audited

**a.** *Regulatory inspections*.  The U.S. Coast Guard regularly inspected the *Horizon*, including in July 2009, and found the rig to be "fit and seaworthy."[223]  The Coast Guard issued a Certificate of Compliance, valid through July 27, 2011, verifying that the rig was "in substantial compliance with the regulations and international regulations that are required of that vessel."[224]

The MMS inspected the *Horizon* every 30 days on location to assure compliance with federal regulations and industry standards.[225]  The MMS inspected the *Horizon* three times in the two-and-one-half months it was at Macondo, most recently on April 1, 2010, and consistently found the rig to be in full compliance with all regulations.[226]  In 2009, the MMS chose the *Deepwater Horizon* as a finalist for its 2009 Safe Rig of the Year Award.[227]

ABS (Marshall Islands) inspected the rig more than 20 times in the five years before the incident, each time concluding the *Deepwater Horizon* met class and statutory requirements.[228]  DNV inspected and verified the rig's compliance with the ISM Code twice every five years; the DNV inspector testified that "the crew are enthusiastic about safety management and pollution

---

[222] *See, e.g.*, TR. 4051:15-4052:2 (Webster) (conceding DNV had power to suspend operations on the *Horizon*); Odom Depo. 87:12-88:11; 188:3-10 (Coast Guard could withhold Certificate of Compliance and stop operations at any time,); Haynie Depo. 184:12-185:2; 185:4-186:6; 187:10-188:7 (ABS could put *Horizon* out of service if failed to meet class and statutory requirements at any inspection); R. Neal Depo. 154:24-155:19 (MMS can issue INC and shut rig down); TREX 44009.1, TREX 1777, TREX 5483 (2007, 2005, and 2002 DNV Ship Audit Reports showing that DNV found no major nonconformity).
[223] Odom Depo. 166:19-25; 167:2-4, 8.
[224] TREX 5571 (July 27, 2009 U.S. Coast Guard Certificate of Compliance); Odom Depo. 133:23-135:6.
[225] R. Neal Depo. 22:20-24; E. Neal Depo. 25:6-30:12.
[226] E. Neal Depo. 17:10-16, 20:20-23, 42:8-18.
[227] TR. 8604:6-11 (Guide).
[228] Haynie Depo. 184:12-185:2, 185:4-186:6, 187:10-188:7.

prevention, and they take the duties required by the ISM Code very seriously."[229]

No evidence supports the speculation, advanced by Mr. Webster, that every one of the scores of trained, experienced, and dedicated inspectors employed by the Coast Guard, MMS, ABS and DNV performed inadequate inspections, failed to ask for or review records, or were duped by a dishonest crew.  To the contrary, the inspectors themselves testified that they took their responsibilities seriously.  They conducted thorough examinations[230]; they reviewed and found compliance with federal regulations and industry standards[231]; they reviewed the installation of proper equipment, the competence of the crew, and the safe conduct of operations[232]; and they properly documented maintenance.[233]  The U.S. Coast Guard in fact commended Transocean for Transocean's transparency on reporting during inspections of rigs.[234]

   **b.  *BP Audits*.**  BP oversaw the *Horizon* throughout its existence and regularly audited the rig to ensure that it was seaworthy and fit for service.[235]  Plaintiffs suggested that these audits consistently found problems with accurate record-keeping for rig maintenance.[236]  The evidence demonstrated that Transocean addressed these concerns by replacing the cumbersome EMPAC

