# Exhibit A

**52536 - 1**

CHARTER PARTY

Dated as of August 17, 2001

Between

TRANSOCEAN OFFSHORE INTERNATIONAL VENTURES LIMITED

Owner

and

R&B FALCON DRILLING CO.

Charterer

Drilling Unit

DEEPWATER HORIZON

FMV   DEC
      2009   400 m

Confidential Treatment Requested by TODDI

TREX-52536
TO-DHTF-01541810

**52536 - 2**

<u>CHARTER PARTY</u>

THIS CHARTER PARTY   (hereinafter referred to as the "CHARTER") is entered into as of the 17th day of August, 2001 by and between TRANSOCEAN OFFSHORE INTERNATIONAL VENTURES LIMITED, a limited liability company duly organized under the laws of the Cayman Islands, with a registered office located in St. Michael, Barbados (hereinafter referred to as "OWNER"), and R&B FALCON DRILLING CO., a company duly organized under the laws of the State of Oklahoma, with principle offices at 4 Greenway Plaza, Houston Texas, (hereinafter referred to as "CHARTERER").

WHEREAS, OWNER has acquired the dynamically positioned semi-submersible drilling rig known as the "DEEPWATER HORIZON" (hereinafter referred to as the "Rig") which is more particularly described in the definition of Rig appearing below; and

WHEREAS, prior to the transfer of ownership of the Rig to Owner, CHARTERER did own and operate the Rig in the performance of that certain drilling contract dated December 9, 1998 between it and Vastar Resources (the "Drilling Contract"),

WHEREAS, CHARTERER continues to be obligated to perform the Drilling Contract

WHEREAS, upon the basis of terms and conditions set out herein, OWNER wishes to charter the rig to CHARTERER and CHARTERER, for the purpose of fulfilling its remaining obligation under the Drilling Contract, wishes to charter the Rig from OWNER.

NOW, THEREFORE, for and in consideration of the premises and mutual covenants contained herein, OWNER and CHARTERER hereby agree as follows:

1

Confidential Treatment Requested by TODDI

# ARTICLE 1

## DEFINITIONS

The following terms shall have the meaning specified below for all purposes throughout this Charter and any Exhibits hereto:

"Bareboat Charter Period" - That period which commences on the date first referred to above and until completion of the primary term of the Drilling Contract or the early termination of the Drilling Contract, unless specifically provided for otherwise under the terms of this Charter.

"Event of Loss" shall mean any of the following events during the Charter Period: (a) the actual loss of the Rig or a constructive or compromised total loss of the Rig under applicable insurance policies or arrangements; or (b) the recognition of condemnation, confiscation, requisition, seizure, forfeiture, compulsory purchase, or other similar taking of the Rig or title thereto under applicable insurance policies or arrangements.

"Service Contract" shall mean any contractual arrangement in effect at any time during the Bareboat Charter Period with respect to the Rig providing for the use and employment of the Rig for any purpose, including the Drilling Contract. When the term "Service Contract" is used herein, it shall include the period of mobilization, demobilization, preparation for mobilization and preparation for stacking, even though such periods may be outside the actual term of the Service Contract.

"Rig" shall mean that certain dynamically positioned semi-submersible known as the " DEEPWATER HORIZON" owned by SELLER and being of Panamanian flag and registry, with official registration number of 29273-PEXT-1, IMO No. 8764597, with Gross Tonnage of 32,588 and with Net Tonnage of 9,778, together with any machinery, engines, equipment, anchors, cable, drilling machinery, drilling equipment, pumps, drilling supplies, tools, stores, furniture, items of personality, electrical, mechanical, or chemical, hydraulic and other systems, actually located thereon, incorporated therein, or attached thereto. In addition the term shall include all of the Capital Equipment, as that term is defined below, whether now owned or hereafter acquired and also any and all additions, improvements, renewals and replacements, at any time made during the Charter Period in or to such Rig, excepting, however, any Capital Equipment, inventory, addition, improvements, renewals or replacements placed upon the Rig by a third party or on a lease or rental basis.

2

"Capital Equipment" shall mean those items of equipment which are classified as capital items under generally accepted accounting principles in the accounting records of OWNER.

## ARTICLE 2

## DELIVERY AND ACCEPTANCE OF RIG; REDELIVERY

ARTICLE 2.1. Delivery of Rig to CHARTERER. The CHARTERER hereby agrees to accept delivery of the Rig from OWNER on August 17, 2001.

ARTICLE 2.2. Redelivery of Rig at End of Bareboat Charter Period.

(a)     Upon the expiration of the Bareboat Charter Period, or early termination of the Charter pursuant to Article 8.2, CHARTERER shall redeliver the Rig to the owner at such port as may be mutually agreed upon between OWNER and CHARTERER.

(b)     CHARTERER agrees that at the time of such redelivery, the Rig shall be free and clear of all liens (except the lien of any OWNER mortgage and liens either resulting from acts or omissions of the OWNER or arising as the result of claims against the OWNER), shall be entitled to and shall have the classification and certification required by Article 5.1, shall be Service Contract free, and in substantially the same order and condition as on the delivery date, ordinary wear and tear excepted.  In applying the term "ordinary wear and tear excepted" in this Article 2.2 (b) and in Article 5.1, the parties recognize that the Rig and its Capital Equipment are in used condition on the delivery date and will be redelivered in used condition.

(c)     During the Bareboat Charter Period this Charter may be terminated only upon the mutual consent of CHARTERER and OWNER.  CHARTERER shall have the right, upon 90 days' written notice prior to the date the Bareboat Charter Period would otherwise end, to renew this Charter for an additional term of five years subject to establishment of a mutually agreeable Basic Hire rate.  Subject to extension pursuant to Article 2.2 (d) below, either party may cause this Charter to terminate upon 180 days' prior written notice during any extension of the Bareboat Charter Period pursuant to this Article.

(d)     The Bareboat Charter Period shall be extended for the time required to complete any well in progress under the Service Contract on the date

3

that the Bareboat Charter Period would have otherwise ended, and for such additional time thereafter as shall be required to effect redelivery in accordance with the terms of this Article 2.2. During such extension period, if any, all of the obligations of CHARTERER and OWNER under this Charter applicable during the Charter Period shall continue in respect of such extension period. CHARTERER shall give a good faith estimate of any such duration to OWNER, and shall promptly, upon obtaining the necessary information, notify the OWNER in writing of any later or more precise estimate or determination of such duration.

ARTICLE 2.3, Rig Documentation. CHARTERER shall keep on behalf of OWNER all documentation delivered with respect to the Rig. Upon redelivery of the Rig at the end of the Bareboat Charter Period, CHARTERER shall deliver to OWNER the documentation referred to in the preceding sentence plus such additional documentation of similar nature as may have been created during the Bareboat Charter Period.

## ARTICLE 3

## EXCEPTIONS

In no event shall OWNER be liable to CHARTERER under any provision of this Charter for any loss or damage whatsoever whether direct or indirect, howsoever arising from any matter relating to the Rig, including, without limitation, any defect, whether of materials, workmanship, construction or design or otherwise in the Rig, and whether caused by the negligence of the OWNER or otherwise, and from and after delivery of the Rig all claims upon and liability whatsoever of OWNER under this Charter or in tort in respect of any such defect shall be absolutely unenforceable. In particular, but without limiting in any way the generality of the foregoing, OWNER shall be under no liability to CHARTERER howsoever caused for loss of profits or loss of use, time or hire or for detention of the Rig or for pecuniary or economic losses of any nature nor shall OWNER be responsible for, and CHARTERER will keep OWNER fully indemnified in respect of, liabilities to the owner of any vessel or structure or cargo or other third parties incurred as a consequence of any defect in the Rig or accident resulting therefrom nor shall OWNER be liable for any accident or damage to the Rig whether direct or indirect arising as a consequence of any such defect or for wages of crew, port charges, towage, salvage, drydocking, general or particular average expenses or any cost or expense whatsoever consequent upon any such defect or any accident caused thereby whether or not the same is foreseeable at the date of this Charter. The provisions of this Charter are in substitution for every guarantee and/or warranty and/or condition and/or term expressed or implied by statute or common law and all such guarantees, warranties, conditions and/or terms are hereby expressly excluded.

4

TO-DHTF-01541814

## ARTICLE 4

## USE AND OPERATION OF RIG

ARTICLE 4.1 Use of Rig; Compliance with Laws. CHARTERER shall have the full use of the Rig and may employ the Rig throughout the world for any legal purpose, except that the Rig may not be used or operated contrary to, and shall comply with, all applicable laws, treaties or conventions and the terms of any policies of insurance then required by Article 10. CHARTERER, in respect of the Rig, shall at all times comply with all applicable laws and regulations and with the applicable provisions and conditions of all licenses, permits, consents and approvals of any governmental authority having jurisdiction over the Rig. Notwithstanding the two preceding sentences, neither the Rig nor the CHARTERER shall be required to comply with any requirements or restrictions which shall then be contested by CHARTERER in good faith by appropriate proceedings.

ARTICLE 4.2. Manning, etc., of Rig. As between the OWNER and CHARTERER, CHARTERER shall have the exclusive right to possession and control of the Rig and shall man, victual, navigate and operate, supply, fuel, maintain and repair the Rig by its own procurement, and shall pay all other charges and expenses of every kind and nature whatsoever incidental to the use and operation of the Rig and shall, subject to Articles 2 and 6, provide such equipment, outfit, tools, spare and replacement parts as may be required for the use and operation of the Rig. As between the OWNER and CHARTER, during the Charter Period the possession, use, operation and maintenance of the Rig shall, subject to Article 11, be at the sole risk of CHARTERER until redelivery pursuant to the terms hereof upon the termination of this Charter. As between the OWNER and CHARTERER, the master, officers, and crew of the Rig and all other persons at any time on board the Rig shall be deemed to be engaged and employed exclusively by CHARTERER and shall be deemed to be and remain CHARTERER'S servants, navigating and working the Rig solely on behalf of and at the risk of CHARTERER.

ARTICLE 4.3. Salvage. The OWNER shall not have any interest in any salvage monies earned by the Rig or its master or crew or received by CHARTERER. As between the OWNER and CHARTERER, CHARTERER assumes and shall satisfy all costs and liabilities incurred in connection with all salvage services rendered by the Rig.

Confidential Treatment Requested by TODDI                                        TO-DHTF-01541815

ARTICLE 4.4.   Documentation of Rig.   CHARTERER shall throughout the Charter Period maintain at CHARTERER'S expense documentation of the Rig and shall ensure the Rig remains properly documented under the laws of such country as OWNER deems appropriate.   Upon the written request of CHARTERER, the OWNER shall execute promptly and with due diligence such documents and furnish such information as may be necessary to enable CHARTERER to maintain the documentation of the Rig.

## ARTICLE 5

## MAINTENANCE OF CONDITION AND CLASSIFICATION; REPAIRS

ARTICLE 5.1.   Maintenance and Classification.   CHARTERER shall at all times during the Charter Period, maintain and preserve the Rig in accordance with good commercial maintenance practices, and keep the Rig in the same good order and condition as on the delivery date, ordinary wear and tear excepted, and in addition, shall keep the Rig in such condition as will, during the Charter Period and at the date of redelivery to the owner, entitle it to, and will cause the Rig to have, the same classification and certification as was possessed by the Rig on the delivery date.   OWNER shall execute promptly and with due diligence such documents as may be necessary to enable CHARTERER to maintain such classification.

ARTICLE 5.2.   Inspection.   The OWNER, or its authorized representative, shall have the right, at reasonable times and on reasonable notice, to inspect the Rig and its logs in order to ascertain its condition and to satisfy itself that the Rig is being properly maintained in accordance with Article 5.1, but the OWNER shall have no duty to do so.   Such inspection shall not unreasonably interfere with the operation of the Rig and will be subject to approval of the operator if a Service Contract is in force at the time the inspection is requested.   CHARTERER shall render its good faith assistance to secure from the operator the permission to enable OWNER to carry out its inspection rights.   Such inspections shall be at OWNER'S expense and risk, and OWNER shall hold CHARTERER harmless from and against any claims for damage or injury or death of any of OWNER'S inspectors or other personnel.

## ARTICLE 6

## CHANGES AND ADDITIONS

ARTICLE 6.1.   Structural Changes or Alterations, etc.   Subject to the provisions of Article 5,  CHARTERER in its sole discretion shall have the right to make structural changes or alterations in the Rig, provided the change or

6

TO-DHTF-01541816

alteration shall not materially diminish the value or utility of the Rig below the value or utility of the Rig immediately prior to such change or alteration. CHARTERER shall not make any structural change or alteration other than the above without obtaining OWNER'S prior written consent.

ARTICLE 6.2. Additions of Capital Equipment and Upgrades. Unless mutually agreed otherwise, OWNER shall pay for all additions of Capital Equipment with respect to the Rig during the term of this Charter. OWNER shall be compensated for payments pursuant to this Article in accordance with Article 9.2.

ARTICLE 6.3. Equipment Changeovers. CHARTERER shall always have within its sole discretion the right to replace existing Capital Equipment with equipment of a different brand name or different characteristics or capability, provided any such replacement shall not materially diminish the value or utility of the Rig below the value or utility of the Rig immediately prior to such replacement, based upon its best judgment of the kind of Capital Equipment needed to obtain Service Contracts or based upon client requests.

ARTICLE 7

LIENS

ARTICLE 7.1. No Liens; Notice of Charter. Neither CHARTERER, nor any subcharterer, nor any party to a Service Contract, nor the master of the Rig, nor any other person shall have the right, power or authority to create, incur or permit to be placed or imposed upon the Rig any lien whatsoever other than liens for crew's wages, for wages of stevedores when employed directly by the CHARTERER, or for the general average or salvage (including contract salvage), or other liens incident to current operations of the Rig or for repairs to the Rig, but only to the extent such other liens are expressly subordinate to the lien of any OWNER mortgage. CHARTERER shall carry a true copy of the Charter with the ship's papers on board the Rig and shall exhibit the same to any person having business with the Rig which may give rise to any lien upon the Rig (other than as set forth above) or to the sale, conveyance or mortgage thereof, and on demand, to any person having business with the Rig or to any representative of the OWNER.

ARTICLE 7.2. CHARTERER'S Indemnification and Duties to Remove Liens, etc. If a libel or complaint in admiralty shall be filed against the Rig, or the Rig shall be otherwise levied upon or taken into custody or detained or sequestered by virtue of the proceedings in any court or tribunal or by any government or other authority because of any liens of whatsoever nature (other than as permitted by Article 7.1 and liens directly resulting from (i) a

7

                    TO-DHTF-01541817

claim against the OWNER whether or not related to its ownership of the Rig or resulting from acts or omissions of the OWNER or (ii) taxes, the payment of which is the obligation of the OWNER), whether such liens are founded or unfounded, provided only that they, or any of them, shall arise during the Charter Period, or shall be in respect of the Charter Period, and shall be upon or relating to the Rig, its possession, management, maintenance, repair, use, employment, chartering, or subchartering or operation, or to any sums payable under this Charter, or to any act or omission of CHARTERER or any agent, employee, subcharterer, party to a Service Contract or other person claiming through CHARTERER, CHARTERER shall, at its own expense, use all reasonable steps to secure that within a reasonable time the Rig is released or the lien is removed including, at its own expense, putting up bail to secure release of the Rig.

