**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010,<br><br>This Pleading applies to:<br><br>*All Cases* | *<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>* | MDL No. 2179<br><br>Section: J<br><br>Judge Barbier<br><br>Magistrate Judge Shushan |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**POST-TRIAL BRIEF OF DEFENDANTS BP EXPLORATION & PRODUCTION INC.,
BP AMERICA PRODUCTION COMPANY, AND BP p.l.c.**

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Matthew T. Regan, P.C.
Hariklia Karis, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL   60654
Telephone:  312-862-2000
Facsimile:  312-862-2200

Christopher Landau, P.C.
Bridget K. O'Connor
Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC   20005
Telephone:  202-879-5000
Facsimile:  202-879-5200

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA   70139-5099
Telephone:  504-581-7979
Facsimile:  504-556-4108

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC   20004-2401
Telephone:  202-662-5985
Facsimile:  202-662-6291

*Attorneys for BP Exploration & Production Inc., BP America Production Co., and BP p.l.c.*

June 21, 2013

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................2

I.    Treble Fines And Punitive Damages Are Available Only Where A Particular Defendant, With A Culpable State Of Mind, Engaged In Extreme And Egregious Misconduct That Caused The Relevant Injury. ...........................................2

    A.    Treble Fines Are Available Under The CWA Only In Cases Of "Gross Negligence Or Willful Misconduct," Both Of Which Require A Culpable Mental State (Question 1). ...................................................................2

        1.    Gross Negligence .............................................................................3

            a.    Objective Element: Extreme Departure From Standard Of Care ...................................................................................4

            b.    Subjective Element: Conscious Indifference To Known Risk .......................................................................................6

        2.    Willful Misconduct .........................................................................8

    B.    Punitive Damages Under Maritime Law Require Willful, Wanton, And Outrageous Conduct (Question 2). ........................................................12

    C.    The Law Addresses The Conduct Relevant To Deciding Whether A Defendant Has Displayed The Requisite Culpability To Warrant Treble Fines Under The CWA Or Punitive Damages Under Maritime Law. ...................12

        1.    A Court May Not Consider A Particular Act Or Omission In Isolation (Question 3). .............................................................13

        2.    A Court May Not Consider Conduct That Did Not Cause The Accident (Question 4). ...............................................................15

        3.    A Court May Not Consider The Acts Of Agents Or Independent Contractors (Question 5)..........................................................16

        4.    A Court Must Consider Compliance With Government Regulations And Industry Standards (Questions 6 & 7)............................20

II.    The Facts Here Do Not Remotely Establish The Culpability Necessary To Subject BP To Treble Fines Under The CWA Or Punitive Damages Under Maritime Law. ........22

    A.    Drilling The Macondo Well Was A Collaborative Endeavor In Which BP, Transocean, And Halliburton All Played Very Substantial Roles.........................22

        1.    BP.........................................................................................................23

        2.    Transocean .........................................................................................25

|  |  | a. | Transocean Owned And Provided The *Deepwater Horizon*, A State-Of-The-Art Rig. | 25 |
|  |  | b. | Transocean's Safety Management System Applied Aboard The *Deepwater Horizon*. | 25 |
|  |  | c. | Transocean Was Responsible For Well Monitoring And Well Control. | 27 |
|  |  | d. | Transocean Owned And Maintained The BOP. | 28 |
|  | 3. | Halliburton | | 30 |
|  |  | a. | Halliburton Was Responsible For Designing, Testing, And Pumping The Cement. | 30 |
|  |  | b. | Halliburton Was Also Responsible For Monitoring The Well. | 31 |
| B. | The Accident Was Caused By A Series Of Acts And Omissions By Independent Entities That Overcame State-Of-The-Art Safety Systems, And No Conduct Attributable To BP Warrants Treble Fines Or Punitive Damages. | | | 31 |
|  | 1. | Halliburton Personnel Failed To Design, Test, And Pump A Cement Slurry That Secured The Wellbore. | | 32 |
|  | 2. | Transocean And BP Personnel Both Erroneously Interpreted The Negative Pressure Test. | | 34 |
|  | 3. | Transocean And Halliburton Personnel Failed To Monitor The Well And Take Appropriate Well Control Actions. | | 38 |
|  | 4. | Transocean Personnel Failed To Properly Utilize The Blowout Preventer To Shut In The Well And Stop The Blowout. | | 42 |
|  |  | a. | Transocean Personnel Failed To Activate The EDS | 42 |
|  |  | b. | Transocean Personnel Failed Adequately To Maintain The AMF/Deadman System. | 43 |
| C. | BP Cannot Be Subjected To Treble Fines Or Punitive Damages Based On An Aggregation Of Disparate Conduct That Did Not Proximately Cause The Accident. | | | 45 |
|  | 1. | Regulatory Safe Drilling Margin | | 48 |
|  | 2. | M57B Sand | | 49 |
|  | 3. | Guide/Sims E-Mails | | 49 |
|  | 4. | Long String Production Casing | | 50 |
|  | 5. | Temporary Abandonment Procedure | | 51 |
|  | 6. | Number And Placement Of Centralizers | | 53 |

7.      Partial Bottoms-Up Circulation ...................................................................54

8.      Float Collar Conversion ...............................................................................54

9.      Decision Not To Run A Cement Bond Log...................................................55

10.     8:52 PM Telephone Call ...............................................................................56

11.     Suitability Of The BOP..................................................................................58

CONCLUSION.............................................................................................................................60

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ainsworth v. Shell Offshore, Inc.*,
  829 F.2d 548 (5th Cir. 1987)................................................................. 17, 18, 19

*Alley v. Gubser Dev. Co.*,
  785 F.2d 849 (10th Cir. 1986)......................................................................... 21

*American River Transp. Co. v. Kavo Kaliakra SS*,
  148 F.3d 446 (5th Cir. 1998)........................................................................... 16

*AMW Materials Testing, Inc. v. Town of Babylon*,
  584 F.3d 436 (2d Cir. 2009)............................................................................ 20

*AT&T Co. v. City of New York*,
  83 F.3d 549 (2d Cir. 1996).............................................................................. 14

*Atlantic Sounding Co. v. Townsend*,
  557 U.S. 404 (2009)........................................................................................ 12

*Babbitt v. Sweet Home Chapter of Communities for a Great Or.*,
  515 U.S. 687 (1995)........................................................................................... 9

*Barber v. Texaco, Inc.*,
  720 F.2d 381 (5th Cir. 1983) (*per curiam*) .......................................................... 6, 7

*Becker v. Tidewater, Inc.*,
  586 F.3d 358 (5th Cir. 2009)....................................................................... 5, 7, 36

*Belt v. EmCare, Inc.*,
  444 F.3d 403 (5th Cir. 2006).......................................................................... 3, 8

*Bullock v. BankChampaign, N.A.*,
  133 S. Ct. 1754 (2013) ...................................................................................... 9

*Cape Flattery Ltd. v. Titan Maritime LLC*,
  607 F. Supp. 2d 1179 (D. Haw. 2009),
  *aff'd*, 647 F.3d 914 (9th Cir. 2011) ..................................................................... 6

*Casey v. FDIC*,
  583 F.3d 586 (8th Cir. 2009)............................................................................. 8

*Chaney v. Dreyfus Serv. Corp.*,
  595 F.3d 219 (5th Cir. 2010)............................................................................ 14

*CIR v. Acker*,
  361 U.S. 87 (1959) ......................................................................................... 11

iv

*Clements v. Steele*,
   792 F.2d 515 (5th Cir. 1986)............................................................................. 13

*Coryell v. Phipps*,
   317 U.S. 406 (1943) ........................................................................................ 45

*Coulter v. Texaco, Inc.*,
   117 F.3d 909 (5th Cir. 1997)..................................................................... 18, 19

*Donaghey v. Ocean Drilling & Explor. Co.*,
   974 F.2d 646 (5th Cir. 1992)........................................................................... 16

*Dowling v. United States*,
   473 U.S. 207 (1985) ........................................................................................ 11

*Drabik v. Stanley-Bostich, Inc.*,
   997 F.2d 496 (8th Cir. 1993)........................................................................... 20

*Estate of Cowart v. Nicklos Drilling Co.*,
   505 U.S. 469 (1992) ........................................................................................ 10

*FAA v. Cooper*,
   132 S. Ct. 1441 (2012) ..................................................................................... 3

*Fruge ex rel. Fruge v. Parker Drilling Co.*,
   337 F.3d 558 (5th Cir. 2003)..................................................................... 18, 19

*Gautreaux v. Scurlock Marine, Inc.*,
   107 F.3d 331 (5th Cir. 1997)............................................................................. 3

*Gehl by Reed v. Soo Line R.R.*,
   967 F.2d 1204 (8th Cir. 1992)......................................................................... 22

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*,
   313 F.3d 305 (5th Cir. 2002)......................................................................... 4, 6

*Harper v. Zapata Off-Shore Co.*,
   741 F.2d 87 (5th Cir. 1984)............................................................................. 12

*Hernandez v. M/V Rajaan*,
   841 F.2d 582 (5th Cir. 1988)........................................................................... 45

*Holmes v. SIPC*,
   503 U.S. 258 (1992) ........................................................................................ 15

*Holtzclaw v. DSC Commc'ns Corp.*,
   255 F.3d 254 (5th Cir. 2001)........................................................................... 16

*Houston Explor. Co. v. Halliburton Energy Servs., Inc.*,
   269 F.3d 528 (5th Cir. 2001)......................................................... 4, 5, 6, 7, 36

*In re Great Lakes Dredge & Dock Co.*,
   624 F.3d 201 (5th Cir. 2010) .................................................................. 16

*In re Mid-South Towing Co.*,
   418 F.3d 526 (5th Cir. 2005) ............................................................ 16, 45

*In re P&E Boat Rentals, Inc.*,
   872 F.2d 642 (5th Cir. 1989) ............................................................ 12, 17

*In re Signal Int'l LLC*,
   579 F.3d 478 (5th Cir. 2009) .................................................................. 45

*Lake Shore & Mich. S. Ry. v. Prentice*,
   147 U.S. 101 (1893) ................................................................................ 17

*Landry v. Huthnance Drilling Co.*,
   889 F.2d 1469 (5th Cir. 1989) ................................................................ 19

*Lobegeiger v. Celebrity Cruises, Inc.*,
   2012 A.M.C. 202 (S.D. Fla. 2011) ....................................................... 4, 7

*Maxey v. Freightliner Corp.*,
   665 F.2d 1367 (5th Cir. 1982) ................................................................ 20

*McCormack v. Noble Drilling Corp.*,
   608 F.2d 169 (5th Cir. 1979) .................................................................. 18

*Microsoft Corp. v. i4i Ltd. P'ship*,
   131 S. Ct. 2238 (2011) ............................................................................. 3

*Milne v. USA Cycling Inc.*,
   575 F.3d 1120 (10th Cir. 2009) .............................................................. 13

*Nader v. Allegheny Airlines, Inc.*,
   626 F.2d 1031 (D.C. Cir. 1980) ............................................................. 21

*Orthopedic & Sports Injury Clinic v. Wang Labs., Inc.*,
   922 F.2d 220 (5th Cir. 1991) .................................................................. 11

*Pacific Operators Offshore, LLP v. Valladolid*,
   132 S. Ct. 680 (2012) ............................................................................. 15

*Palsgraf v. Long Island R.R.*,
   162 N.E. 99 (N.Y. 1928) ......................................................................... 16

*Richards v. Michelin Tire Corp.*,
   21 F.3d 1048 (11th Cir. 1994) .......................................................... 20, 48

*Romero v. Mobil Explor. & Producing N. Am.*,
   939 F.2d 307 (5th Cir. 1991) ........................................ 17, 18, 34, 42, 45

*Russello v. United States*,
  464 U.S. 16 (1983) ................................................................................... 20

*Saba v. Compagnie Nationale Air France*,
  78 F.3d 664 (D.C. Cir. 1996) ................................................................... 14

*Safeco Ins. Co. of Am. v. Burr*,
  551 U.S. 47 (2007) ..................................................................................... 8

*Satcher v. Honda Motor Co.*,
  52 F.3d 1311 (5th Cir. 1995) .............................................................. 21, 48

*Shaboon v. Duncan*,
  252 F.3d 722 (5th Cir. 2001) ..................................................................... 4

*Southern Farm Bureau Cas. Ins. Co. v. McKenzie*,
  252 F.2d 195 (5th Cir. 1958) ................................................................... 37

*Southland Secs. Corp. v. INSpire Ins. Solutions Inc.*,
  365 F.3d 353 (5th Cir. 2004) ................................................................... 14

*Stone Man, Inc. v. Green*,
  435 S.E.2d 205 (Ga. 1993) ....................................................................... 20

*Texas Indus., Inc. v. Radcliff Materials, Inc.*,
  451 U.S. 630 (1981) ................................................................................... 9

*The Amiable Nancy*,
  16 U.S. (3 Wheat.) 546 (1818) ........................................................... 16, 17

*Todd Shipyards Corp. v. Turbine Serv., Inc.*,
  674 F.2d 401 (5th Cir. 1982) ..................................................................... 5

*Tullos v. Resource Drilling, Inc.*,
  750 F.2d 380 (5th Cir. 1985) ................................................................... 12

*United States v. American Commercial Lines, LLC*,
  No. 11-2076, 2013 WL 1182963 (E.D. La. Mar. 21, 2013) ...................... 12

*United States v. Gonzales*,
  327 F.3d 416 (5th Cir. 2003) ..................................................................... 3

*United States v. Hicks*,
  389 F.3d 514 (5th Cir. 2004) ..................................................................... 6

*United States v. Philip Morris USA Inc.*,
  566 F.3d 1095 (D.C. Cir. 2009) (*per curiam*) ........................................ 14

*United States v. Science Applications Int'l Corp.*,
  626 F.3d 1257 (D.C. Cir. 2010) ............................................................... 15

*United States v. Wiltberger*,
  18 U.S. (5 Wheat.) 76 (1820) ............................................................... 11

*Wallace v. Oceaneering Int'l*,
  727 F.2d 427 (5th Cir. 1984) ............................................................... 18

*Warren v. United States*,
  340 U.S. 523 (1951) ............................................................................. 6

*Williamson v. McKenna*,
  354 P.2d 56 (Or. 1960) ......................................................................... 14

*World Ins. Co. of Omaha, Neb. v. Pipes*,
  255 F.2d 464 (5th Cir. 1958) ............................................................... 11

**Statutes**

18 U.S.C. § 2(a) ....................................................................................... 9

30 U.S.C. § 1235(*l*) ................................................................................ 7

33 U.S.C. § 1321(b)(7) ...................................................................... 2, 12

33 U.S.C. § 1321(b)(7)(A) ...................................................................... 2

33 U.S.C. § 1321(b)(7)(D) ................................................... 2, 3, 15, 19

33 U.S.C. § 1321(b)(8) ......................................................................... 10

33 U.S.C. § 2701 ..................................................................................... 1

33 U.S.C. § 2704(c)(1) .............................................................. 10, 19, 22

42 U.S.C. § 1791(b)(7) ........................................................................... 7

42 U.S.C. § 9607(d)(2) ........................................................................... 7

Pub. L. No. 101-380, 104 Stat. 484 (1990) ....................................... 10

**Other Authorities**

135 Cong. Rec. 27,977 .......................................................................... 10

135 Cong. Rec. 27,978 ............................................................................ 8

135 Cong. Rec. 27,979 .......................................................................... 11

135 Cong. Rec. 27,984 ............................................................................ 8

135 Cong. Rec. 27,986 .......................................................................... 10

Am. Jur. 2d (2013) .................................................. 4, 5, 6, 7, 8, 19, 21

*Black's Law Dictionary* (9th ed. 2009) .......................................................................... 5, 6

Br. of United States,
 *United States v. Citgo Petroleum Corp.*,
 No. 11-31117 (5th Cir. Apr. 13, 2012) ................................................................... 8

C.J.S. (2000) ................................................................................................................. 3, 13

H.R. Rep. No. 99-247 (1985) ........................................................................................ 11

Keeton, W. Page *et al.*,
 *Prosser & Keeton on the Law of Torts*  (5th ed. 1984) ........................................... 20

Martin, Patrick H.,
 *The BP Spill & the Meaning of "Gross Negligence or Willful Misconduct,"*
 71 La. L. Rev. 957 (2011) .............................................................................. 4, 8, 9

*Restatement (Second) of Torts* (1965) ........................................................................... 19

Schoenbaum, Thomas J.,
 *Admiralty & Maritime Law* (Supp. 2008) ............................................................. 17

Tsai, E.T.,
 Comment note, *Applicability of Res Ipsa Loquitur Where Plaintiff Must Prove Active or Gross Negligence, Wilful Misconduct, Recklessness, or the Like*,
 23 A.L.R.3d 1083 (1969) ...................................................................................... 11

## INTRODUCTION

On the night of April 20, 2010, a hydrocarbon "kick" at the Macondo well went undetected, and developed into a blowout. That blowout, in turn, led to a gas explosion on the rig floor, a fire, and the loss of eleven lives and the *Deepwater Horizon*. This Court has now conducted a two-month trial into why this kick—an ordinary occurrence in deepwater drilling—developed into such an extraordinarily rare and tragic event. The Phase One Trial revealed that there is no material dispute about the answer to that question: the blowout resulted from a series of independent acts and omissions by independent individuals that, when combined, had the effect of overcoming state-of-the-art safety systems. Specifically, notwithstanding a series of redundant barriers established to prevent such a blowout, each of the four main layers of protection—cement, well integrity testing, well monitoring and control, and a blowout preventer—failed, in succession, for various reasons.

