## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010, | * * * | MDL No. 2179 |
| | * | Section: J |
| This Pleading applies to: | * * | Judge Barbier |
| *All Cases* | * * | Magistrate Judge Shushan |
| | * * | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### BP's PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Matthew T. Regan, P.C.
Hariklia Karis, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL   60654
Telephone:  312-862-2000
Facsimile:  312-862-2200

Timothy A. Duffy, P.C.
R. Christopher Heck
James Sollee Buino
Elizabeth R. Sheyn
David R. Freedman
Vanessa Barsanti
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL   60654
Telephone:  312-862-2000
Facsimile:  312-862-2200

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, LA   70139-5099
Telephone:  504-581-7979
Facsimile:  504-556-4108

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC   20004-2401
Telephone:  202-662-5985
Facsimile:  202-662-6291

*Attorneys for BP Exploration & Production Inc., BP America Production Co., and BP p.l.c.*

June 21, 2013

# TABLE OF CONTENTS

INTRODUCTION..................................................................................................1

I.   THE PARTIES AND THE NATURE OF THE PROCEEDINGS. ..................1

   A.   The Parties..........................................................................................1

      1.   The BP Defendants. ...................................................................1

      2.   The Transocean Defendants.......................................................3

      3.   Halliburton. ..............................................................................4

      4.   Cameron....................................................................................4

      5.   M-I, LLC...................................................................................4

      6.   Claimants. .................................................................................4

      7.   State and Federal Governments. ...............................................5

   B.   The Nature of the Action. .................................................................5

   C.   The Claims at Issue in MDL 2179. ...................................................5

      1.   Economic and Property Damages Cases....................................5

      2.   Post-Incident Medical Cases. ...................................................6

      3.   Day-of-Incident Personal Injury and Wrongful Death Cases. ..............6

      4.   Vessels of Opportunity Charter Cases. .....................................6

      5.   The Transocean Limitation Action. ...........................................6

      6.   United States Government Claims. ............................................7

      7.   State and Local Government Claims. .........................................7

      8.   Foreign Government Claims. ......................................................7

      9.   Claims Between Defendants.......................................................8

   D.   The Phase I Trial................................................................................8

PROPOSED FINDINGS OF FACT .....................................................................9

II.   BP MANAGED THE DRILLING OF THE MACONDO WELL BY
      ASSEMBLING A TEAM OF WORLD-CLASS CONTRACTORS, EACH
      OF WHICH HAD DISTINCT ROLES AND RESPONSIBILITIES WITH
      REGARD TO THE WELL. ..........................................................................9

   A.   Deepwater Drilling in the Gulf of Mexico........................................9

      1.   Offshore Drilling Is Extensively Regulated by the United
           States. ......................................................................................10

      2.   Federal Regulations Reflect the Shared Roles Between
           Operators and Contractors in Drilling Deepwater Wells. ...................11

**B.**     **Consistent with Industry Practice and Federal Regulations, BP Hired Third-Party Contractors to Drill the Macondo Well.** ........................................**12**

**C.**     **BP Contracted with Transocean to Drill the Macondo Well.** ..........................**13**

     **1.**     **Transocean and Its Rig, the *Deepwater Horizon*, Had Extensive Experience and Expertise in Deepwater Drilling.** ................................**13**

     **2.**     **Transocean's Responsibilities.** ........................................................**16**

         **a.**     **Transocean Was Responsible for Providing a Drilling Rig and Equipment Capable of Drilling the Macondo Well.** ......................................................................**16**

         **b.**     **Transocean Was Responsible for Maintaining the *Deepwater Horizon* in Optimal Operating Condition.** ..............**16**

         **c.**     **Transocean Was Responsible for the Safe Operation of the *Deepwater Horizon*.** ..................................................**18**

         **d.**     **Transocean Was Responsible for the Effective Operation and Maintenance of the *Deepwater Horizon* BOP and for Ensuring Its Compliance with Applicable Regulations.** .............................................................**19**

     **3.**     **Transocean's Safety Management System Governed Operations on Board the *Deepwater Horizon*.** ........................................**23**

     **4.**     **Transocean Was 100% Responsible for Well Monitoring and Well Control on the *Deepwater Horizon*, Including Detecting and Responding to "Kicks" and Preventing Blowouts.** ........................**25**

         **a.**     **Transocean's Well Control Policies.** ..........................**26**

         **b.**     **The Transocean Driller Was Responsible for Continuously Monitoring the Well for Kicks and Other Anomalies.** ..........................................................**27**

         **c.**     **The Well-Monitoring Information and Equipment Available to the Transocean Drilling Crew.** .....................**30**

         **d.**     **Transocean Was Responsible for Shutting In the Well in the Event of a Kick.** .................................................**33**

         **e.**     **Transocean Was Responsible for Diverting Hydrocarbons Away from the Vessel in the Event of Flow to the Rig.** ...........................................................**36**

         **f.**     **Transocean Was Responsible for Activating the Emergency Systems on the BOP.** .................................**37**

     **5.**     **Transocean Was Aware that Prudent Well Monitoring and Well Control Responses Exist Precisely to Prevent Kicks, Something that Occurs in Deepwater Drilling, from Developing into Blowouts – Which Are Extremely Rare Events.** ...........................**38**

a. Kicks Regularly Occur in the Industry..................................38

b. Transocean Experienced over 300 Kicks from 2005-2009................................................................................40

c. Transocean Was Aware of These Risks from Prior Well Control Incidents. .............................................................41

D. BP Contracted with Halliburton to Provide Cementing and Mud Logging Services.....................................................................49

1. BP Contracted with Halliburton, Through Its Sperry Division, for Continuous Well Monitoring in Connection with the Drilling of the Macondo Well..................................................49

2. It Was the Mud Logger's Duty to Monitor the Well and Communicate Effectively with the Drilling Crew..................................50

3. Mud Logging Equipment on the *Deepwater Horizon*.............................51

4. BP Contracted with Halliburton to Cement the Macondo Well. ........52

a. Halliburton Is a Leading Oil Field Cementing Company.............................................................................52

b. Halliburton's Contractual Responsibilities Relating to Cementing Services.........................................................53

c. BP Relied Upon Halliburton to Provide Cementing Expertise. ......................................................................55

d. Halliburton Was Responsible for Designing the Cement for the Macondo Well. .................................................55

e. Halliburton Was Responsible for Testing the Cement for the Macondo Well. .................................................56

f. Halliburton Was Responsible for Pumping the Cement for the Macondo Well. .................................................57

E. Other Entities Involved in Drilling the Macondo Well. ...................................57

1. Cameron...................................................................................57

2. M-I Swaco.................................................................................59

3. Weatherford. .............................................................................61

4. Dril-Quip..................................................................................62

III. THE *DEEPWATER HORIZON*. .................................................................63

A. Basic Facts Regarding the *Deepwater Horizon*.....................................63

B. Basic Facts Regarding the *Deepwater Horizon*'s Safety and Operational Equipment.........................................................................65

1. The *Deepwater Horizon* BOP. .................................................65

|  | a. | Annular Preventers.................................................................66 |
|  | b. | Variable Bore Rams (or Pipe Rams)..................................66 |
|  | c. | Casing Shear Rams and Blind Shear Rams. ...................67 |
|  | d. | ST-Locks. .................................................................................68 |
|  | e. | The BOP Control System. ..................................................68 |

| | | i. | BOP Control Pods..............................................................68 |
| | | ii. | MUX Cables. ........................................................................69 |

|  | f. | The *Deepwater Horizon* BOP Emergency Control Systems...............................................................................70 |

| | | i. | The BOP AMF/Deadman System....................................70 |
| | | ii. | The Autoshear System.....................................................70 |
| | | iii. | The Emergency Disconnect System (EDS). ..................70 |

| 2. | The Riser System.......................................................................................71 |
| 3. | Instrumentation and Indication of Well Status. ...............................72 |
| 4. | Hydrocarbon Combustible Gas Detection System.............................72 |
| 5. | Overboard Diverters Direct Flow and Gas Away From the Rig Floor to Reduce the Risk of Ignition. ....................................................74 |

| C. | The Roles and Responsibilities of the Transocean Captain and Crew of the *Deepwater Horizon* .......................................................................75 |

| 1. | The Responsibilities of the Transocean Crew. ...................................75 |
| 2. | The Responsibilities of the Rig Captain/Master and OIM..................75 |
| 3. | The Transocean Personnel Responsible for the Performance of the *Deepwater Horizon* at the Macondo Well. .......................................77 |

| D. | The *Deepwater Horizon* Had a Track Record of Safe Operations in Drilling BP Wells.........................................................................................79 |

| E. | Transocean's Safety Assessments of the *Deepwater Horizon*. ..........................81 |

| 1. | Transocean's Major Accident Hazard Risk Assessment (MAHRA) for the *Deepwater Horizon*.............................................81 |

| | a. | Well Control Procedures and the Training of the Drill Crew in Well Control.............................................................84 |
| | b. | Maintenance and Testing of BOPs and Other Subsea and Well Control Equipment.........................................89 |

| F. | Transocean Safety Initiatives Applicable to the *Deepwater Horizon* Crew. .......................................................................................................90 |

| G. | All Transocean Crew Members Had Stop-Work Authority............................92 |

**H.     All Halliburton Crew Members Also Had Stop-Work Authority**.................**94**

**IV.    HOW THE RISKS OF DEEPWATER DRILLING ARE MANAGED**.....................**96**

    **A.     The Barriers to a Blowout**.............................................................**96**

        **1.     Cement**.............................................................................**96**

        **2.     Well Integrity Testing**...................................................**97**

            **a.     Seal Assembly Tests**..........................................**97**

            **b.     Positive Pressure Tests**.....................................**97**

            **c.     Negative Pressure Tests**....................................**98**

        **3.     Well Control**...................................................................**99**

        **4.     The Blowout Preventer**................................................**101**

**V.     THE DRILLING OF THE MACONDO WELL**.............................................**103**

    **A.     The Design of the Macondo Well**................................................**103**

        **1.     BP's Macondo Well Engineering and Operations Team**. ...................**103**

        **2.     BP's Pre-Spud Planning**................................................**106**

    **B.     Consistent With Industry Practice, BP Worked Closely and Shared Information with Its Contractors to Drill the Macondo Well Safely**...........**110**

    **C.     October to November 2009:  Drilling by the Transocean *Marianas***.............**115**

    **D.     January to April 2010:  Drilling by the Transocean *Deepwater Horizon***.....................................................................**116**

        **1.     The Drilling Program and Pre-Spud Meeting for the *Deepwater Horizon***.............................................................**117**

        **2.     Transocean Had Identified Kicks as a Risk in the Operation of the *Deepwater Horizon* at the Macondo Well**....................................**118**

        **3.     The *Deepwater Horizon* Commenced Drilling on February 6, 2010**.............................................................**119**

        **4.     Drilling in March 2010**.................................................**120**

            **a.     The March 8 Kick**............................................**120**

            **b.     BP and Its Contractors Response to the Kick**..........................**121**

            **c.     BP Investigated the Kick, Developed Lessons Learned, Shared Those Lessons, and Took Steps to Prevent a Reoccurrence**.............................................................**122**

            **d.     Transocean Never Completed an Investigation into the March 8 Kick and Never Took any Action in Response to the Incident**.............................................................**123**

        **5.     Drilling Operations from March 16 to April 1, 2010**.........................**123**

6.      **Drilling Operations from April 1 to April 9, 2010 - the Final Interval.**...................................................................**124**

7.      **April 9, 2010:  Total Depth Reached.**...................................**126**

      a.      **BP Appropriately Managed Loss Events During the Drilling of the Macondo Well.**.........................................**127**

            i.      **Losses Are Common in Deepwater Wells.**...................**127**

            ii.      **Operators and Drillers Have Common Practices to Respond to Losses While Drilling.** ..........................**127**

            iii.      **The Transocean Rig Crew Properly Drilled the Final Production Interval Consistent With Industry Standards and Practices.** .................................**128**

      b.      **BP Complied With Safe Drilling Margin Regulations in Reaching Total Depth at the Macondo Well.** .........................**129**

            i.      **BP Met With the MMS in February 2008 and Discussed the Method for Calculating Drilling Margin and That Results Would Be Reported in the IADC.** ..............................................................**130**

            ii.      **Safe Drilling Margin Definitions.** ................................**132**

            iii.      **The Pressure Integrity Test at the 13-5/8" Shoe Was Valid.** ....................................................................**132**

            iv.      **The Pressure Integrity Test at the 9 7/8" Shoe Was Valid.** ....................................................................**134**

            v.      **BP Complied with Safe Drilling Margin Regulations and No Alleged Violation Was Related to the Incident.**..................................................**135**

      c.      **BP's Decision to Use a Long String Production Casing Was Consistent with Industry Practice, BP's Original Plan, and Was Approved by the MMS.** ...................................**137**

            i.      **The MMS Has Approved Long String Production Casing Designs for Deepwater Wells in the Gulf of Mexico.** ...................................................**139**

            ii.      **BP's Long String Design for the Macondo Well Was Consistent with Industry Standards.**...................**140**

            iii.      **The MMS Independently Reviewed and Approved BP's Long String Design for the Macondo Well.**.............................................................**140**

            iv.      **The Use of a Long String Production Casing Was Not Related to the Incident.**....................................**141**

        d.     The MMS Approved BP's Permits, and There Were No Incidents of Non-Compliance Issued by MMS Inspectors During the Drilling of the Macondo Well. ...........141

E.    The Temporary Abandonment Procedure. .....................................143

    1.    Development of the Temporary Abandonment Procedure................143

    2.    The Depth of the Cement Plug....................................................146

    3.    The Displacement Procedure. .....................................................148

F.    A Long String Production Casing Was Run into the Well with Six Centralizer Subs...........................................................................149

    1.    The Decision to Use Six Centralizers Was Based on Careful Engineering Judgment and Experience. ......................................149

    2.    Halliburton Did Not Indicate that BP's Decision to Use Six Centralizers Was Unsafe. .......................................................154

    3.    The Use of Six Centralizers Was Consistent with Industry Practice and Appropriate for the Macondo Well. ..............155

G.    The Float Collar Was Converted After Running Casing............................157

    1.    The Float Collar Served Its Intended Purpose....................................157

    2.    Nine Attempts Were Made to Establish the Circulation Necessary to Convert the Float Collar. ....................................161

    3.    All Parties on the Rig Agreed that the Float Collar Converted. .......162

    4.    Stress Engineering's Post-Incident Testing Confirmed that the Float Collar Converted................................................................163

    5.    The Float Collar Is Not a Well Control Barrier..................................166

H.    A Partial "Bottoms Up" Circulation Was Performed After Conversion of the Float Collar and Prior to the Pumping of Cement. .........166

    1.    A Full Bottoms-Up Was Neither Necessary nor Consistent with Industry Practice.....................................................................166

    2.    A Partial Bottoms-Up Was Appropriate for the Macondo Well.......167

    3.    Not Spotting a Heavy Pill in the Rat Hole Was Consistent With Industry Practice and Appropriate for the Macondo Well. ..............169

I.    Cementing the Final Production Casing.........................................170

    1.    The Execution of the Cement Job....................................................170

    2.    Based on the Execution of the Cement Job, a Cement Bond Log Was Not Used..................................................................172

        a.     The Cement Job Was Executed as Planned and a Cement Bond Log Was Not Necessary.....................................173

b.     There Was No Requirement to Run a Cement Bond Log to Verify Top-of-Cement, Especially Because There Were No Losses During the Cement Job. ................................173

c.     Not Running a Cement Bond Log at Temporary Abandonment Was Consistent with Industry Practice. .........174

d.     BP Used a Reasonable Process in Deciding Not to Run a Cement Bond Long. ......................................................175

e.     Guide Specifically Asked If Anybody Thought a Cement Bond Log Was Necessary and Halliburton Did Not Request One. ....................................................................177

3.     The Cement Was Set by the Time of the Negative Pressure Test. ...............................................................................177

a.     Pre-Incident Compressive Strength Tests Performed on the Macondo Well Slurry. ............................................177

b.     BP Waited an Appropriate Amount of Time for the Cement to Set Before the Negative Pressure Test...................178

c.     The United States Expert Glen Benge's Arguments Do Not Change This Result....................................................179

    i.     OTC's UCA Compressive Strength Test. ....................179

    ii.     Halliburton's Foam Cube Crush Compressive Strength Test. ..................................................180

d.     BP's Decision for Additional Safety Margin on Pump Time Did Not Affect Wait-on-Cement Time. .........................180

4.     The Decisions Made by BP with Regard to the Cement Job Were Confirmed as Appropriate by Halliburton's Post-Job Report.................................................................................181

J.     The Events of April 20, 2010. ................................................183

1.     Personnel on the Rig on April 20.........................................183

a.     BP Personnel...........................................................183

b.     Key Transocean Personnel.......................................186

2.     Drilling Operations Were Normal for Much of the Day. ...................186

3.     The Positive Pressure Test. ..................................................187

4.     The Use of LCM Spacer. ......................................................188

5.     The Negative Pressure Test...................................................188

a.     The Negative Pressure Test Procedure Was Discussed With the Transocean Rig Crew Multiple Times on April 20, 2010 Before it Commenced. ...................................191

|   | b. | Conducting the Negative Pressure Test. ................................ 193 |
|---|---|---|
|   | c. | The Negative Pressure Test Performed on the Drill Pipe. ....................................................................... 195 |
|   | d. | Transocean Toolpusher Jason Anderson Explained the Pressure Abnormality as a "Bladder Effect." ....................... 196 |
|   | e. | The Negative Pressure Test Performed on the Kill Line ........ 198 |
|   | f. | The Negative Pressure Test Was Deemed Successful. ........... 199 |
|   | g. | The Negative Pressure Tests Were Conducted in Accordance with the April 16 MMS-Approved APM. ........... 203 |
|   | h. | Transocean and BP Both Misinterpreted the Results of the Negative Pressure Test. .......................................... 205 |
|   |   | i. BP and Transocean Shared Responsibility for Interpreting the Negative Pressure Test. .................... 205 |
|   |   | ii. The Misinterpretation of the Negative Pressure Test Was One of Several Proximate Causes of the Incident. ...................................................... 207 |

| 6. |   | Halliburton's Mud Logger Was Able to Continuously Monitor the Well on April 20, 2010. ................................................ 208 |
|---|---|---|
|   | a. | Halliburton's Mud Logger Was Aware of the Planned Rig Operations When He Came on Tour and He Had No Concerns about His Ability to Monitor the Well. ............ 208 |
|   | b. | Halliburton's Mud Logger Was Responsible for Continuously Monitoring the Well and Alerting the Rig Crew and Company Man of Any Kick Indicators. ................. 209 |
|   | c. | Halliburton's Mud Logger Was Able to Perform His Job Fully and Capably on April 20, and Ongoing Rig Operations Did Not Prevent Halliburton from Monitoring the Well ............................................... 210 |
|   | d. | Halliburton's Mud Logger Took a Break Before the Sheen Test and Did Not Identify Any Anomalies in the Data When He Returned. ........................................ 212 |

| 7. |   | The 20:52 Call. ................................................................. 213 |
|---|---|---|
| 8. |   | The Failure to Detect and Respond to Kick Indications in the Final Hour Resulted in the Loss of Well Control. ................. 215 |
|   | a. | 20:52-21:08: The Well Began to Flow. ............................ 216 |
|   | b. | 21:01-21:08: Flow Went Undetected Despite 100 psi Pressure Increase. ......................................................... 217 |
|   | c. | 21:08-21:14: Flow Continued Undetected Despite a 250 psi Pressure Increase with the Pumps Off. ...................... 218 |

d. **21:31-21:38:  The Pumps Were Shut Off to Diagnose Anomalies, but Despite a 550 psi Pressure Increase, the Crew Took No Well Control Actions. ....................................221**

e. **21:38-21:49:  Hydrocarbons Entered the Riser Prior to Activation of the Annular Preventer..............................224**

f. **There Was No Attempt to Activate the Blind Shear Rams Prior to the Explosion. ....................................227**

g. **21:43-21:45:  Transocean Diverted Gas onto the Rig by Directing Flow to the Mud-Gas Separator, Leading to the Initial Explosion and Fire. ................................230**

  i. **Transocean's Well Control Policy Required Diversion Overboard. ..........................232**

  ii. **Diversion Overboard Would Have Prevented the Explosion and Fire on the *Deepwater Horizon*. ...........233**

h. **21:47:  The Middle and Upper Variable Bore Rams Closed and Sealed. ....................................234**

i. **21:49:  Explosions on the Rig..........................236**

j. **The AMF/Deadman Failed to Activate Because of Control Pod Deficiencies. ..........................237**

k. **When Attempted After 21:55, the EDS Failed to Activate. ....................................238**

l. **The *Deepwater Horizon* Was Evacuated Shortly After 22:00. ....................................239**

m. **The Traveling Block Fell at 22:20 and Buckled the Drill Pipe....................................239**

  i. **The Physical Evidence Indicates the Force from the Traveling Block Falling Was Transmitted to the Drill Pipe in the BOP..............................240**

  ii. **The Variable Bore Rams Did Not Have to Resist the Full Force of The Falling Traveling Block. ...........242**

  iii. **It Is Unlikely that Drill Pipe Segments 39 and 1-B-1 Separated in a Classic Tensile Failure Shortly After the Rig Explosions due to Rig Drift. ....................................243**

  iv. **The Ends of the Drill Pipe Segments That Were Above the Upper Annular Do Not Indicate That They Separated in a Classic Tensile Failure Due to Rig Drift....................................244**

  v. **The Force from the Falling Traveling Block Would Still Be Transmitted to the Drill Pipe in**

the BOP if Drill Pipe Above the Upper Annular Were Separated Before the Block Fell. ........................245

    K.    The Events of April 21-22, 2010........................................246

        1.    The Autoshear Was Activated Remotely at 07:48. .............246

        2.    The Blind Shear Rams Closed but Did Not Seal the Well Because the Drill Pipe Was Forcibly Held Partially Outside the Blades. ........................................................................247

        3.    The *Deepwater Horizon* Sank on April 22, 2010...................248

VI.    THE FOAM CEMENT DESIGNED, TESTED, AND RECOMMENDED BY HALLIBURTON FOR THE PRODUCTION CASING FAILED TO SERVE AS A BARRIER BECAUSE IT WAS UNSTABLE. ..................................248

    A.    BP Relied on Halliburton to Provide Suitable Cement. ...................248

        1.    Jesse Gagliano's Responsibilities............................................248

    B.    Gagliano Recommended the Slurry For the Macondo Production Casing...........................................................................249

        1.    Halliburton Knew of the Specific Properties and Risks of the Macondo Well...................................................................250

        2.    Gagliano Made Design Proposals to BP With Knowledge of the Macondo Well Conditions..................................................251

    C.    Halliburton's Testing Resources. ....................................................252

    D.    Halliburton Designed an Unstable Slurry, Improperly Using Defoamer in a Foam Cement. .............................................................252

        1.    Gagliano Recommended to BP the Foam Cement Design Used at the Macondo Well. ............................................................252

        2.    Foam Cement is Appropriate for Deepwater Wells Such as the Macondo Well When Designed Appropriately. ...................254

        3.    Halliburton's Design of the Foam Cement Used at the Macondo Well Was Inconsistent with Best Practices and Halliburton's Manuals.....................................................256

            a.    Halliburton Inappropriately Included D-Air 3000, a Defoamer, to a Foam Slurry Design.........................256

            b.    Halliburton Used Other Inappropriate Additives that Affected Foam Stability.......................................259

            c.    Gagliano Ignored Halliburton Best Practices and Internal Protocols.......................................................260

        4.    Halliburton Failed to Update the Basis of Design for the Macondo Well and Subsequently Did Not Identify Risks or Mitigations Associated With D-Air 3000 or SCR-100. ........................261

E.    **Halliburton Pre-Incident Foam Stability Tests Showed the Slurry Was Unstable, but Halliburton Failed to Report or Misreported the Foam Stability Tests in Advance of the Cement Job.** ...................................263

    1.    **The February 12 Testing Indicated the Foam Slurry Was Unstable.** ...................................266

    2.    **The February 16 Testing Indicated the Foam Slurry was Unstable.** ...................................268

    3.    **Halliburton Conducted Tests on March 7 Using a Nearly Identical Blend That Also Showed Instability.** ...................................268

    4.    **The March 8 Lab Report Sent to BP Did Not Report the Failed February 12 and March 7 Foam Tests and Misreported the February 16 Foam Tests.** ...................................269

    5.    **The Lab Report Sent to BP on April 1 Also Did Not Report the Failed February 12 Foam Tests and Misreported the February 16 Foam Tests.** ...................................270

    6.    **The April 13 Testing Showed the Foam Slurry Was Unstable.** ...................................271

    7.    **On April 16, Gagliano Cancelled the Only Foam Stability Test Scheduled for the Slurry Used on the Macondo Well Production Casing Job.** ...................................272

    8.    **The April 17 Testing Did Not Show Stability.** ...................................272

    9.    **Gagliano Failed to Identify Foam Testing Issues Before Recommending the Slurry to BP on the Evening of April 18.** ...................................274

    10.   **Gagliano Failed to Review or Provide BP with the Final Test Results Before the Cement Job.** ...................................275

F.    **Halliburton Did Not Fully Test the Cement Slurry Used to Cement the Macondo Well.** ...................................276

    1.    **The Formulation Actually Used to Cement the Macondo Well Was Never Tested for Foam Stability.** ...................................276

    2.    **Halliburton Failed to Run Other Industry Standard Tests on the Slurry Before the Cement Job.** ...................................278

        a.    **Fluid Loss Test.** ...................................278

        b.    **Free Water Test.** ...................................278

        c.    **Static Gel Strength Test.** ...................................279

        d.    **Settlement Testing.** ...................................279

        e.    **Cement Compatibility Testing.** ...................................279

G.    **The Halliburton Cement Failed to Isolate the Reservoir.** ...................................280

H.    **Post-Incident Testing Confirms the Slurry Was Unstable.** ...................................281

|  | 1. | CSI Testing on Behalf of BP. | 282 |
|  | 2. | Post-Incident Cement Testing by Chevron | 284 |
|  |  | a. Testing on Lab Stock Is Representative of Testing on the Rig Blend. | 287 |
|  | 3. | Post-Incident Cement Testing by Oilfield Testing & Consulting. | 289 |
|  | 4. | Post-Incident Testing by Halliburton. | 291 |
|  |  | a. Halliburton Post-Incident Testing in Duncan. | 292 |
|  |  | b. Halliburton Post-Incident Testing in Broussard. | 295 |
|  |  | i. Foam Stability Testing. | 295 |
|  |  | ii. Static Gel Strength Testing. | 296 |

I.   Halliburton's April 18 OptiCem Model Contained Several Inaccurate Inputs. ......... 297

J.   Halliburton's Unstable Cement Slurry Created a Flow Path for Hydrocarbons — Up the Casing ......... 300

K.   The Number of Centralizers Used Did Not Cause the Incident. ......... 302

L.   The Partial Bottoms-Up Circulation Did Not Cause the Incident. ......... 303

M.   No Heavy Pill in the Rat Hole Did Not Cause the Incident ......... 304

N.   M57B Was Not a Cause of the Incident. ......... 305

|  | 1. | MMS Regulations Require that the Top-of-Cement Must be 500' Feet Above the Top Hydrocarbon Bearing Zone. | 305 |
|  | 2. | There Is No MMS Definition or Industry Standard Definition of a "Hydrocarbon Bearing Zone." | 306 |
|  | 3. | M57B Was an Approximately Two Foot Zone with Uncertain Petrophysical Properties. | 306 |
|  | 4. | The Determination of a Hydrocarbon Bearing Zone Requires Engineering Discretion. | 308 |
|  | 5. | The M57B Sands Did Not Flow When Underbalanced During Well Operations. | 309 |
|  | 6. | Galina Skripnikova Reviewed All Available Data and Acted Reasonably in Not Identifying M57B as a Hydrocarbon Bearing Zone. | 309 |
|  | 7. | Post-Incident Technical Documents Regarding M57B Do Not Reflect a Determination as to Whether M57B Was a Hydrocarbon Bearing Zone. | 310 |

VII.    **THE BOP FAILED TO SERVE AS A BARRIER BECAUSE OF TRANSOCEAN'S FAILURE TO MAINTAIN THE BOP.** ......................................311

    A.    **Transocean Developed the Maintenance Philosophy for the BOP That It Used Fleet-wide.** ......................................311

    B.    **Transocean Represented to BP that the VBRs Complied with API RP 53.** ......................................312

    C.    **Transocean Failed to Maintain the BOP so as to Allow the AMF/Deadman to Operate During the Incident.** ......................................313

        1.    **The AMF/Deadman Sequence Relied on the 27-Volt Battery and Solenoid 103 to Close the Blind Shear Rams.** ......................................313

        2.    **The AMF/Deadman Failed to Activate Because of Deficiencies in the Yellow and Blue Control Pods.** ......................................315

            a.    **The 27-Volt Battery in the Blue Pod Was Too Depleted to Operate the AMF/Deadman Function.** ......................................316

                i.    **Post-Incident Testing Confirmed that the 27-Volt Battery Was Depleted.** ......................................316

                ii.    **Interlink's Testing Supports the Conclusion that the Blue Pod Battery Was Too Depleted to Operate the AMF/Deadman Sequence.** ......................................318

                iii.    **Childs' Cycling Theory Is Unsubstantiated and Inconsistent with the Forensic Evidence.** ......................................319

                iv.    **Transocean's Internal Battery Testing Is Unreliable and Irrelevant.** ......................................321

                v.    **Transocean Failed to Replace the Blue Pod Batteries in Compliance With Cameron's Recommendations.** ......................................324

                vi.    **Transocean Could Have Detected the Depleted 27-Volt Battery Before Deploying the BOP at the Macondo Well.** ......................................327

                vii.    **Transocean Was on Notice That It Could Not Monitor the Blue Pod Batteries Used at the Macondo Well and That the Batteries Had Not Been Replaced Since 2007.** ......................................328

            b.    **The Reverse-Wired Solenoid Valve Was Not Able to Operate on April 20, 2010.** ......................................329

                i.    **Proper Wiring Is Crucial to Solenoid 103's Functionality.** ......................................330

                ii.    **A Reverse-Wired Solenoid 103Y Could Not Have Operated on April 20, 2010.** ......................................331

(A)     *Q4000* Testing Established That Solenoid 103Y Could Not Operate the AMF/Deadman Sequence. ...................332

(B)     DNV's PETU and AMF Testing Established That Solenoid 103Y Could Not Operate the AMF/Deadman Sequence ..............................333

(C)     DNV's Bench Testing Established That Solenoid 103Y Could Not Function the AMF/Deadman Sequence. ..................336

(D)     Cameron's Testing Established That a Reverse-Wired Solenoid Valve Would Not Have Operated During the AMF/Deadman Sequence. ..................337

(E)     Transocean's Internal Testing Did Not Establish That a Reverse-Wired Solenoid Valve Would Have Functioned Under Actual Conditions ..............................337

iii.    Transocean Could Have Detected the Reverse-Wired Solenoid Valve Before Deploying the BOP at the Macondo Well. ......................................338

D.   The BOP Would Have Sealed the Well If the AMF/Deadman Had Worked ..........................................................................339

1.   Shearing Conditions Were Favorable at the Time the AMF/Deadman Conditions Were Met. ...................340

2.   The "Force-from-Below" Theory Was Unsupported. .........................343

a.   The Force-from-Below Theory Did Not Support Drill Pipe Buckling When the Upper Annular Closed. ...................344

b.   The Force-from-Below Theory Did Not Support Drill Pipe Buckling When the Variable Bore Rams Closed ............346

c.   The Force-from-Below Theory Did Not Support Drill Pipe Buckling After the Variable Bore Rams Closed ............349

3.   The Rig Drift Drill Pipe Buckling Theory Is Unsupported ................351

E.   The *Deepwater Horizon* BOP Would Have Been Suitable for Subsea Drilling and Operations at the Macondo Well. .................................354

1.   The Design and Configuration of the *Deepwater Horizon* BOP Was the Result of a Collaborative Process that Involved Multiple Parties, Including Cameron, Transocean, BP, and Several Contractors. ..............................354

2.      The BOP Configuration Met and Exceeded MMS Regulations and Was Approved by MMS for the Macondo Well. .......................357

3.      The BOP Components Were Adequately Pressure Rated. ................359

4.      The BOP's Configuration, Including the Shear Ram Configuration, Was Consistent with Industry Practice. ...................361

5.      The MMS Approved the BOP Configuration for Use at the Macondo Well and "Compliance with MMS regulations [is considered] the use of BAST [Best Available and Safest Technology.]" 30 C.F.R. § 250.107. .....................................................366

6.      The BOP Had Sufficient Shearing Capacity. ...................................367

      a.      The BOP Had Sufficient Shearing Capacity Based on Cameron's Engineering Bulletin EB 702D. ............................369

      b.      The BOP Had Sufficient Shearing Capacity Based on the April 11, 2000 Shear Test...................................................371

      c.      The BOP Had Sufficient Shearing Capacity Based on the August 6, 1999 Shear Test......................................................373

      d.      Additional Validation that the BOP Had Sufficient Shearing Capacity.................................................................374

      e.      Shear Tests Are the Most Accurate Predictor of Shearing Pressure. ..................................................................374

      f.      Transocean Understood that BP Relied on It for Shearing Calculations.................................................................375

      g.      Maximum Applied Surface Pressure (MASP) Was Properly Calculated in Accordance with Industry Practice, and the BOP Was Capable of Shearing the Drill Pipe under the MASP. .......................................................376

7.      The *Deepwater Horizon*'s BOP's Operational History Indicated That It Was Suitable As Configured for the Macondo Well Deepwater Drilling Operations................................................................380

8.      Modifications Known to BP Before April 20, 2010, Which Included the Conversions to a Stripping Annular and Test Ram, Improved the BOP's Functionality and Were MMS Approved. ..............................................................................................381

      a.      The Conversion of the Lower VBR Into a Test Ram Improved the BOP's Functionality and Was MMS Approved. .....................................................................................381

      b.      The conversion of the lower annular to include a stripping element improved the BOP's functionality and was MMS approved..............................................................384

9.  Alternative BOP Features Were Unnecessary to Allow the *Deepwater Horizon* BOP to Perform Its Intended Function, to Comply with MMS Regulations, to Meet Industry Standards, and Could Have Presented Operational Disadvantages....................386

a.  Two BSRs Were Unnecessary, Not Required By MMS Regulation and Not Industry Standard. ...................387

b.  DVS Rams Were Unnecessary, Not Required by MMS Regulation and Were Not Industry Standard. ........................390

c.  CDVS Rams Were Unnecessary, Not Required by MMS Regulation and Not Industry Standard. ...................393

d.  Inclusion of the CSR in the AMF/Deadman Sequence Was Unnecessary, Consistent with Industry Standards, And Not Required by MMS Regulation. ...................394

e.  Using EDS-2 Instead of EDS-1 as a Default Sequence Was Unnecessary, Not Required by MMS Regulation and Not Industry Standard......................................396

f.  Tandem Boosters Were Unnecessary, Not Required by MMS Regulation, Not Industry Standard and Were Not Practical to Implement. ....................................398

g.  An Acoustic Backup System Was Unnecessary, Not Required by MMS Regulations, and Not Industry Standard.....................................................400

h.  Rechargeable Control Pod Batteries, Battery Monitoring, and a Single Coil Solenoid Were Unnecessary.................................................404

i.  An Alternate Way to Route MUX Cables Was Unnecessary, Not Industry Standard, and Was Not Practical. ...................................................409

VIII.  BP REASONABLY BELIEVED THAT TRANSOCEAN HAD MAINTAINED THE *DEEPWATER HORIZON* IN A MANNER SUITABLE TO DRILL THE MACONDO WELL. ...................................411

A.  The *Deepwater Horizon* Underwent Several BP Audits Prior to the Incident. ..............................................411

1.  BP Conducted Audits of the *Deepwater Horizon* from 2001-2009...................................................411

2.  BP Conducted an Integrated Acceptance Test of the *Deepwater Horizon* in 2001...................................414

3.  BP Conducted a Technical Rig Audit of the *Deepwater Horizon* in 2005. ....................................415

4.      BP's May 2007 *Deepwater Horizon* Marine Assurance Audit and DP Proving Trials. ..................................................415

5.      BP Conducted a Technical Rig Audit of the *Deepwater Horizon* in 2008. ..................................................417

6.      BP Conducted a Follow-Up Technical and Marine Assurance Audit of the *Deepwater Horizon* in 2009 ................................................418

7.      The *Deepwater Horizon* Did Not Resume Drilling Operations Until the BP Wells Team, Marine Group, and Transocean Approved the Resumption of Operations. ...........................419

8.      BP Appropriately Oversaw Transocean's Efforts to Closeout the Findings from the September 2009 Audit. ...................420

9.      Transocean Represented to BP that Certain Audit Findings Had Been Successfully Addressed by April 2010. ...............426

10.    On April 20, 2010, No Safety-Critical Audit Findings Were Outstanding. ..................................................430

B.     The *Deepwater Horizon* Underwent Several Other Maritime Audits, Inspections, and Certifications Prior to the Incident. ...................430

1.      Transocean's Safety Responsibilities, Including Audit Responsibilities, under the ISM Code. ...................................431

2.      Audits on behalf of the Marshall Islands by Det Norske Veritas and the American Bureau of Shipping Consistently Found the *Deepwater Horizon* in Compliance with the ISM Code. ...................434

3.      The Coast Guard Examined the *Deepwater Horizon* Annually. ........435

4.      ModuSpec USA Performed a Rig Condition Assessment of the *Deepwater Horizon* in 2005 and April 2010. ..........................437

5.      The 2010 Lloyd's Register Audit. ..................................443

IX.    AS IMPLEMENTED ON THE *DEEPWATER HORIZON*, TRANSOCEAN'S DUAL COMMAND STRUCTURE WAS ALSO A PROXIMATE CAUSE OF THE INCIDENT ..................................................446

A.     The *Deepwater Horizon* Crew Was Confused with Regard to the Command Structure. ..................................................446

B.     The Command Structure Required a Transition of Authority in an Emergency, Which Increased the Risk of Further Confusion and Delay in a Critical Situation. ..................................................449

C.     As a Result of Confusion and Delay Caused by Transocean's Dual Command Structure, the Crew Failed to Activate the EDS in Time to Save the *Deepwater Horizon*. ..................................................451

1.      Proper Activation of the EDS Would Have Saved the *Deepwater Horizon*. ..................................................456

2.      Inadequate Qualifications and Training Contributed to the Crew's Failure to Activate the EDS Before The Explosions. .............457

3.      Neither Captain Kuchta nor OIM Jimmy Harrell Was Properly Qualified or Adequately Trained to be Master of the *Deepwater Horizon.* ...................................................................458

X.    **BP PROMPTLY INVESTIGATED AND ACCURATELY REPORTED ON THE CAUSES OF THE INCIDENT.** ...............................................459

A.    **The Methodology of BP's Internal Investigation.** ......................459

1.      The Structure and Scope of the Investigation. ....................459

2.      The BP Internal Investigation Team Sought but Was Not Provided Access to Evidence Sufficient to Perform a Complete Systemic Analysis. ..................................................462

B.    **BP's Investigation Determined the Incident Had Multiple Causes Involving the Conduct of Multiple Parties.** ....................................463

C.    **The BP Internal Investigation Report Recommendations and Their Implementation by BP.** ...............................................................464

D.    **Other Parties Did Not Conduct Equally Meaningful Investigations.** ...........466

1.      Halliburton. ..................................................................466

a.      Halliburton Intentionally Hid and Destroyed Evidence and Misled Investigators. ...................................466

i.      Tim Probert's Incorrect Testimony to Congress. .......466

ii.      Tommy Roth's Incorrect Testimony to the NAE. .......467

iii.      Halliburton's Destruction of Test Results and Its Failure to Timely Produce Roth's Notes. ....................467

iv.      Halliburton's Failure to Timely Produce Rig Cement Samples. ....................................................469

b.      Halliburton Has Refused to Accept any Responsibility for Its Conduct. ....................................................472

2.      Transocean ....................................................................472

a.      Transocean Has Admitted It Was Negligent. ............473

b.      Transocean's Negligence Was Not Limited to the Matters for Which It Has Admitted Negligence. ..................474

XI.    **BP'S CONDUCT WITH REGARD TO THE MACONDO WELL WAS CONSISTENT WITH ITS STRONG COMMITMENT TO SAFETY** ..................475

A.    **In the Years Preceding the Incident, BP Enhanced Its Process Safety Management System.** ...............................................................475

1.    BP Developed and Implemented a New Safety Management System. ......................................................................475

2.    BP's Leadership Was Committed to and Emphasized Process Safety. ........................................................................477

3.    BP Enhanced Its Training on Process Safety Issues. ..........................479

4.    BP Increased the Amount and Types of Feedback on Process Safety Performance Metrics. ......................................481

B.    BP Had a Positive and Supportive Safety Culture. ........................483

1.    Safety Was Always the First Priority. ....................................483

    a.    BP's Leadership Set the Tone from the Top. ..........................483

    b.    BP's Leadership in the GoM SPU Engaged Contractors to Support the Message that Safety Was a Top Priority. ........485

    c.    BP Emphasized the Importance of Safety in Employee Performance Evaluations. ..................................487

    d.    BP Had Programs and Initiatives to Emphasize Safety As the Number One Priority in Operations. ............................488

2.    BP Utilized Surveys to Ensure that Its Employees and Contractors Understood that Safety Was the Number One Priority. ..................................................489

3.    BP Had Procedures In Place to Institutionalize Learning From Incidents and Near Incidents. ..............................................491

4.    BP Did Not Sacrifice Safety to Decrease Costs or to Save Time. ......492

    a.    The Initiatives Taken by BP to Improve Process Safety in the Years Leading Up to the Incident Are Not Indicative of a Company that Was Cutting Corners to Save Money. ....................................................492

5.    The "Every $ Counts" Slogan Was Solely About Increasing Efficiency. ..................................................493

    a.    The Removal of the BP Field HSSE Advisor from Rigs Was Done to Eliminate Duplication and Reduce Confusion. ..........................................................494

    b.    Increases in Production and Decreases in Cash Costs in the GoM SPU Were Unrelated to Safety. ...............................495

    c.    Safety Was Never Sacrificed at the Macondo Well to Save Time or Money. ................................................497

    d.    No One Ever Rushed Operations at Macondo to Get the *Deepwater Horizon* to the Kaskida Well Sooner. ....................499

6.   Kevin Lacy, Among Others, Supported and Helped Implement BP's Safety Initiatives.................................................................500

7.   E-mails Between Guide and Sims Do Not Reflect a Poor Safety Culture or Have Any Causal Effect. .......................................501

   a.   The March 2010 E-mails. ........................................501

   b.   The April 2010 E-mails.............................................502

C.   BP Had Process Safety Policies and Procedures in Place to Identify and Mitigate Risks Associated With Deepwater Drilling in the Gulf of Mexico. ............................................................................................505

1.   BP Had Process Safety Systems Governing Deepwater Drilling in the Gulf of Mexico Before the Adoption of OMS. ...........................505

   a.   Beyond the Best Common Process. ............................505

   b.   The Drilling and Wells Operations Practice. ..............507

   c.   Drilling Engineering Technical Practices. ................508

   d.   The Way We Work. ....................................................508

2.   The GoM SPU Adopted OMS in Late 2008. .......................................509

3.   The GoM Drilling & Completions Organization Implemented OMS in Late 2009. ...............................................................................512

4.   BP Managed and Monitored Process Safety Risks Associated With MODUs Owned by Contractors in the Gulf of Mexico. ...........513

   a.   BP Appropriately Managed the Risks Associated with Loss of Well Control. ..................................................513

      i.   Loss of Well Control Was Identified As a Top Risk for the GoM SPU and Managed By the SPU Leadership Team, Including the Vice President of D&C. .................................................................513

      ii.   BP Did Not Need to Conduct A Major Accident Risk Quantified Assessment on Either the *Deepwater Horizon* or the Macondo Well. ..................514

   b.   Consistent with Industry Standards and Practices, As Well As BP's OMS, Transocean's Safety Management System Governed the Operations Onboard the *Deepwater Horizon*. .......................................................515

   c.   BP Applied its Beyond the Best Common Process to the Macondo Well..............................................................517

      i.   BP Identified, Assessed, and Managed Key Risks at Each Stage of the Well Planning and Design Process....................................................................517

        ii.      **The Macondo Wells Team Appropriately Identified Risks in the Macondo Risk Register.**..........518

   **D.**     **BP Had a Superior and Improving Safety Record in the Gulf of Mexico.** .......................................................................519

      **1.**     **BP's Internal Documents and Communications Demonstrated the GoM SPU's Outstanding and Improving Safety Record.**............519

      **2.**     **BP Won the MMS Safety Award For Excellence Award in 2008 and Was a National Finalist in 2008 and 2009.** ..........................519

   **E.**     **Government Data Demonstrates that BP Had a Superior and Improving Safety Record in the Gulf of Mexico in the Years Leading Up to the Incident**..................................................................520

      **1.**     **BP's Gulf of Mexico Safety Record Improved in the Years Before the Incident.**................................................................521

      **2.**     **BP Had A Superior Safety Record in the Gulf of Mexico in the Years Before the Incident**...................................................522

**PROPOSED CONCLUSIONS OF LAW** ...................................................526

**XII.**   **INTRODUCTION TO BP's PROPOSED CONCLUSIONS OF LAW.** ..................526

**XIII.**  **THE COURT'S RULINGS ON PRE-TRIAL AND TRIAL MOTIONS.** ...............528

   **A.**     **The Court's Jurisdiction.** ........................................................528

   **B.**     **BP's Pre-Trial Motions *In Limine* and Daubert Motions.** ............................528

   **C.**     **No Adverse Inference Should Be Drawn Against BP Based on Witnesses Invoking Their Fifth Amendment Rights.** ......................................530

   **D.**     **Sanctions Should Be Imposed on Halliburton for Destruction and Spoliation of Evidence.** .........................................................531

**XIV.**  **BPXP'S LIABILITY UNDER THE OIL POLLUTION ACT OF 1990.** .................533

   **A.**     **BPXP Has Acknowledged Its Responsibilities under OPA.** .......................533

   **B.**     **BPXP Agreed to Waive the Cap on OPA Damages.**...................................534

   **C.**     **OPA Liability for the Spill is Divisible.**...................................................535

   **D.**     **BPXP Has No Liability Under OPA for Injuries Not Proximately Caused by the Incident.** .........................................................535

   **E.**     **BPXP Has No Liability Under OPA to Claimants Who Failed to Comply with OPA's Presentment Requirement.** ......................................536

**XV.**   **BPXP'S LIABILITY UNDER THE CLEAN WATER ACT.** ...................................537

   **A.**     **The Court Lacks Jurisdiction to Enter Additional Findings Concerning the Source of the Discharge.**...........................................538

**B.**   **BPXP Is Not Liable for Discharges from the *Deepwater Horizon*.** .................538

    **1.**   **BPXP Was Not the "Owner or Operator" of the *Deepwater Horizon*.** ......................................................................................538

        **a.**   **BPXP Did Not Own the *Deepwater Horizon*.** ...........................538

        **b.**   **BPXP Did Not Demise Charter the *Deepwater Horizon*.** .........538

        **c.**   **BPXP Did Not "Operate" the *Deepwater Horizon*.** ..................539

    **2.**   **BPXP Was Not the "Person In Charge" of the *Deepwater Horizon*.** ......................................................................................542

**C.**   **BPXP Is Not Liable for Enhanced Penalties Under the Clean Water Act.** ...........................................................................................543

    **1.**   **Negligence.** ..................................................................................544

    **2.**   **Gross Negligence.** .......................................................................547

        **a.**   **Objective Element of Gross Negligence.** ...................548

        **b.**   **Subjective Element of Gross Negligence.** ..................549

    **3.**   **Willful Misconduct.** ....................................................................552

    **4.**   **The CWA's Text Confirms that Treble Fines Require Extreme Misconduct Characterized by a Culpable Mental State.** ...................553

    **5.**   **The Totality of Actions and Omissions Must Be Considered in Determining Negligence, Gross Negligence, or Willful Misconduct.** .................................................................................556

    **6.**   **BP's Liability Can Be Based Only on Conduct that Legally Caused the Incident.** ....................................................................558

    **7.**   **Agents and Independent Contractors.** .......................................560

        **a.**   **BP Cannot Be Vicariously Liable for the Acts of Its Contractors.** ..............................................................560

        **b.**   **The Conduct of Agents Cannot Be Considered for Treble Fines or Punitive Damages.** ..............................564

    **8.**   **A Court Must Consider Compliance with Government Regulations and Industry Standards.** .......................................566

**D.**   **BP's Conduct Establishes That It Is Not Culpable for Treble Fines under the CWA.** .....................................................................569

    **1.**   **BP Exercised Due Care by Implementing Numerous Safety Steps Designed to Avoid a Blowout.** .........................................569

    **2.**   **BP Maintained a Strong Safety Culture.** ...................................576

    **3.**   **BP's Well Design Was Safe and Appropriate.** ..........................578

    **4.**   **BP Maintained a Safe Drilling Margin.** ....................................581

|  | a. | BP Fully Complied with the Drilling Margin Regulation..................................................581 |
|  | b. | No Alleged Violation of the Safe Drilling Margin Regulation Could Have Caused the Incident. ..........................584 |
| 5. | The Temporary Abandonment Procedure Satisfied the Standard of Care and Was Not Causal...................................586 | |
| 6. | BP Is Not Liable for Relying on Halliburton to Conduct the Cement Job. ..................................................588 | |
| 7. | Using Six Centralizers Was Safe, and the Number of Centralizers Used Had No Relationship to the Incident. ..................589 | |
| 8. | Following Industry Practice in Not Running a Cement Bond Log Was Safe and Appropriate. .........................................591 | |
| 9. | Circulating a Partial Bottoms-Up Was Safe under the Circumstances. ................................................593 | |
| 10. | No Heavy Pill Was Necessary. ....................................595 | |
| 11. | The Float Collar Was Properly Converted. ........................596 | |
| 12. | Not Disclosing M57B to Halliburton Played No Role in the Incident. ................................................596 | |
| 13. | Using LCM Spacer Was Safe and Appropriate.................597 | |
| 14. | BP Allowed the Cement to Set Before Conducting the Negative Pressure Test. .........................................598 | |
| 15. | BP's Negligent Supervision of the Negative Pressure Test Does Not Constitute Gross Negligence or Willful Misconduct. ..................599 | |
|  | a. | The Negative Pressure Test Was Properly Designed..............599 |
|  | b. | BP's Conduct Relating to Interpreting the Negative Pressure Test Did Not Amount to Gross Negligence or Willful Misconduct...............................................599 |
|  | c. | BPXP's Negligent Supervision Is Only One of Multiple Proximate Causes of the Incident.................................603 |
| 16. | BP Is Not Liable for Any Failures in Well Monitoring or Well Control. .................................................604 | |
| 17. | The *Deepwater Horizon's* BOP Design Was Suitable for the Macondo Well...............................................604 | |
|  | a. | BP Collaborated on the Design and Configuration of the BOP With Other Parties Including Cameron and Transocean...............................................604 |
|  | b. | The BOP's Configuration Satisfied the Standard of Care. ...............................................605 |

c. None of the Alleged Alternative Features Were Necessary or Make the BOP Design Inadequate. ..................607

18. BP Is Not Liable for Transocean's Failure to Properly Maintain the *Deepwater Horizon's* BOP or Other Equipment. .........608

19. The Guide/Sims E-Mails Do Not Show Negligence and Are Irrelevant in Any Case..............................................609

XVI. BP'S LIABILITY UNDER MARITIME LAW. ........................................609

 A. OPA Displaces All Maritime Law Claims Against BP. ...................610

 B. BP's Liability under Maritime Law.................................................611

 C. Apportionment. ................................................................................612

 D. BP Is Not Liable for Punitive Damages under Maritime Law. .....613

XVII. BP P.L.C. IS NOT LIABLE UNDER ANY LAW. .................................614

XVIII. TRANSOCEAN'S LIABILITY. ...............................................................616

 A. Transocean's Liability under Maritime Law. ...............................617

  1. Transocean Is Liable for the *Deepwater Horizon's* Unseaworthiness.......................................................617

   a. Maritime Law Imposes an Absolute Duty of Seaworthiness on Vessel Owners.................................617

   b. As Implemented on the *Deepwater Horizon*, Transocean's Dual Command Structure and Inadequate Training Caused the Vessel to be Unseaworthy.................................................619

    i. The *Deepwater Horizon's* Divided Command Structure Caused Confusion Aboard the Vessel on April 20, 2010. .........................................619

    ii. Transocean Failed to Train the Crew Regarding When to Activate the EDS.................................620

    iii. The *Deepwater Horizon* Did Not Have a Properly Trained Master..................................................620

   c. Transocean's Failure to Properly Maintain the BOP Caused the *Deepwater Horizon* to be Unseaworthy. ...............621

  2. Transocean Was Negligent.................................................622

   a. Transocean Misinterpreted the Negative Pressure Tests.......622

   b. Transocean Failed in Its Responsibility to Monitor the Well...........................................624

       c.      Transocean Failed in Its Responsibility to Control the Well....................................................................................625

       d.      Transocean Was Negligent for Implementing a Confusing Command Structure and Failing to Train Captain Kuchta. ......................................................628

       e.      Transocean Failed to Properly Maintain the BOP, Causing the AMF/Deadman Not to Function.........................629

    3.     Transocean Breached Its Drilling Contract with BPAP. ..................631

**B.**    **Transocean Cannot Limit Its Liability Under Limitation Act. .....633**

    1.     Standards for Limiting Liability. ...............................................633

    2.     Claimants Have Proven Both Unseaworthiness and Negligence by Transocean. .........................................................636

    3.     Transocean Had Knowledge and Privity of Negligent and Unseaworthy Conditions. .......................................................636

**C.**    **Transocean's Liability Under OPA.............................................637**

**D.**    **Transocean's Liability Under the Clean Water Act. ....................639**

**XIX.**   **HALLIBURTON'S LIABILITY. ...............................................639**

**A.**    **Halliburton Is Liable Under Maritime Law for Its Defective Cement Job. .............................................................................640**

    1.     Halliburton Was Negligent in Designing the Cement Slurry............640

    2.     Halliburton Is Strictly Liable for the Defective Cement Slurry. .......642

**B.**    **Halliburton's Mud Loggers Failed To Properly Monitor The Well. ...........643**

**XX.**   **TRANSOCEAN AND HALLIBURTON CANNOT OBTAIN INDEMNITY FROM BP. .......................................................................644**

**A.**    **Bases For Invalidating Indemnities.................................................644**

    1.     Material Breach of Contract.....................................................644

    2.     Material Increase in Risk or Prejudicing Rights. ............................646

    3.     Intentional or Willful Misconduct, Including Fraud.........................648

    4.     Punitive Damages/Penalties. ....................................................648

    5.     Gross Negligence. ...................................................................648

**B.**    **Transocean Is Not Entitled to Indemnity from BP.......................650**

    1.     Transocean Breached Its Fundamental Contract Obligations..........650

    2.     Transocean Materially Breached Its Fundamental Contract Obligations to Exercise Due Diligence and Use Reasonable Means to Control and Prevent Blowouts. ............................651

3.     **Transocean Materially Breached Its Fundamental Contract Obligation to Maintain Well Control Equipment.**..............................**654**

4.     **Transocean Materially Breached Its Fundamental Contract Obligation to Properly Train and Qualify Its Captain.**.....................**655**

5.     **Transocean Materially Increased the Risk to BPAP as Indemnitor.**.................................................................**657**

6.     **Transocean Is Not Entitled to Indemnity If It Acted With Gross Negligence or Willful Misconduct.**............................**659**

7.     **Transocean Is Not Entitled to Indemnity Under The Language Of The Drilling Contract.**.......................................**659**

8.     **Transocean Cannot Recover Defense Costs From BPAP.**.................**661**

C.     **Halliburton Is Not Entitled to Indemnity From BP.**.......................................**661**

    1.     **Halliburton Breached its Fundamental Contract Obligations.**.........**661**

        a.     **Halliburton Materially Breached Its Fundamental Contract Obligations to Provide Cementing Services, Recommend Fit-For-Purpose Slurry Designs, and Provide Non-Conventional Solutions.**.....................................**662**

        b.     **Halliburton Materially Breached Its Fundamental Contract Obligation to Monitor the Drilling Operation Parameters, Understand Their Significance, and Notify Transocean and BP of Any Safety Implications.**.....................**664**

    2.     **Halliburton Materially Increased the Risk to BP.**..............**665**

    3.     **Halliburton Is Not Entitled to Indemnity if It Acted with Gross Negligence or Willful Misconduct.**................................**667**

    4.     **No Defense Costs.**...........................................................**667**

XXI.   **TRANSOCEAN AND HALLIBURTON ARE LIABLE TO BP.**..............**668**

A.     **BP Is Entitled to Contribution under OPA.**....................................**668**

B.     **BP Is Entitled to Subrogation under OPA.**.....................................**669**

C.     **BP Is Entitled to Subrogation and Contribution under Maritime Law.**......**670**

    1.     **BP Has Contribution Rights Against Transocean and Halliburton under Maritime Law.**..................................**670**

    2.     **BP Has Subrogation Rights Against Transocean and Halliburton under Maritime Law.**..................................**671**

D.     **Transocean and Halliburton Cannot Rely on the Contractual Indemnity Provisions.**.................................................................**672**

E.     **BP Can Recover Direct Damages from Transocean and Halliburton.**.........**672**

**F.      Transocean and Halliburton are Liable to BP for Their Proportionate Share of Fault. ...................................................................................................672**

**XXII.  SUMMARY OF CONCLUSIONS. ...............................................................................673**

## INTRODUCTION

**I.    THE PARTIES AND THE NATURE OF THE PROCEEDINGS.**

    **A.    The Parties.**

        **1.    The BP Defendants.**

      1.    BP Exploration & Production Inc. ("BPXP") is the BP entity that bid for, and was awarded the right to lease, Mississippi Canyon Block 252 ("MC252") in March 2008 and that was named a responsible party for the *Deepwater Horizon* oil spill by the U.S. government on April 28, 2010, under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701.   Agreed Stipulations No. 96 (Rec. Doc. 5927); Statement of BP Exploration & Production Inc. Re Applicability of Limit of Liability Under Oil Pollution Act of 1990 (Rec. Doc. 559).   BPXP originally leased 100% of the MC252 prospect leasehold from the United States, but through lease exchange agreements and assignments had reduced its leasehold interests to a 65% interest. Agreed Stipulations No. 100 (Rec. Doc. 5927); BP Parties' Answer to the First Amended Master Complaint, Cross-Claim, and Third-Party Complaint for Private Economic Losses in Accordance with PTO No. 11 [CMO No. 1] Section III(B1) ("BP B1 Answer") ¶ 247 (Rec. Doc. 4130). BPXP is a Delaware corporation with its principal place of business in Texas.   BP B1 Answer ¶ 210; BP Parties' Answer to the Morales Original Petition ¶ 7 (Rec. Doc. 1216).   BPXP is the only BP defendant in the United States' civil case in this proceeding.   Complaint of the United States of America (Civ. A. No. 2:10-cv-04536, Rec. Doc. 1).

      2.    BP America Production Company ("BPAP") (collectively with BPXP, "BP") was a party to the drilling contract concerning the use of the *Deepwater Horizon* to drill the Macondo well.   Agreed Stipulations No. 98 (Rec. Doc. 5927); BP B1 Answer ¶ 211 (Rec. Doc. 4130).   BP America Production Company is a Delaware corporation with its principal place of business in Texas.   BP B1 Answer ¶ 211 (Rec. Doc. 4130).

3.    BPXP leased the MC252 block from the United States and designed the Macondo well, and BP selected and hired the contractors to execute the Macondo well plan.  BP B1 Answer ¶ 219 (Rec. Doc. 4130).

4.    BP America Inc., BP Company North America Inc., and BP Corporation North America Inc. are holding companies with no Gulf of Mexico operational assets.  BP p.l.c.'s Responses and Objections to Plaintiffs' Interrogatories, Requests for Production, and Requests for Admission at 69 (No. 37) (Dec. 8, 2010) ("BP p.l.c.'s Discovery Responses (Dec. 8, 2010)") (attached hereto as Ex. 1).[1]

5.    BP America Inc. is a Delaware corporation with its principal place of business in Texas; BP Company North America Inc. is a Delaware corporation with its principal place of business in Illinois; and BP Corporation North America Inc. is an Indiana corporation with its principal place of business in Texas.  BP's Answer to First Amended Complaint of the State of Veracruz ¶¶ 11-12 (Rec. Doc. 5339).

6.    BP Products North America Inc. is an entity primarily involved in "downstream" operations, including crude oil refineries and the transportation and marketing of refined products such as gasoline.  BP p.l.c.'s Discovery Responses at 69 (No. 37) (Dec. 8, 2010) (Ex. 1).  It is a Maryland corporation with its principal place of business in Illinois.  *Id*; The BP Parties' First Amended Answer to the First Amended Complaint of the State of Veracruz ¶ 13 (Rec. Doc. 8658-2).

7.    Each of the foregoing BP defendants is a direct or indirect wholly-owned subsidiary of BP p.l.c.  BP p.l.c. is a corporation organized under the laws of England and Wales

---

[1] "Ex." refers to documents contained in the Compendium of Exhibits to BP's Proposed Findings of Fact and Conclusions of Law (June 21, 2013), filed contemporaneously herewith.  The Compendium contains only documents that do not have a transcript, exhibit, or "Rec. Doc." citation.

and does not have a registered agent for service of process in the United States. BP B1 Answer ¶ 212 (Rec. Doc. 4130). It neither leased the MC252 leasehold, nor was a party to the drilling rig contract, and no employees of BP p.l.c. were present aboard the *Deepwater Horizon* on April 20, 2010. BP p.l.c.'s Discovery Responses at 69 (No. 37) (Dec. 8, 2010) (Ex. 1).

### 2. The Transocean Defendants.

8. Several Transocean entities were involved in drilling activities at the Macondo well. Triton Asset Leasing GmbH was the owner of the *Deepwater Horizon* vessel. Tr. 4518 (Newman).[2] Transocean Holdings LLC was a signatory to the drilling contract with BP America Production Company concerning the use of the *Deepwater Horizon* to drill the Macondo well. Agreed Stipulations Nos. 91, 94-95, 98 (Rec. Doc. 5927). Transocean Deepwater Inc. employed numerous personnel onboard the *Deepwater Horizon*, and Transocean Offshore Deepwater Drilling Inc. employed a number of land-based rig operations personnel, including the *Deepwater Horizon* Rig Manager. Tr. 4518 (Newman).

9. The foregoing Transocean defendants (collectively, "Transocean") are subsidiaries of Transocean Ltd. Tr. 4518 (Newman).

10. Transocean's responsibilities at the Macondo well included drilling, monitoring, and shutting-in the well, as well as operating and maintaining the *Deepwater Horizon* and its blowout preventer (BOP). TREX 004271[3] at 16-18; Tr. 4658, 60 (Newman); *see also* Tr. 4694-95 (Newman).

---

[2] "Tr." refers to the transcript of proceedings of the Phase I trial. The relevant witness is listed in parentheses after the transcript page number.

[3] "TREX" refers to exhibits admitted into evidence at the Phase I trial.

### 3.    Halliburton.

11.    Halliburton Energy Services, Inc. ("Halliburton") is a wholly-owned subsidiary of Halliburton Company.  Halliburton Energy Services, Inc.'s Disclosure Statement, Civ. A. No. 10-01573 (Rec. Doc. 8).[4]   Halliburton provided cementing services for the Macondo well, including designing, testing, and pumping the cement slurry.  Tr. 7264 (Beck).  Halliburton's Sperry division was responsible for monitoring the well.   TREX 000611 at BP-HZN-2179MDL00338244.

### 4.    Cameron.

12.    Cameron International Corporation, f/k/a Cooper Cameron Corporation, designed and manufactured the blowout preventer on the *Deepwater Horizon* and used at the Macondo well.  Answer of Defendant/Third-Party Defendant Cameron to First Amended B1 Master Claim and Complaint ¶ 230 (Rec. Doc. 4114).

### 5.    M-I, LLC

13.    M-I, LLC ("M-I") contracted with BP to monitor and provide goods and attendant services related to the drilling fluid, or "mud," for drilling operations on the Macondo well. Agreed Stipulations Nos. 161-62 (Rec. Doc. 5927).

### 6.    Claimants.

14.    The claimants in this action include those whose claims were not settled in the Economic & Property Damages or Medical Settlements previously approved by this Court.  The Court ordered that the Plaintiffs' Steering Committee would represent the many claimants in MDL 2179 at the Phase I Trial.  Second Amended Pretrial Order No. 41 [CMO No. 4] at 3 (Rec. Doc. 6592).

---

[4] "Civ. A. No." is used in this section to designate the Civil Action Number of a MDL 2179 member case pending before this Court.

### 7.      State and Federal Governments.

15.      As a result of their claims against some or all defendants, the States of Alabama and Louisiana and the United States of America were party plaintiffs to the Phase I Trial.

### B.      The Nature of the Action.

16.      The *Deepwater Horizon* was a mobile offshore drilling unit (MODU) owned and operated by Transocean.  *See In re Oil Spill*, 841 F. Supp. 2d 988, 992 (E.D. La. 2012).  BP hired Transocean to use the *Deepwater Horizon* to drill the Macondo well, which was located on the seabed at Mississippi Canyon Block 252 in the Gulf of Mexico.  On the evening of April 20, 2010, a loss of well control allowed hydrocarbons to escape from the *Deepwater Horizon* and its appurtenances.  *Id*. at 991.

17.      The resulting fire destroyed and sank the rig on April 22, 2010.  Eleven men tragically perished.  Hydrocarbons thereafter began to flow from the *Deepwater Horizon*'s appurtenances.  *See In re Oil Spill*, 792 F. Supp. 2d 926, 930 n.1 (E.D. La. 2011).  These events are collectively referred to herein as "the Incident."

### C.      The Claims at Issue in MDL 2179.

18.      While all arising from the Incident, the claims centralized before this Court are advanced by a wide variety of plaintiffs and implicate numerous different legal theories.  The following paragraphs describe the most significant categories of claims that remain pending in these proceedings.

### 1.      Economic and Property Damages Cases.

19.      The majority of the pending cases seek to recover for alleged economic damages such as lost personal income, lost business revenue, or alleged diminution in the value of Gulf Coast real property.  Most of these cases involve claims under OPA, and many also include claims under state law or general maritime law theories of negligence.

5

### 2.    Post-Incident Medical Cases.

20.    Numerous plaintiffs allege harmful exposure to crude oil or to chemical dispersants used in remediation activities.  These plaintiffs, who include cleanup workers, Gulf Coast residents, and visitors to the Gulf Coast, primarily assert claims under general maritime law and state law.

### 3.    Day-of-Incident Personal Injury and Wrongful Death Cases.

21.    A number of the cases before this Court allege personal injuries or wrongful death arising directly from the events of April 20, 2010.  The plaintiffs in these cases include persons onboard or near the *Deepwater Horizon* at the time of the Incident.  The claims in these suits are generally brought under state law or maritime theories of negligence or unseaworthiness.  Most of these claims have now been resolved through settlement.

### 4.    Vessels of Opportunity Charter Cases.

22.    Several dozen contract-based actions involve allegations that defendants breached obligations to charter parties who agreed to allow their vessels to be used in the Vessels of Opportunity ("VoO") program implemented as part of the oil spill clean-up operations.  *See* JPML Transfer Order (April 18, 2011) (Rec. Doc. 2041) (transferring sixteen VoO charter cases to this Court).

### 5.    The Transocean Limitation Action.

23.    On May 13, 2010, certain Transocean defendants brought an action in the Southern District of Texas under the Limitation of Liability Act, 46 U.S.C. § 30501 (2006) *et seq.*, as parties seeking to limit their liability as owners pro hac vice of the *Deepwater Horizon*. The Limitation Action was transferred to this Court for all purposes by the United States District Court for the Southern District of Texas pursuant to Supplemental Rule F(9) on August 16, 2010. Rec. Doc. 62.  In February 2011, Transocean filed a third-party complaint against BP, the U.S.

government, and other corporations involved in the Incident, naming those entities as formal parties in the Limitation of Liability action.  Rec. Doc. 1320.

### 6.    United States Government Claims.

24.    The U.S. Department of Justice ("DoJ") filed a civil complaint in December 2010 against BPXP, Transocean, Anadarko, MOEX, and others seeking a declaration of liability under OPA and civil penalties under the Clean Water Act ("CWA"), 33 U.S.C. § 1251; *See* Civ. A. No. 10-04536.  The United States has settled its claims versus Transocean and MOEX.

### 7.    State and Local Government Claims.

25.    The State of Alabama has filed lawsuits against Anadarko, Transocean, Halliburton, and BP seeking damages for alleged economic and environmental harms, including natural resource damages, civil penalties under state law, declaratory and injunctive relief, and punitive damages as a result of the Incident.  Rec. Doc. 1887; Civ. A. Nos. 10-04182, 13-02645, 13-02646, 13-02647, 13-02813.

26.    The State of Louisiana filed a lawsuit against BP and others seeking to declare various defendants liable for removal costs and damages, including natural resource damages under federal and state law, and to recover civil penalties, attorneys' fees, and response costs under state law.  Rec. Doc. 2031.

### 8.    Foreign Government Claims.

27.    Three States of the Republic of Mexico filed lawsuits under OPA and general maritime law alleging that the oil spill harmed their tourism, fishing, and commercial shipping industries (resulting in, among other things, diminished tax revenue), damaged natural resources and the environment, and caused the States to incur expenses in preparing a response to the Incident.  Civ. A. Nos. 10-4239, 10-4240, 10-4241.  On April 19, 2013, the Mexican federal government filed suit against defendants seeking a determination that each defendant bears

liability under OPA for damages that include (i) the costs of responding to the spill; (ii) natural resource damages allegedly recoverable by Mexico as an OPA trustee; and (iii) the net loss of taxes, royalties, fees, or net profits.  Civ. A. No. 13-01441.

### 9. Claims Between Defendants.

28.     Settlements that BP has reached with other defendants (such as Weatherford; M-I, LLC; Anadarko; MOEX; and Cameron), as well as the class settlements BP has reached with plaintiffs (which have resulted in the assignment of certain of BP's cross-claims to certain settlement class members) have resolved many of the cross-claims between defendants.  *See*, *e.g.*, Rec. Docs. 7278, 7279.  Significant claims between certain defendants remain, including BP's claims against Halliburton and Transocean.

### D. The Phase I Trial.

29.     At the outset of these proceedings, the Court scheduled a Trial of Liability, Limitation, Exoneration, and Fault Allocation and adopted a phased approach to discovery and trial.  Under that approach, Phase I of the Limitations Trial would "be focused on the activities and events leading up to and including April 20, 2010 Incident and resulting explosion, fire and loss of the rig."  Pretrial Order No. 11 [CMO No. 1] at 8 (Rec. Doc. 569); *id.* at Ex. A at 4 (Rec. Doc. 569-1).

30.     The first Trial Phase (or the "Incident" Phase) was structured to address issues arising out of the conduct of various parties allegedly relevant to the loss of well control at the Macondo well, the ensuing fire and explosion on the *Deepwater Horizon* on April 20, 2010, the sinking of the vessel on April 22, 2010, and the initiation of the release of oil from the *Deepwater Horizon* or the Macondo well during those time periods, including whether any party was grossly negligent.  *Id.* at 2.  The Court ultimately scheduled the Phase I Trial to begin on February 25, 2013.  Third Amended Pretrial Order No. 41 [CMO No. 5] (Rec. Doc. 7810).

31.     Following the conclusion of the Phase I Trial, the Court ordered the parties to submit post-trial briefs and proposed Findings of Fact and Conclusions of Law not later than June 21, 2013.  Rec. Doc. 9536.  This document contains BP's proposed findings of fact and conclusions of law.

## PROPOSED FINDINGS OF FACT

**II.     BP MANAGED THE DRILLING OF THE MACONDO WELL BY ASSEMBLING A TEAM OF WORLD-CLASS CONTRACTORS, EACH OF WHICH HAD DISTINCT ROLES AND RESPONSIBILITIES WITH REGARD TO THE WELL.**

### A.     Deepwater Drilling in the Gulf of Mexico.

32.     Oil and gas production in the Gulf of Mexico accounts for a substantial portion of the United States supply and "[i]n recent years the bulk of new production has come from deep sea operations with scores of exploratory and production wells developed at depths equal to or substantially greater than the 5,000-foot depth of the [Macondo well] …."  TREX 075074 at 11.

33.     Deepwater drilling operations are not carried out by a single entity or the "operator" alone; instead, the well construction process is, and needs to be, a collaborative effort involving various entities, including the well operator, government officials, the drilling contractor, the mud contractor, the casing contractor, the cement contractor, and others.  Tr. 4682-83 (Newman); TREX 041215; Tr. 2177-78 (Heenan); Tr. 3014 (Probert); Breazeale Dep.[5] 25 ("[I]t is a team effort to drill the well"); Tr. 8584-85 (Guide); Tr. 1849 (Ezell); Tr. 511-12, 517-18 (McKay); Tr. 8012 (Robinson) ("It's never run as a single individual in command control.  It's a collaborative effort among a team.").

34.     As a matter of standard industry practice, well operators rely on drilling contractors to carry out the specialized activity of offshore drilling.  Tr. 4197-98 (Webster); Tr.

---

[5] "[NAME] Dep." refers to deposition testimony designated by the parties in connection with the Phase I trial, including deposition testimony that was played in the courtroom.

472 (Bea); Tr. 2178 (Heenan) (the "vast majority" of wells are drilled by a drilling contractor). The drilling contractor typically owns the drilling rig and provides the crew.  Tr. 2178 (Heenan); Saucier Dep. 205-06; Tr. 4197 (Webster) (oil companies depend on competent contractors to carry out offshore drilling operations).

35.    In fact, Plaintiffs' process safety expert Robert Bea testified that a prudent operator **should** put in layers of protection by hiring a drilling contractor with a track record and reputation for safe drilling.  Tr. 472 (Bea).  *See also* Tr. 7271 (Beck) (defining sound engineering and judgment as relying on people that have experience and using their experience, and in some cases even their intuition, to make the right decisions).

### 1.    Offshore Drilling Is Extensively Regulated by the United States.

36.    Pursuant to 30 C.F.R. § 250.101, the Minerals Management Service (MMS) has the authority "to regulate oil, gas, and sulphur exploration, development, and production operations on the Outer Continental Shelf (OCS)."

37.    Under this authority, the United States has promulgated regulations that apply to drilling deepwater wells in the Gulf of Mexico.  *See generally* 30 C.F.R. §§ 250.101 (2011) *et. seq.*

38.    The regulations set forth the general requirements for multiple aspects of drilling operations, including casing and cementing requirements, diverter system requirements, blowout preventer system requirements, drilling fluid requirements, and well control.  30 C.F.R. §§ 250.400-463 (2011).

39.    The operator must submit any Application for New Well, Application for Permit to Drill (APD), and/or Application for Permit to Modify (APM) to the MMS through an electronic system called eWell.  Patton Dep. 29.

40.     The regulations set forth the required information that must be included in each Application.  30 C.F.R. § 250.411-18 (2011).

41.     An MMS drilling engineer reviews "all the information that is submitted related to the well . . . to see if it's [in] compliance with the regulations."  Patton Dep. 29.

42.     After the MMS drilling engineer reviews the application, he either notes deficiencies in the application and returns it to the operator for correction of the deficiencies, or he approves the application.  Patton Dep. 29-30.

43.     When applying to make a change from the original application, BP would file a revised APD.  BP was not required to update previously filed APDs when it filed a revised APD.  Douglas Dep. 116.

44.     30 C.F.R. § 250.140 (2011) provides a mechanism for an operator to receive oral approval from the MMS to proceed with certain drilling operations.

45.     While the regulations set forth the general requirements for drilling, "[t]he District Manager may approve departures from the drilling requirements specified in this subpart."  30 C.F.R. § 250.409 (2011).

46.     Prior to drilling a new well or before performing a sidetrack, bypass, or deepening a well, an operator must obtain approval from the MMS District Manager.  30 C.F.R. § 250.410 (2011).

> **2.     Federal Regulations Reflect the Shared Roles Between Operators and Contractors in Drilling Deepwater Wells.**

47.     Section 250.107(a) provides that the operator ***and any designated contractors*** "must protect health, safety, property, and the environment by:  (1) performing all operations in a safe and workmanlike manner; and (2) maintaining all equipment and work areas in a safe

condition." *See also* Tr. 4694 (Newman) (regulations apply not only to operators, but to contractors as well, including with respect to well control).

48.     Section 250.401 requires that the operator or designated contractors "must take necessary precautions to keep wells under control at all times."

**B.     Consistent with Industry Practice and Federal Regulations, BP Hired Third-Party Contractors to Drill the Macondo Well.**

49.     On March 19, 2008, BPXP acquired a lease from the United States of 5,760 acres of property on the Outer Continental Shelf comprising Mississippi Canyon Block 252 ("MC252 lease"). The ten-year lease started on June 1, 2008. Agreed Stipulations No. 96 (Rec. Doc. 5927). As the lessee, BPXP was the operating rights owner and the operator. Tr. 512-513 (L. McKay). BPXP assigned minority working interests in the MC252 lease to Anadarko Petroleum Corporation and Anadarko E&P Company LP (collectively, "Anadarko") and MOEX Offshore 2007 (a wholly-owned subsidiary of MOEX USA Corporation, which is in turn a wholly-owned subsidiary of Mitsui Oil Exploration Co., Ltd.) (collectively, "MOEX"). Agreed Stipulations No. 100 (Rec. Doc. 5927); TREX 001243.

50.     In its role as operator, BP was primarily responsible for designing the Macondo well, including engineering decisions regarding the well design. Tr. 510 (McKay); Tr. 8583-84 (Guide).

51.     Consistent with industry practice, BP relied on a variety of different contractors to implement and construct the Macondo well design, including Transocean, Halliburton, M-I, Oceaneering, Weatherford, and Dril-Quip. Tr. 8584-86 (Guide) ("[O]nce the well is designed … the drilling engineering team and all the third-party contractors come together with myself. And then … they basically implement the plan step-by-step together."); Tr. 1921 (R. Sepulvado) ("We worked as a team drilling the well. The Transocean guys, third-party people, you know, we

have to all work together to drill the well."); Tr.  511-12 (McKay); Saucier Dep. 204-05 (explaining it is common in the Gulf of Mexico deepwater drilling industry for BP to hire expert contractors to provide specialized services – such as Transocean to run the rig and conduct drilling operations, Halliburton to design, develop, and pour the cement job, and Halliburton/Sperry for expertise in mud logging services).

### C.   BP Contracted with Transocean to Drill the Macondo Well.

52.   On December 9, 1998, R&B Falcon Drilling Co. ("R&B Falcon") and Vastar Resources, Inc. ("Vastar") entered into a drilling contract for the construction, use, and operation of the *Deepwater Horizon* (hereafter "Drilling Contract").  Agreed Stipulations No. 91 (Rec. Doc. 5927); TREX 001356A.

53.   Transocean Holdings, LLC became and is the successor to R&B Falcon under the Drilling Contract.  Agreed Stipulations No. 94 (Rec. Doc. 5927).

54.   BPAP became and is the successor to Vastar under the Drilling Contract.  Agreed Stipulations No. 95 (Rec. Doc. 5927).

55.   BPAP contracted with Transocean Holdings, LLC to drill the Macondo well. Agreed Stipulations No. 98 (Rec. Doc. 5927).

56.   Transocean provided the drilling rig, the *Deepwater Horizon*, and the personnel to operate it.  TREX 004248 at 17; TREX 063213 at Ex. A, ¶ 3; TREX 001356A at BP-HZN-MBI00021470.

### 1.   Transocean and Its Rig, the *Deepwater Horizon*, Had Extensive Experience and Expertise in Deepwater Drilling.

57.   In April 2010, Transocean was the world's largest offshore drilling contractor and a leading provider of drilling management services worldwide.  Tr. 4198 (Webster); Tr. 4677-78, 4682 (Newman) (indicating Transocean is at the top of the market among drilling contractors);

Tr. 2181 (Heenan); TREX 005642 (Transocean Proxy Statement and 2009 Annual Report).  *See also* Tr. 4530 (Newman) (indicating of the approximately 18,000 personnel Transocean employed worldwide, roughly 15,000 worked offshore)

58.     Between 2005 and 2009, Transocean drilled nearly 7,000 wells.  Tr. 4530, 4584 (Newman); D6730[6]; TREX 004255 at 5.  Transocean's fleet of 140 mobile offshore drilling units plus three ultra-deepwater units operated in oceans around the globe and was "one of the most modern and versatile in the world due to its emphasis on technically demanding sectors of the offshore drilling business."  Tr. 4530, 4677-79 (Newman); D6730; TREX 005642.2.1.BP; Tr. 4198 (Webster).

59.     Transocean advertised itself as "a company with worldwide capability" and "more experience drilling deepwater and harsh-environment wells than anyone."  TREX 000940.  *See also* Tr. 4530 (Newman); TREX 005642 at 2.  Transocean claimed: "We're never out of our depth."  TREX 000940.

60.     Transocean's long history of achievements in the offshore drilling industry dates back to 1954 and includes launching the first jackup drilling rig, the first dynamically positioned drillship, and the latest generations of ultra-deepwater drillships and semisubmersibles.  Tr. 4679 (Newman); TREX 005642.2.1.BP.   As Transocean's Chief Executive Officer (CEO) Steve Newman boasted: "With respect to Transocean's people and their achievements, we've been there and done that."  Tr. 4681 (Newman).

61.     According to Newman, it was fair for the public, including operators such as BP, to rely on his statements regarding Transocean's capability to provide "the safest, most effective and efficient drilling at all water depths."  Tr. 4681-82 (Newman).

---

[6] "D" refers to demonstrative exhibits used at the Phase I trial.

62.     Newman praised the *Deepwater Horizon* in particular as one of Transocean's "best-performing rigs" with "an exemplary track record" of drilling deepwater wells in the Gulf of Mexico.  Tr. 4681-82 (Newman) ("[The *Deepwater Horizon*] had done some pretty amazing things."); D4341; D6569.  Transocean's drilling expert, Calvin Barnhill, explained that the *Deepwater Horizon* "had drilled some of the most technologically challenging and advanced wells that have ever been drilled."  Tr. 4268, 4448 (Barnhill).

63.     Since coming into service in 2001, the *Deepwater Horizon* successfully drilled approximately 50 wells, all in the Gulf of Mexico, and all (except one) with BP.  Tr. 1641; 1767-68; 1847 (Ezell); Tr. 4683 (Newman); D4341; TREX 052647.

64.     The *Deepwater Horizon* had previously drilled wells with higher pressures and higher bottom-hole temperatures than those at the Macondo well.  Byrd Dep. 272.

65.     In addition, several of the wells drilled by the *Deepwater Horizon* were in water depths similar to, and in some cases, significantly deeper than the water depth at the Macondo well.  D4341; TREX 052647.  In 2005, BP and the *Deepwater Horizon* set a record by drilling the Stones well in the Walker Ridge area of the Gulf of Mexico in more than 9,500 feet of water – approximately twice the water depth of the Macondo well.  Tr. 1769-70 (Ezell); Tr. 4683-84 (Newman); D4341; TREX 052647.

66.     In September 2009, Transocean safely and successfully drilled the Tiber well to a total depth of 35,050 feet – almost twice the depth of the Macondo well and a record for the deepest oil and gas well ever drilled.  Tr. 1769-70 (Ezell); Tr. 4268, 4448 (Barnhill); Tr. 4680 (Newman); Tr. 8230-31 (Shaw); Tr. 8597-98 (Guide); TREX 005642.4.4.

2.      **Transocean's Responsibilities.**

a.      **Transocean Was Responsible for Providing a Drilling Rig and Equipment Capable of Drilling the Macondo Well.**

67.      Under Article 14.1 of the Drilling Contract, Transocean represented that "[t]he Drilling Unit shall be fully equipped as specified … and shall meet the requirements of Exhibit G, and shall be adequate to drill and complete wells in the Operating Area to the depths as specified … and in water depths as specified …" and that "the Drilling Unit satisfies all requirements of [certain articles], and is capable of operating to its full capacity as rated by the manufacturer."  TREX 001356A at BP-HZN- BP-HZN-MBI00021477.

68.      Under Article 14.2, Transocean represented that "the Drilling Unit is mechanically capable of drilling wells to the depths specified …" and under Article 14.3 that "the Drilling Unit is mechanically capable of drilling wells in water depths during environmental conditions, as specified …"  TREX 001356A at BP-HZN-MBI00021478.

69.      The Drilling Contract further required Transocean to provide personnel who are "fully qualified, trained, competent, able bodied and fit for their respective assignments" and "have complied with all necessary laws and regulations in connection therewith."  The minimum standard for qualification and training was set forth in Exhibit F to the Drilling Contract.  TREX 001356A at BP-HZN-MBI00021470 (Article 3.1.4).  Transocean also agreed to comply with the Safety Of Life At Sea Convention (SOLAS), which includes the International Safety Management (ISM) Code.  TREX 001356A at BP-HZN-MBI00021505.

b.      **Transocean Was Responsible for Maintaining the *Deepwater Horizon* in Optimal Operating Condition.**

70.      Under Article 14.1 of the Drilling Contract, Transocean represented that it would maintain equipment "at optimal operating condition, in accordance with good oilfield practices."  TREX 001356A at BP-HZN-MBI00021477-478.

16

71.     Transocean also agreed to keep the drilling equipment "in a condition to permit its continuous and efficient operation … subject to required periods of maintenance, repair, dry docking and inspection by regulatory bodies and classification societies," and promised to "diligently perform the Work in a good workmanlike manner consistent with applicable industry standards and practices," and to furnish material and equipment "in good condition to sufficiently meet the applicable CONTRACT requirements and good oilfield practices."  TREX 001356A at BP-HZN-MBI00021478 (Article 14.1.1).

72.     Under Article 14.5, Transocean agreed that "during the Contract Period, the Drilling Unit is outfitted, conformed, and equipped to meet all applicable laws, rules, requirements, and regulations promulgated by the USCG, the U.S. Environmental Protection Agency, the United States of America Department of the Interior as well as any other agency, bureau, or department of the U.S. federal, territorial possession, state, municipal, or local governments, any political subdivisions thereof, having jurisdiction over the operations in U.S. federal waters."  Transocean's Response to the BP Parties' First Set of Requests for Admission at 50 (July 15, 2011) ("Transocean's Discovery Response (July 15, 2011)") (attached hereto as Ex. 2); TREX 001356A at BP-HZN-MBI00021479; Winslow Dep. 459.

73.     The Drilling Contract also mandated that Transocean "shall maintain well control equipment in accordance with good oilfield practices at all times" and "shall use, test, and maintain blowout prevention equipment in accordance with all applicable governmental rules, regulations, and orders then in effect."  TREX 001356A.20.1.BP (Article 15.2); Tr. 4691-92 (Newman); Boughton Dep. 246.

74.     Performance Monitoring Audit and Assessments ("PMAA") were performed by an internal Transocean team to review all aspects of a rig with regard to maintenance, procedures, policies, and training.  Tr. 5958-59 (Ambrose); Canducci Dep. 300-01.

75.     The last PMAA performed by Transocean on the *Deepwater Horizon* was in mid-2009.  Tr. 5959 (Ambrose).

   c.     **Transocean Was Responsible for the Safe Operation of the *Deepwater Horizon*.**

76.     Article 15.1 of the Drilling Contract provided that Transocean "shall be solely responsible for the operation of the Drilling Unit, including, without limitation, supervising moving operations, and the positioning of the Drilling Unit on drilling locations as required by [BP], as well as such operations on board the Drilling Unit as may be necessary or desirable for the safety of the Drilling Unit."  TREX 001356A.20.4.BP; Tr. 4690-4691 (Newman).

77.     The Drilling Contract further required, in Article 17.1, that Transocean shall take "the primary responsibility for the safety of all its operations, shall take all measures necessary or proper to protect the personnel and facilities and, in addition, shall observe all safety rules and regulations of any governmental agency having jurisdiction over operations conducted hereunder.  [Transocean] shall place the highest priority on safety while performing the work."  TREX 001356A.22.3.BP; Tr. 4643 (Newman); Tr. 4692-93 (Newman); Tr. 402 (Bea); Keeton Dep. 324-26.  While Article 17.1 of the Drilling Contract also required Transocean to observe certain BP safety rules and guidelines, it made clear that if the two manuals conflicted, Transocean's "safety manual shall control."  TREX 001356A.22.1.BP; Tr. 4692-93 (Newman).

78.     Moreover Transocean's Health and Safety Policies and Procedures Manual further required that all Transocean personnel "have the obligation and the responsibility not to participate in an unsafe act and also the obligation and responsibility to interrupt any operation to

18

prevent an unsafe act or unsafe condition from causing an incident.  Each individual also has the

obligation and responsibility to take action to correct any unsafe behavior or condition."  TREX

001499 at TRN-MDL-00046481.  *See also* TREX 001449.5.3.BP ("Each employee has the

obligation to interrupt an operation to prevent an incident from occurring.").

> **d.**  **Transocean Was Responsible for the Effective Operation and Maintenance of the *Deepwater Horizon* BOP and for Ensuring Its Compliance with Applicable Regulations.**

79.     As rig owner, Transocean owned the *Deepwater Horizon* BOP, a critical safety

device that was "designed to quickly shut off the flow of oil or natural gas in the case of a kick or

blowout during drilling operations, which is a sudden, uncontrolled release of pressure from

below the sea floor."  TREX 040008 at 6.

80.     As Transocean's CEO Steve Newman testified, the BOP was a piece of

Transocean equipment, Transocean's employees operated it, and Transocean was responsible for

its maintenance, including the solenoids in the yellow pod, the batteries in the blue pod, the blind

shear rams, and anything else related to the BOP equipment.  Tr. 4658, 4660, 4694-4695

(Newman); *see also* Tr. 3750 (Webster); Tr. 1942 (R. Sepulvado); Boughton Dep. 246;

Stringfellow Dep. 439; M. Byrd Dep. 194 ("Transocean owns the equipment and is accountable

for operating the equipment."); Tr. 4430-31 (Barnhill) (testifying that the Transocean drill crew

was responsible for the operation and activation of the BOP in response to a well control event).

81.     Transocean's employees, from Senior Management through the rig-based Subsea

Supervisors, understood and acknowledged Transocean's responsibility for effectively operating

and maintaining the *Deepwater Horizon* BOP and for ensuring that it was fit for operation.  Tr.

4658, 4660 (Newman); Keeton Dep. 357; Trahan Dep. 18-19, 188; Boughton Dep. 246

(testifying that Transocean was responsible for safely maintaining the BOP in accordance with

industry practices); Stringfellow Dep. 379-80, 439; J. McWhorter Dep. 287; Hay 1 Dep. 347[7] (testifying that it was the responsibility of Transocean's subsea group to ensure that the BOP was fit for operation); Odenwald Dep. 187-88; Pleasant Dep. 345, 353-55.

82.    Transocean was aware that BP relied on Transocean to maintain the BOP. Odenwald Dep. 187-88; *see also* Thierens Dep. 41-42.

83.    Under the Drilling Contract, Transocean was obligated to furnish equipment, including the BOP, "in good condition to sufficiently meet the applicable CONTRACT requirements and good oilfield practices," and to maintain the BOP "at optimal operating condition, in accordance with good oilfield practices," and "in a condition to permit its continuous and efficient operation."  TREX 001356A at BP-HZN-MBI00021478 (Article 14.1, 14.1.1).

84.    Transocean had written procedures, such as the Subsea Maintenance Philosophy and Well Control Handbook, that provided policies and procedures for effective operation, testing, and maintenance of BOPs.  TREX 001469; TREX 001454; TREX 001177.

85.    Transocean's Subsea Maintenance Philosophy governed all of Transocean's subsea maintenance, and set forth that Transocean's Subsea Department employees shall be responsible and accountable for the results of their maintenance and testing.  Stringfellow Dep. 405-08.

86.    Transocean had extensive experience with subsea BOPs, and had a Subsea Department that was dedicated to maintaining BOPs to ensure effective operation.  Stringfellow Dep. 379-81, 394; Hay 1 Dep. 29; J. McWhorter Dep. 287-88.

_____

[7] "Hay 1 Dep." refers to Mr. Hay's first day of deposition testimony, which occurred on June 29, 2011.  "Hay 2 Dep." refers to Mr. Hay's second day of deposition testimony, which occurred on June 30, 2011.

87.     Transocean's Subsea Department comprised numerous subsea specialists, including a Subject Matter Expert for Subsea Systems and Equipment, Subsea Superintendents (who were shore-based subsea specialists who provided support to Transocean rigs), and Subsea Supervisors (who were rig-based subsea specialists assigned to a specific Transocean rig). Stringfellow Dep. 182-83, 377-80, 394; Hay 1 Dep. 29; Trahan Dep. 19; J. McWhorter Dep. 287-88; Pleasant Dep. 345; Boughton Dep. 236.

88.     Transocean had four Subsea Supervisors assigned to, and stationed on, the *Deepwater Horizon* – two Senior Subsea Supervisors (Mark Hay and J. Owen McWhorter) and two Subsea Supervisors (Chris Pleasant and Jay Odenwald).  Stringfellow Dep. 377-78; Hay 1 Dep. 347; J. McWhorter Dep. 50, 54, 287; Odenwald Dep. 187-88; Pleasant Dep. 344-45, 353-54.

89.     The Senior Subsea Supervisors and Subsea Supervisors were directly responsible for ensuring that the *Deepwater Horizon* BOP functioned properly and was in condition to work during a well control event, and had the most knowledge about the *Deepwater Horizon* BOP. Stringfellow Dep. 377-80, 394.

90.     Transocean's onshore management also had responsibilities regarding the *Deepwater Horizon* BOP and would monitor the activities of the Subsea Supervisors. Stringfellow Dep. 182-83.

91.     Additionally, Transocean's Rig Manager Performance, according to Transocean's Well Control Handbook, would ensure that "pressure control equipment," including the BOP, would meet "the working pressure and temperature requirements determined by the maximum anticipated surface pressure and temperature for each well and be reviewed prior to spudding."

TREX 001454.11.2.BP (Article 1.15).  Transocean's Rig Manager Performance performed this assessment prior to spudding the Macondo well.  P. Johnson Dep. 393-94.

92.     Transocean's Well Control Handbook provided that Transocean would ensure that the blind shear rams were capable of shearing the highest grade and heaviest drill pipe on the rig and sealing the well in one operation.  TREX 001454; Trahan Dep. 224-25; Stringfellow Dep. 563-64.

93.     Transocean's Rig Manager Performance had the responsibility of ensuring that the BOP could shear any drill pipe that was used on the rig.  Trahan Dep. 103; TREX 001454.

94.     Transocean's expert, Greg Childs, testified that Transocean had a responsibility to make sure that the BOP was adequate for the Macondo well and confirmed that Transocean's own Well Control Handbook places an independent responsibility on Transocean to assess the BOP shearing capacity.  Tr. 5251-52 (Childs).

95.     On a Transocean rig, Transocean equipment, including the BOP, is only to be operated by Transocean personnel, and no BP employees were involved in the physical work on the BOP.  Moore Dep. 196; Stringfellow Dep. 380-81.

96.     BP employees were not responsible for the maintenance and operation of the BOP, did not supervise Transocean's Subsea Department, and were not authorized to touch the BOP control panel to operate it.  Tr. 1935, 1942-43 (R. Sepulvado); J. McWhorter Dep. 289-90; Wong Dep. 474.

97.     Under the Drilling Contract, Transocean was obligated to supply a BOP that conformed with all applicable regulations, including federal regulations, and to "use, test, and maintain blowout prevention equipment in accordance with all applicable governmental rules, regulations, and orders then in effect."   TREX 001356A at BP-HZN-MBI00021480 (Article

15.2); TREX 001356A.20.1.BP (Article 15.2); *see also* TREX 001356A at BP-HZN-MBI00021572 ("All equipment shall comply with MMS regulations.").

98.     Transocean's Rig Management Team, and specifically the Rig Managers and the OIM, had responsibility for ensuring not only that the BOP worked properly, but that it was in regulatory compliance.  Sannan Dep. 359; Ambrose Dep. 165; P. Johnson Dep. 356; Boughton Dep. 248-49.

### 3.     Transocean's Safety Management System Governed Operations on Board the *Deepwater Horizon*.

99.     Consistent with industry practice, Transocean's safety management system governed operations on the *Deepwater Horizon*.  Tr. 4700-01 (Newman); Tr. 1185-88 (Bly); Tr. 8054-56 (Shaw); Tr. 9251-55 (O'Bryan).

100.     Applying the contractor's safety management system on contractor-owned rigs allows for continuity in safety management across a rig owner's rigs that may be working on behalf of different operators and also allowed Transocean personnel to rotate from rig to rig, without confusion as to whose safety management system governs aboard the rig.  Tr. 4700-01 (Newman); Tr. 1185-88 (Bly); Tr. 8054-56 (Shaw); Tr. 9251-55 (O'Bryan).

101.     Consistent with BP's own safety management system (OMS) and industry practice, BP used contractual provisions and bridging documentation to link Transocean's safety management system to BP's OMS system.  D4943; Tr. 8054-55 (Shaw); 9251-54 (O'Bryan); TREX 000948 at BP-HZN-BLY00076261.

102.     The BP-Transocean HSE Management Systems Bridging Document ("Bridging Document") (TREX 000948 at BP-HZN-BLY00076261; TREX 040011 at 53), stated that Transocean "has an HSE management system that provides the framework through which all operations are conducted.  BP will support [Transocean] in the implementation of their HSE

Management System as the primary system with additional safeguards as required by BP." TREX 000948 at BP-HZN-BLY00076261; TREX 040011 at 53; Keeton Dep. 326-27 (Transocean's safety management system governed on the *Deepwater Horizon*); Canducci Dep. 610 (the Bridging Document was in effect on April 20, 2010).

103.    BP personnel working on the Macondo well onshore at BP's offices in Houston were governed by BP's safety management system and component processes that fell under its umbrella, including Beyond the Best ("BtB"), Drilling and Well Operations Practice ("DWOP"), The Way We Work ("TWW"), and 18 Engineering Technical Practices ("ETPs") that related to drilling and completions.  Tr. 9252-54 (O'Bryan); Tr. 8047-48 (Shaw); Tr. 8605-06 (Guide).  In contrast, personnel working on the Macondo well offshore (onboard the *Deepwater Horizon*) followed Transocean's safety management system, including Transocean's Well Control Handbook, Emergency Response Manual, and Field Operations Handbook.  D4943; Tr. 9254 (O'Bryan); Tr. 1826, 1833 (Ezell).

104.    In addition, the Macondo well drilling program indicated that the HSE objectives for the well – zero incidents, no harm to people, environment, or equipment – would be achieved by fully implementing Transocean's health and safety management system on the *Deepwater Horizon*.  Tr. 4704 (Newman); TREX 007685.4.1.BP.

105.    This was consistent with the ISM Code, which required that the owner of the vessel develop, implement, and maintain the safety management system on the vessel, and it would have been an unlawful nonconformance with the ISM Code, which governed the *Deepwater Horizon*, for the customer of the contractor to impose its own safety management system onboard.  Tr. 9449 (Mitchell).

4. **Transocean Was 100% Responsible for Well Monitoring and Well Control on the *Deepwater Horizon*, Including Detecting and Responding to "Kicks" and Preventing Blowouts.**

106.    On a MODU such as the *Deepwater Horizon*, well control is the most important process safety event.  Tr. 464 (Bea).

107.    Under Article 15.2 of the Drilling Contract, Transocean had a duty to maintain well control at the Macondo well and "use all reasonable means to control and prevent fire and blowouts and to protect the hole and all other property of the COMPANY [BP]."  TREX 001356A.20.5.BP; Tr. 4691-92 (Newman).  "Entailed in this duty were responsibilities related to conducting safe drilling and rig operations, ensuring the safety of personnel onboard and preventing accidents which could impact the environment."  TREX 063213 at Ex. A, ¶ 3.

108.    Transocean was, as part of its well control duties, responsible for monitoring the Macondo well, and for the operation and timely activation of the BOP in response to a well control event.  Tr. 4430 (Barnhill); Tr. 7280 (Beck) ("They [the drill crew] have the first and foremost responsibility to detect kicks, and they have the responsibility to shut the well in when they do detect a kick."); Tr. 8928 (Guide).  No entity other than Transocean was responsible for activating the BOP in response to a well-control event on the *Deepwater Horizon*.  Tr. 4431 (Barnhill).

109.    Transocean described well control as "one of the more important aspects of [its] business and one that [it is] 100% responsible/accountable for when the sh*t hits the fan … it's critical we catch and react ASAP."  TREX 007651; Tr. 4659 (Newman) ("Fundamentally, well control consists of awareness and vigilance, the recognition and identification of signals and anomalies and prompt, appropriate action."); Tr. 1854 (Ezell) (testifying well control is the rig crew's "primary goal."); Tr. 1943-45 (R. Sepulvado) (Transocean drill crew's primary responsibility on the *Deepwater Horizon* was recognizing a kick and dealing with it

25

immediately); Mazzella Dep. 242-43 ("[T]he responsibility of – of frontline well control recognition or response falls on the driller … They're the guys that are seeing it.  They're right there with it.  You know, they have the instrumentation in front of them.").

### a.   Transocean's Well Control Policies.

110.   The well control principles and procedures applicable to Transocean personnel were established and set forth in Transocean's Well Control Handbook and Transocean's Field Operations Handbook, both of which emphasized that the key to effective well control is:  (1) early kick detection; and (2) rapid response, meaning shutting in the well with the BOP.  Tr. 1880-81 (Ezell); Tr. 4724-25 (Newman); McMahan Dep. 309; TREX 001452; TREX 001454.

111.   Transocean's Well Control Handbook, which is part of Transocean's Safety Management System, stated that:  "Prevention and management of well control incidents must conform to the requirements detailed in the Well Control Manual and be carried out by competent, well control certified personnel."  TREX 001454 at TRN-MDL-00286773; Tr. 3965 (Webster).  The Transocean Well Control Handbook was part of Transocean's global policy which applies to Transocean personnel worldwide, including on the *Deepwater Horizon*.  Tr. 4724-25 (Newman); TREX 001454; Tr. 2052 (R. Sepulvado).

112.   Transocean expected and trained its personnel, including OIMs, drillers, and toolpushers, to know the contents of the Transocean Well Control Handbook in order to ensure a clear understanding of their well control roles and responsibilities.  McMahan Dep. 125, 310-11; Tr. 1880-81 (Ezell).  Copies of Transocean's Well Control Handbook were available at all times aboard the *Deepwater Horizon*.  Tr. 1826 (Ezell); Tr. 3965 (Webster).

113.   In addition to the Well Control Handbook, key well control principles and procedures that members of the Transocean crew were required to follow were contained in Transocean's Field Operations Handbook, as well as Transocean's Emergency Response

Manual.  Tr. 1880-81 (Ezell); TREX 001452; TREX 001453.  Like the Well Control Handbook, both of these manuals emphasized that the key to effective well control is early kick detection and rapid response.  Tr. 1881 (Ezell).

114.    Transocean's manuals were consistent with industry standards and served as guides to Transocean's drill crews aboard the *Deepwater Horizon* on how to drill and manage a well.  Tr. 1643 (Ezell); Tr. 7697 (Bourgoyne); Tr. 4640 (Newman) (explaining Transocean had competent managers and personnel carrying out drilling operations, and a management system in place, including Transocean's Well Control Handbook, that contained all of the guidance and procedure Transocean personnel needed).

### b.    The Transocean Driller Was Responsible for Continuously Monitoring the Well for Kicks and Other Anomalies.

115.    Industry standard is for the driller to have primary responsibility to monitor the well.  Tr. 4261, 4270 (Barnhill).  Consistent with this standard, Transocean made it clear that the driller held the primary responsibility for monitoring the well at all times in order to identify kicks.  Tr. 4725 (Newman); Tr. 6124, 6244-46 (Ambrose); Tr. 1412, 1486 (Bly); Tr. 4453-54 (Barnhill); Tr. 7528, 7535-36, 7760 (Bourgoyne); Sannan Dep. 259-63; McMahan Dep. 236-38, 271, 273; Rose Dep. 501-02; Transocean's Discovery Response at 54 (July 15, 2011) (Ex. 2) ("[T]he driller is the primary person responsible for monitoring the well."); TREX 001453 at TRN-MDL-00048232.

116.    Transocean "Driller's Key Responsibilities," set forth in Transocean's Field Operations Manual, require that drillers ***must***:  "[c]onstantly monitor speed, pump strokes, pressure, pit volume, trip tank, penetration, mud weight and rotary torque to detect anything unusual or out of the ordinary."   TREX 001452 at TRN-HCEC-00011650, 52; Tr. 4455 (Barnhill) (constant monitoring of the well by the driller is expected in accordance with the

standard of care).  The driller must "[n]ot leave the drill floor during tour unless properly relieved" and "is responsible for communicating and reinforcing the relevant Driller's Key Responsibilities in relation to the ongoing operation" during relief or handover.  TREX 001452 at TRN-HCEC-00011651, 54.

117.   In fact, in addition to the driller, Transocean requires at least one other rig crew member to be in the drill shack constantly monitoring the well.  Tr. 1713, 1834 (Ezell) ("Bear [sic] minimum we always kept two well control people in there at all times."); Tr. 4450-51 (Barnhill) (agreeing the expectation is that a minimum of two people would always be in the Transocean driller's shack monitoring the well continuously).

118.   Transocean's policy states that the OIM and Toolpusher were also "responsible for ensuring they understand the Driller's Key Responsibilities and verify through daily monitoring that the driller is meeting these responsibilities in a safe and effective manner." TREX 001452 at TRN-HCEC-00011654; TREX 002195 (e-mail from Transocean VP of Performance, Larry McMahan, stating: "You will find that the driller skills are to me [sic] monitored by the Toolpusher and OIM and signed off for competency.").  The *Deepwater Horizon* crew, including the Transocean senior toolpusher, toolpusher, and driller, all understood the driller's responsibility for monitoring the well.  Tr. 1750-52, 1833 (Ezell); Burgess Dep. 320-21.

119.   In 2008, numerous Transocean *Deepwater Horizon* crew members, including senior toolpusher Randy Ezell and driller Micah Burgess, indicated their agreement with and commitment to well control and monitoring responsibilities by signing the "Driller's Key Responsibilities" section of Transocean's Field Operations Handbook.  TREX 004907; TREX 004908.

120.    Transocean's well-monitoring duties ran from the time the BOP was set down on the seafloor until the time the BOP would be pulled off and the rig moved away.  Tr. 4450-52 (Barnhill); Tr. 4727 (Newman).  Transocean's obligation to vigilantly monitor the well at all times was not contingent in any way on the well design, the type of rig activity taking place, or the stage of the well operation.  Tr. 4451-53 (Barnhill); Tr. 7369-70 (Beck); Tr. 6227 (Ambrose); Tr. 4726-27 (Newman) (the driller's responsibility to monitor the well is not contingent on the type of cement used, the type of casing run into the hole, the number of centralizers used, or any assessment of pore pressure or fracture gradients).

121.    Even with tested barriers, it is necessary for the drill crew to pay very close attention to the well.  Tr. 4451-52 (Barnhill); Tr. 1827 (Ezell); TREX 008173 at 65 (Bourgoyne Report) ("The well must be continually monitored even if you have a tested downhole barrier in addition to the hydrostatic pressure of the mud and especially when the hydrostatic pressure barrier is being intentionally removed.").

122.    Transocean's policies and procedures stressed the importance of continuous monitoring during all stages of the well operations in order to detect and respond to kicks as soon as possible:  "Recognizing the signs of an influx and acting with the necessary speed to minimize it requires constant, accurate observation and recording of the mud volume, weight, and relevant parameters.  The resulting trends give the best picture of the well situation.  Any variation can be identified, investigated and resolved before the situation deteriorates."  TREX 001454 at TRN-MDL-00286983; Tr. 6246 (Ambrose) (agreeing well monitoring includes observing trends or signals in well data which can occur over a few minutes and provide meaningful indications of a well control event); TREX 004248 at 127 ("Trends and signals are an important part of

monitoring well parameters."); Burgess Dep. 347-48 (indicating that there is never a time during the life of a well when the driller could pay less attention to monitoring).

### c. The Well-Monitoring Information and Equipment Available to the Transocean Drilling Crew.

123.    The drilling personnel on the *Deepwater Horizon* had a variety of ways to monitor the status of the well.  Tr. 4449 (Barnhill); TREX 007676 at 37; TREX 000001 at 89-90; TREX 004248.   "These methods ranged from using sophisticated data acquisition systems to more mundane techniques of using drill crew members to manually check certain well criteria." TREX 007676 at 37; Tr. 4450 (Barnhill).

124.    As part of the responsibility to detect a kick (intrusion of liquid or gas into the wellbore) the driller must constantly monitor various well parameters, including "speed, pump strokes, pressure, pit volume, trip tank, penetration, mud weight and rotary torque" in order "to detect anything unusual or out of the ordinary."   TREX 001452 at TRN-HCEC-00011652; Tr. 4453-54 (Barnhill); Tr. 1750, 1832-33 (Ezell); TREX 001453 at 73 (Transocean *Deepwater Horizon* Emergency Response Manual Vol. 1) ("The Driller and his crew will continuously monitor the surface system indicators (flow rate, pit level, etc.) and break downhole indications, such as mud pressure, rate of penetration (drilling break), etc., for signs of a kick.").

125.    The Transocean driller's cabin was located in a "central location" on the *Deepwater Horizon* drill floor, with windows that provided a direct view of the rotary table, derrick, and drill floor activities.  Tr. 2187 (Heenan); Tr. 1836-38 (Ezell); Tr. 4011 (Webster); Tr. 4389 (Barnhill); D8179; D6604; D6620; TREX 048109; TREX 048116.

126.    The drilling cabin was equipped with an "A" chair and a "B" chair, which enabled the driller and assistant driller to operate equipment needed for any given operation through various key pads and joy sticks located on the chair arms.  Tr. 1744 (Ezell); D8179.  The driller

would monitor well activity and parameters from the "A" chair, while the "B" chair was designated for the assistant driller.  Tr. 1744-46 (Ezell); D8179.

127.    The drill crew had access to real-time well data through computer screens located in the driller's cabin.  Agreed Stipulations No. 134 (Rec. Doc. 5927); Transocean's Discovery Response at 56 (July 15, 2011) (Ex. 2).

128.    Two monitoring systems were used to obtain well data on the *Deepwater Horizon*, Transocean's HITEC system and the Halliburton monitoring system, both of which were displayed on the computer screens in the driller's cabin.  Burgess Dep. 389-90; TREX 000001 at 90; Tr. 1931 (R. Sepulvado) ("Either one of them were good displays.  You could see about what you needed to see on either one of them."); D2188.

129.    The HITEC system data was displayed on two side-by-side screens in front of the driller and assistant driller control stations in the driller's cabin, while the Halliburton monitoring displays (which also displayed some HITEC sensor data) were located in the driller's cabin as well as the Halliburton mud logger work stations.  Tr. 1744-45 (Ezell); D2188.

130.    The main indicators used to detect hydrocarbons entering the well are:  (1) fluctuations in flow volume or rate through the comparison of flow-out versus flow-in; (2) pit gain; and (3) changes in pressure readings.  Tr. 2140-41, 2149-51 (Heenan); Tr. 7588-89, 7770 (Bourgoyne); TREX 040002.65.1.TO; TREX 060110 at 23; TREX 000001 at 90; Tr. 4449 (Barnhill); Tr. 3504-05 (Keith).

131.    The well monitoring screens in the driller's cabin displayed numerous parameters including pump pressure, pump strokes, flow, return flow, and weight-on-bit.  Tr. 1745 (Ezell); Tr. 1931 (R. Sepulvado).

132.    The numerous well parameters available on the driller's cabin monitoring screens were displayed in a variety of layouts including instantaneous snapshots of the data, as well as graphs depicting trends in pressure, flow, and weight in continuous intervals.   Tr. 4466-67 (Barnhill); D2188.  The driller could also customize the monitoring screens, including reducing or enlarging scaled graphs to better display trends over different time increments.   Tr. 4456 (Barnhill); TREX 004248.

133.    A closed circuit television (CCTV) system available in the driller's cabin also provided views of critical working areas to the driller's cabin.   TREX 004248; Transocean's Discovery Response at 60 (July 15, 2011) (Ex. 2).  *See also* Tr. 5586-87 (Young).  Cameras were placed at strategic points throughout the rig to assist with well monitoring.   Tr. 1857 (Ezell) (CCTV that could show flow was available to the driller); TREX 004248.  For example, cameras monitored the gumbo box to assist in detecting flow.  Tr. 1857 (Ezell); Lindner Dep. 461-62; TREX 004248.

134.    The *Deepwater Horizon* was also equipped with two independent electronic systems for measuring flow out:  Transocean's flow meter for the driller and a Halliburton flow meter for the mud logger.  TREX 000001 at 90; Tr. 2182-83 (Heenan) (agreeing that having two separate flow meters on the *Deepwater Horizon* shows good care and is consistent with having the best available and safety technology); Tr. 3697-98 (Keith).

135.    Other tools to determine whether a potential well-control event is occurring included performing a flow check, looking for flow at the flow line via the CCTV, or physically walking to the rotary table and looking down the hole to determine whether or not the well is flowing.  Tr. 1857 (Ezell); Tr. 2159, 2210 (Heenan); TREX 001454 at TRN-MDL-00286835; Tr. 4262-64, 4270-71 (Barnhill).

136.    Transocean's Field Operations Handbook indicated drillers must conduct a flow check "any time the driller has doubts about the stability of the well" and Transocean's Well Control Handbook makes clear the driller does not need permission from anyone, including BP, to conduct a flow check:  "The Driller has full authority to flow check or shut in the well as he sees fit and is expected to fully investigate any occurrence which deviates from a stable trend." TREX 001452 at TRN-HCEC-00011650; TREX 001454 at TRN-MDL-00286985; Tr. 1857 (Ezell); Tr. 4470 (Barnhill).

> **d.    Transocean Was Responsible for Shutting In the Well in the Event of a Kick.**

137.    In conjunction with the responsibility to constantly monitor the well at all times, the Transocean driller was also responsible for identifying when the well was to be shut in, and shutting-in the well quickly and safely when appropriate.  Tr. 4725 (Newman); Tr. 6124, 6244-46 (Ambrose); Tr. 7280 (Beck); Tr. 3447-48 (Perkin); McMahan Dep. 271; Lee Dep. 289-90; Transocean's Discovery Response at 61 (July 15, 2011) (Ex. 2); TREX 001454 at TRN-MDL-00286784.

138.    The driller's responsibility to shut in the BOP as quickly as possible when a kick is detected or even suspected was present across all of Transocean's rigs, as well as consistent with industry standards.  Tr. 4725 (Newman); Tr. 2978 (Probert); Tr. 7289 (Beck); Rose Dep. 507-10; Mazzella Dep. 302-03.  The "Driller's Key Responsibilities" set forth in Transocean's Field Operations Handbook make clear that a driller *must*:  "Shut-in the well as quickly as possible if a kick is indicated or suspected.  Early recognition of the warning signals and rapid shut-in are the key to effective well control.  Shutting in the well quickly will minimize the amount of formation fluid entering the well bore."  TREX 001452 at TRN-HCEC-00011650; Burgess Dep. 359-60.  *See also* TREX 001454.14.2.BP ("It is the responsibility of the Driller (or

person performing the Driller's role) to shut in as quickly as possible if a kick is indicated or suspected."); TREX 001454.18.5.BP ("The Driller is responsible for monitoring the well at all times, identifying when the well is to be shut-in and shutting in the well quickly and safely.").

139.   According to *Deepwater Horizon* driller Micah Burgess, there is no amount of time beyond "immediately" that would be appropriate in responding to a kick indication. Burgess Dep. 347; Saucier Dep. 222-23 (shutting the well in as quickly as possible is the appropriate first step in controlling a kick).

140.   Transocean's Emergency Response Manual for the *Deepwater Horizon* also emphasizes the importance of an immediate response to well-control situations, stating:  "Upon detecting a kick, the Driller is trained to shut the well in quickly.  In fact, the speed with which this is accomplished will determine the severity of the situation."  TREX 001453 at TRN-MDL-00048232.

141.   Transocean's policies made clear that if there was any doubt whatsoever as to whether a kick was occurring, prompt action by the driller and his crew to shut in the well was required.  Tr. 6244 (Ambrose); Tr. 4469 (Barnhill); Tr. 2187, 2189-90 (Heenan); McMahan Dep. 236; TREX 001452 at TRN-HCEC-00011650; TREX 007651 ("Well Control – one of the more important aspects of our business and one that we are 100% responsible/accountable for when the sh*t hits the fan.  Not an area where we wait to see what the Company Man wants to do.").

142.   Transocean CEO Steve Newman "[a]bsolutely" expected, and 100% supported, Transocean drillers and assistant drillers shutting in the well in if there were any questions or doubts. Tr. 4728 (Newman); TREX 007651.  Transocean would rather have had a driller shut in a well that turned out to be a false alarm than wait too long to shut in a well and run the risk of a catastrophic blowout.  McMahan Dep. 237; Tr. 1853 (Ezell).

143.    Transocean policy also made it clear that the driller has full authority to shut in the well as he sees fit and is not obligated to check with anyone, including the company man, before doing so.  Tr. 4470 (Barnhill); TREX 001454.215.2.BP; Pleasant Dep. 374 (explaining the protocol in the event a kick is detected requires the driller to shut in and secure the well immediately prior to informing others of the situation); Tr. 2045-46 (R. Sepulvado) (BP has no involvement in the driller's decision to shut in the well).

144.    "Shut in the well first and then investigate" was standard practice in the industry, and BP was entitled to rely on Transocean's policy requiring the driller or assistant driller to shut in the well as quickly as possible if they had any doubts.  Tr. 4469-70 (Barnhill) ("The sooner you can shut it in, the better off you are.").

145.    The BOP control panels for shutting in the well on the *Deepwater Horizon* were located in the driller's cabin and were also available in the toolpusher's office, the bridge, and in the control room of the subsea office.  Tr. 1933 (R. Sepulvado); Tr. 1830-31 (Ezell); Tr. 2191 (Heenan) (The controls for the BOP are typically in the driller's cabin because the driller is the closest to the operation, both physically and in terms of knowing what operations are taking place, enabling the driller to take prompt action if necessary); TREX 048110; TREX 048102; TREX 048103.  In addition, shut in procedures, emergency disconnect procedures, volumes, capacity for drill strings, and any other pertinent information that the driller needed easy access to was posted in the *Deepwater Horizon* driller's shack.  Tr. 1747 (Ezell); Rose Dep. 507-10 (Transocean policy requires the Driller's Key Responsibilities to be posted in a visible location near the driller's work station.).

> **e.     Transocean Was Responsible for Diverting Hydrocarbons
> Away from the Vessel in the Event of Flow to the Rig.**

146.     The *Deepwater Horizon* was equipped with a diverter system located under the rotary table on the rig floor.  Tr. 1786 (Ezell); TREX 004248 at 177.  When closed, the diverter system allows for hydrocarbons to be diverted through two large overboard diverter lines, or to the mud-gas separator (MGS), which vents gas from the top of the rig, while sending mud and fluid returns to the mud system.  Tr. 4251-52 (Barnhill).  Use of a rig's diverter system is a method of assisting in well control to contain or redirect an influx of gas.  Tr. 620 (L. McKay); Tr. 1785-86, 1830-31 (Ezell).

147.     In order to operate the diverter system, someone must physically go to the BOP panel, open the door, and push a button to select either diversion overboard or diversion to the mud-gas separator.  Tr. 5003-05 (Barnhill).  The BOP panel containing the diverter system controls is never locked.  Tr. 1933 (R. Sepulvado).

148.     When operating the diverter system, the Transocean drill crew could choose to utilize the 14-inch overboard diverter lines, or the vertical mud-gas separator.  Tr. 5004-06 (Barnhill); TREX 048101.1.1.BP; TREX 048102; Tr. 1786-88 (Ezell) (indicating the diverter could be operated from the driller's chair via the BOP panel); Tr. 3910-11 (Webster) (depending on what the drill crew decides, the diverter assembly diverts mud and gas to the mud-gas separator or overboard); TREX 001454 at TRN-MDL-00286973-77.

149.     Transocean was solely responsible for operating the diverter equipment.  Tr. 1830-31 (Ezell).  *See also* Tr. 1935 (R. Sepulvado) (non-Transocean employees were not authorized to activate or operate any controls on the BOP control panel).  Specifically, the Transocean driller or toolpusher makes the decision whether to divert overboard or to the mud-

36

gas separator.  Tr. 1873 (Ezell); Tr. 5006 (Barnhill).  The decision would be based on all available information, including sights, sounds, and data.  Tr. 1873 (Ezell).

150.    In the event of flow to the rig, Transocean's Well Control Handbook explicitly requires the Transocean rig crew to divert flow overboard and away from the vessel:  "if there is a rapid expansion of gas in the riser, the diverter **must** be closed (if not already) and the ***flow diverted overboard***."  TREX 001454 at TRN-MDL-00286973 (emphasis added); Tr. 1787, 1873 (Ezell) ("if you have uncontrolled expansion in the riser, well, then that would be when you would have to divert [overboard]"); Tr. 5003 (Barnhill); Tr. 6125-26 (Ambrose); Tr. 7701-02 (Bourgoyne); TREX 008173 at 67 ("Transocean Well Control Training manuals clearly showed that their policy was to divert overboard if a kick is taken that goes undetected and a significant gas volume enters the riser."); TREX 002187.

### f.    Transocean Was Responsible for Activating the Emergency Systems on the BOP.

151.    The Transocean drill crew was responsible for the operation and activation of the BOP in response to a well control event on the *Deepwater Horizon*.  Tr. 4430-31 (Barnhill); Tr. 4658 (Newman) ("The operation of the BOP which would be used to control the well is a Transocean piece of equipment, and it's Transocean people who operate that equipment."); Transocean's Discovery Response at 76 (July 15, 2011) (Ex. 2).

152.    In addition to activating the BOP to shut in the well, to prevent hydrocarbons from flowing into the riser, the Transocean crew members were also able to use the BOP's emergency disconnect system (EDS) to close the blind shear rams, or the blind shear rams and casing shear rams, to seal the well and then disconnect the rig from the well.  TREX 000001 at 47; TREX 001453 at TRN-MDL-00048434; Tr. 4311 (Barnhill); TREX 004248 at 146 (The

EDS is one of four secondary methods to control the BOP and is most frequently used to avoid damage to the BOP and wellhead if the rig unexpectedly moves off location).

153.    On the *Deepwater Horizon*, the EDS could be activated via the BOP control panel located in the driller's shack, the bridge, and the engine control room.  Tr. 1885 (Ezell); D4337.

154.    In a well-control situation, the Transocean driller could have activated – without BP's knowledge or authorization – either EDS sequence: EDS-1 (which closes the blind shear rams and then disconnects the rig from the lower BOP stack) or EDS-2 (which closes the blind shear rams and casing shear rams, and then disconnects the rig from the lower BOP stack)..  Tr. 3448 (Perkin); TREX 048102; TREX 048102.1.2.BP; TREX 001453 at TRN-MDL-00048458. A single button initiates either of the EDS sequences, and Transocean's Emergency Response Manual set forth policies as to which EDS sequence to initiate in various scenarios, including a well control situation.  TREX 001453 at TRN-MDL-0048439, 455; TREX 004248 at 146.

155.    Transocean crew members on the *Deepwater Horizon* crew members had full authority to initiate emergency disconnect and were not required to seek permission prior to activation.  Tr. 1872, 1885 (Ezell); Tr. 5800-01 (Young) (testifying the DPOs, captain, driller, OIM, subsea engineer, and toolpusher had authority to EDS).   However, non-Transocean employees, including the company man, were not authorized to activate or operate any controls on the BOP control panel or the drilling system.  Tr. 1935 (R. Sepulvado).

**5.    Transocean Was Aware that Prudent Well Monitoring and Well Control Responses Exist Precisely to Prevent Kicks, Something that Occurs in Deepwater Drilling, from Developing into Blowouts – Which Are Extremely Rare Events.**

**a.    Kicks Regularly Occur in the Industry.**

156.    Kicks are not uncommon occurrences in an exploration well, but rather, "a fact we deal with in the industry."  Tr. 5030 (Barnhill); Tr. 4584-85, Tr. 4723-24 (Newman); Tr. 814

(Huffman); Tr. 8650 (Guide) (agreeing a kick is not unusual in Gulf of Mexico wells); Saucier Dep. 192-94 (a kick occurrence on an exploration well is not a surprise or an anomaly); Sannan Dep. 328 (kicks are not uncommon); Watson Dep. 159 ("[T]aking kicks is nothing, you know. It's just life out there."); Canducci Dep. 494-95. Experiencing a kick or losses in a well does not indicate a lack of reasonable care or recklessness. Tr. 5030-31 (Barnhill). *See also* Saucier Dep. 192-94 (no regulatory requirement for a revised Application for Permit to Drill (APD) due to a loss circulation or kick event).

157.    Although the *Deepwater Horizon* encountered challenges and difficulties while drilling the Macondo well, the issues encountered, including kicks, stuck pipe, losses, and the use of lost circulation material, are not uncommon in the Gulf of Mexico. Tr. 813-814 (Huffman); Tr. 2187 (Heenan); Tr. 5030-5032 (Barnhill); Tr. 8650 (Guide). In fact, the *Deepwater Horizon* encountered difficulties with lost circulation and kicks on other wells and, according to the Senior Toolpusher Randy Ezell, the Macondo well was not more difficult to drill than the challenging wells the *Deepwater Horizon* was used to drilling. Tr. 1691 (Ezell).

158.    The proper application of well control procedures prevents a kick from becoming an uncontrollable blowout. Sannan Dep. 328-29; Saucier Dep. 193-94 (not every kick turns into a blowout because rig personnel control the kick); Tr. 2188 (Heenan). Drillers are required to constantly monitor the well and be ready to take prompt action because drilling wells is a dynamic process, in which kicks are known possibilities. Tr. 4723-24 (Newman); Tr. 2188 (Heenan).

159.    Transocean's Well Control Handbook helped rig crews anticipate kicks by identifying the five major causes of kicks, including the loss of hydrostatic column due to displacing the riser with seawater. TREX 001454 at TRN-MDL-00286809-11; McMahan Dep.

28 ("The recognition that underbalanced operations require high vigilance is identified in the [Transocean] well control handbook, and it is part of the well control training.").

160.    To assist in the early recognition of kicks, Transocean's Well Control Handbook also provided guidance on the warning signals of kicks, for example, that "[a]nnular flow with the pumps shut off may be a positive indicator that a kick is in progress."  TREX 001454 at TRN-MDL-00286843; Transocean's Discovery Response at 71-74 (July 15, 2011) (Ex. 2).

161.    Moreover, Transocean had policies in place for handling a kick once detected in order to ensure prompt action by the rig crew, including describing the specific shut in procedures, as well as emergency disconnect procedures.    TREX 001454 at TRN-MDL-002088847-52, 909.

**b.    Transocean Experienced over 300 Kicks from 2005-2009.**

162.    During the period of 2005 to 2009, Transocean rigs experienced 329 kicks and a historical trend indicating that one in seven exploration wells will experience a kick.  TREX 004255 at TRN-INV-01143146, 148; D4418; Tr. 4584, 4728-29 (Newman).

163.    Transocean classified well control events as "kicks," "loss/gain," and "precautionary."  TREX 004255 at TRN-INV-01143189; Tr. 4732 (Newman) (describing a precautionary shut in as a situation when the well is shut in out of an abundance of caution in response to a possible kick indication, which turns out to be a false alarm).  Transocean also categorized kick volume to grade the severity of events, classifying kicks less than 10 barrels as "minor/routine" and kicks greater than 20 barrels as "critical" or "red zone events."  TREX 004255 at TRN-INV-01143155, 169.

164.    From 2005 to 2009, Transocean experienced 329 kicks, and 80% of all red zone events occurred on exploration wells.  TREX 004255 at TRN-INV-01143148, 171-72.  Despite the fact that BP was one of Transocean's largest clients and was using a large portion of

Transocean's rigs, not one of these "red zone" kicks occurred on a Transocean rig that was working for BP.  TREX 004255 at TRN-INV-01143171; Tr. 4730-32 (Newman).  During the same 2005-2009 time frame, BP also had more "precautionary" shut ins than any other Transocean client, a fact that is indicative of safe operations.  TREX 004255 at TRN-INV-01143189; Tr. 4732 (Newman).

165.    Transocean's goal with respect to kick detection is that "[k]icks should be detected and shut in at less than 20 barrels."  Tr. 4586 (Newman).  Transocean's 2009 Annual Well Control Event Report tracked kicks on Transocean rigs, and indicated: "84% (60) of all kicks were detected in under 20 bbls.  Capturing a kick in less than 20bbls is reasonable, especially on a floating vessel.  14% (10) of all kicks exceeded 20bbls and ranged from 20 to 60bbls.  *Failure to limit a kick to less than 20bbls is less than ideal*."  TREX 004255 at TRN-INV-01143147 (emphasis added); Tr. 4586 (Newman); TREX 008173 at 10 ("The ability to detect an influx of formation fluid in less than 30 barrels is an expected normal response, and numerous drills are generally conducted while drilling to test this response.").

### c.    Transocean Was Aware of These Risks from Prior Well Control Incidents.

166.    Transocean regularly conducted its own investigations of well-control events.  These investigations were generally a process of understanding what was going on at the time (i.e., understanding all the drilling parameters), understanding what guidance had been communicated to the driller that would have or should have alerted him to the possibility of encountering hydrocarbons at an unexpected pressure, understanding the circumstances at the time, understanding the actions the driller took (i.e., how responsive he was), and understanding the performance of the equipment.  Tr. 4586-87 (Newman).

167.    Transocean often created a written report of its investigation of a well-control event; on occasion, the company issued an "advisory" or "alert" – if there was a well-control experience where Transocean thought that there could be something to learn for others throughout the fleet (*e.g.*, equipment behaving in a way that might not be expected under the circumstances) and could serve both as a communication tool and a reminder to Transocean personnel of things they should know.  Tr. 4587-89 (Newman).

168.    When Transocean issued a well-control incident advisory/alert, that document was posted on the company's intranet (eDocs).  Personnel could access eDocs and search by function to obtain relevant documents (*e.g.*, all HSE documents, all supply chain documents); the entire Transocean management system documentation was available on eDocs.   Tr. 4598 (Newman).  Transocean might also modify its well control handbook as a result of lessons coming out of an investigation of a well control event.  Tr. 4589 (Newman).

169.    Transocean's Global Management System was a proprietary reporting system that enabled it to see everything that was reported by Transocean rigs; any GMS user could go into the system and configure customized reports and set up subscription alerts to monitor certain reports (*e.g.*, from a particular rig or of a particular incident type across rigs) on an ongoing basis.  Tr. 4552 (Newman).  The GMS also tracked hole problems and nonproductive time and well control events; *e.g.*, if they were drilling and dealing with a sloughing shale, that event was tracked through an HPR (hole problems report).   Tr. 4582-83 (Newman).  The GMS system could also be used to track all categories of IADC incidents across its rigs.  Tr. 4554 (Newman).

170.    Well-control events in the GMS were divided into different categories:   (1) precautionary shut ins (Transocean crew detected something, shut in well as a precaution, and ultimately realized it was not a well control event); (2) ballooning situations (formation absorbs

drilling fluid, conditions change, and then formation expels drilling fluid); and (3) influxes (of any sort – saltwater, hydrocarbons, etc.).  Tr. 4582-83 (Newman).

171.    An operation event report was part of the system of reporting that Transocean personnel followed.  This report could be triggered from numerous conditions, such as a piece of equipment breaking down, some other failure that results in nonproductive time, a failure to timely deliver a piece of equipment, or a human error that results in downtime.  Operation event reports were reviewed by management on a weekly basis (specifically, the corporate operations staff received weekly reports on all these events through the GMS and then reported back).  Tr. 4583-84 (Newman).

172.    Transocean followed the International Association of Drilling Contractors' incident classification system, which set out the following levels of incidents:  (1) a simple first-aid incident; (2) a medical treatment case (individual is given prescription medicine or stitches but can then return to his regularly scheduled work on the next shift); (3) restricted work case (individual receives medical attention and is not able to go back to his regularly scheduled work on the next shift but is able to do a modified job on his next shift, *e.g.*, restricted to a warehouse instead of a rig floor); and (4) lost time (individual is unable to go back to any job following medical treatment)   Tr. 4553-54 (Newman).    Under Transocean's classification system (following the IADC classification system), any incident beyond a simple first-aid incident is considered a "recordable incident."  Tr. 4553 (Newman).

173.    Transocean was acutely aware of the risks that well-control incidents posed, including serious injury or death to personnel, and stated in a 2009 Annual Well Control Event Report that riser unloading events are "particularly hazardous due to the uncontrolled release of mud and gas through the rotary table and the potential for ignition, either on the rig floor or

further down the flow line in the shaker house." TREX 004255 at TRN-INV-01143154; Tr. 4617-18, 4628 (Newman). Responses to prior well control incidents acknowledged Transocean's responsibilities with respect to well control and identified areas for improvement. TREX 026009.b; TREX 007134; TREX 026025.a; TREX 005650; TREX 000926; TREX 001523; TREX 001760.

174. After Transocean's *Jim Cunningham* incident on August 20, 2004 in the Mediterranean Sea, for example, Transocean criticized its personnel for failing to set up and maintain "a disciplined, coordinated set of procedures to monitor the well." TREX 026009.b at 1. In a summary of the *Jim Cunningham* incident, Transocean stated: "At a minimum, well stability must be confirmed during connections, by checking that there is no flow with the pumps off … Transocean is ultimately responsible for controlling the pits with respect to fluid transfers to ensure we can accurately monitor pit levels both while drilling and during connections." TREX 026009.b at 1-2. Transocean went on to note that "[e]mergency response command and control was weak" on the *Jim Cunningham*, and Transocean further emphasized that "[the] Tool Pusher sets the expectations for the drilling team, and it is his responsibility to ensure the drillers and their teams are controlling the work safely & effectively. It is also the TP's responsibility to advise the OIM on well control issues." TREX 026009.b at 2-3; Tr. 4592 (Newman).

175. In response to the *Jim Cunningham* incident, Transocean indicated an immediate alert was required, among other things, to: (1) "Remind OIM's TP & drillers of their fundamental responsibility to ensure procedures and systems are set up to monitor well stability at all times"; and (2) "Highlight required drills and necessity to shut in well at first sign of problems." TREX 007134 at 21.

176.     Transocean's 2009 Annual Well Control Event Report indicated:  "The frequency of riser unloading events is the biggest concern with 6 separate instances recorded (between December 2008 and December 2009)."  TREX 004255 at 21; Tr. 6147 (Ambrose).  At the same time, Transocean acknowledged that riser unloading events were preventable and avoidable "through the application of fundamental well control practices such as treating every positive indicator as a kick, shutting in quickly and taking returns through the choke whenever in any doubt whatsoever … [T]he well must be shut-in on all positive flow checks or any other positive indications of flow.  No exceptions should be made."  TREX 004255 at 21, 27; Tr. 4618, 4628-29, 4733 (Newman) (agreeing the six-riser unloading events were the result of human error).

177.     Transocean experienced six riser unloading events from 2008 to 2009 – none of which occurred on rigs drilling wells for BP.  Tr. 4617, 4729-30 (Newman).

178.     Based on the prior well control incidents noted in Transocean's 2009 Annual Well Control Event Report, Transocean was aware of the risks associated with riser unloading events at least one year prior to the Macondo blowout, as well as Transocean's own problems with the application of fundamental well control practices.  Tr. 4628 (Newman).

179.     A Transocean draft lessons-learned report for the well control event on the *Deepwater Expedition* during the summer of 2009 indicated:  "Actions taken during the course of this section were contrary to Transocean well control policy and could have resulted in a serious escalation of events … Strict adherence to the procedures contained within the Transocean well control handbook is not optional."  TREX 026025.a at TRN-MDL-01279376, TRN-MDL-01279381.

180.     Another 2009 Transocean well control incident that occurred on the *M.G. Hulme, Jr.* ("*MGH*"), in which the driller failed to recognize an influx until mud was coming out of the

rotary table onto the drill floor, highlighted the need for Transocean to improve in several areas of well control.  TREX 005650; Tr. 4594 (Newman); Tr. 6138-39 (Ambrose).  Specifically, Transocean's incident investigation report on the *MGH* noted:  "Well Control training and Well Control manual does not adequately cover the procedures for closing in a well during a blowout situation; also the use of the diverter is not adequately covered."  TREX 005650 at TRN-INV-01143048; Tr. 4619 (Newman).  Transocean CEO Steve Newman admitted if Transocean's *MGH* crew had recognized that they took a kick when the pumps were off and then followed shut in procedure, the result would have been a standard well control operation instead of a riser unloading event.  Tr. 4734 (Newman); TREX 048093 at 1.

181.    In a May 20, 2009, e-mail, Transocean VP of Performance Larry McMahan expressed frustration with Transocean's well control equipment issues in light of the importance of Transocean's well monitoring responsibilities:   "It amazes me that as a company we [Transocean] are even talking about equipment as simple and fundamental is [*sic*] Flow Show Indicators … [T]here was a well control incident on the *MGH* that revealed a non functional Flow Show as a contributing cause of a serious well control event.  These are the basics and if we cannot get this correct, we are never going to be the world premier drilling contractor we expect to be."   TREX 002194 at TRN-MDL-01146603.   Transocean's *MGH* report also indicated Transocean's well control reference material and training should be updated to include scenarios that adequately cover what to do in the case of the riser unloading and also the proper use of the diverter.  TREX 005650 at 19; Tr. 4620 (Newman).

182.    In response to the *MGH* well control incident, Transocean incorporated the lessons learned via three additions to Transocean's Well Control Manual in 2009, further

clarifying Transocean's established procedures for responding to riser unloading events and the proper use of the diverter system.  D6726; Tr. 4595, 4746-47 (Newman).

183.    Following the *MGH* incident, yet another Transocean well control event occurred in December 2009 on Transocean's *Sedco 711*.  Tr. 4623-24 (Newman); Tr. 6139-40 (Ambrose); Transocean's Discovery Response at 165 (July 15, 2011) (Ex. 2).

184.    The Incident at the Macondo well was "eerily similar" to Transocean's *Sedco 711* well-control incident in the North Sea due to several common characteristics, including that:  (1) the well was being displaced with seawater; (2) a negative pressure test had been performed and deemed acceptable; and (3) indications of flow were not acted upon until the influx had passed the BOPs and unloaded onto the rig floor.  Tr. 2140-41 (Heenan); TREX 022694 at 5-6; TREX 001760 at 5; Transocean's Discovery Response at 165-66 (July 15, 2011) (Ex. 2).

185.    A Transocean presentation regarding the *Sedco 711* well-control incident blamed the uncontrolled release of hydrocarbons onto the drill floor, in part, on the "failure to notice kick indicators" as well as lowered risk perceptions of barrier failure due to the negative pressure test being deemed successful.  TREX 001760 at 2, 8 ("The risk perception of barrier failure was blinkered by the positive inflow test.").

186.    The lessons Transocean identified from the *Sedco 711* incident included "heightened vigilance" when underbalancing the well and reducing the well to one barrier, the importance of highlighting the indications of a kick when not drilling, as well as the fact that "[t]ested barriers can fail."  TREX 1760 at 8-9; Tr. 4597 (Newman).

187.    On April 5, 2010, Transocean issued a Well Operations Group Advisory in order to provide clarification "as a result of a recent well control event on a Transocean rig which occurred due to a failure of a tested mechanical barrier."  TREX 001523 at 1.  The Transocean

Operations Group Advisory indicated when underbalancing the well, "a displacement pumping schedule must be developed and then followed" and that "the integrity of existing mechanical barriers must be monitored at all times.  Any increase in return flow will indicate that a barrier may have failed and the well must be immediately shut-in."  TREX 001523.  Moreover, the Transocean Operations Group Advisory specifically instructed:  "Do not be complacent because the reservoir has been isolated and inflow tested.  Remain focused on well control and maintain good well control procedures."  TREX 001523; Tr. 4597-98 (Newman).

188.    On April 14, 2010, a Transocean Operations Advisory was also issued indicating: "Tested barriers can fail and risk awareness and control measures need to be implemented.  The risk perception of barrier failure was blinkered by the positive inflow test.  Standard well control practices must be maintained through the life span of the well."  TREX 000926 at 3.  In addition, the Operations Advisory called for numerous mandatory actions to be taken, such as:  "Ensure all relevant personnel are aware of the importance of early kick detection and that the Driller must be informed immediately."  TREX 000926 at 3; Transocean's Discovery Response at 168 (July 15, 2011) (Ex. 2).

189.    The lessons learned regarding the *Sedco 711* incident were distributed to Transocean's North Sea division.  But despite being "a well control incident that heightened awareness," according to Transocean's VP of Performance, Larry McMahan, Transocean did not directly communicate these lessons, including Transocean's April 5 and April 14, 2010 advisories, to BP or the *Deepwater Horizon* crew.  Tr. 4598 (Newman); Tr. 6139-40 (Ambrose); Tr. 1841-42 (Ezell) (he never saw either the April 5 or April 14, 2010 Transocean *Sedco 711* advisories prior to April 20, 2010); McMahan Dep. 285-86, 304-05; Canducci Dep. 485 (at no point in time from December 23, 2009, to April 20, 2010, did he receive any knowledge

regarding the *Sedco 711* despite his role as Transocean's North American Division Manager of QHSE); TREX 022694 at 6 ("There is no evidence to indicate that this information, which would have reiterated the importance of standard operating procedures, and reinforced the danger of complacency resulting from a successful pressure test, was effectively communicated beyond Transocean's North Sea operations."); Transocean's Discovery Response at 168-69 (July 15, 2011) (Ex. 2).

> **D.** **BP Contracted with Halliburton to Provide Cementing and Mud Logging Services.**
>
> > **1.** **BP Contracted with Halliburton, Through Its Sperry Division, for Continuous Well Monitoring in Connection with the Drilling of the Macondo Well.**

190.    Sperry Drilling Services ("Sperry") is a division of Halliburton.  Clark Dep. 42-43.  Halliburton, through Sperry, provided the Macondo well with mud loggers and various mud logging services, including well monitoring, real-time data acquisition, pressure detection services, data transmission services, and real-time data transmission.  Tr. 3015 (Probert); Tr. 4430 (Barnhill); Clark Dep. 62-64, 95-99; Bement Dep. 91; TREX 004477 at BP-HZN-2179MDL00055746.

191.    Surface Data Logging (SDL), commonly known as mud logging, encompasses not only conventional mud logging but also analysis and recording of surface and drilling parameters.  Kronenberger Dep. 26.

192.    BP considered Halliburton to have "expert knowledge and capability" with respect to its mud logging services.  TREX 004477 at BP-HZN-2179MDL00055737.  In fact, Halliburton claimed that its mud logging service "ensures you get the best information from your well, so you make better drilling decisions, faster."  Bement Dep. 191-92; TREX 005185 at 2. Halliburton regarded its mud loggers as "the first line of defense," because it was their

responsibility to continuously monitor the well for any sign of a "hazardous or unusual condition." Bement Dep. 200-01; TREX 005185 at 6.

193.    One of the principal responsibilities of the mud logger was to monitor parameters of the well continuously to understand downhole conditions and to advise BP and Transocean "of any situation developing with safety or efficiency implications." Kronenberger Dep. 158; TREX 004477 at BP-HZN-2179MDL00055737. Halliburton's SDL Field Procedures outline the roles and responsibilities for Halliburton employees in the field. Kronenberger Dep. 160; TREX 000609.

194.    The BP-Halliburton contract described the mud logging services Halliburton provided to BP in § 3 (Scope of Work), Appendix 5.C. § 10.0 ("Mudlogging Services"). Kronenberger Dep. 66-68; TREX 004477 at BP-HZN-2179MDL00055737.

195.    Well monitoring and safety are the "prime responsibility" of mud loggers pursuant to § 10.10 of the BP-Halliburton contract. Bement Dep. 140-41, 43; Clark Dep. 82-85; TREX 004477 at BP-HZN-2179MDL00055744.

196.    There were four Halliburton mud loggers on the *Deepwater Horizon*. Bement Dep. 188-89. A four-person crew was appropriate for Halliburton to provide on the Macondo well. Bement Dep. 190; Kronenberger Dep. 230-31.

197.    Halliburton provided mud logging services on each of the approximately fifty wells successfully drilled by the *Deepwater Horizon* since 2001. Tr. 2192 (Heenan); Tr. 3613-14 (Keith).

**2.      It Was the Mud Logger's Duty to Monitor the Well and Communicate Effectively with the Drilling Crew.**

198.    It is the mud logger's duty under the contract to notice and report anomalies in well conditions, such as rapid change in drill pipe pressure or mud flow. Clark Dep. 214-15. It

is also the mud logger's duty to stay aware of rig activity and well status "at ALL times."  Clark Dep. 216; TREX 000609 at HAL_0468843 (§ 10.10.10).

199.    Well control is a team operation which requires good communication between the drilling crew and the mud logger to monitor the well and to keep the mud logger aware of ongoing operations.  Tr. 7764 (Bourgoyne); Tr. 2193-94 (Heenan); Tr. 1840-41 (Ezell).

200.    Transocean's Well Control Handbook emphasizes the importance of communication in order to quickly identify and control a hydrocarbon influx:  "The crucial feature is the 'communication triangle' between the Driller, Mud Loggers and Derrick man/Mud Engineer in the mud pits.  It is essential that all information is regularly shared between the three points and that relevant personnel develop a good understanding of the current well condition."  TREX 001454 at TRN-MDL-00286983.

201.    The standard of care for mud loggers requires constant monitoring of the drilling data at all times.  Tr. 4455 (Barnhill); Tr. 1858-59 (Ezell); Tr. 6246 (Ambrose); Bement Dep. 137.  The Halliburton SDL Field Procedures require the mud logger to be vigilant for early warning signs of a potential kick.  Clark Dep. 228-29; TREX 00609 at HAL_0468845 (§ 11.5).

202.    The mud logger is a "second set of eyes" for constant monitoring of the well.  Tr. 2977-78 (Probert); Tr. 3550 (Keith); Clark Dep. 179; Bement Dep. 196-97.  If the mud loggers identify a problem with the well, they should first call the rig floor (Transocean Driller or Assistant Driller), and then alert the company man.  Tr. 3490, 3504, 3593, 3690 (Keith); Tr. 2193 (Heenan); Kronenberger Dep. 158.

### 3.    Mud Logging Equipment on the *Deepwater Horizon*.

203.    Halliburton was responsible for providing and maintaining the mud logging equipment on the *Deepwater Horizon*, including the mud logger's shack.  Tr. 3639-40 (Keith).

204.    Both Transocean and Halliburton had well monitoring and data capture systems on the rig.  Tr. 1101-02 (Bly).  The Halliburton mud loggers used the real-time Insite data displayed in the mud logger's shack to perform their duties.  Tr. 3490-91 (Keith).  This real-time data was available in the driller's shack.  Tr. 1745 (Ezell); Tr. 3491-92 (Keith).

205.    Likewise, the Halliburton mud loggers had access to Transocean's data on the HITEC system.  Tr. 3498 (Keith).

206.    In the mud logger's shack, there was a monitor that had different channels, including a view of the main deck outside the living quarters, rig floor, rotary table, flow line, and main deck.  Tr. 3495-97 (Keith).

207.    On the monitor in the mud logger's shack, you could see if they were pumping or not, and if the well was flowing.  Tr. 3567-68 (Keith).  There was also a monitor with data from the cementing unit inside the mud logger's shack.  Tr. 3495 (Keith)

208.    The mud logger could look at volumes, do a computation based on pump rates, and look at the drill pipe pressure.  The mud logger's shack had screens displayed all of this information.  Tr. 7214 (Beck).

209.    There were alarms set, with high and low limits, for the pits, standpipe, and gas, which would play a sound if the limits were exceeded and would appear on the monitor and flash red.  This visual alarm would remain activated until acknowledged.  Tr. 3600-01 (Keith); Kronenberger Dep. 163-64.

### 4.    BP Contracted with Halliburton to Cement the Macondo Well.

#### a.    Halliburton Is a Leading Oil Field Cementing Company.

210.    Halliburton is recognized as one of the world's leaders, if not the leader, in cementing services.  Tr. 2982-83 (Probert); Tr. 6206 (Ambrose).  Halliburton performs 6,000

cement jobs throughout the world each month, and a large portion of Halliburton's business is in the Gulf of Mexico.  Tr. 3219-20 (Roth).

211.   As Halliburton itself has acknowledged, "Halliburton is one of the world's largest providers of products and services to the energy industry and has contributed to most of the world's deepwater-well completions."   Halliburton's Responses to the BP Parties' Second Requests for Admissions at 7 (July 18, 2011) ("Halliburton's Discovery Response (July 18, 2011)") (attached hereto as Ex. 3).

212.   Halliburton also held itself out as the leader in foam cement technology.  Serio Dep. 299.  Halliburton reported that it "has successfully used foam cement in over 1000 jobs, including 279 jobs at 15,000 ft. or deeper and 79 jobs at 18,000 ft. or deeper."  Tr. 2483 (Benge); TREX 000982 at 5.

213.   Halliburton's promotional literature stated that the Halliburton ZoneSeal[SM] isolation process was a "better way to achieve maximum zonal isolation" and was "foam cementing done the right way."  Serio Dep. 327-29; TREX 002128.

### b.   Halliburton's Contractual Responsibilities Relating to Cementing Services.

214.   Under the contract between BP and Halliburton, Halliburton had the following responsibilities relating to cementing services:  (1) to provide cementing materials and mixing services; (2) to provide the primary cementing of all casing strings, including job planning and design; (3) to develop and update the cementing basis of design; (4) to make recommendations on fit-for-purpose slurry designs; (5) to test the cement in Halliburton's lab(s); (6) to communicate the results of lab tests to BP; (7) to mix and pump the cement on the rig; (8) to provide onshore engineering support to BP's operation; and (9) to provide job evaluation and reporting.  Tr. 3186-91 (Roth); TREX 060394.83b.TO; TREX 060394.83a.TO.

215.   In the contract, Halliburton agreed that it would take "full responsibility for the adequacy, stability, health, safety, and environmental protection of all of its operations and methods necessary for the performance of the WORK, and shall keep strictly to the provisions of Section 7 — Health, Safety, Security, and Environment."  Tr. 2918 (Probert); TREX 021292 at BP-HZN-2179MDL00335311.

216.   Several provisions of the BP-Halliburton contract expanded on Halliburton's contractual obligations with respect to HSE issues.  For example, Section 9.2 provided that "All personnel employed on the WORK shall, for the work they are required to perform, be competent, properly qualified, skilled and experienced in accordance with good industry practice."  TREX 021292 at BP-HZN-2179MDL00335314.

217.   Section 29.1 provided that "CONTRACTOR warrants and guarantees that: (a) it shall exercise all reasonable skill, care and diligence in the performance of the WORK and shall carry out the WORK in accordance with the requirements of the CONTRACT and to internationally recognized good oilfield practices and standards."  TREX 021292 at BP-HZN-2179MDL00335340.

218.   Section 31.3 provided that "CONTRACTOR shall ensure that its personnel are aware of and carry out their own obligations with regard to health, safety, and environment including the strict obligation to report unsafe working conditions, hazards, dangerous incidents, accidents, and environmental issues."  TREX 021292 at BP-HZN-2179MDL00335342.

219.   Section 8.3.5 provided that Halliburton "shall be responsible" to "ensure all hazards are adequately debated prior to commencing operations."  TREX 021292 at BP-HZN-2179MDL00335402.

###### c.       BP Relied Upon Halliburton to Provide Cementing Expertise.

220.    Consistent with industry practice, BP and other operators have internal global experts on cementing, but rely on the advice and input from individuals from the cement contractors on specific wells.  Tr. 2472 (Benge).

221.    BP fulfilled its responsibility for cementing by working with a world-class cement contractor, which is consistent with industry practice.  Tr. 2481 (Benge); Kellingray Dep. 673.  It was reasonable for an operator to rely on the cement contractor to provide cement expertise and execute the cementing program.  Roller Dep. 213-14.  Indeed, BP and Halliburton have worked together for more than 50 years and Halliburton provided cementing services and advice on most of the approximately 50 wells drilled by the *Deepwater Horizon* in the Gulf of Mexico.  Tr. 2990 (Probert); Tr. 1847-48 (Ezell).

222.    BP had limited experience with foam cement and only used foam cement in the Gulf of Mexico and Norway.  Kellingray Dep. 345, 130.  In contrast, Halliburton had performed a significant number of foam jobs, probably more than any other supplier.  Kellingray Dep. 672.

223.    The Halliburton representative assigned to the Macondo well, Jesse Gagliano, worked closely with the BP well design team throughout the development of the well, and was embedded with the design team at BP's Westlake office headquarters.  Tr. 6805-06 (Gagliano).  Gagliano worked from a cubicle adjacent to those of the BP engineers designing the well, attended planning meetings with the team, and testified that there was an "open and free flow of communication" between him and the BP team about the design of the cement job.  *Id.*

###### d.       Halliburton Was Responsible for Designing the Cement for the Macondo Well.

224.    Halliburton was responsible for recommending a cement slurry design to BP, and designed and recommended the cement slurry used on the production interval of the Macondo

well.   Tr. 3187, 3191-92 (Roth); Tr. 2613 (Calvert); TREX 021292 at BP-HZN-2179MDL00335382.   Halliburton's expert Gene Beck agreed that Halliburton had primary responsibility for slurry design.  Tr. 7264-65 (Beck).

225.    BP provides the cement contractor with the objectives and data required for designing the job and then the cement contractor designs and tests the slurry to meet the design parameters and well conditions presented by BP.  Tr. 2245-46 (Benge); Tr. 7263 (Beck); Tr. 2613 (Calvert); Cunningham Dep. 635.

226.    Although the cement procedure was an iterative process, Halliburton was ultimately responsible for providing a recommendation for the cement job.  Tr. 2477-78 (Benge).

227.    The additives used for the Macondo well were Halliburton proprietary products, and Halliburton had superior knowledge about its own proprietary cement additives.  Serio Dep. 354-57; Nguyen Dep. 251-53.

### e.    Halliburton Was Responsible for Testing the Cement for the Macondo Well.

228.    United States expert Glen Benge and Halliburton's expert Gene Beck agree that Halliburton was responsible for testing the cement slurry.  Tr. 2276 (Benge); Tr. 7264-65 (Beck). BP had no responsibility with regard to lab testing.  Tr. 2277 (Benge).

229.    It is important to test foam cement for stability.  Tr. 6333-34 (Chaisson); Tr. 2338-39 (Benge).   The BP-Halliburton Contract identified minimum cement tests that Halliburton should have performed.   Tr. 3208-11 (Roth); TREX 021292 at BP-HZN-2179MDL00335542.

230.    For the Macondo well, Halliburton conducted the tests on the cement slurry at its Broussard cement lab.  Tr. 6206 (Ambrose); Tr. 3188 (Roth).

231.   BP was not charged by Halliburton on a per-test basis, so it would have cost BP the same whether Halliburton ran 50 tests or 100 tests.  Tr. 3275 (Roth); Dugas Dep. 159.

### f.   Halliburton Was Responsible for Pumping the Cement for the Macondo Well.

232.   Halliburton had primary responsibility for pumping the cement slurry into the well.  Tr. 7264-65 (Beck).   The Macondo well cement job was executed using Halliburton employees, Halliburton products, and Halliburton pumps.  Tr. 2478 (Benge); Tr. 3016 (Probert).

233.   There were two cementers on location at all times: Vincent Tabler and Anthony Cupit.  Tr. 6291, 6376 (Chaisson).  For the cement job on the production interval at the Macondo well, Paul Anderson was the foam team leader aboard the *Deepwater Horizon*.  Tr. 6298 (Chaisson).  In addition, Nathaniel Chaisson, a Halliburton technical professional, was aboard to ensure the cement job was performed and executed as planned.  Tr. 6289-90 (Chaisson).  As Halliburton's representative on the rig, Chaisson was responsible for relaying information learned from BP about the cement job operations to Jesse Gagliano.  Tr. 6371 (Chaisson).

234.   After the job was executed, it was the cementing contractor's responsibility to report to the operator on how the job went.  Tr. 2478 (Benge).  Consistent with industry practice, if there were any problems with the cement job execution, the cementing contractor should have raised those issues with BP.  Tr. 2479 (Benge).

### E.   Other Entities Involved in Drilling the Macondo Well.

### 1.   Cameron.

235.   Cameron has been a leading designer, manufacturer, and supplier of subsea well control equipment, including blowout preventers, for several decades, and supplied the *Deepwater Horizon* BOP and its control system.  Tr. 5259 (Childs); Tr. 7100 (Barbier); D. McWhorter Dep. 427; Coronado Dep. 548-49; TREX 004276.1.1.CAM.

236.   In 1999, R&B Falcon, Transocean's predecessor, issued purchase orders to Cameron concerning specified blowout preventer equipment for the *Deepwater Horizon*, PO 087-00101 and PO 087-00015.  Agreed Stipulations No. 92 (Rec. Doc. 5927).

237.   As of September 28, 2000, Transocean and Cameron mutually executed a Master Service Agreement ("MSA") to supply the *Deepwater Horizon* with a BOP.  Agreed Stipulations No. 93 (Rec. Doc. 5927).

238.   Cameron's customers looked to it to be an industry leader in the design, development, and production of subsea deepwater drilling equipment.  D. McWhorter Dep. 427. Cameron took direction from and submitted quotes to its customer, Transocean, and proposed to Transocean that the *Deepwater Horizon* BOP be equipped with certain Cameron-designed well control devices, including the SBR model blind shear ram.  TREX 007032; TREX 040008 at 15; TREX 004276 at TRN-HCEC-00077386.

239.   Over almost two years, Cameron personnel worked collaboratively with Transocean and BP personnel (through their predecessor entities R&B Falcon and Vastar Resources, respectively), as well as various subsea contractors, to design and implement a BOP for the *Deepwater Horizon* that was suitable for deepwater drilling operations.  TREX 040008 at 7, 12-19; D. McWhorter Dep. 433.

240.   During the commissioning process, Cameron, upon request of Transocean and BP, performed successful shear tests using the blind shear rams and casing shear rams of the *Deepwater Horizon* BOP with the drill pipe that was to be used during drilling operations. While Cameron provides conservative formulas that can be used to assess shearing capacity for its shear rams, Cameron considers actual shear tests, such as those performed for Transocean and BP, to be the best indicator for assessing the BOP's shearing capacity.  Cameron also provided

58

Transocean with shearing capacity calculations for the *Deepwater Horizon* BOP during its operation.  TREX 040008 at 15, 18; Tr. 9096-97 (Shanks); TREX 007713; TREX 003951 at 5; Boughton Dep. 19; Turlak Dep. 386-88; Whitby Dep. 295-96, 521; Erwin Dep. 93; Hay 1 Dep. 59-60; TREX 001199 at 1; D. McWhorter Dep. 183-84.

241.    Throughout the operational history of the *Deepwater Horizon,* upon Transocean's request, Cameron would perform certain modifications and maintenance of the *Deepwater Horizon* BOP, including converting the lower variable bore ram to a test ram and equipping the lower annular with a 5,000-psi rated stripping element.  D. McWhorter Dep. 537-38; Hay 1 Dep. 406-07; Keeton Dep. 349-50; Stringfellow Dep. 466-67; Whitby Dep. 505.  In addition, Cameron issued engineering bulletins, product advisories, and product alerts relating to the *Deepwater Horizon* BOP.  TREX 004304 at Appendix H.

242.    Cameron considered the *Deepwater Horizon* BOP to meet "[i]ndustry [s]tandards," to be a "fine product," and to be the "best available and safest technology."  D. McWhorter Dep. 575; Coronado Dep. 478.

243.    No Cameron personnel were on board the *Deepwater Horizon* on April 20, 2010. Agreed Stipulations No. 103 (Rec. Doc. 5927); TREX 003695.

### 2.    M-I Swaco.

244.    M-I, LLC and BPXP entered into the Contract for Gulf of Mexico Strategic Performance Unit Offshore Well Services, effective February 1, 2009, that governed M-I, LLC's scope of work on the Macondo well.  Agreed Stipulations No. 161 (Rec. Doc. 5927); TREX 002804.

245.    BP contracted with M-I to provide specialized drilling mud and mud engineering services on the *Deepwater Horizon*, which included mud material, equipment, and personnel. TREX 002804; TREX 004248 at 18.

246.    M-I was "responsible for specifying the mud additives to be mixed, measuring mud properties and submitting daily reports to BP regarding mud conditions and effectiveness." TREX 000002 at BP-HZN-BLY00000205.

247.    M-I marketed itself as the "leading supplier of drilling fluid systems engineered to improve drilling performance" and as being "widely recognized for developing solutions for downhole problems, from the simple to the complex."   TREX 002819; Lindner Dep. 549 (testifying that the M-I team were specialists in both the materials to make up the spacer and also the building of the spacer).

248.    For the Macondo well, M-I recommended a drilling fluids program based upon information provided by BP and M-I's experience drafting drilling fluids proposals.   BP reviewed, revised, and approved the drilling fluids program.  Agreed Stipulations No. 162 (Rec. Doc. 5927).

249.    At the well site, the Transocean deck and drill crews conducted mud handling at the direction of M-I mud engineers.  Provision 9.6.15 of the Contract between BP and M-I stated that the completion engineers:   "Manages all completions activities including well-bore displacement clean-up, tool make-up, tool operation, packer fluid, spacers, and pill construction."  TREX 002804 at M-I 00000880; Billon Dep. 109 (it was common practice for M-I to guide the procedure used in the displacement operation on rigs).

250.    M-I recommended using two LCM pills as a spacer at the Macondo well.  Lindner Dep. 60-61; TREX 002810; TREX 002815; Billon Dep. 63-64, 495 ("It was our suggestion.  We – and all of the e-mails support that, that we made a suggestion to BP.").

251.   M-I also created a displacement procedure for the temporary abandonment operations at the Macondo well.  Lindner Dep. 126-28, 236-37; TREX 000567; Billon Dep. 109 ("[I]n most cases they would always prepare a [displacement] procedure").

252.   At the time of the Incident, there were five M-I employees onboard the *Deepwater Horizon*, including two who lost their lives.  TREX 000987.

### 3.   Weatherford.

253.   BP contracted Weatherford to provide casing accessories, including the float collar, the shoe, and centralizers, and also to provide specialist personnel and equipment to advise BP and the drill crew on the installation and operation of the casing and casing components.  TREX 000002 at BP-HZN-BLY00000205; TREX 004248 at 18.

254.   The 7" portion of the 9-7/8" x 7" production casing installed on the Macondo well included a reamer shoe, six centralizer subs, and a float collar manufactured by Weatherford.  Agreed Stipulations No. 114 (Rec. Doc. 5927).  The reamer shoe was a Weatherford 7" x 8-1/4" OD Reamer Shoe (RD070082C-S13/S19) with a Hydril 513 box.  Agreed Stipulations No. 117 (Rec. Doc. 5927).

255.   The six centralizer subs were Weatherford 7" 32 ppf HCQ125 HYDRIL 513 Model 541R Rotating Bow Spring Centralizer Subs with 36S (.171) bow springs 10.750 OD, Legacy Number 541R070H513H12A005.  These centralizers were built according to Nexen centralizer sub requirements in January 2010.  Agreed Stipulations No. 118 (Rec. Doc. 5927).  In addition to the six centralizer subs purchased by BP from Nexen in March 2010, on April 16, 2010, at BP's request, Weatherford delivered to BP's shore base 15 Weatherford 7" Single Bow Slip-On Rotating Bow Spring Centralizers with 30R bows and stop collars.  Kits and material for installation were shipped with these centralizers.  These 15 Slip-On centralizers came from BP's inventory with Weatherford.  Agreed Stipulations No. 119 (Rec. Doc. 5927).  A Weatherford

service technician was flown to the *Deepwater Horizon* on April 16, 2010 to help install the 15 Slip-On centralizers on the 9-7/8" x 7" production casing, although the centralizers were not ultimately used on the Macondo well.  Agreed Stipulations Nos. 120-21 (Rec. Doc. 5927).

256.     Weatherford also provided a M45AP Flow-Activated MidBore Auto-Fill Float Collar to be run in the Macondo well in connection with the cementing operations for the 9 7/8" x 7" production casing.  TREX 022761 at 1; Tr. 6161 (Ambrose).

257.     Weatherford also manufactured and sold to BP a set of cement wiper plugs (Weatherford 7" x 9-5/8" DWP HP N-R SSR Plug Set), consisting of a top and a bottom plug with aluminum cores and wear resistant polyurethane flexible wiper fins.  Agreed Stipulations No. 115 (Rec. Doc. 5927).

258.     At the time of the Incident, two Weatherford personnel were onboard the *Deepwater Horizon*.  TREX 000687.

###     4.     Dril-Quip.

259.     "Dril-Quip provided wellhead equipment, including the casing hangers, seal assembly and lockdown sleeve used on the Macondo well.  Dril-Quip also provided personnel responsible for supervising the installation of this equipment and any subsequent servicing, modifications and maintenance to the wellhead equipment."   TREX 000002 at BP-HZN-BLY00000205.

260.     The "subsea wellhead system" supplied by Dril-Quip included: (a) 18-3/4" rigid lockdown wellhead ("the high-pressure wellhead housing"); (b) 18-3/4" x 9-7/8" casing hanger, part no. 2-409826-02; c) 18-3/4" x 13-3/8" Big Bore II dummy hanger, part no. 2-406385-03; (d) 18-3/4" seal assembly; and (e) 18-3/4" x 9-7/8" lockdown sleeve ("the Macondo Wellhead System").  Agreed Stipulations No. 136 (Rec. Doc. 5927).

261.    On April 19, 2010, the Dril-Quip casing hanger and dummy hanger adapter were installed in the inner profile of the high-pressure wellhead housing in the Macondo well.  The 9-7/8" x 7" production casing was hung from the casing hanger.  Agreed Stipulations No. 143 (Rec. Doc. 5927).  On April 20, 2010, from 00:30 to 01:00, the Dril-Quip seal assembly was installed in the Macondo well between the high-pressure wellhead housing and the top of the casing hanger.  The seal assembly sealed off the casing hanger's 1" flow ports, sealing the wellhead from the annulus of the 9-7/8" x 7" production casing.  Agreed Stipulations No. 144 (Rec. Doc. 5927).

262.    Dril-Quip also supplied BP with a lockdown sleeve for the Macondo well. Agreed Stipulations No. 141 (Rec. Doc. 5927).  The blowout on April 20, 2010, occurred before the lockdown sleeve was installed in the Macondo well.  Agreed Stipulations No. 145 (Rec. Doc. 5927).

263.    At the time of the Incident, one Dril-Quip employee was onboard the *Deepwater Horizon*.  TREX 000687.

## III.    THE *DEEPWATER HORIZON*.

264.    The *Deepwater Horizon* was state-of-the-art as of April 20, 2010.  It had drilled to water depths to which other rigs had never drilled.  Tr. 4253 (Barnhill).

265.    The *Deepwater Horizon* successfully operated in the Gulf of Mexico for 10 years before arriving at the Macondo well and was a top performing deepwater drilling rig.  TREX 007774.a.

### A.    Basic Facts Regarding the *Deepwater Horizon*.

266.    The *Deepwater Horizon* was built in accordance with the 1989 MODU Code; the ABS Rules for the Building and Classing of Mobile Offshore Drilling Units, 1997; the International Convention on Load Lines, 1966, regulation 10(2), Annex 1; and United States

Coast Guard requirements, as the as it was originally intended to be registered in the United States.  Agreed Stipulations No. 181 (Rec. Doc. 5927).

267.    The *Deepwater Horizon* was a Reading & Bates Falcon RBS8D design semi-submersible drilling unit built by Hyundai Heavy Industries in South Korea in 2001. Transocean's Responses to Plaintiffs' Interrogatories and Requests for Production at 8 (Dec. 17, 2010) ("Transocean's Discovery Responses (Dec. 17, 2010)") (attached hereto as Ex. 4).

268.    "MODU" is a general category of vessel – of which there are subcategories such as self propelled dynamically positioned MODUs (like the *Deepwater Horizon*) and non-self-propelled barge-type MODUs that must be towed into position such as jack-ups, and moored semisubmersibles.  Tr. 4201-02 (Webster); Tr. 9445-46 (Mitchell).

269.    The MODU Code is a code for the construction and equipping of MODUs that requires that the MODU operator provide a person in charge during all operations, but the MODU Code applies to all MODUs, including non-self-propelled rigs, and does not conflict with the ISM Code, which applies only to MODUs that are seagoing vessels.   Tr. 4201-03 (Webster); TREX 044072 (International Maritime Organization Code for the Construction & Equipment of MODUs).

270.    The *Deepwater Horizon* was flagged first under Panama and then under the Republic of the Marshall Islands.  Tr. 3738 (Webster).

271.    BP was not a "bareboat charterer" of the *Deepwater Horizon*.  Tr. 4189-90 (Webster); Tr. 9448 (Mitchell); TREX 000938 at 10.

272.    BP and Transocean's contractual agreement for the *Deepwater Horizon* was for a "time charter" because it required the owner, Transocean, to supply the services of the rig,

including the master and crew, for a specified period of time.  Tr. 9449 (Mitchell); TREX 001356A.

273.    On April 20, 2010, the *Deepwater Horizon* was "underway" and subject to maritime perils because it was not at anchor, made fast to the shore, or aground.  Tr. 9414 (Mitchell); TREX 040011 at 12; Hackney Dep.  70-71; Tr. 3748-50, 3972 (Webster); Wolfe Dep. 154.

274.    While on location, the *Deepwater Horizon* was kept in place through the vessel's dynamic positioning, as performed by the crew's marine team, such that the vessel was continuously moving to keep it on station in the current and wind.  Tr. 1940-41 (R. Sepulvado).

**B.    Basic Facts Regarding the *Deepwater Horizon*'s Safety and Operational Equipment.**

275.    The *Deepwater Horizon* was equipped with numerous pieces of equipment that were implemented and used to perform and/or to allow for safe deepwater drilling operations.

**1.    The *Deepwater Horizon* BOP.**

276.    The *Deepwater Horizon* BOP was a critical safety device that was intended, among other things, to close the well in the event of a kick or blowout.  TREX 040008 at 3; Tr. 3796 (Webster); Tr. 4659-60 (Newman); Thierens Dep. 25; Stringfellow Dep. 558, 687-88.

277.    The *Deepwater Horizon* BOP, which is a subsea BOP that sits on top of the wellhead, comprises two main sections: the lower marine riser package ("LMRP") and the lower BOP stack.  Tr. 9013 (Shanks); TREX 040008 at 4; Tr. 4248 (Barnhill).

278.    The *Deepwater Horizon*'s LMRP was configured with an upper annular and a lower annular.  The lower BOP stack was configured with a blind shear ram, a casing shear ram, an upper variable bore ram, a middle variable bore ram, and a lower variable bore ram that was

converted into a test ram.  Tr. 9013 (Shanks); D4327B; TREX 040008 at 5; J. McWhorter Dep. 63-64.

279.    The BOP had an inner diameter of 18-3/4" and was rated for 15,000 psi, the highest pressure rating available for this size BOP.  Tr. 9016-17 (Shanks); TREX 040008 at 29-30; Hay 1 Dep. 42-43; Whitby Dep. 505-06; Stringfellow Dep. 438.

### a.    Annular Preventers.

280.    Annulars contain a large rubber ring with steel reinforced ribs.  The rubber ring or donut is essentially squeezed shut to seal against different sizes of drill pipe.  TREX 040008 at 4; D6669; Tr. 5088-89 (Childs); Tr. 4298 (Barnhill).

281.    The upper annular was pressure rated to 10,000 psi, meaning it could contain 10,000 psi of pressure in the wellbore.  This was the maximum available pressure rating for annulars in the industry.  Tr. 9014 (Shanks); TREX 040008 at 6, 26; TREX 004003.14.1.BP; Whitby Dep. 505.

282.    Revision I of the Application for Revised Bypass for the Macondo well indicated that on October 15, 2009, the upper annular had been downgraded to 7,500 psi when sealed against 5-1/2" drill pipe.  This comment pertains to the *Marianas* rig's BOP because it – not the *Deepwater Horizon* – was on site at that time.  This comment was submitted to MMS and does not apply to the *Deepwater Horizon*.  Tr. 7021-22, 7025 (Stevick); TREX 005834.2.1.BP; Douglas Dep. 276; Tr. 9014 (Shanks).

283.    The lower annular or stripping annular was pressure rated to 5,000 psi.  Tr. 9014 (Shanks); TREX 040008 at 6; TREX 004003.14.1.BP; Whitby Dep. 505.

### b.    Variable Bore Rams (or Pipe Rams).

284.    Variable bore rams ("VBRs"), located in the lower BOP stack, consist of two opposing pistons with rubber sealing elements ("packers") that can seal around different sizes of

drill pipe when they come together.   TREX 040008 at 4; Tr. 5091 (Childs); D6671; J. McWhorter Dep. 66-67.

285.    The *Deepwater Horizon* BOP contained three variable bore rams in the Lower BOP: an upper variable bore ram, a middle variable bore ram, and a test ram.  TREX 040008 at 5; D4327B; Stringfellow Dep. 276-77; Tr. 5090 (Childs).

286.    The lower variable bore ram was converted into a test ram, which was used during BOP pressure tests.  The *Deepwater Horizon* BOP still had two redundant variable bore rams after the conversion and still complied with applicable regulations and policies.  Thierens Dep. 660-61; J. McWhorter Dep. 68-69; Tr. 9107 (Shanks); D4599.

287.    The variable bore rams on the *Deepwater Horizon* BOP could seal around drill pipe ranging from 3-1/2" to 6-5/8" in diameter.  Tr. 9017-18 (Shanks); TREX 040008 at 5.

### c.        Casing Shear Rams and Blind Shear Rams.

288.    Casing shear rams ("CSRs") can shear casing and larger diameter, higher grade drill pipe than blind shear rams, but cannot seal the well.  Tr. 9017 (Shanks); TREX 040008 at 4; J. McWhorter Dep. 64-65.

289.    Blind shear rams ("BSRs") can both shear drill pipe and seal the well.  Tr. 9016 (Shanks); TREX 040008 at 4; Tr. 5092-93, 5252-53 (Childs); D6673; J. McWhorter Dep. 64-65.

290.    The BSR on the *Deepwater Horizon* BOP was pressure rated to 15,000 psi, the maximum pressure rating available for this component.  Tr. 9016-17 (Shanks); TREX 040008 at 6.

291.    The BSR on the *Deepwater Horizon* BOP was Cameron's SBR model.  Tr. 9017 (Shanks); TREX 040008 at 6.

### d.   ST-Locks.

292.    The *Deepwater Horizon*'s VBRs and the BSR had ST-Locks consisting of two locks per "cavity" that functioned to hold or "lock" the rams in a closed position and prevented them from drifting open.  Tr. 5093-94 (Childs).  Once the ST-Locks have closed they will hold the rams closed even if hydraulic pressure to the ST-Locks or the rams is lost.  Tr. 5094 (Childs); D6674; Tr. 9061-64 (Shanks).

293.    The operation of the ST-Locks is a two-step process.  The "ST-Lock" button can be pushed before or after the rams are closed.  Once the "ST-Lock" button is pushed and the rams are closed, the ST-Locks will set and hold the rams closed.  Tr. 9061-63 (Shanks).

294.    The ram must be in a fully closed position for the ST-Locks to be able to function. If the ram was not fully closed, there would be mechanical interference.  Tr. 5095 (Childs); Tr. 9061 (Shanks).

### e.   The BOP Control System.

295.    The BOP had a Cameron Mark II control system that controlled the BOP functions.  This was the standard Cameron control system when the *Deepwater Horizon* BOP was commissioned.  Coronado Dep. 548-49; TREX 040009 at 9.

### i.   BOP Control Pods.

296.    The Mark II control system comprised two redundant subsea control pods that were connected to the rig by multiplex (MUX) cables.  During normal operation, the control pods receive electrical communication signals from the rig and translate these signals into hydraulic signals to function components of the BOP stack.  TREX 040009 at 9-10; Tr. 5157-58 (Childs); Tr. 8407-08 (Zatarain); Tr. 2645 (Davis).

297.    The *Deepwater Horizon* had a total of three BOP control pods on the rig, two subsea on the LMRP, and one spare on deck.  Tr. 9013-14 (Shanks); D4327B; J. McWhorter Dep. 196-97.

298.    Cameron designed the Mark II subsea control pods to automatically operate the automatic mode function/deadman (AMF/Deadman) system when certain emergency conditions are met without any operator intervention.  TREX 040009 at 10.

299.    Batteries power the control pods when the AMF/Deadman system is activated.  J. McWhorter Dep. 95-97; Stringfellow Dep. 387.

300.    The subsea control pods are redundant and operate in exactly the same manner.  J. McWhorter Dep. 293-95; Stringfellow Dep. 272-73.

301.    Cameron designed the *Deepwater Horizon* BOP control system to meet redundancy requirements of MMS regulations and API 16D, which incorporates sound and proven engineering practices.  Coronado Dep. 386, 611.

### ii.    MUX Cables.

302.    MUX cables provided electrical communications and power from the rig to the BOP control pods.  TREX 040008 at 43; TREX 040009 at 9; Tr. 1925-26 (R. Sepulvado).

303.    All MUX cables that Cameron sells and supplied on the *Deepwater Horizon* have stainless steel armor between the inner jacket and the outer jacket.  Coronado Dep. 395.

304.    For the *Deepwater Horizon*, the MUX cables entered the top of the riser through the moon pool.  While the MUX cables were routed through the moon pool, which was designated a hazardous area, this was the way that MUX cables are routed on all rigs and there is no other way to route the MUX cables to attach to the riser.  Coronado Dep. 395-97; Tr. 5228, 5388 (Childs).

f. **The *Deepwater Horizon* BOP Emergency Control Systems.**

i. **The BOP AMF/Deadman System.**

305. The automatic mode function was an emergency system more commonly called a Deadman system. It was designed to close the blind shear rams if electrical power, communications, and hydraulics were lost between the rig and the BOP control pods. Tr. 9019 (Shanks); Tr. 5098, 5283-84 (Childs); Erwin Dep. 405; TREX 001453 at TRN-MDL-00048467.

ii. **The Autoshear System.**

306. The Autoshear system was an emergency system that closed the blind shear ram if the LMRP became disconnected from the Lower BOP. Tr. 9019-20 (Shanks); TREX 040008 at 44; Tr. 5277 (Childs); TREX 001453 at TRN-MDL-00048467.

307. The Autoshear system was a hydromechanical system that did not include any electronics. The Autoshear system was triggered by the release of a plunger that was normally compressed when the LMRP was connected to the lower BOP. Tr. 9020 (Shanks); Tr. 5099-6000 (Childs); Thierens Dep. 662-63.

iii. **The Emergency Disconnect System (EDS).**

308. The Emergency Disconnect System (EDS) was an emergency system that was supposed to shut in the well and release the rig from the well by disconnecting the LMRP from the Lower BOP. TREX 001453 at TRN-MDL-00048458; Hay 1 Dep. 139; J. McWhorter Dep. 101.

309. The *Deepwater Horizon* had two pre-programmed EDS sequences available. EDS-1 activated the blind shear rams before disconnecting the LMRP, while EDS-2 activated the casing shear ram and then the blind shear ram before disconnecting the LMRP. TREX 001453 at TRN-MDL-00048458; TREX 040020 at 19; Tr. 9134-35 (Shanks); Tr. 5096-97 (Childs); J. McWhorter Dep. 102-03.

70

310.    On the control panel, the EDS-1 sequence was labeled "normal" and the EDS-2 sequence was labeled "casing."  Tr. 5096-97 (Childs); TREX 048102.1.2.BP.

311.    When the EDS is activated, either EDS-1 or EDS-2 can be chosen by pushing the "normal" or the "casing" EDS button.  Tr. 5274-75 (Childs).

312.    During drilling operations, Transocean decided which EDS sequence to use at a given time, and the senior subsea supervisor and OIM were responsible for that decision.  Hay 1 Dep. 48.

313.    The EDS could be activated from the rig floor or the bridge.  Hay 1 Dep. 138; Stringfellow Dep. 119.

314.    EDS-1 takes 46 seconds to close the blind shear ram, unlatch the riser connector, and release the LMRP.  EDS-2 takes 75 seconds to close the blind shear ram, unlatch the riser connector, and release the LMRP.  TREX 001453 at TRN-MDL-00048458-62; Hay 1 Dep. 47-48, 138-39.

### 2.    The Riser System.

315.    The riser is a large diameter pipe that connects the LMRP (at the BOP) to the upper marine riser package ("UMRP") (at the rig).  Tr. 4249 (Barnhill).

316.    On the *Deepwater Horizon* the riser was composed of 90' sections with an outside diameter of 21" and an inside diameter of 19-3/4".  Tr. 4249 (Barnhill).

317.    The riser served as a conduit permitting circulation of drilling mud into the well and running of tubulars in and out of the well.  Tr. 4249 (Barnhill).

318.    The riser supported the weight of the MUX cables, which were attached to the riser.  TREX 040008 at 43; Tr. 1926 (R. Sepulvado).

319. Choke and kill lines, which are used, among other things, to input and output fluids into the wellbore during well control situations, extended down the outside of the riser. Tr. 4250, 4256 (Barnhill).

320. The boost line was a pipe that extended down the outside of the riser and reconnects at the base of the riser. Mud could be pumped down the boost line to help boost the fluid up the riser. Tr. 4250 (Barnhill).

### 3. Instrumentation and Indication of Well Status.

321. Section II.C.4.c, above, discusses the well-monitoring information and equipment available to the Transocean drilling crew.

### 4. Hydrocarbon Combustible Gas Detection System.

322. The *Deepwater Horizon* had an automated safety system, known as the IACS system (integrated alarm and control system), built by Kongsberg Simrad, that was designed to manage the many complex safety systems and subsystems onboard the *Deepwater Horizon* and perform multiple emergency response functions simultaneously. Tr. 3755-3757, 3761-62 (Webster).

323. The fire and gas system was the most modern at the time it was put on the rig. Tr. 5951-52 (Ambrose).

324. The IACS received signals from sensors all over the rig; it also sent signals back to various systems and subsystems functioning like a "brain" for the emergency systems on the rig. Tr. 3755, 3760 (Webster). The system was monitored on the bridge and in the drill shack. Tr. 3764-65 (Webster).

325. The IACS fire and gas system has 400-550 sensors and alarms that include heat, smoke, and gas detectors and alarms; watertight door alarms; and engine mist oil detectors. Tr. 3755, 3757-59, 3806-07 (Webster); TREX 001109; Tr. 5951 (Ambrose); D6725.

326.     When working properly, the IACS was capable of: (1) isolating electrical equipment; (2) automatically closing watertight doors; (3) automatically closing fire doors; (4) closing ventilation dampers (including in the engine room); (5) shutting down engines; (6) closing engine air intake dampers; (7) shutting off fuel to engines; (8) actuating the engine's governor through an electronic overspeed device; and (9) activating air shutoff valves ("rig savers").  Tr. 3762-63 (Webster); Hackney Dep.  102-03.

327.     The emergency shutdown system ("ESD") operated so that when the IACS received signals indicating danger in a part of the ship, the IACS could shut down systems in that ship compartment automatically.  Tr. 3759 (Webster); TREX 001109.

328.     The ESD was designed so that when the IACS received signals detecting potential emergency situations in a part of the ship, the IACS could shut down systems in that ship compartment automatically with no or very little human interaction, including automatic closing of dampers and shutting off of ventilation fans to prevent gas ingress to vulnerable locations through the HVAC system.  Tr. 3759-60 (Webster); Tr. 987-88 (Bly); TREX 001109.

329.     Transocean altered the design of the ESD so that the fire dampers on the air intakes to the engine rooms would not automatically close upon the detection of gas.  Tr. 4173 (Webster).

330.     The fire and gas detection system of the IACS was a safety-critical component of the *Deepwater Horizon*.  Tr. 3783 (Webster); Tr. 987-88 (Bly).  Fire and gas systems are critical safety devices which detect hydrocarbon gas and initiate warning alarms when acceptable limits are exceeded, and for some alarms, automatically initiate closing of dampers and shutting off of ventilation fans to prevent gas ingress to vulnerable locations through the HVAC system.  Tr. 987-88 (Bly).

### 5. Overboard Diverters Direct Flow and Gas Away From the Rig Floor to Reduce the Risk of Ignition.

331. The *Deepwater Horizon* was equipped with a diverter system that, when closed, allowed for hydrocarbons to be diverted through two large overboard diverter lines, or to the mud-gas separator (MGS) which vented gas from the top of the rig, while sending mud and fluid returns to the mud system. Tr. 4251-52 (Barnhill); *see also* Tr. 5995 (Ambrose); TREX 004248 at 144.

332. The purpose of the overboard diverter lines was to divert gas away from the rig and the rig floor if hydrocarbons got into the riser. Tr. 5002 (Barnhill); *see also* Tr. 7580-81 (Bourgoyne). The 14-inch overboard diverter lines were designed to handle "high flow rates." TREX 001454 at TRN-MDL-00286973.

333. A primary function of the diverter system was to provide the crew time to safely abandon the rig before a fire or explosion. Tr. 7585 (Bourgoyne).

334. The mud-gas separator was solely designed to clean gas from mud at slow rates and only where "the volume of gas above the BOP stack is kept small by detection equipment and shut-in …." It was not designed to control high gas or liquid flow. TREX 001454 at TRN-MDL-00286972-73; Tr. 984-85 (Bly) (mud-gas separator is intended for very small volumes of gas in the mud).

335. The mud-gas separator system had a 6-inch relief line separate from the 14-inch overboard diverter line. These lines were located next to each other on the starboard side of the *Deepwater Horizon*. Tr. 4439, 5010 (Barnhill); TREX 000001 at 115, 119.

336. The purpose of the mud-gas separator's 6-inch relief line was to relieve pressure if there was excess pressure build-up that overwhelmed the mud-gas separator system. Tr. 5011 (Barnhill).

C.     **The Roles and Responsibilities of the Transocean Captain and Crew of the** *Deepwater Horizon*.

1.     **The Responsibilities of the Transocean Crew.**

337.     As with all Transocean rigs, the vast majority of people onboard the *Deepwater Horizon* were Transocean employees.   Tr. 4689-4690 (Newman); Transocean's Discovery Response at 181 (July 15, 2011) (Ex. 2) ("[O]n April 20, 2010 there were 79 Transocean personnel on board the *Deepwater Horizon*, and on January 1, 2005, there were 73 Transocean personnel on board the *Deepwater Horizon*.").   Everyone onboard the *Deepwater Horizon* had a job to perform – there were no tourists.  Tr. 4689-90 (Newman).

338.     Transocean was responsible for providing and training the marine crew for the *Deepwater Horizon*.  Tr. 4695 (Newman).

339.     The *Deepwater Horizon* had a bridge or marine crew manning it 24 hours a day, 7 days a week.  Tr. 3750 (Webster).

340.     The marine crew normally on duty on the *Deepwater Horizon* included a captain, the first mate (also known as chief mate), and dynamic position operators, who can be considered watch officers.  Tr. 3751 (Webster).

341.     The marine crew was expected to know and understand, generally, though not necessarily in detail, the operations that were being performed on any given day.   Tr. 4996 (Barnhill).

2.     **The Responsibilities of the Rig Captain/Master and OIM.**

342.     All crew members and rig activities should be governed at all times by the authority of the master.  Tr. 9420 (Mitchell); Tr. 3959 (Webster); TREX 040011 at 12-13.

343.     Critical emergency situations on a vessel as large and complicated as the *Deepwater Horizon* required the rapid assessment of the source and nature of the emergency,

especially on a vessel that may encounter hydrogen sulfide or hydrocarbon gas at any moment. Tr. 3761 (Webster).

344.    When an emergency situation threatens the vessel and its crew, it requires a focused and rapid response, and the captain must have the tools to act immediately and decisively, as well as the proper authority to use every tool available and to make overriding decisions necessary to deal with the emergency and take ameliorative action.  Tr. 3926-27, 3963, 3761 (Webster); Tr. 9414-15, 9472 (Mitchell).

345.    International maritime law required that each ship must be in the charge of a master with appropriate qualifications.  Wolfe Dep. 205; TREX 040011 at 12-13.

346.    It is absolutely critical for the safety of the vessel and the crew that the captain should know and understand all risk hazards.  This is because the captain must be able to take immediate action to save the vessel and crew.  Tr. 3921-23, 4009-10 (Webster).

347.    A ship's master must be equipped to make a command decision when the circumstances, require it, which is achieved by first giving him the proper, clear authority so that he knows he is in command, and also through competence, experience, and knowledge. Competence is developed through training and supported by drills and exercises on board the ship.  Experience requires that you move up a ladder of promotion over a period of time with increasing responsibilities, which provides the person with the inner confidence to be able to make the decisions when time counts.  Knowledge of the operation requires understanding responsibilities and the status of current operations.  Tr. 9420-21 (Mitchell); D4965; *see also* Wolfe Dep. 342-43.

### 3. The Transocean Personnel Responsible for the Performance of the *Deepwater Horizon* at the Macondo Well.

348. According to Transocean's *Deepwater Horizon* Operations Manual: "The shore-based Rig Manager is ultimately responsible … for the safe day to day operation of the Rig assigned to him.  It is his role to ensure, in so far as is practicable, that all contractual obligations to our client are met, the Company's policies and procedures are followed, and regulatory requirements are complied with in full."  TREX 000671 at BP-HZN-2179MDL00141835; Tr. 4526 (Newman) (describing the Rig Manager as the rig's "first touch point onshore").

349. There were two dedicated onshore Rig Managers overseeing the maintenance and performance of the *Deepwater Horizon*: Paul Johnson and James Kent.  Tr. 5925-26 (Ambrose).

350. Paul Johnson was the onshore Rig Manager-Performance for the *Deepwater Horizon*, and he was in charge of the overall performance of drilling the Macondo well, as well as the safety aspects of the rig including special training of the crews.  Tr. 4687-88 (Newman); D4594; Tr. 5928 (Ambrose).

351. James Kent was the Rig Manager-Asset assigned to the *Deepwater Horizon*, and he was responsible for maintaining the rig's assets through the *Deepwater Horizon* Transocean maintenance crew.  Tr. 5928 (Ambrose); D4594.

352. Transocean operations managers Buddy Trahan and Daun Winslow were responsible for supervising the Transocean *Deepwater Horizon* Rig Managers, including assisting with forward planning for the rig.  Tr. 5924-25 (Ambrose); D4594.

353. Transocean morning reports and IADC daily drilling reports for the *Deepwater Horizon* were transmitted on a daily basis to Transocean personnel and were reviewed by, among others, the *Deepwater Horizon* Rig Manager-Performance Paul Johnson, as well as the OIMs,

Jimmy Harrell and Rodney Ryan. Transocean's Discovery Responses at 15 (Dec. 17, 2010) (Ex. 4).

354.    In addition to onshore Transocean personnel responsible for the performance of the *Deepwater Horizon*, Transocean's *Deepwater Horizon* Operations Manual indicated the day-to-day activities onboard the rig are managed by the Onboard Management Team (OMT), consisting of the OIM, master, toolpusher(s), chief engineer, and rig safety and training coordinator. TREX 000671 at BP-HZN-2179MDL00141835-36.

355.    The *Deepwater Horizon* drilling group included Senior Toolpusher Randy Ezell, Toolpushers Wyman Wheeler and Jason Anderson, as well as drillers and assistant drillers, among others. Tr. 4689 (Newman); D4594; TREX 001453 at TRN-MDL-00048168; Tr. 1636-37 (Ezell).

356.    The *Deepwater Horizon* marine crew reported to the captain and chief mate, and were responsible for all the lifesaving equipment, vessel systems that kept the rig on location, bilge valve systems, lifeboats, alarm systems, and firefighting systems. Tr. 5930-31 (Ambrose); Tr. 1637-38 (Ezell); Tr. 5595 (Young); Transocean's Discovery Responses at 29-30 (Dec. 17, 2010) (Ex. 4) (DPOs "are responsible for evaluating and monitoring the alarm systems.").

357.    The *Deepwater Horizon* marine crew included Captain Kuchta, first Chief Mate David Young, as well as the dynamic positioning operators, Andrea Fleytas and Yancy Keplinger. Tr. 4689 (Newman); D4594; Tr. 1637-38 (Ezell).

358.    "For the time period during which the Macondo well was being drilled, the *Deepwater Horizon* Senior Subsea Supervisors were Jim Owen McWhorter and Mark Hay, and the Subsea Supervisors were Christopher Pleasant and Jay Odenwald." Transocean's Discovery

Responses at 17 (Dec. 17, 2010) (Ex. 4); Tr. 5930 (Ambrose) (The Transocean *Deepwater Horizon* subsea department was a dedicated group to the BOP equipment.).

### D. The *Deepwater Horizon* Had a Track Record of Safe Operations in Drilling BP Wells.

359.    Prior to the April 2010 Incident, across the entire fleet of rigs employed by BP, the *Deepwater Horizon* had the best safety record.  Tr. 8228-29 (Shaw); Tr. 9264-65, 9361 (O'Bryan) (at the time of the Incident, the *Deepwater Horizon* was the best-performing rig among the rigs contracted to BP globally from a drilling performance and safety perspective); Tr. 597-98 (McKay).

360.    As of April 2, 2010, the *Deepwater Horizon* had gone one year without a recordable incident.  Tr. 8600-02 (Guide); TREX 051350.2.3.BP.  The *Deepwater Horizon* also went seven years without a Day Away From Work Case, meaning it had been seven years since someone had missed work due to an injury.  Tr. 8603-04 (Guide); Tr. 1848 (Ezell).  Its safety record was exemplary.  McMahan Dep. 244; Tr. 5880-81 (Young); Tr. 8600 (Guide); Tr. 8111 (Shaw) (no loss of containment issues on the *Deepwater Horizon* in 2008 or 2009).

361.    According to John Guide, the Wells Team Leader on the *Deepwater Horizon*, the rig had a strong safety culture, and the Transocean personnel assigned to the *Deepwater Horizon* cared about safety and were the best in the business.  Tr. 8855-56 (Guide); Tr. 8596 (Guide).  *See also* TREX 047570.3.1.BP (results of 2008 Safety "Pulse Check" Survey indicating "[s]trong performance and safety culture is imbedded" and "[a]ll rig personnel are very proud of safety and performance history").

362.    Ronnie Sepulvado, a BP Wellsite Leader on the *Deepwater Horizon*, believed the rig was safe and that there was an emphasis on working in an injury free environment.  Tr. 1962-63, 1966 (R. Sepulvado).  Murry Sepulvado, another BP Wellsite Leader on the *Deepwater*

*Horizon*, was "totally confident" in the personnel on the *Deepwater Horizon*.  M. Sepulvado Dep. 537.

363.    Randy Ezell, Senior Toolpusher, believed that the safety culture on board the *Deepwater Horizon* was the best he had ever seen and that the *Deepwater Horizon* was manned with highly capable and qualified leadership.  Tr. 1703-04, 1722 (Ezell).  David Young, the Chief Mate on the *Deepwater Horizon*, described the *Deepwater Horizon*'s safety culture as "excellent."  Tr. 5605 (Young).

364.    BP also recognized the performance of members of the *Deepwater Horizon* crew, submitting a letter of recommendation for Randy Ezell for Transocean's First Excellence Award, one of the highest honors a Transocean employee may receive.  Tr. 1733-34 (Ezell).  BP wrote Randy Ezell a thank-you note, acknowledging his work:   "These efforts have produced an exemplary safety culture on this rig that has achieved 6 years with no LTA [loss time accidents]."  Tr. 1733-35 (Ezell); TREX 07774.

365.    Patrick O'Bryan, BP's Vice President of Drilling & Completions in the Gulf of Mexico at the time of the Incident, visited the *Deepwater Horizon* on April 20, 2010, in order to learn what "good looks like."  Tr. 9264-65 (O'Bryan); Tr. 8234 (Shaw).  The *Deepwater Horizon* had great teamwork between the Wellsite Leaders and the Rig Managers and everyone was on the same page from a safety standpoint.  Tr. 9248 (O'Bryan).  Employees from both BP and Transocean cared about safety and took pride in what they did.  Tr. 9248-49 (O'Bryan).

366.    In preparation for his visit to the *Deepwater Horizon*, O'Bryan asked for talking points on the operations on the *Deepwater Horizon* from David Sims, who was BP's Explorations & Appraisal Operations Manager for the GoM Drilling & Completions organization.   David Sims's talking points included the following comments about the

*Deepwater Horizon* team: genuine concern for HSE, not just ticking the box; tremendous rigor put into risk awareness, mitigation, reporting, investigations, and lessons learned; everybody has the same goal and is on the same page; there is a no-blame culture, meaning fix the problem, learn from it, and move on; there are no egos, no divisions, no agendas on the rig as everybody shares equally; they utilize all available resources to get back on track; and they have excellent communication on the rig between the office and the rig site.  Tr. 9266-68 (O'Bryan); TREX 047964.3.1.BP.

367.    This exemplary performance and safety culture of the *Deepwater Horizon* was a testament to the successful collaboration between Transocean, BP, and all of the other entities involved in the approximately fifty wells successfully drilled by the *Deepwater Horizon* crew. Tr. 4684 (Newman); D4341; TREX 052647.  In 2010, it would have been hard to choose a better rig to drill a well than the *Deepwater Horizon*.  Tr. 4684-85 (Newman).

**E.    Transocean's Safety Assessments of the *Deepwater Horizon*.**

**1.    Transocean's Major Accident Hazard Risk Assessment (MAHRA) for the *Deepwater Horizon*.**

368.    Transocean policy identified "three processes to provide assurance that Major Hazards are effectively managed: the Major Hazard Risk Assessment (MAHRA), the HSE (or Safety) Case, and the Operations Integrity Case (OIC).  Every vessel in the Transocean fleet must have a current version of a MAHRA, Safety Case, or OIC."  TREX 1449.132.1.BP; Tr. 4713 (Newman).

369.    Although only one process was required per Transocean policy to manage major hazards, Transocean completed both an OIC and a MAHRA to assess the levels of risk applicable to the *Deepwater Horizon*.  Tr. 4702-03, 4710-4711, 4713-14 (Newman); TREX 005474; TREX 040011 at 8, 29, 50-51; Tr. 9415-16 (Mitchell); D4401A.1, D4401A.4.

370.    "A Major Hazard Risk Assessment (MAHRA) shows that major hazards have been identified, the risk associated with those hazards has been qualitatively assessed, and that the preventive and mitigating controls necessary to reduce the risk to ALARP [as low as reasonably practical] have been identified."  TREX 1449.132.1.BP; Tr. 4714 (Newman).  The MAHRA performed for the *Deepwater Horizon* was approved by Transocean Rig Manager John Keeton and "identified reasonably foreseeable hazards that might lead to a major accident." TREX 002187 at TRN-MDL-00047536; TREX 002187.2.1.BP; Tr. 4714-15 (Newman).

371.    One such foreseeable hazard identified in the *Deepwater Horizon* MAHRA was "reservoir blowout (at drill floor)."  Tr. 4716 (Newman); TREX 002187.178.1.BP; Tr. 4205-08 (Webster); D4401 at 3-5 (Reservoir Blowout Hazard).  *See also* TREX 002187.5.BP.  The MAHRA identified three consequences associated with this hazard: (1) major environmental impact; (2) multiple personnel injuries or fatalities; and (3) major structural damage and possible loss of vessel.  Tr. 4716 (Newman); TREX 002187.178.1.BP.

372.    The identified preventions for a reservoir blowout (at drill floor) listed in the MAHRA were: (1) well control procedures and training of drill crew in well control; (2) maintenance and testing of BOPs and other subsea and well control equipment; (3) instrumentation and indication of well status; (4) hydrocarbon combustible gas detection system; and (5) redundant BOP controls.  TREX 002187.178.1.BP.  Transocean was responsible for each of the preventions identified, all of which were industry-standard preventions for reservoir blowouts.  Tr. 4716-19 (Newman); TREX 002187.

373.    The MAHRA also identified eight mitigations for the hazard of a reservoir blowout at the drill floor:  (1) emergency response procedure, training and drills; (2) ability to move off station; (3) firefighting capabilities; (4) ability to evacuate the rig; (5) availability of

medical treatment including medivac; (6) redundant BOP controls; (7) passive fire protection in highly populated areas of the vessel; and (8) EX-rated equipment to prevent ignition of blowout. TREX 002187.178.1.BP.   Again all of the identified mitigations were industry-standard mitigations and, with the exception of the availability of medical treatment including medivac, Transocean was responsible for each of the identified mitigations.  Tr. 4719 (Newman); TREX 002187.178.1.BP; Tr. 4205-08 (Webster); Tr. 9416 (Mitchell); D4401A.1; D4401A.4; TREX 0040011 at 8.

374.    The MAHRA performed on the *Deepwater Horizon* also identified BOP component and hydraulic supply failure as a hazard; the identified preventions for these hazards were testing, inspection, and maintenance – Transocean's responsibilities.  Tr. 4720 (Newman); TREX 002187.212.1.BP.

375.    In addition, the *Deepwater Horizon* MAHRA identified gas in the riser as a hazard, noting consequences such as possible ignition at the surface with fire/explosion – *i.e.*, what happened to the *Deepwater Horizon* in April 2010.  Tr. 4624-27 (Newman) (Transocean had full knowledge of the hazard and consequences of gas in the riser); TREX 002187 at TRN-MDL-00047713.  Other consequences of gas in the riser identified in the MAHRA included:  (1) major structural damage to the vessel; (2) possible loss of the riser; (3) possible environmental impact; (4) possible injury to personnel; and (5) possible fatalities.  TREX 002187 at TRN-MDL-00047713.  Four consequences identified in the 2004 MAHRA were certainly realized as a result of the Incident.  Tr. 4626-27 (Newman); TREX 002187 at TRN-MDL-00047713.  The preventions identified in the MAHRA for the hazard of gas in the riser included:  (1) good drilling practices; (2) instrumentation and indication of well status; (3) subsea isolation

equipment; and (4) training in well control including required drills.  Tr. 4627 (Newman); TREX 002187 at TRN-MDL-00047713.

**a.  Well Control Procedures and the Training of the Drill Crew in Well Control.**

376.   The first prevention identified in *Deepwater Horizon* MAHRA is well control procedures and training, both of which were Transocean's responsibility.  Tr. 4716 (Newman); TREX 002187.178.1.BP.   As discussed in greater detail in § II.C.4.a and § II.C.4.b above, Transocean's well control procedures are set forth in Transocean's Well Control Handbook and Transocean's Field Operations Handbook.  Tr. 1880-81 (Ezell); TREX 001454 (Well Control Handbook); TREX 001452 (Field Operations Handbook).   These manuals emphasize that the key to effective well control is early kick detection and rapid response.  Tr. 1881 (Ezell); Tr. 4724-25 (Newman); McMahan Dep. 308-09.   Transocean's well control procedures were consistent with industry standards.   Tr. 464 (Bea); Tr. 4455 (Barnhill); Tr. 7528, 7696-98 (Bourgoyne).

377.   Transocean is also responsible for ensuring its personnel had the proper well control training.  Tr. 4695, 4716 (Newman).  The crew of the *Deepwater Horizon* crew was an experienced, competent, and well-trained team.  Tr. 7569 (Bourgoyne); Tr. 8851-54 (Guide); Tr. 1650-53, 1691 (Ezell) ("Just about all of the wells that we [Transocean *Deepwater Horizon* drill crew] were drilling were not simple, they were all challenging wells like [the Macondo well]."); Tr. 3618-19 (Keith); Mansfield Dep. 125-26; Hackney Dep. 159.

378.   The *Deepwater Horizon* driller and his crew were highly trained in well control, including recognizing the signs of a kick, closing the BOP to stop the influx, and using the diverter system to divert flow overboard and away from the rig when hydrocarbons enter the marine riser above the BOP at the seafloor.  Tr. 7696-98 (Bourgoyne); Tr. 6139 (Ambrose)

84

("[E]verybody [on the *Deepwater Horizon*] had all the training that we [Transocean] would provide, and they were very well trained"); TREX 063213 ¶ 8 ("Rig personnel who observe any indication of a potential influx from the formation into the well are trained, as part of their well control duties, to ensure the well is shut in so that the indication of an influx may be appropriately addressed."); Tr. 1752 (Ezell) (*Deepwater Horizon* Toolpusher Jason Anderson had shut in the well more times than any toolpusher on the rig).

379.    According to the Transocean Well Control Handbook, Transocean personnel are required, at a minimum, to successfully complete "a Transocean well control course or equivalent external course determined by the Business Unit/Division Training Manager to meet Transocean standards."   TREX 001454 at TRN-MDL-00286787.   Transocean's in-house well control training schools were IADC (International Association of Drilling Contractors) certified and met industry standard.   Tr. 1753 (Ezell); Tr. 4259 (Barnhill); Tr. 7696-98 (Bourgoyne). Transocean's in-house well control school offered both a basic or fundamental well control course, and a supervisory level well control course.   Tr. 4259 (Barnhill).

380.    In addition to providing IADC certified in-house well control training, Transocean utilizes outside courses to provide training as needed to their personnel, and also provides on-the-job training programs.  McMahan Dep. 69, 426 ("We utilize IADC certified well control training within Transocean.  We also utilize external courses to provide the same training as needed.").

381.    Offshore rig positions including the OIM, senior toolpusher, toolpusher, driller and drilling supervisor were required to complete the well control course every two years, as well as an IADC WellCAP Supervisory course.  TREX 001454 at TRN-MDL-00286787.  The assistant driller, derrickhand, and subsea supervisor also must complete the well control course

every two years, and in addition, are required to complete the IADC WellCAP course at the Fundamental level.  TREX 001454 at TRN-MDL-00286787.

382.    The curriculum for Transocean's well control schools included going through Transocean's Well Control Handbook section by section, engaging employees in shut in simulations and circulating out kicks, and requiring a series of tests in order to pass the training.  Tr. 1753 (Ezell); Tr. 4260, 4265 (Barnhill); McMahan Dep. 125, 310-11 (it was the policy and procedure of Transocean to train their personnel in the contents of the Transocean Well Control Handbook, and the expectation was that Transocean personnel would reference the Well Control Handbook to understand their responsibilities).

383.    Training regarding formation integrity tests (FIT) and leak-off test (LOT) procedures was part of both the fundamental and supervisory well control courses, and was also addressed during well control drills conducted on the *Deepwater Horizon*.  Tr. 1854-55, 1875 (Ezell); TREX 052652; TREX 000571 at BP-HZN-MBI00167557 (A March 7, 2010, well control drill conducted aboard the *Deepwater Horizon* was a "[g]ood drill and communication to gain knowledge and understanding of formation integrity test and leak off test.").

384.    Transocean on-the-job training (OJT) modules were specifically tailored to each position on the rig (*e.g.*, driller, assistant driller, mechanic, roustabout, electrician, etc.).  Tr. 4549-50 (Newman); Tr. 1755 (Ezell); TREX 041225.  The first module every position must complete is a safety OJT module.  Tr. 4550-51 (Newman).  The Transocean OJT modules involved a combination of computer training and also live training, and every rig was equipped with a training room with training materials (such as manuals, and videos) and a computer solely devoted to training.  Tr. 4550-51 (Newman).

385. Transocean OJT training took place on the rig, involved daily mentoring by supervisors, and was designed to test whether rig personnel had: (1) "a clear understanding of the role and responsibilities" of their respective position; and (2) the ability to perform basic tasks necessary to their respective position both "safely and competently." Tr. 1752-55 (Ezell); Tr. 4550-51 (Newman); TREX 041225 at TRN-MDL-00576079.

386. Transocean's driller OJT module, for example, required 68 competency tasks, including: (1) describing the driller's basic day-to-day key responsibilities with regards to monitoring the drilling operations; (2) showing how to perform a flow check; (3) explaining and simulating how to shut in the well; (4) explaining and simulating how to divert the well; (5) explaining and showing the well-control information displayed in the doghouse; (6) explaining hang-off and emergency disconnect procedures; (7) explaining when, how and why a LOT or FIT is performed; and (8) explaining the procedures for displacing cement with rig pumps. TREX 041225 at TRN-MDL-00576084-86; Tr. 1756-59 (Ezell).

387. As required by Transocean's Well Control Handbook, well control drills were also regularly conducted on at least a weekly basis with the *Deepwater Horizon* crew, as well as trip drills, pit drills, diverter drills, D5 drills, and emergency response fire and abandon drills. TREX 001454 at TRN-MDL-00286823; Tr. 1974-1975 (R. Sepulvado); D4370; Tr. 1777, 1779-1780 (Ezell); Tr. 8854 (Guide); Tr. 1324 (Bly); Tr. 9524 (Mitchell); D6591.

388. D5 drills practiced circulating out kicks through various simulations, as well as recording the crew's well control response reaction time to closing in the BOP. Tr. 1780 (Ezell); Tr. 1324 (Bly); TREX 004254 at 1 (Mar. 22, 2010 MC252 Daily Drilling Report: "perform D-5 well control drill closed lower annular at 07:30; time required 00:27 secs, simulated circulating out kick; time required 30:00 mins"); D6591.

389.   Transocean's weekly well control drills served to reinforce well control messages and reviewed the roles and responsibilities of the rig crew in a well control situation.  Burgess Dep. 92-94.  For example, according to Transocean's Well Control Handbook:  "The interface between the drill crews and mud logging personnel must be considered when planning the well control drills.  Situations may arise where mud logging personnel are first to be aware of potential kick indicators.  Where applicable, the mud logging personnel and the planned method of communication with the drill crews must be included in the drills."  TREX 001454 at TRN-MDL-00286823.

390.   A February 14, 2010, well control drill conducted on the *Deepwater Horizon* specifically "[d]iscussed the importance of monitoring all pit volumes, pump pressures, flowback during connections … the roles and responsibilities of each individual crew members as it pertains to well control … [and] the importance of inspecting all well control equipment."  TREX 000571 at BP-HZN-MBI00167535.  Similarly, an April 4, 2010, well control drill aboard the *Deepwater Horizon* addressed the following issues:  "Discussed with crew roles and responsibilities.  Discussed Section 5 Sub-Section 1, Detecting Kick … The [f]irst positive indicator that the well is flowing is an increase in return flow rate.  A Gain in pit volumes is another positive indicator that a Kick occurred."  TREX 000571 at BP-HZN-MBI00167536.

391.   On April 18, 2010, just two days before the Incident, Transocean conducted another well control drill aboard the *Deepwater Horizon* with a reminder to be vigilant of well control situations arising during cement operations:  "Discuss roles and responsibilities with the crew.  Also discuss kick during cement jobs.  Kicks that occur while cementing are the results of reducing the hydrostatic pressure during the operation.  Well [*sic*] have been lost due to improperly designed cement slurries and spacers."  TREX 000571 at BP-HZN-MBI00167546;

Tr. 1783 (Ezell); Tr. 4598-99 (Newman); Transocean's Discovery Response at 85-91 (July 15, 2011) (Ex. 2).

392.     The general comments to the April 18 drill, which was approved by the OIM, note: "[g]ood topic to review with the mud weight being so close to pore pressure."  TREX 571 at BP-HZN-MBI00167547; Transocean's Discovery Response at 100 (July 15, 2011) (Ex. 2). Participants in the drill included OIM Jimmy Harrell, Wellsite Leader ("WSL") Don Vidrine, Senior Toolpusher Randy Ezell, Toolpusher Jason Anderson, Driller Dewey Revette, and Assistant Drillers Donald Clark and Stephen Curtis.  TREX 000571 at BP-HZN-MBI00167546-47; Transocean's Discovery Response at 86 (July 15, 2011) (Ex. 2).

393.     The *Deepwater Horizon* drill crew had completed well control school every two years as required by Transocean, were well control certified, and had the training that was necessary to understand and react to the well control situation on April 20, 2010.  Tr. 4265, 4267, 4351, 4455 (Barnhill) (indicating drillers are trained to recognize subtle indications for potential kicks and respond accordingly); Tr. 4748-49 (Newman); Tr. 1752-54, 1759 (Ezell); TREX 052658; Burgess Dep. 319-20 (agreeing that identifying causes and warning signs of a kick were skills learned during well control training which he employed in his role as a driller on the *Deepwater Horizon*).

394.     The well control training Transocean provided its crew prior to April 20, 2010 was appropriate, was high quality, and "met or exceeded industry standard."  Tr. 4240-41, 4265, 4267 (Barnhill).

**b.      Maintenance and Testing of BOPs and Other Subsea and Well Control Equipment.**

395.  The second prevention identified in the *Deepwater Horizon* MAHRA is maintenance and testing of BOPs and other subsea and well control equipment, which was

Transocean's responsibility.   TREX 002187.178.1.BP; Tr. 4658, 4660, 4694-95 (Newman); Boughton Dep. 246; TREX 004271 at BP-HZN-MBI00021473, 477-78.

396.   As discussed in greater detail in Section II.C.2.d, Transocean – from its Senior Management through the rig-based Subsea Supervisors – understood and acknowledged its responsibility for effective maintenance and operation of well control equipment, including the blowout preventer.  In that regard, Transocean had detailed policies and procedures, such as those set forth in Transocean's Well Control Handbook and Subsea Maintenance Philosophy, for maintaining and operating such equipment, and had a well-developed and highly experienced Subsea Department that was dedicated to assuring that such equipment would work as intended in an emergency.  Tr. 4658, 4660, 4694-95 (Newman); Boughton Dep. 246; Stringfellow Dep. 439; Tr. 4430-31 (Barnhill); TREX 001454 at TRN-MDL-00286773-74, 6843-57; TREX 001469.

397.   Transocean's Subsea Department applied its policies and procedures for effective maintenance and operation of well control equipment across the entirety of its fleet and therefore these policies and procedures were used with all rigs that were contracted to operators, including Shell and Chevron, among many others, in performing deepwater drilling operations.  Kent Dep. 26-27; Stringfellow Dep. 400-02; Turlak Dep. 212; Tr. 5202 (Childs); TREX 001469; Tr. 4730-31 (Newman); Boughton Dep. 18-19; Farr Dep. 403.

## F.    Transocean Safety Initiatives Applicable to the *Deepwater Horizon* Crew.

398.   Transocean has a practice of holding safety meetings onboard its rigs:  (1) at the start of every 12-hour shift in a pretour meeting; and (2) as part of the THINK planning process, in which a "safety meeting" takes place at the start of every task.  Tr. 4547-48 (Newman).

399.    BP's Macondo Wells Team Leader held periodic meetings with the Transocean rig management and senior crew to discuss safety and what improvements could be made.  Tr. 8617-19 (Guide); TREX 005965.

400.    As discussed above, Transocean has a comprehensive on-the-job training program.  *See* ¶¶ 384-386.  And, in addition to on-the-job training, Transocean had more formal safety training programs – *e.g.*, training courses for well control and training courses for drilling practices (especially for drillers).  These safety courses covered emergency response procedures. Tr. 4551 (Newman).

401.    Transocean safety training also encompassed weekly rig drills which all the rigs must conduct, including weekly fire drills and weekly abandonment drills.  Tr. 4551 (Newman); Tr. 9506 (Mitchell).

402.    All training courses Transocean offered had some embedded element of safety training in them.  Tr. 4548, 4551 (Newman).

403.    Training for Optimum Performance Safety ("TOPS") was Transocean's two-week shore-based program at the Transocean logistics base in Louisiana for new hires.  It was designed to duplicate the environment onboard the rigs as closely as possible.  Tr. 4548-49 (Newman).

404.    The TOPS program involved classroom training combined with basic task training and introduced new employees to the THINK process, the START process, and the concept of their stop-work authority.  At the end of the two-week period, the new hires were given a test.  If they did not pass, they did not go offshore.  Tr. 4548-49 (Newman).

405.    Transocean had a rigorous safety management system, which included START, Prompt card, the THINK process, and task-specific THINK plans.  Tr. 8616 (Guide).

406.     START was a behavioral-based safety-observation program where people would observe something good or not good and would fill out a card and submit it to rig leadership. Rig leadership looked for any trends.  Tr. 8616-17 (Guide); Tr. 4545-46 (Newman).

407.     Prompt cards were meant to prompt the employee before a task to ensure everything was ready.  Tr. 8617 (Guide).

408.     "THINK" was Transocean's comprehensive pre-task planning process designed to identify all hazards with a planned task, and to ensure that the equipment and supplies in place to control the hazards were in good condition.  If a task was more complex and/or had more people involved (*e.g.*, running the BOP), the expectation was that there would be a written THINK plan. Tr. 4542-45 (Newman); TREX 004942 at BP-HZN-2179MDL00132221.

409.     The fundamental expectation of the THINK planning process was that, before any crew member undertook a task, he or she conducted a THINK plan to ensure that the task could be carried out safely and efficiently.  Tr. 4712 (Newman).

410.     The THINK process should have been applied to every task – even something as simple as going to a locker to get a new sling, but especially things like:  (1) the negative pressure test; (2) displacing the riser; and (3) conducting the positive test.  Tr. 4543, 4711-12 (Newman).

**G.     All Transocean Crew Members Had Stop-Work Authority.**

411.     A key component of Transocean's Safety Management System was stop-work authority, also referred to as "Time Out for Safety."  Tr. 4705 (Newman); P. Johnson Dep. 51; Rose Dep. 112; Canducci Dep. 710-11.

412.     Transocean's Health and Safety Policy Statement, signed by Transocean's CEO Steve Newman and Transocean's Vice President of Quality, Health, Safety and Environment, expressly stated:  "Each employee has the obligation to interrupt an operation to prevent an

incident from occurring."  TREX 001449.5.3.BP; Tr. 4706 (Newman); Rose Dep. 112; Burgess

Dep. 310-11.  Similarly, Transocean's Health & Safety Policies & Procedures Manual provides

that all company personnel "[h]ave the obligation and the responsibility not to participate in an

unsafe act and also the obligation and responsibility to interrupt any operation to prevent an

unsafe act or unsafe condition from causing an incident.  Each individual also has the obligation

and responsibility to take action to correct an unsafe behavior or condition."  TREX 004942 at

BP-HZN-2179MDL00132070; Burgess Dep. 311-12; Keeton Dep. 317-18; Rose Dep. 112;

Transocean's Discovery Response at 163 (July 15, 2011) (Ex. 2).

413.    Transocean made clear that stop-work authority should be exercised whenever

personnel did not understand a plan or an operation, whenever personnel required additional

information, when an unsafe condition was observed, and even when personnel were "the least

bit uncomfortable" or concerned.  Tr. 4539, 4658, 4705-06 (Newman) ("At any point in any

operation, any Transocean employee can stop the job."); Tr. 1677-78, 1775 (Ezell); Tr. 5595-96

(Young); Tr. 6224 (Ambrose); Barron Dep. 145-46, 177-78; Canducci Dep. 213, 710-11; Farr

Dep. 109, 122-23; Hay 1 Dep. 366-68; Hart Dep. 225-26; Keeton Dep. 317-18; TREX 005418.

414.    Transocean *Deepwater Horizon* managers testified that they empowered and

expected everyone aboard the *Deepwater Horizon* to stop the job and not proceed until

completely confident conditions were safe.  Keeton Dep. 317-18 (everyone on the *Deepwater

Horizon* from the OIM down to "the galley people" had an obligation to exercise stop-work

authority); Winslow Dep. 452, 505-06.  If any Transocean personnel had concerns about an

operation or decision, BP could not compel them to move forward.  Tr. 6235 (Ambrose); Tr.

7554 (Bourgoyne); Tr. 4705-06 (Newman); Tr. 1677-78 (Ezell); Breland Dep. 145-46.  *See also*

Tr. 6193 (Ambrose) (agreeing that if Transocean *Deepwater Horizon* OIM Jimmy Harrell was

uncomfortable with the Macondo drilling plan, he had the authority and obligation to not proceed with any operations).

415.    Transocean *Deepwater Horizon* crew members uniformly testified that they understood and felt comfortable stopping the job for safety.  Tr. 5595, 5598 (Young); Williams Dep. 270; Holloway Dep. 94-95, 150-51; Brown Dep. 289-90; Burgess Dep. 310; Keplinger Dep. 175-76; Mansfield Dep. 110-11; Pleasant Dep. 349; Hay 1 Dep. 366-68; Meinhart Dep. 225-26;  Winslow Dep. 504 (agreeing everyone from the Transocean CEO to the newest rig crew member was familiar with Time Out for Safety); TREX 004818 at TRN-INV-00002118 ("never had the feeling that he would be criticized or fired for calling a TOFS"); TREX 005732 at 13 ("the crew could call a TOFS on anyone").

416.    And Transocean *Deepwater Horizon* crew members, including by Senior Toolpusher Randy Ezell, Toolpusher Jason Anderson, and Driller Dewey Revette, frequently exercised their stop-the-job authority.  Tr. 1678, 1774 (Ezell); Tr. 5598 (Young); Barron Dep. 119; Hay 2 Dep. 176-77, 366-68; Holloway Dep. 150-51; Stringfellow Dep. 451; TREX 005418 at TRN-INV-00000661 ("TOFS - (Time Out For Safety) - Stanley uses this every day to keep everyone focused.").  A BP Safety Pulse Check Survey administered on the *Deepwater Horizon* described the stop-the-job culture as "very strong by all personnel interviewed."   TREX 047570.3.1.BP; Tr. 8610-11 (Guide); D4350.

**H.    All Halliburton Crew Members Also Had Stop-Work Authority.**

417.    Halliburton crew members also had stop-work authority on the *Deepwater Horizon* if they believed any operations or conditions were unsafe.  Halliburton's Responses to the BP Parties' First Requests for Admissions at 11-12 (May 25, 2011) ("Halliburton's Discovery Response (May 25, 2011)") (attached hereto as Ex. 5); Tr. 2968 (Probert); Tr. 1347-48 (Bly); Rich Dep. 673; Serio Dep. 456-57.

418.    The BP-Halliburton contract specifically incorporated BP's "Golden Rules for Safety" and emphasized that "[e]veryone has an obligation to stop work that is unsafe."  TREX 004477 at BP-HZN-2179MDL00056093.

419.    Halliburton's employees were expected to escalate any unsafe conditions to the attention of the well owner and had the duty to stop any operation that was unsafe.  Tr. 2969-70, 2987 (Probert); Vargo Dep. 409-10; Tabler Dep. 524-25; Serio Dep. 56-57; TREX 005283.4.3.HESI.

420.    Halliburton did not attempt to stop work on April 19 or April 20, 2010 and "did not refuse to execute the cement job on the production casing at the Macondo well."  Halliburton's Discovery Response at 11-13 (May 25, 2011) (Ex. 5); Halliburton's Discovery Response at 5, 6, 26 (July 18, 2011) (Ex. 3).

421.    When Gagliano was involved with the Macondo well, BP never made a decision that warranted or justified the use of stop-work authority.  Tr. 6609 (Gagliano).  Gagliano would have exercised stop-work authority if someone was creating a risk for anyone's life on the rig.  Tr. 6609 (Gagliano).

422.    Mud loggers have the authority to stop operations if rig operations affect their ability to monitor.  Kronenberger Dep. 86-88.  Bement Dep. 148; Gray Dep. 525; TREX 004395.  Mud loggers can ask the rig crew to cease specific rig operations, such as crane movement, if the operations impede the ability of the mud logger to monitor the well.   Gray Dep. 375; Kronenberger Dep. 87-89.

423.    Keith, the mud logger on duty on the evening of April 20, 2010, always knew he had stop-work authority if he ever believed something was unsafe.  Tr. 3622, 3673 (Keith).

Specifically, Keith felt comfortable that he had the authority to stop work if he was unable to monitor important parameters that related to safety.  Tr. 3673 (Keith).

424.    If Keith believed at any time on April 20, 2010, that there was an unsafe event, activity, or condition, he had a responsibility to report it to the company man, the driller, or Transocean OIM Jimmy Harrell.  Tr. 3672 (Keith).

425.    Keith did not report anything on April 20, 2010, because "[n]othing seemed unsafe" to him.  Tr. 3673 (Keith).  Likewise, Keith never had to exercise his stop-work authority because he always felt safe onboard the *Deepwater Horizon*.  Tr. 3622, 3672 (Keith).

## IV.    HOW THE RISKS OF DEEPWATER DRILLING ARE MANAGED.

### A.    The Barriers to a Blowout.

426.    The offshore drilling industry employs a series of redundant measures in the design and execution of every oil well in order to prevent kicks from developing into blowouts, including cement, well integrity testing, well control, and the blowout preventer.  Tr. 471-73 (Bea); Tr. 4716-19 (Newman); TREX 002187.178.1.BP.

427.    By design, if any one of these measures fails, there are other measures in place to ensure that control of the well is not lost.  Tr. 471-73 (Bea); TREX 000001 at 32.  In fact, in order for a blowout to occur, each of these measures has to have failed.  TREX 000001 at 32; D3584.

### 1.    Cement.

428.    As part of the well design, BP employed the services of a Halliburton to provide a design and execute a cement program for the Macondo well, which aims to achieve "zonal isolation," or the isolation of the area of the well being cemented from hydrocarbons until the well is ready for production.  Tr. 959 (Bly); *see also* Tr. 8973 (Guide); TREX 000001 at 34.

Zonal isolation cannot be achieved without cement capable of setting and forming as a bond. Tr. 8973 (Guide); *see also* Tr. 6357 (Chaisson).

429.    The Halliburton team designed and recommended a cement plan that employed foam cement for the final production casing string for the Macondo well. TREX 000186.

430.    The cement pumped into the annulus was designed to be a barrier. Tr. 6709-10 (Gagliano); Tr. 8932 (Guide); Tr. 1403 (Bly).

### 2.    Well Integrity Testing.

431.    As part of its temporary abandonment procedure, BP undertook three separate types of well integrity testing to confirm the integrity of the system of cement, casing strings, and mechanical seals that comprised the wellbore, which were conducted over a period of 14 hours. TREX 000001 at 23-25; Tr. 4321-23, 4327-28 (Barnhill); D4352; D4353; D4354; TREX 001455; TREX 000820.

### a.    Seal Assembly Tests.

432.    The Seal Assembly test assessed the integrity of the interface between the casing and the wellhead. D4352. In the early morning hours of April 20, the rig crew performed two separate pressure tests on the seal assembly. Both tests were successful. D4352; TREX 002805; TREX 000001 at 23; Burgess Dep. 187.

### b.    Positive Pressure Tests.

433.    The first test designed to verify integrity of the well is the positive pressure test, which tests in the direction opposite of flow by increasing pressure in wellbore to see if fluid will flow out. Tr. 4361 (Barnhill); *see also* Tr. 614-15 (L. McKay).

434.    As of April 20, 2010, the positive pressure test was the only well integrity test that was required under then-MMS regulations. Tr. 4323 (Barnhill).

435.    The rig crew conducted the positive pressure test on April 20, 2010, between 10:30 and 12:00, and the test was deemed successful.  D4353; Tr. at 1406-07 (Bly).

### c.    Negative Pressure Tests.

436.    The second test designed to verify integrity of the well is the negative pressure test, which tests in the direction that flow would occur by reducing the pressure in the wellbore to see if fluid will flow in when the mud holding back such pressures is removed.  Tr. 4361 (Barnhill); *see also* Tr. 614-15 (L. McKay).

437.    Negative pressure tests are done to simulate the hydrostatic conditions that the well will experience once the well was is temporarily abandoned to determine well integrity prior to displacement.  Tr. 961-62 (Bly); *see also* Tr. 5012-13 (Barnhill); TREX 000001.39.1.BP. Displacement refers to the removal of the hydrostatic head as part of the overall operation to abandon the well until production takes over.  Tr. 961-62 (Bly).

438.    To conduct a negative pressure test, the crew intentionally displaces a heavier fluid by providing the rig with a hydrostatic head with a lighter fluid, thereby creating an underbalanced condition in the well.  Tr. 1672-73 (Ezell); Tr. 2075-77 (Heenan).  During a negative pressure test you want to test the same differential pressure you are going to see when you leave the well.  Tr. 8761-62 (Guide).  The negative pressure test is also designed to give confidence that when you return to the well for production and drill down through the plug, there will not be an immediate well control event.  Tr. 5012-13 (Barnhill).

439.    By underbalancing the wellbore, the negative pressure test checks the integrity of the cement in the wellbore to determine if it is good, and if the test shows the cement is not good, remediation work can be done, potentially including a squeeze job.  Tr. 622-23 (L. McKay); Tr. 2077 (Heenan); Tr. 1672 (Ezell); *see also* Tr. 6612, 6614 (Gagliano).

440.   As of April 20, 2010, then-MMS regulations did not require that a negative pressure test be performed prior to temporary abandonment.  Tr. 4323, 4472-74 (Barnhill); Tr. 2211-12 (Heenan); Tr. 8760-61 (Guide); Patton Dep. 243-45; Saucier Dep. 190-91.  In addition to the absence of any regulatory requirement to conduct a negative pressure test, the MMS also did not provide any guidance governing: (i) negative pressure testing, (ii) when or how such tests should be performed, (iii) how to interpret such tests, or (iv) what would constitute a successful negative pressure test.  Tr. 4473-74 (Barnhill); F. Patton Dep. 243-45; Saucier Dep. 190-91.

441.   Other operators in the industry temporarily abandoned wells without performing a negative pressure test, and given the absence of a regulatory requirement BP could have complied with MMS regulations for temporary abandonment by conducting only a positive pressure test, even if a negative pressure test was never conducted.  Tr. 4323, 4427, 4473 (Barnhill); Saucier Dep. 191, 266; Patton Dep. 245; Trocquet Dep. 146-47.

442.   Nonetheless, BP included a negative pressure test as part of its temporary abandonment procedure, in order to ensure that the wellbore had integrity prior to displacing the well.  TREX 000570.  Transocean drilling expert Calvin Barnhill characterized BP's decision to include the negative pressure test in its temporary abandonment plan as a "prudent" decision.  Tr. 4480 (Barnhill).

### 3.   Well Control.

443.   Well control is an important aspect in every phase of the operations in every oil well drilled, whether onshore or offshore, shallow or deepwater.  Well control – or maintaining sufficient control over the well at all times – is important because the potential for loss of well control is the biggest risk faced in drilling, and the consequences could be very severe.  Tr. 8927 (Guide).  Fundamentally, well control consists of awareness and vigilance, the recognition and

identification of signals and anomalies, and prompt, appropriate actions (including shutting in the well).  Tr. 4659 (Newman); *see also* Tr. 4722-23 (Newman).

444.    For this reason, one of the fundamental components of any well plan and rig operations team is the drill crew, consisting of the driller, the assistant driller, and the toolpusher(s), who are charged with monitoring the well at all times for signs of a kick.  The driller is the individual on the rig specifically charged with monitoring the well at all times, and with shutting in the well immediately upon the first indication of a kick.  TREX 001452 at 77; TREX 001454 at 18; Transocean's Discovery Response at 54 (July 15, 2011) (Ex. 2) ("[T]he driller is the primary person responsible for monitoring the well.").

445.    In addition, the mud logger is also charged with continuous monitoring of the well, and acts as a second set of eyes.  Tr. 2977-78 (Probert); TREX 004477 at 178; S. Clark Dep. 179   The mud logger is expected to watch for signs of a kick and to notify the driller immediately upon detection of such signs.  Tr. 3502, 3504 (Keith); Tr. 7289-90 (Beck); Tr. 4406-07 (Barnhill); TREX 004477 at 171-72; Kronenberger Dep. 170.

446.    Wells drilled in deep water tend to have much lower kick tolerances than wells in shallower water.  Tr. 1882 (Ezell); TREX 000596 at BP-HZN-2179MDL00330964.  Both the driller and the mud logger watch the data available to them from various gauges and other indicators from the rig to identify anomalies indicative of a kick.  Tr. 1745 (Ezell); Tr. 3490-91, 3597-98 (Keith); TREX 004248 at 118-22; TREX 001453 at 73.  The two primary realtime well control indicators are pit level and return flow rate.  Tr. 4256, 4270 (Barnhill).  When a gain in flow to the pits is observed, that is an indication that there is a potential well control situation. Tr. 4270 (Barnhill).

447.    In the normal course, a primary well control barrier in the well is hydrostatic pressure created by drilling mud.  Tr. 4254 (Barnhill); Tr. 620 (L. McKay); TREX 004248 at 136.  The most important function of mud from a well control perspective is that it provides hydrostatic pressure to offset the pressurized fluids that are contained in the various formations that are drilled through.  Mud is given weight through two components: one is its density; the other is the length of the mud column being used.  Tr. 4254 (Barnhill); TREX 004248 at 136.  Increasing the mud weight is the primary line of defense against a kick.  Tr. 655 (Huffman).  Operators must keep their mud weight slightly higher than their pore pressure while drilling to avoid kicks in a permeable formation.  Tr. 7630 (Bourgoyne).

448.    When well influx occurs, rapid response is critical.  The drill crew needs effective procedures and must effectively implement them to maintain control over the deteriorating conditions of the well.  Tr. 982-83 (Bly); TREX 000001 at 43.  Key members of the rig crew need to be trained and demonstrate competency, and their actions need to be correct and immediate, especially when control of the well has been lost and the flow of hydrocarbons has escalated.  Tr. 982-83 (Bly); TREX 000001 at 43.

449.    The first principle learned in well control school is early detection (*i.e.*, as early as possible).  Early action (*i.e.*, immediate) is the most important thing for well control.  Tr. 1106 (Bly); Tr. 7279-80 (Beck).  In general, the sooner the crew can shut in a well, the better.  Tr. 4469 (Barnhill); Tr. 5369 (Childs).  Specifically, early operation of the BOP is critical to effective well control.  Tr. 5369 (Childs).

### 4.    The Blowout Preventer.

450.    As discussed *supra*, a BOP is a critical piece of safety equipment, in offshore deepwater drilling and may be latched to the wellhead thousands of feet underwater and

inaccessible to the drill crew.  TREX 040008 at 3; Tr. 3796 (Webster); Tr. 4659-60 (Newman); Thierens Dep. 25; Stringfellow Dep. 558, 687-88.

451.    The BOP serves as a secondary means of well control.  In the event of a kick, the BOP and its various components are used to shut in the well immediately.  Tr. 620 (L. McKay); Tr. 992-93 (Bly); TREX 004248 at 136.  For example, when the decision is made to shut in the well with one of the annular preventers, the drill crew will push the appropriate button on the BOP panel, sending a signal to the BOP thousands of feet below sea level and closing the annular preventer to form a seal against the drill pipe in approximately 26 seconds.  Tr. 5230-31 (Childs); TREX 004248 at 154.  *See also* Tr. 1717-18 (Ezell) (indicating that both the annular and the variable bore rams take less than a minute to close once the button on the BOP panel is pushed).

452.    A BOP is a well-control barrier and is critical to stopping well-control situations and shutting in a well.  For a well-control situation, it is the last line of defense.  Tr. 620 (L. McKay); Tr. 992-93 (Bly); Thierens Dep. 25.

453.    Cameron, who supplied the *Deepwater Horizon* BOP and has been the leader in the design and manufacture of subsea BOPs for many decades, understood that "[i]n all cases … when the BOP is called on to function in an emergency situation, it is the main barrier protecting human life, capital equipment and the environment.  Therefore, it must function without fail." TREX 003186_PAGES-OFFERED-BY-PSC.

454.    BOPs are not only supposed to prevent blowouts, but also to control blowouts once they occur.  Tr. 9128 (Shanks).

455.    In a well-control event, the well itself is normally controlled by closing the BOP and then circulating the fluid out through the choke and kill lines.  Tr. 4256-58 (Barnhill).

## V.    THE DRILLING OF THE MACONDO WELL.

### A.    The Design of the Macondo Well.

#### 1.    BP's Macondo Well Engineering and Operations Team.

456.    BP as the operator was responsible for designing and planning the Macondo well. TREX 007676 at 10 ("Well design and planning is a function performed by the Oil Company."). The BP Macondo wells team was comprised of an engineering team and an operations team. D4800; Tr. 8590-91 (Guide).  The engineering team was responsible for designing the Macondo well, developing a well plan, and making engineering design decisions.  Tr. 8583-84 (Guide); Tr. 9239 (O'Bryan).

457.    Once the well was designed by the engineering team, the operations team was responsible for executing and implementing the well plan step-by-step with various third-party contractors.  Tr. 8583-84 (Guide); Cocales Dep. 73-74.

458.    To ensure continuity, the engineering team remains assigned to a well from the initial planning phases through the life of the well.  Tr. 8591 (Guide).  The operations team remains assigned to a specific rig.   Tr. 8590-8591 (Guide); Cocales Dep. 20.   Thus, the engineering team remained with the Macondo well from the initial planning phases up through April 20, 2010, but the *Deepwater Horizon* operations team did not become involved with the Macondo well until the *Deepwater Horizon* replaced the *Marianas* at the Macondo well in February 2010.  Tr. 8590-8591 (Guide); Cocales Dep. 19.

459.    Both the engineering and operations teams for the Macondo well reported to BP's Vice President for Drilling and Completions in the Gulf of Mexico.  Tr. 9238 (O'Bryan); Tr. 8594 (Guide); D4800.

460.    Patrick O'Bryan was BP's Vice President for Drilling and Completions in the Gulf of Mexico on April 20, 2010.  Tr. 9225, 9235 (O'Bryan); Tr. 8917 (Guide).  O'Bryan's

primary responsibilities were to ensure that the resources and organizational capabilities were in place to deliver the drilling and completions portion of BP's Gulf of Mexico business plan.  Tr. 9237-38 (O'Bryan).  O'Bryan's duties also included managing the BP's Gulf of Mexico deepwater fleet, as well as leading many of the peer-reviews that BP conducted as part of the stage gate well planning process.  (Tr. 9233-35).

461.    There were approximately 10 to 15 BP wells being drilled and completed each year in the Gulf of Mexico, and thus the Vice President for Drilling and Completions was not responsible for the day-to-day design and execution of wells.  Tr. 9239 (O'Bryan).  Specifically, O'Bryan was not involved with the design or operational decisions for the Macondo well.  Tr. 9239-9240 (O'Bryan).

462.    Although O'Bryan was not involved in the day-to-day decisions for each of the wells being drilled, he remained informed as to the overall status of BP's 10 to 15 Gulf of Mexico wells, including the Macondo well, through regularly scheduled weekly meetings with David Rich, BP's wells manager.  Tr. 9240 (O'Bryan).  Rich would give O'Bryan an update on each of the rigs and the status of the wells on which they were operating.  Tr. 9240 (O'Bryan).  No concerns were ever raised in any of the weekly meetings about the drilling of the Macondo well.  Tr. 9240 (O'Bryan).

463.    Mark Hafle and Brian Morel were the BP drilling engineers assigned to the Macondo well.  Tr. 8591-92 (Guide); D4800.  Both Hafle and Morel reported to Greg Walz, who was the drilling engineering team leader.  Tr. 8593, 8894 (Guide); D4800.  Walz reported to Jonathan Sprague, the drilling engineering manager.  Tr. 8594 (Guide); D4800.

464.    John Guide was the wells team leader for the *Deepwater Horizon*.  Tr. 8574, 8779-81, 8917 (Guide).  Guide reported to David Sims, the Drilling and Completions (D&C)

Operations Manager for Exploration and Appraisal.  Tr. 8588, 8917 (Guide).  The senior operations engineer, Brett Cocales, and the wellsite leaders assigned to the *Deepwater Horizon* reported to Guide.  Tr. 8574, 8586 (Guide); D4800.

465.    As the wells team leader, Guide was accountable for the health, safety, security, and environmental performance on the *Deepwater Horizon*, as well as leading the *Deepwater Horizon* rig operations team.  Tr. 8583, 8780-84, 8916 (Guide).

466.    Although the wells team leader is responsible for operations and does not have a role in the actual engineering process, Guide would provide input to the Macondo drilling engineers as the well plan was being executed by the *Deepwater Horizon* operations team.  Tr. 8584-85, 8918-19 (Guide).

467.    Brett Cocales was the senior operations engineer.  Tr. 8586, 8918 (Guide).  In contrast to the BP drilling engineers who were responsible for designing the Macondo well, Cocales, as an operations engineer, reported to the wells team leader, assisting Guide with forward planning for rig operations and other operational aspects of the *Deepwater Horizon* such as the rig audit.  Tr. 8586, 8779-80, 8918 (Guide); Cocales Dep. 72-73.

468.    The senior operations engineer is the main liaison from the operations team to the engineering team.  Tr. 8588 (Guide).  The senior operations engineer participates throughout the entirety of the well-planning and design process as a representative of the rig/operations team, with the primary role beginning in the "Execute" phase.  Tr. 8588, 8638-8639 (Guide).

469.    Serving as the *Deepwater Horizon* representative, Cocales provided continuity when the Macondo drilling engineering team – Hafle and Morel – was designing the well in order to ensure any *Deepwater Horizon*–specific idiosyncrasies were included in the plan.  Tr. 8918-19 (Guide).

470.   While at the Macondo well, there were two BP wellsite leaders on the *Deepwater Horizon* at all times, each working 12 hour shifts. Tr. 1921 (R. Sepulvado). Guide served as the onshore "office liaison" responsible for supervising the wellsite leaders who were offshore working aboard the *Deepwater Horizon*. Tr. 8574, 8583-84, 8586, 8779-81, 8917 (Guide).

471.   The BP wellsite leaders worked in collaboration with the Transocean rig crew and other third-party contractors onboard the *Deepwater Horizon* in drilling the Macondo well. Tr. 1921 (R. Sepulvado) ("We worked as a team drilling the well. The Transocean guys, third-party people, you know, we have to all work together to drill the well.").

472.   As members of the operations team, BP wellsite leaders are not responsible for designing the well and do not have authority to alter well plans. Tr. 8584-85 (Guide); Breazeale Dep. 105-06, 462-63 (Breazeale); Lee Dep. 548.

473.   The BP wellsite leaders on the *Deepwater Horizon* were not responsible for continuously monitoring the Macondo well. Tr. 1991 (R. Sepulvado); Tr. 7528-29, 7760 (Bourgoyne); Tr. 4449 (Barnhill); Winslow Dep. 482; Breazeale Dep. 640. Neither the BP wellsite leaders nor any non-Transocean employee were authorized to activate or operate any controls on the *Deepwater Horizon* BOP control panel or the drilling system. Tr. 1935 (R. Sepulvado).

474.   Lee Lambert was a wellsite leader trainee assigned to the *Deepwater Horizon* as part of BP's Wellsite Leader of the Future Program. Tr. 8260-61 (Lambert); Tr. 8590 (Guide). As a trainee, Lambert did not have any job responsibilities aboard the *Deepwater Horizon* but was assigned to observe and learn from the operations conducted on the rig. Tr. 8261 (Lambert).

## 2.   BP's Pre-Spud Planning.

475.   BP began the process of designing the well in early 2009, including by reviewing seismic information and data from offset wells, completing peer reviews and risk assessments,

and drafting a drilling program that would set forth the planned operations necessary to safely and efficiently drill the Macondo well. TREX 000001 at 16; Tr. 8590-91 (Guide).

476.    BP follows a systematic approach to the design and engineering of a well: developing the plans, executing that plan, and having an engineering organization to support the execution of that operation. Tr. 8174 (Shaw). Specifically, BP utilizes a framework it calls "Beyond the Best – Common Process" to plan and design each well throughout its global operations." Tr. 8634-35 (Guide); Jassal Dep. 344-46; TREX 006066.

477.    Within that framework, the planning and design process is divided into four "Stage Gate" phases: Appraise, Select, Define and Execute. Tr. 8634-36 (Guide); D4072; TREX 006066; Jassal Dep. 346-47; Little 1 Dep. 250-52.[8]  For each phase of the Stage Gate process, a BP engineer referred to as the "Gatekeeper" ensures that all necessary engineering work and due diligence has been completed before allowing the project to move on to the next phase. TREX 006066; Tr. 8636 (Guide). The information pertaining to each phase is compiled into a Decision Support Package (DSP), which, for the Macondo well, included offset well information from more than five other wells, regional seismic detail, depth versus temperature profiles, pressure forecasts versus depth, shallow gas hazard analysis, and geohazard analyses, and is reviewed by the Gatekeeper for that phase. Jassal Dep. 346-47. From the outset in early 2009, BP designed the Macondo well to be a "keeper" well. Tr. 7952-53 (Robinson); Little 1 Dep. 249; TREX 007074. The well design planning process for the Macondo well was performed in accordance with BP's Beyond the Best process. Tr. 8642-43 (Guide); Little 2 Dep. 38-39.

---

[8] "Little 1 Dep." refers to Mr. Little's fact deposition, which occurred on June 9-10, 2011. "Little 2 Dep." refers to Mr. Little's 30(6)(b) deposition, which occurred on June 30, 2011.

478.     Consistent with sound drilling engineering principles, BP's well design and planning process also incorporated evaluation and management or mitigation of risks associated with the well design and drilling operations for the Macondo well.  Jassal Dep. 344-46; Sprague Dep. 118-19 ("At different phases we have what we call a stage gated process for planning wells, and the risk register is to be reviewed, typically, at each stage gate and updated prior to the stage gate."); Thierens Dep. 717-18 ("The – purpose of – of this was you could identify risks here, and as you work through Appraise, Select, Define, and Execute, you could work through those processes to mitigate or reduce the risks").

479.     One of the tools utilized during the Stage Gate planning process was a Risk Register, which included a description of the potential risks, a narrative of the way the risk could occur and the potential consequences, descriptions of the mitigations or barriers that are intended to control the risk, and any follow-up actions required to reduce the risk.  TREX 000757 (Macondo Risk Register, June 20, 2009); Little 2 Dep. 45-46 (risk assessment is continually performed throughout the well design process using the well specific risk register).  The Risk Register is continually updated throughout the Stage Gate pre-spud well planning process, but risks that are identified once the well is spudded are handled through the risk management process during operations.  Little 1 Dep. 142-43.  Risks identified in the Macondo Risk Register included loss of well control, complex overburden, PPFG uncertainty, wellbore stability, stuck pipe, lost circulation, narrow pore pressure fracture gradient ("PPFG") window, and others.  TREX 000757; Tr. 8639-42 (Guide).  Other planning documents also addressed risk mitigation, including lessons learned on similar wells in the region.  *See* Jassal Dep.  346-47 (discussing the BP Decision Support Packages for the Macondo well).

480.     BP also engaged in a "Peer Review" process in late June 2009, during the Stage Gate 3 planning phase of the Macondo well.   TREX 004066; TREX 001536; TREX 003700; TREX 006290; Little 2 Dep. 39-40.   Peer review of the overall well plan was conducted by a team of five BP employees from a variety of positions and groups within the company.   TREX 003700; TREX 001536; Daigle Dep. 66.   The peer review team was tasked with reviewing the work done regarding the design of the well and the procedures to drill the well.   Daigle Dep. 65-66.   The output provided in that peer review included assessments that Macondo had a "robust design supported by good data and analysis."   TREX 003700; 001536; Daigle Dep. 69.   A peer review process was also performed by a team of three BP employees, with particular focus on the pore pressure and fracture gradient anticipated for the Macondo well.   TREX 004065.   The peer review process for Macondo was completed by October 1, 2009, before the Macondo well was spudded, and concluded that "all major risks are addressed and mitigations developed."   TREX 003700; TREX 001536; Bellow Dep. 94; Daigle Dep. 74-75.

481.     Even the most comprehensive well plans and drilling program designs prior to drilling a given hole interval are not capable of predicting with absolute certainty the geological conditions of that interval before it is penetrated.   Tr. 1601 (Hurst) (common to have actual hole conditions differ from prediction); Tr. 4584-85 (Newman) (not uncommon to encounter conditions that are different than expected or predicted); Tr. 7635 (Burgoyne) (difficult to predict pore pressures with precision).

482.     There was nothing unreasonable about the design of the Macondo well.   Tr. 5032 (Barnhill).

### B.    Consistent With Industry Practice, BP Worked Closely and Shared Information with Its Contractors to Drill the Macondo Well Safely.

483.    In line with industry standard, the drilling of the Macondo well was a collaborative team effort between BP and various entities, including Transocean and Halliburton. Tr. 8584 (Guide); Tr. 1921 (R. Sepulvado); Breazeale Dep. 25 ("[I]t is a team effort to drill the well"); Tr. 4682-83 (Newman); Tr. 1849 Ezell ("It was a very good team.").

484.    Transocean's Well Control Handbook specifies that "[p]rior to spudding, it is the responsibility of the Rig Manager-Performance, in conjunction with the OIM, to review the well program and ensure that well control issues have been addressed" and mandates that "[n]o well will be spudded or hole section started unless the Rig Manager Performance and OIM have reviewed the relevant information." TREX 001454.9.3.BP; Tr. 6186-87 (Ambrose).

485.    In this instance, Transocean *Deepwater Horizon* OIM Jimmy Harrell, as well as Paul Johnson, the Transocean *Deepwater Horizon* Rig Manager–Performance, reviewed the Macondo well program provided by BP.  Tr. 6186-89 (Ambrose); TREX 007685.

486.    Specifically, Transocean reviewed with BP the different hole sections planned for the Macondo well, and also reviewed the different operating steps to be undertaken during the various stages of drilling the well, including testing that would be done at different intervals such as leak off testing, formation integrity testing, positive pressure testing, and negative pressure testing.  McMahan Dep. 11, 222-26.

487.    Moreover, prior to any drilling activity on the Macondo well, BP provided its contractors − including the drilling contractor, mud contractors, cementing contractors, directional drillers, and other third party contractors − with well information including the drilling plan, as well as any risks associated with that plan through crew engagement meetings,

also referred to as pre-spud planning meetings.   Tr. 8643-44, 8649 (Guide); Tr. 6186-89 (Ambrose).

488.    The purpose of the pre-spud planning meetings was to provide an opportunity for all contractors to identify any issues, suggest ways to improve the operations, and to familiarize everybody with the plan.  Tr. 8649 (Guide).

489.    During a typical pre-spud meeting "the drilling contractor, along with the operator and all the operator's third parties, will get together their subject matter experts and start at the beginning of the well and go through the entire well program and discuss up sides, down sides, potential hazards, risks, and accept recommendations from the entire team of how to change or modify the well program, if needed."  McMahan Dep. 170-71; Tr. 8643 (Guide) ("[W]e would go through the well plan line by line in some cases and hole section by hole section and identify any potential issues.  And, if necessary, we would modify the program.").

490.    Consistent with BP's Beyond the Best process, BP conducted a pre-spud crew engagement meeting before the *Marianas* commenced drilling operations at Macondo in October 2009.  Clawson Dep. 406-07 (Clawson, a Weatherford employee, was among the contractors that attended a pre-spud meeting for Macondo on September 25, 2009).  A second pre-spud meeting was held with the crew and contractors of the *Deepwater Horizon* when it arrived at the Macondo well in early 2010 to replace the *Marianas* and resume drilling operations, and is described in detail below.  *See* § V.D.1.

491.    Following the *Deepwater Horizon* Macondo pre-spud meeting, BP also continued to provide ongoing operational data related to the Macondo well to Transocean crew, as well as to other contractors including Halliburton and Sperry on a regular basis.  Tr. 6195 (Ambrose); D4369; D4370.

492.   "[I]nformation received on a regular basis includes morning reports and IADC reports for the *Deepwater Horizon* and BP planning documents including 5-day planners." Transocean's Discovery Responses at 16 (Dec. 17, 2010) (Ex. 4).

493.   "Transocean morning reports and IADC daily drilling reports were transmitted on a daily basis from the *Deepwater Horizon* to Transocean shore-based personnel, including the Rig Manager–Performance."  Transocean's Discovery Responses at 15 (Dec. 17, 2010) (Ex. 4).

494.   The five-day planner was distributed by BP to "all the third-party companies on the rig" in order to forecast the planned operations for the upcoming five day time period.  Tr. 6195, 6198-99 (Ambrose); Tr. 1983-84 (R. Sepulvado); TREX 041139.

495.   In addition, BP circulated forward plans to its *Deepwater Horizon* contractors, including Transocean, Halliburton, and Sperry, that provided details regarding future operations. Tr. 1879 (Ezell); TREX 000540.

496.   BP and its contractors also shared information regarding the Macondo well through a variety of meetings that were held on a daily and weekly basis.  Tr. 1969 (R. Sepulvado); D4369; D4370; Tr. 1878-79 (Ezell); Tr. 6201 (Ambrose); Tr. 8264 (Lambert); M. Sepulvado Dep. 838-39.

497.   A daily Transocean leadership meeting took place every morning at 06:30 with the OIM, senior toolpusher, captain, maintenance supervisor, and RSTC.  Tr. 1794-95, 1878-79 (Ezell).

498.   Transocean personnel would subsequently join BP and the other *Deepwater Horizon* contractors for a daily 07:30 morning meeting to discuss safety issues and prior operations, as well as upcoming operations.  Tr. 1795-96, 1878-79 (Ezell); Tr. 1969-71 (R. Sepulvado); Tr. 8263 (Lambert); Tr. 6369-70 (Chaisson); Tr. 8919-20 (Guide) ("So you have

everyone on the team and all the third-party contractors – we would just discuss the daily operation and what was going forward.  And in that there were both operational and engineering discussions."); D4369.

499.    *Deepwater Horizon* crew members, as well as onshore team members, participated in the 07:30 meeting, including the Transocean Rig Manager, BP wells team leader, drilling engineers, geologist and pore pressure prediction team, wellsite leader, OIM, senior toolpusher, Transocean Department Heads, captain, toolpushers, drillers, and at least one individual from each of the other third-party contractors onboard.  Tr. 1969-71 (R. Sepulvado); D4369; Transocean's Discovery Responses at 16 (Dec. 17, 2010) (Ex. 4) ("Paul Johnson, Rig Manager Performance, Jimmy Harrell, OIM, and Curt Kuchta, Captain, participated in daily morning meetings with BP and other BP contractors in which information regarding daily operations was received."); Winslow Dep. 498-99 (Transocean's *Deepwater Horizon* Rig Manager–Performance, Paul Johnson, or Transocean's *Deepwater Horizon* Rig Manager–Asset, James Kent, participated in every single morning operational meeting with BP); Tr. 6369-70 (Chaisson) ("Myself and the rest of the Halliburton team, we did our best to attend every morning meeting that we possibly can").

500.    During these daily 07:30 morning meetings, each person was asked if he or she had any questions or comments.  Tr. 1969-71 (R. Sepulvado); D4369.

501.    At 08:30, a daily contractor maintenance meeting took place to discuss the previous, upcoming, and general status of maintenance items on the *Deepwater Horizon*.  Tr. 1973 (R. Sepulvado); D4369.  The daily 08:30 meeting was attended by the OIM, toolpusher, Transocean head of maintenance, electrical and subsea departments, Transocean crane operator, and the wellsite leader as appropriate.  Tr. 1973 (R. Sepulvado); Tr. 1797-98 (Ezell); D4369.

113

502.     A daily pre-tour meeting took place aboard the *Deepwater Horizon* prior to rig personnel changing shifts at 11:30 and 23:30.  Tr. 1973 (R. Sepulvado); D4369; Tr. 1671, 1798 (Ezell); Tr. 6201 (Ambrose); Tr. 8263-64 (Lambert).  The daily pre-tour meetings were attended by the OIM, toolpusher, wellsite leader and all rig personnel beginning the next shift.  Tr. 1973 (R. Sepulvado); D4369.  The pre-tour meetings provided an opportunity to discuss any safety issues and ask questions or voice concerns regarding upcoming operations.  Tr. 1973 (R. Sepulvado); D4369; Tr. 8263-64 (Lambert) ("That is a meeting just prior to crew change so that the crews coming on for that 12-hour tour would … know where we are at, what the operations are, and any safety issues or concerns related to those operations that are upcoming … The pre-tour meetings, the contractors, rig crew contractors, everyone is expected to be involved in that. If they have any concerns or sim ops issues with that, they can bring them up at that time.").

503.     Multiple times throughout the day, pre-job THINK drills occurred before every operation on the rig to discuss the plan, identify the personal and process safety hazards, and communicate to make sure that everybody understood their job responsibility.  Tr. 1971-73 (R. Sepulvado); D4369; Tr. 1864-65 (Ezell); Tr. 6241-42 (Ambrose); Tr. 8264-65 (Lambert) ("And the purpose of those [pre-job meetings] is to make sure everybody understands what's about to happen, what their responsibility is, and if they have any questions at that time, get them cleared up before the task starts."); TREX 047678 (Task Specific Think Procedure – Displacing Riser to Sea H2O).

504.     Everyone involved in the particular operation would participate in pre-job THINK drills in order to walk through the task line-by-line, discuss any safety issues, and provide the opportunity to ask questions or raise concerns.  Tr. 1972-73 (R. Sepulvado); D4369; Tr. 8264 (Lambert).

505.   In addition to daily meetings on the *Deepwater Horizon*, weekly safety and operational meetings provided multiple opportunities for information sharing between BP and its contractors.  Tr. 1973-74 (R. Sepulvado); D4370.

506.   Every Sunday at 18:00, safety meetings took place with BP and third-party contractors including the OIM and toolpushers.  Tr. 1973-74 (R. Sepulvado); D4370.

507.   Weekly well control drills also took place with the *Deepwater Horizon* crew.  Tr. 1974-975 (R. Sepulvado); D4370; TREX 000571; TREX 001454 at 57.

508.   Information about PPFG issues specific to the Macondo well was shared by BP with Transocean and other contractors on the *Deepwater Horizon* such as Halliburton through (1) the pre-spud engagement meetings; (2) the drilling program, and (3) discussions regarding PPFG issues on daily morning calls.  Transocean's training manuals also teach their personnel how, when and why LOTs and FITs are performed.  Tr. 8641-46 (Guide); TREX 007685; Vinson Dep. 252-56; Tr. 1874-75 (Ezell); TREX 041208.

### C.   October to November 2009:  Drilling by the Transocean *Marianas*.

509.   The September 2009 drilling plan for the Macondo well was initially prepared for the *Marianas*.  Little 2 Dep. 40-41.

510.   Initial drilling of the Macondo well began when the Transocean semisubmersible rig *Marianas* spudded the well October 6, 2009.  TREX 000001 at 17; TREX 32019 at 23.

511.   While the *Marianas* was moored at the Macondo well, it drilled from the mud line at 4,992 feet to a total depth of 7,937 feet, successfully setting three casing strings along the way (the 36" at 5,321 feet; the 28" at 6,217, and the 22" at 7,937 feet).  TREX 004032 at 4; Tr. 4243-44 (Barnhill).

512.   After setting the 22" casing, the *Marianas* conducted multiple LOTs ("LOTs") from 7,952' to 8,060' over the course of several days starting on October 21.  The mud weights

and LOT results from these tests were recorded in the IADC reports.  On October 26, while drilling in an exposed sand interval at 8,970 feet, the *Marianas* took an 11-barrel kick.  The *Marianas* responded to the kick with sound engineering decisions and drilled 100' to set the casing at an appropriate depth.  D4363; TREX 32019 at 43-56; Tr. 7652 (Bourgoyne); Bodek Dep. 140-47.

513.    The 22" shoe was set over five months and five casing strings before, and over 9,000' above the production interval in which the Incident occurred.  D4363.  The United States' drilling margin expert, Alan Huffman, conceded that any issues related to the 22" shoe were not causal to the Incident, as that casing shoe was isolated behind several additional casing shoes.  Tr. 807-08 (Huffman).

514.    The *Marianas* successfully conducted a temporary abandonment of the Macondo well through the cementing of an 18 1/4" drilling liner (without the shoe track being drilled out).  Tr. 4243-44 (Barnhill).

515.    The *Marianas* ceased drilling on November 8, 2009, when the rig was secured and evacuated for Hurricane Ida.  TREX 000001 at 22.

516.    On November 9, 2009, after one month of drilling and approximately 9,000 feet of downhole progress, the *Marianas* and its crew were forced to leave the Macondo well following damage to the rig from Hurricane Ida that required dock repairs.  TREX 000001 at 17.

517.    MMS inspectors visited the Marianas rig on November 1, 2009, inspected the records from the Marianas on the Macondo well, and found no violations of the MMS regulations.  Tr. 801-02 (Huffman).

**D.      January to April 2010:  Drilling by the Transocean *Deepwater Horizon*.**

518.    In January 2010, the *Deepwater Horizon* was chosen to resume the drilling of the Macondo well.  TREX 000001 at 17; TREX 007685.

519.    The MMS approved an Application for Revised New Well on January 14, 2010, and the Macondo well plan was updated to reflect the replacement of the *Marianas* with the *Deepwater Horizon*.  The *Deepwater Horizon* arrived onsite on January 31, 2010, and drilling activities recommenced on February 6, 2010.  TREX 000001 at 17; TREX 051219 at 2.

### 1.    The Drilling Program and Pre-Spud Meeting for the *Deepwater Horizon*.

520.    The Macondo drilling plan was updated and adjusted to reflect the use of the *Deepwater Horizon* for the remaining sections of the well.  Little 2 Dep. 40-41; TREX 004003; TREX 000291; TREX 007685.

521.    On January 30, 2010, before the *Deepwater Horizon* began drilling operations at the Macondo well, the Macondo Well Drilling Program was provided to the Transocean Toolpusher and Drillers on the *Deepwater Horizon*.  Tr. 1979 (R. Sepulvado); TREX 041222, TREX 041208; TREX 007685 at 2 (E-mail from *Deepwater Horizon*, OIM to P. Johnson).

522.    Consistent with BP's Beyond the Best process, BP also conducted a pre-spud crew planning on the *Deepwater Horizon*, at which the drilling program was shared with the Transocean rig crew, as well as third party contractors including Halliburton cementers and Halliburton mud loggers, M-I personnel, and others.  Tr. 8643-44 (Guide); Little 2 Dep. 343. John Guide, Brian Morel, and Paul Johnson led the pre-spud planning meeting aboard the *Deepwater Horizon* once the rig arrived at the Macondo well site.  Tr. 8643-44 (Guide); McMahan Dep. 171-72.  The well plan was reviewed in detail – hole section by hole section – in order to identify any potential issues and the geologist reviewed and explained the expected geology of what was going to be drilled.  Tr. 8643-45 (Guide).  Approximately 45 to 50 people participated in the *Deepwater Horizon* Macondo well pre-spud.  Tr. 8644 (Guide).

523.     The Transocean *Deepwater Horizon* crew also had access to an electronic copy of both the September 2009 Macondo drilling program and the final January 2010 Macondo drilling program, which laid out the well section-by-section and included information regarding the Macondo well such as the application for permit to drill, diagrams of the well design, Macondo pore pressure profile, formation fracture profile, and temperature profile.  Tr. 1642, 1873-74 (Ezell); Tr. 1976-79 (R. Sepulvado); TREX 007685; TREX 041222; TREX 041208.

524.     Transocean *Deepwater Horizon* OIM Jimmy Harrell, as well as Paul Johnson, the Transocean *Deepwater Horizon* Rig Manager–Performance, reviewed the Macondo well program provided by BP.  Tr. 6186-89 (Ambrose).

525.     At the *Deepwater Horizon* Macondo pre-spud crew engagement meeting, none of the contractors indicated they had concerns that the well was unusual based on losses or kicks the *Marianas* had experienced drilling the Macondo well.  Tr. 8645-46 (Guide).

## 2.     Transocean Had Identified Kicks as a Risk in the Operation of the *Deepwater Horizon* at the Macondo Well.

526.     Transocean's *Deepwater Horizon* Operations Manual made it clear that a "[b]lowout is a hazard common to all MODU's involved in hydrocarbon exploration/development operations.  Effects of a blowout vary widely from negligible to very severe.  Although unexpected reservoir conditions could lead to a blowout it is more likely to arise from human error or equipment failure."  TREX 000671 at 594.

527.     Transocean's Well Advisor spreadsheet tool was one method available to the Transocean senior drilling crew, and/or Rig Manager-Performance, to assist in evaluating the well design planning and identifying challenging or complex risks associated with a well.  Tr. 4736-37 (Newman); Stipulation Regarding "Well Advisor" Use By Transocean For Macondo (Nov. 28, 2011) (Rec. Doc. 4741) ("Stipulation (Rec. Doc. 4741)"); TREX 004686.

528.    Transocean used Well Advisor to evaluate the Macondo well's kick tolerance on or about February 6, 2010 when the *Deepwater Horizon* was about to begin drilling operations. Stipulation (Rec. Doc. 4741); TREX 004686; TREX 004902; TREX 005696.

529.    In addition, Transocean's Paul Johnson looked at the working pressure in accordance with the applicable Transocean Well Control Handbook before beginning operations at Macondo.  Tr. 3420 (Perkin).

### 3.    The *Deepwater Horizon* Commenced Drilling on February 6, 2010.

530.    The *Deepwater Horizon* commenced drilling the Macondo well on February 6, 2010, and safely drilled from 7,937 feet to the Macondo well's final depth of 18,360 feet on April 9, 2010.  Tr. 8668 (Guide); TREX 004032 at 4.  *See also* Tr. 7443-44 (Bourgoyne) (drilling conducted by the rig crew on the *Deepwater Horizon* was consistent with industry practices and was safely completed).

531.    The *Deepwater Horizon* set the 18" casing at 8,969 feet, the 16" casing at 11,585 feet, sidetracked and set the 13 5/8" casing at 13,145 feet, and set the 11 7/8" casing at 15,103 feet, and the 9 7/8" casing at 17,168 feet  Tr. 8668 (Guide); TREX 004032 at 4.  A proper and valid pressure integrity test was conducted at each interval from the 22" casing through the 9 7/8" casing string set at 17,168 feet.  Tr. 7454 (Bourgoyne).

532.    Although the *Deepwater Horizon* encountered challenges while drilling the Macondo well, the issues encountered, including kicks, stuck pipe, losses and the use of lost circulation material, were not uncommon in the Gulf of Mexico.  Tr. 813-14 (Huffman); Tr. 2187 (Heenan); Tr. 5030-32 (Barnhill); Tr. 8650 (Guide).

533.    It was common for deepwater wells in the Gulf of Mexico to have narrow pore pressure and fracture gradients.  Tr. 814 (Huffman); Tr. 6191 (Ambrose).  In fact, the *Deepwater Horizon* encountered difficulties with lost circulation and kicks on other wells and, according to

the Senior Toolpusher Randy Ezell, the Macondo well was not more difficult to drill than the challenging wells the *Deepwater Horizon* was used to drilling.  Tr. 1691 (Ezell).

534.    Each LOT/FIT was recorded in a spreadsheet and then communicated back to shore.  Each LOT/FIT was also recorded in IADC reports and reported to the MMS in each subsequent APD.   TREX 004533; TREX 004002; TREX 004008; TREX 004007; TREX 004030; TREX 004753; TREX 004754; TREX 005834; TREX 7411 at 20-22.

### 4.    Drilling in March 2010.

#### a.    The March 8 Kick.

535.    On March 8, 2010, while drilling at a depth of 13,250', the *Deepwater Horizon* experienced a kick when it drilled into a higher-than-anticipated pore pressure area.  Tr. 8650 (Guide); Tr. 4269 (Barnhill); M. Sepulvado Dep. 125; TREX 000001 at 17.

536.    According to the March 8, 2010 IADC Drilling Report, the *Deepwater Horizon* crew observed a gain of 10-12 barrels before checking for flow and shutting the well in, with a total estimated gain of 35 barrels.  Tr. 1761 (Ezell); Tr. 4269 (Barnhill); TREX 000657.2.TO. Real-time data from the kick event indicated that the kick went undetected for approximately 25-30 minutes.  Tr. 8653 (Guide); Tr. 1363 (Bly); TREX 000001 at 107.

537.    As a result of the kick and shut in efforts, the influx from the March 8 kick also caused the formation to collapse on the drill pipe, resulting in a "stuck" pipe.  Tr. 8651-52 (Guide); TREX 000001 at 107.

538.    According to IADC Daily Drilling Reports, the drill crew involved with the March 8 kick included some of the same drill crew members who were on tour at the time of the Incident, including Toolpusher Jason Anderson, Driller Micah Burgess, Driller Dewey Revette, Toolpusher Wyman Wheeler, Senior Toolpusher Randy Ezell, and OIM Jimmy Harrell.  Tr. 4268, 4436 (Barnhill); TREX 000001 at 107; TREX 000657; TREX 041022.

### b. BP and Its Contractors Response to the Kick.

539. At the time of the March 8 kick, the BP Wells Team Leader, John Guide, was attending his father's funeral. Tr. 8650 (Guide). Although Guide had previously delegated his duties to BP Senior Operations Engineer, Brett Cocales, Guide voluntarily returned to work upon learning of the kick event because he wanted to help the Macondo wells team. Tr. 8650-51 (Guide); Sims Dep. 705.

540. Upon returning to work, Guide assembled a team of BP engineers, an internal BP well control specialist, and personnel from Wild Well Control to develop and implement a plan to circulate out the kick and continue operations at the Macondo well. Tr. 8651 (Guide); TREX 000577; TREX 003911; TREX 003912; TREX 003913; TREX 006126.

541. BP and Transocean successfully circulated out the kick. Tr. 8663 (Guide). As a result of the stuck pipe, however, the hole section that was being drilled at the time was lost. TREX 000001 at 107.

542. The stuck pipe was severed with a high explosive and part of the pipe was left in the well, and the Macondo team was forced to physically drill around the pipe, or "sidetrack" the well to continue drilling. Tr. 8652 (Guide); TREX 001420.

543. The Macondo team then set a cement plug and the well was successfully sidetracked. Tr. 8666 (Guide); TREX 5973; TREX 001420; Sims Dep. 707.

544. It took approximately one week to resolve the stuck pipe and sidetrack the well, but Guide never asked anyone to hurry or cut corners as a result of the delay. Tr. 8652-53 (Guide).

545. BP's response to the March 8 kick was appropriate and in accordance with the industry standard of care. Campbell Dep. 342.

### c. BP Investigated the Kick, Developed Lessons Learned, Shared Those Lessons, and Took Steps to Prevent a Reoccurrence.

546.    BP's practice after an incident is to conduct a Lessons Learned and distribute the information learned to a broad team.  Tr. 8656 (Guide).

547.    In accordance with BP's practice, the subsurface team developed lessons learned from the March 8 kick, and on March 18, 2010 the lessons learned were distributed to Guide and others.  Tr. 8655-56 (Guide); TREX 001021.  BP also has a bi-weekly meeting where all the Lessons Learned from all the operations are shared and then sent to the rig.  Tr. 8975 (Guide).

548.    As a result of the March 8 kick and the lessons learned, BP made adjustments to general practices and policies, and also made adjustments specific to the Macondo well operations, including assigning an additional person to the rig to assist with real-time pore pressure detection, and deciding to use predetermined casing setting depths going forward.  Tr. 8656-57 (Guide); TREX 001021.

549.    Guide testified that he was disappointed that it took almost a half hour to detect a kick of approximately 35-40 barrels because the *Deepwater Horizon* had previously taken kicks while drilling exploration wells, and typically caught kicks within 20 barrels.  Tr. 8653-54 (Guide); TREX 000153; Cowie Dep. 305 (30 minutes was "an excessive amount of time" to shut in the well "in this case").

550.    After the March 8 kick, Guide communicated his disappointment to both the BP wellsite leaders and the Transocean OIM, and provided verbal feedback about the handling of the event.  Tr. 1364 (Bly); Tr. 8654 (Guide); TREX 000001 at 107; TREX 000153.

551.    Following his discussion with the Transocean OIM and the BP wellsite leaders, Guide felt the rig crew understood their responsibilities and they admitted to Guide that they had erred by not catching the kick.  Tr. 8829 (Guide); TREX 000153.

> **d.    Transocean Never Completed an Investigation into the March 8 Kick and Never Took any Action in Response to the Incident.**

552.    There is "no evidence that Transocean took any documented, corrective actions with the rig crew either to acknowledge or address the response time recorded in the March 8, 2010 event." Tr. 1369 (Bly); TREX 000001 at 107.

553.    A Transocean Operation Event Report, dated March 24, 2010 and describing the March 8, 2010 well control event on the *Deepwater Horizon*, including the reason for the event, actions taken to correct the problem and total downtown for the incident, failed to list any findings and indicated that changes to prevent a reoccurrence were "still under review."  TREX 000688, TREX 000001 at 107; TREX 007321 ("[N]o in depth investigation was made to determine why an influx of this magnitude was taken and why the response to close in the flowing well appears to have taken in the region of 33 minutes").

554.    According to Transocean Rig Manager Paul Johnson, "no action was ever taken by Transocean in response to March 8, 2010 kick event, and Transocean's investigation into the incident was never concluded."  P. Johnson Dep. 219-20, 253-54.

> **5.    Drilling Operations from March 16 to April 1, 2010.**

555.    The 16" casing was successfully drilled and was behind several other casing strings and approximately 6,000' above the production interval.  D4363.

556.    After successfully sidetracking the 16" interval, the 13 5/8" casing was set and a LOT was performed on March 21 at 13,150'.  Thereafter, the 11 7/8" casing was set and a LOT was performed on March 27 at 15,123'.  D4363; TREX 004533.

557.    While conducting the 16" shoe FIT, a value of 12.55 was recorded.  This was reported to the MMS through their online electronic reporting system, eWell.  eWell only accepts numbers reported in tenths.  BP reported a 12.6 in eWell on this FIT.  Rounding to the nearest

tenth is acceptable and consistent with industry practice.   Tr. 811-12 (Huffman); Tr. 7520-21 (Bourgoyne).

### 6.       Drilling Operations from April 1 to April 9, 2010 - the Final Interval.

558.     On April 1, 2010, BP tested the liner, and weighted the mud weight up to 14.3 ppg prior to conducting the FIT at the base of the 9 7/8" liner.  TREX 032019 at 192; D4750; Tr. 7508-09 (Bourgoyne).

559.     On April 2, 2010, BP conducted the FIT at the shoe of the 9 7/8" liner and obtained a 16.0 ppg surface equivalent mud weight for the test result.  D4750; Tr. 7509-10 (Bourgoyne).

560.     TO drilled approximately 450' on April 2, 2010 before raising the mud weight to 14.5 ppg.  D4750; Tr. 7510-11 (Bourgoyne).

561.     BP properly maintained the drilling margin between the mud weight and the result of the FIT on April 2, 2010.  Tr. 7511 (Bourgoyne).

562.     On April 3, 2010, Transocean drilled approximately 130' before indications of hole ballooning.  TREX 041057; D4750; Tr. 7509-10 (Bourgoyne).

563.     The crew stopped drilling, shut in the well, checked for flow and began treatment with lost circulation materials.  TREX 041057; D4750; Tr. 7511 (Bourgoyne).

564.     The response to the indications of hole ballooning event was appropriate and consistent with industry standards.  Tr. 7511 (Bourgoyne).

565.     The crew took GeoTap measurements to evaluate pore pressure data and then cut the mud weight to 14.3 ppg.  TREX 041057; D4750, D4751; Tr. 7510-11 (Bourgoyne).

566.     The Transocean crew continued to monitor the well and check for flow and determined that the well was static.  After determining that the well was static, the crew pumped a 100 barrel LCM pill.  TREX 041057; D4750, D4751; Tr. 7510-11 (Bourgoyne)

567.    After pumping the 100 barrel LCM pill, the Transocean crew drilled to 17,909' with no reported losses.  TREX 041057; D4751; Tr. 7511-12 (Bourgoyne).

568.    BP properly maintained the safe drilling margin while drilling to 17,909'.  Tr. 7513 (Bourgoyne).

569.    BP's activities from April 1 through April 4 were appropriate within industry standard and were within normal practice.  Tr. 7513 (Bourgoyne).

570.    On April 4, 2010 the Transocean crew drilled to 18,195' with 14.3 ppg mud with no losses.  D4751; Tr. 7511 (Bourgoyne).

571.    After drilling to 18,195' BP took a GeoTap pressure test at 18,090' which indicated a pore pressure of 12.6 ppg surface mud weight.  D4751; Tr. 7512-13 (Bourgoyne).

572.    After taking the GeoTap measurement, the Transocean crew drilled to 18,260' with a 14.3 ppg mud weight.  D4751; Tr. 7511 (Bourgoyne).

573.    At that point, the crew had drilled through the entire main Pay Zone with 14.3 ppg mud weight without taking any losses.  D4751; Tr. 7511-12 (Bourgoyne).

574.    Between April 1 and April 4, 2010, the Transocean crew had drilled from the 9 7/8" shoe at 17,147' feet through the Main Pay Zone and to 18,260' with no loss events and two hole ballooning events.  TREX 032019.

575.    Between April 5, 2010 and April 9, 2010, there was no further drilling in the hole and the open hole interval was treated with various lost circulation materials.  TREX 041060; D4753, D4754; Tr. 7513-15 (Bourgoyne).

576.    The crew pumped wellbore strengthening treatments on April 5, 2010, April 6, 2010, April 7, 2010, and April 9, 2010.  TREX 041059; TREX 041060; TREX 041061; D4753, D4754; Tr. 7514-16 (Bourgoyne).

577.   After determining on April 9, 2010 that they had a static well, the crew drilled ahead from 18,260' to 18,360' with no losses.  TREX 041063; D4754; Tr. 7515-16 (Bourgoyne).

578.   After reaching 18,360' the crew circulated the well clean with no losses.  TREX 041063; D4754; Tr. 7517-18 (Bourgoyne).

579.   BP's actions in using wellbore strengthening between April 5 and April 9 were consistent with industry standard.  Tr. 7516-19 (Bourgoyne).

580.   BP's actions in using wellbore strengthening between April 5 and April 9 were reasonable actions.  Tr. 7516-19 (Bourgoyne).

581.   BP properly maintained the safe drilling margin for the entire interval from the 9 7/8" liner through the total depth of 18,360' at the Macondo well.  Tr. 7518-21 (Bourgoyne).

### 7.   April 9, 2010:  Total Depth Reached.

582.   On April 9, 2010, when the Macondo well had been drilled to 18,360 feet, BP, along with its working interest owners, elected to call "TD" (total depth) for the Macondo well and to stop drilling.  TREX 041063 (Daily Drilling Report, Apr. 9, 2010); TREX 001220, TREX 001255, and TREX 001256; Tr. 4246-47 (Barnhill).

583.   Drilling on the Macondo well was therefore completed on April 9, 2010.  There were no kicks, gains, or losses between the completion of drilling on April 9 and the Incident on April 20 2010.  The well was stable during wiper trips, circulation of bottoms up, and cleaning out of the hole.  Tr. 855 (Huffman); Tr. 6537 (Strickland); TREX 041063; TREX 051377; TREX 051342; TREX 050970; TREX 051151; TREX 041022; TREX 32019 at 201-216.  *See also* TREX 004278.

a.     **BP Appropriately Managed Loss Events During the Drilling of the Macondo Well.**

i.     **Losses Are Common in Deepwater Wells.**

584.    Losses are common in deepwater wells.  Tr. 2018 (R. Sepulvado); Trocquet Dep. 94; Tr. 813-14 (Huffman).

585.    It is not a violation of MMS regulations to take a loss.  Trocquet Dep. 175.  The MMS does not require dropping the mud weight by half a pound per gallon before drilling ahead if there has been a loss.  Tr. 2020 (R. Sepulvado).

586.    Other operators do not drop their mud weight by half a pound per gallon before drilling ahead if they have incurred a loss.  Tr. 2021 (R. Sepulvado).

587.    There are no Federal regulations that required BP to stop drilling when it encountered a loss zone.  Trocquet Dep. 104.

588.    BP followed accepted industry practices in response to loss events at the Macondo.  Tr. 7441-42 (Bourgoyne).

ii.     **Operators and Drillers Have Common Practices to Respond to Losses While Drilling.**

589.    Operators and drillers have common practices to respond to losses in deepwater wells.  Those common practices include:  (1) reducing mud weight, (2) using lost circulation material ("LCM"), or (3) setting contingency liners.  Tr. 2018 (R. Sepulvado); Tr. 7464-8 (Bourgoyne); D4675; Tr. 7304 (Beck).

590.    The use of LCM was common.  Tr. 5031 (Barnhill); Tr. 7464 (Bourgoyne).

591.    Those common practices were included in Transocean's Losses While Drilling Flow Chart.  D4675.

592.    Operators evaluate downhole conditions and drill ahead if losses are stopped.  Tr. 7464-8 (Bourgoyne); D4675.

593.     Under Transocean's policies, it was acceptable to drill ahead while taking 30 barrels per hour losses.  Tr. 7464-68 (Bourgoyne); D4675.

594.     Likewise, BP has a Losses While Drilling Flow Chart.  Tr. 7471 (Bourgoyne).

595.     If losses can be cured, operators routinely drill ahead.  If losses cannot be cured, operators will set casing strings.  Tr. 7464-68 (Bourgoyne).

> ### iii.     The Transocean Rig Crew Properly Drilled the Final Production Interval Consistent With Industry Standards and Practices.

596.     The production interval was safely drilled to total depth.  In the final production interval, they carefully and appropriately drilled the final section.  After drilling to 18,260 feet, they spent five days strengthening the wellbore.  After circulating without losses on April 9, 2010, they drilled the final 100 feet.  Tr. 849-51 (Huffman); Tr. 7513-15 (Bourgoyne).  The activities between April 4 and April 9, including pumping multiple LCM pills to strengthen the wellbore, were consistent with industry practice, Transocean's loss circulation decision matrix, and BP's loss circulation policy.  Tr. 7468-71, 7515-19 (Bourgoyne); D4675.

597.     There was no safety issue regarding the pore pressures encountered during the production interval.  Tr. 7519 (Bourgoyne).  In fact, while drilling the Macondo well, none of the individuals who knew about the wellbore conditions stopped the job or raised concerns about the safe drilling operations.  Tr. 808-09 (Huffman).

598.     Contrary to Huffman's allegation that BP's behaviors with respect to managing mud weights and pore pressure during the final interval were unsafe and egregious, BP's actions while drilling the production interval were:  (a) consistent with BP's and Transocean's written policies, (b) consistent with industry practices, and (c) consistent with the behavior of the parties on the rig.  D4675; Tr. 2019-21 (R. Sepulvado); TREX 000291; Tr. 7519-21 (Bourgoyne).

### b.     BP Complied With Safe Drilling Margin Regulations in Reaching Total Depth at the Macondo Well.

599.    The regulatory requirement to maintain the safe drilling margin applies only to drilling activities while the bit is turning.  30 C.F.R. § 250.427.  The blowout was not caused or related to any allegations regarding drilling margin.  Tr. 7441-7444 (Bourgoyne).

600.    30 C.F.R. § 250.427 sets forth the requirements for pressure integrity tests as follows:

> You must conduct a pressure integrity test below the surface casing or liner and all intermediate casings or liners.  The District Manager may require you to run a pressure-integrity test at the conductor casing shoe if warranted by local geologic conditions or the planned casing setting depth.  You must conduct each pressure integrity test after drilling at least 10 feet but no more than 50 feet of new hole below the casing shoe.  You must test to either the formation leak-off pressure or to an equivalent drilling fluid weight if identified in an approved APD.
>
> (a)     You must use the pressure integrity test and related hole-behavior observations, such as pore-pressure test results, gas-cut drilling fluid, and well kicks to adjust the drilling fluid program and the setting depth of the next casing string.  You must record all test results and hole-behavior observations made during the course of drilling related to formation integrity and pore pressure in the driller's report.
>
> (b)     While drilling, you must maintain the safe drilling margin identified in the approved APD.  When you cannot maintain this safe margin, you must suspend drilling operations and remedy the situation.

TREX 001558.1.1.BP.

601.    Section 250.427 does not provide detail regarding how to conduct or interpret the shoe test; the operator is allowed to use procedures that it has deemed appropriate.  Tr. 7445 (Bourgoyne).

602.    Section 250.427 requires that the operator drill at least 10 feet, but no more than 50 feet, below the casing shoe and the operator "must test either to leak-off pressure or to an equivalent drilling fluid weight that has been identified in an approved APD."  Tr. 7445 (Bourgoyne); Tr. 1876 (Ezell).

603.    The "safe drilling margin" referred to in Section 250.427 is the difference between the shoe test and the mud weight.  Tr. 7445-46 (Bourgoyne).

604.    A shoe test involves drilling ahead a short distance below the shoe into new formation and applying pressure to the new hole, verifying that mud of a specified density would not be able to leak through the cement or cause fracture.  Tr. 7453 (Bourgoyne).

605.    MMS personnel David Trocquet (District Manager of the New Orleans District), Michael Saucier (Regional Supervisor), and Frank Patton (Drilling Engineer) agreed that the safe drilling margin is the difference between the fracture gradient calculated at the last exposed shoe and the mud weight.  D4907; D4908; D4867.

606.    The calculation of the drilling margin used by BP was the industry standard and was not a new definition.  This definition was the subject of an article authored by Dr. Bourgoyne in 1999.  TREX 008185.1.1.BP; Tr. 7447 (Bourgoyne).

607.    There were no MMS regulations or documents that refer to the safe drilling margin as being between the mud weight and the weakest point in the wellbore.  Tr. 7471 (Bourgoyne).

        **i.**        **BP Met With the MMS in February 2008 and Discussed the Method for Calculating Drilling Margin and That Results Would Be Reported in the IADC.**

608.    BP properly evaluated the results of the pressure integrity and reported the maximum value observed in their tests.  TREX 004533; TREX 008174 at 26.  The MMS knew of and approved of BP's practice in evaluating the results of the pressure integrity test.  On February 6, 2008, BP representatives Terry Jordan and Scherie Douglas met with MMS representatives including Mike Saucier and David Trocquet to discuss BP's standard Gulf of Mexico Formation Pressure Integrity procedure.  TREX 004550.

609.    MMS representatives understood that BP's testing procedures would entail taking a LOT to the point where the pressure curve clearly breaks over, and reporting the maximum pressure.  TREX 004550; Saucier Dep. 178.

610.    BP representatives explained, and MMS officials agreed, that the results would be recorded on the IADC report as the official MMS record.  TREX 004736.

611.    BP's testing protocol for conducting pressure integrity tests fell well within the range of what is done by other operators in the Gulf of Mexico.  Tr. 7474 (Bourgoyne).

612.    The MMS does not prescribe a specific pressure integrity test procedure; the operator is allowed to run the test in a manner that it deems appropriate.  BP used a test procedure that was appropriate and within industry standard.  Tr. 7474 (Bourgoyne).

613.    A pressure integrity test is the same as a shoe test.  After drilling ahead a short distance below the shoe into new formation, pressure is applied to the new hole drilled below the casing to verify that mud of a specified density would not be able to leak either though the cement or cause a fracture.  Tr. 7453 (Bourgoyne); D4730.

614.    BP protocol required testing the casing in the same manner as a LOT: pump mud down at half a barrel per minute at a constant pump rate and record the pressure every minute as the pressure rises.  When the pressure reaches a certain level, turn the pump off.  When the pump is turned off, there is an immediate drop in pressure which should be recorded.  Next, observe the pressure for thirty minutes.  If the pressure does not decrease by more than ten percent, that is a "passed test."  Tr. 7482 (Bourgoyne); D4737.

615.    This method of testing is "very appropriate for casing tests," is "the way most people do it," and is "standard practice."  Tr. 7482-83 (Bourgoyne).

#### ii.       Safe Drilling Margin Definitions.

616.    The purpose of the drilling margin is to protect the weaker sediments above the previous shoe that has been covered with casing.  Tr. 7445 (Bourgoyne).

617.    The bottom of the casing is called the shoe.  After the casing is placed, cement is pumped to form a seal between the casing and open hole.  Tr. 7451 (Bourgoyne).

618.    Pore pressure is the pressure of the fluid in the pore space between rock grains. Tr. 7448 (Bourgoyne); D4117A.

619.    While drilling, pore pressure is controlled in the permeable zones by increasing the mud weight.  Tr. 7449 (Bourgoyne); D4118A.

620.    The mud weight is measured using a mud balance.  The mud weight is used to control the pressure in the well.  The mud weight should be higher than the pressure in the permeable zone.  Tr. 7451 (Bourgoyne); D4118A.

621.    A kick occurs when the dynamic mud weight decreases below the pore pressure of an exposed zone that has permeability.  Tr. 7457 (Bourgoyne).

622.    Drilling margins in the Gulf of Mexico are generally very narrow.  To address narrow drilling margins, operators review during the well planning phase the pore pressure and fracture gradient data and use predrill estimates to set casing points.  Tr. 7457-58 (Bourgoyne).

623.    Narrow pore pressures and fracture gradients are a common occurrence in deepwater Gulf of Mexico wells and nothing was unusual about operating in a tight PPFG margin in the Gulf of Mexico.  Tr. 6191 (Ambrose).

#### iii.      The Pressure Integrity Test at the 13-5/8" Shoe Was Valid.

624.    On March 21, 2010, BP conducted a pressure integrity test at the 13-5/8 inch shoe.  TREX 041105; TREX 004533.26.6.BP; D4363; TREX 004533.

625.    The leak off test at the 13 5/8 inch shoe was conducted and interpreted in an appropriate way by BP.  Tr. 7485 (Bourgoyne); D4155A.

626.    The operational records, including the morning reports, operational reports, and IADC reports, demonstrated that the 13 5/8 inch shoe test performed at the Macondo was valid. Tr. 7472-73 (Bourgoyne); D4764; TREX 004533.26.6.BP.

627.    Facts important to the determination of whether a shoe test is valid include whether there was new formation drilled and tested, whether he pressure gauges were accurate, whether the crew followed an appropriate procedure, and whether the curve had linear buildup consistent with the successful test.  Tr. 7489-90 (Bourgoyne).

628.    The daily drilling report for March 22, 2010 indicates:  "Drill 10' of new formation from 13,150 to 13,160."  Tr. 7490 (Bourgoyne); TREX 041053.2.5.BP.

629.    The mud log for the interval shows by its gamma ray response that drilling was occurring through shale and that they were in the new hole, whereas if they were inside casing there would be fewer gamma rays.  Tr. 7491-92 (Bourgoyne); D4742.

630.    The gauges can be verified with PWD data and the crew followed the BP procedure and protocol, which was entirely appropriate and falls within the range of what industry does, and the curve had the buildup consistent with a successful test on the casing.  Tr. 7490 (Bourgoyne).

631.    The slope of the pressure integrity test is appropriately the same as the casing test because as the same amount of mud is being pumped, there is no leakage until fracture is initiated.  Tr. 7486 (Bourgoyne); D4155A.

632.    The test results look "perfectly normal."  The high test results indicate a "valid strong shoe."  Tr. 7486 (Bourgoyne); D4155A.

### iv. The Pressure Integrity Test at the 9 7/8" Shoe Was Valid.

633. On April 2, 2010, BP conducted a pressure integrity test at the 9 7/8-inch shoe. TREX 004533. The 9 7/8 inch test was an appropriate test that was properly interpreted by BP, and was a valid test. Tr. 7489 (Bourgoyne); D4157A; D4849; D4850.

634. BP properly drilled new formation, pressure was applied in the proper place, the crew followed an appropriate procedure, and the test curve had linear buildup consistent with a successful test. Tr. 7493-94 (Bourgoyne); D4764.

635. The pressure integrity test was performed at about 09:00 using a pump rate of 0.5 barrels per minute at the liner shoe at 17,168 feet (measured depth). The volume of mud bled back at the end of the test was 10.0 barrels. The test did not go to Leak-off. The equivalent mud weight on bottom as measured by the PWD tool was reported to be equivalent to 16.22 pounds per gallon. TREX 008173 at 42-48.

636. During the 9 7/8-inch interval the penetration rate and torque also confirm that drilling was occurring in the new formation. Tr. 7492-93 (Bourgoyne); D4744.

637. The slope of the buildup for the pressure integrity test at the 9 7/8-inch shoe and the 16-inch shoe are not comparable as conditions downhole are very different at these two intervals. Tr. 7499-7500 (Bourgoyne); D4855.

638. It was reasonable for the slope of the test curve to change more between the casing test and the FIT on the 16-inch than on the 9 7/8-inch "where you had virtually the same amount of mud that you were pressurizing for both tests." Tr. 7500 (Bourgoyne).

639. The fracture gradient indicated by the tests was higher than expected and higher than the overburden stress computed from the logs. But a significant number of times the crew

134

sees shoe tests higher than overburden, which indicates that you have a strong shoe.  Tr. 7502-03 (Bourgoyne); D4162.

640.    Data from Mississippi Canyon is known for being higher than overburden.  Tr. 7505 (Bourgoyne); D4162.  The relief wells in the Macondo area also came above overburden. Tr. 7506-07 (Bourgoyne); D4163.

> **v.    BP Complied with Safe Drilling Margin Regulations and No Alleged Violation Was Related to the Incident.**

641.    30 C.F.R. § 250.401 requires keeping the well properly balanced in terms of its mud weight, and having a safe margin is an integral part of a balanced well.  Tr. 660-61 (Huffman); TREX 006217 (30 C.F.R. § 250.401).

642.    No federal government investigator cited BP at the Macondo well for a regulatory violation.  Tr. 776 (Huffman).  No enforcement actions were written up by the inspectors during the drilling of the well.  Tr. 777 (Huffman); TREX 004135 (MMS Drilling Inspection PINC List).  Eric Neal, drilling inspector for the MMS, inspected the *Deepwater Horizon* in February and April 2010.  E. Neal Dep. 20.  Robert Neal, drilling inspector for the MMS, inspected the *Deepwater Horizon* in February and March 2010.  R. Neal Dep. 94-95.

643.    The purpose of the inspection is to verify that operations aboard the *Deepwater Horizon* were being conducted in accordance with MMS regulations, the Applications for Permit to Drill ("APDs"), the leases, and the Code of Federal Regulations.  E. Neal Dep. 79-80; R. Neal Dep. 99-100.

644.    The inspectors also determined whether the equipment designed to prevent or ameliorate blowouts, fires, spillages, or other major accidents had been installed and was operating according to federal requirements.  E. Neal Dep. 80.

645.    The inspectors took the relevant portions of the C.F.R. and the MMS PINC book with them during their inspections of the *Deepwater Horizon*, and used these documents as checklists to make sure that operations were being conducted safely.  E. Neal Dep. 79.

646.    During the inspections, the inspectors reviewed records and walked around the rig to check the safety of operations.  E. Neal Dep. 30.

647.    The inspectors also conducted a physical inspection of certain devices to determine whether there were any problems with the well.  E. Neal Dep. 80.

648.    Robert Neal did not find any violations of the MMS guidelines or the federal regulations on the *Deepwater Horizon* during his February and March 2010 inspections.  R. Neal Dep. 95; TREX 004121; TREX 004126.

649.    Similarly, Eric Neal did not find any violations of MMS guidelines or federal regulations on the *Deepwater Horizon* during his February and April 2010 inspections.  E. Neal Dep. 86.

650.    No incidents of noncompliance ("INCs") were ever issued regarding drilling margin issues prior to April 20, 2010.  R. Neal Dep. 83, 95, 114; E. Neal Dep. 86, 127; Tr. 786 (Huffman).

651.    Eric Neal and Robert Neal, the MMS inspectors who contemporaneously inspected the *Deepwater Horizon* did not find any violations of the drilling margin, and in fact, INCs were not issued until one or two years after the blowout.  Tr. 785 (Huffman).

652.    The drilling margin allegations are not related to the blowout that occurred on April 20, 2010.  Tr. 7444 (Bourgoyne).

653.    At the time of the blowout, a different operation (temporary abandonment) was underway which is unrelated to the drilling margin.  Tr. 7444 (Bourgoyne).

136

654.     Dr. Huffman, the United States geophysicist, concedes that the drilling margin regulations do not apply after April 9, 2010 when total depth was reached and all drilling at the Macondo well stopped.  Tr. 851 (Huffman).  That is consistent with the testimony of the United States government employees from the MMS.  Patton Dep. 74; Trocquet Dep. 205-06.

> ### c.     BP's Decision to Use a Long String Production Casing Was Consistent with Industry Practice, BP's Original Plan, and Was Approved by the MMS.

655.     There were seven casing strings planned for the Macondo well, one of which was a contingency liner, with "contingency" meaning it may or may not be used depending upon hole conditions encountered during drilling.  Tr. 8324 (Lewis).

656.     Consistent with its original casing plan and contingencies, nine casing strings were installed at Macondo, including the final long string production casing.  Tr. 8325 (Lewis).

657.     The number of casing strings utilized at Macondo was consistent with industry standard in Gulf of Mexico and with casing designs approved by the MMS.  Tr. 7458 (Bourgoyne).  Tr. 8322 (Lewis); Patton Dep. 238; Saucier Dep. 207; TREX 008098.

658.     On April 18, 2010, the rig crew began to run the final 9 7/8" production casing in the wellbore.  TREX 000001 at 23.  The final production interval for the Macondo well consisted of 7" H513 x 9 7/8" H523 x-over production casing.  Agreed Stipulations No. 111 (Rec. Doc. 5927).

659.     The original design for the Macondo well included a long string production casing.  TREX 000788.  In early April 2010, the BP drilling engineering team revisited the original decision to use a long string as the production casing design, and, after considering the available options and risks, decided to proceed with the original design.  TREX 000244.

660.     Both long strings and liners (as well as liners with an eventual tieback) have risks and advantages and both are widely used and fall within the range of accepted practice as viable

137

options for deepwater wells.  Tr. 7605 (Bourgoyne); Tr. 8326, 8332 (Lewis).  Each of these casing design options is used extensively in the Gulf of Mexico and worldwide.  Tr. 8332 (Lewis); D4919; *see also* TREX 004743 (statistics of production casing strings used in the wells in the vicinity of Macondo, indicating that 57% of all operators who have drilled wells in that area have utilized long string production casing designs).

661.    The long string casing design of the Macondo was adequately designed.  Tr. 8322 (Lewis).

662.    The use of a long string casing instead of a liner did not increase the risk of a blowout and explosion.  Tr. 7605 (Bourgoyne).

663.    The factors of safety for the production casing design at Macondo were in excess of industry standard.  Tr. 8322-23 (Lewis); TREX 008098 at 19.  The liner design considered for the Macondo also had a factor of safety greater than allowable and was adequate.  Tr. 8323-24 (Lewis).  BP installed high-collapse Q125, a material more expensive and stronger than C110 modeled and which has higher factors of safety.  Tr. 8331 (Lewis).

664.    The liner and long string had the same number of barriers to annular flow.  Tr. 8326 (Lewis).  A long string provided a barrier to flow at the bottom for cement, and a second barrier at the top, known as the seal assembly.  Tr. 8326 (Lewis).  A liner also provided two barriers, the cement at the bottom, and a liner top packer.  Tr. 8326 (Lewis).

665.    The long string had two advantages, one of which was avoiding the annular pressure buildup (APB) guaranteed with a liner tieback situation.  Tr. 8328 (Lewis).  BP mitigated APB issues by the use of burst discs.  Tr. 8328 (Lewis).  BP properly evaluated and mitigated potential APB concerns with their design.  Tr. 8328 (Lewis).

666.    Structurally, the long string at Macondo was sound and met the loading conditions experienced prior to and during the well control incident.  Tr. 6202 (Ambrose). Nobody from Transocean or Halliburton raised any concerns with running the long string.  Tr. 6204 (Ambrose).

667.    A pressure of 13,000 psi, greater than the working pressure of the pipe at the Macondo well, would not be sufficient to burst the 7 inch 32 pound/foot C110.  Tr. 8330 (Lewis)

668.    Pressure values in this context were differential pressure, the pressure on the inside minus the outside-Delta P.  Tr. 8330-31 (Lewis).

669.    BP installed high-collapse Q125, a material more expensive and stronger than C110.  The factors of safety increase with Q125, as well as the pressures that could burst or collapse the pipe.  Tr. 8331 (Lewis).

i.      **The MMS Has Approved Long String Production Casing Designs for Deepwater Wells in the Gulf of Mexico.**

670.    "The Bureau of Ocean Energy Management, and its predecessor, the Minerals Management Service, have approved long string production casing designs for certain deepwater wells in the Gulf of Mexico."  Agreed Stipulations No. 1 (Rec. Doc. 5927).

671.    "Between April 20, 2005 and April 20, 2010, the Minerals Management Service approved long string production casing designs for certain deepwater wells in the Gulf of Mexico."  Agreed Stipulations No. 2 (Rec. Doc. 5927).

672.    Since April 20, 2005, the MMS has approved approximately 100 well designs that use a long string production casing where the production casing was run prior to temporary abandonment.  TREX 005347; Trocquet Dep. 60-62 (Trocquet).

ii.     **BP's Long String Design for the Macondo Well Was Consistent with Industry Standards.**

673.    The long string casing design of the Macondo was adequately designed for purposes of production casing string at the Macondo well.  Tr. 8322 (Lewis).

674.    BP properly evaluated the factors of safety for the anticipated loads and designed a production casing string with factors of safety in excess of industry standards.  Tr. 8322-24 (Lewis); TREX 008098 at 18-19.

675.    The design had appropriate safety factors for the loads anticipated.  Tr. 8323-24 (Lewis); TREX 008098 at 18-19.

676.    All analyses and all of the factors of safety were based on the working pressure or rating associated with the material.  The production casing design was based on the working pressure, which was lower than the ultimate capacity of the pipe.  Tr. 8330 (Lewis).

iii.     **The MMS Independently Reviewed and Approved BP's Long String Design for the Macondo Well.**

677.    The MMS conducted an independent evaluation of the design, using their own load and safety factors.  Patton Dep. 422-25.

678.    The design submitted to MMS by BP for the production long string was consistent with industry standards.  Tr. 8322 (Lewis); TREX 008098 at 18-19.

679.    The design submitted to MMS by BP for the production long string was superior to industry standards.  Tr. 8322-23 (Lewis); TREX 008098 at 19.

680.    Frank Patton, a Drilling Engineer working in the New Orleans MMS office, reviewed and approved all of BP's applications for permits submitted to the MMS relating to the Macondo well.  Patton Dep. 23.

### iv.   The Use of a Long String Production Casing Was Not Related to the Incident.

681.   The use of a long string casing instead of a liner did not increase the risk of a blowout and explosion.  Tr. 7605 (Bourgoyne).

682.   Both long strings and liners were viable production casing options for deepwater wells.  Tr. 8326, 8332 (Lewis).

### d.   The MMS Approved BP's Permits, and There Were No Incidents of Non-Compliance Issued by MMS Inspectors During the Drilling of the Macondo Well.

683.   The MMS approved the Macondo APD, modifications and revisions to the Macondo permit, as well as BP's exploration plan for the Macondo well.  Trocquet Dep. 66; Saucier Dep. 58, 92, 209, 228, 261, 296, 307-08, 311.

684.   The MMS visited the rig monthly; regularly inspected equipment; looked at documents and maintenance histories, paperwork, computer records, crew training; and conducted drills, including unplanned well control drills.  Tr. 5940 (Ambrose).  If the MMS finds a noncompliance, they can issue an INC.  Tr. 5941 (Ambrose).

685.   Frank Patton, a Drilling Engineer working in the New Orleans MMS office, reviewed and approved all of BP's applications for permits submitted to the MMS relating to the Macondo well.  Patton Dep. 235-36.

686.   Patton carefully reviewed BP's initial APD for the Macondo and each subsequent filing to ensure that all were in compliance with federal regulations, and to ensure that the casing program, cementing program, and drilling program was designed to drill a successful and safe well.  Patton Dep. 153-54.

687.   Specifically, Patton reviewed and approved each of the following:

- BP's Application for Permit to Drill a New Well approved on May 22, 2009.  TREX 004751.

- BP's Application for Revised New Well approved on September 28, 2009. TREX 007411 at 13g.

- BP's Application for Revised New Well approved on October 16, 2009. TREX 004001.

- BP's Application for Revised New Well approved on October 29, 2009. TREX 004002.

- BP's Application for Revised New Well approved on January 14, 2010. TREX 001869.

- BP's Application for Revised New Well approved on January 25, 2010. TREX 004007.

- BP's application for Bypass approved on March 15, 2010.  TREX 001339.

- BP's Application for Revised Bypass approved on March 26, 2010. TREX 004047.

- BP's Application for Revised Bypass approved on April 14, 2010.  TREX 003527.

- BP's Application for Revised Bypass approved on April 15, 2010.  TREX 004753.

- Also on April 15, 2010, Patton approved another Application for Revised Bypass submitted by BP.  TREX 004754.

688.    Patton would not have approved any of these filings unless he believed each complied with all applicable regulations.  Patton Dep. 154-55.

689.    After drilling commenced on the Macondo well, Patton and others at the MMS reviewed certain Weekly Activity Reports ("WAR") for the Macondo well and compared them to BP's APDs to ensure that BP was conducting its operations in accordance with federal regulations and as set forth in the permits.  Patton Dep. 39; 113.

690.    The WAR was the primary method through which the MMS stayed in touch with the operator regarding drilling operations.  Patton Dep. 35.

691.    The WARs submitted by BP contained sufficient information to demonstrate that the well was being drilled safely and Patton saw no problems with the WARs; therefore Patton did not contact BP to raise any questions or concerns, and did not issue any citations for an INC. Patton Dep. 184.

692.    At no point during his review of the WARs and submissions from BP did Patton request additional information or more detail related to the operations at the Macondo well. Patton Dep. 39, 113.

693.    There were no INCs indicated in the MMS' inspection of the *Deepwater Horizon* in February of 2010.  R. Neal Dep. 154, TREX 004121 (MMS Drilling Inspection).

694.    No conditions were observed during Neal's February and March inspections that warranted shutting down the rig.  R. Neal Dep. 155-56.

695.    As part of his inspection, Neal was unaware of any anomalies or deficiencies associated with the alarm or gas systems.  R. Neal Dep. 182-83.

696.    BP never received an INC because *Deepwater Horizon* maintenance records were not available or not produced by the crew in response to requests from the MMS.  Tr. 5945 (Ambrose).

697.    There were no INCs issued for the *Deepwater Horizon* during the last MMS inspection on April 1, 2010.  Tr. 5941 (Ambrose).

**E.     The Temporary Abandonment Procedure.**

**1.     Development of the Temporary Abandonment Procedure.**

698.    After total depth was reached and the final downhole conditions were known, the temporary abandonment procedure was revised and finalized between April 12, 2010 and April 15, 2010.  TREX 000836; TREX 000537; TREX 000545 and TREX 000545GMT.  On April 16,

2010, BP's APM, describing the temporary abandonment procedure, was submitted to and approved by the MMS.  TREX 000570; TREX 007392.

699.    As is common with temporary abandonment procedures, or any procedure, there were multiple drafts or iterations of the Macondo temporary abandonment procedure.  Tr. 8762 (Guide); Tr. 4313 (Barnhill); TREX 000836; TREX 000545 and TREX 000545GMT; TREX 00570; TREX 000097.  It was not unusual for BP to circulate multiple drafts of the temporary abandonment procedure to make sure nothing was left out.  Tr. 1980-81 (R. Sepulvado).

700.    It was standard practice for BP engineers to send all procedures to the wellsite leaders so that they could provide input based on their experience and so they could make necessary logistical arrangements for any equipment that might be needed.  Tr. 8763-64 (Guide). The process of sharing drafts with the wellsite leaders ensured that all necessary steps were included and that the procedure incorporated the knowledge and experience of both the drilling engineer and the wellsite leader, who was familiar with the rig operations and equipment.  Tr. 1981-1982 (R. Sepulvado).

701.    There were also multiple communications between members of the BP Macondo wells team concerning the details of the temporary abandonment procedure and the negative pressure test.  TREX 000533; TREX 001806; TREX 007392; TREX 001816.

702.    It was good practice for a drilling engineer to seek feedback from his wellsite leader before finalizing a procedure, and this type of communication, feedback and input from wellsite leaders in the development of any procedure was standard for the Macondo wells team. Tr. 4494 (Barnhill); Tr. 8763-64, 8892 (Guide); TREX 000836 at 1, TREX 000533 at 1.

703.    On April 12, 2010, BP Drilling Engineer Brian Morel sent a preliminary draft procedure to the BP wellsite leaders for the *Deepwater Horizon* and to John Guide, the Wells

Team Leader for the rig.  TREX 000836.1.2.BP.  The next day, in response to the April 12, 2010 draft procedure, BP wellsite leader Ronnie Sepulvado noted the need to conduct a negative pressure test as part of the temporary abandonment procedure, which Morel added.  Tr. 1981 (R. Sepulvado); Tr. 8892 (Guide); TREX 000533.1.2.BP.  After April 12, all drafts and iterations of the temporary abandonment procedure included a negative pressure test.  Tr. 4328 (Barnhill); TREX 000545GMT (April 15, 2010 procedure); TREX 000570 (April 16, 2010 procedure); TREX 000097 (April 20, 2010 procedure).

704.    On April 15, 2010, Morel circulated an updated draft procedure to all the BP wellsite leaders and drilling engineers for Macondo, as well as to the M-I representative onboard the *Deepwater Horizon*, Leo Lindner.  TREX 000545 and TREX 000545.GMT (reflecting correct date and time).  Morel's e-mail indicated that the procedure depended on approval from the MMS on the proposed depth of the surface cement plug, and that he would revise the procedure and notify the team if any further changes were made to the procedure.  TREX 000545 and TREX 000545.GMT.

705.    The temporary abandonment operations described in the April 15, 2010 procedure included a negative pressure test with base oil to the wellhead prior to displacement.  TREX 000545.9.2.BP; Tr. 8768-69 (Guide).  Morel noted that conducting the negative pressure test with base oil to the wellhead prior to displacement would not achieve a pressure sufficient to simulate the exact conditions the well would see once temporary abandonment was complete. Tr. 8766 (Guide); TREX 001806.

706.    On April 16, 2010, BP's temporary abandonment procedure, which included a negative pressure test, was submitted to and approved by the MMS as part of an Application for Permit to Modify.  TREX 000570; TREX 007392; Patton Dep. 296.  As part of the approval, the

MMS granted BP's requested departure to set the cement plug at a depth of approximately 3,300 feet below the mudline.  TREX 000570; TREX 007392.  The approved procedure was shared with the rig crew the same day.  TREX 007392; Tr. 8769-8770 (Guide).

707.    In an e-mail on April 18, 2010, Morel again noted that, in light of the MMS' approval of the deeper cement plug, conducting the negative pressure test with base oil would not achieve the full amount of underbalance the well would see after temporary abandonment operations were complete.  TREX 001816; Tr. 8770-71 (Guide).  Guide confirmed with Morel that the negative pressure test should be performed with seawater to achieve the appropriate amount of differential pressure.  Tr. 8771-72 (Guide).

708.    Former BP wellsite leader for the *Deepwater Horizon*, Ronnie Sepulvado, explained that he did not find either the timing or the nature of the communications regarding the development of the temporary abandonment procedure unusual.  Tr. 1980-81 (R. Sepulvado).  While drilling the Macondo well, there was never an instance in which operations outpaced the plans and procedures coming from drilling engineers back onshore.  Tr. 1954 (R. Sepulvado).

### 2.    The Depth of the Cement Plug.

709.    The April 15, 2010 temporary abandonment procedure, as well as the plan submitted to the MMS for approval, called for the cement surface plug to be set at approximately 3,300 feet below the mudline.  TREX 000545.9.2.BP, TREX 000570.3.2.BP.

710.    MMS regulations required the cement plug to be set within 1000 feet of the mudline, and BP therefore sought a dispensation or departure for the proposed depth of the cement plug at 3300 feet below the mudline.  Tr. 8765-66 (Guide).  If the MMS did not approve BP's request for departure with respect to the depth of the plug, BP's April 15, 2010 APM provided that the cement surface plug would be set in seawater, at a depth of approximately 1000' below the mudline.  TREX 000545.9.2.BP.  On April 16, 2010, the MMS approved BP's

request for departure on the depth used for the cement surface plug.  Tr. 8769 (Guide); TREX 007392.

711.    The rationale for the dispensation for the depth of the cement plug was stated in the April 16 APM: "[t]he requested surface plug depth deviation is for minimizing the chance for damaging the LDS sealing area, for future completion operations."  The April 16 APM noted that "[t]he cement plug length has been extended to compensate for added setting depth."  TREX 000570.3.2.BP.

712.    A lockdown sleeve (LDS) prevents movement or expansion of the casing during production.  Tr. 4313-14 (Barnhill).  The BP engineering and subsea team chose to set the LDS as part of the temporary abandonment operations and planned to set the LDS after the cement plug to avoid damage to the LDS.  Tr. 4494-96 (Barnhill); Albers Dep. 19-20, 35-37, 57-61.

713.    Setting the LDS required 100,000 pounds of actual weight below the tool to seal the LDS in the wellhead.  Tr. 8765 (Guide).  The length of pipe required to achieve 100,000 pounds of weight would mean the cement plug would have to be set at 8,300 feet.  Tr. 8765 (Guide).

714.    The additional depth of the cement plug would have a minimal impact on the "amount" or "degree" of underbalance in the well.  Tr. at 8766-68 (Guide) (noting that negative pressure test to wellhead with base oil (to simulate conditions of shallower plug depth) would result in 360 psi less than what the well would experience with displacement to 8,367').  If the well was unsecure, the signal from the well from the test done from 8,367 feet would actually be stronger, or more pronounced, than a test from 6,000 feet, or the mudline of 5,000 feet.  Trocquet Dep. 153 ("[i]t would be a more rigorous test.").

715.    In addition, whether the well was underbalanced from the mudline, from 1,000 feet below the mudline, or from 3,300 feet below the mudline, the riser would continue to have mud inside of it, in what is referred to as a "controlled underbalance," and if the negative pressure test showed a communication with the formation under any of those depths, the well could quickly be returned to an overbalanced state.  TREX 000001 at 10 ("The test involved replacing heavy drilling mud with lighter seawater to place the well in a controlled underbalanced condition."); Tr. 2076-77 (R. Sepulvado); Tr. 2220 (Heenan); Tr. at 8773 (Guide).

### 3.    The Displacement Procedure.

716.    The BP/*Deepwater Horizon* Rheliant Displacement Procedure for the temporary abandonment operations was drafted by M-I and approved by BP.  Tr. 4326 (Barnhill); Tr. 7721-22 (Bourgoyne); TREX 000567; Agreed Stipulations No. 163 (Rec. 5927).

717.    The BP/*Deepwater Horizon* Rheliant Displacement Procedure was provided to representatives of BP, Transocean, and Halliburton and discussed at a pre-tour meeting before the displacement.  Agreed Stipulations No. 164 (Feb. 29, 2012) (Rec. Doc. 5927).

718.    The BP/*Deepwater Horizon* Rheliant Displacement Procedure was based upon information provided by BP and the M-I drilling fluids specialist's experience drafting such procedures on the *Deepwater Horizon*.  The BP/*Deepwater Horizon* Rheliant Displacement Procedure was approved by BP.  Agreed Stipulations No. 163 (Rec. Doc. 5927).  M-I calculated the number of strokes needed to pump the spacer above the annular and Transocean pumped the strokes.  Tr. 7722-23 (Bourgoyne).

719.    The displacement procedure, including the routing of fluids overboard, was a common procedure the *Deepwater Horizon* performed since it was in operation.  Tr. 4394 (Barnhill).  It is not uncommon to transfer fluids overboard once you are convinced that the flow barriers are confirmed and the well is secure.  Tr. 4394-95 (Barnhill).

148

720.    Transocean had a task-specific THINK procedure for displacement of the riser with seawater and everyone involved in the operation would participate in a THINK drill prior to conducting the operation to prepare for and identify hazards associated with the job.   TREX 047678; Tr. 1972-73 (R. Sepulvado).

721.    The surface cement plug was to be set once the displacement was completed – cement would be pumped down the drill string, and the drill string slowly pulled up as the cement came in.  Tr. 5018 (Barnhill).  The surface cement plug, which was to be a second barrier to flow, was never set.  Tr. 967-68 (Bly).

### F.    A Long String Production Casing Was Run into the Well with Six Centralizer Subs.

722.    The purpose of centralizers is to center the drill pipe in the hole and allow for better displacement.  Tr. 1987 (R. Sepulvado); Walz Dep. 110.

723.    There are two types of centralizers:   (1) centralizer subs, and (2) slip-on centralizers with stop collars.  D4932A.   *Centralizer subs* are attached to the casing and are preferred over slip-on centralizers because they cannot slide around.  Clawson Dep.  205, 295-97.  *Slip-on centralizers* have a stop collar attached to the exterior of the casing, which can break off or move and cause the centralizer to slide on the casing or get stuck in the well, an issue that BP has experienced on past wells.  Clawson Dep. 205, 220, 295-97; Tr. 1988-89 (R. Sepulvado); Tr. 8692-93 (Guide).

### 1.    The Decision to Use Six Centralizers Was Based on Careful Engineering Judgment and Experience.

724.    On March 31, 2010, Brian Morel contacted Bryan Clawson of Weatherford to acquire the 7" casing and equipment for the Macondo well, including centralizers and float equipment.  Clawson Dep. 102, 203-05; TREX 002576; TREX 002591.  Clawson located 7"

casing and cementing equipment in Nexen's inventory and advised BP that it was appropriate for the Macondo well.  Clawson Dep. 313-16; TREX 002576.

725.    The 9-7/8" by 7" production casing installed on the Macondo well included a reamer shoe, six centralizer subs, and a float collar manufactured by Weatherford.   Agreed Stipulations Nos. 114, 118 (Rec. Doc. 5927); Clawson Dep. 29-31, 66.  Weatherford inspected the centralizers and cementing equipment prior to shipment to the *Deepwater Horizon* and found no problems.  Clawson Dep. 187.

726.    The operator and contractors are involved as a team in deciding the number of centralizers to run on a given well.  Tr. 2043-44 (R. Sepulvado).  Before the final cement job, Halliburton's Jesse Gagliano ran a number of OptiCem models, including 21 centralizers, 10 centralizers, and 7 centralizers.  Tr. 8948 (Guide); TREX 000716; TREX 000717.

727.    On April 15, 2010, Jesse Gagliano sent BP OptiCem modeling with 21 centralizers and raised a concern with running fewer than 21 centralizers.  BP team members Cocales, Hafle, and Walz worked with Gagliano to resolve the issue.  Tr. 6602-04 (Gagliano); TREX 000716.

728.    Initially, Walz and Cocales agreed to run 15 additional centralizers and worked to have them flown out to the rig.  Tr. 6604-05 (Gagliano).  Guide was not available in the office, so Walz discussed ordering the 15 additional centralizers with David Sims and received his approval.  TREX 001685; Tr. 8696-702 (Guide).  Cocales worked with Clawson of Weatherford to locate 15 additional centralizers for delivery to the *Deepwater Horizon*.  Clawson Dep. 217-19; Walz Dep. 132-33.

729.    On the evening of April 15, 2010, Walz e-mailed Guide and told him that the OptiCem model showed that the equivalent circulating density ("ECD") at the bottom of the well

would be too high (15.06 ppg) with six centralizers.  Tr. 8697 (Guide); TREX 000796.  Losses

had been previously experienced while drilling when the ECD exceeded 14.7 ppg, and therefore,

Walz wanted to stay under that pressure.  Tr. 8699 (Guide).

730.    Walz wrote that they should "honor the modeling" by using more centralizers but

that he did not want the same problem as the Atlantis well, where centralizers broke and caused

the casing to become stuck in the hole.  Tr. 8700-01 (Guide).  Walz reported to Guide that 15

Weatherford centralizers of the "Thunder Horse design" would be sent to the *Deepwater Horizon*

rig.  Guide and Walz understood that the centralizers were a one-piece design and had no issues

with using them.  Tr. 8697-702 (Guide); Walz Dep. 174-75, 751-52; TREX 000796.

731.    On the morning of April 16, 2010, Weatherford shipped an additional 15

centralizers to the *Deepwater Horizon*.  Tr. 1420 (Bly); Agreed Stipulations No. 119 (Rec. Doc.

5927).  A Weatherford service technician was also flown to the *Deepwater Horizon* to install the

15 slip-on centralizers.  Agreed Stipulations No. 120 (Rec. Doc. 5927).

732.    On April 16, Brian Morel sent John Guide a picture of the 15 additional

centralizers from the rig.  Tr. 8702-03 (Guide); TREX 048042 at 1.  The centralizers that arrived

on the rig were bow-spring slip-on centralizers, the type with which Guide had previously

experienced problems.  Tr. 8692 (Guide).  Morel indicated to Guide that he did not think these

centralizers should be run on the casing.  Tr. 8703 (Guide).

733.    In response to this new information, Guide wrote to Walz:  "I just found out that

the stop collars are not part of the centralizer as you stated.  Also it will take 10 hrs to install

them.  We are adding 45 pieces that can come off as a last minute addition.  I do not like this and

as David approved in my absence I did not question but now I very concerned about using

them."  Tr. 8704-05 (Guide); TREX 000796 at 1.  When Walz received Guide's message, he

agreed with Guide that the centralizers should not be run because of their multi-piece design and the problems previously encountered on the Atlantis well with that design.  Tr. 8706 (Guide). Walz indicated he would speak with Morel and they would reposition the centralizer subs.  Tr. 8706, 8786 (Guide).

734.    Guide also forwarded the e-mail that he had sent to Walz concerning the decision not to run the wrong centralizers to David Sims, and left a message asking Sims to call him if Sims had a problem with not using the centralizers.  Tr. 8707 (Guide).  Sims did not indicate disagreement with the decision.  Tr. 8707 (Guide).

735.    Members of the BP Macondo well team, including Guide and Sepulvado, had previously experienced problems with slip-on centralizers getting stuck in wells.  Tr. 1988-89 (R. Sepulvado); Tr. 8692-93 (Guide).  In fact, as recently as April 3, 2010, Guide had discussed his experience with stuck casing due to centralizers with stop collars with others at BP.  Tr. 8690, 8694-95 (Guide); TREX 041025 at 1.  In Guide's experience, he had been unsuccessful fishing out broken centralizers from the well and had to sidetrack as a result.  TREX 041025; Tr. 8695-96 (Guide).

736.    Further, at that time, the wellbore was open and leaving it open for an additional ten hours would not have been good engineering practice, as it is a general rule throughout the industry not to leave a hole open any longer than necessary.  Tr. 8704-05 (Guide); TREX 000796 at 1.

737.    If the correct type of centralizers had been available, Guide would have been willing to wait the 10 hours to install them.  Tr. 8705 (Guide).  Under these circumstances, it did not make sense to wait 10 additional hours with an open hole in order to run the wrong type of centralizers.  Tr. 8705 (Guide).

738.     Moreover, the Macondo well 7" casing was cemented in an 8.5" hole.  Tr. 2559 (Benge).  Halliburton documents refer to that as a "slim hole environment" that "reduces the options available to centralize pipe."  Tr. 2559-60 (Benge); TREX 042045.287.BP.

739.     Given the additional operational risks associated with running the 15 slip-on centralizers, BP made the choice not to run them on the Macondo well.  Tr. 1420 (Bly); Tr. 8696, 8948 (Guide); Walz Dep. 189.   The engineering team also took into account the wellbore geometry, configuration of the hole section, location of the pay zone, and the caliper log data in determining the number of centralizers to run.  Tr. 8689-90 (Guide).  Guide made the decision on the number of centralizers based on his engineering judgment; the decision was not based on cost.  Tr. 8707-08 (Guide); Tr. 7273-74 (Beck) (one must use sound engineering judgment when considering the risks of stuck casing from running additional centralizers).

740.     After the decision was made on the number of centralizers, Morel and Cocales continued to correspond on April 16, 2010 regarding whether the additional centralizers were needed.  TREX 001367; Cocales Dep. 268-69.  Cocales' April 16, 2010 e-mail to Brian Morel was part of a larger engineering discussion regarding the risk of additional centralizers becoming stuck above the wellhead versus the reward of possibly lowering the ECD very slightly.  TREX 001367; Cocales Dep. 285-86, 299-00, 502, 505, 524, 525.  Even if the additional centralizers were not used, Cocales believed the risk of not using the additional centralizers was that remedial cement work would need to be performed.  Cocales Dep. 394-97.

741.     Lack of centralization was not a safety concern as its potential result was channeling and a lack of zonal isolation, which would have required remedial cement work but would not led to a blowout.  Tr. 6403-04 (Chaisson); Tr. 6614-15 (Gagliano); Tr. 2242, 2414 (Benge); Tr. 8757 (Guide).  Remedial or squeeze cementing is the process of perforating the

casing after the primary cement job and pumping more cement to achieve zonal isolation.  Tr. 6404 (Chaisson).  And BP engineers understood that if there was an issue with the cement job, it could have been remediated by a squeeze job.  Tr. 6614 (Gagliano); Cocales Dep. 650.

742.    Additionally, in order to mitigate the risk of channeling associated with using fewer centralizers, the six centralizers were positioned across and above the primary hydrocarbon zones.  Tr. 1422 (Bly); TREX 000001 at 35.

### 2.    Halliburton Did Not Indicate that BP's Decision to Use Six Centralizers Was Unsafe.

743.    Because the number or placement of the centralizers on the Macondo well was not a safety issue, Tr. 6853-54 (Gagliano); Cocales Dep. 900, "[a]t the time of the cement job on the final production casing at Macondo … HESI … had no reason to be concerned about the safety of running only six centralizers on the production casing of the Macondo well." Halliburton's Discovery Response at 4 (May, 25, 2011) (Ex. 5).

744.    On the evening of April 16, 2010, Halliburton's Nathanial Chaisson learned from Don Vidrine and Brian Morel that BP was not running the 15 additional centralizers.  Chaisson had no safety concerns about this decision and did not raise any concerns to BP before or after the cement job.  Chaisson also informed Jesse Gagliano that the additional centralizers would not be run on April 16, 2010 and recorded this fact in his notebook that kept while onboard the *Deepwater Horizon*.  Tr. 6380-83 (Chaisson); D4620.

745.    "Halliburton executed the cement job on the production interval of the Macondo well even though it knew that the fifteen centralizers delivered to the Deepwater Horizon were not installed on the production casing."  Halliburton's Discovery Response at 15, 16 (May 25, 2011) (Ex. 5).

746.    Jesse Gagliano, however, never expressed any safety concerns with going forward with the cement job using six rather than 21 centralizers.  Cocales Dep. 900.  Similarly, the Halliburton Foam Team Leader in charge of pumping the cement jog, Paul Anderson, did not have safety concerns about using six centralizers and has participated in other cement jobs where the operator has run fewer centralizers than recommended without issue.  P. Anderson Dep. 254-55.  Likewise, Quang Nguyen, a Halliburton Technical Professional who assisted Gagliano with the Macondo well between February and April 20, 2010, was aware that BP decided to run the casing with six centralizers but he did not have any concerns.  If he had concerns, he would have expressed them.  Nguyen Dep. 228-30.

747.    In fact, no one from Halliburton expressed any safety concerns or attempted to stop the job in light of the decision to proceed with six centralizers.  Cocales Dep. 900-01; Tr. 8707 (Guide).

### 3.    The Use of Six Centralizers Was Consistent with Industry Practice and Appropriate for the Macondo Well.

748.    There is no set number or rule regarding the appropriate number of centralizers to use on a well.  Tr. 8689 (Guide).  Likewise, there are no MMS requirements on the number of centralizers required for a production casing.  Tr. 5026 (Barnhill).

749.    As a result, operators run a wide range of centralizers, from very few to many, depending on the specific well.  Faul Dep. 524-25; Tabler Dep. 446-48; Clawson Dep. 305.  It is also not unusual for an operator to run fewer centralizers than the number recommended by the cement contractor, including fewer than six, and still achieve a successful cement job.  Dugas Dep. 207-08; Tabler Dep. 446-47; Clawson Dep. 305, 309-10.  And Halliburton has pumped cement jobs where operators other than BP have run fewer than the number of centralizers recommended by Halliburton.  Tabler Dep. 446-47.

155

750.     There are advantages and disadvantages to running centralizers and the number of centralizers used depends on the specific conditions of each well.  Tr. 2545-46 (Benge); Tabler Dep. 445-46; Clawson Dep. 309-11.

751.     As Benge testified, optimal centralization cannot be achieved in all instances and, in some cases, well limitations prevent running a large number of centralizers "[s]o sometimes you have to sacrifice that just to get the pipe to bottom."  Tr. 2306-07 (Benge).

752.     Benge and Transocean's expert Calvin Barnhill agreed that centralizers can create operational risk of hanging up at the wellhead or in the wellbore while running casing, which would have been a very difficult situation to manage.  Tr. 2558 (Benge); Tr. 5026 (Barnhill); Tr. 8690-91 (Guide); Clawson Dep. 310.

753.     Additionally, when centralizers break, they can also get stuck or scratch important surfaces in the casing, like the seal assembly.  Clawson Dep. 311.  There is also a risk of centralizers getting stuck across the BOP or across the wellhead, which may prevent the BOP from operating properly.  Tr. 1990-91 (R. Sepulvado); Tr. 8691 (Guide).

754.     In the past, individuals in charge of well operations did not put centralizers on any of the casing strings as they did not want to run centralizers through the wellhead, damage the wellhead, or have them come off and wedge in the BOP stack.  Tr. 8694-95 (Guide).  As such, wellhead manufacturers like Dril-Quip, which furnished the Macondo wellhead, recommend not using any centralizers.  Tr. 1989-90 (R. Sepulvado); TREX 002793 at 17; Clawson Dep. 311.

755.     At trial, experts agreed that BP's decision to use six centralizers was based on engineering judgment considering specific circumstances and conditions of the Macondo well. Tr. 2297 (Benge) (discussing concerns of centralizers becoming stuck in the wellhead); Tr. 5027

(Barnhill) (Guide's focus was on getting a good cement job and on balancing the risks of drilling operations with cementing objectives).

### G.     The Float Collar Was Converted After Running Casing.

#### 1.     The Float Collar Served Its Intended Purpose.

756.    "BP's well plan called for a Weatherford M45AP Flow-Activated MidBore Auto-Fill Float Collar to be run in the Macondo [w]ell" in connection with the cementing operations for the 9 7/8" x 7" production casing.  TREX 022761 at 1; Tr. 6161 (Ambrose).  The M45AP float collar "was designed and manufactured to meet the performance criteria of API [Recommended Practice ("RP")] 10F Category III C," which is "the most challenging test category recommended in API RP 10F ..."  Agreed Stipulations No. 124 (Rec. Doc. 5927).

757.    The components of the M45AP float collar include a non-rotating Wiperlok landing plate for the cementing plugs to land, a composite ball retainer to hold the 2-inch ball in place as the casing is run downhole, an auto-fill tube assembly with four 0.19-inch, threaded brass screws, which hold the auto-fill tube in place until enough force is created to shear the screws and release the auto-fill tube, spring-loaded dual flapper valves, and a high density phenolic ball, which stays inside the auto-fill tube and sits in a ball seat until the auto-fill tube is ejected.  TREX 002582.2.BP; D8036.  The ball seat is held in place by epoxy and four 0.25-inch brass pins; this design ensures that the 0.19 inch threaded brass screws, or shear pins, will shear before the ball seat.  Tr. 8346-52 (Lirette); TREX 002582.2.BP; TREX 087132.

758.    "The Weatherford reamer shoe, M45AP float collar and cement wiper plug set installed on the 9-7/8" x 7" production casing [had] a temporary purpose.  Once the cement has had sufficient time to set, it may be necessary to drill to a deeper depth.  As a result, the internal components of the reamer shoe, float collar and the wiper plugs must be capable of being 'drilled out' by the drill string."  Agreed Stipulations No. 122 (Rec. Doc. 5927).  Specifically, "[t]he dual

flapper valves in the M45AP float collar were made of cast aluminum, a metal strong enough to meet the back pressure rating of the float collar to prevent the reverse flow of wet cement slurry from the annulus back into the casing, yet soft enough to be drilled with PDC (polycrystalline diamond compact) bits, a requirement of the drilling process.  Agreed Stipulations No. 123 (Rec. Doc. 5927); Tr. 8349 (Lirette).

759.    The M45AP float collar was designed with two spring-loaded aluminum flapper valves, which served as a dual check valve system.  TREX 022761 at 7.  As casing was run in the hole, the two flapper valves in the float collar were locked in the open position by the insertion of an auto-fill tube, which allowed mud to flow up through the reamer shoe and past the float collar equipment and prevent surge effects in the well.   Tr. 2634 (Calvert); TREX 002582.2.BP.

760.    Due to the typically narrow pore-pressure fracture-gradient window encountered in deepwater drilling operations in the Gulf of Mexico, it was standard practice to use auto-fill float equipment to minimize the potential for surge pressures and increase the likelihood of being able to run casing without losing circulation.  Tr. 8749-50 (Guide); TREX 041245.9.1.BP.

761.    To reduce the likelihood of surge pressures, the float collar at the Macondo well was run in auto-fill mode, "*i.e.* with the flapper valves open, as the production string was run to total depth."  TREX 022761 at 7; Tr. 6160 (Ambrose).  Running the float collar in auto-fill mode enabled the crew to fill the casing as it was run and eliminated the potential for surge pressures. Tr. 8750 (Guide); Tr. 7331 (Beck).  Although the preferred approach is to trip the auto-fill float equipment prior to running through any hydrocarbon bearing zone, BP drilling engineers obtained a dispensation, which is standard under these conditions, "to allow running [the casing] through hydrocarbon bearing zones without tripping auto-fill float equipment … on an as needed

basis." TREX 041245.9.1.BP; Tr. 8747-50 (Guide); Tr. 7332 (Beck). The justification for the dispensation stated that: "Offset wells have encountered hydrocarbons in the subject hole sections. Disabling the autofill function may add unnecessary surge pressure and may contribute to significant mud losses [and] cementing problems if the float equipment is activated prior to reaching T[otal] D[epth]." Tr. 7333 (Beck); TREX 041245.9.1.BP.

762.    By following the dispensation and not converting the auto-fill float equipment before running the casing to bottom, well control safety was enhanced because the "primary barriers in any well operation is the drilling fluid, and this enables you to keep a full column of drilling fluid." Tr. 8750 (Guide). Running the production casing float equipment in auto-fill mode was appropriate for the Macondo well. Tr. 2635 (Calvert).

763.    In addition to reducing surges, the M45AP auto-fill float collar served two purposes in the cementing operations for the 9 7/8'' x 7'' production casing: "(a) providing a landing profile for the cementing plugs; and (b) preventing flow back of cement slurry into the casing from the annulus." TREX 022761 at 2.

764.    The M45AP float collar's "first function was to serve as a landing profile for the cementing plugs. The cementing plugs segregate the cement slurry from casing fluids while the slurry is being pumped. The bottom plug is run before the cement. When the bottom plug lands on the float collar, pressure builds up until a diaphragm in the plug shears, allowing cement to be pumped through the bottom plug, into the shoe track and up the annulus. The top plug follows the cement slurry. The top plug lands on the bottom plug, and cement displacement stops." TREX 022761 at 6; Tr. 2626-27 (Calvert) ("float collar … serves as a landing place for the bottom and top plugs …").

765.     At the Macondo well, pressure spikes on surface gauges indicated that "the cement plugs landed or 'bumped' on the float collar," with the bottom plug landing at 00:29 on April 20, 2010, and the top plug landing 11 minutes later, at 00:40.  TREX 022761 at 6-7; TREX 000713.8.1.BP; TREX 000820.   Accordingly, the M45AP float collar served the first of its intended purposes as a landing place for the bottom and top plugs, and there is evidence here that both plugs landed on the float collar during the cement job.  Tr. 2626-27 (Calvert); TREX 022761 at 7.

766.     The M45AP float collar's function "was to serve as a check valve preventing the back flow of wet cement into the casing while the cement was hardening."  TREX 022761 at 7; Tr. 7111-12 (Beck) ("[T]he primary function of the float collar is to trap the cement in the shoe track below the float collar …").

767.     Once the production casing was landed, the ball fell to the bottom and there were two ports next to the ball.  TREX 002582.2.BP.  "Conversion of the float collar required that the well be circulated."  TREX 022761 at 8.  When mud was circulated through the hole above the ball, it created a pressure differential.  Tr. 6161-62 (Ambrose); TREX 002582.2.BP; Tr. 2625-26, (Calvert).  In a fully converted mode, the float collar was a one-way valve, meaning the only place fluid could go is down through the valves and circulate down the casing.  Tr. 7111 (Beck); TREX 022761 at 7.  Conversion of the float collar was completed before the cement job, so that after the cement was pumped into place it prevented U-tubing of the cement and any other fluids past the float collar.  Tr. 6164 (Ambrose); Tr. 8266-67 (Lambert).

768.     "The M45AP float collar served its widely accepted, oil and gas industry purpose as a cement placement accessory in the cementing of production casing.  Once the cement was properly pumped in place, the float collar assisted in keeping the pumped cement in place by

preventing wet cement from flowing back into the casing while waiting for the cement to set."
TREX 022761 at 2.

## 2.     Nine Attempts Were Made to Establish the Circulation Necessary to Convert the Float Collar.

769.    At the Macondo well, the crew was initially unable to establish circulation, so a technique called rocking (pressuring up and quickly bleeding off) was used in an effort to clear any debris that might have been in the way.   Tr. 8740 (Guide); Tr. 8267 (Lambert).   While rocking, Morel called the Weatherford representative, Brian Clawson, who indicated this particular float could be pressured up to 5,000 psi to convert; but the BP operations team decided to utilize a more conservative maximum of 3,500 psi, or 70 percent of the rated pressure of the float, and to "stairstep" with smaller pressure increases.   Tr. 8740-41 (Guide); Clawson Dep. 116-17, 126; Tr. 8267 (Lambert) (the BP drilling engineer had discussions with Weatherford "over what the safe pressure would be without damaging the float, to get these things converted").   At no time did anyone pressure up the float collar to a level in excess of 5000 psi. Tr. 8742-43 (Guide).

770.    Ultimately, the crew made nine attempts to establish circulation and convert the float collar by increasing pressure on the casing, and circulation was established on the ninth attempt at 3,142 psi.   Tr. 1095 (Bly); Tr. 6165-66 (Ambrose); Tr. 6344 (Chaisson); TREX 000001 at 70; TREX 000713 at 5; TREX 001455 at 2; TREX 022761 at 8.   The float collar should have converted with a pressure differential between 500 psi to 700 psi, requiring a flow rate of 5 to 8 barrels per minute.   TREX 002582 at 6; Tr. 6162-63 (Ambrose).   The crew could not circulate mud until the ninth attempt when 3,142 psi was applied to the casing from the surface because of a blockage in the float collar, reamer shoe, or both.   Tr. 2635 (Calvert).

771.    According to Brent Lirette, Weatherford's Product Line Engineering Manager for Cementing Products who has designed float collars, "[i]f something were to land or accumulate above the float collar, it should withstand [a pressure differential of more than] 6000 psi."  Tr. 8344-45, 8359 (Lirette).

### 3.    All Parties on the Rig Agreed that the Float Collar Converted.

772.    After the float converted, there were lower circulating pressures than anticipated. Tr. 8744 (Guide).  To investigate the lower pressures the mud pumps were changed, because different mud pumps can give different pressures, and by doing this the pressure changed by 90 psi.  A leak was also considered, and the only place where it could potentially have been other than the shoe was up in the riser at the diverter tool.  But it was verified that this tool was closed. Tr. 8744-45 (Guide).

773.    The BP operations team also contacted Doyle Maxie from M-I to discuss the circulating pressure, but Maxie was unable to replicate the circulating pressure they saw, and indicated that the predicted pressures from the modeling are never quite the same, and that "[p]ressure is one of the hardest numbers to correlate."  Tr. 8745-46 (Guide); TREX 001814. After seeing that circulation had been established and having M-I evaluate the circulating pressures, Guide did not have any reason to question or doubt that the float collar converted.  Tr. 8746-47 (Guide).

774.    Guide believed that the float collar converted on April 19, 2010, based on "the fact that [they] could circulate."  He knew circulation had been established because they "were pumping mud with the rig pumps out of the pits and pumping down the casing and … were getting mud back up the riser on the flow line."  Tr. 8741, 8743 (Guide).  No person on the rig expressed to Guide that he or she did not believe the float collar converted.  Tr. 8747 (Guide).

775.   Lambert was also satisfied that the float collar had successfully converted because the pressure dropped off and returns were gained.  Tr. 8268 (Lambert).  Nobody indicated the float collar had not converted.  Tr. 8268 (Lambert); Clawson Dep. 336 (he did not have any indication that the float collar did not convert).

776.   Halliburton cement team members also believed that the float collar converted. Halliburton cementer Tabler understood that the float collar converted because of the pressure, and the rig was able to circulate after the float collar converted.  Tabler Dep. 146-47, 441-42.

777.   Another Halliburton cementer, Chaisson, indicated that "everyone was under the impression that the floats had converted and the rig was able to circulate fluid, circulate mud." Tr. 6304-05, 6389-90 (Chaisson).  In an e-mail attaching Halliburton's 9.875" x 7" Post Job Report, Chaisson stated about the cement job: "We have completed the job and it went well. Full returns were observed throughout, and I estimated about 100 psi of lift pressure before we bumped the plug."  TREX 000708 at HAL_0011208.  In addition, the attached post job report indicates the "[f]loats held after job."  TREX 000708 at HAL_0011214; Tr. 6207-08 (Ambrose).

778.   Post-job reports by BP, Transocean, and Halliburton also confirmed that the float collars held, and post-job testing by Stress Engineering for BP confirmed that the float collars converted.  TREX 022761 at 8-9; TREX 000820; TREX 000713 at 7-8; TREX 003308.8.1.BP; TREX 022761 at 2.

### 4.   Stress Engineering's Post-Incident Testing Confirmed that the Float Collar Converted.

779.   Following the Incident, BP asked Stress Engineering "to conduct various performance tests on the Weatherford 7" Model M45AP float collar with dual valve seats and an auto-fill tube," which was the exact same float collar used on the Macondo well for the production casing.  TREX 003308.6.1.BP.

163

780.    Stress Engineering evaluated "the performance and design limits of various aspects of the float collar and … document[ed] its performance under conditions similar to those downhole in the Macondo well before, during, and after the cementing operation[s]."  TREX 003308.6.1.BP.  "The performance tests consisted of flow endurance tests, steady-state flow conversion tests, flow-surge conversion tests, flow-surge tests on converted float collars, and mechanical failure tests on auto-fill tubes."  TREX 003308.8.2.BP.

781.    Stress Engineering's post-Incident testing indicated that "for all test scenarios executed in this program, conversion of the float collar occurred."  TREX 003308.8.2.BP.

782.    Stress Engineering confirmed that the float collar would be able to withstand 3,142 psi of pressure without damage.  TREX 003308 at BP-HZN-BLY00128493-94; TREX 022761 at 8.  In addition, Stress Engineering's post-Incident testing also demonstrated that the float collar would have converted in the 3,142 psi pressure surge.  TREX 022761 at 8; TREX 003308 at BP-HZN-BLY00128493-94; Tr. 8355 (Lirette) (when Stress Engineering simulated the flow created from a pressure release of 3,142 psi to zero, the float equipment converted and there was no damage).

783.    Stress Engineering did a flow surge conversion test, and the rupture disc fractured at a pressure of approximately 3036 psi, releasing a flow surge that reached a peak flow rate of 10.5 barrels per minute.  The float converted.  Tr. 8369, 8371 (Lirette); TREX 007597.6.BP; TREX 007597.6.BP.  Stress Engineering did a second flow surge conversion test, and the rupture disc fractured at a pressure of approximately 3,210 psi, releasing a flow surge that reached a peak flow rate of 11.5 barrels per minute.  The float converted.  Tr. 8370-71 (Lirette); TREX 007597.6.BP; TREX 007597.6.BP.

784.   Stress Engineering also conducted post-Incident tests for Transocean.  These tests included conversion, load, and back pressure tests on two 7" M45AP float collars, which were not identical to the one installed at the Macondo well.  TREX 004248 at 53.

785.   The float collars tested by Stress Engineering for Transocean differed from the float collar used at the Macondo well.  They had one flow port on the test auto-fill tube versus two flow ports on the float collar used at the Macondo well.  This reduced the conversion flow rate from 5 to 8 barrels per minute to 2 to 4 barrels per minute.  The float collars Stress Engineering tested for Transocean also had different casing connections than the one used at the Macondo well.  In addition, the float collars had three shear screws secured to the auto-fill tube rather than four for the Macondo well, which changes the shear rating for the auto-fill tube from 500-700 psi to 300-400 psi.  Also, the float collars Stress Engineering tested for Transocean were made of P110 grade of steel as opposed to Q125 grade of steel for Macondo.  This affected collapse, burst, and tensile ratings.  Tr. 6220-22 (Ambrose); Tr. 8347 (Lirette) (the number of screws on float collars varies and changes the conversion pressure); TREX 002582.

786.   Stress Engineering's testing for Transocean of the float collar involved bolting the tube and not allowing the shear pins to activate in the testing.  Tr. 7334-35 (Beck).  In addition, the testing Stress Engineering did for Transocean involved gluing the top of the float collar to a device before testing.  This is not the way the float collar was intended to be used.  Tr. 8354 (Lirette); TREX 007598.19.BP.

787.   Although Transocean concluded, based on Stress Engineering's testing, that the trip ball "may have been ejected from the ball seat without converting the float collar given the pressures that were applied," Lirette testified that it is not possible for the ball to be ejected from the auto-fill tube while the auto-fill tube remains in place.  TREX 004248 at 54; Tr. 8352-53

(Lirette).  Lirette also testified that he had never heard of a float collar having the ball blown through the bottom of it while leaving the auto-fill tube with the shear pins in the top.  Tr. 8353 (Lirette).

### 5.  The Float Collar Is Not a Well Control Barrier.

788.  "API RP 65 Cementing Shallow Water Flow Zones in Deep Water Wells does not list a float collar as a well-control device."  Agreed Stipulations No. 126 (Rec. Doc. 5927).

789.  "API RP 96 states that 'Float collar valves are not designed to provide a gas-tight seal.'"  Agreed Stipulations No. 127 (Rec. Doc. 5927).

790.  The float collar is not designed or marketed as a well-control device or a barrier to seal hydrocarbon flow.  Tr. 8351 (Lirette); Tr. 7757-58 (Bourgoyne) ("I don't normally consider the flappers in these types of device as a well control device … I don't count on it as a barrier."); Tr. 960 (Bly) (float valves are not designed to be a "reliable barrier" to hydrocarbon flow).

### H.  A Partial "Bottoms Up" Circulation Was Performed After Conversion of the Float Collar and Prior to the Pumping of Cement.

791.  A full bottoms-up circulation involves getting the mud at the bottom of the hole to the surface.  Tr. 6607-08 (Gagliano).

792.  In the case of the Macondo well, Gagliano believed that a full bottoms-up was approximately 1,000 or 1,100 barrels.  Tr. 6607-08 (Gagliano).

### 1.  A Full Bottoms-Up Was Neither Necessary nor Consistent with Industry Practice.

793.  Bottoms-up cannot be run in every well and the amount of circulation varies from well to well.  Tr. 2315 (Benge); R. Morgan Dep. 89.  For example, when lost circulation occurs, an operator may not circulate full bottoms-up because it interferes with the goal of placing the cement without breaking down the formation.  Tr. 2037 (R. Sepulvado); Tr. 2315 (Benge).

794.    Over half of the time in deepwater drilling, including on wells run by other operators such as ExxonMobil, a full bottoms-up is not run immediately before pumping the cement job.  Tr. 8737-38 (Guide); Tr. 2569 (Benge).

### 2.    A Partial Bottoms-Up Was Appropriate for the Macondo Well.

795.    Don Vidrine, Bob Kaluza, and John Guide decided not to run a full bottoms-up before the cement job due to concerns about fracturing the formation and the potential for losses. Tr. 8737 (Guide); Brock Dep. 66-67.  Guide applied his best engineering judgment in making the decision not to do a bottoms-up.  He did not factor costs into the decision and he was not in any way compromising the safety of operations.  In fact, he did just the opposite.  Tr. 8739 (Guide).

796.    Halliburton and Transocean were both aware that there would be no bottoms-up circulation before the cement job.  Tr. 7327 (Beck); Tr. 6224 (Ambrose); Tr. 8737 (Guide); Tr. 6307 (Chaisson).

797.    On April 17, Halliburton employees, including Nathaniel Chaisson, Vincent Tabler, Paul Anderson, and others, met with BP employees, including Bob Kaluza and Brian Morel, to discuss the upcoming cement job.  Tr. 6292-93, 6298 (Chaisson); Tabler Dep. 410-11. Kaluza stated that pre-job circulation would be 110 barrels of mud at one barrel per minute followed by 150 barrels at four barrels per minute, which Chaisson understood was not a full bottoms-up.  Tr. 6293 (Chaisson); Tabler Dep. 414-15.

798.    Chaisson drafted and sent the cement job procedure to Gagliano on April 18, 2010, which indicated the amount of pre-job circulation.  TREX 000711 at HAL_125562.  Paul Anderson, who assisted Chaisson in drafting the cement job procedure, did not have any concerns about the amount of circulation planned for the job and has participated in other cement jobs where less than a full bottoms-up was circulated.  P. Anderson Dep. 249-53.  Likewise,

Tabler agreed with BP's decision and indicated that other operators had chosen not to run bottoms-up in similar situations. Tabler Dep. 192-93, 415-16.

799. There is no evidence of a contrary recommendation or of any protest from Halliburton after learning a full bottoms-up would not be run. Tr. 7328-29 (Beck).

800. Moreover, in addition to operational considerations regarding lost circulation and fracturing the formation, a full bottoms-up circulation immediately before the cement job was not necessary to clean the open hole section and prevent contamination of the cement. Tr. 2050 (R. Sepulvado).

801. *First*, more than a full bottoms-up was circulated on April 16, 2010, after which there was no additional drilling. Tr. 6225 (Ambrose); Halliburton's Discovery Response at 21 (May 25, 2011) (Ex. 5). The April 16, 2010, conditioning trip took five times longer than a full bottoms-up and multiple complete circulations were pumped. Tr. 8736-37, 8739 (Guide). Additionally, in terms of possible of mud contamination, data captured during the conditioning trip indicated that mud had not gelled after sitting for five days during the logging runs before the April 16, 2010, conditioning trip. Tr. 8949-50 (Guide).

802. *Second*, a full bottoms-up was not necessary at the Macondo well because there was only 1,000 feet of open hole at the base of the production casing, and thus it was not necessary to circulate a full bottoms-up to clean the open hole section to prevent contamination. Tr. 2047-48 (R. Sepulvado); Tabler Dep. 419.

803. After the production casing was run, the open hole section of the well was only about 59 barrels. Tr. 2564-65 (Benge). The inside of the production casing is about 750 barrels, and the drill pipeline is about 150 barrels. Tr. 2565 (Benge). As a result, approximately 900

barrels of fluid needed to be pumped across the open hole section in order to pump the cement from the rig down to the bottom of the well.  Tr. 2565 (Benge).

804.    Before performing the cement job on April 19, 2010, a partial bottoms-up was performed.  Tr. 8734 (Guide); D4940.  Including pre-job circulation and the spacer, about 1,200 barrels of mud and spacer were pumped across the open hole before the cement was placed.  Tr. 2566 (Benge).

805.    Every 59 barrels of fluid pumped had the effect of replacing the fluid in the open hole section one time.  Tr. 2565-66 (Benge).  Between the mud pumped in advance of the spacer, the spacer, and the mud in front of the cement, the open-hole area was completely flushed more than 20 times before the cement was placed.  Tr. 2567 (Benge).  In addition to cleaning the open hole section multiple times, the volume of mud pumped before the cement reached the open hole section was calculated to get the mud on the bottom of the well above the BOP stack.  Tr. 8736 (Guide).

806.    In short, during the cement job, over 1,000 barrels of mud were pumped, and when the cement job was finished the mud from the bottom of the well was above the BOP stack.  After the cement job was finished and the seal assembly set, that mud was circulated out of the riser.  When it was circulated out, there was no gas in the mud.  Tr. 8735-36 (Guide); D4940.

### 3.    Not Spotting a Heavy Pill in the Rat Hole Was Consistent With Industry Practice and Appropriate for the Macondo Well.

807.    A heavy pill is spotted in the rat hole in order to prevent potential fluid swapping between mud and cement.  Beirute Dep. 91-92.

808.     No heavy pill was spotted in the rat hole at the Macondo well.  TREX 000545 at 3.  As such, a lighter 14.17 ppg mud was left under the heavier 16.74 ppg cement in the rat hole. Beirute Dep. 88.

809.     There are advantages and disadvantages to spotting a heavy pill in a rat hole, and sometimes well conditions "are such that you cannot afford to spot a heavy pill because you might lose returns."  Beirute Dep.  91-92.

810.     BP's decision not the spot a heavy pill considered the potential risk of fracturing the well.  The April 15, 2010, drilling plan stated:  "Do not need to set 16.5 ppg mud in rat hole as volume is only approximately 4 bbls and a large volume may cause issues with the cement job or breaking down the formation."  TREX 000545 at 3.

811.     Halliburton has pumped many cement jobs without spotting a heavy pill in the rat hole.  Vargo Dep. 697.

**I.      Cementing the Final Production Casing.**

       **1.      The Execution of the Cement Job.**

812.     On April 19 and 20, 2010, Halliburton executed the cement job on the production casing at the Macondo well by pumping foam cement into the well.  Halliburton's Discovery Response at 6, 11 (May 25, 2011) (Ex. 5).

813.     A pre-job safety meeting regarding the cement-pumping procedure was held at 19:00 on April 19, 2010.  Tr. 8269 (Lambert).  The pumping of the cement job began at 19:30 on April 19, 2010, and finished at approximately 00:30 the next day.  Tr. 1413 (Bly); TREX 000001 at 23.  The amount of cement pumped at Macondo was about 60 barrels.  Tr. 6782 (Gagliano).

814.     BP told Gagliano what the fracture gradient was, and that dictated how fast the cement job could be pumped without fracturing the formation.  Ultimately a pump rate of four barrels a minute was used.  Tr. 6783 (Gagliano).  The slow pump rate was used to manage ECDs

and was a known issue between Halliburton and BP.  Tr. 2554-55 (Benge).  Slow pump rates are

used in the industry, and can go as low as two or three barrels a minute.  Tr. 2554 (Benge); R.

Morgan Dep. 185.

815.    Before the cement job was executed, Halliburton's Nathaniel Chaisson knew

about the six centralizers, the cement volume, the pump rate, the .09 retarder concentration, and

the wellbore geometry (long string).  He saw no inherent danger in proceeding with the cement

job from a safety standpoint and did not object to moving forward.  Tr. 6388-89 (Chaisson).

816.    During the cement job, there were full returns and lift pressure, and the top and

bottom wiper plugs landed on the float collar.  Tr. 4985 (Barnhill); Tabler Dep. 378-82; Tr.

2626-27 (Calvert).  Full returns and lift pressure were indications that a cement job was executed

as planned.  Tr. 8935, 8969-70 (Guide); Tr. 6401 (Chaisson); Tr. 8270-72 (Lambert); Tabler

Dep. 421; P. Anderson Dep. 265; TREX 000282.

817.    Cementing operations on the *Deepwater Horizon* on April 19 and 20, 2010, were

completed successfully.  Tabler Dep. 378; P. Anderson Dep. 263-64.

818.    Halliburton's technical professional on the *Deepwater Horizon*, Nathaniel

Chaisson, testified that the cement job was "[f]rom an operational standpoint, flawless."  Tr.

6328, 6369 (Chaisson); Tr. 2321 (Benge); Tr. 1416-18 (Bly).  Post-Incident review of the data,

including an internal review by Halliburton immediately after the Incident, showed no issues

with the execution of the cement job.  Tr. 3236 (Roth); Tr. 2321, 2403 (Benge); Tr. 4985

(Barnhill).

819.    After the cement job finished on April 20, 2010, Halliburton informed BP that the

cement job on the final production casing was executed to plan.  Tr. 2570 (Benge); Halliburton's

Discovery Response at 4 (May 25, 2011) (Ex. 5).  Halliburton reported to BP that the cement job

was successful, with full returns (no lost circulation), lift pressure, the plugs bumped on time, and the floats held.  Halliburton's Discovery Response at 4, 5, 21, 24 (May 25, 2011) (Ex. 5); Tr. 6309-10, 6329-30 (Chaisson); Tr. 2570 (Benge).

820.    On April 20, 2010, nobody indicated to Guide there were any issues with the execution of the cement job.  Tr. 8970 (Guide).  Gagliano never told Guide there were any issues with the cement slurry itself.  Tr. 8972 (Guide).

821.    On April 20, 2010, Chaisson e-mailed Gagliano, attaching a Post-Job Report and wrote:  "We have completed the job and it went well.  Full returns were observed throughout, and I estimated about 100 psi of lift pressure before we bumped the plug."  Tr. 6401-02 (Chaisson); TREX 000708; D4379.

## 2.    Based on the Execution of the Cement Job, a Cement Bond Log Was Not Used.

822.    A cement bond log is a device that can be run into a wellbore to test whether the cement on the outside of the pipe is bonded to the pipe.  Tr. 1211-12 (Bly).  A cement bond log is normally run during the completion phase of well operations, as opposed to during temporary abandonment after the completion of drilling the well.  Tr. 8751 (Guide).

823.    A cement bond log was not run on the Macondo well.  Tr. 3275 (Roth); Tr. 8751 (Guide).  However, BP was ready to run the cement bond log if there had been a report of losses. Tr. 7359 (Beck); Tr. 1823 (Ezell); Agreed Stipulations No. 128 (Rec. Doc. 5927).

824.    Not running the cement bond log at the Macondo well did not increase risk.  Tr. 6121 (Ambrose); Tr. 7608-10 (Bourgoyne).

> ### a.   The Cement Job Was Executed as Planned and a Cement Bond Log Was Not Necessary.

825.    Sometimes cement bond logs are run, and sometimes they are not.  Most of the time they are not run if all indications are that the cement job went well, which is consistent across industry practice.  Tabler Dep. 427.

826.    Full returns and lift pressure are appropriate indicators of a successful cement job used by other operators in the industry.  Tabler Dep. 421; P. Anderson Dep. 265.  Halliburton reported to BP that the cement job on the production casing was executed successfully, including full returns and lift pressure.  Halliburton's Discovery Response at 4, 5, 21, 24 (May 25, 2011) (Ex. 5).

827.    Based on the job being executed as planned, U.S. expert Glen Benge "probably wouldn't have run" a cement bond log at temporary abandonment.  Tr. 2570 (Benge); Serio Dep. 265-66.

> ### b.   There Was No Requirement to Run a Cement Bond Log to Verify Top-of-Cement, Especially Because There Were No Losses During the Cement Job.

828.    A cement bond log can be used to verify top-of-cement.  Tr. 8754-55 (Guide).  However, there is no regulatory requirement that a cement bond log be run in order to assess top-of-cement.  Kellingray Dep. 635.  There is also no MMS requirement to use a cement bond log when there have been no lost returns.  Tr. 7359 (Beck); 30 C.F.R. § 250.428 (68 F.R. 8423, Feb. 20, 2003).  It was not mandatory to run a cement bond log on each cement job, and doing so was only one of the recommended practices in the regulations if there were problems with cementing.  Saucier Dep. 188-89.

829.    If there were no losses, as was the case at the Macondo well, then the cement had nowhere to go except up the annulus to at least the planned height.  Tabler Dep. 453; Tr. 7442,

7508 (Bourgoyne).  Target top-of-cement was 17,300 feet, and the Halliburton post-job report estimated top of cement at 17,300 feet.  Tr. 3233-34 (Roth); TREX 000713 at HAL_0125646.

### c.  Not Running a Cement Bond Log at Temporary Abandonment Was Consistent with Industry Practice.

830.    Very few cement bond logs are run in the industry, whether by BP or any other operator.  Kellingray Dep. 192.

831.    "Cement bond logs are not completely definitive.  They're a – one tool that you can use to assess the quality of the cement job.  Their results are variable based on interpretation and also the time after which they're run from the cement being pumped."  K. Lacy Dep. 220.

832.    Other operators do not run cement bond logs at temporary abandonment when the cement job is successful, which is a consistent practice across the industry.  Tabler Dep. 427; Tr. 2569-70 (Benge); Faul Dep. 447-49.  If the cement crew determines that the cement job has gone as expected, including good feedback and pressures, it is not necessary to run a cement bond log.  Shaughnessy Dep. 298; *see also* Tr. 1797 (Ezell) (it was not uncommon to cancel a cement bond log).

833.    "Halliburton's internal best practices do not recommend running a cement bond log for every cement job."  Halliburton's Discovery Response at 17 (May 25, 2011) (Ex. 5).

834.    A cement bond log is not necessarily the best method to determine whether there is bonded cement across the hydrocarbon zones, as the data is unreliable and confusing.  Brock Dep. 64-65; Kellingray Dep. 193.

835.    Cost is not the main driver for not running a cement bond log.  Kellingray Dep. 192.  The reasons for not running a cement bond log have more to do with how much confidence there is in the cement that was placed properly – *i.e.*, are there reasons to question whether isolation was achieved.  Kellingray Dep. 192.

836.    If a cement evaluation log is run soon after a cement job, the quality of the information from those logs is compromised and requires more interpretation.  Cunningham Dep. 732.  Thus, as a general rule, an operator should wait at least 48 hours before running a cement bond log in order to obtain reliable bond information.  Beirute Dep. 433.

### d.    BP Used a Reasonable Process in Deciding Not to Run a Cement Bond Long.

837.    The BP engineering authority Jonathan Sprague made the decision to run a cement bond log as part of complete operations, as is typical, instead of running one at the temporary abandonment stage unless certain conditions were observed.  Tr. 8751-52 (Guide); Tr. 1212 (Bly).

838.    BP prepared a decision tree on April 14, 2010 to determine whether a cement bond log would be needed earlier.  Tr. 7358 (Beck).

839.    BP also made plans in the event a contingency bond log was required, so that the necessary tools and people would be on the *Deepwater Horizon*.  Tr. 8757-58 (Guide).

840.    In deciding not to run a cement bond log, BP looked at several factors, including loss circulation, cement lift pressure, whether there were full returns, and whether the plugs were bumped on time.  Tr. 8751-56 (Guide).  Under BP standards at the time, it was appropriate for the Macondo team to rely on lift pressures and job indications to estimate top of cement. Kellingray Dep. 686.

841.    BP followed all steps of the decision tree by:  (1) making a conditioning trip with no hole or circulation problems; (2) running the 9 7/8'' by 7'' long string casing with no losses; (3) cementing the long string with no losses; and (4) given that there were no losses, running wireline, testing the casing, and setting the TA plug.  Tr. 8753-54 (Guide); TREX 004456.  Thus, the well conditions did not require running a cement bond log.  Tr. 8755 (Guide).

842.    Halliburton understood that BP was using full returns and lift pressure as indicators of a successful cement job, and did not raise any issues with the plan to not run a cement bond log if there were full returns.  Halliburton's Discovery Response at 20 (May 25, 2011) (Ex. 5); Tabler Dep. 420-21.

843.    There was never any discussion about trying to save time by not running a cement bond log.  Tr. 8759 (Guide).  And there was no impact to the safety of the operation by not running a cement bond log.  Tr. 8759 (Guide).

844.    The BP Internal Investigation Team ("BP IIT") concluded that there was a failure to comply with the intent of ETP GP 10-60 by not doing a formal risk assessment.  However, the author of GP 10-60, BP's Engineering Technical Practice on zonal isolation clarified that the ETP does not require a cement bond log be run before temporary abandonment.  Tr. 1212-13 (Bly); Kellingray Dep. 514-15, 684-85.  Running a cement bond log at completion (as opposed to at temporary abandonment) would still meet the requirements of ETP GP 10-60.  Kellingray Dep. 691.

845.    BP's internal top-of-cement guidelines are related to zonal isolation and not safety.  Breazeale Dep. 709.  Moreover, BP's policy actually specifies twice as much cement as the MMS required.  Kellingray Dep. 204.

846.    Finally, in the case of the Macondo well, a cement bond log would not have shown whether zonal isolation was achieved because the placement of the shoe track prevented logging of the entire formation.  Tr. 8973-74 (Guide); Tr. 4426-27 (Barnhill).

**e.     Guide Specifically Asked If Anybody Thought a Cement Bond Log Was Necessary and Halliburton Did Not Request One.**

847.    During the BP morning meeting on April 20, 2010, the cement job was reported as successful and BP indicated that no cement bond log was going to be run.  Tr. 1796, 1822-23 (Ezell).  Gagliano was also in attendance on the morning call.  Walz Dep. 900.

848.    Even though all of the criteria in the decision tree had been met, Guide posed the question, "does anyone think we still need to run the bond log?"  Tr. 8757 (Guide); Walz Dep. 901.  Nobody at the morning meeting of April 20 stated that he or she believed a cement bond log should be run, including Gagliano.  Tr. 8757 (Guide); Walz Dep. 901; Halliburton's Discovery Response at 5, 17, 19 (May 25, 2011) (Ex. 5); P. Anderson Dep. 296.

849.    Transocean employees were also aware that BP did not run a cement bond log on the Macondo well on April 20, 2010.  Transocean's Discovery Response at 231 (July 15, 2011) (Ex. 2).

**3.     The Cement Was Set by the Time of the Negative Pressure Test.**

**a.     Pre-Incident Compressive Strength Tests Performed on the Macondo Well Slurry.**

850.    There were two types of cement strength tests run for the Macondo well cement slurry:  (1) UCA compressive strength testing, which shows the time it takes for the cement to gain strength and set; and (2) foam cube crush compressive strength testing, which is used to determine the ultimate compressive strength of the foam cement after it has set, but cannot show continuous strength development like the UCA test and is not tested under downhole temperature and pressure.  Tr. 2571 (Benge); Tr. 6364-65 (Chaisson); Gardner Dep. 200, 307.

851.    The purpose of the UCA compressive strength is to simulate the time that it would take for the cement to reach 500 psi after it has been placed and/or is in static conditions.  Tr. 2425-26 (Benge).

852.    Gagliano circulated a production casing job report on April 18, 2010 at 20:58 that included a graph of the UCA compressive strength test curve, which showed the time to reach 500 psi compressive strength at 8 hours and 40 minutes.  Tr. 6866-67 (Gagliano); Tr. 8720-22 (Guide); TREX 000741 at 2; TREX 007722.  The UCA test was conducted at a temperature of 210ºF and a pressure of 14,458 psi.  TREX 007722 at 2.  The Gagliano e-mail also attached results from the foam cube crush compressive strength test; this test was conducted at 180ºF and indicated no compressive strength at 12 and 24 hours and 1590 psi of compressive strength at 48 hours.  Tr. 6794-95 (Gagliano); Tr. 6361-63 (Chaisson); TREX 000741 at 49.

### b.      BP Waited an Appropriate Amount of Time for the Cement to Set Before the Negative Pressure Test.

853.    After a cement job is pumped and consistent with industry standard, the crew should wait for the cement to reach 500 psi compressive strength before pressure testing.  Tr. 8722 (Guide); Dugas Dep. 166-67; R. Morgan Dep. 125-26; TREX 000741; 30 C.F.R. § 250.421(c) (75 F.R. 63373, Oct. 14, 2010); 30 C.F.R. § 250.422 (68 F.R. 8423, Feb. 20, 2003). Halliburton recommends casing tests when the cement has reached 500 psi, but the casing could probably be tested at a lower psi.  Tr. 6867 (Gagliano).  In fact, cement is set and immovable at 50 psi and the new industry standard in API RP 65 identifies cement as a barrier at 50 psi.  Tr. 2426, 2571 (Benge).

854.    As such, it was appropriate for BP to rely on Gagliano and his testing showing that 500 psi compressive strength would be reached in 8 hours and 40 minutes under downhole temperature and pressure conditions.  Tr. 2572 (Benge).

855.    Once the cement is in place and set up, a negative pressure test should be done to verify that there is isolation of the hydrocarbon bearing zones.  Tr. 6610 (Gagliano).  The first negative pressure test was conducted approximately sixteen hours after the cement was placed.

TREX 000001 at 23-24.  The cement job on the production interval of the Macondo well was completed at about 00:36 on April 20, 2010.  TREX 000001 at 23; TREX 000708; Tr. 006310 (Chaisson).  Between 15:56 and 16:53, the *Deepwater Horizon* displaced fluid to prepare for the first negative pressure test, which was performed at 16:54.  TREX 000001 at 24.

> ### c.   The United States Expert Glen Benge's Arguments Do Not Change This Result.

856.   United States expert Glen Benge opined that the cement was not set by the time of the negative pressure test, relying on OTC's UCA compressive strength test and on the Halliburton foam cube crush compressive strength tests. Tr. 2324-25 (Benge).

### i.   OTC's UCA Compressive Strength Test.

857.   OTC's UCA compressive strength tests, which were conducted at 3000 psi and showed 500 psi was not reached until 16:33 and 17:42, respectively.  Tr. 2325 (Benge); TREX 005937 at 30 (UCA2 and UCA2-B results).  The OTC UCA tests used a temperature ramp different from the four-hour temperature ramp that Halliburton used.  Tr. 2328 (Benge).

858.   First, it was undisputed that both temperature and pressure affect cement set time. Tr. 2430-31 (Benge); Tr. 6405 (Chaisson).  As such, the best way to test for compressive strength development was to use both downhole pressure and temperature conditions.  Tr. 2430-31, 2573 (Benge).  Benge admitted that the pressures used in the OTC testing were low.  Tr. 2573 (Benge).

859.   The effect of pressure on cement strength development was demonstrated by Chevron's testing.  Chevron's UCA testing under downhole test conditions confirmed Halliburton's test results and showed that the cement would reach 500 psi in 6 hours and 24 minutes.  TREX 004572 at 6.  Chevron also conducted UCA testing at downhole pressure but a lower temperature (180 degrees), which showed that the cement would reach 500 psi in 10 hours

and 47 minutes.  TREX 004572 at 6.  This lower temperature test shows the effect of pressure on cement set time when compared to the crush compressive strength test, which was run at the same temperature (180 degrees) but atmospheric pressure and did not have any strength at 12 or 24 hours.  *Compare* TREX 004572 at 6 *with* TREX 000741 at BP-HZN-2179MDL00015404.

860.    Second, there are differences in opinion on the appropriate heat-up rate.  The four-hour heat-up ramp used by Halliburton was consistent with API RP 10B-2 and is commonly used.  Tr. 2429 (Benge); Gardner Dep. 269.  In fact, Chevron, a major operator, has determined through its internal testing that a four-hour heat-up ramp is more reliable than a slower heat-up ramp.  Tr. 2429-30 (Benge); Gardner Dep. 69, 158.

### ii.    Halliburton's Foam Cube Crush Compressive Strength Test.

861.    Benge also relied on the Halliburton foam cube crush compressive strength tests discussed above, which showed zero strength at 12 and 24 hours.  Tr. 2331 (Benge).  The foam cube crush compressive strength test is performed at atmospheric pressure – not at downhole pressures.  Tr. 2430 (Benge); Tr. 6364-65 (Chaisson); Gardner Dep. 307; R. Morgan Dep. 155.

862.    Therefore, Benge admitted that the Halliburton foam cube crush compressive strength test showing zero strength at 24 hours does not mean that the Macondo well slurry actually had zero strength at 24 hours.  Tr. 2431 (Benge).

### d.    BP's Decision for Additional Safety Margin on Pump Time Did Not Affect Wait-on-Cement Time.

863.    The thickening-time test measures the time from mixing to when the cement begins to set under dynamic conditions.  Gardner Dep. 60.  The reason for performing a thickening test is to make sure you do not cement a pipe in a well while pumping.  If you need to adjust the time available to pump the cement, you adjust the retarder concentration.  Tr. 4980-81 (Quirk).

864.     Halliburton's pre-Incident testing showed that the pump time for a slurry with 8 gallons of retarder was five hours and thirty minutes, and the pump time for 9 gallons would be 7 hours and 37 minutes.   Tr. 6673-74 (Gagliano); TREX 000287; Tr. 6317 (Chaisson); TREX 000717 at 2.   Halliburton recommended the 8-gallon slurry, but BP indicated it preferred the extra pump time of the 9-gallon slurry in light of the risk of having issues with the nitrogen equipment.   Tr. 2265-67 (Benge); TREX 000987 (E-mail from B. Morel to J. Guide).   By adding more retarder and pumping the job slower, BP added a safety factor to make sure the cement was in place and was not cemented in the well.   Tr. 2267 (Benge).

865.     BP's decision did not affect operations:   Chaisson received the concentration of the retarder information in time to successfully pump the job from an operational standpoint.   Tr. 6386 (Chaisson).   The decision did not affect the cement set times because the pre-Incident UCA compressive strength testing that BP relied upon was done on a slurry with 0.09 gallons per sack ("gps") retarder.   Tr. 6866-67, 8720-22 (Guide); TREX 000717 at 1; TREX 007722 at 2.

866.     Chevron tested the effect of mud contamination on the unfoamed slurry's strength development and found that "The final sonic strength decreased as drilling fluid contamination increased, but the time required to achieve 100 psig sonic strength was not greatly affected."   TREX 004572 at 12.   The testing showed that contamination up to 30 percent would not have prevented the cement from setting hard and stopping the migration of oil and gas up the shoe track.   Gardner Dep. 341-42.

### 4.     The Decisions Made by BP with Regard to the Cement Job Were Confirmed as Appropriate by Halliburton's Post-Job Report.

867.     On April 20, 2010, Chaisson e-mailed Gagliano the post-job report and wrote: "We have completed the job and it went well.   Full returns were observed throughout, and I

estimated about 100 psi of lift pressure before we bumped the plug." D4379; TREX 000708; Tr. 6401-02 (Chaisson).

868.   Halliburton's post-job report included several indications of a good cement job: (1) the cement job was pumped as planned; (2) additives were pumped at planned volumes; (3) both plugs bumped; (4) full returns were seen throughout the job; (5) there was lift pressure propelling the cement up the annulus; (6) the float collar held after the job; and (7) the planned top of cement of 17,300 had been achieved and complied with MMS requirements. Tr. 3232-34 (Roth); TREX 000708 at 4, 7; Tr. 6325-26 (Chaisson); Tr. 6207-08 (Ambrose).

869.   On April 21, 2010, Chaisson and Anderson revised the post-job report to add that the float collar took multiple attempts to convert and low circulating pressure, but ultimately noted that the float collar converted.  They did not add any concerns about centralizers, circulating full bottoms-up, not running a cement bond log, or any other operational issues. Tr. 6383 (Chaisson); P. Anderson Dep. 297-300; D4379; TREX 000713.

870.   On April 23, 2010, Halliburton sent the post-job report to BP. D4379; TREX 001709; Halliburton's Discovery Response at 24 (May 25, 2011) (Ex. 5).

871.   Internally, Halliburton also raised no concerns about BP decisions regarding the cement job.  In Gagliano's communication with Roth the day after the Incident, Gagliano indicated that the cement job was successful and did not express any concerns regarding the design of the cement job, the number of centralizers used by BP, potential channeling, or the bottoms-up. Tr. 3227-29 (Roth); TREX 004340.

872.   Indeed, Gagliano testified that BP's decisions never created a safety risk and were not made in a careless or reckless manner. Tr. 6608 (Gagliano).

873.   To the contrary, BP team members working with Gagliano used professionalism in all that they did and listened to Gagliano's recommendations and disagreements on every occasion.  Tr. 6598, 6684 (Gagliano).  Gagliano testified that BP team members exercised their best engineering judgment in the work they were doing with him.  Tr. 6684 (Gagliano).

874.   Richard Vargo reviewed documents and data about the cement job provided to him by Gagliano on April 21, 2010 and did not see anything out of the ordinary.  Vargo Dep. 41-42.  Vargo also interviewed Gagliano, Chaisson, Anderson, Tabler, and Haire immediately after the Incident and, other than not running the additional centralizers, no concerns were raised about the cement job.  Vargo Dep. 38-41.

875.   Given Jesse Gagliano's intimate involvement in the decision-making process regarding the cement job and his recommendations regarding the cement job, it was incumbent upon him and Halliburton to recognize, address, and mitigate the risks as much as they could before the execution of the cement job.  Tr. 2337 (Benge); Tr. 3015 (Probert); Nguyen Dep. 231.

**J.     The Events of April 20, 2010.**

**1.     Personnel on the Rig on April 20.**

**a.     BP Personnel.**

876.   BP's wellsite leaders worked staggered two-week hitches, so there were always two wellsite leaders on the rig at a time, and each wellsite leader's tour overlapped one week with the wellsite leader who had been on the rig for a week prior to his arrival.  Tr. 8672 (Guide).

877.   On April 14, 2010, Don Vidrine relieved Murray Sepulvado on the rig as wellsite leader, as part of a regular crew change.  Tr. 8672 (Guide).  The other wellsite leader at the time, Ronnie Sepulvado, had previously requested that he be allowed to return to shore several days before the end of his regular shift, to obtain his well control certification, which was due for renewal at that time.  Tr. 8669 (Guide); Tr. 1922 (R. Sepulvado).  Guide contacted Keith Daigle,

Gulf of Mexico Wells Operations Advisor, who was in charge of wellsite leader assignments to identify a temporary replacement for Ronnie Sepulvado.  Tr. 8669 (Guide).  After consulting with Daigle, Bob Kaluza was identified as the wellsite leader who would serve as Ronnie Sepulvado's temporary replacement on the *Deepwater Horizon*.  Tr. 8670 (Guide).

878.    At the time, Kaluza was working as a wellsite leader on the drilling rig for the BP *Thunder Horse PDQ*.  *Thunder Horse* is one of BP's largest fields worldwide and like the Macondo well, is a deepwater field in the Gulf of Mexico's Mississippi Canyon.  Tr. 8670-71 (Guide).

879.    Before Kaluza was sent to the Macondo well as Sepulvado's temporary replacement, Guide spoke to Tony Emerson, Kaluza's wells team lead for the *Thunder Horse* rig.  Tr. 8671 (Guide).  At a meeting on April 14-15, Guide also spoke with Kaluza and discussed the upcoming operations at the Macondo well.  Tr. 8671 (Guide).  Kaluza never expressed any concerns about the operations or his ability to oversee them.  Tr. 8671 (Guide).  Based on his conversations with Daigle, Emmerson, and Kaluza, as well as his knowledge of Kaluza's significant training and experience, Guide felt that Kaluza was more than qualified.  Tr. 8673 (Guide).  Guide was satisfied with, and had no concerns about, Kaluza's ability to serve as a wellsite leader on the *Deepwater Horizon*.  Tr. 8671-73 (Guide).

880.    Kaluza had a performance rating of "meets-expectations" – which is the performance rating given to approximately sixty percent of BP's wellsite leaders.  Tr. 8978 (Guide); TREX 045259.8.1.BP.   Under BP's performance rating standards, a "meets expectations" rating indicates that the individual:  (1) "delivered effectively against all critical objectives, and the delivery is acceptable for all others" and that individual's performance "fully meets expectations for the role.  Employee is valued."  Tr. 8978 (Guide); TREX 045259.8.1.BP.

881.    On April 16, 2010, Bob Kaluza temporarily relieved Ronnie Sepulvado as wellsite leader on the rig.  Vidrine, who had been on the rig the week before Kaluza, and was going to remain on during the time Kaluza was there, was available to Kaluza as a source of information concerning the ongoing operations.  Tr. 8672 (Guide).  Ronnie Sepulvado also called Kaluza before his arrival on the rig to inform him of what was going on at the rig at that time.  He also e-mailed him relief notes and brought him up to speed again upon Kaluza's arrival on the rig.  Tr. 1922-23 (R. Sepulvado).

882.    In addition to the wellsite leaders, there were five other BP personnel on the rig on April 20, 2010.  TREX 003695.  Nick Wilson, the rig clerk, worked with the BP wellsite leader to schedule logistical details like helicopter takeoffs and landings and the procurement of necessary equipment.  Tr. 1984 (R. Sepulvado); Taylor Dep. 54; TREX 000323; TREX 003695.  Shane Albers and Brad Tippets, BP engineers in training as part of the BP Challenger program, were on the rig along with BP contractor Randy Skidmore to assist with the installation of the lockdown sleeve.  TREX 003695; Skidmore Dep. 8-9, 12-13; Albers Dep. 246.  Brian Morel, a BP drilling engineer, had been out on the rig for several days to observe ongoing operations including the cement job, and departed from the rig on the morning of April 20, 2010.  Tr. 6292, 6389-90 (Chaisson); Tr. 8702-03, 8740, 8765 (Guide); TREX 003690.

883.    As part of a leadership visit to the rig, BP's Patrick O'Bryan and David Sims, as well as Transocean's Daun Winslow and Buddy Trahan arrived on the rig the morning of April 20, and were on the rig at the time of the explosion.  Tr. 9264-66 (O'Bryan); Sims Dep. 372; TREX 003695.  O'Bryan and Sims were there to present Transocean with a safety award for the *Deepwater Horizon's* "excellent" safety record.  Tr. 8233 (Shaw); Tr. 9264-65 (O'Bryan); TREX 047964.3.1 BP.

### b.      Key Transocean Personnel.

884.     Certain members of Transocean's drill crew on the *Deepwater Horizon* were in the last week of their 21-day "hitch" on April 20, 2010.  Tr. 3934 (Webster); TREX 003695.

885.     The Transocean offshore installation manager ("OIM"), Jimmy Harrell, had been on the rig for 15 days.  TREX 003695.

886.     The senior toolpusher, Miles "Randy" Ezell, was not on duty at the time of the Incident; he had been on the rig for 7 days.  TREX 003695.

887.     The toolpusher on duty at the time of the Incident, Jason Anderson, had been on the rig for 6 days, while the off-duty toolpusher, Wyman Wheeler, was on the last day of a 21-day hitch.  TREX 003695.

888.     The driller on duty at the time of the Incident, Dewey Revette, was on the last day of a 21-day hitch as well.  The off-duty driller, Micah Burgess, had been on the rig for 6 days. TREX 003695.

889.     The assistant drillers on duty at the time of the Incident, Donald Clark and Stephen Curtis, were on the last days of a 21-day hitch.  Clark had been on the rig for 20 days, while Curtis had been on the rig for 19 days.  TREX 003695.

890.     The floorhands on duty at the time of the Incident, Daniel Barron, Caleb Holloway, Karl Kleppinger, Shane Roshto, and Adam Weise, were all on the last day of a 21-day hitch.  TREX 003695.

### 2.      Drilling Operations Were Normal for Much of the Day.

891.     On April 20, 2010, from 00:30 to 01:00, the Dril-Quip seal assembly was installed in the Macondo well between the high-pressure wellhead housing and the top of the casing hanger.  The seal assembly sealed off the casing hanger's 1" flow ports, sealing the wellhead

from the annulus of the 9-7/8" x 7" production casing.  Agreed Stipulations No. 144 (Feb. 29, 2012) (Rec. Doc. 5927).

892.    Between 01:00 and 03:00 on April 20, the rig crew conducted the seal assembly test to assess the integrity of the interface between the casing and the wellhead.  D4352.  The rig crew performed two separate pressure tests on the seal assembly and both tests were successful.  TREX 000001 at 23; Burgess Dep. 187.

893.    The rig team had its morning 07:30 call with participants from shore.  TREX 000001 at 23; Tr. 008757 (Guide).  During that meeting, the decision not to run the cement bond log – in accordance with the pre-established decision tree on the subject – was discussed, and no objections were raised.  TREX 000001 at 23; Tr. 8757 (Guide); Walz Dep. 901.

### 3.    The Positive Pressure Test.

894.    At approximately 10:30 on April 20, the rig crew prepared to conduct the positive pressure test on the well, and that test was conducted from 10:55 to 12:00.  Tr. 1413 (Bly); TREX 000001 at 24.  The positive pressure test was conducted approximately 11 1/2 hours after the conclusion of the cement job.  Tr. 1414 (Bly).

895.    During those 11 1/2 hours, the well was in control and there were no hydrocarbons flowing through the cement.  Tr. 1415-16 (Bly).

896.    To conduct the positive pressure test, the rig crew used the blind shear ram of the BOP to close and seal the wellbore, and the BOP's BSR functioned properly and performed as expected for that test.  Agreed Stipulations No. 101 (Feb. 29, 2012) (Rec. Doc. 5927).  The wellbore held pressures of 250 psi and 2680 psi for 5 minutes and 30 minutes, respectively.  D4353.

897.    The positive pressure test was deemed a success.  TREX 000001 at 82; D4353; Tr. at 1406-07 (Bly).

### 4.    The Use of LCM Spacer.

898.    As the drilling fluids specialist on the rig, Lindner's job was to conduct tests on the drilling fluid and create a daily report and mud check, and to create some LCM pills. Lindner Dep. 368-69.  Lindner suggested to BP wellsite leader Murray Sepulvado that they could combine the two LCM pills for use as spacer in the negative pressure test procedure.  Lindner Dep. 372-73.  Lindner and his colleagues at M-I agreed that using the LCM material as spacer was the right way to go.  Lindner Dep. 564-65.  Lindner also discussed his proposal to use the LCM material as spacer with Brian Morel.  Lindner Dep. 318-19.  Lindner ultimately received permission from BP to use these materials as a spacer.  Lindner Dep. 78-79; Agreed Stipulations No. 168 (Feb. 29, 2010) (Rec. Doc. 5927).

899.    Expert Ted Bourgoyne explained that having additional LCM in the spacer did not increase the risk of using that spacer.  Tr. 7610 (Bourgoyne).  Bourgoyne further explained that having barite in the spacer did increase the risk of plugging, but the barite would be in the spacer whether they started from scratch or reconstituted the LCM.  Tr. 7610-11; 7766-67 (Bourgoyne).

### 5.    The Negative Pressure Test.

900.    While the initial draft of the Macondo temporary abandonment procedures did not include reference to a negative pressure test, Morel, the BP drilling engineer who circulated the draft on April 12, 2010, specifically indicated:  "This isn't perfect yet, but I wanted to get everyone a copy so you can ensure all the equipment required for our upcoming operations is offshore in time.  Please let me know if you have any questions or suggestions how to improve the procedure."  TREX 000836.

901.    In response to Morel's April 12, 2010 e-mail, BP wellsite leader Ronnie Sepulvado noted the need to conduct a negative pressure test as part of the procedure.  Tr. 8892 (Guide); TREX 000836 at 1.

902.    After April 12, 2010, all drafts and iterations of the temporary abandonment procedures at Macondo included a negative pressure test.   Tr. 4328 (Barnhill); TREX 000545GMT; TREX 000570; TREX 000097.

903.    BP's April 16, 2010 Application for Permit to Modify, which included its temporary abandonment procedure calling for a negative pressure test, was approved by the MMS and then disseminated to the rig crew aboard the *Deepwater Horizon*.   Tr. 8769-70 (Guide); TREX 007392.

904.    On the morning of April 20, Brian Morel sent an e-mail containing an "Ops Note" to the rig, describing the forward operational procedures, including a description of the operational steps related to the negative pressure test.  TREX 000097.  The April 20, 2010 "Ops Note" e-mail described the negative pressure test procedure as running in the hole to a depth of 8367' ("RIH to 8367'"), displacing the synthetic oil-based mud in the drill pipe with seawater from 8367' to the mudline ("Displace to seawater from there to above the wellhead."), and then, with seawater in the kill line, closing the annular preventer on the BOP stack to conduct the negative pressure test ("With seawater in the kill close the annular and do a negative pressure test ~2350 psi differential.").  TREX 000097; Tr. 962-63 (Bly).

905.    By displacing seawater down to 8367' and then conducting a negative pressure test, the procedure set forth in the April 20, 2010 "Ops Note" e-mail would achieve the differential pressure required to simulate the conditions that the well would experience when the well was temporarily abandoned, and would therefore verify the integrity of the wellbore.  Tr.

8773 (Guide); Tr. 7524 (Bourgoyne); M. Sepulvado Dep. 575-76 (in order to test the well at the pressure levels that it would see with the top cement plug, the negative pressure test would need to be done at 8367').

906.    The April 20, 2010 "Ops Note" e-mail contained a negative pressure test procedure that was consistent with the standard of care in the industry at the time.  Tr. 5013-14 (Barnhill); Tr. 2219 (Heenan) (BP met the standard of care for an operator in the way the negative pressure test was written); Tr. 7524-25, 7791 (Bourgoyne) (procedure for the negative pressure test was appropriate and in accordance with industry practice); TREX 000097; TREX 000547.1.1.BP.  *See also* Tr. 4498-99 (Barnhill); Tr. 6236 (Ambrose) (agreeing that the way the negative pressure test was written and performed met the standard of care for an operator).  As part of the temporary abandonment procedure for the Macondo well, the negative pressure test designed by BP satisfied its intended purpose and it did not compromise the safety of the operations or increase the risk of a well blowout.  Tr. 8773 (Guide).

907.    Although the negative pressure test was not required by regulation, it was a routine test and one that the rig crew and wellsite leaders were familiar with and had experience in conducting.  Tr. 1802 (Ezell); Tr. 4363 (Barnhill); Tr. 7561-62 (Bourgoyne); Tr. 2027-28 (R. Sepulvado).

908.    As of April 20, 2010, there was no industry guidance regarding negative pressure tests, or how they should be conducted or interpreted.  Tr. 4473-74 (Barnhill); Tr. 2213 (Heenan); Tr. 6228 (Ambrose); K. Lacy Dep. 479; TREX 000001 at 85.  Prior to April 20, 2010, there is no evidence of any industry textbook that addressed negative pressure tests, or any published papers or peer-reviewed articles concerning the proper method of conducting a negative pressure test.  Tr. 2212 (Heenan).  Similarly, there is no evidence of any written policy

from industry operators prior to April 20, 2010 concerning how to perform a negative pressure test. Tr. 2213 (Heenan). Indeed, drilling crews were often given instructions that are as simple as "conduct a negative test." Tr. 2212 (Heenan).

**a.  The Negative Pressure Test Procedure Was Discussed With the Transocean Rig Crew Multiple Times on April 20, 2010 Before it Commenced.**

909.   The specific procedure for the negative pressure test at the Macondo well was discussed with Transocean rig personnel on the April 20, 2010 morning call with BP onshore personnel, which included a discussion of the fact that the test would be monitored on the kill line in accordance with the MMS-approved permit. Tr. 44472-73 (Barnhill); Tr. 8772 (Guide).

910.   The negative pressure test was also discussed at approximately 11:30 on April 20, 2010 during the pre-tour meeting with all rig crew members changing tour at that time. Tr. 8272-73 (Lambert).

911.   The rig crew again discussed the negative pressure test procedure during a task specific THINK plan meeting, or "toolbox talk" led by Transocean Toolpusher Wyman Wheeler about the displacement procedures that took place in the drill shack from approximately 14:30 to 15:00, immediately prior to conducting the negative pressure test. Tr. 8273-74 (Lambert); TREX 041022.1.2.BP; *see also* Lindner Dep. 253-55, 343-46.

912.   The Transocean crew was capable of setting up a negative pressure test, regardless of the planned configuration for the conduct of that test (*i.e.*, monitored on drill pipe or kill line). Tr. 1802 (Ezell). The Transocean rig crew understood how to conduct a negative pressure test and crew members were not afraid to ask questions if there was anything they were unsure about. Burgess Dep. 379-81. If the Transocean rig crew had any issues or concerns about the negative pressure test or the way the test was going to be conducted, they would have raised those concerns, but they did not do so. Tr. 4472-73 (Barnhill).

191

913.    The Transocean rig crew was experienced at conducting and interpreting negative pressure tests.  Tr. 4474-75, 4492 (Barnhill).  The Transocean rig crew was also aware of the purpose of a negative pressure test in the context of temporary abandonment operations.  Tr. 4360 (Barnhill).  The rig crew did not need to be instructed how to conduct a negative pressure test because it is a routine operation and the concepts behind a negative pressure test are taught in well control school.  Tr. 7525-26 (Bourgoyne); Tr. 4363 (Barnhill); TREX 008173.52.1.BP.

914.    Just prior to coming to the Macondo well, the Transocean rig crew on the *Deepwater Horizon* had conducted a negative pressure test at the Kodiak well.  Tr. 4475 (Barnhill); TREX 003326; *see also* Tr. 6228 (Ambrose).  The January 28, 2010 e-mail from the *Deepwater Horizon* Assistant Driller's e-mail account to the *Deepwater Horizon* Toolpusher's account attaching the procedure to be followed at the Kodiak well shows that the procedure used there was similar to that used at the Macondo well, and that the level of detail provided to the rig crew was also similar.  TREX 003326.

915.    The January 29, 2010 IADC Daily Drilling Report for the *Deepwater Horizon*'s operations at the Kodiak well also shows that the negative pressure test was conducted that day.  TREX 007652.  The January 29, 2010 IADC Daily Drilling Report also shows that several members of the team that participated in conducting the negative pressure test at the Macondo well were also on the *Deepwater Horizon* when it conducted a negative pressure test at the Kodiak well, including BP WSL Don Vidrine and Transocean Toolpusher Randy Ezell and Driller Micah Burgess, each of whom signed off on that form.  TREX 007652.

916.    Transocean also had a generic THINK plan document for negative pressure tests, which provided guidance to its employees as to how to set up, conduct and interpret such tests.  TREX 004640.  This procedure specified, among other things, that the rig crew was responsible

for double-checking the lines to ensure that the flow path was open.  Tr. 4476 (Barnhill); TREX 004640 at 1.

917.   The *Deepwater Horizon* also had at least one prior written negative pressure test procedure that was developed jointly by Transocean Toolpusher Jason Anderson, and BP wellsite leader, Murry Sepulvado.  Tr. 1867 (Ezell).

918.   The rig crew and BP personnel at Macondo understood how the negative pressure test would be conducted and what the procedures would be, and there was no confusion concerning the rig crew's roles and responsibilities.  Tr. 8274 (Lambert).  *See also* Tr. 7930-31 (Robinson); TREX 037031.19.1.BP (Transocean Driller, Wyman Wheeler, informed BP wellsite leader, Bob Kaluza, that he was comfortable with the procedure for the negative pressure test).

919.   The Transocean rig crew on the *Deepwater Horizon* was responsible for:  (1) lining up the negative pressure test; (2) verifying that the lines, valves, and gauges were in proper working order to enable accurate readings relevant to the test; and (3) collaborating with the wellsite leaders in understanding whether the test was "right or not."  Tr. 4521-22 (Newman).  *See also* Tr. 970 (Bly); Tr. 8898 (Guide).  Transocean was also required to monitor the Macondo well and take appropriate actions during the negative pressure test in accordance with the standard of care applicable in the deepwater oil exploration industry.  Transocean Guilty Plea Agreement Exhibit A ¶ 9 (TREX 063213).

### b.   Conducting the Negative Pressure Test.

920.   The operations performed on the rig for the negative pressure test on April 20, 2010, mirrored the steps outlined in Morel's "Ops Note" e-mail to the rig.  Tr. 8896-97 (Guide); TREX 000097; TREX 000547 at 1.

921.   Following completion of the successful positive pressure test, the Transocean rig crew began the displacement procedure by running the drill pipe in the hole to a depth of 8,367',

in accordance with the procedure set forth in the April 20, 2010 "Ops Note" e-mail.  TREX 000001 at 24, 83; TREX 000097; Tr. 4323 (Barnhill).  From approximately 15:00 to 16:00, the Transocean rig crew pumped seawater to displace mud in the boost choke and kill lines.  Tr. 7924 (Robinson); TREX 037031.13.2.BP; TREX 000001 at 24, 39.

922.    At approximately 16:00, the rig crew began pumping spacer and seawater down the drill pipe to displace the drilling mud in the pipe and the upper part of production casing.  TREX 000001 at 24, 39; TREX 000567; Tr. 4323 (Barnhill).  Spacer was pumped down the drill pipe ahead of the seawater to provide separation between the mud and the seawater in the casing.  TREX 000001 at 24, 39; TREX 000567.  The members of the rig crew continued pumping seawater until they displaced mud in the casing above 8,367 feet with seawater.  TREX 000001 at 24, 39; TREX 000567.

923.    The spacer material and the weighted mud was intended to be placed above the BOP before closing the BOP to conduct the negative pressure test, so as not to interfere with the test because it is unknown how it may or may not affect the test.  Tr. 4317-18 (Barnhill); Tr. 963 (Bly).

924.    At approximately 16:54, an annular preventer was closed to isolate the hydrostatic head of the fluids in the riser from the well, in order to conduct the negative pressure test.  Tr. 1467-68 (Bly); TREX 000001 at 24, 39.  After closing the annular preventer, however, the rig crew discovered that the annular failed to seal around the drill pipe.  Tr. 1869 (Ezell); Tr. 1467-68 (Bly); TREX 000001 at 24, 39, 85.  Due to the failure of the annular preventer to seal around the drill pipe, approximately 50 barrels of heavy spacer were allowed to leak down past the annular preventer.  Tr. 1869 (Ezell); Tr. 965 (Bly); Tr. 1467-68 (Bly); TREX 000001 at 24, 39,

85.  *See also* Lindner Dep. 271-73 (Lindner heard the assistant driller state 61 barrels were lost past the annular).

925.    At 16:59, drill pipe pressure increased from 273 psi to 1250 psi over a period of six minutes.  TREX 000001 at 24.  Shortly thereafter, the rig crew increased the hydraulic closing pressure for the annular preventer, successfully sealed the annular preventer against the drill pipe, and stopped fluid from continuing to leak past the annular.  Tr. 1869 (Ezell); Tr. 2079-80 (Heenan); Tr. 1468 (Bly); TREX 000001 at 24, 39.  Additional mud was pumped in the hole to make up for what had leaked.  Tr. 1869 (Ezell); Tr. 2079-80 (Heenan).

926.    As a result of the fluid that leaked past the annular preventer, "spacer material was unintentionally placed across the kill line at the BOP.  At least 3 bbls of highly viscous fluid (occupying approximately 150 feet in the kill line) could have been drawn into the kill line during this part of the test."  TREX 000001 at 86.

### c.    The Negative Pressure Test Performed on the Drill Pipe.

927.    At approximately 17:00, the Transocean rig crew began performing the negative pressure test on the drill pipe.  TREX 000001 at 24; Tr. 4328 (Barnhill); Tr. 1675 (Ezell).  The rig crew typically used the drill pipe to conduct negative pressure tests, and, consistent with its regular practice, they began the negative pressure test on the drill pipe.  Tr. 1675 (Ezell); Tr. 1327-28 (Bly); TREX 000001 at 85.

928.    To conduct the negative pressure test on the drill pipe, the Transocean rig crew opened the valve on the drill pipe to bleed off residual drill pipe pressure, and seawater was flowing up through the drill pipe.  Tr. 2077 (Heenan); TREX 000001 at 39, 85.  Approximately 15-23 barrels of seawater were bled off at the cement unit.  TREX 000001 at 39, 85; TREX 003576 (Daigle handwritten interview notes of Kaluza); Tabler Dep. 221, 337-38 (indicating he bled back a total of 15 barrels during the negative pressure test, was told by Transocean Driller,

Dewey Revette, it was a result of "a U-tube effect" and approximately 20 minutes later, Tabler bled an additional volume of approximately 10 barrels).

929.   The BP IIT estimated that the bleed back volume should have been a much smaller volume, approximately 3.5 barrels of fluid, if the well's pressure integrity was intact. TREX 000001 at 39, 85 (referring to TREX 000002 at BP-HZN-BLY 00000384 IIT Appx. R, Fluid Compressibility Calculations).   "This excess flow from the drill pipe, with the well in an underbalanced condition, should have indicated to the rig crew a communication flow path with the reservoir through failed barriers."   TREX 000001 at 39.   *See also* TREX 000001 at 85 ("These calculations suggest that hydrocarbons first entered the wellbore during this bleed."). TREX 003651.

930.   The drill pipe was then closed again and the pressures on both sides should have been the same, but they were not; the drill pipe pressure returned to over 1,200 psi.  Tr. 2077-78 (Heenan) Tr. 7924 (Robinson).

### d. Transocean Toolpusher Jason Anderson Explained the Pressure Abnormality as a "Bladder Effect."

931.   The rig crew discussed the pressure abnormality observed during the negative pressure test and Transocean's Toolpusher Jason Anderson, who did not survive the casualty, suggested that the pressure on the drill pipe was caused by a phenomenon referred to as annular compression or "bladder effect," a phenomenon that the Transocean rig crew had purportedly witnessed previously.  Tr. 2222 (Heenan); Tr. 4481 (Barnhill); Tr. 7209-10 (Beck); Tr. 1096 (Bly); Tr. 8939-41 (Guide); TREX 000001 at 89.

932.   The explanation that is now referred to as the "bladder effect" came from Transocean Toolpusher, Jason Anderson.  Tr. 8302 (Lambert); Tr. 8281 (Lambert); D4429.  BP wellsite leader trainee, Lee Lambert, asked Anderson where the pressures were coming from.

Tr. 8280-81 (Lambert).   Anderson explained that the heavy mud weight in the riser would transmit pressure through the annular preventer into the wellbore that would, in turn, be seen on the drill pipe.  Tr. 8280-81 (Lambert).  Anderson indicated he had seen this before and that it was normal.   Tr. 8280-81 (Lambert).   The phenomenon described by Anderson has since been referred to as the "bladder effect."  Tr. 8280-81 (Lambert).

933.   Interview notes taken by BP IIT member, Steve Robinson during an interview with BP wellsite leader Don Vidrine, indicate that the Transocean rig crew believed the "annular compression" or "bladder effect" had been witnessed before: "… Kaluza was told by senior toolpusher and tour pusher they called it annular compression.  Said it was normal …."  Tr. 7924 (Robinson).  Robinson's interview notes of Kaluza also state:  "On drill pipe side, pressure was building.  Jason said it was bladder effect.  Driller said he had seen this before also …"  Tr. 7932-33 (Robinson); TREX 037031.22.

934.   Vidrine indicated in post-accident interviews that the drill crew began to laugh and make fun of him because of the extent to which he persisted in questioning whether the test had been successful or not.  Tr. 7927 (Robinson); Tr. 4341 (Barnhill); TREX 000003A.2.2.BP ("somewhat joked about my concern over drill pipe – they found it humorous that I continued talking about"); TREX 037031.15.4.BP.

935.   After discussing the theory offered by Anderson, the rig crew and the wellsite leader reportedly concluded that the explanation was plausible.  Tr. 1096 (Bly); TREX 000001 at 89; Tr. 7932-33 (Robinson).  The rig crew and the wellsite leader appeared satisfied that the bladder effect or annular compression theory offered by Anderson explained the differential pressure, and "[n]obody seemed concerned about it."  Tr. 8282 (Lambert).

### e.      The Negative Pressure Test Performed on the Kill Line.

936.    As the negative pressure test was being conducted on the drill pipe, BP wellsite leader Don Vidrine raised the issue that the test should be monitored on the kill line, in accordance with the MMS permit.  Tr. 1675, 1679, 1801 (Ezell); Tr. 1328-29 (Bly); Tr. 7206 (Beck); TREX 000001 at 85.  The Application for the Permit to Modify that was submitted to, and approved by, the MMS included references to conducting the negative pressure test on the kill line.  TREX 000570.  The rig crew was aware that the negative pressure test, as reflected in the MMS approved permit, was to be monitored on the kill line.  Tr. 8772 (Guide).

937.    During this time, there was a shift change, and Transocean's Senior Toolpusher Randy Ezell told Transocean's Toolpusher Jason Anderson to stop the job and have a safety meeting with everybody to make sure everyone was on the same page before continuing the negative pressure test.  Tr. 1680 (Ezell); Ezell Dep. 209-210.  Accordingly, the negative pressure test was completed on the kill line rather than the drill pipe.  Tr. 4334-35 (Barnhill); TREX 000005 at 2.

938.    Negative pressure tests can be performed on either the drill pipe or kill line.  Tr. 6229 (Ambrose); Breazeale Dep. 430.  The Transocean rig crew was capable of conducting a negative pressure test on either the drill pipe or the kill line.  Tr. 1802 (Ezell); Tr. 4470 (Barnhill).  The Transocean rig crew on the *Deepwater Horizon* had previously performed negative pressure tests using either the drill pipe or the kill line.  Tr. 4369 (Barnhill); *see also* Tr. 4475-76 (Barnhill).

939.    The kill line was then filled with seawater, lined up to mini trip tank, and opened to monitor for flow.  TREX 000001 at 86.  Initially, a small amount of fluid (0.2 barrels) flowed from the kill line, but no further flow was observed while the kill line was monitored for 30

minutes.  Tr. 7924 (Robinson); TREX 000001 at 39, 86; TREX 003573 (Vidrine-Kaluza joint handwritten statement); TREX 003576.

940.    When the kill line was closed, pressure on the drill pipe gradually increased to 1400 psi and then stabilized.  TREX 000001 at 86.  During the 30 minutes when no flow was observed from the kill line, the drill pipe pressure remained constant at 1400 psi.  Tr. 7924 (Robinson); TREX 00001 at 39, 86; TREX 003573; TREX 003576.  Although the drill pipe pressure remained constant at 1400 psi, the absence of flow from the kill line for 30 minutes led the Transocean rig crew and BP wellsite leaders to believe the negative pressure test on the kill line was successful.   Tr. 4336 (Barnhill); TREX 003573 at BP-HZN-2179-00252246 ("Successful negative test monitored at the kill line.").

941.    The reason for the anomalous pressure indications of 0 psi on the kill line and 1400 psi on the drill pipe during the negative pressure test on the kill line has not been definitively established.  Agreed Stipulations No. 174 (Feb. 29, 2012) (Rec. Doc. 5927).  The anomalous pressure indications of 0 psi on the kill line and 1400 psi on the drill pipe during the negative pressure test on the kill line may have been caused by some type of blockage, but was more likely caused by a valve on the kill line that was inadvertently closed.  Tr. 963-64; 1489 (Bly); TREX 000001 at 87.

### f.    The Negative Pressure Test Was Deemed Successful.

942.    At 19:55, the negative pressure test was concluded and deemed to be a successful test.  Tr. 1104 (Bly); TREX 000001 at 25.  Although the negative pressure test performed at the Macondo well on April 20, 2010 provided multiple indications that the wellbore was not secure, the situation was not recognized by the Transocean rig crew or the BP wellsite leaders at the time of the test, and as a result, remedial steps were not taken.  TREX 000001 at 39.

943.   During a negative pressure test, if pressure is bled off to zero, any pressure increase above zero pounds per square inch or fluid flow not otherwise accounted for may be an indication that the well is not secure.  Transocean Guilty Plea Agreement Exhibit A ¶ 8 (TREX 063213).  A successful negative pressure test would show no pressure on the drill pipe and no pressure on the kill line.  Tr. 969 (Bly).  An anomaly in a negative pressure test is a potential indication that the barriers to flow in the wellbore have not been confirmed.  Tr. 4362 (Barnhill).

944.   Pressure differences on the lines were a potential indication that something was wrong – either pressure was coming up from the formation or something was wrong with the configuration of the negative pressure test.  Tr. 2077-78 (Heenan).

945.   During the negative pressure testing performed on April 20, 2010, the Transocean rig crew was aware of the pressure anomalies.  Tr. 4332-33 (Barnhill); Tr. 8278-79 (Lambert); Transocean Guilty Plea Agreement Exhibit A ¶¶ 10-11 (TREX 063213).   The rig crew observed pressure build up on the drill pipe multiple times; this "abnormal pressure" continued to be observed even after primary monitoring had switched over from the drill pipe.  Tr. 4332-33 (Barnhill); Tr. 8278-79 (Lambert); Transocean Guilty Plea Agreement Exhibit A ¶¶ 10-11 (TREX 063213).  Specifically, Transocean rig crew members Revette, Anderson, and Clark were all aware of the fact that the negative pressure test was showing differential pressure on the drill pipe and the kill line.  Tr. 4364 (Barnhill).

946.   The pressure readings observed while conducting the negative pressure test on the kill line – 1,400 psi on the drill pipe and the 0 psi on the kill line – were an anomaly that indicated that well integrity had not been established and the wellbore barriers were not verified.  Tr. 4346 (Barnhill); Tr. 968 (Bly); Tr. 1330 (Bly).  One would expect:  (1) the senior toolpusher; (2) the driller; and (3) the company man each to separately stop and investigate any instance

where, during a negative pressure test, they observed pressure build up following attempts to bleed pressure off. Tr. 4482-83 (Barnhill).

947.    The lack of flow from what was believed to be an open kill line, coupled with the erroneous explanation for the 1400 psi in the drill pipe, led the BP wellsite leaders and the Transocean rig crew to the incorrect view that the negative pressure test was successful and that integrity was established. Tr. 968 (Bly); TREX 000001 at 89 (Bly Report). The Transocean rig crew and the BP wellsite leaders appeared to accept the "bladder effect" concept as an explanation for the anomalous pressures observed during the negative pressure test. Tr. 8282 (Lambert).

948.    Despite the crew's belief, there is no evidence to support the "bladder effect" or "annular compression" concept as a possible explanation for the anomalous pressures, and no witness was even familiar with the concept in the context of a temporary abandonment procedure. Tr. 8939-41 (Guide); Tr. 1096 (Bly); TREX 000001 at 89; Tr. 1862 (Ezell); Tr. 1945 (R. Sepulvado); Tr. 4340 (Barnhill); Tr. 7176 (Beck).

949.    The spacer that leaked through the annular preventer gave the crew a "ready explanation" for what was happening during the negative pressure test – though one that was, unfortunately, incorrect. Tr. 4368 (Barnhill); Tr. 4365 (Barnhill). Both Transocean and BP personnel had convinced themselves that they were dealing with a sealed, secure well and it was okay to move forward. Tr. 4367 (Barnhill). Although the crew should have recognized the anomalous pressure indications as an indication that well integrity had not been established, both the Transocean rig crew and the BP wellsite leaders – despite more than 100 years of collective experience – mistakenly believed that the negative pressure test was successful and that the

wellbore was secure.  Tr. 4345 (Barnhill); Tr. 961 (Bly); Tr. 6229 (Ambrose); TREX 000001 at

10.  *See also* TREX 000001 at 88, Fig. 4.

950.    BP wellsite leaders mistakenly believed that the negative pressure test indicated

that well integrity was established.  Tr. 7578 (Bourgoyne); Tr. 8898 (Guide); Tr. 7928-29, 7932-

33, 7985 (Robinson); TREX 037031.22; TREX 003573 ("Successful negative test monitor at the

kill line.").  Transocean rig crew members also independently believed that the negative pressure

test was successful and mistakenly believed that well integrity had been established.  Tr. 1687-88

(Ezell); Tr. 4482 (Barnhill); Tr. 6124 (Ambrose); Tr. 7527 (Bourgoyne).

951.    Transocean OIM Jimmy Harrell was "very aware of the rig operations" and

believed that "[t]hey had conducted successful inflow test/pressure test.  No flow on flowcheck."

Tr. 4738-39 (Newman); TREX 001472 at 1; TREX 001472.  Transocean Rig Manager, Paul

Johnson, likewise believed that both Harrell and Transocean Senior Toolpusher Randy Ezell

were both satisfied that the barriers had been suitably tested and that the negative pressure test

was properly conducted.  P. Johnson Dep. 403.

952.    Both Harrell and Transocean Toolpusher Jason Anderson told Ezell by phone at

approximately 21:20 that the negative pressure test was a good test, and that they watched it for

30 minutes and there was no flow.  Tr. 1682, 1805 (Ezell).  *See also* Tr. 6233-34 (Ambrose);

TREX 050296 at 3.  If Harrell, Ezell, or Anderson had any concern about the results of the

negative pressure test, they had the authority to stop work.  None came to Transocean Rig

Manager Daun Winslow with any concerns, and Harrell affirmatively told Winslow that

everything on the floor was good.  Winslow Dep. 451-54.

953.    The abnormal pressure on the drill pipe was ultimately neither correctly explained

nor remediated.  Transocean Guilty Plea Agreement Exhibit A ¶ 11 (TREX 063213).  The

Transocean rig crew on the *Deepwater Horizon* commenced but did not complete its investigation of the pressure build up on the drill pipe. Transocean Guilty Plea Agreement Exhibit A ¶¶ 10-11 (TREX 063213).

954. Following the conclusion that the negative pressure test was successful, Transocean agreed with the instruction of BP's wellsite leaders to proceed with displacing the heavier drilling mud in the well with lighter weight seawater. Tr. 7728 (Bourgoyne); Transocean Guilty Plea Agreement Exhibit A ¶ 12 (TREX 063213). Had they questioned or disagreed with that decision, any Transocean employee on the rig could have stopped work and questioned whether proceeding with displacement was safe – but none did so. Tr. 4657-58 (Newman). The crew's behavior in proceeding with the displacement operations was consistent with thinking they had established well integrity. Tr. 6060 (Ambrose). As Transocean drilling expert Calvin Barnhill explained, the crew operated on the premise of "[w]e understand this; it's an unbalanced column; let's go," but because the decision on the interpretation of the negative pressure test was wrong, this too was a misinterpretation of the situation and they were wrong in agreeing to proceed with displacement. Tr. 4366 (Barnhill).

### g. The Negative Pressure Tests Were Conducted in Accordance with the April 16 MMS-Approved APM.

955. Consistent with the industry standard at the time, the procedure described in the April 16, 2010 Application for Permit to Modify contained limited detail concerning how the negative pressure test would be conducted. Tr. 2211-13 (Heenan).

956. It stated that the temporary abandonment procedure would include, in part: "1. Negative pressure test casing to seawater gradient equivalent for 30 min. with kill line. 2. TIH with a 3 1/2" stinger to 8367'. 3. Displace to seawater. Monitor well for 30 min." TREX 000570.3.2.BP.

957.   Although the language contained in BP's April 16, 2010 Application for Permit to Modify was broad and not detailed, members of BP's Macondo wells team communicated multiple times about the procedure for the negative pressure test, and expressed a consistent understanding of how the test would be performed. Tr. 8894 (Guide); (one test on the kill line) Tr. 8770-72 (Guide) (at no time did Guide think they were going to conduct two negative pressure tests); Walz Dep. 785-86.  *See also* Frazelle Dep. 60-61, 505.

958.   On April 20, 2010, the operational steps performed by the rig crew to conduct the negative pressure test were consistent with this understanding, as well as with the procedure set forth in Brian Morel's "Ops Note" e-mail of the same day. Tr. 8896-97 (Guide); TREX 000547. *See also* Frazelle Dep. 58, 60-61 (negative pressure test as conducted on April 20, 2010, was consistent with the April 16, 2010 APD that was submitted to the MMS).

959.   Conducting the negative pressure test with seawater at a depth shallower than 8367' would not achieve the purpose of the negative pressure test.  By displacing seawater down to 8367' prior to conducting the negative pressure test, the crew was able to simulate the differential pressure that that would be seen when the well was temporarily abandoned, which is the purpose of the negative pressure test.  Tr. 8765-69, 8773 (Guide); Tr. 2076-2077 (Heenan); M. Sepulvado Dep. 570-76 (In order to test the well at the pressure levels that it would see with the top cement plug, the negative pressure test would need to be done at 8367'.).

960.   Similarly, if a cement plug had been placed in the well before the test was conducted, the negative pressure test would not have provided any indication concerning the integrity of the shoe track barrier. Tr. 7791 (Bourgoyne); Tr. 4500-01 (Barnhill).

961.   The reference to "monitor the well," as used in BP's permit, was not a reference to an additional negative pressure test. The language in the April 16, 2010 APM that refers to

"3. Monitor well for 30 minutes" is consistent with routine flow checks that were conducted on a regular and frequent basis at various points throughout all operations, not a negative pressure test. TREX 041022 (Daily Drilling Report for April 20, 2010 showing at least 13 instances during operations on that day when the crew "monitored the well"). Drillers constantly monitor the well and routinely conduct flow checks because drilling is a dynamic process and they must be ready for unanticipated events. Tr. 1750-51, 1833 (Ezell); Tr. 4724 (Newman). BP Wells Team Leader John Guide also did not understand the language to indicate to monitor the well for 30 minutes and ensure no flow to be a second negative pressure test; rather, he understood it to just be a flow check. Tr. 8769 (Guide).

### h. Transocean and BP Both Misinterpreted the Results of the Negative Pressure Test.

#### i. BP and Transocean Shared Responsibility for Interpreting the Negative Pressure Test.

962. Both Transocean and BP were responsible for interpreting the negative pressure test. Tr. 8787 (Guide). Accordingly, the Transocean rig crew and the BP wellsite leaders were required to reach agreement regarding the observations during the negative pressure test before operations could continue. Tr. 4481-82 (Barnhill).

963. The decision to deem the negative pressure test successful was a group decision, and nobody would have proceeded unless the team was satisfied and convinced that it was safe to proceed. Tr. 970 (Bly); Cowie Dep. 210-11; Lee Dep. 240, 353-54, 638. If the Transocean drillers, assistant drillers, or toolpushers had seen anything that concerned them with respect to the negative pressure test, they would have halted the procedure and expressed their views to the BP wellsite leader. Tr. 1861-62 (Ezell); Roller Dep. 33-36.

964. Either BP or Transocean personnel could have stopped and taken whatever steps thought necessary to further investigate the negative pressure test anomaly, but neither did. Tr.

970-71 (Bly); Tr. 7366 (Beck) (if anyone involved in the negative pressure test wanted to they could stop the job).

965.    The crew spent three hours performing and interpreting the negative pressure test, from approximately 17:00 to 20:00, which included multiple discussions about the results of the test among company men, toolpushers, the OIM, and the drill crew.  Tr. 4328, 4480 (Barnhill). The fact that Transocean and BP spent significant time attempting to conduct the negative pressure test multiple times and attempting to understand the anomalies being observed demonstrates that everyone involved was working to understand the situation and get the negative pressure test right.  Tr. 4480 (Barnhill).

966.    There is no evidence that the people on the rig involved in the negative pressure test did not care about the safety of one another or the outcome of the test.   Tr. 7527-28 (Bourgoyne).   The Transocean rig crew took their jobs very seriously, paid attention to the negative pressure test operations, and were trying to solve the problem during the negative pressure test.  Tr. 8301, 8306 (Lambert).

967.    Both the Transocean rig crew and BP wellsite leaders involved in the negative pressure test at Macondo understood the importance of the test and knew that an unsuccessful test would indicate potential issues in the well that would need to be addressed before proceeding.  Tr. 4361-62 (Barnhill).

968.    There is no evidence that the Transocean rig crew, the BP personnel or anyone involved in the negative pressure test was trying to get it wrong, that anyone acted with indifference towards the safety of themselves or others, or that anyone intentionally or maliciously misinterpreted the negative pressure test.  Tr. 7209, 7367-68 (Beck).  They wanted to get the test right, and would not have intentionally put their own lives, or anybody else's lives, in

danger.  Tr. 2123 (Heenan); Tr. 4481 (Barnhill); Tr. 7527 (Bourgoyne).  Every member of the team had everything to lose and nothing to gain by making the mistake.  Tr. 7728-29 (Bourgoyne); TREX 008174.10.1.TO.  Rather, the crew was working together to try and get to the right answer.  Tr. 7570 (Bourgoyne).

969.    No one involved in the negative pressure test gave any indication that he thought the well was flowing.  Tr. 8301 (Lambert).

970.    Although it was misinterpreted, the negative pressure test procedure achieved its intended purpose, in that it did show signs that well integrity had not been established.  Tr. 8773 (Guide); Tr. 5014 (Barnhill); Tr. 2221 (Heenan).   The negative pressure test itself did not compromise the safety of the operations or increase the risk of a well blowout.  Tr. 8773 (Guide).  The negative pressure test at Macondo provided accurate information about the integrity of the well, repeatedly and consistently answering the very question it was intended to answer.  Tr. 5014 (Barnhill); Tr. 2221 (Heenan).

### ii.    The Misinterpretation of the Negative Pressure Test Was One of Several Proximate Causes of the Incident.

971.    The negative pressure test was misinterpreted, and that misinterpretation was one cause, among others, of the Incident.  TREX 089052.  Both BP and Transocean personnel made a mistake in not correctly interpreting the negative pressure test.  Tr. 7728-29 (Bourgoyne); TREX 008174.10.1.  This mistake was one of a series of breakdowns that, in combination, allowed the blowout to happen.  Tr. 7728-29 (Bourgoyne); TREX 008174.10.1.  However, the misinterpretation of the negative pressure test was not, however, the sole cause of the Incident.  Tr. 1092-93 (Bly) ("…it wasn't any one action or  inaction; that there were interlinked things, there were multiple factors, including designs, operating steps, etcetera, and multiple people, work teams and multiple companies were  involved over time.") (referring to D3584, the 'Swiss

Cheese' model, Fig. 1 from the Bly Rpt. (TREX 000001 at 32)).  *See also* Tr. 6183-84 (Ambrose) ("multiple causes" contributed to the Incident).  The misinterpretation of the negative pressure test does not justify a conclusion of willingly and knowingly proceeding with a disregard for safety.  Tr. 7728-29 (Bourgoyne); TREX 008174.10.1.

### 6.   Halliburton's Mud Logger Was Able to Continuously Monitor the Well on April 20, 2010.

#### a.   Halliburton's Mud Logger Was Aware of the Planned Rig Operations When He Came on Tour and He Had No Concerns about His Ability to Monitor the Well.

972.   Joseph Keith was Halliburton's mud logger onboard the *Deepwater Horizon* at the time of the Incident.  Tr. 3488-89 (Keith).  Keith's shift began at 18:00 on April 20, 2010, and was to run through 06:00 on April 21.  Tr. 3669 (Keith).

973.   Keith arrived approximately 30 minutes before his shift to meet with Cathleenia Willis – another Halliburton mud logger onboard the *Deepwater Horizon* – to discuss rig operations before relieving her from duty.  Tr. 3532, 3664 (Keith).  Keith and Willis met for approximately 15 minutes, and they discussed the rig activities that took place earlier that day, the rig activities planned for that evening, and the M-I displacement procedure.  Tr. 3532-33, 3664, 3666 (Keith); TREX 000967; *see also* TREX 000567.  Keith also reviewed Willis's notes to understand what happened during her tour, as well as the data on the mud logging monitors. Tr. 3665-66 (Keith).

974.   At the time Keith's shift began, the rig crew had already completed the preparatory steps set forth in the M-I displacement procedure, including "Pump[ing] excess volume to Bankston."  Tr. 3667 (Keith); TREX 000967; *see also* TREX 000567.  The rig crew was proceeding with the displacement procedure and had already circulated the spacer up above

the wellhead to prepare for the negative pressure test.  Tr. 3670 (Keith); TREX 000967; *see also* TREX 000567.

975.    After his meeting with Willis, Keith was aware of the rig activities that were planned for the rest of the evening.  Tr. 3668 (Keith).  Keith did not have any questions about the M-I displacement procedure, and was aware that the procedure called for the rig crew to "switch [returns] to overboard discharge" at the time of the sheen test, which would bypass the Sperry flow-out meter.  Tr. 3667-68 (Keith); TREX 000967; *see also* TREX 000567.  Keith also knew there would be pit transfers, or movement of drilling fluids from one pit to another, during the displacement procedure.  Tr. 3669 (Keith).

976.    During their handoff meeting, Willis did not express any concerns to Keith about the movement of mud during displacement affecting her ability to accurately and continuously monitor the well from a mud logging perspective.  Tr. 3669 (Keith).  Nor did Willis express any concerns to Keith about any of the completed or planned rig activities with respect to the mud loggers' duties.  Tr. 3669 (Keith).  Likewise, Willis never expressed any concerns to Transocean's Senior Toolpusher, Randy Ezell, about her ability to monitor the well or the safety of the operations on the rig.  Tr. 1860-61 (Ezell).

> **b.    Halliburton's Mud Logger Was Responsible for Continuously Monitoring the Well and Alerting the Rig Crew and Company Man of Any Kick Indicators.**

977.    From the start of his tour at 18:00 until the Incident, Keith was the only Halliburton mud logger working in the mud logger shack.  Tr. 3670 (Keith).  His only responsibility when he was on duty on the evening of April 20 was to continuously monitor the data and the well conditions.  Tr. 3490, 3670 (Keith); J. Bement Dep. 139, 229-30, 234-35.  Monitoring the well during displacement was a safety critical activity because if a kick were missed it could turn into a blowout.  Tr. 3502-03 (Keith).

978.    Keith's job was not to interpret the data, but rather to monitor for potential problems in the well and report any anomaly even if he was not certain that it was a kick indication.  Tr. 3502, 3643, 3490 (Keith); Tr. 2193 (Heenan).  To report an anomaly, the mud logger should first call the rig floor (Transocean Driller or Assistant Driller), and then alert the company man.  Tr. 3490, 3504, 3593, 3690 (Keith); Tr. 2193 (Heenan); Kronenberger Dep. 158.

### c.    Halliburton's Mud Logger Was Able to Perform His Job Fully and Capably on April 20, and Ongoing Rig Operations Did Not Prevent Halliburton from Monitoring the Well.

979.    Keith was able to perform his job fully and capably on April 20, 2010.  Tr. 3625 (Keith).  He was able to accurately monitor all data he was supposed to monitor from the mud logging shack while he was on tour, and none of the rig activities on April 20 interfered with his ability to do his job.  Tr. 3673-74 (Keith).  Moreover, Keith was not under stress while working on the *Deepwater Horizon*, and he never felt overworked or pressured.  Tr. 3712-14 (Keith).

980.    To monitor the well, mud loggers use both trend lines and digital readings of the well data.  Tr. 3505-06 (Keith); D3182; D2357.  Some of the key parameters to monitor are flow-in, flow-out, drill pipe pressure, and pit volumes.  Tr. 3504-05 (Keith); Tr. 2130-31, 2182 (Heenan) Tr. 7215-16 (Beck); Tr. 3002 (Probert).

981.    All equipment in the mud logger's shack was functioning properly up until the Incident.  Tr. 3625 (Keith).  If Keith had been concerned about a trend in the data, he had the ability to adjust the scale of the data or isolate one of the parameters.  Tr. 3504 (Keith).

982.    Keith knew that an increase in flow rate at the flow line was a potential indication of a kick, and flow rate was one of the parameters that Keith was monitoring on April 20.  Tr. 3585-86 (Keith); TREX 060998 at 159.  Flow rate is monitored by comparing flow-out and flow-in rates.  Gisclair Dep. 315.  Flow-out is flow back to the rig ("[f]low [that] is coming from the

wellbore back up to the surface); flow-in is the flow of fluids pumped into the well ("[u]p and down the hole").  Tr. 3691 (Keith).

983.    Keith was able to accurately monitor flow-in because the Sperry system can calculate the flow-in based on total pump strokes and the volume pumped.  Tr. 3518, 3671 (Keith); Tr. 7765-66 (Bourgoyne); Gisclair Dep. 341-42.

984.    Keith was also able to monitor flow-out, until the time when fluids were diverted overboard after the sheen test.  Tr. 3668 (Keith).  He did not raise any concerns when he was not able to observe flow-out after diversion overboard because it was a common practice to divert during displacement.  Tr. 3698 (Keith).  Keith knew the Transocean crew still had access to data from a separate flow-out meter and could continue to monitor flow-out.  Tr. 3697-98 (Keith); *see also* Tr. 7768-69 (Bourgoyne); Tr. 2154-55 (Heenan).

985.    At all times, Keith was able to monitor drill pipe pressure.  Tr. 3671-72 (Keith); Bement Dep. 140.  An increase or decrease in drill pipe pressure is another kick indicator, and a rapid increase in drill pipe pressure implicates safety concerns.  Tr. 7770-72 (Bourgoyne); Gisclair Dep. 324; Clark Dep. 215.  Keith was trained to look for subtle and unnoticed events, including an increase in drill pipe pressure while pumps are off.  Tr. 3591, 3681 (Keith); TREX 062953 at 190.  To monitor increases and decreases in drill pipe pressure, Keith set the alarms in his shack so that an increase or decrease in pressure of more than 150 to 200 psi would trigger the alarms.  Tr. 3675-76 (Keith).

986.    Keith was also able to track pit transfers, stay in communication with the rig floor regarding how transfers were being made from pit to pit, and have his pit volume sensors available.  Tr. 3665 (Keith); Bement Dep. 140.

987.    As part of the responsibility to continuously monitor the well, the mud logger should also be aware at all times of rig operations that affect pit volume.  Kronenberger Dep. 85-86.  Draining trip tanks is part of normal operations, which happens regularly, and Keith knew they would be dumping trip tanks while he was on tour.  Tr. 3526-27 (Keith); Tr. 7762 (Bourgoyne).  Keith called the rig floor when flow-out increased while the rig crew dumped the trip tanks into the pits.  Tr. 3539, 3605-06 (Keith).  He also called the rig floor after identifying a slow gain in pit volume while the rig crew dumped the sand traps into the active pits, another routine operation.  Tr. 3527-28, 3604 (Keith); Tr. 6118 (Ambrose).

988.    Offloading mud to another vessel would not affect the mud logger's ability to monitor flow in and flow out.  Kronenberger Dep. 118.

989.    There was crane activity while Keith was on tour, and he could have requested this regular operation stop if it was interfering with his ability to monitor the well.  Tr. 3528 (Keith); Tr. 6118-19 (Ambrose); Gray Dep. 375; Kronenberger Dep. 87-88.

990.    Many of the activities that are described as simultaneous operations were actually sequential, and did not occur during the final displacement of the well.  Tr. 6117-19 (Ambrose); *see also* D8167.  These operations were over before the well started flowing and did not affect the ability to detect the kick.  Tr. 7614 (Bourgoyne).

991.    Moreover, Keith never told anyone from BP or Transocean that he was unable to monitor the parameters he needed to monitor because he always felt that he was able to do his job.  Tr. 3673 (Keith); Tr. 1861 (Ezell).

### d.    Halliburton's Mud Logger Took a Break Before the Sheen Test and Did Not Identify Any Anomalies in the Data When He Returned.

992.    Keith took an eight-to-ten minute break between 20:30 and 21:00 on April 20.  Tr. 3538 (Keith).  Keith called the rig floor before he went on his break.  Tr. 3724-25 (Keith).

During his break, he went to the bathroom, had coffee, and smoked half a cigarette.  Tr. 3699 (Keith).  Keith returned to the drill shack within ten minutes.  Tr. 3678 (Keith).

993.   When Keith left for his break, he did not know when the sheen test would be conducted, but returned from his break before the sheen test was conducted.  Tr. 3678-79 (Keith).  When he returned, Keith reviewed the data for the entire time he had been absent, but did not recognize any anomalies and does not recall any alarms going off.  Tr. 3538, 3540, 3601, 3722-23 (Keith).

### 7.   The 20:52 Call.

994.   After the negative pressure tests were concluded and determined successful at 19:55, the rig crew resumed displacement operations at approximately 20:00.  TREX 000001 at 25 (Bly Report); TREX 004248 at 30 (Transocean Investigation Report) ("The drill crew resumed final displacement at 8:02 p.m. on April 20, 2010.").

995.   At 20:52, approximately an hour after the Transocean rig crew and BP wellsite leaders declared the negative pressure test a success and resumed displacement operations, a telephone conversation took place between BP wellsite leader Don Vidrine and BP drilling engineer Mark Hafle.  Tr. 7933-34 (Robinson); Tr. 5018 (Barnhill); Tr. 1229, 1231-32, 1342-43, 1345 (Bly); Corser 2 Dep. 126;[9] TREX 007318; TREX 000001 at 25 (Bly Report); TREX 003808 at 26.

996.   The purpose of the call was to discuss the upcoming operational step of setting the surface cement plug and whether the plug should be weight or pressure tested.  Tr. 1229 (Bly); Tr. 5018 (Barnhill); Tr. 7937-38 (Robinson) (during his interviews, both Vidrine and Hafle indicated that the 20:52 call was about testing the surface plug); TREX 000296.6.10.

---

[9] Corser 2 Dep. refers to Mr. Corser's second day of deposition testimony, which occurred on Feb. 11, 2011.

997.    BP IIT interviewers and their interview notes make clear that while the negative pressure test was mentioned in passing during the call, the call itself had no bearing on the interpretation of the negative pressure test.  Tr. 1229, 1231-32, 1342-43 (Bly) (Hafle and Vidrine "had this discussion an hour after the negative pressure test had been accepted and it was … an after-the-fact conversation"); Tr. 7939, 8005-06 (Robinson); Corser 2 Dep. 129-30 (he did not sense any urgency or need on the part of Vidrine to obtain information regarding the negative pressure test).  *See also* Tr. 1345 (Bly) ("[T]his was after the test had been accepted, you know, changing out the fluids had already started and it was mentioned, but it wasn't in the form of consulting about it.  It was sort of talking about something that had come and gone and actually been handled.").

998.    Although BP IIT interviewers and BP IIT interview notes suggest the differential pressure during the negative pressure tests on the drill pipe and the kill line was mentioned during the 20:52 call, the context and details of the conversation, including whether Hafle understood Vidrine to be referencing the first or second negative pressure test remains unclear.  Tr. 1384-85 (Bly) ("You're implying that the conversation was very clear.  That wasn't our conclusion.  We said it was mentioned, it's not clear that they had some clear understanding what that meant."); TREX 000296.6.10 ("Don told Mark that he was fully satisfied that the rig crew had performed a successful negative pressure test.  Mark said he didn't have the full context for what had transpired during the tests and it wasn't clear to him whether Don was talking about the first or second negative tests.").  *See also* Tr. 5021 (Barnhill) (admitting he was not present for the 20:52 telephone conversation but trying to piece together what occurred based on interview notes).

999.   In addition, the Bly Report and BP IIT members have emphasized that notes taken during the course of the investigation were not verbatim transcripts of the interviews.  Tr. 1227 (Bly); Tr. 7915, 7930, 7936 (Robinson); TREX 000001 at 2 (Bly Report) ("The investigation team did not record or produce verbatim transcripts of any interviews, nor did the team ask interviewees to review or endorse the notes taken by the interview team members.").  Moreover, there were multiple interviews of Vidrine and Hafle.  Tr. 1231, 1337 (Bly).

1000.   Regarding the interview notes of Vidrine specifically, BP IIT member Steve Robinson interviewed Vidrine in person and explained that Vidrine became emotional and required several breaks during the interview to regain composure, which resulted in the interview notes not flowing sequentially and "jumping around quite a bit."  Tr. 7917-18, 7927-28, 8011-12 (Robinson).

1001.   Robinson testified that his own impression from the interview with Vidrine was that Vidrine believed the second negative pressure test was a success.  Tr. 7928-29 (Robinson).  Similarly, based on his two in-person interviews with Hafle, Robinson was not left with any impression from Hafle that the second negative pressure test performed on the kill line was a failure.  Tr. 7934, 7937, 7986 (Robinson).  There is no evidence that Hafle or Vidrine did not want the operations on the Macondo well to succeed.  Tr. 5020-21 (Barnhill).

## 8.    The Failure to Detect and Respond to Kick Indications in the Final Hour Resulted in the Loss of Well Control.

1002.   The Transocean drill crew, in particular the driller and the Halliburton mud logger, were responsible for monitoring the Macondo well and detecting a kick.  Tr. 2208 (Heenan); Tr. 4388, 4430 (Barnhill); Tr. 7579 (Bourgoyne); Tr. 3489-90 (Keith).

1003.   Beginning at 21:01, however, there were numerous indications of a kick that should have been identified and investigated, but instead went undetected by ***both*** the

Transocean drill crew, **and** the Halliburton mud logger.  Tr. 2200, 2128 (Heenan); TREX 060110 at 21 (Heenan Expert Report); Tr. 6246, 6250 (Ambrose) (indicating there were several indications of a kick that went undetected over the course of the last hour prior to the explosion); Tr. 1219 (Bly); Tr. 7534-35 (Bourgoyne); Tr. 7297-98 (Beck); Tr. 4461-64, 4999 (Barnhill); Tr. 3681-83 (Keith).

1004.  Following the assessment and conclusion of the negative pressure tests at 19:55, Transocean and the Halliburton mud logger still had an ongoing duty to monitor and control the Macondo well.  Tr. 4658 (Newman); Tr. 1104 (Bly); TREX 000001 at 25; Tr. 3489-90 (Keith); Bement Dep. 137-38.  The anomalies that should have been detected beginning at 21:01 are separate events from the interpretation of the negative pressure test.  Tr. 2223-24 (Heenan).

1005.  The failure of the rig crew to monitor and act upon well anomalies on April 20, 2010, allowed a kick – a typical drilling event – to go unnoticed until it turned into a blowout. Tr. 7579 (Bourgoyne); Tr. 2208-09 (Heenan); TREX 008173 at 11; Tr. 7289-90 (Beck) (kick detection was a major piece of the Incident that allowed the whole process to escalate).

1006.  Transocean *Deepwater Horizon* senior toolpusher Randy Ezell admitted there must have been misinterpretations by the Transocean drill crew that ultimately led them to miss the signs of the well control event.  Tr. 1687-88 (Ezell).  *See also* Tr. 4300 (Barnhill).

1007.  As Transocean's drilling expert Calvin Barnhill explained, the Incident was "fundamentally a basic well control situation."  Tr. 4351 (Barnhill).

a.   **20:52-21:08:  The Well Began to Flow.**

1008.  Post-Incident "OLGA" modeling by BP dynamic flow expert Morten Emilsen indicated that the Macondo well became underbalanced, resulting in the flow of hydrocarbons into the wellbore beginning at 20:52..  Tr. 7816 (Emilsen); TREX 040003 at 9 (Emilsen Expert

Report); D4853; D4319; D4861; Tr. 1099-100, 1104 (Bly); D3514.006; TREX 000001 at 25 (Bly Report); Tr. 7531 (Bourgoyne).

1009.  Transocean's drilling expert concurred with the results of that modeling, observing that a change in drill pipe character is seen sometime around 20:50 or 20:52, indicative of underbalancing.  Tr. 4359, 4458-59 (Barnhill) (a reasonable estimate of when the well began flowing is approximately 20:52).

1010.  The OLGA simulations and other evidence including real-time data also demonstrated that the flow path was through a leaking casing shoe and up through the inside of the casing.  Tr. 7801-03 (Emilsen); TREX 040003 at 7 (Emilsen Expert Report); D4784; D4861.

### b.  21:01-21:08:  Flow Went Undetected Despite 100 psi Pressure Increase.

1011.  From the time the well began flowing at 20:52 until 21:08, the Macondo well took a 39 to 40 barrel hydrocarbon influx – double the volume of the "red zone event" defined by Transocean.  Tr. 7801-02, 7816-17 (Emilsen); D4861, D4319; TREX 040003 at 9 (Emilsen Expert Report); Tr. 4458-60 (Barnhill); TREX 000001 at 106; TREX 004255.

1012.  Between 21:01 and 21:08, the drill pipe pressure increased by 100 psi (1,250 psi to 1,350 psi) with the pumps at a constant rate, which would have been the first clear, detectable indication of flow visible to both the drill crew and mud loggers.  Tr. 977, 1214-16, 1349 (Bly); Tr. 7532-7534 (Bourgoyne); Tr. 6247 (Ambrose); Tr. 3547-48, 3680 (Keith); D4205A; TREX 000001 at 92 (Bly Report); D4319; Tr. 4280 (Barnhill); Tr. 2197-99 (Heenan) (agreeing that the pressure increase from 21:01 to 21:08 was most likely due to an influx from the formation and that the anomaly would have been observed by a diligent crew).

1013.   Instead of increasing, drill pipe pressure should have decreased during the 21:01 to 21:08 time-frame due to the removal of mud from the wellbore and displacement with seawater.  TREX 000001 at 92 (Bly Report); Tr. 977, 1215-16, 1349 (Bly).

1014.   The standard of care in the industry required investigation of the pressure anomaly by both the Transocean drill crew and the Halliburton mud logger.  Tr. 2200 (Heenan); TREX 022694 at 21 (Heenan Expert Report).

1015.   Specifically, the Transocean drill crew should have conducted a flow check during this time, which would have revealed that the well was flowing, resulting in immediate shut in and presumably avoided the Incident.  Tr. 2200-03 (Heenan).

1016.   Joseph Keith, the on-duty Halliburton mud logger, admitted at trial that he saw the 100 psi increase during the time period of 21:01 to 21:08, but did not alert the drill crew.  Tr. 3680-81, 3685-89 (Keith); Tr. 7221 (Beck).   Keith testified under oath at his deposition, however, that *if* he had seen the 100 psi drill pipe pressure increase, he *would have called* the driller's cabin.  Tr. 3685-88 (Keith).

1017.   Had the drill crew been aware of the kick indicators from 21:01 to 21:08 – either by noticing them themselves, or by being notified by Keith – they could have conducted a flow check and shut in the well.  Tr. 2200-04 (Heenan); Tr. 5002 (Barnhill).

### c.      21:08-21:14:  Flow Continued Undetected Despite a 250 psi Pressure Increase with the Pumps Off.

1018.   Between 21:08 to 21:14, the pumps were shut down to conduct the sheen test.  Tr. 4284 (Barnhill); Tr. 3549 (Keith); TREX 000001 at 26, 42, 93.

1019.   During this time period, the drill pipe pressure increased by more than 200 psi – from 1,017 psi at 21:08 to 1,263 at 21:14 – which the U.S. Government's well control expert Richard Heenan described as a "significant anomaly" that was clearly indicative of a kick.  Tr.

2128, 2202-04 (Heenan); TREX 000001 at 94; Tr. 1217, 1349 (Bly); Tr. 4284, 4425-26 (Barnhill); Tr. 6248-49 (Ambrose); D4320A; TREX 022694 at 21 (Heenan Expert Report).

1020. As Heenan explained in his expert report: "This *disturbing trend* is visible, not only on the BP reconstructed data, but also on the Transocean interpretation and on the Sperry chart. *The increase of 250 psi in six minutes was very significant.* With the pumps off, this was an almost certain indicator of a kick. It definitely was an anomaly to be investigated immediately." TREX 022694 at 21 (Heenan Expert Report) (emphasis added).

1021. Transocean's drilling expert Calvin Barnhill similarly noted that "[a] pressure build up with the pumps off for the sheen test is clearly indicated on the Sperry Sun chart" which "should have triggered action by the drill crew and the Sperry mud logger to check out the anomaly." TREX 050000.7.5.BP; Tr. 4998-99 (Barnhill).

1022. Both the driller and the mud logger had the obligation and the ability to monitor drill pipe pressure and, had they been monitoring, a 20 percent increase in drill pipe pressure with the pumps off should have been detectable. Tr. 4461-64, 4999 (Barnhill); Tr. 1219 (Bly).

1023. Although the only thing that could explain the pressure increase during the 21:08 to 21:14 time-frame was communication from the well, neither the drill crew nor the mud logger acted upon this significant and clearly detectable kick indicator. Tr. 7297-98 (Beck); Tr. 2128 (Heenan); Tr. 7534-35 (Bourgoyne); Farr Dep. 286-87 (admitting the drill pipe pressure increase during the sheen test was a kick indicator which was not acted upon by the Transocean crew and that missing the kick indicator during this time period increased the risk of a blowout).

1024. At trial, Keith acknowledged his prior sworn deposition testimony that *if* he had seen the nearly 250 psi drill pipe pressure increase with the pumps turned off, he *would have called* the drill floor. Tr. 3688-90 (Keith). Yet, during his trial testimony, Keith admitted that he

***did see*** the 250 psi increase between 21:08 and 21:14, but ***did not*** call the drill shack to alert the driller.  Tr. 3681-83, 3689-90 (Keith).

1025.   Keith conceded that his responsibility as a mud logger was to call the rig floor whenever an anomaly or a change is detected.  Tr. 3680-83 (Keith).  Keith also agreed the increase was "an anomaly" and admitted he had been trained by Halliburton that he should not expect to see an increase in drill pipe pressure when the pumps are off.  Tr. 3681-83, 3689-90 (Keith).

1026.   A second anomaly during the 21:08 to 21:14 time frame – the continuation of flow despite the pumps being shut down to perform the sheen test – was described by Transocean senior toolpusher Randy Ezell as a "signature sign" of a kick, "beyond a shadow of a doubt."  Tr. 1751 (Ezell); *see also* Tr. 2202-04 (Heenan) (explaining when the pumps are shut down there should be no flow unless there is a problem); Tr. 4283 (Barnhill); Tr. 7534-35 (Bourgoyne); D4205A; D4320.

1027.   The *Deepwater Horizon* had two flow rate sensors, a Transocean flow meter, as well as a Sperry flow meter.  Tr. 2152 (Heenan).

1028.   From approximately 21:08 to 21:10 the Sperry flow meter was sensing flow with the pumps shut off, and this anomaly would have been visible to the mud logger.  TREX 000001 at 93, 96 (Bly Report).  The Sperry flow meter was bypassed and would not have sensed flow after 21:10, however, when the rig crew opened the overboard dump valve on the flow line in preparation for discharging the spacer overboard.  TREX 000001 at 93, 96 (Bly Report); TREX 040003 at 9 (Emilsen Expert Report); Tr. 4284 (Barnhill); Tr. 7534-35 (Bourgoyne).

1029.   Even though the Sperry flow meter was not able to detect flow after 21:10, data from the separate Transocean flow meter was available the entire time the pumps were shut

down during the sheen test, and also after the spacer was routed overboard.  Tr. 3697 (Keith); Tr. 2155 (Heenan); Tr. 7534-35 (Bourgoyne); Farr Dep. 275; Tr. 4416 (Barnhill) (indicating the driller had Transocean's flow readings available the entire evening of April 20, 2010); TREX 000001 at 93, 96 (IIT Report).

1030.  Post-Incident OLGA modeling indicates that between 21:08 and 21:14, hydrocarbon inflow was occurring at a rate of nine barrels per minute.  Tr. 7818, 7853 (Emilsen); D4320A.

1031.  These two anomalies – the increase in drill pipe pressure and the continuation of flow despite the pumps being turned off from 21:08 to 21:14 – demanded an immediate investigation which should have resulted in the well being shut in.  Tr. 2203-05 (Heenan); Tr. 5002 (Barnhill) (agreeing the Macondo well should have been shut in after the sheen test); TREX 050000.47.3.BP.

1032.  If a proper flow check (which takes a minute or less to perform) had been conducted between 21:08 and 21:14, a flowing well would have been identified with enough time to safely shut it in.  Tr. 7536 (Bourgoyne); Tr. 6249-50 (Ambrose); Tr. 4462-64 (Barnhill); Tr. 2203-05 (Heenan) (explaining the continued flow and drill pipe pressure increases with the pumps off "is a very strong indicator of a kick; and the next step, the flow check, would have been conclusive").

> **d.      21:31-21:38:  The Pumps Were Shut Off to Diagnose Anomalies, but Despite a 550 psi Pressure Increase, the Crew Took No Well Control Actions.**

1033.  At approximately 21:30, Transocean chief mate David Young overheard toolpusher Jason Anderson and driller Dewey Revette in the driller's cabin discussing the "differential pressure" on the well monitoring screens.  Tr. 5705, 5820, 5849 (Young); Tr. 4291 (Barnhill).

1034.   Anderson subsequently told Young "we may need to circulate" and indicated that there was going to be a delay in the upcoming operations.  Tr. 5819-20 (Young); Tr. 4291 (Barnhill).

1035.   The mud pumps were shut down between 21:30 and 21:31 to diagnose the anomalous pressure readings.  TREX 000001 at 98 (Bly Report); D4321; Tr. 7302-03 (Beck); Tr. 2132-34 (Heenan); Tr. 4291-92, 4433 (Barnhill).

1036.   With the pumps off, flow continued and the drill pipe pressure increased by over 500 psi – clearly indicating an influx in the well.  Tr. 7297-98 (Beck) (indicating the only thing that could explain the pressure increase at 21:30 was communication from the well); Tr. 2206-07 (Heenan); Tr. 1221, 1349 (Bly); D4321; TREX 000001 at 98-99; Transocean's Discovery Response at 128 (July 15, 2011) (Ex. 2).

1037.   Post-Incident OLGA modeling by BP dynamic flow expert Morten Emilsen indicates that by 21:31, the well had already experienced an influx of approximately 300 barrels of hydrocarbons.  Tr. 7819 (Emilsen); D4321; Tr. 7302-03 (Beck); Tr. 2132-34 (Heenan); Tr. 4291-92, 4433 (Barnhill); Tr. 1107 (Bly); TREX 000001 at 98.

1038.   The drilling experts in this case, including Transocean's expert Calvin Barnhill, uniformly testified that when the pumps were shut down at 21:31, the Transocean drill crew should have checked for flow and immediately shut in the well, thereby keeping the hydrocarbon kick safely below the BOP.  Tr. 4296 (Barnhill); Tr. 7537 (Bourgoyne); Tr. 7297-98 (Beck); Tr. 2162-63 (Heenan) (explaining a flow check should have been conducted around 21:30, which would have indicated flow and provided time to shut the well in).  In Barnhill's words, such actions represent "basic well control," but did not occur.  Tr. 4351 (Barnhill).

1039.   If the Transocean drill crew had conducted a flow check at any point within the 21:30 to 21:33 time-frame – as they undisputedly should have done – the flow check would have been positive and resulted in the well being safely shut in.  Tr. 7537-38 (Bourgoyne); Tr. 4241-42 (Barnhill) ("I think at that point within the 9:32, 9:33 timeframe, [ ] there should have been a flow check done.  And I think if the flow check would have been done at that point, it would have been positive and they would have shut the well in."); Tr. 7297-98 (Beck); Tr. 2162-63 (Heenan).

1040.   As the U.S. drilling expert Richard Heenan explained, even around 21:30, "there was easily time" before hydrocarbons entered the riser for a driller to "shut the well in, circulate the kick out, and we wouldn't be here."  Tr. 2162-63 (Heenan).  *See also* Tr. 4468 (Barnhill).

1041.   Instead of taking well control actions, the Transocean drill crew instructed floorhand Caleb Holloway to bleed pressure off the drill pipe from approximately 21:36 to 21:38.  Tr. 1362 (Bly); Tr. 7810-11 (Emilsen); Tr. 4468-69 (Barnhill); Tr. 7302-03 (Beck); Tr. 2132-34 (Heenan); Tr. 5818-19 (Young); TREX 000001 at 100 (Bly Report).

1042.   Bleeding pressure off the drill pipe is not a well control step and is not consistent with a drill crew that is aware the well is flowing.  Tr. 2206-07 (Heenan); TREX 000001 at 98; Tr. 4468-69 (Barnhill); Tr. 7536-37, 7579 (Bourgoyne); TREX 8173 at 67 (Bourgoyne Report) ("When anomalous pressures were noticed, the rig crew began trying to diagnose the meaning of the kick indicators instead of immediately closing the blowout preventers.  The failure to shut-in the well and investigate, as opposed to investigating before shut-in, is inconsistent with well control training and guidance.").

1043.   Standard well-control practice dictates that the well be checked for flow once the pumps were shut down, and that if it is flowing the well be shut in before taking any other steps. Tr. 7537 (Bourgoyne).

1044.   According to Barnhill, the diagnostic process the Transocean drill crew engaged in, along with their response time, took long in light of the developing well control situation.  Tr. 4469 (Barnhill).   Barnhill acknowledged the Transocean drill crew's delay in treating the observed anomalies as signs of a kick "obviously cost them valuable time."  Tr. 4445 (Barnhill).

### e.   21:38-21:49:  Hydrocarbons Entered the Riser Prior to Activation of the Annular Preventer.

1045.   Had the influx been detected and responded to before entering the wellbore, the kick would have been contained.  Tr. 1105 (Bly).

1046.   Yet, no well control actions were taken before hydrocarbons entered the riser at 21:38.  Tr. 7819 (Emilsen); Tr. 4434 (Barnhill); Tr. 979-980, 1105 (Bly); TREX 000001 at 25 (Bly Report); D4322; Tr. 2862 (Davis).   Post-Incident OLGA modeling by BP dynamic flow expert Morten Emilsen indicates that hydrocarbons passed the BOP and entered the wellbore at 21:38.  Tr. 7819 (Emilsen); D4322.

1047.   Once hydrocarbons were above the BOP, there was nothing to prevent them from coming to the rig surface.  Tr. 984 (Bly).  At 21:40, mud started to flow out of the riser and onto the rig floor.  TREX 000001 at 104.

1048.   By the time the first well-control action was taken at 21:41, which was the activation of the annular preventer, there was an approximately 1,000 barrel gain.  Tr. 980, 1221-22, 1362, 1470-71 (Bly); Tr. 2862 (Davis); TREX 000001 at 103-04, 106; TREX 040003 at 8 (Emilsen Expert Report); D4322.  *See also* Tr. 3452 (Perkin) (indicating there was no attempt to activate the BOP until after the blowout had started).

1049.   The annulars on the *Deepwater Horizon* BOP took approximately 26 seconds to close.  Tr. 5230-31 (Childs).

1050.   When activated at 21:41, the upper annular closed against the drill pipe at 21:42 but failed to seal around it.  Tr. 9020-22 (Shanks); Tr. 5034 (Barnhill); TREX 040008 at 24-26; Tr. 2862 (Davis); TREX 000620; D4328B; D4806; Tr. 1362 (Bly); TREX 000001 at 28; D4322. *See also* D4328-B; TREX 000001; TREX 000604; TREX 000620; TREX 047657; TREX 047901; TREX 047907; Pleasant Dep. 81-83, 464-65; TREX 003343.

1051.   The gradual pressure increase shown in the Sperry drill pipe pressure beginning at 21:42 supports the conclusion that the annular preventer closed at 21:42, but did not seal the well.  Tr. 9020-21 (Shanks); TREX 040008 at 24-26; Tr. 2861-62 (Davis); TREX 000620; D4328B; D4806; Tr. 1362 (Bly); TREX 000001 at 28, 44; TREX 040003 at 10 (Emilsen Expert Report) ("Simulations indicate a more rapid increase in drill pipe pressure would have resulted if the well was shut-in and sealed at this time [21:41].").

1052.   No party disputes that the upper annular closed but did not form a seal.  Tr. 9022 (Shanks); Tr. 5034 (Barnhill); Tr. 2862 (Davis).

1053.   The upper annular did not seal the well because it closed on the shoulder of a drill pipe tool joint and not on smooth pipe.  This prevented the annular from forming a seal.  Tr. 9020-21, 9144 (Shanks); TREX 040008 at 26; TREX 000620; D4328B; D4806.

1054.   The drill string contained multiple segments of drill pipe that were connected by tool joints.  The tool joints created points on the pipe that were thicker than the rest of the pipe.  Tr. 4990 (Barnhill); Tr. 5106-07 (Childs); D4328B; D4806.

1055.   The tool joint should have been spaced outside any critical BOP mechanism because during the displacement of the well the driller knew the drill pipe would be in one place

for a long period of time, and it is industry practice to space out the tool joint to not be across any critical BOP element.  Tr. 9027, 9181 (Shanks); TREX 040008 at 26.

1056.   Transocean's drilling expert, Barnhill, agreed that the standard of care or standard of practice is for the driller to set the drill string in such a way that there are no tool joints in the BOP stack.  Tr. 4993-95 (Barnhill).

1057.   Transocean had a policy requiring proper space out of the drill pipe (*i.e.*, no tool joints across critical BOP elements, such as ram and annular preventers) so that the BOP is ready to be activated when needed.  This policy does not apply when the rig is actively drilling.  Tr. 4994, 4996 (Barnhill).

1058.   If not for the location of the tool joint, the upper annular should have closed in the well when it was activated because its rated working pressure was greater than the measured wellbore pressure.  TREX 040008 at 26.

1059.   Closing the upper annular was the first BOP action taken by the drill crew.  The upper annular was the only BOP component that was closed at 21:42.  Tr. 9040 (Shanks); TREX 040008 at 24-26; D4953.1; Tr. 980, 1221-22 (Bly); TREX 000001 at 28; Tr. 2862 (Davis).

1060.   According to Transocean's own expert, Barnhill, the drill crew noticed "significant anomalies" at 21:26.  But according to Transocean's expert, Childs, the drill crew did not activate the upper annular until 17 minutes later.  Tr. 5009 (Barnhill); Tr. 5368 (Childs); TREX 007687 at 10.

1061.   The drill pipe pressure data indicated that the upper annular remained engaged, without sealing the well, for approximately five minutes.  Just before 21:47, the drill pipe pressure began to decrease likely representing one of the following events: (1) the failure of the upper annular's sealing element; (2) the reduced hydraulic pressure available to the upper

annular due to activation of the variable bore rams; or (3) a combination of both events.  TREX 040008 at 24-26; Tr. 9141-42 (Shanks); TREX 000620.

> **f.      There Was No Attempt to Activate the Blind Shear Rams Prior to the Explosion.**

1062.   By the time of the explosions at 21:49, the cumulative gain taken by the Macondo well was approximately 2,000 barrels.  Tr. 7802 (Emilsen); TREX 000001 at 106; D4322.

1063.   Transocean's drilling expert, Calvin Barnhill, admitted he was unaware of any evidence to suggest that anyone attempted to activate the blind shear rams prior to the first explosion.  Tr. 5009-10 (Barnhill).

1064.   If any of the indications of flow – either between 21:01 and 21:08, 21:08 and 21:14, or 21:31 and 21:38 – had been detected by the rig crew and mud loggers, and had the rig crew reacted to these indications as trained, the Incident would have been prevented.  Tr. 7563, 7792 (Bourgoyne); Tr. 2207-09 (Heenan) (agreeing that had the parameters available to the rig crew and mud loggers been observed, interpreted correctly and acted upon the events of April 20, 2010 would have been avoided); Tr. 4431-32 (Barnhill) ("I believe if the well had been flow-checked around 2133 and shut in … I don't think the events as they transpired would have happened."); Tr. 979-80, 1105, 1127-28 (Bly) (explaining if the influx had been detected before hydrocarbons entered the riser at 21:38, the kick would have been contained).

1065.   The BOP must be timely activated to function properly and thus, the earlier well control actions are taken the greater the opportunity to contain the well.  However, there was no attempt to rapidly shut in the Macondo well when it started to flow due to an influx of formation fluids.  Tr. 1482-84 (Bly).  Approximately 50 minutes elapsed from the time hydrocarbons began flowing into the well, before the first well control action was taken at 21:41 by activation of the

BOP.  Tr. 7815-16 (Emilsen); Tr. 1104-05, 1469-70 (Bly); TREX 000001 at 98, 104 (Bly Report).

1066.  If the blind shear rams had been activated before the rig explosions by either the drill or bridge crew, through EDS or otherwise, the conditions for shearing the drill pipe would have been favorable and the blind shear rams would have sealed the well.  TREX 040008 at 43-44; Tr. 9037-38 (Shanks); D4811; TREX 007661 at 14; Tr. 2652, 2662 (Davis).

1067.  Had the string of kick indications been detected, there was plenty of time to investigate, shut the well in, and circulate the kick out prior to hydrocarbons entering the riser at 21:38.  Tr. 2160-63, 2200-02 (Heenan).

1068.  Transocean's largest kick event in 2009 was 97 barrels.  TREX 004255 at 29; TREX 004255.44.3.BP.  In contrast, post-Incident modeling regarding the Macondo well estimated that an approximately 300 barrel influx had been taken by 21:31, a roughly 1,000 barrel influx had entered the wellbore by the time the annular preventer was activated at 21:41, and an approximately 2,000 barrel gain had been taken by the time the explosion occurred at 21:49.  Tr. 7802, 7819, 7871 (Emilsen); Tr. 1479 (Bly); TREX 000001 at 106, 108; D4321; D4322.  *See also* Tr. 4469 (Barnhill) ("That's one of the things that makes this really so hard to get your arms around, is the magnitude of the kick [at the Macondo well on April 20, 2010].").

1069.  Transocean's drilling expert, Calvin Barnhill, agreed the standard of care in the deepwater drilling industry is to catch a kick within 20 to 30 barrels, and that one would certainly expect a drilling crew to catch a kick before reaching 300 barrels.  Tr. 4456-57 (Barnhill).

1070.  Likewise, Transocean's goal was to detect and respond to kicks in less than 20 barrels and Barnhill agreed Transocean terms kicks greater than 20 barrels as "red zone events."  Tr. 4586 (Newman); Tr. 4457 (Barnhill); TREX 004255 at 21, 44-45.

1071.   Transocean's conduct aboard the *Deepwater Horizon* on April 20, 2010 violated its duty to exercise well control in accordance with the standard of care applicable in the deepwater oil exploration industry.   Transocean Guilty Plea Agreement Exhibit A ¶14 (TREX 063213).

1072.   Barnhill acknowledged that the Transocean *Deepwater Horizon* drill crew's response on April 20, 2010 was inconsistent with both industry standards for well control and their well control training.  Tr. 4431 (Barnhill).

1073.   Deepwater blowouts are foreseeable events and BP was entitled to rely on the *Deepwater Horizon* driller and assistant driller following Transocean's policy of shutting in the well if there are any doubts.  Tr. 4469 (Barnhill).

1074.   BP did nothing to prevent the drillers on duty on April 20, 2010 from being able to execute their key responsibilities during the well control event.  McMahan Dep. 321-32.

1075.   The failure of the Transocean rig crew and the Halliburton mud logger to recognize the series of kick indicators, together with the failure of the Transocean rig crew to take proper well control actions, was the immediate cause of the blowout.   Tr. 6249-50 (Ambrose); Tr. 2200-04 (Heenan); *see also* Tr. 7536 (Bourgoyne); Tr. 8928 (Guide) (agreeing the loss of well control is what ultimately led to the blowout of the Macondo well).

1076.   Both BP's and Transocean's internal investigations also concluded that the failure to monitor the well and take proper well control action caused the blowout at the Macondo well. Tr. 6125 (Ambrose) ("We admit they missed signs during that last hour of anomalies that should have been acted on. … By having not shut in before the hydrocarbons hit the riser, that's what released the blowout").

g.      **21:43-21:45:  Transocean Diverted Gas onto the Rig by Directing Flow to the Mud-Gas Separator, Leading to the Initial Explosion and Fire.**

1077.   The purpose of the overboard diverter system is to divert gas away from the rig and the rig floor if hydrocarbons get into the riser. Tr. 5002 (Barnhill); Tr. 7580-81 (Bourgoyne).

1078.   According to Transocean *Deepwater Horizon* senior toolpusher, Randy Ezell, the *Deepwater Horizon* driller or the toolpusher was responsible for making the decision whether to divert overboard versus to the MGS. Tr. 1873 (Ezell); Tr. 5006 (Barnhill). The decision would have been based on all available information, including sights, sounds, and data. Tr. 1873 (Ezell).

1079.   The option to divert to overboard as opposed to the MGS was available to the Transocean drill crew via buttons on the BOP panel located in the driller's cabin. D4308A; Tr. 1786-88, 1830-31 (Ezell); TREX 048102; TREX 048110.

1080.   Despite visible signs of a riser unloading event in progress, including mud flowing out of the riser onto the rig floor beginning at 21:40, the Transocean rig crew closed the diverter packer and routed the flow of hydrocarbons to the mud-gas separator shortly after 21:41. TREX 000001 at 104; Tr. 7709, 7712, 7782 (Bourgoyne); TREX 004248 at 31, 106-07, 153-55, 164; Tr. 6126 (Ambrose); D4308A.

1081.  BP IIT member Steve Robinson's handwritten notes from his interview with wellsite leader Don Vidrine stated:  "Jason the toolpusher called and said we are getting mud back and diverting returns to the gas buster.  Also said he was closing or had closed.  Hung up quick.  Started for floor.  Down hall upstairs toward rig area or rig, mud and seawater blowing every where [*sic*].  Positive it was mud.  Stopped and explosion occurred and power went out. Not sure exactly when power went off." Tr. 7928 (Robinson); TREX 037031.15.4.BP.

1082.   The mud-gas separator was rapidly overcome.   Tr. 5007 (Barnhill); TREX 050000.8.2.BP; D4308A; TREX 004248 at 106 ("[T]he volume and force of the flow overwhelmed the MGS, and fluid began pouring out of its outlet lines."); TREX 004248 at 31, 104, 155-56, 174-75.

1083.   The purpose of the mud-gas separator relief valve is to help relieve pressure out of the vessel if there is excess pressure built up – this valve operates when the mud-gas separator is overwhelmed.  Tr. 5011 (Barnhill); TREX 000001 at 119 (Bly Report).

1084.  Post-Incident modeling conducted by both BP's and Transocean's internal investigations concluded that gas reached the surface at 21:46 and was subsequently vented onto the rig from several release points due to the diversion to the mud-gas separator.  Tr. 7871, 7879 (Emilsen); TREX 000001 at 111-12; TREX 004248 at 31, 155-156, 174-175 ("By 9:46 p.m., the flow had overwhelmed the MGS and gas started spreading across the aft deck and into nearby internal spaces…"); Tr. 984, 986 (Bly) (the mud-gas separator became overwhelmed, gas went up the pipe and its gooseneck, and dumped back down on the drill floor); TREX 040003 at 11 (Emilsen Expert Report).

1085.   Vapor dispersion modeling showed a flammable mixture quickly enveloped large areas of the rig, including some enclosed spaces below deck.  Tr. 1390 (Bly); TREX 000001 at 138.   The majority of the bow and aft main deck and the decks below was not electrically classified.  Tr. 1390 (Bly); TREX 000001 at 138; TREX 004248 at 174-75.  *See also* Tr. 989 (Bly) (indicating flammable gas covered the aft starboard deck three minutes and ten seconds after reaching the rig).  Therefore, for gas release events beyond the drill floor, multiple ignition sources could have existed.  Mechanical sources of ignition were also possible.  Tr. 1390 (Bly); TREX 000001 at 138.

### i.   Transocean's Well Control Policy Required Diversion Overboard.

1086.   Basic well control requires flow to be diverted overboard if there is a rapid expansion of gas in the riser.  Tr. 7700 (Bourgoyne).

1087.   Consistent with fundamental well control principles, established Transocean well control procedures explicitly instructed that fluids must be diverted overboard as opposed to through the mud-gas separator when taking a large kick:   "***At any time, if there is a rapid expansion of gas in the riser***, the diverter must be closed (if not already) and the ***flow diverted overboard.***"   TREX 041008.207.1.TO (emphasis added); TREX 001454 at 205; TREX 000001 at 104; TREX 000002 at 206 (BP Internal Investigation Report, Appendix T).  *See also* TREX 001454 at 205 ("[I]f large volumes of gas have entered the riser, it will flow rapidly on its own and there will be no way to control it by adjusting the circulation rate.  Then, the surface gas and liquid rates become very high, especially as the gas bubble reaches surface and the ***flow must be diverted overboard***.") (emphasis added); Tr. 4263-64, 5003 (Barnhill); Tr. 6125-26 (Ambrose); Tr. 7701-02 (Bourgoyne); TREX 8173 at 67-68 (Bourgoyne Report) ("Transocean Well Control Training manuals clearly showed that their policy was to divert overboard if a kick is taken that goes undetected and a significant gas volume enters the riser.   It was also recognized in Transocean presentation material that I reviewed that the Marine Riser could unload quickly when gas begins breaking out of solution."); TREX 002187 at 179 (Major Hazard Risk Assessment-*Deepwater Horizon*).

1088.   Transocean's Well Control Handbook, which contained the applicable well control procedures for operations on the *Deepwater Horizon*, specifically warned that "[l]arge amounts of gas above the BOP stack can rise rapidly and carry a large volume of mud out of the riser at high rates."  TREX 041008.206.1.TO; TREX 001454 at 204; Tr. 3416 (Perkin); Tr. 4262-

63 (Barnhill); Tr. 7701 (Bourgoyne) (explaining the marine riser could unload quickly when gas begins breaking out of solution and gets above the BOP); Tr. 1785-86 (Ezell) (indicating once gas is in the riser, the influx can quickly become "an uncontrolled expansion" moving from the sea floor up to the rig "very rapid[ly]").

1089.   Transocean's procedure for diverting gas made it clear that in instances of a large kick, the rig crew should "be prepared to open up the diverter line to send the mud overboard" in order to "keep combustible gases safely away from sources of ignition."  TREX 001454 at 207, 209; Tr. 1787, 1873 (Ezell) ("if you have uncontrolled expansion in the riser, well, then that would be when you would have to divert [overboard]").

1090.   In addition, Transocean's Well Control Handbook made it clear that diverter drills were "particularly important in familiarizing all personnel with the proper and immediate actions to take, since there is little time to react during an actual emergency.  The actions taken by the Driller and his crew must be planned and practiced.  Diverter drills must be carried out to improve the crew's reaction time and prove the operation of all diverter system equipment." TREX 001454 at 57-58.

1091.   Diverter drills were regularly conducted on the *Deepwater Horizon* and practiced functioning the diverter system, including discussions of where fluids would be routed if the diverter was closed.  Tr. 1324 (Bly); Tr. 1777, 1779-80 (Ezell).  Transocean's on-the-job training also required drillers to explain and simulate how to divert the well.  TREX 041225.

### ii.   Diversion Overboard Would Have Prevented the Explosion and Fire on the *Deepwater Horizon*.

1092.   Diverting the hydrocarbon flow to the mud-gas separator was "a precipitating cause" of the explosion.  Tr. 6127 (Ambrose).

1093.  Not automatically diverting overboard increased the risk of ignition.  Tr. 7614 (Bourgoyne).

1094.  If the drill crew had diverted the hydrocarbons overboard through the 14-inch overboard diverter lines (instead of the mud-gas separator), the explosion and fire aboard the *Deepwater Horizon* would have been avoided, or at the very least, delayed the ignition by directing the flammable gas away from the rig, providing the crew more time to respond to the well control situation.  Tr. 7563, 7783, 7793 (Bourgoyne); Tr. 985-86 (Bly); TREX 000001 at 11, 104, 128-29, 138; Tr. 7038 (Stevick) (concluding based on his expert modeling that if the hydrocarbons had been sent out of the downwind overboard diverter line (instead of the mud-gas separator) there would have been no fire and explosion on the rig and the crew would have had "all the time in the world" to shut in the well); Tr. 7979-81, 7983 (Robinson) (using the diverter to re-direct flow overboard would have bought the crew more time to emergency disconnect).

### h.    21:47: The Middle and Upper Variable Bore Rams Closed and Sealed.

1095.  The middle and upper variable bore rams (VBRs) closed and sealed the wellbore annulus at 21:47.  This was indicated by the sharp increase in the Sperry drill pipe pressure at 21:47 from 1,200 psi to 5,730 psi.  Tr. 9023-24 (Shanks); TREX 040008 at 24-25; TREX 00620; D4329D; D4809; Tr. 1362 (Bly); TREX 000001 at 28, 44; Tr. 5114, 5372, 5514 (Childs); TREX 007687 at 12-13; Tr. 2868-69 (Davis).

1096.  When the middle and upper variable bore rams closed at 21:47, the upper annular was also closed.  At this time the drill pipe was hanging straight and centered in the BOP up to the traveling assembly on the rig.  Tr. 9040-41 (Shanks); TREX 040008 at 25; D4953.1.

1097.  The upper variable bore rams were found closed when the BOP was retrieved from the Macondo well, and because there was no way to close these variable bore rams through

remote operated vehicle (ROV) intervention after the Incident, they must have been closed before the explosion by the Transocean drill crew.  TREX 040008 at 25; Thompson Dep. 101.

1098.  After the middle and upper variable bore rams were closed but before the rig explosions, the ST-Locks on these rams were set and locked.  Once the ST-Locks were locked, there was no way for the variable bore rams to drift open.  Tr. 9062-64 (Shanks); D4953.1.

1099.  The procedures in Transocean's Well Control Handbook for "Actions Upon Taking a Kick" called for closing the variable bore rams and setting the ST-Locks after taking a kick.  Tr. 9178-82 (Shanks); TREX 001454 at 81-82.

1100.  Because there was not time to follow Transocean's full shut in procedure during the Incident, the prudent thing to do would have been to close the variable bore rams and set the ST-Locks.  Tr. 9181-82 (Shanks).

1101.  During remote operated vehicle (ROV) interventions after the rig sank, radiographic photographs were taken of the middle and upper variable bore rams ST-Locks. These radiographic photographs indicated that both ST-Locks on the middle variable bore rams were locked and at least one of the ST-Locks on the upper variable bore ram was locked.  The position of the other ST-Lock on the upper variable bore rams could not be determined.  This indicates that the variable bore rams did not drift open after they were first closed.  Tr. 9059, 9061-62 (Shanks); TREX 000001 at 161; Florence Dep. 30.

1102.  The physical evidence recovered from the BOP during the forensic examination, specifically the erosion patterns on the bottom of the casing shear rams, also supports that the conclusion that the VBRs were closed by the drill crew and remained closed and sealed against the drill pipe until at least the closing of the casing shear rams on April 20, 2010.  Tr. 9073-74 (Shanks); D4810; TREX 007661 at 14-15.

1103.  The casing shear rams were closed on April 29, 2010 during remote operated vehicle (ROV) interventions.  Tr. 9072-73 (Shanks); D4810; TREX 007661 at 15.

1104.  When the casing shear ram closed, it sheared the drill pipe that was across it.  Tr. 9073 (Shanks); D4810; TREX 007661 at 15.

1105.  The erosion pattern on the bottom of the casing shear ram occurred where the drill pipe was directly impinging on the bottom of one of those ram blocks.  This concentrated erosion caused by flow through the drill pipe indicates the variable bore rams remained sealed until April 29 when the casing shear ram closed.  If the annulus was not sealed by the variable bore rams, this concentrated erosion would not have occurred.  Tr. 9073-74 (Shanks); D4810.

1106.  When the variable bore rams were activated, there were even more hydrocarbons in the riser above the BOP than there were when the upper annular was closed.  Once hydrocarbons had passed beyond the BOP before the variable bore rams were activated, it was too late for the BOP to prevent the gas in the riser reaching the rig surface that caused the rig explosions.  Tr. 2869 (Davis).

### i.       21:49:  Explosions on the Rig.

1107.  At 21:49 the Sperry data was lost, which indicates the first explosion on the rig occurred at about this time.   Tr. 9024 (Shanks); TREX 040008 at 24-25; TREX 000620; D4336B; Tr. 5008-09 (Barnhill); TREX 050000.45.3.BP; Tr. 6994 (Stevick); TREX 004248 at 198.

1108.  At the time of the explosions the upper annular, middle variable bore ram, and upper variable bore ram were closed.  The drill pipe was hanging straight under its own weight and centered in the BOP and up to the rig.  Tr. 9041 (Shanks); TREX 040008 at 25; D4953.1.

1109.  Fire and gas systems did not prevent hydrocarbon ignition.  Tr. 987 (Bly); TREX 000001 at 46.

j.      **The AMF/Deadman Failed to Activate Because of Control Pod Deficiencies.**

1110.   The conditions for activating the AMF/Deadman (loss of electrical power, communications, and hydraulics between the rig and BOP) were met within about a minute of the explosions, if not immediately after.   Tr. 9024-25, 9042 (Shanks); D4336B; Tr. 2649-50, 2747-48 (Davis); TREX 007687 at 16; Tr. 996 (Bly); TREX 000001 at 47; TREX 040009 at 10.

1111.   The explosions on the rig severed the MUX cables between the rig and the BOP, which meant the loss of electrical power and communications from the rig to the control pods. TREX 007687 at 2; TREX 040008 at 43; TREX 022737 at 14.

1112.   A few minutes after the explosions, Transocean subsea supervisor Chris Pleasant unsuccessfully attempted to activate the EDS.   At this time he also had an indication that there was no hydraulic flow.   This indicates that all three AMF/Deadman trigger conditions would have been met by that time.   Tr. 9025-26 (Shanks); Pleasant Dep. 58-59; D4336C.

1113.   The *Deepwater Horizon* BOP's subsea control system could not perform the AMF/Deadman function as it was designed to function because of deficiencies with both control pods.   The Blue Pod had a depleted 27-volt battery, which did not have adequate charge to perform the function necessary to close the BSR, and the Yellow Pod had a reverse wired solenoid valve which was also not able to function and close the BSR.   Tr. 8404 (Zatarain); D4881; Tr. 996 (Bly); TREX 000001 at 47; Tr. 2649-50 (Davis); TREX 022737 at 4.

1114.   There is no evidence that the blind shear ram functioned when the AMF/Deadman conditions were met.   Rather, the blind shear ram could not have closed at this time because the blind shear ram closed when the drill pipe was off-center, and there was no reason for it to be off-center when the AMF/Deadman conditions were met.   Tr. 2660 (Davis); TREX 007661 at 4, 13-15; Tr. 9038, 9042 (Shanks); TREX 040008 at 1, 31-42.

1115. Transocean's expert, Childs, is the only expert to conclude that the AMF/Deadman functioned during the Incident.  Tr. 5380 (Childs).  Experts for United States, PSC, BP, and Halliburton have concluded that the AMF/Deadman did not function during the Incident.  Tr. 2650-51 (Davis); Tr. 6998 (Stevick); Tr. 8404 (Zatarain); D4881; D4603A; D4572A.

### k.   When Attempted After 21:55, the EDS Failed to Activate.

1116. The *Deepwater Horizon* crew only attempted to activate the EDS after the explosions.  Pleasant Dep. 464-66, 518-22; Tr. 5372-73 (Childs); Tr. 4211 (Webster); Tr. 9424-95, 9427-29 (Mitchell); TREX 005629 at 4; TREX 004472 at 5; M. Williams Dep. 80-81; TREX 040011 at 17-19; Taylor Dep. 179.

1117. Subsea engineer Chris Pleasant hit the EDS after the explosions and, despite seeing the EDS light flashing, saw that there were no hydraulics, indicating that the EDS was not successful and LMRP did not disconnect from the BOP.  Tr. 9025-26 (Shanks); D4336C; Taylor Dep. 179.

1118. The EDS was intended to disconnect the LMRP from the BOP in emergency situations, but it failed to do so during the Incident.  Tiano Dep. 179-80.

1119. After the explosions, Winslow told Kuchta that if he had not already activated the EDS, he should do so.  Winslow Dep. 494-95.

1120. After the explosions, Jimmy Harrell or somebody else asked again if the EDS had been hit, and Harrell said "Hit it."  Somebody reached over and pushed the red button on the BOP panel.  Tr. 9286-87 (O'Bryan).

1121. The EDS operates by pushing a button, but pushing the EDS after the explosion could not close the blind shear rams as intended because the communication between the rig and

BOP had already been lost due to the MUX cables being severed from the rig explosions.  Tr. 2686 (Davis).

### l.      The *Deepwater Horizon* Was Evacuated Shortly After 22:00.

1122.   The bridge crew of the *Deepwater Horizon* activated the mayday and GMDSS distress signals at 21:52-21:53.  TREX 004248 at 32; TREX 000001 at 29.

1123.   The crew abandoned the *Deepwater Horizon* between 22:00 and 22:37 when it was apparent that the crew could not fight the fire.  Tr. 5720-5721 (Young); TREX 004248 at 32; TREX 000001 at 29; *see also* Tr. 1811-12 (Ezell); Keplinger Dep. 107-08; TREX 004472 at 6.

1124.   Several minutes after the explosions, Captain Kuchta told the persons on the bridge to abandon ship.  Tr. at 9290 (O'Bryan).

1125.   Captain Kuchta was not the last person to leave the *Deepwater Horizon*.  After the last liferaft was launched, Yancy Keplinger asked Captain Kuchta why he had let the raft deploy without him, and Kuchta replied, "I don't know about you, but I'm jumping," after which he jumped from the rig before Keplinger.  Keplinger Dep. 121-22.

### m.      The Traveling Block Fell at 22:20 and Buckled the Drill Pipe.

1126.   The traveling block was a piece of equipment on the derrick of the rig that attached to the hanging drill pipe and provided the ability to raise and lower the drill pipe. The traveling block weighed approximately 190,000 lbs. Tr. 9027-28, 9042-43 (Shanks); D4338C; TREX 040008 at 32-34; Tr. 5375-76 (Childs).

1127.   Approximately 30 minutes after the rig explosions, the traveling block was seen falling to the deck of the rig.  The Sperry block position data indicates it fell about 27 feet.  Tr. 9027-28 (Shanks); TREX 040008 at 33-34; TREX 000620; D4338C; Tr. 5151, 5376-77 (Childs); Tr. 6922 (Stevick); Winslow Dep. 199-200.

1128.   The drill pipe hanging from the traveling block at the time of the Incident weighed approximately 160,000 lbs.  Tr. 9043 (Shanks); D4953.1; TREX 040008 at 34.

1129.   When the traveling block fell it generated sufficient downward force to have buckled the drill pipe in the BOP and forced the drill pipe against the side of the BOP bore.  Tr. 9028-29, 9043 (Shanks); D4813; D4953.1; TREX 040008 at 32, 34; Tr. 5376-77 (Childs).

1130.   As an engineering analysis shows, the closed middle and upper variable bore rams would have generated enough frictional force to have resisted the downward force sufficient to cause the drill pipe to buckle.  Tr. 9043 (Shanks); TREX 040008 at 34.

1131.   The United States expert, Dr. Davis, testified that it is possible that the weight of the drill pipe above the BOP alone could have provided sufficient downward force to have caused the drill pipe to buckle within the BOP.  Tr. 2889-90 (Davis).

1132.   Halliburton's expert, Dr. Stevick, testified that the traveling block theory "is a viable theory as to why you can have pipe buckle in a BOP."  Tr. 6950 (Stevick).

1133.   The traveling block fell and buckled the drill pipe with the BOP after the AMF/Deadman conditions were met.  Tr. 9038 (Shanks).

1134.   When the traveling block fell, the upper annular, middle variable bore ram, and upper variable bore ram were closed.  Until the traveling block fell, the drill pipe was hanging straight and would have been centered in the BOP.  Tr. 9042 (Shanks); D4953.1.

i.      **The Physical Evidence Indicates the Force from the Traveling Block Falling Was Transmitted to the Drill Pipe in the BOP.**

1135.   The drill pipe that was recovered from the middle and upper variable bore rams during the forensic examination provided physical evidence that the downward force of the traveling block falling was transmitted to the drill pipe in the BOP.  This was shown by two sets of erosion marks on the drill pipe at both the middle and upper variable bore rams: a lighter set

and a heavier set.  The lighter set of erosion marks occurred first when the variable bore rams originally closed.  The downward force from the falling traveling block then pushed the drill pipe approximately 4 inches down through the variable bore rams to a second location where the drill pipe was found in the rams.  The second heavier set of erosion marks occurred at this location. The top of the lighter set of erosion marks overlaps with the bottom of the heavier set of erosion marks.  Tr. 9047-49 (Shanks); D4815; D4912; TREX 040008 at 34.

1136.   The erosion patterns on the drill pipe indicated that the variable bore rams closed on the pipe.  Thompson Dep. 102.

1137.   The force-from-below theory, Transocean's theory that it contends explains the buckling of the drill pipe within the BOP, as discussed *supra*, cannot explain these two sets of erosion marks on the drill pipe in the variable bore rams because that force would act in the wrong direction.  Tr. 9049 (Shanks).

1138.   Pipe segment 39 was located immediately above the upper annular on the evening of April 20, 2010, and pipe segment 1-B-1 was immediately below the upper annular.  These pipe segments were originally connected.  Tr. 9050, 9052 (Shanks); D4874.

1139.   Erosion marks on drill pipe segments 39 and 1-B-1 align very well.  When these pipe segments are aligned by the erosion marks, their curvature also aligns in the same plane. This indicates that pipe segments 39 and 1-B-1 experienced a buckling force in the same plane that caused plastic deformation.  Only the force from the falling traveling block could have caused this deformation.  Tr. 9050-52 (Shanks); D4874; TREX 040008 at 32.

1140.   The force-from-below theory could not have caused the plastic buckling in drill pipe segments 39 and 1-B-1.  Tr. 9051-52 (Shanks).

ii.     **The Variable Bore Rams Did Not Have to Resist the Full Force of The Falling Traveling Block.**

1141.   While the full weight of the traveling block and drill pipe was approximately 350,000 lbs, all of this weight of the falling traveling block would not have been transferred to the variable bore rams that were holding the drill pipe and resisting the downward force applied to the drill pipe.  Tr. 9043-46 (Shanks); TREX 040008 at 34.

1142.   As soon as the load rose to around 50,000 lbs to 60,000 lbs. the drill pipe would have begun buckling and would continue buckling until it hit the side of the bore in the BOP.  Above the BOP the drill pipe would helically buckle around the inside of the riser and would exert an outward radial force against the riser.  As the downward force increased, the friction of the helically buckled drill pipe against the side of the BOP and riser would increase and result in "lock-up."  Tr. 9043-45 (Shanks); TREX 040008 at 34; D4953.1.

1143.   Once the traveling block hit the deck the force from its weight was no longer transferred into the drill pipe, but some of this force was still contained in elastic energy in the drill pipe.  Tr. 9045 (Shanks).

1144.   Much of the downward force generated by the falling traveling block was absorbed by plastically or permanently buckling the drill pipe.  Tr. 9045-46 (Shanks).

1145.   If the drill pipe is elastically buckled it will return to its original shape (*i.e.* straighten back out) when the buckling force is removed.  Tr. 9045 (Shanks); Tr. 6946 (Stevick).

1146.   If the drill pipe is plastically buckled, the buckling force has exceeded the pipe's yield stress.  When the buckling force is removed the drill pipe will come back somewhat but will not return to its original shape; it will stay bent.  Tr. 9045 (Shanks); Tr. 6946-47 (Stevick).

1147.   The drill pipe within the BOP probably Euler-buckled because there was not enough room to begin the helical buckling process.  Tr. 9046 (Shanks).

1148.   Euler buckling is also called planar buckling.  Tr. 6946 (Stevick).

1149.   Drill pipe segment 83 was immediately above the blind shear ram at the beginning of the Incident.  That this pipe segment was found straight merely means that it stayed within its elastic limit during the Incident.  Tr. 9198-99 (Shanks).

### iii.   It Is Unlikely that Drill Pipe Segments 39 and 1-B-1 Separated in a Classic Tensile Failure Shortly After the Rig Explosions due to Rig Drift.

1150.   Transocean contends that the downward force generated from the traveling block falling could not have been transferred to drill pipe within the BOP to buckle it because the drill pipe above the BOP would have been separated by rig drift.  Tr. 5149 (Childs).

1151.   As an initial matter, the weather conditions at the time of the rig explosions were very calm, so very little rig drift would have occurred.  Tr. 9052-53 (Shanks); Tr. 6959 (Stevick).

1152.   Further, the riser tensioners, a piece of rig equipment, intended to keep the riser in tension to prevent it from collapsing during drilling operations, would have prevented any meaningful rig drift.  The riser tensioners applied 1.8 million pounds of tension to the riser, and this force helps keep the rig on-station.  If the rig tried to move off-station the horizontal component of the 1.8 million pounds acted as a restoring force tending to pull the rig back on-station.  Tr. 9053 (Shanks); Tr. 4250 (Barnhill).

1153.   Because of the fire rating of the hoses, the riser tensioners should have stayed intact for at least an hour after the explosions keeping tension in the riser.  This should have kept the rig in reasonable proximity to the well.  Tr. 9053 (Shanks).

iv.   **The Ends of the Drill Pipe Segments That Were Above the Upper Annular Do Not Indicate That They Separated in a Classic Tensile Failure Due to Rig Drift.**

1154.   Additionally, there is no physical evidence that supports Transocean's theory that the drill pipe above the upper annular separated by rig drift before the travelling block fell.  Tr. 9052-57 (Shanks); D4926; D4927.

1155.   Because the rig drift would have pulled the drill pipe apart in a slow process, if at all, the walls of the two drill pipe segments (segments 39 and 1-B-1) would have exhibited "necking" or thinning of the metal at the location of the failure.  But there was no necking on these two drill pipe segments.  Tr. 9055-56 (Shanks); D4926; D4927.

1156.   If drill pipe segments above the upper annular had separated in a classic tensile failure from pure tension, the ends of these segments (segments 39 and 1-B-1) would have 45 degree angles on the inside and outside edge with a flat surface in between.  This is because in a classic tensile failure, cracks form simultaneously on the inside and outside surfaces with the fracture moving at a 45 degree angle until a spontaneous flat fracture occurs.  Tr. 9055-56 (Shanks); D4926; D4927.

1157.   Instead of showing evidence of a classic tensile failure, as Transocean contends, the shape of the failure on the end of drill pipe segment 1-B-1 was more consistent with a large bending moment that was applied very quickly and caused a shear failure on a 45 degree plane. If the other side of the fracture existed it would show the fracture started on the inside going out, which would have been a classic bending failure.  Tr. 9056-57, 9184 (Shanks); D4927.

1158.   Contrary to Transocean's contention, the ends of the two drill pipe segments 39 and 1-B-1 do not "fit together" to show that the drill pipe above the upper annular failed in classic tension due to rig drift.  Rather, there is substantial missing metal on each of these drill

pipe segment ends that prevents any conclusion as to the exact failure for the separation of the drill pipe above the upper annular.  Tr. 9054-57 (Shanks); D4926; D4927.

1159.   Specifically, the "tongue" of drill pipe segment 1-B-1 does not fit inside the "groove" of drill pipe segment 39, as Transocean erroneously contends, and demonstrates that there is substantial metal was missing from both of these segments.  Without the original fracture marks it is not possible to determine how or when these drill pipe segments separated.  Tr. 9054-57 (Shanks); D4926; D4927.

> ### v.   The Force from the Falling Traveling Block Would Still Be Transmitted to the Drill Pipe in the BOP if Drill Pipe Above the Upper Annular Were Separated Before the Block Fell.

1160.   The downward force generated by the falling traveling block could have buckled the drill pipe within the BOP even if the drill pipe above the upper annular had separated before or while the block fell.  If any portion of drill pipe above the upper annular (*i.e.*, drill pipe segment 39) had made contact with and stayed in communication with the drill pipe below the upper annular (*i.e.*, drill pipe segment 1-B-1) when the traveling block fell, then the force would have been transmitted to the drill pipe within the BOP and would buckle it.  Tr. 9057-58 (Shanks).

1161.   The bottom of drill pipe segment 39 would be flat if it had just hit the top of the upper annular fingers, and not the drill pipe in the upper annular, when the traveling block fell.  The bottom of segment 39 was not flat, indicating that it did not hit just the top of upper annular fingers but in fact contacted the drill pipe in the upper annular at some time before the rig sank.  Tr. 9058 (Shanks); D4926.

1162.   The shape of the end of drill pipe segment 39 was consistent with the segment partially making contact with the upper annular and partially hanging over the opening in the

annular.  This was strong evidence that drill pipe segment 39 made contact with segment 1-B-1 when it dropped against the upper annular at some time before the rig sank.  If segments 39 and 1-B-1 separated while the traveling block fell, the physical evidence indicates that segment 39 stayed in contact with segment 1-B-1 because part of segment 39 hit outside the fingers of the upper annular and remained overlapped with segment 1-B-1.  Tr. 9058 (Shanks); D4926.

**K.    The Events of April 21-22, 2010.**

**1.    The Autoshear Was Activated Remotely at 07:48.**

1163.   At 07:48 on April 22, 2010, a remotely operated vehicle (ROV) was used to cut the Autoshear plunger simulating the loss of the LMRP from the Lower BOP.  This activated the Autoshear system and closed the blind shear ram.   Tr. 9029-33 (Shanks); D4340A; TREX 040008 at 44; Tr. 1479-80 (Bly); Tr. 2657-60, 2748 (Davis); Tr. 7003-04 (Stevick); Whitby Dep. 46.

1164.   The Autoshear system was activated on the morning of April 22, 2010 at around 07:30 by an ROV cutting the Autoshear plunger.  Tr. 5380 (Childs).

1165.   Video shows that the BOP shook immediately after the Autoshear plunger was cut.  This is consistent with shaking of the BOP that occurs during lab testing and is caused by the release of thousands of pounds of pressure when the blind shear rams are activated, and suggests this is when the blind shear ram was activated.  If the AMF/Deadman had already functioned at this time the accumulator bottles would have been discharged already and there would be no reason for BOP to shake.  Tr. 9029-30 (Shanks); TREX 040008 at 45; Abbassian Dep. 475-76.

1166.   Several eyewitnesses of the video of the Autoshear plunger being cut reported seeing the BOP move immediately after the plunger was cut, including Transocean employees who noted that "[w]e saw shock when we activated auto shear … [w]hen the plunger valve

poppet was cut, it extended firmly and BOP shook."  It was further noted that except for activating the Autoshear, "there has not been any action that made the BOP shake or tremble." TREX 005328 at 2; Emmerson Dep. 259-61; TREX 004794 at 1-2; Winslow Dep. 254-55; Whitby Dep. 46, 226-27, 270; TREX 040008 at 45.

1167.  Melvin Whitby, Cameron's Director of Engineering Technology, watched a live video of the Autoshear plunger being cut on April 22, 2010.  When the plunger was cut Whitby observed a jolt and "personally saw the corner of the LMRP move fairly significantly."  Whitby Dep. 46, 226-27, 270.

### 2.  The Blind Shear Rams Closed but Did Not Seal the Well Because the Drill Pipe Was Forcibly Held Partially Outside the Blades.

1168.  When the blind shear rams were activated on April 22, 2010, the drill pipe was buckled and forcibly held partially outside the blades of the blind shear ram.  Therefore the drill pipe that was outside the shearing blades of the blind shear ram became lodged between the two rams preventing them from fully closing and sealing the well.  Tr. 9012, 9030-31, 9035 (Shanks); D4340A; TREX 040008 at 29; Tr. 2657-60 (Davis); Tr. 7004 (Stevick).

1169.  The drill pipe segments that were above and below the blind shear ram when it closed show indentations that align with the blind shear ram blocks.  From these indentations, it is obvious that a portion of the drill pipe extended outside the blind shear ram blades and prevented the blind shear ram from sealing the well.  Tr. 9031-32 (Shanks); D4824; TREX 040008 at 27; Tr. 5086, 5101-02, 5126-31 (Childs); D6234; D6690; Tr. 2680, 2749, 2751 (Davis); TREX 007661 at 15.

1170.  The much heavier erosion on the kill side of the blind shear ram blocks compared to the choke side indicates that the drill pipe was located to the side of the wellbore when the blind shear rams closed.  TREX 040008 at 28-29; D4824.

1171.   The lower blade of the Cameron SBR model blind shear ram was 17-7/8 inches wide and the upper blade was 15-1/4 inches wide.  The *Deepwater Horizon* BOP's wellbore was 18-3/4 inches in diameter.  TREX 040008 at 29-30; D. McWhorter Dep. 709-10.

1172.   When the blind shear ram closed on April 22, 2010 the upper annular was closed, the middle and upper variable bore rams were closed, the drill pipe inside the BOP was buckled and held firmly against the side of the wellbore, and the drill pipe above the BOP was helically buckled.  Tr. 9033-34 (Shanks); D4953.1.

### 3.     The *Deepwater Horizon* Sank on April 22, 2010.

1173.   The *Deepwater Horizon* sank on April 22, 2010, slightly after 10:00.  TREX 000001 at 29; TREX 040008 at 42; TREX 004248 at 162; Tr. 5137 (Childs); Tr. 4742 (Newman).

## VI.   THE FOAM CEMENT DESIGNED, TESTED, AND RECOMMENDED BY HALLIBURTON FOR THE PRODUCTION CASING FAILED TO SERVE AS A BARRIER BECAUSE IT WAS UNSTABLE.

### A.     BP Relied on Halliburton to Provide Suitable Cement.

### 1.     Jesse Gagliano's Responsibilities.

1174.   BP relied on Halliburton to provide an experienced and competent cement engineer, Jesse Gagliano, for the Macondo well.  Cunningham Dep. 141, 525.  It was reasonable for Morel, Hafle, Cocales, and Guide to rely on Gagliano's expertise.  Tr. 2488 (Benge).

1175.   Gagliano had been embedded at BP for four or five years at the time of the Incident.  Tr. 6583-84 (Gagliano); Cocales Dep. 87.  That meant Gagliano reported to BP's office in Houston on a daily basis.  Tr. 6583-84 (Gagliano).

1176.   As Halliburton's point person for the Macondo well, Gagliano was responsible for communicating with BP on:  (1) Halliburton's proposed slurry design for the Macondo well project, (2) the results of lab tests, and (3) job evaluations and reports.  Tr. 3188-89, 3192 (Roth).

1177.   It was Gagliano's job to recommend a cement plan that would accommodate the casing plan being suggested.  Tr. 6804-05 (Gagliano); Serio Dep. 95-99; Breazeale Dep. 649. Gagliano was the only Halliburton employee responsible for the design of the cement.  Tr. 6685 (Gagliano).

1178.   Gagliano worked with the BP Macondo well team every day and knew that he was being relied upon for his expertise.  Tr. 2491 (Benge).  Gagliano was "much more expert in cementing than were the BP engineers" and "his experience level was higher than that of the BP engineers."  Tr. 2490-91 (Benge); *see also* Nguyen Dep. 253.  For example, Gagliano had more experience in cementing than Brian Morel and Mark Hafle, the Drilling Engineers on the BP team, whose experience Gagliano described as "limited."  Tr. 6808-11 (Gagliano).

**B.     Gagliano Recommended the Slurry For the Macondo Production Casing.**

1179.   If the slurry was unstable, Gagliano should have redesigned it before pumping. Dugas Dep. 227-28, 233-35.

1180.   Gagliano was always comfortable telling BP his recommendations.  Tr. 6598 (Gagliano).  During morning calls, he would speak up when cement issues were discussed to indicate his agreement or disagreement.  Tr. 6601 (Gagliano).

1181.   Gagliano had access to Halliburton software packages, including the Halliburton Integrated Proposal System (HIPS), OptiCem software, the Viking System, and WELLCAT temperature modeling software.  Tr. 6587 (Gagliano).  Gagliano also had other resources available, including a technology center, technical advisors, and other account representatives. Tr. 6589-90 (Gagliano); Tr. 3214 (Roth).  Gagliano was not required to consult any other Halliburton employee about his design recommendations.  Tr. 6691 (Gagliano).

1182.   BP's access to Halliburton's labs and research facility was through Gagliano.  Tr. 6815 (Gagliano).

### 1.   Halliburton Knew of the Specific Properties and Risks of the Macondo Well.

1183.   In performing the cement job, Halliburton was aware that the Gulf of Mexico is challenging for cement jobs because of its narrow pore pressure and fracture gradient (PPFG) windows.  Tr. 3135 (Roth).  Close PPFG represents a "formidable challenge" for a cement job. Tr. 3197 (Roth); TREX 007483.

1184.   BP provided Gagliano with the information needed for design engineering, including pore pressures, mud weights, fracture gradient, casing design, and target top of cement. Tr. 6634-35 (Gagliano).  In addition, "HESI admits that it had certain caliper log and directional data for the Macondo well before April 18, 2010."  Halliburton's Discovery Response, at 24 (May 25, 2011) (Ex. 5).

1185.   Halliburton knew that BP's well design was challenging because it limited the amount of cement that could be poured.  Tr. 3136 (Roth).

1186.   Halliburton knew the volume of cement, which was a boundary condition for the job based on the top-of-cement and the geometry of the well.  Tr. 2549 (Benge).  The boundary condition for the top-of-cement was 500 feet above the top hydrocarbon zone, consistent with MMS requirements.  The top-of-cement could not have been higher because it would then cover the previous shoe (at the 9-7/8" liner) and cause annular pressure buildup (APB), which could jeopardize wellbore integrity.  Tr. 2550-52 (Benge).

1187.   Although the pump rate of four barrels per minute to accommodate the well conditions was low, the Unites States cement expert Glen Benge has seen jobs pumped slower, at two- and three-barrels per minute.  Tr. 2554 (Benge).  Halliburton knew about the pump rate but never said that BP should not pump the job because the pump rate was too low.  Tr. 2555 (Benge).

1188.   Halliburton knew from the OptiCem modeling that there was severe gas flow potential at the Macondo well.  Tr. 3136 (Roth); TREX 000717.

1189.   Halliburton expected Jesse Gagliano to be aware of the Macondo field's "unique history" of kicks and related issues.  Tr. 3135-36 (Roth).  For example, Gagliano knew of the March 8, 2010 kick.  Tr. 8947 (Guide).

1190.   Gagliano also was aware, at least by March 7, of the close PPFG issues associated with the Macondo well.  Tr. 3197 (Roth); TREX 007483.

### 2.   Gagliano Made Design Proposals to BP With Knowledge of the Macondo Well Conditions.

1191.   There was sufficient time to plan the cement job.  Tr. 6384 (Chaisson).

1192.   Gagliano and Morel had several meetings where they worked on OptiCem modeling.  Tr. 6773-74 (Gagliano).  For example, during an April 14 meeting, Gagliano performed modeling to confirm that cement could be placed with the long-string casing.  Tr. 6772-73 (Gagliano).

1193.   Gagliano's April 15, 2010 proposal accounted for the discussion of adding an additional 15 centralizers.  Tr. 6680 (Gagliano); D8247; TREX 063076; TREX 060443.  Gagliano does not recall, however, modeling BP's proposed placement of the six centralizers that Morel sent to him on April 15, 2010.  Tr. 6857-58 (Gagliano).

1194.   Gagliano received an updated casing tally and an updated procedure from the rig, which was included in his April 17, 2010 proposal to BP.  Tr. 6681 (Gagliano); D8247; TREX 063076; TREX 060443.

1195.   There was a written plan by Chaisson of Halliburton for the cement job, which combined the plan received from Gagliano, the cement procedure, and information from a meeting that took place the night of April 17, 2010.  Tr. 6292 (Chaisson); TREX 000737.

1196.   The last Halliburton job proposal was on April 18, 2010, which reflected a change to six centralizers and .09 gallons of retarder.   Tr. 6681 (Gagliano); D8247; TREX 063076; TREX 060443.

1197.   At the time Halliburton recommended the slurry on April 18, Gagliano had not provided foam stability tests for the .08 gps or .09 gps slurry to BP, or indicated any problems with the foam slurry testing.   Tr. 2511-12 (Benge); D4269A.

### C.     Halliburton's Testing Resources.

1198.   In April 2010, Tim Quirk was in charge of the four Halliburton cement labs at Broussard.   Tr. 4754 (Quirk).   The managers of all four labs at Broussard reported to Quirk.   Tr. 4855 (Quirk).

1199.   In 2010, the Broussard lab received test requests through Halliburton's Viking lab database management system, which was designed so that everyone – engineers, system coordinators, and lab techs – could use it to order tests, track a test request, and view the results. Tr. 4808-09 (Quirk).

1200.   BP did not have access to the Viking system that Halliburton used to order laboratory testing and to report results.   Tr. 6827 (Gagliano).

1201.   Generally, the Halliburton lab does not report its results to customers such as BP. To create a report to an outside customer, the requesting engineer would use Viking to generate a "customer report" document with desired test results.   Tr. 4867-68 (Quirk); TREX 007722.

### D.     Halliburton Designed an Unstable Slurry, Improperly Using Defoamer in a Foam Cement.

#### 1.     Gagliano Recommended to BP the Foam Cement Design Used at the Macondo Well.

1202.   Gagliano was asked by Trent Fleece, Brian Morel, and Mark Hafle to come up with a recommendation for the cement to be pumped in the production casing interval for the

Macondo well.  Tr. 6616 (Gagliano).  Halliburton was responsible for recommending a cement design for the Macondo well, and Gagliano recommended foam cement.  Tr. 6619, 6821-22 (Gagliano); Tr. 3187 (Roth); Tr. 2336, 2495 (Benge).

1203.   Gagliano made his recommendation because foam cement provided the ability to adjust the weight of the cement to avoid fracturing the well, and the Macondo well had experienced losses during drilling due to a fragile formation.  Tr. 6618-19, 6642-43 (Gagliano).

1204.   As early as January 28, 2010, Gagliano reported to Halliburton:  "[P]lan on foaming the 9 7/8-[inch] production casing if the well is a find."  Tr. 6821-22 (Gagliano); TREX 007494 at HAL-0023604.

1205.   When the *Deepwater Horizon* moved from the Kodiak well to the Macondo well, there was a dry blend of cement already on the rig, which was leftover from Kodiak.  Tr. 6622 (Gagliano).  Unlike the Macondo well cement job, the Kodiak cement job was not a foam cement job.  Tr. 3193-94 (Roth).

1206.   The *Deepwater Horizon* had additional empty tanks and Gagliano could have ordered new cement if he determined it was appropriate.  Tr. 6819-20 (Gagliano).  Nothing prevented Gagliano from getting additional cement out to the rig if he so desired.  Tr. 6821-22 (Gagliano); TREX 007494 at 1.

1207.   Instead of sending additional cement to the *Deepwater Horizon*, Gagliano recommended that the leftover Kodiak blend cement be used for the Macondo well foam slurry.  Tr. 6622, 6723 (Gagliano); Tr. 2498 (Benge).  Cement from a prior well can be used on the next well if it is tested.  Dugas Dep. 201-02.

1208.   There were potential alternative cement designs – both foam and conventional slurries – that could have been used at the Macondo well with an ECD of less than 14.5 ppg in

response to the tight PPFG issues.  Tr. 3214-15 (Roth).  There is no evidence, however, that Halliburton recommended that BP should use a new blend.  Tr. 2500 (Benge).

1209.  BP accepted Gagliano's recommendation.  Tr. 6723 (Gagliano). The BP team never disagreed with or second-guessed Gagliano's recommendation to use foam cement in the well.  Tr. 6620-21 (Gagliano).  There is no evidence that BP wanted to use the leftover Kodiak blend in order to save money, or that BP refused to pay for a new blend.  Tr. 2500 (Benge); Tr. 3225 (Roth).

1210.  Hafle asked Gagliano in March 2010 whether foam cement could be pumped across a production interval.  TREX 007483 at 1.  Gagliano responded affirmatively:  "We have foamed several production liners and casings across the production zone to be perforated … This has been done in the past with success."  Tr. 6811 (Gagliano); Tr. 3197-98 (Roth); TREX 007484 at 1.

### 2. Foam Cement is Appropriate for Deepwater Wells Such as the Macondo Well When Designed Appropriately.

1211.  Foam cement is cement into which nitrogen is injected to lighten the density before pumping.  Tr. 6615 (Gagliano).  Foam cement delivers three primary benefits:  (1) it protects the formation, (2) it prevents gas migration, and (3) it helps improve mud displacement. Tr. 6374-75 (Chaisson); Serio Dep. 333-34, 379-80; Cunningham Dep. 125; TREX 002128 (listing the "truckload of benefits you get when you do foam cement the right way"); TREX 002129 at 1.

1212.  Halliburton's Cementing Technology Manual stated:  "Attaining an extremely low density is useful to prevent formation breakdown to weak formations and prevent lost circulations."  TREX 004348 at 415.  Foam cement allowed adjustment to the weight of the

cement to make sure the formation is not fractured if there is a low fracture gradient.  Tr. 6615-16 (Gagliano); Tr. 2494-95 (Benge).

1213.   Halliburton advertised and promoted foam cement as a solution for severe gas flow potential.  Tr. 6852 (Gagliano); Tr. 6320, 6372 (Chaisson); D. Kellingray Dep. 544-45; Serio Dep. 289-91, 302-04; Sabins Dep. 693; TREX 002122 at 216; TREX 002124.   Indeed, Halliburton taught its cement engineers that foam cement is a solution for severe gas flow potential.  Tr. 6373 (Chaisson); TREX 005823 at 41.

1214.   Foam cement is more efficient at mud displacement because it is an energized fluid.  Tr. 2493 (Benge); R. Faul Dep. 515-16; TREX 002128 at 4.

1215.   Mud contamination can harm a cement's ability to develop strength and can affect the time it takes for the cement to set, or, depending on the concentration amount, the ability to set at all.  Tr. 6782 (Gagliano).   There could be more potential for contamination with less cement.  Tr. 6782-83 (Gagliano).

1216.   Using foam cement with oil-based mud can be done successfully and was not uncommon.  Tr. 2280 (Benge); Tr. 6707 (Gagliano).   When using a foam cement in a synthetic oil-based environment, a spacer, an unfoamed cap cement, an unfoamed tail cement, and a double plug cementing system to prevent contamination.  Tr. 2496-97 (Benge).   All these steps were taken at the Macondo well, and they were the right steps to help ensure the foam cement could get where it needed to be and to perform as expected.  Tr. 2497-98 (Benge).   Gagliano also planned the cement job to mitigate the risk of contamination by pumping additional spacer.  Tr. 6784-85 (Gagliano).

1217.   However, the beneficial properties of foam cement described in Halliburton's literature are only obtained if the foam is stable.  Tr. 2493-94 (Benge); Tr. 4929-30 (Quirk); *see also* TREX 002128.

### 3. Halliburton's Design of the Foam Cement Used at the Macondo Well Was Inconsistent with Best Practices and Halliburton's Manuals.

1218.   It was reasonable for BP to expect that its cement contractor would recommend a slurry designed in accordance with its global laboratory best practices.  Tr. 2484 (Benge).

1219.   The cement slurry recommended by Halliburton was inconsistent with Halliburton's global laboratory best practices.  Tr. 2485 (Benge); Tr. 3158-59, Tr. 3242-43 (Roth); TREX 000982; TREX 002133; D4381.   Because the leftover cement blend was not originally intended to be foamed, it contained additives that would typically not be in a foam slurry.  Tr. 2270 (Benge).  As a result, the Macondo well cement design contained defoamer and dispersant additives that were detrimental to the stability of the foam design.

1220.   Gagliano was aware that he was violating Halliburton's best practices and he further did not follow proper review procedure on the slurry, which would have identified the design issues.   As Tommy Roth of Halliburton testified, it would have been reasonable for Gagliano to realize that the Macondo well slurry that he recommended had a low probability of success.  Tr. 3221 (Roth).

### a. Halliburton Inappropriately Included D-Air 3000, a Defoamer, to a Foam Slurry Design.

1221.   Certain additives can destabilize foam cement.  Tr. 4787-88 (Quirk).  For a foam cement, the slurry design should be as simple as possible to avoid complexity and any counter-effects of additives.  Tr. 3241 (Roth); R. Morgan Dep. 139-140; TREX 002133.238.BP.  The engineer should consider foam stability when designing the slurry formulation.  R. Morgan Dep. 58-59.

1222.   The Macondo blend contained D-Air 3000, a defoamer additive used to break up air to give the cement a smoother density going downhole.  Tr. 6623-24, 6720 (Gagliano); Tr. 2443 (Benge).

1223.   Halliburton admits that D-Air 3000 and defoamers can destabilize foam cement slurries.  Halliburton's Discovery Response at 26, 27 (July 18, 2011) (Ex. 3).  It would be against expectations to put D-Air in a foam slurry if designing a cement from scratch.  Tr. 3130, 3182, 3195 (Roth).

1224.   Halliburton's manuals stated that defoamers should not be used in foam cement designs.  Tr. 2334-36 (Benge); Tr. 3069-70, 3159, 3182 (Roth); Sabins Dep. 529; D4381.  The BP investigation concluded that dispersants and defoamers could lead to foam stability problems.  Tr. 1380 (Bly); TREX 000001 at 58.  The Transocean investigation report also found that the defoamer had a negative effect on foam stability.  Tr. 6213-14 (Ambrose).

1225.   At least three separate internal Halliburton manuals advised against the use of D-Air in a foam cement job.  Tr. 3193-94 (Roth); D4381; TREX 004347; TREX 004348; TREX 005570.

1226.   Halliburton's U.S. Land Offshore Work Methods, which was published in April 2010, provided that Halliburton must include cementing best practices when using the ZoneSeal Isolation Process, including the best practice that a defoamer should not be used in foam cement.  Tr. 6824-25 (Gagliano); Serio Dep. 408-13; TREX 002133 at 239.

1227.   Halliburton's Global Laboratory Best Practices expressly stated not to use defoamers in foam cement.  Tr. 2503 (Benge); Tr. 4788 (Quirk); Tr. 6826 (Gagliano); Nguyen Dep. 296-97; TREX 004347 at HAL_0677647.

1228.   Halliburton's Foam Cementing Operations Manual indicated that defoamers, such as D-Air, and dispersants, are incompatible with foam cement.  Tr. 4790-91 (Quirk); TREX 000745 at 16.   Halliburton's Cementing Technology Manual also advised:   "Avoid using dispersants or defoamers additives."  Tr. 6643 (Gagliano).

1229.   A Halliburton foamer known as ZoneSealant 2000 was used at the Macondo well to foam the cement.  Tr. 6624, 6637 (Gagliano); Tr. 3129 (Roth).

1230.   The technology bulletin from Halliburton related to ZoneSealant 2000 stated: "Do not use defoamers or dispersants (NF and D-Air defoamers, C.F.R.-2, C.F.R.-3, Halad-9, Halad-12, Halad-22A additives, [et cetera]).  These materials *will* destabilize the foam."  Tr. 4904-05 (Quirk); TREX 005219 at 3 (emphasis added).   Halliburton employees should have known this since it was a Halliburton global best practice.  Tr. 4788-90 (Quirk).

1231.   Halliburton's internal manuals were consistent with industry practices.   The United States cement expert Glen Benge opined that a defoamer should not be used in a foam cement because it will break the foam.  Tr. 2336, 2501-02 (Benge); *see also* R. Morgan Dep. 143-44.  Thus Halliburton's use of a dry blend with defoamer for the foam cement job added risk.  Tr. 2443 (Benge).

1232.   Halliburton's lab manager Tim Quirk stated that a cementer would not want to design a foam cement with D-Air 3000.  Tr. 4787, 4874 (Quirk).

1233.   Halliburton lab shift manager Phyllis Stelly testified that she would not have included D-Air in a foam slurry design.  Stelly Dep. 71-72.  Foam designs usually do not have defoamers, in Stelly's 25 years of experience.  Stelly Dep. 72-73.

1234.   Chevron does not use defoamers in foam cements.  Gardner Dep. 281.

1235.   The Halliburton documents advising against the use of D-Air in foam cement were accessible to Gagliano; they were also accessible to Halliburton technical support staff.  Tr. 3195 (Roth); D4290.

1236.   These documents, aside from the Cementing Technology Bulletin, were internal to Halliburton and not given to customers.  Tr. 2503 (Benge).

1237.   Gagliano did not provide the internal documents to BP which stated not to use defoamer in foam cement, and he never told anybody on the BP wells team he was designing a cement contrary to Halliburton's best practices.  Tr. 6828 (Gagliano).

1238.   Gagliano was involved with four foam production jobs.  Only the slurry used at the Macondo well contained D-Air 3000.  The other three contained no D-Air.  Tr. 6724, 6818 (Gagliano); Tr. 4933-34 (Quirk); TREX 031002 at 2.

1239.   Gagliano was not aware of a January 2010 Halliburton foam cement job that included D-Air and failed.  Tr. 6831 (Gagliano); D4686.

> **b.**     **Halliburton Used Other Inappropriate Additives that Affected Foam Stability.**

1240.   The Macondo well foam slurry contained SCR-100, a retarder additive that lengthens the time it takes for cement to thicken in order to allow sufficient time to place the cement.  Tr. 6637-38, 6779 (Gagliano); TREX 000717 at 43.  SCR-100 also has dispersing properties.  Tr. 2502 (Benge); Tr. 6781 (Gagliano); Tr. 4789-90 (Quirk).

1241.   The Halliburton Global Laboratory Best Practices indicated that:  "Some retarding additives may affect the rheological properties of the slurry and cause problems with settling and/or free fluid.  If the amount of retarder necessary to achieve the required thickening time changes greatly from the estimated concentration in the base slurry stability test, repeat the

259

previous steps with the new additive concentrations."   Tr. 4981 (Quirk); TREX 004347 at HAL_0677647; *see also* Sabins Dep. 529.

1242.   The foam slurry also contained the additive KCl, another dispersant that thins the slurry.  Tr. 2502 (Benge); TREX 000717 at 43.

1243.   Halliburton admits that SCR-100 and other additives with dispersing effects can destabilize foamed cement slurries.  Halliburton's Discovery Response at 27, 28 (July 18, 2011) (Ex. 3).  Thus, Halliburton's best practices recommend ***not*** using dispersants with foam slurries. Tr. 3092-93 (Roth); TREX 004350 at 2; TREX 005219 at 3.

1244.   Halliburton's own witnesses and documents establish that SCR-100 should not have been used in the Macondo well cement because it was detrimental to foam stability.   Tr. 3240 (Roth); D4381.  If a slurry for the Macondo well was being designed from scratch, the best practice would have been to not include SCR-100.  Tr. 3240 (Roth).

1245.   Halliburton had a number of retarders that were compatible with foam cement and do not have dispersant properties.  R. Morgan Dep. 142-43.

### c.   Gagliano Ignored Halliburton Best Practices and Internal Protocols.

1246.   Gagliano knew that Halliburton recommended not using D-Air 3000 in a foam slurry design.  Tr. 6624-25, 6639-41 (Gagliano); TREX 005219 at 3.  Gagliano likewise knew that SCR-100 had dispersant properties.  Tr. 6781 (Gagliano).

1247.   No other Halliburton employee was involved with the design of the Macondo slurry or knew that Gagliano was deviating from Halliburton's operations manuals.  Tr. 6750 (Gagliano).  Tommy Roth of Halliburton conceded that the risks of using D-Air 3000 in the slurry for the Macondo well should have been identified to BP.  Tr. 3091-92 (Roth).

1248.  At trial, Gagliano and Halliburton contended that the effects of D-Air on cement could have been overcome through the use of sufficient foaming agent (also known as a surfactant) such as Halliburton's ZoneSealant.  Tr. 3182 (Roth); Tr. 6644 (Gagliano).  But the Halliburton operations manuals (Foam Cementing Operations Manual, Global Laboratory Best Practices, and the Cement Technology Manual) did not indicate that you can use D-Air with foam cement.  Tr. 6748-49 (Gagliano); D3276.  And Rickey Morgan, Halliburton's Principal Technologist at the Duncan lab, recommended not including a defoamer instead of compensating with more surfactant.  R. Morgan Dep. 16, 145, 147-48.

1249.  Even if the effects of D-Air could have been overcome by increasing the amount of ZoneSealant, there was no evidence that Halliburton did so.  To the contrary, for two of the three other foam production jobs (King South and Nakika), Gagliano used the exact same amount of ZoneSealant as he did at the Macondo well (.11 gps), despite the fact that the Macondo well cement used D-Air and the other jobs had not.  For the third foam production job (Isabela), Gagliano actually used more ZoneSealant (.14 gps) than he did at the Macondo well, despite that fact that the Isabela slurry did not contain D-Air.  Tr. 6726-27 (Gagliano); Tr. 4934 (Quirk); TREX 031002 at 2.

1250.  Quirk has no recollection of the pre-Incident tests using any other concentration of ZoneSealant other than .11 gps.  Tr. 4932-33 (Quirk).  United States expert Glen Benge also observed that there is no evidence that Halliburton ever changed the amount of surfactant.  Tr. 2504 (Benge).

### 4. Halliburton Failed to Update the Basis of Design for the Macondo Well and Subsequently Did Not Identify Risks or Mitigations Associated With D-Air 3000 or SCR-100.

1251. Under the BP/Halliburton contract, Halliburton was required to "[p]rovide onshore engineering support to the operation, with a full and comprehensive technical back up to

the operation.  This shall include as a minimum: 1.2.1 Development and update the cement Basis of Design (BOD) …"  TREX 004477 at BP-HZN-2179MDL00055649.  The contract lays out the requirements for the cement Basis of Design, including, among other things, a discussion of "Risks – What are key risks?"; "Mitigations – How can the major risks be managed?"; "Options – What cement design options exist?"; and "Selection – Based on technical/HSSE/commercial and identified risks, what are the best options for the project?"  TREX 004477 at BP-HZN-2179MDL00055655.

1252.  In 2010, Tommy Roth reported to Halliburton's president Tim Probert that:  "No formal Basis of Design Standard (BOD) exists today" including where the "BOD [is] to formalize agreement with client of challenges to be addressed by cementing service recommendation during well planning."  Tr. 2924 (Probert); TREX 004357 at 5.

1253.  Halliburton's reports provided to BP for the Macondo well did not identify risks, mitigation of risks, alternatives, or continuous assessment of risks (including those associated with D-Air 3000 or SCR-100) as required by a standard process engineering analysis.  Tr. 3092-94 (Roth).

1254.  Gagliano also admitted that his initial 2009 Basis of Design did not contain risk assessments.  Tr. 6682 (Gagliano).  Gagliano did not create another Basis of Design or update the Basis of Design in June of 2009 after finding out that there would be a production casing cement job.  Tr. 6712 (Gagliano).

1255.  If Halliburton had engaged in a Basis of Design for BP, it would have identified and included in its reports the risks and mitigations associated with using D-Air 3000 and SCR-100 in a foam job.  Tr. 3092 (Roth).

1256.  In his March 7 correspondence with BP, Gagliano failed to indicate that the cement intended for the Macondo well included D-Air and that, therefore, it should not be used at the Macondo well.  Roth has no knowledge of any occasion when Gagliano provided such a warning to BP.  Tr. 3198 (Roth); TREX 007484.

1257.  In Halliburton's written correspondence to BP referencing the term "D-Air," not a single document discussed the risk that D-Air could destabilize the foam at Macondo.  Tr. 3277 (Roth); D8011; TREX 001506; TREX 060410; TREX 060060; TREX 000710; TREX 060417; TREX 000717; TREX 001706; TREX 003676; TREX 000716; TREX 000735.

1258.  In addition to the risk of using D-Air in the foam slurry, Halliburton should have identified the risks of using SCR-100 in the foam slurry.  Tr. 3093 (Roth).  However, Halliburton did not identify those risks to BP.  Tr. 3093 (Roth).

**E.   Halliburton Pre-Incident Foam Stability Tests Showed the Slurry Was Unstable, but Halliburton Failed to Report or Misreported the Foam Stability Tests in Advance of the Cement Job.**

1259.  Improved engineering rigor, cement testing, and communication of risk by Halliburton could have identified the low probability of the cement to achieve zonal isolation. Tr. 943 (Bly).

1260.  A foam stability test confirms whether the surfactant is able to overcome the effects of the defoamer.  Tr. 2445-46 (Benge).  According to Glen Benge, the U.S. cement expert, three of Halliburton's four pre-Incident tests showed instability, and the final test had a density that was outside the acceptable density range of 0.2 ppg.  Tr. 2524-25 (Benge); D4309A. There was no successful foam stability test before the cement was pumped on April 19th.  Tr. 2277 (Benge).

1261.  Halliburton agreed that all but the last of the pre-Incident tests for the final production casing provided unstable results.  Tr. 3130-31 (Roth); D3241.  Three separate foam

stability tests on a slurry with the same ingredients before the April 18 recommendation indicated instability.  Tr. 3245 (Roth); Tr. 2574 (Benge); D4309A; TREX 000808 (February 12 test); TREX 000809 (February 16 test); TREX 004564 (April 13 test).  These anomalous results should have been investigated to determine whether the slurry needed to be redesigned.  Tr. 2574 (Benge); Dubois Dep. 330; Dugas Dep. 227-28; Gardner Dep. 94-95.

1262.  Halliburton never performed a test that successfully maintained the 14.5 target density before recommending the slurry on April 18.  Tr. 3245 (Roth); D4309A.

1263.  BP reasonably relied on Gagliano to let it know if the slurry that was going to be pumped was stable or if there were issues with the cement.  Tr. 2479 (Benge); Tr. 8972 (Guide); Dubois Dep. 319; Dugas Dep. 130-31, 139-40, 144-45; Nguyen Dep. 145, 253.  The cement contractor was expected to identify to the operator anything that does not look right in the testing.  If the operator did not receive information about potential risks, it could not take steps to mitigate those risks.  Tr. 2476-77 (Benge).

1264.  If a test was performed on cement which is to be used in a cement job, the test results should have been given to the customer before the cement job begins.  Serio Dep. 212-13.  The customer was entitled to any lab results that show the slurry was unstable, and it was not right for Halliburton to withhold from the customer unstable test results.  Serio Dep. 210-11; Beirute Dep. 476-77.

1265.  Further, Gagliano should not have recommended the slurry without confirming that it was stable.  It was Gagliano's responsibility, and BP reasonably relied on him, to inform BP if he had not seen the results of the foam stability test for the Macondo well slurry.  Tr. 2479-80 (Benge).

1266. However, in the days leading up to the cement job, Halliburton did not discuss with BP any problems with foam stability for the slurry intended to be pumped. Vargo Dep. 540-41; Tr. 8723 (Guide).

1267. A weigh-up sheet is an internal worksheet used by the cementing lab technician. The internal Halliburton lab weigh-up sheets, with test results that would have showed instability, were never sent to BP. Tr. 2514 (Benge); TREX 048195 at 9.

1268. A lab report, on the other hand, is a document Halliburton sends to its customers when it wants to provide the results of lab tests. Tr. 3160-61 (Roth). *Compare* TREX 048195 (weigh-up sheet) *with* TREX 007722 (test results).

1269. For the Macondo well cement job, the lab reports that Halliburton sent to BP did not clearly report on the testing performed. TREX 000750; TREX 001510. U.S. cement expert Glen Benge needed to investigate and "look around" to understand the reports. Tr. 2340-41 (Benge); TREX 000750. Greg Gardner of Chevron, with 30 years of relevant experience, also misread the final lab report as indicating that Halliburton used a slurry with 0.09 gps of retarder in its foam stability test rather than the 0.08 gps actually tested. Gardner Dep. 214. Even Halliburton's Vice President of the Cementing PSL, Roth, admitted that he needed to review additional internal Halliburton documents to understand the lab reports. Tr. 3230-31 (Roth); TREX 000750.

1270. Foam stability testing and foam compressive strength testing are the tests commonly performed on foam cement to test stability. Gardner Dep. 41-42, 45-46.

1271. U.S. cement expert Glen Benge explained that there is a two-step process when evaluating a foam stability test: First, you check the variance in density between the top and bottom. Second, you check the test result against the target density that you are shooting for. Tr.

2448 (Benge).  A final density difference greater than .2 ppg is a sign of instability, and the slurry design should be investigated and potentially redesigned.  Tr. 2510-11 (Benge).

### 1.      The February 12 Testing Indicated the Foam Slurry Was Unstable.

1272.  Pilot testing is performed to confirm the slurry design, and to ensure that any leftover blend is not contaminated.  Tr. 6646 (Gagliano); Gardner Dep. 241; Garrison Dep. 72. Gagliano initiated the pilot testing for the Macondo well on February 10, 2010 through the Viking system.  Tr. 4810-11 (Quirk); TREX 048193.  The pilot slurry contained the same additives at the same concentration as the final job slurry, except for SCR-100 (retarder), which was 0.20 gps in the pilot slurry based on estimated total well depth.  Tr. 6646-48 (Gagliano); TREX 060455.

1273.  In this pilot testing, Halliburton conducted foam stability and crush compressive strength testing containing a foam with 0.25% D-Air 3000, 0.11 gps ZoneSealant, 0.20 gps SCR-100 retarder, and using zero conditioning time.  This testing is reflected on the laboratory worksheet dated February 12, 2010.  Tr. 6832 (Gagliano); D4687; Halliburton's Discovery Response at 19-20 (July 18, 2011) (Ex. 3).

1274.  The February 12, 2010 lab worksheet reflects that the foam stability test results showed 2.02 and 2.11 specific gravity, translating into 16.8 and 17.6 ppg.  Tr. 6834-36 (Gagliano); TREX 000808; Halliburton's Discovery Response at 38-39 (July 18, 2011) (Ex. 3); D4309A.  Thus, the February 12 pilot test significantly missed the target density of 14.5 ppg, and Gagliano admitted he would not have pumped this cement without testing again and getting a closer result.  Tr. 6838 (Gagliano).  Indeed, in Halliburton's Viking system, the February 12 foam stability test is marked as "Test Failed" and there is a technician note that states: "Slurry needs to be conditioned.  Will repeat."  Tr. 6834-36 (Gagliano); TREX 048195 at 10; D4687.

1275.   The February 12, 2010 lab worksheet reflects that the crush compressive strength test on the foam was started but then canceled and refers to "technician notes stating, among other things, 'slurry is settling, will repeat.'"   Tr. 6791-92 (Gagliano); TREX 000808 at 2; Halliburton's Discovery Response at 39 (July 18, 2011) (Ex. 3); D4309A.  In the Viking system, the February 12 crush compressive strength test is marked as "Test Failed" and there is a technician note that "Slurry needs to be conditioned, will repeat.  Severe settling."  Tr. 6832 (Gagliano); TREX 048195 at 9; Halliburton's Discovery Response at 20 (July 18, 2011) (Ex. 3); D4687.

1276.   The settling in the February 12 foam stability test was an indication of instability. Tr. 4938-39 (Quirk); Gardner Dep. 243; TREX 006235 at 10-11; TREX 000808; D4309A. When visual indications of instability (such as settling) are present, the API recommendation is to consider a redesign of the slurry.  Gardner Dep. 244.  Absent a redesign of the slurry, the issue should have been raised so that people were aware of this potential instability.  Gardner Dep. 244-245.

1277.   Halliburton admits that "excessive settling in a foamed cement slurry sample can be an indication of foam instability."  Halliburton's Discovery Response at 40 (July 18, 2011) (Ex. 3).

1278.   The lab would follow the cement engineer's direction on test conditions, including conditioning time.   Tr. 4941 (Quirk).   However, there was confusion within Halliburton: Gagliano requested three hours of conditioning time for the February 12 test, which the lab did not do, and Gagliano never inquired as to why that did not occur.   Tr. 6833 (Gagliano).

### 2.    The February 16 Testing Indicated the Foam Slurry was Unstable.

1279.   A February 16 lab worksheet documented a second set of foam tests.  The only difference between the February 12 and February 16 tests was a change in conditioning time from zero to two hours.  Tr. 2515-16 (Benge); D4269A; TREX 000809.

1280.   The February 16 foam stability testing showed the cement had a uniform density between top and bottom, but the density was 15.9, which was higher than the target of 14.5, and indicated it was not stable.  Tr. 2452-53, 2516 (Benge); Tr. 6650-51, 6666 (Gagliano); Halliburton's Discovery Response at 41 (July 18, 2011) (Ex. 3); TREX 048195 at 10; D4687.

1281.   The February 16 lab worksheet indicated that the crush compressive strength test resulted in a foam cube that was "hard on bottom, soft on top."  Tr. 2517 (Benge); Tr. 4939-40 (Quirk); D4309A; TREX 000809; Halliburton's Discovery Response at 40 (July 18, 2011) (Ex. 3).  Having a foam cube that is "hard on bottom and soft on top" was an indication of instability. Tr. 3245 (Roth); Gardner Dep. 243-44.

1282.   The February 16 tests were conducted with two hours of conditioning time, which again was different than what Gagliano allegedly requested.   TREX 000809; Tr. 6842 (Gagliano).

### 3.    Halliburton Conducted Tests on March 7 Using a Nearly Identical Blend That Also Showed Instability.

1283.   When faced with an unstable slurry, the API recommends a redesign.  Tr. 2507-08 (Benge); Gardner Dep. 244.  The March 7 foam stability testing, which used the dry blend from the *Deepwater Horizon*, specified the same testing conditions as the February tests, and contained almost exactly the same additives, except the foamer was switched from ZoneSealant 2000 to Foamer 760.  Tr. 6871 (Gagliano); TREX 005595.

1284.   The density achieved in the March 7 test was 16.5 ppg and 17.0 ppg, although the target density was again 14.5 ppg.  Tr. 6839-40 (Gagliano); TREX 005595 at 1-2.

1285.   Through March 7, Gagliano always instructed the lab to condition the slurry for three hours, but the lab did not follow his instructions and instead conditioned the slurry for zero, two, and two hours on the foam stability tests.  Tr. 6842 (Gagliano).

### 4.   The March 8 Lab Report Sent to BP Did Not Report the Failed February 12 and March 7 Foam Tests and Misreported the February 16 Foam Tests.

1286.   "[O]n March 8, 2010, Jesse Gagliano sent an e-mail to BP recipients stating, among other things, that he was sending 'the lab test for your review.'"  Halliburton's Discovery Response at 34 (July 18, 2011) (Ex. 3).

1287.   "[T]he foam stability test result provided to BP on or about March 8, 2010, showing top and bottom specific gravity as 1.91 and 1.91, respectively, used a cement slurry sample that had been conditioned for two hours and contained a concentration of .20 gallons of SCR-100 retarder per sack of cement."  Halliburton's Discovery Response at 36 (July 18, 2011) (Ex. 3).

1288.   The March 8, 2010 communication from Gagliano did not report the results of the February 12 foam tests using zero conditioning time, which showed instability in two respects: the foam stability test showed a density of 16.8/17.6, which indicates foam instability, and the settling during the crush compressive strength test indicates a problem with the cement.  Tr. 2513-14 (Benge); TREX 003037; TREX 048195.9.1; D4269A.

1289.  Further, Gagliano's March 8 communication did not include the technician comments on the February 12 worksheet stating that "Slurry needs to be conditioned, will repeat. Severe settling."  Tr. 2514-15 (Benge).

1290.  The March 8 communication also misrepresented the conditioning time of the February 16 foam stability test as zero, when in fact it was two hours.  *Compare* TREX 003037 at 7 ("Conditioning time (hrs:min) - 00:00") *with* TREX 000809 at 2 ("Foamed to 14.5 ppg Condition for 2 hours before pouring").

1291.  And, the March 8 communication did not notify BP that, during the February 16 crush compressive strength test, the foam cube was observed to be "soft on top, firm on bottom." *Compare* TREX 003037 (March 8 e-mail) *with* TREX 000809 at 2.

1292.  On March 8, Gagliano provided BP with the February 16 foam stability test result of 1.9/1.9 specific gravity (which would translate to 15.9/15.9 ppg), but he did not inform BP that it was an unstable result even under Halliburton's alleged 0.5 ppg standard.  Tr. 2516-17 (Benge); Tr. 6676 (Gagliano).

> **5.    The Lab Report Sent to BP on April 1 Also Did Not Report the Failed February 12 Foam Tests and Misreported the February 16 Foam Tests.**

1293.  On April 1, 2010, Gagliano sent BP the same lab test results he had previously provided BP on March 8.  Halliburton's Discovery Response at 34 (July 18, 2011) (Ex. 3); Halliburton's First Amended Objections and Responses to Certain BP First and Second Requests for Admission at 7 (Nov. 1, 2011) ("Halliburton's Discovery Responses (Nov. 1, 2011)") (attached hereto as Ex. 6).

1294.  Halliburton, however, never provided BP with the lab weigh-up sheets dated February 12, 2010.  Halliburton's Discovery Response at 49 (July 18, 2011) (Ex. 3).

1295.  Halliburton did not report the March 7 foam stability test results in either the March 8 or April 1 communication, or provide the weigh-up sheet for that test.  TREX 003037; TREX 001508; D4687.

### 6.   The April 13 Testing Showed the Foam Slurry Was Unstable.

1296.   In April 2010, Jesse Gagliano requested additional testing on the slurry to be pumped for the final production casing.  TREX 048194; D4687.  This slurry consisted of the same additives in similar concentrations to what was actually pumped into the Macondo well except that the retarder concentration was 0.08 gps instead of the 0.09 gps actually pumped.  Tr. 6654-55 (Gagliano); TREX 007722.

1297.   The April 13 foam stability test resulted in a density of 1.88 on top and 1.82 on bottom.  D4309A; TREX 004564; Tr. 2455 (Benge); Halliburton's Discovery Response at 43 (July 18, 2011) (Ex. 3).  This translates to a density of 15.7/15.1 ppg, which is an unstable result. Tr. 2520 (Benge).

1298.   The Viking sheet for the April 13 foam stability test indicates "Test Failed." TREX 048196 at 2.  Halliburton cement lab manager Richard Dubois called Gagliano about the April 13 foam stability test results and they discussed that it showed instability.  Tr. 6848-49 (Gagliano).

1299.   In this litigation, Halliburton contends that the April 13th test result was affected by a weighing error.  Tr. 4975 (Quirk).  However, this weighing error was not known to Halliburton until *after* the Incident.  Tr. 6849 (Gagliano); Tr. 2519-20 (Benge); Tr. 4975 (Quirk); Dubois Dep. 367-68.

1300.   Again, there was confusion within Halliburton about the testing conditions: Gagliano had instructed three hours of conditioning time, but the test was run with one and a half hours.  Tr. 6842-43 (Gagliano).

1301.   "[T]he anomalous test result – 1.88 and 1.82 specific gravity on top and bottom, respectively, as reflected in the Cement Lab Weigh-Up Sheet dated April 13, 2010 – was not reported to BP."  Halliburton's Discovery Response at 42 (July 18, 2011) (Ex. 3).  Nor did

Halliburton tell BP that the April 13th test had failed.  Tr. 2521 (Benge).  At this point, Halliburton's February 12, February 16, and April 13th tests each failed to show a stable foam cement.  Tr. 2520-21 (Benge).

> **7.      On April 16, Gagliano Cancelled the Only Foam Stability Test Scheduled for the Slurry Used on the Macondo Well Production Casing Job.**

1302.   On April 14, BP requested to see what using .09 gallons of retarder would do to the thickening time, so Gagliano ordered a suite of tests.  Tr. 6668-69 (Gagliano).

1303.   On April 16, there were some cement tests performed on the slurry with 0.09 gps retarder but Gagliano called and canceled the two foam tests – the foam stability test and the foam cube crush compressive strength test.  Tr. 6793 (Gagliano); Tr. 2521 (Benge); Tr. 3248 (Roth); Tr. 4908, 4942-43 (Quirk); Stelly Dep. 45-47; TREX 000811; TREX 000984.  BP did not ask Gagliano to cancel this test.  Tr. 2521-22 (Benge).

1304.   Gagliano did not tell BP that he had canceled the foam tests on the .09 gps slurry even though he easily could have done so.  Tr. 2547 (Benge).

> **8.      The April 17 Testing Did Not Show Stability.**

1305.   The April 17 lab worksheet reflects a second foam stability test "on a slurry using .08 gallons of SCR-100 retarder per sack of cement."  Halliburton's Discovery Response at 21 (July 18, 2011) (Ex. 3).

1306.   Rather than repeating the April 13th test on the 0.08 gps slurry using the same conditioning time (1.5 hours), the foam stability test was "repeated" with a different conditioning time (3 hours).  Tr. 4941 (Quirk); Tr. 2522 (Benge); TREX 004566.

1307.   In the April 17 foam stability test, the conditioning time was three hours – more than previous tests – and was done at 135 degrees.  Conditioning time and temperature impact the stability of the slurry.  Tr. 2522-23 (Benge).

1308.  The result of the April 17 foam stability test was a density of 1.8/1.799, which converts to 15.0 ppg (top and bottom) as compared to a target of 14.5 ppg.  Tr. 6845-46 (Gagliano); Tr. 4974 (Quirk); Halliburton's Discovery Response at 43 (July 18, 2011) (Ex. 3); Stelly Dep. 114-15.

1309.  Thus, Halliburton's final test resulted in a density of 15 ppg, which deviated by 0.5 ppg from the target density of 14.5 ppg, and does not meet United States cement expert Glen Benge's standard of stability (a 0.2 ppg margin).  Tr. 2457 (Benge).  A deviation of .5 ppg from the target density would raise questions, require discussion, and potentially require redesign of the slurry.  Tr. 2510-11 (Benge); Gardner Dep. 94-95, 205-06, 233.  The slurry with 15 ppg top and 15 ppg bottom was not ready to be pumped.  Tr. 2525 (Benge).

1310.  Tim Quirk of Halliburton agreed that the 0.5 ppg difference between the test density and the target density represents a substantial loss of air from the foam (approximately 23%).  Tr. 4943-44 (Quirk); D4309A; TREX 004566.  Quirk would have investigated the April 17 result of 15 ppg to determine whether the slurry was good to pump.  Tr. 4946 (Quirk).  Further, as described below, Gagliano did not even receive this April 17 test result until the afternoon of April 19: he did not have it before recommending the slurry to BP and did not review it before the job was pumped.

1311.  Following the Incident, Halliburton's internal standards for a stable foam stability test changed:   If the foam stability test result misses the target by **_two percent_** (which in this case would have been 0.3 ppg) then the test is considered unsuccessful.  Tr. 6847 (Gagliano); Stelly Dep. 82-83, 87-88.

1312.  Further, the changing conditioning times for the slurry used by Halliburton in the different tests are suspect.  Generally speaking, the more viscous a slurry, the better it is able to

hold foam; one effect of conditioning is that it can further increase the viscosity of the slurry.  Tr. 4948 (Quirk).

1313.  Based on the testing result, the conditioning time had an impact on the ability of the slurry to form a stable foam.  Tr. 2523 (Benge).

1314.  However, Halliburton "did not condition the slurry actually mixed and pumped on the rig for the production casing cement job before pumping the slurry into the well." Halliburton's Discovery Response at 18, 44, 46 (July 18, 2011) (Ex. 3).  Unlike the Halliburton test procedures, the RCM mixer on the *Deepwater Horizon* rig did not mix the slurry for three hours at 135 degrees before foaming at the Macondo well.  Tr. 2524 (Benge); Tr. 4942 (Quirk); Tr. 6378-79 (Chaisson); Tr. 3254-55 (Roth); D4373.

### 9.    Gagliano Failed to Identify Foam Testing Issues Before Recommending the Slurry to BP on the Evening of April 18.

1315.  Gagliano sent the final job proposal with slurry recommendation at 20:58 on April 18, 2010.  TREX 000717.  At the time Halliburton recommended the slurry on April 18, Gagliano had not provided BP with the results of the foam stability tests for the .08 or .09 gps slurry.  Tr. 2511-12 (Benge).  Internally, Halliburton knew that three separate foam stability tests on a slurry with the same ingredients indicated instability before Halliburton's April 18 recommendation.  Tr. 3245 (Roth); Tr. 2574 (Benge); D4309A; TREX 000808 (February 12 test); TREX 000809 (February 16 test); TREX 004564 (April 13 test).

1316.  In fact, the April 17 foam stability test had not been completed at the time Gagliano sent his April 18 recommendation.  Tr. 6659-61 (Gagliano).

**10. Gagliano Failed to Review or Provide BP with the Final Test Results Before the Cement Job.**

1317.   Gagliano received an e-mail notification from Viking that the April 17 tests were "finished in lab," meaning that they had been completed on April 19 at 16:14.  Tr. 6659-61 (Gagliano); TREX 063201 (Viking Screenshot, April 19 "Finished in Lab" E-mail).

1318.   The Viking notification does not contain the test results.  Instead, the engineer must log into the Viking system to review the test results.  Tr. 4808-09, 4866-68 (Quirk); Tr. 6751 (Gagliano); Sanders Dep. 150-51.

1319.   Although Gagliano received a Viking notification, he did not log into the system to check the results of the April 17 tests until after the cement job was pumped and the Incident occurred.  Tr. 6659 (Gagliano); Sanders Dep. 146-57 (Viking log-in record indicates that Gagliano did not log into the Viking system until after the Incident).

1320.   At trial, Gagliano contended that he did not have to review the test results to know that the foam test passed (under Halliburton's standard of stability) because Richard Dubois, the Halliburton lab manager in Broussard, was watching the test for him and would have called if there were issues.  Tr. 6849-50 (Gagliano).

1321.   However, Dubois testified that he was not watching the April 17 foam stability test:  Dubois did not see the results of the April 17 test before the Incident and did not even recall if he was in the lab on April 19 when the foam test was finished.  Dubois Dep. 376.

1322.   On April 26, 2010, Gagliano sent BP a lab report containing the April 17 foam stability results – six days after the Incident – writing:  "See attached.  Lab test not captured in Post Job Report."  Halliburton's Discovery Response at 48 (July 18, 2011) (Ex. 3); TREX 001709; D4379.

1323.   Gagliano did not inform BP in the note that the April 17 foam stability test result was included in his April 26 communication, and did not indicate to BP that the result was stable.  TREX 001709.

1324.   A summary of Halliburton's pre-Incident testing and report of test results to BP can be found in D4687, which was used during the cross-examination of Gagliano.  *See* Tr. 6832; D4687.

**F.     Halliburton Did Not Fully Test the Cement Slurry Used to Cement the Macondo Well.**

1325. Because Halliburton recommended a leftover cement blend containing inappropriate additives, it was particularly important for Halliburton to ensure that all of the necessary lab tests were conducted.  Tr. 2276 (Benge).  However, the cement was not adequately tested by Halliburton before the cement job at the Macondo well.  Tr. 2468 (Benge); Tr. 1379 (Bly); TREX 000001 at 34; TREX 004248 at 212; Brock Dep. 83-86.

1326.   Halliburton was responsible for testing the cement slurry, yet it failed to perform critical lab tests, including the unset foam stability test.  Tr. 2276-77 (Benge).  After the Incident, the BP investigation team reviewed Halliburton's lab testing results and further found that there were no test results for fluid loss, free water, static gel strength transition time, settlement, or compatibility testing.  Tr. 1080 (Bly); TREX 000001 at 67.  Each of these testing failures is described below.

**1.     The Formulation Actually Used to Cement the Macondo Well Was Never Tested for Foam Stability.**

1327. Best practice would have been to test the slurry with 0.09 gps retarder concentration that was used on the job.  Tr. 3202 (Roth); Tr. 4791, 4793-94 (Quirk); Gardner Dep. 271; TREX 001395.  But Halliburton never conducted a foam stability test (or other foam tests) on the 0.09 gps cement design used on the Macondo well.  Tr. 3019-20, 3032 (Probert); Tr.

3224-25, 3249 (Roth); Tr. 4951 (Quirk); Tr. 2459-60 (Benge); Tr. 6697 (Gagliano); TREX 048098.  *See also* Halliburton's Discovery Response at 22-23 (July 18, 2011) (Ex. 3) (foam crush compressive strength, FYSA (foam) rheology and foam stability tests performed only on 0.08 gps slurry).

1328.  Instead, as described above, Halliburton performed the final foam stability test on a slurry with 0.08 gps retarder rather than 0.09 gps retarder.  Tr. 3268 (Roth); TREX 000811; TREX 004566; Tr. 6794 (Gagliano).

1329.  Jesse Gagliano knew that to ensure a stable system, "you have to test exactly what you're pumping."  Tr. 6733 (Gagliano).  At trial, however, Gagliano contended that a difference of 0.01 gps retarder would not have made a difference to foam stability.  Tr. 6697 (Gagliano).  But, as described above, Halliburton did not have significant experience with foam slurries containing D-air; its sole experience was with four cement jobs before Macondo.  Tr. 6746-47 (Gagliano); TREX 007491A.  Each of these four prior cement jobs was different because they were not production interval jobs and they did not contain the dispersing retarder SCR-100.  TREX 007491A.

1330.  Further, the impact that the additional retarder would make could not have been known until it was tested.  Tr. 6733 (Gagliano); Garrison Dep. 157-58 (industry standard is to test the slurry at the concentration actually used); R. Morgan Dep. 160-62.  It is undisputed that SCR-100 retarder is a very powerful additive:  a 0.01 gps increase in the retarder concentration is enough to increase the thickening time of the slurry by almost 50%.  Tr. 2267 (Benge); Tr. 6672-74 (Gagliano); TREX 000287.

### 2. Halliburton Failed to Run Other Industry Standard Tests on the Slurry Before the Cement Job.

1331.  In addition to foam stability testing, the BP investigation team found that Halliburton did not run tests for fluid loss, free water, static gel strength transition time, settlement, or compatibility.  Tr. 1080 (Bly); TREX 000001 at 67.

#### a. Fluid Loss Test.

1332.  Before running a cement job for a production interval in a deepwater well, a fluid loss test should have been conducted to make sure the slurry had acceptable fluid loss control. Serio Dep. 474; Sabins Dep. 531-32, 540.  Fluid loss is an important parameter to have in the cement slurry to control influx of gas.  Sabins Dep. 529-30.  Michael Serio, a Halliburton lead technical professional with 30 years of experience, would have expected Gagliano to request a fluid loss test.  Serio Dep. 17, 48-49, 475-76.

1333.  Halliburton did not conduct fluid loss testing on the cement slurry used on the production casing cement job.  Halliburton's Discovery Response at 30 (July 18, 2011) (Ex. 3); Halliburton's Discovery Response at 4 (Nov. 1, 2011) (Ex. 6).

#### b. Free Water Test.

1334.  A free water test gives an indication of the stability of the base slurry and was an important test to run in this case.  Tr. 2339 (Benge).

1335.  The Halliburton/BP contract required Halliburton to run the free fluid or free water test.  Tr. 2338-39 (Benge).  Before running a cement job for a production interval in a deepwater well, a free water test should have been conducted to make sure the slurry had acceptable properties.  Serio Dep. 474-75.  Serio would have expected Gagliano to order free water testing.  Serio Dep. 475-76; *see also* Cunningham Dep. 340-41.

1336.  Halliburton did not run a free water test on the Macondo well slurry.  Tr. 2339 (Benge); Tr. 3206-07 (Roth); TREX 042045; Halliburton's Discovery Response at 30 (July 18, 2011) (Ex. 3); Halliburton's Discovery Response at 5 (Nov. 1, 2011) (Ex. 6).

### c.    Static Gel Strength Test.

1337.  The static gel strength test measures the transition of the cement slurry from the slurry to a set state.  TREX 002477[10] at 7.  A static gel strength test would be important for a well with high gas flow potential.  Serio Dep. 464; Gardner Dep. 275-76.  Serio would have expected Gagliano to order static gel strength testing.  Serio Dep. 475-76.

1338.  Halliburton did not conduct a static gel strength test on the Macondo well cement slurry design pumped on April 19, 2010.  Tr. 4795-96 (Quirk); Halliburton's Discovery Response at 22, 31, 33 (July 18, 2011) (Ex. 3); Halliburton's Discovery Response at 5 (Nov. 1, 2011) (Ex. 6).

### d.    Settlement Testing.

1339.  A settlement test should have been run for a foamed production cement job to check for whether the slurry settles or remains uniform while setting.  Serio Dep. 469-70.

1340.  Halliburton did not conduct a settlement test on the cement slurry used on the production casing cement job.  Halliburton's Discovery Response at 31 (July 18, 2011) (Ex. 3); Halliburton's Discovery Response at 5 (Nov. 1, 2011) (Ex. 6).

### e.    Cement Compatibility Testing.

1341.  Halliburton also did not conduct a suite of compatibility testing on the cement slurry that was pumped at the Macondo well, including cement/spacer compatibility, cement/mud compatibility, and cement/mud/spacer compatibility testing.  Halliburton's

---

[10] TREX 002477 is Appendix K of the BP Internal Investigation Report (TREX 000001), and can also be located within a greater set of Internal Investigation appendices at TREX 000002.

Discovery Response at 29 (July 18, 2011) (Ex. 3) (did not perform cement/spacer compatibility testing); Halliburton's Discovery Response at 4 (Nov. 1, 2011) (Ex. 6).

1342.   These compatibility tests should have been run for the Macondo well.  Faul Dep. 167; Serio Dep. 351, 476-77; Cunningham Dep. 159-60, 339-40; Beirute Dep. 251.

### G.      The Halliburton Cement Failed to Isolate the Reservoir.

1343.   The cement job at the Macondo well was intended to be the primary barrier against the influx of hydrocarbons.  Tr. 3010 (Probert).

1344.   Witnesses from all parties agree that the cement did not form a barrier in the Macondo well.   Tr. 1376 (Bly); Tr. 6214 (Ambrose); Tr. 2242 (Benge); Tr. 3010 (Probert); TREX 004270 at 82; Tr. 2612 (Calvert).

1345.   The annular production casing cement failed to achieve zonal isolation of the hydrocarbon zones and pay sands in the production interval of the Macondo well and was not an acceptable barrier to hydrocarbon flow for the temporary abandonment of the well.   TREX 022761 at 2; Tr. 6710 (Gagliano).

1346.   In addition to the annular cement, the shoe track cement had the potential to form a barrier.  Tr. 2339-40 (Benge).

1347.   The shoe track cement failed to prevent the ingress of hydrocarbons.  Tr. 1437 (Bly); TREX 000001 at 78; Tr. 7835 (Emilsen).

1348.   After the cement job was completed, there was a mud column from the plugs all the way to the top applying hydrostatic pressure in order to keep back anything that may have potentially flowed through the cement.  Tr. 2415 (Benge).

1349.   Hydrocarbons can move through cement as a result of reduced hydrostatic head as the cement transitions from liquid to solid.  Tr. 2614-16 (Calvert).  This can create a flow path

for the movement of formation hydrocarbons through the shoe track cement without displacing the shoe track cement.  TREX 022761 at 2; Tr. 2616 (Calvert).

1350.   Failed cement was a precipitating cause of the Incident and allowed hydrocarbons to flow into the well on April 20 to set off the series of events at issue.  Tr. 6098 (Ambrose); Tr. 6214 (Ambrose); Tr. 916-917; 1089-90; 1376 (Bly).

1351.   If zonal isolation had been achieved in the bottom of the well, the Incident would not have occurred.  Tr. 7792 (Bourgoyne); Gardner Dep. 93; Tr. 2471 (Benge); Garrison Dep. 272.

**H.     Post-Incident Testing Confirms the Slurry Was Unstable.**

1352.   After the Incident, Halliburton's cement slurry design for the Macondo well was tested by numerous parties.   CSI Technologies (CSI), Chevron, and Oilfield Testing & Consulting (OTC) documented their work and issued reports on their testing.  TREX 000002 (Appendix K); TREX 004572; TREX 005937.

1353.   As further described below, each of these three third-party laboratories concluded that the Halliburton cement design for the Macondo well was an unstable foam slurry.  Sabins Dep. 249 ("[CSI's] conclusion was the slurry that we tested showed strong segregation tendencies and the foam was not stable."); TREX 004572 at 2 ("However, [Chevron was] unable to generate stable foam …"); Garrison Dep. 24-25 (all compositions tested, including the Macondo well sample, were unstable).

1354.   At trial, witnesses for the United States and Transocean relied on this testing.  Tr. 2535 (Benge) (Chevron and OTC were unable to generate a stable foam using the Halliburton slurry); Tr. 6213-14 (Ambrose) ("Evidence presented by Chevron from tests using representative samples confirmed that the slurry designed by Halliburton was unstable."); TREX 004248.50.1.BP.

1355. Halliburton also performed post-Incident testing of the slurry design, and notes of discussions relating to that testing indicate that the results indicated stability. TREX 007718 ("WHEN ATTEMPT WAS MADE TO FOAM THE CEMENT, SLURRY WOULD NOT FOAM."). However, the actual results of Halliburton's post-Incident testing will never be known because, as described below, Halliburton employees intentionally discarded test results and notes on the testing.

### 1. CSI Testing on Behalf of BP.

1356. CSI focuses on research in cementing and stimulation, and consults on field jobs and cementing operations. Sabins Dep. 62. The BP investigation team retained CSI to investigate possible factors that contributed to the failure of the cement at the Macondo well. Sabins Dep. 173-75. Among other things, CSI tested a best-match, simulated cement slurry; its testing showed that the Macondo well slurry would have experienced nitrogen breakout, nitrogen migration, and incorrect cement density, explaining the failure to achieve isolation of hydrocarbons. Tr. 931 (Bly); TREX 000001 at 35.

1357. CSI requested that BP obtain materials from Halliburton for testing. Sabins Dep. 172. However, Halliburton refused to turn over testing results and "like" samples so BP could perform "like kind" testing. Tr. 1435 (Bly); TREX 000001 at 57 ("At the time this report was written, Halliburton had declined the investigation team's requests for equivalent samples of the cement components used on the rig."). As such, "[a]lternative additives sold as being similar in form and function [to] the Halliburton additives were used to simulate the HES composition." TREX 002477 at 4. CSI developed a Simulated Halliburton (SIM) slurry using the best engineering substitutes for the Halliburton materials. Sabins Dep. 517-19.

1358. Foam stability is the function of two things: first, the slurry must be capable of being foamed; and, second, once foamed, the foam must remain stable over a period of time.

Sabins Dep. 543-44, 284-86; TREX 002477 at 4.  In other words, if a slurry does not form a

foam at the surface, then it will not form a foam while traveling downhole.  Gardner Dep. 198-

99; Garrison Dep. 55.

     1359.  CSI ran over 500 foam stability tests at different foam qualities and compositions.

Sabins Dep. 238.  CSI tested the slurry at 60% quality (the surface foam quality).  TREX 002477

at 4.  CSI also tested the slurry at 18.5% quality (the foam quality downhole), 13% quality (the

foam quality that Halliburton tested), and at foam qualities in between.  Sabins Dep. 340-41;

TREX 002477 at 11.

     1360.  Based on CSI's extensive testing with the SIM slurry, there was a strong concern

with regard to stability both at the surface and downhole.  Sabins Dep. 548.  Specifically, the

SIM slurry would not even form a 60% quality foam – the uphole foam quality – much less form

a stable foam.  Sabins Dep. 313-14.  Likewise, the SIM slurry was unstable at 18.5% foam

quality – the downhole foam quality.  Sabins Dep. 547-48; TREX 002477 at 5.  Even the 13%

foam quality slurry was unstable.  Sabins Dep. 341.  Many of the other foam qualities were also

unstable.  Sabins Dep. 544-45.  CSI confirmed these findings of instability with testing under rig

conditions of 1000 psi.  Sabins Dep. 541-42; TREX 002477 at 5.

     1361.  In comparison, a slurry consisting of only cement, foamer, and water produced

stable foams at foam qualities from 5% to 60%.  TREX 002477 at 5.  This confirmed that the

inclusion of defoamer and dispersants had a negative effect on foam stability.  Sabins Dep. 562-

63; TREX 002477 at 5.  The foamer did not overcome the effect of the defoamer and dispersant

additives in Halliburton's design.  Sabins Dep. 296-97.

     1362.  CSI concluded that "based upon our data[,] the cement slurry in question had

stability issues, dramatic stability issues in the well."  Sabins Dep. 248, 515.

1363.   According to CSI, Halliburton's pre-Incident rheology test results indicated that the actual Macondo well slurry was too thin to create a stable foam.  Sabins Dep. 527-28; TREX 002477 at 5 ("The yield point of the HES designed base slurry was too low at 135°F (2 lb/100ft$^2$ yield point).  The yield point is a significant factor in the generation and stability of foamed cements.  The higher the yield point, the more stable the slurry will be.  Yield points of over 5[lb/100ft$^2$] are recommended for foam slurries.").  A yield point above 10 lb/100ft$^2$ would be preferred for a foam slurry.  Sabins Dep. 564.

1364.   CSI also observed that there was no additive in Halliburton's slurry to control fluid loss.  Sabins Dep. 533.  Fluid loss is an important parameter to have in the cement slurry to control influx of gas.  Sabins Dep. 529-30.  The SIM slurry had a fluid loss of 302 cc per 30 minutes – a value that is far outside the API recommended fluid loss of 50 cc per 30 minutes for gas-migration control cement designs.  Sabins Dep. 538-40; TREX 002477 at 4.  Chevron's testing with Halliburton additives exhibited even greater fluid loss at 456 and 578 cc per 30 minutes.  Sabins Dep. 539.  The unfoamed tail cement in the shoe did not have sufficient fluid loss control to prevent gas migration.  Sabins Dep. 802-03.

## 2.      Post-Incident Cement Testing by Chevron.

1365.   The National Commission on the BP Deepwater Horizon Oil Spill requested that Chevron conduct testing on the Halliburton cement design.  Gardner Dep. 16.  Craig Gardner was the Team Leader for Cement Team for Chevron Energy Technology Company.  Gardner Dep. 174-75.

1366.   Gardner's October 26, 2010 letter attaching Chevron's report to the National Commission stated:  "We conducted these tests using samples of cement and additives supplied by Halliburton and sent to the Chevron laboratory at the request of the Commission.  To our knowledge, these materials were supplied by Halliburton as representative materials used on the

Deepwater Horizon but neither bulk plant samples nor rig samples from the actual job."  TREX 004572 at 1; Gardner Dep. 75, 145.

1367.   Chevron's report concludes: "[W]e were unable to generate stable foam with any of the tests described in Section 9 of this report."  TREX 004572 at 2.

1368.   The general conclusion from the Chevron tests was that the foam slurry was not stable.  Gardner Dep. 90, 125, 186, 219; TREX 004572 at 12.  The Halliburton slurry was not stable, which meant either the solids were settling out of the slurry and/or the gas was breaking out if it and the resulting density was not uniform.  Gardner Dep. 91-92.  If the cement slurry was unstable, it would need to be redesigned.  Gardner Dep. 92.

1369.   Chevron's testing was performed in a way such that other others in the industry could reproduce the tests and peer review the work.  The testing was the product of reliable principles and established industry methods based on API RP 10B-4, which is accepted in the cementing community.  Gardner Dep. 219-22, 323-24.

1370.   Chevron's foam stability testing data was peer reviewed by others, who agreed with the test methodology and conclusion of instability.  Tr. 2535 (Benge); Sabins Dep. 499-500 ("The testing that Chevron performed was according to, I believe, prudent practices, and I agree with how they ran the tests and understand their out -- their conclusions and the data, and I agree with them.").

1371.   Unset foam stability testing evaluates the foam slurry when it is in a liquid form, and set foam stability testing evaluates the cured slurry in a solid form.  Tr. 2507 (Benge).  Under API 10B-4, a foam slurry should be redesigned if the measured density from an unset foam stability test is above the design.  Tr. 2508 (Benge); TREX 006235 at 15.  The unset foam

stability tests performed by Chevron and OTC showed instability; and, under API guidance, those slurries needed to be redesigned.  Tr. 2508-09 (Benge).

1372.  Foam stability testing and foam compressive strength testing are the tests commonly performed on foam cement to test stability.  Gardner Dep. 41-42, 45-46.  The testing set forth in API RP 10B-4 consists of an unset test, which allows the foam to sit quiescent for two hours before visually observing for signs of instability (and possibly weighing aliquots of the unset foam).  The testing also consists of a set foam test where foam is cured in PVC tubes and the density is measured by the Archimedes principle.  Gardner Dep. 46-47, 112-13.

1373.  In addition, Chevron was unable to produce a stable foam in its Foam Mixing and Stability tests:  "A series of nine tests were conducted under varying conditions as described below. …  None of the tests produced a stable foam."  Gardner Dep. 110, 219; TREX 004572 at 9.  The general conclusion from the tests, looking at all of the pertinent parameters, was that the slurry was not stable, and needed to be redesigned.  Gardner Dep. 110-11, 117, 125; TREX 004572 at 12; Tr. 2536-37 (Benge); TREX 002702.9.1.BP.

1374.  Chevron noted that the foam slurry was settling, which is a sign of instability.  Tr. 2536-38 (Benge); TREX 002702.9.1.BP, TREX 002702.9.2.BP, TREX 002702.10.1.BP, TREX002702.10.2.BP, TREX 002702.10.3.BP, TREX 002702.10.5.BP, TREX 002702.11.1.BP; Tr. 4959 (Quirk); Gardner Dep. 114-16, 118-20.  Chevron also observed a reduction in volume of the slurry, which explained the increase in density in the test sample and is normally attributed to breakout of air from the foam.  Gardner Dep. 121-22.

1375.  Chevron also cured foam cubes for the crush compressive strength test but "[a]fter 48 hours curing, the samples were removed from the molds and were . . . observed to have lost approximately one-half inch of their original two-inch height (photographs in Appendix)."

286

TREX 004572 at 7, 30; Gardner Dep. 99-100.  A loss of half an inch is substantial and no additional testing is required under API RP 10B-2.  Gardner Dep. 336-37.  This loss of volume from the foam cubes is a sign of instability.  Tr. 2538 (Benge); TREX 002702.30.2.BP.

1376.  Chevron had planned to conduct additional foam tests but those tests were canceled because "a stable foam could not be obtained. . . ."  TREX 004572 at 7 (FYSA), 13 (foam stability with contamination); Gardner Dep. 108, 130-31; Tr. 2538 (Benge).

1377.  In addition to foam stability issues, Chevron's testing on the base slurry identified other slurry defects.  Chevron observed sedimentation during mixability and static gel strength development testing.  TREX 004572 at 4-5, 14.  Sedimentation is an indication of instability of the base slurry because the solids are not being uniformly suspended in the mixed slurry, and makes one question whether the design is suitable.  Gardner Dep. 101-02.

1378.  United States cement expert Glen Benge agreed that the free fluid testing by Chevron and OTC showed instability:  "The results from this testing indicate a base slurry that is not stable and should be redesigned."  Tr. 2538-39 (Benge).

### a.    Testing on Lab Stock Is Representative of Testing on the Rig Blend.

1379.  Chevron tested Halliburton lab stock, and OTC (discussed below) tested both Halliburton lab stock and rig sample.  Tr. 2530 (Benge); Gardner Dep. 224.  Lab stock performs the same as rig blend if it is representative.  Gardner Dep. 226.  The materials that Chevron tested were supplied by Halliburton as representative of the materials used on the *Deepwater Horizon*.  Gardner Dep. 227-28.

1380.  Everyday, in work associated with the API, academic literature, and other work, people run tests on lab stock and make judgments about the quality of the slurry based on tests

run on lab stock.  Tr. 2518 (Benge).  And, cement companies advertise the capability of their products based on testing on lab stock.  Tr. 2518 (Benge).

1381.  When the cement is taken from the bulk plant and taken offshore, it may undergo change.  Gardner Dep. 290.  Cement properties can change in response to environmental conditions including humidity, temperature, and potential residual blend from prior blends residing in the transfer systems.  Tr. 2418-21 (Benge).  These environmental factors make performance of the rig blend *worse* than lab stock.  Tr. 2519, 2421 (Benge).  The advantage of testing rig blend is to look for contamination in the transport to the rig.  Gardner Dep. 289.  Therefore, if lab stock – the clean stuff – is not working, then you should stop there and redesign the slurry.  Tr. 2519 (Benge).

1382.  Halliburton's own practice showed that lab stock testing is relevant and informative.  Ten percent of Halliburton's deepwater cement jobs are not tested with rig sample but only with lab stock.  Tr. 4950-51 (Quirk); TREX 005569; Stelly Dep. 188-89.  In addition, 75% of shelf cement jobs do not test rig sample.  TREX 005569.  Even for the Macondo well, Halliburton used liquid additives from lab stock in the testing, and admits that lab stock was representative of what was at the Macondo well.  Halliburton's Discovery Response at 51 (July 18, 2011) (Ex. 3).

1383.  Because the Chevron test results on lab stock were reasonably similar to the pre-Incident tests results on rig blend, the lab stock that Chevron tested is a good approximation of the rig blend.  Gardner Dep. 245-46, 96-99, 109-10; TREX 004572 at 4-6, 8.  Gardner agreed that the lab stock tested by Chevron and the rig blend at the Macondo well would perform reasonably the same because the test results were all reasonably the same.  Gardner Dep. 249.

1384. Dr. Garrison of OTC would be comfortable testing a sample representative of what was on the rig and would not need rig stock. Garrison Dep. 70-71. Even if the lab stock is from different lots, it will give you information as to how the slurry design will perform. Garrison Dep. 72.

### 3. Post-Incident Cement Testing by Oilfield Testing & Consulting.

1385. The Joint Investigation Team retained Oilfield Testing & Consulting (OTC) to test the Macondo well slurry design. TREX 005937 at 1. Dr. Greg Garrison is a principal at OTC, an independent cement testing facility in Houston, Texas. Garrison Dep. 11-12.

1386. Dr. Garrison's August 1, 2011 letter transmits the OTC report of testing conducted on behalf of the Joint Investigation Team. Garrison Dep. 15-16; TREX 005937. Except as noted, the OTC testing was "conducted according to API Recommended Practice 10B-2," which is the standard in the industry. Garrison Dep. 17-18; TREX 005937 at 1.

1387. The OTC testing was "performed with cement, cement additives, spacer, base oil, and drilling fluid samples, representative of those used on the job for the [Macondo] well in April 2010." TREX 005937 at 1. OTC also received and tested a sample of the Macondo well rig blend (designated "MAC4"). Garrison Dep. 19, 22-23; Roller Dep. 241-45.

1388. OTC performed both unset and set foam stability testing on different slurry compositions and on both lab stock and rig blend. Garrison Dep. 23; TREX 005937 at 38-39. None of the foam stability tests on different compositions indicated that the foam was stable. Garrison Dep. 28-29. Dr. Garrison would not have recommended anyone pump the slurry that he tested. Garrison Dep. 149-50.

1389. None of the unset foam stability tests indicated stability; every sample tested had bubble breakout, which is an indication of instability. Garrison Dep. 23-24, 107-08; TREX 005937 at 38. Many of the unset foam samples also showed settling and free fluid, which

indicates instability of the base slurry.  Garrison Dep. 24; TREX 005937 at 38.  Based on OTC's unset foam stability testing, including the testing on the Macondo rig blend, the cement slurry was not stable.  Garrison Dep. 24-25; Tr. 2543 (Benge).

1390.   The OTC set foam stability tests showed density segregation from top to bottom of the samples, which likewise showed that the foam system was not stable.  Garrison Dep. 27, 107.

1391.   In an August 2, 2013 report, OTC tested whether the Macondo slurry was stable at 60% foam quality.  Garrison Dep. 33-34; TREX 005939.  The purpose of the 60% foam quality testing was to simulate the foam quality of the slurry at the *Deepwater Horizon* to get the target density at the bottom of the well.  Garrison Dep. 50-51.

1392.   This testing showed that the slurry could not be foamed to 60% foam quality in 15 seconds following the API recommended procedure.  Garrison Dep. 59-60, 60-62; TREX 004569 at 6.  API RP 10B-4 states if the slurry does not foam within 15 seconds then "it is doubtful the slurry will foam properly under field conditions" and "The slurry should be redesigned."  TREX 004569 at 6.

1393.   OTC then attempted to foam the slurry for another 45 seconds; in total, the slurry was blended for a minute – four times the energy that API recommends for foaming a slurry. Garrison Dep. 62-64; TREX 005939 at 7.  The cement slurry from the 60% foam test had a density of 11.3 pounds per gallon, indicating that it was only able to reach 30% foam quality. Garrison Dep. 64-65; TREX 005939 at 7.  This test depicts an unstable slurry.  Garrison Dep. 63-64; TREX 5939 at 8 (Figure 1).  This 60% foam quality testing provides an indication as to how the rig blend would have performed.  Garrison Dep. 73.

1394.   In addition to testing on lab stock, OTC did testing on MAC4, a rig blend sample taken from the *Deepwater Horizon*.  Garrison Dep. 22-23.

1395.   During the unset foam stability test, the MAC4 sample had bubble breakout, which indicated that the foam was not stable and was falling apart.  Garrison Dep. 23-25, 108; TREX 005937 at 38; Tr. 2545 (Benge).  The MAC4 sample did not show indications of stability in the unset foam stability test.  Garrison Dep. 107-08; TREX 005937 at 38.

1396.   The MAC4 sample lost 6 milliliters of volume during the unset foam stability test, which is a sign of foam instability.  Tr. 2545 (Benge); D4383; Garrison Dep. 198-99; TREX 005940.  The MAC4 sample was also unstable because there was bubble breakout (consistent with the other samples tested).  Garrison Dep. 269-70.  For years the industry has used loss in volume and bubble breakout as indications of an unstable foam.  Garrison Dep. 111.

1397.   In the set foam stability test, the MAC4 foam cube samples did not set in the allotted time according to the JIT protocol.   Garrison Dep. 27-28; TREX 005937 at 39.  Typically, 24 hours is given to allow the foam cube to set and OTC waited twice that amount of time.  Garrison Dep. 273-74; TREX 004569 at 10.  Because the MAC4 samples did not set after 48 hours, they could not be cut into top, middle and lower sections for set foam stability testing.  Garrison Dep. 29, 111-12; TREX 005937 at 43 (Figure 20).  In addition, there was a loss in volume in the MAC4 foam cubes even though the cubes were filled to the top at the beginning of the test.  Garrison Dep. 113-14.

1398.   Based on the MAC4 testing, Dr. Garrison would not have pumped this slurry downhole without further efforts to improve stability.  Garrison Dep. 271-72.

### 4.      Post-Incident Testing by Halliburton.

1399.   As described in detail below, Halliburton conducted tests after the Incident to investigate the Macondo well cement.   *See* D4379 (Halliburton Post-Incident Activity).

Halliburton's Duncan lab tested the slurry design pumped at the well (0.09 gps retarder) and found the slurry was very thin for a foam design and would not foam without conditioning; the test results were discarded and mentioned only on a single page of notes.  Tr. 2526 (Benge); Tr. 3060 (Roth).  Halliburton's Broussard lab conducted foam stability tests on the 0.08 gps slurry but did not record the results.  Tr. 4768 (Quirk); Faul Dep. 294-95, 407.

### a.      Halliburton Post-Incident Testing in Duncan.

1400.   Ronnie Faul was a Halliburton Technology Manager for the Gulf of Mexico for Cementing.  Faul Dep. 10.  Rickey Morgan was a Halliburton Principal Technologist in the Cementing, Materials and Methods Group located in Duncan, Oklahoma.  R. Morgan Dep. 16.  Morgan designs cement slurries frequently as part of his work.  R. Morgan Dep. 131-32.

1401.   After the Incident, Ronnie Faul called Rickey Morgan in late April or early May 2010 and asked Morgan to review "the slurry used on the Macondo well."  R. Morgan Dep. 15-17; Tr. 2526 (Benge); TREX 007718.  This would be the slurry with 0.09 gallons per sack of SCR-100 retarder.  TREX 005670 at 2.  Morgan understood that Faul was investigating potential causes of the blowout and that the information he provided needed to be accurate.  R. Morgan Dep. 36-37.

1402.   Morgan immediately mixed up the slurry but, according to standard practice, did not condition it before foaming.  R. Morgan Dep. 100.  Morgan's first attempt to foam the Macondo well slurry design failed, and the unconditioned slurry did not foam.  Tr. 3068 (Roth); Tr. 4952 (Quirk).  Roth's notes, which are based on a discussion he had with Faul in October 2010, state: "WHEN ATTEMPT WAS MADE TO FOAM THE CEMENT, SLURRY WOULD NOT FOAM."  Tr. 3163 (Roth); TREX 007718; Tr. 2526 (Benge).  The fact that the Macondo well slurry design would not foam indicates that the slurry did not keep with best practices.  Tr. 3253 (Roth).

1403.   Morgan observed that the slurry looked thin and not as viscous as normally seen or expected for a foam cement.  R. Morgan Dep. 20-22, 24, 26-27.  The slurry was also settling.  Tr. 4952-53 (Quirk).  Based on experience, the slurry thinness was noteworthy because a more viscous slurry is generally more stable.  R. Morgan Dep. 20-22.  A thin slurry could also have settling issues, which could affect stability.  R. Morgan Dep. 35.  Others at Halliburton, including Chad Brennis and Brian Waugh, also mixed up the slurry post-Incident and observed that it looked thin.  R. Morgan Dep. 129-30, 185-86.

1404.   Halliburton's Global Laboratory Best Practices state to "avoid … a low rheology slurry" (one with a yield point of 5 or less) as it will be difficult to foam.  R. Morgan Dep. 140-41.  Halliburton's pre-Incident rheology testing gave a yield point of 0, which is similar to water.  R. Morgan Dep. 118-20; TREX 005670 at 3.  If a slurry is too thin then additives should be used to thicken it.  R. Morgan Dep. 65.  Halliburton had various additives that could be used to thicken the slurry.  R. Morgan Dep. 60-61.

1405.   Based on how thin the slurry looked, Morgan immediately dumped it out and did not test it further.  R. Morgan Dep. 99, 180-81.  Morgan called Faul "right back" to report that the slurry was thin.  R. Morgan Dep. 99-100, 187-88; TREX 007718; Tr. 4760-61 (Quirk); Faul Dep. 277, 279-80.  Morgan also reported that the slurry was settling.  Faul Dep. 264, 270, 276.  Morgan did not make any notes on his test, he did not take any pictures, and he dumped the test sample.  R. Morgan Dep. 101; Tr. 3059-60 (Roth).  His normal practice is to log his laboratory findings in an ELAB (electronic lab) book.  R. Morgan Dep. 33.  But Morgan did not document this test and threw out the sample because he was worried that it might be misinterpreted in litigation.  R. Morgan Dep. 101.

1406.   About a week later, in mid-May, Tim Quirk, the Halliburton Lab Manager in Broussard, Louisiana, called Morgan and asked him whether he had conditioned his slurry before foaming.  R. Morgan Dep. 29-30, 33-34.  Quirk told Morgan that the slurry had been conditioned for three hours at 135 degrees when it was tested in the Broussard lab.  R. Morgan Dep. 29-34, 101-02, 104; TREX 007718; Tr. 3060 (Roth); Tr. 4955 (Quirk).

1407.   Morgan then repeated the test on May 20, but conditioned the slurry before foaming.  R. Morgan Dep. 30, 102, 174, 181; TREX 005670; TREX 007718.  Conditioning typically thins the slurry but this slurry contained SA-541 in it, which thickens the slurry when heated.  R. Morgan Dep. 30-31.  Conditioning was necessary to get this slurry to foam.  Tr. 3068 (Roth).  But cement is never conditioned in normal field operations before it is pumped.  Tr. 3068-69 (Roth).  The slurry continued to look thin after foaming in the second test—thinner than expected for a foam slurry.  Tr. 4764 (Quirk); R. Morgan Dep. 30, 104, 180.

1408.   Morgan poured the foam into a 250-mL graduated cylinder.  R. Morgan Dep. 105; TREX 007718.  After 2 hours, Morgan looked at the slurry and stirred it but did not take any density measurements for an unset foam stability test.  R. Morgan Dep. 107; TREX 007718.  This testing was not complete and further testing would be needed for a cement job.  R. Morgan Dep. 107-08.  Again, Morgan did not document the test or take pictures.  R. Morgan Dep. 105, 108; Tr. 3060 (Roth).

1409.   When reviewing the pre-Incident lab report, Morgan noticed that the Macondo well slurry design contained D-Air, which is detrimental to foam stability.  R. Morgan Dep. 59, 93.  The slurry also contained SCR-100 and KCl, which are dispersants that can thin the slurry.  R. Morgan Dep. 93-95.  After the mixing test, Morgan highlighted the D-Air additive on the lab report because foam cement typically does not have D-Air in it.  R. Morgan Dep. 177-78; TREX

005670 at 2.  The D-Air raised a question in Morgan's mind when he saw how thin the slurry was.  R. Morgan Dep. 96-97.

1410.   After the second test, Morgan called Faul and reported that the slurry was still thin.  R. Morgan Dep. 22, 29, 105.  Faul asked Morgan to put this in an e-mail.  R. Morgan Dep. 22.  Morgan, however, did not write it down because he was concerned that opinions he shared about the cement could impact litigation.  R. Morgan Dep. 22-24, 70-71.  Other than Roth's single page of notes, there is no documentation of Morgan's testing.  Tr. 2526-27 (Benge); Tr. 3060 (Roth).

### b.      Halliburton Post-Incident Testing in Broussard.

### i.      Foam Stability Testing.

1411.   A couple of weeks after the Incident, sometime after May 14, Ronnie Faul called Tim Quirk.  Tr. 4761 (Quirk); Faul Dep. 263-64.  Faul told Quirk that tests in Duncan had showed a slurry that was thin and showed instability and settling upon mixing.  Tr. 4760-63, 4952-53 (Quirk); Faul Dep. 262-63.  Faul wanted Quirk to repeat the foam stability test that had been done for the last BP report (using 0.08 gallons per sack of retarder) to compare with the results in Duncan.  Tr. 4758-59 (Quirk); Tr. 3061 (Roth); Faul Dep. 296-97; Halliburton's Discovery Response at 16 (July 18, 2011) (Ex. 3).  Quirk never performed a foam stability test on the 0.09 gallon per sack slurry that was actually pumped.  Tr. 4957-58 (Quirk).

1412.   At the time of Faul's request, it had been years since Quirk had performed a foam stability test.  Tr. 4764-65 (Quirk).  And Faul had never previously called Quirk to do testing.  Tr. 4765-66 (Quirk).  Faul also asked Quirk to do the testing "off the side":  Quirk was instructed not to record the test results in the Viking system or prepare a report, and instead to phone the results to Faul.  Tr. 4766, 4769-70 (Quirk); Faul Dep. 271.  This request for "off the side" testing

was unusual in light of the ongoing post-Incident efforts to investigate the cause of the blowout. Tr. 4770 (Quirk).

1413.   The important results from a foam stability test are the cement densities.  Tr. 4768 (Quirk).  Based on Faul's request, Quirk did not prepare a lab worksheet or notes or otherwise record the densities from the foam stability test and cannot remember what they were.  Tr. 4768 (Quirk).  Quirk phoned Faul and gave him the results; but Faul did not write them down nor could he recall the results.  Faul Dep. 294-95, 407.  Quirk also threw out the test samples.  Tr. 4769 (Quirk); Halliburton's Discovery Response at 18 (July 18, 2011) (Ex. 3).  There are no documents, e-mails, presentations, or pictures reflecting Quirk's post-Incident testing.  Tr. 2527-28 (Benge).

### ii.      Static Gel Strength Testing.

1414.   After the foam stability testing, Quirk received a call from Simon Turton and Anthony Badalamenti (Halliburton employees located in Houston) asking that he perform static gel strength transition time testing.  Tr. 4770-71 (Quirk).  Quirk performed these tests on May 28, 2010 and May 29, 2010.  Tr. 4776-77 (Quirk).

1415.   These post-Incident tests were "done the normal way" by processing and recording in the Viking System.  Tr. 4961-62 (Quirk).  The Viking lab sheets show that the post-Incident static gel strength tests used SCR-100 with the same Sample ID (54573) and Lot No. (6264) as used in the pre-Incident testing.  Tr. 4781, 4785-86 (Quirk); TREX 004566; TREX 005593 at 4.

1416.   The static gel strength transition time was one hour and 29 minutes.  Faul Dep. 392-93; TREX 003117.  This means the slurry did not have good properties for gas migration control, which require a transition time of less than 45 minutes.  Faul Dep. 392.

I.   **Halliburton's April 18 OptiCem Model Contained Several Inaccurate Inputs.**

1417.   Halliburton was responsible for running OptiCem modeling to create a design and to plan the cement job before execution of the job, and for providing the modeling to the customer.  Tr. 6587-88 (Gagliano); Nguyen Dep. 254-55.

1418.   OptiCem depends on inputs to generate the results: the more accurate the data, the better the prediction will be.  Tr. 6852 (Gagliano).

1419.   Halliburton's U.S. Land Offshore Work Methods document stated that "[w]hen modelling [*sic*] a slim-hole well in OptiCem it is important to input the collar and centralizer dimensions as they can have a significant impact on the pressure/ECD profile."  The document defined a slim hole as annular clearance of 1.5 inches or less, which was the annular clearance for the production casing job for the Macondo well.  Tr. 2559-60 (Benge); TREX 042045 at 287.

1420.   "Halliburton predicted that the gas flow potential for the cement job on the production interval of the Macondo well using seven centralizers would be Severe."  Halliburton's Discovery Response at 7 (May 25, 2011) (Ex. 5).

1421.   "[T]he OptiCem program only recommends that changes be made to the cementing program if the gas flow potential category is Critical."  Halliburton's Discovery Response at 7 (May 25, 2011) (Ex. 5).  Critical gas flow potential is any value over 15; severe gas flow potential ranges from 8 to 15.  Serio Dep. 321-22; TREX 002126.

1422.   Halliburton admitted "that that the use of foam cement is one application that HESI recommends for wells with a gas flow potential category of 'Severe,'" and "that its OptiCem software states that foam cement can be used to address severe gas flow potential."  Halliburton's Discovery Response at 8 (May 25, 2011) (Ex. 5).

1423.   It was not uncommon for Halliburton to pump a cement job with predicted severe gas flow potential.  Tabler Dep. 457.  Halliburton has pumped foam cement jobs before the

Macondo well with severe gas flow potential, including production or liner casing jobs. Tr. 6851 (Gagliano); TREX 004270.89.1.

1424. Using seven centralizers, gas flow potential was 10.29. Tr. 6874 (Gagliano). "Halliburton contends that the gas flow potential calculated by OptiCem is substantially the same for six centralizers and seven centralizers." Halliburton's Discovery Response at 7 (May 25, 2011) (Ex. 5).

1425. "HESI admits that the April 18, 2010 OptiCem report did not use the centralizer locations determined by BP …." Halliburton's Discovery Response at 26 (May 25, 2011) (Ex. 5); Tr. 3259 (Roth); Tr. 7356 (Beck); Tr. 2560 (Benge); Tr. 6852 (Gagliano).

1426. Gagliano never knew the location of the centralizers and never asked for this information. Tr. 6853 (Gagliano).

1427. Halliburton did not use the right centralizer dimensions (outer diameter) in its OptiCem model. Tr. 2560 (Benge). Halliburton never ran an OptiCem model with the right size centralizers in the right location. Tr. 2561 (Benge). Having the wrong size centralizers in the wrong place could impact the output of the OptiCem model. Tr. 7357 (Beck). United States cement expert Glen Benge has not seen an OptiCem model run with the correct inputs for the Macondo well. Tr. 2562 (Benge).

1428. Halliburton also used an incorrect pore pressure for the hydrocarbon zone in its OptiCem model, which can impact the validity of its conclusions. Tr. 2562-63 (Benge); Tr. 6852-53 (Gagliano). The pore pressure entered in the model for the sand at 18,200 feet was 13,200 psi, but the true pore pressure of the sand at this depth was shown to be about 11,900 psi. Tr. 7539 (Bourgoyne); TREX 008174.18.1.BP.

1429.   When the proper pore pressure was put into the model, the gas flow potential changed from 10.2 to 1.4, changing the Gas Flow Potential category to minor.   Tr. 7540 (Bourgoyne); TREX 008174.18.1.BP.

1430.   Halliburton also used an incorrect density for base oil in its OptiCem model, which could have impacted the validity of the model.   Tr. 2562-63 (Benge).

1431.   The OptiCem report indicated a risk of gas flow and also had a schematic that predicted channeling.   Tr. 6705 (Gagliano).   Halliburton's expert, however, could point to no direct evidence of channeling.   Tr. 7357 (Beck); *see also* TREX 004352.   To the contrary, the April 18 OptiCem model showed 250 feet of unchannelled cement between 18,050 and 18,300 feet.   Tr. 6862 (Gagliano).

1432.   In fact, the model run by Gagliano predicted ECDs would exceed the fracture gradient and result in losses while cementing, but there were no reported losses on the actual cement job.   Tr. 6854-56 (Gagliano).

1433.   Contrary to suggestions, the April 18 OptiCem report was not a "warning" to BP of potential channeling and gas flow potential: Gagliano first generated the April 18 OptiCem at 11:25.   TREX 000717A at 2.   But Gagliano did not circulate the April 18 OptiCem to BP until 20:58.   TREX 000717.   This was well after the 7" casing with centralizers was already assembled and run into the hole.   TREX 051151 at BP-HZN-MBI00136937 (the rig finished assembling 7" casing at 15:00, and 9-7/8" casing was being assembled starting at 17:00 on April 18).   Gagliano had known for two days that BP had decided not to run the additional centralizers because Chaisson told him on April 16.   Tr. 6380-81 (Chaisson).

### J. Halliburton's Unstable Cement Slurry Created a Flow Path for Hydrocarbons — Up the Casing.

1434.  It is undisputed that the annular production casing cement failed to isolate the hydrocarbon zones in the Macondo well and was not an acceptable barrier to hydrocarbon flow. TREX 022761 at 2 (Calvert Expert Report); Tr. 6710 (Gagliano).

1435.  Pumping unstable foamed cement is unsafe because the unstable foamed cement will not prevent hydrocarbons from coming into the pipe.  Garrison Dep. 153-54.  Nitrogen gas breakout in unstable foam slurry can compromise zonal isolation and create well control issues. Tr. 2471 (Benge); Gardner Dep. 93.  Unstable foam cement can result in pockets of cement and pockets of gas that do not seal the wellbore.  Sabins Dep. 595-96, 867.  In addition, the hydrocarbons can flow through unstable foam cement made permeable by bubble breakout. Garrison Dep. 272.

1436.  If the annular cement fails, the shoe track cement has the potential to be the "last line of defense" to hydrocarbon influx.  Tr. 2339-40 (Benge); Tr. 2629 (Calvert).  The shoe track cement is the cement placed in the casing between the float collar and the casing shoe.  Tr. 4244 (Barnhill).

1437.  Nitrogen breakout could have contaminated the shoe cement and caused it to fail. Tr. 931 (Bly); TREX 000001 at 35.

1438.  Alternatively, if the fluid influx reaches the unfoamed shoe track when the cement is transitioning and the cement is not designed to control gas migration or hydrocarbon influx, then the influx can form flow paths at the cement casing interface or through the cement in shoe track.  Tr. 2616 (Calvert).

1439.   Halliburton should have used an additive to control hydrocarbon influx, but there was no such additive in the shoe track cement slurry.   Tr. 2616-17, 2623 (Calvert); TREX 022761 at 18.

1440.   If Halliburton had used the proper additives, the shoe track cement would have been capable of withstanding the hydrocarbon influx.   Tr. 2623 (Calvert).   For example, additives such as Halliburton's Super Cement Bond Log and Latex 3000 could have been used to prevent hydrocarbon influx into the shoe track.   Tr. 2630 (Calvert).

1441.   Fluid loss can lead to gas migration, and must be controlled through design of the slurry.   Gardner Dep. 259.   Available Halliburton additives to control fluid loss include HALAD 344 variants.   Gardner Dep. 263.   Based on CSI's review, the shoe cement had insufficient fluid loss control to prevent gas migration.   Sabins Dep. 802.

1442.   During the Incident, the flow path of the hydrocarbons from the reservoir to surface was down the annulus and up through the casing shoe inside of the production casing.   OLGA software modeling and post-Incident evidence support this conclusion.   Tr. 7801 (Emilsen); D4861.   In contrast, an annular flow path would be inconsistent with the recorded data and events of April 20.   Tr. 7805, 7892-93 (Emilsen).   For example, the wellbore seal assembly showed no evidence of erosion on the outside, which confirms that the flow path was inside the casing and not on the back side.   Tr. 7820-21 (Emilsen); D4345, D4478; Tr. 9263-64 (O'Bryan); D4878-A; TREX 047656; Tr. 6049 (Ambrose); TREX 004248 at 212; Tr. 5028 (Barnhill).

1443.   Halliburton agreed that the flow went up through the casing based on the kill operation data.   Tr. 3270 (Roth); D4342.

### K.     The Number of Centralizers Used Did Not Cause the Incident.

1444.   The choice to not run 21 centralizers did not cause the Incident.  Tr. 2970-71 (Probert); Tr. 2469 (Benge).

1445.   The potential result of inadequate centralization was channeling and a lack of zonal isolation, which is not a safety concern and can be remediated by a squeeze job.  Tr. 6403-04 (Chaisson); Tr. 6614-15, 6853-54 (Gagliano); Tr. 2242, 2414 (Benge).

1446.   Operators run a range of centralizers, from very few to many depending on the particular job.  Faul Dep. 524-25; Tabler Dep. 446-48; Clawson Dep. 305.

1447.   Halliburton has successfully pumped other cement jobs with fewer than six centralizers and did not have any safety concerns about pumping the Macondo cement job using six centralizers.  Tr. 6288-89 (Chaisson); P. Anderson Dep. 254-55; Faul Dep. 524-25; Tabler Dep. 446-448.

1448.   In order to mitigate the risk of potential channeling associated with using fewer centralizers, BP positioned the six centralizers across and above the primary hydrocarbon zones to achieve good cement placement in these areas.  Tr. 1422 (Bly); TREX 000001 at 35.

1449.   Halliburton's April 18, 2010 OptiCem with seven centralizers demonstrates there was likely good cement bond between 18,050 and 18,300 feet, and as little as ten feet of good bond has been considered effective isolation for most operations.  Tr. 6862 (Gagliano); Roller Dep. 226-27; Vargo Dep. 499-501; TREX 000982; TREX 005204.20.3.BP.  The April 18 OptiCem report did not predict channeling across the centralized portions of the annulus.  Faul Dep. 509-10; 541-43; TREX 003118.

1450.   Halliburton's own expert, Frederick Beck, conceded at trial that the placement of the centralizers was not causal and that he did not see evidence that there was channeling in the lower annulus.  Tr. 7356-57 (Beck).

1451.  Additionally, Halliburton's post-Incident modeling showed that there was no channeling in the Macondo well cement job.  In May 2010, Roth requested Displace 3D modeling of the cement job to determine if the fluids spaced out and if there was sufficient spacer to displace the base oil and the cement from coming into contact.  Tr. 3168-69 (Roth); D4379; TREX 005220.  On July 25, 2010, Roth wrote that the Displace 3D modeling showed no mud channeling with seven centralizers:  "Spacer volume was sufficient to sweep entire annulus volume.  As such, spacer was sufficient to sweep channel.  Subsequent testing with 3D confirms statement that spacer was sufficient."  Tr. 3175 (Roth); TREX 004352; Dugas Dep. 294-96.  Tr. 3168-70 (Roth); D4379; TREX 005220.

1452.  Halliburton's Kris Ravi also noted after the Incident that the placement of the centralizers "should have helped in achieving good cement around the shoe."    TREX 005204.20.3.BP.

1453.  Finally, the number of centralizers used was not causal because all available evidence indicates that the hydrocarbon flow path was through the casing and not up the annulus, and therefore, any potential channeling caused by running six centralizers did not contribute to the blowout.  Tr. 933-34, 1203, 1445 (Bly); Mazella Dep. 104-05, 125-26, 199-200, 205-08, 226-28, 332; Brock Dep. 59-60; 85-86; 88-90; TREX 000001 at 35.

**L.      The Partial Bottoms-Up Circulation Did Not Cause the Incident.**

1454.  A full bottoms-up was not necessary immediately before the cement job because BP circulated more than a full bottoms-up on April 16, 2010, after which there was no further drilling.  Tr. 6225 (Ambrose).

1455.  Enough circulation was done, and additional circulation would not have made any difference.  Tr. 7607 (Bourgoyne).  The lack of a bottoms-up circulation, running less than 21

centralizers, and using a long string did not increase the risk of a blowout.   Tr. 7607 (Bourgoyne).

1456.   A full bottoms-up was not required at the Macondo well because there was only 1,000 feet of open hole at the base of the production casing, and therefore it was not necessary to circulate a full bottoms-up to clean the hole in order to prevent contamination.   Tr. 2047-48 (R. Sepulvado).

1457.   Between the mud pumped in advance of the spacer, the spacer, and the mud in front of the cement, the open-hole area was completely flushed 20 times before the cement was placed.   Tr. 2567 (Benge).

1458.   Halliburton's Displace 3D modeling confirmed that the spacer was sufficient to sweep the annulus before the production casing cement job:   "Spacer volume was sufficient to sweep entire annulus volume.   As such, spacer was sufficient to sweep channel.   Subsequent testing with 3D confirms statement that spacer was sufficient."   Tr. 3175 (Roth); TREX 004352; Dugas Dep. 294-96.   Tr. 3168-70 (Roth); D4379; TREX 005220.

1459.   All available evidence indicates that the hydrocarbon flow path was not up the annulus, and therefore, any potential channeling in the upper annulus caused by circulating less than a full bottoms-up did not contribute to the Incident.   Tr. 933-34, 1203, 1445 (Bly); Mazella Dep. 104-05, 125-26, 199-200, 205-08, 226-28, 332; Brock Dep. 59-60; 85-86; 88-90; TREX 000001 at 35.

   **M.    No Heavy Pill in the Rat Hole Did Not Cause the Incident.**

1460.   Vargo did not see any evidence in his post-Incident investigation work that rat hole swapping occurred in the Macondo well.   Vargo Dep. 694-95.

### N. M57B Was Not a Cause of the Incident.

1461. The M57B sand was not causal to the blowout and explosion on April 20, 2010. Tr. 6510-11 (Strickland); Tr. 7308 (Beck).

1462. There is no evidence that the M57B sand was causal to the failure of Halliburton's cement. Tr. 6511-12 (Strickland) Tr. 7308 (Beck).

1463. The M57B sand is a shaly sand, approximately two feet thick at 17,467 measured depth with low permeability and porosity. Tr. 6421, 6427, 6460, (Strickland); TREX 003540; TREX 006338; TREX 003551.

1464. The M57B sand is a small stringer sand and there is no evidence that prior to the Incident, it flowed hydrocarbons. Tr. 6534-35 (Strickland).

### 1. MMS Regulations Require that the Top-of-Cement Must be 500' Feet Above the Top Hydrocarbon Bearing Zone.

1465. 30 C.F.R. § 250.421 requires an operator to cement the annular space at least 500 feet above the casing shoe and 500 feet above the uppermost hydrocarbon-bearing zone. Agreed Stipulations No. 130 (Rec. Doc. 5927).

1466. In accordance with the MMS requirement, the top-of-cement was chosen to be 500 feet above the hydrocarbon zone at the Macondo. Tr. 2258 (Benge).

1467. Placement of the cement, in accordance with federal regulations, should be 500 feet above the highest hydrocarbon bearing zone. Tr. 6611-12 (Gagliano).

1468. The volume of cement was designed to be 500 feet above the uppermost hydrocarbon bearing zone, but not so high as to cover the shoe, and this is what drove the volume of cement. Tr. 2552-53 (Benge).

2.      **There Is No MMS Definition or Industry Standard Definition of a "Hydrocarbon Bearing Zone."**

1469.   There is no definition of "hydrocarbon-bearing zone" under MMS regulations. Ex. 5485.2; Tr. 6528-29 (Strickland); Trocquet Dep. 109-10; Chemali Dep. 44.

1470.   There is no accepted definition of "hydrocarbon-bearing zone" under industry standards.  Tr. 6528-29 (Strickland); Tr. 7309 (Beck); Chemali Dep. 44-45.

1471.   Hydrocarbon bearing zones are a petrophysical interpretation based on various properties of the formation, such as permeability, porosity and water saturation.  Tr. 6436-39 (Strickland).

1472.   Halliburton's expert developed a definition of hydrocarbon bearing zone in August 2011 after being retained by Halliburton for purposes of this litigation.   Tr. 6529 (Strickland).

3.      **M57B Was an Approximately Two Foot Zone with Uncertain Petrophysical Properties.**

1473.   The data available to evaluate the M57B zone includes cuttings, logging while drilling data ("LWD"), measurement while drilling data ("MWD"), triple combo logs (resistivity, gamma ray, density information), CMR (combinable magnetic resonance) tool, MDT (modular dynamic formation tester), and laminated sands analysis (LSA) from Schlumberger.  Tr. 6421, 6424-25, 6427, 6460 (Strickland); TREX 003540; Emanuel Dep. 11, 76; TREX 003541.

1474.   The LWD and MWD data and cuttings were evaluated by the Halliburton mud loggers while the interval was being drilled.  Tr. 3490-91 (Keith); TREX 000611; TREX004477 at 122.

1475.   Schlumberger wireline engineer, Victor Emanuel, ran the wireline tool during April 10, 2010 through April 14, 2010.  Emanuel Dep. 11, 76.

306

1476.   Stuart Lacy and Galina Skripnikova monitored the wireline runs and reviewed the wireline data in real time.  Emanuel Dep. 76-77, 79.  S. Lacy Dep. 116-17.

1477.   As part of that process, Lacy and Skripnikova compared the wireline data to previously collected LWD/MWD data.  S. Lacy Dep. 116-19.

1478.   The M57B sand had been invaded with synthetic oil-based mud filtrate from drilling fluids.  Tr. 6478 (Strickland).

1479.   Synthetic oil-based mud filtrate affected the resistivity measurements of the M57B, which can cause crossover on triple combo logs.  Tr. 6478-79 (Strickland).

1480.   Mud logging service provider, Sperry, never identified the M57B on any of its Show Reports.  Tr. 6482-83 (Strickland).

1481.  Sperry  (Halliburton)  mud  loggers  have  the  obligation  to  provide geology/lithology descriptions and must give "show reports" that identify and discuss zones of interest whether the mud loggers come across a hydrocarbon "show".  Tr. 3649-50 (Keith); TREX004477 at 122.

1482.   Keith prepared a show report for intervals spanning 18,080 feet (md) to 18,206 feet (md) but did not provide a show report for any zones near or at the M57B, 17,467 feet (md). Tr. 3650-51 (Keith); TREX 042123.

1483.   Keith and other Sperry personnel prepared an End of Well Report for the Macondo well, which covers all show reports and zones of interest.  The End of Well Report did not identify the M57B either as a zone of interest or a show.  Tr. 3652-53 (Keith); TREX 000611.

1484.   No connection gas appeared around the M57B interval.  TREX 004776.  Only background levels of methane appeared around the M57B interval and there was no noticeable

increase in total gas units recorded at the M57B interval.  TREX 004776.  The heavier gases, such as ethane, propane, and butane, did not appear at the M57B interval which is another indicator that this is not a hydrocarbon bearing zone.  TREX 004776.

### 4. The Determination of a Hydrocarbon Bearing Zone Requires Engineering Discretion.

1485.  Whether a zone is hydrocarbon-bearing or not is not a black and white determination and the analysis requires engineering discretion.  Tr. 6519, 6524 (Strickland); Emanuel Dep. 123.

1486.  No physical samples were taken from the M57B sand.  Tr. 6475 (Strickland).

1487.  Without a physical sample, there is no definite answer as to whether a zone contains hydrocarbons.  Chemali Dep. 159-60.

1488.  Using data from the wireline – *e.g.* resistivity, gamma ray, and neutron-density – petrophysicists may have a confidence level of 50 to 70 percent as to whether a zone is hydrocarbon bearing.  Chemali Dep. 53.

1489.  Discounting the Macondo net pay sands, Halliburton chief petrophysicist Roland Chemali did not identify the M57B among the top four likely hydrocarbon-bearing zones in the final interval of the well.  Chemali Dep. 173-75.

1490.  Halliburton's expert, Dr. Strickland has defined a hydrocarbon-bearing zone as "a defined interval that contains oil and/or gas at a sufficient level such that oil and/or gas will flow out of the zone and into a well bore when the pressure in the well bore is reduced below the pressure of the zone."  Tr. 6529 (Strickland); TREX 060875.

1491.  Under Dr. Strickland's definition, "sufficient level" means that the zone in question has to flow into the wellbore in enough quantity to affect wellbore operations.  Tr. 6531 (Strickland).

### 5.   The M57B Sands Did Not Flow When Underbalanced During Well Operations.

1492.   Halliburton has estimated the pore pressure of the M57B sand to be about 14.15 pounds per gallon.  Tr. 6422 (Strickland).

1493.   If mud weight were slightly lower than the pressure of the M57B, the M57B would flow hydrocarbons.  Tr. 6533-34 (Strickland).

1494.   At certain times between April 3 and April 19, 2010, the Macondo well became underbalanced with respect to M57B.  Tr. 6535-36 (Strickland); D4753; Tr. 7518 (Bourgoyne).

1495.   When the Macondo well became underbalanced with respect to M57B, there was no evidence of hydrocarbon flowing from the M57B.  Tr. 6537 (Strickland); D4753; Tr. 7518 (Bourgoyne).

1496.   When the Macondo well became underbalanced with respect to M57B, there was no evidence of any kicks after the well reached total depth.  Tr. 6537 (Strickland); D4753; Tr. 7518 (Bourgoyne).

1497.   There is no evidence that the M57B even meets the definition of hydrocarbon bearing zone created by Dr. Strickland for this litigation.  Tr. 6537 (Strickland).

### 6.   Galina Skripnikova Reviewed All Available Data and Acted Reasonably in Not Identifying M57B as a Hydrocarbon Bearing Zone.

1498.   Skripnikova reviewed all available data when assessing the shallowest hydrocarbon-bearing interval including the LWD, mud log, cuttings/lithology, and wireline data. Tr. 6551-53 (Strickland); Skripnikova Dep. 567.

1499.   Skripnikova analyzed and evaluated the mud log and LWD response of the Macondo well as drilling crossed the M57B interval.  Tr. 6552-53 (Strickland).

1500.   In analyzing all available data and data collected while she was on the *Deepwater Horizon*, Skripnikova concluded that the shallowest hydrocarbon-bearing interval was the M56A at 17,803 feet (md).  Skripnikova Dep. 567.

1501.   In her evaluation of the shallowest hydrocarbon-bearing zone on the *Deepwater Horizon*, Skripnikova did not solely rely on a field print of the triple combo log.  Skripnikova Dep. 567; Tr. 6551-53 (Strickland).

1502.   In her evaluation of the shallowest hydrocarbon-bearing zone on the *Deepwater Horizon*, Skripnikova performed substantial analysis in excess of twenty-seven minutes.  Tr. 6551-53 (Strickland).

### 7.   Post-Incident Technical Documents Regarding M57B Do Not Reflect a Determination as to Whether M57B Was a Hydrocarbon Bearing Zone.

1503.   Post-Incident, BP's petrophysical team decided to characterize the content of the M57B from invaded brine to gas to reflect the high uncertainty in the interpretation of the data. Skripnikova Dep. 444-45; TREX 006338; TREX 003551.

1504.   Post-Incident documents reflecting analysis, such as shut in wellhead pressures, reflect assumptions made by BP engineers to model potential scenarios of flow from various sands in the well.  TREX 003530.

1505.   No pre-Incident BP documents interpret the M57B as a zone consistent with Dr. Strickland's definition of what constitutes a hydrocarbon-bearing zone.   Tr. 6557-58 (Strickland).

## VII.   THE BOP FAILED TO SERVE AS A BARRIER BECAUSE OF TRANSOCEAN'S FAILURE TO MAINTAIN THE BOP.

### A.   Transocean Developed the Maintenance Philosophy for the BOP That It Used Fleet-wide.

1506.   When properly maintained, a BOP stack can last 30 years, but it can fall into disrepair very quickly if not properly maintained.  D. McWhorter Dep. 71-72.

1507.   Proper maintenance is critical to the BOP functioning as intended.  Stringfellow Dep. 398-99.

1508.   Transocean developed the maintenance philosophy for its BOPs on its rigs fleet-wide.  This philosophy encompassed preventive maintenance, condition-based maintenance, corrective maintenance, between-well maintenance, five-yearly survey-type maintenance, and maintenance conforming to API requirements, OEM requirements, and regulatory requirements – "the whole spectrum."  Tr. 5202 (Childs); TREX 001469.

1509.   Transocean uses condition-based maintenance on all of its rigs, including those under contract to operators other than BP.  Hay 1 Dep. 325, 342; Rose Dep. 386-87; Boughton Dep. 203; J. McWhorter Dep. 107; Stringfellow Dep. 584.

1510.   "Condition based maintenance" is intended to monitor the condition of the equipment, and is a systematic way of testing and monitoring equipment on a regular basis.  J. McWhorter Dep. 106-07; Stringfellow Dep. 234-35, 238-39.

1511.   Transocean concluded that its condition-based maintenance programs results in a more rigorous monitoring and repair process than a once-every-five-years approach.  Hay 2 Dep. 93.

1512.   Mark Hay, Transocean's Senior Subsea Supervisor, was not aware of any complaints from other operators about Transocean's use of condition-based maintenance.  Hay 1 Dep. 343.

1513.  BP had nothing to do with Transocean's use of condition-based maintenance. Hay 1 Dep. 324.

**B.     Transocean Represented to BP that the VBRs Complied with API RP 53.**

1514.  Transocean had responsibility for ensuring compliance with API RP 53.  Sannan Dep. 173-74; TREX 001356A.20.1.BP (the Drilling Contract mandated that Transocean "at a minimum, shall use, test, and maintain blowout prevention equipment in accordance with all applicable governmental rules, regulations, and orders then in effect.").

1515.  API RP 53 recommends that the BOP is inspected every 3-5 years, and Transocean represented that it had gone "up and above inspections of the BOP."  Kent 1 Dep. 215.[11]

1516.  Transocean felt that its condition-based maintenance complied with and exceeded the requirements of API RP 53.  Sannan Dep. 173; Stringfellow Dep. 583.

1517.  During the September 2009 audit of the *Deepwater Horizon*, the auditors found that "the test, middle and upper ***pipe ram BOP bonnets*** are original [and] have not been subject to OEM inspection and recertification in accordance with API and OEM requirements."  TREX 000275.20.1.TO (emphasis added); Tr. 2010 (R. Sepulvado).  There was no evidence at the time of the audit to suggest that the pipe ram bonnets had been inspected in the previous five years. Wong Dep. 166.

1518.  BP's auditors made the recommendation that the VBR ram bonnets needed an expedited overhaul.  P. Johnson Dep. 378-79.

_____

[11] "Kent 1 Dep." refers to Mr. James Kent's first day of deposition testimony, which occurred on June 21, 2011.  "Kent 2 Dep." refers to Mr. James Kent's second day of deposition testimony, which occurred on June 22, 2011.

1519.   The finding that the VBR ram bonnets needed overhaul was challenged by Transocean, based on its conditional maintenance program.  P. Johnson Dep. 378-79; Wong Dep. 164.

1520.   Transocean assured BP that its maintenance program regarding the VBR bonnets on the *Deepwater Horizon* met or exceeded the conditions of API RP 53, and BP accepted Transocean's assurances.  P. Johnson Dep. 378-79; Boughton Dep. 257.

1521.   During its monthly inspections, MMS never notified BP or Transocean that the BOP was out of certification or that it did not comply with API RP 53.  P. Johnson Dep. 558.

1522.   Norman Wong, a member of BP's Internal Investigation Team, was not aware of any evidence that issues with the ram bonnets had any impact on BOP functionality during the Incident.  Wong Dep. 331-32.

### C.   Transocean Failed to Maintain the BOP so as to Allow the AMF/Deadman to Operate During the Incident.

#### 1.   The AMF/Deadman Sequence Relied on the 27-Volt Battery and Solenoid 103 to Close the Blind Shear Rams.

1523.   Each control pod – both the Yellow and Blue – contained two subsea electronic modules (SEM-A and SEM-B), one 27-volt battery, two 9-volt batteries, and one solenoid valve 103.  Tr. 2688 (Davis); D4883; Tr. 5162 (Childs).  The 27-volt battery was shared by SEM-A and SEM-B.  Tr. 5416 (Childs); Tr. 8407-08 (Zatarain); D4883.

1524.   The devices within the SEM, when on the sea floor, were sealed in a temperature-controlled environment and kept around 60 degrees Fahrenheit, plus or minus 10 degrees.  Coronado Dep. 171.

1525.   During normal operations, umbilical cables running from the rig to the Yellow and Blue control pods provided electrical power and communications, and hydraulic supply.  Tr. 8406 (Zatarain); D4882; Tr. 5160 (Childs).

1526.  There were certain conditions that need to be met for the AMF/Deadman function to operate:  the loss of electrical power, hydraulic power, and communications with the surface. Tr. 8410 (Zatarain); D4884; Tr. 5097-98 (Childs); Whitby Dep. 212.   There was a very low probability that the rig could lose its MUX cables and not lose hydraulic integrity, such that the AMF would not function.  Coronado Dep. 465.

1527.  The AMF/Deadman conditions were met at the time of the explosion or shortly thereafter.  Tr. 8410 (Zatarain); Tr. 2649 (Davis).

1528.  When the AMF/Deadman conditions were met, *i.e.*, the SEMs sense the loss of power and communication from the surface, the batteries would take over to power the SEMs. Tr. 5160 (Childs).   The AMF/Deadman system has a completely different purpose and functionality than the normal function for the BOP.  Tr. 8408 (Zatarain); D4884.

1529.  If the AMF/Deadman sequence functions as designed, each SEM boots up using its own 9-volt battery power, and then the SEMs power solenoid valve 103 using a common 27-volt battery.  Tr. 8408-10 (Zatarain).  Both coils of solenoid valve 103 are generally energized simultaneously.  Coronado Dep. 180-81; Gaude Dep. 124-25.

1530.  The solenoid valve was designed to be activated for 30 seconds, sending hydraulic pressure to a large valve that closes the BSRs.  Tr. 8410, 8461-62 (Zatarain).  At the end of the 30 seconds of activation, the pod would turn off the AMF function, removing the 9-volt battery power, and the computer would go back to sleep.  Tr. 8410 (Zatarain).

1531.  For a pod to work as intended during the AMF/Deadman sequence, both Solenoid 103 and the 27-volt battery must be functional.  Tr. 8414 (Zatarain).  If the 27-volt battery lacked adequate charge or if Solenoid 103 fails to work properly, the control pod cannot operate the

AMF/Deadman sequence and the BSRs will not activate.  Tr. 5416 (Childs); LeNormand 1 Dep. 175.[12]

### 2.  The AMF/Deadman Failed to Activate Because of Deficiencies in the Yellow and Blue Control Pods.

1532.  The conditions necessary for the AMF/Deadman to function were met during the Incident, but the BOP control system did not function as designed and activate the BSRs.  Tr. 8404, 8410 (Zatarain); Tr. 2649 (Davis); D4881.

1533.  The AMF/Deadman function did not function due to two independent and different failures:  a depleted 27-volt battery in the Blue Pod and a reverse-wired solenoid valve in the Yellow Pod.  Tr. 8404 (Zatarain); D4881; Tr. 2649-50 (Davis).

1534.  If either the Blue Pod 27-volt battery had been sufficiently charged or Solenoid 103Y had been wired correctly, the BSRs would have sheared the drill pipe and sealed the well at the time of the Incident.  Tr. 2656 (Davis).

1535.  Experts retained by the United States, BP, and Halliburton agreed that the deficiencies associated with the Blue Pod 27-volt battery and Yellow Pod reverse-wired solenoid valve prevented the AMF/Deadman from functioning and closing the BSRs at the time of the Incident.  Tr. 2650-51 (Davis); Tr. 6998 (Stevick); Tr. 8404 (Zatarain); D4603A; D4572A.

1536.  Childs, Transocean's expert, is the only expert who contends that the *Deepwater Horizon*'s BOP subsea control system was capable of performing, and did perform, the AMF/Deadman function on April 20, 2010.  Tr. 5157, 5413 (Childs); D4603A; D4572A.

---

[12] "LeNormand 1 Dep." refers to Mr. LeNormand's first day of deposition testimony, which occurred on June 20, 2011.  "LeNormand 2 Dep." refers to Mr. LeNormand's second day of deposition testimony, which occurred on June 21, 2011.

### a.    The 27-Volt Battery in the Blue Pod Was Too Depleted to Operate the AMF/Deadman Function.

1537.   The AMF/Deadman needed adequate power from the 27-volt battery to operate the AMF/Deadman sequence.  If the 27-volt battery power had insufficient battery charge, the AMF/Deadman would not function and the BSRs would not close.  Tr. 8417-18 (Zatarain).

1538.   At the time of the Incident, the 27-volt battery in the Blue Pod was depleted to the point where it could not have activated the solenoid and operated the AMF/Deadman function. Tr. 8418-19 (Zatarain); Tr. 2650, 2872 (Davis); Tr. 6995-96 (Stevick).

1539.   According to Dr. Stevick, Halliburton's expert, "[t]here's no question those batteries were dead and could not activate the AMF."  Tr. 6996 (Stevick).

1540.   The AMF/Deadman sequence would have functioned on April 20, 2010, if the Blue Pod batteries had been replaced per Cameron's recommended schedule for battery replacement.  Tr. 6997 (Stevick).

1541.   If the 27-volt battery in the Blue Pod had been sufficiently charged on April 20, 2010, the AMF/Deadman would have activated and the BSRs "would have closed; it would have cut the whole pipe and bent over the top of it and sealed the well. . . ."  Tr. 2652 (Davis).

### i.    Post-Incident Testing Confirmed that the 27-Volt Battery Was Depleted.

1542.   There is no dispute that the 27-volt battery in the Blue Pod was recovered in a depleted state.   Tr. 8419 (Zatarain); Tr. 2650 (Davis).   The 27-volt battery for the AMF/Deadman was discharged at the time of recovery such that it would not function properly. Coronado Dep. 376.

1543.   DNV conducted testing of the 27-volt batteries from the Blue and Yellow Pods in March 2011.  Tr. 8419-20 (Zatarain); D4889.  DNV subjected the 27-volt batteries from both pods to the same type of testing at the same time.  Tr. 8419-20 (Zatarain).

1544.   DNV conducted testing as a joint effort of the Technical Working Group consisting of various interested parties that formulated the testing that would be performed.   Tr. 8402 (Zatarain).   DNV's testing was very methodical and well-documented.   Tr. 8403 (Zatarain).

1545.   The 27-volt battery from the Blue Pod measured 1.1 volts and 1.0 volts in the first and second tests, respectively.   TREX 001164.60.4.BP (DNV Final Report); D4889.   This testing revealed that the batteries were "basically[,] essentially dead."   Tr. 8419 (Zatarain).   Childs admitted that a 1.1 or a 1.0 voltage battery is not sufficient to operate the 27-volt battery.   Tr. 5419 (Childs).

1546.   Zatarain performed an accident reconstruction analysis to determine the state of the batteries in the Blue Pod during the Incident when the AMF/Deadman conditions would have been met.   Tr. 8420 (Zatarain); TREX 040009.16.1.BP.

1547.   Childs, who was retained by Transocean, did not have any criticisms of Zatarain's analysis.   Tr. 5190-91 (Childs).

1548.   Zatarain concluded that at the time of the Incident, the "most likely scenario" is that the Blue Pod had two "good" 9-volt batteries and a "weak" 27-volt battery that was incapable of operating the solenoid valve and the AMF/Deadman sequence.   Tr. 8423-24 (Zatarain); TREX 040009.16.4.BP.   Under this scenario, the "weak" 27-volt battery would not have had sufficient capacity to activate Solenoid 103.   Tr. 8424-25 (Zatarain).

1549.   Childs admits that the Blue Pod 27-volt battery "might have been weak" at the time of the Incident.   Tr. 5192 (Childs).   Whether the battery was "weak" or "bad" is academic because, regardless of nomenclature, the Blue Pod battery lacked sufficient charge to operate the AMF/Deadman function.   Tr. 8426 (Zatarain).

1550.  Zatarain based his conclusion on forensic evidence.  It is undisputed that when recovered and tested, the Blue Pod had two "good" 9-volt batteries and a depleted 27-volt battery.  The only way to have a "bad" or depleted 27-volt battery when recovered is to start with a "bad" or depleted 27-volt battery at the time of the Incident.  Tr. 8424-26 (Zatarain); TREX 040009.16.4.

1551.  If the Blue Pod had three "good" batteries on April 20, 2010, which Transocean contends is true, the Blue Pod would have had three "good" batteries when recovered and tested, which was not the case.  This is because after the AMF/Deadman completes its procedure, it turns off the power to the computers such that there is no drain on the batteries.  Therefore, if the batteries were "good" at the time of the Incident, they would have been "good" when the pod was pulled up months later.  Tr. 8425-26 (Zatarain).

> ### ii.     Interlink's Testing Supports the Conclusion that the Blue Pod Battery Was Too Depleted to Operate the AMF/Deadman Sequence.

1552.  Interlink, an engineering consulting company that performs work for the oil and gas industry, performed a post-Incident analysis of how a control pod SEM behaves when it has less than adequate battery power.  Tr. 8427 (Zatarain).

1553.  Interlink concluded that "[i]t is most likely that at the time of the incident the AMF system was armed and appeared to be operating normally, ***but the 27V battery was already discharged*** to the point that it could not operate the relays on the AMF circuit boards … Due to the low voltage in the 27V battery, the AMF sequence did not happen, the AMF circuits were not disarmed, and the 27V battery was completely discharged over the next 75 days."  TREX 043158.33.1.BP (emphasis added); Tr. 8428 (Zatarain).

1554.  Although Childs, Transocean's expert, claimed that Interlink's testing somehow supported his theory that the 27-volt battery might have drained itself after running the

AMF/Deadman sequence, he did not point to anything specific in Interlink's testing to support his claim.  Tr. 8429 (Zatarain); Tr. 5192-93 (Childs).  To the contrary, Interlink's analysis supports the opposite conclusion – *i.e.*, the 27-volt battery was depleted at the time of the Incident and prevented the Blue Pod from activating the AMF/Deadman sequence.  TREX 043158.33.1.BP.

### iii.  Childs' Cycling Theory Is Unsubstantiated and Inconsistent with the Forensic Evidence.

1555.  Childs, Transocean's expert, agreed that the 27-volt battery was recovered in a depleted state.  Tr. 8436 (Zatarain).  Nonetheless, he contended that the Blue Pod was able to activate the AMF/Deadman sequence on April 20, 2010.  He is the only expert to take this position.  Tr. 2650-51 (Davis).

1556.  Childs posited that at the time of the Incident, the Blue Pod's 27-volt battery and one 9-volt battery were adequately charged and properly operated the AMF/Deadman sequence.  Then, he claimed, due to a weak 9-volt battery, SEM-B went through a cycling process that eventually drained the 27-volt battery.   Therefore, he concluded, when the Blue Pod was retrieved, the 27-volt battery was depleted.  TREX 007687 at 36; Tr. 8436 (Zatarain); Tr. 2651 (Davis).

1557.  Cameron's Richard Coronado, who was Cameron's lead engineer on the electrical side for the *Deepwater Horizon* BOP project and has worked with AMF cards and software for 13 years, had never witnessed the AMF continuously cycling after the AMF card was triggered.  Coronado Dep. 92-93.  Coronado does not agree with Childs' theory that the 27-volt battery was discharged because of a continuous rebooting of the AMF/Deadman sequence due to a weak 9-volt battery.  Coronado Dep. 537-38.  Coronado had not seen any evidence that Childs' rebooting theory happened.  Coronado Dep. 541-42.

1558.   Cameron had never heard of a scenario where an insufficient 9-volt battery attempted to continuously boot up during an AMF/Deadman sequence.  Gaude Dep. 269.

1559.   Cameron's Senior Field Service Technician could not see how it was possible for the Blue Pod battery to discharge after April 20, 2010.  LeNormand 1 Dep. 334.

1560.   Childs' cycling theory was not supported by the forensic evidence.  His theory required a depleted 9-volt battery in the Blue Pod that was incapable of performing the AMF/Deadman function.   Under his theory, the weak 9-volt battery triggered cycling that depleted the 27-volt battery.   However, when the Blue Pod was recovered, both 9-volt batteries were "good" and neither was depleted.  D4576A; Tr. 8436-38 (Zatarain); Tr. 2651 (Davis).

1561.   Dr. Davis discounted Childs' cycling theory because there was "absolutely no problem with the 9-volt batteries in the blue pod" when tested at Michoud by DNV.  Tr. 2651 (Davis).

1562.   Childs' cycling theory does not explain why the 27-volt battery was depleted upon recovery and testing.  The cycling that Childs referred to would actually have drained the 9-volt battery, not the 27-volt battery.  During cycling, the heavy load would have been on the 9-volt battery, not the 27-volt battery.  Tr. 8437 (Zatarain).

1563.   Cameron's Richard Coronado testified that if the AMF/Deadman sequence had been going through repeated cycling, as Transocean claims, he would have expected that the 9-volt battery would have discharged much faster than the 27-volt battery.  Coronado Dep. 166.  In the AMF/Deadman circuit, the 9-volt battery would have been consumed sooner and faster than the 27-volt battery.  Coronado Dep. 143-44, 162-63.

1564.   Childs' cycling theory relied upon the unsubstantiated claim that when the Blue Pod was retrieved from the seafloor, SEM-A had completed the AMF process, but SEM-B had

not.  There was no evidence of this and when asked about this at his deposition, he could not identify the basis for his claim.  Tr. 8437-38 (Zatarain).

### iv.   Transocean's Internal Battery Testing Is Unreliable and Irrelevant.

1565.  Childs relied upon battery testing conducted by Transocean and WEST Engineering, his employer, to support his conclusion that the AMF/Deadman system allegedly functioned on April 20, 2010, followed by cycling that depleted the 27-volt battery in the Blue Pod.  Tr. 5328-29 (Childs).

1566.  But, Transocean's testing did not reflect cycling of the nature that Childs describes.  Childs has never pointed to any specific tests that support his theory, nor does such testing exist.  Tr. 8439-40 (Zatarain).

1567.  Transocean conducted its testing at the same time that all parties involved in the litigation were testing batteries at Port Michoud under the supervision of the Joint Investigation Team and then the Court.  Tr. 5329 (Childs).  Neither Cameron, nor BP, nor Halliburton, nor the PSC, nor the United States were aware of Transocean's testing at the time, and did not participate in it.  Tr. 5329-30 (Childs).  Childs did not know whether any parties knew that Transocean was conducting its own battery testing.  Tr. 5329-30 (Childs).

1568.  Childs was not aware of anyone who asked the Technical Working Group and DNV to perform testing to attempt to show the cycling theory that Childs contends caused the depletion of the Blue Pod battery.  Tr. 5460 (Childs); TREX 004934.  Transocean had the opportunity to weigh in and discuss methods of battery testing that were performed at Port Michoud, but did not.  The Technical Working Group had representatives from Transocean, and they could have proposed that DNV perform the testing methodology that they utilized during their internal testing.  Tr. 2651-52 (Davis).

1569.  Childs did not set up the battery tests conducted by Transocean and WEST Engineering.  He admitted that there were parts of the testing that were "over [his] head."  Tr. 5332 (Childs).  Childs has no formal training in electrical engineering, electronics, or electronic systems software.  Tr. 5331-32 (Childs).

1570.  Tolleson, a WEST Engineering employee, conducted the battery tests and recorded handwritten notes that Childs relied on to draft his report.  Tr. 5333-34, 5345 (Childs).  Those handwritten notes have never been produced to the parties in this litigation, despite requests for all expert reliance materials, which renders the tests unreliable.  Tr. 5336-39 (Childs).

1571.  Certain of the battery tests were videotaped, but Childs did not know whether those videotapes had been provided to any parties in this litigation.  Tr. 5339 (Childs).

1572.  Transocean's battery testing is irrelevant and unreliable.  Tr. 8438-39 (Zatarain).  Transocean's testing is irrelevant because, although identified as "battery testing," the vast majority of testing was not done with batteries.  Instead, it was performed with power supplies running off of wall power, which does not have the characteristics of a battery.  This is significant given that Transocean was attempting to show that cycling occurs under certain conditions involving battery-powered AMF/Deadman operations.  Tr. 8439 (Zatarain); Tr. 5462 (Childs).  Childs did not know what, if anything, was done to assure that the power supply would simulate the conditions of a battery.  Tr. 5463-64 (Childs).

1573.  Where the testing utilized batteries, the batteries were of an unknown age and no attempt was made to find a battery that was in use from November 2007, like the Blue Pod 27-volt battery on the *Deepwater Horizon*.  Tr. 5461-62 (Childs).  Also, the equipment that Transocean used for the testing was from a rig other than the *Deepwater Horizon*, and Childs

could not explain what was done to assure that this equipment was substantially equivalent to the equipment of the *Deepwater Horizon*. Tr. 5461-64 (Childs).

1574. Transocean's testing is also unreliable because it was not well-documented. The documentation does not describe how the tests were done, or the relevance of the test equipment and the power supplies. Further, the test protocols and results are internally inconsistent, with no explanation for why the same test protocol would yield different results in different tests. Tr. 8439-40 (Zatarain); Tr. 2651 (Davis) (Transocean's battery testing report is "not a very good report, unfortunately, and there are a lot of details left out.").

1575. It appears that Transocean conducted certain battery tests in October and November 2010, the results of which were not disclosed in the summary report of the testing. Tr. 5339-44 (Childs); TREX 007708; TREX 050378. For example, on November 3, 2010, Florence, a member of Transocean's investigation team, e-mailed Tolleson, who conducted Transocean's internal battery testing. In enlarged font, he asked, "Did we managed [*sic*] to get our tests we did yesterday on paper and into a report. I did call Dan last night to warn him this testing we found out yesterday could mean that the AMF did not function." TREX 005662; Tr. 5345-46 (Childs); Florence Dep. 14. The results from those tests, conducted on November 2, 2010, were not disclosed in Transocean's summary report. Tr. 5346 (Childs); TREX 050378 at 2.

1576. Dan Farr served as the lead of Transocean's *Deepwater Horizon* investigation. Farr Dep. 11. Also, on November 3, 2010, Farr e-mailed a Transocean colleague with a list of action items from a "prove to me the BOP worked" meeting. Tr. 5347-48 (Childs); TREX 005409.

1577. As further evidence that this testing is unreliable, a technician working on Transocean's battery testing sent an e-mail stating that he "***massaged*** data from the SEM testing to be used in the report." TREX 007708 at 25 (emphasis added); Tr. 5347 (Childs).

### v. Transocean Failed to Replace the Blue Pod Batteries in Compliance With Cameron's Recommendations.

1578. The Transocean Subsea Department had responsibility for maintaining the control pod batteries on the *Deepwater Horizon* BOP. Tr. 4660 (Newman); Hay 1 Dep. 356; Trahan Dep. 132.

1579. According to Transocean's Senior Subsea Supervisor on the *Deepwater Horizon*, the batteries in the Blue Pod had not been changed since November 4, 2007. J. McWhorter Dep. 187-88; TREX 003792.1.1.BP; D4334D; Tr. 8429-31 (Zatarain); Florence Dep. 64, 68-69. This was almost two-and-a-half years before the Incident and almost eighteen months overdue for replacement. Tr. 5326 (Childs).

1580. Transocean's expert, Childs, did not dispute that the batteries in the *Deepwater Horizon* Blue Pod had not been changed since November 2007. Tr. 5185 (Childs).

1581. Transocean had not replaced the batteries in the Blue Pod in compliance with Cameron's recommendations for replacing the AMF/Deadman batteries. Tr. 8431-32, 8436 (Zatarain); Tr. 2652 (Davis); Tr. 6997 (Stevick). Under Cameron's recommendations for battery replacement, the batteries should have been changed in November 2008, one calendar year after they were installed in November 2007. Tr. 5432-33 (Childs).

1582. In 2004 Cameron issued an engineering bulletin to its customers that recommended that the 9-volt and 27-volt battery packs of its control pods be replaced after the first of: (a) one year of on-time operation; (b) 33 actuations; or (c) five years from date of purchase. TREX 003329.1.1; Tr. 8432-34 (Zatarain); Tr. 2693-94 (Davis); D. McWhorter Dep.

293-94, 489-91; Erwin Dep. 286-87; Tr. 5452 (Childs) (testifying that Cameron means what it says in its bulletins, in terms of how equipment should be maintained).

1583.   According to Cameron's Manager of Field Service, "Cameron's meaning for 'one year of on-time operations' is 1 year from the time the batteries are installed in the SEM." TREX 007669.1.3.BP.   *See also* D. McWhorter Dep. 489-90 (Cameron's Vice President of Engineering and Quality for the Drilling Systems Division testified that "'on-time' operation is from – from the time it's installed.").

1584.   Hay, a Senior Subsea Supervisor on the *Deepwater Horizon*, testified that "Transocean's policy [is] to change the control pod batteries once a year."  Hay 1 Dep. 358-59. Hay understood that Cameron recommends the control pod SEM batteries be changed once a year regardless of whether they have been used.  Hay 1 Dep. 259-60.

1585.   In 2010, Transocean's CEO was informed by his "subsea dynamic duo" that the control pod batteries should be "replaced once a year or after 32 actuations, whichever comes first."  TREX 004306.

1586.   Transocean had knowledge before April 2010 of battery longevity issues in connection with their subsea battery system.   Transocean was aware that Cameron AMF/Deadman batteries could be depleted in less than one year of service.   Tr. 6895-96 (Stevick); Tr. 8435 (Zatarain); TREX 005155 at 8.

1587.   Transocean's internal investigation team admitted that the batteries on at least one of the *Deepwater Horizon* BOP control pods were overdue for a change according to the manufacturer's instructions.  R. Tiano Dep. 144-45.

1588.   Nonetheless, Transocean's expert, Childs, claims that "Transocean replaced AMF batteries in accordance with Cameron recommendations."  Tr. 5184 (Childs); R. Tiano Dep. 144-

45. In order to reach this conclusion, he rejected Cameron's definition of one year of "on-time" operation as one year from the time the batteries are installed in the SEM. Tr. 5187, 5423 (Childs).

1589. At his deposition, Childs contended that even though the batteries were installed in 2007, the Blue Pod was splashed in April 2009 and therefore, was compliant with his definition of one calendar year of "on-time operation" at the time of the Incident. Tr. 5421-22 (Childs).

1590. After his deposition, Childs learned that the Blue Pod had been splashed in March 2009, such that the pod had been in use longer than a calendar year. At trial, Childs presented a new definition of one year of "on-time" operations that allowed him to assert that the batteries had not exceeded one year of "on-time" operation. Tr. 5421-23, 5432, 5449-51 (Childs).

1591. Childs rejected Cameron's position that "on-time" operation, as used in Cameron's engineering bulletin, began when the batteries are installed in the SEM. Tr. 5187, 5423 (Childs). Instead, he claimed that the only days that counted towards one year of "on-time" operation are days when the Blue Pod was subsea and latched to the wellhead. Tr. 5188, 5438 (Childs). He admitted that his view was contrary to that of the manufacturer Cameron. Tr. 5327 (Childs).

1592. Prior to the Incident there was no evidence that Transocean's Subsea Department tracked the number of days the Blue Pod was subsea and latched to the wellhead. Battery life and length of battery use were not recorded in RMS. J. McWhorter Dep. 234. Transocean Senior Subsea Supervisor Owen McWhorter moved SEMs between pods, but did not keep track of which SEMs were in what pod. J. McWhorter Dep. 209-210.

vi.   **Transocean Could Have Detected the Depleted 27-Volt Battery Before Deploying the BOP at the Macondo Well.**

1593.   Transocean could have detected that the 27-volt Blue Pod battery was depleted before deploying the BOP on the Macondo well.  Tr. 8435 (Zatarain); Tr. 2653 (Davis).

1594.   A simple voltage test would have detected a depleted battery.  Tr. 8435 (Zatarain); Tr. 2653 (Davis).  There is no evidence that Transocean conducted a simple voltage test of the Blue Pod batteries before deploying the BOP on the Macondo well.  Tr. 8435 (Zatarain); Tr. 2688-89 (Davis).   According to the *Deepwater Horizon*'s Senior Subsea Supervisor, the batteries on the BOP were not tested as part of the rig move maintenance before the Macondo well.  Hay 1 Dep. 150-51.

1595.   Transocean did not have any policy for checking the charge of the control pod batteries.  Hay 1 Dep. 358.  Transocean's Senior Subsea Supervisor has no knowledge of the batteries on the BOP ever being tested during rig move maintenance.  Hay 1 Dep. 151.

1596.   Transocean could also have detected that the 27-volt battery of the Blue Pod was depleted while the BOP was on the surface by running the actual AMF sequence to make sure it worked.  Tr. 2653 (Davis); Coronado Dep. 364-65, 368, 611-12.  Although required according to Transocean's Well Control Handbook, there is no evidence that that was done before splashing the BOP at the Macondo well.  TREX 001454 at 302-03; Tr. 2653 (Davis); Tr. 5322 (Childs).

1597.   According to Mark Hay, a Senior Subsea Supervisor, the AMF/Deadman had not been tested in eight years.  TREX 005101.  Owen McWhorter, a Senior Subsea Supervisor, testified that he had never tested the AMF/Deadman.  McWhorter Dep. 205, 457.

vii.   **Transocean Was on Notice That It Could Not Monitor the Blue Pod Batteries Used at the Macondo Well and That the Batteries Had Not Been Replaced Since 2007.**

1598.   Control Pod No. 1 was on the surface and acting as the spare pod while the *Deepwater Horizon* was on the Macondo well.  D4334B; J. McWhorter Dep. 227.

1599.   In February 2010, Transocean sent the spare pod to Cameron for refurbishment.  Tr. 5439 (Childs).  The batteries in the spare pod, *i.e.*, Pod No. 1, had been installed in April 2009, less than one year before.  TREX 003792.1.1.BP.

1600.   After receiving the spare pod for refurbishment, Cameron determined that the "batteries on the *Deepwater Horizon*'s SEM are not good."  These batteries were "not good" less than one year after installation in the SEM.  TREX 003782 at TRN-MDL-00311106.

1601.   Cameron notified Fry and Boughton, who both work in Transocean's Subsea Department, that the batteries on the spare pod were "not good" on February 12, 2010.  Tr. 5439-40 (Childs); TREX 003782.2.3.BP.

1602.   On February 16, 2010, Fry, Transocean's Subsea Superintendent, forwarded Cameron's engineering bulletin disclosing that the 27-volt battery packs in the control pods should be replaced after one year of on-time operation to the *Deepwater Horizon* Subsea Supervisors.  TREX 003785.1.1.BP; TREX 003785.4.2; Tr. 5541-42 (Childs); TREX 003785.

1603.   On February 19, 2010, three days after Fry forwarded Cameron's recommendations for battery replacement, the *Deepwater Horizon* Subsea Supervisor attempted to check the battery charge of the Blue Pod and provided Fry with all the information that he could obtain from the diagnostics for the Blue Pod SEM.  The diagnostic information did not provide the voltage of the 27-volt battery in the Blue Pod, which was subsea and latched to the Macondo well.  TREX 003628; Tr. 5444-46 (Childs).

1604.  Fry then forwarded the diagnostic information he received from the Subsea Supervisor regarding the Blue Pod SEMs to a Cameron Field Service Technician, William LeNormand.   TREX 003628.   Transocean sent this e-mail to Cameron's Field Service Technician because Transocean wanted to understand whether it could monitor the charge of the deadman batteries on the event logger when the BOP was subsea, but this was not possible when the pods were subsea.  LeNormand 1 Dep. 408-409.

1605.  On February 24, 2010, the *Deepwater Horizon* Senior Subsea Supervisor informed Transocean's Rig Manager-Asset for the *Deepwater Horizon* that the batteries in Pod No. 3, the Blue Pod, had not been changed since 2007.  TREX 003792.

1606.  Despite discovering that the batteries in the Blue Pod had not been changed since 2007, and after a futile attempt to ascertain the charge of the Blue Pod batteries while on the Macondo well, there is no evidence that Transocean took any further action to determine the charge of the Blue Pod batteries while subsea or to pull the BOP to the surface.  TREX 003792; TREX 003628; LeNormand 1 Dep. 408-409.

1607.  The *Deepwater Horizon* BOP was subsea on the Macondo well from February 6, 2010 to April 20, 2010.   J. McWhorter Dep. 187-88.   During this time Transocean had knowledge that the batteries in control pod No. 3, the Blue Pod, were 18 months overdue for replacement and unsuccessfully attempted to check the charge of the Blue Pod batteries.  TREX 003792; TREX 003628; LeNormand 408-409.

> **b.**     **The Reverse-Wired Solenoid Valve Was Not Able to Operate on April 20, 2010.**

1608.  There is no dispute that Solenoid 103 in the Yellow Pod was reverse-wired.  Tr. 8441 (Zatarain); D4335B; Tr. 5466 (Childs).

1609.   According to Dr. Davis, who was retained by the United States, had Solenoid 103 in the Yellow Pod been properly wired, the AMF would have fired the BSRs and sheared the pipe.  Tr. 2872 (Davis).

### i.      Proper Wiring Is Crucial to Solenoid 103's Functionality.

1610.   Solenoid 103Y was a dual coil solenoid.  Tr. 8413 (Zatarain); D4906.1; D4906.2. Dual coil solenoids provided some redundancy, and so long as they are properly maintained, the redundancy is beneficial.  Tr. 2845 (Davis); Coronado Dep. 529-30.

1611.   During the AMF/Deadman sequence, it was expected that each SEM would energize a coil in Solenoid 103Y, such that SEM-A would energize Coil A and SEM-B would energize Coil B.  Tr. 8414-15 (Zatarain); D4906.1; D4906.2.  Both coils would work together to provide twice the force of one coil and, in cooperation, make the valve operate.  Tr. 8415 (Zatarain).

1612.   When functioning properly, SEM-A and SEM-B provide electrical energy to Solenoid 103Y and energize its dual coils, thereby generating a magnetic field.  The magnetic field, in turn, generates a force that moves the plunger and allows hydraulic fluid to flow.  This, in turn, triggers the closing of the BSRs.  Tr. 8412-13 (Zatarain); D4906.3.

1613.   As long as the coils have adequate electrical energy to generate a magnetic field, enough mechanical force is created for the plunger to overcome the force exerted by the return spring.  Tr. 8412-13 (Zatarain); D4906.3.  When the SEMs stop supplying electrical energy to the coils, the spring pushes the valve back to the closed position.  Tr. 8413 (Zatarain).

1614.   If the coils are reverse-wired, as was the case with Solenoid 103Y, when the SEMs energize the two coils, the magnetic fields have opposite polarities and cancel each other out.  Tr. 8416-17 (Zatarain); D4906.6; Tr. 2654 (Davis); Coronado Dep. 532; LeNormand 1 Dep.

280-82.   The reverse-wired solenoid valve would not function during the AMF/Deadman sequence and would not be able to close the BSRs.  Gaude Dep. 130-32, 134-35, 139-40; Tr. 8416-17 (Zatarain); D4906.6; Tr. 2654 (Davis); Coronado Dep. 532.

1615.   Cameron's position was that solenoid valves need to be wired correctly for the valve to function.  Gaude Dep. 134-35; Coronado Dep. 532.

1616.   Childs admitted that if customers came to him with a miswired solenoid, he would have recommended against using it.  He would have wanted it wired as the designer intended. Tr. 5473 (Childs).  Childs has characterized Solenoid 103Y as the "bad solenoid."  Tr. 5475 (Childs).

### ii.   A Reverse-Wired Solenoid 103Y Could Not Have Operated on April 20, 2010.

1617.   The AMF/Deadman function was not able to successfully close the BSRs at the time of the Incident because Solenoid 103Y was miswired.  Tr. 2870 (Davis); Tr. 6998, 7000-02 (Stevick).

1618.   The reverse-wired Solenoid 103Y was not able to operate when it was simultaneously energized by the two SEMs in the Yellow Pod, as it was at the time of the Incident during the AMF/Deadman sequence.   Tr. 8440-42 (Zatarain); Tr. 2654 (Davis); Coronado Dep. 179-81, 532 (if Solenoid 103 had reverse wiring to its coils, it would not function when both coils are energized, as they are during the AMF/Deadman sequence).  Consequently, because of the defective Solenoid 103Y, the Yellow Pod was not able to close the BSRs at the time of the Incident during the attempted AMF/Deadman sequence.  Tr. 2654 (Davis).

1619.   Experts retained by the United States, Halliburton, and BP agreed that Solenoid 103Y would not have been able to activate the AMF/Deadman sequence and thus close the BSRs.  Tr. 2655 (Davis).

1620.   Only Childs, Transocean's expert, contended that despite the incorrect wiring, the solenoid would still somehow have operated the AMF/Deadman sequence.   Tr. 5162-63 (Childs); Tr. 2655 (Davis).

1621.   The following testing confirmed that a reverse-wired solenoid valve could not function the AMF/Deadman sequence: *Q4000* offshore deck testing (May 2010); DNV's forensic examination, including PETU and AMF testing (March 2011) and bench testing (May 2011); and Cameron's testing of reverse-wired solenoid valves (September 2010).   D4893; Tr. 8442-71 (Zatarain); Tr. 2655 (Davis).

1622.   According to LeNormand, Cameron's Senior Field Service Technician, all of the tests that Cameron performed on Solenoid 103Y indicated that it was a bad solenoid. LeNormand 1 Dep. 315-16, 317.   Reverse-wired solenoids would not function when both coils were energized, based on testing Cameron has performed.   Gaude Dep. 210.

> (A)   *Q4000* **Testing Established That Solenoid 103Y Could Not Operate the AMF/Deadman Sequence.**

1623.   In May 2010, the Yellow Pod was retrieved and brought up to the *Q4000* in connection with the response effort.   Cameron performed a functional check of the pod using Cameron's standard procedure and discovered that Solenoid 103Y did not work.   Tr. 8442-43 (Zatarain); Tr. 2653-54 (Davis); LeNormand 1 Dep. 176-77; Tr. 5476 (Childs); Erwin Dep. 119, 198-99, 202-03; TREX 000599.

1624.   When Cameron tested Solenoid 103Y under different scenarios on the *Q4000*, the valve did not function.   Tr. 8443 (Zatarain); LeNormand 1 Dep. 176, 182-84; TREX 003602.1.1.BP; TREX 003602.3.2.BP.   Specifically, Cameron simulated AMF/Deadman conditions to trigger the SEMs, monitored the operation of the valve, and found that the valve did not operate.   TREX 003602.3.3.BP; Tr. 8443-44 (Zatarain).

1625.   When Cameron removed Solenoid 103Y from the Yellow Pod, replaced it with a new solenoid and repeated the test, the AMF/Deadman function worked.  Tr. 2653-54 (Davis).

1626.   Transocean representatives were present during the testing of the Yellow Pod on-board the Q4000.  Jack Carter Erwin, a Cameron employee who was also present, did not recall Transocean raising any concerns about how Cameron was testing Solenoid 103Y or disputing the results of the testing.  Erwin Dep. 268-69.

1627.   Cameron's *Q4000* testing was not crude or preliminary for purposes of showing that a valve does not work.  If the valve cannot pass this preliminary test, it does not work.  Tr. 8444-45 (Zatarain).

### (B)   DNV's PETU and AMF Testing Established That Solenoid 103Y Could Not Operate the AMF/Deadman Sequence.

1628.   DNV's testing clearly established that reverse-wired Solenoid 103Y would not properly function.  Tr. 2655 (Davis).

1629.   DNV conducted a forensic examination in March 2011, which included Portable Electronic Testing Unit ("PETU") testing.  D4893; D4885.  The PETU could activate SEM-A, SEM-B, or SEMS A and B simultaneously, which was similar to the pod's operations under normal conditions.  Tr. 8446 (Zatarain).

1630.   Whether a SEM was powered by a PETU or by a battery, the same pulse-width modulation was applied to the solenoid.  Coronado Dep. 175-76.

1631.   Childs claimed that the PETU units "had problems" and discounted the PETU testing on this basis.  Tr. 5165, 5172-73 (Childs).  Although DNV's PETU tests were initially misinterpreted due to misunderstandings about the PETU's operation, DNV discovered the problem and the test results can be interpreted and understood with the post-testing knowledge of how the PETUs performed.  TREX 040009 at 21-22.

1632.   DNV's March 3, 2011, PETU test results indicated that when the PETU activated both SEMs, which is how the pod operated during AMF/Deadman operations, Solenoid 103Y did not work under actual conditions, *i.e.*, with 3,000 pounds of pressure.   Tr. 8446-49 (Zatarain); D4897.

1633.   DNV conducted additional PETU testing on March 4, 2011.   This testing also established that when both coils of the solenoid are energized, the valve could not have functioned when under pressure.   Tr. 8450-51 (Zatarain); D4898A.

1634.   Experts including Zatarain and Davis, the latter of whom was retained by the United States, relied on DNV's PETU testing.   Davis found the PETU testing was relevant and reliable, and agreed that the testing showed that if both coils of Solenoid 103Y were energized at the same time, as they were during the AMF/Deadman sequence, the valve would not work under pressure.   Tr. 8452 (Zatarain); Tr. 2796-97, 2800 (Davis); TREX 007660 at 7; TREX 007661 at 18.

1635.   DNV conducted AMF testing in March 2011.   D4893.   The AMF testing simulated the conditions that triggered the AMF/Deadman sequence, *i.e.*, the loss of electrical power, hydraulic power, and communications capability with the surface.   Tr. 8453 (Zatarain). When those conditions were met, it was intended that both SEMs would operate on battery power and simultaneously energize both of the solenoid coils.   Tr. 8455 (Zatarain).

1636.   DNV conducted one successful AMF test on the Yellow Pod with a correctly-wired solenoid.   After simulating conditions that would trigger the AMF/Deadman, the SEMs activated and the solenoid valve correctly functioned and provided over 30 seconds of continuous hydraulic pressure output.   Tr. 8456-58 (Zatarain); TREX 003130.31.2.

1637.   DNV then conducted AMF tests on the Yellow Pod with reverse-wired Solenoid Valve 103Y, the solenoid that was on the Yellow Pod during the Incident.  Tr. 8458 (Zatarain).  DNV's AMF tests did not demonstrate that Solenoid 103Y was capable of functioning the AMF/Deadman during the Incident.  Instead, the tests demonstrated that a reverse-wired solenoid valve with both coils energized could not function.  Tr. 8466 (Zatarain).

1638.   The solenoid valve was designed to continuously operate for at least 30 seconds, sending hydraulic pressure to a large valve that closes the BSRs.  The *Deepwater Horizon*'s control pods were set up for 30 seconds of continuous operation of Solenoid 103Y.  Tr. 8461-62 (Zatarain).  Solenoid 103Y would have had to have been functional for at least 16 seconds for the BSRs to close during the AMF/Deadman sequence.  Tr. 5465 (Childs).

1639.   During the first AMF test with reverse-wired Solenoid 103Y, the solenoid valve only operated for seven seconds instead of the anticipated 30 or more seconds.  Tr. 8461 (Zatarain).  This is likely because at the start of the test, both SEMs were trying to activate the valve with the reverse-wiring and the valve did not activate.  Then, the 9-volt battery powering SEM-B died and with only SEM-A running and energizing a single coil, the valve activated for seven seconds.  After the test, DNV reapplied power with the PETU and, unexpectedly, the solenoid valve activated again.  This indicated that SEM-B (which had a dead 9-volt battery) booted up on external power, recognized that it had not completed the AMF/Deadman sequence, and energized the solenoid valve.  Tr. 8459-60; TREX 003130.33.3.BP.  This was not a successful test because the solenoid valve did not operate as designed under AMF/Deadman conditions.  Tr. 8460-61 (Zatarain).

1640.   Subsequent battery testing by DNV confirmed that the 9-volt SEM-B battery in the Yellow Pod was depleted.  Tr. 8462-63 (Zatarain).

1641.   The second and third AMF tests conducted on reverse-wired Solenoid 103Y did not indicate successful operation of the AMF process with two solenoid coils energized simultaneously, as they would have during the AMF/Deadman sequence.   Tr. 8463-66 (Zatarain).  In both tests, there were exactly 30 seconds of solenoid activation on battery power and then there was a second activation of the solenoid valve once AC power was restored via the PETU.  This indicated that SEM-B could not complete the AMF/Deadman process on battery power, given its dead 9-volt battery, but that once it booted up on AC power from the PETU, it could activate one solenoid coil and complete the AMF process.  Tr. 8463-66 (Zatarain); TREX 003130.34.5.BP.

1642.   DNV's AMF testing does not prove that Solenoid 103Y could have functioned at the time of the Incident.  It does prove that reverse-wired Solenoid 103Y would not work when both coils are energized, as was the case during the AMF/Deadman sequence.   Tr. 8466 (Zatarain).

### (C)   DNV's Bench Testing Established That Solenoid 103Y Could Not Function the AMF/Deadman Sequence.

1643.   DNV conducted bench testing in May 2011, the results of which have not been challenged.   D4893; TREX 005172.1.BP; Tr. 8469 (Zatarain).   Bench testing was a good preliminary test to assess whether a solenoid valve was functioning.  If the valve did not pass the bench test, it was not going to work under actual conditions.  Tr. 8467 (Zatarain).

1644.   DNV's bench testing revealed that when Coils A and B on Solenoid 103Y were simultaneously energized, the valve did not actuate correctly.  When both coils were energized, the two opposing magnetic fields cancelled out and the solenoid valve did not work.   TREX 005172.3.1.BP; Tr. 8469 (Zatarain); Tr. 7000 (Stevick).

1645.   DNV's bench testing indicated that a reverse-wired valve does not work under direct current (DC) power supply.  Further, there was no expectation that it would work under any other operation.  Tr. 8469 (Zatarain).

> **(D)   Cameron's Testing Established That a Reverse-Wired Solenoid Valve Would Not Have Operated During the AMF/Deadman Sequence.**

1646.   In September 2010, Cameron conducted testing on reverse-wired solenoid valves for the purpose of assessing their functionality.   Tr. 8469 (Zatarain); D4893; TREX 005165.1.2.BP.

1647.   Cameron's testing was designed to "simulate field conditions and the affects [sic] of a solenoid with reverse polarity."  TREX 005165.2.4.BP.

1648.   The solenoid valve tested by Cameron was the same type of valve that was used on the *Deepwater Horizon* control pods.  Tr. 8471 (Zatarain); Tr. 2654-55 (Davis).

1649.   Cameron concluded that "[i]t is evident that reverse polarity between Coil A and Coil B in a [-63] solenoid valve will not allow it to properly function with both coils energized.  Reversing the polarity creates opposing magnetic fields with a canceling affect [*sic*].  It is vital to check function with both coils activated."  TREX 005165.2.4.BP; Tr. 8471 (Zatarain).

1650.   Cameron concluded that during the AMF process, where both coils were activated at once, a reverse-wired solenoid "simply would not function."  Tr. 2654-55 (Davis).

> **(E)   Transocean's Internal Testing Did Not Establish That a Reverse-Wired Solenoid Valve Would Have Functioned Under Actual Conditions.**

1651.   Transocean and Childs conducted certain internal tests, purportedly showing that a reverse-wired solenoid valve could function.  Tr. 5165-68 (Childs); TREX 007670.

1652.   According to Dr. Davis, who was retained by the United States, "[t]he reporting on those tests is woefully inadequate.  We can't rely on it."  Tr. 2655 (Davis).

1653.   When asked about Transocean's internal tests of solenoid valves, Dr. Stevick testified that "there were actually many things wrong with the testing, but one was they would just listen to determine whether the solenoid actually activated.   I've tested many solenoids. What you have to do, you have to put pressure on them to determine whether they've actually shut or opened.   You can't just rely on sound."   Further, he criticized Transocean's testing protocol as "not acceptable."  Tr. 7046-47 (Stevick).

### iii.   Transocean Could Have Detected the Reverse-Wired Solenoid Valve Before Deploying the BOP at the Macondo Well.

1654.   Solenoid 103Y was rebuilt and installed on the *Deepwater Horizon*'s Yellow Pod in February 2010, two months prior to the Incident.   TREX 003602 at 3.   Transocean failed to uncover the fact that Solenoid 103Y was miswired before deploying the BOP on the Macondo well.  Florence Dep. 110-12.

1655.   Transocean could have detected the reverse-wired solenoid before deploying the BOP by energizing both coils and testing the valve with pressure applied.   Such testing could have been performed on the valve when it was rebuilt or after it was installed on the pod.   Tr. 8472 (Zatarain); Tr. 2656-57 (Davis); Erwin Dep. 115.   There was no indication that any testing of that type was conducted on the *Deepwater Horizon* before April 20, 2010.   Tr. 8472-73 (Zatarain).

1656.   If Cameron's test procedures had been followed, they would have shown that the solenoid was reverse wired.   Coronado Dep. 184.   Cameron test procedures were designed to catch reverse-wired solenoid valves by energizing both coils.   Gaude Dep. 211.   Cameron test procedures for solenoid valves provided testing of both coils individually and then testing of both coils together because if coils were miswired in reverse polarity, the electric magnetic fields

would oppose each other and cancel themselves out and the solenoid valve would not work. Gaude Dep. 126-30.

1657.   Transocean's technical bulletin informed its subsea engineers, that after wiring the solenoid valve, he or she needed to perform a function test.  That function test would have been able to detect if the solenoid coils were miswired.   Tr. 2848-49 (Davis); TREX 003798.5.1.BP.  There was no evidence that Transocean performed tests in accordance with its policies and practices after installing Solenoid 103Y in February 2010.  Tr. 2849-50 (Davis);  Tr. 5323-24;  5469 (Childs) ("Something happened that they didn't detect the miswiring"; "If somebody at Transocean had followed Transocean's policy for testing refurbished solenoids, they would have discovered that this solenoid in the yellow pod was miswired").

1658.   Transocean's Subsea Maintenance Philosophy, which described Transocean's BOP maintenance procedures, and Transocean's Well Control Handbook required a full function test of the BOP, a test which would have included the AMF/Deadman function, prior to deployment.  TREX 003259 at 10; TREX 001454 at 302-03.

## D.   The BOP Would Have Sealed the Well If the AMF/Deadman Had Worked.

1659.  The *Deepwater Horizon*'s blind shear ram would have sealed the well if the AMF/Deadman had worked as intended because at the time the AMF/Deadman should have activated, there were favorable shearing conditions and the drill pipe had not yet buckled.  Tr. 9012, 9036 (Shanks); D4803.1; D4803.3; TREX 040008 at 44-45; Tr. 2652 (Davis) (If the AMF/Deadman had activated on April 20, the blind shear ram "would have closed; it would have cut the whole pipe and bent over the top of it and sealed the well. . . ."); TREX 007661 at 14 ("At the time the AMF was triggered, the drill pipe was centered.  Pressures above the [variable bore ram] were low, and erosion of the [blind shear ram] at this time was non-existent.  Had the [blind

shear ram] closed at this time, it is almost certain it would have cut the pipe and sealed the well.").

### 1.   Shearing Conditions Were Favorable at the Time the AMF/Deadman Conditions Were Met.

1660.   The shearing conditions were favorable when the AMF/Deadman conditions were met because there was no flow in the annulus, there was low wellbore pressure at the blind shear ram, and the drill pipe was centered.  Tr. 9037-38 (Shanks); D4811; TREX 040008 at 43; TREX 007661 at 14; TREX 040003 at 15.

1661.   The conditions were favorable for shearing the drill pipe and sealing the well with the blind shear rams at the time that the AMF/Deadman should have worked because, in part, there was no flow in the annulus.  No flow in the annulus means that there would be no flowing hydrocarbons outside the drill pipe while the blind shear rams were closing that could possibly have eroded the rams or impacted the ability of the rams to seal, as some experts have suggested would have interfered with the blind shear rams' ability to work as intended.  Tr. 9037-38 (Shanks); D4811; TREX 040008 at 43; TREX 007661 at 14.

1662.   There was no flow in the annulus because the middle and upper variable bore rams were closed and sealed.  Therefore, the lack of hydrocarbon flow in the annulus at the time the AMF/Deadman conditions were met made the situation more favorable for the blind shear rams being able to seal the well.  Tr. 9037-38 (Shanks); D4811; TREX 040008 at 43; TREX 007661 at 14.

1663.   Because the variable bore rams were sealed, the only hydrocarbon flow would have been through the drill pipe when the blind shear rams would have been activated by the AMF/Deadman system.  This means if the AMF/Deadman system had worked, the blind shear rams would have only been exposed to hydrocarbon flow through the drill pipe for a very short

period of time (no more than a few seconds) from when the blind shear rams would have ruptured the 5-1/2" drill pipe until the blind shear rams overlapped and sealed the well.  There is no support for the conclusion that the blind shear rams' exposure to this hydrocarbon flow during such a short duration would have impacted the blind shear rams' ability to work as intended — there is no evidence to suggest that the flow during this period would have been directed at the blind shear rams' elastomeric packers or that blind shear rams' exposure the hydrocarbon flow during this short duration would have lasted long enough to erode the blind shear rams sufficiently to prevent them from sealing.  TREX 040020 at 9-10.

1664.   In a normal shear, the time between rupture and sealing would only be a few seconds.  TREX 040020 at 9.

1665.   The conditions were also favorable for shearing the drill pipe and sealing the well with the blind shear rams at the time that the AMF/deadman should have worked because, in part, there was low wellbore pressure.  Wellbore pressure can impact the ability of the blind shear rams to shear the drill pipe because it creates an additional force that the blind shear rams must overcome when closing.  Tr. 9037-38, 9095, 9100 (Shanks); D4811; TREX 040008 at 43; TREX 007661 at 14.

1666.   There was low wellbore pressure at the blind shear ram because pressure from the well was contained below the blind shear ram by the closed variable bore rams.  Therefore the wellbore pressure at the blind shear rams was only due to the density of the fluid in the BOP and riser, which modeling shows was about 1,000 psi.  Tr. 9037, 9100 (Shanks); D4811; D4872; TREX 040008 at 43; TREX 007661 at 14.

1667.   The low wellbore pressure of about 1,000 psi was a favorable shearing condition because lower pressure would have been required to shear the pipe at lower wellbore pressure. Tr. 9038, 9100 (Shanks); D4872.

1668.   At 1,000 psi wellbore pressure, the margin of shearing pressure available compared to the required shearing pressure was significant.   At this wellbore pressure, Cameron's EB 702D formula predicted a shearing pressure of 2,681 psi.  The April 2000 shear test adjusted for this wellbore pressure predicted a shearing pressure of 2,524 psi.  Tr. 9038, 9100 (Shanks); D4811; D4872; TREX 040008 at 43.

1669.   The conditions were favorable for shearing the drill pipe and sealing the well with the blind shear rams at the time that the AMF/Deadman should have worked because, in part, the drill pipe would have been centered and in tension (*i.e.*, taut or being stretched).  Tr. 9037-38, 9041, 9088-89 (Shanks); TREX 040008 at 31; TREX 007661 at 7, 14.

1670.   The drill pipe was centered at the blind shear ram by the closed upper annular approximately 19.5 feet above and by the closed middle and upper variable bore rams approximately seven feet below.  Under these conditions, the drill pipe was held in tension, was rigid, and was not yet buckled because the traveling block did not fall until after the AMF/Deadman conditions were met.  Tr. 9037-38, 9041, 9088-89 (Shanks); D4811; TREX 040008 at 31, 44-45; TREX 007661 at 7, 14.

1671.   United States expert Dr. Davis agrees that the drill pipe was centered in the BOP by at least one variable bore ram when the AMF/Deadman conditions were met.  The drill pipe was also not yet buckled.  Tr. 2661 (Davis); TREX 007661 at 14.

1672.   Dr. Stevick, who, despite having provided no analysis or calculations, Transocean claims supports its contention that the drill pipe was already buckled and off-center at the time

the AMF/Deadman conditions were met, could not rule out that drill pipe was sufficiently centered such that the blind shear ram was capable of cutting the drill pipe and sealing the well at the time the AMF/Deadman conditions were satisfied.  Tr. 6993-94 (Stevick); Tr. 5142, 5496 (Childs).

1673.  Not only was the drill pipe centered, but the Halliburton mud logger data shortly before the explosions shows that the drill pipe was in tension, meaning that it was taut or being stretched.  When drill pipe is in tension, the conditions for shearing are more optimal, which is recognized by Transocean and other experts that have reviewed this issue.  Tr. 2661-62 (Davis); TREX 001454 at 142; Tr. 1886 (Ezell).

### 2.    The "Force-from-Below" Theory Was Unsupported.

1674.  Childs, Transocean's BOP expert, advocated a "force-from-below" theory to explain the drill pipe being buckled and forcibly held against the BOP's inner wall that prevented the blind shear rams from being able to shear fully the drill pipe and seal the well.  Under his "force-from-below" theory, Childs concluded that as early as 21:43, when he claimed the upper annular closed on the night of the Incident (and several minutes before the AMF/deadman attempted to close the blind shear rams), the drill pipe had buckled based on upwards forces applied to it from below the BOP due to the influx of hydrocarbons through the Macondo well.

1675.  Prior to his work in this litigation, Transocean's expert Childs had never seen or even discussed a situation where helical buckling occurred on a drill pipe from a high-flow environment during loss of well control.  Tr. 5480-81 (Childs).

1676.  Childs relied on Stress Engineering to determine what forces existed that caused the drill pipe to buckle and prevented the blind shear ram from closing fully to seal the well, but he provided no input as to how Stress Engineering should perform any calculations or modeling in connection with the force analysis work.  Childs also relied on Stress Engineering for the flow

rates that existed and the effects those rates had on the drill pipe, but did no independent analysis.  Tr. 5479, 5481, 5495-96 (Childs).

1677.   Childs did not perform any calculations to check Stress Engineering's calculations and did not ask anyone at WEST Engineering to check or redo any of Stress Engineering's calculations.  Tr. 5481 (Childs).

1678.   Childs did not have the ability to run any calculations or modeling to assess whether Dr. Davis' criticisms of Stress Engineering's work were accurate.  Tr. 5482 (Childs).

1679.   Childs did not believe that it was necessary to understand all the information in Stress Engineering's table showing the "Surface Liquid Flow Rates" that he relied on.  Tr. 5488-89 (Childs); TREX 007696.132.2.BP.

1680.   Dr. Stevick, who Transocean cites favorably for its position that the drill pipe was buckled based on forces from below, withdrew his analyses regarding the forces required for the drill pipe to buckle.  He has not submitted any calculations or analysis to support a drill pipe buckling theory.  Tr. 7002 (Stevick); Tr. 9211 (Shanks).

1681.   To the extent that Dr. Stevick's opinion on drill pipe buckling has any value given that he has submitted no engineering analysis or calculations to support it, Dr. Stevick nonetheless testified he could not rule out that the drill pipe could have been sufficiently centered such that the blind shear ram was capable of shearing the drill pipe and sealing the well at the time the AMF/Deadman conditions were satisfied.  Tr. 6993-94 (Stevick).

> **a.    The Force-from-Below Theory Did Not Support Drill Pipe Buckling When the Upper Annular Closed.**

1682.   Stress Engineering's calculations, on which Transocean's expert, Childs, relied, did not support the conclusion that the drill pipe was buckled when the upper annular actually closed (or when Childs alleges that it closed) because these calculations did not show the

creation of enough force to buckle the drill pipe based on forces from below.  Tr. 9077-83 (Shanks); D4818; D4949; TREX 040008 at 36-37.

1683.   The effective weight of the drill pipe was its hanging weight.  Tr. 9079 (Shanks); D4608.

1684.   The effective weight of the drill pipe caused the drill pipe to stretch due to its own weight.  Tr. 9079 (Shanks); D4608.

1685.   The effective weight of the drill pipe below the BOP was about 75,000 lbs.  Tr. 9079 (Shanks); D4818; TREX 022257 at 261-62.

1686.   An upward force that equals the effective weight of the drill pipe would have removed any stretch and tension in the drill pipe caused by its effective weight.  In this condition the pipe would have essentially been in a neutral state with no compression or tension.  Tr. 9080 (Shanks); D4608.

1687.   Once the drill pipe was in a neutral state, an additional large upward force would have been needed to put the pipe into compression and then buckle it.  This additional force would have been between about 50,000 and 100,000 lbs depending on whether the ends of the pipe were pinned or fixed.  Tr. 9080-81 (Shanks); D4608; TREX 040008 at 31; TREX 007697 at 21.

1688.   Stress Engineering's calculations indicated that at 21:42, when the upper annular closed, the upward force on the drill pipe would only have been about 15,000 lbs.  This was not enough force to buckle the drill pipe or even put it in a neutral position.  Tr. 9081-82 (Shanks); D4818; TREX 040008 at 26, 37.

1689.   Stress Engineering's calculations indicated that at 21:43:40, when Transocean alleged the upper annular closed, the upward force on the drill pipe was about equal to its

345

effective weight (*i.e.*, only enough to take the stretch of out the pipe and put it in a neutral position).  The Stress Engineering calculations clearly showed that there was not enough upward force from the well to buckle the drill pipe at 21:43:40, when Childs claimed the upper annular closed.  Tr. 9081-83 (Shanks); D4818; D4949; TREX 040008 at 26, 37.

1690.  For its force calculations at 21:43:40, when the upper annular closed, Stress Engineering assumed the flow rate through the annulus at the BOP was the same as the surface flow-out at the rig.  This assumption "hugely over-predict[ed] flow velocities and forces below the BOP" because gas expands exponentially as it nears the surface.  For example, one barrel of hydrocarbons inside the reservoir would have expanded to 500 barrels of volume by the time it reached the rig.  Tr. 9158, 9167-68, 9209-10 (Shanks); Tr. 7855-56 (Emilsen); TREX 007661 at 4.

1691.  Stress Engineering calculated the flow rate at the rig until 21:46:30 and at that time calculated a flow rate of over 2.5 million barrels per day.  This flow rate was unrealistic and called into question Stress Engineering's earlier calculations on which Childs relied to support his "force-from-below" theory.  Tr. 9157-59 (Shanks); D4538; Tr. 5490-91 (Childs).

1692.  Dr. Stevick did not submit any calculations or analysis supporting his drill pipe buckling theory, but testified that he relied on the flow rates that Stress Engineering calculated.  Because the Stress Engineering flow rate calculations achieved results that were unrealistic and therefore inaccurate, Dr. Stevick's analysis was unreliable, especially when he provided no support for this analysis.  Tr. 9211 (Shanks); Tr. 7002 (Stevick).

### b.   The Force-from-Below Theory Did Not Support Drill Pipe Buckling When the Variable Bore Rams Closed.

1693.  For its buckling analysis at 21:47, when the middle and upper variable bore rams closed, Stress Engineering assumed a flow rate of "approximately 60,000 [Stock Tank

Barrels]/day," but this flow rate was unsupported by any model or analysis that Stress Engineering generated or calculated.  TREX 007696.145.3.BP; Tr. 9083-84 (Shanks); D4949.

1694.  For the flow rates at the time when the middle and upper variable bore rams closed, Stress Engineering instead relied on work performed by Dr. Morten Emilsen. Specifically, for the flow rates that supported its force calculation, Stress Engineering relied exclusively on Figure 3.9 from Appendix W to BP's *Deepwater Horizon* Accident Investigation Report (the "Bly Report"), which it concluded supported a flow rate of approximately 60,000 Stock Tank Barrels per day at the time the upper and middle variable bore rams closed.  Dr. Emilsen testified about Childs' reliance on Figure 3.9 from his work, and he explained that this was improper because the flow rates in Figure 3.9 represented a theoretical flow rate when there was a net pay of 86 feet of reservoir exposure, which meant that this represented a "worst case scenario" where there was no restriction of flow from the reservoir into the wellbore, not what he had calculated to be the actual conditions at that time.  TREX 000002 at 363; TREX 007696.144.1.BP; TREX 007696.145.3.BP; Tr. 5492 (Childs); Tr. 7813-14 (Emilsen); TREX 050150.144.BP;  TREX 007820.145.1;  TREX 041026.31.1.BP; Tr. 9083-85, 9205-06, 9208 (Shanks); TREX 000002 at 363.

1695.  Based on the OLGA simulations that he performed, Dr. Emilsen concluded that the well had a reservoir exposure of between 13 and 16.5 feet of net pay, not 86 feet of net pay as used in the model on which Childs relied.  Models of a full reservoir exposure of 86 foot of net pay did not match the realtime data pressure signals, and the flow rate from 86 feet of net pay would be much higher than the flow rate from 13 to 16.5 of net pay.  Tr. 7814-15 (Emilsen); TREX 041026.30.1.BP; Tr. 9084-85, 9208 (Shanks).

1696.   Stress Engineering calculated the effective tension along the drill pipe for several different load cases before and after the variable bore rams closed and sealed at 21:47, but did not draw any conclusions about buckling of the drill pipe based on these calculations.  Tr. 9086-87 (Shanks); TREX 007697; D4924.

1697.   Effective tension would indicate whether the drill pipe was in compression or tension.  If the effective tension was positive, then the drill pipe was in tension.  If the effective tension was negative, then the drill pipe was in compression.  Tr. 9087 (Shanks); D4924.

1698.   The drill pipe could not have buckled if it had a positive effective tension and was therefore in tension.  Tr. 9087 (Shanks).

1699.   Hook load was the hanging weight of the traveling block assembly and the drill pipe that was hanging below the traveling block assembly.  Tr. 9170, 9085-86 (Shanks); D6750; Tr. 5107-08 (Childs).

1700.   The effective tension at the top of the drill pipe based on the hook load data was 160,000 lbs.  This was determined by subtracting the 190,000 lbs weight of the traveling block assembly from the Sperry measured hook load of 350,000 lbs at the time of the rig explosions. Tr. 9085-88 (Shanks); D4819; TREX 040008 at 39-40; TREX 000620.

1701.   Imposing the actual hook load on Stress Engineering's effective tension graph for the drag load cases (*i.e.* before the variable bore rams closed) predicted that the drill pipe was in tension at the BOP and therefore could not have buckled.  Tr. 9087-88 (Shanks); D4819; TREX 040008 at 39-40.  In other words, when the actual hook load data collected at the time of the Incident was applied to Stress Engineering's analysis, Stress Engineering's own calculations show that drill pipe could not have been buckled before the variable bore rams closed.

1702.   United States expert Dr. Davis performed his own calculations of the forces on the drill pipe using some of the assumptions provided by Stress Engineering.  Dr. Davis calculated that at the time just before the variable bore rams closed, the drill pipe at the variable bore rams would experience 21,600 lbs of compression, which was "far less than any drill pipe Euler buckling force limit of more than 100 [thousand pounds]."  TREX 007661 at 5.  In other words, Dr. Davis, like BP's expert, concluded based on Transocean's own calculations, that the drill pipe could not have been buckled before the variable bore rams closed.

1703.   From his calculations Dr. Davis also noted that step force changes at drill pipe size changes are clear and known to be present but were not apparent in Stress Engineering's work.  "This is a clear indicator of incorrect analysis by [Stress Engineering]."  TREX 007661 at 5.

### c.     The Force-from-Below Theory Did Not Support Drill Pipe Buckling After the Variable Bore Rams Closed.

1704.   Imposing the actual hook load on Stress Engineering's effective tension graph for the VBR load cases (*i.e.*, *after* the variable bore rams closed), predicted that the drill pipe experienced an approximately 50,000 lbs compressive force at the BOP.  This magnitude compressive force would not have been sufficient to overcome the drill pipe's effective weight; therefore the drill pipe would have remained in tension and not buckled.  Tr. 9088-89 (Shanks); D4923A; TREX 040008 at 39-41.  In other words, when the actual hook load data collected at the time of the Incident was applied to Stress Engineering's analysis, Stress Engineering's own calculations show that drill pipe could not have been buckled after the variable bore rams closed.

1705.   Once the middle and upper variable bore rams closed they would have gripped the drill pipe and resisted any upward force being transferred to drill pipe above the variable bore rams.  Specifically, the closed upper and middle variable bore rams would have applied 278,461

lbs of frictional force to the drill pipe, and this force would have resisted any upward force from below the variable bore rams being transferred to drill pipe above the variable bore rams. In other words, closing of the variable bore rams would essentially have isolated the drill pipe above the variable bore rams from any upward force below the variable bore rams. This frictional force would have completely isolated the approximately 166,000 lbs of upward force that Transocean and Childs alleged existed after the variable bore rams closed, preventing this upward force from buckling the drill pipe above the variable bore rams once they closed. Tr. 9089-91 (Shanks); D4948; TREX 040008 at 37-39, 88-93. In other words, once the variable bore rams closed, the forces from below would not have been able to buckle the drill pipe within the BOP because the closed VBRs would have prevented this upward force being transferred to the drill pipe in the BOP.

1706.  United States expert Dr. Davis agreed that "frictional forces from the closed [variable bore rams] would be more than adequate to react substantial forces against pipe movement." TREX 007661 at 7.

1707.  Stress Engineering even agreed that the variable bore rams would have isolated any upward force from below the variable bore rams acting on the drill pipe in the BOP by stating: "At 21:47, the inverse relationship between hook load and standpipe pressure ceased … [Stress Engineering] interprets this combination of signals as the closure of one or more of the BOP's variable bore rams (VBRs), which successfully (albeit temporarily) shut in the well. The shut-in was indicated by the standpipe pressure rise, while the action of the rams gripping the drill pipe created a mechanical 'short circuit.' In this condition, loads on the work string were reacted through the BOP, with only residual force variations transmitted to the block; hence, the small fluctuations in hook load." Tr. 9091-93 (Shanks); TREX 007696.120.6.BP; D4584.

1708.  Dr. Davis' force calculations also supported that the drill pipe would not have been buckled after the variable bore rams closed (and at the time of the AMF/Deadman attempted activation) and he concluded in his report that after the variable bore rams closed "the drill pipe is pulled in tension, not heavily compressed, at the time of AMF."  TREX 007661 at 8.

1709.  Based on his calculations of forces on the drill pipe after the variable bore rams closed, Dr. Davis dismissed Transocean's theory that there was an upward force applied to the drill pipe that could have buckled the drill pipe after the variable bore rams closed (and at the time of the AMF/Deadman activation), noting that "[t]he huge step in force at the closed VBR (and the VBR assumed to not hold axial force for this analysis for consistency with [Stress Engineering] assumption) assumed by [Stress Engineering] is erroneous and does not exist." TREX 007661 at 7.

1710.  Finally, the force-from-below theory did not explain how the drill pipe was buckled and partially outside the blind shear ram's blades when the blind shear ram was closed by the autoshear function on April 22, 2010.  Transocean's expert, Childs, testified that under his force-from-below drill pipe buckling theory, the drill pipe "could not still be buckled" on April 22, 2010, when the autoshear system was activated.  Tr. 5142-43 (Childs).  Childs' "force-from-below" theory, therefore, was inconsistent with the overwhelming evidence that supports the conclusion that the blind shear rams closed with activation of the Autoshear function on April 22, 2010.

### 3.   The Rig Drift Drill Pipe Buckling Theory Is Unsupported.

1711.  While the United States expert, Dr. Davis, believes that BP's theory that the drill pipe buckled from the traveling block falling is plausible and could explain why the drill pipe was buckled at the time the blind shear rams closed with Autoshear activation on April 22, he

primarily supports a theory that the drill pipe buckled from the rig drifting from the Macondo well and imparting forces on the drill pipe.  Tr. 2660, 2889 (Davis); TREX 022737 at 14-15.

1712.  Dr. Davis' rig drift theory for explaining the buckled drill pipe is difficult to reconcile with the physical limitations on the distance the rig could drift and with the direction in which the drill pipe buckled.  This theory also does not adequately account for the centering effect the closed upper annular and upper variable bore ram would have had on the drill pipe within the BOP.  TREX 040008 at 41; Tr. 9053-54, 9184-85 (Shanks); Tr. 2762-64, 68-71 (Davis).

1713.  Dr. Davis' rig drift theory does not explain how the drill pipe would have buckled within the BOP because it does not take into account the forces that would have been attempting to center the drill pipe within the BOP based on the closed variable bore rams and the closed upper annular.  TREX 040008 at 41.

1714.  While it is plausible that rig drift could have pulled the drill pipe against the side of the flex joint at the very top of the BOP stack, the drill pipe would have moved away from the wall as it went down through the BOP.  Therefore, at the location of the blind shear rams, which were approximately thirty feet below the flex joint, it is unlikely that rig drift could have caused the drill pipe to be substantially off-center and pushed against the BOP wall at the blind shear rams.  Tr. 9184-85 (Shanks).

1715.  United States expert' Dr. Davis testified that the rig sank to the northwest of the Macondo well and the drill pipe was against the northeast side of the BOP bore at the blind shear ram.  Dr. Davis did not perform any modeling that showed that it would have been possible for the rig to drift to the northwest and deflect the drill pipe to the northeast.  Tr. 2762-64 (Davis); TREX 022737 at 14.

1716.   Dr. Davis asserted that on April 21, 2010, "the rig was reported to have drifted in a [northeast] direction by 1500 or 1600 feet" and that "[w]hen the rig sank, the following morning, it was approximately 1500 feet [northwest] of the well site."  TREX 022737 at 14; Tr. 2768-69 (Davis).

1717.   The drill pipe would have had to stretch by 249 feet if the rig drifted 1,600 feet and the pipe remained intact.  Tr. 2770-71 (Davis).

1718.    Dr. Davis performed no analysis or calculations to determine if the drill pipe could stretch 249 feet and remain intact, and he provided no explanation in his report of how this could have occurred.  Tr. 2770-71 (Davis).

1719.   The riser slip joint on the *Deepwater Horizon* had a 50 foot stroke and would be spaced at midstroke (approximately 25 feet).  Therefore the rig could have only moved off-station enough to extend the riser length by 25 feet.  Tr. 9053-54 (Shanks).

1720.   The riser was intact until the rig sank because it was vertical until that time. Therefore the riser was preventing the rig from making large excursions away from the well until the rig sank.  Tr. 9054 (Shanks).

1721.   While Dr. Davis' rig drift theory is difficult to reconcile with the physical evidence, if the theory is correct, the drill pipe would have buckled after the AMF/Deadman conditions would have been met.  TREX 007661 at 14; Tr. 2660-62 (Davis).

E.   The *Deepwater Horizon* BOP Would Have Been Suitable for Subsea Drilling and Operations at the Macondo Well.

1.   The Design and Configuration of the *Deepwater Horizon* BOP Was the Result of a Collaborative Process that Involved Multiple Parties, Including Cameron, Transocean, BP, and Several Contractors.

1722.   The Drilling Contract that Vastar Resources (BP) entered into with R&B Falcon Drilling Co. (Transocean) in 1998 specified that Transocean owned the *Deepwater Horizon*, including the BOP.  TREX 001356A at BP-HZN-MBI00021464-21473.

1723.   When Vastar Resources (BP) entered into a contract with R&B Falcon Drilling Co. (Transocean) for the lease and construction of the *Deepwater Horizon*, including the BOP, it requested certain functional requirements for the BOP, but relied on Cameron and Transocean for the BOP's implementation and design.  TREX 040008 at 7; TREX 004271.

1724.   Cameron works with its customers to design systems that meet customer expectations but are also safe and meet industry standards, including the emergency systems, such as EDS, AMF, and Autoshear.  Gaude Dep. 332-35.

1725.   The Drilling Contract between BP and Transocean set forth the BOP's configuration and specified the criteria for the stack configuration, ram preventers, and annular preventers.  TREX 040008 at 7; TREX 001356A at BP-HZN-MBI00021477, 21537-47.

1726.   The Project Execution Plan explained that the "BOP Stack, Test Stump and Wellhead Connector," "BOP Control and Accumulator System," and "BOP Deadman System" were "mutually agreed" upon by Transocean and BP and "no changes will be made without mutual approval."  TREX 001356A at BP-HZN-MBI00021613.

1727.   The Drilling Contract specified that with regards to the blind shear rams, the BOP would have one set of blind shear rams with a working pressure of 15,000 psi for an 18-3/4" wellbore, and that the make of the blind shear rams would be Cameron or equivalent, but did not

specify the type of blind shear ram that was to be used.  TREX 040008 at 8; TREX 001356A at BP-HZN-MBI00021538.

1728.  The Drilling Contract also specified that that there would be two annular preventers with a working pressure of 10,000 psi.  TREX 040008 at 8; TREX 001356A at BP-HZN-MBI00021539.

1729.  Transocean, in consultation with the rig operator, decided what type of BOP equipment gets used on a particular rig.  Hay 2 Dep. 131.

1730.  BP and Transocean together decided on the configuration of the BOP; however, Transocean took the lead role.  Tr. 5259-60 (Childs); D. McWhorter Dep. 592-93.

1731.  When designing the BOP, Cameron's customer was Transocean, not BP, and Cameron took direction from Transocean.  D. McWhorter Dep. 329, 331; LeNormand 1 Dep. 248.

1732.  Cameron was involved with designing, configuring, and commissioning the *Deepwater Horizon* BOP and beginning in June 1999, Cameron attended weekly Progress Meetings with Transocean and BP regarding the BOP.  Coronado Dep. 424-25; TREX 040008 at 12.

1733.  In 2000, Cameron was the largest manufacturer of BOPs.  Whitby Dep. 400.  Cameron would not sell a product within a given design scope that it felt was unsafe.  D. McWhorter Dep. 433.

1734.  Cameron believed that the BOP was a "fine product" that met "Industry Standards."  D. McWhorter Dep. 575.

1735.  Transocean exercised the decision as to how many ram cavities are in a particular BOP.  Cameron Dep. 52.

1736.   Under the Drilling Contract, BP required that Transocean provides a rig and equipment, including the BOP, that complied with all applicable laws and regulations, and Transocean accepted this responsibility.  TREX 001356A at BP-HZN-MBI-00021479, BP-HZN-MBI-00021572.

1737.   Although Transocean and BP agreed to jointly explore the latest technologies available, it was Transocean's responsibility to make such technology available to BP under the Drilling Contract:  "[Transocean] and [BP] agree to explore the latest technologies, including riserless drilling, in an effort to incorporate same into the construction and operation of the Drilling Unit.   [Transocean] shall make such technology available to [BP] as soon as [Transocean] has the right to install and use such technology on its commercial drilling units." TREX 001356A at BP-HZN-MBI00021479.

1738.   The drilling contract specified that BP "[k]ey Representatives will have the opportunity to review design, construction or installation drawings as they are developed in a timely manner involving issues relative to the construction and intended use of components or systems," but "[t]he role of the Key Representatives will be that of an interested end user" and they "will not normally participate in the actual 'approval' of the drawings."  TREX 001356A at BP-HZN-MBI00021614-15.

1739.   Transocean believed that the *Deepwater Horizon* BOP as designed, including the blind shear rams, was suitable for use on the Macondo well.  Ambrose Dep. 169-70; Tr. 5087 (Childs) ("the configuration of the BOP stack did comply with industry standard").

1740.   The BOP was designed in accordance with API specifications.  Ambrose Dep. 169-70; Coronado Dep. 205 (testifying that Cameron's AMF complied with API 16D).

1741.   The *Deepwater Horizon* BOP configuration met and exceeded the requirements of Transocean's Well Control Handbook, as well as the specifications required by BP's DWOP. Hay 2 Dep. 158-59; TREX 001454; Mazella Dep. 289-92, 306-09.

1742.   Transocean did not know of any other device or equipment that would have had a better chance than the *Deepwater Horizon's* BOP of controlling the influx of hydrocarbons. Ambrose Dep. 207-08.

1743.   Owen McWhorter, Transocean Senior Subsea Supervisor aboard the *Deepwater Horizon,* believed that the *Deepwater Horizon* BOP was suitable for use on the Macondo well and never expressed anything different to anyone.  J. McWhorter Dep. 297-98.

> **2.    The BOP Configuration Met and Exceeded MMS Regulations and Was Approved by MMS for the Macondo Well.**

1744.   According to the MMS District Manager in Houma, the MMS was the government agency with the most expertise on blowout preventers and the agency charged with understanding deepwater wells and related technology, including blowout preventers. Domangue Dep. 89.

1745.   The relevant MMS regulation at the time of the Incident, 30 C.F.R. § 250.442, stated: "[y]our subsea BOP stack must include at least four remote-controlled, hydraulically operated BOPs consisting of an annular BOP, two BOPs equipped with pipe rams, and one BOP equipped with blind shear rams."  TREX 040008 at 52; D4599; D4607.

1746.   The *Deepwater Horizon* BOP used a 5-ram cavity stack configuration with a blind shear ram, casing shear ram, and three variable bore rams (the bottom one subsequently converted to a test ram), and a LMRP which had an upper and a lower annular, thus meeting and exceeding the requirements of 30 C.F.R. § 250.442.  TREX 040008 at 6; D4327B; D4599;

D4607; Saucier Dep. 258-59 (MMS acknowledged that the *Deepwater Horizon* BOP complied with 30 C.F.R. § 250.442).

1747.   Experts retained by the PSC, Transocean, and Halliburton do not dispute that the *Deepwater Horizon's* BOP complied with MMS regulations.   Tr. 3440-41 (Perkin); Tr. 5382 (Childs); Tr. 7015 (Stevick).

1748.   The BOP configuration, including the preventers utilized on the *Deepwater Horizon* BOP, was known to and approved by the MMS for use on several deep water wells.   Tr. 5381-82 (Childs); Tr. 2832-33 (Davis); D4599; D4803.4; D4826; D4644; Tr. 7019-20 (Stevick) (testifying that BP sought and obtained MMS approval to use the *Deepwater Horizon* BOP on the Macondo well).

1749.   BP submitted several Applications for a Permit to Drill to the MMS, including an Application for a Revised New Well (for the Macondo well) that contained the configuration of the *Deepwater Horizon* BOP.   The application disclosed that the BOP had an upper annular rated to 10,000 psi, a lower annular rated to 5,000 psi, one blind shear ram, one casing shear ram, and three variable bore rams, with the lower most variable bore ram converted to a test ram.   TREX 004003 at 3; TREX 004003.14.1.BP.

1750.   MMS approved BP's Application for a Revised New Well (for the Macondo well) on January 14, 2010.   TREX 004003 at 3; Tr. 7020 (Stevick).

1751.   When reviewing BOP information in the APD, the MMS looked to see whether the BOP contained the required number of different types of preventers and at their pressure ratings to ensure that the BOP complied with regulations.   Patton Dep. 48-49, 153-55 (The MMS Drilling Engineer who approved the APDs testified that he would not approve a filing unless he believed that it complied with all applicable regulations).

### 3.   The BOP Components Were Adequately Pressure Rated.

1752.   The lower BOP stack (which included the blind shear ram, casing shear ram, and variable bore rams) was pressure rated to 15,000 psi, which was the maximum available pressure rating available for these subsea components as of April 2010.   TREX 040008 at 6; Tr. 9014, 9016, 9017 (Shanks); Whitby Dep. 506; Stringfellow Dep. 438, 439 (no BOP in the Gulf of Mexico or in Transocean's entire fleet is pressure rated higher than 15,000 pounds).

1753.   The 15,000 psi working pressure rating means that the rams are designed to seal a wellbore experiencing up to 15,000 psi of pressure.   TREX 040020 at 7; Whitby Dep. 334.

1754.   Cameron is the only BOP manufacturer to offer subsurface BOPs rated to 20,000 psi, but none of the 20,000 BOPs were in operation as of July 2011.   Whitby Dep. 83-84; 276, 278.

1755.   The LMRP (which contained the upper and lower annulars) was pressure rated to 10,000 psi, which was the maximum available pressure rating for annulars.   In 2006, the lower annular was modified to include a stripping packer that was pressure rated to 5,000 psi.   TREX 040008 at 6; Whitby Dep. 505.

1756.   The upper annular's rating was never downgraded from 10,000 psi to 7,500 psi. Ambrose Dep. 154, 199-200.

1757.   Although a revision of a Macondo APD from October 15, 2009 indicated that the upper annular was rated to 7,500 psi, that provision did not apply to the *Deepwater Horizon*, but rather to the *Deepwater Marianas*, which had been drilling the Macondo at the time of October 15, 2009 and had a different BOP.   TREX 005834.2.1.BP; TREX 005834 at 1, 2; Douglas Dep. 276-77; Tr. 7025-26 (Stevick); Tr. 9014 (Shanks); Tr. 7027 (Stevick) (admitting he was probably incorrect about the upper annular being downgraded to 7,500 psi).

1758.   The APD that BP submitted and MMS approved on January 14, 2010 indicated that the upper annular for the *Deepwater Horizon* BOP was rated to 10,000 psi.  TREX 004003 at 4.

1759.   The MMS was aware that the *Deepwater Horizon* BOP's lower annular was rated to 5,000 psi, as this was stated in the MMS approved application for permit to drill the Macondo well and previous APD applications submitted for previous wells that the *Deepwater Horizon* had drilled.  Tr. 9016 (Shanks); TREX 004003.

1760.   Frank Patton, the MMS Drilling Engineer for the New Orleans district on April 20, 2010, testified that if a BOP had two annulars and one of those annulars met the minimum rating pressure requirements, the MMS would allow the BOP to continue operations.  Patton Dep. 233.

1761.   The *Deepwater Horizon* BOP was rated by Cameron to a 10,000 foot water depth and Cameron designed and developed the BOP to be used up to that water depth.  TREX 040008 at 6-7; D. McWhorter Dep. 577-78.

1762.   Function and pressure tests, which include testing at both high and low pressures, are the best indicators of a blowout preventer's health while the BOP is subsea.  Tr. 5206, 5215-16 (Childs) (explaining that successful tests indicate that the BOP has full pressure capability and that the control system can function each ram and the rams will function when activated).

1763.   All function and pressure tests performed on the *Deepwater Horizon* BOP in 2010 were successful, including a successful function test of the BOP on April 17, 2010.  Tr. 5206, 5216-17 (Childs); TREX 052664; TREX 052664.1.1.TO; TREX 052664.2.1.TO; P. Johnson Dep. 380-81.

1764.  The MMS reviewed the pressure tests performed on the *Deepwater Horizon* and found that the BOP was in compliance with federal regulations.  Saucier Dep. 228, 254-56; Domangue Dep. 168-69.

1765.  Per MMS regulations, the working pressure rating of each BOP component must exceed the Maximum Anticipated Surface Pressure ("MASP"), which is the calculated anticipated pressure at the BOP.  TREX 006169.

1766.  The maximum pressure rating of the BOP upper annular, blind shear rams, casing shear rams, and middle and upper variable bore rams exceeded the MASP calculation that MMS approved (8,404 psi) as well as the calculated maximum wellbore pressure present in the BOP on April 20, 2010 (*i.e.*, 8,300 psi).  TREX 040008 at 6, 48; TREX 001339.12.2.BP; TREX 040020 at 7; Tr. 9101, 9014 (Shanks); Tr. 6885 (Stevick).

### 4.    The BOP's Configuration, Including the Shear Ram Configuration, Was Consistent with Industry Practice.

1767.  The *Deepwater Horizon* BOP used a five-ram cavity stack configuration with a blind shear ram, casing shear ram, and three variable bore rams (the bottom one subsequently converted to a test ram), and a LMRP which had an upper and a lower annular.  TREX 040008 at 6.

1768.  The *Deepwater Horizon*'s BOP was appropriately configured for deepwater drilling and was suitable for the Macondo well.  Tr. 9012 (Shanks); Tr. 5259 (Childs).

1769.  The *Deepwater Horizon*'s BOP configuration was a standard configuration widely used in the industry, including up to the day of the Incident.  TREX 040008 at 6; TREX 007542.3.2.BP; Tr. 5217 (Childs); Tr. 5087 (Childs); D4803.4.

1770.  At the time the BOP was manufactured, most in the industry were using a five-cavity configuration; the 6-cavity configuration would only emerge later on.  Tr. 5268 (Childs).

1771.   For example, a 1999 study by SINTEF Industrial Management commissioned by the MMS depicted the "Typical Configuration of a Subsea BOP" as having one upper annular, one lower annular, one blind shear ram, and three pipe (variable bore) rams, which were all present on the *Deepwater Horizon* BOP in addition to a casing shear ram.  TREX 040008 at 51-52 (of the 26 BOPs included in the study, 25 BOPs had four cavities and only one blind shear ram).

1772.   On April 26, 2001, WEST released a report describing its evaluation of the rig, including an evaluation of the BOP configuration.  Tr. 5219 (Childs); TREX 007691.

1773.   In 2001, WEST assessed the well control equipment on the *Deepwater Horizon*, including the BOP configuration, and issued a report disclosing that, going forward, the BOP stack and the BOP control system for the *Deepwater Horizon* should be "very reliable."  Tr. 5219-20 (Childs); TREX 007691; TREX 007691.10.1.TO.

1774.   The 2001 WEST report determined that "[t]he [*Deepwater Horizon*] is one of the best setups and problem-free startups [WEST] surveyor [Eastveld] has seen."  Tr. 5220-21 (Childs); TREX 007691 at 10.

1775.   As of April 2010, the *Deepwater Horizon*'s BOP configuration was consistent with industry practice, which did not require the addition of a second blind shear ram.  Tr. 5222, 5381 (Childs); D4826; Tr. 9108-10 (Shanks); D. McWhorter Dep. 575.

1776.   According to an experienced ModuSpec well control equipment surveyor, who conducted a rig condition assessment for Transocean of the *Deepwater Horizon* BOP in April 2010, the configuration of the *Deepwater Horizon* BOP was similar to what he had seen used on offshore drilling rigs around the world.  Millsap Dep. 12, 367.

1777.  Not only was the *Deepwater Horizon's* five-ram cavity design the industry standard at the time the *Deepwater Horizon* was manufactured and at the time of the Incident, but rigs that have BOPs with five-ram cavities still remain in use as of today and still represent the industry standard.  Tr. 5222 (Childs).

1778.  Additionally, the MMS approved numerous Applications for Permit to Drill in 2010 for various operators and drilling contractors that utilized a shear ram configuration similar to, or inferior than, the *Deepwater Horizon* BOP configuration for comparable well depths  and MASP.  Tr. 9108-12 (Shanks) (testifying that many deepwater drilling rigs operate with only one blind shear ram in similar conditions to the Macondo well); D4644.

1779.  In 2010, MMS approved an APD for the rig *Diamond Ocean Monarch* (operated by Cobalt) that utilized one blind shear ram and no casing shear rams.  The Application was for a well with a total vertical depth of 35,000 feet, which was deeper than the Macondo well.  D4644; TREX 047846.00163 at 1, 3, 9, 11; TREX 001339 at 7.

1780.  In 2010, the MMS approved an APD for the rig *Stena Forth* (operated by Hess) that utilized one blind shear ram and one casing shear ram.  The Application was for a well with a total vertical depth of 32,210 feet and a MASP of 8,398, which was deeper than the total depth at the Macondo well and comparable to its calculated MASP.  D4644; TREX 047846.00174 at 1, 4, 9-11; TREX 001339 at 7; TREX 001339.12.1.BP.

1781.  In 2010, the MMS approved an APD for the rig *Noble Jim Thompson* (operated by Shell) that utilized one blind shear ram and no casing shear rams.  The Application was for a well with a total vertical depth of 31,082 feet, which was deeper than Macondo.  D4644; TREX 047846.00177 at 1, 3-4, 9-10; TREX 001339 at 7.

1782.  In 2010, the MMS approved an APD for the Transocean rig *Discoverer Inspiration* (operated by Chevron) that utilized one blind shear ram and one casing shear ram. The Application was for a well with a total vertical depth of 30,972 feet and a MASP of 9,431 psi, both of which exceeded the total depth and MASP at the Macondo well.  D4644; TREX 047846.00167 at 1, 3, 9-10, 21; TREX 001339 at 7; TREX 001339.12.1.BP.

1783.  In 2010, the MMS approved an APD for the rig *Noble Paul Romano* (operated by Marathon) that utilized one blind shear ram and no casing shear ram.  The Application was for a well with a total vertical depth of 29,082 feet and a MASP of 8,253 psi, which was deeper than the total depth at the Macondo well and comparable to its calculated MASP.  D4644; TREX 047846.00180 at 1, 2, 8-9, 16; TREX 001339 at 7; TREX 001339.12.1.BP.

1784.  In 2010, the MMS approved an APD for the rig *Noble Amos Runner* (operated by Kerr-McGee Energy) that utilized one blind shear ram and no casing shear rams.  The Application was for a well with a total vertical depth of 20,082 feet, which was similar to total depth at the Macondo well.  D4644; TREX 047846.00169 at 1, 3, 8, 9; TREX 001339 at 7.

1785.  The MMS data for other deepwater drilling rigs drilling in water depths of over 4,500 feet and well depths of over 18,000 feet shows that the majority of the rigs had a configuration of two shearing rams (either a blind shear and a casing shear, or two blind shear and no casing shear rams), just like the *Deepwater Horizon* BOP.  Tr. 9110-11 (Shanks); D4826; TREX 040020 at 13-14; *See also* TREX 004793; TREX 047846.167 at 10; TREX 047846.168 at 10; TREX 047855; TREX 047933; TREX 047936-44.

1786.  In fact, of the fifteen rigs that Transocean operated in North American waters in 2010, nine had two or fewer shear rams (including blind shear rams and casing shear rams). TREX 040020 at 14; TREX 004793; D4876.

1787.   The *Deepwater Nautilus*, the *Deepwater Horizon's* sister ship, performed deepwater drilling operations with one BSR.  Boughton Dep. 121, 345-46; Trahan Dep. 81.

1788.   Prior to April 2010, the *Thunder Horse PDQ* rig and *West Sirius* rig had one BSR.  Emmerson Dep. 78-79.

1789.   To this day, the MMS/BSEE continues to allow operators and drilling contractors to drill deepwater wells in the Gulf of Mexico with rigs that utilize BOPs with one BSR.  Tr. 9112 (Shanks).

1790.   Certain experts have alleged that the *Deepwater Horizon* BOP's shear ram configuration and/or shear ram design were inadequate because they did not adequately account for the possibility of shearing off-center drill pipe.  *See, e.g.*, TREX 007535 at 8-9, 17-18; TREX 061123 at 16.

1791.   While possible, it is not typical for the drill pipe to be off-center in the BOP.  If a pipe comes off center, it usually occurs at the flex joint, not within the body of the BOP itself.  Tr. 9131-32 (Shanks).

1792.   However, nobody could have envisioned the situation of a pipe being forcibly held against the wall of a BOP, which would prevent a SBR blind shear ram from shearing it.  Tr. 9203 (Shanks).

1793.   The forced off-centering of the pipe in the Incident was not the ordinary sort of off-centering that is foreseen and planned for in the drilling industry – it was an extreme occurrence resulting from extreme forces.  Tr. 5324-25 (Childs).

1794.   In 35 years of working with BOPs, Transocean's expert, Greg Childs, had never heard of an instance where drill pipe was unable to be sheared by a Cameron blind shear ram (or any other shear ram, for that matter) because a pipe was outside the shearing blades.  Tr. 5510-11

(Childs); Whitby Dep. 345 (prior to April 20, 2010, Cameron had not recognized a situation where "pipe that was physically pinned up against a wall was an issue").

> **5.  The MMS Approved the BOP Configuration for Use at the Macondo Well and "Compliance with MMS regulations [is considered] the use of BAST [Best Available and Safest Technology.]"  30 C.F.R. § 250.107.**

1795.  The term "best available and safest technology" ("BAST") is defined by the federal regulations.  TREX 007665.2.1.BP.

1796.  30 C.F.R. § 250.105 provided that BAST "means the best available and safest technologies that the Director determines to be economically feasible wherever failure of equipment would have a significant effect on safety, health, or the environment."  TREX 007665.2.1.BP; Tr. 2834 (Davis) (explaining that "Director" means the director of the MMS).

1797.  Director, as used in 30 C.F.R. § 250.105, means the director of the MMS.  Tr. 2834 (Davis).

1798.  30 C.F.R. § 250.107 states that "[y]ou must use the best available and safest technology (BAST) whenever practical on all exploration, development, and production operations.  In general, *we consider your compliance with MMS regulations to be the use of BAST*."  TREX 007665.7.2.BP (emphasis added).

1799.  The MMS approved the Macondo APD with the *Deepwater Horizon* BOP configuration that existed on April 20, 2010 as well as previous APDs submitted by BP for the *Deepwater Horizon*.  TREX 004003 at 3; Patton Dep. 153-55.

1800.  Prior to the Incident, the MMS never contended that the *Deepwater Horizon* BOP failed to comply with MMS regulations.  TREX 040020 at 12.

1801.  In addition to approving the APD that BP submitted, MMS inspectors also visited the *Deepwater Horizon* multiple times while it was drilling the Macondo well and never issued a

notice of noncompliance.   J. McWhorter Dep. 355-56; Saucier Dep. 254-59 (during these inspections, MMS inspectors reviewed the BOP test results, among other things).

1802.   On April 1, 2010, MMS inspectors visited the *Deepwater Horizon* and reviewed BOP testing information.  No INCs were issued based on the April 1, 2010, inspection.  TREX 005332; Domangue Dep. 165-68.

1803.   In any event, United States expert Richard Heenan testified that it was appropriate for an operator like BP to hire a contractor, like Transocean, to ensure compliance with the use of "best available and safest technology."  Tr. 2180-81 (Heenan).

1804.   Geoff Boughton, Transocean's Subject Matter Expert for Subsea Equipment, never notified BP prior to the Incident that the *Deepwater Horizon* BOP did not have the best available and safest technology, nor does he know of anyone at Transocean who did.  Boughton Dep. 252-53.

### 6.      The BOP Had Sufficient Shearing Capacity.

1805.   The *Deepwater Horizon*'s BOP, including the blind shear ram, had sufficient shearing capacity for the 5-1/2" drill pipe that was in the BOP during the Incident.  Tr. 9093-94, 9105 (Shanks); D4803.4; D4872; TREX 040008 at 42-49; TREX 007687 at 2; Boughton Dep. 109, 210; Whitby Dep. 494.

1806.   The *Deepwater Horizon* BOP had sufficient shearing capacity for operations at the Macondo well and was fit for the purpose for which it was being used on April 20, 2010.  Tr. 5389-92 (Childs).

1807.   United States BOP expert Dr. Davis testified that the pressure available to the *Deepwater Horizon*'s blind shear ram was "clearly sufficient to cut the pipe had it been centered," and "almost certainly would have cut the pipe and sealed the well" if the drill pipe was centered.  Tr. 2713-14 (Davis).

1808.   Shearing capacity did not play a factor in the *Deepwater Horizon* BOP's failure to shut in the well during the Incident.  Tr. 9105 (Shanks).

1809.   The BOP failed to seal the well because the drill pipe was forcibly held partially outside the shearing zone of the blind shear ram.  The blind shear ram cut the portion of the drill pipe that was within its blade; it was the remaining drill pipe outside the blades that was not cut and jammed the blind shear ram blocks apart.  Tr. 2751, 2887-89 (Davis); TREX 022693 at 15; Thompson Dep. 103-05, 152-53; Tr. 9105 (Shanks); TREX 040020 at 3.

1810.   Additional shearing capacity, regardless of how much, would not have allowed the *Deepwater Horizon*'s SBR model blind shear ram to seal the well.  TREX 040020 at 3.

1811.   When Childs opined in his report that the shearing capacity had not been properly assessed he was not aware that BP, Transocean, and Cameron had performed shear tests and calculations, including pre-commissioning shear tests of both the blind shear ram and casing shear ram performed by Cameron in 2000.  His opinion was based on the information he had at the time, but he admitted during trial that this was incorrect.  Tr. 5247-50, 5390 (Childs); TREX 007713.1.1.BP, TREX 007713.1.2.BP.

1812.   The shear tests performed in 1999, 2000, and 2001 were still accurate predictors of shear pressure in 2010 because essentially the same 5-1/2" drill pipe was still on the *Deepwater Horizon* with the same specifications and properties.  Tr. 9104-05 (Shanks).

1813.   The *Deepwater Horizon*'s casing shear ram could "easily shear" 6-5/8" drill pipe at the maximum anticipated surface pressure of the Macondo well, and could shear even larger, heavier tubulars.  TREX 007687 at 27.

1814.   Transocean's Well Control Handbook required that "[t]he blind/shear rams must be capable of shearing the highest grade and heaviest drill pipe on the rig (HWDP excluded) and

sealing of the well in one operation" and the "rig personnel must know the capabilities (*i.e.* what size and grade of pipe can be sheared) and operating parameters of the shear rams installed in the rig's BOP stack."  TREX 040008 at 21; TREX 001454 at 142, 273.

1815.  Transocean understood the shearing capabilities of the *Deepwater Horizon* BOP with respect to 6-5/8" drill pipe and had contingencies in place.  Tr. 5257 (Childs).

### a.      The BOP Had Sufficient Shearing Capacity Based on Cameron's Engineering Bulletin EB 702D.

1816.  Based on Cameron's Engineering Bulletin EB 702D formula, the *Deepwater Horizon*'s blind shear ram had more than enough shearing capacity to shear the 5-1/2" drill pipe that was in the BOP at the wellbore pressure conditions that existed when the AMF/Deadman conditions were met, at the maximum anticipated surface pressure of the Macondo well, and at the maximum wellbore pressure experienced on the day of the Incident.  Tr. 9094-96, 9100-02 (Shanks); D4872; TREX 040008 at 46-48; TREX 040020 at 1.

1817.  Cameron's Engineering Bulletin EB 702D provided drillers and operators with a formula they could use to determine whether drill pipe can be sheared at certain conditions.  Tr. 2877-78 (Davis); TREX 001199; TREX 003185.

1818.  Hydrostatic water pressure helps close the blind shear ram and the greater the water depth, the greater the hydrostatic water pressure is.  Tr. 9096 (Shanks); D4872.

1819.  At the depth of 5,000 feet the hydrostatic water pressure is about 2,200 psi.  D. McWhorter Dep. 665-66.

1820.   Accounting for the 5,000 foot water depth of the *Deepwater Horizon* BOP, the shear value predicted by Cameron's EB 702D formula was about 350 psi less than if there is no wellbore pressure.  Tr. 9096 (Shanks); D4872.

1821.   As wellbore pressure increases, the required shearing pressure increases because wellbore pressure pushes out against the blind shear ram blocks resisting their closure.  Tr. 9095 (Shanks); D4872.

1822.   Modeling by Dr. Emilsen of Add Energy shows that the maximum wellbore pressure experienced below the BOP on April 20, 2010 was approximately 8,300 psi.  TREX 040003 at 15; TREX 000002 at 389; TREX 040008 at 49.

1823.   Cameron's EB 702D formula predicted a shearing pressure of 3,764 psi for the 5-1/2", 24.7 ppf, S-135 drill pipe at a wellbore pressure of 8,300 psi and a water depth of 5,000 feet.  TREX 040008 at 46-47; TREX 040020 at 1; D4872.

1824.   Cameron's EB 702D formula predicted a shearing pressure of 3,781 psi at a wellbore pressure of 8,404 psi (*i.e.* the maximum anticipated surface pressure for the Macondo well) and a water depth of 5,000 feet.  Tr. 5362-63 (Childs).

1825.   The *Deepwater Horizon*'s blind shear ram had 4,000 psi of shearing pressure available.  Tr. 9096 (Shanks); Tr. 2876-77 (Davis); D4872.

1826.   Transocean's Subject Matter Expert for Subsea Systems and Equipment, Geoff Boughton performed shearing calculations that showed the drill pipe across the BOP at the time of the Incident was shearable.  Boughton Dep. 211-12.

1827.   The shear pressure predicting formula in Cameron's EB 702D formula is deliberately conservative and the shear pressure value it generated "is derived from the maximum recorded shear force that Cameron has experienced" during a shear test for a given type and size of drill pipe.  Tr. 9102-03 (Shanks); TREX 040008 at 16, 42; D. McWhorter Dep. 401-03; TREX 001199.10.2.BP; Whitby Dep. 95, 322; TREX 003185.

1828.   Cameron believed the EB 702D formula is conservative and expected the actual shearing pressure to be lower than what is calculated.  TREX 040008 at 42; D. McWhorter Dep. 676; Whitby Dep. 324.

1829.   The conservatism of Cameron's EB 702D formula was demonstrated by the June 2003 EDS performed by the *Deepwater Horizon*.  During this EDS the blind shear ram, which had a maximum 4,000 psi of shearing pressure available, sheared 6-5/8", 33 ppf, S-135 drill pipe. For this size pipe and at the wellbore pressure conditions at the time of the EDS, Cameron's EB 702D formula predicted a shearing pressure up to 4,881 psi.  TREX 040008 at 22.

1830.   Because Cameron's EB 702D formula was very conservative, there was no reason to expect that the actual shear pressure would exceed the calculated value, and there was no need to add an additional safety factor on top of the shearing value calculated by EB 702D.  Tr. 9102-03 (Shanks); TREX 007687 at 27 ("the results from the [EB 702D] calculations will be equal to or higher than the actual shear test pressures").

1831.   Shear blade sharpness was not a reason to add an additional shearing capacity safety factor, as contended by one expert for justifying adding a safety factor.  Blind shear ram cavities are regularly opened by the drilling contractor when maintenance is done and any dullness or damage to the blades will be dressed out so that they are in pristine or almost like-new condition.  Tr. 9103-04 (Shanks).

### b.    The BOP Had Sufficient Shearing Capacity Based on the April 11, 2000 Shear Test.

1832.   On April 11, 2000, Cameron performed a shear test on 5-1/2", 24.7 ppf, S-135 drill pipe that was used on the *Deepwater Horizon*, using the actual SBR blind shear ram that was installed on the *Deepwater Horizon* BOP.  TREX 040008 at 15; Tr. 9097 (Shanks); TREX 007713; TREX 003951 at 5; Boughton Dep. 19; Turlak Dep. 386-88.

1833.   The April 11, 2000 shear test complied with Cameron's recommendation in its Engineering Bulletin EB 702D that shear testing using the actual BOP and tubular in question be performed.   TREX 040008 at 15; TREX 007713.1.1.BP; TREX 007713.1.2.BP; TREX 001199; TREX 003951 at 5.

1834.   The April 11, 2000 shear test sheared the 5-1/2", 24.7 ppf, S-135 drill pipe at a closing pressure of 2,700 psi.   The net shearing pressure, which would have been lower than the closing pressure, could not be calculated because the opening line pressure was not recorded. TREX 040008 at 15-17; Tr. 9097-99 (Shanks); TREX 007713.1.1.BP; TREX 007713.1.2.BP.

1835.   Cameron's testing protocol for the April 11, 2000 shear test called for the opening line pressure to be measured and recorded, but this data was not included in the test report.   Tr. 9097-99 (Shanks); TREX 040008 at 16-17; TREX 007713 at 8.

1836.   Blind shear rams are closed by applying pressurized hydraulic fluid to the close side of a piston.   As the rams close, the pressure of the hydraulic fluid on the opposite side (the open side) of the piston increases as it is forced out.   This open side pressure must be accounted for in order to accurately determine the shearing pressure.   TREX 040008 at 16-17; Tr. 9097-99 (Shanks); D4925.

1837.   The net shearing pressure can be several hundred to over one thousand psi lower than the closing pressure, and the net shearing pressure of the April 11, 2000 shear test would be significantly less than the 2,700 psi closing pressure.   TREX 040008 at 17-18; Tr. 9097-99 (Shanks); D4925.

1838.   Based on the April 11, 2000 shear test, the *Deepwater Horizon*'s blind shear ram had more than enough shearing capacity to shear the 5-1/2" drill pipe that was in the BOP at the pressure wellbore pressure conditions that existed when the AMF/Deadman conditions were met,

at the maximum anticipated surface pressure of the Macondo well, and at the maximum wellbore pressure calculated by hydraulic modeling from the data on the day of the Incident.  Tr. 9094, 9097-02 (Shanks); D4872; TREX 040008 at 47-48; TREX 040020 at 1-2.

1839.   Adjusting the April 11, 2000 shear test results for a wellbore pressure of 8,300 psi – the maximum wellbore pressure below the BOP predicted by Add Energy modeling – predicted a shearing pressure of 3,564 psi.  This was less than the 4,000 psi of shearing pressure that was available to the blind shear ram.  TREX 040008 at 46-47, 49; D4872; TREX 040003 at 15; TREX 000002 at 389.

### c.     The BOP Had Sufficient Shearing Capacity Based on the August 6, 1999 Shear Test.

1840.   On August 6, 1999, Cameron performed a shear test on the same 5-1/2", 24.7 ppf, S-135 drill pipe that was in the *Deepwater Horizon* BOP during the blowout.  TREX 040008 at 18; Tr. 9096-97 (Shanks); Whitby Dep. 295-96; TREX 003951.

1841.   The August 6, 1999 shear test sheared the 5-1/2", 24.7 ppf, S-135 drill pipe at 2,178 psi.  TREX 040008 at 18; TREX 003951.

1842.   The August 6, 1999 shear test was "over and above the FAT [factory acceptance test] requirements."  Whitby Dep. 296.

1843.   The August 6, 1999 shear test results appeared to be reasonable and consistent with accounting for the open line pressure.  TREX 040008 at 19; TREX 003951.

1844.   Based on the August 6, 1999 shear test, the *Deepwater Horizon*'s blind shear ram had more than enough shearing capacity to shear the 5-1/2" drill pipe that was in the BOP at the pressure wellbore pressure conditions that existed when the AMF/Deadman conditions were met, at the maximum anticipated surface pressure of the Macondo well, and at the maximum wellbore

pressure experienced on the day of the Incident.  Tr. 9094, 9096-97, 9100-02 (Shanks); D4872; TREX 040008 at 47-48.

1845.  Adjusting the August 6, 1999 shear test results for a wellbore pressure of 8,300 psi – the maximum wellbore pressure below the BOP predicted by Add Energy modeling – predicted a shearing pressure of 3,190 psi.  This is less than the 4,000 psi of shearing pressure that was available to the blind shear ram.  TREX 040008 at 46-47, 49; D4872; TREX 040003 at 15; TREX 000002 at 389.

### d.    Additional Validation that the BOP Had Sufficient Shearing Capacity.

1846.  On September 20, 2001, another shear test was performed using the 5-1/2" drill pipe used on the *Deepwater Horizon* using the rig's BOP.  While the shearing pressure was not recorded, this was reported as a successful test.   TREX 040008 at 19-20; Tr. 9099-9100 (Shanks).

1847.  In June 2003, the *Deepwater Horizon* successfully sheared 6-5/8", 33 ppf, S-135 drill pipe with the blind shear rams by using the EDS system.  TREX 040008 at 22; Abbassian Dep. 630-31; TREX 001890.

1848.  The forensic examination of the physical evidence recovered from the *Deepwater Horizon* BOP after the Incident also indicates that the blind shear rams had sufficient shearing capacity.  Based on the crush marks on the drill pipe that was across the blind shear ram when it closed, the shearing pressure available to the blind shear was "clearly sufficient" to cut the pipe had it been centered.  Tr. 2713-14 (Davis); Tr. 9105 (Shanks).

### e.    Shear Tests Are the Most Accurate Predictor of Shearing Pressure.

1849.  Shear tests are the most accurate predictor of the shearing pressure needed to shear drill pipe.  Tr. 9104 (Shanks).

1850.   Shear tests are a validation that the BOP can shear a certain type of pipe and seal the well.   Cameron's Engineering Bulletin EB 702D states that Cameron's Director of Engineering Technology, Mel Whitby, testified that a shear test is a validation that the BOP can shear a certain type of pipe and seal the well.   Whitby Dep. 521; TREX 001199 at 1 (Cameron's EB 702D states that "testing is always encouraged to validate the sealing and shearing capabilities of the ram"); Erwin Dep. 93 (Cameron's Manager of After-Market Operations, testified that the best way to determine if a type of drill pipe can be sheared "is to actually perform a shear test"); TREX 040008 at 19.

1851.   Cameron's Vice-President of Engineering and Quality, David McWhorter, testified that "the most accurate way for operators and drilling contractors to know if they can shear a piece of pipe or not is to actually do a shear test" and "if you want to be sure, take the pipe that you have and cut it, preferably the exact pipe you're going to use."  D. McWhorter Dep. 183-84.

### f.   Transocean Understood that BP Relied on It for Shearing Calculations.

1852.   Transocean's Subject Matter Expert for Subsea Systems and Equipment, Geoff Boughton, recognized that "[n]ormally, BP looks to [Transocean] and the manufacturer for the shear calculations."  TREX 040008 at 20; Boughton Dep. 66.

1853.   BP talked to Transocean about the shearing capacity of the blind shear rams, asking from time to time what type of pipe the blind shear rams would shear.  Hay 1 Dep. 50.

1854.   Mark Hay, a Transocean Senior Subsea Supervisor on the *Deepwater Horizon*, personally looked at shearability calculations for particular strings of drill pipe on the Macondo well and worked with Cameron on this issue.   If he had had any concerns about the shearing

capability of the blind shear ram, Hay would have gone to Cameron with them.  Hay 1 Dep. 58, 392.

1855.   When the *Deepwater Horizon* got a new string of drill pipe, Hay would send the data for that drill pipe to Cameron and see what the shear capacity was.  Hay 1 Dep. 59-60.

1856.   Shearing calculations are performed on an as-needed basis.  If calculations have been done with a certain size pipe, they do not need to be redone with that same size pipe for subsequent drilling operations.  Boughton Dep. 334-35.

1857.   William Stringfellow, a former Transocean Senior Subsea Supervisor on the *Deepwater Horizon*, testified that Transocean had responsibility for evaluating the ability of the blind shear ram to shear the drill pipe.  Stringfellow Dep. 434.

1858.   Owen McWhorter, a Transocean Senior Subsea Supervisor aboard the *Deepwater Horizon,* knew that the blind shear rams had the ability to shear the 5-1/2" drill pipe and seal the Macondo well.  J. McWhorter Dep. 326.

> **g.     Maximum Applied Surface Pressure (MASP) Was Properly Calculated in Accordance with Industry Practice, and the BOP Was Capable of Shearing the Drill Pipe under the MASP.**

1859.   30 C.F.R. § 250.413 defines "maximum anticipated surface pressures" as "the pressures that you reasonably expect to be exerted upon a casing string and its related wellhead equipment."  TREX 005847.

1860.   For subsea BOPs the maximum anticipated surface pressure is calculated at the BOP.  Tr. 9100-01 (Shanks).

1861.   The maximum anticipated surface pressure for the Macondo well was 8,404 psi.  TREX 040008 at 48; TREX 001339.12.2.BP; Tr. 9101 (Shanks); Tr. 6885 (Stevick).

1862.   The MMS approved the Application for Permit to Drill for the Macondo well that included calculations calculating the maximum anticipated surface pressure for the well as 8,404 psi.  TREX 040008 at 48; TREX 001339.12.2.BP; Tr. 9101 (Shanks); Tr. 3426-27 (Perkin).

1863.   The maximum anticipated surface pressure calculations in the MMS-approved Application Permit to Drill explicitly identified the use of a 50/50 mud-gas ratio.  TREX 040008 at 48; TREX 001339.12.2.BP; Tr. 3426-27 (Perkin).

1864.   The use of a 50/50 mud-gas ratio in the Macondo well for the maximum anticipated surface pressure calculations was consistent with normal industry practice.  Tr. 9101 (Shanks); TREX 040008 at 48-49; TREX 007547; TREX 047855; TREX 047933; TREX 047934; TREX 047936;  TREX 047937; TREX 047938; TREX 047939; TREX 047940; TREX 047941; TREX 047942; TREX 047943; TREX 047944.

1865.   MMS has approved Applications for Permit to Drill using a 50/50 mud-gas ratio to calculate the maximum anticipated surface pressure that was submitted by other operators, including Anadarko, BHP Biliton, Chevron, Devon, ExxonMobil, Marathon, Union, and Woodside.  TREX 040020 at 6; TREX 007547; TREX 047855; TREX 047933; TREX 047934; TREX 047936;  TREX 047937; TREX 047938; TREX 047939; TREX 047940; TREX 047941; TREX 047942; TREX 047943; TREX 047944.

1866.   Transocean's Well Control Handbook required that "pressure control equipment must, as a minimum, meet the working pressure and temperature requirements determined by the maximum anticipated surface pressure and temperature for each well and be reviewed prior to spudding by the Rig Manager Performance."  TREX 001454 at TRN-MDL-00286777; Tr. 6885 (Stevick).

1867. BP provided the maximum anticipated surface pressure to Transocean for the Macondo well prior to drilling, and Transocean's Rig Manager-Performance for the *Deepwater Horizon*, Paul Johnson, evaluated whether or not the well control equipment would function within that range. TREX 040008 at 21; P. Johnson Dep. 392-95.

1868. Domangue, the MMS District Manager for the Houma District on April 20, 2010, testified that while the operator calculates maximum anticipated surface pressure (MASP) and submits it to the MMS for approval, the MMS has its own system that calculates MASP using the eWell system, and the MMS compares the two MASP calculations. MMS also checks the MASP calculation submitted by operators. Domangue Dep. 48-50; Patton Dep. 70-71; Tr. 3423-24 (Perkin).

1869. Contrary to the contention of other parties, BP's GP 10-10 Well Control Manual did not require that maximum anticipated surface pressure be calculated differently from the way that it was calculated for the APD submissions to MMS (*i.e.*, using a full or 100% gas column as opposed to a column of 50% gas and 50% oil). TREX 040020 at 4-5; TREX 000215 at 10.

1870. To the extent that parties rely on paragraph 6.1.3 of GP 10-10 to support the contention that BP's policy required it to use a 100% gas column to calculate MASP, this is erroneous because this paragraph is not directed towards MASP, but a different concept: maximum allowable working pressure. Specifically, this provision provides that maximum allowable working pressure for a well "shall take into account a gas column to surface" for exploration wells. TREX 040020 at 4-5; TREX 000215 at 10.

1871. Maximum anticipated surface pressure depended on the subsurface geology because an evacuated wellbore may not be just a free column of gas, it could well be an interspersed, multi-phase column that would consist of oil, gas, and other things. Therefore the

particular geological features (such as fracture gradient, pore pressure, and bottom hole pressure) must be considered in order to perform the maximum anticipated surface pressure calculation appropriately.  Campbell 1 Dep. 20-21.[13]

1872.   Modeling by Add Energy indicated the maximum pressure that was experienced below the BOP was approximately 8,300 psi, which is less than the calculated maximum anticipated surface pressure of 8,404 psi.  TREX 040008 at 49; TREX 040003 at 15; TREX 000002 at 389.

1873.   Calculating maximum anticipated surface pressure using an all gas column would have been unnecessary and less accurate because the MASP of 8,404 psi that was calculated in the MMS approved Application for Permit to Drill for the Macondo well was still conservative. TREX 040020 at 7.

1874.   MMS and the offshore drilling industry generally agree that maximum anticipated surface pressure is calculated as the lesser of the Fracture Gradient Method and the Bottom Hole Pressure Method, as was done in the MMS-approved Application for Permit to Drill for the Macondo well.  TREX 040020 at 3; TREX 007550 at 51; TREX 001339.12.2.BP.

1875.   A WEST Engineering Services study commissioned by MMS in 2006 explained that "[f]or drilling applications, there are two different possible values for MASP … Both must be calculated and the lesser of the two is used … The use of the smaller value might appear to be in conflict with the idea of maximizing safety, but it is not.  The use of a value from MASP in design MUST make sense."  TREX 040020 at 3, 7; TREX 007550 at 51-52.

---

[13]  "Campbell 1 Dep." refers to Mr. Campbell's first day of deposition testimony, which occurred on July 12, 2011.  "Campbell 2 Dep." refers to Mr. Campbell's second day of deposition testimony, which occurred on July 13, 2011.

7.      The *Deepwater Horizon*'s BOP's Operational History Indicated That
It Was Suitable As Configured for the Macondo Well Deepwater
Drilling Operations.

1876.   In 2001, WEST assessed the well control equipment on the *Deepwater Horizon*,
including the BOP configuration, and issued a report disclosing that, going forward, the BOP
stack and the BOP control system for the *Deepwater Horizon* should be "very reliable."  Tr.
5219-20 (Childs); TREX 007691.10.1.TO.

1877.   Prior to the Macondo well, there is no evidence that the *Deepwater Horizon* BOP
failed to operate in a well control situation.  In fact, when the BOP was activated during a 2003
emergency, it functioned as designed.  On June 30, 2003, the *Deepwater Horizon* was located on
the MC725 #1 well, where it experienced a loop current and winds of 44 knots and waves of 12
to 14 feet.  The *Deepwater Horizon*'s Captain did not properly head the rig to counteract these
conditions, and the rig began to lose positioning.  Because the rig was losing position while still
latched to the well, the driller activated the Emergency Disconnect Sequence (EDS).  The EDS
activated the blind shear rams, sheared the drill pipe in the well, sealed the wellbore, and
disconnected the LMRP from the BOP, allowing the rig to safely drift off location.  TREX
001527.

1878.   From 2001-2010, various entities conducted surveys of the *Deepwater Horizon*
BOP and never pulled the BOP out of service or expressed concerns regarding the modifications
to the BOP, including the test ram and stripping annular.  *See, e.g.*, TREX 000081; TREX
000251.

1879.   The BOP successfully passed function and pressure tests prior to deploying on the
Macondo well.  Transocean's Subsea Department performed a Maximum Working Pressure test
on the *Deepwater Horizon* BOP on February 6, 2010.  Each BOP element was pressure tested as
follows: 15,000 psi for each of the ram preventers; 10,000 psi for the upper annular; and 5,000

psi for the lower annular.  This confirmed to BP that the BOP could seal the wellbore to these pressures.  TREX 043009; TREX 000588.

1880.  After the BOP was deployed on Macondo, Transocean's Subsea Department satisfactorily performed function and pressure tests on the *Deepwater Horizon* BOP.  The Application for Permit to Drill, which was approved by the MMS District Supervisor, set forth the pressures to be used during subsea BOP testing.  In particular, the test pressures used during the testing are: 6,500 psi for each of the ram preventers; 3,500 psi for the upper annular; and 3,500 psi for the lower annular.  TREX 004752.  The results of the successful tests were made available to and reviewed by BP.  P. Johnson Dep. 381.

1881.  The results of the BOP pressure and function tests on Macondo indicated to BP that the BOP was functional and could have been expected to close in the well in case of a well control event.  Tr. 5206, 5215-16 (Childs) (explaining that successful pressure and function tests indicate that the BOP has full pressure capability and that the control system can function each ram and the rams will function when activated).

### 8. Modifications Known to BP Before April 20, 2010, Which Included the Conversions to a Stripping Annular and Test Ram, Improved the BOP's Functionality and Were MMS Approved.

#### a. The Conversion of the Lower VBR Into a Test Ram Improved the BOP's Functionality and Was MMS Approved.

1882.  The lower variable bore ram on the *Deepwater Horizon* BOP was converted to a test ram in November 2004.  Tr. 5292 (Childs); Tr. 4272 (Barnhill); Stringfellow Dep. 459-60; Boughton Dep. 365 (explaining that a test ram is designed to hold pressure from above and cannot seal the well).

1883.   The modification from a VBR to a test ram was widely implemented on drillings rigs worldwide and was not an unusual decision.  D. McWhorter Dep. 65-66; Erwin Dep. 306; Tr. 9018 (Shanks) (testifying that "many rigs have test rams.")

1884.   The conversion to a test ram provided a safety benefit by allowing the crew to pressure test the BOP stack without having to trip the drill pipe out of the hole.  Tripping (or pulling) drill pipe out of the hole is known to potentially cause a kick, and thus by implementing a test ram, the increased risk of initiating a kick during the BOP pressure testing process is reduced.  Tr. 9015-16 (Shanks); Tr. 5292 (Childs).

1885.   The conversion to a test ram provided an additional safety benefit:  by eliminating the need to trip the drill pipe out of the hole during biweekly BOP testing, the time that the drill crew must be on the rig floor handling equipment was reduced.  Tr. 9015-16 (Shanks); Tr. 5292 (Childs); Domangue Dep. 228-29 (the MMS District Manager testified that the test ram conversion resulted in fewer trips and less activity on the rig floor, "which could also increase safety" and "would have been a good thing.")  Advantages of having a test ram in deepwater drilling included allowing the crew to close the test ram around the drill pipe, containing pressure from above (which a normal VBR does from below), and facilitating safer biweekly testing of the BOP stack without having to trip pipe out of the hole and potentially experiencing a kick during the pulling or tripping back in the hole of the BOP.  Tr. 9018 (Shanks).

1886.  BP assessed the risk associated with the conversion to a test ram and did not elevate considerations of cost above risk.  Jackson Dep. 141-50.  Rather, the decision to convert the lower VBR into a test ram was based on "whether it [could] be done safely" and the "priority would have been ensuring safety."  Jackson Dep. 145-46, 149-50.

1887.   While assessing the prospective conversion to a test ram, BP contacted Chevron to discuss Chevron's conversion of the BOP stack on the *Pathfinder*, which had the same five-ram stack configuration as that of the *Deepwater Horizon*, to include a test ram.   Chevron represented that "in their opinion the conversion in no way compromised safety."   TREX 006094.

1888.   Neither Cameron nor Transocean, both of which were involved in converting the lower VBR to a test ram, had any safety concerns associated with the conversion.  D. McWhorter Dep. 537-38; Hay 1 Dep. 406-07; Erwin Dep. 305; J. McWhorter Dep. 69; Keeton Dep. 301.

1889.   Transocean was actively involved in evaluating, approving, and implementing the conversion from a VBR to a test ram, including drafting a management of change for the conversion.  Tr. 5292 (Childs); TREX 001870 (Transocean's Change Proposal).

1890.   The test ram conversion was characterized by Transocean as an "enhancement" to the BOP, and the same conversion had been performed on other drilling rigs.  Keeton Dep. 292, 98, 309-10; TREX 004625; Moore Dep. 169-71 (Transocean's Performance Engineer described the "advantage of having test rams" on the BOP stack).

1891.   The *Deepwater Horizon* BOP remained in compliance with federal regulations following the conversion of the lower VBR to a test ram.  Stringfellow Dep. 459-61; Tr. 6122-23 (Ambrose); Keeton Dep. 234-35, 300 (testifying that the BOP only lost "extra" redundancy in the pipe rams, above and beyond what MMS required).

1892.   The MMS was aware that the *Deepwater Horizon* BOP had a test ram and, after reviewing the BOP configuration with the test ram, concluded that it was suitable for use on the Macondo well.  Tr. 9018 (Shanks); Tr. 2856-57 (Davis); Tr. 5381-82 (Childs); TREX 004003 at

14; Tr. 6122-23 (Ambrose) (the conversion to a test ram did not increase risk, and the BOP configuration still complied with regulatory requirements).

1893.   During the Incident, both the middle and upper variable bore rams closed, stopped the flow, and sealed the well, at least temporarily, and the redundancy that could have been provided by a lower variable bore ram was not needed and would not have influenced the outcome during the Incident.  Tr. 5514, 5372 (Childs); *see also* Tr. 2868-69 (Davis).

> **b.**    **The conversion of the lower annular to include a stripping element improved the BOP's functionality and was MMS approved.**

1894.   In 2006, the lower annular in the BOP was equipped with a stripping annular (an annular with a stripping element).  Stripping annulars are a very common component of BOPs. Tr. 9016 (Shanks); Tr. 5295 (Childs).

1895.   The lower annular's conversion to a stripping annular was initiated after the drill string was severed by an annular during stripping operations in June 2004.  Keeton Dep. 347-48. "Stripping" means to move drill pipe through a BOP component, such as an annular, applying just enough closing pressure that the pipe can move through with the aid of the lubricating effect of mud.  Tr. 4298-99 (Barnhill).

1896.   Although the lower annular's pressure rating went from 10,000 psi to 5,000 psi, the addition of a stripping element provided additional operational capabilities by allowing for stripping capability that the BOP did not have previously and provided a function that was needed and beneficial for well control operations.  Tr. 5295-96 (Childs); Tr. 1846 (Ezell); Tr. 9014-15 (Shanks); Stringfellow Dep. 463.

1897.   The stripping annular enhanced the BOP's functionality during a well-control event by allowing the drill crew to strip drill pipe (*i.e.*, move the pipe up and down while the annular remains sealed against the drill pipe) in a well-control situation.  The improved ability to

strip drill pipe provided the drill crew greater flexibility in the manner that it could kill a well during a well-control event.   Tr. 5295-96 (Childs); Tr. 1846 (Ezell); Tr. 9014-15 (Shanks); Stringfellow Dep. 463.

1898.   The conversion of the lower annular to a stripping element did not reduce the safety of the BOP, but represented a "balance of different operational requirements for safe operations."   Emmerson Dep. 89-90; Domangue Dep. 233-35 (MMS District Manager confirming that changing the lower annular to a stripping element did not decrease the safety profile of the *Deepwater Horizon* BOP).

1899.   Transocean supported the modification, and drafted and approved an engineering change proposal.  TREX 003335; Keeton Dep. 349-50; Stringfellow Dep. 464.

1900.   The MMS was notified about the modification of the lower annular to a stripping annular and approved it.  TREX 043081; Tr. 9016 (Shanks) (explaining that BP disclosed in its APDs that the *Deepwater Horizon* BOP had a stripping element in the lower annular).

1901.  Frank Patton, the Drilling Engineer for the New Orleans District of the Department of the Interior, Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE" formerly "MMS"), knew that the lower annular had a stripping element and was rated to 5,000 psi when he approved BP's Application for Permit to Drill.  Patton Dep. 235-36; Tr. 5381-82 (Childs) (explaining that MMS reviewed the BOP configuration with the stripping annular and concluded that it was suitable for use in the Gulf of Mexico on the Macondo well).

1902.   The BOP continued to comply with MMS requirements after the lower annular was converted to a stripping annular.  Patton Dep. 233 (testifying that if a BOP had two annulars and one of those annulars met the minimum pressure requirements, the MMS allowed the BOP to continue operations); Tr. 5296 (Childs); Stringfellow Dep. 465; Keeton Dep. 349.

9.   **Alternative BOP Features Were Unnecessary to Allow the *Deepwater Horizon* BOP to Perform Its Intended Function, to Comply with MMS Regulations, to Meet Industry Standards, and Could Have Presented Operational Disadvantages.**

1903.   The subsea industry recognized that adding additional features to an otherwise suitable blowout preventer can introduce additional risk and possibly compromise the BOP's functionality, such as creating additional leak paths or complicating maintenance.  For example, in 2007, Melvin Whitby, Cameron's Director of Engineering Technology, wrote an article titled "Design Evolution of a Subsea BOP," in which he wrote "[t]he increased design complexity of modern-day BOPs can come at a price.  While high-tech solutions may seem desirable, the intricate mechanical components that may result must be considered, along with other factors, such as possible leak paths and redundancy of critical seals."  Whitby had no reason to change this opinion in 2011.  Whitby Dep. 398, 402; TREX 003186.

1904.   Additionally, WEST Engineering performed a study in March 2003 for the MMS titled "Evaluation of Secondary Intervention Methods in Well Control" which stated that "[t]here are many systems available that will increase the security of a BOP system, similar to the way a belt adds security to suspenders.  This approach has the potential to create more problems that it solves if not thoroughly thought out in advance, and the added complexity has proven problematic in some cases . . . .  The problem with the 'belt and suspenders' method of safety is that it adds complexity to an already complicated system.  The more systems have to interact with each other, the higher the risk of unintentional operation or failure to operate when needed."  TREX 003298 at 76; Boughton Dep. 224-25 (agreeing that alternative features can add unnecessary complexity, reliability issues, and weight to the BOP).

1905.   Because the *Deepwater Horizon* BOP could perform its intended functions as configured, no alternative BOP features were necessary.  D4803.4; Tr. 9093-9106 (Shanks); Tr. 5220-30 (Childs).

1906.   David McWhorter, Cameron's Vice President for Engineering and Quality, testified that the *Deepwater Horizon's* BOP was designed and manufactured to API specifications, was a "fine product," met "Industry Standards," and neither Cameron nor Transocean suggested that any modifications were necessary to comply with BAST.  TREX 040020 at 13; D. McWhorter Dep. 191-92, 408, 443, 475.

1907.   Transocean had concluded that the BOP configuration used at Macondo was appropriate for the well, and no alternative features were necessary for the *Deepwater Horizon* BOP's safe operation.  Boughton Dep. 221-22; Sannan Dep. 221; Hay 1 Dep. 409 (Transocean's Senior Subsea Supervisor for the *Deepwater Horizon* did not believe that any upgrades were needed in order for the BOP to operate safely and effectively).

### a.      Two BSRs Were Unnecessary, Not Required By MMS Regulation and Not Industry Standard.

1908.   The *Deepwater Horizon* BOP shear ram configuration comprised one blind shear ram and one casing shear ram.  D4327B; Tr. 9013-17 (Shanks).

1909.   The *Deepwater Horizon* BOP did not need a second blind shear ram to have the best available and safest technology ("BAST").  Tr. 5221-22 (Childs); Sannan Dep. 108-109 (Transocean has not recommended that BOP stacks have two blind shear rams for redundancy).

1910.   At the time of the BOP's design and manufacture, at the time of the Incident, and at present, the *Deepwater Horizon* shear configuration complied with federal regulations, which required (and still require presently) that BOPs have one set of blind shear rams.  TREX 040020 at 13; Whitby Dep. 301; Tr. 7016-17 (Stevick) (the BOEMRE continues to approve applications

for permits to drill that use BOPs with the very same configuration and type of blind shear ram that was used on the *Deepwater Horizon* BOP).

1911.   The MMS approved numerous Applications for Permit to Drill in 2010 for various operators and drilling contractors that utilized a shear ram configuration of one blind shear ram, like the *Deepwater Horizon* BOP, for comparable well depth and MASP.  D4644.

1912.   A BOP configured with two blind shear rams − but no casing shear ram − is not a superior configuration to one with one blind shear ram and one casing shear ram.  The latter configuration increases the BOP's capability of shearing tubulars that are thicker and larger in diameter than what a blind shear ram alone is designed to shear.  Tr. 9108 (Shanks).

1913.   For this reason, the decision to utilize a casing shear ram instead of a second blind shear ram was technologically acceptable and reflected sound engineering judgment, given the greater shearing capabilities of the casing shear ram versus the blind shear ram.  TREX 040020 at 14; Tr. 5384 (Childs) (the selection of a casing shear ram and a blind shear ram, rather than two blind shear rams, was an appropriate and non-problematic design decision).

1914.   Cameron and Transocean witnesses have both identified that adding multiple blind shear rams on a BOP stack may have disadvantages that need to be assessed, such as weight concerns, rig superstructure issues, and issues with operating parameters.  The decision whether to implement one or two blind shear rams involves various considerations.  Whitby Dep. 248, 303-04; Sannan Dep. 108-109.

1915.   In any event, a second blind shear ram would not have changed the outcome of the Incident.  A second blind shear ram would have been unable to shear off-center pipe during the Incident, because the second blind shear ram would have been located above the existing blind shear ram and the pipe would have been even further buckled and held against the wellbore

at the location of the second blind shear ram.  TREX 040008 at 52; Tr. 9114 (Shanks); Tr. 5273 (Childs).

1916.  There are practical considerations in reconfiguring an originally five-cavity BOP to a six-cavity BOP.  The reconfiguration would have required additional space that rigs designed for a five-cavity stack may not have had, increasing the weight of the BOP; increasing the height of the BOP such that it may become too tall for the rig; requiring additional control system functions, and potentially adding hydraulic leak paths.  Whitby Dep. 303-04; Tr. 5223 (Childs) (testifying that a reconfigured BOP may not have fit on the rig); Campbell 2 Dep. 106; Keeton Dep. 597.

1917.  The addition of an extra cavity to the *Deepwater Horizon* BOP stack was not a simple matter, and certain ramifications, such as whether the height-increased stack could even fit on the rig, would have needed to be considered.  Tr. 5289-90 (Childs); Campbell 2 Dep. 106; Keeton Dep. 597.

1918.  None of the experts who assert that the *Deepwater Horizon*'s BOP should have been reconfigured or "upgraded" to include two blind shear rams provided any support or analysis demonstrating that this was technologically feasible for the *Deepwater Horizon* or that any other BOP had been "reconfigured" as they recommend.  TREX 007535 (Perkin asserts that BP could have "upgraded the BOP" by adding "another BSR," but offers no analysis to demonstrate that this was technologically feasible); TREX 061123 (Dr. Stevick asserts that BP and Transocean should have "upgrade[d]" the BOP to include a second BSR, but provides no analysis of whether this could be safely and effectively executed).

### b.     DVS Rams Were Unnecessary, Not Required by MMS Regulation and Were Not Industry Standard.

1919.  The *Deepwater Horizon* BOP utilized Cameron's SBR blind shear ram, which was Cameron's standard design at the time and is still in widespread use today by Cameron and its customers for deepwater drilling operations.   TREX 040008 at 6, 49; TREX 003183; Tr. 5224, 5265 (Childs); Tr. 2724, 2850-51 (Davis); Tr. 9017, 9202 (Shanks); Whitby Dep. 340-41 (Cameron has not made any changes to the SBR model design since the Incident).

1920.  The Cameron SBR design has been in operation for 30 years and has been used regularly in the Gulf of Mexico on deepwater drilling rigs.   Whitby Dep. 477; Tr. 2876-77 (Davis); Campbell 2 Dep. 113.

1921.  Thirty-six out of the thirty-eight subsea BOP stacks that Cameron sold between 2005 and 2010 were configured with one blind shear ram that was the "SBR" design as used on the *Deepwater Horizon*.  TREX 040008 at 49-50; Tr. 5222 (Childs); TREX 007542.3.2.BP.

1922.  The Cameron SBR blind shear ram was and remains a reliable design used in hundreds of rigs worldwide.  Tr. 5509 (Childs); Boughton Dep. 228; Turlak Dep. 385.

1923.  The SBR blind shear ram had a V-blade that is designed to center off-center pipe. Tr. 5261 (Childs).

1924.  The DVS was an alternative ram blade design offered by Cameron that uses two "V" shaped blades, whereas the SBR design uses one V-shaped blade and one straight blade. TREX 040008 at 49; Tr. 5223-24 (Childs).

1925.  The DVS blades did not cover the entire width of the wellbore and Cameron did not list the ability to center drill pipe as an advantage offered by its DVS rams.  Whitby Dep. 352, 356; TREX 003183; TREX 040008 at 49; Tr. 3457 (Perkin); Tr. 9121 (Shanks).

1926.  MMS regulations did not require (and do not require) that BOPs operating in North America have a specific blind shear ram design, such as a DVS or CDVS design.  TREX 040020 at 14.

1927.  Transocean did not evaluate whether, and Cameron did not recommend, that the DVS model ram be used on the *Deepwater Horizon* BOP.  Boughton Dep. 227-28.  To the contrary, in its quotation to Transocean to supply the *Deepwater Horizon* BOP, Cameron only quoted the SBR model design.  TREX 040008 at 15; TREX 004276 at TRN-HCEC-00077386.

1928.   DVS blades were under a technical alert in 1998 when the *Deepwater Horizon* BOP was being configured.  Tr. 9120 (Shanks).  A problem was discovered with the DVS rams that resulted in damage to the blades during shearing and required a redesign of the DVS blades. TREX 040008 at 50.

1929.  In 2001, a WEST Engineering Report noted that "[t]he Double V shear rams in an 18-3/4" 15K TL BOP stack failed several tests above 12,500 psi when held closed by only the ST Locks" and that "[o]n several occasions on two different rigs, the Double V shear rams could not be successfully wellbore tested."   Whitby Dep. 360-61; TREX 003956 at CAM_CIV_0381164-65.

1930.  Because there was slightly less sealing rubber in the DVS rams than the SBR rams, Cameron's DVS rams had a decreased sealing capacity compared to the SBR rams and have experienced issues sealing the wellbore at higher pressures.  Tr. 9122 (Shanks); Whitby Dep. 349-51; 362-63.

1931.  Cameron's engineering bulletin compared the SBR to the DVS design and did not recommend using the DVS over the SBR design.  TREX 040008 at 50; TREX 003183.

1932.   Cameron employee, Jack Carter Erwin, when asked about the prevalence of the DVS design, testified that he "didn't know the specifics" and had to make assumptions about which one was more prevalent in 2009-10.  Erwin Dep. 62.

1933.   Geoff Boughton, Transocean's Subject Matter Expert for Subsea Systems and Equipment, was not aware of any Transocean rig equipped with DVS rams.  Boughton Dep. 228-29.

1934.   While the DVS rams provide greater shearing efficiency than the SBR rams, this shearing efficiency was not needed to shear the 5-1/2" drill pipe on the Macondo well.  The SBR ram had sufficient shearing capacity to shear the 5-1/2" drill pipe for the Macondo well conditions.  TREX 040008 at 50; Tr. 5224 (Childs).

1935.   The SBR was unable to shear the pipe and seal the Macondo well because the pipe was forcibly held off-center, not because the SBR lacked adequate shearing capacity.  Therefore, any additional shearing capacity provided by the DVS design would not have made a difference during the Incident.  TREX 040020 at 15.

1936.   Because the DVS rams, like the SBR rams, had blades that did not cover the entire width of the wellbore, there is no credible evidence that the DVS model blind shear rams would have been able to shear the drill pipe in the unforeseen condition of the Incident where the drill pipe was forcibly held against the BOP bore, as it was when the blind shear ram was activated with Autoshear on the morning of April 22.  Tr. 9123-24 (Shanks); Whitby Dep. 345, 652.

1937.   With the magnitude of force on the pipe against the wall of the BOP, it was highly unlikely that a DVS ram would have been able to shear the pipe any better than the SBR.  Tr. 9203 (Shanks).

c. **CDVS Rams Were Unnecessary, Not Required by MMS Regulation and Not Industry Standard.**

1938. The CDVS was another model of shear rams that Cameron began to offer in 2004-2005, only after the *Deepwater Horizon* BOP was commissioned. TREX 040008 at 50; Tr. 9117 (Shanks); Whitby Dep. 354; D. McWhorter Dep. 148.

1939. Cameron CDVS rams were not available in 2001, nor for several years afterward. Tr. 2890-91 (Davis); Tr. 3457 (Perkin).

1940. Transocean did not evaluate whether, and Cameron did not recommend that, the CDVS model ram be used on the *Deepwater Horizon* BOP. Boughton Dep. 227-28.

1941. Unlike the SBR and DVS rams, CDVS rams cover the full width of the wellbore and were developed for wireline operations not drilling operations, and were configured and designed in order to be able to cut cable, not drill pipe. Tr. 9117 (Shanks); Whitby Dep. 353; 649-50.

1942. CDVS blades were made for completions use, not necessarily drilling use – they had the capacity to shear cable or wireline, made out of small strands of wire – their blades must be in very intimate contact so that they can cut even 30,000ths-diameter wire. Tr. 5224-25 (Childs).

1943. United States expert Rory Davis was not aware of anyone, anywhere in the world, actually using CDVS rams for drilling operations such as those that were taking place at Macondo. Tr. 2836, 2850-51 (Davis).

1944. On April 20, 2010, the CDVS design was under a safety alert from Cameron because of reports that it had problems performing as intended at higher pressures. TREX 040008 at 50; Tr. 9125-26 (Shanks); D. McWhorter Dep. 152-53; TREX 007766.

1945.   Because of this problem with CDVS rams, Cameron lowered the fatigue life and the working pressure of the CDVS rams to 10,000 psi, meaning that the CDVS rams would have reduced the operating pressure of the *Deepwater Horizon* BOP.   TREX 040008 at 51; TREX 040020 at 15; Tr. 9125 (Shanks).

1946.   When CDVS rams were first introduced into the market, they had a lower seal life.  Tr. 2891 (Davis).

1947.   Under certain conditions, the CDVS rams would still have a lower fatigue life than the SBR rams.  Whitby Dep. 353-54; TREX 003183.

1948.   Geoff Boughton, Transocean's Subject Matter Expert for Subsea Systems and Equipment, is not aware of any Transocean rig equipped with CDVS rams in their BOP. Boughton Dep. 228-29.

>    **d.    Inclusion of the CSR in the AMF/Deadman Sequence Was Unnecessary, Consistent with Industry Standards, And Not Required by MMS Regulation.**

1949.   Early in the design process, after an engineering evaluation involving multiple parties, an engineering decision was made that the AMF would only operate the blind shear ram rather than the casing shear followed by the blind shear.  Tr. 5278 (Childs).

1950.   The reason the AMF was programmed to operate only the BSR rather than the CSR followed by the BSR had nothing to do with cost; rather, it was an engineering decision informed by a risk assessment evaluated by several different entities and subsea specialists, including Transocean's Rig Manager for the *Deepwater Horizon*.   Ultimately, the aim was likely to ensure the most rapid functioning, which would be to activate the BSR alone.   It was a conscious choice to program the faster route for sealing in the well.   Tr. 5278-79 (Childs). Additionally, utilizing an AMF sequence that immediately activated the BSR was consistent with industry practice and used on the majority of rigs.  Tr. 5099 (Childs); TREX 004272.

1951. Having the AMF programmed to operate the casing shear rams first and then the blind shear rams would have increased the time required for the AMF sequence to execute (rather than just having it operate the blind shear rams). Tr. 5098-99 (Childs).

1952. WEST Engineering, on behalf of Transocean, performed an evaluation of the *Deepwater Horizon*'s well control equipment, including an evaluation of the BOP's AMF system, in 2001. TREX 007691 at 1.

1953. During its 2001 evaluation, WEST Engineering concluded that "The 'deadman' circuit should be modified only to close the shear rams and lock the ST locks. This will reduce clutter on the stack, eliminate many unnecessary valves making the circuit more reliable and reduce leak paths." Tr. 5356 (Childs); TREX 007691 at TRN-MDL-02789713. WEST, therefore, not only knew the AMF/Deadman system would close only the blind shear rams, but recommended that it do so.

1954. WEST Engineering performed another study in March 2003 for the MMS titled "Evaluation of Secondary Intervention Methods in Well Control" where it concluded, with regards to the AMF system, that many secondary intervention systems were not configured with the ability to close the casing shear rams because, in part, it would add more complexity to this automated function: "Casing shear rams could be required if the rig is running casing and experienced a well control event requiring secondary intervention. However, there comes a point of diminishing returns. A system utilizing casing shear rams would be complicated by the need to add sequences to ensure the casing shear rams closed before the blind shear rams … In addition, many drilling contractors at this time place the casing shear rams below the blind shear rams; their plan is to lift the casing up and then secure the well with the blind shear rams. Assuming the riser has parted a deadman sequence could result in casing shear ram closure with

an inability to close the blind shear rams due to interference with the cut section of the pipe.  ***For these reasons, most systems accept the risk associated with excluding secondary intervention from addressing casing shear.***"  TREX 003298 at 78 (emphasis added).

1955.   Having the AMF programmed to just operate the blind shear rams (rather than the casing shear rams first and then the blind shear rams) reflected the practice on the majority of rigs in the industry at the time of the Incident.  Tr. 5099 (Childs).

> **e.     Using EDS-2 Instead of EDS-1 as a Default Sequence Was Unnecessary, Not Required by MMS Regulation and Not Industry Standard.**

1956.   Certain experts have contended that the BOP should have been designed such that it only operated the EDS-2 sequence, which closed the CSRs and the BSRs instead of the BSRs only, instead of providing a choice to operate either EDS-1 or EDS-2 in an emergency.  Tr. 6892, 6991 (Stevick).

1957.   The *Deepwater Horizon* had two pre-programmed EDS sequences, the EDS-1 and the EDS-2, both of which were available to the Transocean crew on the day of the Incident.  TREX 040020 at 19.

1958.   The decision whether to activate EDS-1 or EDS-2 was just a matter of selecting one of two options on the control panel on the rig.  (EDS-1 = "normal" button; EDS-2 = "casing" button).  Tr. 3337-38 (Perkin); Tr. 5096-97, 5274-75 (Childs); Ambrose Dep. 156-57; *see also* Tr. 3450 (Perkin); TREX 048102.

1959.   Transocean could have chosen to utilize EDS-1 or EDS-2 on the day of the Incident simply by selecting the appropriate sequence from the control panel.  TREX 040020 at 19; LeNormand 1 Dep. 73-76, 254; LeNormand 2 Dep. 13, 197.

1960.   The decision of which EDS sequence to use at a given time was Transocean's and the Senior Subsea Supervisor and OIM would make that decision.  Hay 1 Dep. 48.

1961. EDS-1 activated the BSRs before disconnecting the LMRP, while the EDS-2 activated the CSRs then the BSRs before disconnecting the LMRP. TREX 040020 at 19; Tr. 9134-35 (Shanks).

1962. No regulations existed before the Incident, and none exist today, that require the closing of the CSRs as part of the EDS sequence. TREX 004002 at 19.

1963. Domangue, the MMS District Manager for the Houma District on April 20, 2010, has "no opinion" on whether EDS-2 should have been the only option. Domangue Dep. 11-12, 44.

1964. Because it adds the additional function of closing the CSRs before closing the BSRs that can seal the well, EDS-2 takes longer to seal the well than EDS-1. TREX 040020 at 19.

1965. One tradeoff between using EDS-1 versus EDS-2 is time to seal the well: the EDS-1 is faster at sealing the well than EDS-2. In EDS-1, just closing blind shear rams can occur in as fast as 16 seconds, and takes approximately 30 seconds in an emergency application; in EDS-2, the "super shear rams" (*i.e.*, casing shear rams) require roughly double that time to close (plus the additional 16-30 seconds to then close the blind shears). Tr. 5097 (Childs).

1966. In emergency situations, when time is critical and the BSR has sufficient shearing capacity for the drilling operation, the EDS-1 may be preferable for the drill crew to select. TREX 040020 at 19. Either way, the drill crew had the choice of selecting either EDS-1 or EDS-2. Tr. 5274-5275 (Childs).

1967. In any event, because the EDS was not activated until after the explosions on the rig severed the MUX cables that were necessary to communicate with the BOP, the choice of

EDS sequence had no effect on the BOP's ability to seal the well at Macondo.  TREX 040020 at 20.

f.     **Tandem Boosters Were Unnecessary, Not Required by MMS Regulation, Not Industry Standard and Were Not Practical to Implement.**

1968.   The *Deepwater Horizon* BOP did not need tandem boosters to have the best available and safest technology ("BAST").  Tr. 5225-26 (Childs).

1969.   Tandem boosters can be included in a BOP stack to increase the shearing capacity of the blind shear rams.  TREX 040008 at 53.

1970.   As discussed below, the *Deepwater Horizon* BOP had sufficient shearing capacity to shear the 5-1/2" drill pipe across the BOP at the time of the Incident, making tandem boosters unnecessary.  TREX 040008 (See § VII.E.6 "The BOP had sufficient shearing capacity.").

1971.   Tandem boosters were not needed with respect to the 5 1/2" drill pipe at Macondo and would have made no difference, as there still would have been a solid piece of pipe between the two ram blocks keeping them from being able to come together and form a seal.  Tr. 5226-27 (Childs).

1972.   Federal regulations did not, and still do not, require the use of tandem boosters. TREX 40020 at 16.

1973.   Transocean's Subject Matter Expert for Subsea Systems and Equipment was not aware of any Transocean rigs in the Gulf of Mexico that used tandem boosters.  Boughton Dep. 122.

1974.   The *Deepwater Horizon* BOP was designed without tandem boosters, and tandem boosters were not a standard feature on most BOP stacks when the *Deepwater Horizon* BOP was being designed and manufactured.  TREX 040008 at 54; TREX 003183.

1975.  The addition of tandem boosters on the *Deepwater Horizon* BOP after it was manufactured was not practical.  TREX 040008 at 53.

1976.  In order to add tandem boosters to the *Deepwater Horizon* BOP, substantial structural modifications to the rig, such as steel modifications to open BOP bonnets, would have been required that were not practical.  TREX 040008 at 54; Boughton Dep. 225.

1977.  When asked about tandem boosters, Geoff Boughton, Transocean's Subject Matter Expert for Subsea Systems and Equipment, testified that "by physical design of the rig, the tandem boosters were not practical for that rig or there would have to be extensive steel modifications to the body of the rig to be able to open the bonnets on the BOP," and also that tandem boosters would have added to the complexity of the BOP stack and "made maintenance harder."  Boughton Dep. 225.

1978.  Geoff Boughton testified that the sister rig to the *Deepwater Horizon* looked at adding tandem boosters and could not do it: "[t]he sister rig to the *Deepwater Horizon* is the *Deepwater Nautilus*.  They're configured very much alike.  The BOPs are very similar and the operator of the *Deepwater Nautilus* asked about putting tandem boosters on, and we, in our study, realized that you could not operate – the BOP would not fit in the moon pool with tandem boosters on it because the – they were – you would not be able to open the bonnets and do any maintenance to the BOP if you had tandem boosters on without doing significant steel modification changes or moving the BOP out into the moon pool every time that they needed to do that operation, which added a whole level of complexity and danger."  Boughton Dep. 121.

1979.  Geoff Boughton further testified that adding tandem boosters would have substantially complicated maintenance of the BOP: "[t]here's not room to open – tandem boosters hang out beyond the bonnet.  And when you go to open the bonnet, it would have run

into the well inside the moon pool, so they would not have been able to open the bonnets to work on them in the moon pool without making a structural modification to the rig.  So that would have created another issue."  Boughton Dep. 345.

1980.  If tandem boosters had been installed, every time maintenance needed to be performed on the BOP, the BOP would have been required to be moved into a hanging position in the moon pool, rather than being able to perform maintenance in a storage position.  This would have been dangerous, requiring all critical work to be stopped.  Tr. 5226 (Childs).

1981.  Furthermore, tandem boosters would have added around 10,000 pounds to the weight of the BOP and would have roughly doubled the required amount of hydraulic fluid for the subsea accumulators to supply in an emergency.  Whitby Dep. 130, 132-33.

1982.  The additional accumulator volume and the associated piping, among other potential issues, would have created additional leak paths in the BOP.  TREX 040008; Boughton Dep. 225-26.

### g. An Acoustic Backup System Was Unnecessary, Not Required by MMS Regulations, and Not Industry Standard.

1983.  An acoustic backup system is a feature that can be included in a BOP that allows communication with the BOP through acoustic signals when other means of communication with the BOP are lost.  TREX 040008 at 54; Tr. 5229 (Childs).

1984.  The *Deepwater Horizon* BOP did not have an acoustic backup system.  Tr. 9138 (Shanks).  An acoustic backup system was an optional piece of equipment that the purchaser of the rig, RB Falcon, with knowledge of Cameron, elected not to put on the BOP.  Gaude Dep. 337-38.

1985.  An acoustic backup system was not typically included in the BOPs that Cameron sold.  D. McWhorter Dep. 125.

400

1986.   Acoustic backup systems were not frequently used in the Gulf of Mexico, and the industry relied instead on AMF systems as backup.  Tr. 5229, 5387 (Childs).

1987.   Acoustic backup systems serve the same function as the AMF/Deadman system, so an acoustic system is not necessary if the AMF/Deadman system is functional and properly maintained.  TREX 040008 at 54; Tr. 5386-87 (Childs).

1988.   On April 20, 2010, no Transocean rigs in the Gulf of Mexico had acoustic backup systems (Boughton Dep. 230-31; Stringfellow Dep. 58, 469) and Transocean never considered adding an acoustic backup system to the *Deepwater Horizon* BOP.  Boughton Dep. 230.

1989.   Bryan Domangue, the MMS District Manager for the Houma District, was not aware of any Gulf of Mexico operators that had acoustic backup systems for their BOPs as of April 2010.  Domangue Dep. 147.

1990.   There were no regulatory requirement to have acoustic systems in U.S. waters at the time of the Incident – nor is there such a regulatory requirement at the present time.  Tr. 5384, 5387 (Childs); Tr. 3437 (Perkin); Domangue Dep. 146-51.  An acoustic backup system was an optional system according to API 16D.  Coronado Dep. 462.

1991.   Domangue, the MMS District Manager for the Houma District on April 20, 2010, was "not confident" that an acoustic trigger could provide a means of redundancy as a backup system that could communicate with the BOP.  Domangue Dep. 11-12; 57-58.

1992.   Had an acoustic backup system been used on the *Deepwater Horizon* BOP, it would not have been able to close the CSR (or a second BSR) because of accumulator volume limitations.  TREX 040020 at 18.

1993.   Adding additional secondary systems, such as an acoustic system, would have added to the complexity of the BOP.  LeNormand 1 Dep. 393.

1994.   There are reliability problems with acoustic backup systems, including receiving inappropriate or false signals.  Boughton Dep. 230; LeNormand 1 Dep. 92, 94; Stringfellow Dep. 469.

1995.   A March 2003 WEST Engineering Study "Evaluation of Secondary Intervention Methods in Well Control" performed for the MMS found several problems with acoustic control systems.  TREX 003298; Tr. 3438, 3440 (Perkin).

1996.   The WEST study noted that possible shortcomings of an acoustic backup system included:  (1) some systems may not have hydrophones strong enough to penetrate a mud plume that would be present in a disconnect situation; (2) the correct hydrophone must be specified for deepwater; (3) acoustic interference caused by the noise of a flowing well may make operation unreliable; (4) depending on the system, control valves may be too small to operate the ram BOP in the API recommended time; (5) hydrophones must be in the water in order to operate. There has been at least one failure attributed to the hydrophone not being deployed when needed; (6) acoustic communication can be unreliable if operated in water depth that differs significantly from the design criteria (*e.g.* in water that is either much shallower or much deeper than the design range.).   Signal intensity varies significantly with water depth.   An acoustic system optimized for 4,000 feet may be too loud at 1,000 feet and have insufficient amplitude at 7,000 feet.  Acoustic systems can be adjusted for water depth.  However, many rigs do not have the tools or technical training to do so; and (7) many drilling companies do not use acoustic systems unless mandated by regulation because of high cost and perceived high failure rates.   TREX 003298.82.BP; TREX 003298.83.BP.

1997.   The WEST study stated that "[s]ignificant doubts remain in regard to the ability of an acoustic control system to provide a reliable emergency backup to the primary control

system during an actual well flowing incident.  Environmental factors that would be expected to exit during an emergency, such as high noise and/or a mud cloud, may prevent reliable actuation of a stack function with acoustics."  TREX 003298.61.2.TO; Tr. 5229-30 (Childs).

1998.  The WEST study expressed further doubts about the reliability, performance, and operability of acoustic systems:  "WEST does not know of an incident where an acoustic system has been used to operate the BOP during a blowout, either successfully or unsuccessfully;" "[e]ven with widely spaced dual stack mounted transceivers, communication cannot be relied upon in the presence of mud clouds or gas plumes;" and "[a]coustic systems are not recommended because they tend to be very costly, and there is insufficient data available on system reliability in the presence of a mud or gas plume."  TREX 003298.61.2.TO; TREX 003298.60.1.TO; TREX 003298 at 85.

1999.  An ExpoSoft Memorandum published in 2002 on acoustic system reliability similarly noted that "[r]elying on acoustic system with ROV back-up seems questionable … [F]or transmitting an emergency signal that starts a shear and disconnect sequence it seems dubious … The probability of an acoustic system failure seems fairly high and a back-up emergency system that can be activated fast enough should be evaluated."  TREX 040008 at 55; TREX 005166.

2000.  Cameron's "Emergency, Back-Up and Deepwater Safety Systems" document listed several limitations of acoustic systems, including that they were:  "[l]imited to functions hard plumbed from subsea valve" and that they had "[p]erceptions of unreliability in turbulent waters."  TREX 003603; LeNormand 1 Dep. 191-92.

2001.  Neither the IADC nor the API recommended the use of acoustic triggers.  Tr. 3437-38 (Perkin).

2002.   Even after the Incident, a Joint Industry Task Force organized by the IADC and API recommended that the reliability of acoustic systems be further studied before it would recommend their use.  TREX 040008 at 55; TREX 003958; Whitby Dep. 367-72.

2003.   Transocean expert Greg Childs did not trust acoustic backup systems because, in his experience, he repeatedly encountered reports of reliability issues with acoustic systems – *e.g.*, they are non-functional, they have to be repaired, they have difficulties with getting signals to the transponder.  Tr. 5280-81, 5385-86 (Childs).

2004.   PSC expert Gregg Perkin could not identify anyone in the world other than himself who recommended the use of acoustic triggers.  Tr. 3440 (Perkin).

2005.   PSC expert Gregg Perkin did not do a risk assessment to evaluate the potential use of an acoustic trigger on the *Deepwater Horizon*.  Tr. 3438 (Perkin).

### h.   Rechargeable Control Pod Batteries, Battery Monitoring, and a Single Coil Solenoid Were Unnecessary.

2006.   The BOP control system on the *Deepwater Horizon* was a Mark II control system. Tr. 8405 (Zatarain); Tr. 2836 (Davis); Tr. 5227 (Childs).  Cameron's Mark II system was an appropriate control system for the *Deepwater Horizon* and was not inferior to Cameron's next generation Mark III system.  Coronado Dep. 563.

2007.   Approximately 30 rigs were still using Cameron's Mark II control system as of September 2011.  Gaude Dep. 290-91.

2008.   Cameron started selling the next generation Mark III control system around 2007-2008.  LeNormand 1 Dep. 199.

2009.   The Mark III system was available to Transocean as the next generation system for the BOP which would have included rechargeable batteries, battery voltage monitoring

capabilities, and single coil solenoids.   Tr. 2695-96 (Davis); Tr. 5285-86 (Childs); TREX 004277; TREX 040020 at 16.

2010.   The rechargeable batteries of the Mark III system have a finite life and also must be maintained according to Cameron's recommendations.  Coronado Dep. 516-17.

2011.   Transocean decided not to use the Mark III system when it was offered.  Tr. 5287 (Childs).

2012.   There is no MMS regulation today, and none existed prior to April 20, 2010, that required the use of rechargeable batteries, the ability to monitor batteries subsea, or a single coil solenoid, all of which are features of the Mark III system.  TREX 040020 at 16-17; Tr. 5227 (Childs).

2013.   Cameron does not take a position on whether single coil solenoids (Mark III) are better than the dual coil solenoids (Mark II).  As Cameron's corporate representative, David McWhorter stated, "[w]e – we don't have an official position on – on solenoids from our – our Mark II versus our Mark III."  D. McWhorter Dep. 96.

2014.   The dual coil solenoids in a Mark II system provide redundancy, and Cameron presently does not make a Mark III system with dual coil solenoids.  Coronado Dep. 531; Tr. 2845-46 (Davis).

2015.   Richard Coronado, Cameron's Engineering Manager for Drilling Control Systems, testified that Cameron's dual-coil solenoids of the Mark II system had an advantage of redundancy over the single-coil solenoid valves of the Mark III system.  Coronado Dep. 530, 532, 533, 566.

2016.   Transocean's Subject Matter Expert for Subsea Equipment, Geoff Boughton, when asked about an upgrade to the Mark III, testified that the Mark III system is not a

significant upgrade in quality over the Mark II and that the Mark III actually gives up some things such as solenoid redundancy from the Mark II system.  Boughton Dep. 234.

2017.  Transocean expert Greg Childs, in his capacity as a WEST consultant, would not have recommended moving to a Mark III system at the time of the Incident because of loss of solenoid redundancy.  Tr. 5227-28 (Childs).

2018.  Any supposed benefit of the Mark III over the Mark II system relating to the solenoids was more a concern over improper maintenance than of the design of the solenoid itself.  Tr. 2846-47 (Davis).

2019.  With regards to the batteries of the Mark II system, Cameron did not consider non rechargeable batteries to be problematic.  When Cameron's corporate representative, David McWhorter, was asked: "Did people at Cameron say, 'We have a control system where the batteries are not rechargeable, and that's a problem,' did that discussion ever take place at Cameron?" he answered:  "No.  Not – in – in general, that – that system is highly redundant, and at the time it was developed was state-of-the-art, is still a – a fantastic system.  And has – has recommendations for battery change out and replacement that are, by any measure, extremely conservative.  So it – it was not our feeling that that was a problem."  D. McWhorter Dep. 99.

2020.  Cameron's corporate representative, David McWhorter testified that if maintained properly, the Mark II system without rechargeable batteries or battery monitoring "is not a problem at all" because the Mark II system had a "tremendous amount of redundancy built into it."  D. McWhorter Dep. 103-04.

2021.  Cameron would have no reason to believe that Transocean would not follow Cameron's recommended battery guidelines when maintaining the Mark II system.  Coronado Dep. 526.

2022.  Both the Mark II system and the Mark III system will perform their intended function if properly operated and maintained.  Coronado Dep. 509-10.

2023.  Cameron did not offer rechargeable batteries for its Mark II control systems.  Tr. 2842 (Davis); Gaude Dep. 198-99.

2024.  Cameron does not recall any other customers, other than Transocean, inquiring about rechargeable batteries for the Mark II system.  Coronado Dep. 483-84.

2025.  Cameron did not have kits available to add monitoring capabilities to the Mark II system.  Coronado Dep. 578.  Installing rechargeable batteries on a Mark II system "is not a trivial thing" and would require a significant amount of work on both the hardware and software components.  Coronado Dep. 330, 526-27.

2026.  There may have been an issue with the physical dimensions of the control pods such that adding recharging capability would have required a more significant change than simply fitting the feature into the pre-existing system.  Tr. 5291 (Childs).

2027.  Rechargeable batteries are not necessarily better than non-rechargeable ones based on the customer's needs, and both will function as intended if properly operated and maintained.  Coronado Dep. 341-42, 480-82, 484, 502.

2028.  Testing of rechargeable batteries will reduce their capacity over a period of time, and they also might pose problems for inattentive operators.  Coronado Dep. 518-19, 521, 525, 569-70.

2029.  Rechargeable batteries that are able to be monitored provide a tradeoff, whereby other features in the control system would be lost.  Florence Dep. 85-86.

2030.  William LeNormand, Cameron's Senior Field Service Technician, believed that an AMF system without rechargeable batteries would function properly if Cameron's

engineering bulletins were followed, and Cameron never suggested that he tell customers that they needed an upgrade to rechargeable batteries.  LeNormand 1 Dep. 160.

2031.  United States expert Dr. Davis is not aware of anyone, anywhere in the world, that has actually modified a Mark II system so as to use the type of batteries setup he claims should have been used.  Tr. 2836, 2843 (Davis).

2032.  Dr. Davis admitted that at the time of the Incident, there were numerous other rigs in the Gulf that used the very same Mark II control system that he criticized.  Tr. 2838-39 (Davis).

2033.  Dr. Davis admitted that he did not consider the practical aspects of the Mark III system in forming his opinions in this case.  Tr. 2717 (Davis).

2034.  Cameron considers the Mark II system very safe if properly maintained, and the switch to the Mark III system came about only because some components of the Mark II system were difficult to obtain from suppliers.  D. McWhorter Dep. 104, 408-09, 575-76; Coronado Dep. 486.

2035.  In addition to Cameron, Transocean also believed that the *Deepwater Horizon*'s Mark II control system was a quality system.  Coronado Dep. 562-63; Boughton Dep. 234, 492.

2036.  Transocean still has many BOPs around the world operating with the Mark II control system (Boughton Dep. 492) and the Mark II control system is still in use today.  Tr. 5388 (Childs).

2037.  No Transocean rigs utilized the Mark III system as of 2011.  Boughton Dep. 233; Erwin Dep. 368-69; TREX 007029.

2038.  The Mark III system was known to have reliability issues.  TREX 040020 at 17.

2039.   In February of 2009, Cameron issued a safety alert (Safety Alert #4058: Mark III Modular Drilling Control Pod SEM (Subsea Electronics Module) Indication Faults) which indicated that the Mark III system had experienced two types of indication faults.  These faults could result in failure of the BOP to perform its intended function.  Tr. 2720 (Davis); Tr. 5287 (Childs); TREX 003626; TREX 003626.1.2.BP; TREX 003626.3A.TO; Tr. 2840 (Davis).

2040.   As of 2009, at least a dozen Transocean rigs that used a Cameron control system utilized either the Mark I or the Mark II system.  TREX 040020 at 18; TREX 003344.

2041.   In early 2009, there were at least 36 rigs using a Cameron control system that had not switched to a Mark III.  TREX 040020 at 18.

2042.   Richard Coronado, Cameron's Engineering Manager for the software group of Drilling Control Systems, knew of only one rig in the Gulf of Mexico that switched from a Mark II to a Mark III system, and this was after the Incident.  Coronado Dep. 567-68.

2043.   Transocean expert Greg Childs knew of no rig in the world that had upgraded to a Mark III control system when a Mark II control system was already in use.  Tr. 5389 (Childs).

### i.      An Alternate Way to Route MUX Cables Was Unnecessary, Not Industry Standard, and Was Not Practical.

2044.   MUX cables on the *Deepwater Horizon* ran down to the BOP along the side of the riser, with the top of the riser located in the moon pool.  LeNormand 1 Dep. 57.

2045.   Industry practice at the time of the Incident was to route MUX cables through the moon pool, as was done on the *Deepwater Horizon*.  Tr. 5228 (Childs); Tiano Dep. 49-50, 51-52.

2046.   Transocean expert Greg Childs testified that in his 38 years of dealing with BOPs, he has never seen MUX cables located anywhere else but routed through the moon pool of a rig.  A suggestion that MUX cables should be otherwise placed would entail a complete departure from practice and require new design risk assessments and evaluations.  Tr. 5228, 5388 (Childs).

2047. While he criticized routing MUX cables through the moon pool as creating a single point of failure, PSC expert Gregg Perkin was not aware of a rig anywhere in the world that ran its MUX cables differently from the way they were run on the *Deepwater Horizon*. Tr. 3412 (Perkin).

2048. Additionally, PSC maritime expert Geoff Webster testified that in the 40-50 DP MODUs that he has surveyed in his career, not one of them had a setup different than "run MUX cables through moon pool" – and he had not found any of those rigs to be unseaworthy because of such a setup. Tr. 4180-81 (Webster).

2049. William LeNormand, Cameron's Senior Field Service Technician, testified that most of the rigs he had been on had the MUX reel sitting in the moon pool. LeNormand 1 Dep. 55.

2050. Cameron has never taught William LeNormand, its Senior Field Service Technician, that the MUX cables should not be located in the moon pool. LeNormand 1 Dep. 58, 66.

2051. Anthony Emmerson, BP's Wells Operations Manager in the Gulf of Mexico, was not aware of any other rig where the MUX cables are routed anywhere other than through the moon pool. Emmerson Dep. 280.

2052. The MUX cables were always located in the moon pool area because if they were placed anywhere else it would create a much bigger risk that they would incur damage. Stringfellow Dep. 102-03.

2053. Cameron's Richard Coronado was not aware of anywhere else to run the MUX cables other than through the moon pool, and he did not consider them a single point of failure because they are redundant cables. Coronado Dep. 401-02.

2054.   Jack Carter Erwin, Cameron's Manager of After-Market Operations, was not aware of any rigs that have any kind of blast-proof protection for the MUX cables and has never been asked by a customer for any such type of protection.  Erwin Dep. 288-89.

2055.   While a sufficiently large explosion at the moon pool could take out both cables simultaneously, causing loss of communication with the stack, MUX cables were not a single point of failure per se because there were two of them.   Tr. 5276 (Childs); Emmerson Dep. 56-62.

## VIII.   BP REASONABLY BELIEVED THAT TRANSOCEAN HAD MAINTAINED THE *DEEPWATER HORIZON* IN A MANNER SUITABLE TO DRILL THE MACONDO WELL.

### A.   The *Deepwater Horizon* Underwent Several BP Audits Prior to the Incident.

#### 1.   BP Conducted Audits of the *Deepwater Horizon* from 2001-2009.

2056.   During the operational life of the *Deepwater Horizon*, BP had a Rig Audit Group, headed by Norman Wong, which performed audits of third-party drilling rigs that BP contracted with to perform operations.  BP performed these audits to gain assurance that such rigs were being maintained and operated by the drilling contractor in a safe and seaworthy condition. TREX 044046; Wong Dep. 28-30, 41-42, 509, Tr. 8857-58, 8862 (Guide); TREX 001721 at 7 (Drilling Rig Audits and Rig Acceptance); TREX 044046 at 3 (CMID Annex).

2057.   BP's Rig Audit Group operated worldwide and was not affiliated with any of BP's Strategic Performance Units, including the GoM SPU.  Wong Dep. 15.  The Rig Audit Group operated independently from the BP Wells Teams.  Tr. 8857-58 (Guide).

2058.   BP's Rig Audit Group conducted audits of the *Deepwater Horizon* in 2001, 2005, 2007, 2008, and 2009.  Wong Dep. 467-68; TREX 006164.1.TO; TREX 006165; TREX 003404; TREX 003403; TREX 006166; TREX 004362; TREX 001839; TREX 044046.

2059.  PSC expert Dr. Bea admits that BP's audits, which evaluated equipment important to process safety issues, are important for a company like BP.  Tr. 473 (Bea).

2060.  Webster testified that the audits BP conducted of the *Deepwater Horizon* were "above and beyond" the ISM Code and were not required by it.  Tr. 4192 (Webster).

2061.  BP performed technical and marine assurance audits to gain assurances that Transocean was meeting its obligation to maintain and operate the *Deepwater Horizon* in a safe and seaworthy condition.  Further, BP's auditors sought to determine whether operations were being conducted in accordance with certain national and international regulations, established industry guidelines, Transocean's standards, and BP's practices.  TREX 044046; Wong Dep. 28-30, 41-42, 53, 60, 509; Tr. 8857-58, 8862 (Guide); TREX 001721 at 7; TREX 044046 at 3.

2062.  The Drilling Contract provided that BP's general right of inspection did not diminish Transocean's responsibility for safe operations.   TREX 001356A at BP-HZN-MBI00021482.

2063.  The scope of a BP audit may include people, processes, and plant, *i.e.*, equipment.  TREX 001721 at 7.  The scope of a BP audit does not include well design, drilling, or an evaluation of the entire safety management system.  Wong Dep. 435-36, 443.

2064.  During audits, BP auditors employed the following methods:  (1) speaking with individuals on the rig; (2) visually inspecting equipment; (3) reviewing historical service and maintenance reports; and (4) reviewing training matrices to evaluate the competency of the rig personnel.  Tr. 8857-58 (Guide).  Auditors did not "take covers off" equipment or perform equipment testing.  Wong Dep. 510.

2065.  The BP auditors employed a sampling technique to assess whether Transocean was fulfilling its obligation to properly maintain the rig equipment.  For example, the auditors

reviewed a "sampling of various records" in the electronic maintenance system. The auditors did not intend to look at every maintenance record. Tr. 8981-82 (Guide).

2066. By conducting a rig audit, BP was not verifying that Transocean was properly handling all maintenance items in Transocean's maintenance database. Tr. 8982 (Guide).

2067. The auditors looked to see that Transocean, the owner of the BOP, was maintaining the BOP according to its maintenance schedule. To this end, the auditors reviewed maintenance, testing, and inspection records, and spoke with the Chief Engineer, Maintenance Supervisor, and Subsea Engineer to understand the condition and performance of the BOP. Wong Dep. 60, 107, 494, 539-40. The auditors do not physically touch, open, or climb on the BOP if it is on the deck. Wong Dep. 61-62.

2068. Transocean's rig crew would receive immediate notice of the auditors' findings. Each day the audit team communicated the day's findings to rig personnel, and at the end of the audit, the audit team generally met with Transocean's rig supervisors to discuss the main findings. Tr. 8775 (Guide); Wong Dep. 500-02.

2069. The BP auditors notified Transocean about deficiencies because it is the drilling contractor's responsibility to rectify the deficiencies. Little 1 Dep. 74; Cramond Dep. 37, 208-10. After the audit, the drilling contractor is accountable for closing out the audit findings. Little 1 Dep. 77, 23.

2070. The drilling contractor can accept or challenge audit recommendations. Tr. 6019-20 (Ambrose); Wong Dep. 513. When a drilling contractor rejects a recommendation, BP prefers to see a justification for the rejection. Wong Dep. 513.

2071. After an audit, the BP Wells Team Leader is responsible for coordinating with the drilling contractor and developing a final, formal closeout program with actions and deadlines.

TREX 001721.8.1.TO; Tr. 1993 (R. Sepulvado); TREX 044018 (*Deepwater Horizon* Follow-Up Rig Audit).

2072.   After a BP audit, Transocean's rig crew would decide if the action items were something they could take care of, and if so, they would be assigned to a person.  Once the action item was addressed, a BP representative would sign off.  Tr. 5674 (Young).

### 2.     BP Conducted an Integrated Acceptance Test of the *Deepwater Horizon* in 2001.

2073.   Consistent with BP's policies, BP's Rig Audit Group conducted an Integrated Acceptance Test of the *Deepwater Horizon* in 2001 before it was accepted into service by BP.  TREX 006164.

2074.   BP performs an Integrated Acceptance Test on new drilling rigs before they are accepted into service and begin operations for BP.   An Integrated Acceptance Test is more intrusive than subsequent audits because the new rig lacks maintenance, testing, and inspection records to review and evaluate.  As a result, the auditors witness equipment testing to verify that the equipment is working as designed.  TREX 001721; Wong Dep. 21, 471-75.

2075.   The Integrated Acceptance Test was an 18-day audit conducted by a multi-discipline audit team with seven auditors that focused on: (i) safety critical, drilling, mechanical, marine, and electrical equipment; (ii) competence of the drill, marine, and maintenance crews; and (iii) management systems in place to safely and efficiently manage use of the drilling unit.  TREX 001721 at 9-10; TREX 006164.

2076.   The subsea BOP and well control equipment were evaluated as part of the 2001 Integrated Acceptance Test, the BOPs were fully functioned on both control pods, and the EDS was fully functioned.  Wong Dep. 471, 473.

2077.  In the Integrated Acceptance Test report, BP, through its audit team, made observations regarding the availability of the Fire & Gas System, stressed the need to make sure the system be fully operational and functional, inclusive of all fire and gas detectors, and stressed that no alarms or detectors be overridden.  Tr. 3773-74 (Webster); TREX 006164 at BP-HZN-CEC043465 (*Deepwater Horizon* Integrated Acceptance Test).

### 3.      BP Conducted a Technical Rig Audit of the *Deepwater Horizon* in 2005.

2078.  BP's Rig Audit Group conducted a technical follow-up audit of the *Deepwater Horizon* in January 2005.  A follow-up rig audit is designed to, among other things, confirm compliance with recommendations from prior audits and reassess the drilling unit's condition.  TREX 001721 at 8; TREX 006165.

2079.  The BP Drilling Operations Team Leader requested the audit in advance of the *Deepwater Horizon* undertaking two exploration wells that represented significant challenges: Stones and Kaskida.  The Stones well was the deepest water depth the rig had worked in to date and the Kaskida well was a record depth well.  TREX 006165.

2080.  To mitigate a number of potential risks, the auditors focused on equipment and systems that would be rigorously tested and/or subject to greater loads than previously experienced during the Stones and Kaskida wells.   In particular, the auditors audited Transocean's preventative maintenance program applied to the subsea BOP and found that "it is important and understood by the personnel that all tasks must be accomplished and that the testing is 100% with no deficiencies in the system before running BOP."  TREX 006165 at 2, 5.

### 4.      BP's May 2007 *Deepwater Horizon* Marine Assurance Audit and DP Proving Trials.

2081.  In 2007, three BP rig auditors conducted a marine assurance audit of the *Deepwater Horizon* over the course of five days.  A marine assurance audit is designed to ensure

that marine-related operations for the vessel are being conducted and marine-related equipment is being operated and maintained in accordance with national and international regulations and established industry guidelines.  TREX 001721 at 13; TREX 003404; TREX 003403.1.TO.

2082.  BP prepared a spreadsheet that disclosed the auditors' recommendations. "Transocean and BP, working off this spreadsheet in the audit, worked together to close out and track items."  TREX 003404 at 19; Tr. 6021-22 (Ambrose).

2083.  Transocean updated the tracking spreadsheet with comments and information about the status of each item, and shared it with BP.  TREX 047568; TREX 026019.2.TO; Tr. 6022-24, 6028-29 (Ambrose).

2084.  Transocean represented to BP that it had adequately addressed the findings from BP's May 2007 Marine Assurance Audit.  TREX 047568; Tr. 6034-36 (Ambrose); Tr. 5680-82 (Young).

2085.  Although the BP auditors found that a number of fire dampers in the engine rooms were non-operational during testing, Transocean represented to BP that they were testing the dampers on a 30-day basis, that they had already replaced 12 units, and that they would continue to maintain and replace the dampers as necessary.  TREX 047568; Tr. 6024-28 (Ambrose).

2086.  In response to the BP auditors' finding that there was no formal process to inform the BP Wellsite Leaders of overdue critical maintenance or defective equipment, Transocean represented to BP that "[r]ig management feels that pertinent maintenance issues are shared with the [Wellsite Leader] on a routine basis."  TREX 047568.

2087.   BP's audit found that 11 smoke detectors were not functioning.  Subsequently, Transocean informed BP that the smoke detectors were all replaced and the action item was closed.  Tr. 6030-31 (Ambrose); TREX 047568.

2088.   BP's audit also found that a rig saver on engine no. 2 failed to close when ESD was initiated, but Transocean informed BP that the equipment was repaired and successfully retested.  Tr. 6034 (Ambrose); TREX 047568.

2089.   Other issues identified in BP's 2007 audit, such as repairs to fuel oil systems, watertight dampers, bilge valve, and thruster drives, were all addressed.  Tr. 6035 (Ambrose).

2090.   Within two months of the audit, David Sims noted that the *Deepwater Horizon* had "[p]assed recent Marine Assurance Audit and FMEA handily with few significant findings, all of which have been cleared up … Transocean rig leadership is very competent and has the same goals as BP - drill safely and efficiently."  Tr. 6037 (Ambrose); TREX 007088.

### 5.      BP Conducted a Technical Rig Audit of the *Deepwater Horizon* in 2008.

2091.   In 2008, four auditors performed a technical rig audit of the *Deepwater Horizon* over a five day period.  TREX 006166.  Like the 2005 technical rig audit, this audit was designed to, among other things, confirm compliance with recommendations from prior audits and reassess the drilling unit's condition.  TREX 001721 at 8; TREX 006165.

2092.   The 2008 Technical Rig Audit report discloses that "a full BOP test was completed successfully with no failed tests."  TREX 006166 at 5-6, 47.

2093.   Following the audit, BP's Wells Team and Transocean coordinated on the closeout of audit action items, including setting up meetings to discuss the findings and developing a tracking spreadsheet.  TREX 004681; TREX 007054; TREX 026019.2.TO; Little 1 Dep. 105-06; Kent 1 Dep. 75, 87, 96, 208-10.

**6.      BP Conducted a Follow-Up Technical and Marine Assurance Audit of the *Deepwater Horizon* in 2009.**

2094.   In 2009, before the rig was due for a follow-up audit, Guide, the Wells Team Leader, requested that the Rig Audit Group perform an audit on the *Deepwater Horizon* to coincide with a scheduled out-of-service period.  TREX 000275.4.1.TO.

2095.   The September 2009 Follow-Up Technical Rig Audit and Marine Assurance Audit was conducted during a scheduled out-of-service period.  The rig had halted drilling operations for routine maintenance and an American Bureau of Shipping ("ABS") underwater in lieu of drydocking ("UWILD") inspection.  TREX 004362.

2096.   Four auditors performed the audit of the *Deepwater Horizon* over five days. TREX 004362; TREX 001839; TREX 044046.  The marine findings were recorded in the Common Marine Inspection Document ("CMID") and the CMID Annex, which were appended to the audit report.  Tr. 8862 (Guide).

2097.   The September 2009 audit made recommendations in six functional areas: HSSE management, drilling and well control, technical services, marine, environmental, and mechanical handling.  Tr. 8867-68 (Guide); TREX 000275.17.1.Transcoean (Follow-Up Rig Audit).

2098.   The BP auditors confirmed that the rig's third-party certificates were current. Further, the auditors confirmed that the vessel had an ISM Safety Management Certificate.  Tr. 8863-64 (Guide); TREX 044046 at 11 (CMID Annex).

2099.   Because the *Deepwater Horizon* had a current ISM Safety Management Certificate issued by DNV, BP's auditors would not have performed an independent evaluation of the OIM's or Master's responsibility and authority.  The BP auditors only make that

assessment where no ISM Safety Management Certificate is in place.   Tr. 8985-86 (Guide); TREX 044046 at 14 (CMID Annex).

> **7.    The *Deepwater Horizon* Did Not Resume Drilling Operations Until the BP Wells Team, Marine Group, and Transocean Approved the Resumption of Operations.**

2100.   At the audit's conclusion on September 16, 2009, the auditors participated in a joint teleconference with the BP Wells Team, including John Guide, and Transocean to discuss the audit findings.   TREX 001374; Wong Dep. 396-98, 406-07.

2101.   Although Guide did not meet with the auditors in person at the audit's conclusion, the Head of the Rig Audit Group, Wong, was not concerned because Guide had participated in a teleconference with the auditors.   Wong Dep. 10, 138, 406-07.

2102.   On September 16, 2009, the rig auditors recommended that Transocean address specific marine equipment deficiencies and drill floor issues, *i.e.*, the pipe racking system and iron roughneck, before commencing drilling operations.   TREX 001374.1.1.BP; Wong Dep. 508-09.   The Wells Team accepted the recommendation.   Tr. 8844-45 (Guide).

2103.   The auditors did not believe that issues relating to the BOP ram bonnet certifications needed to be addressed before drilling commenced because Transocean had proposed an acceptable forward plan.   Wong Dep. 76.

2104.   On September 17, 2009, Transocean's Rig Manager-Performance (Paul Johnson) represented to BP that Transocean was "addressing all of the issues" that should be addressed before commencing drilling operations.   TREX 047182.1.1.BP.   According to Dr. Bea, this is the kind of interaction that he would like to see in response to an audit and it shows the "safety-mindedness" of BP and Transocean.   Tr. 476 (Bea).

2105.   Transocean's Rig Manager-Asset James Kent testified that BP did not put pressure on anyone to return the rig to operations in September 2009.   Kent 1 Dep. 245-46.

2106.   Representatives from the Wells Team, BP Marine Group, and Transocean were involved in the decision to commence operations after the delayed startup.   If any of these individuals had felt the rig was not suitable to resume drilling operations, they could have continued to delay the resumption of drilling operations.   Wong Dep. 509.

2107.   After Transocean addressed the specific deficiencies and represented that the rig "can start up operations safely," BP's Wells Team and BP's Marine Authority approved the rig's return to drilling operations on September 23, 2009, approximately seven days after the auditors recommended delaying the return to operations.   TREX 044024.1.1; Tr. 476 (Bea); Tr. 8873 (Guide); TREX 044027; Wong Dep. 71, 39, 74-75, 122, 277-78, 319, 320-21, 508-09; Little 1 Dep. 115.

2108.   According to a BP Wellsite Leader, "We were down for a week replacing all safety critical stuff … And after that point, it was decided between BP and Transocean, we had the safety critical stuff done and we could work on the rest of the stuff as we went along."   M. Sepulvado Dep. 100.

2109.   BP would not put a rig back into service if it was not satisfied that all safety-critical issues had been addressed.   Thierens Dep. 448-49.

2110.   Guide relied on Transocean's representations that they could start up operations safely when agreeing that the rig could commence drilling operations.   Tr. 8982-83 (Guide); TREX 044024.1.1.

>   **8.    BP Appropriately Oversaw Transocean's Efforts to Closeout the Findings from the September 2009 Audit.**

2111.   The September 2009 audit report disclosed deficiencies relating to watertight integrity, overdue maintenance, and drilling equipment.    The auditors made particular recommendations for each deficiency.   TREX 004362; TREX 001839; TREX 044046.

2112.  Wong, the Head of the Rig Audit Group, communicated certain findings to individuals within the Gulf of Mexico Special Performance Unit ("SPU").  This was part of a new effort to elevate commonly identified rig deficiencies to SPU leadership.  Wong Dep. 91-92, 108; TREX 006140; TREX 000780; TREX 006144.

2113.  Following the September 2009 audit, BP and Transocean jointly developed a robust and formal closeout program that John Guide supervised for BP.  Rodriguez Dep. 204-05; Wong Dep. 52, 280, 326; TREX 001721.8.1.TO.  From Transocean's perspective, BP was "involved" and "engaged with" the closeout process.  Kent 1 Dep. 233-34.

2114.  Guide and Cocales of BP's Wells Team were personally involved in following up on the rig audit findings and the closeout process for the September 2009 audit.  Tr. 8775-76 (Guide).

2115.  Cocales provided the September 2009 audit report and recommendations to Transocean on October 6, 2009, and described them as "an opportunity for improvement for the safe and efficient working of the rig.  This is a two way street and we very much want your input on content and timing of these which will be reviewed by John Guide and Paul Johnson.  We are all a team in this effort."  TREX 001831; Tr. 478 (Bea).

2116.  After BP distributed the audit report, Transocean's *Deepwater Horizon* crew began to rigorously close out the audit items in the months following September 2009.  Wong Dep. 328; Tr. 4115 (Webster).  Transocean's onshore Rig Managers and offshore supervisors on the *Deepwater Horizon* reviewed the audit findings, created a spreadsheet assigning responsibility for each action item to a different Transocean department, *e.g.*, marine, drilling, maintenance, and presented their strategy to BP.  P. Johnson Dep. 44, 174-76, 372; Kent 1 Dep. 30-31, 38-39.

2117.   Transocean created two spreadsheets tracking the status of the technical and marine audit findings, respectively, and regularly shared them with Guide and Rodriguez, among others.   Cocales Dep. 479; Wong Dep. 499-500.   Specifically, Transocean shared tracking spreadsheets each month from October 2009 through March 2010.   *See, e.g.*, TREX 047221; TREX 000956; TREX 047240; TREX 020845; TREX 047243; TREX 047361; TREX 000686. In this way, the audit action items were closed out, tracked, and managed.   Wong Dep. 54-55, 164, 498-500, 503-04, 530.

2118.   The BP Wells Team verified with Transocean that Transocean was actively closing out the action items.   Little 1 Dep. 236; TREX 001377; Tr. 4113-14 (Webster).

2119.   Guide and Johnson (Transocean's Rig Manager-Performance) spoke on a regular basis, often weekly, to ensure Transocean was making progress on the audit.   P. Johnson Dep. 44-45.

2120.   The Wells Team Leader, John Guide, visited the rig at least three times after the audit to review Transocean's progress on closeout, as would be expected of a good Wells Team Leader who was safety-minded.   Tr. 8875 (Guide); Tr. 480 (Bea).   During one of the rig visits, Guide, Johnson (Transocean's Rig Manager-Performance), and Harrell (Transocean's OIM), verified that audit findings had been addressed and "closed out a bunch of [audit] items."   Tr. 8777 (Guide); Rodriguez Dep. 42-43.

2121.   According to Transocean, Guide came out to the rig on January 12, 2010, and he seemed pleased with everything except the state of the bilges.   Further, Guide signed off on several rig audit items while on board.   TREX 020198; Tr. 8876 (Guide).   Guide was satisfied that Transocean was making progress in closing out the rig audit items.   Tr. 8776 (Guide).

2122.   Each time that Guide signed off on the completion of an audit recommendation, he was personally satisfied with it.  Tr. 8876 (Guide).

2123.   Cocales worked with Transocean's Rig Manager-Performance, Johnson, to facilitate the audit closeout.   In the early days of the closeout process, he met weekly with Johnson, and typically BP's Marine Advisor, and occasionally the Wells Team Leader, Guide, to discuss the audit action items.  Cocales felt the *Deepwater Horizon* crew did a good job closing out the items and as of March 2010, he was satisfied that the *Deepwater Horizon* rig equipment was in safe condition for drilling the Macondo well.  Cocales Dep. 446, 449-50, 469-72, 475-76, 487; TREX 001378.

2124.   In his 2009 performance review of Cocales, Guide commended him on his efforts to close out the audit items.  Tr. 8880 (Guide); TREX 001371.

2125.   The offshore Wellsite Leaders helped to monitor Transocean's audit closeout efforts on the rig.   Ronnie Sepulvado communicated with Guide, and occasionally a representative from BP's Marine Department, as well as the OIM, Toolpushers, and heads of each department on the rig to review the tracking spreadsheet.  Tr. 1994 (R. Sepulvado); TREX 044018.

2126.   Murry Sepulvado, a Wellsite Leader, verified that certain deficiencies were corrected.  M. Sepulvado Dep. 97-99.

2127.   Following the audit, BP's Gulf of Mexico Marine Group assessed risks that the audit findings might pose to vessel operations, communicated about them with Transocean, and provided resources to the BP Wells Team Leader to ensure that the marine findings had suitable mitigations.  Cramond Dep. 83-85; 132-34.  BP's Marine Group placed significant emphasis on overseeing the closeout and verification of the findings.  Cramond Dep. 197.

2128.  A Marine Advisor from the Marine Group, Angel Rodriguez, provided marine support to the Wells Team Leader, reviewing the marine audit findings and working with Transocean to close out those items.  Rodriguez Dep. 6, 19-20, 33, 37-38; Tr. 8844 (Guide).

2129.  BP's Marine Advisor received weekly updates from Transocean's marine crew and regularly discussed the status of closeout with Transocean's Rig Manager-Performance, Johnson, and the Captain.  Rodriguez Dep. 26-27.

2130.  From October 2009 through March 2010, BP's Marine Advisor regularly received updated spreadsheets from Transocean tracking the status of the marine items.  *See, e.g.*, TREX 000956; TREX 001837; TREX 000686; TREX 001722.

2131.  Rodriguez provided periodic updates to Guide.  For example, on October 5, 2009, Rodriguez e-mailed Guide to tell him that "the DW Horizon crew have done a good job in completing the action items on this list."  TREX 001377; Tr. 4114-18 (Webster).

2132.  BP's Marine Advisor visited the *Deepwater Horizon* twice to assess Transocean's progress on the marine audit findings.  Rodriguez Dep. 22-23, 26.  He verified that Transocean had properly addressed certain deficiencies identified during the September 2009 audit, but he did not conduct an examination, inspection, or audit that would allow him to conclude that the entire rig was seaworthy.  Rodriguez Dep. 23, 88, 170.

2133.  BP's Marine Advisor visited the *Deepwater Horizon* in October 2009 and described it as a "very productive visit."  He toured the thrusters, pump rooms, switchboard spaces, and watertight doors.  He agreed to contact the Captain on a bi-weekly basis to get an update on the remaining findings.  TREX 001379; Rodriguez Dep. 99, 101-02; Tr. 4114-18 (Webster); TREX 001379 (following the visit, Rodriguez notified Guide that "the Horizon's crew has been rigoriously [sic] closing out the findings").

2134.   BP's Marine Advisor visited the *Deepwater Horizon* for a second time in March 2010.  Transocean had rectified the majority of marine action items by March.  For the seven outstanding marine items, Transocean informed BP's Marine Advisor about their plans (*e.g.*, parts on order) to address them.  Rodriguez Dep. 180-81; TREX 001832.

2135.   Although a few marine items were outstanding, Rodriguez, BP's Marine Advisor, believed the rig "could operate safely and be seaworthy" without them being closed.  Rodriguez Dep. 181.  Rodriguez signed off on a number of completed audit findings during his March 2010 rig visit.  TREX 001832.

2136.   After his March 2010 visit, Rodriguez provided an update to Guide and the Wells Team, stating:  "[T]he Horizon's crew completed 63 out of 70 findings in a 5 month period, which is commendable . . . I would like to propose another visit in 6 months to close out the remaining findings."  TREX 001832; Tr. 5674-75 (Young); Tr. 8844 (Guide).

2137.   By the end of March 2010, the *Deepwater Horizon* rig crew had closed out approximately 85% of the findings and had an action plan in place for the outstanding items.  P. Johnson Dep. 45, 551-52.  Many of the outstanding items were waiting on parts that were on order.  Tr. 8871 (Guide).

2138.   The seven marine audit findings that were outstanding in March 2010 are highlighted in yellow on the audit tracking spreadsheet.  TREX 001832.  The outstanding items included two marine cable transits which had leaked or failed, a small leak in one seawater pump, a defective parts per million meter on the water maker, a leaking shaft seal on a ballast pump, and a ballast pump that fluctuated when it ran.  None of these items had anything to do with the Incident.  Tr. 5675-78 (Young); TREX 001832 at 8-11, 13-15.

**9.    Transocean Represented to BP that Certain Audit Findings Had Been Successfully Addressed by April 2010.**

2139.  In September 2009, the rig auditors found that overdue maintenance on the *Deepwater Horizon* "was considered excessive totaling 390 jobs and 3545 man hours."  TREX 047221.1.1.BP; Wong Dep. 516-18.

2140.   Transocean explained to BP that this overdue maintenance figure was inflated and not an accurate representation of maintenance on the rig because many maintenance entries were duplicated due to a transition from one maintenance management system to another.  Tr. 8776 (Guide); Wong Dep. 400-01, 405, 518; Kent 1 Dep. 232; Kent 2 Dep. 36, 232; Tr. 1995-96 (R. Sepulvado); Williams Dep. 38-39; Tr. 5975-77 (Ambrose); TREX 047221.1.1.BP (Transocean represented to BP that "[t]he new maintenance system program RMS has multiple PM duplicates.  TODDI is currently reviewing the maintenance system and making adjustments as required.").

2141.  As Transocean's Rig Manager-Asset explained:    "There were numerous duplications due to just migration from Empac to RMS.  There were numerous duplicates and duplications in maintenance.  And yes, this was being worked on vigorously to resolve the issue … so this [was] an administrative error …"  Kent 2 Dep. 36; Kent 1 Dep. 232.

2142.  Johnson, Rig Manager-Performance, and Guide, the Wells Team Leader, communicated, verbally and in writing, concerning the conversion from EMPAC to RMS and how this resulted in issues, including the duplication of maintenance tasks.  Tr. 8869-71, 8776 (Guide).

2143.  Transocean subsequently represented to BP that the audit finding was 100% complete as of October 15, 2009, just a few weeks after the audit.  TREX 047221.1.1.BP.

2144.   In September 2009, the rig auditors found that, "although not widespread it was evident that maintenance routines were still being closed out although the maintenance tasks were not being performed."   The auditors recommended that "the practice of closing incomplete maintenance work orders must cease" and the Maintenance Supervisor was instructed "to produce standing instructions to communicate expectations."   TREX 047221.1.2.BP; Tr. 2829 (Davis).

2145.   Transocean accepted the auditors' recommendation and notified BP that all departments had been "notified that this would not be tolerated" by October 2009.   TREX 047221.1.2.BP.  Guide confirmed this with Transocean.  Tr. 8877 (Guide); TREX 020845.

2146.   In September 2009, the rig auditors found that the "quality of maintenance history reporting remains below par across all disciplines."   The auditors recommended that the Maintenance Supervisor "produce standing instructions to effectively communicate expectation for improved maintenance history reporting."  TREX 047221.1.3.BP.

2147.   Transocean accepted the recommendation and represented to BP that "all departments notified that this would not be tolerated" by October 13, 2009.    TREX 047221.1.3.BP.

2148.   The September 2009 audit disclosed that the Driller's cabin fire and gas panel had numerous alarm conditions displayed.  These included: fire alarm active, fault ESD active, fault fire and gas active, and fire and gas override active.  The Driller and Assistant Driller on tour were unaware of the fault conditions.  TREX 047221 at § 3.3.5.

2149.   The auditors also found that a "formal system to manage alarm inhibits and control of defeats and bypasses was not in place for vessel management system, drilling control system and related PLC's etc."  TREX 047221 at § 2.3.1.

2150.   In response, Transocean represented to BP that it had implemented a system to manage alarm inhibits and control of defeats/bypasses by January 2010.  TREX 047243**.**  By December 1, 2009, Transocean represented to BP that it had "replaced smoke detectors and cleared alarms."  Rodriguez, BP's Marine Advisor, confirmed this during his rig visit on March 29, 2010, when he visually inspected the Fire & Gas panel and confirmed that no alarms were defective and no overrides/inhibits were in place.    Rodriguez Dep. 186-89;  TREX 000686.3.2.BP.

2151.   One month after Rodriguez's March 2010 visit to the *Deepwater Horizon*, ModuSpec surveyors performing a Rig Condition Assessment found that none of the fire and gas alarms were inhibited, meaning switched off or bypassed.   Schneider Dep. 221-22.   The surveyors felt that Transocean had a system in place to the track and manage the inhibits on the alarms.  Schneider Dep. 349.

2152.   During the September 2009 audit of the *Deepwater Horizon*, the auditors found that "the test, middle and upper ***pipe ram BOP bonnets*** are original [and] have not been subject to OEM inspection and recertification in accordance with API and OEM requirements."  TREX 000275.20.1.TO (emphasis added); Tr. 2010 (R. Sepulvado).   There was  no documentary evidence at the time of the audit to suggest that the "pipe ram bonnets," which are a reference to the VBR bonnets, had been inspected in the previous five years.  Wong Dep. 166.

2153. Transocean challenged BP's finding concerning the pipe ram bonnets and represented to BP that the bonnets were "Overhauled on conditional basis's, Subsea Engineer will get clarification of company standard.  All pipe RAM bonnets are tested on rig moves to 3K PSI.  Test middle and upper rams will be changed out during 2011 SPS."  TREX 047243; Tr.

2011 (R. Sepulvado).   Transocean challenged BP's finding based on Transocean's strategy of overhauling the equipment based on its condition.  Wong Dep. 164; Johnson Dep. 378-79.

2154.   Transocean's decision to challenge the audit finding indicated to BP that Transocean felt the ram bonnets were in a satisfactory condition.  Wong Dep. 515-16.

2155.   Transocean proposed a change out plan for the BOP bonnets commencing in 2010 to be completed in 2011.  Tr. 2010 (R. Sepulvado).  Guide agreed to Transocean's plan to replace all ram bonnets when the *Deepwater Horizon* returned to the shipyard in 2011 because the bonnets were not safety-critical items.  Tr. 8882 (Guide).

2156.   Transocean's OIM and lead Subsea Engineer told Ronnie Sepulvado, a Wellsite Leader, that it was acceptable to use the BOP bonnets as long as they "miked" them after each well, meaning they were inspected and measured.  Tr. 2010-11 (R. Sepulvado).  Transocean assured BP of its maintenance program regarding the bonnets, and BP accepted Transocean's assurances.  P. Johnson Dep. 378-79.

2157.   Transocean's Rig Manager-Asset testified that the ram bonnets had been inspected by Cameron and were in compliance with API and OEM requirements.  Kent 2 Dep. 110-12.

2158.   Norman Wong, a member of BP's Internal Investigation Team, was not aware of any evidence that issues with the ram bonnets had any impact on BOP functionality during the Incident.  Wong Dep. 331-32; TREX 000001 at 167-69 (BP's IIT Report).

2159.   The September 2009 audit disclosed that "[m]uch of the well control maintenance was either recorded in the subsea engineer's daily log book or on various spreadsheets[]" and that, by comparison, "[t]he level of well control related maintenance history recorded in RMS was minimal."  Tr. 3892-93 (Webster); TREX 047221.  The auditors recommended that well

control-related maintenance should be recorded in RMS II.  In response, Transocean addressed the recommendation by December 2009 and represented to BP that an "RMS job will be created to track maintenance history for every well control related planned and corrective maintenance." TREX 047243.

2160.  The September 2009 audit disclosed that the rotary table was inoperable.  TREX 000275 at 38.  A rotary table on a modern rig, like the *Deepwater Horizon*, is not safety-critical equipment, does not have a major function, and is not needed for drilling operations.  Tr. 5955 (Ambrose); Tr. 1928-29 (R. Sepulvado).

### 10.    On April 20, 2010, No Safety-Critical Audit Findings Were Outstanding.

2161.  Of the 188 items disclosed in BP's September 2009 audit, 14 remained open and 18 were in progress as of April 20, 2010.  All of these items were low priority, none of them required immediate action, and none of them had any relation to the Incident on April 20, 2010. Tr. 6043 (Ambrose); D6747; TREX 047361 (*Deepwater Horizon* Follow-Up Audit Report); Lee Dep. 390-91.

2162.  As of April 2010, none of the outstanding audit action items impacted the safe operation of the *Deepwater Horizon*.   P. Johnson Dep. 373-75; Tr. 5664 (Young); Tr. 8881 (Guide).  It is typical for rigs to have open maintenance items.  Tr. 5664 (Young).

2163.  When Murry Sepulvado left the rig on April 14, he was not aware of any safety-critical maintenance issues with the rig.  M. Sepulvado Dep. 554-55.

### B.    The *Deepwater Horizon* Underwent Several Other Maritime Audits, Inspections, and Certifications Prior to the Incident.

2164.  BP reasonably believed the *Deepwater Horizon* was fit for service and capable of safe operations on April 20, 2010, because from delivery in 2001, the *Deepwater Horizon* had undergone continuous inspections, surveys, and audits conducted by numerous entities, including

the recognized Flag State, Coastal State, Classification Societies, and external auditors on behalf of BHP Billiton and Transocean, in addition to audits conducted by BP.  TREX 050003 at 20.

2165.  The *Deepwater Horizon* had been audited, examined, or inspected by two Recognized Organizations (DNV and ABS), by two national authorities (the USCG and MMS), and by one third-party inspection company (ModuSpec) in the year before April 2010.  As of April 20, 2010, the *Deepwater Horizon* was current on all of its required flag state statutory surveys and certifications; it possessed all the requisite flag state and port state  certificates of compliance and safety management certificates; and it was fit for service according to the ABS.  Tr. 5933 (Ambrose); TREX 052668; Tr. 4086 (Webster); TREX 005571; TREX 004127; TREX 003074 at 68.

2166.  During the operational life of the *Deepwater Horizon*, the MMS performed monthly inspections of drilling systems, including the BOP, and the MMS performed its final inspection on April 1, 2010, only ten days before the Incident and issued no INCs.  Domangue Dep. 168; TREX 004127.

2167.  In September 2009, BP auditors confirmed that recognized organizations, including DNV and ABS, and national authorities, such as the USCG, were examining, surveying, or inspecting the rig and issuing required certificates and documentation, including a current International Safety Management Code Safety Management Certificate.  TREX 001839; TREX 044046; Tr. 8863-64 (Guide); Tr. 9486 (Mitchell); TREX 044046 at 11 (CMID Annex).

### 1.    Transocean's Safety Responsibilities, Including Audit Responsibilities, under the ISM Code.

2168.  The ISM Code is a code of maritime safety regulations and auditing requirements promulgated by the International Maritime Organization.  Tr. 3736-37 (Webster); TREX 040011 at 31-34.

2169.   The ISM Code is a part of the Safety Of Life At Sea Convention (SOLAS), to which both the United States and the *Deepwater Horizon* flag state, the Republic of the Marshall Islands, are signatories, making it governing law for self-propelled dynamically positioned MODUs.  Wolfe Dep. 115-17; TREX 040011 at 12, 31-33.

2170.   The ISM Code assigned non-delegable duties to the "Company," which in the case of the *Deepwater Horizon* is Transocean, not BP.  Tr. 4189-90 (Webster); TREX 000938; TREX 040011 at 31-34, 45; Canducci Dep. 28, 449-50, 604-06.

2171.   Transocean's non-delegable duties under the ISM Code could not be delegated, shared, or transferred to another entity; Transocean, not BP, was responsible for compliance with the ISM Code.  Tr. 4190 (Webster); Wolfe Dep. 117; TREX 040011 at 31-34, 38, 45; Canducci Dep. 28, 449-50, 604-06; D. McKay Dep. 182-83.

2172.   Transocean was required by Section 1.4 of the ISM Code to develop, implement, and maintain a safety management system that includes a safety environmental protection policy and procedures to prepare for and respond to emergency situations.  Tr. 9448-49 (Mitchell); TREX 000938 at 19; TREX 040011 at 34; Tr. 3743 (Webster).

2173.   There was no disagreement among the PSC, Transocean, and BP maritime experts that it was Transocean's non-delegable responsibility under the ISM Code to implement a safety management system onboard the *Deepwater Horizon*.  Tr. 9447-49 (Mitchell); Wolfe Dep. 118, 141-42; Tr. 4189-90 (Webster); TREX 000938 at 17; TREX 022700 at 3-5; TREX 040011 at 10, 12-13, 45, 112; *see also* Canducci Dep. 28, 449-50, 604-06; D. McKay Dep. 182-83; Odom Dep. 34.

2174.   Under ISM Code Section 10, the company "should establish procedures to ensure that the ship is maintained in conformity with the provisions of the relevant rules and regulations

and with any additional requirements which may be established by the company." Tr. 3753 (Webster); TREX 050361 at 3.

2175.  The ISM Code required periodic audits and inspections of the vessels to which it applies. Tr. 3766 (Webster).

2176.  Under the ISM Code, Transocean was obligated to conduct its own audits every 12 months. Tr. 9468-69 (Mitchell); Tr. 3766 (Webster).

2177.  Transocean contracted with third-party auditors and also had its own internal audit staff that conducted internal audits of its ships. Tr. 3766-67, 4192 (Webster); Canducci Dep. 300-01.

2178.  In the maritime industry, a customer may or may not choose to conduct its own audits of the ship. Tr. 4192 (Webster).

2179.  It was Transocean's obligation to conduct whatever follow-up audits were necessary to ensure that findings from prior audits were appropriately rectified, closed out, and corrected. Tr. 3787 (Webster).

2180.  It was not BP's obligation under maritime law to conduct follow-up audits to ensure that findings from prior audits were rectified, closed out, and corrected. Tr. 3787 (Webster).

2181.  Jeff Wolfe, Transocean's maritime expert, explained that BP's obligation was to ensure that Transocean had implemented a safety management system accepted by the Recognized Organization on behalf of the flag administration, which BP could accomplish by relying on the certificates issued to Transocean, namely, the Document of Compliance and the *Deepwater Horizon* safety management certificate. Wolfe Dep. 141-44.

2. **Audits on behalf of the Marshall Islands by Det Norske Veritas and the American Bureau of Shipping Consistently Found the *Deepwater Horizon* in Compliance with the ISM Code.**

2182.   The *Deepwater Horizon* was always subject to the ISM Code.   Tr. 3737-38 (Webster).

2183.   The Republic of the Marshall Islands required Transocean to obtain certification from a recognized classification society that the company and its ships complied with the ISM Code, such certification being known as a "Document of Compliance."   Tr. 4021-23, 4042-43 (Webster).

2184.   Det Norske Veritas (DNV) was the recognized organization for The Republic of the Marshall Islands that conducted ISM compliance audits of Transocean and the *Deepwater Horizon*.   Agreed Stipulations No. 178 (Rec. Doc. 5927); *see also* Tr. 3738-39 (Webster).

2185.   In May 2007 DNV issued a safety management certificate for the *Deepwater Horizon* required by the ISM Code which was in effect on April 20, 2010.   Tr. 4043-44, 4047 (Webster); Tr. 9483-84 (Mitchell); TREX 001776.

2186.   On April 13, 2007, DNV issued a Document of Compliance effective through January 25, 2012, for Transocean's safety management system.   Tr. 4024-25 (Webster); TREX 020044; Tr. 9481-82 (Mitchell).

2187.   In the course of the BP audit of the *Deepwater Horizon*, BP auditors inspected Transocean's Document of Compliance and the *Deepwater Horizon*'s safety management certificates.   Tr. 9486 (Mitchell).

2188.   It was not the BP auditors' responsibility to tell Transocean that the *Deepwater Horizon* did not comply with the ISM Code; that is the responsibility of the flag administration. Tr. 9488-89 (Mitchell).

2189.   There was no contractual or legal requirement for BP as the operator to advise the ship owner that it was in violation of the ISM Code.  Tr. 9489-90 (Mitchell).

2190.   The ISM audit guidelines made clear that "[c]ompliance with the ISM Code does not relieve the company" or the master of their own responsibilities.  Tr. 4193 (Webster); TREX 003163 at 3.

2191.   The fact that DNV issued an audit certification in 2009 did not relieve Transocean of its continuing obligation to comply with ISM Code and did not mean that the *Deepwater Horizon* was in compliance on April 20, 2010, because possession of a current, unexpired certificate of ISM Code compliance does not absolve the ship-owning company from a continuing responsibility to comply with the ISM Code and maintain its safety management system between audits.  Tr. 9528-29 (Mitchell); Tr. 4193-94 (Webster); TREX 040011 at 8-9, 20-21; TREX 003163 at 3.

2192.   ISM audit guidelines made clear that "[i]ssuance of certification is based upon verification that the sample is in compliance with the ISM Code.  When nonconformities have not been found and reported, it does not mean that none exist" because audits are always a sampling process and are not exhaustive.  Tr. 9527-29 (Mitchell); Tr. 4193-94 (Webster); TREX 003163 at 3; Bjerager Dep. 117; TREX 040011 at 20-21.

### 3.        The Coast Guard Examined the *Deepwater Horizon* Annually.

2193.   The *Deepwater Horizon* had a certificate of compliance from the USCG which was valid until July 27, 2011.  Tr. 9484-85 (Mitchell); Odom Dep.  15, 134; TREX 005571 at 4.

2194.  When the USCG reviews a foreign-flagged vessel such as the *Deepwater Horizon*, it is an examination in which the USCG verifies compliance with the standards set forth for foreign vessels as shown in the certificates, documents, and surveys that have been issued, which is more limited than inspecting U.S.–flagged vessels to ensure full compliance with U.S.

laws and regulations. Odom Dep. 15-17, 40, 122-23, 221; Wolfe Dep. 90-91, 353-54, 356-57; Sutton Dep. 57; Tr. 9485 (Mitchell).

2195. In conducting an examination, the USCG was "not there to ensure that [the *Deepwater Horizon* was] in full compliance with every single regulation and law." Odom Dep. 40, 122-23.

2196. During an examination, the USCG has to rely on the information that is provided by the vessel owner and has to put "a lot of trust" in the documentation that is provided from the vessel, including review of the ABS and DNV inspection and survey reports to ensure they are valid and current. Odom Dep. 39, 115.

2197. The USCG verifies ISM documentation "strictly through documentation checks" and would rely on the presentation of the proper certificates from Recognized Organizations conducting ISM Code reviews in order to verify that the vessel had a Safety Management Certificate, but the USCG does not conduct its own ISM audit. Wolfe Dep. 143, 358; Odom Dep. 39, 115, 186-88.

2198. The USCG examined the *Deepwater Horizon* every year. The last examination was in July of 2009. Odom Dep. 12, 178; Tr. 4088 (Webster); Tr. 5690 (Young); Wolfe Dep. 357.

2199. During the USCG examinations, inspectors only went aboard for four to six hours and performed cursory "spot checks" or "snapshot[s]." Tr. 4124 (Webster); Dep. 354-55, 357-58 (Wolfe); Odom Dep. 86-87, 101, 188, 221.

2200. The USCG granted certification after each examination of the *Deepwater Horizon* in 2005, 2006, 2007, 2008, and July 2009. Tr. 4088-89, 4093-00 (Webster); Odom Dep. 10-11, 17, 178; TREX 005585 at 1-2; TREX 005586 at 1-2; TREX 005590 at 1-2; TREX 005571 at 3.

2201.   The chief of offshore compliance for the USCG Eighth District "did not get into" the details of Transocean's or other companies' command structures and therefore did not know they had command structures on their rigs in which the OIM was designated as the person in charge under certain circumstances and the Master was in charge under other circumstances. Wolfe Dep. 168-71.

2202.   The USCG would not expect Transocean to notify the USCG of every violation of the ISM Code; the nature of the ISM Code is for the company to correct the violation through their ISM system.  Odom Dep. 35.

2203.   The USCG examiners commented on the *Deepwater Horizon*'s "outstanding safety culture, performance during drills, and the condition of the rig" and did not find the crew indifferent or callous to safety.  Odom Dep. 160.

### 4.    ModuSpec USA Performed a Rig Condition Assessment of the *Deepwater Horizon* in 2005 and April 2010.

2204.   ModuSpec is a worldwide inspector of rigs.  Tr. 4101 (Webster).

2205.   In 2005, ModuSpec performed a survey of the *Deepwater Horizon*'s safety critical equipment, including the BOP, on behalf of BHP Billiton.   After the survey, BHP Billiton accepted the *Deepwater Horizon* to drill a well.  Tr. 6007-08 (Ambrose); TREX 000081 (Report of Survey BHP Safety Critical Equipment).

2206.   After completing a well for BHP, BP then accepted the rig back into its service. Tr. 6010 (Ambrose).

2207.   Transocean hired ModuSpec to perform an in-depth Rig Condition Assessment of the *Deepwater Horizon* in April 2010.  Tr. 5990 (Ambrose).

2208.   The Rig Condition Assessment was designed to evaluate the state of maintenance on the rig, verify the effectiveness of previously performed maintenance routines, and determine the current condition of the rig's assets.  Schneider Dep. 305; TREX 000251.

2209.   The work scope for ModuSpec's 2010 Rig Condition Assessment covered drilling equipment, mud systems, the BOP and well control equipment, marine equipment, electrical equipment and systems, power plants, safety equipment, and maintenance systems.  Schneider Dep. 61-62; TREX 000254; Martinez Dep. 40-41.

2210.   ModuSpec sent four surveyors to the rig for 12 days.  They performed a good survey.  Tr. 4101 (Webster).

2211.   The ModuSpec surveyors understood that they had authority to take a timeout for safety or stop work if they saw something that they felt was unsafe.  The surveyors did not exercise their stop work authority at any point during the April 2010 assessment because they did not identify any conditions on the rig that they felt presented an imminent danger to the rig or crew.  Schneider Dep. 373-74.

2212.   The ModuSpec surveyors found, among other things, that hazardous area electrical equipment was in bad condition and improperly tagged; two remotely-operated hydraulic watertight doors did not work correctly; escape routes below the rig on all four columns were in bad condition; and watertight hatch covers were in bad condition.  TREX 000251.

2213.   Transocean instructed ModuSpec not to communicate their findings to BP.  Tr. 4200 (Webster); TREX 000253.  ModuSpec abided by these instructions: the ModuSpec surveyors did not communicate their findings, either verbally or in writing, to BP.  Schneider

Dep. 329; Millsap Dep. 178, 227-29; Martinez Dep. 154-55, 234-235; Sierdsma 1 Dep.[14] 244; Sierdsma 2 Dep. 31- 32.

2214.   A ModuSpec surveyor testified that Transocean was the only party that could act upon ModuSpec's recommendations because ModuSpec did not share their findings with BP. Schneider Dep. 330.

2215.   The ModuSpec surveyors kept Transocean on notice of major issues and concerns that they identified during the April 2010 Rig Condition Assessment.  Schneider Dep. 100-01.

2216.   During the assessment, the ModuSpec surveyors reviewed Transocean's planned maintenance tasks against the maintenance history to identify gaps in maintenance.  Schneider Dep. 63-65.

2217.   ModuSpec's subsea surveyor testified that he was "ascertaining whether or not the [BOP] device is working as it's intended to work," but he is not guaranteeing that it is going to work.  Millsap Dep. 55.

2218.   The BOP, including the blue and yellow control pods, were subsea and in operation during the April 2010 assessment.  Martinez Dep. 98-99, 241.  If a piece of equipment was in operation during the Rig Condition Assessment, the surveyors did not stop the operation in order to conduct an intrusive survey.  Schneider Dep. 77-78.

2219.   The ModuSpec subsea surveyor's evaluation of the equipment condition depended upon records and, to the extent possible, visual inspection.  Martinez Dep. 74.  Owen McWhorter was the Transocean Senior Subsea Engineer who provided the maintenance records

---

[14] Sierdsma 1 Dep. refers to Mr. Sierdsma's first 30(b)(6) deposition, which occurred on February 2, 2011.  Sierdsma 2 Dep. refers to Mr. Sierdsma's second 30(b)(6) deposition, which occurred on February 16, 2011.

relating to the subsea equipment to ModuSpec.  Martinez Dep. 226-27.  McWhorter was the only one the ModuSpec subsea surveyor really spoke with on the rig.  Martinez Dep. 250.

2220.   Although ModuSpec's report disclosed that "[a]ll SEMs on the three pods have had new batteries installed," the surveyor who wrote that finding was "taking the word of Transocean that batteries had been replaced."  The surveyor was not able to conduct a physical inspection of the subsea pods to verify the status of the batteries.  TREX 000251; Millsap Dep. 245-47; Martinez Dep. 145.  The second ModuSpec subsea surveyor had no recollection of seeing "any maintenance records . . . that would indicate that Transocean had replaced these batteries."  Martinez Dep. 322-23.

2221.   When the surveyors functioned the yellow control pod from the control panel, they received an error message: "pod mismatch."  This type of problem could be caused by a stuck solenoid valve on the control pod.  Transocean's subsea engineer explained to the surveyor that the error message had popped up before and Transocean had contacted Cameron.  Millsap Dep. 126-27, 254-56.

2222.   ModuSpec found that the purge panel on the BOP panel in the driller's shack needed repair.  However, the driller's cabin itself was a purged zone so this deficiency did not raise a safety issue and did not impact the BOP's functionality.  Tr. 5993-94 (Ambrose); TREX 003285.

2223.   The ModuSpec surveyors concluded that the riser, BOP, and well control equipment were in "good condition; some minor deficiencies may have been noted."  Millsap Dep. 79-80; Martinez Dep. 205; TREX 002072; TREX 000076.

2224.   The BSRs passed function tests on April 8, 2012, and were determined to be "in good condition."  Millsap Dep. 264; Martinez Dep. 125-26.

2225.   During the April 2010 Rig Condition Assessment, the ModuSpec surveyors found that the BOP annulars "were noted in good condition."  Millsap Dep. 112-13.  According to ModuSpec's subsea surveyor, "the annular and BOPs were operational.  They were working.  They were doing what they were supposed to be doing."  Martinez Dep. 311-12.  The upper and lower annulars were tested during the assessment and the components functioned successfully.  Millsap Dep. 266-67; TREX 002082.

2226.   During the 2010 Rig Condition Assessment, the surveyors found that none of the fire and gas alarms were inhibited, meaning switched off or bypassed.  Schneider Dep. 221-22; Tr. 4137-38 (Webster); TREX 000251 at 93.

2227.   The surveyors felt that Transocean had a system in place to track and manage the inhibits on the alarms.  Schneider Dep. 349; Tr. 5666 (Young); TREX 0000251 at 91.

2228.   The gas detection was also found to be in good condition and the sensors were calibrated.  Tr. 5667-68 (Young); Tr. 5996 (Ambrose); TREX 000251 at 93.

2229.   The ModuSpec surveyors found evidence that preventive maintenance tasks had been signed off on, but not completed.  Schneider Dep. 308-09, 312-13.

2230.   When the ModuSpec surveyors made certain recommendations dealing with maintenance, the decision of whether to add those recommendations to Transocean's maintenance "punch list" rested with Levine.  Martinez Dep. 48-50.

2231.  During the 2010 Rig Condition Assessment, ModuSpec surveyors found that preventive maintenance of certain electrical equipment in hazardous areas had not been performed.  When they raised this issue with Transocean's rig crew, the crew explained that "Transocean management" – not BP management – was not giving them time to perform the

maintenance.  The crew did not attribute the lack of time to perform preventive maintenance to the pace of Macondo well drilling activities or to BP's management.  Schneider Dep. 129-33.

2232.  While there were many requests from maintenance personnel on the *Deepwater Horizon* for more time to complete the required maintenance tasks, there was no problem with getting BP to allow sufficient time to conduct maintenance.  Tiano Dep. 93-96.

2233.  A ModuSpec surveyor found that equipment deficiencies he had noted during a 2005 assessment of the *Deepwater Horizon* had not been addressed or corrected by April 2010. Schneider Dep. 246.  He communicated this verbally to Levine, who "was ashamed" and acknowledged that "no maintenance ha[d] been done."  Schneider Dep. 246-47.  The ModuSpec surveyor also communicated his finding to the rig's electrician who admitted that "he was ashamed that it was in that condition" but explained that "Transocean's management" had not given him any time to look at the equipment.  Schneider Dep. 247-48.

2234.  At the conclusion of the Rig Condition Assessment, ModuSpec surveyors met with members of Transocean's rig crew for an offshore end-of-inspection meeting.  Schneider Dep. 149; TREX 000255.  There were no representatives of BP present at the meeting.  Millsap Dep. 340.  ModuSpec surveyors presented their recommendations with associated priority levels, with A-1 being the highest priority.  Schneider Dep. 194-95.

2235.  At the end-of-inspection meeting, members of the *Deepwater Horizon* rig crew asked Levine to upgrade the priority levels of the recommendations because the rig crew "felt if the priority levels were upgraded they stood a better chance of getting some of these issues addressed by [Transocean's] management."  There was consensus among the Transocean people in attendance that the priority levels should be upgraded.  Schneider Dep. 149-56.

2236.   On April 15, 2010, there was an onshore end-of-inspection meeting attended by a ModuSpec surveyor and Transocean management, including the *Deepwater Horizon* Rig Manager-Asset (James Kent).  Schneider Dep. 189-90.

2237.  The ModuSpec surveyor testified that he did not inform Transocean's onshore management that the rig crew was unable "to perform certain preventive maintenance activity on critical equipment" because they were "already aware of that."  Schneider Dep. 193.

### 5.   The 2010 Lloyd's Register Audit.

2238.  In March 2010, Transocean hired Lloyd's Register to conduct a review of the safety management system, safety culture, and safety climate of both the company and five of its rigs following a series of accidents on Transocean facilities.  Tr. 3915-17 (Webster); TREX 000929; Tr. 5694 (Young); Tr. 4610 (Newman); TREX 026032.

2239.  The March 2010 Lloyd's Register Safety Management and Safety Culture/Climate Review involved interviews with members of the Transocean office as well as various members of rig crews.  Tr. 3918-19 (Webster).

2240.  The 2010 Lloyd's Register Safety Management and Safety Culture/Climate Review found areas in which Transocean fell short of its expectations and improvements could be made.  Tr. 4575 (Newman); *see also* Tr. 4633 (Newman).

2241.  The 2010 Lloyd's Register Safety Management and Safety Culture/Climate Reviews found that the Transocean "workforce was not always aware of the hazards they were exposed to, relating to both their job and to other jobs being conducted in the same adjoining work areas.  They don't know what they don't know," and "[r]isk posed by identified hazards were not fully understood.  The emerging hazards during task execution and hazards with the change in risk level [were] not always detected."  Tr. 1701 (Ezell); TREX 000929 at TRN-HCEC-00090501; Tr. 4577 (Newman).

2242.  According to the 2010 Lloyd's Register Safety Management and Safety Culture/Climate Reviews, the drill crew wished they had more input on some of the changes occurring and felt there was a disconnect with [Transocean] management.  Tr. 1702-03 (Ezell); TREX 000929.

2243.  The 2010 Lloyd's Register Safety Management and Safety Culture/Climate Reviews found that fatigue was a significant weakness for Transocean.  Tr. 456 (Bea); TREX 004261 at TRN-INV-00016761.  Transocean changed the hitch schedule for the *Deepwater Horizon* from 14 days to 21 days.  Tr. 1720 (Ezell).  The 2010 Lloyd's Register Safety Management and Safety Culture/Climate Reviews found that the 21-days-on/21-days-off policy was wearing down the crew and mentally draining them.  Tr. 1721 (Ezell); TREX 000929 at TRN-HCEC-00090589.

2244.  The 2010 Lloyd's Safety Management and Safety Culture/Climate Reviews report found and reported to Transocean that crew member responses to the 21 day work schedule included feeling like they "were in another world" and, during the last week of the hitch, being "so tired they feel like robots."  Tr. 456-57 (Bea); TREX 004261 at TRN-INV-00016761.

2245.  Fatigue is a negative factor that influences employees and their ability to safely discharge their duties, and as a result companies should ensure their employees are not overly fatigued, especially in deepwater drilling environments.  Tr. 457 (Bea); TREX 004261.

2246.  Crew fatigue is a marine safety issue because, when crews get fatigued, they start missing things, get complacent, and their perception of danger can be reduced.  Tr. 3933-34 (Webster).

2247.  The 2010 Lloyd's Safety Management and Safety Culture/Climate Reviews concluded that Transocean training could better prepare its workforce to identify hazards and

risk and to control them with appropriate measures applied both to the drilling crew and the marine crew.  Tr. 3925 (Webster); TREX 000929 at TRN-HCEC-00090523.

2248.  The 2010 Lloyd's Register Safety Survey of the *Deepwater Horizon* contained positive findings, including:  (1) "The *Deepwater Horizon* was relatively strong in many of the core aspects of safety management …"; (2) "Strong team culture onboard the *Deepwater Horizon* and the levels of mutual trust evident between crews …"; and (3) "The rig safety culture was deemed to be robust, largely fair, and inclusive."  Tr. 4186-87 (Webster); TREX 044049.34.TO.

2249.  With respect to the *Deepwater Horizon*, Lloyd's Register found that "[a]lmost everyone felt they could raise safety concerns and these would be acted upon."  Tr. 4576 (Newman); TREX 000932 at 4.

2250.  With respect to the *Deepwater Horizon*, Lloyd's found that 100% of the crew members surveyed felt that "[t]hey understand the safety procedures and hazards associated with their jobs because of the degree of training and support they have received."  Tr. 4576 (Newman); D6734.

2251.  The March 2010 Lloyd's Register presentation which discussed the *Deepwater Horizon* indicated that a common theme and perceived weakness was "[a]pplication of risk management processes, lack of clarity on rig-specific management procedures."  Tr. 4633 (Newman); TREX 005482.

2252.  Transocean first received the findings in the form of a Lloyd's Register presentation in late March 2010.  Tr. 4632-33 (Newman).  Lloyd's final report was issued in July 2010, after the Incident.  Tr. 4575 (Newman).

IX.   **AS IMPLEMENTED ON THE *DEEPWATER HORIZON*, TRANSOCEAN'S DUAL COMMAND STRUCTURE WAS ALSO A PROXIMATE CAUSE OF THE INCIDENT.**

A.   **The *Deepwater Horizon* Crew Was Confused with Regard to the Command Structure.**

2253.   Transocean operated and implemented a confusing command structure on board the *Deepwater Horizon*.  Tr. 9443-44 (Mitchell); TREX 040011 at 7-9, 12-22, 29-30.

2254.   Transocean's safety management system documents indicated that while in drilling mode or "on location," the OIM was in command of the *Deepwater Horizon*, meaning that Jimmy Harrell was in charge of the *Deepwater Horizon* on April 20, not the Master, Captain Kuchta.  Tr. 9444 (Mitchell); TREX 040011 at 13-17, 23-24; Transocean's Discovery Responses at 9 (Dec. 17, 2010) (Ex. 4); Canducci Dep. 478-79.

2255.   Thus the Master was not always the person in charge on the *Deepwater Horizon* because when the *Deepwater Horizon* was on location, the Master reported to the OIM, such that 99.9% of the time, the OIM was in charge.   Wolfe Dep. 164-65, 215, 221-22, 236; TREX 0040011 at 13-17, 23-24; Canducci Dep. 478-79; Rose Dep. 457-60, 463.   The person in charge on the *Deepwater Horizon* was split between the captain and the OIM depending on the circumstances.  Tr. 5792 (Young); TREX 040011 at 13-17; Canducci Dep. 478-79; Rose Dep. 457-60, 463; Wolfe Dep. 221-22.

2256.   The *Deepwater Horizon* organization chart placed the OIM at the top and showed the master and all rig personnel reporting to the OIM.  Tr. 5827 (Young); Wolfe Dep. 216-18; TREX 005299; TREX 005474; TREX 040011 at 13-16.   The chart therefore failed to clearly state that the Master has overriding authority.  Wolfe Dep. 222.  A Welcome Onboard Card was also given to people new to the rig and listed the person in charge as the OIM.  Tr. 5834-35 (Young); TREX 004942 at 85; TREX 040011 at 63.

2257.  The *Deepwater Horizon* operations manual explained Transocean's policy that command changes between the OIM and Master depending on the circumstances:  "In accordance with the ISM Code, the master has overriding authority and responsibility to make decisions with respect to safety and pollution prevention and to request all internal company assistance as necessary" but on the same page also states that, "[u]nder normal operating conditions, when a vessel is on location and considered in the drilling or industrial operating mode," the OIM is the person in charge, and that in the event of an emergency that could endanger the vessel, the OIM can request that the Master become the person in charge and the Master may not refuse that request, and that "[s]imilarly, if the Master feels that a situation has developed that is endangering the vessel, personnel and the environment, [the Master] can request the [OIM] to secure the well and disconnect from the wellhead … and that the role of the person in charge be passed to [the Master], and the [OIM] must not refuse."  Tr. 3973-74, 4053-54 (Webster); TREX 000671 at BP-HZN-2179MDL00141833; *see also* Canducci Dep.  478-79; Transocean's Discovery Responses at 9 (Dec. 17, 2010) (Ex. 4).

2258.  Transocean's Field Operations Handbook divided authority between the OIM ("the most senior onboard") and the Master ("person in charge during an emergency in accordance with the station bill[]") in a way that "inject[ed] confusion" into the command structure.  Tr. 3963 (Webster); TREX 001452.

2259.  The *Deepwater Horizon* station bill listed the captain first but the Transocean job description for Master stated that the Master "[r]eports to the offshore installation manager, OIM."  Tr. 3967-69 (Webster); TREX 000942; TREX 000960; TREX 040011 at 13-14.

2260.  The Transocean Well Control Handbook indicated that "[t]he [OIM] is responsible for overall safety of the installation and all the personnel onboard."  Tr. 3965-66

(Webster); TREX 041008 at BP-HZN-2179MDL00327132; Mazella Dep. 166-69.   The statement of the OIM's authority in the Transocean Well Control Handbook was not consistent with the statement of the OIM's authority in the Transocean Field Operations Handbook.   Tr. 3966 (Webster).

2261.   Transocean CEO Steve Newman approved the 2007 Integration Memo which explained Transocean's policy as follows:   "The [OIM] will remain overall responsible for the health, safety, and welfare of all persons and all activities conducted on board their respective rig.   The OIM is authorized and obligated to take whatever actions he considers necessary to prevent injury, loss of life, damage to equipment/structure, and/or loss of rig and well operation integrity."   Tr. 4722 (Newman); TREX 005643 at 4.   The Integration Memo thus failed to provide for the Master's authority and did not clearly state that the Master has overriding authority in certain circumstances.

2262.   The *Deepwater Horizon* Operations Integrity Case, a Transocean management system document, stated that "the OIM has overall responsibility for the ***command***, activity coordination and control of the management, organization and support structures."   TREX 005474 at TRN-MDL-02865365 (emphasis added); Tr. 3975-76 (Webster); TREX 040011 at 16.

2263.   These contradictory documents resulted in confusion among the crew.   *Deepwater Horizon* Chief Mate David Young believed that the captain had overriding authority on the rig and that the OIM was not in charge.   Tr. 5799-800 (Young); TREX 005643 at 4.

2264.   *Deepwater Horizon* Captain David Hackney believed the Master was always in command and did not report to the OIM, although they sometimes "co-shared" the role of being in charge.   Hackney Dep.   32, 51; TREX 005643 at 4; TREX 041008 at BP-HZN-

2179MDL00327132; TREX 000942; TREX 000671 at BP-HZN-2179MDL00141833; TREX 005299; TREX 005474.

2265.  *Deepwater Horizon* Chief Mate David Young understood that under Transocean policy, during underway mode the Master was in charge and during drilling mode the OIM was in charge, meaning that when the rig was connected to the wellhead, the OIM was in charge.  Tr. 5828 (Young); TREX 005299.

2266.  *Deepwater Horizon* crew member Mike Williams believed that the OIM was always in charge and was not replaced by the Master even during emergencies, including the emergency on April 20; he had never been trained by Transocean that the Master would overtake command during emergencies.  Williams Dep.  201-02, 236.

2267.  *Deepwater Horizon* crew member Mike Williams did not believe that the subsea supervisor Chris Pleasant and Captain Kuchta were in the same chain of command, and believed that Captain Kuchta needed permission from the OIM to EDS.  M. Williams Dep. 234-36.

**B.    The Command Structure Required a Transition of Authority in an Emergency, Which Increased the Risk of Further Confusion and Delay in a Critical Situation.**

2268.  Under Transocean's policy, the Master was supposed to take command in the event of an emergency.  Tr. 5828 (Young); TREX 001452; TREX 000671 at BP-HZN-2179MDL00141833.

2269.  An emergency was determined by the sounding of the general alarm and an emergency announcement being made based on the judgment call of the person sounding the alarm.  Tr. 5828 (Young).

2270.  The *Deepwater Horizon* Chief Mate believed that anyone on board could have decided that a well-control event was an emergency.  But whether it was an emergency such that

the OIM was no longer in command depends on whether the OIM, driller, or captain determined it was an emergency.  Tr. 5830-31 (Young).

2271.   While the Master was supposed to be in charge during emergencies, well control operations were not considered emergencies for this purpose, and the OIM remained responsible for the health, safety, and welfare of all persons on board.  Tr. 5832 (Young); Sannan Dep.  275-80; TREX 005033 at 2.

2272.   Whether an emergency was actually occurring was a subjective judgment call that, for example, a well control situation had progressed to a certain point to where it was no longer a well-control operation and was now an emergency.  Only when that judgment was exercised was there a change of command or transition from the OIM to the Master.  Tr. 5832 (Young).

2273.   Nowhere on the station bill did it instruct crew members about the distinction between when a well-control event would become an emergency such that the station bill's chain of command would apply.  Tr. 5837 (Young).

2274.   *Deepwater Horizon* Chief Mate David Young believed, as a member of the maritime crew, that he was going to declare the situation an emergency and not wait for the drill crew at the time when he hit the general alarm button.  Tr. 5840 (Young).

2275.   Transocean's maritime expert, Jeff Wolfe, believed that the emergency started on April 20 when the crew first started seeing the mud and/or the first gas alarm went off.  Wolfe Dep.  237.

2276.   Members of Transocean's *Deepwater Horizon* crew, including Roustabout Nick Watson, did not know who was in charge of the rig in an emergency situation and would "just be speculating."  Watson Dep.  120.

2277.   The *Deepwater Horizon* chief mate believed that when an uncontrolled blowout occurred in which the only course of action was to move or evacuate the rig, the OIM would tell the Master to initiate the abandonment of the rig.  Tr. 5618-19 (Young); TREX 004644 at 78.

2278.   The captain of a vessel in what he should perceive as potential distress should not believe that he has to communicate with anyone before taking immediate emergency action to save the vessel or its crew.  Tr. 4011 (Webster).

2279.   Any practice requiring the captain to get approval before activating the EDS was not good marine practice because it induced delay in getting off the well and saving the rig.  Tr. 4011 (Webster).

> ### C.   As a Result of Confusion and Delay Caused by Transocean's Dual Command Structure, the Crew Failed to Activate the EDS in Time to Save the *Deepwater Horizon*.

2280.   Every minute counts in a serious emergency, and a response should be rapid and focused because every second wasted not reacting to it decreases the response options available for dealing with it.  Tr. 9415, 9472 (Mitchell).

2281.   There was an opportunity to activate the EDS between the time the blowout reached the rig floor – when mud shot up through the derrick at 21:41 (according to the BP internal investigation report) or came onto the rig floor at 21:43-21:45 (according to Transocean's internal investigation) – and the time that power was lost at 21:49.  Tr. 9417-18 (Mitchell); D4967; D2149.

2282.   During the several minutes of time between the start of the blowout and the loss of power due to the explosions, the marine crew, at the command of Captain Kuchta, should have activated the EDS.  Tr. 9418, 9432, 9514-15 (Mitchell); Tr. 4006-07 (Webster); TREX 040011 at 7-9, 19-21, 29-30.

2283.   When the rig started to shake violently, Pat O'Bryan observed Captain Kuchta walk over to the aft port door of the bridge and open it, from which mud could be seen raining down on the *Damon Bankston*, which was moored to the *Deepwater Horizon*.   Senior DPO Yancy Keplinger also observed the mud covering the *Damon Bankston* and then saw "mud flowing first with massive force, then went from mud to gas."  Tr. 9281-83 (O'Bryan); TREX 005032.

2284.   After Captain Kuchta closed the door, Senior DPO Yancy Keplinger on the bridge called the *Damon Bankston* and told it to stand off from the *Deepwater Horizon*.  Tr. 9284-85 (O'Bryan); TREX 005032.

2285.   The *Damon Bankston* was called at 21:42 by the *Deepwater Horizon* bridge crew and told to stand off from the *Deepwater Horizon*.  TREX 000001; Tr. 4008 (Webster); Tr. 9424-26 (Mitchell); D4328A; TREX 005032.

2286.   The *Deepwater Horizon* call to the *Damon Bankston* to stand off demonstrates that the *Deepwater Horizon* marine crew and Captain Kuchta knew by at least 21:42 that a serious marine emergency was taking place.   Tr. 4008 (Webster); Tr. 9424-26 (Mitchell); D4328A; TREX 005032.

2287.   Prior to the first explosion, DPO Andrea Fleytas received a call from the drill floor stating they had a well control issue and she tried to call back but received no answer. Yancy Keplinger called the shale shaker and waited for seven rings but there was no answer. Captain Kuchta should have understood then that he had a major situation that needed immediate action.   Tr. 9427-28 (Mitchell); TREX 004472 at 5; TREX 040011 at 17-19; Tr. 4005-06 (Webster); TREX 005032.

2288.   Under the circumstances, which included the jolting and vibration of the rig and spewing of mud from the well that rained down on the *Damon Bankston*, Captain Kuchta had all the information he needed to know to press the EDS button; he did not need to confer with anyone or wait for a further report.  Tr. 9514-15, 9518-19 (Mitchell).

2289.   More time passed between the time Captain Kuchta went from wherever he was standing on the bridge when he felt the rig jolt to the aft port door,  where mud was seen raining down, and the time when the bridge called the *Damon Bankston*, until the time when Pat O'Bryan heard a hissing sound prior to any explosion.  Tr. 9424 (Mitchell); D6710.

2290.  Captain Kuchta did not fully understand his responsibilities or his overriding authority as captain of the *Deepwater Horizon* and was inexperienced.  Tr. 9443 (Mitchell); TREX 040011 at 19-20.

2291.   A rapid and focused response requires an understanding on the part of the captain that he has the command authority on the ship.  Tr. 9426 (Mitchell); TREX 040011 at 19-20.

2292.   Captain Kuchta's response to the Incident was completely inadequate.  Tr. 9431-32 (Mitchell); TREX 040011 at 17-19, 26-28.

2293.   Captain Kuchta had the authority to initiate the EDS. Wolfe Dep. 193, 195; Tr. 5800-01 (Young).

2294.   The Master was authorized to activate the EDS under Transocean policy, and a well-control situation was a scenario in the *Deepwater Horizon* Emergency Response Manual when EDS was contemplated.  MacDonald Dep. 165-69, 201-02, 204-08; TREX 004644.

2295.  The EDS button was located on the bridge so the Master could exercise his overriding authority and responsibility to take whatever action he needed to in order to save his

ship, safeguard his crew, and protect the environment – in this case, through the operation of the EDS.  Tr. 9419 (Mitchell).

2296.   Wherever Captain Kuchta was on the bridge, it would only have taken seconds to get to the BOP panel and push the EDS activation button.  Tr. 9420 (Mitchell); D6710.

2297.   Captain Kuchta did not believe he had the overriding responsibility and authority to save his ship.  Tr. 9527 (Mitchell).

2298.   As a result of Transocean's confusing command structure, Captain Kuchta waited for OIM Jimmy Harrell to arrive on the bridge before activating the EDS and did not exercise his overriding authority and responsibility to take the last clear chance to save his ship, his crew, and to preserve the environment.  Tr. 9443-44 (Mitchell); TREX 040011 at 7, 17-20, 26-28; Tr. 4211 (Webster).

2299.   Captain Kuchta believed and told crew members that they could not EDS unless they had permission from OIM Jimmy Harrell to do so.  Tr. 9426-28 (Mitchell); Tr. 9286 (O'Bryan); TREX 004472 at 5; TREX 040011 at 17-19.

2300.   Immediate activation of the EDS was the captain's "last best chance to save the ship and shut in the well."  Tr. 4010 (Webster).

2301.   Immediate activation of the EDS would not have endangered the lives of anyone involved in the well control event on April 20.  Tr. 4013 (Webster).

2302.   The behavior on the bridge was not calm; there was a "great deal of confusion." Tr. 9374 (O'Bryan); Williams Dep.  310.

2303.   After the explosions and loss of power, Captain Kuchta said, "What's going on? This can't be right.   We've lost power," and "This can't be happening."   Tr. 9287, 9291 (O'Bryan).

2304.   After the explosions and prior to evacuation, Dynamic Positioning Operator ("DPO") Andrea Fleytas, who was on watch on the bridge at the time of the Incident, activated the MAYDAY and GMDSS signals, in response to which Captain Kuchta cursed and reprimanded her, saying "[D]id I give you authority to do that?" and "Who told you to do that?" Taylor Dep.  188-89; TREX 004472 at 5; Tr. 9427-28 (Mitchell); TREX 040011 at 17-19; TREX 005032.

2305.   Captain Kuchta appeared to a Transocean crew member who arrived on the bridge several minutes after the explosions to be overwhelmed, "dazed and confused" with a "deer in the headlights" look, and to not understand or believe what had happened or was happening, or why, nor did he believe what crew members were telling him.  Williams Dep.  192-93, 195; Tr. 9429-9430 (Mitchell).

2306.   *Deepwater Horizon* Chief Mate David Young had to pull Captain Kuchta outside of the bridge and show him the magnitude of the fire after Kuchta asked him to "put a hose" on it.  Tr. 5721 (Young); Tr. 9430-31 (Mitchell).

2307.   It was inconceivable to a former captain and expert in maritime safety that someone who was the captain of the ship and was in such a situation had to be told the gravity of the situation by his junior officer.  Tr. 9431 (Mitchell); TREX 040011 at 26-28.

2308.   Between the first explosion and when Harrell arrived on the bridge several minutes had passed.  At no time during those few minutes did Captain Kuchta indicate that anybody should take any action to activate the BOP.  Tr. 9288 (O'Bryan).

2309.  After the explosions, subsea engineer Chris Pleasant asked Captain Kuchta for permission to initiate the EDS, and despite the loss of power, Captain Kuchta told Pleasant

"Calm down.  We're not hitting the EDS."  Pleasant Dep.  464-66, 518-22; Wolfe Dep. 344; Tr. 9428-29 (Mitchell); TREX 005629 at 4; TREX 005032; Taylor Dep.  179.

2310.  Loss of power on the rig was a Red Alert event, and Red Alert events required that the EDS be initiated.  Tr. 5767-68 (Young); TREX 004644 at 274.

2311.  When the rig started to drop out of position due to loss of power, as conveyed in Andrea Fleytas' post-Incident interview, the EDS should have been activated.  Tr. 4006 (Webster); TREX 004472 at 5.

2312.  After the explosions, Captain Kuchta also asked Transocean's Daun Winslow for permission to EDS.  Pleasant Dep. 335-36.

2313.  Due to the absence of a clear command structure, the EDS was not operated in a timely manner and the dual command structure allowed the tragic circumstances to continue.  Tr. 9481, 9496-97 (Mitchell); TREX 040011 at 7-9, 19-21, 29-30.

2314.  As implemented on the *Deepwater Horizon* on April 20, 2010, Transocean's dual command Structure violated the ISM Code by preventing the captain from fulfilling his responsibility to protect life and safeguard the crew, to protect property and save the ship, and to protect the environment.  Tr. 4010 (Webster); Tr. 9414 (Mitchell).

### 1.    Proper Activation of the EDS Would Have Saved the *Deepwater Horizon*.

2315.  If the Transocean crew had activated the EDS prior to the first explosion, the BOP would have successfully sealed the well.  The conditions were ideal to have sheared the pipe and sealed the well.  Tr. 6989, 6991 (Stevick); Tr. 9026 (Shanks).

2316.  Operations on April 20 did not involve movement of the drill pipe, and therefore Captain Kuchta and the marine crew should have understood that the toolpusher would have left the tool joints spaced out in the BOP such that the BOP could be operated effectively, such that

Captain Kuchta had the ability to operate the EDS. Tr. 4993-96 (Barnhill); Tr. 9433, 9516 (Mitchell).

2317. Had the EDS been activated, the well would have been closed in, the LMRP would have disconnected from the BOP, the source of fuel would have been removed from the *Deepwater Horizon*, and the *Deepwater Horizon* would have been able to drive or drift off, resulting in a reduction of the consequences from the fire and explosion. Tr. 9433-34 (Mitchell); Tr. 4008-09 (Webster); TREX 040011 at 19.

2318. If the BOP had remained sealed, oil and gas flow to the surface should have ceased by around 22:00. Tr. 7879 (Emilsen).

2319. Waiting too long to EDS resulted in increased flow rates through the BOP causing erosion and damage to equipment. Tr. 6990 (Stevick).

### 2. Inadequate Qualifications and Training Contributed to the Crew's Failure to Activate the EDS Before The Explosions.

2320. The Master of the *Deepwater Horizon* was incapable, by virtue of the confusion concerning the command structure and inadequate training, to make the right decisions at critical times. Tr. 9420-21, 9480 (Mitchell); TREX 040011 at 7-8, 17-20, 26-28; D4965.

2321. Captain Kuchta was not trained to EDS. Wolfe Dep. 193, 201.

2322. Transocean's policies required the *Deepwater Horizon* crew to conduct weekly EDS drills. Tr. 9439-42, 9524 (Mitchell); D4956.

2323. Transocean failed to enforce its requirement that the *Deepwater Horizon* crew conduct weekly EDS drills; none of the 79 IADC daily drilling reports submitted by *Deepwater Horizon* for the entire period of time the rig was at the Macondo well document any EDS drills. Tr. 9439-41, 9524 (Mitchell); D4956.

2324.   Jeff Wolfe, Transocean's maritime expert, could not recall seeing any evidence of EDS drills in any drill reports and had not found any document or witness who validated that EDS drills were conducted weekly on the *Deepwater Horizon*.  Wolfe Dep. 264-65.

2325.   Earlier IADC daily drilling reports where EDS drills were logged show that when the *Deepwater Horizon* crew did carry out EDS drills they logged them properly, but there were no such drills logged during the entire time the *Deepwater Horizon* was at the Macondo well. Tr. 9524-25 (Mitchell).

2326.   Transocean was warned in 2000 by the risk assessment of the BOP control system that training on when and how to use the EDS was important and lack of "recognition, and willingness of the operator to initiate the appropriate actions" would "increase the risk for failure to disconnect …"   The risk assessment identified that the dominant failure risk of the BOP to disconnect was the crew's "failure … to identify need to EDS or operator failure to initiate EDS."   It warned that it was "essential" to provide "clear and concise" guidelines for initiating disconnect, but Transocean's guidelines were not clear or concise.   Tr. 3768-71 (Webster); TREX 004275 at 37, 40.

> **3.     Neither Captain Kuchta nor OIM Jimmy Harrell Was Properly Qualified or Adequately Trained to be Master of the *Deepwater Horizon*.**

2327.   Captain Kuchta was not properly qualified to be Master of the *Deepwater Horizon*.  Tr. 9472 (Mitchell); TREX 040011 at 23-28.

2328.   Transocean required that Masters complete the major emergency management course and assessment/qualification as a Person-in-Charge.  Tr. 9434-35 (Mitchell); D4951; TREX 040011 at 26.

2329.   Transocean's training requirements for Masters and key rig personnel were appropriate and industry standard.  Tr. 9436 (Mitchell); D4950.1; TREX 003750; TREX 005474; TREX 007563; TREX 040011 at 26.

2330.   Captain Kuchta never received the major emergency management training required by Transocean, nor did he have well-control certification, nor had he been assessed competent as a Person-In-Charge.  Tr. 9436 (Mitchell); D4950.1; TREX 003750; TREX 005474; TREX 007563; TREX 040011 at 26; Wolfe Dep. 196.

2331.   Captain Kuchta's lack of training contributed to the Incident.  Tr. 9436 (Mitchell); TREX 040011 at 26-28.

2332.   Jimmy Harrell's OIM license issued by the Republic of the Marshall Islands permitted him to serve as an OIM only aboard non-self-propelled MODUs and did not permit him to legally serve as OIM aboard the self-propelled *Deepwater Horizon*.  Tr. 9444-47 (Mitchell); TREX 044013 at 14; D4954; TREX 040011 at 23-25, 28.

## X.   BP PROMPTLY INVESTIGATED AND ACCURATELY REPORTED ON THE CAUSES OF THE INCIDENT.

### A.   The Methodology of BP's Internal Investigation.

#### 1.   The Structure and Scope of the Investigation.

2333.   Within 24 hours of the Incident, BP initiated a non-privileged investigation of the Incident.  TREX 000001 at 13; Tr. 486-87 (Bea).

2334.   Mark Bly, BP's Group Head of Safety and Operations, was assigned to lead the investigation team, which was conducted independently from BP's teams managing the ongoing Incident response and regular operations.  TREX 000001 at 13.

2335.   BP believed it was important to get a quick and accurate understanding of the immediate causes of the Incident as soon as possible, so the immediate task the investigation team had was to understand what caused the Incident.  Tr. 488 (Bea).

2336.   The BP IIT Report, published on September, 8, 2010, represented the full and complete reported findings of the BP investigative team into the facts and circumstances surrounding the Incident.  Tr. 903-04 (Bly); TREX 000001.

2337.   The intent of the investigation was to identify critical factors (events or conditions that, if eliminated, could have prevented the Incident or reduced its severity) and to examine potential causal or contributory factors at the immediate cause and system cause levels.  Tr. 912-13 (Bly); TREX 000001 at 13.  The BP IIT's findings and lessons were shared publicly, with a goal of preventing the recurrence of a similar incident.  Tr. 914, 1144 (Bly).

2338.   The BP IIT consisted of over 50 individuals who investigated the Incident for approximately five months, and was comprised of internal BP personnel as well as external consultants and experts, including personnel experienced in areas of safety, cementing, fluids, well control, drilling, BOP, process hazard analysis, subsea, failure mode testing, and operations.  Tr. 1097, 1190 (Bly); Tr. 487-88 (Bea); TREX 000001.9.1.BP; D4307A.  Transocean's drilling expert Calvin Barnhill acknowledged that the organization and procedure of the BP investigation – putting more than 50 engineers and technicians on the team and allowing them to sort out what happened from an engineering and operational standpoint – was an appropriate way to conduct the investigation.  Tr. 5017 (Barnhill).

2339.   As part of its work, the BP IIT interviewed approximately 50 witnesses.  Tr. 1191 (Bly); D4307A; Tr. 487 (Bea).  The investigation team members took notes during these various interviews but did not record the conversations nor did they seek to take verbatim transcriptions

of the discussions, or ask the interviewees to review or endorse the notes.  Tr. 1227 (Bly); Tr. 7914-15 (Robinson); TREX 000001.2.1.BP.

2340.  The scope of the BP internal investigation was set forth in the Terms of Reference.  Tr. 911-12 (Bly); TREX 000002.  According to its Terms of Reference, the BP IIT's report sought to identify critical factors at both the immediate and system levels.  Tr. 911-13 (Bly); TREX 000002.

2341.  The BP internal investigation was conducted in accordance with BP's Group Defined Practice (GDP 4.4-0002) for Incident Investigations, which was in place at the time the investigation began.  Tr. 1005-06, 1199-1200 (Bly); TREX 001742; TREX 045005.  As noted in GDP 4.4-0001, "BP openly investigates HSSE related incidents with the primary intention of reducing risk across operations."  Tr. 1006 (Bly); TREX 045005 at 4; TREX 001742 at 3.

2342.  GDP 4.4-0002 established both the level and type of investigation required for an incident, which depended on the type and severity of the impact resulting from the incident.  Tr. 1200 (Bly); TREX 045005 at 5 (§ 3.1.B), 39-45 (Annex 2.1 and 2.2).  Depending on the circumstances, GDP 4.4-0002 may require investigation into immediate causes, system-level causes, and in some cases, systemic causes.  Tr. 1200 (Bly).  GDP 4.4-0002 also recognized, however, that in certain circumstances, exceptions to the requirements of GDP 4.4-0001 are appropriate.  Tr. 1007, 1200-02 (Bly); TREX 045005.5.2.BP.  The specific circumstances that may require an exception to the requirements of GDP 4.4-0002 included:  (1) the location of the incident, including access to the equipment and personnel involved in the incident; (2) the involvement of other parties; (3) the nature of other investigations into the incident or the possibility of a joint investigation with governmental authorities or other parties; and (4) the

potential for litigation or regulatory action.   Tr. 1201-02 (Bly); Tr. 8179-80 (Shaw); TREX 045005.5.2.BP.

2343.   Each of the reasons for an exception to the requirements of GDP 4.4-0002 was present and applicable to BP's investigation into the Incident, including the inability to access the rig or the site of the Incident, the involvement of other involved parties that did not provide full cooperation, the nature of other investigations, and the potential for litigation or regulatory action.  Tr. 1201-02 (Bly).  Accordingly, the BP IIT sought and received an exception for GDP 4.4-0002's requirement to identify root or systemic failures.  Tr. 1006-07 (Bly).  The exception was endorsed by Matt Lucas, a master root cause specialist who was a member of the BP IIT. Tr. 1202 (Bly).  As a result, the BP IIT followed the root cause process for immediate and system level causes in accordance with its Terms of Reference.  Tr. 1006-07, 1202 (Bly).

### 2.      The BP Internal Investigation Team Sought but Was Not Provided Access to Evidence Sufficient to Perform a Complete Systemic Analysis.

2344.   Pursuant to BP's GDP, BP IIT was given an exception and BP did not conduct a systemic analysis because it did not have access to all the information, people, or interviews it needed to perform a full investigation into the immediate causes, thus impeding BP's ability to complete an investigation into even broader causes.   Tr. 1010-12, 1201-02, 1193-94 (Bly); TREX 040005.  *See also* Tr. 1010 (Bly) (noting that while it was not a focus of the investigation, some of the recommendations in Section 6 of the BP internal investigation report did include recommendations for further improvement at the management level).

2345.   Limited access to information impeded the investigation team's ability to conduct a root cause investigation into systemic issues.  Tr. 1193-94 (Bly).  As Bly explained:  "[I]t's very difficult to draw some investigative conclusions without being able to look at forensic evidence."  Tr. 1194 (Bly).  Limitations on evidence and information available to the BP IIT

included access to cement testing and samples, the inability to conduct forensic examinations of the rig, the BOP, and the well itself. Tr. 1194 (Bly) ("[T]he rig was not available to look at; the BOP was not recovered until after we had done our report. Can't see the condition of the well itself, obviously. So there was [sic] lots of physical things we couldn't look at.").

2346. The BP IIT repeatedly requested that Halliburton provide cement samples and cement testing results, including requests on June 16, 2010, June 22, 2010, and July 26, 2010. D4379; TREX 047541; TREX 047549. Despite the investigation team's multiple requests to Halliburton for cement testing results and cement samples, Halliburton refused to provide any representative samples of the slurry pumped at the Macondo well or the results of any post-Incident testing. Tr. 924-29, 1435 (Bly); D4307A; TREX 047541; TREX 047549.

2347. Transocean did not agree to provide any of its personnel for BP's IIT to interview. Tr. 1192 (Bly); D4307A.

### B. BP's Investigation Determined the Incident Had Multiple Causes Involving the Conduct of Multiple Parties.

2348. The BP IIT did not identify a single action or inaction that caused the Incident. Rather, a complex and interlinked series of mechanical failures, human judgments, engineering design, operational implementation, and team interfaces came together to allow the initiation and escalation of the Incident. Multiple companies, work teams, and circumstances were involved over time. Tr. 1092, 1197-98 (Bly); TREX 000001.10.3.BP; TREX 000001 at 11.

2349. The BP internal investigation report established four critical factors that led to the Incident: "Well integrity not established or failed, hydrocarbons entered the well undetected and well control loss, hydrocarbons ignited on the *Deepwater Horizon*, [and the] blowout preventer did not seal the well." Tr. 914 (Bly); D2017; TREX 000001 at 32. The four critical factors are

associated with the eight key findings of the BP internal investigation report.  Tr. 915 (Bly); D2017; TREX 000001 at 32.

2350.  The eight causes in the BP internal investigation report's "swiss cheese" model are identified as:  (1) the annulus cement barrier did not isolate the hydrocarbons, (2) the shoe track barriers did not isolate the hydrocarbons; (3) the negative pressure test was accepted although well integrity had not been established; (4) the influx was not recognized until hydrocarbons were in the riser; (5) well-control response actions failed to regain control of the well; (6) diversion to the mud-gas separator resulted in gas venting onto the rig; (7) the fire and gas system did not prevent hydrocarbon ignition; and (8) the BOP emergency mode did not seal the well.  Tr. 1090-91 (Bly); D2017; TREX 000001 at 32.

### C.    The BP Internal Investigation Report Recommendations and Their Implementation by BP.

2351.  The investigation team developed a series of 26 recommendations to address each of its key findings and identified these recommendations in its report.  Tr. 1232 (Bly); D4367; TREX 000001 at 181-86.  All 26 of the recommendations were adopted by BP's management, and resulted in 180-200 deliverables to implement.  Tr. 1232-33 (Bly); TREX 000001 at 182-86.

2352.  The recommendations were intended to enable prevention of similar Incidents in the future, and in some cases, to address issues beyond the causal findings for the Incident. TREX 000001 at 12.

2353. The recommendations covered contractor oversight and assurance, risk assessment, well monitoring and well control practices, integrity testing practices, and BOP system maintenance, among other issues.  TREX 000001 at 12, 181-86; D4367.2; Tr. 1002-03 (Bly).

2354.   After completing its investigation, BP shared the lessons learned from its investigation of the Incident with people in the industry as well as the government.   Tr. 489 (Bea).

2355.   BP now has a "Bly Remand Team" to implement all of the recommendations.   Tr. 1233 (Bly).

2356.   Since the Incident, and as a result of the efforts to implement the 26 recommendations, BP has made significant enhancements to its business including the drilling organization.   For example:  (i) a centralized well organization has been created to manage drilling activities to consistent standards across the globe, (ii) independent third party certification of drilling contractors' BOPs has been completed to check the testing and maintenance of their emergency systems, (iii) auditing of rigs has moved into the S&OR audit team, and (iv) and work is under way to enhance the standards for cementing and well integrity testing, including new approvals process and stringent contract laboratory quality audits.   Tr. 1234 (Bly); TREX 007210; D4367.

2357.   As of February 2013, 14 of the 26 recommendations had been completed.   Tr. 1237 (Bly); D4367.4.

2358.   Recommendations that have been completed include updating or clarifying cementing practices and guidelines, well design considerations with negative pressure testing, lockdown requirements for casing hangers, foam cementing, testing to the API, strengthening rig audit processes, etc.   Tr. 1237-38 (Bly); D4367.4.   Additionally, detailed procedures have been developed for negative pressure testing which include pass/fail criteria and lineup requirements and requiring sign-off from the contractor and independent checks to confirm the test was acceptable, and an advanced deepwater well control training program was also created to extend

and strengthen the training available for well control in the industry.  Tr. 1239 (Bly); D4367.6; D4367.7.

### D.    Other Parties Did Not Conduct Equally Meaningful Investigations.

#### 1.    Halliburton.

2359.  Halliburton has not issued any report or findings from any internal investigation into the Incident.

##### a.    Halliburton Intentionally Hid and Destroyed Evidence and Misled Investigators.

2360.  Halliburton sent representatives to make presentations to Congress and other entities investigating the Incident.  D4379.

###### i.    Tim Probert's Incorrect Testimony to Congress.

2361.  On May 11, 2010, Halliburton, through its President and Chief Officer of Health, Safety, Security & Environment (HSSE) Tim Probert, represented to Congress that it was conducting an investigation and that Halliburton "will of course share any information and hopefully use it as a basis for ensuring that the industry is safe and environmentally sound as we look forward into the future."  TREX 002016.  The next day, on May 12, 2010, Probert testified before the House Committee.  D4379, TREX 075074.

2362.  Prior to testifying before Congress, Probert had reviewed the April 30, 2010 Halliburton press release that stated:  "The cement slurry design was consistent with that utilized in other similar applications."  Tr. 3024-25 (Probert); TREX 002013.

2363.  Likewise, Probert testified to Congress that the cement used at the Macondo well had the same chemical makeup as the cement used by Halliburton for other wells.  Tr. 3026-27 (Probert); TREX 075074.77.1.BP.

2364.   But Halliburton had never pumped a foam job containing D-Air 3000 in the Gulf of Mexico across a production interval.  Tr. 3237-38 (Roth); TREX 007491.

### ii.      Tommy Roth's Incorrect Testimony to the NAE.

2365.   On September 26, 2010, Halliburton's Tommy Roth presented to the National Academy of Engineering ("NAE").  D4379; Tr. 3260 (Roth); TREX 000982.

2366.   Roth told the NAE that "all of the testing work that was done by Halliburton in advance of the jobs indicated that the foam system was stable."  Tr. 3261 (Roth).

2367.   At trial, Roth admitted this statement was not correct, as he subsequently saw testing which showed that three of the four foam stability tests done before the Macondo job were unstable.  Tr. 3261-62 (Roth).

2368.   In his presentation to the NAE on September 26, 2010, Roth stated that there were foam stability tests performed on February 10, April 6, and April 12.  Tr. 3262 (Roth); TREX 000982.8.1.BP.  However, Roth did not tell the NAE in his presentation or oral statements that the foam stability tests were not performed on the slurry that was actually pumped at Macondo well.  Tr. 3262 (Roth).

2369.   After Roth's presentation to the NAE, on October 28, 2010, Halliburton issued a press release admitting, for the first time, that the slurry recipe pumped was never tested for foam stability.  D4379; TREX 048098.

### iii.      Halliburton's Destruction of Test Results and Its Failure to Timely Produce Roth's Notes.

2370.   In late April or early May 2010, Halliburton manager Ronnie Faul contacted Rickey Morgan in Halliburton's Duncan facility and asked Morgan to test the Macondo well cement design.  R. Morgan Dep. 15-16.  Tommy Roth, Halliburton's Vice President of the Cementing Product Service Line at the time of the Incident, took notes in October 2010

describing the testing Faul asked Morgan to conduct.  Roth's notes stated:  "WHEN ATTEMPT WAS MADE TO FOAM THE CEMENT, SLURRY WOULD NOT FOAM."  TREX 007718.

2371.   Morgan failed to document the test results and threw out the slurry after testing, in part because he was worried about the test results being misinterpreted in this litigation.  R. Morgan Dep. 101.

2372.   Roth, not knowing about Morgan's tests, meanwhile informed Congress and other investigative bodies between May and September 2010 that Halliburton had designed, tested, delivered, and quality assured a stable foam cement system.  Tr. 3249-52 (Roth).  No one told Roth about the Morgan tests at any time between May and September 2010, even though several Halliburton employees who knew about the Morgan cement testing, including Faul, helped Roth prepare for his Congressional testimony and presentations.  Tr. 3162, 3249-52 (Roth).

2373.   In October 2010, when Roth learned about the Morgan test results that showed the opposite of what Roth had represented to Congress, Roth informed Halliburton's legal team (in whom he placed his confidence) to go back to Congressional investigators and other investigative bodies to correct this information.  Tr. 3263-64 (Roth).  Halliburton did not produce any evidence that its legal team ever corrected this error or other errors with Congress or other investigative bodies.

2374.   Halliburton did not produce the Roth notes until October 17, 2011 (Rec. Doc. 8977-6), well after Roth's July 2011 deposition, even though he prepared the notes in October 2010.  Tr. 3280-81 (Roth).

2375.   After hearing of the failed test conducted at Halliburton's Duncan lab, Faul contacted Tim Quirk at Halliburton's Broussard Lab to request further testing on the Macondo well cement design.  Tr. 4757-58 (Quirk); Faul Dep. 262-65.  Faul instructed Quirk to conduct

the tests "off the side," which Quirk found "a little unusual."  Tr. 4769-70 (Quirk); Faul Dep. 387-88.

2376.  Although Quirk made notes of his testing, he threw them in the trash after verbally reporting the results to Faul over the phone.  Tr. 4767 (Quirk).  Quirk also discarded the physical cement test samples after the tests.  Tr. 4769 (Quirk).

2377.  In addition to this destruction of testing evidence, Halliburton also lost Displace 3D modeling that Roth had requested of the Macondo well cement job.  Tr. 3168-69 (Roth).  Not until BP filed a motion for sanctions did Halliburton admit in its opposition brief that the modeling results were "gone."  Rec. Doc. 4799-12.  Someone at Halliburton deleted the results. Tr. 3171 (Roth).  Forensic testing ordered by the Court to attempt to recover the modeling was unsuccessful, as was the effort to replicate the modeling.  Rec. Doc. 8977-1 at 17-18, n.6.

2378.  On April 3, 2013, Halliburton also produced, in its own words, "a portion of Tommy Roth's custodial file" during the sixth week of the Phase I trial (Halliburton (D. Godwin) letter to the Court at 2 (April 4, 2013) (attached hereto as Ex. 7)), after Roth had already been called as a trial witness and 1.5 years after being ordered to produce all documents related to "non-privileged post-incident activities."  Rec. Doc. 4128 at 2-3.

### iv.    Halliburton's Failure to Timely Produce Rig Cement Samples.

2379.  Immediately after the Incident, a court order directed Halliburton to secure all of the products and cement additives related to the Macondo well that had been kept in the Halliburton labs.  Tr. 2955 (Probert).

2380.  In the immediate aftermath of the Incident, Quirk was told by Tony Angelle, Halliburton's operations manager in Lafayette for the Gulf of Mexico, to gather up everything he

could find related to the *Deepwater Horizon* rig.  Quirk did so and placed these materials in his office.  Tr. 4756-57, 4919 (Quirk); *see also* Tr. 4796 (Quirk).

2381.   After receiving what he thought were instructions to retain all the materials related to the *Deepwater Horizon* rig, Quirk created an inventory of these materials within a couple of weeks of the Incident.  Tr. 4891-92, 4919-20 (Quirk); TREX 048002.  From the inventory list Quirk prepared, he observed that the samples from Kodiak and the samples from the Macondo well were the same recipe and same blend.  Tr. 4787 (Quirk).

2382.   There were no lawyers involved in Quirk's initial securing of the materials in his office or creation of the inventory list.  Tr. 4920 (Quirk).

2383.   In the original "securing" process, Quirk gathered a half-full 5-gallon bucket of cement containing lab sample 63981 ("Sample 63981").  As of April 30, 2010, that bucket was in Quirk's office.  Tr. 4798, 4801 (Quirk); TREX 048002 at 2.  The sample ID for the bucket of Kodiak cement at issue matches the slurry sample ID and the date ID for the blend tested for the Macondo well on March 7, 2010.  Tr. 4799-800 (Quirk); TREX 005595.

2384.   At some point after April 30, 2010, Angelle told Quirk that he was to secure all materials related to the Macondo well — not all materials related to the *Deepwater Horizon* per se.  Quirk therefore all materials that he believed were not related to the Macondo well (including Sample 63981) and put them in a climate-controlled storage warehouse.  Tr. 4802-03 (Quirk); *see also* Tr. 4806 (Quirk).

2385.   Quirk then created a new inventory composed of only materials he believed related to the Macondo well rather than the *Deepwater Horizon*, and this inventory list did not include Sample 63981.  Tr. 4892-93 (Quirk); TREX 003110; *see also* Tr. 4921 (Quirk).

2386.   Quirk personally separated the Macondo well buckets based on Angelle's instruction that only Macondo well materials should be secured.   But no one explicitly said to Quirk that "Kodiak materials don't count."  Tr. 4836, 4838-39 (Quirk).

2387.   The storage warehouse where the other materials were stored is directly connected to the lab by a door.  Tr. 4900 (Quirk).

2388.   Quirk believed that Sample 63981 was Kodiak blend based on its label.  Tr. 4830-32 (Quirk); *see also* Tr. 4849-50 (Quirk).   However, Sample 63981 was logged into the laboratory on February 23, 2010 — after the *Deepwater Horizon* had arrived at the Macondo well.  D3257; TREX 048002 at 2.  And, Sample 63981 also had an ingredient label that showed it was identical to the bucket of Macondo well dry blend that was preserved.  D3257; TREX 048002 at 1-2 (*compare* Sample 63981 *with* Sample 67314).

2389.   When the federal government showed up in November 2010 to collect materials from the Broussard lab, Quirk was present.   Lawyers for Halliburton were also present.   Tr. 4925-26 (Quirk).   Quirk believes that this was the first time lawyers for Halliburton visited the lab regarding materials being held for the federal government.  Tr. 4926 (Quirk).

2390.   The federal government never picked up or tested the materials in the warehouse, including Sample 63981, because Quirk never told anyone it was there.  Tr. 4926-27 (Quirk).

2391.   There is a shelf life on cement and additives, and depending on what cement is exposed to, it can degrade over time.  Tr. 4806 (Quirk); Tr. 2530 (Benge).

2392.   On March 13, 2013, after the questioning of Tim Probert at trial regarding Sample 63981, which was never disclosed or produced, Halliburton notified the Court and the parties for the first time that it had withheld a bucket of cement taken from the *Deepwater Horizon* of the same dry blend that was pumped into the Macondo well in April 2010.  Rec. Doc. 8977-3.  When

asked by the Court about the significance to the trial, Halliburton counsel at first represented its significance was "none." Tr. 3861-62.

2393.   On March 18, 2013, Halliburton provided an update confirming that Sample 63981 is, in fact, the same composition as the cement that was pumped in the production interval of the Macondo well and that Halliburton used in the March 2010 foam stability testing.  Rec. Doc. 8977-4.

### b.   Halliburton Has Refused to Accept any Responsibility for Its Conduct.

2394.   At trial, Halliburton's Tim Probert confirmed that Halliburton continues to contend that it has no responsibility whatsoever for the Incident.  Tr. 3016-17 (Probert).

### 2.   Transocean.

2395.   Transocean CEO, Steve Newman initiated Transocean's internal investigation of the Incident.  Tr. 4517 (Newman).  Newman selected Bill Ambrose, Transocean's director of maintenance and technical support, to lead the investigation.  Tr. 4517, 4686 (Newman).

2396.   In testimony before the United States Senate Committee on Energy & Natural Resources on May 11, 2010, Newman stated:  "[W]e have been working hard to get to the bottom of the question that this Committee and the American public want and deserve an answer to: What happened on the night of April 20, and how do we assure the American public that it will not happen again?"  TREX 002016 at 41; TREX 004248 at 9 ("Transocean commissioned an internal investigation team … to gather, review, and analyze the facts and information surrounding the incident to determine its causes.").

2397.   The Transocean Investigation Report was published in June 2011, more than a year after the Incident, and well after BP's Internal Investigation Report (published on

September 8, 2010), and several other governmental investigation reports.  TREX 004248 at 73-74 (citing to the Bly Report and governmental reports and tests).

2398.   Transocean's investigation was limited to the three questions:  "How did reservoir fluids reach the rig floor?"; "Why did the blowout preventer (BOP) not stop the flow of reservoir fluids?"; and "How did reservoir fluids ignite?"  TREX 004248 at 9; Farr Dep. 117 ("I followed the remit.").

2399.   Notwithstanding the scope of the Transocean investigation – which squarely included the actions of the Transocean rig crew in conducting and interpreting the negative pressure test, well monitoring and well-control activities during the final hour before the Incident, and the actions taken by the crew in diverting the flow of hydrocarbons once a well control situation was identified – certain members of Transocean's investigative team concluded that Transocean did nothing wrong with respect to the Incident.  Florence Dep. 97 (stating that he "never uncovered one thing" that he believed Transocean did wrong); Hart Dep. 23 ("We – we did not draw any conclusions that anyone on the Transocean crew did anything wrong."); Roller Dep. 73.

### a.      Transocean Has Admitted It Was Negligent.

2400.   Transocean pled guilty to "negligently discharging oil into the Gulf of Mexico, in violation of the Clean Water Act, 33 U.S.C. §§ 1319(c)(1)(A) & 1321(b)(3), arising from the defendant's negligent conduct regarding the drilling rig *Deepwater Horizon* in the Gulf of Mexico on April 20, 2010."  TREX 063213 at ¶ 1.

2401.   Transocean admitted that, as part of its duties, it was "required to monitor the well and take appropriate action during the negative pressure test in accordance with the standard of care applicable in the deepwater oil exploration industry."  TREX 063213.13.1.BP.

2402.   Transocean admitted that during the negative pressure test, its rig crew members "commenced, but did not complete, investigation of the pressure anomalies" and "did not take further steps to investigate the source of the abnormal drill pipe pressure, which was neither correctly explained nor remediated."  TREX 063213 at Ex. A, ¶ 10-11.  Transocean CEO Steve Newman "acknowledged that in conjunction with [the] negative pressure test and particularly the pressure anomaly," its "people should have done more."  Tr. 4519, 4521 (Newman).

2403.   Transocean admitted that its "conduct violated its duty to exercise well control in accordance with the standard of care applicable in the deepwater oil exploration industry."  TREX 063213.14.1.BP.

2404.   Transocean admitted that its "negligent conduct, together with the negligent conduct of others, was a proximate cause of the blowout and the discharge of certain quantities of oil and natural gas from the Macondo well into the Gulf of Mexico."  TREX 063213.14.1.BP.

### b.      Transocean's Negligence Was Not Limited to the Matters for Which It Has Admitted Negligence.

2405.   Several mistakes made by Transocean contributed to the Incident.  Tr. 453 (Bea); Tr. 4447 (Barnhill); Tr. 7255 (Beck).   Transocean's CEO, Steve Newman, testified that what occurred on April 20, 2010, was "certainly preventable."  Tr. 4637 (Newman).

2406.   In addition to the conduct for which Transocean has admitted negligence, and as detailed above, Transocean's rig crew failed to properly monitor the well on April 20, 2010, and allowed a kick to go unnoticed until it turned into a blowout, it failed to follow proper well-control procedures and shut in the well immediately, failed to divert the hydrocarbons overboard once they reached the rig, and failed to activate the BOP and then the EDS in a timely manner.

XI.  **BP'S CONDUCT WITH REGARD TO THE MACONDO WELL WAS CONSISTENT WITH ITS STRONG COMMITMENT TO SAFETY.**

A.  **In the Years Preceding the Incident, BP Enhanced Its Process Safety Management System.**

2407.  In the years leading up to the Incident, BP took significant steps to improve its process safety management system.  Tr. 368-69, 373 (Bea).

2408.  To pursue these improvements, BP invested billions of dollars, recruited thousands of people, and made substantial enhancements to its systems, processes and procedures, particularly in the years immediately preceding the Incident.  Hayward Dep. 102; TREX 006001 at 37; Tr. 380-82 (Bea).

2409.  BP also met with leaders in the field of process safety, including Professor Robert Bea, the PSC's expert in process safety (Tr. 370-71 (Bea)) who agreed that there were "many, many signs of BP's efforts to advance and improve process safety."  Tr. 375 (Bea).

1.  **BP Developed and Implemented a New Safety Management System.**

2410.  In the years leading up to the Incident, BP developed and implemented a new safety management system, the Operating Management System ("OMS").  Tr. 395-96 (Bea).  BP rolled out OMS beginning in November 2008.  TREX 002352; Tr. 8045 (Shaw).

2411.  Prior to OMS, BP had operated under the "getting HSE right" ("gHSEr") safety management system.  Tr. 1169 (Bly); Tr. 8045 (Shaw).

2412.   To develop OMS and enhance process safety expertise within the company, BP recruited talent from outside the company, including John Sieg, John Baxter, and Cheryl Grounds.  Tr. 380-82 (Bea).

2413.  As Professor Bea acknowledged, BP's development of OMS is evidence that BP was improving its process safety management system in the years preceding the Incident.  Tr. 395-96 (Bea).

2414.  In fact, Professor Bea described OMS as a "good" system that was generally "outstanding."  Tr. 395-96 (Bea).

2415.  The OMS framework fully integrated safety with BP's operating practices in order to further reduce health, safety, security, and environmental risks.  Tr. 1168-70 (Bly); Tr. 308 (Bea); TREX 002352 at 2.   While every site and business within BP already had management systems in place to set priorities and manage risk, the purpose of the OMS framework was to bring "the appropriate level of consistency and completeness to all these systems."  TREX 002352 at 4.

2416.  The OMS framework accomplished this purpose by defining a set of operating requirements and providing a systematic way to improve local business processes to deliver these requirements.  TREX 002352 at 4.  Specifically, the OMS framework focused on eight "Elements of Operating" that described how plant, process, people, and performance operated within BP.  The Elements represented the highest level of the system and applied to both personal and process safety.  TREX 045002.3.1.BP; Tr. 1176-77 (Bly).

2417.  Within these eight Elements were 48 Sub-Elements that provided a more detailed list of operating activities.   TREX 045002 at 7.   Each Element and Sub-Element was accompanied by a principle or high-level statement that summarized its intent.  TREX 045002 at 7. The OMS framework then provided a list of requirements, known as Group Essentials, which were categorized against the Sub-Elements.  TREX 045002 at 8.

2418.  Although the Group Essentials placed requirements on local businesses, they did not, except in limited cases, dictate the processes the local businesses must use to fulfill these requirements.  TREX 045002 at 8.  Rather, to implement OMS, each local business was required to develop its own Local Operating Management System ("Local OMS") and associated

handbook to describe how the local business would deliver its operating activities in conformance with the Group Essentials.  TREX 002352 at 6; Tr. 1175-76 (Bly); Mogford Dep. 519.

2419.   Professor Bea believed that this approach, allowing local businesses to develop their own Local OMS, specific to their operations, was necessary to advance safe and reliable operations.  Tr. 397-98 (Bea).

2420.   The Performance Improvement Cycle was also part of the OMS framework, and helped "identify, prioritize, plan, implement and embed improvement opportunities, and provide[d] a common approach for [BP's] entities to drive and embed improvements through its annual application and link to the annual planning process."  TREX 045013 at 5; Tr. 1184 (Bly). The Performance Improvement Cycle was intended to improve both personal and process safety performance.  Tr. 1184-85 (Bly).

2421.   According to Professor Bea, a system for continuous improvement, like the Performance Improvement Cycle embodied in the OMS, is one of the basic elements of a good safety management system.  Tr. 405 (Bea).

2422.   As of February 24, 2010, BP had implemented OMS in seventy different BP operating sites.  Tr. 1159-60 (Bly); TREX 003851.

### 2.        BP's Leadership Was Committed to and Emphasized Process Safety.

2423.   BP also enhanced its leadership's oversight of safety matters, including process safety matters.  Tr. 384-86, 388 (Bea).

2424.   For example, in 2005 BP created the Safety & Operations ("S&O") function in 2005.  Tr. 385 (Bea); Mogford Dep. 238.   While the S&O function served many roles, its primary purpose was to provide an independent perspective on company-wide HSSE and

operational risk.  TREX 045062; Tr. 386 (Bea).  The S&O function provided both leadership and guidance on process safety issues, which evidenced BP's safety-mindedness.  Tr. 385-86 (Bea).

2425.  The S&O function was initially led by John Mogford, who was given an unlimited budget for this effort.  Tr. 386 (Bea); Mogford Dep. 546-47.  After John Mogford, the S&O function was led by Mark Bly.  Tr. 387 (Bea).

2426.  The S&O function accomplished its purpose through several means, including the development and maintenance of the OMS framework; the creation of an independent S&O audit function to monitor conformance with OMS; the use of the Orange Book process to track safety performance metrics (described more fully below); the development and provision of core capability training programs; and the provision of specific technical expertise and connection to industry best practice.  TREX 045062.

2427.  The S&O function conducted an audit to measure conformance with OMS, which was described as the difference between the practice actually being used by the operating unit and the practice required by the applicable BP standard.  Tr. 1161-62 (Bly).

2428.  The S&O audit teams included S&O employees and subject matter experts from outside S&O, depending on the operation being audited.  Tr. 902 (Bly).

2429.  BP also developed the Safety, Environment and Ethics Assurance Committee ("SEEAC") to provide oversight over safety.  Tr. 384-85 (Bea).  The SEEAC was a board level committee consisting of independent members of BP's Board.  Tr. 385 (Bea).  Its meetings were also attended by BP Group CEO Tony Hayward.  Tr. 385 (Bea).

2430.  As Professor Bea acknowledged, the SEEAC improved BP leadership's oversight over process safety.  Tr. 384-85 (Bea).

2431.   BP also formed the Group Operations Risk Committee ("GORC").   The GORC was charged with overseeing process safety and integrity management, taking an overall look at the risks across BP, and ensuring that mitigations were in place for those risks.   Tr. 387-88 (Bea).

2432.   The GORC was chaired by the BP Group CEO and included chief executives of the upstream and downstream business segments as well as safety and engineering functional leaders.   Tr. 388 (Bea).

2433.   Professor Bea commended BP for creating the GORC.   According to Professor Bea, the creation of the GORC in the years before the Incident improved BP's process safety management system and BP leadership's oversight of process safety.   Tr. 388 (Bea).

2434.   Through both the SEEAC and the GORC, BP leadership regularly invited relevant members of the operating lines to attend their meetings to present on both personal and process safety issues.   Tr. 1154 (Bly).   Indeed, process safety was a central topic at both SEEAC and GORC meetings.   Tr. 1154 (Bly); Castell Dep. 21; Tr. 388 (Bea); TREX 006245 at 99.

### 3.      BP Enhanced Its Training on Process Safety Issues.

2435.   In the years leading up to the Incident, BP enhanced its process safety training programs.

2436.   The training programs developed by the S&O function in the years preceding the Incident included Operations Essentials, Managing Operations, the Operations Academy, the Academy Executive Session, the Projects and Engineering Academy, and the Projects and Engineering College.   TREX 005958; Tr. 1164 (Bly).   These programs all had a focus on process safety and, together, provided training to individuals at varying levels within BP.   TREX 005958.

2437.   Operations Essentials, a program designed for first- and second-level supervisors, was aimed at embedding OMS in order to deliver safe, reliable, and efficient operations.   TREX 005958 at 3.

2438.   Likewise, Managing Operations, a pilot program in 2009 aimed at mid-level leaders, identified process safety and continuous improvement as focus areas for the program. TREX 005958 at 4.

2439.   The Operations Academy, which began in July 2007, was developed to enhance the safety and operations capabilities of BP's operations leaders.   TREX 005958 at 5.   The Operations Academy was a six-week program at MIT that was attended by site leaders and their respective leaders.   Tr. 1165 (Bly); TREX 005958 at 5; Tr. 389 (Bea).   Mark Bly, the former head of S&O, attended this program and also frequently presented at the program.   Tr. 1164-65 (Bly).   Presentations at the Operations Academy were meant to reinforce the importance of BP's priorities: safety, OMS, leadership, culture, and how all this combines to accomplish safe outcomes.   Tr. 1165-66 (Bly); Tr. 389 (Bea).

2440.   The Academy Executive Session was also located at MIT and was a synopsis of the Operations Academy, lasting two to three days and targeting senior BP executives.   TREX 005958 at 6; Tr. 1166 (Bly).   Presentations at the Academy Executive Session covered topics similar to the Operations Academy, focusing on process safety risks, leadership culture, and OMS.   TREX 005958 at 6; Tr. 1166-67 (Bly).

2441.   The Projects and Engineering Academy was a year-long program that targeted senior project and engineering leaders, and consisted of three two-week residential sessions at MIT.   TREX 005958 at 12; Tr. 1167 (Bly).   Its aim was to assist the delivery of world class projects through a system of continuous improvement over the full life cycle of an asset.   TREX 005958 at 12; Tr. 1167 (Bly).

2442.   The Projects and Engineering College, developed in 2002, was a training program aimed at BP's projects and engineering community.   TREX 005958 at 7.   The Projects and

Engineering College consisted of residential programs at the University of Manchester and at BP facilities in Houston as well as non-residential classes delivered globally.

2443.   The Projects and Engineering College collaborated with the Projects and Engineering Academy and the Operations Academy to ensure a consistent and integrated approach.   TREX 005958 at 7.   As of May 2009, the Projects and Engineering College had provided learning opportunities to over 11,000 attendees.   TREX 005958 at 7.

2444.   Professor Bea acknowledged at trial that these training programs represented a substantial investment by BP to enhance the training of its employees on process safety issues. Tr. 389-90 (Bea).   Further, they were evidence of a safety-minded company.   Tr. 389-90 (Bea). According to Professor Bea, these programs, all initiated before the Incident, were all positive steps towards emphasizing process safety.   Tr. 389-90 (Bea).

### 4.   BP Increased the Amount and Types of Feedback on Process Safety Performance Metrics.

2445.   BP's senior management understood the importance of monitoring safety performance.   As explained by Mark Bly, "I think it's important to be able to monitor the trends … safety metrics, process safety, personal safety allows you to look at trends and see if things are going the direction they should be or if there's [sic] any concerns . . . it's the ability to monitor and have a sense, at least at a high level, of the progress that is happening in the safety arena . . . ."   Tr. 1155 (Bly); Tr. 8027-28 (Shaw).

2446.   BP continuously monitored performance in both personal and process safety, and took considerable steps in the years preceding the Incident to enhance its ability and capacity in this regard.   Tr. 1159 (Bly); Tr. 8026-28 (Shaw).   BP used lagging indicators to look at outcomes and leading indicators to attempt to measure the health of a system and identify precursors to future incidents.   Tr. 1155 (Bly).

2447.   Within BP, Ellis Armstrong led the effort to develop a means to track these indicators consistently across the company, resulting in the creation of the Orange Book in 2007. Mogford Dep. 539-40; Armstrong Dep. 85.  The Orange Book, generated on a quarterly basis, compiled safety metrics relating to personal and process safety, including both leading and lagging indicators, from each of BP's business segments.  Tr. 1156-57 (Bly); Mogford Dep. 540; Flynn Dep. 48.

2448.   The Orange Book was reviewed by, among other entities, the GORC and the SEEAC.  Mogford Dep. 540-41; Armstrong Dep. 85.  Thus, the creation of the Orange Book and its distribution to top BP leadership informed BP's leadership of trends in the safety arena and enhanced their conversations aimed at improving safety performance.  Mogford Dep. 541; Tr. 1156-57 (Bly).

2449.   The safety performance metrics for the Exploration & Production segment, including the GoM SPU were reviewed by Andy Inglis, the Segment Chief Executive for Exploration & Production, Inglis' leadership team, the GORC, and the SEEAC.  Mogford Dep. 540-41; Tr. 1157 (Bly).

2450.   In addition to being reviewed by top company leadership, safety data were also reviewed by leadership within the GoM SPU at weekly operations meetings and at quarterly meetings attended by the SPU's Leadership Team and management.  Tr. 8109-10 (Shaw).

2451.  The GoM SPU tracked a comprehensive set of safety indicators in what was known as the Maroon Book.  Tr. 8027-28, 8109-10 (Shaw); Dupree Dep. 567-70.  The Maroon Book tracked both leading and lagging indicators for both personal and process safety in the GoM SPU, including BP assets and contractor-owned rigs.   Tr. 8109-10 (Shaw); TREX 045257_E11.1.1.BP.

2452.   Through Process Safety Scorecards, the GoM SPU also tracked process safety performance on a monthly basis, which included process safety performance for drilling operations.  Tr. 8062-63 (Shaw).

2453.   Between 2005 and 2010, BP developed new performance metrics.  In fact, BP led the industry in the development and use of process safety metrics.  Tr. 383-84 (Bea).  For example, BP led one of the key API committees aimed at developing new process safety performance metrics.  Tr. 383-84 (Bea).

2454.   BP continuously reviewed the basket of metrics it tracked to ensure those metrics were still helping BP understand emerging risks and driving improvement in safety performance. Flynn Dep. 121-22.  Professor Bea was complimentary of BP's efforts in this area.  Tr. 384 (Bea).

**B.     BP Had a Positive and Supportive Safety Culture.**

**1.     Safety Was Always the First Priority.**

**a.     BP's Leadership Set the Tone from the Top.**

2455.   BP's senior leadership understood that management must set the tone from the top on safety issues.  Tr. 1041, 1153 (Bly); Tr. 8028 (Shaw); Hayward Dep. 150-51.  For example, the GORC and the SEEAC set the tone from the top by reviewing and considering safety performance, including progress on the implementation of OMS.  Tr. 1153 (Bly).

2456.   Statements by BP's key leadership emphasized safety as BP's number one priority.  These statements demonstrate that BP was focusing on and improving its process safety.  Tr. 374-75, 379 (Bea); Tr. 1153 (Bly).

2457.   In external communications to shareholders, BP Group CEO Tony Hayward conveyed the importance of safety.  Tr. 377 (Bea).  Communications like these from Tony Hayward empowered those within the organization to place importance on safety.  Tr. 377 (Bea).

2458.   Andy Inglis, the CEO of Exploration and Production at the time of the Incident, likewise emphasized the importance of safety in his communications.  Tr. 377-79 (Bea).  For example, in an Exploration & Production telecom on April 2, 2010, Andy Inglis began his speech by starting with safety and emphasizing:  "The agenda in the upstream does not change: it is safety and it's people performance, and today I am going to start with safety … nothing changes in terms of safety being our number one priority."  TREX 048157.

2459.   According to Professor Bea, beginning meetings with discussions on safety, like Andy Inglis did, was characteristic of a safety-minded company.  Tr. 378 (Bea).  This emphasis on safety was also conveyed by the leadership in the GoM SPU.  Tr. 8028-29 (Shaw).  For example, when Neil Shaw started as the GoM SPU Leader in February 2008, he sent an e-mail to his leadership team encouraging everyone "to make safety their number 1 priority."  Tr. 8033 (Shaw); TREX 002398.1.2.BP.

2460.   Even after safety performance improved in the GoM SPU, Neil Shaw's message remained the same.  In a report to the GoM SPU employees on the Gulf of Mexico's 2008 safety performance, Neil Shaw wrote:  "This is, of course, a journey, one where there is always room for further improvement, and one where we can never become complacent.  The inherent risks of our business remain, and we must always continue to put safety as our number one priority in everything we do every day."  Tr. 8120-21 (Shaw); TREX 047145 at 1.  While Neil Shaw wanted to acknowledge the GoM SPU's achievements, he also wanted to ensure that the organization remained focused on safety and did not become complacent.  Tr. 8119-21 (Shaw).

2461.   BP management's communications regarding safety focused on both personal and process safety.  Tr. 8041-42, 8045 (Shaw); D4902.  For example, in Neil Shaw's 2008 SPU Update issued in May 2008, he closed his discussion with the following note: "Lets [*sic*]

continue to focus on what matters – continuously improving our personal and process safety, making this a great place to work with the best future in the GoM and delivery of our 2008 performance targets." TREX 048143.1.3.BP; TREX 048143.3.3.BP.

2462.   Neil Shaw also set the tone at the top for safety through weekly operational meetings.  Tr. 8030 (Shaw).  At these meetings, Neil Shaw met with his leadership team, which included the Vice Presidents of Drilling & Completions, Exploration, Projects, and Human Resources.  Tr. 8030 (Shaw); Dupree Dep. 560.   The agenda at these weekly operational meetings always included safety as the first topic.  During these meetings, the leadership team reviewed every personal or process safety incident that happened in the previous week.  Tr. 8030 (Shaw); Dupree Dep. 560.

2463.   Likewise, the BP employees involved in Macondo well operations, including John Guide, Mark Hafle, Greg Walz, Brian Morel, and the Wellsite Leaders, were focused on safety as their number one priority and cared deeply about the people on the rigs.  Tr. 9248-49, 9386 (O'Bryan); Tr. 8594-95, 8778 (Guide); Tr. 2025-26 (R. Sepulvado); Tr. 8265-66 (Lambert). BP's contractors working on the Macondo well also believed safety was a top priority.  Tr. 3620, 3672 (Keith); Tr. 8603 (Guide); Tr. 5605-06 (Young); Garrison Dep. 144-45; Winslow Dep. 406.

> **b.**     **BP's Leadership in the GoM SPU Engaged Contractors to Support the Message that Safety Was a Top Priority.**

2464.  BP leadership within the GoM SPU, and within Drilling & Completions, held Leadership Engagement sessions.   During these sessions, BP leadership, both offshore and onshore, would meet with the contractor's leadership to discuss safety issues.   Tr. 8620-21 (Guide); Tr. 441-42 (Bea); TREX 047414; TREX 008093.  Contractor employees from the rigs, such as the Offshore Installation Manager, the senior toolpusher, the toolpusher and the driller,

would attend Leadership Engagement sessions, if possible, and safety improvement was always a topic at these sessions. Tr. 8622-23 (Guide); Tr. 441 (Bea).

2465.   In March 2010, a Leadership Engagement session occurred in Houma, Louisiana. Tr. 8621-22 (Guide); Tr. 9244-45 (O'Bryan); TREX 008093 at 1; TREX 047414.   Among the topics discussed at the week in Houma were how to improve listening, safety performance, and communication of praise for positive accomplishments.  Tr. 8621-22 (Guide); TREX 008093 at 1; TREX 047414.

2466.   In addition to the Leadership Engagement sessions, BP held regular meetings with key contractors where safety was always the first item on the agenda.  Tr. 8036-37 (Shaw).

2467.  John Guide also communicated the importance of safety to BP and Transocean leadership on the rig.  For example, John Guide sent a note to Paul Johnson, Transocean's Rig Manager for the *Deepwater Horizon* and others from Transocean in September 2009 about how to make safety meetings with Transocean's rig leadership more worthwhile.  TREX 005965. Professor Bea agreed that Guide's note was positive, and that it demonstrated a healthy, open-minded approach to discussing HSE on the *Deepwater Horizon*.  Tr. 415-16, 419-20 (Bea).

2468.   John Guide also sent Ronnie Sepulvado slides from a GoM SPU town hall presentation.  The first item on the agenda from these slides was safety, with an obvious focus on process safety.  TREX 005966.  Professor Bea agreed that sending these slides was safety-minded and showed an emphasis on process safety.  Tr. 417-18 (Bea).

2469.   BP's focus on and prioritization of safety was also successfully communicated to Transocean's Vice President of Performance, Larry McMahan, who believed that BP personnel were genuinely concerned about safe working operations.  McMahan Dep. 346.  Paul Johnson

also felt that safety was the highest priority for the men and women aboard the rig.  P. Johnson Dep. 559-60.

### c.   BP Emphasized the Importance of Safety in Employee Performance Evaluations.

2470.  BP used performance contracts in which an employee and his or her boss set out the employee's objectives for the upcoming year.  Tr. 8113 (Shaw); Little 2 Dep. 34-35.  The employee was then held accountable for these objectives through the contract.  Tr. 8113 (Shaw). Throughout BP, safety was always a significant item on an employee's performance contract. Tr. 8116 (Shaw); Little 2 Dep. 34-35; Tr. 8625-26 (Guide).  As noted by Professor Bea, safety-minded companies try to find ways to motivate and incentivize people about safety.  Tr. 420-22 (Bea).  Thus, for example, in Neil Shaw's 2009 performance contract, safety was the first item listed and was a key component of the contract.  TREX 048074 at 1.  Shaw's performance contract was explicit that any activities to accomplish cost and production targets must not negatively impact the safety and integrity of operations.  Tr. 8113, 8155 (Shaw); TREX 048074 at 1.  Likewise, in John Guide's 2009 performance evaluation, the very first thing mentioned in the key performance indicators is safety, including process safety indicators.  Tr. 431-32 (Bea); TREX 007099.

2471.  In addition to performance contracts, an employee's personal and process safety performance was assessed during quarterly performance reviews.  Tr. 9243 (O'Bryan); TREX 000866 at 23.  For example, in preparation for one such quarterly review, Patrick O'Bryan, BP's Vice President of Drilling & Completions in the Gulf of Mexico at the time of the Incident, drafted a document in March 2010 for his boss, James Dupree, entitled, "What I'm Personally Doing to Improve Safety."  Patrick O'Bryan listed his personal initiatives toward improving

safety performance, including quarterly rig visits, participation in the week at Houma, and face-to-face meetings with Wellsite Leaders.  Tr. 9242-45 (O'Bryan); TREX 048272 at 1.

2472.   The importance of safety was also emphasized through more informal reviews of employees by, for example, complimenting employees when a safety-related task was completed well.  In a March 20, 2010 e-mail from David Sims to John Guide, David Sims congratulated John Guide on a "great job getting redrilled," referencing John Guide's excellent work getting out of a kick situation.  Tr. 446-47 (Bea); TREX 005973.  As Professor Bea acknowledged, this type of positive reinforcement for safety-related tasks was demonstrative of a safety-minded company.  Tr. 447 (Bea).

2473.   BP also tried to find other ways to provide incentives to encourage safety.  For example, BP spent approximately $7,000 on duffel bags to reward individuals for making good safety observations on a rig.  Tr. 420-22 (Bea); TREX 005967.

### d.   BP Had Programs and Initiatives to Emphasize Safety As the Number One Priority in Operations.

2474.   BP also had several initiatives in place to emphasize the importance of safety during operations, including "Stop the Job," "Safety Observations and Conversations" (SOCs), and "Safety Standdowns," each of which improved the safety of onshore and offshore operations.  Tr. 8607 (Guide); Tr. 8040-41 (Shaw); TREX 000505 at 6-9.

2475.   Stop the Job gave everyone on the rig the ability and obligation to stop work if he or she saw anything that he or she did not understand or did not think was proceeding appropriately.  Tr. 8611 (Guide); Tr. 1348 (Bly).  This obligation was widely understood by both BP and contractor personnel working on the Macondo well.  Tr. 1972-73 (R. Sepulvado); Tr. 8265-66 (Lambert); Tr. 1677-78 (Ezell); Tr. 2968 (Probert); Tr. 3622, 3625, 3673 (Keith); Tr. 6609 (Gagliano); Tabler Dep. 527-28; Williams Dep. 270.

2476.   SOCs was initiated by BP, but applied to anyone working on a rig.  SOCs was a program for people to observe the work being done around them and to identify work being done correctly and work being done in areas needing improvement, and covered both personal and process safety concerns.  Tr. 8608-09 (Guide); TREX 000505 at 7-9.

2477.   A Safety Standdown occurred when operations were stopped in order to communicate a particular message regarding safety.   Typically, Safety Standdowns occurred when there was a significant safety incident in order to ensure everyone knew what had happened, why it had happened, the learning from the incident, and to engage in a conversation about how that learning could be applied in their local environments.  Safety Standdowns, which were used extensively across BP, were also used as a powerful tool to reinforce the message that safety was the number one priority.  Tr. 8040-41 (Shaw); Tr. 8614-16 (Guide).

2478.   Safety Standdowns occurred about once a month on the *Deepwater Horizon*. When Safety Standdowns were held on the *Deepwater Horizon*, operations were stopped and everyone who could attend went to the rig's theater room to have a safety discussion.  Tr. 8613-14 (Guide).   During Safety Standdowns on the *Deepwater Horizon*, BP continued to pay the daily rig rate of almost $1 million even though operations were stopped.  Tr. 8614 (Guide).

2479.   A Safety Standdown occurred on the *Deepwater Horizon* on April 10, 2010, in response to two first aid incidents and two dropped objects within a two week timeframe.  John Guide, David Sims, and Paul Johnson advocated the Safety Standdown.  Tr. 8614-16 (Guide); TREX 047461.

##   2.   BP Utilized Surveys to Ensure that Its Employees and Contractors Understood that Safety Was the Number One Priority.

2480.   To ensure that BP's employees and key contractors understood the importance of safety, BP conducted surveys to assess its employees' and contractors' views on safety.  Tr. 392

(Bea); TREX 047570.   Surveys are among the tools a company may use to ensure that its employees understand that safety is a top priority.  Tr. 391 (Bea).  Professor Bea believed that BP's use of surveys, known as Safety Pulse Checks, was a positive initiative that evidenced BP's safety-mindedness.  Tr. 390-92 (Bea).

2481.  The purpose of the Safety Pulse Checks was to engage and listen to frontline employees and to assure them that safety was the number one priority and that they had the authority to stop a job.  Tr. 8035 (Shaw); Tr. 8609-10 (Guide).

2482.  BP's surveys consisted of a list of questions distributed to rig personnel as well as contractor employees.   Tr. 8035, 8223 (Shaw); Tr. 8609-10 (Guide).   The surveys were administered approximately once a year and were aimed at assessing the crew's safety perspectives.   Tr. 8609-10 (Guide); TREX 047570.   Leadership reviewed the results of the surveys and developed responsive action plans for any issues revealed through the surveys.  Tr. 8035-36 (Shaw); Yilmaz Dep. 702-03.

2483.  BP conducted a Safety Pulse Check on the *Deepwater Horizon* in 2008.  The results of the 2008 Safety Pulse Check conducted on the *Deepwater Horizon* showed a strong safety culture.  TREX 047570.3.1.BP.  For example, 100% of people surveyed on the *Deepwater Horizon* felt they were in control of their own safety, that they were given enough time to properly plan the job, and that they could raise a safety concern without repercussion.  D4350; Tr. 8612-13 (Guide).

2484.  The 2008 Safety Pulse Check results showed that the *Deepwater Horizon* had a strong performance and safety culture, including a strong "Stop the Job" culture.  Tr. 8611 (Guide); TREX 047570.  The Safety Pulse Check results also indicated that there was excellent

teamwork on the *Deepwater Horizon* and that the rig personnel were proud of their safety and performance history. Tr. 8611-12 (Guide); TREX 047570.

2485. John Guide, the BP Wells Team Leader for the *Deepwater Horizon*, reviewed these results and passed them along to management. Based on these results, BP and Transocean developed a Report & Action Plan. Tr. 8609-10 (Guide); TREX 047570.

2486. Safety Pulse Checks on the *Deepwater Horizon* from 2009 had similarly strong results. Tr. 8613 (Guide).

2487. When Neil Shaw left the GoM SPU in November 2009, he believed that the SPU had a comprehensive safety system in place that set safety as the number one priority and that the Safety Pulse Checks had confirmed this by revealing a deep commitment to safety. Tr. 8014, 8125 (Shaw).

### 3. BP Had Procedures In Place to Institutionalize Learning From Incidents and Near Incidents.

2488. In October 2009, BP issued a Group Defined Practice, designated as GDP 4.4-0002 Incident Investigation, to establish a consistent approach for investigating incidents and to assist in improving the quality of investigations. TREX 001742; Tr. 1005-06 (Bly). This Group Defined Practice replaced an implementation draft issued in January 2008. TREX 001742 at 3.

2489. Neil Shaw also introduced additional incident investigation initiatives at the GoM SPU level in order to more deeply understand incidents. During Neil Shaw's tenure as GoM SPU Leader, the GoM SPU began to investigate lower threshold recordable incidents in addition to "Day Away From Work Cases" ("DAFWCs"). Tr. 8037-38 (Shaw); TREX 002398 at 4.

2490. Members of BP's GoM extended leadership team served as investigation leads to ensure that leadership was actively involved in the investigations. Tr. 8037 (Shaw); TREX

002398 at 4.  The extended leadership team consisted of forty to fifty people who reported to Neil Shaw or his direct reports.  Tr. 8039 (Shaw).

2491.  As part of the incident investigation process in the Gulf of Mexico, the investigation team would generate a one-page summary of the incident describing why an incident happened as well as any lessons from the incident.  Tr. 8038 (Shaw).  These one-page summaries were then reviewed at the weekly operational meetings with the Gulf of Mexico leadership team.  The leadership teams were then responsible for cascading the lessons down through their organizations.  Tr. 8038 (Shaw).

2492.  Lessons from incidents were also shared with contractors and others outside the organization.  They were often used as "safety moments" during meetings with contractors.  Tr. 8039, 8214 (Shaw).

**4.  BP Did Not Sacrifice Safety to Decrease Costs or to Save Time.**

**a.  The Initiatives Taken by BP to Improve Process Safety in the Years Leading Up to the Incident Are Not Indicative of a Company that Was Cutting Corners to Save Money.**

2493.  As Professor Bea admitted, between 2006 and 2010, BP expressed a major commitment to improve its process safety regime, committing significant resources and personnel to this goal.  Tr. 373 (Bea).

2494.  For example, Professor Bea acknowledged that the following programs initiated by BP were not reflective of a company that was cutting corners with regard to safety:  (i) the Safety & Operations or S&O function; (ii) the Operations Academy with MIT; and (iii) the Projects & Engineering Academy.  Tr. 387, 389-91 (Bea).  These training initiatives are discussed above.

### 5. The "Every $ Counts" Slogan Was Solely About Increasing Efficiency.

2495. The "Every $ Counts" slogan was about improving efficiency and ensuring that money was spent wisely.  Tr. 8075, 8077, 8115-16 (Shaw); Tr. 8629 (Guide); Tr. 2025-26 (R. Sepulvado).

2496. BP's leadership made it clear in its communications that anything done to reduce costs under the "Every $ Counts" initiative needed to be done within the boundary condition of safe and reliable operations because safety remained the number one priority.  Any cost-saving initiatives were to have no impact on safety.  Tr. 8075-76, 8089-90, 8115-16 (Shaw); Tr. 485-87 (Bea); TREX 005689.8.13.BP ("All of this of course takes place within the boundary condition that safe and reliable operations always comes first.").

2497. BP's cost management focused on ensuring its activities were efficiently executed according to OMS and on reducing supply chain costs.  Tr. 8076-77 (Shaw).  For example, one way in which the GoM SPU reduced costs through the "Every $ Counts" initiative was to improve its utilization of logistical resources getting people and supplies on and offshore.  These savings had no impact on safety.  Tr. 8077 (Shaw).

2498. On the *Deepwater Horizon*, one of the inefficiencies identified under the "Every $ Counts" initiative was that BP was continuing to pay licensing fees for an INSITE feed, at a cost of approximately $100/day, for use by individuals who were no longer part of an operation or even employees of BP.  Eliminating this inefficiency saved BP approximately $700,000 a year and had no effect on safety.  Tr. 8630, 8633 (Guide).

2499. The *Deepwater Horizon* also saved money under the "Every $ Counts" initiative by sending rental equipment out to the rig later in order to reduce the amount of time the

equipment sat idle and by returning rental equipment which was never used.  This had no impact on safety.  Tr. 2026 (R. Sepulvado); Tr. 8629-30, 8633-34 (Guide); TREX 006294 at 2.

2500.  In a May 2009 e-mail with the subject line "Re: rig clerks performance coordinators," John Guide wrote, "*Deepwater Horizon* has embraced every dollar matters … We have saved Bp [*sic*] millions and no one had to tell us."  This e-mail was unrelated to matters involving operational safety; rather, it referenced an initiative to reduce third-party contractor rates.  John Guide sent this e-mail to ensure that this initiative did not cause a pay cut for the clerks on the rig.  Tr. 8632-33 (Guide); TREX 007062 at 1.

### a. The Removal of the BP Field HSSE Advisor from Rigs Was Done to Eliminate Duplication and Reduce Confusion.

2501.  Before the Incident, BP had two Field HSSE Advisors permanently assigned to each rig in the Gulf of Mexico.  Each Field HSSE Advisor worked a 14-day-on/14-day-off shift, so that one was on each rig at all times.  The Field HSSE Advisors were assigned to a specific rig and stayed with the rig when it moved to a different operating area.  TREX 000760 at 25.  A Transocean Rig Safety and Training Coordinator was also on the rig full-time to ensure that training sessions were attended and certifications met.  Tr. 1772 (Ezell).

2502.  In late 2009, BP switched from having a full-time BP Field HSSE Advisor on each rig to a rotating, part-time system.  Tr. 8137-39 (Shaw).  As such, at the time of the Incident, there was not a full-time BP Field HSSE Advisor on the *Deepwater Horizon*.  Tr. 1772-73 (Ezell).

2503.  The switch from the full-time to the part-time BP Field HSSE Advisor was done to improve clarity and to avoid confusion over whose safety management system applied on the rig.  Having two safety men permanently on the rig – one from BP and one from Transocean – created confusion.  A part-time rotation, where the BP safety man checked and assured that the

494

contractor's safety management system was meeting expectations, clarified which system applied and ensured accountability.  Tr. 8138-40 (Shaw); Inglis Dep. 366-70; Jackson Dep. 242-44; M. Sepulvado Dep. 18-20.

>   **b.     Increases in Production and Decreases in Cash Costs in the GoM SPU Were Unrelated to Safety.**

2504.  Professor Bea alleged that BP increased production in the Gulf of Mexico between 2008 and 2009 while simultaneously decreasing spending in the Gulf of Mexico, resulting in a sacrifice to safety.  Tr. 323-25 (Bea).

2505.  Production in the GoM SPU between 2008 and 2009 increased by 155 mboe/d. Tr. 8079-80 (Shaw); TREX 048250 at 16.  This was the result of a BP production platform, *Thunder Horse*, being brought to its peak production in 2009, increasing its production by approximately 120 mboe/d from 2008 to 2009.  Tr. 8079-80 (Shaw); Suttles Dep. 62, 65, 843-44; D4869; Tr. 490-91 (Bea); TREX 048250 at 16.

2506.  *Thunder Horse* came fully online in 2009 after seven years of substantial investment and work.  BP's investment paid off in 2009 with substantially more production in the GoM SPU compared to 2008.  Tr. 8079-81 (Shaw); Tr. 491 (Bea); Suttles Dep. 62, 65, 843-44; TREX 048250.

2507.  BP's *Atlantis* and *Marlin* facilities also ramped up to their full production levels in 2009.  Tr. 8081 (Shaw); D4865.2.  BP's *Horn Mountain* facility also increased its production by approximately 10 mboe/d as a result of an industry-wide legal resolution that led to those barrels being allocated to BP.  Tr. 8082 (Shaw); D4865.2.

2508.  The production increases in the GoM SPU between 2008 and 2009 did not relate to the *Deepwater Horizon* or the operations at the Macondo well.  Tr. 8082 (Shaw); D4865.2. Nor was this production increase related to the "Every $ Counts" initiative.  Tr. 8083 (Shaw).

2509.  Cash costs in the GoM SPU decreased by $202 million between 2008 and September 2009.  This reduction in cash cost was documented in a presentation from the September 2009 GoM SPU PerformanzFest, a quarterly meeting held to review the performance of the SPU in terms of safety, production, and costs.  Tr. 8083-84 (Shaw); TREX 005689.1.1.BP.

2510.  Approximately $154 million of the decrease in cash costs in 2009 resulted from decreased repair costs.  In 2008, the GoM SPU incurred one-off non-recurring expenses associated with repairs to the *Thunder Horse* and *Atlantis* platforms.  These repairs and costs were not related to the *Deepwater Horizon* or the Macondo well.  Tr. 8085 (Shaw); TREX 005689.8.13.BP; Tr. 489-91 (Bea); TREX 048250.36.1.BP.

2511.  Another $38 million of the cash savings in the GoM SPU was due to reduced corporate overhead expenses attributed to the GoM SPU from the broader BP Group.  Tr. 8085-86 (Shaw); TREX 005689.8.13.BP.

2512.  Cash costs also decreased between 2008 and 2009 by $38 million due to reductions in "PSCM/Deflation."  These reductions associated with PSCM/Deflation were attained by reducing the number of suppliers from 2,500 to 1,500, allowing for better discounts, and by reaping benefits from economies of scale.  Tr. 8086-87 (Shaw); Suttles Dep. 844; TREX 005689.8.13.BP.

2513.  Cash costs decreased between 2008 and 2009 by $26 million due to improved "Partner Recovery/IPT."  The GoM SPU found that it was not charging out to its partners all legitimate costs as permitted under their joint venture agreements.  In 2009, the GoM SPU began to more diligently charge its partners for legitimate costs and, by doing so, reduced BP's own costs.  Tr. 8087-88 (Shaw); TREX 005689.8.13.BP.

2514.  All of these reductions in cash costs in the GoM SPU between 2008 and 2009 "[t]ook place within the boundary condition that safe and reliable operations always comes first." Tr. 8089 (Shaw): TREX 005689.8.1.BP (Bea).  Cutting safety measures was never considered as a way to improve cost-efficiency.  Suttles Dep. 840-42, 844-45.

### c.   Safety Was Never Sacrificed at the Macondo Well to Save Time or Money.

2515.  There is no evidence that any actions were taken at the Macondo well to save time and money at the expense of safety, nor was there any incentive for anybody to cut corners with respect to safety-critical equipment.  Tr. 5932, 6250 (Ambrose); Tr. 5023 (Barnhill).

2516.  To the contrary, BP's willingness at the Macondo well to declare total-depth early – when it was determined the risk level had risen too high to drill ahead – exhibited safety-mindedness rather than a company cutting corners.  Tr. 443-44 (Bea).

2517.  John Guide never made any decisions with respect to the Macondo well that sacrificed safety in order to save money.  Further, John Guide never put any pressure on anyone from Transocean, Halliburton, or any other contractor to speed up operations at the Macondo well because of budget issues or anything else.  Tr. 8778 (Guide).  Likewise, John Guide believed that the top priority of the Wellsite Leaders and drilling engineers involved with the Macondo well was safety.  Tr. 8594-95, 8603 (Guide).

2518.  Ronnie Sepulvado, one of the Wellsite Leaders at the Macondo well, never felt pressure, whether directly or indirectly, to sacrifice safety in order to reduce costs.  Nor did Ronnie Sepulvado ever feel that he was rushed or asked to cut corners in order to save time or money.  Tr. 2023-25 (R. Sepulvado).

2519.   Lee Lambert, who worked on the Macondo well and was a participant in BP's Wellsite Leader of the Future program, believed that safety always came first and never saw any evidence of anyone cutting corners at the expense of safety.  Tr. 8265-66, 8284-85 (Lambert).

2520.   Randy Ezell, the Transocean senior toolpusher who served three hitches at the Macondo well, never felt pressure to rush through operations.  Tr. 1850 (Ezell).  Vincent Tabler, the senior Halliburton cementer on the *Deepwater Horizon*, was never asked by anyone from BP to cut corners, to rush, or to compromise his safety.  Tabler Dep. 383-84.  Likewise, no BP Wellsite Leader ever asked Leo Lindner, the senior M-I mud engineer on the *Deepwater Horizon* to cut corners to save time or money at the expense of safety.  Lindner Dep. 593.  Joe Keith, a Halliburton employee, always felt safe onboard the *Deepwater Horizon*.  Tr. 3672 (Keith).  Keith never felt overworked or pressured while working on the *Deepwater Horizon*.  Tr. 3713-14 (Keith); TREX 004395.

2521.   At the Leadership Engagement sessions, which were meetings between leadership on the rig and the leadership onshore to discuss safety, no one ever raised a concern that BP was putting pressure on the rig crew to drill too fast or to cut corners at the expense of safety.  Tr. 8624-25, 8647 (Guide); Tr. 9245-46 (O'Bryan).

2522.   Patrick O'Bryan, BP's Vice President of Drilling & Completions in the GoM at the time of the Incident, met monthly with the managing director for North America for Transocean, Keelan Adamson, to discuss drilling performance and safety issues.  Keelan Adamson never raised concerns about how BP conducted itself in connection with the wells Transocean drilled.  Tr.  9246-47 (O'Bryan).  And, no one raised any safety concerns while Patrick O'Bryan was on the *Deepwater Horizon* on the day of the Incident.  Tr. 9269-70 (O'Bryan).

### d. No One Ever Rushed Operations at Macondo to Get the *Deepwater Horizon* to the Kaskida Well Sooner.

2523.   Kaskida was a well that the *Deepwater Horizon* was scheduled to drill after drilling the Macondo well and plugging and abandoning the Nile well.  Tr. 8646 (Guide).  Under BP's lease with the MMS, BP was to begin operations at the Kaskida well by a particular date. Tr. 9270 (O'Bryan).

2524.   In order to drill the Kaskida well, BP needed a particular wellhead developed by Dril-Quip, which was delayed.  Because of the delayed wellhead and the Macondo well taking longer than scheduled, BP sent a letter to the MMS to inquire about an extension for the Kaskida well so that BP would not lose the Kaskida lease.  Tr. 9271 (O'Bryan).

2525.   Even if the MMS did not grant the extension, BP had other options to mitigate the risk of losing the lease, including pulling rigs from other wells to drill the Kaskida well.  Tr. 9271-72 (O'Bryan).

2526.   John Guide never expressed concern to anyone on the crew that the *Deepwater Horizon* needed to get to the Kaskida well or that the crew should cut corners.  Tr. 8778 (Guide).

2527.   Ronnie Sepulvado was never asked to change how he conducted operations at the Macondo well because of the Kaskida well.  Nor was he even aware of the Kaskida well's lease term.  Tr. 2023-25 (R. Sepulvado).

2528.   Lee Lambert was never told to hurry or that the rig was behind schedule.  He never had the impression that anyone working on the Macondo well was rushing to finish.  Tr. 8284 (Lambert).

2529.   No one ever raised any concerns to Patrick O'Bryan – either during his visit to the *Deepwater Horizon* or during his meetings with Transocean management – that BP was rushing to complete the Macondo well.  Tr. 9269-70, 9272 (O'Bryan).

2530.   Further, Calvin Barnhill, Transocean's drilling expert, found no indication that anyone was rushing to complete the Macondo well.  Tr. 5023 (Barnhill).

2531.   Rather than rushing the team working at Macondo, the BP Leadership Team commended the Macondo team members, assuring the Macondo team members that their effort had not gone unnoticed or unrecognized and thanking them for their commitment.   TREX 000572; Tr. 437-39 (Bea).

> ### 6.   Kevin Lacy, Among Others, Supported and Helped Implement BP's Safety Initiatives.

2532.   The GoM SPU was among the first SPUs within BP to make the transition to OMS.  Tr. 8046 (Shaw).   One of the accomplishments noted in Kevin Lacy's 2009 self-evaluation, titled "GoM D&C Performance Summary," was the completion of a gap analysis and Local OMS documentation, fully implementing OMS in the GoM Drilling & Completions organization.  K. Lacy Dep. 716; TREX 002953 at 3.

2533.   Another accomplishment reported in Kevin Lacy's 2009 Performance Summary was that the GoM Drilling & Completions organization had increased staff in the key areas of completions, projects, and Wellsite Leaders by forty-seven employees, and reduced contract staff by thirty, thereby resulting in a net increase of total personnel.  According to Kevin Lacy, this reduction in contractor staff had no visible impact on safety or operational performance.  K. Lacy Dep. 713-14; TREX 002953 at 2.

2534.   Kevin Lacy did not believe that anyone on the leadership or engineering teams within GoM Drilling & Completions ever chose riskier activities sacrificing safety or practiced engineering in a way that chose costs over safety.  K. Lacy Dep. 711.  Kevin Lacy did not believe BP ever cut costs at the expense of safety and no one ever told him to choose cost over safety in 2008 or 2009 in the GoM.  K. Lacy Dep. 710-11.

2535.   When Kevin Lacy left BP, he felt that the GoM Drilling & Completions team was in great shape.  He was satisfied with the accomplishments of the GoM Drilling & Completions organization during the two years he spent there, and he believed that the GoM Drilling & Completions team provided great examples of teamwork and leadership.  K. Lacy Dep. 750-51; TREX 002955.

### 7.   E-mails Between Guide and Sims Do Not Reflect a Poor Safety Culture or Have Any Causal Effect.

2536.   Guide and Sims were professional colleagues but they were also long-time friends.  Tr. 8665 (Guide); Sims Dep. 703.

2537.   In the years prior to the March 8 kick, Guide and Sims worked in close proximity to each other and worked together almost every day.  Sims Dep. 703, 707-08.

### a.   The March 2010 E-mails.

2538.   On March 13, Guide and Sims participated in a conference call with Wild Well Control and rig personnel including Transocean OIM Jimmy Harrell and BP wellsite leaders Murry Sepulvado and Ronnie Sepulvado, to discuss forward operations related to the March 8 kick.  Tr. 8657-58 (Guide).

2539.   During the March 13 conference call, Guide and Sims disagreed about how to circulate out the kick.  Tr. 8658 (Guide).  There are many decisions made while drilling a well that can give rise to professional differences in opinion or engineering judgment.  Tr. 8665 (Guide).  Although Guide and Sims agreed on most decisions, they had a professional difference of opinion concerning the March 8 kick that resulted in the March 13 disagreement.  Tr. 8661, 8665 (Guide).

2540.  Later that same day, Guide and Sims exchanged e-mails regarding their disagreement and expressed their frustration with each other.  Tr. 8658-59 (Guide); TREX

001126.  In addition, Sims also drafted an e-mail that he never sent or communicated to Guide. Tr. 8798-04 (Guide); Sims Dep. 149-50; TREX 001127.

2541.   Guide and Sims resolved their disagreement quickly and reconciled in an e-mail exchange the very next day (March 14).   Tr. 8663-65 (Guide); Sims Dep. 705-08; TREX 001148.

2542.   The nature of the relationship between Guide and Sims did not change after the disagreement and e-mail exchange of March 13, and they continued to work together on a daily basis afterwards.  Sims Dep. 705-06, 708.  *See also* Tr. 8662-66 (Guide); TREX 001148; TREX 005973.

2543.   Shortly after the March 13 conference call, Sims delegated responsibility for the Macondo well to Guide for a week while Sims was out of the office on vacation.   Tr. 8662 (Guide); TREX 001148, 5973.

2544.   Guide continued to work with the team while Sims was away, and the kick was successfully circulated out.  Tr. 8662-63 (Guide).

2545.   When Sims returned, he sent an e-mail complimenting Guide on successfully circulating out the kick and sidetracking the well and stated:   "You [Guide] did a great job getting redrilled."  Tr. 8665-66; TREX 005973; Sims Dep. 707.

**b.      The April 2010 E-mails.**

2546.   On April 14, 2010, Guide was attending a two-day offsite wellsite leader meeting when he became sick.  Tr. 8686 (Guide).  When he felt even worse the next morning, April 15, 2010, Guide decided to leave the meeting and go home.  Tr. 8686 (Guide).

2547.   Guide had previously informed Sims that he was sick and was likely going home, and Guide was therefore surprised when Sims sent an e-mail asking to meet early the next

morning.  Tr. 8687 (Guide); TREX 001129.  Guide jokingly responded to Sims' e-mail: "Are you going to fire me."  Tr. 8687-88 (Guide); TREX 001129.

2548.  Guide was not actually concerned that Sims was going to fire him, but rather was kidding around with Sims.  Tr. 8688 (Guide).  Sims confirmed that he was not considering firing Guide.  Sims Dep. 245-47.

2549.  Guide was not worried that Sims would take him seriously because "David and I were good friends.  You know, we had the kind of relationship that, you know, we kidded around with each other."  Tr. 8688 (Guide); Sims Dep. 192, 616-17 (corroborating Guide's description of his relationship with Sims).  Indeed, several months earlier, Guide had received a performance rating of "Exceeds Expectations" and had no issues with performance that would lead him to believe he might be fired.  Tr. 8688 (Guide).

2550.  Guide's e-mail was intended as a joke, and another example of the friendship between Guide and Sims.  Tr. 8688 (Guide); Sims Dep. 245-47 (Sims was not considering firing Guide).

2551.  On April 17, 2010, Guide sent an e-mail to Sims expressing frustration with logistical issues which Guide felt were making things more difficult for some members of the wells team.  Tr. 8710-14 (Guide); TREX 021099.

2552.  Specifically, Guide expressed frustration with changes to the operational plans that created logistical issues and made the job of the wellsite leaders more difficult.  Tr. 8711-12 (Guide).  Guide felt that part of his job was to make things easier on the wellsite leaders and he did not feel that was happening.  Tr. 8712 (Guide).

2553.   Guide's April 17, 2010 e-mail also discussed frustrations that BP Drilling Engineer Brian Morel shared with Guide in a telephone conversation that same day.  Tr. 8713-14 (Guide).  Guide viewed himself as a mentor to Morel.  Tr. 8710 (Guide).

2554.   The closing statement in Guide's April 17, 2010 e-mail — "[t]he operation is not going to succeed if we continue in this manner" — was intended to convey Guide's concerns about the long-term operations of the *Deepwater Horizon*, and was not in any way predicting a blowout of the well or meant to suggest that the operations at the Macondo well were not being conducted safely.  Tr. 8714-15 (Guide); TREX 021099.

2555.   Guide's e-mail was intended to address logistics and was not related to the safety of operations.  Tr. 8715-16 (Guide).  In fact, both the author (Guide) and the recipient (Sims) testified that this e-mail was not meant to suggest that operations at the well were not being conducted safely, or to predict a blowout, and that he was satisfied that there was a plan in place to address his concerns.  Tr. 8714-20, 8989-91 (Guide); Sims Dep. 182-84, 200-02.  Moreover, Sims personally went out to the rig several days later.  Tr. 8719 (Guide); Sims Dep. 183-84.

2556.   Sims responded to Guide's April 17, 2010 e-mail, and agreed with Guide that "everyone wants to do the right thing."  Tr. 8716-17 (Guide); TREX 021099.  Guide did not believe that Sims' response was dismissive of Guide's concerns.  Tr. 8716 (Guide).  Rather, Guide felt that Sims' response began to address the concerns raised.  Tr. 8718 (Guide).

2557.   Guide also discussed the issues expressed in the April 17, 2010 e-mail with Walz and felt that the conversation with Walz "was a good second step" in alleviating Guide's concerns.  Tr. 8719-20 (Guide).

2558.   Ultimately, Guide was satisfied that the concerns set out in his April 17, 2010 e-mail were understood, and that there was a plan in place to address those concerns.   Tr. 8720 (Guide).

**C.     BP Had Process Safety Policies and Procedures in Place to Identify and Mitigate Risks Associated With Deepwater Drilling in the Gulf of Mexico.**

**1.     BP Had Process Safety Systems Governing Deepwater Drilling in the Gulf of Mexico Before the Adoption of OMS.**

2559.   Prior to the adoption of OMS, BP's Drilling & Completions organization already had a mature process safety system in place that included the "Beyond the Best Common Process" ("BtB"), the "Drilling and Wells Operations Practice" ("DWOP"), "Engineering Technical Practices" (ETPs), and "The Way We Work."   Tr. 8046-47 (Shaw); Tr. 9252-53 (O'Bryan).

**a.     Beyond the Best Common Process.**

2560.   BtB existed prior to OMS.   OMS did not supersede BtB, but rather, BtB simply fits within the OMS framework.   Tr. 8605-06 (Guide); Tr. 9307 (O'Bryan).

2561.   BtB articulated the specific programs for the drilling engineers to follow to plan and engineer wells.   The BtB process included ETPs, Group Practices (GPs), and site-specific practices.   Tr. 8606 (Guide); Tr. 9252 (O'Bryan).

2562.   BtB was an industry standard stage-gate process that applied to all wells across BP.   Tr. 9233 (O'Bryan); Tr. 8635 (Guide).   BP developed the BtB process in 2001 and issued the third edition of the BtB handbook in 2008.   TREX 006066.

2563.   BtB described the process each and every well must go through before a well could be drilled and completed.   Tr. 8635 (Guide); TREX 006066.   There were five stages to this process:   Appraise, Select, Define, Execute, and Review.   Tr. 8635-39 (Guide); TREX 006066; D4072.

2564.  Appraise was the inception phase where the subsurface team developed the idea to drill a well.  Tr. 8636 (Guide).  The team conducted a geological assessment, determined the precise location and expected size of the hydrocarbon reservoir, and developed a project risk register.  TREX 06066 at 36, 42, 106, 129, 164.

2565.  A well moved from the Appraise to the Select stage when this high-level geological assessment showed that the well was a viable project and did not show, from a drilling standpoint, any reason not to proceed.  Tr. 8636-37 (Guide); TREX 006066 at 36, 42, 106, 129, 164.

2566.  During the Select stage, the well planning team analyzed and developed different well design options.  Before proceeding to the next stage, the Define stage, a well design was chosen and the risk register was updated to reflect this choice.  Tr. 8637 (Guide); TREX 006066 at 36, 42, 106, 129, 164.

2567.  During the Define stage, a detailed well design was developed with the assistance of third-party vendors, including, for example, the directional drillers and mud providers.  The risk register was again updated and risk mitigations were put in place.  Tr. 8637-38 (Guide); TREX 006066 at 36, 42, 106, 129, 164.

2568.  A communications plan was also developed during the Define stage, which formed part of the documentation between BP and the drilling contractor.  TREX 006066 at 36, 42, 106, 129, 164.

2569.  Before moving to the next stage, the Execute stage, peer-reviewers provided an independent assessment of the detailed well design.  Tr. 8637-38 (Guide); TREX 06066 at 36, 42, 44, 129, 164.  Before a well moved to the Execute stage, on average hundreds of people had reviewed the well design.  Tr. 8639 (Guide).

2570.  By the time a well was moved to the Execute stage, the drilling engineers were finished; they had approved and handed over the well to operations in order to execute the design.  Tr. 8638 (Guide).

2571.  Although the operational aspect formally begins during the Execute stage, there was a member of the operations team involved in the planning from the Appraise stage.  Tr. 8639 (Guide).

2572.  The operations team reviewed the risk register during the Execute stage throughout the drilling of the well.  Tr. 8639 (Guide); TREX 06066 at 36, 42, 106, 129, 164.

2573.  The final stage, the Review stage, occurred after a well has been drilled to allow the team to capture and disseminate any lessons learned from the drilling of the well.  TREX 06066 at 36, 42, 48, 106, 129, 164.

### b.      The Drilling and Wells Operations Practice.

2574.  BP's Exploration & Production segment established the DWOP in 2008.  The DWOP provided the safety management system and practices for the drilling function of the Exploration & Production segment's operations, laying out how wells were to be operated and executed.  Tr. 1038 (Bly); Tr. 8606 (Guide); TREX 000093.

2575.  The DWOP provided a summary of the key drilling ETPs and also encompassed a number of standard practices that were not covered by the ETPs.  TREX 000093 at 13.

2576.  As acknowledged by Halliburton expert Gene Beck, the spirit of the DWOP was to be safe all the way down to the details.  The DWOP prioritized safety, making safety the number one priority and the delivery of a well the last priority.  Tr. 7076-78 (Beck); TREX 000093 at 21.

2577.  The DWOP articulated very specific tasks to guide safe operations and provided a good framework to safely drill wells.  Tr. 7076-77, 7270 (Beck).

2578.  Like the BtB process, the DWOP became part of OMS when BP developed and adopted OMS.  Thus, OMS provided the overall framework while the DWOP continued to provide the detailed drilling practices relevant to engineering and risk management.  Tr. 1036-38 (Bly); Yilmaz Dep. 575.

### c.      Drilling Engineering Technical Practices.

2579.  The drilling ETPs also existed as part of the mature system in place for Drilling & Completions before the implementation of OMS.  Like the DWOP, the drilling ETPs were not replaced by OMS, but rather fit within the OMS framework.   TREX 007249; Tr. 8046-47 (Shaw); Tr. 1036-37 (Bly).

2580.  The DWOP provided a summary of the key elements of the ETPs applicable to drilling.  The ETPs themselves may contain more detailed requirements than those summarized in the DWOP.  TREX 000093 at 13.

2581.  There were eighteen ETPs that were specific to drilling.  Tr. 8606 (Guide); Tr. 8160 (Shaw).  For example, there were ETPs on zonal isolation and tubular design, both of which relate to process safety.  Tr. 9253 (O'Bryan); TREX 000093 at 39, 90.

### d.      The Way We Work.

2582.  The GoM Drilling & Completions organization issued The Way We Work in April 2009 as the precursor to the Drilling & Completions Local OMS.  K. Lacy Dep. 318-19; TREX 000760; TREX 000268 at 46.

2583.  The GoM Drilling & Completions issued The Way We Work to "provide insight as to how the new Gulf of Mexico (GOM) Drilling and Completions (D&C) Organization [would] function[] as it manage[d] all well planning and execution activity …"  TREX 000760 at 6; K. Lacy Dep. 318-19.

2584. To this end, The Way We Work included a chart that explained the roles and responsibilities of those within the GoM Drilling & Completions organization, including the drilling engineers, wells team leaders, completion engineers, and managers. The chart explained the accountabilities for each role and how all of these individuals were to work together to deliver wells safely. Tr. 9253 (O'Bryan); TREX 000760 at 15.

2585. The Way We Work also defined how the GoM Drilling & Completions organization worked with contractors, specifying that the contractor's safety management system would apply on contractor-owned installations. TREX 000760 at 24-25.

2586. A key objective of The Way We Work was to improve HSE and integrity management within the Drilling & Completions organization in the GoM SPU. TREX 000760 at 6. The Way We Work was placed on a computer sharepoint site so that everyone, including Wellsite Leaders, could access it. Sprague Dep. 165.

### 2. The GoM SPU Adopted OMS in Late 2008.

2587. BP rolled out OMS in waves throughout the company. The relevant Executive Vice President, Group Vice President, and SPU Leader determined the timing for individual BP entities to transition to OMS. Tr. 1171-72 (Bly); TREX 045008 at 22.

2588. While the goal was to have all BP entities operating under OMS by the end of 2010, BP allowed each entity to set the pace of its transition to allow entities to learn from each other's experiences. Tr. 894, 1171-72 (Bly).

2589. The GoM SPU was an early adopter of OMS, implementing it in December 2008 by completing its Local OMS manual and the Management of Change process. Tr. 396-397, 1031, 1172 (Bly); Tr. 8048 (Shaw); TREX 000866.

2590.  The GOM SPU Local OMS handbook set out the "vision, strategy, and priorities of the organization," including how the organization would manage risks.  Tr. 8050 (Shaw); TREX 000866.

2591.  BP rolled out OMS to the various BP operating entities within the GoM SPU at different times.  The initial focus in 2008 was on the GoM SPU overall and the production part of the GoM business as was clear from the scope of the December 2008 GoM SPU Local OMS manual.  Tr. 8046 (Shaw); Tr. 1172 (Bly); TREX 000866 at 4.  By December 2009, all of the BP entities in the GoM, including Drilling & Completions, had implemented OMS.  Tr. 8046 (Shaw); Tr. 1031 (Bly).

2592.  As part of the transition to OMS from Getting HSSE Right (BP's predecessor safety management system), there were specific steps required to make the transition.  These steps included conducting a gap assessment using the Gap Assessment Tool described in OMS. Tr. 1173-74 (Bly); TREX 045006.

2593.  The gap assessment compared the entity's practices and processes already in place with the forty-eight OMS Group Essentials.  Tr. 8048 (Shaw).

2594.  The results of the 2008 GoM SPU gap assessment conducted as part of the transition to OMS were included in its December 2008 Local OMS manual.  TREX 000866 at 35.  These gaps only applied to the GoM SPU and the production facilities that implemented OMS pursuant to the scope of the 2008 GoM SPU Local OMS.  The gaps reported in the GoM SPU Local OMS manual, therefore, were completely unrelated to the Drilling & Completions organization.  Tr. 8048-49, 8242 (Shaw); Skelton Dep. 223-25.

2595.  Neil Shaw, the GoM SPU Leader, met with his Leadership Team to review all of the key gaps and to assign them ratings to identify which gaps could most significantly reduce

risks to the organization.  This initial meeting was then followed up with monthly meetings of the same group to track and discuss the status of OMS gap closure.  Tr. 8057-58 (Shaw).

2596.  The 2008 GoM SPU gap assessment identified a process safety major hazard risk awareness gap.  The gap assessment essentially found that major hazard risks were not being fully understood by engineering or line-operating personnel.  Tr. 8059-60 (Shaw); TREX 000866 at 38; Tr. 9261-62 (O'Bryan).  Again, this gap was not related to Drilling & Completions.  Tr. 9261-62 (O'Bryan); Tr. 8048-49, 8242 (Shaw); Skelton Dep. 223-25.

2597.  To close this and other gaps for the GoM SPU, BP put in place the 2009 GoM SPU Process Safety Improvement Plan, which identified the following as priorities:  major hazard awareness, risk prioritization, and learning.  Specific action plans were put in place to improve performance in each of these areas.  Tr. 8061 (Shaw); TREX 048257 at 2.

2598.  One of the action plans put in place to improve performance in major hazard awareness included increasing work-force awareness of process safety hazards.  Tr. 8061-62 (Shaw); TREX 048257.2.6.BP.

2599.  Before the GoM SPU issued an updated Local OMS manual in March 2010, it conducted a gap reassessment in 2009.  The gap reassessment found that approximately fifty percent of the gaps that had been identified in 2008 had been closed by 2009 (the number of gaps decreased from 435 in 2008 to 245 in 2009).  The GoM SPU continued efforts to close the remaining gaps.  Tr. 8056-57 (Shaw); TREX 003893 at 32.

2600.  Professor Bea agreed that the identification and closure of gaps was a good thing because it forced organizations to look critically to determine how they could improve.  Professor Bea further agreed that the OMS gap closure process, which identified gaps and tracks their closure, reflected a safety-conscious company.  Tr. 406 (Bea).

### 3. The GoM Drilling & Completions Organization Implemented OMS in Late 2009.

2601.  The GoM Drilling & Completions organization implemented OMS in late 2009. Tr. 398-99 (Bea); Tr. 9255 (O'Bryan); TREX 006065.

2602.  As part of its transition to OMS, the GoM Drilling & Completions organization performed its own gap assessment against the OMS Group Essentials.  Unlike the organizations that reported up through the GoM SPU, Drilling & Completions was required to do its own gap assessment separate and apart from the GoM SPU gap assessment.  Tr. 9255-57 (O'Bryan).

2603.  The GoM Drilling & Completions organization had a coordinator to lead the implementation of OMS within the organization.  Part of the coordinator's job was to track identified gaps and ensure their closure.  Tr. 9257 (O'Bryan).

2604.  In order to do this, the GoM Drilling & Completions organization tracked the results of the gap assessment in a register.  The GoM Drilling & Completions gap assessment register identified three process safety gaps.  Of those three, two were closed as of June 2009. The remaining gap had a high conformance rating (four), meaning that the Drilling & Completions organization largely conformed with the requirements of the element due to systems already in place.  Tr. 9257-60 (O'Bryan); TREX 006025.C at 3, 12.

2605.  The GoM Drilling & Completions gap assessment identified sixteen gaps in the area of risk assessment and management.  Of those sixteen gaps, fifteen were closed as of June 2009.  Tr. 9261 (O'Bryan); TREX 006025.C at 9.

2606.  Major hazard risk awareness was never identified as a gap within the GoM Drilling & Completions organization.  Everyone within drilling, both engineering and line personnel, understood that the major risk associated with drilling a well is a blowout.  Tr. 9261-62 (O'Bryan).

2607.   A key part of OMS, as discussed above, was continuous improvement.  These gap assessments were intended to be completed on an ongoing basis in order to facilitate continuous improvement.  There was no intention within the GoM Drilling & Completions organization that all gaps would be closed within a certain period of time.  Tr. 9261 (O'Bryan); Tr. 1174-75 (Bly).

### 4.    BP Managed and Monitored Process Safety Risks Associated With MODUs Owned by Contractors in the Gulf of Mexico.

#### a.    BP Appropriately Managed the Risks Associated with Loss of Well Control.

##### i.    Loss of Well Control Was Identified As a Top Risk for the GoM SPU and Managed By the SPU Leadership Team, Including the Vice President of D&C.

2608.   BP's GOM SPU leadership adopted the vision of the GoM SPU Major Hazards Risk Management Policy, which stated that "[w]e must make it a top priority to continually identify major hazards and effectively minimize risks.  The GoM SPU Risk Management Policy sets out a key risk management structure that will lead us on our journey to excellence in process safety and meeting our vision goals."  TREX 048159 at 5.

2609.   Pursuant to the GoM SPU Major Hazards Risk Management Policy, the GoM SPU leadership team identified the top twenty risks facing its business, including loss of well control.  Tr. 8064-67 (Shaw).  The GoM SPU leadership team met regularly to review and update the top twenty risks and their attendant risk mitigation plans, including loss of well control.  Tr. 8071 (Shaw).  The GoM SPU leadership team communicated the top twenty risks and their risk mitigation plans both up to the Exploration & Production segment level and down to the GoM SPU community.  Tr. 8065-66, 8074 (Shaw); Dupree Dep. 621-23.

2610.   The single most important process safety risk associated with deepwater drilling is loss of well control.  Tr. 465 (Bea); Tr. 9384 (O'Bryan); Tr. 8066, 8125 (Shaw).

2611.  BP's GoM SPU management recognized that loss of well control carried with it the risk of damage to health, safety, and the environment.  TREX 004171 (Risk Mitigation Plan); Tr. 635-36 (McKay); Tr. 8125 (Shaw); TREX 004159.

2612.  BP recognized the risk of loss of well control on its own assets as well as on MODUs such as the *Deepwater Horizon*, and BP had action plans completed for 2009 and in place for 2010 to manage this risk.  TREX 004170 at 23.

2613.  The GoM SPU created a risk mitigation plan to address the loss of well control, and this plan was signed off and managed by the Vice President of Drilling & Completions. TREX 004171; TREX 005691; Jassal Dep. 257, 360-61; Dupree Dep. 620; Tr. 8068-71 (Shaw); Tr. 1179-80 (Bly)

2614.  The GoM SPU leadership team reviewed and updated the loss of well control risk mitigation plan in September 2009.  Tr. 8071 (Shaw); TREX 002912 at 1, 2, and 10.

2615.  The GoM leadership team's loss of well control risk mitigation plan applied equally to contractor-owned rigs as well as to BP-owned facilities.  Tr. 8070 (Shaw); TREX 004170 at 23; Jassal Dep. 361.

2616.  The loss of well control risk mitigation plan built on the mitigations already in place, such as Transocean's crew, which was well-control certified, and safety critical BOP equipment.  Tr. 8070-71 (Shaw); TREX 004171.

        **ii.**     **BP Did Not Need to Conduct A Major Accident Risk Quantified Assessment on Either the *Deepwater Horizon* or the Macondo Well.**

2617.  BP's Major Accident Risk ("MAR") Process was a high level quantified assessment that was designed to identify and quantify major accident risks.  It was not necessary or particularly useful for BP to perform a MAR if the risk was easily identifiable and well understood, such as the risk of a blowout on a deepwater well drilled by a contractor-owned

MODU.  Tr. 1054-55, 1181-82 (Bly); TREX 001734 at 2; Tr. 8159-60 (Shaw); Jassal Dep. 347-48; Baxter 1 Dep.[15] 174-75.

2618.  BP expected that its drilling contractors would take the steps necessary to understand the risks around their own equipment and facilities and, through the appropriate assessments, to understand the appropriate mitigations.  Jassal Dep. 348-350.

2619.  Transocean did conduct a Major Hazard Risk Assessment (MAHRA) on the *Deepwater Horizon*, and identified a reservoir blowout at the reservoir floor as a potential process safety hazard.  Tr. 470-71 (Bea); TREX 002187.

2620.  Transocean's MAHRA also looked at the preventions and mitigations in place on the *Deepwater Horizon* regarding hazards such as well control, maintenance, and testing of the BOP, instrumentation and indication of well status, hydrocarbon combustible gas detection system, and redundant BOP controls.  Tr. 471 (Bea); TREX 002187.

2621.  Transocean's MAHRA also identified a maritime mitigation for a reservoir blowout, namely the ability to move off station, which was the responsibility of the vessel's master.  Tr. 9416 (Mitchell); D4401A.4.

> **b.**   **Consistent with Industry Standards and Practices, As Well As BP's OMS, Transocean's Safety Management System Governed the Operations Onboard the *Deepwater Horizon*.**

2622.  Having the contractor's safety management system (in this case, Transocean's system) apply to the operations onboard the *Deepwater Horizon* was consistent with industry practice.  Tr. 1188 (Bly); Tr. 404-05 (Bea); Tr. 9252 (O'Bryan); Tr. 8053-55 (Shaw).

---

[15] "Baxter 1 Dep." refers to Mr. Baxter's first day of deposition testimony, which occurred on June 21, 2011.  "Baxter 2 Dep." refers to Mr. Baxter's second day of deposition testimony, which occurred on June 22, 2011.

2623.   MODUs move from one operator to the next and a contractor's employees may move between the contractor's rigs, so it makes sense for the rig owner's management system to govern activities onboard the rig, even if a rig is contracted with the same operator for years, as was the case with the *Deepwater Horizon*.   Tr. 8054-56 (Shaw); Tr. 1187-88 (Bly); Tr. 4701 (Newman).

2624.   The Offshore Operators Committee and the American Petroleum Institute have taken the position that because operators neither own nor operate MODUs, it is not only impossible for operators to fully develop and implement a safety management system for a MODU, but it would not serve any useful purpose because MODUs are regulated by their flag state, classification society and the U.S.C.G., and they have their own requirements for hazard analysis and operations procedures.   Tr. 404 (Bea); TREX 005963.

2625.   Likewise, Exxon has stated that if a company contracts for a MODU, the contractor should have to provide its own hazard analyses and safety management system, as opposed to the operator for which the contractor is working.   Tr. 404-05 (Bea); TREX 005984.

2626.   BP's OMS required that where BP relies on a contractor to carry out work, BP shall, as needed, include and apply contract provisions so that contractor's work is carried out in a way that supports and is consistent with the way in which BP applies OMS to BP's operating activities.   Tr. 1185-86 (Bly); TREX 045006 at 16; Tr. 4698-99 (Newman); Baxter 1 Dep. 174-75.

2627.   Consistent with industry practice, OMS envisioned that the contractor's safety management system would govern operations onboard a MODU like the *Deepwater Horizon*, and that the contractor's safety management system would be "bridged" back to BP's OMS.   Tr.

1186 (Bly); Tr. 533-37 (McKay); Tr. 401-02 (Bea); Tr. 8054 (Shaw); Tr. 9251 (O'Bryan); Armstrong Dep. 470.

2628.  If there was a difference between BP's safety management system and Transocean's safety management system, a "bridging document" was executed between BP and Transocean to close that gap.  This arrangement existed between Transocean and each of its customers, including BP.  Tr. 4643-44 (Newman); *see also* Tr. 4693-94 (Newman).

### c.  BP Applied its Beyond the Best Common Process to the Macondo Well.

#### i.  BP Identified, Assessed, and Managed Key Risks at Each Stage of the Well Planning and Design Process.

2629.  BP designed and planned the Macondo well consistent with BP's BtB.  Tr. 8642-43 (Guide); Jassal Dep. 344-46.

2630.  Consistent with BtB, BP used an Excel-based risk register to identify and mitigate risks associated with drilling the Macondo well.  Jassal Dep. 300, 344-46.

2631.  A risk register was created by selecting applicable risks from a tool called No Drilling Surprises, and then adding risks that are specific to the well.  Jassal Dep. 344-45.

2632.  The Macondo well risk register was prepared by BP's wells team and updated during the stage-gate process.  Jassal Dep. 300, 346.

2633.  The first risk identified in the Macondo well risk register was well control, and was described as "[p]otential well control problems, risk of losing the wellbore in an uncontrolled situation."  Tr. 8640-41, 8929-30 (Guide); TREX 000757.

2634.  The Macondo risk register also identified other risks which could lead to well control problems, such as zonal isolation, narrow PPFG, tight hole stuck pipe, shallow gas, and lost circulation, among others.  TREX 000757; Jassal Dep. 257-58; Tr. 8930 (Guide).

2635.   Regardless of the specific "impact type" listed on the Macondo risk register for a given risk, the concern for health, safety and the environment was the important driver in mitigating the identified risks.  Tr. 1060 (Bly); Jassal Dep. 258-59.

2636.   Once the Macondo well entered the "Execute" stage, there was no need to further update the risk register, as it included all known risks and the risk profile had not changed. Jassal Dep. 271-72.

### ii.    The Macondo Wells Team Appropriately Identified Risks in the Macondo Risk Register.

2637.   On January 20, 2010, the GoM Drilling & Completions Leadership Team issued an implementation draft of a new Recommended Practice for Risk Management, which included a description of a new risk assurance tool ("bpRAT") for planning wells.  The bpRAT was an Internet-based risk management tool, as opposed to the Excel-based Risk Register used during the design and planning of the Macondo well.  Tr. 9307-08 (O'Bryan); TREX 001975; Jassal Dep. 268-69.

2638.   At the time the implementation draft of the new Recommended Practice was issued in January 2010, the Macondo well had already been planned using the BtB common process and an Excel-based risk register.  There was never any intention for teams to go back and redesign or re-plan wells that were already in the Execute stage after the implementation draft was issued.  Tr. 9311 (O'Bryan).

2639.   The use of the bpRAT would not have changed the risks identified for Macondo, as these risks were already identified in the Macondo risk register.  Jassal Dep. 368-69.

### D.     BP Had a Superior and Improving Safety Record in the Gulf of Mexico.

#### 1.     BP's Internal Documents and Communications Demonstrated the GoM SPU's Outstanding and Improving Safety Record.

2640.   BP achieved an exceptional safety performance in the GoM SPU in 2008, with a 50% reduction in recordable injuries from 44 in 2007 to 22 in 2008, with the recordable frequency rate (TRIR) dropping from .69 in 2007 to .38 in 2008 (versus a plan of .55).  Tr. 8117-18 (Shaw); TREX 002500 at 2.

2641.   In 2008, the GoM SPU delivered 100% safety-critical equipment inspections, which was a key leading process safety indicator tracked by BP leadership.  Tr. 8118 (Shaw); TREX 002500 at 2.

2642.   BP reduced the number of oils spills greater than one barrel from 2 in 2007 to 0 in 2008.  Tr. 8118 (Shaw); TREX 002500 at 2.

2643.   In 2009, the GoM SPU sustained its improved safety performance in the Gulf of Mexico, with TRIR remaining flat at .38, and the severity and number of process safety incidents in 2009 (80) significantly lower than in 2008 (130).  Drilling & Completions, in particular, achieved more than 20 million hours, over 631 days, without a day away from work case ("DAFWC").  Tr. 8124 (Shaw); TREX 005688 at 5.

2644.   This safety performance in 2009 was achieved against a backdrop of the GoM SPU increasing its activity by approximately 700,000 man-hours over 2008.  Tr. 8240 (Shaw); TREX 004426 at 2.

#### 2.     BP Won the MMS Safety Award For Excellence Award in 2008 and Was a National Finalist in 2008 and 2009.

2645.   In 2009, the MMS recognized BP's 2008 safety record in the GoM SPU by awarding BP its Safety Award for Excellence ("SAFE") Award for the New Orleans and Houma Districts.   The MMS SAFE Award recognizes operating companies which conduct their

519

operations in a safe manner, adhere to all regulatory requirements, motivate personnel, and enhance safe operations.  Tr. 379-80 (Bea).

2646.  The MMS SAFE Award covered the 2008 safety performance of all eight of BP's operating facilities in the Gulf of Mexico and contractor-owned rigs, such as the *Deepwater Horizon*.  Tr. 8122-13 (Shaw); TREX 047145 at 1, TREX 005690 at 3.

2647.  As Professor Bea recognized, BP could not have received the MMS SAFE Award in 2008 if there were problems with BP's process safety management system.  Tr. 380 (Bea).

2648.  BP was a finalist for the MMS National SAFE Award in 2008 and 2009.  The award recognizes and commends companies for conducting safe and pollution free operations, adhering to all regulations, employing trained and motivated personnel, and going the extra mile to enhance safety and environmental protection.  Tr. 9249-50 (O'Bryan); Tr. 8122-23 (Shaw); TREX 047962 at 1; TREX 005690 at 3.

**E.     Government Data Demonstrates that BP Had a Superior and Improving Safety Record in the Gulf of Mexico in the Years Leading Up to the Incident.**

2649.  Data that the U.S. government maintains demonstrates that BP had a superior and improving safety record in the Gulf of Mexico in the years leading up to the Incident.  TREX 045482.00004.

2650.  The Bureau of Ocean Energy Management, Regulation, and Enforcement ("BOEMRE"), previously known as the MMS, maintained safety data on oil companies operating in the Gulf of Mexico.  TREX 045482.00004.  The Bureau of Safety and Environmental Enforcement ("BSEE") is now responsible for recording this information.  30 C.F.R. §§ 251.186-90.

2651.  One of the safety measures that BOEMRE tracked was the number of "accidents" that each operator experienced in the Gulf of Mexico.  TREX 045482.00004.  Operators were

required to report to BOEMRE all "accidents" that occurred in the Gulf of Mexico.  71 Fed. Reg. 19640-41 (April 17, 2006).  "Accidents" include all fatalities, serious injuries, fires, explosion, collisions, blowouts, and oil spills greater than 1 barrel.  Oil and Gas and Sulfur Operations in the Outer Continental Shelf – Incident Reporting Requirements, 71 Fed. Reg. at 19641-42, 19644 (April 17, 2006); 30 C.F.R. § 254.46.

### 1.     BP's Gulf of Mexico Safety Record Improved in the Years Before the Incident.

2652.   The BOEMRE accident data shows that BP's safety record in the Gulf of Mexico improved in the years leading up to the Incident.  TREX 045482.00004.  In particular, the number of accidents that BP experienced in the Gulf of Mexico decreased over the period 2005 through 2009.  TREX 045482.00004.  For example, BP experienced 60 accidents in 2005 but only 27 accidents in 2009.

2653.   BOEMRE separately tracks different kinds of "accidents," including the number of fatalities and the number of fires and explosions, which each operator experienced each year in the Gulf of Mexico.  TREX 45482.00004.

2654.   The BOEMRE data demonstrates that BP experienced zero contractor or employee fatalities in the Gulf of Mexico in the five years prior to the Incident.  TREX 045482.00004; 71 Fed. Reg. at 19645.

2655.   The number of fires and explosions that BP experienced in the Gulf of Mexico also declined over the period 2005 through 2009.  TREX 045482.00004.  For example, BP had 10 fires and explosions in 2005 but only 4 fires and explosions in 2009.  *Id.*

### 2. BP Had A Superior Safety Record in the Gulf of Mexico in the Years Before the Incident.

2656. The BOEMRE accident data also demonstrates that BP had a superior safety record compared to other major operators in the Gulf of Mexico in the years leading up to the Incident.  TREX 045482.00004.

2657.  BOEMRE accident data shows that BP's safety record in the Gulf of Mexico was consistently in line with, and often superior to, that of other major operators.   TREX 045482.0004.

2658.  The accident data includes data for other major operators in the Gulf of Mexico, meaning companies that produced more than 150 million barrels of oil equivalent ("BOE") during the period 2005-2009, as recorded by BOEMRE.  TREX 045482.00004.

2659.  In addition to maintaining accident data, BOEMRE tracked the number of BOE that each company operating in the Gulf of Mexico produced.  TREX 045482.00004.  BOE is the total volume of oil and natural gas measured in barrels or barrel equivalents (5,620 cubic feet per barrel).  http://www.gomr.boemre.gov/homepg/lagniapp/glossary.html.

2660.  The BOEMRE accident data for each major oil company operating in the Gulf of Mexico from 2005-2009 is summarized in the following table:

**Gulf of Mexico Safety Record 2005-2009**
**Accidents**

|  |  | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|
| BP | Accidents | 60 | 29 | 24 | 30 | 27 |
|  | Millions BOE | 145.0 | 115.9 | 85.4 | 107.6 | 219.5 |
|  | Accidents per Millions BOE | 0.414 | 0.250 | 0.281 | 0.279 | 0.123 |
| Anadarko | Accidents | 2 | 5 | 8 | 10 | 12 |
|  | Millions BOE | 2.5 | 8.9 | 59.2 | 59.2 | 77.5 |
|  | Accidents per Millions BOE | 0.788 | 0.564 | 0.135 | 0.169 | 0.155 |
| Apache | Accidents | 27 | 47 | 33 | 82 | 30 |
|  | Millions BOE | 54.5 | 55.9 | 58.6 | 51.1 | 49.6 |
|  | Accidents per Millions BOE | 0.495 | 0.841 | 0.563 | 1.606 | 0.605 |
| Chevron | Accidents | 23 | 83 | 91 | 110 | 92 |
|  | Millions BOE | 86.4 | 103.3 | 72.7 | 55.8 | 117.1 |
|  | Accidents per Millions BOE | 0.266 | 0.803 | 1.251 | 1.973 | 0.786 |
| ExxonMobil | Accidents | 20 | 15 | 5 | 7 | 20 |
|  | Millions BOE | 54.4 | 47.6 | 34.1 | 24.5 | 25.6 |
|  | Accidents per Millions BOE | 0.368 | 0.315 | 0.146 | 0.285 | 0.781 |
| Shell | Accidents | 5 | 21 | 34 | 73 | 44 |
|  | Millions BOE | 177.8 | 182.2 | 168.1 | 124.4 | 130.1 |
|  | Accidents per Millions BOE | 0.028 | 0.115 | 0.202 | 0.587 | 0.338 |

TREX 45482.00004.

2661.  The table shows an accident rate for each company based on the number of BOE the company produced in the Gulf, in addition to the absolute number of accidents for each company.  This allows companies' safety records to be compared by adjusting for each company's volume of production.  TREX 045482.00004.

2662.  The BOEMRE data shows that BP had a positive safety record compared to other major oil companies in the Gulf of Mexico in the years prior to Macondo.  The BP accident rate generally decreased over time and was generally superior to other companies.  For example, BP's accident rate was better than Shell's in 2008 and 2009, and was the best of all major companies operating in the Gulf in 2009.  TREX 045482.00004.

2663.   The BOEMRE data also shows that BP's record of zero fatalities in the Gulf of Mexico during the period 2005 through 2009 was the best of all other major operators.  No major operator other than BP experienced zero fatalities over this time period.  TREX 045482.00004.

2664.   The BOEMRE data showing the number and rate of fatalities that each major operator experienced in the Gulf of Mexico from 2005 through 2009 is summarized in the following table:

### Gulf of Mexico Safety Record 2005 – 2009
### Fatalities

| | | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|
| BP | Fatalities | 0 | 0 | 0 | 0 | 0 |
| | Millions BOE | 145.0 | 115.9 | 85.4 | 107.6 | 219.5 |
| | Fatalities per Millions BOE | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Anadarko | Fatalities | 0 | 0 | 0 | 1 | 0 |
| | Millions BOE | 2.5 | 8.9 | 59.2 | 59.2 | 77.5 |
| | Fatalities per Millions BOE | 0.000 | 0.000 | 0.000 | 0.017 | 0.000 |
| Apache | Fatalities | 1 | 0 | 0 | 2 | 0 |
| | Millions BOE | 54.5 | 55.9 | 58.6 | 51.1 | 49.6 |
| | Fatalities per Millions BOE | 0.018 | 0.000 | 0.000 | 0.039 | 0.000 |
| Chevron | Fatalities | 0 | 1 | 0 | 1 | 1 |
| | Millions BOE | 86.4 | 103.3 | 72.7 | 55.8 | 117.1 |
| | Fatalities per Millions BOE | 0.000 | 0.010 | 0.000 | 0.018 | 0.009 |
| ExxonMobil | Fatalities | 0 | 1 | 0 | 0 | 0 |
| | Millions BOE | 54.4 | 47.6 | 34.1 | 24.5 | 25.6 |
| | Fatalities per Millions BOE | 0.000 | 0.021 | 0.000 | 0.000 | 0.000 |
| Shell | Fatalities | 0 | 0 | 0 | 0 | 2 |
| | Millions BOE | 177.8 | 182.2 | 168.1 | 124.4 | 130.1 |
| | Fatalities per Millions BOE | 0.000 | 0.000 | 0.000 | 0.000 | 0.015 |

TREX 045482.00004.

2665.   Finally, the BOEMRE data demonstrates that BP's rate of fires and explosions in the Gulf of Mexico from 2005 to 2009 generally declined and was generally superior to that of other major operators.   TREX 045482.00004.   In fact, BP had a lower rate of fires and explosions than any other major operator in 2009.  TREX 045482.00004.

2666.   BOEMRE data shows the rate of fires and explosions that BP experienced in the Gulf of Mexico was lower than that of other major operators over the period 2005 through 2009. TREX 045482.00004.

2667.   The BOEMRE data showing the number and rate of fires and explosions that each major operator experienced in the Gulf of Mexico from 2005 through 2009 is summarized in the following table:

### Gulf of Mexico Safety Record 2005 – 2009
### Fires & Explosions

| | | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|
| **BP** | **Fires & Explosions** | 10 | 6 | 3 | 7 | 4 |
| | **Millions BOE** | 145.0 | 115.9 | 85.4 | 107.6 | 219.5 |
| | **Fires & Explosions per Millions BOE** | 0.069 | 0.052 | 0.035 | 0.065 | 0.018 |
| **Anadarko** | **Fires & Explosions** | 1 | 1 | 7 | 3 | 4 |
| | **Millions BOE** | 2.5 | 8.9 | 59.2 | 59.2 | 77.5 |
| | **Fires & Explosions per Millions BOE** | 0.394 | 0.113 | 0.118 | 0.051 | 0.052 |
| **Apache** | **Fires & Explosions** | 5 | 11 | 13 | 24 | 16 |
| | **Millions BOE** | 54.5 | 55.9 | 58.6 | 51.1 | 49.6 |
| | **Fires & Explosions per Millions BOE** | 0.092 | 0.197 | 0.222 | 0.470 | 0.322 |
| **Chevron** | **Fires & Explosions** | 13 | 25 | 14 | 18 | 20 |
| | **Millions BOE** | 86.4 | 103.3 | 72.7 | 55.8 | 117.1 |
| | **Fires & Explosions per Millions BOE** | 0.151 | 0.242 | 0.192 | 0.323 | 0.171 |
| **ExxonMobil** | **Fires & Explosions** | 3 | 6 | 3 | 3 | 13 |
| | **Millions BOE** | 54.4 | 47.6 | 34.1 | 24.5 | 25.6 |
| | **Fires & Explosions per Millions BOE** | 0.055 | 0.126 | 0.088 | 0.122 | 0.508 |
| **Shell** | **Fires & Explosions** | 2 | 7 | 9 | 11 | 9 |
| | **Millions BOE** | 177.8 | 182.2 | 168.1 | 124.4 | 130.1 |
| | **Fires & Explosions per Millions BOE** | 0.011 | 0.038 | 0.054 | 0.088 | 0.069 |

## PROPOSED CONCLUSIONS OF LAW

**XII.   INTRODUCTION TO BP's PROPOSED CONCLUSIONS OF LAW.**

2668.   These conclusions of law are divided into 11 separate sections, with each section addressing a group of claims that one or more parties have against other parties.   This introductory section serves as a road map for the remaining conclusions of law and also summarizes the key proposed conclusions.

2669.   Section XIII analyzes preliminary issues, such as the jurisdiction of the Court, and also addresses motions filed before and during trial, including BP's motion for sanctions resulting from Halliburton's destruction and spoliation of evidence.

2670.   Section XIV concerns BPXP's liability under OPA.   BPXP already has acknowledged its liability under OPA as a responsible party, subject to its rights to recover from other liable parties.   Indeed, BP has paid billions of dollars in damages and removal costs.

2671.   Section XV concerns BPXP's liability under the CWA.   The CWA requires either gross negligence or willful misconduct for enhanced penalties.   These statutory terms have the same meaning as under common law.   Because none of BPXP's conduct reaches the high threshold for either gross negligence or willful misconduct, and much of it could not have been causal, BPXP cannot be liable for enhanced CWA penalties.

2672.   Section XVI analyzes BP's liability under maritime law.   To the extent maritime law claims can be brought against BP, the relevant claims are for negligence, gross negligence, and willful misconduct.   BPXP has previously admitted that it was negligent in misinterpreting the negative pressure test.   None of BP's other conduct identified by the opposing parties constitutes negligence, as that conduct satisfied the standard of care and was not causal to the Incident.   Nor does any of BP's conduct reach the high standard of willful, wanton, or outrageous conduct required for punitive damages.

526

2673.   Section XVII analyzes the alleged liability of BP p.l.c., the ultimate parent of the BP entities.   BP p.l.c. cannot be liable under any of the opposing parties' claims.   It had no involvement with the well, and opposing parties have not presented any evidence to pierce the corporate veil.

2674.   Section XVIII addresses Transocean's liability and fault.   Transocean is liable as a responsible party under OPA.   Transocean is also liable for both unseaworthiness and negligence under maritime law.   Transocean cannot use the Limitation Act to limit its liability.

2675.   Section XIX concerns Halliburton's liability and fault for negligence under maritime law.

2676.   Section XX analyzes Transocean and Halliburton's claims for indemnity against BPAP and BPXP, respectively.   Neither Transocean nor Halliburton are entitled to indemnity. Both materially breached the contracts with BP on which they rely for indemnity and materially increased the risks and prejudiced the rights of BP as indemnitor, which discharges any indemnity obligations of BP.   Moreover, to the extent that Transocean and Halliburton are found liable for either gross negligence or willful misconduct, they cannot obtain indemnity from BP.

2677.   Section XXI reviews BP's contribution, subrogation, and direct damage claims against Transocean and Halliburton.[16]   BP can recover both its own damages and payments made to third parties from the two contractors in proportion to their allocated fault for the Incident.

2678.   Section XXII sets forth the ultimate conclusions of law proposed by BP.

---

[16]   BP has assigned certain of its claims to the class created under the *Deepwater Horizon Economic And Property Damages Settlement*, subject to that settlement reaching its effective date.   Rec. Doc. 8138 at 17.

## XIII.   THE COURT'S RULINGS ON PRE-TRIAL AND TRIAL MOTIONS.

### A.   The Court's Jurisdiction.

2679.   This Court possesses both original subject matter jurisdiction and removal jurisdiction pursuant to the Outer Continental Shelf Lands Act, 43 U.S.C. § 1349(b)(1); pursuant to 28 U.S.C. § 1441; and pursuant to precedent defining the nature of federal enclaves (pursuant to which federal question jurisdiction also inherently exists under 28 U.S.C. § 1331) over thousands of cases consolidated in MDL 2179.  This Court also has jurisdiction over many of the cases consolidated in MDL 2179 pursuant to diversity jurisdiction under 28 U.S.C. § 1332. Finally, this Court has jurisdiction under 28 U.S.C. § 1331(1) and recently revised 28 U.S.C. 1441(b) no longer precludes the exercise of original admiralty and maritime jurisdiction over removed cases.  *See Ryan v. Hercules Offshore, Inc.,* No. H-12-3510, 2013 WL 1967315 (S.D. Tex. May 13, 2013); *see also* Federal Courts Jurisdiction and Venue Clarification Act of 2011, Pub. L. No. 112–63, 125 Stat. 758.

### B.   BP's Pre-Trial Motions *In Limine* and Daubert Motions.

2680.   Before Phase I of the trial began, BP filed various motions *in limine* on which the Court ruled.  *See, e.g.*, Rec. Doc. 5634 (Order and Reasons Regarding Motions *in Limine* to Exclude Instances of Prior Alleged Improper Conduct and Prior Adverse Criminal, Civil or Regulatory Proceedings); Rec. Doc. 5635 (Order and Reasons Regarding Motions *in Limine* to Exclude Other Government Reports and Congressional Testimony); Rec. Doc. 5448 (Order Regarding Motions *in Limine* to Exclude Evidence of the Joint Investigation Report and Testimony); Rec. Doc. 5505 (Order Regarding BP's Motion *in Limine* to Preclude Expert Opinion Testimony Not Disclosed in the Expert's Rule 26(a) Written Report); Rec. Doc. 5643 (Order Regarding the Plaintiffs' Joint Motion *in Limine* to Admit into Evidence Representative Email Communication Exhibits); Rec. Doc. 5615 (Report and Recommendation Regarding the

Plaintiffs' Joint Motion *in Limine* to Admit into Evidence Representative Email Communication Exhibits); Rec. Doc. 5500 (Order Regarding BP's Motion *in Limine* to Bar Evidence Regarding Its Recruitment and Promotion Strategies); Rec. Doc. 5498 (Order Regarding BP's Motion *in Limine* to Exclude Privileged Communications Relating to the Scope of BP's Internal Investigation); Rec. Doc. 8651 (Order & Reasons As to BP's Motion *in Limine* to Exclude Certain Evidence Related to Criminal Proceedings); Rec. Doc. 5143 (Order and Reasons [Motion *in Limine* Set 1: Email Strings]); Rec. Doc. 5407 (Order Regarding BP's Motion *in Limine* to Exclude Phase II Evidence); Rec. Doc. 5495 (Order Regarding BP's Motion *in Limine* to Bar Fact or Opinion Testimony on Issues of Law); Rec. Doc. 5496 (Order Regarding BP's Motion *in Limine* to Preclude Evidence Regarding BP Employee Compensation Information); Rec. Doc. 5499 (Order Regarding BP's Motion *in Limine* to Preclude the Use of Deposition Testimony Arising from Improper and Objectionable Questioning); Rec. Doc. 5492 (Order Regarding BP's Motion *in Limine* Non-Factual Witness Testimony); Rec. Doc. 5603 (Order and Reasons Regarding Motion *in Limine* to Exclude Settlement Evidence); Rec. Doc. 5833 (Order Regarding Motions *in Limine* Concerning Miscellaneous Exhibits); Rec. Doc. 8388 (Order [Regarding BP's Motion *In Limine* to Clarify the Court's Order Regarding the *Deepwater Horizon* Study Group Report]).  BP preserves the benefits of each ruling to the extent it was in BP's favor, and also preserves its arguments to the extent each ruling was against BP.

2681.  The Court also deferred ruling on certain issues raised by BP such as the inadmissibility of evidence relating to BP's temporary suspension by the EPA or BP's settlement with the SEC.  *E.g.*, Rec. Doc. 8650 (Order As to BP's Motions *in Limine* to Exclude Evidence of the EPA Suspension and Evidence Related to the SEC Settlement).  BP re-urges and preserves its arguments on these issues.  *E.g.*, Rec. Doc. 8294-1; Rec. Doc. 8295-1.

2682.   BP also filed motions under Federal Rule of Evidence 702 to exclude testimony of various experts of the PSC, United States, Transocean, and Halliburton.  *See* Rec. Doc. 5420 (BP's Motion to Limit the Testimony of Dr. Frederick "Gene" Beck); Rec. Doc. 5433 (BP's Motion to Exclude Certain Opinions and Testimony of Dr. Glen Stevick); Rec. Doc. 5434 (BP's Motion to Limit the Testimony of Dr. Richard Strickland); Rec. Doc. 5423 (BP's Motion to Exclude Certain Opinions and Testimony of Greg Childs); Rec. Doc. 5419 (BP's Motion to Exclude Certain Opinions and Testimony of Dr. Robert Bea and Dr. William Gale); Rec. Doc. 5428 (BP's Motion to Exclude the Report and Testimony of Dr. Andrew Hurst); Rec. Doc. 5431 (BP's Motion to Exclude Certain Opinions and Testimony of Gregg Perkin); Rec. Doc. 5421 (BP's Motion to Limit the Testimony of Glenn Benge); Rec. Doc. 5424 (BP's Motion to Exclude Certain Opinions and Testimony of Dr. Rory R. Davis and Others); Rec. Doc. 5426 (BP's Motion to Exclude the Reports and Testimony of Dr. Alan R. Huffman); Rec. Doc. 5435 (BP's Motion To Preclude Unreliable Opinions On The Failure Of The Primary Cement Job).  BP re-urges these motions, and preserves the arguments in these motions to the extent that they are denied.

###    C.    No Adverse Inference Should Be Drawn Against BP Based on Witnesses Invoking Their Fifth Amendment Rights.

2683.   BP has submitted briefing explaining that no adverse inferences should be drawn against BP from certain individuals deciding to invoke their Fifth Amendment rights.  *See* Rec. Doc. 5112 (BP's Motion *in Limine* to Preclude the Use of, And the Drawing of Adverse Inferences From, Testimony in Which a Witness Has Invoked the Fifth Amendment; Rec. Doc. 5355 (BP's Reply Memorandum in Support of Its Motion *in Limine* to Preclude Adverse Inferences Drawn From Invocations of Non-Parties' Invocations of the Fifth Amendment During Depositions); Rec. Doc. 7879 (BP's Response in Opposition to Motions for Adverse Inferences

Based on Assertions of the Fifth Amendment).  BP incorporates the arguments contained in this briefing.

2684.   For the reasons explained in BP's prior briefing, in the circumstances of this case, admitting adverse inferences against BP based on invocations of the Fifth Amendment by either BP employees or non-BP employees would be inappropriate.   Furthermore, the specific inferences sought against BP are improper.

2685.   In the alternative, if adverse inferences are allowed against BP, then BP requests adverse inferences based on the Fifth Amendment invocations by Christopher Haire (Halliburton), Andrew Fleytas (Transocean), "Jimmy" Wayne Harrell (Transocean), Curt Robert Kuchta (Transocean), Caleb Holloway (Transocean), Stephen Ray Bertone (Transocean), Allen Seraile (Transocean), Micah Sandell (Transocean), Wyman Wheeler (Transocean), and Patrick Morgan (Transocean) should be granted against Transocean and Halliburton.  *See* Rec. Doc. 7645 (BP's Motion For Adverse Inferences Based on Assertions of the Fifth Amendment); Rec. Doc. 7993 (BP's Reply in Support of Its Motion for Adverse Inferences Based on Assertions of the Fifth Amendment).

## D. Sanctions Should Be Imposed on Halliburton for Destruction and Spoliation of Evidence.

2686. BP has submitted briefing explaining that sanctions should be imposed on Halliburton because of its destruction and spoliation of evidence.  *See* Rec. Doc. 8977 (BP's Motion for Sanctions Resulting From Halliburton's Destruction and Spoliation of Evidence); Rec. Doc. 9041 (BP's Reply Memorandum in Support of Motion for Sanctions Resulting From Halliburton's Destruction and Spoliation of Evidence); *see also* Rec. Doc. 4799 (BP's Motion for Spoliation Sanctions); Rec. Doc. 5061 (BP's Reply Memorandum in Support of Motion for

Spoliation Sanctions); Rec. Doc. 5126 (BP's Supplemental Memorandum in Support of Motion for Spoliation Sanctions).  BP incorporates the arguments contained in this briefing.

2687.  Based on these arguments, pursuant to both Rule 37 and the Court's inherent powers, the following remedies should be ordered.  These sanctions are, for purposes of Rule 37, both just and specifically related to the claim which was at issue in PTO #1, and, for purposes of the Court's inherent-power-inquiry, based on a finding of bad faith by Halliburton.

2688.  **First**, as an adverse factual finding against Halliburton, Halliburton's final cement design was unstable and was a cause of hydrocarbons entering into the wellbore on the night of the Incident.

2689.  **Second**, in light of recent information that a majority of the available rig sample has been spoliated (according to Halliburton's documents and witnesses), the other cement testing data in this case has become far more relevant and critical – including the lab testing done by Morgan and then Quirk.  Thus, the post-Incident tests conducted by Rickey Morgan and Tim Quirk in April/May 2010 – the results of which were destroyed by Halliburton – establish that the cement used on the Macondo well on April 20, 2010 was not stable.

2690.  **Third**, and also to fill the cement testing evidentiary gap created by Halliburton's conduct, the deposition "opinion testimony" of the Chevron and OT&C witnesses (Gardner and Garrison) regarding their post-Incident testing is admissible to the extent such testimony has not already been admitted by the Court.  In particular, Gardner (Chevron) performed post-Incident cement testing using lab stock from Halliburton for the Presidential Commission, while Garrison (OT&C) performed post-Incident testing using lab stock from Halliburton and rig stock for the JIT.  Thus, testing-related deposition opinion testimony of Gardner and Garrison is relevant and

should be entered into evidence to the extent such testimony has not already been admitted by the Court.

## XIV.   BPXP'S LIABILITY UNDER THE OIL POLLUTION ACT OF 1990.

2691.   The PSC (on behalf of private plaintiffs), the United States, Alabama, and Louisiana brought claims against BPXP for strict liability under OPA.  Rec. Doc. 1128 ¶¶ 678-690; Civ. A. No. 2:10-cv-04536, Rec. Doc. 1 ¶¶ 77-91; Rec. Doc. 1872 ¶¶ 205-19; Rec. Doc. 2031 ¶¶ 153-67, 195-221.  This section evaluates BPXP's liability under OPA.

### A.      BPXP Has Acknowledged Its Responsibilities under OPA.

2692.   BPXP has acknowledged it is a "Responsible Party" under OPA.  *See, e.g.*, Rec. Doc. 559 at 1 ("Under the Oil Pollution Act of 1990, BP Exploration & Production Inc. is one of the several 'Responsible Parties' in connection with the Incident and the resulting oil spill.").  Under OPA, a "Responsible Party" includes "[i]n the case of an offshore facility …, the lessee or permittee of the area in which the facility is located" 33 U.S.C. § 2701(32)(C).  An "offshore facility" includes a facility located in the navigable waters of the United States, 33 U.S.C. § 2701(22), and a "facility," in turn, includes equipment that can be used to explore or drilling for oil, 33 U.S.C. § 2701(9).   Under OPA, a mobile offshore drilling unit ("MODU") "means a vessel (other than a self-elevating lift vessel) capable of use as an offshore facility."  33 U.S.C. § 2701(18).   Therefore, because the *Deepwater Horizon* MODU was located at Mississippi Canyon Block 252 ("MC252"), and BPXP is the lessee of MC252, BPXP is a Responsible Party under OPA.  *See also* Rec. Doc. 5809 at 7 ("When the MODU is being used as an offshore facility – *i.e.*, when the MODU is 'exploring for, drilling for, producing, [etc.] ... oil' 'in, on, or under ... navigable waters' – then the responsible party is the lessee (the responsible party for an

offshore facility."). BPXP accepted its designation as a Responsible Party on May 3, 2010. Letter from J. Dupree to T. Morrison (May 3, 2010) (attached hereto as Ex. 8).[17]

2693. As a Responsible Party, BPXP is liable for removal costs and damages as defined in OPA. 33 U.S.C. § 2702(a)-(b). BPXP has the right to seek contribution from other parties. Rec. Doc. 3830 at 21 ("Claimants present their claims to the Responsible Party, who pays the claims and is then allowed to seek contribution from other allegedly liable parties."), citing 33 U.S.C. §§ 2709, 2710, 2713.

2694. BPXP has been fulfilling its obligations under OPA by paying claims for removal costs and damages caused by the spill. *E.g.*, TREX 45393 at BP-HZN-2179MDL04968018; Rec. Doc. 6430; Rec. Doc. 6427.

### B.    BPXP Agreed to Waive the Cap on OPA Damages.

2695. Subject to certain statutory exceptions, OPA places a cap on a Responsible Party's liability. 33 U.S.C. §§ 2704(a)-(b); Rec. Doc. 925 at 1.

2696. On October 18, 2010, BPXP filed with the Court a statement providing that BPXP "has chosen to waive the statutory limitation on liability under OPA" without making any admission regarding BPXP's conduct and specifically denying that BPXP had been grossly negligent. Rec. Doc. 559 at 1-2.

2697. In accord with this statement, the Court ordered that BPXP and its affiliates were barred from raising the OPA cap on liability as defense in this litigation. Rec. Doc. 925 at 2.

---

[17]  BPAP cannot be liable under OPA as the relevant provisions of OPA define a responsible party as the "lessee or permittee of the area in which the facility is located." 33 U.S.C. § 2701(32)(C). The record is undisputed that BPXP was the lessee of the area, and BPAP was not. Similarly, although BPAP was a party to the Drilling Contract, it was not a "person owning, operating, or demise chartering" the *Deepwater Horizon* MODU. 33 U.S.C. § 2701(32)(A).

The Court acknowledged that BPXP and its affiliates were not admitting anything about their conduct, and had specifically denied that they had engaged in gross negligence. *Id.* at 1-2.

### C.   OPA Liability for the Spill is Divisible.[18]

2698.   Although BPXP is liable under OPA, it is premature to assess whether BPXP is liable for the entirety of the spill.   Instead, the doctrine of divisibility contemplates that where there are "volumetric, chronological, or other" bases for dividing liability among multiple causes, liability is appropriately divided.   *See Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 617-18 (2009) (quotation omitted); *see also, e.g.*, Rec. Doc. 4392, at 13-15; Rec. Doc. 5124, at 9-10.   Moreover, "it is immaterial whether all or any [persons having contributed to the harm] are joined as defendants in the particular action.   RESTATEMENT (SECOND) OF TORTS § 433A cmt. a (1965).

2699.   In the Phase II trial, BP intends to establish that there are reasonable bases for dividing liability among multiple causes of the spill.   At this time, it would be inappropriate for the Court to hold on an incomplete record that any parties are jointly and severally liable for the entirety of the spill.

### D.   BPXP Has No Liability Under OPA for Injuries Not Proximately Caused by the Incident.[19]

2700.   OPA imposes liability for damages that "result from" and are "due to" a spill.   *See* 33 U.S.C. § 2702(a), *id.* § 2702(b)(2)(B), *id.* § 2702(b)(2)(E).   This language necessarily adopts a proximate cause standard.   *Cf., e.g., Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock*

---

[18] BP is aware that the Court has previously declined to apply the divisibility doctrine, *see* Rec. Doc. 5809 at 12.   BP submits these proposed conclusions to facilitate its appellate rights.

[19] BP is aware that the Court has previously declined to rule on the standard of causation under OPA, *see* Rec. Doc. 3830 at 32-33.   BP submits these proposed conclusions to facilitate its appellate rights.

*Co.*, 513 U.S. 527, 536 (1995) ("The [Admiralty Extension] Act uses the phrase 'caused by,' which more than one Court of Appeals has read as requiring what tort law has traditionally called proximate causation."); *Babbitt*, 515 U.S. 687 (interpreting causation language in the Endangered Species Act as incorporating proximate cause principles); *Benefiel v. Exxon Corp.*, 959 F.2d 805, 807 (9th Cir. 1992) (where Congress created liability for damages that are "the result of discharges," "we are confident that Congress in enacting TAPAA did not intend to abrogate all principles of proximate cause"). *Cf. Ballard Shipping Co. v. Beach Shellfish*, 32 F.3d 623, 630 (1st Cir. 1994) (concluding that the Rhode Island Environmental Injury and Compensation Act's extension of liability to damages "as a result of damage to the natural resources of the State of Rhode Island caused by the violation" incorporated "familiar tort limitations of foreseeability and proximate cause").

### E.   BPXP Has No Liability Under OPA to Claimants Who Failed to Comply with OPA's Presentment Requirement.

2701.   OPA provides that a claimant may not file suit against BPXP until he or she has first presented a claim to BPXP, and then either (i) the claim is denied; or (ii) a 90-day negotiation period has expired without settlement – a period that begins to run after the claim has been sufficiently substantiated or "presented."   33 U.S.C. § 2713(c). As the Court has held, presentment is a "mandatory condition precedent" under OPA.  *See* Rec. Doc. 3830 at 30.  While the Court has permitted plaintiffs as a whole to survive a Rule 12 motion absent a specific showing that each and every plaintiff has complied with presentment as of the time of that ruling, *see id.* at 29-30, before any individual plaintiff may recover it will need to show that it satisfied the presentment requirement prior to filing suit.

## XV.   BPXP'S LIABILITY UNDER THE CLEAN WATER ACT.

2702.   The United States has brought a claim against BPXP for fines under the Clean Water Act ("CWA").   Civ. A. No. 2:10-cv-04536, Rec. Doc. 1.   The CWA provides that "[a]ny person who is the owner, operator, or person in charge of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged in violation of paragraph (3), shall be subject to a civil penalty in an amount up to $25,000 per day of violation or an amount up to $1,000 per barrel of oil or unit of reportable quantity of hazardous substances discharged."   33 U.S.C. § 1321(b)(7)(A).

2703.   Where the violation "was the result of gross negligence or willful misconduct" of such person, the maximum per-barrel fine is tripled.   *See* 33 U.S.C. § 1321(b)(7)(D).

2704.   The Court has previously held, on summary judgment, that both BPXP[20] and Anadarko are liable for civil penalties under the CWA as an owner of the Macondo well, as it was the offshore facility from which oil was discharged.   *See* Rec. Doc. 5809 at 23-24.   Both BPXP and Anadarko have appealed this ruling to the United States Court of Appeals for the Fifth Circuit.   BPXP's interlocutory appeal from that ruling is currently pending before the Fifth Circuit, *see* 5th Cir. No. 12-30883, and BPXP offers the following discussion without prejudice to that appeal.

2705.   For the reasons described in this section, even if BPXP could be liable on the CWA, it is not subject to treble fines as it was neither grossly negligent nor engaged in willful misconduct.

---

[20]   BPAP was not sued by the federal government under the CWA, Civ. A. No. 2:10-cv-04536, Rec. Doc. 1, and cannot be liable under the CWA as it was not an "owner, operator, or person in charge of any vessel, onshore facility, or offshore facility."   33 U.S.C. § 1321(b)(7)(A).   *See* § I.A.1.   The federal government sued BPXP as the sole BP entity in its case.   Civ. A. No. 2:10-cv-04536, Rec. Doc. 1.   Thus, all references in this § XV to "BP" refer only to BPXP unless otherwise indicated.

**A.    The Court Lacks Jurisdiction to Enter Additional Findings Concerning the Source of the Discharge.**

2706.   Because both Anadarko and BPXP have appealed the Court's summary judgment ruling to the Fifth Circuit, the Court is divested of jurisdiction to make additional findings concerning BP's liability *as a well owner*.  *See, e.g.*, *Coastal Corp. v. Tex. E. Corp.*, 869 F.2d 817, 820-21 (5th Cir. 1989) (district court may not "alter the status of the case as it rests before the court of appeals").

**B.    BPXP Is Not Liable for Discharges from the *Deepwater Horizon*.**

2707.   In its February 2012 summary judgment ruling, the Court held that oil was discharged exclusively from the Macondo well, and not from the *Deepwater Horizon* or its appurtenances.   Because it is possible that this holding may be disturbed on appeal, it is appropriate for the Court to make findings concerning whether BPXP was an owner, operator, or person in charge of the *Deepwater Horizon*.

**1.    BPXP Was Not the "Owner or Operator" of the *Deepwater Horizon*.**

2708.   Under the CWA, the "owner or operator" of a vessel is "any person owning, operating, or chartering by demise, such vessel." 33 U.S.C. § 1321(a)(6).

**a.    BPXP Did Not Own the *Deepwater Horizon*.**

2709.   There is no dispute that BPXP did not own the *Deepwater Horizon*.   Rather, the *Deepwater Horizon* was owned by Transocean's subsidiary Triton Assets Leasing GmbH.  *See* § II.C.2.a.

**b.    BPXP Did Not Demise Charter the *Deepwater Horizon*.**

2710.   Under maritime law, a charter by demise "is essentially the lease of a ship, usually on a long-term contract, often associated with a special finance or purchase arrangement." THOMAS J. SCHOENBAUM, ADMIRALTY & MARITIME LAW § 11-3 (5th ed. 2012).   "In a demise

charter, it is up to the charterer to man and equip the vessel." *Id.*  While the exact terms of the relationship may vary from case to case, "[a]n essential characteristic of the demise ... is that the entire command and possession of the vessel be turned over to the charterer." *Id.* (citing *Leary v. United States*, 81 U.S. (14 Wall.) 607 (1872)).  "At the end of the charter term, the vessel must be returned in the same condition as received excepting 'ordinary wear and tear.'" *Id.* at 8.  This definition of a demise charter has been noted favorably by the Fifth Circuit.  *See Brown v. Offshore Specialty Fabricators*, 663 F.3d 759, 766 n.3 (5th Cir. 2011).

2711.  In this case, the evidence is entirely inconsistent with a demise charter.  The Drilling Contract contains numerous provisions that are inconsistent with a charter by demise. Starting at the very beginning, the Contract expressly recites that "COMPANY desires to engage the services of CONTRACTOR [Transocean], its Drilling Unit, and its equipment and all necessary crews."  TREX 001356A at BP-HZN-MBI00021464.  The Contract further provides that "CONTRACTOR shall be solely responsible for the operation of the Drilling Unit, *id.* at BP-HZN-MBI00021479, that Transocean "shall have the primary responsibility for the safety of all its operations," *id.* ¶ at BP-HZN-MBI00021481, that the Company "shall have no direction or control of CONTRACTOR or its employees and agents except in the results to be obtained," *id.* at BP-HZN-MBI00021482, and that "CONTRACTOR shall maintain at all times strict discipline and good order among its employees," *id.* at BP-HZN-MBI00021483.  With certain exceptions, it is the Contractor, Transocean, who bears the risk of damage to the vessel.  *Id.* at BP-HZN-MBI00021485-86.

### c.    BPXP Did Not "Operate" the *Deepwater Horizon*.

2712.  The Supreme Court has construed the term "operator" in the CERCLA statute that is a cousin to both OPA and CWA Section 311(b), both of which Congress amended as part of its 1990 oil spill legislation.  *See United States v. Bestfoods*, 524 U.S. 51, 66 (1998); *see also*

*United States v. Viking Res., Inc.*, 607 F. Supp. 2d 808, 821 n.47 (S.D. Tex. 2009) (equating meaning of "operator" in OPA to the meaning of the same term in CERCLA).

2713.   Under *Bestfoods*, an operator is "someone who directs the workings of, manages, or conducts the affairs of a facility." 524 U.S. at 66.   In this context, having to do with pollution, "an operator must *manage, direct, or conduct* operations specifically related to pollution, that is, operations having to do with the leakage ..." *Id.* at 66-67 (emphasis added); *see also City of Waco v. Schouten*, 385 F. Supp. 2d 595, 600 (W.D. Tex. 2005) (citations omitted), *clarified on denial of reconsid.*, 2005 WL 2757262 (W.D. Tex. Oct. 24, 2005) (following *Bestfoods*) (quoting *Geraghty & Miller, Inc. v. Conoco Inc.*, 234 F.3d 917, 928 (5th Cir. 2000)), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. United States*, 129 S. Ct. 1870 (2009); *Puerto Rico Ports Auth. v. PCI Int'l, Inc.*, 200 F. Supp. 2d 61, 66 (D.P.R. 2002) ("affirmative acts" required for CERCLA liability) (quoting *United States v. Twp. of Brighton*, 153 F.3d 307, 314 (6th Cir. 1998)).

2714.   Transocean – rather than BPXP – managed, directed, and conducted operation on the *Deepwater Horizon*, including the drilling. *See* § II.C.2.   BPXP did not exercise operational control over Transocean. *See* § II.B.   Moreover, under standard law BPXP cannot be vicariously liable for Transocean's actions. *See* § XV.C.7.   Thus, BPXP is not liable as the operator of the *Deepwater Horizon*.

2715.   Nor is there any merit to the theory that BPXP was an operator of the *Deepwater Horizon* as a matter of law, simply because it was the lessee of the area in which the *Deepwater Horizon* operated. *Cf.* Rec. Doc. 4836-1 (USA Mot. for Summ. J.) at 23.   ***First***, the provision in OCSLA that the government has relied upon for this theory – 43 U.S.C. § 1348(b) – does not purport to define the term "operator." Instead, it merely imposes duties on the "holders of

lease[s] or permit[s]." The fact that lessees have legal obligations to ensure safe operations does not automatically transform them into "operators," either as a general matter or under the CWA specifically.

2716. *Second*, Congress clearly knows how to confer liability status on lessees as a matter of law when it chooses to do so. The OPA statute conspicuously defines "the lessee or permittee of the area in which the [offshore] facility is located" as a "responsible party" for OPA liability purposes. 33 U.S.C. § 2701(32)(C). By contrast, CWA Section 311(b) imposes liability only on an "owner, operator, or person in charge of any vessel, onshore facility, or offshore facility." 33 U.S.C. § 1321(b)(7).

2717. *Third*, OCSLA regulations permit operators to be designated or chosen by lessees. *See* 30 C.F.R. § 250.143(b), *recently recodified to* 30 C.F.R. § 550.143(b). If lessees were already "operators as a matter of law" by virtue of OCSLA Section 1348(b), this regulation would be rendered superfluous.

2718. *Fourth*, OCSLA and CWA Section 311(b) are entirely separate statutes with separate remedial and enforcement regimes. If a lessee's duties under OCSLA Section 1348(b) are violated, the United States can pursue the appropriate remedies directly under OCSLA. *See*, *e.g.*, 43 U.S.C. § 1350(a). OCSLA comes fully equipped with its own enforcement regime, and nothing indicates Congress intended for OCSLA violations to trigger automatically Section 311(b)'s potentially far more serious levels of monetary penalties.

2719. *Fifth*, while the government contends its argument is supported by the purportedly clear statutory text of OCSLA Section 1348(b), it makes no argument based on the equally clear text of the CWA, which is the statutory regime actually at issue.

2720.  *Finally*, the government's argument ignores the fact that enforcement responsibilities under the CWA and OCSLA are committed to different sets of agencies. Specifically, CWA Section 311(b) is enforced by EPA and the USCG, whereas OCSLA is enforced by the Department of the Interior.   These differing enforcement responsibilities foreclose the "operation as a matter of law" proposition, for it is axiomatic that OCSLA's delegation of interpretive responsibility to the Department of the Interior does not grant that Department authority to issue regulations that control the interpretation and application of the CWA.  *See, e.g., Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997) (refusing to defer to an interpretation of the Administrative Procedure Act ["APA"] by the Director of the Office of Workers' Compensation Programs because "[t]he APA is not a statute that the Director is charged with administering"); *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649 (1990) ("[W]e need not defer to the Secretary of Labor's view ... because Congress has expressly established the Judiciary and not the Department of Labor as the adjudicator of private rights of action arising under the statute.  A precondition to deference ... is a congressional delegation of administrative authority."); *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 627 (5th Cir. 2001) ("Interior is not charged with administering the APA; its conclusions of law regarding whether its policy change is a 'rule' for APA purposes are not given deference and are also reviewed de novo."); *Am. Forest & Paper Ass'n v. EPA*, 137 F.3d 291, 297 (5th Cir. 1998) ("We do not, however, accord … deference to EPA's interpretation of the [Endangered Species Act], because the ESA is not a statute that EPA is charged with administering.").

### 2.    BPXP Was Not the "Person In Charge" of the *Deepwater Horizon*.

2721.  The CWA does not define the term "person in charge."  As the Fifth Circuit has explained, "Congress intended the provisions ... to extend, not to every person who might have knowledge of an oil discharge ... but only to persons who occupy positions of responsibility and

power." *United States v. Mobil Oil Corp.*, 464 F.2d 1124, 1128 (5th Cir. 1972); *accord United States v. Carr*, 880 F.2d 1550, 1554 (2d Cir. 1989) ("The term 'person in charge' [was] deliberately designed to cover only supervisory personnel who have the ***responsibility for the particular vessel*** or facility and not to include other employees." (quoting  H.R. CONF. REP. NO. 91-940 (1970) (emphasis added)).

2722.  BPXP was neither responsible for nor exercised power over the *Deepwater Horizon*.  Transocean manned the vessel and their personnel were responsible for and exercised power over the rig.  *See* § II.C.2.  BP hired them but did not exercise operational control over the rig, which instead was committed by the Drilling Contract to Transocean as an independent contractor.  *See* §§ II.B; II.C.  Furthermore, BPXP cannot be vicariously responsible for Transocean's conduct as the person-in-charge of the *Deepwater Horizon*.  *See* § XV.C.7.

### C.    BPXP Is Not Liable for Enhanced Penalties Under the Clean Water Act.

2723.  The CWA does not define the terms "gross negligence" or "willful misconduct," but those terms have established meanings under common law.  Where, as here, Congress adopts such terms, "the general rule [is] that a common-law term comes with its common-law meaning." *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2246 (2011) (citing cases); *see also FAA v. Cooper*, 132 S. Ct. 1441, 1449 (2012) ("[I]t is a cardinal rule of statutory construction that, when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken.") (internal citations omitted).  Accordingly, considering state common law to give meaning to these federal statutory terms is both necessary and proper.  Other relevant sources for determining the terms' meanings are other federal statutes in which they are used, *see, e.g.*, *Belt v. EmCare, Inc.*, 444 F.3d 403, 412 (5th Cir. 2006), as well as both legislative history and statutory structure, *see, e.g., United States v. Gonzales*, 327 F.3d 416, 419 (5th Cir. 2003).

2724.   The subsection begins with an analysis of the basic tort under maritime law: negligence.  Negligence sets the basic requirements for maritime tort claims alleged against BP.  Against the background of the tort of simple negligence, gross negligence and willful misconduct are then analyzed as imposing different and lower standard of care, *i.e.*, higher thresholds for plaintiffs to prove that a defendant is liable.

### 1.   Negligence.

2725.   "[F]our elements that must be met to establish a negligence claim:  first, that the defendant owed a duty to the plaintiff; second, that the defendants breached that duty; third, that the plaintiff sustained injury; and fourth, that there is a causal connection between the defendant's conduct and the plaintiff's injury."  Rec. Doc. 4285 at 5 (citing *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 211 (5th Cir. 2010) (internal quotation marks omitted).

2726.   "The determination of the existence and scope of a duty involves a number of factors, including most notably the foreseeability of the harm suffered by the complaining party.  Duty may be owed only with respect to the interest that is foreseeably jeopardized by the negligent conduct."  *Great Lakes*, 624 F.3d at 211 (citations, footnotes, and internal quotation marks omitted); *see also* Rec. Doc. 4285 at 6.  "To be foreseeable, the harm alleged must bear some proximate relationship with the negligent conduct such that it can reasonably be said to be within the 'scope of the risk' created by that conduct."  *Great Lakes*, 624 F.3d at 212 (quoting *Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987)); *see also* Rec. Doc. 4285 at 6; *In re Signal Int'l, LLC*, 579 F.3d 478, 491 (5th Cir. 2009).

2727.   "Under maritime law, a plaintiff is owed a duty of ordinary care under the circumstances."  Rec. Doc. 4285 at 6 (quoting *Great Lakes*, 624 F.3d at 211); *see also Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1980).  Simply arguing that a defendant could have taken more safety precautions does not establish negligence, as with hindsight one can

always claim that extra precautions could have been taken.  *See Reilly v. Vadlamudi*, 680 F.3d 617, 627 (6th Cir. 2012); *see also* 65 C.J.S. *Negligence* § 27 ("The fact that there may have been a safer method than that employed, or that danger might have been avoided by action in a different manner, does not make an act negligent.").

2728.  Although not dispositive, a party's compliance with applicable statutes and regulations is strong evidence that its conduct satisfied the duty of ordinary care under the circumstances.  *See e.g., Ramirez v. Plough, Inc.*, 863 P.2d 167, 176 (Cal. 1993) ("[W]e conclude that the prudent course is to adopt for tort purposes the existing legislative and administrative standard of care on this issue."); *Jones v. Hittle Serv., Inc.*, 549 P.2d 1383, 1390 (Kan. 1976) ("Compliance is evidence of due care and that the conforming product is not defective, and may be conclusive in the absence of a showing of special circumstances.  Certainly a manufacturer should be able to rely on such standards in the absence of actual or constructive notice that they are inadequate."); *see also Lorenz v. Celotex Corp.,* 896 F.2d 148, 149-50 (5th Cir. 1990) (affirming jury instruction under Texas law that "[c]ompliance with government safety standards constitutes strong and substantial evidence that a product is not defective"); *Simien v. S. S. Kresge Co.*, 566 F.2d 551, 554 (5th Cir. 1978) ("Compliance with these federal statutory safety requirements and industry standards is evidence that a product is not defective."); *Sims v. Washex Mach. Corp.*, 932 S.W.2d 559, 565 (Tex. App. 1995) ("Compliance with government regulations is strong evidence, although not conclusive, that a machine was not defectively designed.").[21]  Accordingly, the Fifth Circuit has repeatedly relied on evidence of regulatory

---

[21]  *See also Perez v. Wyeth Labs, Inc.*, 734 A.2d 1245, 1259 (N.J. 1999) ("Nevertheless, FDA regulations serve as compelling evidence that a manufacturer satisfied its duty to warn the physician about potentially harmful side effects of its product."); *Grundberg v. Upjohn Co.*, 813 P.2d 89, 96-98 (Utah 1991) (adopting regulatory compliance defense for prescription drugs); *Beatty v. Trailmaster Prods., Inc.*, 625 A.2d 1005, 1014 (Md. 1993) ("But where no special

compliance in holding or affirming that a defendant satisfied the standard of care.  *See Lorenz*, 896 F.2d at 151-52 (affirming jury verdict in favor of defendant where defendant complied with asbestos regulations in effect at the time of plaintiff's exposure); *Hawkins v. Evans Cooperage Co.*, 766 F.2d 904, 909 (5th Cir. 1985) (affirming direct verdict that defendant chemical corporation satisfied duty of care in warning of hazardous nature of chemicals in part by having labels that "complied with the relevant Department of Transportation regulations").  Applying this principle is particularly appropriate for offshore drilling, which is extensively regulated by the federal government.

2729.  Similarly, compliance with industry standards is substantial evidence that a defendant's actions were not negligent.  *See, e.g., Baker v. S/S Cristobal*, 488 F.2d 331, 333 (5th Cir. 1974) (holding that although "compliance with the customs and practices of an industry is not in itself due care, … it is evidence of due care") (internal quotations omitted); *Cia Maritima Del Nervion v. James J. Flanagan Shipping Corp., Stevedore Div.*, 308 F.2d 120, 123 (5th Cir. 1962) (holding that although "compliance with the customs and practices of an industry is not in itself due care, … it is evidence of due care") (internal quotations omitted); *Ray Evers Welding Co. v. Occupational Safety & Health Review Comm'n*, 625 F.2d 726, 732 (6th Cir. 1980) ("[N]egligence on the part of a whole industry cannot be lightly presumed.  It must be proven.") (citation omitted).

2730.  "Under the general maritime law, a party's negligence is actionable only if it is the 'legal cause' of the plaintiff's injuries, which is something more than 'but for' causation – the negligence must be a substantial factor in causing the injuries."  *Great Lakes*, 624 F.3d at 213-14 (internal quotation marks omitted).  "The term 'substantial factor' means more than 'but for the

---

circumstances require extra caution, a court may find that conformity to the statutory standard amounts to due care as a matter of law.").

negligence, the harm would not have resulted.'"  *Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 649 (5th Cir. 1992).

2731.  As a result, a defendant's "fault in the abstract does not give rise to liability. Instead, the fault must be a contributory and proximate cause of the damages sustained."  *In re Mid-South Towing Co.*, 418 F.3d 526, 534 (5th Cir. 2005) (footnote omitted); *see also Am. River Trans. Co. v. Kavo Kaliakra SS*, 148 F.3d 446, 450 (5th Cir. 1998) (same).  There is no such thing as "[p]roof of negligence in the air."  *Holtzclaw v. DSC Commc'ns Corp.*, 255 F.3d 254, 261 n.5 (5th Cir. 2001) (quoting *Palsgraf v. Long Island R. Co.*, 162 N.E. 99, 102 (N.Y. 1928)); *see also Schipani v. McLeod*, 541 F.3d 158, 162 (2d Cir. 2008) ("However, mere negligence is not actionable … Causation is the catalyst that converts negligence into liability in tort.").

## 2.        Gross Negligence.

2732.  Gross negligence requires proof of the same elements as negligence – duty, breach, damages, and causation.[22]  Where gross negligence differs is in the standard of care and what must be proven to show a breach of that standard.

2733.  Gross negligence is distinct from, and "materially greater than," ordinary negligence.  65 C.J.S. *Negligence* § 88.  Whereas ordinary negligence is a "fail[ure] to act as an ordinarily prudent person would act in similar circumstances," *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 338 (5th Cir. 1997), gross negligence is far more egregious.  "Gross negligence is a breach of duty involving an extreme degree of risk, considering the probability

---

[22]  *Doe v. MySpace, Inc.*, 474 F. Supp. 2d 843, 850 (W.D. Tex. 2007) (Texas law) ("to state a claim for negligence or gross negligence, Plaintiffs must allege the existence of a duty, a breach of that duty, and damages proximately caused by the breach."); *Fortunati v. Campagne*, 681 F. Supp. 2d 528, 544-45 (D. Vt. 2009) (Vermont law) ("gross negligence requires the usual negligence elements: duty, breach, causation, and damages"); *Burns v. Delaware Charter Guarantee & Trust Co.*, 805 F. Supp. 2d 12, 26 (S.D.N.Y. 2011) (New York and New Jersey law); *Lyles v. Micenko*, 468 F. Supp. 2d 68, 76 (D.D.C. 2006) (D.C. law).

and magnitude of the potential harm to others (an objective element) when the actor has actual awareness of the risk involved but nevertheless proceeds in conscious indifference to the rights, safety, or welfare of others (a subjective element)." *Shaboon v. Duncan*, 252 F.3d 722, 735 (5th Cir. 2001); *see also Lobegeiger v. Celebrity Cruises, Inc.*, 2012 A.M.C. 202, 231 (S.D. Fla. 2011) (recognizing a "general consensus" under maritime law "that gross negligence involves some extreme departure from reasonable care coupled with a conscious awareness of the risk of harm"); Patrick H. Martin, *The BP Spill and the Meaning of "Gross Negligence or Willful Misconduct,"* 71 La. L. Rev. 957, 1028 (2011) (recognizing that "gross negligence" has both an objective and a subjective element).

### a.      Objective Element of Gross Negligence.

2734.   The objective element of gross negligence requires more than a mere failure to abide by the ordinary standard of care; rather, "[i]t implies an ***extreme*** departure from the ordinary standard of care."   57A Am. Jur. 2d *Negligence* § 227 (emphasis added).   The wrongdoing at issue must be "substantially and appreciabl[y] higher in magnitude than ordinary negligence."   *Houston Exploration Co. v. Halliburton Energy Servs.*, 269 F.3d 528, 532 (5th Cir. 2001) (internal quotation omitted).   Gross negligence is "the entire absence of care, the want of even slight care and diligence, and the utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others."   *Id.* (internal quotations omitted); *see also Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 314 (5th Cir. 2002) ("[V]iewed objectively from the standpoint of the actor, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others."); *see also Ambrose v. New Orleans Police Dep't Ambulance Serv.*, 639 So. 2d 216, 220 (La. 1994) (gross negligence requires an "'extreme departure from ordinary care or the want of even scant care'") (quoting W. Page Keeton, *et. al.*, Prosser & Keeton on the Law of Torts § 34, at 211 (5th ed.

1984); BLACK'S LAW DICTIONARY 1134 (9th ed. 2009) (defining "gross negligence" as a "lack of slight diligence or care"); 57A AM. JUR. 2D *Negligence* § 227 ("[G]ross negligence … refer[s] to a different character of conduct than ordinary negligence.").

2735.   This stringent legal standard is not satisfied where the defendant's conduct, even if negligent, was not extreme or egregious.  In *Halliburton*, the Fifth Circuit reversed a finding of gross negligence where the defendant's negligent conduct caused a 19-day blowout of hydrocarbons on an offshore drilling rig in the Gulf of Mexico.  269 F.3d at 532.  As the Court explained, "the record does not support a finding that [the defendant's] conduct amounts to a want of even slight care and diligence, the most relaxed definition of gross negligence the courts provide."  *Id.*  Similarly, in *Becker v. Tidewater, Inc.*, 586 F.3d 358 (5th Cir. 2009), the Fifth Circuit affirmed a finding of no gross negligence where the defendant gave orders to move a boat, which caused a steel hose to snap taut and sever the leg of a 22-year-old summer intern, *see id.* at 364.  The defendant's conduct, including a failure to warn the rig personnel, was "mere inadvertence and not gross negligence."  *Id.* at 367.  In *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401 (5th Cir. 1982), the Fifth Circuit reversed a finding of gross negligence against a defendant that had, without notice or authorization, delegated certain vessel repair work to a subcontractor that performed it improperly, eventually causing the vessel to be so severely damaged that it had to be sold for scrap, *see id.* at 406-07.  Although the defendant had not investigated the subcontractor, or supervised or inspected the work, the Fifth Circuit concluded that the alleged wrongdoing did not rise to the level of gross negligence.  *See id.* at 411.

### b.   Subjective Element of Gross Negligence.

2736.   In addition to its objective element, a finding of gross negligence also requires a culpable mental state.  Although courts have used "various terms … to express the mental state of the actor," the traditional common-law definition requires "at least … a conscious indifference

549

to consequences." 57A Am. Jur. 2d *Negligence* § 232.  As the Fifth Circuit has put it, "the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed with conscious indifference to the rights, safety, or welfare of others."  *Great Plains*, 313 F.3d at 314; *see also Warren v. United States*, 340 U.S. 523, 528 (1951) (characterizing gross negligence as a form of "positively vicious conduct"); *Halliburton*, 269 F.3d at 531 (common-law gross negligence entails "willful, wanton and reckless conduct"); *id.* at 532 ("[O]ne is grossly negligent when he has intentionally done an act of unreasonable character in reckless disregard of the risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.") (internal quotation omitted); *United States v. Hicks*, 389 F.3d 514, 530 (5th Cir. 2004) (defining "gross negligence" in federal criminal context as "a wanton or reckless disregard for human life") (internal quotation omitted); *Cape Flattery Ltd. v. Titan Maritime LLC*, 607 F. Supp. 2d 1179, 1189 (D. Haw. 2009) ("Gross negligence requires the intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another.") (interpreting CWA; internal quotation omitted); Black's Law Dictionary 1134 (defining "gross negligence" as "[a] conscious, voluntary act or omission in reckless disregard of a legal duty and of the consequences to another party").  Mere carelessness, inadvertence, or mistake does not suffice.  *See Becker*, 586 F.3d at 367; *Halliburton*, 269 F.3d at 532; *see also* 57A Am. Jur. 2d *Negligence* § 227 ("'Gross negligence' means more than momentary thoughtlessness, inadvertence or error of judgment,...").

2737.  In *Halliburton*, the Fifth Circuit reversed a finding of gross negligence where "the record d[id] not support a finding that [the defendant] knew or should have known" that his conduct "would contribute to a well blowout."  269 F.3d at 532-33.  Similarly, in *Barber v.*

*Texaco, Inc.*, 720 F.2d 381 (5th Cir. 1983) (*per curiam*), the Fifth Circuit reversed a finding of gross negligence where "a jury could not reasonably find from [the evidence of alleged negligence] such want of care as would amount to 'conscious indifference' to the rights of others …."). *Id.* at 384. In *Lobegeiger*, the court concluded that plaintiffs failed to establish gross negligence as a matter of law where the evidence did not indicate that the defendant actually knew the risk of harm from its challenged conduct, or knew facts that should have made the risk obvious to another in the defendant's position. *See* 2012 A.M.C. at 232-33.

2738.   In addition to the common law definitions, other federal statutes confirm the background common law rule that gross negligence requires a culpable mental state. Indeed, every single definition of gross negligence in the U.S. Code includes such a requirement. *See* 42 U.S.C. § 9607(d)(2) (Superfund Act) ("For the purpose of the preceding sentence, reckless, willful, or wanton misconduct shall constitute gross negligence."); 30 U.S.C. § 1235(*l*) (Surface Mining and Reclamation Act) (same); 42 U.S.C. § 1791(b)(7) (Bill Emerson Good Samaritan Food Donation Act) ("The term 'gross negligence' means voluntary and conscious conduct (including a failure to act) by a person who, at the time of the conduct, knew that the conduct was likely to be harmful to the health or well-being of another person."). While none of these definitions applies to the CWA of its own force, they all confirm the background understanding against which Congress enacted the provision at issue here. It would certainly be odd to think that Congress departed *sub silentio* from that understanding in the CWA – especially because the Superfund Act cited above was used as a model for this provision. *See, e.g.*, 135 Cong. Rec. 27,984 (1989) (Statement of Rep. Stangeland) ("Even the Superfund law, regarded by many as one of the toughest most environmentally protective laws, contains liability limits subject to a gross negligence standard. Our bill merely follows this precedent.") *id.* at 27,978 (Statement of

Rep. Hammerschmidt) ("[G]ross negligence … is virtually the same as the willful negligence standard in the Federal Superfund law."); *see also Casey v. FDIC*, 583 F.3d 586, 591 (8th Cir. 2009) (same language in related statutes should have same meaning); *Belt*, 444 F.3d at 412.

2739. The government cannot overcome this traditional understanding of gross negligence by arguing that the word "or" in the CWA separates the terms "gross negligence" and "willful misconduct," and that to require a culpable state of mind for gross negligence would ignore that disjunctive word and render one of the terms superfluous.  As explained in the text, both terms require a culpable state of mind, but they require a ***different*** culpable state of mind. *See*, *e.g.*, *Bullock v. BankChampaign, N.A.*, 133 S. Ct. 1754, 1757 (2013) (holding that "defalcation" as used in the Bankruptcy Code "includes a culpable state of mind requirement akin to that which accompanies application of the other terms in the same statutory phrase"). Any overlap in the terms' meanings only underscores why Congress used them together, and provides no reason to artificially limit their meanings.  *See id.*; *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 698 n.11 (1995); *cf.* 18 U.S.C. § 2(a) (extending criminal liability to a person who "aids, abets, counsels, commands, induces or procures" the commission of a federal crime).  Nor, contrary to the government's suggestion, does the fact that Congress replaced the term "willful negligence" with "gross negligence" in the CWA prove anything; those two terms are synonyms, and Congress simply chose to adopt the more common term.  *See* Black's Law Dictionary 1134 (gross negligence "[a]lso termed ... willful negligence").

### 3.    Willful Misconduct.

2740. "Willful misconduct" entails an even more culpable state of mind than "gross negligence."  Willful misconduct includes the defendant actually intending to cause injury (***actual*** intent), as well as the defendant knowing that its conduct will naturally or probably cause injury (***constructive*** intent or recklessness).  *See, e.g.*, 57A Am. Jur. 2d *Negligence* § 257

("Generally, to constitute willful misconduct, the actor must have actual knowledge – or what the law deems to be the equivalent of actual knowledge – of the peril to be apprehended, coupled with a conscious failure to avert injury … In order for a defendant to commit a willful injury, there must be design, purpose, and intent to do wrong and inflict the injury, and as long as the element of inadvertence remains in conduct, the conduct is not properly regarded as willful.") (footnotes omitted); *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 57 (2007) (noting that, at common law, "willful" includes both knowing and reckless violations of legal duties).   The government has conceded that willful misconduct "require[s] a finding of [1] intent or [2] recklessness."  *See* Br. of United States 51-52, *United States v. Citgo Petroleum Corp*., No. 11-31117 (5th Cir. Apr. 13, 2012).   There is thus no dispute here that the term "willful misconduct" in the CWA entails a culpable mental state.  *See generally* Martin, *The BP Spill*, 71 LA. L. REV. at 989 ("The negligence of the actor becomes willful misconduct because the actor has willfully and knowingly chosen to act in a manner he knows may bring harm to others.").

### 4.   The CWA's Text Confirms that Treble Fines Require Extreme Misconduct Characterized by a Culpable Mental State.

2741.   Construed together – as they must be, *see*, *e.g.*, *Bullock*, 133 S. Ct. at 1760 – the terms "gross negligence" and "willful misconduct" make it clear that the CWA authorizes treble fines only in cases of extreme and egregious misconduct characterized by a culpable mental state.  That demanding standard makes sense: this is an avowedly ***punitive*** provision akin to a treble damages provision.  *See*, *e.g.*, *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 639 (1981) ("The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers.").  This standard under the CWA is essentially indistinguishable from the common-law standard for awarding punitive damages.  *See* § XVI.D .

2742.   This interpretation of "gross negligence or willful misconduct" in the CWA comports with the Act's structure and purpose.  The treble-fine provision represents an ***exception*** to the CWA's general regime of civil fines, which already allows consideration of a wide array of factors including "the seriousness of the violation or violations, the economic benefit to the violator, if any, resulting from the violation, the degree of culpability involved, any other penalty for the same incident, any history of prior violations, the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge, the economic impact of the penalty on the violator, and any other matters as justice may require."  33 U.S.C. § 1321(b)(8).  Just as extreme and egregious misconduct can lead to the imposition of punitive damages in the ordinary civil case, such misconduct can lead to the imposition of treble fines under the CWA.

2743.   The legislative history of the OPA statute, Pub. L. No. 101-380, 104 Stat. 484, which added the "gross negligence" provision to the CWA in 1990, confirms that Congress intended for the treble-fines exception to be very narrow.[23]   "[G]ross negligence and willful misconduct ... is conduct that is intended to injure or is reckless, showing the wanton disregard for the harm which is the likely result of a certain course of action or activity.  …  These are extraordinarily difficult to prove."  135 Cong. Rec. 27,986 (1989) (Statement of Rep. Synar) (emphasis added); *accord, e.g.*, *id.* 27,877 (Statement of Rep. Miller) ("Both are very difficult to prove."); *id.* 27,979 (Statement of Rep. Miller) ("a very, very difficult test to meet ...."); H.R.

---

[23]  The Act also specifies that OPA's liability caps do not apply where an incident was proximately caused by the responsible party's "gross negligence or willful misconduct."  33 U.S.C. § 2704(c)(1).  That provision is not at issue here with respect to BP, which waived those caps.  *See* Rec. Doc. 559.  That provision remains relevant, however, in interpreting the identical phrase "gross negligence or willful misconduct" added to the separate CWA statute by the same Act.  *See, e.g.*, *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 479 (1992) ("[T]he basic canon of statutory construction [is] that identical terms within an Act bear the same meaning").

Rep. No. 99-247, pt.1 at 24 (1985) ("[An] oil spill incident caused primarily by an intentional violation ... and which violation was committed with knowledge that an incident would probably result, would constitute willful or gross negligence.").

2744.  By attempting to dilute this stringent legal standard, the government is trying to turn this narrow exception into the rule, in derogation not only of the CWA's text, structure, and purpose, but also of the cardinal rule that penal statutes are to be strictly construed.  *See, e.g., Dowling v. United States*, 473 U.S. 207, 213-14 (1985) ("The rule that penal laws are to be construed strictly, is not much less old than construction itself.") (quoting *United States v. Wiltberger*, 18 U.S. 76, 95 (1820) (Marshall, C.J.)); *CIR v. Acker*, 361 U.S. 87, 91 (1959) (rule of strict construction applies to punitive civil statutes); *World Ins. Co. of Omaha, Neb. v. Pipes*, 255 F.2d 464, 472 (5th Cir. 1958) ("Penalties in civil actions are not favored by the courts, and should not be imposed except in cases that are clear and free from doubt.") (internal quotations omitted).

2745.  At bottom, the government is advancing a *res ipsa loquitur* approach to the CWA's treble-fine provision.  In essence, the government contends, this was a particularly terrible oil spill, so there must have been some particularly terrible conduct somewhere.  This argument is directly contrary to the case law.  Gross negligence or willful misconduct cannot be inferred from the consequences.  *See, e.g.*, *Orthopedic & Sports Injury Clinic v. Wang Labs., Inc.*, 922 F.2d 220, 225 (5th Cir. 1991) (*res ipsa loquitur* cannot be used to prove gross negligence); *see generally* E.T. Tsai, Comment note, *Applicability of Res Ipsa Loquitur Where Plaintiff Must Prove Active or Gross Negligence, Wilful Misconduct, Recklessness, or the Like*, 23 A.L.R.3d 1083 (1969) (collecting cases).  Indeed, the CWA's general civil fines already

account for the extent of a spill, imposing civil fines on a per-barrel basis.  *See* 33 U.S.C. § 1321(b)(7).

> ### 5.    The Totality of Actions and Omissions Must Be Considered in Determining Negligence, Gross Negligence, or Willful Misconduct.

2746.   In deciding liability for gross negligence or willful misconduct, a court need not, and may not, consider a particular act or omission in isolation.  That point has two corollaries: (1) a court may consider a series of related culpable acts or omissions by the defendant, and (2) a court must consider not only culpable conduct by the defendant, but also related exculpatory conduct.  *See, e.g.*, 65 C.J.S. *Negligence* § 89; *Clements v. Steele*, 792 F.2d 515, 516 (5th Cir. 1986).  Both negligent mistakes and deliberate precautions are equally relevant in assessing culpability.  *See, e.g.*, *Milne v. USA Cycling Inc.*, 575 F.3d 1120, 1132 (10th Cir. 2009) (holding that the "undisputed steps that defendants took to enhance the safety of [a road race] would prevent any reasonable juror from finding gross negligence").  Indeed, a defendant's safety precautions can preclude a finding of gross negligence even when the defendant engaged in a series of negligent acts.  *See, e.g., id.* ("[T]he organizers' failure to shut down the road, mark and enforce a center line on the road, more closely monitor vehicular traffic, or more thoroughly warn other area drivers of the upcoming race cannot, as a matter of law, amount to gross negligence in light of the other safety steps taken by the organizers of this race."); *Kuykendall v. Young Life*, 261 F. App'x 480, 490 (4th Cir. 2008) ("The many precautions [defendant] took to ensure ... safety preclude a finding that it demonstrated an absence of slight diligence, or the want of even scant care.") (internal quotations omitted); *Computalog U.S.A., Inc. v. Blake Drilling & Workover Co., Inc.*, No. 95-3009, 1996 WL 720761, at *2-4 (E.D. La. Dec. 9, 1996)

(rejecting gross negligence where defendant exercised some care in visually inspecting the crane).[24]

2747.   A "series of mistakes alone, without a showing of recklessness, is insufficient for a finding of gross negligence." *AT&T Co. v. City of New York*, 83 F.3d 549, 556 (2d Cir. 1996) (internal citation omitted); *see also Clements*, 792 F.2d at 516.   Instead, "the negligent acts sought to be combined to produce liability must be related to a particular incident which, as an entirety, indicates recklessness." *Williamson v. McKenna*, 354 P.2d 56, 71-72 (Or. 1960).

2748.   Plaintiffs who seek to infer a culpable mental state from a series of negligent acts must actually identify a responsible ***individual*** with the requisite culpable state of mind. "Individual acts of negligence on the part of employees–without more–cannot ... be combined to create a wrongful corporate intent." *Saba v. Compagnie Nationale Air France*, 78 F.3d 664, 670 n.6 (D.C. Cir. 1996).   That is because, as the Fifth Circuit has explained, there is no such thing as "collective scienter." *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 366 (5th Cir. 2004); *see also United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1122 (D.C. Cir. 2009) (collecting cases).   Where a corporate defendant's state of mind is at issue, the Fifth Circuit "decline[s] to allow this element to be met by a corporation's collective knowledge,

---

[24] *See also Whitley v. Commonwealth*, 538 S.E.2d 296, 300 (Va. 2000) (holding that prison was not grossly negligent in death of an inmate from seizure where they exercised some care in treating him, including monitoring his condition and assessing whether he could take medication); *Milligan v. Big Valley Corp.*, 754 P.2d 1063, 1069 (Wyo. 1988) (rejecting claim of willful and wanton misconduct in a ski race where the "facts show that safety was of concern to appellee and that specific steps were taken for the safety of the racers", including by inspecting the course and having someone assess snow conditions); *Santho v. Boy Scouts of Am.*, 857 N.E.2d 1255, 1263 (Ohio Ct. App. 2006) (affirming directed verdict on claim of recklessness arising from an ice skating race in part because race organizers took some safety precautions, such as monitoring skaters to determine if conditions became dangerous and only allowing those of a certain skill level to participate); *see generally Reilly*, 680 F.3d at 627 (explaining that simply arguing an actor could have taken more safety precautions falls far short of gross negligence which requires "almost a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks").

instead requiring that the state of mind 'actually exist' in at least one individual and not be imputed on the basis of general principles of agency." *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 241 (5th Cir. 2010).  The individual who possesses the wrongful intent must be responsible for the corporation's wrongdoing; an honest mistake does not become grossly negligent because some ***other*** corporate agent acted recklessly.  *See Southland*, 365 F.3d at 366 (in the context of fraud, "the required state of mind must actually exist in the individual making (or being a cause of the making of) the misrepresentation, and may not simply be imputed to that individual on general principles of agency").  If no responsible individual possessed the proscribed intent, then neither did the corporate defendant: "[T]he agency relationship cannot transform negligence into willfulness."  *Saba*, 78 F.3d at 670 n.6; *see also United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1274 (D.C. Cir. 2010) ("'[C]ollective knowledge' provides an inappropriate basis for proof of scienter because it effectively imposes liability, complete with treble damages and substantial civil penalties, for a type of loose constructive knowledge …."").

### 6.    BP's Liability Can Be Based Only on Conduct that Legally Caused the Incident.

2749.   By its express language, and in accord with the common law, the CWA is explicit that heightened penalties are available only if the violation "***was the result*** of gross negligence or willful misconduct.  *See* 33 U.S.C. § 1321(b)(7)(D) (emphasis added).  *Cf.* Rec. Doc. 5809 at 13 (government's argument "would tend to write out OPA's requirement that the violation of the regulation be a 'proximate cause' of the incident").  *See also* 33 U.S.C. § 2704(c) (liability cap removed under OPA only "if the incident was proximately caused by" gross negligence or willful misconduct, or the violation of certain applicable regulations).

2750.   Such language, as the Supreme Court recently explained in construing another federal statute, "plainly suggests causation."  *Pac. Operators Offshore, LLP v. Valladolid*, 132

S. Ct. 680, 690 (2012).  Nor is mere "but for" *factual* causation sufficient; rather, Congress legislates against the background rule that causation also includes a *legal* component.  *See id*. at 690-91; *see also id*. at 691-93 (Scalia, J., concurring in part and concurring in the judgment); *Holmes v. SIPC*, 503 U.S. 258, 267-68 (1992) (construing phrase "by reason of" in RICO). Whether that legal component is characterized as traditional proximate cause or a "substantial-nexus," the point remains that there must be a "significant causal link" between the oil spill and the defendant's culpable misconduct.  *Valladolid*, 132 S. Ct. at 691.  The CWA does not allow courts to punish defendants for conduct unrelated to an oil spill or to trace such a spill to all its remote "but-for" causes.

2751.  The same rule applies under common law, which requires legal causation.  *See §* XV.C.1.  Just as negligence requires proof of legal causation – and not merely "but for" causation – a requirement of heightened misconduct also requires proof that the alleged misconduct proximately caused the asserted injury.  *See, e.g.*, *In re First City Bancorporation of Tex., Inc.*, 205 F.3d 1337, No. 99-10587, 1999 WL 1338398, at *3 (5th Cir. Dec. 23, 1999) (unpublished) ("Finally, the negligence and gross negligence claims fail because the complaint does not sufficiently allege any facts that could support a finding that any damages were proximately caused by the appellees' alleged negligence."); *Shah v. Pan Am. World Servs., Inc.*, 148 F.3d 84, 95 (2d Cir. 1998) (explaining that willful misconduct under the Warsaw Convention requires proof of causation).[25]

---

[25] *See also Essilor Labs. of Am. v. St. Paul Fire & Marine Ins. Co.*, No. 08-C-296, 2009 WL 142323 at *5 (E.D. Wis. Jan. 20, 2009) ("'Juries are not given license to roam the caverns of their consciences to punish conduct they deem despicable unless a plaintiff can prove that he or she has suffered some actual damage as a result of the conduct.'" (quoting *Kehl v. Economy Fire & Cas. Co.*, 433 N.W. 2d 279, 280 (Wis. Ct. App. 1988))); *First Commonwealth Corp. v. Hibernia Nat'l Bank of New Orleans*, 891 F. Supp. 290, 295 (E.D. La. 1995) ("In accord with Louisiana law, the jury was instructed that Hibernia's gross negligence must have caused First

### 7. Agents and Independent Contractors.

#### a. BP Cannot Be Vicariously Liable for the Acts of Its Contractors.

2752. BP is not legally responsible for faultworthy acts of either Transocean or Halliburton. Under maritime law, a principal generally is not vicariously liable for the acts of its independent contractors. *See Wallace v. Oceaneering Int'l*, 727 F.2d 427, 437 (5th Cir. 1984) (regarding semisubmersible drilling rig); *see also Roberts v. Cardinal Servs., Inc.*, 266 F.3d 368, 380 (5th Cir. 2001); *LeJeune v. Shell Oil Co.*, 950 F.2d 267, 270 (5th Cir. 1992); *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548, 549 (5th Cir. 1987); Charles M. Davis, MARITIME LAW DESKBOOK 68 (2010). As the Court has recognized, a principal is not liable for the acts of its contractors unless (1) the principal and contractor were engaged in an ultra-hazardous activity; or

---

Commonwealth's damages in order for First Commonwealth to prevail ... ."); *Verdin v. Shell Offshore, Inc.*, No. 93-3795, 1995 WL 328167, at *5 (E.D. La. May 31, 1995) ("The reckless or wanton handling of the hazardous or toxic substances must have caused Mr. Verdin's death for Hazel Verdin to be able to recover punitive damages."); *Hatfield v. Max Rouse & Sons Nw.*, 606 P.2d 944, 957 (Idaho 1980) ("It is also axiomatic that the allegedly extreme conduct must have caused plaintiff's loss to justify the award of punitive damages."), *overruled on other grounds by Brown v. Fritz*, 699 P.2d 1371 (Idaho. 1985); *Ellis v. Golconda Corp.*, 352 So. 2d 1221, 1225 (Fla. Dist. Ct. App. 1977) ("Exemplary or punitive damages are assessable dependent upon circumstances showing moral turpitude or atrocity **in causing an injury** that is wanton and malicious or gross and outrageous." (emphasis added)); *Taylor v. Dyer*, 593 N.Y.S.2d 122, 124 (N.Y. App. Div. 1993) ("While defendant's flight from the scene might be considered reprehensible, such conduct occurring after the accident did not proximately cause plaintiffs' injuries ... ."); *Estate of Smith ex rel. Smith v. Underwood*, 487 S.E.2d 807, 818 (N.C. Ct. App. 1997) ("[P]unitive damages are allowed where ... an element of aggravation ... **causes the injury**." (emphasis added)); *Rubeck v. Huffman*, 374 N.E.2d 411, 413 (Ohio 1978) (per curiam) ("It is established law in this state that one may obtain punitive damages for personal injury or property loss **caused by** intentional, reckless, wanton, wilful and gross acts ... ." (internal quotation marks omitted and emphasis added)); *Seminole Pipeline Co. v. Broad Leaf Partners, Inc.*, 979 S.W.2d 730, 741 (Tex. App. 1998) ("[A] punitive damage award requires proof that the damage or harm **resulted from** fraud, malice, or gross negligence." (emphasis added and other emphasis omitted)); *Berkley v. Dowds*, 152 Cal. App. 4th 518, 528 (Cal. Ct. App. 2007) ("No claim of willful misconduct can be stated without alleging the specific act or omission that caused the injury."); *Gamez v. Brush Wellman, Inc.*, 34 P.3d 375, 378 (Ariz. Ct. App. 2001) ("A wilful misconduct action includes four elements:  (1) the employer's wilful misconduct must have been the cause of the employee's injury … .").

560

(2) the principal retained operational control over the activities of the contractor.  *See* Rec. Doc. 3830 at 28 (citing *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548 (5th Cir. 1987)).

2753.   This Court has previously recognized that offshore drilling operations are not ultra-hazardous.  *See* Rec. Doc. 3830 at 28 (citing *Ainsworth*, 829 F.2d at 549); *see also Roberts*, 266 F.3d at 381; *Coulter v. Texaco, Inc.*, 117 F.3d 909, 912 (5th Cir. 1997); *Boutwell v. Chevron U.S.A., Inc.*, 864 F.2d 406, 407 (5th Cir. 1989); *Smith v. Hall-Houston Oil Co.*, No. 98-3433, 2000 WL 6265, at *3 (E.D. La. Jan. 4, 2000); *Romero v. Pennzoil Co.*, No. 93-0064, 1993 WL 390148 at *2 (E.D. La. Sept. 23, 1993).

2754.   Nor did BP retain "operational control" over its drilling contractors.  "Operational control" exists only if the principal has "direct supervision over the step-by-step process of accomplishing the work" such "that the contractor is not entirely free to do the work in his own way."  *Fruge v. Parker Drilling Co.*, 337 F.3d 558, 564 (5th Cir. 2003); *see also LeJeune*, 950 F.2d at 269-70; *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 193 (5th Cir. 1991).

2755.   In determining the existence of operational control, the most important question is "whether and to what extent the right to control the work has been contractually reserved by the principal."  *Coulter*, 117 F.3d at 912; *see also Ainsworth*, 829 F.2d at 550; *Triplette v. Exxon Corp.*, 554 So. 2d 1361, 1363 (La. Ct. App. 1989); *Graham v. Amoco Oil Co.*, 21 F.3d 643, 646 (5th Cir. 1994); *Allen v. Seacor Marine, Inc.*, 423 F. Supp. 2d 653, 658 (S.D. Tex. 2003); *Ransom v. Panaco, Inc.*, 28 F. Supp. 2d 1009, 1012 (E.D. La. 1998).  Here, no such control was reserved by BP.   The Drilling Contract with Transocean specifically provides that "CONTRACTOR shall be solely responsible for the operation of the Drilling Unit" and that BP "shall have no direction or control of CONTRACTOR or its employees and agents except in the results to be obtained."   TREX 001356A at BP-HZN-MBI00021479, BP-HZN-MBI00021482.

Similarly, the Well Services Contract states that "CONTRACTOR shall act as an independent contractor with respect to the WORK and shall exercise control, supervision, management, and direction as to the method and manner of obtaining the results required by COMPANY."  TREX 004477 at BP-HZN-2179MDL00055604;  *see also*  TREX 04477 at BP-HZN-2179MDL00055603-04 (similar independent contractor language for Halliburton).

2756.  In *Fruge*, the Fifth Circuit considered nearly identical independent contractor language.  There, a principal contracted with a drilling contractor to complete a well on a platform.  337 F.3d at 560.  The plaintiff was injured when equipment from the drilling contractor's rig ruptured.  *Id.*  The principal successfully moved for summary judgment on the basis of the independent contractor defense.  *Id.*  In considering whether operational control existed, the court first examined the extent to which the principal contractually reserved the right to control the work.  *Id.* at 564.  The contract stated, "[Contractor] shall be an independent contractor with respect to performance of all work hereunder.  [Principal] shall have no direction or control of [contractor] or [contractor's] personnel except in the results to be obtained."  *Id.*  The court held that the contractor was exclusively responsible for controlling the details of the work under the contract.  *Id.*  Likewise, under its contracts BP did not have operational control over either Transocean or Halliburton.  *See also Ransom*, 28 F. Supp. 2d at 1013; *Etheridge v. Sub Sea Int'l*, No. 91-2219, 1992 WL 116031, at *1 (E.D. La. May 25, 1992); *Jones v. H.W.C. Ltd.*, No. 01-3818, 2003 WL 42147, at *1 (E.D. La. Jan. 3, 2003).

2757.  Moreover, the physical presence of a principal's representative is not sufficient to show supervision or control.  *Fruge*, 337 F.3d at 564; *see also Gregory v. Kirby Inland Marine, LP*, No. 08-4185, 2009 WL 1402229, at *2 (E.D. La. May 14, 2009).  Periodic inspections by a "company man" do not amount to control over operations conducted by a drilling crew.  *Fruge*,

337 F.3d at 564; *see also Ainsworth*, 829 F.2d at 550.  That a principal might be ultimately responsible for the work is not operational control by the principal in the absence of active involvement.  *See Helaire v. Mobil Oil Co.*, 709 F.2d 1031, 1040 (5th Cir. 1983) ("While the Teledyne workers were ultimately responsible to the Mobil supervisor, simply because Teledyne was itself responsible to Mobil, certainly this general level of responsibility cannot be sufficient to constitute 'active involvement' in the unloading operation.").  Nor are periodic checks by the contractor with the company man about tasks, safety meetings conducted by the company man, and the requirement of safety guidelines evidence of operational control.  *See Allen*, 423 F. Supp. 2d at 659; *Boutwell*, 864 F.2d at 408 (5th Cir.); *Duplantis*, 948 F.2d at 193; *Triplette*, 554 So. 2d at 1363.  As the court explained in *Coulter*:

> … the fact that a principal like Texaco reserves the right to monitor its contractor's performance and stations a 'company man' on the platform who observes the contractor's activities, has the right to make safety recommendations to the contractor, and is obligated to report continuing unsafe work practices or conditions to his (Texaco) superiors, does not mean that the principal controls the methods or details of the contractor's work.

117 F.3d at 912; *see also Wallace*, 727 F.2d at 436-37; *Fruge*, 337 F.3d at 564; *Ransom*, 28 F. Supp. 2d at 1013; *Zepherin v. Conoco Oil Co.*, 884 F.2d 212, 213 (5th Cir. 1989); *Ham v. Pennzoil Co.,* 869 F.2d 840, 842 (5th Cir. 1989); *Ainsworth*, 829 F.2d at 550.  Thus, the presence and input of BP's Wellsite Leaders is not operational control by BP.

2758.  Furthermore, this conclusion does not change even if the contractors' actions violate MMS regulations applying to the lessee or operator.  In *Bourg v. Texaco Oil Co.,* 578 F.2d 1117 (5th Cir. 1978), the employee of a contractor was injured while carrying out repairs on a well platform.  *Id.* at 1118-19.  The employee sought to rely on MMS regulations to hold the company that owned the platform who had hired the contractor liable.  *Id.* at 1120-21. Specifically, the employee relied on MMS regulations requiring the lessee to take all necessary

steps to avoid accidents and that the lessee conduct all operations in a safe and workmanlike manner.  *Id.* at 1121.  The Fifth Circuit rejected this argument, holding that "[w]e are unable to read the above regulations as creating any form of vicarious liability."  *Id.*  The Fifth Circuit explained:

> It is the plaintiff's position that because of these regulations, a platform owner who is otherwise free of negligence and who hires an experienced independent contractor and assigns to that contractor some rather routine work should be legally responsible for the negligent work methods utilized by that contractor. We feel that it would be error to so interpret these regulations absent a clear indication from Congress that this was their intent.

*Id.*  Fifth Circuit decisions have followed *Bourg* and confirmed that a contractor's violation of an MMS regulation cannot make a lessee or operator vicariously liable for the violation.  *See Fruge*, 337 F.3d at 561-64 (holding that the MMS regulation making the lessee, the operator, and the person actually performing the jointly and severally responsible for complying with the offshore MMS regulations did not change the principle that a lessee or operator is not vicariously liable for the contractor's fault); *Dupre v. Chevron U.S.A., Inc.*, 109 F.3d 230 (5th Cir. 1997); *Romero v. Mobil Exploration & Producing N. Am., Inc.*, 939 F.2d 307, 310 (5th Cir. 1991).

### b.      The Conduct of Agents Cannot Be Considered for Treble Fines or Punitive Damages.

2759.  In deciding whether treble fines under the CWA (or punitive damages under maritime law) are warranted, a court must focus on the conduct of the ***defendant***, not the conduct of ***others***.  Put differently, a defendant may be subjected to civil punishment only for its ***own*** conduct.

2760.  In the maritime context, this principle has been established for almost two centuries.  In *The Amiable Nancy*, 16 U.S. 546 (1818) (Story, J.), the Supreme Court held that a vessel's owners could be subjected to ***compensatory*** damages, but not ***punitive*** damages, based on the captain's conduct.  As the Court explained:

Upon the facts disclosed in the evidence, this must be pronounced a case of gross and w[a]nton outrage, without any just provocation or excuse. … But it is to be considered, that this is a suit against the owners of the privateer, upon whom the law has, from motives of policy, devolved a responsibility for the conduct of the officers and crew employed by them, and yet, from the nature of the service, they can *scarcely ever* be able to secure to themselves an adequate indemnity in cases of loss.  ***They are innocent of the demerit of this transaction, having neither directed it, nor countenanced it, nor participated in it in the slightest degree. Under such circumstances, we are of opinion that they are bound to repair all the real injuries and personal wrongs sustained by the libellants, but they are not bound to the extent of vindictive damages.***

*Id.* at 558-59 (emphasis added); *see also Lake Shore & Mich. S. Ry. Co. v. Prentice*, 147 U.S. 101, 106-08 (1893) (citing *Amiable Nancy* for the general common-law rule that "[a] principal ... cannot be held liable for exemplary or punitive damages, merely by reason of wanton, oppressive or malicious intent on the part of the agent"); *see also* SCHOENBAUM, ADMIRALTY & MAR. LAW § 5-18 ("[A]dmiralty cases deny punitive damages in cases of vicarious fault, holding that a principal or master cannot be liable for an agent or servant's wanton or willful misconduct unless it participated in or ratified the wrongful conduct.").

2761.   As the Fifth Circuit has explained, "punitive damages may not be imposed against a corporation when one or more of its employees decides on his own to engage in malicious or outrageous conduct.  In such a case, the corporation itself cannot be considered the wrongdoer.  If the corporation has formulated policies and directed its employees properly, no purpose would be served by imposing punitive damages against it except to increase the amount of the judgment."  *In re P&E Boat Rentals Inc v. Ennia Gen. Ins. Co.,* 872 F.2d 642, 652 (5th Cir. 1989).

2762.   Nothing in the CWA remotely suggests that Congress intended to depart from these traditional common-law norms.  To the contrary, the Act specifies that where "a violation ... was the result of gross negligence or willful misconduct of ***a person*** described in subparagraph (A), ***the person*** shall be subject" to treble fines.  33 U.S.C. § 1321(b)(7)(D) (emphasis added).

Thus, by its plain terms, the statute authorizes the imposition of treble fines *only* upon the "person" guilty of "gross negligence or willful misconduct."  The OPA provision governing liability caps provides a useful counterpoint.  That provision does permit vicarious liability where the incident was proximately caused by the gross negligence or willful misconduct of not only "the responsible party" but also "***an agent or employee of the responsible party***."  33 U.S.C. § 2704(c)(1) (emphasis added).  No such language appears in the CWA's treble-fine provision, underscoring that Congress did not intend to authorize vicarious liability for such fines.  *Cf., e.g. Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotation omitted).

### 8.      A Court Must Consider Compliance with Government Regulations and Industry Standards.

2763.  Finally, in deciding whether treble fines under the CWA (or punitive damages under maritime law) are warranted, whether the challenged conduct complied with government regulations and industry standards is highly relevant.  Because "compliance with both federal regulations and industry practices is some evidence of due care," such compliance generally negates the culpability necessary to warrant treble fines under the CWA or punitive damages.  *Richards v. Michelin Tire Corp.*, 21 F.3d 1048, 1059 (11th Cir. 1994); *see also* W. Page Keeton, *et al.,* PROSSER & KEETON ON THE LAW OF TORTS § 36 at 233 n.41 (5th ed. 1984) ("In most contexts … compliance with a statutory standard should bar liability for punitive damages.").

2764.  Thus, compliance with regulations is strong evidence rebutting allegations of gross negligence.  *Richards*, 21 F.3d at 1059 (relying on defendant's "compliance with both federal regulations and industry practices [as] some evidence of due care" to hold that its actions

were not wanton as a matter of law); *Nader v. Allegheny Airlines, Inc.*, 626 F.2d 1031, 1035 (D.C. Cir. 1980) (defendant "may not be condemned as a wanton wrongdoer for conforming to the standards set and the practices approved by the agency charged with the duty of regulating it"); *Morris v. Cessna Aircraft Co.*, 833 F. Supp. 2d 622, 641-43 (N.D. Tex. 2011) (finding that evidence showing full regulatory compliance with FAA requirements negated showing of gross negligence); *see also Satcher v. Honda Motor Co.*, 52 F.3d 1311, 1317 (5th Cir. 1995) (vacating punitive damages award where defendant complied with governmental regulations and industry standards); *Sloman*, 841 F. Supp. at 703 n.8 ("Since defendant successfully proved that it complied with federal regulations," the defendant "did not act with malice ... and thus plaintiff is not entitled to punitive damages"); *Stone Man*, 435 S.E.2d at 472 ("[P]unitive damages ... are, as a general rule, improper where a defendant has adhered to environmental and safety regulations.").

2765. Similarly, compliance with industry standards is powerful evidence that the defendant was not grossly negligent. *See AMW Materials Testing, Inc. v. Town of Babylon*, 584 F.3d 436, 454 (2d Cir. 2009) (holding that defendant's decisions could not be grossly negligent "in light of evidence that the decisions, ***far from representing 'an extreme departure from the standards of ordinary care,' fell well within industry standards***") (emphasis added); *Richards*, 21 F.3d at 1059 (relying on defendant's "compliance with both federal regulations and industry practices is some evidence of due care" to hold that its actions were not wanton as a matter of law); *Drabik v. Stanley-Bostich, Inc.*, 997 F.2d 496, 510 (8th Cir. 1993) ("Compliance with industry standard and custom serves to negate conscious disregard and to show that the defendant acted with a nonculpable state of mind ...."); *Maxey v. Freightliner Corp.*, 665 F.2d 1367, 1376 (5th Cir. 1982) (holding "that compliance with industry custom can be relevant

evidence tending to negate an inference of gross indifference[]" and instructing district court on remand to consider any such evidence "as tending to negate a jury issue of gross indifference[]"); *Am. Cyanamid Co. v. Roy*, 498 So. 2d 859, 862-63 (Fla. 1986) ("While ... compliance with industry guidelines should not be taken as conclusive evidence bearing on the question of a corporation's negligence, such information may certainly bear on whether a party's behavior represents such an extreme departure from accepted standards of care").[26]

2766.   On the other hand, "[m]ere violation of a statute or regulation, without more, does not constitute willful and wanton misconduct."   57A Am. Jur. 2D *Negligence* § 247; *see also Clements v. Steele*, 786 F.2d 673, 676 (5th Cir. 1986) (noting jury finding of no gross negligence, despite "evidence that Circle M did not give its employees safety instructions and that Circle M violated OSHA regulations regarding equipment make-up and inspection did not demonstrate gross negligence"); *Maritrans Operating Partners v. Diana T. M/V*, No. 97-1916, 1999 WL 144458, at *4, 6-8 (E.D. La., Mar. 15, 1999) (rejecting gross negligence even though captain tested positive for marijuana); *Bashford v. N. Carolina Licensing Bd. for Gen. Contractors*, 420 S.E.2d 466, 469 (N.C. Ct. App. 1992) (holding that violating a regulation, without more, is insufficient).   Especially in a highly regulated field like offshore drilling, not every regulatory violation will tend to establish a culpable state of mind – a point this Court has recognized by holding that a violation of a generic regulation against conduct that results in oil spills does not establish the culpability necessary to negate the OPA liability cap.   *See* Rec. Doc. 5809 at 12-14. And, for the reasons discussed above, regulatory violations are immaterial to the extent they did

---

[26]   *See also Satcher*, 52 F.3d at 1317 (vacating punitive damages award where defendant complied with governmental regulations and industry standards); *In re Miamisburg Train Derailment Litig.*, 725 N.E.2d 738, 752 (Ohio Ct. App. 1999) ("evidence of compliance does show that appellees were acting according to industry standards," which "overwhelm[s] any suggestion that appellees acted with conscious disregard for safety").

not **cause** a particular accident.  *Cf. Gehl by Reed v. Soo Line R.R. Co.*, 967 F.2d 1204, 1207 (8th Cir. 1992).  Indeed, the OPA liability cap does not apply where "the incident was proximately caused by ... (A) gross negligence or willful misconduct ... **or** (B) the violation of an applicable Federal safety, construction, or operating regulation," 33 U.S.C. § 2704(c)(1), which underscores that Congress could not have believed that a regulatory violation was "gross negligence or willful misconduct" *per se*.

> **D.     BP's Conduct Establishes That It Is Not Culpable for Treble Fines under the CWA.**

2767.   This subsection evaluates BP's conduct under the standards for negligence, gross negligence, and willful misconduct.  In sum, none of BP's actions – considered in combination or individually – constitute either gross negligence or willful misconduct.  Moreover, none of BP's actions other than the negligent supervision of the negative pressure test were negligent.

> **1.     BP Exercised Due Care by Implementing Numerous Safety Steps Designed to Avoid a Blowout.**

2768.   BP's drilling safety record from 2005 to 2009 was generally superior to that of its competitors across a range of data, including accidents, fatalities, and fires and explosions, *see* § XI.D, strongly supporting that BP used due care in drilling wells.  *See, e.g., Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 901 (7th Cir. 1994) ("Both the lawyers and the experts seemed to think that 'defect' is a question of first principles, to be resolved by jurors as if they were engineers designing the first truck in the world rather than observers asking whether the design of a particular truck unduly increased the risk of injury.  Jurors are not engineers, and data on accident rates speak more loudly than abstract arguments."); *Trull v. Volkswagen of Am., Inc.*, 187 F.3d 88, 97 (1st Cir. 1999) (upholding admission and confirming relevance of data showing effectiveness of lap belts alone in preventing deaths in car accidents:  "Regardless of the state of knowledge at the time Volkswagen designed and manufactured the Trulls' vehicle, the company

could be neither negligent nor strictly liable if more comprehensive, up-to-date information demonstrated that a seat belt system using only lap belts was reasonably safe."); *Jones v. Carolina Cas. Co.*, 547 So. 2d 1099, 1102 (La. Ct. App. 1989) (holding that Department of Transportation was not negligent in maintaining road in part because "the accident rate in the area was very low"); *Williams v. Anthony*, 534 So. 2d 458, 466 (La. Ct. App. 1988) (holding that Department of Transportation was not negligent in failing to test a section of road in part because "the accidents at that location did not exceed the significant accident rate").[27]

2769.   The Macondo well was planned and designed pursuant to an extensive process designed to identify and address potential risks, *see* §§ V.A; XI.C.4, establishing that BP was aware of, and committed to addressing to, potential risks.  *See, e.g.*, *Dickerson v. Kroger, Inc.*, 509 So.2d 813, 815 (La. Ct. App. 1987) (affirming dismissal of negligence action for injury allegedly caused by floor condition in corporation's store where corporation had produced evidence of "diligent effort[s] to discover and correct dangerous conditions[]"); *Caruso v. Picayune Pizza Hut, Inc.*, 598 So.2d 770, 773-75 (Miss. 1992) (affirming verdict against plaintiff based in slip and fall case and finding that defendant-appellee had presented sufficient evidence of reasonable efforts to remedy hazardous floor condition to make issue one for jury to determine); *Jennings v. Thompson*, 792 F. Supp. 2d 1, 4 (D.D.C. 2011) (denying plaintiff's

---

[27]   *See also Espeaignnette v. Gene Tierney Co.*, 43 F.3d 1, 9-10 (1st Cir. 1994) (rejecting plaintiff's motion to exclude lack of prior accidents both as to negligence and strict liability issues and holding that such evidence is "clearly relevant" to issues of causation and risk); *In re Cent. Gulf Lines, Inc.*, 176 F. Supp. 2d 599, 615-16 (E.D. La. June 2001) (granting party's motion for summary judgment on finding of no evidence of negligence, citing in support that party had observed no problems or similar incidents, and rejecting plaintiffs' contrary position that "lack of prior accidents does not sanctify the [contested] practice"); *Couvillion v. Shelter Mut. Ins. Co.*, 672 So. 2d 277, 290 (La. Ct. App. 1996) (citing "lack of prior accidents in the area" as a reason for determination that defendant was not negligent regarding amount and type of traffic safety equipment used in area).

motion *in limine* to exclude evidence of maintenance, inspection, and repair and holding that such evidence is relevant to whether defendant exercised reasonable care).

2770.   BP followed or exceeded industry practices in designing and drilling the well, *see* § V, which is powerful evidence that BP's actions were not negligent.  *See Baker*, 488 F.2d at 333; *Cia Maritima*, 308 F.2d at 123; *Ray Evers*, 625 F.2d at 732.

2771.   BP received approval from the federal government agency charged with regulating offshore drilling for its drilling plan and temporary abandonment procedure.  *See* § V.D.7.d.  *See Ramirez*, 863 P.2d at 176; *Hittle Serv.*, 549 P.2d at 1390; *see also Lorenz,* 896 F.2d at 149-50; *Simien*, 566 F.2d at 554.

2772.   BP hired the best-reputed and most experienced contractors to drill the Macondo well, including Transocean and Halliburton, further evidencing that BP exercised due care.  *See, e.g., S. Farm Bureau Cas. Ins. Co. v. McKenzie*, 252 F.2d 195, 200 (5th Cir. 1958) ("Having hired a competent contractor who enjoyed a good reputation in the community and was as 'good as any you can get,' [the defendant] had every reason to believe that the wiring had been installed in a safe and workmanlike manner."); *Green v. United States*, 418 F. App'x. 862, 869 (11th Cir. 2011) (affirming that one contractor "could rely on the opinion of the competent person" of another contractor who certified that a work space in a vessel was safe for hot work).[28]  *Cf. Bourg*, 578 F.2d at 1121-22 (holding that owner of offshore platform who hired an

---

[28]  *See also Schmitt v. Algiers Pub. Serv. Co*., 69 So. 2d 754, 758 (La. Ct. App. 1954) (dismissing plaintiffs negligence claim where defendant showed that ramps at issue "had been designed by a most reputable firm of architects and had been constructed by one of the leading general contractors in this locality"); *Kaltenbrun v. City of Port Washington*, 457 N.W.2d 527, 530 (Wis. Ct. App. 1990) ("Accordingly, we conclude that an owner who has contracted with a reliable and qualified independent contractor to implement all safety precautions associated with the work has fulfilled its duty of reasonable care to those employees of the general contractor or those employed by subcontractors whom the general contractor has hired."); *Sandoval v. Ritz Developers, Inc.*, No. 03-4233, 2006 WL 91606, at *1 (D.S.D. Jan. 13, 2006) (denying plaintiff's

experienced independent contractor would not be liable even if the contractor performed the work negligently).

2773. BP worked closely with its contractors and held regular meetings to provide information and improve safety, *see* § V.B., further confirming that BP had appropriate processes in place to drill safely. *See, e.g.*, *Dye v. Schwegmann Bros. Giant Supermarkets, Inc.*, 627 So. 2d 688, 693-94 (La. Ct. App. 1993) (reversing trial court's finding of defendant's negligence, citing the fact that defendant held "[w]eekly safety meetings" to discuss incidents and improve personnel plans in response thereto); *Allen v. John F. Beasley Constr. Co.*, 347 So. 2d 1185, 1186 (La. Ct. App. 1977) (finding that duty to provide a safe environment was not breached, citing evidence including company practice of holding safety meetings); *Faust v. BNSF Ry. Co.*, 337 S.W.3d 325, 346 (Tex. Ct. App. 2011) (affirming jury determination that company did not negligently operate facility, citing evidence of company's ongoing safety meetings, hazard communications program, safety policy communications, and availability of safety equipment); *Rawson v. Midsouth Rail Corp.*, 738 So. 2d 280, 287 (Miss. Ct. App. 1999) (finding no abuse of discretion denial of motion for new trial after verdict finding defendant non-negligent, citing in support of trial outcome fact that "safety meetings were held on a regular basis").[29]

---

motion for judgment as a matter of law in slip and fall case where defendant claimed it was not negligent because it hired "reputable and good" contractors to build motel sidewalk and complete landscaping).

[29] *See also In re Ingram Barge Co.*, No. 05-4419, 2008 WL 906303, at *6 n.23 (E.D. La. Mar. 31, 2008) (noting that although defendant barge owner was non-negligent, defendant would nevertheless be benefited by having a "written [safety] plan" regarding hurricane preparedness as such a plan would help defendant "move further into the realm of 'reasonableness[]'"); *Webre v. Azalea Fleet, Inc.*, No. 03-1190, 2005 WL 711608, at *5 (E.D. La. Mar. 23, 2005) (granting defendant's motion for summary judgment in maritime wrongful death case, holding that "a rational trier of fact could not conclude that [the defendant] was negligent for failing to properly train[,]" and citing evidence that safety meetings were held).

2774.   During the temporary abandonment process, BP was told by Halliburton that cement was ready to be pumped, and it was pumped as planned by Halliburton.  *See* § V.I. Given Halliburton's experience and resources, BP's decision to rely on them to design and pump the slurry was appropriate and met the standard of care.  *See* §§ II.D; VI.C.  *S. Farm*, 252 F.2d at 200; *Green*, 418 F. App'x at 869.

2775.   BP conducted three separate types of well integrity testing: seal assembly testing, the positive pressure test, and the negative pressure test.  *See* § IV.A.2.  Only the positive pressure test was required under MMS regulations.  *See* § IV.A.2.b.  The fact that BP undertook well integrity testing beyond that required by regulation further supports that BP satisfied the standard of care in the temporary abandonment of the well.  *See, e.g., Dickerson*, 509 So. 2d at 815; *Caruso*, 598 So. 2d at 773-75; *Jennings*, 792 F. Supp. 2d at 4.

2776.   BP's negative pressure test was consistent with the industry standard of care and properly designed to determine whether the well had integrity.  *See* § V.J.5  Although the Wellsite Leaders ultimately agreed to a misinterpretation pressed by the Transocean toolpusher, *see* § V.J.5.h, the appropriate design of the negative pressure test shows that BP had in place proper procedures to test the integrity of the well*, see* § V.J.5.  *See, e.g., Dickerson*, 509 So. 2d at 815; *Caruso*, 598 So. 2d at 773-75; *Jennings*, 792 F. Supp. 2d at 4.

2777.   BP also had the well monitored for kicks by Transocean and Halliburton, two contractors with extensive experience in deepwater drilling on whom BP was entitled to rely. *See* §§ II.C.1.; II.C.4; II.D.1.  *See S. Farm*, 252 F.2d at 200; *Green*, 418 F. App'x at 869.

2778.   Similarly, for well control BP appropriately relied on Transocean as a world-class driller to exercise proper well control, including through using the BOP.  *See* §§ II.C.1; II.C.4. *See S. Farm*, 252 F.2d at 200; *Green*, 418 F. App'x at 869.

2779.   The design of the BOP satisfied BP's standard of care, even though Transocean failed to properly use the BOP to shut in the well and stop the blowout.  *See* § VII.E.  *See S. Farm*, 252 F.2d at 200; *Green*, 418 F. App'x at 869.

2780.   In sum, apart from misinterpretation of the negative pressure test, BP satisfied its duty of care in every aspect of designing and drilling the Macondo well.  Thus, BP's conduct other than the negative pressure test was not negligent.  *See generally* Rec. Doc. 4285 at 6; *Great Lakes*, 624 F.3d at 211; *Daigle*, 616 F.2d at 827.

2781.   Because BP's conduct (other than regarding the negative pressure test) satisfies the standard of care for negligence, it necessarily satisfies the standards of care for gross negligence and willful misconduct.

2782.   Furthermore, even to the extent that BP could be considered negligent, its actions do not reach the high threshold required for gross negligence.  Far from showing conscious indifference to the risk of a blowout and an extreme departure from the standard of care, BP took numerous steps to reduce and mitigate the risk of blowouts and oil spills.  *See Milne*, 575 F.3d at 1132; *Kuykendall*, 261 F. App'x at 490; *Computalog*, 1996 WL 720761, at *2-4; *Whitley*, 538 S.E.2d at 300; *Milligan*, 754 P.2d at 1069.[30]

2783.   BP followed long-established and tested industry standards in creating its well design and drilling plan, rebutting claims that its conduct was grossly negligent.  *See AMW Materials*, 584 F.3d at 454; *Richards*, 21 F.3d at 1059; *Drabik*, 997 F.2d at 510; *Maxey*, 665 F.2d at 1376; *Am. Cyanamid*, 498 So. 2d at 862-63.

---

[30]   *See also Garrett v. Patterson-UTI Drilling Co., L.P.*, 299 S.W.3d 911, 918-19 (Tex. Ct. App. 2009) (affirming trial court's grant of summary judgment in favor of defendant drilling company in wrongful death suit brought against company and employee premised on alleged gross negligence and citing in support of affirmation evidence that, prior to decedent's death, steps had been appropriately taken to minimize risks, including holding of safety meeting and discussions of exact risks at issue).

2784.   BP received government approval for its drilling plan and temporary abandonment procedure, establishing that they satisfied the applicable regulations.  *See Richards*, 21 F.3d at 1059; *Nader*, 626 F.2d at 1035; *Morris*, 833 F. Supp. 2d at 641-43; *see also Satcher*, 52 F.3d at 1317; *Sloman*, 841 F. Supp. at 703 n.8; *Stone Man*, 435 S.E.2d at 206.

2785.   BP hired experienced, world-class contractors to drill the well, further evidence that BP was not grossly negligent.  *See Todd Shipyards*, 674 F.2d 401, 411 (reversing district court finding of gross negligence based on contractor hiring subcontractor who incompetently performed repairs it was not qualified to undertake, where subcontractor had previously performed work in a competent manner); *S. Farm*, 252 F.2d at 200; *Green*, 418 F. App'x at 869.

2786.   BP ran multiple tests to confirm the integrity of the well, hired two separate contractors with the responsibility of constantly monitoring the well for signs of a kick, and hired Transocean to take any well control measures necessary to handle a kick.  *See, e.g., Dickerson*, 509 So. 2d at 815; *Caruso*, 598 So. 2d at 773-75; *Jennings*, 792 F. Supp. 2d at 4.

2787.   In short, BP's conduct demonstrated the exact opposite of conscious indifference to the risk of a blowout or an extreme departure from the standard of care for preventing blowouts.  To the contrary, BP's actions establish its expansive efforts to perform deepwater drilling operations generally – and the drilling and temporary abandonment of the Macondo well in particular – to avoid any blowout.  Thus, BP's actions relating to the Macondo well were not grossly negligent.  *See Milne*, 575 F.3d at 1132; *Kuykendall*, 261 F. App'x at 490; *Computalog*, 1996 WL 720761, at *2-4; *Whitley*, 538 S.E.2d at 300; *Milligan*, 754 P.2d at 1069; *see generally Halliburton*, 269 F.3d at 532; *Becker*, 586 F.3d at 367; *Barber*, 720 F.2d at 384.

2788.   For similar reasons, BP did not engage in willful misconduct.  There is no evidence that BP actually intended to cause injury or knew that its conduct would naturally cause

injury.  To the contrary, BP's actions show that it sought to design and drill the well consistent with the established standards for successfully drilling and temporarily abandoning deepwater wells.  BP had no reason to believe that by complying with government regulations and industry standards a blowout or other injury would result.  *See generally* 57A AM. JUR. 2D *Negligence* § 257; *Burr*, 551 U.S. at 57.

2789.  The parties opposing BP allege that its actions constitute negligence, gross negligence, and/or willful misconduct.  The remainder of this subsection considers each of these specific actions in turn and concludes that BP satisfied the standard of care for each one (except for negligence relating to supervising the negative pressure test).  For each action other than the negative pressure test, BP explains (i) why BP's conduct does not even constitute negligence, which necessarily means that it was not gross negligence or willful misconduct; and (ii) even if the action could be considered negligent, why it does not reach the higher thresholds for gross negligence or willful misconduct.  Importantly, each of these actions must be considered in light of the many positive steps that BP took to drill safely have safe drilling as described in the preceding paragraphs of this subsection.  *See Milne*, 575 F.3d at 1132; *Kuykendall*, 261 F. App'x at 490; *Computalog*, 1996 WL 720761, at *2-4; *Whitley*, 538 S.E.2d at 300; *Milligan*, 754 P.2d at 1069.  Moreover, many of these actions could not have legally caused the Incident.  Therefore, such conduct, either considered individually or collectively, does not come anywhere close to reaching the high thresholds required for gross negligence or willful misconduct.

## 2.  BP Maintained a Strong Safety Culture.

2790.  In the years before the Incident, BP made substantial investments to develop a range of initiatives to improve its safety, and the PSC's expert on safety, Dr. Bea, repeatedly agreed that these initiatives show BP's commitment to safety.  *See* § XI.  All of these demonstrate BP's focus on safety and that BP met and exceeded the standard of care for its

safety culture.  *See generally* Rec. Doc. 4285 at 6; *Great Lakes*, 624 F.3d at 211; *Daigle*, 616 F.2d at 827.

2791.   In its operations, BP emphasized safety through "Stop the Job" procedures to stop operations when safety issues arose; SOCs for people to identify work needing improvement; and Safety Standdowns after incidents for everyone to understand what happened and how to apply learnings.  The fact that all of these were in effect on the *Deepwater Horizon* and support that BP exercised reasonable care.  *See* §§ III.G; III.H.; XI.B; XI.C.  *See generally* Rec. Doc. 4285 at 6; *Great Lakes*, 624 F.3d at 211; *Daigle*, 616 F.2d at 827.[31]

2792.   BP never cut costs at the expense of safety in the GoM SPU in 2008 or 2009.  *See* § XI.B.4.  Furthermore, there is no evidence that any BP personnel involved with the Macondo well or *Deepwater Horizon* cut corners at the expense of safety.  *See* §§ XI.B.5.c; XI.B.5.d.  *See generally* Rec. Doc. 4285 at 6; *Great Lakes*, 624 F.3d at 211; *Daigle*, 616 F.2d at 827.

2793.   Based on this evidence, BP's safety culture met and exceeded the standard of care for an operator's safety culture.  This was reflected in BP's safety statistics and award from the MMS, showing that its safety practice were generally superior to those of its competitors.  *See* §§ XI.D; XI.E.  Therefore, BP's safety culture was not negligent.  *See generally* Rec. Doc. 4285 at 6; *Great Lakes*, 624 F.3d at 211; *Daigle*, 616 F.2d at 827.

2794.   Nor was BP's safety culture so deficient as to meet the high thresholds of gross negligence or willful misconduct.  BP's implementation of numerous new safety initiatives and

---

[31]   *Cf. George v. Nabors Offshore Corp.*, No. H-09-1884, 2011 WL 649988, at *3-4 (S.D. Tex. Feb. 10, 2011) (denying motion for summary judgment for defendant where plaintiff had authority to stop work when confronted with hazardous condition but opted not to exercise authority); *Petri v. Kestrel Oil & Gas Properties, L.P.*, 878 F. Supp. 2d 744, 761 (S.D. Tex. 2012) (denying plaintiffs' motion for summary judgment against oil and gas employer on issue of employer's gross negligence and citing in evidence that employer had established stop-work program and employee failed to exercise stop-work authority).

programs rebuts any claim that BP was consciously indifferent to safety and did not exercise even slight care. Moreover, the PSC's own safety expert repeatedly testified that these programs showed BP's safety-mindedness. *See generally Halliburton*, 269 F.3d at 532; *Becker*, 586 F.3d at 367; *Barber*, 720 F.2d at 384.

2795. There is no evidence that BP designed its safety system to intentionally cause harm as is required to support a claim of willful misconduct. The evidence is precisely the opposite. BP sought to exceed safety requirements and continuously improved its safety processes. BP's safety systems resulted in BP having incident rates that were generally lower than other majors, further confirming that BP did not intend harm through its safety systems. *See* XI. *See generally* 57A AM. JUR. 2D *Negligence* § 257; *Burr*, 551 U.S. at 57.

2796. Moreover, arguments about BP's general "safety culture" divorced from the design and drilling of the Macondo well, cannot prove that BP's actions specifically regarding the Macondo well were negligent, grossly negligent, or willful misconduct. Such allegations at most would show "negligence in the air," which lacks the required causal connection to the Incident itself. *See Holtzclaw*, 255 F.3d at 261 n.5; *Mid-South Towing.*, 418 F.3d at 534; *Schipani*, 541 F.3d at 162.

### 3. BP's Well Design Was Safe and Appropriate.

2797. BP's choice to use a long-string production casing throughout rather than a liner was consistent with industry practice. *See* § V.D.7.c.ii *See Baker*, 488 F.2d at 333; *Cia Maritima*, 308 F.2d at 123; *Ray Evers*, 625 F.2d at 732.

2798. Experts from both BP and other parties testified that the decision to use a long string, and BP's well design generally, were reasonable. *See* § V.D.7.c. Such expert testimony further confirms that BP met the standard of care in well design. *E.g., Burke v. Air Serv Int'l, Inc.*, 685 F.3d 1102, 1105-06 (D.C. Cir. 2012) ("Moreover, a plaintiff must put on expert

testimony to establish what the standard of care is if the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson."); *Ins. Co. of the West v. Island Dream Homes, Inc.*, 679 F.3d 1295, 1299 (11th Cir. 2012) (explaining case law requiring expert testimony to establish the standard of care in cases involving specialized knowledge); *Jerome v. Water Sports Adventure Rentals and Equipment, Inc.*, No. 2009-092, 2013 WL 1568539, at *5 (D.V.I. Apr. 15, 2013) ("Expert testimony may be used to establish the applicable standard of care in a particular industry or profession where the standard of care is 'beyond the common knowledge' …"); *see also Travelers Cas. and Sur. Co. of America v. Ernst & Young LLP*, 542 F.3d 475, 491 (5th Cir. 2008) (holding that expert testimony is necessary to establish standard of care in professional malpractice cases where special skill, knowledge, experience, learning or the like are required).

2799.  The well design was approved by the MMS, which regularly approves long-string designs.  *See* § V.D.7.c.iii.  MMS approval is another indicator that use of the long-string satisfied the standard of care.  *See Ramirez*, 863 P.2d at 176; *Hittle Serv.*, 549 P.2d at 1390; *see also Lorenz,* 896 F.2d at 149-50; *Simien*, 566 F.2d at 554.

2800.  Based on this evidence, BP's decision to use a long-string design satisfied the standard of care and thus could not constitute negligence.  *See generally* Rec. Doc. 4285 at 6; *Great Lakes*, 624 F.3d at 211; *Daigle*, 616 F.2d at 827.

2801.  Nor could the well design be considered evidence of gross negligence or willful misconduct.  Both long-string and liners are commonly used for production casing, which itself rebuts the allegation that BP grossly deviated from the standard of care.  *See AMW Materials*, 584 F.3d at 454; *Richards*, 21 F.3d at 1059; *Drabik*, 997 F.2d at 510; *Maxey*, 665 F.2d at 1376; *Am. Cyanamid*, 498 So. 2d at 862-63.

2802.   Likewise, BP weighed the benefits and risks of a long-string versus a liner, which itself shows that BP did not exhibit conscious indifference or fail to exercise even slight care. *See Energy XXI, GoM, LLC v. New Tech Eng'g, L.P.*, 845 F. Supp. 2d 770, 782 (S.D. Tex. 2012) (holding as a matter of law that there could no gross negligence where the defendants made "a weighed decision at the time" based on competing risks, even though that decisions was contrary to industry standard); *Salasguevara v. Frye*, 31 Cal. App. 4th 330, 334 (Cal. Ct. App. 1995) (affirming that doctor administering a second DPT shot was not grossly negligent where doctor considered the risks and benefits of a second shot); *Hollinger Inc. v. Hollinger Int'l, Inc.*, 858 A.2d 342, 391 (Del. Ch. 2004) (holding that where directors considered the risks and utility of retaining assets, their decision to sell the assets could not be considered grossly negligent).

2803.   That BP complied with MMS regulations regarding BP's well design, as shown by BP seeking and obtaining MMS' approval, further supports that BP was not grossly negligent. *See Richards*, 21 F.3d at 1059; *Nader*, 626 F.2d at 1035; *Morris*, 833 F. Supp. 2d at 641-43; *see also Satcher*, 52 F.3d at 1317; *Sloman*, 841 F. Supp. at 703 n.8; *Stone Man*, 435 S.E.2d at 206.

2804.   There is no evidence that BP intended to cause harm in using a long-string casing design, or believed that it would naturally cause harm.  BP's weighing of two reasonable options, approval by the MMS, and widespread use of long-string design in successfully drilled wells negates any argument that BP intentionally misbehaved.  *See generally* 57A Am. Jur. 2d *Negligence* § 257; *Burr*, 551 U.S. at 57.

2805.   Finally, the evidence shows that the choice of a long-string versus a liner would not increase the chances of a kick or blowout.  *See* § V.D.7.c.iv.  Thus, use of a long-string was not causal to the Incident.  *See, e.g.*, *Great Lakes*, 624 F.3d at 213-14; *Donaghey*, 974 F.2d at

649; *Holtzclaw*, 255 F.3d at 261 n.5.   For this additional reason, BP's choice of a long-string could not give rise to liability.

### 4.      BP Maintained a Safe Drilling Margin.

### a.      BP Fully Complied with the Drilling Margin Regulation.

2806.   The dispute between the United States and BP about the interpretation of the drilling margin regulation centers on what value a lessee must use for determining the safe drilling margin.   *See* § V.D.7.b.   BP argues that the appropriate value is the result of the "shoe test" where the lessee's driller drills a short distance below the last casing and conducts a pressure integrity test.   By contrast, the United States expert Dr. Huffman asserts that the value used for the safe drilling margin is an undetermined "weakest point of the wellbore."   BP is correct regarding the interpretation of the regulation.

2807.   Dr. Huffman's interpretation finds no support in the language of the regulation. Regulations must be read according to their plain language.   *E.g., Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 355-56 (2000); *Anthony v. United States*, 520 F.3d 374, 380 (5th Cir. 2008); *Roberto v. Dep't of Navy*, 440 F.3d 1341, 1350 (Fed. Cir. 2006).   Nothing in 30 C.F.R. § 250.427's text refers to using the weakest point of the wellbore to define the safe drilling margin. There is no reason to believe that the term "safe drilling margin" refers to some unstated standard contained nowhere in the regulation.   In fact, the title of the safe drilling margin regulation refers directly and explicitly to "pressure integrity tests," which are conducted at the casing shoe.   *See, e.g., Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1092 (9th Cir. 2013) (Courts "must interpret a regulation as a whole, in light of the overall statutory and regulatory scheme, and not give force to one phrase in isolation.") (internal brackets and quotation marks omitted); *Lengerich v. Dep't of Interior*, 454 F.3d 1367, 1370 (Fed. Cir. 2006) ("In interpreting a regulatory provision, we examine the text of the regulation as a whole, reconciling the section in

question with sections related to it."). Moreover, the MMS does not have any regulations or documents referring to safe drilling margin as the difference in mud weight and weakest point in the wellbore. *See* § V.D.7.b. Rather, the MMS documents refer to the safe drilling margin as the difference between the mud weight and the result of the pressure integrity test conducted at the shoe. Moreover, prior to this litigation, the MMS did not take any enforcement action against BP for allegedly violating the drilling margin despite reviewing and inspecting all of the records. *See* § V.D.7.d.

2808. In contrast, BP's interpretation harmonizes the language of the statute. BP interprets "safe drilling margin" to refer to the standard for conducting a "pressure integrity test" as described in the regulation. *See Ctr. for Biological Diversity*, 706 F.3d at 1092; *Lengerich*, 454 F.3d at 1370. BP's interpretation of the drilling is the industry standard and has been in use consistently for drilling in the Gulf of Mexico for a very long time. *E.g., Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S.Ct. 1325, 1335-36 (2011); *Fed. Exp. Corp. v. Holowecki*, 552 U.S. 389, 400 (2008). MMS personnel have agreed with BP that the safe drilling margin is the difference between the fracture gradient conduct at the last exposed shoe and the mud weight. *See* § V.D.7.b.

2809. Dr. Huffman challenges the validity of BP's casing shoe tests for the 13 5/8" and 9 7/8" shoe tests and claims those tests are invalid. Under the proper interpretation of 30 C.F.R. § 250.427, BP's testing protocol fully satisfied the regulatory requirement. BP's test procedure was appropriate to measure the fracture gradient and within the industry standard. *See* §§ V.D.7.b.iii; V.D.7.b.iv. BP informed the MMS in 2008 of how it would conduct and report its shoe tests and the MMS agreed that BP's testing protocol was appropriate. *See* § V.D.7.b.i.

2810.   Because BP complied with the regulation, its tests properly measured the fracture gradient, and its testing protocol was within industry standards, BP satisfied the standard of care. Therefore, BP was not negligent in conducting its pressure integrity test.  *See generally* Rec. Doc. 4285 at 6; *Great Lakes*, 624 F.3d at 211; *Daigle*, 616 F.2d at 827.

2811.   *A fortiori*, BP cannot be liable for either gross negligence or willful misconduct. As BP has correctly interpreted and complied with the regulation, it cannot have violated the high thresholds required for gross negligence or willful misconduct.  *See generally Halliburton*, 269 F.3d at 532; *Becker*, 586 F.3d at 367; *Barber*, 720 F.2d at 384; 57A AM. JUR. 2D *Negligence* § 257; *Burr*, 551 U.S. at 57.

2812.   Furthermore, even if BP had misinterpreted the regulation, it would not be liable for gross negligence or willful misconduct.  Violating a statute or regulation is not *per se* gross negligence or willful misconduct.  *See Clements*, 786 F.2d at 676-77 (affirming that defendant's "violations of OSHA regulations did not amount to gross negligence[]"); *Thompson v. Nat'l R.R. Passenger Corp.*, 621 F.2d 814, 817-18 (6th Cir. 1980) (affirming that operation of railroad in excess of regulatory speed limit was not grossly negligent or wanton, and explaining that violation of regulations "does not show conscious indifference to the consequences[]"); *Maritrans Operating Partners*, 1999 WL 144458 at *7 (holding that even if defendant "violated federal regulations by not drug-testing [the] [c]aptain, this behavior still would not necessarily rise to the level of gross negligence[]"); *see also* § XV.C.8..[32]

---

[32]  *See also U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 139 (Tex. 2012) (holding that failure to have current Department of Transportation inspection did not equate to gross negligence on part of motorist and noting that "[t]he mere existence of federal regulations does not establish the standard of care or establish gross negligence per se[]"); *Eister v. Hahn*, 420 N.W.2d 443, 445 (Iowa 1988) (recognizing that, under Iowa law, gross negligence includes "[a] conscious failure to avoid a peril[]" and holding that "[c]learly not every violation of an OSHA regulation amounts to gross negligence[]" given that "[a] person can violate an OSHA regulation without

2813.   Here, BP had a good faith interpretation of the regulation based on its plain language.   BP's interpretation was supported by the MMS and is the industry standard. Moreover, given that the interpretation is industry standard and the number of wells drilled in the Gulf of Mexico, BP's interpretation accomplishes the goal of allowing safe drilling.   Thus, BP cannot be accused of either consciously disregarding the regulation or intending to violate it, or of engaging in an extreme departure from the standard of care.   *See generally Halliburton*, 269 F.3d at 532; *Becker*, 586 F.3d at 367; *Barber*, 720 F.2d at 384; 57A AM. JUR. 2D *Negligence* § 257; *Burr*, 551 U.S. at 57.

### b.   No Alleged Violation of the Safe Drilling Margin Regulation Could Have Caused the Incident.

2814.   Furthermore, even if in drilling the Macondo well there was a drilling margin violation, that violation was not causal.   As causation is an essential element of negligence, gross negligence, or willful misconduct, BP cannot be liable for a drilling margin violation.   *See*, *e.g.*, *Great Lakes*, 624 F.3d at 213-14; *Donaghey*, 974 F.2d at 649; *Holtzclaw*, 255 F.3d at 261 n.5.

2815.   To avoid this conclusion, the United States advances a pure "but for" theory of causation.   The United States assumes that if BP violated the drilling margin regulation, and if the MMS required BP to stop drilling as a result of that violation, then the Incident never would

---

consciously doing so[]"); *Frazier v. City of Norfolk*, 362 S.E.2d 688, 691 (Va. 1987) (affirming trial court's ruling at conclusion of plaintiff's case in chief that plaintiff, who had fallen 18' in municipal hall lacking railings required by city code, had failed to establish prima facie case of gross negligence by city officials since failure to install protective devices required by code or post warnings amounted to "at the most, ... ordinary negligence and a failure to exercise reasonable care.   Such actions of omission do not rise to the degree of egregious conduct which can be classified as [grossly negligent]"); *Bashford*, 420 S.E.2d at 468-69 (rejecting administrative licensing board's contention that general contractor's violations of building code, without more, could constitute grossly negligent conduct and finding, to the contrary, that mere evidence of code violations failed to establish "evidence of gross negligence[]").

have occurred.  The United States' theory contradicts the general law on causation as well as specific Fifth Circuit precedents, and must be rejected.

2816.  As explained in § XV.C.1 causation-in-fact cannot rest on mere "but for" causation.  Instead, the defendant's act must be a "substantial factor" in bringing about the Incident.

2817.  The United States and other opposing parties failed to establish that any alleged drilling margin violation could have been a "substantial factor" in causing the Incident.  The evidence is clear that BP and its contractors had safely drilled the well, and that the well was static for 11 days after drilling was complete.  *See* § V.D.7.  In fact, Dr. Huffman concedes that the drilling margin regulations did not apply after April 9, 2010 when drilling at the Macondo well stopped, which is consistent with the testimony of other MMS employees.  *See* § V.D.7.b.v.  There is no evidence that BP's action in drilling the well caused or contributed to the potential for a kick or blowout.  Thus, BP's asserted failure to comply with the drilling margins was not a "substantial factor" in causing the Incident.  *See*, *e.g.*, *Great Lakes*, 624 F.3d at 213-14; *Donaghey*, 974 F.2d at 649; *Holtzclaw*, 255 F.3d at 261 n.5.

2818.  The Fifth Circuit has rejected claims of causation-in-fact based on a defendant's presence at a location violating a statute.  In *American River Transp. Co. v. Kavo Kaliakra SS*, 148 F.3d 446 (5th Cir. 1998), a bulk carrier owned by Arosita allided with moored barges owned by ARTCO.  *Id.* at 448-49.  Arosita argued that ARTCO was at fault because ARTCO's barges were moored in violation of the Rivers and Harbors Act, 33 U.S.C. § 403, and that their unpermitted presence caused the Incident.  *Id.* at 449.  In other words, Arosita argued that if ARTCO had complied with the River and Harbors Act, ARTCO's barges would not have been present and Arosita's carrier would not have allied with them.

2819.   The Fifth Circuit rejected Arosita's arguments and held that "the unpermitted barges moored at ARTCO's fleeting facility did not cause the allison simply because they were there." *Id.* at 450.  "To be sure, the presence of the barges in this case was a but-for cause of the allision … But in admiralty, the 'fault which produces liability must be a contributory and proximate cause of the collision, and not merely fault in the abstract.'  To give rise to liability, a culpable act or omission must have been 'a substantial and material factor in causing the collision.'" *Id.* (citation omitted).

2820.   The Fifth Circuit held that the presence of ARTCO's barges was not a substantial factor because "the fleeting facilities and barges were not an obstruction to navigation."  *Id.*; *see also Dow Chem. Co. v. Dixie Carriers, Inc.*, 463 F.2d 120, 122 (5th Cir. 1972) (where tugboat struck a stationary railroad bridge fender, rejecting argument that fender built in violation of Rivers and Harbors Act was a cause of the allision:  "The record refutes any suggestion that the fender system caused or contributed to the collisions simply by being there.") (internal quotations omitted).

2821.   Under the reasoning of *American River*, the simple fact that BP had drilled the well – even if done in violation of the drilling margin regulation – cannot be the legal cause of the Incident.  Just as the barges in *American River* were not an obstruction to navigation, the United States did not prove that BP's drilling the full depth of the Macondo well caused or contributed to the blowout.  The mere fact that the parties had drilled to a certain depth cannot make the parties' "presence" at that depth a causal factor in the blowout.

### 5.    The Temporary Abandonment Procedure Satisfied the Standard of Care and Was Not Causal.

2822.   BP developed the temporary abandonment ("TA") procedure on an appropriate timeline.  The documents evidencing the development of the temporary abandonment procedure

reflect multiple drafts of iterations of a single procedure, the process and timing of which comported with standard practice. *See* § V.E. *See Baker*, 488 F.2d at 333; *Cia Maritima*, 308 F.2d at 123; *Ray Evers*, 625 F.2d at 732.

2823.   Furthermore, there is no evidence that the TA procedure itself departed from the standard of care. The TA procedure was submitted to and approved by the MMS. *See Ramirez*, 863 P.2d at 176; *Hittle Serv.*, 549 P.2d at 1390; *see also Lorenz*, 896 F.2d at 149-50; *Simien*, 566 F.2d at 554. The design of the negative pressure included in the TA was appropriate. *See* § V.E.1. *See generally* Rec. Doc. 4285 at 6; *Great Lakes*, 624 F.3d at 211; *Daigle*, 616 F.2d at 827.

2824.   For similar reasons, the TA procedure cannot have breached the higher standards of gross negligence or willful misconduct. The TA procedure was approved by the MMS and thus was not an extreme departure from the standard of care. *See Richards*, 21 F.3d at 1059; *Nader*, 626 F.2d at 1035; *Morris*, 833 F. Supp. 2d at 641-43; *see also Satcher*, 52 F.3d at 1317; *Sloman*, 841 F. Supp. at 703 n.8; *Stone Man*, 435 S.E.2d at 206. The TA procedure, including the negative pressure test procedure, likewise showed at least slight care. *See* § V.E. Similarly, the TA procedure reflects BP's efforts to design a safe procedure for abandoning the well, and thus cannot be considered conscious indifference or evidence of an intent to cause harm. *See generally Halliburton*, 269 F.3d at 532; *Becker*, 586 F.3d at 367; *Barber*, 720 F.2d at 384; 57A AM. JUR. 2D *Negligence* § 257; *Burr*, 551 U.S. at 57.

2825.   Moreover, there is no evidence that the TA procedure itself was causal. *See*, *e.g.*, *Great Lakes*, 624 F.3d at 213-14; *Donaghey*, 974 F.2d at 649; *Holtzclaw*, 255 F.3d at 261 n.5. Plaintiffs cannot simply point to the TA procedure; they must produce evidence that the TA

procedure increased the risk of a blowout.   Such evidence is lacking.   *See* § V.E.   For this additional reason, the TA procedure cannot give rise to liability.

### 6.   BP Is Not Liable for Relying on Halliburton to Conduct the Cement Job.

2826.   BP hired Halliburton to design and test an appropriate cement slurry and to pump the cement.   *See* § II.D.4.

2827.   As discussed in §§ VI.D - VI.J, Halliburton committed various errors in the design and testing of the cement slurry used in the Macondo well.   Halliburton did not explain these design and testing errors to BP prior to the Incident.   *See* § VI.E.

2828.   Although BPXP hired Halliburton, BP is not liable for its errors.   As explained above, the owner of a well is not vicariously liable for its contractors.

2829.   Nor was BPXP's decision to hire Halliburton negligent.   "An employer is subject to liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor (a) to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or (b) to perform any duty which the employer owes to third persons."   RESTATEMENT (SECOND) OF TORTS § 411 (1965); *see also Smolnikar v. Royal Caribbean Cruises Ltd.*, 787 F. Supp. 2d 1308, 1318-19 (S.D. Fla. 2011); *Guarascio v. Drake Assocs. Inc.*, 582 F. Supp. 2d 451, 457 (S.D.N.Y. 2008).

2830.   Halliburton is one of the world's leading drilling contractors, with extensive resources and experience, and  had previously successfully conducted cement jobs for BP across a variety of wells.   *See* § II.D.4.a.

2831.   Therefore, BPXP was not negligent in hiring Halliburton.   *See, e.g., Barbetta v. S/S Bermuda Star*, 848 F.2d 1364, 1373 (5th Cir. 1988) (rejecting claims that ship negligently hired a doctor who was not admitted to practice in the United States, where doctor was qualified

in the Philippines and had practiced for over twenty years); *Cent. Gulf*, 176 F.Supp.2d at 622 (holding shipowner was not negligent in hiring towing contractor where the two had a long-standing relationship without incident, the contractor had performed many tows successfully, and shipowner reasonably believed contractor was towing safely and in accord with the terms of their contract); *Smolnikar*, 787 F. Supp. 2d at 1319 (holding that cruise line was not negligent in hiring zip line tour operator where operator had performed well for years, had a reputation as a first class operator, and other cruises lines used the same operator); *Guarascio*, 582 F. Supp. 2d at 457 (finding that general contractor was not negligent in hiring diving company subcontractor where subcontractor had a reputation of being competent and a low rate of accidents).

2832.   Likewise, BPXP could not have been grossly negligent or engaged in willful misconduct by hiring Halliburton.  Hiring a cementing contractor that is an industry leader and has extensive experience, substantial resources, and a successful track record does not show conscious indifference or the want of slight care.  Nor is there any evidence that BPXP hired Halliburton with the intent that Halliburton would cause injury or that hiring Halliburton would naturally lead to injury.  *See Todd Shipyards*, 674 F.2d at 411; *see also S. Farm*, 252 F.2d at 200; *Green*, 418 F. App'x at 869.

### 7.   Using Six Centralizers Was Safe, and the Number of Centralizers Used Had No Relationship to the Incident.

2833.   There are no MMS requirements relating to centralizers.  Nor is there any standard practice on the number of centralizers to use.  *See* § V.F.3 *See Baker*, 488 F.2d at 333; *Cia Maritima*, 308 F.2d at 123; *Ray Evers*, 625 F.2d at 732.

2834.   Centralizers present both risks and benefits.  *See* § V.F.3.  BP's engineering team made a reasoned decision, based on sound engineering judgment and experience, regarding the number of centralizers to use, taking into consideration the typical factors used in the industry in

determining the number of centralizers. *See* § V.F.1. *See, e.g.*, *Arsement v. Spinnaker Exploration Co.*, 400 F.3d 238, 253 (5th Cir. 2005) (holding that defendant exercised reasonable care in choosing between two plans to install a sump deck on an oil and gas platform, including by considering the comparative safety of each plan); *Dougherty v. Haaland*, 457 F. Supp. 860, 869 (E.D. Pa. 1978) finding that shipowner of listing vessel was not negligent in instructing longshoremen to load pipe working *with* the list where loading pipe *against* the list was perhaps more dangerous than loading with the list).

2835. Running the six centralizers satisfied BP's duty of care, and thus was not negligent. *See generally* Rec. Doc. 4285 at 6; *Great Lakes*, 624 F.3d at 211; *Daigle*, 616 F.2d at 827.

2836. Nor could BP be liable for any higher standard of fault. The evidence shows that BP did not exhibit conscious indifference or a failure to exercise even slight care. Instead, BP followed industry practices in determining the number of centralizers to use. *See AMW Materials*, 584 F.3d at 454; *Richards*, 21 F.3d at 1059; *Drabik*, 997 F.2d at 510; *Maxey*, 665 F.2d at 1376; *Am. Cyanamid*, 498 So. 2d at 862-63. BP also weighed the pros and cons of running more centralizers, which demonstrates that it was attentive to the risks of both running too many centralizers or too few. *See Energy XXI.*, 845 F. Supp. 2d at 782; *Salasguevara*, 37 Cal. Rptr. 2d at 43; *Hollinger*, 858 A.2d at 391. Thus, BP was not grossly negligent regarding the centralizers. *See generally Halliburton*, 269 F.3d at 532; *Becker*, 586 F.3d at 367; *Barber*, 720 F.2d at 384.

2837. Similarly, there is no evidence that BP intended to cause harm by running six centralizers or knew that harm would be a natural result of that decision. BP therefore is not liable for willful misconduct regarding the centralizers. *See generally* 57A Aм. Jur. 2d *Negligence* § 257; *Burr*, 551 U.S. at 57.

2838.   In addition to satisfying the standard of care, BP cannot be liable for the independent reason that the use of six centralizers were not causal to the Incident.

2839.   The purpose of centralizers is to centralize casing to improve displacement efficiency and reduce the possibility of channeling in the annulus.  Halliburton's post-Incident modeling showed that there was no channeling in the annulus.  *See* § VI.K.

2840.   In any case, any potential for channeling in the upper annulus is irrelevant.  The evidence is clear that flow path of the hydrocarbons was not up the annulus, but rather down through the lower annulus and up the casing.  *See* § VI.J.  Halliburton's pre-Incident modeling showed that the lower annulus was well-centralized by the six centralizers.  *See* § VI.K.  And no number of centralizers would have affected flow up the casing.  *See* § VI.K.

2841.   Therefore, the number of centralizers has no causal relationship to Incident.  *See*, *e.g.*, *Great Lakes*, 624 F.3d at 213-14; *Donaghey*, 974 F.2d at 649; *Holtzclaw*, 255 F.3d at 261 n.5.

### 8.   Following Industry Practice in Not Running a Cement Bond Log Was Safe and Appropriate.

2842.   At the time of the Incident, MMS regulations did not require a cement bond log for temporary abandonment of a well.  The regulations provided that if a party had indications of an inadequate cement job (such as lost returns, cement channeling, or failure of equipment), then it must (1) pressure test the casing shoe, (2) run a temperature survey, (3) run a cement bond log, or (4) use a combination of these techniques.  30 C.F.R. § 250.428(c).

2843.   Likewise, the industry standard is that cement bond logs are not run if the cement job appeared to be successful from the job indicators.  *See* § V.I.2.a.  BP followed these standards in determining whether to run a cement bond log, using factors consistent with what other operators look for to indicate a successful cement job.  *See* § V.I.2.d.

2844.   Here, Halliburton reported that the cement job was executed successfully, with full returns, lift pressure, and bumping cement plugs.  *See* § V.I.2.a.  Based on these facts, BP determined that a cement bond log was not needed.  Transocean, Halliburton and other contractors were afforded an opportunity to disagree with the decision but did not do so.  *See* § V.I.2.e.  Not running a cement bond log under such circumstances was consistent with both industry standards, *see Baker*, 488 F.2d at 333; *Cia Maritima*, 308 F.2d at 123; *Ray Evers*, 625 F.2d at 732, and MMS regulations, *see Ramirez*, 863 P.2d at 176; *Hittle Serv.*, 549 P.2d at 1390; *see also Lorenz,* 896 F.2d at 149-50; *Simien*, 566 F.2d at 554.

2845.   Therefore, BP satisfied the standard of care and was not negligent.  *See generally* Rec. Doc. 4285 at 6; *Great Lakes*, 624 F.3d at 211; *Daigle*, 616 F.2d at 827.

2846.   BP also satisfied its standard of care so as to preclude a finding of gross negligence or willful misconduct.  BP complied with industry standards in deciding not to run a cement bond log under the circumstances, including Halliburton's report of a successful cement job.  *See AMW Materials*, 584 F.3d at 454; *Richards*, 21 F.3d at 1059; *Drabik*, 997 F.2d at 510; *Maxey*, 665 F.2d at 1376; *Am. Cyanamid*, 498 So. 2d at 862-63.  BP also complied with MMS regulations.  *See Richards*, 21 F.3d at 1059; *Nader*, 626 F.2d at 1035; *Morris*, 833 F. Supp. 2d at 641-43; *see also Satcher*, 52 F.3d at 1317; *Sloman*, 841 F. Supp. at 703 n.8; *Stone Man*, 435 S.E.2d at 206.

2847.   BP had Schlumberger available to run a cement bond log and created a decision tree employing typical factors to decide whether to run a cement bond log.  Thus, BP was paying attention to risks, had in place a plan to mitigate risks, and would have run a cement bond log if the circumstances called for it.  BP therefore was not consciously indifferent to the risks

regarding cementing, nor did it fail to exercise even slight care.  *See generally Halliburton*, 269 F.3d at 532; *Becker*, 586 F.3d at 367; *Barber*, 720 F.2d at 384.

2848.  Likewise, there is no evidence that BP decided not to run a cement bond log intentionally to cause harm or knowing that its action would cause harm.  The evidence shows that BP reasonably believed there was no reason to run a cement bond log based on the indicators of a successful cement job, and therefore BP did not have any wrongful intent.  *See generally* 57A Am. Jur. 2d *Negligence* § 257; *Burr*, 551 U.S. at 57.

2849.  In addition, whether a cement bond log was run was not causal to the Incident. Even if a cement bond log had been run, it would not have shown whether zonal isolation was achieved because the placement of the shoe track prevented logging of the entire formation.  *See* § V.I.2.d.  *See, e.g.*, *Great Lakes*, 624 F.3d at 213-14; *Donaghey*, 974 F.2d at 649; *Holtzclaw*, 255 F.3d at 261 n.5.

### 9.     Circulating a Partial Bottoms-Up Was Safe under the Circumstances.

2850.  Operators choose not to circulate a full bottoms up typically because of concerns about low fracture gradient and pore pressure.  BP weighed these same risks in deciding how much volume to circulate.  *See* § V.H.1.

2851.  A full bottoms-up was not necessary for the Macondo well for two reasons.  First, on April 16 – three days before the cement job – a wiper trip was performed, which circulated more volume than a bottoms up.  *See* § V.H.2.  Second, the partial bottoms up that was circulated was more than adequate to clean the open hole section where the cement was placed.  *See* § V.H.2.

2852.  Weighing the risks of running a full bottoms up against the fact that a partial bottoms up would clean the hole, the BP team used its best engineering judgment in deciding to run a partial bottoms-up.  *See* § V.H.2.

2853.   Based on this evidence, BP satisfied the standard of care.  BP needed to clean the open hole to avoid contaminating the cement.  The partial bottoms up that BP circulated satisfied this objective.  *See Arsement*, 400 F.3d at 253.  Furthermore, BP appropriately avoided the risk of fracturing the formation associated with circulating a full bottoms up.  *Id.*  BP's actions were consistent with industry standards.  *See Baker*, 488 F.2d at 333; *Cia Maritima*, 308 F.2d at 123; *Ray Evers*, 625 F.2d at 732.  Therefore, BP was not negligent.

2854.   Similarly, BP could not be liable under the higher standards of gross negligence or willful misconduct relating to the bottoms up.  BP's decision to circulate a partial bottoms up to clean the hole negates any claim that BP was indifferent or failed to exercise any care.  Moreover, BP weighed the pros and cons of circulating a full versus partial bottoms up.  *See Energy XXI*, 845 F. Supp. 2d at 782; *Salasguevara*, 37 Cal. Rptr. 2d at 43; *Hollinger*, 858 A.2d at 391.  Thus, BP was not grossly negligent in its decision on the volume of fluid to circulate before the cement job.  *See generally Halliburton*, 269 F.3d at 532; *Becker*, 586 F.3d at 367; *Barber*, 720 F.2d at 384.

2855.   Likewise, BP subjectively – and reasonably – believed that circulating the amount of fluid that it did would clean the hole.  Thus, there is no evidence of intent by BP to cause damage or belief that damage would naturally flow from its actions that is necessary for willful misconduct.  *See generally* 57A Am. Jur. 2d *Negligence* § 257; *Burr*, 551 U.S. at 57.

2856.   In addition, as the flow path was through the casing, any potential channeling in the annulus caused by circulating less than a full bottoms up did not contribute to the Incident.  Thus, there is no evidence of any causal link between the partial bottoms up circulation and the blowout.  *See, e.g., Great Lakes*, 624 F.3d at 213-14; *Donaghey*, 974 F.2d at 649; *Holtzclaw*, 255 F.3d at 261 n.5.

### 10.      No Heavy Pill Was Necessary.

2857.   There is no standard requiring an operator to spot a heavy pill in the rat hole before pumping a cement job.  *See* § V.H.3.  *See Baker*, 488 F.2d at 333; *Cia Maritima*, 308 F.2d at 123; *Ray Evers*, 625 F.2d at 732.

2858.   BP also weighed the risks of spotting a heavy pill, which included the potential for fracturing the well.  *See* § V.H.3.  *See Arsement*, 400 F.3d at 253; *Dougherty*, 457 F. Supp. at 869.

2859.   BP's drilling plan noted that spotting a heavy pill was not necessary.  *See* § V.H.3.  This drilling plan was approved by the MMS.  *See* § V.H.3.  *See Ramirez*, 863 P.2d at 176; *Hittle Serv.*, 549 P.2d at 1390; *see also Lorenz,* 896 F.2d at 149-50; *Simien*, 566 F.2d at 554.

2860.   Therefore, BP satisfied the standard of care and was not negligent.  *See generally* Rec. Doc. 4285 at 6; *Great Lakes*, 624 F.3d at 211; *Daigle*, 616 F.2d at 827.

2861.   BP also was not grossly negligent for similar reasons.  BP weighed the benefits and risks, which shows that it was not consciously indifferent to the risks regarding whether to spot a heavy pill.  *See Energy XXI*, 845 F. Supp. 2d at 782; *Salasguevara*, 37 Cal. Rptr. 2d at 43; *Hollinger*, 858 A.2d at 391.

2862.   BP's conduct also was consistent with the industry standard and thus was not an extreme departure from the standard of care.  *See AMW Materials*, 584 F.3d at 454; *Richards*, 21 F.3d at 1059; *Drabik*, 997 F.2d at 510; *Maxey*, 665 F.2d at 1376; *Am. Cyanamid*, 498 So. 2d at 862-63.

2863.   Furthermore, BP received approval from the government for its drilling plan.  *See Richards*, 21 F.3d at 1059; *Nader*, 626 F.2d at 1035; *Morris*, 833 F. Supp. 2d at 641-43; *see also Satcher*, 52 F.3d at 1317; *Sloman*, 841 F. Supp. at 703 n.8; *Stone Man*, 435 S.E.2d at 206.

2864.   As for willful misconduct, there is no evidence that BP intended to cause harm in not spotting a heavy pill.  BP weighed the costs and benefits and made a considered decision, negating any claims of wrongful intent.  *See generally* 57A AM. JUR. 2D *Negligence* § 257; *Burr*, 551 U.S. at 57.

### 11.      The Float Collar Was Properly Converted.

2865.   BP did nothing inappropriate in attempting to convert the float collar.  BP did not come close to applying pressure that could damage the float collar.  *See* § V.G.4.  Thus, BP did not breach any standard of care in converting the float collar, and therefore its conduct relating to float collar conversion could not constitute negligence, gross negligence, or willful misconduct. *See generally* Rec. Doc. 4285 at 6; *Great Lakes*, 624 F.3d at 211; *Daigle*, 616 F.2d at 827.

2866.   Furthermore, BP's efforts to convert the float collar were not causal.  Post-job reports by BP, Transocean, and Halliburton, and post-job testing by Stress Engineering all confirm that the float collar converted.  *See* § V.G.4.  There is no evidence that the float collar was damaged or that it worked improperly because of BP's efforts to convert it.  *See* § V.G.4. Moreover, in light of the uncontroverted evidence that the flow path was through the casing, any argument that efforts to convert the float collar caused the Incident cannot be supported.  *See* § VI.J.  *See*, *e.g.*, *Great Lakes*, 624 F.3d at 213-14; *Donaghey*, 974 F.2d at 649; *Holtzclaw*, 255 F.3d at 261 n.5.

### 12.      Not Disclosing M57B to Halliburton Played No Role in the Incident.

2867.   The evidence is clear that M57B had no causal impact on the Incident.  The well was underbalanced with respect to M57B at various times between April 3 and April 19, 2010, without there being any evidence of hydrocarbons flowing from M57B.  *See* § VI.N.5.

2868.  Therefore, BP cannot be liable for negligence, gross negligence, or willful misconduct relating to M57B.  *See*, *e.g.*, *Great Lakes*, 624 F.3d at 213-14; *Donaghey*, 974 F.2d at 649; *Holtzclaw*, 255 F.3d at 261 n.5.

2869.  Moreover, BP did not act unreasonably in determining pre-Incident that M57B was not a hydrocarbon-bearing zone.  BP analyzed various information and made a reasonable engineering judgment that the zone was not hydrocarbon-bearing.  *See* § VI.N.6.  Halliburton's own mud loggers are required to prepare reports identifying zones of interest, including those containing hydrocarbons, and Halliburton did not identify M57B.  *See* § VI.N.3.

2870.  Therefore, BP's decision that M57B was not a hydrocarbon zone was objectively reasonable.  *See Arsement*, 400 F.3d at 253; *Dougherty*, 457 F. Supp. at 869.  BP's decision therefore cannot be negligent.  *See generally* Rec. Doc. 4285 at 6; *Great Lakes*, 624 F.3d at 211; *Daigle*, 616 F.2d at 827.

2871.  For the same reasons, BP's conduct is neither grossly negligent nor willful misconduct.  BP took reasonable, good faith steps to determine whether M57B was a hydrocarbon-bearing zone, and thus its conduct does not come close to the high thresholds of gross negligence or willful misconduct.  *See generally Halliburton*, 269 F.3d at 532; *Becker*, 586 F.3d at 367; *Barber*, 720 F.2d at 384; 57A AM. JUR. 2D *Negligence* § 257; *Burr*, 551 U.S. at 57.

### 13.   Using LCM Spacer Was Safe and Appropriate.

2872.  M-I recommended that BP use LCM as a spacer.  Several M-I engineers approved the use of the LCM pills as a spacer.  BP relied on the advice of M-I as its drilling fluids expert in deciding to use the LCM.  *See* § II.E.2.  The Court already has found that M-I was not responsible for the Incident and granted its motion for judgment under Federal Rule of Civil Procedure 52.  Rec. Doc. 8969 at 2.  As M-I was not at fault for recommending the LCM spacer,

BP cannot be liable for accepting that recommendation. *See S. Farm*, 252 F.2d at 200; *Green*, 418 F. App'x at 869.

2873. Therefore, BP was not negligent or grossly negligent in relying on M-I's recommendation to use the LCM spacer, nor did it engage in willful misconduct. *See Todd Shipyards*, 674 F.2d at 411; *S. Farm*, 252 F.2d at 200; *Green*, 418 F. App'x at 869.

2874. Furthermore, the volume of LCM spacer did not increase the risk of using the spacer. *See* § V.J.4. Use of the LCM was not causal, and for this separate reason BP is not liable for negligence, gross negligence, or willful misconduct relating to the use of the LCM spacer. *See, e.g.*, *Great Lakes*, 624 F.3d at 213-14; *Donaghey*, 974 F.2d at 649; *Holtzclaw*, 255 F.3d at 261 n.5.

### 14. BP Allowed the Cement to Set Before Conducting the Negative Pressure Test.

2875. Industry standard is to test when the cement reaches 500 psi compressive strength. *See* § V.I.3.a. Halliburton's Gagliano told BP that the cement would reach that strength in 8 hours and 40 minutes under the Macondo well's conditions. *See* § V.I.3.a. BP was entitled to rely on its experienced contractor as to when the cement could be tested. *See S. Farm*, 252 F.2d at 200; *Green*, 418 F. App'x at 869. Post-Incident testing by Chevron confirmed Halliburton's result that the cement was set by the time of the negative pressure test. *See* § VI.H.2. BP in fact waited approximately 16 hours before conducting the negative pressure test. *See* § V.I.3.b.

2876. By following industry standards, relying on its experienced contractor, and waiting until the cement was set, BP satisfied the standard of care under negligence, gross negligence, and willful misconduct. *See Baker*, 488 F.2d at 333; *Cia Maritima*, 308 F.2d at 123; *Ray Evers*, 625 F.2d at 732; *AMW Materials*, 584 F.3d at 454; *Richards*, 21 F.3d at 1059; *Drabik*, 997 F.2d at 510; *Maxey*, 665 F.2d at 1376; *Am. Cyanamid*, 498 So. 2d at 862-63.

2877.   Furthermore, because the cement was set by the time of the test, BP's decision on when to test the cement could not have been causal to the Incident.  For this additional reason, BP cannot be liable for negligence, gross negligence, or willful misconduct related to waiting for the cement to set before running the negative pressure test.  *See*, *e.g.*, *Great Lakes*, 624 F.3d at 213-14; *Donaghey*, 974 F.2d at 649; *Holtzclaw*, 255 F.3d at 261 n.5.

> ### 15. BP's Negligent Supervision of the Negative Pressure Test Does Not Constitute Gross Negligence or Willful Misconduct.

> #### a. The Negative Pressure Test Was Properly Designed.

2878.   Experts and fact witnesses – including a witness for the United States – testified that the negative pressure test described in Morel's April 20, 2010 "Ops Notes" was an appropriate procedure in accord with industry standards.  *See* § V.J.5.  The Transocean rig crew could have raised any issues or concerns they had about the procedure, but they did not do so.  *See* § V.J.5.a.

2879.   For these reasons, the design of the negative pressure test met the standard of care required under simple negligence, and *a fortiori* met the standards of care for gross negligence and willful misconduct.  *See AMW Materials*, 584 F.3d at 454; *Richards*, 21 F.3d at 1059; *Drabik*, 997 F.2d at 510; *Maxey*, 665 F.2d at 1376; *Am. Cyanamid*, 498 So. 2d at 862-63.  BP's design of the negative pressure test was not negligence, gross negligence, or willful misconduct.

> #### b. BP's Conduct Relating to Interpreting the Negative Pressure Test Did Not Amount to Gross Negligence or Willful Misconduct.

2880.  BP's conduct regarding the negative pressure test does not reach the high thresholds required by gross negligence or willful misconduct.  The evidence shows that – although BP was negligent in supervising Transocean's conduct of the negative pressure test –

BP took a number of steps demonstrating reasonable care and effort to achieve a valid negative pressure test and that its conduct was not an extreme departure from the standard of care.

2881.  *First*, BP's Wellsite Leaders Kaluza and Vidrine questioned why the first negative pressure test had drill pipe pressure.  This shows that the BP WSLs were not indifferent to the results of the test or failing to exercise even slight care.  Instead, they were attempting to understand the indications observed and whether the test was successful.  *See* § V.J.5.d.

2882.  *Second*, it was Transocean personnel who convinced BP that the drill pipe pressure was not a concern.  Transocean's toolpusher advanced the concept of "annular compression" or "bladder effect" and argued that the first test was a good test.  *See* § V.J.5.d.  The Transocean toolpusher and driller told the WSLs that they had witnessed this effect before, further indicating that it was not a concern.  *See* § V.J.5.d.

2883.  BP Wellsite Leader Vidrine fully discussed these results with the Transocean drill crew.  Indeed, Vidrine indicated that the drill crew began to laugh and make fun of him because of his persistence in questioning whether the first test was good.  *See* § V.J.5.d.  Ultimately, based on the theory advanced by the toolpusher, Vidrine reportedly concluded that the explanation was plausible.  *See* § V.J.5.d.

2884.  These discussions show that the erroneous explanation for the negative pressure test came from Transocean rather than BP.  Moreover, Vidrine did not blindly accept the explanation offered by Transocean's toolpusher and driller, but instead engaged in an extensive discussion.  Furthermore, the fact that both the toolpusher and driller advancing the "bladder effect" theory were experienced and well-regarded gave Vidrine a legitimate basis for believing their explanation.

2885.   *Third*, even after this discussion, Vidrine required that a second negative pressure test be run on the kill line.   *See* §V.J.5.e.   This again demonstrates that the BP WSL was making a committed effort to run the test properly and get an accurate result.   Indeed, Vidrine and the drill crew spent approximately 3 hours on the negative pressure tests.   *See* § V.J.5.h.i.

2886.   *Fourth*, during the second negative pressure test Vidrine and the drill crew monitored the kill line for 30 minutes to determine if there was flow — this is a standard procedure to determine whether the well was flowing.   The lack of flow indicated that the well was stable.   This indicator of stability led Vidrine and the drill crew to believe that the well was stable.   *See* § V.J.5.f.

2887.   Thus, the BP WSL's use of a standard procedure once again shows safety-mindedness in the efforts to determine whether the well was stable.   Moreover, Vidrine's conclusion that the well had passed the negative pressure test had a basis in the lack of flow from the kill line, and thus was not wholly unfounded.

2888.   *Fifth*, Transocean's drill crew was responsible for setting up the negative pressure test and appropriately configuring the equipment so that the test yielded accurate results.   Exactly why there was no flow on the kill line is uncertain, but the most likely explanation is that a valve on the kill line was inadvertently closed.   *See* § V.J.5.e.   Properly opening and closing the valves was the responsibility of Transocean.   The Transocean drill crew had run plenty of negative pressure tests in the past, and the BP WSLs had no reason to believe that the drill crew had not set up the test properly.   Nor would they have known that the valves were not opened properly, as Transocean employees were the ones who actually opened and closed the valves.   Thus, the BP WSLs had no reason to believe that the lack of flow from the kill line was the result of an error rather than a true indication of no flow.

2889.   *Sixth*, if Transocean's experienced drill crew and senior personnel, such as the OIM, had any concerns about the negative pressure test, they could have stopped the job at any time and refused to proceed with the displacement.   All Transocean employees had stop-the-job authority and did not hesitate to exercise it where necessary.   Instead, the drill crew and other employees agreed that the negative pressure test was successful and agreed to proceed with the displacement procedure.   *See* § V.J.5.f.

2890.   The Transocean drilling crew was experienced and the vessel was considered one of the best-performing rigs in the fleet contracted to BP.   *See* § II.C.1.   Transocean not stopping the job after the negative pressure tests gave the WSLs a further basis to believe that the negative pressure test was successful.

2891.   *Seventh*, the BP WSLs had a powerful incentive to get the negative pressure test correct.   They were both on the rig, and thus would suffer the consequences of any error.   *See* § V.J.5.h.i.   There is no reason to believe that they would be consciously indifferent of their own safety or intend to harm themselves.

2892.   Based on these facts, BP cannot be said to have consciously disregarded known risks or intended to cause harm through the WSLs' supervision of the negative pressure test, or failed to exercise even slight care.   To the contrary, the WSLs took reasonable steps in their efforts to ensure the negative pressure test was accurate, engaged in extended discussion with the sophisticated Transocean drill crew, and had a basis for their conclusion that the negative pressure test was successful (even though they were mistaken).   Therefore, BP's conduct regarding the negative pressure tests was neither gross negligence nor willful misconduct.   *See generally Halliburton*, 269 F.3d at 532; *Becker*, 586 F.3d at 367; *Barber*, 720 F.2d at 384; 57A Am. Jur. 2d *Negligence* § 257; *Burr*, 551 U.S. at 57.

2893.   Finally, certain parties have suggested a relationship between the Incident and a phone call between Hafle and Vidrine between 20:52 and 21:00 on April 20, 2010.  The purpose of this call was to discuss setting the surface cement plug and whether the plug should be weight or pressure tested.   The negative pressure test was mentioned in passing, but the call was unrelated to the interpretation of the test.  *See* § V.J.7.  Moreover, the evidence regarding this call shows that neither individual believed that the second negative pressure test was unsuccessful. *See* § V.J.7.  Thus, this call does not change the conclusion that BP was neither grossly negligent nor engaged in willful misconduct.

### c.      BPXP's Negligent Supervision Is Only One of Multiple Proximate Causes of the Incident.

2894.   BPXP's negligent supervision of the negative pressure test was only one cause of the Incident.   Other causes included Halliburton's faulty cement design, Transocean's misinterpretation of the negative pressure test results, Halliburton and Transocean's failure to monitor the well, Transocean's failure to exercise proper well control, and Transocean's improper maintenance of the BOP.  *See* §§ V.J.8; VI.A-VI.J; VII.A-VII.D; IX; XVIII; XIX.

2895.   Importantly, a failed negative pressure test does not guarantee a blowout, and will yield a blowout only when additional failures occur.   Thus, if Transocean and Halliburton had properly monitored the well or Transocean had exercised proper well control, the blowout would not have occurred.   Even if the contractors failed at well monitoring and well control, if Transocean had properly maintained the BOP, the BOP would have closed after the explosions and prevented the spill.

### 16. BP Is Not Liable for Any Failures in Well Monitoring or Well Control.

2896. As discussed in § V.J.8 Transocean and Halliburton failed in their duty to monitor the well, and Transocean failed to exercise proper well control. BP is not liable for these failures.

2897. BP was entitled to rely on Transocean and Halliburton to exercise proper well monitoring and control. BP cannot be held vicariously liable for the actions of its contractors. *See* § XV.C.7.

2898. Furthermore, both contractors had extensive experience and resources, *see* §§ II.C.1; II.D, and BP was not negligent, grossly negligent, or engaged in willful misconduct in hiring them to perform their assigned function. *See, e.g., Barbetta*, 848 F.2d at 1373; *Central Gulf*, 176 F.Supp.2d at 622; *Smolnikar*, 787 F. Supp. 2d at 1319; *Guarascio*, 582 F. Supp. 2d at 457.

2899. Finally, BP did not engage in any conduct that obstructed Transocean or Halliburton from monitoring the well. For example, Halliburton's mud logger Keith testified that the operations being conducted on the rig that night did not affect his ability to do his job. *See* § V.J.6.a. If any employee of Transocean or Halliburton had a concern, they could have exercised their stop-work authority, but none did. *See* §§ III.G.; III.H.

### 17. The *Deepwater Horizon's* BOP Design Was Suitable for the Macondo Well.

#### a. BP Collaborated on the Design and Configuration of the BOP With Other Parties Including Cameron and Transocean.

2900. Transocean, as the rig owner, owned the *Deepwater Horizon's* BOP and was responsible for its effective operation. *See* § II.C.2.d.

2901.   BPAP's predecessor Vastar Resources and Transocean's predecessor R&B Falcon together decided on the configuration of the BOP, but Transocean took the lead role. Transocean, in consultation with BP, also decided what BOP equipment to use on the rig. Cameron was also involved in designing, configuring, and commissioning the BOP and attended weekly meetings with Transocean and BP about the BOP.  But Cameron's customer in designing and manufacturing the BOP was Transocean not BP, and Cameron took direction from Transocean.  *See* § VII.E.1.

2902.  Therefore, the specific design of the BOP and keeping it updated was Transocean's responsibility.  BP cannot be vicariously liable for any errors of Transocean regarding the design of the BOP.  *See* § XV.C.7.  Further, BP was not negligent in hiring Transocean, an expert drilling contractor, for this responsibility.  *See, e.g., Barbetta*, 848 F.2d at 1373; *Central Gulf*, 176 F.Supp.2d at 622; *Smolnikar*, 787 F. Supp. 2d at 1319; *Guarascio*, 582 F. Supp. 2d at 457.

2903.  For this reason, BP should not be liable for any alleged errors or defects regarding the design of the BOP.  Nevertheless, even if BP could be liable for the BOP's design, the facts establish that the BOP was properly designed and fully capable of operations at the Macondo well had it been properly operated by Transocean.

### b.    The BOP's Configuration Satisfied the Standard of Care.

2904.  Cameron designed and manufactured the *Deepwater Horizon*'s BOP in accordance with API specifications.  *See* § VII.E.1.  The BOP complied with the applicable MMS regulation 30 C.F.R. § 250.442 and MMS' regulation to use BAST.  *See* § VII.E.5.  *See Ramirez*, 863 P.2d at 176; *Hittle Serv.*, 549 P.2d at 1390; *see also Lorenz,* 896 F.2d at 149-50; *Simien*, 566 F.2d at 554.

2905.   The BOP's configuration met or exceeded industry standards at the time of the Incident.  *See* § VII.E.4.  *See Baker*, 488 F.2d at 333; *Cia Maritima*, 308 F.2d at 123; *Ray Evers*, 625 F.2d at 732.

2906.   The *Deepwater Horizon* BOP's pressure rating exceeded the Macondo well anticipated pressures and the calculated maximum wellbore pressure present on April 20, 2010. *See* § VII.E.3.  The BOP also had sufficient shearing capacity to shear the pipe across the BOP on the day of the Incident.  *See* § VII.E.6.  If Transocean had properly exercised well control or maintained the BOP, the BOP would have shut in the well and prevented the spill.  *See* § VII.E. Therefore, BP was not negligent in the design of the BOP.  *See generally* Rec. Doc. 4285 at 6; *Great Lakes*, 624 F.3d at 211; *Daigle*, 616 F.2d at 827.

2907.   For the same reasons, BP met the standards of care under gross negligence and willful misconduct.  The fact that the BOP complied with all regulations, industry standards, and shearing power requirements negates any inference that BP was indifferent to the risks of the BOP not being able to shut in the well or that BP failed to exercise even slight care.  *See AMW Materials*, 584 F.3d at 454; *Richards*, 21 F.3d at 1059; *Drabik*, 997 F.2d at 510; *Maxey*, 665 F.2d at 1376; *Am. Cyanamid*, 498 So. 2d at 862-63; *Nader*, 626 F.2d at 1035; *Morris*, 833 F. Supp. 2d at 641-43; *see also Satcher*, 52 F.3d at 1317; *Sloman*, 841 F. Supp. at 703 n.8; *Stone Man*, 435 S.E.2d at 206.

2908.   Similarly, there is no evidence that BP intended any harm through the design of the BOP or knew that the natural result of the BOP's design would cause harm.  *See generally* 57A Am. Jur. 2d *Negligence* § 257; *Burr*, 551 U.S. at 57.

c.     **None of the Alleged Alternative Features Were Necessary or Make the BOP Design Inadequate.**

2909.  The putative BOP experts of the PSC, United States, and Halliburton argue that the *Deepwater Horizon* BOP was inadequate because it did not incorporate various alternative features that they claim were available.  All of these arguments are without merit.

2910.  The PSC, United States, and Halliburton ignore the trade-offs involved in their proposed alternative features.  Each of their proposed additional features would introduce additional risks and complications that could decrease the functionality of the BOP.  *See* § VII.E.9.  *See Arsement*, 400 F.3d at 253; *Dougherty*, 457 F. Supp. at 869.

2911.  Moreover, certain of the proposed modifications simply could not be made to the *Deepwater Horizon* BOP because, for example, the vessel could no longer accommodate the BOP due to ballasting or rig space limitations or the modification could render the BOP less effective.  *See* § VII.E.9.  *See Arsement*, 400 F.3d at 253; *Dougherty*, 457 F. Supp. at 869.

2912.  Furthermore, the proposed additional features are rarely used and are not consistent with industry standards.  *See* § VII.E.9.  Indeed, for some of the proposed additional features the putative experts were not aware of a single BOP configured with them.  *See* § VII.E.9.  *See Baker*, 488 F.2d at 333; *Cia Maritima*, 308 F.2d at 123; *Ray Evers*, 625 F.2d at 732.

2913.  Similarly, the MMS regulations existing on April 20, 2010 did not require the proposed additional features.  *See* § VII.E.9.  Even today, regulations do not require any of the additional features proposed by the PSC, United States, and Halliburton's putative experts.  *See* § VII.E.9.  *See Rucker v. Norfolk & W. Ry. Co.*, 396 N.E.2d 534, 535-37 (Ill. 1979) (holding that defendant "should be allowed to show that a given alternative design is not required by Federal regulations and that such evidence is relevant in determining" whether the product had a design

defect); *see generally Ramirez*, 863 P.2d at 176; *Hittle Serv.*, 549 P.2d at 1390; *see also Lorenz*, 896 F.2d at 149-50; *Simien*, 566 F.2d at 554.

2914.   Ultimately, the BOP failed to seal the well because of Transocean's delayed well control and Transocean's failure to properly maintain the BOP such that the AMF/deadman would function, and not due to the lack of any additional features.  *See* §§ V.J.8; VII.C.  The suggested alterations could not have overcome Transocean's delayed activation or inadequate maintenance that resulted in the BOP's failure to seal the well.  *See* §§ VII.C; VII.D; IX.C.

2915.   Therefore, the lack of the proposed additional features does not change the conclusion that BP satisfied any duty of care regarding the design of the BOP.  *See generally* Rec. Doc. 4285 at 6; *Great Lakes*, 624 F.3d at 211; *Daigle*, 616 F.2d at 827.  Separately, the lack of the proposed additional features was not causal to the blowout or oil spill.  *See*, *e.g.*, *Great Lakes*, 624 F.3d at 213-14; *Donaghey*, 974 F.2d at 649; *Holtzclaw*, 255 F.3d at 261 n.5.  Therefore, BP is not liable for the BOP configuration and design.

### 18.   BP Is Not Liable for Transocean's Failure to Properly Maintain the *Deepwater Horizon's* BOP or Other Equipment.

2916.   Under the Drilling Contract, Transocean expressly had the responsibility to maintain the *Deepwater Horizon*, including its BOP.  *See* § II.C.2.  Moreover, under maritime law, Transocean had a non-delegable duty to maintain the BOP and other equipment.  *See* § XVIII.A.1.c.  Therefore, Transocean rather than BP was obligated to properly maintain the BOP.

2917.   BP cannot be vicariously liable for Transocean's failure to properly maintain the BOP or other equipment of the *Deepwater Horizon*, *see* § XV.C.7.a, and BP was not negligent in hiring Transocean, *see* § II.C.1, *see, e.g., Barbetta*, 848 F.2d at 1373; *Central Gulf*, 176 F. Supp. 2d at 622; *Smolnikar*, 787 F. Supp. 2d at 1319; *Guarascio*, 582 F. Supp. 2d at 457.

2918.  Furthermore, given the audits, inspections, and certifications of the *Deepwater Horizon*, BP reasonably believed that Transocean had properly maintained the *Deepwater Horizon* and its BOP.  *See* § VIII.

### 19. The Guide/Sims E-Mails Do Not Show Negligence and Are Irrelevant in Any Case.

2919.  Certain parties have placed significant emphasis on specific e-mail exchanges in March and April 2010 between John Guide, BP wells team leader for the *Deepwater Horizon*, and his supervisor David Sims, BP D&C operations manager for Macondo E&A.  The evidence as to these e-mail exchanges has shown, however, that they neither related to any causal aspect of the well planning nor reflected a flawed process safety system at BP.  Guide and Sims maintained both a professional relationship and a personal friendship and continued to work well together, and none of the e-mails reflect any concern about the safety of the operations at the Macondo well.  *See* § XI.B.7.

2920.  Thus, the Guide/Sims e-mail exchanges do not reflect any breach of any standard of care, nor are they related in any way to any potential or alleged cause of the Incident.  *See generally* Rec. Doc. 4285 at 6; *Great Lakes*, 624 F.3d at 211, 213-14; *Daigle*, 616 F.2d at 827; *Donaghey*, 974 F.2d at 649; *Holtzclaw*, 255 F.3d at 261 n.5.  Thus, they do not show or support a finding of liability.

## XVI.  BP'S LIABILITY UNDER MARITIME LAW.

2921.  The PSC (on behalf of private plaintiffs), Alabama, and Louisiana brought claims of negligence, gross negligence, and willful misconduct against BP under maritime law.  Rec.

Doc. 1128 ¶¶ 569-636; Rec. Doc. 1872 ¶¶ 94-147; Rec. Doc. 2031 ¶¶ 239-48, 386-91. Halliburton[33] alleged similar claims against BP.  Rec. Doc. 2086 ¶¶ 41-45.

2922.   This section begins by discussing the interaction between OPA and maritime law, which the Court previously ruled on in its Order And Reasons As to Motion to Dismiss the B1 Master Complaint, Rec. Doc. 3830.  To the extent maritime law is applicable to BP, the section then analyzes BP's conduct under maritime law, and concludes with an explanation of why BP is not liable for punitive damages.

### A.    OPA Displaces All Maritime Law Claims Against BP.[34]

2923.   Because OPA provides a comprehensive set of remedies for persons who suffer economic losses as a result of an oil spill, claims asserting such injuries under the general maritime law are displaced.

2924.   Where Congress enacts a federal statute on a subject previously controlled by federal common law, the federal statute displaces claims under the prior common law regime, as federal common law is "subject to the paramount authority of Congress," *New Jersey v. New York*, 283 U.S. 336, 348 (1931).  "Even in admiralty, ... where the federal judiciary's lawmaking power may well be at its strongest, it is our duty to respect the will of Congress."  *Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77, 96 (1981).  In the context of

---

[33]  Halliburton attempted to bring claims for fraud against BP relating to the M57B sand, but the Court denied Halliburton's motion to amend its complaint, Rec. Doc. 4267, and thus those claims were not part of the Phase I trial.  Similarly, Halliburton filed a state court defamation action against BP, which was removed and transferred to this Court.  As this action has been stayed and there has been no discovery or briefing, this defamation action also was not part of the Phase I trial.  Such claims likely will be subject to *res judicata* and other doctrines that bar such claim splitting if they are ever pressed.

[34]  BP acknowledges that the Court previously rejected that OPA entirely displaces general maritime law and denied BP's request that it certify this issue for an interlocutory appeal under 28 U.S.C. § 1292(b). Rec. Doc. 3830 at 26, 38; Rec. Doc. 4378 at 2-3 (denying Rec. Doc. 4291). BP submits these proposed conclusions to facilitate its appellate rights.

maritime claims, "once Congress addresses a subject ... the task of the federal courts is to interpret and apply statutory law, not to create common law." *Id.* at 95 n.34.

2925.   Consistent with this principle, courts have consistently found that OPA displaces damages claims under the general maritime law – both as a matter of procedure and of substance. *See, e.g.*, *S. Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 65-66 (1st Cir. 2000); *United States v. Am. Commercial Lines, LLC*, No. 11-2076, 2013 WL 1182963, at *5 (E.D. La. Mar. 21, 2003); *Tanguis v. M/V Westchester*, 153 F. Supp. 2d 859, 867 (E.D. La. 2001); *Clausen v. M/V New Carissa*, 171 F. Supp. 2d 1127, 1133 (D. Or. 2001); *Gabarick v. Laurin Maritime (Am.) Inc.*, 623 F. Supp. 2d 741, 750-51 (E.D. La. 2009); *Nat'l Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp.*, 924 F. Supp. 1436, 1447 (E.D. Va. 1996), *aff'd*, 122 F.3d 1062 (4th Cir. 1997).

### B.   BP's Liability under Maritime Law.

2926.   Maritime law regarding negligence, gross negligence, and willful misconduct is previously described in § XV.C concerning the CWA.[35]   Indeed, many of the cases relied on in that section are maritime cases, and others represent the general common law that should be adopted for purposes of maritime law.   Thus, under maritime law as well as the CWA, (i) the same definitions of negligence, gross negligence, and willful misconduct apply; (ii) the totality of a defendant's actions must be considered in determining liability; (iii) a culpable state of mind for a corporation cannot be based on combining the mental state of separate individuals; (iv) a defendant can be liable for gross negligence or willful misconduct only if its conduct caused the Incident; (v) BP cannot be vicariously liable for the acts of its contractors; and (vi) BP cannot be liable for punitive damages based on the actions of its agents.

---

[35]   For purposes of maritime law, the discussion in §§ XV.C, XV.D applies to both BPXP and BPAP.

2927.   As explained in § XV.D, none of BP's conduct was negligent other than the negligent supervision of the negative pressure test.  Moreover, none of BP's conduct was so deficient as to be culpable under any higher standard of liability, such as gross negligence or willful misconduct.  Finally, much of the conduct relied on by plaintiffs and the other opposing parties simply was not the legal cause of the Incident.

2928.   Therefore, BP's liability under maritime law is limited to negligence regarding the supervision of the negative pressure test.

### C.   Apportionment.

2929.   Under maritime law, liability is apportioned pursuant to comparative fault.  See *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411 (1975) ("[W]hen two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault."); *see also Loose v. Offshore Navigation, Inc.*, 670 F.2d 493, 500 (5th Cir. 1982) ("In *United States v. Reliable Transfer Co.*, 421 U.S. 397 (1975), the Supreme Court held that ... the admiralty rule of divided damages in collision cases should be replaced by a rule requiring, when possible, the allocation of liability for damages in proportion to the relative fault of each party. This principle of fault allocation is not limited to maritime collision cases." (footnote omitted)).

2930.   "[T]he calibration of culpability simply is not susceptible to any real precision. Apportionment is not a mechanical exercise that depends upon counting up the errors committed by both parties."  *Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*, 447 F.3d 360, 370 (5th Cir. 2006) (internal citations and quotations omitted).  "The trial court must determine, based upon the number and quality of faults by each party, the role each fault had in causing the [casualty]." *Id.*; *see also Tokio Marine & Fire Ins. Co., v. M/V Flora*, No. 97-1154, 1999 WL 14000, at *16

(E.D. La. Jan. 11 1999); *Mike Hooks Dredging Co. v. Eckstein Marine Serv., Inc.*, No. 08-3945, 2012 WL 1070106, at *3 (E.D. La. Mar. 29, 2012).  "A court may apportion fault equally in a close case."  *In re Cardinal Services, Inc.*, 304 F. App'x 247, 252 (5th Cir. 2008).

2931.  As explained in §§ XVIII and XIX, the conduct of both Transocean and Halliburton constitutes multiple proximate causes of the Incident, which affects the allocation of fault for the Incident and precludes any claims that BP is solely at fault.  Instead, both Transocean and Halliburton are responsible for a high proportion of fault for the Incident.  *See Stolt Achievement*, 447 F.3d at 370; *Tokio Marine*, 1999 WL 14000, at *16; *Mike Hooks*, 2012 WL 1070106, at *3.

### D.    BP Is Not Liable for Punitive Damages under Maritime Law.

2932.  Punitive damages are available under maritime law only in cases of "wanton willful, or outrageous conduct."  *Atlantic Sounding Co. v. Townsend*, 557 U.S. 404, 409, 415 n.4 (2009); *see also In re P&E Boat Rentals, Inc.*, 872 F.2d 642, 650 (5th Cir. 1989) (same).  This demanding standard, as the Fifth Circuit has explained, necessarily implies a culpable mental state, *i.e.,* it "'requires an element of bad faith.'"[36]  *Tullos v. Res. Drilling, Inc.*, 750 F.2d 380, 388 (5th Cir. 1985) (quoting *Harper v. Zapata Off-Shore Co.*, 741 F.2d 87, 90 (5th Cir. 1984)).

---

[36]  Given the authorities providing that punitive damages are only available under general maritime law in cases of willful, wanton, or outrageous misconduct, the Court's statement in its order resolving the B1 motions to dismiss that punitive damages are available in cases of "gross negligence," see Rec. Doc. 3830 at 27, is properly read as further support for the proposition that, contrary to the government's suggestions, gross negligence requires an element of recklessness.

2933.   Because none of BP's conduct reached the level of wanton, willful, or outrageous conduct, especially when considered against the many safety precautions taken by BP, *see* §§ XI; XV, punitive damages against BP should not be awarded.[37]

## XVII.  BP P.L.C. IS NOT LIABLE UNDER ANY LAW.

2934.   BP p.l.c. cannot be liable under either OPA or the CWA.  BP p.l.c. was not the lessee or permittee of MC252, has no involvement with the *Deepwater Horizon* vessel, and had no role as the owner, operator, or person-in-charge of any vessel or facility.  33 U.S.C. § 2701(32); 33 U.S.C. § 1321(b)(7)(A).

2935.   No BP p.l.c. employees were involved in the events that caused or allegedly caused the Incident.  *See* § I.A.1.  Therefore, there is no basis for holding BP p.l.c. directly liable under maritime law.

2936.   Nor is there any basis for holding BP p.l.c. liable under a theory of alter ego or piercing the corporate veil.  "A corporate entity is liable for the acts of a separate, related entity only under extraordinary circumstances, commonly referred to as 'piercing the corporate veil.'" *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 543 (4th Cir. 2013).  To justify piercing the corporate veil, a parent's control over a subsidiary must "amount[] to total domination of the subservient corporation, to the extent that the subservient corporation manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation."  *Baker v. Raymond Int'l Inc.*, 656 F.2d 173, 181 (5th Cir. 1981); *see also Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 53 (2d Cir. 2008); *Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287, 1294 (9th Cir. 1997).  To determine whether such domination exists, a court

---

[37]   To the extent BP is found liable for punitive damages, BP reserves all arguments regarding the maximum amount of such damages.  *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 513, 515 n. 28 (2008).

applying federal maritime law applies the same factors as in shoreside law, such as grossly inadequate capitalization of the subsidiary, intermingling of funds, failure to maintain separate books and records or other formalities, overlapping officers, directors and other personnel; common office space, and whether dealings between the two are at arm's length.  *See e.g.*, *Baker*, 656 F.2d at 180; *Vitol*, 708 F.3d at 544; *Williamson*, 542 F.3d at 53.

2937.  Here, other parties have failed to present evidence on the factors necessary to meet the extraordinary circumstances for piercing the corporate veil.  For example, there has been no evidence, or even argument, that BP is inadequately capitalized, that BP and BP p.l.c. co-mingle funds, that BP does not properly maintain its books and records, that BP and BP p.l.c. have overlapping directors or other space, and so forth.  Without such evidence, there is no basis to hold BP p.l.c. liable for the actions of its separate corporate subsidiaries BPXP and BPAP.  Furthermore, the limited evidence in the record on these issues rebuts any claims of alter ego.  For example, BP's payments of billions of dollars to claimants and for clean up costs rebuts any allegations that it was undercapitalized, and BP and BP p.l.c. are located in separate offices (Houston, Texas and London, England, respectively).

2938.  Moreover, that BP p.l.c. generally set policies for BP does not serve as a basis for imposing liability on BP p.l.c..  "Ownership of a controlling interest in a corporation entitles the controlling stockholder to exercise the normal incidents of stocks ownership, such as the right to choose directors and set general policies, without forfeiting the protection of limited liability." *Baker*, 656 F.2d at 180; *see also Bestfoods*, 524 U.S. at 72 ("Activities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability.");

*Administrators of Tulane Educ. Fund v. Ipsen, S.A.*, 450 F. App'x 326, 331 (5th Cir. 2011) (holding that parents coordinating with subsidiary on regarding "organisational, budget and technical matters" and providing "general guidance" to its subsidiaries was not sufficient to pierce the corporate veil); *Selser v. Pac. Motor Trucking Co.*, 770 F.2d 551, 555 (5th Cir. 1985) ("Similarly, the parent may properly exercise its right to choose directors and set general policies without forfeiting its limited liability.") (internal quotations omitted); *Doe v. Unocal Corp.*, 248 F.3d 915, 926-28 (9th Cir. 2001); *City of Greenville, Ill. v. Syngenta Crop Prot., Inc.*, 830 F. Supp. 2d 550, 555-56 (S.D. Ill. 2011).   Thus, BP p.l.c. cannot be held liable for setting general safety policies for BP and its other subsidiaries.   Furthermore, as explained in §§ XI; XV.D.1-XV.D.2 the safety policies followed by BP satisfied the standard of care.

2939.   These same conclusions apply to BP America Inc., BP Company North America Inc., and BP Corporation North America Inc. (all of which are holding companies with no involvement in the Macondo well) and BP Products North America Inc. (which is an operating company that had no involvement in the Macondo well), or any other entity in the BP corporate family besides BPXP and BPAP.

## XVIII. TRANSOCEAN'S LIABILITY.

2940.   The PSC (on behalf of private plaintiffs), Alabama, and Louisiana brought claims against Transocean under OPA.   Rec. Doc. 1128 ¶¶ 678-90; Rec. Doc. 1872 ¶¶ 205-19; Rec. Doc. 2031 ¶¶ 153-67.   The United States brought claims under both OPA and the CWA against Transocean, but has since settled those claims.   Civ. A. No. 2:10-cv-04536, Rec. Doc. 1; Rec. Doc. 8608.   The PSC, Alabama, Louisiana, and Halliburton brought claims of negligence, gross negligence, and willful misconduct against Transocean under maritime law.   Rec. Doc. 1128 ¶¶ 569-636; Rec. Doc. 1872 ¶¶ 94-147; Rec. Doc. 2031 ¶¶ 239-48, 386-91.   BP brought a claim of maritime negligence against Transocean, or gross negligence and/or gross fault as may be

established at trial based upon the evidence.  Rec. Doc. 2074 ¶¶ 76-80.  BP also brought claims against Transocean for unseaworthiness and breach of contract.[38]  Rec. Doc. 2074 ¶¶ 64-75.  Transocean has filed a Limitation Action seeking to limit its damages.

2941.  This section begins by discussing Transocean's liability under maritime law. Transocean is liable for unseaworthiness and negligence, as well as the breach of its contract with BPAP.  (These proposed findings and conclusions do not address whether Transocean may be liable for gross negligence or willful misconduct.)  Based on this liability and Transocean's knowledge and privity, Transocean cannot limit its liability under the Limitation Action.  The next portion of this section concludes that Transocean also is liable under OPA.

## A.   Transocean's Liability under Maritime Law.

### 1.   Transocean Is Liable for the *Deepwater Horizon's* Unseaworthiness.

#### a.   Maritime Law Imposes an Absolute Duty of Seaworthiness on Vessel Owners.

2942.  At all relevant times, the *Deepwater Horizon* was a vessel.  *See* Rec. Doc. 3830 at 5 ("Under clearly established law, the DEEPWATER HORIZON was a vessel ... ."); *see also, e.g.*, *Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 543 n.12 (5th Cir. 2002)), *abrogated in part on other grounds*, *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009) (*en banc*); *Smith v. Penrod Drilling Corp.*, 960 F.2d 456, 460 (5th Cir. 1992), *abrogated in part on other grounds by Grand Isle*, 589 F.3d 778.  That the *Deepwater Horizon* used its dynamic positioning system to remain stationary over the well does not change its status as a vessel.  It was not anchored or in any way taken out of navigation.  A stationary vessel remains a vessel in navigation.  *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 495 (2005);

---

[38] In addition, BP brought claims for contribution and subrogation against Transocean, which are discussed in Section XXI.

*Chandris, Inc. v. Latsis*, 515 U.S. 347, 373 (1995) (same); *Demette v. Falcon Drilling Co.*, 280 F.3d 492, 498 n.18 (5th Cir. 2002).  *See also* § III.A.

2943.  A vessel owner has an absolute, non-delegable duty to provide a seaworthy vessel.  *See In re Signal Int'l, LLC*, 579 F.3d at 498; *Howlett v. Birkdale Shipping Co.,* 512 U.S. 92, 102 (1994).  *See also* §§ II.C.2.  That duty requires that vessels "be reasonably suited for the purpose or use for which they were intended."  *Signal Int'l.*, 579 F.3d at 498; *see also Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 208 (1996); *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960); *Johnson v. Offshore Express, Inc.*, 845 F.2d 1347, 1354 (5th Cir. 1988).  The intended purpose of a vessel may be specific to the oil industry.  *See Robichaux v. Kerr McGee Oil Indus., Inc.*, 317 F. Supp. 587, 592 (W.D. La. 1970); *see also Walker v. Harris*, 335 F.2d 185, 191 (5th Cir. 1964) ("The subsidiary questions leading to ultimate conclusion of seaworthiness are therefore: what is the vessel to do?  What are the hazards, the perils, the forces likely to be incurred?").  This duty imposed on a vessel owner is a form of strict liability; that is, a vessel owner is liable for unseaworthy conditions regardless of whether the owner is at fault.  *See Yamaha Motor Corp.,* 516 U.S. at 207–08; *Italia Societa per Azioni di Navigazione v. Or. Stevedoring Co.*, 376 U.S. 315, 318 n.3 (1964); *Mayne v. Omega Protein Inc.*, No. 09-30443, 2010 WL 1141632, at *3 (5th Cir. 2010); *Signal Int'l.*, 579 F.3d at 498.

2944.  A vessel owner's obligation to supply a seaworthy vessel extends to the vessel's appurtenances.  *See Signal Int'l.*, 579 F.3d at 498 (citing *Johnson v. Offshore Express, Inc.*, 845 F.2d 1347, 1354 (5th Cir. 1988)); *Gutierrez v. Waterman S.S. Corp.*, 373 U.S. 206, 213 (1963); *Italia Societa*, 376 U.S. at 322; *McAllister v. Magnolia Petroleum Co.*, 357 U.S. 221, 227 (1958).  And as the Court has previously held, "[t]he BOP and riser are appurtenances of the *Deepwater Horizon*."  Rec. Doc. 5809 at 2.  *See also* § III.B.

2945.   A vessel owner's obligation to supply a seaworthy vessel extends to the vessel's crew, which must be fit to meet the perils reasonably to be anticipated on a particular voyage. *Waldron v. Moore-McCormack Lines, Inc.*, 386 U.S. 724, 727 (1967); *Morales v. City of Galveston, Tex.*, 370 U.S. 165, 170 (1962); *McLanahan v. Universal Ins. Co.*, 26 U.S. 170, 183 (1828); *In re Messina*, 574 F.3d 119, 127 (2d Cir. 2009).

2946.   "To establish the requisite proximate cause in an unseaworthiness claim, a plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness."  *Offshore Express*, 845 F.2d at 1354; *see also Brister v. A.W.I., Inc.*, 946 F.2d 350, 355 (5th Cir. 1991); *Martinez v. Offshore Specialty Fabricators, Inc.*, No. 08-4224, 2011 WL 1527096, at *7 (E.D. La. Apr. 20, 2011).

> **b.** **As Implemented on the *Deepwater Horizon*, Transocean's Dual Command Structure and Inadequate Training Caused the Vessel to be Unseaworthy.**
>
> > **i.** **The *Deepwater Horizon's* Divided Command Structure Caused Confusion Aboard the Vessel on April 20, 2010.**

2947.   On April 20, 2010, Transocean's divided command structure created devastating confusion and delay during the critical period when the blowout began but before the explosions occurred.  This period was approximately 8 minutes from 21:41 to 21:49 – more than enough time for a decisive master to take the actions necessary to save the *Deepwater Horizon* and seal the Macondo well by activating the EDS.  *See* § IX.C.

2948.   Captain Kuchta failed to take action that could have prevented the explosions and the oil spill.  This violated Transocean's duty to maintain a seaworthy vessel because the *Deepwater Horizon's* master was not fit to meet the perils of the voyage and did not ensure the safety of the vessel and his crew.  *See Hercules Carriers, Inc. v. Claimant State of Fla., Dep't of*

*Transp.*, 768 F.2d 1558, 1572-73, 1576 (11th Cir. 1985) (holding that company policy against master interfering with pilots caused master not to relieve pilot and was breach of the master and company's duties).

### ii.      Transocean Failed to Train the Crew Regarding When to Activate the EDS.

2949.   Transocean failed to have clear and concise guidelines on when to EDS, *see* § IX.C, failed to train its crew regarding when to EDS, *see* § IX.C.2, and failed to train Captain Kuchta to EDS, *see* § IX.C.3.

2950.   Had Transocean satisfied these obligations, then Captain Kuchta and the crew would have taken more decisive action to EDS before the explosions.   By failing to properly train its crew on when to EDS, Transocean failed to make them fit for the perils of the *Deepwater Horizon*'s voyage and did not provide Captain Kuchta with the knowledge necessary to ensure the safety of the vessel and his crew.   *See Empire Seafoods, Inc. v. Anderson*, 398 F.2d 204, 210 (5th Cir. 1968) (holding vessel was unseaworthy because crew was incompetent and captain was inexperienced in intra-coastal waters and a qualified lookout was not onboard); *Hercules Carriers,* 768 F.2d at 1574 (finding unseaworthiness based on chief mates inadequate training); *In re Liberty Shipping Corp.,* 509 F.2d 1249, 1250-51 (9th Cir. 1975) (finding unseaworthiness based on inadequate training of master and crew in using fire-fighting equipment).   This lack of training caused the *Deepwater Horizon* to be unseaworthy and contributed to the Incident.

### iii.      The *Deepwater Horizon* Did Not Have a Properly Trained Master.

2951.   Captain Kuchta did not have the proper training to be the master of the *Deepwater Horizon*.   In particular, he lacked major emergency training, did not have well control certification, and had not been assessed competent as a Person-in-Charge.   *See* § IX.C.3.

2952.   Captain Kuchta's lack of training contributed to the Incident on April 20, 2010. *See* § IX.C.3.

2953.   Transocean's failure to provide Captain Kuchta with the training he needed to be a properly qualified master rendered him unfit for his position and the *Deepwater Horizon* unseaworthy.   *See Empire Seafoods*, 398 F.2d at 210; *Hercules Carriers*, 768 F.2d at 1574; *Liberty Shipping*, 509 F.2d at 1250-51.

### c.      Transocean's Failure to Properly Maintain the BOP Caused the *Deepwater Horizon* to be Unseaworthy.

2954.   The BOP is an appurtenance of the *Deepwater Horizon* vessel, Rec. Doc. 5809 at 2, and thus Transocean had a legal duty to maintain the BOP in a seaworthy condition, *Signal Int'l.*, 579 F.3d at 498.   The duty of seaworthiness requires that the vessel "be reasonably suited for the purpose or use for which [it was] intended."   *Signal Int'l.*, 579 F.3d at 498; *see also Yamaha*, 516 U.S. at 208; *Mitchell*, 362 U.S. at 550.   The *Deepwater Horizon* was intended to engage in exploratory offshore drilling operations.   Kicks are an inherent risk in drilling.   *See* § II.C.5.a .   Maintaining and testing well control equipment, such as the BOP, to ensure its ability to effectively control kicks and avoid blowouts is necessary for a drilling vessel such as the *Deepwater Horizon* to be reasonably suited for its purpose.   Moreover, given the possible risk of emergency situations, the *Deepwater Horizon* BOP was equipped with emergency functions that could shut in the well without human intervention.   Thus, to maintain a seaworthy offshore drilling vessel, the BOP, an appurtenance of the vessel, must be maintained so that those emergency functions are capable of securing the well automatically when necessary.

2955.   Experts retained by the United States, BP, and Halliburton all agree that the BOP failed to activate the automated AMF/Deadman sequence when the requisite conditions were met shortly after the rig explosions because of separate and distinct deficiencies in each of the

redundant control pods: the Blue Pod's 27-volt battery was 18 months overdue for replacement and had insufficient charge to power the AMF/deadman sequence, and the Yellow Pod's solenoid 103 was reverse-wired and could not close the BSRs. *See* § VII.C.2.

2956. If Transocean had performed maintenance and testing adequately and according to its own policies, the Blue and Yellow Pods would not have had deficiencies that prevented either of them from being able to function the AMF/Deadman sequence and the BOP would have sealed the well. *See* § VII.D.

2957. Transocean violated this duty of seaworthiness by failing to maintain and test the *Deepwater Horizon*'s BOP in a manner that assured the emergency systems, specifically the AMF/deadman, were functional and could secure the well. *See Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 517 (1971) (listing grounds for a finding of unseaworthiness, including that a vessel's "appurtenances [are] in disrepair"). Because of Transocean's improper maintenance and deficient testing, the BOP was incapable of automatically shutting the well through the AMF/deadman system when the rig explosions created the conditions for the AMF/deadman system activation.

2958. This unseaworthiness of the *Deepwater Horizon* was causal to the Incident. *See Offshore Express*, 845 F.2d at 1354; *Brister*, 946 F.2d at 355. Had the BOP been properly maintained and tested, the AMF/deadman system would have functioned, sealed the well, and prevented the subsequent oil spill.

## 2. Transocean Was Negligent.

### a. Transocean Misinterpreted the Negative Pressure Tests.

2959. Transocean has admitted in its guilty plea allocution that it was negligent in connection with the negative pressure test. Specifically, Transocean admitted that "Defendant TRANSOCEAN'S conduct violated its duty to exercise well control in accordance with the

standard of care applicable in the deepwater oil exploration industry." *See* § X.D.2.a Transocean also admitted that its negligent conduct was a proximate cause of quantities of oil and natural gas flowing into the Gulf of Mexico. *See* § X.D.2.a.

2960.   The record evidence confirms that Transocean was negligent in conducting and interpreting the negative pressure test.   Transocean's actions breached its duty to exercise ordinary care under the circumstances. *See Theriot v. United States*, 245 F.3d 388, 400-01 (5th Cir. 1998); *Gates v. Shell Offshore, Inc.*, 881 F.2d 215, 217-18 (5th Cir. 1989); *Martin v. Walk, Haydel & Associates, Inc.*, 742 F.2d 246, 249 (5th Cir. 1984).

2961.   *First*, Transocean employees were capable of interpreting a negative pressure test. The test is a standard procedure that Transocean employees had performed numerous times in the past.   Transocean and BP regularly worked together on interpreting negative pressure tests. *See* § V.J.5.

2962.   *Second*, Transocean's errors in setting up the negative pressure test misled the Transocean drill crew and BP WSLs.   During the second negative pressure test, the crew and WSLs monitored the kill line for 30 minutes and did not see any flow, causing them to believe the test was successful. *See* § V.J.5.e.   The reason for the perceived lack of flow is uncertain, but the most likely possibility is that a valve on the kill line was inadvertently closed. *See* § V.J.5.e. The Transocean rig crew was responsible for lining up the negative pressure test and verifying that the lines, valves, and gauges were in proper working order, *see* § V.J.5.h.i, and thus was responsible for any error in setting up the valves.

2963.   *Third*, when BP WSL Don Vidrine questioned the results of the first test because of pressure on the drill pipe, the Transocean toolpusher claimed that the pressure was caused by a "bladder effect" or "annular compression."   Transocean's crew thus developed the mistaken

623

explanation that caused both the crew and BP's WSLs to ignore the drill pipe pressure indicating that the well was flowing and not stable. *See* § V.J.5.d. The Transocean crew continued to believe that the well was stable based on this mistaken explanation throughout the evening. *See* § V.J.5.f.

**b.      Transocean Failed in Its Responsibility to Monitor the Well.**

2964.   Tort and maritime law often impose duties to monitor in order to avoid the possibility of significant injuries or damages. For examples, owners of vessel have a duty to maintain a proper lookout that monitors for dangers in navigating. *See The Oregon*, 158 U.S. at 193-94, *United Overseas Export Lines, Inc. v. Medluck Compania Maviera, S.A.*, 785 F.2d 1320, 1326 (5th Cir. 1986). Indeed, courts have found duties to monitor across a wide range of activities. *See, e.g.*, *Phillips Petroleum Co. v. Stokes Oil Co.,* 863 F.2d 1250, 1255 (6th Cir. 1988) (duty to monitor amount of gasoline being pumped from barge into receiving tank); *Simon v. United States*, 341 F.3d 193, 203 (3d Cir. 2003) (duty of air traffic controllers to monitor a flight's approach on radar); *Huber v. United States*, 838 F.2d 398, 400-01 (9th Cir. 1988) (USCG had a duty to monitor radio channel and status of vessel in peril after agreeing to assist the vessel); *Chotin Transp., Inc. v. United States*, 819 F.2d 1342, 1347-48 (6th Cir. 1987) (duty to monitor mooring lines and the distance between a barge and a lift gate).

2965.   Similarly, Transocean has a clear duty to monitor the well as admitted in its plea agreement, expressly stated in its contract with BPAP, and acknowledged in industry standards. *See* §§ II.C.4.; V.J.8.

2966.   Industry standards, as well as Transocean's internal policies, emphasize the importance of catching kicks quickly. *See* §§ II.C.5.a.; V.J.8.f. Specifically, Transocean expected its drillers to detect a kick before 20 barrels of hydrocarbons entered the well bore. Expert testimony similarly indicates that the expected normal response is to catch kicks before

they reach 30 barrels.  *See* § II.C.5.b.  Thus, catching kicks within this limit defines the standard ordinary or reasonable care for purposes of well control.  *See Baker*, 488 F.2d at 333; *Cia Maritima*, 308 F.2d at 123; *Ray Evers*, 625 F.2d at 732.

2967.  In violation of this standard of care of catching kicks as soon as possible and before 20-30 barrels of influx, on April 20, 2010 the Transocean drill crew failed to recognize numerous kick indicators.  *See* § V.J.8.

2968.  If the drilling crew had recognized the indications of flow at 21:01, 21:08, or 21:30 and acted appropriately by shutting in the well, then the Incident would have been prevented.  *See* § V.J.8.  Transocean's senior personnel admit that the drilling crew's failure to recognize the kick indicators and shut in the well was a cause of the blowout.  *See* § V.J.8.f.

2969.  Thus, Transocean had a duty to monitor the well.  It breached that duty by failing to monitor the well so as to catch the kick within 20-30 barrels.  That breach was one of the proximate causes of the Incident.  Therefore, Transocean was negligent in monitoring the well. *See, e.g.*, *The Oregon*, 158 U.S. at 193-94; *United Overseas*, 785 F.2d at 1326; *Phillips Petroleum*, 863 F.2d at 1255; *Simon*, 341 F.3d at 203; *Huber*, 838 F.2d at 400-01; *Chotin Transp.* 819 F.2d at 1347-48.

### c.       Transocean Failed in Its Responsibility to Control the Well.

2970.  Just as Transocean had a duty to monitor the well, it also had a duty to exercise proper well control upon recognizing a kick indicator.  Transocean recognizes this duty, admitted the duty in its plea agreement, and its Drilling Contract with BPAP imposes that duty.  *See* §§ II.C.2.b.; X.D.2.a.

2971.  Here, Transocean breached the applicable standard of care for that duty in four ways.

2972.  *First*, at approximately 21:30 Transocean recognized there was an anomaly. Proper procedure would have been for the crew to stop, check for flow, and then shut in the well. *See* § V.J.8.d.  Instead, the crew apparently discussed the issue and deferred checking for flow, causing them to delay well control operations until hydrocarbons were already in the riser.  *See* § V.J.8.d.  This failure to conduct an immediate flow check upon recognizing an anomaly violated the standard of care.

2973.  If the crew would have immediately done a flow check at 21:30, they would have been able to shut the well in and circulate out the kick while the hydrocarbons were below the BOP.  Thus, this violation of the standard of care was a proximate cause of the Incident.

2974.  *Second*, the drill crew's first well control action, closing the upper annular, took place at approximately 21:42.  But the annular did not form a full seal because it closed on a tool joint.  *See* § V.J.8.e.  As Transocean's own expert admits the standard of care is for the driller to set the drill string so that there are no tool joints located across the rams or annular preventers in the BOP stack.  *See* § V.J.8.e.  By having a tool joint located partially in the BOP's upper annular preventer such that the annular could not form a full seal, Transocean violated the standard of care.

2975.  The upper annular had a working pressure greater than the wellbore pressure, and would have sealed around the pipe but for closing on a tool joint.  *See* § V.J.8.e.  Thus, had the tool joint been properly placed, closing the annular would have stopped the blowout.  *See* § V.J.8.e.  Transocean's failure to properly place the tool joint thus is a proximate cause of the Incident.

2976.  *Third*, when the Transocean drilling crew did begin to exercise well control measures, gas was already in the riser.  Transocean's own policies instruct that when taking a

large kick the hydrocarbons must be diverted overboard rather than put through the mud-gas separator. *See* § V.J.8.g. Similarly, industry standards require that when the pumps are shut down to investigate an issue, the diverter must be set to go to the overboard lines. *See* § V.J.8.g. Transocean's decision to instead use the MGS breached this standard of care.

2977. Transocean admits that the drilling crew's use of the MGS was "a precipitating cause" of the explosion. *See* § V.J.8.g. If the drill crew had diverted the hydrocarbons overboard, expert modeling shows the fire and explosion would have been avoided. *See* § V.J.8.g. Therefore, the decision to use the MGS rather than diverting overboard was a proximate cause of the Incident.

2978. *Fourth*, Transocean failed to EDS timely. The master of a vessel is charged with an overriding legal duty to keep the vessel and its crew safe. *See* § III.C.2. Here, once Captain Kuchta saw mud raining down from the derrick, he should have recognized that this was a serious marine emergency threatening the safety of the vessel and crew. The proper response under the standard of care would have been for Captain Kuchta to immediately activate the EDS or order another crew member to do so.

2979. Failing to activate the EDS was a contributing cause of the Incident. Had the EDS been activated during the several minutes between mud spewing from the derrick and the first explosion, the well would have been closed in and the vessel could have driven off or drifted to safety. *See* § IX.C.1. The delay in activating the EDS allowed the Incident to escalate to the explosions that rocked the *Deepwater Horizon* and caused a major oil spill.

2980. Thus, Transocean breached its duty to exercise proper well control in four separate ways, each of which also causally contributed to the Incident. *See Theriot*, 245 F.3d at

400-01; *Gates*, 881 F.2d at 217-18; *Martin*, 742 F.2d at 249.  Each of these three failures was negligent on the part of Transocean.

### d.    Transocean Was Negligent for Implementing a Confusing Command Structure and Failing to Train Captain Kuchta.

2981.  *First*, Transocean's failure to ensure the crew had a clear understanding of the command structure aboard the *Deepwater Horizon* breached the standard of care.  *See* § IX.A.

2982.  *Second*, the standard of care required Transocean to properly train Captain Kuchta and the crew on when and how to EDS.  *See* § IX.C.2.  Transocean breached this standard of care by failing to train Captain Kuchta on how to EDS, or providing drills or other training for the crew on when and how to EDS.  *See* § IX.C.2.

2983.  *Third,* Transocean requires that masters complete training in major emergency management and undergo assessment/qualification as a person in charge.  *See* § IX.C.3.  These training requirements are the industry standard.  *See* § IX.C.3.  Furthermore, a master onboard a drilling vessel should have training in well control so as to competently fulfill his overriding obligation to keep the vessel and crew safe.  Thus, the applicable standard of care requires that the master receive training in major emergency management and well control, and also assessment/qualification as a person in charge.  Captain Kuchta lacked these qualifications.  *See* § IX.C.3.

2984.  Each of these violations was causal to the Incident.  Had Transocean policy communicated to Captain Kuchta a clear statement of his command authority in an emergency like the one that arose on April 20, 2010, if he had been trained to EDS, or if he had received training in emergency management and well control, he would have been able to react swiftly and decisively by activating the EDS after mud began unloading from the riser before the explosions severed the MUX cables.  *See Trico Marine Assets Inc. v. Diamond B Marine Servs.*

*Inc.*, 332 F.3d 779, 790 (5th Cir. 2003) (affirming district court denial of limitation of liability where district court found that vessel owner was negligent, in part, for failing to provide safety training or a safety manual); *Landry v. Oceanic Contractors, Inc.*, 731 F.2d 299, 302 (5th Cir. 1984) (finding negligence where employer failed to instruct employee on when and how to repair a hose onboard a vessel).[39]  Activating the EDS before the first explosion would have sealed the well, saved the vessel, and prevented the oil spill.  *See* § IX.C.1.

2985.   Therefore, Transocean's failures to clearly implement the command structure aboard the *Deepwater Horizon* and train Captain Kuchta each constitute negligence.

### e.   Transocean Failed to Properly Maintain the BOP, Causing the AMF/Deadman Not to Function.

2986.   As explained in § VII.C.2, Transocean failed to adequately maintain and test each of the redundant Yellow and Blue control pods that function the BOP's AMF/deadman sequence. In addition to causing the *Deepwater Horizon* to be unseaworthy, Transocean's lack of adequate BOP maintenance and testing also constitutes negligence.

2987.   Transocean had a duty to maintain the Blue and Yellow control pods so that they would operate the AMF/Deadman system.  *See* § VII.C.  Transocean violated its duty of ordinary care by: (1) not replacing the Blue control pod batteries within one year, as Cameron recommended; (2) not testing the control pod battery charge before deployment; (3) not taking any appropriate action when it had knowledge that the control pod batteries were overdue for replacement while on the Macondo well; (4) not properly refurbishing the Yellow pod solenoid

---

[39]  *See also Limon v. Berryco Barge Lines, L.L.C.*, 787 F. Supp. 2d 580, 589 (S.D. Tex. 2011) (denying vessel owner's limitation of liability motion for summary judgment in part because there was evidence that vessel owner negligently failed to provide captain with safety training or a safety manual); *Stampley v. Fred's Stores of Miss., Inc.*, No. 5:08cv 197-DCB-JMR, 2009 WL 2849637 (S.D. Miss. Sept. 1, 2009) (denying defendant's motion for summary judgment where plaintiff provided evidence that defendant's employees were negligently trained and received no safety training or policy).

103 to be correctly wired; (5) not adequately testing the Yellow pod solenoid 103 to determine if it was correctly wired; and (6) not testing the AMF/deadman system before deploying the BOP on the Macondo well in violation of its own policies. *See* § VII.C. *See The Sumitomo Marine & Fire Ins. Co. v. The Barge ACBL 1346*, No. Civ.A. 00-0491, 2001 WL 263083, at *5 (E.D. La. Mar. 16, 2001) ("In the present case the plaintiff has clearly established that the rust damage was caused by the negligence of ACBL and the unseaworthiness of the ACBL 1346.  ACBL failed to maintain and inspect the twenty-five (25) year old barge in question as evidenced by the multiple fractures and cracks found in the barge's outer skin and hopper that allowed for flooding in calm waters."); *Berg v. United States*, 806 F.2d 978, 982 (10th Cir. 1986) (affirming finding of negligence where the "record shows that the equipment did not work properly because the hospital failed to maintain the equipment and the technologists were not adequately familiar with the equipment in the back-up room"); *Bodnar v. Hi-Lex Corp.*, 919 F. Supp. 1234, 1241 (N.D. Ind. 1996) ("Admiralty law has long concerned itself with the repair and maintenance of vessels.  Furthermore, the repair and maintenance of vessels is 'a common, if not indispensable, maritime activity.'").

2988.  More generally, Transocean did not test the AMF/Deadman sequence before deploying the BOP on the Macondo well, which also breached its duty of ordinary care.  *See* § VII.C.2.a.vi.  *See Henderson v. Norfolk S. Corp.*, 55 F.3d 1066, 1069 (5th Cir. 1995) (affirming district court decision that defendants' negligent failure to inspect and maintain trailer was the cause of the accident); *Orduna S.A. v. Zen-Noh Grain Corp.*, 913 F.2d 1149, 1152 (5th Cir. 1990) (affirming district court decision that defendant's negligent failure to inspect the structural members of its loading towers for two years was the proximate cause of the casualty); *Wiley v.*

*Offshore Painting Contractors, Inc.*, 711 F.2d 602 (5th Cir. 1983) (affirming district court decision that defendant's negligent failure to inspect equipment lead to offshore explosion).[40]

2989. This was a proximate cause of the Incident. If Transocean had properly maintained the BOP control pods, the AMF/Deadman would have triggered, sheared the pipe, and shut in the well. *See* § VII.D.

### 3. Transocean Breached Its Drilling Contract with BPAP.

2990. The elements of a breach of contract action are a valid contract, breach of that contract, and resulting damages. *See, e.g., F.W.F., Inc. v. Detroit Diesel Corp.*, 494 F. Supp. 2d 1342, 1360 (S.D. Fla. 2007) *aff'd*, 308 F. App'x 389 (11th Cir. 2009); *Tetra Tech Ec, Inc. v. White Holly Expeditions LLC*, No. 3:10-cv-465-J-32MCR, 2010 WL 3259696 (M.D. Fla. Aug. 16, 2010); *Jo Tankers, A.S. v. HBG Logistics*, L.L.C., No. 11-CV-00938, 2013 WL 104827 (S.D. Tex. Jan. 8, 2013); *Rose Containerline, Inc. v. Omega Shipping Co.*, CIV. No. 10-4345 (WHW), 2011 WL 1564637 (D.N.J. Apr. 25, 2011).[41]

---

[40] *See also Becker*, 586 F.3d at 373-74 (affirming that time-charterer was negligent in failing to test a hose system and blue shoe system); *Watz v. Zapata Off-Shore Co.*, 431 F.2d 100, 115 (5th Cir. 1970) (affirming finding of negligence for failure to test chain and hoist); *S. Stevedoring & Contracting Co. v. Hellenic Lines, Ltd.*, 388 F.2d 267 (5th Cir. 1968) (affirming district court's holding that stevedore was negligent in failing to conduct a closer visual inspection of swivel hook used in loading operations after having been placed on notice by size of hook that it was probably inadequate); *Steel Coils, Inc. v. M/V Lake Marion, No. 98-3116,* 2001 WL 1518302, at *15 (E.D. La. Nov. 29, 2001) (finding that defendant was "liable for its negligence in failing to test and repair the hatch covers"); *Richard Constr. Co. v. Monongahela & Ohio Dredging Co.*, 284 F. Supp. 290, 294 (W.D. Pa. 1968) (finding negligence based on defendant's "failing to test the ability of its equipment").

[41] Each of the four Transocean entities is liable to BPAP for breach of the Drilling Contract because each has brought suit based on the contract, Rec. Doc. 2068 ¶¶ 88-114, and each received benefits under the contract, see § I.A.2. *See Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 517-18 (5th Cir. 2006).

2991.   BPAP and Transocean Holdings LLC were parties to a Drilling Contract regarding the *Deepwater Horizon*.   There is no dispute that the Drilling Contract was a valid contract.

2992.   That Contract contains various terms, including Transocean's representations and agreements with BP.   BP relied on Transocean's commitments in contracting for use of the *Deepwater Horizon*.   Nevertheless, Transocean breached multiple obligations, leading to the Incident.

2993.   *First*, Transocean agreed that it "shall use all reasonable means to control and prevent fire and blowouts …" TREX 001356A at BP-HZN-MBI00021479 ¶ 15.2.   Transocean further agreed that it "shall exercise due diligence to prevent the well from blowing out."   *Id.* at BP-HZN-MBI00021480.

2994.   Transocean breached this contract provision by failing to properly monitor the well and exercise proper well control.   *See* § V.J.8.

2995.   *Second*, Transocean agreed to "maintain well control equipment in accordance with good oilfield practices at all times."   TREX 001356A at BP-HZN-MBI00021479.

2996.   Transocean breached this contract provision by failing to adequately maintain and test the Blue and Yellow control pods to assure functionality of the BOP's AMF/Deadman sequence.   *See* § VII.C.2.

2997.   *Third*, Transocean represented that its personnel "shall be fully qualified, trained, competent, able bodied and fit for their respective assignments and shall have complied with all necessary laws and regulations in connection therewith."   TREX 001356A at BP-HZN-MBI00021470.   Transocean also agreed that it would comply with SOLAS, which includes the ISM.   *Id.* at BP-HZN-MBI00021505.

2998.   Transocean's failure to have a clear command structure, to properly train Captain Kuchta, or to ensure that Captain Kuchta was properly qualified to be the master of the *Deepwater Horizon* all breach this contract provision.  *See* § IX.

2999.   Each of these contract breaches caused damage to BP.  Each was causal to the Incident, and if any of them had been rectified by Transocean then the Incident would not have occurred.  *See* §§ V.J.8; VII.D; IX.C.  Because of Transocean's repeated contract breaches, BP has suffered billions in damages.

### B.   Transocean Cannot Limit Its Liability Under Limitation Act.

#### 1.   Standards for Limiting Liability.

3000.   In a Limitation Act proceeding, the claimants bear the initial burden of proving that their injuries arose as a result of the owner's negligence or the vessel's unseaworthiness. *Coryell v. Phipps*, 317 U.S. 406, 409 (1943); *see also In re Port Arthur Towing Co.*, 42 F.3d 312, 317 (5th Cir. 1995); *Farrell Lines, Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir. 1976) (noting that initial burden lies with claimant); *In re Muer*, 146 F.3d 410, 415 (6th Cir. 1998); *Am. Dredging Co. v. Lambert*, 81 F.3d 127, 129 (11th Cir. 1996); *In re M/V Sunshine, II*, 808 F.2d 762, 765 (11th Cir. 1987); *Hercules Carriers,* 768 F.2d at 1563–64.

3001.   If the claimants satisfy their initial burden, then the burden shifts to the owner to prove a lack of "privity or knowledge" of the negligent act or unseaworthy conditions that resulted in the loss or damage. *Coryell*, 317 U.S. at 409; *Signal Int'l*, 579 F.3d at 496 ("Once a claimant proves that negligence or unseaworthiness caused an accident, an owner seeking limitation must show it lacked privity or knowledge of the condition.") (internal quotation omitted); *Hernandez v. M/V Rajaan*, 841 F.2d 582, 591 (5th Cir. 1988) ("The burden of establishing 'lack of privity or knowledge' is on the shipowner."); *Self v. Great Lakes Dredge & Dock Co.*, 832 F.2d 1540, 1558 (11th Cir. 1987); *In re Hellenic Lines, Ltd.*, 813 F.2d 634, 638

(4th Cir. 1987); *Oliver J. Olson & Co. v Luckenbach S.S. Co.*, 279 F.2d 662, 672 (9th Cir. 1960); *Christopher v. Grueby*, 40 F.2d 8, 14 (1st Cir. 1930); *In re The 84-H*, 296 F. 427, 432 (2d Cir. 1923); *In re Moran Towing Corp.*, 166 F. Supp. 2d 773, 775 (E.D.N.Y. 2001) ("Once the claimant has proved negligence or unseaworthiness, the burden of proof shifts to the petitioner shipowner to prove lack of knowledge or privity.").

3002.   "'Privity or knowledge' implies some sort of 'complicity in the fault that caused the accident.'"  *Brister*, 946 F.2d at 355.  "Knowledge, when the shipowner is a corporation, is judged not only by what the corporation's managing officers actually knew, but also by what they should have known with respect to conditions or actions likely to cause the loss."  *Trico Marine*, 332 F.3d at 789-90; *see also Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1473-74 (5th Cir. 1991).[42]  "For example, a corporate shipowner may be deemed to have constructive knowledge if the unseaworthy or negligent condition could have been discovered through the exercise of reasonable diligence."  *Brister*, 946 F.2d at 356.  Privity or knowledge "is deemed to exist if the shipowner has the means of obtaining knowledge, or if he would have obtained the knowledge by reasonable inspection."  *Id.* at 358.  "The corporate owner, therefore, must overcome a presumption not only that its officers and managers had actual knowledge, but also that they should have known of the unseaworthy or negligent condition that caused the

---

[42] *Suzuki of Orange Park, Inc. v. Shubert*, 86 F.3d 1060, 1064 (11th Cir. 1996) ("Over the years, however, the courts have broadened privity or knowledge to include constructive knowledge-what the vessel owner could have discovered through reasonable inquiry."); *In re Oil Spill by the Amoco Cadiz*, 954 F.2d 1279, 1303 (7th Cir. 1992) ("The recent judicial trend has been to enlarge the scope of activities within the 'privity or knowledge' of the shipowner, including ... requiring shipowners to exercise an ever-increasing degree of supervision and inspection."); *Hercules Carriers*, 768 F.2d at 1564, 1576 ("[P]rivity and knowledge is established where the means of obtaining knowledge exist, or where reasonable inspection would have led to the requisite knowledge."); *McNeil v. Lehigh Valley R.R. Co.*, 387 F.2d 623, 624 (2d Cir. 1967) ("Negligent failure to discover constitutes privity and knowledge within the meaning of the statute.").

injury." *Id.* at 356.  "Also, in situations resulting in loss of life or bodily injury, the knowledge of a seagoing vessel's master at the commencement of a voyage is imputed to the vessel's owner." *Trico Marine*, 332 F.3d at 790 (citing what is now 46 U.S.C. § 30506(e).

3003.   If the owner proves the lack of privity or knowledge, then liability is limited to the amount of the claim fund (also called the "limitation fund").  *Tittle v. Aldacosta*, 544 F.2d 752, 756 (5th Cir. 1977).  If the vessel owner does not satisfy its burden, then a court will deny a limitation of liability.

3004.   Furthermore, the Limitation Act does not apply to various types of claims.  "OPA has repealed the Limitation Act as to oil spill pollution claims arising under the OPA."  *In re Metlife Capital Corp.*, 132 F.3d 818, 821-22 (1st Cir. 1997); *see also In re Wilkie*, No. 3:11-cv-00205-HRH-JDR, 2012 WL 1918775, at *2-3 (D. Alaska May 24, 2012); SCHOENBAUM, ADMIRALTY & MAR. LAW § 15-8 ("The Limitation Act also does not apply to a vessel owner's liability for oil pollution damages under federal or state law... .").  "Personal contracts entered into by a vessel owner or bareboat charterer are not subject to limitation under the Act." *Mediterranean Shipping Co. S.A. Geneva v. POL-Atlantic*, 229 F.3d 397, 403 (2d Cir. 2000) (collecting cases).  "The test of the personal contract exception is not merely that the shipowner entered into the contract personally, but is whether the obligation (and therefore the breach) was one the shipowner was personally bound to perform, rather than one contemplated he would delegate to his agents and servants." *Id.*  For example, when "a vessel owner personally warrants the seaworthiness of the vessel, the owner has made a personal contract and is not entitled to limitation under the Act." *Id.*

### 2. Claimants Have Proven Both Unseaworthiness and Negligence by Transocean.

3005. Claimants have satisfied their initial burden of proving that the Transocean was negligent or the *Deepwater Horizon* was unseaworthy. Specifically, the *Deepwater Horizon* was unseaworthy because Captain Kuchta was not properly trained, not fit to be a master, and because Transocean's safety management system did not provide a clear statement of his authority as master. *See* § IX. Furthermore, Transocean did not properly maintain the BOP's control pods. *See* § VII.C.2. Transocean also was negligent because of its failure regarding Captain Kuchta, its inadequate maintenance of the BOP, and failure to monitor and control the well. *See* §§ VII; IX; V.J.8.

### 3. Transocean Had Knowledge and Privity of Negligent and Unseaworthy Conditions.

3006. Transocean has not carried its burden of showing that it had no knowledge or privity with at least some of the unseaworthy or negligent conditions.

3007. *First*, Transocean's failures regarding Captain Kuchta and his authority are chargeable to Transocean. Transocean implemented its dual command structure on board the *Deepwater Horizon* in a confusing manner. *See* § IX.A. *See Hercules Carriers*, 768 F.2d at 1572-73, 1576 (finding privity and knowledge where "the company's unwritten policy of placing the pilot rather than the master in ultimate command of the ship proximately contributed to the collision").

3008. Moreover, Transocean is charged with properly training Captain Kuchta and ensuring he knew how and when to EDS, along with being a qualified person-in-charge and having appropriate emergency management training. *See* § IX.C.3. *See, e.g.*, *Trico Marine*, 332 F.3d at 790 ("Diamond B knew, or should have known, that the MISS BERNICE was unseaworthy and that its captain was improperly trained."); *Hercules Carriers*, 768 F.2d at

1576-77 (finding privity and knowledge based on failure to properly train chief mate and failure of chief mate and second mate to be qualified by having proper licenses).

3009. *Second*, Transocean is also chargeable with knowledge of the inadequate maintenance and testing of the BOP. The deficiencies in the BOP's control pods were easily discoverable by Transocean through testing or inspection. *See* § VII.C. Transocean thus should have known of these deficiencies, and had knowledge of the Blue pod batteries being over 18 months overdue for replacement. *Brister*, 946 F.2d at 356, 358; *Trico Marine*, 332 F.3d at 789-90; *Pennzoil Producing*, 943 F.2d at 1473-74.

3010. Moreover, the failure of the BOP occurred because of failures in Transocean's policies. Transocean has failed to prove that it had a policy requiring testing of the batteries, testing of the solenoids, or testing of the AMF/Deadman function in general. *See* § VII.C.2. Indeed, the AMF/Deadman function on the *Deepwater Horizon* had not been tested in at least 8 years. *See* § VII.C.2.a.vi. Transocean is chargeable with knowledge and privity of its failure to have policies to ensure that the BOP's AMF/Deadman function operates properly. *Brister*, 946 F.2d at 356, 358; *Trico Marine*, 332 F.3d at 789-90; *Pennzoil Producing*, 943 F.2d at 1473-74.

3011. Thus, claimants have carried their burden of proving negligence and unseaworthiness. Transocean has failed to carry its burden of proving that it did not have privity or knowledge of any of these conditions. Therefore, Transocean cannot limit its liability.

## C. Transocean's Liability Under OPA.[43]

3012. The oil was discharged to water from the *Deepwater Horizon*'s riser system and BOP. The *Deepwater Horizon*'s BOP and riser are appurtenances of the larger *Deepwater*

---

[43]   BP acknowledges that on February 22, 2012, the Court held that Transocean is not a responsible party with respect to the discharge of oil that occurred beneath the surface of the water. *See* Rec. Doc. 5809 at 14-15. BP submits these proposed conclusions to facilitate its appellate rights.

*Horizon* vessel.  *See* § XVIII.A.1.  Accordingly, under OPA Section 2701(32)(A), Transocean – as both an owner and operator of the *Deepwater Horizon* vessel – is a "responsible party" under OPA. 33 U.S.C. § 2701(32)(A).

3013.   Notwithstanding its status as a responsible party, Transocean has invoked 33 U.S.C. § 2704, which applies to discharges of oil on or above the "surface of the water."  33 U.S.C. § 2704(b)(1).  Transocean contends that Section 2704(b)(1) should be read effectively to negate Section 2702(a)'s designation of Transocean as an OPA "responsible party."  Transocean's interpretation is not persuasive.

3014.   Section 2704(b)(1) does not expressly, or even by implication, state that MODU owners and operators are "not liable" for discharges below "the surface of the water."  Instead, Section 2704(b)(1) simply "deem[s a MODU] to be a tank vessel" for purposes of determining the applicable liability cap established by Section 2704(a).  33 U.S.C. § 2704(b)(1).

3015.   Critically, OPA's Section 2704(a) liability caps vary in dollar amount depending on the type of discharge source under the Section 2702 "responsible party" designation.  In particular, Section 2704(a) establishes liability caps set at different dollar liability levels for "the liability of a responsible party under Section 2702."  33 U.S.C. § 2704(a).  These dollar liability levels then vary depending on whether responsible party status is imposed based on an oil discharge (or threat of discharge) from –

• "a tank vessel," *see* 33 U.S.C. § 2704(a)(1);

• "any other vessel," *see* 33 U.S.C. § 2704(a)(2);

• "an offshore facility except a deepwater port," *see* 33 U.S.C. § 2704(a)(3);

• "any onshore facility and a deepwater port," *see* 33 U.S.C. § 2704(a)(4).

3016.   In this manner, a responsible party's liability cap critically depends on the specific type of vessel or facility in question.  *Compare* Section 1004(a)(1) (setting a pre-inflation cap for tank vessels of $1,900 to $3,000 per gross ton).

3017.   Against this backdrop, Section 2704(b)(1) simply defines a MODU as a "tank vessel" for purposes of identifying which item on Section 2704(a)(1)'s menu of liability caps applies.  Without Section 2704(b)(1), MODUs might arguably be treated as "other vessels" – not as "tank vessels" (since real world MODUs are not intrinsically tank vessels).  Alternatively, absent Section 2704(b)(1), MODUs might arguably be treated for liability-cap purposes as "offshore facilities."  *See* 33 U.S.C. § 2701(18) ("'[M]obile offshore drilling unit' means a vessel ... capable of use as an offshore facility.").  By including Section 2704(b)(1) in the statute, Congress clarified how the liability limits for MODU owners should be computed.  This straightforward interpretation confirms Section 2704(b)(1)'s limited but important role.  Read together, subsections 2704(b)(1) and 2704(b)(2) make clear that Section 2704(b)(1) provides a set of instructions for computing the applicable OPA cap for MODUs, which are otherwise both vessels and offshore facilities when being used for drilling for oil.

### D.   Transocean's Liability Under the Clean Water Act.

3018.   On February 19, 2013, the court approved a partial consent decree between Transocean and the United States.  *See generally* MDL 2179 Rec. Doc. 8608.  Pursuant to that consent decree, Transocean has agreed to pay a $1 billion fine under the CWA, 33 U.S.C. § 1321(b)(7).  *See id.* at 3, 9.

## XIX.   HALLIBURTON'S LIABILITY.

3019.   The PSC (on behalf of private plaintiffs), Alabama, and Louisiana brought claims against Halliburton under maritime law for negligence, gross negligence, and willful misconduct. Rec. Doc. 1128 ¶¶ 569-636; Rec. Doc. 1872 ¶¶ 94-135; Rec. Doc. 2031 ¶¶ 239-48.  Alabama and

Louisiana also brought claims against Halliburton under maritime for strict products liability. Rec. Doc. 1872 ¶¶ 186-204; Rec. Doc. 2031 ¶¶ 270-92.  BP brought claims against Halliburton for negligence, or gross fault and/or gross negligence if established by the evidence at trial.[44] Rec. Doc. 2082 ¶¶ 132-34.

3020.  This section discusses Halliburton's liability under maritime law.  The first subsection discusses Halliburton's liability for its defective cement job under the theories of negligence and strict liability.  The next subsection addresses the negligence of Halliburton's mud loggers in failing to properly monitor the well.

### A.      Halliburton Is Liable Under Maritime Law for Its Defective Cement Job.

### 1.      Halliburton Was Negligent in Designing the Cement Slurry.

3021.  Halliburton clearly had a duty to use reasonable care in designing and testing a stable cement slurry.  Halliburton's purpose as the cementing contractor for the Macondo well was to design a stable, functional cement slurry that would achieve zonal isolation.  *See* §§ II.D.4; IV.A.1.; VI.A.  Halliburton knew that the cement job was intended to be a barrier against the influx of hydrocarbons.  *See* § IV.A.1.  Therefore, it was foreseeable to Halliburton that if its cement job failed the result would be an oil spill that could harm those in and around the Gulf of Mexico.  *See* Rec. Doc. 4285 at 6; *Great Lakes*, 624 F.3d at 211; *Signal Int'l*, 579 F.3d at 491.

3022.  Halliburton breached this duty to use reasonable care in the design and testing of cement in two basic ways.  *First*, Halliburton failed to take reasonable measures to design a cement slurry.  In particular, Halliburton's foam slurry design included additives that would

---

[44] BP also brought claims for contribution and subrogation against Halliburton, which are discussed in § XXI.

destabilize the foam, including D-Air 3000 defoamer.[45]  *See* § VI.D.3.  *See Orduna*, 913 F.2d at 1154 (affirming negligence finding based on defective design of loading towers); *McIsaac v. Didriksen Fishing Corp.*, 809 F.2d 129, 132 (1st Cir. 1987) (affirming finding that helmsman's chair was negligently designed); *Jones v. Bender Welding & Mach. Works, Inc.*, 581 F.2d 1331, 1334-35 (9th Cir. 1978) (affirming finding that bracket assembly used on fishing vessel was negligent designed).[46]

3023.  *Second*, Halliburton failed to properly test the slurry to confirm that it was stable and could form a barrier against the influx of hydrocarbons.  *See* § VI.F.  *See Becker*, 586 F.3d at 373-74; *Watz*, 431 F.2d at 115.

3024.  Had the cement slurry been properly designed – or if Halliburton had properly tested the slurry, recognized it was unstable, and redesigned the slurry – then the Incident would not have occurred.  A properly designed foam slurry would have served as a barrier against hydrocarbons and a properly designed shoe track cement would also have served as a barrier.  *See* § VI.G.

---

[45]  The sanctions against Halliburton explained in § XIII.D. support that Halliburton breached its duty, but this conclusion would the same even if sanctions were not imposed against Halliburton.

[46]  *See also Connelly v. Hyundai Motor Co*., 351 F.3d 535, 541 (1st Cir. 2003) (jury found defendant liable for negligent design but not strict liability; jury had been instructed that, to find defendant liable for negligent design, it had to conclude that defendant failed to "design the vehicle … to avoid an unreasonable risk of injury to the occupant"; defendant argued that jury's verdicts were inconsistent and that it was therefore not liable for negligent design; court affirmed jury's verdict that defendant was liable for negligent design); *Gonzales v. Caterpillar Tractor Co.*, 571 S.W.2d 867, 871 (Tex. 1978) (holding that there was some evidence of negligent design in action to recover against manufacturer of "Caterpillar" tractor for back injuries suffered by plaintiff when he fell from a step on tractor where step was "unreasonably dangerous"); *Larsen v. Gen. Motors Corp.*, 391 F.2d 495, 502 (8th Cir. 1968) ("Where the manufacturer's negligence in design causes an unreasonable risk to be imposed upon the user of its products, the manufacturer should be liable for the injury caused by its failure to exercise reasonable care in the design.").

3025.   Therefore, Halliburton's failure to properly design or test the slurry was a proximate cause of the blowout, explosions, and oil spill.  *See*, *e.g.*, *Great Lakes*, 624 F.3d at 213-14; *Donaghey*, 974 F.2d at 649.

3026.   Thus, Halliburton's failure to properly design or test the cement slurry was negligent.  *See Theriot*, 245 F.3d at 400-01; *Gates*, 881 F.2d at 217-18; *Martin*, 742 F.2d at 249.

## 2.    Halliburton Is Strictly Liable for the Defective Cement Slurry.

3027.   Under maritime law, strict products liability requires proof that:  (1) the product was defective and unreasonably dangerous for its normal use; (2) the plaintiff was injured as a result of the defect; and (3) the defect existed at the time it left the defendant's control.  *Sullivan v. Rowan Companies, Inc.*, 952 F.2d 141, 148 (5th Cir. 1992); *Daigle v. L & L Marine Trans. Co.*, 322 F. Supp. 2d 717, 727 (E.D. La. 2004); *see also* SCHOENBAUM, ADMIRALTY & MAR. LAW § 5-7; 63 AM. JUR. 2D *Products Liability* § 513 (2010).   A product can be unreasonably dangerous if it was negligently or defectively designed.  SCHOENBAUM, ADMIRALTY & MAR. LAW § 5-7.[47]

3028.   Halliburton's cement slurry was defective and inadequately tested.  *See* §§ VI.D; VI.E; VI.F.  The defect existed at the time that Halliburton pumped its slurry.  *See* § VI.F.  That defect caused the cement to be unable to serve as a barrier to hydrocarbons, and thus was a proximate cause of the Incident.  *See* §§ VI.G; VI.J.

3029.   Therefore, Halliburton also is strictly liable under products liability for its defective and inadequately tested cement slurry.

---

[47]  Products liability claims can be brought both by users of the product as well as third-parties who are injured because of it.  *E.g.*, *Darryl v. Ford Motor Co.*, 440 S.W.2d 630, 633 (Tex. 1969); *West v. Caterpillar Tractor Co.*, 336 So. 2d 80, 89 (Fla. 1976).

## B.     Halliburton's Mud Loggers Failed To Properly Monitor The Well.

3030.   BP contracted with Halliburton to provide mud loggers on the *Deepwater Horizon* to perform various services including well monitoring.  Halliburton regards its mud loggers as "the first line of defense," because it is their responsibility to continuously monitor the well for any sign of a hazardous or unusual condition.  *See* § II.D.1.  The mud loggers' primary function under the BPXP-HESI Well Services Contract is well monitoring and safety.  *See* § II.D.1  Kicks are not uncommon while drilling and, if not detected, can develop into a blowout.  *See* § II.C.5.a. Thus, a blowout and oil spill is a foreseeable consequence of Halliburton failing to properly monitor the well.  Therefore, Halliburton had a duty to monitor the well.  *See, e.g.*, *The Oregon*, 158 U.S. at 193-94; *United Overseas*, 785 F.2d at 1326; *Phillips Petroleum*, 863 F.2d at 1255; *Simon*, 341 F.3d at 203; *Huber*, 838 F.2d at 400-01; *Chotin Transp.* 819 F.2d at 1347-48.

3031.   The appropriate standard of care is for a mud logger to continuously monitor the well and immediately alert the drilling upon detecting any anomalous drilling data.  *See* § II.D.2.

3032.   Halliburton breached that duty on the night of the April 20, 2010, as it failed to alert the drill shack to a series of anomalies that indicated a kick.  *See* § V.J.8.  *See, e.g.*, *The Oregon*, 158 U.S. at 193-94; *United Overseas*, 785 F.2d at 1326; *Phillips Petroleum*, 863 F.2d at 1255; *Simon*, 341 F.3d at 203; *Huber*, 838 F.2d at 400-01; *Chotin Transp.* 819 F.2d at 1347-48.

3033.   Furthermore, this failure was a cause of the Incident.  Had Halliburton notified the driller of the anomalies that were kick indicators, then the well could have been shut in and the Incident avoided.  *See* § V.J.8  *See*, *e.g.*, *Great Lakes*, 624 F.3d at 213-14; *Donaghey*, 974 F.2d at 649.

3034.   Therefore, Halliburton was negligent in failing to properly monitor the well.

## XX.   TRANSOCEAN AND HALLIBURTON CANNOT OBTAIN INDEMNITY FROM BP.

3035.   Both Transocean and Halliburton in their complaints seek indemnity from BP, Rec. Doc. 2068 ¶¶ 88-114, JPML MDL No. 2179, Rec. Doc. 737, and filed motions seeking summary judgment on their indemnity claims, Rec. Docs. 4457, 4767.   BP opposed both motions and argued that the two contractors were not entitled to indemnity for a variety of reasons, Rec. Docs. 4826, 4977, and the Court ruled on both motions, Rec. Docs. 5446, 5493.   This Section begins by reviewing the legal bases for voiding, discharging, or otherwise avoiding an indemnity.   Applying these principles to the facts here, neither Transocean nor Halliburton are entitled to indemnity from any BP entity.

### A.      Bases For Invalidating Indemnities.

#### 1.      Material Breach of Contract.

3036.   A breach of contract can, in some circumstances, invalidate an indemnity clause. Rec. Doc. 5446 at 24.   In a case that applied New York law, the Fifth Circuit explained that interpreting a contract to require indemnification even for breaches of the contract itself would cause the entire contract to become void for lack of mutuality: "[the indemnitee] would have no obligations under the contract; it could breach the contract in any way and to any extent and [the indemnitor] would be liable to itself! This interpretation would be ridiculous."   *Id.* (quoting *Mobil Chem. Co. v. Blount Bros. Corp.*, 809 F.2d 1175, 1182 (5th Cir. 1987) and citing *Marquette Transp. Co. v. La. Mach. Co.*, 367 F.3d 398, 408 (5th Cir. 2004) ("If [the indemnitee] had been found to be in breach of [its warranty duties under the contract], perhaps our application of the indemnity clause would be different.")); *see also Pettus v. Grace Line, Inc.*, 305 F.2d 151, 153-54 (2d Cir. 1962); *Jackson v. Lloyd Brasileirs Patrimonio Nacional*, 324 F. Supp. 556, 562 n.9 (S.D. Tex. 1970); *New Eng. Tel. & Tel. Co. v. Cent. Vt. Pub. Serv. Corp.*, 391

644

F. Supp. 420, 429-30 (D. Vt. 1975); *Schmahl v. Macy's Dep't Stores, Inc.*, No. CV-09-68-EFS, 2010 WL 3061526, at *5 (E.D. Wash. July 30, 2010); 42 C.J.S. *Indemnity* § 61. *Cf. In re Torch, Inc.*, Nos. 94-26300, 95-1982, 1996 WL 185765, at *10 (E.D. La. Apr. 16, 1996) (whether party had breached contract and whether that breach should discharge an indemnity raised factual questions precluding summary judgment).

3037.   The provisions of a contract requiring indemnification for "breach of contract" do not change this conclusion.  The phrase "breach of contract" is best read as referring to breach of some other contract, not the indemnity contract itself.  If the parties meant the same contract containing the indemnities, they would not refer generically to a breach "of contract," but instead would have specified "this contract."  Moreover, a party generally "may not breach a contract and then rely on an indemnity provision to hold itself harmless."  *Schmahl*, 2010 WL 3061526 at *5 (internal quotation marks omitted).  Indeed, as explained in *Mobil*, interpreting the term "breach of contract" to immunize a party from breaches of the contract containing the indemnities would cause the entire contract to become void.  809 F.2d at 1182.

3038.   Not every breach of contract will void the indemnity.  Rec. Doc. 5446 at 24. Instead, the breach must be material, or as this Court has stated, a "breach of a fundamental, core obligation of the contract could invalidate this indemnity clause."  *Id.* at 25.

3039.   A material breach includes a failure to "perform a substantial part of the contract or one or more of its essential terms or conditions," a failure "to do something that is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract," or where "the breach is such that upon a reasonable interpretation of the contract, the parties considered the breach as vital to the existence of the contract."  23 WILLISTON ON CONTRACTS § 63:3 (4th ed. 2009) (listing various other similar formulations of

material breach).  "In many cases, a material breach of contract is proved by the established amount of the monetary damages flowing from the breach."  *Id.*  Under standard contract law, a "party who first commits a material breach cannot enforce the contract."  *Id.*

### 2.    Material Increase in Risk or Prejudicing Rights.

3040.  This Court has recognized that "an act on the part of an indemnitee which materially increases the risk or prejudices the right of the indemnitor will discharge the indemnitor to the extent that he has been damaged as a result of that act."  Rec. Doc. 5446 at 24 (quoting *Gen. Ins. Co. of Am. v. Fleeger*, 389 F.2d 159, 161 n.3 (5th Cir. 1968)); *see also Hiern v. St. Paul-Mercury Indem. Co.*, 262 F.2d 526, 529 (5th Cir. 1959); *Cravens v. Smith*, 610 F.3d 1019, 1028 (8th Cir. 2010) (quoting cases relying on *Hiern* that there is a "general rule of law that any acts on the part of any indemnitee which materially increases the risk, or prejudices the rights, of the indemnitor, will discharge the indemnitor under the contract of indemnity.") (internal quotation marks and brackets omitted); *Rochelle Bail Agency, Inc. v. Md. Nat'l Ins. Co.*, 484 F.2d 877, 879 (7th Cir. 1973); *Am. Cas. Co. of Reading, Pa. v. Idaho First Nat'l Bank*, 328 F.2d 138, 142-43) (9th Cir. 1964) (citing *Hiern* and describing the principle as a general rule of law applicable in indemnity cases); *Dana Corp. v. Fireman's Fund Ins. Co.*, 169 F. Supp. 2d 732, 743 (N.D. Ohio 1999); *Unisys Corp. v. Legal Counsel, Inc.*, 768 F. Supp. 6, 8 (D.D.C. 1991) ("It is well established that any act on the part of an indemnitee which materially increases the risk, or prejudices the rights of the indemnitor, will discharge the indemnitor under a contract of indemnification."); 42 C.J.S. *Indemnity* § 61.

3041.  *Rochelle Bail Agency, Inc. v. Md. Nat'l Ins. Co.*, 484 F.2d 877, 879 (7th Cir. 1973) illustrates this principle.  In *Rochelle*, the defendant Maryland National Insurance Company ("Maryland") contacted Rochelle Bail Agency, Inc. ("RBA") to provide bail for a prisoner.  RBA agreed to do in exchange for "a complete indemnity from Maryland to hold the

plaintiff [RBA] harmless against loss should [the prisoner] flee." 484 F.2d at 878. After Maryland agreed to this indemnity, RBA "exercised no form of supervision over" the prisoner. *Id.* The prisoner fled and his bond was forfeited.

3042. RBA made a demand on Maryland under its indemnity agreement, and Maryland refused to indemnify RBA. The district agreed with Maryland that RBA's failure to supervise the prisoner (named Kaminsky) discharged Maryland's indemnification obligation:

> Upon these undisputed facts, the district court ruled that Rochelle had breached its duty as a bail bondsman to supervise Kaminsky and insure his presence in the federal court action. It further held that the plaintiff's failure to supervise Kaminsky materially increased Maryland's risks under the indemnity agreement, thereby discharging Maryland from its obligations thereunder.

*Id.* The Seventh Circuit affirmed the district court, specifically rejecting RBA's arguments that it did not owe a duty to supervise the prisoner to Maryland as an indemnitor. The Circuit court concluded that RBA's "breach of its duty to maintain some supervision over Kaminsky increased Maryland's risk under the indemnity agreement, and thereby extinguished its obligation thereunder." *Id.*

3043. The rule is grounded in policy considerations related to the moral hazard that would be created if indemnities were applied without regard to the way an indemnitee increased risks of loss. If that were the rule, indemnitees would be freed of a crucial incentive for avoiding risky behavior – including conduct that might injure numerous innocent third parties. *See generally Harley-Davidson, Inc. v. Minstar, Inc.*, 41 F.3d 341, 343 (7th Cir. 1994). Concern for such moral hazard is particularly acute here given that maritime law seeks to deter conduct that may result in injuries to seamen. *See, e.g.*, *Italia Societa*, 376 U.S. at 324.

3044. As with contract breaches, not every act increasing the indemnitor's risk will void the indemnity. Rec. Doc. 5446 at 24. Instead, the act must be a material increase in risk or prejudicing of the indemnitor's rights.

### 3. Intentional or Willful Misconduct, Including Fraud.

3045. The Court has previously held "that fraud could void an indemnity clause on public policy grounds, given that it necessarily includes intentional wrongdoing." Rec. Doc. 5493 at 5. The prohibition on indemnification for fraud is a specific application of the rule that intentional or willful misconduct cannot be indemnified. *See, e.g., Amoco Prod. Co. v. Forest Oil Corp.*, 844 F.2d 251, 254 (5th Cir. 1988); *Diamond Crystal Salt Co. v. Thielman*, 395 F.2d 62, 65 (5th Cir. 1968); *Harris v. Howard Univ., Inc.*, 28 F. Supp. 2d 1, 13-14 (D.D.C. 1998).

### 4. Punitive Damages/Penalties.

3046. BP does not owe indemnity for punitive damages. Rec. Doc. 5446 at 18-19, 29; Rec. Doc. 5493 at 3-4.

3047. BP does not owe indemnity for fines or penalties whose primary objective is punishment and deterrence, including penalties under the CWA. Rec. Doc. 5446 at 19-20, 29; Rec. Doc. 5493 at 4.

### 5. Gross Negligence.[48]

3048. Under maritime law, a contract that purports to indemnify a party for its gross negligence is void as contrary to public policy. In *Becker v. Tidewater, Inc.*, 586 F.3d 358 (5th Cir. 2009), the Fifth Circuit made clear the rule that an indemnitor "escapes indemnity" if an indemnitee's actions "were grossly negligent" and rooted that result in the principle that "a waiver of liability for gross negligence is void." *Id.* at 367; *accord Todd Shipyards*, 674 F.2d at 411; *Nexen Petroleum U.S.A., Inc. v. Sea Mar Div. of Pool Well Servs. Co.*, 497 F. Supp. 2d 787 (E.D. La. 2007); *Marquette Transp. Co. v. La. Mach. Co.*, No. 00-1504, 2002 WL 1809092, at

---

[48]   BP acknowledges that the Court has ruled that gross negligence does not invalidate an indemnity under maritime law. Rec. Doc. 5446 at 29; Rec. Doc. 5493 at 3. BP submits these proposed conclusions to facilitate its appellate rights.

*18 (E.D. La. Aug. 7, 2002), *aff'd in part and rev'd in part on other grounds*, 367 F.3d 398 (5th Cir. 2004); *Energy XXI, GoM, LLC v. New Tech Eng'g, L.P.*, 787 F. Supp. 2d 590, 609-11 (S.D. Tex. 2011); *Broadley v. Mashpee Neck Marina, Inc.*, 471 F.3d 272, 274-75 (1st Cir. 2006); *Sander v. Alexander Richardson Invs.*, 334 F.3d 712, 717 n.3 (8th Cir. 2003); *Royal Ins. Co. of Am. v. Sw. Marine*, 194 F.3d 1009, 1016 (9th Cir. 1999); *La Esperanza de P.R., Inc., v. Perez y Cia de P.R., Inc.*, 124 F.3d 10, 19 (1st Cir. 1997).

3049.   Gross negligence invalidates both "indemnities" (where the parties to the contract allocate the costs of third parties among the contracting parties) and "releases" (where the parties to the contract allocate the costs of the contracting parties among themselves).  For example, in *Becker*, before ultimately finding that there had been no gross negligence, the court held that gross negligence would void an indemnity for third-party costs.  The issue was whether one contracting party (Baker) would have to indemnify the other party (Tidewater) for injuries to an employee (Seth Becker) – a "third party."  The Fifth Circuit made clear the rule that "Baker escapes indemnity if Tidewater's actions leading to Seth's injuries were grossly negligent" and squarely grounded that result in the principle that "a waiver of liability for gross negligence is void."  586 F.3d at 367 (citing *Houston Exploration Co. v. Halliburton Energy Servs., Inc.*, 269 F.3d 528, 531 (5th Cir. 2001)).

3050.   *Nexen Petroleum U.S.A., Inc. v. Sea Mar Div. of Pool Well Servs. Co.*, 497 F. Supp. 2d 787 (E.D. La. 2007), similarly held that a party cannot be indemnified for damage to third parties resulting from its own gross negligence.  Nexen Petroleum had contracted with Sea Mar to support offshore drilling operations.  After Sea Mar's vessel allided with the drilling vessel, Sea Mar claimed that Nexen Petroleum was contractually obligated to indemnify it for the damages sustained by two third parties: the owner of the drilling vessel (Global) and the

owner of the well hole (Nexen Offshore).  *Id.* at 799.  After noting that the "Fifth Circuit has also endorsed the view that under the general federal maritime law, a party may not contractually stipulate out of liability for its gross negligence," *id.,* the court endorsed the rule that "gross negligence is a defense to the enforcement of the exculpatory/indemnification clauses" and held that gross negligence "is another reason why Sea Mar is not entitled to summary judgment on Nexen Petroleum's claim for lost charter hire paid to Global [*i.e.*, Global's economic damages], nor on Nexen Offshore's claim for damage to its well hole." *Id.* at 799 n.33.

3051.  Cases from jurisdictions other than maritime law likewise hold that gross negligence invalidates both "indemnities" and "releases."  *E.g., Caldwell v. Enyeart*, No. 94-1406, 1995 WL 807110, at *4 (6th Cir. Dec. 8, 1995) (unpub.) (Mich. law); *S. Ry. Co. v. Foote Mineral Co.*, 384 F.2d 224, 226 (6th Cir. 1967) (Tenn. law); *Ala. Great S. R.R. Co. v. Louisville & Nashville R.R. Co.*, 224 F.2d 1, 4 (5th Cir. 1955); *CSX Transp., Inc. v. Mass. Bay Transp. Auth.*, 697 F. Supp. 2d 213 (D. Mass. 2010) (Mass. law); *Harris*, 28 F. Supp. 2d at 14-15; *In re Firstline Corp.*, No. 06-70145-JDW, 2007 WL 269086, at *2-3 (Bankr. M.D. Ga. Jan. 25, 2007); *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 893 (Tenn. 2002); *Britt v. May Dep't Stores Co.*, No. 94-3112, 1994 WL 585930, at *3 (E.D. Pa. Oct. 14, 1994); *Albert Trostel & Sons Co. v. Canadian Imperial Bank of Commerce*, No. 82C7536, 1984 WL 868, at *2 (N.D. Ill. Aug. 21, 1984) (Wisc. law).

## B.  Transocean Is Not Entitled to Indemnity from BP.

### 1.  Transocean Breached Its Fundamental Contract Obligations.

3052.  Transocean materially breached three groups of contract provisions in its Drilling Contract with BPAP:

- Transocean "shall use all reasonable means to control and prevent fire and blowouts," TREX 001356A at BP-HZN-MB100021479-8, and "shall

exercise due diligence to prevent the well from blowing out," id. at BP-HZN-MB100021480.

- Transocean "shall maintain well control equipment in accordance with good oilfield practices at all times," *id.* at BP-HZN-MB100021479-80.

- Transocean "represents that all of [its] personnel shall be fully qualified, trained, competent, able bodied and fit for their respective assignments and shall have complied with all necessary laws and regulations in connection therewith." Transocean further represented that the *Deepwater Horizon* would comply with SOLAS, including the ISM. *Id.* at BP-HZN-MB100021477-78, at BP-HZN-MB100021505.

3053. As the Court has previously recognized, not every contract breach will discharge an indemnity. Rec. Doc. 5446 at 25. BP is not relying on technical violations of the contract, breaches that would be expected to have minor consequences, or violations that have only a tenuous connection to the Incident. Instead, the categories of contractual terms BP relies on share several characteristics that would make the breach of any one of them the "breach of a fundamental, core obligation of the contract." Rec. Doc. 5446 at 25. *First*, each one is an essential term of the contract, the breach of which would defeat the purpose of the contract, and is vital to the existence of the contract. *Second*, each imposes a clear and specific obligation. *Third*, these terms are not mere boilerplate or ancillary terms that generally included in all contracts. *Fourth*, breach of each of these terms would be expected to result in substantial damage, and in fact their breach has cost BP billions of dollars to control the spill and compensate losses. *Fifth*, Transocean's breach of these provisions was particularly significant, further reinforcing the materiality and fundamental nature of the breach.

### 2. Transocean Materially Breached Its Fundamental Contract Obligations to Exercise Due Diligence and Use Reasonable Means to Control and Prevent Blowouts.

3054. *First*, requiring that Transocean use reasonable means to control and prevent fire and blowouts and exercise due diligence to prevent blowouts is an absolutely necessary term of

the contract.  The purpose of the contract is for BP to hire Transocean's *Deepwater Horizon* to drill wells.  Kicks are a natural and inevitable occurrence in offshore drilling, and the only way to avoid having kicks develop into blowouts is through continuous well monitoring and proper well control measures with properly maintained and appropriate well control equipment.  *See* § II.C.5.a.  If Transocean did not use reasonable means and due diligence to prevent blowouts, such as by constantly monitoring the well for kicks and taking appropriate well control measures, then drilling the well would be literally impossible.  Thus, these terms are essential provisions of the contract and their breach would defeat the Drilling Contract's purpose.

3055.  Similarly, the terms are vital to the existence of the contract.  Transocean owns the *Deepwater Horizon* and employs its crew.  Thus, Transocean is in the best position to monitor the well through its drillers, and is the only party that can be expected to exercise proper well control under typical conditions.  The industry standard is for the drilling contractor to both monitor the well and exercise well control as necessary.  *See* § V.J.8.  Given the likelihood of kicks and the consequences of a blowout, Transocean's contractual duty to monitor the well is vital to the Drilling Contract.

3056.  ***Second***, the terms regarding avoiding blowouts create clear and specific contractual obligations.  BP is not seeking to show material breach based on broad and general provisions, such as that Transocean must conduct safe operations.  Such broad provisions might create debate and disputes about what they require.  By contrast, Transocean had no doubt about what using "all reasonable means to control and prevent fire and blowouts" and exercising "due diligence to prevent the well from blowing out" meant.  Against the background of industry practice, what these terms required was clear:  continuous monitoring of the well and the use of

standard well control measures, such as conducting flow checks and shutting in the well if flow is detected.  *See* § II.C.4.

3057.  ***Third***, and similarly, these terms are not mere boilerplate included in every contract.  Nor are they minor terms to which a contracting party may not pay attention.  Instead, this is a particular and important term that would be negotiated and included only in certain contracts.  Once again, this reinforces that Transocean should have understood that the provisions requiring due diligence and the use of reasonable means to prevent and control blowouts were of particular significance.

3058.  ***Fourth***, the likely damages that would be caused by breach are particularly substantial.  Kicks are prevalent in offshore drilling.  If Transocean failed to use due diligence and reasonable means to prevent and control blowouts, then the likely result would be causing an oil spill that could significantly damage the environment and cause harm to individuals, businesses, and other entities.  Indeed, Transocean's breach resulted in BP having to make billions in payments to control the spill and compensate claimants.  Transocean must have understood that complying with this contract provision thus was particularly important.

3059.  ***Fifth***, Transocean's breach of these provisions was particularly substantial. Transocean breached its duty to monitor the well by missing multiple obvious kick indicators. *See* § V.J.8.  Likewise, Transocean's failure to exercise well control also was significant, particularly given that Transocean had multiple opportunities to stop the blowout.  *See* § V.J.8.

3060.  Each of these well monitoring and well control failures was causal to the Incident. *See* § V.J.8.

3061.  Thus, Transocean materially breached the Drilling Contract terms that Transocean "shall use all reasonable means to control and prevent fire and blowouts," TREX 001356A at

BP-HZN-MBI00021479-80, and "shall exercise due diligence to prevent the well from blowing out," *id.* BP-HZN-MBI00021480.  Given the nature of these contract provisions and the severity of Transocean's breaches, these material breaches discharge any obligation BPAP had to indemnify Transocean.

### 3. Transocean Materially Breached Its Fundamental Contract Obligation to Maintain Well Control Equipment.

3062.  ***First***, Transocean's obligation that it "shall maintain well control equipment in accordance with good oilfield practices at all times," TREX 001356A at BP-HZN-MBI00021479-80, is an essential term of the contract.  Transocean can prevent and control blowouts only if it properly maintains and tests its well control equipment, including the BOP.  If this equipment is poorly maintained or inadequately tested, it will not be able to control kicks and prevent blowouts.  *See* § VII.C.2.a.vii.  If kicks cannot be controlled, then the vessel cannot drill – which is the purpose of the contract.  Likewise, the requirement to maintain the BOP and other well control equipment is vital to the contract's existence, as the parties would not be able to use the *Deepwater Horizon* for drilling if its BOP was ineffective due to inadequate maintenance and deficient testing.

3063.  ***Second***, in addition, the contractual term creates a specific and clear obligation.  It directs Transocean to maintain a limited group of equipment on the rig in accord with industry standards, *i.e.*, good oil field practices.  Thus, Transocean knew or should have known what was required of it under this provision.

3064.  ***Third***, as with the well control provisions, the requirement to properly maintain well control equipment is not boilerplate or an ancillary term that appears across all contracts.  Instead, it is specific to drilling contracts and put Transocean on notice that this is a material, and indeed essential, term of the Drilling Contract.

3065.   *Fourth*, breach of the term would be expected to cause substantial damage.  If the well control equipment is not properly maintained, it cannot control kicks.  If the equipment cannot control kicks, they will develop into blowouts.  *See* § II.C.5.  Thus the foreseeable result of failing to properly maintain the equipment is a blowout and oil spill.  This is true for the functions of the BOP that are frequently used, such as the annulars, and is just as true for emergency systems such as the AMF/Deadman.  In fact, Transocean's breach caused billions of dollars in damages to BP.

3066.   *Fifth*, Transocean's breach of its obligation to maintain the well control equipment was serious, including by causing a BOP emergency function with built-in redundancies to fail.  *See* § VII.C.

3067.   Each of these failures to maintain the BOP was causal to the Incident.  *See* § VII.D.

3068.   Thus, Transocean materially breached the Drilling Contract term that Transocean "shall maintain well control equipment in accordance with good oilfield practices at all times." *Id.* TREX 001356A at BP-HZN-MBI00021479-80.  Given the nature of these contract provisions and the severity of Transocean's breaches, these material breaches discharge any obligation BPAP had to indemnify Transocean.

### 4.   Transocean Materially Breached Its Fundamental Contract Obligation to Properly Train and Qualify Its Captain.

3069.   *First*, Transocean's representation that "all of [its] personnel shall be fully qualified, trained, competent, able bodied and fit for their respective assignments and shall have complied with all necessary laws and regulations in connection therewith" and that it would comply with SOLAS, which includes the ISM, are essential terms of the Drilling Contract. TREX 001356A at BP-HZN-MBI00021470, BP-HZN-MBI00021479, BP-HZN-MBI00021505.

The contract's purpose was to use the *Deepwater Horizon* to drill offshore wells to explore for oil. Drilling wells requires a properly trained crew, including to sail the vessel and actually conduct the drilling. In particular, a vessel requires a competent and qualified master with clear authority. Without a qualified crew, the purpose of the contract could not be fulfilled. Similarly, the term requiring a properly qualified crew is vital to contract.

3070. **Second**, this provision is clear and specific, requiring that the crew be qualified and trained for their particular assignments, and that they comply with all necessary regulations. Once again, this is not a general or ambiguous provision that could result in debate about what Transocean's obligations were. Instead, Transocean was clearly on notice as to its contractual obligations under this provision.

3071. **Third**, this term is not simply boilerplate, or a provision unrelated to the objectives of the contract. Having a fully qualified crew is critical to the functioning of the vessel and drilling for oil. Including the provision in the contract emphasized the importance to Transocean of having a properly qualified and trained crew.

3072. **Fourth**, Transocean's particular breach of this provision by having an insufficiently trained master operating in a confusing command structure would exacerbate perils. Vessels, including drilling vessels, are likely to encounter emergencies that require a firm and decisive hand to avoid disaster. Because of the likelihood of an emergency at sea or while drilling, an indecisive or poorly trained master will be unable to prevent or mitigate dangers, resulting in serious consequences. In fact, Transocean's failures regarding Captain Kuchta cost BP billions in damages.

3073.   *Fifth*, the particular breaches of these provisions here were substantial, as Captain Kuchta's authority was confused and he was inadequately trained in the basic requirements of handling an emergency.  *See* §§ IX.C.2; IX.C.3.

3074.   Each of these failures to have a properly trained and qualified master with clear authority was causal to the Incident.  *See* § IX.C.1.

3075.   Thus, Transocean materially breached the Drilling Contract term that Transocean "represents that all of [its] personnel shall be fully qualified, trained, competent, able bodied and fit for their respective assignments and shall have complied with all necessary laws and regulations in connection therewith" and the representation that the *Deepwater Horizon* would comply with SOLAS, including the ISM.  *Id.* BP-HZN-MBI00021470, BP-HZN-MBI00021479, BP-HZN-MBI00021505.   Given the nature of these contract provisions and the severity of Transocean's breaches, these material breaches discharge any obligation BPAP had to indemnify Transocean.

### 5.   Transocean Materially Increased the Risk to BPAP as Indemnitor.

3076.   Although the principle that an act by the indemnitee that materially increases the risk of indemnitor does not require the breach of a contract provision, for Transocean the same acts that breached the Drilling Contract also increased BPAP's risk as indemnitor.   For largely the same reasons that these acts materially breached the Drilling Contract, these acts also materially increased the risk to BPAP as indemnitor.

3077.   *First*, Transocean's serious failures to monitor and control the well materially increased BP's risk.   Industry standards, Transocean's own policies, and Transocean's contractual obligations to BP all established that Transocean was required to continuously monitor the well and take reasonable well control measures.  *See* §§ V.J.8; II.C.4.  BP depended, and was entitled to rely on, Transocean to fulfill these duties and so avoid a blowout and oil spill.

*See* § II.C.1.  Thus, Transocean's compliance with these obligations set the baseline amount of risk that BPAP incurred by indemnifying Transocean.  Instead of fulfilling its obligations that set the standard for the amount of risk, Transocean substantially deviated from and violated these obligations and expectations.  *See* § V.J.8.  This caused BPAP to incur far greater risk than what would have been objectively expected if Transocean had complied with the requirements to properly monitor and control the well.  *See* § II.C.4.

3078.  Thus, Transocean's acts of failing to properly monitor and control the well materially increased BPAP's risk as indemnitor and discharge any obligation of BPAP to indemnify Transocean.

3079.  **Second**, industry standards, Cameron's recommendation, and Transocean's contractual obligations to BP all established that Transocean was required to properly maintain the BOP, which includes maintaining the AMF/Deadman function.  *See* § II.C.  BP depended, and was entitled to rely, on Transocean to fulfill these duties and to stop a blowout and oil spill.  *See* §§ II.B; II.C.1.  Thus, Transocean's compliance with these obligations set the baseline amount of risk that BPAP incurred by indemnifying Transocean.  Instead of fulfilling its obligations that set the standard for the amount of risk, Transocean significantly deviated from these obligations and expectations.  *See* § VII.C.  This caused BPAP to incur far greater risk than if Transocean had properly maintained the BOP.

3080.  Transocean's failure to properly maintain the BOP materially increased BPAP's risk as indemnitor and thus discharges any obligation of BPAP to indemnify Transocean.

3081.  **Third**, Transocean's failure to properly articulate Captain Kuchta's authority and its inadequate training materially increased BPAP's risk as indemnitor.  Transocean was required to have a properly trained and qualified master.  *See* § IX.A.  BPAP's expected amount of risk in

extending the indemnities was premised on the *Deepwater Horizon* having a qualified master with proper authority.  Transocean violated this obligation and expectation, *see* § IX, imposing on BPAP substantially greater risks.

3082.   Therefore, Transocean's failure to have a qualified master commanding the *Deepwater Horizon* materially increased BPAP's risk as indemnitor and thus discharges any obligation of BPAP to indemnify Transocean.

> ### 6.      Transocean Is Not Entitled to Indemnity If It Acted With Gross Negligence or Willful Misconduct.

3083.   As described in §§ XX.A.3; XX.A.5, if Transocean is found grossly negligent or to have engaged in willful misconduct, then BPAP should not be required to indemnify Transocean.

> ### 7.      Transocean Is Not Entitled to Indemnity Under The Language Of The Drilling Contract.[49]

3084.   Paragraph 24.2 of the Drilling Contract defines BPAP's duty to indemnify Transocean for pollution losses, and by its terms does not extend to pollution caused by Transocean's gross negligence or conduct for which Transocean is strictly liable, such as violations of OPA or the duty to provide a seaworthy vessel.  The paragraph states that BPAP will indemnify Transocean "without regard for *negligence* of any party or parties and specifically without regard for whether the pollution ... is caused in whole or in part by the *negligence or fault* of contractor."   TREX 001356A at BP-HZN-MBI00021488-9 (emphases added).   By specifying that the indemnity covers "negligence" or "fault," the parties did not extend it to cover the distinct concepts of strict liability or gross negligence.  Where the parties have specified

---

[49]  BP acknowledges that the Court has ruled that the language of the Drilling Contract's pollution indemnity covers strict liability or gross negligence.  Rec. Doc. 5446 at 29; Rec. Doc. 5493 at 5-10.  BP submits these proposed conclusions to facilitate its appellate rights.

particular causes of loss that are covered by an indemnity, the indemnity cannot be expanded to cover *other* causes not within the natural meaning of the terms the parties have chosen.  *See, e.g.*, *Babcock v. Cont'l Oil Co.*, 792 F.2d 1346, 1350-51 (5th Cir. 1986); *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 332-33 (5th Cir. 1981); *see also Smith v. Tenneco Oil Co.*, 803 F.2d 1386, 1388 (5th Cir. 1986).

3085.   That textual limitation in Paragraph 24.2 is further reinforced by the rule under maritime law that an "extraordinary obligation" in an indemnity must be "clearly express[ed] ... in unequivocal terms."  *Corbitt*, 654 F.2d at 333.  Accordingly, courts in this district have held that "silence dictates ... exclusion" of gross negligence from an indemnity, and specifically has held that terms similar to those in Paragraph 24.2 indemnifying in the event of the indemnitee's "fault or liability" do not cover gross negligence.  *See Torch*, 1996 WL 185765 at *8-9; *see also In re TT Boat Corp.*, No. 98-0494, 98-1109, 1999 WL 1442054, at *6 (E.D. La. Sept. 8, 1999); *Nat'l R.R. Passenger Corp. v. Consol. Rail Corp.*, 698 F. Supp. 951, 954, 972 (D.D.C. 1988), *rev'd on other grounds,* 892 F.2d 1066 (D.C. Cir. 1990).  And the Fifth Circuit, applying Delaware law, has held that the logic demanding "clear and unequivocal" language to cover negligence applies equally to strict liability.  *See Fina, Inc. v. ARCO*, 200 F.3d 266, 271 (5th Cir. 2000).

3086.   Paragraph 25.1 defines the phrase "shall protect, release, defend, indemnify and hold harmless" to provide an indemnity covering losses caused by, *inter alia*, gross negligence, strict liability claims, and unseaworthiness.  But Paragraph 25.1 makes clear that this definition is solely a fallback that applies "*[e]xcept* to the extent any such [indemnity] obligation is specifically limited to certain causes elsewhere in this contract."  TREX 001356A at BP-HZN-MBI00021489-90 (emphasis added).  Paragraph 24.2 has precisely such a specific limitation, as

it provides an indemnity for pollution losses caused by "negligence or fault" without including other causes.  By its own terms, the fallback definition in Paragraph 25.1 does not displace the more specific scope for the indemnity identified in Paragraph 24.2.

### 8.    Transocean Cannot Recover Defense Costs From BPAP.

3087.  This Court has previously held that under the Drilling Contract "the duties to defend and indemnify are to be treated identically."  Rec. Doc. 5446 at 28.

3088.  Because Transocean is not entitled to indemnification, Transocean also is not entitled to defense costs.

### C.    Halliburton Is Not Entitled to Indemnity From BP.

### 1.    Halliburton Breached its Fundamental Contract Obligations.

3089.  Halliburton materially breached three groups of contract provisions in its Well Services Contract with BPXP:

- Halliburton shall "provide cementing materials, engineering, mixing and pumping services, hereinafter referred to as 'Cementing Services' as defined herein, which shall include but not be limited to: '1.1.1 Primary cementing of all casing strings.'"

TREX 004477 at BP-HZN-2179MDL00055649.

> Halliburton "shall provide to COMPANY an Onshore Engineer to work either in COMPANY's or CONTRACTOR's offices as required by COMPANY.  This individual shall be a member of COMPANY's well planning team and:
>
> (j)    Provide solutions where conventional cement design and procedures are not suitable, such as blend and foam cement;
>
> (k)    Make recommendations on fit for purpose slurry designs to meet agreed specifications[.]"

*Id.* at BP-HZN-2179 MDL 00055652-3.

- "Principal objectives of the mud logging service" are to "Monitor the drilling operation parameters…understand their significance to the downhole conditions and advise COMPANY and Drilling Contractor personnel of any situation developing with safety or efficiency implications. Where the situation is judged to be of a serious potential

> impact, logging personnel should contact the rig floor directly if
> COMPANY representative cannot immediately be contacted."

*Id.* at BP-HZN-2179MDL00055737-8.

3090.   Halliburton further "warrants and guarantees that: (a) it shall exercise all reasonable skill, care and diligence in the performance of the WORK and shall carry out the WORK in accordance with the requirements of the CONTRACT and to internationally recognized good oil practices and standards."  *Id.* at BP-HZN-2179MDL00055607.

3091.   These are not some mere ancillary provisions in the contract.  Instead, they are the entire basis of the contract and Halliburton's most elemental obligations.  As with Transocean, Halliburton's breaches of these provisions also satisfy a number of characteristics that distinguish them from the types of contract breaches that could not void an indemnity.  Thus, Halliburton's breach of each of these provisions independently discharges any indemnity obligation BPXP had to Halliburton.

### a.   Halliburton Materially Breached Its Fundamental Contract Obligations to Provide Cementing Services, Recommend Fit-For-Purpose Slurry Designs, and Provide Non-Conventional Solutions.

3092.   *First*, Halliburton performing its work with "reasonable skill, care and diligence … and to internationally recognized good oil practices and standards" in providing cementing services, as well as providing "fit for purpose" slurry designs and solutions where conventional cement would not work, were essential terms of the Well Services Contract.  Properly designing and performing cement jobs that are fit for their purpose are essential in drilling; without a successful cement job, hydrocarbons can flow up the casing or annulus.  *See* §§ IV.A.1; VI.A.1.  Likewise, because conventional cements are not always the best choice for a well, the provision that Halliburton provide solutions such as foam cement is an equally essential term of the

contract.  *See* § II.D.4.b.  Breaching these provisions would defeat one of the core purposes of the contract, which was for Halliburton to design and execute cement jobs.

3093.  **Second,** the provisions impose specific obligations.  Halliburton must provide an engineer who makes fit-for-purpose slurry designs using reasonable skill and in compliance with recognized standards.  That engineer must also use reasonable skill to provide non-conventional cement solutions where appropriate, such as foam cement.  Both of these give clear and unambiguous direction to Halliburton on what is required.  Halliburton cannot reasonably assert that it did not understand its obligations under these provisions.

3094.  **Third**, these provisions are not boilerplate, but were drafted for the particular purpose of setting forth certain of Halliburton's obligations under the Well Services Contract.

3095.  **Fourth**, cement serves as a barrier to the influx of hydrocarbons.  *See* §IV.A.1; VI.G.  If the cement fails, then hydrocarbons will enter the casing or annulus and can result in a blowout.  *See* § VI.G.  Thus, creating a fit-for-purpose slurry and developing needed unconventional solutions are critical to avoid blowouts and oil spills.  *See* § II.D.4.b.  In fact, Halliburton's breach resulted in billions of dollars in damages to BP.

3096.  **Fifth**, Halliburton's breach of these provisions was particularly significant.  Halliburton designed, recommended, and pumped a foam slurry containing defoamer and other additives that would destabilize the slurry even though testing repeatedly indicated it was unstable and Halliburton failed to conduct all of the necessary testing.  *See* §§ VI.D; VI.E; VI.F.

3097.  These failures to properly design and test the cement slurry were causal to the Incident.  *See* §§ VI.G; VI.J.

3098.  Thus, Halliburton materially breached the Well Services contract terms that Halliburton shall "[m]ake recommendations on fit for purpose slurry designs to meet agreed

specifications" and "[p]rovide solutions where conventional cement design and procedures are not suitable, such as blend and foam cement," TREX 004477 at BP-HZN-2179MDL00055653 as well as the warranty and guarantee that Halliburton "shall exercise all reasonable skill, care and diligence in the performance of the WORK and shall carry out the WORK in accordance with … internationally recognized good oil practices and standards."   *Id.* at BP-HZN-2179-MDL00055607.  Given the nature of these contract provisions and the severity of Halliburton's breaches, these material breaches discharge any obligation BPXP had to indemnify Halliburton.

> **b.    Halliburton Materially Breached Its Fundamental Contract Obligation to Monitor the Drilling Operation Parameters, Understand Their Significance, and Notify Transocean and BP of Any Safety Implications.**

3099.  ***First***, Halliburton's obligation to continuously monitor the well and report to Transocean and BP any "situation developing with safety or efficiency implications" was an essential part of the mud logger's duty.  *See* §§ II.D.1; II.D.2; V.J.6.  Indeed, at various times – including on the night of April 20, 2010 – the Halliburton mud logger's only duty was to monitor the well for kicks.  *See* §§ V.J.6.b; V.J.8.  BP relied on Halliburton's mud loggers to catch kick indicators and notify the drillers so that kicks could be prevented.  *See* §§ II.D.; V.J.6.b.  Thus, the provision requiring Halliburton mud loggers to monitor the well is essential and vital.  The breach of this provision would defeat a core purpose of the contract of having mud loggers monitor the well to prevent kicks from becoming disasters.

3100.  ***Second***, the obligation is clear and specific.  There can be no debate on what the mud logger's duties are.  The mud logger must monitor data regarding the well, and report to Transocean and BP any data concerning safety implications, particularly data indicating that a kick is occurring.

3101. **Third**, these terms are not boilerplate or common to all contracts. Instead, they are particularized to Halliburton's duties for well monitoring. This should have provided further notice to Halliburton of the importance of these provisions.

3102. **Fourth**, Halliburton knew that breach of these provisions would result in risks to human life and potentially massive damage to the environment. The mud loggers' failure to use reasonable skill to catch a kick would contribute to a blowout. Indeed, Halliburton's breach cost BP billions of dollars.

3103. **Fifth**, Halliburton committed a significant breach of these provisions. Starting at 21:01, the well data provided anomalies that were clear indicators of a kick and should have resulted in the mud logger notifying the drilling crew. Halliburton's mud logger failed to do so, contributing to the Incident. *See* § V.J.8.b.

3104. This failure to properly monitor the well was causal to the Incident. *See* § V.J.8.

3105. Thus, Halliburton materially breached the Well Services contract terms that Halliburton shall "[m]onitor the drilling operation parameters … understand their significance to the downhole conditions and advise COMPANY and Drilling Contractor personnel of any situation developing with safety or efficiency implications." TREX004477 at BP-HZN-2179 MDL00055737. Given the nature of this contract provision and the severity of Halliburton's breach, this material breach discharges any obligation BPXP had to indemnify Halliburton.

## 2. Halliburton Materially Increased the Risk to BP.

3106. As with Transocean, the same acts that materially breached Halliburton's fundamental contract obligations to BPXP also materially increased BPXP's risk as indemnitor.

3107. **First**, Halliburton's failure to exercise reasonable skill in designing a cement slurry − and instead recommending a slurry that was likely to be unstable and then failing to properly test it − materially increased BPXP's risk. Industry standards, Halliburton's own

policies, and Halliburton's contractual obligations to BPXP all required Halliburton to use reasonable skill in designing a cement slurry and testing that slurry.  *See* § II.D.4.b. Halliburton's compliance with these obligations set the baseline amount of risk that BPXP incurred by indemnifying Halliburton.

3108.  Instead of fulfilling these standards and using reasonable skill, Halliburton designed a foam cement that included a defoamer along with other destabilizing additives.  *See* § VI.D.  This was an obvious error.  Halliburton's design of a slurry that had a high likelihood of being unstable, and was in fact unstable, greatly increased BPXP's risk that a blowout and oil spill would occur, which are the events for which Halliburton now seeks indemnity.

3109.  Moreover, Halliburton failed to properly test this high-risk slurry.   When Halliburton conducted its pre-Incident testing on slurry with a very similar design it predictably failed the tests and was found to be unstable.  *See* § VI.E.  Yet Halliburton did not redesign the slurry for the Macondo well.  *See* § VI.E.  Instead, Halliburton recommended the slurry to BPXP and pumped it without telling BPXP that the testing for the Macondo well slurry had failed, and without Halliburton having any testing that showed the slurry was stable.  *See* §§ VI.E.9; VI.E.10.   Indeed, Halliburton never even tested the exact slurry that would be used at the Macondo well.  *See* § VI.F.1.  Halliburton's decision to recommend and proceed with the job despite not having tested the slurry, and indeed having test results indicating the slurry was unstable, also significantly increased the risk of a blowout and oil spill.

3110.  Thus, Halliburton's acts of failing to exercise reasonable skill in designing the cement slurry and testing it materially increased BPXP's risk as indemnitor and discharged any obligation of BPXP to indemnify Halliburton.

3111.  *Second*, the failure of Halliburton's mud logger to properly monitor the well and report anomalies also materially increased BPXP's risk.  Halliburton's mud logger had a duty under industry standards and the Well Services Contract to continuously monitor the well.  *See* §§ II.D.1.; V.J.6.b.  Indeed, the mud logger's ***only*** duty on the night of April 20, 2010 was to monitor the well.  *See* § V.J.6.b.  Halliburton's compliance with this duty set the baseline amount of risk that BPXP incurred by indemnifying Halliburton.

3112.  Halliburton substantially breached this obligation when its mud logger failed to notify the drilling crew of anomalies that were clear kick indicators.  *See* § V.J.8.  This failure significantly increased the risk that a kick would not be caught and would develop into a blowout and oil spill.

3113.  Therefore, Halliburton's failure to properly monitor the well data materially increased BPXP's risk as indemnitor and discharged any obligation of BPXP to indemnity Halliburton.

### 3.   Halliburton Is Not Entitled to Indemnity if It Acted with Gross Negligence or Willful Misconduct.

3114.  As described in §§ XX.A.3, XX.A.5, if Halliburton is found grossly negligent or to have engaged in willful misconduct, then BPXP should not be required to indemnify Halliburton.

### 4.   No Defense Costs.

3115.  This Court has previously held that BPXP did not have a duty to fund Halliburton's defense costs on an ongoing basis.  Rec. Doc. 5493 at 5.  In making this ruling, the Court relied on its prior holding that under the contractual indemnities "the duties to defend and indemnify are to be treated identically."  Rec. Doc. 5446 at 28.

3116.   Because Halliburton is not entitled to indemnification, Halliburton also is not entitled to defense costs.

## XXI.   TRANSOCEAN AND HALLIBURTON ARE LIABLE TO BP.

3117.   BP brought cross-claims and third-party claims against Transocean and Halliburton for BP's own damages and BP's payments to third parties.  Rec. Doc. 2074 ¶¶ 64-107; Rec. Doc. 2082 ¶¶ 135-53.  For the reasons set forth in this section, the Court concludes that both Transocean and Halliburton are liable to BP.[50]

### A.   BP Is Entitled to Contribution under OPA.

3118.   OPA creates a right of contribution:  "A person may bring a civil action for contribution against any other person who is liable or potentially liable under this Act or another law."  33 U.S.C. § 2709; *see also Gabarick v. Laurin Maritime (Am.) Inc.*, No. 08-4007, 2009 WL 102549, at *2 (E.D. La. Jan. 12, 2009) ("The OPA also creates a statutory right to seek contribution from any liable or potentially liable person, and it establishes its own statute of limitations.").

3119.   Nothing in the text of Section 2709 requires that a settling party obtain a "full release" before obtaining contribution.   Imposing a requirement for a full release would impermissibly add language that Congress chose not to include.  *Dean v. United States*, 556 U.S. 568, 572 (2009); *62 Cases, More or Less, Each Containing Six Jars of Jam v. United States*, 340 U.S. 593, 596 (1951).   A full release requirement also would contradict OPA's provisions regarding payment of interim, short-term damages.  33 U.S.C. § 2705(a).  Similar environmental statutes such as CERCLA allow contribution without a full release.  *See United States v. Davis*, 261 F.3d 1, 48 (1st Cir. 2001).  Such a requirement also would be inconsistent with the structure

---

[50]   BP assigned certain of these claims to the class created under the Economic and Property Damages Settlement pursuant to the terms of that Settlement.  Rec. Doc. 8138 at 17.

of OPA, under which "[c]laimants present their claims to the Responsible Party, who pays the claims and is then allowed to seek contribution from other allegedly liable parties." Rec. Doc. 3830 at 21. Finally, a full release requirement would require the settling party to bear the punitive damages liabilities of other parties, which contradicts the public policy behind punitive damages. Rec. Doc. 5446 at 18-19.

3120. Instead, OPA contribution simply requires that a party be liable or potentially liable under OPA or another law. As discussed in Section XVIII; XIX, Transocean is liable for the Incident under OPA and maritime law, and Halliburton is liable for the Incident under maritime law. Therefore, BP can recover from Transocean and Halliburton in proportion to each co-defendant's share of liability.

3121. Under § 2709, BP can recover for all removal costs, damages, and other amounts that it has paid. Nothing in § 2709 limits the kinds of damages that can be recovered in a contribution action. *See Buffalo Marine Servs. Inc. v. United States*, 663 F.3d 750, 752 n. 8 (5th Cir. 2011) ("OPA allows a responsible party to bring a civil action for contribution against any other person who shares responsibility for the spill … ."); *Cape Flattery Ltd. v. Titan Mar., LLC*, 647 F.3d 914, 924 (9th Cir. 2011) (A responsible party "could 'bring a civil action for contribution against any other person who is liable or potentially liable' for the damage 'under this Act or another law' under § 2709.").

**B.      BP Is Entitled to Subrogation under OPA.**

3122. OPA creates a subrogation right: "Any person, including the Fund, who pays compensation pursuant to this Act to any claimant for removal costs or damages shall be subrogated to all rights, claims, and causes of action that the claimant has under any other law." 33 U.S.C. § 2715(a).

669

3123.   As with the right of OPA contribution under § 2709, nothing in § 2715(a) requires a full release and imposing such as requirement would be inconsistent with OPA's text, structure, and purpose.

3124.   BP is thus subrogated to rights of all claimants to which it has paid removal costs or damages under any other law, including maritime law.  These subrogation rights provide an additional basis for recovering from Transocean and Halliburton in proportion to each co-defendant's share of liability.

**C.   BP Is Entitled to Subrogation and Contribution under Maritime Law.**

3125.   In addition to creating new statutory rights of contribution and subrogation, OPA preserves existing rights of contribution under other laws.  OPA provides that "[n]othing in this Act … bars a cause of action that a responsible party subject to liability under this Act … has or would have, by reason of subrogation or otherwise, against any person."  33 U.S.C. § 2710(c).

**1.   BP Has Contribution Rights Against Transocean and Halliburton under Maritime Law.**

3126.   "[I]n order to bring a claim for contribution, the settling tortfeasor must have (1) paid more than he owes to the plaintiff, and (2) have discharged the plaintiff's entire claim." *Combo Mar. Inc. v. U.S. United Bulk Terminal, LLC*, 615 F.3d 599, 603 (5th Cir. 2010); *see also Sea-Land Serv., Inc. v. United States*, 874 F.2d 169, 171-72 (3d Cir. 1989) ("A cause of action for contribution between private parties in admiralty cases accrues either when one party pays, or has a judgment entered against it, for more than its share of the damages.").  BP has paid all of the costs for well control, removal costs, damages to claimants, and other costs related to the Incident (except that Transocean has settled the claims of some of its employees who were on the rig).  Therefore, BP has paid more than it owes by the proportion of fault allocated to Transocean

and Halliburton.  Moreover, BP has discharged all compensatory damages of the claims for which it seeks contribution.

3127.  Cases under maritime law requiring a "full release" do not prohibit contribution here.  Cases such as *Ondimar Transportes Maritimos v. Beatty Street Props., Inc.*, 555 F.3d 184 (5th Cir. 2009), and *Lexington Ins. Co. v. S.H.R.M. Catering Servs., Inc.*, 567 F.3d 182 (5th Cir. 2009), do not address these circumstances, where BP has fully satisfied all compensatory damages for the claims for which it is seeking contribution.

3128.  Therefore, under maritime law BP can recover in contribution from Transocean and Halliburton in proportion to each co-defendant's share of liability.

### 2. BP Has Subrogation Rights Against Transocean and Halliburton under Maritime Law.

3129.  Equitable subrogation under maritime law "is broad enough to include every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter."  *Compania Anonima Venezolana de Navegacion v. A.J. Perez Exp. Co.*, 303 F.2d 692, 697 (5th Cir. 1962).

3130.  BP was not a volunteer or intruder; instead, its payments were made under OPA as required for responsible parties.  BP paid 100% of the compensatory damages so as to extinguish claims against Transocean and Halliburton.  Transocean and Halliburton's share of these damages is a debt for which they are primarily liable.  Equity and good conscience require that BP have a subrogation claim for their proportionate share of compensatory damages.

**D.** **Transocean and Halliburton Cannot Rely on the Contractual Indemnity Provisions.**

3131.   As described in Section XX, BP is not obligated to indemnify either Transocean or Halliburton against claims by third parties.  Thus, the contractors cannot use the contractual indemnity provisions as shields against BP's contribution or subrogation claims.

**E.** **BP Can Recover Direct Damages from Transocean and Halliburton.**

3132.   BP has proven that Transocean is liable for negligence and unseaworthiness and Halliburton is liable for negligence.  The contracts between BP and Transocean or Halliburton do not bar these direct claims against Transocean and Halliburton on two grounds.

3133.   *First*, for the same reasons that material breach of a contract will invalidate an indemnity, it also will invalidate a release.  *See* § XX.A.1.  Because both Transocean and Halliburton committed material breaches of the contracts containing the indemnities, *see* §§ XX.B; XX.C, BP has the right to seek direct damages from them.[51]

3134.   *Second*, this Court previously recognized that *Houston Exploration Co. v. Halliburton Energy Servs., Inc.*, 269 F.3d 528, 531 (5th Cir. 2001) "makes clear that gross negligence will invalidate a *release*."  Doc. Rec. 5446 at 14.  Therefore, if Transocean or Halliburton is found to have been grossly negligent or to have engaged in willful misconduct, then the releases are invalidated and recovery can be had on BP's direct damage claims.

**F.** **Transocean and Halliburton are Liable to BP for Their Proportionate Share of Fault.**

3135.   BP already has paid, and will continue to pay, billions of dollars related to the Incident.  Transocean and Halliburton are liable to BP in proportion to their comparative fault for

---

[51]   Transocean has brought claims against BP for allegedly unpaid invoices for use of the *Deepwater Horizon*.  Rec. Doc. 2068 ¶¶ 115-25.  Because of Transocean's material breach of the Drilling Contract, BP has no obligation to pay any such alleged invoices.  *See Motiva Enterprises, LLC v. St. Paul Fire & Marine Ins. Co.*, 445 F.3d 381, 386 (5th Cir. 2006).

both BP's own damages and the damages of third parties that BP has paid or will pay.  See *Reliable Transfer Co.*, 421 U.S. at 411; *Loose,* 670 F.2d at 500.

## XXII.  SUMMARY OF CONCLUSIONS.

3136.   In sum, the following conclusions apply to all claims designated as part of the Phase I Trial under Second Amended PTO #41, Rec. Doc. 6592, including the claims of the United States; unsettled and still pending day-of-incident personal injury claims in Bundle A; unsettled and still pending claims of private plaintiffs under the B1 and B3 Bundles;  claims of local government plaintiffs under Bundle C; and claims of the States of Louisiana and Alabama.  *See generally* Rec. Doc. 569, PTO #11 (describing Bundles).

3137.   BP was not negligent in any part of its conduct other than negligent supervision of the negative pressure test.[52]

3138.   BP was not grossly negligent, did not act with willful misconduct, and its conduct was not wanton, willful, or outrageous.  Therefore, BP is not liable for treble fines under the CWA or punitive damages under maritime law.

3139.   Transocean is liable under maritime law for unseaworthiness and negligence, and also is liable under OPA.  Transocean cannot limit its liability under the Limitation Act.

3140.   Halliburton is liable under maritime law for negligence and strict products liability.

3141.   The Incident resulted from the combined actions of employees of BP, Transocean, and Halliburton, and thus responsibility for the incident is shared among these defendants.  Any allocation of fault by the Court should take into account the multi-party, multi-causal nature of the Incident.

---

[52]   Neither BP p.l.c. nor any other entity in the BP corporate family is liable for the incident except for BPXP and BPAP.

3142.   Neither Transocean nor Halliburton can obtain indemnification from BP.

3143.   BP has the right to recover its own damages and its payments to third parties from Transocean and Halliburton in proportion to their allocated fault.

June 21, 2013

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Matthew T. Regan, P.C.
Hariklia Karis, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL  60654
Telephone:  312-862-2000
Facsimile:  312-862-2200

Timothy A. Duffy, P.C.
R. Christopher Heck
James Sollee Buino
Elizabeth R. Sheyn
David R. Freedman
Vanessa Barsanti
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL  60654
Telephone:  312-862-2000
Facsimile:  312-862-2200

Respectfully submitted,

*/s/ Don K. Haycraft*
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA  70139-5099
Telephone:  504-581-7979
Facsimile:  504-556-4108

C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC  20004-2401
Telephone:  202-662-5985
Facsimile:  202-662-6291

*Attorneys for BP Exploration & Production Inc., BP America Production Co., and BP p.l.c.*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 21st day of June 2013.

*/s/ Don K. Haycraft*
Don K. Haycraft