# EXHIBIT 3



Jul 18 2011
6:02PM

**UNITED STATES DISTRICT OF COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010,<br><br>Applies to:<br><br>All Cases and 2:10-cv-02771 | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | MDL No. 2179<br><br>SECTION:  J<br><br>JUDGE BARBIER<br><br>MAG. JUDGE SHUSHAN |

**HALLIBURTON ENERGY SERVICES, INC.'S
RESPONSES TO THE BP PARTIES' SECOND REQUESTS FOR ADMISSIONS**

Now comes Halliburton Energy Services, Inc. ("HESI") and, pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, serves upon the BP Parties the following Responses to the BP Parties' Second Requests for Admissions:

## I.     GENERAL OBJECTIONS

HESI asserts the following objections to each and every one of the BP Parties' requests, including any definitions or instructions associated therewith.  These general objections are incorporated by reference into each response set forth by HESI, and are neither waived nor limited by any specific response or answer.

1.     HESI objects to the definition of "you," "your," and "yours" as "plaintiffs that are natural persons, the plaintiff and his or her representatives, agent, attorneys, heirs, and assigns, and for plaintiffs that are entities, the entity and its officers, directors, employees, attorneys, successors, and assigns."  HESI will assume that this definition is an error and that "you," "your," and "yours" references HESI only.

2.      HESI objects to the definition of "Halliburton" as it is broad enough to include entities that are not parties to this or any MDL litigation.  The party deemed served with these requests is HESI, and thus all responses are HESI's only.

3.      HESI objects to the definition of "kick" as it is overbroad, vague, and incomplete. HESI defines a "kick" as the initiation of reservoir fluids or gas into the wellbore due to the underbalanced condition of the well.

4.      HESI objects to the definition of "OptiCem" as overbroad, vague, and ambiguous to the extent it requires HESI to guess how "the term was used by Halliburton in communications with BP."

5.      HESI objects to the requests to the extent they seek information subject to the attorney-client privilege, work product doctrine, joint-defense privilege, or other applicable legal protection or privilege.

6.      HESI objects to the requests to the extent they impose obligations beyond or different from those obligations imposed by the Federal Rules of Civil Procedure or the Pretrial Orders of this Court.

7.      HESI objects to any and all requests that require knowledge or information within the control of BP or another party that has not yet been provided to HESI.

8.      HESI expressly reserves its right to object to the admission into evidence of any and all information made available in response to any of the requests on any grounds, including but not limited to, the ground that the information is irrelevant and immaterial to the issues in this action.  Nothing in HESI's responses to any of the requests should be construed as an admission regarding the admissibility or relevance of any fact or document or of the truth or accuracy of any characterization of any kind contained in the requests.

## II.    SPECIFIC OBJECTIONS AND RESPONSES

**REQUEST FOR ADMISSION NO. 116:**    Admit that on April 20, 2010, the responsibilities of the Sperry Sun mudlogger aboard the *Deepwater Horizon* included continuously monitoring the well.

**RESPONSE:**    HESI objects to this request on the grounds that "continuously" is vague, ambiguous and undefined.   HESI further objects to this request to the extent it suggests incorrectly that only Sperry was responsible for continuously monitoring the well.  Subject to and without waiving the foregoing objections, HESI admits that the responsibilities of the Sperry mudlogger aboard the *Deepwater Horizon* are set forth in Section 3 – Scope of Work, Appendix 5 – Description of the WORK, Subsection C Well Placement, Section 10.0 Mudlogging Services in the "Contract for Gulf of Mexico Strategic Performance Unit Offshore Well Services between BP Exploration and Production, Inc. and Halliburton Energy Services, Inc." (the "Services Contract"), effective April 15, 2009.

**REQUEST FOR ADMISSION NO. 117:**    Admit that on April 20, 2010, the responsibilities of the Sperry Sun mudlogger aboard the *Deepwater Horizon* included alerting the Driller if any anomalies were observed while monitoring the well.

**RESPONSE:**    HESI objects to this request on the grounds that "alerting the Driller" is vague, ambiguous and undefined.   HESI further objects to this request to the extent it suggests incorrectly that only Sperry was responsible for "alerting the Driller if any anomalies were observed" or that only Sperry was responsible for monitoring the well.  Subject to and without waiving the foregoing objections, HESI admits that the responsibilities of the Sperry mudlogger aboard the *Deepwater Horizon* are set forth in Section 3 – Scope of Work, Appendix 5 – Description of the WORK, Subsection C Well Placement, Section 10.0 Mudlogging Services in the Services Contract, effective April 15, 2009.

**REQUEST FOR ADMISSION NO. 118:**    Admit that on April 20, 2010, the responsibilities of the Sperry Sun mudlogger aboard the *Deepwater Horizon* included alerting other rig personnel if there are any operations, issues, or concerns that prevented the mudlogger from being able to continuously monitor the well.

**RESPONSE:**    HESI objects to this request on the grounds that "operations, issues, or concerns" is vague, ambiguous and undefined.  HESI further objects to this request to the extent

it suggests incorrectly that under the terms of HESI's contract with BP only Sperry was responsible for ensuring that well monitoring was effective and uninterrupted, or that only Sperry was responsible for monitoring the well.   Subject to and without waiving the foregoing objections, HESI admits that the responsibilities of the Sperry mudlogger aboard the *Deepwater Horizon* are set forth in Section 3 – Scope of Work, Appendix 5 – Description of the WORK, Subsection C Well Placement, Section 10.0 Mudlogging Services in the Services Contract, effective April 15, 2009.

### REQUEST FOR ADMISSION NO. 119:     Admit that on April 20, 2010 Joseph Keith was a Sperry Sun mudlogger aboard the *Deepwater Horizon*.

**RESPONSE:**   HESI admits that Joseph Keith was a mudlogger employed by Sperry aboard the *Deepwater Horizon* on April 20, 2010.

### REQUEST FOR ADMISSION NO. 120:     Admit that on April 20, 2010 Cathleena [sic] Willis was a Sperry Sun mudlogger aboard the *Deepwater Horizon*.

**RESPONSE:**   HESI admits that Cathleenia Willis was a mudlogger employed by Sperry aboard the *Deepwater Horizon* on April 20, 2010.

### REQUEST FOR ADMISSION NO. 121:     Admit that the Halliburton employees aboard the *Deepwater Horizon* on April 19, 2010 had the authority to stop operations to prevent an incident from occurring.

**RESPONSE:**   HESI objects to this request on the grounds that the terms "authority," "operations" and "incident" are vague, ambiguous and undefined.  HESI further objects to this request to the extent it suggests incorrectly that HESI had sufficient information necessary to form a belief as to whether the acts or omissions of BP and/or any other party involved in the Macondo Well presented a situation in which HESI could or should have stopped operations. HESI further objects to this request to the extent it suggests that HESI could reasonably or successfully exercise stop work authority if it disagreed with operational decisions by BP and/or any other party in which HESI was not involved or for which HESI did not have ultimate decision-making authority.  Subject to and without waiving the foregoing objections, this request is denied.

### REQUEST FOR ADMISSION NO. 122:     Admit that no Halliburton employee aboard the *Deepwater Horizon* exercised stop-work authority on April 19, 2010 during the cementing operations.

**RESPONSE:**   HESI objects to this request on the grounds that "stop-work authority" is vague, ambiguous and undefined.   HESI further objects to this request as duplicative of previous requests.   HESI further objects to this request to the extent it suggests incorrectly that HESI had sufficient information necessary to form a belief as to whether the acts or omissions of BP and/or any other party involved in pre-cementing or cementing operations on April 19, 2010 presented a situation(s) in which HESI could or should have stopped operations.   HESI further objects to this request to the extent it suggests incorrectly that HESI had sufficient information at the time of the cement job on April 19, 2010 to form a belief that subsequent acts or omissions of BP and/or any other party would create a dangerous well control situation after the cement job was completed.   HESI further objects to this request to the extent it suggests that HESI could reasonably or successfully exercise stop work authority if it disagreed with operational decisions by BP and/or any other party in which HESI was not involved or for which HESI did not have ultimate decision-making authority.   Subject to and without waiving the foregoing objections, HESI admits that no HESI employee exercised stop-work authority on April 19, 2010 during the cementing operations.   Except as expressly admitted herein, this request is denied.

### REQUEST FOR ADMISSION NO. 123:   Admit    that    the    Halliburton employees aboard the *Deepwater Horizon* on April 20, 2010 had the authority to stop operations to prevent an incident from occurring.

**RESPONSE:**   HESI objects to this request on the grounds that the terms "authority" and "incident" are vague, ambiguous and undefined.   HESI further objects to this request as duplicative of previous requests.   HESI further objects to this request to the extent it suggests incorrectly that HESI had sufficient information necessary to form a belief as to whether the acts or omissions of BP and/or any other party involved in the Macondo Well presented a situation in which HESI could or should have stopped operations.   HESI further objects to this request to the extent it suggests that HESI could reasonably or successfully exercise stop work authority if it disagreed with operational decisions by BP and/or any other party in which HESI was not involved or for which HESI did not have ultimate decision-making authority.   Subject to and without waiving the foregoing objections, this request is denied.

### REQUEST FOR ADMISSION NO. 124:   Admit that no Halliburton employee aboard the *Deepwater Horizon* exercised stop-work authority on April 20, 2010 during the cementing operations.

**RESPONSE:**   HESI objects to this request on the grounds that "stop-work authority" is vague, ambiguous and undefined.   HESI further objects to this request as duplicative of previous requests.   HESI further objects to this request to the extent it suggests incorrectly that HESI had sufficient information necessary to form a belief as to whether the acts or omissions of BP and/or any other party involved in pre-cementing operations presented a situation(s) in which HESI could or should have stopped cementing or other operations on April 20, 2010. HESI further

objects to this request to the extent it suggests incorrectly that HESI had sufficient information at the time of the cement job on April 20, 2010 to form a belief that subsequent acts or omissions of BP and/or any other party would create a dangerous well control situation after the cement job was completed.  HESI further objects to this request to the extent it suggests that HESI could reasonably or successfully exercise stop work authority if it disagreed with operational decisions by BP and/or any other party in which HESI was not involved or for which HESI did not have ultimate decision-making authority.  Subject to and without waiving the foregoing objections, HESI admits that no HESI employee exercised stop-work authority on April 20, 2010 during the cementing operations.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 125:**     Admit that no Halliburton employee aboard the *Deepwater Horizon* told BP that the cement job associated with the final production casing string should not be performed.

**RESPONSE:**    HESI objects to this request to the extent it suggests that, prior to the cement job on the final production casing, HESI did not provide a warning(s) to BP that the cement job would likely not achieve its goal of zonal isolation.  HESI further objects to this request to the extent that it suggests that it was HESI's decision to determine when and whether the production casing cement job should be pumped.  Subject to and without waiving the foregoing objection, HESI admits that no employee of Halliburton on the *Deepwater Horizon* told BP that the production casing cement job should not be performed.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 126:**     Admit that on April 20, 2010 one or more Halliburton employees informed BP that the cement job associated with the final production casing string was successful.

**RESPONSE:**    HESI objects to this request as duplicative of previous requests.  HESI admits that it informed BP that the cement job on the final production casing, completed on April 20, 2010, was executed successfully to plan.  HESI denies the request to the extent it purports to ask whether HESI informed BP that the cement job, once placed in location, successfully achieved zonal isolation.  Whether the cement job achieved zonal isolation can only be determined conclusively by running a cement bond log or other cement evaluation technique, which BP decided not to run.  Moreover, while HESI informed BP that the cement job was executed to plan, it had previously informed BP that the cement job likely would not achieve zonal isolation due to channeling caused by BP's decision to run fewer centralizers than recommended.  Except as admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 127:**     Admit that on April 20, 2010, one or more Halliburton employees informed BP that circulation was established through the float collar.

**RESPONSE:**     HESI objects to this request as duplicative of previous requests.  HESI denies the implication of the request that HESI was in any way involved in rig operations attempting to convert the float collar or was otherwise responsible for warning BP about any issues associated with attempts to convert the float collar when BP was directly involved with those operations, and HESI was not.  HESI further denies the implication of this request that HESI, or any HESI employee, was in any position to independently confirm to BP or any other party that circulation was established through the float collar.  Subject to and without waiving the foregoing objections, this request is denied.

**REQUEST FOR ADMISSION NO. 128:**     Admit that Halliburton is one of the world's largest providers of products and services to the energy industry and has contributed to most of the world's deepwater-well completions.

**RESPONSE:**     Admitted.

**REQUEST FOR ADMISSION NO. 129:**     Admit that Halliburton is the premiere cementing organization in the world.

**RESPONSE:**     HESI objects to this request on the grounds that "premiere" is vague, ambiguous and undefined.  Subject to and without waiving the foregoing objections, HESI admits that it strives to be the best cementing organization in the world.

**REQUEST FOR ADMISSION NO. 130:**     Admit that under the contract between BP and Halliburton, Halliburton is required to perform cement tests in accordance with the latest API/ISO Specifications.

**RESPONSE:**     HESI admits that the contract between BP and Halliburton specifies that, to the extent the contract requires a particular cement test(s) to be conducted, HESI "shall have [a] facility to perform the [such] tests in accordance with the latest API/ISO Specifications (as found in Appendix 6 – Functional and Technical Specifications, 2.  The Minimum Testing for Cementing Operations) or COMPANY specific procedures."  HESI further admits that the contract authorizes deviation from API procedure in certain instances.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 131:**   Admit   that   under   the   contract between BP and Halliburton, the minimum tests for cementing operations are: static gel strength, pump time, compressive strength, free water, fluid loss, rheology, and mud/spacer compatibility.

**RESPONSE:**   HESI objects to this requests on the grounds that the phrase "the minimum tests for cementing operations" is vague and ambiguous.  HESI further objects to this request to the extent it suggests that certain tests specified in the request were required by the contract to be run on the cement slurry used to cement the production casing at Macondo Well and/or that HESI's ability to run certain such tests was not effected by the timing of decisions made by BP in close proximity to the cement job.  Subject to and without waiving the foregoing objections, this request is denied.

**REQUEST FOR ADMISSION NO. 132:**   Admit   that   under   the   contract between BP and Halliburton, Halliburton is required to provide the results of the cement tests to BP more than 24 hours before pumping cement.

**RESPONSE:**   HESI objects to this request to the extent it suggests incorrectly that HESI determines when BP chooses to order that a cement job be pumped.  HESI further objects to this request to the extent it suggests incorrectly that HESI could obtain certain test results 24-hours before a cement job in certain situations where BP requests changes to the cement job in close proximity to the planned cement job.  Subject to and without waiving the foregoing objections, HESI admits that BP ordered the commencement of the cement job on April 19, 2010, without regard to whether it had received from HESI certain cement testing results.  HESI further admits that the contract states that it was required to provide the results of cement tests to BP more than 24 hours before pumping cement, but in practice, BP determined the timing of testing in relation to commencement of cementing operations.  In addition, the contract specifies that the wells team may agree not to require cement tests more than 24 hours before pumping cement.  Except as admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 133:**   Admit   that   under   the   contract between BP and Halliburton, Halliburton is required to perform the cement tests on actual rig samples and not load out samples.

**RESPONSE:**   HESI objects to this request on the grounds that the terms "the cement tests" and "load out samples" are vague, ambiguous and undefined.  Subject to and without waiving the foregoing objections, HESI admits that the contract between BP and Halliburton requires that

testing for operational cement jobs use the dry cement or cement blend samples from the rig. Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 134:**   Admit that Halliburton did not provide witnesses to be interviewed by the BP Internal Investigation Team and the Presidential Commission after Halliburton released previously unproduced lab worksheets for the Macondo Well on November 05, 2010.

**RESPONSE:**   HESI objects to this request to the extent it suggests incorrectly that the BP Internal Investigation Team requested witness interviews of HESI employees after November 5, 2010.  Moreover, HESI has presented and continues to present witnesses in the MDL litigation to be deposed by BP specifically on topics related to, among other things, HESI's internal laboratory worksheets.  Subject to and without waiving the foregoing objections, HESI admits that it declined to provide additional HESI employees to be interviewed by the Presidential Commission's Chief Counsel's staff after November 5, 2010, as the Chief Counsel's staff demanded that such witnesses be questioned under oath, which was a departure from the manner in which the Chief Counsel's staff treated other parties and other witnesses.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 135:**   Admit that on April 20, 2010, Sperry Sun and/or Halliburton personnel "were monitoring the well activities at our Real Time Operations Center," as stated in deposition Exhibit 2011.

**RESPONSE:**   HESI directs BP to its Response to Interrogatory No. 26 in BP's Second Set of Interrogatories to HESI, in which HESI provides a narrative response explaining that HESI personnel were not monitoring well activities from its Real Time Operations Center on April 20, 2010.  As such, HESI denies this request.

**REQUEST FOR ADMISSION NO. 136:**   Admit that BP requested that Halliburton produce off-the-shelf samples of the cementing materials used in the cementing operation at the Macondo Well on April 19, 2010.

