## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | § | MDL No. 2179 |
| "*DEEPWATER HORIZON*" in the | § | |
| GULF OF MEXICO, | § | SECTION:  J |
| on APRIL 20, 2010 | § | |
| | § | JUDGE BARBIER |
| Applies to:  No. 10-2771, | § | |
| and All Cases | § | MAG. JUDGE SHUSHAN |
| | § | |
| | § | |

---

## HALLIBURTON ENERGY SERVICES, INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**NOW INTO COURT**, comes Halliburton Energy Services, Inc. ("HESI") and files these Proposed Findings of Fact and Conclusions of Law:

## PLEADINGS AND EVIDENCE BEFORE THE COURT

On February 25, 2013, the Court called this matter for trial.  In accordance with Federal Rule of Civil Procedure 52, and based upon the evidence presented during Phase I of this limitations trial, HESI proposes the following findings of fact and conclusions of law.  HESI incorporates herein, as if stated in full, the parties' Agreed Stipulations (Dkt. No. 5927), filed on February 29, 2012.  If any finding is in truth a conclusion of law, or if any conclusion stated is in truth a finding of fact, it should be deemed so.

## TABLE OF CONTENTS

I.   BP Negligently Failed to Implement An Appropriate Process Safety
     System For The Macondo Well. ..........................................................................1

     A.   Proposed Findings Of Fact....................................................................1

          1.   BP Was Responsible For Process Safety On The Macondo Well,
               A Deepwater Well With A High Level Risk For A Blowout. .....................1

          2.   BP Prioritized Cutting Costs Above Safety. ................................2

          3.   BP Violated Its Own Guidelines Requiring Implementation
               of An Effective Process Safety Management System..................................3

          4.   BP Disregarded Warnings About Deficiencies In Its
               Process Safety. ...............................................................5

          5.   BP's Learning From Past Failures Remained Unresolved
               And Were Not Applied To The Macondo Well, Contributing
               To The Blowout. ..............................................................7

     B.   Proposed Conclusions of Law ...............................................................10

II.  BP Negligently Designed The Macondo Well and Poorly Executed
     The Design, Increasing The Risk Of A Blowout And Compromising
     Safety Measures To Ensure Well Control. ..........................................................10

     A.   Proposed Findings of Fact ................................................................10

          1.   BP Violated Safe Drilling Margins And MMS Regulations. ....................11

          2.   BP Poorly Planned The Macondo Well, Creating Greater Risk................13

          3.   BP Poorly Designed The Temporary Abandonment Plan,
               Creating Greater Risk. .....................................................14

     B.   Proposed Conclusions of Law ..............................................................16

III. BP's And Transocean's Negligent Misinterpretation Of The Safety-
     Critical Negative Pressure Test, Which Plainly Revealed The Well
     Was Flowing, Was The Proximate Cause Of The Blowout. ..............................................18

     A.   Proposed Findings of Fact .................................................................18

          1.   The Negative Pressure Test Is A Safety-Critical Test. ............................18

          2.   BP's Temporary Abandonment Plans Were In Flux And Risky................20

i

3.      BP And Transocean Haphazardly Set Up And
        Performed The Negative Pressure Test......................................................23

4.      BP And Transocean Misinterpreted The Negative
        Pressure Test. ...........................................................................................26

5.      BP's And Transocean's Misinterpretation Of The
        Negative Pressure Test Proximately Caused The Blowout. ......................31

B.      Proposed Conclusions Of Law............................................................................33

IV.    Transocean's Untimely Response To Observed Indications Of
       A Well Control Event And Improper Diversion Of Hydrocarbons
       To The Mud Gas Separator Instead Of Overboard Proximately
       Caused The Fire, Explosions, And Sinking Of The *Deepwater Horizon.*.........................36

A.      Proposed Findings Of Fact....................................................................................36

1.      From 2004 To 2009, Transocean Experienced A
        Significant Number Of Well Control Events.............................................37

2.      The August 2004 *Jim Cunningham* Incident Shared
        Similarities With The *Deepwater Horizon* Incident. .................................39

3.      After The *Jim Cunningham*, Transocean Suffered Another
        Similar Well Control Event On The *MG Hulme*. ......................................40

4.      Shortly Thereafter, The *Deepwater Expedition* Sustained
        A Lengthy Well Control Event. .................................................................41

5.      In The Weeks Preceding The Blowout On The Macondo
        Well, Shell Expressed Concerns With The Safe Conduct
        Of Transocean's Operations. ....................................................................42

6.      Just Four Months Beforehand, The *Sedco 711* Well Control
        Incident Foreshadowed The April 20, 2010 Event. ..................................43

7.      Critical Lessons Learned From The *Sedco 711* Incident
        Were Not Shared With The *Deepwater Horizon* Crew. ............................44

8.      Foreshadowed By Each Of The Prior Incidents, On
        April 20, 2010, The Crew Of The *Deepwater Horizon*
        Lost Control Of The Macondo Well............................................................47

9.      The Transocean Drill Crew Had Primary Responsibility
        For Well Control On The *Deepwater Horizon*. .........................................48

10. Only Transocean Was Authorized To Activate The Blowout Preventer And Diverter System In Response To A Well Control Event. ..........................................52

11. HESI Had No Responsibility For Well Control On The *Deepwater Horizon*............................................................53

12. Transocean's Training And Policies Require That The Drill Crew Immediately Shut-In The Well When There Is Any Indication Or Suspicion Of A Well Control Issue. .........................54

13. On The Night Of April 20, 2010, The Transocean Drill Crew Failed To Follow Its Training And Transocean Policies In Responding To The Well Control Event On The *Deepwater Horizon*............................................................56

14. BP's And Transocean's Decision To Divert Fluid To The Mud Gas Separator Violated Company Policy And Put The Rig And Crew Of The *Deepwater Horizon* At Risk.................61

15. Transocean Has Admitted It Made Mistakes In Handling The April 20, 2010 Well Control Event On The *Deepwater Horizon*...................................................64

B. Proposed Conclusions Of Law.................................................................66

V. The Blowout Preventer Was The Last Line Of Defense Protecting The Crew, Vessel And The Environment, And Failed To Control The Macondo Well Blowout Due To BP's Improper Configuration And Transocean's Negligent Maintenance And Use On April 20, 2010.......................................72

A. Proposed Findings Of Fact.....................................................................72

1. The Blowout Preventer Is The "Last Bastion Of Help" And "Must Function Without Fail" In Order To Save Lives And Protect Property And The Environment. ...................................72

2. BP's And Transocean's Actions Concerning The BOP Made It A Useless Tool For Well Control And The Safety Of People, Property And The Environment At The Time Of The Macondo Well Blowout. ...............................................72

3. BP Directed The Design And Configuration Of The *Deepwater Horizon*'s BOP From The Time The Vessel Was Commissioned Until The Time It Sank. ...........................73

4. BP Continued To Exert Substantial Control Over The BOP After It Was Commissioned Until The Time The

iii

Rig Sank, Categorically Downgrading Every Element
On The Stack.......................................................................77

5.    BP Failed To Utilize The Best Available And Safest
      Technology In Designing And Configuring The BOP
      And Directing Its Operation..............................................80

6.    BP's Configuration Of The BOP Should Have Included
      DVS Rams, Thereby Making It Safer And Better Able
      To Shear Off-Center Drill Pipe In An Emergency. ...................80

7.    Had BP Chosen To Install Them, Tandem Boosters Could
      Have Doubled The BOP's Capacity To Shear The Drill Pipe. ......82

8.    Though BP Understood The Benefits Of A Dual-BSR
      Configuration, It Failed To Incorporate Such A Design
      Into The BOP. ..............................................................82

9.    BP Chose Not To Spend The Money Required To
      Upgrade The BOP With A Bi-Directional Test Ram,
      Even Though It Would Have Made The BOP Safer
      And More Reliable...........................................................84

10.   In Spite Of Knowing That The BOP's Control Pod Batteries
      Could Be Depleted And Fail In An Emergency Situation,
      BP And Transocean Chose To Forego Upgrading The BOP's
      Control System To Cameron's Mark III System........................85

11.   Given The Macondo Well's Maximum Anticipated Surface
      Pressure, BP And Transocean Should Have Been Aware
      That The *Deepwater Horizon*'s BOP Was Not Suited For
      Use In Drilling Activities..................................................86

12.   The *Deepwater Horizon*'s BOP Lacked Sufficient Shearing
      Capacity And A Proper Safety Factor, Making It Unnecessarily
      Dangerous And Unsuitable For Use On The Macondo Well. .........87

13.   BP And Transocean Were Aware Of Potential And Unseen
      Issues With Control Pod Batteries And Should Have Taken
      Proper Steps To See That They Were Maintained In
      Accordance With Cameron's Recommendations.......................88

14.   Transocean Failed To Maintain The 103Y Solenoid In The Yellow
      Pod Such That It Could Operate In An Emergency Situation. .......89

15.   BP's And Transocean's Decisions In Configuring The BOP's
      AMF System Made The BOP Unfit For Its Intended Purpose
      And Unsuited For Service On The Macondo Well......................90

iv

16. Even Though It Was Not Suited For The Well, If The BOP Had Been Timely and Properly Operated, The Macondo Well Could Have Been Controlled And A Blowout Would Not Have Occurred. ..........................................................................91

17. Transocean Failed To Adequately Train The Drill Crew To Properly Shut-In Wells During Emergency Situations. ............................92

B. Proposed Conclusions Of Law ................................................................93

VI. The BP/HESI Contract Establishes That BP, As The Operator, Considers HESI's Recommendations On Slurry And Cement Job Design As HESI's "Opinion" Only, And BP Has A Duty To Independently Approve Or Disapprove Of Any Such Recommendations. ....................................................97

A. Proposed Findings Of Fact.....................................................................97

B. Proposed Conclusions Of Law..............................................................101

VII. Jesse Gagliano Is An Experienced And Competent Cement Engineer, Specifically Selected By BP To Be Embedded Within BP's Westlake Office. ...............102

A. Proposed Findings of Fact ....................................................................102

B. Proposed Conclusions of Law ..............................................................104

VIII. Jesse Gagliano's Recommendation To Use A Foam Cement Slurry On The Macondo Production Casing Cement Job Was Reasonable. .....................................105

A. Proposed Findings Of Fact....................................................................105

B. Proposed Conclusions Of Law..............................................................107

IX. BP Independently Approved Of Jesse Gagliano's Recommendation To Use A Foam Cement Slurry On The Macondo Production Casing Cement Job Primarily Because Of BP'S Concerns Regarding Equivalent Circulating Densities At The Bottom Of The Well. .......................................................107

A. Proposed Findings Of Fact....................................................................107

B. Proposed Conclusions Of Law..............................................................108

X. Jesse Gagliano's Use Of The Dry Cement Blend From The Kodiak #2 Well In The Macondo Foam Slurry Design Was Reasonable Given That, As Demonstrated Through Testing, The Effects Of D-Air 3000 Could Be Overcome By A Sufficient Concentration Of ZoneSealant 2000....................................109

A. Proposed Findings Of Fact....................................................................109

v

B.      Proposed Conclusions Of Law..........................................................................114

XI.     While Jesse Gagliano And The BP Drilling Engineers Jointly Designed The Macondo Production Casing Cement Job, BP Made Numerous Operational Decisions That Compromised The Success Of The Cement Job And Accepted The Risk That The Cement Job Would Not Achieve Zonal Isolation. ............................................................................................116

A.      Proposed Findings Of Fact.................................................................116

1.      Jesse Gagliano And The BP Engineers Developed The Macondo Cement Slurry And Cement Job Through An Iterative Process..............116

2.      Jesse Gagliano's OptiCem Modeling, Which Was Based On Inputs Provided By BP, Predicted That The Cement Job Would Channel And, Therefore Was Unlikely To Achieve Zonal Isolation; But BP Rejected Gagliano's Recommendations For Mitigating Those Risks When It Failed To Adequately Centralize The Long String Production Casing And Circulated An Insufficient Volume Of Mud Prior To The Cement Job. ........................................................124

3.      BP's Inadequate Centralization Of The Long String Production Casing Likely Led To Channeling...........................................140

4.      BP's Limitation Of Pre-Cementing Mud Circulation Likely Led To Channeling. ....................................................................146

5.      BP Unnecessarily Increased The Risk That The Cement Job Would Not Achieve Zonal Isolation When It Dictated Low Cement Pumping Rates. .................................................149

6.      BP Is Responsible For Any Alleged OptiCem Input Errors/Omissions..................................................................150

7.      BP Failed To Disclose The M57B Hydrocarbon-Bearing Sand To Both Jesse Gagliano And The Public. .......................................151

8.      HESI Appropriately Communicated To BP Risks Associated With Inadequate Centralization Of The Production Casing, Insufficient Pre-Cementing Mud Circulation, And The Use Of Foam Cement In Synthetic Oil-Based Mud Environment, And BP Accepted Those Risks. ..............166

B.      Proposed Conclusions Of Law..........................................................168

XII.    The Float Collar Did Not Convert And/Or Was Damaged Prior To The Production Casing Cement Job....................................................................173

vi

A.      Proposed Findings Of Fact.................................................................173

B.      Proposed Conclusions Of Law.........................................................184

XIII.  The Inability Of The Production Casing Cement Job To Achieve Zonal Isolation Did Not Cause The Macondo Blowout. ................................186

A.      Proposed Findings Of Fact.................................................................186

B.      Proposed Conclusions Of Law.........................................................194

XIV.  HESI Executed The Production Casing Cement Job In Accordance With Industry Standards And BP's Specifications, And There Were No Indications Of Foam Slurry Instability. ......................................196

A.      Proposed Findings Of Fact.................................................................196

B.      Proposed Conclusions Of Law.........................................................197

XV.  HESI Appropriately Tested The Cement Slurry Used On The Macondo Production Casing Cement Job.................................198

A.      Proposed Findings Of Fact.................................................................198

      1.      HESI Met The Cement Testing Requirements In The BP/HESI Contract.................................................198

      2.      HESI Ran The Required Pump Time/Thickening Time Tests On The Macondo Slurry.................................200

      3.      HESI Ran The Required Compressive Strength Tests On The Macondo Slurry. ........................................201

      4.      HESI Ran The Required Rheology Tests. ...............................205

      5.      API Fluid Loss Tests Are Not Required By The Contract. ....205

      6.      HESI Ran Foam Stability Testing On The Macondo Slurry That Gave No Indications Of Free Water Or Settling. ...........205

      7.      BP Never Requested Additional Tests From Those Identified By HESI In Its Testing Regime.................................206

      8.      The BP/HESI Contract Does Not Address Foam Stability Testing.................................................207

B.      Proposed Conclusions Of Law.........................................................208

vii

XVI.   HESI's Conditioning Of The Base Slurry In The Lab Did Not Artificially Thicken Or Stabilize The Slurry During Foam Stability Testing. ...................................209

    A.    Proposed Findings Of Fact...................................................................209

        1.    Conditioning Simulates Actual Downhole Conditions The Slurry Experiences While It Is Being Pumped. ........................209

        2.    During Testing, HESI Conditioned Rig Samples To Simulate The Downhole Conditions in the Macondo Well....................211

    B.    Proposed Conclusions Of Law.............................................................213

XVII.  HESI's Testing On The Macondo Cement Slurry Indicates That The Foam Cement Slurry Was Stable. .....................................................................213

    A.    Proposed Findings Of Fact...................................................................213

        1.    The Industry Identifies Characteristics Of What Constitutes A Stable Foam System...........................................213

        2.    HESI Pilot Testing Confirmed That The Cement Blend On The *Deepwater Horizon* Could Be Successfully Foamed. ................214

        3.    HESI's Operational Foam Stability Testing Further Confirmed The Macondo Blend Could Be Successfully Foamed. ............................220

        4.    BP's Last Minute Change To The Retarder Concentration Had No Impact On The Ability Of The Macondo Slurry To Be Successfully Foamed........................................................225

    B.    Proposed Conclusions Of Law.............................................................227

XVIII. HESI Timely Reported Test Results To BP. ................................................229

    A.    Proposed Findings Of Fact...................................................................229

    B.    Proposed Conclusions Of Law.............................................................231

XIX.  None Of The Post-Incident Testing Conducted By Third-Parties On Non-Rig Cement Is Representative Of The Properties Of The Foam Slurry Actually Pumped At Macondo. ..................................................232

    A.    Proposed Findings Of Fact...................................................................232

        1.    The Industry Recognizes The Concept Of Cement Variability Due To Exposure To Environmental Factors. ..........................232

2174599 v7-24010/0002 PLEADINGS

2.      The Cement Testing Conducted By CSI On Behalf
        Of BP Is Not Relevant. ...........................................................235

3.      The Cement Testing Conducted By Chevron On Behalf
        Of The National Commission Was Not Conducted On
        Rig Samples And Therefore Not Representative Of
        The Performance Of The Macondo Slurry. ..............................236

4.      The Cement Testing Conducted By OTC On Behalf Of
        The United States Showed That The Macondo Slurry
        Was A Stable Foam System.......................................................237

5.      OTC's Unset Foam Stability Testing On Macondo Rig
        Cement Showed That The Macondo Slurry Was A
        Stable Foam System..................................................................239

6.      OTC Prematurely Terminated The Only Other Post-
        Incident Foam Stability Test On The Macondo Slurry............241

7.      OTC's Testing On Non-Rig Cement Was Not Reflective
        Of The Performance Of The Macondo Slurry. ........................242

8.      OTC's "60% Foam Quality" Tests Are Not Representative
        Of Rig Operations Or Downhole Conditions............................243

B.      Proposed Conclusions Of Law...........................................................246

XX.    Due To A Breach In The Production Casing Below The Float Collar,
       The Cement Job Was Not Placed So As To Provide An Effective
       Barrier To Hydrocarbon Flow. .........................................................247

A.      Proposed Findings Of Fact.................................................................247

1.      Data From The Production Casing Landing Operation
        Indicates That BP Landed The Long String Production
        Casing In Compression, Which Induced Helical Buckling
        Of The Casing And Compromised The Casing's
        Mechanical Integrity. ..............................................................247

2.      BP's Difficulties In Converting The Float Collar Because
        Of Debris Obstructing Flow At The Reamer Shoe And/Or
        At The Float Collar Further Demonstrate That BP Set The
        Long String Production Casing In Compression. .....................249

3.      The Rapid Pressurization That Occurred When BP Regained
        The Ability To Circulate Is More Consistent With A
        Mechanical Failure Than Clearing A Blockage........................250

ix

4. The Lower Than Expected Circulating Pressures Observed After BP's Attempts To Convert The Float Collar Are Also Indicative Of A Mechanical Failure In The Casing, But BP Failed To Resolve The Issue Before Deciding To Commence With The Cement Job. ...........................................................................251

5. BP's Buckling Of The Production Casing And Subsequent Applications Of High Pressure On The Already Weakened Casing Caused A Breach Below The Float Collar...................................254

6. Due To The Breach In The Casing, The Annular Cement Was Placed Above A Large Portion Of The Hydrocarbon-Bearing Zones In The Production Interval, And No Cement Was Placed In The Shoe Track Below The Casing Breach....................256

B. Proposed Conclusions Of Law...............................................................258

XXI. HESI's Mudlogger, A Second Set Of Eyes For Well Monitoring, Performed His Duties Consistent With Industry Standards And Did Not Miss Any Sign Of A Kick Prior To 21:30. .........................................260

A. Proposed Findings of Fact ...................................................................260

1. Pursuant To Transocean Policy, The Drill Crew Maintains Primary Responsibility For Well Monitoring. ..........................................261

2. For Well Monitoring, HESI's Mudloggers Serve As A Back-Up To The Transocean Drill Crew....................................................262

3. BP Determined Mudlogger Staffing And Selected Specific HESI Mudloggers For The *Deepwater Horizon* Crew. ..........................264

4. Transocean Had Access To All Rig Information While HESI Was Dependent Upon Transocean To Provide Necessary Data.............265

5. Joe Keith Is An Experienced, Competent Mudlogger, Specifically Requested By BP For The *Deepwater Horizon*...................269

6. On The Night Of April 20, 2010, Joe Keith Did Not Miss Any Industry Standard Warning Signs Of A Kick. .........................................270

7. On The Night Of April 20, 2010, BP's And Transocean's Multiple, Simultaneous Activities Interfered With Joe Keith's Ability To Monitor The Macondo Well...................................................277

8. The Simultaneous Operations Violated Industry Standards And BP And Transocean Policy. .............................................................278

x

9.     BP And Transocean Failed To Notify Joe Keith Of The Simultaneous Operations. ...........................279

10.   Use Of An Open-Pit System Hindered Joe Keith's Ability To Monitor The Macondo Well. ..............................280

11.   Offloading Of Mud To The *Damon Bankston* Complicated Well Monitoring .........................................281

12.   Numerous Fluid Transfers Impeded Joe Keith's Ability To Monitor The Macondo Well. .............................282

13.   Crane Use Also Affected Joe Keith's Ability To Interpret Data And Detect Kicks. ..................................284

14.   Staggering The Rig Pumps Complicated Standpipe Pressure Reading. ...........................................284

15.   Diverting Overboard Blinded Joe Keith To Primary Kick Indicators. ............................................285

16.   Joe Keith's Actions On The Night Of April 20, 2010 Were Reasonable, Appropriate, And In Accordance With Industry Standards. ......................................288

B.     Proposed Conclusions of Law ......................................292

XXII.  Transocean's Failure To Manage, Maintain, And Operate The *Deepwater Horizon*, Its Equipment And Its Appurtenances In Accordance With Industry Standards And Regulations, Coupled With Transocean's Failure To Properly Train And Instruct Its Crew, Rendered The Vessel Unfit For Its Intended Purpose And Unseaworthy. ..............................................297

A.     Proposed Findings Of Fact.........................................297

B.     Proposed Conclusions Of Law......................................304

XXIII. HESI's General Conclusions of Law. ...................................305

A.     Superseding Cause ...............................................305

B.     Contributory Negligence..........................................311

C.     Limitation of Liability and Unseaworthiness of Vessel. ...................312

D.     Gross Negligence and Willful Misconduct............................313

E.     The Oil Pollution Act of 1990, ("OPA") ............................314

xi

F.      Indemnity ................................................................................................315

G.      Punitive Damages ..................................................................................316

H.      Failure to Satisfy Conditions Precedent...............................................318

I.      Economic Loss Doctrine ........................................................................318

J.      Fraud and Fraudulent Concealment .....................................................318

K.      Breach of Warranty................................................................................319

L.      No HESI Liability ...................................................................................320

2174599 v7-24010/0002 PLEADINGS

# I.   BP Negligently Failed to Implement An Appropriate Process Safety System For The Macondo Well.

## A.   Proposed Findings Of Fact

### 1.   *BP Was Responsible For Process Safety On The Macondo Well, A Deepwater Well With A High Level Risk For A Blowout.*

1.      Process safety is a disciplined, highly organized set of approaches and strategies focused on the prevention of catastrophic failures involving complex engineered, human-based systems.  (R. BEA, T.T. 285:20-23, 281:18—282:3).[1]

2.      The Macondo system was designed and operated by and for BP by public permit in order to develop and produce oil and gas resources.  (R. BEA, T.T. 297:23-25).  As a result, BP was responsible and accountable for the process safety of its system.  That responsibility and accountability came from BP's employees and stockholders, as well as from regulatory bodies. (R. BEA, T.T. 297:7-19).

3.      BP's responsibility for process safety also came from industry and commerce itself, which burdens the owner/operator appropriately with full responsibility and accountability for the system that the owner/operator will design, operate, and maintain.  (R. BEA, T.T. 297:20-25).    Specifically, the upper leadership and management of the corporation bore the responsibility for process safety and risk management of the Macondo well.  (R. BEA, T.T. 298:14-18).

_____

[1] Citations to the record are identified as follows: (1) citations to trial testimony are noted by the first initial of the witness's first name, followed by his or her last name, then page and line, (*e.g.*, M. BLY, T.T. 863:1-15); (2) citations to trial exhibits are noted as "TREX-" followed by the exhibit number; (3) citations to demonstrative exhibits are noted as "D-" exhibit number; and (4) citations to deposition testimony are identified by the first initial of the witness's first name, followed by his or her last name, then page and line (*e.g.* DEPO. OF S. DOUGLAS, 93:1-5).  In the event the deposition page numbering between volumes is not sequential, HESI will identify the requisite volume number as necessary.  Citations to any pleadings filed with the Court are identified by pleading title and docket number.

4.     The operator's process safety system must be the primary process safety system on a rig.  Because the operator is responsible for the organization of the system, the Drilling Contractor must conform to the operator's system.  (R. BEA, T.T. 355:10-22).

5.     Before the *Deepwater Horizon* blowout occurred, BP considered an uncontrolled well blowout in deepwater to be the highest level process safety risk in the entire worldwide BP operation.  (R. BEA, T.T. 302:20-23, 464:8-14).

6.     BP recognized a deepwater blowout to be the highest risk across the organization. For example, BP's own risk mitigation plan acknowledges the, "(r)isk that uncontrolled flow during drilling, completion or well intervention activities have the potential for a loss of well control, release of hydrocarbons, and potential environmental damage and could if ignited, lead to fire and explosion."  This is precisely what happened on the *Deepwater Horizon* on April 20, 2010.  (R. BEA, T.T. 303:21—304:16; TREX-4171 at 2132297).

### 2.     *BP Prioritized Cutting Costs Above Safety.*

7.     BP did not fulfill its commitment to process safety in its drilling operations in deepwater Gulf of Mexico. (R. BEA, T.T. 496:4-10).

8.     There were no legal impediments to prevent BP from implementing a process safety system, and BP had the financial resources to effectively put in place a process safety system that could have prevented the Macondo disaster. (R. BEA, T.T. 356:23—357:1, 357:6-10).

9.     Nonetheless, BP adopted and encouraged an "every dollar counts" culture among the employees on the *Deepwater Horizon*.  (R. SEPUVALDO, T.T. 2025:19—2026:6).  Tellingly, in May 2009, wells team leader John Guide boasted that the "*Deepwater Horizon* has embraced

every dollar matters since (his arrival) 18 months ago.  We have saved BP millions, and no one had to tell us."  (R. BEA, T.T. 323:8-16; D-2897).

10.     Indeed, Andy Inglis, CEO of BP Production and Exploration, testified that BP spent "zero dollars" on research and development on handling blowouts before the Macondo well was drilled.  (DEPO. OF A. INGLIS, 161:20—162:21).

11.     Likewise, BP's own documentation clearly indicated an intense focus on saving time and money.  For example, the selection of well design was justified by significant savings. (R. BEA, T.T. 326:1-4).  Furthermore, in a press release issued in April 2009, Tony Hayward stated, "(a)t BP, we have a mantra, 'every dollar counts, every seat counts,' and we intend to follow it through."  (R. BEA, T.T. 322:9-17; D-2896).

12.     Moreover, for all key decisions attributed to BP management that had a risk accumulation effect during the Macondo project, there was an increased risk for the purpose of saving time and money.  (R. BEA, T.T. 327:4-14).

13.     By April 20, 2010 the well was 60 to 70 percent over budget, not on schedule, and had excessive nonproductive time.  BP was carefully watching nonproductive time when they were not advancing the well, which created significant financial pressure to wrap up the well as quickly as possible.  (R. BEA, T.T. 329:7—330:8).

   **3.     *BP Violated Its Own Guidelines Requiring Implementation of An Effective Process Safety Management System.***

14.     The Operating Management System ("OMS") was the safety management system for dealing with risk in the Gulf of Mexico.  (R. BEA, T.T. 304:24—305:1).  BP's own OMS guidelines state that "OMS has two purposes: To further reduce health, safety, security and environment risks in our operating activities, and to continuously improve the quality of those

activities." (R. BEA, T.T. 307:10—308:5; TREX-2352 at BP-HZN-2179MDL00333198). BP's guidelines also state that "(t)he Operating Management System, OMS, is fundamental to delivering safe and reliable operating activities in BP." (R. BEA, T.T. 308:6-11; TREX-2352 at BP-HZN-2179MDL00333198).

15.     However, BP did not apply its own OMS to the *Deepwater Horizon*. (DEPO. OF A. HAYWARD, 196:19—197:5). In fact, John Baxter, Group Head of Engineering and member of the Group Operating Risk Committee ("GORC") admitted that BP did not apply OMS to the *Deepwater Horizon*. (R. BEA, T.T. 306:10-23, 311:17-24, 304:22-23). Pat O'Bryan, Vice President of Drilling and Strategic Performance in the Gulf of Mexico, also testified that "the only drilling rig that we had in our fleet that would fall under the BP OMS is the BP-owned rig, the *Thunder Horse*." (R. BEA, T.T. 307:1-9).

16.     BP's management process safety failures caused the Macondo blowout. (R. BEA, T.T. 330:16-23). This was rooted in the fact that there was no process safety system implemented on the *Deepwater Horizon*. Instead, an earlier system from Texas City and Prudhoe Bay was implemented. It was a primitive risk assessment and management system that could not pass muster as a current process safety system that would enable the management of a very hazardous system such as the Macondo. (R. BEA, T.T. 331:10-24).

17.     Tony Hayward was a member of the GORC. The sole purpose of that committee was to develop and implement process safety within BP, such as an operation management system. (R. BEA, T.T. 299:8-19; D-2670). Hayward himself admitted if OMS had been implemented in the Gulf of Mexico before April 20, 2010, there would "undoubtedly" have been "potential" for avoiding the blowout. (R. BEA, T.T. 332:6-17; DEPO. OF A. HAYWARD, 793:23—794:8).

4

18.     BP also did not perform a Major Accident Risk Assessment ("MAR") on the *Deepwater Horizon*.  In fact, BP failed to conduct a MAR on any contractor-owned mobile drilling unit prior to the blowout.  (DEPO. OF A. HAYWARD, 193:4—194:17).  The MAR is a disciplined, validated method to assess risks, likelihoods, and consequences associated with major system accidents.  It is a high-level, structured, quantitative, and most importantly validated process to evaluate the likelihood and consequences of major accidents that could cause multiple fatalities, severe damage to the environment, productivity and property.  The MAR process identifies societal risks and significantly the risk of multiple fatalities, rather than individual risks focused on worker safety.  (R. BEA, T.T. 310:4—321:14; TREX-1734 at BP-HZN-2179MDL00407938).

### 4.     *BP Disregarded Warnings About Deficiencies In Its Process Safety.*

19.     Having expertise in risk management, Robert Bea consulted with BP regarding process safety in 2001.  BP expressed very severe concerns to Bea regarding three primary factors influencing process safety management.  First, there was a clash of corporate cultures from United Kingdom and the Gulf of Mexico.  Second, there were significant problems as a result of a loss of core competencies while acquiring Amoco, Arco, and Vastar.  During this time BP reduced staff and lost deep experience, which caused BP to encounter problems with having the competence to manage the technical challenges that it was facing.  Third, BP created a "brittle organization" through downsizing and there was no one to cover for absent employees. (R. BEA, T.T. 334:15—337:10).

20.     Bea warned BP in 2001 to look for problems and that extensive process safety audits help catch safety problems before they develop into major accidents.  (R. BEA, T.T. 339:7-

13; D-2833).   Bea encouraged BP to understand risk and stay vigilant; explaining that identifying, mitigating and minimizing risk is critical and that accident-free periods do not mean that process safety risks have been properly mitigated and minimized.  (R. BEA, T.T. 339:15-20; D-2835).

21.     Bea warned BP in 2001 that senior management must have command and control of process safety management; decisions must be made by the right people, redundancies built in, formal rules and procedures established and followed, and appropriate people selected and trained for safety critical jobs.  (R. BEA, T.T. 339:22—340:3; D-2837).

22.     In addition, Bea warned BP that experience matters; downsizing, reorganizing, and outsourcing can make a company brittle and at an increased risk of major accidents when key personnel are on vacation, sick or off work. (R. BEA, T.T. 340:4-10; D-2839).

23.     Bea was again retained by BP in 2003 to address process safety related to deepwater exploration and production in the Gulf of Mexico. (R. BEA, T.T. 340:11-15).

24.     At this time, Bea warned BP that the human elements on the rig needed immediate attention; that the safety equipment (such as blowout preventers and diverters) had purportedly been designed to make the rig as safe as possible, and now appropriate employees needed to be properly selected, trained and supported.  (R. BEA, T.T. 341:3—342:5; TREX-20308 at 10.).

25.     Bea also warned BP in 2003 that there are no surprises; major accidents are always preceded by warning signs, and one must track and analyze the warning signs in order to intervene before a major accident occurs.  (R. BEA, T.T. 342:11-19; D-2841).  Bea cautioned BP that money is not everything; major accidents are frequently the result of outsourcing and

6

pressure to save time and money.  He advised that while process safety ultimately costs money, a lack of process safety costs more money.  (R. BEA, T.T. 342:22—343:2; D-2843).

26.     Bea further advised BP in 2003 to plan for crisis; whether a crisis turns into a major accident depends on the planning done in the months and years before the crisis arrives. (R. BEA, T.T. 343:3-9).   Bea encouraged BP to investigate management, as identifying the management causes of an accident is the most effective way to prevent future accidents.  (R. BEA, T.T. 343:10-17).

27.     In 2005, Bea was once again retained by BP as a consultant on risk management and process safety.  (R. BEA 346:2-4).  At this time, Bea warned BP to reward the right decisions and that people will choose profit over safety unless the incentives for major accident prevention are equal to incentives for profitability.  (R. BEA, T.T. 346:21—347:4).

28.     In 2007, BP still had not implemented Bea's recommendations.  At a worldwide conference, Bea warned BP that "process safety is deadly serious, and now you've (BP) turned it into a traveling road show." (R. BEA, T.T. 347:5—348:1; D-2855).

### 5.   *BP's Learning From Past Failures Remained Unresolved And Were Not Applied To The Macondo Well, Contributing To The Blowout.*

29.     It is a fundamental tenet of process safety and risk management that one must learn from past disasters, both within and outside the company.  (R. BEA, T.T. 299:24—300:2).

30.     BP however, had a history of process safety failures.  (R. BEA, T.T. 300:13-15). BP had failures at and above the operational levels and the root causes were at the upper management level and leadership.  These past events suggest BP did not learn lessons from these disasters and respond appropriately.  (R. BEA, T.T. 301:6-25).

7

31.     The root cause of the *Deepwater Horizon* incident is a classic failure of management and leadership in BP.  The root causes were firmly embedded in the imbalanced system that was driven by BP corporate management and leadership.  (R. BEA, T.T. 333:4-13).

32.     The Gulf of Mexico was BP's only major strategic performance unit with a deteriorating safety performance in 2009.  (R. BEA, T.T. 500:5-10, TREX-5966 at 4).  As of 2009, a review of BP's process safety found that BP had not provided effective process safety leadership, BP had not adequately established process safety as a core value, and BP's management system had not effectively translated its corporate expectations into measurable criteria for the management of process risk.  (R. BEA, T.T. 502:6-15).

33.     Process Safety root cause analysis requires development of a validated understanding of what happens and why it happens.  The management causes are crucial to appropriately understand complex systems.  (R. BEA, T.T. 286:21—287:2).

34.     BP defined root cause in its own Group Defined Practice as the most basic cause that can be reasonably identified, which management has control to fix, and for which effective corrective actions for preventing recurrence can be generated.  (R. BEA, T.T. 288:21—289:10; TREX-1742 at BP-HZN-2179MDL00205102).

35.     BP's Group Defined Practice also identifies three different types of causes: immediate, system, and systemic.  The immediate causes are those in approximate direct contact with the system causes and are at the operational level.  The system causes are the hardware components and the human-ware components involved in accident causation.  The systemic cause is the glue that keeps the components together or apart and are pervasive organizational management, incentive, or cultural influences that exert dominant control over how the system behaves and the immediate causes.  Accordingly, by BP's own definition in its own standard, a

8

BP root cause analysis would include systemic or management causes.  (R. BEA, T.T. 289:15—290:13; TREX-1742 at BP-HZN-2179MDL00205086).

36.     Nonetheless, BP's Bly Report failed to investigate or discuss systemic causes and only addressed "critical factors, immediate causes, and system causes."  The Bly investigation therefore was not a full and complete investigation of process safety causes.  (R. BEA, T.T. 290:22—292:1; TREX-269 at 194).

37.     Significantly, root cause analysis relative to process safety is an extremely important step in learning, as process safety has a reactive approach which involves understanding the reasons for failure as well as the reasons for success.  Learning is crucial since process safety takes insights and puts them back into the proactive planning to prevent making future failures.  (R. BEA, T.T. 288:7-14).

38.     In January 2010, months before the incident, BP was aware of its discrepancies in process safety.  In a document titled, "Process Safety Planning 2010," BP provided a description of process safety at the time.  "As we have started to more deeply investigate process safety major hazards and risks are not fully understood by engineering or line operating personnel. Insufficient awareness is leading to missed signals that precede incidents and response after incidents, both of which increases the potential for and severity of process safety related incidents."  (R. BEA, T.T. 316:6—317:2; TREX-2919 at BP-HZN-2179MDL01109082).

39.     At this time, BP was also aware that the Gulf of Mexico had "experienced a number of serious and potentially serious process safety incidents as a result of insufficient identification and management of major hazard risks."  (R. BEA, T.T. 316:6—317:2; TREX-2919 at BP-HZN-2179MDL01109083).  Nonetheless, none of these statistics were included in BP's safety record from 2005 to 2009.  (R. BEA, T.T. 317:10-12).

9

40.     As a result, the changes BP made after the Macondo disaster were the same types of changes Bea told BP they needed to make before the disaster occurred. (R. BEA, T.T. 349:12-15).

      **B.**      <u>**Proposed Conclusions of Law**</u>

1.     BP's failure to implement an appropriate Operating Management System and process safety system within the Gulf of Mexico and on the Macondo, a deepwater high-risk well, was negligent and proximately caused the blowout, explosions, fire, and oil spill.

2.     BP's failure to implement its lessons learned from its history of previous disasters was a foreseeable consequence of its negligence.

3.     HESI could not foresee that BP would fail to properly implement appropriate process safety safeguards in its deepwater Gulf of Mexico operations.

**II.**      **BP Negligently Designed The Macondo Well and Poorly Executed The Design, Increasing The Risk Of A Blowout And Compromising Safety Measures To Ensure Well Control.**

      **A.**      <u>**Proposed Findings of Fact**</u>

1.     Pore pressure is the outward pressure of the fluids that are trapped in the formation (*i.e.*, the pressure exerted by the fluids in the formation pushing into the wellbore). (A. HUFFMAN, T.T. 648:6-7, 651:23-25; A. BOURGOYNE, T.T. 7448:15-16).

2.     Fracture gradient is the inward pressure at which the formation will begin to break or fracture.  (A. HUFFMAN, T.T. 648:7-8, 652:6-8; J. GAGLIANO, T.T. 6618:10-11).

3.     Mud weight is calculated to stay higher than the pore pressure to prevent fluids from escaping from the formation into the wellbore, and lower than the fracture gradient so the formation will not break or fracture during the drilling operations.  (A. HUFFMAN, T.T. 650:5-8, 658:24—659:1; C. BARNILL, T.T. 4254:20—4255:2).

4.       A drilling margin is typically understood to be either the difference between mud weight and both the fracture gradient and pore pressure, or the difference between pore pressure and the fracture gradient.  A safe drilling margin is understood by the industry and regulation to be .5 ppg between mud weight and both the fracture gradient and the pore pressure.  (A. HUFFMAN, T.T.  665:23—666:8; R. SEPULVADO, T.T.  2021:20-24; F. BECK, T.T.  7079:9-20; DEPO. OF M. ALBERTIN, 74:14-19; DEPO. OF M. ALBERTY, 34:9-18; DEPO. OF S. DOUGLAS, 93:16-94:8).

5.       Drilling margins in the Gulf of Mexico are very narrow overall and typically narrower than on land.  (A. BOURGOYNE, T.T. 7457:14-19).

1.       *BP Violated Safe Drilling Margins And MMS Regulations.*

6.       BP, as the operator, was ultimately responsible for decisions made on the rig, including determining the design of the well, maintaining a safe drilling margin, mud weight, and managing pore pressure and fracture gradient during drilling operations.  (A. HUFFMAN, T.T. 733:5-9, 734:1-4, 735:8-11, 775:4-10).

7.       During drilling of the Macondo well, BP ran out of drilling margin, creating well integrity and safety issues.  BP did not share this information with MMS.  (A. HUFFMAN, T.T. 745:22—747:7; B. AMBROSE, T.T. 6106:9—6107:10, 6113:4—6114:12; A. BOURGOYNE, T.T. 7619:18—7620:18, 7669:18—7670:18; TREX-126; TREX-1136; TREX-1241).

8.       BP repeatedly violated regulations relating to safe drilling margins, and reported downhole values for leak-offs and Formation Integrity Tests to MMS that were inconsistent with actual results and what was in the IADC reports.  (A. HUFFMAN, T.T. 801:8-17).

9.       BP consistently reported drilling margins to MMS that were greater than what they actually were in the well and in BP's own internal documents.  (A. HUFFMAN, T.T. 663:10—

11

665:8).  That is, BP consistently conducted drilling operations with an actual drilling margin less than the margin reported to MMS.  (*Id*.).

10.     Government regulations, industry standards and BP's best practices all require that cement be placed a certain height above the shallowest hydrocarbon zone.  (G. BENGE, T.T. 2258:19-25, 2549:23—2550:25; TREX-184 at §5.1.3; TREX-5374).

11.     BP was aware of the requirement that cement be placed a certain height above the shallowest hydrocarbon zone in the well.  (DEPO. OF S. DOUGLAS, 254:06-255:04, TREX-1339).

12.     BP violated safe drilling margin while the well was in critical condition and did not act as a prudent operator.  Well conditions on the Macondo were fragile, yet BP continued to drill ahead to 18,220 feet.  (A. HUFFMAN, T.T. 711:7—712:1; F. BECK, T.T. 7079:21—7080:20, 7080:21—7082:15, 7169:19—7171:24).

13.     BP's well design was unreasonably risky for Macondo.  The narrow margins created an unstable and unsafe wellbore that was unsuitable for the reliable installation of casing and the placement of cement.  (F. BECK, T.T. 7169:19—7171:24).

14.     After BP drilled ahead to 18,260 feet, the rig lost returns, increasing the risk to the well because mud was being lost into open fractures at the bottom of the well.  (A. HUFFMAN, T.T. 711:7—712:1, 713:12-715:13; F. BECK, T.T. 7078:23—7079:20).

15.     Discounting valid hole observations, BP mischaracterized its pressure integrity tests and drilled ahead without a safe margin, leaving the well delicate and fragile. (A. HUFFMAN, T.T. 718:9—722:2).

16.     At certain points in the 9 7/8 inch casing interval, the margin was 1 to 2/10 ppg, which is not a safe drilling margin, nor what a prudent operator would or should do.  (A. HUFFMAN, T.T. 742:12—743:21).

12

17.     BP knew it was risky to drill ahead because the rig could drill into another over-pressurized sand that could initiate another well control event, yet it chose to drill ahead, identifying the economic benefit of avoiding an additional casing string.  (A. HUFFMAN, T.T. 677:23—681:7; R. STRICKLAND, T.T. 6464:20—6465:16; TREX-1337).

### 2.     *BP Poorly Planned The Macondo Well, Creating Greater Risk.*

18.     There were many last minute changes to the Macondo operation, creating confusion and a lack of communication among BP employees and rig personnel.  (B. AMBROSE, T.T. 6106:9—6107:10, 6111:21—6113:3, 6113:4—6114:12; TREX-126; TREX-1136; TREX-21099).

19.     The production casing job program on the Macondo well was poorly planned and by BP's own admission, rushed.  (J. GUIDE, T.T. 8942:16—8944:20; TREX-21099).

20.     BP did not choose the safest and most prudent option, which would have been to plug the bottom of the hole with cement and attempt to find a higher, stable point to set the casing, which would isolate the high pressure sand behind the pipe and protect the hydrocarbon-bearing reservoirs below.  (A. HUFFMAN, T.T. 747:13—750:22).

21.     By using a long string casing instead of a liner with tie-back, BP increased the risk of creating an unsafe condition, but saved 7 to 10 million dollars.  (B. AMBROSE, T.T. 6122:18—23; F. BECK, T.T. 7083:17—7084:22, 7085:4—7088:7, 7317:8—7318:12; TREX-2659.1.1.BP).

22.     BP had considered using a liner with tie-back instead of a long string, recognizing that a liner with tie-back would result in a lower equivalent circulating density and would be safer.  The liner with tie-back, however, would cost more to install.  (F. BECK, T.T. 7171:25—7172:15, 7317:8—7318:12; TREX-2659.1.1.BP).

13

###### 3.   *BP Poorly Designed The Temporary Abandonment Plan, Creating Greater Risk.*

23.     In the Macondo well, there were two potential flow paths—up the outside of the casing and up the inside of the casing.  Prudent drilling practices demand that each potential flow path contain two independently tested barriers.  (TREX-8140 at 92-95).

24.     BP repeatedly failed to follow its own written practices when operating the Macondo well, including the temporary abandonment operation.  Specifically, BP failed to follow its own written practices requiring two independently tested barriers along each of the potential flow paths during temporary abandonment.  (F. BECK, T.T. 7175:2—23; TREX-8140 at 92-95).

25.     Likewise, BP's own written practices require that both barriers be independently tested.  (TREX-8140 at 92-93).

26.     In the inside of the production casing, the barriers for potential flow path were the casing/cement system and a secondary cement plug to be set 3,300 feet below the mud line (*i.e.*, beneath the sea floor).  (TREX-8140 at 93).

27.     BP did not independently confirm the integrity of the casing/cement system below the float collar with the positive pressure test or the negative pressure test.  (TREX-8140 at 94).

28.     In the positive pressure test, the top wiper plug was still in place following the cement placement.  As a result, the positive pressure test did not independently test the integrity of the casing/cement system below the float collar.  (TREX-8140 at 94).  The negative pressure test did not independently confirm the integrity of the annular cement, as the negative pressure test tests the float collar and casing/cement system together.  A functioning float collar isolates

14

the annular cement from the pressure differential during the negative pressure test, thus only testing the float collar and leaving the cement untested.  (*Id.*).

29.     In order to have a second, independently-tested barrier, BP should have planned to place and test the upper cement plug only after confirming the integrity of the float collar and casing/cement system.  (TREX-8140 at 94).

30.     BP's failure to design and plan for two independently-tested barriers along each flow path during temporary abandonment added unnecessary risks, while saving BP time and money.  (TREX-8140 at 94).

31.     The final temporary abandonment procedure was never approved by MMS.  (B. AMBROSE, T.T. 6110:9-13).

32.     BP and Transocean failed to conduct a formal risk assessment with respect to the temporary abandonment plan.  (B. AMBROSE, T.T. 6107:16-25, 6111:3-20; TREX-3808).

33.     Pursuant to BP's well design, the cement plug was to be set approximately 3,300 feet below the mudline, much deeper than the 300 feet below mudline where it would typically be set.  (J. KEITH, T.T. 3529:15-18; TREX-97; TREX-8140 at 92; DEPO. OF L. LINDNER, 184:3-8).

34.     BP designed the temporary abandonment procedure to set the cement plug 3,300 feet below mudline in order to have enough room to hang drill string from the wellhead seal assembly to keep it situated at the wellhead.  (J. GUIDE T.T. 8765:1—8766:2; TREX-1 at §3.2).

35.     The well design was changed to set the cement plug in water instead of mud because of the Well-Site Leader's preference.  (TREX-7; TREX-547; TREX-1997; D-4755; D-4940).

36.     The decision to displace and set a surface cement plug in seawater rather than in heavy drilling mud exposed the well to an underbalanced state prior to the installation of a secondary cement barrier.   (B. AMBROSE, T.T. 6109:13—6110:8; F. BECK, T.T. 7202:5—7203:17; TREX-3808 at 78).

37.     Removing mud from the wellbore to 3,300 feet below the mudline during the temporary abandonment procedure greatly reduced the amount of balancing hydrostatic pressure that the mud column exerted on the hydrocarbon zones.  (TREX-8140 at 92).

38.     It was not necessary to underbalance the well to seawater.  Heavy mud can be placed in the well to prevent it from ever being underbalanced, creating much safer conditions to proceed with the temporary abandonment.  BP could also have used drill collars to set the lock-down sleeve rather than hanging drill pipe, and would not have had to set the surface cement plug as deep.  (F. BECK, T.T. 7179:21—7180:21; DEPO. OF B. COCALES, 845:17—846:5).

39.     The plan to set the cement plug so deep in seawater, and the consequent reduction in hydrostatic pressure, created additional unnecessary risk.   (B. AMBROSE, T.T. 6109:13—6110:8; F. BECK, T.T. 7179:21—7180:5; TREX-3808 at 79).

**B.**     **Proposed Conclusions of Law**

1.     BP did not act as a prudent operator and made unsafe choices when drilling the Macondo well.

2.     BP did not exercise reasonable engineering judgment in the design of the Macondo well or in the execution of that design.

3.     A prudent operator would have used a liner with tie-back rather than a long string production casing.

4.      BP's failure to prudently and safely plan and drill the Macondo well constitutes negligence under general maritime law.  *Nat'l Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp.*, 924 F. Supp. 1436, 1450 (E.D. Va. 1996).  Such negligence proximately caused the April 20, 2010 blowout, subsequent fire and explosion on the *Deepwater Horizon* and oil spill into the Gulf of Mexico.  *Id.*

5.      BP's well design was poorly managed such that BP's casing points and drilling margins drove risky operational decision-making that compromised the cement job (*e.g.*, failure to circulate at rate required to convert the float collar, no bottoms-up before the cement job, low pump rate for the cement, low volume of cement used).

6.      BP's failure to establish and confirm the integrity of two independent barriers along each potential flow path (*e.g.*, casing/cement system and secondary cement plug) caused the April 20, 2010 blowout, subsequent fire and explosion on the *Deepwater Horizon* and oil spill into the Gulf of Mexico.  *Nat'l Shipping Co. of Saudi Arabia,* 924 F. Supp. at 1450.

7.      BP's failure to set a secondary cement plug before proceeding to displacement caused the April 20, 2010 blowout, subsequent fire and explosion on the *Deepwater Horizon* and oil spill into the Gulf of Mexico.  *Id.*

8.      BP's decision to set the cement plug 3,300 feet below mudline rather than at the customary depth of 300 feet below mudline, consequently requiring significant displacement of mud and reduction of hydrostatic pressure, caused the April 20, 2010 blowout, subsequent fire and explosion on the *Deepwater Horizon* and oil spill into the Gulf of Mexico.  *Id.*

17

III.  **BP's And Transocean's Negligent Misinterpretation Of The Safety-Critical Negative Pressure Test, Which Plainly Revealed The Well Was Flowing, Was The Proximate Cause Of The Blowout.**

A.  <u>**Proposed Findings of Fact**</u>

1.  When HESI completed its primary cement job around 12:30 a.m. on April 20 and HESI's foam team left the rig, the well was under control.  (M. BLY, T.T. 1415:15-20; T. ROTH, T.T. 3184:10-15, 3277:22—3278:6).

2.  Indeed, the well remained under control for many hours after the cement job, until BP intentionally underbalanced the well for the negative pressure tests and then when it began its operation to displace the heavy drilling mud with seawater.  During the displacement, the well became underbalanced at approximately 20:52 on April 20, 2010.  (M. BLY, T.T. 1415:15— 1416:22; R. HEENAN, T.T. 2123:20—2124:3; F. BECK, T.T. 7376:22—7377:3; TREX-1 at 23, 25).

1.  *The Negative Pressure Test Is A Safety-Critical Test.*

3.  The purpose of the negative pressure test is to intentionally underbalance the well to simulate well conditions upon temporary abandonment, in order to verify well integrity prior to displacement.  By verifying the integrity of the barriers in the well, the negative pressure test signals whether displacement can safely move forward.  (L. MCKAY, T.T. 622:25—623:20; M. BLY, T.T. 961:16—962:7; R. EZELL, T.T. 1672:15-22; R. HEENAN, T.T. 2076:25—2077:8, 2219:19-22; C. BARNHILL, T.T. 5012:8—15; B. AMBROSE, T.T. 6227:19—22; A. BOURGOYNE, T.T. 7522:6—7523:8; DEPO. OF B. COCALES, 184:7-23; DEPO. OF W. GUILLOT, 14:22—15:7; DEPO. OF A. INGLIS, 558:18—559:1, 562:25—563:7; DEPO. OF E. LEE, 195:13—196:3; DEPO. OF P. ROLLER, 311:13-17).

4.      Having foregone the opportunity to evaluate the integrity of the production casing cement job with a cement bond log tool after completion of the cement job, BP's next opportunity to test the integrity of the annular cement, as part of the casing/cement barrier system, was to perform a valid negative pressure test.  (L. MCKAY, T.T. 622:14—623:7; M. BLY, T.T. 1441:24—1142:4, 1442:23—1443:15; G. BENGE, T.T. 2406:9—2407:1; TREX-8140 at 88, 92-94).

5.      While the negative pressure test did not directly test the annular cement at the bottom of the well, it tested the integrity of the casing/cement system at the bottom of the well, of which the annular cement was a part.  (G. BENGE, T.T. 2406:17—2407:14; TREX-1 at BP-HZN-BLY0000039).

6.      The negative pressure test is the last diagnostic test of well integrity prior to placing the well into an underbalanced condition where hydrocarbons could potentially flow into the wellbore.  (R. HEENAN, T.T. 2092:13—2093:5; DEPO. OF A. INGLIS, 562:25—563:7).

7.      Because the purpose of the test is to intentionally underbalance the well and confirm well integrity, the operation is considered "safety critical."  (M. BLY, T.T. 962:8—11; R. SEPULVADO, T.T. 1944:11-16; A. BOURGOYNE, T.T. 7562:5-17, 7759:1–5; TREX-102 at BP-HZN-BLY00094103; DEPO. OF B. COCALES, 598:23—599:2; DEPO. OF D. FARR, 147:15-19, 147:21-22, 148:13-22, 149:4-6, 149:8-9, 149:13-19; DEPO. OF E. LEE, 353:12-16).

8.      A negative pressure test determines whether or not there is a barrier in the well.  (M. BLY, T.T. 1404:17-22; DEPO. OF I. LITTLE, 131:18—132:9; DEPO. OF E. LEE, 195:13—196:3).

9.      A negative pressure test evaluates the overall system; it does not test the individual components of the system.  (G. BENGE, T.T. 2323:20—2324:3, 2407:7-14).  That is, if

19

the test verifies well integrity, at least one of the barriers is holding. If it fails, no effective barrier exists. (M. BLY, T.T. 1404:4-16; G. BENGE, T.T. 2323:20—2324:10).

10.   By BP's own admission, in order for the negative pressure test to perform its intended function, it must be correctly interpreted. (M. BLY, T.T. 1404:8-17).

11.   BP's drilling expert acknowledged that HESI's personnel played no role in the negative pressure test: HESI was not involved in the design, execution or interpretation of the negative pressure test. (DEPO. OF V. TABLER, 623:17-20; *see* C. BARNHILL, T.T. 4427:15—4428:7; A. BOURGOYNE, T.T. 7759:25—7760:4).

12.   HESI did not make the decision to displace the mud from the well or to place the well in an underbalanced condition. (R. HEENAN, T.T. 2145:5-12; DEPO. OF C. PLEASANT, 543:11—544:3; DEPO. OF A. INGLIS, 562:17—563:7).

13.   HESI personnel were not present for any of the BP-Transocean discussions regarding the interpretation of the negative pressure test, the relative pressures observed on the drill pipe and kill line, and/or the so-called "bladder effect." (R. HEENAN, T.T. 2138:23-2139:14; J. KEITH, T.T. 3543:6-20; C. BARNHILL, T.T. 4427:15-4428:7; A. BOURGOYNE T.T. 7759:21-7760:5).

14.   According to BP, BP and Transocean maintained joint responsibility to determine whether the negative pressure test confirmed integrity of downhole barriers. (DEPO. OF A. INGLIS, 562:17-24).

### 2.   *BP's Temporary Abandonment Plans Were In Flux And Risky.*

15.   Confusion existed amongst BP personnel as to the proper design of the temporary abandonment plan and the order of the various procedures. (TREX-3808 at 78). BP devised five temporary abandonment plans between April 12 and April 20 without assessing the increasing

20

risks.  (B. AMBROSE, T.T. 6107:16-25; TREX-3808 at 78).  BP failed to inform its Well-Site Leaders and the Transocean drill crew of the final temporary abandonment plan until after work had already commenced.  (TREX-3808 at 78).

16.    BP adopted a displacement procedure that embedded the safety-critical negative pressure test within the various operational steps of the displacement procedure.  (TREX-967).

17.    Embedding the negative pressure test into the displacement procedure increased risk.  (C. BARNHILL, T.T. 4376:3—4377:7; TREX-8140 at 89; DEPO. OF B. BILLON, 424:24—425:2, 425:4-5, 426:13-15, 426:17-21, 426:33—427:7).

18.    There was no agreed-upon written procedure between BP and Transocean for lining-up and interpreting the safety critical negative pressure test.   (B. AMBROSE, T.T. 6107:16—6109:5; S. ROBINSON, T.T. 7968:1-14; TREX-0062 at BP-HZN-BLY0061376; TREX-102 at BP-HZN-BLY00094102).

19.    BP drilling engineer Brian Morel provided what he termed a "negative test procedure" in a "Quick ops note" dated April 20 at 10:43 a.m., but it contained insufficient guidance to permit the Well-Site Leaders to understand how to set up and conduct the negative pressure test, providing no criteria for determining whether or not the test confirmed well integrity.  (B. AMBROSE, T.T. 6110:20—6111:2; TREX-3808 at 79; TREX-97; DEPO. OF J. SPRAGUE 592:21-22, 593:3-14, 593:17—594:12, 594:18—595:7, 595:10-15, 595:18-19, 596:3-6, 596:22—597:24).

20.    BP did not have a standard written negative pressure test procedure; nor did it train its Well-Site Leaders to properly interpret negative pressure tests.  (DEPO. OF K. LACY 474:20; DEPO. OF W. GUILLOT 21:11-16, 21:19-24, 39:23-25, 40:3-4; DEPO. OF M. SEPULVADO 198:17—199:6; DEPO. OF W. WINTERS 63:1-6).

21

21.     As of April 20, 2010, Transocean did not have written procedures or training materials for negative pressure testing, and there was no standard written procedure for conducting negative tests on the *Deepwater Horizon*. (R. EZELL, T.T. 1673:21—1674:22; R. SEPULVADO, T.T. 1945:17—1947:5; B. AMBROSE, T.T. 6123:25—6124:3; TREX-320 at 2; TREX-4 at BP-HZN-CEC020335; DEPO. OF L. MCMAHAN 124:16-21, 124:23, 125:18-22, 173:19-23, 278:12-21, 391:24—392:5).

22.     A detailed, written procedure would have assisted the Well-Site Leaders and rig crew to properly conduct and interpret the negative pressure test. (TREX-1 at BP-HZN-BLY00000041; DEPO. OF J. COWIE, 278:1-8).

23.     Importantly, BP failed to perform calculations for how much bleed back volume should be expected when attempting to bleed off pressure during the negative pressure test to 0 psi, which would have assisted the Well-Site Leaders and drill crew to correctly interpret the negative pressure test.  (M. BLY, T.T. 1324:25—1325:11; R. SEPULVADO, T.T. 1949:20—1950:4, 1950:7—1951:13).

24.     Bleed back volume calculations are critical to assessing well integrity.  If, during a negative pressure test, bleed back volume exceeds the calculated amount, that additional fluid could be coming from the well.  (R. SEPULVADO, T.T. 1949:20—1950:4).

25.     Had bleed back volume calculations been made, and bleed back volumes during the negative pressure test exceeded expected amounts, that would have been an additional sign to BP and Transocean personnel to investigate and determine whether the excess volume was coming from the well.  (R. SEPULVADO, T.T. 1950:7—1951:13).

26.     To avoid incurring the expense associated with disposing of leftover Form-A-Set AK and Form-A-Squeeze as hazardous substances, BP followed M-I Swaco's unprecedented

recommendation of mixing these lost circulation materials ("LCM") together and pumping the combined LCM pill as a spacer in the mud-to-seawater displacement operation. This is not a common practice; indeed, neither LCM had ever been used before as spacer material, much less mixed together. (TREX-8140 at 102; DEPO. OF B. BILLON, 379:22—380:9; DEPO. OF L. LINDNER, 395:8-18).

27.    There was no operational reason to use LCM as a risky spacer, other than to save time and money. (TREX-8140 at 102; DEPO. OF B. BILLON, 398:19-23, 399:1-10, 399:12-20; DEPO. OF D. MAXIE, 75:5-13; 75:15—76:1, 77:4-6).

28.    Ultimately, it was BP's decision to use the LCM spacer. Its use was inappropriate, and it likely narrowed or clogged the kill line used during the negative pressure testing. It also likely led to anomalous pressure differentials during the negative pressure test. (F. BECK, T.T. 7207:7-18; TREX-8140 at 102; DEPO. OF B. BILLON, 494:15—495:2, 495:3-5; DEPO. OF D. MAXIE, 116:12—117:3, 117:5).

### 3.    *BP And Transocean Haphazardly Set Up And Performed The Negative Pressure Test.*

29.    Transocean and BP disagreed as to whether to displace the riser to mud or seawater. (DEPO. OF D. BARRON, 34:25—35:12, 36:6-13, 36:15—37:3, 37:5-13, 37:15-22, 37:24-25, 38:2-15, 38:17-22, 38:24-25).

30.    In fact, when BP ultimately made the final decision, Transocean Toolpusher Jimmy Harrell responded, "I guess that's what those pinchers are for," meaning the blind shear rams in the BOP. (DEPO. OF D. BARRON, 34:25—35:12, 36:6-13, 36:15—37:3, 37:5-13, 37:15-22, 37:24-25, 38:2-15, 38:17-22, 38:24-25).

31.     The heavy LCM spacer leaked below the BOP during the displacement in preparation for the negative test.  (TREX-8140 at 100-102).

32.     BP pumped an insufficient volume of seawater during the displacement for the negative test, further contributing to the presence of the LCM spacer in the BOP.  (TREX-102 at BP-HZN-BLY00094122; TREX-4248 at 91).

33.     Reported fluid returns during the negative pressure test bleed back were higher than should be expected due to the compressibility of the mud. However, because BP did not perform the necessary calculations of the expected bleed-back volumes, BP's Well-Site Leaders did not recognize this early indication of the loss of well integrity.  (M. BLY, T.T. 1324:25—1325:24; R. SEPULVADO, T.T. 1949:20—1950:4, 1950:7—1951:13; TREX-3651).

34.     Excess flow from the drill pipe during the negative pressure test, with the well in an underbalanced condition, indicated to the rig crew a communication flow path with the reservoir.  (TREX-1 at BP-HZN-BLY00000039).

35.     BP initially conducted the negative pressure test on the drill pipe, attempting to bleed off the drill pipe pressure and shut in pressure on the drill pipe, but each time the drill pipe pressure built back up again, eventually rising to 1400 psi.   (TREX-1 at BP-HZN-BLY00000024-25; TREX-102 at BP-HZN-BLY00094118).  Indeed, each time BP attempted to bleed off pressure and shut in the drill pipe, the drill pipe pressure rose.  (TREX-1 at BP-HZN-BLY00000024-25).

36.     Had the negative pressure test been stopped at this point, it could not have been interpreted as confirming well integrity because the criteria for "passing" was zero pressure with the valve closed or no flow with the valve open.  In this instance, the valve was closed and drill pipe pressure was 1,400 psi.  (R. HEENAN, T.T. 2083:4-23).

24

37.     While this process was ongoing, a BP Well-Site Leader noticed that the Application for Permit to Modify BP's temporary abandonment procedure called for the negative pressure test to be performed on the kill line.  After that realization, BP and Transocean decided to perform a negative pressure test by bleeding down the kill line, shutting the well in and monitoring the kill line pressure.  (R. EZELL, T.T. 1800:23—1801:24, 1801:25—1802:2; R. HEENAN, T.T. 2083:24—2084:8; S. NEWMAN, 4739:21—4740:4, 4740:13—4741:4; TREX-63213 at Ex. A, p. 3; TREX-1 at BP-HZN-BLY00000039).

38.     The rig crew bled down pressure and monitored the kill line for thirty minutes and observed no flow, but the drill pipe pressure again rose to 1,400 psi.  (R. HEENAN, T.T. 2084:15—2084:23; A. BOURGOYNE, T.T. 7789:12–22; TREX-1 at BP-HZN-BLY00000024-25).

39.     Performance of this second negative pressure test on the kill line resulted in the Transocean drill crew and BP Well-Site Leaders being aware of 0 psi on the kill line and 1,400 psi on the drill pipe.  (M. BLY, T.T. 976:6—977:3; TREX-1 at BP-HZN-BLY00000039-40).

40.     Because both the drill pipe and kill line pressure gauges were open to the same closed system, they should have registered identical, zero pressure readings.  (TREX-1 at BP-HZN-BLY00000086-87; DEPO. OF K. CORSER, 403:15-22; DEPO. OF W. GUILLOT, 142:20—143:3; DEPO. OF D. FARR, 110:13—111:4).

41.     BP and Transocean dismissed the 1,400 psi pressure reading on the drill pipe and called the negative pressure test a success solely on the basis of the 0-psi pressure reading on the kill line.  (M. BLY, T.T. 969:20—970:4; C. BARNHILL, T.T. 4365:25—4366:15; TREX-1 at BP-HZN-BLY0000039-41; TREX-4248 at 29-30).

25

42.     The 1400 psi pressure reading on the drill pipe indicated that the drill pipe was in communication with pressure from the formation.  (Plaintiffs' Motion for Adverse Inference from Fifth Amendment Invocations (Dkt. No. 5873)(Bob Kaluza, 44:5-17, 44:24-45:11).

43.     The 1400 psi pressure reading on the drill pipe indicated that the well was flowing.  (Plaintiffs' Motion for Adverse Inferences from Fifth Amendment Invocations (Dkt. No. 5873)(Bob Kaluza, 44:5-17, 44:24—45:11).

44.     Either the BP Well-Site Leaders or the Transocean drill crew could have stopped and taken whatever steps necessary to further investigate the anomalous results indicating that the well was flowing.  Instead, based solely upon the lack of flow in the kill line, BP and Transocean declared that the negative pressure test confirmed well integrity, disregarding the anomalous pressure readings.  (M. BLY, T.T. 970:20—971:8; R. HEENAN, T.T. 2123:20-23; C. BARNHILL, T.T. 4428:8—4429:11; S. NEWMAN, T.T. 4742:3-10; TREX-63213 at Ex. A; DEPO. OF W. WINTERS, 427:13—428:7; DEPO. OF T. FLEECE, 269:18-22; DEPO. OF A. INGLIS, 562:17—563:7; DEPO. OF W. GUILLOT, 105:3-13, 105:16—106:1, 106:4-11, 106:14—107:4).

**4.     *BP And Transocean Misinterpreted The Negative Pressure Test.***

45.     The anomalous pressure readings during the negative pressure tests indicated that the well was flowing and the barrier lacked integrity.  (R. HEENAN, T.T. 2084:16-23; C. BARNHILL, T.T. 4335:22—4337:5, 4362:20—25; DEPO. OF K. CORSER, 398:12—399:9, 402:8-11, 402:14-18; DEPO. OF D. FARR, 110:13—111:4; DEPO. OF P. ROLLER, 49:7-14; DEPO. OF M. SEPULVADO, 275:17—276:14).

46.     A negative pressure test confirming well integrity requires no pressure and no flow.  If there is either pressure or flow, the test demonstrates that the well lacks integrity.  Here, the readings indicated there was pressure.  The pressure was clear to both the BP and Transocean

26

personnel on the rig.  (A. BOURGOYNE, T.T. 7567:22—7568:13; DEPO. OF K. CORSER, 16:23—18:1, 18:11—19:3, 19:6-9, 403:15-22; DEPO. OF M. SEPULVADO, 275:17—276:14).

47.     With anomalous pressure readings on the negative pressure test showing a lack of well integrity, BP's decision to proceed with displacing the well put the rig, its crew, and the environment in danger.  (R. HEENAN, T.T. 2086:22—2087:20).

48.     The negative pressure test, properly interpreted, showed that the annular cement, as part of the casing/cement system, did not form an effective barrier in the well to hydrocarbon flow.  (R. EZELL, T.T. 1673:11-14).  The negative pressure test did not explain why the annular cement did not form an effective barrier in the well to hydrocarbon flow.  (B. BENGE, T.T. 2323:20—2324:3; F. BECK, T.T. 7151:1-8; TREX-8140 at 94).

49.     Despite the pressure anomaly, BP's Well-Site Leader incorrectly declared that the negative pressure test confirmed well integrity.  (R. HEENAN, T.T. 2123:20-23).  At best, the results were inconclusive, informing the crew that they did not have confirmation that the downhole barriers were effective.  (C. BARNHILL, T.T. 4428:8—4429:11).

50.     BP and Transocean misinterpreted a series of signs during the negative pressure test indicating that the well lacked integrity and was flowing.  (A. BOURGOYNE, T.T. 7759:6-11; TREX-89052 at 15).

51.     BP and Transocean were jointly responsible for interpreting the negative pressure test.  Both BP and Transocean misinterpreted the negative pressure test.  (L. MCKAY, T.T. 554:15—556:13, 615:6-21, 638:17—639:3; M. BLY, T.T. 961:18-20, 969:20—970:4, 970:5-11, 1324:25—1325:3, 1335:3-8; R. EZELL, T.T. 1688:21—1689:2, 1704:8-18; R. HEENAN, T.T. 2220:23—2221:11;  C. BARNHILL, T.T. 4346:4–10;  S. NEWMAN, T.T. 4739:21—4740:4, 4740:13—4741:4; B. AMBROSE, T.T. 6124:4–16; F. BECK, T.T. 7366:1–5; A. BOURGOYNE, T.T.

7521:8—7522:4, 7728:15–7729:8, 7759:6–24; J. GUIDE, T.T. 8787:11–14; P. O'BRYAN, T.T. 9379:25—9380:12;   TREX-1   at   BP-HZN-BLY00000040-41;   TREX-102   at   BP-HZN-BLY00094143; TREX-52673 at 15; TREX-60110 at 4; TREX-63213 at Ex. A; TREX-89052 at 15; DEPO. OF K. CORSER, 16:23-17:9; DEPO. OF A. INGLIS, 562:17-24, 564:2-565:6; DEPO. OF D. WALL, 246:10-12, 246:14-20; DEPO. OF C. PLEASANT, 433:20-23, 434:3-5, 543:11—544:3; DEPO. OF D. CAMERON, 85:1-14, 85:15-20, 259:13-24; DEPO. OF P. ROLLER, 45:11—46:4; DEPO. OF L. MCMAHAN, 452:12-22, 452:23—453:3; 453:5-10; 453:12; Plaintiffs' Motion for Adverse Inference from Fifth Amendment Invocations (Dkt. No. 5873)(Mark Hafle, 33:12—34:13; Bob Kaluza, 46:1-11, 275:10-276:18, 277:10—278:8); HESI's Amended Motion for Adverse Inferences Based on Assertions of the Fifth Amendment (Dkt. No. 7644)(Bob Kaluza, 239:13-19, 145:11-25, 219:8-18; Wyman Wheeler, 33:6-20, 110:9—111:2)).

52.     The Transocean crew was responsible for lining up the negative pressure test, making certain that the lines, valves and gauges were set appropriately, reading the pressures and collaborating with the Well-Site Leaders in assessing whether the tests confirmed well integrity. (S. NEWMAN, T.T. 4521:12—4522:1).

53.     Once the negative pressure test was completed, BP made the decision to remove the hydrostatic pressure from the well and Transocean concurred with BP's decision.   (S. NEWMAN, T.T. 4657:2–6, 4521:12–18; A. BOURGOYNE, T.T. 7727:19—7728:14).

54.     After improperly declaring that the negative pressure test confirmed well integrity, BP and Transocean continued to displace the well by removing heavy mud and replacing with lighter seawater.   (R. HEENAN, T.T. 2089:16—2091:6, 2115:20-23; C. BARNHILL, T.T. 4328:2–16; S. NEWMAN, T.T. 4521: 12-18, 4657:2–6; F. BECK, T.T. 7151:21—7154, 7366:6-19; A. BOURGOYNE, T.T. 7556:4—7558:9, 7727:19—7728:14).

55.   The negative pressure test actually confirmed that the well *lacked* integrity; that the well was flowing.  (C. BARNHILL, T.T. 4334:5—4335:16; B. AMBROSE, T.T. 6229:1—6230:14; A. BOURGOYNE, T.T. 7789:5—7790:1; DEPO. OF J. MCKAY, 185:5-19, 185:22-25).

56.   BP and Transocean negligently dismissed the anomalous pressure readings on the drill pipe and kill line with a nonexistent theory termed the "bladder effect."  (R. EZELL, T.T. 1862:13-19; R. SEPULVADO, T.T. 1945:9-16; J. GUIDE, T.T. 8939:7—8941:8; P. O'BRYAN, T.T. 9331:1—9333:13; TREX-759; TREX-192; TREX-2157 at BP-HZN-CEC02022; TREX-3188 at BP-HZN-BLY00061516-17; DEPO. OF P. ROLLER, 56:7—57:10; DEPO. OF V. TABLER, 491:1-24, 492:2-10).

57.   BP's Well-Site Leader Bob Kaluza attempted to explain the bladder effect as a rationale for the anomalous pressures observed during the negative pressure test.  (F. BECK, T.T. 7212:16—7213:9).   But the bladder effect does not exist and cannot explain the pressure differential observed during the negative pressure test.   (R. EZELL, T.T. 1862:13-19; R. SEPULVADO, T.T. 1945:9-16; F. BECK, T.T. 7176:9–24; J. GUIDE, T.T. 8942:6–14, P. O'BRYAN, T.T. 9331:1—9333:13; TREX-759; DEPO. OF M. BREAZEALE, 37:22—38:6, 39:16-19; DEPO. OF J. COWIE, 290:20—291:19, 292:23—294-8; DEPO. OF P. ROLLER, 56:7—57:10; DEPO. OF T. FLEECE, 271:23—272:11, 272:13-20; DEPO. OF L. MCMAHAN, 175:24—176:18).

58.   The rationalization by Transocean and BP personnel that the observed and contradictory data was caused by a "bladder effect" or "annular pressure" falls below the standards of good oil field practice.  (R. HEENAN, T.T. 2092:13—2093:5, 2093:21—2094:10).

59.   Fundamental principles of engineering should have alerted BP and Transocean personnel that the so-called 'bladder effect' theory could not explain the observed data.  Despite the vast resources committed by both companies to their investigations, neither company was

able to explain or verify the existence of a bladder effect.  (R. HEENAN, T.T. 2092:13—2093:5, 2093:21—2094:10).

60.     BP's engineering team had an opportunity to correct the misinterpretation of the negative pressure test around the time that the well began to flow, but failed to do so.  (R. HEENAN, T.T. 2094:15—2095:5, 2102:3-14; DEPO. OF K. CORSER, 394:19-22, 398:12—399:9, 402:8-11, 402:14-18).

61.     Well-Site Leader Don Vidrine spoke to BP's on-shore drilling engineer Mark Hafle at 20:52 on April 20, 2010 (the same time modeling shows the well went underbalanced). Hafle had the rig's real-time data displayed on his computer screen and was given the negative pressure test results by Vidrine.  Hafle told Vidrine that those results were not possible with a secure well in a properly lined-up test.  (M. BLY, T.T. 1230:4—1231:5; C. BARNHILL, T.T. 4342:3-19; TREX-4447.6.1.TO (Barnhill); TREX-296 at BP-HZN-BLY00103037).

62.     The information from Don Vidrine should have raised a question in Hafle's mind about the validity of the negative pressure test.  Hafle or Vidrine should have stopped the operation then, but failed to do so.  (C. BARNHILL, T.T. 4342:20—4344:12; F. BECK, T.T. 7208:8–18; TREX-50964.3.1.TO).

63.     Instead, Hafle allowed Vidrine to go to the drill shack and give the order to continue the displacement.  (M. BLY, T.T. 1360:24—1362:3; C. BARNHILL, T.T. 4342:20—4343:20, 4490:9—4491:4; F. BECK, T.T. 7366:1–19; TREX-49; TREX-50964.3.1.TO).  The Bly Report omits these facts.  (M. BLY, T.T. 1342:15—1343:25).

64.     Had Hafle intervened and the test been repeated, the first step would have been to close the BOP to isolate the hydrostatic pressure of the fluids above.  In other words, the well

30

would have been shut in, preventing the blowout from occurring.  (R. HEENAN, T.T. 2095:10—2096:4).

66. The Well-Site Leaders could also have contacted wells team leader John Guide, but did not do so.  In fact, Guide made several phone calls to the rig the evening of April 20, 2010 that went unanswered and unreturned.  (J. GUIDE, T.T. 8818:7—8820:25).

66. Given the anomalous, unexplained pressure readings, the BP Well-Site Leaders should have investigated the situation while the well was shut in.  They should not have opened the well and continued displacement operations removing the heavy drilling mud and underbalancing the well.  (M. BLY, T.T. 970:20—971:8; C. BARNHILL, T.T. 4335:22—4337:5, 4362:20–25; F. BECK, T.T. 7151:21—7154:9, 7204:5-14, 7208:8–18; J. GUIDE, T.T. 8938:9—8939:5, 8936:4—8938:18; P. O'BRYAN, T.T. 9380:13—9381:1; DEPO. OF K. CORSER, 21:15-22:1; DEPO. OF W. WINTERS, 427:13—428:7, 469:18-24; DEPO. OF T. FLEECE, 269:18-22).

### 5. *BP's And Transocean's Misinterpretation Of The Negative Pressure Test Proximately Caused The Blowout.*

67. A reasonable operator and drilling contractor exercising ordinary care would have understood that the negative test demonstrated that the well lacked integrity and was, in fact, flowing.  (R. HEENAN, T.T. 2094:15—2095:5, 2097:13-16; F. BECK, T.T. 7150:23—7151:20; A. BOURGOYNE, T.T. 7569:11—7570:1, 7570:20—7571:21, 7573:24—7574:7; TREX-89052 at 14-15).

68. BP's and Transocean's conclusion that the test showed well integrity lacked any justification based on basic principles of well control and physics.  (R. HEENAN, T.T. 2092:13—2093:5, 2093:21—2094:10, 2217:10-13; S. NEWMAN, T.T. 4739:21—4740:4; TREX-8140 at 97).

69.     A blowout is a known and reasonably foreseeable risk of misinterpreting a negative pressure test.  (F. BECK, T.T. 7175:24—7176:24; TREX-61117 at 23).

70.     Had the negative pressure test not been misinterpreted, the annular would not have been opened and the riser displaced to seawater, which put the well in an underbalanced position and caused the blowout.  (T. PROBERT, T.T. 3016:25—3017:13; C. BARNHILL, T.T. 5014:21—5015:1; F. BECK, T.T. 7209:1–16, 7377:4–9; A. BOURGOYNE, T.T. 7562:20—7563:12, 7792:11–14; J. GUIDE, T.T. 8938:9—8939:5; TREX-102 at BP-HZN-BLY00094143).

71.     The negative pressure tests plainly informed BP that, as HESI had previously warned was a risk, the cement job did not isolate the hydrocarbons.  Had BP done its job competently and not dismissed the 1,400 psi drill pipe pressure on a safety critical test, it could have shut-in and rebalanced the well, allowing HESI to perform remedial cementing operations. (G. BENGE, T.T. 2323:20—2324:10, 2407:15-24, 2573:19–24; DEPO. OF K. CORSER, 22:21—23:14, 25:1-10, 25:13—26:4; DEPO. OF J. MCKAY, 622:25—623:20, 638:7—639:3; DEPO. OF R. VARGO, 803:11-23; DEPO. OF W. WINTERS, 462:1-11).

72.     BP's and Transocean's misinterpretation of the negative pressure test results led BP to direct Transocean's crew to proceed with the temporary abandonment "displacement procedure."  (F. BECK, T.T. 7151:15-23; TREX-4248 at 102).

73.     Once the well was underbalanced during the displacement procedure, hydrocarbons flowed from the formation, into the well and proceeded up to the rig floor on the *Deepwater Horizon*.  (F. BECK, T.T. 7153:20—7155:24; TREX-1 at BP-HZN-BLY00000025-27, 41-42; TREX-4248 at §3.2.4-§3.2.5).

74.     Had BP and Transocean not misinterpreted the results of the negative pressure test, BP could have investigated the reason(s) why the cement job did not achieve zonal

32

isolation.   (M. BLY, T.T. 976:13—977:11; G. BENGE, T.T. 2407:20-24; C. BARNHILL, T.T. 4376:17—4378:7).

75.    Had BP and Transocean not misinterpreted the results of the negative pressure test, HESI could have performed a remedial cement job to achieve zonal isolation.  (M. BLY, T.T. 1094:4-12; G. BENGE, T.T. 2407:20-24; TREX-1 at BP-HZN-BLY00000039).

### B.    Proposed Conclusions Of Law

1.    HESI played no role in the planning, design, execution, or interpretation of the negative pressure tests.

2.    As a subcontractor, HESI is entitled to rely on the operator and drilling contractor to verify well integrity with a properly interpreted negative pressure test.  HESI could not have reasonably foreseen that BP and Transocean would misinterpret the negative pressure test.  *Lone Star Indus., Inc., v. Mays Towing Co., Inc*., 927 F.2d 1453, 1460 (8th Cir. 1991)(applying general maritime law).

3.    BP's and Transocean's temporary abandonment plan was haphazard and overly risky.

4.    BP's decision to displace the well to seawater after the negative pressure test confirmed that the well was flowing was negligent under general maritime law.

5.    On or about April 20, 2010, between approximately 17:00 and 20:00 Central Daylight Time, the negative pressure tests BP and Transocean performed on the Macondo well provided multiple clear indications that the wellbore was not secure and that, when underbalanced, the well was flowing.   BP's Well-Site Leaders negligently supervised the negative pressure tests during this time, failed to alert engineers on the shore of these

unambiguous indications, and, along with others, ultimately deemed the negative pressure tests to have confirmed that the well was secure, all in violation of the applicable duty of care.

6.      BP and Transocean observed anomalous fluid returns multiple times while bleeding off pressure on the well.  BP and Transocean observed pressure build up on the drill pipe multiple times.  The crew commenced, but did not complete, investigation of the pressure anomalies.  BP's Well-Site Leaders eventually instructed Transocean, and Transocean agreed, to monitor the negative pressure testing on the kill line instead of the drill pipe.  Both BP and Transocean continued to observe abnormal pressure on the drill pipe while monitoring the kill line.  Based on the lack of flow on the kill line, BP and Transocean deemed the negative pressure testing to have confirmed well integrity notwithstanding the continuing abnormal pressure on the drill pipe.  BP and Transocean did not take further steps to investigate the source of the abnormal drill pipe pressure, which was neither correctly explained nor remediated.

7.      BP and Transocean misinterpreted the negative pressure tests, which actually demonstrated that the well was not secure and that it was flowing.

8.      BP's conduct with regard to the negative pressure test and its misinterpretation violated its duty to exercise reasonable care in accordance with the standard of care applicable in the deepwater oil exploration industry.

9.      Transocean's conduct with regard to the negative pressure test and its misinterpretation violated its duty to exercise reasonable care and maintain well control in accordance with the standard of care applicable in the deepwater oil exploration industry.

10.      BP's and Transocean's misinterpretation of the negative pressure test was the proximate cause of the blowout, ensuing fire and explosions onboard the *Deepwater Horizon*, the sinking of the rig and oil spill into the Gulf of Mexico.

11.     BP's attribution of the negative pressure test results to the nonexistent "bladder effect" was negligent under general maritime law.

12.     BP's and Transocean's misinterpretation of the negative pressure test was a departure from the standards of good oil field practice.

13.     BP's decision to displace the well to seawater after the failed negative pressure tests was negligent under general maritime law.

14.     Had BP and Transocean not ignored pressure readings demonstrating that the well was flowing during the negative pressure tests, BP would not have continued with the displacement operation.  BP's and Transocean's negligent disregard of the pressure readings and BP's decision to proceed with displacement proximately caused the blowout, ensuing fire and explosions onboard the *Deepwater Horizon*, the sinking of the rig and oil spill into the Gulf of Mexico.

15.     BP's and Transocean's misinterpretation of the negative pressure tests and decision to displace the well brought about a harm different than any harm which otherwise could have foreseeably resulted from HESI's actions.

16.     BP's and Transocean's misinterpretation of the negative pressure tests constitutes an intervening and superseding cause under *Donaghey v. Ocean Drilling & Exploration Co*., 974 F.2d 646, 652 (5th Cir. 1992) (quoting *Nunley v. M/V Dauntless Colocotronis*, 727 F.2d 455, 464 (5th Cir. 1984), *cert. denied*, 469 U.S. 832 (1984)); *Lone Star Indus., Inc., v. Mays Towing Co., Inc*., 927 F.2d 1453, 1460 (8th Cir. 1991)(applying general maritime law); and RESTATEMENT (SECOND) OF TORTS § 442 (1965).

35

**IV.    Transocean's Untimely Response To Observed Indications Of A Well Control Event And Improper Diversion Of Hydrocarbons To The Mud Gas Separator Instead Of Overboard Proximately Caused The Fire, Explosions, And Sinking Of The *Deepwater Horizon*.**

**A.    Proposed Findings Of Fact**

1.    An influx of hydrocarbons and/or formation fluids into the wellbore is referred to as a kick, and is a serious well control event that could lead to a blowout.  (G. PERKINS, T.T. 3585:13; TREX-7749; TREX-8140 at 32-33).

2.    A well control event like a kick occurs when hydrostatic pressure is not properly managed in the well.  (M. BLY, T.T. 1401:1—1403:6).

3.    If the hydrostatic pressure in the well created by the column of drilling mud in the wellbore becomes lower than the pore pressure of a permeable reservoir, that fluid can get into the wellbore.  If some or all of the drilling fluid in the well is removed, and that hydrostatic pressure becomes lower than the pore pressure lower in the well, and the contents of the casing lower in the well are connected to a reservoir, they could escape to the top.  (M. BLY, T.T. 1402:18—1403:7).

4.    The hydrostatic pressure created by the drilling mud, both the height of the column in the well and the density of the mud, is the primary means of well control, ensuring that there are no uncontrolled kicks.  (L. MCKAY, T.T. 620:1-4; A. HUFFMAN, T.T. 655:1-14).

5.    The different components of the well add complexity to well control.  (C. BARNHILL, T.T. 4256:14—4257:12).  Well control is a component system, involving the control of the well itself, which is maintained by closing the well in with the BOP and circulating the fluid out through the choke and kill line; and controlling the riser with the diverter system.  (*Id.*).

6.      In a normal well control situation, any influx should be controlled while still within the confines of the wellbore; the influx material is then circulated out through the riser. (*Id*.).

7.      In the event there are expandable fluids, such as a gas, in the riser before the well is secured, the BOP must be closed to secure the well and the riser must be secured through the diverter system.  (C. BARNHILL, T.T. 4257:13—4257:20).

8.      Failure to secure the well and/or riser may result in a riser unloading event, which is a kick that leads to partial or complete unloading of fluid from the riser onto the vessel.  (C. BARNHILL, T.T. 4358:17-4359:12).

9.      A typical procedure to determine whether the riser is "live" is to shut-in the well and monitor the riser to see if flow has stopped.  If the flow stops, the system is essentially shut-in.  (C. BARNHILL, T.T. 4257:21—4258:7).  If flow continues after the well is shut-in with the BOP, either the BOP is leaking or there is an expandable fluid in the riser.  In either case, the diverter system should be utilized until the exact issue is determined and well control regained. (*Id*.).

> **1.**      *From 2004 To 2009, Transocean Experienced A Significant Number Of Well Control Events.*

10.      According to Transocean's policy, Transocean management is informed of all well control events.  (DEPO. OF J. CANDUCCI, 53:1-7, 11-12, 54:12-15, 18-20).

11.      As a result, Transocean management was fully aware of and concerned about the frequency and magnitude of well control events prior to April 20, 2010.  (TREX-2189 at TRN-MDL-00349076-78,  TREX-2191  at  TRN-MDL-01157145;  TREX-26052  at  TRN-MDL04320514).

37

12.     From 2004 to 2009, Transocean experienced a number of well control events that gave rise to internal concerns regarding the performance of its drill crews in handling well control events.  From 2005 to 2009, in almost 5,000 wells, there were 556 well control events including 329 kicks (142 that were ballooning).  Of those 329 kicks, 306 were on exploration wells like the Macondo.  (S. NEWMAN, T.T. 4728:14—4729:14; TREX-4255 at TRN-INV-01143146; DEPO. OF L. MCMAHAN, 209:10-12, 209:14-17, 209:19).

13.     Larry McMahan, Transocean's Vice President of Performance worldwide, recognized "(t)he problem is that we are having events at a rate that is overwhelming."  (TREX-2189 at TRN-MDL-00349078).  Transocean management was concerned about the performance of its drill crews in responding to well control events.  (TREX-2189 at TRN-MDL-00349076-78; TREX-2191 at TRN-MDL-01156683, 1157145; TREX-2193 at TRN-MDL-01158985; DEPO. OF L. MCMAHAN, 209:10-12, 209:14-17, 209:19).

14.     In March of 2008, Transocean further recognized that "if we do not change the way we operate we will continue to have these trainwrecks."  (TREX-2189 at TRN-MDL-00349078).

15.     In its Annual Report, Transocean acknowledged that, pre-Macondo, the frequency of riser unloading events was its biggest concern, with six separate instances recorded between December 2008 and December 2009.  (TREX-36070 at TRN-INV-01143148).  These could have been avoided through the application of fundamental well control practices, such as treating every positive indicator as a kick, shutting in quickly, and taking returns through the choke whenever in doubt.  The *Deepwater Horizon* was a riser unloading event.  (S. NEWMAN, T.T. 4618:5-16;  B. AMBROSE, T.T. 6148:2—6149:9;  TREX-36070;  TREX-2189 at TRN-MDL-0349076-78; TREX-2191 at TRN-MDL-01157145; TREX-26052 at TRN-MDL-04320514).

38

16.     Transocean's policies require that significant operational events like riser unloading events and blowouts be "fully investigated and that the lessons learned are shared across the Company."   (TREX-673 at TRN-HCEC-00004663; TREX-1474 at TRN-MDL-00607062, 607067-68).

17.     While Transocean policy recognizes the importance of sharing lessons learned, Transocean failed to share lessons learned from its troubled history with well control.  (TREX-1474 at TRN-MDL-00607084; DEPO. OF S. SANNAN, 223:11-12, 223:14-17, 223:21-25, 224:2-3, 224:5-18, 224:20-22; DEPO. OF L. MCMAHAN, 408:8-10, 408:12-13).

### 2.     *The August 2004 Jim Cunningham Incident Shared Similarities With The Deepwater Horizon Incident.*

18.     Foreshadowing conduct on the *Deepwater Horizon*, on August 20, 2004, a Transocean drill crew on the *Jim Cunningham* failed to follow basic procedures, leading to a significant well control event.  (S. NEWMAN, T.T. 4590:3—4591:23; TREX-7134).

19.     A fire and blowout occurred when the Transocean drill crew attempted to make a connection and the night Toolpusher failed to shut down all pumps to conduct a flow check.  An influx occurred, which the Driller circulated up the annulus.   As the influx expanded up the annulus, a fire erupted, and well control was lost.  (S. NEWMAN, T.T. 4590:3-4591:23; TREX-7134).

20.     Following the incident, Transocean investigated the root causes of the blowout on the *Jim Cunningham* and determined that key personnel failed to follow basic procedures; the drill crew failed to heed clear and specific warnings in the drilling program; and key personnel failed to set up and maintain a disciplined coordinated set of procedures to monitor the well. (TREX-26009.b at TRN-MDL-06172983).

21.     The Transocean drill crew also failed to ensure appropriate pit management on the *Jim Cunningham*.  Transocean is ultimately responsible for controlling the pits during fluid transfers to ensure accurate monitoring of pit levels while drilling and during connections. Nonetheless, several pit transfers were allowed, against specific verbal instructions from the company man.  One such transfer occurred before and during the connection when the influx occurred, making it impossible to identify the influx.  (TREX-26009.b at TRN-MDL-06172984).

22.     Transocean admitted its personnel "made some significant errors which led to this catastrophic event."  (TREX-26009.b at TRN-MDL-06172983).

23.     Foreshadowing the *Sedco 711* and the *Deepwater Horizon* incidents, Transocean observed that "there was an overall complacent attitude."  The key personnel failed to "provide leadership and competent oversight and guidance to ensure all parties fulfilled their respective responsibilities."  (TREX-26009.b at TRN-MDL-06172983).

24.     Transocean recognized the seriousness of the incident, noting that "(t)here is no doubt that we were extremely fortunate that we did not have significant injuries or fatalities from this event."  (TREX-26009.b at TRN-MDL-06172985).

25.     Transocean emphasized that "(i)t is imperative that we learn from this incident." (TREX-26009.b at TRN-MDL-06172985).

     **3.**     ***After The Jim Cunningham, Transocean Suffered Another Similar Well Control Event On The MG Hulme.***

26.     On February 20, 2009, Transocean experienced another serious well control event when the *MG Hulme* experienced a riser unloading event resulting in equipment damage and loss of the well.  (TREX-5650 at TRN-INV-01143041, 1143045).

27.     After experiencing a number of issues with mud weight, torque, weight on bit, increasing gas readings, and flow show anomalies, the *MG Hulme* rig crew finally tried to shut-in the well by closing the upper annular.  (TREX-5650 at TRN-INV-01143043).

28.     Based on its investigation of the *MG Hulme* incident, Transocean concluded that the rig crew did not attempt to activate the upper annular BOP element until after mud was blowing up through the rotary table.  (TREX-5650 at TRN-INV-01143043, 1143045, 1143047).

29.     Transocean further indentified inadequacies in its training, concluding that the "Well Control training and the Well Control manual (did) not adequately cover the procedures for closing in a well during a blowout situation . . ."  (TREX-5650 at TRN-INV-01143043). Transocean also acknowledged that its training and well control manuals did not adequately cover use of a diverter.  (*Id*.).

30.     The *MG Hulme* investigation further found that Transocean did not provide "specific training . . . for handling a kick in the riser" and also noted "a lack of explanation about the proper use of the diverter."  (S. NEWMAN, T.T. 4592:23—4595:8, 4618:22—4620:2; B. AMBROSE, T.T. 6138:23—6139:20; TREX-5650 at TRN-INV-01143048, 1143050, 1143052). The incident investigation recommended a revision to Transocean's Well Control Handbook to more specifically prescribe use of the diverter.  (TREX-5650 at TRN-INV-01143048).

4.     ***Shortly Thereafter, The Deepwater Expedition Sustained A Lengthy Well Control Event.***

31.     Then, a few months later, Transocean experienced a protracted well control event on the *Deepwater Expedition* from July 31 to August 16, 2009.  (S. NEWMAN, T.T. 4599:8–10, 4599:22—4600:3, 4600:12—4601:1; TREX-26025.a).

41

32.     After investigating the incident, Transocean management determined that "(a)ctions taken during the course of this section were contrary to Transocean well control policy and could have resulted in a serious escalation of events."  These included: "multiple failures to shut-in the well when influxes were clearly detected;" "multiple influxes allowed into the wellbore;" and "routinely failing to circulate bottoms-up following positive flow checks and/or high gas levels."  (TREX-26025.a at TRN-MDL-01279376).

33.     Transocean management was aware that the drill crew repeatedly opened the well despite pressure and flow indications; "(o)n multiple other occasions an influx was taken and yet operations continued without the well being shut-in and bottoms-up being circulated through the choke."  Transocean acknowledged that these actions were "completely contrary to standard accepted well control practice."  (TREX-26025.a at TRN-MDL-01279376).

**5.      *In The Weeks Preceding The Blowout On The Macondo Well, Shell Expressed Concerns With The Safe Conduct Of Transocean's Operations.***

34.     Just weeks before the *Deepwater Horizon* incident, on March 31, 2010, a Shell Vice President sent Transocean management an email expressing grave concerns regarding operations in Brazil.  (TREX-26023 at TRN-MDL-01279378-79).

35.     Shell "express(ed its) most serious concern with the HSE status" and referenced prior complaints being voiced to Transocean's Chief Executive Officer Steven Newman.  "(W)e are seeing an increase in incidents . . . and after a recent . . . audit it has become clear that we need to take drastic action now . . . We must act now and turn things around."  (TREX-26023 at TRN-MDL-05467037-38).

36.     Shell further expressed concern about systemic HSE problems throughout Transocean noting that the problem is endemic.  "It is almost in every area and has been accepted

by Transocean leadership offshore and onshore over a long time." (TREX-26023 at TRN-MDL-05467037).

37.     Shell raised additional concerns regarding maintenance issues and Transocean's philosophy, questioning Transocean's "long list of outstanding actions" often leaving "critical" maintenance items overdue.  Shell noted 1,400 items outstanding and a "long list of Transocean maintenance and marine bulletins" waiting for action.  (TREX-26023 at TRN-MDL-05467037).

38.     As a result, Shell recommended suspending all operations to complete all "safety critical" outstanding tasks and suggested changing personnel responsible for maintenance and operations.  (TREX-26023 at TRN-MDL-05467037-38).

**6.     *Just Four Months Beforehand, The Sedco 711 Well Control Incident Foreshadowed The April 20, 2010 Event.***

39.     On December 23, 2009, less than four months before the Macondo blowout, Transocean experienced a significant well control event on its *Sedco 711* rig in the North Sea that bore many similarities to the *Deepwater Horizon* incident.  (C. BARNHILL, T.T. 4440:5–4441: 1; TREX-1761 at TRN-MDL-00607590-1; TREX-1523).

40.     Due to the drill crew's failure to timely respond to events, the *Sedco 711* experienced an uncontrolled release of hydrocarbons onto the rig floor and a loss of 90 barrels of mud from the riser onto the rig.  (B. AMBROSE, T.T. 6139:21—6142:4; TREX-3505-CUR at TRN-MDL-01293208).

41.     During this incident, the Transocean drill crew failed to shut-in the well on the first observed indications of flow.  (DEPO. OF D. CAMERON, 92:3-13, 201:11-202:6; DEPO. OF L. MCMAHAN, 405:20—406:1, 406:3-4, 406:6-9, 406:11, 406:13-15, 406:17-19, 406:21-25, 407:1,

407:3-4,  407:6-7,  407:9,  407:15-19,  407:21-23,  407:25—408:4,  408:6;  TREX-3505-CUR  at

TRN-MDL-01293207).

42.    In fact, the Transocean drill crew disregarded the HESI mudlogger's concerns,

attributing  flow  and  pit  volume  changes  to  rig  trim  issues.    (TREX-1761  at  TRN-MDL-

00607590; TREX-3505-CUR at TRN-MDL-01293207; DEPO. OF D. HART, 248:10-17).

43.    The Transocean drill crew eventually shut-in the well, but not until after mud

started escaping the riser at the rotary table.  (TREX-926 at TRN-MDL-00273897; TREX-3505-

CUR at TRN-MDL-01293207).

44.    In  the  wake  of  the  *Sedco 711*  well  control  event,  Transocean  recognized  the

importance  of  early  kick  detection  and  proper  response  to  any  influx.    (TREX-5749  at  TRN-

MDL-02840791).

45.    Transocean  admitted  that  its  drill  crews'  "mind-set  is  certainly  less  vigilant

regarding  well  control  preparedness  during  the  completion  phase  of  the  well  compared  to  the

drilling phase."  (TREX-3505A at TRN-MDL-01293200; TREX-926 at TRN-MDL-00273897).

46.    This  reminder  could  have  proven  helpful  to  the  *Deepwater Horizon*,  had  the

advisory  and  recommendations  ever  been  conveyed  to  the  *Deepwater Horizon*  crew.    (R.

HEENAN, T.T. 2142:10-19; TREX-7125 at TRN-MDL-00866702-03).

**7.    *Critical  Lessons  Learned  From  The  Sedco  711  Incident  Were  Not
Shared  With  The  Deepwater  Horizon  Crew.***

47.    Following  the  *Sedco 711*  incident,  Transocean  issued  two  separate  advisories.

(TREX-1523; TREX-926 ).

48.    Transocean  learned  a  valuable  lesson  from  the  *Sedco 711*  incident:  tested

mechanical barriers can fail. This lesson was deemed so valuable that Transocean issued an

44

advisory.  (S. NEWMAN, T.T. 4596:17—4598:11).  Indeed, Transocean noted that "risk awareness and control measures need to be implemented," and that "(t)he risk perception of barrier failure was blinkered by the positive inflow test" (*i.e.*, negative pressure test).  (TREX-7124; TREX-926 at TRN-MDL-00273899; TREX-5749 at TRN-MDL-02840790; D-8165; TREX-3505-CUR at TRN-MDL-01293210).

49.     Transocean first issued a global operations advisory on April 5, 2010 proposing changes to its Well Control Handbook.  (R. EZELL, T.T. 1841:15—1842:2; DEPO. OF B. BRANIFF, 82:2-83:21).  There is no evidence that this global operations advisory ever made it to the *Deepwater Horizon* prior to the incident.  (R. EZELL, T.T. 1841:13—1842:17; S. NEWMAN, T.T. 4736:9-18; DEPO. OF B. BRANIFF, 83:1-83:21; DEPO. OF L. MCMAHAN, 303:22-25, 304:2-11, 304:24-35, 407:25-408:4, 408:6, 408:8-10, 408:12-13; DEPO. OF P. JOHNSON, 208:15—210:8).

50.     In its April 5, 2010, Well Operations Group Advisory, Transocean recognized that its Well Control Handbook needed to be revised to include the mandatory preparation of a displacement pumping schedule for procedures involving displacing a well that will put it in an underbalanced condition.  (TREX-1523 at TRN-MDL-00273270).

51.     Transocean also recognized the need for a closed pit system during displacement; better pit management; and heightened vigilance when the well is reduced to a single barrier and when the well is going underbalanced.  (TREX-3505-CUR at TRN-MDL-01293211).

52.     The April 5, 2010 Well Operations Group Advisory further provided "(w)hen preparing to displace to a completion fluid which will put the well under-balance, a displacement pumping schedule must be developed and then followed."  (TREX-7114 at TRN-USCG_MMS-00043227).  The advisory goes on to outline a pumping schedule that allows the rig crew to monitor operations and cautions "(d)o not be complacent because the reservoir has been isolated

in in-flow testing. Remain focused on well control and maintain good well control procedures." (TREX-7114 at TRN-USCG_MMS-00043227; TREX-4906 at Ex. B; *see also* C. BARNHILL, T.T. 4441:2—4444:12).

53.     Unfortunately, these "lessons learned" were not conveyed to the *Deepwater Horizon*.  Randy Ezell, Transocean's senior Toolpusher on the *Deepwater Horizon*, testified that he did not see the April 5, 2010 Advisory prior to April 20, 2010.  (R. EZELL, T.T. 1631:9-12, 1841:22—1842:2).

54.     Transocean did not circulate the Global Advisory to the rigs in the Gulf of Mexico before April 20, 2010 because Bill Sannan, then-General Manager of North America, "hadn't gotten around to it yet."  (DEPO. OF P. JOHNSON, 209:24-210:8).

55.     While the April 5, 2010 global advisory recommended a change to the Transocean Well Control Handbook, Transocean did not revise its Well Control Handbook to take into account lessons learned from the *Sedco 711* event until after the Macondo well control event.  (DEPO. OF BARRY BRANIFF, 81:23—82:23).

56.     Days after the global advisory modifying its well control policies was issued, Transocean issued another operations advisory relating specifically to *Sedco 711*.  (TREX-926). The Operations Advisory was only distributed within the North Sea division.  (*Id*.).  Transocean did not distribute the operations advisory to the crew of the *Deepwater Horizon*.  (R. EZELL, T.T. 1841:15—1842:18, 1842:2-10; TREX-926).

57.     The *Sedco 711* incident was "eerily similar" to Macondo in a number of ways, including: (1) the well was deliberately placed in an underbalanced condition; (2) an open pit system was used during the displacement procedure; (3) there were indications of flow in and flow out discrepancies that the drill crew failed to timely respond to; (4) there were similar

46

indications of increasing flow out that were not acted upon; and (5) no "action was taken by onboard personnel to secure the well until wellbore fluid started to unload."  (R. HEENAN, T.T. 2139:15—2142:19, 2143:4-14; TREX-60110 at 6; D-8165; *see also* C. BARNHILL, T.T. 4440:5—4441:1; DEPO. OF D. HART, 242:10—243:23; DEPO. OF L. MCMAHAN, 20:17-20, 52:11—53:4, 287:5—288:4, 417:22—418:7, 418:20—419:3).

58.     Had a pump displacement schedule been prepared for the Macondo well displacement procedure, the rig crew and mudlogger would have been better able to monitor the well for signs of a kick.  (C. BARNHILL, T.T. 4419:23—4421:7).  Moreover, because of the successful inflow test, the *Deepwater Horizon* crew, like the *Sedco 711* crew, did not consider well control as a realistic risk during displacement.  (TREX-926 at TRN-MDL-00273897).

> **8.     *Foreshadowed By Each Of The Prior Incidents, On April 20, 2010, The Crew Of The Deepwater Horizon Lost Control Of The Macondo Well.***

59.     On April 20, 2010, there was a loss of well control on the *Deepwater Horizon*, a riser unloading event, and a resulting blowout.  (C. BARNHILL, T.T. 4429:16—4430:13).

60.     Transocean was primarily responsible for monitoring the well, and for well control; although BP played a role in the decision to continue the displacement procedure.  BP and Transocean made mistakes that compounded the problems and allowed the incident to happen.  (C. BARNHILL, T.T. 4429:16—4430:13).

61.     The Transocean crew did not feel comfortable exercising stop work authority, as they thought there would be adverse repercussions for exercising stop work authority.  (DEPO. OF D. BARRON, 120:6-13, 168:5-169:3).

47

62.     Nonetheless, as explained in Transocean's own Emergency Response Manual for the *Deepwater Horizon*, well control is a very dynamic situation and it is very important for all personnel involved to communicate.  (D. YOUNG, T.T. 5615:9—5616:16).

### 9.     *The Transocean Drill Crew Had Primary Responsibility For Well Control On The Deepwater Horizon.*

63.     Well control is, in the first instance, about managing the hydrostatic pressure in the well.  (A. BOURGOYNE, T.T. 7526:20-24).  Maintaining control of the well is imperative; a loss of well control is the biggest risk in drilling a well.  (J. GUIDE, T.T. 8927:14-25; P. O'BRYAN, T.T. 9383:24—9384:19).

64.     A blowout was a foreseeable result of the loss of well control; indeed, it was identified as the primary risk to plan for on the Macondo well.  (A. MITCHELL, T.T. 9416:1-13; *see* TREX-26050).

65.     On the Macondo well, the loss of well control allowed hydrocarbons to reach the rig and ultimately led to the blowout, fire, explosions, sinking of the vessel, and oil spill.  (J. GUIDE, T.T. 8928:4-17).

66.     "Primary well control is the use of wellbore fluid density to provide sufficient hydrostatic pressure to prevent the influx of formation fluid (*i.e.,* a kick) into the wellbore."  (R. EZELL, T.T. 1826:1-24; TREX-1454 at TRN-MDL-00286809).

67.     Fundamental well control involves (a) awareness and vigilance, (b) identification of issues, and (c) prompt, appropriate action.  (S. NEWMAN, T.T. 4586:16-4587:8).

68.     The Transocean drill crew had primary responsibility for well control on the Macondo well.  (R. HEENAN, T.T. 2185:19—2186:2;  S. NEWMAN, T.T. 4536:20-23; B. AMBROSE, T.T. 6245:14-17; F. BECK, T.T. 7280:17-25; TREX-153 at BP-HZN-BLY000124228;

Depo. of B. Braniff, 169:6-10).  Only Transocean personnel are authorized and enabled to shut-in a well.  (Depo. of B. Braniff, 142:1-6).

69.     As it admits, Transocean is 100% responsible for well control.  (S. Newman, T.T. 4727:11—4728:10; TREX-153 at BP-HZN-BLY000124228).  The Transocean Driller is the first line of defense in a well control situation.  (TREX-153 at BP-HZN-BLY000124228).

70.     While the Transocean drill crew maintains primary responsibility for well control, the BP Well-Site Leaders should also monitor the well for signs of a kick.  (Depo. of B. Braniff, 123:21—124:5).

71.     The Transocean Well Control Handbook plainly indicates that "(t)he Driller is responsible for monitoring the well at all times, identifying when the well is to be shut-in and shutting-in the well quickly and safely."  (B. Ambrose, T.T. 6245:6-17; TREX-1454 at TRN-MDL-00286784).  It is the responsibility of the Driller, or person performing the Driller's role, to shut-in the well as quickly as possible if a kick is indicated or suspected.  (TREX-26025.a at TRN-MDL-01279388; *see also* R. Ezell, T.T. 1856:1-10; R. Heenan, T.T. 2186:3-10).

72.     As acknowledged in Transocean's Well Control Handbook, it is the Driller's primary responsibility to monitor the well at all times.   (S. Newman, T.T. 4270:1–5; C. Barnhill, T.T. 4387:24—4388:7; C. Barnhill, T.T. 4402:21-23; S. Newman, T.T. 4717: 20—22;  A. Bourgoyne, T.T. 7528:15-19, 7760:6-10; *see also*, TREX-153 at BP-HZN-BLY00124228; Depo. of B. Braniff, 140:1-6, 304:22—305:5; Depo. of D. Farr, 264:17-21; Depo. of M. Burgess, 365:23—367:16; Depo. of M. Mazzella, 242:18—243:1, 243:4-22, 301:1-19; Depo. of D. Sims, 273:18—274:1).

73.     The *Deepwater Horizon* drill crew was responsible for handling all responses to well control events.  (R. Sepulvado, T.T. 1943:5-12).  Upon detecting a kick, the Driller is

49

trained to shut the well in quickly.  In fact, the speed with which this is accomplished will determine the severity of the situation.  (R. EZELL, T.T. 1833:5—1834:3; TREX-1453 at TRN-MDL-00048232; DEPO. OF P. JOHNSON, 313:3-17, 313:20-24, 388:7-10, 388:14-17, 405:3-12, 451:7-11, 451:15-18; DEPO. OF M. MAZZELLA, 303:2-7; DEPO. OF C. PLEASANT, 373:21-23, 374:1-14; DEPO. OF L. MCMAHAN, 205:10-12, 205:14—206:2, 236:15-25, 237:2, 239:24—240:5, 240:7, 428:7-12).

74.    It is critical that a kick be dealt with as soon as possible.  This is the drill crew's primary responsibility.  (R. SEPULVADO, T.T. 1944:24—1945:5).  If a kick is experienced, the Driller would be the one who would shut-in the well.  (R. SEPULVADO, T.T. 2045:11—2046:3).

75.    Transocean admits in its Well Control Handbook that "(i)t is the responsibility of the Driller (or the person performing the Driller's role) to shut-in the well as quickly as possible if a kick is indicated or suspected.  (TREX-1454 at TRN-MDL-00286780).  The Driller has full authority to flow check or shut-in the well as he sees fit and is expected to fully investigate any occurrence which deviates from a stable trend."  (TREX-1454 at TRN-MDL-00286983).

76.    The Driller is responsible for monitoring the well at all times, identifying when the well is to be shut-in, and shutting in the well quickly and safely.  The Driller is 100 percent responsible for well control.   (B. AMBROSE, T.T. 6245:6—6246:8; DEPO. OF M. BURGESS, 365:23—367:16; DEPO. OF D. CAMERON, 144:15—146:6, 154:12—155:8, 162:19—163:20; DEPO. OF C. PLEASANT, 634:25-635:1; DEPO. OF J. COWIE, 187:10-17, 472:17-472:23).

77.    The keys to effective well control are early kick detection and rapid response, which essentially refers to shutting in the well with the BOP.  (R. EZELL, T.T. 1881:2-21; DEPO. OF D. CAMERON, 148:12—149:13, 300:11—300:14).

78.     The first and foremost responsibility of the drill crew is to detect kicks and timely shut-in the well when necessary.  (F. BECK, T.T. 7280:17-25).

79.     Under applicable regulations, Transocean was required to take necessary precautions to keep the Macondo well under control at all times, using the best available and safest technology to monitor and evaluate well conditions, and to minimize the potential for the well to flow or kick.  (TREX-6217).

80.     The fundamental goal of drilling wells is to maintain safety at all times and to use the best technology available to monitor the well and make decisions.  Maintaining well control and balance requires use of proper mud weight.  Mud is the first line of defense against losing well control.  (A. HUFFMAN, T.T. 660:18—662:23).

81.     With respect to monitoring the well, Transocean identifies the Driller as the person responsible for monitoring the well at all times, which involves identifying when the well is to be shut-in quickly and safely.  (A. HUFFMAN, T.T. 6124:17-21).

82.     The Driller's responsibility to monitor the well continues through the temporary abandonment of the Macondo well.  (TREX-1454 at TRN-MDL-00286778, 286780, 286784, 286813, 286845; TREX-1453 at TRN-MDL-0048232).  Well control remains important during temporary abandonment.  (C. BARNHILL, T.T. 4255:22-25).

83.     Taking appropriate action to get the well shut-in is Transocean's responsibility. (R. HEENAN, T.T. 2208:5—2209:2).

84.     The first line of defense for well control is maintaining the mud high enough to control pore pressure but low enough not to break the formation during drilling.  The mud should be to the right of the pore pressure curve and to the left of the fracture gradient curve.  (A. HUFFMAN, T.T. 649:21—652:10).

51

85.     Mud is the primary well control barrier.  (R. HEENAN, T.T. 2145:1-4; DEPO. OF J. LEBLEU, 448:19—449:24).  In other words, the primary well control barrier is maintaining the hydrostatic pressure created by the column of drilling mud in the wellbore equal to or greater than the formation pressure to prevent formation flow.  (L. MCKAY, T.T. 620:1-7; C. BARNHILL, T.T. 4377:8—4378:7; J. GUIDE,  T.T. 8965:3-14; TREX-7749 at OSE126-004149, §4.3).

86.     As weighted fluid is removed, whether it be mud or spacer, hydrostatic pressure in the well is reduced.  (C. BARNHILL, T.T. 4429:12-15).

87.     It is of the utmost importance that primary well control be maintained at all times. Before displacing heavy mud with seawater in the well, the operator and drilling contractor should ensure well integrity.  (R. EZELL, T.T. 1826:17—1827:3).

88.     For a kick to occur, the formation pressure must exceed the hydrostatic pressure in the wellbore; basic principles of physics mandate that a well cannot kick if the hydrostatic pressure is maintained in excess of formation pressure.  (TREX-7749 at OSE126-004174, §5.1).

**10.     *Only Transocean Was Authorized To Activate The Blowout Preventer And Diverter System In Response To A Well Control Event.***

89.     Transocean, as the operator responsible for well control, was responsible for activation of the blowout preventer ("BOP") in response to a well control event.  Transocean was also responsible for operating the diverter system to address any hydrocarbons that may enter the riser.  If gas is in the riser, there is the risk of an uncontrolled expansion.  (S. NEWMAN, T.T. 4658:12-22; C. BARNHILL, T.T. 4430:23—4431:10; TREX-5649 at TRN-INV-00760059).

90.     No other entity on the *Deepwater Horizon* was responsible for the BOP or the diverter system in terms of their activation in response to a well control event.  (C. BARNHILL, T.T. 4430:14—4431:10).

91.     The HESI mudlogger had neither access to any of the well control equipment controls nor any authority or responsibility to take part in well control measures.  (R. EZELL, T.T. 1829:13-1831:15; J. KEITH, T.T. 3593:14-3594:6; TREX-6121 at BP-HZ-BLY00034545; TREX-8140 at 106-07).

92.     BP acknowledged in its Gulf of Mexico Deepwater Well Control Guidelines that, "(i)f a kick is detected late, the influx may already be past the BOP's (*sic*) and into the riser."  In such a case, "the well must be secured while coping with the effect of gas expansion in the riser."  (TREX-2210 at BP-HZN-2179MDL00644991).

93.     BP's guidelines caution that "it is important to deal with only one problem at a time."  Of the steps to secure the well and regain well control, BP specifically requires that the diverter should be closed, diverting any direct fluid through the riser gas buster.  (TREX-2210 at BP-HZN-2179MDL00644991).   BP policy required the diverter be set to default the flow of fluid to the mud gas separator ("MGS").  (R. EZELL, T.T. 1787:6-22).

**11.     *HESI Had No Responsibility For Well Control On The Deepwater Horizon.***

94.     HESI had no responsibility for the operation, maintenance, or control of the BOP.  (R. HEENAN, T.T. 2145:15-18).

95.     Likewise, while a mudlogger's role is to monitor the well for any changes, he does not have any access to buttons, levers or switches that could activate any component of the BOP; nor is there an emergency disconnect switch in the mudlogging shack.  (R. HEENAN, T.T. 2138:5-22, 2138:23—2139:14; J. KEITH, T.T. 3593:11—3594:6).  The mudloggers monitor data relating to the well's condition, but do not have any responsibility nor ability to activate the BOP to ultimately regain well control once it is lost.  (*Id.*).

53

96.     The HESI mudloggers on the *Deepwater Horizon* did not have well control authority or responsibility.  (R. HEENAN, T.T. 2137:14-16).

97.     The mudlogger's duty and responsibility is limited to well monitoring and reporting observed anomalies to the drill crew.  (J. KEITH, T.T. 3643:10-18).

98.     The mudloggers do not have any role in shutting in the well if a well control event occurs.  (J. KEITH, T.T. 3595:11—3597:11; TREX-1453 at TRN-MDL-0048238).

99.     HESI personnel are not involved in the decision to remove mud, the primary hydrostatic barrier, from the well or the operation of the displacement procedure.  (R. HENNAN, T.T. 2137:14-16, 2137:21-25, 2138:18-22).

100.    The mudlogger has no well control responsibility once an anomaly is detected. (C. BARNHILL, T.T. 4403:25—4404:25).

12.     ***Transocean's Training And Policies Require That The Drill Crew Immediately Shut-In The Well When There Is Any Indication Or Suspicion Of A Well Control Issue.***

101.    Strict adherence to Transocean's procedures is not only expected but required. "Any deviation to the well control procedures must be addressed using the Transocean management of change process."  (TREX-26025.a at TRN-MDL-01279381).

102.    Under Transocean policy and standard industry guidelines, the Transocean drill crew must shut-in the well as quickly as possible if a kick is indicated or suspected.  (M. BLY, T.T. 1412:2-16; R. EZELL, T.T. 1831:11-15, 1832:20—1833:3, 1856:1-10; R. HEENAN, T.T. 2187:21-25; C. BARNHILL, T.T. 4257:21—4258:7; S. NEWMAN, T.T. 4725:2-17; B. AMBROSE, T.T. 6245:6-17, 6249:18-25; A. BOURGOYNE, T.T. 7588:24—7589:9; TREX-1452 at TRN-HCEC-00011646, 11650; TREX-1453 at TRN-MDL-0048232; TREX-1454 at TRN-MDL-00286778, 286780, 286813, 286845; TREX-7749 at OSE126-004156, §4.9; DEPO. OF D. FARR,

54

265:16-20; Depo. of D. Hart, 232:16—233:10).  The drill crew should not wait to see how a situation develops.  (R. Ezell, T.T. 1852:24—1853:3).

103.    Early recognition of the warning signals and rapid shut-in are the key to effective well control.  By taking action quickly, the amount of formation fluid that enters the wellbore is minimized.  (R. Ezell, T.T. 1852:20—1853:14; TREX-26025.a at TRN-MDL-01279388-89).

104.    The Transocean Driller must comply with the Driller's Key Responsibilities set forth in Transocean's Field Operations Manual.  (TREX-673 at TRN-HCEC-00004675, TREX-4907 at TRN-MDL-01709691).

105.    According to those Driller's Key Responsibilities, "DRILLERS MUST . . . Shut-in the well as quickly as possible if a kick is indicated or suspected.  Early recognition of the warning signals and rapid shut-in are the key to effective well control.  Shutting in the well quickly will minimize the amount of formation fluid entering the wellbore."  (TREX-4907 at TRN-MDL-01709691).

106.    Transocean management instructed as early as September 28, 2009 that "(i)f there is any indication of flow consider shutting in the well immediately rather than taking the additional time to conduct a flow check."  (TREX-26025.a at TRN-MDL-01279388).

107.    As Transocean's Well Control Manual acknowledges "wells drilled in deep water tend to have much lower kick tolerances than wells in shallower water.  This fact, in addition to the problems that occur when gas enters the riser, makes it very important to prevent kicks and, should one occur, detect and control it at an early stage."  (TREX-596 at BP-HZN-2179MDL00330964; R. Ezell, T.T. 1881:7-12, 25—1882:16).

108.    The industry standard is to "(s)hut in and then figure out what you've got."  (C. Barnhill, T.T. 4469:19—4470:7, 4261:6-21, 4403:2-7).

109.    If a Driller encounters something he is unsure about, or if he has concerns regarding the security of the well, Transocean's Well Control Handbook advises the Driller to conduct a flow check.  (C. BARNHILL, T.T. 4270:22—4271:8).

      **13.**    ***On The Night Of April 20, 2010, The Transocean Drill Crew Failed To Follow Its Training And Transocean Policies In Responding To The Well Control Event On The Deepwater Horizon.***

110.    At approximately 21:27 on the evening of April 20, 2010, the Transocean drill crew noticed an anomalous pressure differential and began discussing it in the drill shack.  (D. YOUNG, T.T. 5704:19—5705:15, 5754:5-9;  B. AMBROSE, T.T. 6058:22–6060:14;  A. BOURGOYNE, T.T. 7780:12-20; TREX-4248 at 11, 30, 106, 128-29; D-8007).  While the crew saw the anomaly and did not understand its origin, they focused on surface indicators and potential explanations rather than downhole issues because they assumed the well was secure based on the misinterpreted negative pressure tests.  (C. BARNHILL, T.T. 4444:10—4445:12).

111.    During the negative pressure tests, the crew had convinced itself that they understood the anomaly, and that the well was secure.  Believing that they had a sealed, secured well, the crew responded to what it believed was a surface situation.  However, the crew eventually realized it was incorrect, which ultimately cost valuable time.  (C. BARNHILL, T.T. 4444:10—4445:12).

112.    At 21:29, in response to the observed pressure differential, the Transocean drill crew started staging down the mud pumps.  (B. AMBROSE, T.T. 6058:22—6060:14; TREX-4248 at 11, 30, 106, 129; D-8007).

113.    By 21:31, the mud pumps were off.  (D-8007; TREX-620).

114.    The Transocean drill crew turned off the mud pumps to investigate the observed pressure differential.  (R. HEENAN, T.T. 2132:19—2133:3; TREX-4248 at 31, 105).    As

56

Transocean's well control expert Calvin Barnhill acknowledged, the Transocean drill crew turned off the pumps to diagnose the situation.  (C. BARNHILL, T.T. 4433:14-21; TREX-7676 at 40-41). They did not, however, shut-in the well at that time.   (R. HEENAN, T.T. 2161:22-2162:1, 2162:23-25;  C. BARNHILL, T.T. 4296:10-4297:15;  B. AMBROSE, T.T. 7780:12-20;  D-8007; TREX-4248 at 30-31).

115.    From approximately 21:30-21:36, the Transocean drill crew discussed the pressure differential.  (D. YOUNG, T.T. 5704:19—5705:15; D-8007; TREX-4248 at 30, 106, 130; TREX-5461 at TRN-INV-00005241).

116.    At 21:36, the Transocean drill crew directed a floor hand, Caleb Holloway, to bleed off standpipe pressure.  (C. BARNHILL, T.T. 4468:17-24;  D. YOUNG, T.T. 5706:6-19; D-8007; TREX-620; TREX-4248 at 30, 106, 130).

117.    Bleeding off standpipe pressure at that point and in that situation was not a standard well control response.  (C. BARNHILL, T.T. 4468:17—4469:1).

118.    At approximately 21:38 hydrocarbons entered the riser. (A. BOURGOYNE, T.T. 7530:20—7531:5; M. EMILSEN, T.T. 7819:9-12; S. ROBINSON, T.T. 7978:9-24).

119.    The Transocean drill crew should have immediately ordered a flow-check and shut-in the well by approximately 21:31 or 21:32.  (C. BARNHILL, T.T. 4241:18—4242:3; S. ROBINSON, T.T. 7537:6—7538:3).

120.    There was ample time for a reasonable Driller acting consistent with well control training and policy to shut-in the well before hydrocarbons entered the riser.  (C. BARNHILL, T.T. 4468:11-15).

121.    The Transocean drill crew did not announce a well control event from 21:30-21:36. (D. YOUNG, T.T. 5704:19—5706:5).  The pumps were completely shut off to "diagnose"

the situation.  The Transocean drill crew had recognized an anomaly and were shutting down to diagnose the situation.  (C. BARNHILL, T.T. 4432:12—4433:21).

122.    When the pumps were first shut down, the pressures appeared to be flat, but then started increasing. At that point, the crew should have done a flow check, which would have taken a few minutes.  (C. BARNHILL, T.T. 4422:22—4435:2).

123.    Chief mate David Young left the bridge around 21:30, and arrived at the drill floor shortly thereafter.  He was in the drill shack for several minutes, heard the drill crew discuss the pressure differential, and did not see the drill crew take any actions to respond to the well control event, shut-in the well, or otherwise advise anyone on the rig of an issue with the well.  (R. HEENAN, T.T. 2160:24—2162:4; D. YOUNG, T.T. 5818:18—5820:24).  When he left the drill shack, Young ran into Holloway, who said he was closing the standpipe.  (D. YOUNG, T.T. 5818:18—5820:24).  Holloway would only close the standpipe if directed to do so by the Driller or the Toolpusher.  (*Id*.).  Likewise, if Holloway was instructed to bleed off standpipe pressure, he would do so and then return downstairs. (*Id*.).

124.    When Young was in the drill shack, the Driller, Dewey Revette, was sitting in the Driller's A-chair.  (D. YOUNG, T.T. 5818:18—5820:24; D-6709).  Anderson, the Toolpusher, was standing to Revette's left.  (*Id*.).  When Young entered, he heard Revette tell Anderson that they were seeing differential pressure and Anderson said they may need to circulate.  Young was told there may be a delay in the surface cement plug operations as a result.  Young did not hear anyone refer to the anomaly as a well control event.  (*Id*.).

125.    When Young returned to the bridge after his time in the drill shack and advised the Captain that there would be a delay in the surface cement plug operations due to "an issue

with the well," the Captain did not ask for an explanation of the delay or the "issue" with the well.  (D. YOUNG, T.T. 5754:20—5756:20).

126.    At approximately 21:41, ten minutes after they should have shut-in the well, the Transocean drill crew routed returns to the trip tank to check for flow.  (D-8007).

127.    At approximately 21:42, the trip tank filled rapidly.  (D-8007; TREX-4248 at 31, 106, 130).  The Transocean drill crew conducted a flow check at the trip tank.  (TREX-4248 at 31, 106, 130).

128.    The Transocean drill crew's first attempt at well control—activating the upper annular—was no earlier than approximately 21:42 or 21:43, only *after* they observed mud shooting out of the well onto the rotary table.  (G. CHILDS, T.T. 5367:9–18; A. BOURGOYNE, T.T. 7713:1-3; D-8007, TREX-4248 at 30-31, 106, 130).

129.    Like prior riser unloading events experienced by Transocean drill crews around the world, the Transocean drill crew on the *Deepwater Horizon* first activated the upper annular after hydrocarbons were already above the BOP in the riser and evacuating the riser onto the rig.  (R. DAVIS, T.T. 2861:25—2862:4; TREX-4248 at 31, 106, 130).

130.    The Transocean drill crew's first attempt to shut-in the Macondo well occurred at least fifteen (15) minutes *after* they were aware of an anomalous pressure differential, at least seven (7) minutes *after* hydrocarbons entered the riser, and only *after* mud started shooting out of the well onto the vessel.  (R. HEENAN, T.T. 2141:14-18; A. BOURGOYNE, T.T. 7780:12-7782:2; TREX-4248 at 30-31; D-8007).

131.    The Transocean drill crew's first attempt to shut-in the Macondo well occurred at least ten minutes *after* they should have shut-in the well to investigate the observed anomalous pressure differential.  (A. BOURGOYNE, T.T. 7780:12-7782:2; TREX-4248 at 30-31; D-8007).

132.    Steve Curtis, Transocean's assistant Driller on tour at the time, called Transocean senior Toolpusher Randy Ezell, and advised him of the situation and advised that there was mud to the crown and that Jason Anderson was shutting in the well.  (R. EZELL, T.T. 1807:24—1808:10).

133.    The Toolpusher, Jason Anderson, however, had previously misinterpreted the data he was seeing.  (R. EZELL, T.T. 1688:21—1689: 2).

134.    By the time the Transocean drill crew first activated the BOP, it was too late to use the standard well control protocol for the BOP to stop the hydrocarbons in the riser that caused the fire and explosions on the *Deepwater Horizon*.  (R. DAVIS, T.T. 2861:25—2862:10; G. STEVICK, T.T. 6991:8-21; DEPO. OF D. MCWHORTER, 552:15—554:02).

135.    At approximately 21:45, the Transocean drill crew activated the diverter thus routing flow to the MGS.  (TREX-4248 at 106, 130; D-8007).

136.    Just one minute later, at 21:46, hydrocarbon gas reached the rig surface. (TREX-1 at BP-HZN-BLY00000028; M. EMILSEN, T.T. 7871:21-23, 7878:13—7879:3).  By the time well control actions were taken by the crew, hydrocarbons had risen above the BOP and into the riser, resulting in a massive release of gas and other fluids that overwhelmed the MGS.  (DEPO. OF D. FARR, 171:8—171:15).

137.    At approximately 21:47, the Transocean drill crew closed the variable bore ram ("VBR") BOP components.    (C. BARNHILL, T.T. 4297:11—4298:4;  A. BOURGOYNE, T.T. 7716:11–14; F. SHANKS, T.T. 9023:12–14; TREX-4248 at 31, 130; D-8007).

138.    If the Transocean drill crew had closed the upper annular and VBRs at 21:30 and sealed the well, the fire, explosions, and sinking of the *Deepwater Horizon* could have been avoided.  (TREX-882 at BP-HZN-BLY00207911).

60

139.     At 21:49, transmission of data from the *Deepwater Horizon* ceased.  (D-8007; TREX-620).

140.     By the time the Transocean drill crew attempted to shut-in the well, the situation was too far gone for standard well control efforts to avoid the fire and explosions.  The drill crew waited too long to act.  (C. BARNHILL, T.T. 4297:24—4298:11,  5034:5-8; A. BOURGOYNE, T.T. 7716:23—7717:8).

**14.     *BP's And Transocean's Decision To Divert Fluid To The Mud Gas Separator Violated Company Policy And Put The Rig And Crew Of The Deepwater Horizon At Risk.***

141.     Industry standards recognize that there is a high possibility of gas entering the riser in deepwater, especially in the Gulf of Mexico.  Gas entering the riser is recognized as the one event that is most dangerous to the rig floor personnel.  (TREX-60105 at TRN-INV-00800430).

142.     The purpose of the emergency diverter system on the *Deepwater Horizon* is to divert the gas away from the rig and the rig floor if hydrocarbons get into the riser.  (C. BARNHILL, T.T. 5002:22—5003:6).

143.     The Transocean Driller or Toolpusher is responsible for determining the method and manner of diversion.  (R. EZELL, T.T. 1873:2-18; C. BARNHILL, T.T. 5003:23—5006:25).  The Transocean drill crew was responsible for the operation and activation of the diverter.  (C. BARNHILL, T.T. 4431:2-5).

144.     Transocean's Well Control Handbook Section 9.2 states "(a)nytime there is a rapid expansion of gas in the riser, the diverter must be closed, if not already, the flow diverted overboard."  (C. BARNHILL, T.T. 4263:23—4264:2, 5002:22—5003:6; TREX-1454 at TRN-MDL-00287047-49; *see also,* DEPO. OF L. MCMAHAN, 509:7-11, 509:13-16, 509:18—510:1).

145.     Transocean's training regarding when to divert to the MGS and when to divert overboard requires that the drill crew divert to the MGS only when there is "drill gas."  The drill crew should route fluids to the diverter when there is an uncontrolled expansion in the riser.  The default setting to the MGS was dictated by BP.  (R. EZELL, T.T. 1786:24—1787:22; DEPO. OF D. FARR, 406:11-17).

146.     The MGS was intended for very small volumes of gas in the mud; it was not designed or intended to handle the volume and speed of mud that was reaching the rig.  (M. BLY, T.T. 984:23—986:21).

147.     The diverter is used to protect the personnel and equipment by rerouting the flow of shallow gas and wellbore fluids emanating from the well through an overboard vent line. (TREX-1188 at §5.1; TREX-60520 at PSC-MDL2179-011055; TREX-63204 at TRN-MDL-07455869).

148.     Gas or mud coming out of the rotary table is a sign that something is not right and that the diverter should be activated after shutting in the BOP to seal the well.  (DEPO. OF B. BRANIFF, 210:20—212:17).  It is mandated in the Transocean Well Control Handbook that if there is rapid expansion of gas in the riser, the diverter must be closed, and the flow diverted overboard.  (*Id.*; *see also* TREX-1454 at TRN-MDL-00286973-74).

149.     The emergency diverter system is the main line of defense against gas in the riser. (A. BOURGOYNE, T.T. 7579:22—7580:2).  Once hydrocarbons enter the riser, the only well control recourse is to properly utilize the diverter.   (A. BOURGOYNE, T.T. 7580:2-12; S. ROBINSON, T.T. 7979:14-19).  At that point, the diverter system was the only thing between the gas and personnel on the rig.  (A. BOURGOYNE, T.T. 7580:3-8, 7583:8-12; S. ROBINSON, T.T. 7979:14-19).

150.    The diverter system on the *Deepwater Horizon* was previously configured to, as default, route flow out of the well to the MGS.  (R. EZELL, T.T. 1787:6—1787:13; C. BARNHILL, T.T. 4310:3–4311:3).   The default setting should be to safely route flow overboard.  (A. BOURGOYNE, T.T. 7581:12—7583:5).

151.    Diverting flow overboard gives the drill crew enough time to control the well and/or disconnect from the well.  (A. BOURGOYNE, T.T. 7585:10-17).

152.    The purpose of the MGS relief line is to serve as a relief port, relieving pressure out of the vessel.  The MGS relief line operates when the MGS is overwhelmed.  (C. BARNHILL, T.T. 5010:16—5011:9).

153.    BP policy instructed that flow be routed to the MGS in the first instance.  (TREX-2210 at BP-HZN-2179MDL00644975-92; *see also*, R. EZELL, T.T. 1787:19–22; A. BOURGOYNE, T.T. 7709:2—7711:23).   Dewey Revette followed BP policy and diverted the flow to the MGS. (DEPO. OF D. FARR, 406:11-17; DEPO. OF C. PLEASANT, 615:15, 18-21).

154.    On April 20, 2010, the Transocean drill crew never routed the flow of mud and hydrocarbons out of the well to the downwind overboard diverter line prior to the explosions on the rig.  (TREX-4248 at 31, 193).

155.    It was understood that a small volume of gas at depth may rapidly expand in size as it approaches the surface.  (DEPO. OF D. FARR, 177:15-24).

156.    On April 20,2010, the MGS became overwhelmed by the flow.   Mud and hydrocarbons began to pour out of the MGS vents and other piping as gas spread rapidly across the aft deck and into the nearby internal spaces.  (TREX-4248 at 31, 193).

157.     After the MGS was completely flooded, flows up the vent line on the MGS caused the 15 PSI rupture disc to open, sending mud and gas through a six inch starboard relief line.  (TREX-4792 at TRN-INV-02845086-88).

158.     Given the size of the influx, routing the influx to the MGS rather than overboard made ignition inevitable.  (TREX-986 at 196).  The MGS was not designed to control a blowout.  (DEPO. OF D. WALL, 119:23—120:7).

159.     After conducting its internal investigation, Transocean concluded that "(i)t does not appear actions were taken to direct flow through the main overboard diverter lines prior to the explosion."  (TREX-4248 at 193; *see also* A. BOURGOYNE, T.T. 7709:5-9, 7782:9-14).

160.     Defaulting flow or intentionally routing flow overboard through the downwind 14-inch diverter line would have prevented the fire and explosions on the *Deepwater Horizon*.  (TREX-1 at BP-HZN-BLY00000001, 011, 044, 0104).

### 15.     *Transocean Has Admitted It Made Mistakes In Handling The April 20, 2010 Well Control Event On The Deepwater Horizon.*

161.     The Transocean drill crew failed to respond to the well control event consistent with industry standards, Transocean policy or their training.  (C. BARNHILL, T.T. 4431:15-17; A. BOURGOYNE, T.T. 7579:10-16).  The industry standard is to shut-in the well immediately upon detection or suspicion of a kick.  (A. BOURGOYNE, T.T. 7780:8-11).

162.     The Transocean drill crew should have shut-in the well right by 21:32.  (C. BARNHILL, T.T. 4241:18—4242:8, 4296:10—4297:10, 4433:22—4434:4, 4467:11-14, 4468:2-10; A. BOURGOYNE, T.T. 7536:9—7537:5, 7537:24—7538:3, 7781:6-11).

163.     The Transocean drill crew's failure to shut the well in before the hydrocarbons entered the riser was a proximate cause of the blowout.  (B. AMBROSE, T.T. 6125:8-19).

164.   The drill crew first identified a problem at about 21:27, but made no effort to shut in the well until 21:43.  (DEPO. OF D. HART, 233:23—235:20; 237:12-17).

165.   No later than approximately 21:32, the Transocean drill crew should have conducted a manual flow check followed by immediate shut-in.  (R. HEENAN, T.T. 2162:14—2163:11; C. BARNHILL, T.T. 4467:11-14, A. BOURGOYNE, T.T. 7589:6-13, 7780:12—7781:13).

166.   The reasonable assumption would have been to conduct a flow check.  If there was positive flow, then the well is shut in and the kick is circulated out.  Had the crew done so, the blowout would not have occurred. There were nine minutes before hydrocarbons entered the riser–sufficient time to shut-in before any gas could reach the rig.  (R. HEENAN, T.T. 2162:14—2163:11).

167.   Had the Transocean drill crew, consistent with their training and Transocean policies, conducted a flow check at or about 21:30 and timely shut-in the well, "we wouldn't be here."  (R. HEENAN, T.T. 2162:23—2163:4).

168.   The OLGA well flow modeling indicated that hydrocarbons entered the riser at approximately 21:38.  The Transocean drill crew first attempted to shut-in the well after fluids had entered the riser and mud was blowing up through the derrick onto the rig floor.  (A. BOURGOYNE, T.T. 7716:23—7717:8; DEPO. OF J. COWIE, 458:8-22).

169.   Had the drill crew shut in the well before 21:38, then hydrocarbons would not have entered the riser and there would not have been a fire or explosions on the vessel.  (M. BLY, T.T. 1105:22-25).

170.   The well blew out so hard that mud shot up to the top of the derrick, some 215 feet above the rig floor.  (DEPO. OF D. FARR, 171:21—172:5).

171.    The flow rate at 21:43 was at least twice the MGS rating.  The Transocean drill crew should not have sent the blowout to the MGS.  (DEPO. OF D. FARR, 198:20—200:13, 15-20, 201:20—202:13, 203:3-24).  The Driller should have known that the flow far exceeded the MGS capacity.  (DEPO. OF D. FARR, 203:3-21, 23-24).

172.    By 21:44 on April 20, it should have been clear to the drill crew that the blowout required diverting overboard.  (DEPO. OF D. FARR, 188:15-189:2).

173.    Senior Toolpusher Randy Ezell agrees that the Transocean drill crew made mistakes in handling the well control event on the *Deepwater Horizon*.  (R. EZELL, T.T. 1687:24—1688:6).

### B.    Proposed Conclusions Of Law

1.    Despite a series of lessons learned relating to deficient well control responses by its drill crews in similar well control events around the world, Transocean did not change or modify its training of its drill crews to reflect those lessons learned prior to April 20, 2010.

2.    Despite a series of lessons learned relating to deficient well control responses by its drill crews in similar well control events around the world, Transocean did not change or modify its well control policies to reflect those lessons learned prior to April 20, 2010.

3.    Transocean investigated prior well control events similar to the April 20, 2010 well control event on the Macondo well, but failed to share the results of those investigations or lessons learned with the crew of the *Deepwater Horizon*.

4.    Transocean investigated prior well control events similar to the April 20, 2010 well control event on the Macondo well, but failed to implement any policy or training modifications or changes to reflect learnings from those well control events prior to April 20, 2010.

5.      As of April 20, 2010, Transocean's well control training and policies did not adequately address the proper procedure for shutting-in a well during a blowout.

6.      As of April 20, 2010, Transocean's well control training and policies did not adequately address the proper use of the emergency diverter system.

7.      Transocean did not provide the drill crew on the *Deepwater Horizon* with adequate training regarding the handling of a kick in the riser or the proper use of the emergency diverter system to control gas in the riser.

8.      Transocean's failure to adequately train the drill crew on the *Deepwater Horizon* constitutes negligence under general maritime law.  *Nat'l. Shipping Co. of Saudi Arabia, v. Moran Mid-Atl. Corp*., 924 F.Supp. 1436, 1450 (E.D. Va. 1996)(applying general maritime law).

9.      Transocean's maintenance of deficient well control policies as of April 20, 2010, constitutes negligence under general maritime law.  *Nat'l. Shipping Co. of Saudi Arabia,* 924 F.Supp. at 1450.

10.      On April 20, 2010, contrary to sound well control practices and lessons it learned from prior well control events, Transocean failed to ensure proper pit management during the displacement procedure.

11.      On April 20, 2010, despite lessons learned from the *Sedco 711* incident, Transocean failed to prepare a displacement pumping schedule for the displacement procedure on the Macondo well.

12.      On the night of April 20, 2010, a reasonably prudent drill crew acting consistent with well control training and policy would have done a flow check and shut-in the well by 21:32.  There was no reason not to have done so.

13.     The Transocean drill crew's failure to timely shut-in the Macondo well and then investigate, rather than investigating before shutting in, is inconsistent with prudent well control practices and industry standards.

14.     Unlike the mudlogger, the drill crew can perform a flow check at any time.  Had a flow check been timely conducted, the flowing well would have been detected before hydrocarbons got into the riser, and the well would have been safely shut-in.

15.     Mud shooting 215 feet up into the air and raining down on the *Damon Bankston* at 21:44 indicated to a reasonably prudent Driller that gas was expanding in the riser.  It is known by fundamental physics that by the time the gas is at the surface it is rapidly expanding.

16.     Had the Transocean drill crew timely shut-in the well, there would not have been a blowout, explosion, fire onboard the *Deepwater Horizon* or an oil spill.

17.     Transocean's failure to timely and properly shut-in the well constitutes negligence under general maritime law.  *Nat'l. Shipping Co. of Saudi Arabia,* 924 F.Supp. at 1450

18.     BP's and Transocean's defaulting the diverter to the MGS and the Transocean drill crew's failure to divert the flow of wellbore fluid overboard was a proximate cause of the fire and explosions on the *Deepwater Horizon* the sinking of the rig and the oil spill.  *Exxon Co. v. Sofec, Inc.*, 517 U.S. 830, 832 (1996).

19.     The blowout on April 20, 2010 would not have happened had the Transocean drill crew treated every positive indicator as a potential kick and timely shut-in the well.

20.     The Transocean drill crew's failure to timely shut-in the well was a proximate cause of the blowout, explosions, fire onboard the *Deepwater Horizon*, and oil spill.  *Exxon Co.*, 517 U.S. at 832.

21.     While it was foreseeable to have rapid expansion of gas once any gas enters the riser, Transocean's failure to timely shut-in the Macondo well and maintain well control was not reasonably foreseeable.  *Signal Int'l. LLC, v. Miss. Dep't. of Transp.*, 579 F.3d 478, 493 (5th Cir. 2009)

22.     The Transocean drill crew's failure to quickly shut-in the well was a contributing cause of the blowout.

23.     BP's and Transocean's defaulting the diverter to the MGS and the Transocean drill crew's diversion of flow to the MGS instead of overboard was a proximate cause of the fire and explosions on the rig.

24.     By defaulting to and diverting to the MGS, BP and the Transocean drill crew created an unsafe situation.  Any hydrocarbon influx should have gone overboard.  Diverting to the MGS was a proximate cause of the fire, explosions and oil spill.

25.     The intentional underbalancing of the Macondo well was a proximate cause of the blowout, fire, explosions and oil spill.  *Exxon Co.*, 517 U.S. at 832.

26.     HESI was entitled to rely on the Transocean drill crew to timely shut-in the well upon detection or suspicion of a kick.  It was not reasonably foreseeable that the drill crew would fail to timely shut-in the Macondo well upon detection or suspicion of a kick.  *Signal Int'l. LLC*, 579 F.3d at 493.

27.     HESI was entitled to rely on BP and the Transocean drill crew to default and route flow overboard through the downwind diverter line in the event of gas in the riser.  It was not reasonably foreseeable to HESI that BP and the Transocean drill crew would default and route the flow in a riser unloading event to the MGS.

28.     The blowout, fire, explosions, sinking of the *Deepwater Horizon* and oil spill would not have occurred had well control been maintained on April 20, 2010.  *United States v. West of England Shipowner's Mut. Prot. & Indem. Ass'n*, 1989 A.M.C. 1497 (5th Cir. 1989).

29.     On April 20, 2010, HESI had no authority or responsibility to take part in any well control measures on the *Deepwater Horizon*.  HESI did not have access to any of the well control equipment controls including the BOP and emergency diverter system.

30.     Transocean's failure to timely shut-in the Macondo well and maintain well control constitutes an intervening and superseding cause under *Donaghey v. Ocean Drilling & Exploration Co*., 974 F.2d 646, 652 (5th Cir. 1992) (quoting *Nunley v. M/V Dauntless Colocotronis*, 727 F.2d 455, 464 (5th Cir. 1984), *cert. denied*, 469 U.S. 832 (1984)); *Lone Star Indus., Inc., v. Mays Towing Co., Inc*., 927 F.2d 1453, 1460 (8th Cir. 1991)(applying general maritime law); and RESTATEMENT (SECOND) OF TORTS § 442 (1965).  In light of the circumstances, Transocean's failure to timely shut-in the Macondo well and maintain well control was not only extraordinary, it also brought about a harm different than any harm which otherwise could have resulted from HESI's actions or inactions.  Transocean's failure was independent of any situation or circumstance created by HESI's actions or inactions, and was the result of Transocean's own failure to act and not the actions of HESI.  Transocean's failure to timely shut-in the Macondo well and maintain well control subjects it to liability to HESI, Plaintiffs, and other parties in this litigation under general maritime law and it also constitutes a superseding, intervening cause, cutting off any potential liability for HESI.

31.     At the time of any alleged tortious action or inaction by HESI, it could not have foreseen that Transocean would fail to timely shut-in the Macondo well and maintain well control.  A reasonable person, under the circumstances, would recognize Transocean's failure to

70

maintain well control and timely shut-in the Macondo well as an extraordinary act and/or failure to act. These failures by Transocean were not only unforeseeable to HESI, but they were not a normal consequence of circumstances created by HESI's actions or inactions. *Donaghey*, 974 F.2d at 652; RESTATEMENT (SECOND) OF TORTS § 447 (1965).

32.     After misinterpreting the negative pressure tests that plainly demonstrated the well lacked integrity, reducing the hydrostatic pressure by displacing drilling mud with seawater to the point the well became underbalanced proximately caused the blowout, fire, explosions, sinking of the *Deepwater Horizon*, and oil spill. BP and Transocean decided to continue the displacement, underbalancing the well and inviting flow. HESI was not involved in the design or execution of the displacement procedure, or in the decision to proceed.

33.     The Transocean drill crew's failure to timely shut-in the well by approximately 21:32 (or prior to hydrocarbons entering the riser at 21:38) proximately caused the blowout, fire, explosions, and sinking of the *Deepwater Horizon. Signal Int'l. LLC,* 579 F.3d at 493.

34.     BP's and the Transocean drill crew's failure to utilize the emergency diverter system to default and route flow from the well through the downwind 14-inch overboard diverter line proximately caused the fire, explosions, sinking of the *Deepwater Horizon* and oil spill. *Signal Int'l. LLC,* 579 F.3d at 493.

35.     At the time of any alleged tortious action or inaction by HESI, it could not have foreseen that Transocean would fail to utilize the emergency diverter system to default and route from the well overboard. A reasonable person, under the circumstances, would recognize Transocean's failure to utilize the emergency diverter system to route flow overboard as an extraordinary act and/or failure to act. This failure by Transocean was not only unforeseeable to

HESI, but it was not a normal consequence of circumstances created by HESI's actions or inactions. *Donaghey*, 974 F.2d at 652; RESTATEMENT (SECOND) OF TORTS § 447 (1965).

**V.     The Blowout Preventer Was The Last Line Of Defense Protecting The Crew, Vessel And The Environment, And Failed To Control The Macondo Well Blowout Due To BP's Improper Configuration And Transocean's Negligent Maintenance And Use On April 20, 2010.**

   **A.     Proposed Findings Of Fact**

       **1.     *The Blowout Preventer Is The "Last Bastion Of Help" And "Must Function Without Fail" In Order To Save Lives And Protect Property And The Environment.***

   1.     The blowout preventer ("BOP") is "the last bastion of help," and is the last resort for the crew of the vessel in a blowout situation. (DEPO. OF D. MCWHORTER, 641:1-17). BOPs are designed to prevent blowouts and control them once they occur. (F. SHANKS, T.T. 9128:9-25). As Melvyn Whitby, Director Engineering for Cameron International Corporation, has written, "in an emergency situation," the BOP "is the main barrier [that protects] human life, capital equipment and the environment" and "must function without fail." (TREX-3186; *see also* M. BLY, T.T. 992:3—993:2; R. DAVIS, T.T. 2674:2—2675:1 (the "BOP is 'safety critical.'")).

   2.     The drill crew expected the BOP (or "pinchers" as some called it) to save their lives on the night the Macondo well blowout began. (DEPO. OF D. BROWN, 56:18—57:4; DEPO. OF D. BARRON, 34:25—35:12, 36:6-13, 36:15—37:3, 37:5-13, 37:15-22, 37:24-25, 38:2-15, 38:17-22, 38:24-25).

       **2.     *BP's And Transocean's Actions Concerning The BOP Made It A Useless Tool For Well Control And The Safety Of People, Property And The Environment At The Time Of The Macondo Well Blowout.***

   3.     If BP had properly configured the *Deepwater Horizon*'s BOP; Transocean had properly maintained it and if the drill crew had operated it timely and in the correct sequence the BOP would have sheared the drill pipe and sealed the well, precluding the *Deepwater Horizon*

from sinking and the Macondo well from flowing uncontrollably.  (R. DAVIS, T.T. 2657:12—2658:13, 2666:5-16; G. STEVICK, T.T. 6894:21—6895:5, 6990:9-14, 6991:2-21).

4.      BP and Transocean engaged in various actions relating to the BOP from the time it was originally designed and commissioned through the night of April 20, 2010, that negated any effectiveness that the stack might have had to control the Macondo well.  (R. DAVIS, T.T. 2649:21—2650:10, 2657:14—2658:13, 2666:5-19; G. STEVICK, T.T. 6882:15—6883:13).

> **3.      *BP Directed The Design And Configuration Of The Deepwater Horizon's BOP From The Time The Vessel Was Commissioned Until The Time It Sank.***

5.      BOPs are modular pieces of equipment put together in a stack much like Lego blocks.  (G. STEVICK, T.T. 6908:2-6).   They are highly customized at the direction of sophisticated parties.  (*See* DEPO. OF D. MCWHORTER, 209:6-25).

6.      BOPs generally consist of three types of mechanical devices designed to aide in well control: (1) annulars, which are elastomeric, doughnut-shaped elements designed to close on drill pipe and seal the annulus of a BOP's wellbore; (2) VBRs, which are ram blocks that can close together around various sizes of drill pipe to seal the annular space of the BOP wellbore, and; (3) shearing rams, which are designed to close together to sever drill pipe and seal the well from bottom-hole flow in an emergency situation.  (R. DAVIS, T.T. 2646:12—2648:1; G. STEVICK, T.T. 6883:17-24).

7.      BP directed the design and configuration of the *Deepwater Horizon*'s BOP from the time of its initial planning in 1998 through the time it was commissioned in 2001.  (G. STEVICK, T.T. 6985:13—6986:7).

8.      In its original 1998 drilling contract to lease the *Deepwater Horizon*, BP (through its predecessor in interest, Vastar Resources, Inc.) required Transocean (through its predecessor

73

in interest, R&B Falcon Drilling Co.) to "maintain well control equipment in accordance with good oilfield practice at all times" and to "use the blowout prevention equipment specified" in the contract by BP "unless otherwise directed by [BP]."   (TREX-4271 at BP-HZN-MBI00021479).  BP directed that the rig's BOP was to be a Cameron-model five ram stack rated to 15,000 psi working pressure, and also specified the order in which the rams were to be placed in the stack.  (*Id*. at BP-HZN-MBI00021537-1538).

9.      In September 2009, BP amended its drilling contract with Transocean concerning the *Deepwater Horizon*.  (TREX-1488 at BP-HZN-CEC041476).   Though other provisions within the contract changed, as it did with the original drilling contract in 1998, BP again specified the rig's blowout prevention equipment in detail.  (*Id.* at BP-HZN-CEC041561-15620).

10.      Before commissioning the *Deepwater Horizon*, BP undertook its own internal studies concerning the BOP configuration for the rig.  (*See, e.g.,* TREX-5094 at TRN-INV-01864068).  BP authored a Technical Position Paper concerning the BOP's design and concluded that "[t]he BOP stack most suited for [the *Deepwater Horizon*] [was to be] a Cameron TL Guidelineless 18-3/4" 15K stack rated for 10,000 ft. water depth."  (*Id*.).   BP went on to recommend a specific element-by-element configuration of the BOP, component operating pressures, ram and annular opening and closing volumetric constraints, the configuration of the ROV intervention panel and the closing time, configuration and parameters for both of the BOP's emergency functions—the electronic disconnect sequence ("EDS") and the automatic mode function ("AMF").  (*Id*. at TRN-INV-01864069–4074).

11.      Prior to commissioning, BP undertook a significant role to analyze the configuration of the BOP's AMF system.  (*See* TREX-4115).

12.     The AMF is an autonomous emergency system designed to shut-in the well in the event of a catastrophic occurrence such as a massive explosion aboard the vessel.  (R. DAVIS, T.T. 2648:4-7).  The system does not require human intervention to activate.  (*Id.*).  In an emergency situation, upon the loss of electronic communication and electrical and hydraulic power between the BOP and the rig, the AMF is designed to activate the BOP's shear rams in order to cut the drill pipe in the hole (if any) and seal the open wellbore.  (*Id.*, R. DAVIS, T.T. 2649:14-23).

13.     BP conducted its own analysis concerning the configuration of the *Deepwater Horizon* BOP's AMF system and whether to close the casing shear ram ("CSR") in addition to the blind shear ram ("BSR") during activation.  (TREX-4115).

14.     BSRs are the most important element of a BOP.  (R. DAVIS, T.T. 2646:4-9).  They are designed to both cut drill pipe and seal the wellbore from flow by way of elastomeric packing elements located above and below the rams' shearing blades.  (R. DAVIS, T.T. 2647:12-16).  In a situation where the well is flowing, a BSR's elastomeric seal can be damaged by erosive flow.  (*See* TREX-4423 at BP-HZN-2179MDL03106206).  Therefore, proper engineering design should always include a means of protecting the seals in order to ensure reliability.  (*See* G. STEVICK, T.T. 6888:23—6889:11, 6891:17-25; DEPO. OF JOHN SHAUGHNESSY, 55:8-17).

15.     CSRs (also known as super shear rams) have the greatest force capability for shearing drill pipe.  (R. DAVIS, T.T. 2646:4-9).  CSRs have steep-angled "V" shaped blades that force the drill pipe to the center of the wellbore while cutting.  (R. DAVIS, T.T. 2808:20—2809:1).  They are generally located below the BSR on a BOP in order to protect the sealing element of the BSR as it closes in the event the BOP is needed to stop a blowout.  (G. STEVICK, T.T. 6890:5-14).

75

16.     BP determined that a CSR-then-BSR AMF closure sequence would protect the BSR's critical elastomeric sealing packers as opposed to a BSR-only configuration that made "no guarantee" of seal preservation.  (TREX-4115).  BP also noted that closing the CSR then the BSR would require purchasing additional accumulator bottles and necessitate reconfiguring the system's software at an additional expense.  (*Id.*).

17.     All in all, BP's AMF closure analysis focused on cost and simplicity of use, as BP determined.  (*Id.*).  BP's focus fell outside of the proper standard of care required in sound engineering design.  (G. STEVICK, T.T. 6987:7—6988:7).

18.     BP also set forth its analysis concerning the manner in which the *Deepwater Horizon*'s AMF system should be configured in a September 13, 1999, position paper.  (TREX-4114).  Therein, BP outlined "the sequence, timing and overall philosophy" that it desired for AMF operation and again noted that its design configuration was intended "to provide reliability through simplicity."  (*Id.* at TRN-HCJ-00026742-6743).

19.     Ultimately, despite its own studies, BP's selected configuration closed only the BSR, rather than both the BSR and the CSR during AMF activation.  (*Id.* at TRN-HCJ-00026742-6743).  As initially alluded to in its earlier studies, this was "due to accumulator volumetric constraints" and BP's decision to forgo spending the money required to install additional hydraulic accumulator capacity on the BOP.  (*Id.*; R. DAVIS, T.T. 2811:15-17).

20.     BP made its configuration decision in spite of the fact that it understood that "[b]y first shearing with the CSR's (*sic*) and then raising the tail, the SBR's (*sic*) [would be] able to close in the well with less risk of damaging the seal."  (TREX-5094 at TRN-INV-01864073).  BP even noted that its selected configuration would only "cover approximately 95-97% of all drilling activities."  (TREX-4114 at TRN-HCJ-00026743).  Configuring the BOP in such a

76

manner was not in line with reasonable and prudent engineering design standards.  (*See* G. STEVICK, T.T. 6891:17-25).

21.     In addition to its own studies, analyses and input, BP also required Cameron to retain a third-party consultant, EQE International, Inc. ("EQE"), to conduct a risk assessment of the BOP. (TREX-4120).  EQE determined that "the major contributor to the failure likelihood" of the BOP was the "selected stack configuration.  With only one shear ram capable of sealing the well in," EQE noted that "it [was] extremely difficult to remove all the single failure points [within the stack.]"  (*Id*. at CAM_CIV_0019070).

22.     In spite of the fact that "it [is] desirable to have two methods to cut [drill] pipe" in order to provide redundancy in the event of unforeseen BSR damage, BP ignored EQE's warning and chose to forego installing a second BSR on the *Deepwater Horizon*'s BOP.  (DEPO. OF J. SHAUGNESSY, 55:23—56:17; G. STEVICK, T.T. 6905:22-23, 6908:19—6909:2).

23.     Additionally, during the BOP's commissioning in 2001, BP had personnel on site in Ulsan, Korea, in order to ensure that the BOP met BP's specifications prior to being put into service.  (DEPO. OF W. LENORMAND, 246:23—247:9, 247:12-14).

### 4.     *BP Continued To Exert Substantial Control Over The BOP After It Was Commissioned Until The Time The Rig Sank, Categorically Downgrading Every Element On The Stack.*

24.     BP continued to exert substantial control over the BOP from the time it was commissioned and placed into service in 2001 until the time the *Deepwater Horizon* sank on April 22, 2010.  (*See, e.g.* TREX-4432, TREX-5115, TREX-3925, TREX-3338).

25.     BP's control of the BOP included a string of operational and engineering decisions that categorically downgraded the safety profile of the stack over a span of almost ten years.  (G. STEVICK, T.T. 6883:5-11).

77

26.     In 2004, BP independently made the decision to convert the lower variable bore ram on the BOP to a test ram.  (TREX-4432).  This reduced the BOP's number of VBRs from three (the industry standard) to two, thereby reducing the stack's built-in redundancy in a well control event.  (R. DAVIS, T.T. 2676:7—2677:6; G. STEVICK, T.T. 6893:14-18).

27.     In the deepwater drilling industry, a test ram is typically installed by inverting a VBR within its existing ram cavity.  (R. DAVIS, T.T. 2676:10-13).  This allows the VBR to hold pressure from above, which is a necessity for conducting routine BOP testing.  (R. DAVIS, T.T. 2676:14-16).  Once a VBR is converted to a test ram, however it can no longer be used to seal the well in the event of bottom-hole flow.  (R. DAVIS, T.T. 2676:24—2677:2).

28.     BP recognized that the traditional manner of tripping drill pipe in and out of the well to conduct BOP testing required significant and valuable rig time that cost the company a substantial amount of money each time a test was required.  (TREX-4432).  BP's decision to convert the lower VBR to a test ram was based solely on these facts and its decision to convert the VBR was made strictly to save time and money.  (*Id.*).  In fact, BP internally lauded the fact that the $100,000 cost to convert the lower VBR would "easily be made back in time savings the first time [it did not] have to run a test plug" when testing the BOP.  (TREX-6093 at 2).

29.     Though this alteration directly conflicted with BP's own well control policy and industry standards, BP internally sought and approved a dispensation to its own mandate.  (*See* G. STEVICK, T.T. 6893:14-18).  BP's decision reduced the redundancy of the BOP and made the lower VBR ineffective in an emergency situation to assist in sealing the well.  (R. DAVIS, T.T. 2676:10—2677:6; TREX-6120 at TRN-HCEC-00064131).

30.     In late 2006, BP directed Transocean to modify the BOP's lower annular to a stripping packer.  (TREX-5115 at TRN-INV-03329097).

78

31.     A stripping packer is an annular that is designed to allow drill pipe to be tripped or run ("stripped") in and out of the well while still maintaining a sealed annulus vis-à-vis the closed elastomeric packer element.  (R. DAVIS, T.T. 2678:1-5).

32.     BP paid Transocean approximately $46,000 to replace the lower annular with a stripping packer.  (TREX-5115 at TRN-INV-03329097).  BP's action downgraded the lower annular's working pressure from 10,000 psi to 5,000 psi and made the element ineffective in controlling the high pressures BP knew could be experienced on the Macondo well.  (G. STEVICK, T.T. 6887:14—6888:1; TREX-5115 at TRN-INV-03329097, TRN-INV-03329099). Ultimately, this decision reduced the BOP's built in redundancy and safety profile.  (G. CHILDS, T.T. 5296:11-15).

33.     In 2007, BP retained Wild Well Control, Inc. ("Wild Well Control") to perform a risk assessment of the BOP in regard to the possibility of a VBR failure.  (G. STEVICK, T.T. 6905:9-12; TREX-3925 at BP-HZN-MBI00038889–8890).  Wild Well Control conducted an internal workshop with high-level BP personnel, including Wells Team Leader John Guide, on the topic, and also presented a report for BP's review suggesting possible changes or improvements that BP could make to the BOP.  (G. STEVICK, T.T. 6905:13-17; TREX-3926 at BP-HZN-2179MDL00846872).   BP declined to follow any of Wild Well Control's recommendations.  (G. STEVICK, T.T. 6905:9-23).

34.     Finally, BP was the ultimate authority concerning the scope of maintenance to be performed between wells drilled by the *Deepwater Horizon*.  (*See* TREX-3338 at BP-HZN-2179MDL00343459).  BP routinely directed Transocean concerning what maintenance tasks would or would not be completed on the BOP prior to its next subsea deployment.  (*Id*., TREX-680).

35.     For example, five days prior to the Macondo well blowout, John Guide instructed Transocean not to perform the routine scheduled change of the BOP's annular elements prior to the *Deepwater Horizon* beginning work on the Nile Well.  (TREX-680).  Guide even noted that "BP accept[ed] responsibility if both annulars were to fail and the stack had to be pulled to repair them."  (*Id.*).

> **5.     BP Failed To Utilize The Best Available And Safest Technology In Designing And Configuring The BOP And Directing Its Operation.**

36.     30 C.F.R. § 250.107(c) requires operators such as BP to "use the best available and safest technology ("BAST") whenever practical on all exploration, development and production operations."  (TREX-6177 at 1).  The statute is clear on its face based on the plain English definitions of its wording and serves as a basis for proper engineering methodology in utilizing drilling equipment.   (G. STEVICK, T.T. 7011:9-22, 7012:14-25; *see* DEPO. OF D. TROCQUET, 41:20—43:1).

37.     As the operator of the Macondo well, BP was required to utilize BAST in all of its drilling operations.  (*See* TREX-6177 at 1).  BP understood this requirement and also recognized the consequences of failing to do so.  (TREX-4761 at BP-HZN-2179MDL01339727, 9749).

38.     However, both at the time the BOP was commissioned and at the time of the blowout, BP did not utilize BAST on the *Deepwater Horizon* BOP.  (*See* G. STEVICK, T.T. 6882:19—6883:11).  A number of better technologies were commercially available and practical for use on the BOP.  (R. DAVIS, T.T. 2835:17-2836:2).

> **6.     BP's Configuration Of The BOP Should Have Included DVS Rams, Thereby Making It Safer And Better Able To Shear Off-Center Drill Pipe In An Emergency.**

39.     In planning, designing and constructing the *Deepwater Horizon* BOP, Cameron's Shearing Blind Ram ("SBR") model shear ram was selected as the BSR to be installed on the

stack.  The upper "V" shaped SBR block measured 15-1/4" wide and the lower straight SBR block measured 17-7/8" wide; both less than the BOP wellbore's diameter of 18-3/4".  (TREX-61123 at 9).  The single "V" design of the SBR model also provided very little ability to center drill pipe prior to shearing it.  (R. DAVIS, T.T. 2662:15—2663:7).  Accordingly, the SBR was not the best available and safest technology either at the time the BOP was constructed, or at the time of the Macondo Incident.  (R. DAVIS, T.T. 2663:20—2664:15; TREX-61123 at 22).

40.     Double "V" shearing rams ("DVS") were available from Cameron in 1998, well in advance of the *Deepwater Horizon*'s BOP being designed or constructed.  (*See* TREX-7001 at 1, 6, 13).  DVS rams provided a number of significant engineering benefits over the SBR model installed on the *Deepwater Horizon*'s BOP.  (*See* TREX-7001 at 13).

41.     DVS rams were 20% more efficient and were capable of cutting the same size and grade of drill pipe with less pressure than the SBR model.  (R. DAVIS, T.T. 2663:11-19; TREX-4276 at TRN-HCEC-00077423, TREX-1300 at 3-5).  They also incorporated dual "V" shaped blades that were a full 1-1/4" wider than the SBR model.  (DEPO. OF D. MCWHORTER, 144:22—145:4; TREX-61123 at 23).  Compared to the SBR, the dual "V" design of DVS rams afforded a significant advantage by providing drastically better centering capability and a much wider safety margin.  (R. DAVIS, T.T. 2662:15—2663:7).

42.     As of 2009, DVS rams were much more widely used in the industry than Cameron's SBR model and were considered to be the best in practice at the time.  (DEPO. OF C. ERWIN, 62:20-25).  DVS rams were a "plug-and-play" option for the BOP and would have cost BP only about $100,000 to install.  (DEPO. OF D. MCWHORTER, 110:13—111:9).  BP was aware that DVS rams offered more robust capabilities than the SBR model, but chose not to incorporate

them into the BOP.  (TREX-4276 at TRN-HCEC-00077423; DEPO. OF D. MCWHORTER, 695:1-8.).

> **7.    Had BP Chosen To Install Them, Tandem Boosters Could Have Doubled The BOP's Capacity To Shear The Drill Pipe.**

43.    BP also chose to forego installing Cameron's tandem boosters on the *Deepwater Horizon* BOP.  (DEPO. OF D. MCWHORTER, 692:20—694:2).

44.    Tandem boosters were developed by Cameron "[i]n order to increase the available shear force for a BOP."  (TREX-7001 at 10).  They were offered for drilling installations in the offshore market as early as 1998.  (*Id.* at 1).  Tandem boosters offered an additional piston housing that could be fitted onto the back of a Cameron shear ram bonnet in order to provide greater shearing capacity.  (DEPO. OF D. MCWHORTER, 118:24-119:6).  Installation was a simple process, if done prior to construction of the vessel.  (*See* DEPO. OF D. MCWHORTER, 124:14-17).

45.    When combined with DVS rams, tandem boosters could have effectively doubled the shearing capacity of the *Deepwater Horizon*'s BOP.    (TREX-3967; DEPO. OF D. MCWHORTER, 118:24—119:6, 120:5-11).

46.    Tandem boosters would have cost BP about $500,000 and were a "plug-and-play" addition that could have been added to the BOP's BSR.  (DEPO. OF D. MCWHORTER, 118:24—119:6, 119:16—120:4).

> **8.    Though BP Understood The Benefits Of A Dual-BSR Configuration, It Failed To Incorporate Such A Design Into The BOP.**

47.    Cameron BOPs are modular pieces of equipment, much like Lego blocks, that are highly customized at the direction of the sophisticated operator and drilling contractor.  (G. STEVICK, T.T. 6908:2-6; *see* DEPO. OF D. MCWHORTER, 209:6-25).  Both parties are responsible for understanding the conditions in which the BOP will be utilized and then configuring it

appropriately.  (R. DAVIS, T.T. 2879:8-15; G. PERKIN, T.T. 3436:6-11; G. STEVICK, T.T. 6950:1-24).

48.    BSRs are the most important element of a BOP.  (R. DAVIS, T.T. 2646:4-9).  In a situation where the well is flowing, a BSR's elastomeric seals can be damaged by erosion and wash out.  (*See* TREX-4423 at BP-HZN-2179MDL03106206).  Therefore, proper engineering design should always include a means of protecting the seals in order to ensure reliability.  (*See* G. STEVICK, T.T. 6888:23—6889:11, 6891:17-25; DEPO. OF J. SHAUGHNESSY, 55:8-17).

49.    In order to protect BSR seals and provide critical redundancy, two blind shear rams should always be utilized on a deepwater BOP installation.  (DEPO. OF J. SHAUGHNESSY, 54:15-20, 55:8-17; G. STEVICK, T.T. 6888:3-12).  Configuring a BOP in such a manner offers a major advantage: in the event that drill pipe needs to be sheared in a flowing well, if the elastomeric packing elements on the first BSR are damaged, the second BSR can still operate as a backup and provide a seal to the well.  (DEPO. OF J. SHAUGHNESSY, 55:8-17).

50.    BP chose to configure the *Deepwater Horizon*'s BOP with only a single BSR in spite of engineering best practices.  (TREX-4120 at CAM_CIV_0019070; *see* G. STEVICK, T.T. 6888:23—6889:11).  It made this decision even though it knew that the BOP's BSR was the most important element on the stack, that the BSR was a single point of failure and that utilizing only one ram capable of sealing the wellbore contributed significantly to the likelihood of a BOP failure.  (TREX-4120 at CAM_CIV_0019070; R. DAVIS, T.T. 2646:4-9).

51.    BP's own December 2000 drilling manual, dated a year prior to the BOP's commissioning, recognized the importance of utilizing a dual BSR design.  (TREX-2390 at BP-HZN-2179MDL00336684).  The manual instructed BP personnel to consider implementing a BOP configuration with two sealing shear rams in dynamically positioned operations in order to

2174599 v7-24010/0002 PLEADINGS

provide a reliable backup in the event of an unforeseen emergency event.  (*Id*.).  The manual even depicted an exemplar BOP configured with two sealing shear rams.  (*Id*. at BP-HZN-2179MDL00336688).

52.     Furthermore, aside from the *Marianas* that began drilling the Macondo well prior to sustaining hurricane damage, the *Deepwater Horizon*, with its single BSR, was the least robust rig in Transocean's entire Gulf of Mexico fleet as of April 2010.  (G. STEVICK, T.T. 7053:3-17). In fact, the vast majority of Transocean's rigs (including at least three contracted by BP) operating in the Gulf of Mexico were equipped with at least two BSRs.  (D-8226.4; G. STEVICK, T.T. 7053:9-17).

53.     Despite BP's own understanding as to the benefits of a dual-BSR BOP design prior to the *Deepwater Horizon* BOP's commissioning, BP did not implement such a configuration.  (*See* G. STEVICK, T.T. 6888:23—6889:21).  This failure was outside of the basic tenets of proper mechanical engineering design and made the BOP unnecessarily unsafe.  (G. STEVICK, T.T. 6888:2-17).

**9.      *BP Chose Not To Spend The Money Required To Upgrade The BOP With A Bi-Directional Test Ram, Even Though It Would Have Made The BOP Safer And More Reliable.***

54.     Though BP independently made the decision to convert the lower VBR on the BOP to a test ram, it could have incorporated Cameron's bi-directional ram instead.  (TREX-4432 at BP-HZN-2179MDL03107285, TREX-6120 at TRN-HCEC-00064131; DEPO. OF D. MCWHORTER, 66:21-24).  Bi-directional rams were available from Cameron as early as 2006. (DEPO. OF D. MCWHORTER, 67:16-20).

55.     Bi-directional rams are designed to offer the functionality of a VBR in sealing the well from bottom-hole flow, while still retaining the timesaving benefits of a test ram.  (DEPO. OF D. MCWHORTER, 66:21-24; TREX-3925 at BP-HZN-MBI 00038892).

56.     Wild Well Control discussed bi-directional rams as an alternative upgrade to the BOP when BP retained the company to conduct a VBR failure analysis for it in 2007.  (TREX-3925 at BP-HZN-MBI 00038892).  Bi-directional rams would have cost BP between $1 and $1.5 million to install on the BOP and would have restored another level of redundancy to the stack that it otherwise lost as a result of BP's decision to invert the lower VBR.  (R. DAVIS, T.T. 2676:10—2677:6; DEPO. OF D. MCWHORTER, 66:21—67:7).

### 10.     *In Spite Of Knowing That The BOP's Control Pod Batteries Could Be Depleted And Fail In An Emergency Situation, BP And Transocean Chose To Forego Upgrading The BOP's Control System To Cameron's Mark III System.*

57.     As early as 2003, the offshore industry was aware that control pod batteries such as those utilized in the BOP's Mark II control system were subject to depleting without notice. (TREX-3624 at TRN-MDL-00494997–4998).  In such a situation, the industry was aware that the only sign of battery failure would likely be the complete inoperability of the AMF system when it was called upon to function in an emergency event.  (*Id*. at TRN-MDL-00494997).

58.     BP understood the potential for pod battery failure as well.  (DEPO. OF D. MCWHORTER, 101:14—102:7).  As early as September 2000, BP recognized that the control pod batteries were "stand-by batteries" that were "not dependent on the system power for operation" and not rechargeable from the rig.  (TREX-5094 at TRN-INV-01864072).

59.     Transocean also understood the potential for pod battery failure.  (DEPO. OF D. MCWHORTER, 101:14—102:7).   In 2005, Transocean personnel made repeated inquiries to

Cameron as to the availably of rechargeable batteries for the *Deepwater Horizon'*s Mark II system. (TREX-5155 at CAM_CIV_0371710–1711). However, Cameron replied by stating that rechargeable battery capability would only be offered on its next generation of control systems. (*Id.*).

60.     Cameron's next generation of control systems, the Mark III, was released to the offshore drilling market in 2006. (DEPO. OF D. MCWHORTER, 289:17-20). As of April 20, 2010, Cameron offered rechargeable batteries that could be monitored for level variances from the surface. (DEPO. OF DAVID MCWHORTER, 289:17-25).

61.     BP was aware of the benefits offered by the Mark III system and even chose to retrofit its *Thunder Horse* installation with a Mark III configuration. (DEPO. OF D. MCWHORTER, 69:25—70:6). However, though it would have cost only about $2 million to install the Mark III system on the *Deepwater Horizon* and its BOP, BP chose to forgo integrating it. (DEPO. OF D. MCWHORTER, 96:22—97:6).

**11.     *Given The Macondo Well's Maximum Anticipated Surface Pressure, BP And Transocean Should Have Been Aware That The Deepwater Horizon's BOP Was Not Suited For Use In Drilling Activities.***

62.     The maximum anticipated surface pressure ("MASP") is a calculated estimate of the maximum pressures that could be expected within various sections of a deepwater well. (R. DAVIS, T.T. 2857:20—2858:1). MASP can be calculated in a number of ways for the surface (at the rig), the mudline (where the BOP sits on the wellhead), and the bottom of the hole. (*Id.*).

63.     Federal regulations required that the *Deepwater Horizon'*s BOP and each of its associated components exceed the MASP of any given well in order to ensure well control. (G. STEVICK, T.T. 6884:13—6885:2). Transocean's internal well control manual required the same. (TREX-1454 at TRN-MDL-00286797). BP and Transocean should have been aware that the

*Deepwater Horizon*'s BOP was not suited for service on the Macondo well.  (G. STEVICK, T.T. 6882:19—6883:11).

64.     BP calculated the MASP of the Macondo well to be 8,404 psi at the mudline where the BOP sat.  (TREX-7004).  This pressure was in excess of the working pressure of the lower annular, which was only rated to 5,000 psi.  (TREX-5115 at TRN-INV-03329097).

65.     Due to at least one occasion where the drill crew inadvertently stripped drill pipe through the closed upper annular (which was not designed for stripping), the well's MASP likely also exceeded the working pressure of the upper annular.  (R. DAVIS, T.T. 2684:3-11; G. STEVICK, T.T. 7027:1-8).   Stripping through the closed elastomeric element had an abrading effect on the annular rubber, thereby weakening it to the point that rubber pieces of the element were found by the handful on the rig floor.  (R. DAVIS, T.T. 2683:23—2684:11; DEPO. OF D. MCWHORTER, 308:2-11; DEPO. OF M. WILLIAMS, 62:7—63:15).   Given that the upper annular was not designed to perform stripping operations, this action would likely have abraded the elastomeric element and reduced its working pressure to no more than 2,500 psi.  (G. STEVICK, T.T. 7026:4-11).

        **12.     *The Deepwater Horizon's BOP Lacked Sufficient Shearing Capacity And A Proper Safety Factor, Making It Unnecessarily Dangerous And Unsuitable For Use On The Macondo Well.***

66.     As early as 2002, a study conducted for the MMS by West Engineering Services, Inc. ("West Engineering"), who also served as a contractor for Transocean, noted deepwater operators' awareness that BOP shearing capacity "paint[ed] a grim picture of the probability of success when utilizing [the BOP as the] final tool in securing a well after a well control event." (TREX-5054 at 3).  BP and Transocean should have been aware that the BOP was not suited for the Macondo well because it lacked sufficient shearing capacity required to shear the drill pipe.

87

(R. DAVIS, T.T. 2664:3-15; G. PERKIN, T.T. 3325:24—3326:12; G. STEVICK, T.T. 6095:4-12, 6908:19-25).   The BSR was regulated to a maximum pressure of 4,000 psi in emergency situations.   (R. DAVIS, T.T. 2664:17—2665:10).   However, at the time of the blowout, only 3,382 psi was available due to leaks in the BOP's ST locks.   (TREX-1 at BP-HZN-BLY00000157).

67.     BP and Transocean were aware that pressures required to shear drill pipe could vary by as much as 2,000 psi, or as much as 57%.   (R. DAVIS, T.T. 2814:22—2815:10; TREX-3185 at CAM_CIV_0098274, TREX-1300 at 3-2, TREX-5054 at 4).   Both parties should have taken this into account and incorporated a proper safety factor.   (R. DAVIS, T.T. 2187:15-23).   In fact, Wild Well Control, BP's own retained BOP consultant, suggested that operators should utilize a minimum safety margin of at least 20% when calculating drill pipe shearing ability. (DEPO. OF P. CAMPBELL, 168:15—171:21).

68.     Despite this, as configured, the BOP had a safety factor of less than one and could easily have required over 4,000 psi to shear the drill pipe.   (R. DAVIS, T.T. 2710:18—2711:1; G. STEVICK, T.T. 6906:19—6907:7, 7047:13—7048:7).   BP was not aware of this fact until well after the blowout.   (TREX-3187 at BP-HZN-2179MDL01287555).   In fact, Macondo Wells Team Leader John Guide had no understanding of the BOP's shearing calculations prior to April 20, 2010, and was only made aware of them after receiving them from BP's BOP expert witness, Forrest Earl Shanks.   (*Id.*).

### 13.     *BP And Transocean Were Aware Of Potential And Unseen Issues With Control Pod Batteries And Should Have Taken Proper Steps To See That They Were Maintained In Accordance With Cameron's Recommendations.*

69.     BP and Transocean should have been aware that the 27-volt battery in the blue BOP control pod was severely depleted prior to the BOP being run on the Macondo well.   (R.

DAVIS, T.T. 2652:13—2653:12).   At the time of the explosion, the 27-volt battery could not

provide the power needed to operate the AMF system.  (A. ZATARAIN, T.T. 8403:24—8404:16).

Cameron's battery replacement guidelines instructed that control pod batteries should be replaced

no later than 365 days after the day they were originally installed.   (TREX-3605 at

CAM_CIV_0003276).  However, the batteries in the blue pod were last replaced on November

4, 2007, far outside of Cameron's recommended timeline. (R. DAVIS, T.T. 2652:13-20;  A.

ZATARAIN, T.T. 8431:12-25; TREX-3792 at TRN-MDL-00310821; DEPO. OF O. MCWHORTER,

227:18—227:24).

70.     The failure of the 27-volt blue pod battery was caused by Transocean's ineffective

maintenance system.   (*See* R. DAVIS, T.T. 2652:13—2653:1, 2666:5-16; G. STEVICK, T.T.

6972:9-15).

71.     The failure of the 27-volt blue pod battery was one of two contributing causes of

the malfunction of the AMF system.  (A. ZATARAIN, T.T. 8403:24—8404:16).

### 14.     *Transocean Failed To Maintain The 103Y Solenoid In The Yellow Pod Such That It Could Operate In An Emergency Situation.*

72.     The BOP was not suited for the Macondo well because the 103Y solenoid in the

yellow BOP control pod was miswired and could not have functioned properly.  (A. ZATARAIN,

T.T. 8403:24—8404:16).  In February 2010, the dual coil design 103Y solenoid was serviced on

the deck of the *Deepwater Horizon*.  (TREX-3602 at CAM_CIV_0046705).  In the process of

that procedure, two electrical wires connected to the solenoid were reversed and miswired.  (*See*

R. DAVIS, T.T. 2653:22—2654:18).  This problem went unnoticed, even though Transocean had

testing procedures in place designed to detect such issues.  (R. DAVIS, T.T. 2847:12—2849:16;

TREX-3798 at TRN-MDL-01547903).  Miswiring the solenoid caused reverse polarity within its

coils and kept it from properly functioning at the time the AMF system would have activated. (A. ZATARAIN, T.T. 8471:8-18).

73.     The failure of the 103Y solenoid was caused by Transocean's ineffective maintenance system.  (R. DAVIS, T.T. 2670:14—2671:2).

74.     The failure of the 103Y solenoid was a second contributing cause of the failure of the AMF system.  (A. ZATARAIN, T.T. 8403:24—8404:16).

**15.     *BP's And Transocean's Decisions In Configuring The BOP's AMF System Made The BOP Unfit For Its Intended Purpose And Unsuited For Service On The Macondo Well.***

75.     BP and Transocean should also have been aware that the BOP was not suited for the Macondo well because its AMF system was improperly configured.  (G. STEVICK, T.T. 6892:20—6893:6).  In fact, by BP's own admission, the system was only designed to operate in 95%–97% of drilling applications.  (TREX-4114 at TRN-HCJ-00026743).  This fell outside of the standard of care required in sound engineering design.  (G. STEVICK, T.T. 6986:1—6988:7).

76.     The system should have been designed to close the CSR first and the BSR second. (G. STEVICK, T.T. 6894:21—6895:5).  BP understood this as well, even noting in its September 2000 position paper that "the CSR's (*sic*) are located below the SBR's (*sic*)" in order "to protect the sealing capabilities of the SBR.  By first shearing with the CSR's (*sic*) and then raising the tail, the SBR's (*sic*) are able to close in the well with less risk of damaging the seal."  (TREX-5094 at TRN-INV-01864073).

77.     Closing the rams in this order in an emergency situation would have had three important effects: (1) the deep "V" shaped blades of the CSR tend to center the drill pipe in the wellbore; (2) shearing the drill pipe with the CSR first alleviates any pressure differential inside and outside of the pipe, and; (3) closing the CSR first restricts flow from below, thereby

preserving the BSR's elastomeric seals from erosion and wash out damage. (G. STEVICK, T.T. 6888:13—6889:18, 6912:20—6913:4).

78.     Though the BOP was initially designed with this more optimal CSR-then-BSR configuration, West Engineering proposed to change this during final commission testing and troubleshooting of the BOP. (G. CHILDS, T.T. 5356:5-22, 5357:6-23; TREX-7691 at TRN-MDL-02789713, 9724). BP and Transocean agreed and re-engineered the BOP to the less optimal BSR-only configuration that was in place at the time of the blowout. (*See* G. CHILDS, T.T. 5357:24—5358:2).

16.     ***Even Though It Was Not Suited For The Well, If The BOP Had Been Timely and Properly Operated, The Macondo Well Could Have Been Controlled And A Blowout Would Not Have Occurred.***

79.     Even though the BOP was not suitable for the Macondo well (fit for its intended purpose), had it been operated properly and timely, it likely would have been able to shear the drill pipe in the hole and seal the well. (R. DAVIS, T.T. 2809:2-6; G. STEVICK, T.T. 6894:21—6895:5). The drill crew should have been aware that a kick was occurring and should have taken action sooner by closing both the upper annular and both VBRs. (G. STEVICK, T.T. 6913:20—6914:9, 6991:8-21; *see* DEPO. OF D. MCWHORTER, 552:15-24). This action, if taken prior to 21:31 on the night of the incident, would have halted flow through the annulus and prevented the blowout. (G. STEVICK, T.T. 6910:21—6911:7, 6913:8-19).

80.     Additionally, had the crew acted timely, they could have activated the rig's EDS function to seal the well on the night of the blowout. (*See* G. WEBSTER, T.T. 4005:3—4006:5; G. STEVICK, T.T. 6991:18-21). Mud began shooting from the drill floor at approximately 21:40 on the night of April 20, 2010. (G. WEBSTER, T.T. 4006:25—4007:2; D-4328-A). At that time, the crew should have activated the EDS function to "get the rig off the wellhead." (G. WEBSTER,

T.T. 4005:3—4006:5).  Taking this action would have likely allowed the well to be shut-in and allowed the *Deepwater Horizon* to drift off location safely.  (G. WEBSTER, T.T. 4007:25—4008:4; G. STEVICK, T.T. 6991:18-21).

81.     Finally, even though the crew missed prior opportunities to shut-in the Macondo well, they still could have saved themselves and the vessel by closing both VBRs at the time the upper annular was closed and then activating the CSR and then the BSR at 21:47.  (G. STEVICK, T.T. 6913:8-13, 6923:7-10, 6981:4-8, 6992:10-17, 6894:21—6895:5).  By shearing the drill pipe with the CSR first, then raising the pipe and finally closing the BSR to seal the well, the Macondo well blowout would have been avoided.  (G. STEVICK, T.T. 6894:21-6895:5).

### 17.     *Transocean Failed To Adequately Train The Drill Crew To Properly Shut-In Wells During Emergency Situations.*

82.     The crew aboard the *Deepwater Horizon* was inadequately trained to respond to well control emergencies.  (G. STEVICK, T.T. 6914:2-9, 7027:1-8; R. DAVIS, T.T. 2684:3-11).

83.     In the event of a well control situation, the crew was trained to respond by closing only the upper annular element of the BOP.  (G. STEVICK, T.T. 6914:2-6).  This was a "big mistake" given the VBRs capabilities to contain greater flow forces and the annular's lack of sealing ability.  (G. STEVICK, T.T. 6914:2-9, 7027:1-8; R. DAVIS, T.T. 2684:3-11).

84.     The crew should have been trained to close both the upper annular and the VBRs at the same time, thereby shortening the free length of drill pipe such that it could not become off-center prior to shearing.  (G. STEVICK, T.T. 7017:4-17, *see* G. STEVICK, T.T. 6894:21—6895:3, 6923:2-25).  Doing so would have allowed for a proper EDS activation by shearing the drill pipe with the CSR then raising it and closing the BSR.  (G. STEVICK, T.T. 6894:21—6895:5; *see* G. WEBSTER, T.T. 4005:19—4006:5, 4007:2-15).

85.     If the crew had taken these actions, the Macondo well could have been contained and the ensuing incident would not have occurred.  (G. STEVICK, T.T. 6894:21—6895:5).

**B.     Proposed Conclusions Of Law**

1.     As the leaseholder and operator of Mississippi Canyon Block 252, BP had a duty to utilize the best available and safest technology when drilling the Macondo well with the *Deepwater Horizon*.   30 C.F.R. § 250.107(c).   The *Deepwater Horizon*'s BOP was not configured with the best available and safest technology from time it was originally commissioned in 2001 until the time the *Deepwater Horizon* sank on April 22, 2010.  *Id.*

2.     BP had a duty to configure the BOP with a wider blind shear ram that was better able to shear off-center drill pipe in the event of an emergency and capable of offering a sufficient safety factor for the purpose of shearing tubulars.

3.     BP's decision to forego installing a better, safer and more efficient blind shear ram made the *Deepwater Horizon*'s BOP unfit for its intended use on the Macondo well.  *Vickers v. Chiles Drilling Co.*, 822 F.2d 535 (5th Cir. 1987).

4.     BP and Transocean also had a duty to configure the AMF system appropriately such that it would activate the BOP's CSR and BSR in both the proper order and on cue, as designed, in the event of an emergency.  *Signal Int'l. LLC, v. Miss. Dep't. of Transp.*, 579 F.3d 478, 491 (5th Cir. 2009)

5.     BP's and Transocean's decisions in configuring the AMF system fell outside of the general standard of care required for sound engineering design and made the *Deepwater Horizon*'s BOP unfit for its intended use on the Macondo well.  *Vickers v. Chiles Drilling Co.*, 822 F.2d 535 (5th Cir. 1987).

6.     The *Deepwater Horizon*'s AMF system did not activate the BOP's BSR, which would have shut-in the well, due to two independent and critical failures.

7.     Prior to the BOP being put into service on the Macondo well, Transocean's maintenance team miswired the 103Y solenoid in the yellow control pod.  This caused the yellow pod to be incapable of functioning the BSR at the time AMF should have activated on the night of April 20, 2010.

8.     Additionally, the 27-volt battery in the blue control pod was severely depleted on the night of April 20, 2010.  This caused the blue pod to be incapable of functioning the BSR at the time the AMF should have activated on the night of April 20, 2010.

9.     The individual and independent issues with the blue and yellow control pods caused the failure of the AMF system.  Had just one of these problems not been present at the time of the blowout, the AMF system would have functioned the BSR and shut-in the Macondo well.

10.     Transocean's failed maintenance program caused both the yellow and blue control pod to be inoperable when the BOP was needed to shut-in the well and prevent the Macondo well blowout.

11.     It was reasonable for HESI to rely on BP, as the operator of the well, in selecting and configuring the *Deepwater Horizon*'s BOP in a manner that was suitable for drilling and controlling the Macondo well.

12.     It was reasonable for HESI to rely on Transocean, as the contractor drilling the Macondo well, to maintain the BOP in an ordinary and prudent manner according to the BOP manufacturer's guidelines and in line with proper industry standards.

94

13.     Both BP's and Transocean's actions in failing to configure the *Deepwater Horizon*'s BOP in a manner that was suitable for drilling the Macondo well and in failing to maintain the BOP in an ordinary and prudent manner according to the BOP manufacturer's guidelines and in line with proper industry standards were negligent under general maritime law. *Nat'l. Shipping Co. of Saudi Arabia,* 924 F.Supp. at 1450.

14.     BP's and Transocean's actions in failing to configure the *Deepwater Horizon*'s BOP in a manner that was suitable for drilling the Macondo well and in failing to maintain the BOP in an ordinary and prudent manner according to the BOP manufacturer's guidelines and in line with proper industry standards was unforeseeable to HESI.  *Signal Int'l. LLC,*  579 F.3d at 493.

15.     BP's and Transocean's negligent actions were an intervening, superseding cause of the Macondo well blowout that precludes any and all liability concerning the Macondo well blowout for which HESI might be responsible.  The failure of the *Deepwater Horizon*'s BOP to maintain control of the dynamic flow from the Macondo well was an independent, superseding cause under *Donaghey v. Ocean Drilling & Exploration Co*., 974 F.2d 646, 652 (5th Cir. 1992) (quoting *Nunley v. M/V Dauntless Colocotronis*, 727 F.2d 455, 464 (5th Cir. 1984), *cert. denied*, 469 U.S. 832 (1984)); *Lone Star Indus., Inc., v. Mays Towing Co., Inc*., 927 F.2d 1453, 1460 (8th Cir. 1991)(applying general maritime law); and RESTATEMENT (SECOND) OF TORTS § 442 (1965). In light of the circumstances, BP's and Transocean's failures to properly configure the BOP and Transocean's independent failure to maintain and operate the BOP were not only extraordinary, they also brought about a harm different than any harm which otherwise could have resulted from HESI's actions or inactions.  BP's and Transocean's failures were independent of any situation or circumstance created by HESI's actions or inactions, and were the result of BP's and

Transocean's own failures to act and not the actions of HESI.  BP's and Transocean's failure to properly configure the BOP and Transocean's failures to maintain and operate the BOP subject both entities to liability to HESI, Plaintiffs, and other parties in this litigation under general maritime law and they also constitute a superseding, intervening cause, cutting off any potential liability for HESI.

16.     At the time of any alleged tortious action or inaction by HESI, it could not have foreseen that BP and Transocean would fail to properly configure the BOP for the Macondo well, much less that Transocean would fail to properly maintain and operate the BOP.   A reasonable person, under the circumstances, would recognize BP's and Transocean's failures as extraordinary acts and/or failures to act.  These failures by BP and Transocean were not only unforeseeable to HESI, but they were not a normal consequence of circumstances created by HESI's actions or inactions.  *Donaghey*, 974 F.2d at 652; RESTATEMENT (SECOND) OF TORTS §447 (1965).

17.     If BP had properly configured the *Deepwater Horizon*'s BOP; if Transocean had properly maintained it and if the drill crew had operated it timely; the BOP could have sheared the drill pipe and sealed the well, precluding the *Deepwater Horizon* from sinking and the Macondo well from flowing uncontrollably.  BP's and Transocean's actions were negligent and proximately caused the Macondo well to blowout and flow uncontrollably.  *Nat'l. Shipping Co. of Saudi Arabia*, 924 F.Supp. at 1450; *Exxon Co. v. Sofec, Inc.*, 517 U.S. at 832.

18.     The configuration and maintenance of the BOP rendered it unfit for its intended use (meant to prevent and stop well blowouts), thereby causing an unseaworthy condition that proximately caused the incident.

19.    The *Deepwater Horizon* was therefore unseaworthy and that unseaworthy condition substantially caused the incident and such unseaworthiness was a reasonably probable consequence of the unseaworthiness.

20.    Transocean's negligence and the unseaworthiness of the vessel constituted acts and conditions within the privity and knowledge of Transocean and, as such, Transocean cannot limit its liability in accordance with the Limitation Act.  46 U.S.C. §§ 30501 *et seq*.; *Cupit v. McClanahan Contractors, Inc.*, 1 F.3d 346, 348 (5th Cir. 1993).

## VI.    The BP/HESI Contract Establishes That BP, As The Operator, Considers HESI's Recommendations On Slurry And Cement Job Design As HESI's "Opinion" Only, And BP Has A Duty To Independently Approve Or Disapprove Of Any Such Recommendations.

### A.    Proposed Findings Of Fact

1.    The legal relationship between BP and HESI during the drilling of the Macondo well was governed by the "Contract for Gulf of Mexico Strategic Performance Unit Offshore Well Services between BP Exploration and Production, Inc. and Halliburton Energy Services, Inc." (the "BP/HESI Contract").  (TREX-4477).

2.    Section 2 of the BP/HESI Contract's General Conditions of Contract states: "Except to the extent that it may be illegal or physically impossible or create a hazard to safety CONTRACTOR (HESI) shall comply with the COMPANY'S (BP's) instructions and directions on all matters relating to the WORK."  (TREX-4477 at BP-HZN-2179MDL00055578, ¶4.4).

3.    Pursuant to the BP/HESI Contract, HESI was required to follow BP's instructions and directions on all matters related to the Macondo cement slurry designs and execution of cement jobs, except in instances where such instructions or directions were illegal, impossible or created a safety issue.  (TREX-4477 at BP-HZN-2179MDL00055578, ¶4.4).

97

4.      Section 2 of the BP/HESI Contract's General Conditions of Contract states: "CONTRACTOR (HESI) may give COMPANY (BP) the benefit of its judgment based on its experience interpreting information and making recommendations, either written or oral, as to DATA or amount of material or type of oilfield service to be provided by CONTRACTOR, or the manner of performance or in prediction of results.  Notwithstanding the foregoing, all such recommendations and/or predictions shall be received by COMPANY as opinions only, and no warranty expressed or implied shall be inferred by COMPANY from such recommendations and/or in view of the impracticability of obtaining first-hand knowledge of the many variable conditions, the reliance on inferences, measurements and assumptions which are not infallible, and/or the necessity of relying on facts and supporting oilfield services provided by others." (TREX-4477 at BP-HZN-2179MDL00055608, ¶29.3).

5.      Pursuant to the Section 3 of the BP/HESI Contract, entitled "Scope of Work", HESI's role at Macondo was to make recommendations to BP regarding cement slurry design and job execution, which BP received as HESI's opinion only and to which no express or implied warranty attached.  (TREX-4477 at BP-HZN-2179MDL00055653, ¶22.1(k)).

6.      In addition, it was <u>BP's responsibility</u> to review HESI's recommendations regarding cement slurry design and job execution, and ultimately to independently approve or disapprove of HESI's recommendations.  (TREX-4477 at BP-HZN-2179MDL00055653, 5608, ¶29.3; DEPO. OF I. LITTLE—CORPORATE REPRESENTATIVE, 91:13—92:9; TREX-569).

7.      Jesse Gagliano recommended the cement slurry design for the Macondo production casing cement job.  (J. GAGLIANO, T.T. 6616:3-13, 6618:1-7, 6619:6-13; G. BENGE, T.T. 2495:12-15).

8.      Jesse Gagliano's recommended cement slurry design for the Macondo production casing cement job was reviewed by BP.  (G. BENGE, T.T. 2408:14-19; TREX-506 at BP-HZN-BLY00125441; TREX-296 at BP-HZN-BLY00103034; DEPO. OF J. SPRAGUE, 109:4—110:2, 100:18—101:23).

9.      Jesse Gagliano's recommended cement slurry design for the Macondo production casing cement job was approved by BP.  (TREX-296 at BP-HZN-BLY00103034; DEPO. OF J. SPRAGUE, 109:4—110:2, 672:11—673:2, 673:20—674:8).

10.     Jesse Gagliano's recommended cement job procedure for the Macondo production casing cement job was reviewed and approved by BP.  (TREX-1689; DEPO. OF J. SPRAGUE, 100:18—101:23, 101:13-23, 109:4-110:2).

11.     BP employed cement specialists to advise it on cement slurry designs.  (J. GAGLIANO, T.T. 6619:14-25; DEPO. OF J. SPRAGUE, 100:18—101:1).

12.     Erick Cunningham was employed by BP as a cement specialist.  (J. GAGLIANO, T.T. 6619:14-25).

13.     The BP engineering team responsible for the Macondo well requested that Erick Cunningham review the Macondo cement slurry design.  (DEPO. OF J. SPRAGUE 100:18—101:23).

14.     Erick Cunningham reviewed and approved the Macondo cement slurry design. (DEPO. OF J. SPRAGUE. 108:11—110:2, 110:13-17).

15.     HESI could not have executed the Macondo production casing cement job without BP's approval and/or permission.  (G. BENGE, T.T. 2246:14-17, 2283:21-24, 2355:3-13, 2591:12-16; DEPO. OF I. LITTLE—CORPORATE REPRESENTATIVE, 91:13—92:9; DEPO. OF G. WALZ, 618:23-621:9; DEPO. OF E. CUNNINGHAM, 179:18—180:5).

16.      Section 1.3 of Section 3 – Scope of Work, Appendix 5 – Description of Work, A. Cementing Services of the BP/HESI Contract states that HESI shall "(p)rovide and maintain fully operational cementing and pumping package suitable for all required cementing, pumping and pressure testing (surface and subsurface) and make immediate provision of cementing bulks and additives suitably bulked, sacked, or drummed necessary to provide all slurries and spacers as to COMPANY specification." (TREX-4477 at BP-HZN2179MDL00055649).

17.      The cement slurry used to cement the Macondo production casing was designed to meet BP's specifications.  (TREX-4477 at BP-HZN2179MDL00055643; G. BENGE, T.T. 2269:23-25, 2273:23—2275:2, 2245:13—2246:10).

18.      BP dictated aspects of the Macondo production casing cement slurry design, including increasing the volume of retarder to .09 gps from the .08 gps volume recommended by Jesse Gagliano.  (TREX-287; TREX-1395; J. GAGLIANO T.T. 6605:5-14, 6606:12-17).

19.      The cement job procedure used to cement the Macondo production casing was designed to meet BP's specifications.  (G. BENGE, T.T. 2245:13—2246:10).

20.      The foundation of BP's specifications for the cement slurry design and the cement job procedure was BP's engineering decision to "minimize the ECD as low as practical" and to "keep ECD below an acceptable level."  (TREX-2659 at BP-HZN-MBI00143259).

21.      BP dictated several important aspects of the Macondo production casing cement job procedure, including the volume of pre-cementing mud circulation, fluid pump rates, and cement volume.  (N. CHAISSON, T.T. 6292:5—6293:19, 6293:24—6294:9; G. BENGE, T.T. 2318: 12-13, 2318:25—2319:11; TREX-51165; TREX-5990 at 25; TREX-737; TREX-1 at 65).

**B.**     <u>**Proposed Conclusions Of Law**</u>

1.      The legal relationship between BP and HESI during the drilling of the Macondo well was governed by the BP/HESI Contract.

2.      Pursuant to the BP/HESI Contract, HESI was required to follow BP's instructions and directions on all matters related to the Macondo cement slurry designs and execution of cement jobs, except in instances where such instructions or directions were illegal, impossible or created a safety issue.

3.      Pursuant to the BP/HESI Contract, HESI's role at Macondo was to make recommendations to BP regarding cement slurry design and job execution, which BP received as HESI's opinion only and to which no express or implied warranty attached.

4.      Pursuant to the BP/HESI Contract, it was BP's responsibility to review HESI's recommendations regarding cement slurry design and job execution, and ultimately to independently approve or disapprove of HESI's recommendations, through the use of BP's own internal cement or other expertise.

5.      HESI recommended a production casing cement job procedure in accordance with BP's specifications.

6.      BP modified HESI's recommended production casing cement job procedure and approved it for use on the Macondo well.

7.      HESI recommended the slurry design for the production casing cement job in accordance with BP's specifications.

8.      BP modified HESI's recommended slurry design on the production casing cement job and approved it for use on the Macondo well.

2174599 v7-24010/0002 PLEADINGS

9.      Pursuant to the BP/HESI contract, HESI did not guarantee or warrant any recommendation regarding cement slurry design or cement job procedure.

**VII.   Jesse Gagliano Is An Experienced And Competent Cement Engineer, Specifically Selected By BP To Be Embedded Within BP's Westlake Office.**

    **A.      Proposed Findings of Fact**

1.      Jesse Gagliano is a very experienced cement engineer, having worked for HESI for over thirteen and a half years, primarily in deepwater operations.  (J. GAGLIANO T.T. 6581:7-16; 6586:10-21)

2.      During that time, Jesse Gagliano has planned or executed over 100 foam cement jobs in the Gulf of Mexico.  (J. GAGLIANO T.T. 6586:10-21)

3.      Jesse Gagliano holds a Bachelor of Science degree in Industrial Engineering from Louisiana State University.  (J. GAGLIANO T.T. 6581:24-6582:5).

4.      At the time of the incident, Jesse Gagliano was a Halliburton technical adviser embedded within BP's Westlake, Texas office, where he had worked for four or five years prior to the incident.  (J. GAGLIANO T.T. 6583:9-12; 6583:18-20; 6586:2-9).

5.      Jesse Gagliano was specifically selected by BP to be embedded at its Westlake office based on his training, experience and unique skill set.  (J. GAGLIANO T.T. 6585:21-25).

6.      While embedded at BP, Jesse Gagliano's sole purpose was to provide cement recommendations and cement support for BP's Gulf of Mexico operations.  (J. GAGLIANO T.T. 6583:18-25).

7.      HESI has personnel in place charged with ensuring adequate training of cementers and cement engineers so that they can adequately and competently perform their duties.  (DEPO. OF R. VARGO, 862:1-863:19)

8.     Jesse Gagliano had substantial on-the-job-training.  After BP selected him for an embedded position, Gagliano continued his training through yearly programs known as "iLearns," as well as other mandated training, including equipment-based on-the-job training in order to stay current with new technology and parts as they entered the marketplace.  (J. GAGLIANO T.T. 6586:23—6587:9; 6807:2-9)

9.     Jesse Gagliano relied on HESI's state of the art software tools while embedded at BP, including OptiCem and WellCat.  (J. GAGLIANO T.T. 6587:11-6588:17)

10.     Erick Cunningham, BP's Cementing Sector Specialist for the Western Hemisphere, including the Gulf of Mexico, recognized Jesse Gagliano as an experienced and competent engineer about whom Cunningham had no concerns.  (DEPO. OF E. CUNNINGHAM, 75:8-13; 105:2-13; 467:7-468:11)

11.     Brett Cocales, BP's Operations Engineer for the Deepwater Horizon, acknowledged Jesse Gagliano's competence as a cement engineer.  (DEPO. OF B. COCALES, 588:9-24).

12.     Glen Benge, cementing expert for the United States and the PSC, evaluated Jesse Gagliano's cementing competency and testified that he was a "competent cementing person."  (G. BENGE, T.T. 2488:7-14).

13.     HESI provided Jesse Gagliano with considerable resources to assist him with carrying out his duties and responsibilities as an embedded cement engineer with BP, including access to other HESI cementing personnel, HESI cement testing facilities, a worldwide network of cementing technical support, and the combined resources of HESI's chemistry and engineering research and development technology centers.  (D-4290; J. GAGLIANO T.T. 6812:8-6815:13; DEPO. OF R. DUGAS,  337:11-23, 186:4-187:1).

14.     HESI furnished Jesse with specific written materials to assist him with his duties and responsibilities as an embedded cement engineer with BP, including HESI's Foam Cementing Operations Manual (TREX-745); HESI's Cementing Technology Manual (TREX-4348), and HESI's Global Laboratory Best Practices (TREX-4347).

**B.     Proposed Conclusions of Law**

1.     On April 20, 2010, neither the HESI offshore cementing personnel nor the HESI onshore cement engineers deviated from industry standards or good oilfield practices with respect to designing the cement slurry and the execution of the cement job during the temporary abandonment of the well.

2.     HESI maintained appropriate policies, guidelines, and written materials for its cementing services, consistent with industry standards.

3.     HESI provided appropriate training to its onshore and offshore cementing personnel in the performance of their duties, including, but not limited to, the design and execution of deepwater foam cement jobs, consistent with industry standards.

4.     HESI provided appropriate training to Jesse Gagliano in the performance of his duties as Technical Adviser, which included making recommendations as to the design of the cement slurry and laboratory testing to be performed therewith, consistent with industry standards.

5.     Jesse Gagliano is an experienced, competent and well-trained cementing engineer, having planned or executed over 100 foam jobs in the Gulf of Mexico, and having worked for HESI for over thirteen and a half years, primarily in deepwater operations.

6.     Jesse Gagliano exercised reasonable care in the performance of his duties related to the Macondo well.

104

7.      It was reasonable and prudent for BP to select and use Jesse Gagliano to make cement recommendations and provide cement support for BP's Gulf of Mexico deepwater operations.

8.      HESI took appropriate steps to ensure that Jesse Gagliano had access to HESI resources to further assist and complement the embedded cementing professional, including, but not limited to, HESI cementing personnel, HESI cement testing facilities, cementing technical support and the combined resources of HESI's chemistry and engineering research and development technology centers.

## VIII.  Jesse Gagliano's Recommendation To Use A Foam Cement Slurry On The Macondo Production Casing Cement Job Was Reasonable.

### A.      Proposed Findings Of Fact

1.      Cement slurries used to cement casing and/or create barriers in a deepwater oil well combine dry cement, specialized additives and mix water.  (TREX-4347 at HAL_0677645; G. BENGE, T.T. 2241:11-24).

2.      Cement slurry additives are designed to affect the properties of the cement slurry. (G. BENGE, T.T. 2246:18—2247:6; J. GAGLIANO, T.T. 6708:17-25).

3.      Cement slurry additives can be either dry additives or liquid additives.  (G. BENGE, T.T. 2241:11-24; J. GAGLIANO, T.T. 6621:7-15).

4.      The density of a cement slurry can be altered by injecting it with an inert gas.  (G. BENGE, T.T. 2348:21—2349:6; J. GAGLIANO, T.T. 6615:4-6; TREX-5990 at 11; DEPO. OF D. KELLINGRAY, 544:25—545:9; DEPO. OF R. FAUL, 203:4-13; DEPO. OF P. ANDERSON, 36:3-10, 88:24—89:17; DEPO. OF J. MCKAY, 130:21—131:3).

5.      Nitrogen is an inert gas.  (DEPO. OF R. FAUL, 203:4-13).

6.     Nitrified cement is a specialized form of oilfield cement in which the cement slurry is injected with nitrogen.  (J. GAGLIANO, T.T. 6720:7-9, 6615:4-6).

7.     Nitrified cement is also referred to as "foam cement."  (DEPO. OF E. CUNNINGHAM, 668:18—669:2).

8.     Foam cement (or nitrified cement) is generated by injecting nitrogen into a base cement slurry while it is being pumped into a well.  (J. GAGLIANO, T.T. 6633:11-23, 6621:7-15; G. BENGE, T.T. 2348:6-17).

9.     When conducting testing on a foam cement slurry, the laboratory uses a blender to entrain air in the slurry for testing purposes instead of nitrogen.  (J. GAGLIANO, T.T. 6615:13-15).

10.     A foam cement slurry should be "stable" by design.  (G. BENGE, T.T. 2240:13-16, 2267:25—2268:10; TREX-5990 at 11).

11.     A stable foam cement design is one in which nitrogen bubbles remain evenly distributed throughout the slurry after nitrogen has been injected, or in the case of laboratory testing after air has been mixed into the slurry.  (G. BENGE, T.T. 2453:13-24; 2493:22—2494:3; J. GAGLIANO, T.T. 6615:13-15).

12.     An unstable foam cement design is one in which nitrogen migrates or "breaks out" of the slurry and/or does not stay evenly distributed throughout the slurry.  (G. BENGE, T.T. 2493:22—2494:3, 2435:18-24; TREX-5990 at 11-12).

13.     The oilfield industry determines whether a foam cement slurry is stable by subjecting the slurry to foam stability testing in a laboratory environment.  (TREX-6235 at 9-10).

14.     A foam cement slurry design has the benefit of being able to control slurry density in real-time from the rig by metering the amount of nitrogen injected into the slurry while it is

106

being pumped into the well.   (J. GAGLIANO, T.T. 6615:23—6616:2, 6618:1-7; G. BENGE, T.T. 2494:25—2495:5).

15.    A foam cement slurry is an energized fluid that has superior mud displacement efficiency as compared to a conventional cement slurry.  (G. BENGE, T.T. 2493:4-17).

16.    A foam cement slurry, which contains pressurized nitrogen bubbles, inherently resists gas migration into the slurry and wellbore as the foam cement slurry sets or transitions from a liquid to a solid.  (G. BENGE, T.T. 2492:10—2493:10; 2494:8-14).

### B.    Proposed Conclusions Of Law

1.    Jesse Gagliano's recommendation to BP to use a foam cement slurry on the Macondo well's production casing cement job was reasonable and consistent with industry standards.

## IX.    BP Independently Approved Of Jesse Gagliano's Recommendation To Use A Foam Cement Slurry On The Macondo Production Casing Cement Job Primarily Because Of BP'S Concerns Regarding Equivalent Circulating Densities At The Bottom Of The Well.

### A.    Proposed Findings Of Fact

1.    Equivalent circulating densities ("ECDs") refer to the downhole pressures exerted on the formation while fluids such as mud or cement are circulated downhole.  (DEPO. OF K. PAINE, 141:11—142:16; SCHLUMBERGER OILFIELD GLOSSARY—EQUIVALENT CIRCULATING DENSITIES).

2.    At a given rate of circulation, a higher fluid and/or cement slurry density will cause higher ECDs.  (TREX-5990 at 7 n. 4).

3.    If ECDs exceed the fracture gradient of the formation, the formation could fracture during circulation and induce losses of drilling fluid or cement slurry into the formation. (G. BENGE, T.T. 2350:18—2351:2).

107

4.      Because BP was concerned about ECDs on the Macondo well, BP identified density control as the primary objective for the production casing cement job. (G. BENGE, T.T. 2257:11-25, 2581:4-16; TREX-5990 at 7; TREX-1387; DEPO. OF K. CORSER, 110:5-18).

5.      If ECDs had exceeded the fracture gradient of the formation at the bottom of the well, pumping the cement job could have fractured the formation and induced the loss of drilling fluid and/or cement into the formation. (J. GAGLIANO, T.T. 6618:8—6619:2).

6.      The density of a nitrified or foam cement can be engineered or designed to maintain ECDs below the formation's fracture gradient during the cement job. (G. BENGE, T.T. 2348:25—2349:8; J. GAGLIANO, T.T. 6618:1-13).

7.      Jesse Gagliano recommended that a nitrified cement slurry be used to cement the production casing on the Macondo well. (J. GAGLIANO, T.T. 6616:3-11, 6617:22—6618:7, 6619:10-13).

8.      BP approved of HESI's recommendation to use a nitrified cement slurry to cement the production casing on the Macondo well. (G. BENGE, T.T. 2283:21-24; J. GAGLIANO, T.T. 6617:22-6618:7, 6619:10-13).

**B.      Proposed Conclusions Of Law**

1.      A reasonable cement engineer exercising ordinary care would recommend to BP the use of a foam cement slurry on the Macondo well's production casing cement job given, among other things: (1) the ability to more easily control the density of the nitrified slurry to, in turn, control the equivalent circulating densities downhole; (2) foam cement's superior mud displacement efficiency as compared to a conventional cement slurry; and (3) a foam cement's inherent ability to resist gas migration as the slurry sets up. Jesse Gagliano's recommendation to

108

BP to use a foam cement slurry on the Macondo well's production casing cement job was reasonable and consistent with industry standards.

2.        BP had the ultimate authority to approve Jesse Gagliano's recommendation to use a foam cement slurry on the Macondo well's production casing cement job.  BP approved Jesse Gagliano's recommended slurry design primarily because of the ability to control the density of the foam slurry, which in turn assists in controlling ECDs downhole.  Even if the cement designed by Gagliano was deficient in some manner, the compromised cement placement, which was BP's responsibility, not the cement design, prevented the cement from isolating the hydrocarbon zones.  Regardless of the design and placement of the cement, HESI was not negligent because the harm that followed was not reasonably foreseeable to Gagliano or to HESI. In fact, the recognized risk of an inadequate cement job or design was that HESI might be required to perform a remedial squeeze job.

X.      **Jesse Gagliano's Use Of The Dry Cement Blend From The Kodiak #2 Well In The Macondo Foam Slurry Design Was Reasonable Given That, As Demonstrated Through Testing, The Effects Of D-Air 3000 Could Be Overcome By A Sufficient Concentration Of ZoneSealant 2000.**

A.      **Proposed Findings Of Fact**

1.        The cement slurry used on the Macondo production casing cement job was comprised of a dry cement blend, liquid additives and mix water.  (J. GAGLIANO, T.T. 6621:7-15).  These components included Lafarge Class H, EZ-FLO, D-Air 3000, KCL (Potassium Chloride) Salt, SSA-1 (Silica Flour)-PB, SSA-2 (100 Mesh)-PB, SA-541, ZoneSealant 2000, SCR-100L and fresh water.  (TREX-7722; TREX-3020).

2.        D-Air 3000, a dry blend additive, is a "defoamer," the purpose of which is to remove air or gas bubbles from the cement slurry.  (J. GAGLIANO, T.T. 6623:15—6624:1; G. BENGE, T.T. 2443:21-22).

109

3.      SA-541, a dry blend additive, is a temperature-activated "viscosifier" (or suspension agent), the purpose of which is to thicken the cement slurry at or above an activation temperature of 150 degrees F.  (J. GAGLIANO, T.T. 6639:2-9; DEPO. OF R. MORGAN, 53:9—54:2; G. BENGE, T.T. 2446:16—2447:24).

4.      ZoneSealant 2000, a liquid additive, is a surfactant (or foaming agent), the purpose of which is to facilitate foam generation in order to suspend nitrogen bubbles in a foamed slurry.  (J. GAGLIANO, T.T. 6637:7-14; G. BENGE, T.T. 2240:13—2241:8).

5.      SCR-100L, a liquid additive, is a "retarder" or retarding agent, the purpose of which is to delay the setting of cement until the cement slurry is pumped into the well and displaced into the location.  (J. GAGLIANO, T.T. 6637:22—6638:9; G. BENGE, T.T. 2502:3-6).

6.      The dry cement blend used to create the foam cement slurry pumped on the Macondo production casing job was not designed from scratch for the Macondo production casing job.  (G. BENGE, T.T. 2270:1-11, 2273:16-22; J. GAGLIANO, T.T. 6621:16-6623:4).

7.      The dry cement blend used to create the foam slurry pumped on the Macondo production casing job was already onboard the *Deepwater Horizon* when the rig reached the Macondo well.  (G. BENGE, T.T. 2273:16-22; J. GAGLIANO, T.T. 6621:16—6623:5).

8.      The dry cement blend was already on the *Deepwater Horizon* because it was previously designed by Jesse Gagliano for use on certain non-foam cement applications on the Kodiak #2 well.  (G. BENGE, T.T. 2270:1-11; J. GAGLIANO, T.T. 6622:5-9).

9.      The *Deepwater Horizon* drilled the Kodiak #2 well immediately prior to drilling the Macondo well.  (J. GAGLIANO, T.T. 6622:5-9).

10.     To create the foam cement slurry used on the Macondo production casing job, the "dry [cement] blend" from the Kodiak #2 well was blended on the rig with liquid additives,

110

including ZoneSealant 2000 and SCR-100L, and rig water.  (J. GAGLIANO, T.T. 6621:7-6622:9, 6624:15-23).

11.     BP owned the dry cement blend remaining from the Kodiak #2 well at the time design work commenced on the Macondo production casing job.  (G. BENGE, T.T. 2273:16-22, 2352:25—2353:8; T. ROTH, T.T. 3054:1—3055:9).

12.     Jesse Gagliano recommended that the "dry [cement] blend" from the Kodiak #2 well be used to create the foam cement slurry used on the Macondo production casing job.  (J. GAGLIANO, T.T. 6622:16-24).

13.     Jesse Gagliano reasonably believed that the "dry [cement] blend" from the Kodiak #2 well could be successfully used to create the foam cement slurry used on the Macondo production casing job with the inclusion of a sufficient concentration of ZoneSealant 2000 to overcome the effects of D-Air 3000.  (J. GAGLIANO, T.T. 6625:3-13, 6625:22-25, 6721:16-22).

14.     From the time BP purchased it from HESI, BP owned the "dry cement blend" from the Kodiak #2 well.  (T. ROTH, T.T. 3142:17—3144:8).

15.     Had BP disposed of the "dry cement blend" remaining from the Kodiak #2 well, BP would have incurred transportation and disposal costs.  (T. ROTH, T.T. 3144:13—3145:4).

16.     Had BP disposed of the "dry cement blend" remaining from the Kodiak #2 well, BP would have incurred additional costs to purchase new cement blend from HESI and to transport such new cement blend to the *Deepwater Horizon*.  (T. ROTH, T.T. 3145:5-11).

17.     HESI was financially disincentivized to use the "dry cement blend" remaining from the Kodiak #2 well for the Macondo production casing foam cement job.  (T. ROTH, T.T. 3145:12-16).

18.     The dry cement blend used on the Macondo production casing cement job contained a small concentration (.25% BWOC) of D-Air 3000 which was counteracted.  (TREX-1706; TREX-60443; TREX-716; TREX-735; TREX-717; J. Gagliano, T.T. 6625:3-10, 6643:16-22, 6721:16-22; G. Benge, T.T. 2443:23—2445:16; Depo. of G. Garrison, 255:25—256:8; *see also* J. Gagliano, T.T. 6625:8-21, 6656:25—6657:21; G. Benge, T.T. 2455:7—2456:18, 2458:24—2459:2; TREX-7722; TREX-5990 at 12).

19.     HESI's internal technical guidance cautions about the use of D-Air 3000 in a foam cement slurry design because too much defoamer can destabilize foam cement.  (TREX-5219; TREX-4348 at HAL_1124604; J. Gagliano, T.T. 6624:24—6625:2, 6639:14—6644:17).

20.     Whether D-Air 3000, or any other additive in a slurry, destabilizes the foam slurry depends on the relative concentrations of the interacting slurry ingredients.  (J. Gagliano, T.T. 6625:3-10; G. Benge, T.T. 2445:13-16).

21.     The mere presence of D-Air 3000 in a cement slurry does not render that slurry incapable of being foamed successfully.  (G. Benge, T.T. 2443:23—2445:16; J. Gagliano, T.T. 6625:3-13, 22-25; Depo. of G. Garrison, 255:14—256:19; Depo. of R. Faul, 451:10—452:12; Depo. R. Dubois, 232:7-20).

22.     The mere presence of D-Air 3000 in a foam cement slurry does not render that slurry unstable.  (J. Gagliano, T.T. 6625:3-6; G. Benge, T.T. 2443:23—2445:16; T. Roth, T.T. 3129:12-23; Depo. of G. Garrison, 255:14—256:19).

23.     ZoneSealant 2000, in sufficient concentrations, can overcome the defoaming effects of D-Air 3000.  (J. Gagliano, T.T. 6625:3-10, 6643:16-22, 6721:16-22; G. Benge, T.T. 2443:23—2445:16; T. Roth, T.T. 3129:12-23; Depo. of G. Garrison, 255:25—256:8).

112

24.     At the time he recommended the Kodiak #2 dry blend for use on the Macondo production casing foam cement job, Jesse Gagliano reasonably believed that the effects of D-Air 3000 could be overcome with sufficient concentrations of the foaming agent, ZoneSealant 2000. (J. GAGLIANO, T.T. 6625:3-10, 6643:16-22, 6721:23—6722:3, 6727:6-16).

25.     The cement expert for the United States and PSC, Glen Benge, testified at trial that the effects of D-Air 3000 could be overcome with sufficient concentrations of the foaming agent, ZoneSealant 2000.  (G. BENGE, T.T. 2443:21—2444:10).

26.     Glen Benge testified at trial that he, himself, had intentionally added a defoamer to a foam cement slurry and then compensated for its effects by adding additional foaming agent. (G. BENGE, T.T. 2444:5—2445:12).

27.     The head of OTC's cement laboratory, Greg Garrison, testified that the effects of D-Air 3000 could be overcome with sufficient concentrations of the foaming agent, ZoneSealant 2000.  (DEPO. OF G. GARRISON, 255:25—256:19).

28.     Foam stability testing in the laboratory showed that the foam cement slurry designed for use on the Macondo production casing job, with 0.08 gallons per sack ("gps") of retarder, generated a stable foam slurry.  (J. GAGLIANO, T.T. 6625:8-21, 6656:25—6657:21; G. BENGE, T.T. 2455:7—2456:18, 2458:24—2459:2; TREX-7722; TREX-5990 at 12).

29.     The results of the final foam stability test with 0.08 gps of retarder, conducted in April 2010 and identified by Test I.D. # 813603, demonstrated that the foam cement slurry was stable.  (G. BENGE, T.T. 2455:7—2456:18, 2458:24—2459:2; TREX-5990 at 12; TREX-7722).

30.     BP knew or should have known that D-Air 3000 was present in the foam cement slurry intended to be used for Macondo's production casing cement job and that D-Air 3000 is a

defoamer.   (TREX-1506; TREX-1508; TREX-1684; TREX-1499; TREX-1509; TREX-717; TREX-1706; TREX-60443; TREX-716; TREX-735).

31.   Prior to April 19, 2010, Jesse Gagliano provided the BP wells team with numerous cement "Program" draft reports identifying the presence of D-Air 3000 in the foam cement slurry intended to be used for Macondo's production casing cement job.  (TREX-1706; TREX-60443; TREX-716; TREX-735; TREX-717).

32.   Prior to April 19, 2010, Jesse Gagliano provided the BP wells team with numerous cement testing results documenting the presence of D-Air 3000 in the foam cement slurry intended to be used for Macondo's production casing cement job.  (TREX-633; TREX-60455; TREX-3757; TREX-741; TREX-1499; TREX-1509).

### B.     Proposed Conclusions Of Law

1.     Jesse Gagliano's use of the dry cement blend from the Kodiak #2 well in the Macondo production casing foam cement slurry design was reasonable.

2.     BP owned the remaining dry cement blend from the Kodiak #2 well.

3.     Since the remaining dry cement blend was already onboard the *Deepwater Horizon*, and BP owned the dry cement blend, it was reasonable for Jesse Gagliano, as a cement engineer contractor, to believe that BP expected him to use it in the Macondo well's foam slurry design if it could be successfully foamed, particularly given that BP would incur transport and disposal costs to dispose of the dry blend if it were not used, and BP would incur additional cost to purchase new cement if it were not used.

4.     HESI had no financial incentive to use the dry cement blend from the Kodiak #2 well; rather, HESI had a financial incentive not to use it since, if not used, BP would have to purchase a new dry cement blend from HESI.

5.      It was reasonable for Jesse Gagliano to believe that any defoaming effects of D-Air 3000, contained in the Kodiak dry blend, could be overcome with sufficient concentrations of the surfactant/foaming agent, ZoneSealant 2000.

6.      The reasonableness of Jesse Gagliano's belief that any effects of D-Air 3000 could be overcome by sufficient concentrations of ZoneSealant 2000 is supported by the testimony of Glen Benge and Greg Garrison, who each testified in agreement with Jesse Gagliano.

7.      The reasonableness of Jesse Gagliano's belief that any effects of D-Air 3000 could be overcome by sufficient concentrations of ZoneSealant 2000 is supported by the testimony Glen Benge, Greg Garrison, Ronnie Faul and Richard Dubois, who each testified that the mere presence of D-Air 3000 in a cement slurry does not disqualify it as a foam cement slurry or otherwise render it incapable of being successfully foamed.

8.      While HESI's internal technical guidance cautions about the use of D-Air 3000 in a foam cement slurry design because of its potentially destabilizing effects, foam stability testing requested by Jesse Gagliano assessed whether the specific concentration of ZoneSealant 2000 was sufficient to overcome the potentially destabilizing effects of D-Air 3000 in the slurry.

9.      The results of the final foam stability test with 0.08 gps of retarder, conducted in April 2010 and identified by Test I.D. # 813603, demonstrated that the foam cement slurry was stable and that 0.11 gps of ZoneSealant 2000 was sufficient to overcome 0.25% BWOC of D-Air 3000.  Therefore, the results of the final foam stability test with 0.08 gps of retarder support the reasonableness of Jesse Gagliano's judgment that D-Air 3000 could be overcome by sufficient concentrations of ZoneSealant 2000.

10.     Jesse Gagliano disclosed to BP all cement and dry and liquid additives to be used in the recommended foam slurry design on the Macondo well's production casing cement job, including the dry additive, D-Air 3000.

11.     BP knew or should have known all cement and dry and liquid additives to be used in the recommended foam slurry design on the Macondo well's production casing cement job, including D-Air 3000, given that Jesse Gagliano provided BP with numerous drafts of Cement Program and test reports identifying the defoamer.

12.     BP approved all cement and dry and liquid additives to be used in the recommended foam slurry design on the Macondo well's production casing cement job. HESI properly designed the foam cement used at the Macondo well in accordance with BP's requested and required parameters.

13.     The risk of a blowout was not a foreseeable risk of an allegedly faulty cement design. HESI properly designed and executed the cement job at the Macondo well and the cementing services it provided do not support a negligence claim.

**XI.     While Jesse Gagliano And The BP Drilling Engineers Jointly Designed The Macondo Production Casing Cement Job, BP Made Numerous Operational Decisions That Compromised The Success Of The Cement Job And Accepted The Risk That The Cement Job Would Not Achieve Zonal Isolation.**

      **A.     Proposed Findings Of Fact**

            **1.     *Jesse Gagliano And The BP Engineers Developed The Macondo Cement Slurry And Cement Job Through An Iterative Process.***

1.     Jesse Gagliano recommended the use of foam cement for the Macondo production casing cement job. (J. GAGLIANO, T.T. 6618:1-7).

2.     At Brian Morel's request, Erick Cunningham provided Morel detailed information about the use of foam cement on the Macondo well. (TREX-643; TREX-7 at BP-HZN-

116

MBI00021328; Plaintiffs' Motion for Adverse Inferences from Fifth Amendment Invocations (Dkt. No. 5873)(Brian Morel, 18:22-19:5, 27:18—28:5).

3.      BP approved Jesse Gagliano's recommendation to use foam cement on the Macondo production casing cement job.  (TREX-296 at BP-HZN-BLY00103034; DEPO. OF J. SPRAGUE, 108:11—110:2, 110:13-17).

4.      The design of the Macondo production casing cement job was arrived at through an iterative process between Jesse Gagliano and the BP drilling engineers.  (G. BENGE, T.T. 2583:5—2584:1, 2474:22—2475:2).

5.      While HESI's responsibility is to provide recommendations regarding cement design and procedure, it is BP's responsibility, as the operator, to determine whether the slurry design is appropriate and meets the operator's requirements for the well.  (G. BENGE, T.T. 2274:6—2275:2; TREX-569; DEPO. OF I. LITTLE—CORPORATE REPRESENTATIVE, 91:13—92:9).

6.      Before approving Jesse Gagliano's recommendation to use foam cement on the Macondo production casing cement job, BP's drilling engineers engaged in an internal process to review the recommendation to use foam cement.   (TREX-643; TREX-7 at BP-HZN-MBI00021328; DEPO. OF J. SPRAGUE, 116:14-22).

7.      BP's drilling engineers met with a BP cementing specialist, Erick Cunningham, to evaluate the use of foam cement on the Macondo production casing job.  (TREX-7 at BP-HZN-MBI00021328; TREX-296 at BP-HZN-BLY00103034; DEPO. OF J. SPRAGUE, 100:18—101:23, 108:11—110:2, 110:13-17).

8.      Erick Cunningham approved of the use of foam cement on the Macondo production casing job.  (TREX-296 at BP-HZN-BLY00103034; DEPO. OF J. SPRAGUE, 108:11—110:2, 110:13-17).

9.     Jonathan Sprague, BP's Drilling Engineer Manager for the Gulf of Mexico, met with Erick Cunningham on April 15, 2010 to review the Macondo production casing cement job. (DEPO. OF J. SPRAGUE, 101:13-23, 108:11—110:2, 110:13-17).

10.     The cement design for the Macondo production casing job was reviewed and approved internally at BP, including by BP's cementing specialist, Erick Cunningham.  (DEPO. OF J. SPRAGUE, 109:4—110:2, 672:11—673:2; TREX-296 at BP-HZN-BLY00103034).

11.     Job performance reports of BP's drilling engineers indicate that they received training in cementing.  (G. BENGE, T.T. 2268:14—2269:19).

12.     Glen Benge testified that he observed that BP's drilling engineers possessed a good deal of knowledge about cementing and a great deal of control over cement job design, including knowledge about and expressed preferences for specific cement additives and spacer selection.  (G. BENGE, T.T. 2228:16—2229:23, 2259:1—2262:21, 2263:13—2266:7, 2268:14—2269:19).

13.     Brian Morel independently researched and requested a lost circulation material for use in the Macondo production casing cement job.  (TREX-31001; G. BENGE, T.T. 2263:13-2264:13).

14.     Brian Morel's direction to use 0.09 gps of retarder instead of the 0.08 gps of retarder recommended by Jesse Gagliano demonstrates Morel's understanding that, in order to pump the cement job with low pumping rates to control ECDs, more retarder would extend the liquid phase of the cement during a longer job pump time.  (TREX-987; G. BENGE, T.T. 2264:14—2268:13).

118

15.    Brian Morel's job performance report indicates that he attended the Drilling Training Alliance ("DTA") course to which Glen Benge would send ExxonMobil drilling engineers to learn more about cementing.  (G. BENGE, T.T. 2269:5-11).

16.    The Macondo production casing cement job was designed through an iterative process between HESI and BP.  (G. BENGE, T.T. 2259:1-8, 2245:13—2246:10; TREX-194 at BP-HZN-BLY00061461; TREX-506; DEPO. OF G. WALZ, 745:1-5, 348:7-13; 450:3-12, 618:23—621:9).

17.    The BP engineering team leader for the Macondo well considered himself ultimately responsible for the cement job on the production casing and ensuring that it met BP's standards and specifications.  (DEPO. OF G. WALZ, 571:24—572:7).

18.    It was not BP's policy simply to turn the cement job over to its cementing contractor, HESI, and have nothing further to do with it.  (G. BENGE, T.T. 2259:1-8, 2263:13—2264:13, 2355:3-13, 2357:21—2360:12; DEPO. OF G. WALZ, 450:3-12).

19.    BP is not required to follow HESI's recommendations regarding cement slurry design.  (G. BENGE, T.T. 2344:18—2345:7, 2591:12-16; J. GAGLIANO, T.T. 6601:20—6602:2; TREX-4477 at BP-HZN-2179MDL00055608; TREX-506 at BP-HZN-BLY00125441; DEPO. OF G. WALZ, 618:23—621:9).

20.    BP is not required to follow HESI's recommendations regarding cement job design and procedure.  (G. BENGE, T.T. 2344:18—2345:7, 2246:11-17; J. GAGLIANO, T.T. 6636:16—6637:5; TREX-60068; TREX-4477 at BP-HZN-2179MDL0055608; DEPO. OF G. WALZ, 450:3-12, 618:23-621:9).

21.    With respect to HESI's cement job recommendations, BP's drilling engineers were responsible for reviewing the results of cement slurry and spacer tests, as well as the details of

119

cement operations, including volumes to be pumped, pumping schedules, and casing jewelry. (TREX-791 at BP-HZN-2179MDL00635192; G. BENGE, T.T. 2357:21—2359:9; Plaintiffs' Motion for Adverse Inferences from Fifth Amendment Invocations (Dkt. No. 5873)(Mark Hafle, 48:11-14, 48:16—49:7).

22.     With respect to the cement job design, BP determined the volumes of cement to be pumped by establishing 17,300 feet as the designed depth for the Top of Cement ("TOC"). (G. BENGE, T.T. 2258:6-25, 2318:12-13; 2381:11—2382:20; TREX-3512; TREX-741 at BP-HZN-2179MDL00015363; DEPO. OF I. LITTLE—CORPORATE REPRESENTATIVE, 81:8-12).

23.     Once BP established 17,300 feet as the designed depth for the TOC, OptiCem calculated volumes of cement based on the geometry of the wellbore.  (G. BENGE, T.T. 2258:6-25; TREX-717A).

24.     With respect to the cement job design, BP directed the use of "base oil" in the fluid staging to lessen the hydrostatic pressure during the cement job.  (G. BENGE, T.T. 2257:11-25, 2375:11—2376:3; TREX-320 at 2; TREX-5990 at 15; TREX-51165 at BP-HZN-CEC021656; DEPO. OF B. COCALES, 554:24—560:9).

25.     With respect to the cement job design, BP directed pumping rates during the pumping and placement of cement.  (G. BENGE, T.T. 2409:22—2410:1; TREX-5990 at 25; TREX-60443 at 9313; TREX-1493 at BP-HZN-2179MDL00041334; TREX-51165 at BP-HZN-CEC021656).

26.     With respect to the cement job design, Jesse Gagliano recommended the use of 0.08 gps of retarder in order to achieve 5 hours and 30 minutes of pump time.  (G. BENGE, T.T. 2264:14—2265:11; J. GAGLIANO, T.T. 6671:25—6672:7; TREX-287).

27.     With respect to the cement job design, BP did not follow Jesse Gagliano's recommendation to use 0.08 gps of retarder in the final slurry design.  (G. BENGE, T.T. 2265-21—2266:7, 2267:1—2268:13; J. GAGLIANO, T.T. 6671:25—6672:7; TREX-1395).

28.     With respect to the cement job design, BP directed the use of 0.09 gps of retarder in the final slurry design in order to achieve 7 hours and 37 minutes of pump time.  (G. BENGE, T.T. 2267:1—2268:13; TREX-287; TREX-1395; TREX-741 at BP-HZN-2179MDL00015363).

29.     In directing the use of 0.09 gps of retarder, Brian Morel communicated to John Guide that "(he) would prefer the extra pump time with the added risk of having issues with the nitrogen." (TREX-287).

30.     With respect to the cement job design, BP determined how many centralizers to affix to the production casing, which was run downhole prior to the cement job's execution.  (J. GUIDE, T.T. 8705:7—8707:25;  G. BENGE, T.T. 2357:6-10, 2409:19-21;  Plaintiffs' Motion for Adverse Inferences from Fifth Amendment Invocation (Dkt. No. 5873)(Brian Morel, 156:22—158:1, 168:5-15); HESI's Amended Motion for Adverse Inferences Based on Assertions of the Fifth Amendment (Dkt. No. 7644)(Brian Morel, 138:24—139:5, 139:7-10; Allen Seriale, 13:21-25).

31.     With respect to preparing the wellbore to receive the production casing cement, BP determined the volume of mud to circulate ahead of the cement job's execution.  (N. CHAISSON, T.T. 6293:1—6294:6; G. BENGE, T.T. 2314:7—2316:5, 2377:25—2380:25, 2410:2-5, 2411:6-14; TREX-5990 at 21).

32.     HESI conveyed to BP the particulars of the cement job design, at different iterative phases of planning, through a document called a "Cement Program" or "Prog." (TREX-1706 (v. 2); TREX-60443 (v. 3); TREX-716 (v. 4); TREX-735 (v. 5); TREX-717 (v. 6)).

121

33.     HESI's Cement Program or "Prog." documents are generated by HESI's Integrated Proposal System ("HIPS").  (J. GAGLIANO, T.T. 6626:22—6627:11, 6628:14-23, 6629:6-12).

34.     HESI generated a Cement Program document for the specific 9 7/8" x 7" Production Casing job.  (TREX-63076; TREX-1706; TREX-60443; TREX-716; TREX-735; TREX-717).

35.     In the weeks leading up to the Macondo production casing cement job, Jesse Gagliano provided numerous versions of the Cement Program specific to the job, each entitled: 9 7/8" x 7" Production Casing.  (TREX-1706 (v. 2); TREX-60443 (v. 3); TREX-716 (v. 4); TREX-735 (v. 5); TREX-717 (v. 6)).

36.     Jesse Gagliano sent the final Cement Program document for the "9 7/8" x 7" Production Casing" to BP on April 18, 2010.  (TREX-717 (v. 6); Plaintiffs' Motion for Adverse Inferences from Fifth Amendment Invocations (Dkt. No. 5873)(Brian Morel, 239:4—240:3)).

37.     The final Cement Program document for the "9 7/8" x 7" Production Casing" that Jesse Gagliano sent to BP on April 18, 2010 was "Version 6" of the document.  (TREX-717).

38.     Each version of the Cement Program that Jesse Gagliano provided to BP identified the slurry design for the foam cement to be used to cement the Macondo production casing.   (TREX-1706 at HAL_0511326;  TREX-716 at  HAL_0130204;  TREX-717 at HAL_0130204; TREX-60443 at HAL_0576810; TREX-735 at BP-HZN-2179MDL00250663).

39.     Each version of the Cement Program that Jesse Gagliano provided to BP identified the relative concentration of each additive to be used in the slurry design to be used to cement the Macondo production casing.   (TREX-1706 at HAL_0511326; TREX-716 at HAL_0130204; TREX-717 at HAL_0125422; TREX-60443 at HAL_0576810; TREX-735 at BP-HZN-2179MDL00250663).

40.     Each version of the Cement Program that Jesse Gagliano provided to BP identified that the foam cement slurry design for the Macondo production casing included "D-Air 3000 (Defoamer)."  (TREX-1706 at HAL_0511326; TREX-716 at HAL_0130204; TREX-717 at HAL_0125422; TREX-60443 at HAL_0576810; TREX-735 at BP-HZN-2179MDL00250663).

41.     After receiving a draft Cement Program from Jesse Gagliano, BP's drilling engineers reviewed the draft and requested that Jesse Gagliano make changes and/or corrections in the next version of the Cement Program.  (J. GAGLIANO, T.T. 6678:9—6682:20, 6702:17—6704:2; TREX-1689 (referring to "cement procedure")).

42.     The "Job Procedure" is a step-by-step schedule for pumping a cement job.  (TREX-711 at HAL_0125562; TREX-737 at HAL_0129303-4).

43.     The "Job Procedure" for the production casing cement job was drafted by HESI engineer Nathaniel ("Nate") Chaisson, who received direction from BP Well-Site Leader Bob Kaluza aboard the *Deepwater Horizon*.  (N. CHAISSON, T.T. 6383:19—6384:22; TREX-711; TREX-737).

44.     Nate Chaisson met with Bob Kaluza on April 17, 2010, to receive direction from him on finalizing the "Job Procedure" for Macondo's production casing cement job.   (N. CHAISSON, T.T. 6292:8—6294:9).

45.     The "Job Procedure" incorporated BP's direction for Macondo's production casing cement job.  (N. CHAISSON, T.T. 6292:8—6294:9; TREX-737).

46.     Nate Chaisson sent the "Job Procedure" from the *Deepwater Horizon* to Jesse Gagliano.  (TREX-737; TREX-3029).

47.     With respect to the volume of mud to circulate ahead of the cement job, Nate Chaisson, in Item 2 of the "Job Procedure," noted "AS PER CO. MAN" to indicate that BP

dictated a pre-job volume of circulation that was less than a "full bottoms-up." (N. CHAISSON, T.T. 6293:12-19; TREX-711; TREX-737).

48.    Jesse Gagliano incorporated the "Job Procedure" into "Version 6" of the Cement Program which he provided to BP on or about April 18, 2010. (TREX-3192).

49.    Jesse Gagliano designed the Macondo production casing cement job to meet BP's specifications. (G. BENGE, T.T. 2273:23—2274:25, 2245:13—2246:17; TREX-569 at BP-HZN-BLY00193969).

50.    BP had full knowledge of and approved Jesse Gagliano's recommended cement slurry design for the Macondo production casing. (G. BENGE, T.T. 2283:21-24, 2245:13—2246:17, 2408:14-19; DEPO. OF J. SPRAGUE, 109:4—110:2, 672:11—673:2; TREX-296 at BP-HZN-00103034).

> **2.    Jesse Gagliano's OptiCem Modeling, Which Was Based On Inputs Provided By BP, Predicted That The Cement Job Would Channel And, Therefore Was Unlikely To Achieve Zonal Isolation; But BP Rejected Gagliano's Recommendations For Mitigating Those Risks When It Failed To Adequately Centralize The Long String Production Casing And Circulated An Insufficient Volume Of Mud Prior To The Cement Job.**

51.    "OptiCem" is a cement-modeling software program that is proprietary to HESI. (J. GAGLIANO, T.T. 6588:5-12; TREX-4304 at Appendix D p. 111; DEPO. OF J. MCKAY, 156:15-25; DEPO. OF G. GARRISON, 89:16—90:16).

52.    OptiCem is widely used in the industry by licensing arrangement with HESI. (DEPO. OF K. CORSER, (VOL. 2) 234:13—235:5, 349:23—350:12; DEPO. OF C. GARDNER, 81:15-23).

53.    OptiCem is highly regarded in the industry and is considered industry-leading software for purposes of modeling cement jobs. (DEPO. OF R. FAUL, 689:9-24).

54.     Jesse Gagliano used OptiCem software to model cement jobs on the Macondo well.  (J. GAGLIANO, T.T.  6588:5-12, 6602:10-18;  TREX-3020;  TREX-3191;  TREX-1714; TREX-3032; TREX-717).

55.     Jesse Gagliano used OptiCem software to model the Macondo production casing cement job.  (TREX-2580; TREX-2040; TREX-716A; TREX-731; TREX-3020; TREX-186; TREX-3032).

56.     OptiCem modeling requires numerous data inputs, including but not limited to: casing size; wellbore geometry; mud weight; pore pressures; fracture gradient of the formation; designed top of cement; cement and spacer volumes; fluid densities; downhole temperatures; and the number and location of centralizers.  (J. GAGLIANO, T.T. 6634:21—6635:8, 6588:5-12; DEPO. OF R. FAUL, 658:9-15).

57.     OptiCem outputs include, but are not limited to, graphic representations of fluid displacement.  (J. GAGLIANO, T.T. 6704:7—6705:18; TREX-719 at 1; TREX-2040).

58.     The graphic representations of fluid displacement can identify whether the cement job, as modeled, is likely to channel.   (J. GAGLIANO, T.T. 6704:7—6705:18; TREX-731 at HAL_00105088).

59.     Channeling is a condition in which cement flows preferentially only on some sides of the casing or borehole and thus does not provide radial coverage around all sides of the casing or borehole.  (SCHLUMBERGER OILFIELD GLOSSARY—CHANNELING).[2]

---

[2] The Schlumberger Oilfield Glossary was provided to the Court pre-trial.  *See* (Dkt. No. 8373 at 8).  Citations to Schlumberger's Glossary are referred to herein as "Schlumberger Oilfield Glossary—" followed by the specific subject matter at issue.

60.     Channeling creates potential communication paths for formation fluids, including hydrocarbons.   (J. GAGLIANO, T.T. 6705:9-13; G. BENGE, T.T. 2285:6—2286:24, 2305:23—2306:5; TREX-5990 at 1, 18; D-3528).

61.     A cement job that channels likely will not achieve zonal isolation.  (J. GAGLIANO, T.T. 6610:17-20, 6872:7-17; G. BENGE, T.T. 2285:6—2286:24, 2305:23—2306:5).

62.     Channeling can be detected after a cement job via a cement evaluation technique, such as a cement bond log ("CBL").  (J. GAGLIANO, T.T. 6856:17-20).

63.     OptiCem outputs also include, but are not limited to, calculations of the "gas flow potential" ("GFP") at a specific area of investigation (or measured depth) input by the user of the program.   (J. GAGLIANO, T.T. 6682:4-6, 6602:19-23; TREX-716A at 17; TREX-731 at HAL_0010586; TREX-186 at BP-HZN-BLY00107717).

64.     Gas flow potential is calculated as a unitless value that represents the potential for gas migration into a wellbore.  (N. CHAISSON, T.T. 6373:4-7; J. GAGLIANO, T.T. 6873:10—6874:8; DEPO. OF G. WALZ, 128:8—129:3; TREX-716A at HAL_0010586; TREX-186 at BP-HZN-BLY00107717).

65.     When the hydrostatic pressure exerted by a cement slurry column maintains an overbalance of pressure on gas-bearing zones in the formation, gas is prevented from flowing or channeling through the unset cement column.  (D. CALVERT, T.T. 2614:1-15; TREX-5823; TREX-7836 at 17-18; D-3093).

66.     When the hydrostatic pressure exerted by a cement slurry column drops below the pressure of gas-bearing zones in the formation, gas may flow or channel through the cement column ("gas migration") before the cement sets.  (D. CALVERT, T.T. 2614:11—2615:14; TREX-7836 at 17-18).

126

67. HESI has developed a chart to categorize the values of gas flow potential (GFP). (TREX-5823).

68. A GFP value of 0 to 4 is considered a "Minor" gas flow problem. (TREX-5823).

69. A GFP value of 5 to 7 is considered a "Moderate" gas flow problem. (TREX-5823).

70. A GFP value of 8 to 15 is considered a "Severe" gas flow problem. (TREX-5823).

71. A GFP value greater than 15 is considered a "Critical" gas flow problem. (TREX-5823; TREX-8140 at 58-59).

72. HESI markets foam cementing as a solution for wells that have a "severe" gas flow problem. (J. GAGLIANO, T.T. 6852:4-9).

73. HESI will not cement a well that has a "critical" gas flow problem. (TREX-8140 at 58-59).

74. If OptiCem calculates that a well has a "critical" gas flow problem, OptiCem presents the following message: "Based on analysis of the above outlined well conditions, this well is considered to have a CRITICAL gas flow problem. If a gas flow potential of greater than 15 is calculated, then changes should be made to the cementing program to lower it below 15. For example: multiple stage cementing, reduce height of cement, hold the back pressure, etc." (TREX-8140 at 58-59).

75. OptiCem outputs also include, but are not limited to, calculations and charts identifying whether the designed cement job, as modeled, will exceed the fracture gradient of the formation. (TREX-716A at 17, 20-22; TREX-186 at BP-HZN-BLY00107717, 7719-7725).

76.     On April 14, 2010, Jesse Gagliano participated in a meeting at BP's offices with BP's drilling engineers and BP's cementing specialist, Erick Cunningham, to evaluate whether the foam cement job could successfully cement a long-string casing, a liner or both in the production interval.   (J. GAGLIANO, T.T. 6620:1-12, 6772:17—6773:7; DEPO. OF G. WALZ, 400:23—404:12).

77.     Prior to the April 14, 2010 meeting, Brian Morel met with Jesse Gagliano several more times where they reviewed OptiCem modeling runs.  (J. GAGLIANO, T.T. 6773:8—6774:4).

78.     During several meetings between Brian Morel and Jesse Gagliano prior to April 14, 2010, Morel directed Gagliano to change certain modeling inputs into the OptiCem program.  (J. GAGLIANO, T.T. 6773:8—6774:4).

79.     BP preferred to run a long-string casing design in the well rather than a liner.  (J. GAGLIANO, T.T. 6804:5-11; DEPO. OF G. WALZ, 403:23—404:12).

80.     During the April 14, 2010 meeting, Jesse Gagliano projected the OptiCem program from his computer onto a screen so that all meeting attendees could see it.   (J. GAGLIANO, T.T. 6773:3-7; DEPO. OF G. WALZ, 401:16-23).

81.     During the April 14, 2010 meeting, the BP engineers present verified all of Jesse Gagliano's OptiCem inputs based on the latest information available.  (J. GAGLIANO, T.T. 6772:17—6773:23).

82.     During the April 14, 2010 meeting, Brian Morel directed Jesse Gagliano to change pore pressure and other inputs based on data Morel was interpreting from a wireline log that he was holding.  (J. GAGLIANO, T.T. 6773:8-24).

128

83.     During the April 14, 2010 meeting, after incorporating BP's revised inputs, Jesse Gagliano ran several models through the OptiCem program in the presence of BP's drilling engineers and Erick Cunningham.  (J. GAGLIANO, T.T. 6772:17—6773:18).

84.     The OptiCem program predicted that a foam cement job could successfully cement a long-string casing in the production interval without incurring losses.  (J. GAGLIANO, T.T. 6804:1-15).

85.     BP decided to use a long-string casing design in the well rather than a liner. (TREX-5990 at 36; TREX-1 at 33; TREX-2659).

86.     On April 15, 2010, Jesse Gagliano updated the production casing OptiCem model to incorporate additional wireline data that had then become available, including but not limited to, imported caliper data, imported directional data, and information on the location and dimensions for 10 centralizers.  (TREX-1391 at BP-HZN-2179MDL00249820).

87.     On April 15, 2010, Jesse Gagliano communicated to Mark Hafle, Brian Morel, Brett Cocales and Greg Walz, after updating additional information into OptiCem, that the modeling program "shows the cement channeling and the ECD going up as a result of the channeling" with the 10-centralizer model.  (TREX-1391 at BP-HZN-2179MDL00249820).

88.     The 10-centralizer OptiCem model also predicted a "MODERATE gas flow problem."  (TREX-1391 at BP-HZN-2179MDL00249820, 36).

89.     On April 15, 2010, in response to a revised OptiCem model that showed cement channeling and an increase in ECDs with 10 centralizers, Jesse Gagliano communicated to Mark Hafle, Brian Morel, Brett Cocales and Greg Walz that he would run additional centralizer scenarios through OptiCem to see if adding more centralizers would assist with the channeling

129

and increased ECD issues.  (J. GAGLIANO, T.T. 6872:18—6873:3; TREX-716; TREX-1391 at BP-HZN-2179MDL00249820).

90.     On April 15, 2010, Jesse Gagliano worked with Brett Cocales and Greg Walz to evaluate whether additional centralizers would assist to alleviate the channeling and increased ECD issues raised by the revised 10-centralizer OptiCem model.  (J. GAGLIANO, T.T. 6872:18—6873:3, 6680:19—6681:3, 6604:19—6605:4).

91.     By April 15, 2010, BP engineer, Brian Morel, had left BP's onshore offices and was onboard the *Deepwater Horizon*.  (J. GAGLIANO, T.T. 6789:2-15; DEPO. OF G. WALZ, 136:9-24).

92.     On April 15, 2010, in response to Jesse Gagliano's email identifying the channeling and increased ECD issues raised by the revised 10-centralizer OptiCem model, Brian Morel responded, stating:  "We have 6 centralizers, we can run them in a row, spread out, or any combinations of the two.  It's a vertical hole so hopefully the pipe stays centralized due to gravity.  As far as changes, it's too late to get any more product to the rig, our only options (*sic*) is to rearrange placement of these centralizers.  Please see attached diagram for my recommendation."  (TREX-716; TREX-2580; TREX-1391; J. GAGLIANO, T.T. 6786:24—6787:7).

93.     After receiving Brian Morel's email to the effect that it was too late to get additional centralizers to the rig, Jesse Gagliano discussed it with Brett Cocales back in BP's onshore offices.  (J. GAGLIANO, T.T. 6787:1-20, 6789:2-15; TREX-2580).

94.     Brett Cocales told Jesse Gagliano that Brian Morel "wasn't in the loop of what was happening" regarding centralizers, that Brett Cocales would talk to Brian Morel, and that

Jesse Gagliano should continue using OptiCem modeling to determine how many centralizers would alleviate the channeling problem. (J. GAGLIANO, T.T. 6789:2-15).

95.     Since he knew that BP already had six (6) centralizers on the rig, Jesse Gagliano ran multiple OptiCem runs trying to spread out six centralizers at different intervals, and no combination of six centralizers that he ran would alleviate the predicted channeling problem. (J. GAGLIANO, T.T. 6857:1-25, 6872:18—6873:13; TREX-2580).

96.     On April 15, 2010, Jesse Gagliano informed Brett Cocales that no arrangement of six (6) centralizers, when modeled in OptiCem, would alleviate the predicted channeling problem. (J. GAGLIANO, T.T. 6872:18—6873:3).

97.     On April 15, 2010, Brett Cocales instructed Jesse Gagliano to run OptiCem to determine whether adding additional centralizers would alleviate the predicted channeling problem. (J. GAGLIANO, T.T. 6872:18—6873:3).

98.     On April 15, 2010, Jesse Gagliano ran multiple OptiCem modeling runs and determined that twenty-one centralizers would alleviate the channeling problem previously predicted in OptiCem modeling with fewer centralizers. (J. GAGLIANO, T.T. 6873:4-23; TREX-716A; TREX-731; TREX-3020; TREX-731).

99.     On April 15, 2010, Jesse Gagliano sent the 21-centralizer OptiCem report to the BP drilling engineering team recommending the use of 21 centralizers to alleviate the predicted channeling problem. (TREX-716; TREX-716A at 15, 17-19; TREX-2580 at HAL_0010650).

100.    The 21-centralizer OptiCem report indicated that 21 centralizers would eliminate channeling and predicted only a "MINOR gas flow problem." (TREX-716A at 15, 17-19).

101.    On April 15, 2010, Brett Cocales and Greg Walz located an additional 15 centralizers manufactured by Weatherford. (TREX-1685).

102.    Brett Cocales and Greg Walz arranged to have the 15 additional centralizers flown out to the *Deepwater Horizon* aboard a helicopter on April 16, 2010.  (TREX-796; TREX-1685; DEPO. OF B. COCALES, 534:22—535:17; 799:23—800:19, 801:1—802:7, 802:17-21; DEPO. OF G. WALZ, 644:12—645:17, 645:24—646:11).

103.    On or about April 16, 2010, Greg Walz sent an email to John Guide explaining why he gave Brett Cocales the "go ahead" to send the 15 additional centralizers out to the *Deepwater Horizon*, stating "we need to honor the modeling to be consistent with our previous decisions to go with the long string."  (TREX-1685).

104.    In the same April 16, 2010 email, Greg Walz wrote that he and Brett Cocales "tried to reach (John Guide) twice to discuss things.  David (Sims) was still here in the office and I discussed this with him and he agreed that we needed to be consistent with honoring the model."  (TREX-1685).

105.    In the same April 16, 2010 email, Greg Walz wrote:  "John, I do not like or want to disrupt your operations and I am a full believer that the rig needs only one Team Leader.  I know the planning has been lagging behind the operations and I have to turn that around.  I apologize if I have over step (sic) my bounds."  (TREX-1685).

106.    When the 15 additional centralizers arrived on the *Deepwater Horizon*, Brian Morel took a picture of them and sent the picture to John Guide.  (J. GUIDE, T.T. 8692:19-21; TREX-48042, TREX-87159; D-4932A).

107.    John Guide testified at trial that upon seeing the picture of the additional centralizers that he did not want to run them because they did not have integrated stop collars. (J. GUIDE, T.T. 8702:18—8704:13).

108.    On April 16, 2010, after seeing a picture of the 15 additional centralizers that had arrived on the *Deepwater Horizon*, John Guide sent an email to Greg Walz, stating:  "I just found out the stop collars are not part of the centralizer as you stated.  Also it will take 10 hrs to install them.  We are adding 45 pieces that can come off as a last minute addition.  I do not like this and as David approved in my absence I did not question but now I (*sic*) very concerned about using them."  (TREX-1687).

109.    On April 16, 2010, John Guide and Greg Walz had a telephone conversation in which they decided not to run the 15 additional centralizers.   (J. GUIDE, T.T. 8698:3-20, 8705:22—8707:1; DEPO. OF G. WALZ, 637:24—639:10, 640:23—641:10, 641:18—643:23).

110.    On April 16, 2010, John Guide and Greg Walz decided that, rather than run the 15 additional centralizers, BP would reposition the six (6) original centralizer subs on the production casing.  (DEPO. OF G. WALZ 641:18—643:23).

111.    On April 16, 2010, in response to an email from Brian Morel questioning Jesse Gagliano's 21-centralizer recommendation, Brett Cocales replied:  "Even if the hole is perfectly straight, a straight piece of pipe even in tension will not seek the perfect center of the hole unless it has something to centralize it.  But, who cares, it's done, end of story, will probably be fine and we'll get a good cement job.  I would rather have to squeeze than get stuck above the WH (well head).  So Guide is right on the risk/reward equation."  (G. BENGE, T.T. 2250:5—2251:6; TREX-1517 at BP-HZN-2179MDL00033080).

112.    There is no such thing as a perfectly straight deepwater well.  (G. BENGE, T.T. 2251:7-19).

113.    Due to the manner in which deepwater wells are drilled with rotating bits, a deepwater well has a corkscrew shape.  (G. BENGE, T.T. 2251:7-19).

114.     The Macondo well was not a perfectly straight well.  (TREX-570; TREX-22858-DEM).

115.     The Macondo well had a dog-leg bend due to a stuck pipe at or about 13,305 feet which required the drilling crew to drill around the pipe with a cement kick-off plug.  (J. GAGLIANO, T.T. 6787:16—6788:13; TREX-1 at 17).

116.     The April 16, 2010 email from Brett Cocales to Brian Morel, in which Brett Cocales wrote "who cares, it's done, end of story, will probably be fine" demonstrates that BP accepted the risk that its decision to use only 6 centralizers could compromise the production casing cement job by causing channeling.  (TREX-1517 at BP-HZN-2179MDL00033080).

117.     The April 16, 2010 email from Brett Cocales to Brian Morel, in which Brett Cocales wrote that "I would rather have to squeeze than get stuck above the WH (well head) demonstrates that BP understood that the foreseeable risk associated with not achieving zonal isolation is not a blowout, but rather a requirement to conduct remedial cementing operations to achieve zonal isolation.  (TREX-1517 at BP-HZN-2179MDL00033080).

118.     BP admitted in the "Bly Report" that "(t)he BP Macondo team erroneously believed that they had received the wrong centralizers due to a concern that these slip-on centralizers could fail during the casing run and cause the casing to lodge across the BOP." (TREX-1 at 35).

119.     The design of the 15 additional centralizers that were delivered to the *Deepwater Horizon* was previously modified by Weatherford, in conjunction with input from BP, to avoid the problem BP experienced on the *Thunder Horse* well of having stop collars come undone or unattached.  (G. BENGE, T.T. 2253:17—2254:8; DEPO. OF B. COCALES, 381:12-384:23).

134

120.     The design of the 15 additional centralizers that were delivered to the *Deepwater Horizon* was changed so that affixing them more securely to the casing required the use of screws and a bonding adhesive or glue.  (G. BENGE, T.T. 2252:12—2253:23; DEPO. OF B. COCALES, 381:12-384:23).

121.     The bonding adhesive or glue that was to be used to affix the stop collars for the 15 additional centralizers would have required BP to wait a period of time for the adhesive/glue to cure prior to running the casing into the wellbore.  (G. BENGE, T.T. 2253:17—2254:8).

122.     BP engineers had been instructed in 2009 by Robert Beirute that, in fact, "contrary to what some think, centralizers properly installed and run in good holes help get the casing to the bottom.  They reduce differential sticking by keeping pipe away from the hole wall."  (TREX-4984 at 1; DEPO. OF R. BEIRUTE, 427:5-13).

123.     After making the decision to reposition only the six original centralizer subs on the production casing, BP never communicated the decision to Jesse Gagliano.  (J. GAGLIANO, T.T. 6603:23—6605:4; DEPO. OF G. WALZ, 644:12—645:17, 645:24—646:11).

124.     After making the decision to reposition only the six existing centralizer subs on the production casing, BP never asked Jesse Gagliano to run an OptiCem model with the six centralizer subs in their final positions as determined by BP.  (G. BENGE, T.T. 2301:2-14; J. GAGLIANO, T.T. 6683:14-24, 6857:1-8; TREX-1 at 68).

125.     BP ordered the production casing cement job to proceed without ever requesting that Jesse Gagliano run an OptiCem model with the six  centralizer subs in their final positions as determined by BP.  (G. BENGE, T.T. 2301:2-14).

126.    On the evening of April 16, 2010, while he was aboard the *Deepwater Horizon*, Nate Chaisson learned that BP had decided not to run the twenty-one centralizers that Jesse Gagliano recommended, but rather only six (6).  (N. CHAISSON, T.T. 6313:1—6314:3).

127.    On the evening of April 16, 2010, Nate Chaisson expressed his concern to Brian Morel and Don Vidrine that BP's decision to only run six centralizers would result in channeling during the cement job.  (N. CHAISSON, T.T. 6313:15—6315:2).

128.    In response to Nate Chaisson's expressed concern about only running six centralizers, Brian Morel and Don Vidrine confirmed that the decision was made not to run the additional fifteen (15) centralizers, and that BP was going to move forward with only six.  (N. CHAISSON, T.T. 6313:15—6315:2).

129.    On the evening of April 16, 2010, Nate Chaisson called Jesse Gagliano from the rig and told Gagliano that BP was planning to run only six centralizers.  (N. CHAISSON, T.T. 6313:17—6314:3).

130.    On April 17, 2010, Jesse Gagliano emailed Brian Morel, Mark Hafle, Brett Cocales and Greg Walz an updated Cement Program, in which email Gagliano asked: "Can you also confirm if we are running the additional centralizers or not(?)  I heard from the rig we were not going to run them.  If this is the casing (*sic*) I will update the OptiCem to reflect."  (TREX-1801).

131.    Neither Brian Morel, Mark Hafle, Brett Cocales, Greg Walz nor anyone else from BP responded to Jesse Gagliano's email, dated April 17, 2010, requesting confirmation of BP's decision not to run the additional centralizers.  (DEPO. OF G. WALZ, 181:16—182:12).

132.    The operation to run the production casing into the Macondo well commenced at approximately 3:30 am on April 18, 2010.  (TREX-1424 at BP-HZN-MBI00191711).

136

133.    Since the production interval was at the bottom of the Macondo well, the production casing to which the centralizers were attached would be among the first casing stands run into the hole in the casing run operation.  (TREX-1 at 75).

134.    Later in the day on April 18, 2010, Jesse Gagliano spoke with a cementer on the *Deepwater Horizon* who confirmed that, indeed, BP had run only 6 centralizers on the production casing.  (J. GAGLIANO, T.T. 6629:16-21, 6681:12-21, 6786:21-23).

135.    On April 18, 2010, when Jesse Gagliano spoke with the cementer on the rig, the production casing, to which the centralizers were attached, had already been run into the well. (J. GAGLIANO, T.T. 6853:14-24).

136.    In response to the cementer's confirmation that only 6 centralizers had been run on the production casing, Jesse Gagliano updated the OptiCem modeling to reflect the job "as run" with only 6 centralizers.  (TREX-717; J. GAGLIANO, T.T. 6629:16-21).

137.    Because BP did not respond to his inquiry requesting confirmation of the number of centralizers run or otherwise provide him with the final placement of the centralizers as determined by BP, Jesse Gagliano updated the April 18, 2010 OptiCem by modeling 7 centralizers at uniform intervals of 45 feet from 18,305 feet.  (TREX-717A at 16; J. GAGLIANO, T.T. 6861:15—6862:6).

138.    Jesse Gagliano intended to incorporate 6 centralizers into the updated April 18, 2010 OptiCem, but inadvertently incorporated 7 centralizers into the modeling.  (TREX-717A at 16; J. GAGLIANO, T.T. 6861:15—6862:6).

139.    The updated April 18, 2010 OptiCem, modeling 7 centralizers, was the last pre-incident OptiCem model prepared by Jesse Gagliano.  (TREX-717.1.HESI at 16; TREX-7140 at 57-58).

140.    The updated April 18, 2010 OptiCem, modeling 7 centralizers, predicted that the production casing cement job would channel.  (J. GAGLIANO, T.T. 6873:24—6874:10; TREX-717A at 18, 23).

141.    The updated April 18, 2010 OptiCem, modeling 7 centralizers, calculated a Gas Flow Potential of 10.29, indicating that "this well is considered to have a SEVERE gas flow problem."  (TREX-717A at 18; J. GAGLIANO, T.T. 6873:24—6874:10).

142.    Had Jesse Gagliano incorporated only 6 centralizers into the updated April 18, 2010 OptiCem model instead of 7 centralizers, the model would have predicted an even greater amount of channeling.  (J. GAGLIANO, T.T. 6860:15—6861:13; TREX-8140 at 57).

143.    Had Jesse Gagliano incorporated only 6 centralizers into the updated April 18, 2010 OptiCem model instead of 7 centralizers, the model would have calculated an even greater gas flow potential.  (J. GAGLIANO, T.T. 6860:24—6861:2).

144.    On the evening of April 18, 2010, Jesse Gagliano emailed the updated OptiCem report modeling 7 centralizers to numerous BP engineers and Well-Site Leaders, including but not limited to, Brett Cocales, Don Vidrine, Earl Lee, John Guide, Brian Morel, Mark Hafle and Greg Walz.  (TREX-717.1.HESI; J. GAGLIANO, T.T. 6627:7-18, 6628:11-23).

145.    After the morning call with the rig on April 19, 2010, Jesse Gagliano sought out Greg Walz in his office to discuss, face-to-face, Gagliano's concerns about certain BP decisions related to the production casing cement job.  (DEPO. OF G. WALZ, 184:13—185:4, 628:24—630:7).

146.    During the April 19, 2010 meeting between Jesse Gagliano and Greg Walz, Gagliano brought a copy of the updated April 18, 2010 OptiCem modeling report.  (DEPO. OF G. WALZ, 185:1-6, 11-16, 628:24—630:7).

138

147.     On April 19, 2010, Jesse Gagliano personally expressed his concern to Greg Walz that BP's decision to run only 6 centralizers would cause channeling, an increase in ECDs and/or potential losses of fluid to the formation during the production casing cement job.  (DEPO. OF G. WALZ,  628:6—630:10, 632:7-19, 632:23—633:19).

148.     On April 19, 2010, Jesse Gagliano personally informed Greg Walz that, according to the updated April 18, 2010 OptiCem, BP's decision to run only 6 centralizers increased the gas flow potential in the Macondo well production interval to "severe."  (DEPO. OF G. WALZ, 628:6—630:10, 632:7-19, 632:23—633:19).

149.     On April 19, 2010, Jesse Gagliano personally recommended to Greg Walz that BP should circulate a full bottoms-up volume of mud prior to the production casing cement job to help alleviate channeling predicted by the updated April 18, 2010 OptiCem report.  (DEPO. OF G. WALZ, 543:25—545:15, 642:12-25).

150.     After his meeting with Jesse Gagliano on April 19, 2010, Greg Walz had a face-to-face discussion with John Guide during which Walz relayed Jesse Gagliano's concerns about inadequate centralization and recommendation to conduct a full bottoms-up circulation prior to the cement job.  (DEPO. OF G. WALZ, 640:13—644:8).

151.     After Greg Walz's meeting with John Guide in which Walz relayed Jesse Gagliano's concerns, BP made no changes to the pre-cement volume of mud circulation or the number of centralizers.  (J. GAGLIANO, T.T. 6789:21-24; J. GUIDE, T.T. 8947:23—8949:5; DEPO. OF G. WALZ, 547:24—548:2, 637:24—639:10, 642:13—643:23).

152.     Greg Walz admitted in his deposition that Jesse Gagliano pointed out to him and BP the risks of not running more centralizers and not circulating a full bottoms-up prior to the cement job.  (DEPO. OF G. WALZ, 637:24—642:25).

153.     Greg Walz further admitted that he and John Guide, on behalf of BP, accepted the risks associated with running fewer centralizers and circulating less volume of mud than Jesse Gagliano recommended.  (TREX-717A; DEPO. OF G. WALZ, 641:18—642:5, 642:13—643:23).

154.     By foreseeing that the production casing cement job would channel, the updated April 18, 2010 OptiCem that Jesse Gagliano provided to BP predicted that the cement job would not achieve zonal isolation.  (G. BENGE, T.T. 2356:12—2357:10; TREX-717A at 18, 23; TREX-8140 at 57 ).

155.     According to Greg Walz, if channeling or losses of fluid to the formation occurred during cementing operations, the cement could be remediated by a cement squeeze job.  (DEPO. OF G. WALZ, 488:17—489:4, 215:14-22, 216:5-17, 542:5-15, 633:5—634:2).

### 3.     *BP's Inadequate Centralization Of The Long String Production Casing Likely Led To Channeling.*

156.     Centralizers are devices that keep casing centered in the wellbore. (SCHLUMBERGER OILFIELD GLOSSARY—CENTRALIZERS).

157.     Bow-spring centralizers are centralizers that attach to the outside of casing and have bow-shaped blades that keep casing centered in the wellbore.  (R. SEPULVADO, T.T. 1988:6-14; G. BENGE, T.T. 2285:1—2286:2; DEPO. OF G. WALZ, 416:17—417:4; D-4932A).

158.     Centralizer subs are centralizers that form a section of the casing and integrate directly into the casing by way of male and female threads.  (R. SEPULVADO, T.T. 2040:7-19; DEPO. OF G. WALZ, 407:16-23).

159.     Centralization of the casing is important because it helps the cement to displace fully or radially around all sides of the casing.  (G. BENGE, T.T. 2287:2-8; TREX-4842; TREX-1 at 76; TREX-4841; DEPO. OF R. BEIRUTE, 427:5-13).

160.    Where casing is uncentralized or inadequately centralized, cement will follow the path of least resistance and displace preferentially to the wide-side between the pipe and wellbore wall, leaving no cement on the narrow-side.  (G. BENGE, T.T. 2305:23—2306:5; TREX-4841; DEPO. OF R. BEIRUTE, 427:5-13).

161.    When cement displaces preferentially to the wide-side of uncentralized or inadequately centralized casing, the lack of cement on the narrow-side between the casing and wellbore wall creates a channel.  (G. BENGE, T.T. 2286:10-24).

162.    The Macondo well production casing was not adequately centralized.  (G. BENGE, T.T. 2558:17-21; 2305:23—2306:5).

163.    BP made the decision to inadequately centralize the production casing at the Macondo well.  (G. BENGE, T.T. 2558:17-23).

164.    The lack of adequate centralization likely caused the cement job to channel.  (G. BENGE, T.T. 2298:7-19; TREX-4841; DEPO. OF R. BEIRUTE, 427:5-13).

165.    A computer program or simulation, such as OptiCem, is required to predict whether the number and placement of centralizers effectively centralizes a pipe.  (G. BENGE, T.T. 2295:23—2296:20).

166.    Without running a computer program or simulation, such as OptiCem, the effectiveness of centralizer placement cannot be predicted accurately.  (G. BENGE, T.T. 2308:16-22).

167.    After Jesse Gagliano prepared the updated April 18, 2010, OptiCem, no BP drilling engineer or any other BP employee, informed Jesse Gagliano of the location of the 6 centralizers that BP ran on the production casing.  (G. BENGE, T.T. 2300:23—2301:22).

168.   After Jesse Gagliano prepared the updated April 18, 2010, OptiCem, no BP drilling engineer or any other BP employee, asked Jesse Gagliano to model the cement job using the location of the 6 centralizers that BP decided to run on the production casing.  (G. BENGE, T.T. 2301:7-14, 2307:4-25).

169.   Glen Benge testified that, without running an OptiCem model on BP's final centralizer placement, BP's decision as to where to place the 6 centralizers can be characterized as, "I guess we'll try to put them here and hope for the best."  (G. BENGE, T.T. 2302:18—2303:24).

170.   BP ran the 6 centralizers in the well without evaluating or confirming the efficacy of its centralizer placement through any OptiCem or other modeling.  (G. BENGE, T.T. 2301:7-22).

171.   Glen Benge testified that, given BP's placement of the 6 centralizers—from Total Depth ("TD") to 17,880 feet the flexible production casing would be laying against the wellbore wall, uncentralized.  (G. BENGE, T.T. 2303:25—2304:19).

172.   The Bly Report incorrectly concluded that "(t)he decision not to use 21 centralizers increased the possibility of channeling above the main hydrocarbon zones, but it likely did not contribute to the cement's failure to isolate the main hydrocarbon zones or to the failure of the shoe track cement."  (TREX-1 at 35; G. BENGE, T.T. 2307:4-20).

173.   As Glen Benge testified, the Bly Report's conclusion about centralizers is incorrect because the mere presence of a centralizer placed in the vicinity of a main hydrocarbon zone does not mean the casing was centralized.  (G. BENGE, T.T. 2307:4-25).

174.   A lack of adequate centralization causes channeling.  (G. BENGE, T.T. 2286:10-19).

142

175.   To form a cement barrier, cement must be able to displace radially or all the way around the pipe.  (G. BENGE, T.T. 2287:2-8).

176.   As Glen Benge testified, use of casing centralizers to provide standoff (between the casing and the wellbore wall) is critical in achieving cement placement to provide zonal isolation.  (G. BENGE, T.T. 2290:2-17).

177.   Good pipe centralization is critical to achieving reliable cement placement and zonal isolation.  (G. BENGE, T.T. 2292:16—2293:6, 2410:16-19).

178.   Glen Benge further testified, "centralizers themselves may not always deliver the performance desired, but the benefits of centralization for zonal isolation are unquestionable." (G. BENGE, T.T. 2293:3—2294:6; 2410:10-19).

179.   A successful primary cement job is a cement job that ultimately achieves zonal isolation.  (G. BENGE, T.T. 2345:24—2346:3).

180.   A successful cement job requires the combination of cement chemistry and cement physics.  (G. BENGE, T.T. 2289:16-23; 2408:10-13).

181.   Cement chemistry pertains to the cement slurry design, which includes the cement and dry and liquid additives.  (G. BENGE, T.T. 2246:23—2247:6, 2408:14-19).

182.   Cement physics pertains to things that affect cement placement in its intended locations, such as pipe centralization, wellbore conditions, and pumping rates.  (G. BENGE, T.T. 2408:20—2409:10).

183.   The best cement design in the world can fail to achieve zonal isolation if cement physics are not optimized for placement.  (G. BENGE, T.T. 2408:10—2409:13).

184.   As Glen Benge testified, BP accepted identified and acknowledged risks that the cement job would be compromised with the understanding that it could come back later and

143

conduct a remedial squeeze job. (G. BENGE, T.T. 2249:15—2250:4, 2250:5—2251:6; TREX-5990 at 2; TREX-1367).

185. As Glen Benge testified, based on his review of material, BP knew of the following known risks associated with the cement job: problems with the operation to convert the float collar; limited centralization of the casing; limited pre-cement job mud circulation; low cement volumes and low pumping rates. (G. BENGE, T.T. 2254:22—2255:25).

186. Despite BP's awareness of these known risks, Glen Benge testified that he observed nothing that BP did to mitigate against their cumulative effect to compromise the cement job. (G. BENGE, T.T. 2255:3-8).

187. Given these known risks, Glen Benge testified that he would not have expected the production casing cement job to successfully achieve zonal isolation. (G. BENGE, T.T. 2256:1-4, 2254:17-2255:12).

188. According to the Bly Investigation notes of his interview, Mark Hafle acknowledged that due to BP's decision not to run all 21 recommended centralizers, he "(t)hought we are going to get shittie [*sic*] cmt job." (TREX-4454; TREX-4451 at 3).

189. Glen Benge's opinion that the cement job would not be successful is consistent with Mark Hafle's statement in the Bly Investigation interview notes that he "(t)hought we are going to get shittie (*sic*) cement job." (TREX-4451 at 3; G. BENGE, T.T. 2252:2-21, 2254:17-2255:12).

190. A cement job's inability to achieve zonal isolation is not considered a safety issue. (J. GAGLIANO, T.T. 6853:25—6854:7; N. CHAISSON, T.T. 6403:14—6404:2; DEPO. OF G. GARRISON, 253:5-18).

144

191.    Approximately 10-20% of deepwater cement jobs are not successful at achieving zonal isolation and require a remedial cement job.  (G. BENGE, T.T. 2243:24—2244:6).

192.    A cement job's inability to form a barrier or achieve zonal isolation does not foreseeably result in a blowout.   (J. GAGLIANO, T.T. 6614:22—6615:1;  G. BENGE, T.T. 2242:17—2243:3, 2414:4-7; T. ROTH, T.T. 3184:5-15).

193.    A cement job's inability to form a barrier or achieve zonal isolation results in a need to conduct remedial cementing operations to repair the cement job.  (G. BENGE, T.T. 2242:15—2243:3, 2414:8-10).

194.    At the end of the production casing cement job, and for a period of 10-12 hours thereafter, there was a mud column in the casing providing hydrostatic overpressure in the well. (G. BENGE, T.T. 2415:1-19; T. ROTH, T.T. 3184:5-15).

195.    At the end of the production casing cement job, the mud column in the casing provided sufficient pressure to hold back the flow of any formation fluids that could potentially have flowed through the annulus and into the casing and the well was static for approximately 18 hours after the cement slurry was pumped into place.  (G. BENGE, T.T. 2415:1-19; T. ROTH, T.T. 3184:5-15).

196.    As long as hydrostatic overpressure to the formation was maintained in the well, HESI could have conducted, at BP's direction, remedial cementing operations on the production casing cement job.  (DEPO. OF R. LYNCH, 673:8-18; DEPO. OF G. GARRISON, 253:20—254:19; DEPO. OF V. PRICE, 193:15-22; G. BENGE, T.T. 2414:8-10, 2415:1-19).

197.    Remedial cement jobs are routine in the oilfield cementing industry.  (G. BENGE, T.T. 2408:5-7; DEPO. OF G. GARRISON, 253:20—254:19).

198.    HESI had conducted several remedial cement jobs on the Macondo well.  (G. BENGE, T.T. 2407:25—2408:4; J. GAGLIANO, T.T. 6613:10-22).

199.    HESI stood ready to conduct a remedial cement job on the production casing cement job, if necessary.  (G. BENGE, T.T. 2407:20-24, 2573:19-24, 2249:15—2250:4; J. GAGLIANO, T.T. 6614:3-12, 6612:19-24; TREX-5990 at 2).

### 4.   *BP's Limitation Of Pre-Cementing Mud Circulation Likely Led To Channeling.*

200.    The primary cause of poor zonal isolation is poor mud displacement.  (G. BENGE, T.T. 2288:15-19; TREX-6230 at BP-HZN-2179MDL00712795).

201.    Proper mud displacement is promoted by circulating mud in the well prior to a cement job.  (TREX-6230).

202.    The industry standard is to circulate at least one full "bottoms-up" volume of mud, meaning a full annular volume of mud such that the mud at the bottom of the well is pumped to the rig for evaluation.  (G. BENGE, T.T. 2377:11-14, 2380:2-4; TREX-1718 at BP-HZN-BLY00104428).

203.    BP's internal best practice states:  "It is best to circulate a minimum of two bottoms-up before starting to pump the cement job or a minimum of 5 hours, whichever is greater."  (TREX-634 at BP-HZN-2179MDL00347527; G. BENGE, T.T. 2379:16—2380:11).

204.    Bottoms-up circulation is a "core" of cementing practice.  (G. BENGE, T.T. 2568:7-11).

205.    There are three primary purposes for circulating mud volume prior to pumping a cement job:  (1) to remove debris in the well; (2) to break the gel strength of mud in the annulus so that the mud can be efficiently displaced; and (3) to pump mud from the bottom of the well to

146

the rig in order to evaluate it to determine if gas/hydrocarbon has percolated into the mud and/or if gelled mud has been sufficiently broken.  (G. BENGE, T.T. 2568:22—2569:14).

206.     BP increased the risk of a failure to achieve zonal isolation when it limited the amount of mud that was circulated in the well prior to the cement job.  (G. BENGE, T.T. 2288:21-2289:10, 2319:21-25).

207.     BP did not circulate a full bottoms-up of mud volume prior to the production casing cement job.  (G. BENGE, T.T. 2315:1-2; N. CHAISSON, T.T. 6293:12—6294:6).

208.     BP only circulated approximately 260 barrels of mud prior to the cement job.  (G. BENGE, T.T. 2411:12-14; TREX-713).

209.     A full bottoms-up circulation of mud volume would have required the circulation of approximately 2400 barrels of mud, which would have taken approximately 10 hours at a pump rate of 4 bpm.  (G. BENGE, T.T. 2316:2-5).

210.     Glen Benge testified that, because there were no indications of lost returns during BP's limited circulation of mud volume, there was no reason why BP could not have continued to circulate a full bottoms-up volume of mud, other than a desire to save approximately ten hours of rig time.  (G. BENGE, T.T. 2568:7-21, 2315:17—2316:5).

211.     Glen Benge testified that, because BP was aware of debris in the wellbore on the basis of its difficulty in converting the float collar and its caliper log, BP should have circulated a full bottoms-up volume of mud prior to the cement job so as to be able to evaluate the extent of debris still in the mud downhole.  (G. BENGE, T.T. 2568:22—2569:9, 2315:17-23).

212.     By not circulating at least a full bottoms-up of mud prior to the production casing cement job, BP never returned mud from the bottom of the well to the *Deepwater Horizon* to

147

evaluate whether hydrocarbon had seeped into the mud while the wellbore was static for three days.  (G. BENGE, T.T. 2314:7-25).

213.    By not circulating at least a full bottoms-up of mud prior to the production casing cement job, BP never returned mud from the bottom of the well to the *Deepwater Horizon* to evaluate whether the gel strengths of the drilling mud, which had been sitting undisturbed in the well for three days had been sufficiently broken or conditioned.  (G. BENGE, T.T. 2314:7-25).

214.    By not circulating at least a full bottoms-up of mud prior to the production casing cement job, BP did not break all of the gelled mud in the annulus prior to the cement job.  (G. BENGE, T.T. 2413:3-16).

215.    By not circulating at least a full bottoms-up of mud prior to the production casing cement job, BP increased the risk that, during the cement job, cement pushed past gelled mud in the annulus, causing mud to contaminate the annular cement.  (G. BENGE, T.T. 2413:17-25).

216.    By not circulating at least a full bottoms-up of mud prior to the production casing cement job, BP increased the risk that, during the cement job, cement pushed past gelled mud in the annulus, causing the annular cement to channel.  (G. BENGE, T.T. 2413:17-25).

217.    Lack of adequate centralization, lack of sufficient mud conditioning and reduced cement pumping rates are causes of poor zonal isolation.   (TREX-6230 at BP-HZN-2179MDL00712775;  G. BENGE, T.T. 2284:24-2287:8, 2287:9-2289:10; TREX-5990 at BP-HZN-2179MDL00712775).

218.    Glen Benge testified that, on the Macondo production casing job, BP made operational decisions that led to a lack of adequate centralization, a lack of sufficient mud conditioning prior to the cement job, and pumping the cement with low pump rates.  (G. BENGE, T.T. 2410:20—2411:5, 2289:6-10, 2297:9-12; TREX-5990 at 3, 25).

219.   BP knew or should have known that the production casing cement job likely would not achieve zonal isolation due to BP's decisions not to adequately centralize the casing and not to conduct adequate mud circulation prior to the cement job.  (G. BENGE, T.T. 2254:17—2255:25, 2591:14—2592:1).

### 5.   BP Unnecessarily Increased The Risk That The Cement Job Would Not Achieve Zonal Isolation When It Dictated Low Cement Pumping Rates.

220.   With respect to the cement job design, BP directed pumping rates during the pumping and placement of cement.  (G. BENGE, T.T. 2257:11-25, 2318:25—2319:11, 2349:9—2350:17;  N. CHAISSON, T.T. 6294:7-9; TREX-5990 at 25; TREX-51165 at BP-HZN-CEC021656;).

221.   The pump rates BP directed to be incorporated into the cement procedure never exceeded 4 bpm.  (G. BENGE, T.T. 2254:6-8, TREX-1493 at BP-HZN-2179MDL00041334).

222.   BP's use of a 4 bpm pump rate during the Macondo production casing cement job was driven by the fact that BP had drilled a fragile well and, therefore, needed to control ECDs downhole during the cement job.  (G. BENGE, T.T. 2318:14—2319:11).

223.   A 4 bpm pump rate for a cement job is considered a low pump rate.  (G. BENGE, T.T. 2554:6-8).

224.   Higher pump rates generate more annular velocity in the spacer and cement, which increases the spacer and cement's ability to efficiently displace mud in the annulus.  (G. BENGE, T.T. 2290:21—2291:9;  N. CHAISSON, T.T. 6294:10-25;  TREX-6230 at BP-HZN-2179MDL0071277; TREX-5990 at 25).

225.    Low pump rates during a cement job decrease the displacement efficiency of the spacer and cement.  (TREX-6230 at BP-HZN-2179MDL00712775; G. BENGE, T.T. 2318:25—2319:11).

226.    The 4 bpm pump rates used during the Macondo production casing cement job added additional risk that the annular cement would not achieve zonal isolation due to a reduced ability to displace mud in the annulus.  (G. BENGE, T.T. 2410:20—2411:3; TREX-6230 at BP-HHZN-2179MDL00712775, 77).

### 6.    *BP Is Responsible For Any Alleged OptiCem Input Errors/Omissions.*

227.    Jesse Gagliano relied on the BP drilling engineers to provide him with the majority of the inputs he needed to run OptiCem modeling.  (J. GAGLIANO, T.T. 6634:25—6635:8, 6585:1-11).

228.    Prior to the Macondo production casing cement job, BP's drilling engineers reviewed Jesse Gagliano's OptiCem inputs several times to verify such inputs and revised and/or directed that certain inputs be changed.  (J. GAGLIANO, T.T. 6772:17—6774:4).

229.    At trial, BP asked Jesse Gagliano if he had become aware that certain inputs to the final April 18, 2010 OptiCem model were incorrect, including:  (1) the actual placement of the centralizers in the well; (2) the pore pressure in the well; (3) the diameters of the centralizers; and (4) the density of the base oil used in the cement program.  (J. GAGLIANO, T.T. 6852:19-6853:13).

230.    Other than inadvertently modeling 7 centralizers in the final April 18, 2010 OptiCem model instead of 6 centralizers, there is no evidence that Jesse Gagliano was the source or cause of any input that BP now asserts was incorrect.  (J. GAGLIANO, T.T. 6634:25—6635:17, 6772:17—6774:4).

150

231.    With respect to the actual placement of the centralizers in the well, Jesse Gagliano requested confirmation from BP regarding the number of centralizers that BP decided to run in the well, but nobody from BP responded to his request for confirmation.  (TREX-1801).

232.    With respect to the actual placement of the centralizers in the well, BP never communicated to Jesse Gagliano, prior to the production casing cement job, their final placement in the well as determined by BP.  (J. GAGLIANO, T.T. 6852:19-22; 6853:2-13).

233.    During an April 14, 2010 meeting, Brian Morel specifically directed Jesse Gagliano what pore pressures to incorporate into the OptiCem model with the modeling inputs projected onto the wall so that all of the present BP drilling engineers could review.  (J. GAGLIANO, T.T. 6772:17—6773:24).

234.    During the April 14, 2010 meeting, Brian Morel directed Jesse Gagliano to input in the OptiCem model specific pore pressures into the OptiCem model that Morel was obtaining from a wireline log.  (J. GAGLIANO, T.T. 6772:17—6773:24).

235.    The centralizer diameters and base oil density used in the final April 18, 2010 OptiCem were provided to Jesse Gagliano by and reviewed and verified by BP's drilling engineers.  (J. GAGLIANO, T.T. 6772:17-6773:24).

### 7.    *BP Failed To Disclose The M57B Hydrocarbon-Bearing Sand To Both Jesse Gagliano And The Public.*

236.    Among the inputs Jesse Gagliano used in the OptiCem modeling on the production casing cement job were the pore pressures associated with sands at various depths in the Macondo production interval.  (TREX-717A at 11; TREX-8140 at 58-59).

237.    Jesse Gagliano relied on BP's drilling engineers to provide him with the pore pressures and associated depths of formation sands in the Macondo production interval.  (TREX-8140 at 58-59; J. GAGLIANO, T.T. 6634:21—6635:17).

238.    Jesse Gagliano is not a petrophysicist, did not have access to BP's proprietary log data and analysis, and could not ascertain on his own the locations of and pore pressures associated with the formation sands in the Macondo production interval.  (J. GAGLIANO, T.T. 6634:21—6635:17).

239.    On April 14, 2010, Jesse Gagliano participated in a meeting with several of BP's drilling engineers and, at that meeting, Brian Morel directed Gagliano to input certain pore pressures at certain depths into the OptiCem model.  (TREX-1391; J. GAGLIANO, T.T. 6772:17—6773:24).

240.    The pore pressures and depths associated with the sands in the production interval were critical for accurately modeling the production casing cement job.  (TREX-1391 at BP-HZN-2179MDL00249829, 36; TREX-717A at 11; J. GAGLIANO, T.T. 6634:21—6635:17, 6772:17—6773:24).

241.    The pore pressures and depths associated with all of the sands in the production interval directly effected the gas flow potential ("GFP") calculations in OptiCem for the production casing cement job.  (TREX-717A at 9-11; TREX-8140 at 58-59).

242.    The location of the uppermost hydrocarbon-bearing sand in the production interval was critical for purposes of designing and modeling the TOC for the production casing cement job in compliance with federal regulations.  (TREX-5374).

243.    Federal regulation, 30 C.F.R. 250.421(e), provides the following with respect to the "cementing requirements" of "production" casing:  "As a minimum, you must cement the

152

annular space at least 500 feet above the casing shoe and *500 feet above the uppermost hydrocarbon-bearing zone.*"  (emphasis added).  (TREX-5374).

244.   The "uppermost" hydrocarbon-bearing zone is synonymous with the "shallowest" hydrocarbon-bearing zone in a well interval.  (TREX-3512; DEPO. OF G. SKRIPNIKOVA, 449:21-455:1; R. STRICKLAND, T.T. 6495:11—6496:9).

245.   Pursuant to 30 C.F.R. 250.421(e), the designed TOC for the production casing cement job was required to be at least 500 feet above the uppermost hydrocarbon-bearing zone in the Macondo production interval.  (D-8015; TREX-5374).

246.   On April 13, 2010, a BP Geologist, Robert Bodek, wrote the following to BP petrophysicist Galina Skripnikova, copying Brian Morel, Greg Walz, Brett Cocales, John Guide, Mark Hafle and others at BP:  "[t]he drilling team, in their cement procedure preparations, needs to know the depth of the shallowest hydrocarbon-bearing interval in the open hole.  From your calculations, could you provide the depth of the shallowest hydrocarbon zone and 'reply all' to this email(?)"  (TREX-3512).

247.   On April 13, 2010, twenty-one minutes after receiving Robert Bodek's email, Galina Skripnikova replied to all, responding:  "I think the shallowest HC sand is at 17,803 md(.)"  (TREX-3512).

248.   The sand that Galina Skripnikova identified as the shallowest hydrocarbon-bearing sand came to be identified as the M56A sand at the corrected depth of 17,804-17,806 ft. MD.  (D-8015; TREX-3533 at BP-HZN-BLY00082909).

249.   BP determined that the M56A sand was a "gas" sand approximately 2 ½ feet thick.  (TREX-3533 at BP-HZN-BLY00082909; TREX-4544).

250.   Hydrocarbons can be either gas or oil.  (TREX-60083 at 8-9).

251.    To determine which sand in the Macondo production casing interval was the shallowest hydrocarbon-bearing sand, Galina Skripnikova looked at a field copy of Schlumberger's "Triple Combo" log.  (DEPO. OF G. SKRIPNIKOVA, 445:18-25, 447:3-16; 567:8-19).

252.    During the iterative planning of the production casing cement job, BP did not inform Jesse Gagliano of the depths of the specific sands identified in the Macondo production interval, nor did BP inform Jesse what type of formation fluids (water, oil or gas) were in such sands.  (TREX-8140 at 58-59; F. BECK, T.T. 7201:15-7202:4).

253.    Pursuant to 30 C.F.R. 250.421(e), if M56A was the uppermost hydrocarbon-bearing zone at 17,804 ft. MD, BP was required to design the TOC in the production interval to a height of at least 17,304 ft. MD.   (TREX-5374; D-8015; R. STRICKLAND, T.T. 6421:21-25; TREX-60083).

254.    BP directed Jesse Gagliano to incorporate into the production casing cement job a designed TOC at 17,300 ft. MD.  (D-8247; TREX-60443 at BP-HZN-2179MDL0006923; J. GAGLIANO, T.T. 6635:18-23; 6634:21—6635:8).

255.    The designed TOC at 17,300 ft. MD, as specified by BP, is reflected on Page 6/12 of the 9 7/8" X 7" Production Casing Cement Program ("Version 6"), as follows:  "Fluid 3:  Lead Cement – Un-foamed  .  .  .  Top of Fluid:   17300 ft."   (TREX-60443 at BP-HZN-2179MDL00006923).

256.    The M56A sand is not the shallowest hydrocarbon-bearing sand in the Macondo production interval.  (D-8015; TREX-3533 at BP-HZN-BLY00082909; R. STRICKLAND, T.T. 6421:2-25).

257.    Galina Skripnikova incorrectly identified the M56A sand as the shallowest hydrocarbon-bearing sand in the Macondo production interval.  (D-8025; TREX-3512; TREX-4544; R. STRICKLAND, T.T. 6421:21-25).

258.    The M57B sand, located at 17,467-17,469 ft. MD, is the shallowest hydrocarbon-bearing sand in the Macondo production interval.   (D-8025; TREX-3533 at BP-HZN-BLY00082909).

259.    The M57B sand is located higher in the production interval (or shallower in depth) than the M56A sand.  (D-8025; D-8015; TREX-3533 at BP-HZN-BLY00082909; TREX-4544; R. STRICKLAND, T.T. 6421:21-25).

260.    The M57B sand is a "gas" sand of approximately 2 feet of thickness.  (D-8025; D-8015; TREX-3533 at BP-HZN-BLY00082909).

261.    The Triple Combo log that BP ran on the Macondo well prior to the production casing cement job shows that the M57B sand at 17,467 ft. MD is the uppermost hydrocarbon-bearing sand in the production interval.  (TREX-3540).

262.    The Triple Combo log and several other logs were created when BP ran Schlumberger's RT Scanner tool during wireline logging operations on the Macondo well.  (TREX-3540).

263.    BP conducted wireline logging operations on the Macondo well from April 9, 2010 to April 15, 2010, prior to the production casing cement job.  (TREX-3537).

264.    The RT Scanner tool was run on April 10, 2010, and the Triple Combo log was prepared and provided to BP on or about April 13, 2010.   (TREX-3540; DEPO. OF G. SKRIPNIKOVA, 468:3-9).

265.    The Triple Combo log contains, from left to right, a Gamma Ray track, a depth track, a Resistivity track and a Density-Neutron track.  (TREX-3540; R. STRICKLAND, T.T. 6440:3-10, 6443:18-6446:4).

266.    In the Triple Combo's Gamma Ray track, the curve represents gamma ray measurements of the natural radiation in the downhole rock formation.  (TREX-3540; R. STRICKLAND, T.T. 6443:18—6444:11).

267.    When the gamma ray curve has an excursion to the right, that is an indication that the tool is measuring a shale formation.  (R. STRICKLAND, T.T. 6443:18—6444:11).

268.    When the gamma ray curve has an excursion to the left, that is an indication that the tool is measuring a sand formation.  (R. STRICKLAND, T.T. 6443:18—6444:14).

269.    At 17,467 ft. MD (marked on TREX-3540 as "M57B"), the gamma ray curve on the Triple Combo log has an excursion to the left indicating the presence of a sand formation. (TREX-3540; R. STRICKLAND, T.T. 6443:18—6444:14, 6447:9-15, 6446:5-10).

270.    In the Triple Combo's Resistivity track, the curve represents measurements of the resistivity of the downhole rock formation.   (TREX-3540; R. STRICKLAND, T.T. 6443:18—6444:17).

271.    Water (salt water/brine) is conductive, so rock formation that contains water will measure at a lower resistivity.  (TREX-3540; R. STRICKLAND, T.T. 6443:18—6444:17).

272.    A lower resistivity (water) is reflected in the Resistivity track as a curve that has an excursion to the left.  (TREX-3540; R. STRICKLAND, T.T. 6443:18—6445:2).

273.    Hydrocarbon is not conductive, so rock formation that contains hydrocarbon will measure at a higher resistivity.  (R. STRICKLAND, T.T. 6443:18—6445:2).

274.     A higher resistivity (hydrocarbon) is reflected in the Resistivity track as a curve that has an excursion to the right.  (R. STRICKLAND, T.T. 6443:18—6445:6).

275.     At 17,467 ft. MD (marked on TREX-3540 as "M57B"), the resistivity curve on the Triple Combo log has an excursion to the right indicating a nonconductive fluid in the sand formation.  (TREX-3540; R. STRICKLAND, T.T. 6443:18—6445:6, 6446:5—6447:15).

276.     In the Triple Combo's Density-Neutron track, there are two curves representing measurements taken by two tools.  (TREX-3540; R. STRICKLAND, T.T. 6445:2-6446:4).

277.     The curves in the Density-Neutron track reflect density and porosity measurements of the rock formation.   (TREX-3540; R. STRICKLAND, T.T. 6445:21—6446:4, 6446:16—6447:8).

278.     In the Density-Neutron track, when a sand formation has porosity, the density log curve (red curve) will move from right to left, and the neutron curve (blue curve) will move from left to right.  (TREX-3540; R. STRICKLAND, T.T. 6445:21—6446:4; 6446:16—6447:8).

279.     In the Density-Neutron track, when the density log curve (red curve) and neutron curve (blue curve) come together and touch or crossover each other, that is an indication that the rock formation has sufficient porosity to contain gas/hydrocarbon.    (TREX-3540; R. STRICKLAND, T.T. 6445:21—6446:4, 6446:16—6448:4).

280.     At 17,467 ft. MD (marked on TREX-3540 as "M57B"), the density and neutron curves approach each other and cross each other, indicating that sand formation has sufficient porosity to contain gas/hydrocarbon.  (TREX-3540; R. STRICKLAND, T.T. 6446:16—6448:15).

281.     With respect to interpreting the Triple Combo log through pattern recognition, the following is a classic pattern indicating that, at a particular depth, there is a likely hydrocarbon-bearing sand:  Gamma Ray curve excursion to the left (indicating a sand); Resistivity curve

excursion to the right (indicating likely nonconductive hydrocarbon); and Density-Neutron curves that touch or cross (indicating porosity sufficient to contain gas/hydrocarbon).  (R. STRICKLAND, T.T. 6443:18—6447:15).

282.    The M56A sand at 17,804-17,806 ft. MD exhibits the classic pattern of a hydrocarbon-bearing zone on the Triple Combo log.  (TREX-3540; D-4666, R. STRICKLAND, T.T. 6559:10—6560:10).

283.    The M57B sand at 17,467-17,469 ft. MD exhibits the classic pattern of a hydrocarbon-bearing zone on the Triple Combo log.  (TREX-3540; D-4666; R. STRICKLAND, T.T. 6447:9-15, 6559:10—6560:10).

284.    The Combinable Magnetic Resonance ("CMR") log also indicates to Dr. Strickland that the M57B sand is a hydrocarbon-bearing sand.  (R. STRICKLAND, T.T. 6481:11-17).

285.    BP misinterprets the ELAN analysis to assert that it calculated the M57B sand's water saturation value to be 90%, deriving a mistaken gas saturation value of 10%.  (R. STRICKLAND, T.T. 6547:4—6550:8).

286.    Dr. Strickland demonstrated at trial that BP mistakenly reversed the scale on the ELAN analysis's water saturation curve and that, properly interpreted, the ELAN analysis calculated the M57B sand's water saturation to be only 10%; meaning, according to what BP calls the ELAN analysis, the M57B sand has a gas saturation or gas content of 90%.  (R. STRICKLAND, T.T. 6547:4—6550:8).

287.    BP admits, in internal post-incident documents, that the M57B sand is a hydrocarbon-bearing sand containing "gas."  (TREX-3533; TREX-4544; D-8025).

288.   On April 21, 2010, the day after the Macondo blowout, a group of BP geologists and petrophysicists, including Galina Skripnikova, gathered at BP's offices in Houston, Texas to review all of the wireline logs and data acquired for the Macondo well.  (TREX-3740; TREX-4544; TREX-60083 at 20; DEPO. OF G. SKRIPNIKOVA, 572:18—574:17).

289.   The data and wireline logs reviewed by the BP team of geologists and petrophysicists starting on April 21, 2010 were the same data and wireline logs available to Galina Skripnikova at the time she was asked to identify the shallowest hydrocarbon-bearing zone.  (TREX-60083 at 20; DEPO. OF G. SKRIPNIKOVA, 572:18—574:17, 441:19—444:21).

290.   On April 22, 2010, two days after the Macondo blowout, Martin Albertin, a BP geophysical advisor, compiled a detailed sand and pressure table of all sands in the Macondo well.  (TREX-4544; TREX-3740; R. STRICKLAND, T.T. 6452:14—6453:13).

291.   On April 22, 2010, the detailed sand and pressure table compiled by Martin Albertin within two days after the blowout identified the sand at 17,467 ft. (which later came to be called the M57B sand) as a "gas" sand.  (TREX-4544).

292.   BP knew as soon as two days after the blowout that the M57B sand was a "gas" sand and that it was higher in the production interval than the M56A sand identified pre-incident by Galina Skripnikova.  (TREX-4544; TREX-60083 at 19-21).

293.   Between May and July of 2010, BP wrote numerous draft "Technical Notes" on the Macondo well identifying the M57B sand at 17,467 ft. as a "gas" sand that was capable of flowing or expected to flow.  (TREX-6339 at BP-HZN-2179MDL00609318; TREX-3533 at B-HZN-BLY00082909; TREX-3530 at BP-HZN-2179MDL02181156; TREX-3375 at BP-HZN-BLY00140905).

159

294.    A sand that is capable of flowing means that it has sufficient porosity and permeability to permit the formation fluid within it to flow out of the sand in the presence of a pressure differential.  (TREX-60083 at 8-9).

295.    After the blowout, Galina Skripnikova calculated that the M57B sand had an average water saturation (Sw) of 52%, which means that it would contain 48% gas/hydrocarbon. (TREX-3533; R. STRICKLAND, T.T. 6461:19—6462:3).

296.    The Technical Notes drafted internally by BP between May and July of 2010 identified the pore pressure of the M57B sand as 14.2 ppg.  (TREX-6339 at BP-HZN-2179MDL00609318).

297.    Between May and July 2010, a group of BP geologists and petrophysicists, including Marty Albertin, Chuck Bondurant, Kelly McAughan, Binh van Nguyen, Bryan Ritchie, Craig Scherschel and Galina Skripnikova worked on and prepared a "Technical Memorandum" containing a post-well analysis of the Macondo well's subsurface.  (TREX-3375; TREX-3533 at BP-HZN-BLY00082874).

298.    Between May and July 2010, several drafts of the subsurface "Technical Memorandum" were circulated internally at BP before a final draft was circulated on July 26, 2010.  (DEPO. OF G. SKRIPNIKOVA, 360:10-361:5; TREX-3375; TREX-3533; DEPO. OF B. RITCHIE 465:11—467:8).

299.    With the exception of the final July 26, 2010 draft of the Technical Memorandum, each prior draft of the subsurface "Technical Memorandum" characterized the M57B sand as a "gas" zone that "(has) a gas signature on Neutron-Density logs."  (TREX-3375; TREX-3533).

300.    With the exception of the final July 26, 2010 draft of the Technical Memorandum, each prior draft of the subsurface "Technical Memorandum" contained a "Macondo Net/Pay

160

summary" table identifying the M57B sand at 17,467 ft. MD as "gas" sand and having a water saturation of 52% (meaning a gas/hydrocarbon content of 48%), porosity of 18% and permeability of 15 millidarcys (MD).  (TREX-3375; TREX-3533; D-8025).

301.    On July 26, 2010, the same date that the Technical Memorandum was finalized, the wording of the subsurface Technical Memorandum changed in several places such that the characterization of the M57B sand changed from "gas" to "probable gas."  (TREX-3533 at BP-HZN-BLY00082909; TREX-3375 at BP-HZN-BLY00140905; D-8025; DEPO. OF B. RITCHIE 493:1-496:14).

302.    Notwithstanding the change in wording from "gas" to "probable" gas in the final July 26, 2010 Technical Memorandum, no changes were made to the water saturation, porosity, permeability and other calculated values that BP used to characterize the M57B sand in the "Macondo Net/Pay summary" table.  (TREX-3375 at BP-HZN-BLY00140905; R. STRICKLAND, T.T. 6465:19-6467:3; TREX-3533 at BP-HZN-BLY00082909).

303.    The gas content of the M57B sand would flow if not held back given the porosity and permeability values that BP calculated for it.  (R. STRICKLAND, T.T. 6457:17-6461:18; D-8025; TREX-3375 at BP-HZN-BLY00140905).

304.    The Bly Report investigation team knew that the M57B sand was a hydrocarbon-bearing sand containing "gas" and that it was higher in the production interval than the M56A sand identified pre-incident by Galina Skripnikova.  (TREX-7279).

305.    On June 25, 2010, Kent Corser, a team leader on BP's internal Bly Report investigation, wrote an email to Morten Emilsen of AddEnergy, who ran OLGA modeling for BP to model the Macondo blowout, stating:  "We have a sand at 17,467' MD that is 2' thick(,) 14.1 ppg and classified as GAS and would flow."  (TREX-7279 at AE-HZN-2179MDL00137414).

306.     In the same chain of email communications to Morten Emilsen, Kent Corser wrote:  "This sand is new.  They did a new study and have classified it a gas-bearing and capable of flow.   See attached chart.   This is not the brine sand."   (TREX-7279 at AE-HZN-2179MDL00137413).

307.     The June 25, 2010 email chain from Kent Corser to Morten Emilsen attaches a chart identifying the M57B sand as a "Gas" sand at 17,467 ft. MD, and indicates "Yes" in the column labeled "Expected to flow (Used in Modeling)."  (TREX-7279 at 6).

308.     Despite the Bly Report investigation team's knowledge that BP considered the M57B sand a hydrocarbon-bearing sand containing gas, BP did not disclose its existence in the Bly Report.  (TREX-1 at 54).

309.     When BP made the Bly Report publicly available on or about September 8, 2010, BP included a graphic on page 54 of the report entitled:   "Figure 1: Hydrocarbon Zones and Potential Flow Paths." (TREX-1 at 54).

310.     Figure 1 on page 54 of the Bly Report does not identify or reflect the M57B sand at 17,467 ft. MD, despite the fact that Kent Corser was aware of its existence.  (TREX-1 at 54; TREX-7279).

311.     Figure 1 on page 54 of the Bly Report contains a "Note," in small print, which states:  "Sands are based on geology known at the time of the accident."  (TREX-1 at 54).

312.     The "Note" to Figure 1 on page 54 of the Bly Report demonstrates that BP intentionally omitted the higher hydrocarbon-bearing sand (M57B) in the Macondo production interval of which it became aware immediately after the blowout.   (TREX-1 at 54; R. STRICKLAND, T.T. 6467:13—6468:4).

313.   BP's water saturation calculation for the M57B sand, 52% (meaning 48% hydrocarbon), was calculated using the Archie equation.   (TREX-3533 at BP-HZN-BLY00082900; R. STRICKLAND, T.T. 6461:19—6462:3).

314.   The Archie equation is appropriate for calculating water saturation in clean sands, meaning there are no shale components in the sand.  (R. STRICKLAND, T.T. 6468:9—6469:13).

315.   The M57B sand contains about 33% shale and is, therefore, a shaly sand.  (R. STRICKLAND, T.T. 6468:9—6470:25).

316.   There are a number of specialized equations for calculating the water saturation of a shaly sand, including but not limited to, the Simandoux, Modified-Simandoux and Indonesian equations.  (R. STRICKLAND, T.T. 6468:9—6470:25; D-8244; D-8245).

317.   The Simandoux, Modified-Simandoux and Indonesian equations are more appropriate for calculating the water saturation of the M57B sand because they account for the effects of shale in the sand.  (R. STRICKLAND, T.T. 6468:9—6470:25; D-8244; D-8245).

318.   Using the Simandoux, Modified-Simandoux and Indonesian equations together with BP's own input parameters, Dr. Strickland calculated the range of water saturation values for the M57B sand as being between 29% and 36%.  (R. STRICKLAND, T.T. 6468:9—6473:20; D-8244).

319.   A range of water saturation values for the M57B sand between 29% and 36% means that the M57B sand has a hydrocarbon content of between 64% and 71%.   (R. STRICKLAND, T.T. 6468:9—6474:1; D-8244).

320.   Based on his calculations using the Simandoux, Modified-Simandoux and Indonesian equations together with Schlumberger's input parameters, Dr. Strickland testified that

163

the hydrocarbon content of the M57B sand could fall in the range between 50% and 70% hydrocarbon.  (R. STRICKLAND, T.T. 6474:3-21; D-8245).

321.    Post-incident, BP calculated the pore pressure of the M57B sand to be 14.2 ppg. (TREX-6339 at 9318; R. STRICKLAND, T.T. 6462:24—6465:16; TREX-7279).

322.    Post-incident, Dr. Strickland calculated the pore pressure of the M57B sand to be 14.15 ppg.  (R. STRICKLAND, T.T. 6481:2-10).

323.    Regardless of whether the actual pore pressure of the M57B sand is 14.15 ppg or 14.2 ppg, the M57B sand's pore pressure is among the highest pore pressures associated with the sands in the Macondo production interval.  (D-8015; TREX-4544; D-8025).

324.    BP's directive to design the TOC on the production casing cement job at 17,300 ft. violated 30 C.F.R. 250.421(e).    (D-8015; TREX-5374; TREX-4544; TREX-3533; R. STRICKLAND, T.T. 6503:20—6504:24; G. BENGE, T.T. 2258:19-25; 2549:18—2550:25).

325.    As the M57B sand at 17,467 ft. was the uppermost hydrocarbon-bearing sand in Macondo's production interval, 30 C.F.R. 250.421(e) required that BP design the TOC at a depth of at least 16,967 ft.  (TREX-5374; TREX-4544; D-8015; TREX-3533; R. STRICKLAND, T.T. 6503:20—6504:24; G. BENGE, T.T. 2258:19-25, 2549:18—2550:25).

326.    BP's failure to identify the M57B sand as the uppermost hydrocarbon-bearing sand prior to the production casing cement job caused BP to violate 30 C.F.R. 250.421(e). (TREX-4544; D-8015; TREX-3533; TREX-5374; R. STRICKLAND, T.T. 6503:20—6504:24; G. BENGE, T.T. 2258:19-25, 2549:18—2550:25).

327.    Had BP identified the M57B sand as the uppermost hydrocarbon-bearing zone prior to the production casing cement job, 30 C.F.R. 250.421(e) would have required BP to pump cement across the previous casing shoe at 17,167 ft. and up into the previous hole section of the

Macondo well. (TREX-60443 at 6920; D-8015; TREX-5374; R. STRICKLAND, T.T. 6503:20—6504:24; G. BENGE, T.T. 2258:19-25, 2549:18—2550:25).

328.    Had BP identified the M57B sand as the uppermost hydrocarbon-bearing zone prior to the production casing cement job, BP likely would have had to redesign the casing in the production interval as cementing across the previous casing shoe at 17,167 ft. and up into the previous hole section would cause risks associated with annular pressure build-up (APB). (DEPO. OF R. MILLER, 235:3-12, 239:3-25, 267:14-18, 263:1-11; G. BENGE, T.T. 2258:19-25; 2549:19—2550:25; TREX-5861 at BP-HZN-2179MDL03409631-33; TREX-1 at 35; TREX-5866).

329.    Because of BP's failure to identify the M57B sand as the uppermost hydrocarbon-bearing sand prior to the production casing cement job, the sand's high pore pressure (14.15-14.2 ppg) was not evaluated in OptiCem modeling. (TREX-717A at 11; D-8015; TREX-7279; TREX-4544; TREX-6339 at BP-HZN-2179MDL00609318; TREX-8140 at 58-59).

330.    BP's failure to identify the M57B sand as the uppermost hydrocarbon-bearing sand and include it in pre-cement job OptiCem modeling caused OptiCem modeling to understate the gas flow potential ("GFP") in the Macondo well's production interval. (TREX-717A at 18; TREX-8140 at 58-59).

331.    Had BP identified the M57B sand as the uppermost hydrocarbon-bearing zone and included it in pre-cement job OptiCem modeling, OptiCem would have calculated a "CRITICAL" gas flow potential of 54.85. (TREX-8140 at 58-59).

332.    Had BP identified the M57B sand as the uppermost hydrocarbon-bearing zone and included it in pre-cement job OptiCem modeling, OptiCem would have generated the following message: "Based on analysis of the above outlined well conditions, this well is

165

considered to have a CRITICAL gas flow problem.  If a gas flow potential of greater than 15 is calculated, then changes should be made to the cementing program to lower it below 15.  For example:  multiple stage cementing, reduce height of cement, hold the back pressure, etc." (TREX-8140 at 58-59).

333.   Had BP identified the M57B sand as the uppermost hydrocarbon-bearing zone prior to the production casing cement job, BP would have had to redesign the cement job, or the production interval casing design, or both.  (TREX-8140 at 58-59; DEPO. OF R. MILLER, 235:3-12, 239:3-25; 267:14-18, 263:1-11; G. BENGE, T.T. 2258:19-25, 2549:18—2550:25; TREX-5861 at BP-HZN-2179MDL03409631-3; TREX-5866; TREX-1 at 35).

**8.    *HESI Appropriately Communicated To BP Risks Associated With Inadequate Centralization Of The Production Casing, Insufficient Pre-Cementing Mud Circulation, And The Use Of Foam Cement In Synthetic Oil-Based Mud Environment, And BP Accepted Those Risks.***

334.   Based on his prior use of OptiCem, Glen Benge testified that the language contained in the Forward to HESI's OptiCem reports—to the effect that "(e)nclosed is our recommended procedure for cementing . . ."—is "canned" language and should not be considered HESI's recommendation, particularly since that language is contained in all drafts and iterations of OptiCem reports regardless of the design.  (G. BENGE, T.T. 2270:15—2272:5).

335.   If BP or any other operator asks HESI to run an OptiCem report to evaluate a particular design, whether or not it is intended for actual use in the well and whether or not HESI intends to recommend the cement procedure identified therein, the language in the Forward is printed as a matter of course.  (G. BENGE, T.T. 2270:15—2272:2).

336.   In a face-to-face conversation with Greg Walz on April 19, 2010, Jesse Gagliano communicated the risks to Greg Walz of not adequately centralizing the production casing and of

not performing a full bottoms-up circulation of mud ahead of the cement job. (DEPO. OF G. WALZ, 543:25—545:15, 631:17—633:19, 638:17—639:1, 641:18—643:23).

337. If synthetic oil-based mud ("SOBM") comes into contact with foam cement, it can destabilize the foam cement. (G. BENGE, T.T. 2280:3-19; TREX-625 at BP-HZN-2179MDL00282745).

338. Brian Morel was informed that foam cement could become destabilized if it comes into contact with SOBM. (TREX-625 at BP-HZN-2179MDL00282745).

339. Jesse Gagliano informed BP's drilling engineers of the risks associated with using foam cement in a SOBM environment. (G. BENGE, T.T. 2280:21-2281:7; J. GAGLIANO, T.T. 6706:5—6707:11).

340. To mitigate against the risk of SOBM coming into contact with the foam cement on the Macondo production casing job, Jesse Gagliano recommended and used spacer in the fluid staging of the job to separate the SOBM from the foam cement. (G. BENGE, T.T. 2495:6—2498:5).

341. To mitigate against the risk of SOBM coming into contact with the foam cement on the Macondo production casing job, the cement job was designed to pump the cement stages between a dual plug system. (G. BENGE, T.T. 2495:6—2497:25).

342. To mitigate against the risk of SOBM coming into contact with the foam cement on the Macondo production casing job, Jesse Gagliano recommended that spacer be pumped ahead of the bottom plug and behind the top plug. (G. BENGE, T.T. 2495:6—2497:25).

343. Pumping foam cement in a SOBM environment is not uncommon in the industry. (G. BENGE, T.T. 2280:21-24, 2337:12-17).

344.    HESI, Baker and Schlumberger all have successfully pumped foam cement in a SOBM environment.  (G. BENGE, T.T. 2337:12-17).

B.    **Proposed Conclusions Of Law**

1.    The design of the foam cement job for the Macondo well's production interval was the result of an iterative process between Jesse Gagliano and BP's drilling engineers, as principally reflected by the six versions of the Cement Program that Jesse Gagliano prepared, updated and provided to BP.

2.    While Jesse Gagliano provided recommendations regarding the design of the Macondo production casing cement job, BP was ultimately responsible for reviewing and approving that design and for ensuring that it met BP's specifications for the well.

3.    HESI properly designed and BP reviewed and approved the Macondo production casing cement job design as meeting BP's standards and specifications for the Macondo well.  A blowout was simply not a foreseeable risk of an allegedly faulty cement design.  HESI properly designed and executed the cement job at the Macondo well, and the cementing services it provided do not support any negligence claim.  *Signal Int'l. LLC, v. Miss. Dep't. of Transp.*, 579 F.3d at 493.

4.    BP provided substantial input into and control over the Macondo production casing cement job, as reflected by:  (1) BP's selection of the lost circulation material to be used in the job; (2) BP's directive to design Top of Cement (TOC) at 17,300 feet, which dictated the low volume of cement to be used; (3) BP's directive to use base oil to lighten the hydrostatic pressure during the job; (4) BP's directive to use 0.09 gps of SCR-100L to achieve a longer pump time instead of the 0.08 gps of SCRL-100L recommended by Jesse Gagliano; (5) BP's directive to use low pumping rates; (6) BP's directive to use 6 centralizer subs to centralize the production casing

168

instead of 21 centralizers recommended by Jesse Gagliano; and (7) BP's directive to circulate significantly less than a full bottoms-up volume of mud prior to the cement job.

5.     The production casing on the Macondo well was inadequately centralized due to BP's operational decision to use only 6 centralizer subs.

6.     BP knew or should have known that inadequate centralization would lead to channeling in and a lack of zonal isolation with the Macondo production casing cement job.

7.     Jesse Gagliano advised BP of the risks associated with inadequate centralization, and BP assumed the risk that its decision to use only 6 centralizer subs on the production casing would lead to channeling in and a lack of zonal isolation with the Macondo production casing cement job.

8.     The Macondo production casing cement job likely channeled and failed to achieve zonal isolation due in whole or in part to BP's decision to run only 6 centralizer subs on the production casing.

9.     BP's failure to adequately centralize the production casing on the Macondo well constitutes negligence under general maritime law.  *Nat'l Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp.*, 924 F. Supp. at 1450.

10.    The mud in the wellbore of the Macondo well was not sufficiently conditioned prior to the commencement of the production casing cement job.

11.    BP knew or should have known that insufficient mud conditioning prior to the cement job would lead to channeling in the Macondo production casing cement job and a consequent lack of zonal isolation.

12.    Jesse Gagliano advised BP of the risks associated with inadequate mud circulation prior to the cement job, and BP assumed the risk that its decision to circulate less than a full

bottoms-up volume of mud would lead to channeling in the Macondo production casing cement job and a consequent lack of zonal isolation.

13.     The Macondo production casing cement job likely channeled and failed to achieve zonal isolation due in whole or in part to BP's decision to circulate significantly less than a full bottoms-up volume of mud prior to the cement job.

14.     BP's failure to adequately condition the mud in the wellbore prior to the Macondo well production casing cement job constitutes negligence under general maritime law.  *Nat'l Shipping Co. of Saudi Arabia*, 924 F. Supp. at 1450.

15.     BP's decision to not comply with its own best practice to circulate a minimum of two bottoms-up or a minimum of five hours, whichever is greater before starting to pump a cement job, constitutes negligence under general maritime law.  *Id.*

16.     BP's decision to not comply with the industry standard of circulating at least a full bottoms-up volume of mud prior to the production casing cement job constitutes negligence under general maritime law.  *Id.*

17.     BP's decision to not circulate mud all the way up to the rig so that the extent of debris and gas content in the mud could be evaluated prior to the production casing cement job constitutes negligence under general maritime law.  *Id.*

18.     Since no loss of mud to the formation occurred during BP's limited circulation prior to the production casing cement job, BP's decision to discontinue circulating mud up to a full bottoms-up volume constitutes negligence under general maritime law.  *Id.*

19.     BP's decision to use pumping rates during the production casing cement job that did not exceed 4 bpm likely led to inefficient displacement of unconditioned mud in the wellbore and, therefore, channeling in the annular cement.

170

20.     BP's failure to use higher pumping rates during the production casing cement job constitutes negligence under general maritime law. *Nat'l. Shipping Co. of Saudi Arabia*, 924 F. Supp. at 1450.

21.     BP knew or should have known that, due to its operational decisions, the production casing cement job likely would not achieve zonal isolation.

22.     The reasonably foreseeable consequence of the production casing cement job's inability to achieve zonal isolation—whether due to a lack of centralization, a lack of pre-cement mud conditioning, low pumping rates, or otherwise—is the need to conduct a remedial cement operation.

23.     The inability of the production casing cement job to achieve zonal isolation did not constitute a safety issue for which stop-work authority should have been exercised.

24.     The inability of the production casing cement job to achieve zonal isolation did not cause the blowout of the Macondo well.  The foreseeable risk of a production casing cement job that was unable to achieve zonal isolation was a remedial squeeze job—not a blowout.  A blowout is not a normal result of a production casing cement job that is unable to achieve zonal isolation.  The failures of both BP and Transocean to properly interpret the negative pressure tests operate as a superseding and intervening cause, breaking the causal link between any actions taken by HESI and the Incident.  *Donaghey v. Ocean Drilling & Exploration Co*., 974 F.2d 646, 652 (5th Cir. 1992) (quoting *Nunley v. M/V Dauntless Colocotronis*, 727 F.2d 455, 464 (5th Cir. 1984), *cert. denied*, 469 U.S. 832 (1984)); *Lone Star Indus., Inc., v. Mays Towing Co., Inc*., 927 F.2d 1453, 1460 (8th Cir. 1991)(applying general maritime law); and RESTATEMENT (SECOND) OF TORTS § 442 (1965).

25. With the exception of inadvertently modeling 7 centralizers instead of 6 in the updated April 18th OptiCem report, there is no evidence that any of the other inputs in that report that BP now alleges to be in error are attributable to Jesse Gagliano.

26. A reasonable petrophysicist exercising ordinary care would have identified the M57B sand at 17,467 feet as the shallowest hydrocarbon-bearing sand in the production interval.

27. The sand at 17,467 feet, which came to be called the M57B sand, is a hydrocarbon-bearing sand containing gas.

28. BP petrophysicist Galina Skripnikova's failure to identify, prior to the production casing cement job, the M57B sand as the shallowest hydrocarbon-bearing sand in the production interval constitutes negligence under general maritime law.

29. Due to BP's failure to identify the M57B sand as the shallowest hydrocarbon-bearing sand in the production interval, BP's designed Top of Cement (TOC) at 17,300 feet violated the requirements of 30 C.F.R. 250.421(e).

30. BP's failure to identify the M57B sand as the shallowest hydrocarbon-bearing sand in the production interval and its associated 14.15-14.2 ppg pore pressure caused HESI's OptiCem modeling to understate the gas flow potential for the production casing cement job.

31. Had BP identified the M57B sand as the shallowest hydrocarbon-bearing sand in the production interval, HESI's OptiCem modeling would have flagged the cement job as having a "CRITICAL" gas flow problem and would have communicated the need to redesign the production casing cement job.

32. BP's internal documents demonstrate that BP knew as early as two days after the Macondo blowout that the M57B sand was a gas sand.

172

33.     Despite its knowledge that the M57B sand was a gas sand and was the shallowest hydrocarbon-bearing sand in the production interval, BP intentionally failed to disclose its existence in the Bly Report published on or about September 8, 2010.

## XII.    The Float Collar Did Not Convert And/Or Was Damaged Prior To The Production Casing Cement Job.

### A.    Proposed Findings Of Fact

1.      Successfully converting a float collar is a prerequisite to conducting cementing operations on a production casing.  (B. AMBROSE, T.T.  6164:2-5).

2.      The purpose of a float collar is to prevent cement, once placed in the annulus, from u-tubing and flowing back up the casing.  (B. AMBROSE, T.T. 6164:16-19).

3.      The float collar used on the Macondo well production casing was the Weatherford M45AP Flow-Activated Mid-Bore Auto-Fill Float Collar.  (TREX-2582; F. BECK, T.T. 7109:2-6).

4.      The M45AP float collar used at Macondo incorporates two, spring-loaded flapper valves.  (B. AMBROSE, T.T. 6161:1-14).

5.      In the unconverted mode, the two, spring-loaded flapper valves in the float collar are held open by an auto-fill tube.  (B. AMBROSE, T.T. 6161:8-14).

6.      When the auto-fill tube is in place across the two flapper valves, fluid can flow through the float collar in two directions.  (F. BECK, T.T. 7110:15-23).

7.      Inside the auto-fill tube is a ball that is free to float the length of the auto-fill tube but that is restricted from exiting the tube at either end by a ball seat.  (F. BECK, T.T. 7110:12-23).

8.     As casing is being run in the auto-fill or unconverted mode, the ball floats to the top of the auto-fill tube and the drilling mud flows around it and out of the top of the auto-fill tube.  (F. BECK, T.T. 7110:12—7111:5).

9.     When casing is set, the ball falls to the bottom of the auto-fill tube and sits on a ball seat.  (F. BECK, T.T. 7110:12—7111:11).

10.     When drilling mud is circulated to convert the M45AP float collar, the ball at the bottom of the auto-fill tube causes the mud to exit through small ports or holes in the side of the auto-fill tube.  (B. AMBROSE, T.T. 6161:15-6162:8).

11.     The M45AP float collar is designed so that mud circulating through the small ports or holes in the side of the auto-fill tube creates a pressure differential causing the pins that hold the auto-fill tube in place to shear.  (B. AMBROSE, T.T. 6161:22—6162:8).

12.     Once the pins holding the auto-fill tube in place are sheared, the auto-fill tube is designed to eject downward and the two, spring-loaded flapper valves close, converting the float collar into a one-way valve.  (B. AMBROSE, T.T. 6163:12—6164:1).

13.     In the tripped or converted mode, the closed flapper valves are intended to make only one-way flow through the float collar possible.  (F. BECK, T.T. 7116:14-16).

14.     Tripping or converting the float collar is the process of changing it into a one-way valve system.  (F. BECK, T.T. 7111:17-21).

15.     Once the float collar is properly converted, circulation down through the float collar is possible; however, flow or circulation back up the casing is prevented by the closed, one-way flapper valves.  (B. AMBROSE, T.T. 6164:16-19).

16.     According to specifications published by Weatherford, converting the M45AP float collar used at Macondo requires circulation of drilling mud at a rate of 5 to 8 bpm in order

174

to create a flow-induced pressure differential of 500 to 700 psi.  (TREX-2582; B. AMBROSE, T.T. 6163:5-9; F. BECK, T.T. 7109:2-17; 7186:8-19).

17.     When 500 to 700 psi of flow-induced pressure differential is created, pins securing the auto-fill tube are designed to shear, allowing the tube to fall away and the spring-loaded flapper valves to close.  (TREX-2582; B. LIRETTE, T.T. 8363:23—8364:5).

18.     When BP first attempted to convert the M45AP float collar on April 19, 2010, the rig crew could not circulate mud at all.  (B. AMBROSE, T.T. 6165:8-11, 6167:7-13; F. BECK, T.T. 7113:7-12).

19.     BP and Transocean's inability to initially circulate mud in an attempt to convert the M45AP float collar is conclusive evidence that the reamer shoe, the float collar or both were plugged with debris.  (B. AMBROSE, T.T. 6168:12-21, 6170:13-24).

20.     The rig crew circulated a full bottoms-up volume of mud to clean debris out of the wellbore on April 16, 2010.  (TREX-60456; B. AMBROSE, T.T. 6169:10-6170:1).

21.     During the three days between the bottoms-up circulation on April 16, 2010 and the operation attempting to convert the float collar on April 19, 2010, the mud in the wellbore sat static.  (B. AMBROSE, T.T. 6197:11-19).

22.     During the three days between the bottoms-up circulation on April 16, 2010 and the operation attempting to convert the float collar on April 19, 2010, the fragile formation at the bottom of the Macondo well continued to fragment and generate debris in the drilling mud.  (F. BECK, T.T. 7125:3-23; G. BENGE, 2302:21—2303:13, 2304:20—2305:8)).

23.     BP did not follow Weatherford's recommendations for preventing debris from plugging the M45AP float collar.  (B. LIRETTE, T.T. 8366:4-8367:1).

24.     Specifications published by Weatherford instruct that the M45AP float collar "should be run with a Weatherford MudMaster shoe filter."   (TREX-2582 at WFT-MDL-00020473; B. LIRETTE, T.T. 8366:8-13).

25.     Weatherford instructs that the M45AP float collar should be run with a Weatherford MudMaster shoe filter in order to filter out cuttings or debris that could plug the float equipment.  (B. LIRETTE, T.T. 8366:8-13).

26.     BP did not run the M45AP float collar used on the Macondo well with a Weatherford MudMaster shoe filter or any other type of shoe filter.  (B. LIRETTE, T.T. 8366:18-21).

27.     By not running the M45AP float collar used on the Macondo well with a Weatherford MudMaster shoe filter or other type of shoe filter, BP allowed debris in the drilling mud to flow into the reamer shoe and into and across the float collar.  (B. LIRETTE, T.T. 8366:22-8367:1).

28.     BP did not follow its own best practices regarding how to run auto-fill float equipment.  (F. BECK, T.T. 7106:11—7107:7; TREX-6121 at BP-HZN-BLY00034545).

29.     BP's best practices, as set forth in DWOP, Section 15.2.15, state:  "Auto fill float equipment shall be tripped prior to running through any hydrocarbon bearing zone."   (D. CALVERT, T.T. 2636:1-9; F. BECK, T.T. 7106:7-16; TREX-6121 at BP-HZN-BLY00034545).

30.     The production interval of the Macondo well, between 17,167 feet and total depth, contained several hydrocarbon bearing zones.  (D-8015; TREX-1; TREX-3533; TREX-3540; TREX-5559; TREX-4544; TREX-3541).

31.     In violation of DWOP, Section 15.2.15, BP did not trip or convert the M45AP auto-fill float collar prior to running the production casing into the production interval that contained hydrocarbon-bearing zones.  (D. CALVERT, T.T. 2636:1-11; TREX-6121).

32.     Instead, BP ran the production casing into the production interval with the M45AP auto-fill float collar in auto-fill or unconverted mode.  (D. CALVERT, T.T. 2634:6-11).

33.     Had BP tripped or converted the M45AP float collar before entering the production interval, it would have decreased the amount of debris that flowed into the reamer shoe and into and about the float collar.  (D. CALVERT, T.T. 2634:6—2635:2; F. BECK, T.T. 7107:8-20).

34.     As a result of running the production casing into the production interval with the M45AP float collar in auto-fill mode and not running a filter shoe on the production casing, debris in the wellbore plugged the reamer shoe, the float collar, or both.  (D. CALVERT, T.T. 2635:3-11).

35.     When BP and the Transocean rig crew could not initially achieve mud circulation to convert the float collar, BP directed the rig crew to pressure up nine times over the course of two hours to clear the apparent blockage in the reamer shoe and/or float collar.  (B. AMBROSE, T.T. 6165:8-15; TREX-713 at HAL_0125646-47).

36.     BP and the Transocean rig crew finally broke circulation on the ninth attempt at 3,142 psi of pressure.  (B. AMBROSE, T.T. 6165:12-22).

37.     There is no conclusive evidence that the float collar converted when circulation was achieved at 3,142 psi.  (F. BECK, T.T. 7114:18-7115:8).

38.     Whereas Weatherford's specifications state that the M45AP float collar should convert at 500-700 psi of flow-activated pressure, BP and the Transocean rig crew broke circulation with 3,142 psi of static pressure.  (B. AMBROSE, T.T. 6162:25—6163:9).

39.     Whereas Weatherford's specifications state that the M45AP float collar was designed to convert when drilling mud is pumped at a rate of 5-8 bpm, BP never directed the Transocean rig crew to pump at a rate of more than 4 bpm.  (B. AMBROSE, T.T. 6167:7—6168:6; TREX-1455).

40.     During each of the nine times that BP directed the Transocean rig crew to pressure up in an attempt to convert the float collar, BP never directed the rig crew to pump at more than 2 bpm.  (B. AMBROSE, T.T. 6167:7—6168:16).

41.     Even after circulation broke on the ninth attempt at 3,142 psi, BP never directed the rig crew to pump at more than 4 bpm.   (TREX-1455 at BP-HZN-MBI00136941; B. AMBROSE, T.T. 6167:20—6168:3).

42.     BP and the Transocean rig crew did not meet or follow Weatherford's specifications for converting the M45AP float collar.  (B. AMBROSE, T.T. 6168:7-11).

43.     Weatherford also manufactures and sells the M45AP float collar with an optional conversion specification that is designed to trip or convert the float collar by circulating at a rate of less than 5 bpm in order to create a flow-induced pressure differential of only 300 to 400 psi. (B. LIRETTE, T.T. 8364:6-15; TREX-2582.4.1.HESI).

44.     BP could have ordered, but did not order, the M45AP float collar with the lower optional conversion specification for use on the Macondo well.  (B. LIRETTE, T.T. 8364:16-21, 8365:2).

45. The "float check" at the end of the production casing cement job was inconclusive as to whether the M45AP float collar had converted. (TREX-8140 at 79; F. BECK, T.T. 7195:7-17).

46. When the lead/cap, foam and tail cement were pumped into the Macondo well during the production casing cement job, they were pumped between two plugs. (G. BENGE, T.T. 2236:21—2238:7).

47. In a typical cement job, when the bottom plug lands on the float collar, pressure pushes the fluid cement stages through the float collar and down the shoe track, where it then "turns the corner" and is lifted up into the annulus. (F. BECK, T.T. 7193:16—7194:8).

48. In a typical cement job, when the top plug "bumps" or lands on the float collar, that is a preliminary indication that the cement job is complete. (TREX-8140 at 79; TREX-5990 at 26).

49. After the top plug bumped at the end of the Macondo production casing cement job, a "float check" operation was conducted. (L. LAMBERT, T.T. 8271:3-9; TREX-5990 at 26-27).

50. To conduct a float check, pumping pressure is bled off to determine if the higher hydrostatic pressure in the annulus will cause the cement to u-tube back into the casing due to the lower hydrostatic pressure inside the casing. (F. BECK, T.T. 7193:16—7194:8).

51. Typically, if the float valves in the float collar have successfully converted, they will prevent cement from u-tubing or flowing back up the casing. (F. BECK, T.T. 7193:16-7194:12).

52. Typically, if the float valves in the float collar are not successfully converted, a large enough pressure differential between the annulus and the casing will lead to u-tubing

cement, which would push the top and bottom plugs upward off of the float collar.  (TREX-8140 at 79).

53.     At Macondo, the float check was inconclusive.  (F. BECK, T.T. 7195:7—7196:7).

54.     At Macondo, there was only 50-60 psi of differential pressure between the annulus and the casing and it would have taken over 100 psi to move the top and bottom plugs, which are wedged in place and held by frictional forces.  (TREX-8140 at 79-80; G. BENGE, T.T. 2321:10—2323:4).

55.     At Macondo, the differential pressure between the annulus and the casing was not great enough to move the top and bottom plugs.  (F. BECK, T.T. 7195:7-7196:1; G. BENGE, T.T. 2321:10-2322:24).

56.     At Macondo, the fact that the top and bottom plugs did not move during the float check does not demonstrate that the flapper valves in the float collar were converted.  (G. BENGE, T.T. 2321:10—2322:24; TREX-5990 at 27-28).

57.     Given the low amount of differential pressure between the annulus and the casing, the flapper valves in the float collar could have been unconverted and the top and bottom plug still not have moved.  (G. BENGE, T.T. 2321:10—2322:24; TREX-5990 at 27-28).

58.     Based on the float check conducted after the Macondo production casing job, BP still would not have known whether the flapper valves in the float collar had successfully converted to one-way valves.  (G. BENGE, T.T. 2321:10-2323:4; TREX-5990 at 27-28).

59.     Achieving circulation on the ninth pressurization, to 3,142 psi, did not confirm that the M45AP float collar converted as designed.  (B. AMBROSE, T.T. 6177:4-22).

60.     There is compelling evidence that the M45AP float collar did not convert or was damaged.  (B. AMBROSE, T.T. 6177:10-22).

180

61.     Specifications published by Weatherford instruct that, once tripped or converted, the two "flow-activated check valves" are designed or rated to withstand 5,000 psi of back pressure from below the float collar.  (B. LIRETTE, T.T. 8363:9-22, TREX-2562; TREX-2582).

62.     During the negative pressure test, the 1,400 psi of pressure communicated from the formation to the drill pipe necessarily came from below the float collar.  (TREX-1 at 39; B. LIRETTE, T.T. 8368:20—8369:7).

63.     Since the M45AP float collar, once converted, is rated to withstand only 5,000 psi of back pressure from below, the fact that 1,400 psi of pressure was communicated through the float collar during the negative pressure test is evidence that either BP did not convert the float collar or the float collar was damaged.  (B. LIRETTE, T.T. 8368:20-8369:7).

64.     When circulation broke at 3,142 psi during attempts to convert the float collar, there was a very rapid depressurization down to about 150-200 psi.  (F. BECK, T.T. 7114:18—7115:4).

65.     The rapid depressurization from 3,142 psi down to 150-200 psi is a signature of mechanical failure, not unplugging of debris.  (F. BECK, T.T 7115:5-8).

66.     The contemporaneous observations of BP's personnel when circulation broke at 3,142 psi demonstrates their recognition that the rapid depressurization from 3,142 psi down to 150-200 psi is a signature of mechanical failure, not unplugging of debris.  (F. BECK, T.T 7118:15—7119:18; TREX-2584; TREX-4457; B. AMBROSE, T.T. 6171:3—6172:15).

67.     In an email dated April 19, 2010, from Brian Morel to Weatherford employee, Bryan Clawson, Morel wrote:  "Yah, we blew it at 3140, but still not sure what we blew yet." (TREX-2584; F. BECK, T.T 7118:18-7119:6; B. AMBROSE, T.T. 6171:25—6172:15).

181

68.     In an email dated April 19, 2010, to a recipient with the email address VHG3@aol.com, Mark Hafle wrote:  "Shifted at 3140 psi.  Or we hope so.  We are circ now." (TREX-4457; F. BECK, T.T 7119:11-18; B. AMBROSE, T.T. 6171:7-24).

69.     HESI cement engineer, Nate Chaisson, while standing back on the rig floor waiting to participate in the production casing cement job, heard Bob Kaluza state in response to the lower than expected circulation pressure: "I need to make a phone call.  We may have blown something higher up in the casing."  (F. BECK, T.T. 6305:4-19).

70.     During the attempt to convert the float collar, debris inside the production casing settled in and around the float collar packing off the auto-fill tube and shear pins.  (F. BECK, T.T 7377:16—7378:24).

71.     Debris packing off the auto-fill tube held the auto-fill tube in place during the nine successive pressurizations.  (F. BECK, T.T 7378:3-24).

72.     Debris packing off the shear pins interfered with the shear pins' ability to be sheared at the pressures at which they were designed to shear.  (F. BECK, T.T. 7377:16—7378:24).

73.     Testing performed by Stress Engineering on behalf of Transocean demonstrated that the ball inside the M45AP float collar's auto-fill tube could be pushed out of the auto-fill tube at pressures substantially less than 3,142 psi.  (B. AMBROSE, T.T. 6176:10—6177:9; F. BECK, T.T 7117:3—7118:5).

74.     In one Stress Engineering test, the ball seat at the bottom of a M45AP float collar's auto-fill tube failed at 1,477 psi allowing the ball inside to be ejected.  (B. AMBROSE, T.T. 6176:22—6177:6).

75.     In a second Stress Engineering test, the ball seat at the bottom of a M45AP float collar's auto-fill tube failed at 1,840 psi allowing the ball inside to be ejected.  (B. AMBROSE, T.T. 6177:4-6).

76.     With the auto-fill tube packed off and held in place by debris, the ball inside the auto-fill tube likely ejected out the bottom of the auto-fill tube when the pressure reached 3,142 psi, leaving the auto-fill tube in place and the float collar unconverted.  (B. AMBROSE, T.T. 6177:10-17).

77.     Other Stress Engineering tests performed on behalf of BP showing that the M45AP float collar can be converted with a pressure surge over 3,000 psi did not simulate the conditions in the Macondo well.  (B. LIRETTE, T.T. 8367:18-24).

78.     The Stress Engineering tests performed on behalf of BP showing that the M45AP float collar can be converted with a pressure surge over 3,000 psi did not account for the effects of debris packed inside the float equipment.  (B. LIRETTE, T.T. 8367:18—8368:4).

79.     The issue of "what was blown" after finally achieving circulation on the ninth attempt to convert the float collar was never resolved by BP.  (TREX-2584; F. BECK, T.T. 7118:18—7119:6; G. BENGE, T.T. 2312:9-12; B. AMBROSE, T.T. 6171:25—6172:15).

80.     If the flapper valves in the float collar had converted to one-way valves, the drill crew would not have been able to reverse circulate mud back up through the float collar.  (G. BENGE, T.T. 2312:13-18; F. BECK, T.T. 7116:14-19; M. BLY, T.T. 958:10—959:4).

81.     BP could have required the Transocean drill crew to reverse circulate after circulation was achieved with 3,142 psi of pressure to determine whether the flapper valves in the float collar had converted to one-way valves.  (G. BENGE, T.T. 2312:13-23).

82.     BP never requested that the Transocean drill crew attempt to reverse circulate after the float collar conversion operation to verify if the flapper valves were converted to one-way valves.  (G. BENGE, T.T. 2312:13-23).

83.     Without resolving whether something was "blown," BP directed HESI to commence the cement job on the Macondo production casing.  (B. AMBROSE, T.T. 6174:2-19, 6171:25—6172:15; G. BENGE, T.T. 2312:9-23).

84.     The operation to convert the float collar at Macondo occurred immediately prior to the operation to cement the production casing.  (TREX-713; TREX-3808 at 27; G. BENGE, T.T. 2312:21—2313:25; B. AMBROSE, T.T. 6173:7—6174:13).

85.     Successful conversion of the float collar is a prerequisite to commencing cementing operations.  (B. AMBROSE, T.T. 6178:6-14).

### B.     Proposed Conclusions Of Law

1.     During BP's operation to land the long string production casing, significant debris flowed into the reamer shoe and into and around the float collar, interfering with the ability to convert the float collar.

2.     Given that the mud in the wellbore had not been circulated to clear debris since April 16, 2010, a reasonable operator exercising ordinary care would have taken steps to mitigate against the influx of debris into the shoe track and float collar equipment that could interfere with the float collar's conversion.

3.     BP's decision to not comply with its best practice of converting the float equipment before running the production casing into the debris-filled production interval containing hydrocarbon-bearing zones constitutes negligence under general maritime law.  *Nat'l. Shipping Co. of Saudi Arabia, v. Moran Mid-Atl. Corp.*, 924 F.Supp. at 1450.

4.      BP's decision to not follow Weatherford's recommendation of running a shoe filter in conjunction with the M45AP float collar constitutes negligence under general maritime law.  BP also failed to use reasonable care under the circumstances.  *Id.*

5.      Given BP's decision to circulate mud at 4 bpm or less to attempt to convert the float collar, and the Weatherford specifications requiring a circulation rate of 5-8 bpm to convert the float collar, BP's decision to not obtain from Weatherford and use a float collar with a lower optional conversion specification constitutes negligence under general maritime law.  BP also failed to use reasonable care under the circumstances.  *Id.*

6.      BP's acknowledgement that, upon breaking circulation at 3,142 psi, the sudden release of pressure indicated that something was "blown," and its failure to take steps, prior to the cement job, to investigate what was blown and whether the float collar actually converted constitutes negligence under general maritime law.  *Id.* BP also failed to use reasonable care under the circumstances.  *Id.*

7.      Upon breaking circulation at 3,142 psi, BP's failure to attempt to reverse circulate to determine whether the float collar valves had converted constitutes negligence under general maritime law.  BP also failed to use reasonable care under the circumstances.  *Id.*

8.      The "float check" conducted after the production casing cement job was inconclusive as to whether the float valves were converted.

9.      Given the lack of differential pressure inside the annulus and inside the casing at the end of the production casing cement job, BP's apparent reliance on the float check as a test of whether the float valves converted constitutes negligence under maritime law.  *Id.* BP also failed to use reasonable care under the circumstances.  *Id.*

10.     That the float collar was either damaged or did not convert prior to the production casing cement job is conclusively established by the fact that, during the negative pressure test, 1,400 psi of pressure was transmitted through the float collar from the formation to the drill pipe; when converted, the float collar is rated to withstand up to 5,000 psi of back pressure from below the float collar.

11.     That the float collar was damaged or did not convert also is supported by:  (a) BP's failure to meet Weatherford's flow rate specifications for converting the float collar; (b) BP's attempts to convert the float collar with excessive static pressure instead of flow-induced pressure differential as specified by Weatherford; (c) BP's directive to pressure up to greater than 3,100 psi of static pressure being sufficient to fail the ball seat in the auto-fill tube, causing the ball to eject but leaving the packed-off auto-fill tube in place across the unconverted flapper valves; and (d) the rapid depressurization from 3,142 psi down to 150-200 psi after circulation broke being a pressure signature of a mechanical failure, not a signature of clearing a blockage by debris.

## XIII. The Inability Of The Production Casing Cement Job To Achieve Zonal Isolation Did Not Cause The Macondo Blowout.

### A.     Proposed Findings Of Fact

1.     Zonal isolation was not achieved in the production interval of the Macondo well. (J. GAGLIANO, T.T. 6747:6-25; R. BEA, T.T. 290:12-291:1; DEPO. OF D. KELLINGRAY, 728:24—729:17; DEPO. OF R. VARGO, 345:17-346:5).

2.     The inability of a cement job to achieve zonal isolation does not cause a well blowout.  (T. ROTH, T.T. 3184:5-15; TREX-4160; DEPO. OF G. WALZ, 216:10-22, 217:15-21, 216:23—217:7; DEPO. OF R. LYNCH, 673:8-18; DEPO. OF K. LACY, 217:12-25, 222:13—223:2; DEPO. OF W. WINTERS, 421:19-422:4; DEPO. OF B. COCALES, 648:23—649:6; DEPO. OF V. PRICE,

193:16-23; DEPO. OF B. YILMAZ, 127:16—128:3, 128:16—129:4; DEPO. OF R. VARGO, 390:14-24; DEPO. OF G. GARRISON, 253:20—254:2, 254:12-19; DEPO. OF K. CORSER (VOL. 2), 75:21—76:8; DEPO. OF D. SUTTLES, 597:23—598:13).

3.      The inability of a cement job to achieve zonal isolation leads to a remedial cement job.  (M. BLY, T.T. 1093:24—1094:12; L. MCKAY, T.T. 630:15-21, 637:10-17; TREX-4160; TREX-1741; TREX-757).

4.      HESI's Broussard cement laboratory attempts to evaluate slurry performance by incorporating downhole conditions, to the extent practicable, into slurry testing.  (G. BENGE, T.T. 2405:4-9; T. QUIRK, T.T. 4857:8-20; T. ROTH, T.T. 3203:9-14; J. GAGLIANO, T.T. 6737:24-6738:3).

5.      Despite its efforts to incorporate downhole conditions into slurry testing, HESI's Broussard cement lab cannot replicate precisely all of the downhole conditions in a well.  (T. ROTH, T.T. 3203:9-14).

6.      Despite its efforts to incorporate downhole conditions into slurry testing, the test results obtained by HESI's Broussard cement lab can only approximately predict a slurry's downhole performance.  (G. BENGE, T.T. 2405:4-12; DEPO. OF R. VARGO, 553:14-554:11).

7.      HESI's OptiCem program attempts to model a designed cement job using known data inputs and parameters.  (G. BENGE, T.T. 2405:4-9; J. GAGLIANO, T.T. 6852:10-18).

8.      Despite being designed to incorporate a wide variety of data inputs and parameters, HESI's OptiCem program can only attempt to predict whether a designed cement job, as modeled, will be successfully placed.  (G. BENGE, T.T. 2405:4—2406:13, 2260:25—2261:7, 2271:16—2272:2; J. GAGLIANO, T.T. 6588:5-12).

187

9.      Despite being designed to incorporate a wide variety of data inputs and parameters, HESI's OptiCem program can only attempt to predict whether a designed cement job, as modeled, will achieve zonal isolation.  (G. BENGE, T.T. 2405:4—2406:13, 2260:25—2261:7, 2271:16—2272:2; J. GAGLIANO, T.T. 6588:5-12).

10.     Because downhole cement slurry performance and cement placement are predictive endeavors, BP, as the operator, was responsible for confirming, by testing or otherwise, that the production casing cement job was properly placed in the annulus.  (G. BENGE, T.T. 2405:4—2406:13).

11.     Because downhole cement slurry performance and cement placement are predictive endeavors, BP, as the operator, was responsible for confirming, by testing or otherwise, that the production casing cement job achieved zonal isolation and/or formed an effective barrier in the well.  (G. BENGE, T.T. 2405:4—2406:16).

12.     A cement job should not be relied upon as a barrier in the well until it has been successfully tested as a barrier.  (L. MCKAY, T.T. 622:14-21, 638:17—639:3; T. PROBERT, T.T. 2967:2—2968:6, 3016:25—3017:6; T. ROTH, T.T. 3183:10-13; C. BARNHILL, T.T. 4426:15-18; J. GAGLIANO, T.T. 6610:7-9; F. BECK, T.T. 7151:1-20 ).

13.     Even a perfectly designed cement job can fail to achieve zonal isolation.  (G. BENGE, T.T. 2404:21-24).

14.     Approximately ten percent (10%) of deepwater cement jobs do not achieve zonal isolation.  (G. BENGE, T.T. 2405:17-21).

15.     The inability to achieve zonal isolation is not unforeseeable.  (J. GUIDE, T.T. 8642:11-17; G. BENGE, T.T. 2249:15—2250:4, 2405:17-21).

188

16.     The reasons for not achieving zonal isolation vary and can include suboptimal cement slurry design or performance, suboptimal wellbore conditions and unknown conditions. (G. BENGE, T.T. 2405:17-2406:8).

17.     If a cement job does not achieve zonal isolation, the foreseeable consequence is the need to conduct a remedial cement job (for example, a cement "squeeze" job).  (G. BENGE, T.T. 2249:15—2250:2; M. Bly, T.T. 1093:24—1094:12; L. MCKAY, T.T. 630:15-21, 637:10-17).

18.     After a cement job is pumped into place, a cement evaluation technique, such as a CBL, can be used to evaluate whether zonal isolation was achieved.  (J. GUIDE, T.T. 8754:18—8755:14; F. BECK, T.T. 7127:14—7128:14; TREX-184 at BP-HZN-2179MDL00269668).

19.     A CBL is a wireline tool that uses sound or acoustic signals and associated software to derive a representation of the integrity of a cement job.  (J. GUIDE, T.T. 8754:18—8755:14;  F. BECK,  T.T. 7127:14—7128:14; SCHLUMBERGER OILFIELD GLOSSARY—CEMENT BOND LOG).

20.     A CBL can evaluate the quality of the bond between the cement and the casing. (TREX-4456; J. GUIDE, T.T. 8754:18—8755:14).

21.     A CBL can evaluate the location or depth of the TOC.  (TREX-4456; F. BECK, T.T. 7128:9-14; Plaintiffs' Motion for Adverse Inferences from Fifth Amendment Invocations (Dkt. No. 5873)(Mark Hafle, 25:14-26:4); HESI's Amended Motion for Adverse Inferences Based on Assertions of the Fifth Amendment (Dkt. No. 7644)(Mark Hafle, 22:8-15; 23:23-24:9)).

22.     BP did not run a CBL after the production casing cement job to evaluate the quality of the cement job.  (M. BLY, T.T. 1370:25-1371:2).

23.     Prior to the cement job, BP had arranged to have Schlumberger personnel and CBL tools on the *Deepwater Horizon* to run the CBL.  (M. BLY, T.T. 1371:3-7; F. BECK, T.T. 7359:10-12; J. GUIDE, T.T. 8757:9—8759:2).

24.     BP prepared and followed a "decision tree" in determining whether to run a CBL after the production casing cement job.  (M. BLY, T.T. 1213:17-21; F. BECK, T.T. 7358:22-24; TREX-4456; J. GUIDE, T.T. 8752:2-8).

25.     Neither Jesse Gagliano nor any other HESI employee provided input or was asked by BP to provide input into the "decision tree."  (J. GUIDE, T.T. 8757:9-20).

26.     The decision of whether to run a CBL to evaluate the placement and integrity of the cement job was the responsibility of BP, the operator.  (J. GUIDE, T.T. 8759:6-21; DEPO. OF G. WALZ, 212:5-20; DEPO. OF K. CORSER (VOL. 1), 211:12—215:4).

27.     According to BP's "decision tree," BP would not run the CBL to evaluate the placement and integrity of the cement job if there were full returns during the pumping of the production casing cement job.  (J. GUIDE, T.T. 8755:22—8756:7; G. BENGE, T.T. 2256:8—2257:1; TREX-4456).

28.     BP decided not to run the CBL because there were full returns observed during the production casing cement job.  (J. GUIDE, T.T. 8755:22—8756:7; TREX-4456; DEPO. OF G. WALZ, 673:23—674:18).

29.     When full returns were observed at the end of the production casing cement job, BP directed that the Schlumberger personnel, who were on board the *Deepwater Horizon* to run the CBL tool, to return to shore.  (B. AMBROSE, T.T. 6097:14-18).

30.     While full returns were observed during the production casing cement job, BP knew that there were many other reasons to suspect that the cement job would be compromised or would fail to achieve zonal isolation.  (G. BENGE, T.T. 2254:17—2256:7; TREX-5990).

31.     The updated April 18, 2010 OptiCem that Jesse Gagliano prepared and provided to BP predicted that the production casing cement job would channel due to inadequate centralization and would not achieve zonal isolation.  (J. GAGLIANO, T.T. 6602:19-23, 6702:12—6706:4; TREX-717A at 18, 23).

32.     Given the accumulated risks presented by BP's unresolved concerns about whether the float collar converted or was damaged, BP's decision to significantly limit the volume of mud circulation prior to the cement job, BP's decision to limit the number of centralizers on the production casing, the April 18th OptiCem that predicted channeling, and BP's failure to model the actual centralizer placement as decided by BP, BP should not have expected the production casing cement to achieve a seal or a barrier in the well.  (TREX-5990 at 3; G. BENGE, T.T. 2254:17—2256:7, 2291:21—2293:24, 2584:6—2586:20).

33.     Given the accumulated risks presented by BP's unresolved concerns about whether the float collar converted or was damaged, BP's decision to significantly limit the volume of mud circulation prior to the cement job, BP's decision to limit the number of centralizers on the production casing, the April 18th OptiCem that predicted channeling, and BP's failure to model the actual centralizer placement as decided by BP, BP should have expected the production casing cement to channel.  (TREX-5990 at 3; G. BENGE, T.T. 2254:17—2256:7, 2291:21—2293:24, 2584:6—2586:20; TREX-717A at 18, 23; TREX-1517).

34.     Given the accumulated risks presented by BP's unresolved concerns about whether the float collar converted or was damaged, BP's decision to significantly limit the

191

volume of mud circulation prior to the cement job, BP's decision to limit the number of centralizers on the production casing, the April 18th OptiCem that predicted channeling, and BP's failure to model the actual centralizer placement as decided by BP, BP should not have relied solely upon an indication of full returns during the cement job to determine that the cement job was properly placed.  (G. BENGE, T.T. 2254:17—2256:7, 2584:6—2586:20, 2255:13-25; TREX-5990; TREX-1 at 65-66, 78).

35.     Given the accumulated risks presented by BP's unresolved concerns about whether the float collar converted or was damaged, BP's decision to significantly limit the volume of mud circulation prior to the cement job, BP's decision to limit the number of centralizers on the production casing, the April 18th OptiCem that predicted channeling, and BP's failure to model the actual centralizer placement as decided by BP, BP should have run the CBL after the cement job to evaluate the placement and integrity of the annular cement.  (G. BENGE, T.T. 2244:11—2245:12, 2254:17—2256:7, 2584:6—2586:20; TREX-1 at 65-66, 78).

36.     Given the location of the float collar inside the production casing, which was directly across from a reservoir sand, the CBL tool, if run, would not have been able to evaluate the entire annulus in the Macondo well's production interval as well as the annulus or annular cement below the depth of the float collar.  (B. AMBROSE, T.T. 6121:11-17, 6157:5-9, 10-18; J. GUIDE, T.T. 8973:14—8974:1).

37.     Notwithstanding the location of the float collar in the production casing, the CBL tool, if run, would have been able to evaluate/confirm the depth or location of the TOC.  (B. AMBROSE, T.T. 6121:11-17, 6157:5-9; N. CHAISSON, T.T. 6323:18-22; TREX-8140 at 88).

192

38.     Had a CBL operation determined that TOC was not at the designed location, it could have provided an indication that the cement job was not properly placed.  (B. AMBROSE, T.T. 6157:5-18; N. CHAISSON, T.T. 6323:18-22).

39.     Had a CBL operation determined that TOC was not at the designed location, it could have provided an indication that zonal isolation may not have been achieved on the cement job.  (M. BLY, T.T. 940:18—941:14; N. CHAISSON, T.T. 6323:5—6324:1; B. AMBROSE, T.T. 6178:15-18).

40.     Had a CBL operation determined that TOC was higher than the designed depth, it could have been an indication that there was channeling in the annular cement.  (F. BECK, T.T. 7127:14—7128:14; B. AMBROSE, T.T. 6097:4-9, 6157:15-18; R. EZELL, T.T. 1823:14-25; TREX-184 at BP-HZN-2179MDL00269660, 66-67; TREX-8140 at 88).

41.     Had a CBL operation determined that TOC was higher than the designed depth, it could have been an indication that the cement was lifted higher in the annulus than planned.  (J. GAGLIANO, T.T. 6856:17-23; R. EZELL, T.T. 1823:14-25).

42.     Had a CBL operation determined that TOC was lower than the designed depth, it could have been an indication that the cement was lost to the formation.  (M. BLY, T.T. 940:18-941:14).

43.     At a minimum, given the BP decisions that increased the risks of a compromised cement job, BP should have run a CBL to investigate and evaluate the placement and integrity of the production casing cement job.  (B. AMBROSE, T.T. 6178:6-18; M. BLY, T.T. 940:24—941:14).

44.     Had BP decided to run a CBL and it indicated that the production casing cement job was compromised or channeled or did not achieve zonal isolation, HESI could have

193

performed a remedial cement job to achieve zonal isolation.  (R. EZELL, T.T. 1823:14-25; N. CHAISSON, T.T. 6404:3-12).

     **B.**     **Proposed Conclusions Of Law**

1.     The inability of the Macondo production casing cement job to achieve zonal isolation did not cause the Macondo blowout; the foreseeable consequence of the Macondo production casing cement job's inability to achieve zonal isolation was the need to conduct remedial cementing operations.  It was not foreseeable that BP and Transocean would misinterpret the safety-critical negative pressure tests.  Their failure to properly interpret the negative pressure tests was an extraordinary, unforeseeable affirmative act unrelated to any alleged act of negligence by HESI, thus satisfying the standards for superseding and/or intervening cause and relieving HESI from any liability.

2.     HESI's slurry testing in the laboratory and cement job modeling with OptiCem are predictive endeavors.  They do not guarantee slurry performance or cement placement in the wellbore.  They can only attempt to predict slurry performance and cement placement.

3.     BP should not have relied upon the production casing cement job as a barrier until it had been tested and confirmed as a barrier.

4.     It was BP's responsibility to test or otherwise confirm the integrity and proper placement of the production casing cement job after it had been pumped.

5.     BP failed to confirm the integrity or confirm the placement of the production casing cement job with a cement bond log.

6.     At the end of the production casing cement job, BP knew that: (1) BP had experienced difficulty attempting to convert the float collar; (2) the production casing was inadequately centralized; (3) BP did not conduct a full bottoms-up circulation prior to the cement

job; (4) pumping rates for the cement job were low, decreasing displacement efficiency; (5) HESI's updated April 18, 2010 OptiCem (modeling 7 centralizers) had predicted that the cement job would channel and not achieve zonal isolation; and (6) BP did not have an OptiCem report modeling the cement job with the placement of the 6 centralizers as determined by BP.

7.      Given the risks known to BP at the end of the cement job, a reasonable operator exercising ordinary care would exercise heightened vigilance in determining whether the cement job achieved zonal isolation, instead of relying on a pre-cement job "decision tree" that looked only to an observation of full returns to determine that the cement job achieved zonal isolation.

8.      A prudent and reasonable operator, given what was known to BP at the end of the cement job, would have run a CBL to ascertain any information it could provide as to the integrity of the production casing cement job and whether the production casing cement was placed as designed.  BP failed to use reasonable care under the circumstances and was negligent under general maritime law.  *Nat'l Shipping Co. of Saudi Arabia*, 924 F. Supp. at 1450.

9.      Given the risks known to BP at the end of the cement job, BP's failure to run a CBL to evaluate the integrity of the production casing cement job and determine whether the production casing cement was placed as designed constitutes negligence under general maritime law.

10.     Given the risks known to BP at the end of the cement job, BP's directive to send Schlumberger personnel onboard the *Deepwater Horizon* to shore immediately after the cement job, without running the CBL tool, constitutes negligence under general maritime law.

**XIV.   HESI Executed The Production Casing Cement Job In Accordance With Industry Standards And BP's Specifications, And There Were No Indications Of Foam Slurry Instability.**

   **A.      Proposed Findings Of Fact**

1.      The foam cement job on the Macondo well's production casing cement job was executed according to plan.  (G. BENGE, T.T. 2570:9-16, 2403:14-25, 2321:2-9).

2.      As Glen Benge testified, after reviewing all of the data from the execution of the cement job, the cement used on the Macondo production casing was mixed properly.  (G. BENGE, T.T. 2321:2-9).

3.      As Glen Benge testified, after reviewing all of the data from the execution of the cement job, the Macondo production casing cement job was pumped and executed properly.  (G. BENGE, T.T. 2320:22—2321:9, 2403:14-22, 2570:9-12).

4.      As Glen Benge testified, after reviewing all of the data from the execution of the cement job, HESI's cement slurry density control during the production casing cement job was excellent.  (G. BENGE, T.T. 2403:14-25).

5.      Data collected during the execution of the Macondo production casing cement job gives no indication that the slurry was unstable or experienced nitrogen breakout during the pumping of the cement job.  (G. BENGE, T.T. 2404:1-14).

6.      No physical sample of cement recovered from the Macondo well indicates that the slurry used to cement the Macondo production casing was unstable.  (G. BENGE, T.T. 2404:1-14).

7.      No physical sample of cement recovered from the Macondo well indicates that nitrogen broke out of the slurry used to cement the Macondo production casing.  (G. BENGE, T.T. 2404:1-14).

8.      If a foam slurry is unstable, it does not form permeable cement when placed downhole.  (G. BENGE, T.T. 2470:5—2471:12, 2579:11—2580:6).

9.      If foam cement is or becomes unstable downhole, nitrogen breaks out of or moves in the slurry, leaving a more dense base slurry behind.  (G. BENGE, T.T. 2579:11-2580:6).

10.      Foam instability does not create permeable cement.  (G. BENGE, T.T. 2579:11—2579:24).

11.      If nitrogen breaks out of a foam cement slurry, the more dense base slurry left behind can create a barrier downhole in the well.  (G. BENGE, T.T. 2579:11—2580:6).

## B.      Proposed Conclusions Of Law

1.      HESI executed the foam cement job on Macondo's production casing in a reasonable manner, consistent with the industry standards for a cement contractor exercising ordinary care, and in accordance with BP's specifications.

2.      There is no competent evidence—either physical or in data captured during the pumping of the cement job—that the foam cement pumped on the Macondo production casing cement job experienced nitrogen breakout or was otherwise unstable.

3.      Had the foam slurry pumped on the production casing job been unstable, nitrogen breakout would have resulted in a more dense base slurry entering the annulus, which likely would have fractured the fragile formation downhole and induced losses to the formation.  Since no losses were observed during the cement job, it is apparent that the foam slurry that was pumped was stable and did not experience nitrogen breakout.

XV.   **HESI Appropriately Tested The Cement Slurry Used On The Macondo Production Casing Cement Job.**

A.     **Proposed Findings Of Fact**

1.     *HESI Met The Cement Testing Requirements In The BP/HESI Contract.*

1.     Section 2.0 of Section 3 – Scope of Work, Appendix 6 – Functional and Technical Specifications of the BP/HESI Contract sets forth "The Minimum Testing for Cementing Operations." (TREX-4477 at BP-HZN-2179MDL00055809).

2.     Section 2.1 of Section 3 – Scope of Work, Appendix 6 – Functional and Technical Specifications of the BP/HESI Contract states that "(a)ll testing is required on rig samples and to be submitted to COMPANY (BP) Wells Team 24 hours prior to cementing operations commence (*sic*), unless otherwise agreed with Wells Team."   (TREX-4477 at BP-HZN-2179MDL00055809).

3.     The BP/HESI Contract required all testing for operational cement jobs to be conducted using cement or cement blend samples brought to shore from the drilling rig.  (TREX-4477 at BP-HZN-2179MDL00055664-5665, 55809).

4.     Section 2.2 ("General Requirements (all slurries all job types") of Section 3 – Scope of Work, Appendix 6 – Functional and Technical Specifications of the BP/HESI Contract states that "(a)ll slurries incorporating a Fluid Loss aid must have API fluid loss determined." (TREX-4477 at BP-HZN-2179MDL00055809).

5.     The foam cement slurry used to cement the Macondo production casing did not have a Fluid Loss aid added to it.  (G. BENGE, T.T. 2539:9-17).

6.     Section 2.2 ("General Requirements (all slurries all job types") of Section 3 – Scope of Work, Appendix 6 – Functional and Technical Specifications of the BP/HESI Contract

further states, in relevant part, that "(s)lurries . . . where gas migration risk is high (predicted flow potential is high and/or static cement overbalance < 200 psi against a permeable gas bearing formations (*sic*)) must have static gel strength transition time and zero gel time determined.  In addition COMPANY (BP) settlement test must be run in these situations."  (TREX-4477 at BP-HZN-2179MDL00055809).

7.      Section 2.3 ("Specific Requirements ") of Section 3 – Scope of Work, Appendix 6 –Functional and Technical Specifications of the BP/HESI Contract sets forth a chart identifying required cement tests by job type (hereinafter, "Specific Requirements matrix").  (TREX-4477 at BP-HZN-2179MDL00055809).

8.      The Macondo production casing cement job would fall under the "job type" identified as "Production Casing and Drilling liners."   (TREX-4477 at BP-HZN-2179MDL00055809; TREX-717A at 1, 8).

9.      The Specific Requirements matrix does not address foam cement slurries specifically.   (TREX-4477 at BP-HZN-2179MDL00055809; G. BENGE, T.T. 2437:17—2439:12).

10.      The Specific Requirements matrix does not identify a foam stability test as a required test.   (TREX-4477 at BP-HZN-2179MDL00055809; G. BENGE, T.T. 2369:8-24, 2437:17—2439:12).

11.      Foam cement testing is not addressed in the BP/HESI Contract.  (TREX-4477 at BP-HZN-2179MDL00055809; G. BENGE, T.T. 2369:8-24, 2437:17—2439:12).

2.   *HESI Ran The Required Pump Time/Thickening Time Tests On The Macondo Slurry.*

12.   The Specific Requirements matrix identifies "Pump Time" as a required test. (TREX-4477 at BP-HZN-2179MDL00055809).

13.   A "Pump Time" test is the same thing as a "Thickening Time" test. (TREX-1509, G. BENGE, T.T. 2264:14—2265:11; J. GAGLIANO, T.T. 6673:3—6674:12; TREX-5990 at 28, n.52).

14.   The purpose of a thickening time test is to determine how long it takes before a slurry reaches 70 Beardon units of consistency (Bc).   (DEPO. OF C. GARDNER, 96:23—97:4, 167:19-23, 169:15—170:10, 199:14-23; TREX-4562; TREX-3120 at HAL_0677815).

15.   After 70 Bc, a slurry is considered too thick or viscous to pump.  (T. QUIRK, T.T. 4814:25—4815:3, TREX-4562, DEPO. OF C. GARDNER 169:15—170:10; 199:14-23).

16.   Retarder is added to a slurry to increase its thickening time, or to increase the amount of time it remains pumpable.  (G. BENGE, T.T. 2264:25—2265:20, 2266:17-25).

17.   Jesse Gagliano requested that "thickening time" testing be performed on production casing slurries containing 0.08 gps of retarder and 0.09 gps of retarder.  (TREX-287, TREX-984, TREX-7722).

18.   The thickening time test on the slurry containing 0.08 gps of retarder rendered a pump time of 5 hours and 30 minutes (05:30 hh:mm).  (TREX-287; TREX-1509).

19.   The thickening time test on the slurry containing 0.09 gps of retarder rendered a pump time of 7 hours and 37 minutes (07:37 hh:mm).  (TREX-287; TREX-1509).

20.     Jesse Gagliano provided the results of the thickening time testing on the slurries containing 0.08 and 0.09 gps retarder, respectively, to BP prior to the commencement of the production casing cement job.  (TREX-287; TREX-1509).

21.     Jesse Gagliano recommended to BP to use the cement slurry containing 0.08 gps of retarder.  (TREX-287).

22.     BP decided to use the cement slurry containing 0.09 gps of retarder in order to have a longer pump time.  (TREX-1395).

### 3.     HESI Ran The Required Compressive Strength Tests On The Macondo Slurry.

23.     The Specific Requirements matrix identifies "Compressive Strength" as a required test.  (TREX-4477 at BP-HZN-2179MDL00055809).

24.     There are two types of Compressive Strength tests typically conducted in a cement field laboratory—the UCA Compressive Strength test and the Crush Compressive Strength test.  (G. BENGE, T.T. 2427:14-23).

25.     UCA Compressive Strength tests can be conducted only on a base (non-foamed) slurry.  (G. BENGE, T.T. 2427:14-23; DEPO. OF G. GARRISON, 217:8-15; DEPO. OF C. GARDNER 307:5-8; J. GAGLIANO, T.T. 6651:7-21).

26.     UCA Compressive Strength tests evaluate compressive strength development of a base slurry under applied temperature and pressure.  (G. BENGE, T.T. 2425:25—2426:8; DEPO. OF C. GARDNER, 307:5-8; J. GAGLIANO, T.T. 6774:21—6775:2).

27.     UCA Compressive Strength tests are used to evaluate the approximate time that a base slurry reaches 50 psi, 500 psi or some other benchmark of compressive strength development.  (G. BENGE, T.T 2425:25—2427:4).

28.     The industry typically looks to see how much time a slurry takes to reach 500 psi of compressive strength development as a guide for determining how much time to wait on cement, once placed downhole, before beginning other downhole operations.  (G. BENGE, T.T 2384:15-22, 2425:25—2427:4, 2571:2-21; TREX-5990 at 37; J. GAGLIANO, T.T. 6789:25—6790:16).

29.     While UCA Compressive Strength tests are not conducted on foamed cement slurries, the results of the test on the non-foamed base slurry are typically used to derive a wait on cement time (time to develop 500 psi of strength) for the foam cement slurry.  (DEPO. OF E. CUNNINGHAM, 308:21—310:9;  J.  GAGLIANO,  T.T.  6774:14-23,  6789:25—6790:13,  6865:21-6866:13).

30.     Crush Compressive Strength tests can be conducted on foamed slurry.  (G. BENGE, T.T. 2430:4—2432:1; DEPO. OF C. GARDNER, 47:10-24, 202:14—203:6, 307:9-11; DEPO. OF G. GARRISON, 217:14-18; J. GAGLIANO, T.T. 6651:7-21).

31.     Crush Compressive Strength tests evaluate the overall compressive strength achieved by a foam cement slurry during specific windows of time—for example, at 12 hours, 24 hours, 36 hours and 48 hours.  (J. GAGLIANO, T.T. 6651:7-21, 6791:4-25; TREX-7722).

32.     Crush Compressive Strength tests are not conducted for the purpose of determining how much time a slurry takes to reach 500 psi of compressive strength development.  (DEPO. OF E. CUNNINGHAM, 308:21-310:9).

33.     Pressure is a driver of a slurry's compressive strength development.  (G. BENGE, T.T. 2430:19—2431:6, 2328:25—2329:20; DEPO. OF E. CUNNINGHAM, 274:20—275:7).

34.     Temperature is a driver of a slurry's compressive strength development.  (G. BENGE, T.T. 2430:19—2431:6, 2328:25—2329:20; DEPO. OF E. CUNNINGHAM, 274:20—275:7).

35.     Crush Compressive Strength tests do not apply simulated downhole pressure or temperature to the slurry.  (G. BENGE, T.T. 2430:4—2432:5; DEPO. OF C. GARDNER, 307:12-15, 308:1-8).

36.     The Crush Compressive Strength at Macondo was not conducted under pressure, even though the downhole pressure at Macondo exceeded 14,000 psi.  (G. BENGE, T.T. 2430:4—2432:5).

37.     The temperature applied to a slurry to conduct a Crush Compressive Strength test at Macondo was limited to 180 degrees for both safety and operational reasons, not the BHST of 210 degrees F.  (G. BENGE, T.T. 2430:4—2432:5).

38.     Because simulated downhole pressure and temperature are not applied to the slurry, Crush Compressive Strength test results are not representative of the compressive strength development of a slurry pumped down a deepwater well.  (G. BENGE, T.T. 2430:4—2432:5).

39.     HESI provided a Crush Compressive Strength test result to BP on the slurry with 0.08 gps of retarder that indicated 0 psi of compressive strength at 24 hours.  (TREX-1509).

40.     As Glen Benge testified at trial, the Crush Compressive Strength test result of 0 psi at 24 hours does not indicate that the slurry pumped on the Macondo production casing cement job had 0 psi of compressive strength at 24 hours under downhole conditions because downhole pressure and temperature were not simulated in the test.  (G. BENGE, T.T. 2430:22—2432:5).

41.     Jesse Gagliano requested that UCA Compressive Strength tests be performed on production casing slurries containing 0.08 gps of retarder and 0.09 gps of retarder.  (G. BENGE, T.T. 2438:4-11, 2427:5-13;  TREX-984;  TREX-7722;  J. GAGLIANO, T.T. 6667:2—6669:13, 6696:15-20; TREX-1509).

42.     Jesse Gagliano provided BP with the full results of the UCA Compressive Strength test on the slurry containing 0.08 gps of retarder prior to the commencement of the production casing cement job.  (TREX-1509).

43.     While he did not provide BP with the full results of the UCA Compressive Strength test on the slurry containing 0.09 gps of retarder prior to the commencement of the production casing cement job, Jesse Gagliano did provide charted results of the test prior to the job indicating when the slurry would reach 500 psi of compressive strength development. (TREX-1509).

44.     As Glen Benge testified in trial, there is a difference of opinion among operators in the industry as to whether API's standard 4-hour heat ramp or a temperature simulation schedule is more appropriate for UCA Compressive Strength testing for deepwater wells.  (G. BENGE, T.T. 2427:14—2430:3).

45.     When conducting the UCA Compressive Strength tests on the slurries containing 0.08 and 0.09 gps of retarder, the HESI laboratory used a standard 4-hour API heat ramp. (TREX-1509; TREX-3032; G. BENGE, T.T. 2427:14—2428:3; J. GAGLIANO, T.T. 6697:2—6797:13, 6775:3—6776:8).

46.     HESI's use of the 4-hour API heat ramp is consistent with API Recommended Practice 10B-2.  (G. BENGE, T.T. 2427:14—2429:6).

47.     Craig Gardner, head of Chevron's lab, testified that Chevron uses the standard 4-hour API heat ramp to conduct UCA Compressive Strength testing as Chevron has found a four hour heat ramp to be more reliable than a simulated temperature ramp.  (DEPO. OF C. GARDNER, 68:25—69:19, 157:21—158:14).

### 4.    *HESI Ran The Required Rheology Tests.*

48.     The Specific Requirements matrix identifies "Rheology" as a required test. (TREX-4477 at BP-HZN-2179MDL00055809).

49.     Jesse Gagliano requested that rheology tests be performed on the production casing slurry containing 0.08 gps of retarder.  (TREX-984 at HAL_DOJ_0000035-6; TREX-7722; J. GAGLIANO, T.T. 6656:4-23).

50.     Jesse Gagliano did not request that rheology tests be performed on the production casing slurry sample containing 0.09 gps of retarder.  (TREX-984 at HAL_DOJ_0000035-6; J. GAGLIANO, T.T. 6668:18—6669:13).

51.     Based on his experience, Jesse Gagliano reasonably believed that 0.01 gps change in retarder would not materially change the rheology of a slurry.  (J. GAGLIANO, T.T. 6672:8-14).

### 5.    *API Fluid Loss Tests Are Not Required By The Contract.*

52.     The Specific Requirements matrix does not identify "API Fluid Loss" as a required test.  (TREX-4477 at BP-HZN-2179MDL00055809; G. BENGE, T.T. 2437:17-2438:15).

53.     Jesse Gagliano did not request that an API fluid loss test be performed on the slurry used on the Macondo production casing job.  (G. BENGE, T.T. 2370:9-11; TREX-811 at HAL_0502393-94; TREX-7722).

### 6.    *HESI Ran Foam Stability Testing On The Macondo Slurry That Gave No Indications Of Free Water Or Settling.*

54.     The Specific Requirements matrix identifies "Free Water" as a required test. (TREX-4477 at BP-HZN-2179MDL00055809).

55.     Jesse Gagliano did not request that a separate free water test be performed on the slurry used on the Macondo production casing job.  (G. BENGE, T.T. 2338:25—2339:5, 2437:17-25).

56.    The foam stability test that Jesse Gagliano requested to be conducted on the slurry containing 0.08 gps retarder, which was not required by the BP/HESI contract, would have given indications of free water.  (G. BENGE, T.T. 2438:25—2439:9).

57.    The Specific Requirements matrix identifies the "COMPANY Settlement Test" as a required test only "(w)hen the hole angle exceeds 70 degrees(.)"  (TREX-4477 at BP-HZN-2179MDL00055809).

58.    The Macondo well did not exceed an angle of 70 degrees.  (G. BENGE, T.T. 2438:19-24).

59.    The purpose of a COMPANY Settlement Test is evaluate whether particles in the cement slurry settle over time.  (G. BENGE, T.T. 2439:25—2440:22).

60.    The foam stability test that Jesse Gagliano did request also evaluates whether particles in the cement slurry settle.  (G. BENGE, T.T. 2440:14-22; J. GAGLIANO, T.T. 6661:12—6662:8, 6743:4-15, 6837:10-23).

**7.    *BP Never Requested Additional Tests From Those Identified By HESI In Its Testing Regime.***

61.    The tests that constituted the testing regime for the Macondo production casing cement slurry were identified in February 2010 during "pilot testing."  (TREX-60456; J. GAGLIANO, T.T. 6719:1-6; G. BENGE, T.T. 2440:23-2443:6).

62.    The tests that constituted the testing regime for the Macondo production casing cement slurry that were identified in February 2010 during "pilot testing" included the following tests:  Thickening Time; Mud Balance Density; Mixability; Foam Mix and Stability; FYSA Viscosity Profile & Gel Strength; Non API Rheology (at 80, 130 and 190 degrees F.); UCA

Compressive Strength and Crush Compressive Strength.  (TREX-60456 at HAL_0026199-200; G. BENGE, T.T. 2440:23—2443:6).

63.    All tests included in the testing regime to be run on the Macondo production casing cement slurry were identified to BP as early as March 8, 2010.  (TREX-60456).

64.    The tests that constituted the "pilot tests" run in February 2010 were the same tests that were performed in "operational testing" in April 2010.  (TREX-60456; TREX-7722).

65.    From February 2010 to April 20, 2010, no BP employee, including those from the Macondo engineering team, informed or otherwise communicated to Jesse Gagliano that he needed to run any additional testing specified in the BP-HESI contract.  (G. BENGE, T.T. 2440:23—2443:6; J. GAGLIANO, T.T. 6719:1-6, 12-18).

66.    From February 2010 to April 20, 2010, no BP employee from the Macondo engineering team or otherwise informed or otherwise communicated to Jesse Gagliano that he needed to run any different testing specified in the BP-HESI contract.  (G. BENGE, T.T. 2440:23—2443:6; J. GAGLIANO, T.T. 6719:1-6, 12-18).

**8.    *The BP/HESI Contract Does Not Address Foam Stability Testing.***

67.    The BP/HESI Contract does not address or speak to foam stability testing.  (TREX-4477 at  BP-HZN-2179MDL00055809-5810;  G.  BENGE,  T.T.  2437:17—2439:12, 2369:8-24).

68.    Despite the fact that the BP/HESI Contract does not address or speak to foam stability testing, Jesse Gagliano included foam stability testing in the testing regime for the Macondo production casing job.  (TREX-60455; TREX-7722; J. GAGLIANO, T.T. 6719:12-18)*.*

B.     <u>**Proposed Conclusions Of Law**</u>

1.     Jesse Gagliano requested all types of cement testing on the Macondo production casing cement slurry required by the BP/HESI Contract except for "free water" testing.

2.     While the BP/HESI Contract does not speak to foam cement testing or require foam stability testing, Jesse Gagliano also requested foam stability testing on the Macondo production casing cement slurry.  The foam stability testing gives indications of "free water."

3.     Pursuant to the terms of the BP/HESI Contract, given the information known to Jesse Gagliano, HESI was not required to conduct the following tests on the foam cement slurry used on the Macondo production casing job:  API Fluid Loss tests, or Company Settlement tests.

4.     Jesse Gagliano complied with the requirements of the BP/HESI Contract on cement testing, and the foam slurry used to cement the production casing at Macondo was appropriately tested.

5.     HESI's use of a 4-hour heat ramp during the UCA Compressive Strength tests was reasonable given that it is consistent with API standards and Chevron's testing standards.

6.     BP knew or should have known, by March 8, 2010, of the testing regime Jesse Gagliano had established for the foam cement slurry used on the Macondo production casing cement job.  BP's failure to inform him that the testing regime was incorrect, inadequate or incomplete demonstrates that BP agreed that the testing regime Jesse Gagliano established was acceptable and approved by BP.

7.     Based upon BP's knowledge of the tests Jesse Gagliano was conducting on the foam cement slurry used on the Macondo production casing cement job, BP waived any complaint regarding variations between contractually required testing and actual testing HESI performed.

XVI.  **HESI's Conditioning Of The Base Slurry In The Lab Did Not Artificially Thicken Or Stabilize The Slurry During Foam Stability Testing.**

   A.      **Proposed Findings Of Fact**

   1.      *Conditioning Simulates Actual Downhole Conditions The Slurry Experiences While It Is Being Pumped.*

1.      The primary goal of testing any cement slurry is to assess the performance of the slurry, to the extent practicable and possible, under anticipated downhole conditions.  (DEPO. OF C. GARDNER, 310:15-312:7; DEPO. OF R. VARGO, 363:13—364:5; TREX-5990 at 12; G. BENGE, T.T. 2430:25—2431:6, 2505:11-21).

2.      It is not possible to precisely simulate all downhole conditions.  (G. BENGE, T.T. 2405:4-12; DEPO. OF C. GARDNER, 311:1-14).

3.      Conditioning a slurry in the lab is the practice of, prior to testing, mixing the slurry for a period of time that approximates the job placement time.  (J. GAGLIANO, T.T. 6738:16-6739:10; DEPO. OF C. GARDNER, 310:15-312:7; T. QUIRK, T.T. 4877:7-11, 4878:2-12, 4971:17-19; DEPO. OF R. FAUL, 483:13-15).

4.      During the conditioning process, the slurry is mixed at a temperature approximating the bottom hole circulating temperature ("BHCT") that the slurry is expected to encounter in the well.  (T. QUIRK, T.T. 4878:2-18; DEPO. OF P. STELLY, 126:23—127:4; DEPO. OF B. RICHARD, 133:6—134:3, 54:6-11; DEPO. OF C. GARDNER, 207:4-208:1; DEPO. OF R. FAUL, 483:16-20).

5.      During the conditioning process, the slurry is mixed under a pressure approximating field conditions that the slurry is expected to encounter in the well.  (T. QUIRK, T.T. 4878:2-18; G. BENGE, T.T. 2430:22—2431:15, 2464:18—2465:16)

6.      The purpose of conditioning a slurry is to simulate the dynamic flow and corresponding temperature and pressure effects that the slurry is likely to experience as it is pumped into its intended location in a well.  (DEPO. OF B. RICHARD, 54:6-11; DEPO. OF C. GARDNER, 310:15-312:7; T. ROTH, T.T. 3069:1-10, 3203:9-14; N. CHAISSON, T.T. 6406:23—6407:11; J. GAGLIANO, T.T. 6737:24—6738:3).

7.      API recommends that a conventional, non-foamed cement slurry be conditioned before it is tested in the lab.  (DEPO. OF C. GARDNER, 310:7—312:20).

8.      API is silent on whether a conventional, non-foamed base slurry should be conditioned prior to being foamed in the lab for foam-related testing.  (DEPO. OF C. GARDNER, 311:15-19; TREX-4572 at 9; TREX-6235).

9.      API leaves it to the judgment of the tester as to whether a conventional, non-foamed base slurry should be conditioned prior to being foamed in the lab for testing.  (DEPO. OF C. GARDNER, 311:15—312:7).

10.      During a deepwater foam cementing operation, a base slurry is not mixed or conditioned for an extended period of time before nitrogen is injected into it to generate a foam slurry, and due to inherent limitations in cement field laboratory equipment and processes, it is not practicable or possible to condition a slurry that already has been foamed.  (N. CHAISSON, T.T. 6378:14-24; DEPO. OF C. GARDNER, 310:15—312:21).

11.      In order to simulate through conditioning the effects of dynamic flow on a foam cement slurry in a cement field laboratory, the base slurry must be conditioned before the slurry is foamed for testing.  (DEPO. OF C. GARDNER, 310:15—312:21).

12.      If a base slurry is not conditioned before being foamed in the cement field lab for testing, the slurry will not be subjected to the effects of dynamic flow, temperature and pressure

210

that the slurry is likely to experience as it is pumped into its intended location in the well. (DEPO. OF C. GARDNER, 310:15—312:21).

> ### 2. *During Testing, HESI Conditioned Rig Samples To Simulate The Downhole Conditions in the Macondo Well.*

13.     When Jesse Gagliano submitted cement slurry "pilot testing" requests to HESI's cement field lab in Broussard, Louisiana, he requested that the slurry be conditioned for 3 hours. (J. GAGLIANO, T.T. 6657:22—6658:8, 6737:24—6738:11).

14.     Jesse Gagliano's request for 3 hours of slurry conditioning was based on his initial estimate that the cement job would take approximately 3 hours to pump into place.   (J. GAGLIANO, T.T. 6737:24—6739:10).

15.     Jesse Gagliano never instructed the Broussard lab to condition the slurry at anything other than 3 hours.  (J. GAGLIANO, T.T. 6738:4-11).

16.     The Broussard lab varied the conditioning times on certain tests between February and April 2010.  (J. GAGLIANO, T.T. 6738:4-15).

17.     The final April 2010 foam stability test (with 0.08 gps of retarder) and the final UCA compressive strength test (with 0.09 gps of retarder) were both conditioned for 3 hours as Jesse Gagliano had initially requested.  (TREX-4565; TREX-60415; TREX-7722).

18.     The slurry used to cement the Macondo production casing contained a blended, dry additive called SA-541.  (G. BENGE, T.T. 2446:4-6; J. GAGLIANO, T.T. 6731:3-22; TREX-4566).

19.     SA-541 is a temperature-activated suspension agent that, at elevated temperatures, thickens or viscosifies the slurry.  (G. BENGE, T.T. 2446:16-23; T. QUIRK, T.T. 4880:20-23; J. GAGLIANO, T.T. 6639:7-9).

20.     SA-541 is activated when the slurry reaches approximately 150 degrees F.  (G. BENGE, T.T. 2446:21-23).

21.     The slurry used to cement Macondo's production casing was conditioned in the lab at 135 degrees F. to simulate bottom hole circulating temperature (BHCT).  (DEPO. OF B. RICHARD, 134:14-135:4).

22.     The conditioning temperature used during the Macondo slurry testing (135 degrees F.) was less than the activation temperature of the SA-541 additive (150 degrees F.).  (T. QUIRK, T.T. 4880:24—4881:5; G. BENGE, T.T. 2446:4—2447:6).

23.     There is no evidence that conditioning the Macondo slurry in the lab activated the SA-541 additive.  (T. QUIRK, T.T. 4880:24—4881:5; G. BENGE, T.T. 2446:24—2447:6; TREX-7722).

24.     There is no evidence that conditioning the Macondo slurry in the lab made the lab sample thicker or more viscous than the slurry used on the *Deepwater Horizon*.  (G. BENGE, T.T. 2446:24—2447:24; T. QUIRK, T.T. 4880:24—4881:5; TREX-7722).

25.     The Thickening Time chart on the slurry containing 0.09 gps of retarder demonstrates conclusively that SA-541 was not activated in the slurry when it was heated to 135 degrees Fahrenheit over three hours.  (TREX-7722).

26.     The Thickening Time chart on the slurry containing 0.09 gps of retarder demonstrates conclusively that the viscosity of the Macondo slurry, after being heated to 135 degrees Fahrenheit over three hours, never exceeded the slurry's initial viscosity.  (TREX-7722).

27.     The Thickening Time chart for the slurry containing 0.09 gps of retarder demonstrates conclusively that the Macondo slurry experienced "thermal thinning" when it is

212

heated to 135 degrees Fahrenheit over three hours, despite the presence of the SA-541 additive. (TREX-7722).

B.   **Proposed Conclusions Of Law**

1.     The final April 2010 foam stability test was conditioned for three hours as originally requested by Jesse Gagliano in order to approximate job placement time.

2.     HESI's practice of conditioning the non-foamed base slurry prior to foaming the slurry for foam-related testing is reasonable given that the practice is not inconsistent with API standards and HESI was simulating dynamic conditions during cement placement.

3.     There is no evidence that HESI's conditioning of the slurry at a BHCT of 135 degrees activated the SA-541 viscosifier in the slurry's dry blend.

4.     The Thickening Time chart for the slurry containing 0.09 gps of retarder demonstrates conclusively that the Macondo slurry experiences "thermal thinning" when it is heated to 135 degrees Fahrenheit over three hours, despite the presence of the SA-541 additive.

**XVII. HESI's Testing On The Macondo Cement Slurry Indicates That The Foam Cement Slurry Was Stable.**

A.   **Proposed Findings Of Fact**

1.   *The Industry Identifies Characteristics Of What Constitutes A Stable Foam System.*

1.     The American Petroleum Institute ("API:) publishes recommended practices for conducting foam stability testing (API RP 10B-4).   (TREX-6235 at 1, 9-12; G. BENGE, T.T. 2435:3-10).

2.     API RP 10B-4 sets forth the recommended procedures for conducting unset foam stability tests.   (TREX-6235 at 9-12).

3.      API RP 10B-4 sets forth the recommended procedures for conducting set foam stability tests.  (TREX-6235 at 9-12).

4.      API RP 10B-4, Section 9.3.4, entitled "Signs of foam instability," identifies the following signs of foam instability:  (1) more than a trace of free fluid; (2) bubble breakout noted by large bubbles on the top of the sample; (3) excessive gap at the top of the specimen (minor meniscus effects are normal); (4) visual signs of density segregation as indicated by streaking or light to dark color change from top to bottom; and (5) large variations in density from sample top to bottom.  (TREX-6235 at 10-11; G. BENGE, T.T. 2435:11—2436:16).

### 2.      *HESI Pilot Testing Confirmed That The Cement Blend On The Deepwater Horizon Could Be Successfully Foamed.*

5.      In February 2010, Jesse Gagliano requested that a number of "pilot tests" be conducted using actual cement dry blend from the *Deepwater Horizon*.  (J. Gagliano, T.T. 6663:3-21; G. BENGE, T.T. 2449:19-21).

6.      At the time the "pilot tests" were conducted, the Macondo well had not been drilled to total depth.   (J. GAGLIANO, T.T. 6680:7-18; 6794:14—6798:15; G. BENGE, T.T. 2449:19-2450:14).

7.      At the time the "pilot tests" were conducted, the bottom hole static temperature (BHST) to be used in final operational testing was not yet known.  (J. GAGLIANO, T.T. 6652:17-6654:12, 6801:22—6802:6; G. BENGE, T.T. 2449:19—2450:14).

8.      At the time the "pilot tests" were conducted, the bottom hole circulating temperature (BHCT) to be used in final operational testing was not yet known.  (J. GAGLIANO, T.T. 6652:17—6654:12, 6801:22—6802:6; G. BENGE, T.T. 2450:15—2451:14).

214

9.      The final concentration of the retarder, SCR-100L, used on the production casing cement job was derived based on the estimated job placement time.  (J. GAGLIANO, T.T. 6738:16-6739:10; G. BENGE, T.T. 2264:14-2265:11).

10.      At the time the "pilot tests" were conducted, the job placement time (the estimated duration of the production casing cement job) was not yet known.  (J. GAGLIANO, T.T. 6738:16—6739:25, 6447:1—6649:7; G. BENGE, T.T. 2449:11—2451:1).

11.      The concentration of the retarder, SCR-100L, used during "pilot testing" was 0.20 gps.  (TREX-808; TREX-809).

12.      The concentration of the retarder, SCR-100L, actually pumped on the Macondo production casing cement job was 0.09 gps.  (TREX-7722; TREX-60068).

13.      The results of the "pilot tests" in February 2010 are not representative of the properties of the slurry actually pumped on the Macondo well production casing job in April 2010 due to differences in testing conditions (BHST and BHCT) and a significant difference in retarder concentration (.20 gps vs. .09 gps).  (TREX-984; TREX-60455; G. BENGE, T.T. 2449:19—2451:1, 2574:6-11; J. GAGLIANO, T.T. 6644:18—6649:7).

14.      At the time of the "pilot tests," the pre-foam base density of the slurry intended to be used to cement the Macondo production casing was 16.741 ppg, which rounds to 16.74 ppg. (TREX-808; TREX-809).

15.      At the time of the "pilot tests," the design density for the foam slurry intended to be used to cement the Macondo production casing was 14.496 ppg, which rounds to 14.5 ppg. (TREX-808; TREX-809).

16.      In the field, a foam slurry is generated by pumping nitrogen, under high pressure, into the cement slurry as it is pumped downhole.  (G. BENGE, T.T. 2463:2-22, 2465:8-15).

215

17.     In the laboratory, a foam cement slurry sample is generated by mixing or blending the slurry at high speed in a blender to entrain air in the slurry.  (G. BENGE, T.T. 2464:18—2465:7; J. GAGLIANO, T.T. 6615:13-19).

18.     There were two (2) set foam stability tests conducted in conjunction with the February 2010 "pilot tests."  (TREX-808; TREX-809).

19.     The first February 2010 foam stability test obtained a result of 2.02 S.G. on top of the sample and 2.11 S.G. on bottom of the sample, which equates to 16.8 ppg and 17.6 ppg, respectively.  (TREX-808).

20.     The base slurry was not "conditioned" before being foamed in preparation for the first February 2010 foam stability test.  (TREX-808 at HAL_0502435).

21.     The result of the first February 2010 foam stability test (16.8 ppg/17.6 ppg) is anomalous in that the densities of both the top and bottom of the set foam stability test sample are higher than the density of the pre-foamed base slurry.  (TREX-808 at HAL_0502435; G. BENGE, T.T. 2451:15-2452:17; J. GAGLIANO, T.T. 6663:3-15, 6833:19—6834:25).

22.     As Glen Benge testified at trial, given the anomalous result on the first February 2010 foam stability test, it was proper for the HESI laboratory to repeat the test.  (G. BENGE, T.T. 2449:19—2452:20).

23.     On its own initiative, the HESI laboratory repeated the first February 2010 set foam stability test during "pilot testing."  (TREX-808 at HAL_0502435; G. BENGE, T.T. 2451:15—2452:20; J. GAGLIANO, T.T. 6834:9—6835:11).

24.     During a crush compressive strength test conducted in conjunction with the February 2010 "pilot tests," a HESI lab technician wrote down on the associated Weigh Up sheet that the "slurry is settling."  (TREX-808).

216

25.     No technician comment to the effect that the "slurry is settling" was recorded on the Weigh Up sheet section associated with the second February 2010 foam stability test. (TREX-809; G. BENGE, T.T. 2452:21—2454:5; 2455:3-6; J. GAGLIANO, T.T. 6837:10—6838:1).

26.     Jesse Gagliano did not communicate with any personnel at the Broussard laboratory regarding the results of the first February 2010 foam stability test.  (J. GAGLIANO, T.T. 6837:4-7, 6662:17—6664:17).

27.     Jesse Gagliano did not communicate with any personnel at the Broussard laboratory regarding whether the first February 2010 foam stability test should be repeated.  (J. GAGLIANO, T.T. 6837:4-7, 6662:17—6664:17).

28.     Jesse Gagliano was not aware of the first February 2010 foam stability test until after the April 20, 2010 *Deepwater Horizon* incident.  (J. GAGLIANO, T.T. 6837:4-7, 6662:17—6664:17).

29.     The first February 2010 foam stability test was not reported by HESI to BP.  (D-4309A; TREX-60456; TREX-5801; J. GAGLIANO, T.T. 6837:4-7; 6662:17—6664:17).

30.     The first February 2010 foam stability test was repeated in the lab, and such re-test obtained the second February 2010 foam stability test result.  (TREX-809).

31.     The base slurry was "conditioned" for 2 hours before being foamed in preparation for the second February 2010 foam stability test.  (TREX-809 at HAL_0502441).

32.     The second February 2010 foam stability test obtained a result of 1.91 S.G. on top of the sample and 1.91 S.G. on bottom of the sample, which equates to 15.9 ppg and 15.9 ppg, respectively.  (TREX-809 at HAL_0502441; G. BENGE, T.T. 2515:17-22).

33.     With respect to the second February 2010 foam stability test, the resulting sample density of 15.9 ppg on top and 15.9 ppg on bottom indicates that the slurry was capable of

217

uniformly entraining air from the top to the bottom.  (J. GAGLIANO, T.T. 6665:15-24; 6650:13-19).

34.    A uniform density from the top to the bottom of the sample is an indication of stability.  (TREX-4569 at 10-11; J. GAGLIANO, T.T. 6650:13-19; 6665:15-24; G. BENGE, T.T. 2456:15-18).

35.    The difference between the set density of the second February 2010 foam stability test sample (15.9 ppg) and the design density (14.5 ppg) was 1.4 ppg.  (TREX-809).

36.    When conducting a set foam stability test, HESI considered up to a 0.5 ppg density differential between the set foam density and the design density to be acceptable variance.  (J. GAGLIANO, T.T. 6675:10—6676:22; 6846:3-7; DEPO. OF R. VARGO, 327:16—330:2).

37.    A density differential of 1.4 ppg between the set foam density and the design density is too large under HESI's acceptable variance.  (J. GAGLIANO, T.T. 6650:13—6651:1, 6665:15—6666:7).

38.    Jesse Gagliano would not have authorized the pumping of a foam cement job on the basis of this test.  (J. GAGLIANO, T.T. 6650:13—6651:1, 6665:15—6666:7, 6837:10—6838:8).

39.    Had cementing operations been in the operational phase, Jesse Gagliano would have requested that the laboratory foam the sample down to an acceptable variance from design density.  (J. GAGLIANO, T.T. 6837:10—6838:8).

40.    Notwithstanding the heavier foam cement sample, Jesse Gagliano reasonably interpreted the results of the second February foam stability tests as demonstrating that the slurry

design was capable of uniformly entraining air and/or nitrogen.  (J. GAGLIANO, T.T. 6650:13-19, 6665:15-25; 6837:10—6838:1; G. BENGE, T.T. 2452:21—2453:4, 2453:13—2454:12, 2455:3-6).

41.     While a heavy or more dense set foam stability sample could be an indication that air broke out of the sample, such breakout would have left observable artifacts in the set sample such as voids or a reduction in sample height.  (G. BENGE, T.T. 2452:21—2455:6).

42.     No voids or reduction in sample height were observed and/or recorded on the Weigh Up sheets associated with the second February foam stability test.   (TREX-809; J. GAGLIANO, T.T. 6837:10—6838:1; G. BENGE, T.T. 2452:21—2455:6).

43.     As Glen Benge testified at trial, if the heavier set density of the test sample was caused by breakout of air in the slurry, he would expect to see variation in density from top to bottom of the sample with the top of the sample being lighter and/or a void or gap at the top of the test specimen where air broke out.  (G. BENGE, T.T. 2452:21-2453:19).

44.     Upon his review of HESI's internal testing documents, Glen Benge found no indication that the HESI laboratory observed variation in density from top to bottom of the sample with the top of the sample being lighter, or a void or gap at the top of the test specimen where air broke out.  (G. BENGE, T.T. 2452:21—2454:12

45.     There are potential reasons for a density differential of 1.4 ppg that have nothing to do with the stability of the foam cement slurry.  (G. BENGE, T.T. 2452:21—2454:12).

46.     All final "pilot test" results, including the second February 2010 foam stability test result, were emailed by Jesse Gagliano to BP on March 8, 2010, and again on April 1, 2010. (TREX-60456; TREX-5801).

3.    *HESI's Operational Foam Stability Testing Further Confirmed The Macondo Blend Could Be Successfully Foamed.*

47.    Jesse Gagliano initiated "operational" testing for the Macondo production casing cement job in April 2010.   (J. GAGLIANO, T.T. 6667:2-15; TREX-984; TREX-811 at HAL_0502393-94).

48.    In April 2010, operational testing incorporated known downhole temperatures acquired and/or determined from wireline logging operations.  (TREX-3537; TREX-984).

49.    Jesse Gagliano calculated or derived the BHCT by inputting the BHST into a temperature simulation program called WellCat.  (J. GAGLIANO, T.T. 6588:13-17; 6634:14-17; 6654:6-18).

50.    At the time that Jesse Gagliano initiated operational testing, it was his understanding that BP intended to use 0.08 gps of retarder (SCR-100L) to obtain a job placement window of 5 hours and 30 minutes.  (J. GAGLIANO, T.T. 6605:5-14, 6667:2-15, 6738:16-6740:6).

51.    The foam slurry sample used in the first April foam stability test contained 0.08 gps of retarder (SCR-100L).  (TREX-984 at HAL_DOJ_0000035-36; TREX-287; J. GAGLIANO, T.T. 6738:16-6740:6).

52.    The base slurry was "conditioned" for 1.5 hours before being foamed in preparation for the first April 2010 foam stability test.  (TREX-984 at HAL_DOJ_0000035-36; J. GAGLIANO, T.T. 6842:24—66843:4).

53.    The first April 2010 foam stability test obtained a result of 1.88 S.G. on top of the sample and 1.82 S.G. on bottom of the sample, which equates to 15.7 ppg and 15.1 ppg, respectively.  (TREX-984 at HAL_DOJ_0000035-36).

54.     If a foam slurry sample is unstable, the density of the set sample would typically be lighter on top than on the bottom as air would migrate to the top of the sample and particles would settle to the bottom of the sample causing the density of the top to measure less than the density of the bottom.  (J. GAGLIANO, T.T. 6667:2-23, 6743:22—6744:19; TREX-984 at HAL_DOJ_0000035-36; G. BENGE, T.T. 2455:7-21).

55.     The heavier-on-top result from the first April 2010 foam stability test is the opposite of what typically would be expected if the slurry sample is unstable.  (J. GAGLIANO, T.T. 6667:2-23; 6743:22—6744:19).

56.     HESI's cement laboratory manager, Richard Dubois, noticed the anomalous results of the first April 2010 foam stability test and called Jesse Gagliano to discuss.  (J. GAGLIANO, T.T. 6667:2-6668:17; DEPO. OF R. DUBOIS, 209:24—210:1, 210:3—211:10).

57.     Richard Dubois and Jesse Gagliano both agreed that the results of the first April 2010 foam stability test were anomalous.  (J. GAGLIANO, T.T. 6667:2-6668:17; DEPO. OF R. DUBOIS, 209:24—210:1, 210:3—211:10).

58.     At the time the results of the first April 2010 foam stability test were obtained, Richard Dubois and Jesse Gagliano did not know the reason for the anomalous test result.  (J. GAGLIANO, T.T. 6667:2—6668:17; DEPO. OF R. DUBOIS, 209:24—210:1; 210:3—211:10).

59.     Richard Dubois and Jesse Gagliano agreed that the first April 2010 foam stability test should be repeated.  (J. GAGLIANO, T.T. 6667:2-6668:17; DEPO. OF R. DUBOIS, 209:24-210:1; 210:3—211:10).

60.     After the April 20, 2010 *Deepwater Horizon* incident, Jesse Gagliano reviewed the lab Weigh Up sheets for the first April 2010 foam stability test and discovered that the

221

laboratory sample was weighed up incorrectly.  (J. GAGLIANO, T.T. 6667:2—6668:2, 6729:20—6730:4, 6826:21-25; D-8242; TREX-984 at HAL_DOJ_0000035).

61.    The cement sample used in the first April 2010 foam stability test was weighed up with 1220.67 grams of dry cement blended with dry additives when it should have been weighed up with 1678.69 grams of the dry cement blend.  (DEPO. OF R. DUBOIS, 361:6—362:7, 364:2-23).

62.    As Glen Benge testified at trial, HESI's laboratory worksheets show that the slurry used in the first April 2010 foam stability test was weighed up incorrectly.  (G. BENGE, T.T. 2453:25—2454:12).

63.    The first April 2010 foam stability test was not reported by HESI to BP as Jesse Gagliano reasonably believed it was an invalid test that needed to be re-tested.  (J. GAGLIANO, T.T. 6827:10—6828:5).

64.    It is not HESI's practice to report anomalous test results to the external customer if such anomaly raises a question about whether the test was performed in a procedurally proper manner.  (DEPO. OF R. FAUL, 704:6-20).

65.    As Glen Benge testified at trial, the result of the first April 2010 foam stability test was "goofy" and it was reasonable for HESI to retest it.  (G. BENGE, T.T. 2452:12-20, 2455:7-21).

66.    As Glen Benge testified at trial, HESI's decision to retest after the first April 2010 foam stability test is an example of HESI's quality control in the lab doing its job.  (G. BENGE, T.T. 2456:6-11).

67.    The foam slurry sample used in the second April foam stability test also contained 0.08 gps of retarder (SCR-100L).  (TREX-984 at HAL_DOJ_000000423).

68.    The base slurry was "conditioned" for 3.0 hours before being foamed in preparation for the second April 2010 foam stability test.  (TREX 984 at HAL_DOJ_0000043).

69.    The second April 2010 foam stability test obtained a result of 1.8 S.G. on top of the sample and 1.8 S.G. on bottom of the sample, which equates to 15.0 ppg and 15.0 ppg, respectively.  (TREX-984 at HAL_DOJ_0000043; TREX-7722; D-8242; J. GAGLIANO, T.T. 6675:10—6676:22).

70.    A uniform density from the top to the bottom of the sample is an indication of stability.  (TREX-4569 at CVX8031100000978-9; J. GAGLIANO, T.T. 6650:13-19; 6665:15-24; G. BENGE, T.T. 2456:15-18).

71.    The difference between the set density of the second April 2010 foam stability test sample (15.0 ppg) and the design density (14.5 ppg) was 0.5 ppg.  (TREX-7722; TREX-984 at HAL_DOJ_0000042-43).

72.    The 0.5 ppg density differential between the set density of the second April 2010 foam stability test sample and the design density is within HESI's acceptable variance.  (J. GAGLIANO, T.T. 6675:10—6676:22; 6846:3-7; DEPO. OF R. VARGO, 327:16—329:13).

73.    While Glen Benge testified at trial that his personal preference is to see a 0.2 ppg density differential between the set density of the test sample and the design density, he admitted that his preference is on the very conservative side.  (G. BENGE, T.T. 2457:2-24).

74.    As Glen Benge testified at trial, whether a 0.02 or 0.05 ppg density differential is more appropriate is a legitimate difference of opinion.  (G. BENGE, T.T. 2458:4-10).

75.    API gives no recommendation of the appropriate density differential between the set density of a foam stability test sample and the design density.  (G. BENGE, T.T. 2456:12-2457:17).

76.     Notwithstanding the legitimate difference of opinion on the proper density differential between the set density of a foam stability test sample and the design density, Glen Benge testified that the result of HESI's second April 2010 foam stability test indicates that the slurry was stable.  (G. BENGE, T.T. 2456:12—2459:2; 2459:22—2460:3, 2524:21—2525:12).

77.     No expert testified that HESI's second April 2010 foam stability test indicated that the slurry was unstable.

78.     None of the signs of instability set forth in API RP 10B-4 were observed and/or recorded on the Weigh Up sheets associated with the second April 2010 foam stability test.  (TREX-4569 at 10-11; TREX-984 at HAL_DOJ_0000042-0043).

79.     The second April 2010 foam stability test indicates that the slurry design was stable with 0.08 gps of retarder (SCR-100L).  (TREX-7722; G. BENGE, T.T. 2456:12—2459:2, 2459:22—2460:3, 2524:21—2525:12; J. GAGLIANO, T.T. 6656:13—6657:21).

80.     The second April 2010 foam stability test indicates that the concentration of the foaming agent, ZoneSealant 2000 (0.11 gps), was sufficient to overcome any destabilizing effects of the small concentration of defoamer, D-Air 3000 (0.25% BWOC).  (J. GAGLIANO, T.T. 6656:13—6657:21; 6644:5-17).

81.     The second April 2010 foam stability test indicates that the concentration of the foaming agent, ZoneSealant 2000 (0.11 gps), was sufficient to overcome any dispersing or destabilizing effects of the retarder, SCR-100L (0.08 gps).  (J. GAGLIANO, T.T. 6656:13—6657:21).

4.   *BP's Last Minute Change To The Retarder Concentration Had No Impact On The Ability Of The Macondo Slurry To Be Successfully Foamed.*

82.   The foam cement slurry actually pumped on the Macondo production casing cement job was identical in all respects with the foam slurry used in the second April 2010 foam stability test, except for the concentration of the retarder.  (J. GAGLIANO, T.T. 6733:8-12; TREX-7722).

83.   The slurry pumped on the Macondo production casing cement job contained a total concentration of 0.09 gps of retarder, SCR-100L.  (J. GAGLIANO, T.T. 6631:3-7).

84.   As compared to the foam cement slurry sample used in the second April 2010 foam stability test, the foam cement slurry actually pumped on the Macondo production casing cement job contained an extra 0.01 gps of retarder, SCR-100L.  (J. GAGLIANO, T.T. 6605:5-14).

85.   On or about April 17, 2010, Brian Morel advised Jesse Gagliano that BP desired to incorporate 0.09 gps of retarder into the final slurry in order to increase pump time for the job to 7 hours and 37 minutes.  (TREX-987; G. BENGE, T.T. 2264:14—2267:13).

86.   Based on his and HESI's prior experience with HESI's proprietary retarder, Jesse Gagliano reasonably believed that increasing the concentration of retarder by 0.01 gps would not change the results of the foam stability test.  (J. GAGLIANO, T.T. 6668:18—6669:13, 6672:9-14, 6697:3-16).

87.   Based on his and HESI's prior experience with HESI's proprietary retarder, Jesse Gagliano reasonably believed that there would be no material or measureable difference in results of a foam stability test result obtained with a slurry that contained 0.08 gps of retarder as compared to a slurry that contained 0.09 gps of retarder.  (J. GAGLIANO, T.T. 6668:18—6669:13, 6672:9-14, 6697:3-16).

225

88.     Jesse Gagliano confirmed his judgment about the negligible effects on a foam stability test result of increasing retarder concentration by 0.01 gps by discussing it with HESI's cement laboratory manager, Richard Dubois.  (J. GAGLIANO, T.T. 6697:7-23).

89.     Richard Dubois agreed with Jesse Gagliano that there would be no material or measureable difference in results of a foam stability test result obtained with a slurry that contained 0.08 gps of retarder as compared to a slurry that contained 0.09 gps of retarder.  (J. GAGLIANO, T.T. 6697:7-23).

90.     After confirming his judgment with Richard Dubois, Jesse Gagliano cancelled his previously requested foam stability test on a foam cement slurry containing 0.09 gps of retarder, SCR-100L.  (J. GAGLIANO, T.T. 6697:7-23, 6793:23—6794:10).

91.     Jesse Gagliano's belief that an incremental 0.01 gps of retarder would not cause a measurable difference in a foam stability test is supported by HESI's Global Laboratory Best Practices which instructs that stability testing needs to be repeated only if the concentration of retarder necessary to achieve the required thickening time "changes greatly."  (T. QUIRK, T.T. 4980:25—4 982:11; TREX-4347 at HAL_0677647).

92.     A 0.01 gps change is the smallest incremental change a field laboratory typically can make to the concentration of liquid retarder.  (G. BENGE, T.T. 2459:3-21).

93.     The 0.09 gps concentration of retarder used in the slurry pumped on the Macondo production casing job did not change greatly from 0.08 gps concentration of retarder used in the second and final April 2010 foam stability test.  (T. QUIRK, T.T. 4981:20—4982:11; G. BENGE, T.T. 2459:3-21).

94.     The second April 2010 foam stability test result, which indicated that the test sample was stable, was representative of the stability of the slurry pumped on the Macondo

226

production casing job.  (J. GAGLIANO, T.T. 6668:18—6669:13; 6672:9-14; 6697:3-23; 6793:23—6794:10; TREX-7722).

> ### B.    Proposed Conclusions Of Law

1.     The pilot tests requested by Jesse Gagliano in February 2010 are not relevant for the purpose of determining the properties of the foam slurry pumped on the Macondo production casing job.  The February pilot tests were conducted using different conditions and of slurries that contained more than twice the amount of retarder as the foam slurry actually pumped.

2.     Notwithstanding this irrelevance, the first February 2010 foam stability test obtained an anomalous test result, and it was reasonable for HESI's cement lab to retest it without reporting the result to BP.

3.     Notwithstanding this irrelevance, the second February 2010 foam stability test indicated that the slurry was capable of uniformly entraining nitrogen, even if the slurry sample was too heavy.

4.     Jesse Gagliano's belief that the second February 2010 foam stability test indicated that the slurry was capable of uniformly entraining nitrogen was reasonable given that there were no voids or reductions in height in the sample noted during testing that would typically be associated with instability or nitrogen break out.

5.     The first April 2010 foam stability test obtained an anomalous test result, and it was reasonable for HESI's cement lab to retest it without reporting the result to BP.  The reasonableness of HESI's decision to not report the invalid test to BP is confirmed by the post-incident discovery that the sample was not weighed up properly.

6.      At the time it was obtained, the reasonableness of Jesse Gagliano's belief that the result of the first April 2010 foam stability test was invalid is demonstrated by the heavier-on-top result, which is the opposite of what would be expected if the slurry was unstable.

7.      The second April 2010 foam stability test is the most relevant evidence of whether the foam slurry pumped on the Macondo production casing cement job was stable, and the second April 2010 foam stability test on a slurry with 0.08 gps of retarder demonstrates that the foam slurry was stable.

8.      HESI concluded that the second April 2010 foam stability test indicated that the slurry was stable given:  (1) the uniform density between top and bottom of the sample; (2) a variance of within 0.5 ppg between set sample density and target density; and (3) a lack of any other indications of instability identified in API Recommended Practice 10B-4, Section 9.3.4.

9.      It was reasonable for HESI to consider the 0.5 ppg differential between the density of the set sample (15.0 ppg) and the design density (14.5 ppg) to be acceptable given API's lack of guidance on the issue and the fact that set cement samples can be heavier due to chemical reactions that have nothing to do with slurry stability.

10.      The second April 2010 foam stability test demonstrates that the slurry design was stable with 0.08 gps of retarder (SCR-100L) and that the concentration of ZoneSealant 2000 (0.11 gps) was sufficient to overcome any potentially destabilizing effects of the small concentration of defoamer, D-Air 3000 (0.25% BWOC), or potentially dispersing effects of the retarder, SCR-100L.

11.      Jesse Gagliano requested and obtained rheology and foam stability test results on a slurry containing 0.08 gps of retarder, but he did not obtain rheology and foam stability test

results on a slurry containing 0.09 gps of retarder, which was pumped on the production casing cement job.

12.     Jesse Gagliano's belief that an incremental change of only 0.01 gps of retarder—the smallest change possible—would not alter the results of the foam stability test on the slurry with 0.08 gps of retarder was reasonable given that he confirmed that belief with the cement lab manager, Richard Dubois, and his belief is consistent with internal HESI technical guidance.

## XVIII. HESI Timely Reported Test Results To BP.

### A.     Proposed Findings Of Fact

1.     The Weigh Up sheets are internal HESI documents used by cement laboratory personnel to record results and observations made during cement slurry testing conducted in the Broussard laboratory.  (J. GAGLIANO, T.T. 6729:14—6730:4).

2.     It is not HESI's practice to provide Weigh Up sheets to its external customers.  (G. BENGE, T.T. 2514:9-13).

3.     Weigh Up sheets are prepared and stored in the Broussard laboratory.  (T. ROTH, T.T. 3121:24—3122:8).

4.     Laboratory technicians take information recorded on Weigh Up sheets and type relevant information on such sheets into HESI's Viking database.  (T. QUIRK, T.T. 4936:3-23; J. GAGLIANO, T.T. 6750:20—6751:6; DEPO. OF B. RICHARD, 236:11-14, 44:25—45:6).

5.     Jesse Gagliano's practice was to access results for cement tests he requested by accessing the Viking database.  (T. QUIRK, T.T. 4936:24—4937:1).

6.     Jesse Gagliano did not see or review any Weigh Up sheet associated with the February 2010 "pilot tests" or the April 2010 "operational tests" until after the April 20, 2010 *Deepwater Horizon* incident.  (J. GAGLIANO, T.T. 6729:20—6730:4).

7.      In each instance that HESI reported cement laboratory testing results to BP, such results were conveyed in a Customer Report generated from the Viking system.  (T. ROTH, T.T. 3161:8-10; T. QUIRK, T.T. 4936:3—4937:4; J. GAGLIANO, T.T. 6588:18-23).

8.      Jesse Gagliano provided BP with the results of every cement lab test that BP requested of him.  (J. GAGLIANO, T.T. 6827:10-14).

9.      Nobody at BP ever requested that Jesse Gagliano provide the results of foam stability testing.  (J. GAGLIANO, T.T. 6719:12-18, 6651:22—6652:3).

10.     The final April 2010 foam stability test result on the slurry containing 0.08 gps of retarder was completed prior to the commencement of the Macondo production casing cement job.  (J. GAGLIANO, T.T. 6730:5-13, 6656:13—6659:9, 6660:7-14, TREX-7722).

11.     The results of the final April 2010 foam stability test result on the slurry containing 0.08 gps of retarder were available prior to the commencement of the Macondo production casing cement job.  (J. GAGLIANO, T.T. 6730:5-13, 6656:4—6662:8; TREX-7722).

12.     On April 19, 2010, at 4:14 pm, prior to the commencement of the production casing cement job, Jesse Gagliano received an email notification from the Viking system indicating that all testing associated with the Macondo production casing cement job, identified as Request 73909, was "Finished in Lab."  (J. GAGLIANO, T.T. 6656:4—6662:8; TREX-63201; TREX-7722).

13.     The "Finished in Lab" notification meant that all test requests associated with Request 73909, including the final foam stability test, were completed, passed and posted to the Viking database.  (J. GAGLIANO, T.T. 6660:7—6662:8).

14.     While he did not access the results of the final April 2010 foam stability test in the Viking database until after the Macondo incident, the "Finished in Lab" notification indicated to

230

Jesse Gagliano that the final foam stability test passed and was a stable foam system.   (J. GAGLIANO, T.T. 6659:4—6662:8).

15.    Had the final foam stability test not passed or generated results indicating that the slurry was unstable, the Broussard lab would not have set the test to "Finished," but rather would have left the test open requiring further direction from Jesse Gagliano.   (J. GAGLIANO, T.T. 6844:18—6845:17).

16.    After the Macondo incident, Jesse Gagliano accessed the Viking database and reviewed the detailed results associated with all testing on the Macondo production casing job, including the final foam stability test.   (J. GAGLIANO, T.T. 6659:4-15, 6659:21-24, 6677:2—6678:2).

17.    Jesse Gagliano's post-incident review of the final foam stability test result confirmed what he knew from pre-incident Viking notification: that the final foam stability test evidenced a stable test foam system.   (J. GAGLIANO, T.T. 6656:4—6662:8, 6677:2—6678:2).

**B.**    **Proposed Conclusions Of Law**

1.    The results of the final April 2010 foam stability test were posted to the Viking database and available to Jesse Gagliano prior to the commencement of the production casing cement job.

2.    Jesse Gagliano's belief that the Viking-generated email he received on April 19, 2010 at 4:14 pm, stating that all slurry testing associated with Request 73909 was "Finished in Lab," indicated that the final foam stability test had "passed" and showed a stable system is reasonable given that such a message would not have been generated had the final foam stability test result showed instability.   Had the final foam stability test result indicated instability, that test would have remained "open" and would not have been set to "finished."

3.      Jesse Gagliano provided the BP drilling engineers with every test result they requested.

4.      It was reasonable for Jesse Gagliano to not provide BP with the final foam stability test result prior to the Macondo production casing cement job given that: (1) he had received the "Finished in Lab" notification; (2) BP never requested that he conduct a foam stability test; and (3) BP never requested results of a foam stability test.

## XIX.     None Of The Post-Incident Testing Conducted By Third-Parties On Non-Rig Cement Is Representative Of The Properties Of The Foam Slurry Actually Pumped At Macondo.

### A.      Proposed Findings Of Fact

#### 1.      *The Industry Recognizes The Concept Of Cement Variability Due To Exposure To Environmental Factors.*

1.      The chemistry of cement can be altered by exposure to different environmental conditions, such as heat and humidity.  (G. BENGE, T.T. 2419:16—2422:2).

2.      When cement is transported from shore to a deepwater drilling rig, it is loaded from a shore-based tank into a ship-based tank via a transport system.  (G. BENGE, T.T. 2420:2-18; DEPO. OF G. GARRISON, 179:2-9, 179:12—180:7).

3.      Cement is offloaded from a ship-based tank onto a rig-based tank via a transport system.  (DEPO. OF G. GARRISON, 179:2—180:7; G. BENGE, T.T. 2420:9-18).

4.      When cement is transferred between tanks, it can be contaminated with minute residue from cement that was previously stored in those tanks.  (DEPO. OF G. GARRISON, 179:2-180:17; G. BENGE, T.T. 2420:9—2421:5).

5.      When cement is transferred between tanks using a transfer system, it can be contaminated with minute residue from cement that was previously transferred through that transfer system.  (G. BENGE, T.T. 2420:9-2421:5).

232

6.      Heat, humidity and other environmental conditions can alter the chemical characteristics of a dry cement or dry cement blend.  (G. BENGE, T.T. 2420:19—2422:2; DEPO. OF G. GARRISON, 180:9-17).

7.      Contamination during the transport and storage process can alter the chemical characteristics of a dry cement or dry cement blend.  (G. BENGE, T.T. 2420:19—2422:2; DEPO. OF G. GARRISON, 179:13—180:17).

8.      Once a portion of dry cement or dry cement blend is transported offshore, it begins to develop its own unique characteristics that are different from those of the onshore dry cement or dry cement blend from which it was originally sourced.  (G. BENGE, T.T. 2419:16-2422:2; DEPO. OF C. GARDNER, 301:11-20, 289:11—290:20, 292:6-10).

9.      The unique and evolving chemical characteristics of a dry cement or dry cement blend located on a drilling rig ("rig cement") can cause variability in cement testing results vis-à-vis the results generated by testing an onshore cement or cement blend of the same composition. (G. BENGE, T.T. 2422:5-17).

10.      The principle of cement variability is well understood in the oilfield industry.  (G. BENGE, T.T. 2422:5-12; DEPO. OF G. GARRISON, 178:1—179:12).

11.      The oilfield industry recognizes cement variability in its practice of incurring costs to transport actual "rig cement" samples back to shore via helicopter or boat to conduct laboratory testing for operational cement jobs.  (G. BENGE, T.T. 2422:5-22; DEPO. OF C. GARDNER, 290:11—291:9; DEPO. OF G. GARRISON, 178:13—179:12).

12.      The oilfield industry recognizes cement variability in its practice of recommending the resampling of actual "rig cement" after 30 days for continued testing on

233

operational cement jobs.  (DEPO. OF G. GARRISON, 178:13-20; DEPO. OF C. GARDNER, 291:25-292:10; DEPO. OF R. FAUL, 536;16-537:4).

13.     The BP/HESI Contract requires that cement testing for an operational cement job use actual "rig samples."   (TREX-4477 at BP-HZN-2179MDL00055809; G. BENGE, T.T. 2422:14—2423:5).

14.     Cement testing conducted on actual "rig cement" is the most relevant for assessing the properties of the foam cement slurry pumped on the Macondo production casing cement job.  (DEPO. OF C. GARDNER, 248:25—249:10; G. BENGE, T.T. 2417:2—2419:6, 2422:5—2424:8, 2451:2-12).

15.     HESI performed cement testing, including the foam stability test, on the slurry containing 0.08 gps of retarder on actual rig samples brought in from the *Deepwater Horizon*. (G. BENGE, T.T. 2423:6-9).

16.     Post-incident, the only cement testing on actual rig samples was conducted by Oilfield Testing & Consulting ("OTC") on the "MAC4" samples.  (G. BENGE, T.T. 2423:6-15).

17.     With the exception of the MAC4 sample tested by OTC, none of the post-incident testing in evidence used actual rig samples.  (G. BENGE, T.T. 2417:25—2418:21; 2423:6-15; TREX-2, Appendix K at 2; TREX-4572 at 1; TREX-5937 at 3; DEPO. OF G. GARRISON, 176:7—177:25; DEPO. OF C. GARDNER, 301:7-10).

18.     The two foam stability tests conducted on actual rig cement—HESI's pre-incident test on the slurry with 0.08 gps of retarder and OTC's unset foam stability test on the MAC4 slurry with 0.09 gps of retarder—both demonstrate that the foam cement pumped on the Macondo production casing cement job was stable.  (G. BENGE, T.T. 2434:18—2437:5, 2456:12-2459:2).

2.      *The Cement Testing Conducted By CSI On Behalf Of BP Is Not Relevant.*

19.     BP commissioned cement testing by CSI Technologies ("CSI") as part of BP's internal investigation into the *Deepwater Horizon* incident.  (TREX-1 at 34, 59).

20.     CSI's cement testing, including procedures and results, is set forth in Appendix K to the Bly Report.  (TREX-2, Appendix K; TREX-1 at 34, 59; DEPO. OF F. SABINS,  102:1-13; 102:22-103:2, 103:4-10, 103:12).

21.     CSI did not test actual rig cement.  (G. BENGE, T.T. 2416:19—2417:8; TREX-2 Appendix K at 2; DEPO. OF F. SABINS, 242:23—243:3, 243:5-21; 243:23—244:8).

22.     CSI did not test any HESI cement or additives.  (TREX-2 Appendix K at 2).

23.     To conduct its testing, CSI developed a "simulated" cement slurry using non-HESI additives allegedly "similar in form and function (to) the HESI additives (that) were used" on the Macondo production casing cement job.  (TREX-2 Appendix K at 2-3).

24.     The results obtained by CSI on the "simulated" cement slurry are not representative of the characteristics of the rig cement blend used on the Macondo production casing cement job.  (G. BENGE, T.T. 2423:16-20; DEPO. OF F. SABINS, 251:1-12, 252:13-24).

25.     The results obtained by CSI on the "simulated" cement slurry are not representative of the properties of the rig cement blend used on the Macondo production casing cement job.  (G. BENGE, T.T. 2423:16-20; DEPO. OF F. SABINS, 251:1-12, 252:13-24).

26.     As Glen Benge testified in court, the results of CSI's cement testing is not relevant at all to the question of whether the foam slurry pumped at Macondo was stable.  (G. BENGE, T.T. 2423:16-20).

27.     CSI's cement report, as set forth in Appendix K to the Bly Report, recommends that the testing it conducted be repeated using actual HESI additives.  (TREX-2 Appendix K at p. 3).

28.     The cement testing conducted by CSI is irrelevant to the performance of the actual rig cement used on the Macondo production casing cement job.  (G. BENGE, T.T. 2423:16-20).

> **3.     *The Cement Testing Conducted By Chevron On Behalf Of The National Commission Was Not Conducted On Rig Samples And Therefore Not Representative Of The Performance Of The Macondo Slurry.***

29.     The National Commission on the BP *Deepwater Horizon* Oil Spill and Offshore Drilling ("National Commission") commissioned cement testing by Chevron as part of the National Commission's investigation into the *Deepwater Horizon* incident.  (TREX-4572 at 1; DEPO. OF C. GARDNER, 16:3—17:8).

30.     Chevron did not test the actual rig cement.  (TREX-4572 at 11; G. BENGE, T.T. 2417:12-15; DEPO. OF C. GARDNER, 284:19—285:5, 301:7-10).

31.     Chevron tested Lafarge Class H cement and proprietary additives provided by HESI.  (TREX-4572 at 1; DEPO. OF C. GARDNER, 284:19—285:5; G. BENGE, T.T. 2424:9-2425:1).

32.     Chevron also tested Lafarge Class H cement sourced directly from the manufacturer of the cement.  (TREX-4572 at 11; DEPO. OF C. GARDNER, 294:20—296:1; G. BENGE, T.T. 2424:9—2425:1).

33.     As Glen Benge testified at trial, Chevron's testing on non-rig HESI cement and additives was a different slurry than what was tested and pumped on the Macondo production casing job.  (G. BENGE, T.T. 2423:21—2424:8).

34.     Glen Benge could not conclude that the results of Chevron's simulation slurry testing reflected the properties of the slurry actually pumped at the Macondo well.  (G. BENGE, T.T. 2423:21—2424:8).

35.     Chevron's Test No. 8 used Lafarge Class H cement sourced from the manufacturer rather than HESI.  (G. BENGE, T.T. 2424:9-2425:1; DEPO. OF C. GARDNER, 294:16—296:23, 297:4—298:12; TREX-4572 at 11).

36.     The foam stability test result from Chevron's Test No. 8 was an outlier compared to the results generated by Chevron's other foam stability tests conducted on non-rig cement provided by HESI.  (TREX-4572 at 11-12; G. BENGE, T.T. 2424:9—2425:12).

37.     The foam stability test result from Chevron's Test No. 8 demonstrates that the source of cement matters and that cement from different sources can produce different results. (G. BENGE, T.T. 2424:9—2425:12).

    **4.**    ***The Cement Testing Conducted By OTC On Behalf Of The United States Showed That The Macondo Slurry Was A Stable Foam System.***

38.     The United States' Joint Investigation Team ("JIT") commissioned cement testing by Oilfield Testing & Consulting ("OTC") as part of the JIT's investigation into the *Deepwater Horizon* incident.  (TREX-5937 at 1; DEPO. OF G. GARRISON, 15:6-15).

39.     OTC primarily tested non-rig cement and additives provided to the U.S. Government by HESI pursuant to subpoena.  (DEPO. OF G. GARRISON, 176:7—177:25, 182:1-24; G. BENGE, T.T. 2417:22—2418:15; TREX-5937).

40.     The U.S. Government also provided OTC with actual rig cement for testing that had been provided by HESI to the U.S. Government via subpoena.  (G. BENGE, T.T. 2417:22—2418:15; DEPO. OF G. GARRISON, 176:7-23).

41.     HESI also provided the U.S. Government, via subpoena, a sample of actual rig water used for mixing cement on the *Deepwater Horizon*.  (DEPO. OF G. GARRISON, 239:7-18).

42.     The U.S. Government did not provide the rig water samples to OTC for any of its testing.  (DEPO. OF G. GARRISON, 239:7-18, 241:16—242:24, 243:2-18, 243:20—244:6).

43.     OTC's use of city water instead of actual rig water for purposes of conducting cement testing introduces more variability into its cement testing results as compared to the results of pre-Incident cement testing obtained by HESI, which used rig water.  (DEPO. OF G. GARRISON, 239:7-18, 241:16—242:24, 243:2—243:18; 243:20—244:6).

44.     In addition to non-rig cement and additives provided by HESI, OTC also tested one sample of rig cement that was provided to the U.S. Government by HESI pursuant to subpoena.  (G. BENGE, T.T. 2417:22—2418:15; TREX-5937; DEPO. OF G. GARRISON, 176:7—177:25, 22:16-23:8).

45.     The U.S. Government provided OTC with a 5-gallon bucket of Macondo rig cement.  (DEPO. OF G. GARRISON, 181:4-25).

46.     OTC only conducted two cement tests from this rig cement—a set foam stability test and an unset foam stability test.   (G. BENGE, T.T. 2417:22—2418:21; DEPO. OF G. GARRISON, 176:7—177:25, 211:12—212:4, 212:7-16).

47.     There were rig cement samples left over after OTC concluded its testing that were never tested and that are still in the possession of the U.S. Government.  (DEPO. OF G. GARRISON, 181:4-182:8).

48.     The rig cement samples that were provided by the U.S. Government and tested by OTC were more than one year old.  (G. BENGE, T.T. 2432:6-10).

49.     OTC labeled the rig cement test samples as the "MAC4" samples.  (TREX-5937 at 35; Depo. Of G. Garrison, 22:16-21).

50.     Glen Benge testified that the age of the MAC4 sample raises a concern that those samples would not test the same as the Macondo rig cement tested by HESI just prior to the production casing cement job.  (G. Benge, T.T. 2432:6-17).

51.     OTC had initially planned to conduct at least eight cement tests using rig cement, but ultimately only initiated two tests with the MAC4 sample—a set foam stability test and an unset foam stability test.  (Depo. Of G. Garrison, 176:24—177:25).

52.     After the OTC testing, there was more rig cement available for testing, but OTC did not conduct any further tests.  (Depo. Of G. Garrison, 181:4-182:8).

   **5.**    ***OTC's Unset Foam Stability Testing On Macondo Rig Cement Showed That The Macondo Slurry Was A Stable Foam System.***

53.     The unset foam stability test conducted by OTC on the MAC4 sample was mixed, foamed and then observed after sitting static in a 250-milliliter cylinder for a period of two hours.  (G. Benge, T.T. 2434:18—2435:2).

54.     The data observed on the unset foam stability test conducted by OTC on the MAC4 sample indicates that the MAC4 foam slurry sample was "stable" pursuant to the indications of instability set forth in API RP 10B-4.  (Depo. Of G. Garrison, 191:5—200:4, 200:6—203:1, 203:3-13, 203:15—204:1, 204:3-6, 204:9—206:24, 207:2-13; G. Benge, T.T. 2434:18—2437:5; TREX-5937; TREX-5940; TREX-4569 at CVX80311 00000986-87).

55.     Both Glen Benge and Greg Garrison agreed that the unset foam stability test on the MAC4 rig sample showed that the slurry was stable despite the age of the sample.  (G. Benge, T.T. 2432:11-17, 2434:18—2435:2, 2436:17—2437:5; Depo. of G. Garrison, 191:5—

239

193:21,  193:23—194:1,  194:3—195:12,  195:16—196:16,  196:18—197:7,  198:16—200:1,

200:3-4, 200:6—203:1, 203:3-13, 203:15—204:1, 204:3-6, 204:9—206:24, 207:1-13).

56.     OTC observed that the MAC4 slurry was mixable during the unset foam stability

test.  (DEPO. OF G. GARRISON, 204:12-14).

57.     With respect to the unset foam stability test conducted by OTC on the MAC4

sample, OTC observed that upon mixing, the MAC4 slurry formed a vortex when blended in the

lab.  (DEPO. OF G. GARRISON, 204:12-16).

58.     During the unset foam stability test, OTC observed that the MAC4 slurry was able

to foam successfully in fifteen (15) seconds or less.  (DEPO. OF G. GARRISON, 204:12-23).

59.     The results of the unset foam stability test showed OTC that the specific gravity

of the MAC4 slurry was 1.79 S.G., which equates to a density of 14.9 ppg.  (DEPO. OF G.

GARRISON, 204:12-206:5).

60.     A density of 14.9 ppg is only 0.4 ppg deviation from the target density of 14.5

ppg for the designed density of the production casing cement job.  (DEPO. OF G. GARRISON,

204:12—206:13).

61.     During the unset foam stability test, OTC did not observe any trace of free fluid.

(DEPO. OF G. GARRISON, 201:10-13, 204:12-206:19).

62.     During the unset foam stability test on the MAC4 sample, OTC also did not

observe any bubble breakout, as noted by large bubbles on the top of the sample.  (DEPO. OF G.

GARRISON, 204:12—206:24; 207:1).

63.     Nor did OTC observe an excessive gap at the top of the specimen during the unset

foam stability test.  (TREX-5940; DEPO. OF G. GARRISON, 195:16-196:16, 196:18-197:7).

64. During the test, OTC did observe "minor" bubble breakout manifesting in a 6 milliliter reduction in the height of the slurry volume of the MAC4 sample. (TREX-5940; DEPO. OF G. GARRISON, 195:16-196:16, 196:18—197:7).

65. The "minor" bubble break out (6 milliliter reduction in the height of the slurry volume) observed by OTC in the MAC4 slurry did not rise to the level of an indication of instability as set forth in API RP 10B-4, Section 9.3.4. (TREX-5940; DEPO. OF G. GARRISON, 195:16-196:16, 196:18—197:7; 206:20-24; 207:1; TREX-4569 at CVX80311 00000986-87).

66. OTC did observe a "minor" bubble breakout, but it did not amount to an excessive bubble breakout within the meaning of API RP 10B-4, Section 9.3.4. (TREX-5940; DEPO. OF G. GARRISON, 195:16—196:16; 196:18—197:7; 206:20-24; 207:1; TREX-4569 at CVX80311 00000986-7).

67. OTC did not detect any signs of density segregation or settling during the unset foam stability test on the MAC4 sample. (DEPO. OF G. GARRISON, 201:10—202:16).

68. During the test on the MAC4 sample, OTC did not witness any indications of instability as set forth in API RP 10B-4, Section 9.3.4. (DEPO. OF G. GARRISON, 202:22—203:1; 203:3-13; 203:15-204:1, 204:3-6; TREX-4569 at CVX8031 00000986-7).

### 6. *OTC Prematurely Terminated The Only Other Post-Incident Foam Stability Test On The Macondo Slurry.*

69. OTC terminated the set foam stability test prematurely after forty-eight hours in contravention of the testing protocols recommended by API RP 10B-4, Section 9.3.2. (TREX-5937 at 39; G. BENGE, T.T. 2432:18—2434:17; DEPO. OF G. GARRISON, 207:14—210:14, 210:16—211:9; TREX-4569 at CVX80311 00000977-8, 985-6).

70.     According to API RP 10B-4, Section 9.3.2, set foam stability test samples should be cured "until they are set."  (TREX-4569 at CVX8031 00000985-6).

71.     OTC prematurely terminated the set foam stability test at the direction of the JIT. (TREX-4569 at CVX8031 00000985-6; TREX-5937 at 39; G. BENGE, T.T. 2432:18—2434:17; DEPO. OF G. GARRISON, 207:14—210:14; 210:16—211:9).

72.     There would be another data set on whether the MAC4 slurry was stable had the JIT not instructed OTC to prematurely terminate the set foam stability test on the MAC4 slurry sampled after curing forty-eight hours.  (DEPO. OF G. GARRISON, 207:14—210:14; 210:16—211:9).

73.     Because OTC prematurely terminated the set foam stability test on the MAC4 slurry sample, the data from the test is inconclusive.  (G. BENGE, T.T. 2432:18—2434:17).

### 7.     *OTC's Testing On Non-Rig Cement Was Not Reflective Of The Performance Of The Macondo Slurry.*

74.     None of the compressive strength tests conducted by OTC used rig cement samples.  (DEPO. OF G. GARRISON, 182:25—183:5).

75.     The compressive strength tests conducted by OTC used non-rig cement and additives provided by HESI to the U.S. Government pursuant to subpoena.  (DEPO. OF G. GARRISON, 182:25—183:5).

76.     Pressure and temperature are drivers of compressive strength development.  (G. BENGE, T.T. 2430:19-24; DEPO. OF G. GARRISON, 217:19-22; 217:24—218:2; 218:4).

77.     Downhole pressure should be simulated for purposes of conducting UCA compressive strength testing.  (G. BENGE, T.T. 2430:19—2431:6; DEPO. OF G. GARRISON, 116:4-8).

78.     When conducting UCA compressive strength tests on non-rig cement, OTC used a simulated downhole pressure of 3,000 psi.  (TREX-5937 at 27; DEPO. OF G. GARRISON, 115:24—116:13, 116:15-22).

79.     OTC used 3,000 psi to simulate downhole pressure during UCA compressive strength tests on non-rig cement, which understated the downhole pressure in the Macondo well. (G. BENGE, T.T. 2572:19—2573:8; TREX-984 at HAL-DOJ_0000043).

80.     HESI used 14,458 psi to simulate downhole pressure during UCA compressive strength tests, which more accurately simulated downhole pressure in the Macondo well. (TREX-984 at HAL-DOJ_0000043).

81.     OTC used a 16-hour heat ramp to simulate downhole temperature during UCA compressive strength tests on non-rig cement.  (G. BENGE, T.T. 2425:25—2428:8).

82.     OTC's use of a lower simulated downhole pressure and a longer heat ramp for UCA testing had the effect of increasing the time of compressive strength development.  (G. BENGE,  T.T.  2425:25—2428:8,  2430:19-24,  2572:19—2573:8;  DEPO. OF G. GARRISON, 114:24—115:11).

**8.     *OTC's "60% Foam Quality" Tests Are Not Representative Of Rig Operations Or Downhole Conditions.***

83.     OTC also prepared a separate cement testing report entitled, "Macondo well Evaluation of 60% Foam Quality Foam Stability Testing." ("60% Foam Quality" testing) (TREX-5939).

84.     The purpose of the 60% Foam Quality testing purportedly was to test whether a simulation slurry would be stable, at atmospheric conditions, when foamed to 60% foam quality. (TREX-5939 at 6; G. BENGE, T.T. 2462:5—2463:1; DEPO. OF G. GARRISON, 32:8-19).

85.     OTC's 60% Foam Quality test obtained results indicating that its simulated foam slurry was not stable at a 60% foam quality.  (DEPO. OF G. GARRISON, 32:08—33:14, 33:16—34:24).

86.     The protocol for the 60% Foam Quality was developed by BP.  (TREX-5939 at 6; DEPO. OF G. GARRISON, 189:15—190:4; G. BENGE, T.T. 2462:3—2464:10).

87.     Neither JIT nor OTC proposed to conduct the 60% Foam Quality test.  (DEPO. OF G. GARRISON, 32:08—33:14; 33:16—34:24, 183:6—184:17; 184:19—185:1).

88.     OTC did not want to conduct BP's 60% Foam Quality test.  (DEPO. OF G. GARRISON, 32:8—33:14, 33:16—34:24, 189:15-25; 190:2-4).

89.     The 60% Foam Quality test protocol is neither recommended nor endorsed by API.  (DEPO. OF G. GARRISON, 32:8-33:14, 33:16-23, 184:7-17, 184:19; G. BENGE, T.T. 2462:3—2464:17).

90.     In deepwater foam cementing operations, nitrogen is injected into the cement slurry on the surface at a higher concentration than the downhole foam quality design.  (G. BENGE, T.T. 2462:3—2463:22).

91.     On the Macondo production casing foam cement job, the downhole foam quality design was between 18-19% to achieve a downhole foam density of 14.5 ppg.  (TREX-717A at 22).

92.     In order to achieve a downhole foam quality of 18-19%, nitrogen was injected at the rig into the foam cement portion of the cement job at approximately 60% foam quality.  (G. BENGE, T.T. 2462:3—2463:22; TREX-1705 at HAL_0028323; TREX-717A at 22).

93.     As the foam cement is pumped into the well, the 60% foam quality cement is compressed under greater and greater pressure as the slurry travels three miles to the bottom of the well.  (G. BENGE, T.T. 2462:3—2463:22).

94.     As the foam cement reaches the bottom of the well, the downhole pressure compresses the foam cement (which was initially injected at approximately 60% foam quality) into a foam cement slurry with 18-19% foam quality.  (TREX-1705 at HAL_0028323; TREX-717A at 22; G. BENGE, T.T. 2462:3—2463:22).

95.     The head of OTC's cement lab, Greg Garrison, who conducted BP's 60% Foam Quality test, testified that the test results he obtained are not representative of what occurred on the rig during the Macondo production casing foam cement job.  (DEPO. OF G. GARRISON, 187:25—188:8, 188:10—189:5, 189:7-11, 189:14).

96.     There is no correlation between BP's 60% Foam Quality testing protocols used by OTC and what actually occurred on the *Deepwater Horizon* during the pumping of the Macondo production casing foam cement job.  (G. BENGE, T.T. 2462:3—2466:1).

97.     BP's 60% Foam Quality testing protocol foamed a simulation slurry to 60% foam quality at atmospheric conditions (no pressure), whereas on the rig the nitrogen was injected into a closed system under pressure.  (DEPO. OF G. GARRISON, 187:3-12, 187:14-23, 187:25—188:8, 188:10-189:5, 189:7-11, 189:14; G. BENGE, T.T. 2462:3—2466:1).

98.     Pressure helps to entrain nitrogen in the foam cement slurry.  (DEPO. OF G. GARRISON, 187:19—187:23; G. BENGE, T.T. 2465:8-13).

99.     BP's 60% Foam Quality testing protocol assumes that the 60% foam quality is a static condition, whereas on the rig, the 60% foam quality occurs for a fraction of a second while

the dynamic slurry is pumped into the closed well system under pressure.   (DEPO. OF G. GARRISON, 187:3-12, 187:14-23, 187:25-188:8, 188:10-189:5, 189:7-11, 189:14).

100.   Contrary to BP's assertion, Glen Benge testified that he personally has seen foam cement successfully foamed at foam qualities higher than 60%.  (G. BENGE, T.T. 2462:3— 2466:1; 2465:14—2466:1).

        **B.**     **Proposed Conclusions Of Law**

1.   Due to the principle of the variability of cement, the most relevant cement testing for assessing the properties of the foam cement slurry pumped on the Macondo production casing cement job is testing done with actual rig cement.

2.   The cement testing, including the foam stability test on the slurry containing 0.08 gps of retarder, that HESI performed for the Macondo production casing cement job was conducted on actual rig sample brought in from the *Deepwater Horizon*, and is the most relevant testing for assessing the properties of the foam cement pumped at Macondo.

3.   Post-incident, the only cement testing on an actual rig sample was conducted by Oilfield Testing & Consulting (OTC) on the "MAC4" samples.

4.   With the exception of the MAC4 sample tested by OTC, none of the post-incident testing in evidence used actual rig samples.

5.   The two foam stability tests conducted on actual rig cement—HESI's pre-incident test on the slurry with 0.08 gps of retarder and OTC's unset foam stability test on the MAC4 slurry with 0.09 gps of retarder—both demonstrate that the foam cement pumped on the Macondo production casing cement job was stable.

6.   Post-incident testing by CSI, Chevron, and OTC on slurries containing non-rig cement are not as representative as the testing conducted on rig cement and, therefore, are either

not relevant at all (CSI) or not as relevant (Chevron and OTC) as HESI's pre-Incident April 2010 testing for purposes of assessing the properties of the foam cement pumped at Macondo.

7.      The "60% Foam Quality" tests conducted by OTC, at BP's insistence, are not relevant to whether a foam slurry generated on the rig with 60% foam quality can generate a stable foam slurry when pumped into a deepwater well such as Macondo given the significant lack of correlation between the testing protocols provided by BP and the real-world conditions that exist while cementing a deepwater well.

**XX.    Due To A Breach In The Production Casing Below The Float Collar, The Cement Job Was Not Placed So As To Provide An Effective Barrier To Hydrocarbon Flow.**

   **A.    Proposed Findings Of Fact**

      **1.    *Data From The Production Casing Landing Operation Indicates That BP Landed The Long String Production Casing In Compression, Which Induced Helical Buckling Of The Casing And Compromised The Casing's Mechanical Integrity.***

1.      On the Triple Combo log, generated from data collected by the R/T Scanner tool run during wireline logging operations, the "Schlumberger Depth" identified on the first page of the log was "18,280 ft," and "Remark 10" on the log header states:  "It was not possible to reach TD (Total Depth) due to borehole conditions and the client requested to start logging from 18280 ft."  (TREX-3540).

2.      An obstruction in the wellbore prevented the R/T Scanner wireline tool from descending to total depth in the Macondo well.  (TREX-3540).

3.      Given the debris in the Macondo wellbore, BP recognized that the production casing could buckle if it set down on an obstruction when being run into the well.  (F. BECK, T.T. 7134:18—7137:10; TREX-4515; TREX-8140 at 84).

4.      On April 16, 2010, prior to the operation to run the production casing into the Macondo well, BP drilling engineer, Brian Morel, emailed Preeti Paikattu at Landmark, a HESI product service line, requesting that she "model the torque and drag/buckling for (BP's) production string."  (TREX-4515.2.1.HESI).

5.      After Preeti Paikattu responded to Brian Morel's email on April 16, 2010, attaching the analysis, Morel asked her:  "[a]nyway to have it tell you how much weight you can set down before bucking (*sic*)?"  (TREX-4515 at 10:30 AM).

6.      On April 16, 2010, Preeti Paikattu and Brian Morel exchanged a series of emails in which Morel sought further clarification on the meaning of Landmark's buckling analysis, asking:  "I want to know if I am 18,200' (*sic*) and set down on something how much weight can I slack off before I start to see buckling?" (TREX-4515.1.1.HESI), to which Ms. Paikattu answered:  "When I have 30 kips at the bottom (at the shoe at 18304 ft) the slack off at the top is 644.3 kips and the helocal (*sic*) buckling exists from 18117 ft downwards to the shoe. . . ." (TREX-4515.1.2.HESI; F. BECK, T.T. 7134:18—7137:10; TREX-8140 at 84).

7.      Prior to running the production casing into the Macondo well, BP was advised that, if the casing was set down on an obstruction with as little as 30 kips (30,000 pounds of compressional force), the production casing would helically buckle from 18,117 ft. down to the reamer shoe.  (TREX-4515.1.2.HESI; F. BECK, T.T. 7134:18—7137:10).

8.      The Sperry data shows that in the last minutes when the casing was landing out, the rates of casing slack off and hook load drop off indicate that the end of the production casing (reamer shoe) impacted fill at the bottom of the wellbore with a compressional load of as much as 140 kips or 140,000 lbs of force.   (F. BECK, T.T. 7146:25—7148:7, 7378:25—7379:22; TREX-604 (April 19, 2010, 13:00-13:40)).

9.      Given that the buckling analysis ordered by BP indicated that 30 kips of compressional force would be sufficient to induce helical buckling in the production casing, a compressional force of 140 kips induced a greater amount of helical buckling in the production casing when it was landed out.  (F. BECK, T.T. 7134:18—7137:10, 7379:15—7380:9).

10.     BP applied stresses to the production casing sufficient to compromise its mechanical integrity by setting the production casing in compression and inducing helical buckling from the bottom of the casing and up the casing string.  (F. BECK, T.T. 7146:25—7148:7, 7379:23—7380:19).

### 2. *BP's Difficulties In Converting The Float Collar Because Of Debris Obstructing Flow At The Reamer Shoe And/Or At The Float Collar Further Demonstrate That BP Set The Long String Production Casing In Compression.*

11.     When BP attempted to convert the float collar prior to the production casing cement job, the production casing was helically buckled by having been set in compression.  (F. BECK, T.T. 7146:25—7148:7, 7379:23—7380:19).

12.     Successfully converting the float collar was a prerequisite to performing the production casing cement job. (B. AMBROSE, T.T. 6049:5-8, 6164:2-19; TREX-8140 at 67).

13.     The float collar did not convert.  (F. BECK, T.T. 7114:18—7115:16).

14.     HESI had no role in the operation on April 19, 2010, which attempted to convert the float collar.  (N. CHAISSON, T.T. 6303:4—6304:10, 6307:5-20).

15.     It was BP's responsibility, once it determined that the float collar had successfully converted, BP was responsible for directing HESI to commence the production casing cement job.  (N. CHAISSON, T.T. 6305:8—6306:3, 6307:5-20; G. BENGE, T.T. 2312:21—2313:11).

16.     When BP could not achieve circulation on its initial attempt to convert the float collar due to debris in the float collar and reamer shoe, BP directed the rig crew to proceed to pressure up nine times over two hours to clear the blockage, and circulation was established on the ninth attempt at 3,142 psi.   (D-8039; F. BECK, T.T. 7113:16—7114:10; TREX-713 at HAL_0125646-47).

17.     BP's initial inability to circulate when it attempted to convert the float collar corroborates other evidence that the reamer shoe was compressed into fill or debris in the bottom of the well, plugging the reamer shoe and initiating compression in the production casing.   (F. BECK, T.T. 7112:19—7113:12, 7143:18—7145:3, 7146:25—7147:12).

### 3.     *The Rapid Pressurization That Occurred When BP Regained The Ability To Circulate Is More Consistent With A Mechanical Failure Than Clearing A Blockage.*

18.     When circulation broke at 3,142 psi on the ninth attempt to convert the float collar, there was a very rapid depressurization.   (F. BECK, T.T. 7114:18—7115:8).

19.     As Dr. Beck testified based on his personal experience, the pressure response for clearing blockage should be a gradual change over time from extremely high pressure to lower pressure as debris is cleared and circulated out.   (F. BECK, T.T. 7122:9—7123:9).

20.     The pressure response at the Macondo well, when circulation broke at 3,142 psi, was an immediate pressure reduction from 3,142 psi down to 150 or 200 psi.   (F. BECK, T.T. 7122:9—7123:9).

21.     The rapid depressurization when circulation broke at 3,142 psi is not a signature of clearing blockage by debris; rather, it bears the signature of a mechanical failure.   (F. BECK, T.T. 7122:9—7123:9).

**4.** ***The Lower Than Expected Circulating Pressures Observed After BP's Attempts To Convert The Float Collar Are Also Indicative Of A Mechanical Failure In The Casing, But BP Failed To Resolve The Issue Before Deciding To Commence With The Cement Job.***

22.     After circulation broke at 3,142 psi, the circulating pressure was much lower than BP expected.   (F. BECK, T.T. 7119:19—7122:19; TREX-3188 at BP-HZN-BLY00061514; B. AMBROSE, T.T. 6173:3—6174:19; G. BENGE, T.T. 2310:8—2311:14).

23.     HESI had modeled or calculated that, after successfully converting the float collar, the circulating pressure at a pump rate of 4 bpm should be 570 psi.   (F. BECK, T.T. 7119:19—7122:2; TREX-3188; B. AMBROSE, T.T. 6173:3-23).

24.     After circulation broke at 3,142 psi, the circulating pressure at 4 bpm was only 350 psi, a difference of 225 psi from what HESI had calculated before the float collar operation. (F. BECK, T.T. 7119:19—7122:8; TREX-3188 at BP-HZN-BLY00061514).

25.     After noticing the rapid depressurization upon breaking circulation and the lower than expected circulating pressure, BP's Well-Site Leader, Bob Kaluza, and BP's drilling engineers, Brian Morel and Mark Hafle, expressed concern.   (N. CHAISSON, T.T. 6303:4—6305:19; TREX-4457; TREX-2584).

26.     As reflected in notes taken during a Bly Investigation interview on April 28, 2010, eight days after the blowout, Bob Kaluza was recorded as saying:  "[m]y opinion is that after it sheared the flow came back real quick.  I said 'Wow look at how much fluid we got back' . . . HESI had modeled that at 4bbls/min pressure should be 570 psi.  Ramped up in 1 bbl increments slowly to 4 bbl/min at 350 psi.  I said 'that is odd you guys this is very low'." (TREX-3188 at BP-HZN-BLY00061514).

27.     In an email dated April 19, 2010, the same day of the float collar operation, Brian Morel wrote to Weatherford employee, Bryan Clawson:  "Yah we blew it at 3140, but still not sure what we blew yet."  (TREX-2584).

28.     In an email dated April 19, 2010, the same day of the float collar operation, Mark Hafle wrote to a recipient with the email address VHG3@aol.com:  "Shifted at 3140 psi.  Or we hope so.  We are circ now."  (TREX-4457).

29.     Mark Hafle's email, dated April 19, 2010, demonstrates that it was possible, at that time, to achieve circulation through the float collar and still not convert it to a one-way valve.  (TREX-4457).

30.     HESI cement engineer, Nate Chaisson, while standing back on the rig floor waiting to participate in the production casing cement job, heard Bob Kaluza state, in response to the lower than expected circulating pressure:  "I need to make a phone call.  We may have blown something higher up in the casing."  (N. CHAISSON, T.T. 6305:8-19).

31.     When Bob Kaluza noticed that the circulating pressure was lower than expected, he directed that the pump used to circulate in the well be switched, but circulating pressure was still lower than expected with the second pump.  (TREX-3188 at BP-HZN-BLY00061514; N. CHAISSON, T.T. 6305:20—6306:18).

32.     As reflected in notes taken during a Bly Investigation interview on April 28, 2010, eight days after the blowout, Bob Kaluza was recorded as saying:  "Switched pumps from number 3 to number 4 took 205 psi to break over then at 4 bbls/min had 390 psi.  That was an anomaly.  I discussed it with John Guide and Keith Daigle.  John said pump cement."  (TREX-3188 at BP-HZN-BLY00061514).

33. After circulation broke at 3,142 psi, Bob Kaluza and Brian Morel took no action to determine why circulating pressure was lower than expected or to confirm that the float collar actually converted, other than to make telephone calls to people on shore, including John Guide. (TREX-3188 at BP-HZN-BLY00061514; N. CHAISSON, T.T. 6305:20—6306:3).

34. Despite the anomalies identified by BP during the attempt to convert the float collar, John Guide directed the BP Well-Site Leaders to commence the production casing cement job. (TREX-3188 at BP-HZN-BLY00061514).

35. After Bob Kaluza and Brian Morel made calls to shore, BP Well-Site Leader Don Vidrine directed Nate Chaisson and the HESI cement team to commence the production casing cement job. (N. CHAISSON, T.T. 6305:8—6306:3, 6307:9-20).

36. The issues of "what was blown" and why there were lower circulating pressures after finally achieving circulation on the ninth attempt to convert the float collar were never resolved by BP. (G. BENGE, T.T. 2311:15—2312:12; TREX-2586).

37. Without resolving whether something was "blown" or why circulating pressure was lower than expected after the attempts to convert the float collar, BP directed HESI to commence the cement job on the Macondo production casing. (G. BENGE, T.T. 2311:15—2313:11; TREX-2586).

38. If the flapper valves in the float collar had converted to one-way valves, the drill crew would not have been able to reverse circulate mud back up through the float collar. (G. BENGE, T.T. 2312:13-20).

39. BP could have directed the Transocean drill crew to reverse circulate after circulation was achieved with 3,142 psi of pressure to determine whether the flapper valves in the float collar had converted to one-way valves. (G. BENGE, T.T. 2312:13-20).

40.     BP never directed that the Transocean drill crew attempt to reverse circulate after the float collar conversion operation to verify if the flapper valves were converted to one-way valves.  (G. BENGE, T.T. 2312:13-20).

5.      *BP's Buckling Of The Production Casing And Subsequent Applications Of High Pressure On The Already Weakened Casing Caused A Breach Below The Float Collar.*

41.     As Glen Benge testified, without investigating whether something was broken below the float collar and why circulating pressure was lower than expected after the ninth attempt to convert the float collar, BP could not be sure where it was circulating drilling mud. (G. BENGE, T.T. 2311:6-14, 2312:21—2313:19).

42.     Bob Kaluza's statement, "We may have blown something higher up in the casing," demonstrates his understanding that, once circulation broke at 3,142 psi, the rig could have been circulating mud down the casing and through a breach point higher up in the shoe track than the reamer shoe.  (N. CHAISSON, T.T. 6305:4-19).

43.     Bill Ambrose testified at trial that, as a matter of common sense, if circulating pressures are lower than expected, that indicates "that something has opened up in a larger geometry" in the path of circulation.  (B. AMBROSE, T.T. 6174:14-19).

44.     The rapidity of the depressurization when circulation broke at 3,142 psi and the significantly lower circulating pressures after circulation was achieved demonstrate that, rather than circulating mud through the three small ports at the bottom of the reamer shoe, the rig was circulating mud through a larger breach or opening in the shoe track below the float collar.  (F. BECK, T.T. 7122:9—7123:9).

45.     The combination of the production casing being compressionally stressed due to helical buckling and the pressure surge created by the rapid depressurization when circulation

254

broke at 3,142 psi was sufficient to open a breach in the casing below the float collar. (F. BECK, T.T. 7379:15—7380:19).

46.     As Glen Benge testified, the sudden release of pressure at 3,142 psi and the lower circulating pressures thereafter indicated that BP may have been circulating through a point higher in the production casing than the reamer shoe. (G. BENGE, T.T. 2311:6-14, 2312:21-2313:19).

47.     After the production casing cement job, the positive pressure test pressurized the production casing from the top plug (which was landed out on top of the float collar) up to the BOP, and the results of that test indicated that the production casing had integrity from the top plug up to the BOP. (B. AMBROSE, T.T. 6174:20—6175:7; G. BENGE, T.T. 2312:21—2313:11).

48.     The most significant buckling occurred below the float collar and the positive pressure test performed after the production casing cement job demonstrates that there was no breach in the production casing above the float collar, indicating that the breach had to be below the float collar. (B. AMBROSE, T.T. 6174:20—6175:7; G. BENGE, T.T. 2312:21—2313:11).

49.     The positive pressure test did not test the integrity of the production casing below the top plug, including the 189 ft. of shoe track from the float collar down to the reamer shoe. (B. AMBROSE, T.T. 6174:20-6175:7; G. BENGE, T.T. 2312:21—2313:11).

50.     The rapid depressurization after breaking circulation at 3,142 psi is indicative of a breach in the shoe track below the float collar. (F. BECK, T.T. 7142:20—7143:15).

51.     The lower than expected circulating pressure after breaking circulation at 3,142 psi is indicative of a breach in the shoe track below the float collar. (F. BECK, T.T. 7122:9—7123:9; 7142:20—7143:15).

52.     The rapidity with which the blowout happened, without apparent restriction to flow into the wellbore and casing, is indicative of a breach in the shoe track below the float collar.  (F. BECK, T.T. 7122:9—7123:9, 7142:20—7143:15).

> **6.     *Due To The Breach In The Casing, The Annular Cement Was Placed Above A Large Portion Of The Hydrocarbon-Bearing Zones In The Production Interval, And No Cement Was Placed In The Shoe Track Below The Casing Breach.***

53.     The bottom 189 feet of casing, from the float collar at 18,115 ft. MD to the bottom of the reamer shoe at 18,304 ft. MD, is called the "shoe track."  (D-8015; B. AMBROSE, T.T. 6159:17—6160:7; D. CALVERT, T.T. 2633:15-22).

54.     The purpose of the shoe track was to assist in placing cement in the annulus during the production casing cement job and to collect contaminated cement.  (B. AMBROSE, T.T. 6178:6-9; D. CALVERT, T.T. 2629:6-13).

55.     If the shoe track is damaged or otherwise loses its integrity, control is lost over where cement is placed during the cement job.  (F. BECK, T.T. 7150:15-22; B. AMBROSE, T.T. 6178:6-14).

56.     The production casing cement job was designed to place unfoamed cap cement in the annulus at a depth of 17,300 feet, to place foam cement in the annulus below the cap cement, and to place unfoamed tail cement inside the shoe track.   (TREX-1719 at BP-HZN-2179MDL00041578; T. ROTH, T.T. 3234:3-9).

57.     The cement in the annulus—the cap cement and foam cement—were intended to create a barrier to isolate the hydrocarbon-bearing zones in the annulus and to prevent them from flowing into the well.  (G. BENGE, T.T. 2258:1-5).

58.     The cement in the shoe track was not intended to be a primary barrier to hydrocarbon flow.  (D. CALVERT, T.T. 2629:20-24).

59.     Due to the breach in the shoe track, the cement likely exited the breach point and turned the corner up into the annulus during the production casing cement job.  (F. BECK, T.T. 7148:24—7149:23).

60.     Due to the breach in the shoe track, the cement exiting the breach point would be placed in the annulus above the breach point, during the production casing cement job.  (F. BECK, T.T. 7148:24—7149:23).

61.     Due to the breach in the shoe track, no cement would be placed in the annulus below the breach point, during the production casing cement job.  (F. BECK, T.T. 7148:24—7149:23).

62.     Because of the breach in the shoe track, no cement would be placed inside the shoe track below the breach point during the production casing cement job.  (F. BECK, T.T. 7148:24-7149:23).

63.     The shoe track was directly adjacent to hydrocarbon-bearing sands in the production interval.  (D-8015).

64.     Cement would not have been placed across hydrocarbon-bearing sand below the breach point, so no cement was placed to form a barrier or to provide zonal isolation below the breach point in the shoe track.  (F. BECK, T.T. 7149:18-23).

65.     With no cement across the hydrocarbon-bearing sands below the breach in the shoe track, hydrocarbons from the uncemented portion of the sands would have unrestricted access into the casing through the breach in the shoe track.  (F. BECK, T.T. 7149:9-17).

66.     The absence of cement across a portion of the hydrocarbon-bearing sands below the breach point is consistent with the OLGA modeling assumptions of BP's expert, Morten Emilsen, who could only get his model to match the flow at Macondo during the blowout if he assumed there were 13-16.5 feet of hydrocarbon-bearing sands flowing into the casing.  (M. EMILSEN, T.T. 7805:19—7806:18).

67.     If 13-16.5 feet of hydrocarbon-bearing sands were flowing into the casing, cement was placed across the remaining reservoir sands (above the breach in the shoe track) and providing zonal isolation.   (TREX-1330 at BP-HZN-BLY00164099; M. EMILSEN, T.T. 7805:19—7806:18).

68.     Post-blowout, when the relief well intercepted the annulus of the Macondo well at the top of the production interval, there were no hydrocarbons in the upper annulus section.  (F. BECK, T.T. 7142:20—7143:15).

69.     The discovery that, upon interception, there were no hydrocarbons in the upper annulus section of the Macondo well's production interval indicates that annular cement indeed set up in the annulus and isolated the upper annular section from the annulus at the bottom of the well.  (F. BECK, T.T. 7142:20—7143:15; 7150:6-14).

70.     The absence of hydrocarbons in the upper annulus section of the Macondo well's production interval demonstrates that the annular cement was capable of and, indeed, did provide zonal isolation in the locations of the annulus where it was placed.  (F. BECK, T.T. 7142:20—7143:15; 7150:6-14).

### B.     Proposed Conclusions Of Law

1.     BP compromised the production casing's structural integrity when it induced helical buckling by running the casing into fill and compressing it while landing it out.

2.      During its attempts to convert the float collar, BP directed that up to 3,142 psi of pressure be applied to the float collar before circulation broke, and the rapid decompression and lower than expected circulating pressure indicated that a breach opened up in the already compromised shoe track below the float collar.

3.      The breach in the shoe track below the float collar compromised the production casing cement job's ability to place cement in the annulus and shoe track as designed.

4.      Due to the breach in the shoe track below the float collar, a portion of the hydrocarbon-bearing sand below the breach point was not covered by annular cement, and there was no cement in the shoe track below the breach point.

5.      The breach in the shoe track below the float collar prevented the production casing cement job from placing cement across a portion of the hydrocarbon reservoir at the bottom of the well and from achieving zonal isolation.

6.      When BP underbalanced the well during the displacement procedure, the absence of cement in portions of the annulus allowed for the hydrocarbon zones adjacent to those portions of the annulus to have unrestricted access into the casing through the breach point.

7.      BP caused the breach in the shoe track by directing that the production casing be run into a debris-filled wellbore, inducing helical buckling and compromising the integrity of the production casing.

8.      BP further caused the breach in the shoe track by directing that excessive pressure be applied in an attempt to convert the float collar with static pressure, which caused a breach to open up in the structurally-compromised shoe track below the float collar.  BP could have determined that the float collar had not converted by reverse-circulating mud down the annulus

and up the casing, but it chose to commence the cement job without resolving the question of whether the float collar had converted and what was causing the low circulating pressure.

9.      Notwithstanding the compromised shoe track and breach below the float collar, BP directed the commencement of the production casing cement job, which exited the breach point and was lifted into the annulus above the breach point, leaving hydrocarbon-bearing sands below the breach point uncemented and no cement in the shoe track below the breach point.

10.     After the production casing cement job, the well was static for approximately 16 hours before the negative pressure test commenced.

11.     BP and Transocean misinterpreted the results of the negative pressure test which, if interpreted correctly, would have confirmed to BP that the annular cement and casing were not providing a barrier to flow.  BP's and Transocean's failure to properly interpret the safety-critical negative pressure test was an extraordinary, unforeseeable affirmative act unrelated to any alleged act of negligence by HESI, thus satisfying the standards for superseding, intervening cause and relieving HESI from liability.

12.     Because BP and Transocean misinterpreted the results of the negative pressure test, BP caused the blowout when it directed that the displacement procedure commence, which intentionally underbalanced the unsecure well and initiated the blowout.

**XXI.   HESI's Mudlogger, A Second Set Of Eyes For Well Monitoring, Performed His Duties Consistent With Industry Standards And Did Not Miss Any Sign Of A Kick Prior To 21:30.**

**A.      Proposed Findings of Fact**

1.      An influx of hydrocarbons or other formation fluid into the wellbore is commonly referred to as a kick.  (TREX-7749 at OSE126-004148; TREX-1453 at TRN-MDL-00048232).

2.      One of the roles and responsibilities of the drill crew on a Mobile Offshore Drilling Unit ("MODU") is to monitor for indications of a kick.  (M. BLY, T.T. 975:18—976:4; R. EZELL, T.T. 1833:5—1834:3; TREX-1453 at TRN-MDL-00048232; TREX-1454 at TRN-MDL-00286784).

3.      While the Macondo well did experience a kick prior to April 20, 2010, Joe Keith was not the mudlogger on duty and by BP's own admission, the March 8, 2010 kick was not identifiable in advance.  (J. KEITH, T.T. 3551:13-17; DEPO. OF K. PAINE, 185:14-25; 239:2-8; 369:24—370:23).

1.      ***Pursuant To Transocean Policy, The Drill Crew Maintains Primary Responsibility For Well Monitoring.***

4.      As a clear matter of Transocean policy, and as acknowledged by numerous witnesses, the Transocean drill crew has primary responsibility for well monitoring and kick detection.  (R. BEA, T.T. 464:22-25; M. BLY, T.T. 975:12-17; R. EZELL, T.T. 1832:20—1833:3, 1833:5—1834:3; R. HEENAN, T.T. 2186:3–10, 2186:19–25; C. BARNHILL, T.T. 4261:2-5, 4270:1-5; F. BECK, T.T. 7280:17-25; A. BOURGOYNE, T.T. 7528:13–19, 7760:6-10; TREX-153 at BP-HZN-BLY00124228; TREX-1453 at TRN-MDL-00048232; TREX-1454 at TRN-MDL-00286784; DEPO. OF J. GISCLAIR, 354:18—355:1; DEPO. OF K. GRAY, 528:12-13, 17; DEPO. OF E. LEE 459:24—460:2, 460:5, 460:12-19, 460:22; DEPO. OF M. SEPULVADO 733:19-23; DEPO. OF B. BRANIFF, 121:17-21; DEPO. OF L. MCMAHAN, 307:9-19).

5.      Transocean's policy mandates that "(d)etection of a kick (intrusion of liquid or gas into the wellbore) is the responsibility of the Driller," and that "(t)he Driller and his crew will continuously monitor the surface system indicators (flow rate, pit level, etc.) . . . for signs of a kick."  (TREX-1453 at TRN-MDL-00048232; *see also* R. EZELL, T.T. 1833:5—1834:3).

2.   *For Well Monitoring, HESI's Mudloggers Serve As A Back-Up To The Transocean Drill Crew.*

6.     HESI's product service line, Sperry Drilling Services, provided a number of SDL services[3] on the Macondo well project.   (TREX-611 at BP-HZN-2179MDL00338243-44). These included real time drilling monitoring, log display of measurement while drilling ("MWD") data, monitoring of drilling fluids, tabular displays of data, trip monitoring and display of data.  The monitored parameters included among other things, mud density in and out, mud temperature in and out, mud volume, and MWD data.     (TREX-611 at BP-HZN-2179MDL00338243-44).

7.     The mudloggers continuously monitor operations during the drilling of the well. They also provide well and drilling data upon request, notify the appropriate personnel of any irregularities or anticipated problems, provide daily reports and print outs of data and prepare master logs and final reports.  (J. KEITH, T.T. 3576:15—3580:14; TREX-611 at 338244).

8.     The mudlogger's well monitoring responsibilities extend beyond merely watching one screen or one surface data parameter for signs of a kick.  (J. KEITH, T.T. 3576:15-25; DEPO. OF K. KRONENBERGER, 159:9-11, 159:14-20, 184:19—185:9).

9.     As a part of his well monitoring responsibilities, the mudlogger monitors sensor data responses for all surface data parameters, monitors data relating to the rig activities about which he is aware, keeps careful track of fluid transfers between and among the pits on the rig, prepares daily operations reports, maintains the rig activities log, collects and analyzes samples, calibrates sensors, and prepares various project/well reports.  (R. EZELL, T.T. 1858:16-22; J.

---

[3] Surface Data Logging, or "SDL", includes  mudlogging.  (J. KEITH, T.T. 3589:24-3590:2).

KEITH, T.T. 3576:15-20, 3580:23—3581:8, 3578:14-16, 3649:10-20; F. BECK, T.T. 7290:13-16; TREX-609 at HAL_0468841-45; TREX-611 at BP-HZN-2179MDL00338243; TREX-8140 at 107; TREX-62953; DEPO. OF J. GISCLAIR, 45:12—46:6; DEPO. OF K. KRONENBERGER, 119:13-16, 119:18-23, 184:19—185:9).

10.     The mudlogger was a "second set of eyes" with well monitoring responsibilities that were secondary to those of the drill crew.  (R. EZELL, T.T. 1836:15-16; T. PROBERT, T.T. 2977:14—2978:7; J. KEITH, T.T. 3489:19-25, 3644:1–4; C. BARNHILL, T.T. 4388:8–14; A. BOURGOYNE, T.T. 7528:20–23, 7760:6-10; DEPO. OF K. GRAY, 316:7-10, 316:14-16, 316:18-22, 321:1-7, 500:25—501:6; 527:20-22; DEPO. OF  E. LEE, 459:15—460:2, 460:5; DEPO. OF J. GISCLAIR, 312:5-14; 354:18—355:1, 388:1-6; DEPO. OF M. SEPULVADO, 733:13—734:5; DEPO. OF J. BEMENT, 265:10-13, 265:15-21; DEPO. OF S. CLARK, 179:13-15, 179:17; DEPO. OF  R. COWIE, 472:17—473:2).

11.     The mudlogger's primary job is to create a log of the well and the formations where the well intersects.  This responsibility includes creating a log to match the operator's model of what the reservoir may look like, calibrating it, and collecting gas-related data to identify whether or not there may be oil or gas shows present in the well.  (T. PROBERT, T.T. 2977:14—2978:7).

12.     Part of the mudlogger's job is to monitor the well and look for anomalies in the data that may reveal the well is flowing (*i.e.*, that there is a kick).  But he does not—and cannot—limit his observations to any single screen or data parameter; he is responsible for monitoring all data.  (F. BECK, T.T. 7290:13-16; DEPO. OF J. GISCLAIR, 402:8-11, 402:15-20; DEPO. OF K. KRONENBERGER, 159:9-11, 159:14-20).

13.     During displacement, the mudlogger's primary focus in terms of well monitoring for signs of a kick is on flow-out from the well and pit gains.  The mudlogger remains responsible for accurately tracking pit movements and mud volumes throughout a displacement procedure.  (J. KEITH, T.T. 3578:6—3580:13; C. BARNHILL, T.T. 4452:24—4453:13; F. BECK, T.T. 7213:24—7215:4).

14.     In the event the mudlogger notices an anomaly or an indicator of a kick, his responsibility is to notify the Transocean drill crew or the BP company man.  (T. PROBERT, T.T. 3002:9-14; J. KEITH, T.T. 3593:14-21; F. BECK, T.T. 7290:21–23; DEPO. OF K. KRONENBERGER, 229:19-24, 230:1-7, 230:10-12; DEPO. OF E. LEE, 460:6-9, 460:12).

15.     Once the mudlogger reports a potential kick indicator to the drill crew, he bears no responsibility for well control or otherwise investigating or responding to the anomaly.  The mudlogger lacks the ability to shut in the well and does not even have access to any buttons that could activate any component of the BOP; there is no EDS switch in the mudlogging shack; and he cannot shut off the pumps or control the movement of mud.  (J. KEITH, T.T. 3593:11—3596:22, 3725:17—3726:16; C. BARNHILL, T.T. 4403:25—4404:20, 4407:9-13; DEPO. OF W. WHEELER, 93:16—94:22; DEPO. OF B. BRANIFF, 142:1-6, 308:24—309:2).

16.     The mudlogger's role is limited to monitoring, observing, and reporting.  (J. KEITH, T.T. 3593:14–21, 3594:11—3596:18; TREX-1453).

### 3.     *BP Determined Mudlogger Staffing And Selected Specific HESI Mudloggers For The Deepwater Horizon Crew.*

17.     As operator, BP determined mudlogging staffing levels, the specific mudloggers assigned to a rig, and the scope of mudlogging services to be provided.  (DEPO. OF J. BELLOW,

455:18-22, 455:25—456:12, 456:15-19; Depo. of J. Gisclair, 462:16—463:1; Depo. of S. Clark, 76:10-77:03, 297:12-23; 337:18-338:08).

18.     In March 2010, Sperry recommended that BP authorize additional mudloggers and increased staffing on the *Deepwater Horizon*.  (Depo. of J. Bellow, 456:24—457:13, 458:18—459:24, 460:2; TREX-1608).

19.     BP chose not to use Sperry's most advanced mudlogging services and/or additional monitoring personnel.  (Depo. of S. Clark, 124:13—125:2, 287:22-24, 288:1—289:3, 290:1-8, 290:10).

20.     Prior to assigning mudloggers to a BP rig, HESI sends resumes, including detailed work histories, to BP and BP specifically approves the mudloggers assigned to its rig.  (Depo. of S. Clark, 32:6—34:16, 35:4-7, 35:9-22, 38:8-9, 38:16-17).  BP specifically requested that Joe Keith be assigned to the *Deepwater Horizon*.  (J. Keith, T.T. 3573:12—3574:6).

### 4.     *Transocean Had Access To All Rig Information While HESI Was Dependent Upon Transocean To Provide Necessary Data.*

21.     The Transocean drill crew was in a better position to accurately monitor the well for signs of a kick than the mudlogger.  (R. Ezell, T.T. 1836:24—1838:5; R. Heenan, T.T. 2149:12-22, 2153:5-15; C. Barnhill, T.T. 4389:11—4390:14, 4393:4-20; A. Bourgoyne, T.T. 7768:15-7769:1, 7779:11-21; Depo. of D. Farr, 187:8-25, 188:1-14; TREX-8140 at 104-106).

22.     As the mudlogger monitors data, his understanding and interpretation of those sensor responses is necessarily dependent on the context of rig activities in which they are observed.  This is because rig operations and other activities affect sensor responses and dictate whether they are anomalous. That is, the data responses are only anomalous if they are not otherwise explained by rig activity.  Thus, in order for the mudlogger to understand what he is

monitoring and whether the data indicates an anomaly, he must understand what is occurring on the rig and with the well.  (R. HEENAN, T.T. 2148:4–19; J. KEITH, T.T. 3726:2—3726:16; C. BARNHILL, T.T. 4419:3–11; C. BARNHILL, T.T. 4422:16-22; F. BECK, T.T. 7298:17—7300:11; DEPO. OF K. GRAY, 297:6-25, 347:22-25, 348:6-10; DEPO. OF J. GISCLAIR, 73:23-74:17, 184:4—185:1, 199:7-10, 199:14—200:8, 230:5-16, 230:20, 230:17—231:1; DEPO. OF K. KRONENBERGER, 79:22-80:18, 80:20—82:11, 84:2-5, 84:7-14, 85:12—86:8, 86:10-13; DEPO. OF E. LEE, 455:14-20, 455:23—457:15, 457:18).

23.    The Transocean drill crew had access to all rig data and was aware of all rig activities.  The Transocean drill crew was situated to physically observe activity on the drill floor and around the rotary table.  (R. EZELL, T.T. 1836:4-16, 1836:17—1838:5; D-8179; DEPO. OF D. FARR, 187:8-25, 188:1-14; D-6620; D-6721).

24.    The Driller would be aware of all operations in his line of sight and/or which he directs, including movements of mud between pits, when the sand traps were being emptied, and when the trip tanks were being dumped.  (R. EZELL, T.T. 1837:14-20, 1837:21—1838:5).

25.    The Transocean drill crew was aware of all rig activity since it actually directed and controlled the activity.  (T. QUIRK, T.T. 4839:22-24; DEPO. OF J. GISCLAIR, 100:20—101:1).

26.    In the Driller's shack, the drill crew had data available from every sensor on the rig, including all Transocean Hitec data, displayed in easy-to-read digital numeric format, and the rig's closed circuit television system, which displayed camera views from various rig locations.  (R. EZELL, T.T. 1836:24—1837:13; D-8179; D-6595; DEPO. OF J. GISCLAIR, 209:10—20310:6).

27.    Further, the drill crew had the Sperry data displayed in the Driller's shack; this data could be customized or displayed in any format chosen by the crew. The drill crew could

266

also view the Sperry data on the rig's closed-circuit television system.  In addition, all of the data the mudlogger monitored—pit sensors, flow-out, gas traps—was also available to the Transocean drill crew on Hitec.  (J. KEITH, T.T. 3497:21—3498:11, 3499:15-18, 3507:23—3508:4, 3598:10-23; C. BARNHILL, T.T. 4390:4—4393:11; DEPO. OF J. GISCLAIR, 121:5-23, 209:18—210:15, 391:1-9, 391:25—392:9; DEPO. OF E. LEE, 73:9-75:19, 75:23—76:1, 76:5-6).

28.    BP's Well-Site Leaders also had access to HESI's real-time data. The real-time data was available on monitors throughout the rig.  (R. SEPULVADO, T.T. 1931:15—1932:14, 1938:1-8; R. HEENAN, T.T. 2129:25—2130:5; J. KEITH, T.T. 3490:22—3492:6, 3497:21—3498:11, 3499:15-18, 3507:23—3508:4, 3598:10-23; C. BARNHILL, T.T. 4284:6—4287:7; A. BOURGOYNE, T.T. 7760:11—22; DEPO. OF J. GISCLAIR, 99:4-21; DEPO. OF E. LEE, 73:15—75:19; DEPO. OF G. VINSON, 125:5-7, 125:9-13).

29.    BP's engineers and other personnel on shore had access to HESI's data via direct satellite feed from the rig.  (M. BLY, T.T. 1353:16-24; T. ROTH, T.T. 3133:4–8; J. KEITH, T.T. 3492:1-6; A. BOURGOYNE, T.T. 7760:23—25; DEPO. OF J. GISCLAIR, 119:18—120:14, 156:21—157:2, 157:6-8, 174:21—175:7, 209:18—210:15, 486:21-23, 487:2, 509:4-6, 509:12-14, 509:16-18, 509:24—510:7; DEPO. OF K. CORSER, 309:25—310:7; DEPO. OF K. LACY, 235:1-12; DEPO. OF D. RAINEY, 66:14-18, 68:21—69:1; DEPO. OF G. SKRIPNIKOVA, 259:17—260:10; DEPO. OF G. WALZ, 252:9—253:17; DEPO. OF G. VINSON, 7:11-13; 7:15-16).

30.    The mud logger, on the other hand, only had access to the limited data and was dependent upon the drill crew to advise him of rig activities that could either influence his ability to monitor the well or affect the data being monitored.  The mudlogger was stationed in the mudlogging shack, a windowless shack, isolated from rig activities.  (J. KEITH, T.T. 3499:7–14,

3492:7—3493:4, 3494:10—3495:23; D-2224; D-3183; D-3184; D-3185; D-3188; D-8166; D-8180).

31.     Rig operations were not controlled by the mudlogger; nor were they visible to him.  (R. EZELL, T.T. 1839:10-20; TREX-8140 at 106-07; DEPO. OF L. LINDNER, 472:15-21, 473:5—475:7; DEPO. OF K. GRAY, 296:13-17, 296:21-22, 296:24—297:5).

32.     Rather, the mudlogger depended upon the rig crew to alert him to activities that were occurring on the rig.  (R. EZELL, T.T. 1840:16—1841:2, 1859:12—1860:11; R. HEENAN, T.T. 2148:4—2149:11; R. HEENAN, T.T. 2193:23–25; C. BARNHILL, T.T. 4419:12–22; TREX-8140 at 106-07; D-8167; DEPO. OF L. LINDNER, 470:6—471:1; DEPO. OF K. GRAY, 296:13-17, 296:21-22, 296:24—297:5; DEPO. OF M. SEPULVADO, 317:3-9, 336:22—337:17, 338:13-22).

33.     In the mudlogger's shack, the mudlogger monitored real-time data on several computer screens.  The mudlogger received information from the HESI flow-out sensor, the HESI gas traps, and from certain Transocean sensors on the rig.  (TREX-606; DEPO. OF J. GISCLAIR, 210:12-22).

34.     The HESI mudlogger did not have the Transocean Hitec display in the mudlogger's shack.  (J. KEITH, T.T. 3490:22—3492:6, 3500:17—3501:9, 3598:10—3599:13).  Nor did he receive data or information from Transocean's flow-out sensor.  (J. KEITH, T.T. 3508:8—3509:24, 3597:24—3600: 8; TREX-606; DEPO. OF J. GISCLAIR, 98:10-20).

35.     In fact, BP specifically instructed Sperry to not receive Transocean flow-out sensor data.  (J. KEITH, T.T. 3508:15—3509:24).

36.     Likewise, HESI lacked the ability to conduct a physical flow check.  There are two ways to check for flow.  The first is to check a camera.  The second is to physically go and look, which would require the mudlogger to leave the mudlogging shack.  The TV screen in the

mudlogger's shack only allowed the mudlogger to view what was coming out of the well until the diversion overboard took place. The mudlogger was not responsible for physically checking whether flow was coming from the well, as it is not appropriate for him to leave the mudlogging shack to go down and monitor flow. (R. HEENAN, T.T. 2210: 1–18; J. KEITH, T.T. 3697:3–25).

### 5. *Joe Keith Is An Experienced, Competent Mudlogger, Specifically Requested By BP For The Deepwater Horizon.*

37.    On the evening of April 20, 2010, Joe Keith, an employee of HESI, was the mudlogger on tour on the *Deepwater Horizon*. (J. KEITH, T.T. 3489:1-3).

38.    HESI's mudloggers generally, and Joe Keith specifically, attended extensive classroom and individualized training in their duties. During the course of his career, Keith has been required to take numerous online and in-person courses. (J. KEITH, T.T. 3581:14—3582:3, 3581:19—3582:19,   3583:9–19,   3584:10—3585:18,   3589:15–3590:7;  DEPO.  OF  K. KRONENBERGER, 34:8-35:24, 36:1-9).

39.    HESI provided Joe Keith with specific written materials to assist him with understanding his duties as a mudlogger. (J. KEITH, T.T. 3583:20—3584: 8, 3589:16—3590:18).

40.    Specifically, Joe Keith received HESI's Surface Data Logging, Core Fundamentals (TREX-60998) and Surface Data Logging, Applied Fundamentals  (TREX-62953) during the course of his training with HESI. (J. KEITH, T.T. 3583:20—3584:8, 3589:16—3590:18). These written materials were also on the *Deepwater Horizon* and Keith was trained to use them. (J. KEITH, T.T. 3584: 19—3585:25, 3589:16—3590:18, 3590:8—18, 3591:5–13).

41.    Keith had substantial on-the-job training. He began his career as a sample catcher offshore in the Gulf of Mexico and worked as a sample catcher for six to eight months. After that, he was a trainee mudlogger.  From 1994 until the night of April 20, 2010, Keith

continuously worked as a mudlogger for HESI.  (J. KEITH, T.T. 3572:2—3573:2, 3585:15-24, 3564:19—3565:3).

42.    Keith was trained specifically in well control and kick detection, in the classroom, in the field, and by HESI's manuals.  (J. KEITH, T.T 3585:9-18, 3585:23-25, 3584:19—3585:25, 3589:16—3590:18; TREX-60998; TREX-62953; DEPO. OF S. CLARK, 92:9-93:2).

43.    Joe Keith was a mudlogger for nearly twenty years, working exclusively in the Gulf of Mexico.  (J. KEITH, T.T 3564:23-25, 3572:2-5, 3573:23—3574:6; DEPO. OF K. GRAY, 283:14—284:1).  He has a reputation for being particularly skilled at well monitoring.  He is competent and well-respected and was specifically requested by BP for assignment to the *Deepwater Horizon*.  (R. EZELL, T.T. 1835:3–16; R. SEPULVADO, T.T. 2032:1-25; J. KEITH, T.T. 3565:4—3565:22, 3592:8–23; DEPO. OF E. LEE, 453:23—455:13, 457:19-22; DEPO. OF K. KRONENBERGER, 200:6-10, 213:17-23, 213:14-17, 224:8-10, 224:13-19; DEPO. OF J. GISCLAIR, 527:12-24; DEPO. OF J. BEMENT, 242:1-6; DEPO. OF G. VINSON, 48:22-49:8; 49:10-11).

44.    Keith served on the *Deepwater Horizon* for almost a decade without BP raising any concerns about his ability to perform his well monitoring or kick detection duties.  (J. KEITH, T.T 3473:23—3574:6; R. EZELL, T.T. 1835:3–16; R. SEPULVADO, T.T. 2032:1-25; DEPO. OF E. LEE, 453:23-455:13, 457:19-22; DEPO. OF G. VINSON, 48:22—49:8, 49:10-11).

45.    In his time aboard the *Deepwater Horizon* prior to April 20, 2010, Joe Keith had never missed a kick.  (R. EZELL, T.T. 1835:17–19; J. KEITH, T.T 3564:23—3565:3, 3592:8–13).

**6.    *On The Night Of April 20, 2010, Joe Keith Did Not Miss Any Industry Standard Warning Signs Of A Kick.***

46.    On the night of April 20, Joe Keith did not miss any standard indicators of a kick prior to 21:30, when the Transocean drill crew started investigating a pressure differential.  (C.

BARNHILL, T.T. 4280:4—4282:1;  A. BOURGOYNE, T.T. 7295:1-20;  J. KEITH, T.T 3539:1-
3606:12, 3607:21; DEPO. OF K. KRONENBERGER, 79:22—80:18, 80:20—82:11, 84:2-5, 84:7-14).

47.     The International Association of Drilling Contractors ("IADC") Deepwater Well
Control Guidelines represent the industry knowledge and standards for well monitoring and well
control principles.    (A. BOURGOYNE, T.T. 7698:21-23, 7770:24—7771:2; TREX-7749 at
OSE126-004143).

48.     According to the IADC, standard kick warning signs are flow rate increase, pit
volume increase, rate of penetration increase, decrease in pump pressure, high gas units, sudden
torque increase, change in mud chlorides, not taking the proper amount of fluid while tripping,
well flow with the pump shut down, and increasing rate of flow on return flow during
connections.   (R. HEENAN, T.T. 2149:23—2151:1; TREX-8140 at 110-111; TREX-60105 at
TRN-INV-00800307).

49.     Notably, the industry standards for well monitoring include a *decrease* in pump
pressure as a standard kick warning sign, but nowhere indicate that an *increase* in pump pressure
is a kick indicator.  (J. KEITH, T.T 3680:13-18; DEPO. OF J. GISCLAIR, 324:10-12, 326:20-327:10;
TREX-8140 at 110-111; TREX-60105 at TRN-INV-00800307).

50.     The "gold standard" or primary kick indicators are an unexplained increase in
flow-out and an unexplained pit volume increase.  (R. HEENAN, T.T. 2149:12-22, 2149:23—
2151:1; J. KEITH, T.T 3504:6–21; C. BARNHILL, T.T. 4256:1-17; 4401:19—4402:9; A.
BOURGOYNE, T.T. 7588:24—7589:2, 7770:9-17; TREX-7749 at OSE126-004143; TREX-60105
at TRN-INV-00800224; TREX-1454 at TRN-MDL-00286843; TREX-2389 at BP-HZN-
2179MDL00336072-6077).  The first indicator of a kick is an unexplained increase in flow out

of the well.  (J. KEITH, T.T 3585:20—3586:13; TREX-60998 at §5.5.1).  The second indicator is an unexplained pit volume increase.  (J. KEITH, T.T 3586:14-20; TREX-60998 at §5.5.2).

51.     On April 20, 2010, the *Deepwater Horizon* was not engaged in drilling.  Because rate of penetration increase, sudden torque increase, change in mud chlorides, and reduction in mud equivalent circulating density are only available as kick indicators during drilling operations, they were not applicable that evening.  The remaining kick indicators, including flow-out and pit volume increase, were either bypassed, unreliable, or did not indicate a kick was occurring.  (TREX-8140 at 110-111; DEPO. OF J. GISCLAIR, 348:12—349:11, 349:24—350:3; DEPO. OF J. BEMENT, 99:24—100:16).

52.     The first alleged kick indicator was flow out of the well from 20:58 to 21:08. (TREX-1 at BP-HZN-BLY00000026).

53.     From 20:58 to 21:08, the Transocean rig crew emptied the 42-barrel trip tank.  (J. KEITH, T.T. 3690:21—3691:4, 3693:10—3694:2; C. BARNHILL, T.T. 4280:4-21; 7776:12-24; D-6652; TREX-1 at BP-HZN-BLY00000026; DEPO. OF J. GISCLAIR, 59:15—61:15).

54.     The increase in flow-out and in pit volume shown on the real-time rig data matches the dumping of the 42-barrel trip tank.  (J. KEITH, T.T 3555:16—3556:24, 3630:14-3631:7; DEPO. OF J. GISCLAIR, 59:23—61:15).

55.     The real-time rig data does not evidence any gain prior to 21:08.  (F. BECK, T.T. 7156:23—7159:15; D-8249; TREX-8140 at 112-13; DEPO. OF J. GISCLAIR, 59:23—61:15, 65:1-15).

56.     A volumetric analysis of the underlying pit volume data establishes that, contrary to PSC and BP assertions, there was not a 39-barrel gain between 20:52 and 21:08.  (F. BECK,

T.T. 7155:19—7156:4, 7156:23—7159:15; D-8249; TREX-8140 at 117; DEPO. OF J. GISCLAIR, 59:23—61:15, 65:1-16).

57.     At most, ten barrels of excess fluid may have entered the pits between 21:06 and 21:09, when Transocean and BP diverted returns overboard. (TREX-8140 at 114, 117).

58.     While Morten Emilsen prepared OLGA modeling to simulate the events on the *Deepwater Horizon* on April 20, 2010, he did not consider or use actual pit data in his OLGA well flow modeling. (M. EMILSEN, T.T. 7884:15-22).

59.     Based on pit data, flow did not actually start until, at the earliest, 21:05. (F. BECK, T.T. 7158:1-22, 7168:6-13; TREX-8140 at 116-117).

60.     In light of the other activities occurring on the rig at the time, it would have been difficult to identify the first indication of flow at 21:05 in real time without conducting a volumetric analysis. (F. BECK, T.T. 7168:6—7169:1; TREX-8140 at 116-17). Prior to 21:08, the increase in flow-out was minimal and would have been difficult to detect. (F. BECK, T.T. 7168:6-7169:1; TREX-8140 at 116-117).

61.     The second alleged kick indicator was a 100-psi increase in standpipe pressure between 21:01 and 21:08. (TREX-1 at BP-HZN-BLY00000026; TREX-620).

62.     The 100-psi increase in standpipe pressure over the course of seven minutes was very subtle and difficult to detect in real-time. (C. BARNHILL, T.T. 4281:16-23, 4282:2-12; DEPO. OF J. GISCLAIR, 395:25—396:13).

63.     Under industry standards for well monitoring, this increase in standpipe pressure is not a standard kick indicator. (J. KEITH, T.T 3680:13-18; DEPO. OF J. GISCLAIR, 324:10-12, 326:23—327:10; TREX-8140 at 110-111; TREX-60105 at TRN-INV-00800307).

64.     Joe Keith visually confirmed at 21:08, at the end of this purported indicator, that the well was not flowing.  (J. KEITH, T.T 3570:6-23; DEPO. OF J. GISCLAIR, 75:21-76:9, 524:25-525:8; TREX-8140 at 113).

65.     Neither the drill crew nor the mudlogger deviated from industry standard or good oilfield practices with respect to monitoring the well for signs of a kick from 21:01-21:08.  (C. BARNHILL, T.T. 4421:12—4422:15; TREX-7676 at 34; TREX-8140 at 103-104).

66.     Neither the drill crew nor the mudlogger missed a standard kick indicator from 21:01-21:08.  (J. KEITH, T.T 3607:12-14, 3627:17-3628:16, 3680:6-18; DEPO. OF J. GISCLAIR, 395:25-396:13; TREX-7676 at 34; TREX-8140 at 116-117).

67.     The third alleged kick indicator was a 246-psi increase in standpipe pressure between 21:08 and 21:14.  (TREX-1 at BP-HZN-BLY00000026).

68.     Standpipe pressure increased by approximately 246-psi during the sheen test from approximately 21:08 to 21:14.  (TREX-620).

69.     This increase in pressure from 21:08 to 21:14 is a slight, gradual increase.  (M. BLY, T.T. 1356:7—1352:2; TREX-61117 at 50-51).

70.     Under industry standards for well monitoring, this increase in standpipe pressure is not a standard kick indicator.  (J. KEITH, T.T  3680:13-18; DEPO. OF J. GISCLAIR, 324:10-12, 326:23—327:7; TREX-8140 at 110-111; TREX-60105 at TRN-INV-00800307).

71.     During the course of his nine years on the *Deepwater Horizon*, Joe Keith had previously observed standpipe pressure remaining constant and/or increasing after the pumps were shut down.  (J. KEITH, T.T 3688:24—3689:5).

72.     Standpipe pressure remaining after the pumps are shut down is not an anomaly. As long as there is heavier fluid in the annular space than in the drill string, there will be pressure

applied back towards the drill string.  When the pumps are shut down, they will trap that pressure.  (C. BARNHILL, T.T. 4283:20—4284:5, 4425:3–12).

73.     Neither the drill crew nor the mudlogger deviated from industry standards or good oilfield practices with respect to monitoring the well for signs of a kick from 21:08-21:14.  (C. BARNHILL, T.T. 4421:8—4422:4).

74.     Neither the drill crew nor the mudlogger missed a standard kick indicator from 21:08-21:14.  (J. KEITH, T.T 3607:12-14, 3627:17—3628:16, 3680:6-18; DEPO. OF J. GISCLAIR, 395:25—3396:13; TREX-7676 at 34; TREX-8140 at 116-117).

75.     It was reasonable for the drill crew and mudlogger not to have identified either increase in standpipe pressure between 21:01 and 21:14 as an indication of a kick on the evening of April 20, 2010.  (C. BARNHILL, T.T. 4421:8—4422:4).

76.     Change in standpipe pressure is not a good kick indicator, particularly here, where there was a pressure increase, rather than a decrease.  Standpipe pressure changes are an ambiguous kick indicator at best.  (R. HEENAN, T.T. 2130:24—2131:18; C. BARNHILL, T.T. 4402:1-9, 4402:1-3; DEPO. OF R. QUITZAU, 644:5-12).

77.     According to IADC and the SPE Reprint on Well Control edited by Dr. Bourgoyne, the industry standard is for personnel monitoring a well to look for a decrease in standpipe pressure, not an increase.  Decreasing standpipe pressure may be a sign of a kick and is a standard kick indicator.  Increasing standpipe pressure is not.  (F. BECK, T.T. 7295:1-20; A. BOURGOYNE, T.T. 7775:25—7776:5; TREX-41556.43.1.HESI; TREX-60105 at TRN-INV-00800307; TREX-1451 at 8; DEPO. OF J. GISCLAIR, 324:10-12, 540:4-6).

78.     Despite his nearly twenty years of experience, Joe Keith has never seen an increase in standpipe pressure as an indication that a well was flowing.  (J. KEITH, T.T 3548:6–23, 3549:5-11, 3565:1–25, 3588:17—3589:10, 3680:6-18, 3683:2-6, 3704:2–7).

79.     The standpipe pressure fluctuations between 20:52 and 21:30 were subtle and, at least in part, influenced by rig activity.  (R. HEENAN, T.T. 2148:25—2149:2; C. BARNHILL, T.T. 4402:1-3, 4412:19—4413:1;  TREX-620;  DEPO. OF J. GISCLAIR, 395:25—396:13, 396:14—397:5).

80.     The real-time rig data from the *Deepwater Horizon* shows complicated pressure responses on the night of the blowout.  (C. BARNHILL, T.T. 4419:25—4420:24, 4422:16—4423:15; F. BECK, T.T. 7298:17—7300:11).

81.     Hookload is not a standard kick indicator, and, as a kick indicator, it is ambiguous.  The hookload fluctuations from 21:06-21:15 are subtle.  (TREX-8140 at 116; TREX-7749 at OSE126-004175-4177; TREX-60105 at TRN-INV-00800307; TREX-604).

82.     It is easier to evaluate the data and identify potential indications of a kick retrospectively with static data rather than in real-time with scrolling data and ongoing rig activities.  (C. BARNHILL, T.T. 4278:8-25, 4421:8—4422:15, 4422:16–22; TREX-8140 at 116-17; DEPO. OF M. ALBERTIN, 466:11-14, 15-16).

83.     In its discussion of purported indicators of a kick, BP's Bly Report presents the real-time rig data in a 2,000-psi pressure scale.  The real-time rig data observed by the mudlogger on the rig on April 20, 2010, however, was in a 5,000-psi scale.  By BP's own admission, use of the 2,000-psi scale exaggerates the slope of pressure trends.  (M. BLY, T.T. 1352:2—1353:4; TREX-1 at BP-HZN-BLY00000093).

276

84.     Of the sensor data parameters he was monitoring, Keith did not see any anomalies on April 20, 2010 that would suggest that a kick was occurring.  (J. KEITH, T.T.  3564:19—3565:3, 3565:4—3566: 23; TREX-620; DEPO. OF J. GISCLAIR, 44:8-20).

85.     Despite opining that Joe Keith missed indications of a kick, Dr. Bourgoyne had no clear understanding of the rig activities underway or the actions Keith took on April 20, 2010, much less his deposition or trial testimony.  (A. BOURGOYNE, T.T. 7761:16—7762:22).

> **7.**     ***On The Night Of April 20, 2010, BP's And Transocean's Multiple, Simultaneous Activities Interfered With Joe Keith's Ability To Monitor The Macondo Well.***

86.     BP's and Transocean's rig activities during the displacement procedure on April 20, 2010 inhibited the mudlogger's ability to detect an influx by obscuring potential kick indicators and complicating the reading of sensor data responses.  As evidenced by D-8167, numerous rig activities occurred on the afternoon and evening of April 20, 2010.  The trip tanks were flushed during displacement; the rig pumps were staggered; the sand traps were emptied; mud was transferred between pits; fluid was diverted overboard, bypassing the Sperry flow-out sensor; mud was offloaded to the *Damon Bankston*; and the crane was in operation.  (J. KEITH, T.T. 3510:23—3512:4; C. BARNHILL, T.T. 4326:22—4327:24; B. AMBROSE, T.T. 6117:16—6119:3; D-8167).  Each of these operations, individually and collectively, affected the sensor data responses being monitored by the mudlogger.  (J. KEITH, T.T. 3514:8-17; C. BARNHILL, T.T. 4409:23—4413:9, 4417:15-18; TREX-8140 at 109-111).

87.     The multiple operations BP and Transocean conducted during the displacement procedure complicated and interfered with well monitoring.  (J. KEITH, T.T. 3514:8-22; C. BARNHILL, T.T. 4409:23—4410:1, 4408:21—4410:1; B. AMBROSE, T.T. 6117:16—6118:4; F. BECK, T.T. 7291:6–9; D-8167; DEPO. OF K. GRAY, 361:5-10, 361:14-16, 361:18-19, 361:23,

362:13-15, 362:19-21, 374:19-21, 374:25—375:1; DEPO. OF J. BELLOW, 476:14—478:1, 478:1—

479:7, 479:10, 480:3-6, 480:11, 480:14-20, 480:23—481:22, 481:25—482:1, 482:4—483:17,

483:24-25, 484:7-18, 484:23, 487:2-11, 487:14-22, 488:2; DEPO. OF J. BEMENT, 283:13-18,

283:21; DEPO. OF EARL LEE, 455:14-20, 455:23—457:15, 457:18; DEPO. OF J. GISCLAIR,

190:18—191:1, 191:7-16, 379:7-9, 379:13-18, 379:20-22, 428:12—429:12; DEPO. OF K.

KRONENBERGER, 278:19-25, 279:3-10).

88.     The simultaneous operations hindered Keith's ability to look at flow in data, flow

out data and pit volume.  Although he was still able to monitor some parameters, Keith was not

able to monitor them in a way that allowed him to accurately identify kicks.  (J. KEITH, T.T.

3514:8-22; 3580:14—3581:8).

### 8.     *The Simultaneous Operations Violated Industry Standards And BP And Transocean Policy.*

89.     Many of the operations conducted on the evening of April 20, 2010 were non-

standard.  In fact, it is unusual for so much rig activity to occur during a displacement.  These

non-routine simultaneous activities were conducted without regard for safety or BP's and

Transocean's own standard operating procedures.  (J. KEITH, T.T. 3512:7–24; C. BARNHILL, T.T.

4407:23—4408:6, 4408:7–13; TREX-8140 at 109-110).

90.     Typically, all rig operations on the *Deepwater Horizon* were at a standstill during

displacement procedures because displacement is a safety-critical activity.   (J. KEITH, T.T.

3512:7-24).

91.     The rig activity occurring on April 20 during displacement violated BP's and

Transocean's policies relating to simultaneous operations.  BP's Drilling and Well Operations

Practice and its Simultaneous Operations Guide required that "Major Accident Hazards as a

result of Simultaneous Operations shall be identified so that controls and mitigations can be put in place before the activity takes place."  BP failed to conduct a formal risk assessment and failed to identify major accident hazards prior to engaging in simultaneous operations on the evening of April 20, 2010.  These failures violated BP's standard practices.  (J. KEITH, T.T. 3513:9—3514:22;   TREX-93   at   BP-HZN-2179MDL00057356;   TREX-1575   at   BP-HZN-2179MDL00408292).

92.   Likewise, Transocean's Well Control Handbook provides: "[k]eep all mud treatment and pit transfers to the absolute minimum during critical sections of the well.  The Mud Engineer and the Derrickman must keep the Driller and Mudloggers informed of any transfers or treatments of mud."  By failing to minimize transfers during displacement and failing to inform Joe Keith of those transfers, Transocean violated its own guidelines and standard practices.  Transocean also failed to conduct a risk assessment prior to engaging in simultaneous operations during the displacement procedure.  (J. KEITH, T.T. 3602:22—3603:21; C. BARNHILL, T.T. 4417:19—4418:12, 4418:13–17; TREX-1454 at TRN-MDL-00286819; D-8167; DEPO. OF L. MCMAHAN, 206:6-10, 206:14-17, 206:25).

**9.   _BP And Transocean Failed To Notify Joe Keith Of The Simultaneous Operations._**

93.   Neither BP nor Transocean ever notified Joe Keith of the multiple activities scheduled for the evening of April 20, 2010, despite the impact of those activities on his monitoring.  Nor was Keith ever asked to participate in any kind of risk assessment of the impact of those activities.  (J. KEITH, T.T. 3512:25—3513:8).  The drill crew and mud engineer failed to timely advise Joe Keith of the various fluid transfers, emptying of trip tank, dumping of sand traps, and other rig activity impacting his sensors after 17:00.  The Transocean drill crew also

failed to inform Keith of the re-routing of flow from the well to the reserve pits and trip tank and sand trap activity.  (J. KEITH, T.T. 3557:11-17, 3602:22—3603:21; C. BARNHILL, T.T. 4417: 19—4418:12, 4418:13—17; D-8167; DEPO. OF L. LINDER, 470:19—473:4).

94.     Indeed, unlike typical displacement procedures, the Transocean drill crew never called Joe Keith to advise him of any rig activities on April 20, 2010.  (J. KEITH, T.T. 3602:22-25).  Nor did the Transocean drill crew announce those rig activities over the rig-wide PA system after 17:00.  (J. KEITH, T.T. 3603:3).  On the evening of April 20, 2010, the Transocean drill crew did not convey any information to Joe Keith regarding ongoing or upcoming rig operations once he came on tour.  (J. KEITH, T.T. 3603:16-21).

### 10.     *Use Of An Open-Pit System Hindered Joe Keith's Ability To Monitor The Macondo Well.*

95.     On the night of April 20, 2010, the *Deepwater Horizon* rig crew was using an open pit system for displacement, which interfered with accurate monitoring of flow-in, flow-out and pit gain.  (R. HEENAN, T.T. 2146:1-11; J. KEITH, T.T. 3510:23—3511:11, 3515:1—3516:7; C. BARNHILL, T.T. 4325:10-23; D-8167; TREX-8140 at 111).

96.     In a closed system, fluid is pumped from, and returned to, the monitored pits on the rig and, under these circumstances, influx is easily detectable as a gain in the pits.  A closed system is the best way to maintain constant kick detection; it permits kick detection through the end of the displacement.  The Transocean rig crew could have configured a closed-pit system for displacement, which would have enabled the mudlogger to accurately track flow-in, flow-out, and pit volume totals.  (F. BECK, T.T. 7293:2—7294:9; TREX-8140 at 111).

97.     When fluid is pumped into the well from an unmonitored source, certain pits will show a steady gain that is not offset by a corresponding loss in another pit, complicating

monitoring and kick detection. On the *Deepwater Horizon*, the drill crew was pumping into the well from the sea chest (an unmonitored source), creating an open pit system and making it much more difficult to ascertain whether the rig was taking gains and the well was flowing. (J. KEITH, T.T. 3516:1–7, 3522:21—3523:7; C. BARNHILL, T.T. 4411:6–18; TREX-8140 at 111; DEPO. OF J. GISCLAIR, 337:23-338:5).

98.     Joe Keith did not have any sensor or monitor to gauge the volume of seawater going into the well. Because the fluids coming out of the well were discharged from different tanks and diverted from Keith's normal system, he was also unable to accurately read the flow out as normal or anomalous relative to the condition of the well. (J. KEITH, T.T. 3516:8-15; DEPO. OF J. GISCLAIR, 337:14—338:6).

> **11.** *Offloading Of Mud To The Damon Bankston Complicated Well Monitoring.*

99.     Until approximately 17:17, mud was being offloaded to the *Damon Bankston*, to make room on the rig for mud coming from the well during displacement. (R. HEENAN, T.T. 2147:12-13; J. KEITH, T.T. 3529:8—3530:2; C. BARNHILL, T.T. 4417:9–12; TREX-967; DEPO. OF L. LINDNER, 29:12—30:1, 30:18—31:8, 31:17-20, 131:3—132:17, 132:19—134:6, 33:15—34:4, 299:9—300:5, 449:5-6, 449:21—451:24).

100.    There were enough pits on the rig to hold the mud returning from the well, but BP had already started cleaning them. Had the cleaned pits been used or had the cleaning been scheduled after displacement as is typical, it would not have been necessary to send mud to the *Damon Bankston*. (DEPO. OF L. LINDNER, 449:5-6, 449:21—450:7, 451:1-24).

101.    Offloading mud interfered with the mudlogger's ability to accurately track the movements of mud and account for pit volume changes. It also complicated the mudlogger's

ability to accurately monitor flow-out and pit gains due to the fact that returns were sent to an unmonitored location.  (J. KEITH, T.T. 3526:11–25, 3529:8—3530:2, 3586:21—3587:8; TREX-8140 at 111; DEPO. OF K. GRAY, 348:12-15, 348:19, 348:21—349:12, 16-19).

102.    In fact, Cathleenia Willis, the HESI mudlogger on duty prior to Joe Keith, informed Transocean personnel that she could not monitor mud volumes during the offloading of mud to the boat.  Transocean personnel told her that they would advise the mudlogger when offloading stopped.  (DEPO. OF J. BEMENT, 148:18—149:20; DEPO. OF J. GISCLAIR, 329:20—330:11, 330:15-19; DEPO. OF J. BELLOW, 482:9—483:17, 483:24-25, 484:7-18, 484:23).

103.    The Transocean rig crew, however, failed to inform Joe Keith when the offloading stopped.  (J. KEITH, T.T. 3601:24—3603:21; C. BARNHILL, T.T.  4417:19—4418:12; DEPO. OF M. SEPULVADO, 317:3-9, 336:22—337:17, 338:13-22; DEPO. OF J. BELLOW, 482:9—483:17, 483:24-25, 484:7-18, 484:23).

### 12.    *Numerous Fluid Transfers Impeded Joe Keith's Ability To Monitor The Macondo Well.*

104.    Numerous fluid transfers during the displacement procedure further complicated the mudlogger's monitoring abilities on the evening of April 20, 2010.  Fluid was routed by and among several different active and reserve pits on the rig.  (TREX-620).  The rig crew was repeatedly switching returns among the various pits and transferring mud, much more mud than was usual during displacement.  (R. HEENAN, T.T. 2146:1—2147:6; J. KEITH, T.T. 3510:23—3512: 4, 3580:14–22; C. BARNHILL,T.T. 4413:5—4414:7; D-8167).

105.    From 20:14 to 20:34, returns were being taken to the active pits (pits 9 and 10). (TREX-620).

106.    At 20:34, the rig crew switched returns to pit 7.  (TREX-620).

107.    At 20:49, the rig crew switched returns to pit 6.  (TREX-620).

108.    At 21:10, the rig crew transferred mud from pit 10 to pit 6.  (TREX-620).

109.    At 21:11, the rig crew transferred mud from pit 9 to pit 6.  (TREX-620).

110.    At 21:18, the rig crew stopped fluid transfers among pits 6, 9, and 10.  (TREX-620).

111.    At 21:21, the rig crew started building a slug in pit 11.  (TREX-620).

112.    With so many mud transfers occurring, tracking volumes was difficult.  Keith was entering the databases for the pits as the mud was being moved among the various pits on the rig, recording volumes and attempting to get the most accurate number he could for his ledger book. He did that throughout the course of his tour that evening, spending 30 to 40 percent of his time that evening tracking mud movement.  (J. KEITH, T.T. 3580:14—3581:8; C. BARNHILL, T.T. 4413:5—4414:7).

113.    During this time, the rig crew repeatedly flushed the trip tank and emptied the sand traps, pushing fluid past the flow-out sensor and into the active pit system.  These activities affected both pit gain and flow-out readings.  (R. HEENAN, T.T. 2146:1—2147:6; J. KEITH, T.T. 3510:23—3512:4, 3526:11—3527:19, 3527:20—3528:10; C. BARNHILL, T.T. 4411:19—4412:3; TREX-620; D-8167; DEPO. OF J. GISCLAIR, 337:14—338:6; 428:24—429:12).

114.    Prior to Transocean diverting flow overboard, when all data was available for monitoring, it was very difficult for Keith to accurately track volumes and flow-out because of the open system and the ongoing fluid transfers, including transfers involving unmonitored pits. The open system and the many fluid transfers severely complicated kick detection.  (R. HEENAN, T.T. 2149:12-19; J. KEITH, T.T. 3526:11—22, 3527:20—24, 3580:14—3581:8; C. BARNHILL, T.T. 4411:19—4412:3, 4413:5—4414:7, 4411:6–18; TREX-8140 at 111-112; DEPO. OF J. GISCLAIR,

337:14—338:6, 342:6—344:2, 344:16—346:6; DEPO. OF K. GRAY, 348:12-15, 348:19, 348:21—

349:12, 349:16-19).

>13.   *Crane Use Also Affected Joe Keith's Ability To Interpret Data And Detect Kicks.*

115.   While unnecessary for displacement, the crane was nevertheless used during Joe

Keith's tour, affecting Keith's ability to interpret the flow-out and pit volume data.  (J. KEITH,

T.T. 3528:11-25; C. BARNHILL, T.T. 4417:1–18; R. EZELL, T.T. 1765:5-14; DEPO. OF C.

BRELAND, 69:24—70:3, 70:6-9, 70:12-16, 70:19).

116.   Crane use causes vessel movement and movement of the fluid in the pits on the

vessel, which complicates the use of pit levels and flow-out for kick recognition.  It affects pit

volumes and flow-out readings.  (J. KEITH, T.T. 3529:1-6; C. BARNHILL, T.T. 4256:1–13; D-

3247; TREX-7749 at OSE126-004188; DEPO. OF C. BRELAND, 69:24—70:3, 70:6-9, 70:12-16,

70:19; DEPO. OF E. LEE, 455:14-20, 455:23-24; 456:1-21; DEPO. OF K. KRONENBERGER, 85:12—

86:2; DEPO. OF L. MCMAHAN, 206:14-17, 206:19-25).

117.   Displacement is a safety-critical activity.  Crane operations should be stopped to

allow accurate monitoring of pit levels.   (J. KEITH, T.T. 3528:11–25; DEPO. OF K.

KRONENBERGER, 85:12—86:2; DEPO. OF C. BRELAND, 18:1-9, 138:3—139:23, 139:24—140:1-6,

140:9-11, 140:14-19; DEPO. OF L. MCMAHAN, 206:14-17, 206:19-25; DEPO. OF E. LEE, 456:1-

21).

118.   In his eighteen years offshore, Keith had never previously even seen anyone use a

crane during displacement or temporary abandonment.  (J. KEITH, T.T. 3528:15-18).

>14.   *Staggering The Rig Pumps Complicated Standpipe Pressure Reading.*

119.   The Transocean drill crew shut-off the rig pumps at 21:08 to conduct a sheen test.

(J. KEITH, T.T. 3569:24—3570:8; C. BARNHILL, T.T. 4491:5-7; TREX-1 at BP-HZN-

BLY00000026; TREX-620).   When flow stopped after shutting off the rig pumps, the Transocean drill crew closed the diverter valve to route fluid overboard.  Once the sheen test was complete, the Transocean rig crew started ramping up the pumps at 21:14 to continue displacement and dumping the LCM spacer overboard.  (J. KEITH, T.T. 3631:16—3632:4; TREX-1 at BP-HZN-BLY00000026; TREX-620).

120.   After the sheen test, the Transocean drill crew brought the rig pumps online in a staggered manner, complicating standpipe pressure readings.  (J. KEITH, T.T. 3510:23—3512:4; C. BARNHILL, T.T. 4412:19—4413:4; D-8167).

### 15.   *Diverting Overboard Blinded Joe Keith To Primary Kick Indicators.*

121.   By diverting flow from the well overboard after the sheen test, Transocean bypassed HESI's flow-out sensor and blinded HESI's mudlogger to primary kick indicators from 21:08 to the end of the transmission.  (DEPO. OF J. GISCLAIR, 224:23—225:20, 226:22—227:1, 227:2-12, 228:8—229:2, 348:12—349:11).

122.   At 21:08, the rig crew shut down the pumps for the sheen test.  (J. KEITH, T.T. 3569:14—3570:8; TREX-1 at BP-HZN-BLY00000026; TREX-620).

123.   After the pumps shut down, Keith looked at the camera and visually confirmed that flow from the well stopped, and then saw the diverter gate valve close.  Keith noted in his log that the sheen test had been performed, that the well was static, and that the gate was closed. (J. KEITH, T.T. 3568:19—3569:5, 3569:14—3571:5; TREX-620).

124.   Transocean then routed flow overboard.  Because the HESI flow-out sensor and gas traps were outside of the overboard flow path, once flow was routed overboard, Keith was unable to monitor flow-out, pit volume, or the gas content of the mud after 21:08.  (R. HEENAN, T.T. 2146:7—2147:11, 2149:12-22, 2151:14—2152:5, 2152:6—2153:7, 2153:10—2154:2; J.

KEITH, T.T. 3510:23—3512:4, 3568:19—3569:2; C. BARNHILL, T.T. 4324:13-17; A. BOURGOYNE, T.T. 7534:15-18, 7768:9—7769:12; TREX-607; TREX-606; TREX-8140 at 114; D-8167; TREX-60999; D-6652; DEPO. OF J. GISCLAIR, 91:17-23, 99:20—100:1, 224:23—225:20, 226:22—227:1, 227:2-12, 228:8—229:2, 348:12—349:11, 431:5—432:6, 526:20—527:2; DEPO. OF K. KRONENBERGER, 241:11-15; DEPO. OF D. FARR, 275:1-5, 275:7-9; DEPO. OF M. SEPULVADO, 375:6-20).

125.    The Transocean sensor data transmitted to Sperry does not include flow-out; Sperry did not receive sensor data from Transocean's flow-out sensor. Keith was blinded to any data from Transocean's flow-out sensor in the mudlogger's shack. He was limited to a visual check of the flow-out path on his camera feed and he could not see the percentage reading from the Transocean sensor that was upstream of the diverter gate valve. (J. KEITH, T.T. 3597:24—3598:9, 3599:14—3600:8; TREX-606; DEPO. OF J. GISCLAIR, 97:3-6, 97:25—96:10, 538:15-17, 538:21, 538:25—539:2, 539:13-16, 539:20-24, 540:1-3, 546:25—547:6).

126.    Kick detection is an important aspect of a mudlogger's job. It is important for the mudlogger to have access to data relating to flow and pits to effectively monitor the well for signs of a kick. Blinding the mudlogger to pit information from the well impedes the mudlogger's ability to monitor the well for signs of a kick. (DEPO. OF J. BELLOW, 467:18—468:7, 468:10—469:11, 469:18-20).

127.    The initial flow of hydrocarbons started at a very low rate. Volumetrically, most of the kick occurred after BP and Transocean diverted fluid overboard, at which point Keith could not monitor flow. At most ten barrels of excess fluid entered the pits between 21:06 and 21:09, when Transocean and BP diverted returns overboard. (M. EMILSEN, T.T. 7875:12-17; F.

BECK, T.T. 7154:12—7156:4; A. BOURGOYNE, T.T. 7779:11–21; TREX-4853; TREX-1 at BP-HZN-BLY000000106, fig. 18; TREX-8140 at 114, 117).

128.    BP and Transocean made the decision to proceed in a manner that bypassed the Sperry sensor.  The displacement procedure could have been designed to allow fluid to reach the gumbo box before going overboard, thereby allowing the mudlogger to continue monitoring flow out of the well.  (C. BARNHILL, T.T. 4399:17—4401:1, 9-18; TREX-5125; DEPO. OF L. LINDNER, 457:25—458:7; DEPO. OF J. BEMENT, 100:17—101:21; DEPO. OF S. JOHNSON, 155:9-10, 155:13-14).

129.    Unlike Joe Keith, the Transocean drill crew was never blind to flow-out.  Unlike HESI's flow-out sensor, the Transocean flow-out sensor was upstream of the diversion point so flow continued to pass the Transocean sensor, allowing Transocean to continue monitoring flow-out even after diverting overboard.  While flow was diverted overboard, HESI's sensor would read no flow.  (R. HEENAN, T.T. 2154:25—2155:4, 2155:5-21; J. KEITH, T.T. 3522:21—3523:7, 3524:5—3525:4, 3525:7–18, 3568:19—3569:5, 3697:9-25, 3698:3-7; C. BARNHILL, T.T. 4393:12–20, 4415:24—4416:13; A. BOURGOYNE, T.T. 7534:3—7535:16, 7769:7–12, 7779:11–21; F. BECK, T.T. 7292:5–11, 7292:12–21, 7293:2—7294:9; TREX-8140 at 111-12; TREX-60999; D-8167; D-2189; DEPO. OF J. GISCLAIR, 431:14-23, 533:22-534:1; DEPO. OF D. FARR, 275:10-276:9).

130.    Thus, on April 20, 2010, at all times that evening, the Transocean Driller had available to him a flow-out reading from the well.  (C. BARNHILL, T.T. 4416:17-19).

131.    Both Transocean and BP were aware of the effect that diverting overboard would have on Keith's well-monitoring ability.  (TREX-8140 at 114).

132.    The operator and vessel owner ultimately determine where HESI's sensors are placed.  Transocean approved the location of HESI's flow-out sensor and installed it.  BP has the final say on the sensor's location.   Accordingly, both Transocean and BP understood that discharging overboard isolated the HESI flow-out sensor, blinding the mudlogger.   (C. BARNHILL, T.T. 4395:17-24; TREX-8140 at 114; DEPO. OF J. GISCLAIR, 431:14-23; DEPO. OF J. BEMENT, 101:12-21, 150:13—151:15, 253:24—254:14; DEPO. OF S. CLARK, 79:21—80:3, 80:18-22, 209:5-9, 209:11-23; DEPO. OF K. GRAY, 542:13—543:8).

133.    Yet, BP instructed HESI not to use or rely upon Transocean's flow-out sensor.  (J. KEITH, T.T. 3509:10-24).

134.    From the time he came on tour between 17:00 and 17:30, and the time his screens went black, Keith continuously and actively monitored all surface data parameters available to him during his tour on April 20, 2010.  (J. KEITH, T.T. 3532:13–24, 3533:17—3534:5).

**16.    *Joe Keith's Actions On The Night Of April 20, 2010 Were Reasonable, Appropriate, And In Accordance With Industry Standards.***

135.    When he arrived at the mudlogging shack for his tour, Joe Keith met with Cathleenia Willis to discuss the status of rig operations and go over anticipated upcoming rig activity, including the negative pressure test and displacement procedure.  (J. KEITH, T.T. 3532:13–24, 3533:17—3534:5, 3623:3–19).

136.    Joe Keith had no role in or responsibility for the design, execution, or interpretation of the negative pressure tests.  He assumed that the negative pressure test was successful because the rig crew proceeded to displacement.  Based upon his experience, he assumed that had the safety critical test not been successful, the crew would not have proceeded with displacing the well.  (J. KEITH, T.T. 3543:6-20).

288

137.     Joe Keith diligently tracked and recorded information regarding mud transfers in his logbook to ensure an accurate accounting of volume.  On that night, Joe Keith spent 30 to 40 percent of his time tracking mud movement.  (J. KEITH, T.T. 3534:2—3535:4, 3542:11—3543:4, 3563:25—3564:18, 3580:14—3581:8, 3586:3–13, 3591:14—3592:7, 3670:10—3672:5; TREX-8140 at 112).

138.     Joe Keith took an eight to ten minute restroom break sometime between 20:30 and 21:00.  He called the rig floor to advise them he was taking a break, and spoke to assistant Driller Steve Curtis.   (J. KEITH, T.T. 3699:13–22, 3677:25—3678:23, 3703:21—3704:1, 3724:19—3725:15, 3722:6-19).

139.     Joe Keith returned to the mudlogging shack from his restroom break approximately ten minutes prior to the sheen test, which occurred at 21:08.  (J. KEITH, T.T. 3677:25—3678:23, 3722:6-19).

140.     Upon his return, Joe Keith looked at the time log and data from the eight to ten minutes of his break.  He viewed all the screens in the mudlogging shack and scrolled back through the time log for the entire period he was on his break.  There were no audible alarms going off.  There were no visual flashes on any of his screens.  He did not see any anomalies that stood out as signs of an influx.  Joe Keith did not see any anomaly or indication of a problem.  (J. KEITH, T.T. 3538:6-25, 3601:18–23, 3722:6—3723:12).

141.     None of the alleged indications of a kick occurred while Joe Keith was on his break.  (TREX-1 at BP-HZN-BLY00000026).

142.     After returning from his restroom break, Keith continuously and actively monitored all available surface data parameters until he heard rain on his shack and evacuated

289

the rig.  (J. KEITH, T.T. 3540:23—3542:10, 3542:11—3543:4, 3586:3–13, 3589:16-23, 3590:8–18, 3591:5—3592:7, 3607:15—3608:5).

143.   At approximately 21:08, when the rig crew shut down the pumps in preparation for the sheen test, Joe Keith visually confirmed that the well was not flowing.  He saw the flow stop and then the gate close.  Joe Keith logged in his book that the sheen test had been performed, that the well was static and the gate was closed.  (J. KEITH, T.T. 3568:19—3569:5, 3569:3—3571:5, 3587:9—3588:16, 3636:3-5, 3638:3-13, 3723:13—3724:11; C. BARNHILL, T.T. 4284:6–25; D-4388; DEPO. OF K. KRONENBERGER, 224:21—225:12, 225:14).

144.   During his tour, Joe Keith made several phone calls to rig personnel regarding potential anomalies he observed.   (J. KEITH, T.T. 3602:15—3603:3; C. BARNHILL, T.T. 4417:19—4418:12).

145.   At approximately 20:00-20:10, Joe Keith noticed an increase in flow-out and called the drill floor.  Steve Curtis explained that the Transocean drill crew had dumped the trip tank across the flow line.  (J. KEITH, T.T. 3603:22—3604:9, 3724:19—3725:15; TREX-620).

146.   Later in the displacement procedure at approximately 20:34, Joe Keith noticed a slow gain in the active pits.  He called the mud room and was told that the Transocean crew was moving mud out of the sand traps and into the active pits.  (J. KEITH, T.T. 3527:20—3528:10, 3604:10–25, 3706:11-23, 3724:19—3725:15; TREX-620).

147.   Between 20:30 and 21:00, Joe Keith called the drill floor to advise the drill crew that he was taking a break.  (J. KEITH, T.T. 3677:25—3678:23, 3724:19—3725:15).

148.   At approximately 21:16-21:17, when the drill crew resumed displacement after the sheen test, Keith noticed the rig pumps were coming online in an abnormal manner.  He called the rig floor and asked Steve Curtis why they were staggering the pumps; Curtis said

290

"we're just doing it like that" and hung up.  (J. KEITH, T.T. 3605:12—3605:22, 3631:16—3633:8, 3724:19—3725:15; TREX-620).

149.    Within a minute or so of calling about the staggered rig pumps (approximately 21:18), he called the rig floor again about a sudden pressure spike and was told that the crew blew a pop-off valve.  In sum, Keith alerted the drill crew to at least four separate potential anomalies on that night, which the Transocean drill crew received.  (J. KEITH, T.T. 3605:12—3606:5, 3633:9—3634:1, 3724:19—3725:15; TREX-620).

150.    Joe Keith did not observe any changes in flow or standpipe pressure that should have given him cause for concern that the well was flowing.  Both the change in flow between 20:52 and 21:08 and the slight increases in standpipe pressure between 21:01 and 21:08 occurred prior to Joe Keith's visual confirmation that the well was not flowing.  A flow check is the best method to detect whether or not a well is flowing.  Thus, at 21:08, Joe Keith had no reason to suspect the well was flowing or that any of the data to that point indicated any problem.  (J. KEITH, T.T. 3566:3-23, 3571:6-21; DEPO. OF K. KRONENBERGER, 224:21—225:12, 225:14; DEPO. OF J. GISCLAIR, 319:16—320:5, 524:25—526:3, 540:4—541:4, 541:8-14, 541:23—542:6).

151.    Joe Keith did not see any signs that the well was taking a kick until he heard what sounded like rain on the roof of his mudlogging shack.  (J. KEITH, T.T. 3540:23—3542:10, 3566:3-23, 3607:12-14, 3607:15—3608:5; DEPO. OF J. GISCLAIR, 521:11-16).

152.    Since the Transocean drill crew identified a pressure differential and began investigating it at approximately 21:30 on April 20, 2010, nothing Joe Keith would have done after that point could have changed anything.  (C. BARNHILL,  T.T. 4291:10—4292:6, 4432:12—4433:21; A. BOURGOYNE, T.T. 7780:12-20; TREX-4248 at 30; D-8007).

153.    BP had no criticisms of Sperry's performance at the Macondo well; BP's Corporate Representative on mudlogging has heard no such criticisms.  (DEPO. OF J. BELLOW, 490:1-8, 13-14; DEPO. OF S. CLARK, 284:11-285:19, 285:21—286:1, 286:3).

154.    Joe Keith takes his job seriously and did so on the evening of April 20, 2010.  He knew that missing a kick could be a threat to life, property, and the environment.  Throughout his tour, Joe Keith continuously and actively monitored all available surface data parameters and made the appropriate phone calls when he observed potentially anomalous sensor data responses. Joe Keith diligently performed his duties as a mudlogger and his conduct was consistent with good oilfield practices and the standard of care that should be exercised by mudloggers.  (J. KEITH, T.T. 3589:16–23, 3590:8–18, 3591:5—3592:7; TREX-62953; TREX-8140 at 118).

### B.      Proposed Conclusions of Law

1.    On April 20, 2010, Joe Keith did not deviate from industry standards or good oilfield practices with respect to monitoring the well for signs of a kick from 20:52-21:30.

2.    A retrospective review of the Sperry log and data, with fully formed trend lines and hindsight cannot reasonably mirror monitoring the real-time development of trends over time, particularly with simultaneous operations occurring.

3.    HESI maintained appropriate policies, guidelines, and written materials for its mudlogging services, consistent with industry standards.

4.    HESI maintained appropriate policies, guidelines, and written materials pertaining to well monitoring and identifying the indicia of an influx (kick indicators), consistent with industry standards.

5.      HESI provided appropriate training to its mudloggers in the performance of their duties, including, but not limited to, monitoring deepwater wells for signs of a kick, consistent with industry standards.

6.      HESI provided appropriate training to Joe Keith in the performance of his duties as a mudlogger, including monitoring wells for signs of a kick, consistent with industry standards.

7.      Joe Keith's training was consistent with industry standards.

8.      The Transocean drill crew, including the Toolpusher, Driller, and assistant Driller, bears primary responsibility for monitoring the well for indications of a kick.

9.      The Transocean drill crew had flow-out data available to them throughout the entire displacement procedure and should have identified that the well was flowing earlier than 21:30.

10.     The Transocean drill crew's failure to timely identify that the well was flowing based on their access to flow-out data from the well fell below the standard of care and industry standards for well monitoring.

11.     The mudlogger's duty with respect to well monitoring is to advise the drill crew of data anomalies that could indicate a kick in the well when such anomalies are noticed by the mudlogger.

12.     The mudlogger has no role in responding to kick indicators once identified.

13.     The mudlogger has no role in or responsibility for well control activities.

14.     The primary indicators of a kick are an unexplained increase in flow-out, flow from the well with the pumps off, an unexplained change in pit volumes, and a decrease in standpipe pressure.

15.     An increase in standpipe pressure, as occurred on the *Deepwater Horizon* on the evening of April 20, 2010, is not a standard kick indicator, according to industry standards.

16.     On April 20, 2010, Joe Keith did not miss or fail to identify any standard kick indicator prior to 21:30, at which point the Transocean drill crew was investigating an observed pressure differential.

17.     A reasonable mudlogger exercising ordinary care would not have recognized the subtle increase in standpipe pressure from 21:01 to 21:08 as a sign of a kick.

18.     A reasonable mudlogger exercising ordinary care would not have attributed any flow-out or pit volume data trends prior to 21:08 as signs of a kick.

19.     A reasonable mudlogger exercising ordinary care would not have recognized the subtle increase in standpipe pressure between 21:08 and 21:14 as a sign of a kick.

20.     A reasonably prudent mudlogger exercising ordinary care would have been confounded by the pressure responses during the displacement procedure and would not have interpreted those responses as indicators that the well was flowing.

21.     A reasonable mudlogger exercising ordinary care would not have recognized the subtle hookload fluctuations from 21:06-21:15 as an indicator that the well was flowing.

22.     A reasonable mudlogger exercising ordinary care would not have attributed any standpipe pressure fluctuations between 21:14 and 21:27 as indicators that the well was flowing.

23.     On April 20, 2010, Joe Keith did not miss any unexplained increase in flow-out; all flow-out data was explained by rig activities.

24.     There was no unexplained increase in flow-out on the *Deepwater Horizon* on the evening of April 20, 2010 during the time that Joe Keith could monitor flow-out.

25.     On April 20, 2010, Joe Keith did not miss any flow from the well with the pumps off.  He visually confirmed the well was not flowing at 21:08, and there is no evidence of flow with the pumps off.

26.     On April 20, 2010, Joe Keith did not miss any unexplained pit volume change; all changes in pit levels were explained by rig activities.

27.     On April 20, 2010, Joe Keith did not miss any decrease in standpipe pressure prior to 21:30; the standpipe pressure changes at issue, which were increases rather than decreases, were not typical or standard indicators of a kick.

28.     Joe Keith exercised reasonable and ordinary care in monitoring the Macondo well on April 20, 2010.

29.     The rig activities BP and Transocean conducted during the displacement procedure on April 20, 2010, along with the lack of communication from the Transocean drill crew to the mudlogger, impeded the mudlogger's ability to monitor the well for signs of a kick.

30.     The surviving data from the *Deepwater Horizon* and other evidence presented do not reveal any clear indicator of a kick prior to 21:30 on April 20, 2010.

31.     Joe Keith's actions on April 20, 2010 were consistent with his training and industry standards.

32.     Joe Keith performed his well monitoring duties on April 20, 2010 consistent with his training and industry standards.

33.     Joe Keith's conduct on April 20, 2010 was consistent with good oilfield practices and the standard of care that should be exercised by mudloggers.

34.     Based on the rig activities being conducted at the time and real-time data signatures, it was reasonable for the mudlogger to not have identified any indication of a kick prior to 21:30 on April 20, 2010.

35.     Joe Keith exercised reasonable care in the performance of his duties on April 20, 2010.

36.     Since the Transocean drill crew was investigating an observed pressure differential at 21:30 and the mudlogger's sole responsibility is to advise the drill crew of observed anomalies, Joe Keith's well monitoring responsibilities and conduct after 21:30 are irrelevant to the initial identification of the kick and the drill crew's response thereto.

37.     BP and Transocean implemented a displacement procedure with simultaneous operations and rig activities that impeded the mudlogger's ability to effectively and accurately monitor the well for signs of a kick.

38.     Contrary to industry standards and their own policies, BP and Transocean failed to conduct a risk assessment of the simultaneous operations performed during the displacement procedure.

39.     The rig activity conducted during the displacement procedure violated BP's and Transocean's policies relating to simultaneous operations, pit management, and communication.

40.     The Transocean drill crew, rather than the mudlogger, was in the best position to monitor the well for signs of a kick.

41.     The Transocean drill crew had flow-out data available to them at all times during the displacement on April 20, 2010, which should have plainly revealed when the well started flowing.

42.     BP and Transocean should have designed the displacement procedure to allow the mud from the well to reach the gumbo box before going overboard, thereby allowing the mudlogger to continue monitoring flow-out.

43.     BP's and Transocean's actions in executing the displacement procedure in a manner that blinded the mudlogger to key leading indicators of a kick were inconsistent with industry standards and good oilfield practices.

44.     The Transocean drill crew deviated from Transocean policy and industry standards by completely failing to communicate with the mudlogger regarding ongoing rig activities that affected his ability to monitor the well for signs of a kick.

45.     BP had access to all real-time data on the rig and in its offices in Houston.

46.     BP should have been continuously monitoring the real-time data in its Houston offices.

**XXII. Transocean's Failure To Manage, Maintain, And Operate The *Deepwater Horizon*, Its Equipment And Its Appurtenances In Accordance With Industry Standards And Regulations, Coupled With Transocean's Failure To Properly Train And Instruct Its Crew, Rendered The Vessel Unfit For Its Intended Purpose And Unseaworthy.**

**A.     Proposed Findings Of Fact**

1.     Transocean and the *Deepwater Horizon* were subject to the dictates of the International Safety Management Code (ISM Code) at the time of the Macondo well blowout on April 20, 2010.  (G. WEBSTER, T.T. 3736:17—3738:8).

2.     The ISM Code provides an international standard for the safe management and operation of ships and for pollution prevention.  (TREX-938 at 9; G. WEBSTER, T.T 3736:17—3737:12).

3.     The ISM Code Part A, Section 1.1.10 defines a major non-conformity as "an identifiable deviation that poses a serious threat to the safety of personnel or the ship . . . and

includes the lack of effective and systematic implementation of the requirements of (the) Code."

(G. WEBSTER, T.T 3741:5-14; TREX-938 at 11).

4.       On April 20, 2010, Transocean had major non-conformities that existed within its

Safety Management System ("SMS") implemented aboard the *Deepwater Horizon*.   (G.

WEBSTER, T.T  3771:23—3772:4, 3772:24—3773:14).

5.       Transocean's lack of clear instruction in its "dual command structure" constituted

a lack of effective and systematic implementation of the requirements of ISM Code 5.   (G.

WEBSTER, T.T 3746:4—3747:20, 3778:18—3779:13; TREX-938 at 13-14).

6.       Transocean's ISM/ISPS MODU Handbook demonstrated the dual command

structure at the time of the blowout:

>    (A)       "The master is the overall responsible person on the MODU when it is
>    underway and/or moving to another location."   (TREX-939 at TRN-MDL-
>    00033226; G. WEBSTER, T.T. 3778:18—3779:9, 3959:1—3959:24)
>
>    (B)       "The Offshore Installation Manager ("OIM") is the overall responsible
>    person for the day to day operation of the MODU while it is drilling."   (TREX-
>    939 at TRN-MDL-00033226; G. WEBSTER, T.T. 3966:16-3967:15, 3970:19-
>    3971:8).

7.       This dual command structure caused confusion and delay in responding to the

Macondo well blowout on April 20, 2010.   (G. WEBSTER, T.T. 3962:23—3963:15, 3964:21—

3965:9).

8.       Before the explosions, Captain Kurt Kuchta waited for permission from Jimmy

Harrell  to  operate  the  rig's  EDS.    (G. WEBSTER,  T.T.  4001:22—4002:18,  4011:25—4012:6;

TREX-4472 at TRN-INV-00001469).

9.       Following the explosions, Captain Kuchta asked for permission to activate the

EDS from Daun Winslow, a visiting Transocean VIP, and Jimmy Harrell.   (DEPO. OF C.

PLEASANT 335:20—336:7; 4002:9-18, 4063:4-14).   He did not realize Chris Pleasant, a

Transocean subsea engineer, had already pressed the EDS button.  (G. WEBSTER, T.T. 4001:2-9; DEPO. OF C. PLEASANT 332:17—333:18).

10.     Transocean's failure to adequately train Jimmy Harrell, the OIM, who was effectively in command of the *Deepwater Horizon* for a large majority of the time, or Kurt Kuchta, the Captain, who was in charge when the vessel was underway, constituted a lack of effective and systematic implementation of ISM Code 6: Resources and Personnel.  (G. WEBSTER, T.T. 3936:10—3937:21).

11.     Transocean inhibited or disabled safety critical alarms.  (G. WEBSTER, T.T. 3818:10-18, 3824:23—3826:6, 3878:3—3879:20).

12.     Transocean placed gas detectors aboard the rig in inhibit mode.  (G. WEBSTER, T.T. 3878:3-24, 4135:24—4136:19; DEPO. OF M. WILLIAMS, 130:17—131:6).

13.     Inhibiting the gas detection system would cause its alarm not to sound.  (G. WEBSTER, T.T. 3824:21—3826:6; DEPO. OF M. WILLIAMS, 132:23—133:11).

14.     Transocean failed to carry out timely and adequate maintenance of the *Deepwater Horizon*.  (M. BLY, T.T. 998:14-17; R. EZELL, T.T. 1888:14—1891:4).  The *Deepwater Horizon* operated for nine years without a single dry docking or shipyard overhaul.  (R. EZELL, T.T. 1904:7-14, R. SEPULVADO, T.T. 1924:10-16, 1940:20-23; G. WEBSTER, T.T.  3891:2-11; TREX-4248 at 19).

15.     The crew believed maintenance to be an ongoing problem.  (*See, e.g.* DEPO. OF M. WILLIAMS, 39:7—40:9).  The Transocean crew was forced to approach maintenance tasks "like triag[e], kind of moving from determining what the most important problem was and attacking that first before you move on to the next."  (DEPO. OF J. MANSFIELD, 44:14—46:2).

299

16.     The Transocean crew could not complete all maintenance required aboard the vessel due to lack of adequate down time, support staff, and sufficient spare parts.  (G. WEBSTER, T.T. 3809:18—3810:5; TREX-5297 at TRN-INV-00695743-44).

17.     Various rig audits showed numerous overdue maintenance items and poorly maintained rig equipment.  (*See, e.g.* G. WEBSTER, T.T. 3803:18—3807:25, 3808:24—3809:17, 4016:11—44017:3; TREX-1778, TREX-3405).

18.     In 2007, Det Norske Veritas ("DNV") observed that maintenance of equipment deemed to be safety-critical aboard the *Deepwater Horizon* was overdue by up to six months. (R. BEA, T.T. 473:9-25; G. WEBSTER, T.T. 3808:24—3809:17; TREX-1778 at TRN-HCEC-00116171).

19.     BP's September 2009 Follow Up Rig Audit, Marine Assurance Audit and Out of Service Period, revealed numerous maintenance items that remained outstanding.  (TREX-3405 at TRN-MDL-00478590-8591).  In particular, 390 overdue jobs amounting to 3,545 man-hours were expressly noted by the audit.   (*Id.* at BP-HZN-IIT-0008872).   In response, a recommendation was made to the BP Wells Team to suspend operations until many maintenance issues were satisfactorily addressed.   (*Id.*; TREX-780 at BP-HZN-2179MDL00340579–80; DEPO. OF J. KENT, Vol. 2; 34:25—36:21; G. WEBSTER, T.T. 3871:18—3873:2).

20.     Many navigation critical issues continued to hound the vessel, including watertight integrity.   (TREX-3404 at BP-HZN-CEC035426; G. WEBSTER, T.T. 3810:6—3813:13).

21.     In an October 6, 2009 email from Brett Cocales to the *Deepwater Horizon*'s OIM, Cocales (citing CMID Annex) noted that the watertight doors did not pass inspection and were not in good condition or able to be properly secured.  (TREX-6167 at BP-HZN-BLY00323218).

22.      BP's September 2009 Follow Up Rig Audit, Marine Assurance Audit and Out of Service Period identified problems with six watertight doors.  (*See generally,* TREX-3405). Four of them were only able to be operated locally instead of remotely.  (*Id.* at TRM-MDL-00478600-8601).  There were insufficient spares onboard to make the necessary repairs.  (*Id.).* An additional two doors were found to have fault conditions, including problems with the deadman levers.  (*Id.).*

23.      According to David Young, watertight doors were occasionally left open on the *Deepwater Horizon* because of issues and problems with those doors.  (DEPO. OF D. YOUNG, 276:22—277:1).

24.      An April 2010 ModuSpec Rig Condition Assessment additionally identified several problems with the manual watertight hatches, including gaskets in need of replacement, hand-operated winches in need of repair, and port/starboard hatch covers in need of servicing. (TREX-251 at MODUSA 000088).

25.      The ModuSpec Assessment also identified that the ballast pipes were worn, leaking, and in need of replacement.  (*Id.* at TRN-MDL-00038603).

26.      Transocean did not adequately maintain the bilge pumps on the *Deepwater Horizon*.  (*See* TREX-3405 at TRN-MDL-00478591; G. WEBSTER, T.T. 3875:2—3877:1).

27.      BP's September 2009 *Follow Up Rig Audit, Marine Assurance Audit and Out of Service Period* identified defective priming systems in the bilge pumps.  (G. WEBSTER, T.T. 3875:2—3877:1; TREX-3405 at TRN-MDL-00478591).   As evidenced by the April 2010 ModuSpec Assessment, these problems were never resolved prior to the Macondo well blowout. (TREX-251 at MODUSA 000093).

28.     Transocean failed to timely and adequately address outstanding maintenance items. (M. BLY, T.T. 998:14-17; R. EZELL, T.T. 1888:14—1891:4; G. WEBSTER, T.T. 3753:8—3754:18).

29.     The ModuSpec Assessment investigator testified that it did not appear that Transocean had taken any action to respond to any of ModuSpec's recommendations prior to April 20, 2010. (DEPO. OF A. SCHNEIDER, 204:9—205:3).

30.     The April 2010 ModuSpec assessment demonstrated that important issues flagged in the September 2009 rig audit were still in disrepair. (*See, e.g.* TREX-251 at MODU 000092-0093, 167-68).

31.     The March 29, 2010, CMID Audit Work List reflected that Angel Rodriguez verified the close out of five audit items regarding the watertight doors. (TREX-1832 at 4-5). However, the April 2010 ModuSpec assessment found that the watertight hatch covers were "in bad condition." (TREX-251 at MODUSA 000088).

32.     The March 29, 2010, CMID Audit Work List reflected that Angel Rodriguez verified the repair of the priming pumps. (TREX-1832 at 1). However, the ModuSpec audit found that the priming pumps would not hold prime. (TREX-251 at 16).

33.     The March 29, 2010, CMID Audit Work List reflected that Angel Rodriguez verified that thirty feet of saltwater pipes had been replaced. (TREX-1832 at 5). However, the ModuSpec assessment found that all of the saltwater pipes were in bad condition and should be replaced. (TREX-251 at MODUSA 000087, 0092-0093).

34.     The March 29, 2010, CMID Audit Work List reflected that Angel Rodriguez confirmed that all pumps (except pump No. 5) were repaired. (TREX-1832 at 10-11). However,

the ModuSpec audit found that the drill water pumps on the starboard side were worn and leaking due to the aging pumps.  (TREX-251 at MODUSA 000151).

35.     Transocean implemented a condition-based maintenance philosophy that did not adequately maintain the rig's equipment, instead consisting of a "run it 'til it breaks" or "run it to destruction" philosophy.  (G. WEBSTER, T.T. 3932:14—3933:4; DEPO. OF M. HAY, 120:12—121:24).

36.     The BOP was not fit for its intended purpose.  (R. DAVIS, T.T. 2652:13—2653:12, 2664:3-15; G. PERKINS, T.T. 3325:24—3326:12; B. AMBROSE, T.T. 6095:4-12; G. STEVICK, T.T. 6882:19—6683:11, 6908:19-25; A. ZATARAIN, T.T. 8403:24—8404:16).

37.     The BOP was generally and continually in a state of disrepair.  (*See, e.g.* TREX-3420 at TRN-MDL-00985307).

38.     Transocean failed to timely recertify the BOP stack and its associated components.  (*See, e.g.* TREX-251 at MODUSA 000124–0125).

39.     Pursuant to 30 C.F.R. 440.446, Transocean was required to maintain the BOP consistent with API RP 53 and OEM guidelines to ensure that the equipment functioned properly.  (TREX-7051; TREX-590 at TRN-MDL-00287035; DEPO. OF W. STRINGFELLOW, 326:2—327:17).  Transocean failed in this duty.  (G. WEBSTER, T.T. 3873:10-25, 3880:7-17, 3907:9—3908:17).

40.     API RP 53 required recertification of the BOP stack and its components every 3-5 years, and disassembly once a year.  (TREX-1169).

41.     Cameron's guidelines called for complete disassembly and overhaul once a year and that the components be recertified every 3-5 years.  (TREX-1170 at CAM-DOI-000000261; TREX-1352 at CAM-DOI-000000249).

303

42.     The BOP was not properly configured.  (G. STEVICK, T.T. 6882:15—6883:11, 6888:2-17, 6906:19—6907:7, 7047:13—7048:7).

43.     Transocean failed to adequately train its marine crew and drill crew in their assigned duties and responsibilities, particularly in the event of an emergency.  (G. WEBSTER, T.T. 3799:5-13, 3926:1-9, 3936:10—3939:18).

44.     Weekly EDS drills were not conducted, as required by the *Deepwater Horizon* Emergency Response Manual.   (TREX-4644 at TRN-MDL-02070856; G. WEBSTER, T.T. 3831:6-21; DEPO. OF Y. KEPLINGER, 150:2—152:18; DEPO. OF J. KEETON, 343:10-15).

45.     The Transocean drill crew was either inadequately trained to recognize and react to well control issues, or they failed to carry out their duties and responsibilities. (G. WEBSTER, T.T. 3799:3-13, 3803:3-17; G. STEVICK, T.T. 6914:2-9, 7027:1-8; R. DAVIS, T.T. 2684:3-11).

46.     The Transocean Well Control Manuals do not advise the drill crew as to when or in what situation to actuate the BSR or CSR.  (G. STEVICK, T.T. 6814:2-6; TREX-596 at BP-HZN-2179MDL00330825-26, 48, 51, 53, 0909-0910).

47.     The Transocean drill crew was not adequately trained in the use of the emergency diverter system. (G. WEBSTER, T.T. 3910:6—3911:5; G. STEVICK, T.T. 7037:8-13, 7038:19—7039:4).

**B.     Proposed Conclusions Of Law**

1.     Transocean had a duty to provide a seaworthy vessel.

2.     Seaworthiness is a duty owed by the owner or operator of the vessel and is absolute and independent of negligence.  *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 549 (1960).

3.      A claim of unseaworthiness does not require a showing of negligence; rather, once the necessary elements of causation are shown, it is a standard of strict liability in which the reason for the unseaworthiness is immaterial.  *Napier v. F/V Deesie, Inc.,* 464 F.3d 61, 68 (1st Cir. 2006).

4.      The duty owed is one of reasonableness.  *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960).

5.      A vessel is unseaworthy when the vessel, its equipment, or its appurtenances are not reasonably fit for their intended use.  *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960).

6.      A wide variety of physical conditions, including a defective hull, equipment, tools, or appliances, may render a vessel unseaworthy.

7.      Unseaworthiness may also be found where an insufficiency exists with relation to the crew, such as negligent orders, improper training, improper method of operation, or understaffing.  *Brown v. Cliff's Drilling Company*, 638 F. Supp. 1009, 1014 (E.D. Tex. 1986).

8.      The *Deepwater Horizon* was unseaworthy because Transocean failed to manage, maintain and operate the *Deepwater Horizon,* its equipment and appurtenances in accordance with industry standards and regulations.  (G. WEBSTER, T.T. 3870:21—3871:17, 3875:3-9, 11-23, 3904:13-18, 4014:24—4015:21, 4016:11—4017:3).

## XXIII. HESI's General Conclusions of Law.

### A.      <u>Superseding Cause</u>

1.      The superseding cause doctrine applies in admiralty cases, and "operates to cut off the liability of an admittedly negligent defendant," where "the injury was actually brought about

by a later cause of independent origin that was not foreseeable." *Exxon Co. v. Sofec, Inc*., 517 U.S. 830, 837-38 (1996).

2.     The Macondo blowout was brought about by BP's and Transocean's negligence subsequent to the completion of the cement job, particularly with respect to BP's and Transocean's negligence in failing to properly interpret the negative pressure tests, mistakenly concluding that the negative pressure tests demonstrated well integrity, when in fact the negative pressure tests showed and/or established an absence of well integrity.

3.     BP's and Transocean's negligence in failing to properly interpret the negative pressure tests was wholly independent of the cement job, and not foreseeable to HESI and others, and constituted the superseding cause of the Macondo blowout. *Sofec, Inc*., 517 U.S. at 837-38; *Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*, 447 F.3d 360, 367-68 (5th Cir. 2006).

4.     BP's and Transocean's negligence with respect to the negative pressure tests satisfies the factors outlined by sections 442 and 447 of the Restatement (Second) of Torts for determining whether an intervening force supersedes any alleged prior negligence.

5.     BP's and Transocean's post-cement job negligence with respect to the negative pressure tests brought about "harm different in kind" from any harm that would otherwise have resulted from the cement job, assuming *arguendo* any negligence occurred with respect to the cement job. RESTATEMENT (SECOND) OF TORTS § 442(a) (1965); *see Lone Star, Indus., Inc. v. Mays Towing Co., Inc*., 927 F.2d 1453, 1459 (8th Cir. 1991).

6.     The intervening negligence of BP and Transocean was "extraordinary" and not "normal," in view of the circumstances existing at the time of the negative pressure tests and the fact that the pressure readings and flow indications during the negative pressure tests showed that well integrity had not been established. RESTATEMENT (SECOND) OF TORTS §§ 442(b), 447(c).

7.     BP's and Transocean's post-cement job negligence with respect to the negative pressure tests was an intervening force "operating independently" of any situation created by the cement job, and BP's and Transocean's negligence in failing to properly interpret the negative pressure tests was not a "normal result" or "normal consequence" following the completion of the cement job.  RESTATEMENT (SECOND) OF TORTS §§ 442(c), 447(c); *see Consolidated Grain & Barge Co., Inc. v. Capital Marine Supply, Inc*., No. 99-0813, 2001 U.S. Dist. LEXIS 1805 at *9 (E.D. La. Feb. 14, 2001).

8.     BP's and Transocean's post-cement job negligence with respect to the negative pressure tests also constitutes an intervening force caused by acts or failures to act of third persons (BP and Transocean) that were unrelated to HESI's cement job, and HESI could not have realized at the time of the cement job that BP and Transocean would be negligent thereafter in this manner.  RESTATEMENT (SECOND) OF TORTS §§ 442(d), (e), (f), 447(a); *see Lone Star, Indus., Inc.*, 927 F.2d at 1460.

9.     BP's and Transocean's post-cement job negligence with respect to the negative pressure tests could only be regarded as "highly extraordinary" under any objective or reasonable standard.  RESTATEMENT (SECOND) OF TORTS §§ 447(b), (c); *see Consolidated Grain & Barge Co., Inc.*, 2001 U.S. Dist. LEXIS 1805 at *9.

10.    BP's and Transocean's negligence in failing to properly interpret the negative pressure tests constitutes a superseding cause that relieves HESI of liability.  *Consolidated Grain & Barge Co., Inc.*, 2001 U.S. Dist. LEXIS 1805 at *9; *see Lone Star, Indus., Inc.*, 927 F.2d at 1460-61.

11.    The Macondo blowout was brought about by Transocean's negligence subsequent to the completion of the cement job and HESI's mudlogging services, particularly with respect to

307

Transocean's negligence in failing to follow its own policies and procedures and industry standards for maintaining well control, when Transocean's rig crew failed to immediately shut in the well upon notice of an anomaly and when the BP and the Transocean rig crew failed to default the diverter overboard and the Transocean drill crew failed to divert the blowout overboard rather than to the mud gas separator.

12.     Transocean's negligence in failing to properly maintain well control and divert overboard was wholly independent of the cement job and mudlogging services, and not foreseeable to HESI and others, and constituted the superseding cause of the Macondo blowout. *Sofec, Inc.*, 517 U.S. at 837-38; *Stolt Achievement, Ltd.*, 447 F.3d at 367-68.

13.     Transocean's negligence in failing to properly maintain well control and divert overboard satisfies the factors outlined by sections 442 and 447 of the Restatement (Second) of Torts for determining whether an intervening force supersedes any alleged prior negligence.

14.     Transocean's post-cement job negligence in failing to properly maintain well control and divert overboard brought about "harm different in kind" from any harm that would otherwise have resulted from the cement job or mudlogging services, assuming arguendo any negligence occurred with respect to the cement job and/or mudlogging services.  RESTATEMENT (SECOND) OF TORTS § 442(a); *see Lone Star, Indus., Inc*., 927 F.2d  at 1459.

15.     The intervening negligence of Transocean was "extraordinary" and not "normal," in view of the circumstances existing at the time of the well control event and the fact that Transocean's policies and industry standards dictated immediate shut-in of the well and diversion of hydrocarbons overboard.  RESTATEMENT (SECOND) OF TORTS §§  442(b), 447(c).

16.     Transocean's post-cement job negligence in failing to properly maintain well control and divert overboard was an intervening force "operating independently" of any situation

created by the cement job or mudlogging services, and Transocean's negligence in failing to properly maintain well control was not a "normal result" or "normal consequence" following the completion of the cement job or provision of mudlogging services.  RESTATEMENT (SECOND) OF TORTS §§ 442(c), 447(c); *see Consolidated Grain & Barge Co., Inc*., 2001 U.S. Dist. LEXIS 1805 at *9.

17.    Transocean's negligence in failing to properly maintain well control and divert overboard also constitutes an intervening force caused by acts or failures to act of third persons (Transocean) that were unrelated to HESI's cement job and/or mudlogging services, and HESI could not have realized at the time of the cement job and/or mudlogging services that Transocean would be negligent thereafter in this manner.  RESTATEMENT (SECOND) OF TORTS §§ 442(d), (e), (f), 447(a); *see Lone Star, Indus., Inc*., 927 F.2d at 1460.

18.    Transocean's post-cement job negligence in failing to properly maintain well control and divert overboard could only be regarded as "highly extraordinary" under any objective or reasonable standard.  RESTATEMENT (SECOND) OF TORTS §§ 447(b), (c); *see Consolidated Grain & Barge Co., Inc*., 2001 U.S. Dist. LEXIS 1805 at *9.

19.    Transocean's negligence in failing to properly maintain well control and divert overboard constitutes a superseding cause that relieves HESI of liability.  *Consolidated Grain & Barge Co., Inc*., 2001 U.S. Dist. LEXIS 1805 at *9; *see Lone Star, Indus., Inc*., 927 F.2d at 1460-61.

20.    The Macondo blowout was brought about by BP's and Transocean's negligence in failing to properly configure and operate the *Deepwater Horizon* BOP.

21.    BP's and Transocean's negligence in failing to properly configure and operate the *Deepwater Horizon* BOP was wholly independent of the cement job and mudlogging services,

and not foreseeable to HESI and others, and constituted the superseding cause of the Macondo blowout. *Sofec, Inc.*, 517 U.S. at 837-38; *Stolt Achievement, Ltd.*, 447 F.3d at 367-68.

22.     BP's and Transocean's negligence in failing to properly configure and operate the *Deepwater Horizon* BOP satisfies the factors outlined by sections 442 and 447 of the Restatement (Second) of Torts for determining whether an intervening force supersedes any alleged prior negligence.

23.     BP's and Transocean's post-cement job negligence in failing to properly configure and operate the *Deepwater Horizon* BOP brought about "harm different in kind" from any harm that would otherwise have resulted from the cement job and mudlogging services, assuming *arguendo* any negligence occurred with respect to the cement job and/or mudlogging services. RESTATEMENT (SECOND) OF TORTS § 442(a); *see Lone Star, Indus., Inc.*, 927 F.2d at 1459.

24.     The intervening negligence of BP and Transocean was "extraordinary" and not "normal," in view of the circumstances existing at the configuration and operation of the *Deepwater Horizon* BOP.  RESTATEMENT (SECOND) OF TORTS §§ 442(b), 447(c).

25.     BP's and Transocean's post-cement job negligence in failing to properly configure and operate the *Deepwater Horizon* BOP was an intervening force "operating independently" of any situation created by the cement job and/or mudlogging services, and BP's and Transocean's negligence in failing to properly configure and operate the *Deepwater Horizon* BOP was not a "normal result" or "normal consequence" following the completion of the cement job and/or mudlogging services.  RESTATEMENT (SECOND) OF TORTS §§ 442(c), 447(c); *see Consolidated Grain & Barge Co., Inc.*, 2001 U.S. Dist. LEXIS 1805 at *9.

26.     BP's and Transocean's post-cement job negligence in failing to properly configure and operate the *Deepwater Horizon* BOP also constitutes an intervening force caused by acts or

failures to act of third persons (BP and Transocean) that were unrelated to HESI's cement job and/or mudlogging services, and HESI could not have realized at the time of the cement job  or mudlogging services that BP and Transocean had been or would be negligent in this manner. RESTATEMENT (SECOND) OF TORTS §§ 442(d), (e), (f), 447(a); *see Lone Star, Indus., Inc.*, 927 F.2d at 1460.

27.     BP's and Transocean's negligence in failing to properly configure and operate the *Deepwater Horizon* BOP could only be regarded as "highly extraordinary" under any objective or reasonable standard.  RESTATEMENT (SECOND) OF TORTS §§ 447(b), (c); *see Consolidated Grain & Barge Co., Inc*., 2001 U.S. Dist. LEXIS 1805 at *9.

28.     BP's and Transocean's negligence in failing to properly configure and operate the *Deepwater Horizon* BOP constitutes a superseding cause that relieves HESI of liability. *Consolidated Grain & Barge Co., Inc*., 2001 U.S. Dist. LEXIS 1805 at *9; *see Lone Star, Indus., Inc.*, 927 F.2d at 1460-61.

29.     The negligence and/or breach of duty of Transocean with respect to the unseaworthiness of the *Deepwater Horizon* constitutes the proximate cause and the superseding cause of the blowout, explosions, fire, and oil spill.

**B.      Contributory Negligence**

1.     BP's actions and inactions leading up to the *Deepwater Horizon* Incident were negligent. FED. R. CIV. P. 8(c)(1).

2.     BP's negligence was a proximate cause of the Incident.

3.     Transocean's actions and inactions leading up to the *Deepwater Horizon* Incident were negligent. FED. R. CIV. P. 8(c)(1).

4.     Transocean's negligence was a proximate cause of the Incident.

311

5.      HESI's actions and/or inactions leading up to the *Deepwater Horizon* Incident were not negligent.

6.      The injuries claimed by Plaintiffs, BP, Transocean, or any other party relating to the Incident, were not a foreseeable risk of the cementing operations or mudlogging services HESI was performing.

7.      HESI did not breach any duty owed to Plaintiffs, BP, Transocean, or any other party relating to the Incident.

8.      Any negligent actions and/or inactions attributed to HESI were not a proximate cause of the Incident.

**C.      Limitation of Liability and Unseaworthiness of Vessel.**

1.      Transocean's *Deepwater Horizon* was unseaworthy and such unseaworthy condition or conditions proximately caused the Incident.

2.      Transocean's *Deepwater Horizon* was unseaworthy and such unseaworthy condition or conditions substantially caused the Incident and such Incident was a reasonably probable consequence of the unseaworthy condition or conditions.

3.      Transocean's negligence and the unseaworthiness of Transocean's *Deepwater Horizon* constituted acts and conditions within the privity and knowledge of Transocean, and, as such, Transocean cannot limit its liability in accordance with the Limitation of Liability Act. 46 U.S.C. §§ 30501 *et seq.*; *Cupit v. McClanahan Contractors, Inc.*, 1 F.3d 346, 348 (5th Cir. 1993); *see Trico Marine Assets Inc. v. Diamond B Marine Servs. Inc.*, 332 F.3d 779, 789 (5th Cir. 2003) (citing *Cupit* in stating "if the vessel's negligence or unseaworthiness is the proximate cause of the claimant's loss, the plaintiff-in-limitation must prove it had no privity or knowledge of the unseaworthy conditions or negligent acts."); *see also In re Signal Int'l LLC*, 579 F.3d 478

312

(5th Cir. 2009) (citing *Cupit*); *In re Omega Protein, Inc.*, 548 F.3d 361, 371 (5th Cir. 2008) (citing *Trico Marine Assets*).

### D. <u>Gross Negligence and Willful Misconduct.</u>

1.     There is no evidence or no legally sufficient evidence to support the required elements of the claims of gross negligence and/or willful misconduct asserted against HESI.

2.     There is no evidence or no legally sufficient evidence of harm willfully inflicted by HESI (or HESI's alleged servants, employees, agents, or anyone for whom HESI is legally responsible) or caused by gross or wanton negligence of HESI (or HESI's alleged servants, employees, agents, or anyone for whom HESI is legally responsible). *Coastal Iron Works, Inc. v. Petty Ray Geophysical*, 783 F.2d 577, 582 (5th Cir. 1986).

3.     There is no evidence or no legally sufficient evidence of reckless or wanton misconduct by HESI (or HESI's alleged servants, employees, agents, or anyone for whom HESI is legally responsible) or harm willfully inflicted by HESI (or HESI's alleged servants, employees, agents, or anyone for whom HESI is legally responsible) or caused by wanton and reckless disregard by HESI (or HESI's alleged servants, employees, agents, or anyone for whom HESI is legally responsible) for the safety of others. *Operaciones Tecnicas Marinas S.A.S. v. Diversified Marine Services, LLC*, No. 12-1979, 2012 U.S. Dist. LEXIS 179419, at *9 (E.D. La. Dec. 19, 2012).

4.     There is no evidence or no legally sufficient evidence to support any basis for the claim for punitive damages asserted against HESI, namely gross negligence and/or willful, wanton, or reckless misconduct. *Miles v. Melrose*, 882 F.2d 976, 989 (5th Cir. 1989), *aff'd*, 498 U.S. 19 (1990); *McBride v. Estis Well Service, LLC*, 872 F.Supp.2d 511, 521 (W.D. La. 2012).

E.    **The Oil Pollution Act of 1990, ("OPA")**

1.    OPA is a "comprehensive statute addressing responsibility for oil spills, including the cost of clean up, liability for civil penalties, as well as economic damages incurred by private parties and public entities." (Dkt. No. 3830 at 23); *In re Oil Spill by the Rig "Deepwater Horizon" in the Gulf of Mex.*, on April 20, 2010,  MDL No. 2179, 808 F. Supp. 2d 943, 959 (E.D. La. 2011).

2.    As a result of the comprehensive nature of the statute, OPA displaces Economic Damage Plaintiffs' general maritime claims, including their claims for punitive damages, against all defendants, whether designated as Responsible Parties or not.  *See S. Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 65-66 (1st Cir. 2000) (noting that Congress has established a "comprehensive" scheme that outlines with particularity the types of damages recoverable under OPA which is a "strong indication that Congress intended OPA to be the sole federal law applicable in this area of maritime pollution."); *Gabarick v. Laurin Mar. (Am.) Inc*., 623 F. Supp. 2d 741, 750-51 (E.D. La. 2009) ("[A]ll [general maritime law] claims that are recoverable under OPA, specifically those covered damages enumerated in 33 U.S.C. § 2702, are preempted by OPA.").

3.    Pursuant to OPA, injured parties may recover a broad range of damages from a Responsible Party, including: (1) damages for injury to, destruction of, or loss of use of natural resources; (2) damages for injury to, or economic losses resulting from destruction of, real or personal property; (3) damages for loss of subsistence use of natural resources; (4) damages equal to the net loss of taxes, royalties, rents, fees, or net profit shares due to the injury, destruction, or loss of real property, personal property, or natural resources; (5) damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real

property, personal property, or natural resources; and (6) damages for net costs of providing increased or additional public services during or after removal activities.  33 U.S.C. § 2702(b)(2) (2006).

4.      OPA provides that the Responsible Party is strictly liable for all associated damages and removal costs.  33 U.S.C. § 2702(a).

5.      Claimants should pursue claims covered under OPA only against the Responsible Party and in accordance with the procedures established by OPA.  *Gabarick*, 623 F. Supp. 2d 750.

6.      Recovery, if any, against non-responsible third parties is an action for contribution by the Responsible Party or Parties.  *See* 33 U.S.C. § 2709 (2006); *Gabarick*, 623 F. Supp. 2d at 750.

7.      The Coast Guard has named BP as the Responsible Party for the downhole release of oil and Transocean as the Responsible Party for the release of diesel on the surface.

8.      HESI is not a Responsible Party under OPA.

9.      The claims against HESI are governed by OPA.

10.      OPA does not permit the recovery of punitive damages.  *See S. Port Marine, LLC*, 234 F.3d at 65-66 (noting that Congress has established a "comprehensive" scheme that outlines with particularity the types of damages recoverable under OPA and that this is a "strong indication that Congress intended OPA to be the sole federal law applicable in this area of maritime pollution.").

F.      **Indemnity**

1.      BP is required to indemnify HESI for any third-party compensatory claims arising from pollution not originating from HESI's property or equipment located above the surface of

315

the land or water, even if HESI's gross negligence caused the pollution.  *See* Order and Reasons [As to Halliburton's and BP's Cross-Motions for Partial Summary Judgment Regarding Indemnity] (Dkt. No. 5493 at 3).

2.    There is no evidence to support BP's claims against HESI for fraud and/or fraudulent concealment, and BP is not entitled to affirmative recovery under these claims and likewise BP cannot use these claims as a basis to invalidate its indemnity obligations to HESI.

3.    BP did not plead against HESI a cause of action for breach of contract and is therefore entitled to no relief, either affirmative or defensive, under a breach of contract theory.

4.    Even if the Court considers BP's claim that HESI breached the BP/HESI Contract, any such breach does not invalidate BP's indemnity obligations to HESI.

5.    No action or inaction by HESI resulted in a material increase of risk to BP, and BP is not entitled to invalidate its indemnity obligations to HESI under a theory of material increase of risk.

6.    HESI is entitled to judgment as to BP's claims against it for consequential damages, whether asserted by BP or by the settling Economic Class, because the BP/HESI Contract prohibits BP from recovering consequential damages from HESI.  *See* BP/HESI Contract at §19.4, §19.6 (a)-(c), §21.

### G.    <u>Punitive Damages</u>

1.    Because HESI's conduct was not negligent, HESI's conduct cannot be grossly negligent, or willful or wanton, or any other description of conduct that might support the imposition of punitive damages.  Therefore, punitive damages cannot be assessed against HESI.

2.     HESI's conduct does not rise to the level of gross negligence, or willful or wanton misconduct, or any other description of conduct that might support the imposition of punitive damages.  Therefore, punitive damages cannot be assessed against HESI.

3.     Under general maritime law, a plaintiff cannot recover punitive damages unless compensatory damages are also recovered.  *Neal v. Barisich, Inc*., 707 F. Supp. 862, 873 (E.D. La. 1989), *aff'd*, 889 F.2d 273 (5th Cir. 1989) (punitive damages are not recoverable unless actual damages are also recovered); *Parr v. Nolty J. Theriot, Inc*., No. 89-3295, 1990 U.S. Dist. LEXIS 5952, at *2 (E.D. La. May 17, 1990) (noting the traditional limits on the right to recover punitive damages: (1) a plaintiff may not recover punitive damages absent a recovery for compensatory damages, and (2) punitive damages recoverable must be commensurate with the amount of compensatory damages).

4.     Settling Plaintiffs under the Economic Class Settlement are not in a position to "recover" or be "awarded" compensatory damages against HESI, as these Plaintiffs have agreed that they will not "accept or attempt to recover" compensatory damages from HESI.  (Dkt. No. 6427 at §§ XVII.A & B.2, 3); (Dkt. No. 6430 at Exh. 21, §§ 1.1.1, 1.1.2.2, 1.1.2.3).

5.     Because these Settling Plaintiffs are no longer in a position to recover compensatory damages, HESI is entitled to judgment as to these Plaintiffs' claims for punitive damages.  *See AmWest Sav. Ass'n v. Statewide Capital, Inc*., 144 F.3d 885, 889, n.6 (5th Cir. 1998) (applying Texas law); *see also Virgilio v. City of New York*, 407 F.3d 105, 116-18 (2nd Cir. 2005) (applying New York law).

6.     OPA does not permit the recovery of punitive damages.  *See S. Port Marine, LLC*, 234 F.3d at 65-66 (noting that Congress has established a "comprehensive" scheme that outlines with particularity the types of damages recoverable under OPA and that this is a "strong

indication that Congress intended OPA to be the sole federal law applicable in this area of maritime pollution."). Because Plaintiffs' only proper claims for economic and property damages is against BP as the OPA Responsible Party, there is no basis for an award of punitive damages in Plaintiffs' favor against HESI.

### H. Failure to Satisfy Conditions Precedent

1.     Plaintiffs who have failed to properly present their claim(s) to BP as the Responsible Party cannot maintain a claim under OPA. HESI has no liability, in contribution or otherwise, for any claim that has not been properly presented.

### I. Economic Loss Doctrine

1.     Recovery against HESI is barred in whole or in part pursuant to *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927) with respect to claims for purely economic losses and/or claims lacking a physical injury to a proprietary interest. *Catalyst Old River Hydroelectric Ltd. P'ship v. Ingram Barge Co.*, 639 F.3d 207, 210 (5th Cir. 2011) ("It is well settled under the general maritime law that there can be no recovery for economic loss absent physical damage to or an invasion of a proprietary interest.").

### J. Fraud and Fraudulent Concealment

1.     To prevail on a fraud claim, a party must prove that: (1) the deceiving party made a material misrepresentation or nondisclosure; (2) the representation was false or the nondisclosure implied that the facts were different from what the deceived party understood them to be; (3) the deceiving party knew that the representation was false or that the nondisclosure implied the existence of false facts; (4) the deceiving party intended the deceived party to rely on the misrepresentation or nondisclosure; and (5) the deceived party detrimentally

relied upon the misrepresentation or nondisclosure. *Atel Mar. Investors, LP v. Sea Mar Mgmt.*, No. 08-1700, 2010 U.S. Dist. LEXIS 47834, at *9 (E.D. La. May 14, 2010).

2.      Fraud "necessarily includes intentional wrongdoing." (Dkt. No. 5493 at p. 5) (citing *Atel Mar. Investors*).

3.      There is no evidence of any intentional act of wrongdoing by HESI and/or its employees.

4.      A claim for fraudulent concealment exists only if the defendant had a duty to disclose information. *Trustees of the Nw. Laundry & Dry Cleaners Health & Welfare Trust Fund v. Burzynski*, 27 F.3d 153, 157 (5th Cir. 1994) (applying Texas law); *see also Bridges v. Metabolife Int'l, Inc.*, 119 Fed. Appx. 660, 663 (5th Cir. 2005) (examining fraudulent concealment claim in the context of the tolling of statute of limitations and holding "[m]ere concealment is insufficient to establish fraudulent concealment, the defendant must have had a duty to disclose."); *Berm. Container Line Ltd. v. Int'l Longshoremen's Assoc.*, 192 F.3d 250, 258 (2d Cir. 1999) (noting requirement of duty to disclose).

5.      There is no evidence that anyone with HESI attempted to wrongfully conceal any material fact from BP.

6.      BP is not entitled to any relief, affirmative or defensive, based upon its claims for fraud and/or fraudulent concealment.

**K.      Breach of Warranty**

1.      There is no contractual privity between Transocean and HESI regarding the services HESI was providing on the *Deepwater Horizon*.

2.      In the absence of contractual privity, Transocean has no claim against HESI for breach of a warranty of good and workmanlike performance. *Kevin Gros Offshore, LLC v. Max*

*Welders, Inc.*, No. 07-7340, 2009 U.S. Dist. LEXIS 6810 at *12 n. 8 (E.D. La. Jan 22, 2009) (citations omitted).

      **L.**      **No HESI Liability**

      1.      HESI is not liable to Plaintiffs, BP, Transocean, or any other party for any actions or inactions relating to the *Deepwater Horizon* Incident.

320

Respectfully Submitted,

**GODWIN LEWIS PC**

**By:**   /s/  *Donald E. Godwin*
Donald E. Godwin
*Attorney-in-charge*
State Bar No. 08056500
Don.Godwin@GodwinLewis.com
Bruce W. Bowman, Jr.
State Bar No. 02752000
Bruce.Bowman@GodwinLewis.com
Jenny L. Martinez
State Bar No. 24013109
Jenny.Martinez@GodwinLewis.com
Floyd R. Hartley, Jr.
State Bar No. 00798242
Floyd.Hartley@GodwinLewis.com
Gavin E. Hill
State Bar No.  00796756
Gavin.Hill@GodwinLewis.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332
and
R. Alan York
State Bar No. 22167500
Alan.York@GodwinLewis.com
Jerry C. von Sternberg
State Bar No.  20618150
Jerry.VonSternberg@GodwinLewis.com
Misty Hataway-Coné
State Bar No.  24032277
Misty.Cone@GodwinLewis.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone:  713.595.8300
Facsimile:  713.425.7594

**ATTORNEYS FOR DEFENDANT
HALLIBURTON ENERGY SERVICES, INC.**

2174599 v7-24010/0002 PLEADINGS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Halliburton Energy Services, Inc.'s Proposed Findings of Fact and Conclusions of Law have been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedure established in MDL 2179, on this <u>21st</u> day of June 2013.

/s/ Donald E. Godwin
Donald E. Godwin