**UNITED STATES DISTRICT OF COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **IN RE: OIL SPILL by the OIL RIG** | § | **MDL No. 2179** |
| **"DEEPWATER HORIZON" in the** | § | |
| **GULF OF MEXICO,** | § | **SECTION:  J** |
| **on APRIL 20, 2010** | § | |
| | § | **JUDGE BARBIER** |
| | § | |
| **Applies to:  No. 10-2771,** | § | **MAG. JUDGE SHUSHAN** |
| **and All Cases** | § | |
| | § | |
| _____ | § | |

**<u>BRIEF REGARDING POST-TRIAL MATTERS</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

I.    Introduction and Summary of Arguments. ............................................................1

II.   HESI is Not Liable Under Any Remaining Causes of Action.................................1

      A.    This Court Has Previously Dismissed Many of Plaintiffs'
            Causes of Action. ..........................................................................................1

      B.    HESI is Not Liable for Negligence.................................................................2

            1.    HESI's Actions Were Not Negligent. ....................................................2

                  a.    HESI Properly Provided Cementing Services
                        on the *Deepwater Horizon*. ........................................................4

                  b.    HESI Properly Provided Mudlogging Services
                        on the *Deepwater Horizon*. ........................................................6

            2.    Even if Negligent, HESI's Actions Were Not the Cause
                  of the Incident. ..................................................................................7

                  a.    There is No Causal Link Between HESI's Actions
                        and the Incident...........................................................................7

                  b.    The Failure to Properly Interpret the Negative
                        Pressure Tests, the Failure to Maintain Well Control,
                        and the Failure to Properly Configure, Maintain,
                        and Operate the BOP are Superseding, Intervening
                        Causes for the Incident................................................................8

      C.    HESI is Not Liable for Products Liability. .....................................................15

            1.    Strict Products Liability Does Not Apply to Services. .............................16

            2.    There is No Evidence That the Production Casing
                  Cement Slurry Departed From Its Intended Design. .................................17

            3.    The Production Casing Cement Slurry Was Not
                  Unreasonably Dangerous for Its Foreseeable Use. ...................................17

            4.    There is No Causal Link Between an Alleged Defect
                  and the Alleged Harm. .........................................................................19

      D.    HESI is Not Liable for Gross Negligence or Willful Misconduct.......................19

        1.      HESI's Actions Do Not Constitute Gross
Negligence or Willful Misconduct..........................................................20

              a.     HESI's Cement Design Activities
Were Not Grossly Negligent...........................................26

              b.     HESI's Mudlogging Activities
Were Not Grossly Negligent...........................................27

        2.      The Actions of Individual HESI Employees
Cannot Be Imputed to HESI. ..................................................27

        3.      Post-Incident Activities of HESI Employees Cannot
Be Considered When Determining Whether HESI
Was Grossly Negligent or Acted With Willful Misconduct.....................31

   E.     HESI is Not Liable for Punitive Damages.............................................34

   F.     HESI is Not Liable for Fraud, Core Breach of Contract,
or Material Increase of Risk........................................................35

III.   HESI is Entitled to Judgment as a Matter of Law. .........................................40

IV.   Conclusion ..........................................................................................40

# TABLE OF AUTHORITIES

**CASES**

*Aetna Cas. & Sur. Co. v. Marshall*,
   699 S.W.2d 896 (Tex. App.—Houston [1st Dist.] 1985,
   writ granted), *aff'd*, 724 S.W.2d 770 (Tex. 1987)...................................................22

*Alaska Bulk Carriers, Inc. v. Goodall Rubber Co.*,
   Civil Action No. 87-573, 1990 U.S. Dist. Lexis 7239 (D. Del. June 14, 1990) .....................19

*Ashton v. Knight Transp., Inc.*,
   772 F. Supp. 2d 772 (N.D. Tex. 2011) .................................................................31

*Atel Mar. Investors, LP v. Sea Mar Mgmt.*,
   No. 08-1700, 2010 U.S. Dist. Lexis 47834 (E.D. La. May 14, 2010) ...................................36

*Baker v. Mobile Corp.*,
   490 F.3d 1066 (9th Cir. 2007) ..........................................................................31

*Becker v. Tidewater Inc.*,
   586 F.3d 358 (5th Cir. 2009) ....................................................................*Passim*

*Bennett v. Greeley Gas Co.*,
   969 P.2d 754 (Colo. App. 1998) .......................................................................34

*Bergeron v. Mike Hooks, Inc.*,
   626 So.2d 724 (La. Ct. App. 1993)....................................................................30

*Berm. Container Line Ltd. v. Int'l Longshoremen's Assoc.*,
   192 F.3d 250 (2d Cir. 1999) ..........................................................................37

*Broussard v. Procter & Gamble Co.*,
   517 F.3d 767 (5th Cir. 2008) .........................................................................19

*Burk Royalty Co. v. Walls*,
   616 S.W.2d 911 (Tex. 1981).............................................................................22

*Burke v. Deere & Co.*,
   No. 92-1990, 1993 U.S. App. LEXIS 21878
   (8th Cir. Aug. 27, 1993) (Iowa law) ...................................................................33

*In re Cameron Boat Rentals, Inc.*,
   683 F. Supp. 577 (W.D. La. 1988)......................................................................21

*Clements v. Steele*,
   792 F.2d 515 (5th Cir. 1986) .........................................................................22

*Computalog U.S.A., Inc. v. Blake Drilling & Workover Co., Inc.*,
No. 95-3009, 1996 U.S. Dist. LEXIS 19074 (E.D. La. Dec. 9, 1996)....................................32

*Consol. Aluminum Corp. v. C.F. Bean Corp.*,
639 F. Supp. 1173 (W.D. La. 1986)............................................................................ 29-30

*Consol. Aluminum Corp. v. C.F. Bean Corp.*,
833 F.2d 65 (5th Cir. 1987) ..........................................................................................2

*Dana Corp. v. Fireman's Fund Ins. Co.*,
169 F. Supp. 2d 732 (N.D. Ohio 1999)................................................................................39

*Davaco, Inc. v. Dunkin' Brands, Inc.*,
No. 3:08-cv-0581-M, 2008 U.S. Dist. LEXIS 95356
(N.D. Tex. Nov. 21, 2008) ...............................................................................................37

*Donaghey v. Ocean Drilling & Exploration Co.*,
974 F.2d 646 (5th Cir. 1992) ................................................................................... 10-11

*E. River S.S. Corp. v. Transamerica Delaval, Inc.*,
476 U.S. 858 (1986)..........................................................................................................15

*Elmwood Dry Dock & Repair v. H & A Trading Co., Ltd.*,
No. 93-2156, 1997 U.S. Dist. Lexis 20309 (E.D. La. Dec. 16, 1997)....................................21

*Employers Ins. of Wausau v. Suwannee River Spa Lines, Inc.*,
866 F.2d 752 (5th Cir. 1989) .....................................................................................15, 17

*Exxon Co. v. Sofec, Inc.*,
517 U.S. 830 (1996)..........................................................................................................8-9

*Exxon Shipping Co. v. Pac. Res., Inc.*,
835 F. Supp. 1195 (D. Haw. 1993)....................................................................................17

*First Commonwealth Corp. v. Hibernia Nat'l Bank*,
891 F. Supp. 290 (E.D. La. 1995)....................................................................................34

*Ford v. Pennzoil*,
974 F. Supp. 559 (E.D. La. 1997)....................................................................................19

*Forquer v. Pinal Cnty.*,
526 P.2d 1064 (Ariz. Ct. App. 1974)..................................................................................33

*Gen. Ins. Co. of Am. v. Fleeger*,
389 F.2d 159 (5th Cir. 1968) ............................................................................................39

*Harcon Barge Co. v. M/V J.B. Chauvin*,
487 F. Supp. 187 (N.D. Miss. 1979)..................................................................................25

*Harley-Davidson, Inc. v. Minstar, Inc.*,
    41 F.3d 341 (7th Cir. 1994) .........................................................................39

*Hiern v. St. Paul-Mercury Indem. Co.*,
    262 F.2d 526 (5th Cir. 1959) .......................................................................39

*Higgins v. E.I. DuPont De Nemours & Co., Inc.*,
    863 F.2d 1162 (4th Cir. 1988) .....................................................................19

*Houston Exploration Co. v. Halliburton Energy Servs., Inc.*,
    269 F.3d 528 (5th Cir. 2001) ................................................................. 23-24

*Howard v. Klika*,
    Civil No. 03-792, 2004 U.S. Dist. LEXIS 9637 (D. Or. May 18, 2004) ................................33

*Hudson v. Forest Oil Corp.*,
    No. 02-2225, 2003 WL 21276385 (E.D. La. June 2, 2003)....................................39

*Huyhn v. R. Warehousing & Port Servs., Inc.*,
    973 S.W.2d 375 (Tex. App.—Tyler 1998, no pet.) .................................................33

*Italia Societa per Azioni di Navigazione v. Or. Stevedoring Co.*,
    376 U.S. 315 (1964).................................................................................39

*Kevin Gros Offshore, LLC v. Max Welders, Inc.*,
    No. 07-7340, 2009 U.S. Dist LEXIS 6810 (E.D. La. Jan. 22, 2009)........................................1

*Kevin M. Ehringer Enters. v. McData Servs. Corp.*,
    646 F.3d 321 (5th Cir. 2011) .......................................................................37

*Krummel v. Bombardier Corp.*,
    206 F.3d 548 (5th Cir. 2000) ................................................................. 15-16

*La. ex rel Guste v. M/V Testbank*,
    752 F.2d 1019 (5th Cir. 1985) .......................................................................2

*Lake Shore & Mich. S. Ry. Co. v. Prentice*
    147 U.S. 101 (1893).............................................................................28, 31

*Librado v. M.S. Carriers, Inc.*,
    No. 3:02-CV-2095, 2004 U.S. Dist. LEXIS 12203
    (N.D. Tex. June 30, 2004)............................................................................23

*Lobegeiger v. Celebrity Cruises, Inc.*,
    2012 AMC 202 (S.D. Fla. 2011)................................................20, 22, 32, 34

*Lone Star Indus. v. Mays Towing Co.*,
    927 F.2d 1453 (8th Cir. 1991) ................................................................. 11-13

*Mack v. Gen. Elec. Co.*,
    896 F. Supp. 2d 333 (E.D. Pa. 2012) ...................................................................16

*Marquette Transp. Co. v. La. Mach. Co.*,
    367 F.3d 398 (5th Cir. 2004) ...........................................................................38

*Maxey v. Freightliner Corp.*,
    665 F.2d 1367 (5th Cir. 1982) ............................................................................6

*McGuffie v. Transworld Drilling Co.*,
    625 F. Supp. 369 (W.D. La. 1985)......................................................................29

*McLennan v. Am. Eurocopter Corp., Inc.*,
    245 F.3d 403 (5th Cir. 2001) ............................................................................16

*Morris v. Cessna Aircraft Co.*,
    833 F. Supp. 2d 622 (N.D. Tex. 2011) .................................................................6

*Morton v. City of Shelby*,
    984 So.2d 323 (Miss. Ct. App. 2007) ................................................................33

*Nat'l Shipping Co. of Saudi Arabia v. Moran Mid-Atl. Corp.*,
    924 F. Supp. 1436 (E.D. Va. 1996) .....................................................................2

*Nissan Motor Co. Ltd. v. Armstrong*,
    145 S.W.3d 131 (Tex. 2004).............................................................................32

*Nunley v. M/V Dauntless Colocotronis*,
    727 F.2d 455 (5th Cir. 1984) .............................................................................9

*Operaciones Tecnicas Marinas S.A.S. v. Diversified Marine Svs., LLC.*,
    2013 AMC 853 (E.D. La. 2012) ..........................................................20, 22, 32

*In re P&E Boat Rentals, Inc.*,
    872 F.2d 642 (5th Cir. 1989) ......................................................................*Passim*

*Pace v. N. Houston Pole Line Corp.*,
    No. 14-97-140, 1999 Tex. App. LEXIS 3398 (Tex. App.—Houston
    [14th Dist.] May 6, 1999, pet. denied)................................................................32

*In re: Parker Drilling and Offshore USA, L.L.C.*,
    No 03-2611, 2006 U.S. Dist. LEXIS 4332 (E.D. La. Feb. 3, 2006) ...........................15-16, 18

*Pillsbury Co. v. Midland Enters., Inc.*,
    715 F. Supp. 738 (E.D. La. 1989) ..................................................................29, 31

