UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig<br>"Deepwater Horizon" in the Gulf<br>of Mexico, on April 20, 2010 | MDL NO. 2179<br><br>SECTION J |
| Applies to: *All Cases* | JUDGE BARBIER<br>MAGISTRATE JUDGE SHUSHAN |

## ORDER

**[Regarding BP/Anadarko's
Motion to Strike Rebuttal Experts for the U.S. (Rec. doc. 10450)]**

Before the Court is the motion of BP and Anadarko (BP/Anadarko) to strike the rebuttal reports (or portions thereof) served on behalf of the United States. Expert reports relating to Phase Two were initially served by the U.S. on March 22, 2013. BP/Anadarko served their expert reports on May 1, 2013 with rebuttal reports by the U.S. being served on June 10, 2013. After reviewing the rebuttal reports, BP/Anadarko objected to some of the rebuttal reports arguing they contained new material that could have been included in the U.S.'s initial reports and requested relief from the undersigned. Rec. doc. 10450. The U.S. replied as to BP/Anadarko's request for postponement of Pooladi-Darvish's deposition. Rec. doc. 10449. Following a telephone status conference with the undersigned on Friday, June 14, 2013, BP/Anadarko detailed the relief sought in a letter of June 17, 2013. Rec. doc. 10445. The U.S. responded on June 17, 2013. Rec. doc. 10446. BP/Anadarko replied (Rec. doc. 104470 with the U.S. filing last on June 20, 2013 (Rec. doc. 10448).

The issue is whether the U.S. rebuttal reports or portions thereof at issue in the motion to strike are proper rebuttal reports. BP/Anadarko contend that: (1) the U.S. cannot defer until the rebuttal stage its analysis of quantification issues long at the center of the case (Rec. doc. 10445 at 3); (2) the rebuttal reports of the U.S. proffer newly disclosed material that could have and should have been included in the initial reports of its experts (Rec. doc. 10450 at 1); and (3) the U.S. held

back scientific justifications on which it now seeks to rely in its rebuttal reports (Rec. doc. 10447 at 5). The U.S. responds that: (1) its rebuttal reports are proper rebuttal in that they contradict or rebut evidence on the same subject matter identified by another party; and (2) that is demonstrated by the fact that they are not necessary to its case-in-chief. Rec. doc. 10446 at 2.[1]

Judge Duval described the standard as:

A rebuttal expert report is one which is "intended solely to contradict or rebut evidence on the same subject matter identified by another party." Fed.R.Civ.P. 26(a) 2)(D)(ii). Rebuttal evidence is appropriate to explain, repel, counteract or disprove the evidence of the adverse part and is not an opportunity for the correction of any oversights in the plaintiffs' case-in-chief. That said Rule 26 does not automatically exclude anything an expert could have included in his or her original report because such a rule would lead to the inclusion of vast amounts of arguably irrelevant material in an expert's report on the off chance that failing to include any information in anticipation of a particular criticism would forever bar the expert from later introducing the relevant material. All that is required is for the information to repel other expert testimony. An opening expert report is an early salvo in the process of defining issues for trial, and thus it is more understandable at the expert discovery stage that a party may need to include significant elaboration in a rebuttal report to challenge the assertions of the opponent's expert reports.

In re Katrina Canal Breaches Consol. Litigation, 2012 WL 2526980, *1 (E.D.La.) (Duval, J.) (some citations, quotation marks and brackets omitted).[2]  In Scientific Components v. Sirenza Microdevices, archetypal rebuttal was described as identification of a flawed premise in an expert

---

[1] The U.S. and BP/Anadarko disagreed on the sequence of the reports of experts. The U.S. proposed one date for the parties to exchange reports for their cases-in-chief and a further date on which all rebuttal reports would be exchanged. The defendants urged that the U.S. has the burden of proving the amount of oil discharged, and therefore the reports of the U.S. experts should be presented first. The Court agreed with the defendants. The schedule described above was set. The U.S. implies that the schedule adopted by the Court affects the analysis of its rebuttal reports. For example, it contends that under the Court's schedule the U.S. retained the opportunity to disclose rebuttal reports after seeing the defendants' reports. Rec. doc. 10446 at 1. The U.S. also retained that opportunity under the schedule it proposed. The analysis of the issue of whether the rebuttal reports of the U.S. are proper rebuttal is the same under either sequence.

