UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL BY THE OIL RIG * | | MDL NO. 2179 "J" (1) |
| "DEEPWATER HORIZON" IN THE * | | |
| GULF OF MEXICO, ON * | | JUDGE BARBIER |
| APRIL 20, 2010 * | | MAG. JUDGE SHUSHAN |
| * | | |
| THIS DOCUMENT RELATES TO: | | |
| * | | |
| MARATHON OIL COMPANY * | | CIVIL CASE NO. 13-1343 |
| * | | |
| Plaintiff * | | |
| * | | |
| VERSUS * | | |
| * | | |
| BP EXPLORATION & PRODUCTION * | | |
| INC., BP AMERICA PRODUCTION * | | |
| COMPANY AND BP p.l.c. * | | |
| * | | |
| Defendant * | | |

**FIRST AMENDED COMPLAINT**

**Rule 9(h)**

**NOW INTO COURT,** through undersigned counsel, comes MARATHON OIL COMPANY, and submits this, its First Amended Complaint, to supplement its claim for damages, to wit:

**Introduction**

On April 20, 2010, a well blowout on the drilling rig *Deepwater Horizon* in the Gulf of Mexico marked the beginning of what would become the most pervasive and devastating environmental disaster in the history of the United States.  The uncontrolled blowout caused explosions and a raging fire aboard *Deepwater Horizon*.  After burning for two days, the rig sank, commencing an oil spill of unprecedented proportion that interfered with, damaged, depleted and destroyed offshore, marine and coastal environments within the Gulf of Mexico,

{B0674410.1}                                                                                         1

Louisiana, Mississippi, Alabama, Texas and Florida (the "Spill"). As a direct and foreseeable result of the Spill and its devastating impact on the marine and coastal environments, the oil and gas exploration, production and associated activities in the Gulf of Mexico were significantly interrupted, resulting in economic losses to Plaintiff and other companies and employees similarly situated. This Complaint asserts claims under the Oil Pollution Act of 1990 ("OPA"), seeking damages arising from the Spill and its environmental devastation.

## PARTIES

### A. Plaintiff

1. Plaintiff, MARATHON OIL COMPANY ("Marathon") is an Ohio corporation, with its principal office in Houston, Texas, which suffered economic damages as a result of the Spill and due to the Spill's environmental devastation.

### B. Defendants

2. Defendant BP Exploration & Production Inc. ("BP Exploration") is a Delaware corporation with its principal place of business in Warrenville, Illinois. BP Exploration was a leaseholder and the designated operator in the lease granted by the former Minerals Management Service ("MMS") allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Oil Spill originated. BP Exploration was designated the "Responsible Party" by the U.S. Coast Guard under the Oil Pollution of 1990, 33 U.S.C. §2714. This court has personal jurisdiction over BP Exploration, because BP Exploration is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

3. Defendant BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas. BP America was a party to

the Drilling Contract with Transocean Ltd. for the drilling of the Macondo well by the *Deepwater Horizon* vessel. This Court has personal jurisdiction over BP America, because BP America is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

4. Defendant BP p.l.c. is a British public limited company with its corporate headquarters in London, England. BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo. BP p.l.c. operates its various business divisions, such as the "Exploration and Production" division within BP Exploration and BP America, through vertical business arrangements aligned by product or service groups. BP p.l.c.'s operations are worldwide, including in the United States. Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Louisiana and the U.S. more generally. Plaintiff further adopts and incorporates by reference all jurisdictional allegations against BP p.l.c. set forth in Paragraphs 212 through 218 of the Amended B1 Master Complaint, Document No. 1128 filed in MDL No. 2179, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010.*

5. BP Exploration, BP America and BP p.l.c. are generally referred to herein collectively as "BP."

## JURISDICTION AND VENUE

6. In the alternative, and solely for the limited purpose of asserting the commandeering claim of the *MR. SIDNEY* for the loss of revenues of $940,944.83, jurisdiction exists before this Court pursuant to Article III, Section 2 of the United States Constitution, which empowers the federal judiciary to hear "all Cases of admiralty and maritime jurisdiction."

7. The claims presented herein are admiralty or maritime claims within the meaning

of Rule 9(h) of the Federal Rules of Civil Procedure. Plaintiff hereby designates this case as an admiralty or maritime case, and requests a non-jury trial, pursuant to Rule 9(h).

