UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig | : | MDL NO.  2179 |
| "Deepwater Horizon" in the Gulf | : | |
| of Mexico, on April 20, 2010 | : | SECTION:  J |
| | : | |
| This Document Relates to: | : | JUDGE BARBIER |
| | : | |
| *Civ. No.* 10-4536 | : | MAG. JUDGE SHUSHAN |

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

**MEMORANDUM IN SUPPORT OF THE UNITED STATES' OBJECTIONS
TO AND MOTION TO REVIEW "ORDER REGARDING MOTION TO STRIKE
REBUTTAL EXPERTS FOR THE U.S."**

# TABLE OF CONTENTS

I.     BACKGROUND ............................................................................................. 2

II.    ARGUMENT ................................................................................................... 3

    A.    Applicable Standard of Review ........................................................... 3

    B.    The Magistrate Judge Erred in Striking the Portions of the Rebuttal Reports....... 6

        1 and 2.    (Zimmerman v. Roegiers) and (Zimmerman v. Huffman):  The Magistrate Judge Erred in Striking the Portions of Dr. Huffman's and Dr. Roegiers' Expert Reports Since They Counteract Directly Positions of BP/Anadarko Experts Blunt and Zimmerman ................. 6

        3.    (Huffman v. Marchand):  The Magistrate Judge Erred in Excluding Portions of Dr. Huffman's Report that Relate Generally to the State of Compaction of the Macondo Reservoir ......................................... 12

        4.    (Zimmerman v. Kelkar): The Magistrate Judge Erred in Striking the Portions of Dr. Kelkar's Rebuttal Expert Report Regarding Rock Compressibility ................................................................................. 14

        5.    (Pooladi-Darvish v. Zimmerman): The Magistrate Judge Relied on a Mistaken Premise in Striking a Portion of Dr. Pooladi-Darvish's Rebuttal Expert Report on the Uncertainty Attributed by Dr. Blunt .. 16

        6.    (Blunt v. Kelkar): The Magistrate Judge Erred in Striking Certain Portions of Dr. Kelkar's Rebuttal Expert Report on Uncertainty and Aquifer Support that Rebut BP Experts Blunt and Gringarten ........... 17

III.    CONCLUSION ............................................................................................ 20

i

## <u>TABLE OF  EXHIBITS</u>

<u>Ex. #</u>          <u>Description</u>

Ex. 1          BP Expert Report, Martin J. Blunt, dated May 1, 2013 (*Redacted*)

Ex. 2          United States' Rebuttal Expert Report, Alan R. Huffman, dated June 10, 2013
               (*Redacted*)

Ex. 3          BP Expert Report, Robert W. Zimmerman, dated May 1, 2013

Ex. 4          United States' Letter Brief Responding to Motion to Strike Expert Testimony and
               Adjust Expert Deposition Schedule, dated June 17, 2013 (with non-confidential
               Attachments 5, 7, 9, 10 and 11)

Ex. 5          Attachment 1 to United States' Letter Brief, dated June 17, 2013 (*Confidential*)

Ex. 6          Attachment 2 to United States' Letter Brief, dated June 17, 2013 (*Confidential*)

Ex. 7          Attachment 3 to United States' Letter Brief, dated June 17, 2013 (*Confidential*)

Ex. 8          Attachment 4 to United States' Letter Brief, dated June 17, 2013 (*Confidential*)

Ex. 9          Attachment 6 to United States' Letter Brief, dated June 17, 2013 (*Confidential*)

Ex. 10         Attachment 8 to United States' Letter Brief, dated June 17, 2013 (*Confidential*)

Ex. 11         United States Reply Letter Brief to BP and Anadarko's Supplemental Briefs
               Regarding Motion to Strike Expert Testimony, dated June 20, 2013

Ex. 12         Appendix A to United States' Reply Letter Brief, dated June 20, 2013
               (*Confidential*)

Ex. 13         United States' Expert Report, Mohan Kelkar and Rajagopal Raghavan, dated
               March 22, 2013

Ex. 14         Email dated June 27, 2010 attaching Kelkar preliminary report (*Confidential*)

Ex. 15         United States' Rebuttal Expert Report, Jean-Claude Roegiers, Ph.D, dated June
               10, 2013

Ex. 16         BP Expert Report, Alain Gringarten, dated May 1, 2013 (*Excerpts*)

Ex. 17          United States' Rebuttal Expert Report, Mohan Kelkar and Rajagopal Raghavan,
                dated June 10, 2013

Ex. 18          United States' Rebuttal Expert Report, Mehran Pooladi-Darvish (without
                appendices)

On BP and Anadarko's joint motion, Magistrate Judge Shushan struck portions of the expert rebuttal reports of several of the United States' quantification witnesses.  In brief, BP and Anadarko have used their motion to strike to prevent the United States from fairly challenging Defendants' expert witnesses.  The United States hereby appeals to ensure that the Court has access to a fair picture of evidence supporting the Parties' estimates of the cumulative discharge of oil from the Macondo well. The United States files these Objections to and Motion to Review Magistrate Judge Shushan's Order Regarding BP/Anadarko's Motion to Strike Rebuttal Experts for the U.S. ("Order") issued on June 24, 2013 (Rec. Doc. 10477).  On BP and Anadarko's joint motion, Magistrate Judge Shushan struck portions of the expert rebuttal reports of several of the United States' quantification witnesses.

