# Exhibit 4



**U.S. Department of Justice**
Environment and Natural Resource Division

*P.O. Box 7611*
*Washington, DC 20044*
*202-616-6537*
*Aristide.Chakeres@usdoj.gov*

June 17, 2013

**BY ELECTRONIC MAIL**
United States District Court
Eastern District of Louisiana
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

   Re: MDL 2179 — Response to Motion to Strike Expert Testimony and Adjust
      Expert Deposition Schedule

Dear Judge Shushan:

  The United States writes in response to the letter from BP and Anadarko seeking to strike certain expert testimony and adjust the expert deposition schedule. For the reasons stated below, the rebuttal expert reports served by the United States are entirely appropriate, and the relief requested by BP and Anadarko should be denied in its entirety.[1]

  In a nutshell, the Court ordered an expert disclosure schedule in which the United States had to go first, but retained opportunity to disclose rebuttal reports after seeing Defendants' reports. Defendants served *16* quantification experts reports (including two reports tucked away as appendices to a third report). As expected, Defendants are aligned against the United States on this issue. In response, the United States served rebuttal from its six original experts, along with rebuttal from six newly-disclosed experts – each of whom deals with a specialty topic raised in Defendants' 16 reports, and in some cases deals with a method of estimation used by Defendants different from those used in the opening reports of the United States.

  The United States responded to Defendants' 16 reports with a reasonable number of rebuttal reports, and should be allowed to present that evidence at trial. As Judge Duval has explained, "An opening expert report is an early salvo in the process of defining issues for trial,

---

[1] The United States submitted a letter brief on June 14, 2013 regarding the deposition of Dr. Mehran Pooladi-Darvish. The arguments contained in that letter brief are not repeated here, although the United States reserves the right to respond to any additional arguments that BP and Anadarko may present regarding that deposition.

and thus it is more understandable at the expert discovery stage that *a party may need to include significant elaboration in a rebuttal report to challenge the assertions of the opponent's expert reports.*"  *In re Katrina Canal Breaches Consol. Litigation*, Civil Action Nos. 05–4182, 10–866, 2012 WL 2526980, at *1 (June 29, 2012 E.D. La.) (internal citations omitted) (emphasis added).[2] If courts adopted BP and Anadarko's apparent position that a plaintiff's initial expert reports must address in detail every potentially relevant factor, "[s]uch a rule would lead to the inclusion of vast amounts of arguably irrelevant material in an expert's report on the off chance that failing to include any information in anticipation of a particular criticism would forever bar the expert from later introducing the relevant material." *Id.*

In response to entirely predictable and appropriate rebuttal reports served by the United States, BP seeks a three-pronged set of extraordinary relief.  First, BP seeks to strike "all of the improper new opinions" in the United States' rebuttal reports (without specifying the full set of what it considers improper).  Second, BP seeks a ***third*** day of deposition for the United States' experts.  Third, BP seeks leave to elicit ***new opinions*** from its experts at deposition.  Finally, BP asserts that the deposition schedule must be revamped as a result of its requested relief.

Below, we respond to the specific allegations that BP has raised thus far.  Nothing BP has presented so far, however, and indeed nothing it can present based on the facts of the situation, can begin to warrant the extraordinary relief the company seeks.

***First***, the United States' rebuttal reports are proper rebuttal in that they "contradict or rebut evidence on the same subject matter identified by another party." *Id.*  That the new reports are true rebuttal can be demonstrated by the fact that they are not necessary to our case-in-chief. For instance, if BP had not decided to make a stand on compressibility – with opinions from three retained experts and the now-withdrawn Dr. Marchand – there would be no need for the United States to present the compressibility opinions of Drs. Huffman and Roegiers.  If BP chooses not to address compressibility at trial, Dr. Huffman and Roegiers need not testify at all on that topic.

***Second***, giving BP a third day of deposition of the United States' experts is not necessary and would only further complicate scheduling the depositions.  Two days is more than enough to explore the full set of the experts' opinions.  If a third day was contemplated, it would be more appropriate for some of BP's experts, such as Dr. Blunt, who set forth more than 150 pages of opinion on a variety of topics.  The fact that United States' experts provided two reports – with much less total rhetoric – does not merit a third day.

***Third***, allowing BP to elicit new opinions from *its* experts in their depositions allows BP to spring new opinions on the United States without any warning or time to prepare.  This would be a dramatic departure from the practice in this case and the rules of expert litigation.

***Finally***, BP and Anadarko's complaints should not result in an overhaul of the deposition schedule.  The Parties picked the current dates with the knowledge that the United States'

---

[2] Notably, Judge Duval only excluded the portion of the expert opinion that was disclosed well *after* the deadline for rebuttal reports.  *Id.* at *2.

rebuttal reports would be served June 10.  Moreover, both common sense and the principle that BP previously espoused for scheduling experts (in which experts testify *after* the experts they are responding to) counsel scheduling the United States' new rebuttal experts at the end of the deposition period.

Below, we attempt to respond to the allegations that BP and Anadarko have raised so far. We note that BP and Anadarko have promised a new round of complaints today that we will not have the opportunity to respond to in writing.  For the reasons described in this letter and our letter submitted on Friday, June 14, 2013, we believe that none of BP or Anadarko's complaints have merit, and their motion to strike and requests to overhaul the long-settled deposition schedule should be denied.

## I.   THE REBUTTAL OPINIONS PRESENTED BY THE UNITED STATES ARE ALL APPROPRIATE RESPONSES TO EXPERT OPINIONS PROFFERED BY BP

In accordance with the Court's Order Regarding Phase Two Expert Document Production (Doc. No. 8907), on June 10, 2013, the United States served twelve rebuttal expert reports appropriately responding to numerous issues raised in the eleven expert reports served by the defendants.  Contrary to the defendants' assertions, the United States' rebuttal expert reports have not "proffered page upon page of newly disclosed material that could have and should have been included" in the United States' initial expert reports.

It is well established that the purpose of rebuttal expert reports is to explain, repel, counteract or disprove opinions expressed by opposing party's experts.[3]  That is exactly what the United States' rebuttal expert reports do.  It is fundamentally unfair for the defendants, who knew full well that the United States would serve rebuttal reports, on the eve of expert depositions to seek to strike certain of those experts, "adjust" the deposition schedule, and perhaps delay the Phase 2 trial.  BP's arguments are based on baseless, unsubstantiated assumptions about the nature of the inquiry undertaken by the United States experts, and are a thinly veiled attempt to insulate BP's experts from scrutiny.  Each of BP's arguments is addressed in turn, below.

**1.** *Expert Opinions Rebutting the Conclusions of BP Experts Blunt and Zimmerman Regarding Pore Volume Compressibility.*
It is ironic that BP and Anadarko claim that the United States has "sandbagged" them when in reality it is BP who is running desperately from the contemporaneous analyses and opinions of its own employees on a variety of issues from the flow rate of the oil released from the reservoir to the pore volume compressibility ("compressibility") of the sandstones found in the Macondo reservoir.

---

[3] *See e.g. Scientific Components Corp. v. Sirenza Microdevices,* 2008 WL 4911440 *2-3 (E.D.N.Y); *Long Term Capital Holdings v. U.S*, 2003 WL 21518555 *2 (D.Conn.).

a. **BP Created the Need for Compressibility Evidence by Abandoning its Position from the Response**

The defendants ask the Court to strike the rebuttal expert reports of Dr. Roegiers and Dr. Huffman related to compressibility. Yet Drs. Roegiers' and Huffman's reports appropriately respond to the compressibility claims asserted by BP/Anadarko's experts Dr. Zimmerman and Dr. Blunt. In their expert reports, Dr. Zimmerman and Dr. Blunt present opinions on compressibility contrary to those of BP's own employees expressed during the incident.

BP also makes the puzzling claim that, because compressibility was an issue that was explored during discovery, the United States should have presented any new expert analysis on compressibility with its original expert reports. What this argument ignores is that the admissions and statements gathered from BP during discovery provided Dr. Kelkar with sufficient evidence to conclude that BP believed, during the response, that 12 microsips was the best value to use.

The United States had no need to perform original compressibility analyses because its experts were relying on the analysis and opinions stated by BP employees during the well integrity testing period in July 2010. During the response, BP had tremendous financial incentive to use and provide the United States with accurate information, including accurate compressibility information, during the well integrity testing period to assess the condition of the well and persuade the United States that the well could be safely closed in without catastrophic consequences. This modeling was not, as BP suggests in its letter brief, simply "worst case scenario" modeling, but was instead an attempt to model the well's pressure response as accurately as possible to determine whether the pressure response could indicate potential flow through burst disks once the well was shut in.[4]

In July 2010, BP performed a variety of simulations of reservoir pressure response and conditions.[5] Robert Merrill, then BP's Senior Advisor for Reservoir Engineering Community of Practice, was responsible for performing this reservoir modeling. Rock compressibility was one of the inputs to this modeling.[6] Weatherford rotary sidewall core tests suggested the pore volume compressibility might be 6 microsips. However, during the well-integrity testing period, Kelly McAughan, then BP's liaison with the United States science team, recommended that Mr. Merrill use a new "most likely" compressibility of 12 microsips as an input to the modeling. Mr. Merrill implemented this recommendation in a number of the simulations that he supervised or performed in July 2010.[7] At his deposition, Mr. Merrill testified that BP determined that it was "prudent" to use a compressibility value of 12 instead of 6 microsips as the recommended input for modeling purposes after an internal discussion at which David W. Schott, one of BP's reservoir engineers, presented evidence based on his experience in the Galapagos field, a field

---

[4] Merrill Deposition (36:15-39:9; 202:19-204:3).

