## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | § | MDL No. 2179 |
| "DEEPWATER HORIZON" in the | § | |
| GULF OF MEXICO, | § | SECTION:  J |
| on APRIL 20, 2010 | § | |
| | § | JUDGE BARBIER |
| Applies to:  No. 10-2771, | § | |
| and All Cases | § | MAG. JUDGE SHUSHAN |
| | § | |
| | § | |

## MEMORANDUM IN SUPPORT OF HALLIBURTON ENERGY SERVICES, INC.'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... ii

I.      Introduction ...................................................................................................................1

II.     Background and Procedural History ..............................................................................2

        A.      The BP/HESI Contract and allocation of risk. ..................................................2

        B.      Procedural history .............................................................................................4

III.    Summary of Argument ...................................................................................................7

IV.     Standard of Review ........................................................................................................8

V.      Argument and Authorities..............................................................................................8

        A.      BP specifically agreed to assume the risks at issue. ..........................................8

        B.      The Fifth Circuit has not invalidated a pre-incident
                release on the basis of gross negligence. ...........................................................9

        C.      There is no public policy reason to invalidate the BP
                release clause. ..................................................................................................12

        D.      To the extent gross negligence could invalidate the
                release, it must bear a causal relationship to the alleged injury.............................14

        E.      Remediation and clean-up costs are not Direct Damages Claims. .......................15

VI.     Conclusion and Prayer .................................................................................................19

**MEMORANDUM IN SUPPORT OF HALLIBURTON ENERGY
SERVICES, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
2190144 v4-24010/0002 PLEADINGS

i

# TABLE OF AUTHORITIES

## CASES

*Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*,
   289 F.3d 373 (5th Cir. 2002) ...................................................................................8

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)..................................................................................................8

*Center for Biological Diversity, Inc. v. BP Am. Prod. Co.*,
   704 F.3d 413 (5th Cir. 2013) .................................................................................18

*Compass Ins. Co. v. Cravens, Dargan & Co.*
   748 P.2d 724 (Wyo. 1988)................................................................................ 16-17

*East River S.S. Corp. v. Transamerica Delaval, Inc.*,
   476 U.S. 858 (1986)................................................................................................13

*Houston Exploration Co. v. Halliburton Energy Servs., Inc.*,
   269 F.3d 528 (5th Cir. 2001) ............................................................................. 9-10

*Houston Exploration Co. v. Halliburton Energy Servs., Inc.*,
   Civil Action No. 98-1302, 2000 U.S. Dist. LEXIS 5406
   (E.D. La. April 18, 2000)................................................................................... 9-10

*Lansco, Inc. v. Dep't of Envtl. Protection*
   350 A.2d 520 (N.J. Super. Ct. Ch. Div. 1975),
   *aff'd*, 368 A.2d 363 (N.J. Super. Ct. App. Div. 1976) ...................................... 17-18

*Mid-Continent Cas. Co. v. Eland Energy, Inc.*,
   795 F. Supp. 2d 493 (N.D. Tex. 2011) .................................................................16

*Todd Shipyards Corp. v. Turbine Servs., Inc.*,
   674 F.2d 401 (5th Cir. 1982) ....................................................................... 10-11, 15

*Todd Shipyards Corp. v. Turbine Servs., Inc.*,
   467 F. Supp. 1257 (E.D. La. 1978).......................................................................10

## STATUTES

FED. R. CIV. P. 56(a) .......................................................................................................8

## OTHER AUTHORITIES

Kenneth G. Engerrand, *Indemnity for Gross Negligence in
   Maritime Oilfield Contracts* 10 LOY. MAR. L.J. 319 ......................................11, 12

**MEMORANDUM IN SUPPORT OF HALLIBURTON ENERGY
SERVICES, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
2190144 v4-24010/0002 PLEADINGS

ii

GREGORY P. DESCHANES & KURT M. MULLER, 1-11 NEW
    APPELMAN INSURANCE LAW PRACTICE GUIDE 11.08 [1] (2012) .............................................16

Halliburton Energy Services, Inc. ("HESI") files this Memorandum in Support of Its Motion for Partial Summary Judgment, and respectfully shows the Court as follows:

## I.    Introduction

As part of its settlement with the Economic and Property Damages Settlement Class ("Economic Class"), BP assigned certain claims against HESI to the Economic Class "as a juridical entity" (the "Assigned Claims").  Included in the Assigned Claims are BP's first-party damage claims for the cost to re-drill the Macondo well, lost hydrocarbons, lost profits, punitive damages, and response, containment, and clean-up costs.[1]  *See* Economic and Property Damages Settlement Agreement (Dkt. No. 6430), at Exh. 21, §1.1.3.  But the contract between HESI and BP contains a mutual allocation of the risks associated with the work to be performed, pursuant to which BP agreed to bear the risk of certain types of damages.  In accordance with that risk allocation, BP released any claims against HESI for Direct Damages, including the claims it has purportedly assigned to the Plaintiffs.[2]

