# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010 | MDL No.: 2:10-md-2179 |
| | SECTION "J" |
| Relates only to:  2:12-cv-01295-CJB-SS | JUDGE BARBIER |
| | MAGISTRATE JUDGE SHUSHAN |

## PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES

NOW INTO COURT, through undersigned counsel, come the Petitioners, GARY BONANNO, et al. , who respectfully represent the following:

### I.   PETITIONERS:

1.

GARY BONANNO, a person of full age and majority who is a resident and domiciliary of Mandeville, Saint Tammany Parish, Louisiana.

2.

STRIKEZONE CHARTERS, L.L.C., a Louisiana limited liability company licensed and doing business in Louisiana with a domicile address of 187 Morningside Drive, Mandeville, Saint Tammany Parish, Louisiana.

3.

MICHAEL BOATRIGHT, a person of full age and majority who is a resident and domiciliary of Harvey, Jefferson Parish, Louisiana

4.

The REEFKEEPER, LLC, a Louisiana limited iability company licensed and doing business in Louisiana 12701 River Road, New Orleans, Orleans Parish, Louisiana.

5.

LAWRENCE PALMISANO, a person of full age and majority who is a resident and domiciliary of Jefferson Parish, Louisiana.

6.

ALLEN OBIOL, a person of full age and majority who is a resident and domiciliary of Jefferson Parish, Louisiana.

7.

GULF COAST MARINE RECOVERY, LLC, a Louisiana Limited Liability Company domiciled in Jefferson Parish Louisiana.

## II.  DEFENDANTS:

1.

BP EXPLORATION & PRODUCTION, INC. a Delaware corporation at all pertinent times registered and doing business in the State of Louisiana, whose principal business establishment and registered business office in Louisiana is 5615 Corporate Blvd., Suite 400B, Baton Rouge, LA 70808 and whose agent for service of process is C.T. Corporation, 5615 Corporate Blvd., Suite 400B, Baton Rouge, Louisiana 70808.

2.

Defendant, BP AMERICA PRODUCTION COMPANY, a Delaware corporation at all pertinent times registered to do and doing business in the State of Louisiana, whose principal business

establishment and registered business office in Louisiana is 5615 Corporate Blvd., Suite 400B, Baton

Rouge, LA 70808 and whose agent for service of process is C.T. Corporation, 5615 Corporate Blvd.,

Ste. 400B, Baton Rouge, LA 70808.   BP AMERICA PRODUCTION COMPANY was party to the

contract for the drilling of the Macondo well by the Deepwater Horizon vessel with Transocean, Ltd.

BP AMERICA PRODUCTION COMPANY was a party to Master Vessel Charter Agreements

signed by petitioner(s) MICHAEL BOATRIGHT, ANDREW MAKI, GARY BONNANO, STRIKE

ZONE CHARTERS, L.L.C., DARRYL GAZZIER, ALLEN OBIOL, GULF COAST  MARINE

RECOVERY LLC AND LAWRENCE PALMISANO.

3.

PARSONS CORPORATION is a Delaware Corporation with its principal place of business

in California.  BP Production Company contracted with Parsons Corporation to operate and manage

the Vessels of Opportunity program.  Parsons Corporation's registered agent for service of process

is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington,

Delaware, 19801.

4.

DANOS & CUROLE STAFFING, L.L.C. is a Louisiana limited liability company with a

domicile address of 13083 Hwy 308, LaRose, Louisiana and its agent for service of process is

Janell Ledet, 13083 HWY. 308, LaRose, Louisiana 70373. BP Production Company contracted with

Danos & Curole Staffing, L.L.C. to provide accounting and payment services for the Vessels of

Opportunity program.

5.

HEPACO, INC. is a North Carolina corporation with its principal place of business in North

Carolina with its domicile address of 2711 Burch Drive, Charlotte, North Carolina and its agent for service of process is The Prentice-Hall Corporation System, Inc., 320 Somerulos Street, Baton Rouge, Louisiana.  HEPACO, INC. was at all pertinent times licensed and doing business in Louisiana with its principal business establishment in Louisiana address of 320 Somerulos Street, Baton Rouge, Louisiana.  BP contracted with HEPACO to manage the handling and deployment of boom.

6.

U.S. ENVIRONMENTAL SERVICES, L.L.C. is a Louisiana limited liability company with the domicile address of 720 St. Nazaire, Broussard, Louisiana and its agent for service of process is Jeffrey M. Landry, 100 E. Kaliste Saloom Road, Lafayette, Louisiana.  BP contracted with U.S. ENVIRONMENTAL SERVICES, L.L.C. to manage the handling and removal of boom.

7.

DRC EMERGENCY SERVICES, L.L.C. is an Alabama limited liability company with its domicile address of 740 Museum Drive, Mobile, Alabama. DRC EMERGENCY SERVICES is and was at all pertinent times licensed and doing business in Louisiana with a principal business establishment in Louisiana address of 5615 Corporate Boulevard, Suite 400B, Baton Rouge, Louisiana and its registered agent for service of process is CT Corporation System, 5615 Corporate Boulevard, Suite 400B, Baton Rouge, Louisiana.  Its agent for service of process is CT Corporation System, 5615 Corporate Boulevard, Suite 400B, Baton Rouge, Louisiana.  DRC EMERGENCY SERVICES, L.L.C. operated two offices in Plaquemines Parish, Louisiana located at 8056 Highway 23, Suite 200, Belle Chasse, Louisiana and at 8066 Highway 23, Belle Chasse, Louisiana.  DRC EMERGENCY SERVICES, L.L.C. was a party to Master Vessel Charter Agreements signed by

-4-

petitioner(s) VINCENT FRELICH, KENT FRELICH, FRELICH BOAT RENTAL, INC. AND
WATER WAVE AIRBOATS, INC.

8.

Defendant ANADARKO PETROLEUM CORPORATION CO. ("ANADARKO") is a
Delaware corporation with its principal place of business in The Woodlands, Texas. ANADARKO
is an oil and gas exploration and production company that owns 2.5% stake in the Macondo prospect
lease where the Oil Spill originated.  Personal jurisdiction over Defendant ANADARKO is proper
under one or more provisions of Fla. Stat. § 48.193 as it has, *inter alia*, committed a tort in whole
or in part in Florida, and has caused Plaintiffs to suffer damages.

9.

Defendant ANADARKO E&P COMPANY LP ("ANADARKO E&P") is a Delaware limited
partnership with its principal place of business in The Woodlands, Texas.  ANADARKO E&P is an
oil and gas exploration and production company that owns a 22.5% stake in the Macondo prospect
lease where the Oil Spill originated.  Personal jurisdiction over Defendant ANADARKO E&P is
proper under one or more provisions of Fla. Stat. § 48.193 as it has, *inter alia*, committed a tort in
whole or in part in Florida, and has caused Plaintiffs to suffer damages.

10.

Defendant, MOEX OFFSHORE 2007 LLC ("MOEX OFFSHORE") is a Delaware
corporation with its principal place of business in Houston, Texas. MOEX OFFSHORE does
business in the State of Florida and/or in state and/or federal waters off the coast of Louisiana.
MOEX OFFSHORE is a wholly-owned subsidiary of MOEX USA Corporation.   MOEX
OFFSHORE holds a 10% stake in the Macondo prospect lease where the Oil Spill originated.

-5-

Personal jurisdiction over Defendant MOEX OFFSHORE is proper under one or more provisions of Fla. Stat. § 48.193 as it has, *inter alia*, committed a tort in whole or in part in Florida, and has caused Plaintiffs to suffer damages.

11.

Defendant, MOEX USA CORPORATION ("MOEX USA") is incorporated in Delaware and has its principal place of business in Houston, Texas. MOEX USA is the parent company of MOEX OFFSHORE. According to Texas Secretary of State records, the stated business purposes of MOEX USA include the direct or indirect engagement in the business of "exploration, development and production of hydrocarbons and any business related to the exploration, development and production of hydrocarbons," and the acquisition of "Hydrocarbon Interests by purchase, lease, farm-in, license, exchange or other means or methods. . . ."

12.

