**Appendix F | WEATHER INFORMATION**

| | |
|---|---|
| Winds: | 6 Knots |
| Direction: | 218 Degrees True / SSW |
| Wave Height: | 0.6 Feet |
| Seas: | < 1 Foot |
| Swell: | None |
| Prevailing Conditions: | High Pressure / Stable Air Mass |
| Ambient Temp: | 69 Degrees Fahrenheit |
| Water Temp: | 71 Degrees Fahrenheit |
| Pressure: | 1013.3 hPa / 29.92 hg |
| Tendency: | Steady |
| Icing: | N/A |

The above were weather conditions at the time of the casualty.

**Appendix G | FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE MASS RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE DRILLING UNIT *DEEPWATER HORIZON***

---

| **U.S. Department of Homeland Security** **United States Coast Guard** | Commandant United States Coast Guard | 2100 2ND ST SW STOP 7000 Washington, DC 20593-7000 Phone: (202) 372-2080 Fax: (202) 372-2908 |

16106

**MEMORANDUM**

MAR 2 5 2010

From:   Cari B. Thomas, Rear Admiral
        CG-53

To:     Distribution

Subj:   FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE MASS RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE DRILLING UNIT DEEPWATER HORIZON

Ref:    (a) U.S. Coast Guard Addendum to the United States National Search and Rescue Supplement (NSS) to the International Aeronautical and Maritime Search and Rescue Manual (IAMSAR), COMDTINST M16130.2E
        (b) 40 CFR Part 300, National Oil and Hazardous Substances Pollution Contingency Plan
        (c) RRT-6 FOSC Dispersant Pre-Approval Guidelines and Checklist

1.  This Final Action Report sets forth the relevant facts adduced from the SAR Case Study following the Mass Rescue Operation (MRO) of the Mobile Offshore Drilling Unit (MODU) DEEPWATER HORIZON (DWH) explosion and resulting fire. The Case Study was conducted pursuant to reference (a) to look at initial actions including coordination of firefighting efforts, the decision process of either evaluating risk or prioritizing the application of dispersants during ongoing SAR efforts and direct actions to improve SAR execution. The Motor Vessel (M/V) DAMON B. BANKSTON was on-scene[1] when the incident occurred and was able to quickly recover personnel who abandoned DWH. As a result, 115 lives were saved. Additionally, vessels and platforms in the area volunteered critical SAR resources and staging areas for U.S. Coast Guard and commercial aircraft use. Without the availability of the M/V DAMON B. BANKSTON on-scene and cooperation of surrounding MODUs and platforms, the MRO would have been more challenging.

2.  **Overview.**

    a.  At 2150 local (approximately 2.5 hours after sunset), April 20, 2010, the MODU DWH Rig Clerk called a British Petroleum (BP) dispatcher in Port Fourchon, Louisiana, reporting that the DWH was on fire and people were evacuating by water and in need of emergency assistance. The dispatcher, in turn, notified Transocean Ltd (hereafter "Transocean"). Over the next twenty (20) minutes, Transocean representatives notified -

---

[1] The M/V DAMON B. BANKSTON was initially alongside and connected to the MODU DWH awaiting a liquid mud transfer. After the explosion, the M/V was disconnected from the MODU and moved approximately 1,000 yards away.

**Appendix G | FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE MASS RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE DRILLING UNIT *DEEPWATER HORIZON***

Subj: FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE MASS          16106
RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE DRILLING
UNIT DEEPWATER HORIZON

MODUs and drill ships in the vicinity of DWH, commercially contracted medical aviation support, BP Houston and the Coast Guard. Environmental conditions on-scene were reported as light winds with a light chop on the water. Average air temperature and water temperature for April 21, 2010, were recorded as 63° F and 69° F, respectively.

b. At 2204, April 20, 2010, Coast Guard Sector Mobile, Alabama, Command Center received the DWH Digital Select Calling (DSC) distress alert. This information was forwarded to the Command Center, Commander, Eighth Coast Guard District. Coast Guard Search and Rescue (SAR) Mission Coordinator (SMC) was assumed by Commander, Eighth Coast Guard District, New Orleans, Louisiana. The District Command Center immediately began coordinating the MRO. The SMC issued an Urgent Marine Information Broadcast (UMIB) and Search and Rescue Units (SRUs) were launched from:

(1) Coast Guard Air Station New Orleans, Louisiana.

(2) Coast Guard Aviation Training Center Mobile, Alabama.

(3) Coast Guard Sector New Orleans, Louisiana.

(4) Coast Guard Sector Mobile, Alabama.

c. The DWH crew evacuated the MODU into survival craft and into the water. Commercial and recreational vessels were first to arrive on-scene and began retrieving the survivors. Survivors on board M/V DAMON B. BANKSTON[2] reported to the SMC that there were a total of 126 persons on-board DWH at the time of the explosion.[3] When Coast Guard SRUs arrived on-scene, they observed that DWH was on fire and multiple surface vessels[4] were actively searching within 100 yards of the MODU, with additional vessels searching within sight of the DWH. DWH was engulfed in flames from below the MODU to the top of the derrick.[5]

d. Coast Guard SRUs were notified of the DWH fire within twenty (20) minutes of SMC notification by Transocean. During these twenty (20) minutes the involved command centers were acquiring reports from various sources, assimilating and interpreting the information that was being received, and determining appropriate assets to launch. The first Coast Guard SRU, CG-6605,[6] was airborne en route the DWH's position eighteen (18) minutes later and arrived on-scene within forty-two (42) minutes.

---

[2] IMO Number: 9275012.
[3] M/V DAMON B. BANKSTON took onboard 115 DWH survivors.
[4] The actual number of vessels that responded to the initial distress broadcast by the DWH is not ascertainable but by one account from a recreational vessel at 0110 local on April 21, 2010, there were ten (10) to fifteen (15) vessels on-scene searching for persons in the water and five (05) vessels spraying water on the DWH fire.
[5] A derrick is the framework erected over the oil well that allows drilling tubes to be raised and lowered.
[6] CG-6605 is a Coast Guard MH65 Dolphin helicopter. The Dolphin is primarily a Short Range Recovery (SRR) aircraft, usually deployed from shore but it can be deployed from Medium and High Endurance Coast Guard Cutters, as well as the Polar Icebreakers. Dolphin missions include: SAR, law enforcement, polar ice breaking, marine environmental protection, and military readiness. CG-6605 is stationed at Coast Guard Air Station New Orleans, Louisiana.

2

**Appendix G | FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE MASS RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE DRILLING UNIT *DEEPWATER HORIZON***

Subj: FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE MASS       16106
RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE DRILLING
UNIT DEEPWATER HORIZON

e. The initial attempted aerial search on the DWH and immediate vicinity by CG-6605 was 75 feet above the water and within 150 feet of the burning MODU; but was unsuccessful due to the extreme radiant heat emitting from DWH. The rescue helicopter reduced altitude to 50 feet above the water and continued the search. The rescue helicopter identified a small raft on fire underneath the DWH and observed burning liquid from the MODU pouring on the small raft. CG-6605 conducted another pass and visually confirmed that no one was in the small raft, under the MODU, clinging to one of the MODU's four legs, or still on the MODU itself.

f. Stationed approximately 1,000 yards from the DWH, M/V DAMON B. BANKSTON initially assumed the lead in coordinating smaller vessels on-scene that were searching for survivors. CG-6605's rescue swimmer was lowered to M/V DAMON B. BANKSTON to coordinate the medical evacuation of critically injured DWH survivors.

g. Throughout the evening of April 20 and early morning hours of April 21, additional Coast Guard SRUs arrived to support the search for eleven (11) persons still missing. These additional SRUs included:

(1) CG-2308[7], which relieved CG-6605 as Coast Guard designated On-Scene Coordinator (OSC) for aviation SRUs.

(2) Coast Guard Cutter (CGC) POMPANO[8], which assumed Coast Guard designated OSC responsibilities from M/V DAMON B. BANKSTON for surface units.

h. Initial firefighting efforts were coordinated from the M/V DAMON B. BANKSTON. OSV's that responded to request for support from Transocean applied firefighting water onto the DWH fire while other vessels launched a Remote Operated Vehicle (ROV) that attempted to secure the flow of hydrocarbons from the well by operating the Blowout Preventer. The other surface SRUs continued searching for the missing DWH crewmebers.

i. Coast Guard Marine Safety Unit Morgan City, Louisiana, Investigation Officer cross-referenced the DWH crew list (of missing personnel) with that of survivors witness/interview statements on April 22, 2010. Of the eleven (11) missing persons, seven (07) were identified as likely to be deceased by eyewitness accounts and four (04) were unaccounted for. None of the eleven (11) missing DWH crewmembers were ever located.

j. Coast Guard and other SRUs searched for over sixty-eight (68) hours; including over twenty-six (26) sorties[9] and more than 137 resource hours before the Coast Guard SMC made the decision to suspend the search for the DWH crewmembers that were

---

[7] CG-2308 is an HC-144A (Ocean Sentry) Maritime Patrol fixed-wing aircraft. The HC-144A performs various Coast Guard missions, including SAR, homeland security, law enforcement, marine environmental protection, military readiness, international ice patrol, as well as cargo and personnel transport. CG-2208 is stationed at Coast Guard Aviation Training Center Mobile, Alabama.
[8] CGC POMPANO is an 87-foot Marine Protector Class Coastal Patrol Boat that conducts SAR, law enforcement, and Homeland Security missions.
[9] Sorties refer to each time a resource such as assets or personnel are dispatched to respond to a SAR incident.

3

Case 2:10-md-02179-CJB-DPC   Document 10675-2   Filed 06/27/13   Page 5 of 102

**Appendix G | FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE
MASS RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE
DRILLING UNIT *DEEPWATER HORIZON***

Subj: FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE MASS           16106
RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE DRILLING
UNIT DEEPWATER HORIZON

unaccounted for. When the SAR case was suspended at 1853 local, April 23, 2010,
twenty-four (24) separate search patterns were conducted by surface and air SRUs,
covering over 5,000 square miles. During these searches, the Coast Guard designated
OSC received and coordinated the investigation of reports of burnt survival craft, an
article of clothing, orange discoloration to the water, other debris, and a possible 121.5
MHz Emergency Position Indicating Radio Beacon (EPIRB) alert located within the
search area.

## 3. Findings of Fact.

a. The position of DWH, a 396 foot by 256 foot, 8,000 metric ton, steel hull, MODU
registered in the Marshall Islands, was 28°- 44' North 088°- 21' West (approximately 50
miles south of South Pass, Louisiana).

b. The time the Coast Guard was notified of the DWH distress was 2204 local, April 20,
2010.

c. Assumptions the SMC used in planning the search for the missing DWH crewmembers
were:

   (1) The eleven (11) missing persons did not perish in the initial MODU fire.

   (2) The eleven (11) persons may have fallen/jumped off the MODU, or may have
remained on board.

   (3) The missing persons were not wearing life jackets or in a life raft; but may have been
floating free in the water.

   (4) The object type used for search planning: Person-in-the-Water (PIW) without a life
jacket.

d. Environmental data utilized by the SAR watchstanders during search planning was
obtained from the Coast Guard Search and Rescue Optimal Planning System (SAROPS),
Environmental Data System (EDS) for wind and manually input from the Self-Locating
Data Marker Buoy (SLDMB) for current. This data was used in planning the searches for
the designated Alpha through Juliet search plans.

e. Many of the completed searches in the SAROPS Summary review column, enclosure
(1), were labeled as "Tentative". In this case SAROPS assumes the actual commence
search time and end search time will both be as planned and that the search is 100%
complete.

f. The SAROPS summary for the PIW searches conducted from April 20, 2010 to April 23,
2010 is provided as enclosure (1).

   (1) Enclosure (1) is a summary of the search areas coordinated, type of SRU assigned,
type of search patterns conducted, the area searched, track length miles and
percentage of the search area completed.

4

**Appendix G | FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE MASS RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE DRILLING UNIT *DEEPWATER HORIZON***

---

Subj: FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE MASS    16106
RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE DRILLING
UNIT DEEPWATER HORIZON

    (2) SAROPS calculated the Probability of Success (POS) in the cumulative searches for a PIW without a lifejacket as 84% within the defined search area at the end of the Juliet search.

g. Commander, Eighth Coast Guard District, New Orleans, Louisiana, assumed SAR case SMC at 2206 local on April 20, 2010.

    (1) The SMC's primary focus was SAR until the search was suspended at 1853 local, April 23, 2010.

    (2) Two additional Coast Guard Eighth District Command Center personnel were recalled to augment and assist the Command Center watch.

h. The SMC was in communication with BP while coordinating the DWH MRO response.

i. M/V DAMON B. BANKSTON initially assumed the lead in coordinating the rescue of DWH survivors with other vessels that arrived on-scene to assist.

j. CG-6605 assumed Coast Guard designated OSC for aviation SRUs and was relieved shortly after arriving on scene by CG-2308.

k. After arriving on-scene, CGC POMPANO assumed the Coast Guard designated OSC from M/V DAMON B BANKSTON for surface SRUs conducting the PIW search. CGC POMPANO was later relieved by CGC ZEPHYR.[10]

l. Both CGCs POMPANO and ZEPHYR communicated with the Offshore Supply Vessels (OSVs) on-scene. During the initial MRO, the OSVs reported to CGCs POMPANO and ZEPHER and requested tasking. The Coast Guard designated OSCs tasked the OSVs and other vessels to continue to maintain a lookout for possible DWH survivors, as well as report findings and changes to the DWH's status.

m. The OSVs provided a heat screen by using their fire monitors to pump water on and around the DWH fire, attempted to secure the source of the hydrocarbons, and kept a lookout for the missing DWH crewmembers. None of these actions inhibited the Coast Guard SAR response.

n. BP assigned six (06) vessels to assist the Coast Guard and Transocean with SAR operations.

o. At 2300, April 21, 2010, BP's Incident Action Plan (IAP) (Submitted by Mr. ▮▮▮▮▮▮▮▮ identified the general response objectives for resources that responded to the DWH disaster. These objectives included:

    (1) Support Coast Guard and Transocean led SAR Activities.

    (2) Control the source of the spill. These actions included:

        (a) Support Transocean in emergency shutdown.

        (b) Develop secondary options for well control.

---

[10] CGC ZEPHYR is a 179-foot Cyclone Class Patrol Coastal Boat. CGC ZEPHYR's missions include SAR, law enforcement, and Homeland Security operations.

5

**Appendix G | FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE
MASS RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE
DRILLING UNIT *DEEPWATER HORIZON***

Subj: FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE MASS          16106
RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE DRILLING
UNIT DEEPWATER HORIZON

    (c) Protect infrastructure in the area.

p. The BP IAP Resource Summary assigned resources to groups within the Incident
Command Operations Branch. These groups included the:

    (1) SAR Group.

    (2) Dispersant Group.

    (3) Emergency Response Branch.

    (4) Firefighting Group.

    (5) Mechanical Recovery Group.

q. According to the IAP Resource Summary (prepared at 2300 by Mr. ▮▮▮▮▮▮▮, five (05)
vessels (M/V C-ENFORCER, M/V GLORIA CALLIS, M/V MONICA ANN, M/V
NORBERT BOUZIGARD and M/V SEACOR LEE) were assigned to the Marine
Firefighting Group.

r. The SMC and Coast Guard designated OSC did not coordinate the firefighting actions of
the vessels assigned to the Marine Firefighting Group.

s. There is no requirement for a Responsible Party or the Regional Response Team (RRT)
to consider SAR when planning the use of dispersants. Regardless, the RRT, Eighth
Coast Guard District Incident Management Team (IMT), and the SMC were consulted
before authorizing the use of dispersants by the Responsible Party. The SMC confirmed
the use of dispersants would not inhibit SAR operations.

t. The dispersant, Corexit EC9527A, was sprayed in an active search area on April 22,
2010, (1,500 gallons were sprayed in five (05) separate sorties). Technical Bulletin #D-1,
provided by the U.S. Environmental Protection Agency, indicates that Corexit EC9527A
is harmful to humans.[11] Dispersant planning and spraying was conducted in accordance
with references (b) and (c).

u. At 1534 local, April 22, 2010, the DWH survivors were debriefed by Coast Guard
Investigating Officers from Coast Guard Marine Safety Unit Morgan City, Louisiana.
The DWH crew list was used during debrief.

    (1) From the interviews it was determined that seven (07) of the missing persons were
    likely to be deceased.

    (2) The remaining four (04) missing persons were not seen by the survivors after the
    explosion.

v. Coast Guard Command Duty Officers, SAR Controllers, Operations and Situation Unit
watchstanders from the Eighth Coast Guard District Command Center, Coast Guard
Sector New Orleans, Louisiana, and Coast Guard Sector Mobile, Alabama, were
interviewed for the SAR case study.

---

[11] The MSDS for Corexit EC9527A indicates that *acute excessive exposure* may cause "central nervous system
effects, nausea, vomiting, anesthetic or narcotic effects" (emphasis added).

6

**Appendix G | FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE
MASS RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE
DRILLING UNIT *DEEPWATER HORIZON***

---

Subj: FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE MASS      16106
RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE DRILLING
UNIT DEEPWATER HORIZON

w. Eighth Coast Guard District Command Center, Coast Guard Sector New Orleans,
Louisiana, and Coast Guard Sector Mobile, Alabama, reported there were no equipment
problems or issues found during the review of the case materials, correspondence and
SAR case history. The Rescue 21[12] system was fully operational.

x. At the time of the DWH distress notification, a Command Duty Officer (qualified SAR
Controller), SAR Controller, and an Operations Unit watchstander were on watch.
Within two (02) hours, an additional SAR Controller was recalled to augment the watch.
This met the requirement of the established policy at the Eighth Coast Guard District
Command Center. Coast Guard Sector New Orleans, Louisiana, and Coast Guard Sector
Mobile, Alabama, had qualified SAR watchstanders on watch at the time of DWH
distress notification as required by policy.

y. The following SRUs were available at the time of the DWH distress notification:

    (1) Coast Guard Aviation Training Center Mobile, Alabama: Four (04) HC-144 aircraft
in Bravo Status. [13]

    (2) Coast Guard Air Station New Orleans, Louisiana: Four (04) HH-65 helicopters in
Bravo Status.[14]

    (3) Coast Guard Sector New Orleans, Louisiana:

        (a) One (01) Coast Guard cutter in Bravo Status[15] (six (06) hours readiness).

        (b) Two (02) Coast Guard cutters in Bravo Status, (twelve (12) hours readiness).

    (4) Coast Guard Sector Mobile, Alabama:

        a. One (01) Coast Guard cutter in Alpha Status (underway).

        b. One (01) Coast Guard cutter in Bravo Status (twenty-four (24) hours readiness).

    (5) CGC ZEPHYR, in transit from maintenance and repairs to homeport, was diverted to
the DWH distress.

z. Of the above listed SRUs, all crewed aircraft and cutters were deployed.

aa. EPIRB satellite data from DWH was originally received at 1252 local, April 21, 2010,
approximately three (03) hours after the initial distress notification to the Coast Guard.
The original positions had a fifty percent (50%) A and B position probability and were
plotted 156 nautical miles (NM) due east of Jacksonville, Florida, and 900 NM north and

---

[12] Rescue 21 is the Coast Guard's new command, control, and communications system for all missions in the coastal
zone that provides increased communications coverage and advanced direction-finding capabilities.
[13] Aircraft Bravo Status indicates that the aircraft is mechanically available for operations. However, there may not
be a crew to operate the Bravo status aircraft.
[14] Aircraft Bravo Status indicates that the aircraft is mechanically available for operations. However, there may not
be a crew to operate the Bravo status aircraft.
[15] Cutter Bravo Status indicates the readiness condition of the resource. This is a time frame in which the vessel will
be able to meet the next level of readiness. In this case the next level of readiness is Alpha, which is an underway
status.

7

**Appendix G | FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE MASS RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE DRILLING UNIT *DEEPWATER HORIZON***

Subj: FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE MASS     16106
RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE DRILLING
UNIT DEEPWATER HORIZON

      east of the Lesser Antilles. Subsequent reports received from the EPIRB indicated the
accurate position of DWH.

bb. The primary means of communication between the SMC, OSC, and SRUs was via a
secure communication system. This data was not saved and cannot be recovered.

cc. The Cold Exposure Survival Model (CESM) was used in accordance with Coast Guard
policy at the time of the DWH incident.[16] SAR watchstanders used the CESM on April
22, 2010. A water temperature of 70°F was used (air temperature is not significant in
CESM calculations for a PIW submerged to the neck). The CESM functional time was
calculated to be 18.7 hours. Survival time was calculated to be thirty-one (31) hours.[17]

**4.   <u>Consolidated SAR Case Timeline.</u>**

**April 20, 2010**
(All times local time)

2150 – Mr.          (BP) received original notification from DWH.

2156 – Maritime Rescue Coordination Center Rome, Italy, and received the DWH Digital
Select Calling (DSC) High Frequency (HF) Distress Alert.

2204 – Coast Guard Sector Mobile, Alabama, Command Center received the DWH DSC HF
distress alert; position 28°-44' North 088°-21' West.

2206 – Eighth Coast Guard District Command Center received a phone call from Mr.
         who reported DWH was on fire with personnel abandoning the
MODU, approximately 50 NM south of South Pass, Louisiana. Eighth Coast Guard
District Command Center assumed SMC.

2206 – Coast Guard Sector Mobile, Alabama, received a radio transmission from recreational
vessel RAMBLIN' WRECK, relaying communications that DWH was engulfed in
flames and personnel were abandoning the MODU.

2210 – Coast Guard Sector Mobile, Alabama, reported the alert and notified the Eighth Coast
Guard District Command Center. Eighth Coast Guard District Command Center
recalled CGCs RAZORBILL[18] and POMPANO and launched aircraft from Air
Stations New Orleans, Louisiana, and Mobile, Alabama.

---

[16] The CESM is a tool that provides SAR professionals with predicted functional time and predicted survival time of
distressed persons based upon cooling of the body's core temperature. At functional time, the person is
incapacitated by hypothermia and is at the limits of self-help. Survival time is the predicted time after immersion
when the person's core temperature falls to the end of moderate hypothermia at 28°C (82.4°F).
[17] The Coast Guard Probability of Survival Detection Aid (PSDA) replaced the CESM and was released on April 16,
2010. The PSDA uses a significantly improved model and includes dehydration survival impacts in warmer waters.
An example PSDA was made during the development of the DWH SAR case study using a water temperature of
70°F and air temperature of 72°F. The PSDA model provided a functional time of 71.7 hours and a survival time of
120 hours. 120 hours is the maximum calculated survival time in the PSDA model for persons immersed in water.
[18] 87-foot Marine Protector Class Coastal Patrol Boat.

8

**Appendix G | FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE MASS RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE DRILLING UNIT *DEEPWATER HORIZON***

Subj: FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE MASS          16106
RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE DRILLING
UNIT DEEPWATER HORIZON

2210 – Coast Guard Air Station New Orleans, Louisiana, was notified of the DWH distress and directed to launch CG-6605.

2215 – Coast Guard Sector Mobile, Alabama, issued an UMIB.

2215 – Civilian helicopter S-92[19] was tasked to support the DWH response.

2228 – CG-6605 was launched, enroute DWH.

2235 – CG-2308 was launched.  Mission: SAR and report any DWH oil.

2240 – S-92 launched from South Lafourche Leonard Miller Jr. Airport,[20] Galliano, Louisiana, to assist in DWH SAR operations.

2300 – CGC COBIA[21] diverted to the DWH.

2310 – CG-6605, the first Coast Guard SRU on-scene, assumed Coast Guard designated OSC.

2315 – CG-2308 on-scene; relieved CG-6605 as the Coast Guard designated OSC.

2337 – BP reports 111 persons[22] from the DWH are onboard the M/V DAMON B. BANKSTON

**April 21, 2010**

0004 – CG-6576[23] arrived on-scene.

0100 – The Federal Aviation Administration (FAA) granted the Coast Guard's request for an airspace Temporary Flight Restriction (TFR).

0110 – A Good Samaritan vessel reported that ten (10) to fifteen (15) vessels were on-scene searching for PIWs; five (05) vessels were spraying water on the DWH fire.

0133 – CG-6508[24] arrived on-scene.

0210 – CGC POMPANO assumed Coast Guard designated OSC for all surface SRUs.

0245 – SAROPS Case Name "DEEPWATER HORIZON" opened by Mr. Curtis Andrews, Eighth Coast Guard District Command Center.

---

[19] The S-92 helicopter used in the DWH response was owned and operated by VIH Cougar Helicopters, Galliano, Louisiana. S-92 received a page from Cougar Helicopters dispatch of a possible fire on BP DWH.  A second page was received from Cougar Helicopter dispatch verifying the mission.
[20] Call Sign: KGAO.
[21] 87-foot Marine Protector Class Coastal Patrol Boat.
[22] Subsequent MISLE entries provide that the final number of DWH personnel aboard the M/V DAMON B. BANKSTON as 115.
[23] Coast Guard Dolphin helicopter stationed at Coast Guard Air Station New Orleans, Louisiana.
[24] Coast Guard Dolphin helicopter stationed at Coast Guard Air Station New Orleans, Louisiana.

9

**Appendix G | FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE MASS RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE DRILLING UNIT *DEEPWATER HORIZON***

Subj: FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE MASS    16106
RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE DRILLING
UNIT DEEPWATER HORIZON

0400 – CG-6016,[25] CG-6605, CGC POMPANO commenced Alpha searches.[26]

0437 – S-92 landed at the University of South Alabama and delivered five (05) critically injured DWH personnel.

0643 – Eighth Coast Guard District requested from Coast Guard Atlantic Area to use CGC DECISIVE.[27]

0700 – CG-6605 and CG-6508[28] commenced Bravo searches.

0715 – CGC ZEPHYR arrived on-scene.

0730 – CGC ZEPHYR assumed Coast Guard designated OSC.

0800 – CG-2308, CGC COBIA[29] and CGC ZEPHYR commenced Bravo searches.

0813 – M/V ODYSSEA DIAMOND[30] located 2 burned life rafts (no persons on board).

0830 – CGC RAZORBILL commenced a Bravo search.

0840 – CG-6556[31] deployed a data marker buoy.[32]

1000 – Unified Command planning meeting was held. Dispersant aircraft on standby in Mississippi and Arizona.

1045 – CG-6016 commenced Charlie search.

1100 – Second attempt to shut the DWH Blowout Preventer failed.

1130 – CG-6556 and CG-6605 commenced Charlie searches.

1230 – Coast Guard Gulf Strike Team[33] personnel en route Houston, Texas, and New Orleans, Louisiana, for possible dispersant operations. Dispersant checklist was reported complete.

1243 – Deployed data marker buoy was relocated.

---

[25] CG-6016 is a Coast Guard HH-60J Jayhawk helicopter. The Jayhawk is a multi-mission, twin-engine, medium-range helicopter that performs various missions, including SAR, law enforcement, homeland security, marine environmental protection, military readiness, as well as cargo and personnel transport. CG-6016 is stationed at Coast Guard Aviation Training Center Mobile, Alabama.

[26] Extended search activities are accomplished in "epochs" of time. A search involving several facilities is planned and a search action plan with specific taskings for these facilities is promulgated. Planning for a subsequent search then begins so that it may be implemented quickly should the present search effort fail to locate the survivors. The two periods when facilities are on-scene would form two search epochs. Search epochs are designed with letters (A, B, C…) where a letter is assigned to each epoch in time sequence. The first planned search epoch is designated, "Alpha," the second, "Bravo," and so forth.

[27] CGC DECISIVE is a 210-foot Coast Guard Medium Endurance Cutter, homeported in Pascagoula, Mississippi.

[28] Coast Guard Dolphin helicopter stationed at Coast Guard Air Station New Orleans, Louisiana.

[29] 87-foot Marine Protector Class Coastal Patrol Boat.

[30] IMO Number: 951454700. This was a Good Samaritan that volunteered to assist in the search for survivors.

[31] Coast Guard Dolphin helicopter; Coast Guard Air Station New Orleans, Louisiana.

[32] Datum Marker Buoys (DMBs) are tools for determining total water current in a search area.

[33] The USCG Gulf Strike Team is one of 3 deployable special teams that make up the National Strike Force and is comprised of personnel who are specifically trained for response to hazards including oil spills and use of dispersants .

10

**Appendix G | FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE
MASS RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE
DRILLING UNIT *DEEPWATER HORIZON***

---

Subj: FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE MASS        16106
RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE DRILLING
UNIT DEEPWATER HORIZON

1600 – S-92 helicopter commenced a Delta search.

1630 – CG-6508 and CG-2308 commenced Delta searches.

