UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in Gulf of Mexico, on April, 20, 2010      * <br> * <br> * <br> * <br> * <br> * <br> * <br> * | MDL NO.     2179 <br><br> NUMBER: <br><br> SECTION: <br><br> JUDGE: |
| This document relates to: <br> 2:12-cv-02048      * <br> * <br> * <br> * | MAGISTRATE: |

*****************************************

PLAINTIFFS:
CHRIS ALBERT MARTIN,
JEFFREY R. VAUGHAN, STEVEN AGUINAGA,
STEPHANE AGUINAGA, MONETTE WYNNE,
GREG WYNNE, DOUG MAURRAS, RACHEL MANEEN,
ROCHELLE VAUGHAN, AND JENNIFER MARTIN

VERSUS

DEFENDANTS:
BP EXPLORATION & PRODUCTION INC., BP
AMERICA PRODUCTION COMPANY, BP, P.L.C.,
AIRBORNE SUPPORT INTERNATIONAL, INC.,
AIRBORNE SUPPORT, INC., ANADARKO
PETROLEUM CORPORATION, ANADARKO E&P
ONSHORE LLC f/k/a ANADARKO E&P COMPANY LP,
MOEX OFFSHORE 2007 LLC, MOEX USA CORPORATION,
TRANSOCEAN LTD, TRANSOCEAN OFFSHORE
DEEPWATER DRILLING INC., TRANSOCEAN
DEEPWATER INC, TRANSOCEAN HOLDINGS LLC,
TRITON ASSET LEASING GMBH, HALLIBURTON
ENERGY SERVICES, INC., M-I L.L.C., CAMERON
INTERNATIONAL CORPORATION, MORAN
ENVIRONMENTAL RECOVERY, LLC,
BOOM TECHNOLOGY, INC., AND JIM FOX

## PLAINTIFFS' AMENDED COMPLAINT FOR DAMAGES

COMES NOW the Plaintiffs, CHRIS ALBERT MARTIN, JEFFREY R. VAUGHAN, STEVEN AGUINAGA, STEPHANE AGUINAGA, MONETTE WYNNE, GREG WYNNE, DOUG MAURRAS, RACHEL MANEEN, ROCHELLE VAUGHAN, AND JENNIFER MARTIN, by and through undersigned counsel, and sue the Defendants, BP EXPLORATION & PRODUCTION, INC., a Delaware corporation, BP AMERICA PRODUCTION COMPANY, a Delaware corporation, BP, PLC., a Foreign corporation, AIRBORNE SUPPORT INTERNATIONAL, INC., a Louisiana corporation, AIRBORNE SUPPORT, INC., a Florida corporation, ANADARKO PETROLEUM CORPORATION, a Delaware corporation, ANADARKO E&P ONSHORE LLC f/k/a ANADARKO E&P COMPANY LP, a Delaware limited partnership, MOEX OFFSHORE 2007 LLC, a Delaware corporation, MOEX USA CORPORATION, a Delaware corporation, a Foreign corporation, TRANSOCEAN LTD a Swiss Corporation, TRANSOCEAN OFFSHORE DEEPWATER DRILLING INC., a Delaware corporation, TRANSOCEAN DEEPWATER INC., a Delaware corporation, TRANSOCEAN HOLDINGS LLC, a Delaware corporation, TRITON ASSET LEASING GMBH, a Foreign corporation, HALLIBURTON ENERGY SERVICES, INC. a Delaware corporation, M-I L.L.C., a Delaware limited liability company, CAMERON INTERNATIONAL CORPORATION, a Delaware corporation, MORAN ENVIRONMENTAL RECOVERY, LLC, a Delaware limited liability company, BOOM TECHNOLOGY, INC., a Maine corporation, JIM FOX is the owner of BOOM TECHNOLOGY INC. and as grounds would therefore state as follows:

## I.  **PARTIES**

1.      Plaintiff, Chris Albert Martin, is a citizen resident of Santa Rosa Beach, Florida and is over the age of 19.  Mr. Martin swam in the Gulf of Mexico and based upon information and belief was toxically exposed to crude oil and chemical dispersants from the Deepwater Horizon Oil Spill Disaster.  Upon information and belief, Mr. Martin was also toxically exposed as a coastal resident via inhalation and dermal exposure to crude oil and dispersants from the Deepwater Horizon Oil Spill Disaster.  Mr. Martin's has also suffered a loss of use and enjoyment of his coastal properties and a diminution of their value as a direct and proximate result of the Deepwater Horizon Oil Spill Disaster.

2.      Plaintiff, Jennifer Martin, is a citizen resident of Santa Rosa Beach, Florida and is over the age of 19. As a result of her husband Chris Martin's exposure related injuries, Mrs. Martin suffers and will continue to suffer the loss of her spouse's services, support, consortium and the care and comfort of his society.

3.      Plaintiff, Jeffrey R. Vaughan, is a citizen resident of Gulf Breeze, Florida and is over the age of 19.  Upon information and belief, Mr. Vaughan was toxically exposed as a coastal resident via inhalation and dermal exposure to crude oil and dispersants from the Deepwater Horizon Oil Spill Disaster.

4.      Plaintiff, Rochelle Vaughan, is a citizen resident of Gulf Breeze, Florida and is over the age of 19. As a result of her husband Jeffrey Vaughan's exposure related injuries, Mrs. Vaughan suffers and will continue to suffer the loss of her spouse's services, support, consortium and the care and comfort of his society.

5.      Plaintiff, Steven Aguinaga, is a citizen resident of Tylertown, Mississippi and is over the age of 19.  Mr. Aguinaga visited Destin and Ft. Walton, Florida as a tourist. Mr. Aguinaga swam in the Gulf of Mexico and upon information and belief was toxically exposed to crude oil and chemical dispersants from the Deepwater Horizon Oil Spill Disaster.  Mr. Aguinaga was also toxically exposed through inhalation of and dermal exposure to crude oil and dispersants from the Deepwater Horizon Oil Spill Disaster.

6.      Plaintiff, Stephane Aguinaga, is a citizen resident of Tylertown, Mississippi and is over the age of 19.  Ms. Aguinaga visited Destin and Ft. Walton, Florida as a tourist.   Ms. Aguinaga swam in the Gulf of Mexico and upon information and belief was toxically exposed to crude oil and chemical dispersants from the Deepwater Horizon Oil Spill Disaster. Upon information and belief, Ms. Aguinaga was also toxically exposed through inhalation of and dermal exposure to crude oil and dispersants from the Deepwater Horizon Oil

7.      Plaintiffs, Monette and Gregory Wynne, are citizen residents of Hilton Head, South Carolina and are over the age of nineteen and on behalf of their three minor children. The Wynne Family formerly resided in Santa Rosa Beach, Florida. While residents of Santa Rosa Beach, Florida, The Wynne Family swam in the Gulf of Mexico and, based upon information and belief, was toxically exposed to crude oil and chemical dispersants from the Deepwater Horizon Oil Spill Disaster.   Based upon information and belief, the Wynne Family was also toxically exposed as coastal residents through inhalation of and dermal exposure to crude oil and dispersants from the Deepwater Horizon Oil Spill Disaster.

8.      Plaintiff, Doug Maurras, is a citizen resident of Pensacola, Florida and is over the age of nineteen.  Doug Maurras was employed aboard various vessels by contractors participating in disaster response efforts related to the Deepwater Horizon Oil Spill Disaster.  Upon information and belief, Doug Maurras was toxically exposed to crude oil and chemical dispersants from the Deepwater Horizon Oil Spill Disaster while aboard vessels participating in the disaster response activities.

9.      Plaintiff, Rachel Maneen, is a citizen resident of Pensacola, Florida and is over the age of nineteen. While a resident of Pensacola, Florida, Rachel Maneen swam in the Gulf of Mexico and upon information and belief was toxically exposed to crude oil and chemical dispersants from the Deepwater Horizon Oil Spill Disaster.  Upon information and belief, Ms. Maneen was also toxically exposed as a coastal resident through inhalation of fumes from crude oil and dispersants from the Deepwater Horizon Oil Spill Disaster.

10.     All plaintiffs in this complaint share common issues of law and fact.  Each was damaged and injured by exposure to and effects from the subject oil spill and chemical remediation negligence of Defendants.

11.     Each joined Plaintiff has a claim based in Maritime Law since each was physically exposed to the hydrocarbons and/or dispersant chemicals and injured by the exposure.

12.     Defendant, BP EXPLORATION & PRODUCTION, INC. is a Delaware corporation, at all pertinent times registered to do and doing business in the State of Louisiana, and/or its territorial waters, whose principal business establishment and registered business office is 501 Westlake Park Blvd., Houston, Texas 77079, and

whose agent for service of process is C.T. Corporation Systems, 5615 Corporate Blvd., Ste. 400B, Baton Rouge, LA.

13.     BP EXPLORATION & PRODUCTION, INC. was a holder of a lease granted by the former Minerals Management Service ("MMS") allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Oil Spill originated.

14.     The MMS, a federal entity that divides the Gulf of Mexico's seafloor into rectangular "block," and then auctions the right to drill for oil and gas beneath those blocks of seafloor, was reorganized as the Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE) on June 18, 2012; however, it is referred to as the MMS throughout this Amended Complaint.

15.     BP EXPLORATION & PRODUCTION, INC. was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution Act of 1990, 33 U.S.C. § 2714.   This court has personal jurisdiction over BP EXPLORATION & PRODUCTION COMPANY because it is registered to do business in Louisiana, does business in Louisiana and has a registered agent in Louisiana.

16.     Defendant, BP AMERICA PRODUCTION COMPANY, is a Delaware corporation, at all pertinent times registered to do and doing business in the State of Florida, and/or its territorial waters, whose principal business establishment and registered business office is 501 Westlake Park Blvd., Houston, Texas 77079, and whose agent for service of process is C.T. Corporation System, 5615 Corporate Blvd., Ste. 400B, Baton Rouge, LA.  BP AMERICA PRODUCTION COMPANY was the party to the Drilling Contract with Transocean Ltd. for the drilling of the Macondo well by the

Deepwater Horizon vessel. This court has personal jurisdiction over BP AMEIRCA PRODUCTION COMPANY because it is registered to do business in Louisiana, does business in Louisiana and has a registered agent in Louisiana.

      17.    Defendant, BP, P.L.C. is a foreign corporation with its corporate headquarters in London, England, at all pertinent times doing business in the State of Florida. BP, P.L.C. is the global parent company of the worldwide business operating under the "BP" logo. BP, P.L.C. is one of the world's largest energy companies with over 80,000 employees and $239 billion in revenues in 2009. BP, P.L.C. operates its various business divisions, such as the "Exploration and Production" division in which BP EXPLORATION & PRODUCTION, INC. and BP AMERICA PRODUCTION COMPANY fall, through vertical business arrangements aligned by product or service groups. BP, P.L.C.'s operations are worldwide, including in the United States. Defendants BP EXPLORATION & PRODUCTION, INC. and BP AMERICA PRODUCTION COMPANY (collectively "BP") are wholly-owned subsidiaries of BP P.L.C. and are sufficiently controlled by BP, P.L.C. so as to be BP, P.L.C.'s agents in Louisiana and the U.S. more generally.

      18.    BP, P.L.C. has submitted to Federal Court jurisdiction by responding to various Plaintiffs' discovery requests in Federal Court.

      19.    BP, P.L.C. states that it is the leading producer of oil and natural gas in the United States and the largest investor in U.S. energy development. A sampling of BP, P.L.C.'s contact with the U.S are as follows: (a) BP, P.L.C.'s American Depository Shares are listed on the New York Stock Exchange and BP, P.L.C. is the largest non-U.S. company listed on the NYSE; (b) roughly 40% of BP's shares are owned

by U.S. individuals and institutions; (c) BP, P.L.C. files annual reports with the U.S. Securities and Exchange Commission; (d) approximately 60% of BP, P.L.C.'s fixed assets are located in the U.S. or the European Union; and (e) BP, P.L.C. reports having 2,100 U.S.-based employees in non-Exploration & Production, non-Refining & Marketing BP entities.

20.     This Court has jurisdiction over BP, P.L.C. pursuant to Louisiana's long-arm statute, in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure.  BP, P.L.C. does business in Louisiana and has had continuous and systematic contacts with Louisiana (and with the U.S. more generally).

21.     Alternatively, this Court may exercise personal jurisdiction over BP, P.L.C. pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure because claims in this action arise under federal law, the exercise of jurisdiction over BP, P.L.C. is consistent with the United States Constitution and laws, and BP, P.L.C. has been served with summonses in individual complaints that allege similar causes of action to those alleged in this Complaint.

22.     Plaintiffs' causes of action arise out of wrongful conduct committed by BP, P.L.C., directly or indirectly by its agents, that caused injury or damage in Louisiana by an offense or quasi offense committed through an act or omission inside and outside of Louisiana.  BP, P.L.C. regularly does or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in Louisiana.  These acts or omissions took place both before the blowout resulting in the Oil Spill and in the negligent conduct of BP, P.L.C. after the blowout in attempting to contain the Oil Spill.

23.     In addition, this Court also has personal jurisdiction over BP, P.L.C. under agency and alter ego principles, because BP, P.L.C.'s agents, BP AMERICA PRODUCTION COMPANY and BP EXPLORATION & PRODUCTION, INC., do business in Florida.   BP AMERICA PRODUCTION COMPANY and BP EXPLORATION & PRODUCTION, INC. are both wholly-owned subsidiaries of BP, P.L.C.   In BP, P.L.C's Annual Report for 2009, in which it presents a consolidated financial statement that includes BP AMERICA PRODUCTION COMPANY and BP EXPLORATION & PRODUCTION, INC., BP, P.L.C. states that it "controls" both BP AMERICA PRODUCTION COMPANY and BP EXPLORATION & PRODUCTION, INC., among other subsidiaries, meaning that it has "the power to govern the financial and operating policies of the [subsidiary] so as to obtain benefit from its activities...."

24.     Moreover, BP, P.L.C. undertook the duty to pay and/or gratuitously to clean up the Oil Spill and as a result is liable for its acts and omissions in the attempt to clean-up the Oil Spill.

25.     BP EXPLORATION & PRODUCTION, INC., BP AMERICA PRODUCTION COMPANY and BP, P.L.C. are generally referred to collectively as "BP." As lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations.

26.     Defendant, AIRBORNE SUPPORT INTERNATIONAL, INC., is a Louisiana corporation, whose domicile address in Louisiana is 3626 Thunderbird Rd., Houma, LA 70363 and whose registered agent is Howard Barker, 3626 Thunderbird Rd.,

Houma, LA 70363 (hereinafter "ASI INTERNATIONAL"). ASI INTERNATIONAL participated in the post-explosion Oil Spill remediation and response efforts including involvement in the negligent spraying or release of chemicals in the Gulf of Mexico.

27.   Defendant, AIRBORNE SUPPORT, INC., is a Florida corporation, with its principal place of business in Houma, Louisiana, and whose registered agent is Hward Barker, 3626 Thunderbird Road, Houma, LA 70363. (hereinafter "ASI"). At all pertinent times ASI was doing business in the State of Louisiana. ASI participated in the post-explosion Oil Spill remediation and response efforts.

28.   Defendant   ANADARKO   PETROLEUM   CORPORATION ("ANADARKO") is a Delaware corporation with its principal place of business in The Woodlands, Texas. ANADARKO is an oil and gas exploration and production company that owns 2.5% stake in the Macondo prospect lease where the Oil Spill originated.

29.   Defendant   ANADARKO   E&P   ONSHORE   LLC   f/k/a ANADARKO E&P COMPANY LP ("ANADARKO E&P") is a Delaware limited partnership with its principal place of business in The Woodlands, Texas. ANADARKO E&P is an oil and gas exploration and production company that owns a 22.5% stake in the Macondo prospect lease where the Oil Spill originated.

