## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **In re:  Oil Spill by the Oil Rig** **"DEEPWATER HORIZON" in the Gulf** **of Mexico, on April 20, 2010** **These Pleadings apply to:  *All Cases*** (Including Nos. 10-2771 and 10-4536) | **MDL No. 2179** **SECTION: J** **JUDGE BARBIER** **MAGISTRATE SUSHAN** |

### <u>REPLY BRIEF</u>

**Submitted by the Plaintiff Steering Committee**
**On Behalf of Plaintiffs and Claimants-in-Limitation**
**For the Phase One Limitation and Liability Trial**

Plaintiffs and Claimants-in-Limitation, through Plaintiffs' Co-Liaison Counsel, the Plaintiffs' Steering Committee, and the PSC Phase One Trial Team, respectfully submit the following Reply Brief, in accordance with the Court's Order of April 24, 2013 [Doc 9536]:

**MAY IT PLEASE THE COURT:**

<u>**TABLE OF CONTENTS**</u>

Page(s)

Table of Contents   .   .   .   .   .   .   .   .   .   .   i

Table of Authorities   .   .   .   .   .   .   .   .   .   .   ii

Legal Issues Addressed in Separate Motions, Orders and Briefs   .   .   .   .   1

Defendants Erroneously Suggest that Direct Evidence (*i.e.* Admission) of Conscious
Disregard of a Known Risk or Danger is Required   .   .   .   .   .   2

BP plc is Liable for Its Own Corporate Policies and for the Conduct of Employees
Made with Knowledge, Approval or Ratification by Officials with Policymaking
Authority   .   .   .   .   .   .   .   .   .   .   4

Neither the Fault of BP nor Transocean Constitutes a "Superseding" Cause
with Respect to the Bad Cement Slurry Provided by Halliburton   .   .   .   .   6

The Chronic Maintenance Problems on the DEEPWATER HORIZON Were
Directly Related to Emergency Shut-Down, Fire & Gas and BOP System Failures
on April 20, 2010   .   .   .   .   .   .   .   .   .   .   9

None of the Four Petitioning Transocean Entities Are Entitled to Limitation
or Exoneration.   .   .   .   .   .   .   .   .   .   .   12

Transocean Erroneously Confuses the Appropriateness of a "Dual Command"
Structure under Normal Conditions with the Requirement for One Qualified
"Master" with Overriding Authority and Responsibility in the Case of an Emergency   .   13

Transocean Disregards the Fact that the Emergency Disconnect (EDS) Serves a
Marine Function, in Addition to (if not Primary to) a Well Control Function   .   .   14

BP and Transocean Ignore the Cumulative Effects of their Intentional Choices and
Reckless Failures in the Configuration, Maintenance and Operation of the BOP   .   .   15

Conclusion   .   .   .   .   .   .   .   .   .   .   18

Certificate of Service   .   .   .   .   .   .   .   .   .   .   21

# TABLE OF AUTHORTIES

**Page(s)**

In re American Milling Co., Ltd., 409 F.3d 1005 (8th Cir. 2005)   .       .       .       12

BP Amoco Chemical Co. v. Sun Oil Co., 166 F.Supp.2d 984 (D.Del. 2001)       .       6

Brown v. Teresa Marie IV, Inc., 477 F.Supp.2d 266 (D.Me. 2007)   .       .       .       12

Clements v. Steele, 792 F.2d 515 (5th Cir. 1986)       .       .       .       .       .       2, 3

Donaghey v. Ocean Drilling & Exploration, 974 F.2d 646 (5th Cir. 1992)   .       .       8-9

Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008)   .       .       .       .       .       2, 3

FDIC v. Fidelity & Deposit Co., 45 F.3d 969 (5th Cir. 1995)       .       .       .       4

Houston Exploration v. Halliburton, 269 F.3d 528 (5th Cir. 2001)   .       .       .       2, 3

International Marine Terminals Partnership v. Hillmon Marine, No. 99-1637,
    2000 WL 351429 (E.D.La. April 3, 2000)   .       .       .       .       12

Lobegeiger v. Celebrity Cruises, Inc., No.11-21620, 2011 WL 3703329
    (S.D.Fla. Aug. 23, 2011)       .       .       .       .       .       2

In re Mercer, 246 F.3d 391 (5th Cir. 2001)   .       .       .       .       .       3

In re Tug OCEAN PRINCE, 584 F.2d 1151 (2d Cir. 1978)   .       .       .       .       17

In re Oil Spill by Amoco Cadiz, 954 F.2d 1279 (7th Cir. 1992)       .       .       17

Operaciones Tecnicas Marinas SAS v. Diversified Marine Services,
    No.12-1979, 2012 WL 6632509 (E.D.La. Dec. 19, 2012)   .       .       .       2

In re Red Circle Transportation Co., No.02-1572,
    2002 WL 31012610 (E.D.La. Sept. 9, 2002)   .       .       .       .       12

Rogers v. Missouri Pacific Railroad, 352 U.S. 500 (1957)   .       .       .       .       3

Spencer v. Cain, No.10-721, 2010 WL 3614318 (E.D.La. Aug. 13, 2010),
    adopted, 2010 WL 3614129 (E.D.La. Sept. 7, 2010)   .       .       .       3

Stolt Achievement Ltd v. Dredge B.E. LINDHOLM, 447 F.3d 360 (5th Cir. 2006)   .       8

Tidewater Marine v. Sanco International, 113 F.Supp.2d 987 (E.D.La. 2000)       .       8

United States v. Bestfoods, 524 U.S. 51 (1998)   .        .        .        .        .        5-6

Water Quality Ins. Syndicate (re Barge Morris J. Berman) v. United States,
  522 F.Supp.2d 220 (D.D.C. 2007)   .        .        .        .        .        .        17

Wilcox v. Kerr-McKee, 706 F.Supp. 1258 (E.D. La. 1989)   .        .        .        .        2

Williams v. Steves Industries, 699 S.W.2d 570 (Tex. 1985)   .        .        .        .        3

Zerangue v. TSP Newspapers, Inc., 814 F.2d 1066 (5th Cir. 1987)   .        .        .        3

SHIPOWNERS' LIMITATION OF LIABILITY ACT OF 1851
  46 U.S.C. §30501   .        .        .        .        .        .        .        .        12

MMS REGULATIONS
  30 C.F.R. ¶250.416(e).   .        .        .        .        .        .        15, 16
  30 C.F.R. ¶250.444   .        .        .        .        .        .        .        15

