UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | * * * * | MDL NO. 2179 SECTION J |
| THIS PLEADING APPLIES TO: No. 12-311 | * * * * * | JUDGE BARBIER MAG. JUDGE SHUSHAN |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**AMENDED INITIAL DISCLOSURES OF PLAINTIFF
CAMERON INTERNATIONAL CORPORATION
PURSUANT TO RULE 26(a)(1)**

Plaintiff Cameron International Corporation ("Cameron"), by and through its undersigned counsel, pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, hereby provides the following amended initial disclosures. These amended initial disclosures are based on the information presently available to Cameron, and Cameron reserves the right to further amend or supplement them.

A.      Disclosure Pursuant to Rule 26(a)(1)(A)(i)

Based on information reasonably available at this time, Cameron believes that the following individuals may have discoverable information (subject to Cameron's reservation of all rights under attorney-client privilege, the attorney work product doctrine, and any other privileges or immunity from disclosure, and the requirement that any current or former Cameron employees are contacted only through undersigned counsel) that Cameron may use to support claims or defenses raised in the above-captioned action:

**EXHIBIT A**

| Name | Subject(s) |
|---|---|
| Jeff Trimarchi<br>Vice President, Casualty Claims<br>ACE Bermuda Insurance Ltd.<br>17 Woodbourne Avenue<br>Hamilton HM 08 Bermuda<br>(441) 295-5200 | Cameron's Deepwater Horizon Insurance;<br>Cameron's negotiations and settlement with BP<br>relating to the Deepwater Horizon incident |
| Miriam Mosseri<br>Claims Specialist<br>ACE Excess Casualty<br>10 Exchange Place, 9th Floor<br>Jersey City, NJ 07302<br>(201) 356-5109 | Cameron's Deepwater Horizon Insurance;<br>Cameron's negotiations and settlement with BP<br>relating to the Deepwater Horizon incident |
| Kevin Williams<br>Underwriter & Claims Manager<br>Argo Re<br>Argo House, 110 Pitts Bay Rd.<br>Pembroke HM 08, Bermuda<br>(441) 296-5858 | Cameron's Deepwater Horizon Insurance;<br>decision not to invoke Liberty's "other insurance"<br>provision; Cameron's negotiations and settlement<br>with BP relating to the Deepwater Horizon<br>incident |
| David Beck<br>Beck, Redden & Secrest, L.L.P.<br>One Houston Center<br>1221 McKinney Street, Suite 4500<br>Houston, Texas 77010<br>(713) 951-3700 | Insurance policies issued by Liberty to Cameron<br>("Liberty Policies"); Cameron's Deepwater<br>Horizon Insurance; Liberty's denial and/or<br>rejection of Cameron's insurance claims related to<br>the Deepwater Horizon incident; Cameron's<br>negotiations and settlement with BP relating to<br>the Deepwater Horizon incident; Cameron's<br>claims against Transocean |
| David Jones<br>Beck, Redden & Secrest, L.L.P.<br>One Houston Center<br>1221 McKinney Street, Suite 4500<br>Houston, Texas 77010<br>(713) 951-3700 | Liberty Policies; Cameron's Deepwater Horizon<br>Insurance; Liberty's denial and/or rejection of<br>Cameron's insurance claims related to the<br>Deepwater Horizon incident; Cameron's<br>negotiations and settlement with BP relating to<br>the Deepwater Horizon incident; Cameron's<br>claims against Transocean |
| Jim Neath<br>Associate General Counsel<br>BP America Inc.<br>501 Westlake Park Blvd.<br>Houston, TX 77079<br>(281) 366-5815 | Cameron's agreements with BP relating to the<br>Deepwater Horizon incident; Cameron's<br>negotiations and settlement with BP relating to<br>the Deepwater Horizon incident |

