**UNITED STATES DISTRICT OF COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | § | MDL No. 2179 |
| "DEEPWATER HORIZON" in the | § | |
| GULF OF MEXICO, | § | SECTION:  J |
| on APRIL 20, 2010 | § | |
| | § | JUDGE BARBIER |
| | § | |
| Applies to:  No. 10-2771, | § | MAG. JUDGE SHUSHAN |
| and All Cases | § | |
| | § | |
| _____ | § | |

## HALLIBURTON ENERGY SERVICES, INC.'S POST-TRIAL REPLY BRIEF

## **Table of Contents**

Table of Authorities ................................................................................................ iii

I.    Many Proposed Findings Against HESI Are Unsupported By The Evidence. ...................1

    A.    Record Evidence Invalidates Many Of The Proposed Mudlogging
          And Well Control Findings. ..........................................................................1

    B.    Record Evidence Invalidates Many Of The Proposed Cement Findings. .............2

          1.    The Evidence Establishes That Foam Stability Testing
              Showed The Rig Cement Was Stable. .......................................................3

          2.    Reliance On Third-Parties' Post-Incident Testing Of
              Non-Rig Cement Is Misplaced. .................................................................4

          3.    Many Proposed Findings Rely Upon Inadmissible,
              Unreliable, And/Or Excluded Evidence. ...................................................5

          4.    Many Proposed Findings Misstate Or
              Mischaracterize The Record. ....................................................................5

    C.    The Evidence Establishes That The BOP Was Not Properly Configured. ............7

II.   Complaints Regarding Gagliano And Keith Are Meritless. ...............................................8

    A.    Gagliano Acted Competently And Reasonably. ..................................................8

    B.    Joe Keith Acted Competently And Reasonably. .................................................10

III.  Transocean's Actions Constitute A Superseding, Intervening
     Cause Of The Blowout. ..................................................................................................12

IV.   The Evidence Does Not Support A Direct Finding Of
     Gross Negligence Against HESI. ...................................................................................13

V.    There Is No Basis To Subject HESI To Vicarious Liability
     For Punitive Damages. ..................................................................................................14

VI.   Post-Incident Conduct Cannot Be Considered In Determining
     Gross Negligence. .........................................................................................................16

    A.    HESI Did Not Conceal Or Destroy Evidence. ...................................................16

    B.    Post-Incident Actions Do Not Bear On HESI's
          Pre-Incident State Of Mind. .........................................................................19

VII.  BP's Indemnity And Release Obligations Are Valid And Enforceable. ..........................21

VIII.   All Strict Products Liability and Fraud Claims Against HESI Fail. .................................24

IX.   Conclusion ......................................................................................................................25

## Table of Authorities

**CASES**

*Atel Maritime Investors v. Sea Mar Mgmt, L.L.C.*,
   No. 08-1700, 2010 U.S. Dist. LEXIS 47834 (E.D. La. May 13, 2010)...................................25

*Banner Sign & Barricade, Inc. v. Berry GP, Inc.*,
   No. 13-07-00596-CV, 2008 Tex. App. LEXIS 7120 (Tex. App.—
   Corpus Christi 2008, pet denied) ......................................................23

*Caparotta v. Entergy Corp.*,
   168 F.3d 754 (5th Cir. 1999) ......................................................17

*Chaney v. Dreyfus Serv. Corp.*,
   595 F.3d 219 (5th Cir. 2010) ......................................................21

*Desiderio v. Celebrity Cruise Lines, Inc.*,
   No. 97 Civ. 5185, 1999 U.S. Dist. LEXIS 9699
   (S.D.N.Y. June 28, 1999).................................................... 24-25

*Doe v. Celebrity Cruises*,
   145 F. Supp. 2d 1337 (S.D. Fla. 2001) ......................................................14

*Fallon v. Fortis Health*,
   No. H-04-2904, 2006 U.S. Dist. LEXIS 3193
   (S.D. Tex. Jan. 18, 2006) ......................................................24

*First Jersey Nat'l Bank v. Dome Petroleum, Ltd.*,
   723 F.2d 335 (2d Cir. 1983)...................................................... 22-23

*Frontier Ins. Co. v. MC Mgmt, Inc.* , No. 3:06-CV-597-H,
   2009 U.S. Dist. LEXIS 17307 (W.D. Ky. Mar. 4, 2009) ......................................................24

*Gulbranson v. Duluth, Misabbe & Iron Range Ry. Co.*,
   921 F.2d 139 (8th Cir. 1990) ......................................................19

*Harley-Davidson, Inc. v. Minstar, Inc.*,
   41 F.3d 341 (7th Cir. 1994) ......................................................24

*Hoppe v. G.D. Searle & Co.*,
   779 F. Supp. 1413 (S.D.N.Y. 1991)......................................................19

*Jimenez v. Chrysler Corp.*,
   74 F. Supp. 2d 548 (D.S.C. 1999), *rev'd in part and vacated*,
   269 F.3d 439 (4th Cir. 2001) ......................................................19

*Jones v. Compagnie Generale Mar.*,
   882 F. Supp. 1079 (S.D. Ga. 1995).........................................................................14

*King v. Hasbro, Inc.*,
   Civil Action No. 07-4001, 2009 U.S. Dist. LEXIS 89119
   (E.D. Pa. Sept. 28, 2009) ......................................................................................19

*Lefler v. Atl. Richfield Co.*,
   785 F.2d 1341 (5th Cir. 1986) ..............................................................................23

*Librado v. M.S. Carriers, Inc.*,
   No. 03:02-CV-2095, 2004 U.S. Dist. LEXIS 12203
   (N.D. Tex. June 30, 2004)......................................................................................20

*Lone Star Indus., Inc. v. Mays Towing Co.*,
   927 F.2d 1453 (8th Cir. 1991) ..............................................................................12

*MacGlashing v. Dunlop Equip. Co.*,
   89 F.3d 932 (1st Cir. 1996)....................................................................................23

*Martin v. Texaco*,
   726 F.2d 207 (5th Cir. 1984) ................................................................................20

*Mobil Chem. Co. v. Blount Bros. Corp.*,
   809 F.2d 1175 (5th Cir. 1987) ..............................................................................22

*New Eng. Tel. & Tel. Co. v. Cent. Vt. Pub. Serv. Corp.*,
   391 F. Supp. 420 (D. Vt. 1975)............................................................................22

*NMS Indus., Inc. v. Premium Corp. of Am., Inc.*,
   451 F.2d 542 (5th Cir. 1971) ................................................................................16

*O'Harra v. Pundt*,
   310 P.2d 1110 (Or. 1957) ....................................................................................19

*Overseas Carriers, Inc. v. Team Ocean Servs.-Dallas, Inc.*,
   Civil Action No. H-10-2842, 2013 U.S. Dist. LEXIS 1302
   (S.D. Tex. Jan. 4, 2013) ........................................................................................16

*In re P&E Boat Rentals, Inc.*,
   872 F.2d 642 (5th Cir. 1989) ...........................................................................14, 16

*R.E. Lindner Steel Erection Co., Inc. v. Wedemeyer, Cernik, Corrubia, Inc.*,
   585 F. Supp. 1530 (D. Md. 1984).........................................................................20

*Saba v. Compagnie Nationale Air Fr.*,
   78 F.3d 664 (D.C. Cir. 1996) ...........................................................................20-21

*Schmahl v. Macy's Dept. Stores, Inc.*,
No. CV-09-68, 2010 U.S. Dist. LEXIS 77294
(E.D. Wash. July 30, 2010) ................................................................................22

*Southland Sec. Corp. v. INSpire Ins. Solutions*,
365 F.3d 353 (5th Cir. 2004) ..............................................................................20

*State Farm Mut. Auto Ins. Co. v. Campbell*,
538 U.S. 408 (2003) ............................................................................................21

*Stires v. Carnival Corp.*,
243 F. Supp. 2d 1313 (M.D. Fla. 2002) ..............................................................14

*Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*,
447 F.3d 360 (5th Cir. 2006) ..............................................................................12

*Tesoro Petroleum Corp. v. Nabors Drilling U.S.*,
106 S.W.3d 118 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) ...................23

*Vick v. Tex. Emp't Comm'n*,
514 F.2d 734 (5th Cir. 1975) ..............................................................................17

*Wilcox v. Kerr-McGee Corp.*,
706 F. Supp. 1258 (E.D. La. 1989) ................................................................ 14-15

*Wolfe v. McNeil-PPC, Inc.*,
773 F. Supp. 2d 561 (E.D. Pa. 2011) ..................................................................19

## OTHER AUTHORITIES

FED. R. EVID. 404(b) ...................................................................................................20

Halliburton Energy Services, Inc. ("HESI") files this Post-Trial Reply Brief and respectfully shows as follows:

## I.   Many Proposed Findings Against HESI Are Unsupported By The Evidence.

Plaintiffs, the States, Transocean, and BP proposed thousands of findings, many of which are unsupported by the trial evidence. Likewise, many arguments in the parties' post-trial briefing are unsupported or controverted by relevant, compelling record evidence. HESI provides the following illustrations.

