## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  **Oil Spill by the Oil Rig** *Deepwater Horizon* **in the Gulf of Mexico, on April 20, 2010**<br><br>**This document applies to:**<br>*All Cases* | **MDL No. 2179**<br><br>**SECTION: J**<br><br>**JUDGE BARBIER**<br>**MAGISTRATE SHUSHAN** |

## TRANSOCEAN'S PHASE ONE POST-TRIAL REPLY BRIEF

Brad D. Brian
Michael R. Doyen
Luis Li
Daniel B. Levin
Susan E. Nash
MUNGER, TOLLES & OLSON LLP
355 So. Grand Avenue, 35th Floor
Los Angeles, CA 90071
Tel: (213) 683-9100
Fax: (213) 683-5180
Email:  brad.brian@mto.com
        michael.doyen@mto.com
        luis.li@mto.com
        daniel.levin@mto.com
        susan.nash@mto.com

John M. Elsley
ROYSTON, RAYZOR, VICKERY & WILLIAMS LLP
711 Louisiana Street, Suite 500
Houston, TX 77002
(713) 224-8380

Steven L. Roberts
Rachel Giesber Clingman
Sean D. Jordan
SUTHERLAND ASBILL & BRENNAN LLP
1001 Fannin Street, Suite 3700
Houston, Texas 77002
Tel: (713) 470-6100
Fax: (713) 354-1301
Email:  steven.roberts@sutherland.com
        rachel.clingman@sutherland.com
        sean.jordan@sutherland.com

Kerry J. Miller
FRILOT, LLC
110 Poydras St., Suite 3700
New Orleans, LA 70163
Tel: (504) 599-8194
Fax: (504) 599-8154
Email: kmiller@frilot.com

*Counsel for Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc.,*
*Transocean Holdings LLC, and Triton Asset Leasing GmbH*

**TABLE OF CONTENTS**

<b>Page</b>

I.      INTRODUCTION ...................................................................................................... 1

II.     THE BRIDGE CREW WAS NOT GROSSLY NEGLIGENT .................................... 4

     A.     The Bridge Crew And Transocean Were Not Grossly Negligent In Failing To EDS While The Drill Crew Was Trying To Shut In The Well ...................... 4

     B.     EDS Efforts After The Explosion Were Not Grossly Negligent or Causal .......... 7

     C.     Captain Kuchta And The Bridge Crew Were Properly Trained And Drilled To Handle An Emergency .................................................................................. 8

          1.     The Captain Was Properly Trained To Respond To An Emergency ......... 8

          2.     The Bridge Crew Could Not And Should Not Have Conducted Full EDS Drills While The BOP Was Latched Up ........................................... 9

     D.     Transocean's Master/OIM Structure Was Proper and Approved By Regulators and BP ............................................................................................ 10

          1.     The Marshall Islands Required Both A Master And An OIM ................ 10

          2.     The Captain Had Overriding Authority In Emergencies ........................ 11

          3.     The U.S. Coast Guard Reviewed The Rig's Command Structure And Found No Regulatory Violation .................................................... 12

          4.     BP Has Admitted That The Master/OIM Structure On The *Deepwater Horizon* Was The "Industry Norm" In The Gulf Of Mexico ................................................................................................. 14

          5.     OIM Jimmy Harrell Was Properly Licensed ........................................ 15

III.    THE DRILL CREW DID NOT ACT WITH GROSS NEGLIGENCE .......................... 15

     A.     The Drill Crew's Initial Diversion of the Flow to the Mud Gas Separator, as Required by BP Policy, Was Not Grossly Negligent ..................................... 15

     B.     The Drill Crew Was Trained And Experienced In The Conduct Of Negative Pressure Tests ................................................................................... 16

     C.     The Drill Crew Was Not Grossly Negligent in Monitoring the Well ................. 17

IV.    THE OPERATION, MAINTENANCE AND CONFIGURATION OF THE BOP WERE NEITHER GROSSLY NEGLIGENT NOR CAUSAL ...................................... 18

     A.     The Only Plausible Theory As To Why The Pipe Was Forced Off-Center Precludes Any Finding That BOP Maintenance Caused The Blowout ............... 18

     B.     Transocean's Maintenance of the Control Pods Was Not Grossly Negligent ............................................................................................................ 19

          1.     It Was Undisputed That The Blue Pod Battery Was *Not* Dead .............. 19

i

**TABLE OF CONTENTS**
**(continued)**

**Page**

2.      The Yellow Pod Solenoid Was Functional And Properly Tested............21

C.      The Configuration Of The BOP Was Specified By BP And Consistent
With MMS Regulations And Industry Practice At The Time Of The
Incident..........................................................................................................22

V.      RIG MAINTENANCE WAS NEITHER GROSSLY NEGLIGENT NOR
CAUSAL .......................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Baker v. S/S Cristobal,*
488 F.2d 331 (5th Cir. 1974) ................................................................. 14, 16

*Becker v. Tidewater, Inc.,*
586 F.3d 358 (5th Cir. 2009) ................................................................. 4

*Exxon Shipping Co. v. Baker,*
554 U.S. 471 (2008) .............................................................................. 3

*Florida Bahamas Lines, Ltd. v. Steel Barge Star 800 of Nassau,*
433 F.2d 1243 (5th Cir. 1970) ............................................................... 14

*In re Great Lakes Dredge & Dock Co.,*
624 F.3d 201 (5th Cir. 2010) ................................................................. 18

*In re P&E Boat Rentals,*
872 F.2d 642 (5th Cir. 1989) ................................................................. 4

*Mutual Pharm. Co. v. Bartlett,*
__ U.S. __, 2013 WL 3155230 (June 24, 2013) .................................. 11

*Nader v. Allegheny Airlines, Inc.,*
626 F.2d 1031 (D.C. Cir. 1980) ............................................................ 13

*Smith v. Trans-World Drilling Co.,*
772 F.2d 157 (5th Cir. 1985) ................................................................. 18

*Southland Secs. Corp. v. INSpire Ins. Solutions Inc.,*
365 F.3d 664 (D.C. Cir. 1996) .............................................................. 21

*Taylor v. Texaco, Inc.,*
814 F.2d 231 (5th Cir. 1984) ................................................................. 23

*Woolard v. Mobil Pipe Line Co.,*
479 F.2d 557 (5th Cir. 1973) ................................................................. 18

FEDERAL REGULATIONS

33 C.F.R. § 146.5(a) (2001) .................................................................. 13

33 C.F.R. § 155.700 (1997) ................................................................... 13

iii

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

46 C.F.R. § 109.107 (2009)................................................................................................. 13

**TREATISES**

6 Am. Jur. 2d *Assignments* § 89 .................................................................................... 14

32 C.J.S. *Evidence* § 572.................................................................................................. 14

Restatement (Third) of Torts - General Principles § 14 (Discussion Draft 1999) ...................... 11

## I.    INTRODUCTION

On the eve of the originally scheduled trial, PSC summarized its position to this Court: "While there is sometimes a tendency to focus on the immediate hours leading up to the incident, the truth is that single-point failures within such systems are rarely consequential. Front-line workers, such as drillers and mud engineers, inherit latent conditions in the system that are created by people far removed in time and location. [¶] In this case, the emergencies confronted by workers on the rig in the hours of April 20th can be traced back to decisions made by businessmen in London . . . ."[1] The evidence at trial showed the drill and bridge crews were confronted with emergencies created by others: by BP personnel who designed a risky well, expected the cement to fail and concluded the negative test was bad, but failed to warn the crew.

Now, having taken an assignment of claims from BP and standing in BP's shoes, PSC adopts BP's effort to blame the spill on the actions of the bridge crew, who had less than three minutes to respond to the emergency BP created over weeks and months. To support this theory, BP has fabricated the idea that hydrocarbon gas flowing up the well reached the rig by *9:40 p.m.* and blew mud to the top of the derrick by *9:41 p.m.,* supposedly giving the bridge crew eight minutes to react. The only objective evidence available, and BP's own expert's analysis, refutes this contention. Using the Sperry Sun data from the rig, BP's expert Morten Emilsen determined that gas reached the rig and set off the alarms on the bridge at approximately *9:46 p.m.* Stress Engineering independently reached the same conclusion using the same objective Sperry data: gas reached the rig at *9:46:40 p.m.* There is no other reliable source for the timing of events on the rig. That evidence gives the bridge crew less than three minutes to react before the explosion that cut the power and set the *Horizon* adrift and aflame.

Citing no precedent, no practice, and no policy, PSC and BP argue the Captain was

---

[1] Plaintiffs' Pre-Trial Statement at 2-3 (submitted to Court and served on all parties on Feb. 7, 2012).

*grossly negligent* for not deciding instantly to do something that no Captain has ever done: interfere with the *ongoing efforts of the drill crew to control the well*.

This argument fails at every level. By the time the *bridge crew* first saw an indication of a problem, the *drill crew* was already trying to shut in the well, and for a brief time, they had. Indeed, the drill crew informed the bridge they were dealing with a well control situation, and their activation of BOP components could be seen on the BOP control panel on the bridge. From the Captain's chair, a unilateral and uninformed decision to interfere with those efforts could do more harm than good. No well control expert and no practice or policy of anyone in the industry supported PSC's and BP's theory that the bridge crew should rush for the EDS button at the first sign of trouble—especially when the drill crew is following established well-control procedures for trying to shut in the well with the BOP.

