UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | : | MDL NO. 2179 |
| "DEEPWATER HORIZON" IN THE GULF | : | |
| OF MEXICO, ON APRIL 20, 2010 | : | SECTION J |
| | : | |
| THIS DOCUMENT RELATES TO: | : | JUDGE BARBIER |
| | : | |
| CIVIL ACTION NO. 10-4536 | : | MAGISTRATE JUDGE SHUSHAN |
| | : | |

......................................................................................................................................................

**UNITED STATES OF AMERICA'S PHASE ONE POST-TRIAL
<u>RESPONSE BRIEF</u>**

# TABLE OF CONTENTS

I.   THE MEANING OF GROSS NEGLIGENCE AND WILLFUL MISCONDUCT
     UNDER SECTION 311 OF THE CLEAN WATER ACT (QUESTION #1) ......... 1

     A.   Gross Negligence is Negligence That Is Especially Bad; No Mental
          State Is Required; and the Court Should Not Adopt Texas Law ............. 1

          1.   Texas State Law Does Not Control the Federal CWA ............... 2

          2.   The Other Authorities Cited by BP Are Similarly Inapposite ........ 4

     B.   Willful Misconduct Can Be Inferred from Conduct ....................... 5

II.  GROSS NEGLIGENCE AND WILLFUL MISCONDUCT MAY BE BASED ON A
     SINGLE ACT *OR* A SERIES OF ACCUMULATED ACTS (QUESTIONS 3 and 4) .. 7

III. BP IS LIABLE FOR THE ACTS OF ITS EMPLOYEES, AND CANNOT SHIFT
     BLAME TO ITS CONTRACTORS (QUESTION #5) .......................... 11

IV.  RESPONSE TO BP'S ARGUMENTS RELATED TO THE FACTS .............. 13

     A.   In Its Papers, BP Agreed with Many of the Underlying Facts That the United
          States Sought to Prove ............................................... 13

     B.   Events That BP Agrees Are Causal – BOP, Cementing, Pressure Testing,
          Monitoring – Demonstrate BP's Gross Negligence or Willful Misconduct .... 14

     C.   If BP Cannot Blame a Decision on Its Contractors, BP Declares That Such
          Decision is Not a Proximate Cause .................................... 19

V.   IN ADDITION TO BEING AND "OWNER," BP WAS ALSO
     AN "OPERATOR" AND A "PERSON IN CHARGE" ......................... 24

VI.  LEGAL ISSUES THAT ARE RESOLVED OR NOT RIPE ..................... 25

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Apex Oil Co. v. United States*, 530 F.2d 1291 (8th Cir. 1976) ..........................................24

*Barber v. Texaco*, 720 F.2d 381 (5th Cir. 1983)...................................................................3

*Beartooth Alliance v. Crown Butte Mines*, 904 F. Supp. 1168 (D. Mont. 1995) .............24

*Becker v. Tidewater, Inc.*, 586 F.3d 358 (5th Cir. 2009) ......................................................3

*Cape Flattery, Ltd. v. Titan Maritime, LLC*, 607 F. Supp. 2d 1179 (D. Haw.
    2009), *aff'd*, 647 F.3d 914 (9th Cir. 2011).......................................................................4

*Clements v. Steele*, 792 F.2d 515 (5th Cir. 1986) .................................................................3

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*,
    313 F.3d 305 (5th Cir. 2002) .........................................................................................3

*Houston Exploration Co. v. Halliburton Energy Services, Inc.*,
    269 F.3d 528 (5th Cir. 2001) .....................................................................................3, 14

*In re Smyth*, 207 F.3d 758 (5th Cir.2000) ..........................................................................14

*Jerman v. Carlisle*, 559 U.S. 573, 130 S. Ct. 1605 (2010) ...................................................7

*Jerome v. United States*, 318 U.S. 101, 63 S. Ct. 483 (1943)..............................................2

*Kratzer v. Capital Marine Supply, Inc.*, 645 F.2d 477 (5th Cir.1981)...............................14

*Lobegeiger v. Celebrity Cruises, Inc.*,
    No. 11-21620-CIV, 2011 WL 3703329 (S.D. Fla. Aug. 23, 2011) ...............................4

*New York State Electric & Gas Corp. v. FirstEnergy Corp.*,
    808 F. Supp. 2d 417 (N.D.N.Y. 2011)..........................................................................25

*Petition of Kinsman Transit Co.*, 338 F.2d 708 (2d Cir. 1964) ...........................................9

*Resolution Trust Corp. v. Diamond*, 45 F.3d 665 (2d Cir. 1995) ........................................2

*Russello v. United States,* 464 U.S. 16, 104 S. Ct. 296 (1983)............................................3

*Saba v. Compagnie Nationale Air France*, 78 F.3d 664 (D.C. Cir. 1996) .......................11

*Safeco v. Burr*, 551 U.S. 47, 127 S. Ct. 2201 (2007)...................................................3, 6, 7

*Shaboon v. Duncan*, 252 F.3d 722 (5th Cir. 2001).............................................................3

*Sierra Club, Inc. v. Tyson Foods, Inc.*, 299 F. Supp. 2d 693 (W.D. Ky. 2003)................24

*Southland Securities Corp. v. INSpire Ins. Solutions Inc.*,
    365 F.3d 353 (5th Cir. 2004) ...................................................................10

*Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401 (5th Cir.1982) ......................3

*Tug Ocean Prince v. United States*, 584 F.2d 1151 (2d Cir. 1978)....................................6

*United States v. Carr*, 880 F.2d 1550 (2d Cir. 1989)........................................................24

*United States v. Coastal States Crude Gathering Co.*,
    643 F.2d 1125 (5th Cir, 1981) ...................................................................12

*United States v. Hicks*, 389 F.3d 514 (5th Cir. 2004) ........................................................3

*United States v. Mobil Oil Corp.*, 464 F.2d 1124 (5th Cir. 1972) ...................................24

*United States v. Pelzer*, 312 U.S. 399, 61 S. Ct. 659 (1941) .............................................2

*United States v. Philip Morris USA Inc.*, 566 F.3d 1095 (D.C. Cir. 2009) .....................10

*United States v. Warner Bros. Well Drilling, Inc.*,
    899 F.2d 15 (6th Cir. 1990) .....................................................................25

*Water Quality Insurance Syndicate v. United States*,
    522 F. Supp. 2d 220 (D.D.C. 2007)...........................................................6

*Water Quality Ins. Syndicate v. United States*,
    632 F. Supp. 2d 108 (D. Mass. 2009) ...................................................2, 5

*Watz v. Zapata Off-Shore Co.*, 431 F.2d 100 (5th Cir. 1970).............................................9

**STATE CASES**

*Apache Corp. v. Moore*, 891 S.W.2d 671, 684 (Tex. App. 1994), *judgment
    vacated on other grounds*, 517 U.S. 1217, 116 S. Ct. 1843 (1996), *aff'd as
    modified on remand*, 960 S.W.2d 746 (Tex. App. 1997)..............................10

*Burk Royalty Co. v. Walls*, 616 S.W.2d 911 (Tex. 1981) ...................................................4

*Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10 (Tex. 1994) .....................................................4

*Williams v. Steves Indus., Inc.*, 699 S.W.2d 570 (Tex. 1985)....................................3, 4, 19

*Wilson N. Jones Mem'l Hosp. v. Davis*, 553 S.W.2d 180 (Tex. Civ. App. 1977)..............10

