**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010, | * <br> *   MDL No. 2179 <br> * <br> *   Section: J |
| This Pleading applies to: | * <br> *   Judge Barbier <br> * |
| *All Cases* | *   Magistrate Judge Shushan <br> * <br> * |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### POST-TRIAL REPLY BRIEF OF DEFENDANTS BP EXPLORATION & PRODUCTION INC., BP AMERICA PRODUCTION COMPANY, AND BP p.l.c.

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Matthew T. Regan, P.C.
Hariklia Karis, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL   60654
Telephone:  312-862-2000
Facsimile:  312-862-2200

Christopher Landau, P.C.
Bridget K. O'Connor
Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC   20005
Telephone:  202-879-5000
Facsimile:  202-879-5200

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA   70139-5099
Telephone:  504-581-7979
Facsimile:  504-556-4108

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC   20004-2401
Telephone:  202-662-5985
Facsimile:  202-662-6291

***Attorneys for BP Exploration & Production Inc., BP America Production Co., and BP p.l.c.***

July 12, 2013

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

ARGUMENT ........................................................................................................................2

I.     The Government And Plaintiffs Err On Key Legal Issues Related To Treble Fines And Punitive Damages. ...........................................................................................2

     A.     "Gross Negligence" And "Willful Misconduct"......................................2

          1.     "Gross Negligence" ...............................................................2

          2.     "Willful Misconduct"..............................................................4

     B.     Causation.............................................................................................5

     C.     Attribution ...........................................................................................8

II.     The Government And Plaintiffs Err On Key Factual Issues Related To Treble Fines And Punitive Damages...................................................................................11

     A.     Negative Pressure Test........................................................................11

     B.     Drilling Margin ...................................................................................15

     C.     Cement Job.........................................................................................17

     D.     Development of the Temporary Abandonment Plan ..............................18

     E.     BOP Maintenance and Suitability........................................................19

     F.     "Corporate Culture" ...........................................................................21

III.     Transocean And Halliburton Err On Other Issues.............................................24

CONCLUSION......................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ainsworth v. Shell Offshore, Inc.*,
   829 F.2d 548 (5th Cir. 1987).........................................................................17, 19

*Atlantic Sounding Co. v. Townsend*,
   557 U.S. 404 (2009)............................................................................................12

*Bassam v. American Airlines*,
   287 F. App'x 309 (5th Cir. 2008) (*per curiam*) ..........................................4

*Bullock v. BankChampaign, N.A.*,
   133 S. Ct. 1754 (2013) ........................................................................................3

*Bunge Corp. v. M/V/ Furness Bridge*,
   558 F.2d 790 (5th Cir. 1977)............................................................................25

*Chaney v. Dreyfus Serv. Corp.*,
   595 F.3d 219 (5th Cir. 2010)..............................................................................7

*Clements v. Steele*,
   792 F.2d 515 (5th Cir. 1986).............................................................................2

*Donaghey v. Ocean Drilling & Explor. Co.*,
   974 F.2d 646 (5th Cir. 1992)............................................................................25

*In re P&E Boat Rentals*,
   872 F.2d 642 (5th Cir. 1989).........................................................................8, 9

*In re Tug Ocean Prince, Inc.*,
   584 F.2d 1151 (2d Cir. 1978)................................................................1, 5, 6, 10

*Lake Shore & Mich. S. Ry. v. Prentice*,
   147 U.S. 101 (1893) .............................................................................................9

*Milne v. USA Cycling Inc.*,
   575 F.3d 1120 (10th Cir. 2009).........................................................................8

*Mobil Chem. Co. v. Blount Bros. Corp.*,
   809 F.2d 1175 (5th Cir. 1987)...........................................................................25

*Orduna S.A. v. Zen-noh Grain Corp.*,
   913 F.2d 1149 (5th Cir. 1990)..........................................................................25

*Pacific Operators Offshore, LLP v. Valladolid*,
   132 S. Ct. 680 (2012) ..........................................................................................6

*Parks v. Wells Fargo Home Mortg., Inc.*,
  398 F.3d 937 (7th Cir. 2005) ......................................................................... 13

*Romero v. Mobil Explor. & Producing N. Am., Inc.*,
  939 F.2d 307 (5th Cir. 1991) ................................................................... 17, 19

*Russello v. United States*,
  464 U.S. 16 (1983) .......................................................................................... 9

*Southland Secs. Corp. v. INSpire Ins. Solutions Inc.*,
  365 F.3d 353 (5th Cir. 2004) .......................................................................... 7

*United States v. Coastal States Crude Gathering Co.*,
  643 F.2d 1125 (5th Cir. 1981) ...................................................................... 10

*United States v. General Motors Corp.*,
  403 F. Supp. 1151 (D. Conn. 1975) .............................................................. 10

*United States v. Texas Pipe Line Co.*,
  528 F. Supp. 728 (E.D. Okla. 1978) .............................................................. 10

*United States v. Tex-Tow, Inc.*,
  589 F.2d 1310 (7th Cir. 1978) ...................................................................... 10

*Water Quality Ins. Syndicate v. United States*,
  522 F. Supp. 2d 220 (D.D.C. 2007) ............................................... 2, 5, 6, 10

*Water Quality Ins. Syndicate v. United States*,
  632 F. Supp. 2d 108 (D. Mass. 2009) ......................................................... 2, 4

**Statutes and Rules**

33 U.S.C. § 1321(b)(3) ......................................................................................... 6

33 U.S.C. § 1321(b)(6) ....................................................................................... 10

33 U.S.C. § 1321(b)(7)(D) ........................................................................... 3, 6, 11

33 U.S.C. § 2701(14) ........................................................................................... 5

33 U.S.C. § 2704(c)(1) ......................................................................................... 9

33 U.S.C. § 2716(f)(1)(C) ................................................................................. 5, 6

Fed. R. Evid. 407 ................................................................................................. 7

**Other Authorities**

135 Cong. Rec. 27,978 ......................................................................................... 4

135 Cong. Rec. 27,984 ......................................................................................... 4

135 Cong. Rec. 27,985.................................................................................................... 9

*Black's Law Dictionary* (9th ed. 2009).................................................................... 3, 4

*Kuroshima Shipping S.A. Act of God Defense & Limit of Liability Analysis*,
    2003 A.M.C. 1681 (U.S. Coast Guard Nat'l Pollution Funds Center 2003)............................. 4

Martin, Patrick H.,
    *The BP Spill & the Meaning of "Gross Negligence or Willful Misconduct,"*
    71 La. L. Rev. 957 (2011) ...................................................................................... 3, 4

**INTRODUCTION**

If there is any single point on which the Phase One Trial left no doubt, it is that deepwater drilling is an endeavor of great complexity that entails innumerable decisions by multiple parties.  It is easy—particularly with the benefit of hindsight—to second-guess any number of those decisions.  And that is precisely what the Government and plaintiffs want this Court to do: they focus on such things as drilling margins, centralizers, and "corporate culture" that have no causal nexus to the loss of well control at the Macondo well and the resulting oil spill.   But that focus on non-causal matters only exposes their inability to dispute the fundamental point that the blowout was an accident that occurred as a result of the successive failure of a series of state-of-the-art barriers on the Macondo well.  BP does not deny that it played a role in these failures: its wellsite leaders, along with others on the rig, misinterpreted the results of a negative pressure test that provided multiple indications that the wellbore was not secure.  In light of this mistake, BP pleaded guilty to ordinary negligence as charged in an information brought by the U.S. Government.  But that mistake does not, as a matter of law, rise to the level of extreme and egregious wrongdoing, characterized by a culpable state of mind, necessary to justify the imposition of either treble damages under the Clean Water Act (CWA) or punitive damages under general maritime law.

