

HOUSTON **DALLAS** PLANO

*Attorneys and Counselors*

Renaissance Tower
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
214.939.4400
800.662.8393
214.760.7332  Fax

**www.GodwinLewis.com**

DONALD E. GODWIN, SHAREHOLDER
BOARD CERTIFIED - CIVIL TRIAL LAW -
TEXAS BOARD OF LEGAL SPECIALIZATION
DIRECT DIAL:      214.939.4412
DIRECT FAX:       214.939.4803
Don.Godwin@GodwinLewis.com

July 11, 2013

**By Electronic Mail**

The Honorable Sally Shushan
United States District Court
Eastern District of Louisiana
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

        RE:    MDL 2179 – BP Motion to Strike Halliburton Experts Kris Ravi's Phase II Rebuttal Report and Glen Stevick's Phase II Rebuttal Report, Section II(b)(i).

Dear Judge Shushan:

      BP has the audacity to complain about HESI's alleged "impermissible attempt at an end-run"[1] around this Court's Phase I rulings, but studiously conceals the fact that its own expert, Dr. Andreas Momber ("Momber"), offers opinions on the very topics that BP now takes issue with in its Motion to Strike.[2] In fact, BP spends much of its time explaining why Dr. Kris Ravi ("Ravi") was kept from testifying in the Phase I Trial,[3] but ignores the misleading and incorrect points in Momber's Phase II report that should and must be rebutted by Ravi and Dr. Glen Stevick ("Stevick").[4]

---

[1] BP's Letter Brief to the Honorable Sally Shushan, dated July 5, 2013 ("BP's Letter Brief"), at p. 1.
[2] HESI files this Response cognizant of the Court's stated preference to avoid briefing on this issue. *See* Working Group Status Conference Transcript, dated June 28, 2013, at 25:13 – 25:15 (Exhibit 1). Given BP's filing, however, HESI files this response to fully preserve and protect its rights.
[3] Obviously, BP feared Dr. Ravi's Phase I Report and opinions and was willing to pull down its own expert, Ronald Crook, which it had sought the Court's permission to add only a few weeks before the initial setting of the Phase I Trial.
[4] Given BP's gamesmanship in its prior dealings with Ravi, HESI reserves the right to call him and Stevick at trial in the event that BP decides to withdraw Momber as a testifying expert.

1

At the outset, the presence, nature, and condition of bottom-hole cement in the Macondo well is relevant to the determination of flow rates and cumulative discharge and is pervasive throughout Phase II discovery. Indeed, several Phase II experts for the United States, BP, and Transocean assume that cement existed at the bottom of the well and served as an impediment to flow or also agree that cement downhole can affect flow.[5]

In his Report, Momber relies on the OLGA flow rate model run by Morten Emilsen ("Emilsen") to opine that the presence of bottom-hole cement served as an initial impediment to flow from the Macondo well. He further acknowledges that "the amount of resistance/restriction in the bottom-hole impacts the amount of oil that can flow into the well" and concedes that his analysis depends on assumptions about the placement and volume of cement.[6] BP would have Momber rely on a model that it endorses, while simultaneously seeking to preclude HESI from offering rebuttal opinions about the proper interpretation of that flow rate model. The reports of Ravi and Stevick directly address the underlying assumptions about the placement and volume of cement that are crucial to Momber's analysis concerning the rate of erosion, and illustrate how his analysis is incorrect and incomplete.

Simply put, BP is wrong in its contention that the Ravi and Stevick Reports "do not properly respond to anything said in ... Momber's Report."[7] As noted in the table below, the opinions of Ravi & Stevick directly respond to several statements contained within the four-corners of the Momber Report:

| Momber's Opinion | HESI's Rebuttal |
| --- | --- |
| "[Morten] Emilsen's analysis suggests that there was some cement blocking the reservoir.... In this model, the flow rate gradually increased until just before 21:30; the flow rate then increased more rapidly.... I agree that it is instructive to assume that this change in model flow rate is related to the capability of the cement material to resist oil | "I also disagree in part with Dr. Momber's interpretation of the OLGA modeling performed by Morten Emilsen, which suggests a sudden change in flow rate after 21:30. Dr. Momber opines that such a sudden increase in flow rate cannot be explained by a gradual process such as cement erosion, and that another 'material destruction process' must be |

