**EXHIBIT 1**

1

09:31:22  1        UNITED STATES DISTRICT COURT
       2          EASTERN DISTRICT OF LOUISIANA

       3    *******************************************************

       4    IN RE:  OIL SPILL BY THE          Docket No. MDL-2179
            OIL RIG *DEEPWATER HORIZON*       Section "J"
            IN THE GULF OF MEXICO ON          New Orleans, LA
       5    APRIL 20, 2010                    Friday, June 28, 2013
            CIVIL
       6
            *******************************************************
       7
                TRANSCRIPT OF WORKING GROUP STATUS CONFERENCE PROCEEDINGS
       8          HEARD BEFORE THE HONORABLE SALLY SHUSHAN
                      UNITED STATES MAGISTRATE JUDGE
       9

      10    APPEARANCES:

      11    FOR THE PLAINTIFFS:          IRPINO LAW FIRM
                                         BY:  ANTHONY IRPINO, ESQ.
      12                                 2216 Magazine St.
                                         New Orleans, LA 70130
      13

      14                                 LEVIN PAPANTONIO THOMAS MITCHELL
                                         RAFFERTY & PROCTOR
      15                                 BY:  BRIAN H. BARR, ESQ.
                                         316 South Baylen Street, Suite 600
      16                                 Pensacola, FL 32502

      17
            FOR MDL 2185:                MITHOFF LAW FIRM
      18                                 BY:  WILLIAM J. STRADLEY, SR., ESQ.
                                         One Allen Center - Penthouse
      19                                 500 Dallas Street
                                         Houston, TX 77002
      20

      21    FOR THE STATE OF LOUISIANA:  KANNER & WHITELEY
                                         BY:  ALLAN KANNER, ESQ.
      22                                      DOUGLAS R. KRAUS, ESQ.
                                         701 CAMP STREET
      23                                 NEW ORLEANS, LA 70130

      24

      25

| | | |
|---|---|---|
| 09:57:37 | 1 | issue to the court.  Our position is that he is in direct response |
| 09:57:41 | 2 | to Mr. Momber, perhaps Dr. Momber, who is a BP expert who raised |
| 09:57:46 | 3 | the issue of permeability of cement in his report and Dr. Ravi has |
| 09:57:51 | 4 | been offered as a rebuttal on that issue.  And that's all I'll say |
| 09:57:54 | 5 | about that. |
| 09:57:55 | 6 | With regard to the procedural standpoint, BP provided us |
| 09:57:59 | 7 | an e-mail yesterday setting out their position regarding his |
| 09:58:02 | 8 | report, Mr. Bowman who is leading up that issue is in deposition |
| 09:58:06 | 9 | today and as I understand it -- Rob, you can correct me if I'm |
| 09:58:10 | 10 | wrong -- has promised to get back to BP no later than Monday, so |
| 09:58:13 | 11 | that we can try to if we need to tee the issue up we can tee the |
| 09:58:16 | 12 | issue up. |
| 09:58:16 | 13 | THE COURT:  Let's handle that with a conference call |
| 09:58:18 | 14 | rather than any kind of briefing or anything.  Seems to me if we |
| 09:58:23 | 15 | need to tackle it we can. |
| 09:58:25 | 16 | MR. GASAWAY:  Okay.  And, your Honor, I would just say in |
| 09:58:28 | 17 | terms of the scheduling issue, which is where we are now, Sarah's |
| 09:58:32 | 18 | most recent schedule reflects two days; and when I did talk to |
| 09:58:35 | 19 | Mr. Bowman yesterday, he said let's put the two days on the |
| 09:58:38 | 20 | schedule.  We'll keep him there depending on how much of the report |
| 09:58:42 | 21 | survives our advocacy and conference call.  So in terms of the |
| 09:58:46 | 22 | procedural posture, I think both sides are happy as far as I know. |
| 09:58:51 | 23 | MR. YORK:  Yes. |
| 09:58:53 | 24 | THE COURT:  Okay.  Both sides are happy, how did that |
| 09:58:57 | 25 | happen? |

# EXHIBIT 2

**EXPERT REPORT**
**U.S v. BP Exploration & Production, Inc., et al.**

## Oil Release from the MC252 Macondo Well

Prepared on Behalf of the United States

Prepared by:

**Stewart K. Griffiths**
**348 Whiteoaks DR NE**
**Albuquerque, New Mexico 87122**

**March 22, 2013**

Stewart K. Griffiths

1

*Confidential per BP*

## EXECUTIVE SUMMARY

The purpose of my study was to quantify flow rates and the cumulative discharge of oil from the Macondo well over the roughly 86 days following blowout. I conclude that the cumulative discharge was 5.0 million stock-tank barrels (mmstb). Quantified uncertainties in this value are -13.9% and +9.7%, leading to bounds on this nominal value of 4.3 to 5.5 mmstb. The flow rate just following blowout was approximately 63,000 stock-tank barrels per day (stbd). This flow rate decayed to approximately 55,000 stbd just prior to installation of the capping stack.

To obtain these values, I developed a physically-based empirical model describing flow in the reservoir, wellbore, BOP, and capping stack. This model is physically-based because it is built on two underlying principles of fluid dynamics. The first of these is conservation of mass. That is, the mass of stock-tank oil entering any segment along the flow path must also exit that segment. The second is that flow rates exhibit certain specific relations to the frictional pressure drop, depending on whether the flow is laminar or turbulent.[1] For laminar flows, as in the reservoir, the flow rate is simply proportional to the pressure drop. For turbulent flows, as in the wellbore, BOP, and capping stack, flow rates are proportional to the *square-root* of the pressure drop. Provided a measured flow rate and pressure drop at one condition, I can therefore calculate flow rates at other conditions for which just the pressure drop is known. This model is also empirical in nature because I determined the constants of proportionality relating flow rates to pressure drops from pressures and flow rates that were actually measured. All pressures and flow rates discussed in my report were measured by BP.

Through this methodology, utilizing a combination of theory and empiricism based on BP data, I believe the model very accurately represents the well from a perspective of flow without the need for details of the flow path or physical dimensions along it. And because the model conserves mass along the flow path, the pressure drop between any pair of known or measured pressures can be used to compute flow rates over the 86 days of interest.

My best estimate of the discharge was calculated using this model along with pressure differences (drops) between reservoir pressures and pressures measured at the bottom of the BOP periodically over the 86 days. An important advantage of using this particular pair of pressures is that resulting calculated flow rates and the cumulative discharge automatically account for the many alterations of the wellhead geometry downstream of the BOP gauge through their influence on BOP pressures. Removal of the marine riser, installation of the top-hat, and even erosion of the BOP rams are all therefore dealt with in a rigorous manner without need for detailed knowledge of the changing wellhead geometry.

Related key findings of my study are that:
- The top-kill activities between May 26 and 29 had essentially no lasting influence on flow rates and very little impact on the cumulative discharge.
- Removal of the marine riser increased flow rates from the well by roughly 3%.
- Any significant erosion of the BOP rams, pipe, riser, and cement barrier in the bottom of the well occurred rapidly over the first few days following blowout. Subsequent erosion had little impact on flow rates or on the cumulative discharge.

I established the validity of this model and its underlying assumptions through comparison with various measured pressures and flow rates, comparison with well-established models of two-phase flow, and comparison with calculations done by BP. Validity of the model was further established through two alternative calculations using the fixed ambient sea pressure to calculate historical flow rates, both of which yield a cumulative discharge that is within 2% of my best estimate. I established accuracy of the model and my best estimate of the discharge through a quantitative analysis of uncertainties.

---

[1] The frictional pressure drop is simply the difference in pressure between two points along a flow path, excluding the difference due to gravity. This difference due to gravity is usually referred to as the elevation head. Laminar flows are characterized by smooth orderly behavior as one layer of fluid slides past another. Turbulent flows are characterized by extensive mixing, folding, and chaotic motion.

4

*Confidential per BP*

# EXHIBIT 3

In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in
The Gulf of Mexico, on April 20, 2010

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
MDL NO. 2179, SECTION J
JUDGE BARBIER; MAGISTRATE JUDGE SHUSHAN

# Modelling Macondo

## A calculation of the volume of oil released during the *Deepwater Horizon* incident

Prepared on Behalf of BP Exploration & Production Inc. and Anadarko

Prepared by:

**Martin J. Blunt**

**Department of Earth Science and Engineering**
**Imperial College, London SW7 2AZ, UK**
**May 1st, 2013**



**CONFIDENTIAL**

M J Blunt Expert Report

This constraint explains how Dr. Pooladi-Darvish, who considered 25 quite different scenarios, can apparently match the pressure data with only a narrow range of cumulative-release numbers at or near 5 MMstb; when he relaxed the assumption of a constant outflow, he was able to find lower values.[14] His superficially impressive array of seemingly diverse simulations essentially answers the question: "If I *assume* a cumulative flow of around 5 MMstb, what are the consistent reservoir properties?" As I show in Section 4 and in Appendix F.4, the reservoir properties that he input to make his model match the pressure data lie outside the measured values, precluding the ability to validate his assumption of constant outflow. This is a key flaw in this approach: since it is not possible to know the outflow with any certainty during the earlier part of the spill, these assumptions are, at best, somewhat speculative, and in any event, do not truly amount to an independent assessment of cumulative flow.

**3.5.2 Evidence for an increasing flow rate caused by erosion of obstacles in the flow path.** There is persuasive evidence that the outflow configuration did, in fact, change over time. For example, Phase 1 expert Dr. Emilsen concludes that at the time of the blow-out, the oil flowed into the well-bore over a restricted interval of the reservoir, perhaps because of residual cement blocking the flow. This would lead to an additional pressure drop between the reservoir and the well-bore, causing a slower flow rate at the outset of the incident, rather than the higher rate assumed by the Government experts. At the end of the incident, just before the well was cemented, the injectivity test showed negligible resistance: the measured pressure increase on injection was an order of magnitude less than if these impediments were still present.[15]

Outflow impediments in oil wells are common: petroleum engineers are accustomed to planning for huge losses in pressure (the driving force of flow rate) from such restrictions. However, petroleum engineers generally consider them to be fixed over time, unless particular efforts are made to increase the flow from the well (by injecting acid, fracturing or making new perforations through the casing). This perhaps explains why Dr. Hsieh neglected this effect completely, while Dr. Pooladi-Darvish considered only a constant additional flow resistance.

Unlike a normal well, the Macondo oil flow was unplanned and uncontrolled: the flow resistance between the reservoir and the well-bore most likely decreased over time, as the oil forced its way through more of the formation, perhaps through erosion of the cement, and as abrasive materials in the oil (such as sand or cement fragments) eroded barriers to flow, either in the blow-out preventer or in the equipment clogging the bottom of the hole. It is likely that initially there was a very large pressure loss down-hole, giving a low initial flow rate, which then rose over time as the restrictions eroded, even if we ignore changes in the surface equipment. It is very difficult to make a reliable estimate the magnitude or duration of this effect, making any calculation of cumulative flow that depends on assumptions about historical flow rates – particularly in the early period of the spill – highly unreliable. Government estimates that assume away this problem (Drs. Hsieh, Pooladi-Darvish, and Griffiths) are therefore unreliable. This confirms why it is so important to have an independent analysis that assesses the cumulative flow directly, such as the material balance method used here. Indeed, this is accepted

---

[14] *See* Pooladi-Darvish report [PD], page 26.
[15] *See* Final Emilsen report [27] and Appendix E.3 for further discussion and quantitative analysis.

# EXHIBIT 4

01-40976
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | ) ) ) ) ) ) ) | MDL NO. 2179 SECTION: J JUDGE BARBIER MAG. JUDGE SHUSHAN |

## *CONFIDENTIAL*

## *WorldwideVIEW* ™
### Interactive Deposition Digital Display

ORAL AND VIDEOTAPED DEPOSITION OF:



# Thomas O. Hunter, Ph.D.

**VOLUME 1**

OCTOBER 30, 2012

# *COPY*



Systems Technology for the Litigation World

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing
**For U.S. & International Services**
**800 - 745 - 1101**

1    restrictions that says:  "Cement, Skin,

2    Mechanical, Friction," and "Sanding."

3            Do you see that?

4        A.  I do.

5        Q.  To your knowledge, Dr. Hunter, what was

6    the restriction of cement in the wellbore?

7                MR. CHAKERES:  Object to form and

8    scope.

9        A.  I don't know what Ron intended by the

10   word "Cement."

11       Q.  (By Mr. Regan) Okay.

12       A.  There certainly was cement at different

13   places in the well that -- that -- that did --

14   that affected the flow.

15       Q.  To your knowledge, Dr. Hunter, did -- did

16   you or anyone from the DOE or National Labs ever

17   determine what restriction existed from the

18   cement across the productive reservoir zones in

19   the Macondo Well as it impacted potential flow?

20               MR. CHAKERES:  Object to scope.

21               MS. RICHARD:  Objection, form.

22       A.  If you mean potential flow up the

23   wellbore?

24       Q.  (By Mr. Regan) (Nodding.)

25       A.  Very little.  If you mean flow out the

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF LOUISIANA**

*In re: Oil Spill by the Oil Rig Deepwater Horizon
in the Gulf of Mexico on April 20, 2010 (MDL No. 2179)*

Before the Honorable Judge Carl J. Barbier

**EXPERT REPORT OF KERRY A. POLLARD**

*REVIEW OF US GOVERNMENT'S FLOW EXPERTS' FLOW RATE AND CUMULATIVE VOLUME ESTIMATES*

Submitted by Transocean Offshore Deepwater Drilling, Inc.

Respectfully Submitted,

Kerry A. Pollard P.E.

Date: May 1, 2013

Confidential

In the case of the BP Macondo well, the path of fluid flow is not through perforations, as none were performed, but some other path around the casing eventually into the wellbore. This Skin Factor is typically reflected in the PI and can be estimated from pressure transient analysis of pressure build up/drawdowns.

Skin is an adjustment factor used in some of the US government's experts' modeling to obtain a history match of the estimated flow and pressures.

