

The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Telephone: 212 710 3900
Facsimile: 212 710 3950
www.clydeco.us

November 17, 2011

Brad Eastman
Vice President
Deputy General Counsel
Cameron International Corporation
1333 West Loop South, Suite 1700
Houston, TX 77027
Brad.eastmand@c-a-m.com

|  |  |
|---|---|
| Re: | ACE American Claim No. JY10J0191125; |
|  | ACE Bermuda Claim No. 12351 |
| Insured: | Cameron International Corporation ("Cameron") |
| Incident: | *Deepwater Horizon* Explosion and Fire |
| Date/Incident: | April 10, 2010 |

Dear Brad:

On behalf of ACE American Insurance Company ("ACE American") and ACE Bermuda Insurance Ltd. ("ACE Bermuda") (collectively, "ACE"), I am replying to your November 8, 2011 letter, which you sent in response to ACE's letters dated November 1 and 6, 2011, which involve issues with respect to settlement and subrogation rights. As explained below, ACE disagrees with the positions taken by Cameron in your November 8 letter.

Cameron's $10M Counteroffer

In its November 8 letter, Cameron criticizes ACE for allegedly having forced Cameron to make a "low ball" counteroffer of $10M to BP in response to BP's $500M demand. There is no basis for any criticism of ACE in this regard, and your version of what happened in this regard is incorrect and incomplete:

Clyde & Co US LLP is a Delaware limited liability partnership with offices in New Jersey, New York and San Francisco.
Clyde & Co US LLP is affiliated with Clyde & Co LLP, a limited liability partnership registered in England and Wales.
597415v9

**EXHIBIT D**

CONFIDENTIAL                                                                                           LIU25259



Brad Eastman
November 17, 2011
Page 2

- Prior to October 27, there was not a single discussion about what amount would be offered by Cameron in response to BP's opening settlement demand of $500 million. Moreover, prior to that date, there was no understanding as to what non-financial terms would be insisted upon by BP, because Cameron and BP had only had one meeting with BP, held on October 20, where there was no negotiation over financial terms and limited discussion about certain non-financial terms.

- In a conference call held during the morning of Friday, October 28, Cameron advised its insurers that it intended to offer $50M to BP and asked all insurers for their views as to that counteroffer, as well as their views on various non-financial terms. (You had advised me of this position by telephone call on the evening of October 27.) Upon conclusion of this conference call, the insurers had their own conference call to discuss what Cameron had proposed with respect to financial and non-financial terms.

- Later on October 28, in an afternoon conference call between Cameron and its insurers, each insurer expressed its own views with respect to Cameron's proposal to offer $50M and the various non-financial terms that BP and Cameron had yet to agree to, including several that they considered objectionable. In one way or another, during this conference call, each insurer advised Cameron that until the non-financial terms were known and agreed upon, it did not make sense for Cameron to offer $50M when BP was insisting on objectionable non-financial terms. Rather, many believed that Cameron should only offer $10M because of the objectionable non-financial terms. Indeed, even Illinois National through Chartis only authorized a counteroffer of $10M of which $3M would be Cameron's self-insured retention. Cameron expressed some skepticism regarding this proposed counteroffer, but stated that it could understand why $50M was not being offered to BP given the uncertainty of the objectionable non-financial terms.

- The next time there was any real discussion of what dollar amount Cameron should offer BP was at the November 2 meeting in Bermuda between Cameron and its insurers. As of that date, Cameron had not offered any dollar amount to BP, and no agreement had been reached between Cameron and BP on non-

CONFIDENTIAL                                                                                                          LIU25260



Brad Eastman
November 17, 2011
Page 3

As the above chronology makes clear, all insurers were against Cameron offering $50M, especially when the non-financial terms had not been agreed upon and there several such terms that were objectionable. Many insurers, not just ACE, also indicated that it was premature and "sent the wrong message" for Cameron to respond with such a high counteroffer. While Cameron may not have agreed with the insurers' position, after hearing from all of its insurers, Cameron itself agreed to only offer $10M.

