# Exhibit 5

# Annual Report and Form 20-F 2012

bp.com/annualreport





# Building a stronger, safer BP

# Information about this report



**Cautionary statement**
This document should be read in conjunction with the cautionary statement on page 32.

**Frequent abbreviations**

ADR
American depositary receipt.

ADS
American depositary share.

Barrel (bbl)
159 litres, 42 US gallons.

b/d
Barrels per day.

boe
Barrels of oil equivalent.

GAAP
Generally accepted accounting practice.

Gas
Natural gas.

Hydrocarbons
Crude oil and natural gas.

IFRS
International Financial Reporting Standards.

Liquids
Crude oil, condensate and natural gas liquids.

LNG
Liquefied natural gas.

LPG
Liquefied petroleum gas.

mb/d
Thousand barrels per day.

mboe/d
Thousand barrels of oil equivalent per day.

mmboe
Million barrels of oil equivalent.

mmBtu
Million British thermal units.

MW
Megawatt.

NGLs
Natural gas liquids.

PSA
Production-sharing agreement.

RC
Replacement cost.

SEC
The United States Securities and Exchange Commission.

Tonne
2,204.6 pounds.



**Certain definitions**
For definitions of certain financial and contractual terms see pages 98-99.

**Key performance indicators**
Definitions for our group KPIs are provided on pages 28-29.

This document constitutes the Annual Report and Accounts in accordance with UK requirements and the Annual Report on Form 20-F in accordance with the US Securities Exchange Act of 1934, for BP p.l.c. for the year ended 31 December 2012. A cross reference to Form 20-F requirements is on page 20F.

This document contains the Directors' Report, including the Business Review and Management Report, on pages 3-126 and 147-175, and 178. The Directors' Remuneration Report is on pages 127-145. The consolidated financial statements of the group are on pages 177-286 and the corresponding reports of the auditor are on pages 179-181. The parent company financial statements of BP p.l.c. and corresponding auditor's report are on pages PC2-PC11 and page PC1 respectively.

The statement of directors' responsibilities, the independent auditor's report on the annual report and accounts to the members of BP p.l.c. and the parent company financial statements of BP p.l.c. and corresponding auditor's report do not form part of BP's Annual Report on Form 20-F as filed with the SEC.

*BP Annual Report and Form 20-F 2012* and *BP Summary Review 2012* may be downloaded from bp.com/annualreport. No material on the BP website, other than the items identified as *BP Annual Report and Form 20-F 2012* or *BP Summary Review 2012*, forms any part of those documents.

BP p.l.c. is the parent company of the BP group of companies. The company was incorporated in 1909 in England and Wales and changed its name to BP p.l.c. in 2001. Where we refer to the company, we mean BP p.l.c. Unless otherwise stated, the text does not distinguish between the activities and operations of the parent company and those of its subsidiaries, and information in this document reflects 100% of the assets and operations of the company and its subsidiaries that were consolidated at the date or for the periods indicated, including minority interests. BP's primary share listing is the London Stock Exchange. Ordinary shares are also traded on the Frankfurt Stock Exchange in Germany and, in the US, the company's securities are traded on the New York Stock Exchange in the form of ADSs (see page 154 for more details).

The term 'shareholder' in this report means, unless the context otherwise requires, investors in the equity capital of BP p.l.c., both direct and indirect. As BP shares, in the form of ADSs, are listed on the New York Stock Exchange (NYSE), an Annual Report on Form 20-F is filed with the US Securities and Exchange Commission (SEC). Ordinary shares are ordinary fully paid shares in BP p.l.c. of 25 cents each. Preference shares are cumulative first preference shares and cumulative second preference shares in BP p.l.c. of £1 each.

