# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | *<br>*<br>*<br>* | MDL NO. 2179<br><br>SECTION J |
| This document relates to all actions. | *<br>*<br>*<br>*<br>*<br>*<br>* | <br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

---

**BP'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR AN EMERGENCY PRELIMINARY INJUNCTION TO SUSPEND PAYMENTS FROM THE COURT SUPERVISED SETTLEMENT PROGRAM PENDING SPECIAL MASTER FREEH'S INVESTIGATION AND REPORT**

*COUNSEL FOR SUBMITTING PARTIES ARE LISTED AT END OF MEMORANDUM*

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION....................................................................................................................1

BACKGROUND ....................................................................................................................2

I.   Mr. Juneau Placed Individuals Into Key Positions Of Significant
     Responsibility Within The CSSP And Settlement Trust Without Performing
     Adequate Diligence. ...................................................................................................2

II.  The Court Appointed Former FBI Director And Federal Judge Louis Freeh
     To Investigate The Extent Of Any Fraud, Corruption And Other
     Malfeasance In The CSSP. ..........................................................................................6

III. During The Investigation, The CSSP Continues To Make Hundreds Of
     Millions Of Dollars Of Payments Based On Potentially Tainted Policy And
     Claims Decisions........................................................................................................7

ARGUMENT .........................................................................................................................7

I.   Legal Standard. ..........................................................................................................8

II.  BP Has A Substantial Likelihood Of Success On The Merits. ...................................8

     A.   The Claims Administrator And His Agents Have Fiduciary Duties To The
          CSSP, The Settlement Trust And BP...................................................................9

     B.   Fiduciaries Must Satisfy The Highest Standard Of Care Imposed By Law. .........10

     C.   BP Has A Substantial Likelihood Of Showing Fiduciary Breaches By The
          Claims Administrator And Settlement Trustee And His Agents. .........................11

III. BP Will Be Irreparably Harmed Absent A Preliminary Injunction...........................13

     A.   BP Cannot Recover All And Possibly Any Funds That Are Improperly
          Paid To Claimants...............................................................................................13

     B.   BP Is Entitled To A Preliminary Injunction To Protect Against And
          Prevent Further Depletion Of Trust And Program Assets....................................14

IV.  The Balance of Equities Weighs Heavily In BP's Favor. ...............................................17

V.   A Preliminary Injunction Will Promote The Public Interest And Avoid
     Further Erosion Of The Integrity Of The CSSP.........................................................18

CONCLUSION .......................................................................................................................19

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Express Travel Related Servs. Co. v. Laughlin*,
   623 A.2d 854 (Pa. Super. Ct. 1993) ............................................................ 19, 20

*Arnone v. CA, Inc.*,
   No. 08 Civ. 4458(SAS), 2009 WL 362304 (S.D.N.Y. Feb. 13, 2009) ................... 15

*Auriga Capital Corp. v. Gatz Props., LLC*,
   40 A.3d 839 (Del. Ch. 2012) ......................................................................... 11

*Brady v. Capital Grp., Inc.*,
   No. 91-3873, 1992 WL 46337 (E.D. La. Mar. 4, 1992) .................................. 12, 13

*Canal Auth. of State of Fla. v. Callaway*,
   489 F.2d 567 (5th Cir. 1974) ........................................................................... 8

*Centurion Reinsurance Co. v. Singer*,
   810 F.2d 140 (7th Cir. 1987) .......................................................................... 20

*De Beers Consol. Mines v. United States*,
   325 U.S. 212 (1945) ...................................................................................... 17

*Deerfield Med. Ctr. v. City of Deerfield Beach*,
   661 F.2d 328 (5th Cir. 1981) .......................................................................... 15

*DuPont v. Del. Trust Co.*,
   320 A.2d 694 (Del. 1974) ............................................................................... 10

*Fed. Sav. & Loan Ins. Corp. v. Dixon*,
   835 F.2d 554 (5th Cir. 1987) ..................................................................... 18, 20

*Foltz v. U.S. News & World Report*,
   760 F.2d 1300 (D.C. Cir. 1985) ...................................................................... 18

*Gerardi v. Pellulo*,
   16 F.3d 1363 (3d Cir. 1994) ........................................................................... 18

*Gerdes v. Estate of Cush*,
   953 F.2d 201 (5th Cir. 1992) .......................................................................... 14

*Harman v. Masoneilan Int'l, Inc.*,
  442 A.2d 487 (Del. 1982)..................................................................................... 16

*Harrison v. Marcus*,
  486 N.E.2d 710 (Mass. 1985) ............................................................................. 10

*In re Celotex Corp.*,
  487 F.3d 1320 (11th Cir. 2007)............................................................................. 9

*In re Enron Corp. Sec. Derivative & ERISA Litig.*,
  MDL-1446, 2004 WL 2889891 (S.D. Tex. Dec. 9, 2004). .................................. 21

*In re Fredeman Litig.*,
  843 F.2d 821 (5th Cir. 1988)......................................................................... 17, 18

*In re Hartzell's Will*,
  192 N.E.2d 697 (Ill. App. Ct. 1963).................................................................... 13

*In re Matter of Green Charitable Trust*,
  431 N.W.2d 492 (Mich. Ct. App. 1988) .............................................................. 14

*In re Nat'l Gypsum Co.*,
  243 B.R. 676 (Bankr. N.D. Tex. 1999) ............................................................... 14

*In re Riley*,
  No. 5436-ML, 2012 WL 5439044 (Del. Ch. Nov. 7, 2012) .................................. 12

*In the Matter of Living Trust of Eleanor A. Wilson*,
  No. 4474-VCG, 2012 WL 5359293 (Del. Ch. Oct. 11, 2012) .............................. 17

*Investors Syndicate of Am., Inc. v. City of Indian Rocks Beach, Fla.*,
  434 F.2d 871 (5th Cir. 1970)............................................................................... 23

*Janvey v. Alguire*,
  647 F.3d 585 (5th Cir. 2011)......................................................................... 15, 18

