# Exhibit 7



July 1, 2013

**By Hand Delivery**

The Honorable Carl J. Barbier
United States District Judge
United States District Court, Eastern District of Louisiana
500 Poydras Street, Room C-256
New Orleans, LA  70131

      Re:     **Response to BP's June 21, 2013 Letter Requesting Independent Investigation**

Dear Judge Barbier:

      The Claim's Administrator's Office ("CAO") is in receipt of a copy of the June 21, 2013, letter to the Court from Mark Holstein of BP requesting an independent investigation regarding allegations against Lionel H. Sutton, III ("Mr. Sutton") and Christine Reitano ("Ms. Reitano"), two former members of the CAO's staff.  The CAO shares BP's concerns regarding these serious allegations and wholly agrees that no place exists in the Deepwater Horizon Court Supervised Settlement Program (the "Program") for employees who stand to gain personally from claimant awards.  Accordingly, immediately upon receipt of allegations of potential misconduct, the CAO initiated a full internal investigation and, upon finding information that potentially supports some of the allegations, the CAO contacted the Court and thereafter presented the information to the Court and both Parties.

      The CAO understands that, since BP's June 21 letter, the Court has appointed an independent investigator, a decision that the CAO itself had recommended and fully supports.  The CAO has been and will continue to be fully committed to working with the Parties, the Court, and the independent investigator.

      In its June 21 letter to the Court, however, BP criticizes the CAO by stating that, had BP not "pressed" the CAO, "it is possible that no further investigation into the Sutton matter would have been undertaken."  This is far from the truth and refuted by the clear evidence of the CAO's diligent investigation from the moment it was notified of the potential wrongdoing, as demonstrated by the following timeline of events.

      On May 28, 2013, David Welker, the CAO's Fraud, Waste, and Abuse Director and former Special Agent in charge of the FBI's New Orleans Division, was notified by a confidential source that he/she possessed information harmful to the CAO.  The source, who

indicated that he/she would provide the information only if strict confidentiality was provided, advised Mr. Welker that he/she had received the information from a third party who also desired to remain anonymous. The confidential source provided the following allegations to Mr. Welker:

(1) Mr. Sutton had been referring claims to the ▮▮▮▮ in exchange for "kickbacks" from any recovery on those claims paid by the Program to the ▮▮▮▮;

(2) Some claims may have been initially filed by Mr. Sutton or Ms. Reitano and were later transferred to the ▮▮▮▮;

(3) Mr. Sutton had recently opened a separate checking account to place the money received from the ▮▮▮▮;

(4) Mr. Sutton and ▮▮▮▮ had been in business together in the past and continued to own a business together;

(5) Mr. Sutton was writing policies within the Program that ultimately may benefit himself and his friends who are attorneys;

(6) Mr. Sutton attempted to influence a claim filed by the ▮▮▮▮.

Mr. Welker immediately notified Program CEO David Odom and CFO Bob Levine of these serious allegations on that same day. I was in Chicago at the time and was notified on May 30, 2013 upon my return. Despite the uncertainty of the source and the potential unreliability of information provided by a confidential informant, I immediately instructed Mr. Welker to investigate the matter aggressively and thoroughly, and I authorized the use of any available resources to do so.

Thereafter, the CAO (through Mr. Welker) developed an investigative plan and began implementing the plan. On June 3, 2013, Mr. Welker began reviewing the Program's database for claims filed by the ▮▮▮▮, ▮▮▮▮, and Mr. Sutton. The review revealed that the ▮▮▮▮ and/or ▮▮▮▮ represented approximately 675 claimants, 402 of which had complete claim files (both a completed registration form and a complete claim form). Over several days, Mr. Welker reviewed and analyzed all pertinent documents in 43 of those claim files. During the course of that review, it was discovered that one of the 43 claimants, ▮▮▮▮ (▮▮▮▮), who was currently represented by ▮▮▮▮ had previously been represented by Ms. Reitano when she worked for Sutton and Reitano, APLC.[1] The claimant had filed a total of five claims and had received payment on

---

[1] Documents in the file indicated that Ms. Reitano ceased representing that claimant on March 30, 2012, and, thereafter, the claimant was represented by ▮▮▮▮. Documents in the file also indicated that Ms.

three of them in excess of $400,000, with the remaining unpaid claims in subsistence and vessel damage. The CAO's review of the claims database also revealed that the ▮▮▮▮ had a pending BEL claim for its firm, payable in an amount of approximately $7.6 million.

