UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "DEEPWATER HORIZON" in the Gulf of Mexico, on April 20, 2010<br><br>Applies to: No. 12-970 | MDL No. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAGISTRATE SUSHAN |

**OPPOSITION TO BP'S MOTION FOR PRELMIINARY INJUNCTION TO SUSPEND PAYMENTS FROM THE COURT SUPERVISED SETTLEMENT PROGRAM**

The Economic & Property Damages Settlement Class, by and through the Class Representatives and appointed Class Counsel, respectfully submits the following memorandum in opposition to BP's Motion for an Injunction to Suspend Payments [Doc. 10761]:

**MAY IT PLEASE THE COURT:**

Class Counsel agree that each and every claim submitted to the Court-Supervised Settlement Program should be evaluated and either denied or paid in strict accordance with the transparent and objective criteria so carefully negotiated and detailed in the 1,000-plus page Settlement Agreement.  However, BP has not identified a single claim that it contends was "tainted" or otherwise affected by the *alleged* conflict of interest.   And because BP retains the right to appeal any and all such determinations (if any) – as well as policy interpretations with which BP might disagree – there cannot be "irreparable harm" nor, indeed, any harm.

One of the great strengths of the Settlement Agreement, in this regard, is that, upon denial or award, both the Claimant and BP are provided with the entire Claims File and an explanation

1

of exactly how the Claim was evaluated and the determination was made.[1]  If, in BP's opinion, any claim was not evaluated in strict accordance with the transparent and objective criteria set forth in the Settlement Agreement – for *any* reason – BP retains the right to appeal any claim in excess of $25,000 to independent Appeal Panelists whom BP recommended jointly with Class Counsel.[2]

Similarly, as recognized by Mr. Moskowitz in his Declaration, BP retains the right to have any Policy reviewed by the Court, and to separately argue to the Settlement Program Appeal Panelists that a Policy to which BP did not formally agree was incorrectly interpreted by the Claims Administrator.[3]  Hence, while BP has not introduced any evidence that a single Policy was "tainted" or otherwise affected by the *alleged* conflict of interest, BP has not suffered, nor does it face the threat of, "irreparable harm", nor indeed any harm.

Both the Claims Administrator and this Court have acted swiftly and appropriately in response to the initial rumors relating to the two former employees.  A preliminary investigation was immediately conducted at Mr. Juneau's direction by Mr. Welker, a former Special Agent in charge of the New Orleans branch of the FBI.  The Law Firm Y Claim and those of all of its clients were immediately placed on hold, and the employees in question were placed on administrative leave.  (They have both since been terminated or resigned.)   The issue was immediately brought to the attention of Judge Barbier, who appointed former FBI Director, Judge Freeh, as Special Master to conduct an independent investigation.   The alleged

---

[1] *See* SETTLEMENT AGREEMENT, § 6.1.2.1.1 ("The Settlement Program shall provide access to the Claimant and the BP Parties of all forms, calculations and worksheets relied upon by the Settlement Program in reaching the final determination"); *see also,* §4.4.14 (the Claim File is provided to BP, as well as the Claimant and Class Counsel, upon determination, so that BP or the Claimant can prosecute or defend a Settlement Program Appeal).

[2] *See* SETTLEMENT AGREEMENT, §§ 6.1.2.2.3 and 6.1.2.2.4. *See generally,* SETTLEMENT AGREEMENT, Section 6 and Exhibit 25.

[3] *See* MOSCOWITZ DECLARATION (July 15, 2013) [Rec. Doc. 10761-5], ¶ 5;  *see also,* HERMAN DECLARATION (April 1, 2013) [Rec. Doc. 9087-3], ¶¶ 7-8;  *see also,* SETTLEMENT AGREEMENT, § 4.3.4.

2

misconduct, which appears to be limited and isolated in nature, has ceased, the investigation is underway, and the public will be informed of the results in due course.

In the meantime, Class Counsel agree that each and every claim should be evaluated and either denied or paid in strict accordance to the transparent and objective criteria so carefully detailed in the 1,000-plus page Settlement Agreement.[4]  And in the event either BP or the Claimant believes this was not done – for any reason – there is an independent and transparent process by which correction of that award or denial can be made.  But there is no provision within the Settlement Agreement, nor the Trust Agreement, nor any statutory or other legal authority, which supports BP's right to enjoin final payments which have been subject to scrutiny and challenge by BP, based solely on the allegation that a conflict may have existed and a general (and at this point completely unsupported) contention by BP that unspecified "corruption" of a policy or claim *may* have occurred.

