| Row No | Policy/Procedure ID | Policy Request ID | Current Status | Announced Date | Type of Decision | Policy Subject | Policy Summary | Settlement Agreement Reference | Affected Claim Types/ Review Processes | Revision No | Policy Availability |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 98 | Pol-1 | 1 | Approved Policy or Procedure | 5/5/2012 | Claims Administrator Decision | Individual Economic Loss Claims: Similar Jobs | The Settlement Agreement refers to "comparable jobs" and "similar jobs." "Comparable job" is defined in Definition C-Benchmark Period, but "similar job" is not defined. Everywhere the Settlement Agreement references "similar job," we will use the "comparable job" definition. | Exhibit 8A | IEL | 0 | External |
| 99 | Pol-2 | 2 | Approved Policy or Procedure | 5/11/2012 | Claims Administrator Decision | Coastal Real Property Claims: Document Requirements for Lessees | If a claimant is the lessee of a Parcel or Deeded Boat Slip, we only require the claimant to submit an executed copy of the lease agreement and proof of payments made under the lease terms. | Exhibit 11A, Section 1 | Coastal | 0 | External |
| 100 | Pol-3 | 3 | Approved Policy or Procedure | 5/11/2012 | Claims Administrator Decision | All Property Claims: Joint Ownership | We will process claims based on claimant responses and submitted documentation. If a claimant submits proof of ownership with someone else, the compensation amount will be reduced by the claimant's ownership percentage of the parcel or vessel. | Exhibit 11A, Section 2.F.iii; Exhibit 12A, Sec. 2.E.iii; Exhibit 13A, Sec. 2.B.c | Real Property Sales,VoO Charter Payment,Coastal,Wetlands,Vessel Physical Damage | 0 | External |
| 101 | Pol-4 | 4 | Approved Policy or Procedure | 5/11/2012 | Claims Administrator Decision | Coastal and Wetlands Real Property Claims: Vessel Damage | The Coastal and Wetlands Real Property Claim Forms inform claimants that claims for physical damage to a vessel must be made under the Vessel Physical Damage Claim framework. If a claimant submits a Coastal or Wetlands Real Property Claim for physical damage to a vessel, we will send the claimant a Notice stating that the physical damage claim must be filed as a Vessel Physical Damage Claim. | Exhibits 11A, p. 7, Sec. 3A; 12A, p. 7, Sec. 3A | Coastal,Wetlands | 0 | External |
| 104 | Pol-6 | 6 | Approved Policy or Procedure | 5/11/2012 | Claims Administrator Decision | Exclusions: Sellers/Marketers of BP-Branded Fuel | We will allow individuals that identify as employees of BP-branded fuel to submit and be compensated for any claim not related to BP-branded fuel. | Section 4.4.7, Section 2.2.4.1, Section 2.2.4.2, Section 2.2.4.3, Section 2.2.4.4, Section 2.2.4.5, Section 5.10.2, Section 5.10.3, Section 5.10.4, Exhibit 16, Exhibit 17, Exhibit 18 | Exclusions | 0 | External |
| 6 | Pol-7 | 7 | Approved Policy or Procedure | 5/17/2012 | Claims Administrator Decision | Business Economic Loss Claims: Causation | If the claimant only submits 2007 and 2009 documentation, the claimant must use 2009 as the only potential benchmark if he/she/it cannot provide 2008 documentation. | Exhibit 4B | BEL | 0 | External |
| 7 | Pol-8 | 8 | Approved Policy or Procedure | 5/17/2012 | Claims Administrator Decision | Individual Economic Loss Claims: Causation | For each Claiming Job, we will determine if a claimant submitted sufficient information for each category designation to pass causation and perform a calculation. If a claimant cannot submit Tax Information Documentation for 2010 and/or the claimant's Base Year(s), we will consider him incomplete unless the claimant provides a Sworn Written Statement for the years in which he is missing information. For example, if the claimant provided tax records from 2007-2009 and only payroll records from 2010, he is incomplete unless he provides a Sworn Written Statement indicating that no 2010 tax return is available. Submitting pay period documentation is not a substitute for tax documentation that is otherwise available. | Exhibit 8A | IEL | 0 | External |
| 106 | Pol-9 | 9 | Approved Policy or Procedure | 5/17/2012 | Claims Administrator Decision | Individual Economic Loss Claims: Causation | We will evaluate each Claiming Job on its own merits. Therefore, claimants could have one Category I Claiming Job and a Category II Claiming Job and a Category III New Entrant Claiming Job. This should be rare. | Exhibit 8A | IEL | 0 | External |
| 102 | Pol-10 | 10 | Approved Policy or Procedure | 5/17/2012 | Claims Administrator Decision | Individual Economic Loss Claims: Causation | We will treat a claimant who worked for an Eligible Employer and was terminated for cause to be eligible to collect losses until the date of termination with no RTP applied as long as that claimant can produce documentation of earnings for at least a 90 day Compensation Period. | Exhibit 8A, I, II and III, Claimants without a Causation Presumption | IEL | 0 | External |
| 107 | Pol-11 | 11 | Approved Policy or Procedure | 5/17/2012 | Claims Administrator Decision | Individual Economic Loss Claims: Causation | The Compensation Period must be 90 days long, and if not, the Claiming Job will fail for causation. The claimant will receive an incomplete notice requesting additional information. If he cannot produce this information, he will be denied for that Claiming Job. | Exhibit 8A, p.5, and Terminated Claimants, pp. 11 and 20 | IEL | 0 | External |
| 108 | Pol-12 | 12 | Approved Policy or Procedure | 5/17/2012 | Claims Administrator Decision | Individual Economic Loss Claims: Causation | We will treat a claimant as if he worked at the time of the Spill if he submits consistent tax document from 2009 to 2010 from the same employer even if there is no clear indication that he was working on 4/20/10. If there is some indication that the claimant was not employed for the entire year (i.e.: through Pay Period Earnings Documentation), we will use that information to make a determination on the start and end date of the claimant's employment. | Exhibit 8A, Terminated Claimants, pp. 11 and 20 | IEL | 0 | External |
| 105 | Pol-15 | 15 | Approved Policy or Procedure | 5/17/2012 | Claims Administrator Decision | Individual Economic Loss Claims: New Entrants | The definition of New Entrant does not contemplate geographical limitations. If claimants were employed anywhere in a comparable job, not just in the Gulf, this disqualifies them from being New Entrants. | Exhibit 8A, p.4 | IEL | 0 | External |

| # | Code | # | Status | Date | Decision Type | Title | Description | Exhibit | Category | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 109 | Pol-21 | 21 | Approved Policy or Procedure | 5/17/2012 | Claims Administrator Decision | Individual Periodic Vendor/Festival Vendor Claims: Causation | One of the eligibility requirements for IPV/FV is that the claimant does not have a fixed business location. However, the causation analysis requires that we determine each loss location because claimants alleging losses in Zone C must provide additional documentation providing causation. We will (1) exhaust every possible avenue to distinguish between the sales (calling the claimant, scouring the documents, etc.) and (2) if we cannot do so, create a calculation method to exclude a certain amount or percentage of the sales that we cannot verify causation. | Exhibit 8D | IPV/FV | 0 | External |
| 110 | Pol-22 | 22 | Approved Policy or Procedure | 5/17/2012 | Claims Administrator Decision | Individual Periodic Vendor/Festival Vendor Claims: Losses Calculation | If a claimant identifies as both an IPV and FV, we will perform a calculation under each and the claimant may be able to recover the maximum amount under both, for a total of $48,000 maximum compensation amount. | Exhibit 8D | IPV/FV | 0 | External |
| 111 | Pol-23 | 23 | Approved Policy or Procedure | 5/17/2012 | Claims Administrator Decision | Real Property Sales: Foreclosures | Footnote 2 excludes property transfers from borrowers to lenders as part of the foreclosure process. We will review all submitted documentation and determine from the documentation whether the nature of the transaction is a foreclosure. | Exhibit 13A - Footnote 2. | Real Property Sales | 0 | External |
| 8 | Pol-25 | 25 | Approved Policy or Procedure | 5/18/2012 | Claims Administrator Decision | Subsistence Claims: Compensable Species | We will consider other species not mentioned in the short list of game included in the "Other Wetlands and Coastal Wildlife" definition as compensable if claimants prove that access to the resource was impaired by the Spill and those claimants satisfy the other requirements of the Subsistence framework. | Exhibit 9, Footnote 1 | Subsistence | 0 | External |
| 10 | Pol-27 | 27 | Approved Policy or Procedure | 5/18/2012 | Claims Administrator Decision | Subsistence Claims: Traditional or Customary Manner | "Traditional or customary manner" means the claimant fishes, hunts, consumes, barters, and/or trades the resources in a manner that is traditional and customary to the claimant. | Exhibit 9, Section A(2) | Subsistence | 0 | External |
| 11 | Pol-30 | 30 | Approved Policy or Procedure | 5/21/2012 | Claims Administrator Decision | Individual Economic Loss Claims: Causation | The Causation Requirements contain a directive that "[c]laimants may establish an alternative location of economic loss for the Claiming Job other than their employer's location by providing evidence that their primary employment activities and responsibilities occur in a location different from their employer's business address, and that the claimed DWH Spill-related economic loss occurred at such location." We will determine "primary" by looking at the claimant's work to see if more than 50% of the claimant's time at work was at the alternative location. | Exhibit 8A, Section II, B | IEL | 0 | External |
| 12 | Pol-32 | 32 | Approved Policy or Procedure | 5/21/2012 | Claims Administrator Decision | Individual Economic Loss Claims: Reimbursable Training Costs | We will not require original documentation for Reimbursable Training Costs. We will accept photocopies and original documents. | Exhibit 8A, I, II and III | IEL | 0 | External |
| 13 | Pol-33 | 33 | Approved Policy or Procedure | 5/21/2012 | Claims Administrator Decision | Subsistence Claims: Recreational Fishermen and Hunters | We will not use frequency of fishing and/or hunting as a proxy to determine whether a claimant is a recreational fisherman and/or hunter. We will use the information we obtain through claimant interviews and Subsistence Claimant Affidavits to determine whether a claimant is a recreational fisherman and/or hunter. | Exhibit 9 | Subsistence | 0 | External |
| 15 | Pol-37 | 37 | Approved Policy or Procedure | 5/21/2012 | Clarified by Seafood Neutral | Seafood Compensation Program Claims: Losses Calculation | We will only include an RTP calculation in the Historical Revenue Method models as the pre-determined compensation award for the Expedited and Reduced Expedited Methods include the RTP. | Exhibit 10 | Seafood | 0 | External |
| 16 | Pol-38 | 38 | Approved Policy or Procedure | 5/21/2012 | Claims Administrator Decision | Seafood Compensation Program Claims: Losses Calculation | We will calculate the best Benchmark Period and Compensation Method (where available) for each claimant. | Exhibit 10 | Seafood | 0 | External |
| 19 | Pol-41 | 41 | Approved Policy or Procedure | 5/21/2012 | Claims Administrator Decision | Seafood Compensation Program: Prior Payments | Prior Seafood Spill-Related Payments are claimant-specific and any offset will be taken after an award is allocated between the Vessel Owner and Lessee. | Exhibit 10 | Seafood | 0 | External |
| 28 | Pol-44 | 44 | Approved Policy or Procedure | 5/22/2012 | Claims Administrator Decision | All Property Claims and Subsistence Claims: Prior Payments | 1. We will deduct prior payments for the sale of Real Property made during the GCCF from Real Property Sales Claims. 2. We will deduct prior payments for physical damage made in the GCCF from Coastal or Wetlands Real Property Claims that include physical damage to Real or Personal Property aspects of the damaged Real or Personal Property is the same property previously compensated in the GCCF. 3. We will deduct prior payments for physical damage to a vessel made in the GCCF from Vessel Physical Damage Claims if the vessel claimed in the DWH Program is the same claimed in the GCCF. 4. We will make the deductions/offsets from VoO Charter Payment Claims as described in the Settlement Agreement. 5. We will deduct prior GCCF Subsistence payments. | | Real Property Sales,Subsistence,VoO Charter Payment,Coastal,Wetlands,Vessel Physical Damage,Prior Payments | 0 | External |

| 29 | Pol-45 | 45 | Approved Policy or Procedure | 5/22/2012 | Claims Administrator Decision | Exclusions: Gaming | Section 2.2.4.3 and Exhibit 18 list "video gaming at bars, bingo parlors, hotels, off-track betting, racetracks, restaurants and truckstops" as an exception to the exclusion for gaming industries and employees. If video gaming occurs at bars, restaurants, hotels, and truck stops, it is included. If video gaming occurs at any other location, it is excluded. | Section 2.2.4.3, Exhibit 18 | Exclusions | 0 | External |
| 30 | Pol-46 | 46 | Approved Policy or Procedure | 5/22/2012 | Claims Administrator Decision | Individual Economic Loss Claims: Prior Payments | We will consider any BP payment and GCCF payment for Lost Earnings and Profits as an offset against an award for Individual Economic Loss. | Exhibit 8A, p.8 | IEL | 0 | External |
| 32 | Pol-47 | 47 | Approved Policy or Procedure | 5/22/2012 | Claims Administrator Decision | Individual Periodic Vendor/Festival Vendor Claims: Losses Calculation | We will calculate a compensation amount by comparing the total earned income for three or more months in 2009 with the same three or more months in 2010 and must also compare all possibilities from May - December in both years to determine this amount. We will ask in the Required Documents that a claimant should provide a monthly breakdown of total earned income for the Compensation Period, if the claimant is able to do so. | 4.3.8 and Exhibit 8D, pp. 6-7, 14-15 | IPV/FV | 0 | External |
| 33 | Pol-53 | 53 | Approved Policy or Procedure | 5/24/2012 | Claims Administrator Decision | Business Economic Loss Claims: Claimant Classification | We will process claimants under the correct framework, regardless of which Claim Form they filed, and give claimants the opportunity to submit any required documentation. | | BEL | 0 | External |
| 34 | Pol-55 | 55 | Approved Policy or Procedure | 5/24/2012 | Claims Administrator Decision | Business Economic Loss Claims: Causation | Businesses that establish causation by demonstrating a Spill-related cancellation are compensated solely pursuant to Exhibit 4E and are not entitled to any compensation pursuant to Exhibit 7 (the Framework for Start-Up Businesses). | Exhibit 4E | BEL | 0 | External |
| 36 | Pol-58 | 58 | Approved Policy or Procedure | 5/24/2012 | Claims Administrator Decision | Business Economic Loss Claims: Consolidated Claims | Accountants are not responsible for determining if the claimant would be better off filing a consolidated claim or individual claims by location if the claimant has made an election and provided full documentation for that selection. If, however, the claimant provides full information with the claim, such that we can make a determination that a better option is available, we will notify the claimant. | Exhibit 5 | BEL | 0 | External |
| 37 | Pol-59 | 59 | Approved Policy or Procedure | 5/24/2012 | Claims Administrator Decision | Individual Economic Loss Claims: Causation | For each Claiming Job, we will determine if claimant submitted sufficient information for each category designation to pass causation and perform a calculation. If a claimant cannot submit Tax Information Documentation for 2010 and/or the Base Year(s), we will consider the claimant incomplete unless the claimant provides a Sworn Written Statement for the years in which he or she is missing information. For example, if the claimant provided tax records from 2007-2009 and only payroll records from 2010, the claimant is incomplete unless he or she submits a Sworn Written Statement indicating that no 2010 tax return is available. Submitting pay period documentation is not a substitute for tax documentation that is otherwise required. | | IEL | 0 | External |
| 39 | Pol-61 | 61 | Approved Policy or Procedure | 5/24/2012 | Claims Administrator Decision | Individual Economic Loss Claims: Reimbursable Search Costs | We will pro-rate the gas tank mileage and allocate the portion of the receipt that we can determine was related to job search to the claimant's losses. | Exhibit 8A, I, II and III | IEL | 0 | External |
| 42 | Pol-63 | 63 | Approved Policy or Procedure | 5/24/2012 | Claims Administrator Decision | Exclusions: NAICS Codes | Section 4.4.7.1 requires the Settlement Program to use the NAICS code found on the Entity's 2010 tax return, 2010 business permits or licenses, and/or other evidence of the Entity's activities necessary for the Settlement Program to determine the appropriate NAICS code for that Entity Claimant and any employees of that Entity making claims related to their employment with that Entity. The Claims Administrator will prioritize 2010 tax records but will use any and all information available to determine the correct NAICS code. If what is on the taxes doesn't match the license or an Entity search, the Claims Administrator will conduct a review to determine the natural of the business and the employees work with that business. | Section 4.4.7, Section 2.2.4.1, Section 2.2.4.2, Section 2.2.4.3, Section 2.2.4.4, Section 2.2.4.5, Section 5.10.2, Section 5.10.3, Section 5.10.4, Exhibit 16, Exhibit 17, Exhibit 18 | Exclusions | 1 | External |
| 103 | Pol-63 | 5 | Approved Policy or Procedure | 5/11/2012 | Claims Administrator Decision | Exclusions: NAICS Codes | Section 4.4.7.1 requires the Settlement Program to use the NAICS code found on the Entity's 2010 tax return, 2010 business permits or licenses, and/or other evidence of the Entity's activities necessary for the Settlement Program to determine the appropriate NAICS code for that Entity Claimant and any employees of that Entity making claims related to their employment with that Entity. The Claims Administrator will prioritize 2010 tax records but will use any and all information available to determine the correct NAICS code. If what is on the taxes doesn't match the license or an Entity search, the Claims Administrator will conduct a review to determine the natural of the business and the employees work with that business. | Section 4.4.7, Section 2.2.4.1, Section 2.2.4.2, Section 2.2.4.3, Section 2.2.4.4, Section 2.2.4.5, Section 5.10.2, Section 5.10.3, Section 5.10.4, Exhibit 16, Exhibit 17, Exhibit 18 | Exclusions | 0 | External |

| 38 | Pol-65 | 65 | Approved Policy or Procedure | 5/24/2012 | Claims Administrator Decision | Individual Economic Loss Claims: Reimbursable Training Costs | During the review, the reviewer will be guided by a chart we developed to determine if a training would be relevant to a particular industry. If the Claiming Job is in an industry and the claimant completed a training that may be relevant to the industry, the training costs are reimbursable. | Exhibit 8A | IEL | 0 | External |
| 44 | Pol-70 | 70 | Approved Policy or Procedure | 5/25/2012 | Claims Administrator Decision | Fraud: Authorizations | Some Exhibits (e.g., Exhibit 8A, Page 10 and Exhibit 10, Page 67) require the claimant to provide forms in which the claimant authorizes the Claims Administrator to: (1) verify employment and wage records, (2) obtain Tax Information Documentation from the Internal Revenue Service and/or Social Security Administration, and (3) confirm any bank account information for certain periods. Other Exhibits provide only that any statements made in a Claim Form and any documentation submitted with a Claim Form may be verified as judged necessary by the Claims Administrator (e.g., Exhibit 4A, Page 2).We will not require the claimant to sign the authorizations at the time that a claim is filed. We will request these authorizations from the claimants if necessary to review and verify the claimantâ€™s submitted documentation. | Exhibits 8A, 10, 4A | Fraud Audits | 0 | External |
| 45 | Pol-79 | 79 | Approved Policy or Procedure | 5/31/2012 | Claims Administrator Decision | Appeals: Parties to the Appeal | BP and the claimant are parties to every Appeal. The Claims Administrator is never a party. | | Appeal | 0 | External |
| 46 | Pol-82 | 82 | Approved Policy or Procedure | 5/31/2012 | Claims Administrator Decision | Business Economic Loss Claims: Failed Businesses | The Failed Business Economic Loss framework only applies to businesses who ceased operations between May 1, 2010 and December 31, 2011. | Exhibit 6 | BEL | 0 | External |
| 47 | Pol-83 | 83 | Approved Policy or Procedure | 5/31/2012 | Claims Administrator Decision | Business Economic Loss Claims: Proof of Customer Addresses | In the event that credit card receipts do not have cardholder address information, there are other types of documents specified that a claimant can provide, e.g., customer registration logs and business documents reflecting contemporaneous recording of receipts or invoices listing customers by location. | Exhibit 4A | BEL | 0 | External |
| 49 | Pol-84 | 84 | Approved Policy or Procedure | 5/31/2012 | Claims Administrator Decision | Business Economic Loss Claims: Multi-Facility Businesses | If a Multi-Facility Business Claimant has its Headquarters and all Facilities located within the Gulf Coast Areas and elects to file as a consolidated business, the Entity can file claims for any one, or more, but not all, of the facilities, or it can file a "consolidated" claim for all facilities. | Exhibit 5 | BEL | 0 | External |
| 48 | Pol-85 | 85 | Approved Policy or Procedure | 5/31/2012 | Claims Administrator Decision | Business Economic Loss Claims: Profit and Loss Statements | Section 4 of Exhibit 4A states, "Profit and loss statements shall identify the dates on which they were created." If a claimant has already submitted P&L statements that do not identify the dates on which they were created, the claimant may resubmit the P&L statements with addition of the dates on which they were created or may provide a separate document identifying the dates on which the P&L statements were created. | Exhibit 4A | BEL | 0 | External |
| 52 | Pol-87 | 87 | Approved Policy or Procedure | 5/31/2012 | Claims Administrator Decision | Business Economic Loss Claims: Proof to Establish Causation Proxy Claimant | A Rural Business claimant may establish causation through a Causation Proxy Claimant only if the claimant provides information sufficient â€œfor the Claims Administrator to determine that a causal relationship exists between the claimantâ€™s financial performance and the financial performance of the Causation Proxy Claimant.â€The claimant must provide sufficient documentation to support the conclusion but is not limited to a particular type or category of documentation. | Exhibit 4B | BEL | 0 | External |
| 51 | Pol-88 | 88 | Approved Policy or Procedure | 5/31/2012 | Claims Administrator Decision | Business Economic Loss Claims: Start-Up Businesses | Exhibit 7 reads: "Claimantâ€™s Expected Profit/Loss for the Compensation Period will be calculated as the difference between the claimantâ€™s Expected Revenue and the claimantâ€™s Expected Costs, provided that Expected Revenue and Expected Costs must both be based on actual results from the Benchmark Period, or, if alternatively selected by claimants in Zones B and C, both Expected Revenue and Expected Costs must both be based on qualifying projections as described herein." Claimants in Zone A can also alternatively use revenue and costs based on qualifying projections. | Exhibit 7 | BEL | 0 | External |
| 50 | Pol-89 | 89 | Approved Policy or Procedure | 5/31/2012 | Agreed to by the Parties | Exclusions: Real Estate Developers | We will allow Businesses that identify as Real Estate Developers to submit a Claim for Coastal, Wetlands and Real Property Sales Damage Claims but no other Claims Forms. The review process will similarly block other Claims if a reviewer identifies a business as a Real Estate Developer. | Section 1.3.1.11, Section 2.2.4.7, Section 5.10.4.1.1, Exhibit 16 | Exclusions | 0 | External |
| 53 | Pol-90 | 90 | Approved Policy or Procedure | 5/31/2012 | Claims Administrator Decision | Individual Economic Loss Claims: Length of Time Calculation | For any reference to events â€œbetweenâ€certain dates in the Settlement Agreement, we will include the start and end dates. | Exhibit 8A | IEL | 0 | External |
| 23 | Pol-91 | 91 | Approved Policy or Procedure | 5/31/2012 | Claims Administrator Decision | Individual Economic Loss Claims: Part-Time and Full-Time Employment Definitions | We will treat a part-time employee as someone who regularly works fewer than 40 hours and a full-time employee as someone who regularly works 40 or more hours. | Exhibit 8A | IEL | 0 | External |

