Exhibit A

## Analysis of DWH Policies and Procedures Packets—Type of Decision (As of 7/1/13)

| | Affected Claim Types / Review Processes | Total | Claims Administrator Decision | Type of Decision | | | Internal Policies Reviewed by Parties[1] | Internal Policies Not Reviewed by Parties[1] |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Agreed to by the Parties | Panel Hearing/ Propose Modification | Court Decision | | |
| 1. | Business Economic Loss | 70 | 53 | | 3 | 2 | 9 | 3 |
| 2. | Accounting Support Reimbursement | 14 | 14 | | | | | |
| 3. | Coastal and Wetlands | 5 | 4 | | 1 | | | |
| 4. | Real Property Sales | 0 | | | | | | |
| 5. | Vessel Physical Damage | 1 | | | | | 1 | |
| 6. | VoO Charter Payment | 6 | 6 | | | | | |
| 7. | All Economic Loss Claims | 10 | 8 | | 1 | 1 | | |
| 8. | Individual Economic Loss | 7 | 7 | | | | | |
| 9. | Periodic/Festival Vendors | 0 | | | | | | |
| 10. | Seafood | 56 | 55 | | | | 1 | |
| 11. | Subsistence | 17 | 12 | 1 | | | | 4 |
| 12. | All Claims and Appeals | 7 | 6 | | | | 1 | |
| 13. | Other | 37 | 33 | | | | 4 | 7 |
| | **Total** | **230** | **198** | **1** | **5** | **3** | **16** | **7** |

[1] These policies were included in the Excel Compendium circulated to the Parties, and based on the Parties' comments, we marked these policies as being internal policies that should not be circulated externally.

428819
7/1/13

1

EXHIBIT B-2

Exhibit B

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-307 v1 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

| I. Profile – EXTERNAL | |
|---|---|
| **Subject** | Business Economic Loss: Non-Profit Entities |
| **Active Date** | 12/12/12 | **Policy Impact** | ☐All Claims Regardless of Active Date<br>☑All Claims Greater than Active Date |
| **Type of Decision** | Court Decision |
| **Settlement Agreement Reference** | Exhibit 4A |
| **Affected Claim Types and/or Review Processes** | BEL |

| II. Summary |
|---|

The Claims Administrator shall apply the Settlement as follows with respect to business economic claims of non-profit entities:

(a) Income received by non-profit entities in the form of grant monies or contributions shall typically be treated as revenue for that entity for purposes of the various required calculations under the terms of the Settlement Agreement.

(b) For those non-profit entities who are required to file income tax returns or who have in fact filed income tax returns (whether required to file or not), submission of income tax returns is required as outlined in Exhibit 4A of the Settlement Agreement.

(c) If a non-profit entity is not required by law to file an income tax return and in fact has not filed such a return, such entity may submit a Verification of Nonfiling from the IRS, together with the entity's organizational documents indicating that the entity is a Non-Profit organization, in satisfaction of the requirement to produce income tax returns as outlined in Exhibit 4A of the Settlement Agreement.

EXHIBIT B-2

# DEEPWATER HORIZON
# CLAIMS CENTER
### ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-308 v1 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

## I. Profile - EXTERNAL

| Subject | Economic Loss: Establishing Causation | |
|---|---|---|
| **Active Date** | 12/12/12 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Court Decision |
| **Settlement Agreement Reference** | | Exhibit 4B |
| **Affected Claim Types and/or Review Processes** | | IEL; BEL |

## II. Summary

The Settlement Agreement represents the Parties' negotiated agreement on the criteria to be used in establishing causation. The Settlement Agreement sets out specific criteria that must be satisfied in order for a claimant to establish causation. Once causation is established, the Settlement Agreement further provides specific formulae by which compensation is to be measured. All such matters are negotiated terms that are an integral part of the Settlement Agreement. The Settlement Agreement does not contemplate that the Claims Administrator will undertake additional analysis of causation issues beyond those criteria that are specifically set out in the Settlement Agreement. Both Class Counsel and BP have in response to the Claims Administrator's inquiry confirmed that this is in fact a correct statement of their intent and of the terms of the Settlement Agreement. The Claims Administrator will thus compensate eligible Business Economic Loss and Individual Economic Loss claimants for all losses payable under the terms of the Economic Loss frameworks in the Settlement Agreement, without regard to whether such losses resulted or may have resulted from a cause other than the Deepwater Horizon oil spill provided such claimants have satisfied the specific causation requirements set out in the Settlement Agreement. Further, the Claims Administrator will not evaluate potential alternative causes of the claimant's economic injury, other than the analysis required by Exhibit 8A of whether an Individual Economic Loss claimant was terminated from a Claiming Job for cause.

EXHIBIT B-2

**DEEPWATER HORIZON
CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-324 v1 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

### I. Profile – EXTERNAL

| Subject | Business Economic Loss Claims: Calculation of Variable Profit | | |
|---|---|---|---|
| Active Date | 3/5/13 | Policy Impact | ☐All Claims Regardless of Active Date<br>☑All Claims Greater than Active Date |
| Type of Decision | | | Court Decision |
| Settlement Agreement Reference | | | Exhibit 4C |
| Affected Claim Types and/or Review Processes | | | BEL |

### II. Summary

Calculation of Variable Profit. Exhibit 4C of the Settlement Agreement sets out the methodology to be used in calculating Variable Profit as a component of determining Step 1 Compensation. That methodology is as follows:
1. Sum the monthly revenue over the period.
2. Subtract corresponding variable expenses from revenue over the same time period. Variable expenses include:
a. Variable Costs as identified in Attachment A.
b. Variable portion of salaries, calculated as described below in the definition of Fixed and Variable Payroll Expenses.
c. Variable portion of COGS, calculated by excluding salary costs . . . and fixed expenses included within COGS, including Amortization, Depreciation, Insurance Expense, and Interest Expense and Contract Services.

In performing these calculations, the Claims Administrator will typically consider both revenues and expenses in the periods in which those revenues and expenses were actually booked in the Claimant's contemporaneous financial statements. The Claims Administrator will not typically re-allocate such revenues or expenses to different periods. The Claims Administrator does, however, reserve the right to adjust the financial statements in certain circumstances that come to their attention including, but not limited to, inconsistent basis of accounting between benchmark and compensation periods, errors in previously recorded transactions and flawed or inconsistent treatment of accounting estimates.

Timing of Revenues for Purposes of Causation. Exhibit 4B of the Settlement Agreement sets out the methodology to be used in assessing causation. That methodology largely concerns consideration of total net revenues before the spill vs. total net revenues after the spill. In performing these calculations, the Claims Administrator will typically consider revenues in the periods in which those revenues were recorded at the time. The Claims Administrator will not typically re-allocate such revenues to different periods. The Claims Administrator does, however, reserve the right to adjust the financial statements in certain circumstances, including but not limited to, inconsistent basis of accounting between benchmark and compensation periods, errors in previously recorded transactions and flawed or inconsistent treatment of accounting estimates.

EXHIBIT B-2

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **In re: Oil Spill by the Oil Rig** | * | **MDL No. 2179** |
| **"Deepwater Horizon" in the Gulf** | * | |
| **of Mexico, on April 20, 2010** | * | **SECTION "J"** |
| | * | |
| **This Document Relates To:** | * | **JUDGE BARBIER** |
| **No. 12-970** | * | |
| | * | **MAGISTRATE SHUSHAN** |

### Review of Issue from Panel (Matching of Revenue and Expenses)

Before the Court is a motion by BP, asking the Court to review and reverse the Claims Administrator's January 15, 2013 policy decision interpreting certain portions of the Economic Settlement Agreement.[1]

Accordingly, the Court has re-visited the issue of whether the Claims Administrator has correctly interpreted the terms of the Economic and Property Damage Settlement Agreement as it applies to the calculation of "Variable Profit" for Business Economic Loss Claims.

After fully reviewing the additional materials submitted by the parties and the relevant portions of the Settlement Agreement, the Court affirms the Claims Administrator's interpretation as set forth in the January 15, 2013 Announcement of Policy Decisions Regarding Claims Administration.

Nowhere does the Agreement state or indicate that revenue and expenses must be "matched" or revenues "smoothed," nor does it state that one should inquire into when revenue was "earned."

---

[1]Following the vacation of the Court's prior ruling in an email dated January 30, 2013, the parties have made further submissions to the Court and have met with Dan Balhoff, court appointed neutral, both privately and jointly. Mr. Balhoff also had the opportunity to meet with the Claims Administrator, Pat Juneau, and representatives of his professional accounting staff. The Court met with Mr. Balhoff on February 19, 2013 and received a report from him regarding his efforts. Mr. Balhoff reported that there is no likelihood of a negotiated resolution of the dispute. The fees of Mr. Balhoff for his participation in attempting to resolve this dispute shall be paid by BP as part of the cost of claims administration.

EXHIBIT B-2

Rather, the provisions of Exhibit 4C and 4A, when read together, support the Claims Administrator's interpretation.

For example, Step 1 of the of Exhibit 4C's Compensation Framework states:

> Step 1 of the compensation calculation is determined as the difference in Variable Profit between the 2010 Compensation Period selected by the claimant and the Variable Profit over the *comparable* months of the Benchmark period.

Exhibit 4C p. 3 (emphasis added); *see also id.* at 1 ("**Step 1** – Compensates claimants for any reduction in profit between the 2010 Compensation Period selected by the claimant and the *comparable* months of the Benchmark Period.  Step 1 compensation reflects the reduction in Variable Profit (which reflects claimant's revenue less its variable costs) over this period." (emphasis added)).  The meaning of "comparable" is illustrated by the examples provided in Exhibit 4C:

> Scenario 1:
> 1) Claimant selected the months of May-July 2010 for the purpose of determining causation, and the claimant, using these months, meets the causation test for the Benchmark period years of 2009, 2008-2009 and 2007-2009;
> 2) In determining Compensation, Claimant would be allowed to select the months of August through November 2010 *as compared to the months* of August through November in either 2009, 2008-2009 or 2007-2009 as the Benchmark years – whichever provides the highest compensation.
>
> Scenario 2:
> 1) Claimant selected the months of October – December 2010 for the purpose of determining causation and the claimant, using these months, meets the causation test for the Benchmark period years of 2009, 2008-2009;
> 2) In determining compensation, Claimant could select the months of May-September 2010 *as compared to the months* of May-September in either 2009 or 2008-2009 – whichever provides the highest compensation.
>
> Scenario 3:
> 1) Claimant selected the months of June – August 2010 for the purpose of determining causation and the claimant, using these months, meets the causation test for the Benchmark period year of 2009.  In addition, Claimant selected the months of August – October 2010 for the purpose of determining causation, and the

2

EXHIBIT B-2

claimant, using these months, meets the causation test for the Benchmark period
years of 2007-2009;

2) In determining compensation, Claimant could select the months of May-December
2010 *as compared to the months* of May-December in either 2009 or 2007-2009 —
whichever provides the highest compensation.

Exhibit 4C, Addendum. These examples make clear that the same months of the Compensation

Period are to be compared with the months in the Benchmark period; not, as BP urges, that the

Claims Administrator's accountants should seek out months where the claimant engaged in

comparable activity. Notably, this is the exact interpretation BP advocated while the parties

negotiated the Settlement Agreement:

> The word "comparable" and phrase "comparable months of" is used throughout the
> document in the context of comparing the months selected by the Claimant in 2010
> to compare against the *same months* in the Benchmark Period.

E-mail from Richard Godfrey to Joe Rice and Calvin Fayard (Feb. 17, 2012), Ex. 3 to PSC

Submission (emphasis added).

The heart of this dispute, however, appears to center on the word "corresponding" as it is

used in the calculation of "Variable Profit" (which, in turn, is used in Step 1 of the Compensation

Framework):

> Variable Profit: This is calculated for both the Benchmark Period and the
> Compensation Period as follows:
> 1. Sum the monthly revenue over the period.
> 2. Subtract the *corresponding* variable expenses from revenue *over the same
> time period*. . . .

Exhibit 4C at 2 (emphasis added). The question is whether variable expenses must correspond to

the revenue those expenses produced, as BP contends, or whether variable expenses must correspond

to "the same time period," as Class Counsel contends. BP claims that Class Counsel's interpretation

ignores "corresponding;" Class Counsel claims that BP's interpretation ignores "the same time

3

period."

The Court adopts Class Counsel's interpretation as it is most in line with the rest of the

Settlement Agreement. For example, the documentation provisions contained within Exhibit 4A

make it clear that the Program's analysis is to be based on revenue and expenses during the relevant

periods chosen by the claimant, as reflected in historical business records. Specifically, the

Framework requires:

> Monthly and annual profit and loss statements (which identify individual expense
> line items and revenue categories), or alternate source documents *establishing
> monthly revenues and expenses for the claimed Benchmark Period, 2010 and, if
> applicable, 2011.*

Exhibit 4A ¶ 4 (emphasis added, footnotes omitted). If expenses had to be "matched" to revenues,

then the Settlement Program would potentially need to consider financials that pre-date the

Benchmark Period. Likewise, Exhibit 4A does not require that accounting occur on an "accrual"

basis, as opposed to a "cash" basis.[2] Similarly, Exhibit 4C's examples quoted above reflect that the

Framework is based on the expenses and revenues that were recorded in the Claimant-selected

months, not expenses and revenues that occurred outside these months. Furthermore, although a

claimant may select the Benchmark and Compensation Periods, his choice is subject to certain

restrictions. Notably, the Benchmark and Compensation Periods must be a minimum of three

consecutive months. This demonstrates that the parties anticipated that too short a snapshot could

create "anomalies," and the three-month minimum was the agreed-upon method for controlling for

---

[2] On a related note, Exhibit 4A ¶¶ 5, 6 does require certain additional documents for certain types of businesses and for certain types of causation tests. However, Exhibit 4A does not require extra documents or a specific type of accounting for the businesses that are the subject of the instant dispute. Similarly, while the Settlement Agreement permits the Claims Administrator to exercise his discretion to request *source* documents for profit and loss statements; it appears that this is to ensure that the statements are accurate and consistent, not that they use one accounting method over another. *See* Exhibit 4A ¶ 4 ("If there is a discrepancy between amounts reflected in a tax return and comparable items reflected in a profit and loss statement for the same period, the Claims Administrator may request the claimant to provide additional information or documentation.").

