# INDIVIDUAL ECONOMIC LOSS CLAIMS

EXHIBIT B-5

| Table of Contents | |
|---|---|
| **Policy** | **Page(s)** |
| 1. | **Policy ID 142:  Individual Economic Loss Claims:  Moratoria** | **1-2** |
| 2. | **Policy ID 143:  Individual Economic Loss Claims:  Moratoria** | **3-4** |
| 3. | **Policy ID 305:  Individual Economic Loss Claims:  Zone for Specified Gulf Waters** | **5-7** |
| 4. | **Policy ID 332:  Individual Economic Loss Claims:  End Date for Reimbursable Search Costs** | **8-9** |
| 5. | **Policy ID 333:  Individual Economic Loss Claims:  Acceptable Substitutes for Sworn Written Statement-12** | **10-11** |
| 6. | **Policy ID 406 v.1.:  Individual Economic Loss Claims:  GCCF Business Claimants as Eligible Employers** | **12-13** |
| 7. | **Policy ID 406 v.0.:  Individual Economic Loss Claims:  GCCF Business Claimants as Eligible Employers** | **14-15** |

EXHIBIT B-5

**DEEPWATER HORIZON
CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 142 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information | | | |
|---|---|---|---|
| **Policy Subject** | Individual Economic Loss Claims: Moratoria | | |
| **Active Date** | 7/10/12 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | Exhibits 16, 19 | |
| **Affected Claim Types and/or Review Processes** | | IEL | |

| II. Approved Policy |
|---|
| One of the parameters provided in Ex. 16 for distinguishing IEL moratoria and non-moratoria losses is: "whether individuals lost their job more than thirty (30) days after the May 28, 2010 moratorium, which will generally indicate that the individual incurred such economic losses as a result of the moratorium, not due to or as a result of the DWH spill." |

1. If the claimant lost the job less than 30 days after 5/28/10, then presume any related losses are due to the Spill and not a result of the moratoria.  If the job passes the requisite causation analysis, we will compensate these non-moratoria economic losses at the Other Industries (Non-Tourism, Non-Seafood) RTP for the zone in which the employer is located.

2. Disregard the term "generally" unless the parties specifically provide a full set of exceptions to this rule.  A firm rule is necessary to ensure consistent treatment of claimants.

## Policy 142: Individual Economic Loss Claims: Moratoria

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment:

   BP objects to making this policy available publicly.  This policy relates to the moratoria exclusion, and the Settlement Program recently sought the parties' input regarding its proposed approaches for addressing the moratoria exclusion.  Thus, it is premature to make policies regarding the moratoria exclusion availably publicly because policies regarding proposed implementation of the exclusion by the Claims Administrator are unsettled, and BP reserves its rights to object to some or all of the Claims Administrator's proposals once the entirety of the Claims Administrator's proposed implementation is clear.  If the Claims Administrator maintains that this particular policy is not subject to change in any respect, please advise us, and BP requests the opportunity to respond.  Additionally, BP objects to making this policy available publicly for the addition reason that BP has no record of having previously been informed of this policy by the Settlement Program and being provided an opportunity to comment.  While column G identifies that BP provided "no answer" previously to this policy, the reference is misleading and should be stricken.  Although Column D indicates that this policy was issued on 7/10/12, BP is unable to locate any correspondence from the Settlement Program with this date.  The Claims Administrator has implemented a procedure for soliciting party input, and it does not appear to BP that this procedure occurred.  BP requests that the Claims Administrator provide the Parties with any communications from 7/10/12.

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/2/13
   c. Comment:

   Can be promulgated as a CA Decision. (1/30/13); Should be published as a CA Decision. (4/2/13)

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 143 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information | | | |
|---|---|---|---|
| **Policy Subject** | Individual Economic Loss Claims: Moratoria | | |
| **Active Date** | 7/10/12 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | Exhibit 16 | |
| **Affected Claim Types and/or Review Processes** | | IEL | |

| II. Approved Policy |
|---|

One of the parameters provided in Ex. 16 for distinguishing IEL moratoria and non-moratoria losses is: "whether individuals experienced reduced hours prior [to] the moratorium but did not lose their job, which will generally indicate that the full value of the lost earnings through December 2010 were losses due to the DWH Spill and not due to the moratorium."

1.  If the Claimant's average daily amount of hours worked from 4/21/10 to 5/28/10 is less than his or her average daily amount of hours worked from the same period in 2009 (4/21/09 – 5/28/09), then presume any related losses are due to the Spill and not a result of the moratoria.  If the job passes the requisite causation analysis, we will compensate these non-moratoria economic losses at the Other Industries (Non-Tourism, Non-Seafood) RTP for the zone in which the employer is located.

2. If the Claimant's average daily amount of hours worked from 4/21/10 to 5/28/10 is greater than or equal to their average daily amount of hours worked from the same period in 2009 (4/21/09 – 5/28/09), then presume any related losses are due to the moratoria and not a result of the Spill.  These moratoria economic losses cannot be compensated under the Settlement.  However, the Claimant could still be compensated for other Claiming Jobs, as applicable.

3. Disregard the term "generally" unless the parties specifically provide a full set of exceptions to this rule.  A firm rule is necessary to ensure consistent treatment of claimants.

## Policy 143: Individual Economic Loss Claims: Moratoria

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment:

   BP objects to making this policy available publicly.  This policy relates to the moratoria exclusion, and the Settlement Program recently sought the parties' input regarding its proposed approaches for addressing the moratoria exclusion.  Thus, it is premature to make policies regarding the moratoria exclusion availably publicly because policies regarding proposed implementation of the exclusion by the Claims Administrator are unsettled, and BP reserves its rights to object to some or all of the Claims Administrator's proposals once the entirety of the Claims Administrator's proposed implementation is clear.  If the Claims Administrator maintains that this particular policy is not subject to change in any respect, please advise us, and BP requests the opportunity to respond.  Additionally, BP objects to making this policy available publicly for the addition reason that BP has no record of having previously been informed of this policy by the Settlement Program and being provided an opportunity to comment.  While column G identifies that BP provided "no answer" previously to this policy, the reference is misleading and should be stricken.  Although Column D indicates that this policy was issued on 7/10/12, BP is unable to locate any correspondence from the Settlement Program with this date.  The Claims Administrator has implemented a procedure for soliciting party input, and it does not appear to BP that this procedure occurred.  BP requests that the Claims Administrator provide the Parties with any communications from 7/10/12.

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/2/13
   c. Comment:

   Can be promulgated as a CA Decision. (1/30/13); Should be published as a CA Decision. (4/2/13)

EXHIBIT B-5

# DEEPWATER HORIZON
## CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 305 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information | | | |
|---|---|---|---|
| **Policy Subject** | Individual Economic Loss Claims: Zone for Specified Gulf Waters | | |
| **Active Date** | 12/4/12 | **Policy Impact** | ☒All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | Exhibit 8A | |
| **Affected Claim Types and/or Review Processes** | | IEL | |

| II. Approved Policy |
|---|

Exhibit 8A to the Settlement Agreement provides:

For purposes of this Framework for Individual Economic Loss Claims, the presumption shall be that the location of economic loss for the Claiming Job is the location of the claimant's employer within the Class Definition geographic area, not the claimant's residence. Claimants may establish an alternative location of economic loss for the Claiming Job other than their employer's location by providing evidence that their primary employment activities and responsibilities occur in a location different from their employer's business address, and that the claimed DWH Spill-related economic loss occurred at such location. For example, the claimant works for a housekeeping company located in Zone C that services households in Zones A, B and C, including vacation condominiums located in Zone A, and the claimant establishes that she works primarily in Zone A.

(Ex. 8A fn 4; fn 12; fn 16; fn 21; fn 23; fn 24.)  To implement these provisions, Individual Economic Loss claimants who establish that their primary employment activities and responsibilities for a Claiming Job occurred in or on the Specified Gulf Waters during the relevant Benchmark Period and Compensation Period, the Claims Administrator will consider the claimant's alternative location of economic loss other than their employer's business address to be in Zone A.

## Policy 305: Individual Economic Loss Claims: Zone Specified Gulf Waters

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment:

The Claims Administrator's memorandum states that IEL claimants who work primarily in the Specified Gulf Waters have contended that their loss location should be Zone A, rather than the street address of their employer's business, which the Settlement Program currently uses.  The e-mail further states that BEL claimants have made a similar argument with respect to their Zone designation.   As an initial matter, BP notes that it is highly likely that claimants who work primarily on the Specified Gulf Waters and are not in the commercial or charter fishing businesses, such as divers or water transport employees (the types of claimants listed by way of example in the Claims Administrator's memo), may be asserting claims that are excluded in whole or in part from the Settlement.   If an individual claimant is employed by a business that fits within a NAICS Code description listed in the Oil & Gas Industry Exclusions exhibit to the Settlement Agreement, the claimant is not in the Class for purposes of an Economic Damage claim relating to his or her employment by the Oil & Gas Industry business, and the claim should be denied on that ground.  (See Settlement Agreement §§ 1, 2, 2.2.4, 2.2.4.5 & Exs. 16, 17.)  Included within the Oil & Gas Industry Exclusions, for example, is the NAICS Code for "Support Activities for Oil and Gas Operations." (Such an individual may still be in the Class for other claims because employees in the Oil & Gas Industry may to pursue "all other types of recovery permitted under other aspects of [the] Economic & Property Damages Settlement Class."  (See Ex. 16 p. 6.)  The Settlement Program must determine if the individual claimant's employer falls within an Oil & Gas Industry NAICS Code description based on review of:  (a) the NAICS Code on the employer's 2010 tax return, (b) the employer's 2010 business permits or license(s), and (c) other evidence of the employer's activities necessary for the Settlement Program to determine the appropriate NAICS Code. (See Ex. 17 p.1)   If an individual claimant does not work for an Oil & Gas Industry employer, it is likely that the on-the-water work is for an employer in the Support Services to the Oil & Gas Industry (NAICS codes listed in Exhibit 19). If so, the claim is subject to the additional provisions of Exhibit 16.  (See Settlement Agreement §5.10.3.2.)  For claims by employees of Support Services to Oil & Gas Industry businesses, "the standard individual framework shall not apply" for determining compensation.  (Ex. 16 p. 7)  Instead, the Claims Administrator must analyze the claim to distinguish compensable non-moratoria losses from excluded moratoria losses.  (See Ex. 16 pp. 6-8, Agreement § 38.93.)   Although there are "[n]o causation presumptions for any individuals/employees in this category seeking recovery for economic losses incurred as a result of their employment in the Support Services to Oil & Gas Industry," (see Ex. 16 p. 7),  BP would support the following claimant-friendly interpretation of this provision applicable only to Support Service to Oil & Gas Industry employee claimants:  (i)  whose "primary employment activities and responsibilities"

occur on the Specified Gulf Waters or in Zone A, or (ii) whose employer is located in Zone A;  If the Claims Administrator has identified that the claimant incurred some "non-moratoria economic loss," causation will be presumed for that non-moratoria economic loss.  (Ex. 16 p. 7). In this regard, "primary employment activities and responsibilities" must mean more than 50%, consistent with the statement in the Claims Administrator's memorandum.    A similar analysis applies for RTP.  Pursuant to Exhibit 16, a Support Services to Oil & Gas Industry employee claimant "receives the RTP for Other Industries for the zone in which the employer is located," and the RTP is applied "only to the base economic loss, if any, that the Claims Administrator determines is non-moratoria loss due to or resulting from the DWH Spill."  (Ex. 16 p. 8)   BP would support a claimant-friendly interpretation of this provision such that a Support Service to Oil & Gas Industry employee claimant whose "primary employment activities and responsibilities" occur on the Specified Gulf Waters or in Zone A, or whose employer is located in Zone A, the claimant may receive the RTP for Other Industries in Zone A which will be applied "only to the base economic loss, if any, that the Claims Administrator determines is non-moratoria loss." As discussed above, "primary employment activities and responsibilities" must mean more than 50%. The claimant's "Moratoria Losses" claim is "not recognized or released" under the Settlement Agreement.  (Settlement Agreement § 3.)   If an individual claimant is not an employee of an Oil & Gas Industry business or a Support Service to Oil & Gas Industry business, and the individual is within the Class and asserts a covered, non-moratoria Economic Damage claim, then the IEL applies.  In such a circumstance, where the IEL claimant's "primary employment activities and responsibilities" (more than 50%) occur on the Specified Gulf Waters, BP agrees that such an individual claimant may be treated as having incurred his or her economic loss in Zone A, which is located closest to the Specified Gulf Waters.  (See Settlement Agreement Ex. 8A at 2 n.4.)   Business claimants are subject to a similar but slightly different analysis due to differences in the provisions governing business claims.  Significantly, there is no provision for a business to be regarded as Zone A other than when it is physically located in Zone A.  In addition, unlike an employee in the Oil & Gas Industry, a business in the Oil & Gas Industry may not pursue any other type of claim and is excluded entirely from recovery under the Settlement Agreement.  (See Settlement Agreement §§ 1, 2, 2.2.4, 2.2.4.5 & Exs. 16, 17.) (10/31/12); Classify as CA decision. (4/16/13)

2.  **Class Counsel**
    a.  Decision:  Defer to Claims Administrator
    b.  Date:  4/2/13
    c.  Comment:

Should likely be clarified that this is only where a Seafood Claim is submitted and paid. (1/30/13); Should be published as a Clarification Agreed To by the Parties. (4/2/13)

**DEEPWATER HORIZON**
# CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 332 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information | |
|---|---|
| **Policy Subject** | Individual Economic Loss Claims:  End Date for Reimbursable Search Costs |

| **Active Date** | 2/8/13 | **Policy Impact** | ☒All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
|---|---|---|---|

| **Type of Decision** | Claims Administrator Decision |
|---|---|
| **Settlement Agreement Reference** | Exhibit 8A |
| **Affected Claim Types and/or Review Processes** | IEL |

| II. Approved Policy |
|---|

To implement Section R of Exhibit 8A of the Settlement Agreement, which provides for compensation for "[d]ocumented travel and job search costs actually incurred after April 20, 2010 in searching for alternative employment due to job loss or work reduction after the DWH Spill," the Claims Administrator will consider as potentially compensable Reimbursable Search Costs incurred by an IEL claimant during the period commencing on or after April 21, 2010, through the earlier of (a) the claimant's procurement of full-time employment or (b) December 31, 2011.

## Policy 332: Individual Economic Loss Claims: End Date for Reimbursable Search Costs

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment:

   Classify as CA Decision. (4/16/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/2/13
   c. Comment:

   Class Counsel defer to the Claims Administrator's interpretation per Section 4.3.1 of the Settlement Agreement, as outlined above. (1/18/13); Can be promulgated as a CA Decision. (1/30/13); Should be published as a CA Decision. (4/2/13)

EXHIBIT B-5



| Policy ID 333 | Claims Administrator's Approved Policy |
|---|---|

| **I. Policy Information** | | | |
|---|---|---|---|
| **Policy Subject** | Individual Economic Loss Claims: Acceptable Substitutes for Sworn Written Statement-12 | | |
| **Active Date** | 2/8/13 | **Policy Impact** | ☒All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | Exhibit 8A | |
| **Affected Claim Types and/or Review Processes** | | IEL | |

| **II. Approved Policy** |
|---|

Exhibit 8A to the Settlement Agreement requires that Category I, II, and III
claimants who do not receive a presumption of causation must provide an Employer Sworn Written Statement attributing the claimant's loss of income during the Compensation Period to the DWH Spill. The Employer Sworn Written Statement must articulate in detail how the claimant's losses at the Claiming Job are causally related to the DWH Spill. Such Employer Sworn Written Statement must also include contact information for an authorized representative of the employer. The Claims Administrator created a form for claimants to use to meet this requirement, known as the SWS-12. The Claims Administrator is required to evaluate the credibility and reliability of the information provided by the employer and the claimant, including any Sworn Written Statements, and has the right to request supplemental
documentation and/or to interview the employer in accordance with the Addendum Regarding Interviews of Claimants Alleging Economic Loss. The Claims Administrator has encountered three scenarios in which claimants are unable to obtain an SWS-12 or an equivalent sworn statement from the claimant's employer:

(a) The Employer Refuses to Sign: The claimant's employer is still in business but refuses to sign the SWS-12 or any sworn statement.
(b) The Employer is Deceased: The employer is deceased and the claimant cannot locate any authorized business representative to sign an SWS-12.
(c) The Employer Has Dissolved and No Longer Exists: The employer is no longer in business and the claimant cannot locate any authorized business representative to sign
an SWS-12.

In these situations, without any acceptable substitute, these claimants will not be eligible for any IEL award. After reviewing the provisions of the Settlement Agreement, the purpose of this SWS-12 requirement and the practicalities of administering this requirement to actual claimant situations, the Claims Administrator has adopted these processing policies:

(a) A claimant must first attempt to procure an employer-provided SWS-12.
(b) If the claimant cannot submit an SWS-12 or adequate sworn written statement from the employer because of one of the three circumstances described above, the claimant must submit a letter with his or her claim explaining the claimant's inability to submit an SWS-12.
(c) The Claims Administrator then will take the actions described the table provided in the 1/11/13 memo.

The Claimant SWS and Third Party SWS Forms are attached to the 1/11/13 memo.

EXHIBIT B-5

**Policy 333: Individual Economic Loss Claims: Acceptable Substitutes for Sworn Written Statement-12**

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment:

   BP does not have any comments to the Claims Administrator's January 11, 2013 Policy Announcements. (1/18/13); Classify as CA Decision. (4/16/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/2/13
   c. Comment:

   Class Counsel defer to the Claims Administrator's interpretation per Section 4.3.1 of the Settlement Agreement, as outlined above. (1/18/13); Can be promulgated as a CA Decision. (1/30/13); Should be published as a CA Decision. (4/2/13)



| Pol-406 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

| I. Profile | | | |
|---|---|---|---|
| **Subject** | Individual Economic Loss Claims: GCCF Business Claimants as Eligible Employers | | |
| **Active Date** | 5/29/13 | **Policy Impact** | ☑ All Claims Regardless of Active Date<br>☐ All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | Exhibit 8A | |
| **Affected Claim Types and/or Review Processes** | | IEL | |

| II. Summary |
|---|

The Parties agreed that certain Business Claimants that did not receive a Final Payment Offer, specifically those where claimants received a Quick Payment or Emergency Advance Payment only, should not be considered Eligible Employers.  The PCC responded that the other four situations involving Business Claimants that did not receive a Final Payment Offer should be considered Eligible Employers.  These four situations are claimants that received from the GCCF a Determination Letter with no Interim or Final Payment Offer, claimants that received payment from BP prior to the start of the GCCF, claimants that received payment from the Real Estate Funds, and claimants that received an Interim Payment during the Transition that did not include a Final Payment Offer because of the rules of the Transition Program.

Claimants that received a Determination Letter from the GCCF with no Interim or Final Payment Offer proved eligibility, but no losses from the Spill.  Because the GCCF did not extend a compensation offer, we should not treat these Business Claimants as Eligible Employers.  The GCCF was not responsible for BP payments or Real Estate Fund payments.  Therefore, this does not qualify as a "compensation offer from the GCCF", and we should not treat these Business Claimants as Eligible Employers.   During the Transition Program, claimants did not receive both an Interim Payment and a Final Payment Offer, but the GCCF still extended a compensation offer.  We should treat these Business Claimants as Eligible Employers.

## Policy 406 v.1:  Individual Economic Loss Claims:  GCCF Claimants as Eligible Employers

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  5/22/13
   c. Comment: N/A

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator
   b. Date:  5/14/13
   c. Comment:

Class Counsel continue to disagree to the extent the situations do not result in Eligibility, but Defer to the Claims Administrator's interpretation.



| Pol-406 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

### I. Profile

| Subject | Individual Economic Loss Claims: GCCF Business Claimants as Eligible Employers | |
|---|---|---|
| **Active Date** | 7/15/12 | **Policy Impact** | ☒All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision |
| **Settlement Agreement Reference** | | Exhibit 8A |
| **Affected Claim Types and/or Review Processes** | | IEL |

### II. Summary

The parties agreed that certain Business Claimants that did not receive a Final Payment Offer, specifically those where claimants received a Quick Payment or Emergency Advance Payment only, should not be considered Eligible Employers.  The PCC responded that the other four situations involving Business Claimants that did not receive a Final Payment Offer should be considered Eligible Employers.  These four situations are claimants that received from the GCCF a Determination Letter with no Interim or Final Payment Offer, claimants that received payment from BP prior to the start of the GCCF, claimants that received payment from the Real Estate Funds, and claimants that received an Interim Payment during the Transition that did not include a Final Payment Offer because of the rules of the Transition Program.

Claimants that received a Determination Letter from the GCCF with no Interim or Final Payment Offer proved eligibility, but no losses from the Spill.  Because the GCCF did not extend a compensation offer, we should not treat these Business Claimants as Eligible Employers.  The GCCF was not responsible for BP payments or Real Estate Fund payments.  Therefore, this does not qualify as a "compensation offer from the GCCF", and we should not treat these Business Claimants as Eligible Employers.   During the Transition Program, claimants did not receive both an Interim Payment and a Final Payment Offer, but the GCCF still extended a compensation offer.  We should treat these Business Claimants as Eligible Employers.

## Policy 406 v.0:  Individual Economic Loss Claims:  GCCF Claimants as Eligible Employers (Superseded by Policy 406 v.1)

Comments and Decisions by the Parties:

1. **BP**
   a.  Decision:  Defer to Claims Administrator
   b.  Date:  4/16/13
   c.  Comment: N/A

2. **Class Counsel**
   a.  Decision:  Defer to Claims Administrator
   b.  Date:  4/2/13
   c.  Comment:

   (1) Yes. / (2) No. / (3) Yes. / (4) No. / (5) Not sure what payments by BP this is referring to, but if BP paid, then BP implicitly recognized loss caused by the Spill. / (6) Yes. (5/31/12); Defer to CA. (6/14/12); Can be promulgated as a CA Decision. (1/30/13); We defer to the Claims Administrator and request that decision be published as a CA Decision. (4/2/13)



SEAFOOD

EXHIBIT B-5

| Table of Contents | | |
|---|---|---|
| **Policy** | | **Page(s)** |
| 1. | **Policy ID 37:  Seafood Compensation Program Claims: Losses Calculation** | **1-2** |
| 2. | **Policy ID 39:  Seafood Compensation Program Claims: Losses Calculation** | **3-4** |
| 3. | **Policy ID 41:  Seafood Compensation Program: Prior Payments** | **5-6** |
| 4. | **Policy ID 113:  Seafood Compensation Program: Vessel Lessees** | **7-8** |
| 5. | **Policy ID 114:  Seafood Compensation Program: Vessel Lessees** | **9-10** |
| 6. | **Policy ID 126:  Seafood Compensation Program: Oyster Leasehold Compensation Zone** | **11-12** |
| 7. | **Policy ID 136:  Seafood Compensation Program: Losses Calculation** | **13-14** |
| 8. | **Policy ID 137:  Seafood Compensation Program: Category I Claimants** | **15-16** |
| 9. | **Policy ID 139:  Seafood Compensation Program: Determination of Oyster Harvesting Year** | **17-18** |
| 10. | **Policy ID 140:  Seafood Compensation Program: Multiple Vessels** | **19-20** |
| 11. | **Policy ID 141:  Seafood Compensation Program: New Entrants** | **21-22** |
| 12. | **Policy ID 210 v 1:  Prior Seafood Spill-Related Payments** | **23-24** |
| 13. | **Policy ID 210 v 0:  Prior Seafood Spill-Related Payments** | **25-26** |
| 14. | **Policy ID 211 v 1:  Seafood Compensation Program: Prior Payments** | **27-28** |
| 15. | **Policy ID 211 v 0:  Seafood Compensation Program: Prior Payments** | **29-30** |
| 16. | **Policy ID 242:  Vessel Registration and Ownership 4/20/10 to 12/31/10** | **31-32** |
| 17. | **Policy ID 243:  Commercial Fishing License Issued Before 4/20/10 for 2009 or 2010 Season** | **33-34** |
| 18. | **Policy ID 258:  Proof of Prior Spill-Related Payments to Claimants** | **35-36** |
| 19. | **Policy ID 261:  Exclusion of a Benchmark Year for Seafood Program Claimants** | **37-39** |

EXHIBIT B-5

| Table of Contents | |
|---|---|
| **Policy** | **Page(s)** |
| **20.** Policy ID 262:  Documents that Allocate Benchmark Period Revenues by Vessel, Landing, and Catch Type | **40-43** |
| **21.** Policy ID 257:  Documents that Allocate Benchmark Period Revenues by Vessel, Landing, and Catch Type (Superseded by Policy 262) | **44-47** |
| **22.** Policy ID 241:  Documents that Allocate Benchmark Period Revenues by Vessel, Landing, and Catch Type (Superseded by Policy 262) | **48-50** |
| **23.** Policy ID 212:  Seafood Compensation Program:  Benchmark Revenue Documentation (Superseded by Policy 262) | **51-52** |
| **24.** Policy ID 269:  Seafood Distribution Chain Definitions | **53-54** |
| **25.** Policy ID 270:  Definition of "Landings" in Seafood Program | **55-56** |
| **26.** Policy ID 271:  Oral Agreements Relating to Seafood Program Oyster Leasehold Claims | **57-58** |
| **27.** Policy ID 272:  Deduction of Prior Spill-Related Payments from Oyster Leaseholder Compensation Payments | **59-60** |
| **28.** Policy ID 277 v 1:  Subleases of Oyster Leaseholds | **61-63** |
| **29.** Policy ID 277 v 0:  Subleases of Oyster Leaseholds | **64-65** |
| **30.** Policy ID 282:  Leases of Private Oyster Beds | **66-67** |
| **31.** Policy ID 283:  Revenue History of Vessels Sold Before 4/20/10 | **68-70** |
| **32.** Policy ID 284:  Seafood Crew Compensation Plan | **71-72** |
| **33.** Policy ID 285:  No Income During Benchmark Period | **73-75** |
| **34.** Policy ID 290:  Boat Captains with Multiple Vessels in the Benchmark Period | **76-77** |
| **35.** Policy ID 291:  2010 Shrimp Vessel Change (Vessel Owners/Vessel Lessees) | **78-80** |
| **36.** Policy ID 292:  2010 Oyster, Finfish, Blue Crab/Other Seafood Vessel Change (Vessel Owners/Vessel Lessees) | **81-83** |
| **37.** Policy ID 293:  2010 Shrimp Vessel Change (Boat Captains) | **84-86** |
| **38.** Policy ID 294: Old Entrant/Add a Vessel | **87-89** |

ii.

