# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | ) ) ) ) ) | MDL No. 2179 Section: J |
| Applies to: ALL CASES and 2:10-cv-02771 | ) ) ) ) ) ) | The Honorable Judge Barbier Mag. Judge Shushan |

REBUTTAL EXPERT REPORT OF DR. KRIS RAVI
TO THE REPORT OF ANDREAS MOMBER REGARDING EROSION OF WELL-CEMENT
DUE TO HYDROCARBON FLOW

June 10, 2013

## <u>TABLE OF CONTENTS</u>

REBUTTAL OPINION #1:   There is no support for Dr. Momber's conclusion that flaws within the cement (*e.g.,* porous cement caused by nitrogen breakout) could be a contributing factor for the creation of a possible flow path.  To the extent that there were any flow channels in the cement, they would have been caused by BP's operational decisions.................................................................................2

REBUTTAL OPINION #2:  The cement designed by Halliburton Energy Services, Inc., was capable of stopping flow, it was adequately tested, and the cement job was executed as planned. ........................................4

REBUTTAL OPINION #3:  Dr. Momber incorrectly analyzes the location of cement and the "hydrocarbon penetration path."...........................5

    A.     *The First Casing Breach* .................................................................6

    B.     *The OLGA Modeling by Add Energy* ...............................................14

    C.     *Mud Channels and The Second Casing Breach*...................................16

## <u>FIGURES</u>

    (Fig. 1) ........................................................................................... 7

    (Fig. 2) ........................................................................................... 9

    (Fig. 3) ........................................................................................... 10

    (Fig. 4) ........................................................................................... 11

    (Fig. 5) ........................................................................................... 12

    (Fig. 6) ........................................................................................... 15

    (Fig. 7) ........................................................................................... 17

## <u>EXHIBITS</u>

    Exhibit A – Ravi Calculations

    Exhibit B – Ravi CV, List of Publications, and Patents

    Exhibit C – Reliance Materials

## INTRODUCTION

I have been asked to respond to the expert report of Andreas Momber.[1]  Dr. Momber expresses the following opinions, which I rebut in whole or in part based on my evaluation of the relevant facts and data:

(1)     Momber opines that small flaws within the cement, either foam-type pores or cracks in a cement-based composite, could have provided early pathways for penetrating fluids prior to the blowout;[2]

(2)     Momber opines that pre-existing flow channels in the Macondo production casing cement were created exclusively by the following possibilities: (a) contamination of the cement by nitrogen breakout and migration from nitrified foam cement, (b) inadequate design of the cement, and/or (c) inadequate testing of the cement;[3]

(3)     Momber opines that the bottom hole section of the Macondo well was essentially filled with cement and that cement filled much of the casing up to the float collar;

(4)     Momber opines that the hydrocarbon penetration path was up through the nozzles in the reamer shoe and up the shoe track; and

(5)     Momber opines that hydraulic fragmentation of the cement in the shoe track explains the increase in flow rate after 21:30, as reflected in Emilsen's OLGA modeling.

My responses to these opinions are set forth below.  To the extent the factual findings, reliance materials, analysis and opinions offered in my Phase I Rebuttal Report are relevant here, I incorporate them by reference.

At the outset, I agree with Dr. Momber to the extent that he expressly or implicitly acknowledges or opines that the cement used in the Macondo well production casing cement job, where it was placed properly, set and hardened in a timely manner and reached sufficient compressive strength.  I agree with Momber's conclusion that the cement, where it was placed properly, continued to provide a barrier to flow, meaning the cement was strong enough to resist erosive and other forces.  I do not agree, however, that the flow paths were due to fault in cement design or job execution.  I also agree with Dr. Momber to the extent he expressly or implicitly acknowledges that BP's own decisions and operations contributed to the risks of cement contamination with mud and mud channeling, which would serve as a potential flow path for hydrocarbons.

---

[1]  I am a Halliburton Energy Services, Inc. ("HESI") employee, and am not being retained or compensated for my opinion in this matter.  I have not previously served as an expert or testified in any prior case, though I have previously testified in several depositions in Phase I of this Litigation.

[2] Expert Report of Andreas Momber, May 1, 2013, at p. 6.

[3] *Id.*

1

## ANALYSIS

BP's position, as reflected in the opinions of Dr. Momber, is puzzling in light of the stance that BP took in Phase I of this litigation.  On the one hand, BP argued in Phase 1 that HESI's cement was unstable and incapable of stopping flow, and thus contributed to the Macondo blowout.  In Phase 1, BP further argued that BP's operational decisions played no role with respect to the alleged failure of the Macondo production casing cement job.  But on the other hand, for purposes of Phase 2 quantification issues, BP now relies on the fact that "cement also filled part of the annulus and would have provided a barrier to flow there" to argue that the United States' assumptions regarding quantification are incorrect, while also arguing that HESI cement would have resisted erosional and other forces for a substantial period of time after the blowout.[4]  It thus appears that the character of HESI's cement changes to suit BP's litigation purposes.

Dr. Momber opines that "it is quite reasonable to assume that the well cement had one or more channels in it by the time of the blowout."   Dr. Momber fails to acknowledge that BP's operational decisions about the number of centralizers to use on the well, its failure to perform bottoms up circulation prior the execution of the cement job, and issues with the float collar conversion, all contributed to the failure of the cement to achieve zonal isolation.[5]  Instead of simply acknowledging that HESI's cement was, in fact, capable of forming a barrier and that it was BP's own decisions that compromised the cement job and lead to the blowout, BP continues to rely on unsupported arguments about the alleged failures of the cement design and job execution.  BP continues to ignore other plausible explanations that account for the data, while concurrently arguing that this same cement was somehow capable of stopping flow.

**REBUTTAL OPINION #1:  There is no support for Dr. Momber's conclusion that flaws within the cement (*e.g.*, porous cement caused by nitrogen breakout) could be a contributing factor for the creation of a possible flow path.  To the extent that there were any flow channels in the cement, they would have been caused by BP's operational decisions.**

Dr. Momber's erosion analysis makes unfounded assumptions about the initial pathways of hydrocarbon flow.  He argues that "foam-type pores in concrete can increase its permeability by a factor of 10," which suggests that this created a flow channel that could alter the structure of cement material that can act as a pathway for penetrating fluids.[6]  This analysis is not correct.  Nitrogen breakout does not account for what occurred at Macondo because this does not create a continuous channel that would sufficiently account for the blowout observed.[7]  Sustained flow of formation fluid through the annulus is possible only if there is a continuous flow path or conduit established or subsequently available.[8]  Poor

---

[4] *Id.,* at p. 5.

[5] *Id.,* at p. 7.

[6] *Id.,* at p. 6.

[7] *See* TREX 6221: Email - From: Daryl Kellingray To: Erick Cunningham - Subject: RE: Investigation Team (BP's in-house cementing engineer remarked after the Incident: "I've suspected all along with the lack of centralization small volumes likelihood of mud contamination we would have had nitrogen breakout.  However this should only matter if the kick came from the annular side, if its come through the floats I'm less convinced nitrogen breakout alone is the issue.").

[8] *Id.*

displacement of drilling fluid during cement placement can bypass a continuous channel of drilling fluid traversing the annulus.[9]  This channel can act as conduit for formation fluid invading the annulus.[10]

With respect to Dr. Momber's assertion about flow through permeable set cement as the origin of the erosion process, there is no plausible basis for the theory.  When formation fluid enters the annulus, percolation can only occur if a sufficient pressure gradient is available.[11]  Several authors have studied the possibility of formation fluid entering through set and unset permeable cement.[12]  Using Darcy's flow equation and laboratory measured  permeability values, David Sutton and I evaluated the possibility that this mechanism was solely responsible for sustained gas percolation through setting cement.[13]  The conclusion was that flow volumes through even one Darcy cement would be too small to account for sustained gas flow.[14]

It is not clear what Momber means by suggesting the possibility of nitrogen contaminating the cement.  First, it is impossible that nitrogen escaped from the annulus into the shoe, through the intact reamer shoe. Secondly, it is impossible that the nitrogen escaped when the cement slurry was pumped down the casing.  The dynamic pumping of the cement slurry would have ensured that all the nitrogen would have entered the annulus.  As Momber (and others) are suggesting, even if the nitrogen were to break out, it is very unlikely to impossible that nitrogen would have broken out while being pumped down the casing. As Momber (and others) allege that nitrogen broke out, the only possibility of this happening is in the annulus, assuming that the shoe track is intact (as discussed later it is very likely that the shoe track was not intact). We know that there was no nitrogen breakout in the annulus and there was a competent cement sheath in the annulus (above the casing breach).  I note Momber seems to concede that there was a significant volume of competent cement in the annulus.

Further, at the Phase I trial, Glen Benge explained that if a foam slurry is unstable, it does not form permeable cement when placed downhole.[15]  To the contrary, if foam cement is or becomes unstable downhole, meaning nitrogen breaks out of or moves in the slurry, the result would be a more dense base slurry being left behind.[16]  The more dense base slurry left behind can create a barrier downhole in the well.[17]  I agree with Benge's analysis, and also note that to the extent nitrogen breakout could have occurred in the Macondo well, such a phenomenon would have been accompanied by losses during the cement job. We know from job data that there were no losses.  Data collected during the execution of the Macondo production casing cement job gives no indication that the slurry was unstable or experienced

---

[9] *Id.*

[10] *Id.*

[11] *See* TREX 60451: E. Nelson & D. Guillot, <u>Well Cementing</u> (2nd ed.) at pp. 255-258.

[12] *Id.*

[13] *See id.; see also* TREX 63136: D.L. Sutton and K.M. Ravi, Halliburton Services, <u>New Method for Determining Downhole Properties that Affect Gas Migration and Annular Sealing</u>, Society of Petroleum Engineers, 1989.

[14] *See* TREX 60451, at p. 255-258.

[15] Benge Trial Transcript, March 6-7, 2013, 2470:16-19, 2579:11-2580:6.

[16] *Id.*, at 2579:11-2580:3.

[17] *Id.*, at 2579:11-2580:6.

nitrogen break out during the pumping of the cement job.[18]  Accordingly, to the extent that Dr. Momber's erosion analysis depends on this underlying assumption, it is incorrect.

To the extent that there were any flow paths in the cement, due to the cement being "disturbed," any disturbance would have been caused by BP.  Momber opines about the existence of flow channels and refers to Table 4.1 for the possible flow paths. What is missing in Table 4.1 is the only type of flow path that could actually account for this magnitude of hydrocarbon flow:  mud channeling.   Momber simply ignores the possibility that mud could have been left behind due to poor centralization, insufficient mud removal, and that mud that would have been wiped by the wiper plug and contained in the shoe.  It is only the *mud channels* that could account for the flow rate observed in Macondo.  A number of capillaries, cracks, pores and permeability cannot account for the flow rates observed at Macondo. Hence, the only likelihood for the "big" channels that Momber is implicitly referring to would be those created from mud that has not been removed and from contamination of mud and cement.

On page 13 of his Report, Momber assumes that somehow magically and selectively a 2.17 inch and then a 2.64 inch diameter of set cement would permit the requisite flow of hydrocarbons.  It is impossible or at least implausible that suddenly about 20% of the set intact cement column would show deterioration and the flow path would be continuous.  Such results are only possible in the presence of mud channels and cement contaminated with mud. The hydrocarbons would then be able to gradually displace the mud channel and thus reduce the hydrostatic pressure that was preventing the gas from flowing.

Dr. Momber opines that "cracks as small as 500 µm (millionths of a meter) in a cement-based composite can increase the permeability of the material by some orders of magnitude" identifying these as a possible source for pathways for penetrating fluids, but he does not describe the source of such cracks. As previously noted, the source for such flow paths is likely due to BP's operational decisions (*e.g.*, poor centralization, failure to perform a full bottoms up, problems in float conversion, etc.).

On page 17 of his Report, Momber refers to the phenomena of hydraulic fragmentation. But for hydraulic fragmentation to occur, sufficient kinetic energy is required to do the work.  At the depth of interest there is not enough kinetic energy imparted by the fluids to cause hydraulic fragmentation. On the other hand, hydrocarbons can displace *mud channels* and thus create the path for flow and also decrease the pressure inside the casing which would accelerate the flow of hydrocarbons.

**REBUTTAL OPINION #2:  The cement designed by Halliburton Energy Services, Inc., was capable of stopping flow, it was adequately tested, and the cement job was executed as planned.**

Dr. Momber concedes that the cement was, at some level, capable of stopping flow and/or resisting flow for a substantial period of time (contrary to the position of certain U.S. quantification experts).  Indeed, he explains that "[a] reasonable inference . . . is that there was substantial cement impeding flow in the wellbore, but that flow was occurring through channels in the cement."[19]  This conclusion is supported by my prior analysis concerning the stability of the  Macondo production casing cement.

---

[18] *Id.*, at 2320:22-2321:9, 2403:14-22, 2404:1-14, 2570:9-12; *see also* TREX 5993: Halliburton 9.875" x 7" Foamed Production Casing Post Job Report, dated April 20, 2010.

[19] Momber Report, at p. 9.

As previously demonstrated, the Macondo slurry (with all additives included) was subjected to a thorough and rigorous testing regime at HESI, which included foam stability testing. In the final foam stability test performed on the Macondo foam slurry, the slurry was successfully foamed in 8 seconds, and the sections of set foamed cement weighed the same at the top and bottom (1.8 S.G. on top, and 1.8 S.G. on bottom).[20] This test demonstrated that the slurry, with all additives, was capable of being foamed and was stable.[21] Further, the execution of the cement job was adequate, and the cement slurry was pumped as planned. The cement likely set within 16 hours of being pumped, assuming that the cement slurry was not in any way prevented from setting by operations conducted by BP on the well prior to and after the primary cementing job. Zonal isolation by set cement also assumes that the cement was actually placed where it was planned to be placed, as opposed to be over-displaced due to a casing breach, which is discussed in more detail below.

Given the successful test result and the proper execution of the Macondo production casing cement job, I find it highly unlikely that contamination of the cement due to nitrogen breakout, the design of the cement, or the alleged inadequate testing played any role in the formation of pre-existing channels. Instead, as I have previously opined, BP's own operational decisions likely contributed to the formation of mud channels in the Macondo well. Indeed, BP's failure to adequately centralize the production casing and its failure to sufficiently circulate mud ahead of the cement job likely contributed to the formation of channels in the Macondo well.[22]

**REBUTTAL OPINION #3: Dr. Momber incorrectly analyzes the location of cement and the "hydrocarbon penetration path."**

I disagree with Dr. Momber's conclusions regarding (1) the location of the cement in the bottom hole portion of the Macondo well and (2) the hydrocarbon penetration path. Dr. Momber concludes that "before the Macondo incident, the bottom of the wellbore was filled with cement; cement filled much of the casing up to the float collar, and more cement filled part of the annulus around the lower portion of the production casing.[23] Dr. Momber also assumes that "the oil passed through the well cement barrier between the shoe and the float collar," and that consequently "a flow path must have been formed in the well cement allowing the oil to flow into and up the shoe track."[24] His Figure 2.1 on page 2 of his report shows a dotted red line, representing inflowing hydrocarbons, entering the shoe track through the bottom of the reamer shoe. More fundamentally, Dr. Momber assumes that because "oil flowed up the casing"

---

[20] *See* TREX 4566: Cement Lab Weigh-Up Sheet – Re/Slurry US-73909/1, dated April 17, 2010.

[21] *See id*.

[22] *See* TREX 5210: R.M. Beirute, F.L. Sabins and K.V. Ravi, <u>Large-Scale Experiments Show Proper Hole Conditioning: A Critical Requirement for Successful Cementing Operations</u>, 1991, Society of Petroleum Engineers (SPE 22774) at p. 1. ("Field experience has suggested that perhaps the most important parameter controlling the success of a cement job is the condition of the hole before the cementing operation. If the hole has not been properly prepared (conditioned) to receive cement, the cement job will likely not be a good one even if other generally accepted practices such as use of spacers, turbulent flow, etc., are followed during the actual execution of the cement job."); at p. 8. ("A properly conditioned or "circulable" hole should be established <u>before the cement job</u> by taking advantage of the following techniques: (a) proper pipe centralization to prevent mud from being trapped behind the pipe; . . . (c) movement of the casing to help break the mud gels and to pull the pipe away from the formation walls; . . . (e) circulation of the well at the biggest rate possible . . . and for long enough periods to fully clean the hole, break the mud gels, and remove as much of the "removable" filter cake as possible.").

[23] Momber Report, at pp. 2, 4-5 and Figs. 2.1 and 2.2.

[24] *Id*., at p. 2, citing Figs. 2.1 and 2.2.

that therefore "the cement structure was disturbed."[25]  Momber then proceeds to analyze how this cement would erode or otherwise be degraded due the hypothesized ability of hydrocarbons to access "flow channels" in the cement.

     *A.    The First Casing Breach*

In my opinion, BP's operations caused a breach in the casing below the float collar.  The existence of a breach in the casing means that the cementing job could have been conducted without an effective shoe track.  A breach in the casing would lead to the cement slurry exiting the casing somewhere between the float collar and the reamer shoe, leaving mud, contaminated with cement, below the location where the casing shoe track was damaged or breached.  Thus Dr. Momber is incorrect in assuming that the entire bottom hole section of the Macondo well was uniformly filled with competent cement, and that there was an intact shoe track filled with cement.

In my opinion, HESI's execution of the production casing cement job was satisfactory, and the cement slurry was pumped as planned.  However, BP's operations caused a breach in the casing below the float collar.  I reach this conclusion based on the empirical data that I have examined, and upon the expert analysis and testimony of various individuals.  The possibility of damage to sections below the float collar has been acknowledged by other experts, including Glen Benge,[26] Robert Grace[27] and Gene Beck,[28] as well as the testimony or documents of John Guide[29], Brian Morel[30], Mark Hafle[31], Robert Kaluza and Jonathan Sprague[32].

BP's operations prior to pumping the cement slurry presented significant challenges to the success of the primary cement job.  BP knew there were problems running the casing into the open hole section of the well, because this section contained washouts.  These suboptimal conditions caused:

    (a)      the inability to run the Schlumberger wireline tools to depth on April 10[33];

    (b)      the fact that the tool could not be run deeper than 18,280' on this date due to "LCM plug or fill?"[34]

---

[25] *Id.*, at p. 5.

[26] *See* Benge Dep., 101:1-102:25.

[27] *See* Robert Grace Dep., 347:16-348:20.

[28] *See* TREX 8140: Revised Expert Report of Dr. Frederick Eugene Beck on Well Design, Control, Drilling, and Monitoring, dated November 10, 2011.

[29] *See* John Guide Dep., 614:4-14.

[30] *See* TREX 2584.

[31] *See* TREX 4457.

[32] *See* Jonathan Sprague Dep., 712:21-713:12.

[33] *See* TREX 3540: Schlumberger Final Triple Combo Log Report.

[34] *See* TREX 3537: Wireline Logging Diary - Macondo MC252  #1 BP01-Run 1, 4/9/10-4/15/10, at BP-HZN-BLY00189101.

(c)     the wireline tool encountering an obstruction at 18,280' on April 11[35];

(d)     a "hard" setting of the logging tool on April 12[36]; and

(e)     the jamming of the motors of the wireline tool with LCM or loose sand.[37]

Indeed, the April 15 notes from the wireline run reflect that the tool encountered a washed out area at a depth of 17,805'.[38]  *See* Fig. 1, illustrating the suboptimal open hole section.



(Fig. 1)

Given these poor bottom hole conditions, BP was concerned about potential buckling of the casing as it was run through these sections.  Due to these concerns, BP's drilling engineer, Brian Morel, asked Preeti Paikattu to determine what depths and slack-off weights could induce buckling of the casing.[39]  After reviewing Paikattu's feedback, Morel wrote to Don Vidrine, Kaluza, and Lambert on

---

[35] *See id.*, at BP-HZN-BLY00189102.

[36] *See* TREX 4776: BP Daily Geological Reports, at BP-HZN-2179MDL00058954.

[37] *See* TREX 3537, at BP-HZN-BLY00189105.

[38] *See id.,* at BP-HZN-BLY00189107.

[39] *See* TREX 62679: Email - From: Preeti Paikattu To: Brian Morel - Subject: RE: Actual vs model - 9-7/8 in liner run, with attachment; *see also* TREX 4515: Email - From: Preeti Paikattu To: Brian Morel - Subject: RE: Actual vs. model 9-7/8 in liner run.

April 17, warning that "model show not being able to set down too much weight before putting the smaller size pipe into buckling." Morel attached a table reflecting the buckling impact of placing 45 kips (45,000 pounds-force) on the long string casing.[40] Despite these concerns, BP decided not to "wash down" as it ran the long string, which could have helped remove debris.[41] Furthermore, as described below, BP also decided not to convert the float collar prior to running through the bottom hole section, *i.e.* the section containing the hydrocarbon bearing zones.

Not surprisingly, BP then encountered significant problems when running the casing through this section. When the casing reached a depth of 18,218', it ran into an obstruction, placing 10 kips (10,000 pounds-force) on the casing string.[42] *See* Fig. 2.



(Fig. 2)

BP recognized the potential for buckling, as evidenced by Brian Morel stating to Kent Corser in his interview notes: "Ran into openhole. Had done calculation. 18,280' 5-10K down. That could helical buckle pipe."[43] The data from the casing landing show that after the casing impacted the apparent bottom

---

[40] *See* TREX 3199: Email - From: Brian Morel To: Don Vidrine and others - Subject: Buckling Models, with attachment.

[41] *See* TREX 713: Email - From: Nathaniel Chaisson To: Jesse Gagliano - Subject: 9.875" x 7" Casing Post Job, with attachment.

[42] *See* TREX 1455: Daily Drilling Report, dated April 19, 2010, at BP-HZN-MBI00136941; *see also* TREX 60912: BP Daily Operations Report - Partners (Completion), dated April 19, 2010, at BP-HZN-2179MDL00004014; *see also* TREX 713, at HAL_0125646; *see also* TREX 718 (Tally Book).

[43] *See* TREX 7: Transcription of Brian Morel Interview Notes, dated April 27, 2010.

of the well, it traveled an additional 17 feet—in other words, the casing was set into debris which had accumulated at the bottom of the well.[44]

The open hole caliper log was run a few days before the cement job.[45]  The openhole log shows washout (i.e., an enlarged hole) below the location of the float collar.[46]   *See* Fig. 1.  In general, washouts get worse with time.  Here, the washout prior to the cement job was greater than 40%.  The presence of a washout of this magnitude increases the stresses on the buckled casing, and could cause it to fail.[47]

My review of the data indicate that 144 kips was placed on the casing near the bottom of the well, which would have induced helical buckling in the lower portion of the long string.[48]  *See* Fig. 3.



(Fig. 3)

My conclusion is consistent with the Transocean Rig Ops Overview, which provides a list of common causes of casing buckling, including landing casing into a washed out, uncemented area, when too much tension is released in the landing.[49]  I also conclude that 144 kips (144,000 pounds-force) far

---

[44] *See* TREX 604: Sperry Log; *see also* Beck Trial Transcript, April 3-4, 2013, 7146:25-7148:7; 7378:25-7379:22.

[45] TREX 7478.

[46] Phase I Expert Report of Glen Benge, at p. 24; see also Trial Tr. 2287:9 -2292:25; Trial Tr. 2302:18-2305:22.

[47] Beck Trial Tr., 7134:18 – 7137:10; 7379:15 – 7380:9; 7146:25 – 7148:7; 7378:25 – 7380:19.

[48] *See* TREX 604; *see also* TREX 3199.

[49] *See* TREX 5464: Transocean Rig Operations, Rig Awareness Training.

exceeded the combined restoring force of the six centralizers, which together provide only 7,146 pounds-force.[50]

By setting the casing into debris at the bottom of the wellbore, BP clogged the reamer shoe. *See* Fig. 4.



(Fig. 4)

As described above, BP had difficulty running the casing to the bottom of the well, and exacerbated these problems by violating its own best practices by not tripping the M45AP float collar (*i.e.* converting it) prior to running it through debris-filled, hydrocarbon bearing zones.[51]  This omission is significant because if the float collar been run in the tripped or converted mode, it would be less likely to

---

[50] *See* TREX 5813: Email - From: Jesse Gagliano To: Quang Nguyen - Subject: RE: Lab Samples (showing restoring force of centralizer at 1,191 pounds).

[51] Beck Trial Transcript, April 3-4, 2013, 7106:8-7107:7; TREX 6121: BP Drilling and Well Operations Practice E&P Defined Operating Practice; Calvert Trial Transcript, March 7, 2013, 2636:1-11.

be filled with debris and clogged.[52]   Having clogged the reamer shoe and buckled the casing, BP predictably encountered serious difficulties in converting the float collar.[53]

Despite these issues, BP attempted to convert the float collar and establish circulation using brute force.  BP pressured up nine separate times and ultimately pressured up to 3,142 psi before circulation was established.[54]   The float collar was supposed to be converted at 400 to 700 psi using a higher flow rate to induce the needed pressure differential to convert.[55]

In my opinion, when BP put pressure inside the shoe track during the nine attempts, it created dynamic pressure pulses inside an already weak shoe track, which was under stress from buckling.  This very likely led to the failure of the shoe track due to the fatigue caused by the repetitive pressure cycle exerted on it during the attempted float conversion.  When the pressure dropped, it did so suddenly,[56] indicating a substantial breach such as a mechanical failure.  This behavior is not what would be expected during a gradual cleaning of the debris.  The pressure cycles used to achieve circulation (up to 3142 psi) very likely damaged the shoe track and created a breach in the casing, especially given the fact that the casing was damaged or weakened due to helical buckling.[57]   *See* Fig. 5.

---

[52] Calvert Trial Transcript, March 7, 2013, 2634:23-2635:2; Beck Trial Transcript, April 3-4, 2013, 7107:8-20.

[53] *See* TREX 2149: Email - From: Lee Lambert To:  Martin Breazeale - Subject: Macondo Daily, with attachment ("Witness and discuss problems with converting the float"); *see also* TREX 5993, at HAL_0028667-668.

[54] *See* TREX 5993, at HAL_0028667-668.

[55] *See* TREX 2562: Weatherford Document No. D000446283 - Flow-Activated Mid-Bore Auto-Fill Collar Model M45AP.

[56] TREX 4248, Figure 13.

[57] *See* Ravi, K, McMechan, D., Reddy, B.R., Crook, R., "A Comparative Study of Mechanical Properties of Density-Reduced Cement Compositions," SPE Drilling & Completion, Volume 22, Number 2, Published by Society of Petroleum Engineers, 2007; *see also* Phase II Rebuttal Report of Glen Stevick (explaining low cycle fatigue); Beck Trial Tr., 7134:18 – 7137:10; 7379:15 – 7380:9; 7146:25 – 7148:7; 7378:25 – 7380:19.



(Fig. 5)

The buckling likely caused one or more areas of the casing to exceed the critical point, which lead to a breach and/or thread failure.  A breach in the shoe track below the float collar was thus caused by the buckling and weakening of the casing, BP's nine attempts to convert the float collar, and application of 3,142 psi of pressure to achieve circulation where specifications on the float collar called for float conversion at 400 to 700 psi.[58]  I also conclude that the buckling and subsequent pressurization would have moved the casing and associated threaded joints back and forth, resulting in low cycle fatigue of the high strength, but low ductility, casing steel.  Such low cycle fatigue induced by cyclical movement can reduce the strength of a material substantially below its undamaged strength "rating."

Further supporting my conclusion of a casing breach is the fact that the circulating pressures after the supposed float conversion were much lower than the expected/previously observed pressure, which raised additional concerns about the conversion, and is consistent with the existence of a breach in the casing.[59]  The pressure following the attempt to convert the float collar was much lower than expected.[60]  The lower circulating pressure indicates that circulation was flowing through an additional flow area or breach in the shoe track casing.  This means that the subsequent cement job was conducted without a competent shoe track, and there was mostly mud below the breach.  *See* Fig. 5.

---

[58] *See id.*; *see also* TREX 5993.

[59] *See* TREX 2149 ("Troubleshoot low pressures while circulating"); TREX 5993, at HAL_0028668. ("Company man feels uncomfortable with the circulating pressure being this low" and "Circulating at 4.0 bpm with 340 psi.  Mi Swaco model estimates circulating pressure should be about 570 psi at 4 bpm"); TREX 3188: Notes from Bob Kaluza Interview, dated April 28, 2010 (interview notes of Robert Kaluza acknowledging lower than expected circulating pressures after supposed conversion of float collar); TREX 1455; TREX 713.

[60] *See* TREX 5993, at HAL_0028668.

12

BP recognized the potential significance of low circulation pressure. Brian Morel, a BP engineer, remarked that "Yah we blew it at 3140, still not sure what we blew yet."[61]  Mark Hafle, another BP engineer wrote "Shifted at 3140 psi.  Or we hope so. We are circ now."[62] Nate Chaisson testified that he heard Bob Kaluza state that Kaluza thought something might have blown higher up in the casing.[63]

My conclusion that there was a casing breach is also consistent with Jonathan Sprague's testimony that during BP's investigations of the Macondo incident, there were discussions about the possibility that the casing was damaged during attempts to convert the float collar.[64]  At trial, John Guide also conceded that damage to the shoe track from the high pressures required to achieve circulation could have explained the lower than expected circulating pressure.[65]

I have reviewed the trial testimony of Dr. Beck, and I agree with his conclusion that when circulation broke suddenly at 3,142 psi, there was a very rapid depressurization down to about 150-200 psi, which is a sign of mechanical failure, not the unplugging of debris.[66]  I have also reviewed the expert reports and testimony of Dr. Beck, and agree with him that there was likely a breach in the casing below the float collar.

My conclusion is also consistent with the opinions of BP's expert Robert Grace, and the U.S.'s expert, Glen Benge.  Grace acknowledged that the blowout could have started a "thread leak" and that since "we had the full force of the well on us" the hydrocarbons "were not coming through a pin hole."[67] Benge also considered this possibility, testifying that "if, following the release of pressure on the float collar that there was a failure of a connector below that float collar—in other words, the casing joints, if they fell off, broke off, no longer there, your circulation path would then be right below the float collar. You would leave the bottom of the well—wouldn't have any cement in it at all."[68]

Momber does elaborate calculations for pressure drop. One important pressure drop calculation that is missing from Momber's analysis is the pressure drop through the nozzles in the reamer shoe. If the reamer shoe were intact, then at 50 bbl/day, the pressure drop across the four 0.5 inch nozzle in the reamer shoe would have been greater than 2,000 psi.  What this means is that it is very unlikely that the reamer shoe was intact because in that case the resistance to flow through the nozzle, float collar and the set cement would have prevented flow of this magnitude.

A breach in the casing below the float collar would be an alternative "hydrocarbon penetration path" that was not considered by Dr. Momber.  The breach probably provided a direct access path for the hydrocarbons to the inside of the casing from below the float collar.  Such a breach would be a contributing factor to explaining why the otherwise stable foam cement pumped at the Macondo well did

---

[61] *See* TREX 2584: Email - From: Brian Morel To: Bryan Clawson - Subject: RE: Circulation.

[62] *See* TREX 4457: Email - From: Mark Hafle To: VHG3@aol.com - Subject: RE: run this one next time.

[63] Chaisson Dep., 337:8-339:21; Chaisson Trial Transcript, March 27, 2013, 6305:8-16.

[64] *See* Sprague Dep., 712:21-713:12.

[65] Guide Trial Transcript, April 15-16, 2013, 8744:6-8745:4.

[66] Beck Trial Transcript, April 3-4, 2013, 7115:5-8.

[67] Robert Grace Dep., 348:1-20.

[68] Glen Benge Dep., 102:9-16.

not achieve its goal of isolating hydrocarbon zones in the well, and does not require Dr. Momber's assumptions regarding nitrogen breakout or channeling caused by faulty cement design.

Dr. Momber also fails to properly consider the significance of the location of the float collar with respect to the hydrocarbon zones. I note that the main reservoir zone (M56E), 71 feet thick, and another reservoir (M56F) about 21 feet thick, were _below_ the float collar.[69]  *See* Fig. 5. I find this to be very unusual. It is against BP's best practices. Even if BP wanted to evaluate the cement against these reservoirs, they would not have been able to do so as the wireline tool would not have reached these zones due to the placement of the float collar above them. More importantly, the probable breach in the shoe track below the float collar means that the hydrocarbons in the bottom-most reservoirs had direct access to inside the casing.

### B.     The OLGA Modeling by Add Energy

I also disagree in part with Dr. Momber's interpretation of the OLGA modeling performed by Morten Emilsen, which suggests a sudden change in flow rate after 21:30.[70] Dr. Momber opines that such a sudden increase in flow rate cannot be explained by a gradual process such as cement erosion, and that another "material destruction process" must be involved.[71] I largely agree with Dr. Momber's conclusion that a gradual, linear process such as cement erosion cannot explain the sudden change in flow rate suggested by the OLGA model. I disagree, however, that the only plausible explanation is hydraulic fragmentation of cement. In my opinion, rapid evacuation of mud in mud channels, and a second breach in the production casing, are more likely candidates for the "material destruction process" needed to account for the rapid increase in flow rate modeled by Add Energy.

As explained above, a breach in the casing below the float collar would cause cement to be over-displaced, *i.e.*, the cement would be placed higher than intended because it exited the breach in the casing rather than the reamer show located below the breach. *See* Fig. 6.

---

[69] *See* TREX 3533: Technical Memorandum - Post-Well Subsurface Description of Macondo well (MC0252_1BP1) v3, at BP-HZN-BLY00082909.

[70] *See* Momber Report, at pp. 7-15 and Figs. 5.1 and 7.1.

[71] *See id.*, at p. 14.



(Fig. 6)

But there should have been competent cement <u>above</u> the breach, in agreement with OLGA model, although this cement would likely be compromised to some degree with mud channels due to less than optimal centralization and less than optimal well circulation.

I believe that the above scenario is what Morten Emilsen, BP's flow expert, simulates using the OLGA model.[72]  He was able to match the time and volume of fluids collected during and after the negative pressure test assuming that 13 to 16.5 feet of reservoir had direct access to the inside of the casing.  In his model, he assumes that the rest of the reservoir (other than the 13 to 16.5 feet) does not have direct access to the inside of the casing.  Where the casing shoe track below the float collar was damaged by helical buckling and repeated and excessive pressurizing, most of the cement slurry in the annulus would be <u>above</u> this damaged location.  *See* Fig. 6.  Any cement that would have been below the breach would have been severely contaminated by mud.  This would translate to set cement slurry in the annulus above the damaged shoe track location and mud contaminated by cement below the breach.  I note that there is a 21' thick 12.6 ppg reservoir from 18,217 feet to 18,238 feet.[73]  If the casing shoe track <u>below</u> the float collar was damaged during the attempted float conversion, then this would mean that there was either no cement below where the casing shoe track was damaged, or only mud contaminated cement.  This would mean that below the float collar the majority of the reservoir was temporarily held back only by the drilling fluid hydrostatic pressure inside the casing.  Thus my analysis is in agreement with the OLGA model and Emilsen's modeling assumption that only 13 or 16.5 feet of reservoir had access to the inside of the casing.

---

[72] *See* TREX 7920: Appendix W. Report-Dynamic Simulations Deepwater Horizon Incident BP (from AE Add Energy).

[73] *Id.*

C.        *Mud Channels and The Second Casing Breach*

Emilsen's model indicates a rapid increase in flow rate commencing after 21:30.  Dr. Momber opines that this sudden increase cannot be explained by a standard erosion process because it occurred much too fast.  Dr. Momber concluded that a faster "material destruction process" must have occurred, and concludes that hydraulic fragmentation of the cement could account for the sudden increase in flow rate.  While I do not reject the possibility of cement fragmentation if sufficient kinetic energy is available, in my opinion there are other, more likely explanations that Dr. Momber fails to consider:  mud channeling and a second breach in the casing.  In my opinion, both of these phenomena were at work during the relevant time period.

One alternative explanation for the relatively sudden increase in flow rate is the existence and characteristics of the mud channels cause by BP's operational decisions, described in more detail above.  A relatively sudden increase in flow can be explained by the removal of the mud channels and the increase in driving force (potential) for flow as the gas enters the casing and reduces the pressure inside the casing. It is the combination of these two factors that increases the flow rate.  In other words, Momber correctly concludes that it is unlikely that a large volume of hardened, set cement would suddenly cease being a barrier to flow.  But Momber fails to appreciate that the presence of mud channels would not present such a formidable barrier to flow, and that mud could be swept out of channels at a relatively high rate.

The other factor at work is a second casing breach.  During the negative pressure test, as the drilling fluid is being swapped with sea water, the hydrostatic pressure inside the casing is intentionally decreased.  This probably enabled the hydrocarbons to enter the inside of the casing through the first casing breach below the float collar, allowing them to migrate past the damaged and/or non-gas-tight float collar.  As the hydrocarbons entered the casing, the hydrostatic pressure inside the casing decreased further due to the lower density of the hydrocarbons compared to drilling mud or seawater.  At some point during the blowout, likely after 21:30, the 7 inch casing likely collapsed due to the differential pressure between the annulus and the casing exceeding the collapse pressure.   This is supported by my calculations, attached hereto as Exhibit A.  *See* Fig. 7.



(Fig. 7)

The lack of centralization higher in the annulus almost certainly created mud channeling. Once a pressure differential caused a casing collapse higher in the annulus, additional hydrocarbons from sands in this uncentralized area likely flowed into the casing through the second breach in the casing.