---

[229] TREX 52668 (Summary: Certifications for *Deepwater Horizon* as of April 20, 2010); D. McKay Depo. 247:7-20.
[230]  Odom Depo. 11:22-12:17; 13:19-14:24 (Coast Guard inspector); TREX 5571.4 (July 27, 2009 Coast Guard Certificate of Compliance).
[231]  *See* E. Neal Depo. 25:6-28:15 (MMS inspectors used federal regulations and API's recommendations).
[232]  E. Neal Depo. 80:5-13 (MMS inspector  - reviewed maintenance records); Odom Depo. 152:25-153:10 (Coast Guard inspector  - reviewed maintenance records); TR. 5940:10-23 (Ambrose); E. Neal Depo. 22:6-17, 30:6-12, 80:17-21, 126:3-127:24; TREX 5332 (4/1/10 MMS Drilling Inspection Report); *see also*  TREX 4121 (2/17/10 MMS Drilling Inspection Report); TREX 4126 (3/3/10 MMS Drilling Inspection Report); E. Neal Depo. 132:20-24 (MMS Inspector); Trocquet Depo. 201:23-202:19 (MMS Inspector—did not find any regulatory issues relating to BOP or rig).
[233] R. Neal Depo. 164:6-18; 171:17-172:14 (MMS inspector) (Transocean provided records during inspections that accurately reflected condition of rig equipment); Odom Depo. 24:8-19; 101:17-102:12; 102:16-21 (Coast Guard inspector) (had free access to *Horizon* crew; was never denied access to any part of rig or any document he needed); Odom Depo. 152:25-153:10 (Coast Guard inspector); Haynie Depo. 155:8-10, 277:17-24 (ABS inspector) (inspectors would "look into maintenance records" and  found no deficiencies in *Horizon*'s maintenance tracking systems); D. McKay Depo. 89:12-15 (DNV); TR. 5940:2-9, 5945:2-17 (Ambrose); Saucier Depo. 315:20-24.
[234] TR. 5932:14-18 (Ambrose).
[235] TR. 8861:12-17 (Guide).
[236] TR. 3793:10-3794:14, 3809:8-14, 3810:8-3811:10 (Webster).

system with the RMS system, implemented on the *Horizon* in the fall of 2009.[237]  In its 2009

audit, BP noted the rollout of the new system, noted the training of personnel on its use, and

expressed satisfaction with the improvement in maintenance management.[238]  Other maintenance

items identified in the audit were properly closed, with BP commending Transocean for its

rigorous response.[239]  BP could have kept the rig out of service if the audit items were not closed

out[240]; BP representatives uniformly testified that there were no safety critical items open from

the 2009 audit on the day of the incident.[241]

The issue in this case is not whether there were isolated maintenance issues in the past,

but whether there were systemic maintenance issues that caused the blowout.  There were not.

### 2.    No Outstanding Maintenance Issues Contributed to the Incident

a. *The April 2010 ModuSpec Survey*.  The most thorough and most recent inspection of

the *Horizon* was provided, at Transocean's request, by ModuSpec, just days before the accident.

Transocean asked ModuSpec to identify all work that should be completed when the rig went out

of service in 2011.[242]  Four ModuSpec inspectors surveyed the rig, top to bottom, from April 1 to

April 14, 2010.[243]  The inspectors reviewed "large quantities" of maintenance records, spanning

---

[237] TR. 1905:22-23 (Ezell); TR. 5970:24-5971:1, 5972:13-15 (Ambrose) (Transocean started designing the move from EMPAC to RMS in late 2008 and started implementing the change in the middle of 2009); TREX 47180.2-3

[238] TREX 275.12 (BP audit).

[239] TR. 8879:5-19 (Guide); TREX 1377 (10/5/09 Rodriguez email) ("I wanted to mention that the *DW Horizon* crew have done a good job in completing the action items on this list."); TREX 1379 (10/20/09 Rodriguez email) ("As you can see the *Horizon*'s crew rigorously [*sic*] closing out the findings."); Rodriguez Depo. 110:18-21; 110:23-111:5; 140:10-19, 147:25-148:23.

[240] Wong Depo. 321:6-9 (BP Auditor); TR. 8872:17-8873:21 (Guide); TREX 6141 (7/12/10 Wong email).

[241] TR. 8881:22-25 (Guide); P. Earl Lee Depo. 390:15-391:12, 391:15-17; M. Sepulvado Depo. 100:12-101:11; Price Depo. 141:15-19.

[242] TR. 5989:18-5990:4 (Ambrose) (Transocean asked ModuSpec to do "in-depth inspection" to identify any issues with rig and equipment); Schneider Depo. 356:20-357:3-21.