## ARTICLE 8

### SALE OF RIG

ARTICLE 8.1. <u>OWNER'S Right to Sell</u>. OWNER agrees not to sell or list the Rig for sale without prior written consent of CHARTERER, not to be unreasonably withheld.

ARTICLE 8.2. <u>Termination of Assignment</u>. In case of a sale of the Rig, OWNER and CHARTERER may agree either to terminate this Charter or assign the Charter to the purchasing party.

## ARTICLE 9

### CHARTER HIRE

ARTICLE 9.1. <u>Basic Hire</u>. CHARTERER shall pay to the OWNER Basic Hire for the Rig throughout the Charter Period in United States dollars at such bank account as OWNER may designate from time to time. Except as otherwise provided in this Charter, Basic Hire shall be U.S. $141,100 per day, to be paid monthly as invoiced by OWNER or at such other intervals as may be mutually agreed. OWNER and CHARTERER may, however, agree to suspend CHARTERER'S obligation to pay Basic Hire during periods when the Rig is undergoing major repair or is being drydocked. In the event CHARTERER extends this Charter beyond the Bareboat Charter Period, the Basic Hire to be paid by CHARTERER shall be readjusted to a rate mutually agreeable to OWNER and CHARTERER.

8

TO-DHTF-01541818

ARTICLE 9.2. <u>Increases in Basic Hire</u>. For each cumulative U.S. $1,000,000 of capital expenditures paid for by OWNER pursuant to Section 6.2, the Basic Hire shall be increased by an amount mutually agreed upon by OWNER and CHARTERER.

ARTICLE 9.3. <u>OWNER'S Right to Audit</u>. OWNER shall have the right, with reasonable advance notice, to audit the accounts of CHARTERER as they pertain to the Rig.

ARTICLE 9.4. <u>Set Off</u>. CHARTERER shall be entitled throughout the Charter Period to credit or reimburse itself any sums of whatever nature owed to it by OWNER against or from any sums of whatever nature owed by or payable by it to OWNER.

## ARTICLE 10

## INSURANCE

ARTICLE 10.1. <u>Insurance Coverage</u>. At all times during the Charter Period, Charterer shall, at its own expense, arrange for and maintain insurance on the Rig and, with respect to the Rig, on itself and the OWNER as their interests may appear against loss, damage or liabilities in such terms and conditions as shall be in accordance with insurance maintained on and with respect to other rigs of comparable age and function which are owned or bareboat chartered by CHARTERER. CHARTERER shall be obligated to arrange for and maintain hull and machinery insurance on the Rig in such an amount as OWNER shall from time to time reasonably specify. If CHARTERER enters into any Service Contract requiring insurance to be maintained with respect to the Rig in amounts in excess of those specified above, additional premiums shall be for the account of CHARTERER. Except for any supplemental coverage maintained by OWNER, all policy deductibles for the above-described insurance shall be for the account of CHARTERER. In addition, CHARTERER shall provide to OWNER certificates for all such insurance.

If OWNER maintains any additional insurance on or with respect to the Rig during the Bareboat Charter Period, the insurance policies providing for such insurance shall be at OWNER'S cost and shall name CHARTERER as an additional insured and shall provide for a waiver of subrogation in favor of CHARTERER. OWNER shall give to CHARTERER certificates of insurance for any such policies.

ARTICLE 10.2. <u>Provision of Policies</u>. All policies, binders or interim insurance contracts in respect of insurance required under Article 10.1 by CHARTERER

9

shall provide that there shall be no recourse against the OWNER for the payment of premiums or commissions or (if such policies provide for the payment thereof) club calls, assessments or advances.

ARTICLE 10.3.   Application of Proceeds Generally.   Payments under all policies required hereby covering loss or damage to the Rig made as the result of an Event of Loss shall be made to the OWNER.   However, all payment of insurance proceeds as a result of partial losses shall be made to CHARTERER and used by CHARTERER to repair the Rig or replace damaged Capital Equipment and inventory, unless the OWNER and CHARTERER shall agree otherwise.

ARTICLE 10.4.   Proofs of Loss; Constructive and Compromised Total Loss. CHARTERER shall, at its own expense, have the duty and responsibility to make all proofs of loss and take all other steps necessary or requested by the OWNER to collect from underwriters for any loss under any insurance with respect to the Rig.   The OWNER shall have the right (a) in the event of any accident, occurrence or event resulting in a constructive total loss of the Rig, to claim for a constructive total loss of the Rig and, if accepted by the underwriters, to abandon such Rig to the underwriters; and (b) to enter into an agreement or compromise providing for an agreed or compromised total loss of the Rig.

ARTICLE 10.5.   Enforcement of Warranties.   During the Charter Period, the CHARTERER shall, as agent for the OWNER, enforce all equipment warranties relating to any equipment forming a part of the Rig.   Any amounts received by the CHARTERER as a result of such enforcement shall be used for the repair, refurbishment or replacement of the Rig's equipment.

## ARTICLE 11

## LOSS, TAKING OR SEIZURE

In event of a taking of the Rig by any government or by person purporting to act as a government or a quasi-government, CHARTERER shall, at its expense, use all reasonable efforts to cause the Rig to be released.   If, notwithstanding the use of all reasonable efforts, CHARTERER fails to obtain release of the Rig prior to the end of the Bareboat Charter Period, this Charter shall terminate at the end of the Bareboat Charter Period and CHARTERER shall be relieved from the redelivery obligation contained in Article 2.2.(a) and such other redelivery obligations as may be impractical to perform.   Unless otherwise agreed between OWNER and CHARTERER, CHARTERER'S obligation to pay Basic Hire in accordance with Article 9.1 shall continue during

Confidential Treatment Requested by TODDI

TO-DHTF-01541820

the Bareboat Charter Period notwithstanding any detention of the Rig. Notwithstanding the above, if any insurer of the Rig shall determine that an event of expropriation, deprivation, non-exportation or other similar taking has occurred, an Event of Loss shall be deemed to have occurred.

ARTICLE 12

TAXES

ARTICLE 12.1.   General.   CHARTERER agrees to be liable for all taxes or withholdings of any nature whatsoever, together with any penalties or interest thereon (herein collectively called "Taxes") imposed upon, withheld from or assessed against OWNER or CHARTERER by any national or local government or taxing authority of any country upon or with respect to or measured by income or earnings of the Rig. CHARTERER shall not be liable for any Taxes which (i) are imposed by the government of the country under which the OWNER is organized or any political subdivision thereof and are imposed upon or in respect of or measured by the Basic Hire or (ii) shall result wholly from action taken by the OWNER not related to the transactions contemplated hereby or (iii) are imposed for any period, or with respect to any act, occurring after expiration or earlier termination of this Charter. Upon request of OWNER, CHARTERER agrees to cooperate reasonably with OWNER to minimize taxes to be borne by OWNER, and, upon request of CHARTERER, OWNER agrees to cooperate reasonably with CHARTERER to minimize taxes to be borne by CHARTERER.

ARTICLE 12.2. Withholding. CHARTERER shall have the right to withhold any tax described in 12.1(i) if required by the tax laws of any government or political subdivision thereof having jurisdiction over the operation of the Rig.

ARTICLE 13

ASSIGNMENT OR SUBCHARTER

Subject to the requirements of applicable law, and the prior written consent of OWNER, CHARTERER may assign all its rights hereunder, subcharter the Rig to any person, permit the further subcharter of the Rig, and enter into or permit any such subcharterer to enter into, and permit the Rig to serve under a Service Contract, provided that:

11

(a)    each such assignment or subcharter shall, except as provided below, expressly be subject and subordinate to all the terms, provisions and operating restrictions of this Charter;

(b)    Irrespective of any assignment, subcharter or Service Contract, CHARTERER shall remain liable for all of its obligations under this Charter to the same extent as if such subcharter were not in effect.

<u>ARTICLE 14</u>

<u>EVENTS OF DEFAULT</u>

The following events shall constitute Events of Default:

(a)    CHARTERER shall fail to make any payment when and as due to Basic Hire within 10 days after written notice thereof shall have been given by or on behalf of the OWNER to CHARTERER; or

(b)    Either OWNER or CHARTERER shall fail to perform or observe any other material covenant, condition or agreement to be performed or observed by it hereunder and such failure shall continue unremedied for a period of 30 days after written notice thereof shall have been given by the OWNER to CHARTERER, or CHARTERER to OWNER, as the case may be; or

(c)    Either OWNER or CHARTERER shall (1) apply for or consent to the appointment of a receiver, trustee, or liquidator of it or of all or a substantial part of its assets; (2) be adjudicated as bankrupt or insolvent by a court of competent jurisdiction, or file a voluntary petition in bankruptcy, or admit in writing its inability to pay its debts as they come due; (3) make a general assignment for the benefit of creditors; (4) file a petition or an answer seeking reorganization or arrangement with creditors or to take advantage of any insolvency or debt readjustment law; or (5) file an answer admitting the material allegations, or consent to, or default in answering, a petition filed against it in any bankruptcy, reorganization or insolvency proceeding; or

(d)    An order, judgment or decree shall be entered against either OWNER or CHARTERER by any court of competent jurisdiction approving as properly filed a petition seeking reorganization or any arrangement with creditors (or any class of creditors) or debt readjustment or appointing a receiver, trustee or liquidator of it or of all or a substantial part of its assets, and such order, judgment or decree shall continue unstayed and in effect for any period of 60 consecutive days; provided that such 60-

12

TO-DHTF-01541822

day period shall be extended for an additional 90 days in the case of any such order, judgment or decree entered by any court outside of the United States.

## ARTICLE 15

## REMEDY

Upon the occurrence of any Event of Default and at any time thereafter so long as the same shall be continuing, the non-defaulting party may, at its option, declare this Charter to be in default.  At any time thereafter, so long as the defaulting party shall not have remedied all outstanding Events of Default, upon written demand, the non-defaulting party may terminate this Charter and require the Rig to be redelivered with all reasonable dispatch and in the same manner and in the same condition as if the Rig were being redelivered at the expiration of the Bareboat Charter Period or early termination of the Charter in accordance with all of the provisions of Article 2.2 irrespective of whether CHARTERER, any subcharterer, or any other person may be in possession of the Rig, all without prior demand and without legal process.

In addition, the defaulting party shall be liable for all legal fees and any other costs and expenses whatsoever incurred by the non-defaulting party by reason of the occurrence of any Event of Default or by reason of the exercise of the remedy hereunder, including without limitation, any costs and expenses incurred in connection with any redelivery of the Rig or, upon the redelivery of the Rig in accordance with this Article 15, the placing of the Rig in the condition and seaworthiness required by and otherwise complying with the terms of Article 2.2.  The remedy referred to in this Article 15 is not intended to be exclusive but is in addition to, and may be exercised concurrently with, any other remedy which may otherwise by available to the non-defaulting party at law, in equity or in admiralty, including without limitation the rights to terminate this Charter.  No waiver by non-defaulting party of any Event of Default shall in any way be, or be construed to be, a waiver of any further or subsequent Event of Default.

## ARTICLE 16

## OBLIGATIONS OF OWNER

Except as otherwise provided in this Charter, the OWNER shall, at its own expense, exonerate, indemnify, and hold harmless CHARTERER from and against any loss, cost or damage suffered by CHARTERER as a result of (a)

13

Confidential Treatment Requested by TODDI

TO-DHTF-01541823

any claims against the OWNER whether or not related to the ownership of the Rig, or (b) the OWNER'S willful misconduct or gross negligence.

## ARTICLE 17

## NOTICES

Unless otherwise specifically provided herein, all notices, consents, directions, approvals, instructions, requests, and other communications required or permitted by the terms hereof shall be given in the English language by telex, telefax or cable, shall be effective when received, shall be promptly confirmed by certified or registered mail, with proper postage for air mail prepaid, shall refer on its face to "Deepwater Horizon" and shall be directed

(a)      if to OWNER to:

        Transocean Offshore International Ventures Limited
        P.O. Box 261
        Bay Street, Bridgetown, Barbados
        Attention: L. Olivia Clark

        Telephone:      246-430-3900
        Telefax:        246-426-9551

        If to CHARTERER to:

        R&B Falcon Drilling Co.
        4 Greenway Plaza
        Houston, Texas
        Attention: Eric Brown
        Telephone:  (713) 232-7608
        Telefax:    (713) 232-7600

or (b) to such other address as any such party may designate by notice given to the other party hereto.

## ARTICLE 18

## GOVERNING LAW AND VENUE

Choice of Law and Venue. This Charter shall be governed by and construed in accordance with the general maritime laws of the United States. Any dispute

14

TO-DHTF-01541824

**52536 - 16**

or claim or other matter arising out of or in connection with this agreement (including but not limited to any dispute or claim relating to the existence, validity or termination of this agreement) shall be subject to the exclusive jurisdiction of the state and federal courts sitting in Houston, Texas, U.S.A., and the parties hereby submit to the jurisdiction of the said courts.

## ARTICLE 19

## AMENDMENTS AND MISCELLANEOUS

ARTICLE 19.1 Amendments, Waivers, etc. The terms of this Charter shall not be waived, altered, modified, amended, supplemented or terminated in any manner whatsoever except by written instrument executed by or on behalf of CHARTERER and the OWNER.

ARTICLE 19.2 Successors and Assigns. This Charter shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. Nothing contained in this Charter shall be deemed to confer any right in favor of or create any obligation of OWNER or CHARTERER to anyone not a party hereto.

ARTICLE 19.3. Currency of Payments. All amounts and moneys referred to in this Charter shall be construed to mean money, which at the time of payment is lawful money of the United States of America.

ARTICLE 19.4. Article Headings, etc. Reference herein to Articles or without reference to the document in which they are contained are references to this Charter. Article headings are for convenience only and shall not be construed as a part of this Charter.

ARTICLE 19.5. Counterparts. This Charter may be executed in counterparts, each of which shall be deemed to be an original hereof.

ARTICLE 19.6. Separability of Provisions. Any provision of this Charter which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, CHARTERER and OWNER hereby waive any provision of law which renders any provision hereof prohibited or unenforceable in any respect.

15

Confidential Treatment Requested by TODDI

ARTICLE 19.7. <u>Title</u>. Nothing herein shall be considered as conveying to CHARTERER any right, title or interest in the Rig except as a CHARTERER.