Just because no single act or omission, in isolation, caused the blowout does not mean that no one can be held responsible. To the contrary, defendants BP Exploration & Production Inc. and BP America Production Company (collectively BP)[1] have from the outset acknowledged their responsibility to remedy the situation and provide compensation to those with legitimate claims of injury. BP voluntarily waived the cap on liability established by the Oil Pollution Act of 1990 (OPA), 33 U.S.C. § 2701 *et seq.*, and has already paid billions of dollars for compensation and remediation, including through two class settlements approved by this Court. In addition, BP has pleaded guilty to negligence as charged in an information brought by the U.S. Government.

---

[1] While BP p.l.c. is also a named defendant, there is no evidence that it had any direct role in the events leading to the April 20 blowout and subsequent loss of well control and oil spill. (*See generally* BP's Proposed Findings of Fact and Conclusions of Law (FFCL) §§ I.A.1, XVII.)

Nonetheless, the Government and plaintiffs still are not satisfied. They now ask this Court to subject BP to **treble fines** under the Clean Water Act (CWA), 33 U.S.C. § 1321(b)(7)(D), and **punitive damages** under maritime law. This Court should deny that request. As explained in Part I below, such treble fines and punitive damages are available only where a particular defendant, with a culpable mental state, engaged in extreme and egregious misconduct that caused the relevant injury. As explained in Part II below, the facts established at the Phase One Trial show that BP's conduct does not remotely approach that demanding standard. This was a terrible and consequential accident, but it was still an accident.

## ARGUMENT

**I.**     **Treble Fines And Punitive Damages Are Available Only Where A Particular Defendant, With A Culpable State Of Mind, Engaged In Extreme And Egregious Misconduct That Caused The Relevant Injury.**

In its order regarding Phase One Post-Trial Briefing, this Court asked the parties to address seven questions that, in combination, establish the legal framework relevant here. *See* Rec. Doc. 9536. These questions are addressed in turn below.

**A.**     **Treble Fines Are Available Under The CWA Only In Cases Of "Gross Negligence Or Willful Misconduct," Both Of Which Require A Culpable Mental State (Question 1).**

The CWA specifies in relevant part that "[a]ny person who is the owner, operator, or person in charge of any vessel, onshore facility, or offshore facility from which oil … is discharged in violation of paragraph (3), shall be subject to a civil penalty in an amount up to $25,000 per day of violation or an amount up to $1,000 per barrel of oil … discharged." 33 U.S.C. § 1321(b)(7)(A).[2]   Where the violation "was the result of gross negligence or willful

---

[2] The Court has previously held that BP is liable under § 1321(b)(7) as a part owner of the Macondo well. *See* Rec. Doc. 5809 at 23-24. BP's interlocutory appeal from that ruling is

misconduct" of such person, the maximum per-barrel fine is *tripled*.   *See* 33 U.S.C. § 1321(b)(7)(D).

Because the CWA does not define the terms "gross negligence" or "willful misconduct," courts and litigants must look elsewhere to determine their meaning.  Where, as here, Congress adopts words with established common-law meanings, "the general rule [is] that a common-law term comes with its common-law meaning."  *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2246 (2011) (citing cases); *see also FAA v. Cooper*, 132 S. Ct. 1441, 1449 (2012) ("[I]t is a cardinal rule of statutory construction that, when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken.") (internal quotation omitted).  Accordingly, it is both necessary and proper to consider state common law to give meaning to these federal statutory terms.  Other relevant sources for determining the terms' meanings are other federal statutes in which they are used, *see, e.g.*, *Belt v. EmCare, Inc.*, 444 F.3d 403, 412 (5th Cir. 2006), as well as both legislative history and statutory structure, *see*, *e.g.*, *United States v. Gonzales*, 327 F.3d 416, 419 (5th Cir. 2003).

### 1.    Gross Negligence

The key point about *gross* negligence is that it is distinct from, and "materially greater than," *ordinary* negligence.  65 C.J.S. *Negligence* § 91 (2000).  Whereas ordinary negligence is merely a "fail[ure] to act as an ordinarily prudent person would act in similar circumstances," *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 338 (5th Cir. 1997) (internal quotation omitted), gross negligence is far more egregious.  In particular, at common law, "[g]ross

_____

currently pending before the Fifth Circuit, *see* 5th Cir. No. 12-30883, and BP offers the following discussion without prejudice to that appeal.

3

negligence is a breach of duty involving an extreme degree of risk, considering the probability and magnitude of the potential harm to others (an objective element) when the actor has actual awareness of the risk involved but nevertheless proceeds in conscious indifference to the rights, safety, or welfare of others (a subjective element)." *Shaboon v. Duncan*, 252 F.3d 722, 735 (5th Cir. 2001) (internal quotation omitted); *see also Lobegeiger v. Celebrity Cruises, Inc.*, 2012 A.M.C. 202, 231 (S.D. Fla. 2011) (recognizing a "general consensus" under maritime law "that gross negligence involves some extreme departure from reasonable care coupled with a conscious awareness of the risk of harm"); Patrick H. Martin, *The BP Spill & the Meaning of "Gross Negligence or Willful Misconduct*," 71 La. L. Rev. 957, 1028 (2011) (recognizing that "gross negligence" has both an objective and a subjective element). The objective and subjective elements are addressed in turn below.

### a. Objective Element: Extreme Departure From Standard Of Care

As a threshold matter, gross negligence at common law requires more than a mere failure to abide by the ordinary standard of care; rather, "[i]t implies an ***extreme*** departure from the ordinary standard of care." 57A Am. Jur. 2d *Negligence* § 227 (2013) (emphasis added). Thus, as the Fifth Circuit has emphasized, the wrongdoing at issue must be "substantially and appreciabl[y] higher in magnitude than ordinary negligence." *Houston Explor. Co. v. Halliburton Energy Servs., Inc.*, 269 F.3d 528, 532 (5th Cir. 2001) (internal quotation omitted). Put differently, in sharp contrast to ordinary negligence, gross negligence is "the entire absence of care, the want of even slight care and diligence, and the utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others." *Id.* (internal quotations omitted); *see also Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 314 (5th Cir. 2002) ("[V]iewed objectively from the standpoint of the actor, the act or omission

4

must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others."); *Black's Law Dictionary* 1134 (9th ed. 2009) (defining "gross negligence" as "[a] lack of slight diligence or care"); 57A Am. Jur. 2d *Negligence* § 227 ("[G]ross negligence … refer[s] to a different character of conduct than ordinary negligence.").

Not surprisingly, courts have concluded that this stringent legal standard is not met where the defendant's conduct, even if negligent, was not extreme or egregious. Thus, in *Halliburton*, the Fifth Circuit reversed a finding of gross negligence where the defendant's concededly negligent conduct caused a 19-day blowout of hydrocarbons on an offshore drilling rig in the Gulf of Mexico. *See* 269 F.3d at 532. As the Court explained, "the record does not support a finding that [the defendant's] conduct amounts to a want of even slight care and diligence, the most relaxed definition of gross negligence the courts provide." *Id.* (internal quotation omitted). Similarly, in *Becker v. Tidewater, Inc.*, 586 F.3d 358 (5th Cir. 2009), the Fifth Circuit affirmed a finding of no gross negligence where the defendant gave orders to move a boat from which a steel hose was extended onto an offshore drilling rig, which caused the hose to snap taut and sever the leg of a 22-year-old summer intern, *see id.* at 364. The defendant's conduct, including a failure to warn rig personnel, was "mere inadvertence and not gross negligence." *Id.* at 367. And in *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401 (5th Cir. 1982), the Fifth Circuit reversed a finding of gross negligence against a defendant that, without notice or authorization, had delegated certain vessel repair work to a subcontractor that had performed it improperly, eventually causing the vessel to be so severely damaged that it had to be sold for scrap, *see id.* at 406-07. Although the defendant had not investigated the subcontractor, or supervised or inspected the work, the Fifth Circuit concluded that the alleged wrongdoing did not rise to the level of gross negligence. *See id.* at 411.

5

### b.      Subjective Element: Conscious Indifference To Known Risk

In addition, gross negligence at common law requires more than an extreme departure from the standard of care: it also requires a culpable mental state.  Although courts have used "various terms … to express the mental state of the actor," the traditional common-law definition requires "at least … a conscious indifference to consequences."  57A Am. Jur. 2d *Negligence* § 232.  Thus, as the Fifth Circuit has put it, "the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed with conscious indifference to the rights, safety, or welfare of others."  *Great Plains*, 313 F.3d at 314 (internal quotation omitted); *see also Warren v. United States*, 340 U.S. 523, 528 (1951) (characterizing gross negligence as a form of "positively vicious conduct"); *Halliburton*, 269 F.3d at 531 (common-law gross negligence entails "willful, wanton and reckless conduct"); *id.* at 532 ("[O]ne is grossly negligent when he has intentionally done an act of unreasonable character in reckless disregard of the risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.") (internal quotation omitted); *United States v. Hicks*, 389 F.3d 514, 530 (5th Cir. 2004) (defining "gross negligence" in federal criminal context as "a wanton or reckless disregard for human life") (internal quotation omitted); *Barber v. Texaco, Inc.*, 720 F.2d 381, 384 (5th Cir. 1983) (*per curiam*) ("Gross negligence is differentiated from simple negligence by the mental attitude of the defendant."); *Cape Flattery Ltd. v. Titan Maritime LLC*, 607 F. Supp. 2d 1179, 1189 (D. Haw. 2009) ("Gross negligence requires the intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another.") (interpreting CWA; internal quotation omitted), *aff'd*, 647 F.3d 914 (9th Cir. 2011); *Black's Law Dictionary* 1134 (defining "gross negligence" as "[a] conscious, voluntary act or omission in reckless disregard of a legal duty and of the

consequences to another party").  Mere carelessness, inadvertence, or mistake does not suffice.  *See Becker*, 586 F.3d at 367; *Halliburton*, 269 F.3d at 532; *see also* 57A Am. Jur. 2d *Negligence* § 227 ("'Gross negligence' means more than momentary thoughtlessness, inadvertence or error of judgment.").

Once again, courts have concluded that this stringent legal standard is not met where the defendant's conduct did not manifest the requisite culpable state of mind.  Thus, in *Halliburton*, the Fifth Circuit reversed a finding of gross negligence where "the record does not support a finding that [the defendant] knew or should have known" that his conduct "would contribute to a well blowout."  269 F.3d at 532-33.  Similarly, in *Barber*, the Fifth Circuit reversed a finding of gross negligence where "a jury could not reasonably find from [the evidence of alleged negligence] such want of care as would amount to 'conscious indifference' to the rights of others."  720 F.2d at 384.  And in *Lobegeiger*, the court concluded that plaintiffs failed to establish gross negligence as a matter of law where the evidence did not show that the defendant knew or should have known the risk of harm from its challenged conduct.  *See* 2012 A.M.C. at 232-33.

Other federal statutes only confirm the background common-law rule that gross negligence requires a culpable mental state.  Indeed, ***every definition of "gross negligence" in the U.S. Code includes such a requirement***.  *See* 42 U.S.C. § 9607(d)(2) (Superfund Act) ("For the purpose of the preceding sentence, reckless, willful, or wanton misconduct shall constitute gross negligence."); 30 U.S.C. § 1235(*l*) (Surface Mining and Reclamation Act) (same); 42 U.S.C. § 1791(b)(7) (Bill Emerson Good Samaritan Food Donation Act) ("The term 'gross negligence' means voluntary and conscious conduct (including a failure to act) by a person who, at the time of the conduct, knew that the conduct was likely to be harmful to the health or well-

being of another person.").  While none of these definitions applies to the CWA of its own force, they all confirm the background understanding against which Congress enacted the provision at issue here.  It would certainly be odd to suppose that Congress departed *sub silentio* from that understanding in the CWA—especially because the Superfund Act cited above was used as a model for the statute at issue here.  *See, e.g.*, 135 Cong. Rec. 27,984 (Rep. Stangeland) ("Even the Superfund law, regarded by many as one of the toughest most environmentally protective laws, contains liability limits subject to a gross negligence standard.  Our bill merely follows this precedent.") *id.* at 27,978 (Rep. Hammerschmidt) ("[G]ross negligence … is virtually the same as the willful negligence standard in the Federal Superfund law."); *see also Casey v. FDIC*, 583 F.3d 586, 591 (8th Cir. 2009) (same language in related statutes should have same meaning); *Belt*, 444 F.3d at 412 (same).

### 2.    Willful Misconduct

The term "willful misconduct" entails an even more culpable state of mind than the term "gross negligence."  In particular, willful misconduct includes the situation where the defendant actually intends to cause injury (***actual*** intent), as well as the situation where the defendant knows that his conduct will naturally or probably cause injury (***constructive*** intent or recklessness).  *See, e.g.*, 57A Am. Jur. 2d *Negligence* § 248; *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007) (noting that, at common law, "willful" includes both knowing and reckless violations of legal duties).  Indeed, the Government has acknowledged that willful misconduct "require[s] a finding of [1] intent or [2] recklessness."  *See* Br. of United States 51-52, *United States v. Citgo Petroleum Corp.*, No. 11-31117 (5th Cir. Apr. 13, 2012).  There is thus no dispute here that the term "willful misconduct" in the CWA entails a culpable mental state.  *See generally* Martin, *The BP Spill*, 71 La. L. Rev. at 989 ("The negligence of the actor becomes

8

willful misconduct because the actor has willfully and knowingly chosen to act in a manner he knows may bring harm to others.").

The fact that "willful misconduct" entails a culpable state of mind does not suggest that "gross negligence" does not entail a culpable state of mind.  While both terms require a culpable state of mind, they require a ***different*** culpable state of mind.  Although the terms may "merge at their margins" in practice, Martin, *The BP Spill*, 71 La. L. Rev. at 960, that does not mean that either is superfluous, *see*, *e.g.*, *Bullock v. BankChampaign, N.A.*, 133 S. Ct. 1754, 1757 (2013) (holding that "defalcation" as used in the Bankruptcy Code "includes a culpable state of mind requirement akin to that which accompanies application of the other terms in the same statutory phrase").  Any overlap in the terms' meanings only underscores why Congress used them together, and provides no reason to artificially limit them.  *See*, *e.g., id.*; *Babbitt v. Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687, 698 n.11 (1995); *cf.* 18 U.S.C. § 2(a) (extending criminal liability to a person who "aids, abets, counsels, commands, induces or procures" the commission of a federal crime).

*      *      *

Construed together—as they must be, *see*, *e.g.*, *Bullock*, 133 S. Ct. at 1760—the terms "gross negligence" and "willful misconduct" make it clear that the CWA authorizes treble fines only in cases of extreme and egregious misconduct characterized by a culpable mental state. That demanding standard makes sense: this is an avowedly ***punitive*** provision akin to a treble damages provision.  *See*, *e.g.*, *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 639 (1981) ("The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers.").  As described below, this

9

standard under the CWA is essentially indistinguishable from the common-law standard for awarding punitive damages.

This interpretation of "gross negligence or willful misconduct" in the CWA comports with the Act's structure and purpose.  The treble-fine provision represents an ***exception*** to the CWA's general regime of civil fines, which already allows consideration of a wide array of factors, including "the seriousness of the violation or violations, the economic benefit to the violator, if any, resulting from the violation, the degree of culpability involved, any other penalty for the same incident, any history of prior violations, the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge, the economic impact of the penalty on the violator, and any other matters as justice may require."  33 U.S.C. § 1321(b)(8).  Just as extreme and egregious misconduct can lead to the imposition of punitive damages in the ordinary civil case, such misconduct can lead to the imposition of treble fines under the CWA.