**RESPONSE:**   HESI objects to this request to the extent it suggests that HESI had an obligation, at the time of BP's request, to provide BP with any off-the-shelf samples of the cementing materials used in the cementing operation at the Macondo Well on April 19, 2010. Subject to and without waiving the foregoing objection, HESI admits that, prior to the initiation of discovery in the MDL litigation, BP requested that HESI produce to BP "equivalent products"

to the cement and additives included in the cement slurry that was used to cement the final production casing at the Macondo Well.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 137:**    Admit    that    BP    requested    that Halliburton produce an off-the-shelf sample of the Lafarge class H cement used in the cementing operation at the Macondo Well on April 19, 2010.

**RESPONSE:**    HESI objects to this request to the extent it suggests that HESI had an obligation, at the time of BP's request, to provide BP with any off-the-shelf samples of the LaFarge Class H cement used in the cementing operation at the Macondo Well on April 19, 2010.  Subject to and without waiving the foregoing objection, HESI admits that, prior to the initiation of discovery in the MDL litigation, BP requested that HESI produce to BP "equivalent products" to the cement and additives included in the cement slurry that was used to cement the final production casing at the Macondo Well.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 138:**    Admit    that    BP    requested    that Halliburton produce an off-the-shelf sample of the EZ-FLOW additive used in the cementing operation at the Macondo Well on April 19, 2010.

**RESPONSE:**    For purposes of this response, HESI will assume that BP's reference to "EZ-FLOW" is intended to be a reference to "EZ-FLO."  HESI objects to this request to the extent it suggests that HESI had an obligation, at the time of BP's request, to provide BP with any off-the-shelf samples of the EZ-FLO additive used in the cementing operation at the Macondo Well on April 19, 2010.  Subject to and without waiving the foregoing objection, HESI admits that, prior to the initiation of discovery in the MDL litigation, BP requested that HESI produce to BP "equivalent products" to the cement and additives included in the cement slurry that was used to cement the final production casing at the Macondo Well.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 139:**    Admit    that    BP    requested    that Halliburton produce an off-the-shelf sample of the D-Air 3000 additive used in the cementing operation at the Macondo Well on April 19, 2010.

**RESPONSE:**    HESI objects to this request to the extent it suggests that HESI had an obligation, at the time of BP's request, to provide BP with any off-the-shelf samples of the D-Air 3000 additive used in the cementing operation at the Macondo Well on April 19, 2010.  Subject

to and without waiving the foregoing objection, HESI admits that, prior to the initiation of discovery in the MDL litigation, BP requested that HESI produce to BP "equivalent products" to the cement and additives included in the cement slurry that was used to cement the final production casing at the Macondo Well.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 140:**   Admit   that   BP   requested   that Halliburton produce an off-the-shelf sample of the potassium chloride salt additive used in the cementing operation at the Macondo Well on April 19, 2010.

**RESPONSE:**   HESI objects to this request to the extent it suggests that HESI had an obligation, at the time of BP's request, to provide BP with any off-the-shelf samples of the potassium chloride salt additive used in the cementing operation at the Macondo Well on April 19, 2010.  Subject to and without waiving the foregoing objection, HESI admits that, prior to the initiation of discovery in the MDL litigation, BP requested that HESI produce to BP "equivalent products" to the cement and additives included in the cement slurry that was used to cement the final production casing at the Macondo Well.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 141:**   Admit   that   BP   requested   that Halliburton produce an off-the-shelf sample of the SSA-1 (Silica Flour) additive used in the cementing operation at the Macondo Well on April 19, 2010.

**RESPONSE:**   HESI objects to this request to the extent it suggests that HESI had an obligation, at the time of BP's request, to provide BP with any off-the-shelf samples of the SSA-1 (Silica Flour) additive used in the cementing operation at the Macondo Well on April 19, 2010. Subject to and without waiving the foregoing objection, HESI admits that, prior to the initiation of discovery in the MDL litigation, BP requested that HESI produce to BP "equivalent products" to the cement and additives included in the cement slurry that was used to cement the final production casing at the Macondo Well.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 142:**   Admit   that   BP   requested   that Halliburton produce an off-the-shelf sample of the SSA-2 (100 Mesh) additive used in the cementing operation at the Macondo Well on April 19, 2010.

**RESPONSE:**   HESI objects to this request to the extent it suggests that HESI had an obligation, at the time of BP's request, to provide BP with any off-the-shelf samples of the SSA-

2 (100 Mesh) additive used in the cementing operation at the Macondo Well on April 19, 2010. Subject to and without waiving the foregoing objection, HESI admits that, prior to the initiation of discovery in the MDL litigation, BP requested that HESI produce to BP "equivalent products" to the cement and additives included in the cement slurry that was used to cement the final production casing at the Macondo Well.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 143:**   Admit   that   BP   requested   that Halliburton produce an off-the-shelf sample of the SA-541 additive used in the cementing operation at the Macondo Well on April 19, 2010.

**RESPONSE:**   HESI objects to this request to the extent it suggests that HESI had an obligation, at the time of BP's request, to provide BP with any off-the-shelf samples of the SA-541 additive used in the cementing operation at the Macondo Well on April 19, 2010.  Subject to and without waiving the foregoing objection, HESI admits that, prior to the initiation of discovery in the MDL litigation, BP requested that HESI produce to BP "equivalent products" to the cement and additives included in the cement slurry that was used to cement the final production casing at the Macondo Well.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 144:**   Admit   that   BP   requested   that Halliburton produce an off-the-shelf sample of the ZoneSealant 2000 additive used in the cementing operation at the Macondo Well on April 19, 2010.

**RESPONSE:**   HESI objects to this request to the extent it suggests that HESI had an obligation, at the time of BP's request, to provide BP with any off-the-shelf samples of the ZoneSealant 2000 additive used in the cementing operation at the Macondo Well on April 19, 2010.  Subject to and without waiving the foregoing objection, HESI admits that, prior to the initiation of discovery in the MDL litigation, BP requested that HESI produce to BP "equivalent products" to the cement and additives included in the cement slurry that was used to cement the final production casing at the Macondo Well.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 145:**   Admit   that   BP   requested   that Halliburton produce an off-the-shelf sample of the SCR-100L additive used in the cementing operation at the Macondo Well on April 19, 2010.

**RESPONSE:**   HESI objects to this request to the extent it suggests that HESI had an obligation, at the time of BP's request, to provide BP with any off-the-shelf samples of the SCR-100L additive used in the cementing operation at the Macondo Well on April 19, 2010.  Subject to and without waiving the foregoing objection, HESI admits that, prior to the initiation of discovery in the MDL litigation, BP requested that HESI produce to BP "equivalent products" to the cement and additives included in the cement slurry that was used to cement the final production casing at the Macondo Well.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 146:**   Admit that Halliburton did not produce to BP off-the-shelf samples of the cementing materials used in the cementing operation at the Macondo Well on April 19, 2010.

**RESPONSE:**   HESI objects to this request to the extent it suggests that HESI had an obligation, at the time of BP's request, to provide BP with any off-the-shelf samples of the cementing materials used in the cementing operation at the Macondo Well on April 19, 2010. Subject to and without waiving the foregoing objection, HESI admits this request.

**REQUEST FOR ADMISSION NO. 147:**   Admit that Halliburton did not produce to BP an off-the-shelf sample of the Lafarge class H cement used in the cementing operation at the Macondo Well on April 19, 2010.

**RESPONSE:**   HESI objects to this request to the extent it suggests that HESI had an obligation, at the time of BP's request, to provide BP with any off-the-shelf sample of the LaFarge class H cement used in the cementing operation at the Macondo Well on April 19, 2010. Subject to and without waiving the foregoing objection, HESI admits this request.

**REQUEST FOR ADMISSION NO. 148:**   Admit that Halliburton did not produce to BP an off-the-shelf sample of the EZ¬FLOW additive used in the cementing operation at the Macondo Well on April 19, 2010.

**RESPONSE:**   For purposes of this response, HESI will assume that BP's reference to "EZ-FLOW" is intended to be a reference to "EZ-FLO."  HESI objects to this request to the extent it suggests that HESI had an obligation, at the time of BP's request, to provide BP with any off-the-shelf sample of the EZ-FLO additive used in the cementing operation at the Macondo Well on April 19, 2010.  Subject to and without waiving the foregoing objection, HESI admits this request.

**REQUEST FOR ADMISSION NO. 149:**   Admit that Halliburton did not produce to BP an off-the-shelf sample of the D-Air 3000 additive used in the cementing operation at the Macondo Well on April 19, 2010.

**RESPONSE:**   HESI objects to this request to the extent it suggests that HESI had an obligation, at the time of BP's request, to provide BP with any off-the-shelf sample of the D-Air 3000 additive used in the cementing operation at the Macondo Well on April 19, 2010.  Subject to and without waiving the foregoing objection, HESI admits this request.

**REQUEST FOR ADMISSION NO. 150:**   Admit that Halliburton did not produce to BP an off-the-shelf sample of the potassium chloride salt additive used in the cementing operation at the Macondo Well on April 19, 2010.

**RESPONSE:**   HESI objects to this request to the extent it suggests that HESI had an obligation, at the time of BP's request, to provide BP with any off-the-shelf sample of the potassium chloride salt additive used in the cementing operation at the Macondo Well on April 19, 2010.  Subject to and without waiving the foregoing objection, HESI admits this request.

**REQUEST FOR ADMISSION NO. 151:**   Admit that Halliburton did not produce to BP an off-the-shelf sample of the SSA¬1 (Silica Flour) additive used in the cementing operation at the Macondo Well on April 19, 2010.

**RESPONSE:**   HESI objects to this request to the extent it suggests that HESI had an obligation, at the time of BP's request, to provide BP with any off-the-shelf sample of the SSA-1 (Silica Flour) additive used in the cementing operation at the Macondo Well on April 19, 2010.  Subject to and without waiving the foregoing objection, HESI admits this request.

**REQUEST FOR ADMISSION NO. 152:**   Admit that Halliburton did not produce to BP an off-the-shelf sample of the SSA¬2 (100 Mesh) additive used in the cementing operation at the Macondo Well on April 19, 2010.

**RESPONSE:**   HESI objects to this request to the extent it suggests that HESI had an obligation, at the time of BP's request, to provide BP with any off-the-shelf sample of the SSA-2 (100 Mesh) additive used in the cementing operation at the Macondo Well on April 19, 2010.  Subject to and without waiving the foregoing objection, HESI admits this request.

**REQUEST FOR ADMISSION NO. 153:**    Admit    that    Halliburton    did    not

produce   to   BP   an   off-the-shelf   sample   of   the   SA¬541   additive   used   in   the

cementing operation at the Macondo Well on April 19, 2010.

**RESPONSE:**    HESI objects to this request to the extent it suggests that HESI had an obligation, at the time of BP's request, to provide BP with any off-the-shelf sample of the SA-541 additive used in the cementing operation at the Macondo Well on April 19, 2010.  Subject to and without waiving the foregoing objection, HESI admits this request.

**REQUEST FOR ADMISSION NO. 154:**    Admit    that    Halliburton    did    not

produce to BP an off-the-shelf sample of the ZoneSealant 2000 additive used in the

cementing operation at the Macondo Well on April 19, 2010.

**RESPONSE:**    HESI objects to this request to the extent it suggests that HESI had an obligation, at the time of BP's request, to provide BP with any off-the-shelf sample of the ZoneSealant 2000 additive used in the cementing operation at the Macondo Well on April 19, 2010.  Subject to and without waiving the foregoing objection, HESI admits this request.

**REQUEST FOR ADMISSION NO. 155:**    Admit    that    Halliburton    did    not

produce   to   BP   an   off-the-shelf   sample   of   the   SCR¬100L   additive   used   in   the

cementing operation at the Macondo Well on April 19, 2010.

**RESPONSE:**    HESI objects to this request to the extent it suggests that HESI had an obligation, at the time of BP's request, to provide BP with any off-the-shelf sample of the SCR-100L additive used in the cementing operation at the Macondo Well on April 19, 2010.  Subject to and without waiving the foregoing objection, HESI admits this request.

**REQUEST FOR ADMISSION NO. 156:**    Admit that the results of the Chevron

and CSI testing reflect what happened to the rig cement used on the production

interval of the Macondo Well.

**RESPONSE:**    HESI objects to the phrase "what happened to the rig cement" as vague and ambiguous.  Subject to and without waiving the foregoing objection, this request is denied.

**REQUEST FOR ADMISSION NO. 157:**    Admit that all foam stability tests conducted by Halliburton for the Macondo Well production casing slurry at 12.98% foam quality were unstable after conditioning at 110 F and 135 F.

**RESPONSE:**    Denied.

**REQUEST FOR ADMISSION NO. 158:**    Admit that Ronald Faul requested Timothy Quirk to mix and conduct post-incident testing on a slurry sample using the design of the Macondo Well production casing slurry.

**RESPONSE:**    HESI objects to the phrase "post-incident testing" as vague and ambiguous. Subject to and without waiving the foregoing objection, HESI admits that after April 20, 2010, Ronald Faul, on behalf of himself, requested that Timothy Quirk conduct a foam stability test on a slurry sample using lab stock cement and additives based on the design of the cement slurry used to cement the final production casing on the Macondo Well.  Mr. Faul, also on behalf of himself, further requested some time later that Mr. Quirk conduct a foam/mud compatibility test using lab stock similar to at least some of the ingredients derived from the design of the cement used to cement the Macondo Well production casing.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 159:**    Admit that Halliburton personnel at the Broussard lab performed post-incident testing on a slurry sample mixed using the design of the Macondo Well production casing slurry.

**RESPONSE:**    HESI objects to the phrase "post-incident testing" as vague and ambiguous. Subject to and without waiving the foregoing objection, HESI admits that after April 20, 2010, Ronald Faul, on behalf of himself, requested that Timothy Quirk at the Broussard lab conduct a foam stability test on a slurry sample using lab stock cement and additives based on the design of the cement slurry used to cement the final production casing on the Macondo Well.  Mr. Faul, also on behalf of himself, further requested some time later that Mr. Quirk conduct a foam/mud compatibility test using lab stock similar to at least some of the ingredients derived from the design of the cement used to cement the Macondo Well production casing.  HESI further admits that after April 20, 2010, Anthony Badalamenti separately, on behalf of himself, requested that the Broussard lab conduct a static gel strength test on a base slurry using lab stock cement and additives derived from the design of the cement slurry used to cement the final production casing on the Macondo Well.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 160:**   Admit that Timothy Quirk drafted notes relating to the post-incident testing performed at the Broussard lab on a slurry sample mixed using the design of the Macondo Well production casing slurry.

**RESPONSE:**   HESI objects to the phrase "post-incident testing performed at the Broussard lab" as vague and ambiguous.  Subject to and without waiving the foregoing objection, HESI admits that Timothy Quirk drafted notes relating to the testing that he conducted, which is referenced in HESI's response to Request for Admission No. 159.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 161:** Admit that Timothy Quirk discarded his notes relating to the post-incident testing performed at the Broussard lab on a slurry sample mixed using the design of the Macondo Well production casing slurry.

**RESPONSE:**   HESI objects to the phrase "post-incident testing performed at the Broussard lab" as vague and ambiguous.  Subject to and without waiving the foregoing objection, HESI admits that Timothy Quirk discarded his notes relating to the testing he conducted, which is referenced in HESI's response to Request for Admission No. 159, but only after providing the results of such testing orally to Ronald Faul over the telephone.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 162:**   Admit that Timothy Quirk's notes relating to the post-incident testing performed at the Broussard lab are not available and have not been produced.

**RESPONSE:**   HESI objects to the phrase "post-incident testing performed at the Broussard lab" as vague and ambiguous.  Subject to and without waiving the foregoing objection, HESI admits that Timothy Quirk's notes relating to the foam stability test that he conducted, which is referenced in HESI's response to Request for Admission No. 159, are not available and have not been produced; however, both Mr. Quirk and Mr. Faul have testified as to the results of such test. HESI further admits that Mr. Quirk's notes relating the foam/mud compatibility test he conducted, which is referenced in HESI's response to Request for Admission No. 159, are not available and have not been produced; however, the results of such test were documented by Mr. Faul and the document containing such results has been produced.  Moreover, both Mr. Quirk and Mr. Faul have testified as to the results of such test.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 163:**      Admit that the Broussard lab created

one or more cured slurry samples as a result of the post-incident testing ordered by

Ronald Faul.

**RESPONSE:**      HESI objects to the phrase "the post-incident testing ordered by Ronald Faul"
as vague and ambiguous.  Subject to and without waiving the foregoing objection, HESI admits
that the post-incident foam stability test requested by Ronald Faul and conducted by Timothy
Quirk on lab stock cement and additives created a cured slurry sample of set cement.  Except as
expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 164:**      Admit that the cured slurry sample(s)

created as by [sic] the Broussard lab as a result of the post-incident testing ordered

by Ronald Faul have been destroyed.