*Quinton v. Toyota Motor Corp.*,
   Civil Action No. 1:10-cv-02187, 2013 U.S. Dist. LEXIS 55004
   (D. S.C. Apr. 17, 2013) ................................................................. 17-18

*Rochelle Bail Agency, Inc. v. Md. Nat'l Ins. Co.*,
   484 F.2d 877 (7th Cir. 1973) ...............................................................39

*Saucedo v. Salvation Army*,
   24 P.3d 1274 (Ariz. Ct. App. 2001) ................................................. 33-34

*Shafer v. LG Electr. USA, Inc.*,
   No. 4:09-CV-105-Y, 2010 U.S. Dist. LEXIS 144737
   (N.D. Tex. Sept. 30, 2010) ...................................................................17

*Signal Int'l LLC v. Miss. Dept. of Transp.*,
   579 F.3d 478 (5th Cir. 2009) ...................................................................3

*Sinram v. Pennsylvania R.R.*,
   61 F.2d 767 (2d Cir. 1932) ....................................................................13

*Solvang v. M/T Plan Kristine*,
   1994 AMC 1133 (S.D. Tex. 1993) .........................................................35

*State Farm Mut. Auto Ins. Co. v. Campbell*,
   538 U.S. 408 (2003) ...............................................................................23

*Stepski v. M/V Norasia Alya*,
   No. 7:06-cv-1694, 2010 U.S. Dist. LEXIS 16602
   (S.D.N.Y. Jan. 14, 2010) .......................................................................30

*Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*,
   447 F.3d 360 (5th Cir. 2006) .............................................................8, 10

*Stone v. Amquip Corp.*,
   Civil Action No. 98-CV-4691, 2000 U.S. Dist. LEXIS
   (E.D. Pa. Sept. 29, 2000) .......................................................................19

*Taylor v. Dyer*,
   190 A.D.2d 902 (N.Y. App. Div. 1993) ................................................34

*The Amiable Nancy*,
   16 U.S. (3 Wheat.) 546 (1818) .........................................................27, 31

*The Capital Times Co. v. Doyle*,
   807 N.W.2d 666 (Wis. Ct. App. 2011) ..................................................34

*Tidewater Marine, Inc. v. Sanco Int'l, Inc.*,
   113 F. Supp. 2d 987 (E.D. La. 2000) ..................................................9, 11

*Todd Shipyards Corp. v. Turbine Serv., Inc.*,
   674 F.2d 401 (5th Cir. 1982) ........................................................20, 22

*Torrejon v. Mobil Oil Co.*,
   876 So. 2d 877 (La. Ct. App. 2004) ..................................................7

*Transp. Ins. Co. v. Moriel*,
   879 S.W.2d 10 (Tex. 1994) ...........................................................33

*Trustees of the Nw. Laundry & Dry Cleaners Health & Welfare Trust Fund v. Burzynski*,
   27 F.3d 153 (5th Cir. 1994) .........................................................37

*Tug Ocean Prince, Inc. v. United States*,
   584 F.2d 1151 (2d Cir. 1978) ........................................................21

*U.S. Fid. & Guar. Co. v. Putfark*,
   158 So. 9 (La. 1934) .................................................................39

*United States Steel Corp. v. Fuhrman*,
   407 F.2d 1143 (6th Cir. 1969) .......................................................30

*United States v. Egan Marine Corp.*,
   Case No. 08 C 3160, 2011 U.S. Dist. LEXIS 138087
   (N.D. Ill. Oct. 13, 2011) ...........................................................23

*United States v. Reliable Transfer Co.*,
   421 U.S. 397 (1975) ...................................................................9

*Vickers v. Chiles Drilling Co.*,
   822 F.2d 535 (5th Cir. 1987) ........................................................16

*Water Quality Ins. Syndicate v. United States*,
   632 F. Supp. 2d 108 (D. Mass. 2009) ................................................21

*Watz v. Zapata Off-shore Co.*,
   431 F.2d 100 (5th Cir. 1970) ......................................................2-3

*Wilcox v. Kerr-McGee Corp.*,
   706 F. Supp. 1258 (E.D. La. 1989) ...............................................20, 29

*Williams v. Steves Indus., Inc.*,
   699 S.W.2d 570 (Tex. 1985) ..........................................................22

## OTHER AUTHORITIES

Kelsey L. Joyce Hooke, *Collision at Sea: The Irreconcilability of the Superseding Cause and Pure Comparative Fault Doctrines in Admiralty*, 74 WASH. L. REV. 159, 170 (Jan. 1999) ............................9

Michael F. Sturley, *Vicarious Liability for Punitive Damages*,
70 La. L. Rev. 501, 507-08 (Winter 2010).................................................................... 27-28

Restatement (Second) of Torts § 447 (1965)..........................................................................10

Restatement (Third) of Torts: Products Liability §1 (1998).............................................15

Restatement (Third) of Torts: Products Liability §2(a) (1998) ..................................15, 17

Restatement (Third) of Torts: Products Liability §2(b) (1998) ........................................16

Restatement (Third) of Torts: Products Liability § 15 (1998).................................... 16-17

Restatement (Third) of Torts: Products Liability § 19(b) (1998) .............................. 16-17

Restatement (Third) of Torts § 21 (1998) ...........................................................................15

Halliburton Energy Services, Inc. ("HESI") files this Brief Regarding Post-Trial Matters in accordance with this Court's April 24, 2013 Order (Dkt. No. 9536) and respectfully shows:[1]

## I.     Introduction and Summary of Arguments.

HESI asks that this Court enter judgment in its favor ruling that Plaintiffs and Co-Defendants take nothing by their claims against HESI.  For the reasons set out below, HESI is not liable for claims under general maritime law for negligence, strict products liability, gross negligence/willful misconduct, fraud, core breach of contract, or material increase of risk.  Likewise, HESI has no liability to Plaintiffs or to BP for punitive damages because HESI's conduct was not negligent, much less grossly negligent, and certainly did not rise to the level of willful misconduct.  For these reasons, HESI asks that this Court enter judgment in its favor.

## II.    HESI is Not Liable Under Any Remaining Causes of Action.

While Plaintiffs filed numerous bundled complaints against HESI for different groups of plaintiffs, and BP filed a cross-claim against HESI for direct damages,[2] none of these causes of action supports a judgment against HESI.

### A.     This Court Has Previously Dismissed Many of Plaintiffs' Causes of Action.

As an initial matter, this Court has previously entered Orders dismissing all state law causes of action against HESI.  *See* Dkt. Nos. 3830, 4159, 4578, and 4845.  In addition, the Court

---

[1] In its April 24, 2013 Order Regarding Phase One Post-Trial Briefing, the Court requested that the parties address seven issues within their post-trial briefs.  (Dkt. No. 9536 at pp. 2-3).  HESI will address those issues throughout this brief, and so indicate by a footnote identifying the issue by number.

[2] The Transocean defendants also filed a cross-claim against HESI seeking to recover the uninsured portion of the value of the *Deepwater Horizon*.  To the extent this claim is based on common law contribution and/or indemnity, HESI is not liable because there is no basis for negligence claims against HESI.  Further, by the terms of the BP/Transocean Contract, Transocean has released and indemnified HESI (as a Service Company Group) from any losses related to Transocean equipment.  *See* TREX 1488 at § 21.1.  Additionally, Transocean filed a claim against HESI for Breach of Warranty of Good and Workmanlike Performance.  As Judge Feldman has noted in a separate proceeding, "there is some support for the notion that the doctrine of implied warranty of workmanlike performance is on the verge of judicial extinction."  *Kevin Gros Offshore, LLC v. Max Welders, Inc.*, No. 07-7340, 2009 U.S. Dist LEXIS 6810, at *12 n.8 (E.D. La. Jan. 22, 2009) (citations omitted).  Absent privity of contract between Transocean and HESI, which is absent here, Transocean has no viable breach of warranty claim.  *Id.*

1

has held that HESI, as a non-Responsible Party under OPA, is only potentially liable under general maritime law for claims involving physical damage to a proprietary interest, and claims made by commercial fishermen.[3]  *See* Dkt. No. 3830.  Following the Court's Orders, Plaintiffs' only remaining claims against HESI are general maritime law claims for negligence, strict products liability,[4] and gross negligence/willful misconduct.  Based upon the Phase One trial evidence,[5] the remaining causes of action do not support a judgment against HESI.

### B.      HESI is Not Liable for Negligence.

Plaintiffs (and other parties) assert against HESI a general maritime law claim for negligence.  For the reasons cited below, this claim cannot support a judgment against HESI.

### 1.      HESI's Actions Were Not Negligent.

In order to prevail on a cause of action for negligence under general maritime law, Plaintiffs must establish that HESI failed to use reasonable care under the circumstances.  *Nat'l Shipping Co. of Saudi Arabia v. Moran Mid-Atl. Corp.*, 924 F. Supp. 1436, 1450 (E.D. Va. 1996) (citing 8 BENEDICT ON ADMIRALTY § 3.02[B][4] (7th ed. 1995)).  Maritime torts are guided by general principles of negligence law.  *Consol. Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987) (*citing Casaceli v. Martech, Int'l., Inc.*, 774 F.2d 1322 (5th Cir. 1985)).  Under general tort principles, a tortfeasor is accountable only to those to whom a duty is owed.  *Watz v.*

---

[3] HESI incorporates by reference its prior Motions to Dismiss arguing that OPA fully displaces general maritime law leaving no direct claim by Plaintiffs against HESI, and no claim by Plaintiffs against any Defendant for punitive damages.  *See, e.g.,* Dkt. No. 1429.  HESI likewise notes that while this Court has held that commercial fishermen have claims under general maritime law, the Fifth Circuit has not adopted the commercial fishermen exception to the *Robins Dry Dock* rule.  *La. ex rel Guste v. M/V Testbank*, 752 F.2d 1019, 1021 n.2 (5th Cir. 1985) (en banc) ("The rights of commercial fishermen who survived summary judgment are not before us.").

[4] The claim for strict products liability against HESI is asserted only in the Local Government Master Complaint and the Amended Complaints of the States of Louisiana and Alabama.

[5] To avoid unnecessary repetition, HESI specifically incorporates its proposed Findings of Fact and Conclusions of Law ("HESI FOF") filed contemporaneously herewith, as well as the evidentiary citations and support noted therein. Rather than provide specific citations to evidence, HESI will provide references to sections of the HESI FOFs that address the factual matters being discussed.

2

*Zapata Off-shore Co.*, 431 F.2d 100, 114 (5th Cir. 1970).  "Duty . . . is measured by the scope of the risk that negligent conduct foreseeably entails."  *Signal Int'l LLC v. Miss. Dept. of Transp.*, 579 F.3d 478, 491 (5th Cir. 2009) (*citing Consol. Aluminum*, 833 F.2d at 67).  The obligation to refrain from . . . particular conduct is owed only to those who are foreseeably endangered by the conduct and only with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous.  *Signal Int'l*, 579 F.3d at 491 (quoting 3 Fowler V. Harper et al., HARPER, JAMES & GRAY ON TORTS §18.2, at 762 (3d ed. 2007)).

"The test [of foreseeability] is whether the harm that does occur is within the *scope of danger* created by the defendant's negligent conduct."  *Signal Int'l*, 579 F.3d at 491 (quoting 3 Stuart M. Speiser et al., THE AMERICAN LAW OF TORTS 68 (2008)) (emphasis in original).  "The scope of danger incorporates 'not only those natural forces which are constantly and habitually operating but also those forces which operate periodically or with a certain degree of frequency.'"  *Signal Int'l*, 579 F.3d at 491 (quoting *Republic of Fr. v. United States*, 290 F.2d 395, 400 (5th Cir. 1961)).  The Fifth Circuit has stated its foreseeability inquiry as:

> We perceive a harm to be the foreseeable consequence of an act or omission if harm of a general sort to persons of a general class might have been anticipated by a reasonable thoughtful person, as a ***probable result of the act or omission***, considering the interplay of natural forces and ***likely human intervention***.

*Signal Int'l*, 579 F.3d at 492 (quoting *Consol. Aluminum*, 833 F.2d at 68) (emphasis added).  "The test of foreseeability is not measured against normal conditions, ***but those that were anticipated or reasonably should have been anticipated***."  *Signal Int'l*, 579 F.3d at 493 (emphasis added); *see also id*. at 495 n.19 (noting cases in which the foreseeability inquiry was not satisfied because "the harm was not of the type risked by the negligent acts, and the party at fault was able to identify events that would not have been foreseen by a reasonable person").