[2] Judge Duval determined that certain material in a "rebuttal report" was not proper rebuttal in that it was not complete. Id. at *2. This is not an issue with the U.S. rebuttal reports as BP/Anadarko do not contend that they are incomplete.

2

report that casts doubt on both that report's conclusions and its author's expertise. 2008 WL 4911440, *2. As discussed in more detail below, some of the U.S. rebuttal reports go beyond this standard. For example, Roegiers, a U.S. rebuttal expert, criticizes data used by Zimmerman, a BP/Anadarko expert. That is, Roegiers contends that he identified a flawed premise, inaccurate data, in Zimmerman's report, which is proper rebuttal. Roegiers, however, does not stop there. He also returns to the initial report from Kelkar, a U.S. expert, and attempts to buttress a premise in that report. That is improper rebuttal.

*   *   *

After reviewing the arguments in detail and referring to the original reports at issue,[3] the BP reports at issue,[4] and the contested rebuttal reports,[5] the undersigned rules as follows:

**1.    Zimmerman v. Roegiers**

Professor Zimmerman reviewed and analyzed test data from 8 rotary sidewall cores and concluded that the uniaxial pore volume compressibility ("UPVC") was no more than 6.35 microsips and that there was no support for using a value of UPVC of 12 (the value used by Kelkar). pp. 6-7.

Roegiers[6] reviewed Zimmerman's report and concluded that the Weatherford[7] testing during drilling of the Macondo well did not yield an accurate estimate of compressibility. He distinguishes between test results from "rotary sidewall core samples" and results that may have been obtained

---

[3] Kelkar, Zick, Poolardi-Darvish.

[4] Zimmerman, Whitson, Blunt and Marchand (the identification of the projected areas of Marchand's opinions).

[5] Roegiers, Huffman, Kelkar, and Pooladi-Darvish.

[6] Roegiers is a new expert for the United States tendered for rebuttal only.

[7] Weatherford was a BP vendor.

3

from "conventional cores." He therefore applies a correction factor to go from rotary sidewall to conventional cores, leading him to conclude that 12 usips was reasonable.

Roegiers argues that sidewall core data was originally chosen because it was much cheaper than conventional coring but much less accurate in predicting compressibility. Therefore, sidewall sample data must be calibrated against conventional core data.

Thus, in "rebuttal" to Professor Zimmerman's conclusion, Roegiers states that the tests were not run under simulated down hole conditions and therefore he does not consider Professor Zimmerman's conclusions to be reliable.

BP/Anadarko argue that the U.S. failed to provide a scientific estimate of pore volume compressibility ("PVC") in any of its expert reports but now seeks to provide such analysis on rebuttal through new experts, Huffman and Roegiers. Specifically, BP/Anadarko point out that Kelkar analyzed the Weatherford measurements and employed a rock compressibility of 5.61 microsips - not the 12 microsips that he employed in his initial expert report.

Roegiers may criticize the sidewall v. core data used by Zimmerman, but he may not make affirmative calculations supportive of Kelkar's estimate of 12 microsips contained in his initial affirmative report. The expert report of Roegiers will be revised to eliminate such material.

**2.   Zimmerman v. Huffman**

BP/Anadarko argue that portions of Huffman's report[8] should be struck where it seeks to explain and justify the use of a UPVC value of 12 microsips.

Huffman expresses the opinion that the core tests conducted by Weatherford were done under the wrong conditions and therefore cannot be used to assign a reliable UPVC value. He

---

[8] Huffman is a new expert for rebuttal.