8. Jurisdiction also exists before this Court pursuant to the Oil Pollution Act, 33 U.S.C. § 2717(b) (the "OPA").

9. Under Fed. R. Civ. P. 82, no allegation of venue is required for admiralty or maritime claims. Moreover, prosecution and venue in this district are proper under 28 U.S.C. §1391 because Defendants do business herein, Marathon does business herein, and the events or omissions giving rise to the claims asserted herein occurred in this district. Venue is also proper pursuant to the OPA, 33 U.S.C. 2717(b), as the discharge occurred in this district. Venue is also appropriate in this district consistent with 28 U.S.C. §1407 and the 2010 Transfer Order of the Judicial Panel on Multidistrict Litigation. *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 731 F. Supp. 2d. 1352 (J.P.M.L. 2010), and this Court's Pretrial Order No. 20 (Rec. Doc. 904), which allows plaintiffs to directly file their complaints arising out of the Oil Spill in this District.

## FACTUAL ALLEGATIONS

10. Marathon is in the business of exploration and production of oil and gas around the world, including in the Gulf of Mexico, and at all material times was and is now making this claim as an owner and in its capacity as operator of the exploratory well at Innsbruck OCS-G 24134 Well No. 1, Mississippi Canyon, Block 993, Gulf of Mexico (the "Innsbruck Well"). The Innsbruck Well is located in the Central Planning area of the Gulf of Mexico, 73 miles offshore of Venice, Louisiana, within the United States' exclusive economic zone in the Gulf of Mexico. Marathon is also making a claim as a direct result of losses incurred on April 20, 21, and 22, 2010, in connection with the Deepwater Horizon disaster and the commandeering and diversion

of the vessel *MR. SIDNEY* as set forth more fully herein below.

11.     BP is the "responsible party" for the Oil Spill under OPA, 33 U.S.C. §2714. Because of the strict liability of responsible parties for all damages due to and arising from the Spill and its environmental devastation, Plaintiff does not need to set forth factual allegations to support culpability.  Nonetheless, out of an abundance of caution, the factual background relating to the BP Defendants' acts, omissions and failures set forth in Paragraphs 258 through 542 of the Amended B1 Master Complaint, Document 1128 filed in MDL No. 2179, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, are adopted and incorporated as if fully restated herein.

## THE COMMANDEERING CLAIM

12.     For purposes of full disclosure to the Court, parties and counsel should know that Marathon has made a claim in the Deepwater Horizon Economic and Property Damages Class Action Settlement Program (hereinafter "Class Action") for its commandeering claim, and may be compensated completely for its damages and losses for this claim through the Class Action claim. It is not Marathon's intent to withdraw its Class Action claim, and Marathon is filing this action as its protection to the extent that all or some part of the Class Action claim is determined to be an excluded or expressly reserved claim and not part of the Class Action.  Marathon has not submitted a Class Action claim for the Moratorium Claim asserted below.

13.     At all material times, the vessel *MR. SIDNEY* was under a long-term, two-year hire from Nautical Solutions, LLC to Marathon, and was working under the direction of Marathon for the Innsbruck Well project.   On April 20, 2013, at 23:45 hours, shortly after the Deepwater Horizon explosion, *MR. SIDNEY* was dispatched by MOC personnel to join the effort to mitigate the effects of the Deepwater Horizon explosion and the Oil Spill. *MR. SIDNEY* was

{B0674410.1}                                         5

later ordered by the United States Coast Guard to mitigate the effects of the Oil Spill, which included conducting grid searches as per Coast Guard direction. After 42 hours and 15 minutes of assisting in Removal and Cleanup activities, the USCG released the vessel *MR. SIDNEY* and returned it to the service of Marathon at 18:00 hours on April 22, 2010.

14. For these 42 hours and 15 minutes, *MR. SIDNEY* was taken off Marathon's hire, and her cargo of essential drilling equipment was unavailable for Marathon's use. Without the vessel *MR. SIDNEY* and its drilling equipment, Marathon had to suspend productive drilling at Marathon's Innsbruck Well, and Marathon suffered damages, costs and expenses directly related to the Oil Spill and Removal and Cleanup efforts undertaken by the vessel *MR. SIDNEY*.

15. The vessel *MR. SIDNEY* was laden with crucial rotary steerable tools needed to drill below the 18" liner (and needed for directional drilling, logging and hole enlargement) over the next several days to advance the Innsbruck Well to the intended 16" Casing Point Depth. The diversion of the vessel *MR. SIDNEY* to assist in Oil Spill mitigation efforts and consequent delay in the work to advance the Innsbruck Well to the intended Casing Point Depth directly caused additional expenses to Marathon. There was no time or opportunity for Marathon to replace the vessel *MR. SIDNEY* and its sophisticated drilling equipment during the 42.15 hour diversion due to the Deepwater Horizon oil spill.