The United States appreciates the Magistrate Judge's ruling in a highly expeditious manner on a number of complex questions related to whether the United States' rebuttal expert reports or portions thereof are proper rebuttal reports.  Although Judge Shushan correctly identified the applicable legal standards, the ruling drew incorrect conclusions on several key disputes between the parties.  In particular, the United States' experts Drs. Roegiers and Huffman should not be precluded from testifying regarding their rebuttal opinions supporting a rock compressibility of 12 microsips for the Macondo reservoir.  Nor should the United States' expert Dr. Huffman be precluded from testifying regarding his rebuttal opinions related to the state of compaction of the Macondo reservoir, Dr. Pooladi-Darvish be prevented from testifying regarding BP's narrow uncertainty range for compressibility, or Dr. Kelkar be prevented from testifying regarding his opinions as to rock compressibility, uncertainty, and aquifer support set forth in his rebuttal report.  Each of these opinions constitute proper rebuttal to the opinions expressed by BP/Anadarko's experts.

1

## I. <u>BACKGROUND</u>

Pursuant to the Court's Order Regarding Phase Two Expert Document Production (Rec. doc. 8907), on March 22, 2013, the United States served its initial expert reports related to Phase Two.  On May 1, 2013, BP/Anadarko served their expert reports.  On June 10, 2013, the United States served rebuttal expert reports.  Shortly after receiving the rebuttal reports, BP/Anadarko objected to certain portions of some of those reports arguing they contained new material that should have been included in the United States' initial reports and requested relief from Magistrate Judge Shushan.  The Parties briefed the issue before Magistrate Judge Shushan. (Rec. docs. 10450, 10445, 10446, 104470, and 10448).

On June 24, 2013, the Magistrate Judge issued an Order Regarding BP/Anadarko's Motion to Strike Rebuttal Experts for the U.S. (Rec. doc. 10450).  Judge Shushan ruled that the United States' experts Drs. Roegiers and Huffman "may criticize the sidewall core data used by [BP/Anadarko's expert Dr.] Zimmerman, but [they] may not make affirmative calculations supportive of [the United States' expert Dr.] Kelkar's estimate of 12 microsips contained in his initial affirmative report."  Order at 4-5.  The Magistrate Judge also ruled that the portions of Dr. Huffman's report that purportedly only respond to Dr. Marchand should be stricken since Dr. Marchand has been withdrawn as an expert.  Order at 6.  The Magistrate Judge also struck a portion of Dr. Pooladi-Darvish's report on the grounds that it was not proper rebuttal to Dr. Zimmerman's report.  Order at 6-7.  Further, the Magistrate Judge struck the portions of Dr. Kelkar's rebuttal expert report regarding rock compressibility, as well as the portions of his rebuttal report on uncertainty and aquifer support that refute BP/Anadarko experts Blunt and Gringarten.  Order at 6-9. With respect, these rulings were in error.

2

## II. <u>ARGUMENT</u>

The portions of the United States' reports at issue in this appeal are proper rebuttal because they are "intended solely to contradict or rebut evidence on the same subject matter identified by another party. . . ."  Order, at 2, citing to *In re Katrina Canal Breaches Consol. Litigation*, Civil Action Nos. 05–4182, 10–866, 2012 WL 2526980, at *1 (E.D. La. June 29, 2012) (Duval, J.).  Given the importance of this litigation, it is critical that the Court allow the United States to put on its full case, rather than preclude relevant testimony based <u>on an unduly restrictive application of the governing case law</u>.  This is particularly so since Phase 2, like Phase 1, will be a bench trial.[1]  The Court is fully capable of determining the reliability, relevance, and helpfulness of expert rebuttal testimony introduced at trial.[2]

### A. <u>Applicable Standard of Review</u>

The standard of review for this appeal is *de novo*.  Rulings on non-dispositive motions by magistrate judges are reviewed under a "clearly erroneous" or "contrary to law" standard.  28 U.S.C. § 636(b)(1)(A); *see also* Fed. R. Civ. P. 72(a).  Under that standard, issues of law are reviewed *de novo* and findings of fact under the clearly erroneous standard.  *Matter of Toyota of Jefferson, Inc.*, 14 F.3d 1088, 1090 (5th Cir. 1994).  Mixed questions of law and fact, including the application of the law to the facts, are also reviewed *de novo*.  *See Payne v. United States*,

---

[1] On multiple occasions during the Phase 1 trial, the Court overruled objections or denied motions to exclude experts or expert opinions. E.g., Tr. at 271:4-23 (explaining that it was a bench trial and overruling *Daubert* motion with regard to Robert Bea); Tr. at 643:10-644:2 (denying motion to preclude Alan Huffman's testimony); Tr. at 4225:1-10 (denying *Daubert* motion and allowing Calvin Barnhill's testimony); Tr. at  6408:9-6409:7 (allowing testimony of Dr. Strickland); Tr. at  8386:25-8390:10 (overruling objection to portion of Arthur Zatarain's testimony).

[2] It is worth noting that the only expert, expert report or portion of such a report that the Court excluded prior to the Phase 1 trial was related to the imputed conflict of Fred Sabins.  The Court acknowledged that disqualification was a "harsh result," but "necessary to preserve the integrity of the judicial process."  (Rec. doc. 4838).  Such a harsh result is unwarranted here, where there has been no misconduct.  Indeed, the integrity of the judicial process could be impaired if the United States is prevented from fairly challenging BP/Anadarko's expert witnesses.