[5] Deposition Ex. 10841; Ex. 9320; Ex. 10845; Ex. 10853.

[6] Deposition Ex. 10841; Ex. 9320; Ex. 10845; Ex. 10853.

[7] Deposition Ex. 10841; Ex. 10845; Ex. 10853.

which includes the Isabela and Santa Cruz wells, that "core volume compressibility determined from sidewall cores was lower than pore volume compressibility based on whole core."[8]

Dr. Paul Hsieh, an employee of the U.S. Geological Survey, U.S. Department of Interior, modeled reservoir depletion for the United States during the well-integrity testing period.  Based on a similar recommendation from Kelly McAughan, Mr. Hsieh used a compressibility of 12 μsips as the compressibility input for his simulation.[9]

BP's recommendation to use a compressibility of 12 microsips is documented in a number of communications between July 6 and July 8, 2010 among various BP employees, including Stephen Willson, David Schott, Robert Merrill, and Kelly McAughan.[10]  After an extended discussion, Ms. McAughan wrote: "How about we use 6-12-18."  Mr. Willson responded: "That sounds very reasonable to me Kelly."  Mr. Merrill followed by stating: "Me too."[11]  The range of 6-18 microsips belies BP's puzzling claim that the use of 12 was for a "worst case scenario" – depending on what was being modeled, either 6 microsips or 18 microsips would have been an appropriate boundary case, but 12 microsips would not have given "worst case" numbers.

Given the above, in their initial expert reports, the United States' experts had every right to rely on the compressibility analysis and opinions expressed by BP's own reservoir engineers during BP's response to the blowout.  The exhibits and testimony cited above were all disclosed on the Kelkar/Raghavan Considered Materials list.  <u>In summary, the full universe of evidence considered by Dr. Kelkar in deciding to use the value of 12 microsips was accurately disclosed with Dr. Kelkar's original expert report.</u>[12]

## b.  <u>Compressibility is Important in Large Part Because BP and Anadarko's Principal Analysis is Dictated by the Compressibility Value Selected</u>

It is important to note that pore volume compressibility is not an especially sensitive input parameter for all of the flow rate calculations presented in this case.  Three United States

---

[8] Merrill Deposition (212:19-214:23; 394:20—395:10; 478:8-480:1; 486:19-488:17).

[9] Deposition Ex. 8615 (Hsieh Pre-Decisional Draft Report, at 12); Hsieh deposition at 264.

[10] Deposition Exs. 8769-8777.

[11] Deposition Ex. 8776.

[12] Similarly, if BP believes that the analysis performed by its engineers during the response was absolutely lacking in scientific validity, it is welcome to present that view at trial as well.

These internal BP documents were generated *after* Dr. Kelkar completed his work for the Flow Rate Technical Group around July 1st, 2010.  Thus, it is entirely unsurprising, and beside the point, that Dr. Kelkar did not rely on them in his FRTG modeling.  (Maclay Deposition at 453:15-21).

experts (Dykhuizen, Griffiths, and Pooladi-Darvish) present cumulative flow rate calculations based on methodologies that are not particularly sensitive to pore volume compressibility.

BP and Anadarko, however, have chosen Dr. Martin Blunt to be their "principal testifying expert," and Dr. Blunt has chosen to use the material balance method as the sole methodology for his estimate of the cumulative volume discharged. Dr. Blunt's estimate is extremely sensitive to what value he chooses to use for pore volume compressibility – if he were to use the value of 12 microsips used by BP during the response, his cumulative estimate would rise from 3.26 million barrels to over 4 million barrels.

Instead, Dr. Blunt relies upon a value of 6.35 microsips that is derived from an *entirely new analysis* by Dr. Robert Zimmerman. The United States had no way to anticipate that Dr. Zimmerman would repudiate BP's own statements during the incident as to compressibility. The United States rebuttal reports of Dr. Huffman and Dr. Roegiers are entirely appropriate responses to this new analysis by Dr. Zimmerman and the use of that data by Dr. Blunt. If BP and Anadarko were granted the relief they seek, the United States would be left entirely unable to challenge one of the key parameters underlying their principal estimate of the cumulative discharge. There is *no basis* to deny the United States the right to challenge this number, and BP and Anadarko's request should be denied.

### c. The Opinions of Drs. Roegiers and Huffman are Proper Rebuttal Reports to the Reports of Drs. Zimmerman and Blunt, and thus the De-Designation of Dr. Ann Marchand Is Not Cause for Them to Be Stricken

This Court should not strike the portions of the reports of Drs. Roegiers and Huffman that address rock compressibility simply because BP has chosen to withdraw Dr. Ann Marchand as an expert witness, rather than provide a proper expert reports for her as required under Fed. R. Civ. P. 26(a)(2)(B).

Dr. Rogiers expert report addresses rock compressibility in rebuttal to the expert report submitted by Dr. Zimmerman, not the cursory two paragraph summary submitted by BP on behalf of Dr. Marchand. Section VI of Dr. Huffman's expert report entitled "Analysis of the Compaction and Cementation State of the Macondo Reservoirs" provides an overall rebuttal to the issues of reservoir conditions (compressibility, permeability, pore pressure, stress, etc.) discussed by Drs. Zimmerman, Blunt and Marchand. It is not merely a rebuttal to issues raised solely by Dr. Marchand. The portion of Section VI of Dr. Huffman's report that discusses the basic physics of shales and sands in the context of compaction processes and basin evolution are directly responsive to the entire body of work of Drs. Blunt, Zimmerman and Marchand, not only the few statements made by BP on behalf of Dr. Marchand. BP and Anadarko's request is clearly intended to carve out significant information and findings from Dr. Huffman's report that will be helpful to the trier of fact in understanding the evidence and determining material facts at issue in the Phase 2 trial. Fed. R. Evid. 702(a).

### 2. Opinion of Drs. Aaron Zick and Curtis Whitson Regarding Oceanic Separation Process

BP next requests that a portion of the Zick rebuttal report be stricken because Dr. Zick, in responding to an argument set forth by Dr. Curtis Whitson, BP's fluid expert, states candidly that

he had earlier considered and rejected the argument, and that his position on the issue had changed as a result of reading Dr. Whitson's report. This is an entirely appropriate rebuttal opinion, as it is a response to the opinions stated by Dr. Whitson. Thus, BP and Anadarko's requested relief should be denied.

By way of background, Dr. Zick and Dr. Whitson both give opinions as to the appropriate conversion of mass flow rates to "stock tank barrels of oil." (The Clean Water Act defines barrels of oil as stock tank barrels of oil, 33 U.S.C. §1321(a)(13), so this conversion is necessary.) The Macondo reservoir fluid is a mixture of lighter and heavier hydrocarbons, and at stock tank conditions, some of the fluid will be gas, and some will be oil. The parties agree that the volume of the hypothetical liquid portion will be used for assessing the Clean Water Act penalty.

The problem is that the proportion of fluid that escapes gas versus the proportion that stays in solution as oil is dependent on the process that is used to bring the fluid to stock tank conditions. In normal oil production, the process that would be used would maximize the amount of oil recovered (and minimize the amount of gas recovered). In his original report, Dr. Zick opined that it was most appropriate to convert hydrocarbon flows to stock tank barrels using the oil fraction that would result from that normal production process – the process that BP would have used once it developed the well and began producing.

BP and Anadarko's experts, unsurprisingly, disagree with Dr. Zick. Most use an imaginary single stage separation process that would *minimize* the oil fraction. Dr. Whitson went further, and said that such an imaginary single stage separation process would come closest to approximating the actual likely flow of the hydrocarbon plume through the ocean, presenting a model of an "oceanic" separation process.

In his rebuttal report, Dr. Zick addresses Dr. Whitson's opinion about the "oceanic" separation process. Dr. Zick discusses what, in his view, is a major flaw in Dr. Whitson's "oceanic" separation analysis that results in significant underestimation of oil volumes. This type of critique is fully appropriate as rebuttal, and surely cannot be the basis for striking his opinions.

As BP and Anadarko points out, Dr. Zick also states that an oceanic separation model "could be another reasonable way of defining the stock tank oil, with the right assumptions."[13] Dr. Zick proceeds to model how an oceanic separation process would work after correcting for Dr. Whitson's erroneous assumptions.[14] This, again, is entirely appropriate in rebuttal – Dr. Whitson proposed a particular method of analysis, and Dr. Zick, while conceding that the concept is reasonable one in theory, performs calculations to point out Dr. Whitson's flaws in actually applying the concept.

---

[13] Zick Rebuttal Report at 2.

[14] Zick Rebuttal Report at 6-12.