In response to HESI's Assignment Motion, Plaintiffs argued that any gross negligence by HESI would invalidate BP's release of its Direct Damages Claims.  *See* Dkt. No. 10187 at 10 (quoting Order and Reasons [As to Transocean's and BP's Cross-Motions for Partial Summary Judgment Regarding Indemnity] (Dkt. No. 5446) ("Transocean Indemnity Order")).  HESI disagrees that it was grossly negligent, but gross negligence (or lack thereof) is irrelevant for the purposes of this Motion.  Because gross negligence will not invalidate the relevant contractual

---

[1] In its Motion for Partial Summary Judgment as to BP's "Direct Damages" Claims Purportedly Assigned to the Economic Class (Transocean's "Motion"), Transocean referred to such claims as "Direct Damages Claims." For consistency, HESI will also do so here.  Additionally, to avoid duplication, HESI incorporates Transocean's Motion as if fully set forth herein and writes separately to make certain additional points.

[2] HESI has challenged the validity of the purported assignments in its Motion for Judgment on the Pleadings or Alternative Motion for Summary Judgment Regarding BP's Assignment of Claims (HESI's "Assignment Motion") (Dkt. No. 8268).

MEMORANDUM IN SUPPORT OF HALLIBURTON ENERGY
SERVICES, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT
2190144 v4-24010/0002 PLEADINGS

1

provisions, HESI moves for partial summary judgment as to any BP Direct Damages resulting from the blowout of the Macondo well.[3]   Additionally, because claims for control, response, containment and clean-up costs are not Direct Damages Claims but, rather, relate to third-party damages, BP's indemnity obligation precludes recovery of such costs from HESI, whether or not HESI was grossly negligent.

## II.   Background and Procedural History

### A.   The BP/HESI Contract and allocation of risk.

On April 15, 2009, BP contracted with HESI to perform cementing operations and provide certain other related support services in the Gulf of Mexico.   Contract for Gulf of Mexico Strategic Performance Unit Offshore Well Services Between BP Exploration and Production, Inc. and Halliburton Energy Services, Inc. ("BP/HESI Contract") at p. 42.[4]   As part of the BP/HESI Contract, BP and HESI agreed on a detailed, mutual allocation of risk pursuant to which each party agreed to bear certain risks, and each party committed to "save, indemnify, release, defend and hold harmless" the other for risks that party agreed to assume.   *Id*. at 20-24.

Generally, BP assumed the risk of injury to BP employees, damage to BP's equipment, damage to any well or hole, damages resulting from a blowout or uncontrolled well condition, pollution or contamination, and third-party claims arising out of BP's negligence or breach of duty.   *Id*. at §§ 19.2, 19.3(b), 19.4(a), 19.6.   HESI assumed the risk of injury to HESI employees, damage to HESI's equipment, pollution occurring on HESI's premises or originating from its

---

[3] HESI notes, as did Transocean, that Plaintiffs have not sought to amend any Master Complaint to assert the claims assigned by BP to the Economic Class, but the position taken by Plaintiffs in their Opposition to HESI's Assignment Motion, as well as the positions taken by Plaintiffs and BP in their Proposed Findings of Fact and Conclusions of Law (Dkt. Nos. 10459, 10467), obligate HESI to bring this Motion at this time.

[4] The BP/HESI Contract has previously been submitted as an exhibit to prior summary judgment pleadings and was admitted as an exhibit at the Phase One trial.   *See* Dkt. No. 4767; TREX 7727.   Therefore, HESI does not attach it here, but will make the Contract available to the Court if requested.

MEMORANDUM IN SUPPORT OF HALLIBURTON ENERGY
SERVICES, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT
2190144 v4-24010/0002 PLEADINGS

property or equipment located above the surface of the land or water, and third-party claims arising out of HESI's negligence or breach of duty.[5]  *Id.* at §§ 19.1, 19.3(a), 19.4(b).  *See also* HESI's Motion for Summary Judgment Regarding Indemnity Issues (Dkt. No. 4767) (incorporated herein by reference as if fully set forth).

Thus, both BP and HESI assumed certain risks under the BP/HESI Contract.  The BP/HESI Contract represents the parties' bargained-for allocation of risks associated with the work to be performed under the BP/HESI Contract.

Moreover, in accordance with the parties' risk allocation, §21 of the BP/HESI Contract dictates that each party is responsible for its own consequential damages:

> For the purposes of this Clause 21, the expression "Consequential Loss" shall mean consequential loss or damages under applicable law and/or any indirect, special, incidental, punitive, or consequential losses or damages, including without limitation loss of production, loss of product, loss of use, loss of business and business interruption and loss of revenue, profit or anticipated profit whether direct or indirect arising from or related to the performance of the CONTRACT and whether or not such losses were foreseeable at the time of entering into the CONTRACT except to the extent such consequential, indirect, and/or special damages, loss of profits, loss of production, or loss of use are part of a Third Party claim for which a party is seeking contribution or indemnification pursuant to this CONTRACT.  For the purpose of this Clause, "Third Party" shall mean any party which is not a member of COMPANY GROUP or CONTRACTOR GROUP and "Third Party Claim" shall mean any claim raised by a Third Party not claiming, directly or indirectly, by or through any member of COMPANY GROUP or CONTRACTOR GROUP.
>
> Notwithstanding any provisions to the contrary elsewhere in the CONTRACT and except to the extent of any agreed liquidated damages or any termination fees provided for in the CONTRACT, COMPANY shall save, indemnify, release, defend and hold harmless CONTRACTOR GROUP from COMPANY GROUP's own Consequential Loss and CONTRACTOR shall save, indemnify, release, defend and hold harmless COMPANY GROUP and SERVICE COMPANY GROUP from CONTRACTOR GROUP's own Consequential Loss.