Defendant, MITSUI OIL EXPLORATION CO., LTD. ("MOECO") is incorporated in Japan and has its principal place of business in Tokyo, Japan.  As of June 30, 2010, MOECO identified itself as having the following U.S. subsidiaries or affiliates: MitEnergy Upstream LLC, MOEX USA Corporation, MOEX OFFSHORE 2007 LLC, MOEX Gulf of Mexico Corporation, MOEX Oil & Gas Texas LLC, and Mitsui E&P USA LLC. Each of these subsidiaries of MOECO share the same Houston, Texas, address.

13.

MOECO states on its website as follows: "MOEX USA Corporation, a wholly owned subsidiary of MOECO, has a 10% interest in ultra-deepwater Mississippi Canyon 252, located in the U.S. Gulf of Mexico, through its 100% owned subsidiary, MOEX OFFSHORE 2007 LLC."

-6-

14.

In a press release dated July 24, 2007, MOECO announced that it had entered into an "Acquisition and Participation Agreement with BP Exploration and Production, Inc. … on the 29th of June 2007 to participate in an ultra-deep gas exploration project in the Gulf of Mexico … which is being actively pursued by BP." According to the release, "MOECO decided to participate in the project based upon its evaluation of the prospect which BP's [Gulf of Mexico] technical team has conducted extensive study and research [sic]." The release also indicates that "Japan Oil, Gas and Metals National Corporation . . . has agreed to provide equity capital finance for MOECO's share of the drilling costs payable under the Acquisition and Participation Agreement. An exploratory well is scheduled to be drilled from September 2007 by BP as the operator and as a result of the participation and such well interests in the project will be BP (75%), MOECO (15%) and other (10%)." The release concludes with MOECO indicating that its participation in the project "provides an excellent opportunity to further expand its business in the U.S." *See* www.MOECO.co.jp/english/topics/070724.html.

15.

Defendants MOEX OFFSHORE, MOEX USA, and MOECO are referred to collectively herein as "MOEX."

16.

While BP was the sole lease operator of the Deepwater Horizon, ANADARKO, ANADARKO E&P, and MOEX were considered non-operational leaseholders.

17.

As of October 1, 2009, ANADARKO owned a 2.5% stake in the Macondo prospect lease, ANADARKO E&P owned a 22.5% stake, and MOEX owned a 10% stake. According to MMS records, however, effective April 1, 2010, record title interest in the Macondo prospect was held by ANADARKO (25%), BP (65%), and MOEX (10%).

18.

As joint holders of a leasehold interest in an oil or gas lease on land beneath navigable waters, Defendants ANADARKO, ANADARKO E&P, and MOEX are jointly, severally, and solidarily liable with their codefendants BP pursuant to the Oil Pollution Act.

19.

Defendant TRANSOCEAN LTD. ("TRANSOCEAN LTD.") is a Swiss corporation that maintains substantial U. S. offices at 4 Greenway Plaza, Houston, Texas, 77046. According to its Complaint and Petition for Exoneration from or Limitation of Liability, TRANSOCEAN LTD. was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon and participated in the Deepwater Horizon's offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated. Personal jurisdiction over Defendant TRANSOCEAN LTD. is proper under one or more provisions of Fla. Stat. § 48.193 because TRANSOCEAN LTD. has, *inter alia*, committed a tort in whole or in part in Florida, and has caused Plaintiffs to suffer damages.

20.

Defendant TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC. ("TRANSOCEAN OFFSHORE") is a Delaware corporation with its principal place of business in Houston, Texas. Defendant, TRANSOCEAN OFFSHORE, is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon and participated in the Deepwater Horizon's

offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated. Personal jurisdiction over Defendant TRANSOCEAN OFFSHORE is proper under one or more provisions of Fla. Stat. § 48.193 as it has, *inter alia*, committed a tort in whole or in part in Florida, and has caused Plaintiffs to suffer damages.

21.

Defendant TRANSOCEAN DEEPWATER, INC. ("TRANSOCEAN DEEPWATER") is a Delaware corporation with its principal place of business in Houston, Texas. Defendant, TRANSOCEAN DEEPWATER, is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon and participated in the Deepwater Horizon's offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated. Personal jurisdiction over Defendant TRANSOCEAN DEEPWATER is proper under one or more provisions of Fla. Stat. § 48.193 as it has, *inter alia*, committed a tort in whole or in part in Florida, and has caused Plaintiffs to suffer damages.

22.

Defendant TRANSOCEAN HOLDINGS, LLC ("TRANSOCEAN HOLDINGS") is a Delaware corporation with its principal place of business in Houston, Texas. Defendant, TRANSOCEAN HOLDINGS is affiliated with TRANSOCEAN LTD. and is a wholly-owned subsidiary of TRANSOCEAN OFFSHORE. TRANSOCEAN HOLDINGS is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon and participated in the Deepwater Horizon's offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated. More specifically, TRANSOCEAN HOLDINGS is party to the contract with BP regarding the lease of the Deepwater Horizon for drilling operations in the Gulf of Mexico. On April

28, 2010, the U.S. Coast Guard named TRANSOCEAN HOLDINGS as a "Responsible Party" under the Oil Pollution Act for the surface oil spill resulting from the explosion aboard the Deepwater Horizon.  Personal jurisdiction over Defendant TRANSOCEAN HOLDINGS is proper under one or more provisions of Fla. Stat. § 48.193 as it has, *inter alia*, committed a tort in whole or in part in Florida, and has caused Plaintiffs to suffer damages.

23.

Defendant TRITON ASSET LEASING GMBH ("TRITON") is a Swiss limited liability company with its principal place of business in Zug, Switzerland. Defendant, TRITON is affiliated with TRANSOCEAN LTD. and is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

24.

Defendants TRANSOCEAN LTD., TRANSOCEAN DEEPWATER, TRANSOCEAN OFFSHORE, TRANSOCEAN HOLDINGS, and TRITON are hereinafter referred to collectively as "TRANSOCEAN." At the Macondo site, TRANSOCEAN provided the Deepwater Horizon vessel and personnel to operate it. At all times relevant to the Oil Spill, Transocean, subject to BP's inspection and approval, was responsible for maintaining well control equipment, such as the blowout preventer and its control systems. TRANSOCEAN also provided operational support for drilling-related activities on board the Deepwater Horizon, as well as onshore supervision and support for those drilling activities at all times relevant to the Oil Spill.


III.        **FACTUAL ALLEGATIONS RELATED TO THE VESSEL OF**

**OPPORTUNITY CONTRACT CLAIMS**

-10-

1.

This case arises from uniform Master Vessel Charter Agreements entered into between Petitioners and Defendant BP America Production Company ("BP") and between Petitioners and Defendant DRC Emergency Services, L.L.C. ("DRC"). The uniform Master Vessel Charter agreements were entered into as part of BP's Vessels of Opportunity ("VOO") program. BP, DRC, Parsons Corporation, Danos & Curole, HEPACO, and U.S. Environmental Services engaged in an illegal and unlawful conspiracy to defraud Petitioners and to underpay Petitioners for services, equipment, materials, repairs and decontaminations related to the VOO program and the oil spill response. That conspiracy is described more fully below.

2.

Following the Deepwater Horizon oil spill, BP established the VOO program as part of BP's response to the oil spill. Publicly, BP claimed that the VOO program would help clean up the Gulf Coast and would provide money to people affected by the oil spill. Once implemented, the VOO program was marred by mismanagement, corruption and broken promises. As a result, when the VOO program was concluded, participants, including Petitioners, were left owed tremendous sums of money for unpaid services, equipment, materials, repairs and decontaminations.

3.

The VOO program was organized, implemented, administered, orchestrated and operated through BP's offices in Plaquemines Parish, Louisiana.

4.

To implement the VOO program, BP and the other defendants needed to mobilize thousands of vessels, captains and crew members in a very short period of time. However, many of the vessels,

captains and crew members that needed to be mobilized, although idled by the Deepwater Horizon oil spill, were entitled under applicable law to be reimbursed by BP and DRC for all their lost income resulting from the Deepwater Horizon oil spill. As a result, in order to effectively implement the VOO program, BP, DRC and the other defendants had to convince vessel owners, captains and crew members that they would receive more money through the VOO program than if they sat idle at the dock or pursued other employment or income opportunities.

5.