2100 – CGC ZEPHYR commenced an Echo search.

### April 22, 2010

0600 – CGC PELICAN[34] commenced a Foxtrot search.

0620 – CG-2305[35] commenced a Foxtrot search.

0741 – CG-6540[36] commenced a Foxtrot search.

0935 – S-92 helicopter commenced a Foxtrot search.

1000 – CGC COHO[37] commenced a Foxtrot search.

1026 – DWH sank.

1205 – Phone conference conducted with Coast Guard liaisons in BP's Houston Incident
Command Post to get updated plans on possible dispersant use.

1226 – Coast Guard Marine Safety Unit Morgan City, Louisiana, and Gulf Strike Team
members assigned to conduct flight observations from Venice, Louisiana.

1300 – Eighth Coast Guard District Incident Management Team was activated.

1345 – Oil targeted for dispersant operations identified in overflight.[38]

1423 – CG-6540 and CG-2305 commenced Golf searches.

1534 – Coast Guard Marine Safety Unit Morgan City, Louisiana, Investigation Officer cross-
referenced the DWH crew list (of missing personnel) with that of survivors
witness/interview statements. Of the eleven (11) missing persons, seven (07) were
identified as likely to be deceased by eyewitness accounts.

### April 23, 2010

0700 – CG-6508 and CG-2301[39] commenced India search.

1000 – CGC COHO commenced an India search.

1615 – Eighth Coast Guard District Command Center recommended Active Search
Suspension.

---

[34] 87-foot Marine Protector Class Coastal Patrol Boat.
[35] HC-144A Ocean Sentry fixed wing aircraft stationed at Coast Guard Aviation Training Center, Mobile, Alabama.
[36] Coast Guard Dolphin helicopter stationed at Coast Guard Air Station, New Orleans, Louisiana.
[37] 87-foot Marine Protector Class Coastal Patrol Boat.
[38] Based on recorded MISLE entries, 1,500 gallons of dispersants were applied in five (05) sorties between 1345 on
April 22, 2010 and 0243 April 23, 2010.
[39] HC-144A Ocean Sentry fixed wing aircraft stationed at Coast Guard Aviation Training Center Mobile, Alabama.

11

**Appendix G | FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE MASS RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE DRILLING UNIT *DEEPWATER HORIZON***

---

Subj: FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE MASS      16106
RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE DRILLING
UNIT DEEPWATER HORIZON

1853 – Coast Guard Eighth District suspended the active search for the unaccounted for DWH personnel.

5. **Opinions**

a. From the time of initial notification of the Command Center, Eighth Coast Guard District to the suspension of the active search, watchstanders remained vigilant, and SRUs professionally executed a thorough search for the survivors of DWH.

b. The U.S. Coast Guard SRUs that initially responded to the reports of distress were small boats and small cutters that have small crews and limited communications capabilities. These units rely primarily on voice communications over very high and high frequencies that are adequate. During the response to DWH, a more robust communications suite would have enhanced the communications and sharing of information, and coordination of SRUs.

c. The SMC utilized CESM to calculate the functional and survival time of the missing personnel from DWH. The System Management and Engineering Facility (SMEF) Advisory number SAROPS-10-001 dated April 16, 2010, announced the release of the Probability of Survival Decision Aid (PSDA) as the survival model of choice. The release was four (04) days prior to DWH incident. The advisory did not mandate that units replace the CESM model, but rather announced a period of familiarization and beta testing. On June 22, 2010, the U.S. Coast Guard Director for Response Policy (CG-53) released an All Coast Guard (ALCOAST) message that required the use of PSDA and removed CESM. PSDA is a physiological based model of both heat and water loss for survivors immersed in water or out in open air. Consideration of these additional factors reflects an improvement over CESM because it predicts more realistic survival times. During the pendency of the DWH MRO, SMC was trained, experienced and most familiar with using CESM; and opted not to use this SAR case to test the newly rolled out PSDA. Accordingly, the use of CESM during the DWH MRO was both prudent and authorized based on the guidance of the SMEF Advisory of April 16, 2010.

d. The fact that the SMC failed to document the completion of the search patterns marked as "Tentative" in the SAROPS Summary may cause the estimated cumulative POS to be inaccurate. The reliance of the SMC on using a single SLDMB as a source of current data combined with the failure to document search start and completion times in SAROPS may affect the cumulative POS and subsequent estimates of the most likely location of survivors.

e. The decision to suspend the active search for survivors of the DWH was made by the SMC. This decision was based on the following facts as presented, appeared prudent and was consistant with policy in reference (a):

(1) The intense saturation of SRUs and excellent search conditions (winds & seas);

(2) The CESM that produced a functional time of 18.7 hours and a survival time of thirty one (31) hours;

12

**Appendix G | FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE
MASS RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE
DRILLING UNIT *DEEPWATER HORIZON***

Subj: FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE MASS          16106
RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE DRILLING
UNIT DEEPWATER HORIZON

    (3) Twenty-two (22) parallel search patterns and four (04) creeping line searches were assigned covering an area of over 5,375 square miles;

    (4) Efforts to raise the cumulative Probability of Success by continuing to search could not be significantly raised through the use of SAROPS;

    (5) The violent and dangerous nature of the DWH explosion and ensuing mass conflagration; and

    (6) The report by the Coast Guard Marine Safety Unit Morgan City, Louisiana, that provided eyewitness accounts that seven (07) of the eleven (11) missing persons were most likely killed in the initial explosion.

f.  During the execution of the SAR case, SAR checklists were not completed, search action plans were not documented and secure internet communications were not saved or otherwise memorialized anywhere. Contemporaneous documentation was available from MISLE[40] entries from watchstanders, SAROPS, SITREPS[41] and audio recordings[42]. There is no indication that the lack of documentation influenced the results of the case. However, lack of documentation hindered this immediate case study and may similarly hinder future case studies or investigations.

g.  Section 4.4.2.1., et seq., of reference (a) provides guidance for firefighting activities. Consistent with reference (a), the SMC did not conduct or coordinate firefighting efforts in support of lifesaving because it was presumed that there could be no survivors onboard the MODU DWH at the time the first SRUs arrived. This conclusion was reached based on the totality of the situation after considering several factors including; the intense radiant heat and flames reported from CG-6605 and other on-scene vessels, the inability for vessels or air assets to get within close proximity, and that the nearest assets to the MODU relayed that there were no survivors visible on the MODU. Review of the findings of fact indicates that all response efforts in regard to fire were concentrated on securing the fuel source. The firefighting and marine incident response did not hinder the SAR efforts.

h.  The decision to spray the dispersant was in accordance with policy and guidance in effect at the time of the DWH MRO. The Responsible Party elected to use dispersants because an area of dispersible oil was identified drifting towards land and the RRT authorized dispersant use in accordance with reference (b and c). The U.S. Coast Guard Federal On-Scene Coordinator (FOSC) concurred with the use of dispersants based on a decision that dispersant use could be coordinated to not hinder the active SAR efforts. The required checklist (which was completed in this case) directs the controller to maintain a lookout

---

[40]  The Marine Information for Safety and Law Enforcement (MISLE) database is managed and used by the Coast Guard to store data regarding marine safety, security, environmental protection and law enforcement information.
[41]  SITREPs are Situation reports used to pass key operational information in a timely manner, both up and down USCG organization.
[42]  As of the date of this report, the official transcription of the audio recordings was not available.

13

Subj: FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE MASS        16106
RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE DRILLING
UNIT DEEPWATER HORIZON

for marine life during the aerial deployment of dispersants.[43]  There is no information
from any source that suggests any of the unaccounted for personnel from the DWH were
in the areas where dispersants were deployed or otherwise came into contact with
dispersants.

**6. Actions.**  Pursuant to the foregoing findings of facts and opinions, the following actions are
necessary:

   a. Coast Guard Eighth District and subordinate Sectors should:

      (1) Coordinate with industry representatives to discuss the DWH incident and evaluate
      industry contingencies for a mass evacuation from their  MODU.

      (2) Ensure SAR, mass rescue, and/or mass evacuation contingencies are incorporated
      into appropriate contingency plans.

   b. Coast Guard designated SMCs should request a suitable command and control platform
   for tactical control during MROs.

   c. SAR Coordinators shall emphasize to subordinates that documentation requirements in
   the U.S. Coast Guard Addendum to the United States National Search and Rescue
   Supplement (NSS) to the International Aeronautical and Maritime Search and Rescue
   Manual (IAMSAR), COMDTINST M16130.2E, are followed.  Additionally,
   watchstanders and watch supervisors shall ensure case documentation and data entry are
   timely, accurate, and complete.

   d. The National Search and Rescue School shall ensure students understand the effect that
   accurate search documentation in SAROPS has on the calculation of POS and subsequent
   estimates of the most likely location of survivors.  The Office of Search and Rescue (CG-
   534) shall update reference (a) to expand the discussion of "Tentative" entries and their
   impact.

   e. Expand Coast Guard Policy in the U.S. Coast Guard Addendum to the United States
   National Search and Rescue Supplement (NSS) to the International Aeronautical and
   Maritime Search and Rescue Manual (IAMSAR) for case file documentation of
   correspondence to include secure communications that occur during the prosecution of
   SAR cases.

   f. The Office of Search and Rescue (CG-534) shall coordinate with the Office of
   Waterways Management (CG-541) to amend the Coast Guard's policy for marine
   firefighting on vessels contained in Marine Safety Manual, Vol. VI, Ports and Waterways
   Activities, COMDTINST M16000.11 (series), and provide expanded guidance to the
   SMC concerning coordination of firefighting efforts for vessel fires beyond the port
   environment.

   g. The Office of Search and Rescue (CG-534) and the Office of Incident Management and
   Preparedness (CG-533) shall develop a policy that requires the FOSC to coordinate with

---

[43] While not explicitly referenced in the checklist it is reasonable to assume that the controller would also be looking
out for PIWs.

14

**Appendix G | FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE MASS RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE DRILLING UNIT *DEEPWATER HORIZON***

Subj: FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE MASS          16106
RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE DRILLING
UNIT DEEPWATER HORIZON

the SMC prior to the use of dispersants during concurrent SAR and pollution response
operations.  Considerations for the use of dispersants during active SAR response should
take a critical look at the area of dispersant use and carefully document and provide
specific direction to dispersant controllers on procedures for identifying and avoiding the
spraying of survivors.

#

Encl:          (1) SAROPS SUMMARY

Distribution:   COMDT (CG-534)
                COMDT (CG-533)
                COMDT (CG-541)
                LANTAREA (Ao/Acc)
                National SAR School
                CGD EIGHT (drm)

15

**Appendix G | FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE
MASS RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE
DRILLING UNIT *DEEPWATER HORIZON***

ENCLOSURE (1)

## SAROPS Summary

### Case Properties

| | |
|---|---|
| **Case Name** | DEEPWATER HORIZON |
| **Status** | ACTSUS |
| **Opened By** | ███████████ |
| **Date Opened** | 210745Z APR 10 |
| **Closed By** | os1 mcgivern |
| **Date Closed** | 240107Z APR 10 |

| | |
|---|---|
| **Unit Case Number** | 0087-10 |
| **MISLE Case Number** | 497499 |
| **MISLE Case URL** | http://misle.osc.uscg.mil/msnweb/MSN_Case_Detail.asp?Case_ID=497499 |

| | |
|---|---|
| **Location** | 45NM ESE OF SOUTH PASS, LA |
| **Nature Of Distress** | Mass Rescue Ops |
| **Number Of Persons** | 126 |
| **Vessel/Aircraft ID** | DEEPWATER HORIZON |

### Run Properties

| | |
|---|---|
| **Case Name** | DEEPWATER_HORIZON |
| **Date** | 231402Z APR 10 |
| **Search Plan** | JULIETT |
| **Planner** | ███████████ |
| **Run Name** | JULIETT_DEEPWATER_HORIZON1 |
| **Comments** | |
| **Status** | Complete |

### Search Objects

| | |
|---|---|
| **Type** | PIW without PFD (Average) |
| **Detection** | |
| **Capacity** | |
| **Length** | 1.00 FT |
| **Beam** | 1.80 FT |
| **Height** | 1.30 FT |

1

G-16

**Appendix G | FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE MASS RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE DRILLING UNIT *DEEPWATER HORIZON***

ENCLOSURE (1)

**Leeway**
Rate (%)                1.10 %
Average Div Angle   30.00 Deg

## Scenarios

| Name | Type | DST | Weight | Weight % |
|------|------|-----|--------|----------|
| Scenario 1 | LKP | 210303Z APR 10 | 5 | 100% |

## Hazards

**No Hazards.**

## Completed Searches as of 232353Z APR 10

| Prefix | SRU ID | Descriptor | Type | CST | EST | % Comp | Track Length Searched | Area Searched | Reviewed |
|--------|--------|-----------|------|-----|-----|--------|----------------------|---------------|----------|
| A-3 | HH60 | | PS | 210900Z APR 10 | 211159Z APR 10 | 100% | 229 NM | 30 SQNM | Tentative |
| A-2 | POMPANO | POMPANO | PS | 210900Z APR 10 | 211656Z APR 10 | 100% | 81 NM | 43 SQNM | Tentative |
| B-1 | 6605 | | PS | 211200Z APR 10 | 211459Z APR 10 | 100% | 230 NM | 48 SQNM | Tentative |
| B-2 | 6508 | | PS | 211200Z APR 10 | 211459Z APR 10 | 100% | 229 NM | 41 SQNM | Tentative |
| B-3 | RAZORBILL | | PS | 211330Z APR 10 | 212325Z APR 10 | 100% | 101 NM | 79 SQNM | Tentative |
| B-4 | 2308 | | PS | 211300Z APR 10 | 211629Z APR 10 | 100% | 446 NM | 446 SQNM | Tentative |
| B-5 | COBIA | | CS | 211300Z APR 10 | 212257Z APR 10 | 100% | 102 NM | 52 SQNM | Tentative |
| B-6 | CGC | | PS | 211345 | 220042 | 100% | 121 NM | 50 SQNM | Tentative |

2

**Appendix G | FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE MASS RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE DRILLING UNIT *DEEPWATER HORIZON***

ENCLOSURE (1)

|  |  |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|
|  | ZEPHYR |  |  | Z APR 10 | Z APR 10 |  |  |  |  |
| <UNK> | CG 2308 | B4-2308 | PS | 211400 Z APR 10 | 211729 Z APR 10 | 100% | 446 NM | 446 SQNM | Tentative |
| C-1 | 6010 |  | PS | 211545 Z APR 10 | 211844 Z APR 10 | 100% | 230 NM | 25 SQNM | Tentative |
| C-2 | 6556 |  | PS | 211630 Z APR 10 | 211929 Z APR 10 | 100% | 229 NM | 32 SQNM | Tentative |
| C-3 | 6605 |  | PS | 211630 Z APR 10 | 211929 Z APR 10 | 100% | 229 NM | 39 SQNM | Tentative |
| D-1 | 6608 |  | PS | 212130 Z APR 10 | 212314 Z APR 10 | 70% | 134 NM | 28 SQNM | Tentative |
| D-3 | 2308 |  | CS | 212130 Z APR 10 | 220029 Z APR 10 | 100% | 381 NM | 413 SQNM | Tentative |
| E-1 | ZYPHER |  | PS | 220300 Z APR 10 | 221050 Z APR 10 | 100% | 80 NM | 132 SQNM | Tentative |
| <UNK> | COUGAR | Cougar D search | PS | 212100 Z APR 10 | 212259 Z APR 10 | 100% | 153 NM | 31 SQNM | Tentative |
| <UNK> | CG 2308 | B4-2308 OFFSET | PS | 211400 Z APR 10 | 211729 Z APR 10 | 100% | 446 NM | 446 SQNM | Tentative |
| F-2 | HC144 |  | PS | 221120 Z APR 10 | 221559 Z APR 10 | 100% | 892 NM | 893 SQNM | Yes |
| F-1 | HH65 |  | PS | 221241 Z APR 10 | 221449 Z APR 10 | 15% | 34 NM | 7 SQNM | Yes |
| F-3 | 87327 | PELICAN | PS | 221100 Z APR 10 | 221721 Z APR 10 | 75% | 61 NM | 41 SQNM | Yes |
| F-5 | COUGAR HELO |  | CS | 221435 Z APR 10 | 221559 Z APR 10 | 50% | 115 NM | 23 SQNM | Yes |
| F-4 | 87321 | COHO | CS | 221500 Z APR 10 | 230258 Z APR 10 | 100% | 122 NM | 53 SQNM | Tentative |
| G-1 | 2305 |  | PS | 221923 Z APR 10 | 230022 Z APR 10 | 100% | 638 NM | 682 SQNM | Tentative |
| H-1 | CGC COHO |  | PS | 231200 Z APR 10 | 232353 Z APR 10 | 100% | 121 NM | 111 SQNM | Tentative |

3

**Appendix G | FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE
MASS RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE
DRILLING UNIT *DEEPWATER HORIZON***

ENCLOSURE (1)

| I-1 | 65 | | PS | 231200 Z APR 10 | 231459 Z APR 10 | 100% | 229 NM | 50 SQNM | Tentative |
|-----|----|----|----|----|----|----|----|----|----|
| I-2 | 23 | | PS | 231200 Z APR 10 | 231658 Z APR 10 | 100% | 550 NM | 1,105 SQNM | Tentative |
| I-3 | CGC COHO | | CS | 231500 Z APR 10 | 231652 Z APR 10 | 100% | 19 NM | 26 SQNM | Tentative |
| | | | | | | Total | 6,647 NM | 5,375 SQNM | |

## Leeway Winds

**Source**   EDS-NOGAPS
**Confidence**  low

D:\CASES\OTHER\HQJRFROST\CASES\DEEPWATER_HORIZON\JULIETT_DEEPWATER_HORIZON1\NOGAPS_201042310512827_67695_94892.NC

## Surface Currents

**Source**   EDS-SKETCH
**Confidence**  low

D:\CASES\OTHER\HQJRFROST\CASES\DEEPWATER_HORIZON\JULIETT_DEEPWATER_HORIZON1\SKETCH_20100423_1418.NC

## Review

**Simulator Mode**  normal
**Shoreline**    Sticky

## Simulator POS Report as of SIM End Time ( 231600Z APR 10 )

| Search Object | Number Adrift | Number on Land | Conditional POS | Object Probability | Joint POS | Remaining Probability |
|---------------|---------------|----------------|-----------------|--------------------|-----------|-----------------------|
| PIW without PFD | 5000 | 0 | 83% | 100% | 83% | 17% |

4

G-19

**Appendix G | FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE MASS RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE DRILLING UNIT *DEEPWATER HORIZON***

ENCLOSURE (1)

| (Average) | | | | | | |
|---|---|---|---|---|---|---|
| **TOTAL** | 5000 | 0 | -- | 100% | 83% | 17% |

Key:

**Number Adrift:** Number of simulation particles adrift at 231600Z APR 2010.

**Number on Land:** Number of simulation particles on land at 231600Z APR 2010.

**Conditional POS:** Cumulative Probability to date of the search object being located, assuming it is the given type.

**Object Probability:** Likelihood a search object of the given type resulted from the distress incident (based on search object and scenario weighting).

**Joint POS:** Cumulative Probability to date of the search object resulting from the distress incident being the given type AND being found (equals Conditional X Object.)

**Remaining Probability:** Cumulative Probability to date of the search object resulting from the distress incident being the given type and remaining unlocated, considering all previous searches (equals Object - Joint.)

**Total Joint POS:** Cumulative Probability to date of finding any search object that is one of the given types (sum of all search object Joint POS values.)

**Total Remaining Probability:** Cumulative Probability to date that any search object described within the run remains to be found.

---

## SAROPS PLANNER:: On Scene Conditions

| What SRU types will be used? | What Sensors will be used? |
|---|---|
| Aircraft : YES | Visual :YES |
| Vessel : NO | NVG : NO |
| | Other : NO |

**On Scene Weather (Visual)**

| | |
|---|---|
| **Visibility** | 5.00 NM |
| **Wind Speed** | 12.00 KTS |
| **Sea Height** | 3 FT |
| **Cloud Ceiling** | 4000 FT |
| **Predicted/Observed** | Observed |

---

## SAROPS PLANNER:: SRUs

| SRU | Type | CST | On Scene | Speed | Search Objects |
|---|---|---|---|---|---|

5

G-20

**Appendix G | FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE**
**MASS RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE**
**DRILLING UNIT *DEEPWATER HORIZON***

ENCLOSURE (1)

| ID | | | Endurance | | Sweep Width | Search for | |
|---|---|---|---|---|---|---|---|
| | | | | | 1: PIW witho | adrift | landed |
| 2301 | FixedWing | 231730Z APR 10 | 6 hrs | 140 kts | | n | n |
| 65XX | Helo | 231700Z APR 10 | 2 hrs | 90 kts | | n | n |

**Search Objects Reference Key:**

1 - PIW without PFD (Average)

Plan the search to maximize POS for search objects that are neither adrift nor landed.

---

## SAROPS PLANNER:: Patterns

| Prefix | SRU ID | Descriptor | Track Length | Area | Type | Plan POS % | Eval POS % |
|---|---|---|---|---|---|---|---|
| J-1 | 2301 | | 713 NM | 764 SQNM | PS | 3% | 3% |
| J-2 | 65XX | | 153 NM | 50 SQNM | PS | 1% | 1% |
| | | Total | 866 NM | 814 SQNM | | | 4% |
| | | Cumulative | 7,512 NM | 6,189 SQNM | | | 84% |

**Key:**

**Plan POS%:** POS value for the Planner rectangle generated for a given SRU.

**Eval POS%:** The Evaluation POS value for the pattern assigned to a given SRU.

**Total POS%:** The combined POS for all SRUs for the given search epoch.

**Cumulative POS%:** The combined POS for all SRUs considering all search epochs.

**Note:** The Probability of Success values within this table are measured across all search objects, not just those specified to Planner for optimization.

**Search epoch:** JULIETT

---

## Planning POS Report as of SRU Completion Time ( 232329Z APR 2010 )

6

G-21

**Appendix G | FINAL ACTION REPORT ON THE SAR CASE STUDY INTO THE MASS RESCUE OF PERSONNEL OFF THE MOBILE OFFSHORE DRILLING UNIT *DEEPWATER HORIZON***

ENCLOSURE (1)

| Search Object | Number Adrift | Number on Land | Conditional POS | Object Probability | Joint POS | Remaining Probability |
|---|---|---|---|---|---|---|
| PIW without PFD (Average) | 5000 | 0 | 84% | 100% | 84% | 16% |
| TOTAL | 5000 | 0 | -- | 100% | 84% | 16% |

**Key:**

**Number Adrift**: Number of simulation particles adrift at 232329Z APR 2010.

**Number on Land**: Number of simulation particles on land at 232329Z APR 2010.

**Conditional POS**: Cumulative Probability to date of the search object being located, assuming it is the given type.

**Object Probability**: Likelihood a search object of the given type resulted from the distress incident (based on search object and scenario weighting).

**Joint POS**: Cumulative Probability to date of the search object resulting from the distress incident being the given type AND being found (equals Conditional X Object.)

**Remaining Probability**: Cumulative Probability to date of the search object resulting from the distress incident being the given type and remaining unlocated, considering all previous searches (equals Object - Joint.)

**Total Joint POS**: Cumulative Probability to date of finding any search object that is one of the given types (sum of all search object Joint POS values.)

**Total Remaining Probability**: Cumulative Probability to date that any search object described within the run remains to be found.

7

1. **Pre-Casualty**

*DEEPWATER HORIZON* was an ultra-deepwater, dynamically positioned, column stabilized, semi-submersible, Mobile Offshore Drilling Unit (MODU).  Construction began in December 1998, the keel was laid on March 20, 2000, and the MODU was delivered on February 23, 2001. *DEEPWATER HORIZON* was built by Hyundai Heavy Industries in Ulsan, South Korea. (CG Vessel Critical Profile; ABS *DEEPWATER HORIZON* Operations Manual; RMI-00068-78)

*DEEPWATER HORIZON* was commissioned by R&B Falcon, which later became part of Transocean, and was registered in Majuro, Marshall Islands at the time of the casualty. *DEEPWATER HORIZON* was originally flagged in Panama following construction, but changed flag states in 2005 to the Republic of the Marshall Islands (RMI).  (CG Vessel Critical Profile; ABS *DEEPWATER HORIZON* Operations Manual; RMI-00068)

**September 13, 2000**

The ABS Houston reviewed the Safety System design philosophy for the RBS8D Project "*DEEPWATER HORIZON*" that performs emergency detection and shutdown services for compliance with the IMO MODU Code (IMO Resolution A. 649).  (TRN-HCEC-00027277-295)

**2001**

The ABS determined *DEEPWATER HORIZON* was built and complied with the ABS, "Rules for Building and Classing Offshore Drilling Units, 1997," "Rules for Building and Classing Steel Vessels," "Guide for Thrusters and Dynamic Positioning Systems," "Guide for Certification of Drilling Systems," "Guide for Certification of Cranes," and "Automated Central Control Units." (RMI-00117-124)

*DEEPWATER HORIZON* was subsequently issued ABS Class notations and symbols as follows:

    A1, AMS, "Column Stabilized Drilling Unit," CDS, DPS-3, ACCU. (RMI-00117-124)

**March 2001**

Transocean's *DEEPWATER HORIZON'S* Operations Manual[471] defined the Person in Charge based upon the vessel's mode of operation:[472]

> *Under normal operating conditions, when the vessel is on location and considered in the drilling or industrial mode, Transocean elects to nominate the Installation Manager as the Person in Charge (PIC).*

---

[471] An Operations Manual is required by the International Maritime Organization (IMO) Mobile Offshore Drilling Unit (MODU) Code, Chapter 14 and must be approved by the Flag Administration.  46 CFR 109.121 requires that the Operating Manual be approved by the Coast Guard.

[472] *DEEPWATER HORIZON* Operations Manual, Chapter 2.

*During transit or underway mode, Transocean elects to nominate the Master as the Person in Charge (PIC).* (ABS *DEEPWATER HORIZON* Operations Manual, Section 2.1 - ABSDWH000061-63)

**June 5, 2001**

Under the Authority of the Government of the Republic of Panama, the ABS issued a MODU Safety Certificate (1989) for *DEEPWATER HORIZON* for a total number of one hundred-thirty persons. (TRN-HCEC-00027264-265)

**August 19, 2001**

Under the Authority of the Government of the Republic of Panama, the ABS issued a MODU Safety Certificate (1989) for *DEEPWATER HORIZON* for a total number of one hundred fifty persons. (TRN-HCEC-00027271-272)

**June 2, 2002**

Under the Authority of the Government of the Republic of Panama, the ABS issued a MODU Safety Certificate (1989) for *DEEPWATER HORIZON* for a total number of one hundred-forty persons after modifications to increase accommodation capacity. (TRN-HCEC-00027269-270)

**September 27, 2002**

Under the Authority of the Government of the Republic of Panama, the ABS issued MODU Safety Certificate (1989) for *DEEPWATER HORIZON* for a total number of one hundred-fifty persons. (TRN-HCEC-00027271-272)

**February 27, 2003**

Under the Authority of the Government of the Republic of Panama, the ABS issued MODU Safety Certificate (1989) for *DEEPWATER HORIZON* for a total number of one hundred-forty-six persons. (TRN-HCEC-00027266)

**September 15, 2003**

The Eighth Coast Guard District (D8) issued policy for the alternative approval of Emergency Response Plans (ERPs) for the Gulf of Mexico (GOM) to D8 Officers in Charge of Marine Inspection (OCMIs).[473]  (BP-HZN-MBI00002549)

---

[473] Coast Guard Eighth District Marine Safety Division, 16711/EEP Approval, September 15, 2003 encouraged each Officer-in-charge, Marine Inspection (OCMI) to exercise their authority under 33 CFR 140.15(a) and permit alternative procedures to those specified in 33 CFR Subpart N, for the submission and approval of Emergency Evacuation Plans (EEPs) under 33 CFR 146.140 and 146.210 provided the MODU was previously operating with the same OCMI zone, changes were minor and the plan was prepared by entities which have a proven their competency in preparing EEPs.  Revised EEPs would be checked in the normal course of inspection. Initial review and approval for newly installed manned Outer Continental Shelf (OCS) facilities remained.