30.   Defendant,   MOEX   OFFSHORE   2007   LLC   ("MOEX OFFSHORE") is a Delaware corporation with its principal place of business in Houston, Texas. MOEX OFFSHORE does business in the State of Florida and/or in state and/or federal waters off the coast of Louisiana. MOEX OFFSHORE is a wholly-owned subsidiary of MOEX USA Corporation. MOEX OFFSHORE holds a 10% stake in the Macondo prospect lease where the Oil Spill originated. Its registered agent for service of

process is The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801

31.    Defendant, MOEX USA CORPORATION ("MOEX USA") is incorporated in Delaware and has its principal place of business in Houston, Texas. MOEX USA is the parent company of MOEX OFFSHORE. According to Texas Secretary of State records, the stated business purposes of MOEX USA include the direct or indirect engagement in the business of "exploration, development and production of hydrocarbons and any business related to the exploration, development and production of hydrocarbons," and the acquisition of "Hydrocarbon Interests by purchase, lease, farm-in, license, exchange or other means or methods. . . ." Its registered agent for service of process is The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801

32.    MOECO states on its website as follows: "MOEX USA Corporation, a wholly owned subsidiary of MOECO, has a 10% interest in ultra-deepwater Mississippi Canyon 252, located in the U.S. Gulf of Mexico, through its 100% owned subsidiary, MOEX OFFSHORE 2007 LLC."

33.    In a press release dated July 24, 2007, MOECO announced that it had entered into an "Acquisition and Participation Agreement with BP Exploration and Production, Inc. ... on the 29th of June 2007 to participate in an ultra-deep gas exploration project in the Gulf of Mexico ... which is being actively pursued by BP." According to the release, "MOECO decided to participate in the project based upon its evaluation of the prospect which BP's [Gulf of Mexico] technical team has conducted extensive study and research [sic]." The release also indicates that "Japan Oil, Gas and

Metals National Corporation . . . has agreed to provide equity capital finance for MOECO's share of the drilling costs payable under the Acquisition and Participation Agreement. An exploratory well is scheduled to be drilled from September 2007 by BP as the operator and as a result of the participation and such well interests in the project will be BP (75%), MOECO (15%) and other (10%)." The release concludes with MOECO indicating that its participation in the project "provides an excellent opportunity to further expand its business in the U.S." *See* www.MOECO.co.jp/english/topics/070724.html.

34.     Defendants MOEX OFFSHORE, MOEX USA, and MOECO are referred to collectively herein as "MOEX."

35.     While BP was the sole lease operator of the Deepwater Horizon, ANADARKO, ANADARKO E&P, and MOEX were considered non-operational leaseholders.

36.     As of October 1, 2009, ANADARKO owned a 2.5% stake in the Macondo prospect lease, ANADARKO E&P owned a 22.5% stake, and MOEX owned a 10% stake. According to MMS records, however, effective April 1, 2010, record title interest in the Macondo prospect was held by ANADARKO (25%), BP (65%), and MOEX (10%).

37.     As joint holders of a leasehold interest in an oil or gas lease on land beneath navigable waters, Defendants ANADARKO, ANADARKO E&P, and MOEX are jointly, severally, and solidarily liable with their codefendants BP pursuant to the Oil Pollution Act.

38.     Defendant TRANSOCEAN LTD. ("TRANSOCEAN LTD.") is a Swiss corporation that maintains substantial U. S. offices at 4 Greenway Plaza, Houston, Texas, 77046, and that at all pertinent times was doing business in the State of Louisiana and within this district.   According to its Complaint and Petition for Exoneration from or Limitation of Liability, TRANSOCEAN LTD. was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon and participated in the Deepwater Horizon's offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated

39.     Defendant     TRANSOCEAN     OFFSHORE     DEEPWATER DRILLING INC. ("TRANSOCEAN OFFSHORE") is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district.  Defendant, TRANSOCEAN OFFSHORE, is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon and participated in the Deepwater Horizon's offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated.

40.     Defendant     TRANSOCEAN     DEEPWATER     INC. ("TRANSOCEAN DEEPWATER") is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district.  Defendant, TRANSOCEAN DEEPWATER, is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon and participated in the Deepwater Horizon's offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated.

41.     Defendant TRANSOCEAN HOLDINGS LLC ("TRANSOCEAN HOLDINGS") is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district.   Defendant, TRANSOCEAN HOLDINGS is affiliated with TRANSOCEAN LTD. and is a wholly-owned subsidiary of TRANSOCEAN OFFSHORE. TRANSOCEAN HOLDINGS is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon and participated in the Deepwater Horizon's offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated. More specifically, TRANSOCEAN HOLDINGS is party to the contract with BP regarding the lease of the Deepwater Horizon for drilling operations in the Gulf of Mexico. On April 28, 2010, the U.S. Coast Guard named TRANSOCEAN HOLDINGS as a "Responsible Party" under the Oil Pollution Act for the surface oil spill resulting from the explosion aboard the Deepwater Horizon.

42.     Defendant TRITON ASSET LEASING GMBH ("TRITON") is a Swiss limited liability company with its principal place of business in Zug, Switzerland. Defendant, TRITON is affiliated with TRANSOCEAN LTD. and is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

43.     Defendants     TRANSOCEAN     LTD.,     TRANSOCEAN DEEPWATER, TRANSOCEAN OFFSHORE, TRANSOCEAN HOLDINGS, and TRITON are hereinafter referred to collectively as "TRANSOCEAN." At the Macondo site, TRANSOCEAN provided the Deepwater Horizon vessel and personnel to operate it. At all times relevant to the Oil Spill, Transocean, subject to BP's inspection and approval, was responsible for maintaining well control equipment, such as the blowout

preventer and its control systems. TRANSOCEAN also provided operational support for drilling-related activities on board the Deepwater Horizon, as well as onshore supervision and support for those drilling activities at all times relevant to the Oil Spill.

44. At all material times, Plaintiffs were ascertainable to TRANSOCEAN identities, as Plaintiffs made written presentment to TRANSOCEAN.

45. Defendant, HALLIBURTON ENERGY SERVICES, INC. is a Delaware corporation with its principal place of business in Houston, Texas. Halliburton is licensed to do and does business in the State of Louisiana. HALLIBURTON provided engineering services, materials, testing, mixing, and pumping for cementing operations on board the Deepwater Horizon, as well as onshore engineering support for those operations. HALLIBURTON was responsible for the provision of technical advice about the design, modeling, placement, and testing of the cement that was used in the Macondo well. At and before the time of the blowout, HALLIBURTON was engaged in cementing operations to isolate the hydrocarbon reservoirs and seal the bottom of the well against the influx of hydrocarbons like gas and oil.

46. Halliburton division Sperry Drilling Services (formerly Sperry Sun Drilling Services) was responsible for mudlogging personnel and equipment on the Deepwater Horizon, including downhole drilling tools. Sperry mudlogging personnel were partially responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, and pressure fluctuations. Throughout this Amended Complaint, "HALLIBURTON" shall refer to both Halliburton Energy Services, Inc. and its Sperry division.

47.     Defendant, M-I L.L.C. ("M-I") is a Delaware limited liability company with its principal place of business in Wilmington, Delaware, and that at all pertinent times was doing business in the State of Louisiana and within this district. M-I, is also known as "M-I SWACO." It supplies drilling and completion fluids and additives to oil and gas companies, providing pressure control, vessel instrumentation, and drilling waste management products and services. On the Deepwater Horizon, M-I provided mud products, including drilling fluids and spacers, engineering services, and mud supervisory personnel, such as mud engineers and drilling fluid specialists, to manage the properties of those fluids in the well. M-I employees planned and/or supervised key fluid-related activities at Macondo, such as the mud displacement that was occurring at the time of the April 20, 2010, blowout.  Personal jurisdiction over Defendant M-I is proper under one or more provisions of Fla. Stat. § 48.193 as it has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs.

48.     BP, Transocean, Halliburton, and M-I are collectively referred to herein as the "Drilling Defendants," as they were all involved in the drilling, cementing, and other temporary well abandonment activities of the Deepwater Horizon, and thus their actions caused and/or contributed to the Spill.

49.     Defendant, CAMERON INTERNATIONAL CORPORATION ("Cameron") is a Delaware corporation with its principal place of business in Houston, Texas. Cameron is registered to do and does business in the State of Louisiana and its registered agent for service of process is CT Corporation Systems 5615 Corporate Blvd., Ste. 400B, Baton Rouge, LA 70808. Cameron manufactured, designed, supplied, and/or installed the Deepwater Horizon's sub-sea emergency well-closure device known as a

blowout-preventer ("BOP"), which is, and was at all material times, an appurtenance of the vessel and a part of the vessel's equipment. The Cameron-made BOP that was installed at the Macondo wellhead failed to operate as intended at the time of the blowout on April 20, 2010, was improperly designed, was inappropriate for the intended environment or use, and/or possessed product defects.

50.    Defendant, MORAN ENVIRONMENTAL RECOVERY, LLC is a Delaware limited liability company with a domicile address of 1209 Orange Street, Wilmington, Delaware 19801 at all pertinent times registered to do and doing business in the State of Louisiana whose principal business establishment and registered office in Louisiana is located at 320 Somerulos St., Baton Rouge, Louisiana 70802-6129 and whose registered agent in Louisiana is Corporation Service Company, 320 Somerulos Street, Baton Rouge, Louisiana 70802-6129. Moran directly employed Doug Mourras as a clean up worker during September 2010.

51.    Defendant, BOOM TECHNOLOGY, INC., is a Maine corporation doing business in the States of Louisiana, Alabama, Mississippi, and Florida and/or their territorial waters, whose domicile address in Maine is 44 Sanford Dr., Gorham, Maine 04038 and whose registered agent is Steven E. Cope, PO BOX 1398, Portland ME, 04104. Boom Technology, Inc. participated in the post-explosion Oil Spill remediation and response efforts including involvement in the spraying or release of dispersant in Louisiana, Alabama, Mississippi, and Floridas' Territorial Seas and Coastal Waters. Boom Technology, Inc. employed Doug Maurras as a clean up worker from May through August 2010.

52.     Defendant, Jim Fox, is the owner of BOOM TECHNOLOGY, INC. and directs the company's marine operations. Mr. Fox employed and directed Doug Maurras.

53.     Each of these Defendants is jointly, severally, and/or solidarily liable under various principles of federal, maritime and/or applicable State tort law.

## II. JURISDICTION AND VENUE

54.     Plaintiffs incorporate by reference, *verbatim*, the allegations in Paragraphs 1 through 46, above.

55.     This Court has jurisdiction over this action pursuant to 28 U.S.C. Section 1332(a)(4), because this matter in controversy exceeds the minimum jurisdictional amount of $75,000.00, exclusive of interest and costs, and this case is between Plaintiff and citizens of a State or of different States.

56.     Jurisdiction is also proper under 28 U.S.C. Section 1331, because the claims asserted by Plaintiffs arise under the laws of the United States of America, including the laws of various states which have been declared, pursuant to 43 U.S.C., Section 1331(f)(1) and 1333(a)(2), to be the law of the United States for that portion of the outer continental shelf from which the oil spill originated.   Federal question jurisdiction under 28 U.S.C. §1331 also exists by virtue of Plaintiff's claims brought herein which arise under the Oil Pollution Act of 1990.

57.     In addition, this Court has jurisdiction over this action pursuant to the Oil Pollution Act, 33 U.S.C. §2717(b) (the "OPA").

58.     Pleading in the alternative, jurisdiction also exists over this action pursuant to The Admiralty Extension Act, 46 U.S.C., §30101, which extends the

admiralty and maritime jurisdiction of the United States to cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land.

59. Venue is also proper pursuant to the OPA, 33 U.S.C. 2717 (b), as the discharge occurred in this district. In addition, venue is proper pursuant to this Court's Pretrial Order No. 20, which allows plaintiffs to directly file their complaints arising out of the Spill in this District.

### III. FACTUAL ALLEGATIONS

60. These cases arise from the April 20, 2010, loss of control of the Macondo well that was being drilled by the Deepwater Horizon drilling vessel and the related explosions on that vessel which caused it to sink and resulted in the discharge of significant amounts of oil that spread throughout the Gulf of Mexico over a period of more than three months. They also arise due to subsequent additional negligent acts and failure of reasonable care which occurred in Gulf of Mexico's territorial waters.

61. At all times relevant to this action, the Deepwater Horizon, an ultra-deep water semi-submersible drilling rig, was leased to BP. At the time of its explosion on April 20, 2010, the Deepwater Horizon was being operated by BP for the purposes of drilling an exploratory well at the Macondo prospect on Mississippi Canyon Block 252 on the Outer Continental Shelf.

62. The Macondo prospect was being explored pursuant to a ten-year lease, OCS-G32306, granted by the Minerals Management Services on June 1, 2008, and owned at the time of the explosion by BP. The lease allowed BP to drill for hydrocarbons and perform oil production-related operations in the Mississippi Canyon

Block 252 area which includes the Macondo prospect.  BP was designated the lease operator.

## THE BLOWOUT

63.     At approximately 10 p.m. on April 20, 2010, following cementing operations aboard the vessel Deepwater Horizon, workers were finishing drilling operations for the Macondo well and displacing the drilling mud in the marine riser at the direction of BP in preparation for completion pursuant to BP's design, when they encountered an uncontrolled influx of highly pressurized hydrocarbons into the wellbore leading to a "blowout" or loss of control of the well.

64.     The combustible gas flowing uncontrolled into the wellbore traveled quickly up to the rig floor where it was ignited leading to a fiery explosion on the Deepwater Horizon.

65.     Defendant, BP was unable to regain control of the well and the fiery explosions onboard the Deepwater Horizon caused the vessel to be destroyed and sink to the bottom of the Gulf of Mexico.

66.     BP did not follow safe procedures, in order to save money, by electing to utilize a risky well design that provided for fewer barriers against hydrocarbon influx into the wellbore relative to well designs typically used in an unknown and troublesome formation like the Macondo prospect.

67.     Due to the depth of the Macondo well, BP was also negligent in the selection of a casing material that was vulnerable to collapse under high pressure. BP's negligence in well design and casing selection allowed for an increase risk of a blowout.  BP knew or should have known of those risks but chose risk over increased

costs.

68.     In addition to the casing-related problems, the float collar installed on the final section of casing likely failed to seal properly, which may have allowed hydrocarbons to leak into the casing, contributing to the April 20, 2010 blowout.

69.     A float collar is a component installed near the bottom of the casing string on which cement plugs land during the cementing job.

70.     Upon information and belief BP was negligent in operations to install the float collar and/or in neglecting warning signs of a potentially improper installation of the float collar.

71.     BP was negligent in preparing the wellbore for cementing operations which led to an increased likelihood that the cement job would fail and a blowout would occur.

72.     BP was negligent in electing to utilize an unsafe cement job design that was unlikely to create a secure barrier against hydrocarbon influxes into the Macondo wellbore.

73.     BP was negligent in the selection of an improper cement mixture that was susceptible to failure under the high pressures and temperatures typical in the Macondo well.

74.     Negligent cementing operations failed to isolate the well bore from hydrocarbon zones and seal the bottom of the well against an influx of gas.  BP was negligent in failing to identify this bad cement job ignoring numerous warning signs in the process.

75.     Upon information and belief, the defective cement job allowed a

pathway for highly pressured gas to enter the Macondo wellbore and travel rapidly from there to the rig floor.

76.    BP was negligent in the monitoring and design of the drilling mud program which failed to prevent hydrocarbons from flowing into the wellbore and up to the Deepwater Horizon.

77.    BP was negligent in the decision and design to displace the drilling mud from the marine riser before allowing time for the cement to fully set.

78.    BP was also negligent in conducting and monitoring the displacement operations, failing to recognize the many signs of trouble.

79.    BP was negligent in failing to utilize a casing hanger lockdown sleeve that would have stopped the hydrocarbons from escaping past the wellhead and reaching the rig floor.