RESTATEMENT (THIRD) OF TORTS:
  LIABILITY FOR PHYSICAL AND EMOTIONAL HARM §2, Comment b (2010)   .        2

RESTATEMENT (THIRD) OF TORTS:
  LIABILITY FOR PHYSICAL AND EMOTIONAL HARM §2, Comment c (2010)   .        2

RESTATEMENT (SECOND) OF TORTS §442 (1965)   .        .        .        .        .        8

RESTATEMENT (SECOND) OF TORTS §500, Comment a (1965)   .        .        .        3

FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS: Civil §2.18 (2009)   .        .        .        3

FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS: Civil §4.10 (2006)   .        .        .        2, 3

Schoenbaum, ADMIRALTY & MARITIME LAW (2d ed. 1994)   .        .        .        .        8

Kelsey L. Joyce Hooke, Collision at Sea: The Irreconcilability of the Superseding
  Cause and the Pure Comparative Fault Doctrine in Admiralty,
  74 Wash.L.Rev. 159 (Jan. 1999)   .        .        .        .        .        .        8-9

**Legal Issues Addressed in Separate Motions, Orders and Briefs**

Transocean and Halliburton propose various findings and conclusions of law relating to the interpretation, operation, enforceability or invalidation of various contractual release and indemnity provisions, claims assigned by BP to the Economic & Property Damages Settlement Class, liability for subsurface discharge, and the availability of punitive damages to Class Members and other Plaintiffs or Claimants-in-Limitation, which have been previously addressed in PLAINTIFFS' OPPOSITION TO TRANSOCEAN'S MOTIONS FOR PARTIAL JUDGMENT ON THE PLEADINGS [Doc. 10186] (May 20, 2013), PLAINTIFFS' OPPOSITION TO HALLIBURTON'S MOTIONS FOR PARTIAL JUDGMENT ON THE PLEADINGS [Doc. 10187] (May 20, 2013), the Court's ORDER AND REASONS [Doc. 5446] (Jan. 26, 2012), and the Court's ORDER AND REASONS [Doc. 5493] (Jan. 31, 2012).[1]

Defendants also propose various conclusions of law relating to the alleged preemption or displacement of general maritime law, which have been previously addressed in the Court's ORDER AND REASONS [Doc. 3830] (Aug. 26, 2011) ("B1 Order"), at pp.18-27, the Court's ORDER AND REASONS [Doc. 4159] (Sept. 30, 2011) ("B3 Order"), at pp.5-6, 20-21, the Plaintiffs' OPPOSITION TO B1 MOTIONS TO DISMISS [Doc. 1821] (March 30, 2011), at pp.30-56, the Plaintiffs' OPPOSITION TO B3 MOTIONS TO DISMISS [Doc. 1815] (March 30, 2011), at pp.4-9, and the Plaintiffs' OMNIBUS BUNDLE C RESPONSE [Doc. 2110] (April 24, 2011), at pp.3-20.[2]

---

[1] *See also,* BP'S COMBINED OPPOSITION TO TRANSOCEAN AND HALLIBURTON'S MOTIONS FOR PARTIAL JUDGMENT RE ASSIGNED CLAIMS [Doc. 10203] (May 20, 2013); THE STATE OF ALABAMA'S OPPOSITION TO MOTIONS FOR PARTIAL JUDGMENT ON PUNITIVE DAMAGES CLAIMS [Doc. 10205] (May 20, 2013); *and,* BP'S OPPOSITION TO TRANSOCEAN'S MOTION FOR PARTIAL JUDGMENT RE SUBSURFACE DISCHARGE [Doc. 10211] (May 20, 2013).

[2] *See also, generally,* MEMORANDUM IN RESPONSE TO SHOW CAUSE ORDER RE EFFECT OF B1 ORDER ON B3 AND BUNDLE C CLAIMS [Doc. 3998] (Sept. 12, 2011); PSC RESPONSE TO CAMERON PETITION FOR MANDAMUS, No.11-30987 [5th Cir. Docket No. 511658553] (Nov. 7, 2011); *In re Cameron Int'l Corp.,* No.11-30987 (5th Cir. Dec. 26, 2011); MOTION FOR LEAVE TO AMEND B3 MASTER COMPLAINT [Doc. 5718] (Feb. 16, 2012); *and,* OPPOSITION TO MOTIONS TO DISMISS B3 DEFENDANTS ON PREEMPTION AND DERIVATIVE IMMUNITY GROUNDS [Doc. 6691-2] (June 17, 2012).

Transocean proposes conclusions of law regarding the exoneration of Triton Asset Leasing GmbH, which are addressed in Plaintiffs' OPPOSITION TO TRITON'S MOTION FOR JUDGMENT ON PARTIAL FINDINGS [Doc. 10709].

## Defendants Erroneously Suggest that Direct Evidence (*i.e.* Admission) of Conscious Disregard of a Known Risk or Danger is Required

Plaintiffs, throughout their Proposed Findings, have pointed to numerous decisions made by the defendants or their employees to proceed in the face of a known risk or danger.

Defendants, in their post-trial submissions, not only ignore (or attempt to mis-characterize) the direct evidence of reckless disregard, but further suggest a burden of proof beyond what is required.

As a substantive matter, the plaintiff is not required to show that the defendant consciously desired or knew that a blowout, explosion, fire or spill was certain to occur.  Such "intentional" or "malicious" conduct is sufficient for the imposition of punitive damages, but is by no means required.  All that is required, by contrast, to satisfy the "willful" or "wanton" or "reckless" standard is that the defendant or its employees display an indifference or disregard for serious *risks* to the rights or safety of others.[3]

---

[3] *See generally,* POST-TRIAL BRIEF [Doc. 10458], p.11 fn.29; Exxon Shipping Co. v. Baker, 554 U.S. 471, 493-494 (2008) ("high degree of risk of … harm to another … in conscious disregard of, or indifference to, that risk"); Houston Exploration v. Halliburton, 269 F.3d 528, 532 (5th Cir. 2001) ("in reckless disregard of the risk known to him"); Clements v. Steele, 792 F.2d 515, 516-517 (5th Cir. 1986) (conscious indifference to the rights or welfare of others); Operaciones Tecnicas Marinas SAS v. Diversified Marine Services, No.12-1979, 2012 WL 6632509 at *4 (E.D.La. Dec. 19, 2012) ( reckless disregard for the safety of others);  Lobegeiger v. Celebrity Cruises, Inc., No.11-21620, 2011 WL 3703329 at *7 (S.D.Fla. Aug. 23, 2011) (conscious awareness of the risk of harm); Wilcox v. Kerr-McKee, 706 F.Supp. 1258, 1264 (E.D. La. 1989) ("reckless disregard for the safety of the crew"); RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM §2, Comment *b* (2010) ("reckless indifference to risk, or reckless disregard for risk"); FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS: Civil §4.10 (2006) ("in a reckless or callous disregard of, or with indifference to, the rights of the plaintiff").