| Name | Subject(s) |
|---|---|
| Anthony Black<br>Risk Manager<br>Cameron<br>c/o Willkie Farr & Gallagher LLP<br>787 Seventh Avenue<br>New York, NY 10019<br>(212) 728-8000 | Liberty Policies; Cameron's Deepwater Horizon Insurance; Liberty's denial and/or rejection of Cameron's insurance claims related to the Deepwater Horizon incident; Cameron's negotiations and settlement with BP relating to the Deepwater Horizon incident |
| Brad Eastman<br>Vice President, Deputy General Counsel<br>Cameron<br>c/o Willkie Farr & Gallagher LLP<br>787 Seventh Avenue<br>New York, NY 10019<br>(212) 728-8000 | Liberty Policies; Cameron's Deepwater Horizon Insurance; Liberty's denial and/or rejection of Cameron's insurance claims related to the Deepwater Horizon incident; Cameron's negotiations and settlement with BP relating to the Deepwater Horizon incident; Cameron's claims against Transocean |
| Bruce Himmelreich<br>Associate General Counsel<br>Cameron<br>c/o Willkie Farr & Gallagher LLP<br>787 Seventh Avenue<br>New York, NY 10019<br>(212) 728-8000 | Cameron's contractual indemnities with Transocean |
| Grace Holmes<br>Vice President, Corporate Secretary & Chief Governance Officer<br>Cameron<br>c/o Willkie Farr & Gallagher LLP<br>787 Seventh Avenue<br>New York, NY 10019<br>(212) 728-8000 | Cameron's communications with its insurers related to Cameron's claim for coverage for liabilities arising from the Deepwater Horizon incident |
| Jack Moore<br>CEO<br>Cameron<br>c/o Willkie Farr & Gallagher LLP<br>787 Seventh Avenue<br>New York, NY 10019<br>(212) 728-8000 | Liberty's denial and/or rejection of Cameron's insurance claims related to the Deepwater Horizon incident; Cameron's negotiations and settlement with BP relating to the Deepwater Horizon incident |

| Name | Subject(s) |
|---|---|
| Charles Sledge<br>Senior Vice President, Chief Financial Officer<br>Cameron<br>c/o  Willkie Farr & Gallagher LLP<br>787 Seventh Avenue<br>New York, NY 10019<br>(212) 728-8000 | Liberty Policies; Cameron's Deepwater Horizon Insurance; Liberty's denial and/or rejection of Cameron's insurance claims related to the Deepwater Horizon incident |
| Veronica Shieves<br>Senior Legal Assistant<br>Cameron<br>c/o  Willkie Farr & Gallagher LLP<br>787 Seventh Avenue<br>New York, NY 10019<br>(212) 728-8000 | Cameron's cooperation with Liberty's investigation relating to Cameron's claim for coverage arising out of the Deepwater Horizon incident |
| Angela Temple<br>Senior Risk Management Analyst<br>Cameron<br>c/o  Willkie Farr & Gallagher LLP<br>787 Seventh Avenue<br>New York, NY 10019<br>(212) 728-8000 | Liberty Policies; Cameron's Deepwater Horizon Insurance; Liberty's denial and/or rejection of Cameron's insurance claims related to the Deepwater Horizon incident |
| Patrick Hughes<br>Account Specialist<br>Chartis<br>101 Hudson Street, 30th Floor<br>Jersey City, NJ 07302<br>(201) 631-4366 | Cameron's Deepwater Horizon Insurance; Cameron's insurance coverage for defense costs related to the Deepwater Horizon incident; Liberty's denial and/or rejection of Cameron's insurance claims related to the Deepwater Horizon incident; decision not to invoke Liberty's "other insurance" provision; Cameron's negotiations and settlement with BP relating to the Deepwater Horizon incident |
| Maureen P. Martin<br>Vice President, PASE Pollution Claims<br>Chartis<br>101 Hudson Street, 30th Floor<br>Jersey City, NJ 07302<br>(201) 631-7280 | Cameron's Deepwater Horizon Insurance; Cameron's insurance coverage for defense costs related to the Deepwater Horizon incident; Liberty's denial and/or rejection of Cameron's insurance claims related to the Deepwater Horizon incident; decision not to invoke Liberty's "other insurance" provision; Cameron's negotiations and settlement with BP relating to the Deepwater Horizon incident |

| Name | Subject(s) |
|---|---|
| Aine Madden<br>Claims Manager<br>Chubb Atlantic Indemnity Ltd.<br>69 Pitts Bay Road<br>Pembroke HM 08, Bermuda<br>(441) 294-6814 | Cameron's Deepwater Horizon Insurance; decision not to invoke Liberty's "other insurance" provision; Cameron's negotiations and settlement with BP relating to the Deepwater Horizon incident |
| Alexis Nusum<br>Claims Analyst<br>Chubb Atlantic Indemnity Ltd.<br>#48 Par-La-Ville Rd.<br>Hamilton HM 11, Bermuda<br>(441) 294-6827 | Cameron's Deepwater Horizon Insurance; decision not to invoke Liberty's "other insurance" provision; Cameron's negotiations and settlement with BP relating to the Deepwater Horizon incident |
| Shannon Boettjer<br>Clyde & Co. US LLP<br>The Chrysler Building<br>405 Lexington Ave.<br>New York, NY 10174<br>(212) 710-3945 | Liberty Policies; Cameron's Deepwater Horizon Insurance; Cameron's coverage for defense costs related to the Deepwater Horizon incident; Liberty's denial and/or rejection of Cameron's insurance claims related to the Deepwater Horizon incident; Cameron's negotiations and settlement with BP relating to the Deepwater Horizon incident; Clyde & Co.'s conflicted representation of Cameron and Liberty |
| Paul Koepff<br>Clyde & Co. US LLP<br>The Chrysler Building<br>405 Lexington Ave.<br>New York, NY 10174<br>(212) 710-3945 | Liberty Policies; Cameron's Deepwater Horizon Insurance; Cameron's coverage for defense costs related to the Deepwater Horizon incident; Liberty's denial and/or rejection of Cameron's insurance claims related to the Deepwater Horizon incident; Cameron's negotiations and settlement with BP relating to the Deepwater Horizon incident; Clyde & Co.'s conflicted representation of Cameron and Liberty |
| Lawrence Engrissei<br>SVP-Claims Manager<br>Iron-Starr Excess Agency Ltd.<br>141 Front St., 7th Fl.<br>Hamilton HM-19, Bermuda<br>(441) 279-7021 | Cameron's Deepwater Horizon Insurance; decision not to invoke Liberty's "other insurance" provision; Cameron's negotiations and settlement with BP relating to the Deepwater Horizon incident |