### A.   Record Evidence Invalidates Many Of The Proposed Mudlogging And Well Control Findings.

In their post-trial filings, Plaintiffs criticize the location of the Sperry flow-out sensor, arguing that HESI failed to explain the location of the sensor. *See* PSC's FOF/COL at 58-60;[1] PSC's Brief at 53-54. But Plaintiffs cite no evidence of a viable alternative location or that the flow-out sensor location was unsafe or unreasonable. Moreover, Plaintiffs fail to acknowledge that Transocean selected the sensor location, BP approved the location, (C. BARNHILL, T.T. 4395:17-24; J. KEITH, T.T. 3640:14-3641:18; DEPO. OF J. BEMENT, 253:24-254:14; DEPO. OF S. CLARK, 79:21-80:22, 209:5-210:01; DEPO. OF K. GRAY, 542:13-543:8; *see also* HESI's FOF/COL at 288; J. KEITH, T.T. 3640:14-3641:18), and Transocean installed the sensor (C. BARNHILL, T.T. 4395:17-24; DEPO. OF J. GISCLAIR, 431:14-23; HESI's FOF/COL at 288).

Likewise, Plaintiffs depart completely from the evidentiary record in contending that HESI had "chronic problems with incompetence." *See* PSC's FOF/COL at 186. Plaintiffs point to only two alleged examples—one from October 2009 on the *Marianas* and another from March 2010 on the *Deepwater Horizon*. *See id.* Yet neither circumstance involved Joe Keith or any mudlogging services provided on April 20, 2010. Nor do these events evidence any problem

---

[1] HESI refers to the various parties' Post-Trial Briefs and Proposed Findings of Fact and Conclusions of Law as "[Party Name]'s Brief" or "[Party Name]'s FOF/COL," respectively.

with HESI's direction and training of its mudloggers.  Rather, the two isolated examples illustrate that HESI was vigilant in responding to its customer as, in both instances, HESI removed the employee from the rig in response to BP's concerns.  *See* TREX-01047; *see also* DEPO. OF S. CLARK, 45:11-21, 66:25—67:7, 210:14—211:8.  No such complaints were ever raised about Keith.  Indeed, BP specifically requested that Keith be assigned to the *Deepwater Horizon* and the record evidence establishes his competence.  HESI's FOF/COL at 265.

Finally, both Transocean and BP argue that simultaneous rig activities did not affect Keith's ability to monitor the well on April 20, 2010.  *See* TO's FOF/COL at 91; BP's FOF/COL at 210, 604.  While Keith "fully and capably" monitored the Macondo well, it is undisputed by the parties' well control experts that the simultaneous activities influenced rig sensors, obscured kick indicators, and impeded well monitoring.  *See, e.g.*, R. HEENAN, T.T. 2148:20-2149:22; C. BARNHILL, T.T. 4409:23-4410:1, 4411:19-4412:3, 4412:19-4413:1, 4417:13-18; A. BOURGOYNE, T.T. 7762:8-15.  On April 20, 2010, numerous rig activities were occurring.  *See* HESI's FOF/COL at 277.  These rig activities compromised the data Keith monitored and his ability to monitor and view it.  They also obscured the import of the data Keith was able to review.  While Keith was able to monitor the Macondo well, there was more activity than usual to monitor; 30-40% of his time was spent monitoring fluid movement, and once diversion of returns occurred at 21:08, he could not monitor flow-out or pit gains for potential kick indicators.  J. KEITH, T.T. 3512:19-24, 3514:14-22, 3524:8-16, 3580:14-3581:8.

**B.    Record Evidence Invalidates Many Of The Proposed Cement Findings.**

Plaintiffs, BP, and Transocean propose many findings regarding cementing issues that are unsupported by the record.  For example, opposing parties' findings regarding foam stability testing are inconsistent with the record.  Further, these proposed findings erroneously rely on third-party, post-Incident testing of non-rig cement, rely on inadmissible and/or excluded

evidence, and mischaracterize the record.  As discussed *infra*, these problems make the proposed findings not only unreliable, but unsupported and controverted by the credible, relevant record evidence.

### 1.   The Evidence Establishes That Foam Stability Testing Showed The Rig Cement Was Stable.

Contrary to the findings proposed by Plaintiffs, BP and Transocean, the most relevant foam stability tests were conducted with actual rig samples by HESI in April 2010 (pre-Incident) and by OTC on the MAC4 sample in 2011 (post-Incident).  Both of those tests show a stable foam slurry, as acknowledged by the United States's cement expert Glen Benge.  G. BENGE, T.T. 2436:17-2437:5, 2456:12-2458:10, 2458:24-2459:2; *see also* HESI's FOF/COL at 224.  OTC's Greg Garrison agreed with Benge, testifying that the unset foam stability test on the MAC4 rig sample produced a *stable* result.  DEPO. OF G. GARRISON, 207:2-13.

Plaintiffs propose that the Court conclude "[i]t is clear from the evidence presented at trial that the [HESI] cement slurry was unstable."  PSC's FOF/COL at 62.  However, Plaintiffs fail to cite *any* evidence to support this assertion.  Instead, Plaintiffs rely upon testimony by Tommy Roth.  But Roth's testimony did not refer to the slurry's *stability;* rather, his testimony refers to operational decisions that affected cement *placement*.  *See* T. ROTH, T.T. 3137:19-3138:1, 3140:25-3141:3.  Absent evidentiary support, Plaintiffs' proposed finding should be disregarded.  Plaintiffs likewise attempt to put words in Roth's mouth, asserting that "[HESI's] own Head of Cement, Tommy Roth, acknowledged, in retrospect, that if [HESI] had followed the specific obligations of the contract . . . there would not have been a blowout."  PSC's FOF/COL at 173.  However, when Roth was asked whether these measures would have prevented the blowout, he responded only that the question was "a statement of risk management."  T. ROTH, T.T. 3089:11-16.  Roth's actual testimony is far from the claimed

acknowledgment asserted by Plaintiffs.

Transocean similarly proposes that the Court find "[u]se of this defoamer destabilized the Macondo foam cement," relying solely on the testimony of Tommy Roth, who only acknowledged that a defoamer *may* destabilize foam cement. Moreover, as has been established *supra*, the most relevant testing and expert testimony at trial demonstrated that the foam cement pumped into the Macondo well's production interval was stable. G. BENGE, T.T. 2436:17-2437:5, 2456:12-2458:10, 2458:24-2459:2; *see also* HESI's FOF/COL at 224, 239-241. Transocean also cites the results of HESI's pre-Incident crush compressive strength testing to suggest that the Macondo foam slurry would have zero psi of compressive strength 24 hours after cement placement. TO's FOF/COL at 63, 65. First, Jesse Gagliano specifically notified BP of the progress of the UCA compressive strength test before BP proceeded with the cement job. TREX-717. In any case, Benge testified that HESI's crush compressive strength test does not prove that the foam slurry would have zero compressive strength after 24 hours because a crush compressive strength test cannot account for downhole pressures or for the full downhole temperature, and pressure and temperature are primary drivers of compressive strength development. G. BENGE, T.T. 2430:4-2432:5.