PSC asks this Court to condemn, as having been unconscionably indifferent to safety, a Captain and bridge crew who, in a *testament* to their training, from the first moments to the end, investigated what was happening, properly communicated with the drill and engine crews, alerted the *Damon Bankston* to move off, sounded the general alarm, alerted the rig that this was no drill, and, in a raging fire, mustered and evacuated every soul who survived the explosion. Ignoring the people whose decisions did cause the blowout, PSC and BP instead ask this Court to find that *Captain Kuchta*—the man who at every moment had no concern other than the safety of the rig and its crew, who stayed on the burning rig until everyone was safely off, who jumped 75 feet into the Gulf of Mexico, who swam to retrieve a knife and cut free a tethered life raft—that this man acted in *disregard of safety*. Such a finding cannot be squared with the evidence.

The other attacks on the Captain and crew are equally without merit:

- BP has fabricated the claim, now echoed by PSC, that Captain Kuchta was "promoted

2

directly from Third Mate to Master"; this delusion was flatly refuted at trial by unchallenged documentary evidence proving that the Captain worked his way up the chain of command in maritime tradition, one rank at a time.

- PSC complains that the bridge crew failed to conduct "full" EDS drills after the BOP was latched to the wellhead at Macondo. The unchallenged evidence at trial was that such drills cannot be conducted once the BOP is latched to the well; that the bridge crew *did* conduct a full EDS drill *before* the BOP was splashed at Macondo; and that they then conducted "tabletop" EDS drills because those are the only EDS drills possible when the BOP is latched up.

- PSC argues that the *Horizon*'s command structure—with a Master and an OIM—violated the ISM Code, even though this was *required* by the Marshall Islands, *reviewed and approved* by ISM Code auditor DNV, and recognized as the "industry norm" by BP.

It is one thing to hold a company grossly negligent when it entrusts a giant oil tanker to a captain with a known drinking problem, and the captain tosses back five double vodkas, puts the tanker on autopilot, retreats to his cabin and sleeps in a stupor as the tanker runs aground. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 476-77 (2008). Captain Kuchta is not Captain Hazelwood. Captain Kuchta had an unblemished record; he stayed at his post to the end, acting at every moment that night with nothing but concern for safety.

PSC's post-trial brief levels one criticism at the drill crew: that their initial diversion of returns to the mud-gas separator amounted to gross negligence. That cannot be. The mud-gas separator is a tool to avoid pollution, and, for entirely reasonable pollution-control concerns, BP policy *required* the drill crew to attempt this diversion in the first instance. The drill crew inherited, without warning, a cement job doomed to failure and a poorly planned and flawed negative test procedure, and they did the best they could. PSC's unfocused laundry list of

3

complaints about BOP design, BOP maintenance, and overall rig maintenance also fails to show gross negligence or any causal connection to the blowout.

In response to the questions posed by the Court, there was neither the "willful, wanton and reckless conduct" nor the conscious disregard of risks required to show gross negligence;[2] PSC's attack on Captain Kuchta and other scattershot mischaracterizations of the evidence do not support a finding of gross negligence against Transocean.[3]

## II.   THE BRIDGE CREW WAS NOT GROSSLY NEGLIGENT

### A.   The Bridge Crew And Transocean Were Not Grossly Negligent In Failing To EDS While The Drill Crew Was Trying To Shut In The Well

The argument that Captain Kuchta should have activated the EDS prior to the explosion is based on a fabricated timeline contrary to the evidence.

Following BP's lead, PSC asserts that "[h]ydrocarbons reached the rig floor at approximately 9:40 p.m. and shot through the derrick a minute later," giving the bridge crew eight minutes to react.[4] BP cites as support only its own self-serving and unsupported assertion in the Bly Report.[5] *As BP's own expert Captain Mitchell conceded at trial, there is actually no evidence that the bridge crew saw mud at 9:41 p.m.*[6]

PSC cites to the report of BP expert Emilsen.[7] Mr. Emilsen did a detailed analysis of the flow of the well based on the Sperry Sun data, but he concluded that "[g]as arrive[d] at surface at

---

[2] *See, e.g.*, *Becker v. Tidewater, Inc.*, 586 F.3d 358, 367 (5th Cir. 2009).
[3] All parties appear to agree the Fifth Circuit employs a high standard for punitive damages against a company based on actions of employees. The PSC acknowledges that *P&E Boat Rentals* supplies the governing standard. Rec. Doc. 10458 at 13-14. It is not enough to show an employee was grossly negligent; the company must authorize or ratify the conduct. *In re P&E Boat Rentals*, 872 F.2d 642, 651-53 (5th Cir. 1989). Alabama says the Eleventh Circuit *may* employ a more permissive "managerial agent" standard, but Alabama's maritime claims are subject to Fifth Circuit law like every other party asserting claims in the Limitation Action.
[4] Rec. Doc. 10459 at 14 & n.33 (PSC Prop. Findings). Citations to docketed materials refer to pdf pages.
[5] *See* Rec. Doc. 10467 (BP Prop. Findings) No. 2281; TREX 1.103 (Bly Report).
[6] TR. 9512:5-9513:4 (Mitchell).
[7] Rec. Doc. 10459 at 14 & n.33.

about 21:46 hrs."[8] That unchallenged timing gives the bridge crew three minutes between the time they learned of a problem and the explosion. The independent analysis by Stress Engineering determined that gas reached the rig at 9:46:40 p.m., giving the crew less than 2 and ½ minutes.[9] The timing of the other key events was not disputed:

- **At ~9:42 p.m.**, the drill crew closed the Upper Annular. No well control expert opined that the crew should have EDS-ed then; the crew still had available well control options.[10]

- **Between 9:42 and 9:45 p.m.**, the drill crew diverted returns to the mud gas separator.[11] The evidence showed that they subsequently diverted the flow overboard.[12]

- **At ~9:45 - 9:46 p.m.**, mud "spray[ed] out of vent lines" of the mud gas separator.[13]

- **At ~9:46 - 9:46:40 p.m.,** gas reached the surface.[14] Witnesses on the bridge report hearing a "hissing noise."[15] The Bly Report attributes this noise to "high-pressure gas discharge" from the mud gas separator which could not happen until gas reached the rig at ~ 9:46 p.m.[16] The gas alarms sounded on the bridge shortly after this point.[17] Testimony and interviews were consistent that gas alarms sounded on the bridge within seconds of the hissing and shaking that first indicated to *the bridge* that something was wrong; after the hissing sound, the drill crew

---

[8] TREX 40003.11 (add energy report).
[9] TREX 50150.147 (Stress Engineering report).
[10] *See* D-4328A (BP Demonstrative); TR. 5033:21-5034:8, 5036:12-21 (Barnhill).
[11] TR. 4436:23-4437:6 (Barnhill).
[12] Senior Toolpusher Ezell and Chief Mate Young saw fire (burning gas) coming out the starboard diverter line, indicating the crew switched from the mud gas separator to the overboard diverter. TR. 1706:15-23, 1812:19-1813:14 (Ezell); TR. 5878:7-5879:7 (Young). Transocean's Well Control Handbook instructs the crew to divert flow overboard if there is expanding gas in the riser. TR. 4263:23-4264:8 (Barnhill); TREX 41008.207.1.TO.
[13] TREX 50150.113 (Stress Engineering report).
[14] TREX 50150.147 (Stress Engineering report); TREX 40003.11 (add energy report).
[15] Keplinger Depo. 75:14-20; TR. 9282:16-9284:3, 9370:14-23 (O'Bryan); TR. 5711:6-16, 5714:5-10 (Young); *see id.* at 5711:1-15. BP's Pat O'Bryan described a violent shaking followed "very shortly" by a hissing sound and explosion. TR. 9370:14-17 (O'Bryan).
[16] TREX 1.103 (Bly Report).
[17] Mr. Emilsen agreed the 9:46 p.m. gas arrival supports "gas alarms going off about this time." TREX 40003.11.

called the bridge and told them a well control situation was in progress.[18]

• **At ~9:47 p.m.**, the drill crew determined that the Upper Annular did not seal the well and they closed the Variable Bore Rams.[19] Post-incident analysis shows that the Variable Bore Rams successfully shut in the well for at least two minutes, from 9:47 to 9:49 p.m.[20]

• **At 9:49 p.m.**, the rig exploded and lost power.[21]

In the short time they had from 9:46 p.m., the bridge crew moved to assess the situation, investigated alarms at the SVC panel, called the *Damon Bankston* to move off,[22] received two calls from the drill floor reporting a well control event, talked to the engine room, attempted to call the shaker house and attempted to call the drill floor two more times.[23]

The claim of PSC and BP's marine experts−that Captain Kuchta should have immediately hit the Emergency Disconnect−is in dangerous conflict with established well control procedures. The evidence at trial established that at the time Captain Mitchell and PSC expert Webster say that the bridge crew should have EDS-ed (in the three minutes between the gas alarms at 9:46 and the explosion at 9:49 p.m.), the drill crew was successfully closing the Variable Bore Rams. Indeed, no one disputes that, for a short time, the well was successfully

---

[18] TR. 5710:4-5712:24 (Young); Keplinger Depo. 86:16-87:12, 144:14-145:16; TREX 4472.5. The add energy and Stress reports provide the only objective analyses of when the bridge could have first learned of a problem; witness testimony as to precise times are inconsistent and unreliable. Moreover, testimony that mud overflowed on the drill floor, which might have been seen by the *drill crew*, has no bearing on when the bridge crew would have seen it.