## FEDERAL STATUTES

30 U.S.C. § 1235(1) ...............................................................................................5

33 U.S.C. § 1319(c)(1)(A) ...................................................................................11

33 U.S.C. § 1321(b) .............................................................................................12

33 U.S.C. § 1321(b)(3) .........................................................................................11

33 U.S.C. § 1321(b)(7)(A) ..............................................................................11, 12

33 U.S.C. § 1321(b)(7)(D) ........................................................................1, 8, 11, 12

33 U.S.C. § 2716(f) .................................................................................................1

42 U.S.C. § 9607(c)(2) ...........................................................................................5

42 U.S.C. § 9607(d)(2) ...........................................................................................5

42 U.S.C. § 9619(a)(2) ...........................................................................................5

42 U.S.C. § 9619(c)(1) ...........................................................................................5

## FEDERAL RULES

30 C.F.R. § 250.105 ..............................................................................................16

30 C.F.R. § 250.400 .........................................................................................16, 19

30 C.F.R. § 250.401 ..............................................................................................19

30 C.F.R. § 250.446 ..............................................................................................16

## OTHER AUTHORITY

Patrick H. Martin, *The BP Spill and the Meaning of Gross Negligence or Willful Misconduct*, 71 La. L. Rev. 957 (2011) ...........................................................4

*Restatement (Second) of Torts* § 435(1) (1965) ....................................................9

*Restatement (Third) of Torts* § 2 (2010) ...............................................................2

135 Cong. Rec. 27,986 (1989) ................................................................................5

BP's Post-Trial Brief sounds familiar themes: While the work may have been bad, it was not *that* bad; while it is nice to do things properly, shortcuts do not matter in the end; while BP was technically in charge, everything was really someone else's fault; sometimes accidents happen. This corporate culture is what caused the blowout and spill. Further, BP's proffered legal standards are based on inapplicable state law and on fundamental errors of law.

## I.   THE MEANING OF GROSS NEGLIGENCE AND WILLFUL MISCONDUCT UNDER SECTION 311 OF THE CLEAN WATER ACT (QUESTION # 1).

Gross negligence and willful misconduct constitute distinct statutory standards, and both are objective tests, BP's efforts to blur them notwithstanding.

### A.   Gross Negligence Is Negligence That Is Especially Bad; No Mental State Is Required; and the Court Should Not Adopt Texas Law.

In effect, BP seeks to merge two distinct standards of liability under Clean Water Act ("CWA") Section 311(b)(7)(D) – gross negligence versus willful misconduct – into a single standard. *See, e.g.*, BP Brf. at 7-8 (gross negligence as "reckless, willful, and wanton misconduct"); BP Brf. 9-10 (calling for "extreme and egregious misconduct characterized by a culpable mental state."). BP argues that gross negligence means that the defendant had "awareness of the risk involved[.]" BP Brf. at 6.  BP argues that gross negligence includes both objective and subjective elements, and that the subjective element necessarily requires "intent" and "willfulness." BP Brf. Part I.A.

BP's argument ignores the statutory structure and legislative history of the CWA and OPA,[1] lacks support in cases interpreting the CWA or OPA, and is based primarily on Fifth

---

[1] See U.S. Brf. at 6-7. There we noted that the CWA uses the disjunctive for the terms "gross negligence *or* willful misconduct," that OPA replaced the original phrase "willful negligence" with "gross negligence," and that OPA distinguishes the two standards by allowing the willful misconduct of a responsible party to serve as a defense to a guarantor's liability, but *not* extending the defense to acts constituting gross negligence. 33 U.S.C. § 2716(f). BP's attempts to argue that the two standards of liability are one and the same are simply wrong as a matter of statutory construction.

Circuit cases that apply Texas state law. Gross negligence does not require proof of "willful" or "reckless" conduct, nor a "culpable state of mind." Gross negligence simply means "negligence that is especially bad." *Restatement (Third) of Torts (Physical and Emotional Harm)* § 2 cmt. a (2010). "Negligence is 'gross' when there is an extreme departure from the care required under the circumstances or a failure to exercise even slight care." *Water Quality Ins. Syndicate v. United States*, 632 F. Supp. 2d 108, 112 (D. Mass. 2009) ("*WQIS (2009)*") (OPA case).[2]

BP thus misstates the legal standard, and, as shown in Part IV below, on the facts of this case BP personnel were "aware of the risks," so even BP's purported standard is met.

### 1.     Texas State Law Does Not Control the Federal CWA.

BP argues that this Court should adopt "common law" meanings and thus incorporate a subjective element into the definition of gross negligence. BP Brf. at 3. Federal courts may look to the common law (*e.g.*, the Restatement), but will not cherry-pick the law of any particular state to interpret Congressionally-established standards. Interpretation and enforcement of the civil penalty provisions of the CWA, which is enforced in *all* fifty of the United States, cannot be not governed by state law. As the Supreme Court succinctly stated:

> But we must generally assume, in the absence of a plain indication to the contrary, that Congress when it enacts a statute is not making the application of the federal act dependent on state law. That assumption is based on the fact that the application of federal legislation is nationwide (*United States v. Pelzer*, 312 U.S. 399, 402, 61 S.Ct. 659, 660, 85 L.Ed. 913) and at times on the fact that the federal program would be impaired if state law were to control.

*Jerome v. United States*, 318 U.S. 101, 104, 63 S.Ct. 483, 485-86 (1943); s*ee also*, *Resolution Trust Corp. v. Diamond*, 45 F.3d 665, 671-72 (2d Cir. 1995).

---

[2] Against this standard, we direct the Court's attention to the United States' Findings of Fact concerning BP's "gross and extreme departures from the standards of Good Oilfield Practice." *See, e.g.*, FoF Nos. 38-41, 44 (BP management's failure to shut down or suspend the Macondo operation at least as of April 17, 2010); FoF Nos. 197-203, 206 (BP's actions concerning the negative pressure test); FoF Nos. 237, 239 (BP's actions in the hour before the first explosion).

The United States had predicted that BP would seek to apply Louisiana law.[3] As it turns out, BP bases its argument on Texas state law, which BP claims contains a "subjective" element of proof (BP Brf. at 4, 6-8) and imports concepts of a "culpable state of mind." In offering its interpretation of the CWA's gross negligence and willful misconduct standards BP relies primarily on Fifth Circuit cases that apply Texas state law, not federal law. *Shaboon v. Duncan*, 252 F.3d 722 (5th Cir. 2001) (cited by BP; applying Texas law); *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305 (5th Cir. 2002) (same); *Barber v. Texaco Inc.*, 720 F.2d 381 (5th Cir. 1983) (same); *Clements v. Steele*, 792 F.2d 515 (5th Cir. 1986) (same).[4]

The Supreme Court's admonishment against using disparate state law to interpret and enforce uniform federal statutes, *Russello v. United States,* 464 U.S. 16, 23 (1983), makes BP's advocacy of Texas law particularly inappropriate, as the Texas Supreme Court itself acknowledged: "The Texas definition is a hybrid definition, *distinctive to this state and unusual* by comparison to the law of other states." *Williams v. Steves Indus., Inc.,* 699 S.W.2d 570, 572-73 (Tex. 1985) (emphasis added). BP thus has not only urged application state law, but a state law outlier at that. In addition, the Texas Supreme Court's limited the "subjective" element of gross negligence. In *Williams*, the Texas Supreme Court observed that requiring direct proof of a

---

[3] BP did cite *Houston Exploration Co. v. Halliburton Energy Servs., Inc.*, 269 F.3d 528 (5th Cir. 2001). Our opening brief addresses that case. BP cites *Becker v. Tidewater, Inc.*, 586 F.3d 358, 367 (5th Cir. 2009), which also cites to *Houston Exploration*. BP also cites to *Todd Shipyards Corp. v. Turbine Serv., Inc.* 674 F.2d 401, 411 (5th Cir.1982). The origin of the definition in *Todd Shipyards* was contract-based and was a quote from 6A Corbin On Contracts § 1472 (1964 ed.). The *Todd Shipyards* definition is an inconsistent tautology; among its definitions of gross negligence, it includes harm "willfully inflicted *or* caused by gross *or* wanton negligence." Moreover, the Corbin definition cited in *Todd Shipyards* merges the gross negligence and willful misconduct standards. Ultimately, the *Todd* court stated, "The type of negligence, 'ordinary' or 'gross', depends on the particular circumstances of each case." *Id.,* 674 F.2d at 411.