The contrary position taken by the Government and plaintiffs is both legally and factually flawed.  Ignoring the vast body of common law—including common law authoritatively interpreted and applied by the Fifth Circuit—that informs the meaning of both the CWA and general maritime law, the Government and plaintiffs rely almost exclusively on just three cases, all of which are from outside this circuit and none of which even interprets the statutory provisions at issue here: *In re Tug Ocean Prince, Inc.*, 584 F.2d 1151 (2d Cir. 1978), *Water*

*Quality Ins. Syndicate v. United States*, 632 F. Supp. 2d 108 (D. Mass. 2009) (*WQIS 2009)*, and *Water Quality Ins. Syndicate v. United States*, 522 F. Supp. 2d 220 (D.D.C. 2007) (*WQIS 2007*). The Government and plaintiffs repeatedly attempt to distinguish, or reserve the right to challenge, controlling Fifth Circuit precedent.  It is quite obvious what is going on here: neither the law nor the facts allows the imposition of treble fines or punitive damages on BP, so the Government and plaintiffs ask this Court to apply snippets of non-controlling law to an assortment of non-causal facts.  At the end of the day, the only relevant facts are those with a causal link to the blowout.  And when those facts are reviewed against the controlling law, there is no basis to subject BP to either treble fines or punitive damages.

## ARGUMENT

**I.      The Government And Plaintiffs Err On Key Legal Issues Related To Treble Fines And Punitive Damages.**

**A.      "Gross Negligence" And "Willful Misconduct"**

**1.      "Gross Negligence"**

Both the Government and plaintiffs acknowledge, as they must, that gross negligence requires "'an ***extreme*** departure from the care required under the circumstances.'"  Gov't Br. 2 (emphasis added; quoting *WQIS 2009*, 632 F. Supp. 2d at 112); PSC Br. 7 (same).  But that, they contend, is ***all*** that gross negligence requires; in particular, they insist that gross negligence involves no culpable mental state whatsoever.  *See* Gov't Br. 5-6; PSC Br. 6-7; *but see* PSC Br. 14 ("The 'mental attitude of the defendant' is what turns ordinary negligence into gross negligence.") (quoting *Clements v. Steele*, 792 F.2d 515, 516 (5th Cir. 1986)).  They are wrong. As BP explained in its opening brief, at common law, gross negligence is understood to have both an objective component (an extreme departure from the standard of care) ***and*** a subjective component (conscious indifference to a known risk).  *See* BP Br. 3-8.

2

There is no indication that Congress intended to depart from this common-law background when enacting this provision of the CWA in 1990.  The Government and plaintiffs argue that Congress did so by limiting treble fines under the CWA to cases of "gross negligence *or* willful misconduct."   33 U.S.C. § 1321(b)(7)(D) (emphasis added). Because willful misconduct requires a culpable state of mind, they argue, gross negligence does not—any other interpretation, they insist, would render gross negligence superfluous and ignore the disjunctive word "or" between the two terms.  *See* Gov't Br. 6; PSC Br. 6-7.

That argument is a *non sequitur*.  Just because willful misconduct includes a culpable state of mind does not mean that gross negligence does not.  Both terms require a culpable state of mind—they simply require ***different*** culpable states of mind.  Willful misconduct, unlike gross negligence, can encompass the situation where a defendant ***intends*** to cause injury.  Thus, a defendant can be liable for willful misconduct without being liable for gross negligence and vice versa, and neither term is superfluous (even if they overlap to some extent).  *See, e.g.*, *Bullock v. BankChampaign, N.A.*, 133 S. Ct. 1754, 1757 (2013); *see also* Patrick H. Martin, *The BP Spill & the Meaning of "Gross Negligence or Willful Misconduct*," 71 La. L. Rev. 957, 988 (2011) ("[A] distinction can be made ordinarily between gross negligence and willful misconduct, but that does not mean that Congress intended a distinction be made between the two for most purposes.").  The disjunctive word "or" proves nothing about the substantive scope of either term; rather, it proves only that a defendant need be liable for one but not both.

Nor, contrary to the Government's suggestion, *see* Gov't Br. 6, does the fact that Congress replaced the term "willful negligence" with "gross negligence" in the CWA prove anything.  Those two terms are synonyms, and Congress simply chose the more common term. *See Black's Law Dictionary* 1134 (9th ed. 2009) (gross negligence "[a]lso termed ... willful

negligence"); *id.* at 1135 (willful negligence: "2. See *gross negligence*."). The legislative history confirms that Congress understood this common-sense point. *See* 135 Cong. Rec. 27,978 (Rep. Hammerschmidt) ("[G]ross negligence … is virtually the same as the willful negligence standard in the Federal Superfund law."); *id.* at 27,984 (Rep. Stangeland) ("Our bill ... looks to instances of gross, willful negligence to determine when limits apply ....").

The Government and plaintiffs thus err by relying on *WQIS 2009* for the proposition that gross negligence does not require a culpable mental state. *See* Gov't Br. 5; PSC Br. 6-7. That case did not even purport to decide that issue; rather, the parties there "agree[d]" upon "the standard for gross negligence … set forth" in *Kuroshima Shipping S.A. Act of God Defense & Limit of Liability Analysis*, 2003 A.M.C. 1681, 1693 (U.S. Coast Guard Nat'l Pollution Funds Center 2003), 632 F. Supp. 2d at 112, an administrative adjudication never challenged or reviewed in court. As one commentator has observed, *Kuroshima*, in turn, "was nothing more than the decision of a claims manager" who "evidently examined no cases and no legislative history of the OPA." Martin, *The BP Spill*, 71 La. L. Rev. at 1017. Indeed, because *Kuroshima* **rejected** a finding of gross negligence for lack of an extreme deviation from the standard of care, *see* 2003 A.M.C. at 1696, any discussion of a culpable mental state in that decision is *dicta*.