---

[5] *See, e.g.,* Expert Report of Stewart Griffiths, dated March 22, 2013, at p. 4 (Exhibit 2) ("Any significant erosion of the ... cement barrier in the bottom of the well occurred rapidly over the first few days following the blowout."); *see also* Expert Report of Martin Blunt, dated May 1, 2013, at p. 14 (Exhibit 3) ("There is persuasive evidence that the outflow configuration did, in fact, change over time. For example ... Dr. Emilsen concludes that ... oil flowed into the well-bore over a restricted interval ... perhaps because of residual cement blocking the flow."); s*ee also* Deposition of Thomas Hunter (Vol. 1), 128:12 – 128:15 (Exhibit 4) ("There certainly was cement at different places in the well that ... affected the flow"); Expert Report of Kerry Pollard, dated May 1, 2013, at p. 6 (Exhibit 5) ("The status and location of ... casing/cement damage were unknown. Therefore assumptions had to be made in order to model it."); Expert Report of John Wilson, dated May 1, 2013, at p. 10, n. 26 (Exhibit 6) ("In this case, the skin represented whatever flow path existed between the reservoir and the well (through the failed cement job, for example.").

[6] Expert Report of Andreas Momber, dated May 1, 2013, at p. 3 (Exhibit 7); Deposition of Andreas Momber, 506:20 – 512:3 (Exhibit 8).

[7] BP's Letter Brief, at p. 5.

| Momber's Opinion | HESI's Rebuttal |
|---|---|
| flow.  The sudden change in flow rate around 21:30 may reflect a notable drop in the cement's resistance to flow.... Contrary to the assumption of the United States' experts, erosional processes cannot explain this short-time event.  Other mechanisms must be considered at play [such as a four step fragmentation process]."[8] | involved.... I disagree ... that the only plausible explanation is hydraulic fragmentation of cement.  In my opinion, rapid evacuation of mud in mud channels, and a second breach in the production casing, are more likely candidates for the 'material destruction process' needed to account for the rapid increase in flow rate modeled by Add Energy."[9]<br><br>"I strongly disagree with Momber's [hydraulic fragmentation] theory....  It is virtually impossible for it to occur in a space confined by 7 inch diameter high strength pipe (casing), 189 feet long.  The buildup of hydrostatic stress prevents the displacements required to crease the cement fractures required for a network of flow paths....  The most likely cause of the sudden increase in flow when the float collar conversion attempts hit 3142 was the straightening out and rupture of a tubular (casing in this case) that had been previously buckled."[10] |
| "The cement barrier in question is located between the shoe and float collar.... [C]ement also filled part of the annulus and would have provided a barrier to flow there as well.... The Halliburton Post Job Report states that there is 189 feet of cement in the shoe track....  In other words, there was 38 cubic feet (around 7 barrels) of cement located in the Macondo's shoe track....  The conditions of the cement in the shoe track and annulus are not known with certainty.  But the fact that others have concluded that oil flowed up the casing suggests that the cement structure was disturbed....  The existence of pre-existing flow channels cannot be neglected in flow-condition and erosion analyses.  These flow channels will alter the structure of the cement material, and they can act as pathways for penetrating fluids."[11] | "Momber incorrectly analyzes the location of cement and the 'hydrocarbon penetration path.'  [...]   BP's operations caused a breach in the casing below the float collar.  The existence of a breach in the casing means that the cementing could have been conducted without an effective shoe track....  Thus, Dr. Momber is incorrect in assuming that the entire bottom-hole section of the Macondo well was uniformly filled with competent cement, and that there was an intact shoe track filled with cement."[12] |

---

[8] Momber Report, at pp. 7 – 8, 14 (Exhibit 7).
[9] Rebuttal Report of Kris Ravi, dated June 10, 2013, at p. 14 (Exhibit 9).
[10] Rebuttal Report of Glen Stevick, dated June 10, 2013, at p. 12 (Exhibit 10).
[11] Momber Report, at p. 5 – 6 (Exhibit 7).