K.     **Other reservoir properties:** There are other factors impacting the reservoir and its volume as well as ability to flow. Most hydrocarbon reservoirs have an irreducible **Water Saturation (Sw)** that occupies a portion of the porosity. This Sw is expressed as a percentage. In order for the OOIP to be accurate the Sw percentage is subtracted from 100 percent and the result is the **Oil Saturation (So)** percentage.

In determining the OOIP and modeling the reservoir, the **aerial (A)** extent of the reservoir and **height (h)** of the reservoir must be accurately reflected for both the OOIP determination and for realistic reservoir modeling. This h is commonly referred to as **net pay**. For complex models that break the reservoir into many grid blocks, the accuracy of the shape, size and heterogeneous nature of the reservoir will impact the results.

**Oil (Co) and Reservoir (Cf) Compressibility** are key elements in the reservoir modeling performed by the US government's flow experts. The accuracy of these elements is important in their determination of oil volumes.

## V.     <u>KEY WELLBORE AND WELLHEAD CONSIDERATIONS</u>

No one "over the counter" program was used by the US government's flow experts. Each method tried to either simulate the series of restrictions and flow paths or lump various complex paths into a single or simplified parameter (coefficient). For example, the flow experienced in the BP Macondo well caused problems modeling the flow from a known choke configuration in the capping stack. The purported inaccuracies are well documented and addressed in many of the US government's flow experts' reports.

A.     **Wellbore:** To fully understand the fluid flowing from the BP Macondo well, the wellbore must be properly depicted. The path from the reservoir to the wellbore was unknown. The status and location of drill pipe, fluid entry and casing/cement damage were unknown. Therefore assumptions had to be made in order to model it.

B.     **Wellhead:** Several parameters regarding the wellhead, its internal configuration and flow through it were unknown, and there were multiple possible flow configurations. For example, the series of BOPs, drill pipe, riser and chokes at various positions and conditions, as well as Top Hat, Capping Stack and other containment setups all contributed to the complexity and uniqueness of the fluid flow over time. To attempt to account for this complex fluid flow, the US government's flow experts had to make numerous assumptions.

6

Confidential

**EXHIBIT 6**

IN THE UNITED STATES DISTRICT COURT FOR

THE EASTERN DISTRICT OF LOUISIANA

*In re: Oil Spill by the Oil Rig Deepwater Horizon*
*in the Gulf of Mexico on April 20, 2010 (MDL No. 2179)*

Before the Honorable Judge Carl J. Barbier

## EXPERT REPORT OF DR. JOHN L. WILSON

*BP Internal Well Flow Rate Estimates in April and May 2010*

May 1, 2013

Submitted by Transocean Offshore Deepwater Drilling, Inc.

John L. Wilson, Ph.D.

CONFIDENTIAL

On the other hand most scenario options were continuous, but with a range of possible values.[25] For example a shallow choke was often represented by a so-called "orifice size." This refers to the equivalent measurement of a plate set across the diameter of the pipe, but allowing flow through a circular hole or orifice at its center. The orifice diameter can take on a value between zero (complete obstruction by the plate; the orifice is closed) and the diameter of the pipe (no obstruction). Some modeling packets of the shallow choke scenarios included more than a half-dozen orifice sizes. A second example is the "skin" measurement, which is a numerical value that describes the connectivity between the well and reservoir.[26] In the case of the Macondo well, BP engineers suggested skin values between 0 and 50 (a skin of 0 represents no obstruction). Instead of simulating all possible values of skin in this range, they typically selected one to as many as three (e.g., 10, 20, 50).

Other parameters with continuous values within a certain range were the reservoir thickness, permeability, and productivity index. The *Deepwater Horizon* drilled approximately 88 feet into the reservoir, but it was uncertain how much of the reservoir was in communication with the well after the blowout. To test this issue smaller thicknesses were sometimes considered, typically 44 feet and 12 or 10 feet. Reservoir permeability was sometimes varied as well, typically from the expected value of 300 mD (millidarcys) to a smaller value like 170 mD.[27] Productivity index (PI), a measurement of flow rate over pressure drop at the reservoir sand face, was also adjusted using test values. A high PI means a reservoir can produce relatively more hydrocarbons. The day after the blowout, BP's reservoir engineers calculated a PI of 50 for the Macondo well, meaning the well could produce 50 barrels per day per psi (flow rate over the pressure drop between the reservoir and the bottomhole pressure at the well).[28] By contrast, in mid-May, other BP engineers were applying a PI (bbl/day/psi) of only 1, 2, 4, or 5 in order to achieve very small model flow rates, in essence treating the PI as a model calibration parameter in order to "match" a prescribed target flow rate.[29]

---

[25] An example of a continuous event is the amount of time it takes to commute to the office in the morning; this number varies given any number of factors such as the weather, how much traffic there is, and whether there is construction on the roads.

[26] A conventional way to imagine skin is as an air conditioning filter around the base of the well. If there is zero skin, the filter is "clean" and hydrocarbons pass without obstruction into the wellbore. If the filter is "dirty," perhaps because the rock face has been damaged by drilling, or sand or silt has become entrapped in the porous rock by flow, hydrocarbons cannot move into the wellbore as quickly and the well is said to have a higher "skin". In this case, the skin represented whatever flow path existed between the reservoir and the well (through the failed cement job, for example).

[27] Permeability measures the ability of fluid to flow through rock or other porous media. It is represented by a unit of measure called the "millidarcy" (mD). An example of modeling that varies these continuous values is summarized in a slidepack from Mike Mason's group in Deposition Exhibit 9156, which will be described further below.

[28] Email from Walt Bozeman to Kurt Mix, et al., April 21, 2010, Deposition Exhibit 9480 ("We are calculating a PI of 50 bbl/psi.")

[29] Deposition of Adam Ballard, October 16, 2012, 128:3-9; Email from Tim Lockett to Trevor Hill, May 13, 2010, Deposition Exhibit 9448.

CONFIDENTIAL

# EXHIBIT 7

**In re: Oil Spill by the Oil Rig "Deepwater Horizon" in
the Gulf of Mexico, on April 20, 2010**
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
MDL NO. 2179, SECTION J
JUDGE BARBIER; MAGISTRATE JUDGE SHUSHAN

**Expert Report of Andreas Momber**

**EROSION OF WELL-CEMENT DUE TO HYDROCARBON FLOW**

May 1, 2013

**CONFIDENTIAL**

Understanding erosion (and other potential processes I discuss) is a crucial aspect of understanding the cement flow path and how it might have changed over time, because erosion will notably affect the flow rate of the oil.  This is intuitive: the amount of resistance/restriction in the bottomhole impacts the amount of oil that can flow into the well--for example, the size of the opening in the cement (such as channels) can impact the amount of oil that flows into the well.

Nevertheless, the government experts have not developed a thorough approach to investigate the effects of erosion of the well cement, as I will discuss next.

2.2      Consideration of cement erosion in the United States' Expert Reports

Cement erosion is briefly mentioned in the reports of Griffiths and Dykhuizen, but both experts make unfounded assumptions regarding the amount and rate of erosion.  The Griffiths Expert Report claims that *"significant erosion of the ... cement barrier in the bottom of the well occurred rapidly over the first few days following blowout.  Subsequent erosion had little impact on flow rates or on the cumulative discharge."*[2]  Yet he acknowledged that *"the methodology I used cannot address ... erosion directly."*[3]

Dykhuizen wrote that *"I do not believe that erosion had a significant effect on overall flow from the well past the second day of the blowout."*[4]  Neither offers any convincing proof to support their assertions.

Thus, although these experts accept erosion of several parts of the flow path for the first few days after the blowout, they ignore it for later periods.  These experts attempt to justify this by suggesting that such a position follows from undisclosed *"simple models."*  Griffiths, looking at Emilsen's work in BP's *Deepwater Horizon Accident Investigation Report*, admits that there was some sort of blockage downhole at the beginning of the incident.[5]  Griffiths contends that Emilsen's work showed an increase in net pay from zero to between 13 and 16.5 feet over a 30 minute period (from 21:00 and

---

[2] Griffiths Report , 4 (2013).
[3] *Id.*
[4] Dykhuizen Report, 11 (2013).
[5] Griffiths Report at 11.

**3      Location and amount of well cement**

3.1      Location

The cement barrier in question is located between the shoe and float collar, as illustrated in *Figs. 2.1*

and *2.2*. It has the geometry of a column that can be characterized by its height ($h_C$) and its diameter

($D_C$). Indeed, this is a conservative assumption, because cement also filled part of the annulus and

would have provided a barrier to flow there as well.


3.2      Volume of well cement

The *Halliburton Post Job Report* states that there is 189 feet of cement in the shoe track.[8]   The

volume to be eroded ($V_C$) is simply the volume of cement in the cylindrical casing and is given as

follows:


$$V_C = \frac{\pi \cdot D_C^2}{4} \cdot h_C \qquad\qquad (3.1)$$


The internal diameter of the 7-inch-pipe (the production casing) is 6.094 inches.[9]  If we take this as

the diameter of the cement column ($D_C$=6.094 inch) and $h_C$=189 ft (57 m), then the volume of cement

($V_C$) in the column is approximately 38 ft³.  In other words, there was 38 cubic feet (around 7 barrels)

of cement located in the Macondo's shoe track.


**4      The conditions at Macondo may have allowed for channelling in the cement**

The conditions of the cement in the shoe track and annulus are not known with certainty.  But the

fact that others have concluded that oil flowed up the casing suggests that the cement structure was

disturbed.

---

[8] BP-HZN-2179MDL00154146.
[9] Bly Report, Appendix W, Table 1.3.

4.1     Flow channels

The existence of flow channels in deteriorated cement is an established phenomenon in well systems.  Some examples of flow channels that can form in deteriorated well cement are provided in *Table 4.1*.  Pre-existing flow channels can be subdivided into three general types (see *Table 4.1*):

-     an individual, comparatively large flow channel (situation 5 in *Table 4.1*);

-     a number of parallel capillaries (situation 3 in *Table 4.1*);

-     a net of cracks, pores and flaws (combination of situation 3 and 6 in *Table 4.1*).

The existence of pre-existing flow channels cannot be neglected in flow-condition and erosion analyses.  These flow channels will alter the structure of the cement material, and they can act as pathways for penetrating fluids.  The following two examples may illustrate these effects:

-     Cracks as small as 500 μm (millionths of a meter) in a cement-based composite can increase the permeability of the material by some orders of magnitude;[10]

-     Foam-type pores in concrete can increase its permeability by a factor of 10.[11]


4.2     Potential for formation of pre-existing channels in the Macondo well

The conditions for the formation of channels may have been present at Macondo.  This would include the following possibilities[12]:

-     contamination of the cement by nitrogen breakout and migration from nitrified foam cement;

-     inadequate design of the cement;

-     inadequate testing of the cement.

---

[10] *Lepech and Li, 2005.*
[11] *Sanjaya et al., 2007.*
[12] Bly Report, at 34.

6

| | Situation | Image | Importance |
|---|---|---|---|
| 1 | Between cement and casing |  | Contact stresses; interface shrinkage; deteriorated bond |
| 2 | Between cement and casing |  | Contact stresses; interface shrinkage; deteriorated bond |
| 3 | Through the cement |  | Insufficient mixing; unfinished hydration; pore system; high permeability; degradation |
| 4 | Through the casing |  | Casing erosion (solid particle/slurry erosion) |
| 5 | Through fractures in cement |  | Cracked cement |
| 6 | Between cement and formation |  | Contact stresses cement/ rock, developed during cement slurry setting |

Table 4.1: Possible flow paths in a deteriorated well; note situations 3 and 5[13]

Accordingly, it is quite reasonable to assume that the well cement had one or more channels in it by the time of the blowout.

5        Evidence for pre-existing flow channels and cement degradation

5.1      Emilsen's analysis suggests that there was some cement blocking the reservoir.

Emilsen modeled events leading up to and including the blowout.  The 200-psi pressure increase recorded at 21:08 on the night of April 20, 2010, was modeled by Emilsen by assuming hydrocarbon flow through the production casing shoe and through the well cement.[14]  This phenomenon could be

---

[13] Adapted from *Celia*, 2010.  I added the right column.
[14] Bly Report, Appendix W, at viii.

explained by assuming the existence of initially small channels in the cement between reservoir and wellbore.[15]

The instantaneous flow rates for Emilsen's best model match are reproduced in *Figure 5.1* below.[16] In this model, the flow rate gradually increased until just before 21:30; the flow rate then increased more rapidly. Griffiths asserts that this shows a fast erosive process.[17] I agree that it is instructive to assume that this change in model flow rate is related to the capability of the cement material to resist oil flow. The sudden change in flow rate around 21:30 may reflect a notable drop in the cement's resistance to flow. In other words, around 21:30, the cement began to permit more hydrocarbons to flow through it. Contrary to the assumption of the United States' experts, erosional processes cannot explain this short-time event. Other mechanisms must be considered at play.



*Figure 5.1*: Emilsen's simulation that most closely matched witnessed events and recorded data. It shows a varying oil influx rate over time.[18]

---

[15] *Id.* at 54 (noting that it is possible that there were initially small channels in the cement and that more of the reservoir became exposed as drawdown increased).
[16] *Id.* at 55.
[17] *See* Griffiths Report, page 11, n. 10.
[18] Bly Report, Appendix W, page 55.

8

**7      Alternative scenario**

7.1      Why an alternative scenario?

The possible rapid, early flow path increase cannot be explained with a standard erosion process, because it occurred much too fast.  It seems that another material destruction process may be involved - namely hydraulic fragmentation, which I explore next.


7.2      Hydraulic fragmentation

We have shown the possibility that the cement initially had substantial flaws, such as a net of cracks or a number of capillaries, and a net of voids separated by cement bridges.  We have also seen, based on the discussion of *Figure 5.1*, that there is a period where the oil flow rate in Emilsen's model changed from moderate numbers to higher numbers over a rather short period of time.  This suggests the possibility of hydraulic fragmentation during some short period around the time the modelled flow rate increased.   Hydraulic fragmentation is known from rock and concrete demolition.[30]  It is similar to the well-known process of hydraulic fracturing, but is characterized by a local pressure increase over a short period of time, leading to the rapid fragmentation of, or internal damage to, a given material volume.  Hydraulic fragmentation requires the existence of fluid-filled voids, flaws or capillaries and the sudden release of a particular pressurized fluid volume.  It is possible that such a situation existed in the Macondo well prior to the incident.