In short, Cameron has no basis to complain about or criticize ACE with respect to the collective view of its insurers that Cameron should not offer $50M but only $10M, a view as to which Cameron ultimately agreed. Moreover, it is hard to see how there is any prejudice here, because Cameron said that BP is still prepared to negotiate financial and non-financial terms, even though BP wants Cameron's settlement counteroffer to be more than $20M, which is still less than the $50 Cameron had wanted to offer.

### ACE American Has Offered Its $25M Limits Provided Its Subrogation Rights Are Preserved

In its November 6 letter, ACE American offered its $25M limits to Cameron in order to help fund a counteroffer to be made to BP, provided that ACE American's subrogation rights were preserved at least as against Transocean (see discussion below with respect to ACE American waiving subrogation rights based on direct contribution claims against BP). Thus, with its $3M SIR and the $25M in limits proffered by Illinois National/Chartis, since at least November 7, Cameron has been in a position to make a counteroffer of up to $53M (subject to the ACE American provision). However, it appears that to date, Cameron has not made any counteroffer to BP.

Notwithstanding ACE's offer, as made in its November 6 letter, nowhere in its November 8 letter does Cameron in anyway acknowledge, let alone address, its ability to offer as much as



Brad Eastman
November 17, 2011
Page 4

$53M. Nor did Cameron criticize this offer by ACE American. This is particularly significant, because based on the November 7 conference call with its insurers, Cameron indicated it hoped to make a counteroffer of approximately $40M-$50M to BP and negotiate further various non-financial terms. Unless we are mistaken, Cameron did not do either last week.

Further, Cameron's assertion that ACE American's position is preventing moving forward

CONFIDENTIAL



Brad Eastman
November 17, 2011
Page 5

defendant a full release and indemnity, and at the same time allow the defendant's insurers "to clawback the payment." That is not a correct description of what happened or what ACE (and other insurers) specifically offered to do to address this problem.

During the November 2 meeting in Bermuda, ACE and the other insurers specifically agreed that Cameron could relinquish or release its direct contribution claim against BP and the insurers would relinquish or release their subrogation rights with respect to such direct contribution claim against BP. By so agreeing, this eviscerated the concern of Cameron that BP would never settle with Cameron if its insurers still had the right to recover directly from BP.

Our understanding is that on November 3, Cameron made this proposal to BP that Cameron would waive its direct contribution claim against BP and its insurers would waive their subrogation rights against BP with respect to such direct contribution claim, but Cameron would retain its contractual indemnity against Transocean and Cameron's insurers would retain their subrogation rights based on such contractual indemnity. You have since advised that BP rejected this proposal. So, it is incorrect for Cameron to contend that ACE (or any other insurer)

CONFIDENTIAL
LIU25263



Brad Eastman
November 17, 2011
Page 6

<u>Cameron's Right To Be Indemnified By Transocean</u>

Just recently, in his very recent ruling that BP was not an additional insured under the London policies issued to Transocean, Judge Barbier pointed out:

> <u>Insurers have to know what risks they are insuring to be able to appropriately calculate the premiums they must collect</u>. Thus, Ranger and the Excess Insurers would not reasonably have agreed to permit Transocean to name additional insureds as to *any* conceivable risk. <u>At the same time, insurance is a contract between the parties: the Insurers and Transocean. But where that contract of insurance requires reference to the underlying Drilling Contract—its insurance provision, which in turn references underlying indemnities—it is within the intent of the Insurers and Transocean that those indemnities shape the extent of additional insured coverage. At least, that is the parties' intent given the language of the *policies at issue*—which is the language that matters.</u> (Emphasis added.)

Similarly, insurers place great value and reliance on an insured's right to contractual indemnity in assessing risk of their insured, especially in the oil and gas industry, where contractual indemnities are commonly done. Indeed, Cameron made this very point in its motion for summary judgment on its right to be indemnified by Transocean. Even Cameron must admit that its right of contractual indemnity is extremely important, and that this is equally true for Cameron's insurers which will rely on such contractual indemnity in pursuing subrogation claims.