Trade marks of the BP group appear throughout this Annual Report and Form 20-F in italics. They include:

*ampm*
*Aral*
*ARCO*
*BP*
*BP Ultimate*
*Castrol*
*Castrol CRB*
*Castrol EDGE*
*Castrol Magnatec*
*Designer Water*
*Field of the Future*
*LoSal*
Project *20K*
*Pushing Reservoir Limits*
*Veba Combi-Cracking (VCC)*

EcoBoost is a trade mark of Ford Motor Company.
SkyMine is a trade mark of Skyonic Corporation.
Permasense is a trade mark of Permasense Limited.

Registered office and our worldwide headquarters:

BP p.l.c.
1 St James's Square
London SW1Y 4PD
UK
Tel +44 (0)20 7496 4000

Our agent in the US:

BP America Inc.
501 Westlake Park Boulevard
Houston, Texas 77079
US
Tel +1 281 366 2000

Registered in England and Wales No. 102498.
Stock exchange symbol 'BP'.

### 36. Provisions continued

Significant uncertainties exist in relation to the amount of claims that are to be paid and will become payable through the claims process. There is significant uncertainty in relation to the amounts that ultimately will be paid in relation to current claims, and the number, type and amounts payable for claims not yet reported. In addition, there is further uncertainty in relation to interpretations of the claims administrator regarding the protocols under the settlement agreement and judicial interpretation of these protocols, and the outcomes of any further litigation including in relation to potential opt-outs from the settlement or otherwise. The PSC settlement is uncapped except for economic loss claims related to the Gulf seafood industry.

While BP has determined its current best estimate of the cost of those aspects of the settlement with the PSC that can be measured reliably, it is possible that the actual cost of those items could be significantly higher than this estimate due to the uncertainties noted above. In addition, the provision will be re-established for remaining business economic loss claims as more information becomes available, the interpretation of the protocols is clarified and the claims process matures, enabling BP to estimate reliably the cost of these claims. BP will continue to analyse claims data and re-evaluate the assumptions underlying the provision.

The provision recognized for litigation and claims includes an estimate for State and Local government claims. Although the provision recognized is BP's current reliable best estimate of the amount required to settle these obligations, significant uncertainty exists in relation to the outcome of any litigation proceedings and the amount of claims that will become payable by BP. In January 2013, the States of Alabama, Mississippi and Florida formally presented their claims to BP under OPA 90 for alleged losses including economic and property damage as a result of the Gulf of Mexico oil spill (see Note 43 for further information).

BP reached an agreement in November 2012 with the US government, subject to court approval, to resolve all criminal claims arising from the incident under which BP will pay $4 billion in instalments over a period of five years. A provision of $3.85 billion has been recognized, representing the discounted cost of the agreement. This settlement was approved by the court in January 2013 and is not covered by the Trust. In addition, BP reached a settlement with the US Securities and Exchange Commission (SEC), which was approved by the court in December 2012, resolving all of the US government's securities claims against the company, under which BP has agreed to a civil penalty of $525 million, payable in three instalments over a period of three years. On 10 December 2012, a federal judge issued a final judgment regarding the SEC's claims and the terms of the settlement. During 2012, a provision was recognized in the amount of $525 million in respect of the cost of the SEC settlement. The remaining obligation of $350 million for the SEC settlement at 31 December 2012, which is not covered by the trust fund, has been reclassified to other payables.

BP also faces other litigation for which no reliable estimate of the cost can currently be made. Therefore no amounts have been provided for these items. See Note 43 for further information.

### Clean Water Act penalties

A provision has been made for the estimated penalties for strict liability under Section 311 of the Clean Water Act. Such penalties are subject to a statutory maximum calculated as the product of a per-barrel maximum penalty rate and the number of barrels of oil spilled. Uncertainties currently exist in relation to both the penalty rate that will ultimately be imposed and the volume of oil spilled.