*Lange v. Orleans Levee Dist.*,
  56 So. 3d 925 (La. 2010)..................................................................................... 11

*Law v. Law*,
  753 A.2d 443 (Del. 2000).................................................................................... 10

*Lynch Corp. v. Omaha Nat'l Bank*,
  666 F.2d 1208 (8th Cir. 1981)............................................................................. 18

*Marett v. Scott*,
  No. 299CV244-D-B, 2000 WL 491857 (N.D. Miss. Apr. 10, 2000)....................... 8

*Mazur v. Gaudet*,
   826 F. Supp. 188 (E.D. La. 1992) ................................................................... 13

*Meinhard v. Salmon*,
   164 N.E. 545 (N.Y. 1928) ............................................................................... 23

*Nken v. Holder*,
   556 U.S. 418 (2009) .......................................................................................... 8

*Norwest Bank Minn. N., N.A. v. Beckler*,
   663 N.W.2d 571 (Minn. Ct. App. 2003) .......................................................... 10

*Opulent Life Church v. City of Holly Springs, Miss.*,
   697 F.3d 279 (5th Cir. 2012) ........................................................................... 21

*Paradee v. Paradee*,
   No. 4988-VCL, 2010 WL 3959604 (Del. Ch. Oct. 5, 2010) ............................. 12

*Pendergest-Holt v. Certain Underwriters at Lloyd's of London*,
   600 F.3d 562 (5th Cir. 2010) ............................................................................. 8

*Riggs Nat'l Bank v. Zimmer*,
   No. 3886, 1977 WL 5316 (Del. Ch. Nov. 30, 1977) ................................... 12, 13

*Shepard v. K.B. Fruit & Vegetable, Inc.*,
   868 F. Supp. 703 (E.D. Pa. 1994) ................................................................... 13

*Tisino v. R&R Consulting & Coordinating Grp., LLC*,
   478 F. App'x 183 (5th Cir. 2012) .................................................................... 20

*Twyman v. Twyman*,
   No. 01-08-00904-CV, 2009 WL 2050979 (Tex. Ct. App. July 16, 2009) ........... 19

*USACO Coal Co. v. Carbomin Energy, Inc.*,
   689 F.2d 94 (6th Cir. 1982) ............................................................................. 20

**Statutes**

DEL. CODE ANN. tit. 12, § 3302 .......................................................................... 10

DEL. CODE ANN. tit. 12, § 3322(d) ...................................................................... 10

DEL. CODE ANN. tit. 12, § 3581(b) ...................................................................... 14

LA. REV. STAT. ANN. § 9:2087 ........................................................................... 10

LA. REV. STAT. ANN. § 9:2090 ........................................................................... 10

**Secondary Sources**

CHARLES ALAN WRIGHT, ARTHUR R. MILLER, ET AL.,
    FEDERAL PRACTICE AND PROCEDURE § 2947 ........................................................................ 8

GEORGE G. BOGERT, ET AL.,
    THE LAW OF TRUSTS AND TRUSTEES § 541 (2d ed. rev. 1993).................................... 9

RESTATEMENT (SECOND) OF TORTS § 874 (1979) ........................................................ 14

RESTATEMENT (SECOND) OF TRUSTS § 185 (1959).......................................................... 9

RESTATEMENT (SECOND) OF TRUSTS § 200 (1959) ......................................................... 9

RESTATEMENT (SECOND) OF TRUSTS § 232 (1959) ........................................................ 9

RESTATEMENT (THIRD) OF TRUSTS § 80 (2007) ......................................................... 12

## INTRODUCTION

BP brings this motion for a temporary suspension of all payments from the Court Supervised Settlement Program ("CSSP") while Special Master Louis Freeh investigates the extent of any fraud, corruption or other improprieties involving the CSSP.  Two of the CSSP's three senior legal counsel recently were terminated after apparently intervening in the processing of claims in which they appear to have had a financial stake.  Because these individuals were in a position to influence nearly every CSSP policy or claim determination, there is a material risk that other aspects of the claims process have been compromised.  In response to this risk, this Court appropriately concluded it was necessary—indeed essential—to appoint a special master of Judge Freeh's stature and provide him with a sweeping mandate to investigate.

Given these risks, business cannot continue as usual during Special Master Freeh's investigation.  On average, the CSSP is making more than $73 million in claims payments per week.  It would be impractical if not impossible for BP to recover all tainted payments made by the CSSP during the investigation.  Indeed, as this Court is well aware, Class Counsel contend that once a payment is made, BP is categorically without recourse to recover those funds from claimants.  Under these circumstances, the law, the reputation of the CSSP, basic fairness and common sense require a brief pause in CSSP payments, though not other CSSP operations, until the Special Master completes his investigation and issues his report.  This is the only way to ensure that BP is not further irreparably harmed by the continued payment of millions of dollars each day on claim awards that may be tainted by improprieties.

Put simply, BP did not bargain for, and should not have to bear the risk of, improper payments due to fraud or corruption.  This Court likewise should not bear the reputational risk of having a settlement facility making payments on tainted claims during the course of this extraordinary investigation.   Accordingly, BP requests that the Court issue a preliminary

injunction temporarily suspending all payments by the CSSP until Special Master Freeh completes his investigation and issues his report.[1]

## BACKGROUND

The evidence uncovered to date demonstrates significant breaches of fiduciary duties by CSSP and Trust personnel that plainly establish the need for this common-sense injunction.