On June 6, Mr. Welker contacted the FBI to determine whether the allegations could constitute a federal crime as opposed to ethical violations. Mr. Welker also queried the Louisiana Secretary of State database for businesses owned by both ▮▮▮▮ and Mr. Sutton. A review of state records confirmed that Mr. Sutton did have a previous business relationship with ▮▮▮▮, and that Mr. Sutton and ▮▮▮▮ (of the ▮▮▮▮ law firm) both have interests in a company called ▮▮▮▮.

During the week of June 10, 2013, Mr. Welker discussed examining the content of the computers of Mr. Sutton and Ms. Reitano with the Program's senior IT manager, who began the process of collecting emails from those computers. During that same week, I confronted Mr. Sutton, and he denied the allegations.

On June 14, Keith Moskowitz of BP contacted me for the first time regarding this matter and requested a meeting. At 9:00 a.m. on June 17, 2013, Mr. Welker and I met with Mark Holstein, Mr. Moskowitz, and two additional BP attorneys. At the meeting, BP informed us that it had been approached by two whistleblowers in late May regarding allegations similar to those provided to the CAO's office by the confidential informant. BP stated that one of these two whistleblowers possessed allegedly incriminating documents, but that BP had told the whistleblower to report the matter up through the facility (the CAO) and to turn the documents over to the Program.[2]

Mr. Welker then related to BP the allegations made by the confidential informant, as well as the investigative measures taken as of that date, including the review of the 43 ▮▮▮▮ claims, the public records searches, and the conversations with the FBI. Mr. Welker further explained that he had not yet reviewed all of the emails of Mr. Sutton and Ms. Reitano but that we had a process for such a review. At that time the process to obtain and review those emails had begun and was ongoing. BP's representatives were also told that I had confronted Mr. Sutton concerning the allegations, and that Mr. Sutton had denied them in full.

BP representatives inquired into the next steps of the internal investigation. We responded that we would review the emails of Mr. Sutton and Ms. Reitano, place a hold on the ▮▮▮▮ $7.6 million BEL claim in question, interview all Program personnel responsible for processing that claim, review the files of all claimants that were represented by the ▮▮▮▮ or ▮▮▮▮, and continue to follow up on any other leads that

---

Reitano had represented other claimants with GCCF claims. A search of the Program's database indicated that none of the former claimants represented by Ms. Reitano had filed a claim in the Program.

[2] Presumably, the whistleblower in possession of allegedly incriminating documents is employed within the Program.

developed. At the meeting, I also told BP that we had considered advising the Court about the matter, but that we wanted to obtain additional information to confirm the veracity (or lack thereof) of the allegations before doing so. I asked BP to contact the whistleblower and attempt to obtain the purportedly incriminating documents.

Mr. Welker and I both left the meeting with the understanding that the CAO would continue its internal investigation and that BP would attempt to re-contact the whistleblower and obtain the purportedly incriminating documents. All parties agreed that an open dialogue would continue as new information arose, and that we would reconvene at a later date. Accordingly, the CAO continued its internal investigation as described in the meeting.

Later in the day on June 17, 2013, I again confronted Mr. Sutton about the allegations this time in the presence of Michael Juneau. Mr. Sutton again adamantly denied the allegations. Mr. Welker's investigation continued as planned.

The CAO heard nothing further from BP until the evening of June 18, 2013, when I received a phone call from Mr. Moskowitz in which he asked if he could hand-deliver something to me. At approximately 9:00 p.m., he met me outside as I was leaving my office and handed me an envelope. I asked him if it contained the documents I had asked BP to obtain from the whistleblower, and Mr. Moskowitz responded that he did not know what it contained.