For these reasons, and for the reasons stated below, BP's Motion for an "Emergency" Injunction to Suspend Settlement Payments should be denied.

**I.      BP Does Not Allege That Any Specific Misconduct Caused or Contributed to the "Variable Profit" Issue currently before the U.S. Fifth Circuit Court of Appeal.**

Given the sweeping generalizations in BP's motion, it bears mention of what is not in question.  BP does not allege that any action taken by Mr. Sutton or Mrs. Reitano in any way caused, contributed to, or influenced the "variable profit" interpretation made by the Settlement Program.  In fact, BP took advantage of the robust administrative process to argue its position. BP briefed and argued its position on "variable profit" to the Claims Administrator personally, having discussed the issue directly with Program Accountants, PricewaterhouseCoopers (PwC)

---

[4] Indeed, it was Class Counsel who insisted upon the inclusion of Section 4.4.7 of the Settlement Agreement, which requires that: "The criteria, documentation, proof, and compensation amount provisions of each of the Claims categories shall apply equally to all Claimants regardless of whether they are proceeding individually, represented by others, or proceeding as an assignee of an individual Claim."

and Postlethwaite & Netterville (P&N), and then argued and briefed its position three times to this Honorable Court.  BP was provided with every opportunity to introduce any and all exhibits it believed supported its position.  Given the bulk of the record and the briefing by the parties, it's simply not credible to believe that either of these former employees could have improperly influenced the development, interpretation, or implementation of "variable profit" within the Business Economic Loss (BEL) portion of the Settlement Program.  And BP makes no such claim.

II.     **The Settlement Program's Robust Process Ensures BP's Involvement in Every Policy Determination, Thereby Defeating BP's Burden to Show the Likelihood of Succeeding on the Merits, as well as any claim of "Irreparable Harm".**

BP makes no "strong showing" for the court to issue an injunction.  BP's sweeping generalizations buried within conditionals and tempered by such words as "potential," "may", and "appear" do not justify shutting down a claims program that is processing well over 100,000 claims.   Even BP's concern of "reputational risk" is not injunction-worthy.  BP's "balance of equities" argument is simply not a component of the preliminary injunction elements.[5]  Even under a far more lenient standard than the United States Supreme Court or the Fifth Circuit have required for the extraordinary relief of a preliminary injunction, BP's showing fails.

   A.   **The Robust Administrative Process Provided BP with the Opportunity to Comment, Influence, and Even Appeal Policy Decisions, Irrespective of Any Lower-Level Administrative Personnel.**

In negotiating the Settlement Agreement, BP ensured that it would be actively involved in its implementation and administration.  Policy decisions could not be drafted or decided without ample opportunities for BP to comment, influence, and object to them.  Safeguards were

---

[5] Equity and public policy favor the implementation of class action settlements. See Ehrheart v. Verizon Wireless, 609 F.3d 590, 593 (3d Cir. 2010) ("A strong public policy exists, which is particularly muscular in class action suits, favoring settlement of disputes, finality of judgments and the termination of litigation.").

included which even allow BP to appeal Policy Decisions to independent Settlement Program Appeal Panelists and to this Honorable Court.  True to the aim of fairness, BP and Class Counsel ensured that neither side could "hoodwink" the other during the implementation and administration of this historic settlement.

As noted by BP Counsel Keith Moskowitz's in his supporting declaration:

> The Settlement Agreement sets forth and contemplates a <u>transparent</u> and <u>collaborative</u> <u>process</u> between the Claims Administrator, BP, and Class Counsel in connection with the implementation and administration of the Settlement Agreement.  <u>The Claims Administrator has implemented a process to present questions and issues related to the Settlement Agreement's implementation and administration to BP</u> and Class Counsel.  At the outset of the claims administration process, the Claims Administrator compiled a spreadsheet of such questions and issues that was updated and <u>presented</u> <u>to</u> <u>BP</u> and Class Counsel for input and resolution.
>
> This process was later refined by the Claims Administrator, but the refined process operates in substantially the same fashion to facilitate the <u>presentation of questions and issues to BP</u> and Class Counsel for consideration and comment prior to the Claims Administrator taking his own final position on the question or issue.  Under the refined process, the Claims Administrator issues a written <u>Request for Input from BP</u> and Class Counsel regarding a question or issue identified by the Claims Administrator related to the implementation or administration of the Settlement.  <u>Once BP and Class Counsel respond to the Request for Input</u>, the Claims Administrator issues a written Policy Statement which constitutes the Claims Administrator's position on the question or issue.  The parties can then provide comments to the Policy Statement…. [I]f the parties do not agree with the Policy Statement, the parties typically provide comments for the Claims Administrator's consideration, and either classify the policy as a "Claims Administrator Decision" or "Request a Panel."  <u>BP and Class Counsel may categorize a policy as "Claims Administrator Decision," which means that they are acknowledging the policy subject to a reservation of the right to object to the policy in the future, including, but not limited to, instances in which the policy is applied to specific claims.</u>[6]

---

[6] MOSCOWITZ DECLARATION (July 15, 2013) (attached as Exhibit 4 to BP's Motion) [Rec. Doc. 10761-5], ¶¶ 4-5, (emphasis supplied).  (*See also, generally,* HERMAN DECLARATION (April 1, 2013) [Rec. Doc. 9087-3], ¶¶ 6-8.)

5

After all of this input and collaboration between BP and the Claims Administrator, BP still has several options to challenge a policy decision that it believes is improper. BP can appeal the Claims Administrator's final policy decision to this Court.[7] Additionally, BP can argue to the independent Settlement Program Appeal Panelists that the Claims Administrator's Policy constitutes an incorrect interpretation of the Settlement Agreement; and in the event such Settlement Program Appeal is rejected, BP can seek discretionary review of the policy or interpretation by this Honorable Court.[8] In all, the robust claims process empowers BP to comment, influence, and challenge a Policy Decision before, during, and after the Claims Administrator has issued same.

Ultimately, whatever malfeasance either former employee may or may not have committed, neither of them would ever be in a position to control formal policy determinations.[9] The decision itself is the Administrator's alone,[10] generally predicated on suggestions made by BP.[11] Neither Mr. Sutton nor Mrs. Reitano were ever authorized to make any policy decisions. Their "description and scope of service" which is attached to their employment contracts confirms this:

---

[7] SETTLEMENT AGREEMENT, § 4.3.4.
[8] *See generally,* SETTLEMENT AGREEMENT Section 6. (*See also,* MOSCOWITZ DECLARATION, ¶ 5, *and,* HERMAN DECLARATION, ¶¶ 7-8, *supra.*)
[9] It is noteworthy that for almost two months BP has had access to the names (and entire Claim Files) of the claimants that Mr. Sutton allegedly may have received "kickbacks" for, but has not alleged that payments were made when not owed.
[10] Questions regarding the interpretation of the Seafood Compensation Program were generally made completely outside of the Settlement Program apparatus, by Mr. Perry and/or Mr. Balhoff, who were appointed as Seafood Program Neutrals by the Court.
[11] While the undersigned have not attempted to systematically recount the history of each Policy Decision, it is Class Counsel's general recollection that the majority of final Policy Decisions were agreed to, if not originally suggested by, BP. Many of these decisions are categorized as a "Claims Administrator's Decision" (as opposed to "Agreed to by the Parties") because Class Counsel either did not fully agree with the interpretation or felt it was more appropriate to preserve for Class Members the argument that the Settlement Agreement should be interpreted (and/or applied) differently in individual cases.

- Work with the Parties to identify any policy/legal issues and seek resolution at the direction of the Claims Administrator

- Assist the Claims Administrator with interpretation of the Settlement Agreement, Court Orders, and other legal documents

- Work with the vendors and Claims Administrator's staff on legal issues and provide guidance as needed.[12]

Even BP's Counsel Mr. Moskowitz, the point person for BP on claims administration who attended many of these meetings, avers that Mrs. Reitano only performed administrative duties such as sending out requests for comment, compiling requests, and attending meetings.[13] Mr. Moskowitz only remembers Mr. Sutton being involved in Subsistence claims and Moratoria Loss reviews (which were still under discussion by the Parties and have not been finalized to this day).[14] In fact, Mr. Sutton did not even start with the program until November 1, 2012, five months after the June 4, 2012 start date.[15]