| 25 | Pol-92 | 92 | Approved Policy or Procedure | 5/31/2012 | Claims Administrator Decision | Individual Economic Loss Claims: Career Changers | We will consider a claimant who is employed in the same line of work but with a different employer and the income earned at the comparable job changed by 20% or more between the Benchmark Period and the Compensation Period as a Career Changer subject to the rules of Category III. | Exhibit 8A, Career Changers | IEL | | 0 | External |
| 26 | Pol-93 | 93 | Approved Policy or Procedure | 5/31/2012 | Claims Administrator Decision | Individual Economic Loss Claims: Losses Calculation | We will select the best Benchmark and Compensation Periods considering all possible variables to determine the optimal calculation result for claimants. | Section 4.3.8 | IEL | | 0 | External |
| 54 | Pol-97 | 97 | Approved Policy or Procedure | 5/31/2012 | Claims Administrator Decision | Individual Economic Loss Claims: Employment-Related Benefit Losses | The Framework requests information and documentation of an offer of COBRA or Replacement Insurance Coverage that was not accepted, but this type of information is not included in any of the calculations of health insurance losses. In addition, if a claimant was offered, but did not accept, an offer for COBRA or Replacement Insurance Coverage, 8C requires the claimant to submit contemporaneous documents evidencing the terms of any COBRA coverage. We request information about offers for Replacement Coverage in the Claim Form as a check box in Section F.2, based on the protocol set forth in 8C. However, based on responses from the Parties, we will not make this part of any incompleteness process, or incorporate this information during review. We will remove this requirement from the online Claim Form and Instructions Booklet, and we will remove it from the hard copy forms for the next printing. | Exhibit 8C., p.4, II.A.5 | IEL | | 0 | External |
| 55 | Pol-98 | 98 | Approved Policy or Procedure | 5/31/2012 | Claims Administrator Decision | Individual Economic Loss Claims: Reimbursable Search Costs | We will not reimburse for moving/relocating expenses, uniform expenses and required tool expenses that are incurred as part of the employment process. Additionally, we will not reimburse for expenses for car repairs, grooming, clothing and meals. | Exhibit 8A, I, II and III | IEL | | 0 | External |
| 56 | Pol-99 | 99 | Approved Policy or Procedure | 5/31/2012 | Claims Administrator Decision | Individual Economic Loss Claims: Reimbursable Search Costs | Expense documentation that does not list the claimant's name is compensable if the expense is eligible, the claimant specifically identifies the expense in either the Claim Form or correspondence and the supporting documentation proves the expense was paid. | Exhibit 8A, I, II and III | IEL | | 0 | External |
| 57 | Pol-102 | 102 | Approved Policy or Procedure | 5/31/2012 | Claims Administrator Decision | Individual Economic Loss Claims: Reimbursable Training Costs | We will reimburse for training costs incurred by claimants who begin employment in a field related to their training prior to the training's completion, claimants who accept employment with the condition that they pay out of pocket for applicable training expenses and/or certifications are eligible for full reimbursement, and claimants who make a claim for expenses associated with any training and/or certifications required to keep their current job are not eligible for reimbursement. | Exhibit 8A, I, II and III | IEL | | 0 | External |
| 58 | Pol-105 | 105 | Approved Policy or Procedure | 5/31/2012 | Claims Administrator Decision | Business Economic Loss Claims: Multi-Facility Businesses | A Multi-Facility Business with its Headquarters located outside the Gulf Coast Areas that did not maintain separate contemporaneous profit and loss statements for each Facility in the Gulf Coast Areas during the Benchmark Period and 2010, may submit a consolidated claim for all Facilities located within the Gulf Coast Areas. The Additional Multi-Facility Business Documentation must be provided, and the Settlement program shall apply the relevant Causation standard and RTP separately to each Facility located within the Gulf Coast Areas. | Exhibit 5 | BEL | | 0 | External |
| 59 | Pol-112 | 112 | Approved Policy or Procedure | 5/31/2012 | Claims Administrator Decision | Fraud: Claimants Found Fraudulent by the GCCF | We will not automatically deny claimants that were found fraudulent and referred to the DOJ by the GCCF. We will independently evaluate their submissions to the Settlement Program. | | Fraud Audits | | 0 | External |
| 60 | Pol-114 | 114 | Approved Policy or Procedure | 6/4/2012 | Claims Administrator Decision | Seafood Compensation Program: Vessel Lessees | If a claimant files as both a Vessel Lessee and as a Boat Captain, we will hold the Vessel Lessee claim until after the filing deadline, but will process the Boat Captain claim. | Exhibit 10 | Seafood | | 0 | External |
| 64 | Pol-119 | 119 | Approved Policy or Procedure | 6/15/2012 | Claims Administrator Decision | Appeals: Reconsideration Requirement | We will require that a claimant request Reconsideration and receive a Post-Reconsideration Notice before submitting an Appeal to the Appeal Panel or to the Documentation Reviewer. | | Appeal | | 0 | External |
| 65 | Pol-120 | 120 | Approved Policy or Procedure | 6/15/2012 | Claims Administrator Decision | Business Economic Loss Claims: Causation | If the only Causation Test(s) the Claimant satisfies is the Causation Proxy Test and/or the Seafood Retailer Test, then the Claims Administrator is not limited to which Benchmark Period (2009, Average of 2008-2009, or Average of 2007-2009) it can use to perform the Compensation Calculation. The CA should use the Benchmark Period that maximizes the claimant's recovery. | Exhibit 4B | BEL | | 0 | External |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 66 | Pol-121 | 121 | Approved Policy or Procedure | 6/15/2012 | Claims Administrator Decision | Business Economic Loss Claims: Causation | If a claimant establishes Causation by providing proof of a Spill-related cancellation, and the claimant satisfies the Modified V-Shaped Revenue Pattern, the claimant's Compensation Calculation must be limited to the losses related specifically to the cancelled contract (as set forth in Exhibit 4E). It is not necessary for the Proof of Spill-Related Cancellations analysis to be applied both with the Modified V-Shaped Revenue Pattern test and then again on its own. | Exhibit 4B | BEL | 0 | External |
| 68 | Pol-125 | 125 | Approved Policy or Procedure | 6/15/2012 | Claims Administrator Decision | Reconsideration: Change in Review Outcome | Payment and Denial Notices issued to claimants will alert claimants that the result on the claim(s) may change, increase, or decrease after Reconsideration. | Section 6.1.1 | Other: Reconsideration | 0 | External |
| 85 | Pol-127 | 127 | Approved Policy or Procedure | 6/15/2012 | Claims Administrator Decision | Subsistence Claims: License Requirements | We will require each Subsistence Claimant who is not exempt from licensing to submit the following fishing and/or hunting licenses: (1) license(s) valid immediately before his or her loss period(s); and (2) license(s) valid at the beginning of his or her loss period(s). | Exhibit 9, Section C(5) | Subsistence | 0 | External |
| 87 | Pol-129 | 129 | Approved Policy or Procedure | 6/25/2012 | Claims Administrator Decision | Business Economic Loss Claims: Contract Cancellation | If a claimant entered into a multi-year contract prior to the Oil Spill and that contract was cancelled as a result of the Oil Spill, the claimant should be compensated only for the value of the contract that would have been earned during the compensation period, less any uninsured expenses related to the earning of that revenue. | Exhibit 4E | BEL | 0 | External |
| 82 | Pol-130 | 130 | Approved Policy or Procedure | 6/25/2012 | Agreed to by the Parties | Exclusions: Government Agencies | The Claims Administrator will allow individuals that identify as employees of government agencies to submit and be compensated for any claim not related to his or her work for a government agency. | Section 2.2.5 | Exclusions | 0 | External |
| 18 | Pol-131 | 131 | Approved Policy or Procedure | 6/25/2012 | Claims Administrator Decision | VoO Charter Payment Claims: Training Requirement | If the claimant signed the MVCA but someone else attended the training (e.g., the captain of the vessel), that claim will still be eligible for payment so long as the claimant submits the training documentation or we know the name of the person who attended training and that person is found in the Training Database. | 38.98 | VoO Charter Payment | 0 | External |
| 89 | Pol-132 | 132 | Approved Policy or Procedure | 6/25/2012 | Claims Administrator Decision | VoO Charter Payment Claims: Prior Payments | For a claimant who files both VoO and Economic Loss Claims, we will always take any applicable VoO Settlement Payment offset out of the last paid claim, whether it is VoO or Economic Loss. The offset amount is 50% of the VoO Charter Payment amount and should not be offset if a claimant has not filed a VoO Claim, so we must take it out of the last filed claim. Both Parties have stated that we may use the VoO data provided by BP to determine the VoO Earned Income offset at the time of the Economic Loss claim calculation, regardless of whether the claimant has filed or been paid on a VoO Charter Payment Claim. As such, we will always take any applicable VoO Earned Income offset out of the Economic Loss Claim, whether the claimant has filed a VoO Charter Payment Claim or not. | 38.164 38.166 | VoO Charter Payment | 0 | External |
| 90 | Pol-135 | 135 | Approved Policy or Procedure | 6/29/2012 | Claims Administrator Decision | Business Economic Loss Claims: Qualifying Projections | Article IV, Section A, Bullet 2 of Exhibit 7 (page 9) states "Claimant's Expected Profit/Loss for the Compensation Period will be calculated as the difference between the claimant's Expected Revenue and Expected Costs, provided that Expected Revenue and Expected Costs must both be based on actual results from the Benchmark Period, or, if alternatively selected by claimants in Zones B and C, both Expected Revenue and Expected Costs must both be based on qualifying projections as described herein." There should be no distinction among Zones for using "qualified projections". Claimants in All Zones are permitted to use projections, as indicated in Exhibit 7, Section IV(A)(1)(b). | Exhibit 7 | BEL | 0 | External |
| 91 | Pol-136 | 136 | Approved Policy or Procedure | 6/29/2012 | Clarified by Seafood Neutral | Seafood Compensation Program: Losses Calculation | The default presumption for the loss calculation should be that 70% of the claimant's annual earnings that were paid after April 20, which roughly reflects the number of days between April 20 and December 31. However, if the documentation submitted by the claimant establishes that the earnings were received in a disproportionate manner to a daily rate, then the settlement program should apportion the annual, earnings in a manner consistent with the documentation. For example, if documentation submitted by the claimant establishes that all of his seafood crew earnings reflected on tax documents were paid from July through December 2009, then 100% of the claimant's seafood crew annual earnings for 2009 should be apportioned to the 4/20 to 12/31 time period. The definition of "pay period earnings documentation" in the seafood compensation program provides examples of documentation that are likely to provide information relevant to apportionment of seafood crew earnings. | Exhibit 10 | Seafood | 0 | External |

| 92 | Pol-137 | 137 | Approved Policy or Procedure | 6/29/2012 | Clarified by Seafood Neutral | Seafood Compensation Program: Category I Claimants | In the event a claimant qualifies under both Category I (by providing necessary documentation, including tax returns and/or pay period earnings documentation) and Category II (by providing necessary documentation, including employer sworn written statements), and the Category II calculation reflects a higher compensation level for the claimant, the claimant should be allowed the option to choose to proceed under Category II provided the claimant can provide an affirmation that Category II more accurately reflects his or her actual seafood crew lost earnings. The procedure for obtaining an affirmation from the claimant should be left to the Claims Administrator. This would permit individuals whose tax returns do not reflect total earnings to participate under either Category I or Category II. However, such a claimant should be advised that no Category II claim shall be paid until a later date, and that if the total aggregate amount of Category II compensation claims for all claimants who have timely submitted eligible and qualifying Category II claims exceeds the aggregate compensation amount for Category II, then Category II claimants will be subject to a pro rata reduction in compensation. | Exhibit 10 | Seafood | 0 | External |
| 95 | Pol-139 | 139 | Approved Policy or Procedure | 6/29/2012 | Clarified by Seafood Neutral | Seafood Compensation Program: Determination of Oyster Harvesting Year | Under the oyster compensation plan, the benchmark period for a claimant is the combination of 2007, 2008, and 2009. There are two exceptions to this requirement: a new entrant exception, and a possibility of excluding one or more years if the claimant did not participate at the same level of effort in oyster harvesting due to circumstances beyond the claimant's control. Under the new entrant exception, which is the subject of this question, in the event that a claimant entered the oyster industry after 2007, then the benchmark period is to include all full years since the claimant entered the oyster harvesting industry, so 2008-2009 or 2009. (Exhibit 10, page 28). In determining whether to use 2008 and 2009 or only 2009, the Claims Administrator should determine whether 2008 also constitutes a representative year in terms of the claimant's work as an oyster harvester. For example, if the claimant worked as an oyster harvester in 2008, 2009, and 2011, only during the months May to December, then 2008 is a representative year and both 2008 and 2009 should be used as the benchmark period. In contrast, if the claimant worked as an oyster harvester from January to December 2009, but only in May to December 2008, then 2008 should not be included in the benchmark period. | Exhibit 10 | Seafood | 0 | External |
| 96 | Pol-140 | 140 | Approved Policy or Procedure | 6/29/2012 | Clarified by Seafood Neutral | Seafood Compensation Program: Multiple Vessels | For the Historical Revenue Compensation Method in the Shrimp Compensation Plan, the only plan in the seafood compensation program for which the compensation amount varies by vessel type and size. Compensation should be calculated separately for each vessel by size and type and the appropriate multiplier used, and then aggregated for a total shrimp compensation plan amount paid to the claimant. A boat captain must select one benchmark period for all vessels for which he seeks compensation under the shrimp compensation plan. (Exhibit 10, page 7). If claimants qualify for Expedited or Reduced Expedited Compensation methods, the offer will be the highest qualifying Expedited or Reduced Expedited award. | Exhibit 10 | Seafood | 0 | External |
| 97 | Pol-141 | 141 | Approved Policy or Procedure | 6/29/2012 | Clarified by Seafood Neutral | Seafood Compensation Program: New Entrants | The new entrant compensation method of the shrimp compensation plan states that only a claimant who had not previously worked as a boat captain for a commercial shrimping vessel home ported in the gulf coast areas is eligible for compensation.(Exhibit 10, page 16). Pursuant to this requirement, "previously worked" means that the claimant cannot have worked as a boat captain for a commercial shrimping vessel home ported in the Gulf Coast areas at anytime during 2007, 2008, or 2009. This interpretation of "previously worked" is appropriate because the benchmark period for the shrimp compensation plan is 2009,2008, and 2009, or 2007,2008, and 2009. (Exhibit 10, page 7). Thus, if the claimant has revenue as a boat captain for a commercial shrimping vessel home ported in the Gulf Coast areas during a period of time that could be used as a benchmark period, the claimant is not eligible for compensation under the new entrant compensation method. However, being a boat captain for a shrimping vessel home ported in the Gulf Coast areas prior to 2007 does not prohibit one from being a new entrant. | Exhibit 10 | Seafood | 0 | External |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 128 | Pol-147 | 147 | Approved Policy or Procedure | 7/13/2012 | Claims Administrator Decision | Individual Economic Loss Claims: Pay Period Earnings Document Requirement | The SA states at I.A.2, "To the extent Pay Period Earnings Documentation is unavailable, the claimant shall so indicate in the sworn Claim Form, and earnings shall be treated as earned evenly throughout each year." In the absence of a Sworn Written Statement attesting that no Pay Period Earnings Documentation exist for the missing time periods, we will make claimants incomplete when they do not provide PPED for 2010 and the Benchmark Period. | Exhibit 8A, Section I.A.2, p. 10 | IEL | 0 | External |
| 86 | Pol-152 | 152 | Approved Policy or Procedure | 7/15/2012 | Claims Administrator Decision | Business Economic Loss Claims: Claimant Classification | If a claimant files a schedule C-EZ in 2009 (no breakout of expenses - therefore understood to be an individual claimant) and a Schedule C in 2010 (breakout of expenses-therefore understood to be a business claimant), the claimant should be evaluated under the business framework. | | BEL | 0 | External |
| 88 | Pol-158 | 158 | Approved Policy or Procedure | 7/15/2012 | Claims Administrator Decision | Individual Economic Loss Claims: One Time Loss Addendum | In Documentation and Causation 3 in the One Time Loss Addendum, the choices account for a claimant with more than ten sales per year, and a claimant with less than ten sales per year. For claimants with exactly ten sales, the Claims Administrator will determine the most favorable result for the claimant. | Exhibit 8A, p.52 | IEL | 0 | External |
| 129 | Pol-160 | 160 | Approved Policy or Procedure | 7/15/2012 | Claims Administrator Decision | Subsistence Claims: Interviews | We will a conduct phone or in person interview as and when the we determine that doing so will facilitate the accurate processing of the claim or will address questions regarding the reliability of the evidence submitted on the claim. We will call a Subsistence Claimant to explain his or her incompleteness before we issue a Notice of Incompleteness. | Exhibit 9 | Subsistence | 0 | External |
| 229 | Pol-169 | 406 | Approved Policy or Procedure | 5/29/2013 | Claims Administrator Decision | Business Economic Loss Claims: Third-Party Rental Management | For claimants with rental properties that are managed by a third party, if the management statement indicates "maintenance" and the tax returns indicates "repairs" for the exact same dollar amount, Accountants should classify the expense as combined 50/50. | | BEL | 1 | External |
| 230 | Pol-170 | 407 | Approved Policy or Procedure | 5/29/2013 | Claims Administrator Decision | Business Economic Loss Claims: Multi-Facility Businesses | A business that owns rental property and engages in some other business activity may file one Business Economic Loss Claim for a Multi-Facility Business. In our example, the real estate sales office would be one location and the rental property would be another location. | Exhibit 5 | BEL | 1 | External |
| 231 | Pol-172 | 408 | Approved Policy or Procedure | 5/29/2013 | Claims Administrator Decision | Business Economic Loss Claims: Multi-Facility Businesses | Claimants with more than one business for which the claimant files taxes under the same Tax ID may file claims as Multi-Facility Business. For example, a towing company would be one location and the commercial rental property would be another location. | Exhibit 5 | BEL | 1 | External |
| 69 | Pol-185 | 185 | Approved Policy or Procedure | 7/18/2012 | Claims Administrator Decision | Rescission of Payment Awards and Releases | (a) A claimant may not rescind a signed Release after the Program has received it. (b) The Program may not rescind a payment award after the claimant has submitted a properly completed Release, except for fraud or the claimant's exercise of an opt-out. | | AllClaims | 0 | External |
| 113 | Pol-191 | 191 | Approved Policy or Procedure | 7/18/2012 | Claims Administrator Decision | Missing Records for a Prior Year | If financial records are missing for any year from 2007-2009 on BEL Claims, the Claims Administrator will consider the claim incomplete and issue an Incomplete Notice only when the missing year was one chosen by the claimant for inclusion in the Benchmark Period. | Exhibit 4A | BEL | 2 | External |
| 130 | Pol-191 | 162 | Approved Policy or Procedure | 7/15/2012 | Claims Administrator Decision | Business Economic Loss Claims: Benchmark Period | If the claimant selects a specific benchmark period (e.g., 07/09, 08/09) and does not provide the required documentation for the full selected benchmark period, but provides enough documentation to calculate a loss, Accountants should calculate the claim based upon the documentation provided by the claimant, even if this is not complete monthly data for full year 2007 through 2010. For example, if the claimant selects 2007-2009 as the benchmark period and only provides 2009 data, the Accountants would perform a calculation using the benchmark period 2009. | Exhibit 4C | BEL | 1 | External |
| 133 | Pol-191 | 178 | Approved Policy or Procedure | 7/15/2012 | Claims Administrator Decision | Business Economic Loss Claims: Benchmark Period | Accountants should calculate the claim based upon the documentation provided by the claimant even if this is not complete monthly data for full year 2007 through 2010. For example, if the claimant selects 2009 as the benchmark period and only provides 2009 data, the accountants would perform a calculation using the benchmark period 2009. | Exhibit 4C | BEL | 0 | External |
| 114 | Pol-193 | 193 | Approved Policy or Procedure | 7/18/2012 | Claims Administrator Decision | Deadlines: Claimant Appeal | The Settlement Agreement Appeal Deadline is 30 days from the date of Post-Reconsideration notice for Denied and Payable claims and 20 days from the date of Post Reconsideration notice for Incompleteness Appeals | | Deadlines | 0 | External |
| 115 | Pol-195 | 195 | Approved Policy or Procedure | 7/18/2012 | Claims Administrator Decision | Deadlines: Seafood Claim Form Submission | Pursuant to Ex. 10 the deadline to file Seafood Compensation Claims was January 22, 2013, at that was thirty (30) days from the date of entry of the Final Order and Judgment of the District Court ruling upon final approval of the Settlement. | | Deadlines | 0 | External |

| # | Pol ID | # | Type | Date | Decision | Title | Description | Exhibit | Category | Count | Ext |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 116 | Pol-201 | 201 | Approved Policy or Procedure | 7/18/2012 | Claims Administrator Decision | Deadlines: Compliance | 1. Online: Midnight user's time. 2. Mail: Postmark date. If a mailed item contains no postmark date, we will assume that the sender mailed it three days before receipt. 3. Overnight Delivery: Date given to carrier. 4. Delivery to CAC or Hammond: Date of receipt. 5. Holidays and Sundays: If the deadline falls on a holiday or Sunday, we will accept a submission on the next business day. |  | Deadlines | 0 | External |
| 61 | Pol-203 | 203 | Approved Policy or Procedure | 7/18/2012 | Claims Administrator Decision | Payment: Retracting Acceptance | Claimants may retract acceptance of an offer by written notice at any time until the claimant has signed and returned a Release. |  | Payments | 0 | External |
| 233 | Pol-211 | 417 | Approved Policy or Procedure | 5/29/2013 | Claims Administrator Decision | Seafood Compensation Program: Prior Payments | The Settlement Agreement directs the Claims Administrator to determine whether the claimant has already received Seafood Spill-Related Payments from BP or the GCCF and, if so, to offset those against the total compensation amount. The Settlement draws a fundamental distinction between (1) business activities associated with the actual harvesting or catching of Seafood and (2) non-harvesting business activities that nevertheless involve Seafood, such as the processing or wholesale distribution of Seafood.  The Seafood Compensation Program covers claims for losses related to harvesting Seafood, while the Business Economic Loss (â€œBELâ€) and Individual Economic Loss Programs (â€œIELâ€) cover claims for losses related to non-harvesting business activities that involve Seafood. The Claims Administrator determined the term â€œSeafood Spill-Related Paymentâ€ as used in Exhibit 10 includes only prior payments made for Seafood harvesting activities, as the Seafood Program compensates only Seafood harvesters. Therefore, prior payments for Seafood harvesting activities would offset payments made to Seafood harvesters for harvesting activities under the Seafood Program, but other prior payments made to Seafood harvesters for non-harvesting Seafood-related business activities would offset a claimantâ€™s BEL or IEL claims. | Exhibit 10 | Seafood | 1 | External |
| 119 | Pol-215 | 215 | Approved Policy or Procedure | 8/2/2012 | Claims Administrator Decision | Method for Deducting Prior Payments on Business Economic Loss Awards to Multi-Facility Businesses | Prior Spill-related payments issued to claimants with a consolidated claim in the GCCF will be treated as an advance payment against any calculated losses for a Multi-Facility Business filing consolidated or individual claims for each facility location under the New Facility and will be deducted from the total compensation amount as calculated by the New Facility on a First-in, First-out basis. | Exhibit 4C.II | BEL | 0 | External |
| 122 | Pol-216 | 216 | Approved Policy or Procedure | 8/2/2012 | Claims Administrator Decision | Entities with No Physical Location Home Port or Landings Within the Geographic Area of the Class Definition | If an entity claimant has no physical location, home port or landings within the geographic area of the Class Definition, the claimant is not in the Class unless the claimant has â€œfull time employees who performed their full-time services while physically present in the Gulf Coast Areas.â€ This rule applies even if the claimantâ€™s business activity, sales or service activity, or revenue source is located within one of the Economic Loss Zones. |  | BEL | 0 | External |
| 123 | Pol-218 | 218 | Approved Policy or Procedure | 8/2/2012 | Claims Administrator Decision | Claimants with 13-Month Reporting Periods | The Programâ€™s accountants have the ability to convert the 13-period revenue and expense statements into a twelve month year by allocating each period's revenue and expense items into their respective months. For example, if Period 1 starts on 1/1 and ends on 1/28 and Period 2 starts on 1/29 and ends on 2/25, 100% (28 days/28 days) of the Period 1 revenue and expenses will be included in January as well as 10.71% (3 days/28 days) of Period 2 revenue and expenses. The remaining 89.29% (25 days/28 days) of the Period 2 revenue and expenses will be included in February. | Exhibit 4A | BEL | 0 | External |
| 124 | Pol-219 | 219 | Approved Policy or Procedure | 8/2/2012 | Claims Administrator Decision | Failed Businesses | For purposes of determining the Failed Business Compensation Framework, the Claims Administrator will define assets in Liquidating Value of assets to mean total net assets received from liquidating a failed business both current and long term assets. However, an accounting of the cash account may be required to identify cash that may have accumulated (from operations) over time, or received because of liquidating an asset. | Exhibit 6 | BEL | 0 | External |
| 118 | Pol-220 | 220 | Approved Policy or Procedure | 8/2/2012 | Agreed to by the Parties | Access to the Workbooks of Accountant Reviewers | The Program will make the Accountantsâ€™ workbooks available, in PDF form, to the claimant, Class Counsel and BP upon the issuance of an initial Notice of Eligibility. | Exhibit 10 | BEL,Seafood | 0 | External |
| 125 | Pol-221 | 221 | Approved Policy or Procedure | 8/2/2012 | Claims Administrator Decision | Updated Seafood and Game Retail Price Chart | The Claims Administrator will use values recommended by BP for Seafood and Game, Class Counselâ€™s recommended value for frogs, and values determined by the Claims Administrator for alligator and turtle. | Exhibit 9, Section B(3) | Subsistence | 2 | External |
| 22 | Pol-221 | 42 | Approved Policy or Procedure | 5/21/2012 | Claims Administrator Decision | Subsistence Claims: Fishing and Hunting Area Impairment | We will use the information provided by claimants about post-Spill fishing and/or hunting areas to determine how the Spill impaired such areas and reduced subsistence resources. | Exhibit 9 | Subsistence | 1 | External |