EXHIBIT B-2

such anomalies. *See* Fishkind Decl. ¶ 87;[3] Henley Decl. ¶ 30 (submitted with BP's motion for final approval).

With respect to BP's argument that this interpretation of the Settlement Agreement can create absurd results, BP's declarant acknowledges that class settlement payments do not always perfectly match economic losses in every instance. Polinsky Declaration, p.5 n.8, Ex. 9 to BP's submission. BP's counsel similarly explained that "false positives" are an "inevitable concomitant of an objective quantitative, data-based test." Letter from Mark Holstein to Patrick Juneau (Sept. 28, 2012), p. 3, Ex. 12 to PSC's Submission.

And, as mentioned above, the parties agreed to give Claimants flexibility in choosing the most favorable Compensation and Benchmark Periods. Indeed, the Settlement Agreement provides that if a Claimant fails to select the period that generates the greatest recovery, the Program will choose that period for him. Objective formulas, the possibility of "false positives," and giving claimants flexibility to choose the most favorable time periods are all consequences BP accepted when it decided to buy peace through a global, class-wide resolution. In light of this, to the extent that the Claims Administrator's interpretation produces "false positives" or, as BP claims, "absurd" results, it appears that the Settlement Agreement anticipates that such results would sometimes occur.

The overarching theme of the Settlement is a transparent, uniform application of an objective quantitative data-based test which can be fairly and efficiently administered by the Claims Administrator. Notably, the Settlement Agreement itself defines those businesses that lost profits,

---

[3] "[T]he requirement that the Benchmark and Compensation periods used to measure decline and recovery be measured over at least 3 months is a reasonable means of ensuring that the data reflect a genuine trend in economic performance and not just routine month-to-month variation that any business can expect even absent any unusual event."

EXHIBIT B-2

income, and/or earnings "as a result of" the Spill as those businesses that meet the objective causation requirements set forth in Exhibit 4B. Once the Settlement's causation formula is met, then all losses calculated under Exhibit 4C are presumed to be attributable to the oil spill.  BP's interpretation injects a subjective notion of alternative causation and a degree of complexity that are contrary to the Settlement's terms.

New Orleans, Louisiana, this 5th day of March, 2013.

United States District Judge

EXHIBIT B-2

Exhibit D



**ALL CLAIMS**

| Table of Contents | |
|---|---|
| **All Claims Policy ID** | **Page(s)** |
| 1. Policy ID 289: Definition of Tourism | 1-2 |
| 2. Policy ID 378: Access to Claims Information and Data | 3-10 |
| 3. Policy ID 273: Specific Dollar Amount in the Individual Release | 11-12 |
| **All Economic Loss Claims Policy ID** | **Page(s)** |
| 4. Policy ID 352: The Appropriate Eligibility Zone for Charter Fishing Businesses | 13-14 |
| 5. Policy ID 331: Economic Loss Claims: Time Period Used to Determine the Applicable Zone | 15-17 |
| 6. Policy ID 344: Economic Loss Claims: Appropriate Treatment of Revenues for Clean Up Activities | 18-19 |
| 7. Policy ID 346 v 1: Economic Loss Claims: The Appropriate RTP for Primary Seafood Processors | 20-21 |
| 8. Policy ID 346 v 0: Business Economic Loss Claims: Primary Seafood Definition RTP | 22-23 |
| 9. Policy ID 363 v 3: Economic Loss Claims: Preventing Double Payment for the Same Loss to an Entity and the Owner or Officer of that Entity | 24-25 |
| 10. Policy ID 363 v 2: Economic Loss Claims: Application of the Policy Preventing Double Payment for the Same Loss to an Entity and the Owner or Officer of that Entity | 26-27 |
| 11. Policy ID 363 v 1: No "Double Recovery" for Compensation of Owners or Officers of Business Entities | 28-29 |
| 12. Policy ID 363 v 0: Business Economic Loss Claims: Double Payment | 30-31 |

EXHIBIT B-2

# DEEPWATER HORIZON
# CLAIMS CENTER
### ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 289 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information ||
|---|---|
| **Policy Subject** | Definition of Tourism |
| **Active Date** | 10/25/12 | **Policy Impact** | ☐ All Claims Regardless of Active Date<br>☐ All Claims Greater than Active Date |
| **Type of Decision** | | | Claims Administrator Decision |
| **Settlement Agreement Reference** | | | |
| **Affected Claim Types and/or Review Processes** | | | All Claims |

## II. Approved Policy

The Claims Administrator has considered the issue of what claimants fall within the definition of "Tourism" under Exhibit 2 to the Settlement Agreement.  The Claims Administrator interprets the Settlement Agreement as follows:

(a) Exhibit 2 provides that "Tourism means businesses which provide services such as attracting, transporting, accommodating or catering to the needs or wants of persons traveling to, or staying in, places outside their home community."
(b) Exhibit 2 then provides a list of NAICS codes which qualify a claimant for inclusion in the Tourism category.  The Claims Administrator finds that the list of NAICS codes is illustrative, not exhaustive.
(c) If the most appropriate NAICS code for a claimant is one of the codes listed on Exhibit 2, that claimant will be considered to fall within the Tourism definition.
(d) If the most appropriate NAICS code for a claimant is not one of the codes listed on Exhibit 2, that claimant may still be considered to fall within the Tourism definition if the Claims Administrator determines in his discretion that the claimant's business meets the definition outlined in Subsection (a) above.
(e) The Claims Administrator has established a specialized team to assess Tourism issues on a case-by-case basis.
(f) Characterization of a claimant's business as Tourism vs. Non-Tourism shall be based on the totality of circumstances, including consideration of the business' activities during the Benchmark Period and the Class Period.

UPDATE:  BP continues to believe that its interpretation of the Tourism definition as set forth in its prior communications to the Claims Administrator is correct.  However, at this point  BP will defer to the sound discretion of the Program to implement the Tourism Definition as set forth in the Policy Announcement, reserving our right to revisit the issue, and to perhaps convene a Panel if necessary, if and as any problems or concerns may be reported or encountered in the processing of claims.

EXHIBIT B-2

## Policy 289: Definition of Tourism

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  4/16/13
   c. Comment:

   BP continues to believe that its interpretation of the Tourism definition as set forth in its prior communications to the Claims Administrator is correct.  However, at this point  BP will defer to the sound discretion of the Program to implement the Tourism Definition as set forth in the Policy Announcement, reserving our right to revisit the issue, and to perhaps convene a Panel if necessary, if and as any problems or concerns may be reported or encountered in the processing of claims. (10/26/12); Classify as CA Decision. (4/16/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  4/2/13
   c. Comment:

   Class Counsel, likewise, believe that the Tourism Definition as set forth in Exhibit 2 should be interpreted and applied as set forth in Class Counsel's Memo, but will likewise defer to the sound discretion of the Claims Administrator, reserving our right to revisit the issue, and to perhaps convene a Panel if necessary, if and as any problems or concerns may be reported or encountered in the processing of claims. (10/26/12). Should be announced to public and provided to Appeal Panelists as CA Interpretation. (1/30/13); Should be published as a CA Decision. (4/2/13)

**DEEPWATER HORIZON**
# CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Proc-378 | CLAIMS ADMINISTRATOR'S APPROVED PROCEDURE |
|---|---|

## I. Profile

| Subject | Access to Claims Information and Data | | |
|---|---|---|---|
| **Active Date** | 4/24/13 | **Policy Impact** | ☑ All Claims Regardless of Active Date<br>☐ All Claims Greater than Active Date |
| **Type of Decision** | | | Claims Administrator Decision |
| **Settlement Agreement Reference** | | | |
| **Affected Claim Types and/or Review Processes** | | | IEL; IPV_FV; Real Property Sales; Subsistence; BEL; VOO Charter Payment; Coastal; Wetlands; Vessel Physical Damage; Seafood; All Claims; All Non Economic Loss Claims; All Economic Loss Claims; Seafood Second Distribution; Other |

## II. Summary

See attached memo.

EXHIBIT B-2



**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

# MEMORANDUM

TO:        **Class Counsel**
           **BP**

FROM:      **Patrick A. Juneau, Claims Administrator**

DATE:      **April 9, 2013**

RE:        **Procedure Regarding Access to Claims Information and Data**

_____

After meeting with the Parties on 3/12/13, the Claims Administrator tentatively adopted and announced to the Parties on 3/19/13, certain rules regarding access by claimants, their counsel, BP and Class Counsel to claim files, images of claim materials, claims-related materials and data maintained by the Deepwater Horizon Economic and Property Damages Settlement Program, subject to the Confidentiality Order entered by the Court on 6/29/12. After receiving and considering comments from the Parties on those rules, the Claims Administrator has adopted this final Procedure.

1. *Definitions.* In addition to defined terms in the Settlement Agreement, this Procedure uses these terms:

    (a) Access: The ability to view and obtain copies of Confidential Information regarding Claimants and claims in the Program, whether by an interactive internet interface or by hard copies furnished by the Claims Administrator.

    (b) Accountant Workbooks: The Excel workbooks uploaded into the Claim File by accountant reviewers that reflect calculations made by such reviewers on a Business Economic Loss Claim or Seafood Program Claim.

    (c) Claim: A claim presented to the Program by a Claimant for any of the Claim Types permitted by the Settlement Agreement.

    (d) Claim File: The Registration Form of a Claimant and the Claim Form, supporting documents and other materials presented by a Claimant or any party relating to a Claimant or Claim by the Claimant, any notices or communications to or from the Claimant or any party relating to a Claimant or Claim, and any materials created by the Claims Administrator relating to a Claimant or a Claim by the Claimant, maintained in electronic images.

    (e) Claims Database: The electronic database maintained by the Claims Administrator of information relating to Claimants and Claims in the Program and the actions taken by the Program relating to such Claimants and Claims.

    (f) Claim Reports: Reports on Claims specifically requested by Class Counsel or BP or that the Settlement Agreement requires the Claims Administrator to provide to Class

422376



**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

Counsel and/or BP regarding Claims in the Program and that are not posted publicly or made available to the Class.

(g) Claim Review Details:  The information placed in the Claims Database by Program personnel relating to the review of a Claim.

(h) Claimant:  A person or entity that has submitted a Registration Form and/or one or more Claims in the Program.

(i) Claimant's Counsel:  The law firm and individual lawyer(s) representing a Claimant as directed by the Claimant and indicated in the Claims Database.

(j) Confidential Information:  All the information referred to in this procedure and covered by the Confidentiality Order.

(k) Denial Notice:  The Notice issued by the Claims Administrator to a Claimant not receiving an Eligibility Notice explaining the denial of an ineligible, incomplete or excluded Claim.

(l) Eligibility Notice: The Notice issued by the Claims Administrator to an eligible Claimant explaining the outcome of the review on a Claim.

(m)Global Notes:  The information entered into the Claims Database by Program personnel to record conversations and emails with Claimants and counsel for Claimants relating to a Claim or the Program.

2.      ***Access to Confidential Information Before Issuance of an Eligibility Notice or a Denial Notice.***  Before the Claims Administrator issues an Eligibility Notice or Denial Notice on a Claim:

(a) **Claimant and Claimant's Counsel:**  Shall have Access to the Claimant's Claim File and the Claims Database pertaining to the Claimant, but shall not have access to the Accountant Workbooks, Claim Review Details or Global Notes relating to the Claim or the Claimant or to any Confidential Information relating to any other Claimants.

(b) **BP and Class Counsel:**  Shall have equal Access to Claim Reports and to the Claim Files and Claims Database on all Claimants and Claims, but shall not have Access to Accountant Workbooks, Claim Review Details or Global Notes relating to a particular Claim or Claimant.

3.      ***Access to Confidential Information After Issuance of an Eligibility Notice or a Denial Notice.***  After the Claims Administrator has issued an Eligibility Notice or Denial Notice on a Claim, in addition to the Access permitted under Paragraph 2 of this Procedure:

(a) **Claimant and Claimant's Counsel:**  Shall have Access to the Global Notes relating to the Claimant and to the Accountant Workbooks and Claim Review Details relating to the Claim on which the Eligibility Notice or Denial Notice was issued, but shall not have Access to any Confidential Information relating to any other Claimants.

422376

2



**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

    **(b) BP and Class Counsel:** Shall have equal Access to the Global Notes relating to a Claimant and the Accountant Workbooks and Claim Review Details relating to the Claim on which the Eligibility Notice or Denial Notice was issued.

    4.    *Access by Appeal Panelist.* The record before the Appeal Panelist on a claim on appeal shall include the Global Notes pertaining to the Claimant and the Claims Database, Claim File, Accountant Workbooks and Claims Review Details relating to the Claim subject to the appeal.

422376

3

## Procedure 378:  Access to Claims Information and Data

Comments and Decisions by the Parties:

**A. Requested Input from Parties**

    **1. BP**
        a.  Decision:  Propose Modification
        b.  Date:  3/22/13
        c.  Comment:

        BP does not object to the scope of the access provided for in the Procedure.  We did want
        to note one definitional matter, which from our perspective does not require a change to
        the Procedure so long as it is understood.  The Procedure defines "Claim File" as "[t]he
        Registration Form of a Claimant and the Claim Form, supporting documents and other
        materials presented by a Claimant or any party relating to a Claimant or Claim in the
        Program, maintained in hard copy form and electronic images."  This differs from the use
        of the term "Claims File" in Section 4.4.14 of the Settlement Agreement, which use
        refers to materials defined in the Procedure as "Claim Review Details" and "Accountant
        Workbook".  Because the Procedure appropriately identifies what data is available to the
        parties and when, we are not insisting on consistency between the use of the term in the
        documents but did want to note the issue.

    **2. Class Counsel**
        a.  Decision:  Propose Modification
        b.  Date:  3/22/13
        c.  Comment:

        See attached memo.