EXHIBIT B-5

| Table of Contents | |
|---|---|
| **Policy** | **Page(s)** |
| **39.** | Policy ID 311:  Seafood Program: Affidavits as Evidence of Landings made within the Gulf Coast Area | **90-91** |
| **40.** | Policy ID 313:  Seafood Program: Bedding Ground Rental Receipts | **92-93** |
| **41.** | Policy ID 334:  Seafood Compensation Program: Benchmark Revenue Treatment of Unreported Cash Sales of Seafood in Louisiana | **94-95** |
| **42.** | Policy ID 335:  Seafood Compensation Program: Determination of Vessel Length | **96-97** |
| **43.** | Policy ID 336:  Seafood Compensation Program: Oyster Vessel Owner and Oyster Boat Captain Compensation Calculations | **98-99** |
| **44.** | Policy ID 337:  Seafood Compensation Program: GCR Oyster Leasehold Database | **100-101** |
| **45.** | Policy ID 338:  Seafood Compensation Program: Protocol for Reclassifying Claims | **102-103** |
| **46.** | Policy ID 339:  Seafood Compensation Program: Documentation Requirements for Oyster Leaseholder Claims | **104-105** |
| **47.** | Policy ID 340:  Seafood Compensation Program: Acknowledgement of Oral Oyster Harvesting Agreements | **106-107** |
| **48.** | Policy ID 341:  Seafood Compensation Program: Determination of Vessel Classification | **108-109** |
| **49.** | Policy ID 342:  Seafood Program: Calculation of Boat Captain Income on Claims by Owner/Operations | **110-111** |
| **50.** | Procedure 379:  Procedure Regarding Handling Untimely Seafood Claims | **112-119** |
| **51.** | Policy ID 382:  Interpretation of "Fleet of Vessels" | **120-121** |
| **52.** | Policy ID 401:  Existing Entities Form a New Entity and Purchase a Vessel | **122-126** |
| **53.** | Policy ID 402:  Interpretation of "the same (or nearly the same) ownership" in Policy ID 401 | **127-128** |
| **54.** | Policy ID 403:  Interpretation of "for the 2010 fishing season" in Policy ID 294 and Policy ID 401 | **129-130** |

EXHIBIT B-5

| Table of Contents | |
| --- | --- |
| **Policy** | **Page(s)** |
| **55.**    Policy ID 440:  IFO "Set-Aside" Shares | **131-132** |
| **56.**    Policy ID 314:  Seafood Program: Protocol for Updating the GCR Database (Superseded by Policy 337) | **133-134** |

55. Policy ID 440: IFO "Set-Aside" Shares — 131-132
56. Policy ID 314: Seafood Program: Protocol for Updating the GCR Database (Superseded by Policy 337) — 133-134

EXHIBIT B-5

**DEEPWATER HORIZON
CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 37 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information | | | |
|---|---|---|---|
| **Policy Subject** | Seafood Compensation Program Claims: Losses Calculation | | |
| **Active Date** | 5/21/12 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Clarified by Seafood Neutral | |
| **Settlement Agreement Reference** | | Exhibit 10 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

| II. Approved Policy |
|---|
| We will only include an RTP calculation in the Historical Revenue Method models as the pre-determined compensation award for the Expedited and Reduced Expedited Methods include the RTP. |

EXHIBIT B-5

## Policy 37: Seafood Compensation Program Claims: Losses Calculation

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment:

   Yes, compensation amounts in the tables include the RTP; Yes, RTP is included in the compensation amounts for the Expedited, Reduced Expedited, and New Entrant models. It is a component of the calculation for the historical revenue model. (answered two questions, later combined into one question on this spreadsheet) (5/17/12); Classify as Clarified by Seafood Neutral. (4/16/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/2/13
   c. Comment:

   The RTP is only pre-calculated into the damages for claimants who take the expedited model.  Anyone that has revenue-driven recovery I believe you have to apply the RTP. (Baden double check this.) (5/15/12); J. Rice: The RTP is included in those payments. (5/21/12); Can be promulgated as a CA Decision (or clarification by the Seafood Neutral). (1/30/13); Should be published as a Clarification by the Seafood Neutral. (4/2/13)

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 39 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information | | | |
|---|---|---|---|
| **Policy Subject** | Seafood Compensation Program Claims: Losses Calculation | | |
| **Active Date** | 5/21/12 | **Policy Impact** | ☑All Claims Regardless of Active Date ☐All Claims Greater than Active Date |
| **Type of Decision** | | Clarified by Seafood Neutral | |
| **Settlement Agreement Reference** | | Exhibit 10 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

| II. Approved Policy |
|---|
| For all non-Crew claims we will consider the Benchmark Period to cover income from the entire year. |

EXHIBIT B-5

## Policy 39: Seafood Compensation Program Claims: Losses Calculation

Comments and Decisions by the Parties:

1. **BP**
   a. Decision: Defer to Claims Administrator
   b. Date: 4/16/13
   c. Comment:

   Benchmark period is calendar year, compensation period is not relevant to calculation since compensation is based on formula using benchmark period only. (5/17/12); Classify as Clarified by Seafood Neutral. (4/16/13)

2. **Class Counsel**
   a. Decision: Defer to Claims Administrator
   b. Date: 4/2/13
   c. Comment:

   I am not sure of the answer, but I need to study, but we've got to be sure that a shrimp claim that also has a crab claim can breakdown the historical revenue.  (5/15/12); J. Rice: In Seafood Program the Claims Administrator will have to determine the appropriate time for Benchmark and Compensation Periods.  A Claimant can have a Shrimp Plan claim, an Oyster Harvest claim, a Crab claim, etc.  The application of the Benchmark Period Revenue will depend on what claim is being evaluated. (5/21/12); Can be promulgated as a CA Decision (or clarification by the Seafood Neutral). (1/30/13); Should be published as a Clarification by the Seafood Neutral. (4/2/13)

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 41 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information | | |
|---|---|---|
| **Policy Subject** | Seafood Compensation Program: Prior Payments | |
| **Active Date** | 5/21/12 | **Policy Impact**    ☑All Claims Regardless of Active Date   ☐All Claims Greater than Active Date |
| **Type of Decision** | Claims Administrator Decision | |
| **Settlement Agreement Reference** | Exhibit 10 | |
| **Affected Claim Types and/or Review Processes** | Seafood | |

| II. Approved Policy |
|---|
| Prior Seafood Spill-Related Payments are claimant-specific and any offset will be taken after an award is allocated between the Vessel Owner and Lessee. |

EXHIBIT B-5

## Policy 41: Seafood Compensation Program: Prior Payments

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment:

   Seafood Spill-Related Payments should be deducted from the claimant's total compensation across all categories within the Seafood Program and after application of any RTPs. (5/17/12); Classify as CA Decision. (4/16/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/2/13
   c. Comment:

   J. Rice: You can only take an offset for what has been paid to the claimant for that claim, so if the claimant is entitled to a dollar amount under the Seafood Plan and he has not been paid previously for that claim, there can be no offset allocated to him.  By the way, the claim form is misleading on this as well and does not fairly limit the offset. (5/21/12); Can be promulgated as a CA Decision. (1/30/13); Should be published as a CA Decision. (4/2/13)

EXHIBIT B-5

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 113 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information | | | |
|---|---|---|---|
| **Policy Subject** | Seafood Compensation Program: Vessel Lessees | | |
| **Active Date** | 6/4/12 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | Exhibit 10 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

| II. Approved Policy |
|---|
| If a Vessel Owner leases to a Vessel Lessee, we will hold the Vessel Owner's claim until the Vessel Lessee files a claim or until the filing deadline.  Likewise, if a Vessel Lessee submits a claim, we will hold the claim until the Vessel Owner files a claim or until the filing deadline. If a Vessel Owner does not assert that he or she leased a vessel to a third party, we will process the claim normally. |

EXHIBIT B-5

## Policy 113: Seafood Compensation Program: Vessel Lessees

Comments and Decisions by the Parties:

1.  **BP**
    a.  Decision:  Defer to Claims Administrator
    b.  Date:  4/16/13
    c.  Comment:

    Correct. (5/17/12); Classify as CA Decision. (4/16/13)

2.  **Class Counsel**
    a.  Decision:  Defer to Claims Administrator
    b.  Date:  4/2/13
    c.  Comment:

    J. Rice: I think they (Claims Administrator) are correct that if the vessel owner says they leased the vessel and the leaseholder doesn't come forward they can't process the claim because it would have to be split but if the leaseholder never comes forward and is barred the lease owner should get the full compensation. (5/21/12); Probably moot now that the deadline has passed. (1/30/13); Probably moot now that the deadline has passed. (4/2/13)

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 114 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information | | | |
|---|---|---|---|
| **Policy Subject** | Seafood Compensation Program: Vessel Lessees | | |
| **Active Date** | 6/4/12 | **Policy Impact** | ☒All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | Exhibit 10 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

| II. Approved Policy |
|---|
| If a claimant files as both a Vessel Lessee and as a Boat Captain, we will hold the Vessel Lessee claim until after the filing deadline, but will process the Boat Captain claim. |

EXHIBIT B-5

## Policy 114: Seafood Compensation Program: Vessel Lessees

Comments and Decisions by the Parties:

1.  **BP**
    a.  Decision:  Defer to Claims Administrator
    b.  Date:  4/16/13
    c.  Comment:

    Not necessary to hold to Boat Captain claim in this circumstance. (5/17/12); Classify as CA Decision. (4/16/13)

2.  **Class Counsel**
    a.  Decision:  Defer to Claims Administrator
    b.  Date:  4/2/13
    c.  Comment:

    J. Rice: They should pay the boat captain and hold up on the vessel lease.  But, the boat captain needs to be notified the release he is signing is a full and final release and the boat captain must accept whatever the vessel lease result is subject to his appeal rights under the Settlement. (5/21/12); Probably moot now that the deadline has passed. (1/30/13); Probably moot now that the deadline has passed. (4/2/13)

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 126 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information | |
|---|---|
| **Policy Subject** | Seafood Compensation Program: Oyster Leasehold Compensation Zone |

| **Active Date** | 6/15/12 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
|---|---|---|---|

| **Type of Decision** | Claims Administrator Decision |
|---|---|
| **Settlement Agreement Reference** | Exhibit 10 |
| **Affected Claim Types and/or Review Processes** | Seafood |

| II. Approved Policy |
|---|
| We will use the database provided by the mapping company to determine Oyster Leasehold compensation zone. Claimants will have the ability to respond to payment or incompleteness notices if they do not agree with the zone designation. |

EXHIBIT B-5

## Policy 126: Seafood Compensation Program: Oyster Leasehold Compensation Zone

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment:

   Required information on lease location will be sufficient for Claims Administrator to identify zone.  Claimant also will be able to review this designation using software being set up by GCR. (5/17/12); BP agrees with CA comments.  (5/31/12); BP agrees with the CA Recommendation (6/15/12); Classify as CA Decision. (4/16/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/2/13
   c. Comment:

   J. Rice: Yes.  Claimant should be able to appeal the leasehold zone designation. (5/21/12); S. Herman: The Claimant cannot challenge whether the Zone is designated under the terms of the Settlement "correctly" but the Claimant can challenge or appeal whether the Claimant's leasehold interest has been correctly identified to lie within a certain Zone. (5/31/12); Defer to CA. (6/14/12); Can be provided to Appeal Panelists as a CA Decision. (1/30/13); Seems primarily internal. No objection to publishing as a CA Policy. Should, in any event, be provided to Appeal Panelists. (4/2/13)


**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-136 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

| I. Profile | | | |
|---|---|---|---|
| **Subject** | Seafood Compensation Program: Losses Calculation | | |
| **Active Date** | 6/29/12 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Clarified by Seafood Neutral | |
| **Settlement Agreement Reference** | | Exhibit 10 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

| II. Summary |
|---|
| The default presumption for the loss calculation should be that 70% of the claimant's annual earnings that were paid after April 20, which roughly reflects the number of days between April 20 and December 31. However, if the documentation submitted by the claimant establishes that the earnings were received in a disproportionate manner to a daily rate, then the settlement program should apportion the annual, earnings in a manner consistent with the documentation. For example, if documentation submitted by the claimant establishes that all of his seafood crew earnings reflected on tax documents were paid from July through December 2009, then 100% of the claimant's seafood crew annual earnings for 2009 should be apportioned to the 4/20 to 12/31 time period. The definition of "pay period earnings documentation" in the seafood compensation program provides examples of documentation that are likely to provide information relevant to apportionment of seafood crew earnings. |

EXHIBIT B-5

## Policy 136: Seafood Compensation Program: Losses Calculation

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment:

   In the event the claimant does not provide pay period  earnings documentation, the Claims Administrator should assume that 70% of the annual earnings take place after April 20, which reflects the number on number of days before/after April 20. (5/22/12); To the extent BP's responses to the six Seafood questions differ from those of John Perry / Dan Balhoff, BP now defers to the responses of John Perry / Dan Balhoff.  It is BP's view that the Seafood Compensation Program should be implemented by the Settlement Program consistent with the responses from John Perry/Dan Balhoff to all six questions. Perhaps Steve or Jim can comment for PCC in this regard.  (6/29/12)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/2/13
   c. Comment:

   John Perry should provide the answer. (5/31/12); Can be promulgated as a CA Decision (or clarification by the Seafood Neutral). (1/30/13); Should be published as a Clarification by the Seafood Neutral. (4/2/13)


| Pol-137 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

### I. Profile

| Subject | Seafood Compensation Program: Category I Claimants | | |
|---|---|---|---|
| **Active Date** | 6/29/12 | **Policy Impact** | ☑ All Claims Regardless of Active Date<br>☐ All Claims Greater than Active Date |
| **Type of Decision** | | Clarified by Seafood Neutral | |
| **Settlement Agreement Reference** | | Exhibit 10 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

### II. Summary

In the event a claimant qualifies under both Category I (by providing necessary documentation, including tax returns and/or pay period earnings documentation) and Category II (by providing necessary documentation, including employer sworn written statements), and the Category II calculation reflects a higher compensation level for the claimant, the claimant should be allowed the option to choose to proceed under Category II provided the claimant can provide an affirmation that Category II more accurately reflects his or her actual seafood crew lost earnings. The procedure for obtaining an affirmation from the claimant should be left to the Claims Administrator. This would permit individuals whose tax returns do not reflect total earnings to participate under either Category I or Category II. However, such a claimant should be advised that no Category II claim shall be paid until a later date, and that if the total aggregate amount of Category II compensation claims for all claimants who have timely submitted eligible and qualifying Category II claims exceeds the aggregate compensation amount for Category II, then Category II claimants will be subject to a pro rata reduction in compensation.

## Policy 137: Seafood Compensation Program: Category I Claimants

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment:

   No.  Category II is only available to claimants without tax returns or pay period earnings documentation.  If tax returns or pay period earnings documentation exist, the claimant must be evaluated under Category I.(5/22/12); To the extent BP's responses to the six Seafood questions differ from those of John Perry / Dan Balhoff, BP now defers to the responses of John Perry / Dan Balhoff.  It is BP's view that the Seafood Compensation Program should be implemented by the Settlement Program consistent with the responses from John Perry/Dan Balhoff to all six questions.  Perhaps Steve or Jim can comment for PCC in this regard.  (6/29/12)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/2/13
   c. Comment:

   John Perry should provide the answer. (5/31/12); Can be promulgated as a CA Decision (or clarification by the Seafood Neutral). (1/30/13); Should be published as a Clarification by the Seafood Neutral. (4/2/13)



| Pol-139 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

### I. Profile

| Subject | Seafood Compensation Program: Determination of Oyster Harvesting Year | | |
|---|---|---|---|
| **Active Date** | 6/29/12 | **Policy Impact** | ☑ All Claims Regardless of Active Date<br>☐ All Claims Greater than Active Date |
| **Type of Decision** | | Clarified by Seafood Neutral | |
| **Settlement Agreement Reference** | | Exhibit 10 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

### II. Summary

Under the oyster compensation plan, the benchmark period for a claimant is the combination of 2007, 2008, and 2009. There are two exceptions to this requirement: a new entrant exception, and a possibility of excluding one or more years if the claimant did not participate at the same level of effort in oyster harvesting due to circumstances beyond the claimant's control. Under the new entrant exception, which is the subject of this question, in the event that a claimant entered the oyster industry after 2007, then the benchmark period is to include all full years since the claimant entered the oyster harvesting industry, so 2008-2009 or 2009. (Exhibit 10, page 28). In determining whether to use 2008 and 2009 or only 2009, the Claims Administrator should determine whether 2008 also constitutes a representative year in terms of the claimant's work as an oyster harvester. For example, if the claimant worked as an oyster harvester in 2008, 2009, and 2011, only during the months May to December, then 2008 is a representative year and both 2008 and 2009 should be used as the benchmark period. In contrast, if the claimant worked as an oyster harvester from January to December 2009, but only in May to December 2008, then 2008 should not be included in the benchmark period.

## Policy 139: Seafood Compensation Program: Determination of Oyster Harvesting Year

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment:

   There must be a consistent rule applied.  BP suggests that the year be excluded if the claimant first harvested in April or later in the year.  Claimants cannot exclude the year 2009 under this rule. (5/22/12); BP defers to the response of John Perry and Dan Balhoff. (6/25/12); To the extent BP's responses to the six Seafood questions differ from those of John Perry / Dan Balhoff, BP now defers to the responses of John Perry / Dan Balhoff.  It is BP's view that the Seafood Compensation Program should be implemented by the Settlement Program consistent with the responses from John Perry/Dan Balhoff to all six questions.  Perhaps Steve or Jim can comment for PCC in this regard.  (6/29/12); BP objects to the making this policy available publicly as written.  Rather, the policy question should be described as presented in Question 21 and the Seafood Neutral's full response to Question 21 should be listed as the policy both attached to 6/28/12 Bloom email to Greer at 12:21.  This policy should then be classified as "Certified by Seafood Neutral." (4/16/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/2/13
   c. Comment:

   John Perry should provide the answer. (5/31/12); Can be promulgated as a clarification by the Seafood Neutral. (1/30/13); Should be published as a Clarification by the Seafood Neutral. (4/2/13)


**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-140 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

| I. Profile | | | |
|---|---|---|---|
| **Subject** | Seafood Compensation Program: Multiple Vessels | | |
| **Active Date** | 6/29/12 | **Policy Impact** | ☑ All Claims Regardless of Active Date ☐ All Claims Greater than Active Date |
| **Type of Decision** | | Clarified by Seafood Neutral | |
| **Settlement Agreement Reference** | | Exhibit 10 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

| II. Summary |
|---|

For the Historical Revenue Compensation Method in the Shrimp Compensation Plan, the only plan in the seafood compensation program for which the compensation amount varies by vessel type and size. Compensation should be calculated separately for each vessel by size and type and the appropriate multiplier used, and then aggregated for a total shrimp compensation plan amount paid to the claimant. A boat captain must select one benchmark period for all vessels for which he seeks compensation under the shrimp compensation plan. (Exhibit 10, page 7).  If claimants qualify for Expedited or Reduced Expedited Compensation methods, the offer will be the highest qualifying Expedited or Reduced Expedited award.

## Policy 140: Seafood Compensation Program: Multiple Vessels

Comments and Decisions by the Parties:

1. **BP**
   a. Decision: Defer to Claims Administrator
   b. Date: 4/16/13
   c. Comment:

   Compensation should be calculated separately for each vessel size/type category. A boat captain must select a single benchmark period (page 7 of framework). (5/22/12); BP defers to the response of John Perry and Dan Balhoff. (6/25/12); To the extent BP's responses to the six Seafood questions differ from those of John Perry / Dan Balhoff, BP now defers to the responses of John Perry / Dan Balhoff. It is BP's view that the Seafood Compensation Program should be implemented by the Settlement Program consistent with the responses from John Perry/Dan Balhoff to all six questions. Perhaps Steve or Jim can comment for PCC in this regard. (6/29/12)

2. **Class Counsel**
   a. Decision: Defer to Claims Administrator
   b. Date: 4/2/13
   c. Comment:

   John Perry should provide the answer. (5/31/12); Can be promulgated as a CA Decision (or clarification by the Seafood Neutral). (1/30/13); Should be published as a Clarification by the Seafood Neutral. (4/2/13)



| Pol-141 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

### I. Profile

| Subject | Seafood Compensation Program: New Entrants | |
|---|---|---|
| **Active Date** | 6/29/12 | **Policy Impact** | ☒All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |

| Type of Decision | Clarified by Seafood Neutral |
|---|---|
| Settlement Agreement Reference | Exhibit 10 |
| Affected Claim Types and/or Review Processes | Seafood |

### II. Summary

The new entrant compensation method of the shrimp compensation plan states that only a claimant who had not previously worked as a boat captain for a commercial shrimping vessel home ported in the gulf coast areas is eligible for compensation.(Exhibit 10, page 16). Pursuant to this requirement, "previously worked" means that the claimant cannot have worked as a boat captain for a commercial shrimping vessel home ported in the Gulf Coast areas at anytime during 2007, 2008, or 2009. This interpretation of "previously worked" is appropriate because the benchmark period for the shrimp compensation plan is 2009,2008, and 2009, or 2007,2008, and 2009. (Exhibit 10, page 7). Thus, if the claimant has revenue as a boat captain for a commercial shrimping vessel home ported in the Gulf Coast areas during a period of time that could be used as a benchmark period, the claimant is not eligible for compensation under the new entrant compensation method. However, being a boat captain for a shrimping vessel home ported in the Gulf Coast areas prior to 2007 does not prohibit one from being a new entrant.

## Policy 141: Seafood Compensation Program: New Entrants

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment:

   BP agrees with CA comments.  Per Ex. 10 p 16, to be eligible for Boat Captain compensation under the New Entrant Compensation Method, the claimant must be someone "who had not previously worked as a Boat Captain for a commercial shrimping vessel home ported in the Gulf Coast Areas…"  The phrase "had not previously worked" means any time before January 2010.  A claimant with such work experience prior to January 2010 fails to satisfy the eligibility requirement for this compensation method. (5/31/12); BP defers to the response of John Perry and Dan Balhoff. (6/25/12); To the extent BP's responses to the six Seafood questions differ from those of John Perry / Dan Balhoff, BP now defers to the responses of John Perry / Dan Balhoff.  It is BP's view that the Seafood Compensation Program should be implemented by the Settlement Program consistent with the responses from John Perry/Dan Balhoff to all six questions.  Perhaps Steve or Jim can comment for PCC in this regard. (6/29/12)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/2/13
   c. Comment:

   John Perry should provide the answer. (5/31/12); Can be promulgated as a CA Decision (or clarification by the Seafood Neutral). (1/30/13); Should be published as a Clarification by the Seafood Neutral. (4/2/13)



DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-210 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

| I. Profile | | | |
|---|---|---|---|
| **Subject** | Prior Seafood Spill-Related Payments | | |
| **Active Date** | 5/29/13 | **Policy Impact** | ☑ All Claims Regardless of Active Date<br>☐ All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | Exhibit 10 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

| II. Summary |
|---|
| In applying offsets of Seafood Spill-Related Payments to compensation under the Seafood Program, the Claims Administrator will offset only the amount of the prior payment related to Seafood harvesting, rather than the entire amount of any prior payment relating to Seafood, where the Claims Administrator is able to make that determination with reasonable certainty. |

## Policy 210 v.1: Prior Seafood Spill-Related Payments

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  5/22/13
   c. Comment: N/A

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  5/14/2013
   c. Comment:  N/A

EXHIBIT B-5



**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| **Pol-210** | **CLAIMS ADMINISTRATOR'S APPROVED POLICY** |
|---|---|

| **I. Profile** ||
|---|---|

| **Subject** | Prior Seafood Spill-Related Payments |
|---|---|

| **Active Date** | 7/18/12 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
|---|---|---|---|

| **Type of Decision** | Claims Administrator Decision |
|---|---|

| **Settlement Agreement Reference** | Exhibit 10 |
|---|---|

| **Affected Claim Types and/or Review Processes** | Seafood |
|---|---|

| **II. Summary** |
|---|

In applying offsets of Seafood Spill-Related Payments to compensation under the Seafood Program, the Claims Administrator offset only the amount of the prior payment related to Seafood harvesting, rather than the entire amount of any prior payment relating to Seafood, where the Claims Administrator is able to make that determination with reasonable certainty.