This area of casing collapse was likely close to but below the previous 9 5/8" shoe located at 17,168 feet. A collapse at this location is corroborated by the report from Vector Magnetics to BP during post-incident attempts to intercept and kill the well. The modeling used by Vector Magnetics when it deployed its ranging tool to intercept the Macondo well encountered an "end of pipe" anomaly which Vector Magnetics said could be explained by a physical parting of the casing just below the previous shoe.[74] The likelihood of a collapse in this area was corroborated by Vector Magnetics when it conducted ranging operations to intercept the Macondo well post-incident.[75] David Winter of Vector Magnetics testified that the ranging tool used by Vector Magnetics experienced an "end of pipe" effect that could

---

[74] *See* TREX 3363: Email - From: John Wright To: Angus Jamieson and others - Subject: DD3 Intersection Team Daily, with attachment; *see also* Winters Dep., 135:14-147:18; *see also* TREX 3364: Email - From: David Winter To: Rahn Pitzer - Subject: MC#3 Ranging intensitys [sic], with attachment; *see also* TREX 3360: Email - From: Rahn Pitzer To: Donal Fitterer and others - Subject: RE: Emailing: Pre-Run12.zip; *see also* TREX 3361: Email - From: David Winter To: William Allen and others - Subject: RE: casing with oil internal; *see also* TREX 3357: Email - From: Elliott Swarthout To: Rahn Pitzer and others - Subject: RE: Modeling at the 9 7/8 csg pt.; *see also* TREX 3358: Email - From: David Mohler To: Donal Fitterer and others -  Subject: RE: Emailing: VMLLC MC252#3 memo 9 july 2010.pdf.

[75] *See* TREX 3363.

only have been caused by a couple of possibilities.[76]  One of those possibilities was that the 9 7/8" liner and the 7" production casing were physically parted around the location of the previous shoe.[77]

This casing collapse probably provided another flow path for hydrocarbons to the inside of the casing, and the presence of mud channels higher in the annulus due to insufficient centralization enabled an influx of additional formation fluid to enter the annulus and casing, contributing to the blowout, and explaining the increase in flow rate modeled by Emilsen.

Thus in my opinion, Dr. Momber misinterprets the significance of the Emilsen model.  In my opinion, this model actually suggests that the flow path of hydrocarbons from the 12.6 ppg reservoir at the bottom of the well was initially through a breach in the casing shoe track (the first breach), as opposed to being flow through pre-existing channels in the cement as Dr. Momber assumes.  There was probably no cement or only cement contaminated by mud below the breach allowing the reservoir direct access to flow inside of the casing.  There was, however, competent cement *above* the breach so the other reservoirs didn't have access to the inside of the casing, at least initially.

As the hydrocarbons continued to enter the inside of the casing, the pressure inside the casing decreased and resulted in casing collapse due to the difference in pressure inside and outside the casing. This is in agreement with the end-of-pipe effect observed by Vector Magnetics.  Once the casing collapsed (the second breach), additional flow paths could have been established for other hydrocarbon zones higher in the annulus, such as the M57B zone, which were located in an entirely uncentralized upper annulus.  The channeling caused by this lack of centralization and lack of circulation prior to cementing likely created communication pathways for these higher sands to flow through the location of the casing collapse, adding to the flow already coming up the casing from the exposed 12.6 ppg reservoirs at the bottom of the well.   Thus contrary to Dr. Momber, the most likely explanation for the increased flow after 21:30 is not hydraulic fragmentation of cement, but the additional flow paths caused by the evacuation of mud in the mud channels caused by BP's poor operational decisions and relatively sudden collapse of the 7 inch casing near the 9 5/8" liner shoe.

***

---

[76] *See* Winters Dep., 8:15-16; 8:20-9:3; 12:5-9; 15:25-16:9; 37:12-39:15; 135:14-147:18.

[77] *See* TREX 3364; TREX 3360; TREX 3361; TREX 3357; TREX 3358; TREX 3363.

I  reserve the right to modify this report and to supplement my opinions if additional data becomes available or if other reports are filed or supplemented.

Dr. Kris Ravi

# Exhibit A

**Time, fluid height, drill pipe pressure, from Figure 16, Page 102, Bly report**

| | density (lb/gal) | height (ft) | pressure (psi) | density (lb/gal) | height (ft) | pressure (psi) | density (lb/gal) | height (ft) | pressure (psi) |
|---|---|---|---|---|---|---|---|---|---|
| →Time→ | | | **21:36** | | | **21:41** | | | **21:42:30** |
| Sea Water | 8.60 | 8367.00 | 3741.72 | 8.60 | 8367.00 | 3741.72 | 8.60 | 8367.00 | 3741.72 |
| Drill Pipe Pressure | | | 1685.00 | | | 510.00 | | | 280.00 |
| Pressure inside casing @8367 ft | | | 5426.72 | | | 4251.72 | | | 4021.72 |
| Hydrocarbon | 4.38 | 8801.00 | 2005.92 | 3.43 | 8801.00 | 1571.59 | 3.25 | 8801.00 | 1486.58 |
| Pressure inside casing @ 17,168 ft | | | 7432.64 | | | 5823.32 | | | 5508.30 |
| Pressure in annulus @17168 ft from fluid density | 14.17 | 17168.00 | 12650.07 | 14.17 | 17168.00 | 12650.07 | 14.17 | 17168.00 | 12650.07 |
| Pressure difference between annulus and inside casing, @ 17,168 ft, without including $\Delta T$ effect | | | 5217.43 | | | 6826.75 | | | 7141.77 |
| Pressure Increase inside the annulus from $\Delta T$, at 17,168 ft | | | 4521.28 | | | 4998.59 | | | 5166.75 |
| Pressure difference between annulus and inside casing @17,168 ft, including $\Delta T$ effect | | | 9738.71 | | | 11825.34 | | | 12308.52 |
| Departure between collapse pressure and differential pressure @17,168 ft | | | **2136.29** | | | **49.66** | | | **-433.52** |
| Conclusion | | | *The casing is far from collapsing - The pressure difference between the outside and inside the casing is about 2000 psi under the potential casing collapse pressure* | | | *The casing is close to collapsing - The pressure difference between the outside and inside the casing is about 50 psi under the potential casing collapse pressure* | | | *The Casing very Likely collapsed - The pressure difference between the outside and inside the casing is about 450 psi over the potential casing collapse pressure* |

inc height | 1000

App W, Bly Report, Fig 3.1

| | | | |
|---|---|---|---|
| Effective compressibility | | 1.25 | 0.85 |
| Effective Molecular Weight | | 30 | 30 |
| Temp | | 239.0 | 200.0 |
| Depth | | | |
| $p$ | psi | 12000 | 7200 |
| $v$ | | | |
| $n$ | | | |
| $T$ | (ft3psi/(R lbmole)) | 10.731 | 10.731 |
| | degR | 698.67 | 659.67 |
| density | lbmole/ft3 | 1.28043918 | 1.196597052 |
| density | lb/ft3 | 38.4131743 | 35.89786052 |
| density | lb/gal | 5.13 | 4.79 |
| | | 5.28 | 4.78 |

density, temperature, pressure, from AppG, P 17, Bly report

**21:36**

| compressibility | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 |
|---|---|---|---|---|---|---|---|---|---|---|
| Weight | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 |
| Temp | 200.0 | 204.4 | 208.9 | 213.3 | 217.7 | 222.2 | 226.6 | 231.0 | 235.5 | 239.0 |
| Depth | 8367 | 9367 | 10367 | 11367 | 12367 | 13367 | 14367 | 15367 | 16367 | 17168 |
| $p$ | 5426.7224 | 5626.278818 | 5831.792973 | 6043.402062 | 6261.245519 | 6485.465034 | 6716.204577 | 6953.61 | 7197.831 | 7399.032 |
| $T$ | 10.731 | 10.731 | 10.731 | 10.731 | 10.731 | 10.731 | 10.731 | 10.731 | 10.731 | 10.731 |
| degR | 659.67 | 664.1013146 | 668.5326292 | 672.9639439 | 677.3952585 | 681.8265731 | 686.2578877 | 690.6892 | 695.1205 | 698.67 |
| lbmole/ft3 | 0.958254109 | 0.986862687 | 1.01613079 | 1.046067021 | 1.076684348 | 1.107993001 | 1.140004027 | 1.172729 | 1.206178 | 1.233595 |
| lb/ft3 | 28.74762328 | 29.6058806 | 30.48390238 | 31.38201062 | 32.30053043 | 33.23979004 | 34.2001208 | 35.18186 | 36.18534 | 37.00785 |
| lb/gal | 3.837623428 | 3.952195279 | 4.069405559 | 4.189297252 | 4.311913758 | 4.437298895 | 4.565496895 | 4.696552 | 4.830511 | 4.940311 |
| | | | | | | | 4.38306 | | | |

**21:41**

| compressibility | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 |
|---|---|---|---|---|---|---|---|---|---|---|
| Weight | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 |
| Temp | 200.0 | 204.4 | 208.9 | 213.3 | 217.7 | 222.2 | 226.6 | 231.0 | 235.5 | 239.0 |
| Depth | 8367 | 9367 | 10367 | 11367 | 12367 | 13367 | 14367 | 15367 | 16367 | 17168 |
| $p$ | 4251.722 | 4408.071 | 4569.087 | 4734.878 | 4905.554 | 5081.225 | 5262.004 | 5448.007 | 5639.349 | 5796.985 |
| $T$ | 10.731 | 10.731 | 10.731 | 10.731 | 10.731 | 10.731 | 10.731 | 10.731 | 10.731 | 10.731 |
| degR | 659.67 | 664.1013 | 668.5326 | 672.9639 | 677.3953 | 681.8266 | 686.2579 | 690.6892 | 695.1205 | 698.67 |
| lbmole/ft3 | 0.750772 | 0.773186 | 0.796116 | 0.819571 | 0.843559 | 0.868089 | 0.893169 | 0.918808 | 0.945015 | 0.966496 |
| lb/ft3 | 22.52316 | 23.19558 | 23.88349 | 24.58714 | 25.30678 | 26.04267 | 26.79507 | 27.56424 | 28.35045 | 28.99487 |
| lb/gal | 3.006697 | 3.096462 | 3.188293 | 3.282226 | 3.378293 | 3.47653 | 3.57697 | 3.67965 | 3.784603 | 3.870629 |
| | | | | | | | 3.434035 | | | |

**21:42:30**

| compressibility | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 |
|---|---|---|---|---|---|---|---|---|---|---|
| Weight | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 |
| Temp | 200.0 | 204.4 | 208.9 | 213.3 | 217.7 | 222.2 | 226.6 | 231.0 | 235.5 | 239.0 |
| Depth | 8367 | 9367 | 10367 | 11367 | 12367 | 13367 | 14367 | 15367 | 16367 | 17168 |
| $p$ | 4021.7224 | 4169.613 | 4321.919 | 4478.741 | 4640.184 | 4806.352 | 4977.353 | 5153.293 | 5334.284 | 5483.393 |
| $T$ | 10.731 | 10.731 | 10.731 | 10.731 | 10.731 | 10.731 | 10.731 | 10.731 | 10.731 | 10.731 |
| degR | 659.67 | 664.1013 | 668.5326 | 672.9639 | 677.3953 | 681.8266 | 686.2579 | 690.6892 | 695.1205 | 698.67 |
| lbmole/ft3 | 0.71015831 | 0.73136 | 0.75305 | 0.775236 | 0.797926 | 0.821129 | 0.844852 | 0.869104 | 0.893894 | 0.914212 |
| lb/ft3 | 21.3047493 | 21.9408 | 22.5915 | 23.25708 | 23.93779 | 24.63388 | 25.34557 | 26.07313 | 26.81681 | 27.42637 |
| lb/gal | 2.84404747 | 2.928956 | 3.01582 | 3.104672 | 3.195542 | 3.288465 | 3.383472 | 3.480596 | 3.579872 | 3.661245 |
| | | | | | | | 3.248269 | | | |

| | | | |
|---|---|---|---|
| Specified Collapse pressure (psi) | **12500** | | 8801 |
| factor | **0.95** | | 39 |
| Effectiev collapse pressure (psi) | **11875** | Temperature Gradient | 4.431314623 |

| | $\alpha\ (m^2/s)$ | Ts | Ta | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1.495E-07 | 233.9919 | 126.5 | | | | | |
| | $\alpha$ in2/s | t (min) | t (sec) | x (inches) | $\eta$ | erfc(n) | Ts-Ta | Ts-T | T |
| 21:08 21:36 | 2.32E-04 | 28 | 1680 | 0.795 | 6.37E-01 | 0.632076 | 107.4919 | 67.94307 | 166.0489 |
| 21:08 21:41 | 2.32E-04 | 33 | 1980 | 0.795 | 5.87E-01 | 0.593235 | 107.4919 | 63.76793 | 170.224 |
| 21:08 21:42:30 | 2.32E-04 | 35 | 2100 | 0.795 | 5.70E-01 | 0.57955 | 107.4919 | 62.29699 | 171.6949 |

| | 2.320E-05 | 239 | 126.5 | | | | | |
|---|---|---|---|---|---|---|---|---|
| | $\alpha$ in2/s | t (min) | t (sec) | x (inches) | $\eta$ | erfc(n) | Ts-Ta | Ts-T | T |
| | 3.60E-02 | 1 | 60 | 0.453 | 1.54E-01 | 0.172434 | 112.5 | 19.39878 | 219.6012 |
| | 3.60E-02 | 5 | 300 | 0.453 | 6.90E-02 | 0.077225 | 112.5 | 8.687815 | 230.3122 |
| | 3.60E-02 | 10 | 600 | 0.453 | 4.88E-02 | 0.054554 | 112.5 | 6.137305 | 232.8627 |
| | 3.60E-02 | 15 | 900 | 0.453 | 3.98E-02 | 0.044516 | 112.5 | 5.008075 | 233.9919 |
| | 3.60E-02 | 30 | 1800 | 0.453 | 2.82E-02 | 0.031448 | 112.5 | 3.537878 | 235.4621 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | **Vol Therm Exp Coeff** | (1/C) | 0.000576 | | | |
| | **Bulk Modulus** | psi | 357142.86 | | | |
| **17168ft** | **Initial Temp** | F | 126.50 | | | |
| **17168ft** | **Initial Temp** | C | 52.50 | | | |
| **17168ft** | **Temp from Hydrocarbon inside the casing** | F | | 166.05 | 170.22 | 171.69 |
| **17168ft** | **Temp from Hydrocarbon inside the casing** | C | | 74.47 | 76.79 | 77.61 |

http://www.engineeringtoolbox.com/volumetric-temperature-expansion-d_315.html

http://physchem.kfunigraz.ac.at/sm/Service/Water/H2Othermexp.htm
http://en.wikipedia.org/wiki/Error_function
http://ipims.com/data/fe31/E3131.asp?UserID=&Code=3298

| | | |
|---|---|---|
| C | 0.0000028 | 180F |
| K | 357142.86 | |

# Exhibit B

**Kris Ravi**
3407 Rambling Pines Dr.
Kingwood, TX 77345
Home: 281-360-6845, Cell: 281-224-8785, e-mail: kris.ravi@halliburton.com

## Highlights of Qualifications and Experience

- Extensive experience in the successful construction of critical wells such as high pressure high temperature (HPHT), deepwater, geothermal, steam injection
- Twenty years experience working with suppliers and customers in developing and deploying the best technical and economical solution to oilfield challenges
- Proven record developing business strategy and negotiating with service providers
- MBA, Ph.D. in chemical engineering with accomplishments in managing multiple projects with leading technology providers and delivering results in the field
- Lived, studied and worked in different countries, in diverse cultures
- Skilled in team management, material properties, fluid flow, thermodynamics, heat transfer, drilling and cementing software, rheology, Microsoft Office software

## Skills and Accomplishments
## Applied Technology

- As a leader of product and project development teams, trained and motivated professionals to meet and exceed the objectives and improved financial results
- Successfully developed design procedures and products to reduce non-productive time and cost per barrel of produced oil and gas
- Successfully implemented solutions to cure losses in carbonate reservoirs, in regions such as India, and made drilling possible in difficult conditions
- Developed materials and methods to maintain zonal isolation for the life of the well, particularly in critical wells such as HPHT and deepwater
- Deployed the solutions successfully by jointly working with customers and field personnel, and improved the financial results of the field
- On invitation, chaired meetings and presented seminars to customers, improved technical image and helped in business development
- Served as SPE (Society of Petroleum Engineers) distinguished lecturer in 2005
- Developed processes and products for effective fluid displacement.  The process is successfully applied in completions and cementing operations
- Developed products to shut-off water in hydrocarbon wells.  The solution is successfully deployed in the field
- Engineered materials to reduce heat loss and help hydrocarbon flow assurance
- Developed mathematical models for rheology of fluids and friction pressure correlation for non-Newtonian fluids
- Developed and deployed solutions to reduce the risk of annular pressure buildup

## Innovation

- Investigating methods and materials for injecting gases such as $CO_2$ into existing or new wells as a part of Carbon Sequestration program
- Investigating new products and processes to improve well construction and the lifecycle performance of oil and gas wells, for example:
  - studied different materials and incorporated into cement sheath matrix to improve long-term durability and successfully implementing in the field
  - developed effective solutions to cure losses during well construction and successfully implementing in the field.

## Training

| Business Leadership Development Program | Mays Business School, Texas A & M University, June 2006 |
|---|---|
| Presentation Skills | Articulus Inc., Michigan, 2005 |
| Technology Deployment | Product Champion Training, 2005 |

## Employment

| 2012- | Technology Fellow | Halliburton, Houston, TX |
|---|---|---|
| 2007-2012 | Chief Tech Advisor | Halliburton, Houston, TX |
| 2004-2007 | Sr. Tech Advisor | Halliburton, Houston, TX |
| 2001-2004 | Technical Advisor | Halliburton/Baroid Drilling Fluids, Houston, TX |
| 1999-2001 | Project Leader | Halliburton Energy Service, Duncan, OK |
| 1996-1999 | Principal Engineer | Halliburton European Center, The Netherlands |
| 1993-1996 | Team Leader | Halliburton Energy Service, Duncan, OK |
| 1991-1993 | Develop. Engineer | Halliburton Energy Service, Duncan, OK |
| 1989-1991 | Senior Engineer | Halliburton Energy Service, Duncan, OK |
| 1985-1989 | Research Assistant | Oklahoma State University, Stillwater, OK |

### Education

- MBA:  Oklahoma State University/Erasmus Business School, Rotterdam, The Netherlands, May 1999.
- Ph.D., Chemical Engineering, Oklahoma State University, May 1989.

## Professional

- More than seventy publications in chemical and petroleum technical journals and conferences.
- More than fifty patents and invention disclosures for various processes and chemicals.
- Member of AIChE (American Institute of Chemical Engineers) and SPE
- Member of API (American Petroleum Institute) workgroups

## Recognition

- 2005-2006 SPE distinguished lecturer
- 2009-2012 SPE Research and Development Advisory Committee Member
- MVP awards

Kris Ravi

## TECHNICAL PAPERS PRESENTED

1. RAVI, K., DARBE, R.; "OVERCOMING THE CEMENTING CHALLENGES IN DEEP GAS ENVIRONMENT," SPE DEEP GAS CONFERENCE AND EXHIBITION, 24-26 JANUARY 2010, MANAMA, BAHRAIN PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 2010

2. DARBE, R., RAVI, K.; "CEMENT CONSIDERATIONS FOR TIGHT GAS COMPLETIONS," SPE DEEP GAS CONFERENCE AND EXHIBITION, 24-26 JANUARY 2010, MANAMA, BAHRAIN PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 2010

3. HEMPHILL, T., RAVI, K.; "MODELING THE EFFECT OF DRILL PIPE ROTATION SPEED ON WELLBORE CLEANOUT," IADC/SPE ASIA PACIFIC DRILLING TECHNOLOGY CONFERENCE AND EXHIBITION, 1-3 NOVEMBER 2010, HO CHI MINH CITY PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 2010

4. PATIL, R., GARNIER, A., GALDIOLO, G., PATIL, S., RAVI, K., FERREIRA, L.; " DESIGNING AND TESTING CEMENT SYSTEM FOR SAGD APPLICATION," SPE ANNUAL TECHNICAL CONFERENCE AND EXHIBITION, 19-22 SEPTEMBER 2010, FLORENCE, ITALY PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 2010

5. C. REPETTO, N. MORONI, AND L. PILIA, AND E. D'ANCONA, K. RAVI, AND A. SANTRA, HALLIBURTON; "SUCCESSFUL APPLICATION OF ACID SOLUBLE PLUGS IN OPEN HOLE SLOTTED LINER COMPLETION," SPE OIL AND GAS INDIA CONFERENCE AND EXHIBITION, 20-22 JANUARY 2010, MUMBAI, INDIA PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 2010

6. RAMOS, X., MARTINEZ, C., HUNTER, W., RAVI, K.; "THREE LEVELS OF ASSURANCE DEPLOYED FOR RELIABLE ZONAL ISOLATION IN LATIN AMERICA," LATIN AMERICAN AND CARIBBEAN PETROLEUM ENGINEERING CONFERENCE, 31 MAY–3 JUNE 2009, CARTAGENA DE INDIAS, COLOMBIA PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 2009

7.  N. MORONI, ENI E&P DIVISION, AND A. SANTRA, K. RAVI, AND W. HUNTER, HALLIBURTON; "HOLISTIC DESIGN OF CEMENT SYSTEMS TO SURVIVE CO2 ENVIRONMENT," SPE ANNUAL TECHNICAL CONFERENCE AND EXHIBITION, 4-7 OCTOBER 2009, NEW ORLEANS, LOUISIANA PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 2009

8.  REDDY, B.R., XU, Y., RAVI, K., GRAY, D., PATTILLO, P.D.; "CEMENT-SHRINKAGE MEASUREMENT IN OILWELL CEMENTING--A COMPARATIVE STUDY OF LABORATORY METHODS AND PROCEDURES," SPE DRILLING & COMPLETION, VOLUME 24, NUMBER 1 PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 2009

9.  MORONI, N., REPETTO, C., DETTORI, N., RAVI, K.; "ZONAL ISOLATION ACHIEVED IN KASHAGAN FIELD THROUGH INTEGRATED APPROACH," SPE/IADC DRILLING CONFERENCE AND EXHIBITION, 17-19 MARCH 2009, AMSTERDAM, THE NETHERLANDS

10. MORONI, N., ZANCHI, A., BARBIERI, E., RAVI, K., MESMACQUE, A., DA ANCONA, E.; "INTELLIGENT AND INTERVENTIONLESS ZONAL ISOLATION FOR WELL INTEGRITY IN ITALY," SPE MIDDLE EAST OIL AND GAS SHOW AND CONFERENCE, 15-18 MARCH 2009, BAHRAIN BAHRAIN PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 2009

11. RAVI, K., IVERSON, B., AND MOORE, S.; "CEMENT-SLURRY DESIGN TO PREVENT DESTABILIZATION OF HYDRATES IN DEEPWATER ENVIRONMENT," SPE DRILLING & COMPLETIONS, VOLUME 24, NUMBER 3 PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 2009

12. N. MORONI, ENI, AND K. RAVI, T. HEMPHILL, AND P. SAIRAM, HALLIBURTON; "PIPE ROTATION IMPROVES HOLE CLEANING AND CEMENT-SLURRY PLACEMENT: MATHEMATICAL MODELING AND FIELD VALIDATION," OFFSHORE EUROPE, 8-11 SEPTEMBER 2009, ABERDEEN, UK PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 2009

13. RAVI, K.,  VARGO, R., LASLEY, B.; "SUCCESSFUL CEMENTING CASE STUDY IN TUSCALOOSA HPHT WELL (RUSSIAN)," SPE RUSSIAN OIL AND GAS TECHNICAL CONFERENCE AND EXHIBITION, 28-30 OCTOBER 2008, MOSCOW, RUSSIA PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 2008

14. RAVI, K. VARGO, R., LASLEY, B.; "SUCCESSFUL CEMENTING CASE STUDY IN TUSCALOOSA HPHT WELL," SPE RUSSIAN OIL AND GAS TECHNICAL CONFERENCE AND EXHIBITION, 28-30 OCTOBER 2008, MOSCOW, RUSSIA PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 2008

15. MORONI, N., REPETTO, C., RAVI, K.; "ZONAL ISOLATION IN RESERVOIR CONTAINING CO2 AND H2S," IADC/SPE DRILLING CONFERENCE, 4-6 MARCH 2008, ORLANDO, FLORIDA, USA PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 2008

16. HEMPHILL, T., RAVI, K., BERN, P., ROJAS, J.D.; "A SIMPLIFIED METHOD FOR PREDICTION OF ECD INCREASE WITH DRILLPIPE ROTATION," SPE ANNUAL TECHNICAL CONFERENCE AND EXHIBITION, 21-24 SEPTEMBER 2008, DENVER, COLORADO, USA PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 2008

17. RAVI, K., MOORE, S.; "CEMENT SLURRY DESIGN TO PREVENT DESTABILIZATION OF HYDRATES IN DEEPWATER ENVIRONMENT," SPE INDIAN OIL AND GAS TECHNICAL CONFERENCE AND EXHIBITION, 4-6 MARCH 2008, MUMBAI, INDIA PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 2008

18. RAVI, K., HUNTER, B., KULAKOFSKY, D.; "MAXIMIZING HEAVY-OIL RECOVERY BY CONTAINING STEAM THROUGH OPTIMIZED CEMENTING," INTERNATIONAL THERMAL OPERATIONS AND HEAVY OIL SYMPOSIUM, 20-23 OCTOBER 2008, CALGARY, ALBERTA, CANADA PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 2008

19. K. RAVI, M. FUKUZAWA, W.J. HUNTER, SPE, HALLIBURTON; A. ISVAN NOERDIN, STAR ENERGY' "ADVANCED CEMENT SYSTEMS USED TO IMPROVE GEOTHERMAL WELL RELIABILITY IN JAVA," SPE ANNUAL TECHNICAL CONFERENCE AND EXHIBITION, 21-24 SEPTEMBER 2008, DENVER, COLORADO, USA PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 2008

20. RAVI, K; HUNTER, B; KULAKOFSKY, D; "JOB DESIGN AND CEMENT SYSTEM TO CONTAIN STEAM AND IMPROVE HEAVY OIL RECOVERY," WORLD HEAVY OIL CONGRESS [WHOC08] (EDMONTON, ALBERTA, 3/10-12/2008) TECHNICAL PAPERS 2008. (PAPER NO.2008-381)

21. RAVI, K; HUNTER, B; "INTERVENTIONLESS ZONAL ISOLATION," E&P V.81, NO.5, PP.93-94, MAY 2008. (ISSN 1527-4063)

22. RAVI, K., MCMECHAN, D., REDDY, B.R., CROOK, R.;" A COMPARATIVE STUDY OF MECHANICAL PROPERTIES OF DENSITY-REDUCED CEMENT COMPOSITIONS," SPE DRILLING & COMPLETION, VOLUME 22, NUMBER 2 PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 2007

23. HEMPHILL, T., BERN, P., ROJAS, J.C., RAVI, K.; "FIELD VALIDATION OF DRILLPIPE ROTATION EFFECTS ON EQUIVALENT CIRCULATING DENSITY," SPE ANNUAL TECHNICAL CONFERENCE AND EXHIBITION, 11-14 NOVEMBER 2007, ANAHEIM, CALIFORNIA, USA PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 2007

24. CAPACHO, C., BAQUERO, F., RAVI, K., VELA, J.; "CEMENT DESIGN TO OPTIMIZE PRODUCTION IN A HIGHLY ACTIVE WATERDRIVE RESERVOIR," LATIN AMERICAN & CARIBBEAN PETROLEUM ENGINEERING CONFERENCE, 15-18 APRIL 2007, BUENOS, AIRES, ARGENTINA PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 2007

25. REDDY, B., XU, Y., RAVI, K., GRAY, D., PATTILLO, P.; "CEMENT SHRINKAGE MEASUREMENT IN OILWELL CEMENTING – A COMPARATIVE STUDY OF LABORATORY METHODS AND PROCEDURES," ROCKY MOUNTAIN OIL & GAS TECHNOLOGY SYMPOSIUM, 16-18 APRIL 2007, DENVER, COLORADO, USA PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 2007

26. RAVI, K; DARBE, R; "AUTO-SEALING CEMENT SHEATH PREVENTS SUSTAINED CASING PRESSURE," OFFSHORE V.67, NO.9, PP.92,94, SEPT. 2007. (ISSN 0030-0608; COLOR)

27. HUNTER, B; KULAKOFSKY, D; RAVI, K, "LIFE-OF-WELL ISOLATION TAKES INTELLIGENCE" E&P V.80, NO.9, PP.77-78, SEPT. 2007. (ISSN 1527-4063)

28. RAVI, K; XENAKIS, H; "CEMENTING PROCESS OPTIMIZED TO ACHIEVE ZONAL ISOLATION," 7TH OIL AND NATURAL GAS CORPORATION LTD. INTERNATIONAL OIL & GAS CONFERENCE [PETROTECH-2007] (NEW DELHI, INDIA, 1/15-19/2007) PROCEEDINGS 2007. (ISBN 81-8385-325-0)

29. HEMPHILL, T; RAVI, K; NAIR, R; EFFECTS OF DRILLPIPE ROTATION ON WELLBORE STABILITY," AMERICAN ASSOCIATION OF DRILLING ENGINEERS NATIONAL TECHNICAL CONFERENCE [2007 AADE] (HOUSTON, TX, 4/10-12/2007) PROCEEDINGS 2007. (PAPER NO.AADE-07-NTCE-66)

30. HUNTER, B; RAVI, K; KULAKOFSKY, D; "THREE KEY MECHANISMS DELIVER ZONAL ISOLATION," IADC DRILLING GULF OF MEXICO CONFERENCE (GALVESTON, TX, 12/5-6/2007) PROCEEDINGS 2007

31. HEMPHILL, T., RAVI, K.; "PIPE ROTATION AND HOLE CLEANING IN ECCENTRIC ANNULUS," IADC/SPE DRILLING CONFERENCE, 21-23 FEBRUARY 2006, MIAMI, FLORIDA, USA PUBLISHED BY SOCIETY OF PETROLEUM ENGINEERS, 2006

32. RAVI, K., SAVERY, M., REDDY, B., WHITFILL, D.,; "CEMENTING TECHNOLOGY FOR LOW FRACTURE GRADIENT AND CONTROLLING LOSS CIRCULATION," SPE/IADC INDIAN DRILLING TECHNOLOGY CONFERENCE AND EXHIBITION, 16-18 OCTOBER 2006, MUMBAI, INDIA PUBLISHED BY SOCIETY OF PETROLEUM ENGINEERS, 2006

33. SAVERY, M; REDDY, B R; RAVI, K; WHITFILL, D; ASTON, M; "DECIDING ON OPTIMUM SOLUTION FOR LOSS CIRCULATION CHALLENGES," 53RD ANNUAL SOUTHWESTERN PETROLEUM SHORT COURSE MEETING (LUBBOCK, TX,  4/26-27/2006) PROCEEDINGS PP.162-171, 2006

34. PATTILLO, P; RAVI, K; REDDY, B R; GRAY, D; "OPTIMIZING CEMENT SYSTEMS FOR SPECIFIC WELL CONDITIONS," OFFSHORE V.66, NO.11, PP.73-75, NOV. 2006. (ISSN 0030-0608)

35. HEMPHILL, T; RAVI, K; "TURNING ON BARITE SAG WITH DRILLPIPE ROTATION: SOMETIMES SURPRISES ARE REALLY NOT SURPRISES," AMERICAN ASSOCIATION OF DRILLING ENGINEERS FLUIDS TECHNICAL CONFERENCE  HOUSTON, TX, 4/11-12/2006) PROCEEDINGS 2006. (AADE-06-DF-HO-28)

36. RAVI, K; REDDY, B R; GRAY, D; PATTILLO, P; "PROCEDURES TO OPTIMIZE CEMENT SYSTEMS FOR SPECIFIC WELL CONDITIONS," AMERICAN ASSOCIATION OF DRILLING ENGINEERS FLUIDS TECHNICAL CONFERENCE (HOUSTON, TX, 4/11-12/2006) PROCEEDINGS 2006. (AADE-06-DF-HO-35)

37. SOLIMAN, F; EL SHABRAWY, M; RAVI, K; SANAD, O; WAHEED, A; "CEMENTING MULTILATERAL WELLS TO WITHSTAND WELL OPERATIONS," 4TH MEDITERRANEAN OFFSHORE CONFERENCE [MOC 2006] (ALEXANDRIA, EGYPT, 4/4-6/2006) PROCEEDINGS 2006

38. TELLISI, M., RAVI, K., PATTILLO, P.; "CHARACTERIZING CEMENT SHEATH PROPERTIES FOR ZONAL ISOLATION," 18TH WORLD PETROLEUM CONGRESS, SEPTEMBER 25-29, 2005, JOHANNESBURG, SOUTH AFRICA PUBLISHED BY <u>WORLD PETROLEUM CONGRESS</u>, 2005

39. HEMPHILL, T., RAVI, K.; "CALCULATION OF DRILLPIPE ROTATION EFFECTS ON AXIAL FLOW: AN ENGINEERING APPROACH," SPE ANNUAL TECHNICAL CONFERENCE AND EXHIBITION, 9-12 OCTOBER 2005, DALLAS, TEXAS PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 2005

40. ILSENG, J., HOSKINS,L., MATTHEWS, H., FULLER, G., PRONGER, D., RAVI, K.; "SHOULD HORIZONTAL SECTIONS BE CEMENTED AND HOW TO MAXIMIZE VALUE," SPE PRODUCTION OPERATIONS SYMPOSIUM, 16-19 APRIL 2005, OKLAHOMA CITY, OKLAHOMA PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 2005

41. RAVI, K; "CEMENTING IN CHALLENGING ENVIRONMENTS," IADC DRILLING ENGINEERING ASSOCIATION WORKSHOP (GALVESTON, TX, 5/24-25/2005) PROCEEDINGS 2005

42. RAVI, K; JEOW, J; "CEMENT DESIGN FOR THE LIFE OF THE WELL," 6TH INDIA OIL AND NATURAL GAS CORPORATION LIMITED INTERNATIONAL PETROLEUM CONFERENCE [PETROTECH 2005] (NEW DELHI, INDIA, 1/15-19/2005) PROCEEDINGS 2005

43. HASHIMOTO, H; RAVI, K; JEOW, J; "DESIGN CEMENT SLURRY FOR SAFE AND ECONOMIC WELL OPERATION," JAPT DRILLING SYMPOSIUM (TOKYO, JAPAN, 6/1/2005) PAPER; JOURNAL OF THE JAPANESE ASSOCIATION FOR PETROLEUM TECHNOLOGY V.70, NO.5, PP.434-440, SEPT. 2005.

44. CARPENTER, B; RAVI, K; "ZONAL ISOLATION CHALLENGES IN HPHT [HIGH PRESSURE - HIGH TEMPERATURE] WELLS," WORLD OIL HPHT/DEEPDRILL TECHNICAL CONFERENCE (HOUSTON, TX, 4/7/2005) PROCEEDINGS PP.95-1 - 95-13, 2005

45. RAVI, K., MCMECHAN, D., REDDY, B., CROOK, R.; "A COMPARATIVE STUDY OF MECHANICAL PROPERTIES OF DENSITY-REDUCED CEMENT COMPOSITIONS," SPE ANNUAL TECHNICAL CONFERENCE AND EXHIBITION, 26-29 SEPTEMBER 2004, HOUSTON, TEXAS PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 2004

46. GRIFFITH, J., RAVI, K.; "FOAM CEMENT ENGINEERING AND IMPLEMENTATION FOR CEMENT SHEATH INTEGRITY AT HIGH TEMPERATURE AND HIGH PRESSURE," IADC/SPE DRILLING CONFERENCE, 2-4 MARCH 2004, DALLAS, TEXAS PUBLISHED BY SOCIETY OF PETROLEUM ENGINEERS, 2004

47. RAVI, K., BOSMA, M., HUNTER, L.; "OPTIMIZING THE CEMENT SHEATH DESIGN IN HPHT SHEARWATER FIELD," SPE/IADC DRILLING CONFERENCE, 19-21 FEBRUARY 2003, AMBSERDAM, NETHERLANDS PUBLISHED BY SOCIETY OF PETROLEUM ENGINEERS, 2003

48. HEATHMAN, J., TARE, U., RAVI, K.; "UNDERSTANDING FORMATION (IN) STABILITY DURING CEMENTING," SPE/IADC DRILLING CONFERENCE, 19-21 FEBRUARY 2003, AMSTERDAM, NETHERLANDS PUBLISHED BY SOCIETY OF PETROLEUM ENGINEERS, 2003

49. RAVI, K., BOSMA, M., GASTEBLED, O.; SAFE AND ECONOMIC GAS WELLS THROUGH CEMENT DESIGN FOR LIFE OF THE WELL," SPE GAS TECHNOLOGY SYMPOSIUM, 30 APRIL-2 MAY 2002, CALGARY, ALBERTA, CANADA PUBLISHED BY SOCIETY OF PETROLEUM ENGINEERS, 2002

50. RAVI, K., BOSMA, M.; "CEMENT SHEATH DESIGN FOR DEEPWATER APPLICATIONS," 7TH ANNUAL PENNWELL OFFSHORE WEST AFRICA CONF. (WINDHOEK, NAMIBIA, 3/11-13/2003) PROC. 2003.