[243] Schneider Depo. 23:14-25:12 (ModuSpec) (assessment was intrusive, equipment taken out of service and covers removed for inspection); Sierdsma Depo. Vol. II, 121:21-123:16 (ModuSpec surveyors put on "detective's hat[s]" to discover information and verify condition of equipment); Kent Depo. Vol. I, 355:6-356:21; TR. 5990:5-17 (Ambrose); TREX 73 (ModuSpec survey guidelines); TREX 3285 (2010 ModuSpec Rig Condition Assessment).

a year of maintenance, as well as the equipment itself.[244]  Of all ModuSpec's clients, only Transocean provides its maintenance records for review.[245]  There was no reason for ModuSpec to pull punches in its report.[246]  After an "intrusive" review that Plaintiffs' expert characterized as a "good survey," ModuSpec rated the rig's overall condition as better or consistent with similar rigs worldwide and in the Gulf of Mexico.[247]  The report identified *no* maintenance or condition issues that contributed in any way to the accident.

   b. ***The April 19, 2010, Morning Report.***  Much was made of the rig's computerized maintenance system listing 222 overdue tasks on the day of the incident.  Of these tasks, some had been completed already and were ready to be closed out, some were awaiting parts, and all but 10% were low priority items.[248]  The evidence showed that not one of the overdue tasks had anything to do with the blowout[249]; no party presented any evidence to the contrary.

   There is never a day when maintenance does not need to be done on a drilling rig, including the day the rig leaves the shipyard.[250]  In a single year some 13,000 maintenance tasks were completed on the *Horizon*.[251]  The fact that a small percentage of these was overdue did not prevent the rig from operating safely,[252] as seen by the fact that BP auditors, MMS inspectors and ModuSpec surveyors were all on the rig within three weeks of the incident and all gave the

---

[244] Sierdsma Depo. Vol. I, 39:5-25, 60:25-61:10; Martinez Depo. 43:9-44:13; Schneider Depo. 63:18-65:9, 364:1-365:9 ,415:24-416:18, 416:21-417:1; TREX 262.1, 262.4 (2010 ModuSpec Rig Condition Assessment).
[245] Martinez Depo. 80:10-25.
[246] Schneider Depo. 24:3-20, 378:5-10 (ModuSpec surveyor -- survey and report provided a "fair and accurate assessment" of condition of the *Horizon*); TREX 262 (2010 ModuSpec Rig Condition Assessment); TR. 5919:2-15 (Ambrose).
[247] Schneider Depo. 415:24-416:18, ,416:21-417:1; TREX 262.1, 262.4 (2010 ModuSpec Rig Condition Assessment); TR. 4101:17-18 (Webster) (ModuSpec does "good" intrusive survey); TR 4103:1-9 (Webster) (the MER system "is a benchmark for the safety and maintenance standards of an individual rig against other rigs").
[248] TR. 5997:14-5999:17 (Ambrose); TR. 5663:14-25 (Young).
[249] TR. 5663:14-5664:9 (D. Young); M. Sepulvado Depo. 554:18-23 (as BP Well Site Leader, he knew of no safety critical maintenance items outstanding when he left rig on April 14, 2010); TR. 5997:14-5999:17 (Ambrose).
[250] TR. 5965:16-18 (Ambrose).
[251] TR. 8871:13-18 (Guide); TR. 5961:24-5962:7 (Ambrose).
[252] TR. 5965:21-25, 5966:9 (Ambrose).

rig a "thumbs up."[253]  No trial evidence justifies a conclusion that these inspectors were wrong.

## ARGUMENT

I.   **PLAINTIFFS FAIL TO MEET THE STRICT STANDARD FOR PUNITIVE DAMAGES AND GROSS NEGLIGENCE**

   A.   **Gross Negligence Requires a Mental State of Reckless Disregard of Consequences**

Punitive damages are reserved for instances of "wanton, willful, or outrageous conduct." *Atl. Sounding Co., Inc. v. Townsend*, 557 U.S. 404, 409, 411 (2009).  As the Supreme Court recognized in *Exxon Shipping*, maritime punitive damages are limited to cases "where a defendant's conduct is 'outrageous,' owing to 'gross negligence,' 'willful, wanton, and reckless indifference for the rights of others,' or behavior even more deplorable."  554 U.S. at 493 (citation omitted).  The Fifth Circuit describes gross negligence as "'willful, wanton and reckless conduct.'"  *Becker v. Tidewater, Inc.*, 586 F.3d 358, 367 (5th Cir. 2009).[254]