ARTICLE 19.8. <u>Brokerage</u>. Each party agrees to indemnify the other party from and against all loss, cost, damage, or expense arising out of claims for fees or commissions of brokers employed or alleged to have been employed by such indemnifying party. Both OWNER and CHARTERER represent to the other that to their knowledge there are no commissions owed to any party as a result of this Charter.

ARTICLE 19.9. <u>Cost of the Transaction</u>. Whether or not the transactions contemplated hereby shall be consummated, the parties agree that each party will pay the fees, expenses and disbursements of such party and its agents, representatives, and counsel incurred in connection with the subject matter of this Charter.

ARTICLE 19.10. <u>Entire Agreement</u>. This Charter supersedes all previous charter contracts or other agreements between the parties, and constitutes the entire agreement of whatsoever kind or nature existing between or among the parties respecting the Charter of the Rig and no party shall be entitled to other benefits than those specified herein. As between or among the parties, no oral statements, prior correspondence, schedules, lists, brochures, drawings, specifications or written material of any kind not specifically incorporated herein shall be of any force and effect, and shall not be relied upon by either party.

All prior representations or agreements, whether written or verbal, not expressly incorporated herein, superseded and no changes in or additions to this Charter shall be recognized unless and until made in writing and signed by both parties hereto.

ARTICLE 19.11. <u>Legal Fees and Cost</u>. In the event any party elects to incur legal expenses to enforce or interpret any provision of this Charter or to defend against a claim by the other party, the prevailing party will be entitled to recover from the losing party such legal expenses, including, without limitation, attorneys' fees, costs and necessary disbursements, in addition to any other relief to which such party shall be entitled.

16

Confidential Treatment Requested by TODDI

IN WITNESS WHEREOF, the OWNER and CHARTERER have executed this
Charter as of the day and year first above written.


OWNER:
TRANSOCEAN OFFSHORE INTERNATIONAL VENTURES LIMITED


By:  _~~~ C. ~~~_____

Name: _BRIAN C. VOEGELE_____

Title: _VICE PRESIDENT_____


CHARTERER:
R&B FALCON DRILLING CO.


By:  _____

Name: _William Turcotte____

Title: _Asst. Secretary____

17

                              TO-DHTF-01541827

**52536 - 19**

IN WITNESS WHEREOF, the OWNER and CHARTERER have executed this Charter as of the day and year first above written.

OWNER:
TRANSOCEAN OFFSHORE INTERNATIONAL VENTURES LIMITED

By: _____
Name: BRIAN C. VOEGELE
Title: VICE PRESIDENT

CHARTERER:
R&B FALCON DRILLING CO.

By: _____
Name: William Turcotte
Title: Asst. Secretary

17

TO-DHTF-01541828

## GENERAL ASSIGNMENT AND ASSUMPTION AGREEMENT

This General Assignment and Assumption Agreement (this "Agreement"), dated October 31st, 2002 between R&B Falcon Drilling Co., an Oklahoma company ("Assignor"), and Transocean Holdings Inc., a Delaware company ("Assignee");

### WITNESSETH

WHEREAS, pursuant to a Charter Party (the "Charter") dated as of August 17, 2001 between Assignor and Transocean Offshore International Ventures Ltd. ("Owner"), Owner chartered the mobile offshore drilling unit known as the "Deepwater Horizon" (the "Drilling Unit") to Assignor; and

WHEREAS, pursuant to a Agreement for Assignment of Drilling Contract dated October 14th, 2002, Assignor is assigning to Assignee, effective as midnight October 31st, 2002, that drilling contract No. 980249 of December 9, 1998 with VASTAR RESOURCES, INC. (hereinafter "VASTAR"), now succeeded in interest by BP AMERICA PRODUCTION COMPANY (hereinafter "BP"), pertaining to the Drilling Unit, as amended to date (hereinafter "Drilling Contract"); and

WHEREAS, Assignor wishes to assign the Charter to Assignee, with effect from midnight October 31st, 2002 and Assignee is willing to accept said assignment;

NOW, THEREFORE, for and in consideration of the premises, and of the mutual covenants and agreement herein contained and other good and valuable consideration in hand paid by Assignee to Assignor, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     Assignment.    Assignor hereby GRANTS, CONVEYS, ASSIGNS, TRANSFERS, SELLS AND DELIVERS unto Assignee, as of the date hereof, all of Assignor's right, title and interest in and to the Charter; TO HAVE AND TO HOLD the Charter, together with all and singular the rights and appurtenances thereto in anywise belonging, unto Assignee, its successors, assigns and legal representatives, forever, free and clear of all liens.

2.     Assumption.    As of the date hereof, Assignee by these presents does hereby assume and agree to pay, perform and discharge the obligations of Assignor under the Charter.

3.     Further Assistance.    Assignor from time to time hereafter and without further consideration, upon request of Assignee, covenants and agrees to execute and deliver to Assignee all such other and additional instruments and other documents, and to take all other actions, as may be reasonably necessary to more effectively grant, convey, and assign and which are reasonably necessary or desirable to facilitate the

C:\ANTON\Work\Projects\Helen\Assignments\Horizon BBC Assignment\2.DOC

Confidential Treatment Requested by TODDI                                          TO-DHTF-01541829

recognition of Assignee's interest in the Charter by all third parties and applicable governmental agencies and authorities. Such separate instruments and documents (i) shall evidence the conveyance and assignment of the Charter herein made and shall not constitute an additional conveyance or assignment of the Charter, (ii) are not intended to modify, and shall not modify, any of the terms, covenants and conditions herein set forth, and (iii) shall be deemed to contain all of the terms and provisions hereof, as fully and to all intents and purposes as though the same were set forth at length therein.

    4.    <u>Applicable Law</u>.  The choice of law provision contained in the Charter shall be applicable to this Agreement and is incorporated herein for such purpose.

    5.    <u>Successors and Assigns</u>.  All of the provisions hereof shall inure to the benefit of and be binding upon the respective successors and assigns of the parties hereto.

    6.    <u>Titles and Captions</u>.  All article or section titles or captions in this Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions hereof or affect in any way the meaning or interpretation of this Agreement.

    IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.


TRANSOCEAN HOLDINGS INC.


By: _____
Name: ERIC B BROWN
Title: VICE PRESIDENT & SECRETARY




R&B FALCON DRILLING CO.



By: _____
Name: Joseph A. Bai
Title: VICE PRESIDENT



C:\ANTON\Work\Projects\Helon\Assignments\Horizon BBC Assignment2.DOC     2

Confidential Treatment Requested by TODDI      TO-DHTF-01541830

52536 - 22

## NOTICE OF INTENT TO EXTEND BAREBOAT CHARTER PARTY

To:   TRANSOCEAN  OFFSHORE  INTERNATIONAL  VENTURES  LTD.
(**OWNER**)

Effective:     April 1, 2004

Dear Sirs

**Re:     Semi-submersible Drilling Unit Deepwater Horizon**

We refer to:

(i)      the Bareboat Charter Party dated August 17, 2001 between OWNER and
         Transocean Holdings Inc, (as successor in interest to R&B Falcon
         Drilling Co. LLC (THI) ;

THI hereby gives notice to OWNER pursuant to Articles 2.2.c and 9.1 of the
Bareboat Charter Party that:

(i)      THI wishes to notify you of its intent to extend all of it's rights under the
         Bareboat Charter Party effective at the end of the Drilling Contract
         dated  December  9  1998  between  BP  America  Production  Inc
         (successor in interest to Vastar Resources Inc.) effective with the end of
         such drilling Contract expected to end on or about September 18, 2004;
         for the period of 1 year effective with the commencement date of the
         Drilling Contract.

(ii)     the jurisdiction of THI is the United States of America.

Confidential Treatment Requested by TODDI

TO-DHTF-01541831

**52536 - 23**

If this meets with your approval, kindly acknowledge receipt and acceptance of this notice by signing and returning the attached copy.

Kevin P. Monaghan
**for and on behalf of TRANSOCEAN OFFSHORE INTERNATIONAL VENTURES LTD.**

Acknowledged and accepted:

Eric B. Brown
**for and on behalf of TRANSOCEAN HOLDINGS INC.**

Extension of DW Horizon Bareboat Charter Party Dated

Confidential Treatment Requested by TODDI

TO-DHTF-01541832

## NOTICE OF EXTENSION OF BAREBOAT CHARTER PARTY, DELIVERY AND ACCEPTANCE

To:   TRANSOCEAN   OFFSHORE   INTERNATIONAL   VENTURES   LTD. (OWNER)

From: TRANSOCEAN HOLDINGS INC. (THI)

Dear Sirs,

**Re:   Semi-submersible Drilling Unit DEEPWATER HORIZION**

We refer to:

(i)     the Bareboat Charter Party dated August 17, 2001 between OWNER and THI (as successor in interest to R&B Falcon Drilling Co. LLC (Charterer);

(ii)    Notice of intent to extend bareboat charter party

1.   **EXTENSION AGREEMENT**

THI is desirous to extend all of its rights under and to be bound by the terms and conditions of the Bareboat Charter Party with effect from September 18, 2004 except daily Charter Hire shall be changed to U. S. Dollars 115,700 per day during the period of the extension subject to amendment based on a change in THI's market conditions, if any, at the end of each three-months period from the effective date of this extension or the last change date.

2.   **NOTICE OF DELIVERY AND ACCEPTANCE**

THI and OWNER hereby mutually confirm that THI has accepted the Vessel in "as-is" condition, on 18th day of September 2004 at 00:00 hours.

3.   **PERIOD OF EXTENSION**

The period of extension will commence on 18 September 2004 and terminate automatically on 18 September 2005, provided that THI has the right to an extension of a period no more than 100 additional days. The termination of extension will in no way alter the rights, obligations and liability of each party to the extent that they relate to the period of extension.

Extension of DW Horizion Bareboat Charter Party
Dated 18 September 2004

Confidential Treatment Requested by TODDI

**52536 - 25**

If this meets with your approval, kindly acknowledge receipt and acceptance of this notice by signing and returning the attached copy.

Kevin P. Monaghan
**For and on behalf of TRANSOCEAN OFFSHORE INTERNATIONAL VENTURES LTD.**

Acknowledged and accepted:

Eric B. Brown
**For and on behalf of TRANSOCEAN HOLDINGS INC.**

Extension of DW Horizon Bareboat Charter Party Dated

**52536 - 26**

## ASSIGNMENT OF BAREBOAT CHARTER PARTIES

This Assignment of Bareboat Charter Parties (hereafter called the "Assignment") is entered into effective as of the 20th day of December, 2004, by and between Transocean Offshore International Ventures Limited, a company duly organized under the laws of the Cayman Islands (hereafter called the "Assignor"), and Transocean Inc., a company duly organized under the laws of the Cayman Islands (hereafter called the "Assignee").

WHEREAS, Assignor and Transocean Holdings Inc. (hereafter called the "Consenting Party") are parties to certain bareboat charter party agreements (hereafter called the "Bareboat Charter Parties") for the charter of the following rigs: *Deepwater Horizon* and *Deepwater Millennium* (collectively the "Rigs"), and

WHEREAS, Assignor now wishes to assign all of its rights, title and interest in and to the Bareboat Charter Parties to Assignee; and

WHEREAS, the Consenting Party has consented to this Assignment.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. On the effective date hereof, Assignor hereby assigns to Assignee all of Assignor's rights, title and interest in and to the Bareboat Charter Parties, and Assignee hereby accepts this Assignment and agrees to perform all of the obligations of "Owner" as they are set forth in the Bareboat Charter Parties.

2. Except as altered by this Assignment the Bareboat Charter Parties shall remain in full force and effect in accordance with its terms.

IN WITNESS WHEREOF, the undersigned parties have executed this Assignment effective as of the date and year first above written.

TRANSOCEAN OFFSHORE                     TRANSOCEAN INC.
INTERNATIONAL VENTURES LIMITED

By: _____            By: _____
Name: KEVIN P. MONAGHAN                 Name:
Title: VICE PRESIDENT                   Title:

ACKNOWLEDGEMENT OF CONSENTING PARTY:
TRANSOCEAN HOLDINGS INC.

By: _____
Name:
Title:

9.11(c) Assmnt Agmt - THI Charters 041220.doc

Confidential Treatment Requested by TODDI                    TO-DHTF-01541835

**52536 - 27**

## ASSIGNMENT OF BAREBOAT CHARTER PARTIES

This Assignment of Bareboat Charter Parties (hereafter called the "Assignment") is entered into effective as of the 20th day of December, 2004, by and between Transocean Offshore International Ventures Limited, a company duly organized under the laws of the Cayman Islands (hereafter called the "Assignor"), and Transocean Inc., a company duly organized under the laws of the Cayman Islands (hereafter called the "Assignee").

WHEREAS, Assignor and Transocean Holdings Inc. (hereafter called the "Consenting Party") are parties to certain bareboat charter party agreements (hereafter called the "Bareboat Charter Parties") for the charter of the following rigs: *Deepwater Horizon* and *Deepwater Millenium* (collectively the "Rigs"), and

WHEREAS, Assignor now wishes to assign all of its rights, title and interest in and to the Bareboat Charter Parties to Assignee; and

WHEREAS, the Consenting Party has consented to this Assignment.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.     On the effective date hereof, Assignor hereby assigns to Assignee all of Assignor's rights, title and interest in and to the Bareboat Charter Parties, and Assignee hereby accepts this Assignment and agrees to perform all of the obligations of "Owner" as they are set forth in the Bareboat Charter Parties.

2.     Except as altered by this Assignment the Bareboat Charter Parties shall remain in full force and effect in accordance with its terms.

IN WITNESS WHEREOF, the undersigned parties have executed this Assignment effective as of the date and year first above written.

TRANSOCEAN OFFSHORE                     TRANSOCEAN INC.
INTERNATIONAL VENTURES LIMITED


By: _____            By: _____
Name:                                  Name: Eric B. Brown
Title:                                 Title: Sr. V.P.

ACKNOWLEDGEMENT OF CONSENTING PARTY:
TRANSOCEAN HOLDINGS INC.

By: _____
Name: Gregory L. Couthier
Title: VP

9.11(e) Assmnt Agmt - THI Charters  041220.doc

## ASSIGNMENT OF BAREBOAT CHARTER PARTIES

This Assignment of Bareboat Charter Parties (hereafter called the "Assignment") is entered into effective as of the 21st day of December, 2004, by and between Transocean Inc., a company duly organized under the laws of the Cayman Islands (hereafter called the "Assignor"), and Triton Hungary Asset Management Kft., a company duly organized under the laws of Hungary (hereafter called the "Assignee").