The legislative history of OPA, Pub. L. No. 101-380, 104 Stat. 484 (1990), which added the treble-fine provision to the CWA, confirms that Congress intended that provision to be very narrow.[3]  "[G]ross negligence and willful misconduct ... is conduct that is intended to injure or is reckless, showing the wanton disregard for the harm to others which is the likely result of a certain course of action or activity.  …  The[se] are extraordinarily difficult to prove."  135 Cong. Rec. 27,986 (Rep. Synar); *accord, e.g.*, *id.* 27,977 (Rep. Miller) ("Both are very difficult

---

[3]  The Act also specifies that OPA's liability caps do not apply where an incident was proximately caused by the responsible party's "gross negligence or willful misconduct."  33 U.S.C. § 2704(c)(1).  That provision is not at issue here with respect to BP, which waived those caps.  *See* Rec. Doc. 559.  That provision remains relevant, however, in interpreting the identical phrase "gross negligence or willful misconduct" added to the separate CWA statute by the same Act.  *See, e.g.*, *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 479 (1992) ("[T]he basic canon of statutory construction [is] that identical terms within an Act bear the same meaning").

to prove."); *id.* 27,979 (Rep. Miller) ("a very, very difficult test to meet ...."); H.R. Rep. No. 99-247, pt.1 at 24 (1985) ("[An] oil spill incident caused primarily by an intentional violation ... and which violation was committed with knowledge that an incident would probably result, would constitute willful or gross negligence.").

By attempting to dilute this stringent legal standard, the Government is trying to turn a narrow exception into the rule, in derogation not only of the CWA's text, structure, and purpose, but also of the cardinal rule that penal statutes must be strictly construed. *See, e.g.*, *Dowling v. United States*, 473 U.S. 207, 213-14 (1985) ("'The rule that penal laws are to be construed strictly, is, perhaps, not much less old than construction itself.'") (quoting *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820) (Marshall, C.J.)); *CIR v. Acker*, 361 U.S. 87, 91 (1959) (rule of strict construction applies to punitive civil statutes); *World Ins. Co. of Omaha, Neb. v. Pipes*, 255 F.2d 464, 472 (5th Cir. 1958) ("Penalties in civil actions are not favored by the courts, and should not be imposed except in cases that are clear and free from doubt.") (internal quotation omitted).

At bottom, the Government is advancing a *res ipsa loquitur* approach to the CWA's treble-fine provision.  In essence, the Government contends, this was a particularly terrible oil spill, so there must be some particularly terrible conduct somewhere.  Needless to say, such "Monday-morning quarterbacking" is impermissible.  *See, e.g.*, *Orthopedic & Sports Injury Clinic v. Wang Labs., Inc.*, 922 F.2d 220, 225 (5th Cir. 1991) (*res ipsa loquitur* cannot be used to prove gross negligence); *see generally* E.T. Tsai, Comment note, *Applicability of Res Ipsa Loquitur Where Plaintiff Must Prove Active or Gross Negligence, Wilful Misconduct, Recklessness, or the Like*, 23 A.L.R.3d 1083 (1969) (collecting cases).  Ordinary negligence and bad judgment, just as much as "gross negligence or willful misconduct," can lead to a terrible

11

accident.  Indeed, because the CWA's general civil-fine provision imposes fines on a per-barrel basis, *see* 33 U.S.C. § 1321(b)(7), the extent of a spill does not justify treble fines.

### B.    Punitive Damages Under Maritime Law Require Willful, Wanton, And Outrageous Conduct (Question 2).[4]

Punitive damages are available under maritime law only in cases of "willful, wanton, or outrageous conduct."  *Atlantic Sounding Co. v. Townsend*, 557 U.S. 404, 409, 414 n.4 (2009); *see also In re P&E Boat Rentals, Inc.*, 872 F.2d 642, 650 (5th Cir. 1989) (same).   This demanding standard, as the Fifth Circuit has explained, necessarily implies a culpable mental state, *i.e.*, it "'requires an element of bad faith.'"  *Tullos v. Resource Drilling, Inc.*, 750 F.2d 380, 388 (5th Cir. 1985) (quoting *Harper v. Zapata Off-Shore Co.*, 741 F.2d 87, 90 (5th Cir. 1984)).

This standard is materially indistinguishable from the standard for imposing treble fines under the CWA.  That is no coincidence: both punitive damages and treble fines are avowedly punitive, and hence it makes sense that they would be subject to similar constraints.

### C.    The Law Addresses The Conduct Relevant To Deciding Whether A Defendant Has Displayed The Requisite Culpability To Warrant Treble Fines Under The CWA Or Punitive Damages Under Maritime Law.

The law not only establishes the standards for imposing treble damages under the CWA and punitive damages under maritime law, but also addresses the conduct relevant to deciding whether such punishment is warranted.  The Court has posed various questions about the conduct that can be considered in this analysis; each of those questions is addressed in turn below.

---

[4] This Court has previously rejected BP's argument that OPA wholly displaces general maritime law as applied to economic loss claims resulting from oil spills, *see* Rec. Doc. 3830 at 38, and denied BP's request to certify that issue for interlocutory review, *see* Rec. Doc. 4378.  BP offers the following discussion without prejudice to its position that general maritime law is displaced here.  *See United States v. American Commercial Lines, LLC*, No. 11-2076, 2013 WL 1182963, at *3-5 (E.D. La. Mar. 21, 2013) (to the extent that OPA governs an oil spill, it displaces general maritime law).

     **1.**     **A Court May Not Consider A Particular Act Or Omission In Isolation (Question 3).**

In deciding whether treble fines under the CWA or punitive damages under maritime law are warranted, a court need not, and may not, consider a particular act or omission in isolation. That point has two corollaries: (1) a court may consider a series of related culpable acts or omissions by the defendant, and (2) a court must consider not only culpable conduct by the defendant, but also related exculpatory conduct. *See, e.g.*, 65 C.J.S. *Negligence* § 89; *Clements v. Steele*, 792 F.2d 515, 516 (5th Cir. 1986). Put differently, both negligent mistakes and deliberate precautions are equally relevant in assessing culpability. *See, e.g.*, *Milne v. USA Cycling Inc.*, 575 F.3d 1120, 1132 (10th Cir. 2009) (holding that the "undisputed steps that defendants took to enhance the safety of [a road race] would prevent any reasonable juror from finding gross negligence"). Indeed, a defendant's safety precautions can preclude a finding of gross negligence even when the defendant engaged in an entire series of negligent acts. *See, e.g., id.* ("[T]he organizers' failure to shut down the road, mark and enforce a center line on the road, more closely monitor vehicular traffic, or more thoroughly warn other area drivers of the upcoming race cannot, as a matter of law, amount to gross negligence in light of the other safety steps taken by the organizers of this race."). That holistic approach makes sense, because a defendant's deliberate safety precautions are *as* (if not ***more***) revealing about gross negligence or willful misconduct as its negligent mistakes.

Even putting safety precautions aside, a series of related negligent acts does not necessarily establish the culpability required for treble fines or punitive damages. A series of related negligent acts often proves nothing more than negligence, and a plaintiff's obligation to prove a defendant's culpability is not lessened when the defendant made more than one mistake. *See, e.g., Clements*, 792 F.2d at 517. Thus, a "series of mistakes alone, without a showing of

recklessness, is insufficient for a finding of gross negligence." *AT&T Co. v. City of New York*, 83 F.3d 549, 556 (2d Cir. 1996). Instead, "the negligent acts sought to be combined to produce liability must be related to a particular incident which, as an entirety, indicates recklessness." *Williamson v. McKenna*, 354 P.2d 56, 71-72 (Or. 1960).

In addition, plaintiffs who seek to imply a culpable mental state from a series of negligent acts must actually identify a responsible ***individual*** with the requisite culpable state of mind. "Individual acts of negligence on the part of employees—without more—cannot ... be combined to create a wrongful corporate intent." *Saba v. Compagnie Nationale Air France*, 78 F.3d 664, 670 n.6 (D.C. Cir. 1996). That is because, as the Fifth Circuit has explained, there is no such thing as "collective scienter." *Southland Secs. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 366 (5th Cir. 2004); *see also United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1122 (D.C. Cir. 2009) (*per curiam*) (collecting cases). Where a corporate defendant's state of mind is at issue, the Fifth Circuit "decline[s] to allow this element to be met by a corporation's collective knowledge, instead requiring that the state of mind 'actually exist' in at least one individual and not be imputed on the basis of general principles of agency." *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 241 (5th Cir. 2010). The individual who possesses the wrongful intent must, of course, be responsible for the corporation's wrongdoing; an honest mistake does not become grossly negligent because some ***other*** corporate agent acted recklessly on that day. *See Southland*, 365 F.3d at 366 (in the context of fraud, "the required state of mind must actually exist in the individual making (or being a cause of the making of) the misrepresentation, and may not simply be imputed to that individual on general principles of agency"). If no responsible individual possessed the proscribed intent, then neither did the corporate defendant: "[T]he agency relationship cannot transform negligence into willfulness." *Saba*, 78 F.3d at 670 n.6; *see*

14

*also United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1274 (D.C. Cir. 2010) ("'[C]ollective knowledge' provides an inappropriate basis for proof of scienter because it effectively imposes liability, complete with treble damages and substantial civil penalties, for a type of loose constructive knowledge ….").

## 2. A Court May Not Consider Conduct That Did Not Cause The Accident (Question 4).

In deciding whether treble fines under the CWA or punitive damages under maritime law are warranted, a court is limited to considering conduct that proximately caused (or—to the extent there is a difference—conduct with a "substantial nexus to") the accident.  Neither the CWA nor maritime law, in other words, allows a court to punish a defendant for acts unrelated to the accident.

With respect to the CWA, this point is manifest on the face of the statute, which allows treble fines only where an oil spill "was ***the result of*** gross negligence or willful misconduct" of the defendant.  33 U.S.C. § 1321(b)(7)(D) (emphasis added).  Such language, as the Supreme Court recently explained in construing another federal statute, "plainly suggests causation." *Pacific Operators Offshore, LLP v. Valladolid*, 132 S. Ct. 680, 690 (2012).  Nor is mere "but for" ***factual*** causation sufficient; rather, Congress legislates against the background rule that causation also includes a ***legal*** component.  *See id.* at 690-91; *see also id.* at 691-93 (Scalia, J., concurring in part and concurring in the judgment); *Holmes v. SIPC*, 503 U.S. 258, 267-68 (1992) (construing phrase "by reason of" in RICO).  Whether that legal component is characterized as traditional proximate cause or a "substantial nexus," there must be a "significant causal link" between the oil spill and the defendant's culpable misconduct. *Valladolid*, 132 S. Ct. at 691.  The CWA does not allow courts to punish defendants for conduct unrelated to an oil spill or to trace such a spill to all of its remote "but-for" causes.

15

The same rule applies in maritime law: "'Under the general maritime law, a party's negligence is actionable only if it is the "legal cause" of the plaintiff's injuries,' which is 'something more than "but for" causation—the negligence must be a substantial factor' in causing the injuries." *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 213-14 (5th Cir. 2010) (quoting *Donaghey v. Ocean Drilling & Explor. Co.,* 974 F.2d 646, 649 (5th Cir. 1992)). As a result, a defendant's "fault in the abstract does not give rise to liability. Instead, the fault must be a contributory and proximate cause of the damages sustained." *In re Mid-South Towing Co.*, 418 F.3d 526, 534 (5th Cir. 2005) (footnote omitted); *see also American River Transp. Co. v. Kavo Kaliakra SS*, 148 F.3d 446, 450 (5th Cir. 1998) (same). There is no such thing, in other words, as "[p]roof of negligence in the air." *Holtzclaw v. DSC Commc'ns Corp.*, 255 F.3d 254, 261 n.5 (5th Cir. 2001) (quoting *Palsgraf v. Long Island R.R.*, 162 N.E. 99, 99 (N.Y. 1928)).

### 3. A Court May Not Consider The Acts Of Agents Or Independent Contractors (Question 5).

In deciding whether treble fines under the CWA or punitive damages under maritime law are warranted, a court must focus on the conduct of the defendant, not the conduct of others. Put differently, a defendant may be subjected to civil punishment only for its *own* conduct.

In the maritime context, this principle has been established for almost two centuries. In *The Amiable Nancy*, 16 U.S. (3 Wheat.) 546 (1818) (Story, J.), the Supreme Court held that a vessel's owners could be subjected to *compensatory* damages, but not *punitive* damages, based on the captain's conduct:

> Upon the facts disclosed in the evidence, this must be pronounced a case of gross and wanton outrage, without any just provocation or excuse. Under such circumstances, the honor of the country, and the duty of the court, equally require that a just compensation should be made to the unoffending neutrals, for all the injuries and losses actually sustained by them. And if this were a suit against the original wrong-doers, it might be proper to go yet farther, and visit upon them in the shape of exemplary damages, the proper punishment which belongs to such

16

lawless misconduct.  But it is to be considered, that this is a suit against the owners of the privateer, upon whom the law has, from motives of policy, devolved a responsibility for the conduct of the officers and crew employed by them, and yet, from the nature of the service, they can scarcely ever be able to secure to themselves an adequate indemnity in cases of loss.  ***They are innocent of the demerit of this transaction, having neither directed it, nor countenanced it, nor participated in it in the slightest degree.  Under such circumstances, we are of opinion that they are bound to repair all the real injuries and personal wrongs sustained by the libellants, but they are not bound to the extent of vindictive damages.***

*Id.* at 558-59 (emphasis modified); *see also Lake Shore & Mich. S. Ry. v. Prentice*, 147 U.S. 101, 106-08 (1893) (citing *Amiable Nancy* for the general common-law rule that "[a] principal ... cannot be held liable for exemplary or punitive damages, merely by reason of wanton, oppressive or malicious intent on the part of the agent"); *see also* Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 5-17 (Supp. 2008) ("[A]dmiralty cases deny punitive damages in cases of imputed fault, holding that a principal or master cannot be liable for an agent or servant's wanton or willful misconduct unless it participated in or ratified the wrongful conduct.").  Thus, as the Fifth Circuit has explained, "punitive damages may not be imposed against a corporation when one or more of its employees decides on his own to engage in malicious or outrageous conduct. In such a case, the corporation itself cannot be considered the wrongdoer.  If the corporation has formulated policies and directed its employees properly, no purpose would be served by imposing punitive damages against it except to increase the amount of the judgment."  *P&E Boat Rentals*, 872 F.2d at 652.

In addition, as this Court has recognized, "'[a] principal generally is not liable for the offenses an independent contractor commits in the course of performing its contractual duties.'" Rec. Doc. 3830 at 28 (quoting *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548 (5th Cir. 1987)); *see also Romero v. Mobil Explor. & Producing N. Am.*, 939 F.2d 307, 310 (5th Cir. 1991). Indeed, this limitation on liability with respect to the acts of independent contractors applies to

*all* liability, and not merely *punitive* liability.  "There are two recognized exceptions to this general principle, in the case of an ultra-hazardous activity, or when the principal retains or exercises operational control."  Rec. Doc. 3830 at 28.  Neither exception applies here.  Again, as this Court has recognized, "[o]ffshore drilling operations are not considered ultra-hazardous." *Id.* (citing *Ainsworth*).  And BP did not retain "operational control" over its contractors.  To the contrary, the Transocean contract provided that "[Transocean] shall be solely responsible for the operation of the Drilling Unit" and that BP "shall have no direction or control of [Transocean] or its employees and agents except in the results to be obtained" (TREX 1356A ¶¶ 15.1, 18.1), and the Halliburton contract provided that "[Halliburton] shall act as an independent contractor with respect to the WORK and shall exercise control, supervision, management, and direction as to the method and manner of obtaining the results required by [BP]" (TREX 4477 ¶ 27.4); *see also* Rec. Doc. 3830 at 28 (observing that the Fifth Circuit "in *Ainsworth* did not find that this exception was met even when the principal had a company man present on the platform"); *Fruge ex rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558, 564 (5th Cir. 2003) (leaseholder who hires independent contractors to drill a well lacks operational control over the drilling contractors and is thus not vicariously liable for their failures); *Coulter v. Texaco, Inc.*, 117 F.3d 909, 912 (5th Cir. 1997) (same); *Wallace v. Oceaneering Int'l*, 727 F.2d 427, 437 (5th Cir. 1984); *McCormack v. Noble Drilling Corp.*, 608 F.2d 169, 174 (5th Cir. 1979) (same).