**RESPONSE:**      HESI objects to the phrase "the post-incident testing ordered by Ronald Faul"
as vague and ambiguous.  Subject to and without waiving the foregoing objection, HESI admits
that the cured slurry sample of set cement referenced in HESI's response to Request for
Admission No. 163 was discarded after the test.  Except as expressly admitted herein, this
request is denied.

**REQUEST FOR ADMISSION NO. 165:**      Admit that Halliburton did not

condition the slurry for the Macondo Well production casing prior to the cement job

and after the cement was mixed on the rig.

**RESPONSE:**      HESI objects to the phrases "condition the slurry" and "after the cement was
mixed" as vague and ambiguous.  Subject to and without waiving the foregoing objections, HESI
admits that it did not condition the slurry actually mixed and pumped on the rig for the
production casing cement job before pumping the slurry into the well.   However, the
conditioning of the slurry sample used in laboratory testing reasonably approximates the
dynamic placement of the slurry and the temperature increases to which the slurry would be
exposed after it was pumped into the well.  Except as expressly admitted herein, this request is
denied.

**REQUEST FOR ADMISSION NO. 166:**      Admit that the foam slurry design for

the Macondo Well production casing had a foam quality of over 60% at injection

conditions.

**RESPONSE:**   HESI objects to the phrase "had a foam quality of over 60%" as vague, ambiguous and misleading insofar as OptiCem calculated a predicted foam quality of cement at certain depths or stages during the production casing cement job and ultimately calculated an average foam quality as a downhole foam quality target.   Subject to and without waiving the foregoing objection, HESI admits that, for a very short period of time, the foam quality at the nitrogen injection point was calculated to be just over 60%, and then the calculated foam quality also dropped below 60% for a short period of time.   Except as expressly admitted herein, this request is denied.

      **REQUEST FOR ADMISSION NO. 167:**   Admit that the foam slurry design for

the Macondo Well production casing had a foam quality of over 18.5% at downhole

conditions.

**RESPONSE:**   HESI objects to the phrase "had a foam quality of over 18.5%" as vague, ambiguous and misleading insofar as OptiCem calculated a predicted downhole foam quality of cement at certain depths or stages during the production casing cement job and ultimately calculated an average foam quality as a downhole foam quality target.   Subject to and without waiving the foregoing objection, HESI admits that the average targeted downhole foam quality was approximately 18.5%, meaning some portions of downhole foamed cement had a calculated foam quality above 18.5% and some portions of downhole foamed cement had a calculated foam quality below 18.5%.   Except as expressly admitted herein, this request is denied.

      **REQUEST FOR ADMISSION NO. 168:**   Admit that the April 18 Opticem

report, page 22, shows that foam quality down hole at 18107.5 feet was 18.61%.

**RESPONSE:**   HESI admits that the referenced page of the April 18, 2010 OptiCem report shows that the foam quality at 18107.5 feet was calculated and predicted to be 18.61%.   Except as expressly admitted herein, this request is denied.

      **REQUEST FOR ADMISSION NO. 169:**   Admit that Halliburton's testing

ordered on February 12, 2010 was performed on a cement slurry with a foam

quality of 12.98%.

**RESPONSE:**   HESI objects to the phrases "with a foam quality of 12.98%" and "ordered on February 12, 2010" as vague, ambiguous and misleading.   HESI further objects to the implication of this request that any testing reflected on a laboratory worksheet bearing a February 12, 2010 date is reflective of the cement slurry actually pumped on the production casing job on April 19, 2010 or of the downhole conditions associated with such job.   HESI further objects to the implication of this request that a 12.98% laboratory foam quality is

representative of the eventual downhole foam quality of the slurry or that the laboratory foam quality is calculated in the same manner that OptiCem calculates the predicted downhole foam quality of the slurry.  Subject to and without waiving the foregoing objections, HESI admits that it used a lab foam quality of 12.98% in the foam stability and crush compressive strength tests reflected on the laboratory worksheet dated February 12, 2010, which tests were conducted on a slurry using .20 gallons of SCR-100L retarder per sack of cement.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 170:**    Admit   that   Halliburton's   testing ordered  on  February  16,  2010  was  performed  on  a  cement  slurry  with  a  foam quality of 12.98%.

**RESPONSE:**    HESI objects to the phrases "with a foam quality of 12.98%" and "ordered on February 16, 2010" as vague, ambiguous and misleading.  HESI further objects to the implication of this request that any testing reflected on a laboratory worksheet bearing a February 16, 2010 date is reflective of the cement slurry actually pumped on the production casing job on April 19, 2010 or the downhole conditions associated with such job.  HESI further objects to the implication of this request that a 12.98% laboratory foam quality is representative of the eventual downhole foam quality of the slurry or that the laboratory foam quality is calculated in the same manner that OptiCem calculates the predicted downhole foam quality of the slurry.  Subject to and without waiving the foregoing objections, HESI admits that it used a lab foam quality of 12.98% in the foam stability and crush compressive strength tests reflected on the laboratory worksheet dated February 16, 2010, which tests were conducted on a slurry using .20 gallons of SCR-100L retarder per sack of cement.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 171:**    Admit   that   Halliburton's   testing ordered on March 7, 2010 was performed on a cement slurry with a foam quality of 12.96%.

**RESPONSE:**    HESI objects to this request as vague, ambiguous and misleading to the extent it seeks an admission regarding "testing ordered [by Halliburton] on March 7, 2010."  HESI further objects to the premise of this request that any testing reflected in a laboratory worksheet dated March 7, 2010 is related to or a part of testing conducted on the production casing cement job for the Macondo Well.  HESI further objects to the implication of this request that any testing reflected on a laboratory worksheet bearing a March 7, 2010 date is reflective of the cement slurry actually pumped on the production casing job on April 19, 2010 or the downhole conditions associated with such job.  HESI further objects to the implication of this request that the 12.96% foam quality is representative of the eventual downhole foam quality of the slurry or that the laboratory foam quality is calculated in the same manner that OptiCem calculates the predicted downhole foam quality of the slurry.  Subject to and without waiving the foregoing

objections, HESI admits that it used a lab foam quality of 12.96% in the foam stability and crush compressive strength tests reflected on one of the laboratory worksheets dated March 7, 2010, which tests were conducted on a slurry using .11 gallons of Foamer 760 surfactant and .20 gallons of SCR-100L retarder per sack of cement, and which were not related to or a part of the testing conducted on the slurry intended for use on the production casing cement job at Macondo Well.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 172:** Admit that Halliburton's testing ordered on April 13, 2010 was performed on a cement slurry with a foam quality of 12.98%.

**RESPONSE:**    HESI objects to the phrases "with a foam quality of 12.98%" and "ordered on April 13, 2010" as vague, ambiguous and misleading.  HESI further objects to the implication of this request that a 12.98% laboratory foam quality is representative of the eventual downhole foam quality of the slurry or that the laboratory foam quality is calculated in the same manner that OptiCem calculates the predicted downhole foam quality of the slurry.  Subject to and without waiving the foregoing objections, HESI admits that it used a lab foam quality of 12.98% in the foam stability and crush compressive strength tests reflected on the laboratory worksheet dated April 13, 2010, which tests were conducted on a slurry using .08 gallons of SCR-100L retarder per sack of cement, and which tests resulted in anomalous test results due to an apparent laboratory procedural error.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 173:** Admit that Halliburton's testing ordered on April 17, 2010 was performed on a cement slurry with a foam quality of 12.98%.

**RESPONSE:**    HESI objects to the phrases "with a foam quality of 12.98%" and "ordered on April 17, 2010" as vague, ambiguous and misleading.  HESI further objects to the implication of this request that a 12.98% laboratory foam quality is representative of the eventual downhole foam quality of the slurry or that the laboratory foam quality is calculated in the same manner that OptiCem calculates the predicted downhole foam quality of the slurry.  Subject to and without waiving the foregoing objections, HESI admits that it used a lab foam quality of 12.98% in the foam stability test reflected on the laboratory worksheet dated April 17, 2010, which test was conducted on a slurry using .08 gallons of SCR-100L retarder per sack of cement.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 174:** Admit that Halliburton did not perform crush compressive strength testing for the Macondo Well cement slurry design pumped on April 19, 2010.

**RESPONSE:**    HESI admits that it performed a crush compressive strength test on a slurry sample that included 0.08 gallons of SCR-100L retarder per sack of cement.  Subsequently, per BP's instructions, HESI added 0.01 gps of retarder to the slurry and did not perform an additional crush compressive strength test on a slurry sample containing a 0.09 gps retarder concentration before BP determined that the cement job would be pumped.  HESI did, however, conduct a UCA compressive strength test on a slurry sample that included 0.09 gallons of SCR-100L retarder per sack of cement, which was the retarder concentration in the slurry pumped on April 19, 2010.  HESI further admits that BP ordered the commencement of the cement job on the production casing at the Macondo Well without seeing or reviewing any crush compressive strength test on a slurry sample that included 0.09 gallons of SCR-100L retarder per sack of cement.  Except as expressly admitted herein, this request is denied.

> **REQUEST FOR ADMISSION NO. 175:**    Admit that Halliburton did not perform FYSA rheology profile and gel strength testing for the Macondo Well cement slurry design pumped on April 19, 2010.

**RESPONSE:**    HESI objects to this request to the extent it suggests that certain tests specified in the request were required by the contract to be run on the cement slurry used to cement the production casing at Macondo Well and/or that HESI's ability to run certain such tests was not affected by the timing of decisions made by BP in close proximity to the cement job on April 19, 2010.  Subject to and without waiving the foregoing objections, HESI admits that it performed FYSA rheology profile testing on a slurry sample that included 0.08 gallons of SCR-100L retarder per sack of cement.  Subsequently, per BP's instructions, HESI added 0.01 gps of retarder to the slurry and did not perform additional FYSA rheology profile testing on a slurry sample containing that concentration of retarder after determining that such a small amount of additional retarder would not significantly affect the existing rheology profile test results.  HESI further admits that, pre-incident, it did not conduct a static gel strength test on the Macondo Well cement slurry design pumped on April 19, 2010.  HESI further admits that BP ordered the commencement of the cement job on the production casing at the Macondo Well without seeing or reviewing any additional FYSA rheology profile test results or static gel strength test results on a sample that included 0.09 gallons of SCR-100L retarder per sack of cement.  Except as expressly admitted herein, this request is denied.

> **REQUEST FOR ADMISSION NO. 176:**    Admit that Halliburton did not perform foam stability testing for the Macondo Well cement slurry design pumped on April 19, 2010.

**RESPONSE:**    HESI admits that it performed foam stability testing on a slurry sample that included 0.08 gallons of SCR-100L retarder per sack of cement.  Subsequently, per BP's instructions, HESI added 0.01 gps of retarder to the slurry and did not perform additional foam stability testing on a slurry sample with that concentration of retarder after determining that such

a small amount of additional retarder would not significantly affect the foam stability test result. HESI further admits that BP ordered the commencement of the cement job on the production casing at the Macondo Well without seeing or reviewing any foam stability test result, either on the slurry sample using 0.08 gallons or an additional slurry sample using 0.09 gallons of SCR-100L retarder per sack of cement.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 177:**   Admit that prior to beginning the production casing cement job for the Macondo Well, Halliburton never generated a sample of the foam slurry using the design pumped on April 19, 2010.

**RESPONSE:**   HESI objects that this request is vague and ambiguous in its use of the phrase "generate a sample of the foam slurry."  Subject to and without waiving the foregoing objection, HESI admits that it successfully foamed a slurry sample that included 0.08 gallons of SCR-100L retarder per sack of cement.  Subsequently, per BP's instructions, HESI added 0.01 gps of retarder to the slurry and did not foam an additional slurry sample for purposes of testing foam stability with a 0.09 gps concentration of retarder after determining that such a small amount of additional retarder would not significantly affect the existing foam stability test result.  HESI further admits that BP ordered the commencement of the cement job on the production casing at the Macondo Well without seeing or reviewing any foam stability test result, either on the slurry sample using 0.08 gallons or an additional slurry sample using 0.09 gallons of SCR-100L retarder per sack of cement.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 178:**   Admit that Halliburton did not perform any foamed slurry tests on the 0.09 gallon per sack retarder cement slurry before the slurry was pumped at the Macondo Well.

**RESPONSE:**   HESI objects that this request is vague and ambiguous in its use of the phrase "foamed slurry tests."  Subject to and without waiving the foregoing objection, HESI admits that it performed foam stability testing on a slurry sample that included 0.08 gallons of SCR-100L retarder per sack of cement.  Subsequently, per BP's instructions, HESI added 0.01 gps of retarder to the slurry and did not perform additional foam stability testing or crush compressive strength testing on a foamed slurry sample with  a 0.09 gps concentration of retarder after determining that such a small amount of additional retarder would not significantly affect the existing foam stability and crush compressive strength test results.  HESI did, however, conduct a UCA compressive strength test on the a slurry sample that included 0.09 gallons of SCR-100L retarder per sack of cement, which was the retarder concentration in the slurry pumped on April 19, 2010.  HESI further admits that BP decided to authorize the commencement of the cement job on the production casing at the Macondo Well without seeing any foam stability test results on the slurry sample using 0.08 gallons of SCR-100L retarder per sack of cement or any foam stability or crush compressive strength test results on a slurry sample using 0.09 gallons of SCR-100L retarder per sack of cement.

**REQUEST FOR ADMISSION NO. 179:**   Admit that Halliburton did not comply with the cement testing specifications in API 10B-4 for the foamed cement slurry for the production interval of the Macondo Well.

**RESPONSE:**   HESI objects that this request is vague, ambiguous in its use of the phrase "did not comply with," as that phrase is not defined and lacks specificity.  HESI also objects to this request to the extent that it implies that API-10B-4 constitutes a regulatory requirement or anything other than a recommended practice.  Subject to and without waiving the foregoing objections, this request is denied.

**REQUEST FOR ADMISSION NO. 180:**   Admit that Halliburton did not perform the set foam stability test on the cement slurry for the production interval of the Macondo Well in accordance with API 10B-4.

**RESPONSE:**   HESI objects to this request to the extent that it implies that API-10B-4 constitutes a regulatory requirement or anything other than a recommended practice.  Subject to and without waiving the foregoing objection, HESI admits that it tested and weighed top and bottom sections of a slurry sample to be used in the production interval of the Macondo Well.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 181:**   Admit that Halliburton did not cut and weigh three sections of the cured foamed cement for the Macondo Well in accordance with the set foam stability test in API 10B-4.

**RESPONSE:**   HESI objects to this request to the extent that it implies that API-10B-4 constitutes a regulatory requirement or anything other than a recommended practice.  Subject to and without waiving the foregoing objection, HESI admits that in conducting foam stability testing, it cut and weighed top and bottom sections of a slurry sample to be used in the production interval of the Macondo Well.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 182:**   Admit that Halliburton did not perform the unset foam stability test on the cement slurry for the production interval of the Macondo Well in accordance with API 10B-4.

**RESPONSE:**    HESI objects to this request to the extent that it implies that API-10B-4 constitutes a regulatory requirement or anything other than a recommended practice.  HESI further objects to this request to the extent that it implies that HESI was obligated under API standards, the contract or otherwise to perform an unset foam stability test on the cement slurry intended to be used on production casing cement job that commenced April 19, 2010.  Subject to and without waiving the foregoing objections, HESI admits that it did not perform an unset foam stability test on the cement slurry intended to be used on production casing cement job that commenced April 19, 2010 because, in HESI's experience, this test can produce inaccuracies and variability that offset any value gained from conducting that test.  HESI further admits that BP ordered the commencement of the cement job on the production casing at the Macondo Well without seeing or reviewing any results from an unset foam stability test.  Except as expressly admitted herein, this request is denied.

### REQUEST FOR ADMISSION NO. 183:    Admit that the lightweight cement blend that Halliburton designed for the cement job on the Macondo Well on April 19 and 20, 2010 did not have less than 2 percent settlement under the BP settlement test.

**RESPONSE:**    HESI objects to the implication of this request that it was required, per the contract or otherwise, to conduct a BP settlement test on the cement slurry used on the production casing cement job pumped on April 19 and 20, 2010.  Subject to and without waiving the foregoing objection, HESI did not conduct a BP settlement test on the cement slurry used on the production casing cement job and, therefore, can neither admit nor deny this request. However, HESI does admit that BP ordered the commencement of the cement job on the production casing at the Macondo Well without seeing or reviewing any results from a BP settlement test.

### REQUEST FOR ADMISSION NO. 184:    Admit that the lightweight cement blend Halliburton provided to BP for the cement job on the Macondo Well on April 19 and 20, 2010 did not have API Fluid Loss of less than 100 milliliters per 30 minutes.

**RESPONSE:**    HESI objects to the implication of this request that it was required, per the contract or otherwise, to conduct an API Fluid Loss test on the cement slurry used on the production casing cement job pumped on April 19 and 20, 2010.  Subject to and without waiving the foregoing objection, HESI did not conduct an API Fluid Loss test on the cement slurry used on the production casing cement job and, therefore, can neither admit nor deny this request. However, HESI does admit that BP ordered the commencement of the cement job on the

production casing at the Macondo Well without seeing or reviewing any results from an API Fluid Loss test.