        *a.     HESI Properly Provided Cementing Services on the Deepwater Horizon.*

The evidentiary record during the Phase One trial is clear.[6]  HESI provided cementing services to BP under a contract (the "BP/HESI Contract").  The BP/HESI Contract provided the standards under which HESI would provide those cementing services.  In accordance with the Contract, HESI's cement engineer, Jesse Gagliano, designed a foam cement that was reviewed and approved by BP.  More importantly, Gagliano's cement design was the result of an iterative process between HESI and BP, with BP having the ultimate authority for approval of the use of foam cement, the foam cement design parameters, and the decision to proceed with pumping the cement.  Ultimately, Gagliano designed a cement that was properly tested and found to be stable.  In fact, the only cement expert who testified at the Phase One trial regarding foam stability (Benge) confirmed that HESI's second April foam stability test and the OTC's post-Incident test on the MAC 4 slurry, both of which used Macondo cement, showed a stable foam.

Even if the cement designed by Gagliano was deficient, the cement ***placement***, which was BP's responsibility, not the cement ***design****,* prevented the cement from isolating the relevant hydrocarbon zones.[7]  Specifically, following multiple failed attempts to convert the float collar, the final attempt, in which BP pressured up to 3142 psi, caused a breach in the casing below the float collar.  BP was immediately aware that the float collar conversion attempts "blew something," but proceeded with running the cement job anyway.  As a result, the cement flowed through the breached casing instead of through the shoe track, resulting in cement placement that could never have entirely isolated the hydrocarbon zones that BP intended to isolate.[8]

---

[6] *See* HESI FOFs at §§ VI.A; IX.A, B; XI.A.1, 2; XV.A; XVII.A; XIX.A.1, 4, 5.

[7] *See* HESI FOFs at §§ IX.B, XII.A, XX.A.

[8] The evidence also supports the conclusion that BP failed to notify HESI of a critical hydrocarbon zone, M57B, during the cement design process.  Had this higher hydrocarbon zone been revealed, the cement design job would

Finally, regardless of the design and placement of the cement, HESI was not negligent because the harm that followed (the blowout and ensuing explosion, fire and oil spill (the "Incident")), and the individuals who suffered harm (Plaintiffs) were not reasonably foreseeable to Gagliano or HESI.[9]  In fact, the recognized risk of an inadequate cement job was that HESI might be required to perform a squeeze job.  Indeed, squeeze jobs had been performed at the Macondo well prior to cementing the production casing.  Pre-Incident, BP fully recognized that the risk of an ineffective cement job was that a squeeze might be necessary, a risk that BP preferred over getting stuck in the hole.  Thus, the adequacy or inadequacy of Gagliano's cement design is irrelevant because the design of the cement is simply too attenuated from the risk of a blowout, which is the cause of Plaintiffs' injuries.  Moreover, because HESI was providing cementing services to BP under the BP/HESI Contract, the foreseeable injury, the need for a squeeze job, would have been suffered by BP and not by Plaintiffs.  Because the Incident and the Plaintiffs' injuries were not reasonably foreseeable risks to Gagliano or HESI during the cement design process, HESI's cementing services cannot serve as the basis for Plaintiffs' negligence claim.

The evidence presented at the Phase One trial establishes that HESI properly designed the foam cement used at the Macondo Well in accordance with BP's requested, required, and approved parameters.  Moreover, BP's decisions to proceed with the cement job despite casing breach concerns and to conceal the existence of a high pressure, shallower hydrocarbon zone, prevented proper cement placement.  Finally, the risk of a blowout was not a foreseeable risk of

---

have been redesigned due to the critically high gas flow potential, likely resulting in a necessary change in the casing design.  *See* HESI FOFs at §§ XI.A.7.

[9] *See* HESI FOFs at §§ IX.B; XI.A.2, 3; XIII.A.

an allegedly faulty cement design.  HESI properly designed and executed the cement job at the Macondo Well, and the cementing services it provided do not support any negligence claims.

> b.    *HESI Properly Provided Mudlogging Services on the Deepwater Horizon.*

Likewise, HESI properly provided the mudlogging services BP engaged it to provide.[10] Joe Keith was the HESI/Sperry mudlogger on duty the night of the Incident.  The Sperry mudlogger is a second set of eyes – the primary responsibility for detecting kicks always remains with the Driller (here Transocean).  Importantly, during his shift, Keith made numerous calls to the rig floor alerting the Driller to various detected anomalies.  In at least one instance, Keith's call was abruptly dismissed by the drill floor.

At approximately 21:09, following the sheen test, returns from the well were diverted overboard, leaving Keith blind to flow out readings and pit gain information.[11]  The only remaining indicator Keith had available to him was standpipe pressure.  Established drilling knowledge and industry standards teach that a potential kick in a well is indicated by a decrease, not an increase, in standpipe pressure.[12]  Importantly, the Macondo well did not experience a decrease in standpipe pressure following the sheen test.  Instead, between 21:01 and 21:08, and between and 21:08 and 21:14, the well experienced increases in standpipe pressure of 100 psi and 246 psi, respectively.  Keith did not alert the drill floor to these increases because he did not

---

[10] *See* HESI FOFs at §§ XXI.A.1, 2, 5, 16.

[11] *See* HESI FOFs at §§ XXI.A.6, 15.

[12] Compliance with regulatory and industry standards is relevant to whether a defendant acted with gross negligence, but is not dispositive.  (Court Issue Nos. 6 and 7).  *See Morris v. Cessna Aircraft Co.*, 833 F. Supp. 2d 622, 641 (N.D. Tex. 2011) ("The holdings of the Fifth Circuit and the Texas Court of Appeals lead the Court to conclude that while evidence of regulatory compliance does not foreclose an award of punitive damages as a matter of law, such evidence may demonstrate the absence of a genuine dispute of material fact as to gross negligence . . .); *Maxey v. Freightliner Corp.*, 665 F.2d 1367, 1376 (5th Cir. 1982) (The Fifth Circuit "fully agrees with the premise—implicit in the district court's reasoning—that compliance with industry custom can be relevant evidence tending to negate an inference of gross negligence.").

view them as an indicator of a potential kick.  Keith's view is supported by expert drilling literature that instructs that a mudlogger should monitor for a decrease in drill pipe pressure.

Thus, Keith's actions were consistent with industry knowledge and standards, and his training and experience.[13]  Keith's actions on April 20, 2010, were entirely consistent with what a reasonable mudlogger in a similar situation would have done.  Therefore, there is no basis for any negligence finding against HESI based upon Keith's performance of mudlogging activities.

### 2.  Even if Negligent, HESI's Actions Were Not the Cause of the Incident.

Even assuming that either Gagliano or Keith breached a duty owed to Plaintiffs (or BP), which HESI denies, any claim for negligence must fail because there is no causal link between any actions taken by Gagliano and/or Keith and the Incident.  *See Torrejon v. Mobil Oil Co*., 876 So. 2d 877, 891 (La. Ct. App. 2004) (citing 2 Martin J. Norris, THE LAW OF SEAMEN § 30:40 (5th ed. 2003)) (noting that in non-Jones Act admiralty cases, a plaintiff must establish that any alleged negligent acts were the proximate cause of his injuries).

### a.  There is No Causal Link Between HESI's Actions and the Incident.

As noted previously, there can be no causal link between HESI's cement services and the Incident because Gagliano acted as a reasonable cement engineer in designing the cement, because the cement placement (which was BP's responsibility), not the cement design, resulted in the cement not properly isolating the relevant hydrocarbon zones, and because the foreseeable consequence of an ineffective primary cement job – for any reason – was a remedial squeeze job and not a well blowout.  All of these factors, singularly and in combination, break the causal chain and defeat any negligence claim against HESI based on cementing services.

---

[13] *See* HESI FOFs at §§ XXI.A.5, 6, 15, 16.

Likewise, any alleged failure by Keith to alert the drill floor to an increase in drill pipe pressure did not proximately cause the blowout. The evidence is undisputed that the most Keith could do as a mudlogger was to report any anomaly he saw and interpreted as a kick.[14] But any such report from Keith on the night of April 20, 2010 would have changed nothing, because the evidence is also undisputed that the Transocean drill crew, who bore responsibility for well control, was aware of an anomaly in the well prior to the time that hydrocarbons reached the BOP. [15] Had the Transocean drill crew acted in accordance with Transocean's policies and procedures, they would have shut the well in, then investigated the anomaly, and "we wouldn't be here." Instead, they chose to shut down the pumps and investigate, leaving the wellbore open to flow. These fateful decisions break any alleged causal link between Keith's alleged failure to report an increase in standpipe pressure and the Incident.

> b. *The Failure to Properly Interpret the Negative Pressure Tests, the Failure to Maintain Well Control, and the Failure to Properly Configure, Maintain, and Operate the BOP are Superseding, Intervening Causes for the Incident.*

According to the Fifth Circuit, "[t]he superseding cause doctrine applies where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable. *Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*, 447 F.3d 360, 367-68 (5th Cir. 2006). "It is predicated on the notion that 'there must be a terminus somewhere, short of eternity, at which the second party becomes responsible in lieu of the first.'" *Id.*

In *Exxon Co. v. Sofec, Inc.*, 517 U.S. 830, 832 (1996), the United States Supreme Court "affirm[ed] that the requirement of legal or 'proximate' causation, and the related 'superseding

---

[14] *See* HESI FOFs at §§ IV.A.11, XXI.A.2.

[15] *See* HESI FOFs at §§ IV.A.9, 12, 13, 15.

cause' doctrine, apply in admiralty notwithstanding our adoption of the comparative fault principle" in *United States v. Reliable Transfer Co.*, 421 U.S. 397 (1975) "for allocating damages among parties responsible for an injury."  The Supreme Court noted that the superseding cause doctrine "operate[d] to cut off the liability of an admittedly negligent defendant," where "the injury was actually brought about by a later cause of independent origin that was not foreseeable."  *Id.* at 837-38 (quoting 1 Thomas J. Shoenbaum, ADMIRALTY & MAR. LAW §5-3, at 165-66 (2d ed. 1994)).  "The problem is 'one of whether the defendant is to be held liable for an injury to which he has in fact made a substantial contribution, when it is brought about by a later cause of independent origin, for which he is not responsible.'"  *Nunley v. M/V Dauntless Colocotronis*, 727 F.2d 455, 464 (5th Cir. 1984) (en banc) (quoting William L. Prosser, THE LAW OF TORTS 270 (4th ed. 1971)); *see also Tidewater Marine, Inc. v. Sanco Int'l, Inc.*, 113 F. Supp. 2d 987, 998 (E.D. La. 2000) (quoting *Nunley*, 727 F.2d at 464).

"The intervening act supersedes the first actor's liability only if the court determines that the second act broke the causal connection between the first action and the result."  Kelsey L. Joyce Hooke, *Collision at Sea: The Irreconcilability of the Superseding Cause and Pure Comparative Fault Doctrines in Admiralty*, 74 WASH. L. REV. 159, 170 (Jan. 1999) (citations omitted).  Section 442 of the RESTATEMENT (SECOND) OF TORTS sets forth the factors to be examined to determine whether an intervening force supersedes prior negligence, and thus satisfies the superseding cause doctrine:

> (a)      the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;
>
> (b)      the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;

(c)      the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;

(d)      the fact that the operation of the intervening force is due to a third person's act or to his failure to act;

(e)      the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;

(f)      the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

*Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 652 n.11 (5th Cir. 1992) (quoting *Nunley*, 727 F.2d at 464 and RESTATEMENT (SECOND) OF TORTS § 442 (1965)); *Stolt Achievement, Ltd.*, 447 F.3d at 368 n.25 ("Many courts, including this one, rely upon the factors set forth in RESTATEMENT (SECOND) OF TORTS § 442 for guidance in this inquiry.").

Further, Section 447 of the RESTATEMENT (SECOND) OF TORTS provides that "[t]he fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if"

(a)      the actor at the time of his negligent conduct should have realized that a third person might so act, or

(b)      a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third party had so acted, or

(c)      the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent.

RESTATEMENT (SECOND) OF TORTS § 447 (1965); *see Donaghey*, 974 F.2d at 652 (quoting section 447); *Nunley*, 727 F.2d at 464-65 (same). "For the subsequent negligence of a third party to absolve the initial wrongdoer of liability for all of the damages suffered by the injured party,

the subsequent negligence of the third party must be so extraordinary that a reasonably prudent person could not have foreseen its occurrence." *Tidewater Marine,* 113 F. Supp. 2d at 999.