4

therefore criticizes the conclusions of Zimmerman and opines that the value of 12 microsips is a more reasonable estimate.

As with Roegiers, the criticism of the core tests is a valid rebuttal opinion.  However, the affirmative opinion supporting 12 microsips is not.  Therefore, the following portions of Huffman's report should be struck:  p. 39 second full paragraph through p. 40; the redacted part of paragraph 2 on p. 75.

### 3. <u>Huffman v. Marchand</u>

Marchand has been withdrawn as a testifying expert geologist specializing in the field of "reservoir quality and diagenesis."  She was to testify concerning the properties of reservoir rocks that could affect oil production including the temperature effect of rock hardness and compaction rate and the mineralogy effect on rock hardness and compaction rate.  She concludes that the sandstone was harder and more consolidated and therefore reduced the rate of compaction and that the sandstone was predominantly of "rigid" quartz.

It appears that Huffman's report, specifically parts of pp. 11-13, all of pp. 44-74 and parts of page 75, are directly responsive to the opinion of Marchand regarding the temperature effect of rock hardness and compaction rate as well as mineralogy effect on rock hardness and compaction rate.  Although in the opening paragraph on page 44, Huffman refers to "BP experts" he directly responds to the 2 assertions which BP/Anadarko revealed Marchand would support.  He quotes those and then goes on to express the opinion that her "her overall view is incorrect and that the M56 sands are currently in a pressure and temperature condition where only patchy and weak cementation will exist that will not result in rigid behavior.  It is my conclusion that Marchand's view of cementation in the M56 reservoirs is simply not supported by the data and observation from the

Macondo well." pp. 44-45.  Huffman's report contains a section on technical discussion in support of his conclusions regarding Marchand's "opinions" and then continues his analysis of various factors that could affect rock hardness and compaction rates.  After pages of explanation, Huffman, on page 73, states that [w]ith the general concepts that precede this conclusion section in mind, I would like to address some of the statements that BP/Anadarko has indicated will be subjects of testimony from Dr. Ann Marchand."  On page 74, Huffman discusses other factors that he believes Marchand did not consider and he concludes that all "oshe f these factors combined lead me to the conclusion that Dr. Marchand's view of cementation in the M56 reservoirs is simply not supported by the data and observation from the Macondo well."

Thus, the portions of the Huffman report cited by BP/Anadarko as directly responding to Marchand should be stricken as Marchand has been withdrawn as an expert by BP/Anadarko.

**4.     Zimmerman v. Kelkar and Raghavan**

BP/Anadarko seek to strike portions of this joint expert report as an improper rebuttal regarding PVC.  BP/Anadarko argue that Kelkar and Raghavan rely on Roegiers' and Huffman's improper "rebuttal" analysis of PVC.  To the extent that the Roegiers and Huffman reports have been stricken, the corresponding portions of the Kelkar and Raghavan report likewise must be struck.  Therefore, the sixth bullet point on p. 5, and the fourth paragraph on p. 15 carried over through p. 16 will be struck.

**5.     Zimmerman v. Pooladi-Darvish**

BP/Anadarko object that Pooladi-Darvish offers new commentary about testing for PVC and argues that his opinion could have been offered in his initial report.  In that initial report, Pooladi-Darvish used PVC values of 2, 6 and 12, with 6 microsips being the base estimate.  In his rebuttal

6

report, Pooladi-Darvish opines that "[d]epending on whether the average rock compressibility of the Macondo rock is 3 or 12 microsips, the total compressibility of the Macondo reservoir (including its oil) could vary by more than 50% between approximately 16 and 15 microsips." p. 28. Pooladi-Darvish also states that, in his opinion, "there could be a significant difference between a value of rock compressibility obtained on a few small samples that collectively could be held in one hand and the value of rock compressibility of between one and two hundred thousand acre-ft of the reservoir rock." Id. These are new opinions not expressed in his initial report nor are they specifically in rebuttal to Zimmerman's calculations. As a result, the highlighted portions contained on p. 28 of the rebuttal report will be struck.