16. Because of the delayed arrival time of the vessel *MR. SIDNEY* and the drilling equipment at the Innsbruck Well, and because of the set-up time required to ready such equipment for drilling once it arrived, the equipment was not ready for drilling at 21:00 hours on April 22, 2010, as per plan, and instead was not ready for drilling until 22:30 hours on April 24, 2010.

17. There was a total of 38.5 hours of "trouble time," or non-productive drill time,

{B0674410.1}                                                    6

due to the Deepwater Horizon diversion of the vessel *MR. SIDNEY* and its drilling equipment. Consequently, the Innsbruck Well did not reach the intended 16" Casing Point Depth until 03:00 hours on May 7, 2010 – 38.5 hours later than it otherwise would have.

18. This additional unproductive time was nevertheless charged to Marathon for the *NOBLE PAUL ROMANO* Drilling Vessel and 23 other service contractors on board at the time. These incremental costs will never be recouped by Marathon (other than as damages). All such damages were directly caused by the diversion of the vessel *MR. SIDNEY* pursuant to the USCG-ordered Removal and Cleanup action in response to the Oil Spill and should therefore be recoverable under 33 U.S.C. §2702(b)(1)(B). Marathon avers that losses due to the commandeering and diversion of the vessel *MR. SIDNEY* total approximately $940,944.83, plus all consequential damages for loss of profits and earning capacity. Of this claim, Marathon has been paid $880,442.56 to date.

## THE MORATORIUM CLAIM

19. As a direct and foreseeable consequence of the *Deepwater Horizon* disaster, the Secretary of the U.S. Department of Homeland Security declared the *Deepwater Horizon* incident a Spill of National Significance ("SONS") under the authority of the National Oil and Hazardous Substance Pollution Contingency Plan ("NCP") (40 CFR §300.323). The SONS declaration triggered the National Response Framework, and the ensuing multi-jurisdictional response necessarily activated every single Emergency Support Function established by the federal disaster response framework to respond to the Oil Spill.

20. On April 30, 2010, MMS and the U.S. Coast Guard ("USCG"), as a direct and foreseeable result of the Spill, issued a Joint National Safety Alert to all offshore operators and drilling contractors. This alert recommended that all operators and contractors: review the

condition and operability of well control equipment (both surface and subsea) currently being used to ensure that it is capable of shutting in the well during emergency operations; review all rig drilling/casing/completion practices to ensure that well control contingencies are not compromised at any point while a BOP is installed on the wellhead; review all emergency shutdown and dynamic positioning procedures that interface with emergency well control operations; inspect lifesaving and firefighting equipment for compliance with federal requirements; ensure that all crew members are familiar with emergency/firefighting equipment and that all personnel have been properly trained, drilled and exercised and are capable of performing in an emergency.

21. Also on April 30, 2010, as a direct and foreseeable result of the Spill, the President of the United States directed the Secretary of the Interior to conduct a 30-day review of the Deepwater Horizon explosion and Oil Spill to determine what other precautionary measures and technologies should be required of the oil and gas industry to improve the safety of industry operations on the OCS.

22. On May 7, 2010, MMS, as a direct and foreseeable result of the Spill and its environmental devastation, sent suspension letters to operators with active leases notifying them that leases would be suspended (including suspension of lessee payment/royalty requirements) to allow the Department to conduct its 30-day review.

23. In response to the President's Directive and after reviewing available information about the causes of the Oil Spill, on May 27, 2010, the Interior Secretary issued a report entitled *Increased Safety Measures for Energy Development on the Outer Continental Shelf* ("Safety Report").

24. In the Safety Report, the Secretary recommended several immediate prescriptive

{B0674410.1}                                   8

requirements and a number of longer-term performance-related safety measures to be taken to improve the safety of offshore drilling. In particular, the Safety Report targets the effectiveness of blowout preventers ("BOP"), and also calls for measures to promote the integrity of wells, to enhance well control, and to foster a culture of safety through operational and personnel management.

25. Among the measures from the Safety Report to take immediate effect was compliance by all operators with the April Joint Safety Alert within 30 days—converting those recommendations to mandates. These measures were taken as a direct and foreseeable result of the Spill and its environmental devastation.