289 F.3d 377, 381 (5th Cir. 2002) (describing standard of review for appellate court reviewing district court decision); *Sandhu v. Bransom*, 932 F. Supp. 822, 826 (N.D. Tex. 1996) (citing *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (describing standard of review for district court reviewing magistrate decision); *In re: Oil Spill*, 2:10-md-02179-CJB-SS, Order Regarding the Regents of the University of California's First Amended Objections and Appeal, January 31, 2013 (Barbier, J.) (Rec. Doc. 8436); *Dat Yat Chat, LLC v. Who Dat, Inc.,* Nos. 10-1333, 10-2296 & 13-280, 2013 WL 2152139 (E.D. La. May 16, 2013) (Barbier, J.) (magistrate erred in awarding counsel attorney fees); *Borganelli v. Grand Isle Shipyard Inc.,* No. 04-2419, 2005 WL 1038104, at *1 (E.D. La. April 22, 2005) (Barbier, J.) (magistrate order compelling functional capacity exam vacated); *Standard Services Company, Inc. v. Witex USA, Inc.*, No. 02-537, 2003 WL 21000358 (E.D. La. April 24, 2003) (Barbier, J.) (three of four objections to magistrate order granted); *Chevron USA, Inc. v. Peuler*, No.. 02-2982, 2003 WL 139164 (E.D. La. Jan. 14, 2003) (Barbier, J.) (motion to review magistrate order granted quashing notice of deposition); *Meekins v. Foster*, Nos. 98-2047, 99-1471, 2000 WL 1023358 (E.D. La. July 21, 2000) (Barbier, J.) (motion to review magistrate order granted allowing leave to file amended complaint).

This appeal involves questions of law and questions of the application of law to facts. The standard of review for both is *de novo.*  As the Court stated, a rebuttal report is one which "is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C)."  Fed. R. Civ. P. 26(a)(2)(D)(ii).  Order, at 2, citing to *In re KCB Litigation*, 2012 WL 2526980, at *1.  The Court also noted that archetypal rebuttal testimony "identifies a flawed premise in an expert report that casts doubt on both that report's conclusions and its author's expertise."  *Scientific Components Corp. v. Sirenza Microdevices,* 2008 WL 4911440 *2 (E.D.N.Y. Nov. 13, 2008).  Those standards were misapplied here.

4

A rebuttal report is appropriate so long as it counteracts opinions identified by another party in its initial expert reports served under Rule 26(a)(2)(B) or (C).  As Judge Duval has explained:

> An opening expert report is an early salvo in the process of defining issues for trial, and thus it is more understandable at the expert discovery stage that a party may need to include significant elaboration in a rebuttal report to challenge the assertions of the opponent's expert reports. [3]

*In re KCB Litigation*, 2012 WL 2526980, at *1.  The United States' rebuttal reports therefore must respond to evidence, including opinions, raised in BP and Anadarko's initial expert reports, not in the defendants' Rule 30(b)(6) or other testimony or documents.  Clearly, the United States' rebuttal reports are appropriate under the standard set forth by Judge Duval in *Katrina* since they reply directly and specifically to the compressibility and other issues raised in the defendants' expert reports.[4]

---

[3] *See e.g. Pakootas v. Teck Cominco Metals, LTD., 2012 WL 183397 (E.D.Wash)*; *Bone Care International, LLC v. Pentech Pharmaceuticals, Inc.,* 2010 WL 3894444 *14-16 (N.D.Ill); *Scientific Components Corp. v. Sirenza Microdevices,* 2008 WL 4911440 *2-3 (E.D.N.Y.); *Long Term Capital Holdings v. U.S*, 2003 WL 21518555 *2 (D.Conn.).

[4] BP and Anadarko have tried to create a standard that does not exist, cherry-picking passages from reports to mischaracterize the opinions of the United States' experts and dredge up hundreds of pages of exhibits in an attempt to show when the United States was "on notice" that BP was "contesting" various input parameters.  Respectfully, the "notice" inquiry BP invites the Court to undertake is totally irrelevant to the issue at hand.  Under BP/Anadarko's proposed rule, the United States would be required to anticipate every foreseeable argument on every foreseeable issue and provide full expert reports rebutting those arguments without ever having actually seen them.  That is not, and has never been, the rule for whether a rebuttal report is proper, because that rule would require opening reports to include "vast amounts of arguably irrelevant material …on the off chance that failing to include any information in anticipation of a particular criticism would forever bar the expert from later introducing the relevant material."  *In re KCB Litigation*, 2012 WL 2526980 at *1 (internal quotations omitted).

**B.  The Magistrate Judge Erred in Striking the Portions of the Rebuttal Reports.**

For the Court's convenience, we use the numbering system and shorthand descriptions employed in the Order, as set out below.

> **1 and 2. (Zimmerman v. Roegiers) and (Zimmerman v. Huffman):  The Magistrate Judge Erred in Striking Portions of Dr. Huffman's and Dr. Roegiers' Expert Reports Since They Counteract Directly Positions of BP/Anadarko Experts Blunt and Zimmerman**

Drs. Roegiers' and Huffman's should be allowed to rebut Drs. Blunt and Zimmerman regarding rock compressibility.  Rock compressibility, also unfortunately called "Uniaxial Pore Volume Compressibility" ("UPVC") is an important building block to the material balance flow estimation technique used by BP/Anadarko expert Dr. Blunt and United States expert Dr. Kelkar. Indeed, the results produced by this technique are particularly sensitive to the rock compressibility parameter.

*UPVC at the time of the Spill*.  As discussed in the United States' letter briefs to Judge Shushan on June 17 and June 20, 2013, and in the United States' initial expert reports, the United States' experts Drs. Kelkar and Hsieh relied on the scientific estimate of UPVC provided by BP to the United States during the well integrity testing period in mid-July 2010.[5]

In July 2010, BP performed a variety of simulations of reservoir pressure response and conditions in preparation for the attempt to shut in the well by placement of the capping stack.[6] Robert Merrill, then BP's Senior Advisor for Reservoir Engineering Community of Practice, was

---

[5]Ex. 4 (United States' letter brief, June 17, 2013, at 4-5); Ex. 11 (United States' reply letter brief, June 20, 2013, at 2-3; Ex. 12 (United States' reply letter brief, Appendix A).