This is miles apart from the only Phase 1 analogy BP and Anadarko could cobble up – the improper "rebuttal" opinion of Halliburton's Dr. Chemali. (Doc. No. 4738). Dr. Chemali was a petrophysicist who opined about the petrophysical analysis of the M57B sand zone. At least one Halliburton expert, Dr. Strickland, had already provided an opinion on the same topic in a report in chief. Moreover, the Chemali opinion was *not* a critique of new analysis performed by BP experts. The only BP experts whom Chemali was purported to be rebutting were a cement expert and a former MMS official (neither of whom had any petrophysical analysis in their reports).

BP and Anadarko, as with the compressibility issue, is seeking to insulate the opinions of its experts from effective critique. The unfair prejudice to the United States, should BP's relief be granted, would be enormous, and would deprive the trier of fact of relevant opinion testimony that would be helpful in assessing the assertions of BP's experts.

Because Dr. Zick's opinion is a fully appropriate rebuttal to the opinions of Dr. Whitson and BP/Anadarko's other experts, BP and Anadarko's requested relief should be denied.

## II.     BP AND ANADARKO'S REQUEST REGARDING EXPERT DEPOSITION SCHEDULING RESTS ON A FAULTY PREMISE

BP and Anadarko's complaints regarding the expert deposition schedule appear to primarily be based upon the mistaken premise that United States rebuttal experts must be deposed *before* BP and Anadarko's experts. This is inconsistent with the logic of BP's preferred method of having its experts go *after* the United States experts to whom they are responding. BP and Anadarko cannot have it both ways – either they have the right to have their experts go after United States experts in chief (in which case United States rebuttal experts should go after their experts), or the order of expert depositions should not be sequential. One this issue is cleared up, it should be feasible to schedule the new United States rebuttal experts in a manner that will not require wholesale changes to the pretrial calendar. Moreover, as described in the United States' June 14 letter concerning the Dr. Pooladi-Darvish deposition, the situation is entirely of the defendants' making: BP insisted on a report schedule in which the United States went first and then provided rebuttal reports (as opposed to the Parties serving simultaneous reports), and BP insisted on the United States experts in chief being deposed before BP/Anadarko experts on corresponding topics. These two demands result in the entirely predictable consequence that BP and Anadarko will have a finite amount of time between rebuttal reports and depositions. BP and Anadarko should not be allowed to argue that the inevitable result of the schedule *they sought* compels an entirely revamped schedule.

BP and Anadarko also request that the deposition of Dr. Nathan Bushnell be moved because his rebuttal report contains opinions regarding "erosion." In reality, Dr. Bushnell carefully states in his rebuttal report that he has "limited [his] comments to the CFD modeling undertaken by Dr. Nesic…."[15] Bushnell is an expert in Computational Fluid Dynamics (CFD) modeling. Dr. Nesic, BP's "erosion" expert, uses CFD models to support his opinions regarding erosion. Dr. Bushnell does nothing more than point out the numerous modeling errors made by

---

[15] Bushnell Rebuttal Report at 32.

Dr. Nesic, including his lack of converged solutions, his lack of proper model validation, the poor mesh employed by Dr. Nesic, and other flaws.[16]  The United States does not understand BP and Anadarko to be requesting that any of Dr. Bushnell's opinions be stricken, but would categorically oppose such a request.  The United States also opposes BP and Anadarko's request to move Dr. Bushnell's deposition.  As stated in its letter brief regarding the deposition of Dr. Pooladi-Darvish, the expert deposition schedule has been exhaustively hammered out, and moving experts at this time is likely to have cascading effects due to limits on witness and attorney availability.  Dr. Bushnell was properly listed as a CFD expert, he remains the same, and no unfair prejudice would result from his deposition going forward on its currently scheduled date.

## III. CONCLUSION

In its requests to strike expert testimony, BP and Anadarko are attempting to shield its experts from any effective critique.  The United States' rebuttal reports properly "contradict or rebut evidence on the same subject matter identified by another party," and thus none of the extraordinary relief sought by BP and Anadarko is warranted.  No expert opinions were improperly withheld.  With respect to BP and Anadarko's requests regarding expert deposition scheduling, these requests appear to be premised on the faulty assumption that all of its experts must be deposed last in the schedule.  In addition, even if BP's faulty premise were adopted, there is no need to move the deposition of Dr. Bushnell, because Dr. Bushnell is not , as BP claims, an "erosion" expert.

Respectfully submitted,

/s/ *A. Nathaniel Chakeres*

cc:    Liaison & Coordinating Counsel

Attachments:
Attachment 1 – Excerpts from Ex. 10841 (confidential)
Attachment 2 – Excerpts from Ex. 9320  (confidential)
Attachment 3 – Excerpts from Ex. 10845 (confidential)
Attachment 4 – Excerpts from Ex. 10853 (confidential)
Attachment 5 – Excerpts from Deposition of Robert Merrill
Attachment 6 – Excerpts from Ex. 8615 (confidential)
Attachment 7 – Excerpts from Deposition of Paul Hsieh
Attachment 8 – Excerpts from Exs. 8769-8777 (confidential)
Attachment 9 – Excerpt from Don Maclay Deposition

---

[16] Bushnell Rebuttal Report at 24-32.

Attachment 10 – Excerpts from Zick Rebuttal Report
Attachment 11 – Excerpts from Bushnell Rebuttal Report

# Attachments 1 - 4
## to

**UNITED STATES LETTER BRIEF, DATED 6/17/2013**

[PENDING MOTION TO FILE UNDER SEAL]
## attached as
# Exhibits 5 - 8
## to

**MEMORANDUM IN SUPPORT OF THE UNITED STATES' OBJECTIONS TO AND MOTION TO REVIEW MAGISTRATE JUDGE SHUSHAN'S ORDER REGARDING MOTION TO STRIKE REBUTTAL EXPERTS FOR THE U.S.**

The United States has moved to attach Exhibits 5-8 as a sealed appendix per Paragraph 8.B of MDL No. 2179 Pre-Trial Order # 13 (Order Protecting Confidentiality), which mandates that documents which have been designated as "Confidential" or "Highly Confidential" must be filed under seal as an appendix to the instrument that refers to them.

# ATTACHMENT 5

(Excerpts from Deposition of
Robert Merrill, January 15-16, 2013)

01-41905
PW/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG        )        MDL NO.  2179
"DEEPWATER HORIZON" in the             )
GULF OF MEXICO,  on                    )        SECTION: J
APRIL 20, 2010                         )
                                       )        JUDGE BARBIER
                                       )
                                       )        MAG. JUDGE SHUSHAN

## *CONFIDENTIAL*

### *WorldwideVIEW* ™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Robert C. Merrill, Jr.

**VOLUME 1**

JANUARY 15, 2013

# COPY



Systems Technology for the Litigation World

Litigation Group✦Court Reporting✦Video Production✦Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

1    proposed that we would use the Horner plot

2    which does not require rate to put it into

3    superposition time, so that you can actually

4    linearize the data.

09:06   5              And once we had a way that you

6    could -- and engineers and scientists like to

7    work with linearized data because then

8    deviations from a straight line can be -- can

9    indicate deviations from ideal behavior, if

09:06  10    you -- if -- it's not quite ideal behavior,

11    but that's in layman's term what we're

12    talking about.  And those deviations could

13    indicate something that wasn't expected.

14              And in this particular case, we

09:06  15    were trying to -- to identify whether we

16    could identify crossflow, which would be the

17    flow from one subsurface interval to another

18    subsurface interval with very limited data

19    interrogation ability, in this case the gauge

09:06  20    at the top of the capping stack.

21        Q.    All right.  And then you say you

22    presented BP's reservoir understanding,

23    including the PTA technique, to the U.S.

24    government science team:  The U.S.G.S.,

09:07  25    U.S.C.G., DOE, NOAA and cabinet secretaries.

```
 1    Okay.  In what form did that presentation
 2    take place?
 3          MR. RIDGE:  Object to the form.
 4          A.    It wasn't a single presentation.
 5    It was a number of presentations.  And when
 6    we actually under -- were in the wellbore
 7    integrity test, from I believe about July
 8    15th onwards, we were meeting at first every
 9    six hours, I think it was, and then they --
10    as we got better and better data --
11          Q.    (BY MR. GLADSTEIN)  Right.
12          A.    -- we lengthened the time
13    between presentations.  But primarily I -- I
14    would go and talk to the government
15    scientists from these organizations and --
16    and then make presentations during these --
17    these meetings to -- about the reservoir
18    behavior we were observing in these Horner
19    plots.
20          Q.    Okay.  And do you remember a
21    particular scientist that you interacted
22    with?
23          A.    I remember there were a number
24    of scientists I -- I -- I interacted with.
25    I'm -- I'm quite poor on names and faces.
```

          1           Q.      Okay.

          2           A.      I do recognize that Paul Hseih,

          3     one of these scientists, is in the room right

          4     now.

09:08     5           Q.      Okay.  And anybody else come to

          6     mind besides Mr. Hseih?

          7           A.      There was a fellow named Art, I

          8     believe.