---

[5] HESI's indemnity obligation for third-party claims is expressly trumped by BP's indemnity obligation for third-party claims arising from a blowout, including pollution claims.  *See* BP/HESI Contract at §§ 19.3(a), 19.4, 19.6.

> CONTRACTOR's obligation with respect to SERVICE COMPANY GROUP shall be subject to the provisions of clause 19.9 [regarding application of release/indemnity provisions only to those Service Companies who have provided similar releases/indemnities].

BP/HESI Contract at pp. 26-27.

Section 19.7 mandates that the Contract's releases and indemnities are to be given a broad reach:

> All exclusions, releases of liabilities and indemnities given under this Clause . . . and Clause 21 [Consequential Loss] shall apply irrespective of cause and notwithstanding the negligence or breach of duty (whether statutory or otherwise) of the indemnified PARTY or any other entity or party and shall apply whether or not the claim, liability, damage, or expense in question is:
>
> (a)   predicated on sole, joint or concurrent fault, negligence (whether active, passive or gross), strict liability, statutory duty, contractual indemnity or otherwise at law, or
>
> (b)   sought directly or indirectly by way of recovery, indemnification, or contribution by any person or entity against COMPANY GROUP, SERVICE COMPANY GROUP, or CONTRACTOR GROUP as the case may be.

BP/HESI Contract at pp. 22-23.

Thus, BP agreed, with certain inapplicable exceptions, to bear the risk for loss or damage to the well, for pollution and contamination claims, for damage to the reservoir and the loss of oil or gas therefrom, for loss of product, for lost profits, and for punitive damages, regardless of the cause of the claims, regardless of whether HESI breached a duty to BP, regardless of whether the claims were based on HESI's negligence or gross negligence, regardless of whether the claims arose under a strict liability statute or were based on statutory violations, and regardless of whether the claims were sought directly or indirectly against BP or HESI.

## B.      Procedural history

In November 2011, HESI moved for summary judgment regarding BP's duty to indemnify it against third-party claims for personal injury, wrongful death, and property damage.

(Dkt. No. 4767). Transocean did the same. (Dkt. No. 4477). BP filed cross-motions in response to both motions. (Dkt. Nos. 4827, 4976).

In the Transocean Indemnity Order, the Court drew a distinction between a pre-incident agreement to indemnify and a pre-incident exculpation or release, suggesting that, while an exculpation or release[6] involves an agreement in advance to release the other contracting party, an indemnity determines who ultimately bears the risk of damage to a third-party. Transocean Indemnity Order at 11 (citing *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 507-08 (Tex. 1993)). The Court recognized that, for purposes of the Transocean Indemnity Order, indemnity was at issue, not a release.[7] Transocean Indemnity Order at 11.

The Court distinguished several Fifth Circuit cases as involving either (1) an indemnity clause that did not purport to include gross negligence or (2) exculpation rather than indemnity. Transocean Order at 12-14 (citing *Becker v. Tidewater, Inc.*, 586 F.3d 358, 367 (5th Cir. 2009); *Houston Exploration Co. v. Halliburton Energy Servs., Inc.*, 269 F.3d 528, 531 (5th Cir. 2001); and *Todd Shipyards Corp. v. Turbine Servs., Inc.*, 674 F.2d 401, 411 (5th Cir. 1982) The Court noted that, "[b]ecause public policy was not at issue in *Becker*, and because *Houston Exploration* and *Todd Shipyards* concerned releases, not indemnities" it was "free to decide this question." Transocean Indemnity Order at 14.

The Court recognized the tension between two different policies—freedom of contract, on the one hand, and a reluctance to encourage grossly negligent behavior on the other,

[6] As the Court did, HESI will refer to BP's agreement to assume the risk of its Direct Damages under the circumstances present here as a "release." Transocean Indemnity Order at 11.

[7] The same is true of the issues presented in HESI's prior summary judgment motion regarding indemnity. Thus, any statements made by the Court in its prior Orders purporting to address the effect of gross negligence on a release provisions are dicta.

acknowledging that invalidating a contract on public policy grounds should be done with caution and "only in cases plainly within the reasons on which that doctrine rests, because the phrase 'public policy' can be vague and variable."  Transocean Indemnity Order at 14-15 (citing *Twin City Pipe Line Co. v. Harding Glass Co.*, 283 U.S. 353, 356 (1931)).