In late April 2010 and continuing through the summer of 2010, BP, DRC and the other defendants launched a campaign to solicit participants for the VOO program. This campaign consisted of, among other things, town hall and community meetings, television, radio, print and internet advertisements and assorted other meetings, communications and discussions with individuals and small groups.

6.

BP's town hall and community meetings were open to the public and often videotaped. The town hall and community meetings were BP and the other defendants' primary means of communicating regarding the VOO program. The representations and communications made by BP and the other Defendants during these meetings were intended and expected to be communicated to and relied on by persons not present at the town hall and community meetings.

7.

Throughout this campaign, and with the intention to encourage vessel owners, captains and crew members to participate in the VOO program, BP and other Defendants represented, promised and warranted, among other things, that (a) VOO participants would be paid for standby time; (b)

-12-

VOO participants would be fully reimbursed for any damage to their vessels that occurred while the vessels were in the VOO program; (c) VOO participants' vessels would be decontaminated at BP's and DRC's expense at the conclusion of the VOO program; and (d) the income that VOO participants received through the VOO program would not be used to offset the lost income that VOO participants had against BP as a result of the Deepwater Horizon oil spill disaster. Defendants knew these representations were false when made. Further, these false representations were part of and in furtherance of BP and the other Defendants' unlawful and illegal conspiracy to defraud Petitioners and to underpay Petitioners for services, equipment, materials, repairs and decontaminations related to Petitioners' participation in the VOO program.

8.

In order to gain entry into the program, a vessel owner was required to execute a Master Vessel Charter Agreement. The Master Vessel Charter Agreement was substantially identical for each participant in the VOO program.

9.

The Master Vessel Charter Agreement provides that (a) a charter begins when the vessel is activated; (b) after being activated, the vessel must be available and ready to work 24 hours a day, 7 days a week; and (c) the charter does not end until BP or DRC sends the vessel owner an "off-hire dispatch notification" and the vessel is decontaminated.

10.

The Master Vessel Charter Agreement also required that BP and DRC: (a) reimburse VOO participants for damage to their vessels that occurred while the vessels were in the VOO program; (b) reimburse VOO participants for costs and expenses incurred as a result of the VOO program; and

(c)decontaminate the vessels that participated in the VOO program at BP's and/or DRC's expense. After VOO participants executed the Master Vessel Charter Agreement, BP, DRC and the other defendants continued to represent to VOO participants that they :(a) would be paid for standby time; (b) would be fully reimbursed for any damage to their vessels that occurred while the vessels were in the VOO program; (c)would be reimbursed for costs and expenses incurred as a result of the VOO program; (d) would have their vessels decontaminated at BP's and/or DRC's expense at the conclusion of the VOO program; and (e) would not have the income that they received through the VOO program offset against the lost income claims that they had against BP as a result of the Deepwater Horizon oil spill disaster.   BP, DRC and the other defendants knew that theses representations were false representations were part of and in furtherance of BP and the other Defendants' unlawful and illegal conspiracy to defraud Petitioner(s) to underpay Petitioner(s) for services, equipment, materials, repairs and decontaminations related to Petitioner(s)' participation in the VOO program.

11.

The invoicing and payment program designed by BP, DRC and the other Defendants for the VOO program was intentionally slow and inefficient. VOO participants were routinely told that their paper work and invoices were insufficient or had been lost. At times, it took weeks and months for VOO participants to be paid for services, equipment, materials and repairs. When payment was finally received, it was difficult, if not impossible, for VOO participants to tell which invoices and services, equipment, materials and repairs the payment applied to.

12.

This deliberately slow and confusing payment methodology was part of and in furtherance

-14-

of BP, DRC and other Defendants' unlawful and illegal conspiracy to underpay VOO participants. In particular, BP and the other Defendants used this intentionally slow and deceptive process to prevent VOO participants from discovering that BP and the other Defendants intended to underpay VOO participants.

13.

Beginning in July 2010, BP, DRC and the other defendants decided to phase out the VOO program. However, with oil still in the Gulf of Mexico and mounting public pressure on BP, BP, DRC and the other defendants determined that it would be a public relations problem to send thousands of VOO participants an "off-hire dispatch notification" pursuant to the uniform Master Service Charter Agreements. Accordingly, as BP, DRC and the other defendants increased the number of VOO participants that were on standby, BP and the other Defendants continued to represent to VOO participants that they were still in the VOO program and that they would be paid in full for services, equipment, materials, repairs and decontaminations related to Petitioner(s)' participation in the VOO program. These representations were part of and in furtherance of BP, DRC and the other defendants' unlawful and illegal conspiracy to defraud and to underpay VOO participants.

14.

In late July 2010, Tropical Storm Bonnie came ashore in Louisiana. Tropical Storm Bonnie provided BP, DRC and the other defendants with an opportunity to begin substantially phasing out the VOO program. Prior to Tropical Storm Bonnie's landfall, BP, DRC and other defendants put virtually all participants in the VOO program on standby and began moving substantial amounts of VOO materials, equipment and assets out of the Gulf Region. BP, DRC and the other defendants

represented, promised and warranted to the press, public and VOO participants that this demobilization was in preparation for Tropical Storm Bonnie, that the VOO program was being phased out, and that VOO participants would be back out on the water in no time. In reality, BP, DRC and the other defendants did not want to deal with the public relations fallout of telling the VOO participants that the VOO program was being phased out.

15.

After Tropical Storm Bonnie's landfall, the majority of VOO participants remained on standby and were not called back out on the water, as BP and the other Defendants had represented. In late August 2010, with the Macondo Well capped, BP began sending official "off-hire dispatch notifications" to VOO participants. Following notification of being off-hire, Petitioner(s) attempted to have their vessels decontaminated, only to be put off for weeks or months by BP, DRC and the other defendants. Since that time, BP, DRC and the other defendants have refused to pay VOO participants for services, equipment, materials, repairs and decontaminations related to Petitioner(s)' partcipation in the VOO program.

16.

Since the VOO program ended, BP, DRC and the other defendants have refused to compensate Petitioner(s) for services, equipment, materials, repairs and decontaminations related to Petitioner(s)' participation in the VOO program, as required by the Master Vessel Charter Agreements as represented by BP, DRC and the other defendants.

17.

Both prior to and during the VOO program, BP and the other Defendants concealed from Petitioner(s) that (a) VOO participants would not be paid for standby time; (b) VOO participants

-16-

would not be fully reimbursed for damages to their vessels that occurred while the vessels were in the VOO program; (c)VOO participants would not be reimbursed for costs and expenses incurred as a result of the VOO program; (d) VOO participants' vessels would not be decontaminated at BP's expense at the conclusion of the VOO program; and (e) the income that VOO participants received through the VOO program would offset the claims VOO participants had against BP as a result of the Deepwater Horizon oil spill disaster.  Further, BP, DRC and the other defendants' concealment of these material facts from Petitioner(s) was part of and in furtherance of BP, DRC and the other defendants' unlawful and illegal conspiracy to defraud Petitioner(s) and to underpay Petitioner(s) for services, equipment, materials, repairs and decontaminations related to Petitioner(s)' participation in the VOO program.

18.

Plaintiffs named herein operated out of ports in Plaquemines Parish and certain plaintiffs executed the master vessel charter agreements in Plaquemines Parish, Louisiana. Based upon information and belief, the Defendants named herein operated offices in Plaquemines Parish, Louisiana as part of the oil spill disaster response and vessels fo opportunity program.

## IV.   FACTUAL ALLEGATIONS RELATED TO THE OIL SPILL DISASTER

1.

These cases arise from the April 20, 2010, loss of control of the Macondo well that was being drilled by the Deepwater Horizon drilling vessel and the related explosions on that vessel which caused it to sink and resulted in the discharge of significant amounts of oil that spread throughout the Gulf of Mexico over a period of more than three months.  They also arise due to subsequent additional negligent acts and failure of reasonable care which occurred in Florida territorial waters.

2.

At all times relevant to this action, the Deepwater Horizon, an ultra-deep water semi-submersible drilling rig, was leased to BP.  At the time of its explosion on April 20, 2010, the Deepwater Horizon was being operated by BP for the purposes of drilling an exploratory well at the Macondo prospect on Mississippi Canyon Block 252 on the Outer Continental Shelf, south, west and north of Florida shores and waters.