**Appendix H | CRITICAL EVENTS TIMELINE**

**December 2004 – July 29, 2005**

*DEEPWATER HORIZON* was registered under the authority of the RMI having been previously registered with the Panamanian authority following completion of construction in 2001. The ABS verified adherence to their Classification Society Standards. (RMI-00112-147)

The RMI authorized Det Norske Veritas (DNV) and the ABS to act as Recognized Organizations (RO's) for conducting inspections and surveys for the purpose of issuing International Statutory and Classification Society Certificates. (RMI-00405-406)

**March 2, 2005**

Mr. Walter Cabucio and Ms. Synthia Osterman were designated as the International Safety Management (ISM) Code Designated Person and Alternate respectively for *DEEPWATER HORIZON*. (RMI-405-406)

**March 27, 2005**

Under the authority of the RMI, ABS inspector ( ) performed a flag state inspection of *DEEPWATER HORIZON* with the master ( ) reviewing the inspection report. One deficiency was noted: Publication, 2001 International Convention for the Safety of Life At Sea (SOLAS) Manual needs to be onboard. (RMI-00169-173)

**August 16, 2005**

The Coast Guard Marine Safety Unit (MSU) Morgan City conducted the annual Certificate of Compliance (COC) examination for *DEEPWATER HORIZON*. No discrepancies were noted. (CG Activity Report 2466860).

**January 2, 2006**

Under the authority of the RMI, the ABS issued the flag state Verification and Acceptance Document under the provisions of the Guidelines for Vessels with Dynamic Positioning (DP) Systems certifying *DEEPWATER HORIZON* has been duly documented, surveyed, and tested in accordance with the Guidelines for Vessels with DP Systems (MSC/Cir. 645) and allowed to operate in DP Equipment Class Three (3). (RMI-00046-48)

Under the authority of the RMI, the ABS inspector ( ) performed a flag state inspection of *DEEPWATER HORIZON* with the master ( ) reviewing the inspection report. There were no deficiencies noted. (RMI-00164-168)

**June 11, 2006**

Under the authority of the RMI, the ABS issued *DEEPWATER HORIZON* an International Maritime Organization (IMO) International Load Line Certificate, MODU Code Construction and Equipment Certificate (1989), Shipboard Elevator Certificate, and International Oil Pollution Prevention Certificate to expire February 28, 2011. (RMI-00030-38, 108)

**Appendix H | CRITICAL EVENTS TIMELINE**

**August 11, 2006**

Coast Guard MSU Morgan City conducted the annual COC examination for *DEEPWATER HORIZON*.  The examination identified two items which were corrected during the visit: (1) provide valve position indicators for the bilge/ballast valves; and (2) provide a cover for the eyewash station on the Drill Floor. (CG Activity Report 2744163).

**January 1, 2007**

Under the authority of the RMI, the ABS inspector (███) performed a flag state inspection of *DEEPWATER HORIZON* with the master (██████ reviewing the inspection report.  There were no deficiencies noted. (RMI-00160-163)

**August 7, 2007**

Coast Guard MSU Port Arthur conducted the annual COC examination for *DEEPWATER HORIZON*.  During the course of the verification it was noted that the cable for the stern falls for Lifeboat #4 were broken.  The crew indicated they were awaiting replacement parts later that week and that the ABS was scheduled to attend the vessel and verify the correction on August 13, 2007.  The Coast Guard issued a discrepancy requiring *DEEPWATER HORIZON* to provide the Coast Guard with a copy of the ABS paperwork pertaining to the renewal of the falls and the associated testing.  Corrections were to be completed by October 4, 2007.  (CG Activity Report 2990305).

**October 4, 2007**

Coast Guard MSU Port Arthur conducted a deficiency check for *DEEPWATER HORIZON*.  The vessel had one outstanding discrepancy from the Coast Guard's earlier annual examination for lifesaving and engineering deficiencies.  The Coast Guard verified that the ABS had submitted its survey report certifying the load test for the Lifeboat #4 cables.  The outstanding discrepancy was cleared.  (CG Activity Report 3072937).

**December 4, 2007**

Under the authority of the RMI, ABS inspector (███) performed a flag state inspection of *DEEPWATER HORIZON* with the master (██████ reviewing the inspection report.  There were no deficiencies noted. (RMI-00156-159)

**April 10, 2008**

DNV completed the ISM Code Certification of Company Audit for Transocean Deepwater Drilling Company and issued the corresponding certificate having found no non-conformities and seven observations.  (0251-JIT-DNV AUDIT; TRN-USCG-MMS-00043660-61)

**May 26, 2008**

*DEEPWATER HORIZON* while located in the Gulf of Mexico (GOM) on the Outer Continental Shelf (OCS) in Mississippi Canyon Block 948 experienced a flooding condition of the starboard forward column. As reported, the casualty resulted in the evacuation of 77 non-essential personnel to two standby vessels. The flooding occurred as a result of the removal of a twelve-inch pipe approximately five feet in length earlier in the day from the seawater line, which could be crossed over to the ballast system. The pump had been electrically isolated, but the valves that protect the pump room from water ingress were not mechanically isolated. Due to a lack of communication, a valve in the system was opened allowing water ingress. (RMI-00182-195)

Transocean assembled an Emergency Support Team at its Park 10 Office and made subsequent notifications to the RMI, the ABS and the Coast Guard. (RMI-00182-195)

The casualty ultimately resulted in damages estimated to be $920,000. (RMI-00182-195)

The ABS Surveyor attended the vessel on May 28, 2008 to conduct a damage survey and on June 2 and 3, 2008 to witness the repairs. Upon completion of the survey and documentation, the attending Surveyor did not exercise International Association of Classification Societies Procedural Requirement (PR) 17.[474]

**May 30, 2008**

1236:  The master ⬛⬛⬛⬛⬛ of *DEEPWATER HORIZON* made written notification to the RMI via e-mail restating the casualty and informing the return of the MODU to the drilling draft and attached RMI Form MI-109, Report of Vessel Casualty or Accident. (RMI-00189-196)

1500:  Mr. ⬛⬛⬛⬛ of the RMI Marine Investigations Division in Reston, Virginia, acknowledged the report delivered via e-mail, "The description of the casualty incident is duly noted. Let us know if there are any corrective safety measures relevant to this situation."[475] (RMI-00189-196)

**August 7, 2008**

1442:  *DEEPWATER HORIZON* while located in the GOM on the OCS in Mississippi Canyon Block 948 experienced an equipment failure causing two main diesel engines (MDEs) to trip off-line resulting in a total loss of electrical power. As reported, the Power Management System and crew stabilized the situation within two minutes and power and propulsion were restored. (RMI-00182-183)

---

[474] International Association of Classification Societies (IACS) Procedural Requirement (PR) No. 17 is an instrument to ensure that the Organization responsible for the issuance of the Safety Management Certificate (SMC) is notified when deficiencies relating to possible Safety Management System (SMS) failures are identified by a surveyor. As noted on the PR 17, "This Procedural Requirement applies from 1 July 2009." However, the American Bureau of Shipping (ABS) Form template used to document the survey clearly identifies PR No. 17.
[475] In a letter to the Joint Investigation Team (JIT) dated December 5, 2010, the Republic of the Marshall Islands (RMI) advised that it was not required to conduct an investigation in accordance with the International Maritime Organization (IMO) Casualty Code.

**August 11, 2008**

1429:  The master ████ of *DEEPWATER HORIZON* made written notification to the RMI via e-mail on Form MI-109, Report of Vessel Casualty or Accident attached. (RMI-00180-181)

1650:  Mr. ████ of the RMI Marine Investigations Division in Reston, Virginia, acknowledged the report of the loss of electrical power and inquired whether the ABS had been informed of the occurrence and if a possible cause of the circumstance was identified. (RMI-00180-181)

**August 12, 2008**

0849:  The master ████ of *DEEPWATER HORIZON* responded to Mr. ████ and informed him, "The chief engineer notified ABS and they said they did not need to get involved with this situation.  But we will keep them advised of any changes we encounter during the investigation." The master ████ reported preliminary finding of a governor malfunction on the #3 MDE and that Wartsila representatives were arriving to help investigate.  The master ████ reported plans to replace the actuator and governor drive gear amounting to $13,000 in parts. (RMI-00180-181)

1131:  Mr. ████ acknowledged the master's ████ e-mail and requested the results of the examination.      (RMI-00180-181)

**October 15, 2008**

The Coast Guard MSU Morgan City conducted the annual COC examination for *DEEPWATER HORIZON*.  No discrepancies were noted. (CG Activity Report 3378271).

**November 2008**

A Transocean representative delivered the failed Woodward governor, identified as the cause of the August loss of electrical power to Wartsila.  The Wartsila inspection revealed that the governor was more than 15,000 hours past its recommended maintenance period. (WART-TO-10178342)

**December 7, 2008**

Under the authority of the RMI, ABS inspector ████ performed a flag state inspection of *DEEPWATER HORIZON* with the master ████ reviewing the inspection report.  There were no deficiencies noted. (RMI-00152-155)

**March 19, 2009**

The ABS conducted the Dry Dock Survey Portion of *DEEPWATER HORIZON's* Annual Class Survey Report while the vessel was dynamically positioned in the Keathly Canyon Block 102 area in the Gulf of Mexico for a six-month Underwater Inspection in Lieu of Dry-Dock

---

[476] Ibid.

(UWILD) survey as noted.  The UWILD extension survey was a general examination of the vessel's structure above the water line including the upper hull column and areas as accessible in the moon pool.  This included verifying that all safety related items throughout the MODU were carried out and found to be satisfactory.  All watertight doors throughout the MODU were examined as were the pump rooms, thruster rooms, tunnels, sea chests, strainers and overboard piping systems; all were found to be satisfactory.  The UWILD extension survey was approved with a new UWILD date of September 30, 2009.  (ABS Class Survey Report of March 20, 2009; RMI-00227-231)

**April 16, 2009**

DNV completed its Annual Survey of the Transocean Deepwater Drilling Company and issued its findings.  DNV identified one non-conformity and eight observations.  The non-conformity related back to the external ISM Code Audit that was conducted for the *TRANSOCEAN DRILLER* which identified eight non-conformities and two observations.  The non-conformity related to the Corrective Action Plan (CAP) for the eight non-conformities, in that there was no evidence that the CAP had ever been completed. (0252-JIT-DNV-AUDIT; TRN-USCG-MMS-00043666-69)

**June 27, 2009**

Coast Guard MSU Port Arthur conducted the annual COC examination for *DEEPWATER HORIZON*.  No discrepancies were noted.  The new COC amended the number of required Lifeboatmen from four to six based upon reconsideration of the number of lifeboats (4) and life rafts (2).  (CG Activity Report 3513781).

**August 4, 2009**

Triton Hungary Asset Management Limited Liability Company (LLC) requested permission of the RMI, International Registries Inc. to sell *DEEPWATER HORIZON* to Triton Asset Leasing GMBH.  (RMI-00099)

**August 17, 2009**

Triton Hungary Asset Management Limited Liability Company (LLC) sold *DEEPWATER HORIZON* to Triton Asset Leasing GMBH for the total price of $10 dollars (US) and other good and valuable consideration. (RMI-00089-92)

**August 18, 2009**

The RMI granted permission for the sale of *DEEPWATER HORIZON* to Triton Asset Leasing GMBH.  (RMI-00071)

**September 13-17, 2009**

The BP MODU Audit Group performed a follow-up MODU and Marine Assurance Audit of *DEEPWATER HORIZON*.  The guidelines and results of the audit were captured in the Marine

Audit, Common Marine Inspection Document (CMID) and a CMID Annex (BP requirements for Mobile Offshore Drilling Units (MODUs). (BP-HZN-MBI00136211-00136270) (BP-HZN-MBI00170612-00170669; BP-HZN-MBI00170553-00170611)

**September 17, 2009**

The RMI documented the sale and re-registry of *DEEPWATER HORIZON* under the RMI and the ownership of Triton Asset Leasing GMBH of Switzerland.  (RMI-00061-77)

The RMI issued a provisional Certificate of Registry and other official forms and publications including a Minimum Safe Manning Certificate (MSMC) (Form Rev. 1/02) for Schedule A, Self-Propelled MODU. (RMI-00061-68)

Mr. Jimmy Moore, Director of Quality Health, Safety and Environment (QHSE), and Mr. Gary Butler, Managing Director Triton Asset Leasing GMBH, were designated as the ISM Code and International Code for the Security of Ships and Ports Facilities (ISPS) Designated Person and Alternate, respectively, for *DEEPWATER HORIZON*. (RMI-00061-70)

**October 4, 2009**

MODU *MARIANAS* moved on to location at Mississippi Canyon Block 252 to commence drilling operations on the Macondo Well.  (BP-HZN-MBI00020885; Testimony ████████ 8/24/2010, p 17)

**October 7, 2009**

The Macondo Well was officially spudded by the *MARIANAS*.  (BP-HZN-MBI00020451)

**October 19, 2009**

At Transocean's Quarterly Health, Safety and Environment (QHSE) Steering Committee Meeting, Mr. ████████ Transocean International Safety Management (ISM)/International Port and Ship Security (ISPS) Manager, reported "*Meeting flag state Minimum Safe Manning requirements continues to be an issue; Records management of required ISM/ISPS documents and certificates remains to be a challenge; and overall understanding of ISM and ISPS requirements beginning to improve as result of audit process, but further improvement still needed.*" (TRN-USCG-MMS-00039100)

**December 14, 2009**

The ABS commenced *DEEPWATER HORIZON's* Annual Statutory Survey.  The surveyor noted the following discrepancies needed to be corrected: (1) the Oily Water Separator (OWS) piping on the starboard aft column at the 28.5 m (92 ft) level was corroded and fitted with multiple soft patches and hose clamps.  The surveyor recommended repairs prior to completion of the Annual International Oil Pollution Prevention Survey; (2) the surveyor noted that the gross tonnage information on the Long Range Identification and Tracking (LRIT) Conformance Test report was incorrect in that the report listed the net tonnage rather than the gross tonnage.  The surveyor

recommended the correction of the error by the completion of the Annual MODU Survey; (3) the surveyor noted that both the port and the starboard crane and hydraulic systems were found to have excessive oil leaks, to the point of creating a fire hazard, and the auxiliary line on the starboard crane was inoperable; and that the starboard crane was giving alarms during normal operations.  The surveyor recommended correction prior to the completion of the Annual Cargo gear survey; and, (4) the surveyor noted that the elevators on all four columns on board were in the process of being upgraded with newer sensors and control systems.  No ABS approval for such upgrades was found on board.  It was also noted that the starboard forward elevator was damaged and inoperable.  Plans were in place to remove and repair the elevator.  The surveyor recommended correction of the above item before completion of the Elevator Survey. (ABS Statutory Survey Report of December 18, 2009)

**December 14, 2009**

The ABS commenced *DEEPWATER HORIZON's* Annual Class Survey.  The surveyor noted the following items needed correction:  (1) the surveyor found the discharge spool on the sea water service pump #8 had a pinhole leak in way of a flange weld with a steady stream in the #8 Thruster Room; (2) the surveyor found the lube oil (L/O) low pressure alarm tripping device on the #5 main generator engine (MGE) was not working as intended.  The engine failed to trip upon simulated loss of oil pressure at the sensor; (3) the surveyor found the piping on the MSD skid on the starboard forward column at the 24 meter level was found to have excessive corrosion and sections of soft patches; (4) the surveyor found that the #3 and #4 Thruster Rooms had excessive oil and grease in the bilges; (5) the surveyor fond that the #3 thruster cooling water heat exchanger was leaking water; (5) the surveyor found that the #2 thruster was taken out of service due to its inability to operate as intended.  The manufacturer's representative was on board examining the electric motor, however; an exact cause was not found by the end of the surveyor's visit.  The surveyor also noted that the vessel's preventative maintenance plan requires oil samples of the thrust lube and hydraulic system to be taken and evaluated every quarter.  The on board records showed that the last time samples were taken was in October of 2008.  The thrusters were examined and tested as necessary and found to be satisfactory for intended service.  (ABS Class Survey Report of December 18, 2009)

**December 17, 2009**

Under the authority of the RMI, ABS inspector ██████ performed a flag state inspection for *DEEPWATER HORIZON* with the master ██████ reviewing the inspection report. There were no deficiencies noted.  (RMI-00152-155)

**January 2010**

*DEEPWATER HOZION* Emergency Evacuation Plan (EEP) for Mississippi Canyon Block 252 was issued and dated January 2010.  (BP-HZN-MBI00002516)

**January 30, 2010**

*DEEPWATER HORIZON* moved on to Mississippi Canyon Block 252 to re-enter the Macondo Well. (TRN-USCG-MMS-00026112-116; BP-HZN-MBI00020368; BP-HZN-MBI00013592-595; Testimony Hafle, 5/28/2010, pp 10-12)

**February 23, 2010**

The ABS conducted a follow-up of *DEEPWATER HORIZON's* Annual Statutory Survey.  The surveyor noted the following outstanding items had been correct from the previous visit: (1) all items concerning the cargo gear operations had been corrected, including faulty alarm sensor, the whip line was retested after repairs on the gross overload protection block (replaced) and the excessive oil was clean with new drip pans having been installed to reduce the amount of oil collected; (2) the LRIT Conformance Report was run and the gross tonnage error was corrected; and (3) repairs to the OWS piping were examined, tested and considered satisfactory. (ABS Statutory Survey Report of February 23, 2010; RMI-00207-211)

**March 10-15, 2010**

An internal ISM Code audit of the Transocean Corporate Office was conducted during the above period.  The primary objective was to assess Transocean's compliance with the ISM Code.  The audit identified six observations and no non-conformities.  The audit specifically noted the need to ensure that previously issued Corrective Action Plans (CAP) were completed citing the non-conformity on the *TRANSOCEAN DRILLER* that was not resolved in accordance with the CAP. (0253-JIT-TO-ISM-AUDIT; TRN-USCG-MMS-00043694-67)

**April 1-14, 2010**

ModuSpec USA, INC. performed a Rig Condition Assessment of the *DEEPWATER HORIZON.* The End-of-Inspection Meeting Document included a listing of those who attended : Transocean Team Leader (Levine), Offshore Installation Manager (  Master (          Chief Engineer (          Electrical/Electronics Supervisor (          Mechanical Supervisor (          and Senior Subsea (          (TRN-USCG_MMS-00038609-00038609)

**April 5, 2010**

Transocean issued Well Operations Group Advisory, HQS-OPS-ADV-09, titled: MONITORING WELL CONTROL INTEGRITY OF MECHANICAL BARRIERS.  (TRN-USCG-MMS-00042595)

**April 5, 2010**

Mr.  reported to *DEEPWATER HORIZON* and assumed the duties and responsibilities of the offshore installation manager (OIM).  (Testimony          5/27/2010, p 8)

**April 14, 2010**

Transocean issued Well Operations Group Advisory, NRS-OPS-ADV-008, titled: LOSS OF
WELL CONTROL DURING UPPER COMPLETION.   The Advisory provided the
investigative results following gas entering another MODU's riser resulting in 11.1 days of lost
time and costs of approximately £5.2M including a significant loss of reputation to Transocean.
(TRN-USCG-MMS-00043223)

**April 15, 2010**

BP relieved one of two of the well site leaders assigned to *DEEPWATER HORIZON* to
reportedly attend a scheduled well control school. Mr. ▮▮▮▮▮▮▮ was transferred from the
*THUNDER HORSE* as Mr. ▮▮▮▮▮▮ relief. Mr. ▮▮▮▮ had no prior experience as the
well site leader on *DEEPWATER HORIZON*.[477] (Testimony Sepulvado, 7/20/2010, pp; 15-16;
Testimony Guide, 7/22/2010, pp 103-113)

**April 16, 2010**

Ms. ▮▮▮▮▮▮▮ reported to *DEEPWATER HORIZON* and was assigned the duties and
responsibilities of dynamic positioning officer (DPO).[478] (Testimony ▮▮▮▮ 10/5/2010, p 10)

Mr. ▮▮▮▮▮▮▮▮ reported to *DEEPWATER HORIZON* and was assigned the duties and
responsibilities of senior dynamic positioning officer (SDPO). (Testimony ▮▮▮▮▮ 10/5/2010,
p 126)

Mr. ▮▮▮▮▮▮▮ reported to *DEEPWATER HORIZON* and was assigned the duties and
responsibilities of chief mate. (Testimony ▮▮▮▮ 5/27/2010, p 248)

**April 19, 2010**

1142 – 1201: *DAMON B. BANKSTON* held a job safety analysis followed by a man overboard /
fast rescue craft (FRC) drill.  The crew launched and operated the FRC for 8 minutes and then
recovered it.  The FRC crew was comprised of ▮▮▮▮▮▮ as the coxswain and Paul
▮▮▮▮▮ as the rescuer. (*BANKSTON* Log; Testimony ▮▮▮▮▮▮ 5/10/2010, pp 174-176;
Testimony ▮▮▮▮▮ 5/11/2010, p 234; Testimony ▮▮▮▮▮ 5/11/2010, pp 89-91)

2.  ***Day of the Casualty***

**April 20, 2010**



---

[477] Mr. ▮▮▮▮ reported to the *DEEPWATER HORIZON* only five days before the casualty and had never served on
the rig before.  However, during the course of the investigation there was no evidence that the timing of his arrival
contributed to the casualty.
[478] The Dynamic Positioning Officer (DPO-▮▮▮▮ the Senior Dynamic Positioning Officer (SDPO-▮▮▮▮▮ and
the Chief Mate (▮▮▮▮ all reported for the beginning of their hitch 4 days prior to the casualty.  All of the
crewmembers had previously completed hitches on the *DEEPWATER HORIZON* in the same capacity.  During the
course of the investigation, there was no evidence that the timing of their arrival contributed to the casualty.

1200: Mr. ███████████ assumed the duties and responsibilities of SDPO in the CCR of *DEEPWATER HORIZON*. (Testimony █████ 10/5/2010, p 148)

1200 – 1430: Captain ████████ reported to *DEEPWATER HORIZON* and assumed the duties and responsibilities of master. (Testimony █████ 5/27/2010, p 182)

1231: *DAMON B. BANKSTON* was dynamically positioned alongside *DEEPWATER HORIZON* and ready for cargo operations. (*BANKSTON* Log; Testimony ██████ 5/10/2010, pp 176-182; Testimony █████ 5/11/2010, p 234)

1328:  The mud hose from *DEEPWATER HORIZON* to *DAMON B. BANKSTON* was onboard *DAMON B. BANKSTON*.  (*BANKSTON* Log; Testimony ██████ 5/10/2020, pp 176-182)

1328 – 1717:  Mud was transferred from *DEEPWATER HORIZON* to *DAMON B. BANKSTON*. Approximately 3,100 barrels (BBLS) were transferred, although an exact amount was never determined and the flow was not monitored by any gauging.  (Testimony ██████ 5/10/2010, pp 176-182; Testimony ██████ 5/11/2010, pp 245-246; Testimony ██████ 5/11/2010, pp 94-97)

*DAMON B. BANKSTON* remained alongside *DEEPWATER HORIZON* after receiving liquid mud from *DEEPWATER HORIZON*.  The transfer was completed; *DAMON B. BANKSTON* was standing by while the transfer hoses remained connected. (*BANKSTON* Log; Testimony ██████ 5/10/2010, p 182; Testimony ██████ 5/11/2010, pp 245-246; Testimony ██████ 5/11/2010, pp 94-97)

1430: Mr. █████████ BP Vice President of Drilling and Completion for the GOM; Mr. ████████ BP Drilling Operations Manager for Exploration and Appraisal for the GOM; Mr. ████████ Transocean Performance Manager for Operations and Mr. ███████████ Transocean Performance Manager for Assets arrived on board *DEEPWATER HORIZON* to conduct a leadership team visit.  As a first time visitor to the *DEEPWATER HORIZON,* Mr. ████████ attends a one hour orientation.  (Testimony ██████ 8/26/2010, pp 354-360; Testimony ████ 5/29/2010, pp 163-169; Testimony ██████ 8/23/2010, p 442)

1600:  The Transocean and BP leadership team visitors began their guided tour of *DEEPWATER HORIZON*. (Testimony ██████ 8/26/2010, p 360)

1700:  The leadership team toured the Drill Shack on *DEEPWATER HORIZON*.  Approximately twelve total persons were in the Drill Shack including the drill crew.  (Testimony ██████ 8/23/2010, p 443)

Mr. ███████████ remained on the Drill Floor as the leadership team continued their tour of *DEEPWATER HORIZON* because they were having a "little trouble with the Annular holding." (Testimony █████ 5/27/2010, p 25)

1730: *DEEPWATER HORIZON* chief engineer (██████ noted that there were some issues with the well.  *DEEPWATER HORIZON* personnel stopped pumping mud to the *BANKSTON* due to

the dinner break. (Sperry Sun Data; Testimony ███████ 7/19/2010, pp 33-34; Testimony ████████ 8/23/2010, p 443)

1730 - 1745:  The leadership team completed their tour of *DEEPWATER HORIZON*. (Testimony ████████ 8/26/2010, p 363)

1800:  Ms. ████████████ assumed the duties and responsibilities of DPO in the CCR of *DEEPWATER HORIZON*. (Testimony ██████ 10/5/2010, p 13)

1800-1900: The BP Transocean leadership team visitors attended dinner in the Galley.  The well site leader (██████ came to BP VP for Drilling and Completion (████ at dinner and asked if he wanted him to attend the 1900 meeting.  The BP VP for Drilling and Completion said, "No, we're not rolling out any new material." and excused him from the meeting. (Testimony ████████ 8/26/2010, pp 360-364; Testimony ████████ 5/29/2010, pp 179 & 200)

1900:  The leadership meeting began. (Testimony █████████ 8/26/2010, p 364; Testimony ████ 5/29/2010, p 172)

1900:  *DEEPWATER HORIZON* chief engineer (██████ attended the leadership meeting with all supervisors and BP and Transocean managers.  The leadership meeting reportedly lasted until approximately 2100 - 2115.  At the conclusion, chief engineer (████████ departed for his room. (Testimony ███████ 7/19/2010, p 34)

2045 – 2100:  The leadership meeting involving BP and Transocean senior management and all supervisors on *DEEPWATER HORIZON* concluded.  (Testimony ████████ 8/26/2010, p 365; Testimony ████████ 8/23/2010, p 444)

2045:  BP and Transocean senior management (████████████ and █████ arrived in the CCR of *DEEPWATER HORIZON* to get a tour and practice on the DP simulator. (Statement ██████ 4/21/2010; Testimony █████████ 8/23/2010, p 446; Testimony █████████ 8/26/2010, p 366.)