80.    BP was negligent in failing to timely identify that hydrocarbons were entering the wellbore during displacement operations and in failing to initiate well control measures.

81.    After hydrocarbons reached the rig floor, the Blowout Preventers (BOP's) for the Deepwater Horizon, failed to activate as designed to prevent the continued uncontrolled flow of gas from the formation.

82.    The BOP utilized by BP was defective and unreasonably dangerous in their manufacture, design, and/or composition, and/or failed to contain adequate warnings and instructions.

83.    BP failed to ensure that the BOP design used on Deepwater Horizon was sufficient for the drilling conditions and program expected at the Macondo

site.

84.     BP was negligent in failing to properly maintain the BOP's for the Deepwater Horizon in accordance with safe practices and federal regulations.

85.     BP failed to ensure that the BOP's possessed the necessary technology to properly function including adequate safeguards and redundant systems to prevent blowouts.

86.     BP failed to ensure that the BOP's and all related systems were properly tested to operational conditions and confirmed to be in good working order.

87.     BP was negligent in failing to properly utilize and maintain emergency systems and equipment on board the Deepwater Horizon or to supervise and/or inspect to assure same.

88.     Defendants' negligent actions and/or omissions caused the blowout of the Macondo well leading to the destruction and sinking of the Deepwater Horizon and subsequent uncontrolled discharge of oil into the Gulf of Mexico.

### Uncontrolled Discharge of Oil into the Gulf and Environmental Implications

After the sinking of the Deepwater Horizon, the well began to release, leak, and/or discharge oil directly into the Gulf of Mexico due to the failure of the well's cement and/or casing and the concurrent failure of the blow-out preventors.

1.     Defendant, BP, recklessly, willfully and/or wantonly failed to ensure that oil would be quickly and fully contained within the immediate vicinity of the Macondo well in the event of a blowout.

2.     The well discharged an estimated 50,000 to 100,000 barrels of oil into the Gulf of

Mexico on a daily basis for at least 87 days.

3.      The United States government has estimated that approximately 5,000,000 barrels (210,000,000 gallons) of oil gushed into the Gulf of Mexico during the months that the well was uncontained with others estimating that the well discharged upwards of 7,000,000 barrels.

4.      Defendant, BP, willfully and/or wantonly failed to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled discharge from the Macondo well into the Gulf of Mexico and to prevent injuring Plaintiffs.

5.      This massive release of oil contaminated thousands of square miles of waters in the Gulf as the well flowed uncontained for three months resulting in the ban of recreational and commercial fishing by the government in many areas during that time period.

6.      The oil discharged into the Gulf of Mexico from the Macondo well contained hydrocarbon molecules, carcinogens and other toxic pollutants including heavy metals which are extremely hazardous to the marine ecosystem in the Gulf of Mexico including into the environment where Plaintiffs work, live and enjoy the recreational activities of swimming, fishing and boating.

7.      After the explosions, BP attempted to downplay and conceal the severity of the Oil Spill.  Government investigators have found BP's initial leak estimate of 1,000 barrels a per day to be a fraction of its measured leakage amount, which in fact exceeded 50,000 barrels per day.  Additionally, an internal BP document from around the time of the spill shows that the company's own analysis had

actually estimated that the rate of oil spillage could reach 100,000 barrels, or 4,200,000 gallons, per day.

8.      Each day during the course of the Oil Spill, tens of thousands of barrels of crude oil gushed from the wellhead and broken riser, bubbling up to the surface and flattening out inot a widening slick of oil, as well as spreading out in vast subsurface plumes.  On the surface, the shifting mass was large enough to be visible from outer spaces, at times covering tens of thousands of square miles, spreading with the wind and currents towards the Gulf States' coastlines.

9.      Beginning on or about April 30, 2010, oil made landfall along the Gulf Coast on white sand beaches, leased and privately owned subsurface areas, and in ecologically sensitive marshes and estuaries.  Underwater, immense plumes of oil and dispersant chemicals swirled through the entire water column, damaging ecosystems throughout the Gulf of Mexico.

10.     The oil spewed from the well of twelve weeks until BP finally capped the well on July 15, 2010.  Ultimately, almost five million barrels (210 million gallons) of crude oil spilled in the Gulf of Mexico.

11.     The crude oil carried with it significant public health risks.  Crude oil has many highly toxic chemical ingredients that can damage every system in the body.

12.     Crude oil contains benzene and other volatile organic compounds ("VOCs") such as ethylbenzene, toluene, xylene and napththalene, polycyclic aromatic hydrocarbons ("PAHs"), diesel fumes and heavy metals such as aluminum, cadmium, nickel, lead and zonc, all of which can harm human health.

13.     Chemicals such as benzene, PAHs and many other chemicals in crude oil are

toxic and volatile, moving from the oil to the air.  Once airborne, they can blow over the ocean for miles, reaching communities far from the spill.  They may be noticed as petroleum odors.

14.     Dermal exposure to certain VOCs in crude oil can cause, *inter alia*, redness, swelling, irritation, rashes and blisters on the skin and mucous membranes. Inhalation exposure to certain VOCs in crude oil can cause, *inter alia*, coughing, throat irritation, congestion, shortness of breath and wheezing.  Inhalation exposure to other OVCs in crude oil can also affect, *inter alia*, the nervous system causing, among other things, nausea, vomiting, dizziness, irritability, confusion, and weakness of extremities.  Ingestion of food or water containing VOCs from crude oil can cause, *inter alia*, nausea, vomiting and diarrhea.

15.     According to the Agency for Toxic Substances and Disease Registry ("ASTDR"), which is part of the U.S. Department of Health and Human Services, benzene is a knwn mutagen and carcinogen.  Benzene in crude oil can cause a variety of health complications, including ventricular fibrillation, congestive gastritis, toxic gastritis, pyloric stenosis, myalgia, kidney damage, skin irritation and burns, swelling and edema, vascular congestion in the brain and lethal central nervous system depression.

16.     A 2007 Centers for Disease Control review of benzene toxicity concluded that there is substantial evidence that benzene causes leukemia, aplastic anemia ( precursor of leukemia), chromosomal abnormalities in lymphocyctes and bone marrow cells, damage to the immune system, and abnormal development of blood cells.  Long-term low-level oral and inhalation exposures to benzene have also

caused peripheral nervous system abnormalities, distal neuropathy, difficulty sleeping and memory loss.

17. As noted by Dr. Lisa Kaplowitz of the U.S. Department of Health and Human Services in her June 15, 2010 testimony before Congress: "Oil can remain toxic in the environment for years."

18. THE OPA imposes liability upon a "responsible party for a …facility from which oil is discharged …into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs.   33 U.S.C. §2702.

19. The U.S. Coast Guard is responsible for implementing many aspects of the OPA, including designating responsible parties, as well as responding to oil spills and supervising and/or coordinating response actions.

20. After the Oil Spill, the Coast Guard formally and/or informally designated, *inter alia*, Defendants BP Exploration and Transocean Holdings as "responsible parties" under the OPA.

21. In the wake of the disaster, and pursuant to its duties as a responsible party under the OPA, BP began implementing a program to attempt to prevent the gushing oil from reaching the shores of the Gulf States.  This disaster response plan had three primary components: offshore containment; shoreline protection; and subsea response.

22. As part of its offshore containment response program, BP directed the use of vessels to, *inter alia*, recover coming to the surface of the Gulf of Mexico; skim oil from the surface of the water; and conduct *in-situ* burning of oil that reached

the surface of the water.  BP also employed vessels to tow and deploy booms –
floating barriers intended to contain, deflect, or hold back oil floating in the
water's surface.

23.     In addition, BP's response plan included the use of chemical dispersants that were
intended to break down the oil into finely dispersed droplets.

24.     Dispersants generally contain a solvent, a surfactant and other additives that break
up the surface tension of an oil slick or sheen to make the oil more soluble in
water.

25.     Among other dispersants, BP applied a highly toxic form of chemical dispersant
called Corexit.  BP used both Corexit®9500 and Corexit®EC9527A.

26.     The Material Safety Data Sheet ("Data Sheet") – a form that sets forth the
properties of a particular substance, including its toxicity and health effects – for
Corexit®9500 indicates that it contains hazardous substances, that it is harmful to
human health, and that dermal exposure, inhalation and ingestion should be
avoided.  The Data Sheet further states that Corexit® 9500 is an eye and skin
irritant and may irritate the respiratory tract if inhaled.  If ingested, it may cause
chemical pneumonia.

27.     The Data Sheet for Corexit ® EC9527A also indicates that it contains hazardous
substances, it is harmful to human health, and that dermal exposure , inhalation
and ingestion should be avoided.  The Data Sheet further states that Corexit®
EC9527A is an eye and skin irritant and, if inhaled, may irritate the respiratory
tract.  If ingested, it may cause liver and kidney effects and/or damage, or irritate
the gastrointestinal tract.  Acute exposure may cause adverse central nervous

system effects, nausea, vomiting, anesthetic or narcotic effects.

28.     In addition, Corexit ® EC9527A contains 2-butoxyethanol, also known as EGBE.
Repeated or excessive exposure to EGBE may cause injury to red blood cells, the
kidneys, and the liver.  EGBE may be carcinogenic to humans.  It is an eye, nose,
and throat irritant.  It can cause nausea, vomiting, diarrhea, and abdominal pain.
Exposure to EGBE can also cause headaches, dizziness, lightheadedness and
unconsciousness.  Exposure to EGBE can damage a developing fetus, and chronic
exposure may result in damage to male and female reproductive systems in
animals.

29.     Both of these Corexit® products also contain non-specified organic sulfonic acid
salt, which is "moderately toxic," as well as propylene glycol, a chemical with
solvent properties.  Propylene glycol is an irritant and exposure to high levels of
propylene glycol and mists containing this chemical can cause eye, nose, throat
and lung irritation.  Some individuals are allergic to propylene glycol and those
with eczema may be at higher risk.  Exposure may cause erythema, edema,
induration, and other skin problems.

30.     Upon information and belief, BP also authorized the application of other chemical
dispersants, including PES51™ and OMI-500®, to near-shore and on-shore areas,
as well as to contaminated vessels and containment equipment, to disperse the oil
and clean vessels and equipment.

31.     The Data Sheet for PES51™ indicates that it should be handled with gloves, that
it is an irritant, and that dermal exposure and ingestion should be avoided.

32.     The Data Sheet for OMI-500® indicates that it is harmful to human health and

that dermal exposure, inhalation, and ingestion should be avoided. Among other effects, OMI-500® can be irritating to skin and eyes and may cause irritation of the respiratory tract, typically experienced as nasal discomfort and discharge, possibly with chest pain and coughing. Headache, nausea, vomiting, dizziness, and drowsiness may occur. Exposure may also cause mild to severe irritation experienced as discomfort or pain, excess blinking and tear production, possibly with marked redness and swelling of the conjunctiva.

33. In summary, the dispersants used by BP are known to cause, *inter alia*, headaches; nausea; vomiting; diarrhea; abdominal pains; dizziness; chest pains and tightness; irritation of the skin, eyes, nose, throat and lung; breathing difficulties and respiratory system damage; asthma attacks; hypertension; damage to the liver and kidneys; central nervous system depression; neurotoxic effects; damage to red blood cells; genetic damage and mutations; reproductive and developmental damage; immune system damage; cardiac arrhythmia; cardiovascular damage; and increased severity of chronic obstructive pulmonary disease.

34. Upon information and belief, immediately after the Deepwater Horizon disaster, on or about April 23, 2010, BP began subsea and aerial application of chemical dispersants to the resulting oil slick and sheens on the surface of the Gulf. Chemical dispersants have been sprayed onto the ocean surface from aircraft that fly over spills and dispense the chemicals from cargo holds, sprayed onto the ocean surface from fountain-type jets on the docks of boats, sprayed from smaller vessels onto the surface of the water, injected immediately below the surface of

the water from vessels, injected deep below the surface of the ocean, and sprayed by hand.

35.    BP coordinated and directed aircraft owned and/or operated by others to fly out over the Gulf to spot oil slicks and to spray chemical dispersants on the surface of the Gulf.

36.    According to the Aerial Dispersants Operations -- Houma Status Report, as of June 26, 2010, BP made use of at least 10 spray aircraft and 8 spotter aircraft.  At least four spray planes left from Houma, Louisiana.  At least six spray planes left from Stennis International Airport in Mississippi.  Upon information and belief, aerial dispersant sorties also would leave from airfields in the Gulf of Mexico and were conducted and orchestrated by BP.

37.    On or about May 19, 2010, the U.S. Environmental Protection Agency ("EPA") Administrator directed BP to identify and begin using chemical dispersants less toxic than Corexit®.

38.    In addition to the oil that was released by BP's Macondo well, BP directed over two million gallons of chemical dispersants to be sprayed, injected or otherwise released into Gulf waters.  BP had injected at least 770,000 gallons of chemical dispersants directly into the damaged wellhead and otherwise directed its contractors to apply considerable amounts of chemical dispersants directly into the Gulf of Mexico.

39.    On or about May 19, 2010, the U.S. Environmental Protection Agency (EPA) Administrator directed BP within 24 hours of issuance to identify and to change to chemical dispersants that are less toxic than those dispersants that BP had been

using, including Corexit®.  BP refused to comply and continued using dispersants of its choice.

40.     On May 20, 2010, BP objected to this order and notified the EPA that it would continue using Corexit®.

41.     BP's use of chemical dispersants then skyrocketed: on May 22, 2010, BP used 45,000 gallons of dispersant and on May 23, 2010, it used 70,000 gallons of dispersant.

42.     Upon information and belief, BP stopped using Nalco's Corexit® 9527 on May 23, 2010, when supplies allegedly ran out.  It relied on Corexit® 9500 thereafter.

43.     On May 26, 2010, the EPA directed BP to reduce the overall use of Corexit® by 75% and to stop using chemical dispersants on the water's surface except in rare cases where an exemption was sought in writing from and approved by the On Site Coordinator.

44.     BP thereafter sought more than 40 exemption requests to use chemical dispersants on the surface of the Gulf of Mexico.  According to the Aerial Dispersants Operations -- Houma Status Report, by June 26, 2010, BP had applied 933,023 gallons of dispersant by aerial application.  As of the same date, BP had ordered application of dispersant by 386 flights, or sorties, and had covered approximately 291 square miles of the Gulf with dispersant.

45.     To date, BP and its contractors have used more than 1.8 million gallons of chemical dispersants in the Gulf of Mexico.

46.     Defendant BP recklessly, willfully and/or wantonly failed to use ordinary care by electing to use chemical dispersants that are more toxic than others in the

response efforts and thereby amplified the toxic effects on and damages of cleanup workers, tourists, and residents including the Plaintiffs named herein.

## DEFENDANTS' KNOWLEDGE OF THE RISKS

89.     OSHA, which promulgates regulations to protect worker safety in certain contexts, including hazardous waste activities and emergency responses, alerted the Coast Guard about its concerns over significant deficiencies in BP's Oil Spill response operations relating to worker safety. OSHA repeatedly raised these concerns with BP as early as May 2010, but remained frustrated that BP did not address the most serious problems.

90.     Commercial fishing vessels and other vessels that make up the majority of the volunteer response vessels are not otherwise subject to inspection by the Coast Guard, and the captains and crew are not customarily trained to recognize or to avoid health hazards in the context of an oil spill. Using these types of vessels is not unknown in response efforts, but OSHA training is required to properly assess and to avoid risks.

91.     Uninspected fishing vessels being used in response actions without training and inspection subjects the captains and crews to exposure to harmful chemicals found in crude oil and chemical dispersants.

92.     BP and the Dispersant Defendants, aware of the risks that fishing vessels would face, ignored worker safety concerns, even in the face of OSHA warnings and notification by the Department of Health and Human Services that vessels and clean-up workers were complaining of illnesses after being exposed to oil and dispersants.