Indeed, there is support for the proposition that punitive damages are warranted even where the defendant failed to appreciate the risk involved under circumstances where a reasonable man in the same position would have done so.[4]

But, even assuming *arguendo* that the disregard of a known risk is required substantively, from an evidentiary standpoint, there is nothing that requires a formal admission by the defendant or its employees.  Rather, it is black-letter law that a Court can reasonably infer these facts from the circumstances, particularly as they involve questions regarding state of mind.[5]

---

[4] *See generally,* Post-Trial Brief, at p.12; Exxon Shipping v. Baker, supra, 554 U.S. at 493-494 (*quoting,* 2 Restatement §500, Comment *a,* pp.587–588 (1964)) ("**Recklessness may consist of either of two different types of conduct.** In one the actor knows ... of facts which create a high degree of risk of ... harm to another, and deliberately proceeds to act, or fail to act, in conscious disregard of, or indifference to, that risk.  **In the other the actor has such knowledge, or reason to know, of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so**") (emphasis supplied); *see also,* Restatement (Third) of Torts:  Liability for Physical and Emotional Harm §2, Comment *c* (2010) (allows for punitive damages when the actor "knows of the risk of harm created by the conduct **or knows facts that make the risk obvious to another in the person's situation**") (emphasis supplied);  Fifth Circuit Pattern Jury Instructions:  Civil §4.10 (2006) ("An actor is indifferent to the rights of another, regardless of the actor's state of mind, when he proceeds in disregard of a high and excessive danger that is known to him **or was apparent to a reasonable person in his position**") (emphasis supplied); Clements v. Steele, supra, 792 F.2d at 516 (*quoting,* Williams v. Steves Industries, 699 S.W.2d 570 (Tex. 1985)) ("a plaintiff may objectively prove a defendant's gross negligence by proving that **under the surrounding circumstances a reasonable person would have realized** that his conduct created an extreme degree of risk to the safety of others") (emphasis supplied).

[5] Clements v. Steele, supra, 792 F.2d at 516 ("The 'mental attitude of the defendant' is what turns ordinary negligence into gross negligence…. [T]he defendant's state of mind may be inferred from actions and circumstances.  Proof by direct evidence is not always required"); *see also, e.g.,* Houston Exploration, supra, 269 F.3d at 532 (a release will be void on public policy grounds where a party acts in reckless disregard of a risk "so obvious that he must be taken to have been aware of it"); In re Mercer, 246 F.3d 391, 409 (5th Cir. 2001) (the subjective intent of the defendant can be established by circumstantial evidence); Zerangue v. TSP Newspapers, Inc., 814 F.2d 1066, 1070 (5th Cir. 1987) ("Although the defendant's state of mind is a subjective fact, it can be shown by indirect or circumstantial evidence"); Spencer v. Cain, No.10-721, 2010 WL 3614318, at p.*4 (E.D.La. Aug. 13, 2010) ("The elements of knowledge and intent are states of mind and need not be proven as facts, but may be inferred from the circumstances. The factfinder may draw reasonable inferences from the evidence presented at trial to determine if the defendant acted knowingly or intentionally"), *adopted,* 2010 WL 3614129 (E.D.La. Sept. 7, 2010); *see also, generally,* Rogers v. Missouri Pacific Railroad, 352 U.S. 500, 508 n.17 (1957) ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive that direct evidence"); Fifth Circuit Pattern Jury Instructions:  Civil §2.18 (2009) ("The law makes no distinction between direct and circumstantial evidence, but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial").

Particularly where key defense witnesses who could best speak to these issues have invoked the Fifth Amendment and refused to testify.[6]

**BP plc is Liable for Its Own Corporate Policies and for the Conduct of Employees Made with Knowledge, Approval or Ratification by Officials with Policymaking Authority**

As previously outlined in Plaintiffs' Proposed Findings:

- BP is organized globally, by function.[7]

- BP plc, through its Chief Executive Officer, the Board's Safety, Ethics and Environment Assurance Committee (SEEAC), and the company's Group Operations Risk Committee (GORC), assumed direct responsibility for process safety across the organization, including Drilling & Completions within the Gulf of Mexico, and made the decision not to apply OMS with respect to the drilling operations at Macondo.[8]

- BP plc's "Every Dollar Counts" culture and cost-cutting policies applied to Drilling & Completions in the Gulf of Mexico and directly contributed to the dangerous decisions that were made at Macondo.[9]

- BP plc is a signatory to the criminal guilty plea.[10]

*See also, generally,* PROPOSED FINDINGS [Doc. 10459] pp.158-169.

---

[6] *See generally,* FDIC v. Fidelity & Deposit Co., 45 F.3d 969, 977-978 (5th Cir. 1995); MOTION FOR ADVERSE INFERENCES FROM FIFTH AMENDMENT INVOCATIONS [Doc. 5873] (Feb. 24, 2012); MEMO FOR ADVERSE INFERENCES FROM FIFTH AMENDMENT INVOCATIONS BY DONALD VIDRINE [Doc. 8601-1] (Feb. 18, 2013).

[7] L. McKay Testimony, p.537.

[8] *See* Plaintiffs' PROPOSED FINDINGS [Doc. 10459] pp.40-46, 159-162.

[9] *See* Plaintiffs' PROPOSED FINDINGS [Doc. 10459] pp.51-54, 163-166.

[10] TREX-52673 (BP Guilty Plea Agreement) at pdf p.12; *see also,* Order, p.19 ¶38 [TREX-52673 at pdf p.38] ("This Order shall be applicable to the defendant, and to the extent specified herein, to BP plc and Affiliates"); Resolutions of the Board of Directors of BP plc [TREX-52673 at pdf pp.54-56]; *see also,* Order, pp.1-2 ¶1.a. [TREX-52673 at pdf pp.20-21] (Retention of Process Safety Monitor applies to "any entity controlled, directly or indirectly, by BP plc that participates in deepwater drilling in the Gulf of Mexico"); Order, p.9 ¶11.a. [TREX-52673 at pdf p.28] (cement Design and Competency applies to "the defendant, BP plc, or the Affiliates").