| Name | Subject(s) |
|---|---|
| Richard Bryan<br>Jackson & Campbell, P.C.<br>1120 20th St., NW<br>South Tower<br>Washington, DC 20036-3437<br>(202) 457-1638 | Cameron's Deepwater Horizon Insurance;<br>Liberty's denial and/or rejection of Cameron's<br>insurance claims related to the Deepwater<br>Horizon incident; decision not to invoke Liberty's<br>"other insurance" provision; Cameron's<br>negotiations and settlement with BP relating to<br>the Deepwater Horizon incident |
| R. Chris Heck<br>Kirkland & Ellis LLP<br>300 N. LaSalle<br>Chicago, IL 60654<br>(312) 862-3030 | Cameron's agreements with BP relating to the<br>Deepwater Horizon incident; Cameron's<br>negotiations and settlement with BP relating to<br>the Deepwater Horizon incident |
| David Cohen<br>President and Global Chief Underwriting<br>Officer, Casualty<br>Liberty Insurance Underwriters, Inc.<br>55 Water Street<br>New York, NY 10041<br>(212) 208-4179 | Liberty Policies; Cameron's Deepwater Horizon<br>Insurance; Liberty's denial and/or rejection of<br>Cameron's insurance claims related to the<br>Deepwater Horizon incident; Cameron's<br>negotiations and settlement with BP relating to<br>the Deepwater Horizon incident; settlement<br>discussions with Marsh |
| James D. Engel<br>Chief Claims Officer<br>Liberty Insurance Underwriters, Inc.<br>55 Water Street<br>New York, NY 10041<br>(212) 208-9500 | Liberty Policies; Cameron's Deepwater Horizon<br>Insurance; Cameron's coverage for defense costs<br>related to the Deepwater Horizon incident;<br>Liberty's denial and/or rejection of Cameron's<br>insurance claims related to the Deepwater<br>Horizon incident; Cameron's negotiations and<br>settlement with BP relating to the Deepwater<br>Horizon incident; settlement discussions with<br>Marsh |
| Daniel Forsythe<br>CEO<br>Liberty Insurance Underwriters, Inc.<br>175 Berkeley Street<br>Boston, Massachusetts 02116<br>(617) 357-9500 | Liberty's denial and/or rejection of Cameron's<br>insurance claims related to the Deepwater<br>Horizon incident |
| Tony Glenn | Liberty Policies; Cameron's Deepwater Horizon<br>Insurance; Cameron's coverage for defense costs<br>related to the Deepwater Horizon incident;<br>Liberty's denial and/or rejection of Cameron's<br>insurance claims related to the Deepwater<br>Horizon incident; Cameron's negotiations with<br>BP relating to the Deepwater Horizon incident |