## 2. Reliance On Third-Parties' Post-Incident Testing Of Non-Rig Cement Is Misplaced.

Plaintiffs, BP, and Transocean rely on post-Incident testing conducted by CSI, Chevron and OTC on *non*-rig cement to support proposed findings that the Macondo slurry was unstable. *See, e.g.*, BP's FOF/COL at 281-87; TO's FOF/COL at 61; PSC's FOF/COL at 62, 139. However, representatives of these entities acknowledged the zero to limited relevance of their testing to the performance of the slurry actually pumped on the Macondo well. Fred Sabins acknowledged the limitations of CSI's testing of the "simulated slurry" to confirm the

performance of HESI's Macondo slurry.  DEPO. OF F. SABINS, 631:2-23; 252:13-24.  And when

asked whether Chevron's testing provided a reliable indication of the likely test results on rig

samples, Craig Gardner similarly responded that he "would have to test the rig blend to answer

that."  DEPO. OF C. GARDNER, 225:8-14; *see also* HESI's FOF/COL at 236.  Finally, OTC's Greg

Garrison testified that if he wanted to evaluate a slurry, he would want to test the actual rig blend

rather than a slurry simulated in the lab.  DEPO. OF G. GARRISON, 179:2-12.

### 3.   *Many Proposed Findings Rely Upon Inadmissible, Unreliable, And/Or Excluded Evidence.*

To support proposed findings against HESI, Plaintiffs, BP and Transocean rely on the

Bly Report.  *See* PSC's FOF/COL at 174; BP's FOF/COL at 276, 278, 300; TO's FOF/COL at 56,

61.  On February 24, 2012, the Court ruled the Bly Report is admissible as a business record,

subject to certain objections, and that the Court would "give th[is] report whatever weight [it]

deserve[s]."  Dkt. No. 5834 at 2.  The Bly Report's cementing conclusions are unreliable and

should not be given any weight.  Glen Benge, the only cement expert who testified on foam

stability issues, concluded that CSI's testing was "not relevant at all" to the stability of the slurry

pumped on the Macondo well's production casing job because CSI did not test HESI materials.

G. BENGE, T.T. 2423:16-20; *see* HESI's FOF/COL at 235.  Therefore, CSI's testing and the Bly

Report's cement conclusions based thereon should be disregarded.

Further, despite this Court's exclusion of Fred Sabins's expert opinions (*see* Dkt. Nos.

4838, 5612), BP relies heavily on those excluded opinions.  *See, e.g.*, BP's FOF/COL at 281,

284, 285, 301.  Sabins's expert opinions have been stricken.  Dkt. No. 5612 at 2.  The Court

should disregard any proposed findings based upon this stricken testimony.

### 4.   *Many Proposed Findings Misstate Or Mischaracterize The Record.*

Plaintiffs assert that Rickey "Morgan testified that, after mixing the slurry, it 'looked thin'

(a classic sign of cement instability) and 'he expected it to be thicker' – something Morgan felt was noteworthy."  PSC's FOF/COL at 64.  Plaintiffs' citations do not support the parenthetical that a thin slurry is a "classic sign of cement instability."  Morgan testified that his observation that the slurry was thin at atmospheric conditions "in no way means it is too thick or too thin in downhole conditions."  DEPO. OF R. MORGAN, 27:3-8.  In fact, Morgan testified that the slurry foamed properly (*id*. at 98:9-24); did not have any signs of gas break out, free fluid, streaking or settling (*id*. at 98:25-99:17, 107:8-18, 180:12-21); did not have *any* signs of instability (*id*. at 199:9-11); and that he would have relied on his foam stability testing to show the foam slurry was *stable*.  *Id*. at 107:22-108:3.  In short, Plaintiffs' proposed finding ignores Morgan's actual, plain and direct testimony, and the proposed finding should be disregarded.

Plaintiffs also propose a finding that "[HESI] should have recognized, and communicated to BP in a serious and forceful way, that the cement job was going to fail, before BP commenced (*sic*) on April 19."  PSC's FOF/COL at 180.  BP proposes that "[t]here is no evidence of a contrary recommendation or any protest from [HESI] after learning a full bottoms-up would not be run."  BP's FOF/COL at 168; *see also id*. at 182.  These findings misstate the record.  On April 19, Jesse Gagliano approached Greg Walz with his concerns about the channeling risk resulting from BP's decisions to run only six centralizers and to perform less than a full pre-cementing bottoms-up circulation.  DEPO. OF G. WALZ, 535:20-537:21, 539:10-540:12, 543:25-545:15; *see also* HESI's FOF/COL at 138-39.  Walz testified that Gagliano recommended a full bottoms-up circulation to benefit the cement job by improving the displacement efficiency by ensuring that there was "plenty of fresh mud moving across the open hole."  DEPO. OF G. WALZ, 543:25-545:15.  This conversation plainly constitutes communication to BP of HESI's concern regarding BP's decision to overrule HESI's initial recommendation to perform a full bottoms-up.

Plaintiffs further argue that HESI failed to prepare the requisite basis of design for the production casing cement job. PSC's FOF/COL at 60-61. Plaintiffs overlook Jesse Gagliano's direct testimony that he created a basis of design for the Macondo well's cementing work and subsequently updated that basis of design *six times* for the production casing interval alone. J. GAGLIANO, T.T. 6678:14-6682:9.

Finally, BP again misrepresents the trial record[2] in its proposed finding that "[e]ven if the effects of D-Air could have been overcome by increasing the amount of ZoneSealant, there was no evidence that [HESI] did so." BP's FOF/COL at 261. BP's proposal ignores the key contemporaneous stability testing evidence discussed *supra* as well as the testimony of Tim Quirk that the normal concentration of ZoneSealant was only .07 gallons per sack, but the concentration of surfactant in the Macondo slurry was .11 gallons per sack. T. QUIRK, T.T. 4876:4-4877:2. Accordingly, BP's proposed finding should be disregarded.

### C.    The Evidence Establishes That The BOP Was Not Properly Configured.

BP's and Transocean's assertion that the *Deepwater Horizon*'s AMF system was properly configured at the time of the blowout is self-serving and contradicted by the trial evidence. *See* BP's FOF/COL at 394-96; TO's FOF/COL at 192-93. In touting that the system was designed to "provide 'reliability through simplicity,'" BP and Transocean fail to acknowledge that "simplicity is not a . . . governing concept" in proper engineering design and "is outside of the standard of care in engineering." HESI's FOF/COL at 76; *see also* G. STEVICK, T.T. 6987:7-21.

Further, in spite of BP's and Transocean's contentions to the contrary, had the BOP been outfitted with DVS rams, the drill pipe could have been sheared and the Macondo well sealed. HESI's FOF/COL at 81-82. Transocean admits that "there was some evidence that the DVS

---

[2] BP also attacks HESI's alleged failure to conduct appropriate testing. *See, e.g.*, BP's FOF/COL at 278. This proposed finding also misrepresents the trial evidence. *See* HESI's FOF/COL at 198-208.

blades may have a better ability to shear drill pipe in certain conditions." TO's FOF/COL at 189. This cautious admission fails to take into account the DVS's greater blade width, combined with the dual 'V' shaped blades, which would have pushed the drill pipe to the center of the Macondo wellbore, allowing the rams to shear the drill pipe, even during the AMF sequence. R. DAVIS, T.T. 2662:15-2663:10; *see also* HESI's FOF/COL at 81. The facts are, the DVS ram was readily available, cost pennies compared to the amount spent on drilling the Macondo well, and could have sheared the drill pipe to seal the well on April 20, 2010. HESI's FOF/COL at 81-82. All-in-all, even though the BOP was ill-suited for the well, had Transocean's crew operated it properly and timely, the BOP likely would have been able to prevent the Macondo disaster. *Id.* at 91.

## II.   Complaints Regarding Gagliano And Keith Are Meritless.

In their proposed findings, Plaintiffs, BP, and Transocean focus their complaints against HESI on the actions of Jesse Gagliano and Joe Keith. These complaints are not only countered by credible, reliable evidence, but are also, in many instances, controverted by evidence tendered by these parties' own witnesses. Indeed, the evidence illustrates that both Gagliano and Keith are valued, competent members of HESI's team, and that both acted reasonably and in accordance with industry standards.