[19] PSC criticizes Transocean as having an improper "close the annular and wait" policy. Rec. Doc. 10459 at 85. No well control expert supported this charge. The drill crew reasonably watched the pressure to determine whether the annular was successful before trying the next well control measure. TR. 5034:16-5036:11 (Barnhill).

[20] TR. 4297:11-4298:11, 5037:25-5039:11 (Barnhill); TREX 40003.11 (add energy report) (pressure at 9:49 p.m. "corresponds to a shut-in pressure with hydrocarbons in the wellbore up to the BOP and drill pipe full of seawater").

[21] *See, e.g.*, TREX 50150.4 (Stress Engineering report); TREX 40003.11 (add energy report).

[22] Mr. Bly speculated that the call warning the *Damon Bankston* to move off occurred at 9:42 p.m. TREX 1.103. But Yancy Keplinger, who made the call, could only have done so *after* the hissing sound that Bly places at ~9:46 p.m., as that was the point at which Keplinger first learned there was a problem. *See* Keplinger Depo. 75:14-20.

[23] TR. 5711:25-5712:18 (Young); Keplinger Depo. 86:16-87:12; TREX 4472.5. Contrary to PSC's claim that Senior DPO Yancy Keplinger "failed to intervene" when DPO Andrea Fleytas was too nervous to make PA announcements for the crew to muster, the evidence showed that Keplinger immediately "jumped in and made the announcement." *Compare* Rec. Doc. 10459 at 122 *with* Keplinger Depo. 98:21-99:2. Later, as one of the last crewmembers on the rig, Fleytas got on the PA and said 'abandon rig' for everyone else to hear who might be on the rig," despite being afraid she and the other crewmembers who remained "were going to die." TREX 4472.5-6.

shut in. The evidence demonstrated that, having already been notified that the drill crew was responding to the well control event, the bridge crew was trying to contact the drill crew to determine the status of their efforts when the rig exploded.[24]

Neither Mr. Webster nor Captain Mitchell suggested that the *drill crew* should have activated the EDS during their efforts to control the well.[25] Instead, their opinions were that the *bridge crew* should have interfered with these well control efforts by *unilaterally* hitting the EDS, which would cut off the ability to use the remaining BOP elements. No party even tried to show that such interference would change the outcome.[26] If, as all conceded, it was reasonable for the drill crew to continue trying to control the well with the BOP, rather than EDS, it is hard to see how a charge of gross neglect can be laid against the bridge crew for not interfering with the drill crew. The bridge crew knew less, not more, than the drill crew about what was happening with the well control situation.

There was no evidence that a policy of having the bridge crew unilaterally activate the EDS, without consulting with the drill crew, has been adopted or recommended or followed by any bridge crew, driller or any other entity in the world.

## B.    EDS Efforts After The Explosion Were Not Grossly Negligent or Causal

PSC asserts that conversations about the EDS *after* the explosion and blackout reflect confusion about who was in charge. That claim is both wrong and irrelevant. First, PSC relies on testimony of witnesses who only arrived on the bridge *after the explosion and blackout* and have no knowledge of what had already occurred.[27] Other witnesses, including those who were on the

---

[24] TREX 4472.5. The bridge crew would also have been able to see that the drill crew was activating BOP components from the BOP control panel on the bridge. *See* Pleasant Depo. 41:23-42:9, 81:21-82:20, 321:25-322:8.
[25] *Cf.* TR. 5038:21-5039:11 (Barnhill) ("EDSing at that point, if you believe that you've got the well shut in and secured, is really not going to accomplish anything more than the fact that you shut the well in").
[26] *See* TR. 4313:2-6, 4354:14-19 (Barnhill) (hitting EDS from bridge would interrupt well control operations and eliminate ability of drill crew to shut in the well); TR. 5039:4-11 (Barnhill) (EDS impact not determinable).
[27] Rec. Doc. 10459 at 122-23 (testimony of Brown, Williams and Pleasant).

7

bridge throughout, testified that the Captain was unquestionably in charge.[28] Second, PSC cites Captain Mitchell's unsupported claim that Captain Kuchta "was prevented from" activating the EDS by the dual command structure until Jimmy Harrell arrived; the evidence showed that the attempt to activate EDS actually occurred *before* Harrell even got to the bridge.[29]

Conflicts in witness accounts of the last minutes on the bridge are not surprising, given the powerful explosion and raging fire, but need not be resolved by this Court. It is undisputed that once the explosion and blackout occurred, the rig lost the ability to send the EDS signal to the BOP.[30] Any delay at that point was therefore not causal and is irrelevant.[31]

### C. Captain Kuchta And The Bridge Crew Were Properly Trained And Drilled To Handle An Emergency

#### 1. The Captain Was Properly Trained To Respond To An Emergency

Captain Kuchta was a master mariner, trained and licensed to respond to a major emergency onboard a vessel under his command.[32] Contrary to PSC's bald allegations, Kuchta's training included gas alarms, activation of the Emergency Shutdown System and the EDS.[33]

PSC repeats the unsupported slander by BP's Captain Mitchell, that Captain Kuchta was "promoted directly from Third Mate to Master."[34] The evidence, again unchallenged, showed that Captain Kuchta followed the traditional progression─Third Mate, Second Mate, Chief

---

[28] Transocean Prop. Finding No. 383 (Rec. Doc. 10463) (testimony of Young, Keplinger and Meinhart).
[29] TREX 30025.2 (Transocean internal investigation: Harrell interview form); Williams Depo. 202:23-203:7, 206:10-14 (Captain Kuchta "made a direct request" to Chris Pleasant to EDS before OIM Jimmy Harrell arrived).
[30] TREX 22700.3 (Webster expert report); TR. 994:19-25 (Bly); Williams Depo. 287:23-288:21 (any EDS delay after blackout did not cause rig to catch fire, explode or sink).
[31] *See* Transocean Prop. Finding Nos. 458-465.
[32] *See* Transocean Prop. Finding No. 355.
[33] *Compare* Rec. Doc. 10458 at 37-38 *with* TR. 5653:6-12, 5656:19-22, 5576:21-5577:4 (Young); McMahan Depo. 69:23-70:4; TREX 4459.4, .6, .31 (DPO OJT module). PSC and BP state that Transocean's seaworthiness expert Jeff Wolfe agreed that Captain Kuchta did not have EDS training. Rec. Doc. 10458 at 39; Rec. Doc. 10467, No. 2321. Mr. Wolfe testified that he could not recall the specific components of all of the training courses, but he suggested that the OJT module for DPOs might include EDS training (Wolfe Depo. 196:15-199:12), which in fact it does. *See* TREX 4459.31. Captain Kuchta completed the DPO OJT module. *See* TREX 52658.20. Captain Young testified that his training included functioning the EDS. TR. 5649:6-8, 5788:6-10 (Young).
[34] Rec. Doc. 10459 at 113.

Mate−*over a 10-year period* before his promotion to Master in 2008.[35] At the time of the incident, BP believed that Captain Kuchta was well-trained for an emergency.[36] BP was right.

PSC complains that Captain Kuchta had not yet completed a Major Emergency Management (MEM) course offered by a third party. Neither the Coast Guard nor the *Horizon*'s Flag State, the Marshall Islands, required the MEM course. TR. 9502:8-11 (Mitchell). Plaintiffs also failed to establish any causal link with the Macondo blowout, offering no evidence that the MEM course would have required any different conduct that night. Captain Kuchta could not be a master mariner without extensive training and drilling on a Captain's most important duty, saving his crew−a duty that Captain Kuchta performed heroically during the evacuation.[37]

> ### 2.     The Bridge Crew Could Not And Should Not Have Conducted Full EDS Drills While The BOP Was Latched Up

When the BOP is latched to the wellhead, it is not possible to do a complete EDS drill: hitting the EDS would detach the rig from the well and would be "catastrophic" if done "just for a drill."[38] There was no evidence that any rig conducts such drills *while attached to the well*.

The *Deepwater Horizon* conducted a full EDS drill when it was possible, just before attaching the BOP to the well at Macondo.[39] After that, the bridge crew did "tabletop exercises when [they] would have emergency disconnect drills for the DPOs" and "run through the time frame it takes for each disconnect sequence."[40] The bridge crew also participated in the drill

---

[35] *See* TREX 3750.11.TO (11/16/07 Chief Mate training certificate); TREX 3750.48.TO (11/15/02 2nd Mate training certificate); TR. 9507:23-9508:15 (Mitchell). BP has properly dropped this assertion.

[36] TR. 8854:12-15 (Guide); *see* M. Sepulvado Depo. 535:1-17 (BP Well Site Leader) (Kuchta put "safety first").

[37] *See* TREX 52658.20-21 (Summary of Training for Curt Kuchta); Transocean Prop. Finding Nos. 348-357.

[38] TR. 1780:13-1781:4 (Ezell).