[4] BP also cites *United States v. Hicks*, 389 F.3d 514 (5th Cir. 2004) (Brf. at 6). *Hicks* is a criminal case and discusses matters dealing with *mens rea* that are wholly inapposite to civil cases. *See, Safeco v. Burr,* 551 U.S. 47, 57 n.9 & 68 n.18, 127 S.Ct. 2201, 2209 n.9 & 2215 n.18 (2007).

defendant's subjective state of mind would "leave outrageous conduct unpunished," and explained that the state of mind could be inferred by an objective reasonable person standard as an alternative to subjective proof. 699 S.W.2d at 573 ("test for gross negligence is both an objective and a subjective test.").[5] *See Burk Royalty Co. v. Walls,* 616 S.W.2d 911 (Tex.1981). In response to *Williams*' elucidation of the objective standard under common law, Texas legislated a change requiring an element of subjective proof. *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 20 n.11 (Tex. 1994). Thus, BP would have this Court apply Texas statutory law to govern a federal statutory law issue (as well as maritime law vis-à-vis private party claims), contrary to the principles of uniform interpretation of federal statutes.[6]

## 2.   The Other Authorities Cited by BP Are Similarly Inapposite.

BP also cites a definition of gross negligence from general maritime law – "some extreme departure from reasonable care coupled with a conscious awareness of the risk of harm." BP Br. at 4, 7 (quoting *Lobegeiger v. Celebrity Cruises, Inc.*, No. 11-21620, 2011 WL 3703329, at *16 (S.D. Fla. Aug. 23, 2011)). GML cases simply do not apply to a CWA claim. U.S. Brf. at 9-11. The same is true of *Cape Flattery, Ltd. v. Titan Maritime, LLC*, 607 F. Supp. 2d 1179 (D. Haw. 2009), *aff'd*, 647 F.3d 914 (9th Cir. 2011), which BP asserts was "interpreting the CWA." BP Brf. at 6. That is not a CWA case, but rather addressed whether a particular dispute was subject

---

[5] Even under the Texas state law standard, the proof of BP conduct that "created an extreme degree of risk to the safety of others" was supplied by BP's own expert, Dr. Bourgoyne: "Q. The negative pressure test, by your own admission, is a safety-critical test, right? A.  It is. . . . No doubt about it. That's why everybody pays so much attention to it. Q. If you botch it, you can have a blowout; rigs can catch fire; rigs can blow up. Yes? A. Yes.…"). U.S. FoF No. 204. *See also,* U.S. FoF No. 191 (Dr. Gene Beck) ("a blowout is a known and reasonably foreseeable risk of such reckless disregard of a negative pressure test, correct? A. I agree with that, yes, sir.").

[6] BP also cites a law review article, Martin, *The BP Spill and the Meaning of Gross Negligence or Willful Misconduct,* 71 La. L. Rev. 957 (2011), which similarly fails to cite the Texas Supreme Court's decision in *Williams*, and states that proof of gross negligence may be based upon a series of acts. *Id.* at 997, and the author was retained for legal work by a party (not disclosed) involved in the BP oil spill. *Id.* n. 1.

to arbitration and was decided under "federal arbitrability law." 647 F.3d at 921. The Ninth Circuit did not once mention the CWA, nor define in any way gross negligence, and to the extent the district court addressed the meaning of "gross negligence" it was *dicta*.

BP also cites to a definition in CERCLA, 42 U.S.C. § 9607(d)(2) ("For the purpose of the preceding sentence, reckless, willful, or wanton misconduct shall constitute gross negligence."). BP Brf. at 7. The reference to "reckless, willful or wanton misconduct" that BP relies on, by its terms, applies only "(f)or purpose of the preceding sentence. . . ." However, CERCLA uses the term gross negligence in other sections of the statute that include no such language. *See, e.g.,* 42 U.S.C. §§ 9619(a)(2), 9619(c)(1), and elsewhere refers to "willful misconduct or willful negligence." 42 U.S.C. § 9607(c)(2). Thus, far from supporting BP's attempt to read these definitions into the CWA, CERCLA makes clear that Congress did not define the terms for all purposes in all federal statutes, and shows Congress's ability to differentiate among standards. To similar effect is BP's citation to the Surface Mining and Reclamation Act, BP Brf. at 7, which also applies by its own terms only "for purposes of the preceding sentence." 30 U.S.C.§ 1235(l).

Finally, BP misstates the legislative history from OPA on which it relies. Brf. at 8, 10-11. On page 10, BP quotes a portion of the statement of Representative Synar, but through careful use of ellipses BP omitted his statement that: "Gross negligence is considered by the courts to be an extreme departure from reasonable conduct. Willful misconduct requires proof of an element of conscious intent." 135 Cong. Rec. at 27,986 (1989). Thus, the legislative history is consistent with the *WQIS (2009)* standard set out above, 632 F. Supp. 2d at 112 ("extreme departure"), and also demonstrates that gross negligence is a different standard lesser than willful misconduct.

**B.**     **Willful Misconduct Can Be Inferred from Conduct.**

Under the CWA, willful misconduct can be an act "done in such a way as to allow an

*inference* of a reckless disregard of the probable consequences." *Tug Ocean Prince v. United States*, 584 F.2d 1151, 1163 (2d Cir. 1978) (CWA case, emphasis added). Additionally, the Court may look to a single act *or* to a series of accumulated acts that collectively constitute willful misconduct. *Tug Ocean Prince, id.*; *Water Quality Ins. Syndicate v. U.S.,* 522 F. Supp. 2d 220, 230 (D.D.C. 2007) ("*WQIS (2007)*").

BP's efforts to inject the *mens rea* elements of "knowing" and "intentional" conduct into the meaning of willful misconduct, BP Brf. at 8-10, fail for two key reasons. First, *Safeco v. Burr*, 551 U.S. 47, 127 S.Ct. 2201 (2007), limits the *mens rea* concepts that BP relies on to *criminal* liability. In examining the term "willful" in another federal statute and concluding that the "willful" standard encompasses "reckless" behavior and not merely intentional conduct, *id.*, 551 U.S. at 56-57, 127 S.Ct. at 2208 (collecting Supreme Court cases), the Supreme Court contrasted "willful" in the civil context with its usage in criminal law:

> When the term 'willful' or 'willfully' has been used in a criminal statute, we have regularly read the modifier as limiting liability to knowing violations. This reading of the term, however, is tailored to the criminal law, where it is characteristically used to require a criminal intent beyond the purpose otherwise required for guilt; or an additional 'bad purpose'; or specific intent to violate a known legal duty created by highly technical statutes. Thus we have consistently held that a defendant cannot harbor such criminal intent unless he 'acted with knowledge that his conduct was unlawful.' Civil use of the term, however, typically presents neither the textual nor the substantive reasons for pegging the threshold of liability at knowledge of wrongdoing.

*Safeco*, 551 U.S. at 57 n.9, 127 S.Ct. at 2209 n.9 (citations omitted). Second, the Court held that proof of "reckless" behavior is based on an objective, *not* a subjective standard

> While 'the term recklessness is not self-defining,' the common law has generally understood it in the sphere of civil liability as conduct violating an objective standard: action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'

*Safeco*, 551 U.S. at 68 (citations omitted). The Court again contrasted civil and criminal law, stating, "Unlike civil recklessness, criminal recklessness also requires subjective knowledge on

the part of the offender." *Id*., 551 U.S. at 68 n.18 (citations omitted). *See also, Jerman v. Carlisle,* 559 U.S. 573 (2010) (in the civil context the word "willful" has been used to impose a "threshold for liability that is lower, not higher, than an intentionality requirement.").[7]

## II.    GROSS NEGLIGENCE AND WILLFUL MISCONDUCT MAY BE BASED ON A SINGLE ACT *OR* A SERIES OF ACCUMULATED ACTS (QUESTIONS 3 and 4).