### 2.    "Willful Misconduct"

The Government also seeks to dilute the culpable mental state for willful misconduct by arguing that the relevant inquiry "is an objective test, not a subjective determination." Gov't Br. 8. Again, the Government is wrong. While it is possible (and often necessary) to rely on objective facts to infer a defendant's subjective mental state, the ultimate question always remains subjective. *See*, *e.g.*, *Bassam v. American Airlines*, 287 F. App'x 309, 314 (5th Cir. 2008) (*per curiam*) ("[The plaintiff's] assertion that ... willful misconduct [should] be evaluated

under an objective test is a misstatement of law.").  Equally erroneous is the Government's further assertion that "the Court need only find an ***inference*** of recklessness," Gov't Br. 8 (emphasis in original): a court can "find" a fact but cannot "find" an inference.  Indeed, the Government recently acknowledged in the Fifth Circuit that willful misconduct "require[s] a finding of [1] intent or [2] recklessness."  Br. of United States 51-52, *United States v. Citgo Petroleum Corp.*, No. 11-31117 (5th Cir. Apr. 13, 2012).  That point is true here too.

### B.     Causation

In addition to seeking to dilute the relevant legal standards, the Government and plaintiffs also seek to relax the legal limits on the conduct relevant to the imposition of treble fines and punitive damages.  Unable to satisfy the demanding legal standards based on the actual causes of the oil spill, they urge the Court to focus instead on various other decisions made during the vast endeavor of drilling the Macondo well.  The Government and plaintiffs, in short, are asking this Court to punish BP for actions that did not cause the spill.  That request is baseless.

The Government argues that it is unconstrained by the traditional tort requirement of proximate cause.  *See* Gov't Br. 13-14.  To support that position, the Government relies primarily on *WQIS 2007* and that case's description of the Second Circuit's decision in *Tug Ocean Prince*, 584 F.2d 1151.  *See* Gov't Br. 12-13; *see also* PSC Br. 13-14.  The discussion of causation in *WQIS 2007*, however, turned on the language of a particular section of the Oil Pollution Act of 1990 (OPA), 33 U.S.C. § 2716(f)(1)(C), involving defenses by guarantors.  That provision requires a court to determine what caused an "incident," defined as "the 'series of occurrences' or events that together … led to the spill"—***not*** what caused the spill itself.  *WQIS 2007*, 522 F. Supp. 2d at 229 (quoting 33 U.S.C. § 2701(14)).  The *WQIS 2007* court took pains to distinguish that causal inquiry from the causal inquiry in a discharge case.  *See id.* at 228-29

5

("The relevant question … is not whether the willful misconduct was the proximate cause of the oil spill.  Rather, the relevant question is whether the 'incident was caused by the willful misconduct of the responsible party.'") (emphasis omitted; quoting 33 U.S.C. § 2716(f)(1)(C)).  The Government's request for treble fines under the CWA, in contrast, requires analysis of what caused a **_discharge_**, 33 U.S.C. §§ 1321(b)(3), (b)(7)(D)—a narrower causal focus that renders the Government's reliance on _WQIS 2007_ misplaced.  Nor did _Tug Ocean Prince_ consider the specific causal link required by this CWA provision (which did not even exist at that time); instead, the portion of _Tug Ocean Prince_ discussing causation involved a different CWA provision establishing the right to limitation.  _See_ 584 F.2d at 1161-64.

The Government goes even beyond _WQIS 2007_ and _Tug Ocean Prince_ to argue that the Court may rely on avowedly "**_[n]on-causal_** acts" in assessing whether treble fines are warranted under the CWA.  Gov't Br. 14 (emphasis added).  That position ignores the Supreme Court's recent holding that the **_same_** phrase used in the CWA—"the result of"—"plainly suggests causation."  _Pacific Operators Offshore, LLP v. Valladolid_, 132 S. Ct. 680, 690 (2012).  As the Court explained, that phrase requires a "significant causal link" or "substantial nexus" that exceeds "but-for" cause and is akin to common-law proximate causation.  _Id._ at 690-91; _see also id._ at 691-93 (Scalia, J., concurring in part and concurring in the judgment) (equating "substantial nexus" with traditional "proximate cause").  Under the CWA and the common law, in short, BP is not on trial for engineering or policy decisions that lack, at the very least, a significant causal link or substantial nexus to the oil spill.  _But see_ Gov't Br. 16 (urging the Court to consider actions that were "not causal" to "show BP's culpability").  Whether non-causal acts may be relevant to determining CWA penalty amounts, _see id._ at 15-16, is an issue to be decided in the CWA penalty phase, and immaterial for present purposes.

6

In addition to misstating basic principles of causation, the Government attempts to smuggle in evidence of random alleged shortcomings by embracing the "analytic construct" of BP's generic internal investigation procedures, which address "immediate," "system," and "systemic" causes of an accident.  *See* Gov't Br. 1-3, 23, 26-38.  Needless to say, BP's internal approach to incident investigations has no bearing on the causal standard to be applied in a court of law: it would be perverse, to say the least, for the law to punish a defendant for seeking to identify and redress issues that transcend the ***legal*** causes of an accident.  *Cf.* Fed. R. Evid. 407.  The Government does not even pretend that the "analytic construct" applied in its brief has any basis in the CWA or the common law.  Nonetheless, the Government devotes the bulk of the argument section of its brief to urging this Court to punish BP for alleged "system" and "systemic" failures, including e-mails and "failures in the corporate attitude," with no substantial nexus to the spill.  *See* Gov't Br. 23, 26-38.

The Government and plaintiffs also suggest that non-causal acts may "show BP's reckless attitude towards safety."  Gov't Br. 16; *see also* PSC Br. 14-15.  Once again, that argument asks the Court to rely on a kitchen-sink set of alleged mistakes without regard for the governing law.  As the Fifth Circuit has explained, to prove a corporate defendant's state of mind (here, an allegedly "reckless attitude towards safety"), a plaintiff must present evidence that the particular actor who actually ***caused*** the harm at issue also possessed the requisite culpable mental state.  *See*, *e.g.*, *Southland Secs. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 366 (5th Cir. 2004).  That is because, in the Fifth Circuit, there is no such thing as "collective scienter," *id.*; rather, the requisite culpable mental state must "actually exist" in at least one responsible individual and may "not be imputed on the basis of general principles of agency," *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 241 (5th Cir. 2010).  The Government makes no

7

attempt to address this point.  Instead, the Government argues that unrelated acts—such as using drill pipe allegedly "too wide" for the BOP to shear on sections of the well not at issue here—can provide evidence of "BP's" mental state.   Gov't Br. 15-16; *see also* PSC Br. 14.   The Government never explains how non-causal decisions by myriad personnel can prove a corporation's culpable mental state.