3

| Momber's Opinion | HESI's Rebuttal |
|---|---|
| "The conditions for the formation of channels may have been present at Macondo. This would include the following possibilities:<br>- contamination of the cement by nitrogen breakout and migration from nitrified foam cement;<br>- inadequate design of the cement;<br>- inadequate testing of the cement."[13]<br><br>"We have shown the possibility that the cement initially had substantial flaws, such as a net of cracks or other capillaries, and a net of voids separated by cement bridges."[14] | "The cement designed by HESI was capable of stopping flow, it was adequately tested, and the cement job was executed as planned."[15]<br><br>"There is no support for ... Momber's conclusion that flaws within the cement (*e.g.*, porous cement caused by nitrogen breakout) could be a contributing factor for the creation of a possible flow path. To the extent that there were any flow channels in the cement, they would have been caused by BP's operational decisions."[16] |

Ravi's and Stevick's opinions properly and directly rebut the assumptions critical to Momber's opinions. Indeed, throughout his Report and subsequent deposition, Momber relies on unsupported assumptions and a partial record for the purpose of his analysis on cement erosion, while at the same time re-iterating BP's continued criticism of HESI's cement. Specifically, BP attempts to backdoor into Phase II its theory of nitrogen breakout, which it failed to support through any expert at the Phase I Trial, to argue that the downhole cement was permeable. Striking Ravi's and Stevick's opinions would leave HESI without an opportunity to defend itself against BP's baseless attacks. As this Court is well aware, HESI did not write the sections of Momber's Report discussing cement and flow path. Momber selected this language, and BP cannot prevent HESI from responding. Nonetheless, by attacking HESI's rebuttal experts, BP once again seeks to limit HESI's ability to properly present its defense through reliable expert testimony and attempts to hide from the Court the true explanations regarding the initial and subsequent flow amounts. Accordingly, the Court should deny BP's request to strike Ravi's Phase II Rebuttal Report and Stevick's Phase II Rebuttal Report, Section II(b)(i), and permit HESI an opportunity to be heard on these issues.

## Argument

BP is using Momber's Report as a sword and a shield. On the one hand, it uses his quantification analysis to argue the likelihood that nitrogen breakout created a flow path, while paradoxically arguing that HESI's shoe track cement also served as an impediment to flow for days. BP, however, also seeks to limit the scope of the Momber Report so as to preclude HESI from properly rebutting his opinions, to offer an alternative explanation that accounts for the Emilsen data that Momber relied on (*e.g.,* casing breach), and to expose Momber's faulty assumptions about cement permeability and initial flow.

---

[12] Ravi Rebuttal, at p. 5 – 6 (Exhibit 9).
[13] Momber Report, at p. 6 (Exhibit 7).
[14] *Id*., at p. 14 (Exhibit 7).
[15] Ravi Rebuttal, at p. 4 (Exhibit 9).
[16] *Id.*, at p. 2 (Exhibit 9).

4

For purposes of context and to assist the Court, HESI offers the following synopsis of the key contentions relating to Momber's analysis:

1) BP argues that the initial flow rate was at most **5,000 stb/d**. In support of this estimate, BP relies on various theories of cement erosion/fragmentation and/or metal erosion in the BOP to suggest that there were impediments to initial flow and that these impediments remained for a significant period of time during the Macondo blowout. Momber supports the theory that the shoe track cement was initially a serious impediment to flow, despite his contention that the initial flow path was through porous cement occasioned by nitrogen breakout.

2) The United States argues that the initial flow rate was as high as **60,000 stb/d**. It counters BP's cement impediment theory by arguing either that the cement would have eroded away quickly (through its experts, Stewart Griffiths and Ronald Dykhuizen) or by arguing that the cement was not an impediment because it was not set (through its expert, Glen Benge).

3) HESI's analysis, through Ravi and Stevick, presents a third option that accounts for Emilsen's flow rate modeling of the initial blowout period and that sheds light into the quantification analysis. Specifically, Ravi and Stevick rebut Momber's opinions regarding the initial flow of the Macondo well and demonstrate that casing breach, and not cement fragmentation, actually corresponds to the data that Momber relies on for purpose of his cement erosion quantification analysis.