The quick release of pressurized oil into a large pre-existing pore or into a pre-cracked section in the well cement due to the collapse of local cement bridges could result in fragmenting, creating pathways allowing the penetration of a substantial volume of oil in a short period of time.

Pressures as low as 3,770 psi, are sufficient to fracture concrete by means of hydraulic fragmentation.[31]   But due to the lateral confinement of the cement volume in the steel pipe in the case of the Macondo well, the long cement column of about 189 feet, and the float collar and other equipment, the ejection of larger cement debris was prevented.  This would have limited the

---

[30] *Momber 1998, 2008; Hammelmann, 1996.*
[31] *Hammelmann, 1996.*

**EXHIBIT 8**

01-42958
PW/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG )     MDL NO.  2179
"DEEPWATER HORIZON" in the )
GULF OF MEXICO,  on )     SECTION: J
APRIL 20, 2010 )
                              )     JUDGE BARBIER
                              )
                              )     MAG. JUDGE SHUSHAN

## *CONFIDENTIAL*

## *WorldwideVIEW* ™
### Interactive Deposition Digital Display

ORAL AND VIDEOTAPED DEPOSITION OF:



# ANDREAS MOMBER

JULY 1 , 2013

## *COPY*



*Systems Technology for the Litigation World*

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing
**For U.S. & International Services**
**800 - 745 - 1101**

Q.      Okay.  And what is the basis for
your statement that the nitrogen migration
could lead to voids filled with gas?

A.      This is evidence from the Chief
01:14  Council's report.  It's been described there
as a very likely scenario.  It is even one of
the key findings, if I remember right, of the
Bly report.  So that sounds reasonable to me.
So that's why I considered this as a possible
01:15  source.

Q.      So you're relying on the Chief
Council's report and the Bly report for your
conclusions?

MR. EISENBERG:  Object to form.
01:15  A.      These are the major sources.
There were others, as I just mentioned.  As I
said, it sounded reasonable that's being
described there, and, yes, I considered it.

Q.      (BY MR. CERNICH)  So it sounded
01:15  reasonable, so you included it in your
report?

MR. EISENBERG:  Object to form.

A.      It is a reasonable assumption
that I finally made.

01:15  Q.      (BY MR. CERNICH)  It's an

208

1    actually happened on the Macondo well,

2    correct?

3        MR. EISENBERG:  Object to form.

4        A.    This representation on how

02:35  5    possible flow paths in the well could look.

6        Q.    (BY MR. CERNICH)  Possible flow

7    paths, but not the actual flow paths?

8        MR. EISENBERG:  Object to form.

9        A.    I don't agree completely.  The

02:35  10    actual -- of the actual flow paths.  Again,

11    you take a look at -- look at situation

12    No. 3, this is a flow path very, very likely

13    for the hydrocarbons to -- to penetrate the

14    well cement.

02:36  15        Q.    (BY MR. CERNICH)  And what is

16    the basis of that opinion?

17        A.    The basis is that the cement was

18    not in an ideal state.  That the structure of

19    the cement was disturbed as being shown here.

02:36  20    You will find all the flaws, the pores, and

21    the voids; and so this figure would very well

22    reflect these conditions.

23        Q.    Okay.  So is it going to be your

24    testimony to Judge Barbier that the flow from

02:37  25    the Macondo well was through a porous,

1   permeable cement through the shoe track?

2       MR. EISENBERG:  Object to form.

3       A.    Yeah, the flow is through a

4   deteriorated, disturbed cement in the shoe

02:37   5   track that provided us a flow path through

6   hydrocarbons.

7       Q.    (BY MR. CERNICH)  My question

8   was are you going to testify to Judge Barbier

9   that the well was flowing through porous,

02:37   10   permeable cement in the shoe track?

11       MR. EISENBERG:  Object to form.

12       A.    No, through a cemented and

13   deteriorated structure.

14       Q.    (BY MR. CERNICH)  Okay.  And

02:37   15   what is that deteriorated structure?

16       MR. EISENBERG:  Object to form.

17       A.    This is a combination of pores,

18   cracks, flaws, and interfaces just mentioned.

19       Q.    (BY MR. CERNICH)  Okay.  And

02:37   20   what is the basis for your opinion that there

21   is a combination of pores, cracks, flaws, and

22   interfaces?

23       MR. EISENBERG:  Object to form.

24       A.    This is from what I know from my

02:38   25   experience in dealing with cement and

210

1      composite materials or cement-based

2      composites, that if the design not properly

3      done, is not properly tested, that these

4      circumstances would lead to a structure like

02:38  5      this.

6            Q.     (BY MR. CERNICH)  Okay.  But you

7      have no experience with well cements,

8      correct?

9            A.     I don't have, but this is a

02:38 10      general issue for cement-based materials.

11            Q.     Okay.  So you're going to tell

12      Judge Barbier that you have enough expertise

13      to tell him what happened in -- to the shoe

14      track cement at the bottom of the Macondo

02:38 15      well?

16            A.     Based on my experience on

17      designing cement-based materials, other

18      testing of cement-based materials, I know

19      that the design was not proper of this

02:39 20      material, that this would create weak zones

21      like we just discussed in that type of

22      material in general.  A cement that is not

23      properly done will always contain pores,

24      flaws, cracks, and other interfaces.

02:39 25            Q.     I'm -- I'm having trouble here

1    formed voids, net of voids.

2         Q.      (BY MR. CERNICH)   Okay.   And you

3    take that possible nitrogen migration into

4    the shoe track cement from the Bly report,

04:17  5    correct?

6         A.      It's from the Bly report and

7    from the Chief Council's report, yes.

8         Q.      Okay.   So it's your contention

9    that the Chief Council's report says that

04:17  10   there was nitrogen break-out that penetrated

11   into the shoe track cement?

12        A.      Yes.

13        Q.      But these are all just -- just

14   possibilities that you list here, correct?

04:17  15        MR. EISENBERG:   Object to form.

16        Q.      (BY MR. CERNICH)   You can't tell

17   Judge Barbier that any of these, whether it

18   be a net of cracks, a number of capillaries,

19   or a net of voids separated by cement bridges

04:17  20   is actually what occurred on the Macondo

21   well, correct?

22        MR. EISENBERG:   Object form.

23        A.      Well, I -- well, I could tell

24   him integration of voids is very -- a very

04:18  25   possible scenario due to the nitrogen

1  migration.  I --

2          Q.      (BY MR. CERNICH)  What

3  experience do you have with nitrogen foam

4  cement?  None, correct?

04:18  5          A.      I don't have experience with

6  that, no.

7          Q.      Okay.  And so if you have no

8  experience in it, obviously you're not an

9  expert in nitrogen foam cement, correct?

04:18  10         MR. EISENBERG:  Object to form.

11         A.      This is correct.  I'm referring

12  to the information I got.

13         Q.      (BY MR. CERNICH)  Okay.

14         A.      But I did not finish my answer,

04:18  15  I guess.  I also could answer crack, network

16  cracks, that is a -- a scenario I have been

17  observing in my career as an engineer and as

18  a researcher all the time.  There is no

19  cement, there is not concrete.  This is free

04:18  20  of cracks.  This is just not possible.  There

21  is no concrete and no cement free of voids in

22  terms of pores, whether it's capillary pores,

23  whether it's gel pores.  They are all related

24  to the cement.  We have cement in the Macondo

04:19  25  well.  So I could tell him this is very, very

272

         Q.      (BY MR. CERNICH)  Okay.  And
1  what leads you to the -- conclude that there
2
3  was a possibility of a net of voids separated
4  by cement bridges on the Macondo well?
04:22 5       A.      What I was referring again to
6  the possibility of the nitrogen migration
7  that would form such a structure.
8       Q.      Okay.  But you've never observed
9  nitrogen migration in any other cements or
04:22 10  concretes you've investigated, correct?
11       A.      This is correct, yes.
12       Q.      I'm looking at Figure 7.1 on
13  Page 15 of the report.  Did you create this
14  figure?
04:23 15       A.      This was provided to me.
16       Q.      Provided to you by counsel?
17       A.      Yes.
18       Q.      Okay.  Did you ask counsel to --
19  to prepare this for you?
04:23 20       MR. EISENBERG:  I'll direct you not to
21  answer about any of our conversations.
22       Q.      (BY MR. CERNICH)  Are you aware
23  that this image or an image much like it was
24  circulated to the parties as a demonstrative
04:23 25  for the Phase 1 trial?

1   lower limit for the compressive strength of

2   this well cement, there would be a -- it

3   would be a number -- a -- we -- I assumed for

4   some reasons and in agreement with

10:04   5   Dr. Griffiths' statement that this cement was

6   in a reasonable good condition or I think it

7   was -- was reasonably intact.

8        Q.      (BY MR. CERNICH)   **Well, you're**

9   **not relying on Dr. Griffiths to tell you the**

10:04  10   **condition of the Macondo cement, are you?**

11       MR. EISENBERG:  Object to form.

12       A.      I wasn't finished with my

13   answer.  Well, I -- I'm dealing with -- with

14   him, with his report, and he made assumptions

10:04  15   on the -- on the condition of the cement,

16   mentioning it reasonably intact.  So I also

17   assumed for reasons I said the concrete is

18   set.  Yes, it's pre-damaged.  But for being

19   considered a set concrete, you can assume a

10:05  20   compressive strength of, I think, 500 psi.

21   For my understanding, this is a number

22   accepted in the community.  So we have -- we

23   have this number as the lowest compressive

24   strength number.  So this is the answer to

10:05  25   your question, actually.  You said what range

1    might be required.  My answer would be so

2    500 psi might be the lowest number we should

3    consider.

4         Q.    (BY MR. CERNICH)  That wasn't

10:05   5    quite the answer to my question, but you --

6    you've raised a couple other questions.

7    You've mentioned 500 psi is a number accepted

8    in the community.  In what community?

9         A.    I mean, for -- for cementing

10:06  10    jobs.

11         Q.    Okay.  And how do you know that?

12    Do you mean cementing jobs on -- on wells?

13         A.    On wells, yes.

14         Q.    Okay.  And how do you know that?

10:06  15         A.    This is being discussed in the

16    testimony of Jesse Gagliano.

17         Q.    The Congressional testimony of

18    Jesse Gagliano?

19         A.    The Congressional testimony,

10:06  20    yes.

21         Q.    So that's where I'd find the --

22    the reference to this.  So you're relying on

23    Mr. Gagliano's testimony to tell you that 500

24    psi is an accepted compressive strength in

10:06  25    the -- in the oilfield cementing community?

506

```
 1        Q.      And quantification refers to
 2   quantifying flow rate -- or quantifying flow,
 3   correct?
 4        A.      I'm not here for quantifying
 5   flow.
 6        Q.      Okay.  But the work that you did
 7   affects BP's quantification of how much
 8   hydrocarbon flowed out of the Macondo well,
 9   fair?
10        A.      This is okay.
11        Q.      Okay.  And you would agree with
12   me that before you can make a reasonably
13   accurate estimate or calculation on quantity
14   of flow, you have to understand what the flow
15   path is, correct?
16        MR. CERNICH:  Object to form.
17        MR. EISENBERG:  Object to form.
18        Q.      (BY MR. HILL)  Sorry.  Correct?
19        A.      Can you repeat it, please?
20        Q.      Yeah.  Determining the flow path
21   is -- affects the quantity of flow, fair?
22        MR. CERNICH:  Objection.
23        A.      Yes.
24        Q.      (BY MR. HILL)  And that's
25   because along that flow path there are
```

1    various restrictions that could affect the
2    quantity of flow, fair?
3          MR. CERNICH:  Object to form.
4          A.    Yeah, I think so.
02:34 5          Q.    (BY MR. HILL)  And we've already
6    talked about some of those.  So I just want
7    to make sure that it's clear for the Judge.
8    One of the potential restrictions in the flow
9    path of Macondo was annulus cement, correct?
02:34 10         A.    It's a possible restriction,
11   yes.
12         Q.    And the one that you focused on
13   almost exclusively was shoe track cement,
14   correct?
02:34 15         MR. EISENBERG:  Object to form.
16         A.    Yes.
17         Q.    (BY MR. HILL)  There are other
18   mechanical devices in the Macondo flow path
19   or potential mechanical devices depending on
02:34 20   the flow path, and I think you identified one
21   as the reamer shoe, correct?
22         A.    Yes.
23         Q.    Another one could be the float
24   collar that you identified, correct?
02:35 25         A.    Yes.

508

```
 1        Q.     Now, you would agree with me

 2   that before you can actually understand the

 3   flow of hydrocarbons in the Macondo well, you

 4   first have to understand how much cement was

 5   likely at the bottom of the well, correct?

 6        MR. EISENBERG:  Object to form.

 7        A.     What do you mean with

 8   "understand the flow"?

 9        Q.     (BY MR. HILL)  Well, let me ask

10   you, what do you mean on Page 4 of your

11   report for purposes of determining your

12   erosion analysis or conducting your erosion

13   analysis you said that it was important to

14   understand that -- "To understand that, we

15   must first understand how much cement was

16   likely at the bottom of the well," correct?

17        MR. EISENBERG:  Object to form.

18        A.     Do I understand that, what is

19   written in front of that sentence?  Yes.

20        Q.     (BY MR. HILL)  Okay.  And I'm

21   not trying to hide the ball from you or

22   misread -- or misinterpret what you've read

23   here, but, essentially, correct me if I'm

24   wrong, what you are saying here is it is

25   important to understand how much cement was
```

02:35 — lines 5, 10, 15, 20
02:36 — line 25

509

1   at the bottom of the well because, as you

2   just indicated before, the cement is a

3   potential restriction, correct?

4       A.    There were two questions.  First

02:36  5   question is yes.  Second question, yes.

6       Q.    Okay, thank you.  And I'll do

7   that on you.  I'm sorry, I'm trying to hurry

8   up in 30 minutes here.  And whether you --

9   you've taken the position, for example, that

02:36  10   the shoe track is filled entirely with

11   unfoamed cement, correct?