In its November 8 letter, Cameron contends that its right to indemnity from Transocean "is not without substantial risks", according to "Beck Redden's assessment." We presume Cameron is referring to the November 1, 2011 Beck Redden memorandum with respect to Cameron's right to be indemnified by Transocean. However, nowhere in that November 1 memorandum did Beck Redden say there were "substantial risks." Rather, Beck Redden said there were "uncertainties", and even then they provided an incomplete and cursory analysis of Cameron's right to be indemnified by Transocean.

CONFIDENTIAL  LIU25265



Brad Eastman
November 17, 2011
Page 8

provisions in the Purchase Order (Terms and Conditions) and the MSA, regardless of the issues in the dispute between Transocean and BP. ACE agrees that the identical pollution indemnity language in both the Terms and Conditions and the MSA give Cameron the right to recover indemnity for pollution claims directly from Transocean. Moreover, as noted, the MSA supersedes the Terms and Conditions to the extent that other provisions in the two agreements differ in any respect.

    In its motion, Cameron also points out that none of the legal issues raised by Transocean concerning BP's indemnity obligation to Transocean "have any bearing on the resolution of Transocean's obligations to Cameron" (p. 3).



Brad Eastman
November 17, 2011
Page 9

Cameron also correctly points out that under the Oil Pollution Act of 1990, pollution indemnities are permitted, including to indemnify a party for any liability under the Act (p.20).

### Cameron's Arguments About ACE's Subrogation Rights and Waiver Thereof Are Incorrect

In its November 8 letter, Cameron makes several arguments in support of its position that ACE American, ACE Bermuda and all of its other insurers have no subrogation rights or claims against either Transocean (including any based on contractual indemnity owed by Transocean to Cameron) or BP (including any based on direct contribution). It also purports to respond to the ACE November 1 letter demonstrating that ACE has such subrogation rights and claims and that subrogation has not been waived by ACE. As we demonstrate below, Cameron is wrong in all respects.

ACE American and ACE Bermuda both have subrogation rights and claims by operation of law. See, e.g., Seamless Floors By Ford Inc. v. Value Line Homes, Inc., 438 S.W.2d 598, 601 (App. Tex.-Fort Worth 1969)("Subrogation occurs by operation of law upon payment (insurance) of loss by an insurance company . . . ."); J&B Schoenfeld Fur Merchants v. Albany Ins. Co., 109 A.D.2d 370, 373, 492 N.Y.S.2d 38, 41 (1st Dep't 1985) ("While the right of subrogation is not dependent on contract but arises by operation of law when payment has been made, where the right of an insurer to subrogation is expressly provided for in the policy, its rights must be governed by the terms of the policy.") 71 N.Y. Jur. 2d Insurance § 2360 (2010) ("Subrogation is a normal incident of liability insurance, and the doctrine is clearly applicable whether or not the policy contains a subrogation clause"). Thus, contrary to your implication in



Brad Eastman
November 17, 2011
Page 10

Under well-settled subrogation principles, an "insurer-subrogee stands in the shoes of its insured" and acquires whatever rights the insured has to recovery against a tortfeasor. See Gibbs v. Hawaiian Eugenia Corp., 966 F.2d 101, 106 (2d Cir. 1992). Accord, Munters Euroform GMBH v. Amer. Nat'l Power Inc., 2009 WL 5150033, *3 (Tex. App-Austin 2009) (same). Thus, as a matter of law, ACE American and ACE Bermuda each are subrogated to all rights and claims which Cameron has against others, including Cameron's rights to sue BP for contribution and Cameron's rights of contractual indemnity from Transocean. It is incorrect for Cameron to suggest otherwise, including by its description of the pleadings in the underlying litigation.

For example, in its November 8 letter, Cameron argued that its insurers do not have true subrogation rights against BP, because Cameron's claim against Transocean for indemnity "is the equivalent of a counterclaim, or a claim of offset, by Cameron against BP." According to Cameron, there is no "true issue of 'subrogation'" because the subrogation recovery "threatens the plaintiff—BP, and not a third party tortfeasor." That argument is wrong as a matter of law and is contrary to very nature and purpose of an insurer having subrogation rights and claims.