A charge for potential Clean Water Act Section 311 penalties was first included in BP's second-quarter 2010 interim financial statements. At the time that charge was taken, the latest estimate from the intra-agency Flow Rate Technical Group created by the National Incident Commander in charge of the spill response was between 35,000 and 60,000 barrels per day. The mid-point of that range, 47,500 barrels per day, was used for the purposes of calculating the charge. For the purposes of calculating the amount of the oil flow that was discharged into the Gulf of Mexico, the amount of oil that had been or was projected to be captured in vessels on the surface was subtracted from the total estimated flow up until when the well was capped on 15 July 2010. The result of this calculation was an estimate that approximately 3.2 million barrels of oil had been discharged into the Gulf. This estimate of 3.2 million barrels was calculated using a total flow of 47,500 barrels per day multiplied by the 85 days from 22 April 2010 through 15 July 2010 less an estimate of the amount captured on the surface (approximately 850,000 barrels).

This estimated discharge volume was then multiplied by $1,100 per barrel – the maximum amount the statute allows in the absence of gross negligence or wilful misconduct – for the purposes of estimating a potential penalty. This resulted in a provision of $3,510 million for potential penalties under Section 311.

The actual penalty a court may impose could be lower than $1,100 per barrel if it were determined that such a lower penalty was appropriate based on the factors a court is directed to consider in assessing a penalty. In particular, in determining the amount of a civil penalty, Section 311 directs a court to consider a number of enumerated factors, including "the seriousness of the violation or violations, the economic benefit to the violator, if any, resulting from the violation, the degree of culpability involved, any other penalty for the same incident, any history of prior violations, the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge, the economic impact of the penalty on the violator, and any other matters as justice may require." Civil penalties above $1,100 per barrel up to a statutory maximum of $4,300 per barrel of oil discharged would only be imposed if alleged gross negligence or wilful misconduct were proven. BP intends to argue for a penalty lower than $1,100 per barrel based on several of these factors. However, the $1,100 per-barrel rate has been utilized for the purposes of calculating the provision after considering and weighing all possible outcomes and in light of: (i) the company's conclusion that it did not act with gross negligence or engage in wilful misconduct; and (ii) the uncertainty as to whether a court would assess a penalty below the $1,100 statutory maximum.

On 2 August 2010, the United States Department of Energy and the Flow Rate Technical Group had issued an estimate that 4.9 million barrels of oil had flowed from the Macondo well, and 4.05 million barrels had been discharged into the Gulf (the difference being the amount of oil captured by vessels on the surface as part of BP's well containment efforts).

It was and remains BP's view, based on the analysis of available data by its experts, that the 2 August 2010 Government estimate is not reliable. BP believes that the 2 August 2010 discharge estimate is overstated by at least 20%. If the flow rate were 20% lower than the 2 August 2010 estimate, then the amount of oil that flowed from the Macondo well would be approximately 3.9 million barrels and the amount discharged into the Gulf would be approximately 3.1 million barrels (using a current estimate of barrels captured by vessels on the surface of 810,000 in line with the stipulation entered with the US government – see Legal Proceedings on pages 162-171), which is not materially different from the amount we used for our original estimate at the end of the second quarter 2010.

For the purposes of calculating a provision for fines and penalties under Section 311 of the Clean Water Act, BP has continued to use an estimate of 3.2 million barrels of oil discharged to the Gulf of Mexico and a penalty of $1,100 per barrel, as its current best estimate, as defined in paragraphs 36-40 of IAS 37 'Provisions, Contingent Liabilities and Contingent Assets', of the amounts which may be used in calculating the penalty under Section 311 of the Clean Water Act and as a result, the provision at the end of the year was $3,510 million.

The amount and timing of the amount to be paid ultimately will depend upon what is determined by the court in the federal multi-district litigation proceedings in New Orleans (MDL 2179) to be the volume of oil spilled and the penalty rate that is imposed or upon any settlement, if one were to be reached. It is not currently practicable to estimate the timing of expending these costs and the provision has been included within non-current liabilities on the balance sheet. Save in relation to the amounts described in this note, and in Note 2, no other amounts have been provided as at 31 December 2012 in relation to other potential fines and penalties because it is not possible to measure the obligation reliably. Fines and penalties are not covered by the trust fund.