**I.     Mr. Juneau Placed Individuals Into Key Positions Of Significant Responsibility Within The CSSP And Settlement Trust Without Performing Adequate Diligence.**

In approximately April 2012, CSSP Claims Administrator and Settlement Trustee Patrick Juneau hired Christine Reitano as Claims Counsel for the CSSP.  Reitano Supplement (attached hereto as Exhibit 1) at 1.  On November 1, 2012, Mr. Juneau hired Ms. Reitano's husband, Lionel "Tiger" Sutton III, as Claims Counsel for the CSSP.  Welker Investigative Report (attached hereto as Exhibit 2) at 1; Sutton Agreement (attached hereto as Exhibit 3) at 1.  Mr. Sutton and Ms. Reitano also were hired as counsel to the Settlement Trust.  Ex. 3, Sutton Agreement at 1; Ex. 1, Reitano Supplement at 1.  Mr. Sutton and Ms. Reitano were two of the three individuals working as counsel at the CSSP and their tenures spanned most of the time that the CSSP and Trust have been in existence.[2]  As such, Mr. Sutton and Ms. Reitano were involved in numerous core operations of the CSSP and had wide-ranging authority, including extensive involvement in the process of developing and implementing CSSP policy decisions.

For example, Ms. Reitano was intimately involved in the CSSP's policy decision process.  Declaration of Keith Moskowitz ("Moskowitz Decl.") (attached hereto as Exhibit 4) ¶ 6.  As the *only* CSSP Claims Counsel for six months, she requested comments and input from the parties

---

[1]     At this time, BP is only seeking a preliminary injunction.  After Special Master Freeh issues his report, BP will seek whatever permanent relief is warranted based on the conclusions of the report.

[2]     The other and only remaining counsel at the CSSP is Mr. Juneau's son.

regarding policies under consideration and then announced those CSSP policy decisions.  Ex. 4, Moskowitz Decl. ¶ 6.  She also attended virtually all Panel meetings in which representatives of the CSSP, Class Counsel and BP discussed issues and disputes related to settlement administration.  Settlement Agreement (Dkt. No. 6430) § 4.3.4.  Mr. Sutton and Ms. Reitano likewise attended numerous meetings among the CSSP, Class Counsel, other members of the Plaintiffs' Steering Committee ("PSC") and BP regarding policies governing claim payments in numerous areas, including seafood compensation, business economic loss, subsistence and the Agreement's exclusion of any compensation for moratorium-related losses.  Ex. 4, Moskowitz Decl. ¶ 8.

Moreover, Mr. Sutton and Ms. Reitano were directly involved in the development and promulgation of CSSP policies that impacted the evaluation and payment of claims.  For example, Mr. Sutton appears to have had significant involvement in drafting the CSSP's "subsistence" policy decision.  Ex. 4, Moskowitz Decl. ¶ 7.  While the investigation is just beginning regarding their involvement in other policies, it is undisputed that Mr. Sutton and Ms. Reitano were in a position to influence or control the outcome of virtually *every* policy decision made by the CSSP.  Significantly, Claims Administrator Juneau's recent actions acknowledge as much.  Following Mr. Sutton's termination, Mr. Juneau began a review of every non-consensual CSSP policy and the "history leading up to the final adoption of each such policy" to "ensure that they are appropriate and free of any improper influence in any respect."  7/2/13 Update on Review of Code of Conduct and Claims Processing Issues (attached hereto as Exhibit 5) at 4.

In addition to their pervasive involvement in policy development at the CSSP, Mr. Sutton and Ms. Reitano apparently were able to influence decisions on specific claims.  For example, in January 2013, while employed at the CSSP, Mr. Sutton was able to review and discuss a claim

filed by a former client of his wife (Ms. Reitano) and his law firm (referred to herein as "Claimant X").[3]  Ex. 2, Welker Investigative Report at 4.  Similarly, in March 2013, Mr. Sutton contacted Claim Administration Vendor Postlewaite and Netterville about a claim filed on behalf of a law firm connected to Mr. Sutton (collectively referred to herein with affiliated entities as "Law Firm Y").  *Id*. at 4.  In an apparent effort to ensure it was paid, Mr. Sutton followed up a number of times with the vendor to check the status of Law Firm Y's claim.  *Id*.

Unbeknownst to BP, at the same time Mr. Sutton was intervening in these claims, he was requesting payments from Law Firm Y.  *Id*. at 5–6.  The limited documents turned over by the CSSP to date include *numerous* e-mails in which Mr. Sutton requested payments from representatives of Law Firm Y.  *Id*.  For example, in January 2013, Mr. Sutton asked a named partner at Law Firm Y "did u [sic] check on my fee from [Claimant X]."  *Id*. at 5.  Later, in March 2013, Mr. Sutton repeatedly e-mailed with the named partner regarding the requested "money."  *Id*. at 5.  Similar communications continued through June 2013.  *Id*. at 6.  At the time, Law Firm Y itself had a pending claim before the CSSP for over $7.6 million.  *Id*. at 2.  Remarkably, Mr. Sutton sent or received these e-mails using his CSSP computer, which was owned by and accessible to the CSSP.  *Id*. at 3.

Mr. Juneau's recent actions also confirm the scope of Mr. Sutton's and Ms. Reitano's influence over decisions on specific claims.  Mr. Juneau has placed a hold on "all claims of clients represented by" Law Firm Y.  Ex. 5, 7/2/13 Update on Review of Code of Conduct and Claims Processing Issues at 3.  This decision, however, was based on a very narrow investigation.  For example, the CSSP's search of Mr. Sutton's e-mails only used two search terms while omitting other key terms related to Law Firm Y.  Ex. 2, Welker Investigative Report

---

[3]   Because of possible confidentiality issues, BP has not specifically identified any CSSP claimants.  BP also has redacted such information from the exhibits attached hereto.

at 3.  Similarly, as of late June, the CSSP only had reviewed 43 of the 675 claims filed by Law Firm Y to identify additional search terms or Sutton Reitano clients.  *Id.* at 2.  Moreover, the search only focused on Law Firm Y, and did not stretch more broadly to determine whether there were any other similar arrangements.