The envelope contained a letter from Mark Holstein to me which outlined specific steps that BP said the CAO should take in its investigation, suggested that the CAO had certain fiduciary obligations, and suggested that an independent investigation be conducted by a person or firm with no interest in the Program. BP further stated in its letter that "[you] did not provide us with any specific information about the nature and extent of [the] investigation or when you expect to complete the investigation," despite the fact that, on the previous day, in the aforementioned meeting with BP, David Welker had provided a detailed account of the progress of the investigation to date.

After reviewing the June 18 letter, I immediately contacted Leslie Schiff, a Louisiana attorney specializing in legal ethics. I reported to him the current status of events and assessed his availability to perform an investigation of the matter.

On the morning on June 19, 2013, I suspended Mr. Sutton and Ms. Reitano from all activities associated with the Program pending the outcome of the internal investigation. On that same morning, Mr. Schiff along and his partner Steve Scheckman came to our office and began investigating the matter by conducting interviews and reviewing pertinent documents.

On the afternoon of June 19, 2013, I, along with Mr. Schiff, met with Your Honor and Magistrate Judge Shushan in chambers to discuss the allegations and report on the ongoing investigation.

At 6:25 p.m. on June 19, Mr. Welker reported the results of his search of emails on Mr. Sutton's computer containing the key words "▮▮▮▮" and "▮▮▮▮," the name of the claimant that had formerly been represented by the Sutton Reitano law firm. Recognizing that the emails may support some of the allegations of the confidential informant, I immediately contacted Your Honor that evening to request an additional meeting with the Court, which was arranged for the following morning.

The next morning, June 20, I met with Your Honor, presented the emails that had been discovered during the investigation, and suggested that the Parties be advised. At 2:00 p.m. that same day, BP, the CAO, and the PSC met with Your Honor in chambers to discuss the allegations, the findings to date, and future steps in the investigation. I provided everyone with a copy of the preliminary investigative report prepared by Mr. Welker outlining the internal investigation and findings to date.[3] At the meeting, BP suggested, as it had in its June 18 letter to the CAO, that there should be an independent investigation conducted by a person or firm with no interest in the Program. According to my recollection, Your Honor acknowledged that you thought that the CAO had already started that process by contacting Mr. Schiff, but that the parties should meet and make a recommendation with regard to an independent investigation.

On Friday June 21, 2013, Mr. Sutton resigned.[4] I did not hear anything further from BP until June 21 at approximately 5:30 p.m. when I received a copy of BP's letter to the Court requesting a full and immediate independent investigation and criticizing the CAO's investigation, alleging that, had BP not "pressed" the Sutton matter by requesting a meeting on June 17 and then following up with its June 18 letter, the CAO may not have undertaken any further investigation. As the facts demonstrate, however, this inference is simply untrue. Quite clearly, the CAO had undertaken a full and thorough investigation of the matter before being contacted by BP. Moreover, BP knew that fact as of its June 17 meeting with the CAO.

On June 24, Mr. Schiff informed me that he might have a conflict of interest that would prohibit him from further working on this matter because of property that he owned in Grand Isle. I called Your Honor to relate this development, and I concurred with the Court's intent to appoint an independent third-party investigator of its choosing.

On June 25, we were advised that the Court had appointed Louis Freeh, former director of the FBI, to conduct an independent investigation into the allegations. The CAO fully supports the Court's designation of Mr. Freeh and will fully cooperate with and aid in his independent investigation. And, as directed by the Court, the CAO will continue to conduct its own internal investigation and relate all findings to the Court, as it has previously done.

---

[3] Curiously, less than one hour after this meeting, the CAO began to receive inquiries concerning these allegations from various news sources.

[4] Ms. Reitano was terminated for cause on June 26, 2013.

July 1, 2013
Page 6

                                Sincerely,

                                Patrick A. Juneau

cc: Magistrate Judge Shushan