The process of creating policy determinations has been working extraordinarily well for more than 14 months. Over 200 policy decisions have been finalized using this process, covering all of the different claim types and the spectrum of administrative and implementation issues.[16] The process is currently in full stride with over 200 more policy determinations in various stages of development, ranging from "sent to the parties for input," "agreed by the

---

[12] LIONEL SUTTON III AGREEMENT, at 6 "Schedule 1", attached as Exhibit 3 to BP Motion for Preliminary Injunction; CHRISTINE REITANO AGREEMENT, at 5, "Schedule 1", attached as Exhibit 1 to BP Motion for Preliminary Injunction.
[13] MOSKOWITZ DECLARATION, ¶ 6.
[14] MOSKOWITZ DECLARATION, ¶ 7. Mr. Moskowitz simply remembers that Mr. Sutton and Mrs. Reitano attended meetings where other claims were discussed but does not state that they engaged in any discussions. *Id.* at ¶ 8.
[15] <u>Investigative Report</u>, at 1 (6/20/13), attached as Exhibit 2 to BP's Motion for Preliminary Injunction.
[16] *See* LIST OF POLICY DETERMINATIONS, attached as Exhibit A.

parties," and awaiting comment of a "claims administrator decision."[17]

Not only does the process itself preclude any untoward manipulation of policy decisions by subordinates, but a necessary implication of the robust process is that no policy determination can ever "slip by" BP without the opportunity for BP to <u>agree to the policy itself</u>.  In other words, BP gets a vote to determine whether or how a policy should be implemented.  That is BP's remedy.  If BP disagrees with the Administrator's policy decision, BP can appeal to independent Settlement Program Appeal Panelists and/or to this Court.  BP has not pointed to a single policy decision that it did not have the opportunity to comment, question, or vote on. Nor has BP identified a single policy that it claims was "tainted" or otherwise departed from the established process.  Moreover, even assuming some inappropriate influence on a Policy to which BP takes exception, there is no threat of "irreparable harm" (nor any harm) as BP fully retains several avenues to object, re-visit, and appeal.

### B. BP's Motion is Not a Preliminary Injunction.

BP's motion should not be treated as a preliminary injunction.  First, there are no underlying "merits" for BP to establish a "likelihood of success" on.  BP has identified no controlling Settlement Agreement provision, statute or other legal authority to provide the basis of its relief, nor does there appear to be an underlying Complaint.

Secondly, BP is requesting to "enjoin" the Settlement Program.  However, Federal Rule of Civil Procedure 65 only pertains to "adverse parties."  BP and Class Counsel both support the settlement and sought final approval before this Court.  BP is not "adverse" to the Settlement Program.  Rule 65 does not contemplate, nor was it designed to address, issues relative to a negotiated settlement program overseen by the federal judge ultimately responsible for its implementation.

---

[17] *See* LIST OF STATUS OF POLICY DETERMINATIONS, attached as Exhibit B.

This is not to say that the Court does not have the authority to take appropriate action (which could theoretically involve a blanket suspension of all claims) in accordance with Sections 4.3.1 and 18.1 of the Settlement Agreement.[18] (Note that Section 18.2 requires a certification that the parties have met and conferred before bringing the issue to the Court, which was not done in this case.) But BP has no right to seek an injunction pursuant to Rule 65.[19]

### III. The Claims Administrator Has Faithfully and Impartially Executed His Fiduciary Duties to the Beneficiaries and the Trust.

Class Counsel agree with BP that the Claims Administrator first owes a fiduciary duty to the beneficiaries of the Settlement Program – *i.e.* the Class Members – who are also the beneficiaries of the Trust.

BP does not allege that the Administrator violated an Order of the Court. BP does not allege that the Administrator violated the terms of his contract. BP does not allege that he harmed the beneficiaries of the Settlement Program. Rather, invoking Delaware law, BP suggests that the Claims Administrator *may* have "violated" some general duty to BP. Such suggestion rings hollow.

The Claims Administrator oversees thousands of employees who assist in the administration of the Settlement Program. He created one of the largest settlement programs in history from scratch in only a matter of months. He established a fraud detection program with

---

[18] *See also,* SETTLEMENT AGREEMENT §§ 4.4.7 and 6.1.2.2.5.