| 9 | Pol-221 | 26 | Approved Policy or Procedure | 5/18/2012 | Claims Administrator Decision | Subsistence Claims: Retail Price Chart | We will use the Seafood and Game Retail Price Chart provided by the Parties. | Exhibit 9, Section B(3) | Subsistence | 0 | External |
|---|---------|-----|------------------------------|-----------|-------------------------------|----------------------------------------|------------------------------------------------------------------------------|--------------------------|-------------|---|----------|
| 70 | Pol-222 | 222 | Approved Policy or Procedure | 8/2/2012 | Agreed to by the Parties | Presumption of Working and Training Status from a VoO Payment by BP | The Claims Administrator will presume that payment for VoO work equates to training. If the VoO database compiled by the Claims Administrator from VoO spreadsheets provided by BP does not contain a definitive finding of Working or Non-Working status, payment for two or more days of work, based on the daily pay rate determined by vessel length, shall considered to be proof of Working status and training status. Accordingly, claimants with an indication of dispatch or placed on hire in the VoO data provided to the Claims Administrator by the Parties will be presumed to have satisfied the training requirement and are not required to submit proof of training. | 38.173 | VoO Charter Payment | 0 | External |
| 72 | Pol-225 | 225 | Approved Policy or Procedure | 8/2/2012 | Agreed to by the Parties | Proof of Training | Proof of dispatch or being placed on hire (â€œWorkingâ€ status) will constitute proof of training. Accordingly, claimants with an indication of dispatch or placed on hire in the VoO data provided to the Claims Administrator by the Parties will be presumed to have satisfied the training requirement and are not required to submit proof of training. | 38.173 | VoO Charter Payment | 0 | External |
| 75 | Pol-230 | 230 | Approved Policy or Procedure | 8/2/2012 | Claims Administrator Decision | Confirming Vessel Length | The Claims Administrator will not use invoices containing vessel length ranges to determine vessel length. The Claims Administrator will only use official documentation, such as a vessel registration or title, and the VoO records if they list the vessel. If the submitted documents conflict with the VoO records, the Claims Administrator will use the greater length. | Sections 5.5.2 and 5.5.3 | VoO Charter Payment | 2 | External |
| 74 | Pol-232 | 232 | Approved Policy or Procedure | 8/14/2012 | Agreed to by the Parties | Profit and Loss Statements (P&Ls) | (a) If a claimant submits 12 monthly P&Ls, an annual P&L is not required. (b) If a claimant submits 11 out of 12 monthly P&Ls and an annual P&L, the 12th monthly P&L is not required. The Claims Administrator will calculate the missing monthâ€™s revenue and expenses as the difference between the 11-month total and the annual total. | Exhibit 4A | BEL | 0 | External |
| 120 | Pol-236 | 236 | Approved Policy or Procedure | 8/14/2012 | Agreed to by the Parties | Proof of Age | Individual Economic Loss and Seafood Crew claimants are no longer required to submit documents to prove their age. The Claims Administrator will rely upon the age provided by the claimant in the Registration Form or require a Sworn Written Statement (SWS-32) signed by the claimant. | Exhibit 10 | IEL,Seafood | 0 | External |
| 17 | Pol-238 | 238 | Approved Policy or Procedure | 8/14/2012 | Agreed to by the Parties | Proof that the Claimant Sold the Good(s) or Service(s) Claimed Regularly Before 4/20/10 | Claimants are no longer required to submit all of the following, but may submit any one of: Photographs reflecting the goods or services sold, news articles, sales flyers or advertisements reflecting the goods or services sold, and documents showing revenues and expenses. | | IPV/FV | 0 | External |
| 76 | Pol-239 | 239 | Approved Policy or Procedure | 8/14/2012 | Claims Administrator Decision | Total Income of Claimants | At this time, the Claims Administrator has determined that he must continue to require Individual Periodic Vendor and Festival Vendor claimants to submit documents showing the claimantâ€™s total income in 2009 and 2010. Such documents are mandatory under the Settlement Agreement. | Exhibit 8D, I.C.1(c) | IPV/FV | 0 | External |
| 77 | Pol-240 | 240 | Approved Policy or Procedure | 8/14/2012 | Agreed to by the Parties | Documents Required When the Mapping Software Does not Show the Parcel as Within the Compensation Zone | Claimants whose Parcels do not appear in the Compensation Zone in the Mapping Software are no longer required to submit official documentation from the county or parish Assessor or a Professional Land Survey showing: (a) the actual presence of a Parcel for which there are no Parcel lines on the Real Property Sales Compensation Zone Map; (b) the Parcel is located within the geography identified in the Real Property Sales Compensation Zone Map; and (c) the county where the Parcel is located has designated the Parcel as Residential. Instead, the Claims Administrator will perform online research of the public property records and try to find the tax assessment notice issued under the name of the claimant/seller for the parcel, make a PDF of it, and then upload it into the claimantâ€™s claim file. If the Claims Administrator is not able to obtain the tax assessment, we will contact the claimant for the information. | Exhibit 13A - Section 1.C. | Real Property Sales | 0 | External |

| 80 | Pol-241 | 241 | Approved Policy or Procedure | 8/14/2012 | Claims Administrator Decision | Documents that Allocate Benchmark Period Revenues by Vessel, Landing, and Catch Type | Exhibit 10 to the Settlement Agreement requires Vessel Owners, Commercial Fisherman Vessel Lessees, and Boat Captains to provide trip tickets or their equivalent to allocate their annual revenues by catch type, vessel and landing site. Alternatively, claimants may submit (1) federal or state tax records showing their revenues and (2) "sufficient documentation" of vessel-specific and catch type-specific revenue derived from Seafood landed in the Gulf Coast Areas. See Ex. 10 at 10-12, 14, 17-20, 31-32, 45-47, 56-58. Exhibit 10 further provides that, "[i]f necessary, the Claims Administrator may require supplemental information from the Claimant" to make determinations related to (1) the allocation of revenue from a certain catch type as compared to other sources and (2) the allocation of revenue for that catch type derived from landings in the Gulf Coast Areas. See, e.g., Ex. 10 at 19. To streamline the claims process and generate significantly more payable outcomes without changing claims criteria, the Claims Administrator exercised his expressly granted authority and created a Sworn Written Statement to serve as sufficient information to allocate Benchmark Revenue shown in tax returns to specific vessels and specific catch types for Seafood landed in the Gulf Coast Areas. This "Sworn Written Statement for Sufficient Documentation of Benchmark Revenue," or SWS-1, became available to all claimants on the public website on July 31, 2012. The Claims Administrator promptly issued a formal portal alert to all registered law firms, proactively called law firms to notify them of the new Form, and posted SWS-1-specific FAQs on the public website. Claimants who have submitted tax returns and no trip tickets or their equivalent may complete, sign, and submit a Sworn Written the SWS-1 to provide the required allocation of Benchmark Period revenues. | Exhibit 10 | Seafood | 0 | External |
| 78 | Pol-242 | 242 | Approved Policy or Procedure | 8/14/2012 | Claims Administrator Decision | Vessel Registration and Ownership 4/20/10 to 12/31/10 | Claimants who have submitted proof of vessel registration for 2011 or 2012 (or if the Claims Administrator has obtained confirmation of such registration) may submit, or the Program may use, any one of the following to show vessel registration and ownership: (a) A copy of the current vessel registration as well as Trip tickets or landing reports issued by Louisiana or Florida that show vessel registration information for the proper time period; (b) Federal registration information provided on submitted Federal Fisheries Permits for the proper time period; (c) Information in Federal and/or State vessel registration databases where available for the proper time period; (d) Saltwater products license showing vessel registration numbers for the proper time period; (e) Vessel registration receipts for the proper time period; or (f) Vessel title for the proper time period. | Exhibit 10 | Seafood | 0 | External |
| 79 | Pol-243 | 243 | Approved Policy or Procedure | 8/14/2012 | Claims Administrator Decision | Commercial Fishing License Issued Before 4/20/10 for 2009 or 2010 Season | If a claimant has submitted valid commercial fishing license documents for 2011 or 2012, claimants may submit, or the Program may use, either of the following for proof of a commercial fishing license: (a) Trip tickets or landing reports issued by Louisiana or Florida that show commercial fishing license information for the proper time period; and (b) Commercial fishing license receipts for the proper time period. | Exhibit 10 | Seafood | 0 | External |
| 83 | Pol-252 | 252 | Approved Policy or Procedure | 9/15/2012 | Claims Administrator Decision | Start-Up Businesses and 2012 Tax Returns | The Claims Administrator interprets Paragraph 3 of Exhibit 4A not to include any requirement that Start Up Business claimants produce 2012 tax returns unless, in his discretion, the Claims Administrator determines a need for such documents to resolve questions presented by a particular claim. The use of 2012 tax returns would be of very limited use when compared to financial statements for only a part of 2012, which by definition, is what any Benchmark Period for 2012 would be. Further, the language of footnotes 2 and 3 as well as the body of Section 3 of Exhibit 4A suggest that 2012 tax returns fall outside the scope of those tax returns that are required. The Claims Administrator reserves the right to require such documents if in his discretion he determines a need for them to address questions presented by a particular claim. | Exhibit 7 | BEL | 0 | External |

| 84 | Pol-253 | 253 | Approved Policy or Procedure | 9/20/2012 | Claims Administrator Decision | Proof of Ownership of Parcel | Exhibit 12A, Section 1.A of the Settlement Agreement requires that the claimant be an owner of an Eligible Parcel during the period from April 20, 2010, to April 18, 2012. If the claimant owned the Eligible Parcel for the entire time period, the claimant must submit the deed and both 2010 and 2011 Tax Assessments to prove ownership. To prove ownership, the Claims Administrator proposed to the Parties that the Program require a deed and either the 2010 or 2011 Tax Assessment, but not both the 2010 and 2011 Tax Assessments. The Parties did not agree to that proposal and instead directed the Claims Administrator to attempt to locate this proof by researching and uploading tax assessments for all parcels, regardless of whether the parcel is in the Wetlands Claim Zone. If the parcel is not in the Wetlands Claim Zone, the Claims Administrator sends the claim to the mapping vendor for its analysis. For deeds, if the parcel is in the Wetlands Claim Zone, the Claims Administrator uses the services of local counsel to research and upload the applicable deed. | Exhibit 12A, Appendix F, Section 1 | Wetlands | 0 | External |
| 136 | Pol-254 | 254 | Approved Policy or Procedure | 9/25/2012 | Agreed to by the Parties | Proof of Prior Spill-Related Payments to Claimants | With regard to the requirement under the Seafood Program concerning submission of a sworn written statement establishing the amount of any prior Spill-related payments to the claimant, the Claims Administrator will consider the data transferred to the Claims Administrator by the Gulf Coast Claims Facility as the equivalent of the required sworn statement and will not require submission of additional documents on this issue, unless the Claims Administrator in his discretion determines a need for an additional statement and/or documents to resolve questions presented by a particular claim. | | IEL | 0 | External |
| 137 | Pol-255 | 255 | Approved Policy or Procedure | 9/25/2012 | Claims Administrator Decision | Sworn Statement on the Absence of Tax Information Documents or Pay Period Earnings Documentation | To facilitate the processing of Individual Economic Loss claims, the Claims Administrator determined that the requirements in Exhibit 8A that claimants submit sworn statements regarding the absence of Tax Returns or Pay Period Earnings Documentation do not aid in the process of properly evaluating Business Economic Loss claims and thus are not necessary to process Claim Forms under the applicable Claims Processes. However, the Claims Administrator interprets the language of Exhibit 8A of the Settlement Agreement to be mandatory in this regard, as BP has contended, requiring the claimant to produce either the missing records or the sworn statement, absent mutual agreement of the Parties to the contrary or unless and until the Court directs otherwise. The Claims Administrator also had considered the efficacy of issuing a potential eligibility notice to claimants with these document deficiencies announcing the compensation available on the claim if the claimant submitted the required documents and such documents then established eligibility, rather than issue incomplete notices that solely direct claimants to submit the missing documents or the sworn statement concerning their absence. BP has taken the position that the Claims Administrator has no discretion to issue potential eligibility notices and instead must have all required documents on file before advising claimants of the compensation potentially payable on a claim. The Claims Administrator has determined not to alter its processes at this time to issue potential eligibility notices and instead will continue to issue incomplete notices to claimants with these missing documents. | Exhibit 8A | IEL | 0 | External |
| 138 | Pol-258 | 258 | Approved Policy or Procedure | 9/25/2012 | Claims Administrator Decision | Proof of Prior Spill-Related Payments to Claimants | With regard to the requirement under the Seafood Program concerning submission of a sworn written statement establishing the amount of any prior Spill-related payments to the claimant, the Claims Administrator will consider the data transferred to the Claims Administrator by the Gulf Coast Claims Facility as the equivalent of the required sworn statement and will not require submission of additional documents on this issue, unless the Claims Administrator in his discretion determines a need for an additional statement and/or documents to resolve questions presented by a particular claim. | Exhibit 10 | Seafood | 0 | External |

| 139 | Pol-260 | 260 | Approved Policy or Procedure | 10/3/2012 | Agreed to by the Parties | Vessel Registration and Title; Percentage of Ownership | The Settlement Agreement requires claimants to submit proof of both registration of the damaged vessel to the claimant and proof of title to the damaged vessel in the claimant's name, during the period from 4/20/10 to 12/31/10. Claimants who have submitted proof of registration or title to a vessel but not both are no longer required to submit proof of both registration and title, but instead submit a Sworn Written Statement (SWS-42) in place of the missing title or registration. Claimants who do not own 100% of the vessel may also use the SWS-42 to establish the percentage of the claimant's ownership of the vessel. The Claims Administrator will pay such claimant the percentage of the Vessel Damage award corresponding to the claimant's percentage of ownership. The claimant (and not a lawyer or claims preparer) must sign the SWS-42, but a "wet ink" signature is not required. | Exhibit 14, Appendix C.a-b, Exhibit 14.2.C | Vessel Physical Damage | 0 | External |
| 141 | Pol-261 | 261 | Approved Policy or Procedure | 10/8/2012 | Clarified by Seafood Neutral | Exclusion of a Benchmark Year for Seafood Program Claimants | In any instance in which Exhibit 10 permits a Seafood Program claimant to request that the Claims Administrator exclude one or more years of the Benchmark Period from the compensation calculation if the claimant earned less-than-normal revenue for the year(s) identified because the claimant could not fish "at the same level of effort . . . due to circumstances beyond the claimant's control," the Claims Administrator will consider each request on a case-by-case basis to determine: (1) whether the circumstances presented justified the claimant's absence from seafood harvesting exclusion for one or more years of the Benchmark Period; and (2) the level of proof required to establish such justification. | Exhibit 10 | Seafood | 0 | External |
| 142 | Pol-262 | 262 | Approved Policy or Procedure | 10/8/2012 | Claims Administrator Decision | Documents that Allocate Benchmark Period Revenues by Vessel, Landing, and Catch Type. | Documents that Allocate Benchmark Period Revenues by Vessel, Landing, and Catch Type. UPDATE: The Claims Administrator modified these rules further and issued the following revised policy in the 10/8/12 Memo to the Parties after the 10/1/12 Panel hearing: On any claim in the Seafood Program where the Claims Administrator is required to allocate the claimant's Benchmark Period revenue by catch type, vessel and landing location, interpreting and applying the language in Exhibit 10 that the claimant must provide "sufficient information" for the Claims Administrator to make such allocation, the Claims Administrator will use the information available on the claim in the following hierarchy of proof, as sufficient to satisfy the proof requirements of Exhibit 10 to the Settlement Agreement: (a) Single Catch/Single Vessel Claimants: If the claimant has submitted tax returns with supporting documents for the Benchmark Period and the Claims Administrator can determine from the Claim Form or other information available on the claim that the claimant is submitting a claim for only one vessel and one catch type: (1) The Claims Administrator will allocate the revenues from the claimant's tax returns to the one type of catch asserted on the Claim Form, subject to the following. (2) The revenues shall be limited to those shown in the applicable tax returns. (3) The Claims Administrator will not enter or compute all information regarding trip tickets or their equivalent for the claimant, but will survey the documents available on the claim to note information that conflicts with the allocation assertions in the Claim Form. If such conflict arises, the Claims Administrator will notify the claimant to resolve the issue or take such other steps as are necessary to determine the correct allocation on the claim. (b) SWS-1 Claimants: If the claimant is not subject to Subsection (a) and has submitted a signed Sworn Written Statement (SWS-1) to allocate the claimant's Benchmark Period revenues shown in tax returns: (1) If the claimant has indicated in the SWS-1 that the Claims Administrator may rely only on the SWS-1 for such allocation: a) The Claims Administrator will rely | Exhibit 10 | Seafood | 0 | External |

| 140 | Pol-263 | 263 | Approved Policy or Procedure | 10/10/2012 | Claims Administrator Decision | Costs Associated with Producing Hard Copies of Claim Files to Claimants or Third Parties | The Claims Administrator regularly received requests from claimants for copies of the documents in the claimant's claim file. Claimants and claimants' attorneys may view, save, or download their Claims Information through a secure web-based Portal created by the Claims Administrator (the "DWH Portal"). Claimants and lawyers not using a DWH Portal have asked that the contents of the claim file be copied and sent to them. In addition, the Claims Administrator receives from third parties and law enforcement agents and officials who cannot access a DWH Portal and must be given hard copies of Claims Information, where permitted under the terms of the Order Regarding the Confidentiality of Claims Information of the Claims Administrator of the Deepwater Horizon Economic and Property Damages Settlement Agreement, issued on June 29, 2012. The Claims Administrator has determined it appropriate to have the Settlement Program pay the expenses of assembling, copying and shipping such hard copies to these claimants or third parties, rather than attempting to invoice the claimants or third parties for such costs. | | AllClaims | 0 | External |
| 143 | Pol-264 | 264 | Approved Policy or Procedure | 10/10/2012 | Claims Administrator Decision | Zone Classification for Businesses in the Class But Not Located in the Gulf Coast Areas | Under the definition of the Class in Section 1.2 of the Settlement Agreement, a business that is physically located outside of the Eligibility Zone is a member of the Class if it engaged in certain activities during the Class Period in the Gulf Coast Areas or Specified Gulf Waters. Such a business has no physical location in any one of the Economic Loss Zones A through D. For purposes of the assignment of a Risk Transfer Premium and the Causation review process required under the Settlement Agreement, the Claims Administrator will place such businesses that are located in Zone D. This approach will replicate the rule applied to businesses that are located in Zone A, B, C, or D, but have activities that cross zones. Under that rule, such a business is classified in the Zone of the primary physical location of the business. Allowing businesses with no physical location in the Gulf Coast Areas to use the Zone where the activities occurred that placed them in the Class would treat them more favorably that businesses with physical locations in the Gulf Coast Areas in Zones less favorable that the Zones in which certain activities of the business occurred. In order to apply the zone considerations in the most consistent and equitable manner, the Claims Administrator will default to Zone D for businesses in the Class but with no physical location in any Zone. | Exhibit 2 | BEL | 0 | External |
| 144 | Pol-265 | 265 | Approved Policy or Procedure | 10/10/2012 | Agreed to by the Parties | Submission of Consolidated Tax Returns | The Claims Administrator has encountered the question of whether a business entity with its own profit and loss statements but with federal tax returns that are filed as part of a consolidated return with other related but separate corporate entities must file the complete consolidated tax return when filing a claim. Section 3 of Exhibit 4A to the Settlement Agreement requires the submission of complete federal tax returns. The Claims Administrator interprets this provision such that it does not necessarily require the production of the complete consolidated returns in this instance. When a claimant business entity does not file a separate federal income tax return, but rather is included in the consolidated return of its parent or affiliate, the Claims Administrator will work with the claimant to ensure that adequate returns and information are provided such that the Claims Administrator is sufficiently satisfied that the books and records used in preparing the financial statements are the same books and records that were used in the preparation of the income tax return. The required documents and information will typically include: (a) face page/main page of the consolidated return, (b) statement / schedule of entities and their respective Employer Identification Numbers (EIN's) covered by the return, (c) consolidating schedule setting forth a breakdown of the covered entities, revenues, expenses, etc. (which may be redacted in part to delete income and/or expense information regarding unrelated entities), (d) complete portions of all aspects of the return dealing with the claimant entity, and (e) for partnerships, schedule of partnership entities and their respective K-1's. The Claims Administrator reserves the right to require submission of additional documents, and if appropriate, even the full return if deemed necessary for accurate review of the claim. It is the Claims Administrator's intent to work cooperatively with claimants to reasonably accommodate privacy concerns regarding unrelated entities and yet also require adequate documentation to ensure that such claims are properly reviewed in accord with the terms of the Settlement Agreement. | Exhibit 4A | BEL | 0 | External |

| 147 | Pol-269 | 269 | Approved Policy or Procedure | 10/10/2012 | Claims Administrator Decision | Seafood Distribution Chain Definitions | The Claims Administrator has encountered claims relating to these businesses that do not expressly fit in any of the definitions of the Seafood Distribution Chain in Exhibit 3. These businesses play a necessary role in the distribution of Seafood, but they are not listed in Exhibit 3: (a) Seafood Brokers: These companies facilitate the bulk purchase of seafood from Commercial Wholesalers and the subsequent sale to Retailers and end users, but do not purchase, sell, take possession of or title to the seafood product. Because Seafood Wholesaler or Distributor most accurately describes the activities of a Seafood Broker, the Claims Administrator will classify such a company as a Seafood Wholesaler or Distributor under the Seafood Distribution Chain. (b) Seafood Transportation/Trucking/Hauling: These are transportation businesses that deal exclusively with seafood. They take possession of the seafood, but do not purchase or take title to the seafood transported and do not also operate a Landing Site. Like Seafood Brokers, Seafood Transportation Businesses are third party intermediaries necessary to facilitate the purchase of bulk seafood and resale to the next step in the Distribution Chain. Accordingly, the Claims Administrator will classify such a company as a Seafood Wholesaler or Distributor under the Seafood Distribution Chain. | | Seafood | 0 | External |
| 148 | Pol-270 | 270 | Approved Policy or Procedure | 10/10/2012 | Claims Administrator Decision | Definition of "Landings" in Seafood Program | Certain claimants have contended that the term "landings" or "landed" in the Seafood Program in Exhibit 10 to the Settlement Agreement should be construed to include the act of harvesting the seafood and placing it in a vessel while on any of the Specified Gulf Waters. The term "Landing Site" is not expressly defined in the Settlement Agreement. The term "Landing Site," is defined as "a business at which boats first land their catch, including facilities for unloading and handling Seafood." Ex. 3 at § 2.a. (emphasis added.) The use of "land" in this definition informs the meaning of "landings," as vessels "land" their catch at a physical, shore-side location for handling seafood. The definition of a "Seafood Dockside Worker" as "a Natural Person performing services for a Landing Site" further indicates that fishermen "land" their catch at shore-side docks. In addition, the Settlement Agreement defines Gulf Coast Areas" separately from "Specified Gulf Waters," which suggests that "landings" made in the "Gulf Coast Areas" mean those made on shore and not the act of loading catch onto a vessel when out on the water. Accordingly, the Claims Administrator interprets the term "landings" or "landing" in the Settlement Agreement to mean solely landing seafood at dockside, and not the act of placing catch into a vessel while out on the water. | Exhibit 10 | Seafood | 0 | External |
| 149 | Pol-271 | 271 | Approved Policy or Procedure | 10/10/2012 | Clarified by Seafood Neutral | Oral Agreements Relating to Seafood Program Oyster Leasehold Claims | Section 2.2.B of the Oyster Leaseholder Compensation Plan in Exhibit 10 of the Settlement Agreement requires that, in addition to tax returns, financial statements, or business documents, an Oyster Leaseholder Lost Income Compensation claimant must provide "[c]ontracts or agreements between the Oyster Leaseholder and another natural person or entity that harvests oysters from their leaseholds located in Zones A, B or C, as reflected on the Oyster Leasehold Compensation Zone Map." Certain Oyster Leaseholder Lost Income claimants have informed the Claims Administrator that while they had oral agreements with oyster harvesters to harvest oysters off of the claimant's oyster leases, they had no written agreements and thus have no documents to submit in response to this requirement. The Claims Administrator has determined that this language of Exhibit 10 does not require that such contracts or agreements be in writing. The Claims Administrator will permit such claimants to satisfy this requirement by submitting a document that memorializes the terms of the oral agreements that existed at the relevant time. The Claims Administrator will require submission of a writing prepared at any time that describes the terms of the oral agreement and that is signed by the claimant and the oyster harvester that is a party to the oral agreement. | Exhibit 10 | Seafood | 0 | External |