**B. Policy Announced to Parties for Positions**

    **1. BP**
        a.  Decision:  Defer to Claims Administrator
        b.  Date:  4/17/13
        c.  Comment: N/A

    **2. Class Counsel**
        a.  Decision:  Defer to Claims Administrator
        b.  Date:  4/17/13
        c.  Comment: N/A

EXHIBIT B-2

# MEMORANDUM

**To:** Patrick A. Juneau
      Claims Administrator

**From:** Class Counsel

**Re:** Access to Data

**Date:** March 22, 2013

## <u>Background</u>

There are three key provisions in the Settlement Agreement which relate to the access of Parties to data:  Section 4.4.14, Section 6.1.2.1.1 and Section 6.8.

The core principles that were made abundantly clear and agreed to by all during the negotiations and which are memorialized in the provisions include: **(I)** The Claimant would have an absolute right to see exactly how his or her claim had been calculated and/or otherwise evaluated by the Program and what the calculation, evaluation and/or denial was based upon. **(II)** BP would have no right to access the individual claim file information, participate in, or otherwise influence the processing or evaluation of a claim before there was a formal Eligibility Notice. **(III)** After there was a formal Eligibility Notice or Denial, both BP and Class Counsel (as well as the Claimant) would have access *to the extent that*, in BP's case, an appeal could be taken or defended, and, in Class Counsel's case, a Class Member could obtain assistance from Class Counsel in making or defending an appeal.

It was also agreed that the Claims Information would remain "confidential" under Pre-Trial Order No. 13, as memorialized in the Court's ORDER REGARDING SETTLEMENT IMPLEMENTATION (May 22, 2012) [Doc 6573], ¶ 4.

The Court's Order further made it clear that: "That the Claims Administrator is authorized to release copies of Claims Information submitted by the claimant to that claimant upon the written request of the claimant or the claimant's authorized representative."  ¶ 5.

While the Court's Order provided that BP and Class Counsel "shall have access to all Claims Files and Claims Information for any legitimate purpose including the operation of BP's separate OPA facility, prosecuting and defending appeals, reviewing and auditing the Settlement Program, reporting financial results, and pursuing indemnification, contribution, subrogation, insurance and other claims from third parties";  the Order, like the Settlement Agreement, also made it clear that:

EXHIBIT B-2

> However, BP and Class Counsel shall **not** have access to any individual Claim File for a Claim that is being processed and has not yet been resolved in the Settlement Program, except if the Claim File is needed by BP, a Claimant, or their counsel, to prosecute or defend an Appeal.

ORDER REGARDING SETTLEMENT IMPLEMENTATION (May 22, 2012) [Doc 6573], ¶ 9.


Over the summer, Co-Lead Class Counsel recall a couple of meetings and/or calls to discuss: **(1)** the extent to which Claimants would be provided with access to and/or information about why they might be investigated for potential "fraud"; and, **(2)** the extent to which Claimants would have access to draft or preliminary or otherwise incomplete work product of the Program Accountants and/or other Program Vendors prior to the formal Eligibility Determination or Denial.

As expressed in Class Counsel's E-Mail of February 12, 2013, a general summary of the application would be:

1. Claimants, absent exceptional circumstances, have full access to the claims file and claims information, except for the Program's work product, at any time.[1]
2. Claimants, as well as Class Counsel and BP, gain access to the Claims Administrator's calculations, including accountant workbooks, when the Program issues the first Eligibility or Denial Notice on a claim.[2]
3. BP and Class Counsel are entitled to general, aggregate, non-personal / non-confidential / non-claim-specific reports and other information about the filing and status of claims, at all times.
4. BP does not get, (absent some exceptional circumstances), access to the claim-specific claim files, claim information, or Claims Administrator's calculations, until after the Program issues the first Eligibility or Denial Notice on the claim.
5. Class Counsel is not generally / automatically provided with access to the claim-specific claim files, claim information, or Claims Administrator's calculations, until after the Program issues the first Eligibility or Denial Notice on the claim; however, Class Counsel can communicate with the Program regarding specific claims information and issues where the Class Member (and/or the Class Member's Attorney and/or CPA) has requested the assistance of Class Counsel.


[1] As noted in Class Counsel's E-Mail of Feb. 13, 2013: We believe the Claimant should always be provided with full access to all claims information, but understand the Claims Administrator's position regarding Program worksheets / calculations and investigations of potential fraud.

[2] Actually, BP would only be provided with access to the extent necessary to prosecute or defend an appeal.

**<u>Comments Regarding Claims' Administrators March 19th Memorandum</u>**

Section 4.4.14 of the Settlement Agreement and Paragraph 9 of the Court's Settlement Implementation Order make it clear that BP "shall not have access to any Claim Files for Claims that are being processed and have not yet been resolved in the Settlement Program except if the Claim File is needed by BP, a Claimant, or their counsel to prosecute or defend an Appeal."

In section 2(b) of the Claims Administrator's March 19th Memo, however, the Claims Administrator indicates that "Access to Confidential Information Before Issuance of an Eligibility Notice or a Denial Notice" shall be given to BP (and Class Counsel) including "Access to the Claim Files and Claims Database relating to all Claimants and to Claim Reports."

Co-Lead Class Counsel do not recall any agreement (or even a discussion) about providing BP with such access prior to an Eligibility Determination or Denial.

However, even assuming *arguendo* that the Claims Administrator understood that Class Counsel had agreed, neither individual Class Members nor the Court have authorized such disclosure to BP.

Many businesses are not interested in making their tax records and other financial data available to BP, which in some instances may be a creditor, vendor, or customer of the Claimant.  These businesses understand that if they receive an favorable Eligibility Notice, BP will then have the right to review the data in order to exercise their appeal rights.  However, should they not be found eligible to receive compensation by the Settlement Program, none of their information should be provided to BP.

We would respectfully suggest that this is not a discretionary issue.  Rather, the issue is governed by the Court's Order and the clear language of the Settlement Agreement.

# DEEPWATER HORIZON
# CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 273 | Claims Administrator's Approved Policy |
|---|---|

## I. Policy Information

| Policy Subject | Specific Dollar Amount in the Individual Release | | |
|---|---|---|---|
| **Active Date** | 10/11/12 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | | |
| **Affected Claim Types and/or Review Processes** | | All Claims | |

## II. Approved Policy

The Claims Administrator determined that replacing the specific dollar amount recited in Section 2 of the Individual Release with a general statement of consideration would enhance the efficiency of the administration of claims under the Settlement Agreement and would reduce the confusion experienced by claimants with more than one claim who are asked to sign a Release stating a payable amount based on only one claim. BP opposed this change to the Release. The Claims Administrator interprets the language of Section 4.4.10.2 to mandate the use of the Release "set forth in Exhibit 26," which requires the insertion in Section 2 of a dollar amount, absent mutual agreement of the Parties to the contrary or unless and until the Court directs otherwise.

The Claims Administrator raised this issue again in the 10/9/12 Memo to the Parties requesting input and again BP refused to permit this change to the Release.

EXHIBIT B-2

## Policy 273: Specific Dollar Amount in the Individual Release (Internal)

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Accept as a Final Policy
   b. Date: 4/16/13
   c. Comment:

   As stated by the CA, BP objected to the omission of a specific dollar amount for the release.  The CA has agreed not to replace the specific dollar amount requirement for the release. This issue is now fully resolved. (2/11/13)

2. **Class Counsel**
   a. Decision:  Accept as a Final Policy
   b. Date:  4/2/13
   c. Comment:

   Since this reflects no change, I am not sure there is anything to announce. Leave to the Claims Administrator's discretion. (4/2/13)

EXHIBIT B-2



ALL ECONOMIC LOSS CLAIMS



**DEEPWATER HORIZON**
# CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-352 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

| **I. Profile** | | | |
|---|---|---|---|
| **Subject** | The Appropriate Eligibility Zone for Charter Fishing Businesses | | |
| **Active Date** | 3/27/13 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | Exhibit 5, Section I | |
| **Affected Claim Types and/or Review Processes** | | BEL; All Economic Loss Claims; IEL | |

| **II. Summary** |
|---|
| To determine the Eligibility Zone for a Business Entity, the Claims Administrator determines the location where that Entity owned, operated, or leased a facility.  See Section 1.2.1 of the Settlement Agreement.  The Claims Administrator locates an entity using the place where it performs or manages its operations.  See Exhibit 5, Section I.  Charter Fishing businesses, whether organized as a sole proprietorship or as a formal business entity, generally do not maintain any separate location to manage or operate the business, but instead use the owner's or captain's home address to receive mail, file tax returns, and register, organize, or incorporate the business entity.  The owners perform all business operations aboard the vessel used to "carry Passenger(s) for Hire to engage in Recreational Fishing."  See Section 38.18 of the Settlement Agreement.  The location of the vessel, rather than the home address of the owner or captain, is the most accurate reflection of the entity's business operating location and of the claimant's loss.  Accordingly, if a Business Claimant submits documents establishing to the satisfaction of the Claims Administrator showing where the Charter Fishing Vessel was docked, harbored, or Home Ported at any time during the Compensation Period applicable to the claimant and the claimant meets the definition of Charter Fishing under Section 38.18 of the Settlement Agreement, the Claims Administrator will assign the Zone where the Charter Fishing Vessel was docked or harbored, or Home Ported at any time during the Compensation Period applicable to the claimant that is most favorable to the claimant. This policy only applies to charter fishing and does not apply to land-based facilities. |

## Policy 352: The Appropriate Eligibility Zone for Charter Fishing Businesses

### A. Requested Input from Parties

1. **BP**
   a. Decision: Defer to Claims Administrator
   b. Date: 2/22/13
   c. Comment: N/A

2. **Class Counsel**
   a. Decision: Propose Modification
   b. Date: 2/22/13
   c. Comment: N/A

### B. Policy Announced to Parties for Positions

1. **BP**
   a. Decision: Request Panel Hearing
   b. Date: 3/4/13
   c. Comment: N/A

With respect to Policy No. 4, relating to eligibility zones for Charter Fishing, BP does not object to the Claims Administrator's interpretation of the Settlement Agreement where all substantive business operations are performed aboard the vessel, and the location at which the vessel was docked, harbored, or Home Ported is established by objective documentation. The policy as currently drafted fails to state that objective documentation establishing the location of the vessel is required. BP also maintains its position that, for a business with land-based facilities, the appropriate zone is the location of the facility, even if some work is performed in other zones.

2. **Class Counsel**
   a. Decision: Defer to Claims Administrator
   b. Date: 3/4/13
   c. Comment: N/A

# DEEPWATER HORIZON
## CLAIMS CENTER
### ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 331 | Claims Administrator's Approved Policy |
|---|---|

| **I. Policy Information** | | | |
|---|---|---|---|
| **Policy Subject** | Economic Loss Claims: Time Period Used to Determine the Applicable Zone | | |
| **Active Date** | 2/8/13 | **Policy Impact** | ☐All Claims Regardless of Active Date<br>☑All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | Exhibit 2 | |
| **Affected Claim Types and/or Review Processes** | | IEL; BEL | |

| **II. Approved Policy** |
|---|

The Settlement Agreement requires the Claims Administrator to determine the Zone applicable to each Economic Loss claimant for purposes of causation and compensation. The Settlement Agreement, however, does not specify the time period used to make this determination for any claimant. In every instance, the Settlement Agreement uses the present tense when describing the impact of the Zone on causation of the RTP applicable to the claim. See, e.g., Ex. 4B Sec. I.1 ("If you are a business in Zone A . . ."); Ex. 15 ("Businesses . . . located in Zone A . . ."); Ex. 8A fn 4 ("Claimants may establish an alternative location of economic loss for the Claiming Job other than their employer's location by providing evidence that their primary activities and
responsibilities occur in a location different from their employer's business address"). With no temporal element prescribed by the Settlement Agreement for the Zone determination, it provides no guidance on how the Claims Administrator is to assign a Zone to an entity that has changed its physical location at any time after 4/20/10 or to an individual whose work area changed at after that date. After reviewing the Settlement Agreement and the responses of the Parties to a request for their positions on this issue, the Claims Administrator has adopted these rules of decision to address this issue:

(a) The Claims Administrator will assign an entity the Zone in which the claimant was located at any time during the Compensation Period applicable to the claimant that is
most favorable to the claimant.

(b) The Claims Administrator will assign an individual the Zone in which the claimant's primary activities and responsibilities occurred at any time during the Compensation
Period applicable to the claimant that is most favorable to the claimant.

(c) Because the Class Period defined in Section 38.28 of the Settlement Agreement extends through 4/16/12, which is beyond the Compensation Period of any claimant,
certain claimants are Class Members but had no physical location in any Zone or did not work in any Zone during the claimant's Compensation Period. The Claims
Administrator will assign Zone D to such claimants.