EXHIBIT B-5

## Policy 210 v.0: Prior Seafood Spill-Related Payments
## (Superseded by Policy 210 v.1)

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment:

   Note Policy Id Nos. 210 and 211 address same issue, and must be harmonized.  BP does not agree to Policy Id No. 210. This policy is inconsistent with the express language of Exhibit 10, which makes clear payments for all economic loss claims relating to Seafood must be offset, not only those relating to harvesting of Seafood.  This issue was address by Seafood Neutral, and BP recalls Seafood Neutral concurred with BP's comment.  BP requests Panel discussion and/or input of Seafood Neutral.  Exhibit 10 provides that "Compensation received by an eligible Claimant under the Seafood Compensation Program will be reduced by the amount of prior Seafood Spill-Related Payments as described in the Seafood Spill Related Payment Reduction Procedures in this document." (p. 3)  Footnote 1 of Exhibit 10 defines "Seafood Spill-Related Payments" as "compensation paid to a claimant through the OPA Process, by BP, the GCCF, or through the Transition Facility for economic loss claims relating to Seafood."  (p.3)  "Seafood" is defined in Exhibit "fish and shell fish And then the "Seafood Spill-Payment Reduction Procedures" section of Exhibit 10 provides, "If the Claims Administrator determines that the Claimant has received Seafood Spill-Related Payments, the Claims Administrator shall offset any compensation under the Seafood Compensation by the total of the Seafood Spill-Related Payment amount."  (p. 85)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  4/2/13
   c. Comment:

   See No. 258. (1/30/13); Should be published as a CA Decision. (4/2/13)



| Pol-211 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---------|----------------------------------------|

| I. Profile | | | |
|---|---|---|---|
| **Subject** | Seafood Compensation Program: Prior Payments | | |
| **Active Date** | 5/29/13 | **Policy Impact** | ☒ All Claims Regardless of Active Date<br>☐ All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | Exhibit 10 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

| II. Summary |
|---|

The Settlement Agreement directs the Claims Administrator to determine whether the claimant has already received Seafood Spill-Related Payments from BP or the GCCF and, if so, to offset those against the total compensation amount. The Settlement draws a fundamental distinction between (1) business activities associated with the actual harvesting or catching of Seafood and (2) non-harvesting business activities that nevertheless involve Seafood, such as the processing or wholesale distribution of Seafood.  The Seafood Compensation Program covers claims for losses related to harvesting Seafood, while the Business Economic Loss ("BEL") and Individual Economic Loss Programs ("IEL") cover claims for losses related to non-harvesting business activities that involve Seafood. The Claims Administrator determined the term "Seafood Spill-Related Payment" as used in Exhibit 10 includes only prior payments made for Seafood harvesting activities. Therefore, prior payments for Seafood harvesting activities would offset payments made to Seafood harvesters for harvesting activities under the Seafood Program, but other prior payments made to Seafood harvesters for non-harvesting Seafood-related business activities would offset a claimant's BEL or IEL claims.

## Policy 211 v.1: Seafood Compensation Program: Prior Payments

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  5/22/13
   c. Comment: N/A

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  5/14/13
   c. Comment:  N/A

EXHIBIT B-5



| Pol-211 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

### I. Profile

| Subject | Seafood Compensation Program: Prior Payments | | |
|---|---|---|---|
| **Active Date** | 7/18/12 | **Policy Impact** | ☑ All Claims Regardless of Active Date<br>☐ All Claims Greater than Active Date |
| **Type of Decision** | | Clarified by Seafood Neutral | |
| **Settlement Agreement Reference** | | Exhibit 10 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

### II. Summary

The Settlement Agreement directs the Claims Administrator to determine whether the claimant has already received Seafood Spill-Related Payments from BP or the GCCF and, if so, to offset those against the total compensation amount. The Settlement draws a fundamental distinction between (1) business activities associated with the actual harvesting or catching of Seafood and (2) non-harvesting business activities that nevertheless involve Seafood, such as the processing or wholesale distribution of Seafood.  The Seafood Compensation Program covers claims for losses related to harvesting Seafood, while the Business Economic Loss ("BEL") and Individual Economic Loss Programs ("IEL") cover claims for losses related to non-harvesting business activities that involve Seafood. The Claims Administrator determined the term "Seafood Spill-Related Payment" as used in Exhibit 10 includes only prior payments made for Seafood harvesting activities, as the Seafood Program compensates only Seafood harvesters. Therefore, prior payments for Seafood harvesting activities would offset payments made to Seafood harvesters for harvesting activities under the Seafood Program, but other prior payments made to Seafood harvesters for non-harvesting Seafood-related business activities would offset a claimant's BEL or IEL claims.

EXHIBIT B-5

**Policy 211 v.0: Seafood Compensation Program: Prior Payments (Superseded by Policy 211 v.1)**

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment:

   BP objects to making this policy available publicly on the ground that it is premature. While the policy references a 7/13/12 Memorandum, BP is not aware that it received this Memorandum or an opportunity to comment.  BP requests that it be provided a copy of the 7/13/12 Memorandum, so that it can provide comment.  Also, Policy ID Nos 210 and 211 address the same issue, and must be harmonized.

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  4/2/13
   c. Comment:

   See No. 258. (1/30/13); Should be published as a CA Decision. (4/2/13)

EXHIBIT B-5


| Pol-242 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

| **I. Profile** ||||
|---|---|---|---|
| **Subject** | Vessel Registration and Ownership 4/20/10 to 12/31/10 ||||
| **Active Date** | 8/14/12 | **Policy Impact** | ☐ All Claims Regardless of Active Date<br>☑ All Claims Greater than Active Date |
| **Type of Decision** || Claims Administrator Decision ||
| **Settlement Agreement Reference** || Exhibit 10 ||
| **Affected Claim Types and/or Review Processes** || Seafood ||

| **II. Summary** |
|---|
| Claimants who have submitted proof of vessel registration for 2011 or 2012 (or if the Claims Administrator has obtained confirmation of such registration) may submit, or the Program may use, any one of the following to show vessel registration and ownership:<br><br>(a) A copy of the current vessel registration as well as Trip tickets or landing reports issued by Louisiana or Florida that show vessel registration information for the proper time period;<br>(b) Federal registration information provided on submitted Federal Fisheries Permits for the proper time period;<br>(c) Information in Federal and/or State vessel registration databases where available for the proper time period;<br>(d) Saltwater products license showing vessel registration numbers for the proper time period;<br>(e) Vessel registration receipts for the proper time period; or<br>(f) Vessel title for the proper time period. |

## Policy 242: Vessel Registration and Ownership 4/20/10 to 12/31/10

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  4/16/13
   c. Comment:

   As long as the Claimant has submitted valid registration documents for 2011 or 2012, BP agrees with the Claims Administrator that it is acceptable to accept items (a)-(f) to establish registration and ownership during the April 2010-December 2010 period. (8/22/12); BP recommended the following edits: As long as the Claimant has submitted valid registration documents for 2011 or 2012, Claimants may submit or the Program may use, any one of the following to show vessel registration and ownership: (1) A copy of the current vessel registration as well as Trip tickets or landing reports issued by Louisiana or Florida that show vessel registration information for the proper time period; (1)(2) Federal registration information provided on submitted Federal Fisheries Permits for the proper time period; (1)(3) Information in Federal and/or State vessel registration databases where available for the proper time period; (1)(4) Saltwater products license showing vessel registration numbers for the proper time period; (1)(5) Vessel registration receipts for the proper time period; or (1)(6) Vessel title for the proper time period. (9/21/12); Should be listed in column A as pertaining to Seafood Compensation Program claims. Inaccurate to classify as "Clarified by Seafood Neutral."  Instead, classify as CA Decision. (4/16/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  4/2/2013
   c. Comment:

   Re Seafood Compensation Program Claims, (Section C(2)) – In addition to the La. DWF database and other sources that are referenced, we understand that there may be a public database that lists all of the vessels with a federal and/or state registration number which can be used to verify vessel ownership.  We are trying to find that website so that, if in fact it exists, the Program should be able to rely upon that data as an additional resource to verify vessel ownership for the various years.  (8/17/12); Can be promulgated as a CA Decision (or clarification by the Seafood Neutral). (1/30/13); Should be published as a Clarification by the Seafood Neutral. (4/2/13)



| Pol-243 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

| I. Profile | | | |
|---|---|---|---|
| **Subject** | Commercial Fishing License Issued Before 4/20/10 for 2009 or 2010 Season | | |
| **Active Date** | 8/14/12 | **Policy Impact** | ☐ All Claims Regardless of Active Date<br>☑ All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | Exhibit 10 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

| II. Summary |
|---|

If a claimant has submitted valid commercial fishing license documents for 2011 or 2012, claimants may submit, or the Program may use, either of the following for proof of a commercial fishing license:

(a) Trip tickets or landing reports issued by Louisiana or Florida that show commercial fishing license information for the proper time period; and
(b) Commercial fishing license receipts for the proper time period.

## Policy 243: Commercial Fishing License Issued Before 4/20/10 for 2009 or 2010 Season

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  4/16/13
   c. Comment:

   As long as the Claimant has submitted valid commercial fishing license documents for 2011 or 2012, BP agrees with the Claims Administrator that it is acceptable to accept items (a)-(b) to establish a valid license for the 2009 or 2010 season. (8/21/12); BP recommended the following edits: As long as the Claimant has submitted valid commercial fishing license documents for 2011 or 2012, Claimants may submit, or the Program may use, any one of the following for proof of a commercial fishing license: (1) A copy of the current commercial fishing license as well as Trip tickets or landing reports issued by Louisiana or Florida that show commercial fishing license information for the proper time period; and (1)(2) Commercial fishing license receipts for the proper time period. (9/21/12); Should be listed in column A as pertaining to Seafood Compensation Program claims.  Inaccurate to classify as "Clarified by Seafood Neutral."  Instead, classify as CA Decision. (4/16/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  4/2/2013
   c. Comment:

   Can be promulgated as a CA Decision (or clarification by the Seafood Neutral). (1/30/13); Should be published as a Clarification by the Seafood Neutral. (4/2/13)

**DEEPWATER HORIZON**
# CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 258 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information | | | |
|---|---|---|---|
| **Policy Subject** | Proof of Prior Spill-Related Payments to Claimants | | |
| **Active Date** | 9/25/12 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | Exhibit 10 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

| II. Approved Policy |
|---|
| With regard to the requirement under the Seafood Program concerning submission of a sworn written statement establishing the amount of any prior Spill-related payments to the claimant, the Claims Administrator will consider the data transferred to the Claims Administrator by the Gulf Coast Claims Facility as the equivalent of the required sworn statement and will not require submission of additional documents on this issue, unless the Claims Administrator in his discretion determines a need for an additional statement and/or documents to resolve questions presented by a particular claim. |

EXHIBIT B-5

## Policy 258: Proof of Prior Spill-Released Payments to Claimants

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment:

   BP agrees with the Claim Administrator's proposed policy that he will consider the data transferred to the Claims Administrator by the Gulf Coast Claims Facility as the equivalent of the required sworn statement and will not require submission of additional documents on this issue, unless the Claims Administrator determines a need for an additional statement and/or documents to resolve questions presented by a particular claim. (9/28/12); Column A should clarify this Policy pertains to Seafood Compensation Program. Classify as CA Decision. (4/16/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/2/13
   c. Comment:

   These "requirements" were outlined by the Court-appointed neutral, who may or may not have been aware that the Program was going to have the GCCF database, from which such information could be reliably determined.  There is no reason for the claimant to have to provide a sworn written statement or other documentation that the Program already has.  (Particularly in this situation, where the set-off is in the nature of an defense, which should be established by BP.) (8/17/12); Class Counsel Defers to CA's Decision. (9/28/12); Appears to be superseded by No. 375. (4/2/13)

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 261 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information | | |
|---|---|---|
| **Policy Subject** | Exclusion of a Benchmark Year for Seafood Program Claimants | |
| **Active Date** | 10/8/12 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Clarified by Seafood Neutral |
| **Settlement Agreement Reference** | | Exhibit 10 |
| **Affected Claim Types and/or Review Processes** | | Seafood |

| II. Approved Policy |
|---|
| In any instance in which Exhibit 10 permits a Seafood Program claimant to request that the Claims Administrator exclude one or more years of the Benchmark Period from the compensation calculation if the claimant earned less-than-normal revenue for the year(s) identified because the claimant could not fish "at the same level of effort . . . due to circumstances beyond the claimant's control," the Claims Administrator will consider each request on a case-by-case basis to determine: (1) whether the circumstances presented justified the claimant's absence from seafood harvesting exclusion for one or more years of  the Benchmark Period; and (2) the level of proof required to establish such justification. |

EXHIBIT B-5

## Policy 261: Exclusion of a Benchmark Year for Seafood Program Claimants

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment:

   The hardship exception in the Seafood Compensation Plan provides: "In the event the Claims Administrator determines that the Claimant (individual or vessel) did not participate at the same level of effort in oyster harvesting due to circumstances beyond the Claimant's control (such as illness, disability or major mechanical failure), the Claims Administrator may at his discretion allow the Claimant to exclude one or more years of the Benchmark Period."  (Ex. 10 pg 28)   Because the claim made in Q10 relates to a potential issue of more general applicability to Mississippi oyster harvesters, as opposed to the inability of a claimant to perform to his or her (or the vessel's) same level of effort due to personal circumstances, we felt it appropriate to raise this issue with the Seafood Neutral.  It is BP's understanding that the Seafood Neutral feels it important that he be consulted when claims regarding interpretation of "circumstances beyond the claimant's control" that are of a general nature are received by the Settlement Program.  BP and PCC will be meeting with Dan Balhoff tomorrow in connection on other issues, and together we can discuss this question with him.   (7/18/12); As a general matter, the Seafood Neutral should provide his input regarding implementation of proposed Seafood Compensation Program policies. BP's view is that what the Claims Administrator proposed in Item 11(b) in response to requests by claimants to exclude more than one year from their Benchmark Period, should likewise apply to any claimant request to exclude a benchmark. There should be additional documentation from the claimant that establishes the right to exclude a benchmark year due to the circumstances set forth in Item 11(b)(1)-(4). For the Claims Administrator to determine that a claimant can exclude a benchmark year, there needs to be additional documentation beyond the claimant's assertion on the Claim Form. The Seafood Neutral designed the program to have standardized benchmark periods, except for exceptional circumstances, in order to ensure a reasonable estimate as to how much money will be paid out of the fund. An interpretation such as Item 11(a) would allow carte blanche exceptions that may upset that methodology. BP believes that it is reasonable that when a claimant seeks to change a generally applicable rule, the claimant should provide additional documentation as set forth in Item 11(b). Further, for "other circumstances" beyond illness, disability and major mechanical failure identified in Item 11(b)(4), the Seafood Neutral should be consulted as to whether it is appropriate. (9/28/12); Classify as CA Decision. (4/16/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/2/13
   c. Comment:

Class Counsel believe that the Policies set forth in the Claims Administrator's September 25th Memo are reasonable, and further note, as above, that the nature and structure of the Seafood Program vest the ultimate authority and discretion with the Court-Appointed Neutral to determine and the Claims Administrator to implement allocation of the Fund to eligible Class Members. (9/28/12); Can be promulgated as a CA Decision (or clarification by the Seafood Neutral), approved by the Parties. (1/30/13); Seems primarily internal. No objection to publishing as a CA Policy. Should, in any event, be provided to Appeal Panelists. (4/2/13)

EXHIBIT B-5

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 262 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information | |
|---|---|
| **Policy Subject** | Documents that Allocate Benchmark Period Revenues by Vessel, Landing, and Catch Type.  UPDATE:   The Claims Administrator modified these rules further and issued the following revised policy in the 10/8/12 Memo to the Parties after the 10/1/12 Panel heari |

| **Active Date** | 10/8/12 | **Policy Impact** | ☐All Claims Regardless of Active Date<br>☑All Claims Greater than Active Date |
|---|---|---|---|

| **Type of Decision** | Claims Administrator Decision |
|---|---|
| **Settlement Agreement Reference** | Exhibit 10 |
| **Affected Claim Types and/or Review Processes** | Seafood |

| II. Approved Policy |
|---|

EXHIBIT B-5

Documents that Allocate Benchmark Period Revenues by Vessel, Landing, and Catch Type – UPDATE - The Claims Administrator modified these rules further and issued the following revised policy in the 10/8/12 Memo to the Parties after the 10/1/12 Panel hearing:

 On any claim in the Seafood Program where the Claims Administrator is required to allocate the claimant's Benchmark Period revenue by catch type, vessel and landing location, interpreting and applying the language in Exhibit 10 that the claimant must provide "sufficient information" for the Claims Administrator to make such allocation, the Claims Administrator will use the information available on the claim in the following hierarchy of proof, as sufficient to satisfy the proof requirements of Exhibit 10 to the Settlement Agreement:

(a) Single Catch/Single Vessel Claimants:  If the claimant has submitted tax returns with supporting documents for the Benchmark Period and the Claims Administrator can determine from the Claim Form or other information available on the claim that the claimant is submitting a claim for only one vessel and one catch type:
(1) The Claims Administrator will allocate the revenues from the claimant's tax returns to the one type of catch asserted on the Claim Form, subject to the following.
(2) The revenues shall be limited to those shown in the applicable tax returns.
(3) The Claims Administrator will not enter or compute all information regarding trip tickets or their equivalent for the claimant, but will survey the documents available on the claim to note information that conflicts with the allocation assertions in the Claim Form.  If such conflict arises, the Claims Administrator will notify the claimant to resolve the issue or take such other steps as are necessary to determine the correct allocation on the claim.
(b) SWS-1 Claimants:  If the claimant is not subject to Subsection (a) and has submitted a signed Sworn Written Statement (SWS-1) to allocate the claimant's Benchmark Period revenues shown in tax returns:
(1) If the claimant has indicated in the SWS-1 that the Claims Administrator may rely only on the SWS-1 for such allocation:
a) The Claims Administrator will rely upon the SWS-1 allocation and will not consider trip tickets or other documents for that purpose, subject to the following.
b) The revenues shall be limited to those shown in the applicable tax returns.
c) The Claims Administrator will not enter or compute all information regarding trip tickets or their equivalent for the claimant, but will survey the documents available on the claim to note information that conflicts with the assertions in the SWS-1.  If such conflict arises, the Claims Administrator will notify the claimant to resolve the issue or take such other steps as are necessary to determine the correct allocation on the claim.
(2) If the claimant has indicated in the SWS-1 that the Claims Administrator is to use the claimant's trip ticket allocations if they result in a higher award than the SWS-1 allocation:
a) The Claims Administrator will determine the claimant's trip ticket allocation under Subsections (c) or (d) below and will compare the resulting award to that determined using the SWS-1 allocation.  The Claims Administrator will base the resulting Eligibility Notice on the higher award.
b) If the award is based upon the SWS-1 allocation, the revenues shall be limited to those shown in the applicable tax returns.

(c) Louisiana Trip Ticket Database:  If the claimant is not subject to Subsections (a) or (b) and the Claims Administrator is able to determine the claimant's Benchmark Period revenues using the trip ticket data received by the Claims Administrator from the Louisiana Department of Wildlife and Fisheries, the Claims Administrator will rely on such data to determine such revenues and their allocation by vessel and catch type and will not consider trip tickets other document for that purpose.  The Claims Administrator will not consider tax return revenues on such claims.
(d) Specific Trip Tickets or Equivalent:  If the Claimant is not subject to Subsections (a), (b) or (c), the Claims Administrator will determine the claimant's Benchmark Period revenues and their allocation using trip tickets or their equivalent.

EXHIBIT B-5

## Policy 262: Documents that Allocate Benchmark Period Revenues by Vessel, Landing, and Catch Type.

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment:

As a general matter, the Seafood Neutral should provide his input regarding implementation of proposed Seafood Compensation Program policies. BP does not agree with the Claims Administrator's proposal in Item 12. The Seafood Compensation Program developed by the Seafood Neutral provides two options for allocating a claimant's revenue by species, vessel and landing location: (i) the claimant's trip tickets or (ii) the claimant's tax returns and supporting documents. If the Claims Administrator's proposal in Item 12 were implemented, a claimant may be able to establish claims that result in overcompensation by submitting one claim or asserting that all the claimant's revenue comes from one commercial seafood species as opposed to several. The Claims Administrator cannot assume that a claimant who has filed only one claim does not harvest any other species. Claimants are not required to submit all claims simultaneously, and it is possible that some claimants will elect to file a claim for their primary species prior to filing additional claims. Nor can the Claims Administrator assume that all revenue on tax returns is from one species exclusively. Even if a claimant filed only one claim and asserted all revenue was from shrimp harvesting, there must be some affirmation by the claimant that all such revenue is from shrimp and substantiation from the claimant in the form of supporting documents for shrimp harvesting (such as a shrimping license). To do otherwise would allow a claimant to funnel all revenue to one species, when they are not entitled to do so because they harvested multiple species. The risks that BP identifies here have already manifested in some claims submitted to the Settlement Program, and BP would like to discuss this issue further. BP has observed that some claimants have submitted Sworn Written Statements that are inconsistent with the full information for that claimant. For example, BP has observed that a claimant submitted a Sworn Written Statement asserting all revenue on his tax return came from shrimp harvesting, but trip ticket data show revenues from multiple species. Another example BP has observed is that a Sworn Written Statement identified revenue greater than supported by tax returns for that claimant. The trip tickets provide the most consistently reliable source of claimant's revenue from all species. If a claimant submits a tax return with no supporting documents, the trip tickets are an appropriate source to confirm the revenues for that claimant. Additionally, if a Sworn Written Statement is inconsistent with the trip tickets, the Claims Administrator should seek additional information from the claimant to explain the discrepancy. (9/28/12); Classify as CA Decision.  Column A should make clear this Policy pertains to Seafood Compensation Program. (4/16/13)

**2. Class Counsel**
    a.  Decision:  Defer to Claims Administrator
    b.  Date:  4/2/13
    c.  Comment:

Class Counsel believe that the Policies set forth in the Claims Administrator's September 25th Memo are reasonable, and further note, as above, that the nature and structure of the Seafood Program vest the ultimate authority and discretion with the Court-Appointed Neutral to determine and the Claims Administrator to implement allocation of the Fund to eligible Class Members. (9/28/12); The Settlement Program should not be doing this. Certainly should not be doing it in light of a BP Appeal.  Should not be making reductions to final Eligibility Determinations, (except via the Appeal Process as set forth in the Settlement Agreement). (4/2/13)



| Pol-257 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

### I. Profile

| **Subject** | Documents that Allocate Benchmark Period Revenues by Vessel, Landing, and Catch Type.  UPDATE: Reliance Upon Available Data for Allocation Required in the Seafood Program | | |
|---|---|---|---|
| **Active Date** | 9/25/12 | **Policy Impact** | ☐All Claims Regardless of Active Date<br>☑All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | Exhibit 10 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

### II. Summary

Documents that Allocate Benchmark Period Revenues by Vessel, Landing, and Catch Type.  UPDATE:

Reliance Upon Available Data for Allocation Required in the Seafood Program.  On any claim in the Seafood Program where the Claims Administrator is required to allocate the claimant's revenue by catch type, vessel and landing location, interpreting and applying the language in Exhibit 10 that the claimant must provide "sufficient information" for the Claims Administrator to make such allocation, the Claims Administrator will use the information available on the claim in the following hierarchy of proof, as sufficient to satisfy the proof requirements of Exhibit 10 to the Settlement Agreement:

(a) If the claimant has submitted federal or state tax returns with supporting documents for the Benchmark Period and the Claims Administrator can determine from the Claim Form or other information available on the claim that the claimant is submitting a claim for only one vessel and one catch type, the Claims Administrator will allocate the revenues from the claimant's tax returns to the one type of catch asserted on the Claim Form, unless documents submitted by the claimant indicate that the revenues reported in the tax returns are not solely related to harvesting the catch type claimed.
(b) If the claimant is not subject to (a) and has submitted a signed Sworn Written Statement (SWS-1) to allocate the claimant's Benchmark Period revenues shown in tax returns and has indicated in the SWS-1 that the Claims Administrator may rely only on the SWS-1 for such allocation, the Claims Administrator will use the SWS-1 allocation and will not consider trip tickets or other documents for that purpose.
(c) If the claimant is not subject to (a) or (b) and the Claims Administrator is able to determine the claimant's Benchmark Period revenues using the trip ticket data received by the Claims Administrator from the Louisiana Department of Wildlife and Fisheries, the Claims Administrator will rely on such data to determine such revenues and their allocation by vessel and catch type and will not consider trip tickets other document for that purpose.
(d) If the Claimant is not subject to (a), (b) or (c), the Claims Administrator will determine the claimant's Benchmark Period revenues and their allocation using trip tickets or their equivalent.