51. MCCULLOCH, J; GASTINEAU, J; BOUR, D L; RAVI, K; :LIFE CYCLE MODELING OF WELLBORE CEMENT SYSTEMS USED FOR ENHANCED GEOTHERMAL SYSTEM DEVELOPMENT," ANNU. GEOTHERM. RESOURCES COUNC. MTG. (MORELIA, MICHOACAN, MEXICO, 10/12-15/2003) TRANS. V.27, PP.147-154, 2003

52. RAVI, K., BOSMA, M., GASTEBLED, O.; "IMPROVE THE ECONOMICS OF OIL AND GAS WELLS BY REDUCING THE RISK OF CEMENT FAILURE," IADC/SPE DRILLING CONFERENCE, 26-28 FEBRUARY 2002, DALLAS, TEXAS PUBLISHED BY SOCIETY OF PETROLEUM ENGINEERS, 2002

53. RAVI, K, BOSMA, M., GASTEBLED, O.; "CEMENT DESIGN, EVALUATION METHOD IMPROVES WELL SAFETY AND ECONOMICS," OIL GAS J. V.100, NO.31, PP.43-47, 8/5/2002. (ISSN 0030-1388)

54. RAVI, K., BOSMA, M., GASTEBLED, O.; "DESIGN FOR OPERATIONAL EVENTS THROUGHOUT WELL LIFE MAINTAINS ZONZAL," OIL GAS J. V.100, NO.41, PP.45-47, 10/7/2002. (ISSN 0030-1388)

55. BIEZEN, E., VAN DER WERFF, N., RAVI, K.; "EXPERIMENTAL AND NUMERICAL STUDY OF DRILLING FLUID REMOVAL FROM A HORIZONTAL WELLBORE," SPE ANNUAL TECHNICAL CONFERENCE AND EXHIBITION, 1-4 OCTOBER 2000, DALLAS, TEXAS PUBLISHED BY SOCIETY OF PETROLEUM ENGINEERS, 2000

56. BIEZEN, E., RAVI, K.; "DESIGNING EFFECTIVE ZONAL ISOLATION FOR HIGH-PRESSURE/HIGH-TEMPERATURE AND LOW TEMPERATURE WELLS," SPE/IADC MIDDLE EAST DRILLING TECHNOLOGY CONFERENCE, 8-10 NOVEMBER 1999, ABU DHABI, UNITED ARAB EMIRATES PUBLISHED BY SOCIETY OF PETROLEUM ENGINEERS, 1999

57. RAVI, K., BIEZEN, E., LIGHTFORD, C., HIBBERT, A., GREAVES, C.; "DEEPWATER CEMENTING CHALLENGES," SPE ANNUAL TECHNICAL CONFERENCE AND EXHIBITION, 3-6 OCTOBER 1999, HOUSTON, TEXAS PUBLISHED BY SOCIETY OF PETROLEUM ENGINEERS, 1999

58. BOSMA, M., RAVI, K., VAN DRIEL, W.,  JAN SCHREPPERS, G.; "DESIGN APPROACH TO SEALANT SELECTION FOR THE LIFE OF THE WELL," SPE ANNUAL TECHNICAL CONFERENCE AND EXHIBITION, 3-6 OCTOBER 1999, HOUSTON, TEXAS PUBLISHED BY SOCIETY OF PETROLEUM ENGINEERS, 1999

59. AL KHAYYAT, B., MORRIS, J., SALAHUDIN, S., RAVI, R., FARIA, J.; "SUCCESSES IN PRODUCTION-LINER CEMENTING IN OIL-BASED MUD: A CASE STUDY," SPE/IADC MIDDLE EAST DRILLING TECHNOLOGY CONFERENCE, 8-10 NOVEMBER 1999, ABU DHABI, UNITED ARAB EMIRATES PUBLISHED BY SOCIETY OF PETROLEUM ENGINEERS, 1999

60.   RAVI, K., LAWRENCE, W.; "DRILL-CUTTING REMOVAL IN A HORIZONTAL WELLBORE FOR CEMENTING," SPE/IADC DRILLING CONFERENCE, 12-15 MARCH 1996, NEW ORLEANS, LOUISIANA PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 1996

61.   GRIFFITH, J., RAVI, K.; "MONITORING CIRCULATABLE HOLE WITH REAL-TIME CORRECTION: CASE HISTORIES," SPE PRODUCTION OPERATIONS SYMPOSIUM, 2-4 APRIL 1995, OKLAHOMA CITY, OKLAHOMA PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 1995

62.   RAVI, K., BEIRUTE, R.; "IMPROVE PRIMARY CEMENTING BY CONTINUOUS MONITORING OF CIRCULATABLE HOLE,"  SPE ANNUAL TECHNICAL CONFERENCE AND EXHIBITION, 3-6 OCTOBER 1993, HOUSTON, TEXAS PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 1993

63.   WARREN, B., SMITH, T., RAVI, K.; "STATIC AND DYNAMIC FLUID-LOSS CHARACTERISTICS OF DRILLING FLUIDS IN A FULL-SCALE WELLBORE," WESTERN REGIONAL MEETING, 26-28 MAY 1993, ANCHORAGE, ALASKA PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 1993

64.   RAVI, K., BEIRUTE, R., COVINGTON, R.; "ERODABILITY OF PARTIALLY DEHYDRATED GELLED DRILLING FLUID AND FILTER CAKE," SPE ANNUAL TECHNICAL CONFERENCE AND EXHIBITION, 4-7 OCTOBER 1992, WASHINGTON, D.C. PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 1992

65.   SUTTON, D.L., RAVI, K.M.; "LOW-RATE PIPE MOVEMENT DURING CEMENT GELATION TO CONTROL GAS MIGRATION AND IMPROVE CEMENT BOND," SPE ANNUAL TECHNICAL CONFERENCE AND EXHIBITION, 6-9 OCTOBER 1991, DALLAS, TEXAS PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 1991

66.   SMITH, T.R., SHELL CANADA LTD.; RAVI, K.M., HALLIBURTON SERVICES; "INVESTIGATION OF DRILLING FLUID PROPERTIES TO MAXIMIZE CEMENT DISPLACEMENT EFFICIENCY," SPE ANNUAL TECHNICAL CONFERENCE AND EXHIBITION, 6-9 OCTOBER 1991, DALLAS, TEXAS PUBLISHED BY <u>SOCIETY OF PETROLEUM ENGINEERS</u>, 1991

67. BEIRUTE, R.M., AMOCO PRODUCTION CO.; SABINS, F.L., RAVI, K.V., HALLIBURTON SERVICES; "LARGE-SCALE EXPERIMENTS SHOW PROPER HOLE CONDITIONING: A CRITICAL REQUIREMENT FOR SUCCESSFUL CEMENTING OPERATIONS," SPE ANNUAL TECHNICAL CONFERENCE AND EXHIBITION, 6-9 OCTOBER 1991, DALLAS, TEXAS PUBLISHED BY SOCIETY OF PETROLEUM ENGINEERS, 1991

68. HARRIS, K., RAVI, K., KING, D., WILKINSON, J., FAUL, R.; "VERIFICATION OF SLURRY RESPONSE NUMBER EVALUATION METHOD FOR GAS MIGRATION CONTROL," SPE ANNUAL TECHNICAL CONFERENCE AND EXHIBITION, 23-26 SEPTEMBER 1990, NEW ORLEANS, LOUISIANA PUBLISHED BY SOCIETY OF PETROLEUM ENGINEERS, 1990

69. RAVI, K.M., SUTTON, D.L., HALLIBURTON SERVICES; "NEW RHEOLOGICAL CORRELATION FOR CEMENT SLURRIES AS A FUNCTION OF TEMPERATURE," SPE ANNUAL TECHNICAL CONFERENCE AND EXHIBITION, 23-16 SEPTEMBER 1990, NEW ORLEANS, LOUISIANA PUBLISHED BY SOCIETY OF PETROLEUM ENGINEERS, 1990

70. SUTTON, D.L., RAVI, K.M., HALLIBURTON SERVICES; "NEW METHOD FOR DETERMINING DOWNHOLE PROPERTIES THAT AFFECT GAS MIGRATION AND ANNULAR SEALING," SPE ANNUAL TECHNICAL CONFERENCE AND EXHIBITION, 8-11 OCTOBER 1989, SAN ANTONIO, TEXAS PUBLISHED BY SOCIETY OF PETROLEUM ENGINEERS, 1989

71. HEMPHILL, T., RAVI, K., HALLIBURTON; "IMPROVED PREDICTION OF ECD WITH DRILL PIPE ROTATION," INTERNATIONAL PETROLEUM TECHNOLOGY CONFERENCE [IPTC], 7-9 FEBRUARY 2012, BANGKOK, THAILAND, PROCEEDINGS 2012. (ISBN 978-1-61399-148-0; IPTC-15424)

72. REPETTO, C., MORONI, N., PILIA, L., D'ANCONA, E., RAVI, K., SANTRA, A., ENI E&P; HALLIBURTON, "PLUGS HELP OVERCOME CEMENTING ISSUES," E&P V. 85, NO.8, PP.66,68, AUG. 2012. (ISSN 1527-4063)

73. BEIRUTE, R., SABINS, F., RAVI, K., HALLIBURTON SERVICES, AMOCO PRODUCTION CO; "[R] LARGE-SCALE EXPERIMENTS SHOW PROPER HOLE CONDITIONING: A CRITICAL REQUIREMENT FOR SUCCESSFUL CEMENTING OPERATIONS," SPE PERMIAN BASIN OIL & GAS RECOVERY CONF., 18-20 MARCH 1992, MIDLAND, TEXAS.  SPE-22774

**PATENTS**

```
TI    [R] CEMENT COMPOSITIONS COMPRISING PARTICULATE CARBOXYLATED ELASTOMERS
      AND ASSOCIATED METHODS
IN    REDDY, B R; RAVI, K M
PA    HALLIBURTON ENERGY SERVICE
PI    US 7650940      B2   20100126
AI    US 2005-321113       20051229
SO    U.S. 7,650,940B2, c. 1/26/2010, f. 12/29/2005 (Appl. 321,113)
      (E21B-0033/13; E21B-0033/14). (12 pp) SRPA# 936,502


TI    [R] CEMENT COMPOSITIONS WITH IMPROVED MECHANICAL PROPERTIES AND METHODS
      OF CEMENTING IN SUBTERRANEAN FORMATIONS
IN    BROTHERS, L E; RAVI, K M; PALMER, A V
PA    HALLIBURTON ENERGY SERVICE
PI    US 7441600      B2   20081028
AI    US 2003-435297       20030509
SO    U.S. 7,441,600B2, c. 10/28/2008, f. 5/9/2003 (Appl. 435,297)
      (E21B-0033/13). (7 pp) SRPA# 860,165


TI    [R] CEMENT COMPOSITIONS CONTAINING FLEXIBLE, COMPRESSIBLE BEADS AND
      METHODS OF CEMENTING IN SUBTERRANEAN FORMATIONS
IN    REDDY, B R; RAVI, K M; SZYMANSKI, M J
PA    HALLIBURTON ENERGY SERVICE
PI    US 7543642      B2   20090609
AI    US 2003-350533       20030124
SO    U.S. 7,543,642B2, c. 6/9/2009, f. 1/24/2003 (Appl. 350,533)
      (E21B-0033/13). (9 pp) SRPA# 852,558


TI    [R] CEMENT COMPOSITIONS COMPRISING HIGH ASPECT RATIO MATERIALS AND
      METHODS OF USE IN SUBTERRANEAN FORMATIONS
IN    REDDY, B R; LENDE, G; RAVI, K M
PA    HALLIBURTON ENERGY SERVICE
PI    US 7424914      B2   20080916
AI    US 2006-595147       20061109
PRAI  US 2004-884756       20040702
SO    U.S. 7,424,914B2, c. 9/16/2008, f. 11/9/2006 (Appl. 595,147), pr. U.S.
      7/2/2004 (Appl. 884,756) (E21B-0033/13). (11 pp) SRPA# 893,993


TI    [R] OILWELL SEALANT COMPOSITIONS COMPRISING ALKALI SWELLABLE LATEX
IN    REDDY, B R; SAVERY, M R; RAVI, K M; WHITFILL, D L
PA    HALLIBURTON ENERGY SERVICE
PI    US 20090137431  A1   20090528
AI    US 2009-357335       20090121
PRAI  US 2004-10117        20041208
SO    U.S. 2009/0,137,431A1, p. 5/28/2009, f. 1/21/2009 (Appl. 357,335), pr.
      U.S. 12/8/2004 (Appl. 10,117) (C09K-0008/00). (19 pp) SRPA# 909,653
```

```
TI      METHODS OF INTEGRATING ANALYSIS, AUTO-SEALING, AND SWELLABLE-PACKER
        ELEMENTS FOR A RELIABLE ANNULAR SEAL
IN      KULAKOFSKY, D S; FAUL, R R; HUNTER, W; RAVI, K M; BADALAMENTI, A M;
        TURNER, C R
PA      HALLIBURTON ENERGY SERVICE
PI      WO 2009060170   A1   20090514
AI                           20081017
AIO     WO0,803,536
PRAI    US 2007-937661       20071109
SO      World 2009/060,170A1, p. 5/14/2009, f. 10/17/2008 (Appl. 0,803,536), pr.
        U.S. 11/9/2007 (Appl. 937,661) (E21B-0033/12; C09K-0008/467). (32 pp)


TI      CEMENT COMPOSITIONS COMPRISING A HIGH-DENSITY PARTICULATE ELASTOMER AND
        ASSOCIATED METHODS
IN      RAVI, K M; MAXSON, J K; SANTRA, A K
PA      HALLIBURTON ENERGY SERVICE
PI      WO 2009047496   A2   20090416
AI                           20081009
AIO     WO0,803,402
PRAI    US 2007-978951P      20071010
        US 2008-206299       20080908
SO      World 2009/047,496A2, p. 4/16/2009, f. 10/9/2008 (Appl. 0,803,402), pr.
        U.S. 10/10/2007 (Appl. 60/978,951) and U.S. 9/8/2008 (Appl. 206,299)
        (C09K-0008/42). (18 pp; Also assigned to C.R.Turner)


TI      ZONAL ISOLATION ACHIEVED IN KASHAGAN FIELD THROUGH INTEGRATED APPROACH
AU      MORONI, N; REPETTO, C; DETTORI, N; RAVI, K
CS      ENI E&P; HALLIBURTON
NR      SPE/IADC-119296
SO      SPE/IADC DRILLING CONFERENCE (Amsterdam, The Netherlands, 3/17-19/2009)
        PROCEEDINGS 2009. (SPE/IADC-119296; Available on CD-ROM; 11 pp; 9 refs)
DT      Conference; Conference Article


TI      SEALANT COMPOSITIONS AND METHODS OF USE
IN      RAVI, K M; LENDE, G
PA      HALLIBURTON ENERGY SERVICE
PI      WO 2009019471   A1   20090212
AI                           20080805
AIO     WO0,802,668
PRAI    US 2007-835847       20070808
        US 2007-835871       20070808
SO      World 2009/019,471A1, p. 2/12/2009, f. 8/5/2008 (Appl. 0,802,668), pr.
        U.S. 8/8/2007 (Appl. 835,847) and U.S. 8/8/2007 (Appl. 835,871)
        (C09K-0008/50; C09K-0008/62; C09K-0008/03; C09K-0008/68). (32 pp; Also
        assigned to C.R.Turner)


TI      METHODS OF DRILLING WELLBORES USING VARIABLE DENSITY FLUIDS COMPRISING
        COATED ELASTIC PARTICLES
IN      RAVI, K M; WHITFILL, D L; REDDY, B R
PA      HALLIBURTON ENERGY SERVICE
PI      US 7482309      B2   20090127
AI      US 2003-721055       20031124
SO      U.S. 7,482,309B2, c. 1/27/2009, f. 11/24/2003 (Appl. 721,055)
        (E21B-0021/00; C09K-0008/24; B01F-0003/12). (10 pp)
```

```
TI      [R] CASING COMPRISING STRESS-ABSORBING MATERIALS AND ASSOCIATED METHODS
        OF USE
IN      RAVI, K M
PA      HALLIBURTON ENERGY SERVICE
PI      US 7337841     B2   20080304
AI      US 2004-807625     20040324
SO      U.S. 7,337,841B2, c. 3/4/2008, f. 3/24/2004 (Appl. 807,625)
        (E21B-0043/02). (9 pp) SRPA# 884,297


TI      [R] EMULSION ADMIXTURES FOR IMPROVING CEMENT ELASTICITY
IN      REDDY, B R; RAVI, K M
PA      HALLIBURTON ENERGY SERVICE
PI      US 7294194     B2   20071113
AI      US 2006-502205     20060810
PRAI    US 2004-767672     20040129
SO      U.S. 7,294,194B2, c. 11/13/2007, f. 8/10/2006 (Appl. 502,205), pr. U.S.
        1/29/2004 (Appl. 767,672) (C04B-0024/00). (8 pp) SRPA# 880,381


TI      [R] CEMENT COMPOSITIONS WITH IMPROVED MECHANICAL PROPERTIES AND METHODS
        OF CEMENTING IN SUBTERRANEAN FORMATIONS
IN      BROTHERS, L E; RAVI, K M; PALMER, A V
PA      HALLIBURTON ENERGY SERVICE
PI      US 7282093     B2   20071016
AI      US 2005-99002      20050405
PRAI    US 2003-435297     20030509
SO      U.S. 7,282,093B2, c. 10/16/2007, f. 4/5/2005 (Appl. 99,002), pr. U.S.
        5/9/2003 (Appl. 435,297) (C04B-0016/06). (7 pp) SRPA# 860,165


TI      [R] METHODS AND COMPOSITIONS FOR CONTROLLING LOST CIRCULATION IN
        SUBTERRANEAN OPERATIONS
IN      REDDY, B R; WHITFILL, D L; RAVI, K M; SAVERY, M R
PA      HALLIBURTON ENERGY SERVICE
PI      US 7284611     B2   20071023
AI      US 2004-982016     20041105
SO      U.S. 7,284,611B2, c. 10/23/2007, f. 11/5/2004 (Appl. 982,016)
        (E21B-0033/138; E21B-0021/00). (17 pp) SRPA# 906,933


TI      SWELLABLE ELASTOMERS AND ASSOCIATED METHODS
IN      BADALAMENTI, A M; PODOWSKI, J; SANTRA, A K; RAVI, K M
PA      HALLIBURTON ENERGY SERVICE
PI      WO 2008001112   A1   20080103
AI                           20070629
AIO     WO0,702,444
PRAI    US 2006-806137P    20060629
SO      World 2008/001,112A1, p. 1/3/2008, f. 6/29/2007 (Appl. 0,702,444), pr.
        U.S. 6/29/2006 (Appl. 60/806,137) (C09K-0008/50; C09K-0008/40). (24 pp;
        Also assigned to P.A.Curtis, A.M.Badalamenti, J.Podowski, A.K.Santra and
        K.M.Ravi)
```

```
TI      [R] CEMENT COMPOSITIONS COMPRISING HIGH ASPECT RATIO MATERIALS AND
        METHODS OF USE IN SUBTERRANEAN FORMATIONS
IN      REDDY, B R; LENDE, G; RAVI, K M
PA      HALLIBURTON ENERGY SERVICE
PI      US 7178597     B2  20070220
AI      US 2004-884756     20040702
SO      U.S. 7,178,597B2, c. 2/20/2007, f. 7/2/2004 (Appl. 884,756)
        (E21B-0033/13). (10 pp) SRPA# 893,993


TI      [R] METHODS OF GENERATING GAS IN WELL FLUIDS
IN      REDDY, B R; RAVI, K M; GRIFFITH, J E; ZAMORA, F; LUKE, K; DENNIS, J L
        JR; COX, R A
PA      HALLIBURTON ENERGY SERVICE
PI      US 7156175     B2  20070102
AI      US 2004-789712     20040227
PRAI    US 2002-159590     20020531
SO      U.S. 7,156,175B2, c. 1/2/2007, f. 2/27/2004 (Appl. 789,712), pr. U.S.
        5/31/2002 (Appl. 159,590) (E21B-0043/22; E21B-0043/27). (7 pp) SRPA#
        830,642


TI      CEMENT COMPOSITIONS COMPRISING PARTICULATE CARBOXYLATED ELASTOMERS AND
        ASSOCIATED METHODS
IN      REDDY, B R; RAVI, K M
PA      HALLIBURTON ENERGY SERVICE
PI      WO 2007074330   A1  20070705
AI                          20061220
AIO     WO0,604,826
PRAI    US 2005-321113     20051229
        US 2005-321268     20051229
SO      World 2007/074,330A1, p. 7/5/2007, f. 12/20/2006 (Appl. 0,604,826), pr.
        U.S. 12/29/2005 (Appl. 321,113) and U.S. 12/29/2005 (Appl. 321,268)
        (C04B-0024/04; C04B-0028/02). (32 pp; Also assigned to P.A.Curtis,
        B.R.Reddy and K.M.Ravi)


TI      [R] EMULSION ADMIXTURES FOR IMPROVING CEMENT ELASTICITY
IN      REDDY, B R; RAVI, K M
PA      HALLIBURTON ENERGY SERVICE
PI      US 7143828     B2  20061205
AI      US 2004-767672     20040129
SO      U.S. 7,143,828B2, c. 12/5/2006, f. 1/29/2004 (Appl. 767,672)
        (E21B-0033/138). (8 pp) SRPA# 880,381


TI      [R] COMPOSITIONS COMPRISING MELT-PROCESSED INORGANIC FIBERS AND METHODS
        OF USING SUCH COMPOSITIONS
IN      REDDY, B R; RAVI, K M; WAUGH, B K
PA      HALLIBURTON ENERGY SERVICE
PI      WO 2007054670   A2  20070518
AI                          20061102
AIO     WO0,604,106
PRAI    US 2005-272951     20051114
SO      World 2007/054,670A2, p. 5/18/2007, f. 11/2/2006 (Appl. 0,604,106), pr.
        U.S. 11/14/2005 (Appl. 272,951) (C04B-0028/02; C09K-0008/46;
        C04B-0014/38). (20 pp; Also assigned to P.A.Curtis, B.R.Reddy, K.M.Ravi
        and B.K.Waugh) SRPA# 893,993
```

```
TI      [R] ELASTOMERIC ADMIXTURES FOR IMPROVING CEMENT ELASTICITY
IN      REDDY, B R; RAVI, K M
PA      HALLIBURTON ENERGY SERVICE
PI      US 7138446     B2   20061121
AI      US 2004-825976      20040416
PRAI    US 2002-246943      20020919
SO      U.S. 7,138,446B2, c. 11/21/2006, f. 4/16/2004 (Appl. 825,976), pr. U.S.
        9/19/2002 (Appl. 246,943) (C04B-0028/02). (5 pp) SRPA# 837,839


TI      [R] METHODS FOR SELECTING A CEMENTING COMPOSITION FOR USE
IN      RAVI, K M; GASTEBLED, O; BOSMA, M G R
PA      HALLIBURTON ENERGY SERVICE
PI      US 7133778     B2   20061107
AI      US 2005-155912      20050617
PRAI    US 2002-81059       20020222
        US 2003-739430      20031218
SO      U.S. 7,133,778B2, c. 11/7/2006, f. 6/17/2005 (Appl. 155,912), pr. U.S.
        2/22/2002 (Appl. 81,059) and U.S. 12/18/2003 (Appl. 739,430)
        (G01V-0001/40; E21B-0033/00). (16 pp; 27 claims) SRPA# 826,473


TI      METHODS OF FORMULATING A CEMENT COMPOSITION
IN      REDDY, B R; RAVI, K M
PA      HALLIBURTON ENERGY SERVICE
PI      WO 2007031736  A1   20070322
AI                          20060913
AIO     WO0,603,378
PRAI    US 2005-228099      20050916
SO      World 2007/031,736A1, p. 3/22/2007, f. 9/13/2006 (Appl. 0,603,378), pr.
        U.S. 9/16/2005 (Appl. 228,099) (C09K-0008/467; C04B-0018/08;
        C09K-0008/473; C09K-0008/42; C04B-0014/38; C04B-0028/04;
        C04B-0014/42; C04B-0016/06; C04B-0111/50; C04B-0018/22). (35 pp; 22
        claims; Also assigned to P.A.Curtis, B.R.Reddy and K.M.Ravi)


TI      [R] COMPOSITIONS COMPRISING MELT-PROCESSED INORGANIC FIBERS AND METHODS
        OF USING SUCH COMPOSITIONS
IN      REDDY, B R; RAVI, K M; WAUGH, B K
PA      HALLIBURTON ENERGY SERVICE
PI      US 20060157244  A1   20060720
AI      US 2005-272951       20051114
PRAI    US 2004-884756       20040702
        US 2005-101762       20050408
SO      U.S. 2006/0,157,244A1, p. 7/20/2006, f. 11/14/2005 (Appl. 272,951), pr.
        U.S. 7/2/2004 (Appl. 884,756) and U.S. 4/8/2005 (Appl. 101,762)
        (E21B-0033/13). (7 pp; 20 claims) SRPA# 893,993
```

```
TI     [R] OILWELL SEALANT COMPOSITIONS COMPRISING ALKALI SWELLABLE LATEX
IN     REDDY, R B; SAVERY, M R; RAVI, K M; WHITFILL, D L
PA     HALLIBURTON ENERGY SERVICE
PI     WO 2006061561   A1    20060615
AI                           20051118
AIO    WO0,504,455
PRAI   US 2004-10117        20041208
SO     World 2006/061,561A1, p. 6/15/2006, f. 11/18/2005 (Appl. 0,504,455), pr.
       U.S. 12/8/2004 (Appl. 10,117) (C09K-0008/504; C09K-0008/508;
       C09K-0008/506). (47 pp; 71 claims; Also assigned to C.P.Wain, R.B.Reddy,
       M.R.Savery, K.M.Ravi and D.L.Whitfill) SRPA# 909,653


TI     OILWELL SEALANT COMPOSITIONS COMPRISING ALKALI SWELLABLE LATEX
IN     REDDY, B R; SAVERY, M R; RAVI, K M; WHITFILL, D L
PA     HALLIBURTON ENERGY SERVICE
PI     US 20060122071  A1    20060608
AI     US 2004-10117        20041208
SO     U.S. 2006/0,122,071A1, p. 6/8/2006, f. 12/8/2004 (Appl. 10,117)
       (E21B-0043/00; C09K-0008/00). (21 pp; 71 claims)


TI     [R] ELASTOMERIC ADMIXTURES FOR IMPROVING CEMENT ELASTICITY
IN     REDDY, B R; RAVI, K M
PA     HALLIBURTON ENERGY SERVICE
PI     US 7007755      B2    20060307
AI                           20040903
AIO    US
PRAI   US 2002-246943       20020919
SO     U.S. 7,007,755B2, c. 3/7/2006, f. 9/3/2004, pr. U.S. 9/19/2002 (Appl.
       246,943) (E21B-033/138). (5 pp; 49 claims) SRPA# 837,839


TI     CEMENT COMPOSITIONS COMPRISING HIGH ASPECT RATIO MATERIALS AND METHODS
       OF USE IN SUBTERRANEAN FORMATIONS
IN     REDDY, B R; LENDE, G; RAVI, K M
PA     HALLIBURTON ENERGY SERVICE
PI     WO 2006003389   A2    20060112
AI                           20050629
AIO    WO
PRAI   US 2004-884756       20040702
SO     World 2006/003,389A2, p. 1/12/2006, f. 6/29/2005, pr. U.S. 7/2/2004
       (Appl. 884,756) (E21B-033/13; C04B-014/48; C04B-014/42; C04B-028/02).
       (26 pp; 82 claims; Also assigned to C.P.Wain)


TI     [R] METHOD FOR ENHANCING THE STABILITY OF A WATER SENSITIVE, REACTIVE
       SUBTERRANEAN FORMATION
IN     TARE, U A; HEATHMAN, J F; RAVI, K M
PA     HALLIBURTON ENERGY SERVICE
PI     US 6994164      B2    20060207
AI                           20041001
AIO    US
PRAI   US 2002-298251       20021115
SO     U.S. 6,994,164B2, c. 2/7/2006, f. 10/1/2004, pr. U.S. 11/15/2002 (Appl.
       298,251) (E21B-033/13). (14 pp; 21 claims) SRPA# 848,032
```

```
TI      [R] METHODS OF GENERATING GAS IN WELL TREATING FLUIDS
IN      REDDY, B R; RAVI, K M; LUKE, K; MORGAN, R L
PA      HALLIBURTON ENERGY SERVICE
PI      US 6992048     B2   20060131
AI                          20040304
AIO     US
PRAI    US 2002-159588     20020531
SO      U.S. 6,992,048B2, c. 1/31/2006, f. 3/4/2004, pr. U.S. 5/31/2002 (Appl.
        159,588) (C09K-003/00). (8 pp; 28 claims) SRPA# 830,643


TI      IMPROVED CASING COMPRISING STRESS-ABSORBING MATERIALS AND ASSOCIATED
        METHODS OF USE
IN      RAVI, K M
PA      HALLIBURTON ENERGY SERVICE
PI      WO 2005093202   A1   20051006
AI                           20041217
AIO     WO
PRAI    US 2004-807625     20040324
SO      World 05/093,202A1, p. 10/6/2005, f. 12/17/2004, pr. U.S. 3/24/2004
        (Appl. 807,625) (E21B-017/00; E21B-033/14). (22 pp; 57 claims; Also
        assigned to C.P.Wain)


TI      EMULSION ADMIXTURES FOR IMPROVING CEMENT ELASTICITY
IN      REDDY, B R; RAVI, K M
PA      HALLIBURTON ENERGY SERVICE
PI      WO 2005073502   A2   20050811
AI                           20041217
AIO     WO
PRAI    US 2004-767672     20040129
SO      World 05/073,502A2, p. 8/11/2005, f. 12/17/2004, pr. U.S. 1/29/2004
        (Appl. 767,672) (E21B-033/13; C04B-028/02). (20 pp; 55 claims; Also
        assigned to C.P.Wain)


TI      [R] METHODS OF DISCOVERING AND CORRECTING SUBTERRANEAN FORMATION
        INTEGRITY PROBLEMS DURING DRILLING
IN      SWEATMAN, R E; VARGO, R F JR; KULAKOFSKY, D S; ESCORCIA, A; RAVI, K M
PA      HALLIBURTON ENERGY SERVICE
PI      US 6926081     B2   20050809
AI      US 2002-82459      20020225
SO      U.S. 6,926,081B2, c. 8/9/2005, f. 2/25/2002 (Appl. 82,459) (E21B-047/10;
        E21B-033/13). (7 pp; 24 claims) SRPA# 824,826


TI      [R] METHOD FOR SELECTION OF CEMENTING COMPOSITION
IN      RAVI, K M; GASTEBLED, O; BOSMA, M G R
PA      HALLIBURTON ENERGY SERVICE
PI      US 6922637     B2   20050726
AI                          20031218
AIO     US
PRAI    US 2002-81059      20020222
SO      U.S. 6,922,637B2, c. 7/26/2005, f. 12/18/2003, pr. U.S. 2/22/2002 (Appl.
        81,059) (G01V-001/40; E21B-033/00). (16 pp; 34 claims) SRPA# 826,473
```

```
TI     CEMENT COMPOSITIONS WITH IMPROVED MECHANICAL PROPERTIES AND METHODS OF
       CEMENTING IN A SUBTERRANEAN FORMATION
IN     RAVI, K M; REDDY, B R
PA     HALLIBURTON ENERGY SERVICE
PI     WO 2005061846   A1   20050707
AI                          20041123
AIO    WO
PRAI   US 2003-745470      20031222
SO     World 05/061,846A1, p. 7/7/2005, f. 11/23/2004, pr. U.S. 12/22/2003
       (Appl. 745,470) (E21B-033/13). (24 pp; 61 claims; Also assigned to
       C.P.Wain)


TI     [R] METHOD FOR ENHANCING THE STABILITY OF A WATER SENSITIVE, REACTIVE
       SUBTERRANEAN FORMATION
IN     TARE, U A; HEATHMAN, J F; RAVI, K M
PA     HALLIBURTON ENERGY SERVICE
PI     US 6910535      B2   20050628
AI     US 2002-298251       20021115
SO     U.S. 6,910,535B2, c. 6/28/2005, f. 11/15/2002 (Appl. 298,251)
       (E21B-033/13). (14 pp; 32 claims) SRPA# 848,032


TI     CEMENT COMPOSITIONS WITH IMPROVED MECHANICAL PROPERTIES AND METHODS OF
       CEMENTING IN SUBTERRANEAN FORMATIONS
IN     BROTHERS, L E; RAVI, K M; PALMER, A V
PA     HALLIBURTON ENERGY SERVICE
PI     WO 2004099101   A2   20041118
AI                          20040415
AIO    WO
PRAI   US 2003-435297      20030509
SO     World 04/099,101A2, p. 11/18/2004, f. 4/15/2004, pr. U.S. 5/9/2003
       (Appl. 435,297) (C04B-028/00). (17 pp; 62 claims; Also assigned to
       C.P.Wain)


TI     METHODS AND COMPOSITIONS FOR COMPENSATING FOR CEMENT HYDRATION VOLUME
       REDUCTION
IN     HEATHMAN, J F; RAVI, K M
PA     HALLIBURTON ENERGY SERVICE
PI     WO 2004099557   A2   20041118
AI                          20040415
AIO    WO
PRAI   US 2003-429506      20030505
SO     World 04/099,557A2, p. 11/18/2004, f. 4/15/2004, pr. U.S. 5/5/2003
       (Appl. 429,506) (E21B-033/138). (24 pp; 62 claims; Also assigned to
       C.P.Wain)


TI     CEMENT COMPOSITION EXHIBITING IMPROVED RESILIENCE/TOUGHNESS AND METHOD
       FOR USING SAME
IN     RAVI, K M; REDDY, B R; MORGAN, R L
PA     HALLIBURTON ENERGY SERVICE
PI     US 6832651      B2   20041221
AI     US 2002-230782       20020829
SO     U.S. 6,832,651B2, c. 12/21/2004, f. 8/29/2002 (Appl. 230,782)
       (E21B-033/13). (7 pp; 25 claims)
```

```
TI     CEMENT COMPOSITIONS CONTAINING FLEXIBLE, COMPRESSIBLE BEADS AND METHODS
       OF CEMENTING IN SUBTERRANEAN FORMATIONS
IN     REDDY, B R; RAVI, K M; SZYMANSKI, M J
PA     HALLIBURTON ENERGY SERVICE
PI     WO 2004065321   A1   20040805
AI                          20040108
AIO    WO
PRAI   US 2003-350533     20030124
SO     World 04/065,321A1, p. 8/5/2004, f. 1/8/2004, pr. U.S. 1/24/2003 (Appl.
       350,533) (C04B-028/02; E21B-033/13). (22 pp; 51 claims; Also assigned to
       C.P.Wain)


TI     [R] LIGHTWEIGHT WELL CEMENT COMPOSITIONS AND METHODS
IN     DAO, B; RAVI, K M; VIJN, J P; NOIK, C; RIVEREAU, A
PA     HALLIBURTON ENERGY SERVICE
PI     US 6776237       B2   20040817
AI                           20030221
AIO    US
PRAI   US 2000-664487     20000918
       US 2002-86024      20020228
SO     U.S. 6,776,237B2, c. 8/17/2004, f. 2/21/2003, pr. U.S. 9/18/2000 (Appl.
       664,487) and U.S. 2/28/2002 (Appl. 86,024) (E21B-033/13). (8 pp; 44
       claims) SRPA# 814,443


TI     A METHOD FOR ENHANCING THE STABILITY OF A WATER SENSITIVE, REACTIVE
       SUBTERRANEAN FORMATION
IN     TARE, U A; HEATHMAN, J F; RAVI, K M
PA     HALLIBURTON ENERGY SERVICE
PI     WO 2004046501   A1   20040603
AI                          20031024
AIO    WO
PRAI   US 2002-298251     20021115
SO     World 04/046,501A1, p. 6/3/2004, f. 10/24/2003, pr. U.S. 11/15/2002
       (Appl. 298,251) (E21B-033/13; E21B-033/138). (30 pp; 41 claims; Also
       assigned to C.P.Wain)


TI     [R] METHODS OF GENERATING GAS IN WELL TREATING FLUIDS
IN     REDDY, B R; RAVI, K M; LUKE, K; MORGAN, R L
PA     HALLIBURTON ENERGY SERVICE
PI     US 6722434       B2   20040420
AI     US 2002-159588     20020531
SO     U.S. 6,722,434B2, c. 4/20/2004, f. 5/31/2002 (Appl. 159,588)
       (E21B-043/22; E21B-033/13; C09K-017/00; C09K-003/00). (9 pp; 32 claims)
       SRPA# 830,643


TI     [R] METHODS OF GENERATING GAS IN WELL FLUIDS
IN     REDDY, B R; RAVI, K M; GRIFFITH, J E; ZAMORA, F; LUKE, K; DENNIS, J L
       JR; COX, R A
PA     HALLIBURTON ENERGY SERVICE
PI     US 6715553       B2   20040406
AI     US 2002-159590     20020531
SO     U.S.  6,715,553B2, c. 4/6/2004, f. 5/31/2002 (Appl. 159,590)
       (E21B-021/14; C09K-007/02; C09K-007/08). (8 pp; 20 claims) SRPA# 830,642
```

```
TI     CEMENTING SUBTERRANEAN ZONE
IN     REDDY, B R; RAVI, M K
PA     HALLIBURTON ENERGY SERVICE
PI     EP 1400497     A2  20040324
AI                        20030912
AIO    EP
PRAI   US 2002-246943    20020919
SO     Europe. 1,400,497A2, p. 3/24/2004, f. 9/12/2003, pr. U.S. 9/19/2002
       (Appl. 246,943) (C04B-024/26; E21B-033/13). (4 pp; 9 claims)


TI     [R] METHOD FOR SELECTION OF CEMENTING COMPOSITION
IN     RAVI, K M; GASTEBLED, O; BOSMA, M G R
PA     HALLIBURTON ENERGY SERVICE
PI     US 6697738     B2  20040224
AI     US 2002-81059    20020222
SO     U.S. 6,697,738B2, c. 2/24/2004, f. 2/22/2002 (Appl. 81,059)
       (G01V-001/40; E21B-033/00). (15 pp; 21 claims) SRPA# 826,473


TI     METHODS OF GENERATING GAS IN WELL TREATING FLUIDS
IN     REDDY, B R; LUKE, K; RAVI, K M; MORGAN, R L
PA     HALLIBURTON ENERGY SERVICE
PI     WO 2003102107  A1  20031211
AI                        20030522
AIO    WO
PRAI   US 2002-159588    20020531
SO     World 03/102,107A1, p. 12/11/2003, f. 5/22/2003, pr. U.S. 5/31/2002
       (Appl. 159,588) (C09K-007/08; E21B-033/13). (24 pp; 32 claims; Also
       assigned to C.P.Wain)


TI     METHODS OF GENERATING GAS IN WELL FLUIDS
IN     REDDY, B R; RAVI, K M; GRIFFITH, J E; ZAMARA, F; LUKE, K; DENNIS, J L
       J; COX, R A
PA     HALLIBURTON ENERGY SERVICE
PI     WO 2003102108  A1  20031211
AI                        20030522
AIO    WO
PRAI   US 2002-159590    20020531
SO     World 03/102,108A1, p. 12/11/2003, f. 5/22/2003, pr. U.S. 5/31/2002
       (Appl. 159,590) (C09K-007/08). (25 pp; 48 claims; Also assigned to
       C.P.Wain)


TI     METHOD FOR SELECTING A CEMENTING COMPOSITION FOR CEMENTING WELLS
IN     RAVI, K M; GASTEBLED, O; RENE, M G
PA     HALLIBURTON ENERGY SERVICE
PI     WO 2003071094  A1  20030828
AI                        20030221
AIO    WO
PRAI   US 2002-81059    20020222
SO     World 03/071,094A1, p. 8/28/2003, f. 2/21/2003, pr. U.S. 2/22/2002
       (Appl. 81,059) (E21B-033/14). (25 pp; 15 claims; Also assigned to
       C.P.Wain)
```

```
TI      METHODS OF DISCOVERING AND CORRECTING SUBTERRANEAN FORMATION INTEGRITY
        PROBLEMS DURING DRILLING
IN      SWEATMAN, R E; VARGO, R F JR; KULAKOFSKY, D S; ESCORCIA, A; RAVI, K M
PA      HALLIBURTON ENERGY SERVICE
PI      WO 2003071090    A1   20030828
AI                            20030221
AIO     WO
PRAI    US 2002-82459    20020225
SO      World 03/071,090A1, p. 8/28/2003, f. 2/21/2003, pr. U.S. 2/25/2002
        (Appl. 82,459) (E21B-021/00; E21B-021/08). (17 pp; 20 claims; Also
        assigned to C.P.Wain)


TI      LIGHTWEIGHT WELL CEMENT COMPOSITIONS AND METHODS
IN      DAO, B; RAVI, K M; VIJN, J P; NOIK, C; RIVEREAU, A
PA      HALLIBURTON ENERGY SERVICE
PI      WO 2003074443    A1   20030912
AI                            20020306
AIO     WO0,201,024
SO      World 03/074,443A1, p. 9/12/2003, f. 3/6/2002 (Appl. 0,201,024)
        (C04B-028/02; E21B-033/13; C04B-014/24; C04B-018/08; C04B-018/14;
        C04B-022/12; C04B-024/16). (24 pp; 44 claims; Also assigned to C.P.Wain)


TI      LIGHTWEIGHT WELL CEMENT COMPOSITIONS AND METHODS
IN      DAO, B; RAVI, K M; VIJN, J P; NOIK, C; RIVEREAU, A
PA      HALLIBURTON ENERGY SERVICE
PI      US 6562122       B2   20030513
AI                            20020228
AIO     US
PRAI    US 2000-664487   20000918
SO      U.S. 6,562,122B2, c. 5/13/2003, f. 2/28/2002, pr. U.S. 9/18/2000 (Appl.
        664,487) (C04B-014/22). (8 pp; 20 claims)


TI      [R] WELL STABILIZATION TOOLS AND METHODS
IN      RAVI, K M; BEIRUTE, R M; DUELL, A B; ROGERS, H E; MURRAY, D A; WEBB, E D
PA      HALLIBURTON CO
PI      US 5823273            19981020
AI                            19960806
AIO     US
PRAI    US 1996-692868   19960802
SO      U.S. 5,823,273, c. 10/20/1998, f. 8/6/1996, pr. U.S. 8/2/1996 (Appl.
        692,868) (E21B-007/18). (13 pp; 30 claims) SRPA# 670,462


TI      [R] WELL STABILIZATION TOOLS AND METHODS
IN      RAVI, K M; ROGERS, H E; MURRAY, D A; DUELL, A B; WEBB, E D; BEIRUTE, R M
PA      HALLIBURTON ENERGY SERVICE
PI      CA 2212199            19980202
AI                            19970801
AIO     CA
PRAI    US 1996-692868   19960802
SO      Can. 2,212,199, p. 2/2/98, f. 8/1/97, pr. U.S. 8/2/96 (Appl. 692,868)
        (E21B-033/13). CAN. PAT. OFFICE REC. v.126, no.17, p.74, 4/28/98. (ISSN
        0008-4670; Abstract only) SRPA# 670,462
```

```
TI      [R] WELL STABILIZATION TOOLS AND METHODS
IN      BEIRUTE, R M; RAVI, K M; WEBB, E D; MURRAY, D A; ROGERS, H E; DUELL, A B
PA      HALLIBURTON ENERGY SERVICE
PI      CA 2212198          19980202
AI                          19970801
AIO     CA
PRAI    US 1996-692868      19960802
        US 1996-692665      19960806
SO      Can. 2,212,198, p. 2/2/98, f. 8/1/97, pr. U.S. 8/2/96 (Appl. 692,868)
        and U.S. 8/6/96 (Appl. 692,665) (E21B-033/138). CAN. PAT. OFFICE REC.
        v.126, no.17, p.74, 4/28/98. (ISSN 0008-4670; Abstract only) SRPA#
        670,462

TI      [R] WELL COMPLETION SPACER FLUIDS AND METHODS
IN      CARPENTER, R B; WILSON, J M; LOUGHRIDGE, B W; JOHNSON, D L; RAVI, K M;
        JONES, R R
PA      HALLIBURTON CO
PI      US 5789352          19980804
AI      US 1996-666782      19960619
SO      U.S. 5,789,352, c. 8/4/98, f. 6/19/96 (Appl. 666,782) (E21B-043/00;
        E21B-021/00; C09K-007/02). (9 pp; 22 claims) SRPA# 670,525

TI      [R] WELL COMPLETION SPACER FLUIDS AND METHODS
IN      WILSON, J M; JOHNSON, D L; JONES, R R; LOUGHRIDGE, B W; CARPENTER, R B;
        RAVI, K M
PA      HALLIBURTON ENERGY SERVICE
PI      CA 2208205          19971219
AI                          19970618
AIO     CA
PRAI    US 1996-666782      19960619
SO      Can. 2,208,205, p. 12/19/97, f. 6/18/97, pr. U.S. 6/19/96 (Appl.
        666,782) (E21B-033/138). CAN. PAT. OFFICE REC. v.126, no.14, p.54,
        4/7/98. (ISSN 0008-4670; Abstract only) SRPA# 670,525

TI      [R] WELL STABILISATION TOOL AND METHOD
IN      RAVI, K M; ROGERS, H E; BEIRUTE, R M; MURRAY, D A; DUELL, A B; WEBB, E D
PA      HALLIBURTON ENERGY SERVICE
PI      EP 823537           19980211
AI                          19970801
AIO     EP
PRAI    US 1996-692868      19960802
        US 1998-692665      19980806
SO      Europe. 823,537, p. 2/11/98, f. 8/1/97, pr. U.S. 8/2/96 (Appl. 692,868)
        and U.S. 8/6/98 (Appl. 692,665) (E21B-033/13; E21B-034/14). EUROPE. PAT.
        BULL. v.1998, no.7, p.105, 2/11/98. (ISSN 0170-9305; Abstract only)
        SRPA# 670,462
```

```
TI      WELL COMPLETION SPACER FLUIDS
IN      CARPENTER, R B; LOUGHRIDGE, B W; RAVI, K M; WILSON, M J; JOHNSON, D L;
        JONES, R R
PA      HALLIBURTON ENERGY SERVICE
PI      EP 814232            19971229
AI                          19970519
AIO     EP
PRAI    US 1996-666782      19960619
SO      Europe. 814,232, p. 12/29/97, f. 5/19/97, pr. U.S. 6/19/96 (Appl.
        666,782) (E21B-033/13; E21B-043/25). (18 pp; 19 claims)


TI      WELL STABILIZATION TOOLS AND METHODS
IN      RAVI, K M; BELRUTE, R M; DUELL, A B; ROGERS, H E; MURRAY, D A; WEBB, E D
PA      HALLIBURTON CO
PI      US 5711375          19980127
AI      US 1996-692868      19960802
SO      U.S. 5,711,375, c. 1/27/98, f. 8/2/96 (Appl. 692,868) (E21B-023/00). (14
        pp; 40 claims)


TI      [R] DOWNHOLE DRILLING FLUID AND FILTER CAKE REMOVAL
IN      WEAVER, J; EOFF, L S; WILSON, J M; RAVI, K M; GDANSKI, R
PA      HALLIBURTON CO
PI      EP 702127           19960320
AI                          19950913
AIO     EP
PRAI    US 1994-306689      19940915
SO      Europe. 702,127, p. 3/20/96, f. 9/13/95, pr. U.S. 9/15/94 (Appl.
        306,689) (E21B-037/06). (8 pp; 10 claims) SRPA# 625,165


TI      DRILLING FLUID AND FILTER CAKE REMOVAL METHODS AND COMPOSITIONS
IN      WEAVER, J; RAVI, K M; EOFF, L S; GDANSKI, R; WILSON, J M
PA      HALLIBURTON CO
PI      US 5501276          19960326
AI      US 1994-306689      19940915
SO      U.S. 5,501,276, c. 3/26/96, f. 9/15/94 (Appl. 306,689) (E21B-033/16;
        E21B-037/00). (5 pp; 16 claims)


TI      [R] METHODS AND APPARATUS FOR MEASURING THE ERODABILITY OF DRILLING
        FLUID DEPOSITS
IN      RAVI, K M; BEIRUTE, R M
PA      HALLIBURTON CO
PI      CA 2120585          19941122
AI                          19940405
AIO     CA
PRAI    US 1993-65295       19930521
SO      Can. 2,120,585, p. 11/22/94, f. 4/5/94, pr. U.S. 5/21/93 (Appl. 65,295)
        (E21B-047/00). CAN. PAT. OFFICE REC. v.123, no.1, p.59, 1/3/95. (ISSN
        00084670; Abstract only) SRPA# 580,299
```

```
TI      [R] MEASUREMENT OF THE ERODABILITY OF DRILLING FLUID DEPOSITS
IN      RAVI, K M; BEIRUTE, R M
PA      HALLIBURTON CO
PI      EP 625705              19941123
AI                             19940117
AIO     EP
PRAI    US 1993-65295          19930521
SO      Europe. 625,705, p. 11/23/94, f. 1/17/94, pr. U.S. 5/21/93 (Appl.
        65,295) (G01N-033/24; G01N-033/28; G01N-017/00). (17 pp; 10 claims)
        SRPA# 580,299


TI      [R] APPARATUS AND METHODS FOR DETERMINING THE SHEAR STRESS REQUIRED FOR
        REMOVING DRILLING FLUID DEPOSITS
IN      COVINGTON, R L; RAVI, K M; HEATH, S A; WAUGH, B
PA      HALLIBURTON CO
PI      US 5361631             19941108
AI                             19930827
AIO     US
PRAI    US 1992-939235         19920902
        US 1993-65295          19930521
SO      U.S. 5,361,631, c. 11/8/94, f. 8/27/93, pr. U.S. 9/2/92 (Appl. 939,235)
        and U.S. 5/21/93 (Appl. 65,295) (E21B-049/00). (19 pp; 22 claims) SRPA#
        580,299


TI      DRILLING FLUID REMOVAL IN PRIMARY WELL CEMENTING
IN      RAVI, K M; SABINS, F L
PA      HALLIBURTON CO
PI      US 5339899             19940823
AI                             19930928
AIO     US
PRAI    US 1992-939197         19920902
SO      U.S. 5,339,899, c. 8/23/94, f. 9/28/93, pr. U.S. 9/2/92 (Appl. 939,197)
        (E21B-047/00). (8 pp; 20 claims)


TI      METHODS AND APPARATUS FOR MEASURING THE ERODABILITY OF DRILLING FLUID
        DEPOSITS
IN      RAVI, K M; BEIRUTE, R M
PA      HALLIBURTON CO
PI      US 5309761             19940510
AI                             19930521
AIO     US
PRAI    US 1992-939235         19920909
SO      U.S. 5,309,761, c. 5/10/94, f. 5/21/93, pr. U.S. 9/9/92 (Appl. 939,235)
        (E21B-049/00). (15 pp; 20 claims)


TI      Methods of formulating a cement composition
PI      US 7,913,757


TI      Providing route alternatives based on radio strength
PI      US 7,899,614


TI      Cement compositions comprising a high-density particulate elastomer and
        associated methods
PI      US 7,878,245


TI      Swellable elastomers and associated methods
PI      US 7,866,393
```