What separates gross negligence from ordinary negligence is the defendant's "mental attitude."  *City Nat'l Bank v. United States*, 907 F.2d 536, 541 (5th Cir. 1990).  The defendant must act "in reckless disregard of a legal duty and of the consequences to another party." BLACK'S LAW DICTIONARY (9th ed. 2009).  "'Mere inadvertence or honest mistake does not amount to gross negligence.'"  *Becker*, 586 F.3d at 367 (quoting *Houston Exploration Co. v. Halliburton Energy Servs. Inc.*, 269 F.3d 531 (5th Cir. 2001)).  To "lift[ ] ordinary negligence into gross negligence . . . the plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrated *that he didn't care*."  *Maxey v. Freightliner Corp.*, 665 F.2d

---

[253] Rodriguez Depo. 171:20-171:7, 181:9-22, 24 (BP); E. Neal Depo. 17:10-16, 20:20-23, 42:8-18 (MMS); TR 4113:1-4 (Webster) (conceding that ModuSpec concluded "the *Deepwater Horizon* compared favorably in 2010 to the rest of the industry"); TR. 5966:1-11 (Ambrose) (customers, auditors and regulators would give the rig a "thumbs up certification" because small percentage of overdue maintenance tasks did not including anything major).
[254] Transocean has settled the United States' Clean Water Act penalty claim.  A gross negligence finding would lift the OPA liability cap, but as this Court has determined, Transocean's OPA liability is limited to damages caused by any above-surface discharge.

1367, 1374 (5th Cir. 1982) (en banc) (emphasis added).  As the Fifth Circuit explained in reversing a finding of gross negligence in a gas well blowout case, one is grossly negligent only "when he has *intentionally* done an act *of unreasonable character in reckless disregard of the risk known to him*, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow."  *Houston Exploration Co.*, 269 F.3d at 532 (emphasis added and internal quotation marks omitted) (applying Louisiana law). There is no basis to find Transocean had the culpable mental state required for gross negligence.

###   B.      An Accumulation of Negligent Acts Does Not Constitute Gross Negligence

Because gross negligence requires a heightened mental state, the Fifth Circuit has rejected the argument that "separate acts of ordinary negligence may collectively constitute gross negligence," where there is no showing of reckless disregard.  *Clements v. Steele,* 792 F.2d 515, 516 (5th Cir. 1986).  It is insufficient as a matter of law for Plaintiffs to point to a series of separate acts by different people at different times, none of which exhibited reckless disregard of risks, and claim that they can be added up to establish gross negligence by Transocean.

###   C.      Only Acts that Proximately Caused the Blowout Can Be a Basis for Liability

Nor can Plaintiffs establish gross negligence by focusing on acts that did not cause the accident.  Such actions do not give rise to liability.  *E.g.*, *Woolard v. Mobil Pipe Line Co.*, 479 F.2d 557, 563-64 (5th Cir. 1973) (even if Mobil was grossly negligent in maintaining equipment, it was not liable when evidence did not show equipment was the proximate cause of explosion that caused plaintiff's death); *Taylor v. Texaco, Inc.*, 814 F.2d 231 (5th Cir. 1987) (no liability where Texaco's failure to comply with regulations for fueling operations was not a contributing factor to the accident).  To establish liability, Plaintiffs must establish Transocean was consciously indifferent to the risks *that actually caused the blowout.  See Martin v. Texaco, Inc.*, 726 F.2d 207, 209-12 (5th Cir. 1984) ("The inquiry in this case . . . does not involve an

42

evaluation of Texaco's overall conduct.  It focuses instead upon the particular hazard that caused [the plaintiff's] death. The question is not whether Texaco's general safety program reflected an attitude of conscious indifference. The relevant inquiry is whether Texaco was consciously indifferent as to the dangers presented by the use of nitrogen in the refinery [which caused the plaintiffs' death].") (original emphasis omitted).