WHEREAS, pursuant to the Assignment of Bareboat Charter Parties dated December 20, 2004, Assignor and Transocean Holdings Inc. (hereafter called the "Consenting Party") are parties to certain bareboat charter party agreements (hereafter called the "Bareboat Charter Parties") for the charter of the following rigs: *Deepwater Horizon* and *Deepwater Millenium* (collectively the "Rigs"); and

WHEREAS, Assignor is the owner of the Rigs and desires to sell the Rigs to Assignee; and

WHEREAS, Assignor now wishes to assign all of its rights, title and interest in and to the Bareboat Charter Parties to Assignee; and,

WHEREAS, the Consenting Party has consented to this Assignment;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.  On the effective date hereof, Assignor hereby assigns to Assignee all of Assignor's rights, title and interest in and to the Bareboat Charter Parties, and Assignee hereby accepts this Assignment and agrees to perform all of the obligations of "Owner" as they are set forth in the Bareboat Charter Parties.

2.  Except as altered by this Assignment the Bareboat Charter Parties shall remain in full force and effect in accordance with its terms.

IN WITNESS WHEREOF, the undersigned parties have executed this Assignment effective as of the date and year first above written.

TRITON HUNGARY                             TRANSOCEAN INC.
ASSET MANAGEMENT KFT

By: _____                   By: _____
Name:                                     Name:
Title:                                      Title:

ACKNOWLEDGEMENT OF CONSENTING PARTY:

TRANSOCEAN HOLDINGS INC.

By: _____
Name:
Title:

10.20(c) Assnmt Agmt - THI Charters 041220.doc

Confidential Treatment Requested by TODDI                                                     TO-DHTF-01541837

## ASSIGNMENT OF BAREBOAT CHARTER PARTIES

This Assignment of Bareboat Charter Parties (hereafter called the "Assignment") is entered into effective as of the 21st day of December, 2004, by and between Transocean Inc., a company duly organized under the laws of the Cayman Islands (hereafter called the "Assignor"), and Triton Hungary Asset Management Kft., a company duly organized under the laws of Hungary (hereafter called the "Assignee").

WHEREAS, pursuant to the Assignment of Bareboat Charter Parties dated December 20, 2004, Assignor and Transocean Holdings Inc. (hereafter called the "Consenting Party") are parties to certain bareboat charter party agreements (hereafter called the "Bareboat Charter Parties") for the charter of the following rigs: *Deepwater Horizon* and *Deepwater Millenium* (collectively the "Rigs"); and

WHEREAS, Assignor is the owner of the Rigs and desires to sell the Rigs to Assignee; and

WHEREAS, Assignor now wishes to assign all of its rights, title and interest in and to the Bareboat Charter Parties to Assignee; and,

WHEREAS, the Consenting Party has consented to this Assignment;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.  On the effective date hereof, Assignor hereby assigns to Assignee all of Assignor's rights, title and interest in and to the Bareboat Charter Parties, and Assignee hereby accepts this Assignment and agrees to perform all of the obligations of "Owner" as they are set forth in the Bareboat Charter Parties.

2.  Except as altered by this Assignment the Bareboat Charter Parties shall remain in full force and effect in accordance with its terms.

IN WITNESS WHEREOF, the undersigned parties have executed this Assignment effective as of the date and year first above written.

TRITON HUNGARY
ASSET MANAGEMENT KFT

By: _____
Name:
Title:

TRANSOCEAN INC.

By: _____
Name: ERIC B BROWN
Title: SR. Vice President

ACKNOWLEDGEMENT OF CONSENTING PARTY:

TRANSOCEAN HOLDINGS INC.

By: _____
Name: GREGORY L. CAUTHEN
Title: SR. Vice President

10.20(c) Assunt Agmt - THI Charters 041220.doc

Confidential Treatment Requested by TODDI

Letter of Variation of Charter Hire Rate of Bareboat Charter Party Agreement of
Drilling Unit
**"DEEPWATER HORIZON"**
Between
**Triton Hungary Asset Management Kft ("Owner")**
And
**Transocean Holdings Inc. ("Charterer")**

1.  Pursuant to the Bareboat Charter Party Agreement ("the Charter") between the
    Charterer and Owner effective the 18th day of August, 2001 and extended for one year
    effective 18 September 2004, the Charter Hire rate was fixed at US$ 115,700 per day
    as noted in Article 9.1 of the Charter as amended by the Extension Agreement.

2.  Having considered the overall drilling rig utilization market (demand and supply) in
    the United States of America during the last 4 months of 2004 and future prospects for
    hire of the rig, the Charterer and Owner hereby agree to vary the Charter Hire rate
    effective on the 1st day of January 2005 00:00 hours.

3.  Effective the 1st day of January 2005 00:00 hours, a variation of Charter Hire rate in
    Article 9.1 of the Charter to an amount of US$ 86,700 per day replaces the existing
    Charter Hire rate of US$ 115,700 per day and will apply and may be varied at each
    three (3) months' intervals starting on 1st day of April 2005 by mutual agreement
    between the Charterer and Owner. Such new variation, if needed shall reflect the
    prevailing drilling rig utilization market and operating costs conditions at each
    subsequent 3-months interval.   All other terms of the Charter shall remain applicable.

In witness whereof, the Charterer and Owner represented by their duly authorized signatories
have set out their signatures below.

**For Transocean Holdings Inc. ("Charterer")**

By: _____
    **Eric Brown**
    **Sr. Vice President, Secretary & General Counsel**

**For Triton Hungary Asset Management Kft ("Owner")**

By: _____
    **Simon Crowe**
    **Managing Director**

Page 1 of 1        DW Horizon Letter of Variation of Charter Hire Rate-as of 1 Jan
2005.doc

Confidential Treatment Requested by TODDI                                              TO-DHTF-01541839

**Letter of Variation of Charter Hire Rate of Bareboat Charter Party Agreement of**
**Drilling Unit**
**"DEEPWATER HORIZON"**
**Between**
**Triton Hungary Asset Management Kft ("Owner")**
**And**
**Transocean Holdings Inc. ("Charterer")**

1. Pursuant to the Bareboat Charter Party Agreement ("the Charter") between the Charterer and Owner effective the 18th day of August, 2001 and extended for one year effective 18 September 2004 and amended by subsequent Letter of Variation of Charter Hire dated 1 January, 2005, the Charter Hire rate was fixed at US$ 86,700 per day as noted in Article 9.1 of the Charter as amended by the Extension Agreement.

2. Having considered the overall drilling rig utilization market (demand and supply) in the United States of America during the last 6 months of 2005, the existing dayrate and operating costs conditions, and future prospects for hire of the rig, the Charterer and Owner hereby agree to vary the Charter Hire rate effective on the 1st day of July 2005 00:00 hours.

3. Effective the 1st day of July 2005 00:00 hours, a variation of Charter Hire rate in Article 9.1 of the Charter to an amount of US$ 90,000 per day replaces the existing Charter Hire rate of US$ 86,700 per day and will apply and may be varied at each subsequent three (3) months' interval by mutual agreement between the Charterer and Owner. Such new variation, if needed shall reflect the prevailing drilling rig utilization market, existing dayrate and operating costs conditions at each subsequent 3-months interval.   All other terms of the Charter shall remain applicable.

In witness whereof, the Charterer and Owner represented by their duly authorized signatories have set out their signatures below.

**For Transocean Holdings Inc. ("Charterer")**

By: _____

Eric Brown
Sr. Vice President, Secretary & General Counsel

**For Triton Hungary Asset Management Kft ("Owner")**

By: _____

Simon Crowe
Managing Director

DW Horizon Letter of Variation of Charter Hire Rate-as of 1 July

Confidential Treatment Requested by TODDI                                   TO-DHTF-01541840

## AGREEMENT OF AMENDMENT AND EXTENSION OF BAREBOAT CHARTER PARTY, DELIVERY AND ACCEPTANCE

To:    TRITON HUNGARY ASSET MANAGEMENT LLC (OWNER)

From: TRANSOCEAN HOLDINGS INC. (THI or Charterer)

Dear Sirs,

Re:    **Semi-submersible Drilling Unit DEEPWATER HORIZON ("Horizon")**

We refer to:

(i)    the Bareboat Charter Party dated 18th day of August 2001 between OWNER and THI;

(ii)   Notice of intent to amend and extend bareboat charter party

### 1.   EXTENSION AGREEMENT

THI and Owner are desirous to extend all of their rights under and to be bound by the terms and conditions of the Bareboat Charter Party with effect from the 1st day of January 2006 except:

a)     Daily Charter Hire shall be changed to U. S. Dollars 168,000 per day during the period of the extension,

b)     The daily Charter Hire may be reviewed and amended at any time during this extension period, subject to mutual consent of the parties hereto (and such review shall occur at least annually by the 1st day of a new year),

c)     Daily Charter Hire will be suspended during any idle time or downtime for whatever reason where THI is not receiving any compensation under its current services contract,

d)     THI shall not have to compensate Owner for any equipment lost if THI replaces such equipment by equipment whose standards are equal to or greater than the equipment lost,

e)     Daily Charter may be changed if a transfer pricing study by either party indicates the rates so charged in a) above does not fall within a range of compensation that 3rd parties would have agreed using the same criteria.

### 2.   NOTICE OF DELIVERY AND ACCEPTANCE

THI and OWNER hereby mutually confirm that THI has accepted the Vessel in "as-is" condition, on 1st day of January 2006 at 00:00 hours.

3.    **PERIOD OF EXTENSION**

The period of extension will commence on 1st day of January 2006 and terminate the later date of

a        December 31st, 2010,

b        until completion of a THI well in progress at December 31st 2010, or

c        unless a new charter that supersedes this charter is mutually agreed and executed by the parties hereto.

The termination of this extension will in no way alter the rights, obligations and liability of each party to the extent that they relate to the period of extension.

If the terms of this agreement meet with your approval, kindly acknowledge receipt and acceptance of this notice by signing and returning the attached copy.


Bobby L. New (Managing Director)
for and on behalf of TRITON HUNGARY ASSET MANAGEMENT LLC at 2427 Újlengyel, Ady Endre 41, Hungary



Acknowledged and accepted:


TIM JURAN (Vice President)
for and on behalf of TRANSOCEAN HOLDINGS INC. at 4 E. Greenway Plaza, Houston, Texas 77046-0400, U. S. A.

**Schedule of Estimated Bareboat Charter Charges for USGOM Rigs
Owned by Triton Hungary Asset Management Kft.
For Calendar Year 2006**

| RIG NAME | | US$ | US$ |
|---|---|---:|---:|
| **TODDI RIGS:** | | | |
| Discoverer Deep Seas | | 45,643,000 | |
| Discoverer Spirit | | 52,925,000 | |
| Discoverer Enterprise | | 29,200,000 | |
| Transocean Marianas | | 26,573,750 | |
| Cajun Express | | 32,485,000 | |
| Falcon 100 | | 40,515,000 | |
| Jack Bates | | - | |
| | TOTAL | | 227,341,750 |
| | | | |
| **THI RIGS:** | | | |
| Deepwater Horizon | | 61,320,000 | |
| Deepwater Millennium | | 74,916,250 | |
| | TOTAL | | 136,236,250 |
| | | | |
| **GRAND TOTAL** | | | **$ 363,578,000** |

q1-2006-Schedule of Estimated Annual Bareboat Charter Charges for USGOM Rigs.xls

Confidential Treatment Requested by TODDI

TO-DHTF-01541843

**52536 - 35**

Message                                                                                      Page 1 of 3

## Waters, Claudia

|  |  |
|---|---|
| m: | New, Bobby |
| **Sent:** | Tuesday, April 04, 2006 9:18 AM |
| **To:** | Koch, Bethany; Kemp, Robert; McAllister, Kathleen; Najvar, Karen |
| **Cc:** | Waters, Claudia; Avery, Keith; Briscoe, John; Lamel, Steve |
| **Subject:** | RE: Charter Resets |

**Importance:** High

On behalf of the Managing Directors of Triton Hungary Asset Management Kft. ["THAM"], I am attaching a schedule of Estimated Annual Bareboat Charter Fees for THAM's rigs operating the USGOM.   The fees reflect THAM's best estimate of 2006 Charter Fees for its rigs, subject to negotiations to be held soon by THAM and the Lessees' for selective rigs (as based on preliminary financial conditions' information supplied by Lessees').

**Best regards,**
**Steve Lamet**
**Managing Director**
(by BNew)
**lamet@pau.deepwater.com**
**Triton Management Services Kft.**
**1053 Budapest**
**Képíró u. 9.**
**Hungary**
**Phone=+36-30-407-1865; Fax=+36-1-266-1109**
The information contained herein is sent in the strictest confidence for the addressee only. It is intended only for the use of the addressee and may cont···' in legally privileged information which may be unlawful for you to read, copy, distribute, disclose or otherwise use.  If you have received this er···h in error, you are requested to preserve its confidentiality and advise the sender of the error in transmission. It is the responsibility of the addr···ssee to scan this email and any attachments for computer viruses or other defects. The sender does not accept liability for any loss or damage of any nature, however caused, which may result directly or indirectly from this email or any file attached.
===========================================
-----Original Message-----
**From:** Koch, Bethany
**Sent:** Monday, 27 March, 2006 6:01 PM
**To:** New, Bobby; Kemp, Robert; McAllister, Kathleen; Najvar, Karen
**Cc:** Waters, Claudia
**Subject:** RE: Charter Resets

Bobby

I've attached the worldwide cube (received from Neil, received from Michael, received from Shiv).  I also fiddled around in Essbase to try to come up with revenue by month, by rig and this is what I came up with.  If something looks odd, keep in mind that I'm not real experienced in moving around in Essbase.  What I pulled did however tie to the JMT and I checked a couple of the Jan/Feb numbers to Peoplesoft and those tied also...so as far as I can tell, this seems right.  Let me know if this is not what you are asking for.

Bethany

          -----Original Message-----
          **From:** New, Bobby
          **Sent:** Monday, March 27, 2006 5:16 AM
          **To:** Kemp, Robert; McAllister, Kathleen; Najvar, Karen
          **Cc:** Koch, Bethany; Waters, Claudia
          **Subject:** FW: Charter Resets

5/4/2006

In order for me to work up charter resets, as I told Bethany below, I will need 2006 budgeted or forecasted information, by rig.   Preferably, it would be good to know the month that any USGOM rig's revenue changes, if any, for any rig in the USGOM so I can time when the resets need to occur.   I have been monitoring the K:\departmental\tax directory to see if tax cube has been posted, but it will not give me the revenue information I need.   Sometimes, Nick Brown has provided Tax with a file that contains the revenue amounts, by month, by rig that he uses in the forecast.  That file would be most helpful.

I do have constant, albeit slow, internet connectivity at the office now.   T.Com installed ADSL lines for us last Friday afternoon.  We hope to get office phones this week.  (NOTE:  due to the slowness of my internet connection, it would be better if files are emailed to me instead of me having to go to the K:Drive.   By the time I drill down to the K:Drive, it it next to impossible pull up a large Excel file.  I can receive it as an attachment and move it to my hard drive with no problem.)