Nor may a principal be punished for the conduct of its independent contractors on the theory that it was "ultimately responsible" for a project.  Were that theory the law, the exception would swallow up the rule: principals by definition bear ultimate responsibility over the projects for which they hire independent contractors, and if such responsibility, without more, were sufficient to render principals liable for their independent contractors' conduct, principals would

invariably be subject to such liability.  That is not the law; to the contrary, "operational control," not "ultimate responsibility," over independent contractors is the relevant legal standard.  *See*, *e.g.*, *Fruge*, 337 F.3d at 564; *Coulter*, 117 F.3d at 912; *Ainsworth*, 829 F.2d at 550.  Thus, "[i]t is not enough that [the principal] has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations or deviations."  *Landry v. Huthnance Drilling Co.*, 889 F.2d 1469, 1471 (5th Cir. 1989) (quoting *Restatement (Second) of Torts* § 414, cmt. c (1965)); *accord* 41 Am. Jur. 2d *Independent Contractors* § 11 ("[A] general power of supervision and control of results—such that the relationship of employer and independent contractor is not changed—includes the right to inspect, the right to stop the work, the right to make suggestions or recommendations as to details of the work, and the right to prescribe alterations or deviations in the work.") (footnotes omitted).  The concept of "ultimate responsibility," thus, has no legal relevance in this context.

Nothing in the CWA suggests that Congress intended to depart from these traditional common-law norms.  To the contrary, the Act specifies that where "a violation ... was the result of gross negligence or willful misconduct of ***a person*** described in subparagraph (A), ***the person*** shall be subject" to treble fines.  33 U.S.C. § 1321(b)(7)(D) (emphasis added).  Thus, by its plain terms, the statute authorizes the imposition of treble fines ***only*** upon the "person" guilty of "gross negligence or willful misconduct."  The OPA provision governing liability caps provides a useful counterpoint.  That provision specifically authorizes vicarious liability where the incident was proximately caused by the gross negligence or willful misconduct of not only "the responsible party" but also "***an agent or employee of the responsible party***."  33 U.S.C. § 2704(c)(1) (emphasis added).  No such language appears in the CWA's treble-fine provision, underscoring

19

that Congress did not intend to authorize vicarious liability for such fines.  *Cf. Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotation omitted).

> **4.     A Court Must Consider Compliance With Government Regulations And Industry Standards (Questions 6 & 7).**

Finally, in deciding whether treble fines under the CWA or punitive damages under maritime law are warranted, it is highly relevant whether the challenged conduct complied with government regulations and industry standards.   Because "compliance with both federal regulations and industry practices is some evidence of due care," such compliance generally negates the culpability necessary to warrant punitive damages or treble fines.  *Richards v. Michelin Tire Corp.*, 21 F.3d 1048, 1059 (11th Cir. 1994); *see also* W. Page Keeton *et al.*, *Prosser & Keeton on the Law of Torts* § 36, at 233 n.41 (5th ed. 1984) ("In most contexts … compliance with a statutory standard should bar liability for punitive damages."); *Stone Man, Inc. v. Green*, 435 S.E.2d 205, 206 (Ga. 1993) ("[P]unitive damages ... are, as a general rule, improper where a defendant has adhered to environmental and safety regulations."); *Drabik v. Stanley-Bostich, Inc.*, 997 F.2d 496, 510 (8th Cir. 1993) ("[C]ompliance with industry standard and custom serves to negate conscious disregard and to show that the defendant acted with a nonculpable state of mind ...."); *Maxey v. Freightliner Corp.*, 665 F.2d 1367, 1376 (5th Cir. 1982) ("[C]ompliance with industry custom can be relevant evidence tending to negate an inference of gross indifference."); *AMW Materials Testing, Inc. v. Town of Babylon*, 584 F.3d 436, 454 (2d Cir. 2009) ("[P]laintiffs … do not argue on appeal that the decisions manifested gross negligence, nor could they in light of evidence that the decisions, far from representing an

extreme departure from the standards of ordinary care, fell well within industry standards.")
(internal quotation omitted).

Thus, while compliance with government regulations or industry standards does not invariably preclude an award of punitive damages or treble fines, courts have not hesitated to conclude that such compliance renders such awards inappropriate. *See, e.g.*, *Satcher v. Honda Motor Co*., 52 F.3d 1311, 1317 (5th Cir. 1995) (punitive damages improper where manufacturer failed to employ leg guards, because "no government or agency thereof has ever required them, … no independent testing or professional organization has ever recommended them, … [and] the industry as a whole categorically rejects the need for leg guards"); *Nader v. Allegheny Airlines, Inc.*, 626 F.2d 1031, 1035 (D.C. Cir. 1980) (defendant "may not be condemned as a wanton wrongdoer for conforming to the standards set and the practices approved by the agency charged with the duty of regulating it"); *Alley v. Gubser Dev. Co.*, 785 F.2d 849, 856 (10th Cir. 1986) (finding error "[i]n submitting the issue of punitive damages to the jury" where "[t]he record fails to establish that the defendants did anything other than conform to industry standards").

It does not follow, however, that any and every regulatory violation necessarily establishes sufficient culpability to warrant punitive damages or treble fines. "Mere violation of a statute or regulation, without more, does not constitute willful and wanton misconduct." 57A Am. Jur. 2d *Negligence* § 247. Especially in a highly regulated field like offshore drilling, not every regulatory violation establishes a culpable state of mind—a point this Court has recognized by holding that the violation of a generic regulation against conduct that results in oil spills does not establish the culpability necessary to negate the OPA liability cap. *See* Rec. Doc. 5809 at 12-14. And, for the reasons discussed above in Subpart (2), regulatory violations are immaterial to the extent they did not ***cause*** a particular accident. *Cf. Gehl by Reed v. Soo Line R.R.*, 967 F.2d

21

1204, 1207 (8th Cir. 1992).  Indeed, the OPA liability cap does not apply where "the incident was proximately caused by ... (A) gross negligence or willful misconduct ... *or* (B) the violation of an applicable Federal safety, construction, or operating regulation," 33 U.S.C. § 2704(c)(1), which underscores that Congress could not have believed that a regulatory violation was "gross negligence or willful misconduct" *per se*.

## II.     The Facts Here Do Not Remotely Establish The Culpability Necessary To Subject BP To Treble Fines Under The CWA Or Punitive Damages Under Maritime Law.

In light of the foregoing legal principles, it is clear that the facts established at the Phase One Trial do not remotely establish the culpability necessary to subject BP to treble fines under the CWA or punitive damages under maritime law.   Drilling the Macondo well was a collaborative endeavor in which BP, Transocean, and Halliburton all played very substantial roles.   The accident was the result of a series of actions and omissions by independent entities that combined to overcome state-of-the-art safety systems, and no conduct attributable to BP warrants treble fines or punitive damages.   Nor may BP be subjected to such punishment based on an aggregation of disparate conduct that did not proximately cause the accident.   Each of these points is discussed in turn below.

### A.     Drilling The Macondo Well Was A Collaborative Endeavor In Which BP, Transocean, And Halliburton All Played Very Substantial Roles.

The construction of the Macondo well was a collaborative effort involving various entities and personnel, including well operator BP, drilling contractor Transocean, and cement contractor Halliburton.   (Tr. 4682-83 (Newman); TREX 41215; Tr. 2177-78 (Heenan); Tr. 3014 (Probert); Breazeale Dep. 25 ("[I]t is a team effort to drill the well."); Tr. 8584-85 (Guide); Tr. 1849 (Ezell); Tr. 8012 (Robinson) ("It's never run as a single individual in command and

control.  It's a collaborative effort among a team."); *see generally* FFCL §§ II.A, II.B.)  The roles and responsibilities of each of these entities are discussed below.

### 1.    BP

BP, one of the largest operators in the Gulf of Mexico and around the world, drew upon its experience to design and plan the Macondo well.  BP leased the MC 252 block from the United States, studied the geology, and designed the well.  BP's drilling engineers served as the well "architects" and coordinated the well planning.  (*See generally* FFCL §§ V.A, V.B.)

BP engineers began planning the Macondo well in early 2009 by, among other things, preparing a drilling program outlining the steps necessary for a safe and efficient operation.  (Tr. 8590-91 (Guide); TREX 1 (Bly Report) at 16.)  In particular, BP followed its robust and systematic well planning process, known as "Beyond the Best—Common Process" (BtB), which includes geological review, risk assessments, and independent peer review assessments.  (Jassal Dep. 344-46; TREX 6066; Tr. 8635-38, 8642-43 (Guide).)  There was nothing unreasonable about the design of the Macondo well.  (Tr. 5032 (Barnhill).)  To the contrary, the Minerals Management Service (MMS), the federal agency then responsible for overseeing offshore drilling, independently reviewed and approved the Macondo Application for Permit to Drill (APD), modifications and revisions to that APD, and BP's exploration plan.  (Saucier Dep. 58, 92-93, 209-10, 228, 261-63, 296-97, 307-08, 311-12; Patton Dep. 28-29, 45-46, 51-52.)

BP reviewed the drilling plan with its contractors at a series of crew engagement meetings (also called "pre-spud meetings").  (Tr. 8643 (Guide); Tr. 6186-89 (Ambrose).)  During a typical pre-spud meeting, "the drilling contractor, along with the operator and all the operator's third parties, will get together their subject matter experts and start at the beginning of the well and go through the entire well program and discuss up sides, down sides, potential hazards, risks,

and accept recommendations from the entire team of how to change or modify the well program, if needed." (McMahan Dep. 170-71; Tr. 8643 (Guide) ("[W]e would go through the well plan line by line in some cases and hole section by hole section and identify any potential issues. And, if necessary, we would modify the program.").)

Once drilling began, BP's wellsite leaders were present on the rig to oversee the contractors' execution of the plan. On the rig, BP typically had two wellsite leaders who worked alternating shifts, as well as a rig clerk who coordinated logistics and periodically other specialty personnel. In contrast, Transocean—as the rig owner and drilling contractor—typically had around 80 personnel living and working on the rig at any given time. (*See* D4275.) Representatives from Halliburton and other contractors made up the remainder of the personnel on the rig. The two BP wellsite leaders monitored operations through inspections and routine daily and weekly meetings with the rig crew and other contractor employees. (D4369-70; *see also* Tr. 1969-71, 1973-75 (R. Sepulvado); Tr. 8919-20 (Guide); Tr. 1878-79 (Ezell).) The wellsite leaders, in other words, were not responsible for executing the day-to-day operations, but rather performed an oversight function. (Tr. 1921 (R. Sepulvado); Tr. 1848-49 (Ezell); Tr. 4690-91 (Newman); Tr. 7528-29 (Bourgoyne).) Additional BP personnel onshore monitored the progress of the well through daily meetings and frequent telephone and e-mail contact with the wellsite leaders, as well as direct communications with their counterparts at Transocean, Halliburton, and the other contractors. (D4369; Tr. 8919-20 (Guide); Tr. 1969 (R. Sepulvado).) The BP onshore personnel adjusted the plan as necessary in response to the dynamic events common in deepwater drilling. (*See*, *e.g.*, Tr. 2057 (R. Sepulvado); Tr. 4723-24 (Newman).)

2.      **Transocean**

Transocean is a leading international provider of offshore contract drilling services for energy companies.   Building on decades of experience with the most sophisticated rigs, Transocean specializes in drilling oil and gas wells in technically demanding environments.  (*See generally* FFCL § II.C.1.)

a.      **Transocean Owned And Provided The *Deepwater Horizon*, A State-Of-The-Art Rig.**

The *Deepwater Horizon* was one of Transocean's "best-performing rigs" with "an exemplary track record" drilling deepwater wells.  (Tr. 4681-82 (Newman); D4341; D6569; *see generally* FFCL § II.C.1.)   Since entering into service in 2001, the *Deepwater Horizon* had successfully drilled about 50 wells in the Gulf of Mexico, all but one for BP.  (Tr. 1641; 1767-68; 1847 (Ezell); Tr. 4683 (Newman); D4341; TREX 52647.)   These included the Tiber well, which set a record in September 2009 as the world's deepest oil and gas well (with a total depth of 35,050 feet, almost twice that of the Macondo well).  (Tr. 1769-70 (Ezell); Tr. 4267-68, 4448 (Barnhill); Tr. 4680 (Newman); Tr. 8230-31 (Shaw); Tr. 8597-98 (Guide); TREX 5642.4.4.BP.)

The *Deepwater Horizon* had an excellent safety record: as of April 20, 2010, it had gone seven years without a single person missing work due to injury.  (Tr. 8228-29 (Shaw); Tr. 8603-04 (Guide); Tr. 1848 (Ezell).)   In the words of Patrick O'Bryan, BP's vice president of Drilling & Completions in the Gulf of Mexico at the time of the accident, the *Deepwater Horizon* represented what "good looks like."  (Tr. 9264-65 (O'Bryan); *see also* Tr. 8234 (Shaw).)

b.      **Transocean's Safety Management System Applied Aboard The *Deepwater Horizon*.**

Under its contract with BP, Transocean was solely responsible for the day-to-day operations of the *Deepwater Horizon*.  (TREX 1356A.20.4.BP; Tr. 4529-30, 4690-91 (Newman);

25

Rose Dep. 64-66; TREX 1 at 208; Transocean's Resp. to BP's 1st Set of Requests for Admission at 7-8 (7/15/11); FFCL §§ II.C.2.c., II.C.3.)   In particular, Transocean's drill crew was responsible for implementing the Macondo well program and drilling the well.  (Tr. 1637 (Ezell); Tr. 4389 (Barnhill); Tr. 617 (L. McKay).)   In addition, under its contract with BP, Transocean accepted "primary responsibility for the safety of all its operations," including a duty to "take all measures necessary or proper to protect the personnel and facilities" and to "place the highest priority on safety while performing the work."   (TREX 1356A.22.1.BP; Tr. 4643, 4692-93 (Newman); Tr. 402 (Bea); Rose Dep. 64-66.)   Industry practice also dictated that the drilling contractor's safety management system governed on its rigs.  (Tr. 4699-701 (Newman); Tr. 1188 (Bly); Tr. 9252 (O'Bryan); Tr. 8053-55 (Shaw).)   And, because it owned the vessel, Transocean and its marine crew were responsible for the rig's safety management system not only by contract and industry practice but also by international maritime law as expressed in the International Safety Management Code.  (Tr. 9448-49 (Mitchell); TREX 938 at 12; Tr. 5930-31 (Ambrose); Tr. 1637-38 (Ezell); Wolfe Dep. 115-18; TREX 40011 at 12, 31-34, 45; Tr. 4189-90 (Webster).)

The application of Transocean's safety management system aboard the *Deepwater Horizon* was also Transocean's preference and worldwide practice, as its CEO, Steven Newman, confirmed at trial.  (Tr. 4699-701 (Newman).)  The Macondo drilling program specified that the goal of zero incidents and no harm to people, environment, or equipment was to be accomplished by "[f]ully implementing Transocean's Health & Safety Management System."  (TREX 41222; Tr. 4704 (Newman); TREX 7685 at 4.)

As the owner of the *Deepwater Horizon*, Transocean prepared a Major Accident Hazard Risk Assessment (MAHRA) for the rig.  (TREX 2187 at 2; Tr. 4714-15 (Newman).)  Such an

26

assessment "shows that major hazards have been identified, the risk associated with those hazards has been qualitatively assessed and that the preventive and mitigating controls necessary to reduce the risk to [as low as reasonably practical] have been identified."   (TREX 1449.132.1.BP; Tr. 4714 (Newman).)   In the *Deepwater Horizon* MAHRA, Transocean identified "Reservoir blowout (at Drill Floor)" as an anticipated hazard, and described the preventions for such a blowout: "Well control procedures and training of drill crew in well control; Maintenance and testing of BOP's and other subsea and well control equipment; Instrumentation and indication of well status; Hydrocarbon/Combustible Gas detection system; Redundant [blowout preventer] controls."  (Tr. 4716-18 (Newman); TREX 2187; TREX 2188; Tr. 4205-07 (Webster); D4401 at 3-5 (Reservoir Blowout Hazard).)   The MAHRA also identified gas in the riser as a potential hazard, noting consequences such as possible ignition at the surface with fire/explosion.  (Tr. 4624-27 (Newman) (agreeing that Transocean had full knowledge of the hazard and consequences of gas in the riser); TREX 2187; TREX 2188.)  BP required risk mitigations for each those hazards, and those mitigations were in place.  (TREX 1356A at 20-23; TREX 48159; TREX 5691; TREX 4171; Tr. 8065-71 (Shaw); Tr. 9240-41 (O'Bryan).)

          c.       **Transocean Was Responsible For Well Monitoring And Well Control.**

As the drilling contractor, Transocean had responsibility for maintaining control of the Macondo well from the moment the blowout preventer (BOP) latched to the wellhead until the BOP was removed and the rig moved away.  (Tr. 4450-52 (Barnhill); Tr. 4727 (Newman); TREX 63213 (Transocean Guilty Plea Agreement, Ex. A ¶ 3) (duty to maintain well control also entailed responsibilities related to conducting safe drilling and rig operations, ensuring the safety of personnel onboard, and preventing accidents that could impact the environment); FFCL

§ II.C.4.)   Transocean agreed to "use all reasonable means to control and prevent fire and blowouts and to protect the hole."   (TREX 1356A.20.5.BP (Drilling Contract); Tr. 4691-92 (Newman); Rose Dep. 64-66.)   In particular, Transocean was responsible for kick detection, which included monitoring the well at all times and shutting it in quickly and safely if a kick were indicated or suspected.  (Tr. 4430-31 (Barnhill); Tr. 464 (Bea); Tr. 7579 (Bourgoyne), TREX 1454 at 18.)