**REQUEST FOR ADMISSION NO. 185:**   Admit that Halliburton did not exercise its right to stop the job and refuse to pump the cement job on April 19 and 20, 2010 because of safety concerns.

**RESPONSE:**   HESI objects to this request on the grounds that "right" is vague, ambiguous and undefined.  HESI further objects to this request as duplicative of previous requests.  HESI further objects to this request to the extent it suggests incorrectly that HESI had sufficient information necessary to form a belief as to whether the acts or omissions of BP and/or any other party involved in pre-cementing or cementing operations on April 19 and April 20, 2010 presented a situation(s) in which HESI could or should have stopped operations.  HESI further objects to this request to the extent it suggests incorrectly that HESI had sufficient information, at the time of the cement job on April 19 and April 20, 2010, to form a belief that subsequent acts or omissions of BP and/or any other party would create a dangerous well control situation after the cement job was completed.  HESI further objects to this request to the extent it suggests that HESI could reasonably or successfully exercise stop work authority if it disagreed with operational decisions by BP and/or any other party in which HESI was not involved or for which HESI did not have ultimate decision-making authority.   Subject to and without waiving the foregoing objections, HESI admits that no HESI employee exercised stop-work authority on April 19 and April 20, 2010 because of safety concerns.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO.  186:**   Admit that defoamers can destabilize foamed cement slurry.

**RESPONSE:**   HESI objects that the term "defoamers" is vague, ambiguous and undefined. HESI further objects to the implication of this request that the mere presence of a defoaming agent in a foamed cement slurry will destabilize the foam cement.  HESI further objects to this request to the extent it implies that HESI added a defoamer(s) to the slurry intended for use on the production casing cement job at Macondo Well without testing to determine whether other additives sufficiently counteracted the effect of the defoamer and otherwise whether the foamed cement slurry was stable.  Subject to and without waiving the foregoing objections, HESI admits that under some circumstances not identified in this request, defoamers can destabilize foamed cement slurries.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 187:**   Admit that dispersants can destabilize foamed cement slurry.

**RESPONSE:**   HESI objects that the term "dispersants" is vague, ambiguous and undefined. HESI further objects to the implication of this request that the mere presence of a dispersing agent(s) in a foamed cement slurry will destabilize the foam cement.  HESI further objects to this request to the extent it implies that HESI added additives with dispersing effects to the slurry intended for use on the production casing cement job at Macondo Well without testing to determine whether other additives sufficiently counteracted the effects of such dispersing additives and otherwise whether the foamed cement slurry was stable.  Subject to and without waiving the foregoing objections, HESI admits that excessive volumes of additives with dispersing effects can destabilize foamed cement slurries under circumstances not identified in this request.  Except as expressly admitted herein, this request is denied.

### REQUEST FOR ADMISSION NO. 188:   Admit that EZ-FLO is a dispersant

that can destabilize foamed cement slurry.

**RESPONSE:**   HESI objects that the term "dispersants" is vague, ambiguous and undefined. Subject to and without waiving the foregoing objection, HESI denies this request.

### REQUEST FOR ADMISSION NO. 189:   Admit that D-AIR 3000 is a

defoamer that can destabilize foamed cement slurry.

**RESPONSE:**   HESI objects to the implication of this request that the mere presence of D-Air 3000 in a foamed cement slurry will destabilize the foam cement.  HESI further objects to this request to the extent it implies that HESI added D-Air 3000 to the slurry intended for use on the production casing cement job at Macondo Well without testing to determine whether other additives sufficiently counteracted the effect of the D-Air 3000 and otherwise whether the foamed cement slurry was stable.  Subject to and without waiving the foregoing objections, HESI admits that under some circumstances not identified in this request, D-Air 3000 can destabilize foamed cement slurries.  Except as expressly admitted herein, this request is denied.

### REQUEST FOR ADMISSION NO. 190:   Admit that salt is a dispersant that

can destabilize foamed cement slurry.

**RESPONSE:**   HESI objects that the term "dispersants" is vague, ambiguous and undefined. Subject to and without waiving the foregoing objection, HESI denies this request.

### REQUEST FOR ADMISSION NO. 191:   Admit that potassium chloride is a

dispersant that can destabilize foamed cement slurry.

**RESPONSE:**   HESI objects that the term "dispersants" is vague, ambiguous and undefined. Subject to and without waiving the foregoing objection, HESI denies this request.

**REQUEST FOR ADMISSION NO. 192:**     Admit that SA-541 is a dispersant

that can destabilize foamed cement slurry.

**RESPONSE:**     HESI objects that the term "dispersants" is vague, ambiguous and undefined. Subject to and without waiving the foregoing objection, HESI denies this request.

**REQUEST FOR ADMISSION NO. 193:**     Admit that SCR-100L is a dispersant

that can destabilize foamed cement slurry.

**RESPONSE:**     HESI objects that the term "dispersant" is vague, ambiguous and undefined. HESI further objects to the implication of this request that the mere presence of SCR-100L in a foamed cement slurry will destabilize the foam cement.  HESI further objects to this request to the extent it implies that HESI added SCR-100L to the slurry intended for use on the production casing cement job at Macondo Well without testing to determine whether the amount of SCR-100L was sufficient to achieve BP's requested pumping time without destabilizing the foamed cement slurry.  Subject to and without waiving the foregoing objections, HESI admits that excessive volumes of SCR-100L, which has secondary dispersing properties, can destabilize foamed cement slurries under circumstances not identified in this request.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 194:**     Admit that the final cement lab test

results for the cementing job on the production interval at the Macondo Well were

not provided to BP more than twenty-four hours before pumping the cement job on

April 19 and 20, 2010.

**RESPONSE:**     HESI objects to the phrase "final cement lab test results" as vague, ambiguous and undefined.  HESI further objects to the implication of this request that HESI, as opposed to BP, determined when the cement job on the production casing at Macondo Well commenced in relation to the availability of certain test results.  Subject to and without waiving the foregoing objections, HESI admits that some final lab test results obtained on the production casing cement job at Macondo Well were provided to BP more than twenty-four hours before the commencement of the cement job on April 19, 2010, and some final lab test results were not. HESI further admits that BP ordered the commencement of the production casing cement job on April 19, 2010 without seeing or reviewing all applicable test results or without otherwise having all applicable test results in hand.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 195:**   Admit that Halliburton did not conduct cement/spacer compatibility testing on the cement slurry for the Macondo Well before pumping the cement on April 19 and 20, 2010.

**RESPONSE:**   HESI objects this request to the extent it suggests, contrary to the terms of the parties' applicable contract, that cement/spacer compatibility testing was required on the production casing cement job at the Macondo Well.   Subject to and without waiving the foregoing objection, HESI admits that it did not conduct cement/spacer compatibility testing on the cement slurry pumped on the production casing cement job at the Macondo Well before April 19 and 20, 2010.   HESI further admits that BP ordered the commencement of the cement job on the production casing at the Macondo Well without requesting, seeing or reviewing any results from cement/spacer compatibility testing.   Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 196:**   Admit that Halliburton did not conduct cement/mud compatibility testing on the cement slurry for the Macondo Well before pumping the cement on April 19 and 20, 2010.

**RESPONSE:**   HESI objects to this request to the extent it suggests, contrary to the terms of the parties' applicable contract, that cement/mud compatibility testing was required on the production casing cement job at the Macondo Well.   Subject to and without waiving the foregoing objection, HESI admits that it did not conduct cement/mud compatibility testing on the cement slurry pumped on the production casing cement job at the Macondo Well before April 19 and 20, 2010.   HESI further admits that BP ordered the commencement of the cement job on the production casing at the Macondo Well without requesting, seeing or reviewing any results from cement/mud compatibility testing.   Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 197:**   Admit that Halliburton did not conduct cement/mud/spacer compatibility testing on the cement slurry for the Macondo Well before pumping the cement on April 19 and 20, 2010.

**RESPONSE:**   HESI objects to this request to the extent it suggests, contrary to the terms of the parties' applicable contract, that cement/mud/spacer compatibility testing was required on the production casing cement job at the Macondo Well.   Subject to and without waiving the foregoing objection, HESI admits that it did not conduct cement/mud/spacer compatibility testing on the cement slurry pumped on the production casing cement job at the Macondo Well before April 19 and 20, 2010.   HESI further admits that BP ordered the commencement of the cement job on the production casing at the Macondo Well without requesting, seeing or

reviewing any results from cement/mud/spacer compatibility testing.  Except as expressly admitted herein, this request is denied.

REQUEST FOR ADMISSION NO. 198:    Admit that Halliburton did not complete fluid loss testing on the cement slurry pumped on the production interval of the Macondo Well before April 19 and 20, 2010.

RESPONSE:    HESI objects to the erroneous implication of this request that it was required, per the contract or otherwise, to conduct fluid loss testing on the cement slurry used on the production casing cement job pumped on April 19 and 20, 2010.  Subject to and without waiving the foregoing objection, HESI admits it did not conduct fluid loss testing on the cement slurry used on the production casing cement job as such testing is normally not conducted on foamed cement slurries.  HESI further admits that BP ordered the commencement of the cement job on the production casing at the Macondo Well without seeing or reviewing any results from fluid loss testing.  Except as expressly admitted herein, this request is denied.

REQUEST FOR ADMISSION NO. 199:    Admit that Halliburton did not conduct free fluid testing on the cement slurry pumped on the production interval of the Macondo Well before April 19 and 20, 2010.

RESPONSE:    HESI objects to the implication of this request that it was required, per the contract or otherwise, to conduct fluid/free water testing on the primary foamed cement slurry used on the production casing cement job pumped on April 19 and 20, 2010.  Subject to and without waiving the foregoing objection, HESI admits it did not conduct free fluid/water testing on the cement slurry used on the production casing cement job as such a test would be redundant of foam stability testing which would also identify free fluid/water, if any, in the sample slurry. HESI further admits that BP decided ordered the commencement of the cement job on the production casing at the Macondo Well without seeing or reviewing any free fluid/water testing results.  Except as expressly admitted herein, this request is denied.

REQUEST FOR ADMISSION NO. 200:    Admit that Halliburton did not perform BP's settlement test on the cement slurry used on the production interval of the Macondo Well.

RESPONSE:    HESI objects to the implication of this request that it was required, per the contract or otherwise, to conduct a BP settlement test on the cement slurry used on the production casing cement job pumped on April 19 and 20, 2010, and/or that BP's decision-making in close proximity to the cement job made it possible for HESI to comply with any

potentially applicable contract term requiring that a BP settlement test be conducted. Subject to and without waiving the foregoing objection, HESI admits it did not conduct a BP settlement test on the cement slurry used on the production casing cement job. HESI further admits that BP ordered the commencement of the cement job on the production casing at the Macondo Well without seeing or reviewing any results from a BP settlement test. Except as expressly admitted herein, this request is denied.

### REQUEST FOR ADMISSION NO. 201:   Admit that Halliburton did not conduct static gel strength transition time testing on the cement slurry for the production interval of the Macondo Well before it pumped the cement on April 19 and 20, 2010.

**RESPONSE:**   HESI objects to the phrase "static gel strength transition time testing" as vague and ambiguous. A static gel strength test is run to determine zero gel time and transition time, but the later two are not separate tests. HESI further objects to the implication of this request that it was required, per the contract or otherwise, to conduct a static gel strength test on the cement slurry used on the production casing cement job pumped on April 19 and 20, 2010, and/or that BP's decision-making in close proximity to the cement job made it possible for HESI to comply with any potentially applicable contract term requiring that a static gel strength test be conducted prior to the cement job. Subject to and without waiving the foregoing objections, HESI admits it did not conduct a static gel strength test on the cement slurry prior to the commencement of the production casing cement job. HESI further admits that BP ordered the commencement of the cement job on the production casing at the Macondo Well without seeing or reviewing any results from a static gel strength test. Except as expressly admitted herein, this request is denied.

### REQUEST FOR ADMISSION NO. 202:   Admit that Halliburton did not conduct zero gel time testing on the cement slurry for the production interval of the Macondo Well before it pumped the cement on April 19 and 20, 2010.

**RESPONSE:**   HESI objects to the phrase "zero gel time testing" as vague and ambiguous. A static gel strength test is run to determine zero gel time and transition time, but the later two are not separate tests. HESI further objects to the implication of this request that it was required, per the contract or otherwise, to conduct a static gel strength test on the cement slurry used on the production casing cement job pumped on April 19 and 20, 2010, and/or that BP's decision-making in close proximity to the cement job made it possible for HESI to comply with any potentially applicable contract term requiring that a static gel strength test be conducted prior to the cement job. Subject to and without waiving the foregoing objection, HESI admits it did not conduct a static gel strength test on the cement slurry prior to the commencement of the production casing cement job. HESI further admits that BP ordered the commencement of the

cement job on the production casing at the Macondo Well without seeing or reviewing any results from a static gel strength test.  Except as expressly admitted herein, this request is denied.

### REQUEST FOR ADMISSION NO. 203:

Admit that Halliburton did not conduct free water testing on the lead cement or tail cement slurry for the production interval of the Macondo Well before it pumped the cement on April 19 and 20, 2010.

**RESPONSE:**   HESI objects to term "lead cement or tail slurry" as vague, ambiguous and misleading, particularly insofar as the lead and tail cement slurry is the same slurry used for the primary foam cement, all of which constitute a single slurry for testing purposes and which combined constitute the cement stages of a single cement job on the production casing cement job.  HESI objects to the implication of this request that it was required, per the contract or otherwise, to conduct free fluid/water testing on the primary foamed cement slurry used on the production casing cement job pumped on April 19 and 20, 2010.  Subject to and without waiving the foregoing objection, HESI admits it did not separately conduct free fluid/water testing on the slurry used on the production casing cement job as such a test would be redundant of foam stability testing which would also identify free fluid/water, if any, in the sample slurry.  HESI further admits that BP ordered the commencement of the cement job on the production casing at the Macondo Well without seeing or reviewing any free fluid/water testing results.  Except as expressly admitted herein, this request is denied.

### REQUEST FOR ADMISSION NO. 204:

Admit that Halliburton did not conduct API mud/spacer testing for the production interval of the Macondo Well before it pumped the cement on April 19 and 20, 2010.

**RESPONSE:**   HESI objects that the phrase "mud/spacer testing" is vague, ambiguous and undefined.  Subject to and without waiving the foregoing objection, HESI denies this request.

### REQUEST FOR ADMISSION NO. 205:

Admit that Halliburton did not conduct compressive strength testing for a 95/5 cement/spacer combination for the production interval of the Macondo Well before it pumped the cement on April 19 and 20, 2010.

**RESPONSE:**   HESI objects to the term "compressive strength testing" as vague and ambiguous as there are various types of such tests.  HESI further objects to the erroneous

implication of this request that it was required, per the contract or otherwise, to conduct a compressive strength test testing for a 95/5 cement/spacer combination for the production casing cement job pumped on April 19 and 20, 2010. Subject to and without waiving the foregoing objections, HESI admits that it did not conduct a compressive strength test testing for a 95/5 cement/spacer combination for the production casing cement job pumped on April 19 and 20, 2010, but it did conduct various other compressive strength tests as set forth herein. HESI further admits that BP ordered the commencement of the cement job on the production casing at the Macondo Well without seeing or reviewing any compressive strength test results testing for a 95/5 cement/spacer combination. Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 206:** Admit that Halliburton did not conduct static gel strength transition time testing on the cement slurry pumped on the production interval of the Macondo Well before April 19 and 20, 2010.

**RESPONSE:** HESI objects to the phrase "static gel strength transition time testing" as vague and ambiguous. A static gel strength test is run to determine zero gel time and transition time, but the later two are not separate tests. HESI further objects to this request as vague and ambiguous as to time. For purposes of this response, HESI will assume that the request seeks an admission regarding whether a static gel strength test was conducted before the cement slurry used to cement the production casing at the Macondo Well was pumped on April 19 and 20, 2010. HESI further objects to the erroneous implication of this request that it was required, per the contract or otherwise, to conduct a static gel strength test on the cement slurry used on the production casing cement job pumped on April 19 and 20, 2010, and/or that BP's decision-making in close proximity to the cement job made it possible for HESI to comply with any potentially applicable contract term specifying that such a test be conducted prior to the cement job. Subject to and without waiving the foregoing objections, HESI admits it did not conduct a static gel strength test on the cement slurry prior to the commencement of the production casing cement job. HESI further admits that BP ordered the commencement of the cement job on the production casing at the Macondo Well without seeing or reviewing any results from a static gel strength test. Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 207:** Admit that Halliburton did not conduct expansion/shrinkage testing on the cement slurry pumped on the production interval of the Macondo Well before April 19 and 20, 2010.

**RESPONSE:** HESI objects to the term "expansion/shrinkage testing" as vague and ambiguous. HESI further objects to the implication of this request that it was required, per the contract or otherwise, to conduct a so-called expansion/shrinkage test on the cement slurry used on the production casing cement job pumped on April 19 and 20, 2010. Subject to and without waiving the foregoing objection, HESI admits it did not conduct an expansion/shrinkage test on the cement slurry used on the production casing cement job. HESI further admits that BP

ordered the commencement of the cement job on the production casing at the Macondo Well without seeing or reviewing any results from an expansion/shrinkage test.  Except as expressly admitted herein, this request is denied.