*Lone Star Indus. v. Mays Towing Co.*, 927 F.2d 1453 (8th Cir. 1991) is helpful on this point.[16]  On December 23, 1983, Mays Towing took under tow the Lone Star barge *LS 1501*, and delivered the barge to Lone Star on December 25, 1983.  *Id*. at 1454.  The district court found that when Mays Towing took the *LS 1501* under tow, the barge was undamaged.  *Id*.  "The LS 1501, full of cement, sat at Lone Star's dock for three days, and then, during unloading on December 28, 1983, with most of its cargo still onboard, it sank."  *Id*.

Lone Star employees were responsible for unloading the barge and, on December 27, "Lone Star employees attempted to conduct a standard pre-unloading inspection, which normally involved opening all the hatches and entering the void compartments to look for water or hull damage."  *Id*. at 1455.  The Eighth Circuit Court noted that "because the barge is unloaded bow to stern, so that part of the stern necessarily submerges during unloading, an inspection of the stern compartments is especially critical."  *Id*.  While Lone Star employees did open the forward hatches of the barge for inspection, they were unable to open the stern hatches due to an accumulation of ice, which they unsuccessfully attempted to hack away from the hatches with sledgehammers.  *Id*.  Lone Star's employees waited until the next day, but due to continuing bad weather, they were still unable to open the stern hatches.  *Id*.  "Under some financial pressure to unload the barges, and knowing that the LS 1502 had been unloaded without incident, Lone Star took, by its own admission, a calculated risk, and decided to unload the LS 1501 without inspection of the stern compartments."  *Id*.  As unloading progressed, the *LS 1501* began taking on water at the stern, and the barge sank.  *Id*.

---

[16] *See Donaghey*, 974 F.2d at 652-53 (5th Cir. 1992) (citing *Lone Star* favorably).

11

"Later, when the LS 1501 was raised, marine surveyors found a vertical crack in its stern log—the heavy steel at the stern of the barge to which tugboats face up." *Id*. "The crack was eight or ten inches above the waterline, but, because the barge is unloaded bow to stern, it became submerged during unloading." *Id*. The district court found both Lone Star and Mays Towing negligent, concluding "that the negligence of Mays Towing Company caused the damage to the LS 1501, resulting in the loss of the barge and its cargo." *Id*. (quoting *Lone Star Indus. v. Mays Towing Co.*, 725 F. Supp. 440, 444 (E.D. Mo. 1989)). The court assessed fault at sixty percent to Mays Towing and forty percent to Lone Star. 927 F.2d at 1455.

Against these facts, the Eight Circuit analyzed the Restatement superseding cause factors. Key to the court's analysis was the factor that the intervening force "brings about harm different in kind from that which would otherwise have resulted from the actor's negligence." *Id.* at 1459 (citations and quotations omitted). The Court held that "the intervening force, Lone Star's negligence in not inspecting before unloading, brought about a harm—sinking—different in kind than would otherwise have occurred—the barge incurring a fracture in its stern log." *Id*. at 1459. As the Court noted, the evidence established that the *LS 1501* "likely did not take on water en route to Memphis because the fracture was above the waterline and frozen over with ice," and that "the fully loaded barge sat at Lone Star's dock in Memphis for several days over the Christmas holiday without listing." *Id*. "The barge sank only because it took on water during unloading when the stern became submerged and the ice covering the fracture melted, allowing water to enter the stern compartments." *Id*. at 1459-60. The Court determined that "[a]bsent Lone Star's negligence in failing to inspect prior to unloading, the barge could have sat at the dock indefinitely and would not have sunk." *Id*. at 1460.

12

The Court of Appeals also held that "the intervening force was not a normal result of the situation created by the negligence of Mays Towing," in that "Lone Star's negligence in failing to inspect was an affirmative act unrelated to any negligence of Mays Towing." *Id*.  According to the Court, "it is clear that Lone Star's negligence was not sufficiently related to the negligence of Mays Towing to impose liability on Mays Towing.  The Lone Star negligence could not have been reasonably anticipated by Mays Towing and Mays Towing was not negligent in failing to forecast such acts." *Id*.  The Court of Appeals concluded that Lone Star's negligence was a superseding cause that relieved Mays Towing of liability for loss of the barge and its cargo.  *Id*. at 1460-61; *see also Sinram v. Pennsylvania R.R.*, 61 F.2d 767, 769 (2d Cir. 1932) (finding superseding cause cut off liability of tug operator under similar facts).

Here, as in *Lone Star*, the failure of both BP and Transocean to properly interpret the negative pressure tests operate as a superseding, intervening cause, breaking the causal link between any actions taken by HESI and the Incident.  After HESI completed the production casing cement job, the well remained in a stable condition for approximately 20 hours.[17]  The negative pressure tests were intended to be the ultimate tests to determine whether the well was sealed or whether it could flow.  In fact, the negative pressure tests invite the well to flow (not unlike the unloading of the barge in *Lone Star* which submerged the existing hull crack, allowing the flow of water into the ship).  Also as in *Lone Star*, the foreseeable risk of an inadequate cement job on the Macondo well was entirely different (squeeze job) from the risk ultimately experienced (well blowout).  More importantly, it was not foreseeable that BP and Transocean would misinterpret the safety-critical negative pressure tests.  Absent BP's and Transocean's misinterpretation of the negative pressure tests, which directly led to the replacement of drilling

---

[17] *See* HESI FOFs at §§ III.A; III.A.1, 4, 5; III.B; IV.A.9; IX.B; XI.A.2, 3; XII.A.

mud with much lighter seawater (drastically reducing the hydrostatic head that was the principal form of well control in place), the Macondo well could have sat static indefinitely without experiencing a blowout.  In short, BP's and Transocean's failure to properly interpret the safety-critical negative pressure tests was an extraordinary, unforeseeable affirmative act unrelated to any alleged act of negligence by HESI, thus satisfying the standards for superseding, intervening cause and relieving HESI from any liability.

Likewise, Transocean's failure to maintain well control on the night of the Incident was not foreseeable and operates as a second superseding, intervening cause.[18]  Transocean's policies and procedures, as well as industry standards, required that upon detection of an anomaly, the well should be shut in before conducting any other activities.  On April 20, 2010, the Transocean drill crew acted in contravention of this clear and direct policy, choosing to shut down the pumps and investigate the anomaly without shutting in the well.  Further, Transocean's failure to divert flow from the blowout overboard once the volume of flow was obvious was not foreseeable.  Gagliano could not have foreseen such a departure from established oilfield practice.  And Keith, assuming he had a duty to report an increase in standpipe pressure, would have fulfilled his duty upon reporting the same.  The existence of an anomaly was known to the Transocean drill crew in time to prevent the blowout, regardless of any notification from Keith, and Transocean's failure to properly respond to the situation precludes any finding that the actions of HESI and/or its employees was a causal factor in the Incident.

Finally, BP's and Transocean's failures to properly configure, maintain, and operate the BOP were unforeseeable actions that constitute a third superseding, intervening cause.[19]  The BOP is intended to prevent blowouts and to control them once they occur.  Despite the safety-

---

[18] *See* HESI FOFs at §§ IV.A.9, 11, 12, 13, 14, 15; IV.B; XXI.A.2.

[19] *See* HESI FOFs at §§ V.A, B.

critical nature of this equipment, BP failed to configure the *Deepwater Horizon* BOP with the best available and safest technology and failed to ensure that the BOP was appropriate for use at the Macondo well.  Moreover, Transocean failed in its duty to properly maintain the BOP and, on the night of the Incident, failed to properly operate the BOP such that it could perform its intended function.  The combination of BP's and Transocean's failures to properly configure, maintain, and operate the *Deepwater Horizon* BOP were unforeseeable, especially given the safety critical nature of the equipment, and serve as another superseding, intervening cause that severs any causal link between HESI's actions and the Incident.

### C.    HESI is Not Liable for Products Liability.

General maritime law recognizes a cause of action for strict products liability.  *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 865 (1986); *Employers Ins. of Wausau v. Suwannee River Spa Lines, Inc.*, 866 F.2d 752, 758 (5th Cir. 1989).  Admiralty courts look to the Restatement of Torts and state law, where applicable, for strict liability standards.  *Krummel v. Bombardier Corp.*, 206 F.3d 548, 552 (5th Cir. 2000); *In re: Parker Drilling and Offshore USA, L.L.C.*, No 03-2611, 2006 U.S. Dist. LEXIS 4332, at *12 (E.D. La. Feb. 3, 2006).  "One . . .who sells or distributes a defective product is subject to liability for harm to persons or property caused by the defect." [20]  RESTATEMENT (THIRD) OF TORTS:  PRODUCTS LIABILITY §1 (1998).

Louisiana, Alabama, and the Local Government Entities assert both manufacturing and design defects.  (Dkt. Nos. 2031 at ¶283; 1510 at ¶619; 1872 at ¶187).  A product "contains a manufacturing defect when the product departs from its intended design even though all possible care was exercised in the preparation and marketing of the product."  RESTATEMENT (THIRD) OF TORTS:  PRODUCTS LIABILITY §2(a) (1998).  Examples of common manufacturing defects include

---

[20] Strict liability applies only where there is direct harm to persons or property, but can include economic loss where such direct harm has occurred.  RESTATEMENT (THIRD) OF TORTS:  PRODUCTS LIABILITY §§1, cmt. d; 21.

"products that are physically flawed, damaged, or incorrectly assembled." *Id.* at cmt. c.  A product "is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design . . . and the omission of the alternative design renders the product not reasonably safe."  RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY §2(b) (1998); *see also McLennan v. Am. Eurocopter Corp., Inc.*, 245 F.3d 403, 426-27 (5th Cir. 2001) (similar standard under Texas law); *Krummel*, 206 F.3d at 551-52 (similar standard under Louisiana law); *see also Vickers v. Chiles Drilling Co.*, 822 F.2d 535, 538 (5th Cir. 1987) (in order to recover under a design defect theory of products liability, a plaintiff must show that the product was defective and unreasonably dangerous for its "normal use.") (citing RESTATEMENT (SECOND) OF TORTS §402A (1965)). Thus, to establish the existence of a design defect, it must be shown that "the manufacturer placed a product into the stream of commerce that was unreasonably dangerous for a foreseeable use." *Parker Drilling*, 2006 U.S. Dist. LEXIS 4332, at *14 (citing *McLennan*, 245 F.3d at 431). Accordingly, establishing liability for a design defect requires an independent assessment of advantages and disadvantages through a risk-utility balancing.  *Krummel*, 206 F.3d at 552.

### 1.   *Strict Products Liability Does Not Apply to Services.*

BP contracted HESI to perform mudlogging services and cementing services at the Macondo Well.  The mudlogging HESI provided through its Sperry product service line is purely service-based and is not a product subject to claims for products liability.  *Mack v. Gen. Elec. Co.*, 896 F. Supp. 2d 333, 346 (E.D. Pa. 2012); RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 19(b) (1998).  HESI, in conjunction with BP, also designed, blended, and pumped the cement for the Macondo Well, including the final production casing.  Analysis of the cement job requires separating the design of the cement slurry from the placement of the cement slurry.

16

The placement of the slurry is a service and not subject to strict products liability. *Id*. As services, HESI's mudlogging and cement placement cannot subject HESI to strict products liability.

> **2.     There is No Evidence That the Production Casing Cement Slurry Departed From Its Intended Design.**

No party introduced evidence at trial that there was a manufacturing defect in the cement slurry. There is no evidence that the cement that was pumped departed from its intended design, or that it was physically flawed, damaged, or incorrectly mixed. RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY §2(a) (1998) & cmt. c. Nor was there any evidence that any component part of the cement was defective, whether manufactured by HESI or not. Accordingly, HESI cannot be subject to a products liability claim based on a manufacturing defect.

> **3.     The Production Casing Cement Slurry Was Not Unreasonably Dangerous for Its Foreseeable Use.**

The only possible basis for a strict products liability claim against HESI is based on the design of the cement slurry.[21] However, there is no evidence that the cement slurry was defective or unreasonably dangerous (or dangerous at all). Failure of a product, alone, does not establish liability.[22] *Shafer v. LG Electr. USA, Inc.*, No. 4:09-CV-105-Y, 2010 U.S. Dist. LEXIS 144737, at *11 (N.D. Tex. Sept. 30, 2010) (Texas law); *Quinton v. Toyota Motor Corp.*, Civil

---

[21] HESI worked closely with BP to design the cement job. *See* HESI FOFs at §§ XI.A. The BP/HESI Contract required the cement to be designed to BP's specifications. *See* HESI FOFs at §§ VI.A. Given that the cement was a component part of a complex well system engineered by BP, and BP had an active role in the design of the cement slurry, HESI was obligated to follow the specifications approved by BP.