**6.     Blunt v. Kelkar and Raghavan**

Blunt prepared a calculation of the volume of oil released during the incident relying on the analysis of other experts, including the rock compressibility calculations of Zimmerman and the fluids analysis of Whitson. In formulating his opinion, Blunt reviewed the analysis conducted by Kelkar and Raghavan, particularly the material balance calculation which consists of 3 quantities: 1) oil volume connected to the well; 2) compressibility; 3) and pressure depletion. Blunt report p. 6.

BP/Anadarko assert that the rebuttal report of Kelkar and Raghavan includes an analysis that was not in their original report. In their original report they opined that the amount of oil produced during the 86 days of the flow was between 4.5 and 5.5 million STB. pp. 8, 28. BP/Anadarko complain that Kelkar and Raghavan's rebuttal report involves a new method of calculation (the "Monte Carlo" method) which increased their estimate to a range of 5.9 to 8.3. In the rebuttal report they express the following opinion:

7

> Using a Monte Carlo simulation method, we developed an uncertainty distribution of the cumulative volume of oil released over the approximately 86 days of the spill, using the material balance analysis done in our initial report. The average value of oil released is 5.9 MMSTB with 10 percentile value equal to 8.3 MMSTB and 90 percentile value equal to 3.7 MMSTB. These values are calculated based on the assumption that there is no aquifer supporting the reservoir.

p. 6. See also rebuttal report p. 11 where they state that "we formalize our analysis by quantifying the uncertainties in the amount of oil released," and pp. 24-27.

It is clear that the Monte Carlo simulation is different from the analysis which Kelkar and Raghavan performed in order to prepare their original report. They do not explain the need to use the Monte Carlo simulation as being in rebuttal to anything specifically done by Blunt. Rather, it appears that they instead wanted to confirm the uncertainties of their prior calculations. That is not proper rebuttal analysis and therefore those portions of pp. 6, 11 and 24-27 concerning the Monte Carlo simulation will be struck.

A second issue raised by BP/Anadarko is the assertion that Kelkar and Raghavan have for the first time in their rebuttal covered the issue of whether the well flow was affected by the existence of an aquifer near the reservoir and potentially connected to it. The initial report of Kelkar and Raghavan did "not include the influence of water influx since only limited knowledge regarding the size and the strength of aquifer support in the Macondo reservoir is available." p. 28. Earlier in their rebuttal report, Kelkar and Raghavan calculate values based on the assumption there is no aquifer supporting the reservoir (see quoted language above). However, Appendix C to their rebuttal report is an analysis of the "Impact of Aquifer on Total Volume Released." In the Appendix, the experts make assumptions regarding the shape, location and size of an aquifer and then perform various calculations, including the Monte Carlo simulation, based on those

8

assumptions. An analysis of the impact of an aquifer is not in rebuttal to the report of any expert for BP/Anadarko. Indeed, Appendix C, paragraph 1, contains the following statement by Kelkar and Raghavan:

> Although both Dr. Blunt and Dr. Gringarten claim that an aquifer is absent based on their pressure derivative analysis, as we have discussed in the previous section, the derivative analysis is extremely sensitive to the rate profile assumed prior to shut in.

Assumptions and analysis regarding the existence of an aquifer is not proper rebuttal opinion when no expert on behalf of BP/Anadarko has opined regarding the affirmative existence of an aquifer.

**7.     Whitson v. Zick**

Part of Zick's analysis was to estimate the flow of hydrocarbons from the Macondo well and convert the flow to units of "stock tank barrels." He based his analysis on "the assumption of a multistage separation process to define the stock tank oil." Initial report p. 3. Zick reviewed data from tests run by BP/Anadarko vendors prior to the event, both single-stage and multistage separator tests. The multistage tests passed the samples through four separation stages. Id. Zick's estimate of stock tank barrels was based on the multistage process.