26. On May 28, 2010, based on the Safety Report and its recommendations, which were the direct and foreseeable consequences of the Spill and its environmental devastation, the Secretary formally concluded in a Decision Memorandum that "offshore drilling of new deepwater wells poses an unacceptable threat of serious and irreparable harm to wildlife and the marine, coastal, and human environment . . . [and] that the installation of additional safety or environmental protection equipment is necessary to prevent injury or loss of life and damage to property and the environment."

27. As a direct and foreseeable result of the Oil Spill and its environmental devastation, the Secretary in the Decision Memorandum, *inter alia*, directed the MMS to suspend certain well drilling activity in the OCS. On May 30, 2010, MMS made effective a Notice to Lessees and Operators (NTL No. 2010-N04) that imposed a six-month moratorium ("May Moratorium") on the drilling of deepwater wells in the Gulf of Mexico and Pacific regions of the OCS, in light of significant risks associated with drilling in deepwater absent implementation of the recommendations from the Safety Report on safety equipment, practices and procedures.

28. Specifically, NTL No. 2010-N04 directed operators to cease drilling new deepwater wells in the Gulf of Mexico and the Pacific regions of the OCS. It also prohibited drilling any wellbore sidetracks and bypasses. Moreover, it halted spudding of any new wells. It also notified lessees and operators that MMS would not consider any new permits for deepwater wells or related activities for six months.

29. Consistent with NTL 2010-N04, the MMS, as a direct and foreseeable result of the Spill and its environmental devastation, also issued Suspensions of Operations to lessees and operators pursuant to 30 C.F.R. §250.172. The suspensions affected 33 active deepwater drilling rigs in the Gulf of Mexico.

30. On the heels of its directive to implement the deepwater moratorium, MMS issued a second Notice to Lessees and Operators of Federal Oil and Gas Leases (NTL No. 2010-N05) on June 8, 2010, calling for seven new, increased safety measures for drilling permits on the OCS. The recommendations applied to all activities (deepwater and shallow water) on the OCS, including the deepwater drilling activity suspended under NTL No. 2010-N04. These actions were taken as a direct and foreseeable result of the Spill and its environmental devastation.

31. On June 18, 2010, MMS issued a third Notice to Lessees and Operators of Federal Oil and Gas Leases (NTL No. 2010-N06) in direct response to the Oil Spill, BP's abysmal planning for a blowout and worst-case scenario, BP's failure to contain the Oil Spill and limit the Spill's environmental devastation, and BP's incapacity to adequately respond to the Spill. NTL No. 2010-N06 required all operators to adhere to revised information requirements for exploration, development and oil spill response plans to include worst-case discharge and blowout scenarios.

32. On June 22, 2010, Judge Feldman of the United States District Court for the

Eastern District of Louisiana, in response to a motion brought by a number of oil and gas drilling service industries, preliminarily enjoined the implementation and enforcement of the May Moratorium effectuated by the Department of Interior through MMS' NTL No. 2010-N04.

33. In accordance with the Court's order, in June 2010 the Department of the Interior notified lessees and operators that the suspension orders they had received were of no legal force and effect and instructed agency personnel that the first Moratorium was unenforceable.

34. On July 12, 2010, the Secretary of the Interior issued a new decision memorandum finding that, as a direct and foreseeable result of the Oil Spill and its environmental devastation, certain drilling operations should be suspended and approvals of pending or future applications of specific drilling types should be frozen until November 30, 2010 ("July Moratorium").

35. In particular, the Secretary found that, because the available response vessels, personnel and other resources were consumed with the Macondo Spill response, there was a direct, foreseeable, current, then-existing threat of further environmental devastation produced by exploration and drilling activities in the Gulf of Mexico.

36. That same day, July 12, 2010, the Department of the Interior issued individual temporary suspension letters to each of the affected operators, implementing the July Moratorium. The July Moratorium also allowed for the possibility of the July Moratorium being lifted before November 30, 2010.

37. With certain exceptions, the July Moratorium suspended drilling operations that relied on subsea BOPs or surface BOPs on floating facilities. The July Moratorium had no bearing on production activities; drilling operations that were necessary to conduct emergency activities; drilling operations necessary for completions or workovers; abandonment or

intervention operations; or water flood, gas injection or disposal wells.