[6]Ex. 4 (United States' letter brief); Ex. 5 (United States' letter brief, attachment 1, Ex. 10841);  Ex. 6 (United States' letter brief, attachment 2, Ex. 9320); Ex. 7 (United States' letter brief, attachment 3, Ex. 10845); Ex. 8 (United States' letter brief, attachment 4, Ex. 10853).

6

responsible for performing this reservoir modeling.[7]  Rock compressibility was one of the inputs to this modeling.[8]  Based on the Weatherford rotary sidewall core tests, BP previously had concluded that the compressibility of the reservoir was most likely 6 microsips.  However, during the well-integrity testing period, Kelly McAughan, then BP's liaison with the United States science team, recommended that Mr. Merrill use a new "most likely" compressibility of 12 microsips as an input to the modeling based on a discussion with another BP in-house reservoir engineering expert.  Mr. Merrill implemented this recommendation in a number of the simulations that he supervised or performed in July 2010.[9]

At his deposition, Mr. Merrill testified that BP determined that it was "prudent" to use a compressibility value of 12 instead of 6 microsips as the recommended input for modeling purposes after an internal discussion at which David W. Schott, one of BP's reservoir engineers, presented evidence based on his experience in the Galapagos field, a field which includes the nearby Isabela and Santa Cruz wells, that "core volume compressibility determined from sidewall cores [like those taken from the Macondo reservoir] was lower than pore volume compressibility based on whole core."[10]

BP's recommendation to use a compressibility of 12 microsips is documented in a number of communications between July 6 and July 8, 2010 among various BP employees,

---

[7] Ex. 4 (United States letter brief, attachment 5 (Deposition of Robert Merrill, January 15, 2013, at 34-44); Ex. 5 (United States' letter brief, attachment 1, Ex. 10841); Ex. 6 (United States' letter brief, attachment 2, Ex. 9320); Ex. 7 (United States' letter brief, attachment 3, Ex. 10845); Ex. 8 (United States' letter brief, attachment 4, Ex. 10853).

[8] Ex. 5 (United States' letter brief, attachment 1, Ex. 10841).

[9] Ex. 6 (United States' letter brief, attachment 2, Ex. 9320); Ex. 7 (United States' letter brief, attachment 3, Ex. 10845); Ex. 8 (United States' letter brief, attachment 4, Ex. 10853).

[10] Ex. 4 (United States letter brief, attachment 5 (Deposition of Robert Merrill, at 212-214, 394-395, 479, 486-487).

including David Schott, Robert Merrill, Kelly McAughan, and Stephen Willson, the geomechanics expert responsible for the Macondo well.[11]   After an extended discussion, Ms. McAughan wrote: "How about we use 6-12-18."  Mr. Willson responded: "That sounds very reasonable to me Kelly."  Mr. Merrill followed by stating: "Me too."[12]

   *UPVC in the US Original Reports.*  Contrary to BP/Anadarko's claims, the United States provided a scientific estimate of UPVC in its initial expert reports, and -- not surprisingly in light of the foregoing -- the experts for the United States used a UPVC of 12 microsips, BP's "most prudent" number.  As Dr. Zimmerman acknowledges, "[t]he report of Drs. Kelkar and Raghavan includes a material balance analysis that uses a base UPVC of 12 microsips as one of its inputs. Citing a July 8, 2010 PowerPoint presentation by Robert Merrill, Drs. Kelkar and Raghavan claim 'this is the most likely value of formation compressibility. . . ."  Dr. Zimmerman also notes that Dr. Paul Hsieh used a UPVC of 12 microsips based on information provided to him by BP employees Kelly McAughan and Bob Merrill.  Ex. 3 (Zimmerman Report at 20-21).[13]

   *UPVC in the Defendants Reports.*  In his expert report, Dr. Blunt rejects BP's "most prudent" estimate of 12 and uses a rock compressibility of 6 microsips in his material balance

---

[11]Ex. 10 (United States letter brief, attachment 8 (Exs. 8769-8777).

[12]Ex. 10 (United States letter brief, attachment 8 (Exs. 8776).

[13] Both the Court and BP/Anadarko mention that Dr. Kelkar submitted a preliminary report on behalf of the Flow Rate Technical Group ("FRTG") in June 2010 that used a rock compressibility of 5.61 microsips – not the 12 microsips used in Dr. Kelkar's March 22, 2013, expert report.  Order at 4. Of course, such a discrepancy should be the subject of cross examination, not the subject of an exclusion order.  Moreover, the key difference between the two numbers used is that when Dr. Kelkar wrote his preliminary report in June 2010, only the flawed Weatherford data was available to Dr. Kelkar. Ex. 14 (Email from Dr. Kelkar attaching Preliminary Report, June 27, 2010, at 17). BP had not had its July 2010 internal discussion in which it concluded that the Weatherford rotary sidewall core data was likely to underestimate the UPVC at Macondo by a factor of two.  BP also had not recommended that a UPVC of 12 microsips be used to determine the integrity of the well in mid-July 2010.  In contrast, when Dr. Kelkar wrote his Phase 2 expert report that was served on March 22, 2013, he was aware of and relied on BP's internal discussions and conclusion in mid-July 2010 that 12 microsips was the best scientific estimate of rock compressibility for the Macondo reservoir. Ex. 13 (Kelkar Report at 28).

calculation.  Dr. Blunt's material balance equation has three inputs:  initial oil volume in the reservoir, total compressibility (which includes rock compressibility), and the difference between the initial and final reservoir presure.  Dr. Blunt states that the main difference between his compressibility estimate and those of Dr. Kelkar and another United States expert Dr. Hsieh is that they double the value purportedly measured on Macondo rock samples by the Weatherford laboratory.  Dr. Blunt criticizes Dr. Kelkar's use of a rock compressibility of 12 microsips in his material balance calculation, and Dr. Hesih's use of a rock compressibility of 12 microsips in his reservoir simulation.  As Dr. Blunt indicates, if a rock compressibility of 12 instead of 6 microsips is used, the cumulative oil flow from the Macondo well is much greater than Dr. Blunt's projected estimate.  Ex. 1 (Blunt Report at 6-7, 29-32).