          9           Q.      Uh-huh, Mr. Ratzel?

09:08    10           A.      Mr. Ratzel.  And then I remember

         11     quite clearly a fellow named Dick who was on

         12     the phone, but it was when we were

         13     presenting.  But a lot of the names have

         14     escaped me.  It's been several years.

09:09    15           Q.      Yeah.  Then you say in you --

         16     your next bullet, it says, Liaised With

         17     Science Team, and I -- and now you're

         18     referring to the government science team; is

         19     that right?

09:09    20           A.      Yes, sir.

         21           Q.      Okay.  -- on a daily basis, and

         22     successfully convinced them of the merits of

         23     pressure monitoring as the primary means of

         24     assessing Wellbore Integrity during the

09:09    25     fitting of the stacking cap.

```
 1                    What -- what -- what does that
 2      mean there?  What's that?
 3              Q.      This refers back to the pressure
 4      transient analysis --
09:09  5              Q.      Right.
 6              A.      -- and the Horner plot --
 7              Q.      Yeah.
 8              A.      -- and how that we could
 9      actually use the data from the -- from the
09:09 10      pressure gauge to indicate whether we had
11      significant crossflow in the course of this
12      wellbore integrity test.
13              Q.      Okay.  What was the importance
14      of that modeling, that exercise?  It was
09:09 15      basically to make sure that the -- the well
16      had integrity, right?
17              A.      Yes, sir.  Specifically to --
18      with respect to these blowout disks.
19              Q.      Yeah.  And why did people care
09:10 20      about that?
21              MR. BEFFA:  Object to the form.
22              A.      There was a concern amongst
23      the -- the team that if you had significant
24      crossflow into these shallower sands, you
09:10 25      could set up this subsurface blowout or
```

38

```
 1    subsea blowout, as mentioned earlier in

 2    this -- in this document.

 3         Q.    (BY MR. GLADSTEIN)  So there was

 4    going to be more flow to the surface, more

 5    oil released to the ocean and -- and the

 6    environment in that situation, right?

 7         MR. BEFFA:  Object to the form.

 8         A.    I -- I couldn't say about

 9    quantity, but certainly if you had a subsea

10    blowout through rock fractures or something

11    of that nature, it would be less controllable

12    than coming up through a -- a -- a wellbore.

13         Q.    (BY MR. GLADSTEIN)  And so you

14    had an incentive to make your predictions as

15    accurate as possible; is that right?

16         MR. BEFFA:  Object to the form.

17         A.    Would you repeat the question.

18         Q.    (BY MR. GLADSTEIN)  Sure.

19         A.    I'm not -- I'm not sure I follow

20    it.

21         Q.    So you -- you had an interest

22    in -- in making your predictions using the

23    pressure transient analysis as accurate as

24    possible; isn't that right?

25         MR. BEFFA:  Object to the form.
```

09:10 5
09:10 10
09:11 15
09:11 20
09:11 25

39

```
  1              A.     Well, in this situation -- one
  2      always strives for accuracy.  In this
  3      situation, without knowing the flow rate and
  4      given the large uncertainties on the other
09:11 5  reservoir parameters, we -- we did our best
  6      to be accurate.
  7              Q.     (BY MR. GLADSTEIN)  Okay.
  8              A.     One always strives to be
  9      accurate.
09:12 10             Q.     Now, you say -- you presented --
  11     going back a step.  You presented BP's
  12     reservoir understanding, including the PTA
  13     technique, to the team and cabinet
  14     secretaries.
09:12 15             Were -- were there any cabinet
  16     secretaries that you presented the PTA
  17     technique to?
  18             A.     In person to Secretary Chu.
  19             Q.     Okay.
09:12 20             A.     I believe Sal- --
  21     Secretary Salazar was in one of the phone
  22     conversations which I was giving
  23     presentations on the technique to in one of
  24     these evening meetings.
09:12 25             Q.     Right.  And -- and with
```

1    Secretary Chu, that would have been in mid

2    July; is that right?

3        A.    I believe so.  It was in the

4    time leading up to the top kill.  Not the top

09:12  5    kill, I'm sorry.  The wellbore integrity

6    test.

7        Q.    Right.  Okay.  And then it says

8    toward the bottom, you provided convincing

9    evidence to senior government officials and

09:13 10    science team which was instrumental in

11    gaining permission to attempt the static

12    kill.  Okay.

13              What did you mean by that?  How

14    is the -- the evidence that you provided, do

09:13 15    you believe, instrumental in gaining

16    permission to attempt the static kill?

17        A.    I'm not exactly sure what I

18    meant by this -- this -- this bullet point.

19    Clearly it's the amount -- it refers to the

09:13 20    preceding bullet points in terms of the data

21    and the data analysis -- data analysis

22    techniques which were being used to monitor

23    the wellbore integrity.  And we were con- --

24    you know, there was -- we really wanted to

09:14 25    ensure that the wellbore had integrity

```
 1    because we did not want there to be a

 2    possibility of a -- of a subsea blowout, and

 3    so it was instrumental data to actually come

 4    to that conclusion.

 5         Q.    Now, what would have happened if

 6    the government team wasn't convinced that --

 7    that the well had integrity?

 8         MR. RIDGE:  Objection to form.

 9         MR. BEFFA:  Object to the form.

10         A.    I -- I can't say for sure what

11    would have happened if they were not

12    convinced of the integrity of the -- of

13    the -- of the wellbore.  There was concern

14    that we'd be asked to open the -- the well up

15    again to flow into the environment.

16         Q.    (BY MR. GLADSTEIN)  Right.  Was

17    there concern that you'd have to wait until

18    the relief well came in order to finally shut

19    down the well?

20         A.    I don't know if that's concern.

21    I think that if the well was still flowing to

22    the ocean, that is the ultimate -- you know,

23    the ultimate way to kill the well would have

24    been that.

25         Q.    Okay.  And then it says at the
```

09:14  5
09:14  10
09:14  15
09:15  20
09:15  25

1    bottom of the page, you "Continued

2    contributions to legal defense by

3    coordinating sub-surface facets of flow rate

4    determination."

09:15    5              Okay.  So I think that might get

6    into some privileged areas, so I don't need

7    to ask about that.

8              All right.  Then let's look at

9    the next page, which is -- has the last

09:15   10    digits 6652548.  Under year-end -- okay.  So

11    under mid-year performance con- --

12    conversation, "Agreed that this effort took

13    precedence over all other tasks."

14              When you say "this effort," are

09:16   15    you referring to the Macondo incident

16    response?  Is that what you're referring to

17    there?

18         A.    Yes.

19         Q.    So -- so during the -- the

09:16   20    Macondo incident from, you know, the blowout

21    of approximately April 20th to the shut-in,

22    was that the -- was that what -- the primary

23    work that you were involved in on behalf of

24    BP?

09:16   25              MR. RIDGE:  Object to the form.

```
 1          A.      Would you repeat the question,

 2    please.

 3          Q.      (BY MR. GLADSTEIN)  For the

 4    period of -- of the blowout, starting

 5    approximately April 20th through the

 6    completion of the well integrity testing

 7    in -- in the end of July, was your primary

 8    work for BP on the Macondo incident?

 9          MR. RIDGE:  Same objection.

10          MR. BEFFA:  Objection; form.

11          A.      I'm sorry, I was actually

12    reading the document here, see what I

13    actually said --

14          Q.      (BY MR. GLADSTEIN)  Oh, okay.

15          A.      -- because I hadn't read my

16    year-end assessment of myself here.  So could

17    you repeat the question?

18          Q.      Okay.  So most of the work you

19    were doing in April through July that you

20    were doing for BP was related to the Macondo

21    incident; isn't that right?

22          MR. RIDGE:  Same objection.

23          A.      A large proportion of my time

24    from May, actually mid May through to the end

25    of July was -- was related to the -- the
```

        1    Macondo incident.

        2        Q.    (BY MS. GLADSTEIN)  Okay.  All

        3    right.  So -- so let's go to what you were

        4    looking at.  Let's look at the first sentence

09:17   5    of -- of your year-end assessment.

        6            You say, "I am proud of the work

        7    which I performed for Paul Tooms' engineering

        8    team."

        9            You mentioned that Mr. Tooms was

09:17  10    in -- was he in charge of the engineering,

       11    the GoM engineering group?

       12        A.    No, sir, he was in charge of the

       13    responses engineering group.

       14        Q.    Okay, I'm sorry.  Okay.  Where

09:18  15    you worked with -- where I worked with Kate

       16    Baker, who liaise -- who led the liaison

       17    efforts with the government's science team

       18    and SETAs/senior advisers in a variety of

       19    disciplines.

09:18  20            That's what we referred to

       21    before, you worked with Kate Baker.  And what

       22    does the acronym SETAs stand for?

       23        A.    Segment technical authority.

       24        Q.    Is that within BP?

09:18  25        A.    That's within BP.