The Court found it significant that the BP/Transocean contract did not encourage Transocean to act in a grossly negligent manner because it allocates risk to both BP and Transocean.  Transocean Indemnity Order at 15.  The Court also found that Transocean and BP held "roughly" equal bargaining power (to the extent it was not equal, Transocean was likely the weaker party), and that "BP and Transocean are sophisticated parties engaging in a potentially lucrative and obviously risky endeavor.  The Drilling Contract reflects that they attempted to allocate risk ahead of time, ostensibly in the hopes that some degree of certainty may be brought to the risks inherent in that undertaking."  Transocean Indemnity Order at 16 & n.12 (citations omitted).  Finally, noting that the indemnity clause (unlike a release) did not leave an injured party uncompensated, the Court held that "in the absence of a binding rule to the contrary, the Court finds that *if* Transocean committed gross negligence that caused pollution originating below the surface of the water, public policy would not bar its contractual indemnity from BP." *Id*. at 16-18 (emphasis in original).

As to HESI's and BP's Cross Motions for Partial Summary Judgment Regarding Indemnity, the Court noted that the Transocean Indemnity Order, "resolve[s] many of the issues presented," and "for reasons stated in the Transocean Indemnity Order," BP must indemnify HESI "for third-party compensatory claims that arise from pollution or contamination that did not originate from the property or equipment of HESI located above the surface of the land or water, even if [HESI's] gross negligence caused the pollution."  Order and Reasons [As to

Halliburton's and BP's Cross-Motions for Partial Summary Judgment Regarding Indemnity] (Dkt. No. 5493) at 3 ("HESI Indemnity Order") (footnotes omitted).  Accordingly, the Court enforced the plain terms of the BP/HESI Contract and required BP to comply with its obligation to indemnify HESI.

As part of its settlement agreement with the Plaintiffs, BP assigned its Direct Damages Claims against HESI to the Economic Class.  *See* Dkt. No. 6430.  The Assigned Claims include:

- damages related to the repair, replacement, and/or re-drilling of the MC-252 Well;

- economic damages for the loss of the MC-252 Well, including lost profits, lost hydrocarbons, and diminution in value of the leasehold;

- costs that BP incurred to control the MC-252 Well and/or to respond to, contain, and/or clean up the DWH Spill; and

- punitive damages

Dkt. No. 6430 at Exh. 21, §1.1.3.  *See also* BP's Cross-Complaint and Third-Party Complaint Against Halliburton (Dkt. No. 2082) at 44-45 (Seeking "costs and expenses incurred by BP to clean up and remediate the oil spill . . . , the lost profits from and/or diminution in value of the Macondo prospect, and other costs and damages incurred by BP related to the *Deepwater Horizon* incident and resulting oil spill.").  The Economic Class may not seek recovery of or collect damages from HESI for any Assigned Claims until it is "finally determined" that HESI cannot recover those damages from BP under any theory.  Dkt. No. 6430, Exh. 21, at §1.1.2.4.

## III.    Summary of Argument

The Assigned Claims fall squarely within the risks that BP specifically agreed it would assume, whether or not caused by HESI's negligence, gross or otherwise.  The Fifth Circuit has not invalidated a pre-incident release on the basis of gross negligence, and would not do so under

the circumstances present here, which include a detailed, bargained-for allocation of various risks between two sophisticated parties—a situation which, as the Court has already recognized, does not encourage negligence.  Public policy does not compel nullification of BP's release.  Moreover, to the extent that BP seeks the recovery of control, containment, response and clean-up costs, these are not Direct Damages Claims.  Rather, they are third-party claims for which the Court has ruled HESI is entitled to indemnity.  Because the Court has already held gross negligence does not invalidate an indemnity, HESI is entitled to summary judgment as to those claims.

## IV.    Standard of Review

Summary judgment is proper if the moving party establishes that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp*., 289 F.3d 373, 375 (5th Cir. 2002).  Here, because there is no genuine dispute as to any material fact, HESI is entitled to partial summary judgment.

## V.    Argument and Authorities

### A.    BP specifically agreed to assume the risks at issue.

The Assigned Claims include risks that BP specifically and indisputably agreed to assume under the terms of the BP/HESI Contract.  BP agreed to bear the risk of pollution or contamination from the reservoir, blowout, fire, explosion, or uncontrolled well condition, loss or damage to the well or hole, and damage to the reservoir.  BP/HESI Contract at §§19.4, 19.6.  BP further agreed that it would assume the risk of its loss of production, loss of product, loss of revenue, loss of profit, and punitive damages.  BP/HESI Contract at §21.  BP agreed to assume

these risks regardless of whether claims or damages result from HESI's negligence, gross or otherwise.  BP/HESI Contract at §19.7.