3.

The Macondo prospect was being explored pursuant to a ten-year lease, OCS-G32306, granted by the Minerals Management Services on June 1, 2008, and owned at the time of the explosion by BP.  The lease allowed BP to drill for hydrocarbons and perform oil production-related operations in the Mississippi Canyon Block 252 area which includes the Macondo prospect.  BP was designated the lease operator.

## THE BLOWOUT

4.

At approximately 10 p.m. on April 20, 2010, following cementing operations aboard the vessel Deepwater Horizon, workers were finishing drilling operations for the Macondo well and displacing the drilling mud in the marine riser at the direction of BP in preparation for completion pursuant to BP's design, when they encountered an uncontrolled influx of highly pressurized hydrocarbons into the wellbore leading to a "blowout" or loss of control of the well.

5.

The combustible gas flowing uncontrolled into the wellbore traveled quickly up to the rig floor where it was ignited leading to a fiery explosion on the Deepwater Horizon.

6.

Defendant, BP was unable to regain control of the well and the fiery explosions onboard the Deepwater Horizon caused the vessel to be destroyed and sink to the bottom of the Gulf of Mexico.

7.

BP did not follow safe procedures, in order to save money, by electing to utilize a risky well design that provided for fewer barriers against hydrocarbon influx into the wellbore relative to well designs typically used in an unknown and troublesome formation like the Macondo prospect.

8.

Due to the depth of the Macondo well, BP was also negligent in the selection of a casing material that was vulnerable to collapse under high pressure. BP's negligence in well design and casing selection allowed for an increase risk of a blowout.  BP knew or should have known of those risks but chose risk over increased costs.

-19-

9.

In addition to the casing-related problems, the float collar installed on the final section of casing likely failed to seal properly, which may have allowed hydrocarbons to leak into the casing, contributing to the April 20, 2010 blowout.

10.

A float collar is a component installed near the bottom of the casing string on which cement plugs land during the cementing job.

11.

Upon information and belief BP was negligent in operations to install the float collar and/or in neglecting warning signs of a potentially improper installation of the float collar.

12.

BP was negligent in preparing the wellbore for cementing operations which led to an increased likelihood that the cement job would fail and a blowout would occur.

13.

BP was negligent in electing to utilize an unsafe cement job design that was unlikely to create a secure barrier against hydrocarbon influxes into the Macondo wellbore.

14.

BP was negligent in the selection of an improper cement mixture that was susceptible to failure under the high pressures and temperatures typical in the Macondo well.

15.

Negligent cementing operations failed to isolate the well bore from hydrocarbon zones and seal the bottom of the well against an influx of gas.  BP was negligent in failing to identify this bad

cement job ignoring numerous warning signs in the process.

16.

Upon information and belief, the defective cement job allowed a pathway for highly pressured gas to enter the Macondo wellbore and travel rapidly from there to the rig floor.

17.

BP was negligent in the monitoring and design of the drilling mud program which failed to prevent hydrocarbons from flowing into the wellbore and up to the Deepwater Horizon.

18.

BP was negligent in the decision and design to displace the drilling mud from the marine riser before allowing time for the cement to fully set.

19.

BP was also negligent in conducting and monitoring the displacement operations, failing to recognize the many signs of trouble.

20.

BP was negligent in failing to utilize a casing hanger lockdown sleeve that would have stopped the hydrocarbons from escaping past the wellhead and reaching the rig floor.

21.

BP was negligent in failing to timely identify that hydrocarbons were entering the wellbore during displacement operations and in failing to initiate well control measures.

22.

After hydrocarbons reached the rig floor, the Blowout Preventers (BOP's) for the Deepwater Horizon, failed to activate as designed to prevent the continued uncontrolled flow of gas from the

-21-

formation.

23.

The BOP utilized by BP was defective and unreasonably dangerous in their manufacture, design, and/or composition, and/or failed to contain adequate warnings and instructions.

24.

BP failed to ensure that the BOP design used on Deepwater Horizon was sufficient for the drilling conditions and program expected at the Macondo site.

25.

BP was negligent in failing to properly maintain the BOP's for the Deepwater Horizon in accordance with safe practices and federal regulations.

26.

BP failed to ensure that the BOP's possessed the necessary technology to properly function including adequate safeguards and redundant systems to prevent blowouts.

27.

BP failed to ensure that the BOP's and all related systems were properly tested to operational conditions and confirmed to be in good working order.

28.

BP was negligent in failing to properly utilize and maintain emergency systems and equipment on board the Deepwater Horizon or to supervise and/or inspect to assure same.

29.

Defendants' negligent actions and/or omissions caused the blowout of the Macondo well leading to the destruction and sinking of the Deepwater Horizon and subsequent uncontrolled

discharge of oil into the Gulf of Mexico.

## UNCONTROLLED DISCHARGE OF OIL INTO THE GULF
## AND ENVIRONMENTAL IMPLICATIONS

30.

After the sinking of the Deepwater Horizon, the well began to release, leak, and/or discharge oil directly into the Gulf of Mexico due to the failure of the well's cement and/or casing and the concurrent failure of the blow-out preventors.  These actions also likely caused damage to the seafloor structure surrounding the well, causing unabated and continuing seepage of petroleum into the Gulf of Mexico which likely continues presently.

31.

Defendant, BP, recklessly, willfully and/or wantonly failed to ensure that oil would be quickly and fully contained within the immediate vicinity of the Macondo well in the event of a blowout.

32.

The well discharged an estimated 50,000 to 100,000 barrels of oil into the Gulf of Mexico on a daily basis for at least 87 days.  Discharge likely continues presently.

33.

The United States government has estimated that approximately 5,000,000 barrels (210,000,000 gallons) of oil gushed into the Gulf of Mexico during the months that the well was uncontained with others estimating that the well discharged upwards of 7,000,000 barrels.

34.

Defendant, BP, willfully and/or wantonly failed to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled discharge from the Macondo well into the Gulf of Mexico and to prevent damages to Plaintiffs.

35.

This massive release of oil contaminated thousands of square miles of waters in the Gulf as the well flowed uncontained for three months resulting in the ban of recreational and commercial fishing by the government in many areas during that time period.  Contamination continues with fresh crude still flowing from the Macondo site.  Contamination occurs with each tropical weather system's effects.

36.

The oil discharged into the Gulf of Mexico from the Macondo well contained hydrocarbon molecules, carcinogens and other toxic pollutants including heavy metals which are extremely hazardous to the marine ecosystem in the Gulf of Mexico including that found in the territorial waters and shores of Louisiana.

37.

In addition to the oil that was released by BP's Macondo well, BP directed over two million gallons of chemical dispersants to be sprayed, injected or otherwise released into Gulf waters including Louisiana territorial waters.  BP had injected at least 770,000 gallons of chemical dispersants directly into the damaged wellhead and otherwise directed its contractors, including ASI, to apply considerable amounts of chemical dispersants directly onto the territorial waters of Florida. These negligent, reckless and wanton activities constitute tortious conduct which occurred in the

-24-

territory of Louisiana, and created new chemical moieties and physical states of the hazardous mixed chemicals.

38.

Upon information and belief, ASI and ASI INTERNATIONAL, directed by BP, knowingly and willfully released toxic and harmful chemical dispersants and/or other toxic chemicals into the Territorial Waters of Louisiana, which alone and in combination with the Macondo chemicals began damaging the natural environment and threatening both marine and human life and thereby causing economic loss to the business and industry and to Plaintiffs who are economically dependent on those waters.

39.

The chemical dispersants released into the Gulf and Louisiana territorial waters and shores at the direction of BP contain hazardous and toxic substances and have been reported to be harmful to both human health and the marine environment.   The chemical dispersants are designed to interact with spilled oil which then sinks below the surface, where these solubilized amalgams are more available for exposure to all marine environments.

40.

The use of chemical dispersants introduces toxic pollutants to a larger portion of the marine environment than when using mechanical oil collection methods, since the dispersant causes oil to become suspended in the water column available to be moved by subsurface currents and tides, and deposited in the seafloor sediment…all places where it is more likely to be encountered and more readily available to be contacted and absorbed by marine life.

41.