2130:  The chief mate (██████ on *DEEPWATER HORIZON* visited the Drill Floor and heard the on-watch tool pusher and driller ██████████████ discussing differential pressure. (Statement ██████ 4/21/2010)

2140-2150:  The chief electrician (████████ secured the electricity to the #2 pump by locking out/tagging out the electricity so a pump man, AD and two roughnecks (████████████████████ could replace a pressure relieving device (aka, pop-off  valve) located on the #2 mud pump.  After completing the pump repair he then de-isolating the electricity.  Shortly thereafter, he heard a noise of high pressure, felt the rig vibrate and heard a loud boom from the direction of the mud pump room.  (Statement ██████ 4/21/2010; Testimony ████████ 5/27/2010, pp 335-336)

2145:  The mate (████████ on-watch on board the Bridge of *DAMON B. BANKSTON* observed "outflow" under the MODU and received a radio message from *DEEPWATER HORIZON* indicating a well control problem. (██████ Statement 4/21/2010; Testimony █████████ 5/11/2010, pp 228-232)



2145-2150:  While in his unit, Sperry Sun mud logger (          saw his well monitors start shaking, heard a loud whistling sound and the sound of rain falling on his unit.  Next, he smelled gas and observed his unit shutting down, and saw fire between his unit and the sample collection unit.  He noticed his air conditioners coils on fire, the electrical breaker box inside his unit start arcing and sparking and then felt and heard a loud explosion. (Testimony          12/7/2010, pp 62-64, 102, 137-138)

2148:  According to the witnesses, the first explosion on *DEEPWATER HORIZON* occurred; the crane operator (          believes the degasser (tank) exploded, which was stored on the motor shed, starboard side of the derrick. "…and that started the first fire."  This is the same area that the chief mate (          on the *DAMON B. BANKSTON* reported seeing the explosion. (Testimony          5/29/2010, pp 9-12, 15-16; Testimony          5/11/2010, pp 238-243)

2150:  The OIM (          was in his stateroom 228A on the Second Deck of *DEEPWATER HORIZON*. (Testimony          5/27/2010, p 3)

2150:  The on-watch assistant driller (          called the senior tool pusher (          and told him "we have a situation."  "The well is blown out."  "We have mud going to the crown."  The on-watch assistant driller (          was asked if the well was shut in and he indicated that "Jason is shutting it in now."  (Testimony          5/28/2010, pp 283-289; Testimony          5/28/2010, pp 180-182)

2150: The on-watch tool pusher (          called the well site leader (          and informed him, "We're getting mud back, I (sic) diverting returns to gas buster."  (0268-          interview notes, BP-HZN-MBI00021406-432)

2150:  *DEEPWATER HORIZON* jolted.  Personnel on the Drill Floor notified the DPO, "we are under a well control situation."  The Engine Control Room (ECR) called the DPO to inquire into the situation and was told "we were under a well control situation."  An explosion occurred followed by combustible gas alarms in the Shaker House and Drill House were received and acknowledged which was followed by all of the combustible gas alarms sounding.  A second explosion occurred followed by a loss of electrical power.  (Statement          4/21/2010; Testimony          10/5/2010, pp 18-19; Statement          4/21/2010; Testimony          10/5/2010, pp 150-151)

2150-2155:  The Sperry Sun mud logger (          testified "Everything in the back [deck] exploded."  "And then the flames went away from me where I was at and it was shooting straight up to over the derrick." (Testimony          10/5/2010, p 14; Testimony          5/28/2010, pp 283-289; Testimony          5/27/2010, pp 263-266, 271; Testimony          5/29/2010, pp 9-16; Testimony          12/7/2010, pp 63-67, 103-109; Statement          4/21/2020)

2151-2155:  The chief mate (          activated the general alarm in the CCR on *DEEPWATER HORIZON* before exiting.  He later returned and reported an uncontrolled fire and advised the master (          to abandon.  (Testimony          10/5/2010, p 19;  Testimony          10/5/2010 p 152, Testimony          5/28/2010, p 145)

2152 - 2156:  The subsea supervisor (███████ arrived in the CCR and told the master (████████ that he was going to activate the emergency disconnect system (EDS).  The master told him "Calm down. Don't activate the EDS."  He proceeded to the EDS panel and saw the well site leader (████████ standing next to the panel.  The well site leader said, "They got the well shut in."  The subsea supervisor said, "Yeah, the lower annular closed, the vertical closed and I had alarms going off, lower accumulator alarm."  Without the master's knowledge, the subsea supervisor and the well site leader activated the EDS.  The subsea supervisor noted the gallon count showed "no flow", which indicated the lower marine riser package (LMRP) had not retracted.  At the same time, the subsea supervisor overheard the master talking with Transocean's operations manager-performance asking, "Could we EDS?"  The operations manager-performance said, "Yeah, You hadn't already."  The Captain then said to the subsea supervisor, "We can EDS."  He replied, "I already did." (Statement ████████ 4/23/2010; Testimony █████████ 5/28/2010, pp 122-124,144-145, 175-176)

The chief engineer (█████████ arrived in the CCR and overheard the master (█████████ screaming at the on-watch DPO (█████████ for pushing the distress button.  The main diesel engines (MDEs) were not starting back up.  The chief engineer (█████████ asked the subsea supervisor (█████████ if the EDS functioned, but was told permission was needed to function it.  The Transocean operations manager-performance (█████████ was asked for said permission and informed them to function (initiate) the EDS.  Someone then indicated only the OIM could approve the action. (Statement █████████ 4/21/2010)

2153:  Crew members on *DAMON B. BANKSTON* heard and observed a large release of air/gas followed by mud raining down on the afterdeck of the *BANKSTON B. BANKSTON*.  The master (█████████ of *DAMON B. BANKSTON* contacted *DEEPWATER HORIZON* CCR via VHF Channel 66 and was advised that *DEEPWATER HORIZON* was having trouble with the well and ordered them to move to a 500 meter standby position.  This was immediately followed by an explosion on board *DEEPWATER HORIZON*.  The transfer hoses were manually released and *DAMON B. BANKSTON* moved away. (Statement █████████ 4/21/2010; *BANKSTON* Log; Testimony █████████ 5/10/2010, p 183; Testimony █████████ 5/11/2010, pp 234-243; Testimony █████████ 5/11/2010, pp 99-100)

2155 – 2200  The OIM (█████████ arrived in the CCR and told the subsea supervisor (█████████ to go ahead and EDS (Emergency Disconnect System). (Testimony █████████ 5/27/2010, pp 11, 68)

The BP VP for Drilling and Completions (█████████ heard the master (█████████ ask permission of the OIM (█████████ to EDS. (Testimony █████████ 8/26/2010, p 440)

2156 – 22:04:47 *DEEPWATER HORIZON* issued a Digital Select Calling (DSC) Alert which was then relayed to the Eighth Coast Guard District Command Center via Maritime Rescue Coordination Center Mumbai (India), Ministry of Infrastructure and Transportation, Italian Coast Guard.  Coast Guard Sector Mobile, Alabama received a Distress Alert via the High Frequency (HF) site. (SAR Case Report; Testimony █████████ 5/11/2010, p 105)

The OIM (█████████ went to the lifeboat station to check out the damage to ensure the lifeboats were safe to load personnel. (Testimony █████████ 5/27/2010, p 11)

The chief engineer (███████ after determining that a change-of-command from the OIM (██████ to the master (████████ had occurred, asked permission from the master (██████ to send a party to attempt to start the standby generator.  The master (██████ agreed and the chief electronics technician (██████ the chief engineer (██████ and the motorman (Meinhardt) departed to the standby generator room in an attempt to start it and regain electrical power and energize the onboard fire pumps. (Statement ██████ 4/21/2010; Testimony ██████ 10/5/2010, pp 152-153, 165-166; Testimony ██████ 8/23/2010, p 478; Testimony ██████ 5/28/2010, pp 122-123)

2200:  The on-watch DPO (██████ reportedly activated the general alarm (GA) and the on-watch SDPO (██████ made an announcement using the public address (PA) system to alert personnel to report to their emergency stations and the lifeboats.  An announcement was made over the PA system of "This is not a drill, [Report] to muster at your emergency stations." (Testimony ██████ 10/5/2010, p 152; Testimony ██████ 7/19/2010, p 57)

A mud engineer (██████ heard the announcement "fire, fire, fire, report to your secondary muster station.  Do not go outside."  The mud engineer (██████ also testified that his secondary muster station, the Galley, was completely collapsed. After making his way to the Galley, he waited for about ten seconds with the others trying to muster until they noticed the door leading to the Lifeboat Deck was open.  He and the others made their way to the Lifeboat Muster Deck where they found the off-watch assistant driller (██████ attempting to take a muster. (Testimony ██████ 5/28/2010, pp 220-236)

The roustabout (██████ chief mate (██████ mud engineer (██████ and the driller (██████ along with others attempted to report and execute their Fire and Emergency Stations as required by the announcement.  After reporting to the Fire Team Muster area, the driller noticed that there was nobody around and that the fire in the derrick was too big of a fire to fight and went to his lifeboat muster station.  (Testimony ██████ 5/29/2010, p 105)

The crane operator (██████ testified that the muster of the persons assigned to Lifeboat #2 was so chaotic that they could not achieve a muster and they attempted to have the mustering personnel count off to determine how many people were around the boat.  The personnel were unable to effectively achieve this due to fear.  A decision was made to fill the boat until full, load the wounded and launch. (Testimony ██████ 5/29/2010, p 13)

The Transocean operations manager-performance (██████ testified that after arriving at the Lifeboat Embarkation Deck, neither of the lifeboats had been launched.  He further testified that he believed that the coxswain of Lifeboat #2 was awaiting instruction to launch the lifeboats.  In the absence of the master and observing the traveling block in the derrick fall, he told the coxswain to "go."  (Testimony ██████ 8/23/2010, pp 452-453)

As additional personnel continued to board Lifeboat #1, a stretcher containing an injured crew member (██████ was also placed aboard.  Once the injured party was onboard, the stretcher was thrown out of the lifeboat.  The BP VP for Drilling & Completions (██████ testified that upon reaching the Lifeboat Embarkation Deck, he confirmed his assignment to Lifeboat #2 by use of the "T" Card that was issued to him from the safety orientation.  He retrieved the card from his pocket at the Embarkation Deck and nonetheless boarded Lifeboat #1 along with the subsea

supervisor (███████   The BP VP for Drilling & Completions (███████ further testified that he had to wedge himself into the boat to get a seat because the lifeboat was cramped as some injured were lying down.  He also stated that he did not use his seat belt and referred to the environment as pandemonium. (Testimony █████ 8/23/2010, pp 453-455; Testimony ███████ 8/26/2010, p 368)

The master (█████ of *DAMON B. BANKSTON* received calls from *DEEPWATER HORIZON's* Global Marine Distress Safety System (GMDSS) as well as by Very High Frequency (VHF) radio.  Upon receiving the calls, the crew of *DAMON B. BANKSTON* prepared their fast rescue craft (FRC) for recovery of MODU personnel.  *(BANKSTON* Log; Testimony █████ 5/22/2010, p 1050; Testimony █████ 5/10/2010, pp 187-197)

2205:  Coast Guard D8 Command Center issued an Urgent Marine Information Broadcast (UMIB). Quote: "The Coast Guard has received a report of *DEEPWATER HORIZON* on fire POSITION 28-44.3N 088-21.9W with approximately 144 POB, 45NM ESE of South Pass, LA. All Mariners are requested to maintain a sharp lookout, assist if possible and report all sightings to the nearest U.S. Coast Guard unit."  (SAR Case Report)

2206:  Coast Guard Sector Mobile, Alabama documented receiving a Good Samaritan VHF radio report from the recreational fishing vessel *RAMBLIN' WRECK* announcing that *DEEPWATER HORIZON* is engulfed in fire and the personnel are abandoning the MODU. (SAR Case Report)

2209:  Coast Guard Sector New Orleans Command Center documented receiving notification from *DEEPWATER HORIZON* MODU Manager (█████ of the casualty. (SAR Case Report)

2212-2332:  *DAMON B. BANKSTON* launched their FRC with chief engineer (█████ and Able-Bodied Seaman (Longlois).  Personnel from *DEEPWATER HORIZON* were observed jumping into the water.  (*BANKSTON* Log; Testimony █████ 5/10/2010, pp 187-197; Testimony █████ 5/11/2010, pp 234-236; Testimony █████ 5/11/2010, p 116)

During the muster of personnel at Lifeboat #1 Embarkation Deck, the mud engineer (█████ decided to depart the Lifeboat Deck, and proceeded to the Lower Smoking Deck and jumped overboard; in his opinion, the muster was taking too long.  He and two others, who had previously jumped, were quickly recovered from the water by *DAMON B. BANKSTON* FRC before either of the two lifeboats was launched from *DEEPWATER HORIZON*.  (Testimony █████ 5/28/2010, pp 210-211, 224; Testimony █████ 5/11/2010, pp 187-197; Testimony █████ 5/11/2010, pp 106-115)

The launching of Lifeboat #1 was delayed because the Transocean operations manager-performance (█████ waited for the master (█████ to make his way to the boat.  However, when master (█████ did appear he told the Transocean operations manager-performance (█████ "We have other people. We are going to the rafts."  The Transocean operations manager-performance (█████ further testified that he said "don't [and] get in the boat."  However, the master turned and left.  The Transocean operations manager-performance (█████ testified that he procrastinated for a minute or so and then decided to launch the boat and leave.  The roustabout █████ who was assigned to Lifeboat #1 estimated it took about thirty to forty-five minutes to get everyone up in lifeboats and launch them. Lifeboat #1 was the

last lifeboat to leave *DEEPWATER HORIZON*.  (Testimony ███ 8/23/2010, pp 453-455; Statement ███ 4/21/2010)

After boarding Lifeboat #1, the Transocean operations manager-performance (███ testified that the coxswain was a bit excited and he told him to calm down.  The Transocean operations manager-performance (███ further instructed the launching and movement of the boat.  The Transocean operations manager-performance (███ stated, that the off-watch DPO (███ who was serving as the coxswain said he was going to turn on the air supply to the lifeboat as well as the water spray system to cool the boat; this never happened.  (Testimony ███ 8/23/2010, pp 453-455)

Despite numerous efforts and adjustments, the chief electronics technician (███ the chief engineer (███ and the motorman (███ could not get the standby generator to start and headed back to the CCR.  After returning to the CCR, there were three people remaining in the CCR, the master (███ the on-watch SPDO (███ and the on-watch DPO (███ The lifeboats were already gone.  The master was standing at the door to the CCR and called abandon…get the hell out.  The chief electronics technician (███ and motorman (███ ran to the liferaft.  The chief engineer (███ soon followed the master after verifying the SDPO and the DPO was also departing the CCR. (███ Statement 4/21/2010; Testimony ███ 7/19/2010, pp 33-35)

While motoring Lifeboat #1 to *DAMON B. BANKSTON*, the Transocean operations manager-performance (███ opened the hatch and proceeded to climb on top of the boat to actuate the windshield wiper and cleaned the window of mud from the blowout in order to see where they were going.  (Testimony ███ 8/23/2010, p 455)

After both lifeboats had departed, the eleven remaining persons including the chief engineer (███ the master (███ the on-watch DPO (███ the chief electronics technician (███ the electrical/electronics supervisor (███ the toolpusher (███ the senior tool pusher (███ the chief mate (███ the motorman (███ the senior DPO (███ and the chief electrician (███ mustered near the forward Liferaft Embarkation Deck to determine if the remaining persons on board could safely transit *DEEPWATER HORIZON* to Lifeboats #3 and #4 on the stern.  It was determined that; evacuation of the remaining eleven persons including the tool pusher (███ who was in a stretcher, could only occur by means of the inflatable liferaft served by a launching appliance from the bow of *DEEPWATER HORIZON*.  (Testimony ███ 10/5/2010, pp 161-164)

During the transit to the davit launched liferafts, the SDPO (███ saw the master (███ and a few others getting the davit ready while the chief mate (███ was preparing the liferaft.  However, the davit would not rotate over the side of *DEEPWATER HORIZON*.  Upon closer examination, the chief electronic technician (███ noticed a rope attached to the releasing hook was secured to the davit by way of a shackle preventing the davit from swinging clear of *DEEPWATER HORIZON*.  Using a small tool, the shackle pin was removed, the davit rotated and the liferaft was inflated for boarding. (███ Statement 4/21/2010; Testimony ███ 10/5/2010, p 154)

Once the liferaft was inflated, the chief engineer (████████) ran over to a nearby stretcher containing the off-watch tool pusher and proceeded to drag the stretcher across the deck to the Liferaft Embarkation Deck.  The chief mate (████████) and the chief electrician (████████) boarded the raft first and then assisted the chief engineer (████████) in loading the stretcher into the liferaft despite an order from the master (████████) to leave him [injured].  After the stretcher was loaded, the electrician (████████) chief engineer (████████) senior tool pusher (████████) and finally the DPO (████████) boarded the liferaft.  (Statement ████████ 4/21/2010; Statement ████████ 4/21/2010)

During embarkation, the liferaft was reported to be slowly rotating, swinging, filling with smoke and becoming very hot.  The chief engineer (████████) testified the flames and heat from under *DEEPWATER HORIZON* was creating a vortex at the Liferaft Embarkation Deck.  After entering, the chief engineer (████████) described how he could feel the heat of the fire penetrating his clothing on his knees and through his leather gloves.  (Testimony ████████ 7/19/2010, pp 44-47; Testimony ████████ 5/27/2010, pp 326, 331-335)

The chief electronics technician (████████) who was standing outside the liferaft waiting to board, also noted the fire was coming out of the top of the derrick and projectiles were coming from everywhere and that some type of back draft was occurring underneath *DEEPWATER HORIZON* and the fire was starting to feed itself.  At that point, he recalled he wasn't sure if the liferaft was going to survive because of the heat and that it was going to pop or melt and the people inside were going to cook.  (Testimony ████████ 7/23/2010, p 23)

As the master (████████) the on-watch SDPO (████████) and the chief electronics technician (████████) waited, the chief mate (████████) testified the raft filled with black smoke, got really hot and the brake handle couldn't be identified when the raft began its descent.  The on-watch SDPO (████████) testified that he was standing behind the master for boarding and heard someone within the raft tell the master, "Let's go.  You all get in." But, he (the master) did not and said not to worry about him.  The chief electrician (████████) an occupant of the raft, testified that the chief mate (████████) pulled the release handle that began the raft's descent.  (Testimony ████████ 10/5/2010, pp 161-164; Testimony ████████ 5/27/2010, pp 326-335)

The master, on-watch SDPO, the chief electronics technician, and the on-watch motorman were left aboard *DEEPWATER HORIZON* at the Liferaft Embarkation Deck.  The master determined there was not enough time to manually crank the davit's releasing hook back to the davit to deploy another liferaft.  When the on-watch SDPO asked the master, "What about us?" the master said, "I don't know what you're going to do, but I'm going to jump."  The master then jumped approximately 50 feet [479] into the water followed by the on-watch SDPO and the on-watch motorman.  The chief electronics technician said, he departed the Liferaft Embarkation Deck and made his way to the Helicopter Landing Deck where he then proceeded to jump approximately 71 feet into the water.[480]  (Testimony ████████ 5/27/2010, pp 193-194, 209-211; Testimony ████████ 10/5/2010, pp 154-156; Testimony ████████ 7/23/2010, pp 17-28)

During the liferaft's descent, the painter line which is required to be attached to the MODU remained connected.  As the liferaft descended approximately 35 feet, the painter line became

---

[479] Distance determined by *DEEPWATER HORIZON* outboard profile drawing using the drilling draft (ABSDWH000074).
[480] Ibid.

taught causing the liferaft to jerk and tilt 90 degrees causing all of the occupants to tumble to one side and ejecting the injured crew member (███████) from the stretcher. (Testimony █████ 10/5/2010, p 15; Testimony █████ 5/27/2010, pp 332-334; Testimony █████ 5/27/2010 pp 269-270)

Once the liferaft hit the water, the DPO (███████) said she fell out of the liferaft and managed to safely swim away.  The chief mate (███████) chief electrician (███████) and chief engineer (███████) all exited the liferaft and began pulling it away from the burning *DEEPWATER HORIZON*.  While pulling the liferaft away, the chief engineer (███████) witnessed the master (███████) land approximately five feet from the raft after he jumped from the deck; the SDPO (███████) landed approximately ten feet from the raft; the chief electronics technician (███████) run across the Helicopter Landing Deck, jump and landed in the water.   As the FRC from *DAMON B. BANKSTON* began its approach to the liferaft, the crew retrieved the DPO (███████) and the chief electronics technician (███████).  While the FRC began towing  the liferaft to safety, someone noticed the painter line still attached to *DEEPWATER HORIZON*.  None of the occupants of the liferaft, the master (███████) or the SDPO (███████) had a knife to cut the liferaft's painter line from the MODU nor could they find the knife stored on the liferaft.  Ultimately, the chief engineer (███████) obtained a knife from the FRC crew and gave it to the master (███████) who finally freed the raft.  The FRC then towed the liferaft to safety.  (Testimony █████ 10/5/2010, pp 161-164; Testimony █████ 10/5/2010, p 15; Testimony █████ 5/11/2010, pp 106-107; Testimony █████ 5/27/2010, pp 267-271; Testimony █████ 7/19/2010, pp 47-49; Testimony █████ 5/27/2010, pp 331-335; Testimony █████ 5/10/2010, pp 187-197)

2226:  The Coast Guard D8 Command Center documented notification from BP of seven persons being retrieved from the water. (SAR Case Report)

2235:  The Coast Guard D8 Command Center documented that *DEEPWATER HORIZON* MODU Manager (███████) reported that there were one hundred twenty-six persons-on-board (POB) *DEEPWATER HORIZON* at the time of the casualty and that one hundred-fifteen (115) made it to *DAMON B. BANKSTON*.  This is considered to be the first accurate accounting of the POB.  (SAR Case Report)

2240:  Coast Guard Aircraft Training Center (ATC) Mobile, Alabama documented that aircraft HC-144A (CG-2308) from Coast Guard ATC Mobile, AL departed the airfield.  (SAR Case Report)

2245:  Coast Guard Sector New Orleans Command Center documented that the *USCGC POMPANO* (CG-87339) departed Coast Guard Station (STA) Venice, LA.  (SAR Case Report)

2248:  *MONICA ANN* arrived on-scene in the vicinity of *DEEPWATER HORIZON* and commenced Search and Rescue (SAR) operations.  (*MONICA ANN* Log)

2249:  Coast Guard Sector Mobile documented that the *USCGC COBIA* (CG-87311) was diverted to assist in the mass rescue operations (MRO).  (SAR Case Report)

2305:  Coast Guard ATC Mobile documented that Coast Guard helicopter from ATC Mobile (CG-6531) was delayed due to mechanical issues.  (SAR Case Report)

2310:  Coast Guard Air Station New Orleans documented that helicopter (CG-6605) arrived on-scene and commenced searching.  (Total elapsed time from initial launch order was 1 Hour and 7 Minutes).  (SAR Case Report)

2313:  Coast Guard Air Station New Orleans documented that helicopter (CG-6576)'s launch was delayed due to critical equipment not functioning.  (SAR Case Report)

2314:  Off-watch DPO (████) was the last person to debark Lifeboat #1 alongside *DAMON B. BANKSTON*. (████ Statement, 4/21/2010; Testimony ████ 5/10/2010, pp 187-197)

2315:  Coast Guard ATC Mobile documented that CG-HC-144A (CG-2308) was on-scene and commenced search. (Total elapsed time was 1 Hour and 12 Minutes).  (SAR Case Report; Testimony ████ 5/11/2010, p 112))

2330:  *DAMON B. BANKSTON* took a head count of *DEEPWATER HORIZON* personnel on board *DAMON B. BANKSTON*; total is 126-15 = 111 persons-on-board (POB).  (SAR Case Report; *BANKSTON* Log)

2330:  *DAMON B. BANKSTON* advised all vessels in the vicinity of *DEEPWATER HORIZON* by radio that there were 15 crew members from *DEEPWATER HORIZON* that were missing. (*MONICA ANN* Log)

2353:  A Coast Guard (CG) rescue swimmer from CG helicopter (CG-6605) boarded *DAMON B. BANKSTON* to conduct triage and assume control of medical evacuations.  (SAR Case Report; *BANKSTON* Log)

2355:  The Coast Guard D8 Command Center documented completion of the Critical Incident Communication.  (SAR Case Report)

2358:  *LEE* arrived on-scene in the vicinity of *DEEPWATER HORIZON* and directed its fire monitors on *DEEPWATER HORIZON*. (*LEE* Log)

2400:  *ALICE G McCALL* arrived at *DEEPWATER HORIZON* and commenced SAR operations. (*ALICE G. McCALL* Log).

2400:  *MONICA ANN* terminated their SAR operations and moved in closer to *DEEPWATER HORIZON* and engaged in cooling efforts with their fire monitor.  (*MONICA ANN* Log)

**April 21, 2010**

0004:  Coast Guard Air Station New Orleans documented that helicopter (CG-6576) was on scene and commenced searching.  (Total elapsed time from launch was 51 Minutes).  (SAR Case Report)

0006:  The first injured person was emergency-evacuated from *DAMON B. BANKSTON* to Coast Guard helicopter (CG-6605).  (SAR Case Report; *BANKSTON* Log)

0030:  Coast Guard ATC Mobile documented that (CG-6010) departed the airfield with a Coast Guard flight surgeon on board (O/B).  (SAR Case Report)

0043:  A second person was emergency-evacuated from *DAMON B. BANKSTON* to Coast Guard helicopter (CG-6605).  (SAR Case Report)

0045:  Coast Guard Air Station New Orleans documented helicopter (CG-6508) was launched from the airfield.  (SAR Case Report)

0053:  *DAMON B. BANKSTON* reported that three Coast Guard rescue swimmers were now on board for emergency evacuation operations.  (*BANKSTON* Log)

0055:  A Coast Guard Message was sent reading:  CG Flight Surgeon will be lowered to *DAMON B. BANKSTON* to triage injured parties.  Oil platform *NAKITA* can treat non-evacuation medical issues.  (SAR Case Report)

0055:  *DAMON B. BANKSTON* reported that there were now four boats applying water to the fire: *SECOR LEE, GULF PRINCESS, NORBET BOUZIGA,* and *MONICA ANN.*  The vessels *BEE STING* and *KATRINA FAGAN* reported that they were two miles away and en route with fire monitors and would take up fire-fighting positions upon arrival.  (*BANKSTON* Log; *NORBERT BOUZIGA* Log)

0100:  The Coast Guard D8 Command Center requests airspace restriction for the area in and around *DEEPWATER HORIZON.*  The Federal Aviation Administration (FAA) grants the request.  (SAR Case Report)

0106:  Three additional persons-on-board (POBs) were emergency-evacuated from *DAMON B. BANKSTON* via Coast Guard helicopter.  It was reported that multiple vessels could be seen arriving on scene with fire-fighting capabilities.  All parties directed to commence AJC search patterns around *DEEPWATER HORIZON.*  (*BANKSTON* Log)

0110:  The vessels *BEE STING* and *KATRINA FAGAN* were moving into position to fight the fire.  (*BANKSTON* Log)

0115:  *DAMON B. BANKSTON* reported the following vessels were now assisting with fire-fighting and SAR operations:  *ALICE G. MACALL; KOBE CHOUEST; OCEAN INTERVENTION III; RELIANCE; MAX CHOUEST; PAT TILLMAN; C-PACER; MSC FAMILIA; GLORIA B. CALLAIS; LAINEY CHOUEST* and *C-EXPRESS.*  (*BANKSTON* Log)

0120:  Coast Guard ATC Mobile documented that helicopter (CG-6010) was on scene.  (SAR Case Report)

0130:  *DEEPWATER HORIZON* starts to develop a list towards its starboard stern, with some rotation along with secondary explosions.  Firefighting vessels were forced to move back.  (*BANKSTON* Log)

0130:  *KATRINA FAGAN, LEE, MOINCA ANN* and other response vessels back off from fire-fighting on *DEEPWATER HORIZON* efforts due to the explosions.  (*KATRINA FAGAN* Log; *LEE* Log; *MONICA ANN* Log)

0130:  *LANEY CHOUEST* arrived on-scene in the vicinity of *DEEPWATER HORIZON*. *DAMON B. BANKSTON* directed *LANEY CHOUEST* to begin searching three to five miles around *DEEPWATER HORIZON*.  (*LANEY CHOUEST* Log)

0132:  Two additional POBs were emergency-evacuated to *NAKITA* from *DAMON B. BANKSTON*.  (*BANKSTON* Log)

0133:  Coast Guard Air Station New Orleans documented that helicopter (CG-6508) was on-scene.  (SAR Case Report)

0139:  The Coast Guard D8 Command Center documented BP informing them that vessels providing fire-fighting water to *DEEPWATER HORZION* were being backed off due to the list.  (SAR Case Report)

0156:  One critical injured POB on *DAMON B. BANKSTON* was emergency-evacuated.  (*BANKSTON* Log)

0200:  *WASHINGTON* arrived on-scene in the vicinity of *DEEPWATER HORIZON* and was directed by *DAMON B. BANKSTON*, the On-Scene Coordinator (OSC) [*BANKSTON* assumed OSC responsibilities despite no formal designation in the absence of any Coast Guard assets], to position itself to pump water on the burning MODU.  (*WASHINGTON* Log)

0200:  *NORBERT BOUIZGA* backs off from *DEEPWATER HORIZON* to a distance of 900' and stands by for further orders.  (*NORBERT BOUIZGA* Log)

0220:  Coast Guard Air Station New Orleans documented that helicopter (CG-6605) departed the incident scene. (SAR Case)

0225:  Four additional POBs on *DAMON B. BANKSTON* were emergency-evacuated plus one critical POB.  Coast Guard helicopters (CG-6605), (CG-6531), (CG-6576) and HC-144A (CG-2308) were working on-scene.  (*BANKSTON* Log)

0227:  Coast Guard ATC Mobile documented that helicopter (CG-6010) departed the incident scene. (SAR Case Report)

0237:  *USCGC RAZORBILL* (CG-87332) was delayed getting underway due to the fact that the unit readiness status was other than Bravo-Zero (B-0). (SAR Case Report)

0240:  *BOA SUBSEAS EXPRESS* commenced a search four nautical miles to the South of the position of *DEEPWATER HORIZON*.  (*BANKSTON* Log)

0248: Coast Guard Air Station New Orleans documented that helicopter (CG-6576) departed the incident scene. (SAR Case Report)

0250:  *DAMON B. BANKSTON* reported that *DEEPWATER HORIZON* has now rotated 180 degrees and moved 1,600 feet to the East Northeast.  (*BANKSTON* Log)

0300:  *KATRINA FAGAN* and *LEE* re-engaged in fire-fighting efforts for *DEEPWATER HORIZON* at a safe distance.  (*KATRINA FAGAN* Log; *LEE* Log)