93.     At all times relevant to this litigation, Defendants knew or should have known that:

a.)     Crude oil contains chemicals hazardous to human health and to the environment and ecosystems;

b.)     chemical dispersants contain chemicals hazardous to human health and to the environment and ecosystems;

c.)     Plaintiffs should have been adequately and timely warned of the harmful effects of crude oil and chemical dispersants, and the hazardous substances which they contain, which are being released into the environment; and

d.)     Plaintiffs should have been provided with proper protective clothing and respirators.

### Factual Allegations of Clean-Up and Response Workers: Doug Maurras

94.     BP hired clean-up and response contractors, including defendants, BOOM TECHNOLOGY, INC. AND MORAN ENVIRONMENTAL  to clean up beaches, marshes, wetlands and other onshore areas.   Clean-up workers' primary tasks were to, *inter alia*, lay and haul oil containment boom, install other barriers, collect tar balls, remove polluted sand contaminated with oil and/or dispersants, assist with *in-situ* burning, spray and clean vessels that came into contact with oil, dispersants, and other harmful chemicals resulting from the Oil Spill, decontaminate oiled wildlife, and transport contaminated boom and other clean-up equipment and other Clean-up Workers. Response workers were also hired as part of the Vessels of Opportunity Program and other offshore cleanup and response efforts.   While offshore response workers worked

and often lived aboard vessels engaged in oil-skimming and boom retrieval, containment and deployment activities, oil burning activities, and location of oil slicks.

95.     As part of these efforts, clean-up workers and response workers, including Plaintiff Doug Maurras, came into contact with crude oil, chemical dispersants and oil/chemical mixtures. Even more disturbing, BP's aerial spray planes negligently and/or intentionally sprayed chemical dispersants on the water despite the presence of boats and crew in the vicinity of the spraying. Upon information and belief, Plaintiff, Doug Maurras, was in the vicinity when BP sprayed chemical dispersants from airplanes.

96.     Upon information and belief, Plaintiff, Doug Maurras, was not outfitted with respirators or equivalent safety devices. Some attempted to use respirators while working, but BP and other Defendants prevented them from doing so and threatened them with loss of their clean-up jobs if they did not abide by the instruction.

97.     Plaintiff, Doug Maurras, working as a clean-up and offshore response worker was exposed to oil and dispersants by, *inter alia*, inhalation, ingestion, dermal exposure, and through contact with the eyes from spray mist. Many of the chemicals in crude oil and the dispersants to which Plaintiff was exposed target the organs in the human body, and this increases the risk and may also increase the severity of harm. The dispersants that were used also can increase the uptake or dose of crude oil chemicals and movement of chemicals into critical organs. Moreover, the odors emanating from the oil and/or the dispersants are foul, and the fumes are harmful.

98.     The negative health effects caused by exposure to oil, dispersants, and/or some mixture of the two are varied and can cause a wide range of diseases and

conditions.   Some of these diseases, conditions, and symptoms may be evident immediately or within several days, and others can appear months or years later.

### Factual Allegations Regarding Coastal Resident and Tourist Plaintiffs: Chris Albert Martin, Jeffrey Vaughan, Steven and Stephane, The Wynne Family and Rachel Maneen

99.     In the wake of the disaster, BP began implementing a program to attempt to prevent the gushing oil from reaching the shores of the Gulf States. This disaster response plan had three primary components: subsea response; offshore containment; and shoreline protection.

100.     BP's response to its self-created disaster included the use of chemical dispersants that were intended to break down the oil into finely dispersed droplets. Dispersants generally contain a solvent, a surfactant and other additives that break up the surface tension of an oil slick or sheen to make the oil more soluble in water.

101.     Chemical dispersants have been sprayed onto the ocean surface from aircraft that fly over spills and dispense the chemicals from cargo holds, sprayed onto the ocean surface from fountain-type jets on the decks of boats, sprayed from smaller vessels onto the surface of the water, injected immediately below the surface of the water from vessels, injected deep below the surface of the ocean, and sprayed by hand.

102.     BP and its contractors have used more than 1.8 million gallons of chemical dispersants in the Gulf of Mexico in connection with the Oil Spill.

103.     Tarballs, tar-mats and oil slicks containing crude oil and chemical dispersants reached beaches, waterways, marshes, and bays where Resident and Tourist Plaintiffs were living and visiting. Based upon information and belief, Plaintiffs were

exposed to crude oil and chemical dispersants in their environment through recreational activities in the Gulf of Mexico.

104.    Based upon information and belief, Resident and Tourist Plaintiffs were also exposed to fumes from the oil spill and oil spill response activities – including fumes from BP's burning of oil slicks as a response measure.

105.    Resident Plaintiffs, due to the proximity of their homes and schools to the Gulf of Mexico, and the actions and omission by Defendants, have been exposed to oil, dispersants, and other harmful chemicals.

106.    Resident Plaintiffs live and/or work in close proximity to areas that are the subject of Defendants' remedial activities. Due to their physical location, Resident Plaintiffs are subjected to fumes and odors from the oil and dispersants.

107.    Exposure to chemicals in crude oil and chemical dispersants can cause a wide range of health problems. Crude oil has many highly toxic chemical ingredients that can damage every system in the body. Dispersant chemicals can affect many of the same organs. These include: respiratory system, nervous system (including the brain), liver, reproductive/urogenital system, kidneys, endocrine system, circulatory system, gastrointestinal system, immune system, sensory systems, usculoskeletal system, hematopoietic system (blood forming), skin and integumentary system and disruption of normal metabolism.

108.    Damage to these systems can cause a wide range of diseases and conditions. Some of these diseases and conditions may be immediately evident, and others can appear months or years later. The chemicals can impair normal growth and development through a variety of mechanisms, including endocrine disruption and direct fetal damage.

They can cause mutations that may lead to cancer and multi-generational birth defects. Some of the chemicals are known carcinogens, such as benzene.

109.    Many of the chemicals in crude oil and the dispersants target the same organs in the human body, and this increases the risk and may also increase the severity of harm. In addition, the dispersants currently used can increase the uptake (dose) of crude oil chemicals and movement of chemicals into critical organs.

## IV. DAMAGES AND OTHER RELIEF REQUESTED

110.    As a result of Defendants' acts or omissions, Plaintiffs have suffered the following physical injury damages:

a.)    Exposure to chemicals in crude oil that have caused , or will likely cause, adverse health  effects;

b.)    Exposure to chemicals in weathered crude that have caused, or will cause, adverse health effects;

c.)    Exposure to chemicals in dispersants that have caused, or will likely cause, adverse health effects;

d.)    Exposure to chemicals in oil and dispersant mixtures that have caused, or will likely cause, adverse health effects; and

e.)    Costs incurred and inconvenience sustained by obtaining medical treatment for exposure to chemicals in the past and in the future.

111.    Plaintiffs have suffered a discernible physical injury from exposure to oil, dispersants, and/or oil and dispersant mixtures.

112.    Plaintiffs also demand injunctive and equitable relief and further, that Defendants be ordered to provide continued environmental, water supply, food

supply, and air monitoring for Plaintiffs.

113.   As a result of Defendants' acts or omissions, Plaintiffs have suffered emotional distress caused by concern over exposure to chemicals and their physical health effects.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### Claims Under General Maritime Law

### NEGLIGENCE, GROSS NEGLIGENCE AND WILLFUL MISCONDUCT OF BP

### *COUNT I*

114.   Plaintiffs reallege and reaver each and every allegation set forth in all preceding paragraphs as fully set forth herein and further state:

115.   BP owed and breached duties of reasonable care to ensure the safety of their operations and guard against and prevent the risk of a blowout an oil spill and its effects in the Gulf of Mexico and the coastal regions.

116.   BP owed and breached duties of ordinary and reasonable care with respect to the design and manufacture of the BOP and float collar used on the Macondo well.

117.   BP was injecting its dispersants at the wellhead and breached a duty of ordinary and reasonable care with respect to the design, manufacture and use of the chemical dispersants.

118.   At all times BP controlled and directed the response and recovery efforts and failed to exercise reasonable care in the operation, design, implementation and execution of the response efforts, including the injection of dispersants at the wellhead.

Additionally, as the chemicals entered Gulf of Mexico territorial waters, BP owed a duty, and failed the duty, to exercise reasonable care in response efforts, including timely mitigating of the damage caused and stopping the spread of the oil onto and around Gulf of Mexico waters, shores and properties and where plaintiffs were working, living and swimming.

119. Defendant BP recklessly, willfully and/or wantonly failed to use reasonably safe chemical dispersants in reasonably safe locations and quantities in response efforts and thereby exacerbated the contamination in the Gulf of Mexico and resulting injury to Plaintiffs.

120. The incidents described above that caused damage to Plaintiffs, were a proximate result of the negligence, fault, gross negligence, and/or willful misconduct of BP through their agents, servants, employees, contractors and other persons or entities for whose conduct Defendant is responsible, which are more particularly described as follows:

a. Failing to operate the Deepwater Horizon in a safe manner;

b. Operating the Deepwater Horizon in such a manner that a fire and explosion occurred onboard, causing it to sink and resulting in an oil spill;

c. Failing to properly inspect the Deepwater Horizon to assure that its equipment and personnel were fit for their intended purpose;

d. Failing to promulgate, implement, and enforce rules and regulations pertaining to the safe operations of the Deepwater

Horizon, which, if they had been promulgated, implemented, and enforced, would have averted the fire, explosion, sinking, and oil spill;

e. Failing to adhere to applicable safety, construction, and/or operating regulations, including, but not limited to, regulations designed to prevent the fire, explosion, and discharge of oil;

f. Failing to properly design and/or engineer the well, drilling program, cementing program, mud program and completion program;

g. Failing to take appropriate action to avoid or mitigate the accident;

h. Negligent implementation of policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

i. Failing to properly train their employees;

j. Failing to ascertain that the Deepwater Horizon and its equipment were free from defects and/or in proper working order;

k. Failing to timely warn; Failing to provide respiratory and dermal protective gear to Plaintiffs;

l. Failing to provide all reasonable cooperation and assistance requested by the responsible officials in connection with the clean-up and removal activities;

m. Failing to ensure that adequate plans, equipment, safeguards, resources and technology were readily available to prevent and/or mitigate the effects of the loss of control of a well and unfettered discharge of oil into the Gulf of Mexico;

n. Failing to timely bring the oil release under control, to prevent the spill from migrating throughout the Gulf of Mexico;

o. Failing to provide appropriate accident prevention equipment;

p. Failing to ensure that the casing and float collar were properly designed and installed;

q. Providing BOP's that failed to properly function;

r. Failing to ensure that BOP's would work as intended;

s. Failing to test the BOP's to ensure that they would operate properly;

t. Recklessly altering the BOP's and failing to use them in a safe manner;

u. Failing to conduct well cementing operations properly;

v. Failing to employ alternative cementing operations in light of known problems with the actual cementing operations employed;

w. Failing to have a reasonably adequate well control plan and necessary equipment in case of a loss of the well;

x.   Failing to exercise reasonable care in the design and implementation of both well control efforts and response and recovery efforts;

y.   Failing to insure that adequate plans, equipment, safeguards resources, and technology were available to prevent or mitigate the quantity of hazardous chemicals that would enter into and effect Gulf of Mexico territorial waters and Gulf Coast Region real property.

z.   Recklessly using dispersants so as to cause the greatest migration and widest potential for environmental toxic exposures and effects throughout the Gulf including Gulf Coast Region territorial waters and real property.

aa.  Failing to close or failing to advise local authorities to close beaches and Gulf waters where Plaintiffs swam and participated in recreational activities.

bb.  Failing to post warnings at beaches and adjacent to Gulf coast waters regarding the dangers of swimming, , or participating in recreational activities in or around the Gulf of Mexico at the time of the Oil Spill disaster.

cc.  Failing to adequately monitor the air and Gulf water in Plaintiffs' vicinity for the presence of chemical dispersants and crude oil.

dd. Failing to provide warnings to local hotels and lodging facilities regarding the potential negative health effects of swimming of in the Gulf of Mexico.

121.   Defendants were aware at all times relevant hereto that their operations and the acts and/or omissions described above created an unreasonable risk of harm and knew that catastrophic environmental destruction and economic loss would occur if the well being serviced by the DEEPWATER HORIZON were to blow out.

122.   Defendants were indifferent to this risk of harm.   Defendants intentionally failed to perform the duties owed to Plaintiffs in reckless disregard of the consequences their actions and/or omissions would have on Plaintiffs.

123.   Moreover, Defendants acted intentionally with knowledge that their acts would probably result in injury or in such a way as to allow an inference of a reckless disregard of the probable consequences of their acts.   Therefore, Defendants are also liable to Plaintiffs for gross negligence and/or willful misconduct.

124.   Plaintiffs have suffered and will continue to suffer significant economic damages and loss of business due to the impacts and the stigma caused by the impacts, on the marine environment, fish and shellfish populations, as well as to the Gulf waters from the oil spill disaster and related response efforts.

125.   The oil spill and subsequent response and recovery efforts that have caused damage and continue to cause damage to Plaintiffs was proximately caused by Defendants' negligence, gross negligence and/or willful misconduct.

126.    Further, upon information and belief, the oil spill was proximately caused by the Defendants' violation of applicable federal safety, construction, or operating regulations and/or by violations of such regulations by an agent or employee of the Defendants and/or a person acting pursuant to a contractual relationship with Defendants.

127.    Defendants had a duty to conform their conduct in such a manner as to assure that a blowout would not occur, that the Deepwater Horizon would not be destroyed and sink, that an uncontrolled oil spill would not result and that adequate well control and response measures would exist in case of emergency pursuant to federal and State law.

128.    Defendants failed to conform their conduct to the appropriate legal standard, thereby breaching their duty to assure that a blowout would not occur, that the Deepwater Horizon would not be destroyed and sink, that an uncontrolled oil spill would not result and that adequate well control and response measures would exist and be properly implemented in case of emergency pursuant to federal and State law.

129.    Defendants' substandard conduct in failing to prevent the blowout, the ensuing destruction and sinking of the Deepwater Horizon, and the uncontrolled discharge of oil from the Macondo well into the Gulf of Mexico pursuant to federal and State law was the cause-in-fact of the injuries, harm, and damages suffered by the Plaintiffs.

130.    Defendants' substandard conduct in failing to prevent and/or contain the blowout that resulted in the sinking of the Deepwater Horizon and the

subsequent oil spill from the Macondo well was the legal cause of the Plaintiffs' injuries, harm, and damage.

131.   In addition, and/or in the alternative, the blowout, fire, explosion, destruction of the Deepwater Horizon and ensuing oil spill were caused by defective equipment and would have been prevented by non-defective equipment, including the BOP and float collar, which were in the care, custody, and control of the Defendants and over which the Defendants had *garde*. Defendants knew or should have known of these defects and Defendants are therefore liable for the defects.

132.   BP has taken responsibility for the oil spill and cleaning up the oil spill, as former BP Chief Executive, Tony Hayward, had issued a statement on the BP website that BP is "… taking full responsibility for the spill and we will clean it up." BP has therefore admitted its liability for the oil spill.

133.   BP's duties are non-delegable.

134.   It was foreseeable that the Defendants' actions and/or omissions, resulting in the blowout of the Macondo well, the sinking and destruction of the Deepwater horizon, and the ensuing uncontrolled oil spill from the Macondo well, would proximately cause the damage, injury, and harm that Plaintiffs did suffer and will continue to suffer, as alleged herein.

135.   The injuries to the Plaintiffs were also caused by or aggravated by the fact that Defendants failed to take reasonably necessary actions to mitigate the dangers associated with their operations.

136.   As a direct and proximate result of the Defendants' negligence and gross negligence, Plaintiffs have each suffered and will continue to suffer significant

46

physical, economic and other damages in excess of $75,000.00 and are entitled to recover monetary damages.

137.    The existence and breach of Defendants' legal duties are established under general maritime law.

138.    At all times material hereto, Defendants owed duties of ordinary and reasonable care to Plaintiffs in connection with the drilling operations and maintenance of the Deepwater Horizon, including its appurtenances and equipment. BO additionally owed duties to guard against and/or prevent the risk of an oil spill and to mitigate the harm if an oil spill did occur.