In addition:

- BP plc is included within, sets standards for, and provides management for the "BP Group" – which describes the entirety of BP's operations, from exploration and production, to refining and marketing, to alternative energy, and the corporate center; [11]

- According to Mr. Hayward, BP Exploration & Production is more appropriately characterized as an "internal organizational unit" within BP plc than as a "legal subsidiary". [12]

- "BP" or "BP Group" is defined by the company as "BP p.l.c. and its subsidiaries" which are defined as entities "controlled by the BP group"; which control includes "the power to govern the financial and operating policies" of the subsidiaries. [13]

- The Group had a "financial control process" which required the approval or endorsement of the CEO of BP plc on contracts of a certain size, including the Drilling Contract with Transocean. [14]

- Mr. Inglis was the Chief Executive Officer of BP Exploration & Production and served on the Board of BP plc. [15]

- Mr. Suttles could not state which specific BP entity he was the Chief Operating Officer of at the time of his retirement in March of 2011. [16]

The *Bestfoods* case cited by BP actually supports the conclusion that, because BP plc officers and employees were directly involved in shaping the operations at the Macondo Well, BP plc is directly liable to plaintiffs for punitive and other damages arising from the disaster. United States v. Bestfoods, 524 U.S. 51, 72 (1998) (when the parent and its employees play key

---

[11] Armstrong Deposition, pp.25-27.

[12] Hayward Deposition, pp.561-562. *See also, e.g.,* Suttles Deposition, pp.797-798, 803 (Exploration & Production was an "organizational entity" within the BP Group; "I don't know if BP Exploration & Production was a legal entity").

[13] TREX-6079 at pdf p.3 (BP Annual Report and Accounts, 2009, p.2); Hayward Deposition, pp.864-866.

[14] Suttles Deposition, pp.797-801.

[15] Hayward Deposition, p.561.

[16] Suttles Deposition, pp.548-551.

roles in shaping regulatory compliance policy, the parent becomes directly liable as an operator); *see also,* BP Amoco Chemical Co. v. Sun Oil Co., 166 F.Supp.2d 984, 990-991 (D.Del. 2001) (CERCLA prevents parent corporations from hiding behind the corporate shield when they actually participate in the wrongful conduct; such parents can be held liable when they operate the facility alongside the subsidiary).

### Neither the Fault of BP nor Transocean Constitutes a "Superseding" Cause with Respect to the Bad Cement Slurry Provided by Halliburton

Halliburton's argument regarding the alleged "superseding" fault of Transocean and BP ignores the fact that: **(i)** an uncontrolled blowout was a foreseeable result of the failure of the cement slurry to seal the well from hydrocarbon flow;  **(ii)** Halliburton itself was responsible for the placement of the cement, as well as its design;  and **(iii)** Halliburton-Sperry also contributed to the failure to recognize the kick and shut in the well.

The purpose of the final cement job was to achieve "zonal isolation" – *i.e.* to isolate the hydrocarbon-bearing zones in the formation and prevent the hydrocarbons from migrating into the well.[17]   The direct and foreseeable consequence of the cement's failure (absent intervention) was an uncontrolled blowout.[18]

---

[17] *See, e.g.,* Benge Testimony, pp.2383-2384; Probert Testimony, p.3010; Gagliano Testimony, pp.6609-6610.

[18] *See, e.g.,* M. Sepulvado Deposition, pp.156-157, 164, 197 (a cement failure can lead to a blowout and an explosion); Kellingray Deposition, p.548 (cement is one of the barriers which, if it fails, may result in a blowout); Benge Testimony, p.2470 ("if the slurry design doesn't meet the requirements of the well… that can result in a well failure"); Cocales Deposition, p.287 (one of the purposes of a good cement job is to act as a barrier against a blowout); *see also, e.g.,* Bly Testimony, pp.1089-1094 (*and* D-3584) (each and all elements of the "Swiss Cheese" Model, including the failed cement job, caused and contributed to the blowout, explosion, fire and spill); Ambrose Testimony, p.6098 (the compromised cement job allowed the kick and the blowout); TREX-3808 pdf p.197 (Transocean Investigation Report, Vol. I, p.213) ("The precipitating cause of the Macondo incident was the failure of the cement in the shoe track and across the producing formations. This failed barrier allowed hydrocarbons to flow into the well"); Roth Testimony, p.3089 (if Halliburton had followed the specific obligations of the contract (*i.e.* identification of risks, mitigation of risks, determining what designs should be used), there would not have been a blowout); Bourgoyne Testimony, p.7792 (if zonal isolation had been achieved, the blowout would not have occurred).

Moreover, to the extent that it was the placement of the cement that caused or contributed to the slurry's failure, Halliburton itself was responsible along with BP for the cement job.  As Halliburton itself notes, the company "also designed, blended, and pumped the cement for the Macondo Well, including the final production casing."[19]  Significantly, in this regard, Halliburton told BP that the cement would cure after only 8 hours and 40 minutes, as contrasted with the recognized 24-hour industry standard for allowing the cement to set before conducting the negative pressure test or otherwise proceeding with displacement.[20]  Moreover, Halliburton was responsible, along with BP, for the pumping and placement of the cement, as well as the foam slurry's formulation and design.[21]  As noted by Transocean in its Investigation Report, "BP and Halliburton failed to isolate the reservoir due to a poorly planned, executed, and untested cement program" which was "the precipitating cause of the incident."[22]

Finally, Halliburton-Sperry itself played a part in failing to timely identify the inflow and shut in the well.[23]

---

[19] HALLIBURTON POST-TRIAL BRIEF [Doc. 10469] p.16 (wherein Halliburton also takes the position that: "Analysis of the cement job requires separating the design of the cement slurry from the placement of the cement slurry").

[20] Beck Testimony, pp.7167-7168.  *See also, e.g.,* Beck Report (TREX-8140) p.81; Benge Testimony, pp.2331-2332; Benge Report, pp.33-34 (TREX-5990 at pdf pp.39-40); Beck Report (TREX-8140) p.82; Chaisson Testimony, pp.6359-6360.

[21] *See, e.g.,* Chaisson Testimony, pp.6290-6291.  *See also, generally,* Plaintiffs' PROPOSED FINDINGS [Doc. 10459] pp.178-180.

[22] TREX-3808 pdf p.60 (Transocean Investigation Report, Vol. I, p.72); *see also,* TREX-3808 at pdf pp.6, 43, 197 (Report, Vol. I, at pp.10, 55, 213); *see also,* Roth Testimony, p.3089 (if Halliburton had followed the specific obligations of the contract (*i.e.* identification of risks, mitigation of risks, determining what designs should be used), there would not have been a blowout).

[23] *See* HALLIBURTON POST-TRIAL BRIEF [Doc. 10469] p.16 ("The mudlogging HESI provided through its Sperry product service line is purely service-based and is not a product subject to claims for product liability"); *see also, generally,* Plaintiffs' PROPOSED FINDINGS [Doc. 10459] pp.56-60, 180 (The Halliburton-Sperry Mudlogger, Joe Keith, completely failed to monitor the well during displacement, and Halliburton-Sperry should have positioned the Flow-Out Sensors, or a second set of Flow-Out Sensors, to allow for better monitoring by Defendants while fluids were being diverted overboard).