| Name | Subject(s) |
|---|---|
| Arlene Hinckson<br>Commercial General Liability Claims<br>Liberty Insurance Underwriters, Inc.<br>55 Water Street<br>New York, NY 10041<br>(212) 208-2805 | Liberty Policies; Cameron's Deepwater Horizon Insurance; Liberty's investigation into Cameron's insurance claims related to the Deepwater Horizon incident |
| David Long<br>CEO<br>Liberty Mutual Group<br>175 Berkeley Street<br>Boston, Massachusetts 02116<br>(617) 357-9500 | Liberty Policies; Liberty's denial and/or rejection of Cameron's insurance claims related to the Deepwater Horizon incident; settlement discussions with Marsh |
| Alan Mandel<br>Vice President, Excess Casualty Division<br>Liberty Insurance Underwriters, Inc.<br>55 Water Street<br>New York, NY 10041<br>(212) 208-4247 | Liberty Policies; Cameron's Deepwater Horizon Insurance; Cameron's coverage for defense costs related to the Deepwater Horizon incident; Liberty's denial and/or rejection of Cameron's insurance claims related to the Deepwater Horizon incident; Cameron's negotiations and settlement with BP relating to the Deepwater Horizon incident |
| Gordon McBurney<br>President<br>Liberty Insurance Underwriters, Inc.<br>55 Water Street<br>New York, NY 10041<br>(212) 208-4247 | Liberty Policies; Cameron's Deepwater Horizon Insurance; Liberty's denial and/or rejection of Cameron's insurance claims related to the Deepwater Horizon incident; Cameron's negotiations and settlement with BP relating to the Deepwater Horizon incident; settlement discussions with Marsh |
| George Perrotta<br>Chief Financial Officer<br>Liberty Insurance Underwriters, Inc.<br>55 Water Street<br>New York, NY 10041<br>(212) 208-2808 | Liberty Policies; Cameron's Deepwater Horizon Insurance; Liberty's denial and/or rejection of Cameron's insurance claims related to the Deepwater Horizon incident; Liberty's reinsurance for the Liberty Policy, Liberty's reserves for Cameron's insurance claims |
| Jeffrey Roberts<br>AVP Excess Casualty Claims<br>Liberty Insurance Underwriters, Inc.<br>55 Water Street<br>New York, NY 10041<br>(212) 208-9595 | Liberty Policies; Cameron's Deepwater Horizon Insurance; Cameron's coverage for defense costs related to the Deepwater Horizon incident; Liberty's denial and/or rejection of Cameron's insurance claims related to the Deepwater Horizon incident; Cameron's negotiations and settlement with BP relating to the Deepwater Horizon incident |

| Name | Subject(s) |
|---|---|
| John Russomanno<br>Vice President, Excess Casualty<br>Liberty Insurance Underwriters, Inc.<br>55 Water Street<br>New York, NY 10041<br>(212) 208-4138 | Liberty Policies; Cameron's Deepwater Horizon Insurance; Cameron's coverage for defense costs related to the Deepwater Horizon incident; Liberty's denial and/or rejection of Cameron's insurance claims related to the Deepwater Horizon incident; Cameron's negotiations and settlement with BP relating to the Deepwater Horizon incident |
| Rusty Lee<br>Client Executive<br>Marsh USA Inc<br>Houston, TX 77002<br>(713) 276-8000 | Cameron's Deepwater Horizon Insurance; Cameron's negotiations and settlement with BP relating to the Deepwater Horizon incident |
| Natasha Nye<br>Peters & Nye LLP<br>14 Executive Ct, Ste. 2<br>South Barrington, IL 60010<br>(847) 423-0352 | Cameron's Deepwater Horizon Insurance; decision not to invoke Liberty's "other insurance" provision; Cameron's negotiations and settlement with BP relating to the Deepwater Horizon incident |
| Michael Larsen<br>Parson Behle & Latimer<br>201 S. Main St.<br>Ste. 1800<br>Salt Lake City, UT 84111<br>(801) 532-6735 | Cameron's Deepwater Horizon Insurance; decision not to invoke Liberty's "other insurance" provision; Cameron's negotiations and settlement with BP relating to the Deepwater Horizon incident |
| Eric. B. Brown<br>Executive Vice President – Legal & Admin.<br>Transocean Ltd.<br>P.O. Box 2765<br>Houston, Texas 77252 | Cameron's agreements with Transocean relating to the Deepwater Horizon incident |

**B.**   Disclosure Pursuant to Rule 26(a)(1)(A)(ii)

Based on information now known to Cameron, some or all of the following categories of documents in Cameron's possession, custody or control may be used by Cameron in support of claims and defenses raised in this action:

a.   Documents and communications relating to Policy Number LQ1B71198583046, the excess liability insurance policy Cameron purchased from Liberty for the policy period from July 1, 2009 to July 1, 2010 (the "Liberty Policy").

b.   Documents and communications relating to the tower of insurance purchased by Cameron in July 2009, including the Liberty Policy.

c.   Documents and communications relating to Cameron's settlement agreement with BP Exploration & Production, Inc. regarding the Deepwater Horizon incident.

d.   Documents and communications relating to Liberty's denial and/or rejection of Cameron's claims under the Liberty Policy.

e.   Documents and communications relating to the Terms and Conditions and Master Service Agreement entered into between Cameron and Transocean Ltd. regarding the Deepwater Horizon incident.