### A.   Gagliano Acted Competently And Reasonably.

Opposing parties' complaints regarding Jesse Gagliano include, among others, attacking his competence (*see* TO's FOF/COL at 59; PSC's FOF/COL at 140, 172-78), questioning his recommendation of foamed cement for the Macondo production casing cement job (*see* BP's FOF/COL at 256-58), misconstruing his role in the OptiCem modeling (*see* PSC's FOF/COL at 60-61; BP's FOF/COL at 297-98), and manufacturing a role and involvement in the decision to forego a cement bond log ("CBL"). *See* BP's FOF/COL at 177. Plaintiffs even attack Gagliano's

decision to initially invoke his Fifth Amendment rights, despite the fact that he subsequently testified by deposition and live at trial, where he was vigorously cross-examined.

At the time of the Incident, Jesse Gagliano had worked as a HESI cement engineer for over thirteen years.  HESI's FOF/COL at 102.  Over the course of his career, Gagliano planned or executed over 100 foam cement jobs in the Gulf of Mexico and, based on his history and skills, BP requested that Gagliano work as an embedded technical adviser in its Westlake office. *Id*.  BP's cement specialist, Erick Cunningham, recognized Gagliano as an experienced, competent cement engineer.  *Id*. at 103.  Others, including BP's Brett Cocales and the cementing expert for both the United States and Plaintiffs, acknowledged Gagliano's competence and ability.  *See id*.

Plaintiffs propose a finding that "[HESI] knew that Gagliano lacked the experience and reliability necessary for the Macondo project and that his performance as its cement engineer was deficient with BP, yet it vested in him with (*sic*) unfettered control over all slurry design and testing decisions."  PSC's FOF/COL at 185.  Plaintiffs cite as support testimony of Tommy Roth, Tim Quirk and Jesse Gagliano, none of which suggests that Gagliano lacked the requisite experience and reliability or that HESI was aware of Gagliano's alleged shortcomings.  HESI's FOF/COL at 102-04.

In addition, Gagliano reasonably believed that a nitrified cement slurry could be successfully used on the Macondo production casing cement job.  HESI's FOF/COL at 108.  BP independently approved of this decision.  *Id*. at 99, 108.  Neither HESI nor Gagliano could have executed the Macondo production casing cement job without BP's approval and/or permission. *Id*. at 99.  Thus, Gagliano designed the Macondo cement slurry to meet BP's specifications because BP made the ultimate decisions related to the cement job.  *Id.* at 100.

Plaintiffs further allege that "[HESI] personnel exhibited willful and reckless disregard by participating in a cement job that was contrary to its best practices."  PSC's FOF/COL at 178-180.  This statement contradicts the record, which demonstrates that, to the extent HESI personnel deviated from its best practices, those personnel either performed testing to confirm the viability of that course of action or informed BP of the risks associated with such deviations. *See* HESI's FOF/COL at 112-14; 129-132; 138-140.  Thus, the record evidence actually establishes the opposite of willful and reckless disregard by HESI.

Plaintiffs' and BP's complaints regarding Gagliano's OptiCem modeling and alleged errors in OptiCem inputs are also without merit.  Gagliano depended on BP for modeling inputs. *See id*. at 124-140.  Gagliano received modeling inputs directly from BP, which were subsequently verified or changed by BP on multiple occasions.  *Id*. at 128-29.  With the exception of modeling seven instead of six centralizers in the final April 10 OptiCem model, errors in the model, if any, were due to inputs received from or withheld by BP.  *Id*. at 124-140.

Finally, BP incorrectly claims that Gagliano had a role in BP's decision to forego running a CBL.  BP followed a "decision tree" to determine whether to run a CBL.  *Id*. at 190.  Neither Gagliano nor any HESI employee provided input into the "decision tree" or was asked to do so. *Id*.  The decision to run a CBL was BP's responsibility.  *Id*.  There is no evidence that Gagliano agreed with or endorsed BP's decision to forego a CBL—a decision that violated BP's own guidelines and practices.  *See e.g.*, TREX-1 at 36, 66; TREX-1802 at BP-HZN-BLY00093963; TREX-4456.  It was BP's decision to test the placement and integrity of the cement—neither HESI nor Gagliano played any role in that decision.  HESI's FOF/COL at 188-90, 194.

## B.    Joe Keith Acted Competently And Reasonably.

Plaintiffs, BP, and Transocean raise several complaints regarding Joe Keith's actions on the night of April 20, 2010.  Among these complaints, the parties point to: (1) Keith's failure to

see as a sign of a kick the 100-psi increase in the drill pipe pressure around 21:00 (*see* TO's FOF/COL at 93; PSC's FOF/COL at 57; BP's FOF/COL at 218); and (2) Keith's alleged failure to see or realize the significance of the 200+ psi increase in drill pipe pressure from 21:08 to 21:14 (*see* TO's FOF/COL at 98-99; BP's FOF/COL at 219-20).   Transocean also questions whether Keith's ability to monitor the Macondo well was affected by displacement operations.  *See* TO's FOF/COL at 91.   Based upon these questions, Plaintiffs contend that Keith abandoned his post during the displacement procedure.  PSC's FOF/COL at 58, 180.

A review of the record dispels these complaints.  First, the 100-psi increase in standpipe pressure from 21:01-21:08 was very subtle and difficult to detect in real-time.  HESI's FOF/COL at 273.  And, as discussed *supra*, while Keith was able to capably monitor the Macondo well, the simultaneous rig operations made well monitoring more difficult.  Moreover, under prevailing industry standards, a pressure increase is not a standard kick indicator and Keith visually confirmed at 21:08 that the well was not flowing.  *Id*. at 274.  Keith did not deviate from industry standards with respect to monitoring the well for signs of a kick from 21:01-21:08.  *Id*.

Likewise, as BP's Mark Bly recognized, the 246-psi standpipe pressure increase during the sheen test, from 21:08-21:14, was a slight, gradual increase.  *See id*.  During his nearly twenty years working as a mudlogger, Keith had previously observed standpipe pressure increase after rig pumps were shut down for a sheen test; such an increase was not an indication that the well was flowing.  *Id*.  Transocean's own expert, Calvin Barnhill, opined that it was reasonable for Keith, as the mudlogger on duty, not to have identified either the 100-psi or the 246-psi increase in standpipe pressure as kick indicators.  *Id*. at 275.

Finally, there is no basis in the record for the Court to find that Keith abandoned his post on the night of April 20, 2010.  Keith diligently tracked and recorded information regarding mud

transfers, made several calls to the rig crew when potential anomalies were observed, and continuously and actively monitored all available surface data parameters until he heard rain on his shack and evacuated the rig.  *See id*. at 289-291.

### III.    Transocean's Actions Constitute A Superseding, Intervening Cause Of The Blowout.

HESI established in its post-trial briefing that BP's and Transocean's failure to properly interpret the negative pressure tests, Transocean's failure to maintain well control, and Transocean's and BP's failures to properly configure, maintain, and operate the BOP were unforeseeable, superseding, intervening causes of the blowout that broke the causal link between any action by HESI and the blowout.  HESI's Brief at 8-15.

Relying upon the Fifth Circuit's decision in *Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*, 447 F.3d 360 (5th Cir. 2006), Transocean argues that it is not "highly extraordinary" or "unforeseeable" that Transocean "would fail to shut in the well," and that "[n]ot shutting in the well was a foreseeable consequence of BP's decision[] to proceed with a faulty cement job . . . [.]"  TO's FOF/COL at 278; *see also* TO's Brief at 50.  In *Stolt*, the Fifth Circuit distinguished *Lone Star Indus., v. Mays Towing Co.*, 927 F.2d 1453 (8th Cir. 1991) on the ground that all of the negligent acts in *Stolt* occurred in a small window of time (approximately two minutes).  447 F.3d at 368.  The *Stolt* court noted that in *Lone Star*, unlike in *Stolt*, the negligence of the first actor started and finished before any alleged negligence of the second actor; the second act was of independent origin, and two different types of harm were involved.  *Id*. at 368-69.

With respect to HESI's alleged "faulty cement job," the situation is much more akin to *Lone Star* than *Stolt*.  After the cement job was finished, the well remained under control for approximately 18 hours.  HESI's FOF/COL at 145.  Any alleged HESI negligence was complete long before Transocean failed to maintain well control.  And the reasonably foreseeable risk of

12

an inadequate primary cement job (remediation) is different from the risk that actually occurred (blowout).  HESI's FOF/COL at 109, 133-34, 140, 143-44, 171, 189.  Transocean's failure to maintain well control, its (and BP's) failure to properly interpret the negative pressure test, and its failure to properly maintain the BOP were not reasonably foreseeable to HESI and, accordingly, were superseding causes of the blowout.