[39] TREX 51219.2.1.TO (Safety Drill Report) ("Perform BOP maintenance, subsea an accumulator drills, *EDS drill* and tested the auto shears, split LMRP from BOP, pull open[] bonnets on BOP") (emphasis added).

[40] TR. 5788:20-5790:16 (Young). Despite Young's explicit testimony that the bridge crew did these drills using the rig (instead of a simulator), PSC insists on asserting that DPOs Keplinger and Fleytas were not trained in EDS. Like Captain Kuchta, both had completed the DPO OJT module that included EDS functioning, and both participated in "emergency disconnect drills for the DPOs." *Id.*; TREX 52658.24, .26. It is disingenuous to base a lack of training claim on statements by Keplinger and Fleytas that they had not seen the likes of a blowout like Macondo before; no one had. PSC's assertions that these DPOs did not have fire and gas alarm training because they did not take a

crew's well control drills, which include shutting in and emergency disconnect functions.[41]

### D. Transocean's Master/OIM Structure Was Proper and Approved By Regulators and BP

Both PSC and BP now characterize *Deepwater Horizon*'s command structure as improper and in violation of the ISM Code. In fact, the rig's command structure (1) was required by the Marshall Islands; (2) specifically gave the Captain overriding authority in emergencies, as required by the ISM Code; (3) was reviewed and approved by both DNV and the Coast Guard; and (4) despite BP's recent about-face on this issue, was known to and recognized by BP and others as an "industry norm" in the Gulf of Mexico.

#### 1. The Marshall Islands Required Both A Master And An OIM

The Marshall Islands required both a Master and an OIM on board a drilling rig when on location.[42] This combination *increases* safety, as the jobs required different sets of skills: "an individual with a Master's qualifications is needed to supervise the station-keeping and marine operations of the MODU while an individual with an OIM's qualifications is needed to supervise the drilling operations of the MODU. It would be impractical and unreasonable for a single person to be expected to adequately supervise the myriad of simultaneous marine and drilling activities that occur when the rig is on location."[43]

Transocean was not grossly negligent in complying with the Marshall Islands standards. A contrary ruling—in effect, a finding that the Marshall Islands mandates grossly negligent

---

Kongsberg course are equally misleading; Keplinger and Fleytas were trained on responding to alarms by Transocean. *See* Transocean Prop. Finding Nos. 348-354.
[41] "[C]ertain portions of the well control and emergency disconnect functions . . . were practiced daily or weekly." TR. 5843:12-23 (Young); *id.* 5809:24-5810:12 (bridge crew "participated in the [well control] drills," which often "happened at the same time that we were having our emergency drill, because a portion of the emergency drill is to shut [the] well in and secure the well"); Hackney Depo. 110:25-111:8 (DPOs participated in well control drills).
[42] TREX 50381.5 (Wolfe expert rebuttal report); Wolfe Depo. 146:3-14; TREX 7561.3 (RMI Marine Notice No. 7-038-2) (requiring both a Master and OIM for DP MODUs on location); *see* TREX 50394.2 (specifying change from "1 Master or OIM" to "1 Master" and "1 OIM" when Transocean re-registered the rig to the Marshall Islands).
[43] TREX 50381.5 (Wolfe rebuttal expert report); *see* Transocean Prop. Finding No. 368.

conduct on dynamically positioned vessels−would put owners of such rigs in the impossible position of facing a licensing violation or a liability finding. The law precludes such a result.[44]

## 2.   The  Captain Had Overriding Authority In Emergencies

The ISM Code requires a company's safety management system to establish "that the master has the overriding authority and the responsibility to make decisions with respect to safety and pollution prevention and to request the Company's assistance as may be necessary."[45] The *Deepwater Horizon*'s Operations Manual *complied exactly* with this provision, specifying that "the Master has overriding authority and responsibility to make decisions with respect to safety and pollution prevention and to request all internal company assistance as necessary."[46] The station bill affirmed the Master's overriding authority.[47] Crewmembers understood that the Master would be in charge in any emergency.[48]

Unable to find a problem with the command structure *on the Horizon*, PSC points to a statement in a November 2007 Integration Memo concerning the impact of Transocean's merger with Global SantaFe. That Memo stated, properly, that OIMs "will remain overall responsible for the health, safety and welfare of all persons, and all activities conducted onboard their respective rig. The OIM is authorized and obligated to take whatever actions he considers necessary to prevent injury, loss of life, damage to equipment/structure, and/or loss of rig and well operation integrity."[49] This recognition of OIMs' *responsibility* did not diminish the Master's *authority*. To

---

[44] *See* Restatement (Third) of Torts - General Principles § 14 (Discussion Draft 1999) ("If the actor's adoption of a precaution would require the actor to violate a statute, the actor cannot be found negligent for failing to adopt that precaution."); *cf. Mutual Pharm. Co. v. Bartlett*, __ U.S. __, 2013 WL  3155230, at *10-11 (June 24, 2013) (impossibility preemption doctrine precludes liability if compliance with state law requires violation of federal law).
[45] TREX 40011.104 (Mitchell expert report) (App 3: 2002 ISM Code § 5.2).
[46] TREX 671.47 (*Deepwater Horizon* Operations Manual); *see* Transocean Prop. Finding Nos. 378-379.
[47] D-6588 (*Deepwater Horizon* Station Bill); TR. 5621:4-24, 5622:23-5623:7 (Young); TREX 50003.11 (Wolfe expert report); TR. 1909:25-1910:22 (Ezell).
[48] TR. 5859:13-24 (Young) (Captain Kuchta was "[a]utomatically in charge" of emergency response); TR. 5623:17-5625:18 (Young) (Master can override OIM when circumstances require); Hackney Depo. 228:17-229:03 ("no doubt whatsoever" Master had authority in emergency on the *Horizon*); Transocean Prop. Finding Nos. 378, 383.
[49] TREX 5643.4 (11/20/07 Integration Memo).

the contrary, the Integration Memo explicitly stated that "[t]here will be no changes to the current chain of command and rig organization on Transocean or Global SanteFe [sic] rigs on Day 1," and that each rig would "continue to utilize their current Rig Operating Manual per policy."[50] The *Horizon* Operating Manual indisputably gave the Captain overriding authority.

PSC's claim that the dual command structure is in obvious violation of the ISM Code is rebutted by DNV's contrary determination. DNV looked at the *Deepwater Horizon*'s command structure early in the rig's existence and reported as a non-conformity that "certain responsibilities and authorities were *not fully defined and documented*" in the rig's safety management system.[51] After Transocean responded to the non-conformity, DNV certified that the *Deepwater Horizon* complied with the ISM Code, in 2002 and in every later inspection.[52]

### 3.   The U.S. Coast Guard Reviewed The Rig's Command Structure And Found No Regulatory Violation

The *Deepwater Horizon* complied with MMS regulations by (i) designating the Master as the "Person In Charge" (PIC) when the vessel was in "transit or underway mode," (ii) designating the OIM as the PIC when the vessel was "on location and considered in the drilling or industrial operating mode,"[53] and (iii) providing that, at all times, "should a situation develop that could endanger the vessel, personnel or environment," the Master could require transfer of

---

[50] *Id.*

[51] TREX 5483.1, .4 (2002 DNV Non-Conformity and Finding Note) (emphasis added); *see* Transocean Prop. Finding No. 378 & n. 21. A "non-conformity" is "[a]n observed situation where objective evidence indicates the non-fulfillment of a specified requirement"; a "major" non-conformity "poses a serious threat to personnel or ship safety or a serious risk to the environment." *See* TREX 5483.1.

[52] TREX 1774 (2002 Safety Management Certificate); Transocean Prop. Finding Nos. 378 n. 21, 709-713. PSC's citation to an observation from DNV's 2009 audit of Transocean only underscores the point. Rec. Doc. 10459 at 115. There, DNV noted that "the statement of Master's Authority is still not clearly and completely stated within the Company Safety Management System." TREX 1768.9 (DNV Survey Report – Transocean Offshore Deepwater Drilling Inc.). That observation pertained to *the company*'s safety management system, not the *Deepwater Horizon*. TR. 4062:24-4063:3 (Webster). DNV reported its observation because the statement of the Master's overriding authority in the *company* safety management system "wasn't really in one place. It was – it was in different places." D. McKay Depo. 190:9-191:20. DNV auditor David McKay "d[id]n't think there was any doubt about the company's statement of the master's authority. It certainly was stated." *Id.* DNV certified in 2009, and again in 2010, that Transocean's safety management system complied with the ISM Code. TREX 953.2.

[53] TREX 671.47 (*Deepwater Horizon* Operations Manual).