BP sets up a tautology that makes it virtually impossible to hold them liable for gross negligence or willful misconduct. First, BP states that the Court must *only* look at an accumulation of acts; single acts do not count. BP Brf. at 13. Second, BP argues that the United States must prove that each individual act or omission was done by a specific individual with a culpable state of mind (because there is no "collective *scienter*"), *id.* at 14, and that even if that mental state is shown, the culpable act must be the proximate cause of the blowout. *Id*. at 15-16. Next, BP argues that of the accumulated set of acts, the Court must look at all the "exculpatory" acts, *i.e.,* "safety precautions," which by definition are not "causes" of the blowout. *Id*. at 13. *Ergo*, causation becomes a one-way street in which the Court is to give credit for all "safety precautions" – regardless of whether such precautions against "slips, trips, and falls" have any nexus at all to the blowout; while no single act can suffice because single acts do not count, single acts must be a proximate cause, and single acts must be done by a culpable individual. In

---

[7] Applying these CWA and Supreme Court standards to BP's conduct, the United States' proposed Findings of Fact are replete with examples of gross and reckless behavior. *E.g.*, FoF No. 42(a) (Houston-based Drilling Engineer's statement concerning centralizers, "But, who cares, it's done, end of story, will probably be fine and we'll get a good cement job …"); FoF No. 42(b) (BP's Houston-based Senior Drilling Engineer's pre-blowout belief that the Macondo Well cement job was on the "ragged edge," and his belief that BP would get a "shittie" cement job); FoF Nos. 190, 196-197 (BP's approval of the negative pressure test described as "reckless" and "unbelievable," and the fact, according to BP's own expert, that "any minimally competent, adequately trained … well site leader, petroleum engineer … should have known" that there was no such thing as a "bladder effect" in the context of a negative pressure test); FoF Nos. 229-243 (BP's failure to redo the negative pressure test and, instead, its WSL's order to the rig crew to re-start the rig's pumps and re-commence displacement and under-balancing of the well after completion of the "sheen test" at 9:14 p.m. -- despite the WSL having been told only minutes before by BP's Houston headquarters-based Senior Drilling Engineer that "you can't have pressure on the drill pipe and zero pressure on the kill line in a [negative pressure] test that's properly lined up."). The foregoing actions of course also satisfy the lower threshold standard of gross negligence.

other words, BP is hoping to get credit for personal safety programs while escaping blame for its failings in process safety and corporate management.

The United States argues that a single act, a series of accumulated acts, or both will suffice. U.S. Brf. at 12-13. As long as the CWA violation "resulted from" one act, an accumulated set of acts, or totality of circumstances as a whole –including acts that in a vacuum may not have been the proximate cause – then the higher penalty amount is available.

*Single Act*. That gross negligence and willful misconduct may be based upon a single act or event is an entirely non-remarkable proposition. We therefore shall not discuss "single act" liability further and instead direct the Court to the U.S. FoFs, and in particular: Section V (negative pressure test); Section VI (well monitoring and well control response); and Section I (corporate management and its failure to stop or suspend Macondo operations at least as of April 17th despite warnings of "paranoia," "chaos," "insanity," "wits end," "flying by the seat of the pants," and "the operation is not going to succeed …").

*Accumulated Acts*. As to the accumulation of acts, BP concedes that liability can be based upon a *series* of acts, BP Brf. at 13-14. BP merely asserts that the series of acts must have a proximate cause nexus. BP Brf. at 15-16. BP overstates the causal nexus required by the CWA.

*Causation*. CWA Section 311(b)(7)(D) does not refer to proximate cause, but instead imposes liability when the violation "was the result of" gross negligence or willful misconduct. U.S. Brf. at 13-16. The issue here is not what the legal standard is *per se* ("but for" versus "proximate"), but rather to what acts that standard applies. The United States posits that if either a single act or a totality of acts is causally linked, then causation is shown. BP posits that a plaintiff must prove that an act by a specific culpable individual is the cause, and cannot show that a totality of circumstances caused the blow out. BP Brf. at 14-15. BP's position is ironic as it also

argues that the Court must consider the totality of circumstances. *Id.* at 13.

Ultimately, however, the facts of this case make it unnecessary for the Court to base its ruling on the distinction between the "result of" and "proximate cause" standards. That is because BP, at its highest levels of corporate management, has admitted the predicates of proximate cause. As the United States set out in proposed FoF No. 3, BP's "Internal Investigation" (the "Bly Report") states that "a complex and interlinked series of mechanical failures, human judgments, engineering design, operational implementation, and team interfaces came together to allow the initiation and escalation of the accident." As BP's Mark Bly testified at trial (U.S. FoF No. 4):

> It [the "Swiss cheese" accident model at p. 32 of the Bly Report, TREX-00001] was our way of summarizing … the fact that there were eight mechanical or procedural barriers that were penetrated here, that there were a variety of people involved at different stages of that, and that there were a number of things that went wrong both mechanically, human judgments, as it says here, to allow the accident to happen.

*Watz v. Zapata Off-Shore Co*., 431 F.2d 100 (5th Cir. 1970), is instructive. Citing the *Restatement (Second) of Torts* § 435(1) (1965), the court stated, "if the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of that harm or the manner in which it occurred does not prevent him from being liable." *Id*., 431 F.2d at 116. Using language that applies four-square to BP's actions in this case, the court quoted *Petition of Kinsman Transit Co.*, 338 F.2d 708, 723-24 (2d Cir. 1964):

> We would find it difficult to understand why one who had failed to use the care required to protect others in the light of expectable forces should be exonerated when the very risks that rendered his conduct negligent produced other and more serious consequences to such persons than were fairly foreseeable when he fell short of what the law demanded.

*Zapata Offshore,* 431 F.2d at 116. We shall not go through the "slices" of BP's accident model (negative pressure testing, *etc*.) other than to point out the patently obvious: the totality of the

components of BP's own accident model were the proximate cause of the *Deepwater Horizon* disaster. *See* U.S. FoF Nos. 44-45, 143, 205, 242, 256, 265, 331, 333, and 355. Pursuant to *Tug Ocean Prince,* the accumulation of those "interlinked series of mechanical failures, human judgments, engineering design, operational implementation, and team interfaces" (quoting the Bly Report) gives rise to BP's liability under CWA Section 311(b)(7)(D) – liability up to $4,300 for each barrel of the millions of barrels of discharged oil.

*Individual mental state.* BP proposes that a plaintiff must prove the mental state of specific individuals, and specifically that such individuals had the "culpable" state of mind used in Texas law. To demonstrate that "collective scienter" is not appropriate, BP cites cases dealing with allegations of fraud, in which a showing of intent is required.[8] Such cases simply do not apply here, as no such "intent" is required for gross negligence. Moreover, a review of cases under the Texas law "mental state" standard proposed by BP demonstrates that individualized scienter is not required. The court in *Apache Corp. v. Moore*, a Texas case relating to a blowout, found that the company had knowledge of the inherent dangers of shutting in a well with a leak and had knowledge that its employees, although not at this well in particular, had been accepting kickbacks, but nonetheless did not take corrective action. 891 S.W.2d 671, 684 (Tex. App. 1994), *judgment vacated on other grounds*, 517 U.S. 1217, 116 S.Ct. 1843 (1996), *aff'd as modified on remand*, 960 S.W.2d 746 (Tex. App. 1997). Importantly, the Court did not focus on the *scienter* of any specific individuals in upholding the jury verdict. *Id.; see e.g*., *Wilson N. Jones Mem'l Hosp. v. Davis*, 553 S.W.2d 180, 182 (Tex. Civ. App. 1977) (gross negligence where hospital failed to follow its own policies for background checks, no finding of individual with scienter).

---

[8] BP cites *Southland Secs. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 367 (5th Cir. 2004) ("fraudulent intent" required), and *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1118 (D.C. Cir. 2009) (required showing of "intent" by corporate employees).