Finally, while the Government and plaintiffs acknowledge that "[b]oth gross negligence and willful misconduct are assessed on the totality of the circumstances," Gov't Br. 12; *see also* PSC Br. 13-14, they identify only circumstances that, in their view, demonstrate culpability. They cannot, however, have it both ways: "the totality of the circumstances" includes not just alleged shortcomings, but also affirmative safety measures undertaken to prevent a blowout and resulting oil spill.  *See, e.g.*, *Milne v. USA Cycling Inc.*, 575 F.3d 1120, 1132 (10th Cir. 2009). Here, BP implemented a series of industry-standard barriers approved by federal regulators to prevent an ordinary kick from developing into an extraordinary blowout, and those barriers would have prevented the accident but for the acts and omissions of multiple individuals working for multiple entities.  *See* BP Br. 22-45.

## C.    Attribution

As BP noted in its opening brief, the Fifth Circuit has conclusively held that a corporation may not be found vicariously liable for punitive damages under general maritime law.  *See* BP Br. 17 (citing *In re P&E Boat Rentals*, 872 F.2d 642, 652 (5th Cir. 1989)).  To the extent that plaintiffs suggest otherwise, *see* PSC Br. 3-6, 18-20; Ala. Br. 1-16; La. Br. 5, their quarrel is with the Fifth Circuit, not BP.

The Government contends that a different rule should apply under the CWA, asserting that "there is no basis whatsoever in the plain language of the statute to require the United States

to prove shore-based or upper management involvement." Gov't Br. 17. That assertion turns matters upside down. The key point is that there is nothing in the CWA's treble-fines provision that indicates an intent to deviate from traditional common-law attribution rules. While it is true that "[c]orporations act through their employees," it is not true that "the acts of employees in the course and scope of their employment are the acts of the corporation," *id.*, for purposes of treble fines and punitive damages. To the contrary, as the Fifth Circuit recognized in *P&E Boat Rentals*, the traditional common-law rule is precisely the opposite. *See* 872 F.2d at 651-52; *see generally Lake Shore & Mich. S. Ry. v. Prentice*, 147 U.S. 101, 106-08 (1893).

If anything, the CWA's language, structure, and legislative history only confirm that a corporation may not be subjected to treble fines except insofar as it authorized or ratified an agent's wrongdoing. Congress knows how to provide that the "gross negligence or willful misconduct" of employees should be attributed to corporations, and did so in the OPA liability caps enacted along with the CWA provision at issue here. *See* 33 U.S.C. § 2704(c)(1) (removing OPA liability cap where incident caused not only by responsible party by also by "an agent or employee of the responsible party"). If Congress had wanted to follow that approach in the CWA provision at issue here, it could and would have done so. *See* BP Br. 19-20 (citing *Russello v. United States*, 464 U.S. 16, 23 (1983)). Were the Government correct that acts of employees are automatically attributable to a corporation for purposes of these provisions, *see* Gov't Br. 17, the special attribution rule in § 2704(c)(1) would have been unnecessary. Again, the legislative history only confirms the point. *See* 135 Cong. Rec. 27,985 (Rep. Kennelley) ("To prove Exxon's liability in this case, under the gross negligence standard, not only would a court have to deem that the captain was drunk, but it would also have to find that Exxon had full knowledge of his drunkenness.").

9

The Government further misses the mark by arguing, in an apparent effort to attribute the conduct of third parties to BP, that "civil penalties cannot be avoided based on blaming third parties," and "[c]ourts have held corporations liable for CWA civil penalties … for the acts of unrelated third parties."  Gov't Br. 14-15, 18 (citing *United States v. Coastal States Crude Gathering Co.*, 643 F.2d 1125 (5th Cir. 1981); *United States v. Tex-Tow, Inc.*, 589 F.2d 1310 (7th Cir. 1978); *United States v. Texas Pipe Line Co.*, 528 F. Supp. 728 (E.D. Okla. 1978); *United States v. General Motors Corp.*, 403 F. Supp. 1151 (D. Conn. 1975)).  Those cases, however, are readily distinguishable: all of them involve the CWA's strict-liability penalty provision, 33 U.S.C. § 1321(b)(6), and none involves the distinct treble-fines provision at issue here.  *See Coastal States Crude*, 643 F.2d at 1127 ("Section 1321(b)(6) provides no defense to the assessment of the civil penalty; indeed, it establishes an absolute liability standard which obviates the need for a finding of fault."); *Tex-Tow,* 589 F.2d at 1314 ("Under the absolute liability standard here involved neither fault nor defect need be proved ...."); *Texas Pipe Line*, 528 F. Supp. at 733 ("§ 1321(b)(6) is based on a concept of strict liability ... [T]he fact that a third party may have been the sole cause of an oil discharge is no defense ...."); *General Motors*, 403 F. Supp. at 1157 ("Although such a rule may appear to be a just and wise public policy, it is not contained in the statute, which is based on a concept of 'strict liability.'").

In short, there is no legal basis for the Government's remarkable assertion that a corporation may be held liable for "gross negligence or willful misconduct" based on the acts of an unrelated third party.  The Government's reliance on *WQIS 2007* on this point is also puzzling, as that case simply notes that, in evaluating willful misconduct, it is permissible to consider multiple acts of the defendant.  *See* 522 F. Supp. 2d at 230.  Finally, the Government's reliance on *Tug Ocean Prince* for the proposition that a vessel owner is liable for failing to

10

provide a competent master and crew, *see* Gov't Br. 18, fails on the facts here: while a party may be liable for knowingly hiring incompetent contractors, Transocean and Halliburton were each leaders in their fields, *see* BP Br. 25, 30.  Having hired expert independent contractors, BP cannot be punished for their errors.  *See* BP Br. 17-20.

## II.    The Government And Plaintiffs Err On Key Factual Issues Related To Treble Fines And Punitive Damages.

The Government and plaintiffs contend that the facts here establish the extreme and egregious culpability by BP necessary to justify the imposition of treble fines under the CWA and punitive damages under general maritime law.  Again, they are wrong.

### A.    Negative Pressure Test

The Government first argues that the misinterpretation of the negative pressure test ***alone*** establishes "gross negligence or willful misconduct."  *See* Gov't Br. 1, 2, 22-26.  As a threshold matter, it is undisputed that, at all times relevant here, no statute or regulation required such a test to be performed at the Macondo well in the first place.  By deciding to include such a test in its temporary abandonment procedure for the well, BP thus went above and beyond legal requirements, hardly evincing "gross negligence or willful misconduct."  (Tr. 4323, 4472-74, 4480 (Barnhill); Tr. 2211-12 (Heenan); Tr. 8760-61 (Guide); Patton Dep. 243-45; Saucier Dep. 190-91.)

To be sure, both Transocean and BP personnel aboard the rig misinterpreted the results of the negative pressure test—a mistake for which BP has already pleaded guilty to ordinary negligence.  But ordinary negligence is not the same thing as "gross negligence or willful misconduct," the legal standard for imposing treble fines under the CWA, *see* 33 U.S.C. § 1321(b)(7)(D), or "wanton, willful, or outrageous conduct," the legal standard for imposing punitive damages under general maritime law, *see Atlantic Sounding Co. v. Townsend*, 557 U.S.