While BP may argue that the topics raised by Ravi and Stevick were already raised by Phase I of the litigation, the reality is that the initial flow path is crucial to understanding Momber's Phase II analysis. Indeed, as the following exchange from his deposition illustrates, Momber agrees that his analysis is affected by the volume of cement at the bottom of the well and its placement:

> Q.   Determining the flow path is – affects the quantity of flow, fair?
> A.   Yes.
> Q.   And that's because along that flow path there are various restrictions that could affect the quantity of flow, fair?
> A.   Yeah, I think so.
> Q.   ... One of the potential restrictions in the flow path of Macondo was annulus cement, correct?
> A.   It's a possible restriction.
> Q.   And the one you focused on almost exclusively was shoe track cement, correct?
> A.   Yes.
> Q.   There are other mechanical devices in the Macondo flow path or potential mechanical devices depending on the flow path, and I think you identified one as the reamer shoe, correct?
> A.   Yes.

5

> Q. Another one could be the float collar that you identified, correct?
> A. Yes.
> Q. ... [I]t is important to understand how much cement was at the bottom of the well because, as you just indicated before, the cement is a potential restriction, correct?
> A. There were two questions. First question is yes. Second question, yes.
> Q. And whether you agree or not, if that shoe track was filled only halfway with cement, that would affect your erosion analysis, correct?
> A. It would affect the erosion great, analysis, yes.
> Q. And would you agree with me that this is because the nature or the size of that restriction would change if the shoe track is only half filled with cement?
> A. ... The size, yes.
> Q. But your analysis assumed 189 feet of cement in the shoe track, right?
> A. That is right, yes.
> Q. And if there were only 30 feet from the float collar down, that would affect your erosion analysis, correct?
> A. This is correct.
> ...
> Q. If you assume that there is ... coverage across all ... of the hydrocarbon bearing sands, that would affect the type of restriction or the extent of the restriction of flow between the formation and the casing, correct?
> A. Yes, I think so, yes.
> Q. ... If there was [partial] coverage, that, too, would affect the ... quantification of flow through that cement restriction, correct?
> A. Yes.
> Q. So, placement of cement, actually affects the analysis of restrictions that impact flow – quantification of flow, correct?
> A. Yes.[17]

Despite these key admissions, BP nonetheless insists that HESI's Rebuttal Reports, which directly address these issues, should be stricken as impermissible rebuttal testimony. The following exchange further highlights why HESI needs a rebuttal witness to respond to Momber's unfounded attacks:

---

[17] Deposition of Andreas Momber, 506:20 – 512:3 (Exhibit 8).

2198224 v2-24010/0002 PLEADINGS

> Q. So is it going to be your testimony to Judge Barbier that the flow from the Macondo well was through a porous, permeable cement through the shoe track?
> A. Yeah, the flow is through a deteriorated, disturbed cement in the shoe track that provided ... a flow path....
> Q. My question was are you going to testify to Judge Barbier that the well was flowing through a porous, permeable cement in the shoe track?
> A. No, through a cement and deteriorated structure.
> Q. And what is that deteriorated structure?
> A. This is a combination of pores, cracks, flaws, and interfaces just mentioned.
> Q. And what is the basis for your opinion that there is a combination of pores, cracks, flaws, and interfaces?
> A. This is from what I know from my experience in dealing with cement and composite materials or cement-based composites, that if the design not properly done, is not properly tested, that these circumstances would lead to a structure like this.
> ...
> Q. So you're going to tell Judge Barbier that you have enough experience to tell him what happened in – to the shoe track cement at the bottom of the Macondo well?
> A. Based on my experience on designing cement-based materials, other testing of cement-based materials, I know that the design was not proper of this material, that this would create weak zones like we just discussed in that type of material in general. A cement that is not properly done will always contain pores, flaws, cracks, and other interfaces.[18]

Momber intends to testify about the very issues that HESI rebuts through Ravi & Stevick and that are addressed by other experts, including Stewart Griffiths, Ronald Dykhuizen, and Mehran Pooladi-Darvish – namely the role of cement and its potential impact on Phase II quantification. Given that multiple experts opine on this issue, there is hardly anything improper about HESI offering rebuttal opinions about its own cement. It is absurd to suggest that both the United States and BP can castigate HESI's cement in connection with the issue of quantification in Phase II, and yet HESI – the cement contractor – is precluded from offering a rebuttal analysis that explains its position regarding the role of cement in Phase II. Accordingly, HESI must be provided with an opportunity to present a rebuttal to challenge Momber's underlying assumptions and statements about the location and placement of cement as it pertains to restrictions on flow.