12       MR. EISENBERG:  Object to form.

13       A.    This is an assumption I made.

14       Q.    (BY MR. HILL)  Okay.  And

02:36  15   whether you agree or not, if that shoe track

16   was filled only halfway with cement, that

17   would affect your erosion analysis, correct?

18       A.    It would affect the erosion,

19   great, analysis, yes.

02:36  20       Q.    And -- I'm sorry, I didn't mean

21   to interrupt you.  And would you agree with

22   me that that is because the nature or the

23   size of that restriction would change if the

24   shoe track is only half filled with cement?

02:37  25       MR. EISENBERG:  Object to form.

510

1       A.    I'm not sure what of the nature

2  of the change.  The size, yes.

3       Q.    (BY MR. HILL)  Okay.  But your

4  analysis assumed 189 feet of cement in the

02:37  5  shoe track, right?

6       A.    This is right, yes.

7       Q.    And if there was only 30 feet

8  from the float collar down, that would affect

9  your erosion analysis, correct?

02:37  10       A.    This is correct.

11       Q.    All right.  Similarly, in the

12  annulus if there was complete coverage of

13  cement across all the hydrocarbon-bearing

14  sands in the annulus, that would affect an

02:37  15  analysis of -- of flow path from the

16  formation into the -- into the casing,

17  correct?

18       A.    Yes, that's correct.

19       Q.    And if only part of those

02:37  20  hydrocarbon sands were covered by cement and

21  half of them were uncovered, that would

22  affect the flow path analysis and the --

23  sorry, the quantification of what could flow

24  into the casing, correct?

02:38  25       MR. EISENBERG:  Object to form.

511

```
     1        A.      Would you please repeat the
     2   question.
     3        Q.      (BY MR. HILL)  Sure.
     4        A.      Repeat slower --
02:38 5        Q.      Sure.
     6        A.      -- if you don't mind.
     7        Q.      If you assume that there is a
     8   hundred -- that there is coverage across all
     9   feet, all of the hydrocarbon-bearing sands,
02:38 10   that would affect the type of restriction or
    11   the extent of the restriction of flow between
    12   the formation and the casing, correct?
    13        MR. EISENBERG:  Object to form.
    14        A.      Yes, I think so, yes.
02:38 15        Q.      (BY MR. HILL)  Okay.  And if
    16   there was portion coverage, not -- before we
    17   talked about complete coverage.  If there was
    18   portion coverage, that, too, would affect
    19   the -- the -- the quantification of flow
02:38 20   through that cement restriction, correct?
    21        MR. EISENBERG:  Object to form.
    22        A.      Yes.
    23        Q.      (BY MR. HILL)  Okay.  So
    24   placement of cement, actually, affects the
02:38 25   analysis of restrictions that impact flow --
```

```
 1    quantification of flow, correct?
 2            MR. EISENBERG:  Object to form.
 3            A.    Yes.
 4            Q.    (BY MR. HILL)  I'm not sure I
 5    understood.  I think I've heard this question
 6    asked of you, but have you read the actual
 7    trial transcript testimony from Phase 1, the
 8    Phase 1 trial?
 9            MR. EISENBERG:  Object to form.
10            A.    I --
11            Q.    (BY MR. HILL)  Or any portion of
12    it?
13            A.    The testimony?
14            Q.    Uh-huh.
15            A.    I don't think so.
16            Q.    Has it been explained to you
17    that we have already had a trial for three
18    months talking about what the cause of the
19    blowout was?
20            A.    I have heard about it.
21            Q.    Okay.  Did you read any of the
22    testimony from that trial?
23            A.    No, I don't think so.
24            Q.    Okay.  And the reason I ask is
25    the people in this room sat through three
```

02:39 markers appear at lines 5, 10, 15, 20, 25.

532

```
 1    the same as the tests that are performed on
 2    actual rig cement?
 3              MR. EISENBERG:  Object to form.
 4         A.    Now, I agree on what you said.
02:57  5         Q.    (BY MR. HILL)  Okay, thank you.
 6    I only have a few minutes.  I wish we could
 7    talk for hours, but I need to know --
 8              MR. CERNICH:  Object.
 9         Q.    (BY MR. HILL)  I need to know
02:57 10   this:  Do you have any independent experience
11    or understanding that in a closed,
12    pressurized system where you are pumping
13    cement into a deepwater well, if it is even
14    possible for -- for nitrogen to migrate
02:58 15   backwards and settle in the shoe track?
16              MR. EISENBERG:  Object to form.
17         A.    I was -- I was depending on what
18    I have read in the Bly Report and in the
19    Chief Council's report.
02:58 20         Q.    (BY MR. HILL)  Okay.  And you
21    understand that BP didn't even put up a
22    single expert to validate that theory in the
23    Phase 1 trial, right?
24              MR. EISENBERG:  Object to form.
02:58 25         A.    I'm not aware of this.
```

1       Q.      (BY MR. HILL)  Okay.  So they

2    let you come in here today without telling

3    you that?

4           MR. EISENBERG:  Object to form.

02:58 5       Q.      (BY MR. HILL)  Right?

6       A.      I'm not aware of this.

7       Q.      All right.  Last thing.  I only

8    got a few minutes.  Hydraulic fragmentation,

9    all right.  I understand the concept of

02:58 10   hydraulic fragmentation.  The way it's been

11   explained to me, and please tell me if I'm

12   wrong, in order to fragment cement, you have

13   to have the ability for that cement to be

14   displaced, correct?

02:59 15      MR. EISENBERG:  Object to form.

16      A.      In --

17      Q.      (BY MR. HILL)  Sorry.

18      A.      No, please.

19      Q.      I was just going to try to maybe

02:59 20   clarify the question.  In order to fragment

21   cement, it has to be able to move or

22   displace, correct?

23      MR. EISENBERG:  Object to form.

24      A.      To -- to a small quantity, I

02:59 25   think that it's in the records somewhere.

# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010     ) ) ) ) ) | MDL No. 2179 |
|     ) | Section: J |
| Applies to:     ) ) | |
| ALL CASES and 2:10-cv-02771     ) ) ) | The Honorable Judge Barbier Mag. Judge Shushan |

REBUTTAL EXPERT REPORT OF DR. KRIS RAVI
TO THE REPORT OF ANDREAS MOMBER REGARDING EROSION OF WELL-CEMENT
DUE TO HYDROCARBON FLOW

June 10, 2013

## ANALYSIS

BP's position, as reflected in the opinions of Dr. Momber, is puzzling in light of the stance that BP took in Phase I of this litigation. On the one hand, BP argued in Phase 1 that HESI's cement was unstable and incapable of stopping flow, and thus contributed to the Macondo blowout. In Phase 1, BP further argued that BP's operational decisions played no role with respect to the alleged failure of the Macondo production casing cement job. But on the other hand, for purposes of Phase 2 quantification issues, BP now relies on the fact that "cement also filled part of the annulus and would have provided a barrier to flow there" to argue that the United States' assumptions regarding quantification are incorrect, while also arguing that HESI cement would have resisted erosional and other forces for a substantial period of time after the blowout.[4] It thus appears that the character of HESI's cement changes to suit BP's litigation purposes.

Dr. Momber opines that "it is quite reasonable to assume that the well cement had one or more channels in it by the time of the blowout." Dr. Momber fails to acknowledge that BP's operational decisions about the number of centralizers to use on the well, its failure to perform bottoms up circulation prior the execution of the cement job, and issues with the float collar conversion, all contributed to the failure of the cement to achieve zonal isolation.[5] Instead of simply acknowledging that HESI's cement was, in fact, capable of forming a barrier and that it was BP's own decisions that compromised the cement job and lead to the blowout, BP continues to rely on unsupported arguments about the alleged failures of the cement design and job execution. BP continues to ignore other plausible explanations that account for the data, while concurrently arguing that this same cement was somehow capable of stopping flow.

**REBUTTAL OPINION #1: There is no support for Dr. Momber's conclusion that flaws within the cement (*e.g.*, porous cement caused by nitrogen breakout) could be a contributing factor for the creation of a possible flow path. To the extent that there were any flow channels in the cement, they would have been caused by BP's operational decisions.**

Dr. Momber's erosion analysis makes unfounded assumptions about the initial pathways of hydrocarbon flow. He argues that "foam-type pores in concrete can increase its permeability by a factor of 10," which suggests that this created a flow channel that could alter the structure of cement material that can act as a pathway for penetrating fluids.[6] This analysis is not correct. Nitrogen breakout does not account for what occurred at Macondo because this does not create a continuous channel that would sufficiently account for the blowout observed.[7] Sustained flow of formation fluid through the annulus is possible only if there is a continuous flow path or conduit established or subsequently available.[8] Poor

---

[4] *Id.,* at p. 5.

[5] *Id.,* at p. 7.

[6] *Id.,* at p. 6.

[7] *See* TREX 6221: Email - From: Daryl Kellingray To: Erick Cunningham - Subject: RE: Investigation Team (BP's in-house cementing engineer remarked after the Incident: "I've suspected all along with the lack of centralization small volumes likelihood of mud contamination we would have had nitrogen breakout. However this should only matter if the kick came from the annular side, if its come through the floats I'm less convinced nitrogen breakout alone is the issue.").

[8] *Id.*

nitrogen break out during the pumping of the cement job.[18]   Accordingly, to the extent that Dr. Momber's erosion analysis depends on this underlying assumption, it is incorrect.

To the extent that there were any flow paths in the cement, due to the cement being "disturbed," any disturbance would have been caused by BP.  Momber opines about the existence of flow channels and refers to Table 4.1 for the possible flow paths. What is missing in Table 4.1 is the only type of flow path that could actually account for this magnitude of hydrocarbon flow:  mud channeling.   Momber simply ignores the possibility that mud could have been left behind due to poor centralization, insufficient mud removal, and that mud that would have been wiped by the wiper plug and contained in the shoe.  It is only the *mud channels* that could account for the flow rate observed in Macondo.   A number of capillaries, cracks, pores and permeability cannot account for the flow rates observed at Macondo. Hence, the only likelihood for the "big" channels that Momber is implicitly referring to would be those created from mud that has not been removed and from contamination of mud and cement.

On page 13 of his Report, Momber assumes that somehow magically and selectively a 2.17 inch and then a 2.64 inch diameter of set cement would permit the requisite flow of hydrocarbons.  It is impossible or at least implausible that suddenly about 20% of the set intact cement column would show deterioration and the flow path would be continuous. Such results are only possible in the presence of mud channels and cement contaminated with mud. The hydrocarbons would then be able to gradually displace the mud channel and thus reduce the hydrostatic pressure that was preventing the gas from flowing.

Dr. Momber opines that "cracks as small as 500 μm (millionths of a meter) in a cement-based composite can increase the permeability of the material by some orders of magnitude" identifying these as a possible source for pathways for penetrating fluids, but he does not describe the source of such cracks. As previously noted, the source for such flow paths is likely due to BP's operational decisions (*e.g.*, poor centralization, failure to perform a full bottoms up, problems in float conversion, etc.).

On page 17 of his Report, Momber refers to the phenomena of hydraulic fragmentation. But for hydraulic fragmentation to occur, sufficient kinetic energy is required to do the work.  At the depth of interest there is not enough kinetic energy imparted by the fluids to cause hydraulic fragmentation. On the other hand, hydrocarbons can displace *mud channels* and thus create the path for flow and also decrease the pressure inside the casing which would accelerate the flow of hydrocarbons.

**REBUTTAL OPINION #2:   The cement designed by Halliburton Energy Services, Inc., was capable of stopping flow, it was adequately tested, and the cement job was executed as planned.**

Dr. Momber concedes that the cement was, at some level, capable of stopping flow and/or resisting flow for a substantial period of time (contrary to the position of certain U.S. quantification experts).  Indeed, he explains that "[a] reasonable inference . . . is that there was substantial cement impeding flow in the wellbore, but that flow was occurring through channels in the cement."[19]   This conclusion is supported by my prior analysis concerning the stability of the  Macondo production casing cement.

---

[18] *Id.*, at 2320:22-2321:9, 2403:14-22, 2404:1-14, 2570:9-12; *see also* TREX 5993: Halliburton 9.875" x 7" Foamed Production Casing Post Job Report, dated April 20, 2010.

[19] Momber Report, at p. 9.

4

As previously demonstrated, the Macondo slurry (with all additives included) was subjected to a thorough and rigorous testing regime at HESI, which included foam stability testing. In the final foam stability test performed on the Macondo foam slurry, the slurry was successfully foamed in 8 seconds, and the sections of set foamed cement weighed the same at the top and bottom (1.8 S.G. on top, and 1.8 S.G. on bottom).[20]  This test demonstrated that the slurry, with all additives, was capable of being foamed and was stable.[21]  Further, the execution of the cement job was adequate, and the cement slurry was pumped as planned.  The cement likely set within 16 hours of being pumped, assuming that the cement slurry was not in any way prevented from setting by operations conducted by BP on the well prior to and after the primary cementing job.  Zonal isolation by set cement also assumes that the cement was actually placed where it was planned to be placed, as opposed to be over-displaced due to a casing breach, which is discussed in more detail below.

Given the successful test result and the proper execution of the Macondo production casing cement job, I find it highly unlikely that contamination of the cement due to nitrogen breakout, the design of the cement, or the alleged inadequate testing played any role in the formation of pre-existing channels.  Instead, as I have previously opined, BP's own operational decisions likely contributed to the formation of mud channels in the Macondo well.  Indeed, BP's failure to adequately centralize the production casing and its failure to sufficiently circulate mud ahead of the cement job likely contributed to the formation of channels in the Macondo well.[22]

**REBUTTAL OPINION #3:  Dr. Momber incorrectly analyzes the location of cement and the "hydrocarbon penetration path."**

I disagree with Dr. Momber's conclusions regarding (1) the location of the cement in the bottom hole portion of the Macondo well and (2) the hydrocarbon penetration path.  Dr. Momber concludes that "before the Macondo incident, the bottom of the wellbore was filled with cement; cement filled much of the casing up to the float collar, and more cement filled part of the annulus around the lower portion of the production casing.[23]  Dr. Momber also assumes that "the oil passed through the well cement barrier between the shoe and the float collar," and that consequently "a flow path must have been formed in the well cement allowing the oil to flow into and up the shoe track."[24]  His Figure 2.1 on page 2 of his report shows a dotted red line, representing inflowing hydrocarbons, entering the shoe track through the bottom of the reamer shoe.  More fundamentally, Dr. Momber assumes that because "oil flowed up the casing"

---

[20] *See* TREX 4566: Cement Lab Weigh-Up Sheet – Re/Slurry US-73909/1, dated April 17, 2010.