Under the clear terms of the policies, there is no limitation on the insurer's subrogation rights to pursuing only a third party tortfeasor who is not a plaintiff in the underlying action. Rather, the policies permit recovery against any person or organization from which the insured has rights to recover, regardless of whether that party is in litigation with the insured. ACE American Policy Condition N preserves the insurer's right to recover "against any person or organization" without reference to whether that person or organization is a third party tortfeasor. Similarly, ACE Bermuda Policy at VI.O.1 preserves the insurer's right to recover for payments made under the policy, without reference to whether payment is made to a third party tortfeasor; and ACE Bermuda Policy at VI.O.3 refers to insured's waiver of rights to recover against any "specific person or organization" without reference to a third party tortfeasor.

CONFIDENTIAL

LIU25268



Brad Eastman
November 17, 2011
Page 11

Moreover, case law applying traditional subrogation principles makes clear that an insurer's right of subrogation is derivative of the insured's rights to recover from any person or organization, regardless of whether the insured is in litigation with the tortfeasor. See <u>Continental Ins. Co. v. Washeon Corp.</u>, 524 F. Supp. 34 (E.D. Mo. 1981) (maritime law) (insurer brought subrogation claims against the opposing party in the underlying litigation with the

CONFIDENTIAL                                                                                                    LIU25269

CONFIDENTIAL

LIU25270

CONFIDENTIAL

LIU25271



Brad Eastman
November 17, 2011
Page 14

and, for that reason, insurer was barred under this provision from pursuing its subrogation claim). That situation is simply not present here because Cameron has not waived pre-loss any of its rights -- and in fact is owed substantial indemnities -- with respect to the vast majority of potential liability in the *Deepwater Horizon* litigation.

Although Cameron argued that the "overwhelming weight of legal authority states that insureds may enter into contracts that effectively foreclose post-loss subrogation," it failed to cite a single case to that effect. The sole support offered by Cameron (cited in its October 31, 2011 letter) is an out of context quote from <u>Couch on Insurance</u>. Significantly, Cameron no longer relies on this quote after ACE distinguished it in its November 1 letter as involving situations where the insured had released its pre-loss rights as against another party and after we pointed out that the relevant section of <u>Couch</u> agreed with the insurers' position that "a waiver of subrogation will be found only where the subrogated party has specifically and unequivocally relinquished that right." 16 Couch on Insurance § 224:139.

<u>Other Issues Raised In The November 8 Letter</u>

Cameron made a number of other assertions or arguments in its November 8 letter that are incorrect:

- Cameron was wrong in arguing that ACE American's policy limit is exposed because, after application of the any subrogation recoveries "top down," there will likely not be anything left to offset ACE American's exposure. The indemnities owed to Cameron are uncapped; any argument that that there will be nothing left for ACE American is sheer speculation and, therefore, must be rejected.

- Cameron contended on the bottom of page 2 and also on page 3 that, from BP's perspective, there is a "net settlement value" that takes into account any off-set for subrogation rights. To date, however, Cameron has not given a settlement value to the case or a basis to support the conclusion that the net settlement value as proposed by BP does, in fact, take into account subrogation rights.

CONFIDENTIAL

LIU25272



Brad Eastman
November 17, 2011
Page 15

- Cameron asserts on page 3 of its letter that "there is a risk of Transocean's insolvency." First, Transocean is entitled to be indemnified by BP, and therefore, there is no purported risk of insolvency of Transocean, because BP will bear whatever amounts are awarded against Transocean, and there is no suggestion that BP has any risk of insolvency. Indeed, BP has already established a claim fund which has approximately $20 billion in available funds, and BP has pledged to infuse more money if needed. Second, Transocean's net equity is approximately $20 billion, which is another reason why it faces no risk of insolvency. Finally, given the amounts spent by the GCCF to date, as well as other reports and analyses of the likely damages, it is questionable at best that Transocean's ultimate exposure is $40 billion, as Cameron has suggested from time to time.

In conclusion, ACE American and ACE Bermuda rely upon and incorporate by reference their prior correspondence with Cameron, including in particular their letters dated October 31, November 1 and November 6. They also reserve all rights which they have under their respective policies, at law and in equity.

Very truly yours,

Paul R. Koepff

cc: Other insurers of Cameron

CONFIDENTIAL                                                                                                      LIU25273