Even a cursory effort by the CSSP would have revealed these substantial conflicts of interest that should have disqualified Mr. Sutton and Ms. Reitano from being hired and placed in these unique positions of trust in the first place.  Such due diligence would have been expected by any trustee before placing individuals in sensitive positions of trust, especially in a facility processing billions of dollars of claims.  Mr. Juneau, however, failed to discover that Mr. Sutton and Ms. Reitano had substantial relationships with CSSP claimants and counsel with claims before the CSSP.  For example, Ms. Reitano represented claimants before the Gulf Coast Claims Facility ("GCCF")—the predecessor to the CSSP—who later became CSSP claimants.  *Id.* at 2.  Multiple communications and documents before the GCCF identified Ms. Reitano and her law firm, Sutton Reitano, as counsel for Claimant X.  *Id.*  Additional documents in Claimant X's file, which was fully available to the CSSP to use for background checks, reveal that in spring 2012 Sutton Reitano passed Claimant X to Law Firm Y.  *Id.*

Moreover, a cursory review of public records shows that:

- Mr. Sutton had *current* business relationships with a named partner in Law Firm Y, Ex. 2, Welker Investigative Report at 3;

- Mr. Sutton had past business relationships with another named partner of Law Firm Y, *id.* at 2–3; and

- Mr. Sutton was listed as the registered agent for *ten* businesses that shared an address with Law Firm Y, *id.*

These connections with Law Firm Y should have raised immediate "red flags."  Based on the CSSP's own files, Law Firm Y represents 675 claimants that have completed either a claims

form or a registration form to file a claim before the CSSP.  Law Firm Y also is a claimant itself. *Id*. at 2.

## II.     The Court Appointed Former FBI Director And Federal Judge Louis Freeh To Investigate The Extent Of Any Fraud, Corruption And Other Malfeasance In The CSSP.

In late May, BP and Mr. Juneau learned of allegations of fraud and kickbacks within the CSSP.  7/1/13 Juneau Ltr. re Independent Investigation (attached hereto as Exhibit 7) at 2, 4. BP later brought these issues to the Court's attention after the CSSP failed to sufficiently investigate these allegations.  *See* 6/21/13 Holstein Ltr. (attached hereto as Exhibit 6) at 1.  On June 25, the Court announced that it intended to appoint former federal judge and FBI Director Louis Freeh as a Special Master to investigate these and other issues within the CSSP.  7/2/13 Order (Dkt No. 10564) at 1.  No one objected to the appointment.  *Id.*  Indeed, the Claims Administrator's Office stated that it "fully support[ed] the decision."  Ex. 7, 7/1/13 Juneau Ltr. at 1.

The Court ordered Special Master Freeh to undertake and complete an "independent, external investigation."  7/2/13 Order (Dkt No. 10564) at 2.  Specifically, the Court tasked him with investigating "any other possible ethical violations or other misconduct within the CSSP" and "examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP." *Id*.  This sweeping mandate was necessary to "ensure the integrity of the program for the benefit of the parties and the public."  *Id*.  Thus, Special Master Freeh's investigation will focus not only on Mr. Sutton and Ms. Reitano, but on fundamental policies and practices within the CSSP that could have a substantial impact on the validity of every type of claim.

**III.    During The Investigation, The CSSP Continues To Make Hundreds Of Millions Of Dollars Of Payments Based On Potentially Tainted Policy And Claims Decisions.**

During Special Master Freeh's investigation, BP is faced with the prospect of paying out millions of dollars each day based on claims and policy decisions that may be tainted by fraud, corruption or other improprieties.  Since BP and Mr. Juneau first learned of the allegations of potential fraud and misconduct in the facility, the CSSP has made more than $440 million in claims payments, at an average of $73.5 million per week.  Declaration of Hal Sider (attached hereto as Exhibit 8) ¶ 4.  The payments are made to thousands of people throughout the Gulf region.  Since the CSSP began, more than 29,000 claimants have received payments.  *Id.* ¶ 3.

Given the number of recipients, it will be impractical if not impossible for BP to recover all payments that might be based on policies or claims determinations that Special Master Freeh later concludes were tainted by fraud, corruption or other misconduct.  Moreover, Class Counsel assert that BP has no right to those funds.  6/24/13 Class Counsel Ltr. to BP (attached hereto as Exhibit 9) at 2.  It is clear that Class Counsel, the PSC and affiliated counsel intend to fight BP's efforts to recover any payments—regardless of what Special Master Freeh ultimately concludes and regardless of whether the payments were improper.

## ARGUMENT

To avoid irreparable harm and restore the integrity of the CSSP, BP seeks a temporary pause in settlement payments until Special Master Freeh completes his investigation and issues his report.  This common-sense relief will have no material impact on the payment of legitimate claims.  But it will allow BP and the Court to avoid the irreparable monetary and reputational harm that otherwise will result from the payment of claims based on tainted policies and claims determinations.

## I.    Legal Standard.

A preliminary injunction should be granted where a movant establishes "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, 600 F.3d 562, 568−69 (5th Cir. 2010) (citation omitted).  All four factors strongly support entry of an injunction here.

## II.    BP Has A Substantial Likelihood Of Success On The Merits.

In evaluating these factors, likelihood of success on the merits and likelihood of irreparable harm "are the most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009).  The "Fifth Circuit has instructed that when considering whether a movant has demonstrated a substantial likelihood of prevailing on the merits, courts must recognize that the importance of this requirement varies with the relative balance of threatened hardships facing each of the parties." *Marett v. Scott*, No. 299CV244-D-B, 2000 WL 491857, at *3 (N.D. Miss. Apr. 10, 2000) (citing *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576–77 (5th Cir. 1974)).  Thus, a "showing that plaintiff will be more severely prejudiced by a denial of the injunction than defendant would be [if granted] … lower[s] the standard that must be met" in showing "some probability of winning on the merits." *Canal Auth.*, 489 F.2d at 576–77 (citing CHARLES ALAN WRIGHT, ARTHUR R. MILLER, ET AL., FEDERAL PRACTICE AND PROCEDURE § 2947).  That is precisely the case here.  Granting the motion will avoid severe *permanent* harm to BP while causing *minimal harm* to *some* claimants that might experience a slight *delay* in payment.  Thus, the Court need not apply an exacting standard in examining likelihood of success on the merits.