[19] Even assuming BP used the proper procedural vehicle, the exacting standard of a preliminary injunction motion has not been met. *See, e.g.,* Moore v. Tangipahoa Parish Sch. Brd., ___ F.3d ___, 2013 U.S. App. LEXIS 877 at *8 (5th Cir. 1/14/13) (citing Niken v. Holder, 556 U.S. 418, 434 (2009)) (movant must show more than a mere possibility of relief"; rather, movant must make "a strong showing that [it] is likely to succeed on the merits."); Tex. Med. Providers Performing Arbortion Servs. v. Lakey, 667 F.3d 570, 579 (5th Cir. 2012) (vacating preliminary injunction) ("We have cautioned repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion on all form requirements'"); Lake Charles Diesel, Inc. v. Gen. Motors Corp., 328 F.3d 192, 195-196 (5th Cir. 2003). Moreover, an "absence of likelihood of success on the merits is sufficient to make the district court's grant of a preliminary injunction improvident as a matter of law." Tex. Med. Providers, 667 F.3d at 574; Lake Charles Diesel, 328 F.3d at 203.

numerous safeguards – safeguards built largely upon those employed by the GCCF.

The Claims Administrator hired numerous professionals from a range of backgrounds – lawyers, certified public accountants, economists, IT, and managerial staff.  He ensured that their employment contracts included a "Conflict of Interest and Recusal" clause which required them not to "participate, without prior written approval, from the Claims Administrator, in any activity that presents or would appear to present to a reasonable person who is knowledgeable of the relevant facts, a conflict of interest with the Court Supervised Claims Program."[20]

BP irresponsibly suggests that the Administrator violated some duty to BP by hiring "unqualified and unethical employees" and by failing to "detect and combat fraud."  Yet, BP does not explain how Mr. Juneau was to know that these former employees were "unethical" (assuming that they were) nor how they were allegedly "unqualified".

As for repeated references to "whistleblowers," it would seem that if these sources are employed by the Program, this would be evidence of a positive hiring program that resulted in the selection and retention of conscientious employees.

Based on the existing record, it appears that this was a very limited and isolated situation, to which the Claims Administrator immediately and appropriately responded.  There is no evidence that any Policy was wrongfully implemented or any Claim wrongfully paid.  Even assuming *arguendo* that a former employee of the Program may have received referral fees contrary to his or her ethical or contractual responsibilities, the appropriate remedy would not be to suspend payments made in accordance with the strict terms of Settlement Agreement to innocent trust beneficiaries.

---

[20] SUTTON EMPLOYMENT CONTRACT, at 4-5, attached as Exhibit 3 to BP's Motion for Preliminary Injunction (attesting that he will responsibly carry out his duties "free of any conflict of interest as an independent contractor not affiliated with any other person or entity" and that he will "take appropriate steps to avoid even the appearance of a conflict of interest or loss of impartiality").

## Conclusion

There is simply no excuse for fraud or self-dealing. The Court and the Administrator have taken immediate and appropriate steps. BP should place its faith in the Court, the Special Master, the Appeal Panelists, and the Claims Administrator it selected, rather than seeking to enjoin potentially thousands of transparent, objective and appropriate awards that BP has not identified or challenged as improper under the Settlement Agreement.

This 18th day of July, 2013.

Respectfully submitted,

| | |
|---|---|
| /s/   Stephen J. Herman | /s/ James Parkerson Roy |
| **Stephen J. Herman**, La. Bar No. 23129 | **James Parkerson Roy**, La. Bar No.11511 |
| **HERMAN HERMAN & KATZ LLC** | **DOMENGEAUX WRIGHT ROY & EDWARDS LLC** |
| 820 O'Keefe Avenue | 556 Jefferson Street, Suite 500 |
| New Orleans, Louisiana 70113 | Lafayette, Louisiana 70501 |
| Telephone: (504) 581-4892 | Telephone: (337) 233-3033 |
| Fax No. (504) 569-6024 | Fax No. (337) 233-2796 |
| E-Mail: sherman@hhkc.com | E-Mail: jimr@wrightroy.com |
| *Co-Lead Class Counsel* | *Co-Lead Class Counsel* |

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing Opposition has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 18th day of July, 2013.

s/  James Parkerson Roy and Stephen J. Herman