| 150 | Pol-272 | 272 | Approved Policy or Procedure | 10/10/2012 | Clarified by Seafood Neutral | Deduction of Prior Spill-Related Payments from Oyster Leaseholder Compensation Payments | The Claims Administrator has reviewed with the Parties and the Seafood Neutral the contention presented by certain claimants that payments to Oyster Leaseholder Lost Income claimants under the Seafood Program in Exhibit 10 to the Settlement Agreement should not be offset by prior Spill-Related Payments to the claimant, on the ground that the prior payments represented compensation for lost income, while the Seafood Program payments represent compensation for property damages. The Seafood Neutral, BP and Class Counsel agreed that Prior Spill-Related Payments relating to Seafood must be deducted from payments to Oyster Leaseholder claimants under the Oyster Leaseholder Compensation Plan. Exhibit 10 at p. 2 provides that â€œ[c]ompensation received by an eligible Claimant under the Seafood Compensation Program will be reduced by the amount of prior Seafood Spill-Related Payments as described in the Seafood Spill Related Payment Reduction Procedures in this document.â€ Footnote 3 defines Seafood Spill-Related Payments as â€œcompensation paid to a claimant through the OPA Process, the GCCF, or through the Transition Facility for economic loss claims relating to Seafood.â€ All Oyster Leaseholder claims are covered by the Seafood Program and are Seafood interests. The Settlement Agreement does not delineate between property and other characterizations of the prior payments. Instead, the only distinction between the types of offsets under the Seafood Spill Related Payment Reduction Procedures is that between Seafood and. non-Seafood related prior payments. | Exhibit 10 | Seafood | | 0 | External |
| 151 | Pol-274 | 274 | Approved Policy or Procedure | 10/11/2012 | Claims Administrator Decision | Reconciliation of Financial Information | Pursuant to Section 4 of Exhibit 4A to the Settlement Agreement, the Claims Administrator may, in his discretion, request additional information or documentation to address discrepancies between amounts reflected in a tax return and comparable items in a profit and loss statement for the same period. Reconciliation of tax returns and profit and loss statements may be performed as deemed most appropriate by the reviewing accountants in the exercise of their professional judgment and given the circumstances of any particular claim, whether at the revenue level only or otherwise. The Settlement Program will perform a reconciliation of (i) revenue and (ii) total expenses in the claimantâ€™s P&Ls and tax returns. Where such reconciliation reveals a material discrepancy between the claimantâ€™s P&Ls and tax return, the Claims Administrator will seek to resolve the discrepancy. | Exhibit 4A | BEL | | 0 | External |
| 153 | Pol-275 | 275 | Approved Policy or Procedure | 10/11/2012 | Agreed to by the Parties | Discontinuing Incompleteness Reasons Associated with SWS-10 | Exhibit 8A to the Settlement Agreement requires a Claimant Sworn Written Statement (SWS-10) attesting to the number of hours a claimant worked towards earnings reported on a Schedule C or F, for both Claiming Jobs and Non-Claiming Jobs. The number of hours is involved in the Offsetting Earnings calculation. Offsetting Earnings are defined as â€œearnings from any Non-Claiming Job(s) during the claimantâ€™s Compensation Period in excess of earnings from any Non-Claiming Job(s) during the claimantâ€™s Benchmark Periodâ€ and are used â€œto offset Claimant Lost Earnings.â€ The Settlement Agreement provides for two exceptions to offsetting a claimantâ€™s earnings: (1) if the claimant can provide documentation showing that he worked the same or more total hours at his Claiming Job(s) during the Compensation Period; or (2) if the claimant can provide documentation showing that he worked fewer hours at the Claiming Job(s) and worked increased hours at the Non-Claiming Job(s) during the Compensation Period. A Schedule C or F does not list the hours worked to generate the income reported on those schedules, thus necessitating a sworn written statement to furnish us that information. The Claims Administrator created SWS-10 for that purpose. Under the Settlement Agreement, an IEL claimant with a Schedule C or F (not showing deduction of expenses, which would make the claimant a BEL claimant rather than an IEL claimant), and with no SWS-10 was to receive an Incomplete Notice asking for the SWS-10. The Claims Administrator recommended to the Parties on 10/9/12 that the SWS-10 requirement be eliminated altogether and that instead the Program would compensate claimants without consideration of the hours worked towards these earnings. Class Counsel agreed. BP agreed, unless a claimant wishes to reduce Offsetting Earnings using a pre-Spill and post-Spill hours comparison. The Claims Administrator is implementing that policy. | Exhibit 8A | IEL | | 0 | External |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 154 | Pol-276 | 276 | Approved Policy or Procedure | 10/11/2012 | Claims Administrator Decision | Scope of the GCCF Release Exclusions | (a) Spouse of GCCF Claimant: A claimant's spouse who signed a GCCF Release is not barred from pursuing his/her own claims, independent of his/her spouse's claims. (b) GCCF Business Claimant: A claimant that submitted a claim for a business in the GCCF, signed a Release and was paid is not barred from pursuing a claim as an individual, unrelated to the business involved in the GCCF claim. (c) GCCF Individual Claimant: A claimant who submitted a claim as an individual in the GCCF, signed a Release and was paid, is not barred from pursuing a claim for a business operated by the claimant that is unrelated to the individual claim involved in the GCCF claim. (d) GCCF Release on One Claim Type: A GCCF Release after asserting one Claim Type in the GFFC (not a personal injury claim) bars the claimant from pursuing a different Claim Type in the DWH Program (except for VoO Charter Damage and Vessel Physical Damage claims permitted for all GCCF Released claimants). (e) Double Payment Policy: A GCCF Release signed by an owner of a business on a business claim bars that person from asserting a DWH claim as a W-2 employee of that business. A GCCF Release signed by an owner of a business as a W-2 employee of that business bars that business from asserting a DWH claim. | Section 2.2.6, Section 38.75 | Exclusions | 0 External |
| 155 | Pol-277 | 277 | Approved Policy or Procedure | 10/11/2012 | Clarified by Seafood Neutral | Subleases of Oyster Leaseholds | The Claims Administrator recommended to the Parties on 10/9/12 that claims based on subleases of oyster beds are compensable in the Oyster Compensation Plan in the Seafood Program. The Parties responded that such claims can be based on subleases as follows: (a) In Louisiana, Florida, Mississippi, and Texas, the sublessee must have a State ID number. (b) In Alabama, sublessees are eligible without a State ID number. (c) If there is both a lessee and a sublessee, allocation of the compensation amount is required. The Claims Administrator is implementing that policy. | Exhibit 10 | Seafood | 1 External |
| 94 | Pol-277 | 138 | Approved Policy or Procedure | 6/29/2012 | Clarified by Seafood Neutral | Seafood Compensation Program: Oyster Leaseholders | We will only consider Oyster Leaseholder claims compensable if they are submitted by the entity or person that holds title to the oyster beds as a lessee through a state issued lease or private landownership document. | Exhibit 10 | Seafood | 0 External |
| 156 | Pol-278 | 278 | Approved Policy or Procedure | 10/16/2012 | Claims Administrator Decision | Lodging Tax Returns and Occupancy Reports for Lodging Businesses | Section 5 in Exhibit 4A the Settlement Agreement requires Lodging Tax Returns and Occupancy Reports for Lodging Businesses. Such documents will be required of all lodging business, except owners of vacation rental properties that are managed by a party other than the claimant. Claimants with such managed vacation rental properties may submit a Form 1099 and annual or other report from the management company regarding the property but need not submit lodging tax returns or occupancy reports. Claimants with self-managed vacation rental properties must submit lodging tax returns and occupancy reports. | Exhibit 4A | BEL | 0 External |
| 157 | Pol-279 | 279 | Approved Policy or Procedure | 10/16/2012 | Agreed to by the Parties | Minimum Age Requirement for Claimants | Exhibit 8A for Individual Economic Loss claims and Exhibit 10 for Seafood Program Seafood Crew Claims require that claimants submit: Evidence the Claimant was at least 16 years of age as of April 20, 2010. Acceptable evidence includes a copy of a valid driver's license, a valid passport, a certified copy of the Claimant's birth certificate, or a print out from a public database providing the same information as would be provided by the original document. The Claims Administrator determines the claimant's age is determined from the date of birth provided by the claimant in a Registration Form or, if not provided in that Form, in a Sworn Written Statement (SWS-32) signed by the claimant. The Claims Administrator received claims from claimants with dates of birth making them less than 16 years of age on 4/20/10. These claimants contend that the state law in their state allows persons to work legally at age 14 (or younger, in certain circumstances). In a 10/9/12 Memo, the Claims Administrator asked the Parties for their positions on whether such claimants are eligible for compensation under Exhibit 8A and Exhibit 10. The Parties agreed that such claimants are eligible, if as of 4/20/10, the claimant was of an age permitted to work in the claimant's job under applicable state law. | Exhibit 8A, Exhibit 10 | IEL,Seafood | 0 External |

| 158 | Pol-281 | 281 | Approved Policy or Procedure | 10/18/2012 | Claims Administrator Decision | Payment Documentation and Processing | The requirements for the Attorney Fee Acknowledgment Form ('Form') have changed. Until now, claimants were required to submit an original, signed Form. The Program is now authorized to pay a claim that is otherwise ready for payment, if it has a signed copy of the Form. Claimants may upload a .pdf of the signed Form on their Portal. As soon as the Program has received a signed copy (either on the Portal or by mail/overnight delivery), the Program will consider the document received for purposes of processing it for payment. However, claimants still need to mail or deliver the original, signed Form to the Program. | Exhibit 27 Section 8 | Payments | 0 | External |
| 160 | Pol-282 | 282 | Approved Policy or Procedure | 10/19/2012 | Clarified by Seafood Neutral | Leases of Private Oyster Beds | Leases of privately-owned oyster beds are included in the Settlement Class and Compensation Program. The Class is defined to include all Oyster Leaseholders, whether the lease establishes the Claimant as the lessee of an oyster leasehold for which the state is the lessor (â€œstate-issued leaseâ€) or the lessee of an oyster leasehold for which a private landowner is the lessor (â€œprivate leaseâ€). However, while private leases are included in the Settlement Class, certain private leases may not be eligible to receive payment under the Seafood Compensation Program, and thus those oyster leaseholders will have their associated Oyster Leaseholder Interest claims in connection with such private leases Expressly Reserved. To be eligible for compensation under the Seafood Compensation Program, a Oyster Leaseholder Claimants seeking recovery for oyster leaseholds in Louisiana, Florida, Mississippi, and Texas  must be the lessee of an oyster lease (whether â€œstate-issuedâ€or â€œprivateâ€) for which the State has issued an oyster lease ID number. In Alabama, where the state does not issue oyster lease ID numbers for oyster leases, then Claimants who are lessees of oyster leases (whether â€œstate-issuedâ€or â€œprivateâ€) are eligible for compensation from the Seafood Compensation Program. Thus, if a claiming Oyster Leaseholder seeks compensation for a lease in Louisiana, Florida, Mississippi or Texas that did not have a State-issued lease oyster ID number for the year 2010, then the Claimant remains in the Class and may be eligible for compensation under other aspects of the Seafood Compensation Program, (e.g., Oyster Harvester Lost Income Compensation, compensation under a different Seafood Compensation Program category such as the Shrimp Compensation Plan or Finfish Compensation Plan, or Oyster Leaseholder Interest claims for oyster leases in Louisiana, Florida, Mississippi or Texas that do have a State-issued lease ID number); however, that Claimantâ€™s Oyster Leaseholder Interest claims and Oyster Leaseholder Lost Income claims arising out of any Louisiana, Florida, Mississippi or Texas oyster lease without a State-issued lease ID number are Expressly Reserved | FAQ 189 | Seafood | 0 | External |
| 152 | Pol-284 | 284 | Approved Policy or Procedure | 10/19/2012 | Clarified by Seafood Neutral | Seafood Crew Compensation Plan | Seafood Crew claimants who receive compensation in Categories II and III do participate in any second distribution if there are Seafood Compensation Program Amount funds remaining after the Claims Administrator pays all eligible Seafood Compensation Program claims. | Exhibit 10 | Seafood | 0 | External |

| 161 | Pol-285 | 285 | Approved Policy or Procedure | 10/19/2012 | Clarified by Seafood Neutral | No Income During Benchmark Period | Under the Seafood Program, claimants with no income from owning or leasing a vessel or harvesting shrimp, oysters, fin fish, blue crab, or other seafood or from working as a Seafood Crew in the Benchmark Period nonetheless are Class Members. According to the Class Definition in Section 1.1 of the Settlement Agreement, an individual is a Class Member if at any time between 4/20/10 and 4/16/12, the claimant owned or leased or worked on a vessel harbored or home ported in the Gulf Coast Areas, or the Specified Gulf Waters, or worked on a vessel in Specified Gulf Waters after April 20, 2009. With respect to Seafood Crew, persons must have worked on a vessel that landed Seafood in the Gulf Coast Areas after April 20, 2009.  Under Section 1.2.3 an entity is in the Class if it owned, operated, or leased a vessel (1) that was Home Ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012 or (2) landed Seafood in the Gulf Coast Areas at any time from April 20, 2009 to April 16, 2012.  Individuals and Entities who meet these geographical descriptions are included in the Economic Class only if their claims meet the descriptions of one or more enumerated Damage Categories, including the Seafood Compensation Program.  The description for Seafood Compensation Program provides â€œDamages suffered by a COMMERCIAL FISHERMAN, Seafood Crew, or SEAFOOD VESSEL OWNER that owned, operated, leased or worked on a vessel that was (1) Home Ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012, or (2) Landed Seafood in the Gulf Coast Areas at any time from April 20, 2009 to April 16, 2012; and damages suffered by, OYSTER LEASEHOLDERS and IFQ Owners.  (Exhibit 10).  Claims for Economic Damage arising from fishing, processing, selling, catching, or harvesting menhaden (â€œpogyâ€) fish are excluded from the Seafood Compensation Program and other Economic Damage Claims under this Agreement.   A claimant may also be a Class Member based on the existence of other claims that meet the description of one or more of the other damage categories, such as VoO Charter Payment or Subsistence. The | FAQ 177 | Seafood | 0 | External |
| 159 | Pol-286 | 286 | Approved Policy or Procedure | 10/22/2012 | Claims Administrator Decision | Creation of Monthly Profit and Loss Statements | I. INTRODUCTION In support of a Business Economic Loss (â€œBELâ€) claim, Section 4 of Exhibit 4A of the Settlement Agreement Framework requires monthly and annual profit and loss statements, or alternate source documents establishing monthly revenues and expenses for the claimed Benchmark Period, 2010 and, if applicable, 2011. The Claims Administrator submits the following reminder to assist claimants in understanding how they can satisfy this required documentation. II. MEANS FOR SATISFYING REQUIREMENT OF MONTHLY P & Ls A. BEL claimants are required to submit both monthly and annual profit and loss statements that were maintained in the course of their business. B. If a BEL claimant did not maintain monthly profit and loss statements, that claimant may create such monthly statements based on contemporaneous alternate source documents (such as bank statements, check registers, cancelled checks, etc.). If accounting services are retained to create such monthly statements, those accounting expenses may be submitted for reimbursement in accord with the terms of the Claimant Accounting Support provisions as set out in Section 4.4.13 of the Settlement Agreement. C. If a BEL claimant did not maintain monthly profit and loss statements and if creating such statements would result in an undue burden to the claimant despite the availability of Claimant Accounting Support reimbursement, the claimant may provide the contemporaneous alternate source documentation to the Claims Administrator, and the Claims Administratorâ€™s accountant team will work with the claimant to devise monthly financial statements sufficient to enable evaluation of the claim. | Exhibit 4A | BEL | 0 | External |

| 162 | Pol-287 | 287 | Approved Policy or Procedure | 10/23/2012 | Claims Administrator Decision | Start-Up Business Financial Projections | Paragraph 4 of Section 4(D) of Exhibit 7 states that a claimant must submit â€œall financial projections.â€ The Claims Administrator interprets this provision to mean that if projections exist, then the claimant is required to submit those projections; however, if projections do not exist, and thus are not provided, then the claim is not Incomplete for projections. The Settlement Program will not assume the absence of projections in the claimantâ€™s documents is evidence that projections do not exist. Otherwise, claimants for whom projections do exist but who fail to submit the projections would not be found Incomplete, contrary to the documentation requirements set forth in the Settlement Agreement. The claimant must inform the Settlement Program that projections do not exist. An oral communication from the claimant is sufficient to establish that projections do not exist. | | BEL | 0 | External |
| 163 | Pol-288 | 288 | Approved Policy or Procedure | 10/25/2012 | Claims Administrator Decision | Business Economic Loss Claims and Individual Economic Loss Claims: Determination of Entity NAICS Code | The Claims Administrator will determine the appropriate NAICS Code for a business by looking at the nature of the business that operates under the Tax Identification Number (â€œTINâ€) as a whole and then selecting the most appropriate NAICS Code for the entire business associated with that TIN (the â€œEntityâ€). Once the Claims Administrator determines the appropriate NAICS Code for the Entity, then the NAICS Code will be attributed down to each Facility of the Entity. The Claims Administrator will use this process for NAICS Code determinations for all purposes under the Settlement Agreement, including classifying Entities under the NAICS Codes provided in Exhibits 2, 17, 18, and 19. The Claims Administrator will not examine the individual Facilities of an Entity to determine the Tourism, excluded, or Moratoria status of an Entity. For example, having an excluded Facility will not necessarily exclude the whole Entity. To determine the appropriate NAICS Code the Claims Administrator will look at the tax returns, business licenses, and other evidence such as revenues and the businessâ€™s website to determine the most appropriate NAICS Code for the whole Entity. | Section 4.4.7, Section 2.2.4.1, Section 2.2.4.2, Section 2.2.4.3, Section 2.2.4.4, Section 2.2.4.5, Section 5.10.2, Section 5.10.3, Section 5.10.4, Exhibit 16, Exhibit 17, Exhibit 18 | Exclusions | 0 | External |
| 164 | Pol-289 | 289 | Approved Policy or Procedure | 10/25/2012 | Claims Administrator Decision | Definition of Tourism | The Claims Administrator has considered the issue of what claimants fall within the definition of â€œTourismâ€ under Exhibit 2 to the Settlement Agreement. The Claims Administrator interprets the Settlement Agreement as follows: (a) Exhibit 2 provides that â€œTourism means businesses which provide services such as attracting, transporting, accommodating or catering to the needs or wants of persons traveling to, or staying in, places outside their home community.â€ (b) Exhibit 2 then provides a list of NAICS codes which qualify a claimant for inclusion in the Tourism category. The Claims Administrator finds that the list of NAICS codes is illustrative, not exhaustive. (c) If the most appropriate NAICS code for a claimant is one of the codes listed on Exhibit 2, that claimant will be considered to fall within the Tourism definition. (d) If the most appropriate NAICS code for a claimant is not one of the codes listed on Exhibit 2, that claimant may still be considered to fall within the Tourism definition if the Claims Administrator determines in his discretion that the claimant's business meets the definition outlined in Subsection (a) above. (e) The Claims Administrator has established a specialized team to assess Tourism issues on a case-by-case basis. (f) Characterization of a claimant's business as Tourism vs. Non-Tourism shall be based on the totality of circumstances, including consideration of the business' activities during the Benchmark Period and the Class Period. | | AllClaims | 0 | External |

| 165 | Pol-291 | 291 | Approved Policy or Procedure | 10/25/2012 | Clarified by Seafood Neutral | 2010 Shrimp Vessel Change (Vessel Owners/Vessel Lessees) | If the Claims Administrator determines that the vessel the Claimant owned or leased in the Benchmark Period qualifies in all respects for the either the Expedited Compensation Method or the Reduced Expedited Method of the Shrimp Compensation Plan and that the Claimant, in fact, changed to a different vessel for the 2010 season, the Claimant's compensation amount will be the vessel owner/lessee compensation amount for the same expedited method for which the Claimant's Benchmark Period vessel qualifies but for the vessel class of the Claimant's 2010 vessel. The vessel classes identified in the Shrimp Compensation Plan take into account vessel size and type, e.g. <30', 30'-44', 45'-74' (Ice), 45'-74' (Freezer), >75' (Ice) and >75' (Freezer). If in the Benchmark Period the Claimant owned a 45'-74' (Ice) vessel with revenue that qualifies for the Expedited Compensation Method, but the Claimant sold the vessel in December 2009 and purchased a 75' (Ice) vessel, then the Claimant's compensation amount will be the Expedited Compensation Method vessel owner/lessee compensation amount for a 75' (Ice) vessel. A claimant who switches to owning or leasing a different vessel in 2010 from the vessel owned or leased in the Benchmark Period must provide sufficient proof that it owned or leased the Benchmark Period vessel during the Benchmark Period; that it was no longer using the Benchmark Period vessel in 2010, i.e. that the vessel was sold or destroyed; and that the claimant in fact purchased or leased a different vessel for 2010. | FAQ 184 | Seafood | | 0 | External |
| 166 | Pol-292 | 292 | Approved Policy or Procedure | 10/25/2012 | Clarified by Seafood Neutral | 2010 Oyster, Finfish, Blue Crab/Other Seafood Vessel Change (Vessel Owners/Vessel Lessees) | A claimant is eligible for compensation for the 2010 vessel if it owned or leased a vessel in the Benchmark Period that qualifies for compensation under the Oyster, Finfish or Blue Crab/Other Seafood Compensation Plans. Under the Oyster, Finfish or Blue Crab/Other Compensation Plans, compensation is calculated using the revenue generated by the vessel that the entity owned or leased in the Benchmark Period. A claimant who switches to owning or leasing a different vessel in 2010 from the vessel that it owned or leased in the Benchmark Period must provide sufficient proof to establish that it owned or leased the Benchmark Period vessel during the Benchmark Period; that it was no longer using the Benchmark Period vessel in 2010, e.g., that the vessel was sold or destroyed; and that the claimant in fact purchased or leased a different vessel for 2010. | FAQ 179 | Seafood | | 0 | External |