**Policy 331: Economic Loss Claims: Time Period Used to Determine the Applicable Zone**

Comments and Decisions by the Parties:

1. **BP**
   a. Decision: Defer to Claims Administrator Decision
   b. Date: 4/16/13
   c. Comment:

The Compensation Period was negotiated by Class Counsel and BP based, in part, upon consideration of economic data regarding the impact of the DWH spill. The economic reasonableness for using May to December 2010 as the Compensation Period is explained in BP's and Class Counsel's jointly filed Proposed Findings of Fact and Conclusions of Law submitted in support of the motion for final approval of the Settlement that is pending before the Court. See Joint Proposed Findings of Fact and Conclusions of Law (filed Nov. 19, 2012) (Rec. Doc. 7945) ¶¶ 107, 112, 124, 149, 153, 470, 571-579, 630-634 and expert declarations cited therein. Class Counsel and BP have explained that the RTP multipliers provide additional compensation "for, among other things, the risk of future injuries that may never occur." See id. ¶ 162; see also id. ¶¶ 112, 127, 629-633, 648, 682, 724. BP's point in our email response to you regarding assignment of an Economic Loss Zone for a claimant that moves locations is simply that, since a claimant's Zone location is used for determining Economic Damage Compensation, it makes logical sense in answering the question to turn to how Zone assignment is used within those Frameworks. The Economic Loss Zone is used to assign a causation standard to a claimant with the notion that "as distance increases away from the coast, the likelihood of damage is reduced." Id. at ¶ 123. For business claimants without a causation presumption there is a comparison of revenues for three consecutive months of May-December 2010 to the same months in the Benchmark Period and the same months 2011. (Settlement Ex. 4B, Sections II, III)  For individual claimants without a causation presumption, causation may be established if the claimant's employer established causation under the BEL or in some other specified circumstances. (Settlement Ex. 8A at p. 14, 22-23) Likewise, BEL and IEL compensation is determined by comparing actual and expected profits or earnings for a defined post-spill period in 2010 with certain exceptions. (Ex. 4C at p.1; Ex. 8A at p.5) RTPs are applied to this base compensation amount. Thus, for assigning an Economic Loss Zone to a claimant, it makes logical sense to focus upon the claimant's location during May to December 2010. The class period, which is defined in Section 1.2.1 of the Settlement Agreement, extends from April 20, 2010, the beginning date of the spill, until April 16, 2012, when the currently operative Bon Secour class action complaint was filed. See Proposed Joint Findings and Conclusions ¶ 35. The class period applies not only to Economic Damage claims but rather to all Damage Categories, which also include Seafood Compensation Program, Subsistence, VoO Charter Payment, Vessel Physical Damage, Coastal Real Property, Wetlands Real Property, and Real Property Sales. It covers any claims that could have been asserted through the date of the complaint, two days before the Settlement. As is typical in many class settlements, the class period extends to the filing of the amended complaint so as to pick up any peripheral claims. Thus, there is not a

basis to use that date for purposes of determining zones.  As the proposed Joint Findings of Fact and Conclusions of Law reflect, the experts whose declarations were presented by the parties unanimously agreed that the Settlement is fair, reasonable and adequate.   As you know, the parties now await Judge Barbier's ruling on final approval of the Settlement.  (12/5/12); Classify as CA Decision. (4/16/13)

2. **Class Counsel**
   a.  Decision: Defer to Claims Administrator Decision
   b.  Date: 4/2/13
   c.  Comment:

The position of the Claims Administrator in Paragraph 4(a) and 4(b) is an appropriate interpretation of the Settlement in the view of Class Counsel. The statement in Paragraph 4(c) regarding Class Members with no physical locations and did no work in any Zone during the claimant's Compensation Period is not a provision set forth in the Settlement Agreement. Class Counsel understand that this interpretation will not be applied to IEL claims, and will only be a working premise for BEL claims. Class Counsel does not oppose the Claims Administrator accepting as a working premise that Zone D is the applicable Zone; however, Class Counsel believe that a Class Member should have the opportunity to establish why its applicable Zone is Zone A, B, or C, and not Zone D, based on the individual facts and circumstances. (1/18/13); Can be promulgated as CA Decision. (1/30/13); Should be published as a CA Decision. (4/2/13)

EXHIBIT B-2

# DEEPWATER HORIZON
## CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 344 | Claims Administrator's Approved Policy |
|---|---|

### I. Policy Information

| | |
|---|---|
| **Policy Subject** | Economic Loss Claims:  Appropriate Treatment of Revenues for Clean Up Activities |

| **Active Date** | 2/8/13 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
|---|---|---|---|

| **Type of Decision** | Claims Administrator Decision |
|---|---|
| **Settlement Agreement Reference** | |
| **Affected Claim Types and/or Review Processes** | IEL; BEL |

### II. Approved Policy

On Business Economic Loss claims, Section II of Ex. 4C to the Settlement Agreement provides that "[f]or Claimants that participated in the VoO program, Variable Profit in the Compensation Period will exclude revenue generated or costs incurred in connection with the VoO."  Similarly, on Individual Economic Loss claims, Section A of Exhibit 8A defines a claimant's "Actual Earnings" as "income actually earned from the Claiming Job(s) during the Compensation Period excluding Spill-Related Payments and employment earnings from the VoO program."  Given that the Settlement Agreement does not expressly exclude from Variable Profit or Actual Earnings revenues and costs or earnings for clean up activities other than the VoO Program, the Claims Administrator will not exclude such revenues and costs from Variable Profit in the Compensation Period on BEL claims or from Actual Earnings or Offsetting Earnings during the Compensation Period on IEL claims.  Instead, the Claims Administrator will treat them in the same manner as any other revenues and costs or earnings during the Compensation Period.  Accordingly, the Claims Administrator will not consider such revenues or earnings as Spill-Related Payments to be deducted from an award to the claimant in the Program.

EXHIBIT B-2

## Policy 344: Economic Loss Claims: Appropriate Treatment of Revenues for Clean Up Activities

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date: 4/16/13
   c. Comment:

   Section II of Exhibit 4C regarding exclusion of VoO revenues and costs is unique to the VoO program. It does not apply to other clean-up activities that a claimant may have engaged in, which were -- and should be treated as -- alternate sources of revenue. This is evidenced by the very language the Settlement Program quotes in posing this question, namely, Section II of Ex. 4C which states "[f]or Claimants that participated in the VoO program, the Variable Profit in the Compensation Period will exclude revenue generated or costs incurred in connection with the VoO." If the parties intended to treat revenues and costs associated with other clean-up activities similarly, the sentence would have expressly made reference to the other clean-up activities rather than limited to VoO. The reason VoO is not treated as an alternate source of revenue is that it reflects a compromise reached by the Parties in negotiations taking into account the contract dispute claims specific to the VoO program. (1/19/13); Classify as CA Decision. (4/16/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date: 4/2/13
   c. Comment:

   Should be published as a CA Decision. (4/2/13)

# DEEPWATER HORIZON
## CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 346 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information | | | |
|---|---|---|---|
| **Policy Subject** | Economic Loss Claims:  The Appropriate RTP for Primary Seafood Processors | | |
| **Active Date** | 2/8/13 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | | |
| **Affected Claim Types and/or Review Processes** | | IEL; BEL | |

| II. Approved Policy |
|---|
| Exhibit 15 to the Settlement Agreement states that an RTP of 3.00 applies to "businesses satisfying the Primary Seafood Processor Definition in the Seafood Distribution Chain Definitions who process Shrimp/Crab/Oyster and are located in Zone A, Zone B, Zone C or Zone D."   It then provides that an RTP of 2.25 applies to "businesses satisfying the Primary Seafood Processor Definition in the Seafood Distribution Chain Definitions who process seafood other than Shrimp/Crab/Oyster and are located in Zone A, Zone B, Zone C or Zone D."  For businesses in these Zones satisfying the Primary Seafood Processor Definition in the Seafood Distribution Chain Definition that process Shrimp/Crab/Oyster and also process seafood other than Shrimp/Crab/Oyster, the Claims Administrator has determined that it is not feasible to distinguish reliably or efficiently Shrimp/Crab/Oyster revenues from revenues from other seafood processing.  The Claims Administrator will apply an RTP of 3.00 to such claimants, unless it is apparent from the claim materials that Shrimp/Crab/Oyster processing is a minor and insignificant portion of the claimant's operations during each year of the applicable Benchmark Period, in which case an RTP of 2.25 shall apply. |

## Policy 346 v.1: Economic Loss Claims:  The Appropriate RTP for Primary Seafood Processors

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  4/16/13
   c. Comment:

The question posed by the Claims Administrator to the parties is to comment upon the appropriate RTP to be applied to BEL claims by Primary Seafood Processors that process multiple seafood species. Exhibit 15 to the Settlement Agreement provides for an RTP of 3.00 for Primary Seafood Processors "who process Shrimp/Crab/Oyster," and it provides for an RTP of 2.25 for Primary Seafood Processors that process seafood species other than Shrimp/Crab/Oyster. Primary Seafood Processors who process both Shrimp/Crab/Oyster and other seafood species should receive a weighted-average RTP based on the percentage of annual revenues in the Benchmark Period generated by each species. For example, if the Primary Seafood Processor processed a mix of shrimp, oysters and red snapper with Benchmark Period annual revenue for each species as set forth in this table below, the Settlement Program should calculate the RTP as set forth in the table: [a][b][c][d]=[b]*[c] Shrimp $250,000 25% 3.00 0.75 Oysters $500,000 50% 3.00 1.50 Red Snapper $250,000 25% 2.25 0.56 Total $1,000,00 100% 2.81. In this example, the Primary Seafood Processor would receive an RTP of 2.81 based on its mix of annual revenue by species in the Benchmark Period. (1/19/13); Classify as CA Decision. (4/16/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  4/2/13
   c. Comment:

Should be published as a CA Decision. (4/2/13)

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-346 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---------|----------------------------------------|

### I. Profile

| | |
|---|---|
| **Subject** | Business Economic Loss Claims: Primary Seafood Definition RTP |
| **Active Date** | 7/15/12 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | Claims Administrator Decision |
| **Settlement Agreement Reference** | Exhibit 15 |
| **Affected Claim Types and/or Review Processes** | BEL |

### II. Summary

The Settlement Agreement states that an RTP of 3.00 applies to "businesses satisfying the Primary Seafood Definition in the Seafood Distribution Chain Definitions who process Shrimp/Crab/Oyster and are located in Zone A, Zone B, Zone C or Zone D," but that an RTP of 2.25 applies to "businesses satisfying the Primary Seafood Definition in the Seafood Distribution Chain Definitions who process seafood other than Shrimp/Crab/Oyster and are located in Zone A, Zone B, Zone C or Zone D." We will apply the RTP of 3.00 to businesses that exclusively process Shrimp/Crab/Oyster. We will apply an RTP of 2.25 to businesses that process a combination of Shrimp/Crab/Oyster and other seafood.

**Policy 346 v.0: Business Economic Loss Claims: Primary Seafood Definition RTP (Superseded by Policy 346 v.1)**

Comments and Decisions by the Parties:

1. **BP**
   a. Decision: Defer to Claims Administrator Decision
   b. Date: 4/16/13
   c. Comment: N/A

2. **Class Counsel**
   a. Decision: Defer to Claims Administrator Decision
   b. Date: 4/2/13
   c. Comment:

Understand that this is still under discussion, and has not yet been finalized as policy. (#346) (1/30/13); Appears to be superseded by No. 346. (4/2/13)

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-363 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

### I. Profile

| Subject | Economic Loss Claims: Preventing Double Payment for the Same Loss to an Entity and the Owner or Officer of that Entity | | |
|---|---|---|---|
| Active Date | 4/23/13 | Policy Impact | ☐All Claims Regardless of Active Date<br>☑All Claims Greater than Active Date |
| Type of Decision | | Claims Administrator Decision | |
| Settlement Agreement Reference | | | |
| Affected Claim Types and/or Review Processes | | All Economic Loss Claims | |

### II. Summary

The accounting methodology used for calculation of Business Economic Loss claims, pursuant to Exhibit 4C of the Settlement Agreement, treats owner/officer payroll costs as a fixed cost. All fixed costs, including owner/officer compensation, are inherently included in the compensation amount calculated under the Business Economic Loss framework. If the business has filed a BEL claim and any Owner or Officer of the business has filed any IEL claims, and the Claims Administrator has identified the connection among the claims before any claimant is awarded a payment, the Claims Administrator will compensate the business entity for the loss and will deny the claims of the Owners and Officers. If, however, an Owner or Officer of a business is paid on an IEL claim for lost income or was paid by the Gulf Coast Claims Facility on a Lost Earnings or Profits claim before the Claims Administrator assesses the BEL claim of the business of that Owner or Officer, to avoid double recovery for the same loss, the amount paid to the Owner or Officer on the IEL claim or by the GCCF shall be offset from the award amount, if any, of the entity's BEL claim.

## Policy 363 v.3: Economic Loss Claims: Preventing Double Payment for the Same Loss to an Entity and the Owner or Officer of that Entity

Comments and Decisions by the Parties:

1. **BP**
   a.  Decision:  Defer to Claims Administrator
   b.  Date:  4/16/13
   c.  Comment:

   Should be published as a CA Decision. (4/19/13)

2. **Class Counsel**
   a.  Decision:  Defer to Claims Administrator
   b.  Date:  4/2/13
   c.  Comment:

   Should be published as a CA Decision. (4/2/13)

**DEEPWATER HORIZON**
# CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-363 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

## I. Profile

| Subject | Economic Loss Claims: Application of the Policy Preventing Double Payment for the Same Loss to and Entity and the Owner or Officer of that Entity | | |
|---|---|---|---|
| **Active Date** | 2/8/13 | **Policy Impact** | ☑All Claims Regardless of Active Date ☐All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | | |
| **Affected Claim Types and/or Review Processes** | | IEL; BEL | |

## II. Summary

The Claims Administrator previously adopted and announced to the Parties a Double Payment policy that prohibits payment of Economic Losses to both the business entity and the individual Owners and Officers of that entity for the same loss. Normally, if the business has filed a BEL claim and any Owner or Officer of the business has filed any IEL claims, and the Claims Administrator has identified the connection among the claims before any claimant is awarded a payment, the Claims Administrator will compensate the business entity for the loss and will deny the claims of the Owners and Offers pursuant to the Double Payment Policy. If, however, an Owner or Officer of a business is paid on an IEL claim for lost income or was paid by the Gulf Coast Claims Facility on a Lost Earnings or Profits claim before the Claims Administrator assesses the BEL claim of the business of that Owner or Officer, to avoid double recovery for the same loss, the amount paid to the Owner or Officer on the IEL claim or by the GCCF shall be offset from the award amount, if any, of the entity's BEL claim.

> **Policy 363 v.2: Economic Loss Claims: Application of the Policy Preventing Double Payment for the Same Loss to and Entity and the Owner or Officer of that Entity**
> **(Superseded by Policy 363 v.3)**

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Accept as a Final Policy
   b. Date:  3/27/13
   c. Comment:

   Agreed. (5/17/12); BP agrees with CA Recommendation. (6/15/12); BP does not have any comments to the Claims Administrator's January 11, 2013 Policy Announcements. (1/18/13); Agree. (2/11/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  3/27/13
   c. Comment:

   Agree that the same Entity or Natural Person should not be able to recover more than once relative to the same loss as part of the same claim by the same Natural Person or Entity. (5/31/12); Defer to CA (6/14/12); Class Counsel have previously stated their position regarding the so-called "double payment" issues. Class Counsel do not believe that the Settlement Agreement excludes payments for individuals who otherwise meet the qualifications for payment under the IEL Framework. If, under the facts of the given case, it is established that the individual earnings loss was in fact paid to the business, then the stated intent of the Claims Administrator to offset from the BEL payment the monies that were paid for the same loss in the IEL claim may be appropriate. However, Class Counsel believe that this is an individual claim analysis. The underlying predicate of the Claims Administrator's position is an assumption that the BEL claim was in fact paid for the loss that is being claimed in the IEL claimant. Unless that is established, both losses should be compensated. (1/18/13); Can be promulgated as CA Decision. (1/30/13) (See No. 124.)