**Policy 257: Documents that Allocate Benchmark Period Revenues by Vessel, Landing, and Catch Type. UPDATE:**
**Reliance Upon Available Data for Allocation Required in the Seafood Program**
**(Superseded by Policy 262)**

Comments and Decisions by the Parties:

1. **BP**
   a.  Decision:  Propose Modification
   b.  Date: 5/23/13
   c.  Comment:

   As a general matter, the Seafood Neutral should provide his input regarding implementation of proposed Seafood Compensation Program policies. BP does not agree with the Claims Administrator's proposal in Item 12. The Seafood Compensation Program developed by the Seafood Neutral provides two options for allocating a claimant's revenue by species, vessel and landing location: (i) the claimant's trip tickets or (ii) the claimant's tax returns and supporting documents. If the Claims Administrator's proposal in Item 12 were implemented, a claimant may be able to establish claims that result in overcompensation by submitting one claim or asserting that all the claimant's revenue comes from one commercial seafood species as opposed to several. The Claims Administrator cannot assume that a claimant who has filed only one claim does not harvest any other species. Claimants are not required to submit all claims simultaneously, and it is possible that some claimants will elect to file a claim for their primary species prior to filing additional claims. Nor can the Claims Administrator assume that all revenue on tax returns is from one species exclusively. Even if a claimant filed only one claim and asserted all revenue was from shrimp harvesting, there must be some affirmation by the claimant that all such revenue is from shrimp and substantiation from the claimant in the form of supporting documents for shrimp harvesting (such as a shrimping license). To do otherwise would allow a claimant to funnel all revenue to one species, when they are not entitled to do so because they harvested multiple species. The risks that BP identifies here have already manifested in some claims submitted to the Settlement Program, and BP would like to discuss this issue further. BP has observed that some claimants have submitted Sworn Written Statements that are inconsistent with the full information for that claimant. For example, BP has observed that a claimant submitted a Sworn Written Statement asserting all revenue on his tax return came from shrimp harvesting, but trip ticket data show revenues from multiple species. Another example BP has observed is that a Sworn Written Statement identified revenue greater than supported by tax returns for that claimant. The trip tickets provide the most consistently reliable source of claimant's revenue from all species. If a claimant submits a tax return with no supporting documents, the trip tickets are an appropriate source to confirm the revenues for that claimant. Additionally, if a Sworn Written Statement is inconsistent with the trip tickets, the Claims Administrator should seek additional information from the claimant to explain the discrepancy. (9/28/12); Please see attached memo. (5/23/13)

**2. Class Counsel**
   a. Decision:  Defer to Claims Administrator
   b. Date:  5/22/13
   c. Comment:

Should harmonize with No. 241, and promulgate as a Claims Administrator Decision, approved by the Parties. (1/30/13); Class Counsel believe that the Policies set forth in the Claims Administrator's September 25th Memo are reasonable, and further note, as above, that the nature and structure of the Seafood Program vest the ultimate authority and discretion with the Court Appointed Neutral to determine and the Claims Administrator to implement allocation of the Fund to eligible Class Members. (2/28/13); Appears that the Policy has already been announced.  It is a CA Decision. (4/2/13); Is this new / different? - Should be determined by, or at least with input from, the Seafood Neutral. - Also note the issue that recently arose re Trip Tickets which reflect the wrong Vessel; needs to be a way for the Claimant to clarify / correct. (5/8/13)

TO:            Patrick Juneau, Claims Administrator

FROM:        BP

DATE:         May 23, 2013

CC:            Class Counsel

RE:            BP Response to Policy ID #257 - Documents that Allocate Benchmark Period
               Revenues by Vessel, Landing, and Catch Type: Reliance Upon Available Data for
               Allocation Required in the Seafood Program

_____

        Proposed Policy 257, that was formerly Request ID 423, fails to take into account both (i)
modifications announced by the Claims Administrator to BP and Class Counsel in a
memorandum dated October 8, 2012 regarding "Revisions to or Clarifications of Selected Policy
Decisions Following the October 1, 2012 Panel Meeting"  (10/8/12 Memo) and (ii) an edit to the
revision announced in the 10/8/12 Memo that was agreed to by both BP and Class Counsel as
reflected in a 10/11/12 letter from Mark Holstein to Mr. Juneau.   The 10/8/12 Memo at Issue 12
announces a revision to the original proposed policy on Reliance Upon Available Data for
Allocation Required in the Seafood Program, which was announced on September 25, 2012.  At
a minimum, Proposed Policy 257 should be revised to reflect the revised language in the 10/8/12
Memo because the original policy announcement in the 9/25/12 policy announcement is
superseded by the revised policy announced in the 10/8/12 Memo.   Additionally, per an October
11, 2012 letter from Mark Holstein to Mr. Juneau in which Mr. Holstein report that "BP and
Class Counsel have been able to resolve several issues implicated by Revisions (Issues 2, 12, and
13)," BP reported to the Claims Administrator edits to Issue 12.  Specifically, Mr. Holstein's
letter provides "Class Counsel and BP  agree that the Claims Administrator's policy decision for
Issue 12 as set forth in the Claims Administrator's memo of October 8 should be amended by
adding the following underlined language to the first sentence of 12(a)(3) and 12(b)(1)(c):  "The
Claims Administrator will not enter or compute all information regarding trip tickets or their
equivalent for the claimant, but will survey the documents available on the claim, including
without limitation trip tickets, to note information that conflicts in a material manner with the
allocation assertions in the Claim Form, sworn statement, or other evidence submitted by the
Claimant."

        BP requests that the Settlement Program inform the parties whether that in determining
Seafood Compensation Program claims to date it has been implementing its policy on "Reliance
Upon Available Data for Allocation Required in the Seafood Program" consistent with the
10/8/12 Memo and edit agreed by BP and Class Counsel and reported to the Claims
Administrator in the 10/11/12 Holstein letter.

        In addition, BP incorporates its comments provided at Item 12 page 7 of 9 in a letter from
Mark Holstein to Mr. Juneau dated September 28, 2012 regarding September 25 Announcement
of Policy Decisions Regarding Claims Administration.

EXHIBIT B-5

# DEEPWATER HORIZON
## CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 241 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information | |
|---|---|
| **Policy Subject** | Documents that Allocate Benchmark Period Revenues by Vessel, Landing, and Catch Type |
| **Active Date** | 8/14/12 |

| **Active Date** | 8/14/12 | **Policy Impact** | ☐ All Claims Regardless of Active Date<br>☑ All Claims Greater than Active Date |
|---|---|---|---|
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | Exhibit 10 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

| II. Approved Policy |
|---|
| Exhibit 10 to the Settlement Agreement requires Vessel Owners, Commercial Fisherman Vessel Lessees, and Boat Captains to provide trip tickets or their equivalent to allocate their annual revenues by catch type, vessel and landing site.  Alternatively, claimants may submit (1) federal or state tax records showing their revenues and (2) "sufficient documentation" of vessel-specific and catch type-specific revenue derived from Seafood landed in the Gulf Coast Areas in the Benchmark Period.  See Ex. 10 at 10-12, 14, 17-20, 31-32, 45-47, 56-58.  Exhibit 10 further provides that, "[i]f necessary, the Claims Administrator may require supplemental information from the Claimant" to make determinations related to (1) the allocation of revenue from a certain catch type as compared to other sources and (2) the allocation of revenue for that catch type derived from landings in the Gulf Coast Areas.  See, e.g., Ex. 10 at 19.  To streamline the claims process and generate significantly more payable outcomes without changing claims criteria, the Claims Administrator exercised his expressly granted authority and created a Sworn Written Statement to serve as sufficient information to allocate Benchmark Revenue shown in tax returns to specific vessels and specific catch types for Seafood landed in the Gulf Coast Areas. This "Sworn Written Statement for Sufficient Documentation of Benchmark Revenue," or SWS-1, became available to all claimants on the public website on July 31, 2012.  The Claims Administrator promptly issued a formal portal alert to all registered law firms, proactively called law firms to notify them of the new Form, and posted SWS-1-specific FAQs on the public website.  Claimants who have submitted tax returns and no trip tickets or their equivalent may complete, sign, and submit a Sworn Written the SWS-1 to provide the required allocation of Benchmark Period revenues. |

EXHIBIT B-5

## Policy 241: Documents that Allocate Benchmark Period Revenues by Vessel, Landing, and Catch Type
## (Superseded by Policy 262)

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment:

   Exhibit 10 allows a claimant to use federal or state tax information for determining the amount of revenue earned that is attributable to a particular vessel.  However, in each of the seafood compensation program plans, the plan specifies that when a Claimant chooses to use tax financial information instead of trip tickets, "the Claimant must provide sufficient documentation for the Claims Administrator to be able to identify (i) Claimant's Revenue [by species] compared to other sources, (ii) Claimant's revenue from landings in the Gulf Coast Areas.  If necessary, the Claims Administrator may require supplemental information from the Claimant in order to make these determinations."  Accordingly, creation of SWS-1 is insufficient to satisfy this requirement.  For Claimants that have trip tickets or are from Louisiana, BP would recommend using that information as a source for allocating revenue.  Other sources of documentation that would be acceptable for allocating revenue reported on the tax return include invoices reporting sales of seafood by species, vessel log books, and inventory records.  Unlike other sworn written statements, SWS-1 does not require the Claimant to sign, and it should. (8/22/12); BP recommended the following edits: (1) Trip tickets should identify the revenues by vessel, landing and catch type and no additional documents should be necessary. (2) When benchmark revenues are established by tax returns and additional documents showing the necessary licenses and registration (such as shrimping license for claimants asserting shrimp harvest revenue), Claimants may complete, sign, and submit SWS-1 to provide the allocation. (3) Where a vessel owner has submitted a Seafood Compensation Claim relating to only one vessel and one catch type supported by the claimant's Tax Returns and additional documents showing the necessary license and registration (such as shrimping license for claims asserting shrimp harvest revenue), a SWS-1 or Trip Tickets will not be required.  Instead, the Claims Administrator will allocate the revenues from the claimant's Tax Returns to the one type of catch asserted on the Claim Form.  Where the documents submitted by the claimant indicate that the revenues reported in the Tax Returns are not solely related to harvesting the catch type claimed, the Claims Administrator will contact the claimant and request SWS-1. (8/21/12); Classify as CA Decision. (4/16/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/2/13
   c. Comment:

Is this revised by No. 257?  Final should be promulgated as a CA Decision, approved by the Parties. (1/30/13); The final should be published as a Clarification Agreed To by the Parties. (4/2/13)



| Pol-212 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

| **I. Profile** | | | |
|---|---|---|---|
| **Subject** | Seafood Compensation Program: Benchmark Revenue Documentation | | |
| **Active Date** | 7/18/12 | **Policy Impact** | ☐ All Claims Regardless of Active Date<br>☑ All Claims Greater than Active Date |
| **Type of Decision** | | Clarified by Seafood Neutral | |
| **Settlement Agreement Reference** | | Exhibit 10 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

| **II. Summary** |
|---|
| The Settlement Agreement further requires Vessel Owners, Boat Captains, and Commercial Fishermen Vessel Lessees to establish on a vessel-by-vessel basis, the amount of revenue derived from each specific catch type, landed in the qualifying Gulf Coast Areas during the Benchmark years of 2007, 2008, and/or 2009.  The Claims Administrator will make a Sworn Written Statement for Sufficient Documentation of Benchmark Revenue (SWS-1), available for claimants to supplement their claim with vessel-specific Benchmark Revenue information.  Claimants who submit an SWS-1 must either submit, or have already submitted, federal or state tax returns and schedules for the years that correspond to the Benchmark Revenue on the completed SWS-1 Form. |

## Policy 212: Seafood Compensation Program: Benchmark Revenue Documentation
## (Superseded by Policy 262)

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment:

   BP objects to making this policy available publicly on the ground that it is premature. While the policy references a 7/13/12 Memorandum, BP is not aware that it received this Memorandum or an opportunity to comment.  BP requests that it be provided a copy of the 7/13/12 Memorandum, so that it can provide comment.

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/2/13
   c. Comment:

   Can be promulgated as a CA Decision. (1/30/13); Should be published as a CA Decision. (4/2/13)



| Pol-269 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

### I. Profile

| Subject | Seafood Distribution Chain Definitions | | |
|---|---|---|---|
| Active Date | 10/10/12 | Policy Impact | ☐ All Claims Regardless of Active Date<br>☐ All Claims Greater than Active Date |
| Type of Decision | | | Claims Administrator Decision |
| Settlement Agreement Reference | | | |
| Affected Claim Types and/or Review Processes | | | Seafood |

### II. Summary

The Claims Administrator has encountered claims relating to these businesses that do not expressly fit in any of the definitions of the Seafood Distribution Chain in Exhibit 3.  These businesses play a necessary role in the distribution of Seafood, but they are not listed in Exhibit 3:

(a) Seafood Brokers:  These companies facilitate the bulk purchase of seafood from Commercial Wholesalers and the subsequent sale to Retailers and end users, but do not purchase, sell, take possession of or title to the seafood product.  Because Seafood Wholesaler or Distributor most accurately describes the activities of a Seafood Broker, the Claims Administrator will classify such a company as a Seafood Wholesaler or Distributor under the Seafood Distribution Chain.

(b) Seafood Transportation/Trucking/Hauling:  These are transportation businesses that deal exclusively with seafood.  They take possession of the seafood, but do not purchase or take title to the seafood transported and do not also operate a Landing Site.  Like Seafood Brokers, Seafood Transportation Businesses are third party intermediaries necessary to facilitate the purchase of bulk seafood and resale to the next step in the Distribution Chain. Accordingly, the Claims Administrator will classify such a company as a Seafood Wholesaler or Distributor under the Seafood Distribution Chain.

EXHIBIT B-5

## Policy 269: Seafood Distribution Chain Definitions

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date: 4/16/13
   c. Comment:

   BP Exploration & Production Inc. ("BP") is in receipt of the Revisions to or
   Clarifications of Select Policy Decisions Following the October 1, 2012 Panel Meeting
   ("Revisions") issued by the Settlement Program. We are pleased to report that BP and
   Class Counsel have been able to resolve several issues implicated by the Revisions
   (Issues 2, 12, and 13). (10/11/12); Classify as CA Decision. (4/16/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  4/2/13
   c. Comment:

   Can be promulgated as a CA Decision (or clarification by the Seafood Neutral).
   (1/30/13); Should be published as Clarification by the Seafood Neutral. (4/2/13)



| Pol-270 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

### I. Profile

| Subject | Definition of "Landings" in Seafood Program | |
|---|---|---|
| **Active Date** | 10/10/12 | **Policy Impact** | ☑ All Claims Regardless of Active Date<br>☐ All Claims Greater than Active Date |

| Type of Decision | Claims Administrator Decision |
|---|---|
| **Settlement Agreement Reference** | Exhibit 10 |
| **Affected Claim Types and/or Review Processes** | Seafood |

### II. Summary

Certain claimants have contended that the term "landings" or "landed" in the Seafood Program in Exhibit 10 to the Settlement Agreement should be construed to include the act of harvesting the seafood and placing it in a vessel while on any of the Specified Gulf Waters.   The term "landings" is not expressly defined in the Settlement Agreement.  The term "Landing Site," is defined as "a business at which boats first land their catch, including facilities for unloading and handling Seafood."  Ex. 3 at § 2.a. (emphasis added.)  The use of "land" in this definition informs the meaning of "landings," as vessels "land" their catch at a physical, shore-side location for handling and sale.  The definition of a "Seafood Dockside Worker" as "a Natural Person performing services for a Landing Site" further indicates that fishermen "land" their catch at shore-side docks.  In addition, the Settlement Agreement defines Gulf Coast Areas" separately from "Specified Gulf Waters," which suggests that "landings" made in the "Gulf Coast Areas" mean those made on shore and not the act of loading catch onto a vessel when out on the water.  Accordingly, the Claims Administrator interprets the term "landings" or "landing" in the Settlement Agreement to mean solely landing seafood at dockside, and not the act of placing catch into a vessel while out on the water.

EXHIBIT B-5

## Policy 270: Definition of "Landings" in Seafood Program

Comments and Decisions by the Parties:

1. **BP**
   a.  Decision:  Defer to Claims Administrator Decision
   b.  Date: 4/16/13
   c.  Comment:

   BP Exploration & Production Inc. ("BP") is in receipt of the Revisions to or
   Clarifications of Select Policy Decisions Following the October 1, 2012 Panel Meeting
   ("Revisions") issued by the Settlement Program. We are pleased to report that BP and
   Class Counsel have been able to resolve several issues implicated by the Revisions
   (Issues 2, 12, and 13). (10/11/12); Classify as CA Decision. (4/16/13)

2. **Class Counsel**
   a.  Decision:  Defer to Claims Administrator Decision
   b.  Date:  4/2/13
   c.  Comment:

   Can be promulgated as a CA Decision (or clarification by the Seafood Neutral).
   (1/30/13); Should be published as Clarification by the Seafood Neutral. (4/2/13)

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 271 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information | | | |
|---|---|---|---|
| **Policy Subject** | Oral Agreements Relating to Seafood Program Oyster Leasehold Claims | | |
| **Active Date** | 10/10/12 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Clarified by Seafood Neutral | |
| **Settlement Agreement Reference** | | Exhibit 10 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

| II. Approved Policy |
|---|

Section 2.2.B of the Oyster Leaseholder Compensation Plan in Exhibit 10 of the Settlement Agreement requires that, in addition to tax returns, financial statements, or business documents, an Oyster Leaseholder Lost Income Compensation claimant must provide "[c]ontracts or agreements between the Oyster Leaseholder and another natural person or entity that harvests oysters from their leaseholds located in Zones A, B or C, as reflected on the Oyster Leasehold Compensation Zone Map." Certain Oyster Leaseholder Lost Income claimants have informed the Claims Administrator that while they had oral agreements with oyster harvesters to harvest oysters off of the claimant's oyster leases, they had no written agreements and thus have no documents to submit in response to this requirement. The Claims Administrator has determined that this language of Exhibit 10 does not require that such contracts or agreements be in writing. The Claims Administrator will permit such claimants to satisfy this requirement by submitting a document that memorializes the terms of the oral agreements that existed at the relevant time. The Claims Administrator will require submission of a writing prepared at any time that describes the terms of the oral agreement and that is signed by the claimant and the oyster harvester that is a party to the oral agreement.

EXHIBIT B-5

## Policy 271: Oral Agreements Relating to Seafood Program Oyster Leasehold Claims

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment:

   With regard to Item 6 of your October 10, 2012 Announcement of Policy Decisions memorandum, BP, Class Counsel and the Seafood Neutral respectfully request that the title of the policy announcement be changed to read: Oral Contracts Relating to Seafood Program Oyster Lost Income Claims, rather than as it currently reads "Oral Lease Agreements Relating to Seafood Program Oyster Leasehold Claims." The substance of the policy announcement does not pertain to "oyster leases" as the document, but rather to contracts between an Oyster Leaseholder and an oyster harvester allowing the harvester to harvest from the leaseholder's lease. Specifically, the item pertains to Documentation Requirement 2.2 Documentation Requirements for Oyster Leaseholder Lost Income Claims which requires a Claimant to provide "Contracts or agreements between the Oyster Leaseholder and another natural person or entity that harvests oysters from their leaseholds located in Zones A, B, or C, as reflected on the Oyster Leasehold Compensation Zone Map." As to this documentation requirement regarding contracts or agreements between the Oyster Leaseholder and harvester, BP, Class Counsel and the Seafood Neutral have no objection to the Claims Administrator's policy decision, rather we fear the title of the policy decision is confusing because it mistakenly references "oral lease agreements" which would be a different animal all together than a contract between an Oyster Leaseholder and oyster harvester. (10/11/12)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/2/13
   c. Comment:

   After discussing with BP, we don't think there is an inconsistency between your Policy No. 6 and the determination by the Court-Appointed Neutral with concurrence of BP and Class Counsel on the "Private" Oyster Leaseholder Claims, as the Claims Administrator's Policy relates to "contracts" and not "leases".  At the same time, we think it would likely be helpful to draw this distinction in your heading: e.g., Oral Contracts Lease Agreements Relating to Seafood Program Oyster Leasehold Loss of Income Compensation Claims. (10/10/12); Wasn't a formal Policy recently released publicly on this?  Final should be promulgated as a CA Decision (or clarification by the Seafood Neutral). (1/30/13); Should be published as Clarification by the Seafood Neutral. (4/2/13)

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 272 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information | | | |
|---|---|---|---|
| **Policy Subject** | Deduction of Prior Spill-Related Payments from Oyster Leaseholder Compensation Payments | | |
| **Active Date** | 10/10/12 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Clarified by Seafood Neutral | |
| **Settlement Agreement Reference** | | Exhibit 10 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

| II. Approved Policy |
|---|

The Claims Administrator has reviewed with the Parties and the Seafood Neutral the contention presented by certain claimants that payments to Oyster Leaseholder Lost Income claimants under the Seafood Program in Exhibit 10 to the Settlement Agreement should not be offset by prior Spill-Related Payments to the claimant, on the ground that the prior payments represented compensation for lost income, while the Seafood Program payments represent compensation for property damages. The Seafood Neutral, BP and Class Counsel agreed that Prior Spill-Related Payments relating to Seafood must be deducted from payments to Oyster Leaseholder claimants under the Oyster Leaseholder Compensation Plan. Exhibit 10 at p. 2 provides that "[c]ompensation received by an eligible Claimant under the Seafood Compensation Program will be reduced by the amount of prior Seafood Spill-Related Payments as described in the Seafood Spill Related Payment Reduction Procedures in this document." Footnote 3 defines Seafood Spill-Related Payments as "compensation paid to a claimant through the OPA Process, the GCCF, or through the Transition Facility for economic loss claims relating to Seafood." All Oyster Leaseholder claims are covered by the Seafood Program and are Seafood interests. The Settlement Agreement does not delineate between property and other characterizations of the prior payments. Instead, the only distinction between the types of offsets under the Seafood Spill Related Payment Reduction Procedures is that between Seafood and. non-Seafood related prior payments.

EXHIBIT B-5

## Policy 272: Deduction of Prior Spill-Related Payments from Oyster Leaseholder Compensation Payments

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment:

   BP Exploration & Production Inc. ("BP") is in receipt of the Revisions to or Clarifications of Select Policy Decisions Following the October 1, 2012 Panel Meeting ("Revisions") issued by the Settlement Program. We are pleased to report that BP and Class Counsel have been able to resolve several issues implicated by the Revisions (Issues 2, 12, and 13). (10/11/12)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/2/13
   c. Comment:

   Can be promulgated as a CA Decision (or clarification by the Seafood Neutral). (1/30/13); Should be published as Clarification by the Seafood Neutral. (4/2/13)

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 277 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information | | | |
|---|---|---|---|
| **Policy Subject** | Subleases of Oyster Leaseholds | | |
| **Active Date** | 10/11/12 | **Policy Impact** | ☒All Claims Regardless of Active Date ☐All Claims Greater than Active Date |
| **Type of Decision** | | Clarified by Seafood Neutral | |
| **Settlement Agreement Reference** | | Exhibit 10 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

| II. Approved Policy |
|---|
| The Claims Administrator recommended to the Parties on 10/9/12 that claims based on subleases of oyster beds are compensable in the Oyster Compensation Plan in the Seafood Program.  The Parties responded that such claims can be based on subleases as follows:

(a) In Louisiana, Florida, Mississippi, and Texas, the sublessee must have a State-issued oyster lease ID number.
(b) In Alabama, sublessees are eligible without a State ID number.
(c) If there is both a lessee and a sublessee, allocation of the compensation amount is required.

The Claims Administrator is implementing that policy. |

EXHIBIT B-5

## Policy 277 v.1: Subleases of Oyster Leaseholds

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date: 4/16/13
   c. Comment:

   The question of whether a claim based on a sublease is compensable in the Oyster
   Compensation Plan in the Seafood Program is answered by the response of BP, Class
   Counsel and the Seafood Neutral to Question 5(A) above regarding private oyster leases.
   The term lease includes subleases. Accordingly, to be eligible for compensation under the
   Seafood Compensation Program, a Oyster Leaseholder Claimant seeking recovery for
   oyster leaseholds in Louisiana, Florida, Mississippi, and Texas must be the sublessee of
   an oyster sublease (whether "state-issued" or "private") for which the State has issued an
   oyster lease ID number. It is not sufficient that the State has issued an oyster lease ID
   number to for the lease, rather it must be the sublease that is registered with the State. In
   Alabama, where the state does not issue oyster lease ID numbers for oyster leases
   (including subleases), then Claimants who are sublessees of oyster leases (whether "state-
   issued" or "private") are eligible for compensation from the Seafood Compensation
   Program. Thus, if a claiming Oyster Leaseholder seeks compensation for a sublease in
   Louisiana, Florida, Mississippi or Texas that did not have a State-issued lease oyster ID
   number for the year 2010, then the Claimant may be eligible for compensation under
   other aspects of the Seafood Compensation Program, (e.g., Oyster Harvester Lost Income
   Compensation, compensation under a different Seafood Compensation Program category
   such as the Shrimp Compensation Plan or Finfish Compensation Plan, or Oyster
   Leaseholder Interest claims for oyster leases in Louisiana, Florida, Mississippi or Texas
   that do have a State-issued lease ID number); however, that Claimant's Oyster
   Leaseholder Interest claims and Oyster Leaseholder Lost Income claims arising out of
   any Louisiana, Florida, Mississippi or Texas oyster sublease without a State-issued lease
   ID number are Expressly Reserved Claims under the Settlement Agreement, such that
   they are neither compensated in nor released by the Economic Loss and Property
   Damages Settlement or the Individual Release. In the event there is both a lessee and a
   sub-lessee, allocation of the compensation amount is required. BP is conferring with
   Class Counsel and the Seafood Neutral to confirm that both are in agreement with BP's
   response to Item 5(B). (10/11/12); Classify as Certified by Seafood Neutral.  (4/16/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  4/2/13
   c. Comment:

   This should be governed by the rule above. In the States where a state-issued registration
   ID Number is required, a lessee or sub-lessee who has such a valid registration can
   recover; a lessee or sub-lessee who does not, cannot; however, his or her such claims are
   Expressly Reserved. There may be (where both the lessee and the sub-lessee are eligible

under the Settlement) an administrative potential double-recovery issue for the Program to work out, but we understand that, as a practical matter, in most cases where there is a sub-lease, the sub-lease is not formally registered with the State (and therefore will generally not be eligible). (10/11/12); The final FAQ should be provided to the Appeal Panelists (and public) as a clarification of the Agreement by the Seafood Neutral and the Parties. (1/30/13); The final FAQ should be published as a Clarification Agreed To by the Parties. (4/2/13)



| Pol-277 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---------|----------------------------------------|

### I. Profile

| | |
|---|---|
| **Subject** | Subleases of Oyster Leaseholds |

| **Active Date** | 10/11/12 | **Policy Impact** | ☑ All Claims Regardless of Active Date<br>☐ All Claims Greater than Active Date |
|---|---|---|---|

| **Type of Decision** | Clarified by Seafood Neutral |
|---|---|
| **Settlement Agreement Reference** | Exhibit 10 |
| **Affected Claim Types and/or Review Processes** | Seafood |

### II. Summary

The Claims Administrator recommended to the Parties on 10/9/12 that claims based on subleases of oyster beds are compensable in the Oyster Compensation Plan in the Seafood Program.  The Parties responded that such claims can be based on subleases as follows:

(a) In Louisiana, Florida, Mississippi, and Texas, the sublessee must have a State-issued oyster lease ID number.
(b) In Alabama, sublessees are eligible without a State ID number.
(c) If there is both a lessee and a sublessee, allocation of the compensation amount is required.