TI      Variable density fluids and methods of use in subterranean formations
PI      US 7,749,942

TI      Swellable elastomers and associated methods
PI      US 7,717,180

TI      Cement compositions comprising particulate carboxylated elastomers and
        associated methods
PI      US 7,645,817

TI      Compositions comprimising melt-processed inorganic fibers and methods of
        using such compositions
PI      US 7,493,968

TI      Oilwell sealant compositions comprising alkali swellable latex
PI      US 7,488,705

TI      Method for enhancing the stability of a water sensitive, reactive
        subterranean formation
PI      US 6,994,164

TI      Methods of generating gas in well treating fluids
PI      US 6,992,048

TI      Methods of discovery and correcting subterranean formation integrity
        problems during drilling
PI      US 6,926,081

TI      Method for selection of cementing composition
PI      US 6,922,637

TI      Floating point addition pipeline including extreme value, comparison and
        accumulate functions
PI      US 6,397,239

TI      Method and apparatus for performing vector and scalar multplication and
        calculating rounded product
PI      US 6,393,554

# Exhibit C

# MDL NO. 2179

*In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*

## *KRIS RAVI*
## EXPERT REBUTAL REPORT CONSIDERATION MATERIALS
## JUNE 10, 2013

## EXHIBIT C

| |
|---|
| D-04784 |
| D-04691B |
| D-04852 |
| D-08018 |
| TREX 000001 |
| TREX 000007 |
| TREX 000102 |
| TREX 000183 |
| TREX 000184 |
| TREX 000231 |
| TREX 000296 |
| TREX 000604 |
| TREX 000607 |
| TREX 000713 |
| TREX 000718 |
| TREX 000742 |
| TREX 000986 |
| TREX 001036 |
| TREX 001037 |
| TREX 001455 |
| TREX 001517 |
| TREX 002039 |
| TREX 002149 |
| TREX 002562 |
| TREX 002565 |
| TREX 002584 |
| TREX 002730 |
| TREX 003003 |
| TREX 003188 |
| TREX 003199 |
| TREX 003357 |
| TREX 003358 |
| TREX 003360 |
| TREX 003361 |
| TREX 003363 |
| TREX 003364 |
| TREX 003533 |
| TREX 003537 |
| TREX 003540 |
| TREX 003557 |
| TREX 004142 |
| TREX 004248 |

| |
|---|
| TREX 004304 |
| TREX 004457 |
| TREX 004502 |
| TREX 004511 |
| TREX 004515 |
| TREX 004566 |
| TREX 004776 |
| TREX 005210 |
| TREX 005464 |
| TREX 005813 |
| TREX 005992 |
| TREX 005993 |
| TREX 006121 |
| TREX 006221 |
| TREX 007401 |
| TREX 007478 |
| TREX 007615 |
| TREX 007654 |
| TREX 007716 |
| TREX 007878 |
| TREX 007883 |
| TREX 007889 |
| TREX 007920 |
| TREX 008140 |
| TREX 008141 |
| TREX 041019 |
| TREX 041020 |
| TREX 041021 |
| TREX 041026.031.1.BP |
| TREX 060071 |
| TREX 060080 |
| TREX 060097 |
| TREX 060098 |
| TREX 060114 |
| TREX 060124 |
| TREX 060423 |
| TREX 060451 |
| TREX 060863 |
| TREX 060873 |
| TREX 060912 |
| TREX 061124 |
| TREX 062679 |
| TREX 063136 |
| TREX 063138 |
| TREX 063185 |
| TREX 063186 |
| TREX 063200 |
| All materials referenced in TREX 7878 (Jan. 30, 2012 Rebuttal Expert Report of Dr. Kris Ravi), including Appendix A, and any supplemental materials provided to parties thereafter |
| Article:  A Comparative Study of Mechanical Properties of Density-Reduced Cement Compositions (SPE-90068-PA-P2) |
| Report:  Phase II Expert Report of Richard Strickland (HESI) |
| Report: Andreas Momber Amended Phase II Expert Report |
| Report: Glen Stevick Phase II Rebuttal Expert Report |
| Transcript Excerpt:  Adam Bourgoyne Deposition, pgs. 214:10-216:6 |
| Transcript Excerpt:  Brent Lirette Deposition, pgs. 73:21-76:23, 79:15-80:15, 97:19-99:6 |

| |
|---|
| Transcript Excerpt:  Bryan Clawson Deposition, pgs. 256:4-257:12, 259:2-25, 461:7-462:22, 463:25-465:25, 471:2-472:22, 487:2-488:4, 499:22-500:17 |
| Transcript Excerpt:  David Winter Deposition, pgs. 110:4-111:9, 157:9-161:9, 37:12-41:8, 50:9-50:24, 97:22-98:7, 106:7-109:10, 132:17-139:20, 146:11-147:18 |
| Transcript Excerpt:  Doyle Wayne Maxie Deposition, pgs. 220:1-223:21 |
| Transcript Excerpt:  Greg Walz Deposition, pgs. 773:23-774:4 |
| Transcript Excerpt:  Gregory McCormack Deposition, pgs. 201:3-201:13 |
| Transcript Excerpt:  John Guide Deposition, pgs. 614:4-614:14, 633:20-634:24 |
| Transcript Excerpt:  John Guide Trial Transcript, April 15-16, 2013, 8744:6-8745:4 |
| Transcript Excerpt:  John Hughett Deposition, pgs. 536:16-537:24, 316:6-317:9 |
| Transcript Excerpt:  Krishna Ravi Deposition, pgs. 471:9-472:6, 473:10-473:19, 563:7-564:7, 565:2-588:19, 659:14-661:25, 663:3-666:12, 687:21-690:9, 739:11-739:16, 740:10-749:22, 771:10-771:14, 772:6-777:18, 827:13-829:25, 848:1-848:10, 849:7-850:6, 854:7-857:4, 867:22-868:24, 875:1-875:24, 877:14-878:6, 878:11-881:19, 934:3-934:12, 1110:5-1112:23 |
| Transcript Excerpt:  Marion Woolie Deposition, pgs. 110:2-110:12, 111:1-112:11, 113:20-116:24 |
| Transcript Excerpt:  Micah Burgess Deposition, pgs. 182:1-182:17, 395:13-396:14 |
| Transcript Excerpt:  Nathanial J. Chaisson Deposition, pgs. 266:14-268:12, 337:8-339:21, 692:2-693:24, 704:7-705:22 |
| Transcript Excerpt:  Ottis Benge Deposition, pgs. 101-102 |
| Transcript Excerpt:  Ottis Benge Deposition, pgs. 351:3-352:22 |
| Transcript Excerpt:  Ottis Glen Benge Trial Transcript, pgs. 2470:16-19, 2579:11-2580:6; 2320:22-2321:9, 2403:14-22; 2404:1-14; 2570:9-12; 2287:9-2292:25, 2302:18-2305:22 |
| Transcript Excerpt:  Richard Strickland Deposition, pgs. 293:25-295:17 |
| Transcript Excerpt:  Roland Chemali Deposition, pgs. 196:13-198:15 |
| Transcript Excerpt: Galina Skripnikova Deposition, pgs. 587:12-590:14 |
| Transcript Excerpt: Jonathan Sprague Deposition, pgs. 712:21-713:12 |
| Transcript Excerpt: Leif Colson Deposition, pgs. 79:7-80:12, 124:8-124:21 |
| Transcript Excerpt: Leo Abel Deposition, pgs. 152:1-153:23 |
| Transcript Excerpt: Morton Emilsen Deposition, pgs. 135:23-136:19 |
| Transcript Excerpt: Morton Emilsen Phase I Trial Testimony |
| Transcript Excerpt: Ronald Crook Deposition, pgs. 255:23-256:14 |
| Transcript Excerpt: Victor Emanuel Deposition, pgs. 172:2-172:25 |
| Transcript Excerpt: Warren Winters Deposition, pgs. 437:15-438:17 |
| Transcript: David Calvert Deposition |
| Transcript: Frederick Gene Beck Deposition |
| Transcript: Robert Grace Deposition Transcript & Exhibits |
| Transcript: Trial Transcript of David Calvert |
| Transcript: Trial Transcript of Frederick "Gene" Beck |
| Transcript: Trial Transcript of Nathaniel Chaisson |
| Transcript: Warren Winters Deposition |

# EXHIBIT 2

(DOCUMENT CONFIDENTIAL –

REQUEST TO FILE EXHIBIT UNDER SEAL)

# EXHIBIT 3

(DOCUMENT CONFIDENTIAL –

REQUEST TO FILE EXHIBIT UNDER SEAL)

# EXHIBIT 4

01-40976
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG    )    MDL NO. 2179
"DEEPWATER HORIZON" in the    )
GULF OF MEXICO, on    )    SECTION: J
APRIL 20, 2010    )
   )    JUDGE BARBIER
   )
   )    MAG. JUDGE SHUSHAN

## *CONFIDENTIAL*

## *WorldwideVIEW* ™
### Interactive Deposition Digital Display

ORAL AND VIDEOTAPED DEPOSITION OF:



# Thomas O. Hunter, Ph.D.

**VOLUME 1**

OCTOBER 30, 2012

# *COPY*



WORLDWIDE

*Systems Technology for the Litigation World*

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing
**For U.S. & International Services**
**800 - 745 - 1101**

1    restrictions that says:  "Cement, Skin,

2    Mechanical, Friction," and "Sanding."

3         Do you see that?

4         A.  I do.

5         Q.  To your knowledge, Dr. Hunter, what was

6    the restriction of cement in the wellbore?

7              MR. CHAKERES:  Object to form and

8    scope.

9         A.  I don't know what Ron intended by the

10   word "Cement."

11        Q.  (By Mr. Regan) Okay.

12        A.  There certainly was cement at different

13   places in the well that -- that -- that did --

14   that affected the flow.

15        Q.  To your knowledge, Dr. Hunter, did -- did

16   you or anyone from the DOE or National Labs ever

17   determine what restriction existed from the

18   cement across the productive reservoir zones in

19   the Macondo Well as it impacted potential flow?

20             MR. CHAKERES:  Object to scope.

21             MS. RICHARD:  Objection, form.

22        A.  If you mean potential flow up the

23   wellbore?

24        Q.  (By Mr. Regan) (Nodding.)

25        A.  Very little.  If you mean flow out the

# EXHIBIT 5

(DOCUMENT CONFIDENTIAL –

REQUEST TO FILE EXHIBIT UNDER SEAL)

# EXHIBIT 6

(DOCUMENT CONFIDENTIAL –

REQUEST TO FILE EXHIBIT UNDER SEAL)

# EXHIBIT 7

```
 1                    UNITED STATES DISTRICT COURT

 2                    EASTERN DISTRICT OF LOUISIANA

 3

 4   ****************************************************************

 5      IN RE:  OIL SPILL BY THE OIL
        RIG DEEPWATER HORIZON IN THE
 6      GULF OF MEXICO ON APRIL 20,
        2010
 7

 8                            CIVIL ACTION NO. 10-MD-2179 "J"
                              NEW ORLEANS, LOUISIANA
 9                            Wednesday, April 3, 2013

10

11      THIS DOCUMENT RELATES TO:

12      CASE NO. 2:10-CV-02771,
        IN RE:  THE COMPLAINT AND
13      PETITION OF TRITON ASSET
        LEASING GmbH, ET AL
14
        CASE NO. 2:10-CV-4536,
15      UNITED STATES OF AMERICA V.
        BP EXPLORATION & PRODUCTION,
16      INC., ET AL

17   ****************************************************************

18

19

20            DAY 21 - AFTERNOON SESSION

21        TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS

22     HEARD BEFORE THE HONORABLE CARL J. BARBIER

23            UNITED STATES DISTRICT JUDGE

24

25
```

14:13:56  1   recommended they run CBL, right?

14:13:59  2            THE WITNESS:  Correct.

14:13:59  3            THE COURT:  Do you have an understanding as to why that

14:14:01  4   was not done?  What was the decision?

14:14:05  5            THE WITNESS:  There was a decision made that if we saw

14:14:09  6   lift pressure and we saw full circulation, that they would forego

14:14:14  7   the cement bond log.  So they had prethought out that decision.

14:14:17  8   And when they saw those two items -- you know, the full circulation

14:14:22  9   and lift pressure -- they decided that that was evidence that they

14:14:26  10  were going to have ample top of cement and they would go ahead and

14:14:29  11  run it --

14:14:30  12            THE COURT:  Okay.  Thank you.

14:14:32  13            THE WITNESS:  -- or not run it, excuse me.

14:14:33  14            THE COURT:  Thank you.

14:14:37  15            MR. HILL:  Does that answer Your Honor's question?

14:14:39  16            THE COURT:  Yes.

14:14:40  17  BY MR. HILL:

14:14:41  18  Q.  All right.  Dr. Beck, on page 84 of your report you cite to a

14:14:48  19  couple of buckling analyses that were requested by BP prior to

14:14:54  20  running the casing, correct?

14:14:55  21  A.  Correct.

14:14:55  22  Q.  And in that part of your report, you opined that buckling

14:15:00  23  possibly occurred under the conditions in which the casing was

14:15:03  24  actually run into the hole, correct?

14:15:04  25  A.  Correct.

14:15:05  1    Q.  I would like to look at those buckling analyses and then I'm

14:15:07  2    going to look at conditions under which it was -- under which they

14:15:10  3    were run.

14:15:10  4                MR. HILL:  So could you please bring up TREX-4515.  Let's

14:15:26  5    read this up from the second page up, okay.

13:42:02  6    BY MR. HILL:

14:15:33  7    Q.  Are you familiar with this e-mail chain?

14:15:35  8    A.  Yes.

14:15:35  9    Q.  Can you tell the Court what it's about?

14:15:38 10    A.  Well, this was a request by one of the BP drilling engineers to

14:15:42 11    Halliburton to model the possibility or to identify the conditions

14:15:51 12    under which buckling would be a concern in the well.

14:15:54 13    Q.  And who was that BP drilling engineer?

14:15:56 14    A.  The drilling engineer was Brian Morel.

14:15:58 15    Q.  And on April 16th Brian Morel e-mails -- I apologize for

14:16:05 16    butchering the name, but it's Preeti Paikattu, which is a Landmark

14:16:10 17    Halliburton employee, correct?

14:16:10 18    A.  Correct.

14:16:11 19    Q.  He asked, "Preeti, can you model the torque and drag/buckling

14:16:16 20    for our production string?  Attached is the casing tally and float

14:16:19 21    collar.  I don't have the shoe information, but is a reamer shoe.

14:16:22 22    This is a dual plug job.  I need this today if possible."  Right?

14:16:26 23    A.  Correct.

14:16:27 24    Q.  Now, in response Ms. Preeti asks a follow-up question up

14:16:34 25    here -- I'm sorry, Brian asked a follow-up question:  "Anyway to

7136

14:16:40  1   have it tell you how much weight you can set down before bucking?"

14:16:44  2   Given that there's references of buckling, we're going to assume

14:16:48  3   that there's a missing L in that word, okay?

14:16:50  4   A.  Correct.

14:16:50  5   Q.  Can you tell the Court, what is -- is it apparent to you what

14:16:56  6   BP is requesting here and why?

14:16:57  7   A.  I think the drilling engineer was actually doing a job of

14:17:00  8   foreseeing conditions in the wellbore, and he was being prudent and

14:17:04  9   asking for help running buckling calculations so that he could give

14:17:08  10  some direction to his supervisors at the rig site that says, "You

14:17:14  11  know what, if you start seeing X numbers of pounds, 10,000, 20,000,

14:17:19  12  30,000 pounds of down weight on the casing, that I want to know if

14:17:24  13  I need to be concerned with the casing buckling or not."

14:17:27  14          MR. HILL:  Can we go to the first page, please.  Let's

14:17:32  15  pull this up right here (INDICATING).

13:42:02  16  BY MR. HILL:

14:17:35  17  Q.  In this e-mail chain back and forth between Mr. Morel and

14:17:39  18  Preeti, which is her first name because I can't pronounce the

14:17:42  19  second name, Mr. Morel actually asked, "I want to know if I am not

14:17:48  20  18,200 feet and set down on something, how much weight can I slack

14:17:52  21  off before I start to see buckling?"

14:17:54  22          Generally in what area of the well is 18,200 feet?

14:18:00  23  A.  That's the bottom of the well.

14:18:01  24  Q.  And he is asking how much weight can be set down on an

14:18:05  25  obstruction before buckling can occur, correct?

14:18:08  1    A.  Correct.

14:18:11  2              MR. HILL:  Go to the top e-mail, please.

13:42:02  3    BY MR. HILL:

14:18:14  4    Q.  And in response Preeti says, "Brian, when I have 30 kips at the

14:18:20  5    bottom (at the shoe at 18304 feet) the slack off at the top is

14:18:26  6    644.3 kips and the helocal buckling exists from 18117 feet

14:18:32  7    downwards to the shoe," correct?

14:18:33  8    A.  Correct.

14:18:34  9    Q.  What is 30 kips?

14:18:35 10    A.  Thirty kips is 30,000 pounds of compression put into the pipe.

14:18:39 11    Q.  If, based on this analysis, the buckling -- or the weight of

14:18:46 12    30 kips is applied to the casing at -- what is it that you would

14:18:51 13    expect to see based on this modelling in terms of buckling?

14:18:54 14              MR. REGAN:  Your Honor, my objection is he can read the

14:18:57 15    words on the page.  But this expert has not done an analysis other

14:19:01 16    than read an e-mail.  He has not done any independent modeling of

14:19:04 17    the phenomenon.  He cites an e-mail and he can read it, but he

14:19:07 18    hasn't done any of this work.

14:19:09 19              MR. HILL:  Your Honor, he actually has done analysis on a

14:19:11 20    data set that was on his existing reliance document and it's going

14:19:15 21    to be --

14:19:15 22              THE COURT:  Why don't you lay a foundation for that,

14:19:18 23    then.

14:19:18 24              MR. HILL:  Okay.  Your Honor, that's part of the

14:19:21 25    animation.  What I wanted to show is what he reviewed about what BP

14:19:25  1  knew about buckling analysis, and we can move past this and right

14:19:28  2  into the animation if you like.

14:19:29  3       MR. REGAN:  I am going to have an objection to the

14:19:31  4  animation for this reason:  There has been a depiction that has

14:19:34  5  been created by lawyers that is not found in his report, and it was

14:19:36  6  not something that was presented in his report or at his

14:19:39  7  deposition, and I think that it is a mischaracterization of the

14:19:42  8  evidence.

14:19:43  9       So if there's a foundation to be laid, my objection is I

14:19:46  10  think we need to hear it now before we see any animations.

14:19:51  11       MR. HILL:  Your Honor, on page 84 of Mr. Beck's report,

14:19:55  12  he expresses the opinion that based on this buckling analysis, he

14:19:59  13  believes buckling is possible in the open hole while the casing is

14:20:06  14  being run under the conditions in this well.  The conditions in the

14:20:06  15  well are set forth in the Sperry data which has been on his

14:20:08  16  reliance document, and he is going to show how that data actually

14:20:11  17  shows what conditions existed that induced buckling.

14:20:22  18       THE COURT:  Page 84 you said of his report?

14:20:26  19       MR. HILL:  Yes, sir.

14:20:35  20       THE COURT:  I am trying to find it.  Okay.  I think I see

14:20:38  21  it.

14:20:39  22       MR. HILL:  It starts with, "Brian Morel requested that

14:20:41  23  Halliburton personnel perform a buckling analysis," and there's a

14:20:44  24  comment --

14:20:45  25       THE COURT:  Wait.  Let me read it first.

7139

14:20:47  1           MR. HILL:  Okay.

14:21:06  2           THE COURT:  So what are you -- he is relating what Brian

14:21:12  3    Morel said or did?

14:21:15  4           MR. HILL:  His opinion is in the last part of the

14:21:18  5    sentence, your Honor.

14:21:19  6           MR. REGAN:  If you'll note, the very last sentence of

14:21:21  7    that paragraph says his conclusion is illustrated in Figure 16.

14:21:25  8    His Figure 16 is on page 85.  It shows the casing broken in half.

14:21:29  9    If he wants to put that picture up and explain his basis for that

14:21:32 10    opinion, I have no objection.  But there have been other animations

14:21:36 11    that have been produced, and I think shown in opening, that are not

14:21:38 12    found in this report that show casing moving and casing in

14:21:42 13    different dimensions.  I strongly object to that because this is a

14:21:45 14    picture, Figure 16.  If he wants to explain it.  He thinks the

14:21:49 15    casing broke in half, he can do it and we can cross examine him on

14:21:53 16    it.

14:21:53 17           MR. HILL:  Your Honor, may I respond?

14:21:54 18           THE COURT:  If this was a jury trial, I would remove the

14:21:57 19    jury and I'd look at animation and make a decision, but since this

14:22:00 20    is a bench trial, I have to look at it one way or the other.  I

14:22:03 21    don't have enough understanding of where this is going to know

14:22:06 22    whether it's -- should be admitted or considered or not.  So I am

14:22:09 23    going to let him -- we'll look at the animation and see where it

14:22:13 24    goes.  You can object and you can cross-examine him on it, okay?

14:22:17 25           MR. HILL:  Fair enough, your Honor.  Thank you.

OFFICIAL TRANSCRIPT

14:22:23  1    BY MR. HILL:

14:22:24  2    Q.  I think what I would like to do with that introduction is have

14:22:26  3    you go to the animation.  Have you helped -- have you assisted in

14:22:29  4    preparing --

14:22:30  5            THE COURT:  Just tell me first, what is the animation?

14:22:32  6    This is the animation you prepared?

14:22:35  7            THE WITNESS:  I've worked, of course I am not a computer

14:22:37  8    programmer, but I worked on the concept.

14:22:39  9            THE COURT:  You helped in it?

14:22:41  10           THE WITNESS:  Yes.

14:22:42  11           THE COURT:  What is it intended to show?

14:22:44  12           THE WITNESS:  Your Honor, if I can back up just a minute

14:22:47  13   to explain where this is coming from.

14:22:48  14           THE COURT:  Go ahead.

14:22:49  15           THE WITNESS:  There is certain unexplained data in this

14:22:52  16   well that is very confusing.  The rapidity with which the blowout

14:22:57  17   happened.  This blowout happened very, very, quickly.  It indicates

14:23:02  18   to me that there was not much restriction in the flow from the

14:23:06  19   formation into the casing up to the surface.

14:23:10  20           I cannot come up with a rectification that the flow was

14:23:16  21   coming out of the formation, down the outside of the casing,

14:23:20  22   through cement that would have been there, up the middle of the

14:23:23  23   shoe track through cement that would be there unrestricted to the

14:23:27  24   surface.  So in the context of developing this report, I realized

14:23:34  25   that one of the situations that would explain almost all of the

14:23:37  1  anomalies that we see would be that there was some type of rupture

14:23:42  2  in the shoe track, that the casing ruptured.  Whether it fully

14:23:46  3  parted or just split open, I can't tell you.

14:23:50  4       THE COURT:  That the casing ruptured?

14:23:52  5       THE WITNESS:  That the casing would have ruptured.  And

14:23:55  6  so for the casing to rupture, of course, there has to be some

14:23:58  7  fairly extreme stresses placed on the casing.  And so I looked

14:24:04  8  originally at the report, and I considered buckling as this

14:24:08  9  document said.  What this document basically says is that the

14:24:11 10  casing is going to be very simple to buckle.  It's not going to

14:24:15 11  take a lot of weight to make the casing buckle.  The consequences

14:24:19 12  of buckling the casing are that you're not only putting this

14:24:24 13  additional compression in the casing, you're bending it which

14:24:27 14  increases the stress on the casing as well.

14:24:29 15       THE COURT:  Is there some analysis or calculation or

14:24:32 16  testing that you did or is this an hypothesis based on reading

14:24:39 17  these reports?

14:24:40 18       THE WITNESS:  Oh, no, sir.  I went back and early on I

14:24:44 19  looked at the Sperry data.  I don't have to calculate enough -- I

14:24:48 20  mean, I live with buckling every day of my life in the job that I

14:24:51 21  have.  I know the magnitudes of buckling.  I know what causes

14:24:55 22  buckling, how much compression causing buckling.  I was looking at

14:24:59 23  the Sperry data for any evidence that I could see that said, "Was

14:25:03 24  there extreme compression put on this casing?"

14:25:05 25       And I admit, the first time I looked at it in the context

14:25:09  1   of this report, when I looked at the data, I didn't see that -- I

14:25:14  2   didn't see that I thought buckling was that big of an issue.  But

14:25:17  3   as I went back and looked over the Sperry data over and over and

14:25:21  4   over, I began to focus on a piece of it that I had ignored before.

14:25:25  5   So I went back and reviewed the Sperry data in detail, and I think

14:25:31  6   that I have a very good explanation for a loading on the casing

14:25:37  7   that occurred that has, up to now, been unknown.

14:25:41  8              THE COURT:  Is this explanation stated in your report?

14:25:44  9              THE WITNESS:  The explanation -- no, sir, it's not.  All

14:25:48  10  that my report states is that I feel like there was some type of

14:25:53  11  failure in the shoe track, and at the time of the report, I hadn't

14:25:57  12  figured out what that failure was yet.