## II.    THE EVIDENCE DOES NOT SHOW GROSS NEGLIGENCE BY THE CREW

### A.    The Drill Crew Was Not Grossly Negligent in Monitoring and Trying To Shut in the Well

Transocean has conceded negligent and inadvertent error, but there was no evidence of the "willful, wanton and reckless conduct" and conscious disregard of risks necessary to show gross negligence.  *Becker*, 586 F.3d at 367; *Maxey*, 665 F.2d at 1374.  BP had the overall responsibility for, and made, the critical decisions that put the well in jeopardy.  The drill crew was tasked with carrying out those decisions, and they showed at all times a concern for safety. They worked diligently on the negative test.  BP interrupted their effort to complete the test on the drill pipe, and insisted on changing the test mid-course.  And BP then declared the test a success despite the anomalies seen on the drill pipe.  The crew did not get the test right, but it was not for want of effort or concern.

Likewise, when BP instructed the crew to proceed with displacement, the crew did so diligently.  Although Halliburton, BP, and the Transocean crew missed early anomalies, the evidence at trial showed that the crew was alert and responsive.  The crew did see anomalies, and they took action.  They shut down the pumps to investigate; they activated BOP elements to close the well; they diverted the flow; they alerted the Well Site Leader, the bridge and the Senior Toolpusher.  They took their last known action at 9:47 p.m., just two minutes before the explosion, when they closed the Variable Bore Rams and it appeared, for a time, they had shut in

43

the well.

The question is not whether there were errors.  Transocean has conceded errors, as have the other defendants.  The question before the Court is whether the errors of the Transocean crew grew out of conscious disregard for duty or safety.  That question is not close.  The drill crew was not cavalier or reckless about safety.  They were never told of the grave concerns that others had about the cement and the negative test, but the crew did the best they could in the circumstances as they understood them.  They worked diligently to the end, with but one goal: Getting the work done safely so they could get home to their families.

**B.**  **The Actions of the Bridge Crew Were Not Causal and Not Grossly Negligent**

**1.  *Causality*.**  The claim that the bridge crew should have hit the EDS as soon as they saw a problem, without communicating with the drill floor, is contradicted by standard well-control procedure, is without precedent in the history of the industry, and would not have changed the outcome.  Captain Mitchell may have felt strongly about the EDS issue, but expressed no opinion about whether hitting the EDS would actually accomplish anything in the circumstances, and he had no competence to do so.  Whatever the merits of his view that the Captain should activate the EDS *without regard for the consequences*, such testimony does not establish *causal connection* between EDS timing and the blowout.  That connection could not be established.  The weight of the evidence demonstrated that, by the time the bridge saw the first signs of trouble, the pipe was already pushed to the side by the force of the blowout.  The EDS activates the Blind Shear Rams, and *they could not function with the pipe pushed to the side.*

**2.  *No Negligence and No Gross Negligence*.**  The bridge crew's conduct was in accord with training and policy and showed concern for safety.  The crew investigated the sights, sounds, and alarms; they communicated with the drill crew and engine room about the situation, warned the supply vessel to move off, attempted to reach and warn the crew in the shaker house,

sounded the general alarm, gave the order to abandon ship, mustered and evacuated the entire remaining crew—including the badly injured, and were the last to leave the burning vessel. Transocean was not alone in calling their conduct heroic.  There was not a shred of evidence of lack of concern or reckless disregard of risks.

### C.   The BOP's Operation and Maintenance Were Not Causal and Not Grossly Negligent

**1. *Lack of Causation*.**  The allegation that the operation and maintenance of the BOP, and in particular the solenoids and batteries, establish gross negligence by Transocean fails at the outset:  There was no causation.  The BOP could not seal the well because the pipe was pushed off center by the force of the blowout.  As Dr. Stevick explained, that meant that the Blind Shear Rams could not shut in the well at AMF time, even if the Blue and Yellow Pods "function[ed] perfectly."[255]  That was the conclusion of the experts of DNV, Stress Engineering, Halliburton and Transocean.  Because no causal connection can be established, the operation and maintenance of these BOP parts cannot form the basis of a gross negligence finding.  *See Woolard*, 479 F.2d at 563-64.  Moreover, the evidence demonstrated that both pods were in fact capable of functioning in actual operating conditions on April 20.