**Best regards,**
**Bobby New**
**bnew@houston.deepwater.com**
**Triton Management Services Kft.**
**1053 Budapest**
**Képíró u. 9.**
**Hungary**
**New Cell Phone=+36-30-407-3899; Fax=None**
The information contained herein is sent in the strictest confidence for the addressee only. It is intended only for the use of the addressee and may contain legally privileged information which may be unlawful for you to read, copy, distribute, disclose or otherwise use.  If you have received this email in error, you are requested to preserve its confidentiality and advise the sender of the error in transmission. It is the responsibility of the addressee to scan this email and any attachments for computer viruses or other defects. The sender does not accept liability for any loss or damage of any nature, however caused, which may result directly or indirectly from this email or any file attached.
=============================================
-----Original Message-----
**From:** Koch, Bethany
**Sent:** Friday, 24 March, 2006 6:52 PM
**To:** New, Bobby
**Subject:** RE: Charter Resets

Hi Bobby,  The tax cube wont be ready till later today, so I can send that on Monday.  Same with the G&A numbers - I don't believe those are final yet either but I'll pass them your way when we get them

-----Original Message-----
**From:** New, Bobby
**Sent:** Friday, March 24, 2006 8:19 AM
**To:** Koch, Bethany
**Cc:** Kemp, Robert
**Subject:** RE: Charter Resets
**Importance:** High

Bethany

Thanks for the email.   I can not do any charter resets until I can see the 2006 forecast numbers for the US GOM rigs.   If you have the numbers, can you email them to me.   What would be even better; if you have the forecasted Revenue for the rigs shown on a monthly basis (my reset timing depends on the effective dayrate increases/decreases).   That information would assist my "reset" calcs immensely because the expenses are easier to extrapolate.  I could even use 2006 Budget amounts for the USGOM rigs if you do not have the forecast yet.  Also, if Jackie has an estimate of the G&A per rig, please send that information as well(if not I believe I can access the management reports and get an estimate from there).  Just now, my limited internet connectivity

5/4/2006

Confidential Treatment Requested by TODDI                                                    TO-DHTF-01541845

did not allow me to look on our K:Drive for any forecast/budget information.

**Best regards,**
**Bobby New**
**bnew@houston.deepwater.com**
**Triton Management Services Kft.**
**1053 Budapest**
**Képíró u. 9.**
**Hungary**
**New Cell Phone=+36-30-407-3899; Fax=None**
The information contained herein is sent in the strictest confidence for the addressee only. It is intended only for the use of the
addressee and may contain legally privileged information which may be unlawful for you to read, copy, distribute, disclose or otherwise
use. If you have received this email in error, you are requested to preserve its confidentiality and advise the sender of the error in
transmission. It is the responsibility of the addressee to scan this email and any attachments for computer viruses or other defects.
The sender does not accept liability for any loss or damage of any nature, however caused, which may result directly or indirectly from
this email or any file attached.
=============================================================
-----Original Message-----
**From:** Koch, Bethany
**Sent:** Thursday, 23 March, 2006 11:16 PM
**To:** New, Bobby
**Subject:** Charter Resets

Hi Bobby,
    How's everything going in Hungary?  I hope all is well and you've gotten a chance to settle in.  Are you still the
person to go to for the Charter re-sets?  We are trying to get a head start on 1st quarter - do you happen to have the
1st quarter charter numbers?

5/4/2006

**52536 - 38**

BOBBY L NEW
MANAGING DIRECTOR

Thursday, November 30, 2006

Mr. Anton Dibowitz
Marketing Manager
Transocean Holdings Inc.
1311 Broadfield Blvd.  Suite 400
Houston, Texas 77084
U. S. A.

Subject:     Proposed Adjustments to 2005 Bareboat Charter Fees

Dear Sir:

Anton, at your request, I was pleased to discuss this matter with your advisors recently.  Your in-house advisors forwarded their analysis comparing the fees charged by Triton Hungary Asset Management LLC ["THAML"] against the levels indicated in the 2005 Baker & McKenzie (Houston) Transfer Pricing Study commissioned by your firm, Transocean Holdings Inc ["THI"].  After thorough review, I accept their findings as indicated on the attached Exhibit A.  My acceptance includes the interest calculations.

| | | |
|---|---|---|
| Increase in THAML Revenue | US$ | 12,211,154 |
| Interest Payable to THAML | | 479,447 |
| TOTAL DUE THAML by THI | US$ | 12,690,601 |

If you concur with these adjustments, please execute this letter agreement in the following section.   This agreement may be executed on any number of counterparts, each an original, and all taken as a whole shall constitute one and the same instrument.

Triton Hungary Vagyonkezelő Kft.
**Triton Hungary Asset Management LLC**
Adószám/tax number: 12963241-2-13, székhely/address: 2724. Újlengyel, Ady Endre u. 41.
Hungary

DWH

Confidential Treatment Requested by TODDI

2005 Bareboat Charter Fees Adjustments—Letter Agreement       THAM & THI
Page 2 of 2

For and on behalf of Transocean Holdings Inc.

Anton Dibowitz
Marketing Manager

For and on behalf of Triton Hungary Asset Management LLC

Bobby L. New
Managing Director

Triton Hungary Vagyonkezelő Kft.
Triton Hungary Asset Management LLC
Adószám/tax number: 12963241-2-13, székhely/address: 2724. Újlengyel, Ady Endre u. 41.
Hungary

Confidential Treatment Requested by TODDI                                    TO-DHTF-01541848

RECAP OF THAM's I/C RENTAL INCOME (INCREASE) / DECREASE
AND
INTEREST INCOME / EXPENSE

PAGE 1 OF 1

**EXHIBIT A**

| DESCRIPTION | THAM I/C Rental Revenue (Increase) / Decrease | THAM I/C Interest (Income) / Expense | |
|---|---|---|---|
| **TODDI Adjustments:** | | | |
| Discoverer Deep Seas | $719,483 | $28,249 | |
| Discoverer Spirit | $979,046 | $38,440 | |
| Transocean Marianas | $31,567,254 | $1,239,426 | $1,320,087 |
| Cajun Express | $355,850 | $13,972 | |
| Falcon 100 | ($1,625,008) | ($63,803) | ($63,803) |
| | $31,996,625 | $1,256,284 | $1,256,284 |
| | | | |
| **TEI Adjustments:** | | | |
| Discoverer Enterprise | $448,863 | $17,624 | $17,624 |
| | $448,863 | $17,624 | $17,624 |
| TODDI Group's Recap of Interest | | | |
| Int Exp | | | $1,337,711 |
| Int Inc | | | ($63,803) |
| TODDI Group's Sub Totals | $32,445,488 | $1,273,908 | $1,273,908 |
| **THI Adjustments:** | | | |
| Deepwater Horizon | ($3,847,128) | ($151,050) | |
| Deepwater Millennium | ($8,364,026) | ($328,397) | |
| | ($12,211,154) | ($479,447) | |
| | | | |
| **RECAP:** | | | |
| TODDI | $31,996,625 | $1,256,284 | |
| TEI | $448,863 | $17,624 | |
| Total TODDI Group | $32,445,488 | $1,273,908 | |
| THI | ($12,211,154) | ($479,447) | |
| | | | |
| TOTAL THAM ADJUSTMENTS– (RECEIVABLE) / PAYABLE | $20,234,334  + | $794,461 | |

$21,028,795

C:\Documents and Settings\BNew\My Documents\Hungary related\THAM and TFin matters\Hungary Tax Related-ALL\CY 2005 I_C Rental Inc Adjs & related Interest Inc_Exp (by rlg_affl).xls

Confidential Treatment Requested by TODDI

TO-DHTF-01541849

## AMENDMENT TO BAREBOAT CHARTER PARTY
## ("AMENDMENT")

**WHEREAS,** Triton Hungary Asset Management LLC ("OWNER") and Transocean Holdings Inc. ("CHARTERER") (collectively "the Parties") entered into that Bareboat Charter Party dated 18th day of August, 2001, as amended, for that semi-submersible drilling unit known as the Deepwater Horizon (the "CHARTER"); and

**WHEREAS,** the Parties wish to make certain amendments to the CHARTER relating to force majeure events;

**NOW THEREFORE** OWNER and CHARTERER hereby agree to amend the CHARTER as follows:

> CHARTERER shall be responsible for making any Capital Equipment, other capital expenditures and repairs resulting from a Force Majeure or Adverse Sea or Weather event. Any such amounts resulting from a Force Majeure or Adverse Sea or Weather event and not otherwise covered by insurance shall be for the sole account of OWNER and shall not be compensated by CHARTERER pursuant to this CHARTER. CHARTERER shall timely remit to OWNER all insurance proceeds related to such events.

> "Force Majeure" shall have the same meaning as provided in the Service Contract in force, or if no Service Contract is in force, then the most recent Service Contract in force.\

> "Adverse Sea or Weather" shall mean: hurricanes, named tropical storms, adverse sea and / or weather and loop or eddy currents.

(Remainder of page intentionally left blank)

Page 1 of 2

Confidential Treatment Requested by TODDI

CHARTER AMENDMENT for Force Majeure                    Deepwater Horizon
22 December 2006

**IN WITNESS WHEREOF** the Parties hereto have caused this
AMENDMENT dated 22 December 2006 be executed by their duly
authorized representatives in counterparts, each of which shall be deemed to
be an original hereof.

OWNER:
TRITON HUNGARY ASSET MANAGEMENT LLC

By:_____

    Name:  Bobby New
    Title:   Managing Director

CHARTERER:
TRANSOCEAN HOLDINGS INC.

By:_____

    Name:  Anton Dibowitz
    Title:  Marketing Manager, North America

Page 2 of 2

Confidential Treatment Requested by TODDI                    TO-DHTF-01541851

CHARTER AMENDMENT for Force Majeure                    Deepwater Horizon
22 December 2006

**IN WITNESS WHEREOF** the Parties hereto have caused this
AMENDMENT dated 22 December 2006 be executed by their duly
authorized representatives in counterparts, each of which shall be deemed to
be an original hereof.

OWNER:
TRITON HUNGARY ASSET MANAGEMENT LLC


By:_____
      Name: Bobby New
      Title:   Managing Director


CHARTERER:
TRANSOCEAN HOLDINGS INC.

By:_____
      Name: Anton Dibowitz
      Title: Marketing Manager, North America

Page 2 of 2

Confidential Treatment Requested by TODDI

CHARTER AMENDMENT for Force Majeure                Deepwater Horizon
22 December 2006

---

**IN WITNESS WHEREOF** the Parties hereto have caused this
AMENDMENT dated 22 December 2006 be executed by their duly
authorized representatives in counterparts, each of which shall be deemed to
be an original hereof.

OWNER:
TRITON HUNGARY ASSET MANAGEMENT LLC

By: _____
    Name:  Bobby New
    Title:   Managing Director


CHARTERER:
TRANSOCEAN HOLDINGS INC.


By: _____
    Name:  Anton Dibowitz
    Title:  Marketing Manager, North America


Page 2 of 2

Confidential Treatment Requested by TODDI                TO-DHTF-01541853

CHARTER AMENDMENT for Force Majeure                    Deepwater Horizon
22 December 2006

**IN WITNESS WHEREOF** the Parties hereto have caused this
AMENDMENT dated 22 December 2006 be executed by their duly
authorized representatives in counterparts, each of which shall be deemed to
be an original hereof.

OWNER:
TRITON HUNGARY ASSET MANAGEMENT LLC


By: _____
       Name:  Bobby New
       Title:   Managing Director


CHARTERER:
TRANSOCEAN HOLDINGS INC.

By: _____
       Name:  Anton Dibowitz
       Title:  Marketing Manager, North America

Page 2 of 2

Confidential Treatment Requested by TODDI                    TO-DHTF-01541854

**52536 - 46**

1/1/07

## AGREEMENT OF AMENDMENT OF BAREBOAT CHARTER PARTY, DELIVERY AND ACCEPTANCE

To:    TRITON HUNGARY ASSET MANAGEMENT LLC (OWNER)

From: TRANSOCEAN HOLDINGS INC. (THI or Charterer)

Dear Sirs,

Re:    **Semi-submersible Drilling Unit DEEPWATER HORIZON ("Horizon")**

We refer to:

(i)    The Bareboat Charter Party effective 18th August 2001 (including all subsequent amendments and extensions) between THI and OWNER;

1.    **AMENDMENT AGREEMENT**

THI and Owner are desirous to amend their rights under and to be bound by the amended terms and conditions of the Bareboat Charter Party with effect from the 1st day of January 2007 except:

a)    Daily Charter Hire shall be changed to U. S. Dollars 192,000 per day during the period of the Bareboat Charter Party;

b)    The daily Charter Hire may be reviewed and amended at any time during the Bareboat Charter Party period, subject to mutual consent of the parties hereto and such review shall occur at least semi-annually on or about the 1st day of July and January of each year;

c)    Daily Charter Hire will be suspended during any idle time, for whatever reason, when THI is not receiving any compensation under a current services contract;

d)    THI shall not have to compensate Owner for any equipment lost if THI replaces such equipment by equipment whose standards are equal to or greater than the equipment lost;

e)    Daily Charter may be changed if a transfer pricing study arranged by either party indicates the rates so charged in a) above does not fall within a range of compensation that 3rd parties would have agreed using the same comparison criteria.

DW HORIZON (1/1/07)          Confidential                              Page 1 of 2

2.    **NOTICE OF DELIVERY AND ACCEPTANCE**

THI and OWNER hereby mutually confirm that THI has accepted the Horizon in "as-is" condition, on 1st day of January 2007 at 00:00:00 hours.

3.    **EFFECTIVE PERIOD OF BAREBOAT CHARTER PARTY**

The terms and conditions of this amendment will commence on the 1st day of January 2007 and terminate the later date of
a      September 30th, 2010,
b      until completion of a THI contract or well in progress at September 30th, 2010, or
c      unless a new Bareboat Charter Party that supersedes this Bareboat Charter Party is mutually agreed and executed by the parties hereto.

The termination of this extension will in no way alter the rights, obligations and liability of each party to the extent that they relate to the period of extension.

If the terms of this agreement meet with your approval, kindly acknowledge receipt and acceptance of this notice by signing and returning the attached copy.


**BOBBY L. NEW - Managing Director**
**For and on behalf of: TRITON HUNGARY ASSET MANAGEMENT LLC**
**At 2427 Újlengyel, Ady Endre Ut. 41, Hungary**


Acknowledged and accepted:


**TERRY BONNO - Director-Business Development (Americas Unit)**
**For and on behalf of: TRANSOCEAN HOLDINGS INC**
**At 4 E. Greenway Plaza, Houston, Texas 77046-0400, U. S. A.**


DW HORIZON (1/1/07)
Confidential                                      Page 2 of 2

Confidential Treatment Requested by TODDI                                      TO-DHTF-01541856

 **Transocean**

Triton Hungary Vagyonkezelő Kft.
Triton Hungary Asset Management Limited Liability Company
Adószám/tax number: 12963241-2-13,
székhely/address: 2724. Újlengyel, Ady Endre u. 41.Hungary

BOBBY I. NEW
MANAGING DIRECTOR

Monday, 03 December, 2007

Terry Bonno
Director of Business Development – Americas Unit
Transocean Holdings Inc
4 Greenway Plaza
Houston, Texas 77046
U. S. A.