Transocean's obligation to monitor the well vigilantly at all times was not contingent in any way on the well design, the type of rig activity taking place, or the stage of the well operation.  (Tr. 4451-53 (Barnhill); Tr. 7369-70 (Beck); Tr. 6226-27 (Ambrose); Tr. 4726-27 (Newman) (driller's responsibility to monitor well not contingent on type of cement used, type of casing run into the hole, number of centralizers used, or assessment of pore pressure or fracture gradients); Saucier Dep. 192-94, 223; Tr. 1827 (Ezell); TREX 8173 (Bourgoyne Report) ("The well must be continually monitored even if you have a tested downhole barrier in addition to the hydrostatic pressure of the mud and especially when the hydrostatic pressure barrier is being intentionally removed.").

### d.   Transocean Owned And Maintained The BOP.

BOPs play a vital safety role in offshore deepwater drilling, where the wellhead may be thousands of feet underwater and inaccessible to the drill crew, and are designed not only to prevent a blowout from occurring but also to control a blowout once underway.  (TREX 40008 at 3; Tr. 3796 (Webster); Tr. 4659-60 (Newman); Thierens Dep. 25; Stringfellow Dep. 558, 687-88; Tr. 9128 (Shanks); FFCL § II.C.2.d.)  "BOPs are designed to quickly shut off the flow of oil or natural gas in the case of a kick or blowout during drilling operations …."  (TREX 40008 at 6.)  As Cameron, which supplied the *Deepwater Horizon*'s BOP, has explained, "when the BOP

is called on to function in an emergency situation, it is the main barrier protecting human life, capital equipment and the environment.  Therefore, it must function without fail." (TREX 3186.)

Transocean, as rig owner, was responsible for ensuring that equipment, including the BOP, was fit for use and would function without fail.  (Tr. 4658-60, 4694-95 (Newman); *see also* Tr. 3750 (Webster); Tr. 1942 (R. Sepulvado); Tr. 5251-52 (Childs); Boughton Dep. 63, 246; Stringfellow Dep. 439.)   Under its contract with BP, Transocean was obligated to furnish equipment, including a BOP, "in good condition to sufficiently meet the applicable CONTRACT requirements and good oilfield practices," and to maintain the BOP "at optimal operating condition, in accordance with good oilfield practices," and "in a condition to permit its continuous and efficient operation." (TREX 1356A ¶¶ 14.1, 14.1.1).)  In addition, the contract specified that "[t]he Drilling Unit shall be fully equipped as specified," that it "is capable of operating to its full capacity as rated by the manufacturer," and that it "is mechanically capable of drilling wells in water depths and during environmental conditions, as specified." (*Id.* ¶¶ 14.1, 14.3).)  Transocean understood and acknowledged its responsibility for effectively operating and maintaining the *Deepwater Horizon* BOP.  (Tr. 4658-60 (Newman); Keeton Dep. 357; Trahan Dep. 18-19, 188; Boughton Dep. 63, 246-49; Stringfellow Dep. 238-39, 379, 439; Hay Dep. (Vol. 1) 347; Odenwald Dep. 187-88; Pleasant Dep. 345, 353-54; Sannan Dep. 359; Ambrose Dep. 165; Winslow Dep. 459-60; P. Johnson Dep. 356.)  And Transocean knew that BP relied on Transocean to meet those responsibilities.  (Odenwald Dep. 187-88; Thierens Dep. 41-42.)  BP personnel, in contrast, had no direct responsibility for BOP maintenance, did not supervise Transocean's Subsea Department in carrying out those responsibilities, and were not authorized to operate the BOP.   (Moore Dep. 196; Stringfellow Dep. 380-81; Tr. 1935, 1942 (R. Sepulvado); J. McWhorter Dep. 289-90; Wong Dep. 474; Thierens Dep. 41.)

Transocean was similarly required to supply a BOP that complied with all applicable regulations, and to "use, test, and maintain blowout prevention equipment in accordance with all applicable governmental rules, regulations, and orders then in effect." (TREX 1356A ¶ 14.5; *see also id.* ¶¶ 1.20, 1.30) ("All equipment shall comply with MMS regulations.").) Indeed, Transocean's own expert confirmed that Transocean was required to ensure that the *Deepwater Horizon*'s BOP was adequate for the Macondo well, including assessing the BOP's shearing capacity in accord with Transocean's own Well Control Handbook. (Tr. 5251-52 (Childs); *see also* TREX 1454; Trahan Dep. 224-25; Stringfellow Dep. 563-64.)

### 3.   Halliburton

Halliburton is a leading offshore drilling contractor that holds itself out as "the world's largest cementing company and the world's premium supplier of foam cement." (Tr. 2982-83 (Probert); Tr. 6206 (Ambrose); TREX 2128; FFCL § II.D.4.a.) Accordingly, BP reasonably relied on such expertise in contracting with Halliburton to provide a variety of services at the Macondo well, including cement slurry recommendations, cement design and testing, cement job planning, cement job execution, cement job evaluation and reporting, mud logging, directional drilling, and real-time data services. (Tr. 2481 (Benge); Kellingray Dep. 673; Tr. 2916-17 (Probert); TREX 7346 at 45 (Probert Congressional Testimony); Tr. 3186-91 (Roth); TREX 60394.83a.TO, TREX 60394.83b.TO.)

### a.   Halliburton Was Responsible For Designing, Testing, And Pumping The Cement.

On the Macondo well, Halliburton's "primary responsibility ... [was for] the specific slurry design and testing of the slurry and then pumping the slurry into the well." (Tr. 7264 (Beck); FFCL § II.D.4.b-f.) Halliburton had exclusive control over pre-job cement testing and was solely responsible for conducting tests on the cement. (Tr. 919 (Bly); Tr. 6206 (Ambrose);

Tr. 2276-77 (Benge); Tr. 7264 (Beck); Tr. 3188 (Roth); Kellingray Dep. 424.)  BP reasonably relied on Halliburton to conduct such testing and provide BP with information about the results. (Tr. 2479 (Benge); Kellingray Dep. 424.)

> **b.      Halliburton Was Also Responsible For Monitoring The Well.**

Through its Sperry subsidiary, Halliburton was also responsible for providing "mud logging" services to monitor the Macondo well.  (Tr. 3015 (Probert); TREX 4477 ¶ 10; *see generally* FFCL §§ II.D.1, II.D.2.)  Under the BP-Halliburton contract, the "prime responsibility of the Mud Logging service" was "well monitoring and safety."  (TREX 4477 ¶ 10.10).)  This included "continuous monitoring of operations" on the *Deepwater Horizon* and "advis[ing] [BP] and [Transocean] personnel of any situation developing with safety or efficiency implications." (*Id.* ¶ 10.2; Bement Dep. 136-37; *see also* Tr. 4455 (Barnhill).)  The Halliburton mud loggers monitored the well from a dedicated area with equipment owned and maintained by Halliburton. (Tr. 3639-40 (Keith).)  They were a part of the "first line of defense" for well control and served as a "second set of eyes" for well monitoring.  (Tr. 3550 (Keith); Tr. 4388 (Barnhill); Tr. 2137-38 (Heenan); Bement Dep. 200-01; TREX 5185 at 4.)

> **B.      The Accident Was Caused By A Series Of Acts And Omissions By Independent Entities That Overcame State-Of-The-Art Safety Systems, And No Conduct Attributable To BP Warrants Treble Fines Or Punitive Damages.**

The purpose of the Phase One trial, as this Court has explained, was to "address issues arising out of the conduct of various parties … allegedly relevant to the loss of well control at the Macondo Well, the ensuing fire and explosion on the MODU DEEPWATER HORIZON on April 20, 2010, and the sinking of the MODU DEEPWATER HORIZON on April 22, 2010, and the initiation of the release of oil from the Macondo Well or DEEPWATER HORIZON during

31

those time periods." (Rec. Doc. 4083 at 2.) The trial record established that there is little factual dispute about these issues. (*See generally* FFCL § IV.)

By April 20, 2010, the Macondo well had been drilled to its total depth, cased, and cemented, and was in the final stages of temporary abandonment. Consistent with industry standards, *four* independent barriers were in place to prevent an ordinary kick from turning into an extraordinary blowout: (1) cement over the reservoir, (2) well integrity testing, (3) well monitoring and well control, and (4) a blowout preventer. But on that April day, every one of these barriers failed, in succession, for independent reasons, through the acts or omissions of independent entities and individuals. None of those failures, either alone or in combination, remotely establishes the culpability necessary to subject BP to treble fines or punitive damages. Each of those failures is addressed in turn below.

### 1.   Halliburton Personnel Failed To Design, Test, And Pump A Cement Slurry That Secured The Wellbore.

The first barrier to fail on April 20, 2010, was the cement recommended, designed, tested, and pumped by Halliburton. (*See generally* FFCL § V.I, VI.A-J.) Cement is intended to serve as the primary barrier to the reservoir upon abandonment of a well. (Tr. 3010 (Probert).) At the Macondo well, Halliburton recommended using a dry blend mix left over on the rig from a previous job. (Tr. 6618-22, 6811, 6817 (Gagliano); Tr. 2336, 2490-91, 2495-98 (Benge); Tr. 3187-98 (Roth); *see also* Nguyen Dep. 253; Dugas Dep. 224, 234-35; TREX 7484.) Nothing prevented Halliburton from using a new cement blend, and there is no evidence that BP asked to use the leftover cement. (Tr. 6821-22 (Gagliano); Tr. 2500 (Benge).)

There is no dispute that foam cement, when properly designed, helps improve mud displacement, addresses gas flow potential, and protects the formation. (Tr. 6374-75 (Chaisson); TREX 2129; Cunningham Dep. 125.) While Halliburton is the world leader in foam cement, it

recommended a design for the Macondo well that included proprietary additives that made the cement unstable. (Tr. 2982-83 (Probert); Tr. 3193, 3241-43 (Roth); Tr. 6621-22 (Gagliano); Tr. 2270, 2334-36, 2524-25 (Benge); Tr. 4904-05 (Quirk); TREX 4348 at HAL_1124604; TREX 5570 at 3; D4381 (D-Air Should Not Be Used in Foam Cement); D4687 (Halliburton Pre-Incident Viking Information).) The impropriety of the "defoamer" in the foam cement that Halliburton used on the Macondo well is explicit in Halliburton's own internal best practices guidelines, and the resulting instability of the cement was evident in Halliburton's pre-job testing. (Tr. 6623-24, 6720 (Gagliano); Tr. 3130-31, 3193-94 (Roth); Tr. 2524-25 (Benge); D4381; D4269A; D4687.) Although numerous tests showed instability, ***Halliburton never alerted BP that there was any problem with the stability of the foam slurry that Halliburton designed and recommended for the Macondo well***. (Tr. 2512-17 (Benge); D4269A; D4309A.) Post-accident testing done by Halliburton, Chevron, and OTC—including OTC testing on behalf of the U.S. Government of the exact Macondo blend taken from the rig—all showed the instability of the cement design. (Tr. 3185 (Roth); Tr. 4760-61 (Quirk); Garrison Dep. 28-29; Gardner Dep. 90; R. Morgan Dep. 13-21; TREX 4572 at 1-2; TREX 5937; TREX 7718.)

Precisely because cement is the primary barrier to the flow of oil from a well, unstable cement can result in lack of zonal isolation and well-control issues. (Gardner Dep. 93.) Hydrocarbons can flow through unstable foam cement made permeable by bubble breakout, which prevents zonal isolation. (Tr. 2471 (Benge); Garrison Dep. 272.) In this case, Halliburton's slurry failed to provide isolation, and hydrocarbons were allowed to enter the wellbore when the well became underbalanced during the displacement of drilling mud in preparation for abandonment. (Tr. 1376 (Bly); Tr. 3010 (Probert); Tr. 6710 (Gagliano); Tr. 6214 (Ambrose); Tr. 2242 (Benge); Tr. 2612 (Calvert); TREX 1 at 25.)

Needless to say, the failure of Halliburton's cement job provides no basis for subjecting BP to treble fines or punitive damages. Halliburton was an independent contractor with a sterling reputation in this field, and (as explained above in Part I.C.3) a principal is not liable—for either compensatory or punitive damages—for the failures of its independent contractors. *See*, *e.g.*, *Romero*, 939 F.2d at 310 (rejecting contention that "a platform owner who is otherwise free of negligence and who hires an experienced independent contractor and assigns to that contractor some rather routine work should be legally responsible for the negligent work methods utilized by that contractor").[5]

### 2.   Transocean And BP Personnel Both Erroneously Interpreted The Negative Pressure Test.

After the cement was pumped, the crew conducted a series of well integrity tests, including a seal assembly test, a positive pressure test, and a negative pressure test. The well passed the first two tests. (D4352; TREX 1 at 23; D4353; Tr. 1406-07 (Bly).) Although government regulations did not require a negative pressure test, BP nonetheless included such a test as part of its temporary abandonment procedure. (TREX 570; *see also* Saucier Dep. 191; Patton Dep. 245; Trocquet Dep. 146-47; *see generally* FFCL § V.J.5.)

The crew conducted the negative pressure test by placing the well in a controlled underbalanced condition. (Tr. 1672-73 (Ezell); Tr. 2075-77 (Heenan).) The crew then monitored the drill pipe, consistent with its past practice. (Tr. 1675 (Ezell); Tr. 1327-28 (Bly); TREX 1 at 24, 85.) Even after accounting for spacer leaking past the annular preventer, the crew

---

[5] In their complaints, both Transocean and Halliburton seek contractual indemnity from BP. Those requests are meritless. (*See generally* FFCL § XX.) Indeed, BP has contribution claims against both contractors, although it has assigned certain of those claims to the class created under the Economic and Property Damages Settlement approved by this Court. (*See generally* FFCL § XXI.)

saw 1200 psi of pressure when monitoring the drill pipe during this first test—a result inconsistent with a successful test.   (Tr. 2077-78 (Heenan) Tr. 7924 (Robinson); TREX 37031.22.BP.)

The team discussed this result, and Transocean Toolpusher Jason Anderson suggested that the pressure on the drill pipe was caused by annular compression (or the "bladder effect"), a phenomenon that the Transocean rig crew purported to have previously witnessed.   (Tr. 2222 (Heenan); Tr. 4481 (Barnhill); Tr. 7209-10 (Beck); Tr. 1096 (Bly); Tr. 8939-41 (Guide); TREX 1 at 89.)   BP wellsite leader trainee Lee Lambert testified that he asked Anderson where the pressures were coming from, and that Anderson explained that the heavy mud weight in the riser would transmit pressure through the annular preventer into the wellbore which would, in turn, be seen on the drill pipe.   (Tr. 8280-81 (Lambert).)   Lambert further testified that Anderson indicated that he had seen the bladder effect before, and that it was normal.   (*Id.*)   After some discussion, the rig crew and the wellsite leaders accepted Anderson's explanation and decided to proceed.   (Tr. 1096 (Bly); TREX 1 at 89; Tr. 7932-33 (Robinson).)

As the negative pressure test was being conducted on the drill pipe, BP wellsite leader Don Vidrine suggested that the test should be monitored on the kill line, in accordance with the MMS-approved permit.   (Tr. 1675, 1679, 1801 (Ezell); Tr. 1328-29 (Bly); Tr. 7206 (Beck); TREX 1 at 85.)   Transocean Senior Toolpusher Randy Ezell told Anderson to "stop the job" and have a safety meeting to make sure everyone was on the same page before continuing the negative pressure test.   (Tr. 1680 (Ezell).)   The negative pressure test was thereafter completed on the kill line rather than the drill pipe.   (Tr. 4334-35 (Barnhill); TREX 5 at 2.)