### REQUEST FOR ADMISSION NO. 208:   Admit that on March 8, 2010, Jesse

Gagliano stated to BP that it was sending "the lab test for your review."

**RESPONSE:**   HESI admits that, on March 8, 2010, Jesse Gagliano sent an email to BP recipients stating, among other things, that he was sending "the lab test for your review."  Except as expressly admitted herein, this request is denied.

### REQUEST FOR ADMISSION NO. 209:   Admit that on March 8, 2010, neither

Jesse Gagliano, nor any other Halliburton employee, sent BP all of the available test

results for the pilot slurry for the Macondo Well.

**RESPONSE:**   HESI objects to the phrase "available test results" as vague, ambiguous and misleading.  Certain tests conducted by HESI in February 2010 sought only a target parameter. Results of tests conducted that do not reach target parameters are not typically reported by HESI to BP.  With respect to certain other tests, if anomalous test results indicate the possibility that a test was not properly performed by lab personnel or that testing equipment did not perform as expected, HESI will repeat the test and report the test result to BP once the laboratory is confident that the testing procedure was properly performed and/or the lab equipment performed as expected.   Subject to and without waiving the foregoing objection, and based on the foregoing, HESI admits that, on March 8, 2010, it provided BP with all valid and applicable test results for the pilot slurry for the Macondo Well and, therefore, denies this request.

### REQUEST FOR ADMISSION NO. 210:   Admit that on April 1, 2010, Jesse

Gagliano stated to BP that "I already have a pilot test run, see attached."

**RESPONSE:**   HESI admits that, on April 1, 2010, Jesse Gagliano sent an email to BP recipients stating, among other things, "I already have a pilot test run, see attached," and attaching the same lab test results he had previously provided BP by email on or about March 8, 2010.  Except as expressly admitted herein, this request is denied.

### REQUEST FOR ADMISSION NO. 211:   Admit that on April 1, 2010, neither

Jesse Gagliano, nor any other Halliburton employee, sent BP all of the available test

results for the pilot slurry for the Macondo Well.

**RESPONSE:**   HESI objects to the phrase "available test results" as vague, ambiguous and misleading.  HESI further objects to the erroneous implication that anyone other than Jesse Gagliano would provide test results.  HESI representative Certain tests conducted by HESI in February 2010 sought only a target parameter.  Results of tests conducted that do not reach target parameters are not typically reported by HESI to BP.  With respect to certain other tests, if anomalous test results indicate the possibility that a test was not properly performed by lab personnel or that testing equipment did not perform as expected, HESI will repeat the test and report the test result to BP once the laboratory is confident that the testing procedure was properly performed and/or the lab equipment performed as expected.  Subject to and without waiving the foregoing objection, and based on the foregoing, on April 1, 2010, HESI again provided BP with all valid and applicable test results for the pilot slurry for the Macondo Well and, therefore, this request is denied.

**REQUEST FOR ADMISSION NO. 212:**   Admit that the test results for the

pilot slurry sent on March 8, 2010 indicated that no conditioning had been done on

the cement slurry for the foamed stability test.

**RESPONSE:**   HESI objects to the implication of this request that it intentionally misrepresented or omitted the conditioning time on the foam stability test result provided to BP on or about March 8, 2010, which test result showed top and bottom specific gravity as 1.91 and 1.91, respectively.  The slurry sample for such foam stability test was conditioned for 2 hours, as reflected on the applicable laboratory worksheet.  Subject to and without waiving the foregoing objection, HESI admits that an unintentional clerical error resulted in the conditioning time for such test being reflected as "00:00 hrs:min" on the test result document provided to BP on or about March 8, 2010.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 213:**   Admit that the test results for the

pilot slurry sent on April 1, 2010 indicated that no conditioning had been done on

the cement slurry for the foamed stability test.

**RESPONSE:**   HESI objects to the implication of this request that it intentionally misrepresented or omitted the conditioning time on the foam stability test result that it provided to BP a second time on or about April 1, 2010, which test result showed top and bottom specific gravity as 1.91 and 1.91, respectively.  As the test results document provided to BP on April 1, 2010 was the same test results document provided to BP on March 8, 2010, HESI's response to this request incorporates its response to Request for Admission No. 212.  Specifically, the slurry sample for such foam stability test was conditioned for 2 hours, as reflected on the applicable laboratory worksheet.  Subject to and without waiving the foregoing objection, HESI admits that an unintentional clerical error resulted in the conditioning time for such test being reflected as "00:00 hrs:min" on the test result document provided to BP on or about April 1, 2010.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 214:**    Admit that the results reported in the

report sent March 8, 2010 were for a foamed stability test using a cement slurry that

had been conditioned for two hours.

**RESPONSE:**    HESI admits that the foam stability test result provided to BP on or about
March 8, 2010, showing top and bottom specific gravity as 1.91 and 1.91, respectively, used a
cement slurry sample that had been conditioned for two hours and contained a concentration of
.20 gallons of SCR-100L retarder per sack of cement.  Except as expressly admitted herein, this
request is denied.

**REQUEST FOR ADMISSION NO. 215:**    Admit that the results reported in the

report sent April 1, 2010 were for a foamed stability test using a cement slurry that

had been conditioned for two hours.

**RESPONSE:**    HESI admits that the foam stability test result provided to BP on or about April
1, 2010 (which was the same test result previously provided to BP on or about March 8, 2010),
showing top and bottom specific gravity as 1.91 and 1.91, respectively, used a cement slurry
sample that had been conditioned for two hours and contained a concentration of .20 gallons of
SCR-100L retarder per sack of cement.  Except as expressly admitted herein, this request is
denied.

**REQUEST FOR ADMISSION NO. 216:**    Admit that the test results for the

pilot slurry sent on March 8, 2010 did not report any problems with the crush

compressive strength test.

**RESPONSE:**    HESI objects to the phrase "any problems" as vague and ambiguous.  HESI
further objects to the implication of this request that the results of tests reflected on documents
provided by HESI to BP on or about March 8, 2010 are representative of results applicable to the
actual slurry used to pump the production casing cement job on April 19, and 20, 2010.  HESI
further objects to this request to the extent it incorrectly suggests that BP would not, without
more information, be able to ascertain the status of or quality of results from the crush
compressive strength testing by looking at the quantitative test results provided on or about
March 8, 2010.  Subject to and without waiving the foregoing objection, HESI admits that the
pilot test results document provided to BP on or about March 8, 2010 reported quantitative data
and/or results relevant to the crush compressive strength test reflected in such document and did
not otherwise report qualitative observations regarding the test.  Except as expressly admitted
herein, this request is denied.

**REQUEST FOR ADMISSION NO. 217:**   Admit that the test results for the pilot slurry sent on April 1, 2010 did not report any problems with the crush compressive strength test.

**RESPONSE:**   HESI objects to the phrase "any problems" as vague and ambiguous.  HESI further objects to the implication of this request that the results of tests reflected on documents provided by HESI to BP on or about April 1, 2010 are representative of results applicable to the actual slurry used to pump the production casing cement job on April 19, and 20, 2010.  HESI further objects to this request to the extent it incorrectly suggests that BP would not, without more information, be able to ascertain the status of or quality of results from the crush compressive strength testing by looking at the quantitative test results provided on or about April 1, 2010.  Subject to and without waiving the foregoing objections, HESI admits that the pilot test results document provided to BP on or about April 1, 2010 (which was the same test results document previously provided to BP on or about March 8, 2010) reported quantitative data and/or results relevant to the crush compressive strength test reflected in such document and did not otherwise report qualitative observations regarding the test.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 218:**   Admit that the test results for the pilot slurry sent on March 8, 2010 did not report the results of the foam stability test for the pilot slurry documented on the Cement Lab Weigh-Up Sheet dated February 12, 2010.

**RESPONSE:**   HESI objects to the phrase "results" as vague, ambiguous and misleading. HESI further objects to the phrase "the Cement Lab Weigh-Up Sheet dated February 12, 2010" as vague and ambiguous as there are three such documents bearing the date, February 12, 2010. HESI further objects to this request to the extent it suggests that the foam stability test which obtained a result of 2.02 and 2.11 specific gravity on top and bottom, respectively, was a valid test result that should have been reported to BP.  The results of this test, which attempted to test a cement slurry sample with a retarder concentration of .20 gallons of SCR-100L per sack of cement, were sufficiently anomalous to prompt HESI to reconduct the test in order to ensure that proper laboratory procedure was followed and that a valid test result was obtained to report to BP.  HESI further objects to the implication of this request that the aforementioned foam stability test result is representative of the stability of the actual foamed slurry pumped on the production casing cement job on April 19, and 20, 2010.  Subject to and without waiving the foregoing objections, HESI admits that the anomalous test result—2.02 and 2.11 specific gravity on top and bottom, respectively—was not reported to BP.  Instead, the foam stability test was repeated to ensure that a valid test result was achieved, which test result was reported to BP.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 219:**   Admit that the test results for the pilot slurry sent on April 1, 2010 did not report the results of the foam stability test for the pilot slurry documented on the Cement Lab Weigh-Up Sheet dated February 12, 2010.

**RESPONSE:**   HESI objects to the phrase "results" as vague, ambiguous and misleading. HESI further objects to the phrase "the Cement Lab Weigh-Up Sheet dated February 12, 2010" as vague and ambiguous as there are three such documents bearing the date, February 12, 2010. HESI further objects to this request to the extent it suggests that the foam stability test which obtained a result of 2.02 and 2.11 specific gravity on top and bottom, respectively, was a valid test result that should have been reported to BP.  The results of this test, which attempted to test a cement slurry sample with a retarder concentration of .20 gallons of SCR-100L per sack of cement, were sufficiently anomalous to prompt HESI to reconduct the test in order to ensure that proper laboratory procedure was followed and that a valid test result was obtained to report to BP.  HESI further objects to the implication of this request that the aforementioned foam stability test result is representative of the stability of the actual foamed slurry pumped on the production casing cement job on April 19, and 20, 2010.  Subject to and without waiving the foregoing objections, HESI admits that the anomalous test result—2.02 and 2.11 specific gravity on top and bottom, respectively—was not reported to BP.  Instead, the foam stability test was repeated to ensure that a valid test result was achieved, which test result was reported to BP (and which test result was the same result previously provided to BP on or about March 8, 2010).  Except as expressly admitted herein, this request is denied.


**REQUEST FOR ADMISSION NO. 220:**   Admit that the foam stability test for the pilot slurry documented on the Cement Lab Weigh-Up Sheet dated February 12, 2010 notes a "SG top" of 2.02 and a "SG bot." of 2.11.

**RESPONSE:**   HESI objects to the phrase "pilot slurry" as vague and ambiguous.  HESI further objects to the phrase "the Cement Lab Weigh-Up Sheet dated February 12, 2010" as vague and ambiguous as there are three such documents bearing the date, February 12, 2010. HESI further objects to this request to the extent it suggests that the foam stability test which obtained a result of 2.02 and 2.11 specific gravity on top and bottom, respectively, was a valid test result that should have been reported to BP.  The results of this test, which attempted to test a cement slurry sample with a retarder concentration of .20 gallons of SCR-100L per sack of cement, were sufficiently anomalous to prompt HESI to reconduct the test in order to ensure that proper laboratory procedure was followed and that a valid test result was obtained to report to BP.  HESI further objects to the implication of this request that the aforementioned foam stability test result is representative of the stability of the actual foamed slurry pumped on the production casing cement job on April 19, and 20, 2010.  Subject to and without waiving the foregoing objections, HESI admits that a Cement Lab Weigh-Up Sheet dated February 12, 2010 reflects that a flawed foam stability test procedure generated the following specific gravity values—2.02

and 2.11 specific gravity on top and bottom, respectively.  The foam stability test was repeated to ensure that a valid test result was achieved, which test result was reported to BP (and which test result was the same result previously provided to BP on or about March 8, 2010).  Except as expressly admitted herein, this request is denied.

> **REQUEST FOR ADMISSION NO. 221:**    Admit that a foam stability test result showing a "SG top" of 2.02 and a "SG bot." of 2.11, when the target density is a SG of 1.737, indicates that the foamed slurry is unstable.

**RESPONSE:**    Denied.

> **REQUEST FOR ADMISSION NO. 222:**    Admit that the crush compressive strength test for the pilot slurry documented on the Cement Lab Weigh-Up Sheet dated February 12, 2010 notes that the "slurry is settling, will repeat."

**RESPONSE:**    HESI objects to the phrase "pilot slurry" as vague and ambiguous.  HESI further objects to the phrase "the Cement Lab Weigh-Up Sheet dated February 12, 2010" as vague and ambiguous as there are three such documents bearing the date, February 12, 2010. HESI further objects to the implication of this request that a crush compressive strength test result obtained in February 2010, which attempted to test a cement slurry sample with a retarder concentration of .20 gallons of SCR-100L per sack of cement, is representative of the compressive strength of the actual foamed slurry pumped on the production casing cement job on April 19, and 20, 2010, or that any technician's noted observation of such test is applicable to the foamed slurry actually pumped on such production casing job.  Subject to and without waiving the foregoing objections, HESI admits that a Cement Lab Weigh-Up Sheet dated February 12, 2010 contains technician notes stating, among other things, "slurry is settling, will repeat." Except as expressly admitted herein, this request is denied.

> **REQUEST FOR ADMISSION NO. 223:**    Admit that the crush compressive strength test for the pilot slurry documented on the Cement Lab Weigh-Up Sheet dated February 12, 2010 was canceled due to settling by the foam cement slurry.

**RESPONSE:**    HESI objects to the phrase "canceled" as vague, ambiguous and misleading. Subject to and without waiving the foregoing objection, HESI denies this request.

> **REQUEST FOR ADMISSION NO. 224:**    Admit that settling by the foam cement slurry can be an indication of foam instability.

**RESPONSE:**    HESI objects to the phrase "settling" as vague and ambiguous.  Subject to and without waiving the foregoing objection, HESI admits that excessive settling in a foamed cement slurry sample can be an indication of foam instability which would have to be evaluated in conjunction with other potential indicators.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 225:**    Admit that the crush compressive strength test documented on the Cement Lab Weigh-Up Sheet dated February 16, 2010 notes at 60 hours that the cement is "hard on bottom, soft on top."

**RESPONSE:**    HESI objects to the implication of this request that a crush compressive strength test result obtained in February 2010, which attempted to test a cement slurry sample with a retarder concentration of .20 gallons of SCR-100L per sack of cement, is representative of the compressive strength of the actual foamed slurry pumped on the production casing cement job on April 19, and 20, 2010, or that any technician's noted observation of such test is applicable to the foamed slurry actually pumped on such production casing job.  Subject to and without waiving the foregoing objections, HESI admits that the Cement Lab Weigh-Up Sheet dated February 16, 2010 contains technician notes stating, among other things, "hard on bottom, soft on top."  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 226:**    Admit that the crush compressive strength test documented on the Cement Lab Weigh-Up Sheet dated February 16, 2010 notes at 84 hours that the cement is "hard on bottom, firm on top."

**RESPONSE:**    HESI objects to the implication of this request that any crush compressive strength test result obtained in February 2010, which attempted to test a cement slurry sample with a retarder concentration of .20 gallons of SCR-100L per sack of cement, is representative of the compressive strength of the actual foamed slurry pumped on the production casing cement job on April 19, and 20, 2010, or that any technician's noted observation of such test is applicable to the foamed slurry actually pumped on such production casing job.  Subject to and without waiving the foregoing objections, HESI admits that the Cement Lab Weigh-Up Sheet dated February 16, 2010 contains technician notes stating, among other things, "hard on bottom, firm on top."  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 227:**    Admit that density segregation by the foam cement slurry can be an indication of foam instability.

**RESPONSE:**   HESI admits that visual signs of density segregation as indicated by streaking or light to dark color change from top to bottom of a foamed cement slurry sample can be an indication of foam instability.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 228:**   Admit that the foam stability test for the pilot slurry documented on the Cement Lab Weigh-Up Sheet dated February 16, 2010 notes a "SG top" of 1.91 and a "SG bot." of 1.91.

**RESPONSE:**   HESI objects to the phrase "pilot slurry" as vague and ambiguous.  HESI further objects to the implication of this request that the foam stability test results made the subject of this request, which attempted to test a cement slurry sample with a retarder concentration of .20 gallons of SCR-100L per sack of cement, is representative of the stability of the actual foamed slurry pumped on the production casing cement job on April 19, and 20, 2010. Subject to and without waiving the foregoing objections, HESI admits that a Cement Lab Weigh-Up Sheet dated February 16, 2010 reflects that a foam stability test procedure generated the following specific gravity values—1.91 and 1.91 specific gravity on top and bottom, respectively.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 229:**   Admit that a foam stability test result showing a "SG top" of 1.91 and a "SG bot." of 1.91, when the target density is a SG of 1.737, indicates that the foamed slurry is unstable.