[22] To the extent the failure of the cement resulted in injury to the cement alone—a condition that can be remediated through a squeeze job—such a claim is not subject to a products liability claim and is more properly presented as a warranty claim under contract. *Employers Ins. of Wausau*, 866 F.2d at 758; *Exxon Shipping Co. v. Pac. Res., Inc.*, 835 F. Supp. 1195, 1198-99 (D. Haw. 1993). The possibility of remediating the cement job before the cement could be relied upon as a barrier in the wellbore was recognized by BP. *See* TREX 1517 ("But, who cares, it's done, end of story, will probably be fine and we'll get a good cement job. I would rather have to squeeze than get stuck above the WH.")

Action No. 1:10-cv-02187, 2013 U.S. Dist. LEXIS 55004, at *7 (D. S.C. Apr. 17, 2013) ("The mere fact that a product failed does not necessarily lead to an inference that the product was defectively designed.") (South Carolina law).  Specifically, lack of zonal isolation in a well does not establish that the cement was defective.  A perfectly designed and executed cement job can fail to achieve zonal isolation.[23]

Further, there is no evidence that the cement slurry was unreasonably dangerous for its foreseeable use as is required to establish a claim for strict products liability.  *Parker Drilling*, 2006 U.S. Dist. LEXIS 4332, at *14.  Cement is placed in a well to isolate hydrocarbon-bearing zones.[24]  Because downhole cement slurry performance and cement placement are predictive endeavors, and because even a perfectly-designed cement job can fail to achieve zonal isolation, the foreseeable use of cement includes successful confirmation by the operator of zonal isolation, as well as the integrity of the cement-casing barrier system.  The foreseeable risk of a failed cement job—whether flawlessly designed or flawed—is the failure to achieve zonal isolation and the added step of a remedial cement job, not a blowout.  Only BP had the resources, the access, and the obligation to test the integrity of the cement to determine if it achieved zonal isolation.  BP elected not to run the cement bond log that would have evaluated the integrity of the cement, even though BP and the industry recognize that it is not uncommon for a cement job to require remediation.  Moreover, BP and Transocean failed to confirm well integrity with a properly-interpreted negative-pressure test.  There is simply no basis in the evidence to determine that the cement designed by Gagliano was unreasonably dangerous for its foreseeable use.  Therefore,

---

[23] *See* HESI FOFs at § XIII.A.

[24] As established at trial, cement cannot be relied upon as a barrier until properly confirmed by the operator (BP). *See* HESI FOFs at §§ III.A.1, 4, 5; XIII.A; XX.A.6.

the claims of the local municipalities and the States of Louisiana and Alabama for strict products liability against HESI must fail.

#### 4.    There is No Causal Link Between an Alleged Defect and the Alleged Harm.

According to the Restatement, "[w]hether a product defect caused harm to persons or property is determined by the prevailing rules and principles governing causation in tort." RESTATEMENT (THIRD) TORTS: PRODUCTS LIABILITY §15 (1998). Proximate cause is a necessary element to establish a cause of action under a strict liability theory. *See Alaska Bulk Carriers, Inc. v. Goodall Rubber Co.*, Civil Action No. 87-573, 1990 U.S. Dist. Lexis 7239, at *10 (D. Del. June 14, 1990); *Stone v. Amquip Corp.*, Civil Action No. 98-CV-4691, 2000 U.S. Dist. LEXIS, at *8 (E.D. Pa. Sept. 29, 2000); *Ford v. Pennzoil*, 974 F. Supp. 559, 565 (E.D. La. 1997) (Louisiana law). As discussed, *supra*, there is no causal link between HESI's cement services and the Incident. Likewise, BP's and Transocean's failure to properly interpret the negative pressure tests operate as superseding, intervening causes, breaking the chain of causation. *See Ford*, 974 F. Supp. at 565-66 (superseding cause destroyed causal connection between product's failure and plaintiff's injury).[25]

#### D.    HESI is Not Liable for Gross Negligence or Willful Misconduct.

In the absence of negligence, HESI cannot be liable for gross negligence or willful misconduct. Nonetheless, even assuming some negligence on HESI's part, the actions of HESI's employees do not rise to the level of gross negligence or willful misconduct.

---

[25] In fact, BP misused the cement in a way that itself constitutes an additional superseding cause. Misuse of a product can bar recovery against the manufacturer where it is the sole proximate cause of damage, or where it is the intervening or superseding cause. *See Higgins v. E.I. DuPont De Nemours & Co., Inc.*, 863 F.2d 1162, 1167 (4th Cir. 1988) (Maryland law); *see also Broussard v. Procter & Gamble Co.*, 517 F.3d 767, 769 (5th Cir. 2008) (Louisiana law) ("If a plaintiff's damages did not arise from a reasonably anticipated use of the product, then the 'unreasonably dangerous' question need not be reached."). Product misuse is the use of a product in a manner that could not reasonably be foreseen by the defendant. *Higgins*, 863 F.2d at 1167. BP's failure to successfully confirm zonal isolation and well integrity is a misuse of the cement that HESI could not have reasonably foreseen. *See id.* (unforeseeable misuse of product barred recovery by plaintiffs).

### 1.      *HESI's Actions Do Not Constitute Gross Negligence or Willful Misconduct.*

In maritime cases, the Fifth Circuit recognizes gross negligence as "harm willfully inflicted or caused by gross or wanton negligence."[26]   *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401, 411 (5th Cir. 1982).   Recognizing the ambiguity of this definition, district courts have attempted to clarify it.   For example, in *Lobegeiger v. Celebrity Cruises, Inc.*, 2012 AMC 202, 231 (S.D. Fla. 2011), the court noted that "[a] review of relevant admiralty case law reveals a general consensus that gross negligence involves some extreme departure from reasonable care coupled with a conscious awareness of the risk of harm."   *See also Operaciones Tecnicas Marinas S.A.S. v. Diversified Marine Svs., LLC.*, 2013 AMC 853, 859 (E.D. La. 2012) ("Gross negligence is defined as reckless and wanton misconduct.").   "[G]ross negligence is distinguished from ordinary negligence in that it 'encompasses harm that is willfully inflicted or is caused by the wanton and reckless disregard for the safety of others.'"   *Id.* at 858 (quoting *Computalog U.S.A., Inc. v. Blake Drilling & Workover Co., Inc.*, No. 95-3009, 1996 U.S. Dist. LEXIS 19074, at *7 (E.D. La. Dec. 9, 1996)).   A determination of whether a defendant's conduct constitutes "gross" as opposed to "ordinary" negligence depends on the particular circumstances of each case.   *Todd Shipyards*, 674 F.2d at 411.

Willful and wanton misconduct is conduct that reflects a reckless disregard for the safety of the crew.   *Wilcox v. Kerr-McGee Corp.*, 706 F. Supp. 1258, 1264 (E.D. La. 1989) (citing *In re Merry Shipping, Inc.*, 650 F.2d 622, 626 (5th Cir. 1981)).

> "Willful" is a state of mind surpassing in culpability ordinary negligence but less than intentional harm.   "Willful" and "wanton" are roughly synonymous, at least in legal effect, with each other and with "reckless."   "Wantonness" has been defined as "the doing of some act or omission to do some act with reckless

---

[26] Court Issue No. 2.

indifference to the ***knowledge that such act or omission will likely or probably result in injury***."

*In re Cameron Boat Rentals, Inc.*, 683 F. Supp. 577, 585 (W.D. La. 1988) (internal citations omitted) (emphasis added).  "Willful misconduct" is a "conscious, intentional failure or reckless indifference."  *Elmwood Dry Dock & Repair v. H & A Trading Co., Ltd.*, No. 93-2156, 1997 U.S. Dist. Lexis 20309, at *59 (E.D. La. Dec. 16, 1997) (quoting *In re Schwager*, 121 F.3d 177, 185 (5th Cir. 1997)).[27]

In analyzing gross negligence and willful misconduct, two additional issues are relevant. The first is whether an accumulation of acts of simple negligence can be aggregated to meet a gross negligence standard.[28] The second is whether actions or omissions that are not causally related to the Incident can be considered in determining the existence of gross negligence or willful misconduct.[29]  Regarding aggregation, HESI acknowledges that the Second Circuit has previously stated that it may, in certain circumstances, be appropriate to consider "the combination of factors which together indicate a probable consequence of damage resulting from several failures to act . . . ." *Tug Ocean Prince*, 584 F.2d at 1164.  However, the Second Circuit tied the aggregation to "reckless disregard of the consequences," thus recognizing that even in the case of an aggregation of negligent acts, the trial court must also find the requisite state of mind to find gross negligence or willful misconduct.  *Id*.  This is the same approach adopted by

---

[27] HESI is not an OPA Responsible Party and has not been directly sued under the Clean Water Act ("CWA"). Nonetheless, in response to the Court's request (Court Issue No. 1), HESI notes that courts considering gross negligence and willful misconduct under OPA and the CWA have focused on similar variations on the definitions of these liability standards provided by general maritime law.  *See, e.g.*, *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1162-63 (2d Cir. 1978) (analyzing willful misconduct under the CWA and adopting the Warsaw Convention's definition: "an act, intentionally done, with knowledge that the performance will probably result in injury, or done in such a way as to allow an inference of a reckless disregard of the probable consequences."); *Water Quality Ins. Syndicate v. United States*, 632 F. Supp. 2d 108, 112 (D. Mass. 2009) (defining gross negligence as "an extreme departure from the care required under the circumstances or a failure to exercise even slight care.").

[28] Court Issue No. 3.

[29] Court Issue No. 4.

the Fifth Circuit some eight years after *Tug Ocean Prince*.  In considering Texas law and the

plaintiff's argument that multiple acts of simple negligence could be aggregated to establish gross

negligence,[30] the Fifth Circuit rejected the proposition that simple aggregation of single acts of

negligence could establish a basis for gross negligence.  After noting that "*Williams* does not

hold, however, that acts of ordinary negligence may combine to produce gross negligence

without proper proof of the defendant's state of mind," the Court went on to state:

> Proof of the defendant's state of mind is necessary to support a finding of gross
> negligence and an award of punitive damages under Texas law.  Clements's
> [plaintiff's] assertion that ordinary acts of negligence may constitute gross
> negligence without this element of "unconscious [sic] indifference" is erroneous.

*Clements v. Steele*, 792 F.2d 515, 516-17 (5th Cir. 1986).  Thus, although the number of acts of

negligence may be a factor to consider, gross negligence/willful misconduct cannot exist without

the defendant's requisite state of mind.

Further, the law requires that there be a causal link between acts alleged to be grossly

negligent and the incident that serves as the basis for plaintiffs' claims.  *See Operaciones

Tecnicas Marinas*, 2013 AMC at 858 (gross negligence "encompasses harm that is willfully

inflicted or is ***caused*** by the wanton and reckless disregard for the safety of others.") (quoting

*Computalog*, 1996 U.S. Dist. LEXIS 19074 at *7) (emphasis added); *Todd Shipyards,* 674 F.2d

at 411 ("Gross negligence is defined as harm willfully inflicted or ***caused by*** gross or wanton

negligence.") (emphasis added); *Lobegeiger*, 2012 AMC at 215 ("[A] plaintiff may recover

punitive damages under general maritime law, consistent with the common-law rule, where the

plaintiff's injury ***was due to*** the defendant's 'wanton, willful or outrageous conduct.'")  (citing *Atl.*

---

[30] *See, e.g.*, *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 922 (Tex. 1981) (holding that the defendant's state of mind may be inferred from actions and circumstances); *Williams v. Steves Indus., Inc.*, 699 S.W.2d 570, 572-73 (Tex. 1985) (reaffirming *Burk*'s holding); *Aetna Cas. & Sur. Co. v. Marshall*, 699 S.W.2d 896, 903 (Tex. App.—Houston [1st Dist.] 1985, writ granted), *aff'd*, 724 S.W.2d 770 (Tex. 1987) (relying on *Burk* and stating that single acts of negligence may combine to constitute gross negligence).

*Sounding Co. v. Townsend*, 557 U.S. 404, 409 (2009)) (emphasis added).[31]  *See also Librado v.*

*M.S. Carriers, Inc.*, No. 3:02-CV-2095, 2004 U.S. Dist. LEXIS 12203, *17 n.9 (N.D. Tex. June

30, 2004) (refusing to consider, for gross negligence, defendant's documented history of deficient

safety control enforcement and compliance because it was independent from the acts that

arguably caused the accident) (Texas law).   Indeed, the United States Supreme Court has

recognized that a court cannot "award[] punitive damages to punish and deter conduct that

[bears] no relation to the [plaintiffs'] harm.  A defendant's dissimilar acts, independent from the

acts upon which liability was premised, may not serve as the basis for punitive damages."  *State*

*Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003).