Whitson based his analysis on the "oceanic process" which estimates separation of oil from other hydrocarbons as they move through the ocean elements in order to arrive at an estimate of stock tank barrels under those conditions.

BP/Anadarko argue that Zick's initial report reflects that he considered but did not rely on the ocean-separation method, yet his rebuttal report abandons the multistage method and adopts the ocean separator method, which they contend is improper rebuttal.

Zick, in his rebuttal report, explains that he chose the four stage separation process based on the following:

9

> "My reasoning was that BP would never have used a less efficient process to define their stock tank oil during production, so why should a less efficient process define their stock tank oil during disaster?"

p. 2. Zick then turned his attention to Whitson's proposed oceanic separation process and agreed "that this could be another reasonable way of defining the stock tank oil, with the right assumptions." Id. Zick reviews Whitson's analysis and opines that Whitson made a "serious omission." Id. He performed calculations to adjust for what he believes was Whitson's error and reaches a conclusion based on the correction. pp. 8-11.

BP/Anadarko seek to exclude Zick's calculation regarding the oceanic separation process. The issue is whether his calculation is a new model or whether his calculation simply corrects for what he contends is a wrong assumption by Whitson. Rebuttal report p. 10. Zick appears to take into account many of Whitson's assumptions and references them. Zick does however, appear to affirmatively abandon his calculations in his initial report in favor of the ocean separator calculations contained in the rebuttal report:

> In light of the calculations presented in this section, my current recommendation is to use my oceanic separation process to make the conversions.

p. 12. Rather than withdrawal of his earlier calculations, Zick may be examined on both his original four stage analysis as well as his oceanic process model which he calculated in rebuttal to Whitson's ocean separator method.

### 8.     Whitson v. Kelkar and Raghavan

BP/Anadarko seek to strike a part of the rebuttal report of Kelkar and Raghavan:

> As noted above, our value of initial formation volume factor of 2.14 is consistent with that calculated by various fluid experts on behalf of BP. The United States' fluid expert, Dr. Aaron Zick, using his own

10

>ocean separation methodology that accounts for liquid dropout, predicts a value of 1.972 to 2.045 bbl/STB. We conclude that this value is more appropriate since Dr. Whitson's analysis ignores the stock tank oil that will drop out of the gas phase as the reservoir fluid flows through the ocean.

p. 5 second bullet point and p. 12, paragraph 2. Kelkar and Raghavan, like Zick, are replying to the analysis of Whitson. That is proper rebuttal and will be allowed.

### 9.     Pooladi-Darvish Correction of "Systemic Error"

BP/Anadarko find fault with Pooladi-Darvish's rebuttal report claiming that it fundamentally changes his initial analysis which used two methods to estimate cumulative flow: 1) an analytical method; and 2) a numerical method. BP/Anadarko argue that the rebuttal report discards the analytical method and then modifies the numerical method to correct a problem that was systemic. Rebuttal report at p. 8 note 3. The U.S. states that Pooladi-Darvish acknowledges an input error for one of his calculations, as pointed out by defense experts, but then discusses the fact that the error does not impact his conclusions. Rebuttal report p. 4.

Pooladi-Darvish, on the prompting of experts for BP, agreed that his initial report had a problem with input into his model which resulted in a too restrictive wellbore. On correcting for the error, he concluded it increased his estimate by approximately 1%. pp. 8-9 fn. 3. Pooladi-Darvish's rebuttal report in all other respects appears to reply to the expert opinions raised by Gringarten, Blunt and Strickland. As such, no part of the report will be struck.[9]

---

[9] BP/Anadarko may question Pooladi-Darvish about his abandonment of the analytical model.

The parties must file any appeal of this ruling **by noon on Thursday, June 27, 2013.** Depositions of the experts will not be suspended pending any appeal.

New Orleans, Louisiana, this 24th day of June, 2013.

_____
**SALLY SHUSHAN**
**United States Magistrate Judge**