38. The July Moratorium also instructed MMS to develop and gather information about safety, blowout containment capabilities, and oil spill response capability, and provide a report to the Secretary regarding potential conditions for the resumption of drilling by October, 2010.

39. On October 12, 2010, the U.S. Department of Interior announced that the federal government would lift the July Moratorium. The October announcement indicated an early end to the July Moratorium, which had been scheduled to extend through the month of November 2010.

40. On October 14, 2010, MMS published an Interim Final Rule (75 Fed. Reg. 63346), "Increased Safety Measures for Energy Development on the Outer Continental Shelf." The Interim Final Rule addressed certain recommendations from the Secretary to the President in the Safety Measures Report. The Interim Final Rule set forth new basic requirements for containment resources in its interim drilling safety rule, which incorporated many of the previously issued requirements contained in NTLs issued during the aftermath of the *Deepwater Horizon* explosion and the protracted Oil Spill response.

41. In direct and foreseeable response to the Oil Spill and its environmental devastation, on November 8, 2010, Interior issued another Notice to Lessees and Operators, specifically requiring operators engaging in activities using subsea BOPs or surface BOPs on floating facilities to provide the Department with adequate documentation demonstrating that they have access to and can deploy resources to respond to another blowout or loss of well control, such as the kind experienced in the Oil Spill.

42. On January 3, 2011, MMS notified 13 oil companies that they could resume

previously approved exploration and production activities without submitting revised plans.

43. The economic impacts of the Oil Spill and its environmental devastation affected individuals and businesses in various industries across the Gulf Coast OCS and the Pacific OCS.

44. The Oil Spill and the foreseeable governmental response to a disaster of this magnitude, including the Moratoria imposed in direct response to the Oil Spill's devastation of the coastal and marine environments, have caused and will continue to cause a loss of revenue for individuals and entities that rely on the use of the Outer Continental Shelf and its resources in connection with offshore deepwater drilling activities.

45. The Moratorium caused 43.4 days of additional out-of-pocket expenses at the Innsbruck Well which were the direct and foreseeable result of the *Deepwater Horizon* Explosion and Oil Spill. These expenses include: Phase 1 costs of temporarily abandoning the well and towing and releasing the drilling rig from the Innsbruck Well; interim costs to Phase 2; Phase 2 costs of remobilizing a rig and removing abandonment plugs; and Phase 2 costs (both differential and additional) to drill, evaluate and abandon the well and release the rig.

46. Upon issuance of the Moratorium, Marathon began the process of temporarily abandoning the Innsbruck Well and towing, re-mooring and releasing the Innsbruck rig, *NOBLE PAUL ROMANO,* at an approximate out-of-pocket cost of $9,655,708.00.

47. Innsbruck Well's additional out-of-pocket expenses between the time the Moratorium was issued and a substitute drilling rig, *MAERSK DEVELOPER,* was mobilized to complete the Innsbruck Well totaled approximately $437,617.00.

48. After the Moratorium on Deepwater Drilling and Exploration was lifted, additional expenses were incurred to mobilize the *MAERSK DEVELOPER* and to remove abandonment plugs, at an estimated out-of-pocket cost of $25,676,307.00.

49. Additional differential out-of-pocket costs for the use of *MAERSK DEVELOPER* to complete the drilling and exploration expenses at the Innsbruck Well, including drilling out the 13-5/8" well casing shoe, the resumption and completion of drilling, and abandoning and negative well testing, totaled approximately $8,802,701.00.

50. Phase 2 additional expenses for duplicate costs of pulling of the riser, setback blowout preventers and finishing mud pit cleaning, totaled approximately $2,123,390.00.

51. Marathon avers that as a result of the Moratorium, it has lost profits from increased expenses and other economic losses on the Innsbruck Well project presently calculated to total $46,695,722.00.

## THE CLAIM FOR INCREASED OPERATIONAL COSTS

52. Marathon realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

53. As a direct result of the Spill and its environmental devastation, Marathon's operational costs, including increased costs for insurance, regulatory compliance and other costs have increased, resulting in a loss of profits, and Marathon is entitled to recover from BP for such damages in amounts to be determined by the trier of fact.

## CLAIM FOR RELIEF

54. Marathon realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

55. The Oil Pollution Act, 33 U.S.C. § 2701, *et seq.* (the "OPA"), imposes liability upon a "responsible party for a ... vessel or a facility from which oil is discharged ... into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs.  33 U.S.C. § 2702.