Dr. Zimmerman not only concludes that "[b]ased on measurements by Weatherford Laboratories of pre-incident rotary sidewall core rock samples, 6.35 microsips is the best estimate of the average UPVC [uniaxial pore volume compressibility] of the Macondo Reservoir."  He also concludes that "[a] value of UPVC on the order of 12 microsips, which is used by some United States experts, is not consistent with, and is not supported by any available data, including data from Weatherford's tests."  Ex. 3 (Zimmerman Report at 6-7).  The Magistrate Judge's Order incorrectly permits the United States to rebut the former, but not the latter opinion of Dr. Zimmerman.  This creates an untenable scenario where the United States is permitted to challenge the compressibility value calculated by Dr. Zimmerman, but not respond to his criticism of the rock compressibility values estimated by the United States and BP's internal experts at the time of the spill.

*The Rebuttal Reports*. In rebuttal, Drs. Roegiers and Huffman did two things:  they criticized and identified flawed premises in the Weatherford Laboratories' results used by Dr.

Zimmerman and the use of 6 microsips by Dr. Blunt; and they also supported the 12 microsips

rock compressibility number originally used by Drs. Kelkar and Hsieh.

Drs. Huffman and Roegiers were entitled to present evidence to refute and identify

flawed premises in Dr. Blunt's criticism in his expert report of the rock compressibility values

used by Drs. Kelkar and Hsieh in their initial expert reports.  For instance, with respect to Dr.

Blunt's report, Dr. Huffman states:  "The combination of the use of unreasonably low

compressibilities combined with unreasonably low permeabilities suggests to me that the total

material balance calculations of Dr. Blunt are underestimating significantly the total amount of

oil that was available to flow and that may have been produced from April 20 until the well was

finally shut in."  Ex. 2 (Huffman Report at 12, 43).  Drs. Roegiers and Huffman also should be

able to contradict or rebut evidence and identify flawed premises and methodologies relied on by

Zimmerman to conclude that a value of 12 microsips used by the United States' experts is

unsupported by the data, including by contradicting or rebutting flawed premises regarding the

Weatherford data relied on by Dr. Zimmerman.

Moreover, they are entitled to rebut the opinions of Drs. Blunt and Zimmerman that Drs.

Kelkar's and Hsieh's reliance on the opinions of BP's internal experts was unreasonable.  For

example, in *Scientific Components Corp. v. Sirenza Microdevices,* 2008 WL 4911440 *2, the

court ruled that a seller of amplifiers was not entitled to strike the rebuttal report of a new expert

witness in an action alleging breach of warranty.  There, the seller contended that the expert

witness' report was not rebuttal, but rather a de novo expert report submitted on the eve of trial.

However, a review of the new witness' report showed its central argument to be that the report of

the other party's expert conflated oscillation with noise, and that this confusion led the other

expert to draw a variety of unjustified conclusions regarding the amplifiers' performance and

merchantability.  The court held that the new witness had provided archetypal rebuttal testimony since the report identified a flawed premise that cast doubt on the conclusions of the other party's report.  The court reasoned that when "the alleged confusion in the report in chief turns on a subtle scientific distinction that neither side's experts have previously discussed, it is not only permissible but also obligatory for the rebuttal expert report to provide technical background information adequate to illustrate the point."  *Id.* at *2.

Here, Drs. Blunt and Zimmerman conclude, without significant explanation, that Drs. Kelkar's and Hsieh's reliance on the opinions of BP's internal experts was unreasonable.  One of Dr. Huffman's central arguments is that based on the comparison of the Macondo core testing data to core testing data from an analog well (Isabela), BP's decision to use 12 microsips as an input for rock compressibility during the  well integrity testing period was reasonable.  Ex. 2 (Huffman Report at 12, 39-40).  Similarly, a review of the rebuttal report of Dr. Roegiers shows that one of his basic arguments is that when a correction factor is applied to the sidewall cores taken by the Weatherford laboratory, BP's determination to use 12 microsips for rock compressibility during the well integrity period was reasonable.  Ex. 15 (Roegiers Report at 2, 12-14, Appendix B).  As a result, it is not only permitted, but the United States' rebuttal experts have a duty to provide technical information  adequate to criticize Drs. Blunt's and Zimmerman's opinions and support those of Drs. Kelkar and Hsieh regarding whether 12 microsips is the best estimate of rock compressibility for the Macondo reservoir.

*Conclusion.*  During the response, BP held out 12 microsips as the best rock compressibility value to use in understanding the Macondo well.  Now, in litigation, the company has decided that 12 microsips is too high and provided expert opinion that six is the appropriate number.  Rather than litigate the merits of the appropriate compressibility, however,

BP and Anadarko have sought to preclude the United States from presenting evidence on the topic.  The Court should grant the United States' appeal so that the Court may consider the full range of evidence on this issue, rather than the constrained record in which BP and Anadarko seek to take refuge.