01-41906
PW/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | ) | MDL NO.  2179 |
| "DEEPWATER HORIZON" in the | ) | |
| GULF OF MEXICO,  on | ) | SECTION: J |
| APRIL 20, 2010 | ) | |
| | ) | JUDGE BARBIER |
| | ) | |
| | ) | MAG. JUDGE SHUSHAN |

# *CONFIDENTIAL*

## *WorldwideVIEW* ™
### Interactive Deposition Digital Display

ORAL AND VIDEOTAPED DEPOSITION OF:



# Robert C. Merrill, Jr.

## VOLUME 2

JANUARY 16, 2013

# COPY



WORLDWIDE

*Systems Technology for the Litigation World*

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

1    here.  Data for Qo equals 60 mbd; Cr 12,

2    microsips; aquifer, 3.8X.  So you're saying

3    you don't know why they're using 12 on this

4    scenario, also, correct?

10:19  5        MR. BEFFA:  Object to the form.

6        A.    I didn't say I don't know why

7    they are using 12.

8        Q.    (BY MR. GLADSTEIN)  Uh-huh,

9    okay.

10:19  10        A.    We had said prior to the well

11   integrity test that we were going to move to

12   12 from 6 for the purposes of the well

13   integrity test to ensure that we were

14   capturing the -- the upper end of the -- you

10:19  15   know, the -- a reasonable range of pressures

16   response expected in the well.

17        Q.    Okay.

18        A.    And I -- again, I don't know

19   whose numbers these are.

10:19  20        Q.    Okay.  Did you get the -- the 12

21   infor- -- information from Kelly McAughan?

22        A.    No.

23        Q.    Who did you get that from?

24        A.    As the result of a BP internal

10:19  25   meeting, there was a discussion about whether

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

1    sidewall cores might be -- give different

2    weight results than full core and -- and a

3    reservoir engineer in this meeting said,

4    well, why don't we double the

10:20  5    compressibilities, or words along those --

6    along that line, and we decided it was

7    prudent to do so.

8              In fact, we also used a

9    compressibility of 18 microsips at one point

10:20  10   as a -- an upside scenario.

11        Q.    Okay.  Do you remember who the

12   reservoir engineer was?

13        A.    I believe -- I -- there were

14   several, but I believe -- the name that

10:20  15   sticks in my mind was Dave Schott.

16        Q.    Dave Schott?

17        A.    S-c-h-o-double t.

18        Q.    Okay.  And you said something

19   about sidewall cores versus some other kind

10:20  20   of cores; is that what you said?  Did I

21   understand?

22        MR. BEFFA:  Object to the form.

23        MR. GLADSTEIN:  Okay, I guess I could

24   look in here.

10:21  25        MR. BEFFA:  Object to the question.

1    one of our other fields in the Gulf of Mexico

2    for which there was data on a number of

3    wells.

4         Q.    During the incident did you ever

12:45  5    analyze whether that anecdotal evidence was

6    accurate or not?

7         A.    No, I did not.

8         Q.    Did you during the incident ever

9    reach any conclusions about whether the

12:45 10    measured pore volume compressibility was an

11    accurate representation of the Macondo

12    reservoir?

13         MR. GLADSTEIN:  Objection as to form.

14         A.    Would you repeat the question?

12:45 15         Q.    (BY MR. BEFFA)  Sure.  During

16    the incident did you reach any conclusions

17    about whether the measured pore volume

18    compressibility was an accurate

19    representation of the Macondo reservoir?

12:45 20         MR. GLADSTEIN:  Same -- same objection.

21         A.    I don't believe I came to a

22    conclusion.  I'd never used 12 after the

23    lead-up to the -- the wellbore integrity test

24    because it wasn't necessary to match the data

12:46 25    that was being -- being collected during the

```
 1    the head that would -- was in the well.
 2         Q.      And I guess specifically I'm
 3    interested in whether you were talking about
 4    a modeled pressure or an observed pressure
 5    from a gauge.
 6         A.      I was referring to the observed
 7    pressure in the gauge.
 8         MR. BEFFA:  I have no further
 9    questions.
10         MR. GLADSTEIN:  And the United States
11    has some follow-up.
12         THE VIDEOGRAPHER:  The time is
13    12:55 p.m., and we're off the record.
14         (Recess from 12:55 p.m. to 12:58 p.m.)
15         THE VIDEOGRAPHER:  The time is
16    12:58 p.m.  We're back on the record.
17         F U R T H E R   E X A M I N A T I O N
18    BY MR. GLADSTEIN:
19         Q.      Good afternoon, Dr. Merrill.  As
20    I said, we're going to get you out of here
21    pretty soon.  I want to go back to the line
22    of questioning on rock compressibility,
23    12 microsips versus 6 microsips.  I believe
24    that you indicated in your testimony there
25    was a discussion about the value of -- of
```

12:54  5
12:55  10
12:58  15
12:58  20
12:59  25

1    6 microsips and anecdotal evidence was

2    presented.  What anecdotal evidence were you

3    referring to?

4         A.    I was referring to the -- to a

12:59   5    discussion we had in this internal meeting

6    where one of the reservoir engineers said

7    that he thought that the sidewall -- sidewall

8    core pore volume level -- well, I was

9    referring to the anecdotal evidence from --

12:59   10   presented by a reservoir engineer in this

11   meeting where he said that core volume

12   compressibility determined from sidewall

13   cores was lower than pore volume

14   compressibility based on whole core.

12:59   15        Q.    Yeah, and that was, I think you

16   said, from some other fields, in his

17   experience; is that right?

18        A.    That is correct.

19        Q.    Do you remember what particular

12:59   20   fields he was referring to?

21        A.    I do not remember the exact

22   fields that he was referring to.  I believe

23   they were in the Galapagos field.

24        Q.    And the -- the side volume cores

01:00   25   that you were referring to, you had indicated

# Attachment 6

## to

### UNITED STATES LETTER BRIEF, DATED 6/17/2013

## [PENDING MOTION TO FILE UNDER SEAL]
# attached as
# Exhibit 9

## to

**MEMORANDUM IN SUPPORT OF THE UNITED STATES' OBJECTIONS TO AND
MOTION TO REVIEW MAGISTRATE JUDGE SHUSHAN'S ORDER REGARDING
MOTION TO STRIKE REBUTTAL EXPERTS FOR THE U.S.**

The United States has moved to attach Exhibit 9 as a sealed appendix per Paragraph 8.B of MDL
No. 2179 Pre-Trial Order # 13 (Order Protecting Confidentiality), which mandates that
documents which have been designated as "Confidential" or "Highly Confidential" must be filed
under seal as an appendix to the instrument that refers to them.

# ATTACHMENT 7

(Excerpts from Deposition of
Paul Hsieh, September 11-12, 2012)

01-40906
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG )    MDL NO.  2179
"DEEPWATER HORIZON" in the )
GULF OF MEXICO,  on )    SECTION: J
APRIL 20, 2010 )
                         )    JUDGE BARBIER
                         )
                         )    MAG. JUDGE SHUSHAN

# CONFIDENTIAL

## WorldwideVIEW ™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Paul Anthony Hsieh, Ph.D.
## VOLUME 1

SEPTEMBER 11, 2012

# *COPY*



*Systems Technology for the Litigation World*

Litigation Group✦Court Reporting✦Video Production✦Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

264

```
 1    a coarser time step in the modeling so that the
 2    time increment was larger, and in the Final
 3    Report, I used a finer or smaller time step, so
 4    that the simulation is more accurate.
 5            So those minor changes are the
 6    differences between this Presentation and my
 7    Final Report.
 8        Q.  And at this stage of your work on
 9    Macondo, you were dealing with the second type of
10    modeling, namely the modeling to determine a flow
11    rate?
12        A.  That's correct.
13        Q.  And if I recall your testimony this
14    morning, in that kind of modeling, the rock
15    compressibility parameter was assumed, as opposed
16    to estimated by the model?
17        A.  Yes, that is right.
18        Q.  And where did you get these numbers of 6,
19    12, and 15?
20        A.  12 is the number that I used, 12, I --
21    the number 12 times -- the unit would be
22    microsips, m-i-c-r-o-s-i-p-s, or alternatively
23    10-6 inverse psi, as indicated by this chart.
24            12 is the number that I used, and I
25    obtained that number from my meeting with Kelly
```

1    McAughan and from Bob Merrill's Presentation.

2          And 6 and 15 are a high and low end

3    following Bob Merrill's Presentation that he gave

4    on around July 8th or July 9th, where he also

5    used 12 as the rock compressibility, 6 as -- and

6    15 as a higher and low -- lower end value to see

7    what are the effects on the estimated flow rates.

8          Q.  And what did Kelly McAughan tell you

9    or -- about rock compressibility that led to

10   these numbers shown here?

11         A.  Kelly McAughan told me that 12 microsips

12   was the number that they were using in their

13   reservoir modeling.

14         Q.  Did she tell you anything more about

15   that?

16         A.  Yes, she told me that they had used 6

17   microsips earlier, but they felt that 12 was a

18   representative number, so they switched to 12.

19         Q.  And did she tell you why?

20         A.  Did she tell me --

21         Q.  Did she give you an explanation why she

22   thought 12 was a more representative number?

23         A.  No.

24         Q.  Was there any -- anyone else at BP

25   besides Kelly McAughan and Bob Merrill who gave

1    you any input with respect to your rock

2    compressibility inputs for your flow rate

3    modeling at any time?