### B.    The Fifth Circuit has not invalidated a pre-incident release on the basis of gross negligence.

In the Transocean Indemnity Order, the Court distinguished two Fifth Circuit cases on the ground that they involved releases rather than indemnities.  In *Houston Exploration Co. v. Halliburton Energy Servs., Inc.*, Halliburton was hired by The Houston Exploration Company ("THEC") to perform drill stem testing operations on THEC's offshore well.  269 F.3d 528, 529 (5th Cir. 2001).  After the testing was completed, the well blew out, and THEC sued, alleging that Halliburton was responsible for the blowout.  269 F.3d at 530-31.  The contract at issue, which required THEC "to defend, indemnify and hold Halliburton . . . harmless from and against any and all liability, claims, costs, expenses, attorneys fees and damages . . . resulting from a loss of well control," was a "printed form work ticket," with the exculpatory language on the back of the form.  *Id*. at 529-30; *Houston Exploration Co. v. Halliburton Energy Servs., Inc.*, Civil Action No. 98-1302, 2000 U.S. Dist. LEXIS 5406, at *22-23 (E.D. La. April 18, 2000).  The District Court did not enforce the indemnity clause because the Court found Halliburton grossly negligent.  2000 U.S. Dist. LEXIS 5406, at *22-23.  The Fifth Circuit reversed, noting that "[n]either party disputes that a party's gross negligence defeats its right to enforce an indemnity agreement," but ultimately holding that the conduct at issue did not amount to gross negligence. 269 F.3d at 532-33.

In the Transocean Indemnity Order, this Court stated that "[a]lthough *Houston Exploration* makes clear that gross negligence will invalidate a ***release***, the case does not stand for the proposition that public policy prohibits ***indemnification*** for gross negligence."

**MEMORANDUM IN SUPPORT OF HALLIBURTON ENERGY
SERVICES, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
2190144 v4-24010/0002 PLEADINGS

9

Transocean Order at 14 (emphasis in original).  But the Fifth Circuit did not invalidate the release in *Houston Exploration* given that it reversed the district court's finding that Halliburton was grossly negligent.  *Id.* at 532-33.  Moreover, although *Houston Exploration* stated "[b]ecause neither party challenges [the district court's finding that Louisiana law applied] on appeal, and because we find that that the same outcome obtains whether Louisiana or maritime law applies, we adhere to the district court's finding and apply Louisiana law," it did not cite maritime authority or specifically analyze maritime law on the issue of whether a release of liability for gross negligence is void.  *See id.* at 531 nn.5, 6 (citing La. Civ. Code  Ann. Art. 2004 and *Sevarg Cor. v. Energy Drilling Co.*, 591 So.2d 1278 (La. Ct. App. 1991)).

The District Court opinion in *Houston Exploration* cited *Todd Shipyards Corp. v. Turbine Servs., Inc.*, 647 F.2d 401 (5th Cir. 1982) for the proposition that the result would have been the same under general maritime law: "Gross negligence . . . will invalidate an exemption from liability . . . ."  2000 U.S. Dist. LEXIS 5406, at *23, n.11 (citing *Todd Shipyards*, 674 F.2d at 411).  In *Todd Shipyards*, the district court held a limitation of liability clause in a ship repair contract ineffective because the party was guilty of gross negligence.  674 F.2d at 409, 411.  The contract at issue was typed on Todd Shipyards stationery, on which the limitation of liability clause was pre-printed.  *Todd Shipyards Corp. v. Turbine Servs., Inc.*, 467 F. Supp. 1257, 1270 (E.D. La. 1978).  The district court seemed particularly concerned with discouraging negligence, and stated that "[t]he rule I have stated merely discourages [g]ross negligence by making those who are guilty of [g]ross negligence pay damages . . . [W]hen a shipyard effectively ignores a vessel repair it has contracted to perform, red-letter clauses must fall."  *Id.* at 1299.

Reversing, the Fifth Circuit stated:

> Gross negligence which will invalidate an exemption from liability has been defined as ". . . harm willfully inflicted or caused by gross or wanton negligence." 6A CORBIN ON CONTRACTS §1472 (1964 ed.).  The type of negligence, "ordinary" or "gross," depends upon the particular circumstances of each case.  A careful review of the record leads us to the firm conclusion that Todd was not guilty of inflicting an intentional tort, or that the Owners' damages were caused by a wanton disregard of Todd's responsibility under the contract or the duty owed by it to the owners.  Thus the district court's conclusion that Todd was guilty of gross negligence is erroneous.

674 F.2d at 411.  Accordingly, the court relied on Corbin on Contracts for its broad, general statement that gross negligence will invalidate an exemption from liability, but held, as did the Fifth Circuit in *Houston Exploration*, that gross negligence was not established under the circumstances present.  *Id*.  Also, like the court in *Houston Exploration*, the Fifth Circuit in *Todd Shipyards* did not examine whether gross negligence is a proper standard for invalidating a release.  And both cases dealt with unilateral exemptions from liability; neither addressed a detailed risk allocation scheme such as the one that governs here.

> Thus,

> [a]s neither the Supreme Court nor the Fifth Circuit has been required to decide whether gross negligence actually invalidates a contractual allocation of liability, this issue is ripe for admiralty judges to consider all of the public policy considerations in a maritime setting.  This includes exemptions from liability in diverse contexts ranging from ship repair to offshore drilling and exploration.  It includes provisions that range from red-letter releases by parties who may be of unequal bargaining power to reciprocal indemnity provisions that are extensively negotiated by sophisticated parties of equal bargaining power.  It involves different standards of conduct ranging from the liability without fault of unseaworthiness, to simple negligence, to gross negligence, to intentional conduct.