To date, BP and its contractors have used more than 1.8 million gallons of chemical dispersants in the Gulf of Mexico in connection with the Oil Spill.

42.

On or about May 19, 2010, the U.S. Environmental Protection Agency (EPA) Administrator directed BP within 24 hours of issuance to identify and to change to chemical dispersants that are less toxic than those dispersants that BP had been using. BP refused to comply and continued using dispersants of its choice.

43.

Defendant BP recklessly, willfully and/or wantonly failed to use ordinary care by electing to use chemical dispersants that are more toxic than others in the response efforts and thereby amplified the toxic effects on the marine environment and the damages to Plaintiffs.

44.

Defendants knew or should have known that the chemical dispersants used would increase toxicity and marine environment exposure of the oil and increase damages to Plaintiffs.

45.

The untested manner and unprecedented scale in which Defendants used dispersants on such a sheer volume of oil likely caused foreseeable negative consequences. BP used the dispersants in a manner and quantity for which they were not designed, labeled or tested by injecting chemical dispersants directly at the wellhead approximately 5,000 feet below the surface.

46.

Defendants knew or should have known that injecting dispersants at the wellhead had not previously been tested or used in this manner and had not been tested under similar conditions.

Defendants failed to warn the public or ensure the safe use of these products.

47.

Defendants also failed to ensure the dispersants' design was appropriate for the extreme conditions expected to be encountered during use by BP at the wellhead.

48.

BP's decision to use chemical dispersants in such extreme conditions for which they were not designed likely resulted in the foreseeable negative consequence of preventing the oil from fully rising to the surface resulting in the formation of massive solubilized subsurface toxic plumes of amalgamated dispersed oil droplets and chemical dispersants at varying depths that are extremely slow to degrade due to their combined toxic effect on oil consuming microbes in the marine environment.  It also likely caused more toxic chemicals to penetrate into the shores, beaches and marshes of Florida in their dispersant solubilized state.

49.

Upon information and belief, BP knew or should have known, as basic science suggests, that the direct injection of large amounts of chemical dispersants into the damaged wellhead at a depth of 5,000 feet would likely cause the formation of massive, deep water, subsurface oil plumes that would be extremely slow to degrade, and subject to subsurface current movements to cause much greater exposure to the entire environment but BP continued with the application of dispersants in this manner to prevent the oil from reaching the surface in order to conceal the amount of oil being discharged from the Macondo well and obscure the true extent of the contamination being caused to the Gulf and marine environment.

50.

The number and magnitude of such plumes have been investigated and the severe environmental implications continue to be studied. Large oil-dispersant plumes were confirmed at depths of 3,280 to 4,265 feet many miles from the wellhead of the Deepwater Horizon. Studies have shown that these dispersant-hydrocarbon plumes are not degrading as expected and continue their slow movement throughout the environment more than two years after BP's Macondo well was capped. Fresh Macondo oil continues to be observed and detected to date.

51.

Since these deep oil-dispersant plumes and other related hydrocarbon accumulations on the seafloor are not degrading and will continue to periodically surface from depth in a difficult to predict manner, and because the fractured Macondo sea floor continues to seep fresh petroleum, it is probable that recurring significant damage to the marine environment and continued oiling of the marshes and estuaries will persist for many years to come.

52.

Such results have resulted in marine life kills and will likely have long term impacts on the commercial and recreational fishing industries. The full extent of these impacts has not yet been determined and may take years to assess, but preliminary evaluation suggests they will be severe. The amount of oil spilled, combined with the amount of dispersants applied in the Gulf of Mexico, immediately had significant acute effects on the entire marine ecosystems of the Gulf on which Plaintiffs are economically dependent, and chronic negative effects are likely to be felt long after the oil and dispersants have degraded. Likely impacts include direct mortality from the chemicals, and indirect impacts that include reduction in reproduction, genetic disorders, increased susceptibility to disease, and likely enhanced pathogenicity of marine disease organisms.

-28-

54.

Rowan Gould, Acting Director of the U.S. Fish & Wildlife Service, has stated that the Deepwater Horizon spill "is significant and in all likelihood will affect fish and wildlife across the Gulf, if not all of North America, for years if not decades . . . ."

55.

The oil and dispersants that were discharged and released are extremely hazardous to marine life in the Gulf of Mexico.  They are especially hazardous to marine life at the bottom of the food chain, including creatures such as plankton, shrimp, and crabs which are food for the finfish sought by fishermen.

56.

These plankton, shrimp, and other marine creatures are vital to the entire marine ecosystem, and the damage already sustained by these tiny marine creatures threatens the entire marine species throughout the Gulf.  The chemicals released into the Gulf have both direct and indirect impact to tourism and on the businesses of the Plaintiffs.

57.

Due to impacts from the oil spill, Plaintiffs have seen greatly reduced business and have suffered loss of income, loss of business value, and loss of value to their real property.

58.

In an effort to stay viable and economically survive this disaster Plaintiffs have been forced to take financial steps to limit the effects of the disaster.

59.

Due to the toxic effect of the oil spill and dispersants on the fisheries of the Gulf of Mexico,

now and in the future, the tourism and sales upon which Plaintiffs' businesses are dependent have been diminished, endangering the ability of Plaintiffs to operate or maintain their businesses.

60.

Despite increased business efforts combined with longstanding reputations for business savvy and competency, the stigma and effect of the spill has drawn fewer customers to the Gulf business locations of Plaintiffs. More than a year after the well was capped Gulf Coast communities and waters proximate to Plaintiffs' businesses and properties continue to be awash in fresh oil with ongoing harmful effects with no end in sight. Recovery efforts to repair the physical and stigma damages to Gulf waters have been inadequate and incomplete, causing economic loss to these Plaintiffs who are financially dependent on healthy marine environments.

61.

Due to the oil spill disaster, Plaintiffs' customers have taken their business to other non-gulf regions and consequently are unlikely to return to the Gulf Coast. Formerly regular customers simply do not want to visit and spend their money in the Plaintiffs' Gulf neighborhoods where the natural marine bounty has been and continues to be damaged.

62.

Due to the unprecedented scope of the disaster and the as yet unknown impact on future marine generations of wildlife, it may take years to assess the full extent of the devastation to the marine life in the Gulf and it may be decades before the marine environment is able to completely recover. Thus far the impact of the oil and other chemicals discharged into the Gulf during the Deepwater Horizon oil spill disaster has been devastating to marine life upon which Plaintiffs' businesses rely.

63.

The discharge of crude oil from the Macondo well and the spraying of dispersants into the Gulf of Mexico and Louisiana territorial waters has caused and will continue to cause a direct and proximate loss of revenue, profits and/or loss of earning capacity to Plaintiffs. The fact that the reputation of the geographic areas in which Plaintiffs operate has been severely tainted, Plaintiffs have experienced and continue to experience significant business damage due to a significant decrease in clients and increase in cancellations of business opportunity with the likely long term and possibly permanent loss of customers and potential customers.

## V.   GARY BONANNO AND STRIKE ZONE CHARTER, L.L.C. FACTS:

1.

On or about June 6, 2010, Gary Bonanno, d/b/a Strike Zone Charters, entered into a Master Vessel Charter Agreement with BP America Production Company [BP Contract # HOU-1584].

2.

From June 6, 2010 through September 18, 2010, Mr. Bonanno was paid for performing SERVICES, as defined by agreement Article 2.A. He was also paid for periods of standby.

3.

To terminate its agreement with Mr. Bonanno, BP was required to decontaminate Mr. Bonanno's vessel and issue him an off-hire dispatch notification letter. See Articles 10(D) and 1(B) of the Master Vessel Charter Agreement. BP issued an off-hire dispatch notification to Mr. Bonanno on November 26, 2010 and decontamination was completed December 10, 2010. Therefore, the contract between Mr. Bonanno and BP was not terminated until December 10, 2010, and BP remains

liable to Mr. Bonanno for all outstanding fees owed him pursuant to the agreement. Pursuant to Louisiana Revised Statutes 9:2781, the contract is an open account and payment is due in full.

4.