0305: *GULF PRINCESS* was en route to check the report of a flipped life raft.  Search discovered no POB.  (*BANKSTON* Log)

0315: *SAILFISH* was now on location searching the area and assisting with supplies and water. (*BANKSTON* Log)

0318:  *USCGC POMPANO* (CG-87338) was on scene and began searching.  *DAMON B. BANKSTON* reported that *DEEPWATER HORIZON* has developed a heavy list toward the starboard stern.  (SAR Case Report; *BANKSTON* Log; Testimony ███████ 5/11/2010, p 115)

0325:  *NORBERT BOUIZGA* requested the name of the person requesting fire-fighting help. The master (███████ of *DEEPWATER HORIZON* provided the name. (*BANKSTON* Log)

0330:  Transocean contacted SMIT Americas and requested that they come to the Transocean command center to "assist" developing a salvage plan for *DEEPWATER HORIZON*.  (Testimony ███████ 10/4/2010, pp 110-116; Testimony ███████ 8/23/2010, pp 468-472)

0335:  *ALICE G. McCALL* departed the vicinity of *DEEPWATER HORIZON* for Port Fourchon, LA.  (*ALICE G. McCALL* Log)

0340:  *USCGC POMPANO* (CG-87338) was en route to check out a report of an overturned liferaft northeast of *DEEPWATER HORIZON*'s location in a debris field.  No POBs were discovered.  (*BANKSTON* Log)

0343:  The Coast Guard D8 Command Center documented that the BP representative would like to establish a joint command center.  (SAR Case Report)

0345:  Four Coast Guard rescue swimmers were aboard *DAMON B. BANKSTON*.  (*BANKSTON* Log)

0347:  Two additional POBs were emergency-evacuated from *DAMON B. BANKSTON* via Coast Guard Helicopter.  (*BANKSTON* Log)

0349:  Coast Guard Air Station New Orleans documented that helicopter (CG-6508) was on scene. (SAR Case Report)

0350: *SECOR LEE* and *NORBERT BOUIZGA* attempted to re-engage with fire-fighting efforts. (*BANKSTON* Log)

0356: Coast Guard ATC Mobile documented that helicopter (CG-6531) departed the incident scene. (SAR Case Report)

0405: One Coast Guard Rescue Swimmer was airlifted to a Coast Guard (CG) helicopter. (SAR Case Report)

0415: *LEE* re-engaged in fire-fighting efforts at the request of *DAMON B. BANKSTON* at a distance they were comfortable. (*LEE* Log)

0420: *NORBERT BOUIZGA* re-engaged in fire-fighting efforts at the request of *DAMON B. BANKSTON* at a distance they were comfortable. (*NORBERT BOUIZGA* Log)

0425: All injured POBs had been emergency-evacuated (16 total). 99 POB remained on board *DAMON B. BANKSTON* from *DEEPWATER HORIZON*. (*BANKSTON* Log)

0426: *DAMON B. BANKSTON's* FRC was back on board and secured. (*BANKSTON* Log)

0438: The Coast Guard D8 Command Center documented that *USCGC POMPANO* (CG-87339) started their search pattern. (SAR Case Report)

0445: Coast Guard ATC Mobile documented that helicopter (CG-6010) was launched. (SAR Case Report)

0447: *USCGC COBIA* (CG-87311) reported that it has an estimated time of arrival of four hours. (SAR Case Report)

0451: Coast Guard Air Station New Orleans documented that helicopter (CG-6508) departed the incident scene. (SAR Case Report)

0500: *DAMON B. BANKSTON* was still on-scene directing and coordinating fire-fighting and SAR operations. Many additional vessels were seen, too many to accurately identify. (*BANKSTON* Log; Testimony ███████ 5/11/2010, p 238)

0500: SMIT Americas personnel arrived at Transocean command center. (Testimony ███████ 10/4/2010, pp 110-111)

0500: *MONICA ANN* shut down their fire monitor on the starboard side of *DEEPWATER HORIZON* as directed. (*MONICA ANN* Log)

0535: Coast Guard ATC Mobile documented that helicopter (CG-6010) was on scene. (SAR Case Report)

0545:  Coast Guard ATC Mobile documented that a HC144A (CG-2308) departed the incident scene. (SAR Case Report)

0600:  *DAMON B. BANKSTON* requested all vessels to intensify their SAR efforts as daylight approaches.  (*BANKSTON* Log)

0600:  *VANGARD* is chartered to SMIT America.  (*VANGARD* Log)

0628:  Coast Guard Air Station New Orleans documented that helicopter (CG-6605) was launched. (SAR Case Report)

0632:  Coast Guard Air Station New Orleans documented that helicopter (CG-6556) was launched. (SAR Case Report)

0637:  The Coast Guard D8 Command Center documented that BP reported a Cougar flight took six passengers to a Mobile, AL hospital; five were critical.  A Coast Guard Flight Surgeon was still on board *DAMON B. BANKSTON*.  (SAR Case Report)

0643:  The Coast Guard D8 Command Center documented their request for the assistance of *USCGC DECISIVE* (WMEC 629).  (SAR Case Report)

0645:  *LANEY CHOUEST* terminated their SAR efforts in and around *DEEPWATER HORIZON* location.  (*LANEY CHOUEST* Log)

0655:  *DAMON B. BANKSTON* reported that all Coast Guard rescue swimmers had departed the vessel.  (*BANKSTON* Log)

0700: *MR. SYDNEY* arrived on scene, in the vicinity of *DEEPWATER HORIZON,* to assist with fire-fighting efforts.  (*MR. SYDNEY* Log)

0715:  *FAST CAJUN* arrived on scene, in the vicinity of *DEEPWATER HORIZON,* to assist with SAR and fire-fighting efforts.  (*FAST CAJUN* Log)

0723:  The Coast Guard Eighth D8 Command Center documented the release of *DAMON B. BANKSTON* to return to shore with ninety-nine *DEEPWATER HORIZON* persons-on-board. (SAR Case Report; Testimony ████████ 10/5/2010, p 161)

0730:  *USCGC ZEPHYR* (WPC8) was on-scene and assumed On-Scene-Coordinator (OSC) of the SAR operations.  *DAMON B. BANKSTON* was released to depart. (*BANKSTON* Log; Testimony █████ 5/11/2010, p 119)



0800:  The Transocean Command Center contacted the Transocean operations manager-performance (████████ while he was on *MAX CHOUSET* and advised him of the need for the fire responders to direct their water flow at the underside of *DEEPWATER HORIZON* instead of on the deck or the columns in order to avoid down flooding and the possible loss of stability. (Testimony ██████ 10/4/2010, pp 120-125; Testimony ████████ 10/5/2010, p 33; Testimony

███████  8/23/2010, 468-474)

0803:  *DAMON B. BANKSTON* released the custody of Lifeboats # 1 and # 2 from *DEEPWATER HORIZON* to *SAILFISH*.  (*BANKSTON* Log)

0803:  *DAMON B. BANKSTON* released *NORBERT BOUZIGA* which immediately departed for the *ENSCO 8501*.  (*NORBERT BOUIZGA* Log)

0813:  *DAMON B. BANKSTON* departed the vicinity of *DEEPWATER HORIZON* en route to the *OCEAN ENDEAVOR*, which was approximately fourteen nautical miles away.  (*BANKSTON* Log; Testimony ██████ 5/11/2010, p 119)

0815:  Coast Guard Air Station New Orleans documented that helicopter (CG-6556) arrived on scene. (SAR Case Report)

0816:  Coast Guard Air Station New Orleans documented that helicopter (CG-6605) arrived on scene. (SAR Case Report)

0819:  Coast Guard ATC Mobile documented that helicopter (CG-6010) departed the incident scene. (SAR Case Report)

0827:  *MONICA ANN* was requested to re-engage fire-fighting operations on *DEEPWATER HORIZON*.  (*MONICA ANN* Log)

0830:  *LEE* was relieved of fire-fighting duties by *JOE GRIFFIN* and departed the vicinity of *DEEPWATER HORIZON* with the permission of *USCGC ZEPHYR*.  (*LEE* Log)

0906:  *DAMON B. BANKSTON* rendezvoused with *OCEAN ENDEAVOR*, which was standing by for transfer of personnel.  (*BANKSTON* Log)

0907:  *USCGC RAZORBILL* (87332) was on scene.  (SAR Case Report)

0913:  The Coast Guard D8 Command Center documented that *ODESSEY DIAMOND* located two burned liferafts with no sign of life or having had life on board.  (SAR Case Report)

0925:  The Coast Guard D8 Command Center documented that *USCGC ZEPHYR* (WPC8) assumed OSC responsibilities from *USCGC POMPANO* (87339).  *USCGC POMPANO* remained on scene.  (SAR Case Report)

0945:  *MONICA ANN* backed away from *DEEPWATER HORIZON* because the fire was getting too hot (intense).  *MONICA ANN* took up a new position approximately 400' to 500' away. (*MONICA ANN* Log)

0949 – 1028:  *DAMON B. BANKSTON* transferred six persons-on-board and two packages off. *DAMON B. BANKSTON* then on-loaded two POB: (Medics – Kimball, Talbot).  Four additional POB were off loaded to the *MAX CHOUEST* (██████ ██ & ██████  (*BANKSTON* Log; Testimony ██████ 8/23/2010, pp 472, 515-527; Testimony ██████ 5/28/2010, p 176)

1015:  Despite having no regulatory requirement to do so, four of the surviving personnel from *DEEPWATER HORIZON* (████████ and █████ remained on-scene on the *MAX CHOUEST* in an attempt to fight the fire, secure the well and stabilize *DEEPWATER HORIZON*. (*BANKSTON* Log; *MAX CHOUEST* Log; Testimony █████ 8/23/2010, pp 472, 515-527; Testimony █████ 5/28/2010, p 176)

1028:  *DAMON B. BANKSTON* departed and rendezvoused with *OCEAN ENDEAVOR* en route to the platform *MATTERHORN TLP*.  (*BANKSTON* Log)

1030:  *SEACOR VANGUARD* began loading equipment for *DEEPWATER HORIZON*. (*SEACOR VANGUARD* Log)

1100:  Coast Guard MSU Morgan City conducted its first unified command meeting with all of the involved parties.  (SAR Case Report)

1200:  *C-ENFORCER* arrived on scene, in the vicinity of *DEEPWATER HORIZON,* and began directing water on *DEEPWATER HORIZON* from their forward and aft fire monitors.  (*C-ENFORCER* Log)

1325:  *MAX CHOUEST* informed *USCGC ZEPHYR* to direct fire fighting vessels to redirect water to the columns of *DEEPWATER HORIZON* as per the Transocean Performance Manager (█████ (*MAX CHOUEST* Log)

1400  *MAX CHOUEST* making loop around rig to evaluate.  (*MAX CHOUEST Log*)

1409:  *DAMON B. BANKSTON* arrived at *MATTERHORN TLP* (MC 243).  (*BANKSTON* Log)

1439 – 1522:  *DAMON B. BANKSTON* stood by for a helicopter landing on the *MATTERHORN TLP*.  (*BANKSTON* Log)

1440:  *MAX CHOUEST* setting up dynamically positioned (DP), port forward side of *DEEPWATER HORIZON*.  (*MAX COUEST* Log*)*

1445:  *SEACOR VANGUARD* departed the Inter-Moor Dock en route for MC 252 *DEEPWATER HORIZON*.  (*SEACOR VANGUARD* Log)

1450:  *SEACOR WASHINGTON* advised *MAX CHOUEST* that they observed a breach of the port forward column of *DEEPWATER HORIZON*.  (*MAX CHOUEST* Log)

1515:  *LANEY CHOUEST* was released from further SAR efforts by *USCGC ZEPHYR* and departed the area.  (*LANEY CHOUEST* Log)

1515:  *MONICA ANN* was requested to move in closer to *DEEPWATER HORIZON* and focus on extinguishing fires on the water in and around *DEEPWATER HORIZON*.  (*MONICA ANN* Log)

1522 – 1549:  *DAMON B. BANKSTON* conducts loading of nine persons-on-board (3 CG; 2 MMS; 4 Tidewater).  (*BANKSTON* Log)

1540:  The *MAX CHOUEST* launches their ROV to inspect the Riser and BOP for *DEEPWATER HORIZON*.  (*MAX CHOUEST* Log)

1549:  *DAMON B. BANKSTON* departed the platform *MATTERHORN TLP* en route to Port Fourchon, LA.  (*BANKSTON* Log)

1610:  *MAX CHOUEST* ROV reached the BOP for *DEEPWATER HORIZON*.  (*MAX CHOUEST* Log)

1730:  *MAX CHOUEST* ROV attempted to close the pipe rams on *DEEPWATER HORIZON's* BOP.  *MAX CHOUEST* efforts were unsuccessful.  (*MAX CHOUEST* Log)

1800:  ROV operations were initiated from responding vessels.  (Testimony ██████ 8/23/2010, pp 474-475, 515-527)

1930:  *MAX CHOUEST* ROV was back on the deck of the *MAX CHOUEST*.  (*MAX CHOUEST* Log)

2050:  *MAX CHOUEST* ROV re-entered the water and headed for *DEEPWATER HORIZON* BOP.  (*MAX CHOUEST* Log)

2110:  *MAX CHOUEST* reported that BP called "all stop" to the ROV efforts.  (*MAX CHOUEST* Log)

2140:  *MAX CHOUEST* ROV arrived at *DEEPWATER HORIZON* BOP and began pumping in an effort to close the valve on the BOP.  (*MAX CHOUEST* Log)

2230:  *PAT TILLMAN* was released and departed the vicinity of *DEEPWATER HORIZON* for the *THUNDER HORSE*.  (*PAT TILLMAN* Log, TDW-04579)

2240:  *MONICA ANN* was directed to back away from *DEEPWATER HORIZON* and stand by for further direction.  (*MONICA ANN* Log)

2340:  *MAX CHOUEST* ROV returned to the surface to install a grinder.  Heading changed to 145 degrees true.  (*MAX CHOUEST* Log)

2345:  *SEACOR VANGUARD* arrived on scene, in the vicinity of *DEEPWATER HORIZON,* and commenced a damage assessment of the vessel.  (*SEACOR VANGUARD* Log)

**April 22, 2010**

0000:  *MAX CHOUEST* changed out cutting tools.  (*MAX CHOUEST* Log)

0001:  *VANGARD* standing by at MC 252 *DEEPWATER HORIZON.  (VANGARD* Log)

Appendix H | CRITICAL EVENTS TIMELINE

0050 – 0355:  *C-EXPRESS* was on scene in the vicinity of *DEEPWATER HORIZON* to commence ROV operations.  (*C-EXPRESS* Log)

0050:  *MAX CHOUEST* ROV re-entered the water headed for *DEEPWATER HORIZON* BOP.  (*MAX CHOUEST* Log)

0100:  *BEE STING* arrived at *DEEPWATER HORIZON* location and maneuvered into position to spray water on the burning *DEEPWATER HORIZON*.  (*BEE STING* Log)

0125:  *MAX CHOUEST* ROV was operating on *DEEPWATER HORIZON* BOP as directed.  (*MAX CHOUEST* Log)

0127 – 0135:  *DAMON B. BANKSTON* arrived C-Port 1 and moored in Slip #1 Port Fourchon, LA.  (*BANKSTON* Log)

0135 - 0200:  All persons-on-board (POB) *DAMON B. BANKSTON* disembarked; total POB disembarked = 105.  All survivors are subject to drug testing.  Tidewater employees Breaux, Dawson and Dominque were on board.  (*BANKSTON* Log; SAR Case Report)

0200 – 0600:  *DAMON B. BANKSTON* was standing by for orders.  SE-CON was on board for chemical screening of *DAMON B. BANKSTON* crew following the casualty.  The casualty was considered a serious marine incident (SMI) by the Coast Guard; therefore, requiring chemical testing of the crew.  (*BANKSTON* Log)

0259:  *C-EXPRESS* reported feeling an explosion coming from *DEEPWATER HORIZON*.  (*C-EXPRESS* Log)

0345:  *SEACOR VANGUARD* at port side aft of rig using their water cannon.  (*SEACOR VANGUARD* Log)

0500:  *SEACOR VANGUARD* began making a pass around *DEEPWATER HORIZON* (*SEACOR VANGUARD* Log)

0645:  *MAX CHOUEST* ROV was back on deck on the *MAX CHOUEST*.  (*MAX CHOUEST* Log)

0700:  *C-ENFORCER* re-aims their fire monitors as directed.  (*C-ENFORCER* Log)

0700:  *SEACOR VANGUARD* reported that *DEEPWATER HORIZON's* heading had now shifted to 055 degrees true and that it listing heavily to starboard and the stern.  (*SEACOR VANGUARD* Log)

0730:  *MAX CHOUEST* off loaded four persons onto *BOA SUB C*.  (*MAX CHOUEST* Log)

0745: *SEACOR VANGUARD* reported that *DEEPWATER HORIZON's* heading had now shifted to 160 degrees true and that it was listing 22 degrees to starboard and the stern.  (*SEACOR VANGUARD* Log)

0825: *SEACOR VANGUARD* reported that *DEEPWATER HORIZON's* heading had now shifted to 150 degrees true and that it was listing 22 degrees to starboard and the stern.  (*SEACOR VANGUARD* Log)

0835: *SEACOR VANGUARD* reported that *DEEPWATER HORIZON's* heading had now shifted to 140 degrees true and that it was listing 22 degrees to starboard and the stern.  (*SEACOR VANGUARD* Log)

0850: *SEACOR VANGUARD* reported that *DEEPWATER HORIZON's* heading had now shifted to 130 degrees true and that it was listing 22 degrees to starboard and the stern.  (*SEACOR VANGUARD* Log)

0910: *SEACOR VANGUARD* reported that *DEEPWATER HORIZON's* heading had now shifted to 100 degrees true and that it was listing 22 degrees to starboard and the stern.  The efforts of the ROV to close the Subsea Valve on the BOP failed.  *INTERVENTIN 3* rigging up for Dive.  (*SEACOR VANGUARD* Log)

0930: *BEE STING* departs MC 252 en route to VK 826 Neptune Pool 10.  (*BEE STING* Log)

1000: *MONICA ANN* backed away from *DEEPWATER HORIZON* as the MODU began to capsize.  (*MONICA ANN* Log)

1005: *SEACOR VANGUARD* reported that they had rigged fire hoses on the port side of the vessel in order to provide a shield from the fire and heat.  (*SEACOR VANGUARD* Log)

1020: *SEACOR VANGUARD* reported that the starboard side of *DEEPWATER HORIZON* was now in the water and they were moving away to a safe distance.  (*SEACOR VANGUARD* Log)

1025: *MAX CHOUEST* reported that *DEEPWATER HORIZON* had capsized and that they had moved five miles away as directed by the Coast Guard.  (*MAX CHOUEST* Log; *C-EXPRESS* Log; *MONICA ANN* Log)

1026: *DEEPWATER HORIZON* sank in position 28.73N Latitude and 88.36W Longitude approximately 45 Nautical Miles (NM) East South East (ESE) of South Pass, LA in 5,000 feet of water.  (SAR Case Report)

**Appendix I | POTENTIAL LEGAL ISSUES ASSOCIATED WITH VESSELS
EMPLOYING DYNAMIC POSITIONING SYSTEMS**

---

U.S. Department of
Homeland Security

United States
Coast Guard



2100 Second Street, S.W.
Washington, DC 20593-0001
Staff Symbol: CG-094
Phone: (202) 372-3726
Fax: (202) 372-3966

16712
11 Feb 2011

# MEMORANDUM

From:   S. D. Poulin, CAPT
       COMDT (CG-0941)

Reply to   CG-0941
Attn of:   Stephen Hubchen
       2-1198

To:   CG-5

Subj:   POTENTIAL LEGAL ISSUES ASSOCIATED WITH VESSELS EMPLOYING
      DYNAMIC POSITIONING SYSTEMS

Ref:   (a) 46 U.S.C. Parts B, E, and F
      (b) 43 U.S.C. Subchapter III
      (c) 46 C.F.R. Subchapters B, I-A and N
      (d) 33 C.F.R. Subchapter N
      (e) NVIC 8-68
      (f) TJAG memorandum - POTENTIAL IMPACTS ON COAST GUARD PROGRAMS
      OF SUPREME COURT RULING IN STEWART V. DUTRA INTERPRETING
      "VESSEL" UNDER 1 U.S.C. §3, 20 July 2006

This memorandum was prepared to assist Coast Guard programs in considering issues related to Dynamic
Positioning technology on vessels. While not written to address the DEEPWATER HORIZON incident, this
document was drafted with an appreciation that the analyses and conclusions may be relevant to the inquiry of the
USCG-BOEMRE Joint Investigation into the Marine Casualty, Explosion, Fire, Pollution, and Sinking of the Mobile
Offshore Drilling Unit DEEPWATER HORIZON with Loss of Life in the Gulf of Mexico 21-22 April 2010. As
such, if deemed helpful to that inquiry, this memorandum may be appended to the report of the Joint Investigation.

## Executive Summary

1.   Coast Guard regulations need to be updated to account for the emergence of Dynamic
Positioning (DP) aboard vessels. Current regulations do not expressly address DP and may
therefore extend certain requirements that are not practical for DP vessels. For example, under
existing regulatory definitions, watercraft operating with a DP system are considered: (1) "self-
propelled motor vessels"; (2) "underway"; and (3) most relevant for Mobile Offshore Drilling
Units maintaining position with a DP system (without an anchor or load bearing connection to
the bottom), cannot be considered "on location." Significant issues relating to manning and
operational conditions also arise when considering foreign registered DP vessels operating in the
navigable waters of the U.S. or engaged in U.S. regulated activities on the outer continental shelf
(OCS) which further reflect a need for new regulations and possible legislative changes to
address the shortcomings in the current U.S. regulatory regime.

## Appendix I | POTENTIAL LEGAL ISSUES ASSOCIATED WITH VESSELS EMPLOYING DYNAMIC POSITIONING SYSTEMS

Subj: DYNAMIC POSITIONING VESSELS

16712
11 Feb 2011

### Background

2.  This memorandum is written to address legal issues associated with vessels that operate with DP systems.  It addresses both vessels of the U.S.[1] and foreign vessels,[2] including the impact of DP systems on operating requirements on vessels engaged in OCS activities on U.S. OCS, territorial seas and inland waters, as well as in the case of U.S. vessels, on the high seas or the waters of a foreign country.  In general, a DP system is a computer controlled system that automatically maintains a vessel's position and heading by use of its own propellers and/or thrusters.[3]  Position reference sensors (most commonly differential GPS), combined with wind sensors, motion sensors and heading (gyro compass), provide information to a computer pertaining to the vessel's position and the magnitude and direction of environmental forces affecting its position.  The computer will direct the vessel's propulsion and rudder systems to maintain a fixed position and heading.  Although a vessel operating under a DP system is capable of making way, its primary purpose is station keeping.  The functional difference is that, unlike traditional station keeping, DP does not use anchors or a load bearing connection to the ocean bottom.  Additionally, vessels may use DP systems to accurately follow a course, as in survey operations.

3.  A vessel operating under DP does not easily fit into existing U.S. statutes and regulations administered by the Coast Guard.  In fact, the term "Dynamic Positioning" is only referenced once in Coast Guard regulations, the context of which is not useful in this analysis.[4]  The offshore drilling industry is particularly aware of the deficiencies in current regulations, especially whether MODUs operating in DP mode are "underway" or "on location."[5]  These statutes and regulations were written well before the use of DP systems became so prevalent and have not been amended to take their unique characteristics into account.  Furthermore, technology is continually outpacing existing regulatory requirements.  These existing requirements may not be well-suited to DP vessels, especially with respect to minimum manning, training, system requirements (including safety equipment) and credited seagoing experience; all depend on the classification of a subject vessel within the current regulatory regime, along with a determination of its operating condition.  As stated, the laws and regulations have not kept up with the burgeoning DP capability on these vessels.

4.  Some attempts to address the regulatory shortcomings through policy documents have been made.  However, these are at best short-term fixes and reflect policy interpretations.  Various program elements within the Coast Guard are beginning to update our regulations.  In so doing,

---

[1]  46 U.S.C. § 116 states, "[i]n this title, the term "vessel of the United States" means a vessel documented under chapter 121 of this title, (or exempt from documentation under section 12102(c) of this title), numbered under chapter 123 of this title, or titled under the law of a State."

[2]  46 U.S.C. § 110 states, "[i]n this title, the term "foreign vessel" means a vessel of foreign registry or operated under the authority of a foreign country."

[3]  See IMO MSC/Circ. 645, para. 1.3.1

[4]  The sole reference of note is 46 C.F.R § 113.40-10 which mentions DP systems in relation to requirements of Rudder Angle Indicator Systems.  DP is not defined or referenced in statute.

[5]  See International Association of Drilling Contractors (IADC) 19 February 2010 letter commenting on USCG's 17 November 2009 Notice of Proposed Rulemaking, Docket Number USCG-2004-47914.

2

## Appendix I | POTENTIAL LEGAL ISSUES ASSOCIATED WITH VESSELS EMPLOYING DYNAMIC POSITIONING SYSTEMS

Subj: DYNAMIC POSITIONING VESSELS                16712
                                                 11 Feb 2011

they are attempting to reconcile a DP vessel's status when determining pertinent issues within their sphere of responsibility and have requested legal analysis. The issues with which they are confronted include:

 a. A determination of minimum manning requirements for a vessel operating (often for extended duration) in a DP system status. This includes both the complement of personnel and the chain of command depending on operational status;

 b. A determination of a watercraft's status when the DP system is used in very limited circumstances such that it could potentially be considered incidental to its operational purpose;

 c. A determination of whether a vessel operating with a DP system may, in certain circumstances, satisfy operational requirements of vessels that have traditionally used a conventional mooring (anchor) or bottom bearing system; and

 d. A determination of a credited sea service for seafarers serving aboard vessels engaged in extended DP operations.

5. This memorandum's purpose is to place DP vessels within the current legal framework and address those laws and regulations that may need to be amended and/or created so the Coast Guard can provide industry with clarity and direction. The primary issues addressed in this memorandum are:

 a. Whether vessels operating under DP are considered "self propelled";

 b. Whether vessels operating under DP are considered "on location";

 c. Whether vessels operating under DP are considered "underway";

 d. Manning and operating condition implications of classifying DP vessels as self-propelled and "underway" and/or engaged in drilling on our OCS; and

 e. U.S. authority over foreign vessels using DP systems engaged in OCS activities[6] on our OCS.

### Self-propelled motor vessel

6. The determination of whether a particular watercraft is a "vessel" is critical because it sets the foundation of the regulatory regime. TJAG memorandum (ref. (f)) regarding the definition of "vessel" following the Supreme Court decision, *Willard Stewart v. Dutra Construction Company*, 543 U.S. 481 (2005), discusses the criteria to be considered. This memorandum does not attempt to replicate the *Stewart* memo analysis, but notes 1 U.S.C. § 3's definition of "vessel,"[7] following the Supreme Court decision in *Stewart*, has been somewhat narrowed.[8] Each case is potentially unique, depending on the specific factual determination. There is less emphasis on what is possible and more on what is practicable when determining whether a particular watercraft qualifies as a vessel.[9]

---

[6] 33 CFR 140.10 defines OCS activities as, "any offshore activity associated with exploration for, or development or production of, the minerals of the Outer Continental Shelf."

[7] The word "vessel" includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water. 1 U.S.C. § 3.

[8] *Stewart* at 494.

[9] *Id.*

3

## Appendix I | POTENTIAL LEGAL ISSUES ASSOCIATED WITH VESSELS EMPLOYING DYNAMIC POSITIONING SYSTEMS

Subj: DYNAMIC POSITIONING VESSELS                16712
                                                 11 Feb 2011

7.  Assuming a watercraft is a "vessel," the determination of whether it is a "motor vessel" is significant since self-propelled vessels are, in addition to requirements related to their design and equipment, typically subject to 46 U.S.C. Chapters 81-83, addressing minimum manning complements, required credentials, citizenship and watchstanding requirements. 46 U.S.C. § 2101(16) defines "motor vessel" as "a vessel propelled by machinery other than steam." Self-propelled vessels are addressed in several locations in U.S. regulation. 46 C.F.R. § 10.107 defines "self propelled" as having the same meaning as the terms "propelled by machinery" and "mechanically propelled."[10] 46 C.F.R. § 42.05-63 notes that "(t)he terms ship(s) and vessel(s) are interchangeable or synonymous words, and include every description of watercraft, other than a seaplane on the water, used or capable of being used as a means of transportation on water."[11] These provisions provide a very broad definition of what constitutes a self-propelled vessel such that virtually any watercraft that is equipped with machinery that can be used to propel itself would fall under the classification. There are no requirements with respect to duration of operation or distance traveled. The available case law is sparse with respect to the designation of vessels that operate with DP. Cases that mention DP do so in a context that is not germane to the purposes of this memo, but interestingly conclude that DP vessels are self-propelled.[12] As such, any vessel operating under its DP system unless and until our regulations are updated and provide differently would be considered a self-propelled vessel.