139.    Further, BP owed a duty to Plaintiffs to exercise due care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.

140.    BP had a heightened duty of care to Plaintiffs because of the great danger associated with exposure to oil, dispersants, and/or other hazardous chemicals.

141.    At all times relevant to this litigation, BP and the other defendants knew or should have known that: (a) crude oil contains chemicals hazardous to human health; (b) chemical dispersants contain chemicals hazardous to human health; (c) Plaintiffs were entitled to adequate and timely warning of the harmful effects of exposure to crude oil and chemical dispersants and the hazardous substances that crude oil and dispersants contain; and (d) Plaintiff should have been provided proper protective clothing and respirators when engaged in Oil Spill clean-up and response activities; and (d) failure to exercise reasonable care in the operation, maintenance, handling, design,

implementation and execution of the relief and recovery measures would result in harm to Plaintiffs.

142. BP breached its duty of care to the Plaintiffs in the following non-exclusive respects:

a) failing to prevent the explosion on board the Deepwater Horizon;

b) failing to cap the Macondo well in a timely manner;

c) failing to warn Plaintiffs, public officials, and government agencies of the harmful effects of crude oil, chemical dispersants and any mixture thereof, and the hazardous chemicals they contain;

d)failing to properly train and equip cleanup and response workers to avoid exposure to hazardous substances encountered in connection with relief efforts;

e) failing to conform to the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and shallow waters;

f) failing to coordinate and conduct aerial spraying sorties in a manner so as to eliminate the risk of vessels and crewmembers including Plaintiffs being exposed to aerial chemical dispersants; and

g) failing to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures;

h) failing to operate the Deepwater Horizon in a safe manner;

i) operating the Deepwater Horizon in such a manner that a fire and explosion occurred onboard, causing it to sink and resulting in an oil spill;

j) failing to properly inspect the Deepwater Horizon to assure that its equipment and personnel were fit for their intended purpose;

k) failing to promulgate, implement, and enforce rules and regulations pertaining to the safe operations of the Deepwater Horizon, which, if they had been promulgated, implemented, and enforced, would have averted the fire, explosion, sinking, and oil spill;

l) failing to adhere to applicable safety, construction, and/or operating regulations, including, but not limited to, regulations designed to prevent the fire, explosion, and discharge of oil;

m) failing to properly design and/or engineer the well, drilling program, cementing program, mud program and completion program;

n) failing to take appropriate action to avoid or mitigate the accident;

o) negligent implementation of policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

p) failing to properly train their employees;

q) failing to ascertain that the Deepwater Horizon and its equipment were free from defects and/or in proper working order;

r) failing to timely warn; Failing to provide respiratory and dormal protective gear to Plaintiffs;

s) failing to provide all reasonable cooperation and assistance requested by the responsible officials in connection with the clean-up and removal activities;

t) failing to ensure that adequate plans, equipment, safeguards, resources and technology were readily available to prevent and/or mitigate the effects of the loss of control of a well and unfettered discharge of oil into the Gulf of Mexico;

u) failing to timely bring the oil release under control, to prevent the spill from migrating throughout the Gulf of Mexico;

v) failing to provide appropriate accident prevention equipment; Failing to ensure that the casing and float collar were properly designed and installed; providing BOP's that failed to properly function;

x) failing to ensure that BOP's would work as intended;

y) failing to test the BOP's to ensure that they would operate properly;

z) recklessly altering the BOP's and failing to use them in a safe manner;

aa) failing to conduct well cementing operations properly;

bb) failing to employ alternative cementing operations in light of known problems with the actual cementing operations employed;

cc) failing to have a reasonably adequate well control plan and necessary equipment in case of a loss of the well;

dd) failing to exercise reasonable care in the design and implementation of both well control efforts and response and recovery efforts;

ee)failing to insure that adequate plans, equipment, safeguards resources, and technology were available to prevent or mitigate the quantity of hazardous chemicals that would enter into and effect the Gulf of Mexico.

ff) recklessly using dispersants so as to cause the greatest migration and widest potential for environmental toxic exposures and effects throughout the Gulf.

143.    The blowout and explosions on the Deepwater Horizon, its sinking and the resulting spill were caused by the joint and concurrent negligence of the BP Defendants and the Transocean and/or Halliburton Defendants named herein.

144.    Defendants' breach of their duties posed an unreasonable risk of harm to Plaintiffs.

145.    As a direct and proximate result of the negligence of the Defendants, the Plaintiffs' suffered bodily injury and resulting pain and suffering, disability and disfigurement, mental anguish, loss of the capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a pre-existing condition.  These losses are either permanent or continuing in nature and Plaintiffs will continue to suffer these losses in the future.   Plaintiffs' physical injuries required medical care in the past and will likely require on going care in the future. The Defendants are liable jointly and severally for Plaintiffs' damages resulting from Defendants negligence and gross negligence.  As a result of Defendants' gross negligence, Plaintiffs are also entitled to punitive damages.

WHEREFORE, the Plaintiffs, demand judgment for damages against the

Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

## Claims Under General Maritime Law

### A. NEGLIGENCE

### (All Plaintiffs v. All Defendants).

### *COUNT II*

146.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

147.    At all times material hereto, Drilling Defendants were participating in drilling operations onboard the Deepwater Horizon in the Gulf of Mexico.

148.    At all times material hereto, Drilling Defendants owed and breached duties of ordinary and reasonable care to Plaintiffs in connection with the drilling operations of the Deepwater Horizon and the maintenance of the vessel, its appurtenances and equipment, and additionally owed and breached duties to Plaintiffs to guard against and/or prevent the risk of an oil spill.

149.    In addition, Cameron as designer, manufacturer, and supplier of the Deepwater Horizon's BOP and float collar, respectively, owed and breached duties of ordinary and reasonable care to Plaintiffs in connection with the design, manufacture and supply of the BOP and float collar.

150.    Anadarko, Anadarko E&P, and MOEX Offshore had access to Halliburton/Sperry Sun INSITE real time feed data that was transmitted from the Deepwater Horizon on April 20, 2010 As such, they knew or should have known of the presence of hydrocarbons in the well on the evening of April 20, 2010, and they owed a

duty to Plaintiffs to warn of the impending disaster in sufficient time to avert it. Anadarko, Anadarko E&P, and MOEX Offshore breached their duties to Plaintiffs by failing to warn the drilling vessel crew of the imminent blowout so that they could take evasive action.

151.    Anadarko, Anadarko E&P, and MOEX Offshore were not the passive and unknowing investors that they have portrayed themselves to be in the worldwide media.   The Operating Agreement gave Anadarko, Anadarko E&P, and MOEX Offshore rights and information regarding the Macondo well that put them on actual or constructive notice of the potentially disastrous conditions at the well site. Further, having been on actual or constructive notice of those conditions and having negotiated for and obtained the right to be privy to HSE information, conduct HSE inspections, and call HSE meetings, it was incumbent on Anadarko, Anadarko E&P, and MOEX Offshore to perform the important check and balance role that they had carved out for themselves in the both the Operating Agreement and the Lease Exchange Agreement. Failure to exercise this role given the known history of specific problems at the well site was negligence.

152.    At all relevant times, MOECO dominated and controlled the business, operations, policies, and actions of its subsidiaries MOEX Offshore and MOEX USA to such an extent that they were agents and/or alter egos of MOECO. Neither MOEX Offshore nor MOEX USA properly complied with corporate formalities or operated as corporations distinct from MOECO – rather, MOECO conducted its U.S. activities, including its activities regarding the Macondo Prospect lease, through these agent/alter ego entities. Thus, all activities of MOEX Offshore and MOEX USA,

including activities surrounding the leasehold interest in the Macondo Prospect, should be imputed to MOECO, rendering MOECO liable to Plaintiffs for negligence.

153.    The existence and breach of these legal duties are established under the general maritime law and state law as deemed applicable herein.

154.    The blowout and explosions on the Deepwater Horizon, its sinking and the resulting Spill were caused by the joint and concurrent negligence of Defendants which renders them jointly, severally, and solidarily liable to Plaintiffs.

155.    Defendants knew of the dangers associated with deep water drilling and failed to take appropriate measures to prevent damage to Plaintiffs and the Gulf of Mexico's marine and coastal environments and estuarine areas.

156.    Defendants were under a duty to exercise reasonable care while participating in drilling operations on the Deepwater Horizon to ensure that a blowout and subsequent oil spill did not occur as a result of such operations.

157.    Defendants were under a duty to exercise reasonable care to ensure that if crude oil discharged in the event of a blowout, that it would be contained and/or stopped within the immediate vicinity of the Deepwater Horizon in an expeditious manner.

158.    Defendants knew or should have known that the acts and omissions described herein could result in damage to Plaintiffs.

159.    Defendants, respectively and collectively, failed to exercise reasonable care while participating in drilling operations to ensure that a blowout and subsequent oil spill did not occur, and thereby breached duties owed to Plaintiffs.

160.    Defendants, respectively and collectively, failed to exercise reasonable care to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the Deepwater Horizon in the event of a blowout, and thereby breached duties owed to Plaintiffs.

161.    Defendants, respectively and collectively, failed to exercise reasonable care to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico, and thereby breached duties owed to Plaintiffs.

162.    The conduct of the Defendants with regard to the manufacture, maintenance and/or operation of drilling operations and oil rigs such as the Deepwater Horizon and its appurtenances and equipment is governed by numerous state and federal laws and permits issued under the authority of these laws. These laws and permits create statutory standards that are intended to protect and benefit Plaintiffs. One or more of the Drilling Defendants violated these statutory standards.

163.    The violations of these statutory standards constitute negligence per se under Louisiana, Texas, Mississippi, Alabama, Florida, and the general maritime law.

164.    At all times material hereto the Deepwater Horizon was owned, navigated, manned, possessed, managed, and controlled by Transocean.

165.    As the owner and manager of the Deepwater Horizon, Transocean owed duties of care to Plaintiffs to, *inter alia*, man, possess, manage, control, navigate, maintain and operate the Deepwater Horizon with reasonable and ordinary care.

166.     Transocean breached its duties to Plaintiffs by, *inter alia*, failing to properly manage, control, maintain and operate the Deepwater Horizon and its safety equipment, including the gas sensors, air intake valves, emergency shutdown systems, and BOP, and in disabling vital alarm systems on the Deepwater Horizon before the blowout.

167.     Transocean also breached its duties to Plaintiffs by making and/or acquiescing to a series of reckless decisions concerning, *inter alia*, well design, the use of centralizers, mudding operations, cementing, integrity testing, deployment of the casing hanger lockdown sleeve, spacer material, and simultaneous operations causing worker confusion and loss of focus.

168.     Defendants also violated the International Safety and Management Code ("ISM"), as adopted by the International Convention for the Safety at Life at Sea ("SOLAS"), which provides rules and standards to ensure that ships are constructed, equipped, and manned to safeguard life at sea, by failing to properly maintain the vessel, train personnel, and perform appropriate risk assessment analyses. *See* 46 USC §§ 3201-3205 and 33 CFR §§ 96.230 and 96.250.

169.     At all times material hereto, the Deepwater Horizon was leased and operated pursuant to a contract between Transocean and BP. Together, Transocean and BP and other Drilling Defendants were responsible for design and well control.

170.     BP owed duties to Plaintiffs to, *inter alia*, exercise reasonable care to design, create, manage and control the well and the flow of hydrocarbons therefrom in a safe and prudent manner and to conduct its drilling operations with reasonable and ordinary care.

171.   BP breached its duties to Plaintiffs by, *inter alia*:

a.)   choosing and implementing a less expensive and less time-consuming long string well design, which had few barriers against a gas blowout, instead of a safer liner/tieback design which would have provided additional barriers to gas blowout, despite its knowledge that the liner/tieback design was a safer option;

b.)   using pipe material that it knew, and which it recognized before the blowout, might collapse under high pressure;

c.)   using too few centralizers to ensure that the casing was centered into the wellbore;

d.)   failing to implement a full "bottoms-up" circulation of mud between the running of the casing and the beginning of the cement job in violation of industry standards;

e.)   failing to require comprehensive lab testing to ensure the density of the cement, and failing to heed the ominous results of negative pressure testing which indicated that the cement job was defective;

f.)   cancelling the cement bond log test that would have determined the integrity of the cement job;

g.)   failing to deploy the casing hanger lockdown sleeve to prevent the wellhead seal from being blown out by pressure from below;

h.)   using an abnormally large quantity of mixed and untested spacer fluid;

i.)     failing to train drilling vessel workers and/or onshore employees, and to hire personnel qualified in risk assessment and management of complex systems like that found on the Deepwater Horizon;

j.)     requiring simultaneous operations in an effort to expedite the project, making it difficult for workers to track fluid volumes in the wellbore; and,

k.)     causing property damage to the vessels involved in the clean-up and remediation program, and failing to properly administer and provide payment for work, time, and/or property damage to those entities and workers participating in the program.

172.    All of the foregoing acts and/or omissions by BP proximately caused and/or contributed to Plaintiffs' injuries and damages.

173.    At all times material hereto, Halliburton was responsible for cementing the well that was the subject of the Spill, and further was engaged in testing, analysis, and monitoring of the aforementioned well.

174.    At all times material hereto, Halliburton owed duties to Plaintiffs to, *inter alia*, exercise reasonable care in conducting its cementing, testing, analysis and monitoring of the Deepwater Horizon's well.

175.    Halliburton breached its duties to Plaintiffs by, *inter alia*, failing to exercise reasonable care in conducting its cementing, testing, analysis, and monitoring of the Deepwater Horizon's well. Halliburton was negligent by, *inter alia*, failing to use a full "bottoms-up" circulation of mud between the running of the casing and the beginning of the cement job in violation of industry standards; failing to require comprehensive lab testing to ensure the density of the cement, and failing to heed the ominous results of

negative pressure testing which indicated that the cement job was defective; cancelling, or acquiescing in the cancellation of, the cement bond log test that would have determined the integrity of the cement job; failing to deploy, or acquiescing in the decision not to deploy, the casing hanger lockdown sleeve to prevent the wellhead seal from being blown out by pressure from below, all of which proximately caused and/or contributed to Plaintiffs' injuries and damages.

176.    At all times material hereto, M-I was providing the drilling fluids or "mud" for the drilling operations onboard the Deepwater Horizon and was responsible for mud drilling, composition and monitoring, and for the provision of "spacer" solution.

177.    At all times material hereto, M-I owed duties of care to Plaintiffs to, *inter alia*, exercise reasonable care in providing, controlling and monitoring the mud and spacer solutions used on the Deepwater Horizon.

178.    M-I breached its duties to Plaintiffs by, *inter alia*, failing to provide, control, and monitor the mud and spacer solutions used on the Deepwater Horizon in a reasonably safe manner, proximately causing and/or contributing to Plaintiffs' injuries and damages.

179.    At all times relevant hereto, Cameron designed, manufactured and supplied the BOP that was, at all times relevant herein, appurtenant to and a part of the vessel's equipment.

180.    Cameron owed duties to Plaintiffs to, *inter alia*, exercise reasonable and ordinary care in the design and manufacture and supply of the BOP for the Deepwater Horizon.

181.   Cameron breached its duties to Plaintiffs by failing to exercise reasonable care in the design, manufacture and supply of the BOP such that it failed to operate to prevent the blowout,, thereby proximately causing and/or contributing to Plaintiffs' injuries and damages.

182.   Cameron breached its duties to Plaintiffs by, *inter alia*, failing to ensure and verify that the BOP it designed and manufactured was suitable for the types of drill pipe and casing assembly design which would foreseeably be used during the Deepwater Horizon's drilling and exploration operations; designing the BOP such that it was vulnerable to a single-point failure; failing to install a backup activation system for the BOP; and failing to provide adequate warnings, instructions and guidelines on the permissible uses, modifications, and applications of the BOP appurtenant to the vessel.