The harm from the failed slurry and the harm from the subsequent well control failures are not different "in kind";  the subsequent well control failures were wanton and reckless, but not "extraordinary" in the sense of being unforeseeable (particularly given the history of Transocean well control failures, and the well control events and management dysfunctionality experienced on the DEEPWATER HORIZON);  the well control failures were not "independent" of the slurry failure;  the well control failures were not due solely to the fault of third parties (as Halliburton-Sperry itself was responsible for and failed to detect the kick and help shut in the well);   and, while the failures of Transocean and BP were wanton and reckless, so was Halliburton's conduct in providing the doomed slurry, concealing the failed stability test results, and allowing its mudlogger to abandon his post during one of the most critical stages in the drilling process.[24]

Plaintiffs agree that BP and Transocean – and Halliburton-Sperry itself – should have timely intervened in various ways between the time the cement was pumped and the time of the blowout.   Yet that did not occur.   What Halliburton is really complaining of is not an "intervening event" but rather the *failure to intervene*.   Yes, Transocean's fault, BP's fault, and additional fault on the part of Halliburton-Sperry all contributed, along with the slurry's failure, to the blowout.   But there was nothing that BP or Transocean did (or failed to do) that was so "independent" or "unforeseeable" or "extraordinary" that it can be said to break the chain of causation.[25]

---

[24] *See generally,* HALLIBURTON POST-TRIAL BRIEF [Doc. 10469] pp.9-10; *citing,* RESTATEMENT (SECOND) OF TORTS §442 (1965) (setting forth the factors to be considered in determining whether an intervening event is a "superseding"cause).

[25] *See, e.g.,* TRANSOCEAN'S PROPOSED FINDINGS [Doc. 10463] pp.277-278; *citing,* Stolt Achievement Ltd v. Dredge B.E. LINDHOLM, 447 F.3d 360, 367-368 (5th Cir. 2006) (*citing,* 1 Schoenbaum, ADMIRALTY & MARITIME LAW 165 (2d ed. 1994)) (it is only a superseding or intervening cause where "the injury was actually brought about by a later cause of independent origin that was not foreseeable"); Tidewater Marine v. Sanco International, 113 F.Supp.2d 987, 999 (E.D.La. 2000) ("the subsequent negligence of the third party must be so

**The Chronic Maintenance Problems on the DEEPWATER HORIZON Were Directly Related to Emergency Shut-Down, Fire & Gas and BOP System Failures on April 20, 2010**

The evidence presented at trial established that the primary sources of ignition were the DEEPWATER HORIZON's engines, which oversped and ignited after combustible gas escaped onto the rig.[26]   Several pieces of equipment existed solely to prevent this occurrence, including Fire Dampers, which are designed to seal off the engine rooms from combustible gas;[27]   Engine Governors, which are designed to limit the engines to a certain rotation speed;[28]   and Rig Savers, which are designed to cut off airflow to the engines.[29]   In addition, the vessel's Blowout Preventer (BOP) was designed to shut in the well, cut off the fuel source, and allow the vessel to drift safely off-station, without an uncontrolled discharge of oil into the Gulf of Mexico.

It is clear that the Fire & Gas System failed to prevent the explosions and fire aboard the rig and that the BOP failed to successfully shut in the well either when the crew attempted to close the annular shortly prior to the first explosion or when the AMF ("Deadman") should have sealed the well shortly thereafter.

---

extraordinary that a reasonably prudent person could not have foreseen its occurrence"); Donaghey v. Ocean Drilling & Exploration, 974 F.2d 646, 652-653 (5th Cir. 1992) (the fact that a third party "knowingly exceeded the rated capacity" was not a superseding cause absolving the defendant of liability for negligence in allowing the situation necessitating the use of the tool to develop in the first place); see also, HALLIBURTON POST-TRIAL BRIEF [Doc. 10469] p.9 (quoting, Kelsey L. Joyce Hooke, Collision at Sea: The Irreconcilability of the Superseding Cause and the Pure Comparative Fault Doctrine in Admiralty, 74 Wash. L. Rev. 159, 170 (Jan. 1999)) ("The intervening act supersedes the first actor's liability only if the court determines that the second act broke the causal connection between the first action and the result").

[26] See, e.g., Webster Testimony, pp.3950-3951; TREX-00001 (Bly Report) pp.136-138;  Transocean Investigation Report, Vol. I, p.190 (TREX-3808 at pdf p.177); Meinhardt Deposition, pp.100-104, 116-118, 206-215; Brown Deposition, pp.67-69, 74-75; Williams Deposition, pp.70-72, 188-191; D. Johnson Deposition, pp.64-66.

[27] Webster Testimony, p.3760.

[28] Webster Testimony, p.3953.

[29] Webster Testimony, p.3948.

Contrary to Transocean's suggestion that none of its ongoing maintenance problems were directly causal of the disaster, the evidence clearly demonstrates a documented history of maintenance problems with these very items, uncorrected and unaddressed at the time of the explosions and fire.   Specifically including:

- The Rig Savers;[30]

- The Fire Dampers;[31]

- The Engine Governors;[32]

- The BOP generally, which was out of certification;[33]

---

[30] *See, e.g.,* TREX-664 at pdf p.14 (April 19, 2010) (corrective maintenance on Rig Saver for Engine #6 overdue by 166 days); Webster Testimony, pp.3947-3948; Meinhardt Deposition, pp. 118, 210, 231 (and TREX-4372) (the Rig Savers should have killed the engines upon overspeed, but did not work).   *See also,* TREX-3404 at PSC pdf pp.3, 6 (BP Rig Audit, May 2007, pp.5, 23).

[31] *See, e.g.,* TREX-5295 (Feb. 2010) (the Fire Dampers needed to be replaced); TREX-664 at pdf pp.10, 21 (April 19, 2010) (the replacement of the Fire Dampers was a "high priority" maintenance task that was 453 days overdue); Young Testimony, pp.5748-5749 (no Fire Dampers were replaced between February 2010 and April 20, 2010); Webster Testimony, pp.3957-3958, 4214-4215.  *See also,* TREX-3404 at PSC pdf pp.2, 3, 4 (BP Rig Audit, May 2007, pp.4, 5, 19).

[32] TREX-664 at pdf p.16 (April 19, 2010) (corrective repairs to Governor Actuators on the Wartsila Engines was 78 days overdue).