C.    Disclosure Pursuant to Rule 26(a)(1)(A)(iii)

a.    Compensatory damages totaling $50 million in connection with Cameron's losses incurred in connection with its settlement of claims with BP in In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010, MDL No. 10-2179 ("Oil Spill MDL").

b.    Compensatory damages (in an amount to be determined) for post-settlement defense costs incurred on an ongoing basis in connection with the Oil Spill MDL and related proceedings.

c.    Compensatory damages (in an amount to be determined) for costs and fees incurred in connection with Cameron's claim for insurance coverage from Liberty.

d.    Statutory damages equal to triple Cameron's actual compensatory damages under Texas Insurance Code § 541.

e.    Statutory damages equal to 18 percent per year of Cameron's defense costs in connection with the Oil Spill MDL and related proceedings under Texas Insurance Code § 542.

f.    Attorneys' fees and costs related to bringing this action.

Dated:      June 7, 2013                          _/s/ Phillip A. Wittmann_
                                                  Phillip A. Wittmann, 13625
                                                    pwittmann@stonepigman.com
                                                  Carmelite M. Bertaut, 3054
                                                    cbertaut@stonepigman.com
                                                  Keith B. Hall, 24444
                                                    khall@stonepigman.com
                                                  Jared Davidson, 32419
                                                    jdavidson@stonepigman.com

                                                  STONE PIGMAN WALTHER WITTMANN L.L.C.
                                                  546 Carondelet Street
                                                  New Orleans, Louisiana  70130
                                                  504-581-3200
                                                  504-581-3361 (fax)

                                                  *Attorneys for Cameron International
                                                  Corporation*

                                                    Of Counsel:

                                                    WILLKIE FARR & GALLAGHER LLP
                                                    Mitchell J. Auslander
                                                    Jeffrey B. Korn
                                                    787 Seventh Avenue
                                                    New York, NY  10019
                                                    (212) 728-8000
                                                    mauslander@willkie.com

*7585474*

Page 1

```
 1
 2     UNITED STATES DISTRICT COURT
       EASTERN DISTRICT OF LOUISIANA
 3     ---------------------------------------X
       In Re:  OIL SPILL BY THE OIL RIG
 4     "DEEPWATER HORIZON" IN THE GULF OF
       MEXICO, ON APRIL 20, 2010,
 5
 6     Applies to:
 7     12-311, Cameron Int'l Corp. v. Liberty
       Ins. Underwriters, Inc., a/k/a Liberty
 8     Int'l Underwriters
 9
       ---------------------------------------X
10
11
12              VIDEO DEPOSITION OF JESSICA ROGIN
13                 New York, New York
14                 Friday, May 31, 2013
15
16
17
18
19
20
21     Reported by:
22     Rebecca Schaumloffel, RPR, CLR
23     Job No:  61443
24
25
```

**EXHIBIT B**

Page 94

J. ROGIN
is, does anything come to mind when I ask you
do you recall what you were told?
    A.   BP was demanding $500 million of
Cameron at one point.
    Q.   Did you discuss internally how
you thought Cameron should respond to that
demand?
    A.   We were made aware of what the
carrier group was discussing and meeting with
Cameron about their discussions in terms of
how they should respond to that demand.
    Q.   Anything more specific?
    A.   I know -- I recall that carriers
wanted Cameron to respond with $10 million at
one of the meetings.  We -- the carriers were
objecting to Cameron agreeing to any of the
non-financial terms of the agreement.  I
recall that the carriers wanted to have a
presence at the negotiations and Cameron
refused to allow that.
    Q.   Was it Liberty's view that
Cameron should respond to BP with a
$10 million settlement proposal?
    A.   I think it was Liberty's view

Page 95

J. ROGIN
that -- that was -- our policy hadn't
attached, and we didn't have any comment to
that.  I don't think we either supported or
discouraged it.
    Q.   Do you believe that Cameron has
extinguished Liberty's subrogation rights
through the BP Cameron settlement?
    A.   Yes.
    Q.   What is that belief based on?
    A.   Based on what I have been told by
Jeff and Jim Engel that the agreement says.
    Q.   And we already established you
have never read the agreement personally?
    A.   No.
    Q.   You wouldn't know the intent of
the parties even had you read it, right?
    A.   No.
    Q.   Is it fair to say you have no
firsthand knowledge that Cameron in fact
extinguished Liberty's subrogation rights
through the BP Cameron settlement?
    A.   I have no firsthand knowledge
from reading the agreement.
    Q.   Do you have any firsthand

Page 96

J. ROGIN
knowledge from any other source?
    A.   Well, like I said, I have been
told by Jim and Jeff firsthand to me that
this was what happened.
    Q.   Are Jim and Jeff parties to the
BP Cameron Settlement Agreement?
    A.   No, they are not.
    Q.   Do you feel that you are in a
position to testify under oath that Cameron
extinguished Liberty's subrogation rights in
the BP Cameron Settlement Agreement?
    A.   Well, I am testifying under oath
that that's my understanding.
    Q.   And that understanding is based
solely on what you were told by Mr. Roberts
and Mr. Engel, correct?
    A.   And I mean, I may have been told
that by our counsel at the time as well.
    Q.   Do you have any other basis for
saying that Cameron extinguished Liberty's
subrogation rights in the BP Cameron
Settlement Agreement other than what you were
told by Mr. Roberts, Mr. Engel and possibly
counsel?