## IV.   The Evidence Does Not Support A Direct Finding Of Gross Negligence Against HESI.

Plaintiffs ask the Court to find HESI grossly negligent because a finding of ordinary negligence "would likely not afford" Plaintiffs with "meaningful relief."  PSC's Brief at 1.  But finding HESI grossly negligent merely to increase damages is improper.  In reality, Plaintiffs can and are recovering "meaningful relief" from BP, HESI's indemnitor.

Plaintiffs ask the Court to find that the conduct of Gagliano, Keith, and "other [HESI]-Sperry personnel was the direct result of [HESI] corporate policy or with the knowledge, approval or ratification of corporate officials with policymaking authority."  PSC's Brief at 182.  In support, Plaintiffs argue that (1) the HESI lab was understaffed and unable to keep up with testing; (2) the failure to provide a Basis of Design was a corporate responsibility and HESI was indifferent to its completion; (3) Jesse Gagliano lacked competence and was unsupervised; and (4) there was a history of incompetence of mudloggers.  PSC's FOF/COL at 183-186.

HESI addresses the last three of these issues, *supra*.  Regarding the first, even if Plaintiffs' allegations regarding the lab were true, there is no causal relationship between an allegedly understaffed lab and the blowout.  Gagliano received the notification from the lab that that testing was "Finished in Lab" prior to the commencement of the production casing cement job.  J. GAGLIANO, T.T. 6656:4-6662:8; TREX 7722.  This test showed a stable foam slurry.  G. BENGE, T.T. 2455:7-2456:18; TREX 7722, 5990 at 12.  It is axiomatic that "fault in the abstract

13

does not give rise to liability."  *In re Mid-South Towing Co.*, 418 F.3d 526, 534 (5th Cir. 2005).

Finally, Plaintiffs allege that BP expressed issues with Gagliano's performance. However, the only evidence Plaintiffs cite regarding HESI's knowledge of such issues is John Guide's testimony that he shared unspecified "concerns" about Gagliano with someone at HESI whose name Guide could not quite remember.  PSC's FOF/COL at 185; J. GUIDE, T.T. 8901:16-24.  Despite this, Guide trusted Gagliano and was never concerned about the reliability of his work.  J. GUIDE, T.T. 8901:25-8902:6.

## V.    There Is No Basis To Subject HESI To Vicarious Liability For Punitive Damages.

The issue of corporate liability for punitive damages based on acts of employees has been answered in the Fifth Circuit.  *See In re P&E Boat Rentals, Inc.*, 872 F.2d 642 (5th Cir. 1989).  *P&E* governs here,[3] as even Plaintiffs concede.  PSC's Brief at 19.  HESI cannot be subjected to punitive damages based on the acts of its non-policymaking employees.

Rather than point the court to evidence of wrongdoing on the part of a policymaking official,[4] Plaintiffs state that "[i]t would be difficult to conclude that BP and Transocean, if not also [HESI], were not directly involved and implicated, as companies, in the major decisions that were made in carrying out the drilling operations that led to the blowout and fire in question."  PSC's Brief at 5.  First, it is unclear from the stated reference whether Plaintiffs intend to include HESI.  Moreover, Plaintiffs cite no authority supporting this expansion of *P&E* to include "major

---

[3] Based on a single district court opinion that does not address *P&E*, Alabama argues that the Eleventh Circuit would apply the Restatement approach.  Alabama's Brief at 9-10.  But the majority of Eleventh Circuit district courts addressing this issue have held that a principal cannot be held liable for punitive damages where it neither authorized nor ratified an employee's act.  *See Doe v. Celebrity Cruises*, 145 F. Supp. 2d 1337, 1347 (S.D. Fla. 2001); *Jones v. Compagnie Generale Mar.*, 882 F. Supp. 1079, 1085-86 (S.D. Ga. 1995); *see also Stires v. Carnival Corp.*, 243 F. Supp. 2d 1313, 1323 (M.D. Fla. 2002).

[4] Plaintiffs argue, with no supporting evidence, that Gagliano had policymaking authority.  PSC FOF/COL at 182.  This unsupported statement is insufficient to permit the Court to make such a finding; nor can Plaintiffs seriously contend that Gagliano had authority to make corporate policy.  *See P&E*, 872 F.2d at 652-53 (Chevron could not be subject to punitive damages based on wanton acts of foremen who did not exercise policymaking authority); *Wilcox v. Kerr-McGee Corp.*, 706 F. Supp. 1258, 1267 (E.D. La. 1989) (Court did not find that there was sufficient evidence that offsite drilling superintendent was a corporate officer or policymaker).

decisions," and cite no evidence to support HESI's involvement in unspecified "major decisions."

Plaintiffs also attempt to avoid the effect of *P&E* by arguing that "[w]hen BP or Transocean, or even [HESI], entrusted critical decisions to low-level, unsupervised or untrained personnel in a project of such inherent magnitude and risk, such delegation was in and of itself reckless."  PSC's Brief at 6.  Again, Plaintiffs do not appear certain that HESI belongs in this category.  The record does not support that either Keith or Gagliano were "unsupervised or untrained" and that "low-level" employees made decisions they were unqualified to make.  To the contrary, Keith and Gagliano were well trained and well qualified.  To the extent Plaintiffs argue a principal is liable for primary negligence if all important decisions are not made by a policymaking employee, they essentially propose undermining *P&E* for any "critical" activity. This approach is unsupported by any legal authority.

Arguing that HESI ratified pre-Incident conduct by allegedly attempting to conceal evidence after the Incident, Plaintiffs state that "a company's liability for punitive damages can be established where the decision, conduct or policy in question is 'ratified' by either a managerial agent or an official with policymaking authority," and that HESI "[m]anagement effectively ratified its employees' pre-Incident conduct by attempting to conceal the evidence after the [I]ncident."  PSC's Brief at 18;  PSC's FOF/COL at 186.  Plaintiffs' argument is inconsistent with *P&E*.  Ratification requires a policymaking official, not a "managerial agent." *See Wilcox*, 706 F. Supp. at 1267 (declining to impose liability on corporation based on approval or ratification of drilling superintendent who was not a corporate officer or policymaker). Accordingly, the unauthorized acts of non-policymaking officials cannot constitute ratification.

Moreover, "[r]atification occurs when a party affirms an act done by another, whereby the act is given effect as if committed by an agent with actual authority.  A person ratifies an act by manifesting assent that the act shall affect his or her legal relations, or by conduct that

15

justifies a reasonable assumption that he or she so consents." *Overseas Carriers, Inc., v. Team Ocean Servs.-Dallas, Inc.*, Civil Action No. H-10-2842, 2013 U.S. Dist. LEXIS 1302, at *39 (S.D. Tex. Jan. 4, 2013) (citing RESTATEMENT (THIRD) OF AGENCY §4.01).   Such ratification "must be based on full, actual knowledge of the facts of the transaction, constructive or imputed knowledge being insufficient to make the principal liable by way of ratification." *NMS Indus., v. Premium Corp. of Am.*, 451 F.2d 542, 544 (5th Cir. 1971).   Plaintiffs have cited no authority that alleged post-Incident concealment can somehow manifest assent by a policymaking official with full knowledge of the transaction at issue, as the law requires, and fail to cite any example of such manifestation of assent or conduct justifying a reasonable assumption of consent.   *See* PSC's FOF/COL at 186.   Moreover, as discussed *infra* and as previously briefed to the Court, *there was no post-Incident concealment*.   Dkt. Nos. 4961, 5082, 8903, 9022.   Finally, the post-Incident activities that Plaintiffs point to are not activities of policymaking employees, with the possible exception of alleged "misrepresentations" to Congress and the public that, even according to Plaintiffs' evidence, were not misrepresentations, as discussed *infra*.