Person In Charge authority to him and that the OIM "must not refuse" such a request.[54]

Nothing in the Coast Guard regulations prohibited assigning different PICs for different operations; nothing required that the PIC of drilling operations be the Master. Indeed, the regulations make clear that persons other than the Master may act as the Person In Charge.[55]

Lieutenant Commander Michael Odom, a Coast Guard examiner during the rig's last inspection in July 2009, understood that the OIM was "the person who would be ultimately in charge of what's going on on that vessel while it is attached to the seafloor with the riser," and that "[w]hile the vessel is underway, then the captain would be the person that was ultimately in charge."[56] The Coast Guard found no violation of the "Persons in Charge" standard.[57] The Coast Guard could and would have withheld the Certificate of Compliance if it found any noncompliance with federal regulations.[58] It would be unprecedented to find grossly negligent a command structure the Coast Guard deemed acceptable.[59]

### 4. BP Has Admitted That The Master/OIM Structure On The *Deepwater Horizon* Was The "Industry Norm" In The Gulf Of Mexico

Although BP *now* says the command structure on the *Deepwater Horizon* was

---

[54] TREX 671.47. PSC implies that Young's testimony that "the Person in Charge was split between the Captain and the OIM" reflected his confusion over command during an emergency. *See* Rec. Doc. 10458 at 36-37. There was no such confusion. Young's full testimony on this point was: "The person in charge was split between the Captain and the OIM. The command would lie with the master," TR. 5792:20-21, including "overall authority for the vessel and the safety of the people on board." TR. 5792:23-24. As a Captain himself at the time of trial, Young understood his overriding authority. TR. 5623:14-25 (Young).

[55] *See* 33 C.F.R. § 146.5(a) (2001) (owner of foreign-flagged MODU on Outer Continental Shelf (OCS) "shall designate by title and in order of succession the *persons* on each OCS facility who shall be the 'person in charge'") (emphasis added); *cf.* 46 C.F.R. § 109.107 (2009) (U.S.-flagged MODUs must designate individual to be the master *or* person in charge). Regulations for oil or liquefied gas transfer operations require vessels to designate a person in charge to oversee such operations. 33 C.F.R. § 155.700 (1997). These regulations set out the qualifications of the person in charge and permit crewmembers other than the Master to serve in the position. *See id.* § 155.710.

[56] Odom Depo. 11:1-17, 216:17-217:1, 217:3-9.

[57] *See* TREX 50381.6 (Wolfe rebuttal expert report) (*Deepwater Horizon*'s "formal designation [of persons in charge] would be reviewed each time the *Deepwater Horizon* was boarded by the Coast Guard"); Sutton Depo. 79:12-25 (Coast Guard Rule 30(b)(6) witness). Transocean seaworthiness expert Jeff Wolfe served as a Coast Guard inspector, conducted and supervised numerous vessel inspections, and trained other inspectors. TREX 50003.3.

[58] Odom Depo. 87:12-88:11, 188:3-10.

[59] *See Nader v. Allegheny Airlines, Inc.*, 626 F.2d 1031, 1035 (D.C. Cir. 1980) (reversing, as clear error, findings of willful and wanton disregard where defendant conformed to regulator's standards).

"confusing,"[60] BP conceded that it was aware of the rig's dual command structure at the time and considered it to be the "industry norm."[61] BP's Marine Authority for the Gulf of Mexico was aware of the Master-OIM command structure, had "no information that would lead [him] to see that as an improper structure," and never "raise[d] any concern to anyone at BP, to anyone at Transocean, to any governmental agency, concerning that OIM master structure."[62] BP's expert, Captain Mitchell, reported that 30 of 84 dynamically positioned MODUs operating in the Gulf of Mexico had a dual command structure, all with valid ISM certificates.[63] This compliance with industry standards is strong evidence of due care.[64]

It is particularly improper for the PSC to complain about the dual command structure when asserting BP's claims. As assignee, PSC takes those claims subject to the same defenses that could be asserted against BP. BP knew of and acquiesced in the structure. Even if there were merit in the challenge, and there is not, both PSC and BP are bound by BP's admissions that the dual command structure was proper and the "industry norm."[65]

### 5.   OIM Jimmy Harrell Was Properly Licensed

PSC claims that Marshall Islands' regulations barred Mr. Harrell from serving as OIM on a dynamically propelled MODU. This theory is contradicted by Mr. Harrell's Marshall Islands

---

[60] Rec. Doc. 10467, No. 2253.

[61] Cramond Depo. 331:13-24, 336:16-20; TR. 8864:18-21 (Guide) (knew rig had "both a captain and an OIM").

[62] Cramond Depo. 332:4-6, 336:21-337:2; *see also* TREX 44046.16 (BP September 2009 CMID) (confirming that *Deepwater Horizon*'s emergency response plan included an "[e]ffective management structure in the event of an Emergency"). BP contends that its auditors did not evaluate the OIM's or Master's responsibility and authority. *See* Rec. Doc. 10467, No. 2099. To the contrary, the auditors expressly found that "The Transocean Health and Safety Policies and Procedures Manual describe the safety management system and adequately address the elements set out below," including "OIM's Master's or Barge Master's responsibility and authority." TREX 44046.14.

[63] TREX 40011.114.TO (Mitchell expert report); TR. 9496:20-9497:7 (Mitchell).

[64] *Baker v. S/S Cristobal*, 488 F.2d 331, 333 (5th Cir. 1974).

[65] BP has purportedly assigned to the Economic Class certain claims against Transocean. (Rec. Doc. 6430-39, ¶¶ 1.1.3.1-6.) As BP's assignee, the PSC "stands in the shoes" of BP. *Florida Bahamas Lines, Ltd. v. Steel Barge Star 800 of Nassau*, 433 F.2d 1243, 1246 (5th Cir. 1970) (in maritime law, "a valid and unqualified assignment operates to transfer to the assignee no greater right or interest than was possessed by the assignor"); *see also* Rec. Doc. 10186 (PSC acknowledging it has "no greater rights or remedies" than BP in the assigned claims). As assignee, PSC would be bound by BP's prior admissions. *See* 32 C.J.S. *Evidence* § 572 ("the generally accepted view is that admissions of the assignor of a claim are competent against the assignee"); 6 Am. Jur. 2d *Assignments* § 89 (same).

license, which states on its face that he is licensed for "Mobile Offshore Drilling Units."[66] Captain Mitchell, who proposed this new regulatory interpretation, based his theory on a sentence in the regulations stating that "MODU certification does not permit service aboard self-propelled vessels."[67] This sentence, however, is followed by provisions setting out the requirements for an OIM license. As there is no alternative set of provisions for becoming an OIM on a *dynamically propelled vessel*, Captain Mitchell's interpretation would bar all OIMs from serving on such vessels, in plain conflict with the Marshall Islands' explicit requirement that dynamically propelled MODUs must be manned by an OIM.[68]

The Marshall Islands has explicitly confirmed that the *Deepwater Horizon* was (1) a dynamically positioned MODU and (2) that it was properly manned, including the OIM position.[69] ABS and the Coast Guard regularly reviewed the licenses of crewmembers during their inspections of the *Deepwater Horizon* and similarly found that all were in order.[70]

## III.   THE DRILL CREW DID NOT ACT WITH GROSS NEGLIGENCE

### A.   The Drill Crew's Initial Diversion of the Flow to the Mud Gas Separator, as Required by BP Policy, Was Not Grossly Negligent

The drill crew diverted flow to the mud gas separator because *BP policy required the diverter be set up that way.*[71] For an influx above the BOP, BP's guidelines specifically instruct the drill crew to "[c]lose the diverter and direct fluid through the riser gas buster" (the mud gas separator).[72] BP implemented this policy because federal regulations and good oil field practice require drilling contractors to avoid polluting the Gulf, and the mud gas separator provides a

---

[66] TREX 3802.4 (Jimmy Harrell's Marshall Islands Certifications).
[67] *See* TREX 44013.14 (Marshall Islands Requirements for Merchant Marine Personnel Certification).
[68] *See* n. 42, *supra*.
[69] *See* TREX 50394.2 (8/25/10 Marshall Islands letter).
[70] *See* Transocean Prop. Finding No. 385.
[71] Pleasant Depo. 325:9-12, 615:11-616:11, 624:5-23, 625:1-3, 625:6; TREX 220.17 (BP NAX_DW Gulf of Mexico Deepwater Well Control Guidelines, § 4.1.13) (crew should "attempt to keep flow going through the gas buster−as opposed to over board lines−to minimize synthetic oil mud going into the Gulf, but be prepared to divert").
[72] TREX 220.17 (BP NAX_DW Gulf of Mexico Deepwater Well Control Guidelines, § 4.1.4).

clean, pollution-free way of circulating out a kick.[73] The drill crew's compliance with BP's reasonable policy does not support gross negligence.[74]

Moreover, there was uncontroverted evidence that the crew subsequently diverted the flow overboard.[75] In any event, neither BP, nor PSC as BP's assignee, should be heard to complain of the crew's compliance with BP policy. BP knew better than anyone that the Macondo well was at risk of a catastrophic blowout due to a poor cement job and a failed negative pressure test. The BP Well Site Leader or the onshore engineers could have directed that the diverter's default setting be changed to reflect the extraordinary risks. BP failed to do so.

## B.    The Drill Crew Was Trained And Experienced In The Conduct Of Negative Pressure Tests

PSC proposes an incorrect factual finding that the drill crew was not properly trained on conducting a negative pressure test.[76] The drill crew was both well trained and experienced. Negative pressure tests are "one of the routine operations that [the drill crew] are trained to do."[77] The evidence demonstrated that the *Deepwater Horizon* drill crew had a preferred procedure for running such tests, which was to use the drill pipe.[78] It was BP's decisions−to use an untested combination of two lost circulation materials with a recognized potential for clogging small lines as spacer fluid,[79] and to switch the negative test procedure in the middle of the test from the drill pipe to the kill line−that produced the confounding results.[80] No witness or

---

[73] *See* TR. 1787:6-22 (Ezell) (diverter set to mud/gas separator "due to the environmental impact of just diverting synthetic-based mud overboard").