### III.   BP IS LIABLE FOR THE ACTS OF ITS EMPLOYEES, AND CANNOT SHIFT BLAME TO ITS CONTRACTORS (QUESTION # 5).

As demonstrated in our Findings of Fact, the culture of recklessness that led to the blowout was sowed high up in BP's Macondo Well corporate chain of command. But even if BP could disregard the acts of its managers and pin all of the blame on rogue employees or contractors, it would not absolve itself of liability. BP appears to argue that it may not be held vicariously liable for the acts of its "employees." BP also argues that it cannot be liable for acts of its contractors because that would be impermissible "vicarious" liability.

*BP's Employees.* BP appears to argue (Brf. at 19) that it may not be held vicariously liable for higher penalties under CWA Section 311(b)(7)(D) for acts of its "employees." BP's argument appears to assert that because statutory liability under the CWA's penalty provision is assessed against a "person," BP somehow becomes immune. BP's arguments would thus both require showing a specific employee with a culpable mental state (*i.e.,* not collective scienter), BP Brf. at 14, but then absolve the company for the actions of that employee. *Id.* at 19. But, of course, corporations act through their employees. *Saba v. Compagnie Nat'l Air France*, 78 F.3d 664, 670 n.6 (D.C. Cir. 1996) (within a corporation, "the negligent acts of employees can be fairly imputed to the corporation.").

This argument cannot be squared with a basic understanding of the CWA and its penalty section. First, BP has already *admitted* in its criminal Plea that it is legally responsible *as a corporation* for the actions of its Well Site Leaders with respect to the negative pressure test. TREX-89052, pdf page 15. The Plea was to violations of Sections 309(c)(1)(A) and 311(b)(3) of the CWA, which together provide for criminal liability against "*any* person" resulting from the negligent discharge of oil. 33 U.S.C. §§ 1319(c)(1)(A) and 1321(b)(3). The corporation is clearly the "person" in question, acting through its employees. Second, Section 311(b)(7)(A) of the

CWA establishes liability against "*Any person* who is the owner, operator, or person in charge . . . ." 33 U.S.C. § 1321(b)(7)(A) (emphasis added). The statutory definition of "person" includes corporations, and contains no requirement to identify corporate management. Section 311(b)(7)(D) also does not require any specific level of corporate management involvement. To the contrary, the Section refers back to the entities who can be held strictly liable under Section 311(b)(7)(A). 33 U.S.C. § 1321(b)(7)(D). Congress could have added additional requirements for corporate management involvement to Section 311(b) but did not. In fact, a defendant may even be held liable under the CWA for acts of unrelated *third parties* who are by definition neither low echelon nor management level employees. *United States v. Coastal States Crude Gathering Co.*, 643 F.2d 1125 (5th Cir, 1981). Third, though not necessary to do so, the United States *has* in fact established that the spill resulted from, *and was proximately caused by*, BP management. *See, e.g.*, Section I of the United States' proposed Findings of Fact.

　　*BP's Contractors*. BP also argues that it cannot be held "vicariously" liable for the acts of Transocean or Halliburton, citing General Maritime Law cases about independent contractors. BP Brf. at 16-20. Those cases simply do not apply to the CWA claim. U.S. Brf. at 9-11. Indeed, this Court has already implicitly ruled that these GML principles do not apply to the CWA, by holding Anadarko liable under the CWA, *SJ Order*, Doc. 5809, even though the Court had previously dismissed Anadarko from all GML claims. *B1 Dismissal Order*, Doc.3830 (citing *Ainsworth*, which BP cites in its brief at 17-19). The Court relied on the very same GML case that BP cites in its brief to dismiss the GML claims, but did not apply those cases to the CWA. BP blurs the distinctions among employees, agents, and independent contractors, by setting up a strawman argument about "vicarious liability." In this case, BP's own employees and managers made the crucial decisions, and while its contractors may have participated in discussions, BP

was the final decision-maker, and is liable for the acts of its own employees.

## IV.     RESPONSE TO BP'S ARGUMENTS RELATED TO THE FACTS.

BP's arguments on the facts fall into two inconsistent camps: where BP can manage to spread some of the blame for a given act or omission onto Transocean or Halliburton, BP admits that such event was causal; but where an event cannot be credibly blamed on Transocean or Halliburton, BP argues that it was not causal. As to the "blame the contractors" camp, BP is entirely correct that failings with the cement job, BOP, negative pressure failed, and well monitoring were causal. What BP ignores is that BP itself (along with the others)[9] is responsible for those failures based on its own conduct, not just on a generalized theory applicable to any contractor relationship, as BP suggests. Indeed, as a BP executive wrote about the Well Team Leader to whom BP's Vice-President had delegated BP's corporate authority for managing and operating Macondo: "You ... don't seem to realize that you are responsible for everything we do on the rig." U.S. FoF Nos. 20, 25, 43. As to the "we did something bad but it was not causal" camp, BP is simply wrong on the legal standard of causation applicable to the CWA claim, because the totality of circumstances caused the blowout, and we need not prove that every single act was the proximate cause individually. Moreover, the decisions that BP itself solely made are inextricably and causally linked to the blowout as a factual matter.

### A.     In Its Papers, BP Agreed with Many of the Underlying Facts That the United States Sought to Prove.

One aspect of BP's brief bears highlighting: in most of the areas at issue – such as the cement job, the BOP, and the negative pressure test -- BP does not dispute the relevant facts, but

---

[9] Evidence of relative fault is not relevant for the CWA issues in Phase One, even if it is relevant for other purposes in other cases. Thus, BP's arguments about the relative fault of Transocean or Halliburton are not dispositive as to whether BP itself acted with gross negligence or willful misconduct. The United States agrees that Transocean bears fault for this incident, but the fact that Transocean participated along with BP in some of the conduct that led to the blowout does not exonerate BP.

merely argues the implications of those facts. For example, BP admits that it "erroneously" interpreted the negative pressure test (BP Brf. at 34), but not "grossly" so. Thus, there appears to be relatively little difference in views about the details of the operational facts in the parties' opening briefs; the difference among the parties goes to the inferences to be drawn by the Court from those facts, *i.e.,* whether BP acted with gross negligence or willful misconduct. Ultimately, that finding is a finding of fact, to be reviewed by the Fifth Circuit on a clearly erroneous standard. *Houston Exploration*, 269 F.3d at 531; *see In re Smyth,* 207 F.3d 758, 762 (5th Cir. 2000); *Kratzer v. Capital Marine Supply, Inc.,* 645 F.2d 477, 480 (5th Cir. 1981).

**B.       Events That BP Agrees Are Causal – BOP, Cementing, Pressure Testing, Monitoring -- Demonstrate BP's Gross Negligence or Willful Misconduct.**

*Cement Slurry Design (Cement "Chemistry").* BP admits the following facts regarding the cement job. The cement blend used at Macondo was leftover from a prior well, and included a defoamer. BP Brf. at 32-33. Nothing prevented using new cement for the Macondo foamed cement job. *Id.* Use of cement blend with a defoamer was improper. *Id.* at 33. The cement did not secure the wellbore, did not provide isolation, and hydrocarbons were allowed to enter the wellbore. *Id.* at 33. The cement job was "inadequate." *Id.* at 38. BP's defense to these failings, predictably, is to shift blame to Halliburton, citing its contract with Halliburton. But, federal regulations, BP's own internal practices, and industry standards made BP's drilling engineers responsible for all aspects of Macondo's design, including cementing. Little Dep., 91:5-11; 92:7-9; TREX 00569 at 3-12. In fact, BP specifically acknowledges in its internal documents that "reliance on service company expertise is unacceptable." TREX-37005 at 11. The cement design was a "collaborative" effort, U.S. FoF No. 84, and so BP was not a passive observer without responsibility. BP also argues that Halliburton never alerted BP that there was a problem with the stability of the foam slurry. Brf. at 33. This is incorrect. In February and in April 2010,

Halliburton provided BP with cement test results showing that the foam cement slurry was *not* stable. *See*, U.S. FoF No. 100. Even under BP's proposed test for gross negligence or willful misconduct (requiring evidence of consciousness of risk), it is clear that BP *knew* these were risks but used the slurry anyway. BP knew it was using leftover cement with a defoamer, and that it pumped the job without waiting for test results that showed foam stability. U.S. FoF Nos. 93-97, 98-100. BP therefore knowingly accepted numerous acknowledged risks of a cement job failure. U.S. FoF. No. 90. Indeed, Mr. Hafle understood that the well would likely have a "shittie" cement job. U.S. FoF Nos. 42(b), 105. In the end, BP divides the chemistry of cement (slurry design) from the physics of cement placement (centralizers, etc., which we address below in Part IV.C.), and blames 100% of the failure of the cement job on the slurry design and 0% on the physics. Why? Because it cannot credibly blame Halliburton for the cement placement.