11

404, 409, 414 n.4 (2009).  To the contrary, the misinterpretation of the negative pressure test is a quintessential example of a mistake.  There is no dispute that BP and Transocean personnel on the rig conducted that test in good faith—they even re-did the test with a different lineup to ensure its accuracy—and carefully reviewed and discussed the results for more than ***three hours***. (Tr. 4328, 4480 (Barnhill); Tr. 7570 (Bourgoyne); Tr. 8301, 8306 (Lambert).)  Nor is there any dispute that BP and Transocean personnel concluded, albeit mistakenly, that the test was a success.   (Tr. 1682, 1687-88, 1703-04, 1805 (Ezell); Tr. 4482 (Barnhill); Tr. 7527-28 (Bourgoyne); Tr. 8898 (Guide); Tr. 6124, 6233-34 (Ambrose); Tr. 7928-29, 7932-33, 7985 (Robinson); Tr. 7209, 7367-68 (Beck).)  This is ordinary negligence, pure and simple.

The Government insists that this is "gross negligence" because "BP declared the test a success based on the supposed 'bladder effect,' but at trial BP admitted that no such phenomenon exists."  Gov't Br. 2; *see also id.* at 24.  That argument is a *non sequitur*.  The question here is not whether a "bladder effect" actually exists, but whether the BP and Transocean personnel on the rig interpreting the test honestly and in good faith believed that it did.  As noted above, the record is undisputed that they did.  Accordingly, those individuals cannot, as a matter of law, be deemed to have acted with a culpable state of mind—putting aside the fact that, under established attribution principles, no such culpability could be attributed to BP.  *See supra* § I.C; BP Br. 16-20.[1]

---

[1] The Government also contends that "BP's acts … violated numerous OCSLA regulations." Gov't Br. 24 n.22.  None of those regulations, however, relates to the interpretation of a negative pressure test; to the contrary, as noted in the text, the regulations did not require a negative pressure test at all.  The regulations cited by the Government simply state that regulated entities must act "in a safe and workmanlike manner," and must "minimize the potential for the well to flow or kick."  *Id.* (internal quotations omitted).  As this Court has recognized, a violation of such generic regulations does not establish heightened culpability.  *See* BP Br. 21 (citing Rec. Doc. 5809 at 12-14).

Indeed, experts for the Government, Transocean, and BP agreed at trial that the Transocean rig crew and BP wellsite leaders had every incentive to get the test right and would not have permitted the displacement to resume if they had any doubts about the well's integrity. (Tr. 2123 (Heenan); Tr. 4481 (Barnhill); Tr. 7527-29 (Bourgoyne).)  The interests of that rig crew and those wellsite leaders were aligned with the interest of everyone else on the rig: to prevent a blowout and possible fire and explosion.  *See*, *e.g.*, *Parks v. Wells Fargo Home Mortg., Inc.*, 398 F.3d 937, 942-43 (7th Cir. 2005).  The Government does not even try to explain why BP wellsite leaders on the rig would have consciously disregarded concerns about the safety of the rig on which they themselves were living and working.  Because "[a]ny reckless indifference [BP] exhibited … would have been equally detrimental to its own" interests, and BP "stood to lose as much" as anyone else from a fire and explosion, *id.*, the Government's theory that BP acted with "gross negligence or willful misconduct" is simply not plausible.

But the Government does not stop there; rather, it asserts that "the facts underlying the 8:52-9:02 p.m. telephone call [between BP wellsite leader Don Vidrine and BP onshore drilling engineer Mark Hafle] not only establish BP's gross negligence, but its willful misconduct." Gov't Br. 25.  The Government argues that, during that call, Hafle and Vidrine exchanged "critical information" that should have led either of them to them "to order that the negative pressure test be re-done." *Id.*  That argument represents a gross distortion of the record.  The 8:52 PM call was made to discuss the upcoming surface plug operation, not the negative pressure test (*see*, *e.g.*, TREX 296)—indeed, the call took place about an hour ***after*** that test had ended and displacement had resumed (*see, e.g.*, Tr. 1343 (Bly)).  Not surprisingly, thus, there is no evidence that Vidrine sought Hafle's advice or guidance regarding the proper interpretation of the test, which, as noted above, had already been extensively debated on the rig.  To the contrary,

13

notes from interviews with the call participants indicate that, in the course of telling Hafle how things were otherwise going on the rig, Vidrine mentioned that the negative pressure test had been run twice and that he was "fully satisfied" with the results.  (TREX 296; *see also* TREX 193; TREX 62; TREX 62853.)   Further, the very interview notes on which the Government relies state that Hafle "said he didn't have the full context for what had transpired during the tests and it wasn't clear to him whether [Vidrine] was talking about the first or second negative tests .… so [Hafle] assumed that [Vidrine] had concluded that it was not a problem."  (TREX 296.) There is no evidence that either Hafle or Vidrine willfully ignored a clear warning that the negative pressure test had been misinterpreted and therefore consciously "speed[ed] the deadly flow of hydrocarbons toward their final destination: the *Deepwater Horizon*," Gov't Br. 25-26, on which Vidrine himself was standing.

Finally, the record contradicts the Government's assertion that the "single act" of misinterpreting the negative pressure test was the "immediate" cause of the blowout.  Gov't Br. 21, 25.  As BP explained in its opening brief, *see* BP Br. 31-45, that mistake was just one of a series of failures that, in combination, allowed a kick to turn into a blowout, including the failure of the cement job designed and executed by Halliburton, the failure of Transocean and Halliburton personnel to properly monitor the well, the failure of the Transocean drill and marine crew to take appropriate well control and EDS actions once the kick was detected, and the failure of the BOP maintained and operated by Transocean.  The Government's exclusive focus on the negative pressure test is at odds with the testimony of its own drilling expert, Richard Heenan, who testified that if any of the indications of flow between 9:01 and 9:38 PM had been detected by the Transocean rig crew and Halliburton mud loggers, and had the rig crew reacted to these indications as trained, the blowout would not have occurred.  (Tr. 2207-09 (Heenan); *see* Tr.

14

4431-32 (Barnhill) ("I believe if the well had been flow-checked around 2133 and shut in … I don't think the events as they transpired would have happened.").)

> **B.      Drilling Margin**

The Government and plaintiffs next assert that treble fines and punitive damages are warranted because "BP violated the safe drilling margin regulation, misled MMS, and ended up with a 'fragile' well."  Gov't Br. 27 (capitalization modified); *see also* PSC Br. 44-46.  That assertion is both legally irrelevant and factually false.