---

[18] *Id.* at 208:23 – 210:24 (Exhibit 8).

2198224 v2-24010/0002 PLEADINGS

This is not unlike what the United States does through the Phase II Rebuttal Reports of Glen Benge and Ronald Dykhuizen. In his report, Benge rebuts Momber and opines that there could not have been any erosion of cement because the cement did not set.[19] Similarly, Dykhuizen assumes "unset or poorly formed cement" failed completely and quickly, not in two separate phases as proposed by Momber.[20] These opinions relate to Phase I, yet BP has not moved to strike them, likely because it recognizes the interrelated nature between Phase I and Phase II. HESI's use of the Ravi Report and the Stevick Report is the same – it challenges Momber's assumptions about the location and volume of cement and suggests a casing breach as another plausible explanation for the data that affected where cement was placed and, thus, the extent of restrictions to flow. The end-result, however, would be the same because it would tend to undermine Momber's assumptions about initial flow and the rate of cement erosion. Indeed, Dr. Pooladi-Darvish and Stewart Griffiths, United States' Phase II experts, opined that a casing breach was a possibility.[21] Furthermore, the idea of a casing breach is not a new concept, and has been acknowledged by other experts, including Glen Benge[22], Gene Beck,[23] and Robert Grace,[24] as well as the testimony or documents of Brian Morel,[25] Mark Hafle,[26] and Jonathan Sprague.[27]

Moreover, Momber argues that his belief in nitrogen breakout is a "reasonable assumption," and he states that he would opine that nitrogen migration was a "very possible scenario."[28] Indeed, Momber's testimony is riddled with assumptions about the quality of cement, including his belief that the cement was "pre-damaged."[29] Given Momber's opinions on these topics and his lack of knowledge about this issue,[30] it would be inequitable to prohibit HESI from proving the fallacies in his opinions through proper rebuttal testimony, and it would effectively leave no response to BP's and the United States' criticism of the cement. The Court should, therefore, permit HESI to rebut these assumptions and any testimony concerning these topics.

For the foregoing reasons, the Court should reject BP's gamesmanship and deny BP's Motion to Strike.

---

[19] Rebuttal Report of Glen Benge, June 10, 2013, at p. 2 (Exhibit 11).
[20] Rebuttal Report of Ronald Dykhuizen, June 10, 2013, at p. 12 (Exhibit 12).
[21] Deposition of Mehran Pooladi-Darvish, 612:24 – 615:21 (Exhibit 13); Deposition of Stewart Griffiths, 605:19-608:18 (Exhibit 14).
[22] Deposition of Glen Benge (Phase I), 101:1 – 102:25 (Exhibit 15).
[23] TREX 8140, at pp. 62 – 77 & 84 - 85 (Exhibit 16).
[24] Deposition of Robert Grace, 347:16 – 348:20 (Exhibit 17).
[25] TREX 2584 (Exhibit 18).
[26] TREX 4457 (Exhibit 19).
[27] Deposition of Jonathan Sprague (Phase I), 712:21 – 713:12 (Exhibit 20).
[28] Momber Dep., 157:1 – 157:24 & 268:23 – 269:1 (Exhibit 8).
[29] *Id.* at 395:8 – 396:3 (Exhibit 8).
[30] *Id*. at 269:2 – 269:12; 272:8 – 272:11; 532:9 – 533:6 (Exhibit 8).

2198224 v2-24010/0002 PLEADINGS

Respectfully submitted,

*Donald E. Godwin* (signature)

Donald E. Godwin

Exhibits

cc    (by electronic mail)
      United States' MDL Counsel
      States Liaison Counsel
      Plaintiffs' Liaison Counsel
      Defense Liaison Counsel

9

2198224 v2-24010/0002 PLEADINGS