[21] *See id.*

[22] *See* TREX 5210: R.M. Beirute, F.L. Sabins and K.V. Ravi, <u>Large-Scale Experiments Show Proper Hole Conditioning: A Critical Requirement for Successful Cementing Operations</u>, 1991, Society of Petroleum Engineers (SPE 22774) at p. 1. ("Field experience has suggested that perhaps the most important parameter controlling the success of a cement job is the condition of the hole before the cementing operation.  If the hole has not been properly prepared (conditioned) to receive cement, the cement job will likely not be a good one even if other generally  accepted practices such as use of spacers, turbulent flow, etc., are followed during the actual execution of the cement job."); at p. 8. ("A properly conditioned or "circulable" hole should be established <u>before the cement job</u> by taking advantage of the following techniques: (a) proper pipe centralization to prevent mud from being trapped behind the pipe; . . .  (c) movement of the casing to help break the mud gels and to pull the pipe away from the formation walls; . . . (e) circulation of the well at the biggest rate possible . . . and for long enough periods to fully clean the hole, break the mud gels, and remove as much of the "removable" filter cake as possible.").

[23] Momber Report, at pp. 2, 4-5 and Figs. 2.1 and 2.2.

[24] *Id.*, at p. 2, citing Figs. 2.1 and 2.2.

that therefore "the cement structure was disturbed."[25]  Momber then proceeds to analyze how this cement would erode or otherwise be degraded due the hypothesized ability of hydrocarbons to access "flow channels" in the cement.

    A.    *The First Casing Breach*

        In my opinion, BP's operations caused a breach in the casing below the float collar.  The existence of a breach in the casing means that the cementing job could have been conducted without an effective shoe track.  A breach in the casing would lead to the cement slurry exiting the casing somewhere between the float collar and the reamer shoe, leaving mud, contaminated with cement, below the location where the casing shoe track was damaged or breached.  Thus Dr. Momber is incorrect in assuming that the entire bottom hole section of the Macondo well was uniformly filled with competent cement, and that there was an intact shoe track filled with cement.

        In my opinion, HESI's execution of the production casing cement job was satisfactory, and the cement slurry was pumped as planned.  However, BP's operations caused a breach in the casing below the float collar.  I reach this conclusion based on the empirical data that I have examined, and upon the expert analysis and testimony of various individuals.  The possibility of damage to sections below the float collar has been acknowledged by other experts, including Glen Benge,[26] Robert Grace[27] and Gene Beck,[28] as well as the testimony or documents of John Guide[29], Brian Morel[30], Mark Hafle[31], Robert Kaluza and Jonathan Sprague[32].

        BP's operations prior to pumping the cement slurry presented significant challenges to the success of the primary cement job.  BP knew there were problems running the casing into the open hole section of the well, because this section contained washouts.  These suboptimal conditions caused:

    (a)    the inability to run the Schlumberger wireline tools to depth on April 10[33];

    (b)    the fact that the tool could not be run deeper than 18,280' on this date due to "LCM plug or fill?"[34]

---

[25] *Id.*, at p. 5.

[26] *See* Benge Dep., 101:1-102:25.

[27] *See* Robert Grace Dep., 347:16-348:20.

[28] *See* TREX 8140: Revised Expert Report of Dr. Frederick Eugene Beck on Well Design, Control, Drilling, and Monitoring, dated November 10, 2011.

[29] *See* John Guide Dep., 614:4-14.

[30] *See* TREX 2584.

[31] *See* TREX 4457.

[32] *See* Jonathan Sprague Dep., 712:21-713:12.

[33] *See* TREX 3540: Schlumberger Final Triple Combo Log Report.

[34] *See* TREX 3537: Wireline Logging Diary - Macondo MC252 #1 BP01-Run 1, 4/9/10-4/15/10, at BP-HZN-BLY00189101.

not achieve its goal of isolating hydrocarbon zones in the well, and does not require Dr. Momber's assumptions regarding nitrogen breakout or channeling caused by faulty cement design.

Dr. Momber also fails to properly consider the significance of the location of the float collar with respect to the hydrocarbon zones. I note that the main reservoir zone (M56E), 71 feet thick, and another reservoir (M56F) about 21 feet thick, were _below_ the float collar.[69] *See* Fig. 5. I find this to be very unusual. It is against BP's best practices. Even if BP wanted to evaluate the cement against these reservoirs, they would not have been able to do so as the wireline tool would not have reached these zones due to the placement of the float collar above them. More importantly, the probable breach in the shoe track below the float collar means that the hydrocarbons in the bottom-most reservoirs had direct access to inside the casing.

B.      *The OLGA Modeling by Add Energy*

I also disagree in part with Dr. Momber's interpretation of the OLGA modeling performed by Morten Emilsen, which suggests a sudden change in flow rate after 21:30.[70] Dr. Momber opines that such a sudden increase in flow rate cannot be explained by a gradual process such as cement erosion, and that another "material destruction process" must be involved.[71] I largely agree with Dr. Momber's conclusion that a gradual, linear process such as cement erosion cannot explain the sudden change in flow rate suggested by the OLGA model. I disagree, however, that the only plausible explanation is hydraulic fragmentation of cement. In my opinion, rapid evacuation of mud in mud channels, and a second breach in the production casing, are more likely candidates for the "material destruction process" needed to account for the rapid increase in flow rate modeled by Add Energy.

As explained above, a breach in the casing below the float collar would cause cement to be over-displaced, *i.e.*, the cement would be placed higher than intended because it exited the breach in the casing rather than the reamer show located below the breach. *See* Fig. 6.

---

[69] *See* TREX 3533: Technical Memorandum - Post-Well Subsurface Description of Macondo well (MC0252_1BP1) v3, at BP-HZN-BLY00082909.

[70] *See* Momber Report, at pp. 7-15 and Figs. 5.1 and 7.1.

[71] *See id.*, at p. 14.

14

# EXHIBIT 10

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 – Phase II | ) ) ) ) ) ) | MDL No. 2179 |
| Applies to: | ) ) | Section: J |
| ALL CASES and 2:10-cv-02771 | ) ) ) ) | The Honorable Judge Barbier Mag. Judge Shushan |

# SOURCE CONTROL EXPERT REBUTTAL REPORT

## OF GLEN STEVICK, Ph.D., P.E.

## June 10, 2013

1

cement hydraulic fragmentation is a real phenomenon that can be used for demolition.

I strongly disagree with Momber's theory; it is less likely than the United States' experts' erosion theory.  It is virtually impossible for it to occur in a space confined by 7 inch diameter high strength pipe (casing), 189 feet long.  The buildup of hydrostatic stress prevents the displacements required to create the cement fractures required for a network of flow paths.  Further, any fractures at the bottom would be filled by erosion debris, and the stresses in a cement column due to pressure at the bottom are dissipated in 10 to 20 diameters of a pipe.  The most likely cause of the sudden increase in flow when the float collar conversion attempts hit 3142 psi was the straightening out and rupture of a tubular (casing in this case) that had been previously buckled.

Experiments conducted by the author indicate the rupture pressures can be significantly reduced by prior buckling.  The high strain due to buckling and low cycle fatigue of subsequent pressure cycles damages the metal and reduces its rupture strength.  Buckling preceding pressurization was determined to be the cause of the low pressure pipe rupture shown below:[8]



Figure 2.  Photograph of the 6 inch ruptured pipe from the Canadian Syncrude refinery fire in 1984.[9]

All commonly used engineering metals are susceptible to this damage mechanism based on bend tests conducted by the author.  To demonstrate the phenomenon twenty years ago, the author conducted buckling/pressurization tests with Coca-Cola cans and found a similar rupture pressure reduction:

---

[8] Failure analysis of the Canadian Syncrude refinery fire in 1984.  Reverse bending resulting from the straightening out of a 6 inch diameter pipe under pressure resulted in a rupture at a pressure too low to normally rupture the pipe.  The pipe was buckled prior to being pressurized.
[9] Photograph from the failure analysis of the Canadian Syncrude refinery fire in 1984.

12

**EXHIBIT 11**

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF LOUISIANA


IN RE: OIL SPILL BY THE OIL RIG MDL NO. 2179

"DEEPWATER HORIZON" IN THE

GULF OF MEXICO, ON APRIL 20, 2010


REBUTTAL REPORT OF GLEN BENGE

TO THE ANDREAS MOMBER REPORT

"EROSION OF WELL CEMENT DUE TO HYDROCARBON FLOW"


ON BEHALF OF

THE UNITED STATES OF AMERICA


June 7, 2013


DATED:  June 7, 2013

Signature:  Glen Benge

# Executive Summary

I have been asked to respond to the expert report of Dr. Andreas Momber titled "Erosion of Well Cement Due to Hydrocarbon Flow."  Dr. Momber makes **4 key statements** that are core to his opinions:

- Statement 1: The initial assumption made by Dr. Momber is there was set cement at the bottom of the well which would have provided resistance to flow.

   **Response**: Evidence presented in Phase 1 of the case clearly shows the cement in the Macondo well was **not set** at the time of the negative test.  As such, it was acting as a fluid and not a set material, and therefore could not have provided resistance to flow.  For the unset cement to have acted as any sort of barrier to flow in the well, as implied by Dr. Momber, is clearly in error.

- Statement 2: Momber contends the cement in the well would have impeded flow dramatically, and as flow continued over time, the cement would have been degraded.

   **Response:** As noted above, without the presence of set cement, there is no impediment to flow.  The cement slurry used in the Macondo well was incapable of providing an impediment to flow.

- Statement 3: Momber contends that the United States' expert reports ignore or misjudge the importance of cement erosion.

   **Response**:  The expert report of Dr. Griffiths addresses barriers in the well, and specifically notes that if the cement were to have been set, <u>or other barriers present in the well</u> (like the float collar) they would not have provided a barrier for any appreciable length of time. <u>Dr. Momber ignores any other potential barriers</u> to restrict flow in the well like the float collar, and incorrectly assumes the only barrier would be due solely to the cement.

- Statement 4: Dr. Momber concludes the cement underwent a *4-step degradation scenario*.

   **Response**:  The erosion process proposed by Dr. Momber depends on work performed with <u>concrete</u> and not oil field cements.  There is a significant and important difference in the two materials.  Concrete has cement as a component of the blend, but also contains various aggregates that are quite large. Oil field cement slurries do not contain aggregates as they cannot be pumped by the equipment used to cement wells.  The concrete data referenced by Dr. Momber shows compressive strengths thousands of psi stronger than any cement in the Macondo well.

**EXHIBIT 12**

**REBUTTAL EXPERT REPORT**
*U.S v. BP Exploration & Production, Inc., et al.*

Flow Rates from the Macondo MC252 Well
Submitted on Behalf of the United States

Prepared by:

Ronald C. Dykhuizen, Ph.D.
Principal Member of the Technical Staff
Sandia National Laboratories
Albuquerque, New Mexico

Ronald C. Dykhuizen, Ph.D.

June 10, 2013

estimate of the total flow from the well is zero since I did not start my integration of the flow until day three. To accept Appendix B of Dr. Johnson (where Dr. Johnson proposes an alternate model of the transient well flow in an attempt to demonstrate that the model of Dr. Griffiths is not unique), one has to believe that the resistance through the BOP constantly decreases with time in concert with the PI (productivity of the well) increasing with time. These two changes have to occur at remarkably coordinated rates to allow the PT-B pressure reading to behave as if there is no change in either. Dr. Griffiths, however, does not have to propose this serendipitous event and simply has the PT-B pressure reading change due to reservoir depletion, which generates a much more believable model.

In an attempt to discredit the work of Dr. Griffiths (and by implication mine since I rely in part on the work of Dr. Griffiths), Dr. Johnson incorrectly states that Dr. Griffiths has a variable resistance through the flow. Dr. Griffiths' integration of the flow is better stated as an estimate from the reservoir up to but not including the BOP. By formulating it in this way, the impact of the BOP resistance (constant or not) is not a concern. However, Dr. Griffiths does include a model including the BOP (with a constant resistance) and shows that this results in matching the PT-B pressure measurements and produces similar flow rates. Dr. Griffiths' work was validated by the work of US expert Dr. Pooladi-Darvish. Due to the lack of PT-B data early in May, it is possible that the erosion processes continued past day two as I assumed. This is a source of uncertainty in my modeling. However, the agreement of the Griffiths' model with the PT-B data, and the lack of any significant sand observed in the oil collections prove to me that erosion did not occur past May 14, 2010.

Dr. Momber proposes that the cement rapidly failed resulting in a 2.17 inch channel through 189 linear feet. He then proposes that further failure of the cement occurred very gradually. Dr. Momber's proposed scenario is not credible. He provides some mechanisms that *might* have caused the rapid formation of the assumed initial 2.17 inch channel in "deteriorated" cement. Dr. Momber claims that "erosional processes cannot explain this short-time event." I completely agree that the short time event was not caused by erosional processes. However, it did not occur in "deteriorated" cement as Dr. Momber assumes. This cement was freshly poured and thus not deteriorated. In fact, the United States' cement expert Benge (TREX 5990), BP's cement expert Calvert (TREX 22791), and BP's Macondo Wells Team Leader Guide (Trial Transcript 8950:17-8951:10) all agree that the cement was not set at the time of the negative pressure test.   It is likely that unset or poorly formed cement failed completely and quickly, not in two separate time scales as proposed by Dr. Momber. Dr. Momber tries to present literature values for erosion rates in volume per time to demonstrate that the rapid failure assumed by myself and Dr. Griffiths is not credible. However, these rates are more traditionally presented in other units (length per time), and these rates are for concretes (as opposed to well cements) that are successfully formed. They in no way apply to the cement in the Macondo well.