Regardless, BP has a substantial likelihood of success under *any* standard.  The limited facts uncovered to date demonstrate that Mr. Juneau, Mr. Sutton and Ms. Reitano each have

breached their fiduciary duties to the CSSP, the Settlement Trust and BP by failing to exercise

appropriate care in the management, oversight, and operation of the CSSP and Trust.

    **A.**    **The Claims Administrator And His Agents Have Fiduciary Duties To The CSSP, The Settlement Trust And BP.**

As Claims Administrator and Trustee of the Settlement Trust, Mr. Juneau owes

significant fiduciary duties to the CSSP, the Settlement Trust and BP:

- **Fiduciary duties owed to the CSSP.**  Mr. Juneau, as Claims Administrator, exercises discretion over the administration of the Settlement Program.  He thus owes fiduciary duties to the beneficiaries of the CSSP.[4]  *See In re Celotex Corp.*, 487 F.3d 1320, 1331 (11th Cir. 2007) (citing RESTATEMENT (SECOND) OF TRUSTS § 185 cmts. c, e (1959)).

- **Fiduciary duties owed to the Settlement Trust.**  The Trust Agreement plainly states that Mr. Juneau as Trustee is "and shall act as the fiduciar[y]" of the Settlement Trust.  Trust Agreement (attached hereto as Exhibit 11) § 2.1.[5]

- **Fiduciary duties owed to BP.**  As trustee, Mr. Juneau likewise owes fiduciary duties to the Trust's beneficiaries.  Because BP functionally is a "successive beneficiary," Mr. Juneau owes BP a fiduciary duty.  At the termination of the Trust, the Trust Agreement specifies that the BP Parties "shall have a reversionary interest" in the Trust's funds.  Ex. 11, Trust Agreement § 6.2.  It is well-established that "[w]here . . . the settlor retains an interest in the trust property, he can of course maintain a suit against the trustee to protect that interest." RESTATEMENT (SECOND) OF TRUSTS § 200 (1959); *see also Law v. Law*, 753 A.2d 443, 445 (Del. 2000) (finding trustees breached their fiduciary duties to remainderman by not properly funding the trust); *DuPont v. Del. Trust Co.*, 320 A.2d 694, 699 (Del. 1974) (quoting RESTATEMENT (SECOND) OF TRUSTS § 232 (1959)) (holding trustee did not adequately protect the rights of the remainderman); *Harrison v. Marcus*, 486 N.E.2d 710, 714 n.11 (Mass. 1985); *Norwest Bank Minn. N., N.A. v. Beckler*, 663 N.W.2d 571, 581 (Minn. Ct. App. 2003); GEORGE G. BOGERT, ET AL., THE LAW OF TRUSTS AND TRUSTEES § 541, at 163 (2d ed. rev. 1993).

---

[4]    Mr. Juneau's undertaking agreement is governed by Louisiana law.  *See* Undertaking of Patrick Juneau (attached hereto as Exhibit 10) § 8.  Therefore, Mr. Juneau's fiduciary duties to the CSSP are likewise governed by Louisiana law.

[5]    Under the Trust Agreement, all matters pertaining to validity, construction and trust administration are governed by Delaware law.  *See* Ex. 11, Trust Agreement § 7.8.

Similarly, Mr. Sutton and Ms. Reitano, as Mr. Juneau's agents with delegated authority, owed the same fiduciary duties.  *See* DEL. CODE ANN. tit. 12, § 3322(a) ("The agent must observe the same standard of care required of the fiduciary with respect to each responsibility so delegated…."); *id.* DEL. CODE ANN. tit. 12, § 3322(d) ("The agent shall comply with the scope and terms of the delegation and shall exercise the delegated function subject to the standard of care required of the fiduciary and shall be liable to the trust for failure to do so."); LA. REV. STAT. ANN. § 9:2087 ("In performing a delegated function, an agent owes a duty to the trustee and to the beneficiaries to exercise reasonable care and skill, considering the scope and terms of the delegation."); *Auriga Capital Corp. v. Gatz Props., LLC*, 40 A.3d 839, 850 (Del. Ch. 2012), *judgment entered* No. 4390-CS, 2012 WL 598121 (Del. Ch. Feb. 23, 2012), *aff'd*, 59 A.3d 1206 (Del. 2012) (finding LLC manager "easily fits the definition of a fiduciary" because he is "vested with discretionary power" (citations omitted)).

### B.    Fiduciaries Must Satisfy The Highest Standard Of Care Imposed By Law.

As fiduciaries, Mr. Juneau, Mr. Sutton and Ms. Reitano are held to the highest standard of care imposed by law.  Under Louisiana law, "the defining characteristic of a fiduciary relationship . . .  is the special relationship of confidence or trust imposed by one in another who undertakes to act primarily for the benefit of the principal in a particular endeavor."  *Lange v. Orleans Levee Dist.*, 56 So. 3d 925, 935 (La. 2010).  Similarly, under Delaware law, a fiduciary must execute his duties "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use to attain the purposes of the account."  DEL. CODE ANN. tit. 12, § 3302; *see also* LA. REV. STAT. ANN. § 9:2090 ("[T]he trustee shall exercise reasonable care and skill, considering the purposes, terms, distribution requirements, and other circumstances of the trust.").  Moreover, where a trustee fails to act prudently in a manner that causes depletion or wasting of

the trust assets, or fails to take steps to correct errors in the administration of the trust, courts find mismanagement of trust assets or failure to supervise trust operations. *See In re Riley*, No. 5436-ML, 2012 WL 5439044 (Del. Ch. Nov. 7, 2012); *Paradee v. Paradee*, No. 4988-VCL, 2010 WL 3959604 (Del. Ch. Oct. 5, 2010).

### C. BP Has A Substantial Likelihood Of Showing Fiduciary Breaches By The Claims Administrator And Settlement Trustee And His Agents.