| 167 | Pol-293 | 293 | Approved Policy or Procedure | 10/25/2012 | Clarified by Seafood Neutral | 2010 Shrimp Vessel Change (Boat Captains) | A Boat Captain (whether he has an exclusive work arrangement with the vessel owner/lessee or he is the vessel owner/lessee) qualifies in all respects for the either the Expedited Compensation Method or the Reduced Expedited Method of the Shrimp Compensation Plan for the vessel on which he or she worked in the Benchmark Period and that the Claimant, in fact, committed to an exclusive arrangement to work on the vessel owner/lessee's new vessel for the 2010 season, the Claimant's compensation amount will be the Boat Captain compensation amount for the same expedited method for which the Claimant's Benchmark Period vessel qualifies but for the vessel class of the vessel on which the Claimant worked in 2010. The vessel classes identified in the Shrimp Compensation Plan take into account vessel size and type, e.g. <30', 30'-44', 45'-74' (Ice), 45'-74' (Freezer), >75' (Ice) and >75' (Freezer).  An exclusive arrangement is one in which the Boat Captain works on no other vessel, and the vessel owner/lessee exclusively used the Boat Captain as the boat captain on the vessel at issue. For example, if (1) in the Benchmark Period the Boat Captain had an exclusive arrangement to work for a vessel owner of a 45'-74' (Ice) vessel with revenue that qualifies for the Expedited Compensation Method, and (2) in December 2009 the vessel owner/lessee sold the 45'-74' (Ice) vessel and purchased a new 75' (Ice) vessel, and (3) the Boat Captain accepted an exclusive arrangement to work on the new vessel, then the Boat Captain's compensation amount will be the Expedited Compensation Method Amount for Boat Captains who work on 75+feet (Ice) vessels, rather than the Compensation Amount for Boat Captains who work on 45-74 feet (Ice) vessels. Boat Captain with such circumstances must provide sufficient proof to establish (i) that he had an exclusive work arrangement to work for the vessel owner/lessee during the Benchmark Period on the Benchmark Period vessel (or that he was the vessel owner/lessee and worked as the only Boat Captain on the vessel), (ii) the vessel | FAQ 185 | Seafood | | 0 | External |
| 168 | Pol-294 | 294 | Approved Policy or Procedure | 10/29/2012 | Clarified by Seafood Neutral | Old Entrant/Adds a Vessel | If an entity owned and/or leased a fleet of vessels in the Benchmark Period and the same entity purchased or leased an additional vessel for use in 2010 fishing season, is the additional vessel eligible for compensation under the Seafood Compensation Plan, and, if so, how is compensation calculated? A: In all Seafood Compensation Plans, if an entity, for example an LLC, owned and/or leased a fleet of vessels in the Benchmark Period and the same entity establishes that it added an additional vessel to its fleet for the 2010 fishing season, the Claims Administrator will apply the average Benchmark Period revenue data for the relevant vessels from the Claimant's fleet to determine the compensation amount for the newly added vessel. For Claimants in the Oyster, Finfish and Blue Crab/Other Compensation Plans, Benchmark Period revenue for the newly added vessel will be calculated as the average for all vessels in the Claimant's fleet that were operating to harvest the relevant species during the Benchmark Period (applying the same Benchmark Period for all vessels in the Claimant's fleet). For example, if the Claimant owned six vessels during the Benchmark Period -- three vessels used to finfish and three vessels used to shrimp, and the new vessel the Claimant purchased to add to his fleet for the 2010 fishing season was another finfish vessel, only the average Benchmark Period revenue for the Claimant's three finfish vessels will be considered to determine the compensation amount for his new finfish vessel. The Benchmark Period revenue for all three finfish vessels must be included for the average Benchmark Period revenue. For Claimants in the Shrimp Compensation Plan, Benchmark Period Revenue for the new vessel will be calculated as the average Benchmark Period revenue for the Claimant's shrimping vessels in the same vessel class as the Claimant's new vessel that were operating during the Benchmark Period, using the same Benchmark Period for all such vessels. The vessel classes identified in the Shrimp Compensation Plan take into account vessel size and type, e.g. <30', 30'-44', 45'-74' (Ice), 45'-74' | FAQ 182 | Seafood | | 0 | External |

| 170 | Pol-295 | 295 | Approved Policy or Procedure | 11/1/2012 | Claims Administrator Decision | Entry of Total Revenue | If a Business Claimant does not fall within the Causation Presumption, the Settlement Program uses several â€œRevenue Patternâ€ tests to determine if the Business Claimant satisfies the Causation requirement set forth in the Settlement Agreement. These tests require a claimantâ€™s monthly â€œtotal business revenueâ€ to show certain revenue patterns. The Program interprets â€œtotal business revenueâ€ to mean Total Net Revenue. Most Profit and Loss statements list only one amount for monthly total revenues. This one amount may be labeled as Gross Revenues, Gross Sales or Total Sales. If the claimantâ€™s Profit and Loss statements provide only one amount for monthly total revenues, the Settlement Program will use that amount for â€œtotal business revenue.â€ Some Profit and Loss statements show both Gross Revenues and Net Revenues. Net Revenues may also be labeled as Net Sales. If the claimantâ€™s Profit and Loss statements provide both Gross Revenues and Net Revenues, the Settlement Program will use Net Revenues for â€œtotal business revenueâ€ The Settlement Program will never calculate the revenue patterns using the amounts shown for Gross Profits, Net Profits or Net Income. These amounts reflect income after the deduction of expenses, which the Program does not use to perform the Revenue Pattern Causation tests. | Exhibits 4B and 4C | BEL | | 0 | External |
| 171 | Pol-297 | 297 | Approved Policy or Procedure | 11/26/2012 | Claims Administrator Decision | Subsistence Claims: Field Visits | As stated in the Settlement Agreement, Field Visits are mandatory for Subsistence claims with payable base amounts above $10,000. The base amount is the total payable value of a Subsistence claim before it is multiplied by a Risk Transfer Premium of 2.25. The CADA will appoint a Field Visit Team to conduct Field Visits. The Field Visit Team will travel to the claimantsâ€™ homes, dock locations, and other applicable areas to evaluate any equipment used by claimants for Subsistence purposes. | Exhibit 9, Section E | Subsistence | | 0 | External |
| 169 | Pol-299 | 299 | Approved Policy or Procedure | 12/3/2012 | Agreed to by the Parties | Determination of an Excluded Real Estate Developer | Section 2.2.4.7 of the Settlement Agreement excludes: Real Estate Developers, including any Natural Person or Entity that develops commercial, residential or industrial properties. This includes, but is not limited to, any Entity developing an entire subdivision (as defined by the law of the state in which the parcel is located) of Real Property, including condominiums with multiple residential units and/or a residential subdivision with contiguous home sites and homes, provided, however, that Real Estate Developers shall be eligible to assert Coastal Real Property Claims under Section 5.7 and Real Property Sales Damage Claims under Section 5.9. Section 5.9.3 of the Settlement Agreement provides that, other than as allowed in the Real Property Sales framework, no claimant may â€œrecover under this Agreement, including any Exhibit thereto, for Economic Damage based on a reduction in sale price, or an alleged reduction in market value, of real estate they owned or in which they had an ownership interest.â€ Section VI of Exhibit 18 to the Settlement Agreement confirms this exclusion, by reference to Sections 2.2.4.7 and 5.9.3. Exhibit 18 requires the Claims Administrator to determine the applicability of the exclusion of real estate developers based upon â€œreview of (a) the claimantâ€™s 2010 tax return, (b) 2010 business permits or license(s), and/or other evidence of the relevant businessâ€™s or individualâ€™s activities necessary for the Claims Administrator to determine whether the exclusion applies.â€ In contrast to its treatment of excluded Defense Contractors, the Settlement Agreement provides no revenue threshold applicable to determining who is or is not a Real Estate Developer; rather, the Settlement Agreement takes a more subjective approach and leaves that determination to the sound discretion of the Claims Administrator. The Claims Administrator will implement these provisions as follows: (a) Claimants Affected by this Exclusion: This exclusion applies to any Entity that is a Real Estate Developer and any Individual employed by a Real Estate Developer, attempting to assert any claim in the Program other than Coastal Real Property Claims | Section 2.2.4.7, Exhibit 18 | Exclusions | | 0 | External |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 174 | Pol-300 | 300 | Approved Policy or Procedure | 12/4/2012 | Claims Administrator Decision | Business Economic Loss Claims: Multi-Facility Business Claimants | Exhibit 5 of the Settlement Agreement addresses Compensation of Multi-Facility Businesses. Pursuant to Section II of Exhibit 5, required documentation includes â€œSeparate profit and loss (P&L) statements for each individual Facility that were prepared and maintained in the normal course of business.â€(a) For a Multi-Facility Business with locations both within and outside the Gulf Coast Areas who submits claims for only those Facilities within the Gulf Coast Areas, the Claims Administrator interprets this provision such that P&Lâ€™s for those Facilities outside the Gulf Coast Areas are not necessarily required. (b) The Claims Administrator may in his discretion require any and all documentation that he deems appropriate to properly evaluate a given claim or to resolve questions presented by a particular claim, including but not limited to additional individual Facility P&Lâ€™s, consolidating schedules, or other records. | Exhibit 5 | BEL | 0 External |
| 176 | Pol-301 | 301 | Approved Policy or Procedure | 12/4/2012 | Claims Administrator Decision | Moratoria Losses: Entities Subject to Analysis for Moratoria Losses | To implement Exhibit 16 to the Settlement Agreement, the Claims Administrator will evaluate economic loss claims from entities and the employees of entities within the NAICS Codes enumerated and marked with an â€œXâ€in Section I of Exhibit 19 to the Settlement Agreement and enumerated and marked with an â€œXâ€in Section II of Exhibit 19 to the Settlement Agreement (if such entity provided significant services, goods, and/or supplies to businesses in the offshore oil and gas industry in the Gulf of Mexico in 2009) to determine whether the claimantâ€™s losses were non-compensable Moratoria Losses or were compensable Non-Moratoria Losses. The Claims Administrator will not automatically conduct this Moratoria Losses analysis on the economic loss claims from any other entities or employees of other entities. | Exhibits 16, 19 | BEL | 0 External |
| 177 | Pol-302 | 302 | Approved Policy or Procedure | 12/4/2012 | Claims Administrator Decision | Moratoria Losses: Choice of NAICS Code | For purposes of implementing Exhibit 16 and Exhibit 19 to the Settlement Agreement, the Claims Administrator will review an entityâ€™s 2010 tax return and business permit (if available) and other evidence of the business activities of the entity to determine the appropriate NAICS Code that best fits the entity, in the same manner in which the Claims Administrator assigns NAICS Codes to an entity for any purpose under the Settlement Agreement. The NAICS Code used on the 2010 tax return or business license will not be considered conclusive, and the Claims Administrator will not apply any presumptions regarding the selection of the NAICS Code to classify the entity properly. | Exhibits 16, 19 | BEL | 0 External |
| 178 | Pol-305 | 305 | Approved Policy or Procedure | 12/4/2012 | Claims Administrator Decision | Individual Economic Loss Claims: Zone for Specified Gulf Waters | Exhibit 8A to the Settlement Agreement provides: For purposes of this Framework for Individual Economic Loss Claims, the presumption shall be that the location of economic loss for the Claiming Job is the location of the claimantâ€™s employer within the Class Definition geographic area, not the claimantâ€™s residence. Claimants may establish an alternative location of economic loss for the Claiming Job other than their employerâ€™s location by providing evidence that their primary employment activities and responsibilities occur in a location different from their employerâ€™s business address, and that the claimed DWH Spill-related economic loss occurred at such location. For example, the claimant works for a housekeeping company located in Zone C that services households in Zones A, B and C, including vacation condominiums located in Zone A, and the claimant establishes that she works primarily in Zone A. (Ex. 8A fn 4; fn 12; fn 16; fn 21; fn 23; fn 24.) To implement these provisions, Individual Economic Loss claimants who establish that their primary employment activities and responsibilities for a Claiming Job occurred in or on the Specified Gulf Waters during the relevant Benchmark Period and Compensation Period, the Claims Administrator will consider the claimantâ€™s alternative location of economic loss other than their employerâ€™s business address to be in Zone A. | Exhibit 8A | IEL | 0 External |

| 179 | Pol-307 | 307 | Approved Policy or Procedure | 12/12/2012 | Court Decision | Business Economic Loss: Non-Profit Entities | The Claims Administrator shall apply the Settlement as follows with respect to business economic claims of non-profit entities: (a) Income received by non-profit entities in the form of grant monies or contributions shall typically be treated as revenue for that entity for purposes of the various required calculations under the terms of the Settlement Agreement. (b) For those non-profit entities who are required to file income tax returns or who have in fact filed income tax returns (whether required to file or not), submission of income tax returns is required as outlined in Exhibit 4A of the Settlement Agreement. (c) If a non-profit entity is not required by law to file an income tax return and in fact has not filed such a return, such entity may submit a Verification of Nonfiling from the IRS, together with the entity's organizational documents indicating that the entity is a Non-Profit organization, in satisfaction of the requirement to produce income tax returns as outlined in Exhibit 4A of the Settlement Agreement. | Exhibit 4A | BEL | 1 | External |
| 35 | Pol-307 | 64 | Approved Policy or Procedure | 5/24/2012 | Claims Administrator Decision | Exclusions: Not for Profit Businesses | We will allow non-profit businesses to file and be compensated where eligible. | Section 38.65 | Exclusions | 0 | External |
| 181 | Pol-308 | 308 | Approved Policy or Procedure | 12/12/2012 | Court Decision | Economic Loss: Establishing Causation | The Settlement Agreement represents the Parties' negotiated agreement on the criteria to be used in establishing causation. The Settlement Agreement sets out specific criteria that must be satisfied in order for a claimant to establish causation. Once causation is established, the Settlement Agreement further provides specific formulae by which compensation is to be measured. All such matters are negotiated terms that are an integral part of the Settlement Agreement. The Settlement Agreement does not contemplate that the Claims Administrator will undertake additional analysis of causation issues beyond those criteria that are specifically set out in the Settlement Agreement. Both Class Counsel and BP have in response to the Claims Administrator's inquiry confirmed that this is in fact a correct statement of their intent and of the terms of the Settlement Agreement. The Claims Administrator will thus compensate eligible Business Economic Loss and Individual Economic Loss claimants for all losses payable under the terms of the Economic Loss frameworks in the Settlement Agreement, without regard to whether such losses resulted or may have resulted from a cause other than the Deepwater Horizon oil spill provided such claimants have satisfied the specific causation requirements set out in the Settlement Agreement. Further, the Claims Administrator will not evaluate potential alternative causes of the claimant's economic injury, other than the analysis required by Exhibit 8A of whether an Individual Economic Loss claimant was terminated from a Claiming Job for cause. | Exhibit 4B | IEL,BEL | 1 | External |
| 146 | Pol-308 | 268 | Approved Policy or Procedure | 10/10/2012 | Claims Administrator Decision | No Analysis of Alternative Causes of Economic Losses | The Settlement Agreement represents the Parties' negotiated agreement on the criteria to be used in establishing causation. The Settlement Agreement sets out specific criteria that must be satisfied in order for a claimant to establish causation. Once causation is established, the Settlement Agreement further provides specific formulae by which compensation is to be measured. All such matters are negotiated terms that are an integral part of the Settlement Agreement. The Settlement Agreement does not contemplate that the Claims Administrator will undertake additional analysis of causation issues beyond those criteria that are specifically set out in the Settlement Agreement. Both Class Counsel and BP have in response to the Claims Administrator's inquiry confirmed that this is in fact a correct statement of their intent and of the terms of the Settlement Agreement. The Claims Administrator will thus compensate eligible Business Economic Loss and Individual Economic Loss claimants for all losses payable under the terms of the Economic Loss frameworks in the Settlement Agreement, without regard to whether such losses resulted or may have resulted from a cause other than the Deepwater Horizon oil spill provided such claimants have satisfied the specific causation requirements set out in the Settlement Agreement. Further, the Claims Administrator will not evaluate potential alternative causes of the claimant's economic injury, other than the analysis required by Exhibit 8A of whether an Individual Economic Loss claimant was terminated from a Claiming Job for cause. | Exhibit 4B | IEL,IPV/FV,BEL | 0 | External |

| 180 | Pol-309 | 309 | Approved Policy or Procedure | 12/13/2012 | Claims Administrator Decision | Appeals: Re-Review Process | The Claims Administrator will implement the Re-Review process outlined in the memo dated 11/20/12 and flow chart. The Claims Administrator respectfully disagree with BPâ€™s arguments that: (1) the Settlement Agreement does not allow this; and (2) establishing it will compromise the finality this Program requires. Although the specific process is not spelled out in the Settlement Agreement, Exhibit 25 provides authority for the Claims Administrator to promulgate this process, and we think that having this process will provide finality sooner on more claims than the current process provides. The Claims Administrator announced this policy decision in a memo dated 12/13/12. | | Appeal | | |
| | | | | | | | | | | 0 | External |
| 175 | Pol-311 | 311 | Approved Policy or Procedure | 12/17/2012 | Claims Administrator Decision | Seafood Program: Affidavits as Evidence of Landings made within the Gulf Coast Area | The Claims Administrator will consider affidavits from both the claimant and the wholesaler who issued trip tickets as reliable evidence that landings listed on those triptickets were made within the Gulf Coast Area. If such documentation is submitted by the claimant, we will count those revenues in the calculation of the claimantâ€™s Seafood Compensation Award. | Exhibit 10 | Seafood | | |
| | | | | | | | | | | 0 | External |
| 182 | Pol-313 | 313 | Approved Policy or Procedure | 12/21/2012 | Claims Administrator Decision | Seafood Program: Bedding Ground Rental Receipts | The Settlement Agreement requires claimants to submit a copy of the oyster lease or title. The Bedding Ground Rental Receipts are not a reliable substitute because the ownership information contained on a copy of the lease may not be reflected on the associated receipts. Enforcing this documentation requirement will not significantly burden claimants, who can obtain copies of their leaseholds easily and quickly by contacting the LDWF. The vast majority of Oyster Leaseholder Lost Interest Claimants have submitted copies of the original oyster leases. | Exhibit 10 | Seafood | | |
| | | | | | | | | | | 0 | External |
| 126 | Pol-315 | 315 | Approved Policy or Procedure | 1/2/2013 | Claims Administrator Decision | Subsistence: Application of 2010 and 2011 Retail Prices | Where a claimantâ€™s Loss Period begins in the same year, the CADA Team will use the average retail value of each species for the applicable year in the loss calculation. For example, if a claimantâ€™s Loss Period begins and ends in 2010, the CADA team will apply the average cost per species for the year 2010. When a claimantâ€™s Loss Period begins in 2010 and ends in 2011, the CADA Team will apply the 2010 retail values to the portion of the harvest lost in 2010 and 2011 retail values to the portion of the harvest lost in 2011. | Exhibit 9 | Subsistence | | |
| | | | | | | | | | | 0 | External |
| 40 | Pol-316 | 69 | Approved Policy or Procedure | 5/25/2012 | Claims Administrator Decision | Subsistence Claims: Evidence of Impairment | There are circumstances where a fishing/hunting area could be impaired beyond the length of closure. However, we must have objective evidence that the Spill impaired a hunting or fishing area. If a claimant submits proof that the Spill impaired an area beyond the length of closure, we will use our discretion when considering that proof and whether it is objective evidence of impairment. | Exhibit 9, Section B(1) | Subsistence | | |
| | | | | | | | | | | 1 | External |
| 43 | Pol-316 | 68 | Approved Policy or Procedure | 5/25/2012 | Claims Administrator Decision | Subsistence Claims: Evidence of Impairment | We must have objective evidence that the Spill impaired a hunting or fishing area. Oiling is one factor that would prove that the Spill impaired a hunting or fishing area. If a claimant submits proof that the Spill impaired an area that did not close or was not oiled, we will use our discretion when considering that proof and whether it is objective evidence of impairment. | Exhibit 9, Section B(1) | Subsistence | | |
| | | | | | | | | | | 0 | External |
| 27 | Pol-317 | 317 | Approved Policy or Procedure | 1/2/2013 | Claims Administrator Decision | Subsistence: Consumption and Bartering Calculation | The CADA Team will use the formula presented in the 11/21/12 Subsistence Claims Review Updates Alert to calculate consumption and bartering losses with the exception of the activity levels as set forth in item 3 below. However, the CADA Team will continue to consider all claims on a case-by-case basis. | Exhibit 9 | Subsistence | | |
| | | | | | | | | | | 1 | External |
| 172 | Pol-317 | 298 | Approved Policy or Procedure | 11/26/2012 | Claims Administrator Decision | Compensation Formula for Consumption Losses | The Claims Administrator retained Peter T. Katzmarzyk, PhD, FACSM, FAHA, a Professor and Associate Executive Director for Population Science at the Pennington Biomedical Research Center in the Louisiana State University System, to assess and report on the actual caloric intake of residents in the Gulf Coast region. Dr. Katzmarzykâ€™s recommended approach is to utilize the actual caloric intake of men and women of average height and weight in the United States who function at a â€œevery activeâ€ physical activity level. The Claims Administrator incorporated Dr. Katzmarzykâ€™s recommendations into a revised Subsistence loss formula. The Subsistence loss formula is a tool that the Claims Administrator will use to calculate actual consumption rates that are reasonable for Gulf Coast residents. The calculation results will be used by the Court-Appointed Distribution Agent (CADA) Team as a guideline in which to compare actual reported losses for individual claimants. | | Subsistence | | |
| | | | | | | | | | | 0 | External |

| 173 | Pol-320 | 320 | Approved Policy or Procedure | 1/3/2013 | Claims Administrator Decision | Changes to the Identity Verification Process for the Program | The Settlement Program asks every claimant to provide a Social Security number (â€œSSNâ€), Individual Taxpayer Identification Number (â€œITINâ€), or Employer Identification Number (â€œEINâ€) on the Registration Form. The Claims Administrator uses that number as a unique identifier to keep claimants separate in the Program. When the Claims Administrator receives the Registration Form, the accuracy of the SSN, ITIN, or EIN that is provided by the claimant must be verified, to make sure it is the right number and that the number exists and does not belong to anyone else. The Claims Administrator does verification step for several reasons: (a) The SSN, ITIN or EIN is the only way to give each claimant a unique identifier, which is necessary for tracking, processing and payment purposes. (b) It enables the Claims Administrator to link a Deepwater Horizon claimant to a previous GCCF claim, copy existing documents to the new claim and account for any previous offers or payments. (c) Further, accurate and genuine taxpayer numbers are necessary to prevent issuing payments to fictitious taxpayers or paying the same claim more than once. Documentation Required to Verify Identity: If the claimant provides is able to verify from what the claimant provides or through research that the SSN, ITIN, or EIN on the Registration Form belongs to the claimant, then the claimant does not need to provide any further information or documentation. In a small percentage of claims, the Claims Administrator will not be able to match the SSN, ITIN, or EIN to an existing, authentic number, often because a digit has been transposed, there are other typos in the number or because the name associated with that number in the official governmental records is different from the name the claimant provided. If the Claims Administrator is unable to verify the claimantâ€™s SSN, ITIN or EIN, the Claimant will be asked to help confirm the number and to provide additional information, as described below. The acceptable documentation for proof of Identity for claimants who use an EIN was recently updated to include Tax Return Transcripts and Tax Account Transcripts and relaxed | Claimant Identity Verification procedures are not included in the Settlement Agreement. | | | 0 | External |
| 183 | Pol-324 | 324 | Approved Policy or Procedure | 3/5/2013 | Court Decision | Business Economic Loss Claims: Calculation of Variable Profit | Calculation of Variable Profit. Exhibit 4C of the Settlement Agreement sets out the methodology to be used in calculating Variable Profit as a component of determining Step 1 Compensation. That methodology is as follows: 1. Sum the monthly revenue over the period. 2. Subtract corresponding variable expenses from revenue over the same time period. Variable expenses include: a. Variable Costs as identified in Attachment A. b. Variable portion of salaries, calculated as described below in the definition of Fixed and Variable Payroll Expenses. c. Variable portion of COGS, calculated by excluding salary costs . . . and fixed expenses included within COGS, including Amortization, Depreciation, Insurance Expense, and Interest Expense and Contract Services. In performing these calculations, the Claims Administrator will typically consider both revenues and expenses in the periods in which those revenues and expenses were actually booked in the Claimantâ€™s contemporaneous financial statements. The Claims Administrator will not typically re-allocate such revenues or expenses to different periods. The Claims Administrator does, however, reserve the right to adjust the financial statements in certain circumstances that come to their attention including, but not limited to, inconsistent basis of accounting between benchmark and compensation periods, errors in previously recorded transactions and flawed or inconsistent treatment of accounting estimates. Timing of Revenues for Purposes of Causation. Exhibit 4B of the Settlement Agreement sets out the methodology to be used in assessing causation. That methodology largely concerns consideration of total net revenues over the period vs. total net revenues after the spill. In performing these calculations, the Claims Administrator will typically consider revenues in the periods in which those revenues were recorded at the time. The Claims Administrator will not typically re-allocate such revenues to different periods. The Claims Administrator does, however, reserve the right to adjust the financial statements in certain circumstances, including but not limited to, inconsistent basis of accounting | Exhibit 4C | BEL | | 1 | External |
| 63 | Pol-324 | 124 | Approved Policy or Procedure | 6/15/2012 | Claims Administrator Decision | Business Economic Loss Claims: Non-Recurring Operating Revenues and Expenses | Large, non-recurring operating revenues or expenses will be included in the variable profit calculation. However, the following will not be considered large non-recurring operating revenues or expenses: cashing in on a business interruption insurance policy and sale of equipment or a building. Instead, these types of large and/or extraordinary non-operating items will be excluded from the calculation of variable profit. | Exhibit 4C | BEL | | 0 | External |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 185 | Pol-327 | 327 | Approved Policy or Procedure | 2/8/2013 | Claims Administrator Decision | Business Economic Loss Claims: State Sales and Use Tax Returns for Retail Businesses | Section 5 in Exhibit 4A of the Settlement Agreement requires monthly State Sales and Use Tax Returns for Retail Businesses. These documents shall be required of all Retail Business claimants, and must cover all years included in the Benchmark Period, 2010, and, if applicable, 2011. The Claims Administrator recognizes that there may be rare instances in which a Retail Business is not required to file monthly State Sales and Use Tax Returns, and therefore does not file monthly State Sales and Use Tax Returns, because of local regulations that are unique to specific jurisdictions. As such, the Claims Administrator submits the following policy clarification: (a) If a Business Claimant submits documentation establishing that local regulations exempt the particular type of retail business in question from filing monthly State Sales and Use Tax Returns, and the Claims Administrator verifies the same, then the Claims Administrator may allow the claimant to be eligible for compensation without submitting monthly State Sales and Use Tax Returns. The Claims Administrator may, however, require any additional documentation that it deems necessary to satisfy this document requirement. (b) If, however, a Business Claimant submits documentation establishing that local regulations exempt the particular type of retail business in question from filing monthly State Sales and Use Tax Returns, but requires non-monthly State Sales and Use Tax Returns, and the Claims Administrator verifies the same, then the Claims Administrator may allow the claimant to satisfy this document requirement by submitting the non-monthly State Sales and Use Tax Returns for the applicable period. The Claims Administrator may, however, require any additional documentation that it deems necessary to satisfy this document requirement. (c) To the extent that a Business Claimant has filed State Sales and Use Tax Returns, even if not required by local regulations, such returns are required to be submitted in support of the claim. | Exhibit 4A | BEL | 0 | External |
| 184 | Pol-328 | 328 | Approved Policy or Procedure | 2/8/2013 | Claims Administrator Decision | Business Economic Loss Claims: Non-Revenue Items of Entities | The Claims Administrator interprets the Settlement Agreement such that the following items shall not typically be treated as â€œrevenueâ€ for purposes of the various calculations to be performed under the terms of the Settlement Agreement with regard to entities asserting BEL claims: (a) insurance proceeds, (b) interest income, and (c) gains or losses from sales of assets. In arriving at this conclusion, the Claims Administrator has in part relied upon two factors. First, such items are not typically treated as â€œrevenueâ€ under generally accepted accounting principles. Second, the extensive templates and testing of claims calculations jointly conducted by both Parties prior to implementation of this claims program, by agreement of the Parties, did not treat such items as â€œrevenueâ€ for purposes of this Settlement Agreement. | | BEL | 0 | External |
| 187 | Pol-330 | 330 | Approved Policy or Procedure | 2/8/2013 | Agreed to by the Parties | Economic Loss Zones: Definition of Zone A-28 â€" The Florida Keys | Economic Loss Zones are defined by the Economic Loss Zone maps in Exhibit 1A, read in conjunction with the textual Geographical Definitions in Exhibit 1B. In the case of Zone A-28, representing the Florida Keys, the language of Exhibit 1B appears to conflict with the map drawn in Exhibit 1A. Exhibit 1B, page 8 describes Zone A-28: â€œA-28: Florida Keys: This zone consists of the entirety of the series of islands off the south coast of Florida stretching from Key West in the south/west to Key Largo in the north/east.â€ On the map in Exhibit 1A, page 15, Zone A extends from the Southwestern most point in Key West to the municipality of Key Largo, but does not include all of Key Largo Island. The northern remainder of that Island is in Zone D on the map. According to the Interactive Mapping Tool furnished by the Parties, Zone A ends midway through Key Largo Island. The border is a straight line perpendicular to FL-905, beginning approximately at coordinates N 25.2118 W -80.3401. There is no geographical, roadway, or legal boundary at this location that would explain placing a boundary between Zones in this area. There is no language in Exhibit 1B that supports this boundary. After reviewing the issue with the Parties, the Claims Administrator has determined that the textual description in Exhibit 1B controls over the map in Exhibit 1A and the Interactive Mapping Tool and the Claims Administrator will consider all of Key Largo, including northernmost portion, as included in Zone A. | Exhibit 2 | IEL,BEL | 0 | External |