# DEEPWATER HORIZON
# CLAIMS CENTER
#### ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-363 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

## I. Profile

| | |
|---|---|
| **Subject** | No "Double Recovery" for Compensation of Owners or Officers of Business Entities |

| **Active Date** | 10/10/12 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
|---|---|---|---|

| **Type of Decision** | Claims Administrator Decision |
|---|---|

| **Settlement Agreement Reference** | |
|---|---|

| **Affected Claim Types and/or Review Processes** | BEL |
|---|---|

## II. Summary

It is the view of the Claims Administrator that the Settlement Agreement does not contemplate that a claimant may recover for the same damages twice. The accounting methodology being used for calculation of Business Economic Loss claims, pursuant to Exhibit 4C of the Settlement Agreement, treats owner/officer payroll costs as a fixed cost. All fixed costs, including owner/officer compensation, are inherently included in the compensation amount calculated under the Business Economic Loss framework. As a result, a claim made for the same owner/officer compensation amount under the Individual Economic Loss ("IEL") framework would constitute duplicate recovery. Such a duplicate claim/duplicate recovery will not be allowed.

**Policy 363 v.1: No "Double Recovery" for Compensation of Owners or
Officers of Business Entities
(Superseded by Policy 363 v.2)**

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Accept as a Final Policy
   b. Date:  4/16/13
   c. Comment:

   Agree. Promulgate 143 only. (2/11/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  4/2/13
   c. Comment:

   Think this was superseded by No. 363.  (1/30/13); Should be published as a CA Decision,
   but should only say "request" not "obtain".  At some point, depending on the nature of the
   business and the records, this may become impossible, or at least unduly burdensome.
   (4/2/13)

**DEEPWATER HORIZON**
# CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-363 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

## I. Profile

| Subject | Business Economic Loss Claims: Double Payment | | |
|---|---|---|---|
| **Active Date** | 6/15/12 | **Policy Impact** | ☑All Claims Regardless of Active Date <br> ☐All Claims Greater than Active Date |
| **Type of Decision** | | | Claims Administrator Decision |
| **Settlement Agreement Reference** | | | |
| **Affected Claim Types and/or Review Processes** | | | BEL |

## II. Summary

An Entity or Natural Person can only recover once as part of the same claim by the same Person or Entity. We should deny a different claim from a different person or entity when the losses pertain to a business that has already received a payment.

**Policy 363 v.0: Business Economic Loss Claims: Double Payment
(Superseded by Policy 363 v.1)**

Comments and Decisions by the Parties:

1. **BP**
   a. Decision: Defer to Claims Administrator Decision
   b. Date: 4/16/13
   c. Comment:

   Agreed (5/17/12); BP agrees with CA Recommendation. (6/15/12); Classify as CA Decision. (4/16/13)

2. **Class Counsel**
   a. Decision: Defer to Claims Administrator Decision
   b. Date: 4/2/13
   c. Comment:

   Agree that the same Entity or Natural Person should not be able to recover more than once relative to the same loss as part of the same claim by the same Natural Person or Entity. (5/31/12); Defer to CA (6/14/12); Believe Policy was revised slightly recently. Whatever the Policy is should be promulgated as a CA Interpretation. (1/30/13); I thought that Policy was revised slightly recently (i.e. re Owner vs. Officer of an Entity with BEL Claim), Whatever the Policy is should be promulgated as a CA Decision. (4/2/13)

EXHIBIT B-2



**COASTAL and WETLANDS**

EXHIBIT B-2

| Table of Contents | | |
|---|---|---|
| **Coastal and Wetlands Policy ID** | | **Page(s)** |
| 1. | Policy ID 380:  Wetlands Real Property Claims: Payment to a Usufructuary | 1-12 |
| 2. | Policy ID 253:  Proof of Ownership of Parcel | 13-14 |
| 3. | Policy ID 444:  Deeded Timeshares | 15-19 |
| 4. | Policy ID 366 v 1:  Coastal Real Property: How to Calculate Claims for Deeded Timeshare Interests | 20-21 |
| 5. | Policy ID 366 v 0:  Coastal Real Property: How to Calculate Claims for Deeded Timeshare Interests | 22-23 |
| **VoO Charter Payment Policy ID** | | **Page(s)** |
| 6. | Policy ID 353:  VoO MCVAs and Recognized Charterers | 24-28 |
| 7. | Policy ID 364 v 2:  Evaluating Multiple Claims for the Same Vessel | 29-30 |
| 8. | Policy ID 364 v 1:  Evaluating Multiple Claims for the Same Vessel | 31-32 |
| 9. | Policy ID 364 v 0:  VoO Charter Payment Claims: MVCA | 33-34 |
| 10. | Policy ID 370 v 1:  VoO Charter Payment Claims: Eligibility | 35-36 |
| 11. | Policy ID 370 v 0:  VoO Charter Payment Claims: Eligibility | 37-38 |
| **Vessel Physical Damage** | | |
| 12. | Policy ID 182:  Vessel Physical Damage Claims: Eligibility | 39-40 |

EXHIBIT B-2

# DEEPWATER HORIZON
# CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-380 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

### I. Profile

| Subject | Wetlands Real Property Claims: Payment to a Usufructuary | | |
|---|---|---|---|
| Active Date | 5/8/13 | Policy Impact | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| Type of Decision | | | Claims Administrator Decision |
| Settlement Agreement Reference | | | Exhibit 12A, Section 2.E |
| Affected Claim Types and/or Review Processes | | | Wetlands |

### II. Summary

The Claims Administrator will process Wetlands Claims in accordance with state law and the Wetlands Framework in Exhibit 12A to the Settlement Agreement. As a matter of Louisiana law, when property is subject to a usufruct, the usufructuary has the right to claim and receive damages during the term of the usufruct. Immediately on termination of the usufruct, the naked owner succeeds to full ownership rights, including the right to claim and receive damages. The Louisiana Civil Code imposes certain rights and obligations on the two parties which regulate the ownership relationship between them.

Applying the principles of the Wetlands Framework and state law, the Claims Administrator has designated the usufructuary as the Eligible Claimant entitled to the Wetlands Real Property Compensation Amount during the term of the usufruct and the naked owner as the Eligible Claimant entitled to the Wetlands Real Property Compensation Amount upon termination of the usufruct. Accordingly, if the Eligible Parcel is subject to a usufruct for the entirety of the period from April 20, 2010, to April 18, 2012 (the "Claim Period"), the usufructuary is the Eligible Claimant entitled to the Wetlands Real Property Compensation Amount and the Claims Administrator will pay the Compensation Amount in its entirety to the usufructuary. If the usufruct commences or ends during the Claim Period, the Compensation Amount shall be allocated between the two Eligible Claimants, the usufructuary and the naked owner, in accordance with the number of days the usufruct was in effect and the number of days when it was not in effect, in accordance with Section 2.E of Exhibit 12A. If a usufructuary holds the usufruct for the entire Claim Period and fails to make a claim during the term of the usufruct, the naked owner may pursue his or her remedies against the usufructuary afforded by the Louisiana Civil Code.

**Policy 380:   Wetlands Real Property Claims: Payment to a Usufructuary**

Comments and Decisions by the Parties:

A. <u>Requested Input from Parties</u>

   1. **BP**
      a. Decision:  Propose Modification
      b. Date: 2/7/13
      c. Comment:

     See attached documents.

   2. **Class Counsel**
      a. Decision:  Propose Modification
      b. Date: 2/7/13
      c. Comment:

     See attached memo.

B. <u>Policy Announced to Parties for Positions</u>

   1. **BP**
      a. Decision:  Propose Modification
      b. Date: 4/23/13
      c. Comment:

     BP agrees with how draft Policy No. 380 proposes to allocate the Wetlands Real Property Compensation Amount between a usufructuary and a naked owner - i.e., the compensation amount will be allocated based on the period of legal possession by the usufructuary and the naked owner.  The policy, however, uses the term Eligible Claimant in a way that is inconsistent with the definition of Eligible Claimant in the Wetlands Framework, and, thus, BP respectfully requests that Policy No. 380 be revised slightly to ensure it is consistent with the definition of Eligible Claimant in the Wetlands Framework.

   2. **Class Counsel**
      a. Decision:  Defer to Claims Administrator
      b. Date: 4/23/13
      c. Comment: N/A

C. <u>Policy Reissued to Parties for Final Positions</u>

   1. **BP**
      a. Decision:  Defer to Claims Administrator
      b. Date: 4/24/13
      c. Comment:

BP would like to designate the revised Policy Announcement 380 as Defer to Claims Administrator Decision.

**2. Class Counsel**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  4/24/13
   c. Comment:  N/A

EXHIBIT B-2

At the January 3, 2013 Wetlands meeting with the Claims Administrator, Class Counsel, and BP, Mr. Juneau requested that Rose LeBreton draft a memorandum analyzing whether, in the case of a wetlands claim for an Eligible Parcel subject to a usufruct, the usufructuary or the naked owner is entitled to receive the Wetlands Real Property Compensation Amount. Miss LeBreton issued her memorandum on January 9, 2013 and BP was asked to provide comments by today.

BP's position is that the Wetlands Framework clearly addresses this issue. Under the Wetlands Framework, Eligible Claimants are defined as "owners of Eligible Parcels during the time period April 20, 2010 to [the date of the Settlement Agreement]." (Wetlands Framework § 1. A.) Since the usufructuary and the naked owner are both owners, they are both Eligible Claimants under the Wetlands Framework. Where there is more than one Eligible Claimant for an Eligible Parcel, as there is where an Eligible Parcel is subject to a usufruct, the Wetlands Framework specifically addresses how the Wetlands Real Property Compensation Amount should be allocated: "allocation shall be determined by dividing the Wetlands Real Property Compensation Amount by the number of days between April 20, 2010, and [the date of the Settlement Agreement] and then multiply the result by the number of days each Eligible Claimant had legal possession of the Eligible Parcel." (Wetlands Framework, § 2. E. ii.) Assuming that the usufruct was not terminated during the eligible time frame, the usufructuary is the party in legal possession of an Eligible Parcel and is thus entitled to the Wetlands Real Property Compensation Amount pursuant to the Wetlands Framework. Accordingly, BP agrees with Ms. LeBreton's conclusion that the Wetlands Real Property Compensation Amount should be paid to the usufructuary, and not the naked owner, provided that the usufruct was not terminated during the eligible time period. If the usufructuary is paid the Wetlands Real Property Compensation Amount, the usufructuary would retain its duties under state law to the naked owner and the naked owner would retain its state law rights related to the Eligible Parcel subject to the usufruct and would have a right to an accounting upon termination of the usufruct.

While BP agrees with the ultimate conclusion in Ms. LeBreton's memorandum regarding payment of the usufructuary, BP does wish to state that it disagrees with the memorandum's reliance on Louisiana law to arrive at the conclusion as opposed to the text of the Wetlands Framework which is controlling. Moreover, and as a general matter, we disagree with the position expressed in the memorandum that the correct interpretive approach to the settlement agreement is that if a term is undefined, the Claims Administrator has the authority to choose any method to interpret the term. It is BP's position that there are, instead, many legal tools that can and must be applied to interpret the meaning of the Settlement Agreement where appropriate.

In addition, because of the unique nature of the usufruct issue, BP requests that the Settlement Facility propose to the Court that it enter an order regarding the following: i) both the naked owner and the usufructuary are members of the Economic and Property Damages Settlement Class; ii) Section 2. E. ii. to Ex. 12 A to the Economic and Property Damages Settlement Agreement provides for the allocation of the Wetlands Real Property Compensation Amount where an Eligible Parcel under Ex. 12 A to the Economic and Property Damages Settlement Agreement is subject to a usufruct; iii) the naked owner retains whatever are its state law rights with respect to the usufructuary; and, iv) notice was sufficient to both usufruct and naked owner. I attach a draft of the such an order which the Settlement Facility can propose to the Court.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater | * | **MDL No. 2179** |
| Horizon" in the Gulf of Mexico, | * | |
| on April 20, 2010 | * | **Section: J** |
| | * | |
| This filing relates to: *All Cases* | * | **Honorable Carl J. Barbier** |
| | * | |
| (Including Civil Action No. 12-970) | * | **Magistrate Judge Shushan** |
| | * | |
| | * | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**[PROPOSED] ORDER REGARDING ELIGIBLE PARCELS UNDER EXHIBIT 12 A TO
THE ECONOMIC LOSS AND PROPERTY DAMAGE SETTLEMENT AGREEMENT
SUBJECT TO A USUFRUCT**

CONSIDERING the joint motion of Class Counsel and BP, the Economic and Property

Damages Settlement Agreement, and the record in these proceedings:

IT IS HEREBY ORDERED:

1.      In this Order, undefined capitalized terms have the meaning ascribed to them in

the Economic and Property Damages Settlement Agreement and its exhibits as embodied in the

Court's consent decree approving and incorporating the terms of that voluntary settlement into

the consent decree. *See* Order and Judgment Granting Final Approval of Economic and Property

Damages Settlement and Confirming Certification of the Economic and Property Damages

Settlement Class (Rec. Doc. 8139) (Dec., 21, 2012).

2.      Where an Eligible Parcel under Ex. 12 A to the Economic and Property Damages

Settlement Agreement is subject to a usufruct, both the usufructuary and the naked owner are

members of the Economic and Property Damages Settlement Class.  This is because Ex. 12 A to

the Economic and Property Damages Settlement Agreement defines Eligible Claimants as

"owners of Eligible Parcels during the time period April 20, 2010 to [the date of the Settlement

Agreement]," and both the naked owner and the usufructuary of an Eligible Parcel subject to a usufruct are owners of that Eligible Parcel.

3.      Section 2. E. of Ex. 12 A to the Economic and Property Damages Settlement Agreement provides for the allocation of the Wetlands Real Property Compensation Amount, including where an Eligible Parcel under Ex. 12 A to the Economic and Property Damages Settlement Agreement is subject to a usufruct. The naked owner of an Eligible Parcel retains its state law rights with respect to the usufructuary and thus the naked owner also retains any potential state law-based rights existing at the termination of the usufruct that the naked owner may possess concerning any Wetlands Real Property Compensation Amount paid to the usufructuary under the Economic and Property Damage Settlement Agreement. In short, the Settlement Agreement leaves state law ownership rights over Eligible Parcels as it finds them.