The Claims Administrator is implementing that policy.

## Policy 277 v.0: Seafood Compensation Program: Oyster Leaseholders (Superseded by Policy 277 v.1)

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date: 4/16/13
   c. Comment:

   Per Exhibit 3 and Exhibit 10 definitions of "Oyster Leaseholder," the oyster leaseholder is a lessee, not a lessor.  Thus, only a lessee who satisfies all other eligibility requirements may be compensated under the Oyster Leaseholder compensation plan methods, namely, Leaseholder Interest Compensation and Leaseholder Lost Income Compensation.  To the extent there exists a legally valid oyster lease with a private lessor, it is possible such a person or entity might qualify for the Oyster Harvester compensation plan method, Historical Revenue Compensation, provided all the other requirements are met.  (5/31/12); To the extent BP's responses to the six Seafood questions differ from those of John Perry / Dan Balhoff, BP now defers to the responses of John Perry / Dan Balhoff.  It is BP's view that the Seafood Compensation Program should be implemented by the Settlement Program consistent with the responses from John Perry/Dan Balhoff to all six questions.  Perhaps Steve or Jim can comment for PCC in this regard.  (6/29/12)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  4/2/13
   c. Comment:

   John Perry should provide the answer. (5/31/12); Isn't this subsumed within / superseded by the FAQ that was issued? (1/30/13); Isn't this subsumed within / superseded by the "Private" Oyster Lease FAQ that was issued? If so, the entire FAQ should be published as a Clarification Agreed To by the Parties.  If not, it should be published as a Clarification by the Seafood Neutral. (4/2/13)

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 282 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information | | | |
|---|---|---|---|
| **Policy Subject** | Leases of Private Oyster Beds | | |
| **Active Date** | 10/19/12 | **Policy Impact** | ☑All Claims Regardless of Active Date ☐All Claims Greater than Active Date |
| **Type of Decision** | | Clarified by Seafood Neutral | |
| **Settlement Agreement Reference** | | FAQ 189 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

| II. Approved Policy |
|---|

Leases of privately-owned oyster beds are included in the Settlement Class and Compensation Program. The Class is defined to include all Oyster Leaseholders, whether the lease establishes the Claimant as the lessee of an oyster leasehold for which the state is the lessor ("state-issued lease") or the lessee of an oyster leasehold for which a private landowner is the lessor ("private lease"). However, while private leases are included in the Settlement Class, certain private leases may not be eligible to receive payment under the Seafood Compensation Program, and thus those oyster leaseholders will have their associated Oyster Leaseholder Interest claims in connection with such private leases Expressly Reserved. To be eligible for compensation under the Seafood Compensation Program, a Oyster Leaseholder Claimants seeking recovery for oyster leaseholds in Louisiana, Florida, Mississippi, and Texas must be the lessee of an oyster lease (whether "state-issued" or "private") for which the State has issued an oyster lease ID number. In Alabama, where the state does not issue oyster lease ID numbers for oyster leases, then Claimants who are lessees of oyster leases (whether "state-issued" or "private") are eligible for compensation from the Seafood Compensation Program. Thus, if a claiming Oyster Leaseholder seeks compensation for a lease in Louisiana, Florida, Mississippi or Texas that did not have a State-issued lease oyster ID number for the year 2010, then the Claimant remains in the Class and may be eligible for compensation under other aspects of the Seafood Compensation Program, (e.g., Oyster Harvester Lost Income Compensation, compensation under a different Seafood Compensation Program category such as the Shrimp Compensation Plan or Finfish Compensation Plan, or Oyster Leaseholder Interest claims for oyster leases in Louisiana, Florida, Mississippi or Texas that do have a State-issued lease ID number); however, that Claimant's Oyster Leaseholder Interest claims and Oyster Leaseholder Lost Income claims arising out of any Louisiana, Florida, Mississippi or Texas oyster lease without a State-issued lease ID number are Expressly Reserved Claims under the Settlement Agreement, such that they are neither compensated in nor released by the Economic Loss and Property Damages Settlement or the Individual Release.

EXHIBIT B-5

## Policy 282: Leases of Private Oyster Beds

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment:

   Per Exhibit 3 and Exhibit 10 definitions of "Oyster Leaseholder," the oyster leaseholder is a lessee, not a lessor.  Thus, only a lessee who satisfies all other eligibility requirements may be compensated under the Oyster Leaseholder compensation plan methods, namely, Leaseholder Interest Compensation and Leaseholder Lost Income Compensation.  To the extent there exists a legally valid oyster lease with a private lessor, it is possible such a person or entity might qualify for the Oyster Harvester compensation plan method, Historical Revenue Compensation, provided all the other requirements are met.  (5/31/12); To the extent BP's responses to the six Seafood questions differ from those of John Perry / Dan Balhoff, BP now defers to the responses of John Perry / Dan Balhoff.  It is BP's view that the Seafood Compensation Program should be implemented by the Settlement Program consistent with the responses from John Perry/Dan Balhoff to all six questions.  Perhaps Steve or Jim can comment for PCC in this regard.  (6/29/12); Classify as Certified by Seafood Neutral. (4/16/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/2/13
   c. Comment:

   John Perry should provide the answer. (5/31/12); The final FAQ should be provided to the Panelists (and public) as a clarification of the Agreement by the Seafood Neutral and the Parties. (Note typo in first line: Should be Settlement "Class") (1/30/13); The final FAQ should be published as a Clarification Agreed To by the Parties. (4/2/13)

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 283 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information | | | |
|---|---|---|---|
| **Policy Subject** | Revenue History of Vessels Sold Before 4/20/10 | | |
| **Active Date** | 10/19/12 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Clarified by Seafood Neutral | |
| **Settlement Agreement Reference** | | FAQ 176 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

| II. Approved Policy |
|---|
| Claimants are eligible only for compensation for a vessel that the claimant continued to own or lease during 4/20/10 to 12/31/10.  The payable compensation amount is based solely on the revenue that the vessel the claimant continued to own or lease in that period generated during the Benchmark Period.  A claimant cannot "swap" or aggregate Benchmark Period revenue from vessels sold or no longer leased before 4/20/10 with revenues of vessels still owned or leased on 4/20/10. |

EXHIBIT B-5

## Policy 283: Revenue History of Vessels Sold Before 4/20/10

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment:

   Under the terms of the Seafood Compensation Plan, a Claimant can only make claims for vessels that they owned during the time period of April 20, 2010 to December 31, 2010. See e.g., Ex. 10 at 52. Once the Claimant provides evidence of ownership of a vessel, then the Claimant establishes the benchmark revenue to be used in the claim based on the historic revenue of that vessel. See Ex. 10 at 12 ("A Claimant may have more than one vessel and is eligible for compensation for each vessel for which the Claimant independently satisfies the eligibility and documentation requirements"); Ex. 10 at 18 (discussing eligibility requirements for Historic Revenue and identifying "trip tickets for each vessel for which Claimants seek compensation" or tax information and "sufficient documentation to identify those components of gross revenue derived from commercial harvesting by vessel."). The Seafood Compensation Program clearly states that revenues are based on the historic revenue of the specific vessel. A claimant cannot combine revenues from multiple vessels, including vessels not owned between April 20, 2010 to December 31, 2010 to enhance his or her recovery. The per vessel requirement is consistent in the Seafood Compensation Program and is consistent with the FAQs and a policy clarification BP and Class Counsel will be providing to the Claims Administer clarifying that a Claimant who adds a vessel to his or her fleet can recover for that vessel because his earning capacity in 2010 increased as the fleet size increased. To be consistent with the terms of the Seafood Compensation Program and the policy behind the FAQs, Claimant cannot use multiple vessel revenues for benchmark period and can only make claims for vessels they own during the time period of April 20, 2010 to December 31, 2010 based on that vessel's revenue. BP has forwarded the Claims Administrator's 10/9 Request for the Positions of the Parties, along with BP's response, to consult the Seafood Neutral for his view. Under the terms of the Seafood Compensation Plan, a Claimant can only make claims for vessels that they owned during the time period of April 20, 2010 to December 31, 2010. See e.g., Ex. 10 at 52. Once the Claimant provides evidence of ownership of a vessel, then the Claimant establishes the benchmark revenue to be used in the claim based on the historic revenue of that vessel. See Ex. 10 at 12 ("A Claimant may have more than one vessel and is eligible for compensation for each vessel for which the Claimant independently satisfies the eligibility and documentation requirements"); Ex. 10 at 18 (discussing eligibility requirements for Historic Revenue and identifying "trip tickets for each vessel for which Claimants seek compensation" or tax information and "sufficient documentation to identify those components of gross revenue derived from commercial harvesting by vessel."). The Seafood Compensation Program clearly states that revenues are based on the historic revenue of the specific vessel. A claimant cannot combine revenues from multiple vessels, including vessels not owned between April 20, 2010 to December 31, 2010 to enhance his or her recovery. The per vessel requirement is consistent in the

Seafood Compensation Program and is consistent with the FAQs and a policy clarification BP and Class Counsel will be providing to the Claims Administer clarifying that a Claimant who adds a vessel to his or her fleet can recover for that vessel because his earning capacity in 2010 increased as the fleet size increased. To be consistent with the terms of the Seafood Compensation Program and the policy behind the FAQs, Claimant cannot use multiple vessel revenues for benchmark period and can only make claims for vessels they own during the time period of April 20, 2010 to December 31, 2010 based on that vessel's revenue. BP has forwarded the Claims Administrator's 10/9 Request for the Positions of the Parties, along with BP's response, to consult the Seafood Neutral for his view. (10/11/12); Classify as Certified by Seafood Neutral.  (4/16/13)

2.   **Class Counsel**
   a.   Decision:  Defer to Claims Administrator
   b.   Date:  4/2/13
   c.   Comment:

Class Counsel and BP have been in consultation with the Court-Appointed Neutral to ascertain his intent, and to formalize in a FAQ. (10/11/12); Can be promulgated as a CA Decision (or clarification by the Seafood Neutral). (Note that the 4/20/12 should be "4/20/10".) (1/30/13); Should be published as a Clarification by the Seafood Neutral. (4/2/13)



| Pol-284 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---------|----------------------------------------|

| I. Profile | | | |
|---|---|---|---|
| **Subject** | Seafood Crew Compensation Plan | | |
| **Active Date** | 10/19/12 | **Policy Impact** | ☑ All Claims Regardless of Active Date<br>☐ All Claims Greater than Active Date |
| **Type of Decision** | | | Clarified by Seafood Neutral |
| **Settlement Agreement Reference** | | | Exhibit 10 |
| **Affected Claim Types and/or Review Processes** | | | Seafood |

| II. Summary |
|---|
| Seafood Crew claimants who receive compensation in Categories II and III do participate in any second distribution if there are Seafood Compensation Program Amount funds remaining after the Claims Administrator pays all eligible Seafood Compensation Program claims. |

EXHIBIT B-5

## Policy 284: Seafood Crew Compensation Plan

Comments and Decisions by the Parties:

1. **BP**
   a. Decision: Defer to Claims Administrator Decision
   b. Date: 4/16/13
   c. Comment:

   Q: In the Seafood Crew Compensation Plan of the Seafood Compensation Program, do Claimants who receive compensation in Categories II and III participate in any second distribution in the event there are Seafood Compensation Program Amount funds remaining after the Claims Administrator pays all eligible Seafood Compensation Program claims? A: Yes, Claimants who receive compensation in Categories II and III do participate in any second distribution of remaining Seafood Compensation Program Amount funds. (10/12/12); Classify as Certified by Seafood Neutral. (4/16/13)

2. **Class Counsel**
   a. Decision: Defer to Claims Administrator Decision
   b. Date: 47/2/13
   c. Comment:

   Can be promulgated as a CA Decision (or clarification by the Seafood Neutral), approved by the Parties. (1/30/13)



**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 285 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information | | |
|---|---|---|
| **Policy Subject** | No Income During Benchmark Period | |
| **Active Date** | 10/19/12 | **Policy Impact** | ☒All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Clarified by Seafood Neutral |
| **Settlement Agreement Reference** | | FAQ 177 |
| **Affected Claim Types and/or Review Processes** | | Seafood |

| II. Approved Policy |
|---|

Under the Seafood Program, claimants with no income from owning or leasing a vessel or harvesting shrimp, oysters, fin fish, blue crab, or other seafood or from working as a Seafood Crew in the Benchmark Period nonetheless are Class Members. According to the Class Definition in Section 1.1 of the Settlement Agreement, an individual is a Class Member if at any time between 4/20/10 and 4/16/12, the claimant owned or leased or worked on a vessel harbored or home ported in the Gulf Coast Areas, or the Specified Gulf Waters, or worked on a vessel in Specified Gulf Waters after April 20, 2009. With respect to Seafood Crew, persons must have worked on a vessel that landed Seafood in the Gulf Coast Areas after April 20, 2009.  Under Section 1.2.3 an entity is in the Class if it owned, operated, or leased a vessel (1) that was Home Ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012 or (2) landed Seafood in the Gulf Coast Areas at any time from April 20, 2009 to April 16, 2012.  Individuals and Entities who meet these geographical descriptions are included in the Economic Class only if their claims meet the descriptions of one or more enumerated Damage Categories, including the Seafood Compensation Program.  The description for Seafood Compensation Program provides "Damages suffered by a COMMERCIAL FISHERMAN, Seafood Crew, or SEAFOOD VESSEL OWNER that owned, operated, leased or worked on a vessel that was (1) Home Ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012, or (2) Landed Seafood in the Gulf Coast Areas at any time from April 20, 2009 to April 16, 2012; and damages suffered by, OYSTER LEASEHOLDERS and IFQ Owners.  (Exhibit 10).  Claims for Economic Damage arising from fishing, processing, selling, catching, or harvesting menhaden ("pogy") fish are excluded from the Seafood Compensation Program and other Economic Damage Claims under this Agreement.   A claimant may also be a Class Member based on the existence of other claims that meet the description of one or more of the other damage categories, such as VoO Charter Payment or Subsistence.  The Shrimp Compensation Plan provides a New Entrant Compensation Method for vessel owners, commercial fishermen vessel lessees and boat captains for which claimants with no income may qualify if they satisfy the eligibility requirements.  In the Oyster, Finfish, Blue Crab/Other Compensation Plans, claimants with no income would not satisfy the eligibility requirements for vessel owner/commercial fishermen vessel lessee compensation or for boat captain compensation because they have no Benchmark Period revenue for the vessel and no Benchmark Period earnings as a boat captain.  In the Seafood Crew Plan, such a claimant may qualify for compensation under Categories II or III if the claimant satisfies the eligibility requirements.

EXHIBIT B-5

## Policy 285: No Income During Benchmark Period

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment:

   Q:  Under the Seafood compensation Program, if I have no income from owning or leasing a vessel or harvesting shrimp, oysters, fin fish, blue crab, or other seafood or from working as a seafood crew in the Benchmark Period, am I a Class Member?  A: Per the Class Definition, Section 1.1 of the Settlement Agreement, if you are an individual, you are a class member if at any time between April 20, 2010 and April 16, 2012, you owned or leased or worked on a vessel harbored or home ported in the Gulf Coast Areas, or the Specified Gulf Waters, or worked on a vessel in Specified Gulf Waters after April 20, 2009. With respect to Seafood Crew, persons must have worked on a vessel that landed Seafood in the Gulf Coast Areas after April 20, 2009. Per the Class Definition, Section 1.2.3, if you are an entity, you are in the class if you owned, operated, or leased a vessel (1) that was Home Ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012 or (2) landed Seafood in the Gulf Coast Areas at any time from April 20, 2009 to April 16, 2012.  Individuals and Entities who meet these geographical descriptions are included in the Economic Class only if their Claims meet the descriptions of one or more enumerated Damage Categories, including the Seafood Compensation Program.  The description for Seafood Compensation Program provides "Damages suffered by a COMMERCIAL FISHERMAN, Seafood Crew, or SEAFOOD VESSEL OWNER that owned, operated, leased or worked on a vessel that was (1) Home Ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012, or (2) Landed Seafood in the Gulf Coast Areas at any time from April 20, 2009 to April 16, 2012; and damages suffered by, OYSTER LEASEHOLDERS and IFQ Owners.  (Exhibit 10).  Claims for Economic Damage arising from fishing, processing, selling, catching, or harvesting menhaden ("pogy") fish are excluded from the Seafood Compensation Program and other Economic Damage Claims under this Agreement.   (You may also be a Class Member based on the existence of other claims that meet the description of one or more of the other damage categories, such as VoO Charter Payment or Subsistence.) In this situation, the Shrimp Compensation Plan provides a New Entrant Compensation Method for vessel owners, commercial fishermen vessel lessees and boat captains for which you may qualify if you satisfy the eligibility requirements.  In the Oyster, Finfish, Blue Crab/Other Compensation Plans, you would not satisfy the eligibility requirements for vessel owner/commercial fishermen vessel lessee compensation or for boat captain compensation because you have no Benchmark Period revenue for the vessel and no Benchmark Period earnings as a boat captain. In the Seafood Crew Plan, you may be qualify for compensation under Categories II or III if you satisfy the eligibility requirements.(10/18/12); Classify as Certified by Seafood Neutral. (4/16/13)

**2. Class Counsel**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/2/13
   c. Comment:

Can be promulgated as a CA Decision (or clarification by the Seafood Neutral), approved by the Parties. (Note, however, that Class Counsel have not agreed that these Claimants are in fact Class Members or bound by the Class Release.) (1/30/13); Can be promulgated as a CA Decision (or clarification by the Seafood Neutral), approved by the Parties. (Note, however, that Class Counsel have not agreed that these Claimants are in fact Class Members or bound by the Class Release.) (4/2/13)

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 290 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information | |
|---|---|
| **Policy Subject** | Boat Captains with Multiple Vessels in the Benchmark Period |
| **Active Date** | 10/25/12 | **Policy Impact** | ☑ All Claims Regardless of Active Date ☐ All Claims Greater than Active Date |
| **Type of Decision** | | | Clarified by Seafood Neutral |
| **Settlement Agreement Reference** | | | FAQ 180 |
| **Affected Claim Types and/or Review Processes** | | | Seafood |

| II. Approved Policy |
|---|
| Boat captain need not work on the same vessel in 2010 that he or she worked on in the Benchmark Period to be eligible for compensation.  Under the Oyster, Finfish or Blue Crab/Other Compensation Plans, compensation for a boat captain is calculated using his or her Benchmark Period earnings for vessel(s) that he or she worked on. |

## Policy 290: Boat Captains with Multiple Vessels in the Benchmark Period

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment:

   Q:  Under the Seafood Compensation Program, if a boat captain worked on one vessel in the Benchmark Period that qualifies for compensation under the Oyster, Finfish or Blue Crab/Other Seafood Compensation Plan but changed to work on a different vessel in 2010, is the boat captain eligible for compensation, and, if so, how will compensation be calculated? A:  Yes, a boat captain need not work on the same vessel in 2010 that he or she worked on in the Benchmark Period to be eligible for compensation.  Under the Oyster, Finfish or Blue Crab/Other Compensation Plans, compensation for a boat captain is calculated using his or her Benchmark Period earnings for vessel(s) that he or she worked on. (10/18/12); Classify as Certified by Seafood Neutral. (4/16/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/2/13
   c. Comment:

   Can be promulgated as a CA Decision (or clarification by the Seafood Neutral), approved by the Parties. (1/30/13); Should be published as a Clarification by the Seafood Neutral. (4/2/13)

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 291 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information | | | |
|---|---|---|---|
| **Policy Subject** | 2010 Shrimp Vessel Change (Vessel Owners/Vessel Lessees) | | |
| **Active Date** | 10/25/12 | **Policy Impact** | ☐All Claims Regardless of Active Date<br>☑All Claims Greater than Active Date |
| **Type of Decision** | | Clarified by Seafood Neutral | |
| **Settlement Agreement Reference** | | FAQ 184 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

| II. Approved Policy |
|---|

If the Claims Administrator determines that the vessel the Claimant owned or leased in the Benchmark Period qualifies in all respects for the either the Expedited Compensation Method or the Reduced Expedited Method of the Shrimp Compensation Plan and that the Claimant, in fact, changed to a different vessel for the 2010 season, the Claimant's compensation amount will be the vessel owner/lessee compensation amount for the same expedited method for which the Claimant's Benchmark Period vessel qualifies but for the vessel class of  the Claimant's 2010 vessel. The vessel classes identified in the Shrimp Compensation Plan take into account vessel size and type, e.g. <30', 30'-44', 45'-74' (Ice), 45'-74' (Freezer), >75' (Ice) and >75' (Freezer).

If in the Benchmark Period the Claimant owned a 45'-74' (Ice) vessel with revenue that qualifies for the Expedited Compensation Method, but the Claimant sold the vessel in December 2009 and purchased a 75' (Ice) vessel, then the Claimant's compensation amount will be the Expedited Compensation Method vessel owner/lessee compensation amount for a 75' (Ice) vessel.

A claimant who switches to owning or leasing a different vessel in 2010 from the vessel owned or leased in the Benchmark Period must provide sufficient proof that it owned or leased the Benchmark Period vessel during the Benchmark Period; that it was no longer using the Benchmark Period vessel in 2010, i.e. that the vessel was sold or destroyed; and that the claimant in fact purchased or leased a different vessel for 2010.