14:26:00  13             MR. HILL:  Your Honor, he also indicated that buckling

14:26:02  14  was a possibility.

14:26:03  15             MR. REGAN:  We have a rule in this case about the four

14:26:06  16  corners --

14:26:08  17             THE COURT:  I am going to sustain the objection.

14:26:10  18             MR. REGAN:  Thank you, your Honor.

14:26:22  19  BY MR. HILL:

14:26:22  20  Q.  Let's wrap up this way then.  Based on what you reviewed and

14:26:26  21  those things that were -- the things that you identified before,

14:26:30  22  can you explain to the Court the evidence that you looked at that

14:26:33  23  indicate to you that there was a rupture or a breach below the

14:26:39  24  FLOAT collar?

14:26:39  25  A.  So the first piece of evidence that I see is the conversion of

14:26:45  1    the FLOAT collar, the sudden drop in pressure from over 3,000 to

14:26:49  2    under 200 psi.  That looks like a failure, like a rupture to me.

14:26:54  3    And then the second piece of evidence that I have is that the

14:27:00  4    rapidity with which the blowout happened, that there was

14:27:03  5    unrestricted flow, in my opinion, into this wellbore.  And the

14:27:07  6    third piece of evidence that I have to try to explain is that when

14:27:12  7    the well was re-entered and the upper casing string was perforated,

14:27:18  8    there was no evidence of hydrocarbon in that upper annular section.

14:27:23  9    Q.  What does that indicate to you?

14:27:25 10    A.  That tells me that at some point there had to be some type of

14:27:29 11    isolation in the annulus.  The only way to get that isolation would

14:27:32 12    have been through cement being placed in the annulus and setting

14:27:36 13    up.  So I have a real hard time understanding how the cement in the

14:27:41 14    annulus can set up yet there would be cement in the shoe track and

14:27:47 15    in the lower part of the annulus that didn't set up.

14:27:50 16            MR. HILL:  Let's bring up demonstrative 8015, please.

14:27:50 17    BY MR. HILL:

14:28:00 18    Q.  And here is the wellbore schematic that the Court has seen

14:28:03 19    numerous times.  If there was, in fact, a rupture in the casing

14:28:07 20    below the FLOAT collar, can you explain to His Honor what -- where

14:28:12 21    the cement would go when the cement is actually pushed -- when the

14:28:15 22    cement is actually staged and the cementing operation is actually

14:28:19 23    done?

14:28:19 24    A.  I would really like to look at a different demonstrative that I

14:28:23 25    have that actually -- let's go ahead and look at the picture of the

14:28:27  1    casing where it fell off the bottom.  I think that's --

14:28:31  2              MR. REGAN:  Page 85 of your report.

14:28:33  3              THE WITNESS:  Correct.

14:28:34  4              MR. HILL:  Thanks.

14:28:37  5              MR. REGAN:  Got it right here.

14:28:38  6              MR. HILL:  Bring up demonstrative 8041, please.

14:28:48  7              THE WITNESS:  So this demonstrative is showing what the

14:28:53  8    condition of the bottom of the casing would look like if there was

14:28:56  9    a rupture.  Now, the diagram showing a complete dropping of the

14:29:02 10    shoe track -- separation of the shoe track, that can be a

14:29:07 11    separation, it could be a split, it could be the pipe cracking

14:29:12 12    open.  It's irrelevant really whether the pipe fell down or not.

14:29:17 13    What it's really saying is a broach shallow in the shoe track near

14:29:21 14    the FLOAT collar, and most particularly, opposite one of the

14:29:25 15    hydrocarbon bearing zones.

14:29:26 16    BY MR. HILL:

14:29:26 17    Q.  Let's stop there for a second and just unpack that for a little

14:29:29 18    bit.

14:29:29 19              You know what, I've counted four or five places in your

14:29:34 20    report where you talk about debris plugging the reamer shoe.  If

14:29:39 21    there was debris plugging this reamer shoe, would you see this drop

14:29:43 22    off of this distance?

14:29:44 23    A.  No.  I mean, if there was debris in the reamer shoe, I think

14:29:48 24    that means you lowered the casing into debris in the bottom of the

14:29:52 25    well.  And in that situation, that would act to do two things:  It

14:29:57  1  would stop the casing from moving down, it would start applying

14:30:00  2  compression on the casing, and then from a rupture standpoint,

14:30:05  3  there wouldn't be a very big drop of the casing in the well.

14:30:07  4  Q.  If the casing had been run into debris or fill and those

14:30:13  5  compressional forces were applied, what would the affect, if any,

14:30:17  6  be on the strength of that casing below the float collar?

14:30:21  7       MR. REGAN:  Outside the scope of his report.  I mean, he

14:30:24  8  uses the word "buckling" as referenced from an e-mail, but he

14:30:28  9  doesn't go into any analysis of what the strength or impact would

14:30:31 10  be on this type of casing, given its compression, given its

14:30:35 11  buckling capacities, so forth.

14:30:38 12       THE COURT:  Is this in your report, this opinion?

14:30:40 13       THE WITNESS:  The opinion, your Honor, is around the

14:30:45 14  realization that a rupture in the casing explains a lot of the

14:30:50 15  other observations that I see in the well.

14:30:53 16       MR. REGAN:  The objection is that there is a very

14:30:55 17  specific field of study about the rupture loads, collapse loads of

14:30:59 18  this brand of casing with these characteristics, made out of this

14:31:02 19  material.  People have done that.  One of the experts Halliburton

14:31:05 20  has who they wanted to testify claims to have done that.  Dr. Beck

14:31:09 21  didn't do that.

14:31:10 22       MR. HILL:  Your Honor, Dr. Beck has approached this by

14:31:12 23  actually looking at the Sperry data which is on the reliance

14:31:15 24  exhibit of every drilling engineer expert in this case, and he can

14:31:18 25  actually show you data that supports in the event that there is a

7146

14:31:21  1    compressional load here.  If the Court doesn't want to see that, I

14:31:24  2    understand that, but he is ready to show you if you would like to

14:31:27  3    see it.

14:31:27  4              THE COURT:  I will allow him to testify.

14:31:29  5              MR. HILL:  Your Honor, that's exactly what the animation

14:31:32  6    shows; so I don't know if you would like us to use the animation.

14:31:35  7              THE COURT:  I thought that was a different question.

14:31:37  8              MR. HILL:  Not really.

14:31:38  9              MR. REGAN:  The issue here is also timeframe.  We're

14:31:40  10   hearing the witness at that one point he had one view, and then he

14:31:43  11   looked at it some more and had a different view.  We have his

14:31:46  12   report and we are looking at it on the screen.  That was disclosed

14:31:49  13   and I don't object to questions about it.  I do object if he, then,

14:31:53  14   tries to analyze how he figured that out because there is some

14:31:57  15   sophisticated math you can do to determine whether that casing of

14:32:00  16   that load, this high collapse casing, could ever do that given the

14:32:03  17   loads that were put in this well.

14:32:05  18             MR. HILL:  That's cross-examination.

14:32:07  19             THE COURT:  All right.  We are not going to the

14:32:09  20   animation.

14:32:10  21             MR. HILL:  Okay.  But you will allow him to testify about

14:32:13  22   what he thinks happened?

14:32:14  23             THE COURT:  Yes.  Yeah, I thought he was doing that.

14:32:17  24   BY MR. HILL:

14:32:17  25   Q.  When the casing is run, if there is -- do you believe that

7147

14:32:20  1   there was debris and fill in the bottom of this hole?

14:32:22  2   A.  Well, I am virtually certain that there was, because when we

14:32:26  3   went to -- when they went to convert the float collar, something

14:32:30  4   was plugged up.  The way it was plugged up is because there was

14:32:32  5   debris in the well.

14:32:33  6   Q.  And what would that do in terms of the compressional load as

14:32:36  7   you continue to drive casing into that fill?

14:32:39  8   A.  So if there's debris on the bottom of the well and you're

14:32:43  9   trying to go ahead and lower the casing into the well, you would

14:32:48  10  put a compressional load on the casing and very small compressional

14:32:53  11  loads would, then, translate to helical buckling of the casing; all

14:32:58  12  of which are magnifying the stresses on the casing.

14:33:00  13  Q.  We had reviewed a buckling analysis that BP had requested on

14:33:03  14  April 16th that identified helical buckling occurring at the bottom

14:33:07  15  of the well with a load of 30 klbs or 30,000 pounds, correct?

14:33:12  16  A.  Correct.

14:33:13  17  Q.  Did you look at data that identifies what the compressive load

14:33:16  18  is or was at Macondo when they ran the casing in the bottom?

14:33:19  19  A.  Yes.  When I look at the Sperry log and look specifically at

14:33:24  20  the last few minutes of landing the casing, I see an anomaly.

14:33:28  21  Q.  What is that anomaly?

14:33:29  22  A.  The anomaly is the rate at which the hook load changes as you

14:33:35  23  slack the casing off in the well.  And at that point in the well if

14:33:39  24  there's no debris, if there's no compression being formed, the rate

14:33:42  25  that you slack the casing off and the rate that the hook load drops

14:33:47  1   off should both be constant.

14:33:49  2   Q.  Are you able to quantify, even in ranges, what the klb load was

14:33:53  3   in the data that you looked at when they landed the case at

14:33:57  4   Macondo?

14:33:57  5   A.  Without doing any calculations at all, I can look at the Sperry

14:34:00  6   data and I can see a signature on the log that says there may have

14:34:04  7   been as much as 140,000 klbs.

14:34:07  8   Q.  So BP internal analysis said there will be helical buckling at

14:34:12  9   30 klbs, you've identified a compressive load or how many klbs were

14:34:17 10   actually applied?

14:34:18 11   A.  I identify off the log 140,000 klbs applied to the casing.

14:34:23 12          MR. REGAN:  Just move to strike as not in his report,

14:34:27 13   your Honor.  I don't mean to be continuing objecting, but we really

14:34:30 14   are getting into something that was not disclosed.

14:34:35 15          MR. HILL:  I'll move on.

14:34:37 16          THE COURT:  I think we keep veering into stuff.  If it's

14:34:40 17   not in his report, it's not fair to be talking about it here.

14:34:44 18          MR. HILL:  Understood, your Honor.  With respect, we

14:34:46 19   disagree that it's not in his report, but I can move on at this

14:34:49 20   point.

14:34:50 21          THE COURT:  Okay.  Let's move on.  I sustain that

14:34:52 22   objection.

14:34:52 23   BY MR. HILL:

14:34:56 24   Q.  So if there is a breach below the float collar, what affect, if

14:35:01 25   any, does that have on the cement?

7149

14:35:03 1   A.  So if there is a breach in the float collar, then the cement as

14:35:07 2   it traverses the casing and comes down the casing, it's going to

14:35:11 3   turn right here and go up the annulus, so that there would be no

14:35:15 4   cement in this lower part of the wellbore.  There would be no

14:35:18 5   cement in the lower part of the shoe track at all.  And then you

14:35:22 6   would end up with uncemented formation, hydrocarbon bearing

14:35:26 7   formation opposite the breach that would be free to flow

14:35:31 8   unrestricted into the wellbore.

14:35:32 9   Q.  Now, that's kind of obvious based on this diagram when you have

14:35:36 10  this large separation between the casing and the detached part of

14:35:40 11  the shoe track.  What if there's just a breach and not a full

14:35:44 12  separation?  Will cement flow through that breach point?

14:35:48 13  A.  Any kind of rupture would allow a significant amount of flow,

14:35:52 14  and if the rupture was more than, say, one square inch in diameter,

14:35:59 15  virtually 100 percent of the flow would go through that rupture.

14:36:02 16  Q.  And why is that?

14:36:03 17  A.  It's just taking the path of least resistance at that point.

14:36:07 18  Q.  So at this point, if there is a rupture -- with a rupture below

14:36:11 19  the float collar, is there any cement providing zonal isolation

14:36:15 20  below that rupture point?

14:36:16 21  A.  No, there would not be.  All of the cement would be above the

14:36:20 22  rupture point, and so there would be no barrier, no zonal isolation

14:36:24 23  below the rupture point.

14:36:25 24  Q.  Dr. Beck, a breach below the float collar, you've said that

14:36:52 25  that is consistent with the pressure response you saw on the rapid

14:36:57  1   depressurization during the float collar conversion attempt,

14:37:00  2   correct?

14:37:00  3   A.  Correct.

14:37:01  4   Q.  You said it explains the low circulating pressures, correct?

14:37:03  5   A.  Correct.

14:37:03  6   Q.  Is there any other evidence or in your opinion does that fit

14:37:07  7   with any of the other information that you reviewed in this case

14:37:11  8   regarding the nature of the blowout?

14:37:12  9   A.  Well, it's consistent with what I said before.  The evidence

14:37:16 10   that there was some type of zonal isolation in the annulus

14:37:21 11   protecting the upper annulus from hydrocarbons, it would be

14:37:25 12   consistent with cement being put into place and successfully

14:37:29 13   isolating the hydrocarbon zones at that point, and it's very

14:37:35 14   consistent with the unrestricted flow path to the surface.

14:37:39 15   Q.  So we can't use the animation so we're going to have to talk

14:37:44 16   through this.  As you're linking these chain of events in your

14:37:47 17   causal opinion, we come to the point where there is cement, the

14:37:51 18   cementing operation is done and, I think, you indicated that if

14:37:55 19   cementing was done through a breach in the shoe track, what, if

14:37:59 20   anything, what type of control, if any, does that give for

14:38:02 21   placement of the cement, if there is a breach in the shoe track?

14:38:05 22   A.  Well, it keeps the cement from being placed in the shoe track.

14:38:11 23   Q.  In this situation, we now know there was a time period between

14:38:14 24   the cement operation and the conduct of the negative test, and I

14:38:17 25   know the Court has heard a lot about the negative pressure test.

# EXHIBIT 8

From: Paikattu, Preeti (HALLIBURTON)
Sent: Fri Apr 16 22:23:22 2010
To: Morel, Brian P
Subject: RE: Actual vs model - 9-7/8 in liner run
Importance: Normal

Brian
When I have 30 kips at the bottom (at the shoe at 18304 ft) the slack off at the top is 644.3 kips and the helocal buckling exists from 18117 ft downwards to the shoe.
I can do the same set of scenarios for when the shoe is at 18200 ft. Is that what you want.Is it clear? If not I can give you call and explain.
**Preeti Paikattu (Landmark,Halliburton)**
**Real Time Engineering Applications Specialist (3)**
**WL-4; 1091 D**
Direct line: 281.366.8659
Cell: 832.260.3060
Email: Preeti.Paikattu@bp.com

---

From:   Morel, Brian P
Sent:   Friday, April 16, 2010 11:53 AM
To:    Paikattu, Preeti (HALLIBURTON)
Subject:    RE: Actual vs model - 9-7/8 in liner run
Can you explain what this is trying to show in more detail.  I am a little confused on the spreadsheet.  What does downhole weight vs point in the string mean?  At 18117' if you put 30' down it will helical buckle or does?  I want to know if I am 18,200' and set down on something how much weight can I slack off before I start to see buckling?
                            30      644.3    Helical 18117 to shoe

---

From: Paikattu, Preeti (HALLIBURTON)
Sent: Friday, April 16, 2010 10:59 AM
To: Morel, Brian P
Subject: RE: Actual vs model - 9-7/8 in liner run
Yes
I have attached an excel with with downhole weight and slack off and buckling mode
Since the string is almost vertical wellplan will show the onset of buckling quite fast.
It will take a lot to lock up the string.
Please see attached to see if this what you wanted.
 << File: weight to buckle.xls >>
**Preeti Paikattu (Landmark,Halliburton)**
**Real Time Engineering Applications Specialist (3)**
**WL-4; 1091 D**
Direct line: 281.366.8659
Cell: 832.260.3060
Email: Preeti.Paikattu@bp.com

---

From:   Morel, Brian P
Sent:   Friday, April 16, 2010 10:30 AM

4515
Exhibit No. _____
Worldwide Court
Reporters, Inc.

BP-HZN-2179MDL00025379

TREX-04515

To:     Paikattu, Preeti (HALLIBURTON)
Subject:     RE: Actual vs model - 9-7/8 in liner run

Anyway to have it tell you how much weight you can set down before bucking?

---

**From:** Paikattu, Preeti (HALLIBURTON)
**Sent:** Friday, April 16, 2010 10:28 AM
**To:** Morel, Brian P
**Subject:** RE: Actual vs model - 9-7/8 in liner run

Brian

I have attached the drag analysis of the production string.

<< File: 9.875x7 in production casing drag analysis.ppt >>

When do they plan to run the string?

**Preeti Paikattu (Landmark,Halliburton)**
**Real Time Engineering Applications Specialist (3)**
**WL-4; 1091 D**
Direct line: 281.366.8659
Cell: 832.260.3060
Email: Preeti.Paikattu@bp.com

---

**From:** Morel, Brian P
**Sent:** Friday, April 16, 2010 8:05 AM
**To:** Paikattu, Preeti (HALLIBURTON)
**Subject:** RE: Actual vs model - 9-7/8 in liner run

Preeti,

Can you model the torque and drag / buckling for our production string? Attached is the casing tally and float collar. I don't have the shoe information, but is a reamer shoe. This is a dual plug job. I need this today if possible.

Thanks
Brian

<< File: Macondo #1  9.875 x 7 CSGRUN (2).ZIP >> _____ <<
File: M45AP 7 H513 32ppf 6 drift.ZIP >>
**From:** Paikattu, Preeti (HALLIBURTON)
**Sent:** Thursday, April 01, 2010 10:57 AM
**To:** Morel, Brian P
**Subject:** Actual vs model - 9-7/8 in liner run

Brian

I have attached the act vs model for the 9-7/8 in liner run

<< File: 9.875 in liner run act vs model.ppt >>

Thanks

**Preeti Paikattu (Landmark,Halliburton)**
**Real Time Engineering Applications Specialist (3)**
**WL-4; 1091 D**
Direct line: 281.366.8659
Cell: 832.260.3060
Email: Preeti.Paikattu@bp.com

BP-HZN-2179MDL00025380

# EXHIBIT 9

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4    ****************************************************************

5        IN RE:  OIL SPILL BY THE OIL
         RIG *DEEPWATER HORIZON* IN THE
6        GULF OF MEXICO ON APRIL 20,
         2010
7

8                                    CIVIL ACTION NO. 10-MD-2179 "J"
                                     NEW ORLEANS, LOUISIANA
9                                    Thursday, March 7, 2013

10

11       THIS DOCUMENT RELATES TO:

12       CASE NO. 2:10-CV-02771,
         *IN RE:  THE COMPLAINT AND*
13       *PETITION OF TRITON ASSET*
         *LEASING GmbH, ET AL*
14
         CASE NO. 2:10-CV-4536,
15       *UNITED STATES OF AMERICA V.*
         *BP EXPLORATION & PRODUCTION,*
16       *INC., ET AL*

17
     ****************************************************************
18

19

20                   **DAY 8 - MORNING SESSION**

21            TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS

22         HEARD BEFORE THE HONORABLE CARL J. BARBIER

23                    UNITED STATES DISTRICT JUDGE

24

25

─────────────────── OFFICIAL TRANSCRIPT ───────────────────

08:07:02  1    Q.  Now, in your review in preparing for your expert opinions to

08:07:06  2    submit to this Court and to appear here today to opine, did you see

08:07:11  3    anything in the job execution data that indicated to you that

08:07:14  4    nitrogen break out occurred with the respect to the slurry foam

08:07:20  5    pump?

08:07:20  6    A.  No, sir.  But that job data was as it was being pumped gave no

08:07:24  7    indication.

08:07:24  8    Q.  That's exactly my point.  There's no indication in the job data

08:07:27  9    that nitrogen breakout occurred?

08:07:29  10   A.  No, sir.

08:07:30  11   Q.  And you haven't seen any physical sample recovered from the

08:07:33  12   well, through the blowout or anything else, of cement that looks

08:07:35  13   like unstable cement, have you?

08:07:37  14   A.  No, sir, I have not.

08:07:39  15   Q.  Now, you talked yesterday about the ability of a cement job to

08:07:46  16   achieve zonal isolation depending primarily on two things, correct?

08:07:49  17   A.  Yes, sir.

08:07:50  18   Q.  And that was the slurry performance as well as proper placement

08:07:53  19   of the cement in the wellbore, correct?

08:07:57  20   A.  That is correct.

08:07:58  21   Q.  Would you agree with me that a perfectly designed cement job

08:08:01  22   and a perfectly executed cement job sometimes fails to achieve

08:08:05  23   zonal isolation?

08:08:06  24   A.  I would agree with that statement, sir.

08:08:07  25   Q.  And in fairness, the converse is also true, a non-optimized

09:28:07  1   Q.  It could also fail because it's inherently unstable, correct?

09:28:13  2   Or would you include that in one of the other two categories?

09:28:16  3   A.  Well, that was failure to form a barrier, and is that how

09:28:21  4   you're defining failure in that?

09:28:23  5   Q.  I actually am trying to find out how you were defining it in

09:28:27  6   the answer.  Let me ask it this way:  When you say that the cement

09:28:30  7   was either not present across the formation to be able to form a

09:28:34  8   barrier, do you include in that answer that the cement could

09:28:38  9   physically have been in place but be inherently unstable and

09:28:43 10   therefore permeable and, therefore, allow formation fluids to come

09:28:47 11   through?

09:28:47 12   A.  I think in my report, sir -- and you'll forgive me, but I

09:28:53 13   mentioned that if the slurry design doesn't meet the requirements

09:28:57 14   of the well, if you look at it, it's in the report, that that can

09:29:02 15   result in a well failure.

09:29:04 16   Q.  Right.  Maybe -- let me ask the question more precisely.  Do

09:29:09 17   you agree that an inherently unstable cement can be permeable when

09:29:14 18   it's put downhole?

09:29:17 19   A.  No.  I don't.

09:29:20 20   Q.  Let's try it this way.  Yesterday you had your plate.  Do you

09:29:23 21   still have it up there?

09:29:27 22   A.  Yes.

09:29:28 23         THE COURT:  Right there.  Right under your cement.

09:29:30 24         THE WITNESS:  Right under my cement, yes, sir.

09:29:32 25   BY MR. REGAN:

12:05:35  1    and the other one present.

12:05:36  2            THE COURT:  The contract itself is in evidence, so I

12:05:38  3    think the Court will be able to figure out what was required or not

12:05:41  4    required.

12:05:42  5            THE WITNESS:  Yes, sir, I think.

12:05:43  6            THE COURT:  Okay.  Thank you, sir.  I'm sorry, give me

12:05:47  7    the demonstrative number again.

12:05:50  8            MR. CERNICH:  6630.

12:05:51  9            THE COURT:  6630.  Thank you very much.

12:05:55 10    BY MR. CERNICH:

12:06:02 11    Q.  Now, Mr. Regan asked you a question about whether you thought

12:06:08 12    the cement was permeable, do you recall that?

12:06:10 13    A.  Yes, sir.

12:06:11 14    Q.  And I believe you answered the question no?

12:06:14 15    A.  That's correct.

12:06:15 16    Q.  Can you explain that answer?

12:06:16 17    A.  Well, I believe the question was if the cement is unstable,

12:06:21 18    does that make it permeable, and if I look at one of these foam

12:06:27 19    cement things or look at foam, if it's unstable and all of the

12:06:33 20    nitrogen comes out or nitrogen starts coming out, the material

12:06:36 21    that's left back in behind is the base slurry.  So that -- the

12:06:43 22    movement of that nitrogen or the stability of that doesn't go to

12:06:47 23    permeability.  It goes to changes in density, changes in

12:06:52 24    properties.  But permeability is not -- that would not be a result.

12:06:58 25    Q.  What would be the result?

12:07:00  1   A.  Well, you wind up -- if I take the Macondo well, at the bottom

12:07:04  2   of the well, you would have higher density.  If you took all of the

12:07:09  3   nitrogen out, you would have the tail cement.

12:07:11  4   Q.  And could that cement have provided a barrier in the bottom of

12:07:15  5   the well?

12:07:15  6   A.  Yes, sir.

12:07:16  7   Q.  Only if it was set?

12:07:19  8   A.  Only if it was set.

12:07:20  9   Q.  Mr. Regan used a term with you, do you recall, a discharged

12:07:32  10  responsibility?

12:07:32  11  A.  Yes, sir.

12:07:33  12  Q.  Did you understand the meaning of that term?

12:07:37  13  A.  Not really.  I asked that question twice, and I struggled with

12:07:44  14  that because I am not real familiar with that.

12:07:46  15  Q.  And I believe Mr. Regan asked you whether BP discharged its

12:07:50  16  responsibility on the cement job by relying on Halliburton?

12:07:54  17  A.  I don't know the legal definition for "discharge," I'm sorry.

12:07:57  18  Q.  Does that mean to you that BP absolved itself of responsibility

12:08:03  19  for the cement job by relying on Halliburton's services?

12:08:07  20  A.  No, sir, that does not.

12:08:08  21  Q.  Did BP absolve itself of responsibility for this cement job by

12:08:14  22  relying on Halliburton's services?

12:08:16  23  A.  No, sir.

12:08:17  24  Q.  And why not?

12:08:18  25  A.  Well, that's, first of all, that iterative technique back and

# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL BY THE OIL RIG MDL NO. 2179

"DEEPWATER HORIZON" IN THE

GULF OF MEXICO, ON APRIL 20, 2010

REBUTTAL REPORT OF GLEN BENGE

TO THE ANDREAS MOMBER REPORT

"EROSION OF WELL CEMENT DUE TO HYDROCARBON FLOW"

ON BEHALF OF

THE UNITED STATES OF AMERICA

June 7, 2013

DATED: June 7, 2013

Signature:  Glen Benge

# Table of Contents

**Executive Summary**................................................................................................**2**

**Background and Credentials** ...............................................................................**3**

**Discussion**............................................................................................................**5**

   1.   Introduction ....................................................................................................5

   2.   The cement was not set at the time of the negative test....................................6

   3.   The Momber Report misrepresents key differences in construction concrete and oil field cement................................................................................................7

   4.   Table 4.1 of the Momber report is irrelevant to erosion .....................................8

   5.   Momber grossly underestimates the fluid velocities at Macondo.....................10

   6.   The Calculations in Appendix A are Misleading.................................................11

      6.1.   Flow Rates and Channel Size: ...................................................................11

      6.2.   Pressure Drops.........................................................................................12

      6.3.   Appendix A Summary ...............................................................................12

   7.   No supporting data is offered for any conclusions ...........................................12

**Conclusion** .......................................................................................................**13**

**Appendix A - Information Required by Federal Rules of Civil Procedure ..14**

**Appendix B - Curriculum Vitae of Glen Benge**.............................................**15**

**Appendix C - Statement of Compensation** ...................................................**19**

**Appendix D - Documents Considered**............................................................**20**

## Tables

Table 1 - Flow Velocities in 7" Casing...........................................................................11

Table 2 – Corrected Downhole "Channel" Velocities .....................................................12

# Executive Summary

I have been asked to respond to the expert report of Dr. Andreas Momber titled "Erosion of Well Cement Due to Hydrocarbon Flow."  Dr. Momber makes **4 key statements** that are core to his opinions:

- Statement 1: The initial assumption made by Dr. Momber is there was set cement at the bottom of the well which would have provided resistance to flow.

  **Response**: Evidence presented in Phase 1 of the case clearly shows the cement in the Macondo well was **not set** at the time of the negative test.  As such, it was acting as a fluid and not a set material, and therefore could not have provided resistance to flow.  For the unset cement to have acted as any sort of barrier to flow in the well, as implied by Dr. Momber, is clearly in error.

- Statement 2: Momber contends the cement in the well would have impeded flow dramatically, and as flow continued over time, the cement would have been degraded.

  **Response:** As noted above, without the presence of set cement, there is no impediment to flow.  The cement slurry used in the Macondo well was incapable of providing an impediment to flow.

- Statement 3: Momber contends that the United States' expert reports ignore or misjudge the importance of cement erosion.

  **Response**:  The expert report of Dr. Griffiths addresses barriers in the well, and specifically notes that if the cement were to have been set, <u>or other barriers present in the well</u> (like the float collar) they would not have provided a barrier for any appreciable length of time.  <u>Dr. Momber ignores any other potential barriers</u> to restrict flow in the well like the float collar, and incorrectly assumes the only barrier would be due solely to the cement.

- Statement 4: Dr. Momber concludes the cement underwent a *4-step degradation scenario*.

  **Response**:  The erosion process proposed by Dr. Momber depends on work performed with <u>concrete</u> and not oil field cements.  There is a significant and important difference in the two materials.   Concrete has cement as a component of the blend, but also contains various aggregates that are quite large. Oil field cement slurries do not contain aggregates as they cannot be pumped by the equipment used to cement wells.   The concrete data referenced by Dr. Momber shows compressive strengths thousands of psi stronger than any cement in the Macondo well.

## Background and Credentials

In April 2011, I retired from ExxonMobil and began consulting in oil field cementing. Over my 36 year career, I have worked in every aspect of oil field cementing from shallow onshore wells to deep water applications globally. I served on the client advisory boards for Schlumberger and Halliburton. I have worked extensively with foamed cementing. I designed and managed the initial offshore application of foamed cement in Mobile Bay in 1995 and published a paper on the well in 1996.

I received a B.S. degree in chemistry from Southwestern Oklahoma State University in 1976. I also completed one year of graduate school coursework in Analytical Chemistry at Oklahoma State University.

In 1977, I began working for Dowell, a division of Dow Chemical, in the technical services lab in Tulsa, Oklahoma. In this position, I analyzed the composition of field samples of cement blends and was a liaison between the research lab and field operations. I later moved to the technical engineering and development group in Tulsa. In 1981, I transferred to Houston and worked as a regional cementing specialist. In 1986, I moved to New Orleans to become a division marketing specialist. In that position, I was in charge of the division laboratory and all cementing technical operations for the Gulf of Mexico.

In 1988, I moved to Mobil Oil in New Orleans and was part of the fluids team that managed drilling fluids, cementing, NPDES compliance and toxicity testing for the Gulf of Mexico drilling organization. I transferred to the Mobil E & P Technical Center group in Dallas in 1992 and served as a global cementing advisor. While at Mobil, I introduced foamed cementing technology to projects in Qatar, Angola, Germany and the east coast of Canada.

With the merger of Exxon and Mobil, I moved to Houston in 2000 to become the Senior Technical Advisor for cementing for ExxonMobil's global drilling operations. In 2009, I became the Drilling Training Manager for ExxonMobil and served in that position until my retirement in 2011.

Throughout my career I have attended over 30 industry schools covering cementing, drilling fluids, lost circulation, drilling practices and well control. I have authored over 20 technical papers, several of which have appeared in peer reviewed journals. While in New Orleans, I was on the board of directors of the American Association of Drilling Engineers (AADE) from 1989 until 1992 and served as AADE President from 1991 until 1992.

I have been a member of API Subcommittee 10 on Oil Well Cements since 1980 and served as its chairman from 2002 until 2005. I have served on and chaired numerous task groups on centralizers and completion fluids testing. I received the API Citation for Service in 2005. I chaired the task group on foamed cement for the ISO Technical Committee 67, Work Group 2 on cementing. ISO 10426-4 and its companion document, API RP 10B-4, are the results of this work.

I have been a member of the Society of Petroleum Engineers since 1977, and served as program and session chair for the SDPE/IADC International Drilling Conference from 1995 through 2004. I served as technical editor for the Journal of Petroleum Engineering for three years and have served as a technical editor for Drilling and Completion Journal since 2005. I received the SPE Outstanding Technical Editor Award for four years from 2007-2010.

I serve as a technical advisor for the Department of Energy, National Energy Testing Laboratory for evaluations of cement systems for $CO_2$ sequestration and for current research into foamed cement. I am also a charter member of the Wellbore Integrity Work Group for the International Energy Association, Greenhouse Gas R & D Program (IEAGHG). I have presented papers at the Greenhouse Gas Technology Conferences in Washington, D.C. and Amsterdam. Most recently I have given invited papers and presentations to the Groundwater Protection Council on wellbore integrity and industry best practices.

In the last four years I have been a witness in the Phase 1 of the Macondo case.

I understand that fact discovery in this case is ongoing. In light of that, or should relevant information otherwise become available to me, I reserve the right to revise or supplement these conclusions.

## Discussion

## 1.    INTRODUCTION

This report is an evaluation of the expert report of Andreas Momber with respect to the erosion of the primary cement placed on the 9 7/8 x 7" production string on the Macondo well.

The Momber expert report begins with the following key statement:

> "The evidence suggests that before the Macondo incident the bottom of the wellbore was filled with cement; cement filled much of the casing up to the float collar, and more cement filled part of the annulus around the lower portion of production casing."[1]

The entirety of Dr. Momber's report hinges on the validity of this assumptive statement.   Without the presence of set cement at the bottom of the wellbore, none of the statements made in the Momber report are valid, and the entire premise of the report is without merit.

Considering the cement as placed in the Macondo well was **NOT SET** at the time of the negative test, the arguments put forth by Dr. Momber are moot.   The evidence from Phase 1 demonstrated there was no set cement in the Macondo well to be eroded.

As stated in my expert report issued in Phase 1[2] as well as in the expert report of David G. Calvert,[3] BP's cement expert, the Macondo well cement was not set at the time of the negative test.   **This is further confirmed by the testimony of Mr. John Guide, the BP Wells Team Leader for the Macondo well, that the cement "obviously didn't set up."**[4]

Dr. Momber goes on to state:

> "At the start of the blowout, this column of 189 feet of cement in the bottom hole would have impeded the flow of oil dramatically. As flow continued over time, this cement would have been degraded through multiple processes, including cement erosion."[1]

At the start of the blowout, for the cement in the shoe track (the bottom 189 feet of pipe in the well) to have impeded the flow of the oil, the cement must have been set with measurable strength.   Evidence in Phase 1 clearly established that the cement was not set and had not formed a barrier in the well.

---

[1] Andreas Momber Expert Report, page 2

[2] TREX 05990 - Expert Report of Glen Benge

[3] TREX 22791 - Expert Report of David Calvert

[4] Testimony of John Guide, Page 8950 line 17 to 8951, line 10

In reviewing the Government's expert reports, Dr. Momber opines:

> "In fact, for the government experts' assumptions to be true, it would require one to believe that erosion rates at Macondo were many times greater than the highest reported rates for the erosion of cement mixtures."[5]

Dr. Momber states that for the government reports to be valid, erosion rates for set cement would be much higher than for the construction concrete mixtures noted in Dr. Momber's report.  The high rates characterized in the government reports, however, are not due to erosion, but the simple fact there was no set cement in the bottom of the Macondo well.

Finally, Dr. Momber attempts to justify his alternative multi-step erosion process based on comparative data with construction concretes.  Dr. Momber incorrectly selects cement strengths from the Chevron report that are not representative of the actual Macondo well, and of equal importance uses concrete erosion rates based on testing at flow rates that are *markedly lower* than those found at Macondo.

Based on my review of Dr. Momber's expert report, <u>actual data</u> on the cement from the well, and evaluation of the "data" reported by Dr. Momber, **it is my expert opinion the conclusions drawn by Dr. Momber are without merit and have no scientific basis.**

## 2.   <u>THE CEMENT WAS NOT SET AT THE TIME OF THE NEGATIVE TEST</u>

As reported in my Phase 1 expert report, the foamed and unfoamed cement placed in the Macondo well did not have an opportunity to set before the negative test was performed.  Laboratory data collected after the blow out demonstrated the sensitivity of the cement slurry to temperature, and showed the cement was not set at the time of the negative test.

Cement strength testing by Oilfield Testing and Consulting[6] showed the following results for the series of tests performed for the Joint Investigation Team:

| Slurry UCA-2 | | Slurry UCA-2B | |
|---|---|---|---|
| Conditioning ramp - 83 min to 135 | | Conditioning ramp - 230 min to 135 | |
| 50 psi | 15:22 | 50 psi | 16:32 |
| 500 psi | 16:33 | 500 psi | 17:42 |
| 12 hr. psi | 0 | 12 hr. psi | 0 |
| 24 hr. psi | 2,762 | 24 hr. psi | 2,794 |

---

[5] Andreas Momber Expert Report, page 2

[6] Report by Oilfield Testing and Consulting, August 1, 2011 TREX 5937

The conditioning ramp used by OT&C for the testing ramped to 135 F in 83 minutes and has a _total_ of 293 minutes or 4:53 of conditioning time prior to being placed in the Ultrasonic Cement Analyzer (UCA).   (The UCA is used for determination of cement strength.)   Likewise, the sample using the 230 minute heat up ramp would have a total of 450 minutes or 6:30 of total conditioning time prior to being placed in the UCA.

This means from the time the cement was initially mixed until it reached 50 psi of strength was over 20 hours for each of the tests. (20:15 and 23:02 respectively).

The Halliburton UCA testing performed at 210° F with the sample of cement containing 0.09 gallons per sack of SCR-100 retarder showed the following:[7]

| 50 psi | 8:12 |
| 500 psi | 8:40 |
| 12 hr. psi | 2,301 |

In the same laboratory report from Halliburton, tests on the foamed cement show **ZERO** compressive strength development until 48 hours.

For the cement to be considered set and acting as a barrier, it must be tested.   It is certain the cement was not acting as a barrier due to the failed negative test on the Macondo well.   The only logical explanation offered in this case is the cement was not set.[8]

## 3.   THE MOMBER REPORT MISREPRESENTS KEY DIFFERENCES IN CONSTRUCTION CONCRETE AND OIL FIELD CEMENT

Throughout his report, Dr. Momber sites a number of examples of erosion testing performed on various blends of concrete.[9]   This is trying to compare apples and oranges.   There is a key and critical difference in concrete used for construction purposes and oil well cement.

Oil well cements do not contain aggregate (large particle size rocks or sand) where construction concretes will contain these additives.   On pages 12 and 13 Dr. Momber identifies the Macondo cement system as containing sand, and concludes, through no testing at all, that the resulting slurry "must be considered pre-damaged."   Dr. Momber offers no testing, references or indeed any other information to support his statement.