**2. *No Negligence*.**  There was also no evidence of negligence, let alone gross negligence, in the replacement or testing of the solenoid.  The evidence established that the solenoid was timely tested and replaced just before the BOP was installed at Macondo.  The manufacturer (Cameron) had to modify its recommended solenoid test *after the accident* for the express purpose of detecting reverse wired solenoids.

There was also no evidence that the dropping of the annual battery change requirement from the prior computer-based maintenance system (which was reinstated in the new system)

---

[255] TR. 6924:3-7 (Stevick).

was anything other than an inadvertent mistake.

      **3.** *No Indifference to Safety.*  Finally, there was no evidence of conscious disregard for safety.  To the contrary, the extensive and routine maintenance and testing of the BOP demonstrated a concerted and continuous effort to assure the BOP was operational.

      **D.**    <u>**Other Rig Maintenance Issues Are Irrelevant**</u>

      Plaintiffs' unfocused attempt to criticize the condition of the rig more broadly should be rejected both as a factual matter and because no other maintenance issue was shown to play any role in the incident.

      The crew performed thousands of maintenance tasks on the *Horizon*, and the rig repeatedly passed audits and inspections by experienced and diligent Coast Guard, MMS, ABS, and DNV personnel with no goal other than to assure safe operations.  Inspectors could have taken the rig out of service, but, for good reason, they never did.  The *Horizon* was, by all accounts, an exemplary rig.  The "overdue maintenance" allegations were shown to be both overblown and irrelevant, having nothing to do with the accident.

**III.**    **THE EVIDENCE DOES NOT ESTABLISH GROSS NEGLIGENCE BY ANY TRANSOCEAN ENTITY**

      **A.**    <u>**Punitive Damages May Not Be Assessed Against Transocean Unless the Company Authorized or Ratified Outrageous or Wanton Conduct**</u>

      The law in the Fifth Circuit is settled that "punitive damages may not be imposed against a corporation when one or more of its employees decides on his own to engage in malicious or outrageous conduct."  *In re P&E Boat Rentals*, 872 F.2d at 652.  Plaintiffs must prove that Transocean "authorize[d] or ratifie[d] wanton actions" of its employees.  *Id.* at 650.  Because Transocean has "formulated policies and directed its employees properly, no purpose would be served by imposing punitive damages against it of an agent."  *Id.* at 652.

      Plaintiffs cannot satisfy the Fifth Circuit standard because:

**1.**  Transocean provided the *Horizon*'s crew with state of the art training, including well control school, scores of on-the-job training modules, and weekly drills designed to keep fresh and apply well-control skills to upcoming tasks.  Transocean studied well control events, determined the lessons, and applied those lessons to future training and operations.  No one identified any better training program in use anywhere.

**2.**  The crew's specific conduct on the evening of April 20, such as its erroneous acceptance of BP's misinterpretation of the negative test, was not ratified by Transocean.

**3.**  Transocean required, and provided special teams to support, extensive maintenance on the rig and the BOP in particular, including requiring the regular replacement of the solenoids and batteries.  There is no basis to conclude that any errors or failures by the subsea maintenance crew were authorized or ratified by Transocean.

**4.**  BP and other third parties inspected, audited, and reviewed the *Deepwater Horizon* and consistently found it not only fit for service, but one of the best performing and safest rigs in service.  The rig was thoroughly audited by BP in late 2009 and again by ModuSpec in April 2010.  Each of these inspections and audits resulted in reports to Transocean that the rig and her crew were in appropriate condition for the challenging work they did.