Subject:      Proposed Adjustments to 2006 Bareboat Charter Fees

Dear Terry:

I was pleased to discuss this matter with your in-house advisors recently.  Your
advisors forwarded their analysis comparing the fees charged by Triton Hungary
Asset Management LLC ["THAML"] against the levels indicated in a 2006 Baker &
McKenzie Transfer Pricing Study commissioned by your firm, Transocean Holdings
Inc ["THI"].  After thorough review, I accept their findings as indicated on the
attached Exhibit A.  My acceptance includes the interest calculations.

| | | |
|---|---|---|
| Net Increase in THAML Revenue | US$ | 8,267,186 |
| Interest Payable by THI | | 392,589 |
| TOTAL DUE THAML BY THI | US$ | 8,659,775 |

If you concur with these adjustments, please execute this letter agreement in the
following section.   This agreement may be executed on any number of counterparts,
each an original, and all taken as a whole shall constitute one and the same
instrument.

Page 1 of 2

*DEEPWATER HORIZON*

Confidential Treatment Requested by TODDI                                          TO-DHTF-01541857

2006 Bareboat Charter Fees Adjustments—Letter Agreement     THAM & THI
Page 2 of 2

For and on behalf of Transocean Holdings Inc

Terry Bonno
Director of Business Development – Americas Unit

For and on behalf of Triton Hungary Asset Management LLC

Bobby L. New
Managing Director

Page 2 of 2

Confidential Treatment Requested by TODDI                                    TO-DHTF-01541858

RECAP OF THAM's I/C RENTAL INCOME (INCREASE) / DECREASE
AND
INTEREST INCOME / EXPENSE                    PAGE 1 OF 1

**EXHIBIT A**

| DESCRIPTION | THAM I/C Rental Revenue (Increase) / Decrease | THAM I/C Interest (Income) / Expense | |
|---|---|---|---|
| **TODDI Adjustments:** | | | |
| Discoverer Deep Seas | **$415,856** | $19,762 | $488,135 |
| Discoverer Spirit | ($563,147) | ($26,761) | ($505,577) |
| Transocean Marianas | ($10,076,035) | ($478,816) | |
| Cajun Express | **$9,501,927** | $451,534 | |
| Falcon 100 | **$354,347** | $16,839 | |
| | ($367,052) | ($17,442) | ($17,442) |
| | | | |
| **TEI Adjustments:** | | | |
| Discoverer Enterprise | **$2,522,899** | $119,889 | $119,889 |
| | **$2,522,899** | **$119,889** | **$119,889** |
| TODDI Group's Recap of Interest | | | |
| Int Exp | | | $608,024 |
| Int Inc | | | ($505,577) |
| TODDI Group's Sub Totals | $2,155,847 | $102,447 | **$102,447** |
| | | | |
| **THI Adjustments:** | | | |
| Deepwater Horizon | ($4,478,847) | ($212,836) | |
| Deepwater Millennium | ($3,788,339) | ($180,023) | |
| | ($8,267,186) | ($392,589) | |
| | | | |
| **RECAP:** | | | |
| TODDI | ($367,052) | ($17,442) | |
| TEI | **$2,522,899** | $119,889 | |
| Total TODDI Group | **$2,155,847** | **$102,447** | |
| THI | ($8,267,186) | ($392,589) | |
| | | | |
| TOTAL THAM ADJUSTMENTS-- (RECEIVABLE) / PAYABLE | ($6,111,339) + | ($290,142) | |

($6,401,481)

C:\Documents and Settings\BNew\My Documents\Hungary related\THAM matters\THAM Hungary CIT Tax Related\THAM - TP Related\THAM's CY 2006 I_C Rental Inc Adjs & related Interest Inc_Exp (by rig_affl).xls

Confidential Treatment Requested by TODDI

 **Transocean**

**Triton Hungary Vagyonkezelő Kft.**
**Triton Hungary Asset Management Limited Liability Company**
Adószám/tax number: 12963241-2-13,
székhely/address: 2724. Újlengyel, Ady Endre u. 41.Hungary

BOBBY I. NEW
MANAGING DIRECTOR

Friday, 31 October, 2008

Andrew Tietz
Director of Marketing – Americas Unit
Transocean Holdings Inc
4 Greenway Plaza
Houston, Texas 77046
U. S. A.

Subject:     Proposed Adjustments to 2007 Bareboat Charter Fees

Dear Andrew:

I was pleased to discuss this matter with your in-house advisors recently.  Your
advisors forwarded their analysis comparing the fees charged by Triton Hungary
Asset Management LLC ["THAML"] against the levels indicated in a Baker &
McKenzie Transfer Pricing Study for Calendar Year 2007, commissioned by your
firm, Transocean Holdings Inc ["THI"].  After thorough review, I accept their
findings as indicated on the attached Exhibit A.  My acceptance includes the
interest calculations.

| | | |
|---|---|---|
| Net Increase in THAML Revenue | US$ | 7,755,374 |
| Interest Payable by THI | | 369,597 |
| TOTAL DUE THAML BY THI | US$ | 8,124,971 |

If you concur with these adjustments, please execute this letter agreement in the
following section.   This agreement may be executed on any number of counterparts,
each an original, and all taken as a whole shall constitute one and the same
instrument.

Confidential Treatment Requested by TODDI                                    TO-DHTF-01541860

2007 Bareboat Charter Fees Adjustments—Letter Agreement     THAM & THI
Page 2 of 2

For and on behalf of Transocean Holdings Inc

Andrew Tietz
Director of Marketing – Americas Unit

For and on behalf of Triton Hungary Asset Management LLC

Bobby L. New
Managing Director     26 Nov 2008

Page 2 of 2

Confidential Treatment Requested by TODDI                                    TO-DHTF-01541861

Letter of Variation of Charter Hire Rate

Of

Bareboat Charter Party Agreement of Drilling Unit

"DEEPWATER HORIZON"

Between

Transocean Holdings Inc ["Charterer"]

And

Triton Hungary Asset Management Limited Liability Company ["OWNER"]

1.  Pursuant to the Bareboat charter Party Agreement dated and effective 18th day of August 2001, including all subsequent amendments and extensions, (hereinafter the "Agreement")between the Charterer and OWNER the Daily Charter Hire rate was last fixed at US$ 192,000 per day as noted in Article 9 of the Agreement including all subsequent amendments and extensions.

2.  Having considered the overall drilling rig utilization (demand and supply) rates, prevailing market conditions in the United States of America with the intent that the amount of the daily rate reflect a fair market value, the OWNER and Charterer hereby agree to an annualized Daily Charter Hire rate of US$ 113,460,000 (approximately US$ 310,000/day) for the calendar year 2008. Such annualized amount is to be adjusted prorata over the remainder of 2008.

3   A new preliminary Daily Charter Hire rate of US$ 318,000 will continue in 2009 and subsequent periods until such time a new amendment to the current Bareboat Charter Party Agreement, subsequent Letter of Variation of Charter Hire Rate Bareboat, or new Charter Party Agreement, is agreed.


This variation of Charter Hire rate replaces The Daily Charter Hire rate per day as noted in Article 9 of the Agreement, including all subsequent amendments and extensions, shall be reviewed semiannually on or about the 1st of January and 1st of July each year during the remaining months of this charter and shall be varied as of such dates, including but not limited to a decision not to change the rate per day, by mutual agreement between the OWNER and Charterer.  All other terms of the Agreement, including all subsequent amendments and extensions, shall remain applicable.

This agreement may be executed on any number of counterparts, each an original, and all taken as a whole shall constitute one and the same instrument.

Page 1 of 2

Confidential Treatment Requested by TODDI

<u>Letter of Variation –Calendar Year 2008</u>

In witness whereof, the OWNER and Charterer represented by their duly authorized signatories have set out their signature below.


For Transocean Holdings Inc ("Charterer")

_____

Andrew Tietz – Senior Manager Sales and Contracts


For Triton Hungary Asset Management Limited Liability Company ("OWNER")

_____

Bobby L. New – Managing Director

Confidential Treatment Requested by TODDI                    TO-DHTF-01541863

Letter of Variation of Charter Hire Rate

Of

Bareboat Charter Party Agreement of Drilling Unit

"DEEPWATER HORIZON"

Between

Transocean Holdings Inc ["Charterer"]

And

Triton Asset Leasing GmbH ["OWNER"]

1.    Pursuant to the Bareboat charter Party Agreement dated and effective 18th day of August 2001, including all subsequent amendments and extensions, (hereinafter the "Agreement") between the Charterer and OWNER the Daily Charter Hire rate was last fixed at US$ 318,000 per day as noted in Article 9 of the Agreement including all subsequent amendments and extensions.

2.    Having considered the overall drilling rig utilization (demand and supply) rates, prevailing market conditions in the United States of America with the intent that the amount of the daily rate reflect a fair market value, the OWNER and Charterer hereby agree to a Lump Sum payable to the Charterer in the amount of US Dollars 7,602,000 covering the period 1st January 2009 ending with June 30, 2009.

3     A new Daily Charter Hire rate of US$ 276,000 will continue from July 1st until such time (1) a new amendment to the current Bareboat Charter Party Agreement is negotiated, or (2) a subsequent Letter of Variation of Charter Hire Rate Bareboat is negotiated , or (3) a new replacement Charter Party Agreement, is agreed.

This variation of Charter Hire rate replaces The Daily Charter Hire rate per day as noted in Article 9 of the Agreement, including all subsequent amendments and extensions, shall be reviewed semiannually on or about the 1st of January and 1st of July each year during the remaining months of this charter and shall be varied as of such dates, including but not limited to a decision not to change the rate per day, by mutual agreement between the OWNER and Charterer.   All other terms of the Agreement, including all subsequent amendments and extensions, shall remain applicable.

This agreement may be executed on any number of counterparts, each an original, and all taken as a whole shall constitute one and the same instrument.

Page 1 of 2

**52536 - 56**

<u>Letter of Variation –Calendar Year 2009</u>

In witness whereof, the OWNER and Charterer represented by their duly authorized signatories have set out their signature below.

**For Transocean Holdings Inc ("Charterer"}**

*[signature]*

**For Triton Asset Leasing GmbH ("OWNER")**

*[signature]*

**Robert N. Bowden – Managing Director**

Page 2 of 2

Confidential Treatment Requested by TODDI

TO-DHTF-01541865

TRITON HUNGARY ASSET MANAGEMENT
ASSET SALE AND PURCHASE AGREEMENT

This Asset Sale and Purchase Agreement (this "Agreement"), dated as of August 17, 2009, is entered into by Triton Hungary Asset Management LLC, a Hungarian limited liability company ("Transferor"), and Triton Asset Leasing GmbH, a Swiss limited liability company ("Transferee").

WHEREAS, Transferee is a wholly-owned subsidiary of Transferor;

WHEREAS, on the date hereof, Transferor and Transferee have entered into a Contribution Agreement whereby Transferor has contributed certain assets of Transferor, including the Discoverer Deep Seas, Discoverer Spirit, Discoverer Enterprise, Deepwater Horizon, Deepwater Millennium, Discoverer Clear Leader, Transocean Marianas, Cajun Express and Falcon 100 (collectively referred to as the "Rigs"), to Transferee;

WHEREAS, on the date hereof, Transferor and Transferee have entered into separate assignment agreements whereby Transferor has assigned certain rights and obligations under bareboat charters, revolving credit agreements and/or promissory notes to Transferee ("Assignments");

WHEREAS, Transferor is the owner of certain capital equipment, installment works and allocated costs related to the Rigs ("CIP");

WHEREAS, Transferor wishes to sell, transfer, assign and convey to Transferee the CIP which has been purchased, performed and incurred from July 31, 2009 to August 16, 2009 (the "Assets");

WHEREAS, Transferor is unable to contribute, sell or transfer the Assets pursuant to the Contribution Agreement or Assignments on the date hereof due to an incomplete accounting of the Assets; and

WHEREAS, the parties have agreed to sell the Assets with closing to occur at a later date pursuant to the terms hereof;

NOW THEREFORE, in consideration of the premises and of the mutual covenants of the parties to this Agreement, it is hereby agreed as follows:

1.  <u>Transfer of Assets</u>. On the Closing Date (as hereinafter defined), Transferor agrees to sell, transfer, assign and convey to Transferee all of its right, title and interest in the Assets and Transferee agrees to purchase and acquire from Transferor all of such right, title and interest in the Assets, free and clear of all liens, mortgages, security interests, pledges or other charges or encumbrances, on the terms and conditions stated in this Agreement.

-1-

Sale and Purchase Agree – THAMK and TritonAssetLeasing.doc



Confidential Treatment Requested by TODDI                                    TO-DHTF-01541866

2. <u>Closing Date</u>:  On or before October 30, 2009 ("Closing Date"), Transferor shall prepare and deliver to Transferee a full itemized inventory of the Assets and the fair market value thereof ("Inventory List").

3. <u>Consideration for Assets</u>.  As full consideration for the Assets detailed on the Inventory List, on the Closing Date Transferee will pay to Transferor an amount equal to the fair market value of the Assets as detailed in the Inventory List.  Payment of the consideration may occur by wire transfer or through the intercompany accounts of Transferor and Transferee.

4. <u>Representations and Warranties of Transferor</u>.  In order to induce Transferee to enter into this Agreement and each transaction contemplated by this Agreement, Transferor represents and warrants as follows:

   (a) <u>Asset Ownership and Other Matters</u>.  Transferor is the sole legal and beneficial owner of the Assets, has good and marketable title to such Assets and has the right, power and authority to sell, assign, convey, transfer and deliver the same to Transferee pursuant to this Agreement, free of any lien, claim, mortgage, or other encumbrance.

   (b) <u>Organization and Standing</u>.  Transferor is a company duly incorporated, validly existing and in good standing under the laws of Hungary.

   (c) <u>Corporate Authority; No Violation</u>.   This Agreement and the transactions contemplated hereby have been validly authorized by Transferor, and this Agreement is a valid and binding obligation of Transferor enforceable against it in accordance with its terms, except as such enforceability may be limited by (i) bankruptcy, insolvency, liquidation, reorganization, moratorium or similar laws of general application relating to or affecting the enforcement of the rights of creditors and (ii) the application of general principles of equity.

   (d) <u>Consents and Approvals</u>.  Neither the execution nor delivery of this Agreement by Transferor nor the transfer by Transferor of the Assets pursuant to this Agreement will:

      (i) require the approval or consent of any governmental authority of any country, state or other jurisdiction;

      (ii) conflict with or result in the breach or violation of any term or provision of, or will constitute a default under, or will otherwise impair the good standing, validity or effectiveness of the Articles of Association of the Transferor.