During the negative pressure test on the kill line, a small amount of fluid (0.2 bbls) flowed from the kill line, but no further flow was observed for 30 minutes.   (Tr. 7924

(Robinson); TREX 37031.13.2.BP; TREX 1 at 39, 86; TREX 3573 (Vidrine-Kaluza joint handwritten statement); TREX 3576.)  During this time, however, the pressure on the drill pipe gradually increased to 1400 psi and then stabilized.  (TREX 1 at 39, 86; Tr. 7924 (Robinson); TREX 37031.13.2.BP; TREX 3573; TREX 3576.)  Although the drill pipe pressure remained constant at 1400 psi, the absence of flow from the kill line for 30 minutes led the Transocean rig crew and BP wellsite leaders to believe the negative pressure test on the kill line was successful. (Tr. 4336 (Barnhill); TREX 3573 ("Successful negative test monitored at the kill line.").)

In hindsight, there is no dispute that the negative pressure test provided multiple indications that the wellbore was not secure.  Despite the anomalous pressure indications, both the Transocean rig crew and the BP wellsite leaders—with more than a century of collective experience—mistakenly believed that the negative pressure test was successful and that the wellbore was secure.  (Tr. 4345 (Barnhill); Tr. 961 (Bly); Tr. 6229 (Ambrose); TREX 1 at 10, 88.)  Nor is there any dispute that the misinterpretation of the negative pressure test was one cause, among others, of the accident.  (Tr. 609 (L. McKay).)  Indeed, BP has pleaded guilty to negligence (but not gross negligence or willful misconduct) as charged in an information brought by the U.S. Government based upon the mistaken interpretation of the negative pressure test. (*See* TREX 89052.)  But just because both Transocean and BP personnel misinterpreted the negative pressure test does not mean that either entity was guilty of "gross negligence or willful misconduct" under the CWA or "willful, wanton, or outrageous conduct" under maritime law. This was a terrible mistake, but it was still a mistake.  *See*, *e.g.*, *Becker*, 586 F.3d at 367 ("'Mere inadvertence or honest mistake does not amount to gross negligence.'") (quoting *Halliburton*, 269 F.3d at 531).

As a threshold matter, there was no extreme deviation from the standard of care. Transocean was an expert contractor with vast experience in performing and interpreting negative pressure tests, and BP wellsite leader Vidrine's decision to accept the expert opinion of Transocean's experienced crew that the test was successful was at most ordinary negligence. *See Southern Farm Bureau Cas. Ins. Co. v. McKenzie*, 252 F.2d 195, 200 (5th Cir. 1958) ("Having hired a competent contractor who enjoyed a good reputation in the community and was as 'good as any you can get,' [the defendant] had every reason to believe that the wiring had been installed in a safe and workmanlike manner.").

In addition, the misinterpretation of the negative pressure test did not display the requisite culpable mental state. To the contrary, the fact that BP and Transocean undertook the test (which no regulation required) in the first place shows that they were not proceeding with conscious indifference. The evidence is undisputed that both Transocean and BP personnel honestly—albeit mistakenly—believed that the negative pressure test was a success. For example, Transocean OIM Jimmy Harrell was "very aware of the rig operations" and believed that "[t]hey had conducted successful inflow test/pressure test. No flow on flowcheck." Tr. 4738-39 (Newman); TREX 1472 (e-mail from A. Rose to L. McMahan); *see also* P. Johnson Dep. 403 (both Harrell and Ezell were satisfied that "the barriers had been suitably tested," and that "the negative pressure test had been conducted"); Tr. 1682, 1805 (Ezell) (Harrell and Anderson both told Ezell it was a good test); Tr. 6233-34 (Ambrose); TREX 50296 at 3 (Transocean Investigation Team Interview of R. Ezell).) Nor is it credible to suggest that anyone on the rig would have permitted abandonment to proceed if they had any doubt about the test results; all of those involved would sleep on the rig that night, and were thus putting their own lives on the line. (Tr. 2123 (Heenan); Tr. 4481 (Barnhill); Tr. 7527 (Bourgoyne).) Indeed, the

testing of the well took almost three hours, was repeated, and discussed at length—all signs of people trying in good faith to get to the right answer.

Finally, the misinterpretation of the negative pressure test was far from the sole cause of the accident.  (Tr. 1092-93 (Bly) ("[I]t wasn't any one action or inaction; … there were interlinked things, there were multiple factors, including designs, operating steps, etcetera, and multiple people, work teams and multiple companies were involved over time."); *see also* Tr. 6183-84 (Ambrose).)  Even after the negative pressure test failed to reveal Halliburton's inadequate cement job, two more redundant barriers to a blowout—Transocean's and Halliburton's well monitoring and well control responsibilities, and Transocean's BOP—had to, and did, fail.  Those failures are discussed below.

### 3. Transocean And Halliburton Personnel Failed To Monitor The Well And Take Appropriate Well Control Actions.

Notwithstanding the erroneous conclusion that the negative pressure test had been successful, Transocean and Halliburton personnel still had ongoing duties to monitor and control the Macondo well.  (Tr. 4658 (Newman); Tr. 1104 (Bly); TREX 1 at 25); *see generally* FFCL §§ V.J.6-8.)  As the well started to flow after 9:00 PM, these individuals failed to act in accordance with their training, and failed in their responsibility to prevent the reservoir blowout at the drill floor.  (Tr. 2208 (Heenan); Tr. 4387-88, 4430 (Barnhill); Tr. 7579 (Bourgoyne); Tr. 3489-90 (Keith).)

Just before 9:00 PM—nearly an hour after the negative pressure test had been deemed successful and the rig crew had continued with displacement—the well became underbalanced. Within minutes, the well provided numerous signals that a "kick" was underway.  There is no material dispute regarding the timing of the flow or that hundreds of barrels entered the well

before the blowout.  (Tr. 7801-02, 7816-17 (Emilsen); Tr. 4458-59 (Barnhill); TREX 40003 at 7-9 (Emilsen Expert Report); D4861.)

Plaintiffs' expert Robert Bea identified well control as "the most important process safety event" on a rig like the *Deepwater Horizon*.  (Tr. 464 (Bea).)  And Transocean executive Larry McMahan observed in an e-mail sent to the *Deepwater Horizon* that well control is "one of the more important aspects of our business and ***one that we are 100% responsible/accountable for*** when the sh*t hits the fan. … it's critical we catch and react ASAP."  (TREX 7651 (emphasis added) (Transocean is "100% responsible/accountable" for well control); *see also* Tr. 4725 (Newman); Tr. 6124, 6244-46 (Ambrose); Tr. 3447-48 (Perkin); McMahan Dep. 271; Lee Dep. 289-90; Transocean's Resp. to BP's 1st Set of Requests for Admission at 61 (7/15/11); Tr. 4430 (Barnhill); Tr. 7280 (Beck) ("They [the drill crew] have the first and foremost responsibility to detect kicks, and they have the responsibility to shut the well in when they do detect a kick."); Tr. 8928 (Guide) (Transocean responsible for well control on the *Deepwater Horizon*). Transocean Senior Toolpusher Randy Ezell described well control as the rig crew's "primary goal," (Tr. 1854 (Ezell)), not only on the *Deepwater Horizon* but across the industry (Tr. 4723-24 (Newman); Tr. 2188 (Heenan); Tr. 4261, 4270, 4455 (Barnhill).)  Industry standards require that a well be immediately shut in upon detection or suspicion of a kick.  (Tr. 7780 (Bourgoyne); Tr. 2188 (Heenan).)

The Halliburton mud logger was also required to continue monitoring the well after the negative pressure test.  (Bement Dep. 137-38.)  The mud logger on duty that night confirmed that he saw anomalous pressure indications between 9:01 and 9:08 PM, and again between 9:08 and 9:14 PM, but failed to notify anyone.  (Tr. 3680-90 (Keith).)  The fact that the drill pipe pressure continued to increase and the well continued to flow, even though the pumps were turned off

from 9:08 to 9:14 PM, demanded an immediate flow check and shut-in of the well.  (Tr. 2203-04 (Heenan); Tr. 5002 (Barnhill); TREX 50000 at 40 (Barnhill Expert Report).)  If these basic steps had been followed, the accident presumably would have been avoided.  (Tr. 2200-03 (Heenan).)

The Transocean crew, however, failed to act upon these anomalies, and instead continued with well displacement.  At 9:30 PM, the crew stopped the displacement operation and shut down all of the rig pumps, in clear recognition of the anomalies in the well.  (Tr. 2132-34 (Heenan); Tr. 4291-92 (Barnhill); Tr. 6991 (Stevick); TREX 1 at 98; D4321.)  With the pumps off, flow continued and the drill pipe pressure increased by over 500 psi.  (Tr. 1220-21 (Bly); Tr. 7297-98 (Beck); Tr. 2206-07 (Heenan); TREX 1 at 98-99; D4321.)  But even then the crew did not follow the industry standard step of *first* shutting in the well, and *then* investigating. (Tr. 7537, 7579 (Bourgoyne); Tr. 4351 (Barnhill); Tr. 2162-63 (Heenan).)  Instead, the crew bled pressure off the drill pipe, which is not a well control action.  (Tr. 5818-19 (Young); Tr. 7810-11 (Emilsen); Tr. 2206-07 (Heenan); Tr. 4468-69 (Barnhill); Tr. 7536-37, 7579 (Bourgoyne); TREX 1 at 98; TREX 8173 at 67.)  Undisputed post-accident simulations confirm that, had the rig flow line been checked instead, it would have been flowing at a massive rate, upwards of 300 barrels of cumulative flow after the kick started.  (Tr. 1107 (Bly); Tr. 7537-38 (Bourgoyne); Tr. 7819 (Emilsen); Tr. 4241-42, 4433-35 (Barnhill); Tr. 2132-34 (Heenan); TREX 1 at 98; D4321.)

Transocean's drilling and well control expert, Calvin Barnhill, confirmed that when the pumps were shut down at 9:31 PM, the Transocean crew should have checked for flow and immediately shut in the well, thereby keeping the hydrocarbon kick safely below the BOP. (Tr. 4296 (Barnhill); *see also* Tr. 7537 (Bourgoyne).)  In Barnhill's words, such actions represent "basic well control."   (Tr. 4351 (Barnhill).)   Drilling experts with more than a century of

collective experience all agreed on this fundamental point.  (*See*, *e.g.*, TREX 8173 at 10, 67; Tr. 7536 (Bourgoyne).)  Had the indications of this flow been detected, there would have been ample time to investigate, shut in the well, and circulate out the kick before hydrocarbons entered the riser at 9:38 PM.  (Tr. 2160-63, 2200-02 (Heenan); Tr. 7537-38 (Bourgoyne); TREX 8173 at 10, 67.)  As the Government's drilling expert Richard Heenan testified, a flow check should have been conducted at around 9:30 PM and "easily" would have provided time to "shut the well in, circulate the kick out, and we wouldn't be here."  (Tr. 2162-63 (Heenan).)  Barnhill agreed: "I believe if the well had been flow-checked around 2133 and shut in … I don't think the events as they transpired would have happened."  (Tr. 4431-32 (Barnhill).)

Unchecked, the well continued to flow, and by the time the first identifiable well control actions were taken after 9:40 PM—***almost 50 minutes after the well began to flow***—the hydrocarbons were already ***above*** the BOP.  (Tr. 7815-16 (Emilsen); Tr. 1104-05, 1469-70 (Bly); TREX 1 at 98, 104.)  By then, drilling mud was gushing onto the rig, as seen by survivors both in person and on the closed circuit television screens.  (Tr. 9417-18 (Mitchell); D4967; TREX 1 at 103-04; TREX 4248 at 95; Tr. 9281-83 (O'Bryan); TREX 5032.)   And even then, the Transocean crew did the wrong thing: the industry standard of care and Transocean's own policies dictated that the crew divert the hydrocarbons overboard.  (Tr. 7700-01 (Bourgoyne); TREX 1454 at 206-09; Tr. 4262-63, 5003 (Barnhill); Tr. 6125-26 (Ambrose); Tr. 7701-02 (Bourgoyne); Tr. 7038-39 (Stevick); TREX 8173 at 67; TREX 2187; Tr. 1785-87, 1873 (Ezell); Tr. 3416 (Perkin).)  Instead, the crew sent the flow to the low-capacity mud gas separator rather than to the large 14-inch-diameter overboard "diverter" pipes.  (TREX 1 at 104; Tr. 7709, 7712, 7782 (Bourgoyne); TREX 4248 at 31, 106-107, 153-155, 164; Tr. 6126 (Ambrose); Tr. 7928 (Robinson); TREX 1454 at 204-05; Tr. 984-85 (Bly).)  The overboard diverter pipes existed on

the rig for the sole purpose of being used in this situation to keep hydrocarbons away from the rig. (TREX 1454 at 205; Tr. 5002 (Barnhill); Tr. 7580-81, 7585 (Bourgoyne).)  The mud gas separator was quickly overwhelmed, and gas vented onto the rig and spread rapidly across the deck and into internal spaces containing ignition sources.   (Tr. 5007 (Barnhill); TREX 50000.8.2.BP; TREX 4248 at 31, 104-06, 155-56, 174-75; TREX 1 at 11, 138.)  If the crew had diverted the hydrocarbons overboard, the explosions and fire would have been avoided, or, at a minimum, the explosions would have been delayed, allowing the crew more time to respond, seal the well, and move personnel to safety. (Tr. 7563, 7783, 7793 (Bourgoyne); Tr. 985-86 (Bly); TREX 1 at 11, 104, 128-29, 138; Tr. 7038 (Stevick).)  The crew's decision to send the flow to the mud gas separator instead of sending it overboard was a "precipitating cause" of the explosion.  (Tr. 6127 (Ambrose).)

Once again, the failure of BP's independent contractors Transocean and Halliburton to exercise their basic responsibilities over well monitoring and well control is not attributable to BP.  *See, e.g.*, *Romero*, 939 F.2d at 310.

### 4. Transocean Personnel Failed To Properly Utilize The Blowout Preventer To Shut In The Well And Stop The Blowout.

Even after Transocean and Halliburton failed to notice the kick and shut in the well, it still was not too late to prevent the blowout, explosions, and oil spill.  As described below, however, Transocean failed once again to exercise its basic responsibilities.

### a. Transocean Personnel Failed To Activate The EDS.

As the drilling mud began to gush up onto the rig, the bridge was a scene of great confusion.   (Tr. 3975, 4014, 4063 (Webster); Tr. 9429-31 (Mitchell); *see generally* FFCL § IX.C.)  Although the Master was in a position to hear, see, and feel the developing emergency, he failed to activate the BOP's Emergency Disconnect Sequence (EDS) to close the blind shear

rams and seal the well.  (Tr. 9285-86 (O'Bryan); Tr. 4006-07, 4211 (Webster); TREX 40011 at

7-9.)    At 9:49 PM, massive explosions rocked the rig, and a fire broke out.    (TREX

3808.21.2.PSC.)  Only then—minutes *after* the explosions—did the Master activate the BOP's

EDS, but by then it was too late—the explosions had severed the cables that connected the rig to

the BOP, rendering the EDS ineffective.  (Pleasant Dep. 55-58; Tr. 5009 (Barnhill); TREX 7687

at 8, 28; TREX 40008 at 44; Tr. 7802 (Emilsen).)   The explosions and resulting fire resulted

directly from hydrocarbons being permitted to reach the rig floor: if the EDS had been hit before

the explosions, the accident would have been avoided.  (TREX 4248 at 174, 190-91.)

### b.   Transocean Personnel Failed Adequately To Maintain The AMF/Deadman System.

And even at that point, despite these mistakes, the BOP was still designed to shut in the

well without human intervention through an automated "deadman" system.  (*See generally* FFCL

§§ VII.C-D.)  With two independent "pods" each able to activate the BOP's blind shear rams, the

BOP was designed to operate autonomously in *exactly* the conditions presented after the

explosions when communication with the BOP was lost.  (Tr. 8404-10 (Zatarain); Tr. 9024-26

(Shanks); Tr. 2649-50, 2656 (Davis); Tr. 6991-92 (Stevick); Stringfellow Dep. 272-73.)  But that

automated emergency system was only as good as Transocean's maintenance of the system.

(D. McWhorter Dep. 71-72; Stringfellow Dep. 398-99.)