**RESPONSE:**   Denied.

**REQUEST FOR ADMISSION NO. 230:**   Admit that on April 17, 2010, Halliburton stated to BP that it "[a]ttached the lab tests."

**RESPONSE:**   HESI objects to BP's request as misleading, particularly insofar as BP erroneously represents that the quoted language in the request contains a period, further erroneously suggesting that the quoted language constitutes a single, four-word sentence without more.  HESI admits that, on April 17, 2010, Jesse Gagliano sent BP an email identifying the status of ongoing tests and separately attaching up-to-date and then available test results on the cement slurry containing 0.08 gallons of SCR-100L per sack of cement and on the cement slurry containing 0.09 gallons of SCR-100L per sack of cement.   The full text of the email communication from Jesse Gagliano to BP is as follows:

>"Attached are the lab tests, one with 8 gal of retarder and one with 9 gals.  Below are the pump times.  The 8 gals lab test also includes the UCA and foamed crush CS.  The 9 gals UCA has only been on for 30 min and has not shown any CS yet.

8 gals – 5:30 hrs

9 gals – 7:37 hrs

The JPT is about 4:08 hrs, I would be comfortable going with the 5:30 hrs time.  Please review and let me know.  Thanks!!!"

Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 231:**   Admit that on April 17, 2010, Halliburton did not send all of the available test results for the cement slurry for the Macondo Well.

**RESPONSE:**   HESI objects to the phrase "all of the available test results" as vague, ambiguous and misleading.  Certain tests conducted by HESI sought only a target parameter.  Results of tests conducted that do not reach target parameters are not typically reported by HESI to BP or any other operator.  With respect to certain other tests, if anomalous test results indicate the possibility that a test was not properly performed by lab personnel or that testing equipment did not perform as expected, HESI will repeat the test and report the test result to BP once the laboratory is confident that the testing procedure was properly performed and/or the lab equipment performed as expected.  Subject to and without waiving the foregoing objections, and based on the foregoing, HESI admits that, on April 17, 2010, it provided BP with all valid and applicable test results at that time for the Macondo Well production casing cement job and, therefore, denies this request.

**REQUEST FOR ADMISSION NO. 232:**   Admit that on April 17, 2010, Halliburton did not send the foam stability test results for the cement slurry documented on the Cement Lab Weigh-Up Sheet dated April 13, 2010.

**RESPONSE:**   HESI objects to the phrase "the foam stability test results" as vague, ambiguous and misleading.  HESI further objects to this request to the extent it suggests that the foam stability test which obtained a result of 1.88 and 1.82 specific gravity on top and bottom, respectively, was a valid test result that should have been reported to BP.  The results of this test were sufficiently anomalous to prompt HESI to reconduct the test in order to ensure that proper laboratory procedure was followed and that a valid test result was obtained to report to BP.  Indeed, the slurry sample used to conduct this test was weighed-up improperly in the laboratory.  Subject to and without waiving the foregoing objections, HESI admits that the anomalous test result—1.88 and 1.82 specific gravity on top and bottom, respectively, as reflected in the Cement Lab Weigh-Up Sheet dated April 13, 2010—was not reported to BP.  Instead, the foam stability test was repeated to ensure that a valid test result was achieved, which test result was reported to BP.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 233:**      Admit that the foam stability test for the cement slurry documented on the Cement Lab Weigh-Up Sheet dated April 13, 2010 notes a "SG top" of 1.88 and a "SG bot." of 1.82.

**RESPONSE:**     HESI objects to this request to the extent it suggests that the specific gravity values documented on the Cement Lab Weigh-Up Sheet dated April 13, 2010 constitute valid foam stability test results.  Indeed, the slurry sample used to conduct this test was weighed-up improperly in the laboratory.  HESI further objects to the implication of this request that the foam stability test result made the subject of this request is representative of the stability of the actual foamed slurry pumped on the production casing cement job on April 19, and 20, 2010. Subject to and without waiving the foregoing objections, HESI admits that a Cement Lab Weigh-Up Sheet dated April 13, 2010 reflects that a foam stability test procedure generated the following specific gravity values—1.88 and 1.82 specific gravity on top and bottom, respectively.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 234:**      Admit that a foam stability test result showing a "SG top" of 1.88 and a "SG bot." of 1.82, when the target density is a SG of 1.737, indicates that the foamed slurry is unstable.

**RESPONSE:**     HESI objects to the phrase "a foam stability test result showing a 'SG top' of 1.88 and a 'SG bot.' of 1.82" as vague, ambiguous and misleading.  For purposes of this response, HESI assumes that BP is requesting that HESI admit that the specific gravity values documented in the Cement Lab Weigh-Up Sheet dated April 13, 2010—1.88 and 1.82 specific gravity on top and bottom, respectively—"indicate that the foamed slurry is unstable."  Subject to and without waiving the foregoing objections, HESI denies this request.

**REQUEST FOR ADMISSION NO. 235:**      Admit that the foam stability test for the cement slurry documented on the Cement Lab Weigh-Up Sheet dated April 17, 2010 notes a "SG top" of 1.8 and a "SG bot." of 1.799.

**RESPONSE:**     Admitted.

**REQUEST FOR ADMISSION NO. 236:**      Admit that a foam stability test result showing a "SG top" of 1.8 and a "SG bot." of 1.799, when the target density is a SG of 1.737, indicates that the foamed slurry is unstable.

**RESPONSE:**    Denied.

**REQUEST FOR ADMISSION NO. 237:**    Admit that Halliburton did not tell BP that it considers a foam stability test result within one pound per gallon of the target density to be a successful test.

**RESPONSE:**    HESI objects to the phrase "within one pound per gallon of the target density" as vague, ambiguous, misleading and contrary to the evidence deduced in discovery to date. HESI further objects to this phrase to the extent it suggests that HESI has taken the position that up to a one pound per gallon variance between a foamed sampled density and the target density constitutes a "successful test." The density of the set foam stability test sample (14.99 ppg) on the final foam stability test is approximately one-half pound greater than the target density of 14.5 ppg. HESI further objects to the suggestion in this request that BP has no knowledge of what constitutes an acceptable variance between such densities without being told by HESI. Subject to and without waiving the foregoing objections, after a reasonable inquiry, information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny whether HESI had communications with BP regarding what constitutes such an acceptable variance and, therefore, HESI denies the request.

**REQUEST FOR ADMISSION NO. 238:**    Admit that "conditioning time" documented on the Cement Lab Weigh-Up Sheet for foam stability testing refers to the time the unfoamed cement slurry is conditioned at a set temperature.

**RESPONSE:**    Denied.

**REQUEST FOR ADMISSION NO. 239:**    Admit that the unfoamed cement slurry was conditioned at 180°F for 3 hours for the foam stability test documented on the Cement Lab Weigh-Up Sheet dated April 17, 2010.

**RESPONSE:**    Denied.

**REQUEST FOR ADMISSION NO. 240:**    Admit that the unfoamed cement slurry was not conditioned at 180°F for 3 hours on April 19, 2010 on the *Deepwater Horizon* before foaming.

**RESPONSE:**    HESI objects to this request as vague, ambiguous and misleading, particularly to the extent it suggests that HESI has conditioned any slurry in the lab at 180º F for 3 hours. Subject to and without waiving the foregoing objection, HESI admits this request.

>  **REQUEST FOR ADMISSION NO. 241:**    Admit that the unfoamed cement slurry was conditioned at 180°F for 1.5 hours for the foam stability test documented on the Cement Lab Weigh-Up Sheet dated April 13, 2010.

**RESPONSE:**    Denied.

>  **REQUEST FOR ADMISSION NO. 242:**    Admit that the unfoamed cement slurry was not conditioned at 180°F for 1.5 hours on April 19, 2010 on the *Deepwater Horizon* before foaming.

**RESPONSE:**    HESI objects to this request as vague, ambiguous and misleading, particularly to the extent it suggests that HESI has conditioned any slurry in the lab at 180º F for 1.5 hours. Subject to and without waiving the foregoing objection, HESI admits this request.

>  **REQUEST FOR ADMISSION NO. 243:**    Admit that the unfoamed cement slurry was conditioned at 180°F for 2 hours for the foam stability test documented on the Cement Lab Weigh-Up Sheet dated February 16, 2010.

**RESPONSE:**    Denied.

>  **REQUEST FOR ADMISSION NO. 244:**    Admit that the unfoamed cement slurry was not conditioned at 180°F for 2 hours on April 19, 2010 on the *Deepwater Horizon* before foaming.

**RESPONSE:**    HESI objects to this request as vague, ambiguous and misleading, particularly to the extent it suggests that HESI has conditioned any slurry in the lab at 180º F for 2 hours. Subject to and without waiving the foregoing objection, HESI admits this request.

**REQUEST FOR ADMISSION NO. 245:**    Admit that the unfoamed cement slurry was not conditioned at an elevated temperature on April 19, 2010 on the *Deepwater Horizon* before foaming.

**RESPONSE:**    HESI objects that the phrase "elevated temperature" is vague, ambiguous, and undefined.   HESI further objects to the implication of this request that the practice of conditioning a slurry in the laboratory at elevated temperatures before foaming has no operational basis.  HESI further objects to the suggestion in this request that conditioning a slurry in a laboratory should not be done if the precise procedure for conditioning cannot be replicated on the actual cement slurry to be pumped on the job location.  Subject to and without waiving the foregoing objections, HESI admits this request.

**REQUEST FOR ADMISSION NO. 246:**    Admit that SA-541 is an additive that increases the viscosity of the cement slurry with increasing temperature.

**RESPONSE:**    HESI objects that the phrase "increasing temperature" is vague, ambiguous, and undefined.  Subject to and without waiving the foregoing objection, HESI admits that SA-541 can increase the viscosity of a cement slurry with increasing temperature over time.

**REQUEST FOR ADMISSION NO. 247:**    Admit that the cement slurry for the Macondo Well is designed to become more viscous with increasing temperature.

**RESPONSE:**    HESI objects that the phrase "cement slurry for the Macondo Well" is vague, ambiguous, undefined, and does not specify which cement slurry used at the Macondo Well is the subject of the request.   HESI further objects that the phrase "increasing temperature" is vague, ambiguous, and undefined.   Subject to and without waiving the foregoing objections, HESI admits that the SA-541 additive in the cement slurry used to cement the production casing at the Macondo Well would be expected to make the slurry more viscous as temperature increased over time.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 248:**    Admit that the cement slurry for the Macondo Well produces a more stable foam with increasing temperature.

**RESPONSE:**    HESI objects to the phrase "cement slurry for the Macondo Well" because that phrase is vague, ambiguous and undefined and does not specify which cement slurry is implicated by this request.  Subject to and without waiving the foregoing objection, HESI admits that, under certain circumstances, the cement slurry pumped in the production casing interval of the Macondo Well can become more stable as temperature increases.

**REQUEST FOR ADMISSION NO. 249:**     Admit that the cement slurry for the

Macondo Well forms a more stable foam at 180°F than at 80°F.

**RESPONSE:**     Denied.

**REQUEST FOR ADMISSION NO. 250:**     Admit that Halliburton told BP on or

around April 23, 2010 that he had tested stability of the foamed cement slurry

containing a defoamer additive.

**RESPONSE:**     HESI objects to use of the terms "Halliburton" and "he" in this request as vague, ambiguous and nonsensical.  HESI further objects to this request to the extent it suggests that BP did not learn that a defoamer additive was contained in the cement slurry used on the production casing cement job at the Macondo Well until around April 23, 2010, particularly since BP owned the cement blend before the *Deepwater Horizon* arrived on location at the Macondo Well, and the defoamer additive was specifically identified by name on multiple laboratory reports provided by HESI to BP starting in March 2010 and specifically identified as a "defoamer" in numerous production casing cement program documents provided by HESI to BP before commencement of the production casing cement job.  HESI will interpret this nonsensical request as requesting that HESI admit that it informed BP for the first time, on or about April 23, 2010, that the cement slurry used to cement the production casing at Macondo Well contained a defoamer additive.  Subject to and without waiving the foregoing objections, HESI denies this request.

**REQUEST FOR ADMISSION NO. 251:**     Admit that Halliburton told BP on or

around April 23, 2010 that the foam stability test showed that the cement slurry

containing a defoamer additive was stable.

**RESPONSE:**     HESI objects to this request to the extent it suggests that HESI did not provide BP with a written foam stability test for the production casing cement job at the Macondo Well showing that the cement slurry containing a defoamer additive was stable.  To the extent this request seeks an admission regarding whether an oral conversation occurred between Jesse Gagliano and BP on or about April 23, 2010 concerning the substance of this request, HESI has conducted a reasonable inquiry, and is without knowledge or information sufficient to admit or deny this request and, therefore, denies it.

**REQUEST FOR ADMISSION NO. 252:**  Admit that on April 26, 2010, Halliburton wrote to BP to "See attached.  Lab test not captured in Post Job Report."

**RESPONSE:**   Admitted.

**REQUEST FOR ADMISSION NO. 253:**  Admit that on April 26, 2010, Halliburton did not send all of the available test results for the cement slurry for the Macondo Well not captured in the post-job report.

**RESPONSE:**   HESI objects to the phrase "all of the available test results" as vague, ambiguous and misleading.  Certain tests conducted by HESI sought only a target parameter. Results of tests conducted that do not reach target parameters are not typically reported by HESI to BP.  With respect to certain other tests, if anomalous test results indicate the possibility that a test was not properly performed by lab personnel or that testing equipment did not perform as expected, HESI will repeat the test and report the test result to BP once the laboratory is confident that the testing procedure was properly performed and/or the lab equipment performed as expected.   Subject to and without waiving the foregoing objections, and based on the foregoing, HESI admits that, on April 26, 2010, it provided BP with all valid and applicable test results for the Macondo Well production casing cement job and, therefore, denies this request.

**REQUEST FOR ADMISSION NO. 254:**  Admit that on April 26, 2010, Halliburton did not send the foam stability test results for the cement slurry documented on the Cement Lab Weigh-Up Sheet dated April 13, 2010.

**RESPONSE:**   HESI objects to the phrase "the foam stability test results for the cement slurry documented on the Cement Lab Weigh-Up Sheet dated April 13, 2010" as vague, ambiguous and misleading.  HESI further objects to this request to the extent it suggests that the foam stability test which obtained a result of 1.88 and 1.82 specific gravity on top and bottom, respectively, was a valid test result that should have been reported to BP.  The results of this test were sufficiently anomalous to prompt HESI to reconduct the test in order to ensure that proper laboratory procedure was followed and that a valid test result was obtained to report to BP. Indeed, the slurry sample used to conduct this test was weighed-up improperly in the laboratory. Subject to and without waiving the foregoing objections, HESI admits that the anomalous test result—1.88 and 1.82 specific gravity on top and bottom, respectively, as reflected in the Cement Lab Weigh-Up Sheet dated April 13, 2010—was not provided to BP on April 26, 2010.  Instead, the foam stability test was repeated to ensure that a valid test result was achieved, which test result was reported to BP.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 255:**   Admit that prior to April 20, 2010,

Halliburton did not send BP the Cement Lab Weigh-Up sheets dated February 12,

2010.

**RESPONSE:**   HESI objects to the phrase "the Cement Lab Weigh-Up sheets dated February 12, 2010" as vague and ambiguous as there are three such documents bearing the date, February 12, 2010.  HESI further objects to this request to the extent it suggests that test results and other values documented on such Weigh-Up Sheets were all valid test results that should have been reported or provided to BP.  HESI further objects to this request to the extent it incorrectly suggests that HESI was obligated to provide such Weigh-Up Sheets to BP or that HESI normally provides such Weigh-Up Sheets to BP in the normal course of business, on the Macondo Well or any other well.  HESI further objects to the implication of this request that all tests results and values documented on such sheets, which were obtained testing various cement slurry samples with retarder concentrations from 0.14 to 0.20 gallons of SCR-100L per sack of cement, are representative of the foamed slurry pumped on the production casing cement job on April 19, and 20, 2010.  Subject to and without waiving the foregoing objections, HESI admits that it did not, prior to April 20, 2010, provide BP with the three Cement Lab Weigh-Up Sheets dated February 12, 2010.  Except as expressly admitted herein, this request is denied.

**REQUEST FOR ADMISSION NO. 256:**   Admit that prior to April 20, 2010,

Halliburton did not provide BP all of the results of the cement testing from the

Cement Lab Weigh-Up sheets dated February 12, 2010.

**RESPONSE:**   HESI objects to the phrase "all of the results of the cement testing" as vague, ambiguous and misleading.  HESI further objects to this request to the extent it suggests that test results and other values documented on the Cement Lab Weigh-Up sheets dated February 12, 2010, were all valid test results that should have been reported or provided to BP. Certain tests conducted by HESI sought only a target parameter.  Results of tests conducted that do not reach target parameters are not typically reported by HESI to BP.  With respect to certain other tests, if anomalous test results indicate the possibility that a test was not properly performed by lab personnel or that testing equipment did not perform as expected, HESI will repeat the test and report the test result to BP once the laboratory is confident that the testing procedure was properly performed and/or the lab equipment performed as expected.  Subject to and without waiving the foregoing objections, and based on the foregoing, HESI admits that, prior to April 20, 2010, it provided BP with all valid and applicable test results from testing that occurred in February 2010 and, therefore, denies this request.