Given the factually intensive nature of the gross negligence/willful misconduct inquiry, a

review of cases applying the standard is helpful.  For example, *Houston Exploration Co. v.*

*Halliburton Energy Servs., Inc*., 269 F.3d 528, 529 (5th Cir. 2001) involved a blowout of a

natural gas well over the outer continental shelf of the Gulf of Mexico.  Houston Exploration

contracted with Halliburton to perform drill stem testing operations on the gas well.  *Id.*  The

alleged gross negligence occurred when a Halliburton tool operator, Lemaire, inspected an

Internal Pressure Operating ("IPO") valve and correctly fitted the valve with five pins, but failed

to mark the valve for identification or record the serial number.  *Id*. at 530.  During a delay

before the drill stem test, the valve was moved around the drilling rig.  *Id*.  Without reopening

the valve to determine whether it had been properly pinned, Lemaire picked up what he thought

was the correct valve and inserted it into the test string.  *Id*.  In fact, he inserted a valve with only

one pin, but a second test was completed successfully.  *Id*.  Before a third test was run, Lemaire

---

[31] The same is true of gross negligence under OPA.  *United States v. Egan Marine Corp.*, Case No. 08 C 3160, 2011 U.S. Dist. LEXIS 138087, *15 (N.D. Ill. Oct. 13, 2011).  ("[B]ecause the Government was unable to prove that the explosion was proximately caused by EMC's gross negligence or the violation of a safety regulation, the limitation of liability does apply in this case and the Government is not entitled to recover additional funds from EMC.").

was replaced as the tool operator by Costlow, who, relying on Lemaire's statements and the successful second test, did not disassemble the test string to reinspect the IPO valve to determine that it had been properly pinned.  *Id*.  Eventually, as pressure in the well increased, the IPO sheared unexpectedly, allowing a blowout of natural gas.  *Id*. at 531.  Neither party disputed that if the IPO had been properly pinned, the blowout would not have occurred.  *Id*.

The district court found gross negligence in Lemaire's failure to verify that the valve had been properly pinned and Costlow's subsequent failure to disassemble the test string and recheck Lemaire's work.  *Id*. at 532.   The Fifth Circuit vacated the district court's judgment and remanded, after concluding that "the record does not support a finding that Lemaire's conduct amounts to a 'want of even slight care and diligence,' the most relaxed definition of gross negligence the courts provide."  *Id*. at 532.  Several facts (also relevant here) supported the Fifth Circuit's finding.  First, the record did not show that "Lemaire knew or should have known that a blowout might occur if the IPO valve was not properly pinned."  *Id*.  The record further did not support a finding that "a blowout has ever resulted from a mispinned IPO valve.  A tool operator would reasonably expect that an improperly pinned valve would result only in a botched drill stem test, requiring the drill stem to be removed from the well in order to replace the IPO valve." *Id*. at 532-33.  The Court further concluded that "Costlow's conduct presents an even weaker case for gross negligence than Lemaire's behavior" because he had no reason to suspect that anything was wrong with the IPO valve, given that the second test had been successful.  *Id*. at 533.

Similarly, *Becker v. Tidewater Inc*., 586 F.3d 358, 363 (5th Cir. 2009) involved an oil rig accident that occurred over the outer continental shelf of the Gulf of Mexico during well-stimulation activities performed by a vessel that was tethered to the oil rig.  The plaintiff was injured while working on the rig when a steel hose cut through his legs after the boat captain

pulled away from the rig without warning in order to avoid colliding with the rig.  *Id*. at 364.
The Fifth Circuit upheld the district court's conclusion that the vessel was merely negligent, not
grossly negligent, in pulling away from the rig without warning, relying, at least in part, on the
Louisiana law definition of gross negligence ("willful, wanton, and reckless conduct that falls
between intent to do wrong and ordinary negligence" and that is more than mere inadvertence or
an honest mistake).  *Id*. at 367-368.  The defendant's most egregious conduct in the case was
moving the vessel without warning because the captain of the vessel had previously requested
that the steel binding the vessel and the rig be disconnected and, therefore, knew that moving the
vessel would cause the steel hose to move across the deck of the rig at a time when workers
would be on the rig attempting to disconnect the hose.  *Id*. at 367.  The Fifth Circuit, however,
noted that a finding of gross negligence would be inappropriate because the captain moved the
vessel to avoid colliding with the rig and that his actions "reflect a concern for safety, rather than
a reckless disregard for safety." *Id*.

Finally, *Harcon Barge Co. v. M/V J.B. Chauvin*, 487 F. Supp. 187, 189 (N.D. Miss.
1979), involved the collision of two barges on the Mississippi River.  The collision occurred
after the captain of the *M/V J.B. Chauvin* decided to proceed at full speed northbound despite his
knowledge that this course could cause him to lose control over his tow in the currents, allowing
his tow to move outriver and into the path of the southbound barge.  *Id*.  The captain also knew
that he could have slowed his flotilla to allow sufficient room for the southbound flotilla, but he
nonetheless decided to continue ahead at full speed.  *Id*.  In finding gross negligence on the part
of the captain of the *Chauvin*, the district court emphasized his knowledge of the likely
consequences as well as his knowledge of the applicable statutory rules known as the "Rules of
The Road Western Rivers" (33 U.S.C.A. §§ 301-356).  *Id*.

Thus, although a finding of gross negligence or willful misconduct does not require an intent to do harm, cases applying the governing liability standards do require foreseeability of the specific consequences at issue and a conscious disregard of those consequences. In *Houston Exploration*, a finding of gross negligence was not warranted where the known or foreseeable consequences of the use of the wrong valve did not include the blowout of the well. In *Becker*, the captain's overall actions evidenced a concern for safety rather than a disregard for safety. By contrast, in *Harcon Barge*, the captain's knowledge of the foreseeable risk involved in his decision was decisive in the court's finding of gross negligence. These cases provide the prism through which to view the Phase One trial evidence regarding HESI's cementing and mudlogging activities. It is clear that HESI's actions were not grossly negligent.

### a.      HESI's Cement Design Activities Were Not Grossly Negligent.

As noted previously, Gagliano's actions in designing and testing the cement used in the production casing string at the Macondo well do not show a lack of even slight diligence, reckless disregard of a legal duty, or conscious, intentional failure or reckless indifference. In fact, Gagliano's actions establish the opposite.[32]   After designing the cement to be used at Macondo through a fully iterative process with BP, Gagliano continued to provide information to BP (even after BP cut him out of the information loop as to decisions being made regarding the well), and specifically informed BP, through Greg Walz, of channeling concerns he had based upon BP's decision to use an inappropriate number of centralizers. As was the case in *Becker*, Gagliano's actions "reflect a concern for safety, rather than a reckless disregard for safety." *Becker*, 586 F.3d at 367.

---

[32] *See* HESI FOFs at §§ XI.A.1, 2, 3; XI.B.

b.      *HESI's Mudlogging Activities Were Not Grossly Negligent.*

Likewise, Keith's actions as the Sperry mudlogger on duty at the time of the Incident do not support a finding of gross negligence or willful misconduct.[33]   As Gagliano did, Keith consistently acted to alert the appropriate parties of issues he believed could cause problems, repeatedly calling the drill floor to report anomalies on the night of the Incident.  While Keith did not alert the drill floor about an increase in standpipe pressure, he testified that he did not do so because he did not interpret that increase in pressure as a potential kick indicator.  Keith's actions do not meet the standards necessary to establish either gross negligence or willful misconduct.

2.      ***The Actions of Individual HESI Employees Cannot Be Imputed to HESI.***[34]

The Supreme Court first addressed the master's liability for punitive damages for the wanton acts of an agent in the admiralty case *The Amiable Nancy*, which involved an armed privateer's plundering of a neutral vessel during the War of 1812.  16 U.S. (3 Wheat.) 546 (1818).   The Supreme Court affirmed the shipowner-employer's responsibility to pay compensatory damages to the owners of the neutral vessel, but expressly recognized the unfairness of holding the employer vicariously liable in punitive damages for the wrongful conduct of the employees aboard the ship.  *Id*. at 558-59.  The Supreme Court concluded that the employer was not liable for punitive damages when the employer did not direct, countenance, or participate in the wrong.  *Id*. at 559.  Because the district court did not award punitive damages, the Supreme Court's statements are dicta, but many courts have nonetheless treated this dicta as strong authority for limiting vicarious liability for punitive damages.  *See* Michael F. Sturley,

---

[33] *See* HESI FOFs at §§ XXI.A.6; 16; XXI.B.

[34] Court Issue No. 5.

27

*Vicarious Liability for Punitive Damages*, 70 LA. L. REV. 501, 507-08 (Winter 2010).   At a minimum, *The Amiable Nancy* represents a rejection of the respondeat superior standard.  *Id*.

Seventy-four years later, the Supreme Court affirmed these principles in *Lake Shore & Mich. S. Ry. Co. v. Prentice*, clearly rejecting the respondeat superior standard.  147 U.S. 101 (1893).  In *Lake Shore*, the Court held, under pre-*Erie* federal common law, that an injured passenger could not recover punitive damages from a railroad based on the misconduct of the conductor on the train.  *Id*. at 107-08.  Although *Lake Shore* was a non-admiralty case, the Court noted that a principal cannot be liable for punitive damages because of wanton or malicious intent by an agent.  *Id.*

The Fifth Circuit has followed *The Amiable Nancy-Lake Shore* reasoning and determined that a principal is liable in punitive damages for the acts of its agent only if it authorizes or ratifies wanton actions of that agent.  In *In re P&E Boat Rentals, Inc*., 872 F.2d 642 (5th Cir. 1989), a jury awarded substantial punitive damages against Chevron because its field foreman acted recklessly in ordering the captain of a crewboat to make a trip to a work facility at high speed in heavy fog.  *Id*. at 645-46.  Two ships collided, and several passengers were killed.  *Id*. On appeal, the Fifth Circuit discussed other circuits' reasoning and decisions regarding vicarious liability for punitive damages.  *Id*. at 650-52.  In the end, the Fifth Circuit noted that most admiralty courts have taken a more restrictive view of the principal's liability for punitive damages for the acts of an agent and held that the principal is liable for punitive damages only if the principal authorizes or ratifies wanton actions of the agent.  *P&E*, 872 F.2d at 650.

The *P&E* court also noted that punitive damages are imposed to punish the wrongdoer and deter others from engaging in similar conduct.  *Id*. at 652.  "These objectives are not achieved when courts drop the punitive damage hammer on the principal for the wrongful acts of

the simple agent or lower echelon employee." *Id*.  Accordingly, the Fifth Circuit determined that "punitive damages may not be imposed against a corporation when one or more of its employees decides on his own to engage in malicious or outrageous conduct." *Id*.  Stated the court, "[i]f the corporation has formulated policies and directed its employees properly, no purpose would be served by imposing punitive damages against it except to increase the amount of judgment." *Id*.

Other courts in the Fifth Circuit have routinely applied *The Amiable Nancy, Lake Shore*, and *P&E* for the proposition that punitive damages are not recoverable against a principal or master for the willful or reckless act of an agent or employee unless the act was committed with the approval and knowledge of the principal.  *See Pillsbury Co. v. Midland Enters., Inc.*, 715 F. Supp. 738, 762-63 (E.D. La. 1989) (holding there was no evidence that the corporate policymaking officials were aware that the captain would proceed in an unsafe manner, nor was there evidence that he had been involved in an accident prior to this incident; also noting "hindsight has shown him [the Captain] wrong, but punitive damages are not due simply for poor judgment"); *Wilcox*, 706 F. Supp. at 1266 (holding employer did not authorize or ratify the actions of the toolpusher who did not stop unsafe drilling operations); *Consol. Aluminum Corp. v. C.F. Bean Corp.*, 639 F. Supp. 1173, 1183 (W.D. La. 1986) (stating the principal or master cannot be assessed punitive damages for the willful or reckless act of an agent or employee unless the act was committed with the approval and knowledge of the principal and noting that defendant met all requirements of established safety practice and nothing in the record indicated that defendant, as a routine and continuing practice, allowed, approved, or had knowledge of operations conducted in contravention of accepted practices); *McGuffie v. Transworld Drilling Co.*, 625 F. Supp. 369, 373 (W.D. La. 1985) (holding there was no evidence that Transworld authorized or ratified the acts of its toolpusher before or after the accident in question or that

Transworld was at fault in employing the toolpusher, thus, an award for punitive damages could not stand); *Bergeron v. Mike Hooks, Inc.*, 626 So.2d 724, 728 (La. Ct. App. 1993) (holding punitive damages are not recoverable against the owner of a vessel for the act of the master unless the owner authorized or ratified the acts of the master either before or after the accident).