{B0674410.1}                                                14

56. The Coast Guard has named BP as the "responsible party" under OPA for the downhole release of oil. Therefore, BP is strictly liable pursuant to 33 U.S.C. § 2702 for all damages due to or resulting from the Oil Spill and its environmental devastation.

57. Defendant BP is not entitled to limit its liability under 33 U.S.C. § 2704(a) because the Spill was proximately caused by its gross negligence, willful misconduct, or violation of applicable safety, construction or operating regulations. 33 U.S.C. § 2704(c).

58. Defendant BP is not entitled to limit its liability under 33 U.S.C. § 2704(a) because it failed to report the Deepwater Horizon Explosion and Oil Spill as required by law, and/or failed to provide all reasonable cooperation and assistance requested by officials in connection with the removal activities by misrepresenting post-spill flow rate estimates. 33 U.S.C. § 2704(c).

59. Moreover, in its "Statement of BP Exploration & Production Inc. Re Applicability of Limitation of Liability Under Oil Pollution Act of 1990," filed on October 19, 2010, BP waived the statutory limitation on liability under the OPA.

60. As a direct result of the Spill and its environmental devastation, Marathon is entitled to recover from BP for such damages in amounts to be determined by the trier of fact.

61. OPA imposes strict liability for *all* damages due to and/or resulting from the Spill and its environmental devastation. Therefore, the concepts of "superseding" or "intervening" cause are not applicable. In the alternative, the Moratoria were not "intervening" or "superseding" causes with respect to damages arising from the Oil Spill. The Moratoria, rather, were direct and foreseeable consequences of the environmental havoc wreaked by a spill designated as one of National Significance.

62. The size, scope, and breadth of the Spill's environmental damage caused

foreseeable actions by the federal and state governments, including the closures of massive portions of the Gulf to fishing and shipping. The Spill's destructive and contaminating qualities directly affected all industries in the Gulf and the federal agencies that oversee them. The Moratoria was enacted by one such federal agency within its authority to ensure the safety by affecting very narrow activities of an industry under its control.

## PRESENTMENT

63. To the extent required by law, and/or by consent and/or stipulation by BP, Marathon has satisfied all of the administrative requirements of 33 U.S.C. §§ 2713(a) and (b), by the submission of its claims to the BP OPA Claims Program, the Deepwater Horizon Court-Supervised Settlement Program and/or the Gulf Coast Claims Facility ("GCCF"), as BP's agents and/or designees.

64. In particular, on January 9, 2013 and December 4, 2012, Marathon's Claims for the *MR. SIDNEY,* commandeering losses and moratorium losses were sent, respectively, to the BP OPA Claims Program in Houston, Texas by U.S./ certified mail and via e-mail. These claims included a "sum certain" and brief descriptions of the claims presented, as well as some supporting documentation.

WHEREFORE, Marathon demands judgment against the BP Defendants, jointly, severally, and *in solido,* as follows:

(a) economic and compensatory damages for loss of profits, revenues, earning capacity, or additional out-of-pocket expenses, and/or other compensable damages as provided in 33 U.S.C. § 2702(b), in amounts to be determined at trial;

    (b)    pre-judgment and post-judgment interest at the maximum rate allowable by law;

    (c)    reasonable claims preparation expenses;

    (d)    attorneys' fees;[1]

    (e)    the costs of litigation;

    (f)    such other and further relief as the Court deems just and appropriate.

Dated:  June 27, 2013.

                                   Respectfully submitted:
                                   BALDWIN HASPEL BURKE & MAYER, L.L.C.

                                     /s/ Paul N. Vance
                                 DAVID L. CARRIGEE – Bar #3892
                                 PAUL N. VANCE - Bar #13007
                                 SCOTT L. STERNBERG - Bar #33390
                                 3600 Energy Centre
                                 1100 Poydras Street
                                 New Orleans, LA 70163
                                 Telephone: (504) 569-2900
                                 Fax: (504) 569-2099
                                 Attorneys for Plaintiff, Marathon Oil Co.

SUMMONS REQUESTED FOR
BP EXPLORATION & PRODUCTION, INC.
AND
BP AMERICA PRODUCTION COMPANY
AND
BP p.l.c.

---

1 Although this Court has dismissed similar claims for attorneys' fees asserted by Plaintiffs under general maritime law in the operative B1 Master Complaint. (Rec. Doc. 1128), Marathon realleges them here out of an abundance of caution to preserve them for potential reconsideration, appeal or other resolution.

{B0674410.1}                              17