### 3. (Huffman v. Marchand):  The Magistrate Judge Erred in Excluding Portions of Dr. Huffman's Report that Relate Generally to the State of Compaction of the Macondo Reservoir

At the time BP/Anadarko served their responses to the United States' expert reports, BP/Anadarko also disclosed that a non-retained expert employed by BP, Dr. Ann Marchand, would testify as to the temperature effect on rock hardness and compaction rate, as well as the minerology effect on rock hardness and compaction rate.  The day after the United States served its reply reports, however, BP/Anadarko withdrew Dr. Marchand by letter to the parties, and included in their motion a request to strike portions of Dr. Huffman's report responsive to Dr. Marchand's opinions.  The Magistrate Judge, in addition to striking the summary portions of Dr. Huffman's report that specifically replied to Dr. Marchand's disclosure (parts of pages 11-13, 44, 45, 73, 74, and 75 of Dr. Huffman's report), also ordered excluded Dr. Huffman's general analysis of the state of compaction of the Macondo reservoir (pages 44-74).  Order, at 5-6. Because this general analysis also serves as rebuttal to Drs. Zimmerman and Blunt, it should not be excluded.

The state of compaction affects the rock properties of the reservoir, including the values of compressibility and permeability, which in turn impact how oil moves through the reservoir and the rate of flow.  In his section entitled, "Analysis of the Compaction and Cementation State of the Macondo M56 Reservoirs," Dr. Huffman's first subsection is, "BP Comments on Compaction and Cementation State of the Macondo Reservoir."  Ex. 2 (Huffman Report at 44).

12

Dr. Huffman begins the subsection by stating, "*BP experts* have made certain assertions regarding the compaction and cementation state of the Macondo M56 Reservoir in support of their claims that (1) the reservoir permeabilities are lower than prognosed by United States Experts, and (2) the compressibilities are lower because of these effects." *Id.* (emphasis added).[14] Dr. Huffman's opinions related to the minerology and cementation of the reservoir contained in this section are not exclusively in response to Dr. Marchand. For instance, in his report, Dr. Blunt asserts that "[t]he minerology of the sandstone suggests a relatively incompressible rock compared to other samples from the Gulf of Mexico," and that "there is likely a relatively high degree of cementation (the grains are stuck or fused together)." Ex. 1 (Blunt Report at 61).

Dr. Huffman's opinions that follow under the next heading, "Opinion Regarding the Current Pressure, Temperature and Rock Properties of the Macondo M56 Reservoirs," also are not simply in response to Dr. Marchand. For example, Dr. Huffman opines that the "compressibility of the reservoir declines significantly as porosities drop into the 10-15 percent range (much lower than the porosities at Macondo)." Huffman Report at 73-74. This is in direct rebuttal to Dr. Blunt, who asserts that the porosity range at Macondo suggests a lower compressibility than Dr. Huffman believes is reasonable based on the state of compaction of the reservoir. Blunt Report at 60-62. In his analysis, Dr. Huffman also addresses the effect of saturating fluid on reservoir properties and pressures. Huffman Report at 60. This is in rebuttal to Dr. Zimmerman, who relies on the Weatherford Laboratories tests to derive his

---

[14]Section VI of Dr. Huffman's report summarizes Dr. Marchand's disclosure, but does not summarize the reports of Drs. Blunt and Zimmerman, because previous sections of Dr. Huffman's report introduced their opinions and responded to aspects of those opinions.

compressibility value, despite the fact that the tests were not conducted under saturating conditions present at the reservoir.  Ex. 2 (Huffman Report at 38-39).

These examples demonstrate that Dr. Huffman's analysis of the state of compaction and cementation of the Macondo M56 reservoir should not be stricken as a result of BP/Anadarko's withdrawal of Dr. Marchand.  Rather, Dr. Huffman's analysis in this section bears on more generally on the rock properties of compressibility and permeability addressed in the reports of Drs. Blunt and Zimmerman, and is appropriate rebuttal to their conclusions.

**4.  (Zimmerman v. Kelkar): The Magistrate Judge Erred in Striking the Portions of Dr. Kelkar's Rebuttal Expert Report Regarding Rock Compressibility**

The Magistrate Judge erred by striking portions of Dr. Kelkar's rebuttal expert report where the authors state that they stand by their original analysis based on the work of Huffman and Roegiers.  This ruling should be over turned for two reasons.

First, as discussed in Section II.B., *supra*, the opinions of Drs. Roegiers and Huffman regarding PVC were proper rebuttal to BP's new estimate of UPVC (contradicting BP's earlier representations to the United States during the Macondo response). Thus, the corollary exclusion of Dr. Kelkar's report should be overturned.

Second, regardless of whether he *adopts* the PVC values presented by other U.S. experts, Dr. Kelkar certainly should be free to *reject* the analysis of BP's litigation experts as unreliable.

The Magistrate Judge struck, inter alia, the following paragraph from the rebuttal report of Dr. Kelkar, reasoning that "[t]o the extent that Roegiers' and Huffman's reports have been stricken, the corresponding portions of the Kelkar and Raghavan report likewise must be struck." Order at p. 6.

14

> Based on analyses by United States experts Drs. Roegiers and Huffman, we conclude that, despite the conclusions set forth in the report by Dr. Zimmerman on behalf of BP, our most likely value of formation compressibility from our initial report – 12 microsips – is reasonable.

Ex. 13 (Kelkar Report, at 5).

> In our original report, we used a formation compressibility value of 12 microsips. We justified the use of this value based on what BP presented during the Macondo crisis. . . . Dr. Blunt criticizes our selection of this value. He uses a value of 6 microsips as a base case. Dr. Blunt justifies his use of 6 microsips based on rotary sidewall core compressibility measurements taking from the Macondo well. However, as discussed in detail by United States experts Drs. Alan Huffman and Jean-Claude Roegiers, sidewall core measurements are not as reliable as full core measurements. Further, they conclude that it is likely that the values observed in the sidewall cores are substantially lower than the reservoir's effective core compressibility values. Based on BP's original presentation and the conclusions of Drs. Huffman and Roegiers, we conclude that the value of 12 microsips used in our original report is reasonable.