4        A.   I can't -- I can't think of any at this

5    point.  Those are the two pieces of -- those are

6    the two sources that -- that I based my -- the

7    number that I used on.

8        Q.   Can -- can we go to Slide 73, please.

9        A.   Yes.

10       Q.   Can you explain what -- is this one of

11   your slides?

12       A.   Yes, that's one of my slides.

13       Q.   Okay.  Can you explain what this is

14   presenting?

15       A.   This is presenting the differences in

16   flow rates, simulated flow rates if different

17   rock compressibilities are used.

18            So the one that -- that I used in the

19   model at -- was 12 times 10-6 inverse psi, and

20   that is the red line.  The blue line is the

21   simulated flow rate from Day One to Day 86 using

22   a rock compressibility of 15 times 10-6 inverse

23   psi.  And the green line is the simulated flow

24   rate if I use a rock compressibility of 6 times

25   10-6 inverse psi.

# Attachment 8

## to

### UNITED STATES LETTER BRIEF, DATED 6/17/2013

## [PENDING MOTION TO FILE UNDER SEAL]
## attached as
# Exhibit 10

## to

**MEMORANDUM IN SUPPORT OF THE UNITED STATES' OBJECTIONS TO AND MOTION TO REVIEW MAGISTRATE JUDGE SHUSHAN'S ORDER REGARDING MOTION TO STRIKE REBUTTAL EXPERTS FOR THE U.S.**

The United States has moved to attach Exhibit 10 as a sealed appendix per Paragraph 8.B of MDL No. 2179 Pre-Trial Order # 13 (Order Protecting Confidentiality), which mandates that documents which have been designated as "Confidential" or "Highly Confidential" must be filed under seal as an appendix to the instrument that refers to them.

# ATTACHMENT 9

(Excerpt from Don Maclay Deposition)

1        or does not exist, and how those numbers were

2        derived or presented in that article.

3              Q.     So you don't know whether the

4        question he was raising here is based on his

5        work, modeling the Macondo reservoir, for your

6        team?

7                    MS. HARVEY:  Object to form.

8              A.     Not exactly at this time,

9        August 5th.  We were concluded with our work

10        with Dr. Kelkar.  I noticed my response to him

11        is somewhat curious, as if I'm responding to

12        another e-mail of his.  We had many at that

13        time, and I did not discuss any of the issues

14        that he brought up.

15              Q.     So at -- at this time of

16        August 5th, 2010, Dr. Kelkar had finished his

17        work for your modeling team?

18              A.     Yes, I believe the three

19        contractors completed their work the beginning

20        of July, very end of June, that time frame, in

21        that area.

22              Q.     And do you know whether any of the

23        analysis he did during that work was the cause

24        for the question he raises here in

25        exhibit 9864 about how the report of flow

# ATTACHMENT 10

(Excerpts from Zick Rebuttal Report)

about 11% more stock tank oil than the simplest possible, single-stage separation process would yield, so I recommended that the multistage process be used to calculate the amount of spilled stock tank oil. My reasoning was that BP would never have used a less efficient process to define their stock tank oil during production, so why should a less efficient process define their stock tank oil during disaster?

Dr. Whitson (like several other BP experts)[1] felt that the multistage separation process that BP had planned to use was irrelevant, because the spilled oil never went through such a process. Of course, the same could be said of the simple single-stage process. Dr. Whitson, however, proposed a model of an *oceanic separation process*, in which the spilled oil, as it floated to the surface of the ocean, would pass through a large number of theoretical separation stages with continually increasing temperatures and decreasing pressures. The idea was to define the oil that stayed in the liquid phase, all the way to the ocean surface, as the Macondo stock tank oil. I agree that this could be another reasonable way of defining the stock tank oil, with the right assumptions.

Dr. Whitson calculated the yield of stock tank oil from his oceanic separation model to be higher than from a single-stage separation, but slightly less (by about 0–2.5%, depending on the well's exit temperature) than from the 4-stage separation that BP had explored experimentally. Dr. Whitson made a serious omission, however. Exiting the well, at the bottom of the ocean, there was both an oil plume and a gas plume. As the oil rose toward the surface, it would give off additional gas, causing the oil to shrink and the gas plume to grow. Dr. Whitson accounted for these effects. What he didn't account for, however, was the amount of condensable hydrocarbons contained in the rising and growing gas plume. Those heavier hydrocarbons would continue to condense from the gas for roughly the first two-thirds of its journey to the surface. The additional condensed liquids would actually make the oceanic stock tank volume about 2.1–2.3% greater than that of the 4-stage separation (with very little sensitivity to the well's exit temperature, incidentally). Details of the oceanic separation process and its predictions (using both Dr. Whitson's variation and mine) are presented in Section 2.

Dr. Whitson also suggested that, by the time the spilled oil reached the ocean surface, all of its light hydrocarbons (up to C5) and light aromatics (up to C12) would have dissolved in the seawater, reducing the ultimate volume of the hydrocarbon liquids (i.e., the stock tank oil volume) by up to 13%. In essence, Dr. Whitson is saying that oil that dissolves quickly doesn't count in an oil spill. In my opinion, this idea is irrelevant. There's no denying that some of the spilled hydrocarbons would have dissolved in the water. For that matter, additional hydrocarbons would have evaporated into the atmosphere and/or biodegraded. In fact, given enough time, all of the liquid hydrocarbons could have been dispersed by a combination of those mechanisms. That should have no bearing on the estimated amount of stock tank oil spilled, however. Otherwise, if an oil company spilled a million barrels of (clearly defined and measured) stock tank oil from an oil tanker, for example, that company could similarly argue that it should only be held accountable for the 870,000 barrels (or less) that didn't dissolve, evaporate, or biodegrade right away. In

---

[1] To the extent other BP experts assume multistage or oceanic separation is irrelevant to what occurred during the Macondo spill, my analysis regarding multistage separation and criticism of the use of single stage separation to determine shrinkage, FVF, GOR, or other fluid properties applies to them as well.

single-stage separation and the 4-stage separation that BP had specified for the laboratory experiments.

Dr. Whitson reported so many different shrinkage factors and formation volume factors (for each of the four laboratory samples, different initial conditions, and many different processes and variations thereof) that it is impossible to enumerate them all. The best way to summarize his findings, however, is to repeat the shrinkage factors he calculated for an average reservoir fluid (he used the molar average of the four samples), going from initial reservoir conditions (243 F and 11,850 psia) to stock tank conditions (60 F and 1 atm). I was easily able to recalculate the corresponding shrinkage factors for my average reservoir fluid (which I took to be the molar average of the Pencor 19 sample, from highest in the formation, and the Schlumberger 1.18 sample, from lowest in the formation).

Table 1 summarizes the predictions of the two fluid models for a single-stage separation and for BP's specified four-stage separation. Regardless of the process, my EOS predicts a shrinkage factor about 3% greater than Dr. Whitson's, and regardless of the EOS, the four-stage separation would produce about 11% more stock tank oil than would the single-stage separation.

|  | Calculated Shrinkage Factor | | |
| --- | --- | --- | --- |
| **Surface Process** | **Whitson EOS** | **Zick EOS** | **% Difference** |
| **Single-Stage** | 0.433 | 0.445 | 2.8 |
| **Four-Stage** | 0.479 | 0.494 | 3.1 |
| **Difference, %** | 10.6 | 11.0 | |

Table 1. Shrinkage factors for an average Macondo reservoir fluid going from 243 F and 11,850 psia to 60 F and 1 atm, as calculated by both the Whitson and Zick equations of state for a single-stage separation and BP's specified 4-stage separation.

Since normal production, and normal surface processing did not occur for the Macondo reservoir fluids, Dr. Whitson proposed an alternative separation process for defining the Macondo stock tank oil, namely an *oceanic* separation process, a schematic of which is shown in Figure 1.[6]  In this process, the usual three or four surface separators are replaced by a continuum of theoretical separation stages, each one represented by the temperature and pressure from a different depth within the ocean, from the seabed to the surface. The first separation stage represents the conditions at the very exit of the well, before the reservoir fluid hits the water. These conditions determine the split of the reservoir fluid into an oil stream and a gas stream. From there, Dr. Whitson's model passes the oil stream through the sequence of assumed oceanic conditions from the seabed to the surface, removing the gas and adding it to the gas stream at each stage. The oil that reaches the surface is defined as stock tank oil. In Dr. Whitson's theoretical process, the gas stream does not undergo any other separation until it reaches the surface, where just the original exit gas is flashed in a single-stage separation at standard conditions, which

---

[6] Despite repeated requests to BP, the modeling files for Dr. Whitson's oceanic process were not provided to the US, so I had to deduce the details of his process from the somewhat vague description in his report, some files containing a simplified version of his process, and some trial-and-error modeling of my own until I was able to duplicate his reported results.

condenses a small amount of additional liquid (condensate) that adds to the stock tank oil volume. Dr. Whitson experimented with the number of theoretical stages and found that it took 130 stages before his results became insensitive to the number.



Figure 1. Dr. Whitson's proposed oceanic separation process, which does not account for potential condensation from the rising gas stream until it reaches the ocean surface. The separator conditions are determined from estimated profiles of temperature (T) and pressure (P) with depth.