Kenneth G. Engerrand, *Indemnity for Gross Negligence in Maritime Oilfield Contracts*, 10 LOY. MAR. L.J. 319, 355 (Spring 2012).

**C.**     **There is no public policy reason to invalidate the BP release clause.**

Public policy does not support invalidating the release provisions in the BP/HESI Contract under the circumstances of this case.  In the Transocean Indemnity Order, the Court recognized the tension between the differing policies of freedom of contract and a reluctance to encourage grossly negligent behavior.  Transocean Indemnity Order at 14.  The Court acknowledged that invalidating a contract on public policy grounds should be done with caution and "only in cases plainly within the reasons on which that doctrine rests."  Transocean Indemnity Order at 15.

With respect to the policy argument, the Court found it significant that the contract between BP and Transocean allocates risk to both parties and, given that, did not encourage Transocean to act in a grossly negligent manner.  The Court also found that Transocean and BP held approximately equal bargaining power, and that the contract represented their attempt to allocate the risk of engaging in a potentially lucrative and risky endeavor in advance, "ostensibly in the hopes that some degree of certainty may be brought to the risks inherent in that undertaking." *Id.* at 16 & n.12 (citations omitted).  "Many courts that have tackled this issue have agreed that there is a critical difference between unilateral exemptions from liability in contracts of adhesion produced from superior bargaining power in comparison to indemnity provisions that fairly allocate risks between sophisticated parties based on substantive and economic reasons."  Engerrand, 10 Loy. Mar. L.J. at 355-56.

The BP/HESI Contract involves the latter.  BP and HESI are sophisticated entities, represented by competent counsel, and are familiar with the oil and gas industry.  HESI did not take advantage of BP.  BP and HESI can and should be permitted to make decisions about the risks they are willing to bear, and the Court should respect their allocation of those risks.  *See*

Transocean Indemnity Order at 15 ("The general rule is that competent persons should have the utmost liberty of contracting, and therefore agreements voluntarily and fairly made are upheld).

Any argument that public policy favors invalidating the BP release ignores the economic realities of the situation.  Indemnity and release agreements in maritime oilfield contracts are negotiated not only to allocate risks to each party based on their ability to prevent the damage at issue, but also based on the parties' relative investments and economic interests.  BP, as the well owner, had an enormous upside in the potential profits from the Macondo well.  HESI stood only to gain the relatively minor price of its cement job.  With greater potential for reward comes the burden of the greater risk associated with the escape of the oil and loss of the well.  Certainly the cost of a cement job would increase, likely to a level beyond which BP (or any other operator) would be willing to pay, if HESI was required to include in its pricing the risk of pollution damage, the cost to re-drill the well, and the loss of hydrocarbons.  As the U.S. Supreme Court has noted:

> Contract law, and the law of warranty in particular, is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreement.  The manufacturer can restrict its liability, within limits, by disclaiming warranties or limiting remedies.  In exchange, the purchaser pays less for the product.  Since a commercial situation generally does not involve large disparities in bargaining power, we see no reason to intrude into the parties' allocation of the risk.

See *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 872-73 (1986) (citations omitted) (describing warranty action).

As the Court has already recognized, the BP/HESI Contract's risk allocation does not encourage negligence.  Unlike an adhesion-style, unilateral, pre-incident waiver, HESI does not escape all liability for its actions in connection with the parties' relationship.  To the contrary, HESI assumed responsibility for its employees, for claims arising out of damage to HESI's

**MEMORANDUM IN SUPPORT OF HALLIBURTON ENERGY SERVICES, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
2190144 v4-24010/0002 PLEADINGS

13

property or equipment, and claims for pollution originating from HESI's property or equipment located above the surface of the land or water.  HESI also agreed to release BP from HESI claims for consequential losses.  These are risks that HESI can reasonably account for (and insure for) in pricing its services.

The primary policy reason cited by the Court for drawing a distinction between a release and an indemnity is that a release leaves an injured party uncompensated.[8]  Transocean Indemnity Order at 16.  Under these facts, that concern should not prevail because unlike an adhesion contract, BP and HESI are sophisticated parties who contractually allocated the risks of doing business together, and that allocation does not encourage negligence.  To invalidate the release provision would, in essence, reward BP (the contracting party with arguably more power) by absolving it of the very bargained for risk allocation that served as the basis of the contract.  Under these facts, the "uncompensated" party is a sophisticated company who knowingly accepted those risks.