According to Articles 1, 2 and 10 and based on BP's course of performance, BP is contractually obligated to pay Mr. Bonanno for all days from June 6, 2010, through December 10, 2010. BP only paid Mr. Bonanno from June 6, 2010, through September 18, 2010. As such we demand full payment by BP for the 113 days (September 19, 2010 through December 10, 2010) of unpaid time, totaling THREE HUNDRED TWENTY-SEVEN THOUSAND AND SEVEN HUNDRED DOLLARS ($327,700.00).

5.

On or about June 6, 2010, Gary Bonanno, d/b/a Strike Zone Charters, entered into a Master Vessel Charter Agreement with BP America Production Company [BP Contract # HOU-2055].

6.

From June 6, 2010 through August 24, 2010, Mr. Bonanno was paid for performing SERVICES, as defined by agreement Article 2.A. He was also paid for periods of standby.

7.

To terminate its agreement with Mr. Bonanno, BP was required to decontaminate Mr. Bonanno's vessel and issue him an off-hire dispatch notification letter. See Articles 10(D) and 1(B) of the Master Vessel Charter Agreement. BP issued an off-hire dispatch notification to Mr. Bonanno on November 26, 2010 and decontamination was completed December 10, 2010. Therefore, the contract between Mr. Bonanno and BP was not terminated until December 10, 2010, and BP remains liable to Mr. Bonanno for all outstanding fees owed him pursuant to the agreement. Pursuant to

Louisiana Revised Statutes 9:2781, the contract is an open account and payment is due in full.

8.

According to Articles 1, 2 and 10 and based on BP's course of performance, BP is contractually obligated to pay Mr. Bonanno for all days from June 6, 2010, through December 10, 2010. BP only paid Mr. Bonanno from June 6, 2010, through August 24, 2010. As such we demand full payment by BP for the 107 days (August 25, 2010 through December 10, 2010) of unpaid time, totaling TWO HUNDRED AND TWENTY-FOUR THOUSAND AND SEVEN HUNDRED DOLLARS ($224,700.00).

9.

On or about June 6, 2010, Gary Bonanno, d/b/a Strike Zone Charters, entered into a Master Vessel Charter Agreement with BP America Production Company [BP Contract # HOU-1583].

10.

From June 6, 2010 through October 24, 2010, Mr. Bonanno was paid for performing SERVICES, as defined by agreement Article 2.A. He was also paid for periods of standby.

11.

To terminate its agreement with Mr. Bonanno, BP was required to decontaminate Mr. Bonanno's vessel and issue him an off-hire dispatch notification letter. See Articles 10(D) and 1(B) of the Master Vessel Charter Agreement. BP issued an off-hire dispatch notification to Mr. Bonanno on November 26, 2010 and decontamination was completed December 9, 2010. Therefore, the contract between Mr. Bonanno and BP was not terminated until December 9, 2010, and BP remains liable to Mr. Bonanno for all outstanding fees owed him pursuant to the agreement. Pursuant to Louisiana Revised Statutes 9:2781, the contract is an open account and payment is due in full.

-33-

12.

According to Articles 1, 2 and 10 and based on BP's course of performance, BP is contractually obligated to pay Mr. Bonanno for all days from June 6, 2010, through December 9, 2010. BP only paid Mr. Bonanno from June 6, 2010, through October 24, 2010. As such we demand full payment by BP for the 45 days (October 25, 2010 through December 10, 2010) of unpaid time, totaling NINETY FOUR THOUSAND AND FIVE HUNDRED DOLLARS ($94,500.00).

13.

On or about June 6, 2010, Gary Bonanno, d/b/a Strike Zone Charters, entered into a Master Vessel Charter Agreement with BP America Production Company [BP Contract # HOU-2056].

14.

From June 6, 2010 through August 13, 2010, Mr. Bonanno was paid for performing SERVICES, as defined by agreement Article 2.A.  He was also paid for periods of standby.

15.

To terminate its agreement with Mr. Bonanno, BP was required to decontaminate Mr. Bonanno's vessel and issue him an off-hire dispatch notification letter.  See Articles 10(D) and 1(B) of the Master Vessel Charter Agreement. Decontamination was completed on October 26, 2010, and BP issued an off-hire dispatch notification to Mr. Bonanno on November 26, 2010. Therefore, the contract between Mr. Bonanno and BP was not terminated until November 26, 2010, and BP remains liable to Mr. Bonanno for all outstanding fees owed him pursuant to the agreement.  Pursuant to Louisiana Revised Statutes 9:2781, the contract is an open account and payment is due in full.

16.

According to Articles 1, 2 and 10 and based on BP's course of performance, BP is

contractually obligated to pay Mr. Bonanno for all days from June 6, 2010, through November 26, 2010. BP only paid Mr. Bonanno from June 6, 2010, through August 13, 2010. As such we demand full payment by BP for the 104 days (August 14, 2010 through November 26, 2010) of unpaid time, totaling ONE HUNDRED AND EIGHTY-SEVEN THOUSAND AND TWO HUNDRED DOLLARS ($187,200.00).

17.

Plaintiff, Gary Bonanno, d/b/a, STRIKE ZONE CHARTERS LLC, has suffered an adverse economic impact on his charter business due to the oil sill.

18.

Plaintiff, Gary Bonanno, d/b/a, STRIKE ZONE CHARTERS LLC, recreational, and sport charter fishing expeditions with professional guide service in Louisiana since 2001.

19.

Due to impacts from the oil spill, Plaintiff, STRIKEZONE CHARTERS, LLC, has seen greatly reduced business and has suffered loss of income.

20.

Prior to the oil spill disaster, STRIKEZONE CHARTERS, LLC was one of the most popular charter guide services in southern Louisiana and was solidly booked for spring and summer seasons.

21.

Due to impacts from the Deepwater Horizon oil spill disaster, Plaintiff, STRIKEZONE CHARTERS, LLC, is now struggling financially.

22.

Due to the toxic effect of the oil spill and dispersants on the fisheries of the Gulf of Mexico,

-35-

now and in the future, the fish upon which Plaintiff's business is dependent have been diminished, endangering the ability of Plaintiff to operate his charter fishing business.

23.

Despite increased marketing efforts combined with a longstanding reputation for both knowledgeable guides and top notch service, STRIKEZONE CHARTERS, LLC. is no longer able to draw customers to the Gulf for sport fishing due to the oil spill disaster.  More than a year after the well was capped; Gulf Coast communities and waters continue to be awash in fresh oil with no end in sight.  Recovery efforts to repair the physical and stigma damages to Gulf waters have been inadequate causing economic loss to fishing charter businesses, such as STRIKEZONE CHARTERS, LLC, who are financially dependent on Gulf waters.

24.

Due to the oil spill disaster, people and corporations have begun booking charter fishing expeditions and vacations in other coastal regions and consequently are unlikely to return to the Gulf Coast.  Formerly regular customers simply do not want to fish in potentially oil contaminated waters where fish populations have diminished.

25.

Due to the unprecedented scope of the disaster and the as yet unknown impact on future fish generations, it may take years to assess the full extent of the devastation to the marine life in the Gulf and it may be decades before the marine environment is able to completely recover.  Thus far the impact of the oil and other pollutants discharged into the Gulf during the Deepwater Horizon oil spill disaster has been devastating to numerous fish and shellfish populations upon which Plaintiff's businesses rely.

-36-

26.

The discharge of crude oil from the Macondo well and the spraying of dispersants into the Gulf of Mexico, has caused and will continue to cause a direct and proximate loss of revenue and/or loss of earning capacity to Plaintiff, including but not limited to the fact that the fish populations upon which Plaintiff rely have been diminished and may continue to diminish and the fact that the reputation of the geographic areas in which Plaintiff operates have been severely tainted, causing Plaintiff to have experienced and continue to experience significant business interruption owed to a significant decrease in clients and increase in cancellations of orders for charter services in the Gulf of Mexico with the likely long term and possibly permanent loss of customers and potential customers.

## VI.   MICHAEL BOATRIGHT AND THE REEFKEEPER, LLC FACTS:

1.

On May 18, 2010, Michael Boatright entered into a Master Vessel Charter Agreement with BP America Production Company [BP Contract # HOU-1649].

2.