8.  In 1968, NVC (NVIC) 8-68 recognized that application of such a broad definition of "self propelled" would result in certain unintended (and undesirable) consequences. Some watercraft - such as barges with "kickers" or tunnel type thrusters used solely to aid in assisting mooring or transiting confined areas, that were not intended to be subject to U.S. inspection and manning requirements, would be classified as self propelled thus subjecting them to additional manning and U.S. inspection regulations. NVC 8-68 attempted to solve that perceived problem by simply interpreting such vessels to be exempt. The goal was to exclude certain vessels from those requirements that would be applicable if the vessels were determined to be "self propelled." NVC 8-68 exempted those vessels where the equipped machinery was used solely in limited operations whereby the propulsion was incidental to its intended purpose of assisting steerage. NVC 8-68, while a policy document, is nevertheless instructive to the present issue; it notes that "Vessels equipped with directional maneuvering equipment and/or substantial propulsion assist units will *normally* be considered as self-propelled vessels. . ." (emphasis added). This would include vessels equipped with DP systems.

9.  In light of the broad and generally applicable regulatory definitions of "motor vessel" and "self propelled," a vessel operating in DP mode, regardless of whether the involved machinery is also used for the vessel making way (transiting), is considered a self-propelled vessel.

---

[10]  Although this section of the C.F.R. applies to licensing and credentialing of merchant mariners, it is useful in a general context.
[11]  This section of the C.F.R. applies to the application of load lines, but is also instructive.
[12]  *See Garry v. Exxon Mobil Corporation*, 2004 WL 3676210 (E.D.La.)(noting the subject DP vessel was self-propelled); *Global Industries v. Pipeliners Local*, 2006 WL 724815 (W.D.La.)(distinguishing a vessel operating under DP from a fixed structure while operating in the OCS).

4

## Appendix I | POTENTIAL LEGAL ISSUES ASSOCIATED WITH VESSELS EMPLOYING DYNAMIC POSITIONING SYSTEMS

Subj: DYNAMIC POSITIONING VESSELS

16712
11 Feb 2011

### On location

10. As noted above, motor vessels are subject to specific manning requirements, one of which involves minimum numbers of licensed individuals as set forth in 46 U.S.C. § 8301. Subsection (c) of that section effectively exempts certain vessels operating under specific conditions, one of which is a MODU when "on location." A MODU is considered a vessel.[13] As DP systems on MODUs are becoming more common, the question of whether a MODU, operating with DP during drilling operations, is considered "on location," must be addressed.

11. 46 C.F.R. § 10.107 (Definitions in subchapter B) states that "*On location* means that a mobile offshore drilling unit is bottom bearing or moored with anchors placed in the drilling configuration." This precludes a vessel maintaining a fixed position with DP from being considered "on location" under our regulations, since there is no physical connection to the ocean bottom that either holds (anchors) the vessel in place or supports it (bottom bearing, as in a jack-up rig). It is noted that a MODU operating under DP may well have a physical connection to the ocean bottom (sometimes referred to as "hooked up" or "latched up"), such as where riser pipelines or drilling lines run from the MODU to the ocean bottom. However, with no actual load involved (i.e., the connection to the ocean floor is not serving as an anchor or support), the regulatory definition of "on location" in 46 C.F.R. § 10.107 is not satisfied. As such, under our current regulations, any vessel holding position solely through the use of its DP system cannot be "on location."

### Underway

12. A corollary to the "on location" issue is whether a vessel operating with DP is considered "underway." Whether a vessel is considered underway will determine what navigation rules must be followed. 46 C.F.R. § 10.107 defines "underway" as

> "a vessel is not at anchor, made fast to the shore, or aground. When referring to a mobile offshore drilling unit (MODU), underway means that the MODU is not in an on-location or laid-up status and includes that period of time when the MODU is deploying or recovering its mooring system."

Both the International and Inland Navigation Rules have the same definition, except for the second sentence referencing MODUs.[14] "Underway," as defined in our regulations and in the navigation rules is essentially contrary to the "on location" definition; that definition even expressly referring to MODU's on location as being *not* underway. As such, because a vessel operating under DP is not at anchor, nor is it made fast to shore or the ocean bottom,[15] it is by

---

[13] *See* 46 U.S.C. § 2101(15a).

[14] *For the international rule, see* Convention on the International Regulations for Preventing Collisions at Sea, 1972, as codified by 33 U.S.C. § 1602 (Navigation Rule 3(i)); *for the inland rule, see* 33 U.S.C. § 2003(h).

[15] The term "made fast" is not defined in regulation. Some common definitions state that "made fast" is merely the process of connecting a line to an object. However, in the context of the "underway" definition, it implies more than simply being attached, requiring that the connection be capable of supporting a load and ensuring that the vessel is secure in its position. The other two controlling terms, "anchor" and "aground," clearly denote a level of security

5

## Appendix I | POTENTIAL LEGAL ISSUES ASSOCIATED WITH VESSELS EMPLOYING DYNAMIC POSITIONING SYSTEMS

Subj: DYNAMIC POSITIONING VESSELS                    16712
                                                     11 Feb 2011

definition "underway," although perhaps not *making* way, assuming it is essentially maintaining a fixed position.[16]

13. As noted above, the current definitions in U.S. regulation and law were enacted and published well before the rising prominence of DP systems on vessels. There has been some opinion within USCG programs that a ship operating under DP should be treated the same as a vessel in a traditional anchor mooring system, assuming sufficient precautions (such as operational system redundancies) are taken,[17] or, in the alternative, that its status at least be differentiated from that of a traditional underway vessel. This approach to DP classification would be a policy decision; there is no statutory or international treaty prohibition to this approach. However, such a position should be adopted through a significant rulemaking to modify both the definitions of "on location" and "underway," along with detailed requirements describing the DP systems to be used.

### Manning Implications

14. Concluding that a watercraft operating under a DP system is to be classified as an underway, self propelled vessel (*not* "on location") results in that vessel being subject to the somewhat inflexible statutory requirements of 46 U.S.C. Part F, pertaining to the manning of vessels, particularly §§ 8101(complement), 8103(citizenship requirements), 8104(watches), and 8301(minimum number of licensed individuals).

15. Manning requirements are generally dependent on the type and size of a vessel. Because there are no manning exceptions specific to DP-equipped vessels, a vessel that is a "DP vessel" would not be subject to different standards. As an example, a MODU that is operating under DP would be considered a self-propelled MODU. Any exemptions that may apply to its manning requirements would be primarily based on it being a MODU. The fact that it operates under a DP system would only indirectly affect its manning requirements.[18] Similarly, an offshore supply vessel (OSVs) that holds station with a DP system would be subject to the manning requirements of 46 U.S.C. §§ 8301(b) and 8104(g) in the same way as an OSV with a traditional propulsion system.

---

beyond that of mere attachment. Consequently, a MODU, connected to the ocean floor with a riser or some other non-load bearing manner, would not be considered made fast. *See also Virginia Intern. Terminals, Inc. v. M/V Katsuragi*, 263 F.Supp.2d 1025, 1038-39 (E.D.Va., 2003)(in the mooring context, supporting the concept that a line must be capable of supporting a load before a vessel is considered "made fast.")

[16] Although considered underway, a DP vessel may be "restricted in her ability to maneuver" as defined by Navigation Rule 3(g) (both Inland and International) depending on the operations being conducted from the vessel at the time.

[17] *See* Coast Guard D8 22 January 2003 Memorandum addressing the use of DP systems by OSVs during oil and hazmat transfers.

[18] 46 U.S.C. § 8101(a)(2) allows that "the specialized nature of the unit" may be considered when imposing manning requirements on a MODU. This could arguably include the DP system used. However, the primary factor to consider would be that the vessel is a MODU, not a "DP vessel." Additionally, since a MODU operating under DP would be considered a self-propelled MODU, it would be subject to 46 CFR §15.520(d), requiring it be under the command of a licensed master who also holds an OIM endorsement at all times.

## Appendix I | POTENTIAL LEGAL ISSUES ASSOCIATED WITH VESSELS EMPLOYING DYNAMIC POSITIONING SYSTEMS

Subj: DYNAMIC POSITIONING VESSELS 16712
11 Feb 2011

16.  A distinction must be made between U.S. and foreign registered vessels.  U.S. jurisdiction over all vessels engaged in OCS activities is described below.[19]  However, virtually all manning regulations in the C.F.R. are specific to U.S. flagged ships.  Vessels flagged by countries that are parties to international safety conventions to which the U.S. is also a party and offering the same privileges to U.S. flagged vessels are generally granted reciprocity.[20]  As such, while a U.S. registered MODU equipped with a DP system must be under the command of a Master (who also holds an Offshore Installation Manager endorsement),[21] the manning requirements of a foreign registered MODU are not subject to the same requirement.

### Authority over foreign vessels utilizing DP systems engaged in OCS activities on U.S. OCS

17.  The U.S. has certain authority of over any vessel that operates on waters subject to its jurisdiction and may penalize persons operating vessels in an unsafe manner.[22]  With few exceptions, vessels operating in U.S. waters are subject to inspections that are broad in scope[23] and the authority to promulgate regulations is well established.[24]  In addition, U.S. authority over foreign registered vessels engaged in OCS activities within the outer continental shelf is set forth in 43 U.S.C. §§ 1331 - 1356a (Outer Continental Shelf Lands Act – "OCSLA").  43 U.S.C. § 1332(6) states:

> operations in the Outer Continental Shelf should be conducted in a safe manner by
> well-trained personnel using technology, precautions, and techniques sufficient to
> prevent or minimize the likelihood of blowouts, loss of well control, fires,
> spillages, physical obstruction to other users of the waters or subsoil and seabed,
> or other occurrences which may cause damage to the environment or to property,
> or endanger life or health.

33 C.F.R. § 140.3 further clarifies OCSLA as applying to vessels operating on the OCS that are engaged in "OCS activities."  This does not, however, include every vessel that is operating in waters over the OCS.  Vessels operating in waters above the OCS, but not engaged in OCS activities as defined by 33 C.F.R. § 140.10 are not subject to OSCLA.[25]  Regulations may be promulgated by the Coast Guard as deemed necessary.[26]

18.  International instruments addressing DP systems aboard vessels are also lagging behind the emerging technology.  To date, only broad advisory documents have been adopted addressing vessel systems[27] and more recently the training and experience of personnel,[28] allowing industry

---

[19]  *See* paragraph 19, infra.

[20]  46 U.S.C. § 3303.

[21]  46 CFR § 15.520(d).  The status of the vessel (underway, at anchor, etc.) is irrelevant to this requirement.

[22]  46 USC §§ 2301-2302.

[23]  46 U.S.C. §§ 3301-3318.

[24]  46 U.S.C. §3306.

[25]  *Alex v. Wild Well Control*, 2009 WL 2599782 (E.D.La.)(not reported in Fed.Supp.).

[26]  43 U.S.C. § 1347(c).

[27]  IMO MSC/Circ 645 *Guidelines for Vessels with Dynamic Positioning Systems*, (6 June 1994); The IMO Code for Construction and Equipment of Mobile Offshore Drilling Units, 2009 (MODU Code), devotes one sentence to DP

7

## Appendix I | POTENTIAL LEGAL ISSUES ASSOCIATED WITH VESSELS EMPLOYING DYNAMIC POSITIONING SYSTEMS

Subj: DYNAMIC POSITIONING VESSELS                    16712
                                                     11 Feb 2011

leaders such as the International Marine Contractors Association (IMCA) and the Nautical Institute (NI) to publish guidance. Some international bodies desire that DP standards be made mandatory, but the current consensus is that broad guidance is better suited to address the wide variances in DP systems coupled with the rapidly expanding nature of this technology.[29]

19. As noted above, the legal views expressed herein, as they apply to U.S. registered vessels, have not universally been adopted by the international community. For example, the term "on location," a creature of U.S. law and regulation, is without an international equivalent. IMO MSC/Circular 645 (*Guidelines for Vessels with Dynamic Positioning Systems*), only defines the term "position keeping" as the act of ". . . maintaining a desired position."[30] The IMO MODU Code states that MODUs utilizing DP systems as ". . . a sole means of position keeping should provide a level of safety equivalent to that provided for anchoring arrangements."[31] The Code furthermore exempts MODUs from complying with the Convention on the International Regulations for Preventing Collisions at Sea, 1972 ("COLREGs") "when stationary and engaged in drilling operations."[32] As such, although not specifically stated, the available international guidance strongly suggests that a MODU operating under a DP system would likely be considered in the same status as one that is traditionally anchored. This does not mean that a foreign MODU (or any vessel) may ignore U.S. law in favor of international guidelines but, at a minimum, it results in the potential for significant confusion, particularly when U.S. regulations allow for a foreign MODU to comply with the "operating standards of the [MODU Code]" as a means of complying with U.S. law.[33] This confusion is compounded, since the MODU Code itself states that in certain circumstances, a MODU should comply with the laws of the coastal state in which it is operating.[34]

20. Additionally, the international community has been unable to agree on any mandatory international manning (numbers of required credentialed mariners on board) standards. The IMO Convention on Standards of Training and, Certification and Watchkeeping for Seafarers, July 7, 1978 (STCW) is not particularly relevant to the issue of such manning. It is principally concerned with safety by establishing minimum competency of seafarers; it says nothing about the minimum number of required seafarers on board, only stating that ships must comply with "applicable safe manning requirements."[35] The level of on board manning is only indirectly

---

systems, noting they should be as safe as that of anchoring arrangements. When operating on the OCS, the MODU Code is only mandatory to those foreign MODUs subject to 33 CFR § 146.205(c).

[28] STCW Code B-V/f, *Guidance on the training and experience for personnel operating dynamic positioning systems*, (adopted 2 July 2010).

[29] IMO subcommittee Standards of Training and Watchkeeping (STW) *Report To The Maritime Safety Committee*, STW 40/14, p. 25 (23 February 2009).

[30] IMO MSC/Circ 645, p. 3. While the two terms – "on location" and "station keeping" are similar in concept, and may have similarities in some usages, they are not legally equivalent, at least until the USCG takes steps consistent with the APA to make them so for purposes of the laws it administers.

[31] MODU Code, at paragraph 4.13

[32] *Id.*, at paragraph 14.8.1.

[33] 33 C.F.R § 146.205(c) allows foreign MODUs to comply with the MODU Code as an alternative to complying with the 46 C.F.R. Part 109.

[34] MODU Code, at paragraph 14.8.2.

[35] STCW Regulation I/4, at paragraph 1.2.

8

## Appendix I | POTENTIAL LEGAL ISSUES ASSOCIATED WITH VESSELS EMPLOYING DYNAMIC POSITIONING SYSTEMS

Subj: DYNAMIC POSITIONING VESSELS                        16712
                                                         11 Feb 2011

affected by the convention due to watchkeeping standards,[36] which dictate minimum hours of rest requirements. Furthermore, while minimum standards with respect to watchstanding durations may affect the *number* of personnel required aboard a vessel to insure safe operation and navigation, it will not delineate the orders of responsibility or chain of command for those serving any type of vessel. Therefore, each flag state determines the minimum safe manning required on the safe manning certificate for its registered MODUs.[37]

21. Pursuant to 33 CFR § 146.205, foreign MODUs engaged in OCS activities must comply with one of three regulatory schemes outlined therein, one of which is compliance with the IMO MODU code. Other than requiring[38] that the owner or operator of a MODU designate a person in charge for emergency situations, there are no manning requirements in the MODU Code. As noted above, the MODU code does require compliance with coastal states' safety of navigation laws, but only "when stationary and engaged in drilling operations."[39] It is unclear whether this was intended to apply to MODUs holding position with a DP system. It is unstated what is meant by "requirements for the safety of navigation," whether this is limited to appropriate navigation lights/shapes for a fixed structure or whether this includes all manning and competency requirements of U.S. law and regulation. Reading paragraph 14.8.2 as a whole, noting that it pertains only to stationary MODUs, strongly suggests the former.[40]

22. The U.S. does not prescribe manning requirements for a foreign MODU operating in the OCS adjacent to U.S. territories, other than to require that "[t]he owner or operator shall designate by title and order of succession the person on each OCS facility who shall be the 'person in charge.'"[41] This manning requirement is not specifically effected by the operational status of a MODU, be it underway, on location, at anchor or some other condition. Nor does the U.S. differentiate between foreign MODUs operating with DP systems (self-propelled) and those without. Because the international standards (guidance) do not establish a manning requirement and such mandatory manning standards are a long way off (if ever),[42] there is a gap with respect to the manning and operational requirements for foreign registered MODUs that operate in the U.S. OCS.

---

[36] *See* STCW Chapter VIII/1 of the Annex and STCW Code Section A-VIII/1.

[37] The U.S. could, but does not currently dictate additional manning requirements for foreign flagged MODUs engaged in OCS activities on the U.S. OCS under OCSLA authorities as well as customary international law.

[38] Use of the word "requiring" may be too strong since the MODU Code uses the word "should" throughout its text. IMO's use of "should" is reserved for guidance (non-mandatory) publications. Nonetheless, the MODU code may be made mandatory through U.S. regulation as in 33 C.F.R. § 146.205(c).

[39] MODU Code, at paragraph14.8.2.

[40] In the alternative, foreign MODUs would have to comply with all U.S. laws regarding manning and credentialing, including the alternative provided by 46 U.S.C. § 8101(a)(2), dictating that manning requirements for MODUs "consider the specialized nature of the unit."

[41] 33 C.F.R. § 146.5.

[42] Some guidance addressing manning that has come from the IMO STW subcommittee. The most recent attempt to adopt mandatory requirements occurred in January 2010 at STW 41 and had very little support. At most, only mandating the *process* of determining safe manning levels enjoys any broad support. *See* STW 41/16 *Report To The Maritime Safety Committee*, pp.42-44, (22 January 2010).

9

## Appendix I | POTENTIAL LEGAL ISSUES ASSOCIATED WITH VESSELS EMPLOYING DYNAMIC POSITIONING SYSTEMS

Subj: DYNAMIC POSITIONING VESSELS

16712
11 Feb 2011

### Conclusion

23. Under current law, a watercraft operating with a DP System is an underway, self-propelled vessel, and subject to all the regulatory requirements of "traditional" vessels. While operating in DP mode, a vessel cannot be considered "on location."

24. Subject to the provisions of OCSLA and our implementing regulations in 33 C.F.R. Part 140-147, and to the reciprocity provision in 46 U.S.C. § 3303, 46 U.S.C. Part F, pertaining to the manning of vessels, particularly §§ 8101(complement), 8103(citizenship requirements), 8104(watches), and 8301(minimum number of licensed individuals) applies to vessels in DP mode.

25. There is sufficient statutory authority to address and clarify DP vessels' status in regulations and both the Coast Guard and industry would be well served by doing so. Items where clarification would be beneficial include:

    a.  New and/or amended definitions in the regulations concerning credentialing, manning, ship design and operations, including:

        (1) DP systems;

        (2) Self-propelled MODU;

        (3) Station Keeping with DP systems;

        (4) Clarifying *on location* to specifically exclude MODUs operating under DP; and

        (5) Clarifying *underway* to include vessels operating under DP;

    b.  Regulations addressing the need for competency standards for seafarers serving aboard vessels equipped with DP systems;

    c.  Regulations addressing crediting sea service for seafarers serving on vessels using DP for extended periods;

    d.  Regulations addressing DP systems used for station keeping;

    e.  Regulations addressing the unique manning requirements of vessels equipped with DP systems.  This is one area that would additionally require a statutory change in 46 U.S.C. § 8101(a), similar to what is currently provided therein for sailing school vessels and MODUs.

    f.  Regulations addressing manning and operational requirements of self-propelled MODUs in 46 C.F.R. Part 109; and

    g.  Regulations addressing the manning requirements of foreign registered vessels, including MODUs, operating with DP systems in the OCS.

Any new regulations to be promulgated should consider current international standards/practices and that DP technology is constantly evolving.

#

Copy: CG-52
      CG-54
      Marine Safety Center

10

**Appendix J SYNOPSIS OF AUDITS & SURVEYS**

| Audit | Item | Category | Discrepancy | Reportable if US-flagged? | Applicable CG Regulation if US-flagged | Applicable IMO Code | IMO Resolution A.787(19) Detention | CG Enforcement Action |
|---|---|---|---|---|---|---|---|---|
| BP 09/09 MODU Audit[481] | 1.1.1 | Health, Safety and Safety Management | Permit to Work on Powered Systems (SMS) | No | 33 CFR § 142.90 | ISM | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 1.1.2 | Health, Safety and Safety Management | Isolation Certificate (Lock-out/Tag-out) Incomplete | No | 33 CFR § 142.90 | ISM | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 1.1.3 | Health, Safety and Safety Management | Contractors not knowledgeable w/Drilling and Well Operations Practice or Engineering Technical Practices | No | None | ISM | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 1.1.4 | Health, Safety and Safety Management | No Competence Assurance Program Implemented | No | None | ISM | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 1.1.5 | Health, Safety and Safety Management | Mechanical Isolations Inadequate Prior to Repairs/Maintenance | No | 33 CFR § 142.90 | ISM | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 1.6.1 | Mechanical Handling | E-Stop on forward Moon Pool man riding winch inoperable | No | None | ISM 10.3 | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 1.6.2 | Mechanical Handling | Proof load test certification not available for man riding winches, utility winches, trolley beams, pad eyes | No | 33 CFR § 96 | ISM 1.2.3.2 | | Non-Conformity |

J-1

---

[481] *DEEPWATER HORIZON* Follow Up MODU Audit, Marine Assurance Audit and Out of Service Period September 2009, BP-HZN-MBI00136211–70

**Appendix J SYNOPSIS OF AUDITS & SURVEYS**

| Audit | Item | Category | Discrepancy | Reportable if US-flagged? | Applicable CG Regulation if US-flagged | Applicable IMO Code | IMO Resolution A.787(19) Detention | CG Enforcement Action |
|---|---|---|---|---|---|---|---|---|
| BP 09/09 MODU Audit[480] | 2.1.1 | Health, Safety and Safety Management | Coupling guards inadequate/missing | No | 46 CFR § 108.223/33 CFR § 96 | ISM 1.2.2.1 | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 2.1.11 | Health, Safety and Safety Management | Heli-foam system inhibited | Yes, If Refueling Capable | 46 CFR § 108.487 | (89) 9.11.2.2 | | Deficiency; Helo Restrict |
| BP 09/09 MODU Audit[480] | 2.1.14 | Health, Safety and Safety Management | No MSDS information in mud mixing area | No | 33 CFR § 96 | ISM 11.2.1 | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 2.1.16 | Health, Safety and Safety Management | Fall Hazards in ballast pump rooms | No | 33 CFR § 96/33 CFR § 142.87 | ISM 1.2.2.1 | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 2.1.2 | Health, Safety and Safety Management | Fall Hazard at crown access platform | No | 33 CFR § 96/33 CFR § 142.42 | ISM 10.2.3 | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 2.1.3 | Health, Safety and Safety Management | Outdated BP HSE Policy posted | No | No | ISM 11.2.1 | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 2.1.4 | Health, Safety and Safety Management | No annual Health and Safety Plan implemented | No | 33 CFR § 96 | ISM 7 | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 2.1.5 | Health, Safety and Safety Management | Inadequate Training (26 of 28 lacked Kelvin Top Set Training) | No | 33 CFR § 96 | ISM 6.4 | | Non-Conformity |

**Appendix J SYNOPSIS OF AUDITS & SURVEYS**

| Audit | Item | Category | Discrepancy | Reportable if US-flagged? | Applicable CG Regulation if US-flagged | Applicable IMO Code | IMO Resolution A.787(19) Detention | CG Enforcement Action |
|---|---|---|---|---|---|---|---|---|
| BP 09/09 MODU Audit[480] | 2.1.6 | Health, Safety and Safety Management | BP awareness of Transocean Focus System (incident tracking system) | No | 33 CFR § 96 | ISM 6.4 | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 2.1.9 | Health, Safety and Safety Management | Inadequate lighting in stbd-aft stairwell | No | 33 CFR § 96 | ISM 1.2.2.1 | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 2.2.1 | Drilling and Well Control | BOP control unit triplex pump pressure relief valve out of date for calibration (Every 2 yrs - API) | No | 46 CFR § 58.60-1(c) | None | | Deficiency |
| BP 09/09 MODU Audit[480] | 2.2.10 | Drilling and Well Control | Damaged/Outdated BOP high pressure boost hose | No | 46 CFR § 58.60-1(c) | ISM 1.2.3.1 | | Non-Conformity/ Deficiency |
| BP 09/09 MODU Audit[480] | 2.2.12 | Drilling and Well Control | Failure to complete annual maintenance for choke/kill, mud lines | No | 46 CFR § 58.60-1(c) | None | | Deficiency |
| BP 09/09 MODU Audit[480] | 2.2.2 | Drilling and Well Control | No safety lanyards for derrick gates/hatches | No | 33 CFR § 143.110 | ISM 1.2.2.2 | | Non-Conformity/ Deficiency |
| BP 09/09 MODU Audit[480] | 2.2.3 | Drilling and Well Control | Toe boards not installed IAW API RP 54 | No | 33 CFR § 143.110 | ISM 1.2.3.2/ Load Line 68 | | Non-Conformity/ Deficiency |
| BP 09/09 MODU Audit[480] | 2.2.6 | Drilling and Well Control | Detached/Loose grating clamps | No | 33 CFR § 96 | ISM 1.2.2.1 | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 2.2.8 | Drilling and Well Control | Damaged high pressure mud hose | No | 46 CFR § 58.60-1(c) | ISM 1.2.3.1 | | Non-Conformity/ Deficiency f |

**Appendix J SYNOPSIS OF AUDITS & SURVEYS**

| Audit | Item | Category | Discrepancy | Reportable if US-flagged? | Applicable CG Regulation if US-flagged | Applicable IMO Code | IMO Resolution A.787(19) Detention | CG Enforcement Action |
|---|---|---|---|---|---|---|---|---|
| BP 09/09 MODU Audit[480] | 2.3.1 | Technical Services | No management system for alarm inhibits/defeats/bypasses | No | No | ISM 10.1 | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 2.3.3 | Technical Services | Inadequate maintenance history reports | No | 33 CFR § 96 | ISM 10.1 | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 2.3.5 | Technical Services | Overdue maintenance for 390 jobs | No | 33 CFR § 96 | ISM 10.3 | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 2.3.6 | Technical Services | T2 thruster motor low resistance reading | No | 33 CFR § 96 | ISM 1.2.3.2 | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 2.6.1 | Mechanical Handling | Derrick sheaves not being maintained properly | No | 33 CFR § 96 | ISM 10.3 | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 2.6.8 | Mechanical Handling | Inoperable back lit LCD screen for safe load indicator for stbd deck crane | No | 46 CFR § 108.601(b)(2) | ISM 1.2.3.2 | | Non-Conformity/ Deficiency |
| BP 09/09 MODU Audit[480] | 3.2.10 | Drilling and Well Control | Incomplete maintenance records for RMS II | No | 33 CFR § 96 | ISM 10.1 | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 3.2.12 | Drilling and Well Control | Missing maintenance records for deadline anchor 5 year overhaul | No | 33 CFR § 96 | ISM 10.1 | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 3.2.13 | Drilling and Well Control | Inadequate inspection of crown/travelling blocks | No | 33 CFR § 96 | ISM 10.2 | | Non-Conformity |