183.   In addition to the negligent actions described herein, and in the alternative thereto, the injuries and damages suffered by Plaintiffs were caused by the acts and/or omissions of Defendants that are beyond proof by the Plaintiffs, but which were within the knowledge and control of the Defendants, there being no other possible conclusion than that the blowout, explosions, fire, sinking, and Spill resulted from the negligence of Defendants. The blowout, explosions, fire, sinking, and the resulting Spill would not have occurred had the Defendants satisfied the duty of care imposed on them and Plaintiffs, therefore, plead the doctrine of *res ipsa loquitur*.

184.   In addition to the foregoing acts of negligence, Plaintiffs aver that the blowout, explosions, fire, and resulting Spill were caused by the joint, several, and solidary negligence and fault of Defendants in the following non-exclusive particulars:

a.)   Failing to properly operate the Deepwater Horizon;

b.)     Operating the Deepwater Horizon in such a manner that a fire and explosions occurred onboard, causing it to sink and resulting in the Spill;

c.)     Failing to properly inspect the Deepwater Horizon to assure that its equipment and personnel were fit for their intended purpose;

d.)     Acting in a careless and negligent manner without due regard for the safety of others;

e.)     Failing to promulgate, implement and enforce rules and regulations pertaining to the safe operations of the Deepwater Horizon which, if they had been so promulgated, implemented and enforced, would have averted the blowout, explosions, fire, sinking, and Spill;

f.)     Operating the Deepwater Horizon with untrained and unlicensed personnel;

g.)     Negligently hiring, retaining and/or training personnel;

h.)     Failing to take appropriate action to avoid or mitigate the accident;

i.)     Negligently implementing or failing to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

j.)     Failing to ascertain that the Deepwater Horizon and its equipment were free from defects and/or in proper working order;

k.)     Failing to warn in a timely manner;

l.)     Failing to timely bring the oil release under control;

m.)     Failing to provide appropriate accident prevention equipment;

n.)     Failing to observe and read gauges that would have indicated excessive pressures in the well;

o.) Failing to react to danger signs; and

p.) Such other acts of negligence and omissions as will be shown at the trial of this matter; all of which acts are in violation of the general maritime law.

185. Plaintiffs are entitled to a judgment finding Defendants liable, jointly, severally, and solidarily, to Plaintiffs for damages suffered as a result of Defendants' negligence and awarding Plaintiffs adequate compensation therefor in amounts determined by the trier of fact.

186. The injuries to Plaintiffs were also caused by and/or aggravated by the fact that Defendants failed to take necessary actions to mitigate the danger associated with their operations.

WHEREFORE, the Plaintiffs, demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

## B.  GROSS NEGLIGENCE AND WILLFUL MISCONDUCT

### (All Plaintiffs v. Drilling Defendants and Cameron)

187. Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

188. Drilling Defendants and Cameron owed and breached duties of ordinary and reasonable care to Plaintiffs in connection with the maintenance of, and drilling operation on, the Deepwater Horizon, and additionally owed and breached duties to Plaintiffs to guard against and/or prevent the risk of the Spill. The existence and breach

of these legal duties are established under the general maritime law and state law as deemed applicable herein.

189.    Drilling Defendants and Cameron breached their legal duty to Plaintiffs and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard in the negligent manufacture, maintenance, and/or operation of the Deepwater Horizon.

190.    Drilling Defendants and Cameron knew or should have known that their wanton, willful, and reckless misconduct would result in a disastrous blowout and oil spill, causing damage to those affected by the Spill.

191.    Transocean acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs by, *inter alia*, disabling the gas alarm system aboard the Deepwater Horizon.

192.    BP and Transocean acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs by, *inter alia*, failing to use a sufficient number of "centralizers" to prevent channeling during the cement process; failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job; disregarding proper drilling, casing, mudding, and cementing procedures; failing to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

193.    BP, Transocean, and Halliburton acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs by, *inter alia*, using an inappropriate cement mixture for the

well; failing to appropriately test that cement mixture prior to using it in the well; failing to run a cement bond log to evaluate the integrity of the cement job; and failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

194.    BP, Transocean, and M-I acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs by, *inter alia*, using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

195.    BP, Transocean, and Cameron acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs by, *inter alia*, defectively designing, recklessly maintaining and altering, and/or wantonly operating and/or using the BOP appurtenant to the Deepwater Horizon.

196.    As a result of Defendants, BP, Transocean and Cameron's gross negligence, willful misconduct, and reckless disregard, Plaintiffs are entitled to a judgment finding Defendants, BP, Transocean and Cameron liable to Plaintiffs for damages suffered in an amount to be determined by the trier of fact, including but not limited to punitive damages.

WHEREFORE, the Plaintiffs, demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

## C. STRICT LIABILITY FOR MANUFACTURING AND/OR DESIGN DEFECT

**(All Plaintiffs v. Cameron)**

197.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

198.    Plaintiffs are entitled to recover from Cameron for its defective design and/or manufacture of the BOP that was appurtenant to and a part of the equipment of the Deepwater Horizon, pursuant to Section 402A of the Restatement (Second) of Torts as adopted by maritime law.

199.    At all times relevant hereto, Cameron was in the business of designing, manufacturing, marketing, selling, and/or distributing the BOP used in connection with the drilling operations onboard the Deepwater Horizon.

200.    If operating as intended on the night of the disaster, the BOP could have been manually or automatically activated immediately after the explosion, cutting off the flow of oil at the wellhead, and limiting the Spill to a minute fraction of its ultimate severity and thereby sparing Plaintiffs millions of dollars in losses and damage.

201.    Cameron sold and delivered the BOP at the Deepwater Horizon to Defendant Transocean in 2001.

202.    Cameron's BOP failed to operate properly or at all, at the time of or following the blowout and this failure caused and/or contributed to the Spill.

203.    Cameron failed to effectively design the BOP with a backup activation system, or provide adequate warnings, instructions, and/or guidelines on the permissible uses, modifications and applications of the BOP.

204.    The BOP was defectively designed because its emergency modes of system operation did not provide a fully-independent means of closing the BOP, which

rendered the BOP abnormally dangerous. For instance, all of the emergency methods for closing the BOP provide different ways of closing a single blind shear ram, which must seal to isolate the wellbore. As such, if the blind shear ram fails to operate for any reason, there is nothing the BOP can do to seal the well. In addition, all emergency methods of operating the BOP, other than the autoshear and ROV hot stab, rely on an operational control pod which, if not functioning, renders those methods useless.

205.   In addition, the two emergency methods of closing the BOP that can be activated from the vessel by personnel (the high pressure closure of the blind shear ram and the EDS) require the same communication, electrical and hydraulic components, meaning that if those components are destroyed or damaged, there is no method by which drilling vessel personnel can communicate with the BOP.

206.   Moreover, Cameron's BOP was defectively designed and/or manufactured because its blind shear rams were vulnerable to the failure of a single shuttle valve carrying hydraulic fluid to the ram blades. If the shuttle valve fails, the blind shear ram will be unable to seal the well.

207.   Cameron's BOP was defectively designed and/or manufactured because it failed to operate as intended, if at all, and thus proximately caused and contributed to the blowout and subsequent Spill.

208.   Cameron's BOP was defectively designed and/or manufactured such that it did not operate as intended to prevent or minimize blowouts, which caused and/or contributed to the Spill.

209.   Cameron's BOP was in a defective condition and unreasonably dangerous to Plaintiffs when it left Cameron's control.

210.    At all times, Cameron's BOP was used in the manner intended, or in a manner reasonable foreseeable and/or actually disclosed to Cameron prior to April 20, 2010.

211.    At the time the BOP left Cameron's control, it was in a defective condition unreasonably dangerous to Plaintiffs in that they were designed and manufactured with over 260 known defects and failure modes, including but not limited to:

a.)    Inadequate, faulty, nonfunctioning and defective battery systems;

b.)    Inadequate, faulty, nonfunctioning and defective dead man switches and related wiring;

c.)    The absence of acoustic triggers;

d.)    Inadequate, faulty, nonfunctioning and defective emergency disconnect systems (EDS);

e.)    Improperly sealed, leaky hydraulic systems;

f.)    Improperly designed, manufactured, and installed annular seals;

g.)    Insufficiently robust blind shear rams;

h.)    Insufficient warnings, instructions, and guidelines on permissible, foreseeable uses and modifications to the BOP and its component parts;

i.)    Insufficient testing and design verification of the BOP and its component parts to ensure the shearing capability of the ram and other functioning of the BOP during reasonably foreseeable uses; and

j.)    In such other particulars as the evidence may show.

212.    At the time the BOP appurtenant to the Deepwater Horizon left Cameron's control, Cameron knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the aforementioned unreasonably dangerous conditions.

213.    At the time the BOP appurtenant to the Deepwater Horizon left Cameron's control, feasible design alternatives existed which would have to a reasonable probability prevented the harm suffered by Plaintiffs without impairing the utility, usefulness, practicality or desirability of the BOP.

214.    At all relevant times, the BOP appurtenant to the Deepwater Horizon was used in an intended and/or reasonably foreseeable manner.

215.    Plaintiffs were foreseeable bystanders and victims of the manifestation of the defects in the Deepwater Horizon's BOP.

216.    Cameron had actual and/or constructive knowledge of the facts and circumstances relative to the BOP which caused or contributed to this incident, which in turn caused Plaintiffs' injuries, and its actions and/or inactions were grossly negligent, reckless, willful, and/or wanton.

217.    As a result of the defective design and/or manufacture of the BOP, Plaintiffs have suffered bodily injury and resulting pain and suffering, disability and disfigurement, mental anguish, loss of the capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a pre-existing condition.   These losses are either permanent or continuing in nature and Plaintiffs will continue to suffer these losses in the

future.     Plaintiffs' physical injuries required medical care in the past and will likely require ongoing care in the future.

218.     As a result of the defect(s) in Defendant Cameron's product, Plaintiffs are entitled to a judgment finding Defendant Cameron liable to Plaintiffs for damages suffered in an amount to be determined by the trier of fact, including but not limited to punitive damages.

WHEREFORE, the Plaintiffs, demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

### Claims Under General Maritime Law

### MEDICAL MONITORING AS AN ELEMENT OF DAMAGES

### *COUNT III*

219.     Plaintiffs reallege and reaver each and every allegation set forth in all preceding paragraphs as fully set forth herein and further state:

220.     Plaintiffs have been exposed to greater than normal background levels of the oil, dispersants, and/or other hazardous chemicals used for combating or resulting from the Oil Spill.

221.     The oil, dispersants, and/or other hazardous chemicals used for or resulting from the Oil Spill are proven hazardous, dangerous, or toxic substances, to which Plaintiffs have been exposed.

222.    Plaintiffs' exposures are likely to be causing serious health problems, diseases, and medical conditions that may be prevented by timely medical diagnosis and treatment.

223.    The method and means for diagnosing the Plaintiffs' potential medical problems are well-accepted in the medical and scientific community and will be of great benefit to Plaintiffs by preventing or minimizing health problems that Plaintiffs may encounter as a result of the Oil Spill and from dispersants used to attempt to clean the Oil Spill.

224.    As a proximate result of Plaintiffs' exposure to oil, dispersants, and/or other hazardous chemicals used for or resulting from the Oil Spill, Plaintiffs have developed a significantly increased risk of contracting a serious latent disease.

225.    Monitoring procedures exist that make the early detection of any latent disease possible that are different from those normally recommended in the absence of the exposure.

226.    The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

227.    Plaintiffs have required medical treatment as a result of injuries caused by exposure to oil and/or chemical dispersants and other hazardous chemicals used to combat or resulting from the Oil Spill and have not reached maximum medical improvement.

228.    Defendants have denied such payment and/or have paid benefits in an insufficient amount.

229.    As a result of Defendants failure to pay and/or delay in timely providing and/or paying the proper amount, Plaintiffs have suffered further injuries and damages.

230.    Defendants failure to provide benefits has been callous, willful, wanton, or otherwise tortuous, for which punitive damages are recoverable.

231.    Defendants are also liable for all reasonable and necessary attorney's fees and costs incurred on Plaintiffs' behalf in seeking to secure proper benefits from Defendants.

WHEREFORE, the Plaintiffs, demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

## Claims Under The Oil Pollution Act

### ECONOMIC LOSS

### (All Plaintiffs v. BP, Transocean, Anadarko, Anadarko E&P, MOEX Offshore,

### MOEX USA, and MOECO)

### *COUNT IV*

247.    Plaintiffs reallege and reaver each and every allegation set forth in all preceding paragraphs as fully set forth herein and further state:

248.    Under the Oil Pollution Act, 33 U.S.C. §2701, *et seq* ("OPA"), "each responsible party for a vessel or facility…from which oil is discharged…is liable for removal costs and damages", including "the loss of profits or impairment of earning

capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant." 33 U.S.C. §2702.

249.    A responsible party in the case of a vessel is any person owning, operating, or demise chartering the vessel. 33 U.S.C. §2701(32)(A). A responsible party for an offshore facility is the lessee or permittee of the area in which the facility is located. 33 U.S.C. 33 U.S.C. §2701(32)(C). A lessee is any "person holding a leasehold interest in an oil or gas lease on lands beneath navigable waters (as that term is defined in section 1301(a) of Title 43) or on submerged lands of the Outer Continental Shelf, granted or maintained under applicable State law or the Outer Continental Shelf Lands Act (43 U.S.C. 1331 et seq.)." 33 U.S.C. §2701(16).

250.    For purposes of determining the responsible parties for a mobile offshore drilling unit, it is first deemed to be a tank vessel and then treated as an offshore facility for excess liability. 33 U.S.C. §2704(b) (1)&(2).

251.    At all pertinent times herein, BP leased the Deepwater Horizon. Defendants, BP, Anadarko, Anadarko E&P, and MOEX Offshore held a leasehold interest in a lease granted by the MMS for Block 252, Mississippi Canyon (the "Macondo lease"), an oil lease on lands beneath navigable waters, before and/or at the time of the spill. As such, they were lessees of the area within which the well (an "offshore facility") was located at the time of the Spill and are responsible parties pursuant to Section 2701 (16) and (32) of the OPA. BP was the designated operator for said lease. As such, they are strictly liable pursuant to Section 2702 of the OPA for all damages resulting from the spill.

252.    The United States Coast Guard identified BP, ANADARKO E&P, ANADARKO, MOEX, and TRANSOCEAN HOLDINGS as "responsible parties." Therefore, BP, ANADARKO LP, ANADARKO, MOEX, and TRANSOCEAN HOLDINGS are liable pursuant to Section 2702 for all damages that result from the Oil Spill.

253.    At all relevant times, MOECO dominated and controlled the business, operations, policies, and actions of its subsidiaries MOEX Offshore and MOEX USA to such an extent that they were agents and/or alter egos of MOECO. Neither MOEX Offshore nor MOEX USA properly complied with corporate formalities or operated as corporations distinct from MOECO – rather, MOECO conducted its U.S. activities, including its activities regarding the Macondo Prospect lease, through these agent/alter ego entities. All activities of MOEX Offshore and MOEX USA, including the holding of the leasehold interest in the Macondo Prospect in the Mississippi Canyon Block 252, where the Macondo well is located, should be imputed to MOECO. MOECO is therefore a "responsible party" under OPA and liable to Plaintiffs for damages available under that statute

254.    Defendant, BP and Transocean are not entitled to limit their liability under Section 2704(a) of OPA because the oil spill disaster was proximately caused by their gross negligence, willful misconduct, or violation of applicable safety, construction or operating regulations as alleged above.  Additionally, in its "Statement of BP Exploration & Production, Inc. Re Applicability of Limitation of Liability Under Oil Pollution Act of 1990" filed on October 19, 20120, BP explicitly waived the right to raise the statutory limitation on liability under OPA.