[33] *See, e.g.,* TREX-3405 (BP 2009 Rig Audit) pdf p.3; TREX-80 (2005 Moduspec Audit), pp.15-16, 24; TREX-251 (2010 Moduspec Audit), pp.47-48, 51-52; Webster Testimony, pp.3873-3874; Childs Report (TREX-7687) p.40 (neither BP nor Transocean complied with API RP 53); R. Sepulvado Testimony, p.2010 (BOP was beyond API certification); *see also,* TREX-1168 (maintenance must meet or exceed API RP 53); TREX-3286 p.68 (API RP 53).  BP's Norman Wong believed that in order to comply with 30 CFR 250.466, Transocean had to comply with API RP 53 by disassembling and inspecting the BOP every 3 to 5 years.  *See* Wong Deposition, pp.209-213.  Transocean Subsea Supervisor William Stringfellow admitted that the DEEPWATER HORIZON's BOP did not comply with 30 CFR 250.466's requirements. *See* Stringfellow Deposition, p.178. *See also, e.g.,* Winslow Deposition, pp.122-123, 585-586 (Transocean applies its "condition based" maintenance philosophy to the BOP, even if it falls outside of API or OEM certification); Hay Deposition, pp.114-115, 119-121 (Transocean applies its "condition based" maintenance philosophy to the BOP, even if it falls outside of API or OEM certification), p.202 (did not follow manufacturer's recommendation of 5-year recertification of the annular); Trahan Deposition, pp.217-218 (Transocean did not comply with API recommendation to disassemble BOP every three to five years).  *See also, generally,* TREX-3813 at pdf pp.75, 93 ("run it, break it, fix it"); Williams Deposition, p.273 (did not make that comment, but agrees with it); Brown Deposition, pp.155-156 ("In the Transocean culture, it was run it until it breaks").

- The BOP Annular elements, which were leaking;[34]

- The 27-volt Battery in the Blue Pod;[35] and,

- The mis-wired Solenoids in the Yellow Pod.[36]

With respect to Transocean's contention that its failures to maintain the Blue Pod and the Yellow Pod were not causal, (as, according to Transocean, the AMF "Deadman" function would not have successfully sheared and sealed the well due to off-center pipe anyway), it is important to note that Transocean itself contributed to the situation by **(i)** inadequately selecting, modifying, configuring and refusing to upgrade the BOP,[37] and **(ii)** failing to timely recognize the kick and shut in the well, or at least activate the EDS, prior to the explosion.[38]  Moreover, the weight of the evidence indicates that **(iii)** the BOP would have likely, in fact, successfully sealed in the well had the Blind Shear Ram been activated at "AMF Time".[39]

---

[34] *See, e.g.,* TREX-00001 (Bly Report) pp.169-171; TREX-3808 at pdf p.137 (Transocean Investigation Report, Vol. I, p.149); TREX-4304 (Transocean Report, Vol. II, Appendix K) at pdf pp.391-395; Hay Deposition, pp.99-100; TREX-3293 (2010 Moduspec Audit) pdf pp.48-49; TREX-680 (April 15, 2010) (BP and Transocean agree not to change the annular elements prior to starting the Nile Well, and recognize possibility that both annulars could fail); Childs Testimony, pp.5321-5322 (this is an example of "deferred maintenance" in order to keep the rig and the BOP working).

[35] *See generally,* Plaintiffs' PROPOSED FINDINGS [Doc. 10459] pp.36-37.

[36] *See* Plaintiffs' PROPOSED FINDINGS [Doc. 10459] p.101.

[37] *See generally,* Plaintiffs' PROPOSED FINDINGS [Doc. 10459] pp.75-90.

[38] *See generally,* Plaintiffs' PROPOSED FINDINGS [Doc. 10459] pp.111-112, 114-117; *see also,* pp.29-30, 31-32.

[39] *See, e.g.,* Davis Testimony, pp.2649-2650, 2652, 2656, 2660-2662; Shanks Testimony, p.9026.  *See also, generally,* BP PROPOSED FINDINGS [Doc. 10467] pp.340-343; *citing,* Shanks Testimony, pp.9037-9038; D4811; Davis Rebuttal Report (TREX-7661) p.14;  Davis Testimony, pp.2661-2662; Emilsen Report (TREX-40003) p.15.

**None of the Four Petitioning Transocean Entities Are Entitled to Limitation or Exoneration**

Only the vessel owner or bareboat charterer is generally entitled to seek limitation.[40]

In this case, the owner, Triton Asset Leasing GmbH, and the bareboat charterer, Transocean Holdings LLC, are not entitled to limitation or exoneration on account of the negligently-created and unseaworthy conditions of the DEEPWATER HORIZON, both at the time of the charter and at the time of the blowout, as set forth in Plaintiffs' Proposed Findings and in Plaintiffs' Opposition to Triton's Motion.[41]

Assuming *arguendo* that Transocean Offshore Deepwater Drilling, which allegedly employed the on-shore supervisory and managerial employees, were legally entitled to seek limitation or exoneration, such claim would be defeated based on the managerial and supervisory failures in scheduling and completing the appropriate maintenance and repair of the vessel and BOP certification, in establishing the "dual command" structure, in directing that the fleet be run on manual override, and in the other failures to provide for a competent and adequately trained crew, with privity and knowledge, as outlined in the Proposed Findings.[42]

Likewise, assuming *arguendo* that Transocean Deepwater Inc, which allegedly employed the DEEPWATER HORIZON crew, were legally entitled to seek limitation or exoneration, such

---

[40] 46 U.S.C. §30501. *See, e.g.,* In re American Milling Co., Ltd., 409 F.3d 1005, 1016 (8th Cir. 2005) (employer of towboat's crew was not considered an owner *pro hac vice* for limitation of liability purposes); Brown v. Teresa Marie IV, Inc., 477 F.Supp.2d 266, 271 (D.Me. 2007) (provider of maintenance and management services for fishing vessel was not an "owner" entitled to limitation under the Act); In re: Red Circle Transportation Co., No.02-1572, 2002 WL 31012610, at p.*1 (E.D.La. Sept. 9, 2002) (noting that each owner's right to limit is independent of the other owners); International Marine Terminals Partnership v. Hillmon Marine, No. 99-1637, 2000 WL 351429, at p.*2 (E.D.La. April 3, 2000) ("The Limitation of Liability Act explicitly applies only to ship owners"; the court-created exceptions are few; where the operational manager and agent were separate and distinct corporations from the owner, they were not permitted to limit).

[41] *See* OPPOSITION TO TRITON'S MOTION FOR PARTIAL JUDGMENT [Doc. 10709]; *see also, generally,* Plaintiffs' PROPOSED FINDINGS [Doc. 10459] pp.71-72.