Page 97

J. ROGIN
    A.   No.
    MR. KORN:  We have been going
for about an hour.  Let's take a
break.
    THE VIDEOGRAPHER:  The time is
11:24; let's go off the record.
    (Whereupon, a recess was held.)
    THE VIDEOGRAPHER:  The time is
11:39.  We are back on the record.
CONTINUED EXAMINATION BY
MR. KORN:
    Q.   Welcome back, Miss Rogin.  If you
can pull out of your stack Engel Exhibit 11,
please.
    Miss Rogin, what is Engel
Exhibit 11?
    A.   A letter dated November 7, 2011,
to Brad Eastman at Cameron from Paul Koepff
on behalf of LIU.
    Q.   And have you seen Mr. Koepff's
letter before?
    A.   Yes.
    Q.   Did you see it when it was sent?
    A.   Yes.

**EXHIBIT B**

Page 1

1

2      UNITED STATES DISTRICT COURT
       EASTERN DISTRICT OF LOUISIANA
3      ---------------------------------------X
       In Re:  OIL SPILL BY THE OIL RIG
4      "DEEPWATER HORIZON" IN THE GULF OF
       MEXICO, ON APRIL 20, 2010,
5
6      Applies to:
7      12-311, Cameron Int'l Corp. v. Liberty
       Ins. Underwriters, Inc., a/k/a Liberty
8      Int'l Underwriters
9
       ---------------------------------------X
10
11
12            VIDEO DEPOSITION OF JAMES ENGEL
13                 New York, New York
14                   May 29, 2013
15
16
17
18
19
20
21     Reported by:
22     Rebecca Schaumloffel, RPR, CLR
23     Job No.  61441
24
25

**EXHIBIT C**

---

Page 190

J. ENGEL

1
2  policyholder hasn't preserved their own
3  rights, then they have preserved no rights
4  for the insurer.
5      Q.   Is there a specific way that an
6  insured is supposed to do that?
7      A.   I don't know. I am not a
8  technician. I am and always have been a
9  manager of large claim organizations with no
10  claim handling experience.
11     Q.   Are you capable of reviewing an
12  agreement and determining whether or not
13  subrogation rights have or have not been
14  preserved?
15     A.   Yes.
16     Q.   What qualifies you to do that?
17     A.   Well, I guess I have been around
18  contracts and agreements long enough to be
19  able to interpret them, reasonably interpret
20  them. And so when I see an agreement like
21  the Cameron BP agreement, which says in a
22  paragraph that they preserved all LIU's
23  rights but then further on in the agreement,
24  state that they give up the -- our insured
25  gives up all of its rights, the statement

---

Page 191

J. ENGEL

1
2  that they preserved LIU's rights is an empty
3  statement. Because we can no longer stand in
4  their shoes. They have given up their rights
5  so they have given up our rights.
6      Q.   And do you know what the term
7  notwithstanding any other provision in this
8  agreement means when it is used in a
9  contract?
10     A.   So it means what it says.
11     Q.   So I will go back to my earlier
12  question. Are there different ways that an
13  insured may preserve the insurer's
14  subrogation rights in a settlement agreement
15  with the third-party?
16     A.   Yes.
17     Q.   In your experience over the many
18  years you have worked in the insurance
19  industry, what are some of the ways that you
20  have seen?
21     A.   The insured has to make it clear
22  they have preserved their rights. Because,
23  and I will say it for about the fourth time,
24  the insurer has to stand in the shoes of the
25  policyholder. If the policyholder has not

---

Page 192

J. ENGEL

1
2  preserved their rights, they have not
3  preserved the rights of the insurer to file
4  subrogation action. Insurer has no standing.
5      Q.   And if an insured does preserve
6  its rights against the third-party, would
7  that thereby preserve the insurer's
8  subrogation rights to stand in its shoes?
9      A.   I believe so.
10     Q.   Are there different formulations
11  of the words that may be used in order to
12  effect that result?
13     A.   So, again, I am not a technician,
14  and I don't craft words and so I don't know.
15     Q.   And despite the fact that you're
16  not a technician and don't craft words, you
17  think you are competent to testify about what
18  the words in a particular agreement mean?
19     A.   In some agreements.
20     Q.   Are you competent to testify as
21  to what the terms used in a particular
22  agreement mean when you're not a party to the
23  agreement?
24     A.   I think I can interpret
25  terms, yes.