Finally, Plaintiffs imply that this case should not be governed by *P&E* because it does not involve a "rogue employee" who "decided, on his own, to engage in reckless conduct."   PSC's Brief at 5-6.   HESI denies that any act of a HESI employee done in connection with the Macondo well was reckless.   But, again, Plaintiffs propose an expansion of the *P&E* holding that is unwarranted and insupportable.   *P&E* does not require that the conduct at issue be undertaken by a rogue employee.   Rather, in order to impose vicarious liability, it must be done with the approval, knowledge, or ratification of the principal.   *See P&E*, 872 F.2d at 652-53.

## VI.   Post-Incident Conduct Cannot Be Considered In Determining Gross Negligence.

### A.   HESI Did Not Conceal Or Destroy Evidence.

Plaintiffs ask the Court to find that whether HESI's "conduct in concealing or destroying

evidence after the incident was intentional or not, it certainly points to a broken corporate culture lacking an appropriate level of commitment to the public, the environment, the government and the industry."  PSC's FOF/COL at 182.  There is *no evidence* that HESI or its employees concealed or destroyed evidence.[5]  These issues have been briefed at length and HESI refers the Court to its briefing.  *See* Dkt. Nos. 4961, 5082, 8903, 9022.

Plaintiffs grasp at straws in an attempt to lengthen their list of HESI's alleged post-Incident "bad acts."  PSC's FOF/COL at 69-71.  But Plaintiffs cite nothing suggesting that HESI's post-Incident conduct was inappropriate.  HESI did not make misrepresentations to Congress or to the public, and nothing in the record demonstrates otherwise.  At the very most, HESI employees testified that they lacked information at the time certain statements were made, and that they learned more information as the investigation progressed.[6]

Plaintiffs' allegation that HESI cloaked an investigation behind attorney-client privilege is unfounded and directly contradicted by the testimony and evidence they cite.  *See* PSC's FOF/COL at 70.  Probert actually testified that he was not involved in an investigation and that he would not have expected anyone to do any testing unless counsel directed it.  T. PROBERT, T.T. 3007:2-16.  HESI did not conduct a formal, company-directed investigation into the Incident in the sense that BP and Transocean did.  Dkt. No. 4942.  Instead, HESI relied on

---

[5] Even if Plaintiffs could prove spoliation, an adverse inference, which is essentially what Plaintiffs seek (*see also* BP FOF/COL at 532-33), is predicated on bad faith or bad conduct of the defendant.  *Vick v. Tex. Emp't Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975); *Caparotta v. Entergy Corp.*, 168 F.3d 754, 756 (5th Cir. 1999).  No such conduct has been shown here.

[6] *See* T. ROTH, T.T. at 3249-51, 3260-62, 3266-67 (Roth did not testify that he or anyone else made misrepresentations to Congress or to the public, but that he made every effort to be truthful and accurate, and his presentation reflected his understanding of the information available to him at the time); T. PROBERT, T.T. at 3025, 3036-38, 3043 (Probert did not testify that he made misrepresentations.  His testimony regarding HESI's experience with similar foamed jobs referred generally to foam cement and not to the exact design used at Macondo); T. PROBERT, T.T. at 3007, 3029 (The cited testimony does not suggest that Probert or anyone else at HESI represented to Congress that HESI would conduct a non-privileged investigation of the Incident); T. ROTH, T.T. 3263 (Roth did not concede that HESI made misrepresentations to Congress and the public.  He acknowledged that he later "identified gaps" in the application of HESI's best practices to the design of the Macondo production casing slurry).

Transocean and BP, the parties with the most pertinent information available, to carry out their respective investigations.

HESI did assert privilege as to certain documents regarding activities conducted at the direction of counsel to prepare for governmental hearings/inquiries and to prepare for litigation. HESI's assertion of privilege was challenged and upheld (Dkt. No. 5067), and Plaintiffs fail to cite any authority that a party's legitimate assertion of privilege should somehow be considered nefarious.  Documents and testimony regarding other informal testing or fact-gathering not done at the direction of counsel were produced, as Plaintiffs are aware.  *See* Dkt. No. 4942.

Plaintiffs' citation of an internal discussion regarding what a Wall Street analyst could be told about HESI's involvement in the Incident, the decisions of a HESI employee regarding the assertion and subsequent waiver of his Constitutional rights,[7] John Gisclair's discarding of post-Incident notes after the notes were transcribed into a database, and an inadvertent failure to timely produce documents likewise fail to demonstrate concealment of evidence or misrepresentations by HESI.  *See* PSC's FOF/COL at 69-70.

Finally, Plaintiffs imply Tim Quirk admitted using SCR-100L from the rig in post-Incident testing.  PSC's FOF/COL at 68-69.  While Quirk was admittedly confused during the PSC's questioning,[8] he never said that he tested rig materials.  The line of questioning cited by the PSC was based on counsel's unsupported and incorrect representation to the witness.  T. QUIRK, T.T. 4773:5-24.  Quirk testified that although the SCR-100L sample used in a post-Incident test shared a common "Lot Number" with samples of SCR-100L from the *Deepwater Horizon*, the SCR-100L sample that Quirk used came from a *lab sample* of the additive and not

---

[7] In support of their assertion regarding Gagliano's decision to invoke and then waive, his Fifth Amendment rights, Plaintiffs cite the trial testimony of Glen Benge.  PSC's FOF/COL at 70.  But Benge explicitly stated that his analysis and conclusions were not at all affected or modified by Gagliano's testimony.  G. BENGE, T.T. at 2334:2-21.

[8] *See* T. QUIRK, T.T. 4780:21-4781:8.

from a *Horizon* rig sample.  T. QUIRK, T.T. 4848:3-19, 4851:5-14.  Roth merely testified that he did not know the source of the sample identification number.  T. ROTH, T.T. 3125:1-4.

### B.     Post-Incident Actions Do Not Bear On HESI's Pre-Incident State Of Mind.

A defendant's state of mind distinguishes ordinary from gross negligence.  *See* HESI's Brief at 32-33; BP's Brief at 6-8; TO's Brief at 41-42.  Arguing that post-Incident conduct can be considered in determining whether HESI was grossly negligent, Plaintiffs cite authorities for the proposition that evidence of post-Incident activities may be admissible to the extent it bears on the defendant's state of mind at the time of the Incident.[9]  PSC's Brief at 16-17.  But such evidence cannot be considered by the Court in determining whether HESI was grossly negligent *unless it bears upon the issue of whether HESI acted with the required state of mind at the time of the Incident*.  *See* HESI's Brief at 32-34.[10]  Plaintiffs fail to explain how *any* specific instance of post-Incident conduct is probative of the state of mind of *any* HESI employee at the time of the Incident.   Rather, they make broad, unsupported, allegations that post-Incident conduct evinces a culture of conscious disregard, a "broken corporate culture," and a culture lacking "an

---

[9] Certain of these authorities cannot even be stretched this far.  *See Wolfe v. McNeil-PPC, Inc.*, 773 F. Supp. 2d 561 (E.D. Pa. 2011) (Though the opinion is not clear, the conduct at issue appears to be pre-injury, not post-injury); *Jimenez v. Chrysler Corp.*, 74 F. Supp. 2d 548 (D.S.C. 1999), *rev'd in part and vacated*, 269 F.3d 439 (4th Cir. 2001) (Punitive damage award reversed and judgment granted to defendant on punitive damage claim; the Fourth Circuit further noted that post-design conduct did not point to defendant's consciousness of wrongdoing at the time it designed the vehicle.); *Hoppe v. G.D. Searle & Co.*, 779 F. Supp. 1413 (S.D.N.Y. 1991) (Post-Incident conduct admissible as a matter of Minnesota statutory law in considering appropriate *amount* of punitive damages).