[74] *See, e.g.*, *S/S Cristobal*, 488 F.2d at 333 (compliance with industry standard is evidence of due care).

[75] *See* note 12, *supra*; Transocean Prop. Finding No. 342.

[76] Rec. Doc. 10459 at 110.

[77] TR. 7525:17-7526:14 (Bourgoyne); Keeton Depo. 123:12-25, 124:9-12, 124:14 (driller knows how to do negative test through on-the-job training); McMahan Depo. 315:02-315:14 (Transocean "drillers are qualified to take the operational steps necessary to perform a negative pressure test"); *see* Rec. Doc. 10467, Nos. 378, 384, 394 (drill crew was highly trained under program that met or exceeded industry standards). Transocean's THINK process specifically included a negative pressure test procedure. *See* TREX 4640.1; TR. 4476:6-24 (Barnhill).

[78] TR. 2027:22-23 (R. Sepulvado); TR. 4369:10-19 (Barnhill); TR. 1677:6-10 (Ezell).

[79] *See* Transocean Prop. Finding Nos. 238-242.

[80] TR. 2122:18-22 (Heenan) (agreeing that anomalous results were produced by switch from drill pipe to kill line).

16

party has even suggested it was inappropriate for the crew to follow BP's instructions on these points.[81] There was similarly no evidence that anyone in the world provided or recommended that the drill crew be trained for the responsibility of interpreting negative pressure tests: The overwhelming weight of the evidence established that it was BP's responsibility, not the crew's, to determine the test procedures and interpret the results.[82]

### C.    The Drill Crew Was Not Grossly Negligent in Monitoring the Well

The evidence demonstrated that the drill crew's monitoring of the well was compromised by BP's failure to disclose that the cement job was suspect and the negative pressure test unsuccessful. The crew's conduct was not wanton or reckless. PSC's attempt to attribute gross negligence to Transocean is based on false premises.

PSC contends that Transocean did not update its Well Control Handbook to incorporate lessons learned from prior incidents, but the updated Handbook was admitted in evidence together with unchallenged testimony identifying the changes due to the 2009 *MG Hulme* incident cited by PSC.[83] PSC asserts that Transocean did not take steps to drill the crew after a March 8 well control incident at Macondo, but the Safety Drill Report following that kick−also admitted in evidence−demonstrates exactly the opposite.[84] PSC cites corporate emails that they incorrectly characterize as relating to well control.[85] In fact, the emails relate to personal safety incidents (such as dropped objects) and demonstrate appropriate management concern with and

---

[81] TR. 7208:3-7 (Beck) (crew would be expected to follow Well Site Leader's instruction).

[82] *See* P. Johnson Depo. 154:10-22, 411:12-14, 411:18-412:14; Keeton Depo. 653:11-19; Roller Depo. 45:11-46:04, 46:15-47:03 (as operator, BP has technical and engineering expertise to determine whether negative pressure test is successful); Sannan Depo. 150:2-14; Tabler Depo. 343:14-18, 343:21-24.

[83] *Compare* Rec. Doc. 10459 at 110 *with* TR. 4592:23-4595:10, 4744:25-4747:15 (Newman); D-6726 (additions to 2009 Well Control Handbook based on *MG Hulme* incident); TREX 52546.

[84] *Compare* Rec. Doc. 10459 at 134-35 *with* Transocean Prop. Finding Nos. 92-99.

[85] *Compare* Rec. Doc. 10459 at 130 *with* TREX 2189.3.1.TO. Although McMahan titled the email PSC cites "Loss of Control," only one of the 30 events mentioned referred to loss of *well control*, on a jack-up rig in the Far East. *Id.*

commitment to safe operations.[86]

## IV.   THE OPERATION, MAINTENANCE AND CONFIGURATION OF THE BOP WERE NEITHER GROSSLY NEGLIGENT NOR CAUSAL

### A.   The Only Plausible Theory As To Why The Pipe Was Forced Off-Center Precludes Any Finding That BOP Maintenance Caused The Blowout

Criticisms of Transocean's BOP maintenance are irrelevant because none of the maintenance-related issues were causally linked to the blowout.[87]

Testimony by the most "neutral" BOP expert, Halliburton's Dr. Stevick, established that, even if the AMF control pods "function[ed] perfectly," the BOP could not shut in the well − because extreme flow from the well forced the drill pipe off center by the time AMF conditions were met.[88] DNV, Stress Engineering, and former Cameron engineer Greg Childs agreed.[89]

This conclusion, supported by the forensic evidence, detailed models, and experts with many years of experience, stands in stark contrast to the theories of two contrary experts. No party now advocates the discredited opinion of United States' expert Rory Davis that "rig drift" over a 33-hour period pulled the drill pipe inside the BOP off to the side of the wellbore; the forensic evidence and overwhelming agreement by most of the experts (and the Bly report) that

---

[86] *See* TREX 5653.1.1.TO (1/16/09 Newman email) (discussing leadership's responsibility for setting expectations, tracking compliance with expectations, and improving); TREX 48144.1.1.TO (10/5/09 B. Long email) (challenging management team to help operations teams focus on safety); Transocean Prop. Finding Nos. 113-118.

[87] *See Woolard v. Mobil Pipe Line Co.*, 479 F.2d 557, 563-64 (5th Cir. 1973) (no gross negligence based on maintenance failures that are not proximate cause of injury); *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 213-14 (5th Cir. 2010) (maritime law requires negligence to be "legal cause" of injuries); *Smith v. Trans-World Drilling Co.*, 772 F.2d 157, 162 (5th Cir. 1985) (claimant alleging unseaworthiness must show that "(1) the unseaworthiness played a substantial part in bringing about or actually causing the injury and that (2) the injury was either a direct result or a reasonably probable consequence of the unseaworthiness").

[88] TR. 6924:3-13, 6962:19-6963:2 (Stevick); *see* TREX 61124.16 (Stevick rebuttal expert report) (before the Variable Bore Rams closed, "the drill string [was] already in its buckled state, forced to a position near the bore wall (kill side) in the BSR" due to the flow of the well; TREX 61124.15.

[89] TREX 43093.167.1.TO (DNV Report Callout) ("Upon closing the Upper VBR, the wellbore flow was directed only through the drill pipe. . . . the pressure increase produced an upward force . . . [which] provided the forces necessary for the drill pipe to elastically buckle, forcing the drill pipe to the side of the wellbore"); TREX 43093.171.1.TO (DNV Report callout) ("Based on conditions likely present in the wellbore at the time of the incident, calculations indicate that the force needed to buckle the drill pipe was present"); TREX 7688.11 & n.15 (Childs rebuttal expert report) (flow of 60,000 bpd at time crew closed VBRs "sufficient force to remove drill pipe stretch and compress the 5.5-inch drill pipe from below" and buckle the pipe within the BOP); TREX 50150.145 (Stress Engineering report) (calculating flow rate); Transocean Prop. Finding Nos. 495-510.

the drill pipe above the BOP broke shortly after the explosion made Davis's theory impossible.[90]

The remaining theory, from BP's Earl Shanks—that the drill pipe became off center when the traveling block fell on the rig half an hour after the explosion—was similarly undercut by the conclusion of the Bly Report and others that the pipe above the BOP broke before the traveling block fell.[91] BP tried to rescue this theory by arguing that there is "substantial missing metal" from the broken ends of the pipe.[92] That the pipe did break above the BOP shortly after the explosion is beyond serious dispute, and BP offered no explanation of what "missing" pieces would show or how they would support Shanks' claim that, even after the pipe broke in two, the broken pipe *above* the BOP could somehow bend the pipe *inside the BOP*.

At the time the drill crew activated the BOP, the drill pipe was forced off side by the tremendous flow of the well. In such conditions, whether the Blind Shear Rams were activated by the AMF or the Autoshear, they could not seal the well. There is therefore no causal connection between the ability of the control pods to operate and the inability of the BOP to shut in the well. For that reason alone, the operation and maintenance of the pods could not support a finding of gross negligence.

### B.      Transocean's Maintenance of the Control Pods Was Not Grossly Negligent

#### 1.      It Was Undisputed That The Blue Pod Battery Was *Not* Dead

Regardless of causation, PSC's arguments that Transocean acted with gross negligence with respect to the Blue Pod battery are not supported. It is not true, as PSC claims, that "every

---

[90] *See* D-6637 (models of 39-E and 1-B-1-E); D-6704 (photographs of 39-E and 1-B-1-E); TR. 2755:25-2757:10 (Davis); TR. 6952:24-6953:9 (Stevick); TR. 5121:20-5122:12 (Childs).

[91] TREX 1.165.1.TO (Bly Report) (by time traveling block fell, "[t]he drill pipe likely had already failed at the eroded section . . . as it was being pulled upwards due to increasing vessel offset"); TREX 1.148.1.TO (Bly Report) ("the fluid velocity through a leaking annular preventer could have reached levels that were orders of magnitude greater than drill pipe steel erosion velocity"); TR. 9191:16-9192:18 (Shanks) (erosion from flow of the well sufficient to cause erosion in less than a second). Contrary to BP Proposed Finding Nos. 1152-1153 (Rec. Doc. 10467), Mr. Shanks' suggestion that the riser tensioners would have prevented the pipe above the Upper Annular from failing due to tension was not supported by any evidence or the testimony of any other expert.