*BOP.*   BP admits all of the following facts regarding the AMF/Deadman and Autoshear functions of the BOP. The AMF/Deadman was triggered on April 20, shortly after the explosion, but did not function due to inadequate maintenance as critical checks and inspections were missed. BP FoF Nos. 1110-1115, BP Brf. at 43-45. Specifically, the AMF/deadman failed to seal due to a miswired solenoid in one pod on the BOP and a depleted battery that was overdue for replacement in the other pod. Brf. at 44. The alternate explanations offered by Mr. Childs (Transocean's expert) are not reliable. *See, e.g*., BP FoF Nos. 1555-1577. If the AMF/deadman had worked, it would have sheared the drill pipe and sealed the well. Brf. at 45. The "Autoshear" activated the blind shear ram on April 22nd. Brf. at 44. But, because the blind shear rams could not be fully closed due to the drill pipe's being off center and partially outside their blades, the Autoshear failed. Brf. at 44; *see,* BP FoF Nos. 1163-1172.

BP's defense on these failings, predictably, is to shift blame to Transocean, claiming that

BOP maintenance was solely Transocean's responsibility. This argument ignores the plain language of the governing federal regulation which states to lessees and operators, "You must maintain your BOP system[s] to ensure that the equipment functions properly." 30 C.F.R. § 250.446; s*ee*, 30 C.F.R. §§ 250.105 ("you," includes "lessee"); 250.400 (applies to lessees and operators). BP did not maintain the BOP system and as a result that system did not function properly. Moreover, BP in fact exercised control over maintenance by determining how much time for maintenance would be allowed, approving of work items during rig moves, and auditing of preventative maintenance of the BOP. U.S. FoF Nos. 311-13.

Under BPs own proposed subjective "consciousness of risk" standard, BP in fact was aware of the risks associated with the BOP. The Wells Team was clearly aware of the risks associated with the BOP, as it was informed not once, but three times in five years, that Transocean maintenance failures were leading to "critical checks and inspections" being missed. U.S. FoF Nos. 295-297, 300, 303. No effort was made or directed by BP to identify these missed items and rectify them. U.S. FoF No. 298. Auditors had specifically warned the Wells Team that Transocean's "closing out" of audit items was not reliable, as items had never actually been addressed. U.S. FoF Nos. 296, 297, 302. Instead, the risks identified in the audit findings were ignored, as evidenced by (1) the rig's being placed into service after just five days, (2) Wells Team Leader John Guide's characterization of the findings as "throwing DW Horizon under the bus," (3) Guide's declining to meet and debrief with the audit leader, and (4) Guide's ignoring requests from the audit group head on three separate occasions to discuss the audit findings. U.S. FoF Nos. 304, 305. BP understood from previous incidents the importance of verifying and closing out audit findings, yet no process ensured that the Wells Team did so. U.S. FoF Nos. 299, 304. Making matters worse, the Wells Team was responsible for determining that the BOP

was suitable for Macondo, yet BP could not identify anything in writing showing that such an analysis had been done. U.S. FoF Nos. 268-271. Previous risk assessments had already identified that the *Deepwater Horizon's* BOP stack configuration of only one sealing shear ram was the major contributor to likelihood of failure of the BOP. U.S. FoF Nos. 284-288. Yet, despite this knowledge, BP selected the *Deepwater Horizon* even though BP had access to other Transocean rigs with more than one blind shear ram. U.S. FoF No. 287.

*Negative Pressure Test, Vidrine & Hafle's Communications.*[10] BP admits all of the following facts regarding the negative test. BP conducted a negative pressure test on the drill pipe first, and later switched to the kill line. Brf. at 34-35. The drill pipe showed pressure while the kill line did not. Brf. at 34-35. The test provided multiple indications that the wellbore was not secure. Brf. at 36. BP Well Site Leader Vidrine spoke with BP on-shore engineer Hafle at 8:52 p.m. and discussed the negative pressure test. Brf. at 57-58. BP erroneously interpreted the negative pressure test. Brf. at 34. The misinterpretation was a cause of the blowout. Brf. at 36. Those facts suffice to show BP's gross negligence or willful misconduct.

BP asserts that the men took the test seriously and worked on it for hours. That is true, but in the end, they effectively gave up, because they did not understand the conflicting results of the test. When asked if the Well Site Leaders were satisfied with the annular compression/bladder effect, Mr. Lambert testified: "*Nobody seemed concerned about it.*" Lambert 8282:7-14. To the extent the rig crew was attempting to understand the pressures on the drill pipe, it was BP Well Site Leader Vidrine who ordered those efforts to stop, and have the test moved to the kill line. U.S. FoF 181-183.  Indeed, as BP's expert Dr. Bourgoyne acknowledged, had the drill crew been allowed to continue negative pressure testing by monitoring the drill pipe,

---

[10] BP discusses the 8:52 p.m. phone call under its litany of "non-causal" events (because it cannot blame Transocean for a call exclusively between two BP employees). Brf. at 56-58. To avoid duplication, this brief discusses the call and the test together.

they would have gotten the "correct result." Bourgoyne 7725:6-11; Heenan 2119:3-21, 2122:14-22 (the discrepant results were created by the change in test to the kill line).

BP also argues that it was all just a "mistake," that no one had a "culpable mental state" Brf. at 35-37), and that there was "no evidence that either Hafle or Vidrine did not want the operation on Macondo to succeed." Brf. at 58. As argued above, no "mental state" is required under CWA, and certainly there is no requirement to prove that BP intended the operation to fail. Moreover, despite that the fact that Vidrine, Hafle, and Kaluza all invoked the Fifth Amendment, the evidence still shows they were conscious of the risks of displacing the riser in the face of a failed negative pressure test. BP's own investigator acknowledged that Vidrine understood the risk, stating, that "there was something niggling in the back of his mind around this 1400 he didn't understand. " Cowie Depo. 315:5-10.

Indeed, every expert witness, including BP's expert, testified that all the information was obvious and should have been known. FoF 173-175; Bourgoyne 7521:4-2 ("the data was clearly there . . . With what they normally are taught in well control schools and so forth, this is very surprising to me."), 7523:9-17 ("I would have expected that they would have fully understood, you know, the situation");7522:24-7523:8 ("so that's the purpose of the negative test, is check before you do it and make sure nothing will break down . . . Flow after cementing is one of the most serious well control issues we've had to deal with in the gulf.");*see* Beck 7151:1-23, 7176:3-8; Heenan 2094:2-14. Another BP expert similarly opined that, the "failure of the negative pressure test demonstrates a failed cement job" and, "in this situation, *industry standards require, and a prudent operator should insist*, that remediation actions be undertaken to establish well integrity." TREX 22761 (Calvert Report) at p. 13 (emphasis added). Thus, according to BP's own experts, BP's personnel knew or should have known of the risks in the

situation, thus satisfying even BP's espoused legal standard. *See e.g. Williams*, 699 S.W.2d at 573 (under Texas law plaintiff "may objectively prove a defendant's gross negligence by proving that under the surrounding circumstances a reasonable person would have realized that his conduct created an extreme degree of risk to the safety of others.").