As BP explained in its opening brief, there is no evidence that the drilling margins that existed while drilling the well had any causal role in the loss of well control on April 20.  *See* BP Br. 48-49 (citing, *inter alia*, Tr. 850 (testimony by the Government's drilling margin expert, Dr. Alan Huffman, that safe drilling margin regulations only "apply while drilling the well," and that no drilling activities took place after April 9, 2010)).  To the extent that the Government now tries to suggest that the drilling margin was causal because it rendered the well "fragile," Gov't Br. 29, that suggestion is meritless, because the well was open and stable for ten days and was circulated multiple times before casing was run (*see generally* BP FFCL §§ V.D.6-7).

In any event, the Government's assertions about the application of the safe drilling margin regulations are inaccurate, and at odds with both industry practice and the Government's own documents.  The Government's assertion that the regulatory safe drilling margin is the "cushion between the mud weight and the fracture gradient," which it refers to as the "weakest link" in the wellbore, is incorrect.  Gov't Br. 27, 29; *see also* PSC Br. 44.  Rather, the regulatory safe drilling margin protects weaker formations above the casing shoe from a critical cascading failure, and is not reset each time a weaker zone is encountered.  (See Tr. 7459-61 (Bourgoyne); D4732; *see generally* BP FFCL § V.D.7.a.)  As BP expert Dr. Ted Bourgoyne explained,

cascading failures behind casing shoes are uncommon and something that operators and drillers seek to avoid—by keeping their mud weight below the tested and measured strength of the casing shoe.  (Tr. 7461-62 (Bourgoyne).)

The Government's "weakest link" theory is also contradicted by industry practice with respect to the standard response to loss circulation events—relatively common occurrences in which the mud weight exceeds the fracture gradient of the formation while drilling the interval, and that are remedied through standard industry procedures.  (*See* Tr. 7459-60 (Bourgoyne).) Operators and drillers, working with specialized service providers such as M-I Swaco, routinely use loss circulation material pills and wellbore strengthening materials to cure and strengthen the wellbore after loss events, and do not reset their safe drilling margin.  (Tr. 7515-20 (Bourgoyne).)  After pumping pills to strengthen the wellbore, the industry practice—as reflected in, among other things, Transocean and BP "Loss Circulation While Drilling" flow charts—is for operators and drillers to continue to drill ahead with a mud weight at or near the previously used mud weight.  (Tr. 7515-20 (Bourgoyne); Tr. 2012-15 (R. Sepulvado); D4736.)  No industry document identified at trial reflects the interpretation asserted here by the Government, *i.e.*, that operators drop their mud weight when a weaker zone is encountered in the wellbore, much less that operators redefine the safe drilling margin.  (Tr. 819 (Huffman).)  As BP wellsite leader Ronnie Sepulvado testified, no one would drill wells if it were necessary to redefine the drilling margin after each loss event in the narrow margin wells of the Gulf of Mexico.  (Tr. 2017-19 (R. Sepulvado).)

The Government's "weakest link" theory is also contradicted by MMS documents and the actions of MMS regulators.  For example, the MMS inspectors' instruction manual discusses the safe drilling margin as being between the mud weight and the result of the casing shoe test

(TREX 4019 at 30), and MMS regional director Frank Patton testified that the regulatory safe drilling margin is between the mud weight and the "last casing shoe … actually tested," not the downhole fracture gradient (D4867; Patton Dep. 142-43).  Indeed, despite a specific examination of the data underlying the regulatory safe drilling margin, monthly MMS inspections of the *Marianas* (the rig on the well at the time of the alleged regulatory violation) and the *Deepwater Horizon* never found such a violation.   (Tr. 776 (Huffman); R. Neal Dep. 94-95.)   The Government's current approach to the regulatory safe drilling margin represents a drastic departure from past practice, and is unknown to operators, drillers, and even experienced federal regulators.  (Tr. 2020 (R. Sepulvado); Patton Dep. 142-43; D4867.)

### C.      Cement Job

The  Government  next  argues  that  BP  should  be  punished  because  it  made  "risky decisions on the cement job."  Gov't Br. 29 (capitalization modified).  The Government does not dispute, however, that BP hired Halliburton, a world leader in drilling cement, to handle the cement  job,  and  that  Halliburton  both  designed  and  executed  that  job.   *See*  BP  Br. 30-34. Nonetheless, the Government asserts that "it was BP, not Halliburton that had ***final authority*** in the majority of the risks that BP took."  Gov't Br. 30 (emphasis added).

"Final authority," however, is not the legal standard for attributing liability based on the acts of independent contractors.  A principal generally has "final authority" over the decisions of its independent contractors, but that does not render the principal liable for the independent contractor's decisions unless the principal exercised "operational control" over the contractor. *See, e.g.*, *Romero v. Mobil Explor. & Producing N. Am., Inc.*, 939 F.2d 307, 310 (5th Cir. 1991); *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548, 550 (5th Cir. 1987).  The Government makes no effort to satisfy this standard, much less to establish a causal link between any of its challenges to

BP's decisions (*e.g.*, on centralizers and "bottoms up") and the accident.  *See generally* BP Br. 53-54.

### D.    Development of the Temporary Abandonment Plan

The Government also argues that "there was a chaotic ramp-up to the temporary abandonment of Macondo," and that "constant change" in the temporary abandonment procedure somehow warrants treble fines.  Gov't Br. 31.  Once again, this section of the Government's brief is notable for its failure to articulate a substantial nexus between the challenged conduct and the accident.  The most the Government can say, with poetic license, is that "with the weeks of chaos preceding these decisions in the final hours, the decisions and their consequences seem almost inevitable."  *Id.* at 32.  That is neither law nor fact, but pure rhetoric.  There was nothing at all "inevitable" about the successive failure of multiple redundant barriers on the *Deepwater Horizon* on April 20, 2010.

The Government's characterization of the development of the temporary abandonment procedure as "chaotic," and its corresponding suggestion that the procedure was changed "to stop the financial losses and complete the work at Macondo," *id.* at 31, have no basis in fact.  The temporary abandonment procedure for the Macondo well was developed according to the usual timing and process, *i.e.*, after total depth for the well was reached and the final downhole conditions were known.  (TREX 836; TREX 537; TREX 545.GMT.)  As is prudent and common with the development of any procedure, multiple drafts or iterations of that procedure were exchanged among the team for input and feedback.  (Tr. 8762 (Guide); Tr. 4313 (Barnhill); TREX 570; TREX 97.)  BP wells team leader John Guide testified that it was standard practice for BP engineers to send all draft procedures to the wellsite leaders for their input based on their experience and to make logistical arrangements for any equipment that might be needed.  (Tr.

18

8763-64.)  And BP wellsite leader Ronnie Sepulvado confirmed that it was not unusual for a BP team to circulate multiple drafts of the temporary abandonment procedure to ensure that nothing was omitted.  (Tr. 1980-81.)  Thus, the Government errs by asserting that "BP produced at least five different Temporary Abandonment plans," Gov't Br. 31, for the Macondo well.  Indeed, Sepulvado testified that there was nothing unusual about either the timing or the nature of communications regarding development of the temporary abandonment procedure for the Macondo well (Tr. 1980-81), and there was never an instance during the drilling of the well in which operations outpaced the plans and procedures coming from the onshore drilling engineers (*id.* at 1954; *see generally* BP FFCL ¶¶ 698-708, ¶¶ 2523-31).