### E.     Dr. Zaldivar's Method Cannot Quantitatively Predict the Flow Rate

BP retained expert Dr. Zaldivar offers a unique method to estimate the flow. While it is quite impressive for Dr. Zaldivar to demonstrate chaotic behavior (switching from double peak to single peak oscillation modes) in a numerical simulation, I do not think that the model of this instability can quantitatively predict the flow rate.  The method has never been validated to show

**EXHIBIT 13**

01-43220
PW/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG        )        MDL NO.  2179
"DEEPWATER HORIZON" in the             )
GULF OF MEXICO, on                     )        SECTION: J
APRIL 20, 2010                         )
                                       )        JUDGE BARBIER
                                       )
                                       )        MAG. JUDGE SHUSHAN

## *CONFIDENTIAL*

### *WorldwideVIEW* ™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Mehran Pooladi-Darvish
## Volume 2

**JULY 4 , 2013**

## *COPY*



*Systems Technology for the Litigation World*

Litigation Group•Court Reporting•Video Production•Videoconferencing
**For U.S. & International Services**
**800 - 745 - 1101**

```
 1          Q.     Okay.  Have you read the
 2   rebuttal report of Dr. Chris Ravi?
 3          A.     I do not think so.
 4          Q.     Okay.  In your experience in the
 5   oil and gas industry have you ever seen
 6   casing fail or breach?
 7          A.     Yes.
 8          Q.     And what sort of failure were
 9   you talking about?
10          A.     So the ca- -- cases that I'm
11   referring to that I have come across is
12   either because of the geotechnical -- geo --
13   high-stress environments where there is a --
14   a differential stress imposed on the wellbore
15   and then the -- the casing has sheared or
16   failed.  And -- and, also, when -- in thermal
17   operations, particularly happens in -- in --
18   in Canada a lot, sometimes that you -- that
19   the change in temperature, again, leads --
20   especially at the location of the shales
21   leads to changes, again, and stresses that
22   leads to failure of a casing.  So somewhat
23   similar cases.
24          Q.     Okay.  Let's suppose that there
25   was a failure of the casing at the bottom
```

02:42  5
02:42 10
02:42 15
02:43 20
02:43 25

1    hole of the Macondo well such that there was

2    a -- a hole or a gap or some failure at one

3    of the threads.  Would that be something that

4    could provide a path for the hydrocarbons out

02:43  5    of the pay zones and into the 7-inch casing

6    the -- the way that we've been talking about?

7    Is that at least a possibility?

8         A.     And so I am not -- I haven't

9    studied the stress conditions or the

02:43  10   geomechanical properties of the --

11        Q.     Right.

12        A.     -- reservoir in the vicinity of

13   the wellbore to consider whether that

14   hypothesis is possible or not.

02:44  15            So with -- but within that

16   hypothesis, that -- let's assume -- if I

17   assume that a crack or opening has occurred

18   within the 7-inch casing, there is a second

19   thing that needs to happen for flow to find

02:44  20   its way, and that is the -- that the cement

21   that was supposed to be -- or was intended to

22   be in the annulus between the casing and the

23   formation.

24            To isolate the formation from

02:44  25   the wellbore, that -- that cement

614

| | |
|---|---|
| 1 | shouldn't -- shouldn't be there or shouldn't |
| 2 | do its work, and shou- -- it -- it -- it had |
| 3 | to have been failed in one way or the other |
| 4 | and allowed a communication from the |
| 02:44  5 | formation, then through that hypothetical |
| 6 | crack into the bottom of the well. |
| 7 | **Q.     Okay.  Well, obviously, I mean,** |
| 8 | **if the cement was not present in the annulus** |
| 9 | **at this location, in other words, and then** |
| 02:44  10 | **there's a hole or a gap in the casing, that's** |
| 11 | **the kind of potential flow path of hy- --** |
| 12 | **of -- from -- for -- for hydrocarbons to** |
| 13 | **leave the pay zone and then get into the** |
| 14 | **casing, right?** |
| 02:45  15 | A.     So it's -- if you -- I -- so the |
| 16 | que- -- hypo- -- |
| 17 | **Q.     That --** |
| 18 | A.     -- hypothetical is correct, but |
| 19 | it's -- |
| 02:45  20 | **Q.     It's probably a bad question.  I** |
| 21 | **mean, you -- you keep assuming that there was** |
| 22 | **cement in the annular space, and now I'm just** |
| 23 | **asking you to assume that there wasn't cement** |
| 24 | **there and there is a hole there.** |
| 02:45  25 | A.     Okay.  So -- |

615

```
 1          Q.      And that's all you really need
 2     for your model to -- to get off the ground,
 3     right, because now you've got a path that
 4     hydrocarbons could take out of the formation,
 5     across an annular space that doesn't have
 6     cement in it, and then into a hole in the
 7     casing, and up, right?
 8          MR. CHAKERES:  Object to form.
 9          A.      So I think we are again
10     considering hypothetical condition --
11          Q.      (BY MR. SMITH)  Yes.
12          A.      -- scenario where there is no
13     cement in the annulus between the casing and
14     the formation, so then formation is open to
15     flow into that annulus, and there is also --
16     and there is a second pathway between the
17     annulus into the production casing through a
18     crack or hole, then my -- yes, that is the
19     conditions that would be consistent -- that
20     is a hypothetical condition that would be
21     consistent with my models.
22          Q.      Okay.  Let me switch gears.
23     Have you read the expert report of
24     Dr. Richard Strickland?
25          A.      Yes.
```

# EXHIBIT 14

01-42953
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG    )     MDL NO.  2179
"DEEPWATER HORIZON" in the     )
GULF OF MEXICO, on            )     SECTION: J
APRIL 20, 2010               )
                             )     JUDGE BARBIER
                             )
                             )     MAG. JUDGE SHUSHAN

## *CONFIDENTIAL*

### *WorldwideVIEW* ™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# STEWART K. GRIFFITHS, Ph.D.
## Volume 2

JUNE 27, 2013

## *COPY*



WORLDWIDE
*Systems Technology for the Litigation World*
Litigation Group♦Court Reporting♦Video Production♦Videoconferencing
**For U.S. & International Services**
**800 - 745 - 1101**

605

1    the outcome when you ran the numbers for

2    Alternate 1 or Alternate 2, you then would have

3    paused and said, "Okay.  This is suggesting the

4    possibility of something I haven't previously

03:21  5    accounted for, maybe erosion or something else,

6    and so now I need to think more about that other

7    possibility"?

8        A.   Absolutely.

9        Q.   Okay.  Let me now turn your attention to

03:21 10    Pages 14 and 15 of your Rebuttal Report,

11    Exhibit 11486.

12             MR. BENSON:   The Rebuttal Report.

13    Let's switch Reports.

14             THE WITNESS:   Page what?

03:22 15             MR. BENSON:   14.

16        Q.   (By Mr. Smith) 14 and 15 of your Rebuttal

17    Report.

18        A.   (Complying.)  Okay.

19        Q.   At the top of Page 15, you say:   "There

03:22 20    was something" -- and you put the "something" in

21    italics -- "at the bottom of well that was

22    causing the resistance in this region to fall

23    rapidly."

24             Do you see that portion of the sentence?

03:22 25        A.   Yes.

1      Q.  Now -- now, there, you're referring to

2  something that's physically occurring in the

3  bottom of the well, right?

4      A.  Yes.

03:22  5      Q.  Okay.  And later you say that you don't

6  really know what is physically occurring in the

7  bottom of the well?

8      A.  Yes.

9      Q.  And then I'm in -- I'm in the middle of

03:23 10  Page 15, you -- you say:  "I only suggest, in a

11  footnote, that the 'likely mechanism' was erosion

12  and never indicate that this was erosion of the

13  cement plug."

14          And that's just another way of you

03:23 15  explaining that you're not taking a definitive

16  position about what physical change was occurring

17  at the bottom of the well.  You're just making

18  the point that there was some relatively sudden

19  decrease in the resistance.  Fair?

03:23 20      A.  Yes.

21      Q.  Perhaps it was erosion, but it could have

22  been something else?

23      A.  It could have been, yes.

24      Q.  Okay.  Now, you've considered the

03:23 25  possibility of erosion, and you've testified

1    today and yesterday about erosion to a fair

2    degree.  Have you considered any other mechanism

3    that might have accounted for the sudden decrease

4    in resistance other than some kind of erosion

03:24  5    process of erosion of cement or erosion of steel

6    or erosion of a float collar?  Have you

7    considered any other mechanism that might account

8    for that resistance dropping away?

9        A.  H'm.  I'm not sure.  I mean, there's --

03:24  10   I've thought about issues of, "Well, what if the

11   cemented hadn't hardened," that that might not be

12   described as an erosive process.  It might be

13   just something that's disgorged; so -- so that

14   might be a matter of semantics, but -- but maybe

03:24  15   it's not erosion in the normal sense of the word.

16       There was -- there wasn't -- there's a

17   lot of possibilities.  You know, the -- the check

18   valves in the -- in the float collar, this might

19   involve erosion in the end anyway; but, you know,

03:25  20   there could have been something where they were

21   in some state where -- where they got inverted --

22   I think that would have happened faster than

23   this, but -- so -- so there are some sort of

24   mechanical things down there that -- that could

03:25  25   conceivably have given this sort of

608

```
 1    characteristic.
 2         Q.  So it's not necessarily erosive.  It's at
 3    least possible there's a mechanical change that
 4    accounts for the relatively sudden decrease in
03:25 5    the resistance at the bottomhole?
 6         A.  I think from the -- the -- the data,
 7    the -- the information, so information and data
 8    that is available, I -- I'm not sure I would ever
 9    be able to conclude with any certainty that I
03:25 10   knew what it was.
 11        Q.  But your analysis itself doesn't exclude
 12   a mechanical change as a possibility about what
 13   was physically occurring downhole to cause the
 14   rapid decrease in resistance --
03:25 15        A.  I --
 16        Q.  -- correct?
 17        A.  -- I don't think so.  I -- no, I -- I
 18   don't think it does.
 19        Q.  Okay.  Have you read the Rebuttal Report
03:26 20   of Chris Ravi?
 21        A.  I don't believe so.  I -- I -- I
 22   sometimes know what's in Reports, that I -- I
 23   read them but I don't remember the name on them.
 24   So if -- if it's important to you, if you told me
03:26 25   a little bit about it, I might --
```

# EXHIBIT 15

01-38789
TC/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | ) | MDL NO. 2179 |
| "DEEPWATER HORIZON" in the | ) | |
| GULF OF MEXICO, on | ) | SECTION: J |
| APRIL 20, 2010 | ) | |
| | ) | JUDGE BARBIER |
| | ) | |
| | ) | MAG. JUDGE SHUSHAN |

## *CONFIDENTIAL*

## *WorldwideVIEW* ™
### **Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# **Glen Benge**
### **VOLUME 1**

NOVEMBER 17, 2011

# *COPY*



*Systems Technology for the Litigation World*

Litigation Group●Court Reporting●Video Production●Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

1       Dowell book is?

2           A.  It's the Dowell Field Data Handbook.

3           Q.  And I think I asked this already.  But

4       other than the industry papers that are listed

11:21  5       here, can you think of any other industry papers

6       that you reviewed?

7           A.  I did look at a couple of the real early

8       ones that I had written on foam.  But, no, I

9       didn't review too many others.

11:21  10          Q.  And these references that you reviewed,

11      were they ones that you found yourself, or were

12      you provided with references also?

13          A.  I found all of these on my own.

14          Q.  Are all of the opinions that you reached

11:21  15      contained in your report?

16              MR. CERNICH:  Objection.

17          A.  Yes.

18          Q.  (BY MR. CHEN)  And asking it the other

19      way, are there any other opinions that you've

11:22  20      reached based on your work that are not contained

21      in your report?

22              MR. CERNICH:  Object to form.

23          A.  There is -- I've found one other

24      possibility but have no support data back or

11:22  25      forward that would explain the problem.  But I

**PURSUANT TO CONFIDENTIALITY ORDER**

102

```
 1   didn't put that in the report because there's
 2   no -- there's no way to know.
 3        Q.   (BY MR. CHEN)  Okay.  And what is that,
 4   if you could tell me?
 5        A.   One thing that would -- that could
 6   explain -- again, I have no data, so please
 7   understand that this is -- there is no data on
 8   this whatsoever.
 9             If following the release of pressure on
10   the float collar that there was a failure of a
11   connection below that float collar -- in other
12   words, the casing shoe joints, if they fell off,
13   broke off, no longer there, your circulation path
14   would then be right below that float collar.  You
15   would leave the bottom portion of the well --
16   wouldn't have any cement in it at all.
17        Q.   What would be -- what would need to be
18   done, in your opinion, in order to confirm or --
19   or rule out this possibility?
20        A.   Having seen that happen, the only way to
21   know that, you'd have to go back into the well,
22   drill it out and see if that's still attached.
23        Q.   Is there any way you think that someone
24   could do any sort of review of data or testing to
25   determine that this occurred to a degree of
```

11:22  5
11:22  10
11:23  15
11:23  20
11:23  25

**PURSUANT TO CONFIDENTIALITY ORDER**

**EXHIBIT 16**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG )
"DEEPWATER HORIZON" in the )
GULF OF MEXICO, )
on APRIL 20, 2010 )
)
Applies to: )
)
ALL CASES and )
2:10-cv-02771 )
)

MDL No. 2179

Section: J

The Honorable Judge Barbier
Mag. Judge Shushan

### REVISED EXPERT REPORT OF
### DR. FREDERICK "GENE" BECK
### ON WELL DESIGN, CONTROL, DRILLING, AND MONITORING

CONFIDENTIAL

8140

Exhibit No. _____
Worldwide Court
Reporters, Inc.