A fiduciary breaches his duties when he fails to act with the "care, skill, prudence and diligence" of a "prudent person" in both hiring and managing his agents. DEL. CODE ANN. tit. 12, § 3302; *see Riggs Nat'l Bank v. Zimmer*, No. 3886, 1977 WL 5316, at *14–15 (Del. Ch. Nov. 30, 1977); *Brady v. Capital Grp., Inc.*, No. 91-3873, 1992 WL 46337, at *2 (E.D. La. Mar. 4, 1992). Thus, a fiduciary is "liable for abusing its discretion in hiring [an] agent, for negligently hiring such agent, or for negligently continuing the agency relationship." DEL. CODE ANN. tit. 12, § 3322(a); *see generally* BOGERT § 557 ("[T]he trustee owes the beneficiary a duty to use reasonable care in selecting an honest and qualified person to whom to delegate . . . .").

Mr. Juneau breached his fiduciary duties by hiring unqualified and unethical employees—including Mr. Sutton and Ms. Reitano—to fill key positions in the Claims Administrator's Office and the Settlement Trust. Mr. Juneau negligently hired these individuals without adequate background or conflict checks, which would have revealed Mr. Sutton's and Ms. Reitano's improper relationships with claimants and their law firms. *See In re Hartzell's Will*, 192 N.E.2d 697, 707 (Ill. App. Ct. 1963) ("[A] trustee must select his agents and attorneys with reasonable care, and he must supervise their acts with the same care."); *see also Riggs*, 1977 WL 5316, at *14–15 ("If a power is delegable, the trustee owes to the beneficiary a duty to use reasonable care in selecting an honest and qualified person to whom to delegate the power.").

Further, when a fiduciary delegates responsibilities to another individual, he has a "duty to act with prudence in supervising or monitoring the agent's performance and compliance with the terms of the delegation." RESTATEMENT (THIRD) OF TRUSTS § 80 (2007); *see Brady*, 1992 WL 46337, at *2 ("[U]nder general principles of trust law, the trustee has a duty to monitor the performance of professionals hired by the trust." (citing BOGERT § 557)); *Mazur v. Gaudet*, 826 F. Supp. 188, 190–91 (E.D. La. 1992) (Clement, J.) (finding breach of ERISA fiduciary duties based on "a breach of duty by the defendants themselves which enabled the co-fiduciary to commit a breach" through embezzlement); *Shepard v. K.B. Fruit & Vegetable, Inc.*, 868 F. Supp. 703, 707 (E.D. Pa. 1994) (finding trustee breached its fiduciary duty when it hired a third-party to operate the trust business "without oversight to ensure that [trust] creditors were paid. . . ."); *In re Nat'l Gypsum Co.*, 243 B.R. 676, 681 (Bankr. N.D. Tex. 1999) ("[W]here a trustee has properly delegated to agents or co-trustees or other persons, the trustee maintains a duty to exercise general supervision over their conduct."); *In re Matter of Green Charitable Trust*, 431 N.W.2d 492, 504 (Mich. Ct. App. 1988) ("Where a trustee allows its agents to pursue their own interests while carrying on trust work, the trustee may be liable to the same extent as the agent.").

Mr. Juneau failed to institute any meaningful prophylactic measures, or to expend sufficient resources, to detect and combat fraud and corruption within the CSSP. He had no mechanism in place to detect the malfeasance occurring at the highest levels of the program as evidenced by the fact that whistleblowers detected and exposed the alleged fraud and corruption within the CSSP. Even then, BP was ultimately compelled to inform the Court because Mr. Juneau did not deal with the allegations with the necessary urgency. His delay compounded the absence of effective controls and compliance processes.

At this point, BP is required to show only a "likelihood" of success on the merits.  But, unlike the normal case, the severe breaches of trust within the CSSP and Settlement Trust are *known*.  In addition to Mr. Juneau's breaches, there is virtually no dispute that Mr. Sutton and Ms. Reitano breached their duties to the program and its beneficiaries by intervening in the processing of certain claims in which they appear to have had a financial stake.  *Gerdes v. Estate of Cush*, 953 F.2d 201, 205 (5th Cir. 1992) ("The duty of loyalty which results from the position of trust distinguishes the fiduciary relationship."); *Arnone v. CA, Inc.*, No. 08 Civ. 4458(SAS), 2009 WL 362304, at *7 (S.D.N.Y. Feb. 13, 2009) (finding two attorneys who were delegees to an ERISA plan administrator did not fulfill their fiduciary duties to the plan beneficiaries to "insure that the correct benefits determination was made").  Indeed, as a result of their actions, Mr. Sutton and Ms. Reitano have been terminated, certain claims have been placed on hold and the CSSP is examining every nonconsensual policy it has ever announced.  This factor strongly supports BP's requested relief.

## III.   BP Will Be Irreparably Harmed Absent A Preliminary Injunction

### A.   BP Cannot Recover All And Possibly Any Funds That Are Improperly Paid To Claimants.

BP's injuries from these breaches are "irreparable" because they cannot be "undone through monetary remedies."  *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981).  BP has no practical way to recover all payments that are made based on claims or policy decisions tainted by fraud or corruption.  BP has no recourse against the Settlement Trust or the CSSP, both of which are funded exclusively by BP.  *See* Settlement Agreement (Dkt. No. 6430) § 5.12.  BP also cannot recover from the Claims Administrator and Trustee to the extent that he is indemnified by BP.  Ex. 10, Undertaking § 4; Ex. 11, Trust Agreement §3.5(a).  Regardless, the Claims Administrator and Trustee would be unable to satisfy the

monetary amounts at issue.  And BP will not be able to recover from many if not all claimants receiving tainted awards.  *See Janvey v. Alguire*, 647 F.3d 585, 599–60 (5th Cir. 2011) (rejecting the argument that "difficulty securing economic damages is insufficient to demonstrate irreparable harm").  It simply will be impracticable to commence suit against each and every claimant.  Moreover, Class Counsel have asserted a number of grounds that they believe preclude BP's recovery of ***any*** payments.  Ex. 9, 6/24/13 Class Counsel Ltr. to BP at 2.  Their position heightens the need for the Court to take precautionary measures to ensure wrongful claims are not paid during Special Master Freeh's investigation.