| 188 | Pol-331 | 331 | Approved Policy or Procedure | 2/8/2013 | Claims Administrator Decision | Economic Loss Claims: Time Period Used to Determine the Applicable Zone | The Settlement Agreement requires the Claims Administrator to determine the Zone applicable to each Economic Loss claimant for purposes of causation and compensation. The Settlement Agreement, however, does not specify the time period used to make this determination for any claimant. In every instance, the Settlement Agreement uses the present tense when describing the impact of the Zone on causation of the RTP applicable to the claim. See, e.g., Ex. 4B Sec. I.1 (â€œIf you are a business in Zone A . . .â€); Ex. 15 (â€œBusinesses . . . located in Zone A . . .â€); Ex. 8A fn 4 (â€œClaimants may establish an alternative location of economic loss for the Claiming Job other than their employerâ€™s location by providing evidence that their primary activities and responsibilities occur in a location different from their employerâ€™s business addressâ€). With no temporal element prescribed by the Settlement Agreement for the Zone determination, it provides no guidance on how the Claims Administrator is to assign a Zone to an entity that has changed its physical location at any time after 4/20/10 or to an individual whose work area changed at after that date. After reviewing the Settlement Agreement and the responses of the Parties to a request for their positions on this issue, the Claims Administrator has adopted these rules of decision to address this issue: (a) The Claims Administrator will assign an entity the Zone in which the claimant was located at any time during the Compensation Period applicable to the claimant that is most favorable to the claimant. (b) The Claims Administrator will assign an individual the Zone in which the claimantâ€™s primary activities and responsibilities occurred at any time during the Compensation Period applicable to the claimant that is most favorable to the claimant. (c) Because the Class Period defined in Section 38.28 of the Settlement Agreement extends through 4/16/12, which is beyond the Compensation Period of any claimant, certain claimants are Class Members but had no physical location in any Zone or did not work in any Zone during the claimantâ€™s Compensation Period. The Claims Administrator will assign Zone D to such claimants. | Exhibit 2 | IEL,BEL | 0 | External |
| 189 | Pol-332 | 332 | Approved Policy or Procedure | 2/8/2013 | Claims Administrator Decision | Individual Economic Loss Claims: End Date for Reimbursable Search Costs | To implement Section R of Exhibit 8A of the Settlement Agreement, which provides for compensation for â€œ[d]ocumented travel and job search costs actually incurred after April 20, 2010 in searching for alternative employment due to job loss or work reduction after the DWH Spill,â€ the Claims Administrator will consider as potentially compensable Reimbursable Search Costs incurred by an IEL claimant during the period commencing on or after April 21, 2010, through the earlier of (a) the claimantâ€™s procurement of full-time employment or (b) December 31, 2011. | Exhibit 8A | IEL | 0 | External |

| 191 | Pol-333 | 333 | Approved Policy or Procedure | 2/8/2013 | Claims Administrator Decision | Individual Economic Loss Claims: Acceptable Substitutes for Sworn Written Statement-12 | Exhibit 8A to the Settlement Agreement requires that Category I, II, and III claimants who do not receive a presumption of causation must provide an Employer Sworn Written Statement attributing the claimant's loss of income during the Compensation Period to the DWH Spill. The Employer Sworn Written Statement must articulate in detail how the claimant's losses at the Claiming Job are causally related to the DWH Spill. Such Employer Sworn Written Statement must also include contact information for an authorized representative of the employer. The Claims Administrator created a form for claimants to use to meet this requirement, known as the SWS-12. The Claims Administrator is required to evaluate the credibility and reliability of the information provided by the employer and the claimant, including any Sworn Written Statements, and has the right to request supplemental documentation and/or to interview the employer in accordance with the Addendum Regarding Interviews of Claimants Alleging Economic Loss. The Claims Administrator has encountered three scenarios in which claimants are unable to obtain an SWS-12 or an equivalent sworn statement from the claimant's employer: (a) The Employer Refuses to Sign: The claimant's employer is still in business but refuses to sign the SWS-12 or any sworn statement. (b) The Employer is Deceased: The employer is deceased and the claimant cannot locate any authorized business representative to sign an SWS-12. (c) The Employer Has Dissolved and No Longer Exists: The employer is no longer in business and the claimant cannot locate any authorized business representative to sign an SWS-12. In these situations, without any acceptable substitute, these claimants will not be eligible for any IEL award. After reviewing the provisions of the Settlement Agreement, the purpose of this SWS-12 requirement and the practicalities of administering this requirement to actual claimant situations, the Claims Administrator has adopted these processing policies: (a) A claimant must first attempt to procure an employer-provided SWS-12. (b) If the claimant cannot submit an SWS-12 or adequate sworn written | Exhibit 8A | IEL | 0 | External |
| 190 | Pol-334 | 334 | Approved Policy or Procedure | 2/8/2013 | Claims Administrator Decision | Seafood Compensation Program: Benchmark Revenue Treatment of Unreported Cash Sales of Seafood in Louisiana | All Louisiana Wholesale/Retail Dealers and Fresh Products Licenses must participate in the Trip Ticket Program and report all Seafood landings to the LDWF. If a Louisiana commercial fisherman sells landings in cash to individuals, that fisherman must report the cash transaction to the LDWF Trip Ticket Program. However, certain claimants have indicated that, in practice, cash sales are seldom reported to the LDWF and generally are poorly documented. These claimants have requested that the Claims Administrator accept handwritten receipts from unreported cash sales made in Louisiana as proof of additional Benchmark Revenue. Ex. 10 to the Settlement Agreement requires Vessel Owner claimants to submit either (1) Trip Tickets or their equivalents or (2) federal or state tax information and other sufficient documentation as evidence of their Benchmark Revenue. (Ex. 10 at 19.) Because handwritten receipts from cash sales do not include vessel information or commercial fishing license numbers, they are not equivalent to trip tickets. Further, these receipts represent revenue not reported either to Louisiana when the sale was made or to the Federal government on the claimant's tax returns. Accordingly, the Claims Administrator will not accept such documentation to prove Benchmark Revenue. | Exhibit 10 | Seafood | 0 | External |

| 192 | Pol-335 | 335 | Approved Policy or Procedure | 2/8/2013 | Claims Administrator Decision | Seafood Compensation Program: Determination of Vessel Length | Both the VoO Program and the Seafood Compensation Program rely on a vesselâ€™s length to determine the amount of a claimantâ€™s award. The VoO Program uses the greater of the vessel length recorded in the Master Vessel Charter Agreement (MVCA) or the vessel length in the government registration to establish the vessel length for the purposes of the compensation calculation. This policy, which the Claims Administrator decided after soliciting input from the parties, gives claimants the benefit of the longer measurement between two source documents common to all VoO claims. The Seafood Compensation Program does not have a similar controlling database of all vessel lengths. For proof of the vessel length in the Seafood Compensation Program, the Settlement Agreement states that â€œthe Claimant must provide documentation to establish the vessel size and type for each vessel for which the Claimant seeks Compensation.â€ (Exhibit 10 at 11.) The Settlement Agreement does not specify the type of documents that can be used to establish a vessel length. Some claimants have submitted conflicting information about the lengths of their vessels, where the length listed in their vessel registration documents conflicts with the corresponding figure in the MVCA database used on VoO claims. BP compiled the MVCA database during the VoO program using lengths reported by claimants. Claimants with a higher vessel length in the MVCA database than is listed on the official registration for the vessel have asked that the Claims Administrator compensate them in the Seafood Compensation Program on the basis of the greater vessel length. Vessel length significantly affects the amount of the claimantâ€™s award in the Shrimp portion of the Seafood Compensation Program, and increasing one claimantâ€™s award reduces the value of all other claims to be compensated by the limited Seafood Compensation Fund. The Claims Administrator has determined that the claimant-reported specifications in the MVCA database are less reliable than the official vessel length data provided on the State and Federal registration documents. Accordingly, the Claims Administrator will | Exhibit 10 | Seafood | 0 | External |
| 193 | Pol-336 | 336 | Approved Policy or Procedure | 2/8/2013 | Clarified by Seafood Neutral | Seafood Compensation Program: Oyster Vessel Owner and Oyster Boat Captain Compensation Calculations | Exhibit 10 to the Settlement Agreement contains an inconsistency in its description of compensation to certain combined Oyster Harvester/Leaseholders. Section 3.3 of Exhibit 10 describes the calculations for Oyster claimants who are the Sole Boat Captain of the vessel that is the subject of the claim. Exhibit 10 also contains a document called â€œOyster Compensation Plan - Exhibit 2â€ which includes an example of an Oyster Boat Captain calculation (the â€œExample Calculationâ€). The language of Section 3.3 and the Example Calculation differ in how they treat the Leaseholder Payment Cost, a component of the compensation calculation. Though the same factors should apply in both places, the values differ by 10%, and the calculation in Section 3.3 results in a more favorable outcome for the claimant. As text generally controls over numerical characters in the law, and as express language in the Settlement Agreement sets forth the required compensation methodology, the Claims Administrator has determined that the written text of Section 3.3 controls, rather than the Example Calculation. | Exhibit 10 | Seafood | 0 | External |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 195 | Pol-337 | 337 | Approved Policy or Procedure | 2/8/2013 | Claims Administrator Decision | Seafood Compensation Program: GCR Oyster Leasehold Database | On May 25, 2012, the Claims Administrator was provided with an Oyster Leasehold database containing the names of 2010 leaseholders, the lease numbers, the quad locations, the current acreage of the leases, and the percentage of each lease in the three Oyster Leaseholder Compensation Zones. The database also incorporated the compensation calculations for each leasehold based on the acreage located in its respective Oyster Leasehold Compensation Zone in accordance with Exhibit 10, pg. 28, Section 1.3. On June 29, 2012, the mapping company provided an updated Oyster database to replace the first one. During the course of reviews, the Claims Administrator has discovered gaps in the updated database requiring the actions described below for: (a) inactive leases or leaseholds outside of Louisiana and (b) leaseholds re-surveyed and re-plotted after 2010: (a) Leaseholds located outside of Louisiana or leases no longer active in 2012: The updated database cannot accommodate two scenarios affecting a small number of claims: (1) where the claimed lease is located outside of Louisiana, as the updated database only covers Louisiana leases; and (2) where the claimed leasehold interest has changed from its 2010 active designation, as the updated database shows leases active in 2012, not 2010. In these instances, the Claims Administrator will provide the data points required to update the database. The mapping company will perform a spatial analysis of the claimed lease and return the results to the Claims Administrator. The Claims Administrator will rely on that determination in processing the affected claim. (b) Re-surveyed and re-plotted leaseholds: The Claims Administrator uses the Oyster Leasehold Database to confirm the geographic zone and compensation calculations for Oyster Leasehold Lost Interest claims. The database is based on the most current surveys performed by the state of Louisiana that run through 2012. The Settlement Agreement requires Oyster Leaseholder claimants to provide a âvalid oyster lease entered into by Claimant that establishes, as of April 20, 2010, the Claimant as the lessee of the oyster leasehold, or a | Exhibit 10 | Seafood | 0 | External |
| 196 | Pol-338 | 338 | Approved Policy or Procedure | 2/8/2013 | Claims Administrator Decision | Seafood Compensation Program: Protocol for Reclassifying Claims | The Seafood Compensation Program consists of twenty-two distinct claim types across five catch types and four operator types. Certain claimants have filed claims incorrectly under the wrong claim type. The Claims Administrator has adopted these policies to address these situations: (a) Reclassifying Claims Automatically: The most common claim type filing error occurs when a claimant selects the incorrect Species Type during the claim filing process, such as where a claimant identifies Finfish landings as Other Seafood landings. Where the trip tickets associated with the claim show landings of a species type different from the species type indicated on the Claim Form, the Claims Administrator automatically will reclassify that claim under the correct species type for the claimant and process the reclassified claim to a notice. (b) Requiring Claimants to File the Correct Claim Form: Occasionally, claimants submit their claims under the wrong operator type, such as a Boat Captain who filed as a Vessel Owner. The Claim Form contains sworn statements, vessel data, and other required claim information that support the compensation calculation for a specific operator type, and that information must appear in a properly completed Claim Form. Without these data points, the Claims Administrator cannot process the claim as required by Ex. 10. To obtain the information required to identify and process the claim, the Claims Administrator will assist the claimant in submitting a new Claim Form to correct the error. For purposes of the Bar Date for submitting claims in the Seafood Compensation Program, the filing date of this correct Claim Form will relate back to the date of filing of the incorrect Claim Form that it replaces. | Exhibit 10 | Seafood | 0 | External |

| 197 | Pol-339 | 339 | Approved Policy or Procedure | 2/8/2013 | Claims Administrator Decision | Seafood Compensation Program: Documentation Requirements for Oyster Leaseholder Claims | The Settlement Agreement provides that a claimant filing an Oyster Leaseholder claim must submit these documents to participate in the Oyster Compensation Plan: Valid oyster lease entered into by Claimant that establishes, as of April 20, 2010, the Claimant as the lessee of the oyster leasehold, or a copy of the actual title for the leasehold. Claimants are required to provide documentation that their leasehold interest is in good standing, such as proof of renewal. (Ex. 10 at 26.) The Claims Administrator has encountered certain claimants who have not submitted a copy of the original Leasehold Document and instead proffered alternative evidence of Oyster Leasehold Ownership. These claimants argue that they should not have to submit official copies of the lease or the title for the leasehold and that LDWF Oyster Bedding Ground Rental Receipts should suffice. The LDWF issues those receipts to confirm that the owner of the lease paid the required annual lease fees. While these receipts do contain some of the same data points needed to perform the review required by Ex. 10 to the Settlement Agreement, they are not a reliable substitute for the documentation required by the Settlement Agreement. For example, in at least one claimant's file, payment receipts were incorrectly issued in the name of a former owner instead of the name of the current owner. Because the Settlement Agreement expressly requires claimants to submit a copy of the oyster lease or title and the Bedding Ground Rental Receipts are not a reliable substitute, the Claims Administrator will not accept rental receipts or other unsatisfactory supporting documentation in lieu of copies of the lease or title for the leasehold. | Exhibit 10 | Seafood | 0 | External |
| 198 | Pol-340 | 340 | Approved Policy or Procedure | 2/8/2013 | Clarified by Seafood Neutral | Seafood Compensation Program: Acknowledgement of Oral Oyster Harvesting Agreements | In his 10/10/12 Announcement of Policy Decisions Regarding Claims Administration, the Claims Administrator addressed Section 2.2.B of the Oyster Leaseholder Compensation Plan in Exhibit 10 of the Settlement Agreement, which requires that, in addition to tax returns, financial statements, or business documents, an Oyster Leaseholder Lost Income Compensation claimant must provide "[c]ontracts or agreements between the Oyster Leaseholder and another natural person or entity that harvests oysters from their leaseholds located in Zones A, B or C, as reflected on the Oyster Leasehold Compensation Zone Map." Certain Oyster Leaseholder Lost Income claimants had informed the Claims Administrator that, while they had oral agreements with oyster harvesters to harvest oysters off of the claimant's oyster leases, they had no written agreements and thus had no documents to submit in response to this requirement. Accordingly, the Claims Administrator permits such claimants to satisfy the "[c]ontracts or agreements" requirement by submitting a writing prepared at any time that describes the terms of the oral agreement and that is signed by the claimant and the oyster harvester that is a party to the oral agreement. Some claimants have struggled with the form of writing sufficient to satisfy this requirement. To facilitate the completion of such claims, the Claims Administrator created an Acknowledgement of Verbal Oyster Harvesting Agreement Form (attached to the 1/11/13 memo) to be used by Oyster Leaseholder Lost Income claimants and Combined Oyster Harvester/Leaseholder claimants who never memorialized in writing their oyster harvesting agreements to acknowledge retroactively the controlling terms of their verbal oyster harvesting agreements that existed during their Benchmark Period. | Exhibit 10 | Seafood | 0 | External |
| 194 | Pol-341 | 341 | Approved Policy or Procedure | 2/8/2013 | Claims Administrator Decision | Seafood Compensation Program: Determination of Vessel Classification | The value of many Seafood Compensation Claims depends on the classification of the qualifying vessel as either an ice or freezer boat. Exhibit 10 states that "the Claimant must provide documentation sufficient to establish the vessel size and type for each vessel for which the claimant seeks compensation." Exhibit 10 pg. 11 Section B.1.(c.). The Claims Administrator uses the documentation provided by the claimant to classify the vessel as an ice or freezer boat and perform the appropriate compensation calculations. The Claims Administrator has encountered a few instances where a qualifying vessel has changed classification during the Benchmark Period because the owner of an ice boat installed a freezer. In evaluating this subset of claims where the proffered documentation supports either vessel classification, the Claims Administrator will classify the vessel in the manner that will lead to the higher compensation calculation for the claimant. | Exhibit 10 | Seafood | 0 | External |

| 199 | Pol-342 | 342 | Approved Policy or Procedure | 2/8/2013 | Clarified by Seafood Neutral | Seafood Program: Calculation of Boat Captain Income on Claims by Owner/Operators | Under Exhibit 10, Class Members who owned or leased and captained their own vessel during the qualifying time period have both (1) a Vessel Owner and (2) a Boat Captain claim in the Seafood Compensation Program. The Historical Revenue Compensation Method, which is available for all of the Seafood species types, uses revenues in past Benchmark Years to calculate an award amount that differs by operator type. When a claimant who is both Boat Captain and Vessel Owner/Lessee has submitted a Schedule C to support the Boat Captain claim, the Claims Administrator will use the gross revenues in Line 1 of the Schedule C as the revenues in past Benchmark Years and then will apply the Exhibit 10 Cost Percentage, the Loss Percentage and the Boat Captain share set by Exhibit 10 to derive the number multiplied by the RTP to get the award amount for the claimant on the Boat Captain claim. The Claims Administrator will not use Schedule C Line 29 net profits number (or the net profits number shown on any line in other tax forms) on the Boat Captain claim of a claimant who is both Boat Captain and Vessel Owner/Lessee, for doing so would eliminate the premise for an award to that claimant on a Vessel Owner/Lessee claim. The Seafood Neutral has informed the Claims Administrator that he agrees with this policy. | Exhibit 10 | Seafood | 0 | External |
| 200 | Pol-343 | 343 | Approved Policy or Procedure | 2/8/2013 | Claims Administrator Decision | Business Economic Loss Claims:  Partial Year Step 2 Compensation | Exhibit 4C of the Settlement details the framework for the calculation of Step 1 and Step 2 Compensation for Business Economic Loss claims. The Settlement Agreement fails to provide specific direction on how to address BEL claims with a partial year start date that do not qualify as Start-Up or Failed Business claims. The Claims Administrator interprets the Settlement Agreement as a whole such that the framework is most reasonably applied in the following manner: For purposes of Step 2 Compensation, for those claimants who commenced operations during the optimal Benchmark Period, the claimant will be limited to a General Adjustment Factor of 2%. No additional Claimant-Specific Factor will be applied to such claims. | | BEL | 0 | External |
| 201 | Pol-344 | 344 | Approved Policy or Procedure | 2/8/2013 | Claims Administrator Decision | Economic Loss Claims: Appropriate Treatment of Revenues for Clean Up Activities | On Business Economic Loss claims, Section II of Ex. 4C to the Settlement Agreement provides that "[f]or Claimants that participated in the VoO program, Variable Profit in the Compensation Period will exclude revenue generated or costs incurred in connection with the VoO." Similarly, on Individual Economic Loss claims, Section A of Exhibit 8A defines a claimant's "Actual Earnings" as "income actually earned from the Claiming Job(s) during the Compensation Period excluding Spill-Related Payments and employment earnings from the VoO program." Given that the Settlement Agreement does not expressly exclude from Variable Profit or Actual Earnings revenues and costs or earnings for clean up activities other than the VoO Program, the Claims Administrator will not exclude such revenues and costs from Variable Profit in the Compensation Period on BEL claims or from Actual Earnings or Offsetting Earnings during the Compensation Period on IEL claims. Instead, the Claims Administrator will treat them in the same manner as any other revenues and costs or earnings during the Compensation Period. Accordingly, the Claims Administrator will not consider such revenues or earnings as Spill-Related Payments to be deducted from an award to the claimant in the Program. | | IEL,BEL | 0 | External |