4.      The Class Notice and Class Notice Plan satisfied and continue to satisfy the applicable requirements of the Federal Rules of Civil Procedure 23(c)(2)(b) and 23(e), the Class Action Fairness Act (28 U.S.C. Sec. 1711 et seq.) and the Due Process Clause of the United States Constitution (U.S. Const. amend. V), constituting the best notice that is practicable under the circumstances of this litigation, including with respect to the naked owner and the usufructuary of an Eligible Parcel under Ex. 12 A to the Economic and Property Damages Settlement Agreement subject that is subject to a usufruct. All types of legal "owners" within the meaning of Ex. 12 A were on notice that they were being included as class members. And nothing in the Settlement Agreement or the Class Notice and Class Notice Plan indicates that the Settlement Agreement or any order of this Court approving it would cause state ownership rights to be redefined.

2

**SIGNED AND ENTERED** this _____ day of _____, 2013.


_____
United States District Judge

3

EXHIBIT B-2

**MEMO**

| | |
|---|---|
| To: | Christine Reitano |
| From: | Aaron Ahlquist |
| | Caroline Fayard |
| | on behalf of Class Counsel |
| Date: | February 7, 2013 |
| Re: | Class Counsel's Response to BP's Memo dated January 31, 2013 |
| cc: | Chris Esbrook, BP |
| | Jim Roy |
| | Steve Herman |
| | Calvin Fayard |
| | Joe Rice |
| | John Baden |

-

Dear Christine,

Class Counsel has reviewed BP's Memo to the Claims Administrator dated January 31, 2013 addressing two principal items, a) the Claims Administrator's use of a 2011 Tax Assessment Notice; and b) the proper payee of a Wetlands compensation amounts on property subject to a usufruct.  In response Class Counsel submits the following:

**A. Use of the 2011 Tax Assessment Notice**

There is a discrepancy between the Wetlands Compensation Framework as contained in Exhibit 12A of the Settlement Agreement, which *nowhere* makes mention of the 2011 tax assessment as required document (see also Appendix F, Document requirements), and the Wetlands Claim Form and Instructions booklet which lists this document as being required of Claimants.

As a threshold matter it is Class Counsel's considered position that the text of Settlement Agreement and its related Exhibits control.  This is true irrespective of what the Claim Form or Instruction Booklet states.  To that end Class Counsel does *not* agree that the 2011 tax assessment is required or should be, and in fact Class Counsel *never consented* to its inclusion.[1]

---

[1] BP in its proposal regarding the use of the 2011 tax assessment states, "During the last moments of the settlement negotiations, the time period cut off for eligible claimants in the Wetlands Framework was changed from December 31, 2010 to "the date of the Settlement Agreement" to accommodate a request from Class Counsel."  BP email submission to CA dated January 31, 2013. BP is correct on this point and the parties agreed that this change was to be made.  It was, and the Settlement Agreement, Exh. 12A Section 1.A., reads "Eligible Claimants shall be comprised of claimants who do not fall within the exclusions . . . and who were owners

Nevertheless, in keeping with the good faith intent of the parties, Class Counsel submitted a proposal in its January 31, 2013 submission to the Claims Administrator, in an attempt to try to work towards resolution of this issue.  Class Counsel stands by this proposal, and submits the following additional points in favor thereof:

BP attempts to cure its failure to include the 2011 tax assessment into its view of what should be required documents by holding Claimants to the standard of a non-consented to Claim Form rather than the text of the Settlement Agreement.  However, in doing so BP now conflates the intent of the Settlement Agreement and its use of tax assessments.

First, BP argues that the 2011 tax assessment is a necessary required document, despite the fact that Appendix F to Exhibit 12A makes no mention of same. See Appendix F, Document Requirements, Exh. 12A.

Second, BP now argues that the 2011 assessment is some how needed to prove eligibility of a claimant "since the period of eligibility under the Wetlands Framework is nearly two years long, it is certainly possible that an owner of an Eligible Parcel could have sold his or her parcel at some point during that time." Yet BP has already agreed in a joint letter to Mr. Juneau from Class Counsel and BP dated July 10, 2012 "there is no requirement in the Wetlands Framework that an individual must be named on the tax bill in order to be eligible for compensation." See Section I. Proof of Wetlands Parcel Ownership (memo previously provided by BP in its February 7, 2013 response to Class Counsel's January 31, 2013 memo). Indeed both parties as well as the Claims Administrator and his assorted experts, have admitted that one cannot legally rely on tax assessments in Louisiana to prove ownership.   Under the framework eligibility turns on ownership and ownership turns on possession of a deed, a judgment of possession, or other title-conveying document—*not a tax assessment.* [2]

BP is correct when it says: "the Wetlands Framework, specifically contemplates situations in which an owner of a Eligible Parcel sold his or her parcel during the eligible time frame.  In such a case, where there are two owners of an Eligible Parcel that each own it for different time periods, the Framework provides that the "Wetlands Real Property Compensation Amount shall be allocated based on the period of legal

---

of Eligible Parcels during the time period April 20, 2010 to [the date of the Settlement Agreement]."  Importantly, however, Class Counsel *never consented* to the Claims Form or the Instructions Booklet being modified to include the 2011 Tax Assessment as a *required* document. Rather this change was made on an ex parte basis, via Saturday morning conference call, with only Brown Greer and BP attending. Please see attached email, Exhibit 1.

[2] Additionally, BP's concern about a claimant having sold their parcel is best answered by examination of a deed or other title documents

possession of the particular Eligible Parcel by each Eligible Claimant between April 20, 2010, and [April 18, 2012]."

However it is not "necessary for Settlement Facility to review the 2011 property tax assessment notice to determine whether, and during what time period, a claimant owned an Eligible Parcel," as any change in ownership would be indicated via examination of title. BP's stated goal of "paying the right claimant and [preventing] double payment" is not answered by requiring the 2011 property tax notice.

In any event, Class Counsel has no objection to the Claims Administrator independently procuring the 2011 notice if, *in the Claims Administrator's discretion*, the Claims Administrator deems review of such a notice to be informative. However, per its previous proposal as to the use the of the 2011 tax assessment by the Claims Administrator, in no way should the Claims Administrator's review of this non-required document delay, impede, or otherwise impair processing of wetlands claims.

Accordingly Class Counsel would urge the Claims Administrator to take heed of the parties' previous joint request, per their July 10, 2012 joint submission, wherein reviewers are to be instructed ". . . that they *do not require* that a claimant be named on the tax bill in order to be eligible for compensation and that they *do not deny a claim* solely on the basis that a claimant is not listed on the property tax assessment or deed." See Section III. 1 (emphasis added).

Class Counsel would similarly urge adoption of its previous proposal on this issue per its January 31, 2013 submission to the Claims Administrator.

### B. Class Counsel's Response to BP's January 31, 2013 Proposal re: Usufructs

BP has taken the position that both Naked Owners and Usufructuaries are class members, owners, and unless otherwise excluded, both qualify as eligible claimants under the Settlement Agreement. See Exh. 12A, Section 1.A. Although BP considers both to be eligible claimants, BP submits that Usufructuaries have the superior claim for compensation. Specifically, Usufructuaries should get paid over Naked Owners. The Usufructuary would then be subject to any duties and obligations to the Naked Owner arising under Louisiana state law that payment would create. Put another way, BP would have the Claims Administrator pay the Usufructuary with the Naked Owner's recourse for compensation being state law claims against the Usufructuary.

To support its position, however, BP does *not* rely on the LeBreton memo dated January 9, 2013 and subsequently adopted by the Claims Administrator. Rather, BP locates this authority in Section 2.E.ii of the Wetlands compensation framework. BP argues that under the Framework, any money owed on an eligible parcel would be pro-rated as between Naked Owner and Usufructuary, depending on the time each claimant

was in "legal possession" of the parcel.  Importantly the term "legal possession" is not defined in the agreement.

BP further proposes that the Claims Administrator seek an Order from the Court validating BP's approach.

Class Counsel has the following concerns with the position taken by BP relating to claims of Usufructuaries and Naked Owners:

1.      Class counsel notes a contradiction in BP's position as to what law should apply. In the first instance BP wants the Settlement Agreement to control whom the Claims Administrator should pay, and now seeks a Court order to that effect. However, in the second instance, BP points to Louisiana state law in its argument about the recourse available (if any) to the Naked Owner.  BP argues that Louisiana state law implicitly protects any claims of the Naked Owner as against the holder of the usufruct in that the Usufructuary would still be subject to any duties and obligations under state law it owes to the Naked Owner, including an accounting, etc.  See LeBreton memo, pp. 6-8.[3]

Thus, in a situation where a Naked Owner files a claim on a property, but the Usufructuary never does, this proposal by BP would mean the property claim would go completely uncompensated.   Class Counsel finds this possibility unacceptable since, under the terms of the Settlement Agreement, and, as admitted by BP, the Naked Owner is also an  "owner." If, as BP argues, the terms of the Settlement Agreement alone apply (and not state law), then a Naked Owner's claim should be compensable on its face and pursuant to the explicit terms of the Settlement Agreement, as the settlement language clearly envisions compensation going to "owners," naked or otherwise.[4]

---

[3] Class counsel notes that while Louisiana law may indeed provide rights and remedies as between the Naked Owner and his usufructary, it says nothing of protecting the rights and remedies of a Naked Owner as to BP.

[4] In some cases, the only way a Usufructuary may be identified is through proactive research by Rose Lebreton or her team.  Class Counsel believes that this exceeds her mandate to determine ownership of title and deny payment to otherwise compensable wetlands property. While the Settlement Agreement provides "[t]he Claims Administrator shall determine whether an Eligible Claimant(s) is the owner of an Eligible Parcel," see Exhibit 12A,Section 1.A.i., class counsel submits that  the scope of this authority was intended to be strictly limited to making "ownership" determinations as opposed to "possession" determinations. Similarly Class Counsel also objects to the contention in the LeBreton memo of January 9, 2013 wherein it is stated that in the absence of a term being defined, authority vests in the Claims Administrator to determine the meaning of the term.  See LeBreton memo, page 2, Section IV.

While class counsel does not advocate double recovery, we certainly advocate for compensable claims being paid – whether to a Naked Owner with an absent usufruct, or to a usufruct, or some combination thereof.

Class Counsel does not know what constitutes "legal possession" as used in the Settlement Agreement. BP now seeks to rely on this term to pay only usufructuaries. The LeBreton memo does not address this issue, but instead focused on the fact that they are both types of ownership under Louisiana law, and the rights and remedies between them.

2. An important component of compensation is the RTP multiplier applied to wetlands payments. This multiplier compensates for, among other things, the risk of future damages. Class Counsel has concerns with paying a usufructuary for damages that may arise after the termination of the usufruct and thus would rightfully belong to the Naked Owner.

Class Counsel also has concerns for the Class as a whole as a result of BP's proposal. Class Counsel does not see how a Usufructuary can release the claims of a Naked Owner. Again, BP argues that both the usufructuary and the Naked Owner are class members and have claims. Thus Class Counsel believes, at a minimum, unless a Naked Owner is on the release, their claims are reserved and not impaired. Correspondingly if, as BP asserts, a Naked Owner is *not* entitled to wetlands compensation through the Settlement, then they are *not* in class and their claims are *reserved*.

For the foregoing reasons, Class Counsel has significant reservations with involving the Court at this stage, and does not support a Court Order. Instead we would rely upon the discretion and informed decisions of the Claims Administrator in handling payments on these claims.

EXHIBIT B-2

# DEEPWATER HORIZON
## CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 253 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information | |
|---|---|

| Policy Subject | Proof of Ownership of Parcel | | |
|---|---|---|---|
| **Active Date** | 9/20/12 | **Policy Impact** | ☒All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | Exhibit 12A, Appendix F, Section 1 | |
| **Affected Claim Types and/or Review Processes** | | Wetlands | |

| II. Approved Policy |
|---|

Exhibit 12A, Section 1.A of the Settlement Agreement requires that the claimant be an owner of an Eligible Parcel during the period from April 20, 2010, to April 18, 2012.  If the claimant owned the Eligible Parcel for the entire time period, the claimant must submit the deed and both 2010 and 2011 Tax Assessments to prove ownership.  To prove ownership, the Claims Administrator proposed to the Parties that the Program require a deed and either the 2010 or 2011 Tax Assessment, but not both the 2010 and 2011 Tax Assessments.  The Parties did not agree to that proposal and instead directed the Claims Administrator to attempt to locate this proof by researching and uploading tax assessments for all parcels, regardless of whether the parcel is in the Wetlands Claim Zone.  If the parcel is not in the Wetlands Claim Zone, the Claims Administrator sends the claim to the mapping vendor for its analysis.  For deeds, if the parcel is in the Wetlands Claim Zone, the Claims Administrator uses the services of local counsel to research and upload the applicable deed.