EXHIBIT B-5

## Policy 291: 2010 Shrimp Vessel Change (Vessel Owners/Vessel Lessees)

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment:

   Q:  Under the Shrimp Compensation Plan of the Seafood Compensation Program, if an entity owned or leased a vessel in the Benchmark Period with revenue that qualifies for an expedited method but for the 2010 season the same entity changed to a different vessel is the Claimant able to proceed under the expedited method for the 2010 vessel?  A:  If the Claims Administrator determines that the vessel the Claimant owned or leased in the Benchmark Period qualifies in all respects for the either the Expedited Compensation Method or the Reduced Expedited Method of the Shrimp Compensation Plan and that the Claimant, in fact, changed to a different vessel for the 2010 season, the Claimant's compensation amount will be the vessel owner/lessee compensation amount for the same expedited method for which the Claimant's Benchmark Period vessel qualifies but for the vessel class of  the Claimant's 2010 vessel. The vessel classes identified in the Shrimp Compensation Plan take into account vessel size and type, e.g. <30', 30'-44', 45'-74' (Ice), 45'-74' (Freezer), >75' (Ice) and >75' (Freezer). For example, if in the Benchmark Period the Claimant owned a 45'-74' (Ice) vessel with revenue that qualifies for the Expedited Compensation Method, but the Claimant sold the vessel in December 2009 and purchased a 75' (Ice) vessel, then the Claimant's compensation amount will be the Expedited Compensation Method vessel owner/lessee compensation amount for a 75' (Ice) vessel.  A claimant who switches to owning or leasing a different vessel in 2010 from the vessel owned or leased in the Benchmark Period must provide sufficient proof that it owned or leased the Benchmark Period vessel during the Benchmark Period; that it was no longer using the Benchmark Period vessel in 2010, i.e. that the vessel was sold or destroyed; and that the claimant in fact purchased or leased a different vessel for 2010. [NOTE TO SETTLEMENT PROGRAM:   This is a clarification of the Seafood Compensation Program which requires that each vessel for which a vessel owner/lessee seeks compensation under an expedited method be owned or leased by the claimant in both April 20-December 31, 2010 and in the Benchmark Period.  The Seafood Neutral, BP and Class Counsel would like to expand the understanding of the expedited method to make it available to a Claimant who sold or lost his Benchmark Period vessel and purchased/leased a new vessel in April 20-December 31 2010 such that the Claimant's 2010 vessel is compensated at the expedited method amount, provided that the claimant's Benchmark Period vessel qualifies for the expedited method.  Under the current interpretation, the new 2010 vessel would qualify only for the New Entrant method.  Unlike the Oyster, Finfish and Blue Crab/Other Compensation Plans, the Shrimp Compensation Plan provides different compensation amounts based upon vessel size and type, referred to as vessel class.  As a result of this new interpretation, the claimant not only benefits by having the vessel compensated based on the expedited method rather than new entrant, but also to the extent there was an upgrade of vessel class.  An adjustment to the claimant's compensation amount is made if there is a change in the

vessel class of the vessel owned/leased by the claimant in 2010 as compared to the vessel class of the vessel that the Claimant owned or leased in the Benchmark Period.   A sworn written statement or other type of statement by the Claimant standing alone will be insufficient to establish that the Claimant owned or leased the Benchmark Period vessel during the Benchmark Period; that the Benchmark Period vessel was not used by the Claimant in 2010, e.g. it was sold or destroyed; and that the claimant in fact purchased or leased a different vessel for 2010.   In addition to proof of vessel ownership or the vessel lease for both the Benchmark Period and the 2010 vessel, the Claimant will need to provide proof the Benchmark Period vessel was not used in 2010 by the Claimant, and the new vessel was used instead.  Examples of such proof include:  (1) Comparison of claimant's trip tickets for Benchmark Period and 2010 such that in the Benchmark Period they contain the license number of the Boat Captain hired by the vessel owner/lessee and the vessel registration number for the claimant's Benchmark Period vessel and in 2010 the trip tickets contain the license number of the Boat Captain hired by the vessel owner/lessee for 2010 and the vessel registration number for the claimant's 2010 vessel. (2) Insurance documentation such as submission of a claim for major damage to the claimant's Benchmark Period vessel, or correspondence in which the claimant requests that the insurer remove the Benchmark Period vessel from coverage and add the 2010 vessel to the policy (3) Sales contract reflecting the claimant's sale of the Benchmark Period vessel, and a purchase contract reflecting the claimant's purchase of the replacement vessel. (4) Lease agreements reflecting termination of the lease for the Benchmark Period vessel and a new lease for the 2010 vessel.  There may be other examples of a similar nature that are listed here, the sufficient of which will be left to the Claims Administrator's discretion (with the understanding that a Claimant s/worn written statement alone will not suffice).] (10/18/12); Classify as Certified by Seafood Neutral. (4/16/13)

2.  **Class Counsel**
   a.  Decision:  Defer to Claims Administrator
   b.  Date:  4/2/13
   c.  Comment:

Can be promulgated as a CA Decision (or clarification by the Seafood Neutral), approved by the Parties. (1/30/13); Should be published as a Clarification by the Seafood Neutral. (4/2/13)

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 292 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information | | | |
|---|---|---|---|
| **Policy Subject** | 2010 Oyster, Finfish, Blue Crab/Other Seafood Vessel Change (Vessel Owners/Vessel Lessees) | | |
| **Active Date** | 10/25/12 | **Policy Impact** | ☐All Claims Regardless of Active Date<br>☑All Claims Greater than Active Date |
| **Type of Decision** | | Clarified by Seafood Neutral | |
| **Settlement Agreement Reference** | | FAQ 179 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

| II. Approved Policy |
|---|
| A claimant is eligible for compensation for the 2010 vessel if it owned or leased a vessel in the Benchmark Period that qualifies for compensation under the Oyster, Finfish or Blue Crab/Other Seafood Compensation Plans. Under the Oyster, Finfish or Blue Crab/Other Compensation Plans, compensation is calculated using the revenue generated by the vessel that the entity owned or leased in the Benchmark Period.<br>A claimant who switches to owning or leasing a different vessel in 2010 from the vessel that it owned or leased in the Benchmark Period must provide sufficient proof to establish that it owned or leased the Benchmark Period vessel during the Benchmark Period; that it was no longer using the Benchmark Period vessel in 2010, e.g., that the vessel was sold or destroyed; and that the claimant in fact purchased or leased a different vessel for 2010. |

EXHIBIT B-5

## Policy 292: 2010 Oyster, Finfish, Blue Crab/Other Seafood Vessel Change (Vessel Owners/Vessel Lessees)

Comments and Decisions by the Parties:

1. **BP**
   a.  Decision:  Defer to Claims Administrator
   b.  Date:  4/16/13
   c.  Comment:

Q:  Under the Seafood Compensation Program, if an entity owned or leased a vessel in the Benchmark Period that qualifies for compensation under the Oyster, Finfish, or Blue Crab/Other  Seafood Compensation Plan but the same entity changed to a different vessel in 2010, is the 2010 vessel eligible for compensation, and, if so, how will compensation be calculated? A:  Yes, a claimant is eligible for compensation for the 2010 vessel if it owned or leased a vessel in the Benchmark Period that qualifies for compensation under the Oyster, Finfish or Blue Crab/Other Seafood Compensation Plans.  Under the Oyster, Finfish or Blue Crab/Other Compensation Plans, compensation is calculated using the revenue generated by the vessel that the entity owned or leased in the Benchmark Period. A claimant who switches to owning or leasing a different vessel in 2010 from the vessel that it owned or leased in the Benchmark Period must provide sufficient proof to establish that it owned or leased the Benchmark Period vessel during the Benchmark Period; that it was no longer using the Benchmark Period vessel in 2010, e.g., that the vessel was sold or destroyed; and that the claimant in fact purchased or leased a different vessel for 2010. [NOTE TO SETTLEMENT PROGRAM: This is a clarification of the Seafood Compensation Program in that the Oyster, Finfish, Blue Crab/Other Plans require that for each vessel for which a vessel owner/lessee seeks compensation that the claimant both (i) own/lease the vessel in April 20-December 31, 2010 and (ii) own/lease that same vessel in the Benchmark Period.  This clarification allows a Claimant who was no longer using his Benchmark Period vessel in 2010, e.g. because he sold it or it was destroyed or significantly damaged, and who purchased or leased a new vessel in April 20-December 31 2010 to be compensated for the new vessel,  and explains how compensation is to be calculated.  A sworn written statement or other type of statement by the Claimant standing alone will be insufficient to establish that the Claimant owned or leased the Benchmark Period vessel during the Benchmark Period; that the Benchmark Period vessel was not used by the Claimant in 2010, e.g. it was sold or destroyed; and that the claimant in fact purchased or leased a different vessel for 2010.  In addition to proof of vessel ownership or the vessel lease for both the Benchmark Period and the 2010 vessel, the Claimant will need to provide proof the Benchmark Period vessel was not used in 2010 and the new vessel was used instead.  Examples of such proof include:  (1) Comparison of claimant's trip tickets for Benchmark Period and 2010 such that in the Benchmark Period they contain the license number of the Boat Captain hired by the vessel owner/lessee and the vessel registration number for the claimant's Benchmark Period vessel and in 2010 the trip tickets contain the license number of the Boat Captain hired by the vessel owner/lessee for 2010 and the vessel registration number for the claimant's 2010 vessel. (2) Insurance documentation such as submission of a claim for major damage to the claimant's Benchmark Period vessel, or correspondence in which

the claimant requests that the insurer remove the Benchmark Period vessel from coverage and add the 2010 vessel to the policy (3) Sales contract reflecting the claimant's sale of the Benchmark Period vessel, and a purchase contract reflecting the claimant's purchase of the replacement vessel. (4) Lease agreements reflecting termination of the lease for the Benchmark Period vessel and a new lease for the 2010 vessel.  There may be other examples of a similar nature that are not listed here, the sufficiency of which will be left to the Claims Administrator's discretion (with the understanding that a Claimant sworn written statement alone will not suffice). Unlike the Shrimp Compensation Plan, the Compensation Plans for Oyster, Finfish, Blue Crab/Other do not vary compensation amounts based on the size or type of vessel owned/leased by the Claimant.  Thus, no adjustment to the compensation amount is required if there is a change in the vessel class of the vessel used for the 2010 fishing season as compared to the vessel owned or leased by the Claimant in the Benchmark Period.] (10/18/12); Classify as Certified by Seafood Neutral. (4/16/13)

2. **Class Counsel**
    a. Decision:  Defer to Claims Administrator
    b. Date:  4/2/13
    c. Comment:

Can be promulgated as a CA Decision (or clarification by the Seafood Neutral), approved by the Parties. (1/30/13); Should be published as a Clarification by the Seafood Neutral. (4/2/13)

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 293 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information | | | |
|---|---|---|---|
| **Policy Subject** | 2010 Shrimp Vessel Change (Boat Captains) | | |
| **Active Date** | 10/25/12 | **Policy Impact** | ☐All Claims Regardless of Active Date<br>☑All Claims Greater than Active Date |
| **Type of Decision** | | Clarified by Seafood Neutral | |
| **Settlement Agreement Reference** | | FAQ 185 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

| II. Approved Policy |
|---|

A Boat Captain (whether he has an exclusive work arrangement with the vessel owner/lessee or he is the vessel owner/lessee) qualifies in all respects for the either the Expedited Compensation Method or the Reduced Expedited Method of the Shrimp Compensation Plan for the vessel on which he or she worked in the Benchmark Period and that the Claimant, in fact, committed to an exclusive arrangement to work on the vessel owner/lessee's new vessel for the 2010 season, the Claimant's compensation amount will be the Boat Captain compensation amount for the same expedited method for which the Claimant's Benchmark Period vessel qualifies but for the vessel class of the vessel on which the Claimant worked in 2010. The vessel classes identified in the Shrimp Compensation Plan take into account vessel size and type, e.g. <30', 30'-44', 45'-74' (Ice), 45'-74' (Freezer), >75' (Ice) and >75' (Freezer). An exclusive arrangement is one in which the Boat Captain works on no other vessel, and the vessel owner/lessee exclusively used the Boat Captain Claimant as the boat captain on the vessel at issue.

For example, if (1) in the Benchmark Period the Boat Captain had an exclusive arrangement to work for a vessel owner of a 45'-74' (Ice) vessel with revenue that qualifies for the Expedited Compensation Method, and (2) in December 2009 the vessel owner/lessee sold the 45'-74' (Ice) vessel and purchased a new 75' (Ice) vessel, and (3) the Boat Captain accepted an exclusive arrangement to work on the new vessel, then the Boat Captain's compensation amount will be the Expedited Compensation Method Amount for Boat Captains who work on 75+feet (Ice) vessels, rather than the Compensation Amount for Boat Captains who work on 45-74 feet (Ice) vessels.

Boat Captain with such circumstances must provide sufficient proof to establish (i) that he had an exclusive work arrangement to work for the vessel owner/lessee during the Benchmark Period on the Benchmark Period vessel (or that he was the vessel owner/lessee and worked as the only Boat Captain on the vessel), (ii) the vessel owner/lessee replaced the Benchmark Period vessel on which he worked with a new vessel for 2010, and (iii) that he had an exclusive work arrangement to work on the vessel owner/lessee's new vessel for 2010 (or that he was the vessel owner/lessee and was going to work as the only Boat Captain on the new vessel in 2010).

EXHIBIT B-5

## Policy 293: 2010 Shrimp Vessel Change (Boat Captains)

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment:

   Q:  Under the Shrimp Compensation Plan of the Seafood Compensation Program, if a Boat Captain worked exclusively in the Benchmark Period for a Vessel Owner/Lessee on a vessel that generated revenue that qualifies for an Expedited Method but for the 2010 season the Vessel Owner/Lessee switched to the a new vessel that the Boat Captain was to work on exclusively, how is the Boat Captain Claimant's compensation determined? How about if the Boat Captain is also the Vessel Owner/Lessee?  A:  In such a circumstance, if the Claims Administrator determines that the Boat Captain (whether he has an exclusive work arrangement with the vessel owner/lessee or he is the vessel owner/lessee) qualifies in all respects for the either the Expedited Compensation Method or the Reduced Expedited Method of the Shrimp Compensation Plan for the vessel on which he or she worked in the Benchmark Period and that the Claimant, in fact, committed to an exclusive arrangement to work on the vessel owner/lessee's new vessel for the 2010 season, the Claimant's compensation amount will be the Boat Captain compensation amount for the same expedited method for which the Claimant's Benchmark Period vessel qualifies but for the vessel class of  the vessel on which the Claimant worked in 2010.  The vessel classes identified in the Shrimp Compensation Plan take into account vessel size and type, e.g. <30', 30'-44', 45'-74' (Ice), 45'-74' (Freezer), >75' (Ice) and >75' (Freezer).  An exclusive arrangement is one in which the Boat Captain works on no other vessel, and the vessel owner/lessee exclusively used the Boat Captain Claimant as the boat captain on the vessel at issue. For example, if (1) in the Benchmark Period the Boat Captain had an exclusive arrangement to work for a vessel owner of a 45'-74' (Ice) vessel with revenue that qualifies for the Expedited Compensation Method, and (2) in December 2009 the vessel owner/lessee sold the 45'-74' (Ice) vessel and purchased a new a 75' (Ice) vessel, and (3) the Boat Captain accepted an exclusive arrangement to work on the new vessel, then the Boat Captain's compensation amount will be the Expedited Compensation Method Amount for Boat Captains who work on 75+feet (Ice) vessels, rather than the Compensation Amount for Boat Captains who work on 45-74 feet (Ice) vessels.  A Boat Captain with such circumstances must provide sufficient proof to establish (i) that he had an exclusive work arrangement to work for the vessel owner/lessee during the Benchmark Period on the Benchmark Period vessel (or that he was the vessel owner/lessee and worked as the only Boat Captain on the vessel), (ii) the vessel owner/lessee replaced the Benchmark Period vessel on which he worked with a new vessel for 2010, and (iii) that he had an exclusive work arrangement to work on the vessel owner/lessee's new vessel for 2010 (or that he was the vessel owner/lessee and was going to work as the only Boat Captain on the new vessel in 2010).  [NOTE TO SETTLEMENT PROGRAM:   This is a clarification of the Seafood Compensation Program in that the Shrimp Compensation Plan does not as a general matter look to the vessel on which the Boat Captain works in 2010 to determine

the compensation amount.  Rather, compensation is based entirely on the Boat Captain's earnings in the Benchmark Period. This clarification is to allow a Boat Captain Claimant who is (or works exclusively for) a vessel owner/lessee who upgrades to a larger vessel class in 2010 from the vessel owned or leased in the Benchmark Period to take advantage of the higher compensation amount under the Expedited Methods for the larger class size vessel. Because this is an expansion of the Shrimp Compensation Plan, there are some additional documentation requirements. A sworn written statement or other type of statement by the Boat Captain Claimant standing alone will be insufficient to establish (i) that he had an exclusive arrangement to work for the vessel owner/lessee during the Benchmark Period on the Benchmark Period vessel; (ii) that he had an exclusive arrangement to work for the vessel owner / lessee in 2010 on the new vessel; or (iii) that the vessel owner/lessee replaced the Benchmark Period vessel on which he worked with a new vessel for 2010.   Examples of proof sufficient to document a Boat Captain's exclusive employment for the vessel owner/lessee include an employment contract, Employer Sworn Written Statement, and trip tickets with the Boat Captain's license information, or, if the Boat Captain is the vessel owner, trip tickets with his license information or financial records that do not reflect payments to a third party Boat Captain.   Examples of proof sufficient to establish the switch of vessels from the Benchmark Period to 2010 include:  (1) Comparison of Claimant's trip tickets for Benchmark Period and 2010 such that in the Benchmark Period they contain the Boat Captain's license number and vessel registration for the employer's Benchmark Period vessel and in 2010 they contain the Boat Captain's license number and the vessel registration for the employer's new boat (2) Captain's log books or other documentation substantiating the Boat Captain's attachment to the Benchmark Period vessel and then to the replacement vessel.  There may be other examples of a similar nature that are not listed here, the sufficiency of which will be left to the Claim Administrator's discretion (with the understanding that a Claimant sworn written statement alone will not suffice).] (10/18/12); Classify as Certified by Seafood Neutral. (4/16/13)

**2. Class Counsel**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/2/13
   c. Comment:

Can be promulgated as a CA Decision (or clarification by the Seafood Neutral), approved by the Parties. (1/30/13); Should be published as a Clarification by the Seafood Neutral. (4/2/13)

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 294 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information ||
|---|---|
| **Policy Subject** | Old Entrant/Adds a Vessel |

| **Active Date** | 10/29/12 | **Policy Impact** | ☐All Claims Regardless of Active Date<br>☑All Claims Greater than Active Date |
|---|---|---|---|

| **Type of Decision** | Clarified by Seafood Neutral |
|---|---|
| **Settlement Agreement Reference** | FAQ 182 |
| **Affected Claim Types and/or Review Processes** | Seafood |

| II. Approved Policy ||
|---|---|

If an entity owned and/or leased a fleet of vessels in the Benchmark Period and the same entity purchased or leased an additional vessel for use in 2010 fishing season, is the additional vessel eligible for compensation under the Seafood Compensation Plan, and, if so, how is compensation calculated?

A:  In all Seafood Compensation Plans, if an entity, for example an LLC, owned and/or leased a fleet of vessels in the Benchmark Period and the same entity establishes that it added an additional vessel to its fleet for the 2010 fishing season, the Claims Administrator will apply the average Benchmark Period revenue data for the relevant vessels from the Claimant's fleet to determine the compensation amount for the newly added vessel.

For Claimants in the Oyster, Finfish and Blue Crab/Other Compensation Plans, Benchmark Period revenue for the newly added vessel will be calculated as the average for all vessels in the Claimant's fleet that were operating to harvest the relevant species during the Benchmark Period (applying the same Benchmark Period for all vessels in the Claimant's fleet).

For example, if the Claimant owned six vessels during the Benchmark Period -- three vessels used to finfish and three vessels used to shrimp, and the new vessel the Claimant purchased to add to his fleet for the 2010 fishing season was another finfish vessel, only the average Benchmark Period revenue for the Claimant's three finfish vessels will be considered to determine the compensation amount for his new finfish vessel.   The Benchmark Period revenue for all three finfish vessels must be included for the average Benchmark Period revenue.

For Claimants in the Shrimp Compensation Plan, Benchmark Period Revenue for the new vessel will be calculated as the average Benchmark Period revenue for the Claimant's shrimping vessels in the same vessel class as the Claimant's new vessel that were operating during the Benchmark Period, using the same Benchmark Period for all such vessels.  The vessel classes identified in the Shrimp Compensation Plan take into account vessel size and type, e.g. <30', 30'-44', 45'-74' (Ice), 45'-74' (Freezer), >75' (Ice) and >75' (Freezer).

If a Shrimp Compensation Plan Claimant did not have any shrimping vessels in its fleet during the Benchmark Period that are in the same vessel class as the new shrimping vessel that the Claimant purchased or leased to add to its fleet for the 2010 fishing season, then the Benchmark Period revenue that will be used for the new vessel will be the average revenue for the vessel class of the newly purchased or leased vessel as reported in Table 1:

Table 1:  Average Revenue by Shrimp Vessel Class

Class Size/Type Average Revenue
1 < 30' $7,399
2 30' - 44' $29,527
3 45' - 74' (Ice) $66,881
4 45'- 74' (Freezer) $220,772
5 > 75' (Ice) $179,586
6 > 75' (Freezer) $362,160

In addition to the documentation requirements in the Seafood Compensation Plan, the Claimant must provide proof it added the new vessel to its fleet for the 2010 fishing season (e.g. purchase or lease documentation with date of purchase or lease), documentation establishing the type of Seafood harvesting for which the newly added vessel was used for during the 2010 fishing season, and, for shrimping vessels, sufficient documentation to identify the vessel class of the newly added vessel. Also, the Claimant must provide a Sworn Statement attesting that it has identified all vessels that it owned or leased in the Benchmark Period, the type of Seafood harvesting for which the vessel was used, and, for shrimping vessels, the vessel class for each vessel.  For Claimants in the Oyster, Finfish and Blue Crab/Other Compensation Plans, the Claimant must provide for each vessel in the Claimant's fleet during the Benchmark Period engaged in harvesting the relevant Seafood species (i) sufficient documentation for the Claims Administrator to establish proof of ownership of, or a leasehold interest in, the vessel during the Benchmark Period and (ii) documentation sufficient to determine the annual revenue generated by the vessel.  A Claimant who seeks to exclude a vessel it owned or leased during the Benchmark Period from the determination of average Benchmark Period revenue because it was not in operation during the Benchmark Period, e.g. it was non-operable, must provide proof the vessel was not in operation.  For Claimants in the Shrimp Compensation Plan, the Claimant must provide for each shrimping vessel (i) sufficient documentation for the Claims Administrator to establish proof of ownership of, or a leasehold interest in, the vessel during the Benchmark Period, and the vessel class (ii) documentation sufficient to determine the annual revenue generated by each vessel in the same vessel class as the Claimant's newly added vessel.

EXHIBIT B-5

## Policy 294: Old Entrant/Adds a Vessel

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment:

   Classify as Certified by Seafood Neutral. (4/16/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/2/13
   c. Comment:

   Can be promulgated as a CA Decision (or clarification by the Seafood Neutral), approved by the Parties. (1/30/13); Should be published as a Clarification by the Seafood Neutral. (4/2/13)

EXHIBIT B-5



| Pol-311 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---------|----------------------------------------|

| **I. Profile** | | | |
|---|---|---|---|
| **Subject** | Seafood Program: Affidavits as Evidence of Landings made within the Gulf Coast Area | | |
| **Active Date** | 12/17/12 | **Policy Impact** | ☐ All Claims Regardless of Active Date<br>☑ All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | Exhibit 10 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

| **II. Summary** |
|---|
| The Claims Administrator will consider affidavits from both the claimant and the wholesaler who issued trip tickets as reliable evidence that landings listed on those triptickets were made within the Gulf Coast Area. If such documentation is submitted by the claimant, we will count those revenues in the calculation of the claimant's Seafood Compensation Award. |

## Policy 311:  Seafood Program: Affidavits as Evidence of Landings made within the Gulf Coast Area

Comments and Decisions by the Parties:

1. **BP**
   a.   Decision:  Defer to Claims Administrator Decision
   b.   Date: 4/16/13
   c.   Comment:

   Classify as CA Decision. (4/16/13)

2. **Class Counsel**
   a.   Decision:  Defer to Claims Administrator Decision
   b.   Date:  4/2/13
   c.   Comment:

   Can be promulgated as a CA Decision (or clarification by the Seafood Neutral). (1/30/13); Should be published as Clarification by the Seafood Neutral. (4/2/13)



| Pol-313 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

| I. Profile | | | |
|---|---|---|---|
| **Subject** | Seafood Program: Bedding Ground Rental Receipts | | |
| **Active Date** | 12/21/12 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | Exhibit 10 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

| II. Summary |
|---|
| The Settlement Agreement requires claimants to submit a copy of the oyster lease or title.  The Bedding Ground Rental Receipts are not a reliable substitute because the ownership information contained on a copy of the lease may not be reflected on the associated receipts.  Enforcing this documentation requirement will not significantly burden claimants, who can obtain copies of their leaseholds easily and quickly by contacting the LDWF.  The vast majority of Oyster Leaseholder Lost Interest Claimants have submitted copies of the original oyster leases. |

EXHIBIT B-5

## Policy 313:  Seafood Program: Bedding Ground Rental Receipts

Comments and Decisions by the Parties:

1. **BP**
   a.   Decision:  Defer to Claims Administrator Decision
   b.   Date: 4/16/13
   c.   Comment:

   Classify as CA Decision. (4/16/13)

2. **Class Counsel**
   a.   Decision:  Defer to Claims Administrator Decision
   b.   Date:  4/2/13
   c.   Comment:

   Wasn't this recently modified? The final should be promulgated as a CA Decision (or clarification by the Seafood Neutral). (1/30/13); Final should be published as a Clarification by the Seafood Neutral. (4/2/13)



| Pol-334 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

### I. Profile

| | |
|---|---|
| **Subject** | Seafood Compensation Program: Benchmark Revenue Treatment of Unreported Cash Sales of Seafood in Louisiana |

| **Active Date** | 2/8/13 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
|---|---|---|---|

| **Type of Decision** | Claims Administrator Decision |
|---|---|
| **Settlement Agreement Reference** | Exhibit 10 |
| **Affected Claim Types and/or Review Processes** | Seafood |

### II. Summary

All Louisiana Wholesale/Retail Dealers and Fresh Products Licensees must participate in the Trip Ticket Program and report all Seafood landings to the LDWF. If a Louisiana commercial fisherman sells landings in cash to individuals, that fisherman must report the cash transaction to the LDWF Trip Ticket Program. However, certain claimants have indicated that, in practice, cash sales are seldom reported to the LDWF and generally are poorly documented. These claimants have requested that the Claims Administrator accept handwritten receipts from unreported cash sales made in Louisiana as proof of additional Benchmark Revenue. Ex. 10 to the Settlement Agreement requires Vessel Owner claimants to submit either (1) Trip Tickets or their equivalents or (2) federal or state tax information and other sufficient documentation as evidence of their Benchmark Revenue. (Ex. 10 at 19.) Because handwritten receipts from cash sales do not include vessel information or commercial fishing license numbers, they are not equivalent to trip tickets. Further, these receipts represent revenue not reported either to Louisiana when the sale was made or to the Federal government on the claimant's tax returns. Accordingly, the Claims Administrator will not accept such documentation to prove Benchmark Revenue.