Dr. Momber fails to note that the sand used for construction purposes has a very course particle size.   Construction sand is commonly divided into five categories depending on the size, ranging from very find sand of approximately 0.125 mm diameter to very course sand at 2mm.   The most common construction sand is medium sand with an average sand size of 0.5 mm.   The silica sand used in the Macondo slurry design is sold as "Oklahoma #1" which has an average particle size of less than 0.15 mm.   This difference of over 3 times in particle size has a significant impact on the properties of the final set material.

---

[7] HAL_0028709 - 0028710

[8] See TREX 05990 - Expert Report of Glen Benge, TREX 22761, Expert report of David Calvert and Testimony of John Guide, Page 8950 line 17 to 8951, line 10

[9] See, e.g., Momber Expert Report, page 13

To compare concrete testing of erosion rates to an oil well cement that is in the confined environment of a casing is without merit.  None of the references sited in Dr. Momber's report relate to the situation in the Macondo well.  Further Dr. Momber presents no calculations at all to support his theory.

Dr. Momber cites to the Chevron testing report and states typical compressive strength numbers for cement are 3,918 to 4,575 psi.  This is a gross overstatement of reality.

Dr. Momber has selected the two highest **final** strength tests found in the entirety of the Chevron testing.  Dr. Momber fails to note that three of the tests *in the same data table* showed **final** strengths less than 1,500 psi.[10]  Dr. Momber also fails to mention the Chevron strength results were obtained after the samples had been tested for 73 to 108 hours instead of less than 18 hours which would be representative of the actual conditions in the Macondo well.

By selecting the highest values reported by Chevron for any testing, and ignoring any data relevant to the actual time of the Macondo blow out, Dr. Momber has attempted to justify using his selected concrete references to compare erosion rates of concrete to oil well cements.[11]  Such a comparison is unjustified and unreliable.

## 4.    TABLE 4.1 OF THE MOMBER REPORT IS IRRELEVANT TO EROSION

In section 6 of Dr. Momber's report, he attempts to opine on the condition of the cement in the shoe track of the Macondo well.  At the top of page 6, Dr. Momber states:

> "The existence of flow channels in **deteriorated** cement is an established phenomenon in well systems." (emphasis added)

It is unclear, and goes unexplained, how Dr. Momber can determine that a cement system that was correctly mixed and placed in the well[12] could have deteriorated in under 24 hours.

Momber depends on the Bly report for potential faults in the Macondo cement.[13]  The Bly report quotes testing performed by Cementing Solutions Incorporated (CSI).  None of the CSI testing was done with any material from the Macondo well, or materials from Halliburton.  None of this data should be considered conclusive at all.

---

[10] See Table 4 - Chevron Report - October 26, 2010

[11] See, e,g, Momber Expert Report - Page 12

[12] Benge Expert Report, page 25

[13] Momber Expert Report, Page 6

Reproduced below, Table 4.1 in the Momber report is actually an excerpt from a paper on $CO_2$ impacts on cement and the resulting potential flow paths.

| | Situation | Image | Importance |
|---|---|---|---|
| 1 | Between cement and casing |  | Contact stresses; interface shrinkage; deteriorated bond |
| 2 | Between cement and casing |  | Contact stresses; interface shrinkage; deteriorated bond |
| 3 | Through the cement |  | Insufficient mixing; unfinished hydration; pore system; high permeability; degradation |
| 4 | Through the casing |  | Casing erosion (solid particle/slurry erosion) |
| 5 | Through fractures in cement |  | Cracked cement |
| 6 | Between cement and formation |  | Contact stresses cement/ rock, developed during cement slurry setting |

*Table 4.1: Possible flow paths in a deteriorated well; note situations 3 and 5[13]*

Dr. Momber has "adapted" this figure from a publication by Dr. Mike Celia in 2010 to illustrate potential flow paths. The figure by Dr. Celia is in fact from presentations that represent a core taken from a $CO_2$ flood where the well was exposed to the gas for over *30 years*. The figure has been in use since 2004, with versions published in 2005.[14]  Dr. Momber has added the third column to the table to justify his theory.

Of particular concern is his statement regarding situation 3 where he states the cause could potentially be "unfinished hydration."  The reference actually describes the situation as gas diffusion through the cement.  To claim a failure mechanism in a cement that is over 30 years old could be due to unfinished hydration is irrational and inapplicable to the Macondo well cement program.

The cement used on the Macondo production casing had been in place less than 24 hours prior to the blow out.  Situation 3 in the Momber report would have us believe that the cement had insufficient mixing, high permeability and degradation. This is simply not true.

The cement slurry used on the Macondo well was properly mixed as per the job design, and showed no indications of improper or insufficient mixing.[15]  I have reviewed the

---

[14] "Scherer, G. W., et al, "Leakage of $CO_2$ Through Abandoned Wells: Role of Corrosion of Cement." 2005, Elsevier Publishing

[15] HAL_0028665

actual Halliburton performance on location and can find no issues whatsoever with the mixing and pumping of the cement job on the Macondo well.[16]

Finally there has been no data presented on the permeability of the Macondo cement system, nor any work to show any degradation of the cement after it was in place.  To claim these mechanisms as faults in the Macondo well cement is unfounded.

# 5. MOMBER GROSSLY UNDERESTIMATES THE FLUID VELOCITIES AT MACONDO

On page 12, Dr. Momber notes he has investigated erosion of concrete materials at high-speed slurry rates at velocities of 180 ft./min.  For the Macondo well, this equates to a daily flow rate of 9,400 barrels per day.  There are no credible calculations that would put the flow rate anywhere near such a low rate.  There was no indication Dr. Momber considered the much higher flow velocities at the Macondo well in his analysis.

BP Phase 1 expert Morten Emilsen[17] opines at 21:42, the flow rate was approximately 26 to 27 stock tank barrels per minute (or approximately 38,000 stock tank barrels per day).

In his report, Emilsen[18] uses a conversion factor of 2.14 reservoir bbl / stock tank bbl. This means for every 1 bbl (42 gallons) at surface, at the reservoir, and of equal importance also in the shoe track, there would be a flow of 2.14 bbl.  Using this conversion factor, the flow at the reservoir would be 74,900 bbl/day.

To perform a comparison of velocities with more realistic information, I took the Emilsen flow rates in reservoir barrels and determined a fluid velocity for each case. The calculations use the full casing ID (inner diameter) of 6.094 inches, which is the ID of the 7" casing in the Macondo well.

The ID was converted into bbl/ft by using the equation[19]:

$$\text{Capacity (bbl/ft)} = ID^2 / 1029.4$$

Where ID is in inches.

This calculation gives the capacity of the 7" casing as 0.036 bbl/ft.

**Table 1** lists the calculations of flow velocities at the reservoir.  To ease reading, the velocities in ft/min have been converted to miles/hour using the equation:

$$\text{Velocity (miles/hour)} = \text{Velocity (ft/min)} * 60 \text{ (min/hr)} / 5280 \text{ (ft/mile)}$$

---

[16] Benge Expert Report, page 25

[17] TREX 40003 - Morten Emilsen Expert Report, October 17, 2011, Figure 3.33

[18] TREX-00001 Bly Report, Appendix W - Page vi

[19] Lapeyrouse, N. J.: Formulas and Calculations for Drilling, Production and Workover, Gulf Professional Publishing, Second Edition, 2002

| Flow (bbl/day) in stock tank barrels | Flow (bbl/day) at the reservoir | Fluid Velocity (ft/min) [at the reservoir] | Velocity (miles/hr) |
|---|---|---|---|
| 38,000 | 74,900 | 1,442 | 16.4 |
| 50,000 | 107,000 | 2,060 | 23.4 |
| 60,000 | 128,400 | 2,471 | 28.1 |

**Table 1 - Flow Velocities in 7" Casing**

By way of comparison, a flow rate of 180 ft/min, as noted in the Member report, is a comfortable walking pace which is approximately 2 miles per hour. The flow velocity in the Emilsen report of 38,000 stb/day (1442 ft/min) gives a flow velocity of 16.4 miles/hr. This means the _minimum_ flow velocity in the shoe track of the Macondo well _was over 8 times_ that used by Dr. Member for justifying the comparison with erosion rates in concrete.

It is also noted the above velocities are for flow across the **entire** area inside the 7" casing. There are no corrections for any reduction in flow area due to restrictions of any kind. As seen in the following section, any reduction in area dramatically increases the calculated velocities.

## 6.      THE CALCULATIONS IN APPENDIX A ARE MISLEADING

### 6.1.      Flow Rates and Channel Size:

In Appendix A of his report, Dr. Member goes through a series of calculations to solve a flow channel size based on assumptions of fluid viscosities, pressure drops and flow rates. On page 23, Dr. Member uses a conversion factor of 2.36 reservoir barrels per stock tank barrel. Even with this conversion in hand, he continues to use the stock tank barrel flow rate to under estimate the flow at the bottom of the well, where clearly the rates would be much higher.

Member further alters terms in his calculations to adjust the productivity index (PI) for his calculations. To determine the pressure drop from Darcy flow, he assumes the entire reservoir is open for flow. He then changes to a different PI for calculation of pressure bottom hole pressures. The confusing part of the calculation is both of these PI calculations are made for the exact same point in time (21:30).

Even assuming the flow rate is correct, which it is not, the calculated flow area through the cement reported by Dr. Member was 2.17 inches at 12 stb/min and 2.64 inches at a flow rate of 27stb/min.  Using the same calculations to calculate the flow velocities above, I applied Dr. Member's conversion factor of 2.36 reservoir bbl / stock tank bbl, to determine the flow velocities through the channels calculated by Dr. Member in Appendix A. The results are shown in **Table 2** below. The data shows flow velocities exceeding 100 miles/hour.

| Flow Rate (stb/min) | Flow Rate (Reservoir bbl/min) | Channel Size = 2.17 inches | | Channel Size = 2.64 inches | |
|---|---|---|---|---|---|
| | | Velocity (ft/min) | Velocity (mph) | Velocity (ft/min) | Velocity (mph) |
| 12 | 28.3 | 6,191 | 48 | | |
| 27 | 63.7 | | | 9,411 | 107 |

**Table 2 - Corrected Downhole "Channel" Velocities[20]**

## 6.2.    Pressure Drops

Dr. Momber assumes the entirety of the pressure drop in the well is due solely to a cement channel in the shoe track. He fails to consider the restrictions provided by the float collar or any other down hole equipment. He further assumes no pressure drop in the annulus of the well.

Additionally Dr. Momber does not acknowledge the increase in reservoir exposed pay that was postulated by Emilsen[21] from an increased pressure drop resulting from a pump shut down, not simply an erosion process.

The Emilsen report notes between 21:08 and 21:14 there was a pressure increase of 200 psi with the pumps shut down, which required flow through the casing shoe to model. Momber does not acknowledge this event in his report or state how this would have impacted the supposed erosion in the shoe track cement.

## 6.3.    Appendix A Summary

Appendix A simply applies the assumed flow rates and pressure drops to calculate a channel size. There is no attempt in the appendix to provide any calculation on erosion rates. The appendix is simply a calculation of flow diameter based on assumed flow rates from Emilsen, and further assuming the full pressure drop in the well occurs in the 189 ft. shoe track. This is equivalent of simply calculating the size of a 189 foot long pipe that would give a pressure drop equivalent to his assumptions.

## 7.    <u>NO SUPPORTING DATA IS OFFERED FOR ANY CONCLUSIONS</u>

Dr. Momber gives three calculations in the body of his report, one for the volume of cement and two to calculate the apparent erosion rate from review of the two expert reports for the United States. These calculations are presented merely to illustrate the erosion rates are higher than those found in construction concretes which were tested at flow rates considerably lower than those in the Macondo well.

---

[20] Momber Expert Report – Appendix A

[21] See Emilsen - page viii

Nowhere does Dr. Momber opine as to the impact on flow rates based on the "alternative multi-step scenario," in which Dr. Momber introduces an alternative scenario consisting of four steps.[22]

In the alternative scenario, Dr. Momber introduces a "threshold period" that apparently relates to an initial 20 bbl influx taken at the time of the negative test.  This is quickly followed by an "initial period" which is defined "*by a rapid increase in flow-path area*".  He does not discuss or even reference the *2,000 bbl* of flow taken during the next 41 minutes or its impact on the erosion rate.

Dr. Momber has done no testing, nor offered any scientific rigor to support his alternate scenario or conclusions.

**Dr. Momber has misrepresented the following to make his conclusions**:

- The cement in the Macondo well was set at the time of the negative test.  **It was not.**

- Compressive strengths of the cement were on par with construction concrete samples that had been cured for 28 days.  **They are not.**

- Potential flow paths of $CO_2$ are representative of the Macondo well.  **They are not.**

- Failure mechanisms of a 30 year old well include incomplete hydration of the cement.  **They do not.**

- Flow velocities of 180 ft/min are comparable to those from *eight to fifty times higher.*  **They are not.**

## Conclusion

Based on my review of Dr. Momber's expert report, the <u>actual data</u> on cement from the well, and evaluation of the "data" reported by Dr. Momber, **it is my expert opinion the conclusions drawn by Dr. Momber are without merit and have no scientific basis.**

---

[22] See Momber Expert Report, page 16

## Appendix A - Information Required by Federal Rules of Civil Procedure

The following is a list of the items required by the Federal Rules of Civil Procedure:

1. This report contains my opinions, conclusions and the reasons therefore;

2. A statement of my qualifications is contained in Appendix B;

3. My compensation for the preparation of this report is included in Appendix C;

4. The data or other information I considered in forming my opinions is listed in the Documents Reviewed and References sections of Appendix D.

5. I have testified as an expert at deposition and trial only in the current case, In Re: Oil Spill by the Oil Rig "DEEPWATER HORIZON" in the Gulf of Mexico, on April 20, 2010, MDL NO. 2179.

## Appendix B - Curriculum Vitae of Glen Benge

### GLEN BENGE

**Employment Overview:**

- Involved with all aspects of the development, coordination and implementation of oil field cementing services for global drilling operations for ExxonMobil.
- Subject matter expert in all facets of oil field cementing including laboratory and job design, equipment and field operations, and cement logging evaluation.
- Authored numerous technical papers on oil field cementing.

**Employment Experience:**

**April 2011 - Present**                    Consultant - Oil Field Cementing

**January 2009 - March 2011**          Drilling Training Manager, ExxonMobil – Houston, TX

- Manage training curriculum and schools for global drilling organization.
- Coordinate and develop schools to address current and future business needs, assuring sufficient personnel are trained for specific future operations.  Identify and mentor future technical trainers.
- Develop competency framework to assimilate new hire personnel into drilling throughout the global organization, including partner affiliates (UAE, Qatar, Angola and others).
- Serve as ExxonMobil Drilling representative for $CO_2$ – Carbon Capture and Sequestration issues.

**January 2000 - January 2009**        Senior Technical Advisor, ExxonMobil – Houston, TX

- Subject matter expert for ExxonMobil's global drilling operations in cementing. Responsibilities included global operations support, and the development of internal technical standards, reference documents and training materials.
- Senior Technical Advisor for cementing to Drilling Management.  Served as client advisor to the three major cementing Service Companies.  Set ExxonMobil expectations for cementing Service Providers, provided direction for procurement of cementing services and materials, and evaluated tenders for drilling and production.
- Served as corporate contact for cementing related issues on industry and government committees.  Acted as technical advisor to the industry and government groups.

**July 1992 - January 2000**          Engineering Advisor - Fluids Team Lead, Mobil – Dallas, TX
- Coordinated fluids group in Well Construction and Completions for Mobil Exploration & Production Technical Center.
- Provided technical expertise in fluids for Mobil worldwide drilling operations.
- Managed internal and external cementing research and development projects.
- Coordinated cement system design and evaluation, equipment selection and cement job performance for Mobil drilling.
- Functioned as a liaison between cementing Service Companies and Mobil.
- Designed and executed first offshore foamed cement job for Mobil in Gulf of Mexico, Mobile Bay operations.
- Introduced foamed cement use on wells in Germany and HTHP (high temperature high pressure) wells for offshore operations in Qatar and Nova Scotia.

**February 1988 - July 1992**   Senior Drilling Fluids Specialist, Mobil - New Orleans, LA.
- Managed the cementing business for Mobil, Gulf of Mexico Drilling.
- Developed Mobil operational and laboratory guidelines and cementing policies.
- Monitored EPA requirements for NPDES discharges and mud toxicity compliance testing.  Coordinated efforts with environmental groups internal and external to Mobil.

**1977 - 1988**                  Dowell Schlumberger, New Orleans, Houston and Tulsa
- Division Technical Specialist for offshore Gulf of Mexico and inland water cementing operations.
- Manager of the offshore division testing laboratory.  Coordinated research and marketing plans to address the technical needs of the offshore and inland marine cementing operations.
- Developed cementing marketing plans for Southern Region of Dowell Schlumberger, which covered the Gulf Coast and all offshore operations.  Responsibilities included trend analysis, equipment and personnel deployment and market share evaluation.
- Worked in laboratory and engineering functions with Dowell in Tulsa.  Managed introduction of new cementing materials and services to field operations.  Coordinated efforts in technical writing of internal and client training schools and sales literature.  Evaluated equipment and technical requirements for new services and developed ultra lightweight cementing capabilities for Dowell.

**Education:**

BS, Chemistry, Cum Laude, Southwestern Oklahoma State University, Weatherford, OK

Course work toward Masters, Analytical Chemistry, Oklahoma State University

Continuing education through industry, Mobil and ExxonMobil.  (25 + schools)

**Professional Activities:**

President, New Orleans Chapter, American Association of Drilling Engineers, 1991 - 1992,

    Board of Directors, 1989 - 1992

Member, American Petroleum Institute (API) Committees 10 & 13 - 1980 to present

    Chairman, API Sub-Committee 10 on Oil Well Cements - 2002 - 2005

    Chairman, Task Group on Centralizers - API Spec 10 B

    Chairman, Work Group on Completion Fluids - API RP 13J

    API Citation for Service - 2005

Member, ISO Subcommittee 3, Technical Committee 67, Work Group 2

Member, Society of Petroleum Engineers (SPE) – 1978 to present

Member, Program Committee and Session Chairman, SPE/IADC Drilling Conferences, 1995-2004

Technical Editor - Journal of Petroleum Technology - 2003 - 2005

Technical Editor - SPE Drilling and Completion - 2003 to present

    SPE Outstanding Technical Editor Award - 2007, 2008, 2009 and 2010


**Publications:**                                **\* Denotes Peer Reviewed Journal**

Bannister, C. E. and Benge, O.G.: "Pipe Flow Rheometry: Rheological Analysis of a Turbulent Flow System for Cement Placement,"  SPE 10216, 1981.

Benge, O. G., Jones, R. R. , Dresher, T. D., and Dolan, R. T.,: "A New Low Cost Permafrost Cementing System," SPE 10757, 1982.

Benge, O. G., Spangle, L. B. and Sauer, C. W. : "Foamed Cement - Solving Old Problems with a New Technique," SPE 11204, 1982.

Abbott, R., Benge, G., Elbel, J., Jeffrey, R., Klarfeld, D. and Naylor, J. : "Deep Well Evaluation and Completion," Drilling, July 1983.

Edmondson, T. D. and Benge, O. G. : "A Case Study of Ultralightweight Cementing Practices in the Northeastern United States," SPE 12318, 1983.

Cementing Technology, Nova Communications LTD, London, Dowell Schlumberger copyright 1984, co-author and co-editor.

Bannister, C. E, Marcinew, R. P. and Benge, O. G., : "Critical Design Parameters to Prevent Gas Invasion During Cementing Operations," CIM Paper No. 84-35-106, 1984.

Benge O. G., "Field Study of Offshore Cement Spacer Mixing," SPE 19864, 1989. Published in **SPE Drilling Engineering\***, September 1990.

Tilghman, S. E., Benge O. G. and George, C. R., : "Temperature Data for Optimizing Cementing Operations," IADC / SPE 19939, 1990.  Published in **SPE Drilling Engineering\***, June 1991.

Benge, O. G., "A New Technique for Evaluating Field Cement Mixing," IADC / SPE 27522, 1994.  Published in **SPE Drilling & Completion\***, June 1995.

Benge, O. G. and Webster, W.W., "Evaluation of Blast Furnace Slag Slurries for Oil Field Application," IADC/SPE 27449, 1994.

Benge, O. G. and Webster, W. W., "Blast Furnace Slag Slurries may have limits for Oil Field Use," Oil & Gas Journal, July 18, 1994.

Benge, Glen, McDermott, Jim R., Langlinais, Joey C. and Griffith, James E., "Foamed cement job successful in deep HTHP offshore well," Oil & Gas Journal, March 11, 1996.

Judge, Robert A, and Benge, Glen, "Advances in Metering and Control Technology Improves Design and Execution of Foamed Cement Jobs,"  IADC / SPE 47831, 1998.

Deeg, Wolfgang, Griffin, James, Crook, Ron and Benge, Glen,  "How foamed cement advantages extend to hydraulic fracturing operations," World Oil, November 1999.

Ron Crook, Ronnie Faul, Glen Benge, and Richard Jones, "Eight Ways to Help Ensure a Successful Cement Job," World Oil, July, 2001.

Benge, Glen and Dew, Ed, "Meeting the Challenges in Design and Execution of Two High Rate Acid Gas Injection Wells," SPE / IADC 91861, 2004.  Published in **SPE Drilling & Completion\***, Sept. 2006.

Benge, Glen and Poole, David, "Use of Foamed Cement in Deep Water Angola," SPE/IADC 91662, 2004.

Benge, Glen, Carruthers, Bill, Gardner, Craig, "New program enhances API monogram," Oil & Gas Journal, September 2004.

Benge, G., Darby, J., Peroyea, M., Aguilar. T, Mueller, D and Doherty, D., "Deep Gas-Well Cementation: A Review of Risks and Design Basis for Use of a Liquid Cement Premix for Large Offshore Cementing Operations" SPE/IADC 98970, 2006.

Benge, Glen, "Improving Wellbore Seal Integrity in $CO_2$ Injection Wells," Greenhouse Gas Technology Conference - 9, Washington D.C., 2008.

Benge, Glen, "Improving Wellbore Seal Integrity in $CO_2$ Injection Wells," SPE / IADC 119267, 2009.

Benge, Glen, Khatri, Deepak and Lockwich, Brian, "Design Process for Sustainable Long-Term Wellbore Integrity" Groundwater Protection Council, Annual Forum, September 2012

## Appendix C - Statement of Compensation

I have been compensated at a rate of $225 per hour for my services to the United States Department of Justice (USDOJ) in this matter.  For any deposition or trial testimony the USDOJ will compensate me at a rate of $375 per hour.

## Appendix D - Documents Considered

The information reviewed for the development of this report includes:

Expert Report of Andreas Momber, May 1, 2013

Expert Report of Stewart K. Griffiths, March 22, 2013

Expert Report of Ronald C. Dykhuizen, PhD., March 22, 2013

Report by Oilfield Testing and Consulting, August 1, 2011

Expert Report of Morten Emilsen, October 17, 2011

Trial Testimony of Morten Emilsen

Trial Testimony of John Guide

Expert Report of Glen Benge, August 26, 2011 (TREX-05990) (including Consideration Materials)

Expert Report of David Calvert, October 14, 2011 (TREX-22761)

Halliburton Post Job Report, April 20, 2010

*Deepwater Horizon* Accident Investigation Report, BP, September 8, 2010 (TREX-00001 and TREX-00002)

Duiguid, Andrew and Tombari, John, "Technologies for Measuring Well Integrity in a $CO_2$ Field, "Sixth annual conference on Carbon Capture and Sequestration, May 2007

Guthrie, George, "Science-Based Risk Assessment of Wellbores in a $CO_2$ Storage System," American Geophysical Union, Fall Meeting 2008

Benge, Glen, McDermott, Jim R., Langlinais, Joey C. and Griffith, James E., "Foamed cement job successful in deep HTHP offshore well," *Oil & Gas Journal*, March 11, 1996

Benge, Glen, "Improving Wellbore Seal Integrity in $CO_2$ Injection Wells," Greenhouse Gas Technology Conference - 9, Washington D.C., 2008.

Benge, O. G., Spangle, L. B. and Sauer, C. W., "Foamed Cement - Solving Old Problems with a New Technique," paper SPE 11204, 1982

Economides, M. J., Watters, L. T., and Dunn-Norman, S., Petroleum Well Construction, West Sussex, England, John Wiley & Sons Ltd., 1998

Halliburton Redbook™ Engineering Tables, 2001

Lapeyrouse, N. J.: Formulas and Calculations for Drilling, Production and Workover, Gulf Professional Publishing, Second Edition, 2002

Nelson, E. B. and Guillot, D, Well Cementing, Second Edition, Sugarland Texas, Schlumberger, 2006

Stewart, R. B. and Schouten, F. C., "Gas Invasion and Migration in Cemented Annuli: Causes and Cures," SPE Drilling Engineering, March 1998

Scherer, George W. et.al., "Leakage of $CO_2$ Through Abandoned Wells: Role of Corrosion of Cement," Carbon Dioxide Capture for Storage in Deep Geologic Formations, Volume 2, D. C. Thomas and S. M. Benson (Eds.) 2005, Elsevier Ltd.

# EXHIBIT 11

(DOCUMENT CONFIDENTIAL –

REQUEST TO FILE EXHIBIT UNDER SEAL)

# EXHIBIT 12

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: OIL SPILL by the OIL RIG<br>"DEEPWATER HORIZON" in the<br>GULF OF MEXICO,<br>on APRIL 20, 2010 | MDL No. 2179 |
| | Section: J |
| Applies to: | The Honorable Judge Barbier<br>Mag. Judge Shushan |
| ALL CASES and<br>2:10-cv-02771 | |

## REBUTTAL EXPERT REPORT OF DR. KRIS RAVI
## TO THE REPORT OF RONALD J. CROOK REGARDING CEMENTING ISSUES

### January 30, 2012

CONFIDENTIAL

## TABLE OF CONTENTS

A.   EXECUTIVE SUMMARY.................................................................................3

B.   DR. RAVI'S EXPECTED OPINIONS...........................................................8

    I.   BP HAD THE FINAL SAY IN THE DESIGN OF THE CEMENT SLURRY USED ON THE PRODUCTION CASING CEMENT JOB AT THE MACONDO WELL..........................................................................................................8

    II.   FOAM CEMENT WAS A PROPER CHOICE FOR THE MACONDO WELL......................11

    III.   THE CEMENT SLURRY PUMPED ON THE MACONDO PRODUCTION CASING JOB WAS ADEQUATELY DESIGNED..........................................................................11

    IV.   TESTING OF THE CEMENT SLURRY PUMPED ON THE MACONDO PRODUCTION CASING JOB SHOWED THAT THE SLURRY WAS STABLE...........................................14

    V.   BP'S OPERATIONAL DECISIONS PLACED CONSTRAINTS ON THE FOAM CEMENT JOB PUMPED AT MACONDO THAT UNDERMINED ITS ABILITY TO ISOLATE THE HYDROCARBON ZONES IN THE WELL.....................................................................21

    VI.   BP DID NOT SUFFICIENTLY "VERIFY" THE INTEGRITY OF THE PRIMARY CEMENT JOB OR "CONFIRM" TOP OF CEMENT...........................................................25

    VII.   BP'S FAILURE TO ADEQUATELY CIRCULATE MUD AHEAD OF THE CEMENT JOB AND FAILURE TO ADEQUATELY CENTRALIZE THE PRODUCTION CASING DID CONTRIBUTE TO THE BLOWOUT.......................................................................27

    VIII.   RESPONSE TO BP'S WAIT ON CEMENT (WOC) ARGUMENT.................................31

## EXECUTIVE SUMMARY

I have been asked to respond to the expert report of Ronald J. Crook.[1]  Mr. Crook, in his executive summary, expresses eight primary opinions, as well as a number of other opinions in the body of his report in support of his eight primary opinions.  My general responses to Mr. Crook's eight primary opinions are summarized below, and these general responses are developed more fully with specific responses in the body of my rebuttal report.

**Mr. Crook's Opinion #1:**  Although operators are responsible for the construction of the well, they rely on industry contractors to perform skilled services.  In particular, operators such as BP rely on cement contractors such as Halliburton to design and test the cement slurry, and to design and execute the cement job.

> **General Response:**  Service companies, such as Halliburton, depend on the operator, such as BP, to clearly outline the objectives of the well and to timely provide all the data needed to recommend the cement slurry formulation, placement and execution procedure. However, ultimately, the operator holds the final authority, and the responsibility to review, approve, implement the recommendations, evaluate the results and plan subsequent well operations safely.[2]

**Mr. Crook's Opinion #2:**  The use of a properly designed-and-tested foam cement was appropriate for the Macondo Well.  A foam cement would assist in displacing the mud out of the wellbore and mitigating any potential gas flow.

> **General Response:**  I agree with Mr. Crook's opinion that appropriately designed and tested foam cement was appropriate for the Macondo well.  However, not following industry best practices for centralization and pre-job mud circulation places even a properly designed and placed foam cement job at risk of not being able to successfully isolate potential hydrocarbon bearing zones and mitigate potential gas flow.  In addition, the well must be drilled and the casing must be placed effectively to minimize the risks to a successful primary cement job.  The way that the Macondo well was drilled and the way that the production casing was placed posed a number of risks to the primary cement job that potentially undermined the goal of isolating hydrocarbons in the well.  Further, BP's well operations following the primary cement job did not appear to take these risks into account.

**Mr. Crook's Opinion #3:**  Halliburton's use of a defoamer and dispersants in the slurry design is contrary to best practices.

> **General Response:**  The cement slurry additives are designed to meet certain objectives.  Their properties can be tuned to meet those objectives.  However, looking at each cement blend additive in isolation will not help understand how the cement slurry as a whole (with multiple additives blended) will perform.  It is laboratory testing of the slurry, with all the additives present that determines whether slurry specifications are met and

---

[1]  I am a Halliburton employee, and am not being retained or compensated for my opinion in this matter.  I have not previously served as an expert in any prior case.

[2]  *See, e.g.,* MDL Litigation Exs. 2038 and 818 (BP requesting its in-house cementing engineer to provide advice regarding the Macondo well cement job).

whether certain effects of additives are properly counterbalanced by other additives. For example, whether ZoneSealant 2000 effectively counteracts the defoaming effect of D-Air 3000 is tested by foaming the entire slurry with the defoamer blended and testing the slurry's stability. The Macondo slurry (with all additives included) was subjected to a foam stability test, and the test demonstrates that this slurry, with all additives, was capable of being foamed and was stable.[3] The mere presence of D-Air 3000 does not make the slurry incapable of being foamed. Nor does the mere presence of D-Air 3000 renders the slurry unstable.

**Mr. Crook's Opinion #4:** Although foam tests should have been conducted on the slurry formulation that was pumped at the Macondo Well, Halliburton did not run those tests. Available pre-incident testing by Halliburton shows that the slurry design exhibited signs of settling and foam instability. Post-incident testing by various laboratories confirmed the pre-incident testing results showing slurry instability.

> **General Response:** The decision to change the retarder concentration was done by BP at the last minute, 48 hours before the cement job was supposed to be pumped.[4] It was the decision of BP to accept the risks of proceeding with the cement job without having the foam stability test results on the slurry with an additional .01 gps of retarder. Nevertheless, the final April foam stability test (on a slurry containing .08 gps of retarder) shows that the set foamed cement density is the same at the top and bottom of the set foam cement sample, demonstrating that the slurry was stable.[5] I do not believe that this foam stability test result would change with the addition of only .01 gps of additional retarder. Further, the only completed post-incident foam stability test using the actual rig cement blend was the unset foam stability test conducted by OTC on the "MAC4" sample, with 0.09 gps of retarder.[6] Even though the MAC4 sample was more than a year old, that test showed that the slurry was stable according to the API criteria.[7] All of the post-incident testing relied upon by Mr. Crook to assert that the Macondo slurry was unstable was conducted on non-representative, non-rig samples.

**Mr. Crook's Opinion #5:** The design of the cementing program appears to be adequate. Sufficient cement was used to cement above the designated hydrocarbon zones and sufficient spacer was pumped before the cement. The pump rates were adequate based on the well conditions.

> **General Response:** BP did not accept HESI's recommendations regarding the number of centralizers and proper wellbore cleaning prior to the cement job, both of which contributed to mud channeling and fluid influx from the formation. BP did not disclose all the hydrocarbon bearing formations with significant pore pressure. BP did not meet the MMS requirement of placing cement at least 500 feet above the highest hydrocarbon

---

[3] *See* MDL Litigation Ex. 4566 at HAL_DOJ_0000042.

[4] *See* MDL Litigation Ex. 5567.

[5] *See* MDL Litigation Ex. 4566 at HAL_DOJ_0000042.

[6] *See* MDL Litigation Exs. 5937, 5939 (Oilfield Testing & Consulting tests for Joint Investigation Team); *see also* G. Garrison Dep. at 176:7-23.

[7] *See* G. Garrison Dep. at 207:9-13.

bearing zone, nor its own internal requirement of placing 1,000 feet of cement above the highest permeable zone.

**Mr. Crook's Opinion #6:**   The execution of the cement job appears to have been adequate. Halliburton reported full returns, plugs bumping on time, lift pressure and floats holding.   A wireline tool would not typically be run to check top of cement in such a situation.

> **General Response:**   The execution of the cement job was adequate, and the cement slurry was pumped as planned.   However, BP operations prior to pumping the cement slurry presented significant challenges to the success of the primary cement job.   For example, BP had difficulty running the casing to the bottom of the well, and attempted to convert the float collar by pressuring up nine times and ultimately pressured up to 3,142 psi before circulation was established.[8]   The float collar was supposed to be converted at 400 to 700 psi using a higher flow rate to induce the needed pressure differential to convert.[9]   I believe that BP's application of this significantly higher pressure probably damaged the float collar and/or the shoe track below the float collar, making the final placement of the cement uncertain due to a breach below the float collar.   This was a contributing factor to why the otherwise stable foam cement pumped at the Macondo well did not achieve its goal of isolating hydrocarbon zones in the well.   Also, the densities of the fluids (drilling mud, spacer, and cement slurry) pumped were close to each other, within 0.3 lb/gal.[10]   Hence the very low lift pressure that was observed at the end of the cement job was insufficient to rely on for determining the top of cement (TOC) or proper placement of the cement.   Even BP's internal documents warn against relying on the lift pressure when the densities of the fluids are within 1.67 lb/gal (0.2 S.G).[11]   Since the density differences between the fluids pumped were very small on the Macondo well, there would not have been measurable back flow of fluids even if the float valves were damaged or open.   Also, the main reservoir zone (M56E), 71 feet thick, and another reservoir (M56F) about 21 feet thick, were _below_ the float collar.[12]   I find this to be very unusual.   It is against BP's best practices.   Even if BP wanted to evaluate the cement against these reservoirs, they would not have been able to do so as the wireline tool would not have reached these zones due to the placement of the float collar above them. More importantly, as I believe that there was a probable breach in the shoe track below the float collar, the bottom-most reservoirs gave hydrocarbons direct access inside the casing to the float collar, which is not a gas tight barrier.   I explain in the body of my report the significance of this improper well design on the cause of the blowout.

> It is important to evaluate the success of a primary cement job.   HESI can predict slurry performance through laboratory testing and can predict cement placement through OptiCem modeling.   But in the end, these are just predictions.   It is critical that the

---

[8] *See* MDL Litigation Ex. 5993 at HAL_0028667-668.

[9] *See* MDL Litigation Ex. 2562 at WFT-MDL-00020469.

[10] *See* MDL Litigation Ex. 4511 at p. 6.

[11] *See* MDL Litigation Ex. 184, Sec. 5.3.2   (BP's GP 10-60, "*Zonal Isolation Requirements during Drilling Operations and Well Abandonment and Suspension*").

[12] *See* MDL Litigation Ex. 3533 at BP-HZN-BLY00082909.

operator perform its job of "confirming" placement and integrity of the primary cement after it is pumped. The result of a primary cement job that does not isolate hydrocarbon zones is usually pressure on the annulus and/or pre-mature water production, and these situations are usually solved by remedial cementing (squeeze jobs). It does not appear to me that BP conducted sufficient operations to "confirm" the placement and integrity of the primary cement job such that, with the well still under control, HESI could perform a remedial cement job.

**Mr. Crook's Opinion #7:** The decisions to use less centralizers and circulate less than a bottoms up are consistent with industry practice. This practice may increase the likelihood of channeling. However, based on the undisputed flow path of the hydrocarbons, these decisions did not contribute to the incident.

> **General Response:** In rare circumstances, well conditions may force an operator to use less centralizers and less than a full bottoms up circulation prior to the cement job. However, under these conditions, an operator consistently understands the risks of such decisions and evaluates the success of the primary cement job even more carefully. If necessary, the operator conducts a remedial cement job and proceeds with more caution and utmost safety in conducting subsequent well operations.
>
> I do not agree with Mr. Crook that the flow path of the hydrocarbons at the Macondo well is "undisputed." BP's nine attempts to convert the float collar, and application of 3,142 psi of pressure to achieve circulation where specifications on the float collar called for float conversion at 400 to 700 psi,[13] probably created a breach in the shoe track below the float collar. The pressure following the attempt to convert the float collar was much lower than expected,[14] and a BP engineer remarked that "Yah we blew it at 3140, still not sure what we blew yet."[15] Thus, it is likely that there was a breach below the float collar during the attempted float conversion, as evidenced by the lower than expected circulating pressure after the last attempt. That lower circulating pressure indicates that circulation was flowing through an additional hole or breach in the shoe track casing. This means that the cement job was conducted without a competent shoe track, and there was mostly mud below the breach. This probably provided a direct access for the hydrocarbons to the inside of the casing, for a portion of the reservoir from 18,217 feet to 18,238 feet, below the float collar. While no one can know for sure what happened without drilling out all the cement and the shoe track at the bottom of the well, I reach this conclusion based on the empirical data that I have examined.
>
> Moreover, such flow path is in direct agreement with the flow path simulated by the OLGA model developed by BP's expert, Add Energy.[16] There should have been competent cement above the breach, in agreement with OLGA model, but with mud channels due to less than optimal centralization and less than optimal well circulation.