**B.**      **Transocean's Compliance With Regulations and Industry Standards Is Strong Evidence Against Gross Negligence**

The consistent evidence that Transocean in fact complied with or exceeded regulatory and industry standards provides strong evidence refuting allegations of gross negligence.  *Lorenz v. Celotex Corp.*, 896 F.2d 148, 150 (5th Cir. 1990) (holding, in product liability case that "compliance with such government safety standards constitutes strong and substantial evidence that a product is not defective") (*quoting Gideon v. Johns-Manville Sales Corp.*, 761 F.2d 1129, 1144 (5th Cir. 1985)); *Baker v. S/S Cristobal*, 488 F.2d 331, 333 (5th Cir.  1974) ("compliance

47

with the customs and practices of an industry . . . is evidence of due care") (internal quotation marks and citation omitted).  Indeed, successful inspection by a classification society, such as DNV, is "very strong evidence of due diligence" and seaworthiness.  *Firemen's Fund Ins. Cos. v. M/V VIGNES*, 794 F.2d 1552, 1556 (11th Cir. 1986).

Time and again at trial Transocean's policies and equipment choices were shown to be approved by regulators and inspectors, and consistent with industry standards.  This compliance with regulations and standards is particularly probative in the highly regulated drilling industry, where government regulators and neutral third party organizations exercise substantial and up-to-date oversight.  It would be extraordinary—and an indictment of numerous regulatory and independent entities and their professional staffs—to conclude that compliance with industry standards constituted conscious and reckless disregard for safety.

## IV.   THE TRANSOCEAN ENTITIES ARE ENTITLED TO EXONERATION OR LIMITATION IN THE LIMITATION ACTION

Transocean has admitted negligence by TDI employees.  But no evidence establishes negligence on the part of employees of TODDI (the employer of the onshore personnel), Transocean Holdings (which chartered the *Horizon*), or Triton (which owned the *Horizon* but demise chartered it to Holdings in 2001).

**1.  *No Privity or Knowledge*.**  Transocean has carried its burden to show that no Transocean entity had privity or knowledge of negligence by the drill crew.  *E.g.*,  *In re Kristie Leigh Enters., Inc.*, 72 F.3d 479, 482 (5th Cir. 1996) ("An employee's negligence at sea, without more, is not enough to deny limitation").  An owner is entitled to rely on the expertise of a competent crew—and no one has argued that Transocean fielded an incompetent drill crew on the *Horizon*.  *Coryell v. Phipps*, 317 U.S. 406, 412 (1943) ("One who selects competent men … and who is not on notice … cannot be denied the benefit of … limitation," unless privity or

knowledge are to become empty words.); *Mac Towing, Inc. v. Am. Commercial Lines*, 670 F.2d 543, 548 (5th Cir. 1982) (similar).

As for the BOP, the Plaintiffs had the burden to show that some negligence or unseaworthiness was "the proximate cause of [their] loss." *Trico Marine Assets, Inc. v. Diamond B Marine Servs. Inc.,* 332 F.3d 779, 789 (5th Cir. 2003). The evidence failed to establish such causation. And even if there was a causal connection, there was no basis for attributing the failure to detect a reverse-wired solenoid or the failure to change the Blue Pod batteries to Transocean, because there was no evidence Transocean had knowledge of these conditions.

Having selected and trained a competent bridge crew that had successfully steered the rig through numerous wells in challenging seas—including a successful emergency disconnect[256]— there is no basis for attributing errors by the bridge crew on the evening of April 20 to Transocean. No court has denied a corporate shipowner limitation of liability for a master's negligence at sea when the owner has exercised reasonable care in selecting the master. *See, e.g.*, *Continental Oil Co. v. Bonanza Corp.*, 706 F.2d 1365, 1377, n.15 (5th Cir. 1983) (en banc).

**2. *Triton Is Entitled to Exoneration.*[257]** Triton, the owner of the *Horizon*, in particular is entitled to exoneration and should be dismissed. Triton is differently situated from the other entities: when an owner enters into a demise charter, it "is not liable for unseaworthiness or negligence that comes into existence while the charter is in effect." *Picou v. D & L Towing, Inc.*, No. 09-2810, 2010 WL 2696468, at *3 (E.D. La. July 2, 2010). The *Horizon* demise charter was in effect continuously from August 2001;[258] there is no evidence of any negligence or unseaworthiness that caused the accident *and* that *pre-dated* the charter.