      (iii) result in a breach or violation of any material terms or provision of, or constitute a default or give rise to any right of termination, cancellation or

-2-
Sale and Purchase Agree - THAMK and TritonAssetLeasing.doc



Confidential Treatment Requested by TODDI                                          TO-DHTF-01541867

acceleration under any of the terms, conditions or provisions of any contract, agreement or other instrument to which the Transferor is bound; or

(iv)   violate any governmental law or ordinance, or any order, writ, injunction, decree, rule or regulation of any country, state or other jurisdiction.

5.   <u>Representations and Warranties by Transferee</u>.  In order to induce Transferor to enter into this Agreement and each transaction contemplated by this Agreement, Transferee represents and warrants as follows:

(a)   <u>Organization and Standing</u>.  Transferee is a company duly incorporated, validly existing and in good standing under the laws of the Switzerland.

(b)   <u>Corporate Authority; No Violation</u>.  This Agreement and the transactions contemplated hereby have been validly authorized by Transferee, and this Agreement is a valid and binding obligation of Transferee enforceable against it in accordance with its terms, except as such enforceability may be limited by (i) bankruptcy, insolvency, liquidation, reorganization, moratorium or similar laws of general application relating to or affecting the enforcement of the rights of creditors and (ii) the application of general principles of equity.

(c)   <u>Consents and Approvals</u>.  Neither the execution nor delivery of this Agreement by Transferee nor the acceptance by Transferee of the Assets pursuant to this Agreement will:

(i)   require the approval or consent of any governmental authority of any country, state or other jurisdiction;

(ii)   result in a breach or violation of any material terms or provision of, or constitute a default or give rise to any right of termination, cancellation or acceleration under any of the terms, conditions or provisions of any contract, agreement or other instrument to which the Transferee is bound; or

(iii)   violate any governmental law or ordinance, or any order, writ, injunction, decree, rule or regulation of any country, state or other jurisdiction.

6.   <u>Deliveries at Closing</u>.  On or before the Closing Date, the following deliveries shall be made:

(a)   Transferor will deliver to Transferee the Inventory List.

(b)   Transferee will deliver to Transferor payment in an amount equal to the total fair market value of the Assets as set forth in the Inventory List, such payment to be in the form of a wire transfer or through the intercompany accounts of Transferor and Transferee.

-3-

Sale and Purchase Agree – THAMK and TritonAssetLeasing.doc

**52536 - 60**

(c) Transferor will deliver to Transferee a Bill of Sale transferring title to the Assets, in the form attached hereto as Exhibit A.  Such instrument shall vest in Transferee good and marketable title to the Assets.

7. <u>Construction</u>.  This Agreement is to be construed in accordance with the laws of Switzerland and the parties submit to the exclusive jurisdiction of the courts of Switzerland.  The captions used in this Agreement are for convenience only and are not to influence its construction.

8. <u>Amendment and Waiver</u>.  This Agreement may be amended only by a written instrument signed by both parties hereto.  Any party may waive any condition to its own obligations hereunder, provided that any waiver hereunder shall be in writing, signed by the party to be bound thereby.

9. <u>Assignment</u>.  Transferee may sell, assign or transfer its rights under this Agreement and may likewise sell, assign or transfer the Assets.

10. <u>Entire Agreement</u>.  This Agreement, including the Exhibit hereto, constitutes the entire agreement between the parties pertaining to the subject matter contained herein and supersedes all prior agreements, representations and understandings, both written and oral, between the parties with respect to the subject matter of this Agreement.

11. <u>Counterparts</u>:  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which, together, shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above written.  This Agreement is for the benefit of and will bind the parties hereto and their respective successors, representatives and assigns except as otherwise herein provided.

- TRANSFEROR -

TRITON HUNGARY ASSET
MANAGEMENT LLC

By: _____
Name: Bobby L. New
Title:  Managing Director

- TRANSFEREE -

TRITON ASSET LEASING GmbH

By: _____
Name: Robert N. Bowden
Title:  Managing Director

-4-

Sale and Purchase Agree – THAMK and TritonAssetLeasing.doc

Confidential Treatment Requested by TODDI

**EXHIBIT A**

**BILL OF SALE**

This Bill of Sale ("Agreement") dated *17 August*, 2009, between Triton Hungary Asset Management LLC, a Hungarian limited liability company ("Grantor"), and Triton Asset Leasing GmbH, a Swiss limited liability company ("Grantee");

**W I T N E S S E T H:**

WHEREAS, pursuant to an Asset Sale and Purchase Agreement dated August 17, 2009, Grantor agreed to sell, assign and transfer certain of its assets to Grantee, and Grantee desires to acquire such assets from Grantor;

NOW, THEREFORE, for a purchase price of $____, paid by Grantee to Grantor by wire transfer or through the intercompany accounts of Grantor and Grantee on the date hereof, the receipt, adequacy and sufficiency of which are hereby acknowledged, Grantor has granted, bargained, sold, assigned, transferred, set over and delivered, and by these presents does hereby grant, bargain, sell, assign, transfer, set over and deliver unto Grantee and to its successors and assigns forever, free and clear of any security interests, liens or other encumbrances, all of the assets detailed on the Inventory List attached hereto as Exhibit A, which is incorporated herein and made a part hereof (such assets are hereinafter collectively referred to as the "Assets"). The Grantor reserves and does not sell or transfer any right, title or interest in or to any assets not set forth in Exhibit A and such assets shall not be considered part of the Assets.

TO HAVE AND TO HOLD, all and singular, the Assets, together with all and singular the rights and appurtenances thereunto in anywise belonging, unto Grantee, its successors and assigns forever.

The Assets are in a used condition, and Grantor is neither a manufacturer or distributor of, nor dealer of merchant therein.

GRANTEE ACKNOWLEDGES AND AGREES THAT THE ASSETS ARE BEING TRANSFERRED AND ASSIGNED BY GRANTOR TO GRANTEE "AS IS, WHERE IS" WITH ALL FAULTS AND THAT GRANTOR, NOT BEING THE MANUFACTURER OF THE ASSETS NOR THE MANUFACTURER'S AGENT, MAKES NO EXPRESS OR IMPLIED WARRANTY OR REPRESENTATION OF ANY KIND WHATSOEVER WITH RESPECT TO THE ASSETS, INCLUDING, BUT NOT LIMITED TO: THE MERCHANTABILITY OF THE ASSETS OR THEIR FITNESS FOR ANY PARTICULAR PURPOSE; THE DESIGN OR CONDITION OF THE ASSETS; THE QUALITY OR CAPACITY OF THE ASSETS; THE WORKMANSHIP IN THE ASSETS; COMPLIANCE OF THE ASSETS WITH THE REQUIREMENTS OF ANY LAW, RULE, SPECIFICATION OR CONTRACT PERTAINING THERETO; PATENT INFRINGEMENT; OR LATENT DEFECT.

-5-

Sale and Purchase Agree – THAMK and TritonAssetLeasing.doc



Confidential Treatment Requested by TODDI                                                TO-DHTF-01541870

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which, together, shall constitute one and the same instrument.

IN WITNESS WHEREOF, the undersigned have caused this Bill of Sale to be duly executed effective as of the date first above written.

GRANTOR:

TRITON HUNGARY ASSET MANAGEMENT LLC

By: _____
Name: BOBBY L NEW
Title: MANAGING DIRECTOR

GRANTEE:

TRITON ASSET LEASING GmbH

By: _____
Name: Robert Bowman
Title: Managing Director

-6-
Sale and Purchase Agree -- THAMK and TritonAssetLeasing.doc

Confidential Treatment Requested by TODDI

**52536 - 63**

# SACHEINLAGEVERTRAG
## *CONTRIBUTION AGREEMENT*

zwischen
*between*

**Triton Hungary Vagyonkezelő Kft.,**
Ady Endre u. 41, H-2724 Újlengyel, Hungary

Vertreten durch die Geschäftsführerin
*Represented by its managing director*
Bobby Lynn New

bzw. durch den Bevollmächtigten
*resp. by its Proxy*
Mauro Locarnini

(„Sacheinlegerin")
(„*Transferor*")

und
*and*

**Triton Asset Leasing  GmbH, in Gründung**
Turmstrasse 30, CH-6300 Zug, Switzerland

Vertreten durch die Geschäftsführer
*Represented by its managing director*
Robert N. Bowden

(„Sachübernehmerin")
(„*Transferee*")

---

1.    **Gegenstand der Sacheinlage**
*1.    Subject of the contribution in kind*

1.1   Die Sachübernehmerin übernimmt bei ihrer Gründung die in der Beilage aufgelisteten betriebsnotwendigen Aktiven der Sacheinlegerin, mit Aktiven im Buchwert von USD 2'070'938'775.16 im Gegenwert von CHF 2'221'206'092.70 (gemäss Kurs vom 17. August 2009). An sämtliche Aktiven sind keine Pfandrechte begründet. Die Buchwerte entstammen aus den Bewertungen der ungarischen Netto-Steuerbeträge per 17. August 2009.

*1.1   At incorporation, Transferee receives from Transferor assets which are essential for its business as listed in the annex. Namely, assets with a book value in the amount of USD 2,070,938,775.16 and an equivalent value of CHF 2,221,206,092.70 (according to the exchange rate of 17 August 2009). All the assets are free of encumbrance. The book values are taken from the Hungarian net tax values as per 17 August 2009.*

Confidential Treatment Requested by TODDI

1.2   Die Übernahme erfolgt auf den 17. August 2009 (Stichtag). Nutzen und Gefahr hinsichtlich aller übertragenen Vermögenswerte gelten als per 17. August 2009 auf die Sachübernehmerin übergegangen. Die Sachübernehmerin kann mit ihrer Eintragung im Handelsregister über die gesamte Sacheinlage frei verfügen.

1.2   *The transfer will be effective as per 17 August 2009 (effective date). Risk and benefits in connection with all assets to be transferred will pass to the Transferee as per 17 August 2009. After the registration with the commercial register Transferee will be in the position to dispose freely over the assets.*

1.3   Sollte ein Vertragspartner dem Eintritt der Sachübernehmerin in den Vertrag nicht zustimmen, so wird der entsprechende Vertrag von der Sacheinlegerin treuhänderisch für die Sachübernehmerin unverändert weitergeführt, aber auf Rechung, Nutzen und Gefahr nach Anweisung der Sachübernehmerin.

1.3   *Should a contracting party refuse the entry of Transferee in a current agreement, Transferor will remain party of such agreement and will act according to instructions of Transferee as a fiduciary on behalf of and for the account, the benefits and the risk of Transferee.*

## 2.   Wert der Sacheinlage und Entschädigung

Die Sachübernehmerin übernimmt von der Sacheinlegerin die oben in Ziffer 1 erwähnten Sacheinlagen im Wert und zum Preis von insgesamt CHF 2'221'206'092.70.

Für den Wert von CHF 1'164'300'000.00 kommt der Sacheinlegerin 116'430 als vollständig liberiert geltende Stammanteile im Nominalwert von CHF 10'000 zu. Der Rest wird den allgemeinen Reserven zugewiesen.

Die Sacheinlegerin bestätigt, dass der Wert, welcher der Sachübernehmerin als Sacheinlage zukommt, ihrem tatsächlichen Wert entspricht.

## 2.   *Value of the contribution in kind and remuneration*

*Transferee receives from Transferor the under cipher 1 above mentioned contribution in kind with a value and with a total price of CHF 2,221,206,092.70.*

*In exchange for the value of CHF 1,164,300,000.00, Transferor is granted 116'430 fully paid in quotas with a par value of CHF 10,000. The rest will be allocated to the Transferee's surplus.*

*Transferor confirms that the value which Transferee receives as a contribution in kind corresponds to its effective value.*

## 3.   Vorbehalt

Dieser Sacheinlagevertrag ist für die Parteien nur unter der Bedingung der Gründung der Sachübernehmerin verbindlich.

## 3.   *Proviso*

*This contribution agreement is only binding for the parties if the incorporation of Transferee will be executed.*

**52536 - 65**

4.    **Anwendbares Recht**

Dieser Vertrag untersteht schweizerischem Recht.

4.    *Applicable Law*

*This Contract is governed by Swiss material Law.*


Zug, 17. August 2009

**Für Triton Hungary Vagyonkezelő Kft.,
als Sacheinlegerin:**

*On behalf of Triton Hungary Vagyonkezelő Kft.
as Transferor*

Mauro Locarnini


**Für Triton Asset Leasing GmbH in Gründung**

*On behalf of Triton Asset Leasing GmbH in the course of incorporation*

Der Gründer:
*The founder:*

Robert N. Bowden


- Beilage: Liste der Aktiven
- *Annex: List of Assets*

Anhang zum Sacheinlagevertrag zwischen Triton Hungary Vagyonkezelő Kft. und Triton Asset Leasing GmbH, in Gründung vom 17. August 2009

*Appendix to the Contribution Agreement between Triton Hungary Vagyonkezelő Kft. and Triton Asset Leasing LLC, in foundation from 17 August 2009*

1.      **Maritime Anlagen /** *Rigs*

**1.1      Discoverer Deep Seas**

Name / *Name*:                 Discoverer Deep Seas

Ausführung / *Type*:          Ship-shaped drilling unit

Design:                              Enhanced Enterprise

Erbauer / *Builder*:            Ast. y Talleres del Noroeste S.A.

Baujahr / *Year built*:         2000

Klassifizierung / *Classification*: DNV

Fahne / *Flag*:                   Marshall Islands

**1.2      Discoverer Spirit**

Name / *Name*:                 Discoverer Spirit

Ausführung / *Type*:          Ship-shaped drilling unit

Design:                              Enhanced Enterprise

Erbauer / *Builder*:            Ast. y Talleres del Noroeste S.A.

Baujahr / *Year built*:         1999

Klassifizierung / *Classification*: DNV

Fahne / *Flag*:                   Marshall Islands

**1.3      Discoverer Enterprise**

Name / *Name*:                 Discoverer Enterprise

Ausführung / *Type*:          Ship-shaped drilling unit

Design:                              Enhanced Enterprise

Erbauer / *Builder*:            Ast. y Talleres del Noroeste S.A.