The BOP's manufacturer, Cameron, advised its customers, like Transocean, of the need

to maintain the BOP to ensure that it was "ready to do its job" (D. McWhorter Dep. 71-75), and

directed them specifically to replace the control pod batteries at least every year (TREX

3329.1.1.BP; TREX 3329.2.1.BP; Tr. 8432-34 (Zatarain); Tr. 2693-94 (Davis); D. McWhorter

Dep. 293-94, 489-91; Erwin Dep. 286-87; Tr. 5327-28 (Childs); TREX 36708).   Transocean

knew the importance of BOP maintenance, and had its own policies that, among other things,

informed its Subsea Supervisors to wire correctly and test the solenoids of the control pods (Tr. 2847-49 (Davis); TREX 3798.5.1.BP), as well as to perform a full function test of the BOP, including the AMF/deadman system, before deployment (TREX 3259; TREX 1454 at 302-03).

The post-accident forensic examination, however, confirmed that the control pods had not been maintained according to Transocean's own policies and Cameron's recommendations, and thus neither pod activated the AMF/deadman to close the blind shear rams during the incident: one control pod had a depleted battery that was almost 18 months overdue for replacement, while the other had an improperly wired solenoid. (Tr. 8404 (Zatarain); D4881; Tr. 996 (Bly); TREX 1 at 47; Tr. 2649-50 (Davis); TREX 22737 at 4.) As a result of these control pod deficiencies—either of which would have been detected before BOP deployment had Transocean followed its own testing policies—the AMF/deadman failed to activate and the BOP failed to secure the well. (Tr. 8404, 8410, 8435, 8472-73 (Zatarain); Erwin Dep. 115-16; Tr. 2649-50, 2653, 2656-57, 2688-89 (Davis); Coronado Dep. 364-65, 368, 611-12; TREX 22737 at 4; TREX 3259; J. McWhorter Dep. 457; Tr. 5322-23, 5469 (Childs) ("[I]f somebody at Transocean had followed Transocean's policy for testing refurbished solenoids, they would have discovered that this solenoid in the yellow pod was miswired[.]").)

Approximately thirty minutes after the rig explosions (and after the AMF/deadman would have secured the well but for the control pod deficiencies), the travelling block fell to the rig floor and caused a downward force of hundreds of thousands of pounds to be applied to the drill pipe, resulting in it buckling within the BOP. (Tr. 9012, 9028-35, 9042-47 (Shanks).) Because of this unforeseen condition that forcibly held the drill pipe against the BOP's inner wall, when subsea robots attempted to close the blind shear rams on the morning of April 22, those rams could not be fully closed to seal the well because the drill pipe was partially outside their blades.

(Tr. 9012, 9029-35 (Shanks); D4340A; TREX 40008 at 26-30, 44-45; Tr. 2657-60, 2748 (Davis); Tr. 7003-04 (Stevick); Tr. 1479-80 (Bly); Whitby Dep. 46.)  As a result, oil flowed through the BOP for a total of 87 days.

If the drilling or maritime crew had closed the blind shear rams before the explosions, or if the subsea crew had maintained the BOP such that the AMF/deadman had worked, the drill pipe would have been straight across the BOP when the blind shear rams closed, and they would have sheared the drill pipe and sealed the well.  (Tr. 9012, 9025-27, 9036-38 (Shanks); D4803.3.)  Once again, Transocean's failure to timely activate the BOP or maintain the BOP's failsafe systems cannot be attributed to BP.  *See, e.g.*, *Romero*, 939 F.2d at 310.[6]

### C.   BP Cannot Be Subjected To Treble Fines Or Punitive Damages Based On An Aggregation Of Disparate Conduct That Did Not Proximately Cause The Accident.

As discussed above in Part I.C.2, treble fines under the CWA and punitive damages under maritime law are justified only with respect to conduct that ***proximately caused*** the harm at issue, and as discussed above in Part II.B, the Phase One Trial record leaves no real dispute with respect to the conduct that ***proximately caused*** the Macondo blowout and the resulting oil spill.  The upshot of these points is that the Phase One Trial reveals that many of the themes and factual allegations advanced by the Government and plaintiffs have no bearing on the availability of treble fines or punitive damages against BP.

The importance of this point cannot be overstated: BP is not on trial for any engineering or policy decisions that did not cause the blowout.  *See, e.g.*, *Mid-South Towing*, 418 F.3d at 534

---

[6] As detailed in § XXVIII.B of BP's Proposed Findings of Fact and Conclusions of Law, Transocean cannot limit its liability in this Limitation Act proceeding because it is chargeable with knowledge and privity of the negligence of its personnel and the unseaworthiness of its vessel.  *See, e.g.*, *Coryell v. Phipps*, 317 U.S. 406, 409 (1943); *In re Signal Int'l LLC*, 579 F.3d 478, 496 (5th Cir. 2009); *Hernandez v. M/V Rajaan*, 841 F.2d 582, 591 (5th Cir. 1988).

("[F]ault in the abstract does not give rise to liability."). As explained in detail below, the record is clear that the blowout was not proximately caused by e-mails, arguments among coworkers, allegations about budgets, or an alleged desire to put savings over safety. Nor was it caused by choices on the number of centralizers, the volume of pre-cement job fluid circulated in a "bottoms up," a reservoir sand that did not flow, or the decision to not run a cement bond log after Halliburton reported that cement operations went as planned. In a complicated operation like deepwater drilling, there are undoubtedly many things that could have been done differently. Unless such things caused the accident, however, they are irrelevant for present purposes.

Evidence regarding the flow path of hydrocarbons establishes that several of these issues—including centralizers, bottoms up, and the float collar—were not causal, because the hydrocarbons flowed in a direction inconsistent with these causation theories. Specifically, flow simulations performed by BP expert Morten Emilsen showed that the hydrocarbons were flowing through the bottom of the production casing, and up through the inside of the casing, rather than up the annulus or through a crossover breach in the casing, and physical evidence recovered through relief well operations in the months after the accident confirmed that conclusion. (Tr. 7801, 7804-06 (Emilsen); TREX 40003 at 16-17.) Emilsen's flow path testimony is uncontested, as no party presented any evidence of analysis performed regarding any alternative flow path theory. (*See*, *e.g.*, Tr. 7141-42 (Beck) (acknowledging that he performed no flow path analysis and did not discuss any new theories in his expert report).)

The Government and plaintiffs cannot avoid fundamental principles of proximate causation by aggregating disparate ***non-causal*** actions or events. Zero plus zero cannot equal one, and an aggregation of non-causal actions or events cannot magically establish causation. Perhaps nothing better underscores this point than the argument that BP should be punished for a

flawed "safety culture" with some amorphous alleged causal nexus to the accident.  In fact, trial testimony—including that of plaintiffs' own process safety expert Robert Bea—established that BP's safety culture was both strong and improving.  In the years preceding the accident, BP undertook numerous initiatives to enhance its process safety management system, committing significant resources and personnel to this goal.  (*See*, *e.g.*, Tr. 368-71, 373, 375 (Bea).)  The cornerstone of these initiatives, BP's Operating Management System (OMS), provided a framework to incorporate BP's existing standards, processes, and practices under a single management system and to continuously improve safety performance (TREX 45013 at 5; Tr. 999, 1169-70, 1184 (Bly); Tr. 405 (Bea)), and was acknowledged by Professor Bea to be generally "outstanding" (Tr. 395-96 (Bea)).  And, contrary to the suggestions of the Government and plaintiffs, BP's OMS was (1) implemented in BP's Gulf of Mexico Drilling & Completions organization before the accident (Tr. 398-99 (Bea); Tr. 9255 (O'Bryan); TREX 6065); and (2) applicable to rigs like the *Deepwater Horizon* as the result of OMS and the contractor's safety management system being contractually "bridged" (Tr. 1185-86 (Bly); Tr. 533-37 (McKay); Tr. 401-02 (Bea); Tr. 8054 (Shaw); Tr. 9251 (O'Bryan); Armstrong Dep. 470; Tr. 8605 (Guide)).

In addition to focusing on safety internally, BP also emphasized the importance of safety to its contractors (*see*, *e.g.*, Tr. 8620-23 (Guide) (discussing Houma Leadership Engagement session); *see also* FFCL § XI.C.4), and both BP and contractor personnel working on the Macondo well received that message, uniformly testifying that they believed safety was a top priority (*see*, *e.g.*, Tr. 9386 (O'Bryan); *see also* FFCL § XI.B.2).  Moreover, BP never cut costs at the expense of safety.  (Suttles Dep. 840-42, 844-45; Tr. 8089 (Shaw); TREX 5689.8.1.BP.) While BP increased production in the Gulf of Mexico Strategic Performance Unit between 2008

and 2009, this production increase had no impact on safety, but was instead attributable to various BP assets coming fully online in 2009.  Cost reductions during this same period resulted from decreased one-off repair and start-up costs associated with new production platforms, deflation, reduced overhead, and improved recovery by BP from its partners—changes totally unrelated to safety, the *Deepwater Horizon*, or the Macondo well.  (*See generally* FFCL § XI.B.4.d.)

As set forth below, none of the Government's and plaintiffs' kitchen-sink set of alleged errors by BP was causal, and none of those alleged errors involved any deviation from regulations or industry standards, to the extent applicable.  "[C]ompliance with both federal regulations and industry practices is some evidence of due care," *Richards*, 21 F.3d at 1059, and the Government and plaintiffs therefore overreach in basing their request for treble fines and punitive damages on such compliant conduct, *see*, *e.g.*, *Satcher*, 52 F.3d at 1317 (vacating punitive damages award where defendant complied with government regulations and industry standards).  These issues, in a nutshell, are red herrings.

### 1.    Regulatory Safe Drilling Margin

The Government has focused on issues relating to the regulatory requirement of "drilling margin" on the well, but has not shown that any violation of that requirement relates in any way to the blowout.  To the contrary, the record shows that the rig crew properly maintained the regulatory safe drilling margin (Tr. 7441, 7513-21 (Bourgoyne)), and MMS inspectors and onshore engineers reviewed all of the drilling records through April 1, 2010 without raising any safety concerns or regulatory issues (E. Neal Dep. 20; R. Neal Dep. 94-95; Patton Dep. 153-55).  BP and Transocean drilled the well to its total depth on April 9, and the well was stable from then through April 20.  (Tr. 850, 854-55 (Huffman); Tr. 5021-22 (Barnhill); Tr. 7508-16

48

(Bourgoyne).)  Because the drilling margin at the Macondo well had no causal link to the blowout (*see*, *e.g.*, Tr. 850 (Huffman)), and complied with industry standards and regulations, it has no bearing here (*see generally* FFCL § V.D.7.b.).

### 2.    M57B Sand

Certain parties have suggested that BP's petrophysicist did not appropriately analyze the small two-foot M57B sand before the accident.  As an initial matter, there is no evidence that the M57B sand had any effect on well operations, caused a kick, or had any other impact on the cement job at the Macondo well (Tr. 6534-35 (Strickland)), and Halliburton's experts testified that the M57B sand had no causal relationship to the blowout (Tr. 6510-12 (Strickland); Tr. 7308 (Beck).)  Halliburton's experts further conceded at trial that the petrophysical characteristics of the M57B sand are uncertain and require discretion and judgment to interpret (Tr. 6519, 6524 (Strickland); *see also* Chemali Dep. 159-60; Emanuel Dep. 123), and Halliburton's mud loggers did not identify the M57B sand as a "show zone" in their own analysis of the production interval (Tr. 3652-53 (Keith); TREX 611). There is no regulatory definition for a "hydrocarbon-bearing" zone, so Halliburton's expert created his own definition, and even under that definition, the M57B sand is not a hydrocarbon-bearing zone because it did not flow when the well was underbalanced.  (Tr. 6535-37 (Strickland); Tr. 7518 (Bourgoyne).)  Because the M57B sand had no causal relationship to the accident, and BP properly identified the top hydrocarbon-bearing zone in the well, this is another non-issue.  (*See generally* FFCL § VI.N.)

### 3.    Guide/Sims E-Mails

Significant emphasis was placed at trial on e-mail exchanges in March and April 2010 between John Guide, BP wells team leader for the Macondo well, and his supervisor David Sims, BP well operations manager for the well.  The evidence as to these e-mail exchanges has shown,

however, that they neither related to any causal aspect of the well planning nor reflected a flawed process safety system at BP.

On March 13, during a conference call, Guide and Sims disagreed about how to circulate out a kick taken on March 8, and exchanged e-mails regarding that disagreement later that day. (Tr. 8657-59 (Guide); TREX 1126; *see also* TREX 1127 (e-mail Sims drafted but never sent).) By the following day, Guide and Sims had resolved their disagreement. (Tr. 8663-65 (Guide); Sims Dep. 705-08; TREX 1148.) They continued to work together on a daily basis after this disagreement, and their collaborative and friendly relationship did not change. (Sims Dep. 705-08; *see also* Tr. 8662-66 (Guide); TREX 1148; TREX 5973.)

On April 14, Guide fell ill and told Sims that he was leaving a two-day offsite wellsite leader meeting. (Tr. 8686-87 (Guide).) In response to a later e-mail from Sims asking Guide to meet early the following morning, Guide responded jokingly, "Are you going to fire me." (Tr. 8687 (Guide); TREX 1129.) Guide testified that he was kidding and not actually concerned that Sims was going to fire him. (Tr. 8688 (Guide) ("David and I were good friends. You know, we had the kind of relationship that, you know, we kidded around with each other.").)

On April 17, Guide sent Sims an e-mail expressing his frustration with certain logistical issues. (Tr. 8710-14 (Guide); TREX 21099.) Guide testified that this e-mail was not meant to suggest that operations at the well were not being conducted safely, or to predict a blowout, and that he was satisfied that there was a plan in place to address his concerns. (Tr. 8714-20 (Guide); *see also* Sims Dep. 182-84, 200-02; *see generally* FFCL § XI.B.7.)

### 4.    Long String Production Casing

BP's decision to use a long string production casing design at the Macondo well is also causally unrelated to the accident. BP casing design expert David Lewis testified that the long

string casing design used at the well was adequate, with a factor of safety in excess of industry standards.  (Tr. 8322 (Lewis); TREX 8098 at 19; *see also* Tr. 7605 (Bourgoyne).)  MMS Regional Supervisor Michael Saucier similarly testified that there was nothing unusual about a long string production casing design and that the MMS independently reviewed and approved the proposed long string production casing.  (Saucier Dep. 207; *see also* Patton Dep. 238; TREX 2.178.2.BP; TREX 2.178.1.BP.)  In fact, Gene Beck, the only expert to criticize the use of the long string design at trial, admitted that—owing to his lack of any deepwater drilling experience in any context—he had never personally been involved in making a choice between using a long string or a liner for a deepwater well. (Tr. 7245-48 (Beck) ("I have never presented myself as a deepwater drilling expert.").)  Moreover, because the flow path of hydrocarbons was established to have been up the casing, rather than up the annulus of the well (Tr. 7801, 7804-06 (Emilsen); TREX 40003 at 16-17 (Emilsen Expert Report)), Beck's criticisms of the long string design have no causal relationship to the accident.  (*See generally* FFCL § V.D.7.c.)

### 5.    Temporary Abandonment Procedure

The plaintiffs and other parties also criticized BP's planning process for temporary abandonment (TA), alleging that multiple changes were made to the plan at the last minute or suggesting that soliciting input from the BP wellsite leaders reflected a lack of integrity in the process.  The evidence as to the TA planning process shows, however, that: (1) TA planning took place when it made sense to do so, *i.e.*, when total depth was called and the details needed to generate such plans became known (Tr. 1980-81 (R. Sepulvado); TREX 836); (2) the development of that procedure followed the protocol established by the BP wells team leader, which called for the input of the wellsite leaders in order to achieve a thorough plan, reflective of feedback on the current conditions from the rig (Tr. 8763 (Guide); *see also* Tr. 1980-81

(R. Sepulvado) (same)); and (3) rather than "multiple changes to the plan," the documents evidencing the development of the TA procedure reflect iterations on the development of the draft of a single procedure, the timing of which comported with standard practice.  (Tr. 8762-64, 8892 (Guide); Tr. 4313, 4494 (Barnhill); TREX 836; TREX 545GMT; TREX 570; TREX 97; TREX 533 at 1; Tr. 1980-82 (R. Sepulvado).)