**REQUEST FOR ADMISSION NO. 257:**   Admit that prior to April 20, 2010,

Halliburton did not send BP the Cement Lab Weigh-Up sheets from April 13, 2010.

**RESPONSE:**     HESI objects to the phrase "the Cement Lab Weigh-Up sheets from April 13, 2010" as vague, ambiguous and misleading as HESI is only aware of a single Weigh-Up Sheet related to the Macondo Well's production casing cement job bearing the date, April 13, 2010. HESI further objects to this request to the extent it suggests that test results and other values documented on such Weigh-Up Sheet were all valid test results that should have been reported or provided to BP.  HESI further objects to this request to the extent it incorrectly suggests that HESI was obligated to provide such Weigh-Up Sheet to BP or that HESI normally provides such Weigh-Up Sheets to BP in the normal course of business, on the Macondo Well or any other well.  Subject to and without waiving the foregoing objections, HESI admits that it did not, prior to April 20, 2010, provide BP with the Cement Lab Weigh-Up Sheet dated April 13, 2010. Except as expressly admitted herein, this request is denied.

<u>**REQUEST FOR ADMISSION NO. 258:**</u>     Admit that prior to April 20, 2010,

Halliburton did not provide BP all of the results of the cement testing from the

Cement Lab Weigh-Up sheets dated April 13, 2010.

**RESPONSE:**     HESI objects to the phrase "all of the results of the cement testing" as vague, ambiguous and misleading.  HESI further objects to this request to the extent it suggests that test results and other values documented on the Cement Lab Weigh-Up sheet dated April 13, 2010, were all valid test results that should have been reported or provided to BP. Certain tests conducted by HESI sought only a target parameter.  Results of tests conducted that do not reach target parameters are not typically reported by HESI to BP.  With respect to certain other tests, if anomalous test results indicate the possibility that a test was not properly performed by lab personnel or that testing equipment did not perform as expected, HESI will repeat the test and report the test result to BP once the laboratory is confident that the testing procedure was properly performed and/or the lab equipment performed as expected.  Subject to and without waiving the foregoing objections, and based on the foregoing, HESI denies this request.

<u>**REQUEST FOR ADMISSION NO. 259:**</u>     Admit that Halliburton did not take

representative field samples of the dry blend cement used on the production interval

of the Macondo Well.

**RESPONSE:**     HESI objects to the terms "take" and "field samples" as vague and ambiguous. HESI further objects to this request as vague and ambiguous as to time.  Subject to and without waiving the foregoing objections, and to the extent BP intends this request to apply to the dry blend cement samples collected in April 2010 for testing on the cement slurry used to cement the Macondo Well's production casing, HESI denies this request.

**REQUEST FOR ADMISSION NO. 260:**    Admit that Halliburton did not take representative field samples of the dry additives used on the production interval of the Macondo Well.

**RESPONSE:**    HESI objects to the terms "take" and "field samples" as vague and ambiguous. HESI further objects to this request as vague and ambiguous as to time.  Subject to and without waiving the foregoing objections, and to the extent BP intends this request to apply to the dry additives in the blend cement samples collected in April 2010 for testing on the cement slurry used to cement the Macondo Well's production casing, HESI denies this request.

**REQUEST FOR ADMISSION NO. 261:**    Admit that Halliburton did not take representative field samples of the liquid additives used on the production interval of the Macondo Well.

**RESPONSE:**    HESI objects to the terms "take" and "field samples" as vague and ambiguous. HESI further objects to this request as vague and ambiguous as to time.  Subject to and without waiving the foregoing objections, and to the extent BP intends this request to apply to the liquid additives used in the samples tested in April 2010 for the cement slurry used to cement the Macondo Well's production casing, HESI admits that testing samples of such liquid additives were obtained from the laboratory.  However, HESI denies that such liquid additives, which are closely tracked by lot and/or other identifying numbers, were unrepresentative of the liquid additives used on the *Deepwater Horizon* during the production casing cement job.

**REQUEST FOR ADMISSION NO. 262:**    Admit that Halliburton did not take representative field samples of the rig water used on the production interval of the Macondo Well.

**RESPONSE:**    HESI objects to the terms "take" and "field samples" as vague and ambiguous. HESI further objects to this request to the extent it assumes incorrectly that all testing conducted on the Macondo Well's production casing slurry used the same source of water to mix testing samples.  HESI will assume that BP seeks an admission that HESI did not use "rig water" to mix the slurry samples used to conduct the final foam stability test.  Subject to and without waiving the foregoing objections, HESI denies this request

**REQUEST FOR ADMISSION NO. 263:**   Admit that Halliburton did not adequately monitor the drilling operation on the *Deepwater Horizon* on April 20, 2010.

**RESPONSE:**   HESI objects to the phrases "adequately monitor" and "drilling operation" because such phrases are vague, ambiguous and undefined.  HESI further objects to the extent this request assumes or suggests a "drilling operation" was being performed on the *Deepwater Horizon* on April 20, 2010.  Subject to and without waiving the foregoing objections, HESI denies this request.

**REQUEST FOR ADMISSION NO. 264:**   Admit that Halliburton did not provide a mud logging program capable of monitoring mudflow trends on the *Deepwater Horizon* during the cementing operations or the negative test on April 19 and 20, 2010.

**RESPONSE:**   HESI objects to the phrases "mud logging program" and "monitoring mudflow trends" because such phrases are vague, ambiguous and undefined.  Subject to and without waiving the foregoing objections, this request is denied.

**REQUEST FOR ADMISSION NO. 265:**   Admit that Halliburton did not provide a mud logging program capable of monitoring gas trends on the *Deepwater Horizon* during the cementing operations or the negative test on April 19 and 20, 2010.

**RESPONSE:**   HESI objects to the phrases "mud logging program" and "monitoring gas trends" because such phrases are vague, ambiguous and undefined.  Subject to and without waiving the foregoing objections, this request is denied.

**REQUEST FOR ADMISSION NO. 266:**   Admit that Halliburton did not monitor trends of the pit volumes on the *Deepwater Horizon* during the cementing operations on April 19 and 20, 2010.

**RESPONSE:**    HESI objects to the phrase "trends of the pit volumes" because such phrase is vague, ambiguous and undefined.  Subject to and without waiving the foregoing objections, HESI denies this request.

> **REQUEST FOR ADMISSION NO. 267:**    Admit that Halliburton did not monitor trends of the pit volumes on the *Deepwater Horizon* during the negative test operations on April 19, 2010.

**RESPONSE:**    HESI objects to the phrase "trends of the pit volumes" because such phrase is vague, ambiguous and undefined.  HESI further objects to this request because it incorrectly states that a negative test was performed on the *Deepwater Horizon* on April 19, 2010.  Subject to and without waiving the foregoing objections, HESI denies this request.

> **REQUEST FOR ADMISSION NO. 268:**    Admit that Halliburton did not monitor trends of the pit volumes on the *Deepwater Horizon* during the riser displacement operations on April 20, 2010.

**RESPONSE:**    HESI objects to the phrase "trends of the pit volumes" because such phrase is vague, ambiguous and undefined.  Subject to and without waiving the foregoing objection, this request is denied.

> **REQUEST FOR ADMISSION NO. 269:**    Admit that Halliburton did not provide a mud logging system on the *Deepwater Horizon* where placement of the mud logging sensors allowed all measurements to be made independently of other contractor equipment.

**RESPONSE:**    HESI objects to this request to the extent it suggests incorrectly that HESI was responsible for coordinating all of BP's contractors.  HESI further objects to this request to the extent it assumes that HESI selected the quantity and/or type of sensors it would install on the *Deepwater Horizon* and that HESI selected the locations for its sensors, and to the extent BP directed and/or authorized the sensor locations.  HESI also objects to the phrases "mud logging system," "mud logging sensors," "all measurements" and "other contractor equipment" because such phrases are vague, ambiguous and undefined.  Subject to and without waiving the foregoing objections, HESI denies this request because its flow-out and gas sensors, the only Sperry sensors installed on the *Deepwater Horizon* pertaining to mudlogging operations, were capable of taking measurements independently of other contractor equipment.

**REQUEST FOR ADMISSION NO. 270:**   Admit that Halliburton did not provide BP with a full accounting for mud losses while drilling (especially in the reservoir) at the Macondo Well.

**RESPONSE:**   HESI objects to the phrases "full accounting" and "while drilling" because such phrases are vague, ambiguous and undefined.   Subject to and without waiving the foregoing objections, this request is denied.

**REQUEST FOR ADMISSION NO. 271:**   Admit that, on April 19 and 20, 2010 on the *Deepwater Horizon*, during cementing operations, Halliburton did not monitor the progress of the circulation and returns.

**RESPONSE:**   HESI objects to the term "monitor" and to the phrase "progress of circulations and returns" because they are vague, ambiguous and undefined.   Subject to and without waiving the foregoing objections, this request is denied.

**REQUEST FOR ADMISSION NO. 272:**   Admit that Halliburton did not reconcile the mud volumes during the cementing operations on April 19 and 20, 2010 on the *Deepwater Horizon*.

**RESPONSE:**   HESI objects to the term "reconcile" because such term is vague, ambiguous and undefined.   Subject to and without waiving the foregoing objection, this request is denied.

**REQUEST FOR ADMISSION NO. 273:**   Admit that Halliburton did not reconcile the mud volumes after the cementing operations on April 19 and 20, 2010 on the *Deepwater Horizon*.

**RESPONSE:**   HESI objects to the term "reconcile" because such term is vague, ambiguous and undefined.   Subject to and without waiving the foregoing objection, this request is denied.

**REQUEST FOR ADMISSION NO. 274:**   Admit that Halliburton did not implement mud logging engineering procedures on the *Deepwater Horizon* to a

sufficiently high level of competency to detect kicks in a timely manner from the

Macondo Well on April 20, 2010.

**RESPONSE:**     HESI objects to the phrase "mud logging engineering procedures" because such phrase is vague, ambiguous and undefined.  Subject to and without waiving the foregoing objection, this request is denied.

**REQUEST FOR ADMISSION NO. 275:**     Admit that Halliburton did not

monitor the following parameters on the *Deepwater Horizon* during the negative

test operations on April 20, 2010:

    a.       Casing pressure;

    b.       Standpipe pressure;

    c.       Total pit volume;

    d.       Mud weight in/out;

    e.       Mud flow in;

    f.       Total barrels displaced;

    g.       Total strokes pumped;

    h.       Plot of casing pressure, standpipe pressure and pit volume; and

    i.       Total gas.

**RESPONSE:**     HESI objects to the phrase "negative test operations" because such phrase is vague, ambiguous and undefined, failing to set forth with reasonable clarity the scope of activities and/or operations encompassed therein.  Subject to and without waiving the foregoing objections, HESI denies this request.

**REQUEST FOR ADMISSION NO. 276:**     Admit that Halliburton did not

monitor the following parameters on the *Deepwater Horizon* during the riser

displacement operations on April 20, 2010:

    a.       Casing pressure;

    b.       Standpipe pressure;

    c.      Total pit volume;

    d.      Mud weight in/out;

    e.      Mud flow in;

    f.      Total barrels displaced;

    g.      Total strokes pumped;

    h.      Plot of casing pressure, standpipe pressure and pit volume; and

    i.      Total gas.

**RESPONSE:**    HESI objects to the phrase "riser displacement operations" because such phrase is vague, ambiguous and undefined, failing to set forth with reasonable clarity the scope of activities and/or operations encompassed therein.  Subject to and without waiving the foregoing objections, HESI denies this request.

        **REQUEST FOR ADMISSION NO. 277:**    Admit that, on April 20, 2010 on the

*Deepwater Horizon*, Halliburton did not monitor the well for circulating system

volumes during the negative test operations.

**RESPONSE:**    HESI objects to the phrase "negative test operations" because such phrase is vague, ambiguous and undefined, failing to set forth with reasonable clarity the scope of activities and/or operations encompassed therein.  Subject to and without waiving the foregoing objections, HESI denies this request.

        **REQUEST FOR ADMISSION NO. 278:**    Admit that, on April 20, 2010 on the

*Deepwater Horizon*, Halliburton did not monitor the well for mud flow during the

negative test operations.

**RESPONSE:**    HESI objects to the phrase "negative test operations" because such phrase is vague, ambiguous and undefined, failing to set forth with reasonable clarity the scope of activities and/or operations encompassed therein.  Subject to and without waiving the foregoing objections, HESI denies this request.

**REQUEST FOR ADMISSION NO. 279:**    Admit that, on April 20, 2010 on the *Deepwater Horizon*, Halliburton did not monitor the well for circulating system volumes during the riser displacement operations.

**RESPONSE:**    HESI objects to the phrase "circulating system volumes" because such phrase is vague, ambiguous and undefined.  HESI further objects to the phrase "riser displacement operations" because such phrase is vague, ambiguous and undefined, failing to set forth with reasonable clarity the scope of activities and/or operations encompassed therein.  Subject to and without waiving the foregoing objections, HESI denies this request.

**REQUEST FOR ADMISSION NO. 280:**    Admit that, on April 20, 2010 on the *Deepwater Horizon*, Halliburton did not monitor the well for mud flow during the riser displacement operations.

**RESPONSE:**    HESI objects to the phrase "riser displacement operations" because such phrase is vague, ambiguous and undefined, failing to set forth with reasonable clarity the scope of activities and/or operations encompassed therein.  Subject to and without waiving the foregoing objections, HESI denies this request.

**REQUEST FOR ADMISSION NO. 281:**    Admit that Halliburton did not provide high resolution flow monitoring on the *Deepwater Horizon* on April 20, 2010 with the ability to:

    a.    Compensate for rig heave, pitch/roll, and riser boosters on floating rigs;

    b.    Raise alarms in response to influx rate, influx volume, loss rate and loss volume; and

    c.    Sensitivity sufficient to allow detection of losses or kicks of 1-2 barrels.

**RESPONSE:**    HESI objects to the erroneous implication in this request that HESI was required by contract or otherwise to provide such services.  HESI admits that the high resolution flow monitoring it provided on the *Deepwater Horizon* on April 20, 2010 did not compensate for rig heave or pitch/roll, but otherwise denies this request.  Except as expressly admitted herein, HESI denies this request.

**REQUEST FOR ADMISSION NO. 282:**    Admit that on April 18, 2010, a well control drill was conducted on board the *Deepwater Horizon*.

**RESPONSE:**    HESI admits that BP produced in this litigation documents bates numbered BP-HZN-MBI00167534 to BP-HZN-MBI00167575 and that these documents appear to be a record of safety drills conducted on the *Deepwater Horizon*.   However, after a reasonable inquiry, information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny the remaining allegations in this request and, therefore, the request is denied.

<u>**REQUEST FOR ADMISSION NO. 283:**</u>    Admit that on April 18, 2010, 16 persons attended the well control drill conducted on board the *Deepwater Horizon*.

**RESPONSE:**    HESI admits that BP produced in this litigation documents bates numbered BP-HZN-MBI00167534 to BP-HZN-MBI00167575 and that these documents appear to be a record of safety drills conducted on the *Deepwater Horizon*.   However, after a reasonable inquiry, information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny the remaining allegations in this request and, therefore, the request is denied.

<u>**REQUEST FOR ADMISSION NO. 284:**</u>    Admit that on April 18, 2010, Transocean was responsible for conducting the well control drill on board the *Deepwater Horizon.*

**RESPONSE:**    HESI admits that BP produced in this litigation documents bates numbered BP-HZN-MBI00167534 to BP-HZN-MBI00167575 and that these documents appear to be a record of safety drills conducted on the *Deepwater Horizon*.   However, after a reasonable inquiry, information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny the remaining allegations in this request and, therefore, the request is denied.

<u>**REQUEST FOR ADMISSION NO. 285:**</u>    Admit that on April 18, 2010, Transocean did in fact conduct the well control drill on board the *Deepwater Horizon*.

**RESPONSE:**    HESI admits that BP produced in this litigation documents bates numbered BP-HZN-MBI00167534 to BP-HZN-MBI00167575 and that these documents appear to be a record of safety drills conducted on the *Deepwater Horizon*.   However, after a reasonable inquiry, information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny the remaining allegations in this request and, therefore, the request is denied.

**REQUEST FOR ADMISSION NO. 286:**   Admit that on April 18, 2010, Transocean conducted a well control drill on board the *Deepwater Horizon* in which Transocean discussed "kicks" which can take place during cement jobs.

**RESPONSE:**   HESI admits that BP produced in this litigation documents bates numbered BP-HZN-MBI00167534 to BP-HZN-MBI00167575 and that these documents appear to be a record of safety drills conducted on the *Deepwater Horizon*.  However, after a reasonable inquiry, information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny the remaining allegations in this request and, therefore, the request is denied.