As an initial matter, HESI denies that any actions of its employees rise to a level that would satisfy the gross negligence/willful misconduct standard.  But even if Gagliano or Keith did act in a grossly negligent manner or exhibited willful misconduct, those actions cannot be imputed to HESI for the purpose of justifying an award of punitive damages.  Neither Plaintiffs nor BP have provided any evidence that HESI authorized or ratified any alleged malicious actions by its employees in such a manner as to render it liable for punitive damages.  *See Stepski v. M/V Norasia Alya*, No. 7:06-cv-1694, 2010 U.S. Dist. LEXIS 16602, at *31 (S.D.N.Y. Jan. 14, 2010).  Nor have Plaintiffs or BP provided any evidence that any HESI employee was unfit or that HESI was reckless in employing them.  *Id*; *see also United States Steel Corp. v. Fuhrman*, 407 F.2d 1143, 1148 (6th Cir. 1969).  To the contrary, HESI employees, such as Gagliano and Keith, were highly respected and seasoned in their respective fields.[35]  Further, HESI met all requirements of established safety practice and nothing in the record indicates that HESI employees or management, as a routine and continuing practice, allowed, approved, or had knowledge of operations conducted in contravention of accepted practices.  *See Consol. Aluminum*, 639 F. Supp. at 1183.  Because HESI formulated policies and directed its employees appropriately, no purpose is served by imposing punitive damages except to artificially increase the amount of judgment.  *See P&E*, 872 F.2d at 652.  Additionally, neither Gagliano nor Keith exercised policymaking authority.  To the contrary, their principal duties included cement design

---

[35] *See* HESI FOFs at §§ VII.A; XXI.A.5.

(in collaboration with BP), running tests, making recommendations, observing data, and providing information to BP.  Finally, even if a HESI employee misinterpreted mudlogging data or a cement slurry test, "punitive damages are not due simply for poor judgment." *See Pillsbury*, 715 F. Supp. at 762.

Based on the Fifth Circuit's decision in *P&E* and Supreme Court authority, it would be improper to hold HESI liable for punitive damages for any alleged misconduct by a HESI employee.  The Fifth Circuit has shown a marked reluctance to approve vicarious imputation of an agent's conduct to the principal for purposes of awarding punitive damages under general maritime law, and its authority rests on United States Supreme Court authority dating back almost 200 years.  *See Lake Shore*, 147 U.S. 101; *The Amiable Nancy*, 16 U.S. (3 Wheat) 546; *P&E*, 872 F.2d at 652.  In other words, the Fifth Circuit, along with a majority of other circuits and current Supreme Court precedent, abide by the longstanding maritime principle, which is to limit liability.  *See Baker v. Mobile Corp.*, 490 F.3d 1066, 1070 (9th Cir. 2007) (Kozinski, J., dissenting).

### 3.      Post-Incident Activities of HESI Employees Cannot Be Considered When Determining Whether HESI Was Grossly Negligent or Acted With Willful Misconduct.

BP and Plaintiffs have complained at length regarding certain alleged post-Incident actions of HESI's employees.  *See, e.g.*, Dkt. Nos. 4799, 8977, 8979.  As HESI established at the time these motions were filed, HESI neither concealed nor destroyed any evidence, did not act in bad faith, and no party suffered prejudice.[36]  (Dkt. Nos. 4961, 5058, and 9022).  Post-Incident

---

[36] As discussed, *supra*, the actions of Gagliano and Keith cannot be imputed to HESI for the purpose of imposing punitive damages.  The same is true of the HESI employees allegedly involved in the complained-of post-incident activities —Ronnie Faul, Rickey Morgan, and Tim Quirk.  Moreover, even if the actions of these employees are considered to be in bad faith, such unratified actions should not be imputed to HESI.  "Bad faith is personal" and not "automatically visited on others." *Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 803 n.14 (N.D. Tex. 2011) (quoting *Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009)).  Courts should not find bad faith against a party-company based on the unratified actions of its employees. *See id.*  Accordingly, even if

activities have no bearing on whether HESI employees acted with gross negligence or willful misconduct in allegedly causing the blowout, and the Court cannot consider such activities in determining whether HESI acted with gross negligence.

"[G]ross negligence is distinguished from ordinary negligence in that it 'encompasses harm that is willfully inflicted or is caused by the wanton and reckless disregard for the safety of others.'" *Operaciones Tecnicas Marinas*, 2013 AMC at 858 (quoting *Computalog*, 1996 U.S. Dist. LEXIS 19074 at *7). Thus, it is the defendant's state of mind that distinguishes ordinary negligence from gross negligence. *See Computalog*, 1996 U.S. Dist. LEXIS 19074, at *7 ("[O]rdinary negligence is based on the fact that one ought to have known the results of his acts, while 'gross negligence' rests on the assumption that one ***knew*** the results of his acts.") (quoting Black's Law Dictionary 1034) (emphasis in original); *Lobegeiger*, 2012 AMC at 231 ("A review of relevant admiralty case law reveals a general consensus that gross negligence involves some extreme departure from reasonable care coupled with a ***conscious awareness of the risk of harm***.") (emphasis added).

Accordingly, by definition, gross negligence "concerns the actor's mental state ***at the time of the action*** to determine whether he was consciously indifferent of the risk." *Pace v. N. Houston Pole Line Corp.*, No. 14-97-140, 1999 Tex. App. LEXIS 3398, *44 (Tex. App.— Houston [14th Dist.] May 6, 1999, pet. denied) (subsequent accidents not relevant to knowledge or intent for establishing gross negligence) (emphasis added) (Texas law).  As the Texas Supreme Court has recognized, post hoc gross negligence is improper. *Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 148 (Tex. 2004) (citing *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex. 1994)).  Rather, "[d]etermining whether an act or omission involves extreme risk or

---

such acts rise to the level of bad faith, which HESI denies, the actions were not requested or known by HESI, and should not be imputed to HESI.

peril requires an examination of the events and circumstances from the view point of the defendant at the time the events occurred, without viewing the matter in hindsight." *Moriel*, 879 S.W.2d at 23. *See also Armstrong*, 145 S.W.3d at 148 (citing *Moriel*, 879 S.W.2d at 23).

HESI employees' post-Incident conduct has no relationship to the state of mind of different HESI employees leading up to the Incident. *See Burke v. Deere & Co.*, No. 92-1990, 1993 U.S. App. LEXIS 21878, *20-27 (8th Cir. Aug. 27, 1993) (post-incident conduct could not be admitted as relevant to defendant's state of mind at the time of the incident for purposes of awarding punitive damages) (Iowa law); *Huyhn v. R. Warehousing & Port Servs., Inc.*, 973 S.W.2d 375, 378 (Tex. App.—Tyler 1998, no pet.) (post-incident refusal to submit to a drug test had no tendency to prove defendant's state of mind at the time of the incident or competency as a driver) (Texas law).[37]   Absent such a relationship, evidence of post-incident conduct is not admissible. *Forquer*, 526 P.2d at 1067-68 ("[I]n . . . cases allowing . . . after-occurring conduct to be admitted on the issue of punitive damages, the conduct has a reasonable relationship either to the state of mind of the tortfeasor at the time of the event itself or to the injured parties' actual damages.  Therefore, after-occurring conduct not related to these matters, such as failing to file an accident report, is inadmissible on the issue of punitive damages.").

Post-Incident conduct cannot have contributed to the blowout or caused Plaintiffs' damages. *See Saucedo v. Salvation Army*, 24 P.3d 1274, 1279-80 (Ariz. Ct. App. 2001) ("[A] survey of other states' jurisprudence indicates that punitive damages are proper when the conduct

---

[37] *See also Howard v. Klika*, Civil No. 03-792, 2004 U.S. Dist. LEXIS 9637, *2 (D. Or. May 18, 2004) (Memorandum written subsequent to the conduct giving rise to plaintiff's claims was not material to defendants' state of mind at the time of those incidents); *Morton v. City of Shelby*, 984 So.2d 323, 333 (Miss. Ct. App. 2007) (Police officer's actions after accident could not be used to support inference or create a presumption that the officer was reckless before or during the accident for purpose of determining whether or not officer was entitled to governmental immunity) (Mississippi law); *Forquer v. Pinal Cnty.*, 526 P.2d 1064, 1067-68 (Ariz. Ct. App. 1974) (Alleged misstatements to the investigating officer did not bear any relationship to the state of mind of the defendant at the time of the accident nor did they enhance or aggravate the deceased's actual damages) (Arizona law).

giving rise to punitive damages contributes to, or is a cause of, the injury.") (Arizona law) (citing cases).   In *Saucedo*, post-incident conduct involving fleeing the scene of an accident could not demonstrate an entitlement to punitive damages—the alleged aggravated course of conduct did not cause harm to plaintiff, because he had been killed in the initial impact.  *Id.* at 1278.  The post-incident conduct was not a contributing factor or the proximate cause of the injury.  *Id.  See also First Commonwealth Corp. v. Hibernia Nat'l Bank*, 891 F. Supp. 290, 295 (E.D. La. 1995) (Under Louisiana law, gross negligence must have caused damages in order for plaintiff to prevail).[38]

HESI strongly disagrees with BP's and the Plaintiffs' attempts to mischaracterize certain post-Incident activities.   Any assertion by Plaintiffs or BP that HESI should be subject to punitive damages based on the post-Incident activities of certain employees, none of which harmed BP or Plaintiffs[39] is an improper attempt to unfairly punish HESI for actions that are not causally related to the Incident.  Such arguments by BP and/or the Plaintiffs should be rejected.

### E.      HESI is Not Liable for Punitive Damages.

HESI can only be liable for punitive damages if Plaintiffs' injuries were caused by wanton, willful, or outrageous conduct on the part of HESI.  *Lobegeiger*, 2012 AMC at 214

---

[38] *See also The Capital Times Co. v. Doyle*, 807 N.W.2d 666, 669 (Wis. Ct. App. 2011) ("Plaintiffs must allege the underlying cause of action, request and prove actual damages, and request punitive damages ***based on the conduct that caused the actual damages***.") (emphasis added) (Wisconsin law); *Bennett v. Greeley Gas Co.*, 969 P.2d 754, 761 (Colo. App. 1998) ("The purpose of the jury's award of punitive damages is to punish the wrongdoer for willful and wanton misconduct.  However, the conduct referred to is that causing the injuries.  It is the quality of that tortious act, not the character of the wrongdoer that justifies exemplary damages.  As a result, acts of the wrongdoer occurring after the event creating liability ordinarily are not material to the jury's award of exemplary damages.") (citations omitted) (Colorado law); *Taylor v. Dyer*, 190 A.D.2d 902, 903-04 (N.Y. App. Div. 1993) (Record insufficient to justify an award of punitive damages.  While defendant's flight from the scene of accident might be considered reprehensible, such conduct occurring after the accident did not proximately cause the plaintiff's injuries and is outside the conduct alleged in the complaint) (New York law).

[39] While not at issue for the purpose determining whether a finding of gross negligence can be based upon post-incident activities, HESI notes, as it did in its Response in Opposition to Motion for Spoliation Sanctions (Dkt. No. 4961), Surreply in Opposition to BP's Motion for Spoliation Sanctions (Dkt No. 5058), and Response to BP's Motion for Spoliation Sanctions and Related Submissions of the PSC and the States (Dkt No. 9022), that neither Plaintiffs nor BP were prejudiced in this litigation by any post-incident activities of HESI's employees.

("[A] plaintiff may recover punitive damages under general maritime law, consistent with the common-law rule, where the plaintiff's injury was due to the defendant's 'wanton, willful or outrageous conduct.'") (citing *Townsend*, 557 U.S. at 409); *Solvang v. M/T Plan Kristine*, 1994 AMC 1133, 1145 (S.D. Tex. 1993) ("Punitive damages are available under the general maritime law where the conduct causing the injury is willful, wanton, grossly negligent, or unconscionable so as to evidence a callous disregard for the rights of others."). *See also P&E*, 872 F.2d at 650 ("[P]unitive damages are recoverable under the general maritime law where a defendant is shown to have engaged in willful and wanton conduct.") (citing *Merry Shipping*, 650 F.2d at 626). Because there is no basis for finding HESI guilty of willful, wanton or outrageous conduct, there is no basis for assessing punitive damages against HESI, and such claims must fail.[40]

### F.     HESI is Not Liable for Fraud, Core Breach of Contract, or Material Increase of Risk.

In addition to claims based on negligence and gross negligence, BP has also pled a cause of action against HESI based on fraud and fraudulent concealment.  Additionally, in prior summary judgment pleadings, BP has alleged that HESI is guilty of a core breach of contract that resulted in a material increase in BP's risk associated with drilling the Macondo well.[41]  As is the case with BP's and Plaintiffs' allegations of negligence and gross negligence against HESI, BP's allegations of fraud, fraudulent concealment, breach of contract, and material increase of risk are meritless and cannot support any form of relief in BP's favor.