*Id.* at pp. 15-16. However, the Magistrate Judge also permitted Roegiers and Huffman to testify regarding "core tests," ruling that Drs. Roegiers and Huffman offered *proper* rebuttal opinions criticizing BP expert Zimmerman's PVC estimates, including their opinions that Zimmerman's work cannot be used to assign a reliable UPVC value because it is based on a flawed premise, inaccurate data, and improper testing conditions.  Order, at pp. 3-5.

Accordingly, it is proper rebuttal for Dr. Kelkar, based on the work of Drs. Roegiers and Huffman criticizing Zimmerman, to reject the PVC estimates that Zimmerman developed for this litigation because of the core test issues, and use the PVC value they used in their initial report – the same number that BP represented to United States government representatives in July 2010 during the Macondo response as a most likely value.

**5.   (Pooladi-Darvish v. Zimmerman):   The Magistrate Judge Relied on a Mistaken Premise in Striking a Portion of Dr. Pooladi-Darvish's Rebuttal Expert Report on the Uncertainty Attributed by Dr. Blunt[15]**

The Magistrate Judge clearly erred in excluding a portion of Dr. Pooladi-Darvish's rebuttal expert report relating to the uncertainty surrounding Dr. Blunt's compressibility values. The Magistrate Judge ruled that this portion of Dr. Pooladi-Darvish's opinion was not responsive to any argument made by Dr. Zimmerman.  However, the stricken discussion was clearly in a section of the report responding to Dr. Blunt.  The Magistrate Judge therefore erred in excluding this portion of the report.

Dr. Pooladi-Darvish opined, in a section of his report entitled "Key Weaknesses in the works of Defendants' experts – Dr. Blunt – Compressibility," that there was significant uncertainty in what the compressibility could be.  Ex. 18 (Pooladi-Darvish Rebuttal Report at 28).  While Dr. Pooladi-Darvish used the same base value for compressibility as Dr. Zimmerman (and therefore Dr. Blunt), Dr. Pooladi-Darvish opined that, with no additional information other than the sidewall core data, it would not be possible to rule out a wide range of compressibility values.  Thus, reasoned Dr. Pooladi Darvish, Dr. Blunt should not have claimed that the range of possible compressibilities is small.  Ex. 18 (Pooladi-Darvish Rebuttal Report at 28).

The Magistrate Judge struck a portion of this section on the grounds that the opinions were not responsive to Dr. Zimmerman's expert report.  Order at 7.  This finding was irrelevant and should not have been used to justify striking the passage, because the context of the passage made clear that Dr. Pooladi-Darvish was not critiquing Dr. Zimmerman (in fact, Dr. Pooladi-Darvish used the same base compressibility value as Dr. Zimmerman, so there was no need for

---

[15] This portion of the Magistrate Judge's ruling is currently subject to a partial motion for reconsideration due to the fact that it was based on a mistaken premise.  The argument is contained in this brief in the event the Magistrate Judge does not grant the motion for partial reconsideration.

such a critique), but instead was critiquing Dr. Blunt for putting too much faith in one set of measurements.  Dr. Blunt, in fact, varied his compressibility values between approximately 4.3 and 8.6 microsips.  Dr. Pooladi-Darvish believed the variation could be over a wider range, and thus modeled cases varying compressibility between 3 and 12 microsips.  Had Dr. Blunt considered a case with 12 microsips, he would have calculated a cumulative discharge of over 4 million barrels.  Dr. Pooladi-Darvish's critique of the compressibility uncertainty range used by Dr. Blunt was thus part of a more general critique that Dr. Blunt relied solely on a methodology (the material balance method) that was highly sensitive to a small number of inputs, and that Dr. Blunt failed to properly acknowledge the uncertainty around those inputs.  Ex. 18 (Pooladi-Darvish Rebuttal Report at 26-28).

The Magistrate Judge relied upon a mistaken premise – that Dr. Pooladi-Darvish's Rebuttal Report should have been responsive to Dr. Zimmerman – in striking a portion of Dr. Pooladi-Darvish's Rebuttal Report.  Because Dr. Pooladi-Darvish's discussion of the uncertainty surrounding compressibility was a proper rebuttal to Dr. Blunt, the Magistrate Judge erred in striking it.

6. **(Blunt v. Kelkar): The Magistrate Judge Erred in Striking Certain Portions of Dr. Kelkar's Rebuttal Expert Report on Uncertainty and Aquifer Support that Rebut BP Experts Blunt and Gringarten**

*Summary.*  The Magistrate Judge erred in excluding Dr. Kelkar's Monte Carlo uncertainty analysis and their assumptions and analysis regarding the existence of an aquifer.[16] Order, at p. 7-9.  The stricken opinions are proper rebuttal and are clearly nothing more than "elaboration" to "to challenge the assertions of the opponent's expert reports."  *In re KCB*

---

[16] "**Aquifer drive**: Ground water located below the hydrocarbons in a reservoir may exert pressure in the reservoir 'driving' the oil or gas out."  Ex. 13 (Kelkar Expert Report, at 32).