Because most petroleum engineering software would not allow a separation process to be designed with so many stages, Dr. Whitson came up with a 5-stage approximation to his 130-stage oceanic separation, with the temperatures and pressures determined by regression (a mathematical form of trial-and-error), instead of being tied to oceanic temperature and pressure profiles. The schematic of the separation process remained the same; it just had far fewer separators. He called this his *oceanic proxy* separation process. I confirmed the agreement between his proxy process and his full oceanic process for a few cases, but there is no way to guarantee that it will always predict similar results. There is also no guarantee that all petroleum engineering software would simulate the separation process correctly, given the 5 sets of separator conditions. I suspect that many software packages would fail to perform the final separation on the gas stream, because that stage is not part of a typical separation train. If that were the case, the simulation would predict less stock tank oil than intended.

I have also developed an oceanic process model to simulate how the Macondo reservoir fluid might have separated into stock tank oil and surface gas on its way to the ocean surface. My oceanic process differs from Dr. Whitson's with one significantly different assumption, however. Dr. Whitson made a serious omission by assuming that the gas stream would rise all the way to the ocean surface before any additional liquids would condense from it. My calculations show that liquids should actually continue to condense (at each stage) from the total accumulating gas stream until the pressure falls below approximately 750 psia (which would occur about two-thirds of the way from the seabed to the ocean surface), and the amount of condensation is considerable. A schematic of my oceanic separation process is shown in Figure 2.



Figure 2. Zick oceanic separation process that accounts for potential condensation from the rising gas stream. The separator conditions are determined from estimated profiles of temperature (T) and pressure (P) with depth.

My oceanic separation process assumes that, at each depth, there is both an oil stream and a gas stream that remain isolated from each other. However, any gases that separate from the oil stream will commingle with the gas stream at the next depth, while any liquids that condense from the gas stream will commingle with the oil stream at the next depth.

This will continue all the way from the seabed to the ocean surface, where the final streams represent the stock tank oil and the surface gas. These assumptions are simple enough to allow the separation calculations (without requiring the tracking of each oil droplet and each gas bubble in a rigorous plume simulation), but they account for the separation of both streams in a logical way.  It should not matter that the gas stream, being more buoyant, might travel at a higher velocity than the oil stream, as long as one also assumes that both streams settle into a pseudo-steady state, which I believe to be a very reasonable assumption.

In order to compare my oceanic separation model with Dr. Whitson's, I adopted his 129 sets of separator conditions, giving my model 257 separator stages (one for the well's exit and 128 for each stream), as opposed to his 130 (one for the well exit, 128 for the oil stream, and one for the exit gas stream). As in Dr. Whitson's model, the well's exit pressure is assumed to be 2250 psia. Dr. Whitson made his calculations for several different exit temperatures, but seemed to suggest 210 and 130 F as the most likely extremes, so the results for those two exit temperatures are presented here as well, in Table 2 and Table 3, respectively.

| | Calculated Shrinkage Factor | | |
|---|---|---|---|
| **Oceanic Process** | **Whitson EOS** | **Zick EOS** | **% Difference** |
| **Whitson Model** | 0.467 | 0.482 | 3.2 |
| **Zick Model** | 0.489 | 0.506 | 3.5 |
| **Difference, %** | 4.7 | 5.0 | |

Table 2. Shrinkage factors for an average Macondo reservoir fluid going from 243 F and 11850 psia to 60 F and 1 atm, as calculated by both the Whitson and Zick equations of state for the oceanic separation models of both Whitson and Zick with an exit temperature of 210 F.

| | Calculated Shrinkage Factor | | |
|---|---|---|---|
| **Oceanic Process** | **Whitson EOS** | **Zick EOS** | **% Difference** |
| **Whitson Model** | 0.480 | 0.495 | 3.1 |
| **Zick Model** | 0.490 | 0.507 | 3.5 |
| **Difference, %** | 2.1 | 2.4 | |

Table 3. Shrinkage factors for an average Macondo reservoir fluid going from 243 F and 11850 psia to 60 F and 1 atm, as calculated by both the Whitson and Zick equations of state for the oceanic separation models of both Whitson and Zick with an exit temperature of 130 F.

The first thing to note is that my oceanic separation model is more efficient than Dr. Whitson's, because of the additional condensation from the gas stream. It predicts 2–5% more stock tank oil than Dr. Whitson's model does, depending slightly on the EOS but much more so on the well's exit temperature. Regardless of the EOS, my oceanic model is very insensitive to the exit temperature, but that is not the case for Dr. Whitson's oceanic model. That is understandable, because the exit temperature determines how the flowing reservoir fluid splits into the initial oil and gas streams, which are both processed in a similar manner with my oceanic model, but which are processed very differently with Dr. Whitson's model.

The other thing to note is that my EOS predicts a 3.1–3.5% greater shrinkage factor than Dr. Whitson's EOS does, depending slightly on the oceanic separation model. This is similar to the differences in the predictions for the 4-stage separation.

All of the previous shrinkage factor calculations can be summarized by Table 4, which lists the calculated shrinkage factor for a given process, relative to the shrinkage factor calculated for a single-stage process (by either Dr. Whitson's EOS or mine). The processes are listed in the order of increasing shrinkage factor. The higher the shrinkage factor, the more stock tank barrels produced per barrel of reservoir fluid.

| Separation Process | Relative Shrinkage Factor | |
|---|---|---|
| | Whitson EOS | Zick EOS |
| Single-Stage | 1.000 | 1.000 |
| Whitson Oceanic @ 210 F | 1.079 | 1.083 |
| Four-Stage | 1.106 | 1.110 |
| Whitson Oceanic @ 130 F | 1.109 | 1.112 |
| Zick Oceanic @ 210 F | 1.129 | 1.137 |
| Zick Oceanic @ 130 F | 1.132 | 1.139 |

Table 4. Shrinkage factor (to stock tank conditions) for a variety of processes, relative to the shrinkage factor predicted by either the Whitson or the Zick EOS for a single-stage separation.

The way to use Table 4 is as follows. If you are given a simulated prediction of the volume of stock tank oil that flowed from the Macondo well, and you know that the simulation assumed a certain surface process (process A), then you can determine the amount of stock tank oil for any other assumed surface process (process B) simply by dividing the given results by the table's relative shrinkage factor for process A and then multiplying them by the table's relative shrinkage factor for process B.

For example, if a simulation using my EOS has predicted 5 million barrels of stock tank oil under the assumption of BP's four-stage separation, then 5.122 million barrels would be predicted by a switch to my oceanic process with an exit temperature of 210 F (5 divided by 1.110 times 1.137 equals 5.122). There would be no reason to rerun the simulation (even if the software could handle the complicated oceanic process).

The reason the Macondo stock tank volumes can be scaled so easily (without rerunning any simulation) is that the physics of the fluid flow, from the reservoir to the well's exit, can in no way be influenced by any of the processing that takes place subsequently. Furthermore, since the flowing composition was essentially constant during the entire Macondo disaster, the conversion of the flowing reservoir fluid from mass units to stock tank volumes will always be by a constant factor that is simply proportional to the relative shrinkage factor shown in Table 4 for the assumed process.

No matter which surface process is chosen to convert the amount of spilled Macondo oil into stock tank barrels, the mass of the resulting stock tank oil will still always be less than the mass of the hydrocarbons that were actually spilled (because the stock tank oil will not include the mass of the separated surface gas). My recommendation has always been to perform the conversion with the most efficient process available, to account for

as much of the hydrocarbon mass spilled into the Gulf of Mexico as possible. Some sort of multistage separation process will always be the most efficient. In light of the calculations presented in this section, my current recommendation is to use my oceanic separation process to make the conversions. Despite Dr. Whitson's claims to the contrary, there is no need for special software to simulate such a complex process. The necessary flow calculations can be performed with any software that can handle a single-stage separation to define the stock tank oil; the predicted number of stock tank barrels should then just be increased by 13 or 14% to account for the oceanic separation (see Table 4).

# ATTACHMENT 11

(Excerpts from Bushnell Rebuttal Report)

Typically, validation data is used to select the best turbulence model based on a comparison between the experimental results and the different solutions, thus reducing the uncertainty of the calculation.  As there is only limited validation data (only the choke valve), a comparison of the results for the various turbulence models is the next best thing.  My results show very good agreement when comparing the various turbulence models.

### Gas Evolution

Dr. Sundaresan questions whether the gas evolution can fully occur in the short residence time through the capping stack: "The extent to which phase change can actually occur in these flows, given the high velocities and short residence times, is not clear" (Sundaresan Report at 4).  Dr. Sundaresan claims that my CFD solutions would be a limiting case: "Thus, his CFD simulations can consider only limiting cases" (Sundaresan Report at 4).

My assumption that the gas evolution was fully complete is conservative because it lowers the flow rate of oil.  As the oil flows through the capping stack, the lowering of the pressure releases gas from the oil.  This increases the amount of gas in the gas/oil mixture (gas evolution).  If the gas is not fully released, the gas volume fraction will be reduced, and therefore the actual flow rate would be greater than the calculated value.  Dr. Sundaresan is correct that the complete gas evolution solution can be thought of as limit, but it is a **lower limit** for calculating the mass flow rate.