> **D.     To the extent gross negligence could invalidate the release, it must bear a causal relationship to the alleged injury.**

Plaintiffs have taken the position—citing no authority—that "unlike the claim for punitive damages, which arguably needs to satisfy the *P&E Boat Rentals* showing of knowledge, participation or ratification by the management of the corporation, any grossly negligent or reckless conduct (even if only 'operational') is sufficient to invalidate the release as a matter of

---

[8] Even BP argued that maritime law makes no distinction between an indemnity and a waiver, and that it should not do so.  *See* BP's Memorandum in Opposition to Transocean's Motion for Partial Summary Judgment and in Support of BP's Cross Motion for Partial Summary Judgment Relating to Alleged Contractual Indemnities (Dkt. 4826), at 6-12.

public policy."[9]  Plaintiffs' Opposition to Halliburton's Motions for Partial Judgment on the

Pleadings at 10 n.23.  (Dkt. No. 10187).  But, contrary to Plaintiffs' broad statement, to the extent

that gross negligence could invalidate the bargained-for risk allocation between BP and HESI, it

would only do so to the extent that such gross negligence bears a causal relationship to the

alleged injury.  *See Todd Shipyards*, 674 F.2d at 411 ("[G]ross negligence which will invalidate

an exemption from liability has been defined as '. . . harm willfully inflicted ***or caused by gross***

***or wanton negligence***.'") (citing 6A RICHARD L. CORBIN, CORBIN ON CONTRACTS §1472 (1964))

(emphasis added).  As HESI established in its Post-Trial Brief, there is no causal link between

actions on its part and the blowout of the Macondo well.  *See* Brief Regarding Post-Trial Matters

(Dkt. No. 10469), at 7-15.

### E.      Remediation and clean-up costs are not Direct Damages Claims.

In the Transocean Indemnity Order, the Court distinguished between an indemnity and a

release, stating that

> Courts and contracts sometimes broadly use the term "indemnity" to refer to a
> contract whereby one party agrees in advance to release the other contracting
> party from liability in the event the former party is damaged.  Though other
> names are applicable, the Court will refer to such a clause as a "release."  As
> distinguished from a release, a true "indemnity" agreement determines which
> party to a contract will ultimately bear the risk of injury to a ***third*** party.

Transocean Indemnity Order at 11 (emphasis in original).  Plaintiffs have suggested that

response and clean-up costs are included in BP's Direct Damages:  "the assignment primarily

relates to BP's own 'first-party' damages, such as the loss of the well, loss of production, the costs

of drilling the relief wells, ***clean-up and response costs directly incurred by BP***, etc."  Plaintiffs'

---

[9] Plaintiffs assert essentially the same position in their post-trial brief.  *See* Post-Trial Brief Submitted by the
Plaintiff Steering Committee on Behalf of Plaintiffs and Claimants-in-Limitation For the Phase One Limitation and
Liability Trial (Dkt. 10458) at 3.

Opposition to HESI's Assignment Motion (Dkt. No. 10187) at 7 n.13 (emphasis added).   But

first-party damages require injury *to BP*; an indemnity involves injury to a third-party, or third-

party damages.   *See* Transocean Indemnity Order at 11 (Indemnity involves injury to a third

party); *see also Mid-Continent Cas. Co. v. Eland Energy, Inc.*, 795 F. Supp. 2d 493, 505 n.8

(N.D. Tex. 2011) (citing *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 17 (Tex.

2007)) ("[A] first party claim is stated when 'an insured seeks recovery for the insured's own

loss,' whereas a third-party claim is stated when 'an insured seeks coverage for injuries to a third

party.'"); GREGORY P. DESCHENES & KURT M. MULLEN, 1-11 NEW APPLEMAN INSURANCE LAW

PRACTICE GUIDE 11.08 [1] (2012) (explaining that under a first-party insurance policy, a

policyholder typically seeks coverage for a loss the policyholder has directly suffered, such a fire

loss or a business interruption claim, while third-party insurance provides coverage for claims

against the insured).   Regarding clean-up and response costs, BP did not suffer injury to its own

property, as it does not own the Gulf of Mexico or the shores, beaches, and wetlands of

neighboring states.   Rather, it paid to clean up the property of others, making clean-up and

response costs third-party damages.

In *Compass Ins. Co. v. Cravens, Dargan & Co.*, the Wyoming Supreme Court addressed

whether environmental cleanup costs were first-party damages covered by a property insurance

policy or third-party damages covered by a commercial liability policy.   748 P.2d 724 (Wyo.

1988).   There, an unknown person opened the valve on an oil storage tank in a maintenance yard

owned by the Wyoming highway department; approximately 3000 gallons of oil flowed out of

the tank and into a ditch, where it was carried by water onto the fields of other landowners.   *Id.* at

726.   The state cleaned up its own property as well as that of the other landowners.   *Id.*   The state

had both a property insurance policy and a commercial liability insurance policy; the liability

**MEMORANDUM IN SUPPORT OF HALLIBURTON ENERGY
SERVICES, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
2190144 v4-24010/0002 PLEADINGS

insurance policy covered "all sums which the insured shall become legally obligated to pay as damages because of . . . property damage . . . ." *Id.* at 726-27. The property insurance carrier paid the entire claim and acquired subrogation rights against the liability insurer. *Id*.

The clear intent of the liability policy was to pay for damage to others' property, while the property damage policy was to pay for damage to the state's property. *Id*. at 729-30. Accordingly, the court held that the property insurance carrier was entitled to recover the amounts it paid the insured to clean up the property of other landowners. *Id.* at 730. The court thus drew a distinction between first-party and third-party claims based upon whose property was actually damaged.