To terminate its agreement with Mr. Boatright, BP was required issue him an off-hire dispatch notification letter.  See Articles 10(D) and 1(B) of the Master Vessel Charter Agreement. Mr. Boatright received his off-hire dispatch notification on November 26, 2010. From May 18, 2010 until Mr. Boatright received his off-hire dispatch notification letter dated November 26, 2010, Mr. Boatright and his vessel were contractually obligated under Article 2. A to remain available at BP's disposal for operation twenty-four hours (24) hours per day and Mr. Boatright was prohibited from

-37-

using his vessel for any purpose other than performance of services during the charter term.  Because Mr. Boatright was contractually obligated to BP, he was unable to pursue any other sources of revenue until he received his off-hire dispatch notification.

3.

According to Articles 1, 2 and 10 and based on BP's course of performance, BP is contractually obligated to pay Mr. Boatright for all days from May 18, 2010, through November 26, 2010.  Pursuant to Louisiana Revised Statutes 9:2781, the agreement is an open account and payment is due in full.  We demand full payment by BP for the 192 days of unpaid time, totaling THREE HUNDRED EIGHTY-FOUR THOUSAND DOLLARS ($384,000.00) and the expense that Mr. Boatright incurred in hiring a captain for his vessel totaling SEVEN THOUSAND AND FIVE HUNDRED DOLLARS ($7500.00).

4.

As of the date of the filing of this petition for damages, Mr. Boatright's vessel still has oil residue adhering to and/or embedded in the surface of the hull.   Further, damage and/or modifications to Mr. Boatright's vessel and/or equipment which were incurred during hire by BP and/or as a direct result of hire by BP has not been repaired by BP, nor has BP paid for such repairs. Pursuant to the Agreement prepared by BP, BP owes Mr. Boatright money to pay for the cost of such damage and/or modifications incurred during deployment for BP and/or as a direct result of such deployment by BP.

**VII. ALLEN OBIOL FACTS:**

1.

-38-

Plaintiff, Allen Obiol, entered into a Master Vessel Charter Agreement on or about June 30, 2010 with DEFENDANT BP AMERICA PRODUCTION COMPANY. Defendant BP breached said contract by failing to tender payment to Plaintiff Obiol for the charter term and for standby time. Defendant BP breached said contract by failing to properly terminate the Master Vessel Charter Agreement by decontaminating Plaintiff Obiol's vessel by failing to issue an off-hire notification.

## VIII. LAWRENCE PALMISANO AND GULF COAST MARINE RECOVERY, LLC

### FACTS:

1.

Plaintiff, Lawrence Palmisano d/b/a Gulf Coast Marine Recovery, LLC, entered into Master Vessel Charter Agreements related to two vessels on or about June 2010 with DEFENDANT BP AMERICA PRODUCTION COMPANY. Defendant BP breached said contract by failing to tender payment to Plaintiff for the charter term and for standby time. Defendant BP breached said contract by failing to properly terminate the Master Vessel Charter Agreement by decontaminating Plaintiff's vessels by failing to issue an off-hire notification.

2.

Additionally, Plaintiff seeks recovery for damages to his vessels which were damaged during Plaintiff's participation in the Vessels of Opportunity Program.

3.

The oil and dispersants caused significant damage to the fiberglass hull of Plaintiff's boat to the extent that it cannot be properly repaired. The oil and dispersants also destroyed internal components of the motors resulting in the need to replace the motors.

## IX.  CAUSES OF ACTION:

### COUNT I

### **Breach of Contract**

1.

Petitioners incorporate by reference the preceding allegations of this Petition for Damages as if fully set forth below.

2.

Defendants BP and DRC breached the terms of the uniform Master Vessel Charter Agreements.  In particular, BP and DRC refuse and fail to pay Petitioners for services, equipment, materials, repairs and decontaminations, as required by each of the Petitioners' Master Vessel Charter Agreements entered into with BP.

### COUNT II

### **Fraudulent Misrepresentation**

1.

Petitioners incorporate by reference the preceding allegations of this Petition for Damages as if fully set forth below.

2.

Defendants made false representations of material facts to Petitioners regarding the VOO program as set forth above.

3.

Petitioners relied on the Defendants' false representations of material facts to Petitioners

-40-

regarding the VOO program as set forth above.

4.

Petitioners' reliance on the Defendants' false representations of material facts regarding the VOO program was reasonable under the circumstances.

5.

Petitioners have been damaged as the proximate result of their reliance on the Defendants' false representations of material facts regarding the VOO program.

## COUNT III

### Fraudulent Suppression

1.

Petitioners incorporate by reference the preceding allegations of this Petition for Damages as if fully set forth below.

2.

Defendants had a duty to disclose to Petitioners all material facts regarding the VOO program.

3.

Defendants concealed material facts from Petitioners regarding the VOO program.

4.

As the result of the Defendants' concealment of material facts from Petitioners regarding the VOO program, Petitioners were induced to enroll in and continue participate in the VOO program when they could have engaged in other activities and/or opportunities.

5.

-41-

Petitioners have been damaged as the proximate result of the Defendants' concealment of material facts regarding the VOO program.

## COUNT IV

### Conspiracy

1.

Petitioner(s) incorporate by reference the preceding allegations of this Petition for Damages as if fully set forth below.

2.

Defendants engaged in an illegal and unlawful conspiracy to defraud Petitioners, to induce Petitioners' participation in the VOO program and to under pay Petitioners for services, equipment, materials, repairs and decontaminations related to Petitioners' participation in the VOO program.

3.

The acts of the Defendants described above constitute a conspiracy under Louisiana Civil Code Article 2324 and the defendants are answerable, in solido, for damage caused by this conspiracy.

4.

Petitioners have been damaged as the result of the Defendants' illegal and unlawful conspiracy.

## COUNT V

### Louisiana Open Accounts Law

1.

The uniform Master Vessel Charter Agreements are open accounts pursuant to Louisiana

Revised Statutes 9:82781. Petitioners previously demanded that defendants issue payment in full

for the amounts described in Sections of this Petition for Damages. Petitioner(s) issued their written

demands 30 days prior to filing this suit, and BP and DRC refused to pay. As such, BP and DRC

are liable for reasonable attorney fees for the prosecution and collection of this debt.

**COUNT VI**

**ECONOMIC LOSS UNDER THE OIL POLLUTION ACT**

1.

Plaintiffs reallege and reaver each and every allegation set forth in all preceding paragraphs

as fully set forth herein and further state:

2.

Under the Oil Pollution Act, 33 U.S.C. §2701, *et seq* ("OPA"), "each responsible party for

a vessel or facility...from which oil is discharged...is liable for removal costs and damages",

including "the loss of profits or impairment of earning capacity due to the injury, destruction, or loss

of real property, personal property, or natural resources, which shall be recoverable by any claimant."

33 U.S.C. §2702.

3.

A responsible party in the case of a vessel is any person owning, operating, or demise

chartering the vessel. 33 U.S.C. §2701(32)(A). A responsible party for an offshore facility is the

lessee or permittee of the area in which the facility is located. 33 U.S.C. 33 U.S.C. §2701(32)(C).

A lessee is any "person holding a leasehold interest in an oil or gas lease on lands beneath navigable

waters (as that term is defined in section 1301(a) of Title 43) or on submerged lands of the Outer

-43-

Continental Shelf, granted or maintained under applicable State law or the Outer Continental Shelf Lands Act (43 U.S.C. 1331 et seq.)." 33 U.S.C. §2701(16).

4.

For purposes of determining the responsible parties for a mobile offshore drilling unit, it is first deemed to be a tank vessel and then treated as an offshore facility for excess liability. 33 U.S.C. §2704(b) (1)&(2).

5.

At all pertinent times herein, BP leased the Deepwater Horizon. Defendants, BP, Anadarko, Anadarko E&P, and MOEX Offshore held a leasehold interest in a lease granted by the MMS for Block 252, Mississippi Canyon (the "Macondo lease"), an oil lease on lands beneath navigable waters, before and/or at the time of the spill. As such, they were lessees of the area within which the well (an "offshore facility") was located at the time of the Spill and are responsible parties pursuant to Section 2701 (16) and (32) of the OPA. BP was the designated operator for said lease. As such, they are strictly liable pursuant to Section 2702 of the OPA for all damages resulting from the spill.

6.