J-4

**Appendix J SYNOPSIS OF AUDITS & SURVEYS**

| Audit | Item | Category | Discrepancy | Reportable if US-flagged? | Applicable CG Regulation if US-flagged | Applicable IMO Code | IMO Resolution A.787(19) Detention | CG Enforcement Action |
|---|---|---|---|---|---|---|---|---|
| BP 09/09 MODU Audit[480] | 3.2.17 | Drilling and Well Control | Inadequate RMS II2 training of MODU floor personnel | No | 33 CFR § 96 | ISM 6.5 | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 3.3.10 | Technical Services | Daily maintenance report incomplete/inaccurate | No | 33 CFR § 96 | ISM 10.3 | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 3.3.13 | Technical Services | Outdated thermographic inspection of switchboards and MCC | No | 33 CFR § 96 | ISM 10.2.1 | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 3.3.2 | Technical Services | Injection tests of main breakers not completed | No | 33 CFR § 96 | ISM 10.1 | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 3.3.3 | Technical Services | High voltage test gear not calibrated | No | 33 CFR § 96 | ISM 10.1 | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 3.3.5 | Technical Services | Driller's cabin fire/gas panel displaying alarms/faulty | Yes | 46 CFR § 109.425 | (89) MODU 9.7.1 | | Deficiency/Provide Live Watch |
| BP 09/09 MODU Audit[480] | 3.3.8 | Technical Services | Defective monitor on port side drilling UPS | No | 33 CFR § 96 | ISM 1.2.2.1 | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 3.3.9 | Technical Services | Main Engine #1 Inoperable (fuel pump) | Yes | 46 CFR § 4.05 | ISM 10.2.3 | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 3.6.1 | Mechanical Handling | Failure to grease derrick mounted divert sheaves | No | 33 CFR § 96 | ISM 10.1 | | Non-Conformity |

**Appendix J SYNOPSIS OF AUDITS & SURVEYS**

| Audit | Item | Category | Discrepancy | Reportable if US-flagged? | Applicable CG Regulation if US-flagged | Applicable IMO Code | IMO Resolution A.787(19) Detention | CG Enforcement Action |
|---|---|---|---|---|---|---|---|---|
| BP 09/09 MODU Audit[480] | 3.6.8 | Mechanical Handling | No emergency lowering instructions on aft Drill Floor man riding winch | No | 33 CFR § 96 | ISM 8.3 | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 4.1.1 | Health, Safety and Safety Management | HSE OJT not provided for long term 3rd party personnel | No | 33 CFR § 96 | ISM 6.3 | | Non-Conformity |
| BP 09/09 MODU Audit[480] | 4.2.4 | Drilling and Well Control | HSE OJT not provided for long term 3rd party personnel | No | 33 CFR § 96 | ISM 6.3 | | Non-Conformity |
| ModuSpec[482] 04/10 | | | Saltwater and freshwater pipes corroded and damage/inoperable valves | Yes | 46 CFR § 4.05 | (89) 4.8 | | Cease Operations |
| ModuSpec 04/10[481] | | | 2 hydraulic watertight doors inoperable | Yes | 46 CFR § 109.419 | (89) 3.6.1 | | Cease Operations |
| ModuSpec 04/10[481] | | | Escape routes in columns in bad condition and in need of repairs/replacement | No | 46 CFR § 108.151 | (89) 9.3 | | Cease Ops/Temp Repair |
| ModuSpec 04/10[481] | | | Repair the general alarm light | No | 46 CFR § 113.25-10 | None | | Deficiency |
| ModuSpec 04/10[481] | | | Repair the skin damage on lifeboat #4 | No | 46 CFR § 180.500 | LSA Code | | Depends on damage |
| ModuSpec 04/10[481] | | | Replace the damaged glass on lifeboat #2 | No | 46 CFR § 180.500 | LSA Code | | Depends on damage |

[482] MODU Condition Assessment *DEEPWATER HORIZON*, ModuSpec USA, Inc., 4/1-14/2010, TRNUSCG_MMS00038609-95

**Appendix K | EXAMPLES OF TRANSOCEAN'S NON-COMPLIANCE WITH THE INTERNATIONAL SAFETY MANAGEMENT CODE**

| ISM Code | Requirement Description | *DEEPWATER HORIZON* Discrepancies | Other Transocean Situations |
|---|---|---|---|
| 1.2.3.1 | The safety management system should ensure compliance with mandatory rules & regulations. | September 2009 - BP Maritime Assurance Audit of Deepwater Horizon identified numerous discrepancies that violated USCG regulations and international standards, and if known by USCG, it would have resulted in ceasing of vessel's operations[483] April 2010 - Transocean intentionally used its "condition-based" maintenance program instead of complying with 30 CFR § 250.446 for maintenance and inspection of Deepwater Horizon's blowout preventer[484] April 2010 – MODUSpec audit identified several discrepancies that violated USCG regulations and international standards, and if known by USCG, it would have resulted in ceasing of vessel's operations[485] | April 2005 - Transocean Offshore Deepwater Drilling Inc. - Currently, engineering work carried out within Transocean that does not go through a formal approval process by a third party (e.g., class, flag administration, coast state administration, etc.) is not formally verified by within the Company. Company should review their practices and introduce a minimum level of formal verification of work specified above.[486] January 2007 - Transocean Offshore Deepwater Drilling Inc. - There is currently no formal means to ensure that design engineers have access to the correct revisions of relevant codes, standards, and regulations.[487] March 2009 - Transocean Driller received a major non-conformity for not correcting non-conformities as indicated in the vessel's maintenance tracking system and as was reported to flag state[488] |
| 4 | To ensure the safe operation of each ship and to provide a link between the Company and those on board, every Company, as appropriate, should designate a person or persons ashore having direct access to the highest level of management. The responsibility and authority of the designated person or persons should include monitoring the safety and pollution-prevention aspects of the operation of each ship and ensuring that adequate resources and shore-based support are applied, as required. | | April 2005 - Transocean Offshore Deepwater Drilling Inc. - The corporate Designated Person and Designated Persons in the regional office should have an overview of all ISM audit results relevant to their jurisdiction/operations. |

K-1

[483] BP *Deepwater Horizon* Follow Up Rig Audit, Marine Assurance Audit & Out of Service Period September 2009, BP-HZN-MBI00136211 -- 70
[484] Witness Testimonies, USCG-BOEMRE MBI Public Hearings, Various Dates,
[485] MODU Condition Assessment *DEEPWATER HORIZON*, ModuSpec USA, Inc., 4/1-14/2010, TRN-USCG_MMS-00038609 --95
[486] ISM Code Certification, TRN-USCG_MMS-0005930I
[487] ISM Code Certification, TRN-USCG_MMS-0005932I
[488] DNV Job ID EOCUS466/EP001568-1

**Appendix K | EXAMPLES OF TRANSOCEAN'S NON-COMPLIANCE WITH THE INTERNATIONAL SAFETY MANAGEMENT CODE**

| ISM Code | Requirement Description | *DEEPWATER HORIZON* Discrepancies | Other Transocean Situations |
|---|---|---|---|
| 5.1 | The Company should clearly define and document the master's responsibility with regard to: .1 implementing the safety and environmental protection policy of the Company; .5 reviewing the safety management system and reporting its deficiencies to the shore-based management | 20 April 2010 - *Deepwater Horizon's* safety management system was designed to operate similar to a fixed platform with the OIM in charge.[489] 20 April 2010 – "The function of the vessel and performance of personnel are the responsibility of the offshore installation manager (OIM)."[490] | |
| 5.2 | The Company should ensure that the safety management system operating on board the ship contains a clear statement emphasizing the master's authority. The Company should establish in the safety management system that the master has the overriding authority and the responsibility to make decisions with respect to safety and pollution prevention and to request the Company's assistance as may be necessary. | March 2009 - "As previously observed the statement of master's Authority is not clearly and completely stated within the Company Safety Management System."[6] | April 2009 - Transocean Offshore Deepwater Drilling Inc. - As previously observed, the statement of master's authority is still not clearly and completely stated within the Company Safety Management System. Although there are various statements of the master's authority, there is no clear and absolute indication of the master's overriding authority and responsibility.[491] |
| 6.1.2 | The Company should ensure that the master is fully conversant with the Company's safety management system | In his testimony, the master was not able to recall much about *Deepwater Horizon's* safety management systems[492] | |
| 6.1.3 | The Company should ensure that the master is given the necessary support so that the master's duties can be safely performed. | The master was not in the charge of Transocean drilling personnel, BP representatives or BP contractors while the MODU was latched up[493] In response to uncontrolled escape of hydrocarbons, the Transocean OIM had to consult with the BP's drilling representative before requesting the master to proceed with procedures to move off location[494] | |

[489] Health and Safety Policies and Procedures Manual HQS-HSE-PP-01 and Operations Manual
[490] TRN-HCEC-00006430
[491] ISM Code Certification, TRN-USCG_MMS-00059333
[492] Testimony ▮▮▮▮ 5/27/2010, pg 213-214
[493] DWH Organization Chart TRN-HCEC-00006431
[494] *Deepwater Horizon* Operations Manual TRN-HCEC-00018993

K-2

**Appendix K | EXAMPLES OF TRANSOCEAN'S NON-COMPLIANCE WITH THE INTERNATIONAL SAFETY MANAGEMENT CODE**

| ISM Code | Requirement Description | *DEEPWATER HORIZON* Discrepancies | Other Transocean Situations |
|---|---|---|---|
| 6.2 | The Company should ensure that each ship is manned with qualified, certificated and medically fit seafarers in accordance with national and international requirements | Transocean procedures for uncontrolled escape of hydrocarbons did not clearly document the change of command from the OIM to master[495]<br><br>September 2009 – No competence assurance program[1]<br>"Numerous personnel changes had occurred in the eighteen months since our last audit. These were seen at all levels and all disciplines.... Any further dilution of experienced personnel may be detrimental to the performance of the rig."<br>20 April 2010 - While Mr. ███ was showing BP & Transocean VIPs the DP simulator, the navigational watch may not be in compliance with STCW requirements[2] | January 2007 - Transocean Offshore Deepwater Drilling, Inc. - It was stated that manning is becoming an issue in the current economic climate for the drilling industry, and that there is a potential 'knowledge gap' between senior personnel nearing retirement age and new personnel coming into the industry. It is recommended the Owner prepare and execute a plan to maintain sufficient numbers of trained, qualified and suitable experienced personnel in the organization both onshore and offshore to ensure safe operations.[486] |
| 6.3 | The Company should establish procedures to ensure that new personnel and personnel transferred to new assignments related to safety and protection of the environment are given proper familiarization with their duties. Instructions which are essential to be provided prior to sailing should be identified, documented and given | There was no written procedures for relieving of key crewmembers[2]<br>"It is a requirement that all staff and contractor personnel be knowledgeable of the Drilling and Well Operations Practice and associated Engineering Technical Practices. The audit highlighted that this still needed to be communicated to relevant Transocean personnel on the rig."[1]<br>"With many new personnel, continuous rigor is required to ensure that that there is the expected consistency in the application of the risk management tools including Permit to Work & Energy Isolation"[1] | March 2009 - GSF C.R. Luigs - It was noted that a number of personnel onboard require training as defined by the Company training matrix.[496]<br>April 2009 - GSF Development Driller I - It was noted that a number of personnel onboard require training defined by the Company training matrix (overall compliance 63%).[497]<br>April 2009 - GSF Development Driller II - It was noted that a number of personnel on board require training as defined by the Company training matrix.[498]<br>September 2009 - Discoverer Clear Leader - It was noted that a number of personnel on board require training as defined by the Company |

---

[495] *Deepwater Horizon* Operations Manual TRN-HCEC-00018989-94
[496] Initial ISM/ISPS; TRN-USCG_MMS-00059193
[497] Initial ISM/ISPS; TRN-USCG_MMS-00059172
[498] Initial ISM/ISPS - TRN-USCG_MMS-00059216

**Appendix K | EXAMPLES OF TRANSOCEAN'S NON-COMPLIANCE WITH THE INTERNATIONAL SAFETY MANAGEMENT CODE**

| ISM Code | Requirement Description | *DEEPWATER HORIZON* Discrepancies | Other Transocean Situations |
|---|---|---|---|
| 6.5 | The Company should establish and maintain procedures for identifying any training, which may be required in support of the safety management system and ensure that such training is provided for all personnel concerned | In his testimony, the master was not able to recall much about *Deepwater Horizon's* safety management systems[10] | training matrix (overall compliance approximately 85%).[499] <br><br> May 2007 – Discoverer Spirit - It was noted that a number of personnel onboard require training as defined by the Company training matrix.[500] <br> July 2007 – Transocean Marianas - It was noted during the audit that while the crew are very familiar with the Company's Safety management documents and procedures, some crewmembers are somewhat unfamiliar with the ISM Code itself.[501] <br> April 2009 - GSF Development Driller I - It was noted that some crewmembers are new to the unit and, although familiar with the general requirements of the Code, they require further exposure/ training to the Company Safety Management System.[15] <br> January 2010 – Discoverer America - GMS (Global Management System) Records of Personnel Training- The GMS data/reports retrieved on board were found to be missing or inaccurate, and use of previous tracking programs GRS has been phased out.[502] <br> March 2010 - Discoverer Inspiration - Gallery service was provided by third party and there is no systematic way to train the galley staff using the fire fighting system and equipment.[503] |
| 7 | The Company should establish procedures for the preparation of plans and instructions, including checklists as appropriate, for key shipboard | "Control of work issues identified specifically with isolation permit process & integrity of mechanical isolations"[11] | |

[499] Initial ISM/ISPS; TRN-USCG_MMS-00059202
[500] Renewal ISM/ISPS; TRN–USCG_MMS-00059151
[501] Initial ISM/ISPS; TRN-USCG_MMS-00059229
[502] Initial ISM/ISPS; TRN-USCG_MMS-00059179
[503] Initial ISM/ISPS; TRN-USCG_MMS-00059187

**Appendix K | EXAMPLES OF TRANSOCEAN'S NON-COMPLIANCE WITH THE INTERNATIONAL SAFETY MANAGEMENT CODE**

| ISM Code | Requirement Description | *DEEPWATER HORIZON* Discrepancies | Other Transocean Situations |
|---|---|---|---|
| | operations concerning the safety of the ship and the prevention of pollution. The various tasks involved should be defined and assigned to qualified personnel | "Control of alarms and defeats and bypasses was not well managed, in fact no single person could account for which alarm etc. were overridden or indeed for what reason."[1]<br><br>20 April 2010 - There was no bridging document for BP and Transocean Management of Change processes[2]<br><br>20 April 2010 – There was no Management of Change for implementing the Rig Maintenance System[2] | |
| 8.3 | The safety management system should provide for measures ensuring that the Company's organization can respond at any time to hazards, accidents and emergency situations involving its ships. | 20 April 2010 - Transocean's safety management system promoted a culture of complacency: (1) general alarm was inhibited, (2) drills were conducted at same time & on the same weekday, and (3) conduct and documentation of drills were unsatisfactory[504] | |
| 9.1 | The safety management system should include procedures for ensuring that non-conformities, accidents and hazardous situations are reported to the Company, investigated and analyzed with the objective of improving safety and pollution prevention. | "The Incident Report Log was reviewed for the past year … The status of actions arising from these incidents should be periodically monitored by BP to ensure proper close-out…."[1] | April 2008 – Transocean Offshore Deepwater Drilling, Inc. - It was noted that a number of REAs for update of the Operations Manuals are outstanding due to workload within the Marine Department.[505] |
| 9.2 | The Company should establish procedures for the implementation of corrective action. | "Many of the recommendations concerning the toe boards and safety slings as per API recommended practices made during our 2008 audit remain outstanding with no action taken…. not only is this an NOV requirement but also a lesson learned from industry incidents, including one on this rig, …."[1]<br><br>"NOV inspection reports dated August 2006 and May 2007 highlighted that both PRS' had worn pins and bushes, it was highlighted during our last audit in January 2008 that although this | April 2010 – Operations Manager Performance did not actively distribute the Operations Advisory or the revised well control published after the loss of well control during displacement of riser in the North Sea, despite being onboard during similar operations. |

K-5

[504] USCG-BOEMRE Public Hearings Witness testimonies; TRN-USCG_MMS-00024204 through 00024211
[505] ISM Code Certification; TRN-USCG_MMS-00059293

**Appendix K | EXAMPLES OF TRANSOCEAN'S NON-COMPLIANCE WITH THE INTERNATIONAL SAFETY MANAGEMENT CODE**

| ISM Code | Requirement Description | *DEEPWATER HORIZON* Discrepancies | Other Transocean Situations |
|---|---|---|---|
| | | work was necessary to improve PRS reliability it had not been completed."[1] "Test, middle and upper BOP ram bonnets are original and out with OEM and API five year recommended recertification period"[1] "As reported during our 2008 audit, comprehensive checks to verify proper operation of the anti-collision system (ACS) were still not being periodically undertaken. Clearly, lessons learned from the equipment collisions on this rig have not been fully implemented."[1] "Despite previous recommendations it could not be demonstrated that all critical digital and analogue drilling instrumentation is being calibrated."[1] "There is an issue with the dead man lever associated with the watertight door... The culture onboard is to start the open/close cycle then release the handle... This difference in operating philosophy also presents a risk to personnel and watertight door operation familiarization should be taken on an urgent basis."[1] April 2010 – MODU/Spec audit identified several discrepancies that violated USCG regulations and international standards, and if known by USCG, it would have resulted in ceasing of vessel's operations[484] | |
| 10.1 | The Company should establish procedures to ensure that the ship is maintained in conformity with the provisions of the relevant rules and regulations and with any additional requirements which may be established by the Company. | September 2009 - BP Maritime Assurance Audit of *Deepwater Horizon* identified numerous discrepancies that violated USCG regulations and international standards, and if known by USCG, it would have resulted in ceasing of vessel's operations[1] April 2010 – MODU Spec audit identified several discrepancies that violated USCG regulations and international standards, and if | 16 May 2007 – "During the period 20-23 March 2007, the Petroleum Safety Authority Norway (PSA) conducted an audit of maintenance management in Transocean Offshore Ltd (TO). TO does not meet the regulatory requirements for maintenance management, nor does the company meet the requirements for handling of nonconformities. We found the conditions to be so serious that we issued a notification of order |

K-6

**Appendix K | EXAMPLES OF TRANSOCEAN'S NON-COMPLIANCE WITH THE INTERNATIONAL SAFETY MANAGEMENT CODE**

| ISM Code | Requirement Description | *DEEPWATER HORIZON* Discrepancies | Other Transocean Situations |
|---|---|---|---|
| | | known by USCG, it would have resulted in ceasing of vessel's operations.[484] | in a letter dated 23 March 2007, followed by an order in a letter dated 3 April 2007."[506] |
| | | The Maintenance Management System, RMS II, was not effectively implemented.RMS II replaced Transocean's Empack system after the corporate merger of Global Santa Fe, RMS II database listing redundant maintenance procedures, and required performance of maintenance of equipment not onboard the MODU resulting in significant overdue planned maintenance routines in excess of 30 days and totaled 390 routines corresponding to 3545 man hours. | May 2007 – Discoverer Spirit - Overdue planned maintenance tasks were noted in the unit's planned maintenance system database, including five overdue items for equipment deemed safety critical.[18] |
| | | | July 2007 – Transocean Marianas – A number of planned maintenance tasks were noted in the unit's planned maintenance system database, including some overdue items for equipment deemed safety critical.[500] |
| | | Engine #1 and #4 were overdue for overhaul by 24k hrs while Thruster #2 was non operational | March 2009 - GSF C.R. Luigs - A small number of overdue planned maintenance tasks were noted in the unit's planned maintenance system database, including some overdue items for equipment deemed critical, dating back up to one month.[495] |
| | | | April 2009 - GSF Development Driller I - A small number of overdue planned maintenance tasks were noted in the unit's planned maintenance system database, including some overdue items for equipment deemed critical.[15] |
| | | | April 2009 - GSF Development Driller II - A number of overdue planned maintenance tasks were noted in the units planned maintenance system database, including 20 items six months overdue for equipment deemed critical.[497] |
| | | | September 2009 - Discoverer Clear Leader - A large number of overdue planned maintenance tasks (approximately 650) were noted in the unit's planned maintenance system database, including some overdue items for equipment deemed critical.[498] |

506 www. http://www.ptil.no/news/audit-of-maintenance-management-in-transocean-offshore-ltd-article3286-79.html

**Appendix K | EXAMPLES OF TRANSOCEAN'S NON-COMPLIANCE WITH THE INTERNATIONAL SAFETY MANAGEMENT CODE**

| ISM Code | Requirement Description | *DEEPWATER HORIZON* Discrepancies | Other Transocean Situations |
|---|---|---|---|
| 11.1 | The Company should establish and maintain procedures to control all documents and data which are relevant to the safety management system. | "All too frequently maintenance history was substandard with missing information and poor quality reports that lacked sufficient detail to convince the reader that the task had been performed in accordance with the procedure."[1] | April 2008 – Transocean Offshore Deepwater Drilling Inc. - Currently, an overview of the Fleet ISM certification, internal/external audit status, and Master's Review status is not easily obtained. |
| 12.2 | The Company should periodically evaluate the efficiency of and, when needed, review the safety management system in accordance with procedures established by the Company. | "Closing out of the last audit recommendations had no apparent verification by BP. Consequently a number of recommendations that Transocean had indicated as closed out had either deteriorated again or not been suitably addressed in the first instance"[1] | |
| 12.6 | The management personnel responsible for the area involved should take timely corrective action on deficiencies found. | | October 2009 - After almost 8 years after the implementation of the ISM Code for MODU, Transocean senior executives failed to ensure the company's full compliance with the ISM Code[507] |
| 13.4 | The validity of a Document of Compliance should be subject to annual verification by the Administration or by an organization recognized by the Administration or, at the request of the Administration, by another Contracting Government within three months before or after the anniversary date. | 11 April 2010 - "Last external audit of this office was 2006-12-11, and external Company audit plan not found available."[508] | April 2010 – Transocean Discoverer Deep Seas operated with an invalid Safety Management Certificate[507] |

K-8

[507] TRN-USCG_MMS-00039100 & 1
[508] DNV Job ID 196115



| U.S. Department of Homeland Security<br>United States Coast Guard | Commanding Officer<br>United States Coast Guard<br>Marine Safety Center | 2100 2ND ST SW STOP 7102<br>WASHINGTON DC 20593-7102<br>Staff Symbol: MSC-1<br>Phone: (202) 475-3401<br>Fax: (202) 475-3920<br>Email: msc@uscg.mil |

16732/P015713
Serial: H1-1100432
01 March 2011

## MEMORANDUM

From: ▇▇▇▇▇▇▇▇▇

CG MSC - SERT

Reply to   LT ▇▇▇▇

Attn of:   (202) 475-3396

To:     H. M. NGUYEN
        Co-chair, DEEPWATER HORIZON Joint Investigation Team

Subj:   POST SINKING ANALYSIS FOR DEEPWATER HORIZON, IMO 8764597

1.  As requested, we performed a technical analysis of the stability of the DEEPWATER HORIZON.  Our review of the operational load conditions in the rig's Operations Manual indicated that those conditions met the applicable intact and damaged stability criteria in the IMO MODU Code.  In addition, our analysis confirmed the validity of the loading restrictions imposed in the Stability Letter issued by the American Bureau of Shipping in 2001.  Because details of the rig's loading condition immediately prior to the casualty are unknown, it was not possible to determine whether or not she was in compliance with her Stability Letter at that time.

2.  The extent of damage required by the IMO MODU Code's damage stability criteria is limited to the outer shell area of the columns, consistent with a collision with another vessel at or near the waterline.  We are confident that the IMO MODU Code's required extents of damage are clearly not intended to address the type of casualty sustained by the DEEPWATER HORIZON.

3.  The lack of information regarding the DEEPWATER HORIZON's loading, extent of damage, and sources of flooding made it impossible to conduct a conclusive analysis of the factors that contributed to her sinking.  An analysis of photographs taken in the hours before she sank, indicated that weight was added to the starboard aft quadrant of the rig.  The nearly infinite permutations and combinations of hull damage scenarios and flooded compartments make it impossible to determine the dominant source of added weight or lost buoyancy.  Ultimately, through some unknown combination of floodwater and a lack of watertight integrity, the rig's weight exceeded the available buoyancy, resulting in sinking.

4.  Enclosure (1) is a detailed explanation of our assumptions and analysis.

5.  If you have questions or need additional information, please contact LT ▇▇▇▇▇▇▇ of our staff.

\#

Enclosure:  (1) Explanation of Analysis & Assumptions

## EXPLANATION OF ANALYSIS & ASSUMPTIONS

**1   General Comments Regarding Our Stability Analysis**

- Our computer model's hull geometry was created using R&B Falcon, Drawing D-87-G13, rev. 4A, "Construction Lines," 2 sheets, dated July 18, 1999.

- Our computer model's compartmentation was created using R&B Falcon, Drawings HRBS-058-000-P-0607, 058-000-P0608, 058-000-P0609, 058-000-P0611, 058-000-P0613 058-000-P0617, rev. 5, "General Arrangement," dated January 18, 2001

- Creative Systems General HydroStatics (GHS) software version 12.26B was used for our analysis.

- All longitudinal references in this report are measured from amidships (MS) located at frame 23. Vertical references and drafts were measured from a baseline (BL) located at the bottom of the pontoons.

- All weights are reported in metric tons (MT). One MT is equivalent to 2205 pounds.

- Downflooding points are described in the Operations Manual in Appendix A (page A-25) and in the Stability Letter issued by the American Bureau of Shipping (ABS) (page A-33)

- The DEEPWATER HORIZON is a foreign-flagged mobile offshore drilling unit (MODU) and, as such, is subject to the International Maritime Organization (IMO) Code for the Construction and Equipment of Mobile Offshore Drilling Units, Resolution A.649(16), 1989, (MODU Code) for intact and damaged stability.

**2   Model Development**

The computer model used throughout this analysis was created using the Construction Lines Plan (shown in Figure 1). Compartmentation and superstructure were added to the model based on the provided General Arrangements. Our model's hydrostatic properties were validated against the hydrostatics tables provided in Appendix A of the Operations Manual (pages A-8 through A-12) and are accurate to within 1.4% of those listed in the Operations Manual.

1                                                                Encl (1)

**Appendix L | POST SINKING ANALYSIS FOR *DEEPWATER HORIZON***



Figure 1: Construction Lines for the DEEPWATER HORIZON (Sheet 1)



Figure 2: MSC's Computer Model of the DEEPWATER HORIZON

2                                          Encl (1)

Appendix L | POST SINKING ANALYSIS FOR *DEEPWATER HORIZON*

## 3    Intact and Damaged Stability Review

The intact and damaged stability requirements applicable to the DEEPWATER HORIZON at the time of her construction are contained in the MODU Code. For intact stability in the normal operating condition, the MODU Code requires that righting energy exceed heeling energy by at least 30 percent when subjected to a 70 knot wind from any direction. In an intact survival condition, the righting energy must also exceed heeling energy by at least 30 percent when subjected to a 100 knot wind from any direction. To reach the survival condition, the rig's freeboard may be increased by discharging ballast, but solid and other variable loads must be retained onboard.

The MODU Code also provides damage stability requirements for conditions where the rig sustains damage to periphery compartments located from 5 meters above to 3 meters below the rig's intact waterline. In each damage stability scenario, only one compartment is damaged if that compartment extends more than 1.5 meters in from the side shell, is more than 3 meters in height, and extends over more than 1/8 of the side shell of a column. These damage extents are consistent with a collision scenario at or near the waterline.

When the rig is subjected to the extent of damage listed above, the MODU Code requires the rig to come to equilibrium at a static heel angle less than 17 degrees, with weathertight downflooding points more than 4 meters above the damaged waterline, and with residual righting energy that exceeds the heeling energy caused by a 50 knot wind by 100%.

The ABS issued a Stability Letter for the DEEPWATER HORIZON in February of 2001 after verifying compliance with multiple standards, including the MODU Code. The ABS's stability approval and subsequent loadline assignment limited the rig to a maximum draft of 23 meters and to a table of maximum vertical centers of gravity (VCG) at operational drafts ranging from 20 meters to 23 meters.

Based on our independent analysis of the DEEPWATER HORIZON's intact and damage stability, we concur with the limits provided in the ABS Stability Letter. In our independent review, we did not evaluate the heeling moment due to the thrusters because no thrust was provided during the casualty. Table 1 shows how our independent stability review limits compare with those provided by ABS's Stability Letter for the "no thrust" condition. ABS' maximum VCG values are slightly more conservative than ours; these differences are within expected tolerance, resulting from minor variations in the hull model.

| Baseline Operational Draft (meters) | ABS Letter Maximum VCG (meters) | Independent Review Maximum VCG (meters) |
|---|---|---|
| 23.0 | 22.77 | 22.77 |
| 22.0 | 22.91 | 23.32 |
| 21.0 | 23.48 | 24.09 |
| 20.5 | 23.86 | 24.52 |
| 20.0 | 24.24 | 25.00 |

Table 1: Stability Review, Limiting VCG Comparison

## 4   Load Condition at the Time of the Casualty

### 4.1   Pre-Casualty

Based on witness testimony, the DEEPWATER HORIZON was approximately at a 23 meter draft prior to the casualty. This is consistent with the draft specified in the "Gulf of Mexico Max. Load Condition" as described on page B-51 of the Operations Manual. Using this draft, we know from the hydrostatics tables in the Operations Manual, as well as our own computer model, that the DEEPWATER HORIZON displaced approximately 52,800 MT with a longitudinal center of gravity (LCG) and transverse center of gravity (TCG) located at amidships on centerline. Normally, a VCG is necessary to calculate the LCG and TCG associated with a given trim and heel, however in this case, since the underwater body is symmetric fore and aft, a zero trim condition implies an LCG at amidships with a TCG on centerline.