255.    As a result of the Spill and the resulting damages to natural resources in the Gulf of Mexico, Plaintiffs have sustained and will continue to sustain a loss of profits and/or impairment of earning capacity, as alleged above.  Plaintiffs have not been able to use natural resources (air and water, and potentially wetlands and other areas and spaces that have and/or may become contaminated by the spilled oil), and they are entitled to recover from BP, Transocean, Anadarko, Anadarko E&P, MOEX Offshore, MOEX USA, and MOECO for such damages in amounts to be determined by the trier of fact, in addition to the damages as set forth below.

256.    As a direct and proximate cause and post explosion clean-up efforts from the Oil Spill, Plaintiffs have sustained damage to their real and/or personal property as a result of the post-explosion clean-up activity, and they are entitled to recover from BP, ANADARKO E&P, ANADARKO, MOEX and TRANSOCEAN HOLDINGS for such damages in amounts to be determined by the trier of fact.

257.    Plaintiffs are entitled to damages pursuant to Section 2702(b)(2)(B), which provides for recovery for damages to real and/or personal property, including "[D]amages for injury to, or economic losses resulting from destruction of, real and/or personal property, which shall be recoverable by a claimant who owns or leases that property."

258.    As a result of the Spill, Plaintiffs are entitled to damages pursuant to Section 2702(b)(2)(C), which provides for recovery for "[D]amages for loss of subsistence use of natural resources, which shall be recoverable by any claimant who so uses natural resources which have been injured, destroyed, or lost, without regard to the ownership or management of the resources."

259.    As a result of the oil spill and the resulting damage to the marine environment in the Gulf of Mexico, Plaintiffs are entitled to damages pursuant to OPA, Section 2702(b)(2)(E), which allows for "[D]amages equal to loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."

260.    It was foreseeable that a massive oil spill in the Gulf of Mexico would cause economic harm to Plaintiffs. Plaintiffs have also suffered and will continue to suffer the economic dangers of lost wages, lost earning, lost profits and loss of business opportunity due to their physical injuries from the Oil Spill disaster. Additionally, plaintiffs have incurred and will continue to incur economic damages in the form of medical expenses for treatment of their injures.

261.    To the extent required by law, and/or by consent or stipulation by BP, Plaintiffs have satisfied, or will have satisfied, all of the administrative requirements of 33 U.S.C. §§ 2713(a) and (b), as to each and all defendants, by the submission of their claims to the Gulf Coast Claims Facility (the "GCCF") and/or BP and/or its agents or designees.

262.    Plaintiffs are entitled to recover from Defendants for economic damages occasioned as a result of the oil spill in amounts to be determined by the jury.

WHEREFORE, the Plaintiffs, demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

**(All Plaintiffs v. BP, Halliburton and Transocean)**

**FRAUDULENT CONCEALMENT**

***COUNT V***

263.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

264.    To the extent available under state law, Plaintiffs are entitled to recovery against Defendants BP, Halliburton and Transocean for their fraudulent concealment of material facts concerning the Spill.

265.    After the explosions, Defendant BP attempted to downplay and conceal the severity of the Spill. BP's initial leak estimate of 1,000 barrels per day was found by government investigators to be a fraction of the actual leakage amount of 50,000 barrels of oil per day.

266.    Moreover, in the aftermath of the explosions, BP did not provide complete and timely announcements and warnings about the severity, forecast and trajectory of the Spill.

267.    In addition, BP misrepresented its capabilities to respond to the Spill. BP overstated its ability to a handle a blowout in its Exploration Plan, wherein it claimed that in the event of a blowout resulting in an oil spill, it was "unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses."

268.    In fact, BP did not have proven equipment and technology to respond to the Spill; instead, according to the letter to Attorney General Eric Holder by Members of Congress on May 17, 2010, it did not "in any way appear that there was

'proven equipment and technology' to respond to the spill, which could have tragic consequences for local economies and the natural resources of the Gulf of Mexico." As noted further in that letter, "much of the response and implementation of spill control technologies appear[ed] to be taking place on an ad hoc basis."

269.   BP admitted on May 10, 2010 that "[a]ll of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before."

270.   Despite its inability to respond and control the Spill, BP resisted requests from scientists to use sophisticated instruments at the ocean floor that would have provided a more accurate picture of the amount of oil that was gushing from the well.

271.   BP did not in the aftermath of the blowout or since that time provide complete or timely announcements and warnings about the severity, forecast and trajectory of the Spill.

272.   The severity, forecast and trajectory of the Spill, and BP's ability to respond to the Spill, were material facts that BP had a duty to disclose.

273.   In addition, Defendant Halliburton misrepresented and concealed the stability of the cement used at the Macondo well, despite having performed three tests before the Spill, all of which demonstrated that the foam cement used at Macondo was unstable.

274.   The instability of the cement used at the Macondo well and the results of the testing performed before the Spill were material facts that Halliburton had a duty to disclose.

275.     Moreover, BP was aware, before the Spill, that Halliburton's testing had revealed that the concrete foam was unstable, yet it concealed this material fact.

276.     For its part, Transocean misrepresented and concealed the condition of the Deepwater Horizon and the known hazards associated with the disabling of, and/or failure to maintain, its safety features and appurtenances, including, *inter alia*, its BOP.

277.     Transocean also misrepresented and concealed the safety record of the vessel, which was based on false data supplied by its personnel.

278.     Transocean misrepresented and concealed the condition of many key components, including, *inter alia*, the BOP rams and failsafe valves, which had not been fully inspected for ten years before the blowout, and at least 36 components and systems on the vessel that were in "bad" or "poor" condition, and which it was aware might lead to loss of life, serious injury or environmental damage.

279.     The foregoing known hazards, poor condition, and maintenance and safety issues associated with the Deepwater Horizon and its appurtenances and equipment were material facts that Transocean had a duty to disclose.

280.     Defendants Halliburton, BP, and Transocean failed to disclose or concealed the foregoing material facts, and their failure to do so induced Plaintiffs to act or to refrain from acting to protect their property, businesses, livelihoods and income.

281.     As a direct and proximate result of the fraudulent concealment of the foregoing material facts by Halliburton, BP, and Transocean, Plaintiffs suffered

damage to their businesses, livelihood, income and damage to and diminution in value of their property, for which they are entitled to compensation.

282.   Moreover, the acts of misrepresentation and concealment of the foregoing material facts by Halliburton, BP, and Transocean were willful, wanton, and/or in callous disregard for the safety of others and, accordingly, Plaintiffs are entitled to an award of punitive damages.

WHEREFORE, the Plaintiffs, demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

### Negligence *Per Se*

### (All Plaintiffs v. All Defendants)

### *COUNT VI*

283.   Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

284.   Defendants' conduct with regard to the manufacture, maintenance and/or operation of drilling operations and oil vessels such as the *Deepwater Horizon*, the release of hazardous and toxic chemicals into the environment, and the application of dispersants and other hazardous chemicals is governed by numerous state and federal laws and permits issued under the authority of these laws. These laws and permits create statutory and regulatory standards that are intended to protect and benefit Plaintiffs, including, but not limited to, those set forth in Section 311 of the Clean Water Act, 40 C.F.R. § 300 App. E, 30 C.F.R. Part 254 and the Oil Pollution Act, 33 U.S.C. § 2717(b) (the "OPA").

285.    One or more of Defendants violated these statutory and/or regulatory standards.

286.    Defendants' violations of these statutory and/or regulatory standards constitute negligence *per se* under Louisiana, Texas, Mississippi, Alabama and Florida law.

287.    Defendants had actual and/or constructive knowledge of the facts and circumstances leading to and causing the incidents described herein which in turn caused Plaintiffs' injuries and their actions and inactions were grossly negligent, reckless, willful and/or wanton.

288.    As a direct and proximate cause of Defendants' violation of statutory and/or regulatory standards, Plaintiffs have suffered physical injuries and/or property damage.  Plaintiffs are entitled to a judgment in their favor for damages suffered in an amount to be determined by the trier of fact, including, but not limited to, punitive damages.

WHEREFORE, the Plaintiffs, demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

### Nuisance

### (All Plaintiffs v. All Defendants)

### *COUNT VII*

289.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

290.    BP's oil disaster has significantly interfered with the public's right to use and enjoy the Gulf of Mexico without oil slicks, chemical dispersants, tar balls, and other associated pollution.

291.    Prior to the *Deepwater Horizon* disaster, Plaintiffs enjoyed the use of the Gulf of Mexico for fishing, boating, and other economic and recreational pursuits, including residing on the Gulf of Mexico.

292.    Since the disaster, Plaintiffs have been unable to fish or boat, and many have lost their livelihoods.

293.    As a direct and proximate cause of the oil disaster, and Plaintiffs' work to assist in the relief effort, these Plaintiffs were exposed to harmful chemicals in the crude oil and in the chemical dispersants at levels, amounts, and under conditions different from the general public.

294.    As a result of the oil disaster, Resident Plaintiffs are constantly exposed to harmful chemicals in the air from oil, dispersants, and/or other harmful chemicals resulting from the Oil Spill at levels, amounts, and under conditions different from the general public.

295.    Moreover, Plaintiffs were subjected to foul and harmful odors emanating from the crude oil soaked booms and/or the chemical dispersants.

296.    Plaintiffs have no adequate remedy at law.

297.    There exists an imminent likelihood of irreparable harm if the injunction is not issued.

298.    The threatened harm to the Plaintiffs and class members outweighs any potential harm to Defendants.

299.    Granting the injunction does not contravene a substantial public interest.

300.    Plaintiffs are entitled to judgment finding Defendants liable to Plaintiffs for damages, including costs of future medical screening and monitoring, for the creation of a public nuisance and a judgment for injunctive relief to abate the nuisance.

WHEREFORE, the Plaintiffs, demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

### **Battery**

### **(All Plaintiffs v. All Defendants)**

### ***COUNT VIII***

301.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

302.    Defendants placed Plaintiffs on cleanup and response activities without adequate training, warning of risks, or safety equipment.

303.    Defendants intentionally sprayed, and/or directed spraying, chemical dispersants in the immediate vicinity of Plaintiffs.

304.    Defendants' spraying of chemical dispersants in the immediate vicinity of Plaintiffs without warning or safety equipment has caused Plaintiffs to be exposed to harmful chemicals and resulted in physical symptoms.

305.    Defendants spraying of chemical dispersants in the immediate vicinity of Plaintiffs without warning has caused Plaintiffs to be exposed to harmful chemicals and resulted in physical exposure and harm.

306.    Plaintiffs are entitled to judgment finding Defendants liable to Plaintiffs for damages suffered as a result of subjecting Plaintiffs to unwanted, offensive conduct and enjoining Defendants' tortious conduct toward Plaintiffs.  Further, Plaintiffs are entitled to an award of Punitive Damages.

WHEREFORE, the Plaintiffs, demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

## Florida Medical Monitoring Claim

## (Florida Plaintiffs v. All Defendants)

### COUNT IX

307.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

308.    Plaintiffs will suffer irreparable harm if the Court does not render the medical monitoring relief set forth herein, and if Defendants are not ordered to create, fund and support a medical monitoring program as set forth herein.

309.    Plaintiffs demand injunctive and equitable relief and that Defendants be ordered to provide continued environmental, water supply, food supply, and air monitoring for Plaintiffs in Florida.

310.    Plaintiffs have been exposed to greater than normal background levels of oil, dispersants, and/or other hazardous chemicals as a result of the Oil Spill.

311.    The oil, dispersants, and/or other hazardous chemicals used for or resulting from the Oil Spill are proven hazardous, dangerous, or toxic substances, to which Plaintiffs have been exposed.

312.    Plaintiffs' exposures were caused by Defendants' negligence or otherwise tortious conduct.

313.    Plaintiff's exposure may lead to serious health problems, diseases, and medical conditions that may be prevented by timely medical diagnosis and treatment.

314.    The method and means for diagnosing Plaintiffs' potential medical problems are well accepted in the medical and scientific community and will be of great benefit to Plaintiffs by preventing or minimizing health problems that Plaintiffs may encounter as a result of the Oil Spill and from dispersants used to attempt to clean the Oil Spill.

315.    As a proximate result of Plaintiffs' exposure to oil, dispersants, and/or other hazardous chemicals which have been released from the Oil Spill, Plaintiffs have developed a significantly increased risk of contracting a serious latent disease.

316.    Monitoring procedures exist that make the early detection of any latent disease possible that are different from those normally recommended in the absence of the exposure.

317.    The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

WHEREFORE, the Plaintiffs, demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

## LOSS OF CONSORTIUM CLAIM

### *COUNT X*

318. Plaintiff realleges and reavers each and every allegation as if fully set forth herein and further states:

319. At all times material hereto, the Plaintiffs, ROCHELLE VAUGHAN, JENNIFER MARTIN, GREGORY WYNNE, were and are the lawful spouses of the Plaintiffs, JEFFREY VAUGHAN, CHRIS MARTIN AND MONETTE WYNNE respectively.

320. As a direct and proximate result of the negligence of the Defendants, Plaintiffs, ROCHELLE VAUGHAN, JENNIFER MARTIN and GREGORY WYNNE, have suffered and will continue to suffer the loss of their spouses' services, support, consortium and the care and comfort of their society.

## STRICT LIABILITY FOR MANUFACTURING AND/OR DESIGN DEFECT

### (All Plaintiffs v. Cameron)

### *COUNT XI*

321. Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

322. Plaintiffs are entitled to recover from Cameron for its defective design and/or manufacture of the BOP that was appurtenant to and a part of the equipment of the Deepwater Horizon, pursuant to Section 402A of the Restatement (Second) of Torts as adopted by maritime law.

323. At all times relevant hereto, Cameron was in the business of designing, manufacturing, marketing, selling, and/or distributing the BOP used in connection with the drilling operations onboard the Deepwater Horizon.

324. If operating as intended on the night of the disaster, the BOP could have been manually or automatically activated immediately after the explosion, cutting off the flow of oil at the wellhead, and limiting the Spill to a minute fraction of its ultimate severity and thereby sparing Plaintiffs millions of dollars in losses and damage.

325. Cameron sold and delivered the BOP at the Deepwater Horizon to Defendant Transocean in 2001.

326. Cameron's BOP failed to operate properly or at all, at the time of or following the blowout and this failure caused and/or contributed to the Spill.

327. Cameron failed to effectively design the BOP with a backup activation system, or provide adequate warnings, instructions, and/or guidelines on the permissible uses, modifications and applications of the BOP.

328. The BOP was defectively designed because its emergency modes of system operation did not provide a fully-independent means of closing the BOP, which rendered the BOP abnormally dangerous. For instance, all of the emergency methods for closing the BOP provide different ways of closing a single blind shear ram, which must seal to isolate the wellbore. As such, if the blind shear ram fails to operate for any reason, there is nothing the BOP can do to seal the well. In addition, all emergency methods of operating the BOP, other than the autoshear and ROV hot stab, rely on an operational control pod which, if not functioning, renders those methods useless.

329. In addition, the two emergency methods of closing the BOP that can be activated from the vessel by personnel (the high pressure closure of the blind shear ram and the EDS) require the same communication, electrical and hydraulic components, meaning that if those components are destroyed or damaged, there is no method by which drilling vessel personnel can communicate with the BOP.

330. Moreover, Cameron's BOP was defectively designed and/or manufactured because its blind shear rams were vulnerable to the failure of a single shuttle valve carrying hydraulic fluid to the ram blades. If the shuttle valve fails, the blind shear ram will be unable to seal the well.

331. Cameron's BOP was defectively designed and/or manufactured because it failed to operate as intended, if at all, and thus proximately caused and contributed to the blowout and subsequent Spill.

332. Cameron's BOP was defectively designed and/or manufactured such that it did not operate as intended to prevent or minimize blowouts, which caused and/or contributed to the Spill.

333. Cameron's BOP was in a defective condition and unreasonably dangerous to Plaintiffs when it left Cameron's control.

334. At all times, Cameron's BOP was used in the manner intended, or in a manner reasonable foreseeable and/or actually disclosed to Cameron prior to April 20, 2010.