[42] *See generally,* Plaintiffs' PROPOSED FINDINGS [Doc. 10459] pp.27-28, 32-35, 72-74, 91-103, 107-109, 118-129; *see also, generally,* BP's PROPOSED FINDINGS [Doc. 10467] pp.311-318.

claim would be defeated based on the failure to provide for an appropriately licensed, competent and adequately trained crew, with privity and knowledge, as outlined in the Proposed Findings.[43]

**Transocean Erroneously Confuses the Appropriateness of a "Dual Command" Structure under Normal Conditions with the Requirement for One Qualified "Master" with Overriding Authority and Responsibility in the Case of an Emergency**

In the ordinary operation of the vessel, there is nothing wrong with having a marine Captain in charge of the navigation function and an Offshore Installation Manager (OIM) in charge of the drilling operations. To the extent that the Marshall Islands, industry practice, or other authority allows for a "dual command" structure, it is in that sense.

However, as demonstrated by the events which unfolded on the DEEPWATER HORIZON on April 20, 2010, in the event of an emergency, there must be one clear and unequivocal "Master" with overriding authority and responsibility – and that Master must be knowledgeable, experienced and adequately trained to respond appropriately to the circumstances.

Difficult, and indeed critical, decisions must be made in a hurry. That is the nature of an emergency.[44] In this case, there were essentially eight minutes. Which proved to be insufficient time for the Bridge Crew to figure out who was in charge, consult intelligibly with others, and make the right decisions.

Particularly in a dynamically positioned MODU attached to the ocean floor, there may be confusion as to what is a "marine" operation versus what is a "drilling" operation – including, significantly, the operation of the Emergency Disconnect System (EDS).

---

[43] *See generally,* Plaintiffs' PROPOSED FINDINGS [Doc. 10459] pp.29-32, 72-74, 103-107, 118-129.

[44] *See, e.g.,* Mitchell Testimony, pp.9470-9472 (recognizing the importance of training and preparing for emergency situations so that quick and instinctive action can be taken).

Thus, when the term "Dual Command" Structure is used in the context of where the buck does or does not stop in the event of an emergency, (versus the ordinary day-to-day operations of the vessel), it is clear that neither the Marshall Islands nor other industry practices gainsay the ISM Code requirement, as established in the testimony of Captain Mitchell and Mr. Webster.

**Transocean Disregards the Fact that the Emergency Disconnect (EDS) Serves a Marine Function, in Addition to (if not Primary to) a Well Control Function**

The Emergency Disconnect System (EDS) enables the vessel to either drive or drift "off station" without damaging the BOP, the riser, or the vessel.[45] It therefore serves a marine or navigational function in addition to, if not primary to, a well control function.

Transocean disregards this when it suggests (erroneously) that the opinions of marine experts, such as Mr. Webster and Captain Mitchell, are somehow insufficient to establish that the crew should have activated the EDS. (Indeed, the fact that Captain Kuchta had no EDS training is not an opinion, but a fact – which was agreed to by Transocean's own expert.[46] Similarly, the fact that the DPOs Keplinger and Fleytas were not trained was established by Durkan and Keplinger himself.[47])

Similarly, Transocean disregards the marine function of the EDS when it suggests (erroneously) that it was prudent to allow the rig to blow up and catch on fire before attempting to disconnect the riser from the BOP. While activation of the EDS might not have prevented the initial explosions and fire aboard the vessel, (particularly given the maintenance, training and

---

[45] *See, generally,* Young Testimony, pp. 5741-5744. *See also, e.g.,* Webster Testimony, pp.4204-4206 (discussing TREX-2188 at pdf p.198) (Transocean's major risk assessment for the DEEPWATER HORIZON identifies "Ability to move off station" as a "Mitigation" that can be done on the marine side to reduce the risk of a "Reservoir blowout (at Drill Floor)").

[46] Wolfe Deposition, p.193.

[47] Durkan Deposition, pp.15-16, 42-46, 50; Keplinger Deposition, pp.89-91, 124.

operational failures impeding the effectiveness of the Rig Savers, Engine Governors and Fire Dampers), Transocean's own well control expert, Mr. Barnhill, conceded that successful activation of the EDS prior to the explosion would have cut off the fuel source and ensured that the well was shut in.[48]

As Mr. Webster observed, the reluctance to activate the EDS is primarily a "commercial" issue, as it takes time and money to re-connect.[49]

**BP and Transocean Ignore the Cumulative Effects of their Intentional Choices and Reckless Failures in the Configuration, Maintenance and Operation of the BOP**

In addition to the observations made about Defendants' alleged "compliance" with MMS or other Federal Regulations in Plaintiffs' original Post-Trial Brief,[50] the defendants, in discussing changes to the BOP that were allegedly known to or "approved" by some employee of MMS, ignore the cumulative effects of their intentional choices and reckless failures in the configuration, maintenance and operation of the BOP.[51]

For example, BP argues that converting the BOP's Lower Annular to a Stripping Annular improved its "functionality" and was "approved" by the MMS, despite the fact that each of the BOP's components are required by Federal Regulations to function successfully while exposed to Maximum Anticipated Surface Pressures (MASP).[52]  By deliberately reducing the pressure capacity to 5,000 pounds, the annular became incapable of functioning successfully at 8,404 psi,

---

[48] Barnhill Testimony, p.5039.

[49] Webster Testimony, p.4012.

[50] *See* Plaintiffs' POST-TRIAL BRIEF [Doc. 10458] pp.21-23.

[51] Similarly, the defendants ignore these interrelated issues when they discuss causation.

[52] *See* 30 C.F.R. ¶250.444.  (*See also* 30 C.F.R. ¶250.416(e), *infra*.)

the Maximum Anticipated Surface Pressure at Macondo.[53]   Moreover, when BP and Transocean decided to convert the Lower Annular to a Stripping Annular, both of the defendants recognized that it would reduce redundancy by cutting the pressure rating in half, and yet made the decision to proceed with the modification without even doing a formal risk assessment.[54]   Finally, this decision becomes all the more reckless when combined with both companies' decision to defer maintenance,[55] and their express policy to "close the annular and wait" in the event of a kick and potential blowout.[56]

BP also suggests that the Blind Shear Rams were in compliance with 30 C.F.R. ¶250.416(e), which required rams "capable of shearing drill pipe in the hole under Maximum Anticipated Surface Pressure."  BP points, for example, to Function Tests, which only establish that the BSRs will open and close – not that they will actually shear and seal the drill string or other pipe or casing.  Transocean's expert, Mr. Childs, admitted that the BSRs would not shear 6⅝" Drill Pipe at what BP admitted was Maximum Anticipated Surface Pressure (MASP).[57]  BP also ignores the fact that BP was required, but admittedly failed, to provide proof of shearing capacity under MASP to the MMS in connection with its Application for Permit to Drill (APD).[58]

---

[53] *See, e.g.,* TREX-1559.  *See also, e.g.,* Perkin Testimony, pp.3377-3380; TREX-26011.