---

Page 193

J. ENGEL

1
2      Q.   Do you know the intent of either
3  BP or Cameron in entering into the BP
4  settlement when they included the provision
5  that you referenced a minute ago about
6  preserving Liberty's subrogation rights?
7      A.   You mean can I get into their
8  head and understand their intent?
9      Q.   That's my question.
10     A.   I can't do that.
11     Q.   You don't know their intent,
12  right?
13     A.   No.
14     Q.   Have you been involved in
15  negotiating settlements between insurers and
16  insureds?
17     A.   Often.
18     Q.   That is something that you do
19  many times, right?
20     A.   When we have big complicated
21  cases, I get involved, yes.
22     Q.   Have you ever been involved in a
23  situation where the insurer that you worked
24  for reserved the right to claw back the
25  settlement payment from the insured as part

---

Page 1

1

2   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF LOUISIANA
3   ---------------------------------------X
    In Re:  OIL SPILL BY THE OIL RIG
4   "DEEPWATER HORIZON" IN THE GULF OF
    MEXICO, ON APRIL 20, 2010,
5
6   Applies to:
7   12-311, Cameron Int'l Corp. v. Liberty
    Ins. Underwriters, Inc., a/k/a Liberty
8   Int'l Underwriters
9
    ---------------------------------------X
10
11
12      VIDEO DEPOSITION OF MAUREEN MARTIN
13          New York, New York
14           June 25, 2013
15
16
17
18
19
20
21  Reported by:
22  Rebecca Schaumloffel, RPR, CLR
23  Job No: 62301
24
25

TSG Reporting - Worldwide      877-702-9580

**EXHIBIT D**

Page 174

1          M. MARTIN
2     MR. MISHKIN: Object to form.
3     A.   They can.
4     Q.   Isn't that what indemnity
5  agreements all about?
6     MR. MISHKIN: Object to form.
7     A.   In my experience, sometimes
8  contracts can be very, very broadly written.
9  So that it may not actually be a legal
10 liability but just the mere allegation can be
11 transferred or the allegation or the defense
12 of the suit can also be transferred.
13    Q.   Are there any other agreements
14 between Chartis and Cameron relating to the
15 Deepwater Horizon other than the one that we
16 have looked at today, the Settlement
17 Agreement?
18    A.   Not that I am aware. This is the
19 only Settlement Agreement that we have in
20 place for Cameron.
21    Q.   Is there any agreement, not just
22 a Settlement Agreement, but any other
23 agreement between Chartis and Cameron
24 relating to the Deepwater Horizon claims?
25    A.   Any other agreement pertaining

Page 175

1          M. MARTIN
2  to? I am not really clear what you are
3  driving at. As far as I am aware, the only
4  agreement that I am aware is the Settlement
5  Agreement that was concluded between us and
6  Cameron.
7     Q.   Tell me what you did to prepare
8  for today's deposition.
9     A.   To prepare for today's
10 deposition, I met with my esteemed coverage
11 counsel to review the pertinent documents
12 that were responsive to the Subpoena that was
13 served. So we reviewed some of the
14 communications amongst the carriers and
15 reviewed the policies and I reviewed the
16 agreements.
17    Q.   Did you meet with anyone else?
18    A.   No, I did not.
19    Q.   Did you talk with anyone else?
20    A.   No, I did not.
21    Q.   Is Mr. Hughes still at Chartis?
22    A.   Yes, he is still employed at
23 Chartis.
24    Q.   Is he someone that you supervise
25 still?

Page 176

1          M. MARTIN
2     A.   He is no longer in my supervision
3  line. He works for a different department,
4  actually.
5     Q.   Still in the environmental --
6     A.   No, he has moved onward to a
7  different claim group.
8     Q.   A different world, okay.
9     MS. BARRASSO: I tender the
10 witness.
11    Thank you for your patience.
12    THE WITNESS: Sure.
13    MR. MISHKIN: I have a few
14 follow-up questions. Go off the
15 record for a moment.
16    THE VIDEOGRAPHER: The time is
17 3:44; we are going off the record.
18    (Whereupon, a recess was held.)
19    THE VIDEOGRAPHER: The time is
20 3:45; we are back on the record.
21 CONTINUED EXAMINATION BY
22 MR. MISHKIN:
23    Q.   Good afternoon, Miss Martin.
24    A.   Good afternoon.
25    Q.   I am Douglas Mishkin. I