[10] *See also, e.g.*, *Gulbranson v. Duluth, Misabbe & Iron Range Ry. Co.*, 921 F.2d 139, 142 (8th Cir. 1990) (That railroad was aware of problem in 1985 was not probative of its knowledge in 1984); *King v. Hasbro, Inc.*, Civil Action No. 07-4001, 2009 U.S. Dist. LEXIS 89119, at *3 (E.D. Pa. Sept. 28, 2009) ("Evidence regarding events that transpired subsequent to an injury is generally irrelevant to claims arising from that injury.").  In *O'Harra v. Pundt*, the Supreme Court of Oregon refused to allow the consideration of post-incident misrepresentations regarding the incident at issue: "The fact . . . that defendant lied . . . to escape the results of his mistake . . . would not show that *at the time of the killing* he acted in wanton or wilful [*sic*] disregard of the rights of the plaintiff . . . [.]  An innocent or negligent act could not be converted into a wanton and willful one by the fact that the defendant thereafter sought by improper means to justify his mistake."  310 P.2d 1110, 1118-19 (Or. 1957) (emphasis in original); *see also Jimenez*, 269 F.3d at 451 (Because South Carolina law permits punitive damages only to punish behavior that was reckless at the time of commission, alleged post-design cover-up could not be considered. Post-design conduct must point to defendant's consciousness of wrongdoing at the time it designed the product, not to consciousness of wrongdoing thereafter.).

appropriate level of commitment to the public, the environment, the government, and the industry."  PSC's Brief at 59; PSC's FOF/COL at 71.

Plaintiffs cannot create the necessary state of mind by collecting unrelated post-Incident activities and then contending that HESI is reckless and consciously disregards risks generally, and therefore must have done so prior to the Incident.  *See* FED. R. EVID. 404(b); *R.E. Lindner Steel Erection Co., Inc. v. Wedemeyer, Cernik, Corrubia, Inc.*, 585 F. Supp. 1530, 1532 (D. Md. 1984) (Willful, wanton and reckless acts committed after incident were not admissible to show pre-incident conduct was similarly willful, wanton, and reckless).  Rather, Plaintiffs must point to specific post-Incident activity that is probative of HESI's state of mind with respect to risks that caused the blowout.  *See Martin v. Texaco*, 726 F.2d 207, 211 (5th Cir. 1984) (Gross negligence inquiry does not involve an evaluation of defendant's "overall conduct . . . The question is not whether Texaco's general safety program reflected an attitude of conscious indifference.  The relevant inquiry is whether Texaco was consciously indifferent as to the dangers presented by the use of nitrogen in the refinery."); *Librado v. M.S. Carriers, Inc.*, No. 03:02-CV-2095, 2004 U.S. Dist. LEXIS 12203, at *17 n.9 (N.D. Tex. June 30, 2004) (In determining whether defendant was grossly negligent, court would not consider history of deficient safety control and enforcement independent from the acts that arguably caused the incident).  Plaintiffs have failed to make this showing.

Nor can Plaintiffs create the proper pre-Incident state of mind by collecting different employees' post-Incident activities.  *See Saba v. Compagnie Nationale Air Fr.*, 78 F.3d 664, 670 n.6 (D.C. Cir. 1996) ("Individual acts of negligence on the part of employees—without more—cannot . . . be combined to create a wrongful corporate intent.").[11]  As the court noted in *Saba*,

---

[11] *See also Southland Sec. Corp. v. INSpire Ins. Solutions*, 365 F.3d 353, 366 (5th Cir. 2004) (For purposes of determining whether statement was made with the requisite scienter, it was appropriate to look to the state of mind

the acts of an agent can be imputed to the principal, but the agency relationship cannot transform negligence into willfulness.  78 F.3d at 670 n.6.  The same is true here.

Any assertion that HESI should be subject to punitive damages based on the post-Incident activities of certain employees, none of which harmed Plaintiffs,[12] is nothing more than an attempt to improperly paint HESI as generally bad with no foundation in fact or in the evidence presented at trial.  But "[a] defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business."  *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 423 (2003).  Ultimately, Plaintiffs' attempt to turn molehills into mountain ranges is telling.  They endeavor to string together inadvertencies and exaggerations that say nothing about HESI's state of mind at the time of the Incident, that do not paint a picture of a plot to conceal or destroy evidence, and that do not point to "a broken corporate culture." PSC's FOF/COL at 71.  Plaintiffs have not established that HESI acted willfully or recklessly either before or after the Incident.

### VII.    BP's Indemnity And Release Obligations Are Valid And Enforceable.

BP argues, as it did in response to HESI's Motion for Summary Judgment regarding Indemnity, that HESI's gross negligence, alleged breaches of contract, material increase of the risk, and fraud vitiate BP's indemnity obligations under the contract between BP and HESI (the "BP/HESI Contract").  BP's FOF/COL at 644-50, 661-67.[13]  The Court has already determined

---

of the individuals making or issuing the statement "rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.") (citing cases); *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 241 (5th Cir. 2010) ("[W]e have declined to allow [a subjective state of mind] to be met by a corporation's collective knowledge, instead requiring that the state of mind 'actually exist' in at least one individual and not be imputed on the basis of general principles of agency.") (quoting *Southland*, 365 F.3d at 366).

[12] As HESI established in its Response in Opposition to Motion for Spoliation Sanctions (Dkt. No. 4961), Surreply in Opposition to BP's Motion for Spoliation Sanctions (Dkt No. 5058), and Response to BP's Motion for Spoliation Sanctions and Related Submissions of the PSC and the States (Dkt. No. 9022), neither Plaintiffs nor BP were prejudiced in this litigation by any post-Incident activities of HESI's employees.

[13] BP also argues in its proposed findings and conclusions that it is entitled to contribution and subrogation under OPA.  BP's FOF/COL at 668-70.  While HESI objects to BP's improper inclusion of legal argument in its proposed

that gross negligence does not invalidate BP's agreement to indemnify HESI. *See* Dkt. Nos. 5493, 5446. Both HESI and Transocean have also moved for summary judgment that gross negligence does not affect BP's releases. *See* Dkt. Nos. 10281, 10548. Moreover, as noted *infra*, there is no evidence to support the fraud claims actually pled by BP.

Nor do alleged breaches of contract invalidate BP's independent indemnity or release obligations. *See* BP's FOF/COL at 644-46, 661-62, 672. First, the cases on which BP relies largely deal with either (1) increased risk to the indemnitor resulting from the breach of contract[14] or (2) an indemnitee arguing that it has no liability to the other party in a breach of contract action because it must be indemnified for its own breaches of contract.[15] As discussed, *infra*, an increased risk analysis does not support invalidation of the indemnity obligations at issue. Nor is HESI asserting, in a breach of contract action by BP, that BP must indemnify it for its own breaches of contract. Rather, HESI asserts that any alleged breaches of contract on its part do not exempt BP from its responsibilities under the risk allocation provisions of the contract. Here, BP agreed to indemnify HESI for claims arising out of a blowout or pollution from the reservoir, notwithstanding any negligence or breach of duty on HESI's part. In *First Jersey Nat'l Bank v. Dome Petroleum, Ltd.*, 723 F.2d 335, 339-40 (2d Cir. 1983), the defendant's breach of an explicit contractual requirement in a depository agreement was the cause of the losses at issue, but did not invalidate the plaintiff's indemnity obligation pursuant to the parties' agreed-upon risk allocation in the agreement. According to the court, an indemnity agreement

---

findings of fact and conclusions of law, HESI addressed this argument in its Reply Memorandum to BP's and the Plaintiffs' Responses to HESI's Motion for Judgment on the Pleadings or Alternative Motion for Summary Judgment Regarding BP's Assignment of Claims (Dkt. No. 10288), which HESI incorporates by reference. HESI likewise incorporates its Reply in Support of HESI's Motion for Judgment on the Pleadings or Alternative Motion for Summary Judgment Regarding Punitive Damages (Dkt. No. 10287).

[14] *See, e.g., New Eng. Tel. & Tel. Co. v. Cent. Vt. Pub. Serv. Corp.*, 391 F. Supp. 420, 429-30 (D. Vt. 1975).

[15] *See, e.g., Mobil Chem. Co. v. Blount Bros. Corp.*, 809 F.2d 1175, 1181-82 (5th Cir. 1987); *Schmahl v. Macy's Dept. Stores, Inc.*, No. CV-09-68, 2010 U.S. Dist. LEXIS 77294, at *17-18 (E.D. Wash. July 30, 2010).

that excluded only intentional and deliberate misconduct required the plaintiff to indemnify the defendant despite the breach of contract.  *Id.*

Indemnity obligations are independent and generally unaffected by allegations that the indemnitee breached the contract.  *Tesoro Petroleum Corp. v. Nabors Drilling U.S.*, 106 S.W.3d 118, 127 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (applying Texas law); *see also Banner Sign & Barricade, Inc. v. Berry GP, Inc.*, No. 13-07-00596-CV, 2008 Tex. App. LEXIS 7120 (Tex. App.—Corpus Christi 2008, pet denied) (applying Texas law).  In *Tesoro*, a drilling contractor allegedly breached a provision of the drilling contract requiring the contractor to maintain well control equipment in good condition at all times and use all reasonable means to prevent fires and blowouts and to protect the hole.  106 S.W.3d at 127.  According to the court, because the operator's agreement to release and indemnify the contractor for damage to or loss of the hole was an independent covenant, the drilling contractor's alleged breach of the drilling contract did not affect the indemnity obligation.[16]  *See also MacGlashing v. Dunlop Equip. Co.*, 89 F.3d 932, 937-940 (1st Cir. 1996).[17]  The same is true here of BP's indemnity obligations.