[92] Rec. Doc. 10467, No. 1158.

expert" except Transocean's Greg Childs agreed that the 27-volt battery was effectively dead on April 20.[93] To the contrary, all of the experts who opined on this issue agreed that the 27-volt battery was dead *11 months after the incident* but *could not* have been dead *at the time of the incident*.[94] Some experts speculated that it *might* have been too discharged to function on April 20, but Cameron's testing showed the battery should have had sufficient charge for at least two years of "normal operations."[95] It was undisputed that the Blue Pod had spent less than a year in operation on the BOP at the time of the incident.[96]

In addition, the evidence did not show outrageous conduct or conscious disregard for safety with respect to maintenance of the Blue Pod battery. It was uncontroverted that the annual reminder to change the batteries was inadvertently dropped from the EMPAC system but reinstated in RMS-II,[97] that batteries in the other two pods had been timely changed, and that the Blue Pod was scheduled for service, including a battery change, in July 2010.[98] When the crew put the Blue Pod on the BOP, they understood that it had been in the spare pod position, out of service, since the batteries were installed; as stated in the RMS records, the crew reasonably viewed this pod as "just overhauled."[99]

---

[93] Rec. Doc. 10458 at 44.

[94] Mr. Zatarain showed that if the 27-volt battery had been dead at the time of the incident, both 9-volt batteries would have been dead 11 months later, as they would have continued cycling through the AMF sequence in an attempt to activate the Blind Shear Rams. TR. 8517:22-8519:5 (Zatarain); TREX 40009.16 (Zatarain Chart). But the 9-volt batteries were found in good condition: "there is no combination where you can start with two good nines and a good 27 and end up with two good nines and a bad 27." TR. 8519:6-19, 8424:14-23 (Zatarain); *accord* TR. 2787:3-2788:2, 2788:8-25 (Davis); TR. 6973:7-11 (Stevick); TR. 5191:16-24 (Childs).

[95] TREX 5154.1 (1/13/06 Cameron internal email).

[96] TR. 5187:10-5190:11 (Childs); D-6716; *see* Transocean Prop. Finding Nos. 575-586, 613-616.

[97] TREX 5495.5.1.TO (Transocean internal investigation team document) ("Between Mid 2007 and the introduction of RMS replacing the AMF batteries was not included in the Subsea 365 Work order plan description"); *see* Tiano Depo. 78:15-20, 78:22-79:01 ("Somebody at the corporate level is writing the procedure to do the maintenance on the BOP and the control system. Whatever those tasks are with−inside that maintenance system is−are performed at a rig level"); TR. 8531:19-8532:2 (Zatarain) ("change in maintenance . . . may have been a problem of why [the annual battery change out] didn't transfer").

[98] TREX 4304.382 (Transocean Internal Investigation Report, Vol. II) (showing SPM-02 Control Pod-Service scheduled for blue pod on 7/11/10); TREX 581.4.1 (RMS records) (showing that SPM-02 BOP Control Pod-Service includes changing AMF/deadman battery).

[99] TREX 4617.66.1.TO (RMS records) ("This pod was just overhauled and put into service on 3/14/09"). BP's claim

20

### 2. The Yellow Pod Solenoid Was Functional And Properly Tested

Evidence as to the Yellow Pod solenoid does not support a finding of gross negligence.

The only DNV tests that replicated "field" conditions showed that the reverse-wired solenoid

functioned when activated in actual operating conditions; all of the experts opining on this issue

agreed.[100] DNV's other tests, done with Portable Electronic Testing Units (PETUs), required a

re-interpretation of results that BP and all of the experts agreed were "inexplicable."[101] Even if

these tests could be reliably reconstructed—which they cannot, since the PETU units "[n]ot only

didn't function the way people thought they would be functioning, each unit functioned

differently than the other"[102]—the results of PETU testing with a constant current do not replicate

what happened when the solenoid was triggered in actual operating conditions on April 20.[103]

In addition, the unchallenged evidence at trial was that Transocean had adopted

Cameron's recommended test procedures[104] and that a Transocean technician installed and tested

---

that Transocean onshore personnel were on notice that the Blue Pod batteries had not been replaced since November 2007 is factually and legally wrong. BP first cites emails relating to replacement of batteries in the spare pod, including one in which Transocean's Mike Fry took the opportunity to remind the *Deepwater Horizon* crew of Cameron's battery replacement policy. TREX 3782, 3785, 3628. BP then cites another email involving different onshore personnel; that email noted the dates of battery replacement for various pods, but did not discuss which pods or batteries were installed on the BOP at the time. *See* TREX 3792. As BP itself argues, the law does not allow the a corporate defendant's state of mind to be shown by a "collective scienter." *Southland Secs. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 664, 670 n.6 (D.C. Cir. 1996); BP Brief at 24 (Rec. Doc. 10466) ("an honest mistake does not become grossly negligent because some *other* corporate agent acted recklessly on that day").

[100] TREX 61123.27.2.TO  (Stevick expert report); TR. 6963:22-6964:6, 6965:1-8, 6968:5-13 (Stevick) (solenoid functioned when activated through SEM A and SEM B); TR. 8497:15-20, 8498:5-20, 8499:6-12 (Zatarain); TR. 5163:13-5164:23 (Childs); TREX 43093.64.1 (DNV Report callout); TREX 43093.64.2 (DNV Report callout) ("The connection from the Laptop/PETU to the Yellow Pod was removed to simulate loss of MUX communication"); Kenney Depo. 132:18-133:22, 154:5-20 (DNV Lead Investigator) (Solenoid 103Y functioned as expected when tested using SEM A and SEM B simultaneously "as they do in normal operation"). Dr. Davis opined that the first test of Solenoid 103Y was unsuccessful but agreed that, in two of these three field tests, the solenoid "appeared to function" as it should. TR. 2798:22-2799:7 (Davis); TREX 7661.18 (Davis rebuttal expert report). Mr. Zatarain's belated theory, not set out in his report, that these test results should be discounted because one of the Yellow Pod batteries must have died during the testing, was based on the incorrect assumption that the Yellow Pod batteries were five years old. *See* Transocean Prop. Finding No. 553.

[101] TR. 2796:8-13 (Davis); TR. 8447:1-8448:13 (Zatarain) (after second set of PETU tests, DNV experts "were really befuddled"); TR. 5174:7-16 (Childs); Transocean Prop. Finding Nos. 596-597.

[102] TR. 8493:10-13 (Zatarain).

[103] DNV's PETU tests did not "mimic actual subsea operations." TR. 8489:19-23 (Zatarain); TR. 2799:1-7 (Davis) (in actual emergency, solenoid would be activated by AMF, not PETU or bench test unit).

[104] *See* TREX 4613.5 (Instructions For Rebuilding Cameron Controls Solenoid Valve).

solenoid 103Y, and other newly installed solenoids, just before the BOP was latched up at Macondo. The test showed "no coil breaks, no faults, and all corresponding functions operating as they should."[105] Cameron determined only *after* the accident that its recommended testing procedure would not reveal miswired solenoids and therefore changed its test.[106] There is no basis for finding Transocean's application of or reliance on such tests grossly negligent.

### C.    The Configuration Of The BOP Was Specified By BP And Consistent With MMS Regulations And Industry Practice At The Time Of The Incident

PSC's (and now BP's) efforts to charge Transocean with gross negligence related to the configuration of the BOP are meritless. The drilling contract shows that BP specified the BOP's configuration, including the use of a single Blind Shear Ram.[107] PSC's expert Perkin agreed: "Vastar, and its successor, BP specified the configuration of the BOP, participated in its design, and chose its components and control systems."[108] BP specifically designated the design option that the PSC raises in its post-trial brief—an acoustic trigger system— as "N/A" (not applicable) in its list of components to be included (or not) in the BOP.[109] When BP renewed its contract for the *Horizon*, "BP again specified the BOP configuration."[110] For good reason, Mr. Perkin's report contained *no opinion* that Transocean was in any way responsible for BOP configuration.