*Well Monitoring.* BP admits that there were anomalies during displacement that should have been seen. Brf. at 40-42. BP blames the failure of well monitoring and well control response on Transocean and on Halliburton's (Sperry's) mudlogger. Again, BP ignores the law. The federal regulations impose the duty of well control squarely on BP, as operator and lessee. 30 C.F.R. §§ 250.400 and 250.401. Moreover, BP was responsible for the conduct of simultaneous operations ("SIMOPs") during the displacement, which impeded the ability of the driller and mudlogger to monitor properly. U.S. FoF Nos. 258-265. Finally, Mr. Hafle, BP's on-shore Senior Drilling Engineer, had the Sperry "real time" data on his screen in Houston, and had also had his phone call with WSL Vidrine, and knew of the "shittie" cement job. Thus, BP personnel were "conscious of the risks."

### C.   If BP Cannot Blame a Decision on Its Contractors, BP Declares That Such Decision is Not a Proximate Cause.

BP argues that some of its malfeasance cannot be considered because it was not a proximate cause of the blowout. BP Brf. Part II.C. BP's position is stunningly contrary to its own theme regarding the legal standards for liability for gross negligence or willful misconduct, in which BP argues that the court "may not consider a particular act or omission in isolation." Brf. at 13. BP does exactly that in Part II.C of its Brief, where it takes the totality of the circumstances (those that it cannot blame on its contractors), and then slices that totality into smaller and smaller slices to argue that no individual slice is causal. However, BP is correct when it says that the Court *can* (and indeed must) look to the totality of events, rather than a

microscopic examination of the causality of every act or omission. Moreover, BP is wrong on the facts, because as explained below these actions were causal.

*Drilling Margin*. BP argues that its violations of this law are not causal because it successfully drilled through to total depth despite the margin issues (*i.e.*, succeeded in surviving one of the "most dangerous" things Dr. Huffman had seen). BP Brf. at 48. But causation is proven in two ways. First, BP should never have reached total depth in those circumstances. BP "had no permission to continue to explore the Outer Continental Shelf of the United States. . . . You don't do that. You don't continue to drill without permission from the government." U.S. FoF No. 76. The very hydrocarbons that destroyed the well were only encountered because BP seized a portion of the Outer Continental Shelf to which it was not legally entitled. *Id*.

Second, BP's decision to reach total depth left the well in the fragile state that required low ECDs ("Equivalent Circulating Densities"), which contributed to problems in the cement job (*e.g.*, need for foamed cement, limited pump rates, and limited bottoms up circulation). Because BP decided to drill ahead without a safe drilling margin, it left the well in such a "critical," "delicate" and "fragile" condition "that anything else they did from that point forward had to be done with extreme care at the risk of losing the well completely." Huffman at 718-19; *see also* Beck at 7171; Benge at 2257. As discussed in the United States' Findings of Fact at 24-25, 27, BP's concerns about the minimal margin during the cementing process so dominated the way it cemented the well that BP made a number of decisions to vary from standard cementing practices, each one increasing the risk of cement failure.

*Placement of Cement (the Cement "Physics")*. BP blames 100% of the slurry design (discussed above) on Halliburton. But this is a false division: BP's global cementing expert, Darryl Kellingray, states a significant reason for cement failures is "over reliance on the slurry

design to mitigate problems believing the cement slurry design can mitigate any risks." TREX 6230 ("Cement Placement SRP") at pp. 3-4. BP then divides up all of the operational decisions (placing the job) to argue that each one in isolation was not causal. This is another false division, as the "primary cause of poor zonal isolation is due to poor mud displacement," *id.;* Benge 2287-2294, and those operational decisions are exactly what contributes to poor mud displacement.

Centralizers help improve mud displacement, and BP admits that it used only six centralizers on the Macondo casing (BP Brf. at 53), contrary to Halliburton's recommendation. The United States' expert Glen Benge was unequivocal when he testified that "there was not adequate centralization" of the Macondo production casing. Benge 2307-08, 2291-92. BP offered no expert testimony at all to support its contention that the casing was properly centralized. As Mr. Benge explained, the casing was poorly centralized, even across the pay zones, providing a flow path for hydrocarbons, because the hole was washed out, Benge 2291-92, 2308, and the centralizers were far apart (six centralizers spaced out over the height of an 18-story building). Benge 2302-04, 2236-37.[11] BP posits that the number of centralizers was not causal because the oil flowed under what BP claims is the centralized portion of the annular cement, rather than through it, relying on stylized diagrams showing flow path going under the centralized part of the hole. BP Brf. at 53. That the hydrocarbons flowed up the production casing (as opposed to the annulus) does not demonstrate that there was adequate centralization. Poor centralization caused channeling, which allowed a flowpath in the annulus - up *or* down. Benge 2305-06. Once the

---

[11] BP's "Recommended Practice for Cement Design and Operation in DW GoM" also provides that "[t]he drilling engineer will coordinate with the service provider (equipment or cementing services) to run a centralizer placement simulator to optimize the selection and placement of centralizers for the hole section at hand." TREX 0634, Section 4.1, at p. 18. Neither BP nor Halliburton ever accurately modeled the actual placement of the centralizers on the Macondo well's production casing, Benge 2303, because BP never told Halliburton where BP had in fact placed the centralizers on the casing. Gagliano 6853.The centralizer locations in Halliburton's April 18, 2010 OptiCem model are not accurate. Benge 2301.

casing was underbalanced, the hydrocarbons sought the path of least resistance down through the annulus to the reamer shoe, and up the production casing. TREX 7401 (Emilsen Report) at pp. 7-8, 14. BP's own cement expert, David Calvert, agrees that the "annular production casing cement allowed for movement of hydrocarbons from the pay sands" to the shoe track and that hydrocarbons can move through cement as a result of mud contamination. TREX 22761 (Calvert Report) at p. 2. Lack of centralization also caused contamination of the cement, which delays strength development, contributing to cement's not being set. Benge 2248-49. Thus, there is a causal link between the lack of centralizers and the flowing hydrocarbons.[12]

BP also admits that it did not conduct a full "bottoms up" circulation of drilling mud immediately prior to the cement job, but argues that the failure to do pre-job circulation was not causal because the well had been partially circulated some time prior to the job placement. BP Brf. at 54. Pre-job mud circulation is a cementing best practice and a BP best practice. Benge 2378-80, 2287-89; TREX 634. It removes cuttings and debris from the well and breaks up mud gel strengths, which is important to reduce the ECDs and prevent contamination of the cement. Areas containing cuttings or gelled mud prevent proper placement of, and will contaminate, cement. Benge Report TREX 05990 at 21; Benge 2412:9-2414:3. BP's cement expert agreed that "*contamination of cement alone* could also compromise the cement job, and allow hydrocarbon flow," TREX 22761 (Calvert Report) at 19 (emphasis added), and BP's in-house cement expert explicitly warned BP Macondo engineer Brian Morel in March 2010 that mud contamination could destabilize foam cement. TREX 625; Benge 2281-2282. Circulating a minor amount of mud is insufficient to break such gel strength. Benge 2313:11-16. Nonetheless, BP circulated only about 10 percent of the volume of a full bottoms up (250 barrels) and ignored its own best

---

[12] Ironically, adequate centralization also would have reduced ECDs, Benge at 2296, 2298, 2300, one of BP's primary concerns due to the fracture gradient issues.

practices for the Gulf of Mexico which required a minimum of two bottoms up (approximately 5,000 barrels) or five hours of circulation. Benge 2378:9-2380:25, TREX 634. BP's failure to adequately circulate mud prior to the cement job resulted in additional contamination of the cement. TREX 05990 at 21; Benge 2412:-2414:3. Such contamination delays strength development and destabilizes foam cement.[13] TREX 05990 (Benge Report); Benge 2248-49, 2280; TREX 625.

Taken together, BP's decisions regarding placement of cement – including centralization pre-job circulation, use of a base oil pre-flush, BP's decision to ignore the float collar anomalies, decision to forego the CBL, *etc.* -- virtually assured that the cement job would be compromised. Benge 2255:6-25; TREX-05990 (Benge Report) at 9, 15-16.