### E.     BOP Maintenance and Suitability

The Government next argues that "BP is responsible for both of the[] failures" with the BOP: (1) the failure of the "AMF/Deadman" system "due to poor maintenance," and (2) the failure of the "Autoshear" system "because the Blind Shear Ram ('BSR') was unable to center the off-centered drill pipe."  Gov't Br. 32.  The Government does not and cannot dispute, however, that BP hired Transocean, a world leader in deepwater drilling, to handle the drilling job, and that Transocean was responsible for maintaining and operating the BOP.  *See* BP Br. 25-30.  Again, as noted above, BP is not responsible for the acts of its independent contractors absent "operational control" over them, which is not even alleged here.  *See, e.g.*, *Romero*, 939 F.2d at 310; *Ainsworth*, 829 F.2d at 550.  In any event, the various disjointed BOP-related criticisms leveled at BP by the Government and plaintiffs are unfounded.

*First*, the Government's assertion that BP is responsible for the failure of the AMF/Deadman system, Gov't Br. 32-33, is belied by the testimony of Transocean's own CEO that Transocean was responsible for the maintenance of that system.  (Tr. 4660 (Newman).)  That

responsibility was contractually assigned to Transocean, understood and acknowledged by Transocean employees, and carried out by a specialized Transocean Subsea Department.  (*See* BP FFCL § II.C.2.d; *see also* TO Br. 30-32 (acknowledging Transocean responsibility for BOP maintenance); La. Br. 15-16 (AMF/Deadman failed due to "poor maintenance" by Transocean); HESI Br. 15 ("Transocean failed in its duty to properly maintain the BOP.").)  The record is similarly clear that BP personnel were not responsible for BOP maintenance, did not supervise Transocean's Subsea Department, and were not even authorized to ***touch*** the BOP control panel. (BP FFCL ¶¶ 95-96.)   The Government's efforts to saddle BP with responsibility for BOP maintenance-related failures on the theory that BP was generally aware of "maintenance issues" through its rig audits, Gov't Br. 33, are unavailing.  Although BP prudently performed audits on the *Deepwater Horizon*, there is no evidence that BP knew about maintenance deficiencies with the control pods.  (BP FFCL ¶ 1654 (Transocean had not yet even installed the reverse-wired solenoid valve when BP conducted the audit); *id.* ¶¶ 2113-47 (BP's diligent close-out efforts with Transocean for September 2009 audit findings); *id.* ¶¶ 2158-63.)   Having hired a world-class expert contractor, BP was entitled to believe that the contractor would do the job properly, and cannot be subjected to treble fines or punitive damages for the contractor's failures.

***Second***, the Government errs by attempting to blame BP because the *Deepwater Horizon*'s BOP was equipped with Cameron's SBR model blind shear ram.  *See* Gov't Br. 33-34. That model has long been (and continues to be) standard for subsea BOP stacks, and federal regulators approved its use for the Macondo well and continue to approve its use for other deepwater wells.  (BP FFCL ¶¶ 1799, 1910-11, 1919-22.)  No federal regulation required (or now requires) the use of any specific shear ram design, and no evidence has been offered to

prove that any other model (such as DVS or cDVS) would have sealed the well under the conditions at issue here.  (BP FFCL ¶ 1926*; see generally* BP FFCL § VII.E.9.)

***Finally***, plaintiffs advance several disparate claims against BP regarding the BOP, all of which are meritless.  Plaintiffs assert that the conversion of the lower ram into a test ram was a cost-cutting measure that sacrificed safety, *see* PSC Br. 49-50, but that conversion improved the BOP's functionality, enhanced safety by eliminating a bi-weekly operation that could induce a kick, complied with federal regulations, and was a change accepted by and commonly implemented in the industry (BP FFCL § VII.E.8).  Plaintiffs assert that the maximum anticipated surface pressure (MASP) for the Macondo well should have been calculated differently, PSC Br. 50-51, but the record shows that BP calculated MASP in accordance with industry practice and its own standards, that federal regulators independently verified and approved BP's calculations, and that the issue is non-causal because the calculated MASP closely comported with, and slightly exceeded, the actual pressures experienced at the Macondo well (BP FFCL ¶¶ 1766, 1822, 1872, § VII.E.6.g).  And plaintiffs assert that BP violated industry standards by not complying with API RP 53, PSC Br. 24 n.62, but the record shows that BP notified Transocean of a perceived non-compliance with API RP 53, and was assured by Transocean that its maintenance program met and exceeded the API RP 53 recommended practices (BP FFCL ¶¶ 1514-22).

## F.      "Corporate Culture"

Finally, the Government and plaintiffs urge this Court to impose treble fines or punitive damages based on what they describe as "BP's corporate culture."  Gov't Br. 34 (capitalization modified); *see also* PSC Br. 39-40.  Once again, this entire discussion misses the point, because neither the Government nor plaintiffs establish a substantial nexus between this alleged

"corporate culture" and the accident.  *See* BP Br. 45-48.  In any event, these various challenges to BP's "corporate culture" are unavailing.

*First*, the Government's assertion that BP focused only on ***personal*** safety, as opposed to ***process*** safety, Gov't Br. 35-38, is belied by the testimony of plaintiffs' own process safety expert, Professor Robert Bea, who acknowledged that "BP expressed a major commitment to a far, far better process safety regime" in the years before the accident, including the adoption of a new Operating Management System (OMS).  (*See generally* BP FFCL ¶¶ 2407-22.)

BP's focus on process safety included identifying the risk of loss of well control and developing mitigations for this risk for its Gulf of Mexico business unit as well as for its Drilling & Completions organization and the Macondo well specifically.  (BP FFCL ¶¶ 2608-16.)  BP's key leadership emphasized safety—both personal ***and*** process safety—as BP's number one priority.  (BP FFCL ¶¶ 2461, 2434.)   Again, as Professor Bea conceded, these statements demonstrate that BP focused on process safety and empowered its personnel to safeguard both personal and process safety.  (Tr. 374-79 (Bea); Tr. 1153 (Bly); TREX 48157.)  BP's record for both personal ***and*** process safety in the Gulf of Mexico was also improving, and the company was nominated for and won awards in recognition of this performance.  (BP FFCL ¶¶ 2640-67.)

*Second*, plaintiffs' contention that "BP presented … three different stories about the extent to which OMS was or wasn't implemented on contractor-owned rigs in the Gulf prior to the explosion," PSC Br. 39-40, is yet another red herring.  Plaintiffs simply ignore the uniform testimony of BP witnesses that OMS ***was*** implemented before the accident and ***did*** apply to the *Deepwater Horizon*.  (Tr. 532-33 (McKay); Tr. 1185-88 (Bly); Tr. 8047, 8054 (Shaw); Tr. 8604-06 (Guide); Tr. 9251-52, 9255 (O'Bryan); *see generally* BP FFCL §§ XI.C.4.)  Indeed, even

Professor Bea acknowledged that BP adopted OMS in its Gulf of Mexico Drilling & Completions organization in 2009, before the accident.  (Tr. 399 (Bea).)