TREX-08140

plans for equivalent circulating density management. Because equivalent circulating density is highest with a long string casing configuration, reliance upon the auto-fill collar to reduce surge (and thus equivalent circulating density) while lowering the casing, forced BP to take additional risk by delaying the conversion until the casing was on bottom. In my opinion, the float collar should have been converted prior to running the casing into open hole. BP could have then confirmed that the check valves in the float collar were indeed functioning and could then proceed with confidence that an effective barrier was in place in the casing string, prior to exposing the shoe track to potential debris and hydrocarbons in the open hole.

Had the casing been installed as a liner, surge on the well would have been minimized and the effect of a converted float collar at the bottom of a liner would have been far less than that at the bottom of a long string, so that the increased surge by shutting the float valves prior to entering the open hole would not have been as much of a concern. Regardless of the casing configuration, the auto-fill collar should have been converted prior to the casing being run into the open hole.

### D.   BP likely damaged the float collar.

BP included a float collar in the long string production casing in order to hold the cement in a static condition after the cement had been pumped into the well. However, BP was reckless in attempting to convert the float collar into a one way valve (to close its valves to block flow up the casing) as intended in the well design. BP's recklessness came with the following consequences:

- BP likely damaged and failed to convert the float collar, thus removing a barrier that would have prevented the blowout of the Macondo well;

- The damaged and unconverted float collar enabled cement to u-tube in the long string production casing, extending the cement setting time or potentially keeping the shoe track cement from setting at all; and

- BP's recklessness in attempting to convert the float equipment may have also damaged the shoe track, compromising the shoe track cement placement and effectiveness.

BP used a float collar with valves on the Macondo well to prevent "u-tubing" of cement. U-tubing is a term that describes how cement that has

62

**CONFIDENTIAL**

been pumped into the well moves because of differential pressures between the interior of the casing string and the annulus on the outside the casing. U-tubing relates to any movement, even very small movements, of the cement caused by the pressure differential. U-tubing occurs when the cement has started to rise from the shoe and it imparts a higher hydrostatic pressure back toward the shoe. This pressure difference is what can cause the cement to u-tube back into the casing.

When cementing a well, the cement is typically pumped down the inside of the casing, out through the shoe, and then back up the annulus on the outside of the casing and towards the surface. In order to accomplish the desired result (*i.e.* cement in the annulus providing zonal isolation for the target formation) the well must be designed in such a way to prevent u-tubing. This is because any movement of the cement can delay or prevent the cement from setting.

In order to prevent u-tubing and keep the cement in place in the annulus long enough for it to set, it is necessary to have a device that serves as a check valve to prevent the cement from reentering the casing and to keep the cement in a static state. This is the purpose of the float equipment, including the float valve used in the Macondo well. Float equipment is critical for the placement of cement, holding the cement in place, and allowing cement to set in a static condition. Specifically, properly functioning float equipment is a necessary pre-condition to a successful cement job. Float equipment may be a float collar and/or a float shoe, and in most wells both are run.

Figure 10 shows u-tubing:

63

CONFIDENTIAL

EXPERT REPORT OF DR. FREDERICK "GENE" BECK



**Figure 10: U-Tubing**

A shoe is a component positioned at the bottom of a casing string that is typically used to guide the casing or liner into the wellbore. For example, a reamer shoe was used at the bottom of the long string production casing in the Macondo well. A commonly used type of shoe, a float shoe, contains a check valve assembly that prevents fluids from flowing up into the casing string when the casing string is being installed into the well and during the cementing process.[95]

---

[95] Schlumberger Oilfield Glossary definition for "float shoe" found at http://www.glossary.oilfield.slb.com/DisplayImage.cfm?ID=502.

**CONFIDENTIAL**

EXPERT REPORT OF DR. FREDERICK "GENE" BECK

A float collar is a component installed near the bottom of the casing string, at the top of the shoe track, that usually contains one or more check valves called float valves. The float valves allow fluid to flow both up and down the casing when the float collar is in the unconverted position, and when the float collar is converted the float valves are closed and will allow fluid flow in the downward direction only. The purpose of the float valves is to prevent the backflow of cement up the casing during the cementing operation (*i.e.* u-tubing), and by holding back the cement, also preventing the flow of hydrocarbons below the cement up the casing.

BP purchased a Weatherford M45AP float collar from Nexen Petroleum for use in the Macondo well,[96] which is depicted in the following figure. BP did not use a float shoe in the Macondo well, but instead used a reamer shoe, a shoe without any check valve inside.

---

[96] Depo. Ex. 2446 at NEX000051.

CONFIDENTIAL

EXPERT REPORT OF DR. FREDERICK "GENE" BECK



| REVISION | A.2 |
| DATE | 1/25/2011 |
| DOCUMENT No. | D000446283 |



**Figure 11: Weatherford M45AP Float Collar Used In Macondo Well**[97]

The Weatherford M45AP is an auto-fill type float collar. "Auto-fill" means that the check valve feature of the collar is held open while running in the hole to automatically fill up the casing and to prevent increasing the pressure on the formations to be cemented (called "surging" the formation) which could fracture the formation and prematurely cause a hydrocarbon kick or lost circulation. The Weatherford M45AP float collar used by BP has a phenolic resin auto-fill tube that holds two aluminum flapper-type check valves in an open position. Inside the auto-fill tube is a high density ball that is held in place at the top by three fingers and on the bottom by a

---

[97] Depo. Ex. 2582 at WFT-MDL00020470.

**CONFIDENTIAL**

EXPERT REPORT OF DR. FREDERICK "GENE" BECK

lip molded in the phenolic auto-fill tube. When running in the hole this ball is free to travel up to the three fingers where drilling fluid may pass around the ball, filling the casing string. When the casing string is finally in position in the wellbore, the ball will drift down and land on the retaining lip at the bottom of the phenolic auto-fill tube.

Once the casing is successfully positioned at the bottom of the well, the float collar must be converted so that it will act as a check valve. The conversion method described by Weatherford is to circulate fluid through the two ports at the bottom of the auto-fill tube at a rate of 5-8 barrels per minute with equivalent pressures of 500 PSI to 700 PSI.[98] Establishing a flow rate within the limits specified by Weatherford creates a differential pressure across the two ports which pushes the phenolic auto-fill tube out of its position and allows the two aluminum flapper valves to close. Once this conversion is accomplished the well is circulated and then cemented. This conversion process is illustrated in the following figure:

---

[98] Depo. Ex. 2562 at WFT-MDL-0020469-476.

67

**CONFIDENTIAL**

EXPERT REPORT OF DR. FREDERICK "GENE" BECK



**Figure 12: Flow-Activated Auto-Fill Float Collar Properly Converted Without Damage**

1.  **BP used brute force and high pressures in its failed attempt to convert the float collar, disregarding the manufacturer's warning of potential consequences.**

Once BP had the casing shoe located at 18,304 feet it was ready to convert the float collar. Robert Kaluza, BP's well site leader, was on site at the time float conversion was attempted. When Kaluza and the crew attempted to circulate the well, they could not get it to circulate. The inability to circulate indicated that there was an obstruction somewhere in the lower part of the casing, likely in the float collar plugging the auto-fill tube and/or in the reamer shoe.

68

**CONFIDENTIAL**

EXPERT REPORT OF DR. FREDERICK "GENE" BECK



Figure 13: Obstructions Prevent Circulation

CONFIDENTIAL

Mr. Kaluza and his team established circulation after nine attempts, continually raising the pump pressure far above designed specifications. The nine attempts to establish circulation were as follows:

1. Pressure up to 1,800 psi at 1 barrel per minute (bpm), no circulation established, bleed off pressure.

2. Pressure up to 1,900 psi at 1 bpm, no circulation established, bleed off pressure.

3. Pressure up to 2,000 at 1 bpm, pressure held at 1,950 psi, no circulation established, bleed off pressure.

4. Pressure up to 2,000 at 1 bpm, pressure held at 1,940 psi, no circulation established, bleed off pressure.

5. Pressure up to 2,000 at 1 bpm, held pressure for ten minutes, no circulation established, bleed off pressure.

6. Pressure up to 2,000 at 2 bpm, no circulation established, bleed off pressure.

7. Pressure up to 2,250 at 1 bpm, no circulation established, bleed off pressure.

8. Pressure up to 2,500 at 1 bpm, pressure held at 2,450 psi, no circulation established, bleed off pressure.

9. Pressure up to 2,750 at 1 bpm and held for two minutes, pressure up to 3,000 psi and held for two minutes, pressure up to 3,142 psi when the pressure finally drops and mud starts to circulate.[99]

During these attempts to establish circulation and convert the float collar, the rig crew sought advice from onshore.  BP's Morel called Bryan Clawson of Weatherford to ask how much pressure could be applied to the

---

[99] Depo. Ex. 1425 at BP-HZN-MBI00191720-726.

70

CONFIDENTIAL

EXPERT REPORT OF DR. FREDERICK "GENE" BECK

float collar.[100]   Clawson checked with Weatherford engineering and told Morel that BP could pressure up as high as 6,800 psi; however, Clawson also stated that the ball would pass through the auto-fill tube without converting the floats at 1,300 psi.[101]   Despite this warning, BP continued its risky brute force attempts to convert the float collar.

The Weatherford specifications state that to convert the float collar, flow must be established at 5-8 barrels per minute.[102]   As seen in the following figure and as described in BP's daily logs, the flow rate during the attempted conversion never exceeded 2 bpm.[103]

---

[100]  CCR at 89; _see also evidence cited at CCR at 89 e.g.,_ Tr. of USCG/MMS Investigation, 7/22/2010 (J. Guide Testimony) at 197:1-25.

[101]  CCR at 89; _see also evidence cited at CCR at 89 e.g.,_ Tr. of USCG/MMS Investigation, 7/22/2010 (J. Guide Testimony) at 197:1-25; BP-HZN-MBI21330.

[102]  Depo. Ex. 2562 at WFT-MDL-0020469-476.

[103]  Depo. Ex. 1425 at BP-HZN-MBI00191722-23.

71

**CONFIDENTIAL**

EXPERT REPORT OF DR. FREDERICK "GENE" BECK



**Figure 14: Nine Attempts Prior to Assumed Conversion of Float Collar on April 19, 2010 (Figure 13 from Transocean Report, Alteration Added)[104]**

Disregarding Weatherford's advice that the ball could be blown out of the tube at 1,300 psi, BP pressured up the well and established flow at 3,142 psi, which could have ejected the ball or otherwise damaged the float collar, casing, or reamer shoe.[105]   At the time, although BP's Kaluza was worried that they had blown something up, instead of stopping to determine what could have been blown up he and his team pushed forward.[106] Kaluza confirmed BP's disregard for Weatherford's advice in his interview with the BP investigation team, stating "To shear out we had to gradually ramp up - I called town as I wasn't sure how high to go (Weatherford said 7

---

[104] Transocean Report, Vol. I at 52.

[105] *Id.*

[106] Tr. of USCG/MMS Investigation, 8/24/2010 (N. Chaisson Testimony) at 432:19-24.

Deleted: R. Kaluza Testimony

72

CONFIDENTIAL

- 800 psi).  I called 2 times and spoke to John Guide - Got the OK to go higher went to 3000 then sheared out at 3,124 psi."[107]

BP's brute force attempts to convert the float collar were in contradiction of the float collar conversion plan sent out by BP's Brian Morel.  As the daily logs show, the flow rates never came close to the plan laid out by Morel which stated, "[c]ontinue to circulate and slowly increase pump rates greater than 8 bpm to convert the float equipment (~ 500 - 700 psi) per Weatherford recommendation."[108]

BP acknowledged that there were problems with the conversion. In fact, at that time, Kaluza said "I'm afraid that we've blown something higher up in the casing joint":

```
19      Q.   And do you recall how you understood that
20   Mr. Kaluza was concerned about these low circulating
21   pressures?
22      A.   Yes.  His exact statement as I recall it was
23   that, "I'm afraid that we've blown something higher up
24   in the casing joint," which basically means possibly
```

Tr. of USCG/MMS Investigation (N. Chaisson testimony), 8/24/2010 at 432:19-24 (highlighting added).  This is similar to Morel's statement that "we blew it":

From: Morel, Brian P <Brian.Morel@bp.com>
To: Clawson, Bryan R
Sent: Mon Apr 19 18:29:52 2010
Subject: RE: Circulation
Yah we blew it at 3140, still not sure what we blew yet.

---

[107] Depo. Ex. 3570 (Kaluza Interview, BP-HZN-BLY00083875-879 at BP-HZN-BLY00083876).

[108] Depo. Ex. 4513 (Well Forward Plan, 4/15/2010, BP-HZN-BLY00068832, BP-HZN-MBI00127532-552).

73

CONFIDENTIAL

EXPERT REPORT OF DR. FREDERICK "GENE" BECK

Depo. Ex. 2584 at BP-HZN-MBI 00129068 (highlighting added). A prudent operator would have taken steps at that time to evaluate the condition of the float collar.

### 2. BP ignored that it likely damaged the float collar with the high pressures it applied.

Once BP's team established circulation they assumed that the float collar had been converted even though they never circulated at a rate higher than 4.3 barrels per minute, which was too low to bring about conversion.[109] Specifically, observed flow rates and pressures never exceeded 4.3 bpm and 375 psi, respectively.[110]

The pressure predicted by Weatherford for flow through an unconverted float collar at 4.3 BPM is 330 psi. By my calculations, 375 psi is consistent with the pressure that would be required to circulate the entire casing through either a converted float collar or through a float collar with the flow tube still in place but with the ball and ball seat blown out. In hindsight, the observed pressure, in conjunction with the fact that the check valves did not prevent the blowout, suggests that the ball seat had been blown out of the float collar, leaving the tube in place with the check valves locked open. Transocean's tests show the ball being blown out at 1,477 psi with the auto-fill tube held in place, which could have been facilitated by debris in and around the auto-fill tube.[111] It is also possible that BP damaged the float collar in some other manner that prevented the float collar from serving as a barrier to the shoe track while exhibiting the observed flow-pressure profile.

BP had knowledge that the pressures placed on the well were likely to damage the float collar and should have proceeded with all caution on subsequent well operations. Instead BP ignored the likelihood that the float collar was damaged and proceeded to cement the casing and conduct further operations.

---

[109] Depo. Ex. 1425 at BP-HZN-MBI00191720-726

[110] Bly Report at 70; see also note 99, supra.