**B.     BP Is Entitled To A Preliminary Injunction To Protect Against And Prevent Further Depletion Of Trust And Program Assets.**

At this time, BP seeks only the equitable relief necessary to address the severe breaches of trust within the CSSP and Settlement Trust.  Under Delaware law, upon a showing of a Trustee's "breach of trust," the Court "may order any equitable remedy, including . . . [e]njoining the trustee from committing a breach of trust; [c]ompelling the trustee to redress a breach of trust by paying money, restoring property, or other means; [o]rdering a trustee to account; . . . [and] imposing a lien or a constructive trust on trust property or tracing trust property wrongfully disposed of and recover the property or its proceeds."  DEL. CODE ANN. tit. 12, § 3581(b).  In applying § 3581(b), a court has wide discretion to impose a suitable remedy.  *See, e.g., Harman v. Masoneilan Int'l, Inc.*, 442 A.2d 487, 500 (Del. 1982) ("[T]he relief available in equity for tortious conduct by one standing in a fiduciary relation with another is necessarily broad and flexible." (citing RESTATEMENT (SECOND) OF TORTS § 874 (1979)); *In the Matter of Living Trust of Eleanor A. Wilson*, No. 4474-VCG, 2012 WL 5359293, at *2 (Del. Ch. Oct. 11, 2012) (Under § 3581, "[t]his Court has broad discretion to impose a remedy for breach of trust as equity requires.").

14

Likewise, breaches of fiduciary duty under Louisiana law can be remedied by equitable relief, including injunctions. *Corrosion Specialties & Supply, Inc. v. Dicharry*, 631 So. 2d 1389, 1392 (La. Ct. App. 1994) *writ denied*, 635 So. 2d 242 (La. 1994) (Plaintiff "may seek to enjoin defendants' actions if those actions constituting breaches [of fiduciary duty] cause him irreparable harm."). And, because BP seeks only equitable relief, it is "appropriate to grant intermediate relief of the same character as that which may be granted finally." *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945); *see also In re Fredeman Litig.*, 843 F.2d 821, 825 (5th Cir. 1988).

Injunctive relief is necessary and appropriate here to avoid the wrongful dissipation of funds and address Mr. Juneau's, Mr. Sutton's and Ms. Reitano's breaches of fiduciary duties. If the CSSP continues to make payments based on any policies or claims determinations tainted by fraud, corruption or other malfeasance (all of which Special Master Freeh is actively investigating at this very moment), BP effectively will be left without recourse. It is unknown how many and which wrongful claims were paid after the misconduct was uncovered, or might be in process right now. The law—and prudence—dictate that payment of CSSP claims should be enjoined until Special Master Freeh completes his investigation and report. Otherwise, BP and this Court have no assurances that the claims being paid are not infected by misconduct.

The Fifth Circuit has recognized that "an injunction may issue to protect assets that are the subject of the dispute." *In re Fredeman Litig.*, 843 F.2d at 827. This is particularly true where—as here—a party "may lose its opportunity to recover the alleged improper or illegal payments" if the injunction is not issued. *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 561 (5th Cir. 1987). Simply put, following "dissipation of the funds to numerous recipients," a party "might never recover" them. *Id.* (citing *Foltz v. U.S. News & World Report*, 760 F.2d 1300

15

(D.C. Cir. 1985)).   Under those circumstances, an injunction is necessary to avoid irreparable harm:

> [Plaintiff's] injury is irreparable and there is no adequate remedy at law because a *multiplicity of suits would be required to gain relief*. . . . [I]rreparable harm is established when the distribution of assets of a liquidated company before an adjudication of rescission claims would defeat and delay satisfaction of those claims if they were ultimately sustained.

*Id.* (emphasis added) (citing *Lynch Corp. v. Omaha Nat'l Bank*, 666 F.2d 1208, 1212 (8th Cir. 1981)); *see also Janvey*, 647 F.3d at 601 (granting a preliminary injunction "to protect against monetary asset dissipation" where failure to freeze the assets might preclude the court from later "grant[ing] the effective remedy"); *Gerardi v. Pellulo*, 16 F.3d 1363, 1373 (3d Cir. 1994) ("[T]here is ample authority for the proposition that the unsatisfiability of a money judgment can constitute irreparable injury for the purposes of granting a preliminary injunction." (quotation marks and citation omitted)).

Courts similarly enjoin trustees from further dissipating trust funds where they have breached their fiduciary duties.   For instance, in *Am. Express Travel Related Servs. Co. v. Laughlin*, 623 A.2d 854, 856 (Pa. Super. Ct. 1993), the Superior Court affirmed entry of a preliminary injunction against further dissipation of trust funds because "[w]ithout injunctive relief enjoining further breach of [the trustee's] fiduciary duty, [the plaintiff] would suffer great injustice." *Id.*; *see also Twyman v. Twyman*, No. 01-08-00904-CV, 2009 WL 2050979, at *5 (Tex. Ct. App. July 16, 2009) (enjoining trustee from disbursing additional funds from the trust to prevent probable, imminent, and irreparable injury).

So too here.   The Court should issue a temporary pause in payments so that BP is not forced to bear the risk of paying millions of dollars of claims each day until Special Master Freeh completes his investigation, particularly given the significant evidence indicating that core CSSP processes may be tainted by fraud and/or corruption.   ***Indeed, if the requested injunction is not***

16

*entered, and it turns out that Special Master Freeh determines that payments made by the CSSP over the next several weeks were tainted, there will be no good answer as to why this occurred.  For the sake of the CSSP itself, and the reputation of all court supervised settlement programs, the need for absolute integrity and transparency is of paramount importance.*  The only way to ensure that given the known facts here is for this Court to act now and to enter the requested injunction.  *See, e.g., Tisino v. R&R Consulting & Coordinating Grp., LLC*, 478 F. App'x 183, 184–85 (5th Cir. 2012) (granting preliminary injunction to freeze assets where defendant allegedly breached a fiduciary duty); *Fed. Sav. & Loan Ins. Corp.* at 561 (same); *USACO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 97–98 (6th Cir. 1982) (same); *Am. Express Travel Related Servs. Co., Inc.* at 856 (same).