| 203 | Pol-345 | 345 | Approved Policy or Procedure | 2/8/2013 | Claims Administrator Decision | Business Economic Loss Claims: Customer Mix Test | Exhibit 4B of the Settlement Agreement provides that one of the ways that BEL claimants can establish Causation is by satisfying what is referred to in Exhibits B and C as the Customer Mix Test, together with other requirements. The Settlement Agreement states that the claimant may submit the following types of documents to establish the required revenue decline as specified under the Customer Mix Test: (a) Customer credit card receipts or other contemporaneously maintained records of payment; (b) Customer registration logs (e.g., hotel registries); (c) Documentation maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers; or (d) Business documents reflecting contemporaneous recording of receipts or invoices listing customers by location. The Claims Administrator has observed that it is difficult or even impossible for some BEL claimants to satisfy this test because they do not have documentation to establish the addresses/locations of their customers. This is particularly problematic for businesses that deal primarily in cash, which businesses often do not maintain the type records specified in the above-referenced section of the Settlement Agreement. But the Claims Administrator interprets the Settlement Agreement's documentation requirements as mandatory. The Settlement Agreement does not grant the Claims Administrator discretion to waive these document requirements. In order to establish Causation under the Customer Mix Test, a BEL claimant must provide supporting documentation of the type described in the above-referenced section. With regard to application of the Customer Mix Test to specific factual patterns, the Claims Administrator provides the following illustrations concerning how this test is to be most reasonably applied: (a) Project-based businesses: When project-based businesses, such as construction companies, end a project in the regular course of business, the completion of those contracts will not be equated to the loss of total revenue generated by the customer(s) for purposes of the Customer Mix Test. (b) Property owners/commercial tenants: If a |  | BEL | 1 | External |
| 202 | Pol-346 | 346 | Approved Policy or Procedure | 2/8/2013 | Claims Administrator Decision | Economic Loss Claims: The Appropriate RTP for Primary Seafood Processors | Exhibit 15 to the Settlement Agreement states that an RTP of 3.00 applies to "businesses satisfying the Primary Seafood Processor Definition in the Seafood Distribution Chain Definitions who process Shrimp/Crab/Oyster and are located in Zone A, Zone B, Zone C or Zone D." It then provides that an RTP of 2.25 applies to "businesses satisfying the Primary Seafood Processor Definition in the Seafood Distribution Chain Definitions who process seafood other than Shrimp/Crab/Oyster and are located in Zone A, Zone B, Zone C or Zone D." For businesses in these Zones satisfying the Primary Seafood Processor Definition in the Seafood Distribution Chain Definition that process Shrimp/Crab/Oyster and also process seafood other than Shrimp/Crab/Oyster, the Claims Administrator has determined that it is not feasible to distinguish reliably or efficiently Shrimp/Crab/Oyster revenues from revenues from other seafood processing. The Claims Administrator will apply an RTP of 3.00 to such claimants, unless it is apparent from the claim materials that Shrimp/Crab/Oyster processing is a minor and insignificant portion of the claimant's operations during each year of the applicable Benchmark Period, in which case an RTP of 2.25 shall apply. |  | IEL,BEL | 1 | External |
| 132 | Pol-346 | 171 | Approved Policy or Procedure | 7/15/2012 | Claims Administrator Decision | Business Economic Loss Claims: Primary Seafood Definition RTP | The Settlement Agreement states that an RTP of 3.00 applies to "businesses satisfying the Primary Seafood Definition in the Seafood Distribution Chain Definitions who process Shrimp/Crab/Oyster and are located in Zone A, Zone B, Zone C or Zone D," but that an RTP of 2.25 applies to "businesses satisfying the Primary Seafood Definition in the Seafood Distribution Chain Definitions who process seafood other than Shrimp/Crab/Oyster and are located in Zone A, Zone B, Zone C or Zone D." We will apply the RTP of 3.00 to businesses that exclusively process Shrimp/Crab/Oyster. We will apply an RTP of 2.25 to businesses that process a combination of Shrimp/Crab/Oyster and other seafood. | Exhibit 15 | BEL | 0 | External |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 204 | Pol-348 | 348 | Approved Policy or Procedure | 2/8/2013 | Claims Administrator Decision | VoO Charter Payment Claims: Transitional MVCAs | Sections 38.170 and 38.96 define eligible VoO claimants as those who "executed a VoO Master Vessel Charter Agreement." Section 38.165 defines "VoO Master Vessel Charter Agreement" as "the standard agreements utilized by BP and its agents or subcontractors to charter the vessels available for work or service in connection with the VoO program." Certain claimants have submitted Transitional Master Vessel Charter Agreements ("TMVCAs") with BP in an effort to satisfy the eligibility requirement that the claimant have executed a VoO Master Vessel Charter Agreement ("MVCA"). The Claims Administrator concludes that a TMVCA is not the same as an MVCA as defined in the Settlement Agreement, because the documents contain these key differences: (a) The MVCA states that the vessel shall be employed for the Charterer's use as a "vessel of opportunity," while the TMVCA does not; (b) The MVCA measures vessel length by "Length Over All," while the TMVCA measures vessel length by that listed on the state or federal registration documents as of 3/30/10; (c) The contracts contain different daily rate payment amounts for work performed; (d) An MVCA contains a rate of $200 per crew member per eight-hour day, while the TMVCA does not; (e) The TMVCA does not appear to contain the language issue that gave rise to the contract claims in the VoO Charter litigation; and (f) The dates of the TMVCAs we have seen are after the date that the VoO program ended (11/26/10), according to BP. It appears that BP used the contracts for two different clean-up programs and used only MVCAs in the VoO program that forms the basis of the VoO Charter Payment benefit in the Settlement Agreement. Accordingly, VoO Charter Payment claims based on TMVCAs do not meet the eligibility requirements for such claims and will be denied. Class Counsel has asked that BP stipulate that a person or entity with a claim arising out of a TMVCA is not a Class Member under the Settlement Agreement. The Claims Administrator considers the discussion and preparation of any such stipulation to be a matter between the Parties to the Settlement | 38.165 | VoO Charter Payment | 0 | External |
| 1 | Pol-349 | 349 | Approved Policy or Procedure | 3/27/2013 | Claims Administrator Decision | Benchmark Period for Claimants Passing the Local and Non-Local Customer Mix Test. | Exhibit 4B to the Settlement Agreement prescribes the causation requirements for Business Economic Loss claims. Claimants in Zones B, C, and D that pass the Modified V-Shaped Revenue Pattern or Decline-Only Revenue Pattern, and who do not satisfy causation requirements through another method prescribed in Exhibit 4B, must also satisfy the requirements of the "Customer Mix Test." Exhibit 4B does not specify which Benchmark Period applies to a claimant that establishes causation by satisfying the Customer Mix Test, together with the other requirements of the Modified V-Shaped Revenue Pattern Test or the Decline-Only Revenue Pattern Test. The Claims Administrator will apply the policy that if a claimant passes the Customer Mix Test by the comparison of local and non-local customers for a three consecutive month period in 2009 as compared to the same period in 2010, the Claims Administrator will calculate the claimant's compensation using the most favorable Benchmark Period for which the claimant satisfies the applicable Revenue Pattern Test. That Benchmark Period may, or may not, include 2009 only. | Exhibit 4B | BEL | 0 | External |
| 2 | Pol-350 | 350 | Approved Policy or Procedure | 3/27/2013 | Claims Administrator Decision | Lodging Tax Returns for Lodging Businesses | Section 5 of Exhibit 4A of the Settlement Agreement directs: If the claimant falls within any of the specific business types listed below, the following additional documents are required for the years included in the Benchmark Period, 2010, and, if applicable, 2011: ...b) Lodging (including hotels, motels, and vacation rental properties): i. Lodging tax returns. The Claims Administrator interprets this requirement to allow an exception for Business Claimants not required to file lodging tax returns with its state or locality. Accordingly, if a Business Claimant submits documents establishing that it is exempt from filing lodging tax returns and therefore did not file the returns for some or all of the required periods, the claimant will not be required to submit such returns. | Exhibit 4A Section 5 | BEL | 0 | External |

| 3 | Pol-351 | 351 | Approved Policy or Procedure | 3/27/2013 | Claims Administrator Decision | Lodging Tax Returns and Occupancy Reports for Managed Lodging Businesses | Section 5 of Exhibit 4A of the Settlement Agreement directs: If the claimant falls within any of the specific business types listed below, the following additional documents are required for the years included in the Benchmark Period, 2010, and, if applicable, 2011â€¢.b) Lodging (including hotels, motels, and vacation rental properties): i. Lodging tax returns, ii. Occupancy reports or historical rental records, on a per unit basis if available; iii. Documentation to identify how the rental property is managed, such as (i) a management contract from a third-party management company or (ii) a Sworn Written Statement from an owner that manages its own property. The Claims Administrator revised this requirement after meeting with the Parties so that such documents will be required of all lodging business, except owners of vacation rental properties that are managed by a party other than the claimant. Claimants with such managed vacation rental properties may submit a Form 1099 and an annual or other report from the management company regarding the property, but need not submit lodging tax returns or occupancy reports. Claimants with self-managed vacation rental properties must submit lodging tax returns and occupancy reports. In certain situations, management companies are not required by law to report income on a Form 1099 to the vacation rental property owner. The Claims Administrator interprets this requirement to allow exceptions for such claimants. Accordingly, if a Business Claimant submits documents establishing that it is an owner of a vacation rental property that is managed by a third party and that it received less than $600 of rental income from the property during a required period and did not receive a Form 1099 from the applicable management company, the claimant will not be required to submit a Form 1099. | Exhibit 4A Section 5 | BEL | 0 | External |
| 4 | Pol-352 | 352 | Approved Policy or Procedure | 3/27/2013 | Claims Administrator Decision | The Appropriate Eligibility Zone for Charter Fishing Businesses | To determine the Eligibility Zone for a Business Entity, the Claims Administrator determines the location where that Entity owned, operated, or leased a facility. See Section 1.2.1 of the Settlement Agreement. The Claims Administrator locates an entity using the place where it performs or manages its operations. See Exhibit 5, Section I. Charter Fishing businesses, whether organized as a sole proprietorship or as a formal business entity, generally do not maintain any separate location to manage or operate the business, but instead use the ownerâ€™s or captainâ€™s home address to receive mail, file tax returns, and register, organize, or incorporate the business entity. The owners perform all business operations aboard the vessel used to â€œcarry Passenger(s) for Hire to engage in Recreational Fishing.â€ See Section 38.18 of the Settlement Agreement. The location of the vessel, rather than the home address of the owner or captain, is the most accurate reflection of the entityâ€™s business operating location and of the claimantâ€™s loss. Accordingly, if a Business Claimant submits documents establishing to the satisfaction of the Claims Administrator showing where the Charter Fishing Vessel was docked, harbored, or Home Ported at any time during the Compensation Period applicable to the claimant and the claimant meets the definition of Charter Fishing under Section 38.18 of the Settlement Agreement, the Claims Administrator will assign the Zone where the Charter Fishing Vessel was docked or harbored, or Home Ported at any time during the Compensation Period applicable to the claimant that is most favorable to the claimant. This policy only applies to charter fishing and does not apply to land-based facilities. | Exhibit 5, Section I | IEL,BEL,All Economic Loss Claims | 0 | External |

| 5 | Pol-353 | 353 | Approved Policy or Procedure | 3/27/2013 | Claims Administrator Decision | VoO MVCAs and Recognized Charterers | Section 38.165 of the Settlement Agreement defines a VoO Master Vessel Charter Agreement (â€œVoO MVCAâ€) as â€œthe standard agreements utilized by BP and its agents or subcontractors to charter the vessels available for work or service in connection with the VoO program.â€Section 38.17 of the SA defines â€œChartererâ€ as â€œBP, Lawson, USMS, USES, DRC, or any other subcontractor utilized by BP to implement the VoO Program.â€Before we began reviewing VoO Charter Payment claims, BP provided the Claims Administrator with VoO data including participant names and vessel information. The data includes information from the subcontractors listed in Section 38.17: Lawson, USMS, USES and DRC. When reviewing a VoO claim, we first look to the data to determine whether the claimant executed a VoO MVCA for the claimed vessel. If the data lists the claimed vessel and the claimantâ€™s name, we presume that the claimant executed a VoO MVCA for that vessel. If the data does not list the claimant or vessel, we review the submitted documents to determine if the claimant submitted a fully executed VoO MVCA listing the claimed vessel. On 2/6/13, Claims Administrator announced the policy that VoO MVCAs are specific contracts used in the VoO program that state that the vessel shall be employed for the Chartererâ€™s use as a â€œvessel of opportunityâ€and contain specific language and payment terms that gave rise to contract claims in the VoO Charter litigation. The Claims Administrator will extend that policy to apply to any clean-up contract presented by a claimant that has these distinguishing features to meet the requirements of a VoO MVCA defined in Section 38.165: (1) The contract must state that the vessel shall be employed for the Chartererâ€™s use as a â€œvessel of opportunity;â€(2) The contract must measure vessel length by â€œLength Over All;â€(3) The date of the contract must be before the VoO program ended (11/26/10), according to BP; and, (4) The contract must contain daily rate payment structure based on vessel length: Vessel Length Daily Rate 1. >65 feet $3,000/24 hour day 2. >45 â€“ 65 feet $2,000/24 hour day 3. >30 | Section 38.165 and Section 38.17 | VoO Charter Payment | 0 | External |
| 81 | Pol-354 | 247 | Approved Policy or Procedure | 8/24/2012 | Claims Administrator Decision | Business Economic Loss Claims: Newly Acquired Businesses | We will treat an existing business that was acquired during the start-up period as a Start-Up Business. A newly-acquired business should be considered a standard business under the BEL rules if the claimant can document the claim with financials from prior ownership to establish operating history for a benchmark period, a 2010 compensation period, and 2011 (if needed for causation) as required by the framework. However, if the business undergoes a fundamental change in operating activities in the course of the change of ownership, we will use judgment to determine if the business fits the Start-Up or BEL framework. | Exhibit 7 | BEL | 1 | External |
| 73 | Pol-354 | 229 | Approved Policy or Procedure | 8/2/2012 | Claims Administrator Decision | Newly Acquired Businesses as Start-Up Businesses | A newly-acquired business will be considered a standard business under the BEL rules if the claimant can document the claim with financials from prior ownership to establish operating history for a benchmark period, a 2010 compensation period, and 2011 (if needed for causation) as required by the framework. However, if the business undergoes a fundamental change in operating activities in the course of the change of ownership, the Claims Administrator will use judgment to determine if the business fits the Start-Up or BEL framework. | Exhibit 7 | BEL | 0 | External |

| 205 | Pol-356 | 355 | Approved Policy or Procedure | 4/17/2013 | Claims Administrator Decision | All Claims: Assignment of Settlement Program Claims | Section 1.1.2.1 of Exhibit 21 to the Settlement Agreement provides: No Assignment of Economic Classâ€™s, Plaintiffsâ€™, or Economic Class Membersâ€™ Claims or Reassignment of Assigned Claims. Neither the Economic Class nor any Plaintiff or Economic Class Member shall assign or reassign, or shall attempt to assign or reassign, to any person or entity other than BP any rights or claims arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident, including attempts to reassign the Assigned Claims. Any such assignment or reassignment, or attempt to assign or reassign, to any person or entity other than BP any rights or claims arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident shall be void, invalid, and of no force and effect. The Claims Administrator has adopted these policies to implement this section: 1. The clear language of Section 1.1.2.1 prohibits a claimant from assigning to a third party the right to file and pursue a claim in the Settlement Program. The Claims Administrator will not recognize any such assignments as valid. 2. The clear language of Section 1.1.2.1 prohibits a claimant from assigning to a lender a security interest in the proceeds of a claim under the Settlement Agreement. The Claims Administrator will not recognize any such assignments or claims based on them as valid. 3. Section 1.1.2.1 does not apply to the circumstance of the sale or exchange of a business or property between persons or entities. The Claims Administrator will process a claim presented by an authorized representative of a business claimant or the owner of property as required by the Settlement Agreement. | Section 1.1.2.1 of Exhibit 21 | IEL,IPV/FV,Real Property Sales,Subsistence,BEL,VoO Charter Payment,Coastal,Wetlands,Vessel Physical Damage,Seafood,AllClaims,All Economic Loss Claims,All Non-Economic Loss Claims,Seafood Second Distribution | 0 | External |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 211 | Pol-357 | 383 | Approved Policy or Procedure | 4/23/2013 | Claims Administrator Decision | Payment of 40% Balance to Transition Claimants Previously Paid 60% of a GCCF Award | Claimants who received a 60% payment from the GCCF will "receive the greater of (a) the remaining 40% of the GCCF offer, or (b) the Economic Class Settlement Payment minus any amount previously paid by the Transition Process," as provided in Section 4.2.3.1 of the Settlement Agreement. The Eligibility Notice will explain that the 40% amount will offset any future offers on subsequently filed claims, and that the claimant will receive an additional payment only if the amount of a future claim exceeds the 40% amount. | | Prior Payments | 2 | External |
| 14 | Pol-357 | 209 | Approved Policy or Procedure | 7/18/2012 | Claims Administrator Decision | Payment: 40% | A claimant may file multiple claims and accept them at different times and will "receive the greater of (a) the remaining 40% of the GCCF offer, or (b) the Economic Class Settlement Payment minus any amount previously paid by the Transition Process," as provided in Section 4.2.3.1 of the Settlement Agreement with the first offer. The Eligibility Notice will explain that the 40% amount will offset any future offers on subsequently filed claims, and that the claimant will receive an additional payment only if the amount of a future claim exceeds the 40% amount. | Section 4.2.3.1 | Payments | 1 | External |
| 135 | Pol-358 | 183 | Approved Policy or Procedure | 7/18/2012 | Claims Administrator Decision | Claimant Accounting Support Services: Prior Payments | We will add the Accounting Fees award to the Compensation Amount and then deduct prior payments to determine the claimant's payment amount. If the amount of prior payments is a complete offset to the payment amount, no accounting fee reimbursement will be made. Accordingly, Accounting Fees will only be awarded if the claimant actually receives a settlement payment. | Section 4.4.13.1 and 4.4.13.11 | Acct. Support | 5 | External |
| 93 | Pol-358 | 148 | Approved Policy or Procedure | 7/15/2012 | Claims Administrator Decision | Claimant Accounting Support Services: Out-of-Pocket Expenses | Any work or Accountants' out-of-pocket expenses is reimbursable if the work and billing follows the rules and rates of the framework. | Section 4.4.13.5 | Acct. Support | 4 | External |
| 127 | Pol-358 | 144 | Approved Policy or Procedure | 7/13/2012 | Claims Administrator Decision | Claimant Accounting Support: Eligibility | Claimant Accounting Support is available to IEL, BEL, and Seafood Claimants. | Section 4.4.13.1 | Acct. Support | 2 | External |

| 212 | Pol-359 | 385 | Approved Policy or Procedure | 4/23/2013 | Claims Administrator Decision | Claimant Account Support: SWS-38 | The Claims Administrator modified the SWS-38 to require the accountant to check whether he or she had a written contract or an oral contract. If the contract is written, the accountant must submit the contract with the submission of SWS-38. If the contact is oral, the Claims Administrator will require the accountant to describe the terms of the agreement in the SWS-38. If an accountant has a contractual relationship with a claimant where he or she receives a contingency or success fee and additionally receives compensation on an hourly basis from the settlement fund to prepare the claim, the Claims Administrator will not pay the fixed fees/lump sums because hourly rates and time for compensation are required. The Claims Administrator will allow claimants with sufficient documentation to receive reimbursement for internal accountants. Section 4.4.13.6 indicates that the "Reimbursement will be limited to the accounting services necessary to complete the claim form or prepare documentation." Any work or Accountants' out-of-pocket expenses is reimbursable if the work and billing follows the rules and rates of the framework. | | Acct. Support | 3 | External |
| 112 | Pol-359 | 187 | Approved Policy or Procedure | 7/18/2012 | Claims Administrator Decision | Accounting Support Reimbursement | (a) Claimants are required to submit a copy of the contract or engagement letter between the claimant and the accounting firm that provided the services being reimbursed. (b) The Program will not reimburse fixed fees or lump sums. Claimants must submit documents showing hourly billing rates and time incurred. (c) The Claims Administrator will add an Accounting Fees award to the Compensation Amount and then deduct prior payments to determine the claimant's resulting award amount. | | BEL | 1 | External |
| 134 | Pol-359 | 184 | Approved Policy or Procedure | 7/18/2012 | Claims Administrator Decision | Claimant Accounting Support: Fixed Fees | If an accountant has a contractual relationship with a claimant where he or she receives a contingency or success fee and additionally receives compensation on an hourly basis from the settlement fund to prepare the claim, we do not pay the fixed fees/lump sums. We will require hourly rates and time for compensation. | Section 4.4.13.6 | Acct. Support | 0 | External |
| 214 | Pol-360 | 386 | Approved Policy or Procedure | 4/23/2013 | Claims Administrator Decision | Reimbursement of Claimant Accounting Support | Benefit Available. Section 4.4.13 of the Settlement Agreement authorizes the Claims Administrator to reimburse claimants for reasonable and necessary accounting fees relating to claim preparation. Rates and Limits for Claims by Individual Claimants. Under Sections 4.4.13.6 and 4.4.13.7 of the Settlement Agreement, Individual Claimants with claims over $10,000 may receive up to 2% of their Economic Damage Compensation Amount (excluding the Risk Transfer Premium) as reimbursement for Claimant Accounting Support, up to a maximum of $6,000. All other claims of Individual Claimants are limited to $200 in reimbursement. The Claims Administrator will reimburse for Preparation hours at rates of up to $85 and Supervision and Review hours at rates of up to $130 for Individual Claimants. Rates and Limits for Claims by Business Claimants. Under Sections 4.4.13.6 and 4.4.13.8 of the Settlement Agreement, Business claimants with claims over $50,000 may receive up to 2% of their Economic Damage Compensation Amount excluding the Risk Transfer Premium as reimbursement for Claimant Accounting Support, up to a maximum of $50,000. All other claims of Business Claimants are limited to $1,000 in reimbursement. The Claims Administrator will reimburse for Preparation hours at rates of up to $110 and Supervision and Review hours at rates of up to $160 for Business claimants. Review and Supervision Hours. Section 4.4.13.6 of the Settlement Agreement limits reimbursement for Review and Supervision hours to 25% of the total time spent on the claim. The Claims Administrator calculates the 25% limit for Review and Supervision hours using the following formula: .25= Supervision and Review Hours Supervision and Review Hours+Preparation Hours Awards. Claimants will receive reimbursement for all Preparation hours and up to the allowed 25% limit for Review and Supervision hours up to the rates provided by Sections 4.4.13.7 and 4.4.13.8. The Claims Administrator calculates the total hours expended by the accountants on the claim and then determines whether the Review and Supervision hours exceed the 25% limit. The | | Acct. Support | 2 | External |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 145 | Pol-360 | 266 | Approved Policy or Procedure | 10/10/2012 | Claims Administrator Decision | Reimbursement of Claimant Accounting Support | Benefit Available. Section 4.4.13 of the Settlement Agreement authorizes the Claims Administrator to reimburse claimants for reasonable and necessary accounting fees relating to claim preparation. Rates and Limits for Claims by Individual Claimants. Under Sections 4.4.13.6 and 4.4.13.7 of the Settlement Agreement, Individual Claimants with claims over $10,000 may receive up to 2% of their Economic Damage Compensation Amount (excluding the Risk Transfer Premium) as reimbursement for Claimant Accounting Support, up to a maximum of $6,000. All other claims of Individual Claimants are limited to $200 in reimbursement. The Claims Administrator will reimburse for Preparation hours at rates of up to $85 and Supervision and Review hours at rates of up to $130 for Individual Claimants. Rates and Limits for Claims by Business Claimants. Under Sections 4.4.13.6 and 4.4.13.8 of the Settlement Agreement, Business claimants with claims over $50,000 may receive up to 2% of their Economic Damage Compensation Amount excluding the Risk Transfer Premium as reimbursement for Claimant Accounting Support, up to a maximum of $50,000. All other claims of Business Claimants are limited to $1,000 in reimbursement. The Claims Administrator will reimburse for Preparation hours at rates of up to $110 and Supervision and Review hours at rates of up to $160 for Business claimants. Review and Supervision Hours. Section 4.4.13.6 of the Settlement Agreement limits reimbursement for Review and Supervision hours to 25% of the total time spent on the claim. The Claims Administrator calculates the 25% limit for Review and Supervision hours using the following formula: .25= Supervision and Review Hours Supervision and Review Hours+Preparation Hours Awards. Claimants will receive reimbursement for all Preparation hours and up to the allowed 25% limit for Review and Supervision hours up to the rates provided by Sections 4.4.13.7 and 4.4.13.8. The Claims Administrator calculates the total hours expended by the accountants on the claim and then determines whether the Review and Supervision hours exceed the 25% limit. The | Sections 4.4.13.6, 4.4.13.7, and 4.4.13.8 | BEL | 1 | External |
| 131 | Pol-360 | 163 | Approved Policy or Procedure | 7/15/2012 | Claims Administrator Decision | Business Economic Loss Claims: Claimant Accounting Support | Section 4.4.13.1 states that all claimants who receive Settlement Payments for Economic Damage Compensation Amounts are eligible for reimbursement of accounting services. Accountants are only compensated for services if the claimant is determined to be compensable and payments are made from the settlement fund. | | BEL | 0 | External |
| 216 | Pol-361 | 387 | Approved Policy or Procedure | 4/23/2013 | Claims Administrator Decision | Business Economic Loss Claims: Fixed and Variable Expenses | The Claims Administrator will treat expenses as Variable or Fixed if they fall within either of those categories pursuant to Exhibit 4A Attachment D. If an expense does not fit the description of the Variable or Fixed expense categories in Exhibit 4D Attachment A, the accountants will use discretion to apply the classification that best conforms to delineations made by the Parties, as reflected in Ex. 4D. | | BEL | 4 | External |
| 121 | Pol-361 | 134 | Approved Policy or Procedure | 6/26/2012 | Claims Administrator Decision | Business Economic Loss Claims: Fixed and Variable Expenses | To the extent expenses fall within a category defined as â€œFixedâ€ or â€œVariableâ€ in Exhibit A, the definition applicable to that category should be applied | Exhibit 4D | BEL | 1 | External |
| 213 | Pol-362 | 388 | Approved Policy or Procedure | 4/23/2013 | Claims Administrator Decision | Operating History of and Definition of Start-Up Businesses | For purposes of inclusion in the Start-Up framework, the Claims Administrator will define operating history as the date that a Start-Up business begins incurring revenues or expenses, whichever is most beneficial for the claimant. If a business can establish that it incurred Start-Up expenses before April 20, 2010, it will be eligible for compensation, even if it did not generate revenue before April 20, 2010; however, only months in which the business was open for business will be considered compensable months. | | BEL | 0 | External |