EXHIBIT B-2

## Policy 253: Proof of Ownership of Parcel

Comments and Decisions by the Parties:

1. **BP**
   a. Decision: Defer to Claims Administrator
   b. Date: 4/16/13
   c. Comment:

   BP is fully on board with an interpretation of the wetlands and coastal frameworks such that: (a) If a deed / tax assessment is available online, the Settlement Program can pull the document from the website rather than seek to obtain it from a claimant who failed to provide it. This includes having the Settlement Program pay subscription fees required to access the online deed databases maintained by LA parishes. (b) If a deed / tax assessment is not available online, BP is of the view that for pro se claimants where it appears that the claimant's parcel is likely in the zone (e.g. based on the physical address, information in the Claims Administrator's database. a provided legal description, or a review of the tax assessment), the Settlement Program should consider sending an experienced person (e.g. a title attorney, an abstractor, an appraiser or a trained member of the wetlands review team) to obtain a copy in person rather than require the claimant to obtain the document. As we discussed, where a claimant is represented by the counsel, the Settlement Program would contact the attorney, provide the information in the attached charts on how to obtain the document missing from his client's claim file, and request that the attorney go get the missing document. (c) If a deed / tax assessment is not available online, and it is not likely the parcel is in the wetlands zone, as contemplated the wetlands and coastal frameworks, the Settlement Program should contact the claimant, provide the information in the attached charts on where to go to obtain a copy, and request the claimant to provide the missing document. (d) As the Settlement Program is well aware, it is important that the wetlands team for the Settlement Program review the correlation of the deed, assessments, and other ownership information very carefully. There are instances in which the legal description of the property contained in the tax assessment may not match up with the deed, e.g. assessment has a truncated description, or assessor did not updated record to account for a subdivision. There are instances in which the deed on file may not account for the actual current owners of a property, e.g. the failure of heirs to start a succession. (9/20/12); Classify as CA Decision. (4/16/13)

2. **Class Counsel**
   a. Decision: Defer to Claims Administrator
   b. Date: 4/2/13
   c. Comment:

   Can be promulgated as CA Decision. (1/30/13); Should be published as a CA Decision. (4/2/13)

EXHIBIT B-2

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-444 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

| **I. Profile** | | | |
|---|---|---|---|
| **Subject** | Deeded Timeshares | | |
| **Active Date** | 6/19/13 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | Section 2 of Exhibit 11A | |
| **Affected Claim Types and/or Review Processes** | | Coastal | |

| **II. Summary** |
|---|
| Please see attached memo. |

## COASTAL REAL PROPERTY CLAIMS: DEEDED TIMESHARES

## I.    Introduction.

The Coastal Compensation Framework is predicated on using the 2010 Appraised Value of each Eligible Parcel as the basis for calculating the Coastal Compensation Amount. Section 2 of Exhibit 11A to the Deepwater Horizon Economic and Property Damages Settlement Agreement ("Settlement Agreement") requires the Claims Administrator to:  (1) calculate the Coastal Compensation Amount by multiplying the 2010 County Appraised Value by 1.18%, to get the 2010 Applicable Property Tax; and (2) then multiply the 2010 Applicable Property Tax by the Applicable Compensation Percentage (30%, 35%, 40% or 45%).  The Claims Administrator will award a minimum compensation amount to an Eligible Parcel if it has a County Land Use Designation listed in Appendix I to Exhibit 11A and the Coastal Compensation Amount is below the predetermined amounts described in Section 2.E.i. of Exhibit 11A.

The Claims Administrator identified certain Florida counties in the Coastal Real Property Claim Zone that either do not assign 2010 Appraised Values or assign an Appraised Value of zero to deeded timeshare interests.  Instead, these counties assign a 2010 Appraised Value to the entire building and tax the timeshare management company instead of the owners of the deeded timeshare interests.  The timeshare management company then bills each deeded timeshare owner for his or her proportional share of the 2010 taxes.  This method of valuation by counties results in $0.00 awards for deeded timeshare claims if the Parcel is not eligible for minimum compensation as described in Section 2.E of Exhibit 11A of the Settlement Agreement.  For those counties that do not provide Appraised Values to deeded timeshare interests, the Claims Administrator must determine whether he will:  (1) calculate an Appraised Value to the deeded timeshare Parcels based on the taxes assigned to the owners by the timeshare management company; or (2) use the 2010 Appraised Value assigned by the county where the timeshare parcel is located, even if it is zero.

## II.    Policy Statement.

The Claims Administrator will use the 2010 Appraised Value assigned to the Parcel by the county where the timeshare is located as described in Sections 2.C. and 2.D. of Exhibit 11A to the Settlement Agreement.  The Claims Administrator will determine the Coastal Compensation Amount using the formula described in Section 2 of Exhibit 11A to the Settlement Agreement, which may result in an Eligibility Notice of zero if the Parcel is not eligible for the minimum compensation described in Section 2.E of Exhibit 11A of the Settlement Agreement.  If a deeded timeshare Parcel is eligible for the minimum compensation, the Claims Administrator will divide the calculated Coastal Compensation Amount by the number of shares sold by the timeshare management company for a particular unit and pay each deeded timeshare owner his or her proportional interest.

1

## Policy 444:  Deeded Timeshares

Comments and Decisions by the Parties:

**A.  Requested Input from Parties**

   **1.  BP**
      a.  Decision:  Oppose
      b.  Date:  5/8/13
      c.  Comment:

     Please see attached memo.

   **2.  Class Counsel**
      a.  Decision:  Defer to Claims Administrator
      b.  Date:  5/8/13
      c.  Comment: N/A

**B.  Policy Announced to Parties for Positions**

   **1.  BP**
      a.  Decision:  Defer to Claims Administrator
      b.  Date:  6/19/13
      c.  Comment: N/A

   **2.  Class Counsel**
      a.  Decision:  Defer to Claims Administrator
      b.  Date:  6/13/13
      c.  Comment: N/A

EXHIBIT B-2

TO:            Patrick Juneau, Claims Administrator

FROM:        BP

DATE:        May 7, 2013

CC:            Class Counsel

RE:            BP Response to Claims Administrator Request for Input - Policy Request ID #
               425 - Coastal Real Property:  How to Calculate Claims for Deeded Timeshare
               Interests

_____

        BP appreciates the opportunity to respond to the Settlement Program's request for input regarding Proposed Policy No. 425.  BP requests that the Claims Administrator reconsider this proposed policy regarding timeshare units because it is inconsistent with the plain language of the Coastal Framework.  Under the proposal, the Claims Administrator will make up a formula and create the Settlement Program's own County Appraised Value for a timeshare parcel even though the Settlement Agreement is clear that the Claims Administrator must use the County Appraised Value determined by the respective County Tax Assessor.

        A parcel's "County Appraised Value" is used in the calculation of the Coastal Real Property Compensation Amount. (Settlement Agreement Ex. 11A, §2. C.)  "County Appraised Value" is a defined term in the Settlement Agreement, and it is defined as the value placed on an Eligible Parcel by the County Tax Assessor of the particular county where the Eligible Parcel is located. (Settlement Agreement Ex. 11A, §2. D.)  Because different counties within the Coastal Real Property Zone use different terms to describe a parcel's appraised value, Section 2. D. explicitly defines "County Appraised Value" as the term each County uses to describe a parcel's appraised value. (Settlement Agreement Ex. 11A, §2. D.)  For example, "[f]or an **Eligible Parcel** located in the Florida counties of Escambia, Okaloosa, Santa Rosa, Walton, Bay, Gulf, Franklin and Wakulla, **County Appraised Value** shall mean Just Value as determined by the respective Florida County tax assessor." (*Id.*)(emphasis in original).  The timeshare parcels implicated by Proposed Policy No. 425 are located in Okaloosa County, Florida.  Accordingly, the Settlement Agreement clearly defines County Appraised Value as "Just Value" as determined by the Okaloosa County tax assessor, and the Claims Administrator must use that value in determining the Coastal Real Property Compensation Amount. (*Id.*).  Thus, Proposed Policy 425 is contrary to the express definition of "County Appraised Value" set forth in the Coastal Framework.

        This proposed policy, however, may be driven by a misunderstanding regarding the County Appraised Value of timeshare units.  A question on this issue, provided as Proposed Policy No. 310 in the policy compendium, seemed to assume that timeshare units do not have a 2010 County Appraised Value determined by the County Tax Assessor.  This is not the case.  Timeshare units do have a 2010 County Appraised Value determined by the County Tax Assessor and thus the Claims Administrator must use that value to determine the Coastal real Property Compensation Amount under Section 2 of the Coastal Framework.

EXHIBIT B-2

In some cases, the 2010 County Appraised Value determined by the County Tax Assessor for timeshare units may be zero. In that case, the Settlement Facility should calculate compensation for Eligible Parcels, including parcels that are owned in timeshare, consistent with Section 2 of the Coastal Framework. Specifically, if an Eligible Parcel has a 2010 County Appraised Value of zero, the calculation method provided in Section 2 of the Coastal Framework will result in a zero. However, the Coastal Framework also provides that "an Eligible Parcel with a County Land Use Designation listed in Appendix I shall be entitled to the greater of (i) calculation in 2. B. above or (ii) a minimum compensation as detailed below." (Settlement Agreement Ex. 11A, §2. E.) Accordingly, if the Eligible Parcel owned in time share has a County Land Use Designation listed in Appendix I, then it will be entitled to the minimum payments provided in Section 2. E. i. of the Coastal Framework. In that case, the coastal compensation for the Eligible Parcel will be allocated amongst the time share owners (provided they are Eligible Claimants) based on the allocation rules in Section 2. F. of the Coastal Framework which provides "For an Eligible Parcel for which there are more than one Eligible Claimants, the Coastal Real Property Compensation Amount shall be allocated based on the period of legal possession of the particular Eligible Parcel by each Eligible Claimant between April 20, 2010 and December 31, 2010." (Settlement Agreement Ex. 11A, §2. F.)

EXHIBIT B-2

**DEEPWATER HORIZON
CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-366 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

### I. Profile

| Subject | Coastal Real Property: How to Calculate Claims for Deeded Timeshare Interests | | |
|---|---|---|---|
| **Active Date** | 4/23/13 | **Policy Impact** | ☐All Claims Regardless of Active Date<br>☑All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | | |
| **Affected Claim Types and/or Review Processes** | | Coastal | |

### II. Summary

The Claims Administrator ("CA") will determine the 2010 Appraised Value of individual timeshare units based on their share of the 2010 Property Taxes paid for the entire facility.  First, the CA calculates the taxes paid per unit (C) by multiplying the taxes paid be each timeshare owner (A) by the number of timeshares per unit (B).  Second, the CA calculates each unit's share of the 2010 taxes (E) by dividing the total 2010 Taxes paid on the building (D) by the taxes paid per unit (C).  Third, the CA multiplies the unit's share of the 2010 taxes (E) by the 2010 Appraised Value for the building (F) to determine the 2010 Appraised Value of the individual unit (G).  The formula looks like this:

Taxes paid per unit (C):                        A x B = C
Each unit's percent share of taxes (E):        C ÷ D = E
Individual unit's 2010 Appraised Value (G):    E x F = G

The Individual Unit 2010 Appraised Value is then used to calculate the Coastal Real Property Compensation Amount for the submitted claim.

EXHIBIT B-2

**Policy 366 v.1: Coastal Real Property: How to Calculate Claims for Deeded Timeshare Interests
(Superseded by Policy 444)**

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment: N/A

   Classify as CA Decision. (4/16/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/2/13
   c. Comment:

   Should be published as a CA Decision. (4/2/13)

EXHIBIT B-2



| Pol-366 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

### I. Profile

| Subject | Coastal Real Property: How to Calculate Claims for Deeded Timeshare Interests | | |
|---|---|---|---|
| **Active Date** | 12/16/12 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | Exhibit 11A, Section 2.C | |
| **Affected Claim Types and/or Review Processes** | | Coastal | |

### II. Summary

We need to decide how to calculate payment amounts for Coastal Real Property claims for deeded timeshare interests with no assigned 2010 County Appraised Value.  Normally, under Exhibit 11A, we calculate the Coastal Compensation Amount by multiplying the 2010 County Appraised Value by 1.18%, to get the 2010 Applicable Property Tax.  Then we multiply that 2010 Applicable Property Tax by the Applicable Compensation Percentage (30%, 35%, 40% or 45%) to get the Coastal Compensation Amount, to which we apply a 2.5 RTP to derive the Final Coastal Compensation Amount.  There are no 2010 County Appraised Values for these deeded timeshares because the county assesses taxes against the entire building and not to each separate timeshare interest.  The missing 2010 County Appraised Value prohibits us from applying the standard Coastal formula.

Exhibit 11A also provides for a minimum Coastal Real Property Compensation Amount of $1,000, $1,100, or $800, depending on the Compensation Category, that we are to use when a Parcel or Deeded Boat Slip has a Residential County Land Use Designation.  The issues are whether we use this minimum amount for timeshare owners, or whether we develop an alternative method to calculate their losses.  We are processing one claimant with this deeded timeshare issue and anticipate more similarly-situated claimants because this facility has 125 units, each with eight fractional timeshare interests.

EXHIBIT B-2

**Policy 366 v.0: Coastal Real Property: How to Calculate Claims for Deeded Timeshare Interests (Superseded by Policy 366 v.1)**

Comments and Decisions by the Parties:

1. **BP**
   a. Decision: Defer to Claims Administrator
   b. Date: 4/16/13
   c. Comment:

   BP objects to making this policy available publicly on the ground that the policy was not previously presented to BP for comment. The Claims Administrator has implemented a procedure for soliciting Party input and then engaging in a process to attempt to obtain agreement on policy issues. It does not appear that this process has taken place with regard to this policy. Accordingly, it is premature to publish this policy until the Claims Administrator completes the procedure for review, comment and discussion among the Parties.

2. **Class Counsel**
   a. Decision: Defer to Claims Administrator
   b. Date: 4/2/13
   c. Comment:

   Needs to be harmonized as a CA Interpretation with Nos. 51, 134, 165 and 180.(Note, however, that when a business is unable to allocate payroll, the claimant is given a default or incomplete notice, when the Program should just do the best they can, as claimant just cannot do so. Number 62 read together with number 51 indicates (correctly) that the Program is going to allocate, but, based on our experience, they are not doing it.) (1/30/13); Appears to be Superseded by No. 367. (4/2/13)



VOO CHARTER PAYMENT

EXHIBIT B-2

# DEEPWATER HORIZON
## CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 353 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information | | |
|---|---|---|
| **Policy Subject** | VoO MVCAs and Recognized Charterers | |
| **Active Date** | 3/27/13 | **Policy Impact** ☑All Claims Regardless of Active Date ☐All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision |
| **Settlement Agreement Reference** | | Section 38.165 and Section 38.17 |
| **Affected Claim Types and/or Review Processes** | | VOO Charter Payment |

| II. Approved Policy |
|---|

EXHIBIT B-2

Section 38.165 of the Settlement Agreement defines a VoO Master Vessel Charter Agreement ("VoO MVCA") as "the standard agreements utilized by BP and its agents or subcontractors to charter the vessels available for work or service in connection with the VoO program." Section 38.17 of the SA defines "Charterer" as "BP, Lawson, USMS, USES, DRC, or any other subcontractor utilized by BP to implement the VoO Program."