## Policy 334: Seafood Compensation Program: Benchmark Revenue Treatment of Unreported Cash Sales of Seafood in Louisiana

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  4/16/13
   c. Comment:

   BP does not have any comments to the Claims Administrator's January 11, 2013 Policy Announcements. (1/18/13); Classify as CA Decision. (4/16/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  4/2/13
   c. Comment:

   Class Counsel defer to the Claims Administrator's interpretation per Section 4.3.1 of the Settlement Agreement, as outlined above. (1/18/13); Should be promulgated as a CA Decision. (1/30/13); Should be published as a CA Decision. (4/2/13)

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 335 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information | |
|---|---|
| **Policy Subject** | Seafood Compensation Program: Determination of Vessel Length |
| **Active Date** | 2/8/13 |

| | | | |
|---|---|---|---|
| **Active Date** | 2/8/13 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | Exhibit 10 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

| II. Approved Policy |
|---|

Both the VoO Program and the Seafood Compensation Program rely on a vessel's length to determine the amount of a claimant's award. The VoO Program uses the greater of the vessel length recorded in the Master Vessel Charter Agreement (MVCA) or the vessel length in the government registration to establish the vessel length for the purposes of the compensation calculation. This policy, which the Claims Administrator decided after soliciting input from the parties, gives claimants the benefit of the longer measurement between two source documents common to all VoO claims. The Seafood Compensation Program does not have a similar controlling database of all vessel lengths. For proof of the vessel length in the Seafood Compensation Program, the Settlement Agreement states that "the Claimant must provide documentation to establish the vessel size and type for each vessel for which the Claimant seeks Compensation." (Exhibit 10 at 11.) The Settlement Agreement does not specify the type of documents that can be used to establish a vessel length. Some claimants have submitted conflicting information about the lengths of their vessels, where the length listed in their vessel registration documents conflicts with the corresponding figure in the MVCA database used on VoO claims. BP compiled the MVCA database during the VoO program using lengths reported by claimants. Claimants with a higher vessel length in the MVCA database than is listed on the official registration for the vessel have asked that the Claims Administrator compensate them in the Seafood Compensation Program on the basis of the greater vessel length. Vessel length significantly affects the amount of the claimant's award in the Shrimp portion of the Seafood Compensation Program, and increasing one claimant's award reduces the value of all other claims to be compensated by the limited Seafood Compensation Fund. The Claims Administrator has determined that the claimant-reported specifications in the MVCA database are less reliable than the official vessel length data provided on the State and Federal registration documents. Accordingly, the Claims Administrator will base the vessel size determination for purposes of the Seafood Compensation
Program on the more consistent and reliable information in the state and federal vessel registration documentation, rather than vessel lengths in the MVCA database.

EXHIBIT B-5

## Policy 335: Seafood Compensation Program: Determination of Vessel Length

Comments and Decisions by the Parties:

1.  **BP**
    a.  Decision:  Defer to Claims Administrator Decision
    b.  Date:  4/16/13
    c.  Comment:

    BP does not have any comments to the Claims Administrator's January 11, 2013 Policy Announcements. (1/18/13); Classify as CA Decision. (4/16/13)

2.  **Class Counsel**
    a.  Decision:  Defer to Claims Administrator Decision
    b.  Date:  4/2/13
    c.  Comment:

    Class Counsel defer to the Claims Administrator's interpretation per Section 4.3.1 of the Settlement Agreement, as outlined above. (1/18/13); Should be promulgated as a CA Decision. (1/30/13); Should be published as a CA Decision. (4/2/13)

# DEEPWATER HORIZON
## CLAIMS CENTER
### ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 336 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information ||
|---|---|
| **Policy Subject** | Seafood Compensation Program: Oyster Vessel Owner and Oyster Boat Captain Compensation Calculations |
| **Active Date** | 2/8/13 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** || Clarified by Seafood Neutral |
| **Settlement Agreement Reference** || Exhibit 10 |
| **Affected Claim Types and/or Review Processes** || Seafood |

| II. Approved Policy ||
|---|---|

Exhibit 10 to the Settlement Agreement contains an inconsistency in its description of compensation to certain combined Oyster Harvester/Leaseholders. Section 3.3 of Exhibit 10 describes the calculations for Oyster claimants who are the Sole Boat Captain of the vessel that is the subject of the claim. Exhibit 10 also contains a document called "Oyster Compensation Plan - Exhibit 2" which includes an example of an Oyster Boat Captain calculation (the "Example Calculation"). The language of Section 3.3 and the Example Calculation differ in how they treat the Leaseholder Payment Cost, a component of the compensation calculation. Though the same factors should apply in both places, the values differ by 10%, and the calculation in Section 3.3 results in a more favorable

outcome for the claimant. As text generally controls over numerical characters in the law, and as express language in the Settlement Agreement sets forth the required compensation

methodology, the Claims Administrator has determined that the written text of Section 3.3 controls, rather than the Example Calculation.

EXHIBIT B-5

## Policy 336: Seafood Compensation Program: Oyster Vessel Owner and Oyster Boat Captain Compensation Calculations

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  4/16/13
   c. Comment:

   Classify as CA Decision. (4/16/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  4/2/13
   c. Comment:

   Class Counsel defer to the Claims Administrator's interpretation per Section 4.3.1 of the Settlement Agreement, as outlined above. (1/18/13); Can be promulgated as a CA Decision (or clarification by the Seafood Neutral). (1/30/13); Should be published as a Clarification by the Seafood Neutral. (4/2/13)

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 337 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information | | | |
|---|---|---|---|
| **Policy Subject** | Seafood Compensation Program: GCR Oyster Leasehold Database | | |
| **Active Date** | 2/8/13 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | Exhibit 10 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

| II. Approved Policy |
|---|

On May 25, 2012, the Claims Administrator was provided with an Oyster Leasehold database containing the names of 2010 leaseholders, the lease numbers, the quad locations, the current acreage of the leases, and the percentage of each lease in the three Oyster Leaseholder Compensation Zones. The database also incorporated the compensation calculations for each leasehold based on the acreage located in its respective Oyster Leasehold Compensation Zone in accordance with Exhibit 10, pg. 28, Section 1.3. On June 29, 2012, the mapping company provided an updated Oyster database to replace the first one. During the course of reviews, the Claims Administrator has discovered gaps in the updated database requiring the actions described below for (a) inactive leases or leaseholds outside of Louisiana and (b) leaseholds re-surveyed and re-plotted after 2010:

(a) Leaseholds located outside of Louisiana or leases no longer active in 2012: The updated database cannot accommodate two scenarios affecting a small number of claims: (1) where the claimed lease is located outside of Louisiana, as the updated database only covers Louisiana leases; and (2) where the claimed leasehold interest has changed from its 2010 active designation, as the updated database shows leases active in 2012, not 2010. In these instances, the Claims Administrator will provide the data points required to update the database. The mapping company will perform a spatial analysis of the claimed lease and return the results to the Claims Administrator. The Claims Administrator will rely on that determination in processing the affected claim.

(b) Re-surveyed and re-plotted leaseholds: The Claims Administrator uses the Oyster Leasehold Database to confirm the geographic zone and compensation calculations for Oyster Leasehold Lost Interest claims. The database is based on the most current surveys performed by the state of Louisiana that run through 2012. The Settlement Agreement requires Oyster Leaseholder claimants to provide a "valid oyster lease entered into by Claimant that establishes, as of April 20, 2010, the Claimant as the lessee of the oyster leasehold, or a copy of the actual title for the leasehold." (Ex. 10 at 26; emphasis added.) For the majority of the leases eligible under the Oyster Leaseholder Lost Interest compensation plan, the acreage of the lease is the same in both 2010 and 2012. If the leasehold interest owned at the time of the Spill has been re-surveyed since that time, the Claims Administrator will not rely on the database but instead will perform an independent calculation of the claim using the information in the title or other oyster leasehold documentation to determine the status as of 4/20/10.

## Policy 337: Seafood Compensation Program: GCR Oyster Leasehold Database

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  4/16/13
   c. Comment:

   BP does not have any comments to the Claims Administrator's January 11, 2013 Policy Announcements. (1/18/13); Classify as CA Decision. (4/16/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  4/2/13
   c. Comment:

   Class Counsel defer to the Claims Administrator's interpretation per Section 4.3.1 of the Settlement Agreement, as outlined above. (1/18/13); Can be promulgated as a CA Decision. (1/30/13); Should be published as a CA Decision. (4/2/13)



| Pol-338 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

### I. Profile

| Subject | Seafood Compensation Program: Protocol for Reclassifying Claims | | |
|---|---|---|---|
| **Active Date** | 2/8/13 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | Exhibit 10 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

### II. Summary

The Seafood Compensation Program consists of twenty-two distinct claim types across five catch types and four operator types. Certain claimants have filed claims incorrectly under the wrong claim type. The Claims Administrator has adopted these policies to address these situations:

(a) Reclassifying Claims Automatically: The most common claim type filing error occurs when a claimant selects the incorrect Species Type during the claim filing process, such as where a claimant identifies Finfish landings as Other Seafood landings. Where the trip tickets associated with the claim show landings of a species type different from the species type indicated on the Claim Form, the Claims Administrator automatically will reclassify that claim under the correct species type for the claimant and process the reclassified claim to a notice.

(b) Requiring Claimants to File the Correct Claim Form: Occasionally, claimants submit their claims under the wrong operator type, such as a Boat Captain who filed as a Vessel Owner. The Claim Form contains sworn statements, vessel data, and other required claim information that support the compensation calculation for a specific operator type, and that information must appear in a properly completed Claim Form. Without these data points, the Claims Administrator cannot process the claim as required by Ex. 10. To obtain the information required to identify and process the claim, the Claims Administrator will assist the claimant in submitting a new Claim Form to correct the error. For purposes of the Bar Date for submitting claims in the Seafood Compensation Program, the filing date of this correct Claim Form will relate back to the date of filing of the incorrect Claim Form that it replaces.

| Policy 338: Seafood Compensation Program: Protocol for Reclassifying Claims |
|---|

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  4/16/13
   c. Comment:

   BP does not have any comments to the Claims Administrator's January 11, 2013 Policy Announcements. (1/18/13); Classify as CA Decision. (4/16/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  4/2/13
   c. Comment:

   Class Counsel defer to the Claims Administrator's interpretation per Section 4.3.1 of the Settlement Agreement, as outlined above. (1/18/13); Can be promulgated as a CA Decision (or clarification by the Seafood Neutral). (1/30/13); Should be published as a Clarification by the Seafood Neutral. (4/2/13)



| Pol-339 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

### I. Profile

| Subject | Seafood Compensation Program: Documentation Requirements for Oyster Leaseholder Claims | |
|---|---|---|
| **Active Date** | 2/8/13 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision |
| **Settlement Agreement Reference** | | Exhibit 10 |
| **Affected Claim Types and/or Review Processes** | | Seafood |

### II. Summary

The Settlement Agreement provides that a claimant filing an Oyster Leaseholder claim must submit these documents to participate in the Oyster Compensation Plan:

Valid oyster lease entered into by Claimant that establishes, as of April 20, 2010, the Claimant as the lessee of the oyster leasehold, or a copy of the actual title for the leasehold. Claimants are required to provide documentation that their leasehold interest is in good standing, such as proof of renewal.

(Ex. 10 at 26.) The Claims Administrator has encountered certain claimants who have not submitted a copy of the original Leasehold Document and instead proffered alternative evidence of Oyster Leasehold Ownership. These claimants argue that they should not have to submit official copies of the lease or the title for the leasehold and that LDWF Oyster Bedding Ground Rental Receipts should suffice. The LDWF issues those receipts to confirm that the owner of the lease paid the required annual lease fees. While these receipts do contain some of the same data points needed to perform the review required by Ex. 10 to the Settlement Agreement, they are not a reliable substitute for the documentation required by the Settlement Agreement. For example, in at least one claimant's file, payment receipts were incorrectly issued in the name of a former owner instead of the name of the current owner. Because the Settlement Agreement expressly requires claimants to submit a copy of the oyster lease or title and the Bedding Ground Rental Receipts are not a reliable substitute, the Claims Administrator will not accept rental receipts or other unsatisfactory supporting documentation in lieu of copies of the lease or title for the leasehold.

## Policy 339: Seafood Compensation Program: Documentation Requirements for Oyster Leaseholder Claims

Comments and Decisions by the Parties:

1. **BP**
   a. Decision: Defer to Claims Administrator Decision
   b. Date: 4/16/13
   c. Comment:

   BP does not have any comments to the Claims Administrator's January 11, 2013 Policy Announcements. (1/18/13); Classify as CA Decision. (4/16/13)

2. **Class Counsel**
   a. Decision: Defer to Claims Administrator Decision
   b. Date: 4/2/13
   c. Comment:

   While Class Counsel understood the logic being applied by the Claims Administrator, Class Counsel would ask that this matter be further deferred until such time as there are conflicting claims filed with respect to the same leasehold property. Without a duplicate claim, default to the so-called "best evidence approach" is not necessary. If it turns out, at the end of the Seafood Compensation Program processing period, that the only claim that filed for a particular oyster leasehold interest is one supported by the Rental Receipts, then the Claims Administrator should accept that Rental Receipt as the best evidence available with respect to the lease, and make that payment accordingly. (1/18/13); Wasn't this recently modified? The final should be promulgated as a CA Decision (or clarification by the Seafood Neutral). (1/30/13); Should be published as a Clarification by the Seafood Neutral. (4/2/13)

# DEEPWATER HORIZON
# CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Policy ID 340 | Claims Administrator's Approved Policy |
|---|---|

| I. Policy Information | | | |
|---|---|---|---|
| **Policy Subject** | Seafood Compensation Program: Acknowledgement of Oral Oyster Harvesting Agreements | | |
| **Active Date** | 2/8/13 | **Policy Impact** | ☒All Claims Regardless of Active Date ☐All Claims Greater than Active Date |
| **Type of Decision** | | Clarified by Seafood Neutral | |
| **Settlement Agreement Reference** | | Exhibit 10 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

| II. Approved Policy |
|---|

In his 10/10/12 Announcement of Policy Decisions Regarding Claims Administration, the Claims Administrator addressed Section 2.2.B of the Oyster Leaseholder Compensation Plan in Exhibit 10 of the Settlement Agreement, which requires that, in addition to tax returns, financial statements, or business documents, an Oyster Leaseholder Lost Income Compensation claimant must provide "[c]ontracts or agreements between the Oyster Leaseholder and another natural person or entity that harvests oysters from their leaseholds located in Zones A, B or C, as reflected on the Oyster Leasehold Compensation Zone Map." Certain Oyster Leaseholder Lost Income claimants had informed the Claims Administrator that, while they had oral agreements with oyster harvesters to harvest oysters off of the claimant's oyster leases, they had no written agreements and thus had no documents to submit in response to this requirement. Accordingly, the Claims Administrator permits such claimants to satisfy the "[c]ontracts or agreements" requirement by submitting a writing prepared at any time that describes the terms of the oral agreement and that is signed by the claimant and the oyster harvester that is a party to the oral agreement. Some claimants have struggled with the form of writing sufficient to satisfy this requirement. To facilitate the completion of such claims, the Claims Administrator created an Acknowledgement of Verbal Oyster Harvesting Agreement Form (attached to the 1/11/13 memo) to be used by Oyster Leaseholder Lost Income claimants and Combined Oyster Harvester/Leaseholder claimants who never memorialized in writing their oyster harvesting agreements to acknowledge retroactively the controlling terms of their verbal oyster harvesting agreements that existed during their Benchmark Period.

## Policy 340: Seafood Compensation Program: Acknowledgement of Oral Oyster Harvesting Agreements

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  4/16/13
   c. Comment:

   With regard to Item 6 of your October 10, 2012 Announcement of Policy Decisions memorandum, BP, Class Counsel and the Seafood Neutral respectfully request that the title of the policy announcement be changed to read: Oral Contracts Relating to Seafood Program Oyster Lost Income Claims, rather than as it currently reads "Oral Lease Agreements Relating to Seafood Program Oyster Leasehold Claims." The substance of the policy announcement does not pertain to "oyster leases" as the document, but rather to contracts between an Oyster Leaseholder and an oyster harvester allowing the harvester to harvest from the leaseholder's lease. Specifically, the item pertains to Documentation Requirement 2.2 Documentation Requirements for Oyster Leaseholder Lost Income Claims which requires a Claimant to provide "Contracts or agreements between the Oyster Leaseholder and another natural person or entity that harvests oysters from their leaseholds located in Zones A, B, or C, as reflected on the Oyster Leasehold Compensation Zone Map." As to this documentation requirement regarding contracts or agreements between the Oyster Leaseholder and harvester, BP, Class Counsel and the Seafood Neutral have no objection to the Claims Administrator's policy decision, rather we fear the title of the policy decision is confusing because it mistakenly references "oral lease agreements" which would be a different animal all together than a contract between an Oyster Leaseholder and oyster harvester. (10/11/12); Classify as "Certified by Seafood Neutral." (4/16/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  4/2/13
   c. Comment:

   Class Counsel defer to the Claims Administrator's interpretation per Section 4.3.1 of the Settlement Agreement, as outlined above. (1/18/13); Can be promulgated as a CA Decision (or clarification by the Seafood Neutral). (1/30/13); Should be published as a Clarification by the Seafood Neutral. (4/2/13)



| Pol-341 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

| **I. Profile** | | | |
|---|---|---|---|
| **Subject** | Seafood Compensation Program: Determination of Vessel Classification | | |
| **Active Date** | 2/8/13 | **Policy Impact** | ☐ All Claims Regardless of Active Date<br>☑ All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | Exhibit 10 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

| **II. Summary** |
|---|
| The value of many Seafood Compensation Claims depends on the classification of the qualifying vessel as either an ice or freezer boat. Exhibit 10 states that "the Claimant must provide documentation sufficient to establish the vessel size and type for each vessel for which the claimant seeks compensation." Exhibit 10 pg. 11 Section B.1.(c.). The Claims Administrator uses the documentation provided by the claimant to classify the vessel as an ice or freezer boat and perform the appropriate compensation calculations. The Claims Administrator has encountered a few instances where a qualifying vessel has changed classification during the Benchmark Period because the owner of an ice boat installed a freezer. In evaluating this subset of claims where the proffered documentation supports either vessel classification, the Claims Administrator will classify the vessel in the manner that will lead to the higher compensation calculation for the claimant. |

EXHIBIT B-5

## Policy 341: Seafood Compensation Program: Determination of Vessel Classification

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/16/13
   c. Comment:

   BP does not have any comments to the Claims Administrator's January 11, 2013 Policy Announcements. (1/18/13); Classify as CA Decision. (4/16/13)

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator
   b. Date:  4/2/13
   c. Comment:

   Class Counsel defer to the Claims Administrator's interpretation per Section 4.3.1 of the Settlement Agreement, as outlined above. (1/18/13); Can be promulgated as a CA Decision (or clarification by the Seafood Neutral). (1/30/13); Should be published as a Clarification by the Seafood Neutral. (4/2/13)

EXHIBIT B-5



| Pol-342 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

### I. Profile - EXTERNAL

| Subject | Seafood Program:  Calculation of Boat Captain Income on Claims by Owner/Operators | | |
|---|---|---|---|
| **Active Date** | 2/8/13 | **Policy Impact** | ☑ All Claims Regardless of Active Date<br>☐ All Claims Greater than Active Date |
| **Type of Decision** | | Clarified by Seafood Neutral | |
| **Settlement Agreement Reference** | | Exhibit 10 | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

### II. Summary

Under Exhibit 10, Class Members who owned or leased and captained their own vessel during the qualifying time period have both (1) a Vessel Owner and (2) a Boat Captain claim in the Seafood Compensation Program.  The Historical Revenue Compensation Method, which is available for all of the Seafood species types, uses revenues in past Benchmark Years to calculate an award amount that differs by operator type.  When a claimant who is both Boat Captain and Vessel Owner/Lessee has submitted a Schedule C to support the Boat Captain claim, the Claims Administrator will use the gross revenues in Line 1 of the Schedule C as the revenues in past Benchmark Years and then will apply the Exhibit 10 Cost Percentage, the Loss Percentage and the Boat Captain share set by Exhibit 10 to derive the number multiplied by the RTP to get the award amount for the claimant on the Boat Captain claim.  The Claims Administrator will not use Schedule C Line 29 net profits number (or the net profits number shown on any line in other tax forms) on the Boat Captain claim of a claimant who is both Boat Captain and Vessel Owner/Lessee, for doing so would eliminate the premise for an award to that claimant on a Vessel Owner/Lessee claim.  The Seafood Neutral has informed the Claims Administrator that he agrees with this policy.

## Policy 342: Seafood Program:  Calculation of Boat Captain Income on Claims by Owner/Operators

Comments and Decisions by the Parties:

1. **BP**
   a.  Decision:  Defer to Claims Administrator Decision
   b.  Date:  4/16/13
   c.  Comment:

   BP agrees with the current practice of the Settlement Program which is to use gross revenues in Line 1 of the claimant's Schedule C to evaluate the Boat Captain claim of a claimant who is also the vessel owner/lessee, not Line 29 of the Schedule C. As the Claims Administrator's memorandum correctly observes, using Line 29 "would eliminate the premise for the claimant receiving any payment on the Vessel Owner claim by artificially assuming that the Vessel Owner had no share of the vessel's profits." The Settlement Program is appropriately interpreting the Seafood Compensation Plan to produce logical results whereas using Line 29 would produce an illogical outcome. (1/19/13); Classify as CA Decision. (4/16/13)

2. **Class Counsel**
   a.  Decision:  Defer to Claims Administrator Decision
   b.  Date:  4/2/13
   c.  Comment:

   Should be published as a CA Decision (or perhaps Clarification by the Seafood Neutral). (4/2/13)

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Proc-379 | CLAIMS ADMINISTRATOR'S APPROVED PROCEDURE |
|---|---|

| I. Profile | | | |
|---|---|---|---|
| **Subject** | Procedure Regarding Handling Untimely Seafood Claims | | |
| **Active Date** | 5/22/13 | **Policy Impact** | ☑ All Claims Regardless of Active Date<br>☐ All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | | |
| **Affected Claim Types and/or Review Processes** | | Seafood; Seafood Second Distribution; Deadlines | |

| II. Summary |
|---|
| See Final Procedure Announcement Memo. |



# FINAL PROCEDURE ANNOUNCEMENT

**FROM:**     **Patrick A. Juneau, Claims Administrator**

**DATE:**     **May 22, 2013**

**RE:**       **Procedure Regarding Handling Untimely Seafood Claims**

---

After meeting with the Seafood Neutral and the parties, the Claims Administrator has adopted the following rules to govern the handling of Seafood Compensation Program claims filed after the January 22, 2013 Bar Date (the "Untimely Seafood Claims Procedure").

1. ***Definitions.***  In addition to defined terms in the Settlement Agreement, this Untimely Seafood Claims Procedure uses these terms:

   (a) Claim:  A formally prosecuted claim presented in a Claim Form to the Program by a Claimant for any of the claim types permitted by the Settlement Agreement.

   (b) Claim File:  The Registration Form of a Claimant and the Claim Form, supporting documents and other materials presented by a Claimant or any party relating to a Claimant or Claim in the Program, maintained in hard copy form or electronic images.

   (c) Claimant:  A person or entity that has submitted one or more Claims in the Program.

   (d) Claimant's Counsel:  The law firm and individual lawyer(s) representing a Claimant as directed by the Claimant and indicated in the Claims Database.

   (e) Claims Database:  The electronic database maintained by the Claims Administrator of information relating to Claimants and Claims in the Program.

   (f) Excusable Neglect:  The standard for accommodating certain Untimely Seafood Claims as set forth in Section 3 below.

   (g) Notice:  The notification issued by the Claims Administrator to a Claimant explaining the outcome of the review on a Claim or action taken by the Claims Administrator in response to the receipt of a Claim from the Claimant.

   (h) Notice of Seafood Compensation Program Excusable Neglect Filing Deadline Extension:   The Notice issued to a Claimant by the Claims Administrator following the review of an Excusable Neglect request and determination that the Claimant has demonstrated Excusable Neglect.

   (i) Notice of Seafood Compensation Program Relation Back Filing Deadline Extension: The Notice issued to a Claimant by the Claims Administrator following the review of a Qualifying Claim and determination that the Claimant is eligible for Relation Back treatment.



(j) Portal:  The interactive online web interface used by Claimants and their counsel to submit Claim Forms and supporting materials to the Claims Administrator.

(k) Procedure Effective Date:  May 22, 2013, the date on which the Claims Administrator implemented this Untimely Seafood Claims Procedure.

(l) Program:  The Deepwater Horizon Economic & Property Damages Settlement Program.

(m) Qualifying Claim:  A Claim, excluding Business Economic Loss claims related to industries other than (1) Finfish Farming and Fish Hatcheries, (2) Finfish Fishing, (3) Fish and Seafood Markets, (4) Fish and Seafood Merchant Wholesalers, (5) Fresh and Frozen Seafood Processing, (6) Marinas, (7) Other Aquaculture, (8) Other Marine Fishing, (9) Other Miscellaneous Nondurable Goods Merchant Wholesalers, (10) Packaged Frozen Food Merchant Wholesalers, (11) Scenic and Sightseeing Transportation, Water, (12) Seafood Canning, (13) Shellfish Farming, (14) Shellfish Fishing, (15) Sporting and Recreational Goods and Supplies Merchant Wholesalers, and (16) Sporting Goods Stores, for which a Claim Form was filed on or before January 22, 2013 in which the Claimant presented a Substantive Seafood Claim mistakenly identified, in whole or in part, as either (1) a non-Seafood Compensation Program claim or (2) a Seafood Compensation Program claim of another type, that, but for the mistaken claim type designation and need for a technicality cure, would have been eligible for compensation in the Seafood Compensation Program, after, if necessary, affording the Claimant the normal opportunities to cure Seafood Compensation Program incompleteness caused by the Claimant having originally prosecuted the Claim as another type.