---

[13] *See* MDL Litigation Ex. 2562 at WFT-MDL-00020469; *see also* Ex. 5993.

[14] *See* MDL Litigation Ex. 5993 at HAL_0028668.

[15] *See* MDL Litigation Ex. 2586 at WFT-MDL-00017597.

[16] *See* MDL Litigation Ex. 7920 (Dynamic Simulations: Deepwater Horizon Incident, August 2010).

I do not agree with Mr. Crook that BP's decisions regarding centralizers and pre-cement job circulation "did not contribute to the incident."[17]  It is likely that the 7 inch casing collapsed close to the previous (9 5/8" liner) shoe after the hydrocarbons entered the inside of the casing due to the pressure differential between the inside and outside of the casing.   The lack of centralization higher in the annulus almost certainly created channeling.  Once a pressure differential caused a casing collapse higher in the annulus, additional hydrocarbons from sands in this uncentralized area likely flowed into the casing through the breach in the casing.  This area of casing collapse was likely close to but below the previous 9 5/8" shoe located at 17,168 feet.  A collapse at this location is corroborated by the report from Vector Magnetics to BP during post-incident attempts to intercept and kill the well.  The modeling used by Vector Magnetics when it deployed its ranging tool to intercept the Macondo well encountered an "end of pipe" anomaly which Vector Magnetics said could be explained by a physical parting of the casing just below the previous shoe.[18]  This casing collapse probably provided another flow path for hydrocarbons to the inside of the casing, and the presence of mud channels higher in the annulus due to insufficient centralization enabled an influx of additional formation fluid to enter the annulus and casing, contributing to the blowout.

**Mr. Crook's Opinion #8:**  Based on information available before and from the cement job, the cement should have set in the sixteen hours before the negative pressure test based on Halliburton's lab test results provided to BP.

> **General Response:**  I agree with Mr. Crook that the cement likely set within 16 hours of being pumped, assuming that the cement slurry was not in any way prevented from setting by operations conducted on the well prior to and after the primary cementing job. Zonal isolation by set cement also assumes that the cement was actually placed where it was planned to be placed.  The well had not been circulated for three days when the casing was run and set at 18,304 feet.  When mud is left without circulation for such a long period of time, exposed to the permeable formation to which it loses fluid, the mud gel strength increases.  It is important to circulate the well before cementing, especially when the well has been left static for such a long period of time and when the debris is present in the well as evidenced by the difficulties in float conversion. The cement slurry volume pumped in the Macondo well was small by design.  This increased the risk of contamination with mud, especially, when the well had not been fully circulated.  BP did not take into account all the risks associated with the events occurring before the cement job in evaluating how long to wait on cement before proceedings with subsequent well operations.  Operators generally tend to wait on cement 24 to 72 hours before continuing with subsequent well operations.  This extended waiting period increases the chances that a slurry contaminated with mud due to poor placement procedure might still set.

---

[17] *See* MDL Litigation Ex. 6221 (BP's in-house cementing engineer remarked after the Incident: "I've suspected all along with the lack of centralization small volumes likelihood of mud contamination we would have had nitrogen breakout. However this should only matter if the kick came from the annular side, if its come through the floats I'm less convinced nitrogen breakout alone is the issue.").

[18] *See* MDL Litigation Ex. 3363 (Vector Magnetics Report): *see also* D. Winters Dep. at 135:14-147:18; MDL Litigation Ex. 3364;  MDL Litigation Ex. 3360; MDL Litigation Ex. 3361; MDL Litigation Ex. 3357; MDL Litigation Ex. 3358.

## DR. RAVI'S EXPECTED OPINIONS

In his report, Mr. Crook expresses a number of opinions, and many of those opinions (both what I consider to be his eight primary opinions as well as other opinions expressed in support of those primary opinions) are intertwined throughout the report. To assist the Court in understanding the points to which I am responding, I have tried to identify the opinions to which I am responding by citing the page number or numbers of Mr. Crook's report where they are found.

I. **BP HAD THE FINAL SAY IN THE DESIGN OF THE CEMENT SLURRY USED ON THE PRODUCTION CASING CEMENT JOB AT THE MACONDO WELL.**

**(Crook Report, Pages 8-10) – opining on the relationship between operator and cement service contractor.**

Service companies such as Halliburton depend on operators such as BP to clearly outline the objectives of the well and to timely provide all the data necessary to be able to recommend a cement slurry formulation, and to recommend a placement and execution procedure to put that cement slurry into place in the well. However, ultimately, the operator holds the final authority and the responsibility to review, approve, and implement the recommendations; to evaluate the results of testing and modeling; to confirm predictions made by testing and modeling after the cement is pumped; and to plan subsequent well operations safely.

This is consistent with the contract provisions between BP and HESI. According to the contract between BP and HESI, HESI must comply with BP's instructions and directions regarding any work performed by HESI on the Macondo well. Section 4.4 of that contract states: "Except to the extent that it may be illegal or physically impossible or create a hazard to safety [HESI] shall comply with [BP's] instructions and directions on all matters relating to the WORK."[19]

Furthermore, BP treats any recommendations or predictions of results provided by HESI as "opinions only." Sec. 29.3 of the BP-HESI contract states:

> [HESI] may give [BP] the benefit of its judgment based on its experience interpreting information and making recommendations, either written or oral, as to DATA or amount of material or type of oilfield service to be provided by [HESI], or the manner of performance or in prediction of results. Notwithstanding the foregoing, all such recommendations and/or predictions shall be received by [BP] as **opinions only**, and no warranty express or implied shall be inferred by [BP] from such recommendations and[/]or predictions in view of the impracticability of obtaining first-hand knowledge of the many variable conditions, the reliance on inferences, measurements and assumptions which are not infallible, and/or the necessity of relying on facts and supporting oilfield services provided by others.[20]

---

[19] *See* MDL Litigation Ex. 4354 (BP-HESI Contract, Sec. 4.4).

[20] *See* MDL Litigation Ex. 4354 (BP-HESI Contract, Sec. 29.3, emphasis added).

As this contract provision states, HESI may make recommendations and provide predictions of results through testing or modeling, but BP receives those recommendations and predictions as HESI's "opinion only" and acknowledges that BP has ultimate decision-making authority in light of its superior knowledge about data, well conditions and the varied operations of other parties.

> **(Crook Report, Page 11) – opining that BP planned top of cement (TOC) to 17,300 feet—500 feet above the hydrocarbon zone at 17,800 feet—to comply with MMS regulations.**

I do not agree that planning TOC to 17,300 feet would comply with MMS regulations. My opinion is based on the fact that BP's documents disclose the existence of at least one other higher hydrocarbon-bearing zone at 17,467 feet (the M57B zone), which BP determined to be a gas bearing sand in the months after the incident.[21]  I am not a petrophysicist, and I am not independently expressing the opinion that M57 is a hydrocarbon bearing zone.  However, I am assuming it is hydrocarbon bearing given the BP admissions in its documents indicating that BP, at least in the months following the incident, considered it a hydrocarbon bearing sand capable of flow.[22]

MMS regulations require that a minimum of 500 feet of cement be placed above the uppermost hydrocarbon bearing zone.[23]  BP's own best practice requires placing 1,000 feet of cement above the uppermost permeable zone when the hydraulic isolation is not proven and TOC is only estimated.[24]  The top of the M57B hydrocarbon (gas)-bearing zone is estimated at 17,467 feet and, as I understand, was not disclosed to HESI prior to the incident.[25]  The top of the M57C brine zone is estimated at 17,700 feet, and the top of the M56A hydrocarbon bearing zone is estimated at 17,804 feet.[26]  The planned TOC was 17,300 feet.[27]

Looking at the depths of the known zones in the production interval of the well and the planned TOC, the internal BP best practice of placing 1,000 feet of cement above a permeable zone is not met for any of the hydrocarbon bearing zones in the production interval.  The MMS requirement of 500 feet of cement above the uppermost hydrocarbon bearing zone is not satisfied for the M57B.  While BP has not classified the M57C zone as hydrocarbon-bearing, it appears to

---

[21] *See* MDL Litigation Ex. 3533 at BP-HZN-BLY00082909; *see also* MDL Litigation Ex. 4544.

[22] *Id.*

[23] *See* 30 C.F.R. § 250.421(e).

[24] *See* MDL Litigation Ex. 184 (Section 5.1.3 of BP's GP 10-60 requires cement to be placed 1000 ft. MD above any distinct permeable zone.  The technical practice document defines a "permeable zone" as "[a]ny zone in the well where flow is possible on the application of a pressure differential."  Notably, for zonal isolation purposes, BP's technical guidance properly requires cement to be placed across a permeable zone without regarding to whether it contains hydrocarbon or water/brine.).

[25] *See* MDL Litigation Ex. 3533 at BP-HZN-BLY00082909; *see also* MDL Litigation Ex. 4544.

[26] *Id.*

[27] *See* MDL Litigation Ex. 4511 (9 7/8" X 7" Production Casing Program, dated April 17, 2010).  On page 6/12, the cement program calls for the "top of fluid" on the unfoamed lead cement ("Fluid 3") to be designed for 17,300 ft.

be a high-pressured brine zone that should be isolated by placing cement 1,000 feet above it even under BP's best practices.[28]

To the extent the M57B sand at 17,467' is a gas sand capable of flow, as indicated in BP's own documents, BP did not satisfy the MMS requirement of placing 500 feet of cement above the uppermost hydrocarbon bearing zone when it designed TOC at 17,300 feet. That designed TOC cement would mean there would be only about 167' of uncentralized/channeled cement across M57B up to TOC.

Because BP "estimated" TOC after the primary cement job and did not use a "proven" technique to determine actual TOC, BP did not meet its own internal best practice of placing cement 1,000 feet above several permeable zones—the M56A and M57B hydrocarbon-bearing zones, and the M57C brine zone. Had these zones been known, the cement job would not have proceeded the way it did. It would have been redesigned, and in light of APB issues and mitigations, it might have been completely changed since increasing the height of cement would have eliminated a major migration in BP's APB plans for the well.

### (Crook Report, Pages 11-12) – opining that BP planned to conduct a negative test to "verify the primary cement job."

It is essential to evaluate the success of a primary cement job with competence and diligence before carrying out subsequent well operations. Operators do not have to verify zonal isolation before well completion activities. However, they have to competently "confirm" zonal isolation to prevent fluid influx, in order to safely abandon the well. During temporary abandonment then, underbalancing the well invites the well to flow, and BP should not have removed the hydrostatic pressure provided by the mud without confirming the primary isolation or providing additional zonal isolation barriers such as cement plugs and bridge plugs. In the Macondo well the negative pressure test was incorrectly analyzed and interpreted, hydrostatic pressure provided by the mud was removed and there were no additional zonal isolation barriers installed.

The result of an unsuccessful primary cement job is a need for a remedial cement job wherein additional cement slurry is squeezed into any un-cemented sections of the annulus. Cement that does not isolate hydrocarbons does not equate to a loss of well control and certainly does not equate to a blowout.

### (Crook Report, Pages 12-13) – opining that BP relied on HESI to design and test the cement slurry, and to design and execute the cement job.

As I have stated previously, the idea that BP "relied" exclusively on HESI to design the slurry and the cement procedure is not consistent with the parties' contract. It is more accurate to say that HESI recommended a slurry design and cementing procedure, but BP reviewed, sometimes changed and ultimately approved with its own independent judgment the design of the slurry and the cement procedure. Moreover, BP chose to ignore some of the recommendations given by HESI's engineer, Jesse Gagliano, most notably the recommendation to use a cement slurry with .08 gps of retarder (which BP changed at the last minute to a slurry with .09 gps of retarder), the recommendation to run 21 centralizers on the production casing,

---

[28] *See* MDL Litigation Ex. 184, Sec. 5.1.3.

and the recommendation to conduct a full bottoms up circulation before the cement job to prepare the wellbore to receive the cement.

## II. FOAM CEMENT WAS A PROPER CHOICE FOR THE MACONDO WELL.

**(Crook Report, Pages 13-14) – opining that foam cement was an appropriate application for the Macondo well.**

I agree with Mr. Crook's opinion that the use of foam cement was appropriate for the Macondo well. Generally, a foamed cement slurry will help with the removal of fluids in front of it better than a non-foamed slurry. However, it is only effective when used along with the best cementing practices such as effective centralization, optimal wellbore conditioning (circulation), and effective casing placement. Effective casing placement includes placing casing in a competent zone and placing the shoe deep enough to give an adequate sump for logging, perforating, and testing on production activities.[29] A lack of centralization, a lack of adequate wellbore conditioning and inadequate placement of casing and shoe track created displacement difficulties that a foam cement slurry, standing alone, could not overcome.

The main reservoir zone was below the float collar which contradicts BP's recommended practices.[30] It was impossible for a properly and effectively designed and executed foam cement job to compensate for the risks associated with that and other operational decisions made by BP at the Macondo well. The following operational decisions by BP affected the ability of the foam cement job to isolate hydrocarbons in the well: difficulties with converting the float collar;[31] the presence of a reservoir zone below the float collar;[32] leaving the mud static in the wellbore for three days before conducting very minimal pre-cement circulation, which contributed to increased gel strength development in the mud that the cement needed to displace; [33] and using less than the optimum number of centralizers to reduce channeling.

Foam cement is one of the preferred solutions to help prevent fluid influx from the formation through the cement. Even BP's internal technical documents recommend foam cement for this purpose. BP's internal technical guidance also emphasizes the importance of mud removal and effective centralization. A stable foam cement slurry cannot prevent fluid influx through mud channels in the annulus caused by less than optimum centralization, less than optimum hole circulation, and less than optimum mud removal ahead of the cement job.

## III. THE CEMENT SLURRY PUMPED ON THE MACONDO PRODUCTION CASING JOB WAS ADEQUATELY DESIGNED.

**(Crook Report, Page 15-18) – opining that HESI's foam cement design was inappropriate due to the inclusion of D-Air 3000 (defoamer).**

I agree with Mr. Crook's opinion that a foam cement slurry should be stable to realize all of its benefits. To make his point, Mr. Crook partially quotes from a Schlumberger book. But I

---

[29] *See* MDL Litigation Ex. 5861, Sec. 7.3, pp. 92 & 95 (BP Tabular Design Manual).

[30] *Id.*

[31] *See* MDL Litigation Ex. 5993 at HAL_0028667-668.

[32] *See* MDL Litigation Ex. 3533 at BP-HZN-BLY00082909.

[33] *See Deepwater Horizon Accident Investigation (Bly Report)* (Sept. 8, 2010), pp. 22-29.

also agree with a part of the paragraph that Mr. Crook does not quote, which states: "A simple test to evaluate stability involves slicing a column of set foamed cement into wafers of equal size. The weight of each wafer should be the same in a stable system."[34]  In the final foam stability test performed on the Macondo foam slurry, the slurry was successfully foamed in 8 seconds, and the wafers of set foamed cement weighed the same at the top and bottom (1.8 S.G on top, and 1.8 S.G. on bottom).[35]  As per API's recommended practices and the testing outlined in the Schlumberger book quoted by Mr. Crook, this showed that the cement slurry designed for the Macondo well was stable.

Mr. Crook criticizes the presence of a defoamer, called D-Air 3000, in the Macondo cement slurry.  I disagree with Mr. Crook's suggestion that the mere presence of D-Air 3000 in the cement slurry disqualifies it from being able to be successfully foamed.  What matters is whether the defoaming effect of D-Air 3000 can be successfully counteracted by the addition of sufficient concentrations of a surfactant/foaming agent.  Foam stability testing is how it is determined that the surfactant has successfully counteracted the defoamer.

I agree that HESI's internal best practices specify that defoamers should not be used in cement slurries intended to be foamed.  Given that guidance, I would not expect a cementing engineer to include D-Air 3000 in a foam slurry that the engineer is designing from scratch. However, that does not mean that a slurry with D-Air 3000 cannot be used for a foam cement job so long as the effects of D-Air 3000 are known and successfully counteracted by the inclusion of other counteracting additives like surfactant or a foaming agent.

In general, when cement slurries are mixed in the lab and in the field, they entrain air. This could affect the density of the base slurry.  Hence, it is not uncommon to use defoamer to remove entrained air from the base slurry so that it is measured at the correct density.[36] Subsequently, foaming and stabilizing surfactant, ZoneSealant 2000, is used to foam the slurry. A sufficient amount of foamer/stabilizer should be used to overcome the effects of defoamer used in the slurry.  Usually, about 1.5% by volume of water (bvow) foamer/stabilizer is used in foam slurries.[37]  In the Macondo slurry, 2.1% bvow ZoneSealant 2000 was used.[38]  The testing in the laboratory clearly showed that the amount of ZoneSealant 2000 used to foam the slurry successfully counteracted the small amount of D-Air 3000 in the base slurry, and the set foam cement was stable.

---

[34] *See* E. Nelson & D. Guillot, Well Cementing (2nd Ed.) at p. 258.

[35] *See* MDL Litigation Ex. 4566.

[36] *See* G. Benge Dep. at. 359:24 – 260:22 ("Q: Is it possible to counteract defoamer in a cement blend using sufficient surfactant? A: Yes, it is. Q: And do operators other than Halliburton, from time to time, in fact do that? A: Yes, they do. Q: What do you know in that regard? A: From my personal experience in designing a foam cement job, I have had to use an antifoam to get the base cement density correct because of some of the foam -- we had additives in that and there was latex in there that tends to foam when it's mixed. We put a minimum amount of antifoam to allow the slurry density to be controlled, and then compensated with that by overtreating with foaming surfactant down -- downstream of that. Q: Is that something you did when you were at ExxonMobil? A: That was something we did when I was at Mobil.").

[37] *See* R. Morgan Dep. at 196:5-197:6.

[38] *See* MDL Litigation Ex. 4566.

It is not true that defoamer is never used in a slurry that is going to be foamed. Defoamer is used in Halliburton's PS-Lite slurry, and the purpose is to minimize entrained air in order to mix the base slurry to the correct density.[39] Glen Benge, the U.S.'s cement expert, states in his testimony that he has used defoamer for the same reason, in a foam slurry, to mix the base density to the correct density.[40] Foamer and stabilizer, such as ZoneSealant 2000, is then added at the tested concentration to compensate for the defoamer and successfully foam the slurry.

**(Crook Report, Pages 19-22) – opining that the Macondo cement slurry contained other additives that contributed to instability.**

Mr. Crook also criticizes the Macondo foam slurry design for including what he says are other dispersing additives. I understand that operators prefer to use the cement blend available on their rigs, and I presume that is what happened here. Mr. Crook's focus on individual additives in isolation is not helpful to the question of whether the slurry was stable. Tests are done in the field lab to evaluate if the cement slurry meets the requirements. Such testing includes mixability, pumpability and stability. It is not the purpose of the field lab to test the interaction of each chemical or additive on the other. Rather, the field lab tests the cement slurry with all the additives included to make sure that competing but necessary attributes of different additives are ultimately balanced, and the final slurry is acceptable for successful field deployment. What matters is whether the slurry, with all additives blended, is tested. That testing shows whether the slurry is stable and whether the slurry meets the requirements for successful field deployment. That is what happened with the final foam stability test on the Macondo foam slurry. Regardless of the primary or secondary effects of any one additive, the slurry as a whole was tested in a way that all blended additives acting and counteracting together were tested to determine whether the foam slurry designed for Macondo was stable. It was.

Nevertheless, I will respond to Mr. Crook's specific opinions regarding specific additives and slurry properties.

**EZ-FLO** is a flow enhancer.[41] It is used very often in the marine environment (like deepwater cementing) and has been successfully used in blends, including those that were foamed. At the concentration used in the Macondo slurry, the lab tests showed that it did not make the slurry unstable. Moreover, Crook's criticism is curious in that his own patent specifically states that EZ-FLO can be used in foamed slurries and that the additive was designed to be foamed.

**KCL** is used to improve the stability of the shale formation, and it is commonly used for this purpose. Slurries with KCl have been successfully foamed.

---

[39] *See* MDL Litigation Ex. 5204 at p. 19 ("PS Lite Halliburton field bulletin – recommends adding D-Air to slurries that entrain air during mixing, in order to achieve correct base slurry density before foaming.").

[40] *See* G. Benge Dep. at 359:24-360:22.

[41] *See* HAL_0612435 (Technology Bulletin: EZ-Flow Additive Blending Update).

**SCR-100L**, a non-lignant retarder, is a very commonly used retarder which helps with early strength development of cement.[42]  It provides better strength development than the lignant retarders. It has been successfully used in foamed slurries. Also see p. 50-51 of the Rebuttal Expert Report of Sam Lewis dated November 7, 2011, which demonstrates the appropriateness of using SCR-100L.

**SSA-1** and **SSA-2** are silica, and silica is added to a slurry to prevent strength retrogression.[43]  SSA-1 is finer than SSA-2 and, at densities at which the Macondo slurry was mixed, it is common to use both of these. SSA-1 increases the slurry's viscosity, and it becomes difficult to mix the slurry at these densities if only SSA-1 is used.

**Slurry rheology.**   I disagree with Mr. Crook's criticism about the rheology of the Macondo slurry. The pore pressure and fracture gradient in the Macondo well were close to each other.[44]  This poses challenges to the design and deployment of a cement job. In this situation, the density has to be as low as possible, and the rheology has to be as low as possible, to reduce friction pressure while pumping so as not to fracture the formation. Low density and low rheology help in preventing cement losses to a fractured formation. On the other hand, the cement slurry density has to be higher than the pore pressures to help prevent formation fluid influx into the cement once placed. The rheology of the Macondo slurry was designed to provide stability but low friction pressures. It necessarily had to have a low rheology, and testing demonstrated that it was capable of being foamed and generating a stable foam slurry. The rheology of the Macondo slurry was tuned for successful placement (given the challenging narrow window between pore pressure and fracture gradient) and for stability.

The rheology values are inputted into OptiCem program, along with other well data obtained from BP to evaluate the job placement parameters, including flow rates. Halliburton has performed a number of simulations with OptiCem to evaluate the effect of rheology on slurry placement, effect of centralization on mud displacement and Gas Flow Potential (GFP).[45]  The pore pressure of formations, fracture gradient of formations and hole size are all inputted into the OptiCem program.[46]

## IV.   TESTING OF THE CEMENT SLURRY PUMPED ON THE MACONDO PRODUCTION CASING JOB SHOWED THAT THE SLURRY WAS STABLE.

**(Crook Report, Pages 23–24) – opining that February "Pilot Tests" conducted by HESI show that the slurry should have been redesigned.**

---

[42] *See* MDL Litigation Ex. 5592 (Technology Bulletin:  SCR-100 Synthetic Cement Retarder); *see also* MDL Litigation Ex. 4350.

[43] *See* BP-HZN-BLY00169399-40; HAL_1262535-36.

[44] *See* M. Hafle Dep. at 44:18-45:12; J. Bellow Dep. at 87:21-88:2.

[45] *See* MDL Litigation Ex. 717 (April 18, 2010 OptiCem Report);  MDL Litigation Ex. 716 (April 15, 2010 OptiCem Report); MDL Litigation Ex. 728 (April 14, 2010 OptiCem Report).

[46] *See, e.g.,* MDL Litigation Ex. 717.

**Pilot Tests (February).**  Mr. Crook does not appear to understand the purpose of a pilot test.  First, the pilot tests conducted in February were not conducted on the slurry that was intended to be pumped at Macondo, but was conducted on the blend already on board of the rig, which operators prefer to use rather than having to procure new cement.  At the time these tests were conducted, BP had not yet finished drilling the Macondo well, so the downhole conditions used to set the laboratory testing parameters were not yet known.[47]  For example, the bottom hole circulating temperature (BHCT) used to set testing parameters in February was 223F, whereas the BHCT actually used for the testing of the production casing cement slurry was 135F.[48]  HESI conducted these tests, as is its practice, to ascertain starting data points to begin designing the slurry with appropriate additives.  Further, the tests in February were conducted on a slurry with .20 gps of retarder.[49]  These tests were not intended to predict performance of the slurry to be pumped downhole.  The final concentrations of all additives had not yet been determined, and the downhole conditions impacting testing parameters had not yet been determined.

Rather, the purpose of the pilot tests was to make sure that the slurry was mixable and pumpable, and that it would be responsive to the retarder on hand on the rig.  These tests are conducted early to ascertain what additives generally are needed.  For example, SCR-100L was on the rig and was intended to be used as the liquid retarder on the actual cement job.  The pilot tests help determine that the dry blend would be responsive to this particular retarder.  Had it not been, HESI would have needed to transport a different retarder to the rig, and it would have needed to know this sooner rather than later because of the logistics involved and so as not to unduly delay the operational cement testing that was coming up.

I note that Jesse Gagliano twice sent the final results of the February pilot testing to BP.[50]  However, in my experience, pilot tests are not typically provided to the customer.  Moreover, based on my experience, HESI never sends the weigh up sheets to customers as they are internal lab documents.

**(Crook Report, Pages 25-26) – opining that HESI's testing in April indicates that the Macondo cement slurry is unstable.**

I disagree with Mr. Crook's opinion that the testing conducted by HESI in April 2010 indicates that the foam cement slurry was unstable.  On the contrary, the testing shows that the foam cement slurry was stable.

Contrary to Mr. Crook's inaccurate characterization, the first foam stability test in April was not a "failed" foam stability test.  It was an invalid test, and the result of that test tells nothing about whether the slurry intended to be tested was stable or unstable.  There was an error

---

[47] *See* MDL Litigation Ex. 1131 (BP called total depth and stopped drilling on April 13, 2010).

[48] *Compare* MDL Litigation Ex. 4566 (final Macondo slurry test on April 17, 2010) *with* MDL Litigation Ex. 808 (February 12, 2010 pilot test) and MDL Litigation Ex. 809 (February 16, 2010).

[49] *See* MDL Litigation Exs. 808 and 809.

[50] *See* MDL Litigation Ex. 5801 (Jesse Gagliano forwarding BP the results of a February pilot test on April 2, 2010); *see also* MDL Litigation Ex. 3644 (Jesse Gagliano forwarding BP the results of a February pilot test on March 25, 2010).

in the weighing of the sample. The test was conducted using 1220.67 grams of the cement blend instead of the 1678.69 grams that was needed for a valid test on the sample.[51] The slurry mixed and poured was nowhere close to the intended Macondo slurry. Hence, I do not agree with the statement that the first test showed the Macondo slurry to be unstable.

The technicians either realized that the test result was anomalous or that they erred in weighing up the slurry.[52] Either way, if a procedural error in testing is suspected, the technicians did what they are trained to do. They redid the test.[53] They mixed the slurry as it was supposed to be mixed, using 1678.69 grams of the cement blend and conducted the second April foam stability test. The second stability test conducted in April shows that the base slurry can be foamed as designed in the lab, in 8 seconds, and there is no variation in density of the set foam cement between the top and the bottom.[54] This shows that the slurry as poured is stable. The API RP 10B-4 recommendation is that the base slurry should be foamed in less than 15 seconds.[55] The following were achieved in foaming the slurry during the last April foam stability test:

- The slurry could be foamed in 8 seconds. API RP 10B-4 states that "[i]f the slurry does not fill the blending container at the end of the 15 ssecond period, it is doubtful the slurry will foam properly under field conditions. The slurry should be redesigned."[56] That did not occur here, and redesigning the slurry was not required.
- No free fluid is reported
- No bubble break out is reported
- No excessive gap is reported
- No visual segregation is reported
- There is no variation in the densities of the set foamed cement sample from the top to the bottom.

As per API RP 10B-4, the above results indicate that the Macondo slurry was stable and that it could be foamed successfully in the field.

The set foam cement density is same at the top and the bottom, 15 lb/gal.[57] The target density is 14.5 lb/gal.[58] There is no specific standard or API-recommended acceptable variance between cured density of sample and foamed density. However, API does acknowledge that the cured density of a sample can be expected to be higher than the target densit. API RP Spec 10

---

[51] *See* MLD Litigation Ex. 802 at HAL_DOJ_0000040-41.

[52] *See* R. Dubois Dep. at 153:24-156:7.

[53] *Id.*

[54] *See* MDL Litigation Ex. 4566.

[55] *See* API RP 10b-4.

[56] *Id.*

[57] *See* MDL Litigation Ex. 4566.

[58] *Id.*

clearly states that a slightly higher density can be expected after the slurry sets.[59]  In addition, the set cement sample could have adsorbed some water, mainly during weighing the set sample under water, using Archimedes method.[60]  These factors could account for a higher set foam cement density from when it was foamed and poured for curing.  At HESI, we typically consider up to a .5 ppg variance between target density and cured density to be acceptable, and the final April foam stability test was within this accepted variance.

I also am aware that the slurry actually pumped at Macondo contained .09 gps of SCR-100L, and that the final April foam stability test used a slurry sample containing .08 gps of SCR-100L.  However, I do not believe that an additional .01 gps of retarder would change the foam stability test result obtained on the test slurry containing .08 gps of retarder.

> **(Crook Report, Pages 27-28) – opining that, due to conditioning of lab sample, the presence of SA-541 in the slurry activated in the lab slurry sample making the slurry sample more stable than the slurry pumped downhole.**

I disagree with Mr. Crook's opinion that HESI's conditioning of the slurry prior to the final foam stability test would have activated the slurry's SA-541 additive making the lab sample more stable than the slurry pumped down the well.  Typically, a cement slurry thins with increase in temperature.[61]  In a thickening time measuring device, slurry consistency is measured in the units of Bc and is an indication of viscosity of the slurry.  As seen in the thickening time chart for the Macondo slurry,[62] the consistency value decreases as the temperature is increased.  The consistency value starts at 14 Bc and goes down to 9 Bc in about 80 minutes and then increases to 13 Bc in the next 100 min.[63]  So, the slurry is about the same consistency after 3 hours, at 135 degrees F., in the thickening time test.  This shows that SA-541 did not increase the viscosity of the slurry in the lab during the 3 hour conditioning time.  This is consistent with SA-541's specifications that it activates at 150 degrees F. or higher temperature.[64]  Hence, I do not agree with Mr. Crook that SA-541 viscosified the lab slurry during conditioning and artificially increased foam stability in the lab as compared to the slurry that was mixed in on the rig.

> **(Crook Report, Pages 22-23, 31-32) – opining that post-incident testing on non-rig cement is indicative of the performance of the cement slurry pumped at the Macondo well.**

While Mr. Crook addresses the "relevance of post-incident testing" on pages 31-32 of his report, he also refers to it repeatedly throughout other sections of his report.  I will respond to Mr. Crook's opinions about post-incident testing here, but my response applies to his reliance on such tests wherever he so relies on them in his report.

---

[59] *See* API RP 10B-2.

[60] *Id.*

[61] *See* K.M. Ravi and D.L. Sutton, New Rheological  Correlation for Cement Slurries as a Function of Temperature, Society of Petroleum Engineers, 1990.

[62] *See* MDL Litigation Ex. 802 at  HAL_0010642.

[63] *Id.*

[64] *See* HAL 0045047 (Halliburton Technical Bulletin on SA-541) ("This additive does not increase viscosity until the temperature is at 150F.").

I disagree with Mr. Crook's primary opinion on page 32 that "testing performed on laboratory stock is largely representative of the performance of actual field blends."

It is common in the industry, particularly in deepwater wells, to perform operational cement testing on cement and additive samples taken from the field (or in this case, from the rig). Time and expense is incurred to bring these samples from the rig by boat or by helicopter.[65] The very purpose for this practice is the recognition that cement, in particular, is variable. That means that test results can vary between laboratory stock cement and actual rig cement. It is all the more important to obtain actual rig samples for testing when the cement blend is coming from a marine environment. In the marine environment of deepwater cementing, the cement on the rig is loaded into a tank on a boat, transported by boat to the rig, and then blown into other tanks aboard the rig. All these events have the potential to contaminate the cement blend with humidity/moisture and even the contents of other cement blend residue in the tanks and transport systems. Thus, once a slurry leaves shore for the rig, it begins to develop its own unique history that has the potential to change the slurry's chemical composition and thus performance under testing.[66]

Even the passage of time can change the chemical composition of the cement blend. That is why samples for testing are routinely re-taken after the passage of time. Mr. Benge, for example, expressed the opinion that he would re-sample dry blend for operational testing every two weeks.[67] This practice also is in recognition of the fact that samples taken just two or three weeks apart may themselves render variable testing results.

The principle of cement variability is also recognized in BP's own internal cementing documents. For example, in its Drilling and Completions Cementing Manual, BP states: "Laboratory testing is a critical element in successful well cementing. Cement, chemical additives and well conditions are never entirely consistent or predictable; therefore, the testing of field representative samples is critical to ensure the slurry has the properties to meet the cementing objectives."[68] Further, in recognition of cement's variability, the HESI-BP contract requires HESI to use rig cement, not laboratory stock, for testing.[69] Finally, virtually every

---

[65] *See* G. Garrison Dep. at 178:13-179:12.

[66] *See* D. Kellingray Dep., at 556:17-24 (testifying that there is "a level of uncertainty" if rig samples were not used for testing); at 560-8:12 (testifying that "There was . . . it's quite common that we would see differences" when testing rig samples and substitute samples.).

[67] *See* G. Benge Dep. at 271:5-20.

[68] *See* MDL Litigation Ex. 6233 (Drilling and Completions Cementing Manual: Cement Laboratory Testing Section SRP 4.1-0003) at p. 3

[69] *See* MDL Litigation Ex. 447 (Contract, Section 3, Appendix 6, ¶ 2.1 (All testing is required on rig samples . . . ").

knowledgeable cement expert in this case agrees that cement exhibits variability and that variability of test results should be expected between tests on laboratory stock and rig cement.[70]

For these reasons, I don't agree with Mr. Crook's statement that testing on laboratory stock is largely representative of testing on actual rig cement. The industry disagrees with him. BP's internal documents disagree with him. And the most experienced cement experts in this case disagree with him. Therefore, to the extend Mr. Crook relied on post-incident testing on lab stock or non-rig cement to support his opinions, I would disagree.

Yes, HESI may run preliminary tests on lab stock material, but it confirms the results using the cement and additives from the rig or field location. There is a very good reason why the industry has adopted this procedure and is willing to incur the time and cost of getting the materials from the location to the lab.

Cement is manufactured using naturally occurring materials such as limestone. Cement clinker is then ground with other materials, tested and then sent to end users. Cement powder reacts with water and hence is susceptible to changes in chemistry on exposure to air, especially in a marine environment. The cement produced may change from batch to batch due to the differences in raw materials used, and how it is produced. In addition, even two samples from the same batch will differ in their performance if they are stored, handled, transported and moved differently.[71]

This variability depending on the source of the cement is actually demonstrated by the Chevron testing. Chevron's post-incident tests were conducted using lab stock cement and additives sent by HESI.[72]   But they were not conducted on actual rig samples as those were being preserved by order of the court. Foam stability tests were conducted by Chevron on the cement provided by HESI. Those were Chevron tests 6, 7 and 9.[73]   Chevron also conducted a foam stability test using cement directly obtained from Lafarge, not HESI. That was Chevron test 8. Despite being branded as the very same cement, the foam stability test result on the cement obtained directly from Lafarge (test 8) was significantly different than the foam stability test results obtained on the Lafarge cement obtained from HESI's lab stock (tests 6, 7 and 9).[74] This clearly demonstrates the importance of knowing which cement is used in the testing before drawing conclusions from the test results.

With that preface about the variability of cement, I will respond to Mr. Crook's reliance on the various post-incident testing conducted after the Macondo incident.

---

[70] *See* Beirute Dep. at 323:10-19; 326:15-327:14 (A cementing consulting expert for BP, opined that there is a difference between "rig sampling and shelf sampling" because "cements do change from batch to batch . . . field waters may change, and even additives from batch to batch may change, so there might be differences" and therefore it is "possible" that "shelf samples could test differently than the rig samples."). *See also* G. Garrison Dep. at 73:7-12, 177:15-179:12 (The JIT's cementing expert, agreed that lab stock gives "some indication" but that rig sampling testing is preferred out of "concerns for representativeness of testing."); C. Gardner Dep., 289:18-291:24 (same); and D. Brown Dep., 239:2-12 (same).

[71] *See* G. Benge Dep. at 271:5-20.

[72] *See* MDL Litigation Ex. 4572 at p. 1

[73] *See* G. Gardner Dep. at 295:2-299:5.

[74] *Id.*

**(Crook Report, Pages 34–36) – relying on Chevron testing as representative of the slurry pumped on the Macondo well.**

**Chevron testing.** Chevron did not test actual rig samples.[75]  Based on the above discussion, I do not agree that the results of Chevron's testing are representative of the slurry pumped at the Macondo well.[76]  I disagree with Mr. Crook's reliance on the Chevron tests to opine about the properties and/or performance of the slurry pumped at the Macondo well.