---

[256] P. Earl Lee Depo. 393:15-24 (crew successfully used EDS during 2009 Hurricane Ida); *see also* Rec. Doc. 5927, #24.

[257] Triton has concurrently filed a Federal Rule of Civil Procedure 52(c) Motion for Judgment on Partial Findings.

[258] TREX 52356 (demise charter agreement).

## V.   THE INABILITY OF THE RIG AND HER CREW TO AVOID THE BLOWOUT CANNOT JUSTIFY SHIFTING BLAME FROM BP AND HALLIBURTON

There is no basis to shift liability from BP or Halliburton to Transocean on the theory that the crew's conduct was a superseding or intervening cause. To assert a superseding or intervening cause defense that would absolve BP or Halliburton from fault, they must show that the blowout was "brought about by a later cause of independent origin that was not foreseeable." *Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM*, 447 F.3d 360, 367-68 (5th Cir. 2006).

BP expressly recognized a blowout as a foreseeable risk of drilling.[259]  Failing to shut in the well was not some unforeseeable catastrophe, like a hurricane blowing in just as the cement was pumped.  Not shutting in the well was a foreseeable consequence of BP's decisions to proceed with a faulty cement job, to adopt an unusually risky abandonment plan, and, most importantly, to order continuation of the displacement at 9:14 p.m. after Hafle told Vidrine the negative test was wrong.  These decisions gave the drill crew at 9:30 p.m. and the Bridge Crew at 9:46 p.m. only moments to react.  Even if the conduct of the crew were negligent, that would not absolve the party that created the difficulty.  *See Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 652 (5th Cir. 1992) (party's negligence was "a normal consequence of the situation created by" the defendant and therefore not an intervening cause); *Allied Chem. Corp. v. Hess Tankship Co. of Del.*, 661 F.2d 1044, 1060 (5th Cir. 1981) ("A subsequent negligent act does not excuse prior negligence except in most unusual circumstances.").

## CONCLUSION

The Court should grant Transocean's petition in limitation and limit the liability of TDI and exonerate TODDI, Holdings, and Triton.  Judgment on all claims for punitive damages and on all cross-claims against Transocean should be entered in Transocean's favor.

---

[259]TREX 4160.2 (BP Drilling & Completions Risk Register dated March 12, 2010).

DATED: June 21, 2013

By:   s/ Brad D. Brian
Brad D. Brian
Michael R. Doyen
Luis Li
Daniel B. Levin
Susan E. Nash
MUNGER, TOLLES & OLSON LLP
355 So. Grand Avenue, 35th Floor
Los Angeles, CA 90071
Tel:  (213) 683-9100
Fax:  (213) 683-5180
Email: brad.brian@mto.com
        michael.doyen@mto.com
        luis.li@mto.com
        daniel.levin@mto.com
        susan.nash@mto.com

John M. Elsley
ROYSTON, RAYZOR, VICKERY & WILLIAMS
LLP
711 Louisiana Street, Suite 500
Houston, TX 77002
(713) 224-8380

Respectfully submitted,

By:   s/ Steven L. Roberts
Steven L. Roberts
Rachel Giesber Clingman
Sean D. Jordan
SUTHERLAND ASBILL & BRENNAN LLP
1001 Fannin Street, Suite 3700
Houston, Texas 77002
Tel:  (713) 470-6100
Fax:  (713) 354-1301
Email: steven.roberts@sutherland.com
        rachel.clingman@sutherland.com
        sean.jordan@sutherland.com

By:   s/ Kerry J. Miller
Kerry J. Miller
FRILOT, LLC
110 Poydras St., Suite 3700
New Orleans, LA 70163
Tel:  (504) 599-8194
Fax:  (504) 599-8154
Email: kmiller@frilot.com

*Counsel for Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc.,
Transocean Holdings LLC, and Triton Asset Leasing GmbH*

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2013, I electronically filed the foregoing with the Court's

CM/ECF system and service on all counsel of record by using the LexisNexis File & Serve, in

accordance with Pretrial Order No. 12 which will send a notice of filing to all counsel accepting

electronic notice.

   /s/ Kerry J. Miller
        Kerry J. Miller