Baujahr / *Year built*:         1998

Klassifizierung / *Classification*: DNV

Fahne / *Flag*:                   Marshall Islands

090813 tsl gmbh list of assets.doc

Confidential Treatment Requested by TODDI

### 1.4   Deepwater Horizon

| | |
|---|---|
| Name / *Name*: | Deepwater Horizon |
| Ausführung / *Type*: | Column stabilized drilling unit |
| Design: | RBS 8-D |
| Erbauer / *Builder*: | Hyundai Heavy Industries |
| Baujahr / *Year built*: | 2000 |
| Klassifizierung / *Classification*: | ABS |
| Fahne / *Flag*: | Marshall Islands |

### 1.5   Deepwater Millennium

| | |
|---|---|
| Name / *Name*: | Deepwater Millennium |
| Ausführung / *Type*: | Ship-shaped drilling unit |
| Design: | RBF/Samsung |
| Erbauer / *Builder*: | Samsung Heavy Industries |
| Baujahr / *Year built*: | 1999 |
| Klassifizierung / *Classification*: | ABS |
| Fahne / *Flag*: | Marshall Islands |

### 1.6   Discoverer Clear Leader

| | |
|---|---|
| Name / *Name*: | Discoverer Clear Leader |
| Ausführung / *Type*: | Ship-shaped drilling unit |
| Design: | Enhanced Enterprise |
| Erbauer / *Builder*: | Daewoo Shipbuilding |
| Baujahr / *Year built*: | 2009 |
| Klassifizierung / *Classification*: | Det Norske Veritas (DNV) |
| Fahne / *Flag*: | Marshall Islands |

### 1.7   Transocean Marianas

| | |
|---|---|
| Name / *Name*: | Transocean Marianas |
| Ausführung / *Type*: | Column stabilized drilling unit |
| Design: | Sedco 700 |
| Erbauer / *Builder*: | Mitsubishi Heavy Ind. |
| Baujahr / *Year built*: | 1979 |
| Klassifizierung / *Classification*: | ABS |
| Fahne / *Flag*: | Marshall Islands |

TO-DHTF-01541876

**52536 - 68**

3

**1.8    Cajun Express**

| | |
|---|---|
| Name / *Name*: | Cajun Express |
| Ausführung / *Type*: | Column stabilized drilling unit |
| Design: | SFXpress 2000 |
| Erbauer / *Builder*: | Promet Shipyard |
| Baujahr / *Year built*: | 2000 |
| Klassifizierung / *Classification*: | American Bureau of Shipping (ABS) |
| Fahne / *Flag*: | Liberia |

**1.9    Falcon 100**

| | |
|---|---|
| Name / *Name*: | Falcon 100 |
| Ausführung / *Type*: | Column stabilized drilling unit |
| Design: | F&G L-900 Pacesetter |
| Erbauer / *Builder*: | Avondale Shipyards, INC |
| Baujahr / *Year built*: | 1974 |
| Klassifizierung / *Classification*: | ABS |
| Fahne / *Flag*: | Marshall Islands |

Confidential Treatment Requested by TODDI

**52536 - 69**

4

**2.    Verbriefte Forderungen / *Notes***

**2.1    Note R-02**

Darlehensgeber / *Lender:*      Triton Hungary Vagyonkezelő Kft.

Darlehensnehmer / *Borrower:*   Transocean Inc.

Datum / *Date:*                 21. Juni 2005 / *21 June 2005*

Fälligkeit / *Maturity:*        21. Juni 2010 / *21 June 2010*

Übertragbar / *Transferability:* Ja / *Yes*

Recht / *Law:*                  Cayman Island

**2.2    Note R-17**

Darlehensgeber / *Lender:*      Triton Hungary Vagyonkezelő Kft.

Darlehensnehmer / *Borrower:*   Transocean Offshore International Ventures Limited

Datum / *Date:*                 26. März 2009 / *26 March 2009*

Fälligkeit / *Maturity:*        26. März 2014 / *26 March 2014*

Übertragbar / *Transferability:* Ja / *Yes*

Recht / *Law:*                  State of Texas

**3.    Bargeld / *Cash***                    USD:    7'044'072.00

Confidential Treatment Requested by TODDI

TO-DHTF-01541878

## ASSIGNMENT OF BAREBOAT CHARTER PARTY

This Assignment of Bareboat Charter Party (hereafter called the "Assignment") is entered into effective as of the 17th day of August, 2009, by and between Triton Hungary Asset Management LLC, a company duly organized under the laws of Hungary (hereafter called the "Assignor"), and Triton Asset Leasing GmbH, a company duly organized under the laws of Switzerland (hereafter called the "Assignee").

WHEREAS, pursuant to the Assignment of Bareboat Charter Party dated December 21, 2004, Assignor and Transocean Holdings LLC (hereafter called the "Consenting Party") are party to certain bareboat charter party agreements and amendments thereto (hereafter called the "Bareboat Charter Party") for the charter of the following rig: *Deepwater Horizon* (the "Rig"); and

WHEREAS, Assignor is the owner of the Rig and desires to sell the Rig to Assignee; and

WHEREAS, Assignor now wishes to assign all of its rights, title and interest in and to the Bareboat Charter Party to Assignee; and,

WHEREAS, the Consenting Party has consented to this Assignment;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the party hereby agrees as follows:

1.    On the effective date hereof, Assignor hereby assigns to Assignee all of Assignor's rights, title and interest in and to the Bareboat Charter Party, and Assignee hereby accepts this Assignment and agrees to perform all of the obligations of "Owner" as they are set forth in the Bareboat Charter Party.

2.    Except as altered by this Assignment the Bareboat Charter Party shall remain in full force and effect in accordance with its terms.

3.    The text of the Assignment may be executed in any number of counterparts, each an original, and all taken as a whole shall constitute one and the same instrument.

IN WITNESS WHEREOF, the undersigned party have executed this Assignment effective as of the date and year first above written.

TRITON ASSET LEASING GmbH

By: _____
Name:  Robert N. Bowden
Title:  Managing Director

TRITON HUNGARY ASSET
MANAGEMENT LLC

By: _____
Name:  Bobby New
Title:  Managing Director

ACKNOWLEDGEMENT OF CONSENTING PARTY:

TRANSOCEAN HOLDINGS LLC

By: _____
Name:  Walter A. Baker
Title:  Vice President

## ASSIGNMENT OF BAREBOAT CHARTER PARTY

This Assignment of Bareboat Charter Party (hereafter called the "Assignment") is entered into effective as of the 17th day of August, 2009, by and between Triton Hungary Asset Management LLC, a company duly organized under the laws of Hungary (hereafter called the "Assignor"), and Triton Asset Leasing GmbH, a company duly organized under the laws of Switzerland (hereafter called the "Assignee").

WHEREAS, pursuant to the Assignment of Bareboat Charter Party dated December 21, 2004, Assignor and Transocean Holdings LLC (hereafter called the "Consenting Party") are party to certain bareboat charter party agreements and amendments thereto (hereafter called the "Bareboat Charter Party") for the charter of the following rig: *Deepwater Horizon* (the "Rig"); and

WHEREAS, Assignor is the owner of the Rig and desires to sell the Rig to Assignee; and

WHEREAS, Assignor now wishes to assign all of its rights, title and interest in and to the Bareboat Charter Party to Assignee; and,

WHEREAS, the Consenting Party has consented to this Assignment;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the party hereby agrees as follows:

1.   On the effective date hereof, Assignor hereby assigns to Assignee all of Assignor's rights, title and interest in and to the Bareboat Charter Party, and Assignee hereby accepts this Assignment and agrees to perform all of the obligations of "Owner" as they are set forth in the Bareboat Charter Party.

2.   Except as altered by this Assignment the Bareboat Charter Party shall remain in full force and effect in accordance with its terms.

3.   The text of the Assignment may be executed in any number of counterparts, each an original, and all taken as a whole shall constitute one and the same instrument.

IN WITNESS WHEREOF, the undersigned party have executed this Assignment effective as of the date and year first above written.

TRITON ASSET LEASING GmbH

By:_____
Name:  Robert N. Bowden
Title:  Managing Director

TRITON HUNGARY ASSET
MANAGEMENT LLC

By:_____
Name:  Bobby New
Title:  Managing Director

ACKNOWLEDGEMENT OF CONSENTING PARTY:

TRANSOCEAN HOLDINGS LLC

By:_____
Name:  Walter A. Baker
Title:  Vice President

# AGREEMENT OF AMENDMENT AND EXTENSION OF BAREBOAT CHARTER PARTY, DELIVERY AND ACCEPTANCE

**To: Transocean Holdings LLC ["Charterer"]**

**From : Triton Asset Leasing GmbH ["OWNER"]**

Dear sirs,

Re:  Semi-submersible Drilling Unit – Deepwater Horizon ("Horizon")

We refer to:

(I)  In reference to the Assignment of the Bareboat Charter Party Agreement dated August 17, 2009, including all subsequent amendments and extensions, (hereinafter the "Agreement") between the OWNER and Charterer (Transocean Holdings LLC)

(II) Notice to intent to amend and extend bareboat charter party

1)  EXTENSION AGREEMENT

OWNER and Charterer are desirous to extend all of their rights under and to be bound by the terms and conditions of the Bareboat Charter Party agreement with effect from September 18, 2010 except:

a)   The contracted Daily Charter Hire rate will remain unchanged during the period of this extension, except where:
b)   The Daily Charter Hire rate will be reviewed and adjusted if necessary on January 1st and July 1st of each year.
c)   The Daily Charter Hire rate will be suspended during the idle time or downtime for whatever reason where Charterer is not receiving compensation under its current services contract,
d)   Charterer shall not have to compensate OWNER for any equipment lost if Charterer replaces such equipment by equipment whose standards are equal to or greater than the equipment lost,
e)   Daily Charter rate may be changed if a transfer pricing study by either party indicates the rates so charged in a) above does not fall within a range of compensation that 3rd parties would have agreed  using the same criteria.

2)    NOTICE OF DELIVERY AND ACCEPTANCE

OWNER and Charterer hereby mutually confirm that Charterer has accepted the Horizon in "as-is" condition on the 18th day of September, 2010 at 00:00 hours.

3)    PERIOD OF EXTENSION

Confidential Treatment Requested by TODDI

TO-DHTF-01541881

**52536 - 73**

<u>Letter of Variation –Calendar Year 2009</u>

The period of the extension will commence on the 18th day of September, 2010 and terminate the later date of

a. September 17, 2013,
b. until completion of a Charterer well in progress at September 17 2013, or
c. unless a new charter that supersedes this charter is mutually agreed and executed by the parties hereto.

The termination of this extension will in no way alter the rights, obligations and liability of each party to the extent that they relate to the period of the extension

In witness whereof, the OWNER and Charterer represented by their duly authorized signatories have set out their signature below.


For Transocean Holdings LLC ("Charterer")

**RECEIVED**

OCT 1 2 2009

LEGAL DEPARTMENT

_____
Walter Baker – Vice President


For Triton Asset Leasing GmbH ("OWNER")

_____
Robert Bowden – Managing Director

Confidential Treatment Requested by TODDI                              TO-DHTF-01541882

*Original
R8,*

Letter of Variation of Charter Hire Rate

Of

Bareboat Charter Party Agreement of Drilling Unit

"DEEPWATER HORIZON"

Between

Transocean Holdings Inc ["Charterer"]

And

Triton Asset Leasing GmbH ["OWNER"]

1.  Pursuant to the Bareboat charter Party Agreement dated and effective 18th day of August 2001, including all subsequent amendments and extensions, (hereinafter the "Agreement") between the Charterer and OWNER the Daily Charter Hire rate was last fixed at US$ 318,000 per day as noted in Article 9 of the Agreement including all subsequent amendments and extensions.

2.  Having considered the overall drilling rig utilization (demand and supply) rates, prevailing market conditions in the United States of America with the intent that the amount of the daily rate reflect a fair market value, the OWNER and Charterer hereby agree to a Lump Sum payable to the Charterer in the amount of US Dollars 7,602,000 covering the period 1st January 2009 ending with June 30, 2009.

3   A new Daily Charter Hire rate of US$ 276,000 will continue from July 1st until such time (1) a new amendment to the current Bareboat Charter Party Agreement is negotiated, or (2) a subsequent Letter of Variation of Charter Hire Rate Bareboat is negotiated , or (3) a new replacement Charter Party Agreement, is agreed.

This variation of Charter Hire rate replaces The Daily Charter Hire rate per day as noted in Article 9 of the Agreement, including all subsequent amendments and extensions, shall be reviewed semiannually on or about the 1st of January and 1st of July each year during the remaining months of this charter and shall be varied as of such dates, including but not limited to a decision not to change the rate per day, by mutual agreement between the OWNER and Charterer.   All other terms of the Agreement, including all subsequent amendments and extensions, shall remain applicable.

This agreement may be executed on any number of counterparts, each an original, and all taken as a whole shall constitute one and the same instrument.

Page 1 of 2

<u>**Letter of Variation –Calendar Year 2009**</u>

**In witness whereof, the OWNER and Charterer represented by their duly authorized signatories have set out their signature below.**

**For Transocean Holdings Inc ("Charterer")**

**For Triton Asset Leasing GmbH ("OWNER")**

**Robert N. Bowden – Managing Director**

**Page 2 of 2**

Confidential Treatment Requested by TODDI

**52536 - 76**

### Letter of Variation of Charter Hire Rate

### Of

### Bareboat Charter Party Agreement of Drilling Unit

### "DEEPWATER HORIZON"

### Between

### Transocean Holdings Inc ["Charterer"]

### And

### Triton Asset Leasing GmbH ["OWNER"]

Pursuant to the Bareboat charter Party Agreement dated and effective the 18th day of August 2001, including all subsequent amendments and extensions, (hereinafter the "Agreement") between the Charterer and OWNER the Daily Charter Hire rate was originally fixed at USD 141,100 per day as noted in Article 9 of the Agreement including all subsequent amendments and extensions, whereas the Daily Charter Hire rate was last fixed at USD 276,000 per day.

A new Daily Charter Hire rate of USD 333,000 will continue from January 1, 2010 until such time as (1) a new amendment to the current Bareboat Charter Party Agreement is negotiated, or (2) a subsequent Letter of Variation of Charter Hire Rate is negotiated, or (3) a new replacement Bareboat Charter Party Agreement, is agreed.

This variation of Charter Hire rate replaces The Daily Charter Hire rate per day as noted in Article 9 of the Agreement, including all subsequent amendments and extensions, and shall be reviewed semiannually on or about the 1st of January and 1st of July each year during the remaining months of this charter and shall be varied as of such dates, including but not limited to a decision not to change the rate per day, by mutual agreement between the OWNER and Charterer.  All other terms of the Agreement, including all subsequent amendments and extensions, shall remain applicable.

This agreement may be executed on any number of counterparts, each an original, and all taken as a whole shall constitute one and the same instrument.

Confidential Treatment Requested by TODDI

TO-DHTF-01541885

**52536 - 77**

In witness whereof, the OWNER and Charterer represented by their duly authorized signatories have set out their signature below.

**For Transocean Holdings Inc  ["Charterer"]**

_____
Jess Richards – Marketing Manager

**For Triton Asset Leasing GmbH  ["OWNER"]**

_____
Robert N. Bowden – Managing Director

Page 2 of 2 – Deepwater Horizon – Rate Reset – January 1, 2010

Confidential Treatment Requested by TODDI                                        TO-DHTF-01541886