The allegation that the final TA procedure increased the *risk* of a blowout cannot substitute for evidence (of which there is none) that any aspect of the TA procedure *actually caused* the blowout.  Rather, the record shows that (1) the TA procedure was submitted to and approved by the MMS (TREX 570); (2) BP's decision to include a negative pressure test in the procedure was a prudent safety step in excess of regulatory requirements (Tr. 4480 (Barnhill)); (3) the negative pressure test in that procedure also complied with industry standards and practices at that time (Tr. 2219 (Heenan); Tr. 6236 (Ambrose); Tr. 4498-99 (Barnhill)); and (4) the negative pressure test, and specifically the depth at which it was conducted, achieved its intended purpose by yielding anomalous pressure responses that, if properly interpreted, would have indicated that the well was not secure.  (Tr. 5013-14 (Barnhill); Tr. 2221 (Heenan); Tr. 8773 (Guide).)  Similarly, the April 20 "Ops note" e-mail to the wellsite leaders was consistent with the standard of care and gave the rig crew the ability to test the integrity of the shoe track cement.  (Tr. 4498-99, 5013-14 (Barnhill); TREX 97; Tr. 7524, 7791 (Bourgoyne); TREX 547; Tr. 2219 (Heenan); Tr. 6236 (Ambrose).)  In short, neither the TA procedure planning process nor the procedure itself had any causal relationship to the accident and both are thus irrelevant here.  (*See generally* FFCL § V.E.)

**6.      Number And Placement Of Centralizers**

The number of centralizers for the cement job on the production casing string also did not cause the blowout or otherwise compromise safety.  (Tr. 2970-71 (Probert); Tr. 2469 (Benge).) Operators run a range of centralizers, from very few to many depending on the particular job. (Faul Dep. 524-25; Tabler Dep. 446-48; Clawson Dep. 305.)  In this case, BP was justified in using fewer centralizers in light of the type of centralizers involved and the risk that extra pieces of equipment could become hung up on the BOP.  (Tr. 1987-89 (R. Sepulvado).)  Halliburton witnesses testified that they did not have any safety concerns about pumping this job with six centralizers.  (Tr. 6403-04 (Chaisson); Tr. 6614-15, 6853-54 (Gagliano); P. Anderson Dep. 254-55; Faul Dep. 524-25; Tabler Dep. 446-48.)   Ultimately, the decision as to the number of centralizers reflected a balancing of risks and, as Halliburton expert Gene Beck conceded, all well planning involves similar balancing.  (Tr. 1422 (Bly); Tr. 8688-91, 8705-08 (Guide); Tr. 7274-75 (Beck); TREX 1 at 35.)  Moreover, in light of the evidence and consensus view that the flow path of hydrocarbons was through the casing (Tr. 7801, 7804-06 (Emilsen); TREX 40003 at 16-17 (Emilsen Expert Report)), any potential channeling that resulted from running six centralizers did not contribute to the blowout.  (Tr. 933-34, 1203, 1445 (Bly); Mazella Dep. 104-05, 125-26, 199-200, 205-08, 226-28, 332; Brock Dep. 59-60, 85-86, 88-90; TREX 1 at 35.)

The casing flow path also confirms that the placement of the centralizers had no causal relationship to the blowout.  BP positioned the six centralizers across and above the primary hydrocarbon zones to achieve good cement placement in these areas.  (Tr. 1422 (Bly); TREX 1 at 35.)  All available evidence shows no channeling in the lower part of the annulus.  (Tr. 6862 (Gagliano); Roller Dep. 226-27; Vargo Dep. 499-501; TREX 982; TREX 5204.20.3.BP; TREX

5220; Tr. 7356-58 (Beck).)  In short, there was simply no showing that the number or placement of centralizers had any casual relationship to the accident.  (*See generally* FFCL § V.F, VI.K.)

### 7.      Partial Bottoms-Up Circulation

Criticisms of BP for not circulating a full "bottoms up" before the cement job are also misplaced.  A full bottoms up was not necessary immediately before the cement job because BP circulated more than a full bottoms up on April 16, 2010, after when there was no further drilling.  (Tr. 6225 (Ambrose); Tr. 7607 (Bourgoyne).)  At the time of the cement job on April 18, only 1,000 feet of open hole at the base of the production casing needed to be cleaned in order to prevent contamination of the cement job, and there was thus no need to circulate a full bottoms up to achieve that purpose.  (Tr. 2047-48 (R. Sepulvado); Tr. 2567 (Benge); *see also* TREX 545.)  That purpose was satisfied by the circulation before the cement job, because the open-hole area was completely flushed ***more than 20 times*** before the cement was placed. (Tr. 2567 (Benge).)  Moreover, in light of the consensus view that the flow path was through the casing, any potential channeling in the annulus caused by circulating less than a full bottoms up was not causally related to the accident.  (Tr. 933-34 (Bly); Mazella Dep. 104-05, 125-26, 199-200, 205-08, 226-28, 332; TREX 1 at 35.)  In sum, there is no evidence of any causal link between the partial bottoms up circulation and the blowout.  (*See generally* FFCL §§ V.H, VI.L.)

### 8.      Float Collar Conversion

Suggestions that efforts to convert the float collar contributed to the accident are also unavailing.  Both BP's and Halliburton's experts agreed that the Weatherford M45AP auto-fill float collar was not a cause or contributing cause of the failure of the annular production casing cement to achieve zonal isolation of the hydrocarbon zones and pay sands in the production interval of the Macondo well.  (TREX 22761 at 2 (Calvert Expert Report); Tr. 7330 (Beck).)

Rather, the float collar fulfilled its intended functions.  (Tr. 2625-27 (Calvert); TREX 22761 at 2, 6-10; TREX 1705 at 6-10; TREX 820; TREX 60413 at 6.)  In attempting to convert the float collar on April 20, after BP consulted with the manufacturer, the rig crew increased the pressure applied to the float collar in nine increments, until it converted at 3142 psi.  (TREX 22761 at 8; TREX 1705 at 3-4; Tr. 2635 (Calvert); Tr. 6165-66 (Ambrose); Tr. 6344 (Chaisson).)  All parties on the rig agreed that the float collar converted.  (Tr. 8741, 8743, 8747-48 (Guide); Tr. 8268 (Lambert); Tabler Dep. 146-47, 441-42; Clawson Dep. 336; Tr. 6304-05, 6389-90 (Chaisson); TREX 22761 at 8-9; TREX 60413 at 6; TREX 820; TREX 1705 at 6-7; TREX 708.)  Post-accident testing also confirmed this conclusion.  (TREX 3308; *see also* TREX 7597.5.BP; TREX 22761 at 8; Tr. 8355, 8369-71 (Lirette).)  Moreover, in light of the uncontroverted evidence that the flow path was through the casing, it is clear that efforts to convert the float collar had no causal relationship to the accident.  (*See generally* FFCL § V.G.)

### 9.    Decision Not To Run A Cement Bond Log

Nor is there any causal relationship linking the decision not to run a Cement Bond Log (CBL) during temporary abandonment with the accident.  (Tr. 6121 (Ambrose); Tr. 7608-10 (Bourgoyne).)  Even if a CBL had been run, it would not have shown whether zonal isolation was achieved because the placement of the shoe track prevented logging of the entire formation. (Tr. 8973-74 (Guide); Tr. 4426-27 (Barnhill).)  Moreover, a CBL is not necessarily the best method to determine whether there is bonded cement across the hydrocarbon zones, because the data is not absolute and can be inaccurate.  (Brock Dep. 64-65; Kellingray Dep. 193.)  Where, as here, there are indications of a successful cement job, CBLs are not typically run during temporary abandonment and are instead normally run during the completion phase.  (Tr. 8751 (Guide).)  BP paid to have a Schlumberger crew standing by on the *Deepwater Horizon* to

perform a contingency CBL if lost returns were seen during the cement job (Rec. Doc. 5927 ¶ 128; Tr. 1823 (Ezell)), but Halliburton reported to BP that the cement job was executed as planned—with full returns, lift pressure, and no losses, indicating that target top of cement was achieved.  (Tr. 2321 (Benge); Tr. 8755-56, 8935 (Guide); Tr. 6328, 6401 (Chaisson); D4379; TREX 708; TREX 4456.)  Based on that report, BP applied its decision tree criteria to conclude that a CBL was unwarranted and—consistent with established practice—would instead be performed upon completion of the well.  (Tr. 8751-55 (Guide); TREX 4456.)  During the April 20 morning call, Guide asked whether anyone thought a CBL was still necessary, and no one so indicated.  (Tr. 8757 (Guide); Walz Dep. 901.)  There is no regulatory requirement that a CBL be run prior to temporary abandonment.  (Tr. 7359 (Beck); Kellingray Dep. 192.)  Thus, there is no causal link between the CBL and the accident.  (*See generally* FFCL § V.I.2.)

### 10.    8:52 PM Telephone Call

Certain parties have also suggested a relationship between the accident and a phone call between BP wellsite leader Don Vidrine and BP drilling engineer Mark Hafle, which took place more than an hour after the rig crew and wellsite leaders had agreed that the negative pressure test was successful and proceeded with displacement.  In particular, it has been suggested that one or both of the participants in this call—neither of whom had any incentive to allow the well to be unsecure—nonetheless believed or had reason to believe the well was unsecure based on this phone call and did nothing.  The evidence as to that call, however, does not support this suggestion because (1) the call took place more than an hour after the decision at issue had already been made by consensus of those involved in the test (TREX 1 at 25; TREX 4248 at 30); (2) the purpose of the call was to discuss matters other than the negative pressure test and there is no evidence that Vidrine sought Hafle's advice or guidance regarding the interpretation of that

test, instead telling Hafle that he was "fully satisfied" with the test results (Tr. 7933-34 (Robinson); Tr. 5018 (Barnhill); Tr. 1229-32, 1342-43, 1345 (Bly); Corser Dep. (Vol. 2) 126; TREX 7318; TREX 1 at 25; TREX 4248 at 26); and (3) there is no evidence that either Vidrine or Hafle had any reason not to act if their discussion suggested that the wrong result had been reached.

Specifically, as reflected in the BP Internal Investigation Team (IIT) notes of interviews with the participants, the purpose of the call was to discuss the upcoming operational step of setting the surface cement plug and whether the plug should be weight or pressure tested. (Tr. 1229 (Bly); Tr. 5018 (Barnhill); Tr. 7936-38 (Robinson) (during their interviews, both Vidrine and Hafle indicated that the 8:52 PM call was about testing the surface plug); TREX 296.6.10.BP.)  The BP IIT interviewers and their interview notes reflect that while the negative pressure test was mentioned in passing during the call, the call was unrelated the interpretation of the test.   (Tr. 1229, 1231-32, 1342-43 (Bly) (indicating that Vidrine and Hafle "had this discussion an hour after the negative test had been accepted and it was … an after-the-fact conversation"); Tr. 7939, 8005-06 (Robinson); Corser Dep. (Vol. 2) 129-30 (indicating he did not sense any urgency or need on Vidrine's part to obtain information regarding the negative pressure test).

Although the interview notes indicate that the differential pressure observed during the tests on the drill pipe and the kill line was mentioned during the call, the context of that discussion, specifically whether Hafle understood Vidrine to be referencing the negative pressure test on the drill pipe or on the kill line, is not clear from the notes.  (Tr. 1384-85 (Bly) ("You're implying that the conversation was very clear.  That wasn't our conclusion.  We said that it was mentioned, it's not clear that they had some clear understanding what that meant."); TREX

57

296.6.10.BP ("Don [Vidrine] told Mark [Hafle] that he was fully satisfied that the rig crew had performed a successful negative test.  Mark said he didn't have the full context for what had transpired during the tests and it wasn't clear to him whether Don was talking about the first or second negative tests."); *see also* Tr. 5021 (Barnhill).)

Robinson further testified that his impression based on his in-person interview with Vidrine was that Vidrine believed the negative pressure test on the kill line was a success. (Tr. 7928-29 (Robinson).)   Similarly, based on his two in-person interviews with Hafle, Robinson testified that he was not left with any impression that Hafle thought the negative pressure test performed on the kill line was a failure.  (Tr. 7934, 7937, 7986 (Robinson).)  This impression is consistent with the finding in the BP IIT Report that "[t]he investigation team has found no evidence that the rig crew or wellsite leaders consulted anyone outside their team about the pressure abnormality."  (TREX 1 at 89.)  As Transocean drilling expert Calvin Barnhill observed, there is no evidence that either Hafle or Vidrine did not want the operations on the Macondo well to succeed.  (Tr. 5020-21 (Barnhill).)  There is simply no causal connection between the 8:52 PM call and the blowout.  (*See generally* FFCL § V.J.7.)

### 11.   Suitability Of The BOP

Finally, there is no evidence of a causal link between the accident and issues related to the suitability of the BOP.  Specifically, no evidence suggests that any modifications to the BOP's configuration or design would have enhanced the likelihood that the device would have successfully secured the well under the circumstances at issue here.  In fact, the *Deepwater Horizon*'s BOP met industry standards and applicable government regulations.  (Tr. 3440-41 (Perkin); Tr. 5087, 5217, 5382 (Childs); Tr. 7015, 7019-20 (Stevick); D-4599; Tr. 9107-08, 9114 (Shanks); D-4786; D. McWhorter Dep. 575.)

Cameron, the leader in designing and manufacturing BOPs, supplied Transocean with a BOP that met industry standards as set by the American Petroleum Institute (API). (TREX 40020 at 13; D. McWhorter Dep. 191-92, 427, 438, 443, 575.) Cameron was deeply involved, along with Transocean and BP, in designing, configuring, and commissioning the BOP. (Coronado Dep. 424-25; TREX 40008 at 12-15; Tr. 9096-97 (Shanks); Whitby Dep. 295-96; TREX 3951; TREX 7713; Turlak Dep. 386-88; D. McWhorter Dep. 592-93.) The *Deepwater Horizon* BOP was fit for its purpose and configured with several Cameron-designed devices (one Cameron *SBR* model blind shear ram, one casing shear ram, two variable bore rams, and two annular preventers) to secure the well during a well-control event, along with several emergency response functions, including the AMF/Deadman, Emergency Disconnect System (EDS), and the Autoshear System. (TREX 40008 at 5-6, 44; TREX 1453 at TRN-MDL-0004858-68; Hay Dep. (Vol. 1) 139; J. McWhorter Dep. 101; Tr. 9019-20 (Shanks); Tr. 5098, 5277, 5283-84 (Childs); Erwin Dep. 405.) This design not only complied with the API specifications, met and exceeded the requirements of Transocean's Well Control Handbook and BP's DWOP (Ambrose Dep. 169-70; Hay Dep. (Vol. 2) 158-59; Mazella Dep. 289-92, 306-09), and satisfied MMS regulations, but was explicitly approved by MMS for use on the Macondo well (TREX 40020 at 12; D4327B; D4599; D4607; Tr. 3424, 3440-41 (Perkin); Saucier Dep. 258-59; Tr. 7015 (Stevick); Tr. 9107 (Shanks); Tr. 5087, 5217-18, 5381-82 (Childs); TREX 7542.3.2.BP; D4803.4; TREX 4003; Patton Dep. 153-55.) Transocean and Cameron, along with independent subsea experts from West Engineering, believed that the BOP, including the rams, annulars, and control system was a "fine product," a "very reliable subsea BOP stack and control system," and suitable for Macondo. (TREX 7691.10.1.TO; Tr. 5220-21 (Childs); J. McWhorter Dep. 297-98;

D. McWhorter Dep. 575; Coronado Dep. 562-63.)  The trial record, in short, negates any causal link between the suitability of the BOP and the accident.  (*See generally* FFCL § VII.E.)

## CONCLUSION

For the foregoing reasons, the Court should conclude, based on the record established at the Phase One Trial, that the *Deepwater Horizon* oil spill resulted from the combined conduct of multiple independent entities, and that BP did not display the culpability necessary to warrant treble fines under the CWA or punitive damages under maritime law.

June 21, 2013                                 Respectfully submitted,

Richard C. Godfrey, P.C.                      _/s/ Don K. Haycraft_____
J. Andrew Langan, P.C.                        Don K. Haycraft (Bar #14361)
Matthew T. Regan, P.C.                        R. Keith Jarrett (Bar #16984)
Hariklia Karis, P.C.                          LISKOW & LEWIS
KIRKLAND & ELLIS LLP                          701 Poydras Street, Suite 5000
300 North LaSalle Street                      New Orleans, LA  70139-5099
Chicago, IL  60654                            Telephone:  504-581-7979
Telephone:  312-862-2000                      Facsimile:  504-556-4108
Facsimile:  312-862-2200

                                              Robert C. "Mike" Brock
Christopher Landau, P.C.                       COVINGTON & BURLING LLP
Bridget K. O'Connor                           1201 Pennsylvania Avenue, NW
Steven A. Myers                               Washington, DC  20004-2401
KIRKLAND & ELLIS LLP                          Telephone:  202-662-5985
655 Fifteenth Street, NW                      Facsimile:  202-662-6291
Washington, DC  20005
Telephone:  202-879-5000
Facsimile:  202-879-5200


*Attorneys for BP Exploration & Production Inc., BP America Production Co., and BP p.l.c.*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 21st day of June 2013.

*/s/ Don K. Haycraft*
Don K. Haycraft