**REQUEST FOR ADMISSION NO. 287:**   Admit that on April 18, 2010, Transocean conducted a well control drill on board the *Deepwater Horizon* in which Transocean discussed the fact that kicks can occur while cementing.

**RESPONSE:**   HESI admits that BP produced in this litigation documents bates numbered BP-HZN-MBI00167534 to BP-HZN-MBI00167575 and that these documents appear to be a record of safety drills conducted on the *Deepwater Horizon*.  However, after a reasonable inquiry, information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny the remaining allegations in this request and, therefore, the request is denied.

**REQUEST FOR ADMISSION NO. 288:**   Admit that on April 18, 2010, Transocean conducted a well control drill on board the *Deepwater Horizon* in which Transocean discussed the fact that kicks which can occur while cementing are the results of reducing the hydrostatic pressure during the operation.

**RESPONSE:**   HESI admits that BP produced in this litigation documents bates numbered BP-HZN-MBI00167534 to BP-HZN-MBI00167575 and that these documents appear to be a record of safety drills conducted on the *Deepwater Horizon*.  However, after a reasonable inquiry, information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny the remaining allegations in this request and, therefore, the request is denied.

**REQUEST FOR ADMISSION NO. 289:**   Admit that on April 18, 2010, Transocean conducted a well control drill on board the *Deepwater Horizon* in which

Transocean discussed that wells have been lost due to improperly designed cement slurries and spacers.

**RESPONSE:**    HESI admits that BP produced in this litigation documents bates numbered BP-HZN-MBI00167534 to BP-HZN-MBI00167575 and that these documents appear to be a record of safety drills conducted on the *Deepwater Horizon*.   However, after a reasonable inquiry, information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny the remaining allegations in this request and, therefore, the request is denied.

**REQUEST FOR ADMISSION NO. 290:**    Admit  that  on  April  18,  2010, Transocean conducted a well control drill on board the *Deepwater Horizon* which started at 10 am in the morning.

**RESPONSE:**    HESI admits that BP produced in this litigation documents bates numbered BP-HZN-MBI00167534 to BP-HZN-MBI00167575 and that these documents appear to be a record of safety drills conducted on the *Deepwater Horizon*.   However, after a reasonable inquiry, information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny the remaining allegations in this request and, therefore, the request is denied.

**REQUEST FOR ADMISSION NO. 291:**    Admit  that  on  April  18,  2010, Transocean conducted a well control drill on board the *Deepwater Horizon* which lasted for thirty (30) minutes.

**RESPONSE:**    HESI admits that BP produced in this litigation documents bates numbered BP-HZN-MBI00167534 to BP-HZN-MBI00167575 and that these documents appear to be a record of safety drills conducted on the *Deepwater Horizon*.   However, after a reasonable inquiry, information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny the remaining allegations in this request and, therefore, the request is denied.

**REQUEST FOR ADMISSION NO. 292:**    Admit  that  on  April  18,  2010, Transocean conducted a well control drill on board the *Deepwater Horizon* which was attended by sixteen (16) persons on board the vessel.

**RESPONSE:**    HESI admits that BP produced in this litigation documents bates numbered BP-HZN-MBI00167534 to BP-HZN-MBI00167575 and that these documents appear to be a record of safety drills conducted on the *Deepwater Horizon*.   However, after a reasonable inquiry,

information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny the remaining allegations in this request and, therefore, the request is denied.

**REQUEST FOR ADMISSION NO. 293:**   Admit that on April 18, 2010, Transocean conducted only one well control drill on board the *Deepwater Horizon*.

**RESPONSE:**   HESI admits that BP produced in this litigation documents bates numbered BP-HZN-MBI00167534 to BP-HZN-MBI00167575 and that these documents appear to be a record of safety drills conducted on the *Deepwater Horizon*.   However, after a reasonable inquiry, information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny the remaining allegations in this request and, therefore, the request is denied.

**REQUEST FOR ADMISSION NO. 294:**   Admit that on April 18, 2010, the persons on board the *Deepwater Horizon* who attended the well control drill conducted by Transocean included each of the following:  Jason Anderson, Daniel Barron III, Donald Clark, Stephen Curtis, Miles (Randy) Ezell, Jimmy Harrell, Caleb Holloway, Roy Kemp, Karl Kleppinger, Todd Ladner, Blair Manuel, Jay Oldenwald, Dewey Revette, Shane Roshto, Donald Vidrine and Adam Weise.

**RESPONSE:**   HESI admits that BP produced in this litigation documents bates numbered BP-HZN-MBI00167534 to BP-HZN-MBI00167575 and that these documents appear to be a record of safety drills conducted on the *Deepwater Horizon*.   However, after a reasonable inquiry, information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny the remaining allegations in this request and, therefore, the request is denied.

**REQUEST FOR ADMISSION NO. 295:**   Admit that on April 18, 2010, one of the Transocean employees who led the well control drill on board the *Deepwater Horizon* included Jason Anderson.

**RESPONSE:**   HESI admits that BP produced in this litigation documents bates numbered BP-HZN-MBI00167534 to BP-HZN-MBI00167575 and that these documents appear to be a record of safety drills conducted on the *Deepwater Horizon*.   However, after a reasonable inquiry, information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny the remaining allegations in this request and, therefore, the request is denied.

**REQUEST FOR ADMISSION NO. 296:**    Admit that on April 18, 2010, one of the Transocean employees who led the well control drill on board the *Deepwater Horizon* was Miles (Randy) Ezell.

**RESPONSE:**    HESI admits that BP produced in this litigation documents bates numbered BP-HZN-MBI00167534 to BP-HZN-MBI00167575 and that these documents appear to be a record of safety drills conducted on the *Deepwater Horizon*.   However, after a reasonable inquiry, information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny the remaining allegations in this request and, therefore, the request is denied.

**REQUEST FOR ADMISSION NO. 297:**    Admit that on April 18, 2010, one of the Transocean employees who led the well control drill on board the *Deepwater Horizon* was Jimmy Harrell.

**RESPONSE:**    HESI admits that BP produced in this litigation documents bates numbered BP-HZN-MBI00167534 to BP-HZN-MBI00167575 and that these documents appear to be a record of safety drills conducted on the *Deepwater Horizon*.   However, after a reasonable inquiry, information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny the remaining allegations in this request and, therefore, the request is denied.

**REQUEST FOR ADMISSION NO. 298:**    Admit that on April 18, 2010, one of the Transocean employees who led the well control drill on board the *Deepwater Horizon* was Dewey Revette.

**RESPONSE:**    HESI admits that BP produced in this litigation documents bates numbered BP-HZN-MBI00167534 to BP-HZN-MBI00167575 and that these documents appear to be a record of safety drills conducted on the *Deepwater Horizon*.   However, after a reasonable inquiry, information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny the remaining allegations in this request and, therefore, the request is denied.

**REQUEST FOR ADMISSION NO. 299:**    Admit that Jason Anderson was told during the April 18, 2010 well control drill conducted on board the *Deepwater Horizon* that wells have been lost due to improperly designed cement slurries and operations.

**RESPONSE:**    HESI admits that BP produced in this litigation documents bates numbered BP-HZN-MBI00167534 to BP-HZN-MBI00167575 and that these documents appear to be a record of safety drills conducted on the *Deepwater Horizon*.   However, after a reasonable inquiry, information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny the remaining allegations in this request and, therefore, the request is denied.

**REQUEST FOR ADMISSION NO. 300:**    Admit that Dewey Revette was told during the April 18, 2010 well control drill conducted on board the *Deepwater Horizon* that wells have been lost due to improperly designed cement slurries and operations.

**RESPONSE:**    HESI admits that BP produced in this litigation documents bates numbered BP-HZN-MBI00167534 to BP-HZN-MBI00167575 and that these documents appear to be a record of safety drills conducted on the *Deepwater Horizon*.   However, after a reasonable inquiry, information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny the remaining allegations in this request and, therefore, the request is denied.

**REQUEST FOR ADMISSION NO. 301:**    Admit that Stephen Curtis was told during the April 18, 2010 well control drill conducted on board the *Deepwater Horizon* that wells have been lost due to improperly designed cement slurries and operations.

**RESPONSE:**    HESI admits that BP produced in this litigation documents bates numbered BP-HZN-MBI00167534 to BP-HZN-MBI00167575 and that these documents appear to be a record of safety drills conducted on the *Deepwater Horizon*.   However, after a reasonable inquiry, information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny the remaining allegations in this request and, therefore, the request is denied.

**REQUEST FOR ADMISSION NO. 302:**    Admit that Donald Clark was told during the April 18, 2010 well control drill conducted on board the *Deepwater Horizon* that wells have been lost due to improperly designed cement slurries and operations.

**RESPONSE:**    HESI admits that BP produced in this litigation documents bates numbered BP-HZN-MBI00167534 to BP-HZN-MBI00167575 and that these documents appear to be a record

of safety drills conducted on the *Deepwater Horizon*.   However, after a reasonable inquiry, information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny the remaining allegations in this request and, therefore, the request is denied.

**REQUEST FOR ADMISSION NO. 303:**     Admit that Jason Anderson was told during the April 18, 2010 well control drill conducted on board the *Deepwater Horizon* that kicks which can occur while cementing are the results of reducing the hydrostatic pressure during the operation.

**RESPONSE:**     HESI admits that BP produced in this litigation documents bates numbered BP-HZN-MBI00167534 to BP-HZN-MBI00167575 and that these documents appear to be a record of safety drills conducted on the *Deepwater Horizon*.   However, after a reasonable inquiry, information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny the remaining allegations in this request and, therefore, the request is denied.

**REQUEST FOR ADMISSION NO. 304:**     Admit that Dewey Revette was told during the April 18, 2010 well control drill conducted on board the *Deepwater Horizon* that kicks which can occur while cementing are the results of reducing the hydrostatic pressure during the operation.

**RESPONSE:**     HESI admits that BP produced in this litigation documents bates numbered BP-HZN-MBI00167534 to BP-HZN-MBI00167575 and that these documents appear to be a record of safety drills conducted on the *Deepwater Horizon*.   However, after a reasonable inquiry, information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny the remaining allegations in this request and, therefore, the request is denied.

**REQUEST FOR ADMISSION NO. 305:**     Admit that Stephen Curtis was told during the April 18, 2010 well control drill conducted on board the *Deepwater Horizon* that kicks which can occur while cementing are the results of reducing the hydrostatic pressure during the operation.

**RESPONSE:**     HESI admits that BP produced in this litigation documents bates numbered BP-HZN-MBI00167534 to BP-HZN-MBI00167575 and that these documents appear to be a record of safety drills conducted on the *Deepwater Horizon*.   However, after a reasonable inquiry,

information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny the remaining allegations in this request and, therefore, the request is denied.

**REQUEST FOR ADMISSION NO. 306:**    Admit that Donald Clark was told during the April 18, 2010 well control drill conducted on board the *Deepwater Horizon* that kicks which can occur while cementing are the results of reducing the hydrostatic pressure during the operation.

**RESPONSE:**    HESI admits that BP produced in this litigation documents bates numbered BP-HZN-MBI00167534 to BP-HZN-MBI00167575 and that these documents appear to be a record of safety drills conducted on the *Deepwater Horizon*.   However, after a reasonable inquiry, information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny the remaining allegations in this request and, therefore, the request is denied.

**REQUEST FOR ADMISSION NO. 307:**    Admit that Jimmy Harrell was told during the April 18, 2010 well control drill conducted on Board the *Deepwater Horizon* that wells have been lost due to improperly designed cement slurries and operations.

**RESPONSE:**    HESI admits that BP produced in this litigation documents bates numbered BP-HZN-MBI00167534 to BP-HZN-MBI00167575 and that these documents appear to be a record of safety drills conducted on the *Deepwater Horizon*.   However, after a reasonable inquiry, information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny the remaining allegations in this request and, therefore, the request is denied.

**REQUEST FOR ADMISSION NO. 308:**    Admit that Jimmy Harrel was told during the April 18, 2010 well control drill conducted on board the *Deepwater Horizon* that kicks which can occur while cementing are the results of reducing the hydrostatic pressure during the operation.

**RESPONSE:**    HESI admits that BP produced in this litigation documents bates numbered BP-HZN-MBI00167534 to BP-HZN-MBI00167575 and that these documents appear to be a record of safety drills conducted on the *Deepwater Horizon*.   However, after a reasonable inquiry, information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny the remaining allegations in this request and, therefore, the request is denied.

**REQUEST FOR ADMISSION NO. 309:**   Admit that Jimmy Harrel, the OIM for the *Deepwater Horizon*, personally approved the well control drill that Transocean conducted on April 18, 2010 on board the vessel.

**RESPONSE:**   HESI admits that BP produced in this litigation documents bates numbered BP-HZN-MBI00167534 to BP-HZN-MBI00167575 and that these documents appear to be a record of safety drills conducted on the *Deepwater Horizon*.   However, after a reasonable inquiry, information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny the remaining allegations in this request and, therefore, the request is denied.

**REQUEST FOR ADMISSION NO. 310:**   Admit that each of the Safety Drill Reports with document control numbers BP-HZN-MBI00167534 to BP-HZN-MBI00167575 is a record of a regularly conducted business activity of Transocean under Federal Rule of Evidence 803(6).

**RESPONSE:**   HESI admits that BP produced in this litigation documents bates numbered BP-HZN-MBI00167534 to BP-HZN-MBI00167575 and that these documents appear to be a record of safety drills conducted on the *Deepwater Horizon*.   However, after a reasonable inquiry, information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny the remaining allegations in this request and, therefore, the request is denied.

**REQUEST FOR ADMISSION NO. 311:**   Admit that deposition Exhibit 2122 in the MDL 2179 proceedings is a record of a regularly conducted business activity of Halliburton under Federal Rule of Evidence 803(6).

**RESPONSE:**   Admitted.

**REQUEST FOR ADMISSION NO. 312:**   Admit that deposition Exhibit 2123 in the MDL 2179 proceedings is a record of a regularly conducted business activity of Halliburton under Federal Rule of Evidence 803(6).

**RESPONSE:**   Denied.

**REQUEST FOR ADMISSION NO. 313:**   Admit that deposition Exhibit 2124 in the MDL 2179 proceedings is a record of a regularly conducted business activity of Halliburton under Federal Rule of Evidence 803(6).

**RESPONSE:**   Admitted.

**REQUEST FOR ADMISSION NO. 314:**   Admit that deposition Exhibit 2125 in the MDL 2179 proceedings is a record of a regularly conducted business activity of Halliburton under Federal Rule of Evidence 803(6).

**RESPONSE:**   Admitted.

**REQUEST FOR ADMISSION NO. 315:**   Admit that deposition Exhibit 2128 in the MDL 2179 proceedings is a record of a regularly conducted business activity of Halliburton under Federal Rule of Evidence 803(6).

**RESPONSE:**   Admitted.

**REQUEST FOR ADMISSION NO. 316:**   Admit that deposition Exhibit 2129 in the MDL 2179 proceedings is a record of a regularly conducted business activity of Halliburton under Federal Rule of Evidence 803(6).

**RESPONSE:**   Admitted.

**REQUEST FOR ADMISSION NO. 317:**   Admit that deposition Exhibit 2130 in the MDL 2179 proceedings is a record of a regularly conducted business activity of Halliburton under Federal Rule of Evidence 803(6).

**RESPONSE:**   Admitted.

**REQUEST FOR ADMISSION NO. 318:**     Admit that deposition Exhibit 2131 in the MDL 2179 proceedings is a record of a regularly conducted business activity of Halliburton under Federal Rule of Evidence 803(6).

**RESPONSE:**     Admitted.

**REQUEST FOR ADMISSION NO. 319:**     Admit that deposition Exhibit 2133 in the MDL 2179 proceedings is a record of a regularly conducted business activity of Halliburton under Federal Rule of Evidence 803(6).

**RESPONSE:**     Admitted.

**REQUEST FOR ADMISSION NO. 320:**     Admit that deposition Exhibit 2134 in the MDL 2179 proceedings is a record of a regularly conducted business activity of Halliburton under Federal Rule of Evidence 803(6).

**RESPONSE:**     Admitted.

**GODWIN RONQUILLO PC**

By: /s/ Donald E. Godwin
Donald E. Godwin, T.A.
DGodwin@GodwinRonquillo.com
Bruce W. Bowman, Jr.
BBowman@GodwinRonquillo.com
Jenny L. Martinez
JMartinez@GodwinRonquillo.com
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
Telephone: 214.939.4400
Facsimile: 214.760.7332

and

R. Alan York
AYork@GodwinRonquillo.com
Misty Hataway Coné
MCone@GodwinRonquillo.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone: 713.595.8300
Facsimile: 713.425.7594

**ATTORNEYS FOR DEFENDANT
HALLIBURTON ENERGY SERVICES, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing document, Defendant Halliburton Energy Services, Inc.'s Responses to The BP Parties' Second Requests for Admissions, has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, on this 18th day of July, 2011.

/s/  Donald E. Godwin
Donald E. Godwin