---

[40] HESI incorporates by reference its previously filed summary judgment motion regarding punitive damages, including its arguments that settling Plaintiffs are precluded from recovery of punitive damages based upon their release of any claims against HESI for compensatory damages.  *See* Dkt. No. 8267.  HESI also incorporates by reference its legal arguments in its Motion for Judgment on the Pleadings or Alternative Motion for Summary Judgment Regarding BP's Assignment of Claims.  *See* Dkt. No. 8268.

[41] As noted in its prior summary judgment pleadings, BP has waived any claim for breach of contract by failing to assert such claim.  *See* Dkt. No. 4767-1 at p. 15.

"[F]ederal courts sitting in admiralty apply common law fraud principles." *Atel Mar. Investors, LP v. Sea Mar Mgmt.*, No. 08-1700, 2010 U.S. Dist. Lexis 47834, at *9 (E.D. La. May 14, 2010) (citing *Black Gold Marine, Inc. v. Jackson Marine Co.*, 759 F.2d 466, 470 (5th Cir. 1985)).  To prevail on a fraud claim, a party must prove that:

> (1) the deceiving party made a material misrepresentation or nondisclosure; (2) the representation was false or the nondisclosure implied that the facts were different from what the deceived party understood them to be; (3) the deceiving party knew that the representation was false or that the nondisclosure implied the existence of false facts; (4) the deceiving party intended the deceived party to rely on the misrepresentation or nondisclosure; and (5) the deceived party detrimentally relied upon the misrepresentation or nondisclosure.

*Atel Mar. Investors*, 2010 U.S. Dist. LEXIS 47834, at *9 (quoting *Black Gold Marine*, 759 F.2 at 470).

This Court, in considering HESI's summary judgment motion regarding indemnity issues, specifically noted that fraud "necessarily includes intentional wrongdoing."  (Dkt. No. 5493 at p. 5) (*citing Atel Mar. Investors*).  Thus, absent evidence of intentional wrongdoing on HESI's part, BP's claims for fraud and fraudulent concealment must fail.  And the evidentiary record reveals no evidence of any intentional act of wrongdoing by HESI and/or its employees.  Even if the actions of Gagliano and/or Keith were improper, and even if those actions could be imputed to HESI, all of which HESI denies, there is no evidence that Gagliano, Keith, or anyone else associated with HESI engaged in any intentional act of wrongdoing.  In fact, the record reveals the opposite.[42]  The Phase One trial evidence shows that Gagliano worked hand-in-hand with BP in designing the Macondo well cement program, and that when he did note a potential problem with the number of centralizers to be used, Gagliano went directly to BP (Greg Walz) to alert BP of the issue.  Moreover, Gagliano transmitted to BP all valid pre-Incident foam stability tests;

---

[42] *See* HESI FOFs at §§ XI.A.1, 2, 3; XI.B; XVII.A.2, 3; XVIII.A.B; XXI.A.6, 16; XXI.B.

36

and the last foam stability test, although not transmitted to BP until after the Incident, would have been reported by Gagliano as a passed test.  Likewise, the trial evidence shows that on the evening of April 20, 2010, Keith diligently monitored the well, and advised the Driller of numerous anomalies that he saw.  The actions of Gagliano and Keith show an intent to properly and timely advise BP and Transocean of potential issues, and cannot support a finding of any intentional wrongdoing.

Further, a claim for fraudulent concealment exists only if the defendant had a duty to disclose information.  *Trustees of the Nw. Laundry & Dry Cleaners Health & Welfare Trust Fund v. Burzynski*, 27 F.3d 153, 157 (5th Cir. 1994) (Texas law); *Berm. Container Line Ltd. v. Int'l Longshoremen's Assoc.*, 192 F.3d 250, 258 (2d Cir. 1999) (noting requirement of duty to disclose) (New York law).  In this case, there is no evidence that Gagliano, Keith, or anyone with HESI attempted to wrongfully conceal any material fact from BP.  Further, given that the BP/HESI Contract does not require that HESI conduct a foam stability test, it is questionable at best whether HESI had any duty to disclose to BP test results that were not contractually required.  For these reasons as well, BP's claims for fraud and fraudulent concealment must fail.

Finally, HESI denies that the claims asserted by BP are proper fraud and/or fraudulent concealment claims rather than breach of contract claims improperly cloaked as fraud.  *See, e.g.*, *Kevin M. Ehringer Enters. v. McData Servs. Corp.*, 646 F.3d 321, 325 (5th Cir. 2011) ("[M]ere failure to perform contractual obligations as promised does not constitute fraud but is instead a breach of contract.") (Texas law); *Davaco, Inc. v. Dunkin' Brands, Inc.*, No. 3:08-cv-0581-M, 2008 U.S. Dist. LEXIS 95356, *8 (N.D. Tex. Nov. 21, 2008).  This Court has previously acknowledged that BP cannot succeed on a fraud claim by merely renaming a breach of contract claim.  (Dkt. No. 5493 at p. 5).  Having failed to allege a claim for breach of contract, BP cannot

succeed in imposing liability upon HESI for a misnamed claim for fraud or fraudulent concealment, especially in the absence of any evidence to support those claims.

Likewise, even if the Court overlooks BP's failure to plead breach of contract, that claim, to the extent it seeks to void BP's indemnity obligations, must likewise fail.[43]  The Fifth Circuit tangentially addressed the issue of whether a breach of a contract that includes an indemnity provision can nullify the indemnity in *Becker*, 586 F.3d at 368.  In considering language from the Court's previous holding in *Marquette Transp. Co. v. La. Mach. Co*., 367 F.3d 398 (5th Cir. 2004), the Court noted:

> However, the court in *Marquette*, after finding that the indemnity agreement at issue was enforceable, states only that if the party "had been found to be in breach of those warranties, perhaps our application of the indemnity clause would be different."  *Marquette* does not hold that breach of a contract necessitates invalidation of an indemnity agreement included therein.  Even if the indemnity agreement could be invalidated by Tidewater's breach of the time-charter contract, the district court did not err in holding that Tidewater did not breach the contract.

*Becker*, 586 F.3d at 368 (citation omitted).

BP has not pled that HESI breached the BP/HESI Contract.  Absent any such allegation, HESI's performance thereunder cannot form the basis of affirmative relief or a nullification of BP's indemnity obligations.  However, even if BP had alleged a claim for breach of contract, any such breach would not invalidate the BP/HESI Contract's indemnity provisions.

Without any supporting underlying pleading, BP alleged in prior summary judgment pleadings that its indemnity obligations are nullified because HESI increased BP's risk.  *See* Dkt. No. 4977 at pp. 14-15.  BP is incorrect.  First, none of the cases upon which BP relied involves indemnification for the indemnitee's own negligence (of whatever degree) or indemnifying the

---

[43] HESI incorporates by reference its previously filed summary judgment pleadings relating to the indemnity issue. *See* Dkt. Nos. 4767, 5050.

indemnitee for a certain type of claim (i.e., blowout or pollution claims) irrespective of cause.[44] Instead, each of the cases cited by BP addresses a simple indemnity agreement whereby one party agrees to indemnify another against costs and expenses.

Second, application of BP's cited cases to this dispute would require the Court to ignore the context and language of the extensive BP/HESI Contract and the parties' roles in the drilling operation.  As this Court has previously affirmed, BP's indemnity obligation under the BP/HESI Contract – including indemnity for pollution and contamination claims arising from the reservoir – is broad and reflects a bargained for risk allocation between sophisticated global businesses. (Dkt. No. 5493 at p. 3).  Through its material increase in risk argument, BP urges the Court to disregard BP's own bargained-for risk allocation.  BP agreed to indemnify HESI for all claims arising from a blowout or uncontrolled well and from all sub-surface pollution claims, irrespective of cause and without regard to the level of negligence or other bases for the claims.

HESI's actions cannot increase a risk that BP has already fully assumed for these types of claims.  BP's argument, at its base, is that, despite the indemnity language, an indemnitee found to be even 1% negligent has, by definition, increased the indemnitor's risk, thus allowing the indemnitor to avoid its obligations.  That is not the law.  Here, based on the broad scope of the indemnity provisions, BP assumed the full risk of blowout and pollution claims, even if HESI did something to increase BP's risk incrementally, which HESI denies.  BP's "increased risk" argument is at odds with both the clear language of the BP/HESI Contract and the law.  Neither HESI, nor the business community at large, should be subjected to such a reallocation of risk

---

[44] *See Hiern v. St. Paul-Mercury Indem. Co.*, 262 F.2d 526, 528 (5th Cir. 1959); *U.S. Fid. & Guar. Co. v. Putfark*, 158 So. 9, 10 (La. 1934); *Gen. Ins. Co. of Am. v. Fleeger*, 389 F.2d 159, 161 n.3 (5th Cir. 1968); *Hudson v. Forest Oil Corp.*, No. 02-2225, 2003 WL 21276385, at *4 (E.D. La. June 2, 2003); *Rochelle Bail Agency, Inc. v. Md. Nat'l Ins. Co.*, 484 F.2d 877, 879 (7th Cir. 1973); *Dana Corp. v. Fireman's Fund Ins. Co.*, 169 F. Supp. 2d 732, 742-43 (N.D. Ohio 1999); *Harley-Davidson, Inc. v. Minstar, Inc.*, 41 F.3d 341, 343 (7th Cir. 1994); *Italia Societa per Azioni di Navigazione v. Or. Stevedoring Co.*, 376 U.S. 315, 324 (1964).

merely because BP has now decided that it does not wish to live by the terms of the mandates of decades-long oilfield risk allocation and its own specific, detailed, and clear contractual agreement.

There is no evidentiary or legal basis for BP's claims of fraud, fraudulent concealment, breach of contract, or material increase in risk. This Court should grant judgment in HESI's favor, denying BP any relief under these theories.

## III.    HESI is Entitled to Judgment as a Matter of Law.

As a matter of law, and based upon the evidence presented at the Phase One trial, HESI is not liable to Plaintiffs or any co-Defendant for any action sounding in negligence or strict products liability. Absent a basis in negligence, and further absent any evidence to support the requisite degree of culpability, HESI cannot be liable for gross negligence and/or willful misconduct. Without these findings, HESI cannot be liable for punitive damages. For these reasons, HESI is entitled to judgment as a matter of law, and based upon the evidence, that it is not liable to Plaintiffs or any co-Defendant on any claims.

## IV.    Conclusion

For the reasons stated herein, HESI requests that this Court enter judgment in HESI's favor, ruling that Plaintiffs, and remaining co-Defendants take nothing by their claims, and granting to HESI such other and further relief to which it is entitled.

40

Respectfully submitted,

**GODWIN LEWIS PC**

**By:**   /s/  *Donald E. Godwin*
Donald E. Godwin
*Attorney-in-charge*
State Bar No. 08056500
Don.Godwin@GodwinLewis.com
Bruce W. Bowman, Jr.
State Bar No. 02752000
Bruce.Bowman@GodwinLewis.com
Jenny L. Martinez
State Bar No. 24013109
Jenny.Martinez@GodwinLewis.com
Floyd R. Hartley, Jr.
State Bar No. 00798242
Floyd.Hartley@GodwinLewis.com
Gavin E. Hill
State Bar No.  00796756
Gavin.Hill@GodwinLewis.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone:  (214) 939-4400
Facsimile:  (214) 760-7332

and

R. Alan York
State Bar No. 22167500
Alan.York@GodwinLewis.com
Jerry C. von Sternberg
State Bar No.  20618150
Jerry.vonSternberg@GodwinLewis.com
Misty Hataway-Coné
State Bar No.  24032277
Misty.Cone@GodwinLewis.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone:  (713) 595-8300
Facsimile:  (713) 425-7594

**ATTORNEYS FOR DEFENDANT
HALLIBURTON ENERGY SERVICES,
INC.**

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Brief Regarding Post-Trial Matters has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedure established in MDL 2179, on this 21st day of June, 2013.

/s/ Donald E. Godwin
Donald E. Godwin