*Litigation*, 2012 WL 2526980, at *1.  First, the Magistrate Judge incorrectly deemed the Kelkar Monte Carlo analysis a "new method of calculation," when, in fact, it is simply an uncertainty analysis rebutting BP expert Blunt's flawed uncertainty analysis.  Order, at pp. 7-8.  Second, the Magistrate Judge also erred by striking Dr. Kelkar's analysis involving the existence of an aquifer concluding that it was "not proper rebuttal opinion when no expert on behalf of BP/Anadarko has opined regarding the affirmative existence of an aquifer," Order at p. 9,  when in fact it rebuts two BP experts on a technical issue.  Both Blunt and Gringarten contend there is *no aquifer support* for the Macondo reservoir.  The absence of such an aquifer drives down Gringarten's and Blunt's estimates of oil released.  Dr. Kelkar specifically rebuts Gringarten's and Blunt's conclusions regarding an aquifer and demonstrates the impact that such an aquifer would have – increasing the amount of oil released.  With regard to both the Monte Carlo uncertainty analysis and the issue of aquifer support, Dr. Kelkar simply "identifies a flawed premise in an expert report that casts doubt on both that report's conclusions and its author's expertise."  Order at p. 2-3 (citing *Scientific Components Corp.*, 2008 WL 4911440, at *2).

 *Rebutting Blunt's Uncertainty Analysis*.  The Kelkar Monte Carlo simulation is simply an uncertainty analysis that examines the probability distribution of Dr. Kelkar's material balance calculations – in this case the amount of oil released from the Macondo reservoir.  It is not "a new method of calculation" as described by the Magistrate Judge.  Order, at p. 7.  Rather, it is an uncertainty analysis offered in direct rebuttal to the myopic uncertainty analysis offered by BP expert Blunt.  Indeed, Blunt devotes an entire section of his report to opinions on "Statistical analysis and a likely range of oil released."  Ex. 1 (Blunt Report, Sec. 5.2.2, at 49).[17]  He states

---

[17] Gringarten provides a range of estimates for cumulative oil released but does not explain what kind of uncertainty analysis, if any, he performed.

that his uncertainty range is +/-12% (excluding completely the potential effect of aquifer drive) and states that, "The approach taken here in the determination of cumulative flow is more robust and avoids the unsupported extrapolations, poor analysis and scant regard for measured data in the Government's analyses." *Id.* at 50. Dr. Kelkar responds to Blunt's uncertainty analysis and his criticism of the "Government's analyses" with one of his own. This is appropriate rebuttal.

*Rebutting the Aquifer Issue.* Dr. Kelkar's analysis of aquifer impacts is proper rebuttal to BP experts Gringarten and Blunt. Dr. Kelkar specifically addressed aquifer impacts in his initial report.

> We do not include the influence of water influx since only limited knowledge regarding the size and the strength of aquifer support in the Macondo reservoir is available. As a result, our estimates are conservative in that they are low.

Ex. 13 (Kelkar Report, at 28). In addition, in Appendix C to his initial report, Dr. Kelkar included a "Parameter Variation and Sensitivity Analysis" where he "examine[s] the sensitivity of the reservoir material balance calculations"[18] to, among other things, "aquifer support." Id. at 41. Dr. Kelkar specifically noted that his "estimates are conservative" because he did not "quantify the influence of water influx from an aquifer." However, he went on to say:

> If we include the influence of aquifer, the amount of oil spilled would increase as the strength of the aquifer increases. In the BP presentation by Merrill, there is some consideration of aquifer support with some reduction in the permeability value indicating that there is a possibility of aquifer support in this reservoir. In that presentation, BP identified the Macondo reservoir as having aquifer support and considered aquifer sizes ranging from 1.5x to 3.7x the size of the oil reservoir. If the aquifer properties are similar to the reservoir properties, this sized aquifer can result in a significant increase in the oil released from the reservoir.

Id. at 45, Appendix C.

---

[18] In addition to their Capping Stack calculations.

In response to that report, two BP experts, Gringarten and Blunt, attempt to minimize the amount of oil released from the Macondo reservoir by claiming that there is no aquifer support, despite the representations made to the U.S. government during July 2010.  *See* Ex. 1 (Blunt Report, at 47; Ex.16 (Excerpts from Gringarten Report, at 35, 59).  Dr. Kelkar explicitly states his disagreement with Gringarten and Blunt in his rebuttal report.  *See* Ex. 17 (Kelkar Rebuttal Report, at  22 and C-1).  Indeed, one of the portions of the Kelkar rebuttal report the Magistrate Judge incorrectly struck states:

> Although both Dr. Blunt and Dr. Gringarten claim that an aquifer is absent based on their pressure derivative analysis, as we have discussed in the previous section, the derivative analysis is extremely sensitive to the rate profile assumed prior to shut-in. In the absence of reliable rate data, the derivative values can be significantly influenced by assumed rates just prior to shut-in. Therefore, any conclusions drawn based on derivative analysis are unreliable.

Ex. 17 (Kelkar Rebuttal, Appendix C-1).  Dr. Kelkar then offers a rebuttal analysis, which demonstrates the impact such an aquifer would have on total oil released and that Blunt's and Gringarten's uncertainty ranges are unreliable because they failed to account for the potential impact of an aquifer.  This is proper rebuttal and simply elaborates on Dr. Kelkar's aquifer examination in his initial report.  *See In re KCB Litigation*, 2012 WL 2526980, at \*1.

## III. CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court review and reverse the Magistrate Judge's Order entered June 24, 2013 Regarding the BP/Anadarko's Motion to Strike Rebuttal Experts for the U.S. [Rec. Doc. 10450].  The excluded opinions are proper rebuttal and are necessary for the United States to fully present its evidence on potentially important issues in the Phase Two trial.

Respectfully submitted,

/s/ Steven O'Rourke
STEVEN O'ROURKE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone: 202-514-2779
Facsimile: 202-514-2583
E-mail: steve.o'rourke@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

Date:  June 27, 2013                          /s/ Steven O'Rourke
                                              Steven O'Rourke