To give an estimate of the maximum magnitude of this effect, Dr. Lo only found a 0.3% reduction in oil flow rate between his case with gas evolution and without it.  Therefore, the gas evolution has a very small effect on the oil flow rate.

## Dr. Sundaresan Summary

Dr Sundaresan raises general objections to the use of CFD but does not provide an alternate approach.  CFD is one of the best tools available for practicing engineers and is widely accepted in industry.

## Rebuttal of Dr. Nesic's Report

Dr. Nesic performed a number of CFD simulations in support of his report.  Dr. Nesic's CFD models' deficiencies include:

- Dr. Nesic uses the wrong particle size for the sand particles in his CFD models.  He used a diameter of 149.86$\mu$m (0.0059inch) in his CFD models; yet on page 12 he reports "grains of sand 500$\mu$m in diameter".  The smaller diameter particles typically hit walls at slower speeds and, for a given mass flow rate, increase the number of particles.  Both factors will change the erosion rate.  The incorrect particle diameter is likely to invalidate any erosion prediction, as the particle diameter is critical to any erosion calculations.

- Dr. Nesic's linear fit to his transient model is unfounded.  Refer to the following Blind Shear Ram (BSR) Transient Model section.
- Dr. Nesic's CFD modeling practices do not seem to be consistent with industry standards for CFD analysis:
    - The equations that define the CFD model using standard industry tests are not converged in a number of Dr. Nesic's models.  This means he does not have accurate mathematical solutions to the equations he used to define his model (refer to following convergence screen grabs section).
    - Dr. Nesic uses a poor quality mesh for some of his CFD models based on standard CFD industry practices.  The meshes are poor quality because they contain stretched elements, are missing inflation layers[13], and do not have enough elements through the small gaps.  It is generally accepted in industry that solving a CFD model on a poor quality mesh could give incorrect results.
    - Dr. Nesic did not perform a mesh independence study.  Industry standard for CFD modeling includes solving the model for several different levels of mesh refinement. The calculated results are then compared to verify that the results do not change depending on the mesh used.  Dr. Lo and I each performed mesh independence studies. There was no indication in Dr. Nesic's report that this had been done.  Without a mesh independence study, it is not possible to quantify the accuracy of his results.  This is particularly important given the lack of convergence and poor quality mesh used by Dr. Nesic.
- Some of Dr. Nesic's CFD models were solved using a transient (time dependent) model. However, Dr. Nesic seemed to arbitrarily stop the transient model solution and used an instantaneous solution value with steady particle tracking.  This approach is not correct.  If the fluid needs a transient solution, then the particles traveling through the fluid typically will need a transient solution as well.
- Dr. Nesic's models were not consistent, thus making any comparison or trends drawn between their results meaningless.
    - In different models, Dr. Nesic couples the discrete phase differently.  Some models include fluid interactions; others do not.
    - When the particles hit the walls they can bounce back into the fluid.  The momentum of the bouncing particles were set using bounce coefficients (1 is perfect elastic bounce, 0 is no bounce).  These coefficients are often tuned so particle tracking results will match experimental results.  Dr. Nesic uses a number of different values with his models. Some models assume elastic bounce (1,1), others use a reduced bounce (0.933 and 0.988 values), and his calibration model used a (0,0) bounce assumption.  The different bounce coefficients will result in different particle motion, which will in turn affect the erosion model results.  Dr. Nesic did not give any justification for the variation.

---

[13] Inflation layers are special shaped elements to help capture the gradient near the wall.

- o Gravity is included for some models; in other models it is not.  In some models gravity is set incorrectly to 0.981 m s$^{-2}$ instead of the correct value 9.81 m s$^{-2}$, which can be found in standard physics, engineering textbooks.  The particle motion would be different, depending on which gravity value was used, as would the erosion patterns that are dependent on accurate particle motion prediction.
- Dr. Nesic did not perform any other sensitivity studies other than the high/low flow rate solutions to help quantify his assumptions.

## Blind Shear Ram (BSR) Transient model

Dr. Nesic created a transient model of the BSR to justify/obtain a linear pressure drop versus time.  To do this he created a transient model using a very simplified geometry.  The model is very poorly documented, the only available information was on page 31 of his report *"To flesh out the erosion process between these two times, I recreated simplified versions of the BSR and CSR and then performed transient CFD simulations. The simplified versions of the BOP components retained all key features important for CFD simulations of these elements, but omitted unnecessary geometrical details that complicate and lengthen the simulations."*

The information reported in Dr Nesic's report is not enough information to recreate his CFD model and the transient models are not in his "relied-on" materials.  There is a folder[14] that contains pictures that appear to be exported from an Ansys Fluent model and two Excel workbooks containing a summary of results.  I have based my critique of the transient model results on the files in this folder.

Dr. Nesic does not appear to complete (finish) the 14 days he indicates in his report (Figure 11).  He only reports the results for 12.4 days in his excel workbook and he has only 11.1 days of exported pictures. Figure 7 shows the pressure drop against time reproduced from the "BSR-Parameter Changes with Erosion Time-0.xls" workbook in his considered materials.  The final two data points vary significantly and in combination with the pictures indicate that the mesh deformation is producing extremely large "spikes".  These "spikes" typically indicate that the model is not converging.

---

[14] The folder is \\Nesic, Srdjan - Relied Upon Modeling Runs\Fluent Simulations\Fluent Simulations\BSR\Simulation results\BSR-mesh-moving-last-2013-2-26\.



**Figure 7: Reproduced from "BSR-Parameter Changes with Erosion Time-0.xls" workbook and arrows added to show approximate time of the following pictures.**



**Figure 8: The surface mesh at 10.4 days.**



Figure 9: The surface mesh at 11.1 days, with the mesh deformation "spikes".



Figure 10: Surface mesh at 11.1 days, with larger mesh deformation "spikes".  This is the final mesh in the series.

Figure 11 shows the surface mesh as reported in Dr. Nesic's report.  The 14 days value in the third picture in Figure 11 does not agree with the pictures in the folder.  The final picture has a simulation time stamp of 9.6000e+05 (s) which time is equal to 11.1 days (Figure 10).  The time stamp is located on the bottom left corner of the Figures 8 through 10.  The timestamp appears to be clipped in Figure 11.

The surface mesh for the 14 days picture in Figure 11 is more similar to the surface mesh in Figure 8 than Figure 10.



Figure 11: "Figure 30. Transient simulation showing erosion of BSR flow geometry; red arrow points to locations of maximum erosion" reproduced from Dr. Nesic's report page 32.

Even ignoring the results simulated after 10.4 days[15] it can be shown, that a simple exponential function provides a better fit than the linear assumption used by Dr. Nesic (Figure 12 ).

$$f(x) = e^{-C1*t+C2} + C3$$

C1 = 0.103463

C2 = 69919.32

C3 = 8.969604

t is time in days.

---

[15] Had Dr. Nesic included the last two data points after 10.4 days, it would have resulted in an even worst linear fit.



**Figure 12: Pressure Drop vs. day data from "BSR-Parameter Changes with Erosion Time-0.xls" workbook extended to 24 days, with a linear and an exponential curve fits**

In general it is not a good practice to extrapolate (extend beyond available data points) CFD results, because the results may not continue to follow any trend as you move through time.  However, Figure 12 clearly shows that the exponential and linear fits would give significantly different predictions as the time increases.

The exponential fit shows that the change in pressure due to erosion would be greatest during the initial time period, reducing over time.  This is inconsistent with the linear relationship and Dr. Nesic's conclusions on page 32 of his report: *"For all the simulated geometries (BSR, CSR and UAP), I obtained a linear change of pressure over time"*.  The exponential fit shows why Dr. Nesic should have completed his transient solution before reaching his linear assumption conclusion.

## Convergence Screen grabs

The following shows the residual plots inside of Fluent showing some of the CFD models of Dr. Nesic's that are not converged.



**Figure 13: Residuals for "\\Fluent Simulations\BSR\Pre-erosion BSR case\low Flow Rate (5000 bopd)\SR-Nominal-geometry-flow-crushed-pipe-v1-dpm-strat-1-two_injection-Flux=0^01m3_s.dat"**



**Figure 14: Residuals for "\\Fluent Simulations\BSR\Pre-erosion BSR case\high Flow Rate (65000 bopd)\ BSR-Nominal-geometry-flow-crushed-pipe-v1-dpm-strat-1-two_injection-v=0^686873066m_s-dpm-end.dat" model**



**Figure 15: Residuals for "\\Fluent Simulations\BSR\Post-erosion BSR case\high Flow Rate (65000 bopd)\ BSR-erroded-flow-crushed-pipe-v1-fluent-unsteady-steady-particle-start-end.dat"**

## Dr. Nesic Summary

I limited my comments to the CFD modeling undertaken by Dr. Nesic, but given the numerous serious problems with Dr. Nesic CFD models, I do not believe Dr. Nesic can use his CFD results to form any meaningful conclusions.