Likewise, in *Lansco, Inc. v. Dep't of Envtl. Protection*, an insured (Lansco) had oil storage tanks on property bordering the Hackensack River. 350 A.2d 520 (N.J. Super. Ct. Ch. Div. 1975), *aff'd*, 368 A.2d 363 (N.J. Super. Ct. App. Div. 1976). As in *Cravens*, an unknown person opened the valves on two tanks, causing 14,000 gallons of oil to leak from the tanks; the oil made its way into storm drains that emptied into the Hackensack River. *Id*. at 521. The New Jersey Department of Environmental Protection informed Lansco that if it did not clean up the spill, the state would do so and bill Lansco for the cost, as well as levy fines. *Id*. at 522. Lansco paid to clean up the spill and its insurer denied coverage, in part, because it argued that coverage did not extend to damages recoverable by the state (a third-party claim) for injury to the environment. *Id.* at 523.

According to the court, the state had the right to recover damages for an injury to public resources and the environment. *Id*. at 524. Since "an insurance contract is essentially one of indemnification," Lansco could reasonably have expected to be indemnified for liability arising out of the operation of its business and, because the statutory scheme in question fixed the

**MEMORANDUM IN SUPPORT OF HALLIBURTON ENERGY SERVICES, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
2190144 v4-24010/0002 PLEADINGS

17

measure of damages as the cost of eliminating the oil from the waters of the state, the cost of clean-up determined the amount Lansco became obligated to pay and for which it was entitled to indemnification. *Id.* at 524-25. Thus, because the insured was liable for damage to and the clean-up of public property, it was entitled to indemnification under its liability policy.

Similarly here, as Transocean pointed out in its Motion, there is no question that BP was liable under OPA for response and clean-up costs. *See* Transocean's Motion at 22-25 (citing cases). Indeed, BP's clean-up and source control activities were conducted at the direction of the federal government. *See Center for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 425 (5th Cir. 2013) ("The killing of the Macondo well occurred at the insistence of the federal government acting pursuant to the extraordinary powers granted to the President to oversee and direct the emergency response to the oil spill."); *id.* at 18 ("BP participated in the response activities at the direction of the federal authorities to stop the oil spill."); *id.* at 431 ("[T]he Executive Branch is charged with the responsibility to oversee the cleanup."). Costs paid by BP to clean up the property of others, or to stop the flow oil onto the property of others, are properly viewed as relating to BP's liability to third-parties for which, in the absence of its indemnity obligations, and under certain circumstances, BP ***might*** be entitled to seek contribution under OPA. Here, however, the Court has already ruled that BP is required to indemnify HESI (and Transocean) for such third-party claims even if HESI (and/or Transocean) is found to be grossly negligent. *See* Transocean Indemnity Order at 18; HESI Indemnity Order at 3. Therefore, HESI is entitled to summary judgment that control, containment, clean-up and response costs are third-party claims for which BP must indemnify HESI.

**VI.     Conclusion and Prayer**

For the reasons stated herein, HESI requests that this Court grant its motion for partial summary judgment, and all other relief to which it is entitled.

Dated:  June 28, 2013.

Respectfully submitted,
**GODWIN LEWIS PC**

**By:** _/s/ *Donald E. Godwin*_
Donald E. Godwin
*Attorney-in-charge*
State Bar No. 08056500
Don.Godwin@GodwinLewis.com
Bruce W. Bowman, Jr.
State Bar No. 02752000
Bruce.Bowman@GodwinLewis.com
Jenny L. Martinez
State Bar No. 24013109
Jenny.Martinez@GodwinLewis.com
Floyd R. Hartley, Jr.
State Bar No. 00798242
Floyd.Hartley@GodwinLewis.com
Gavin E. Hill
State Bar No.  00796756
Gavin.Hill@GodwinLewis.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone:  (214) 939-4400
Facsimile:   (214) 760-7332

and

R. Alan York
State Bar No. 22167500
Alan.York@GodwinLewis.com
Jerry C. von Sternberg
State Bar No.  20618150
Jerry.vonSternberg@GodwinLewis.com
Misty Hataway-Coné
State Bar No.  24032277
Misty.Cone@GodwinLewis.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone:  (713) 595-8300
Facsimile:   (713) 425-7594

**ATTORNEYS FOR DEFENDANT
HALLIBURTON ENERGY SERVICES,
INC.**

**MEMORANDUM IN SUPPORT OF HALLIBURTON ENERGY
SERVICES, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
2190144 v4-24010/0002 PLEADINGS

20

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Memorandum in Support of Halliburton Energy Services Inc.'s Motion for Partial Summary Judgment has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedure established in MDL 2179, on this 28th day of June 2013.

/s/ Donald E. Godwin
Donald E. Godwin

**MEMORANDUM IN SUPPORT OF HALLIBURTON ENERGY
SERVICES, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
2190144 v4-24010/0002 PLEADINGS