The United States Coast Guard identified BP, ANADARKO E&P, ANADARKO, MOEX, and TRANSOCEAN HOLDINGS as "responsible parties." Therefore, BP, ANADARKO LP, ANADARKO, MOEX, and TRANSOCEAN HOLDINGS are liable pursuant to Section 2702 for all damages that result from the Oil Spill.

7.

At all relevant times, MOECO dominated and controlled the business, operations, policies, and actions of its subsidiaries MOEX Offshore and MOEX USA to such an extent that they were

-44-

agents and/or alter egos of MOECO. Neither MOEX Offshore nor MOEX USA properly complied with corporate formalities or operated as corporations distinct from MOECO – rather, MOECO conducted its U.S. activities, including its activities regarding the Macondo Prospect lease, through these agent/alter ego entities. All activities of MOEX Offshore and MOEX USA, including the holding of the leasehold interest in the Macondo Prospect in the Mississippi Canyon Block 252, where the Macondo well is located, should be imputed to MOECO. MOECO is therefore a "responsible party" under OPA and liable to Plaintiffs for damages available under that statute.

8.

Defendant, BP and Transocean are not entitled to limit their liability under Section 2704(a) of OPA because the oil spill disaster was proximately caused by their gross negligence, willful misconduct, or violation of applicable safety, construction or operating regulations as alleged above. Additionally, in its "Statement of BP Exploration & Production, Inc. Re Applicability of Limitation of Liability Under Oil Pollution Act of 1990" filed on October 19, 20120, BP explicitly waived the right to raise the statutory limitation on liability under OPA.

9.

As a result of the Spill and the resulting damages to natural resources in the Gulf of Mexico, Plaintiffs have sustained and will continue to sustain a loss of profits and/or impairment of earning capacity, as alleged above.  Plaintiffs have not been able to use natural resources (air and water, and potentially wetlands and other areas and spaces that have and/or may become contaminated by the spilled oil), and they are entitled to recover from BP, Transocean, Anadarko, Anadarko E&P, MOEX Offshore, MOEX USA, and MOECO for such damages in amounts to be determined by the trier of fact, in addition to the damages as set forth below.

10.

As a direct and proximate cause and post explosion clean-up efforts from the Oil Spill, Plaintiffs have sustained damage to their real and/or personal property as a result of the post-explosion clean-up activity, and they are entitled to recover from BP, ANADARKO E&P, ANADARKO, MOEX and TRANSOCEAN HOLDINGS for such damages in amounts to be determined by the trier of fact.

11.

Plaintiffs are entitled to damages pursuant to Section 2702(b)(2)(B), which provides for recovery for damages to real and/or personal property, including "[D]amages for injury to, or economic losses resulting from destruction of, real and/or personal property, which shall be recoverable by a claimant who owns or leases that property."

12.

As a result of the Spill, Plaintiffs are entitled to damages pursuant to Section 2702(b)(2)(C), which provides for recovery for "[D]amages for loss of subsistence use of natural resources, which shall be recoverable by any claimant who so uses natural resources which have been injured, destroyed, or lost, without regard to the ownership or management of the resources."

13.

As a result of the oil spill and the resulting damage to the marine environment in the Gulf of Mexico, Plaintiffs are entitled to damages pursuant to OPA, Section 2702(b)(2)(E), which allows for "[D]amages equal to loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."

14.

It was foreseeable that a massive oil spill in the Gulf of Mexico would cause economic harm to Plaintiffs' businesses in Florida.

15.

To the extent required by law, and/or by consent or stipulation by BP, Plaintiffs have satisfied, or will have satisfied, all of the administrative requirements of 33 U.S.C. §§ 2713(a) and (b), as to each and all defendants, by the submission of their claims to the Gulf Coast Claims Facility (the "GCCF") and/or BP and/or its agents or designees.

16.

Plaintiffs are entitled to recover from Defendants for economic damages occasioned as a result of the oil spill in amounts to be determined by the jury.

**COUNT VII**

**BREACH OF CONTRACT UNDER GENERAL MARITIME LAW**

1.

Plaintiffs re-allege and re-aver each and every allegation set forth in all the preceding paragraphs as fully set forth herein and further state.

2.

Plaintiffs assert a cause of action against the defendants for breach of contract under general maritime law.

3.

There is maritime jurisdiction over maritime contract disputes. The guiding principle is that

-47-

a contract is maritime if its "subject matter" is maritime. *North Pac.S.S. Co. V. Hall Bros. Marine Ry & Shipbuilding Co.*, 249 U.S. 119 (1919). The Master Vessel Charter Agreements entered into by Plaintiffs and Defendants are the subject of this dispute and provide a maritime subject matter. Accordingly, maritime jurisdiction exists.

4.

Plaintiffs entered into contracts with the defendants.

5.

Plaintiffs and their vessels were available to perform and did perform all obligations under the terms fo the Master Vessel Charter Agreements.

6.

Defendants breached the Master Vessel Charter Agreements by failign to tender payment to Plaintiffs for services rendered as required under the terms Master Vessel Charter Agreement; failing to tender payment for standby time as required under the terms Master Vessel Charter Agreement; failing to decontaminate plaintiffs' vessels as required under the terms Master Vessel Charter Agreement; failing to issue off-hire notification to Plaintiffs' as required under the terms of the maaster Vessel Charter

## IX.  JURISDICTION, VENUE, AND JURY TRIAL:

1.

This court has jurisdiction under the United States Constitution, the Louisiana Constitution, La. Code Civ. Proc. art. 1 *et seq.*, and La. Rev. Stat. § 13:3201.  Petitioners' claims arise only under state law; no federal claims are alleged.

-48-

2.

Plaquemines Parish comprises a parish of proper venue under La. Code Civ. Proc. art. 42 *et seq.* and all other Louisiana laws, statutes, and codal articles providing venue.

3.

Proper venue lies in Plaquemines Parish because this action is against defendants having business offices or establishments with supervisory capacity in Plaquemines Parish. La. Code Civ. Proc. art. 77.

4.

Proper venue lies in Plaquemines Parish pursuant to La. Code of Civ. Proc. Art. 76.1 because this action relates to contracts that were executed in Plaquemines Parish and work related to the contract was performed in Plaquemines Parish.

5.

Plaquemines Parish comprises a parish of proper venue under Article 73(A) of the Louisiana Code of Civil Procedure.

## X.   DAMAGES

1.

Petitioners seek judgment against Defendants for compensatory damages, punitive damages, attorney's fees, plus interest, costs and all other relief that is appropriate and just.

2.

Petitioners now seek recovery for any damages available under all theories of fraud established in this petition and for full protection from the defendants' fraud and fraudulent concealment in this case, including but not limited to protection from defendants' pleadings, assertions of prescription, and limitation of damages.

3.

Petitioners seek reasonable attorney's fees for the prosecution and collection of this claim pursuant to Louisiana Revised Statutes 9:2781 which pertains to open accounts.

4.

Petitioners reserve their right to a jury trial.

5.

Defendants are jointly, severally, and solidarity liable to plaintiff for the following non-exclusive particulars:

    a)    loss of income and revenue;

    b)    loss of business opportunity;

    c)    diminution of value to business;

    d)    loss of business;

    e)    goodwill and stigma damages; and

f)     loss of marine natural resources

6.

Defendants are liable jointly, severally and *in solido*.

**WHEREFORE**, petitioners pray for service of the petition upon defendants and, that after due proceedings had, there be judgment in their favor, and against all defendants, in *solido*, for all damages alleged hereinabove, any and all other equitable and just relief, and all costs of these proceedings.

Respectfully submitted,

*S/Catherine B.Cummins*
**STUART H. SMITH (# 17805)**
**MICHAEL G. STAG (# 23314)**
**CATHERINE B. CUMMINS (#29558)**
Email: ccummins@smithstag.com
Smith Stag, L.L.C.
365 Canal Street, Suite 2850
New Orleans, Louisiana  70130
Telephone: (504) 593-9600
Facsimile:  (504) 593-9601

**ROBERT J. McKEE (# 0972614)**
Email: RMcKee@krupnicklaw.com

-51-

The Law Offices of Krupnick,Campbell, et al

12 Southeast 7th Street - #801

Fort Lauderdale, Florida 33301

Telephone: (954) 763-8181 #8619

Facsimile: (954) 763-8292

*Attorneys for Plaintiffs*