The exact tank loading, variable deck loads, and other deadweight items are not available, making it impossible to determine the rig's VCG. Without this information, we could not evaluate whether the DEEPWATER HORIZON was in compliance with her Operations Manual and applicable regulatory stability criteria at the time of the casualty.

### 4.2   During the Casualty

Without information on the rig's loading prior to the casualty, it is impossible to analyze specific damage scenarios. We also lack precise information regarding the rig's draft, heel, and trim as the casualty progressed. However, using photographs of the DEEPWATER HORIZON during the casualty, we estimated her waterplane in the damaged, floating condition. To estimate the waterplane, we used photographs taken at known times and identified three recognizable hull locations that intersected the waterline. The hull locations at the waterline that we used are marked on the photographs (see below) with yellow circles. Figure 3 and Figure 4 were reportedly taken at 0612 on April 22, 2010. Figure 5 and Figure 6 illustrate how the waterplane estimated from these photographs looks when applied to our computer model. Figure 7 and Figure 8 were taken at approximately 1030 on April 22, 2010, just prior to the rig sinking. Figure 9 and Figure 10 illustrate how the waterplane that was estimated from these photographs looks when applied to our computer model. Although the extent of damage shown in Figure 7 and Figure 8 indicate that some hull deflection may exist, our waterplane estimates cannot account for deflection and necessarily assume that the hull was not deflecting in the pictures.

Encl (1)

**Appendix L | POST SINKING ANALYSIS FOR *DEEPWATER HORIZON***



Figure 3: DEEPWATER HORIZON, Port Bow Aspect (0612 on 22 April 2010)



Figure 4: DEEPWATER HORIZON, Port Aspect (0612 on 22 April 2010)

5                                                Encl (1)

**Appendix L | POST SINKING ANALYSIS FOR *DEEPWATER HORIZON***



Figure 5: Computer Model Showing the Estimated Waterline, Port Bow Aspect (0612 on 22 April 2010)



Figure 6: Computer Model Showing the Estimated Waterline, Port Aspect (0612 on 22 April 2010)

6                                                Encl (1)

**Appendix L | POST SINKING ANALYSIS FOR *DEEPWATER HORIZON***



Figure 7: DEEPWATER HORIZON, Stern Aspect (1034 on 22 April 2010)



Figure 8: DEEPWATER HORIZON, Starboard Quarter Aspect (1023 on 22 April 2010)

7                                                Encl (1)

**Appendix L | POST SINKING ANALYSIS FOR *DEEPWATER HORIZON***



Figure 9: Computer Model Showing the Estimated Waterline, Stern Aspect (1034 on 22 April 2010)



Figure 10: Computer Model Showing the Estimated Waterline, Starboard Quarter Aspect
(1023 on 22 April 2010)

8                                    Encl (1)

## 5   Analysis

Based on the waterplane estimates shown in Figures 5, 6, 9, and 10, we estimated the displacement, heel, and trim at two discrete times: 0612 and 1030 on 22 April 2010. The rig's attitude and displacement for these conditions, as well as the presumed 23 meter draft pre-casualty condition are shown in Table 2. These results show that the rig's displacement had increased by approximately 1500MT at 0612 and by 2300MT at 1030 on 22 April 2010. Changes in displacement describe the cumulative effect of added weight (or lost buoyancy) required for the rig to achieve its estimated waterline. The results shown in Table 2 indicate that the vessel must have experienced flooding, either as the result of damage to the watertight envelope, or as a result of downflooding caused by firefighting water and/or downflooding through preexisting openings, or some combination thereof. In other words, without any flooding, the shifting of on-board weights such as ballast, topside loads, and/or the toppling of the derrick, either alone or in combination, would not have been sufficient to place the vessel in the conditions shown in Table 2.

| Condition | Displacement, metric tons | Heel | Trim |
|---|---|---|---|
| 23 meter draft | 52,800 | 0° | 0° |
| 0612 on 22 April 2010 | 54,300 | 11° to starboard | 6° aft |
| 1030 on 22 April 2010 | 55,100 | 15° to starboard | 5° aft |

Table 2: Displacement, Heel, and Trim for Estimated Waterplanes

For the purpose of comparison, the changes in displacement are listed in Table 3 and converted to volume.

| Condition | Change in Displacement, metric tons | Change in Displacemed Volume, gallons | Side length of an equivalent cube of seawater, meters (feet) |
|---|---|---|---|
| 0612 on 22 April 2010 | 1,500 | 400,500 | 12 (38) |
| 1030 on 22 April 2010 | 2,300 | 622,100 | 13 (44) |

Table 3: Change in Displacement Volume Comparisons

The exact location of flooding cannot be determined because the rig's initial loading condition, sources of floodwater, and potential damage to watertight boundaries are unknown. We identified numerous hypothetical scenarios in which various combinations of compartments in either the upper hull, starboard aft column, or starboard pontoon were flooded, each of which could have caused the rig to attain the approximate attitude and displacement shown in the photographs above. In short, there are a large number of flooding scenarios that could have caused the rig to attain its observed condition of draft, trim and heel. The actual scenario cannot be determined with the information available.

9                                                                    Encl (1)

Assuming that the DEEPWATER HORIZON had a 23 meter draft prior to the blowout at approximately 2200 on 20 April, the rate at which her estimated displacement changed was non-linear.  In the first 32 hours after the casualty, from 2200 on 20 April until 0612 on 22 April, we estimate that the rig's displacement increased by 1500MT.  In the subsequent 4 hour period, from 0612 to 1030 on 22 April, we estimate that the rig's displacement increased an additional 800MT.  One possible reason for this increased rate is the significant structural damage visible in Figure 7 and Figure 8, indicating compromised watertight integrity of the upper hull.  This lack of watertight integrity may have allowed free ingress of seawater into compartments of the upper hull as the starboard aft section submerged.

## 6   Conclusions

Our independent analysis of the operational load conditions in the DEEPWATER HORIZON's Operations Manual indicated that those conditions met the applicable intact and damaged stability criteria in the MODU Code.  In addition, our analysis confirmed the validity of the loading restrictions imposed in the Stability Letter issued by the ABS in 2001.  Because the rig's loading condition immediately prior to the casualty is unknown, it was not possible to determine whether or not she was in compliance with her Stability Letter at that time.

The extent of damage required by the IMO MODU Code is limited to the outer shell area of the columns, consistent with a collision with another vessel at or near the waterline.  The compartments within the columns of the DEEPWATER HORIZON were arranged to limit the effects from this type of damage and ensure compliance with damaged stability requirements. The extent of damage, if any, to the rig's columns cannot be discerned from available photographic evidence.  These photographs do, however, show significant damage to the upper hull and topside equipment.  The MODU Code's required extents of damage are clearly not intended to address the type of casualty sustained by the DEEPWATER HORIZON.

The lack of information regarding the DEEPWATER HORIZON's loading, extent of damage, and sources of flooding made it impossible to conduct a conclusive analysis of the factors that contributed to her sinking.  An analysis of photographs taken in the hours before she sank indicated that weight was added to the starboard aft quadrant of the rig.   The nearly infinite permutations and combinations of hull damage and compartments flooding scenarios make it impossible to determine the dominant source of added weight or lost buoyancy.  Ultimately, through some unknown combination of floodwater and a lack of watertight integrity, the rig's weight exceeded the available buoyancy, resulting in sinking.

10                                                          Encl (1)

**Appendix M | OPERATIONAL RISK ASSESSMENT**

Using the guidance in the Coast Guard Marine Safety Manual Volume V on causal analysis and the standards identified in various International Maritime Organization (IMO) and the Republic of the Marshall Islands guidelines, an operational risk assessment model was developed by the Joint Investigation Team.  This is the first time such a model has been used and it does not have Coast Guard Headquarters approval.

The first diagram outlines the model.  It identifies the system and organization factors involved that can reduce or enhance (increase) risk and whether the risk increase poses a moderate or serious enhanced risk.  Time may be allowed to correct Moderate risks.  However, serious risk discrepancies require immediate action, such as exercising stop work authority, detaining the vessel, or removing certificates.

The second diagram applies this model to evaluate the status of *DEEPWATER HORIZON* and the operating environment at the time of the casualty.  The results of the evaluation illustrate that immediate action should have been taken, such as *DEEPWATER HORIZON* crew exercising their Stop Work Authority or reporting the discrepancies to the Coast Guard.

The fact that the crew did not exercise their stop work authority or report the unsafe working conditions reflects problems in the Stop Work Authority and the unsafe working conditions reporting programs.

**Appendix M | OPERATIONAL RISK ASSESSMENT**

## OPERATIONAL RISK ASSESSMENT MODEL

| | COMMON FACTORS[509] | RISK CHARACTERIZATION | | |
| --- | --- | --- | --- | --- |
| | | GREEN (Risk Reducer) | YELLOW (Risk Enhancer) | RED (Risk Enhancer) |
| SYSTEM[510,511] | Vessel Design Vessel Inspection Vessel Maintenance Safety Management System Emergency Preparedness | Condition or tool that reduces risk.  For example, <br><br> – Quality operator <br> – Non-novel vessel <br> – Routine operation <br> – Vessel Safety Management System (SMS) in Compliance with International Safety Management (ISM) Code | Discrepancy that poses a MODERATE threat to the safety of personnel or the ship or a serious risk to the environment that MAY BE ALLOWED TIME to correct.  For example, <br><br> – CG-835 cited items <br> – ISM Code non-conformity or observation <br> – Items pending regulatory action | Discrepancy that poses a SERIOUS threat to the safety of personnel or the ship or a serious risk to the environment that requires IMMEDIATE corrective action.  For example, <br><br> – Loss of situational awareness <br> – Port State Control (PSC) detainable discrepancies <br> – ISM Code major non-conformity |
| ORGANIZATION[509,510] | Staffing/Manning Training Organizational Structure Chain of Command Delegation of Authority Communications Operational Culture Norms and Rules Values and Beliefs Operational Tempo Time Pressures Incentives Risk Management Safety Management Operations & Internal Oversight Regulations & External Oversight Laws/Regulations Standards Enforcement | – Complying with Standards of Training, Certification and Watchkeeping (STCW) Code <br> – Empowering safety personnel & integrating them in operation <br> – Conducting internal safety surveys and following up on results | – ISM Code non-conformity or observation <br> – Items pending regulatory action <br> – Operator not ensuring adequate experience of key personnel | – PSC detainable discrepancies <br> – Attitude of non-compliance toward regulatory requirements <br> – Unwillingness to report unsafe operations <br> – Unwillingness to accept responsibility <br> – Not learning from past incidents <br> – Flag state not in compliance with International Maritime Organization (IMO) Resolution A.739(18)[512] <br> – Flag state or its recognized organization not in compliance with IMO MSC/Circ. 1059 MEPC/Circ. 401[513] |

---

[509] USCG Marine Safety Manual Volume V, Investigations and Enforcement
[510] International Maritime Organization Resolution A.787(19), Procedures for Port State Control
[511] Republic of the Marshall Islands Marine Notice No. 2-011-13, International Safety Management  (ISM) Code
[512] International Maritime Organization Resolution A.739(18), Guidelines for the Authorization of Organizations Acting On the Behalf of the Administration
[513] International Maritime Organization MSC/Circ. 1059 MEPC/Circ. 401, Procedures Concerning Observed ISM Code Major Non-Conformities

**Appendix M:  OPERATIONAL RISK ASSESSMENT**

### *Model Applied to DEEPWATER HORIZON CASUALTY*

| | GREEN<br>(Risk Reducer) | YELLOW<br>(Risk Enhancer) | RED<br>(Risk Enhancer) |
|---|---|---|---|
| **SYSTEM[508]** | Coast Guard QUALSHIP21-designated flag state<br>Transocean THINK planning process<br>Transocean START process | *DEEPWATER HORIZON*<br>– Fire & gas detection system logic was not configured to stop operating machinery or close ventilation dampers if explosive gases were detected<br>– Non-random drill schedule did not prepare crew for actual emergency<br>– Did not utilize class optional certification of drilling package since 2005<br><br>Transocean<br>– Emergency Response Center did not have updated information on BOP configuration<br><br>IMO 1989 MODU Code<br>– Lifeboat design did not adequately provide for placement of a stretcher or reflect actual physical build of average offshore worker<br>– Subjective language "when practicable" reduced effectiveness of emergency preparedness<br>– No guidance on the continued inspection, testing, repair and maintenance of classified electrical equipment<br>– No guidance on design and arrangement of gas detection and alarm systems<br>– No minimum standards for blast resistance of occupied structures<br>– Not require separation of emergency generator air inlets from likely sources of combustible gases<br>– Inadequate level of fire protection when considering fires originating from the Drill Floor<br>– Lifeboat embarkation station not adequately shielded from radiant heat of fire<br>– No requirement for man overboard drill<br>– Lack of requirements on crisis management and crowd control for MODU | *DEEPWATER HORIZON*<br>– Poor materiel conditions, unsafe work practices & inadequate training (see Appendix J)<br>– Loss of situational awareness; too many activities were going on during temporary plugging and abandonment operation<br>– Systemic failure of vessel's Safety Management System (see Appendix K)<br><br>Transocean<br>– Corporate emergency response team was not adequately trained<br>– Systemic failure of company's Safety Management System (see Appendix K) |

Appendix M: OPERATIONAL RISK ASSESSMENT

## Model Applied to *DEEPWATER HORIZON* CASUALTY

| | GREEN (Risk Reducer) | YELLOW (Risk Enhancer) | RED (Risk Enhancer) |
|---|---|---|---|
| **ORGANIZATION[509,510]** | Transocean<br>– HSE Bridging Document for occupational safety<br><br>Coast Guard<br>– Newly-established Offshore Center of Expertise | *DEEPWATER HORIZON*<br>– Dual-command organizational structure adversely impacted vessel senior leaders' situational awareness, risk assessment & decision making<br>– No training or instruction was provided for crew members on watch in the CCR on how to activate the ESD systems in the event of fire or gas detection<br>– Workers worried about drilling priorities taking precedence over planned maintenance[514]<br>– Workers felt they could not report actions leading to a "risky" situation without retaliation[513]<br><br>Transocean<br>– Lack of a bridging document to coordinate marine & drilling operations<br>– Lack of compatible model that could be used by both Transocean and SMIT personnel<br><br>RMI<br>– Did not provide proper oversight of its recognized organizations (ABS, DNV)<br>– Did not investigate *DEEPWATER HORIZON*'s complete loss of electrical power and flooding casualties in 2008<br><br>USCG<br>– Regulations for Outer Continental Shelf activities have not been updated since 1982<br>– Lack of a coordinated off-shore fire-fighting response policy | *DEEPWATER HORIZON*<br>– Despite poor materiel conditions and concerns about multiple activities during plugging and abandonment operation, no one exercised their Stop Work Authority<br>– Lack of unit's loading information<br>– Did not conduct a deadweight survey every 5 years as required<br><br>Transocean<br>– Policy on using its condition-based maintenance program, vice complying with regulatory requirements<br>– Lack of commitment to ensure its full compliance with ISM Code<br>– Lack of communication between Transocean Command Center and the representative on scene<br><br>RMI<br>– DNV failed to identify systemic failure of Transocean's Safety Management System |

---

[514] Lloyd's Register Safety Survey of *DEEPWATER HORIZON* Workers

**Appendix O | RESULTS OF INSPECTIONS & SURVEYS OF *DEEPWATER HORIZON* (2009-2010)**

| Date | RMI (ABS)[515] | RMI (DNV)[516] | USCG[517] | ABS[518] | BP[519] | ModuSpec USA Inc.[520] |
|---|---|---|---|---|---|---|
| 16 MAY 07 | | No Non-Conformity | | | | |
| 20 MAR 09 | | | | No problem noted | | |
| 27 MAY 09 | No problems noted | | | | | |
| 27 JUL 09 | | | No problems noted | | | |
| 13 SEP 09 | | | | No problems noted | | |
| 17 SEP 09 | | | | | Fire pump #1 out of service due to mechanical seal Main engine 1 fuel pump not operational. Fire damper system checks 24,000 and 12,000 hour main engine overhauls are overdue. Maintenance records were complete but quality of reporting was poor. Of 26 remotely activated ventilation dampers spot checked and tested, six failed to operate. Monthly maintenance routine for inspection/activation exists but has not been carried out since July | |

O-1

[515] Republic of the Marshall Islands Form MSD 252 MOU/MODU – RMI 00149.
[516] DNV ISM Audit, 000017-000024.
[517] US Coast Guard Marine Inspection Safety & Law Enforcement (MISLE) data base Activity # 3513781.
[518] ABS survey reports 2009-2010, ABSDWH003979-ABSDWH004146.
[519] BP Common Marine Inspection Document dated 13-17 September 2009, BP-HZN-MBI00136211- BP-HZN-MBI00136270, BP-HZN-MBI00170553- BP-HZN-MBI00136669.
[520] MODU Condition Assessment *DEEPWATER HORIZON*, ModuSpec USA, Inc., 4/1-14/2010, TRN-USCG_MMS-00038609-00038695.

**Appendix O | RESULTS OF INSPECTIONS & SURVEYS OF *DEEPWATER HORIZON* (2009-2010)**

| Date | RMI (ABS)[515] | RMI (DNV)[516] | USCG[517] | ABS[518] | BP[519] | ModuSpec USA Inc.[520] |
|---|---|---|---|---|---|---|
| | | | | | 2009. A60 classed doors latch mechanisms did not always energize allowing fire doors to be easily blown open. Fire doors were being left open between engine rooms and switchboard rooms, compromising fire integrity of each compartment. Watertight dampers were tested and found to be non-functional Watertight door limit switches were found to be frozen and required fault finding or replacement. Watertight doors automatic closing failed and could only be operated by local emergency hand pump. Unable to close remotely. Watertight door dead man lever springs found to be in poor condition and required replacement. 7 defective fire detector heads need to be changed out 2 defective flammable gas detector heads need to be changed out Two loss of electrical power recover tests were performed.  The first test did not fully recover but the MODU was able to recover enough to maintain position.  The second test had a full recovery of the system. | |
| 18 SEP 09 | No problems noted | | | No problems noted | | |

O-2

**Appendix O | RESULTS OF INSPECTIONS & SURVEYS OF *DEEPWATER HORIZON* (2009-2010)**

| Date | RMI (ABS)[515] | RMI (DNV)[516] | USCG[517] | ABS[518] | BP[519] | ModuSpec USA Inc.[520] |
|---|---|---|---|---|---|---|
| 23 FEB 10 | No problems noted | | | Lube Oil low pressure tripping device on the number5 Main Generator engine inoperable | | |
| 14 APR 10 | | | | | | Supply fans for the machinery area on the port and starboard sides of the MODU were corroded severely and the gaskets were in bad condition.  Supply duct for the fans on the port side of the MODU had gaskets pieced together in the corners of the hatch covers leaving gap in the gasket. None of the electrical equipment in the hazardous locations on the MODU were tagged Shaker motor starters extremely dirty and covered in mud and several were missing certification labels No ABS approved hazardous area drawings on the MODU at the time of this assessment Fire Detection System – no detectors inhibited or any in alarm. Gas Detection System – no detectors either in fault or inhibited condition, other than |

O-3

**Appendix O | RESULTS OF INSPECTIONS & SURVEYS OF *DEEPWATER HORIZON* (2009-2010)**

| Date | RMI (ABS)[515] | RMI (DNV)[516] | USCG[517] | ABS[518] | BP[519] | ModuSpec USA Inc.[520] |
|------|----------------|----------------|-----------|----------|---------|------------------------|
|      |                |                |           |          |         | units being serviced. Port forward air winch wire rubbing against a steel plate on the lower derrick level creating friction |

O-4

JOINT DEPARTMENT OF THE INTERIOR
AND
DEPARTMENT OF HOMELAND SECURITY
STATEMENT OF PRINCIPLES AND CONVENING ORDER
REGARDING
INVESTIGATION INTO THE MARINE CASUALTY, EXPLOSION, FIRE,
POLLUTION, AND SINKING OF MOBILE OFFSHORE DRILLING UNIT
DEEPWATER HORIZON, WITH LOSS OF LIFE
IN THE GULF OF MEXICO 21-22 APRIL 2010

1. The Department of the Interior and the Department of Homeland Security (collectively, "the Agencies") have determined that a joint investigation ("Joint Investigation") of the April 21-22, 2010 explosion and sinking of the mobile offshore drilling unit DEEPWATER HORIZON is warranted. Therefore, the Agencies hereby adopt the following statement of principles and convening order regarding the Joint Investigation. Each Agency, at its discretion, may elect to adopt additional internal measures to govern direction and oversight of their respective portion of the Joint Investigation.

2. The Outer Continental Shelf Lands Act ("OCSLA") grants the Secretaries of the Agencies the authority to investigate incidents resulting from operations on the U.S. Outer Continental Shelf ("OCS"). 43 U.S.C. § 1348. The Minerals Management Service ("MMS"), a unit of the Department of the Interior, and the United States Coast Guard ("USCG"), a component of the Department of Homeland Security, have identified a process for conducting investigations under the authority of the OCSLA in a Memorandum of Agreement ("MOA"), dated 27 March 2009. As set forth in the MOA, the MMS investigates incidents associated with, *inter alia*, exploration and drilling operations for hydrocarbons on the OCS, and the USCG investigates, *inter alia*, deaths, injuries, property loss, and environmental damage arising from such incidents.

3. A Joint Investigation is hereby convened in accordance with the MOA, as modified herein. The Joint Investigation is classified as a Coast Guard Marine Board of Investigation within the meaning of 46 C.F.R. § 4.09 and a Panel Investigation within the meaning of 30 C.F.R. § 250.191. The Joint Investigation is convened pursuant to agency authorities and will be conducted pursuant to the procedures contained in 43 U.S.C. § 1348, 14 U.S.C. § 141, 46 U.S.C §§ 6301 *et seq.*, 33 C.F.R. § 140, Subpart C; 30 C.F.R. §§ 250.186-191, and 46 C.F.R. Part 4.

4. The Agencies intend to conduct the Joint Investigation as follows: The MMS and the USCG will co-chair the Joint Investigation. The Joint Investigation team will investigate thoroughly the matter hereby submitted to it in accordance with the provisions of 43 U.S.C. § 1348, 46 U.S.C. § 6301 *et seq.*, and the applicable regulations thereunder. The Joint Investigation shall have the powers of both Agencies, and, for the public hearing portions of the Joint Investigation, shall follow the policies and procedures for a Marine Board of Investigation contained in 46 C.F.R. § 4.09 and the Coast Guard Marine Safety Manual, Volume V. In cases where the procedures of a Marine Board of Investigation and a Panel Investigation appear to differ, the procedures for a Marine Board of Investigation shall govern. Any issue involving procedure may be referred to

the Chief of the Accident Investigation Board of the MMS, and the Chief of USCG Office of
Investigations and Casualty Analysis. They will refer any unresolved procedural issue to the
Chief, Office of Offshore Regulation, MMS, and the Commandant, Director of Prevention Policy
(CG-54), USCG, who will consider the matter together and provide guidance jointly to the Joint
Investigation.

5. Upon completion, the Joint Investigation team will issue a single report to the Director, MMS,
and the Commandant, USCG, containing the evidence adduced, the facts established thereby,
and its conclusions and recommendations. The report shall meet the requirements of both the
MMS and USCG. Any conclusions or recommendations concerning commendatory actions or
misconduct which would warrant further inquiry shall be referred by separate correspondence to
the cognizant Regional Coordinator or District Commander. Similarly, any information
warranting further evaluation for potential civil violations or criminal activity shall be referred in
accordance with applicable procedures. On days that the Joint Investigation conducts a public
hearing, a daily summary of significant events shall be transmitted to the Chief of the Accident
Investigation Board and the Chief of USCG Office of Investigations and Casualty Analysis. The
Joint Investigation team will report its progress, as may be requested by superior authority
designated by the Department of Interior or the Department of Homeland Security.

6. The report should be completed and submitted simultaneously to the Director, MMS, and the
Commandant, USCG, within nine months of the convening date. If this deadline cannot be met,
at least thirty calendar days prior, a written explanation for the delay and the expected
completion date shall be submitted to the Director, MMS, and Commandant, USCG. The Joint
Investigation team is encouraged to submit interim recommendations intended to prevent similar
casualties, if appropriate, early in the Joint Investigation.

7. Prior to submission of the team's report to the Director, MMS, and the Commandant, USCG,
the Joint Investigation team will confer with the Chief of the Accident Investigation Board and
the Chief of USCG Office of Investigations and Casualty Analysis, both of whom will review the
report and reconcile any remaining issues to the maximum extent practicable. If the respective
Chiefs are unable to reconcile any remaining issues, they will elevate the issues to appropriate
officials within their respective Agency.

8. The Director, MMS, and the Commandant, USCG, will jointly sign and release the final
report. If either Agency differs with the other concerning any conclusions or recommendations,
either Agency may issue a supplemental or separate report.

9. David Dykes, MMS, and Captain Hung Nguyen, USCG, are designated as Co-Chairs of the
Joint Investigation. Other Members and the Recorder of the Joint Investigation will be
designated by separate correspondence, and each Agency has the right to be equally represented.
Agency costs for the Joint Investigation shall be borne by the Agency incurring the expense.

10. The Government of Marshall Islands, the flag state administration of the DEEPWATER
HORIZON has requested to participate in this Joint Investigation. It shall be designated as a
Party In Interest and given the rights associated with such status in accordance with 46 U.S.C.
§ 6303.

THAD W. ALLEN
Admiral, U.S. Coast Guard
Commandant

Date: APR 2 6 2010

Director
Minerals Management Service

Date: APR 2 7 2010

JANET NAPOLITANO
Secretary
Department of Homeland Security

Date: APR 2 7 2010

KEN SALAZAR
Secretary
Department of the Interior

Date: APR 2 7 2010

3

**Appendix Q | USCG INVESTIGATION TEAM MEMBERS**

CAPT Suzanne Englebert (CG-545)

CAPT David Fish (CG-545)

CAPT Mark Higgins (LANTAREA)

CAPT Hung Nguyen (Sector Ohio Valley/D14)

CAPT James Whitehead (Sector Houston-Galveston)

CDR Malcolm "Rob" McLellan (CG-545)

LCDR ████████ (CG-0942)

LCDR ████████ (TRACEN Yorktown)

LCDR ████████ (CG-5451)

LCDR ████████ (CG-5451)

LCDR ████████ (Sector Honolulu)

LCDR ████████ (Offshore National Center of Expertise)

LCDR ████████ (CG-5451)

LCDR ████████ (CG-5451)

LT ████████ (MSU Houma)

LT ████████ (MSU Morgan City)

LT ████████ (MSU Morgan City)

LT ████████ (District Eight)

LT ████████ (Marine Safety Center)

LT ████████ (Offshore National Center of Expertise)

LT ████████ (CG-545)

LT ████████ (MSU Morgan City)

CWO4 ████████ (PADET Houston)

CWO2 ████████ (MSU Morgan City)

PACS ████████ (District Eight)

PA1 ████████ District Eight)

YN1 ████████ (CG-545)

YN1 ████████ (MSU Port Arthur)

PA2 ████████ (PADET Houston)

PA2 ████████ (District Eight)

PA2 ████████ (PADET Houston)

**Appendix Q | USCG INVESTIGATION TEAM MEMBERS**

YN2 ███████████ (Sector New Orleans)

PA3 ███████████ (PADET Houston)

SK3 ████████ (CG-0948)

PA3 ███████████ (District Eight)

PA3 ████████ (District Eight)

Mr. ████████ (Investigations National Center of Expertise)

Mr ████████ (CG-5451)

Mr. ██████████ (Investigations National Center of Expertise)

Mr ████████ (CG-5214)

Mr. ███████ (Sector San Francisco)

Mr. ██████ (CG-5222)

Mr. ██████████ (Offshore National Center of Expertise)

Ms. ████████ (CG-5453)

Mr. █████████ (Marine Safety Center)

Mr. ████████ (Offshore National Center of Expertise)

Mr. ██████████ (Sector San Francisco)

Mr. ████████ (MSU Morgan City)