335. At the time the BOP left Cameron's control, it was in a defective condition unreasonably dangerous to Plaintiffs in that they were designed and

manufactured with over 260 known defects and failure modes, including but not limited to:

      a.)     Inadequate, faulty, nonfunctioning and defective battery systems;

      b.)     Inadequate, faulty, nonfunctioning and defective dead man switches and related wiring;

      c.)     The absence of acoustic triggers;

      d.)     Inadequate, faulty, nonfunctioning and defective emergency disconnect systems (EDS);

      e.)     Improperly sealed, leaky hydraulic systems;

      f.)     Improperly designed, manufactured, and installed annular seals;

      g.)     Insufficiently robust blind shear rams;

      h.)     Insufficient warnings, instructions, and guidelines on permissible, foreseeable uses and modifications to the BOP and its component parts;

      i.)     Insufficient testing and design verification of the BOP and its component parts to ensure the shearing capability of the ram and other functioning of the BOP during reasonably foreseeable uses; and

      j.)     In such other particulars as the evidence may show.

336. At the time the BOP appurtenant to the Deepwater Horizon left Cameron's control, Cameron knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the aforementioned unreasonably dangerous conditions.

337. At the time the BOP appurtenant to the Deepwater Horizon left Cameron's control, feasible design alternatives existed which would have to a reasonable

probability prevented the harm suffered by Plaintiffs without impairing the utility, usefulness, practicality or desirability of the BOP.

338. At all relevant times, the BOP appurtenant to the Deepwater Horizon was used in an intended and/or reasonably foreseeable manner.

339. Plaintiffs were foreseeable bystanders and victims of the manifestation of the defects in the Deepwater Horizon's BOP.

340. Cameron had actual and/or constructive knowledge of the facts and circumstances relative to the BOP which caused or contributed to this incident, which in turn caused Plaintiffs' injuries, and its actions and/or inactions were grossly negligent, reckless, willful, and/or wanton.

341. As a result of the defective design and/or manufacture of the BOP, Plaintiffs have suffered bodily injury and resulting pain and suffering, disability and disfigurement, mental anguish, loss of the capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a pre-existing condition. These losses are either permanent or continuing in nature and Plaintiffs will continue to suffer these losses in the future. Plaintiffs' physical injuries required medical care in the past and will likely require ongoing care in the future.

342. As a result of the defect(s) in Defendant Cameron's product, Plaintiffs are entitled to a judgment finding Defendant Cameron liable to Plaintiffs for damages suffered in an amount to be determined by the trier of fact, including but not limited to punitive damages.

## JONES ACT CLAIM OF PLAINTIFF, DOUG MAURRAS

### *COUNT XII*

343. Plaintiff, DOUG MAURRAS, asserts claims pursuant to the Jones Act under 46 U.S.C. § 688. Plaintiff, DOUG MAURRAS, asserts this claim against his employers, DEFENDANT MORAN ENVIRONMENTAL RECOVERY, BOOM TECHNOLOGY and JIM FOX. Plaintiff, DOUG MAURRAS, was injured while employed on vessels engaged in commerce and navigation on navigable waters, performing service work entailing inspection and maintenance of vessel appurtenances, and their injuries bear a significant relationship to maritime activity, thus invoking general maritime law and the Jones Act under 46 U.S.C. § 688. During this time, Plaintiff was a Jones Act seaman because:

344. his duties contributed to the function of the vessel and to the accomplishment of its mission, and;

345. his connection to the navigational vessels was substantial in duration and nature. *See Chandris, Inc. v. Latsis*, 515 U.S. 347, 368 (1995). Alternatively, Plaintiff, DOUG MAURRAS, was a maritime worker entitled to compensation under the Longshore and Harbor Workers' Compensation Act (LHWCA) codified at 33 U.S.C. §§ 901-950 (2003). *Id.* at 356.

## NEGLIGENCE OF MORAN ENVIRONMENTAL RECOVERY, BOOM TECHNOLOGY, INC. AND JIM FOX

### *COUNT XIII*

346. Plaintiffs reallege and reaver each and every allegation set forth in all preceding paragraphs as fully set forth herein and further state:

347. MORAN ENVIRONMENTAL RECOVERY, BOOM TECHNOLOGY and JIM FOX knew or should have known of the risk of exposing clean up workers to substances dangerous to human health and safety.

348. MORAN ENVIRONMENTAL RECOVERY, BOOM TECHNOLOGY and JIM FOX owed DOUG MAURRAS a duty, and failed that duty, to refrain from unreasonable conduct that exposed their workers to foreseeable risk.

349. DOUG MAURRAS' injuries were a proximate result of the negligence, fault, gross negligence, and/or willful misconduct of MORAN ENVIRONMENTAL RECOVERY, BOOM TECHNOLOGY and JIM FOX through their agents, servants, employees, contractors and other persons or entities for whose conduct Defendant is responsible, which are more particularly described as follows:

a.     Failing to adequately train DOUG MAURRAS in safe cleanup methods.

b.     Failing to warn DOUG MAURRAS of the dangers of exposure to crude oil and/or oil mixed with dispersants.

c.     Failing to properly equip DOUG MAURRAS with personal protective equipment.

**PUNITIVE DAMAGES**

*COUNT XIV*

350. Defendants focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon.*

351. Defendants BP, Transocean, and Halliburton engaged in

conduct so reckless, willful, wanton and in such utter and flagrant disregard for the safety and health of the public and the environment in their activities leading up to and/or during the blowout, explosions, fire, and Spill, as alleged herein, that an award of punitive damages against them at the highest possible level is warranted and necessary to impose effective and optimal punishment and deterrence. Plaintiffs, society and the environment cannot afford and should never be exposed to the risks of another disaster of the magnitude caused by Defendants' misconduct herein.

352. BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by performing a critical well pressure test with untrained and unqualified personnel and by callously ignoring and/or misinterpreting abnormal "red flag" pressure test results.

353. BP's corporate culture caused and allowed it to disregard the lessons it should have learned and applied from previous incidents at its facilities that resulted in extensive damage and loss of live; instead, it continued to place others at risk in the interests of cost-cutting and financial gain.

354. Transocean callously and with reckless disregard for human life disabled the flammable gas alarm system aboard the Deepwater Horizon and prevented said system from operating properly and preventing or containing the explosions, fire and loss of life.

355. BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous

activities on the Deepwater Horizon by using a well design with too few barriers to gas flow.

356.   BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by failing to use a sufficient number of "centralizers" to prevent channeling during the cement process.

357.   BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job.

358.   BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by using an inappropriate cement mixture for the type of rock formation surrounding the well, and by failing to appropriately test that cement mixture prior to using it in the well.

359.   BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by failing to run a cement bond log to evaluate the integrity of the cement job.

360.   BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

361.    BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

362.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by ignoring and/or misinterpreting abnormal, "red flag" pressure test results.

363.    BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill by their grossly inadequate maintenance, and reckless and improper operation and use of the BOPs appurtenant to the Deepwater Horizon.

364.    BP and Transocean recklessly, willfully and/or wantonly failed to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the Deepwater Horizon in the event of a blowout.

365.    BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill through their collective and respective disregard for proper drilling, casing, mudding, and cementing procedures.

366.    BP and Transocean willfully and/or wantonly failed to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

367.   Defendants recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico.

368.   In addition, after the blowout and before the well was finally sealed, BP was aware of procedures that would immediately block the flow of oil into the Gulf, yet it delayed the implementation of any such procedures, and limited its efforts to plug the well to options that would salvage the well for future use, instead of selecting procedures that would stop the flow of oil as soon as possible regardless of the well's continued functionality. As such, BP increased the magnitude of, and damage caused by, the Spill by willfully and/or wantonly and recklessly choosing its profits over the lives of the workers on the vessel, the safety of the environment, and the health, welfare, and value of the people, businesses, and property of the Gulf states.

369.   Defendants' conduct was oppressive, wanton, malicious, reckless, or grossly negligent each time they:

a.)     failed to properly maintain and/or operate the Deepwater Horizon;

b.)     operated the Deepwater Horizon in such a manner the safety and integrity of the vessel and the well were disregarded to save time and money;

c.)     ignored warnings that the integrity of the well, the cementing job, and the vessel were in jeopardy;

d.)     failed to promulgate, implement, and enforce proper rules and regulations to ensure the safe operations of the Deepwater Horizon;

e.)     violated MMS regulations for the safe design and operation of oil wells and drilling rigs in the Gulf of Mexico;

f.) failed to take appropriate action to avoid or mitigate the accident;

g.) failed to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

h.) failed to ensure that the Deepwater Horizon and its equipment were free from defects, properly maintained and/or in proper working order;

i.) failed to provide appropriate disaster prevention equipment;

j.) failed to have an appropriate emergency spill response plan or readily available spill response equipment.

370. BP and Dispersant Defendants recklessly, willfully and/or wantonly caused or contributed to Plaintiffs' injuries by their tortious design, and reckless and wanton operation and use of chemical dispersants.

371. BP and Dispersant Defendants recklessly, willfully and/or wantonly failed to ensure that Plaintiffs would be adequately protected from exposure to harmful chemicals in oil, chemical dispersants, and other harmful chemicals resulting from the Oil Spill.

372. Defendants willfully and/or wantonly failed to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill into the waters of the Gulf of Mexico and the corresponding clean up response measures involving the use of chemical dispersants.

373. BP recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Oil Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico.

374.    Defendants' conduct, as described more fully hereinabove, is at the highest level of reprehensibility, warranting and necessitating the imposition of punitive damages at the highest level, because Defendants' conduct was motivated by financial gain; because it injured and endangered human and environmental health and safety; because it caused devastating damage and loss to the livelihoods, businesses, and properties of Plaintiffs; because it was not isolated or accidental, but part of a culture and ongoing pattern of conduct that consistently and repeatedly ignored risks to others in favor of financial advantage to Defendants; and because it has accordingly caused societal harm, moral outrage and condemnation, and the need to punish Defendants and deter further repetition by Defendants or others.

375.    Accordingly, Plaintiffs are entitled to an award of punitive damages in an amount to be determined at trial.

WHEREFORE, the Plaintiffs, demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

## NEGLIGENCE

### *COUNT XV*

**(Plaintiffs v. Airborne Support International Inc. and Airborne Support, Inc.)**

376.    Plaintiffs reallege and reaver each and every allegation set forth in all preceding paragraphs as fully set forth herein and further state:

377.   ASI INTERNATIONAL and ASI owed the Plaintiffs a duty, and failed that duty, to refrain from conduct that causes damage Plaintiffs' environment and exposes Plaintiffs to physical harm.

378.   ASI INTERNATIONAL and ASI owed and breached duties of reasonable care to ensure the safety of their operations and to guard against and prevent injury to response workers, coastal residents and tourists, including Plaintiffs.

379.   ASI INTERNATIONAL and ASI owed a duty and failed in their duty to know what products  they were spraying or applying onto the waters of the Gulf of Mexico and to know the likely impact that their activities would have upon the environments on which they were spraying their chemicals and upon the health and safety of the Plaintiffs. ASI INTERNATIONAL and ASI applied the chemicals and dispersants without regard to the likely short and long term impacts upon the Plaintiffs' environment and upon Plaintiffs' health and safety.

380.   ASI INTERNATIONAL and ASI owed a duty and breached the duty to spray chemicals onto the waters of the Gulf of Mexico including in the Plaintiffs' environment in a way which was consistent with their product labels.

381.   ASI INTERNATIONAL and ASI owed a duty, and breached the duty, to warn of the effects of their spraying activities to Plaintiffs and all those who would be potentially injured or damaged by their activities in a time frame which would have allowed Plaintiffs to attempt to stop or reduce the quantity or location of the spraying activities, or alternatively to devise plans to mitigate or prevent damage.

382.   ASI INTERNATIONAL and ASI owed a duty to reject spraying

huge quantities of dispersants onto the Gulf of Mexico and into Plaintiffs' environment in order to protect Plaintiffs from physical harm. ASI INTERNATIONAL AND ASI knew or should have known that they would be sparying quantities of chemicals over columes of water in ways which had never been tested for affect. ASI INTERNATIONAL and ASI breached that duty of reasonable care.

383.   ASI INTERNATIONAL and ASI owed a duty and failed in its duty of exercising reasonable care in the use of dispersants repetitiously in the same and contiguous areas, and in the type of the dispersants used.

384.   ASI INTERNATIONAL and ASI owed a duty and failed in that duty to mitigate the damages caused by the negligent activities in order to prevent its harm or to reduce the quantity of hazardous chemicals that would enter into and effect the Gulf of Mexico and cause harm to Plaintiffs.

385.   As a direct and proximate result of the Defendants' ASI INTERNATIONAL and ASI's negligence, Plaintiffs have each suffered and will continue to suffer damages in excess of $75,000.00 and are entitled to recover monetary damages, including but not limited to the Defendants, BP, ASI INTERNATIONAL and ASI are liable jointly and severally for Plaintiffs' damages resulting from Defendants' negligence.   As a result of Defendants' gross negligence, Plaintiffs are also entitled to punitive damages.

WHEREFORE, the Plaintiffs, demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants jointl,
severally and solidarily, and demands trial by jury of all issues triable as of right by jury,
as follows:

1. Economic and compensatory damages in amounts to be determined at trial;

2. Punitive damages to be set by a jury;

3. Damages for medical screening and monitoring;

4. The implementation of medical screening and monitoring program to be funded by the Defendants;

5. Pre-judgment and post-judgment interest at the maximum rate allowable by law;

6. Attorneys' fees and costs of litigation;

7. Injunction to abate the public nuisance created by Defendants;

8. Injunction to abate the unwanted, offensive conduct by Defendants;

9. Injunction to require monitoring of air and water;

10. Any other and further relief available under all applicable state and federal laws;

11. Loss of enjoyment of life;

12. Physical disability, pain and suffering;

13. Past and future mental pain and suffering;

14. Past and future loss of income and benefits;

15. Past and future medical expenses;

16. Loss of family relationships;

17. Love and affection;

18. Loss of consortium; and

19. Any other damages available under state of federal law.


Respectfully submitted,

KRUPNICK, CAMPBELL, MALONE,
BUSER, SLAMA, HANCOCK,
LIBERMAN & McKEE, P.A.


By: /s/   Catherine B. Cummins

Catherine B. Cummins
Louisiana Bar No. 29558
Stuart H. Smith, Esquire
Louisiana Bar Number:  17805
ssmith@smithstag.com
SMITH STAG, L.L.C.
One Canal Place, Suite 2850
365 Canal Street
New Orleans, Louisiana  70130
(504) 593-9600 telephone
(504) 593-9601 facsimile
And
Robert J. McKee, Esquire
Florida Bar Number:  972614
rmckee@krupnicklaw.com
12 Southeast Seventh Street, Suite 801
Fort Lauderdale, Florida  33301-3426
954-763-8181 telephone
954-763-8292 facsimile

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the above and foregoing Plaintiffs' Amended Complaint for Damages has been served on All Counsel by electronically uploading the same to LexisNexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 19th day of April 2013.

Respectfully submitted,

By: /s/    Catherine B. Cummins

**Catherine B. Cummins**
Louisiana Bar No. 29558
**Stuart H. Smith, Esquire**
Louisiana Bar Number:  17805
ssmith@smithstag.com
SMITH STAG, L.L.C.
One Canal Place, Suite 2850
365 Canal Street
New Orleans, Louisiana  70130
(504) 593-9600 telephone
(504) 593-9601 facsimile

And

**Robert J. McKee, Esquire**
Florida Bar Number:  972614
rmckee@krupnicklaw.com
12 Southeast Seventh Street, Suite 801
Fort Lauderdale, Florida  33301-3426
954-763-8181 telephone
954-763-8292 facsimile

*Attorneys for Plaintiffs*