[54] *See, e.g.,* Childs Testimony, pp.5295-5300.

[55] *See, e.g.,* TREX-680 (April 15, 2010) (BP and Transocean agree not to change the annular elements prior to starting the Nile Well, and recognize possibility that both annulars could fail); Childs Testimony, pp.5321-5322 (this is an example of "deferred maintenance" in order to keep the rig and the BOP working).

[56] *See, e.g.,* TREX-1454 p.59; TREX-7005 p.79.

[57] *See, e.g.,* Childs Testimony, pp.5255-5256; TREX-5492; Davis Report (TREX-7660) pp.11-16.

[58] *See, e.g.,* Douglas Deposition, pp.284-286; Powell Deposition, pp.195-196; TREX-1559. *See* 30 C.F.R. ¶250.416(e).

BP further ignores the fact that BP and Transocean themselves expressly acknowledged and agreed to assume additional risks of failure with the conversion of the Lower Ram to a Test Ram.[59]

With respect to the issue of causation, as well as the issue of willful or reckless disregard, the Court should not view the defendants' decisions and failures in isolation, but rather, the entire "accumulation of acts" and "chain of circumstances" that were "a contributing cause even though not the immediate or proximate cause of the casualty" should be considered.[60]   The uncontrolled spill that commenced on April 22, 2010 was the culmination of numerous causative factors, which separately and collectively contributed to the BOP's failure, and which separately and collectively demonstrate the defendants' willful and wanton disregard of known risks in the configuration, modification, refusal to upgrade, refusal to maintain, refusal to provide proper guidance and training, and ultimately the failure to timely activate the BOP on the evening of April 20, 2010.[61]

---

[59] TREX-6120 (letter agreement between Transocean and BP acknowledging that the conversion "will reduce the built-in redundancy of the BOP, thereby potentially increasing the … risk profile"); Childs Testimony, pp.5292-5294; *see also, e.g.,* TEX-6094 (increase risk profile); TREX-274 (BP "drove the decision to install test rams"); TREX-4433 (cost savings of conversion); TREX-4432 (cost savings); TREX-4624 (time and cost savings).

[60] Water Quality Ins. Syndicate (re Barge Morris J. Berman) v. United States, 522 F.Supp.2d 220, 230 (D.D.C. 2007) (*quoting* In re Tug OCEAN PRINCE, 584 F.2d 1151, 1158 (2d Cir. 1978)); *see also,* In re Oil Spill by Amoco Cadiz, 954 F.2d 1279, 1303 (7th Cir. 1992) (applying same principle in context of the Limitation Act). *See generally,* Plaintiffs' POST-TRIAL BRIEF [Doc. 10458] pp.13-14.

[61] *See generally,* Plaintiffs' PROPOSED FINDINGS [Doc. 10459] pp.31-37, 75-90, 91-107, 111-112, 114-117, 155-158.

## Conclusion

For the above and foregoing reasons, and for the reasons set forth in Plaintiffs' PROPOSED FINDINGS AND CONCLUSIONS and the original POST-TRIAL BRIEF, Plaintiffs respectfully pray that the Court enter Final Judgment and Reasons against Defendants as set forth in the PROPOSED FINDINGS AND CONCLUSIONS submitted on June 21, 2013.

This 11th day of July, 2013.

Respectfully submitted,

   /s/   Stephen J. Herman                    /s/ James Parkerson Roy
**Stephen J. Herman**, La. Bar No. 23129      **James Parkerson Roy**, La. Bar No.11511
**HERMAN HERMAN & KATZ LLC**            **DOMENGEAUX WRIGHT ROY**
820 O'Keefe Avenue                    **& EDWARDS, LLC**
New Orleans, Louisiana 70113         556 Jefferson Street, Suite 500
Telephone: (504) 581-4892           Lafayette, Louisiana 70501
Fax. No. (504) 569-6024             Telephone: (337) 233-3033
Email: sherman@hhklawfirm.com      Fax No. (337) 233-2796
*Plaintiffs Liaison Counsel*             E-Mail: jimr@wrightroy.com
                                       *Plaintiffs Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office:  (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Jeffrey A. Breit
BREIT, DRESCHER & IMPREVENTO
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, Virginia 23451
Office:  (757) 670-3888

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY  10003
Office:  (212) 558-5802
Telefax: (212) 344-5461
E-Mail:  rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office:  (334) 269-2343
Telefax: (334) 954-7555

Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail:  ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA &
TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail:  pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.

E-Mail:  rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU LLP
501 Broad Street
Lake Charles, LA  70601
Office:  (337) 439-0707
Telefax: (337) 439-1029
E-Mail:  mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail:  mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail:  sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, Louisiana 70360
Office: (985) 876-7595
Fax No. (985) 876-7594
E-Mail: duke@williamslawgroup.org

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office: (843) 216-9159
Fax No. (843) 216-9290
E-Mail: jrice@motleyrice.com

## ADDITIONAL PSC PHASE ONE TRIAL TEAM MEMBERS

Johnny deGravelles
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail:  jdegravelles@dphf-law.com

Walter J. Leger, Jr.
LEGER & SHAW
600 Carondelet St., 9th Floor
New Orleans, LA 70130
Phone: (504) 588-9043
Fax: (504) 588-9980
E-Mail: wleger@legershaw.com

Jimmy Williamson
WILLIAMSON & RUSNAK
Texas State Bar No. 21624100
4310 Yoakum Blvd.
Houston, TX 77006
Phone: (713) 223-3330
Fax: (713) 223-0001
E-Mail: Jimmy@JimmyWilliamson.com

Tom W. Thornhill
THORNHILL LAW FIRM, APLC
1308 Ninth Street
Slidell, Louisiana 70458
Phone: (985) 641-5010
Fax: (985) 641-5011 fax
E-Mail: tom@thornhilllawfirm.com

Anthony Irpino
IRPINO LAW FIRM
2216 Magazine Street
New Orleans, LA 70130
Tel: (504) 525-1500
Fax: (504) 525-1501
E-Mail: airpino@irpinolaw.com

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing Post-Trial Reply Brief has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 11th day of July, 2013.

s/ Stephen J. Herman and James Parkerson Roy