Page 177

1          M. MARTIN
2  represent Cameron in this matter and I just
3  have a few follow-up questions for you.
4     Do you recall that Liberty's
5  counsel asked you some questions in which she
6  assumed that Cameron had extinguished
7  Liberty's subrogation rights in the BP
8  settlement?
9     A.   Yes.
10    MS. BARRASSO: Object to the
11 form.
12    Q.   Have you ever reviewed the final
13 BP Settlement Agreement?
14    A.   I have seen it. I have looked it
15 over. I reviewed it very, very preliminary
16 in preparation for today.
17    Q.   Okay. I would like to mark the
18 final BP Settlement Agreement. This is
19 Martin Exhibit 64, I believe.
20    (Whereupon, Martin Exhibit 64,
21 Final BP Settlement Agreement was
22 marked for identification as of this
23 date by the Reporter.)
24    Q.   Would you agree that whether
25 Cameron agreed to release Liberty's

45 (Pages 174 to 177)

Page 178

```
1              M. MARTIN
2  subrogation rights would be governed by this
3  agreement?
4       MS. BARRASSO: Object to the
5       form and lack of foundation.
6       A.   I would agree with that
7  statement.
8       Q.   If I can direct your attention to
9  Section 4.4 of this agreement, which appears
10 on page 7 of Bates number CIC '7203. Take a
11 minute to review.
12      A.   Yes, I have read it.
13      Q.   Do you know why this provision
14 was inserted into the BP Cameron Settlement
15 Agreement?
16      A.   Truthfully, I didn't know
17 anything about this particular clause until
18 after the agreement was executed. So I don't
19 have knowledge as to what was going on, but I
20 would suspect it relates to the issues that
21 were ongoing between Cameron and Liberty
22 Mutual and the failure for Liberty to grant
23 its consent.
24      Q.   Do you know when this provision
25 was inserted into the Cameron BP Settlement
```

Page 179

```
1              M. MARTIN
2  Agreement?
3       A.   I didn't see it until it was
4  already in the finalized agreement.
5       Q.   Do you see the second sentence of
6  Section 4.4?
7       A.   Yes.
8       Q.   And have you read that to
9  yourself?
10      A.   Um-hum. Yes.
11      Q.   Isn't that sentence an express
12 preservation of Liberty's subrogation rights?
13      MS. BARRASSO: Object to the
14      form. Object to leading.
15      A.   As I read that sentence, it's
16 clear to me that Cameron, under this
17 agreement, is not releasing any of Liberty's
18 rights pursuant to this agreement.
19      Q.   And that's what not withstanding
20 any other provision of this agreement means?
21      MS. BARRASSO: Object to form.
22      A.   Yes, that's how I would read it.
23      Q.   Liberty's counsel did not show
24 you this provision when she examined you,
25 correct?
```

Page 180

```
1              M. MARTIN
2       A.   Correct. We didn't discuss this.
3       Q.   So when counsel for Liberty told
4  you that Cameron had extinguished Liberty's
5  subrogation rights, that was not true, right?
6       MS. BARRASSO: Objection.
7       Object to the form and object to
8       leading.
9       A.   I concur that pursuant to this
10 paragraph, Cameron is not releasing or
11 waiving Liberty's rights.
12      Q.   In connection with Cameron's
13 Deepwater Horizon claim, Chartis concluded
14 that its policies were implicated by the BP
15 settlement notwithstanding the other
16 insurance provision relied on by Liberty,
17 correct?
18      MS. BARRASSO: Objection.
19      Leading.
20      A.   I am sorry, can you just repeat
21 that?
22      Q.   In connection with Cameron's
23 Deepwater Horizon claim, Chartis concluded
24 that its policies were implicated by the BP
25 settlement notwithstanding the other
```

Page 181

```
1              M. MARTIN
2  insurance provision relied on by Liberty,
3  correct?
4       MS. BARRASSO: Objection.
5       Leading.
6       A.   Correct, that's accurate.
7       Q.   And Chartis funded Cameron's
8  settlement with BP not withstanding the other
9  insurance provision relied on by Liberty,
10 correct?
11      A.   That's correct.
12      MR. MISHKIN: Thank you,
13      Miss Martin. I have nothing further
14      at this time.
15      MS. BARRASSO: I have
16      two follow-up questions about this
17      document.
18 CONTINUED EXAMINATION BY
19 MS. BARRASSO:
20      Q.   You have in front of you the BP
21 Settlement Agreement, Miss Martin?
22      A.   Yes.
23      Q.   Can you tell me earlier that you
24 your understanding of an insurer's
25 subrogation rights is that the insurer steps
```

46  (Pages 178 to 181)