With respect to BP's "material increase in risk" argument, the cases it cites largely deal with situations where "the indemnitor had good reason to believe that the potential loss it was risking was less than the loss that actually occurred."  *See First Jersey*, 723 F.2d at 342

---

[16]Citing no authority, BP asks the Court to find "for the same reasons that material breach of contract will invalidate an indemnity, it will also invalidate a release."  BP's FOF/COL at 672.  As established, the alleged breaches of contract do not invalidate BP's indemnity obligations.  For the same reasons, they do not invalidate BP's release.  Indeed, the clause at issue in *Tesoro* was, as is the case here, both a release and indemnity supporting the drilling contract's risk allocation.  106 S.W.3d at 128.

[17] *MacGlashing* distinguished *Blount*, 809 F.2d at 1182, on the ground that the indemnity clause at issue in *Blount* was "buried deep in the contract," which was not the case in *MacGlashing*.  89 F.3d at 939.  Rather, the *MacGlashing* court noted that, as is the case here, the parties to the risk allocation agreement were sophisticated business entities, that risk allocation agreements are common in the industry at issue, and they allow the parties to shift the significant and often unforeseeable risks inherent in the undertaking.  *Id.* at 939-40.  Additionally, the Fifth Circuit in *Blount* applied New York law to the contract at issue, which "disapproves of indemnity provision[s], so Mobil must make a powerful showing."  809 F.2d at 1181.  Of course, under general maritime law, indemnity agreements are valid and enforceable.  *See Lefler v. Atl. Richfield Co.*, 785 F.2d 1341, 1343 (5th Cir. 1986).

(distinguishing certain of BP's cases); *see also Frontier Ins. Co. v. MC Mgmt, Inc.*, No. 3:06-CV-597-H, 2009 U.S. Dist. LEXIS 17307 at *25-29 (W.D. Ky. Mar. 4, 2009) (same).  Here, given that BP agreed to indemnify HESI against damages resulting from blowout, fire, explosion, uncontrolled well condition, pollution, or contamination "irrespective of cause and notwithstanding" HESI's negligence, gross negligence, or breach of duty,[18] any negligence or gross negligence on HESI's part could not have materially altered the risk BP agreed to assume.  *See Frontier*, 2009 U.S. Dist. LEXIS 17307, at *27 (court must determine the scope of the risk defendants undertook by indemnity agreement; "[u]nfortunately, that risk was quite extensive.").  BP's argument to the contrary is akin to saying that the negligent act of a driver vitiates a contract of liability insurance because it materially increased the insurance company's risk; no contract of indemnity covering the indemnitee's own negligence could ever be enforced.[19]

## VIII.   All Strict Products Liability And Fraud Claims Against HESI Fail.

HESI is not liable for strict products liability.  In addition to the substantive reasons set out in HESI's Brief, only Louisiana, Alabama, and the Local Government Master Complaint asserted such claims against HESI; however, because these parties failed to propose corresponding findings, the claims are abandoned.  *Fallon v. Fortis Health*, No. H-04-2904, 2006 U.S. Dist. LEXIS 3193, at *42-43 (S.D. Tex. Jan. 18, 2006); *Desiderio v. Celebrity Cruise Lines, Inc.*, No. 97 Civ. 5185, 1999 U.S. Dist. LEXIS 9699, at *9-11 (S.D.N.Y. June 28, 1999).  While BP proposed strict products liability findings against HESI, it never asserted such claims.

---

[18] TREX-4477 at ¶¶19.4, 19.6, 19.7.

[19] Nor should "moral hazard" bar indemnification if there is a "material increase in risk," as BP argues.  BP's FOF/COL at 647 (citing *Harley-Davidson, Inc. v. Minstar, Inc*., 41 F.3d 341 (7th Cir. 1994)).  As the Seventh Circuit recognized, dismissing Harley-Davidson's argument that indemnification would remove the incentive for polluters to involve CERCLA liability, this issue exists "with any form of insurance or indemnification." 41 F.3d at 343.  It amounts to nothing more than an argument that indemnification should be prohibited for public policy reasons.  But here, the Court has recognized that public policy does not bar indemnification even for a party's gross negligence.  *See* Dkt. Nos. 5446, 5493.

*Compare* BP's FOF/COL at p. 642 *with* Dkt. Nos. 2082, 2083.

Similarly, while BP alleged pre-Incident fraudulent conduct and concealment claims against HESI, it failed to tender any corresponding findings and has therefore abandoned these claims, for which there is no supporting evidence.  Dkt. No. 2082 at 34-40; Dkt. No. 2083 at 34-40; *see, e.g., Desiderio*, 1999 U.S. Dist. LEXIS 440775, at *9-11.  And while BP proposed findings against HESI regarding alleged *post-Incident* intentional and fraudulent conduct, it failed to plead such a claim.  *Compare* BP's FOF/COL at 466-69, *with* Dkt. Nos. 2082, 2083.  BP cannot recover on a claim never pled.

Likewise, Plaintiffs only pled fraud against HESI under state law, which claims have been dismissed.  Dkt. 3830 at 3, 18.  Nonetheless, Plaintiffs propose findings purportedly supporting a fraud claim.  *See* PSC's FOF/COL at 63-71; 180-82.  Plaintiffs attempt to link HESI's alleged post-Incident conduct to their claims for explosion and spill-related damages. But a fraud claim requires reliance on an intentional misrepresentation or nondisclosure.  *See Atel Maritime Investors v. Sea Mar Mgmt, L.L.C.*, No. 08-1700, 2010 U.S. Dist. LEXIS 47834, at *9 (E.D. La. May 13, 2010).  Plaintiffs cannot demonstrate reliance on HESI's post-Incident actions because, at the time of the Incident, the alleged fraudulent conduct had not yet occurred. Thus, as a matter of law, any fraud claim against HESI, to the extent such claim exists, must fail.

## IX.    Conclusion

For these reasons, HESI requests that this Court enter judgment in its favor, ruling that Plaintiffs and remaining co-Defendants take nothing by their claims, and granting HESI any other and further relief to which it is entitled.

Respectfully submitted,

**GODWIN LEWIS PC**

**By:** _/s/  Donald E. Godwin_
Donald E. Godwin
*Attorney-in-charge*
State Bar No. 08056500
Don.Godwin@GodwinLewis.com
Bruce W. Bowman, Jr.
State Bar No. 02752000
Bruce.Bowman@GodwinLewis.com
Jenny L. Martinez
State Bar No. 24013109
Jenny.Martinez@GodwinLewis.com
Floyd R. Hartley, Jr.
State Bar No. 00798242
Floyd.Hartley@GodwinLewis.com
Gavin E. Hill
State Bar No.  00796756
Gavin.Hill@GodwinLewis.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone:  (214) 939-4400
Facsimile:   (214) 760-7332

and

R. Alan York
State Bar No. 22167500
Alan.York@GodwinLewis.com
Jerry C. von Sternberg
State Bar No.  20618150
Jerry.vonSternberg@GodwinLewis.com
Misty Hataway-Coné
State Bar No.  24032277
Misty.Cone@GodwinLewis.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone:  (713) 595-8300
Facsimile:   (713) 425-7594

**ATTORNEYS FOR DEFENDANT
HALLIBURTON ENERGY SERVICES,
INC.**

26

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Post-Trial Reply Brief has been served on All Counsel by electronically uploading the same to *Lexis Nexis File & Serve* in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedure established in MDL 2179, on this 12th day of July, 2013.

/s/  Donald E. Godwin
Donald E. Godwin