Moreover, the after-the-fact criticisms of the BOP's configuration do not establish gross negligence at the time of the incident. MMS regulations then in effect required a BOP configured precisely as the *Horizon* BOP was configured.[111] Many of the design modifications now suggested by PSC were subject to safety alerts; none was shown to be required by industry

---

[105] TREX 3797.3.1.TO (5/9/10 Guidry email); TREX 3797.2.1.TO ("Before the pod went back onto the LMRP, with the PETU, every single function was tested, all solenoids…."); *see* TR. 2795:8-2796:7 (Davis).
[106] *See* Transocean Prop. Finding Nos. 599-603.
[107] TREX 4112.11-12 (Drilling Contract).
[108] TREX 7536.27 (Perkin expert appendices)
[109] TREX 4112.18 (Drilling Contract § E.12).
[110] TREX 7536.27 (Perkin expert appendices); TREX 1488.88 (contract extension specifying one Blind Shear Ram).
[111] TREX 4748.3 (30 C.F.R. § 250.442(b) (2003)); TR. 3440:23-3441:3 (Perkin); TR. 9107:5-18 (Shanks); TR. 5381:16-22 (Childs); D-4607 (comparing BOP to MMS requirements); D-4599.

practice.[112] In the five years leading up to the incident, 36 of the 38 BOP stacks sold by Cameron had a single Blind Shear Ram and a single Casing Shear Ram, exactly like the *Horizon* BOP.[113] PSC's expert Perkin conceded that he was not aware of any drilling rig anywhere in the world that routed its MUX cables through any location other than the moonpool.[114]

## V.     RIG MAINTENANCE WAS NEITHER GROSSLY NEGLIGENT NOR CAUSAL

PSC has offered a hodge-podge of maintenance allegations. Many are demonstrably false; all of them fail to show that there were any significant maintenance issues outstanding on April 20, that Transocean's approach to maintenance consciously disregarded safety, or that any of the alleged maintenance problems had even an arguable causal connection to the blowout.[115]

- There were not "a substantial number of material deficiencies" outstanding from the September 2009 BP audit. By the time of the incident, 156 of the 188 items flagged by the BP audit had been closed. The remaining 32 were lower priority items that did not require immediate action. None was safety critical and no witness testified that any of these items had any causal relationship to the blowout.[116]

- The BOP was not "out of certification." PSC does not challenge the evidence establishing that Cameron, the manufacturer who would have to provide such "certification", specifically disavowed the possibility of, or need for, certifying compliance with API Recommended Practice 53. The extensive record of regular BOP maintenance met or exceeded

---

[112] *See* Rec. Doc. 10467, Nos. 1903-2055; Transocean Prop. Finding Nos. 627-641.
[113] TREX 7542.4 (6/9/10 Cameron email).
[114] TR. 3412:1-5 (Perkin); *accord* TR. 4180:11-4181:12 (Webster); TR. 5228:9-23, 5388:6-13 (Childs); Coronado Depo. 401:17-24. BP specified that the MUX cables would be located in the moonpool. TREX 4112.18 (Drilling Contract § E.11.1).
[115] *E.g.*, *Taylor v. Texaco, Inc.*, 814 F.2d 231, 235-37 (5th Cir. 1984) (reversing negligence finding against Texaco because alleged misconduct was not causal). A series of unrelated acts cannot be accumulated to constitute gross negligence. *See* Transocean Prop. Conclusions of Law Nos. 65-68.
[116] *Compare* Rec. Doc. 10458 at 41 *with* Transocean Prop. Finding Nos. 756-769. PSC selectively cites portions of Chief Electronics Technician Mike Williams' testimony where he criticized certain maintenance items, but Mr. Williams testified that *none* of the issues he identified caused the incident Williams Depo. 305:15-306:6, 324:14-22

23

industry requirements; no one has even articulated how an optional "certification" could have made a difference in this case.[117]

- The only evidence of a "leaking" annular related to the *lower stripping annular*.[118] The crew used the *upper annular* when trying to shut in the well on April 20.

- The October 2009 email by Maintenance Supervisor Stephen Bertone did not reflect a "chronic problem" with maintenance. Mr. Bertone raised issues with the new RMS system;, the evidence showed that Transocean assigned an RMS specialist to the *Deepwater Horizon* to facilitate the transition to the new system.[119] Mr. Bertone mentioned a problem with the rotary skid; the evidence established that the rotary table performs a backup function on modern drilling rigs and is not necessary for operations.[120] Mr. Bertone remained committed to the safety of the rig; he was still on the rig on April 20 and in fact assisted in the rescue efforts.[121]

- PSC asserts "there was no evidence of specific follow-up to address" concerns set out in a February 21, 2010 email from Operations Manager Buddy Trahan to Rig Manager James Kent regarding the tracking of maintenance.[122] To the contrary, Mr. Kent responded to this message, stating the rig was "better to good at tracking BOP and related hoses surface and sub-surface," that "BOP tracking is better but not where we need[] to be," and that "[r]iser tracking is good" and "I will continue pressing until we get 100% desired result."[123]

- The *life raft certificates* were not overdue for renewal. The new certificates were on board; the crew had simply not yet updated RMS.[124] The ModuSpec survey in April 2010

---

[117] *See* Transocean Prop. Finding Nos. 748-755.
[118] *See* TREX 3293.48-49.
[119] Trahan Depo. 214:20-216:2; TR. 5978:3-21 (Ambrose).
[120] *Compare* Rec. Doc. 10458 at 44 *with* TR. 5955:2-13 (Ambrose); TR. 1928:11-22 (R. Sepulvado).
[121] *See* Transocean Prop. Finding Nos. 478-479, 741-747.
[122] Rec. Doc. 10458 at 43, citing TREX 3420.
[123] TREX 5619. Other maintenance allegations are addressed in Transocean Prop. Finding Nos. 675-683, 748-755, and 782-790.
[124] TR. 5679:19-5680:23 (Young).

24

concluded that the life rafts and lifeboats were operational and in good order.[125] It was undisputed that crew members successfully used a life raft to evacuate on April 20.

- Like every owner of a drilling rig, Transocean performed ongoing maintenance of the hundreds of fire dampers on board.[126] BP specifically closed out fire dampers as an audit item in 2009.[127]

- There was no evidence that the Rig Savers failed to function on April 20 or that any failure to shut down the engines or close the engine room dampers contributed to the explosion and fire.  The Bly Report concluded that, given the enormous cloud of gas that enveloped the rig, there were multiple potential ignition sources.[128]

- There were a total of 222 jobs on April 20, *not* 222 plus "115 additional jobs" awaiting parts. Far from showing neglect of maintenance, this demonstrated that the crew "was keeping control of maintenance," given that over 13,000 maintenance tasks were performed each year.[129]

No drilling rig–or any vessel−is ever free of maintenance. Transocean and the *Deepwater Horizon* crew were committed to maintaining and operating a safe, high-performing rig that was repeatedly inspected and found fit for service.[130] There is no evidentiary basis for finding that any outstanding rig maintenance issues contributed to the incident or constituted gross neglect.

---

[125] Schneider Depo. 406:21-407:3.

[126] TR. 5682:9-5683:3 (Young).

[127] TREX 47194.1.1.TO (9/29/09 Rodriguez email). PSC also points out that an audit tracking sheet identified outstanding issues regarding the Emergency Shut Down (ESD) system and fire and gas alarms, but PSC ignores the updated sheet the following month, reflecting that "[a]ll alarms have been corrected." TREX 1381.4.1.TO, item 3.3.5. Claims that the rig's gas alarms were inhibited and that the general alarm and ESD were improperly configured are simply wrong. *See* Transocean Prop. Finding Nos. 386-399,400-405.

[128] *See* TREX 1.130 (Bly Report) ("The extent of electrically classified areas on *Deepwater Horizon* appeared to be consistent with normal industry practices; however, for gas release events beyond the drill floor, multiple ignition sources could have existed."); TREX 1.138 (Bly Report); TREX 50003.39 (Wolfe expert report) (the "vast cloud of combustible gas that enveloped the vessel resulted in numerous potential ignition sources in the vicinity of the engines and all across the rig").

[129] *Compare* Rec. Doc. 10458 at 44 *with* TR. 5964:19-24, 5999:18-6000:7 (Ambrose).

[130] *See* Transocean Prop. Finding Nos. 643-646, 684-731, 770-781.

DATED: July 12, 2013

By: s/ Brad D. Brian
Brad D. Brian
Michael R. Doyen
Luis Li
Daniel B. Levin
Susan E. Nash
MUNGER, TOLLES & OLSON LLP
355 So. Grand Avenue, 35th Floor
Los Angeles, CA 90071
Tel: (213) 683-9100
Fax: (213) 683-5180
Email: brad.brian@mto.com
michael.doyen@mto.com
luis.li@mto.com
daniel.levin@mto.com
susan.nash@mto.com

John M. Elsley
ROYSTON, RAYZOR, VICKERY & WILLIAMS LLP
711 Louisiana Street, Suite 500
Houston, TX 77002
(713) 224-8380

Respectfully submitted,

By: s/ Steven L. Roberts
Steven L. Roberts
Rachel Giesber Clingman
Sean D. Jordan
SUTHERLAND ASBILL & BRENNAN LLP
1001 Fannin Street, Suite 3700
Houston, Texas 77002
Tel: (713) 470-6100
Fax: (713) 354-1301
Email: steven.roberts@sutherland.com
rachel.clingman@sutherland.com
sean.jordan@sutherland.com

By: s/ Kerry J. Miller
Kerry J. Miller
FRILOT, LLC
110 Poydras St., Suite 3700
New Orleans, LA 70163
Tel: (504) 599-8194
Fax: (504) 599-8154
Email: kmiller@frilot.com

*Counsel for Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc.,*
*Transocean Holdings LLC, and Triton Asset Leasing GmbH*

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2013, I electronically filed the foregoing with the Court's

CM/ECF system and service on all counsel of record by using the LexisNexis File & Serve, in

accordance with Pretrial Order No. 12 which will send a notice of filing to all counsel accepting

electronic notice.

/s/ Kerry J. Miller
Kerry J. Miller

26