*Temporary Abandonment.* BP admits that the temporary abandonment plan underwent numerous iterations, Brf. at 51-52, but argues that there is no causal link between the multitudinous iterations of the plan and the loss of well control. Brf. at 51-52. Dr. Beck disagreed, testifying that the last minute changes "rendered the well a high risk and dangerous well." Beck 7175. In response, BP argues that increasing **risk** is not evidence that the risk actually **caused** the blowout. Brf. at 52 (emphasis original). In other words, BP hangs its hat on the purely legal argument that no event can be considered unless that event – in a vacuum – caused the blowout. As argued above, that is the wrong legal standard. Rather, an accumulating set of risky decisions, each increasing the risk of disaster, all conducted without a systematic assessment of risks and potential mitigations, caused this blowout. Moreover, even if the Court were to adopt BP's "consciousness of risk" standard, BP's brief tacitly admits that the changes in the plan did create risks that BP personnel were aware of.

---

[13]  Mr. Calvert, BP's only cement expert, also agrees with Mr. Benge that the cement was not set at the time of the negative pressure test. TREX 22761 (Calvert Report) at pp. 15, 19.

## V.    IN ADDITION TO BEING AN "OWNER," BP WAS ALSO AN "OPERATOR" AND A "PERSON IN CHARGE."

As noted in the brief of the United States, BP is already liable as "owner" of the well, based on the Court's SJ Order [Rec.Doc. 5809]. BP was also an "operator" and a "person in charge" for purposes of liability under the CWA. *See,* U.S. FoF Nos. 13-14. BP's proposed Conclusions of Law address this issue, so we respond here.[14]

BP correctly cites the controlling legal test for "operator" status using the same test set out by this Court in its SJ Order. BP CoL ¶ 2713 ("operator must *manage, direct, or conduct* operations specifically related to pollution"). BP does not set out the correct test for "person in charge." BP CoL ¶ 2721. A "person in charge" is one who has the capacity to make timely discovery of oil discharges, the power to direct the activities of persons who control the mechanisms causing the pollution, and the capacity to prevent and abate damage. *United States v. Mobil Oil Corp.*, 464 F.2d 1124, 1127 (5th Cir. 1972). This Court previously cited this test in its SJ Order [Doc. 5809 at 23, n.34]; s*ee also, Beartooth Alliance v. Crown Butte Mines,* 904 F. Supp. 1168 (D. Mont. 1995) (interpreting Section 311) (same test); *Apex Oil Co. v. United States*, 530 F.2d 1291 (8th Cir. 1976); *United States v. Carr*, 880 F.2d 1550 (2d Cir. 1989); *Sierra Club, Inc. v. Tyson Foods, Inc.*, 299 F. Supp. 2d 693 (W.D. Ky. 2003) (under CERCLA).

Applying those tests, BP is liable as operator and person in charge of the well, and also of the drilling equipment on the vessel.[15] As part of the drilling, well control, and pollution

---

[14] The Court can hold BP liable as well "operator" and "person in charge" (which might moot the appeal as to BP); or, the Court could hold this issue in abeyance until the Fifth Circuit rules, and only if the SJ Order is vacated would the Court need to reach this issue. The opening brief also argued Transocean's status as "operator," but during the Liaison Counsel meeting of June 27, 2013, Transocean and the United States agreed to defer such issues until Phase Two.

[15] We do not contend that BP was a person in charge or operator of the *Deepwater Horizon* with respect to its *navigation functions as a vessel*. But the primary function of the *Deepwater Horizon*, indeed its *raison d'etre*, was its *drilling function*. Its drilling related equipment (*e.g.*, rotary table, BOP, riser) had nothing to do with its navigation. As to the drilling and pollution-prevention related equipment, BP was an operator and a person in charge of those parts of the facility. Also, BP cannot name Transocean as the *sole* operator of the *Deepwater Horizon* drilling equipment, because there can be more than one operator

prevention operations of Macondo, BP used equipment, such as drill pipe, pumps, and pressure gauges, for tests and other functions essential to drilling and preventing pollution. To take the negative pressure test as but one example, the failed test conducted on April 20th was performed using the *Deepwater Horizon's* pumps, BOP, pressure gauges, and many other pieces of rig equipment "owned" by Transocean. However, while Transocean's "ownership" of the equipment would be relevant to the issue of *Transocean's* CWA status under the CWA as an "owner," it does *not* limit BP's status as an "operator" and "person in charge" of the negative pressure test and the equipment used during the performance of the test. As to that issue, BP has admitted that it was in charge of the negative pressure test. As candidly stated by BP's Well Site Leader, Murry Sepulvado, "BP has the final say" in approving a negative pressure test. U.S. FoF No. 14. The admission that "BP has the final say" in approving the test means that BP was the "person in charge" and "operator" of the offshore facility that was being tested with rig-owned (as well as BP-owned) equipment. Other examples abound concerning BP's actions as an "operator" and "person in charge" of the facility and the actions directly related to the management, direction, and conduct of operations (albeit disastrously failed operations) directed to pollution prevention.

## VI.    **LEGAL ISSUES THAT ARE RESOLVED OR NOT RIPE.**

BP's Proposed Conclusions of Law raise several other legal issues that are not ripe for resolution by the Court. *E.g.*, BP CoL at 535-536 (joint and several liability; legal standard for damages). The Court should refrain from ruling on these and other tangential matters at this time.

Respectfully submitted,

---

for a facility. *United States v. Warner Bros. Well Drilling, Inc.*, 899 F.2d 15 (6th Cir. 1990) (pre-OPA); *New York State Elec. & Gas Corp. v. FirstEnergy Corp.*, 808 F. Supp. 2d 417, 492 n.38 (N.D.N.Y. 2011) (under CERCLA "there can be more than one operator of a facility at any given time").

BRIAN HAUCK
Deputy Assistant Attorney General
Civil Division

PETER FROST
Director, Torts Branch, Civil Division
Admiralty and Aviation
STEPHEN G. FLYNN
Assistant Director
MICHELLE DELEMARRE
Senior Admiralty Counsel
SHARON SHUTLER
JESSICA SULLIVAN
JESSICA McCLELLAN
MALINDA LAWRENCE
Trial Attorneys

/s/ R. Michael Underhill
_____
R. MICHAEL UNDERHILL, T.A.
Attorney in Charge, West Coast Office
Torts Branch, Civil Division
U.S. Department of Justice
7-5395 Federal Bldg., Box 36028
450 Golden Gate Avenue
San Francisco, CA 94102-3463
Telephone: 415-436-6648
Facsimile: 415-436-6632
E-mail: mike.underhill@usdoj.gov

DANIEL SPIRO
Senior Trial Counsel
KELLEY HAUSER
ELIZABETH YOUNG
Trial Attorneys
Civil Fraud Section, Commercial Litigation
Branch
U.S. Department of Justice
Ben Franklin Station
Washington, D.C. 20044
Telephone: 202- 616-3898
Facsimile: 202-307-3852
E-mail: daniel.spiro@usdoj.gov

ROBERT DREHER
Acting Assistant Attorney General
Environment & Natural Resources Division

SARAH HIMMELHOCH
Senior Litigation Counsel
SCOTT CERNICH
Senior Counsel
ABIGAIL ANDRE
DEANNA CHANG
A. NATHANIEL CHAKERES
RACHEL HANKEY
Trial Attorneys

/s/ Steven O'Rourke
_____
STEVEN O'ROURKE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone: 202-514-2779
Facsimile: 202-514-2583
E-mail: steve.o'rourke@usdoj.gov

DANA J. BOENTE
Acting United States Attorney
Eastern District of Louisiana
SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana
650 Poydras Street, Suite 1600
New Orleans, LA 70130
Telephone: 504-680-3000
Facsimile: 504-680-3184
E-mail:sharon.d.smith@usdoj.gov

Attorneys for the United States of America

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

Date: July 12, 2013.                                   /s/ Steve O'Rourke
                                                        U.S. Department of Justice