Moreover, plaintiffs' efforts to manufacture an issue with respect to the implementation of BP's OMS ignores that all personnel on the *Deepwater Horizon* were governed by rig owner Transocean's safety management system (SMS).  (Tr. 4700-01 (Newman); D4943; Tr. 9250-55 (O'Bryan); Tr. 8604-06 (Guide); Tr. 8047-48 (Shaw); Tr. 1643-44 (Ezell); Tr. 2052 (R. Sepulvado).)  As is consistent with the industry standard, any gaps between BP's OMS and Transocean's SMS were contractually bridged together.  (Tr. 401-02 (Bea); Tr. 4693-94, 4699-4700 (Newman); Tr. 533-37 (McKay); Tr. 1186-88 (Bly); Tr. 8054 (Shaw); Tr. 9251-52 (O'Bryan); D4943; Tr. 8604-06, 8832-34 (Guide).)  Indeed, not only is Transocean required by the ISM Code to apply its SMS on its rigs (*see* BP Br. 26), but that is Transocean's preference, because it avoids confusion for Transocean personnel who may switch between rigs contracted to different operators (Tr. 4701 (Newman); *see also* Tr. 8054-56 (Shaw); Tr. 1187-88 (Bly); Tr. 9254 (O'Bryan)).  This Court indicated at trial that it understood BP's position on this point, noting during plaintiffs' questioning of Lamar McKay that "we are quibbling now about words," and that "the witness is saying that the OMS applies to BP's part of the responsibility, and they depend on the Transocean safety system for what Transocean does on the rig."  Tr. 536; *see also* Tr. 9314 (question from the Court regarding bridging documents).)

*Third*, plaintiffs' assertion that BP was not addressing OMS gaps at the time of the accident, PSC Br. 41-42, is again contradicted by the record, including the uncontroverted testimony of Pat O'Bryan, BP's former Vice President of Drilling & Completions for the Gulf of Mexico organization, regarding BP's closure of OMS gaps before April 20, 2010.  (Tr. 9257-62 (O'Bryan); TREX 6025-C at 3, 9, 12; *see generally* BP FFCL §§ XI.C.2-3.)

***Finally***, while the Government claims that "BP needed the *Deepwater Horizon* to move on because it was behind schedule and needed to drill other wells" and "made numerous last minute changes to stop the financial losses and complete the work at Macondo," Gov't Br. 31, individuals working on the Macondo well testified uniformly and without contradiction that BP never placed pressure on them in order to move on to another well.  (Tr. 8778 (Guide); Tr. 2023-25 (R. Sepulvado); Tr. 8284 (Lambert); Hackney Dep. 113; Tr. 9269-70, 9272 (O'Bryan); *see also* Tr. 5023 (Barnhill).)  Indeed, those working on the Macondo well testified that they did ***not*** feel pressured to sacrifice safety in order to reduce costs.  (Tr. 8778 (Guide); Tr. 2023-25 (R. Sepulvado); Tr. 8265-66, 8284-85 (Lambert); Tabler Dep. 383; Lindner Dep. 593.)

## III.   Transocean And Halliburton Err On Other Issues.

Finally, although space constraints do not allow BP to respond in this reply brief to statements with which it disagrees in the post-trial briefs submitted by co-defendants Transocean and Halliburton, a few comments are in order.

Transocean's argument that it is "entitled to exoneration or limitation in the limitation action," TO Br. 48 (capitalization modified), is unavailing for reasons BP has already addressed at length.  (*See* BP FFCL § XVIII.B.)  In addition, Transocean is not entitled to contractual indemnity from BP because, among other things, it materially breached its contract with BP. (*See* BP FFCL § XX.)  To the extent that Transocean now advances the novel argument that BP must prove conduct more culpable than gross negligence to invalidate the indemnity based on material breach, *see* TO FFCL § VI.A, the argument is wrong.  To the contrary, proof of a material breach (a contract concept) does not even require proof of gross negligence (a tort concept).  (*See* BP FFCL § XX.A.1.)  BP certainly did not agree to indemnify Transocean for injuries caused by Transocean's material breach of the contract.  *See*, *e.g.*, *Mobil Chem. Co. v.*

*Blount Bros. Corp.*, 809 F.2d 1175, 1182 (5th Cir. 1987).  That common-sense point does not render the indemnity meaningless; to the contrary, the indemnity may apply whenever an injury is ***not*** caused by the indemnitee's material breach.  *See id.*

And Transocean's novel argument that BP breached its obligation to provide a safe port and berth, *see* TO FFCL § VII.A, fails for the simple reason that BP expressly disclaimed any such representation except as specifically provided in Article 31.  (TREX 1356A ¶ 14.6.)  Article 31, involving ingress to and egress from the well, does not even arguably apply here.  (*See id.* ¶ 31.)  In any event, BP used due diligence in selecting a safe berth, *see Orduna S.A. v. Zen-noh Grain Corp.*, 913 F.2d 1149, 1157 (5th Cir. 1990), and the Macondo well falls under the "named port" exception to any safe-berth warranty, *see Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 802 (5th Cir. 1977).

BP has already responded to Halliburton's arguments regarding material breach and material increase in risk, and that response is incorporated by reference here.  (Rec. Doc. 4977 at 14-17; *see generally* BP FFCL § XX.)  Finally, Halliburton's superseding cause argument fails because its defective cement job was not independent of subsequent events.  *See, e.g., Donaghey v. Ocean Drilling & Explor. Co.*, 974 F.2d 646, 652-53 (5th Cir. 1992); *see generally* BP FFCL § VI.A-J.

## CONCLUSION

For the foregoing reasons and those in the opening brief, the Court should conclude that BP did not display the culpability necessary to warrant treble fines under the CWA or punitive damages under maritime law.

July 12, 2013

Respectfully submitted,

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Matthew T. Regan, P.C.
Hariklia Karis, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL   60654
Telephone:  312-862-2000
Facsimile:  312-862-2200

Christopher Landau, P.C.
Bridget K. O'Connor
Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC   20005
Telephone:  202-879-5000
Facsimile:  202-879-5200

*/s/ Don K. Haycraft*
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA   70139-5099
Telephone:  504-581-7979
Facsimile:  504-556-4108

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC   20004-2401
Telephone:  202-662-5985
Facsimile:  202-662-6291

*Attorneys for BP Exploration & Production Inc., BP America Production Co., and BP p.l.c.*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 12th day of July 2013.

*/s/ Don K. Haycraft*
Don K. Haycraft