[111] Transocean Report, Vol. II, App. C (Stress Engineering Report) at 14.

74

**CONFIDENTIAL**

EXPERT REPORT OF DR. FREDERICK "GENE" BECK

E.   **BP created wellbore conditions that were conducive to plugging and damaging the casing, float collar, and/or shoe track.**

During the installation of the production casing on the Macondo well, the drilling fluid sat static for over 45 minutes after the casing reached bottom.   This is ample time for barite, or other debris such as lost circulation material, to settle in the shoe track across the flow tube and/or in the guide shoe, plugging either or both and locking in the auto-fill tube. Circulation was not established in the well until after the ninth attempt (*see* Fig. 14 above) when a pump pressure of 3,142 psi was reached, at which point there was an instantaneous drop in pump pressure, after which return flow was noted.   Tests conducted by Transocean determined that the pressure that BP placed on the well (3,142 psi) was sufficient to have damaged the auto-fill mechanism in the float collar,[112] the guide shoe, and/or perhaps the shoe track itself.  BP was aware that the float collar was potentially damaged[113] and should have maintained caution throughout all subsequent well operations until testing confirmed that a barrier was placed successfully in the well.

1.   **Transocean confirmed Weatherford's warning about ejecting the float collar ball.**

Transocean retained Stress Engineering Inc. to test the Weatherford M45AP float collar. One test conducted by Stress Engineering evaluated the pressure required to push the ball through the seat by testing two auto–fill tubes and balls.  One seat failed at 1,477 psi and the other seat failed at 1,840 psi.[114]   This supports Weatherford's recommended practice of a maximum pressure of 1,300 psi prior to conversion, which BP ignored, and shows that blowing the ball out of the auto-fill tube without conversion was possible as indicated and advised by Mr. Clawson of Weatherford prior to

---

[112] Transocean Report, Vol. II, App. C (Stress Engineering Report) at 14.

[113] CCR at 89; *see also evidence cited at CCR at 89, e.g.*, BP-HZN-MBI 129068; Tr. of USCG/MMS Investigation, 8/24/2010 (N. Chaisson testimony) at 432:19-24; Tr. of Telephone Interview of Jesse Marc Gagliano, 6/11/2010 at 64-65.

[114] Transocean Report, Vol. II, App. C (Stress Engineering Report) at 14.

75

CONFIDENTIAL

**EXPERT REPORT OF DR. FREDERICK "GENE" BECK**

the blowout, particularly with barite or other debris holding the auto-fill tube in place.[115]  The ball seat failure is illustrated in Figure 15:



---

[115] Transocean Report, Vol. II, App. C (Stress Engineering Report) at 14.

**CONFIDENTIAL**

EXPERT REPORT OF DR. FREDERICK "GENE" BECK

Figure 15: Failure to Convert the Float Collar

**2.    Transocean confirmed that an undamaged, properly converted float collar would have prevented flow up the shoe track by way of its pair of valves at the top of the shoe track.**

Stress Engineering also tested two exemplar Weatherford M45AP float collars for pressure sealing of the aluminum flapper valves. When it heated the float collars to 225°F and then pressured them to more than 3,000 psi with synthetic oil based mud, both float collars held this pressure.[116]   When it pressure tested the valves in the exemplar flow collars to the failure point the flapper valve assembly did not fail until an equivalent pressure of 10,155 psi was applied; at the high pressure the flapper valve assembly failed in the cast portion.[117]   The results of these tests indicate that if the float collar had in fact been converted without damage, the check valves in the float collar would have prevented the blowout.

**F.    BP could have avoided the consequences of its failure to convert the float collar without damaging it.  Instead, BP's failure to convert the float collar at the safest time, and subsequent failure to repair the damaged float collar, led to the blowout.**

BP could have avoided any problems with the float collar by simply following DWOP 15.2.15, its own guidelines, and converting and testing the float collar prior to running the casing into debris-filled open hole.   This would have placed an effective barrier in the shoe track and, in my opinion, prevented the blowout.

Given that BP instead lowered the unconverted float collar into the debris-filled open hole, and after its repeated conversion attempts at an excessive pressure, BP should have assumed the worst, *i.e.* a mechanical failure of the float collar or a loss of integrity of the shoe track, and adjusted plans accordingly.   At a minimum this would have called for extreme

---

[116] Transocean Report, Vol. II, App. C (Stress Engineering Report) at 16-17.

[117] Transocean Report, Vol. II, App. C (Stress Engineering Report) at 22.

CONFIDENTIAL

EXPERT REPORT OF DR. FREDERICK "GENE" BECK

began displacing the well after the negative pressure test, any unset shoe track cement would have been free to flow up the well during the initiation of the blowout.

Third, BP may have damaged the shoe track during its failed attempt to convert the float equipment by applying excessively high pressures to the well.  BP personnel were aware that something "blew out" during the failed float conversion,[126] and BP engineers were concerned that the long string production casing could buckle when it was being lowered into the well.[127]  In the days leading up to installation of the long string production casing in the well, BP's Brian Morel requested that Halliburton personnel perform a buckling analysis on the long string production casing, and that analysis indicated that buckling from the float collar to the bottom of the shoe track was possible under the conditions in which the casing was actually run into the hole.[128]  It is possible that the entire shoe track separated from the float collar, meaning that there was, in essence, no shoe track at all.  What "blew" down hole could have been the shoe track separating from the remainder of the long string production casing just below the float collar assembly.  This is illustrated in Figure 16 below:

---

[126] Depo. Ex. 2584 at BP-HZN-MBI00129068.

[127] Depo. Ex. 3199 (highlighting added).

[128] Depo. Ex. 4515.

84 |

CONFIDENTIAL

EXPERT REPORT OF DR. FREDERICK "GENE" BECK



**Figure 16: Shoe Track Blowout**

If the shoe track separated from the long string production casing, there would have been no shoe track cement to act as a potential barrier to hydrocarbon flow.  All of the cement, including the shoe track cement, would have been pumped up the annulus, leaving the main pay zone exposed and forming a free path for hydrocarbons to flow up the long string production casing through the damaged and unconverted float collar.  The shoe track including the float collar and reamer shoe could have also failed in various other ways, compromising the cement job.

85 |

CONFIDENTIAL

# EXHIBIT 17

01-38858
TB/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG )    MDL NO. 2179
"DEEPWATER HORIZON" in the )
GULF OF MEXICO, on )    SECTION: J
APRIL 20, 2010 )
)    JUDGE BARBIER
)
)    MAG. JUDGE SHUSHAN

## *CONFIDENTIAL*

### *WorldwideVIEW* ™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Robert Grace
**VOLUME 1**

DECEMBER 12, 2011

## *COPY*



*Systems Technology for the Litigation World*

Litigation Group•Court Reporting•Video Production•Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

347

1        A.      I don't remember.

2        Q.      Did your calculations that you

3   say you did, did they take into account that

4   14.2 shallower zone?

5        A.      My best recollection is that I

6   did, but I don't -- I think that zone was

7   phantom.  I don't think it was there.

8        Q.      But none of this is in your

9   expert report, anyway, these discussions of

10  pressures, right?

11       A.      That's correct.

12       Q.      Now, the Dril-Quip lawyer asked

13  you a few questions about flow path, asked

14  you whether the flow was up the production

15  casing or -- or up the annulus.

16              If the float collar converts as

17  it's supposed to and those two float collar

18  valves shut, how can you get the blowout

19  occurring through that float collar?

20       MR. BROCK:  Object to form.

21       A.      Well, I'd just be speculating,

22  you know.  I mean, I didn't -- I didn't

23  really look at that all that hard.  But

24  failure could have been above the float

25  collar.  It could have been -- I mean, Mr.

PURSUANT TO CONFIDENTIALITY ORDER

348

1    Barnhill alluded -- alluded to a -- a thread

2    leak, starting with a thread leak.  I think

3    Mr. Beck said -- maybe the whole dadgum shoe

4    joint -- shoe -- shoe track fell off.  And so

5    maybe something happened down there and the

6    whole thing fell off.  I don't know.

7         Q.    We just don't know what caused

8    the absence of zonal isolation down there, do

9    we?

10        A.    We -- we do not know.

11        Q.    In performing --

12        A.    I don't --

13        Q.    In performing the kill

14   operation, did you see anything that would

15   answer any of those questions?

16        A.    I thought it had a hell of a

17   flow path.  We -- we had the full force of

18   the well.  We had a lot of well on us.  We

19   had -- we had a lot of well on us.  It wasn't

20   coming through a pin hole.

21        MR. POLLINGER:  Thank you.  No further

22   questions.

23        THE WITNESS:  Thank you.

24        VIDEOGRAPHER:  The time is 4:22 p.m.

25   and we're off the record.

**PURSUANT TO CONFIDENTIALITY ORDER**

**EXHIBIT 18**

From: Morel, Brian P
Sent: Tue Apr 20 14:31:49 2010
To: Clawson, Bryan R
Subject: RE: Circulation
Importance: Normal

Full returns, didn't see the bottom plug go, but saw it and top plug at all indication points and landed out right on time.

Brian

**From:** Clawson, Bryan R [mailto:bryan.clawson@weatherford.com]
**Sent:** Tuesday, April 20, 2010 8:02 AM
**To:** Morel, Brian P; Cotton, Brian A
**Subject:** Re: Circulation

How did the cement job go? Bryan

**From:** Morel, Brian P <Brian.Morel@bp.com>
**To:** Clawson, Bryan R
**Sent:** Mon Apr 19 18:29:52 2010
**Subject:** RE: Circulation
Yah we blew it at 3140, still not sure what we blew yet.

**From:** Clawson, Bryan R [mailto:bryan.clawson@weatherford.com]
**Sent:** Monday, April 19, 2010 5:30 PM
**To:** Morel, Brian P
**Subject:** Circulation

Brian, any progress! Bryan

CONFIDENTIAL & PRIVILEGED COMMUNICATION

The information contained in this message is privileged, confidential, and protected from disclosure.

This message is intended for the individual or entity addressed herein.

If you are not the intended recipient, please do not read, copy, use or disclose this communication to others.

Also please notify the sender by replying to this message, and then delete it from your system.

The sender totally disclaims, and will not accept, any responsibility or liability for the unauthorized use,

or the consequences of any unauthorized use, of this communication or message.



EXHIBIT
2584

TREX-02584

BP-HZN-MBI 00129068
BPD107-217469

*****************************************

CONFIDENTIAL & PRIVILEGED COMMUNICATION

The information contained in this message is privileged, confidential, and protected from disclosure.

This message is intended for the individual or entity addressed herein.

If you are not the intended recipient, please do not read, copy, use or disclose this communication to others.

Also please notify the sender by replying to this message, and then delete it from your system.

The sender totally disclaims, and will not accept, any responsibility or liability for the unauthorized use,

: the consequences of any unauthorized use, of this communication or message.

BP-HZN-MBI 00129069
BPD107-217470

**EXHIBIT 19**

**From:** Hafle, Mark E
**Sent:** Mon Apr 19 21:38:00 2010
**To:** 'VHG3@aol.com'
**Subject:** Re: run this one next time
**Importance:** Normal

Shifted at 3140 psi. Or we hope so. We are circ now

**From:** VHG3@aol.com <VHG3@aol.com>
**To:** Hafle, Mark E
**Sent:** Mon Apr 19 16:25:46 2010
**Subject:** run this one next time

this model is more debris tolerant.

4457

Exhibit No. _____
Worldwide Court
Reporters, Inc.

BP-HZN-MBI00257031

TREX-04457

**EXHIBIT 20**

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2

 3    IN RE:  OIL SPILL      )      MDL NO. 2179
      by the OIL RIG,        )
 4    DEEPWATER HORIZON in   )      SECTION "J"
      the GULF OF MEXICO,    )
 5    April 20, 2010         )      JUDGE BARBIER
                             )
 6                           )      MAG. JUDGE
                             )      SHUSHAN
 7

 8
```

```
14

15                  * * * * * * * * * * * * *
                           VOLUME 2
16                  * * * * * * * * * * * * *

17

18              Deposition of JONATHAN SPRAGUE,
      taken at Pan-American Building, 601 Poydras
19    Street, 11th Floor, New Orleans, Louisiana,
      70130, on the 22nd of March, 2011.
20

21

22    APPEARANCES:

23    Mr. Duke Williams
      WILLIAMS LAW GROUP, LLC
24    909 Poydras Street, Suite 1650
      New Orleans, Louisiana 70112
25
```

GAUDET KAISER, L.L.C.
Board-Certified Court Reporters

1    the casing --

2        Q.    Yes, sir.

3        A.    -- or up the annulus.  And so

4    obviously, to plan the relief well, we were

5    going to make plans for both of those

6    eventualities.

7        Q.    Yes, sir.  Have you heard prior

8    to today that Mr. Bob Kaluza, a company man

9    there on the Macondo well, stated on the

10   20th of April that he was concerned that,

11   quote, they blew something out higher up in

12   the drill string when they were trying to

13   convert the Weatherford float collar?

14           MS. KARIS:

15               Object to form.

16       A.    I never heard that.

17       Q.    You never heard that before

18   today?

19       A.    No, sir.  I don't recall hearing

20   that.

21       Q.    At anytime after the event, has

22   anyone said in your presence or to you over

23   the phone that there was a concern that the

24   casing had been damaged with the attempts

25   to convert the float collar what appeared

1    to have been nine times?  Have you heard

2    that?

3        A.      There were some conversations, I

4    think, about a lot of possibilities.

5        Q.      Yes, sir.

6        A.      And we were investigating a lot

7    of them.

8        Q.      And was one of those

9    possibilities that the casing was damaged

10   while they were attempting nine times to

11   convert the float collar?

12       A.      That was discussed.

13       Q.      Thank you, sir.

14               I'm going to hand you

15   what's marked as Exhibit 907.

16               (Exhibit Number 907 marked.)

17       Q.      This is a BP -- and this is

18   under Tab 40.  This is BP incident

19   investigation team, participants in

20   interview.

21               You were one of these

22   participants according to the document,

23   were you not?

24       A.      Yes.

25       Q.      Okay, sir.  And you go down to