## IV.    The Balance of Equities Weighs Heavily In BP's Favor.

A temporary pause in payments will have little impact on claimants, in contrast to the impact on BP.  A brief suspension of payments will not fundamentally alter the terms of the settlement as the CSSP will continue to receive, review and process claims and issue policy decisions.  Even assuming that some valid claims are delayed payment, such delay is not sufficient to show harm because the claimants had no right under the Settlement to receive payment at a specific time.[6]  *See, e.g.*, *Centurion Reinsurance Co. v. Singer*, 810 F.2d 140, 144–45 (7th Cir. 1987); *In re Enron Corp. Sec. Derivative & ERISA Litig.*, MDL-1446, 2004 WL 2889891, at *6 (S.D. Tex. Dec. 9, 2004).

In any event, the requested delay will be brief, especially given that it has been more than three years since the incident occurred.  This motion requests an injunction only until Special

---

[6]    The Economic Settlement is unique in that it provides for payment to claimants **before** appeals regarding the District Court's approval of the class settlement have been decided.  The **temporary** suspension of this extraordinary feature thus does not leave claimants worse off than they would have been in a traditional class action settlement.

Master Freeh completes his investigation and issues his report.  As the Court knows, Judge Freeh began his investigation on July 8, has committed to an intense and expeditious schedule, and has promised to devote sufficient resources to the effort.  At the conclusion of the investigation, when the parties are able to determine whether and which claims were impacted by any improprieties, the CSSP can begin paying valid claims again.  Any temporary delay resulting from this common-sense pause in payments is vastly outweighed by the permanent harm that BP would suffer as a result of payments of hundreds of millions of dollars in tainted claims.

**V.      A Preliminary Injunction Will Promote The Public Interest And Avoid Further Erosion Of The Integrity Of The CSSP.**

The limited, common-sense injunction requested by BP will not "disserve the public interest."  *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 288 (5th Cir. 2012).  Instead, it will protect and advance it by preventing the payment of claims infected by fraud, corruption or other malfeasance.  There is no public interest in paying such claims.  Indeed, as the Court already has recognized, the public has a strong interest in "ensur[ing] the integrity of the program for the benefit of the parties and the public."  7/2/13 Order (Dkt No. 10564) at 2.  Just like the appointment of Special Master Freeh, a temporary suspension in payments will help remove doubts about the integrity of the CSSP and claimant awards.  It is in the interests of this Court and all parties involved in this Settlement that the cloud currently enveloping the CSSP be lifted before payments resume and to ensure that no further improper payments are made.

Moreover, as set forth above, the requested injunction would only stop *payments* by the CSSP during Special Master Freeh's investigation.   The CSSP would continue to receive, process and determine claims, minimizing any claimed impact of the injunction on the public.

Finally, the injunction also will serve the public interest by assuring future litigants of the safety and propriety of large, court supervised settlement programs.  While Special Master

18

Freeh's investigation is important to identify and correct any corruption, fraud and malfeasance at the CSSP, any fraudulent payments made in the meantime are a powerful disincentive to future litigants to voluntarily settle claims through a claims facility. Large and complex cases require large claims administration groups, which may be susceptible to fraud. Entering the requested injunction serves the public interest by sending a powerful message that such fraud will not be tolerated and will not result in fraudulent settlement payments.

## CONCLUSION

Two of the three CSSP counsel have been terminated after engaging in serious misconduct. They had wide ranging claims and policy responsibilities, and their actions have called into question the integrity of the entire CSSP. This Court has appointed Special Master Freeh to determine the extent of this and other misconduct and to examine the compliance and controls practices of the CSSP. Given the allegations and evidence uncovered thus far, BP should not be required to take the risk that any payments, much less the hundreds of millions of dollars that will be paid on claims during the pendency of the Freeh investigation, were tainted by fraud, corruption and malfeasance. A temporary suspension in CSSP payments will eliminate the serious risk of any further irreparable harm to BP while having little negative impact upon the claimants. As Justice Cardozo prudently wrote long ago, a fiduciary owes "[n]ot honesty alone, but the punctilio of an honor the most sensitive."[7] And the only way to restore that honor to the CSSP is to suspend all payments now and await Judge Freeh's report. Accordingly, the Court should grant the narrow relief requested to protect BP as well as the CSSP and this Court while Special Master Freeh completes his work.

---

[7]     *Investors Syndicate of Am., Inc. v. City of Indian Rocks Beach, Fla.*, 434 F.2d 871, 879 (5th Cir. 1970) (citing *Meinhard v. Salmon*, 164 N.E. 545, 547 (N.Y. 1928)).

July 16, 2013

James J. Neath
Mark Holstein
BP AMERICA INC.
501 Westlake Park Boulevard
Houston, TX  77079
Telephone:  (281) 366-2000
Telefax:  (312) 862-2200

Daniel A. Cantor
Andrew T. Karron
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone:  (202) 942-5000
Telefax:  (202) 942-5999

Jeffrey Lennard
Keith Moskowitz
DENTONS US LLP
233 South Wacker Drive
Suite 7800
Chicago, IL  60606
Telephone:  (312) 876-8000
Telefax:  (312) 876-7934

**OF COUNSEL**

Respectfully submitted,

   _/s/ Richard C. Godfrey, P.C._
Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
David J. Zott, P.C.
Jeffrey J. Zeiger
Wendy L. Bloom
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone:  (312) 862-2000
Telefax:  (312) 862-2200

Jeffrey Bossert Clark
Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 879-5000
Telefax:  (202) 879-5200

   _/s/ Don K. Haycraft_
S. Gene Fendler (Bar #05510)
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
Telephone:  (504) 581-7979
Telefax:  (504) 556-4108

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  (202) 662-5985
Telefax:  (202) 662-6291

**ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.
AND BP AMERICA PRODUCTION COMPANY**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 16th day of July, 2013.

<u>/s/ Don K. Haycraft</u>
Don K. Haycraft