| 217 | Pol-363 | 389 | Approved Policy or Procedure | 4/23/2013 | Claims Administrator Decision | Economic Loss Claims: Preventing Double Payment for the Same Loss to an Entity and the Owner or Officer of that Entity | The accounting methodology used for calculation of Business Economic Loss claims, pursuant to Exhibit 4C of the Settlement Agreement, treats owner/officer payroll costs as a fixed cost. All fixed costs, including owner/officer compensation, are inherently included in the compensation amount calculated under the Business Economic Loss framework. If the business has filed a BEL claim and any Owner or Officer of the business has filed any IEL claims, and the Claims Administrator has identified the connection among the claims before any claimant is awarded a payment, the Claims Administrator will compensate the business entity for the loss and will deny the claims of the Owners and Officers. If, however, an Owner or Officer of a business is paid on an IEL claim for lost income or was paid by the Gulf Coast Claims Facility on a Lost Earnings or Profits claim before the Claims Administrator assesses the BEL claim of the business of that Owner or Officer, to avoid double recovery for the same loss, the amount paid to the Owner or Officer on the IEL claim or by the GCCF shall be offset from the award amount, if any, of the entity's BEL claim. | | All Economic Loss Claims | 3 | External |
| 186 | Pol-363 | 329 | Approved Policy or Procedure | 2/8/2013 | Claims Administrator Decision | Economic Loss Claims: Application of the Policy Preventing Double Payment for the Same Loss to and Entity and the Owner or Officer of that Entity | The Claims Administrator previously adopted and announced to the Parties a Double Payment policy that prohibits payment of Economic Losses to both the business entity and the individual Owners and Officers of that entity for the same loss. Normally, if the business has filed a BEL claim and any Owner or Officer of the business has filed any IEL claims, and the Claims Administrator has identified the connection among the claims before any claimant is awarded a payment, the Claims Administrator will compensate the business entity for the loss and will deny the claims of the Owners and Officers pursuant to the Double Payment Policy. If, however, an Owner or Officer of a business is paid on an IEL claim for lost income or was paid by the Gulf Coast Claims Facility on a Lost Earnings or Profits claim before the Claims Administrator assesses the BEL claim of the business of that Owner or Officer, to avoid double recovery for the same loss, the amount paid to the Owner or Officer on the IEL claim or by the GCCF shall be offset from the award amount, if any, of the entity's BEL claim. | | IEL,BEL | 2 | External |
| 219 | Pol-364 | 390 | Approved Policy or Procedure | 4/23/2013 | Claims Administrator Decision | Evaluating Multiple Claims for the Same Vessel | Only the person who signed the MVCA agreement may file a VoO Charter Payment claim on behalf of a vessel. This means that only one person may submit a claim and be paid on it for each vessel, as opposed to multiple parties being able to submit payable claims on behalf of one vessel. The Claims Administrator will compensate each vessel only once, regardless of the number of signatories or different contracts signed by the signatory. In the case of an inconsistency between the VoO data and the hard copy MVCA, the Claims Administrator will use the hard copy MVCA to determine the appropriate signatory. | | VoO Charter Payment | 2 | External |
| 71 | Pol-364 | 223 | Approved Policy or Procedure | 8/2/2012 | Agreed to by the Parties | Evaluating Multiple Claims for the Same Vessel | Only the person who signed the MVCA agreement may file a VoO Charter Payment claim on behalf of a vessel. The Claims Administrator will compensate each vessel only once, regardless of the number of contracts or signatories. In the case of an inconsistency between the VoO data and the hard copy MVCA, the Claims Administrator will use the hard copy MVCA to determine the appropriate signatory. | 5.5.2 5.5.3 | VoO Charter Payment | 1 | External |
| 117 | Pol-364 | 214 | Approved Policy or Procedure | 7/21/2012 | Claims Administrator Decision | VoO Charter Payment Claims: MVCA | Only the person who signed the MVCA may submit a claim and be paid on it for each vessel. This means that only one person may submit a claim and be paid on it for each vessel, as opposed to multiple parties being able to submit payable claims on behalf of one vessel. | Sections 38.98 and 38.173 | BEL | 0 | External |
| 215 | Pol-365 | 391 | Approved Policy or Procedure | 4/23/2013 | Claims Administrator Decision | Exclusions: Moratoria | The Industry Types Subject to Review by Claims Administrator for Potential Moratoria Losses (Exhibit 19) contains two sections that list NAICS codes and business descriptions, and many of the business descriptions are marked with an â€œx.â€ In some cases, business descriptions marked with an â€œxâ€ are very similar to one or more unmarked business descriptions. The Claims Administrator will make a determination or request information where necessary. | | IEL,BEL,Exclusions | 1 | External |

| 31 | Pol-365 | 48 | Approved Policy or Procedure | 5/22/2012 | Claims Administrator Decision | Exclusions: Moratoria | The Industry Types Subject to Review by Claims Administrator for Potential Moratoria Losses (Exhibit 19) contains two sections that list NAICS codes and business descriptions, and many of the business descriptions are marked with an â€œx.â€ In some cases, business descriptions marked with an â€œxâ€ are very similar to one or more unmarked business descriptions. We will make a subjective determination or request information where necessary. | Exhibit 19 | IEL,BEL,Exclusions | | 0 | External |
| 218 | Pol-367 | 393 | Approved Policy or Procedure | 4/23/2013 | Claims Administrator Decision | Business Economic Loss Claims: Document Requirements | If Owner/Officer compensation and Non-Owner/Officer compensation is not separated out on the claimant P&L, we will request sufficient information and documentation from claimant to properly delineate. | | BEL | | 1 | External |
| 41 | Pol-367 | 62 | Approved Policy or Procedure | 5/24/2012 | Claims Administrator Decision | Business Economic Loss Claims: Document Requirements | If Owner/Officer compensation and Non-Owner/Officer compensation is not separated out on the claimant P&L, we will obtain sufficient information and documentation from claimant to properly allocate. | Exhibit 4A | BEL | | 0 | External |
| 220 | Pol-368 | 394 | Approved Policy or Procedure | 4/23/2013 | Claims Administrator Decision | Business Economic Loss Claims: Multi-Facility Businesses | For Multi-Facility Businesses filing separate claims, we will apply causation presumption, standards and RTP to the various portions of the claim depending on the nature and location of each Facility in the Multi-Facility Business. | | BEL | | 1 | External |
| 21 | Pol-368 | 74 | Approved Policy or Procedure | 5/26/2012 | Claims Administrator Decision | Business Economic Loss Claims: Multi-Facility Businesses | We will apply causation presumption, standards and RTP to the various portions of the claim depending on the nature and location of each Facility in the Multi-Facility Business. | Exhibit 5 | BEL | | 0 | External |
| 221 | Pol-369 | 395 | Approved Policy or Procedure | 4/23/2013 | Claims Administrator Decision | Business Economic Loss Claims: Document Requirements | Pursuant to agreement by the Parties, if a claimant has 11 out of 12 months worth of P&L data and the annual totals, we will calculate the missing 12th month by comparing to the annual financial totals. | | BEL | | 1 | External |
| 20 | Pol-369 | 73 | Approved Policy or Procedure | 5/26/2012 | Claims Administrator Decision | Business Economic Loss Claims: Document Requirements | Under the GCCF, if ten months worth of P&L data and the annual totals were provided, analysts estimated the amount for the remaining months by spreading the remainder over those months. We will require the claimant to provide the missing two months of P&L statements. If the claimant only has quarterly P&L statements, the claimant must provide all quarterly P&L statements for the relevant time periods. As of October 2012, pursuant to agreement by the Parties, if a claimant has 11 out of 12 months worth of P&L data and the annual totals, we will estimate the P&Lâ€™s for the missing month. | Exhibit 4A | BEL | | 0 | External |
| 222 | Pol-370 | 396 | Approved Policy or Procedure | 4/23/2013 | Claims Administrator Decision | VoO Charter Payment Claims: Eligibility | If a claimant is listed on the list of people who previously settled VoO Charter Payment claims with BP, the Claims Administrator will deny any VoO Charter Payment Claims submitted by the claimant without review. The Claims Administrator makes any such determination based on a list provided by a BP and does not have copies of the Releases themselves. As such, if a claimant appeals a determination on this basis, BP may need to present a copy of the Release from the previous settlement in its Appeal Proposal to verify this determination. | | VoO Charter Payment | | 1 | External |
| 223 | Pol-371 | 397 | Approved Policy or Procedure | 4/23/2013 | Claims Administrator Decision | Business Economic Loss Claims: Management Salary/Key Employee Compensation | We will treat Management Salary/Key Employee compensation as Fixed expense only if the employee is an Owner and/or Officer. | | BEL | | 1 | External |
| 62 | Pol-371 | 117 | Approved Policy or Procedure | 6/15/2012 | Claims Administrator Decision | Business Economic Loss Claims: Management Salary/Key Employee Compensation | We will treat Management Salary/Key Employee compensation as Fixed expense only if the employee is an Owner and/or Officer. We will identify Owners/Officers based on the financial statements. | | BEL | | 0 | External |
| 224 | Pol-372 | 398 | Approved Policy or Procedure | 4/23/2013 | Claims Administrator Decision | Business Economic Loss Claims: Losses Calculation | The results of Step 1, whether positive or negative, should be added to results of Step 2. Substituting a negative result for Step 1 with zero may overstate the claimant's lost variable profit during the compensation period as there is an inherent relationship between the Step 1 and Step 2 calculations. | | BEL | | 1 | External |

| 67 | Pol-372 | 123 | Approved Policy or Procedure | 6/15/2012 | Claims Administrator Decision | Business Economic Loss Claims: Losses Calculation | The results of Step 1, whether positive or negative, should be added to results of Step 2. Substituting a negative result for Step 1 with zero may overstate the claimant's lost variable profit during the compensation period as there is an inherent relationship between the Step 1 and Step 2 calculations . The Step 1 calculation considers projected and actual variable profit, before consideration of growth, if any. The Step 2 calculation does not consider any actual results, it simply calculates growth, if any. Hence the results of both calculations need to be added together to calculate the total compensation amount. To substitute a negative result in Step 1 with "0" does not consider the actual results of the business during the compensation period. To calculate a loss based only on Step 2 results does not take into consideration the actual results achieved during the compensation period. | Exhibit 4C | BEL | | 0 | External |
| 225 | Pol-373 | 399 | Approved Policy or Procedure | 4/23/2013 | Claims Administrator Decision | Business Economic Loss Claims: Recurring Revenue Streams | All recurring revenue streams that are deemed to be within the businesses' normal course of operations should be included in the analysis. For example, a restaurant that generates income from food service and also generates rental income by renting an apartment attached to the building. | | BEL | | 1 | External |
| 24 | Pol-373 | 150 | Approved Policy or Procedure | 7/15/2012 | Claims Administrator Decision | Business Economic Loss Claims: Recurring Revenue Streams | All recurring revenue streams be included in the analysis. For example, a restaurant that generates income from food service and also generates rental income by renting an apartment attached to the building. | | BEL | | 0 | External |
| 206 | Pol-376 | 376 | Approved Policy or Procedure | 3/28/2013 | Agreed to by the Parties | All Claims: Sixth-Month Period to Make Additional Claims | If a Business Entity (C-Corporation, S-Corporation, LLC, LLP or other business entity) submits a Business Economic Loss (â€œBELâ€) claim, the Claims Administrator will interpret Section 4.4.8 of the Settlement Agreement as follows with respect to that Business Entityâ€™s owners, members, limited partners or shareholders: 1. Where one or more of the Business Entityâ€™s owners, members, limited partners or shareholders submitted and received payment on a claim that is not related in any way to their ownership interest in or employment by the Business Entity (an "Unrelated Claim"), the Business Entity's BEL claim is not required to be submitted within six months of the date of initial payment of that Unrelated Claim (i.e., a shareholderâ€™s receipt of payment for a personal Coastal claim does not start the six month deadline to submit a BEL claim for the Business Entity); and 2. Where the Business Entity has submitted and received payment on the BEL claim, none of its owners, members, limited partners or shareholders are required to submit an Unrelated Claim within six months of initial payment of the Business Entity's claim. | Section 4.4.8 | AllClaims,Deadlines | | 0 | External |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 207 | Pol-377 | 358 | Approved Policy or Procedure | 4/17/2013 | Claims Administrator Decision | Exclusions: Real Estate Development Activities on Non-Profit Entities | The Settlement Agreement excludes: Real Estate Developers, including any Natural Person or Entity that develops commercial, residential or industrial properties. This includes, but is not limited to, any Entity developing an entire subdivision (as defined by the law of the state in which the parcel is located) of Real Property, including condominiums with multiple residential units and/or a residential subdivision with contiguous home sites and homes. (Section 2.2.4.7). Exhibit 18 of the Settlement Agreement requires the Claims Administrator to assess this exclusion based upon â€œreview of (a) the claimantâ€™s 2010 tax return, (b) 2010 business permits or license(s), and/or other evidence of the relevant businessâ€™s or individualâ€™s activities necessary for the Claims Administrator to determine whether the exclusion applies.â€Under CA Policy 299 (announced on 11/28/12, approved by the Parties as of 12/3/12) the Claims Administrator examines an entityâ€™s 2010 attributes and activities to determine whether it was more likely than not that the entity was sufficiently engaged in Real Estate Development Activity during 2010 such that it may reasonably be characterized as a Real Estate Developer. Real Estate Development Activity includes any activities involved in the making of any material change in the use of buildings or land, including the renovation and re-lease of existing buildings, the purchase of raw land for development, the sale of improved land or parcels to others and the planning, design, arranging of financing, zoning approvals, construction, marketing, sale or lease of such projects. We evaluate an entityâ€™s 2010 business permits or licenses, 2010 revenues from real property sales, 2010 business expenses, and any additional materials in the entityâ€™s claim file, as well as all available promotional materials, website, and other statements, to apply this policy and the terms of the Settlement Agreement. The Claims Administrator sought input from Class Counsel and BP on whether Section 2.2.4.7 excludes non-profit entities, such as 501(c)(3) charitable organizations, that engage in such real estate development activity | 2.2.4.7 | Exclusions | 0 | External |
| 208 | Proc-379 | 378 | Approved Policy or Procedure | 5/22/2013 | Claims Administrator Decision | Procedure Regarding Handling Untimely Seafood Claims | See Final Procedure Announcement Memo. | | Seafood,Seafood Second Distribution,Deadlines | 0 | External |
| 209 | Pol-380 | 379 | Approved Policy or Procedure | 5/8/2013 | Claims Administrator Decision | Wetlands Real Property Claims: Payment to a Usufructuary | The Claims Administrator will process Wetlands Claims in accordance with state law and the Wetlands Framework in Exhibit 12A to the Settlement Agreement. As a matter of Louisiana law, when property is subject to a usufruct, the usufructuary has the right to claim and receive damages during the term of the usufruct. Immediately on termination of the usufruct, the naked owner succeeds to full ownership rights, including the right to claim and receive damages. The Louisiana Civil Code imposes certain rights and obligations on the two parties which regulate the ownership relationship between them. Applying the principles of the Wetlands Framework and state law, the Claims Administrator has designated the usufructuary as the Eligible Claimant entitled to the Wetlands Real Property Compensation Amount during the term of the usufruct and the naked owner as the Eligible Claimant entitled to the Wetlands Real Property Compensation Amount upon termination of the usufruct. Accordingly, if the Eligible Parcel is subject to a usufruct for the entirety of the period from April 20, 2010, to April 18, 2012 (the â€œClaim Periodâ€), the usufructuary is the Eligible Claimant entitled to the Wetlands Real Property Compensation Amount and the Claims Administrator will pay the Compensation Amount in its entirety to the usufructuary. If the usufruct commences or ends during the Claim Period, the Compensation Amount shall be allocated between the two Eligible Claimants, the usufructuary and the naked owner, in accordance with the number of days the usufruct was in effect and the number of days when it was not in effect, in accordance with Section 2.E of Exhibit 12A. If a usufructuary holds the usufruct for the entire Claim Period and fails to make a claim during the term of the usufruct, the naked owner may pursue his or her remedies against the usufructuary afforded by the Louisiana Civil Code. | Exhibit 12A, Section 2.E | Wetlands | 0 | External |

| 210 | Pol-381 | 380 | Approved Policy or Procedure | 5/2/2013 | Claims Administrator Decision | Business Economic Loss Claims: The Commencement Date for a Start-Up Business | The first paragraph of Exhibit 7 to the Settlement Agreement defines a Start-Up Business as âa claimant with less than eighteen months of operating history at the time of the DWH Spill.â This differs from Section I of Exhibit 6, which defines a Failed Business as âan entity that commenced operations prior to November 1, 2008, and that, subsequent to May 1, 2010 but prior to December 31, 2011, either (i) ceased operations and wound down, or (ii) entered bankruptcy (through the filing of a petition for bankruptcy protection in a court of competent jurisdiction), or (iii) otherwise initiated or completed a liquidation of substantially all of its assets.â Eighteen months before the Spill was 10/20/08. The Registration Form, Start-Up Business Economic Loss Claim Form and the Instruction Booklets for the certain forms, prepared with the involvement and approval of the Parties, refer to 11/1/08 as the earliest Commencement Date for Start-Up BEL Claims, rather than 10/20/08. The Claims Administrator has determined that the correct application of Exhibit 7 is to classify as a Start-Up Business one that commenced operations after 10/20/08 and classify as a general BEL business one that commenced operations on or before 10/20/08. The Claims Administrator will evaluate such claims accordingly and will update the online versions and any future printings of the Registration Form, the Business Economic Loss Claim Form (Purple Form), the Start-Up Business Economic Loss Claim Form (Gray Form), the Failed Business Economic Loss Claim Form (Red Form), and the Instruction Booklets for such Forms to use that date, rather than 11/1/08. | Exhibit 7 | BEL | 1 | External |
| 226 | Pol-401 | 426 | Approved Policy or Procedure | 5/7/2013 | Clarified by Seafood Neutral | Existing Entities Form a New Entity and Purchase a Vessel | See attached memo. | | Seafood | 0 | External |
| 227 | Pol-402 | 427 | Approved Policy or Procedure | 5/7/2013 | Claims Administrator Decision | Interpretation of "the same (or nearly the same) ownership" in Policy ID 401 | This policy addresses a common circumstance in the fishing industry related to the practice of forming an individual Limited Liability Company (LLC) for a single vessel, as identified in Policy ID 401. Where an LLC owner purchases a new vessel for the 2010 fishing season and forms a new LLC for it, the policy offers a method of compensating the new vessel based on the Benchmark Period Revenue of the older vessel, provided that the LLC's have âthe same (or nearly the same) ownership.â The Claims Administrator has determined that the phrase âsame (or nearly the same) ownershipâ requires that there be at least one common owner among the claiming LLCs or vessels. Therefore, vessels and/or LLCs with entirely separate owners cannot benefit from the policy outlined in Policy ID 401, despite some other existing business or family relationship. | | Seafood | 0 | External |
| 228 | Pol-403 | 428 | Approved Policy or Procedure | 5/7/2013 | Claims Administrator Decision | Interpretation of "for the 2010 fishing season" in Policy ID 294 and Policy ID 401. | Policies 294 and 401 provide compensation for vessels purchased "for the 2010 fishing season" in addition to other vessels owned by the claimant in the Benchmark Period. However, neither provides guidance on when a vessel was purchased âfor the 2010 fishing season,â such as a date range for the vesselâs purchase. The Claims Administrator has determined that vessels bought between January 1, 2009, and April 20, 2010, were purchased "for the 2010 fishing season." | | Seafood | 0 | External |

| 232 | Pol-406 | 415 | Approved Policy or Procedure | 5/29/2013 | Claims Administrator Decision | Individual Economic Loss Claims: GCCF Business Claimants as Eligible Employers | The Parties agreed that certain Business Claimants that did not receive a Final Payment Offer, specifically those where claimants received a Quick Payment or Emergency Advance Payment only, should not be considered Eligible Employers. The PCC responded that the other four situations involving Business Claimants that did not receive a Final Payment Offer should be considered Eligible Employers. These four situations are claimants that received from the GCCF a Determination Letter with no Interim or Final Payment Offer, claimants that received payment by BP prior to the start of the GCCF, claimants that received payment from the Real Estate Funds, and claimants that received an Interim Payment during the Transition that did not include a Final Payment Offer because of the rules of the Transition Program. Claimants that received a Determination Letter from the GCCF with no Interim or Final Payment Offer proved eligibility, but no losses from the Spill. Because the GCCF did not extend a compensation offer, we should not treat these Business Claimants as Eligible Employers. The GCCF was not responsible for BP payments or Real Estate Fund payments. Therefore, this does not qualify as a "compensation offer from the GCCF", and we should not treat these Business Claimants as Eligible Employers. During the Transition Program, claimants did not receive both an Interim Payment and a Final Payment Offer, but the GCCF still extended a compensation offer. We should treat these Business Claimants as Eligible Employers. | Exhibit 8A | IEL | 1 | External |
| 234 | Pol-440 | 441 | Approved Policy or Procedure | 6/5/2013 | Claims Administrator Decision | IFQ "Set-Aside" Shares | The Individual Fishing Quota (IFQ) program began in 2010 and initially distributed 97% of all possible shares to shareholders prior to the Spill, holding back 3% as a reserve to accommodate the resolution of appeals after the initial distribution. These "set-aside" shares vested later in 2010 and were distributed to shareholders in proportion to the initial allocation of shares. Certain claimants have asked to receive compensation on shares that were "set-aside" for them as of April 20, 2010 but that ultimately vested in August of 2010. Section II.A of the Finfish Compensation Plan, which sets forth the eligibility and documentation requirements for IFQ compensation, requires "proof of ownership" of the IFQ shares as of April 20, 2010. (Ex. 10 at 49.) Section II.B states that IFQ shareholders will be compensated "based on the value of Individual Fishing Quota shares held." (Id.) The Claims Administrator has determined that a claimant may receive compensation for all of the IFQ shares that were allocated to that claimant as of April 20, 2010, even if the shares technically vested after that date in 2010, so long as the claimant provides proof that the "set-aside" shares the claimant held as of April 20, 2010 actually did vest in that claimant's name in 2010. | | Seafood | 0 | External |