Before we began reviewing VoO Charter Payment claims, BP provided the Claims Administrator with VoO data including participant names and vessel information. The data includes information from the subcontractors listed in Section 38.17: Lawson, USMS, USES and DRC. When reviewing a VoO claim, we first look to the data to determine whether the claimant executed a VoO MVCA for the claimed vessel. If the data lists the claimed vessel and the claimant's name, we presume that the claimant executed a VoO MVCA for that vessel. If the data does not list the claimant or vessel, we review the submitted documents to determine if the claimant submitted a fully executed VoO MVCA listing the claimed vessel.

On 2/6/13, Claims Administrator announced the policy that VoO MVCAs are specific contracts used in the VoO program that state that the vessel shall be employed for the Charterer's use as a "vessel of opportunity" and contain specific language and payment terms that gave rise to contract claims in the VoO Charter litigation. The Claims Administrator will extend that policy to apply to any clean-up contract presented by a claimant that has these distinguishing features to meet the requirements of a VoO MVCA defined in Section 38.165:

(1) The contract must state that the vessel shall be employed for the Charterer's use as a "vessel of opportunity;"

(2) The contract must measure vessel length by "Length Over All;"

(3) The date of the contract must be before the VoO program ended (11/26/10), according to BP; and,

(4) The contract must contain this daily rate payment structure based on vessel length:

       Vessel Length Daily Rate
1.  >65 feet $3,000/24 hour day
2.  >45 – 65 feet $2,000/24 hour day
3.  >30 – 45 feet $1,500/24 hour day
4.  <30 feet $1,200/24 hour day
5.  Crewmember $200/8 hour day

The Claims Administrator will not limit the potential Charterers that granted clean-up contracts to the four companies identified Section 38.17, provided the claimant executed a contract issued by a BP contractor or subcontractor that meets the requirements of a VoO MVCA.

EXHIBIT B-2

## Policy 353: VoO MVCAs and Recognized Charterers

Comments and Decisions by the Parties:

### A. Requested Input from Parties

**1. BP**
  a. Decision: Defer to Claims Administrator
  b. Date: 3/5/13
  c. Comment:

  See attached.

**2. Class Counsel**
  a. Decision: Defer to Claims Administrator
  b. Date: 3/5/13
  c. Comment:

  Pursuant to the terms of the Settlement Agreement, and in accordance with your Policy Decision #341, any entity ("Charterer") that entered into a VoO Master Vessel Charter Agreement ("MVCA") with a claimant constitutes an "other subcontractor utilized by BP to implement the VoO Program." The Settlement Agreement is not based on the identity of the particular charterer. Indeed, as written, it includes any and all charterers that were engaged in the VoO program. SA, Section 38.17. The parties identified several specific charterers (in addition to BP) that were well-known to the parties as sub-contractors that assisted BP in implementing the VoO program. But the parties understood that other sub-contractors were utilized, and that the list of VoO Charterers was substantially longer than the four examples that were identified in the Settlement Agreement for illustrative purposes. And it was intended that the Settlement would include all VoO MVCAs, regardless of the charterer. With respect to the list of 17 companies identified in your February 27th Request for Input, it is noteworthy that six entities are specifically identified in the Settlement Agreement as Released Parties. SA, Exhibit 20.2. As to the remaining 11 entities, if a claimant entered into a VoO MVCA with the one or more of those entities, under the plain language of the Settlement Agreement, they too are "other subcontractor[s] utilized by BP to implement the VoO Program." Class Counsel understood, agreed and intended that all VoO Charterers would be included – irrespective of whether that entity was specifically identified in the Settlement Agreement or in the BP Regional Oil Spill Response Plan. The inquiry should be simply whether the claimant has a valid VoO MVCA.

EXHIBIT B-2

**B.** <u>Policy Announced to Parties for Positions</u>

    **1.  BP**
        a.  Decision:  Defer to Claims Administrator
        b.  Date:  3/27/13
        c.  Comment:

    BP defers to the Claims Administrator's decision provided in this Policy Announcement but reserves its rights regarding the same.

    **2.  Class Counsel**
        a.  Decision:  Defer to Claims Administrator
        b.  Date:  3/27/13
        c.  Comment:  N/A

TO:        **Patrick Juneau, Claims Administrator**

FROM:      **BP**

DATE:      **March 5, 2013**

RE:        **BP'S Response To Claims Administrator's February 27, 2013 Request for Input From The Parties on Policy Issues Affecting Claims Administration**

BP has reviewed the Claims Administrator's February 27, 2013 memorandum requesting input from the parties regarding whether any of the 17 companies listed in the memorandum are "other subcontractor[s] utilized by BP to implement the VoO Program" within the meaning of Section 38.17 of the Settlement Agreement.  In answer to this question, BP responds that none of the 17 companies listed in the Claims Administrator's memorandum were subcontractors utilized by BP to implement the VoO program.  None of the 17 companies entered into VoO Master Vessel Charter Agreements with any claimants because none of the 17 companies were involved with the VoO program.

The scope of the response to the DWH incident was unprecedented.  During the response, separate and apart from the VoO program, BP utilized a great number of contractors and subcontractors to perform various spill response tasks.  Some of the 17 companies listed in the Claims Administrator's February 27 memorandum were used by BP for non-VoO related spill response efforts and some of those companies may have chartered vessels to assist them in performing whatever spill response activities BP requested.  However, none of the 17 companies used a VoO MVCA.  That is because none of those companies were used by BP at all to implement the VoO program.

Thus, the fact that a claimant may present a clean-up contract executed between it and one of the 17 companies listed in the Claims Administrator's memorandum does not make the claimant eligible for the VoO Charter Payment program.  These 17 companies had nothing to do with the VoO program, and therefore do not satisfy the definition of "Charterer" in 38.17.  Nor do the clean-up contracts such claimants may present constitute VoO MVCAs.

EXHIBIT B-2

# DEEPWATER HORIZON
# CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-364 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

### I. Profile

| Subject | Evaluating Multiple Claims for the Same Vessel | | |
|---|---|---|---|
| Active Date | 4/23/13 | Policy Impact | ☑ All Claims Regardless of Active Date<br>☐ All Claims Greater than Active Date |
| Type of Decision | | | Claims Administrator Decision |
| Settlement Agreement Reference | | | |
| Affected Claim Types and/or Review Processes | | | VOO Charter Payment |

### II. Summary

Only the person who signed the MVCA agreement may file a VoO Charter Payment claim on behalf of a vessel. This means that only one person may submit a claim and be paid on it for each vessel, as opposed to multiple parties being able to submit payable claims on behalf of one vessel. The Claims Administrator will compensate each vessel only once, regardless of the number of signatories or different contracts signed by the signatory. In the case of an inconsistency between the VoO data and the hard copy MVCA, the Claims Administrator will use the hard copy MVCA to determine the appropriate signatory.

## Policy 364 v.2: Evaluating Multiple Claims for the Same Vessel

Comments and Decisions by the Parties:

**1. BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment:

Should be published as a CA Decision. (4/16/13)

**2. Class Counsel**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/2/13
   c. Comment:

Should be published as a CA Decision. (4/2/13)

# DEEPWATER HORIZON
# CLAIMS CENTER
### ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-364 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

### I. Profile

| Subject | Evaluating Multiple Claims for the Same Vessel | | |
|---|---|---|---|
| **Active Date** | 8/2/12 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | | Agreed to by the Parties |
| **Settlement Agreement Reference** | | | 5.5.2<br>5.5.3 |
| **Affected Claim Types and/or Review Processes** | | | VOO Charter Payment |

### II. Summary

Only the person who signed the MVCA agreement may file a VoO Charter Payment claim on behalf of a vessel.   The Claims Administrator will compensate each vessel only once, regardless of the number of contracts or signatories.  In the case of an inconsistency between the VoO data and the hard copy MVCA, the Claims Administrator will use the hard copy MVCA to determine the appropriate signatory.

**Policy 364 v.1: Evaluating Multiple Claims for the Same Vessel
(Superseded by Policy 364 v.2)**

Comments and Decisions by the Parties:

1. **BP**
   a. Decision: Accept as a Final Policy
   b. Date: 3/27/13
   c. Comment:

   With respect to Example (1), BP agrees that a contract is only paid once and that the payment is to the MVCA signatory. In case of conflict between the portion of the database that lists the MVCA signatory and the actual MVCA, the MVCA governs. In all circumstances, the Claims Administrator has copies of the MVCA and should verify the database entry.

   With respect to Example (2), BP agrees with the recommendation to pay each vessel only once. (8/2/12); Agree. (2/11/13)

2. **Class Counsel**
   a. Decision: Accept as a Final Policy
   b. Date: 3/27/13
   c. Comment:

   Class Counsel defer to the recommendation.[4]

   [4] It may be that there are actually two different vessels, and the MVCAs have the wrong information. The Program might follow up with the claimant or his attorney to see whether a clarification and/or additional documentation can be provided.  (8/2/12); Can be promulgated as CA Decision. (1/30/13)

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-364 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

| I. Profile | | | |
|---|---|---|---|
| **Subject** | VoO Charter Payment Claims: MVCA | | |
| **Active Date** | 7/21/12 | **Policy Impact** | ☒All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | | Claims Administrator Decision |
| **Settlement Agreement Reference** | | | Sections 38.98 and 38.173 |
| **Affected Claim Types and/or Review Processes** | | | BEL |

| II. Summary |
|---|
| Only the person who signed the MVCA may submit a claim and be paid on it for each vessel.  This means that only one person may submit a claim and be paid on it for each vessel, as opposed to multiple parties being able to submit payable claims on behalf of one vessel. |

EXHIBIT B-2

**Policy 364 v.0: VoO Charter Payment Claims: MVCA
(Superseded by Policy 364 v.1)**

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Accept as a Final Policy
   b. Date:  4/16/13
   c. Comment:

   Agree. (2/11/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator
   b. Date: 4/2/12
   c. Comment:

   See No. 223. (1/30/13); Apparently superseded by No. 223. (4/2/13)

**DEEPWATER HORIZON
CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-370 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---------|----------------------------------------|

| I. Profile | |
|---|---|

| Subject | VoO Charter Payment Claims: Eligibility |
|---|---|
| Active Date | 4/23/13 | Policy Impact | ☐ All Claims Regardless of Active Date<br>☑ All Claims Greater than Active Date |
| Type of Decision | | | Claims Administrator Decision |
| Settlement Agreement Reference | | | |
| Affected Claim Types and/or Review Processes | | | VOO Charter Payment |

| II. Summary |
|---|

If a claimant is listed on the list of people who previously settled VoO Charter Payment claims with BP, the Claims Administrator will deny any VoO Charter Payment Claims submitted by the claimant without review. The Claims Administrator makes any such determination based on a list provided by a BP and does not have copies of the Releases themselves. As such, if a claimant appeals a determination on this basis, BP may need to present a copy of the Release from the previous settlement in its Appeal Proposal to verify this determination.

EXHIBIT B-2

## Policy 370 v.1: VoO Charter Payment Claims: Eligibility

Comments and Decisions by the Parties:

1. **BP**
   a. Decision: Defer to Claims Administrator
   b. Date: 4/16/13
   c. Comment:

   Classify as CA Decision. (4/16/13)

2. **Class Counsel**
   a. Decision: Defer to Claims Administrator
   b. Date: 4/2/13
   c. Comment:

   Should be published as a CA Decision. (4/2/13)

**DEEPWATER HORIZON**
## CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-370 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

### I. Profile

| Subject | VoO Charter Payment Claims: Eligibility | | |
|---|---|---|---|
| **Active Date** | 6/25/12 | **Policy Impact** | ☑ All Claims Regardless of Active Date<br>☐ All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | | |
| **Affected Claim Types and/or Review Processes** | | BEL | |

### II. Summary

If a claimant is listed on the list of people who previously settled VoO Charter Payment claims with BP, we will deny any VoO Charter Payment Claims submitted by the claimant without review.

## Policy 370 v.0: VoO Charter Payment Claims: Eligibility
## (Superseded by Policy 370 v.1)

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Accept as Final Policy
   b. Date:  4/16/13
   c. Comment:

   Agree. (2/11/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/2/13
   c. Comment:

   Okay, but if contested by the Claimant, BP should have to come forward with a copy of the Release. (1/30/13); Appears to have been superseded by No. 370. (4/2/13)



VESSEL PHYSICAL DAMAGE



**DEEPWATER HORIZON**
# CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-182 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

| I. Profile | | | |
|---|---|---|---|
| **Subject** | Vessel Physical Damage Claims: Eligibility | | |
| **Active Date** | 7/17/12 | **Policy Impact** | ☑ All Claims Regardless of Active Date<br>☐ All Claims Greater than Active Date |
| **Type of Decision** | | | Claims Administrator Decision |
| **Settlement Agreement Reference** | | | Exhibit 14.1.A.ii |
| **Affected Claim Types and/or Review Processes** | | | Vessel Physical Damage |

| II. Summary |
|---|
| Vessel damage claims resulting from work with Oil Spill Response Organizations and Oil Spill Removal Organizations (OSROs) are not eligible for compensation. We will use a list of ORSOs and VoO Contactors provided by BP to identify excluded claims. Our reviewers will compare a claimant's supporting documentation, including Master Vessel Charter Agreements, against this list to determine whether the claimant worked for an OSRO or the VoO Program. |

## Policy 182: Vessel Physical Damage Claims: Eligibility (Internal)

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Accept as Final Policy
   b. Date:  4/16/13
   c. Comment:

Oil Spill Removal Organization means an entity that provides oil spill response resources, and includes any for-profit or not-for-profit contractor, cooperative, or in-house response resources that have been established in a geographic area to provide required response resources." 40 C.F.R. § 112.2.  The acronym OSRO also is used for Oil Spill Response Organization.  Seems that the R" in OSRO sometimes is "removal" and sometimes "response."  (5/11/12); There is a list of OSROs on the U.S. Coast Guard website. (added to original answer 5/17/12); Agree. (2/11/13); Classify as CA Decision. (4/16/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/2/13
   c. Comment:

This appears to be a primarily internal administrative policy. We leave it to the Program's discretion what if anything, to communicate publicly. (4/2/13)