(n) Relation Back:  The standard for accommodating certain Untimely Seafood Claims as set forth in Section 2 below.

(o) Substantive Seafood Claim:  A Claim presented by a knowing or unknowing Commercial Fisherman, Seafood Boat Captain, Seafood Crewman, Oyster Leaseholder, and/or Seafood Vessel Owner or Lessee related to Seafood and compensable in the Seafood Compensation Program.

(p) Untimely Seafood Claim:  A Seafood Compensation Program claim for which an appropriate Claim Form was not filed on or before January 22, 2013.

**2.  *Untimely Seafood Claims that Relate Back to a Qualifying Claim.***

The Claims Administrator will accept Untimely Seafood Claims that Relate Back to Qualifying Claims in accordance with the provisions of this Section.  The Portal will reopen automatically for eligible Claimants for the duration of their curative period to allow for the filing of Untimely Seafood Claims under this Relation Back rule.  Claimants can also file Untimely Seafood Claims in paper form under this Relation Back rule.  Paper claims mailed to the Claims Administrator must be postmarked on or before the expiration of the Claimant's curative filing window to receive Relation Back treatment.

(a) **Qualifying Claims.**  To benefit from the Relation Back rule, a Claimant must have presented a Qualifying Claim to the Claims Administrator.  Claimants without at least one Qualifying Claim in their Claim File cannot benefit from Relation Back treatment.

(b) **30-Day Window for Curative Relation Back Action.** Where and when the Claims Administrator has determined that a Claimant submitted a Qualifying Claim and is eligible for Relation Back treatment, he will issue that Claimant a Notice of Seafood Compensation Program Relation Back Filing Deadline Extension, and the Claimant will have 30 calendar days from the date of that notice to file the Untimely Seafood Claim(s) that he failed to assert properly in his original filing.  The Notice of Seafood Compensation Program Relation Back Filing Deadline Extension will inform the Claimant which Untimely Seafood Claim(s) he became eligible to file.  Any of these approved Untimely Seafood Claims filed within the curative window will receive Relation Back treatment and will be reviewed for eligibility in the normal course.  Simply uploading or already having supporting documents on file that could potentially prove an Untimely Seafood Claim will not qualify a Claimant for Relation Back treatment on that Untimely Seafood Claim.   Instead, the Claimant must actually file the missing Seafood Claim Form for the Untimely Seafood Claim within the curative window.  Subject to the Excusable Neglect standard set out in Section 3 below, there will be no exceptions made to this rule for any reason, and failure to file any Untimely Seafood Claims within 30 days from the date of the Claimant's Notice of Seafood Compensation Program Relation Back Filing Deadline Extension shall forfeit those Untimely Seafood Claims, regardless of circumstances.

   3.     *Untimely Seafood Claims that do not Relate Back to a Qualifying Claim.*

For Claimants with Untimely Seafood Claims who are either ineligible for Relation Back treatment because they did not have a Qualifying Claim or though eligible missed the curative 30-day window to file, the Claims Administrator will use an Excusable Neglect standard informed by Fifth Circuit decisional law and the Court's 1/24/13 Order Denying Brent Coon's Motion for Extension of Time to Submit Seafood Claims to the Seafood Compensation Program (Docket No. 8326, the "1/24/13 Order") to decide, on a claim-by-claim basis, whether to accept the Untimely Seafood Claims into the Seafood Compensation Program.  The Claims Administrator will receive requests for Excusable Neglect review of Untimely Seafood Claims only until 30 calendar days after the date that he issues the last Notice of Seafood Compensation Program Relation Back Filing Deadline Extension.  The Claims Administrator will not make any filing deadline exceptions for this Claimant population for any reason for Untimely Seafood Claims filed after that date, and any such Untimely Seafood Claims will be forever forfeited.  Any Untimely Seafood Claims accepted into the Seafood Compensation Program under the Excusable Neglect rule will receive eligibility review in the normal course.  The Portal will allow Claimants seeking Excusable Neglect review to request such a review and to upload their Excusable Neglect explanation at the same time.  Paper filers can request Excusable Neglect review by filing their Untimely Seafood Claims in paper form with their Excusable Neglect explanation.  Paper claims and Excusable Neglect explanations mailed to the Claims Administrator must be postmarked on or before the expiration of the Excusable Neglect review period to receive Excusable Neglect review.  When and where a Claimant demonstrates Excusable Neglect, the Claims Administrator will issue that Claimant a Notice of Seafood Compensation Program Excusable Neglect Filing Deadline

Extension affording the Claimant 30 calendar days from the date of the issuance of that notice to file the approved Untimely Seafood Claim(s).

**(a) Excusable Neglect Factors.**

Adapting Fifth Circuit excusable neglect factors to this Program, the Excusable Neglect inquiry will include consideration of:

> (1) The danger of prejudice to all Seafood Compensation Program Claimants who submitted and prosecuted timely Seafood Claim Forms;
>
> (2) The length of the tardy-filing Claimant's delay or Claimant's counsel's delay beyond the 1/22/13 Bar Date;
>
> (3) The potential impact the tardy-filing will have on the Seafood Compensation Program; and
>
> (4) The reason for the tardy-filing Claimant's delay or Claimant's counsel's delay, including (a) whether the delay was within the reasonable control of the Claimant or the Claimant's counsel and (b) whether the Claimant or the Claimant's counsel acted in good faith.

The Claims Administrator notes that, under Factors 1 and 3, there will be prejudice to each Claimant who submitted a timely Seafood Claim because each Untimely Seafood Claim that the Seafood Compensation Program accepts diminishes the value of timely Claimants' Second Distribution amounts, and accommodating Untimely Seafood Claims has a significant impact on the Seafood Compensation Program because it delays both the conclusion of the Initial Seafood Distribution and the commencement of the Second Seafood Distribution.

**(b) The Court's 1/24/13 Order.**

As the Court's 1/24/13 Order explains in detail, the Seafood filing deadline was "well publicized," the notice plan satisfied due process, CAFA, and FRCP 23, and class members had adequate, or often even actual, notice of the deadline. (Docket No. 8326 at 2-3.) The Court further noted that, "[a]ny class member who did not properly and timely request to be excluded from the Settlement [is] bound by the terms of the Settlement, including the deadline for submitting seafood claims." (*Id.* at 3.) Indeed, "no claimant needed to wait until the Court granted final approval before submitting a seafood claim," as they had "nearly eight months to submit their seafood claims" after the program opened and started accepting claims on June 4, 2012. (*Id.*) Importantly, the Court concluded by identifying the "logical reason why the seafood claim deadline is earlier than the other claims deadlines" – to accommodate the Second Distribution of residual Seafood funds. (*Id.* at 4-5.)

**(c) The Excusable Neglect Bar.**

In light of Sections 3(a)-(b) above, the Claims Administrator will analyze Untimely Seafood Claims qualifying for Excusable Neglect review on a claim-by-claim basis, but the bar for excusing a Claimant's or Claimant's Counsel's neglect will necessarily be high. As required by Factor 4 above, Claimants must describe in detail the neglect that led to their failure to file the



Untimely Seafood Claim by the Bar Date and should be sure, in so doing, to include Factor 2 length of delay issues.

## Procedure 379:  Procedure Regarding Handling Untimely Seafood Claims

Comments and Decisions by the Parties:

### A. <u>Policy Announced to Parties for Positions</u>

1. **BP**
    a.  Decision:  Propose Modification
    b.  Date:  4/19/13
    c.  Comment:

As it turns out, BP and Class Counsel will be meeting with the Seafood Neutral and Brent Coon next week on Tuesday at 2 p.m.  Perhaps it might be helpful for BP, Class Counsel and the Seafood Neutral to meet with the appropriate folks from the Settlement Program on Tuesday before 2 p.m.  to make sure we have a clear understanding of this proposed Procedure.  The Tuesday meeting with Brent Coon is one of several meetings the Seafood Neutral has been hosting with various counsel representing Seafood Compensation Program claimants relating to the distribution of the balance remaining in the Seafood Compensation Program Amount after payment of eligible Seafood Compensation Program claims.  We also have meetings on Wednesday with other counsel representing Seafood Compensation Program claimants.  In particular, it would be helpful ahead of these meetings with counsel representing Seafood claimants to make sure the Seafood Neutral, BP and Class Counsel have a clear understanding of what the proposed Procedure will mean with regard to identifying the date certain on which we will know the balance remaining of the Seafood Compensation Program Amount and the universe of claimants eligible to receive a distribution of the remaining balance.   Here are some questions that occur to us: As an initial matter, the policy does not appear to entirely track the Seafood Neutral's responses on this topic from 1/31/13, which I have copied below, yet the procedure begins "After meeting with the Seafood Neutral, the Claims Administrator has adopted the following rules . . . ."  Were there further discussions with the Neutral?  With regard to untimely seafood claims that relate back to a Qualifying Claim, the Procedure provides that claimants with at least one Qualifying Claim in their file (defined as any SCP, IEL, IPV, FV, BEL, Start-up, Failed Business, Subsistence claim filed on or before 1/22/13), will have 30 days from the issuance of their Last First Notice (defined as the first Notice issued to a Claimant by the Claims Administrator on that Claimant's last Qualifying Claim to receive an initial Notice) to file any Untimely Seafood Claims (defined as claims not filed on or before January 22, 2013) that they wish to assert.  Are we understanding correctly then that the Claims Administrator's proposal will mean the full universe of Seafood Compensation Program claimants will not be known until all IEL, IPV, FV, BEL, Start-up, Failed Business, and Subsistence claims filed on or before 1/22/13 are processed through to the issuance of First Notices and the expiration of 30 days from the date the last of these First Notices is issued?  If so, it would be helpful to get a sense of the Settlement Program's estimated timing for getting through this claims processing.  Also, are we understanding correctly, that the Settlement Program will continue to accept Seafood Compensation Claims that do not relate back to a Qualifying Claim for some time to come, namely until the date

that the Last First Notice is issued on the last Qualifying Claim in the Program to receive an initial Notice of any Kind, and is an initial Notice different than a First Notice?   And, is it the case that all such untimely seafood claims will be subject to an Excusable Neglect review?  And, lastly, we would appreciate some clarification from the Settlement Program regarding how the Claims Administrator intends this Procedure, which relates deadlines for Seafood Compensation Program claims, be interpreted in light of other proposed policies issued by the Claims Administrator regarding deadlines.  In particular, Policy 202 (Deadlines: Extensions) and Policy 251 (Relief from Claims Processing Deadlines) also address deadlines, and would purport to encompass the deadline for filing Seafood Compensation Program claims.

**2. Class Counsel**
   a.  Decision:  Defer to Claims Administrator
   b.  Date: 4/16/13
   c.  Comment:  N/A

**B. Policy Reissued to Parties for Final Positions**

**1. BP**
   a.  Decision:  Defer to Claims Administrator
   b.  Date: 5/17/13
   c.  Comment: N/A

**2. Class Counsel**
   a.  Decision:  Defer to Claims Administrator
   b.  Date: 5/10/13
   c.  Comment:  N/A

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-382 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

| I. Profile | | |
|---|---|---|
| **Subject** | Interpretation of "Fleet of Vessels" | |
| **Active Date** | 4/24/13     **Policy Impact** | ☑ All Claims Regardless of Active Date<br>☐ All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision |
| **Settlement Agreement Reference** | | |
| **Affected Claim Types and/or Review Processes** | | Seafood |

| II. Summary |
|---|
| The Claims Administrator has decided to interpret "fleet of vessels" in Policy 294 to mean "one or more vessels." |

## Policy 382:  Interpretation of "Fleet of Vessels"

Comments and Decisions by the Parties:

**1. BP**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  4/24/13
   c. Comment: N/A

**2. Class Counsel**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  4/23/13
   c. Comment:  N/A

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-401 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

| I. Profile | | | |
|---|---|---|---|
| **Subject** | Existing Entities Form a New Entity and Purchase a Vessel | | |
| **Active Date** | 5/7/13 | **Policy Impact** | ☒ All Claims Regardless of Active Date<br>☐ All Claims Greater than Active Date |
| **Type of Decision** | | Clarified by Seafood Neutral | |
| **Settlement Agreement Reference** | | | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

| II. Summary |
|---|
| See attached memo. |

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

# FINAL POLICY ANNOUNCEMENT

TO:   **Class Counsel**
     **BP**

FROM:  **Patrick A. Juneau, Claims Administrator**

DATE:  **May 7, 2013**

RE:   **Policy Regarding Benchmark Revenue of Closely Related Claiming Entities in the Seafood Compensation Program**

_____

The parties adopted the following policy on October 29, 2012, and the Claims Administrator posted the policy in the form of a Frequently Asked Question on the public website on the same day.

**FAQ Presented:** During the Benchmark Period my father and I were owners of an entity (LLC1) that owned a fleet of vessels, as well as owners of a second entity (LLC2) that owned one vessel. In December 2009, my father and I formed a new entity (LLC3) that purchased a vessel. Is our LLC3 vessel eligible for compensation?

**Policy Answer**: The Claims Administrator shall have the discretion to allow compensation for the new vessel in LLC 3 using the Benchmark Period revenue for vessels in LLC 1 and LLC2 provided that the Claims Administrator receives sufficient documentation to establish that LLC3 has the same (or nearly the same) ownership as LLC 1 and LLC 2 such that the Benchmark Period revenue for vessels in LLC1 and LLC2 provide a sufficient basis to project revenue for the new vessel in LLC3. In such circumstances, LLC3 must disclose all entities with the same (or nearly the same) ownership that owned or leased vessels in operation during the Benchmark Period harvesting Seafood.

In such circumstances, for Claimants in the Oyster, Finfish and Blue Crab/Other Compensation Plans, Benchmark Period revenue for the vessel in LLC3 will be calculated as the average revenue for all vessels in LLC1 and the vessel LLC2 that were operating to harvest the relevant species during the Benchmark Period (applying the same Benchmark Period for all vessels in LLC1 and LLC2).

For example, if LLC1 owned four vessels operating during the Benchmark Period -- two vessels used to finfish and two vessels used to shrimp -- and LLC 2 owned one shrimping vessel operating during the Benchmark Period -- two vessels used to shrimp, and the vessel purchased by LLC 3 is a finfish vessel, only the average Benchmark Period revenue for the two finfish vessels in LLC1 will be considered to determine the compensation amount for finfish vessel owned by LLC. The Benchmark Period revenue for both finfish vessels owned and operated by LLC1 must be included in calculating the average Benchmark Period revenue to be used for compensating the finfish vessel owned by LLC3.

1

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

In such circumstances, for Claimants in the Shrimp Compensation Plan, Benchmark Period revenue for the shrimping vessel in LLC3 will be calculated as the average revenue for all shrimping vessels in LLC1 and LLC2 that were operating during the Benchmark Period that are in the same vessel class as the shrimping vessel owned by LLC3, using the same Benchmark Period for all such LLC1 and LLC2 vessels. The vessel classes identified in the Shrimp Compensation Plan take into account vessel size and type, e.g. <30', 30'-44', 45'-74' (Ice), 45'-74' (Freezer), >75' (Ice) and >75' (Freezer).

In the event the shrimping vessel in LLC3 is not in the same vessel class as any of the shrimping vessels in LLC1 or LLC2 that were operating during the Benchmark Period, then the Benchmark Period revenue for the shrimping vessel in LLC3 will be the Average Revenue for the vessel class, as reported in Table 1:

**Table 1: Average Revenue by Shrimp Vessel Class**

| Class | Size/Type | Average Revenue |
|---|---|---|
| 1 | < 30' | $7,399 |
| 2 | 30' - 44' | $29,527 |
| 3 | 45' - 74' (Ice) | $66,881 |
| 4 | 45' - 74' (Freezer) | $220,772 |
| 5 | > 75' (Ice) | $179,586 |
| 6 | > 75' (Freezer) | $362,160 |

In addition to the documentation requirements in the Seafood Compensation Plan, the Claimant must provide proof (i) that the Claimant has the same (or nearly the same) ownership as the entities it has disclosed as being the same (or nearly the same) in ownership and as owning or leasing vessels operating during the Benchmark Period harvesting Seafood; (ii) proof the Claimant owned or leased a vessel for use during the 2010 fishing season (e.g. purchase or lease documentation with date of purchase or lease); (iii) documentation establishing the type of Seafood harvesting for which the vessel was used for during the 2010 fishing season; and, (iv) for shrimping vessels, sufficient documentation to identify the vessel class of the Claimant's vessel.

Also, the Claimant must provide a Sworn Statement attesting that it has identified: (i) All entities with the same (or nearly the same) ownership as the Claimant that owned or leased vessels for harvesting Seafood during the Benchmark Period; and (ii) All vessels owned or leased in the Benchmark Period by each entity that the Claimant has identified as having the same (or nearly the same) ownership as the Claimant, and, for each such vessel, the type of Seafood harvesting for which the vessel was used, and, for shrimping vessels, the vessel class for each such vessel.

For Claimants in the Oyster, Finfish and Blue Crab/Other Compensation Plans, the Claimant must provide for each vessel owned or leased by the entities with the same (or nearly the same) ownership as the Claimant that was operating during the Benchmark Period harvesting the relevant Seafood species (i) sufficient documentation for the Claims Administrator to establish proof of ownership of, or a leasehold interest in, the vessel during the Benchmark Period and (ii) documentation sufficient to determine the annual revenue generated by the vessel during the Benchmark Period.



For Claimants in the Shrimp Compensation Plan, the Claimant must provide for each vessel owned or leased by the entities with the same (or nearly the same) ownership as the Claimant that was operating during the Benchmark Period harvesting shrimp, sufficient documentation for the Claims Administrator to: (i) establish proof of ownership of, or a leasehold interest in, the vessel during the Benchmark Period, (ii) determine the vessel class of each such vessel and (iii) determine the annual revenue generated by each vessel in the same vessel class as the Claimant's vessel.

A Claimant who seeks to exclude a vessel that was owned or leased during the Benchmark Period by an entity with the same (or nearly the same) ownership as the Claimant from the determination of average Benchmark Period revenue because it was not in operation during the Benchmark Period, e.g. it was non-operable, must provide proof the vessel was not in operation.

3

## Policy 401:  Existing Entities Form a New Entity and Purchase a Vessel

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  5/6/13
   c. Comment:

   This policy should be classified as "Clarification by Seafood Neutral."

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  4/29/13
   c. Comment:  N/A


| Pol-402 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

### I. Profile

| Subject | Interpretation of "the same (or nearly the same) ownership" in Policy ID 401 | | |
|---|---|---|---|
| **Active Date** | 5/7/13 | **Policy Impact** | ☑ All Claims Regardless of Active Date<br>☐ All Claims Greater than Active Date |
| **Type of Decision** | | | Claims Administrator Decision |
| **Settlement Agreement Reference** | | | |
| **Affected Claim Types and/or Review Processes** | | | Seafood |

### II. Summary

This policy addresses a common circumstance in the fishing industry related to the practice of forming an individual Limited Liability Company (LLC) for a single vessel, as identified in Policy ID 401. Where an LLC owner purchases a new vessel for the 2010 fishing season and forms a new LLC for it, the policy offers a method of compensating the new vessel based on the Benchmark Period Revenue of the older vessel, provided that the LLCs have "the same (or nearly the same) ownership." The Claims Administrator has determined that the phrase "same (or nearly the same) ownership" requires that there be at least one common owner among the claiming LLCs or vessels. Therefore, vessels and/or LLCs with entirely separate owners cannot benefit from the policy outlined in Policy ID 401, despite some other existing business or family relationship.

## Policy 402:  Interpretation of "the same (or nearly the same) ownership" in Policy ID 401

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  5/6/13
   c. Comment: N/A

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  4/29/13
   c. Comment:  N/A

EXHIBIT B-5

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-403 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

| I. Profile | | | |
|---|---|---|---|
| **Subject** | Interpretation of "for the 2010 fishing season" in Policy ID 294 and Policy ID 401. | | |
| **Active Date** | 5/7/13 | **Policy Impact** | ☒All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

| II. Summary |
|---|
| Policies 294 and 401 provide compensation for vessels purchased "for the 2010 fishing season" in addition to other vessels owned by the claimant in the Benchmark Period.  However, neither provides guidance on when a vessel was purchased "for the 2010 fishing season," such as a date range for the vessel's purchase.  The Claims Administrator has determined that vessels bought between January 1, 2009, and April 20, 2010, were purchased "for the 2010 fishing season." |

EXHIBIT B-5

## Policy 403:  Interpretation of "for the 2010 fishing season" in Policy 294 and Policy ID 401

Comments and Decisions by the Parties:

1. **BP**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  5/6/13
   c. Comment: N/A

2. **Class Counsel**
   a. Decision:  Defer to Claims Administrator Decision
   b. Date:  4/29/13
   c. Comment:  N/A

EXHIBIT B-5

| Pol-440 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---------|----------------------------------------|

| I. Profile | | | |
|------------|---|---|---|
| **Subject** | IFQ "Set-Aside" Shares | | |
| **Active Date** | 6/5/13 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | | |
| **Affected Claim Types and/or Review Processes** | | Seafood | |

| II. Summary |
|-------------|

The Individual Fishing Quota (IFQ) program began in 2010 and initially distributed 97% of all possible shares to shareholders prior to the Spill, holding back 3% as a reserve to accommodate the resolution of appeals after the initial distribution.  These "set-aside" shares vested later in 2010 and were distributed to shareholders in proportion to the initial allocation of shares.  Certain claimants have asked to receive compensation on shares that were "set-aside" for them as of April 20, 2010 but that ultimately vested in August of 2010.

Section II.A of the Finfish Compensation Plan, which sets forth the eligibility and documentation requirements for IFQ compensation, requires "proof of ownership" of the IFQ shares as of April 20, 2010.  (Ex. 10 at 49.)  Section II.B states that IFQ shareholders will be compensated "based on the value of Individual Fishing Quota shares held."  (Id.)

The Claims Administrator has determined that a claimant may receive compensation for all of the IFQ shares that were allocated to that claimant as of April 20, 2010, even if the shares technically vested after that date in 2010, so long as the claimant provides proof that the "set-aside" shares the claimant held as of April 20, 2010 actually did vest in that claimant's name in 2010.

## Policy 440:  IFQ "Set-Aside" Shares

Comments and Decisions by the Parties:

1. **BP**
   a.  Decision:  Defer to Claims Administrator
   b.  Date:  5/30/13
   c.  Comment: N/A

2. **Class Counsel**
   a.  Decision:  Defer to Claims Administrator
   b.  Date:  6/4/13
   c.  Comment:  N/A



| Pol-314 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

| **I. Profile** ||||
|---|---|---|---|
| **Subject** | Seafood Program: Protocol for Updating the GCR Database ||||
| **Active Date** | 12/21/12 | **Policy Impact** | ☐ All Claims Regardless of Active Date<br>☑ All Claims Greater than Active Date |
| **Type of Decision** || Claims Administrator Decision ||
| **Settlement Agreement Reference** || Exhibit 10 ||
| **Affected Claim Types and/or Review Processes** || Seafood ||

| **II. Summary** |
|---|
| Step 1.  If, during the course of a review, a BrownGreer reviewer identifies either a lease located outside of Louisiana or documentation that a 2010 oyster lease is not reflected in the GCR data, the BrownGreer reviewer will contact the Seafood Team Lead with the relevant lease information.  The claim will remain pending in the reviewer's queue while we obtain updated geographic information needed to complete the review.<br><br>Step 2.  The Seafood Team Lead will compile data points required by GCR to update the database and send that information to GCR in a standard table format.  These data will include the Lease Number, a metes and bounds description of the claimed lease, and the relevant claimant information including the Claimant ID, claim ID, and document citation to a copy of the lease or title hold.<br><br>Step 3.  Using the geographic description and the documentation on file, GCR will perform a spatial analysis of the claimed lease and return the results to BrownGreer as a supplemental Oyster Leasehold spreadsheet.  The supplemental file will be in the same format as the controlling Oyster Lease Databases from June 29, 2012.<br><br>Step 4.  BrownGreer's programming team will update the lease information on the programming table and notify the Seafood Team Leads when this is complete.<br><br>Step 5.   The Seafood Team Lead will instruct the BrownGreer reviewer to complete processing the affected claim and will confirm that the compensation calculation matches the compensation information provided by GCR on the supplemental Oyster Leasehold spreadsheet. |

## Policy 314:  Seafood Program: Protocol for Updating the GCR Database (Internal)

Comments and Decisions by the Parties:

1. **BP**
   a.  Decision:  Defer to Claims Administrator Decision
   b.  Date: 4/16/13
   c.  Comment:

   BP is amenable to making this policy available publicly provided the language in Step 3 is modified because it is inaccurate.  BP was not previously provided an opportunity to comment on the language of the policy.  The phrase "spatial analysis" is not accurate. Also, we request the reference to GCR be deleted.  We request the policy read as follows: "...a mapping firm will plot the lease using the metes and bounds provided in the description and calculate the acreage of the lease that is situated within Oyster Leasehold Compensation Zones A, B, and/or C.  They will then return these results to BrownGreer as a supplemental Oyster Leasehold Spreadsheet."  At the end of the paragraph, please add : "If the geographical description of the lease is insufficient to create an accurate map of the lease, the Settlement Program will request additional information from the leaseholder." (4/16/13)

2. **Class Counsel**
   a.  Decision:  Defer to Claims Administrator Decision
   b.  Date:  4/2/13
   c.  Comment:

   Seems primarily internal. No objection to publishing as a CA Policy. Should, in any event, be provided to Appeal Panelists. (4/2/13)