**(Crook Report, Pages 37–39) – relying on OTC testing as representative of the slurry pumped on the Macondo well.**

**OTC testing.** OTC conducted cement testing at the request of the U.S. government.[77]  The majority of the cement tests conducted by OTC were conducted on lab stock cement and additives.  However, OTC did conduct two—and only two—tests on actual rig blend from the Macondo production casing job.  That rig blend was turned over to the U.S. government by HESI, and the U.S. government in turn provided some portion of what was turned over to OTC for testing.  The specific slurry sample comprised of actual rig blend was designed "MAC4" in the OTC report.[78]  Other than the Halliburton testing in April 2010, this is the only test with the rig cement blend, although it was more than a year old when OTC tested it.[79]

OTC conducted an "unset" foam stability test and "set" foamed stability test on the MAC4 slurry, which contained the same amount of retarder - .09 gps – that the Macondo slurry contained.  The results of the unset foam stability test, by even Greg Garrison's admission, showed a stable slurry in the unset form.  The report from OTC shows a Table titled "Stability of Unset Foamed Cement Slurry" on Page 38.[80]  The last row shows results for the Macondo rig blend under "MAC4."  This clearly shows that the foamed cement slurry had no settling and no free fluid.  While the Table says the MAC4 slurry experienced "bubble breakout," Greg Garrison testified that it was "minor" and not to the degree that it would be considered unstable under API criteria.[81]  In fact, Mr. Garrison testified that the unset foam stability test on the MAC4 slurry indicated that the rig cement slurry was stable,[82] even more than a year after the incident.

---

[75] *See* G. Gardner Dep. at 300:22-301:20.

[76] Even Craig Gardner of Chevron conceded in front of the National Commission that he would need to test the rig samples to determine if the Macondo slurry was stable ("More specifically, do you believe that your testing is a reliable indication of what would have happened if you tested the rig blend?  A:  I would have to test the rig blend to answer that.") (National Commission Testimony at 225:8-14).

[77] *See* MDL Litigation Ex. 5937.

[78] *Id.* at p. 35.

[79] *Id.* at p. 3 ("Well samples were received Wednesday, June 22, 2011 from the U.S. Coast Guard.").

[80] *Id.* at p. 38.

[81] *See* G. Garrison Dep. at 195:16-204:6.

[82] *Id.* at 205:10-207:13.

**Page 20**

With respect to the "set" foam stability test conducted by OTC on the MAC4 slurry, that test was prematurely terminated in contravention of API recommended testing protocols.[83]   Thus, no foam stability test result was obtained from this test.[84]   OTC terminated the test after 48 hours and noted that the cured sample would not set up completely.   API clearly states that the sample should be allowed to cure for 24 hours **or until set**.[85]   However, there is a good reason why the cured sample did not set within 48 hours, and it has to do with OTC's testing protocol.

The temperature ramp OTC used to heat the water bath into which the foam slurry is poured was different from what was used in the Halliburton testing in April 2010.   Halliburton used 4 hours to ramp the temperature from 135 degrees F to 180 degrees F.[86]   OTC used 8 hours to ramp from 135 degrees F to 180 degrees F (4 hours from 135 degrees F to 165 degrees F, and another 4 hours from 165 degrees F to 180 degrees F).[87]   When a Wellcat temperature simulator was used to simulate the temperature during cement slurry hydration, the simulation results showed that it would take 1½ hours from 135 degrees F to 165 degrees F and 2 hours from 165 degree F to 180 degrees F. (See Table 1 in Sec. VIII).   This means that Halliburton's temperature ramp is correct.   It also means that OTC's temperature ramp was too long, which likely explains why the MAC4 foam slurry did not set up within 48 hours.   Had OTC used the proper temperature ramp, the cured foam slurry sample likely would have set up within 48 hours, as it did when Halliburton conducted the test back in April 2010.

In conclusion, the test on lab cement at Chevron was not representative of the Macondo rig cement blend, and the test on the Macondo rig cement blend conducted by OTC showed that the base cement slurry could be foamed successfully and that the foamed slurry was stable, as per API specifications.

The most relevant foam stability test for the Macondo foam cement was the one conducted by Halliburton in April 1010.[88]   Only one other foam stability test was performed to conclusion on the actual rig cement since the Macondo incident (although more than a year later), and that test (OTC's unset foam stability test) showed the foam cement slurry could be successfully foamed and that it was stable.   Given the acknowledged variability of cement, post-incident testing conducted on lab stock cement or any other non-rig cement is unrepresentative of the slurry pumped at the Macondo well.

## V.   BP'S OPERATIONAL DECISIONS PLACED CONSTRAINTS ON THE FOAM CEMENT JOB PUMPED AT MACONDO THAT UNDERMINED ITS ABILITY TO ISOLATE THE HYDROCARBON ZONES IN THE WELL.

**(Crook Report, Pages 39-41) – opining that BP properly designed TOC to be 17,300 feet.**

---

[83] *See* G. Garrison Dep. at 211:12-212:8.

[84] *See* G. Garrison Dep. at 29:8-21.

[85] *See* API RP 10b-4.

[86] *See* MDL Litigation Ex. 802 at HAL_0010642.

[87] *Id.*

[88] *See* MDL Litigation Ex. 4566.

I have already responded above and stated my disagreement with Mr. Crook's opinion that BP's designed TOC complied with MMS regulations and BP's own best practices. However, it is worth commenting further on the M57B sand, which BP did not disclose to HESI pre-incident.

According to BP's internal documents, M57B is a gas bearing zone.[89]  As such, it poses risk to the well if not isolated. The gas from this zone can enter the annulus because the pore pressure of this zone is very close to the mud hydrostatic pressure. As the mud starts to gel and loses filtrate to the formation, the hydrostatic over balance could be lost because the overbalance was very small to begin with. The influx of this gas into the formation could pressurize the annulus, or flow through the annulus if a flow path is available to the surface or to the adjacent formation.

The original plan[90] for the Macondo well was to bring cement slurry into the previous shoe and use a foamed spacer to address the Annular Pressure Buildup (APB) issues. It seems that APB mitigation plan changed to "cement shortfall" at a later date,[91] meaning it was decided that TOC should be located below the prior shoe at 17,168 ft. However, cement shortfall is not an appropriate APB mitigation strategy as explained by BP's own internal APB expert.[92] The small amount of cement slurry pumped in the Macondo well was directly related to BP's decision to design TOC well below the previous shoe. That small volume of cement, in the order of 50 barrels,[93] increases the risk of cement contamination with mud the risk of not covering the critical zones of formation fluid, and the risk of not reaching the planned TOC in the narrow annulus when the casing is not centralized. Theses risks make other operational decisions even more important, like properly centralizing the casing and conducting a full bottoms up circulation to condition the wellbore to receive cement. However, BP decided against these best practices also.

**(Crook Report, Page 42) – opining that there was adequate displacement efficiency during slurry placement**

**(Crook Report, Pages 55, 59) – opining that SOBMs do not develop high gel strengths.**

I disagree with Mr. Crook's opinion that there was adequate displacement efficiency. BP's decisions not to adequately centralize and to forego sufficient volumes of pre-cement mud circulation increased the risk that mud would be left behind during cement slurry placement. There are many indications that there was considerable risk to obtaining good displacement efficiency.

As per the Bly report, the last section was difficult to drill due to the reduction in the fracture gradient at the bottom of the wellbore. This condition required selecting the correct mud weight to maintain overbalance on the formation while avoiding fluid losses to the well. This

---

[89] *See* MDL Litigation Ex. 3533 at BP-HZN-BLY00082909.

[90] *See* HAL_0116007-60016.

[91] *See* MDL Litigation Ex. 4511.

[92] *See* Rich Miller Dep. at 238:19-239:2.

[93] *See* MDL Litigation Ex. 5993.

limited the flow rate at which the fluids could be pumped and limited the wellbore circulation prior to the cement job. These things, taken together under the conditions presented by the Macondo well, likely contributed to mud channeling during cement placement.

In addition, BP's placement of the casing shoe so close to a loss circulation zone, the presence of a main reservoir below the float collar, and the fact that it took nine attempts and 3,142 psi to initiate circulation after running the casing to the bottom, all taken together, introduced a significant risk that the production casing cement job would not isolate hydrocarbon zones in the well. BP's nine attempts to convert the float collar and difficulty establishing circulation clearly show that something was probably plugged below the float collar. The reamer shoe flow ports were probably plugged. If these were plugged, it is an indication that there were drill cuttings or gelled mud that was obstructing the flow and preventing mud from being freely circulated. These are indications of a "dirty annulus," into which the cement was going to be pumped, and this condition decreases displacement efficiency.

After finally pressuring up successively and initiating circulation at 3,142 psi, BP didn't know what had happened. BP's drilling engineer, Brian Morel, for example, wrote in an email to Bryan Clawson of Weatherford, on April 19: "Yah we blew it at 3140, still not sure what we blew yet."[94] Notably, the circulation pressure was much lower than expected after the supposed float conversion, indicating possible increased or additional flow path was made available.[95]

BP decided not to fully circulate the wellbore after the float collar was assumed to be converted. This means that the drill cuttings and/or gelled mud were not removed from the hole. Moreover, the failure to circulate sufficient volumes of mud ahead of the cement job likely resulted in gelled mud being left in the annulus, which would have a direct impact on displacement efficiency.

On page 59 of his report, Mr. Crook incorrectly opines that synthetic oil based muds (SOBMs) do not develop gel strengths. I do not agree with this unqualified statement by Mr. Crook. It is incorrect to assume that the SOBMs don't develop gel strength when left static under the bottom hole pressure and temperature. The SOBM usually does not develop gel strength like a Water Based Mud (WBM). However, it does develop gel strength and needs to be considered in designing cement jobs and in deciding whether to conduct a full bottoms up circulation before the cement job.

Data on MI-Swaco Rheliant mud shows that the mud does develop gel strength with time. The 10s/10min/30min gel strengths are 14/23/29 lbf/100$^2$ft.[96] These values are at atmospheric pressure. The effect of leaving the well static for about three days prior to the cement job and having the mud subjected over that time to the downhole pressure and temperature is not definitely known because BP appears not to have ordered appropriate FANN 70 testing conducted on the mud. However, at this pressure and temperature, the static mud over

---

[94] *See* MDL Litigation Ex. 2586 at WFT-MDL-00017597.

[95] *See* MDL Litigation Ex. 5993 at HAL_0028667-668.

[96] *See* MDL Litigation Ex. 7654.

**Page 23**

time almost certainly increased the gel strength beyond 29 lbf/100ft$^2$ before it plateaued at some value.[97]

The above conditions do not present the best conditions for a successful primary cement job, and lead me to disagree with Mr. Crook that the wellbore was adequately cleaned and conditioned prior to the cement job.

### (Crook Report, Page 42) – opining that M57B should not be included for calculating Gas Flow Potential (GFP) at the Macondo well.

I disagree with Mr. Crook that the gas flow potential (GFP) calculation does not need to account for the M57B zone. GFP calculations should take into consideration all permeable zones in an interval. The gas flow potential calculation takes into account pore pressure in the permeable zones. This is in line with what should be done to prevent any flow from zones containing any gas or any fluid for that matter. As per BP documents, M57B was a gas bearing zone with pore pressure of approximately 14.17 ppg and was capable of flow.[98] So, I disagree with Ron Crook that M57B was not capable of flow.

Foam cement is an appropriate solution for mitigating gas influx into the wellbore. The hydrostatic pressure from the cement column has to be overbalanced to help prevent formation fluid from entering the unset cement in the annulus. During cement curing, if there is a decrease in hydrostatic pressure, then the magnitude of this decrease would depend on the volume of filtrate lost to the formation, compressibility of the hydrating slurry, and the development of static gel strength.[99] Foamed slurry is compressible and assists in mitigating the effects of filtrate loss and static gel strength development, and hence hydrostatic pressure is maintained for a longer time.[100] If the formation fluid enters the unset cement and moves the cement aside or ahead and creates a gas flow channel, the pressure in the annulus will quickly equal the formation pore pressure so the gas will be contained.[101] Hence it is difficult to establish continuous gas channels through unset cement, but it may create what is called as gas cut cement, meaning cement could set with pockets of gas around it.[102] However, if gas bubbles into the unset cement, it would not result in a blowout because of pressure equalization.

However, foam cement is not a solution to prevent gas influx caused by mud channeling. Sustained, catastrophic flow of formation fluid through the annulus is possible only if there is a continuous flow path or conduit established or available.[103] Poor displacement of drilling fluid during cement placement can bypass a continuous channel of drilling fluid traversing the annulus.[104] This channel can act as conduit for formation fluid invading the annulus.[105]

---

[97] Id.

[98] See MDL Litigation Ex. 3533 at BP-HZN-BLY00082909.

[99] See E. Nelson & D. Guillot, Well Cementing (2nd Ed.) at p. 255-258.

[100] Id.

[101] Id.

[102] Id.

[103] Id.

[104] Id.

**Page 24**

I agree that an unsuccessful primary cement job does not result in a blowout. A unsuccessful cement job could manifest as annulus pressure and is solved by a remedial cement job. For the well to blow out, as in the Macondo well, something more drastic than nitrogen breakout had to happen.[106]

## VI.   BP DID NOT SUFFICIENTLY "VERIFY" THE INTEGRITY OF THE PRIMARY CEMENT JOB OR "CONFIRM" TOP OF CEMENT.

### (Crook Report, Pages 46-47) – opining that the float collar converted and that TOC was properly estimated.

BP encountered serious difficulties in converting the float collar.[107]   Per the manufacturer's specifications, the establishment of circulation and float collar conversion should have taken one attempt at approximately 400 to 700 psi with a flow-induced pressure differential.[108]   Instead, the conversion took nine attempts with gradually increasing pressure until a final pressure of 3,142 psi was applied.[109]   As I discussed before, BP was concerned that they might have damaged something in the well.  Additionally, the circulating pressures after the supposed float conversion was much lower than the expected which raised additional concerns about the conversion.[110]  So, I do not agree with Mr. Crook's assertion that "all the parties on the rig agreed that the float converted."  There was apprehension and people on the rig were not sure of what happened during the attempted conversion process.

I disagree with Mr. Crook's opinion that BP was justified in relying on lift pressure and full returns as an indication of TOC, especially since the lift pressure BP relied on was so small. BP's own recommendation says not to rely on lift pressure to estimate TOC/zonal isolation integrity if the densities of the fluids in the annulus and casing are within 1.6 lb/gal (0.2 S.G.).[111] The density difference between the fluids pumped in the Macondo well was about 0.3 lb/gal.[112] Due to the close densities of the fluids pumped, there would have been minimal to no back flow even if the float collar was not converted.  So, I do not agree with Mr. Crook that there was sufficient information available to BP to conclude that TOC was reached.  The data and the

---

[105] *Id.*

[106] *See* MDL Litigation Ex. 6221 (BP's in-house cementing engineer remarked after the Incident: "I've suspected all along with the lack of centralization small volumes likelihood of mud contamination we would have had nitrogen breakout. However this should only matter if the kick came from the annular side, if its come through the floats I'm less convinced nitrogen breakout alone is the issue.").

[107] *See* MDL Ex. 2149 ("Witness and discuss problems with converting the  float"); Ex. 5993 at HAL_0028667-668.

[108] *See* MDL Litigation Ex. 2562 at WFT-MDL-00020469.

[109] *See* MDL Litigation Ex. 5993 at HAL_0028667-668.

[110] *See* MDL Litigation Ex. 2149 ("Troubleshoot low pressures while circulating"); Ex. 5993 at HAL_0028668. ("Company man feels uncomfortable with the circulating pressure being this low" and "Circulating at 4.0 bpm with 340 psi. Mi Swaco model estimates circulating pressure should be about 570 psi at 4 bpm").

[111] *See* MDL Litigation Ex. 184, Sec. 5.3.2  (BP's GP 10-60, "*Zonal Isolation Requirements during Drilling Operations and Well Abandonment and Suspension*").

[112] *See* MLD Litigation Ex. 4511 at p. 6.

events on the rig that day and BP's own recommendation do not point to achieving TOC and do not justify the failure to run a cement evaluation technique to confirm zonal isolation. Moreover, as an indication of BP's flawed well design, BP could not have run the cement evaluation tool to determine the integrity of cement around the primary reservoir as these zones were below the float collar, although a CBL could have assisted in confirming TOC.

**(Crook Report, Page 48) – opining that the float collar achieved its intended purpose.**

I disagree with Mr. Crook's statement that the float collar achieved its intended purposes and did not contribute to the blowout. I agree that the float collar served its purpose of serving as a seat for wiper plugs. However, as discussed earlier, even if the float valve was open/unconverted, there would not have been noticeable flow back due to the near balance of pressures inside and outside the casing. Thus, given the conditions in the well at the time of the float check, no test actually determined whether the float collar converted or not. Under these circumstances, nobody can say that the float collar achieved its intended purpose.

**(Crook Report, Pages 49-50) – opining that BP was justified in not running a CBL.**

**(Crook Report, Page 51) – opining that BP's use of a decision tree to determine whether or not a CBL should be run was consistent with industry practice.**

As discussed above, there were number of questions raised regarding the conversion of float collar, what was plugged during the attempt to convert the float collar, what blew when the pressure was increased to 3,142 psi in nine attempts, and a lower than anticipated circulating pressure after the attempt to convert the float collar. In addition, BP decided to use less than the optimum number of centralizers, less than optimum volumes of mud circulation ahead of the cement job, and the knowledge that mud was left to develop static gel strength for about three days prior to the cement job. Due to the close densities of the fluids pumped, there is no way to tell that the estimated TOC was achieved from lift pressure. When BP decided to proceed with the negative pressure test, primary cementing had been completed under very questionable circumstances, and BP had not verified that the primary cementing was successful in isolating hydrocarbons in the well. Moreover, BP didn't have a second barrier to hydrocarbon flow in place, like a cement plug or bridge plug inside the casing, in case the unproven cement barrier was not isolating hydrocarbons in the well. Under these circumstances, it is difficult to imagine, other than the costs associated with it, why BP would not run a CBL or some other sort of cement evaluation technique to evaluate the cement bond in the annulus and to gain insight into whether the hydrocarbon zones were being effectively isolated.

I agree with Ron Crook that a cement evaluation tool such as a CBL would not have provided data about the cement below the float collar. However, that portions of the reservoir were below the float collar and could not be evaluated with a CBL is a consequence of poor well and casing design. Even with this limitation, a CBL could have been used to confirm TOC and whether there was channeling, as that portion of the well would have been visible to the CBL tool.

**(Crook Report, Page 52) – stating that HESI made no suggestion that BP should have run a CBL.**

Halliburton does not make recommendations on whether to run a CBL or other cement evaluation tools. That is not the cement contractor's responsibility. It is the responsibility of the

operator, BP.  As I discussed earlier, even if a CBL was run on this well, it could not have evaluated the main reservoir sections for the reasons discussed above.  However, it could have assisted in confirming TOC.

## VII.   BP's Failure to Adequately Circulate Mud Ahead of the Cement Job and Failure to Adequately Centralize the Production Casing Did Contribute to the Blowout.

**(Crook Report, Page 52-61) – opining generally that BP was justified in not circulating a full "bottoms up" prior to the cement job and not running 21 centralizers, and that neither BP decision contributed to the Macondo blowout.**

I agree with Ron Crook that at times, depending on well conditions, operators are forced to circulate less than "bottoms up."  However, while this may be a judgment call of the operator, it is not without incurring additional risk to the success of the primary cement job, and thus should be taken into account by the operator in going forward with the well activities.  Where pre-cement job circulation cannot be adequately performed due to well conditions, BP should have used this as an additional reason to evaluate the primary cement job using a CBL or other cement evaluation technique.

I note that Mr. Crook cites Vince Tabler as acknowledging in his deposition that, in the industry, there are circumstances when less than full bottoms up are used.  However, Mr. Tabler is not a drilling engineer who makes those decisions.  Moreover, Mr. Crook's citation of his deposition testimony is selective and incomplete, as Mr. Tabler also testified that BP should have circulated a full bottoms up.[113]  Furthermore, regardless of who agrees or disagrees with BP's decision, BP made a decision that increased the risks to the primary cement job, and that decision should have made BP more conservative in its operational decisions going forward about how to evaluate whether the primary cement job was isolating the hydrocarbon zones as intended.

**(Crook Report, Page 56) – opining that foam cement alone should have adequately displaced mud in the annulus during cement displacement.**

It would be a bad practice leading to a very high probability of unsuccessful cementing if the industry were to rely on a cement slurry alone to displace mud in the annulus, clean the annulus and get it ready for cementing by removing the drill cuttings and removing the gelled mud.[114]  Mr. Crook's suggestion runs counter to cementing best practices as I know them.

I further agree with Mr. Crook that unsuccessful primary cementing does not cause or contribute to a blow out.  Unsuccessful primary cementing can be remedied by squeeze jobs assuming the operator properly maintains well control after the primary cement job is complete.  That did not happen at Macondo.  I further agree with Mr. Crook that the flow path for

---

[113] *See* V. Tabler Dep. at 384:14-385:3.

[114] *See* R.M. Beirute, F.L. Sabins and K.V. Ravi, Large-Scale Experiments Show Proper Hole Conditioning: A Critical Requirement for Successful Cementing Operations, 1991, Society of Petroleum Engineers (SPE 22774) at p. 1.  ("Field experience has suggested that perhaps the most important parameter controlling the success of a cement job is the condition of the hole before the cementing operation.  If the hole has not been properly prepared (conditioned) to receive cement, the cement job will likely not be a good one even if other generally accepted practices such as use of spacers, turbulent flow, etc., are followed during the actual execution of the cement job.").

hydrocarbons was likely through the inside of the casing, but I do disagree with him on how and why the hydrocarbon got to the inside of the casing.

**Flow Path for Hydrocarbons:**  I disagree with Mr. Crook that the flow path of the Macondo blowout is "undisputed." I also disagree with Mr. Crook that BP's decisions not to run 21 centralizers and not to circulate full bottoms up prior to the cement job did not contribute to the incident.

I do not discern any coherent explanation in Mr. Crook's report of the flow path he believes to be "undisputed." However, in his deposition, Mr. Crook at times seems to indicate that, because he believes nitrogen broke out of the foam cement, that it set as permeable or porous cement. Mr. Crook also seems to suggest that hydrocarbons from the formation then flowed through permeable set cement, u-tubed down the annulus and up through the ports of the reamer shoe, up through the shoe track cement and then on up the casing to the rig floor. I find this theory highly implausible and unlikely. As shown below, BP's flow path is not plausible, and there is a more plausible flow path explanation that takes into account data and information that BP largely ignores. Moreover, as set forth below, failure to adequately centralize the production casing and failure to sufficiently circulate mud ahead of the cement job likely did contribute to the incident.[115]

With respect to Mr. Crook's testimony about flow through permeable set cement, there is no plausible basis for the theory. When formation fluid enters the annulus, percolation can only occur if a sufficient pressure gradient is available.[116] Several authors have studied the possibility of formation fluid entering through set and unset permeable cement.[117] Using Darcy's flow equation and laboratory measured permeability values, Sutton and Ravi (1989) evaluated the possibility that this mechanism was solely responsible for sustained gas percolation through setting cement.[118] Their conclusion is that flow volumes through even one Darcy cement would be too small to account for sustained gas flow.[119]

BP's and Mr. Crook's apparent flow path theory is simply not plausible. It certainly is not "undisputed" as Mr. Crook suggests.

As I discussed above, BP encountered serious difficulties in converting the float collar.[120] The massive pressure used to achieve circulation—3142 psi—likely damaged the shoe track. Importantly, the circulating pressures after the supposed float conversion was much lower than

---

[115] *Id.* at p. 8. ("A properly conditioned or "circulable" hole should be established <u>before the cement job</u> by taking advantage of the following techniques: (a) proper pipe centralization to prevent mud from being trapped behind the pipe; . . . (c) movement of the casing to help break the mud gels and to pull the pipe away from the formation walls; . . . (e) circulation of the well at the biggest rate possible . . . and for long enough periods to fully clean the hole, break the mud gels, and remove as much of the "removable" filter cake as possible.").

[116] *See* E. Nelson & D. Guillot, <u>Well Cementing</u> (2nd Ed.) at pp. 255-258.

[117] *Id.*

[118] *See id; see also* D.L. Sutton and K.M. Ravi, Halliburton Services, <u>New Method for Determining Downhole Properties that Affect Gas Migration and Annular Sealing</u>, Society of Petroleum Engineers, 1989.

[119] *See* E. Nelson & D. Guillot, <u>Well Cementing</u> (2nd Ed.) at p. 255-258.

[120] *See* MDL Ex. 2149 ("Witness and discuss problems with converting the float"); Ex. 5993 at HAL_0028667-668.

the expected pressure which raised additional concerns about the conversion.[121]  This indicates to me that an additional flow path could have opened up below the float collar (*i.e.*, a breach) causing a decrease in circulating pressure.  This could have caused cement to be pumped through an open or partially opened shoe track.  The consequence of this would have been that there would have been no cement, but only mud, below the point of the breach.  This, in effect, means that the cementing job could have been conducted without an effective shoe track.  This could have lead to the cement slurry exiting the casing somewhere between the float collar and the reamer shoe, leaving mud, contaminated with cement, below the location where the casing shoe track was damaged or breached.

    This probably provided potential direct access for the fluids from the 12.6 ppg reservoir sections below the float collar to the inside of the casing.[122]  There is a 21' thick 12.6 ppg reservoir from 18,217 feet to 18,238 feet.[123]  If the casing shoe track below the float collar was damaged during the attempted float conversion, then this would mean that there was no cement below where the casing shoe track was damaged.  This would mean that a majority of the 12.6 ppg reservoir, from 18,217 feet to 18,238 feet, could be temporarily held back only by the drilling fluid hydrostatic pressure inside the casing.

    The above scenario is what Morten Emilsen, BP's flow expert, simulates using the OLGA model.[124]  He was able to match the time and volume of fluids collected during and after the negative pressure test assuming that 13 to 16.5 feet of reservoir had direct access to the inside of the casing.  In his model, he assumes that the rest of the reservoir (other than the 13 to 16.5 feet) does not have direct access to the inside of the casing.  Where the casing shoe track below the float collar was damaged during repeated and excessive pressurizing, all the cement slurry in the annulus would be above this damaged location.  This would translate to set cement slurry in the annulus above the damaged shoe track location.  Hence, initially the reservoirs above this location would not have direct access to flow into the casing.  This breach below the float collar from excessive pressurizing is in agreement with the OLGA model.

    The possibility of damage to sections below the float collar has been acknowledged by other experts, including U.S. expert, Glen Benge.[125]  I reach this conclusion based on the empirical data that I examined.  The only sure way to know if this happened is to go into the well, drill it out and see if it is still attached.

    During the negative pressure test, as the drilling fluid is being swapped with sea water, the hydrostatic pressure inside the casing is decreased by design.  This probably enabled the hydrocarbons to enter the inside of the casing, allowing them to migrate past the damaged and/or non-gas-tight float collar.  As the hydrocarbons entered the casing, the hydrostatic pressure inside the casing decreased further due to the lower density of the hydrocarbons.  At some point,

---

[121] *See* MDL Litigation Ex. 2149 ("Troubleshoot low pressures while circulating"); Ex. 5993 at HAL_0028668. ("Company man feels uncomfortable with the circulating pressure being this low" and "Circulating at 4.0 bpm with 340 psi.  Mi Swaco model estimates circulating pressure should be about 570 psi at 4 bpm").

[122] *See* MDL Litigation Ex. 3533 at BP-HZN-BLY00082909.

[123] *Id.*

[124] *See* MDL Ex. 7920.

[125] *See* G. Benge Dep. at pp. 101-102.

**Page 29**

the 7 inch casing likely collapsed due to the differential pressure between the annulus and the casing exceeding the collapse pressure. I have done the calculations to determine that this was likely.

The 7 inch casing likely collapsed above the cemented section of the 7 inch annulus, which would put the location of the collapse around the previous shoe at 17,168 feet. The likelihood of a collapse in this area was corroborated by Vector Magnetics when it conducted ranging operations to intercept the Macondo well post-incident.[126]   David Winter of Vector Magnetics testified that the ranging tool used by Vector Magnetics experienced an "end of pipe" effect that could only have been caused by a couple of possibilities.[127]   One of those possibilities was that the 9 7/8" liner and the 7" production casing were electronically or physically parted around the location of the previous shoe.[128]   A collapse in this area also makes sense given that, due to BP's "cement short fall" design, there would not be cement in this area reinforcing the casing against a collapse.

Hence, the flow path of hydrocarbons from the 12.6 ppg reservoir at the bottom of the well was probably through a breach in the casing shoe track.  There was probably no cement below the breach allowing this exposed 13 to 16.5 feet of the reservoir direct access to flow inside of the casing.  There was competent cement above the breach so the other reservoirs didn't have access to the inside of the casing, at least initially.  This is in agreement with the OLGA model.  As the hydrocarbons entered the inside of the casing, the pressure inside the casing decreased and resulted in casing collapse due to the difference in pressure inside and outside the casing.  This is in agreement with the end-of-pipe effect observed by Vector Magnetics.  Once the casing collapsed, additional flow paths could have been established for other hydrocarbon zones higher in the annulus, such as the M57B zone, which were located in an entirely uncentralized upper annulus.  The channeling caused by this lack of centralization and lack of circulation prior to cementing likely created communication pathways for these higher sands to flow through the location of the casing collapse, adding to the flow already coming up the casing from the exposed 12.6 ppg reservoirs at the bottom of the well.

### (Crook Report, Page 57) – opining that a Displace 3D model conclusively established that no channeling occurred in the well.

I disagree with Mr. Crook's characterization of and opinion regarding Displace 3D modeling, particularly his conclusion that it showed that no channeling at all occurred in the well.  Displace 3D does not take into account the gelling of mud or channeling caused by a lack of mud removal.[129]   It only looks at one fluid displacing the other when all of them are continuously mobile, without going static.[130]   Accordingly, MDL Exh. 4352 does not indicate to me that there would be no channeling in the well, particularly since OptiCem modeling (which

---

[126] *See* MDL Litigation Ex. 3363 (Vector Magnetics Report).

[127] *See* D. Winters Dep. at 135:14-147:18.

[128] *See* MDL Litigation Ex. 3364;  MDL Litigation Ex. 3360; MDL Litigation Ex. 3361; MDL Litigation Ex. 3357; MDL Litigation Ex. 3358.

[129] *See* D. Bolado Dep. at 252:5-253:13.

[130] *Id.* at 244:20-245:9.

shows a different kind of channeling not shown by Displace 3D) shows that there would be channeling.

## VIII. RESPONSE TO BP'S WAIT ON CEMENT (WOC) ARGUMENT.

**(Crook Report, Pages 63-68)**

Halliburton used API recommended temperature schedule for compressive strength testing. As Glen Benge states in his deposition this was an accepted procedure and Halliburton did not do anything wrong in using the API procedure.[131]

I agree with Mr. Benge that temperature simulator such as Wellcat gives better estimation of temperature schedule for wells such as deepwater. I disagree with Mr. Crook that temperature simulator is something new to the cementing. A temperature simulator such as Wellcat is well recognized in the industry, including BP.[132]

Temperature simulators have the capability to include the heat of hydration that is generated during cement curing to determine the temperature schedule. Wellcat has this particular feature and has been successfully used in the industry. Wellcat temperature simulator was used to simulate the temperature during cement slurry hydration and is shown in the following table:

**Table 1**

| Source | Foam Testing in Water Bath | Base Slurry Testing in UCA | | |
|---|---|---|---|---|
| | Time for 135F to 180F | Time for 135F to 180F | Time for 180F to 210F | Pressure |
| Wellcat[1] | 3 ½ hrs | 3 ½ hrs | 12 | 14,458 psi |
| Halliburton | 4 hrs | 4 hrs as per API | | 14,458 psi |
| OTC | 8 hrs | 8 hrs | 8 hrs | 3,000 psi |

[1]Heat of Hydration option used. HOH=30Btu/lbm

OTC conducted compressive strength of a base slurry, in UCA, using lab stock, at 3,000 psi.[133] API recommends that in a deep well like Macondo, the compressive strength of a base slurry be determined using the bottom hole pressure. The bottom hole pressure of the Macondo well was approximately 14,458 psi.[134] It is well recognized in the industry that the compressive strength development of cement slurry increases considerably with increase in pressure, especially when the pressure reaches the levels of the Macondo well.

---

[131] *See* G. Benge Dep. at 392:5-394:2.

[132] *See* MDL Litigation Ex. 5861 (BP Tubular Design Manual, Sec. 6.2.3).

[133] *See* MDL Litigation Ex. 5939 at p. 27.

[134] *See* MDL Litigation Ex. 4564.

Halliburton conducted its compressive strength test on the rig blend in April, 2010, at the bottom hole pressure of approximately 14,458 psi, and using the API recommended temperature schedule.  This  showed that the UCA compressive strength of the base slurry at 12 hrs reached 2,301 psi.[135]  Tests in the lab are conducted under ideal conditions and this reflects the minimum length of time for waiting before subsequent well operations.

OTC tested the base slurry cement samples at 3,000 psi and at a slower rate of heating than the Wellcat estimation.[136]  As demonstrated in Table 1, Wellcat estimates that the sample would go from 135F to 180F in 3 ½ hrs whereas OTC heated the sample from 135F to 180F in 8 hrs.  Thus, using both lower pressure and lower rate of heating than estimated by Wellcat, OTC tests showed that the cement would start setting at about 16 hrs.[137]  Had OTC conducted their compressive strength test on the lab cement sample at the Macondo well bottom hole pressure of 14,458 psi (instead of 3,000 psi) and heated the cement sample using Wellcat estimate for the well of 135F to 180F in 3 ½ hrs (instead of 8 hours), the cement sample would have set much earlier than the 16 hours.

I would expect a prudent operator to use the lab data and the information obtained during the well operations preceding the cement job to decide the appropriate weight on cement time (WOC).  Operators in general tend to wait 24-72 hours WOC before continuing with subsequent well operations.[138]  This way, if the cement gets contaminated with mud during inadequate placement procedure (as probably happened on the Macondo well for reasons outlined below) the longer WOC makes it more probable that the cement will set despite the contamination.

BP did not consider that the following factors could have increased the risk of mud-cement contamination:

- Using less than the optimum number of centralizers
- Conducting less than a full bottoms up after the well has been static for three days
- Using a small volume of cement
- Pumping cement down the annulus that contained debris (as evidence by difficulties in float collar conversion)
- Placing the casing at or close to loss circulation zone
- Placing the casing at or close to main reservoir zones

BP should have considered these factors in determining the WOC.

---

[135] *See* MDL Litigation Ex. 802 at HAL-0010642.

[136] *See* MDL Litigation Ex. 5937.

[137] *Id.*

[138] *See* R. Beirute Dep. at 433:12-434:15; G. Benge Dep. at 151:2-15.

   I  reserve the right to modify this report and to supplement my opinions if additional data becomes available or if other reports are filed or supplemented.


30/Jan/2012

Dr. Kris Ravi

# EXHIBIT 13

01-42959
PW/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG    )     MDL NO.  2179
"DEEPWATER HORIZON" in the    )
GULF OF MEXICO,  on    )     SECTION: J
APRIL 20, 2010    )
    )     JUDGE BARBIER
    )
    )     MAG. JUDGE SHUSHAN

## CONFIDENTIAL

### *WorldwideVIEW* ™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Andreas Momber
## Volume 2

**JULY 2 , 2013**

# *COPY*



*Systems Technology for the Litigation World*

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing

**For U.S. & International Services
800 - 745 - 1101**

1    extent they existed in the annular cement was

2    caused by any of those three things I just

3    read from your report on Page 6?

4         MR. EISENBERG:  Object to form.

02:47 5       A.    Well, this 4.2, the three

6    bullets.

7         Q.    (BY MR. HILL)  Yes.

8         A.    They refer to -- mean to refer

9    to the shoe track cement.

02:47 10      Q.    Just the shoe track cement, fair

11   enough.  All right.  So I don't have much

12   time and so I took liberty of writing down

13   certain words that I found in your report and

14   I can give you page numbers if you care to

02:47 15   look at them.

16         But you have said that that shoe

17   track cement was disturbed on Page 5,

18   deteriorated on Page 6, pre-damaged on

19   Page 13, and had -- and containing

02:47 20   substantial flaws on Page 14, fair?

21        MR. EISENBERG:  Object to form.

22        Q.    (BY MR. HILL)  Those sound like

23   your words?

24        MR. EISENBERG:  Object to form.

02:48 25      A.    As -- I would think so, that I

1    used these words, although I'm not sure where

2    they are on the particular pages.

3         Q.    (BY MR. HILL)  You can go back

4    and look and correct me at trial if I'm

02:48  5    wrong, okay?

6              What is the basis for your

7    opinion here today that that shoe track

8    cement suffered from any of those four

9    characterizations?

02:48  10        MR. EISENBERG:  Object to form.

11        Q.    (BY MR. HILL)  Is it just the

12   Chevron report?

13        MR. EISENBERG:  Object to form.

14        A.    No, it is the -- the case that

02:48  15   there are flow paths in that cement --

16        Q.    (BY MR. HILL)  Uh-huh.

17        A.    -- and it's my understanding

18   that a flow of hydrocarbons through the shoe

19   track cement could not have happened if it

02:48  20   would have been in a perfect, say,

21   undisturbed condition.

22        Q.    Okay.  Did you leave room --

23   you're an objective man, I assume, as a

24   scientist.  Do you leave room for the

02:49  25   possibility that there were operational

1    things that happened at Macondo that, for

2    example, may have caused a breach in the shoe

3    track?

4          MR. EISENBERG:  Object to form.

02:49  5          A.     Well, the list on Page 6 is not

6    complete.  I wrote this would include the

7    following possibilities.

8          Q.     (BY MR. HILL)  Fair enough.

9          A.     So, yes, there -- there might be

02:49 10    other reasons for the formation of what's

11    called -- be called channels.

12          Q.     Fair enough.  In fact, on your

13    Page 8, there is a step increase at 21:30 on

14    this Figure 5.1, correct?  A step increase in

02:49 15    the -- in the oil influx, correct?

16          A.     At 9:30, yes.

17          Q.     Yeah.  And this is that point

18    where you basically attribute this to

19    hydrocarbon -- I'm sorry, to hydraulic

02:50 20    fragmentation, correct?

21          MR. EISENBERG:  Object to form.

22          A.     What I contribute this to an

23    increase in the cross-section in the cement

24    available to the hydrocarbons to flow -- flow

02:50 25    through and, yes, a mechanism for the