# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig | § | MDL NO. 2179 |
| "Deepwater Horizon" in the Gulf of | § | |
| Mexico, on April 20, 2010 | § | SECTION: J(1) |
| | § | |
| This Document Relates to: | § | Judge Barbier |
| 2:13-cv-01778 and All Cases | § | |
| | § | Mag. Judge Shushan |
| | § | |

**************************************************************************

## PLAINTIFFS' FIRST AMENDED AND SUPPLEMENTAL COMPLAINT FOR DAMAGES

**NOW COME PLAINTIFFS,** Sergio Alvarado and his wife, Eileen Gonzalez, through their undersigned counsel, who file herein Plaintiffs' First Amended and Supplemental Complaint for Damages, replacing the original Complaint for Damages. Said First Amended and Supplement Complaint relates back to the original Complaint in accordance with the applicable Federal Rules of Civil Procedure, wherein, in said Amended and Supplemental Complaint, Plaintiffs further allege, aver and represent the following to wit:

## THE PARTIES, JURISDICTION AND VENUE

1. Plaintiff, Sergio Alvarado (hereinafter referred to as "Plaintiff"), is an individual over the age of majority who is a resident and citizen of Louisiana, domiciled in the Parish of Jefferson.

2. Plaintiff, Eileen Gonzalez (hereinafter referred to as "Plaintiff"), is an individual over the age of majority who is a resident and citizen of Louisiana, domiciled in the Parish of Jefferson. At all relevant times herein, Eileen Gonzalez was married to Sergio Alvarado (sometimes herein collectively referred as "Plaintiffs").

3.  Plaintiffs bring these claims pursuant to Federal General Maritime Law including and/or under La. Civ. Code articles 2315, 2316, 2317, 2317.1, 2320 and/or 2322.

4.  Jurisdiction exists before this Court pursuant to Article III, Section 2 of the United States Constitution, which empowers the federal judiciary to hear, "all Cases of admiralty and maritime jurisdiction."

5.  In addition, jurisdiction in this case is asserted under the General Maritime Law of the United States, 28 USC §1333. The claims presented herein are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.  Plaintiffs hereby designate this case as an admiralty or maritime case, and request a jury trial, pursuant to 28 U.S.C. §1873.

6.  The Court also has jurisdiction over this action pursuant to The Admiralty Extension Act, 46 U.S.C. §30101, which extends the admiralty and maritime jurisdiction of the United States to cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land.

7.  In the alternative, jurisdiction is asserted under the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §1331 *et seq.*

8.  In addition, this Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, 28 U.S.C. §1332 and 28 U.S.C. §1333.

9.  Venue is proper in this Honorable Court in the United States District Court for the Eastern District of Louisiana given the events detailed hereafter and the litigation arising out of the *Deepwater Horizon* catastrophe.

10. The amount in controversy exceeds $75,000.00, exclusive of interests and costs, and is between citizens of different States.

11. Based upon information and belief, Sergio Alvarado, Plaintiff herein, is not a class member of the Medical Benefits Settlement Class due to his timely opt-out.

12. Based upon information and belief, Sergio Alvarado, Plaintiff, is not a class member of the Economic and Property Damages Settlement Class due to his timely opt-out.

13. Plaintiff, Sergio Alvarado, was hired by BP or BP's clean up and response contractors, ("BP" is defined below) and engaged in oil spill cleanup activities subsequent to the Oil Spill and injured as a result of exposure to oil and/or oil dispersing chemicals and/or decontaminants by virtue of his employment as a clean-up and/or response worker. Plaintiff also suffered lost wages as a result of said Oil Spill.

14. The *Deepwater Horizon* explosion and subsequent oil spill was proximately caused by the acts and omissions of one or more of the defendants named herein, and by virtue of exposure and contact with dispersants, oil, oil bi-products, distillates, benzene, hexane and other chemicals which were used and or exposed from the oil spill, including dispersants that were authorized by and/or released by one or more of the defendants.

15. Defendant, BP Exploration & Production, Inc. ("BP Exploration") is a Delaware corporation with its principal place of business in Warrenville, Illinois. BP Exploration was a lease holder and the designated operator in the lease granted by the former Minerals Management Service ("MMS")[1] allowing it to perform oil exploration, drilling and production-related operations in Mississippi Canyon Block 252, the location known as "Macando" where the spill originated. BP Exploration was designated as the "responsible party" by the U.S. Coast Guard under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C.

---

[1] The MMS, a federal entity that divides the Gulf of Mexico's seafloor into rectangular "blocks," and then auctions the rights to drill for oil and gas beneath those blocks of seafloor, was recognized as the Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE) on June 18, 2010. It shall, however, be referred to as the MMS throughout this Complaint.

§2714. This Court has personal jurisdiction over BP Exploration, because BP Exploration is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

16. Based upon information and belief, defendant, BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas. BP America was the party to the drilling contract with Transocean Ltd. for the drilling of Macondo well by the *Deepwater Horizon* vessel. This Court has personal jurisdiction over BP America, because BP America is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

17. Based upon information and belief, defendant, BP p.l.c. is a British public limited company with its corporate headquarters in London, England. BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo. BP p.l.c. is one of the world's largest energy companies with over 80,000 employees and $239 billion in revenues in 2009. BP p.l.c. operates its various business divisions, such as the "Exploration and Production" division within BP Exploration and BP America, through vertical business arrangements aligned by product or service groups. BP p.l.c.'s operations are worldwide, including in the United States. Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Louisiana and the U.S. more generally.

18. Based upon information and belief, BP p.l.c. states that it is the leading producer of oil and natural gas in the United States and the largest investor in U.S. energy development. A sampling of BP p.l.c.'s contacts with the U.S. are as follows: (a) BP p.l.c.'s American Depository Shares are listed on the New York Stock Exchange ("NYSE") and BP p.l.c. is

the largest non-U.S. company listed on the NYSE; (b) roughly 40% of BP's shares are owned by U.S. individuals and institutions; (c) BP p.l.c. files annual reports with the U.S. Securities and Exchange Commission; (d) approximately 60% of BP p.l.c.'s fixed assets are located in the U.S. or the European Union; and (e) BP p.l.c. reports having 2,000 U.S.-based employees in non-Exploration and Production, non-Refining and Marketing BP entities, based upon information and belief.

19. This court has jurisdiction over BP p.l.c. pursuant to Louisiana's long-arm statute (La. Rev. Stat. Ann. §13:3201(B), in combination with Rule 4(k)(l)(A) of the Federal Rules of Civil Procedure). Plaintiffs' causes of action arise out of wrongful conduct committed by BP p.l.c., directly or indirectly by its agents that caused injury or damage in Louisiana by an offense or quasi-offense committed through an act or omission. These acts or omissions took place both before the blowout resulting in the oil spill, which is described more fully herein, and in the negligent conduct of BP p.l.c. after the blowout in attempting to contain the oil spill. At all relevant times herein, BP p.l.c. regularly does or solicits business, or engages in other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in Louisiana. These acts or omissions took place both before the blowout resulting in the Oil Spill and in the negligent conduct of BP p.l.c. after the blowout in attempting to contain the Oil Spill.

20. In addition, this Court has personal jurisdiction over BP p.l.c. under agency and alter ego principles, because based upon information and belief, BP p.l.c.'s agents, BP America and BP Exploration are both wholly owned subsidiaries of BP p.l.c. In BP p.l.c.'s Annual Report in 2009, in which it presents a consolidated financial statement that includes BP America and BP Exploration, based upon information and belief, BP p.l.c. states that it

"controls" both BP America and BP Exploration, among other subsidiaries, meaning that it has "the power to govern the financial and operating policies of the [subsidiary] so as to obtain benefits from its activities…"

21. BP p.l.c.'s direct, joint and/or assumed responsibility and/or liability for safety and well control, both before and/or after the explosion and blowout on April 20, 2010, is further evidenced by the announcement of the Macondo  Project on the BP website hosted and copyrighted by BP p.l.c., the publication of information concerning the casualty and spill on the BP website hosted and copyrighted by BP, the express and/or implied acceptance of responsibility for the safety of BP operations in North America and the Gulf of Mexico in statements by officers of BP p.l.c., the presence (upon information and belief) of a BP p.l.c. officer or employee on the *Deepwater Horizon* for the celebration that occurred shortly before the explosions and fire, the direct participation of BP p.l.c. employees in the post-casualty investigations, the direct participation of BP p.l.c. officers and employees in the post-casualty well-control efforts, and the direct participation of BP p.l.c. in the establishment and/or funding of the Escrow Fund and/or Gulf Coast Claims Facility, based upon information and belief.

22. Moreover, BP p.l.c. undertook the duty for pay and/or gratuitously to clean up the Oil Spill and as a result, is liable for its acts and omissions in the attempt to clean-up the Oil Spill.

23. Venue is appropriate in this District under 28 U.S.C. §1391 because the events or omissions giving rise to the claims asserted herein occurred in this District.

24. Plaintiffs further adopt and incorporate by reference all jurisdictional allegations against BP p.l.c. set forth in Paragraphs 212-218 of the Amended B1 Master Complaint,

Document No. 1128 filed in MDL No. 2179, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010.*

25. BP Exploration, BP America, and BP p.l.c. are generally referred to herein collectively as the "BP Defendants" or "BP." Based upon information and belief, as lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations.

26. Defendant, Transocean Ltd. ("Transocean Ltd.") is a Swiss corporation that, upon information and belief, maintains substantial U. S. offices in Houston, Texas, and that at all pertinent times was, upon information and belief, doing business in the State of Louisiana and within this district.  According to its Complaint and Petition for Exoneration from or Limitation of Liability in The MDL, Transocean Ltd. was an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.

27. Based upon information and belief, defendant, Transocean Offshore Deepwater Drilling, Inc. ("Transocean Offshore") is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district.  Transocean Offshore is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.

28. Based upon information and belief, defendant, Transocean Deepwater, Inc. ("Transocean Deepwater"), is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and

within this district.  Transocean Deepwater is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.

29. Based upon information and belief, defendant, Transocean Holdings, LLC ("Transocean Holdings") is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. Based upon information and belief, Transocean Holdings is affiliated with Transocean Ltd. and is a wholly-owned subsidiary of Transocean Offshore. Based upon information and belief, Transocean Holdings is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon* and participated in the *Deepwater Horizon's* offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated. Based upon information and belief, Transocean Holdings and party to the contract with BP regarding the lease of the *Deepwater Horizon* for drilling operations in the Gulf of Mexico. Based upon information and belief, on April 28, 2010, the U.S. Coast Guard named Transocean Holdings as a "Responsible Party" under the Oil Pollution Act for the surface oil spill resulting from the blowout by the *Deepwater Horizon*.

30. Based upon information and belief, defendant, Triton Asset Leasing GmbH ("Triton") is a Swiss limited liability company with its principal place of business in Zug, Switzerland. Based upon information and belief, Triton is affiliated with Transocean Ltd. and is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.

31. Defendants, Transocean Ltd., Transocean Deepwater, Transocean Offshore, Transocean Holdings, and Triton are hereinafter referred to collectively as "Transocean." Based upon information and belief, at the Macondo site, Transocean provided the *Deepwater Horizon* vessel and personnel to operate it. At all relevant times of the Oil Spill, Transocean,

8

subject to BP's inspection and approval, was responsible for maintaining well control equipment, such as the blowout preventer and its control systems. Transocean also provided operational support for drilling-related activities on board the *Deepwater Horizon*, as well as onshore supervision and support for those drilling activities at all times relevant to the Oil Spill, based upon information and belief.

32. Based upon information and belief, defendant, Halliburton Energy Services, Inc. is a Delaware corporation with its principal place of business in Houston, Texas. Halliburton is registered to do and does business in the State of Louisiana. Halliburton provided engineering services, materials, testing, mixing, and pumping for cementing operations on board the *Deepwater Horizon*, as well as onshore engineering support for those operations. Based upon information and belief, Halliburton was also responsible for the provision of technical advice about the design, modeling, placement and testing of the cement that was used in the Macondo well. At and before the time of the blowout, Halliburton was engaged in cementing operations to isolate the hydrocarbon reservoirs and seal the bottom of the well against the influx of hydrocarbons like gas and oil, based upon information and belief.

33. Based upon information and belief, Halliburton division Sperry Drilling Services (formerly Sperry Sun Drilling Services), based in and/or with its principal place of business in Houston, Texas, was responsible for mudlogging personnel and equipment on the *Deepwater Horizon*, including downhole drilling tools. Sperry mudlogging personnel were partially responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, and pressure fluctuations. "Halliburton" shall refer to both Halliburton Energy Services, Inc. and its Sperry division.

34. Based upon information and belief, defendant M-I, LLC ("M-I"), is a Delaware limited liability company with its principal place of business in Wilmington, Delaware, and at all relevant times was doing business in Louisiana. Based upon information and belief, M-I (also known as M-I SWACO) supplies drilling and completion fluids and additives to oil and gas companies in Louisiana and elsewhere, providing pressure control, vessel instrumentation, and drilling waste management products and services. On the Deepwater Horizon, M-I provided mud products, including drilling fluids and spacers, engineering services, and mud supervisory personnel, such as mud engineers and drilling fluid specialists, to manage the properties of those fluids in the well. M-I employees planned and/or supervised key fluid related activities at Macondo, such as the mud displacement that was occurring at the time of the April 20, 2010, blowout.

35. BP, Transocean, Halliburton, and M-I are collectively referred to herein as the "drilling defendants," as they were all involved in the drilling, cementing, and/or other temporary well abandonment activities of the *Deepwater Horizon,* and thus their actions caused and/or contributed to the Oil Spill.

36. Based upon information and belief, defendant Cameron International Corporation f/k/a Cooper-Cameron Corporation ("Cameron"), is a Delaware corporation with its principal place of business in Houston, Texas. Cameron does business in the State of Louisiana. Based upon information and belief, Cameron manufactured, designed, supplied, and/or installed the *Deepwater Horizon's* sub-sea emergency well-closure device known as a blowout-preventer ("BOP"), which is, and was at all material times, an appurtenance of the vessel and a part of the vessel's equipment. The Cameron-made BOP that was installed at the Macondo wellhead failed to operate as intended at the time of the blowout on April

20, 2010, was improperly designed, was inappropriate for the intended environment or use, and/or possessed product defects.

37. Based upon information and belief, defendant Anadarko Petroleum Corporation ("Anadarko"), is a Delaware corporation with its principal place of business in The Woodlands, Texas. Anadarko does business in the State of Louisiana. Anadarko is an oil and gas exploration and production company.

38. Based upon information and belief, defendant, Anadarko E&P Company LP ("Anadarko E&P"), is a Delaware limited partnership with its principal place of business in The Woodlands, Texas. Anadarko E&P does business in the State of Louisiana. Anadarko E&P is an oil and gas exploration and production company and has been recently renamed Anadarko E&P Onshore LLC, based upon information and belief.

39. Based upon information and belief, defendant MOEX Offshore 2007 LLC ("MOEX Offshore"), is a Delaware corporation with its principal place of business in Houston, Texas. MOEX Offshore does business in the State of Louisiana and/or in state and/or federal waters off the coast of Louisiana. Based upon information and belief, MOEX Offshore is a wholly-owned subsidiary of MOEX USA Corporation, which in turn is a wholly-owned subsidiary of Mitsui Oil Exploration Co., Ltd. ("MOECO"). However, MOEX Offshore is not a distinct corporate entity performing autonomous business activities, but instead an entity wholly dominated and controlled by its ultimate parent company, MOECO, as alleged herein. At all relevant times, MOEX Offshore was a party to the Operating Agreement, and held a 10% ownership interest in the lease of the Macondo Prospect site in the Mississippi Canyon Block 252 in the Gulf of Mexico.

40. Based upon information and belief, defendant MOEX USA Corporation ("MOEX USA"), is incorporated in Delaware and has its principal place of business in Houston, Texas. Based upon information and belief, MOEX USA is the parent company of MOEX Offshore. However, MOEX USA is not a distinct corporate entity performing autonomous business activities, but is instead an entity created solely to serve as a holding company for other corporate entities, including MOEX Offshore, and is dominated and controlled by its parent company MOECO, as alleged herein. MOEX USA is named as a defendant herein because it is part of the corporate construct by which MOECO owns, dominates, controls and benefits from the activities of MOEX Offshore.

41. Based upon information and belief, defendant Mitsui Oil Exploration Co., Ltd. ("MOECO"), is incorporated in Japan and has its principal place of business in Tokyo, Japan. As of June 30, 2010, MOECO identified itself as having the following U.S. subsidiaries or affiliates: MitEnergy Upstream LLC, MOEX USA Corporation, MOEX Offshore 2007 LLC, MOEX Gulf of Mexico Corporation, MOEX Oil & Gas Texas LLC, and Mitsui E&P USA LLC. Each of these subsidiaries of MOECO shares the same Houston, Texas, address. Further, MOECO wholly owns MOEX USA, which in turn wholly owns MOEX Offshore. As alleged herein, MOECO is named as a defendant herein because at all relevant times it dominated and controlled the activities of MOEX Offshore and MOEX USA, such that it is the alter ego of its subsidiaries, MOEX Offshore and MOEX USA, thus requiring that the liability of MOEX Offshore and/or MOEX USA be imputed to MOECO. Alternatively, as alleged herein, MOEX Offshore and MOEX USA acted at all relevant times as agents of MOECO and the liability of those entities should therefore be imputed to MOECO.

42. As alleged herein, MOECO's activities in the United States, including in this and all relevant jurisdictions, have been continuous and systematic. MOECO has purposely availed itself of the protections, benefits, and privileges of American law and should have reasonably anticipated being involved in this litigation in the United States. Moreover, because at all relevant times MOECO asserted dominion and control over the business, operations and policy decisions of MOEX Offshore and MOEX USA, those U.S. companies were merely the alter egos and/or agents of MOECO. Thus, MOECO is subject to the exercise of both general and specific jurisdiction by this Court, an exercise of jurisdiction that will not offend traditional notions of fair play and substantial justice.

43. Based upon information and belief, MOECO is a majority-owned subsidiary of Mitsui & Co., Ltd. ("Mitsui"). Mitsui is a publically traded company, whose American depository shares are traded on the NASDAQ Global Select Market. MOECO is listed in Mitsui's consolidated financial statements and filings with the U.S. Securities and Exchange Commission as a "major" subsidiary of Mitsui. MOECO is engaged in the business of "exploration, development, production and sales of crude oil, natural gas and other mineral resources and investment in companies engaged in these activities."

44. Based upon information and belief, MOECO operates through its own activities and those of its subsidiaries and affiliates located throughout the world, including the United States. Since MOECO opened its office in Houston, Texas, in February of 2002, "we have been expanding our business in the USA," and "striving to acquire assets with high potential" in the United States. MOECO identifies the United States as a "Focus Area" that it seeks to continue to "develop into [a] Core Area[.]"

45. Based upon information and belief, MOECO's expansion of its United States business ventures has included numerous oil and gas exploration and investment activities in the Gulf of Mexico. For example, in May of 2006, MOECO and Mitsui acquired a 50% interest in an oil and gas leasehold in the Gulf of Mexico. These Japanese companies established MitEnergy for the purpose of holding that interest. In November of 2009, MOECO and Mitsui arranged for the company to sell their Gulf of Mexico oil and gas assets to a third party, the proceeds of which solely benefited MOECO.

46. In July of 2007, MOECO entered into an agreement with BP E&P for a partial interest in an ultra-deep gas exploration project at the Gouda Prospect site in the Gulf of Mexico, noting in a press release that its participation in this project "provides an excellent opportunity to further expand its business in the US." As alleged herein, MOECO later orchestrated a transaction in which it used MOEX Offshore to obtain 10% working interest in the Macondo Prospect site through an exchange with BP E&P, swapping MOECO's interest in the Gouda Prospect for the 10% interest in the Macondo Prospect.

47. More recently, in February of 2010, MOECO reported that it had entered into yet another new business in the United States when "we [MOECO and Mitsui] entered into a definitive agreement with a partner to participate in the development and production of Marcellus Shale Gas Project in the State of Pennsylvania."

48. Although MOEX Offshore was the entity identified as the owner of the 10% leasehold interest in the Macondo Prospect – a 10% interest in the hydrocarbons extracted from that location – it was MOECO that was responsible for creating MOEX Offshore and its immediate holding company, MOEX USA, and for orchestrating the acquisition of the ownership in the Macondo Prospect. As alleged herein, in July 2007, MOECO announced

it had entered into an "Acquisition and Participation Agreement with BP Exploration and Production, Inc. … on the 29th of June, 2007 to participate in an ultra-deep gas exploration project in the Gulf of Mexico … which is being actively pursued by BP." That gas exploration project was the exploratory drilling exercise at the Gouda Prospect site in the Garden Banks Block 997 in the Gulf of Mexico. MOECO announced that it would own a 15% leasehold interest in the Gouda Project site (an interest apparently reduced at 10%).

49. In September 2007, MOECO, through its agent/alter ego MOEX USA, established MOEX Offshore for the purpose of holding MOECO's interest in various Gulf of Mexico projects, including the Gouda Prospect, and later, the Macondo Prospect.

50. In November 2009, BP E&P and MOEX Offshore entered into a Lease Exchange Agreement (effective October 1, 2009), pursuant to which MOEX Offshore conveyed to BP E&P its interest in the Gouda Prospect site, and BP E&P, in exchange, conveyed to MOEX Offshore a 10% interest in the Macondo Prospect site. A condition of the Lease Exchange Agreement was that MOEX Offshore pay BP E&P "cash consideration of 1.92 million dollars," to be "allocated" to the Macondo Prospect lease. The Lease Exchange Agreement also refers to a February 15, 2008, operating agreement between BP E&P, as operator, an the MOECO subsidiary, MitEnergy, as non-operator, concerning the Goada Prospect lease. Upon information and belief, Plaintiffs allege that it was in fact MOECO that caused and directed MOEX Offshore to enter into the Lease Exchange Agreement for the purpose of obtaining a leasehold interest in the Macondo Prospect.

51. On or about October 1, 2009, BP E&P, as Operating Party, and MOEX Offshore, as a Non-Operating Party, entered into the Operating Agreement. On or about December 17, 2009, BP E&P, MOEX Offshore, Anadarko, and Anadarko E&P executed a "Joinder" of

the Operating Agreement. Subsequently, the parties to the Operating Agreement held the following working interest ownership in the lease of the Macondo Prospect: BP E&P: 65%, MOEX Offshore: 10%, Anadarko E&P: 22.5%, and Anadarko: 2.5%.

52. At all times relevant herein, MOECO has dominated and controlled the business, operations, policies, and actions of MOEX Offshore and MOEX USA to the extent that there is no meaningful distinction between them and MOECO, and they are more accurately described as agents and/or alter egos of MOECO, rather than simply its subsidiaries. MOECO dominates and controls MOEX Offshore and MOEX USA through, inter alia: financial, operational, and policy control; a lack of corporate formalities at MOEX Offshore and MOEX USA; and nearly identical directors, managers, and/or officers of both MOEX Offshore and MOEX USA; four (4) of them are and/or were also directors and executive officers, and the Texas Secretary of State lists MOECO's Tokyo address for all of the overlapping directors/officers. MOEX USA and MOEX Offshore also share the same Houston, Texas, office and have a common president, Naoki Isshii, at all relevant times herein. Upon information and belief, Mr. Ishii is and/or was the only management level employee of MOEX Offshore and MOEX USA, and he reports directly to MOECO directors and/or executive officers, at all relevant times herein.

53. Although Mr. Ishii has issued public statements with regard to the *Deepwater Horizon* disaster and the ensuing Oil Spill, it has been MOECO, speaking on behalf of MOEX Offshore and itself, that has been the primary source of public statements concerning the Oil Spill and its aftermath. MOECO's parent, Mitsui, has also made numerous public statements about the potential impact of the spill on its financial condition. Upon information and belief, Plaintiffs allege that all public statements about the Oil Spill and

16

its aftermath by or on behalf of MOEX Offshore, as well as all operational and financial decision-making concerning the Oil Spill and its aftermath (including payment, or non-payment, of response and clean-up expense invoices from BP E&P), have been made and directed by MOECO (and in some instances, Mitsui).

54. Thus, neither MOEX Offshore nor MOEX USA are operated as corporations distinct from each other or from MOECO – rather, MOECO conducts its U.S. activities through these agent and/or alter ego entities, and all activities of MOEX Offshore and MOEX USA should be imputed to MOECO, subjecting MOECO to exercise of general and/or specific personal jurisdiction in the United States and this Court.

55. Neither MOEX Offshore nor MOEX USA are distinct corporate entities that perform autonomous business activities. Instead, both entities are dominated and controlled by their ultimate parent company, MOECO, which wholly owns MOEX USA, which in turn wholly owns MOEX Offshore. Because MOECO is an alter ego of its subsidiaries (MOEX Offshore and MOEX USA), any and all liability of MOEX Offshore and MOEX USA is imputed to MOECO.

56. Defendants MOEX Offshore, MOEX USA, and MOECO are referred to collectively herein as "MOEX."

57. While BP was the sole lease operator of the *Deepwater Horizon,* Anadarko, Anadarko E&P, and MOEX were considered non-operational leaseholders. On October 1, 2009, BP Exploration, as operator, and MOEX Offshore, as non-operator, entered into the Macondo Prospect Offshore Deepwater Operating Agreement. On December 17, 2009, BP Exploration, MOEX Offshore, Andarko E&P, and Andarko executed a "Joinder" of the Operating Agreement. Subsequently, the parties to the Operating Agreement held the

following ownership percentages in the Macondo Prospect: BP Exploration, 65%; MOEX Offshore, 10%; Anadarko E&P, 22.5%; and, Anadarko, 2.5%. According to the MMS's website, effective April 1, 2010, record title interest in the Macondo prospect was held as follows: BP Exploration, 65%; MOEX Offshore, 10%; and, Anadarko, 25%. As joint holders of a leasehold interest in an oil or gas lease on land beneath navigable waters, defendants Anadarko, Anadarko E&P, and MOEX are jointly, severally, and solidarily liable with their codefendants BP pursuant to the Oil Pollution Act. Anadarko, Anadarko E&P, and MOEX also had access to Halliburton/Sperry Sun INSITE real-time data that was transmitted from the *Deepwater Horizon* on April 20, 2010, and therefore knew or should have known of the red flags indicating a leak in the well in sufficient time to avert the disaster.

58. Drilling defendants, Cameron, Anadarko, Anadarko E&P, and MOEX are jointly, severally, and solidarily liable under various principles of federal, maritime, and/or applicable State law, and under the Oil Pollution Act.

59. All of the above named defendants are also generally referred as "defendants" herein.

## FACTUAL BACKGROUND

### *Macondo lease and BP's Exploration Plan and Drilling Permit*

60. Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

61. On June 1, 2008, BP acquired a ten-year lease from the MMS to search for and exploit hydrocarbon reservoirs at the Macondo prospect site in Mississippi Canyon Block 252, a location on the Outer Continental Shelf 48 miles off the coast of Louisiana.

62. In the process of obtaining its lease, BP represented that it had planned and prepared its

proposed activities in a manner that was safe, conformed to applicable regulations and sound

conservation practices and would not cause undue or serious harm or damage to human or

marine health or the coastal environment.

63. BP represented that it was unlikely that an accidental surface or subsurface oil spill would

occur from the proposed activities. In the event that a spill did occur, BP predicted a worst

case scenario of 162,000 gallons of oil per day, an amount which it assured the MMS that it

was prepared to respond to and handle. BP also claimed the well's distance from the nearest

shoreline would preclude any significant adverse impacts from a spill.

64. Based on these assurances, the MMS approved BP's Initial Exploration Plan ("EP") for the

Macando prospect on April 6, 2009, including approval of a "categorical exclusion" from the

full environmental analysis normally required under the National Environmental Policy Act.

65. After its EP was approved, BP sought a permit from the MMS authorizing it to drill up to a

total depth of 19,650 feel at the Macondo site.

### *Defendants' Action and/or Inaction Which Resulted in the Oil Spill*

66. Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully

restated herein.

67. Defendants knew the cementing work the *Deepwater Horizon* was performing was especially

risky. BP's mid-April plan review predicted cement failure, stating "[c]ement simulations

indicated it is unlikely to be a successful cement job due to formation breakdown." Yet,

defendants made minimal efforts to contain the added risk. To save time and money,

defendants chose not to run a 9-12 hour procedure called a cement bond log to assess the

integrity of the cement seal. Defendants also failed to secure the wellhead with a lockdown

sleeve, a critical apparatus that locks the wellhead and the casing in the deal assembly at the

seafloor, before allowing pressure on the seal from below.

68. Based on testing performed before the final cement job at the Macondo well, Halliburton knew that its cement slurry design was unstable. In addition, Halliburton and BP had results in March 2010 showing that a very similar foam slurry design to the one actually pumped at the Macondo well would be unstable, but neither acted upon that data.

69. In addition to increasing the risk of blowouts, deep-sea drilling also increases the failure risk of the chief blowout safety mechanisms, the blowout-preventer (BOP). Defendants were aware of the risk of BOPs failing at greater depths, yet did not install a backup BOP activation system or backup BOPs. Defendants were also aware that the industry and government had major concerns about the reliability of BOPs like the one installed on the *Deepwater Horizon.*

70. Defendants BP, Transocean and one or more of the other drilling defendants, failed to ensure that the BOP present on the *Deepwater Horizon* possessed reasonably safe, adequate, functional technology to prevent blowouts.

71. Defendants BP and Transocean, and one or more of the other drilling defendants, failed to ensure that all foreseeable repairs (if any) and foreseeable modifications (if any) to the *Deepwater Horizon's* BOP were performed, completed and tested with the drilling vessel's operations shut down and the well secured.

72. Defendants BP and Transocean and one or more of the other drilling defendants, failed to ensure that the testing of the *Deepwater Horizon's* BOP was comprehensive, reviewed and verified, and further failed to check and verify the BOP's entire operating and control system, including but not limited to, checking for with leaks with an ROV (remotely operated vehicle) at the connection points, and verifying the functionality of the automated mode

function and/or autoshear.

73. Defendants BP, Transocean and one or more of the other drilling defendants could have ensured that a BOP and/or backup BOP with sufficient strength and reliability for deep water drilling was present and available on the *Deepwater Horizon*, but did not do so.

74. Transocean, the vessel's owner, had a history or postponing and ignoring needed maintenance on the *Deepwater Horizon*. In the weeks before the blowout, the *Deepwater Horizon* suffered power outages, computer glitches and a balky propulsion system. In other cases, Transocean officials purposely overrode or disabled vital safety mechanisms and alarms. These events contributed to the events of the disaster or made it worse.

75. The other drilling defendants knew of the poor maintenance of the *Deepwater Horizon* by Transocean and its practice of disabling or bypassing vital safety systems and alarms, but they continued to operate the vessel and did not report the inadequacies.

76. Upon information and belief, in addition to the examples set forth above, other non-exclusive examples of defendants' misconduct, negligence and wantonness include:

    a.    Utilizing a defective well casing that was prone to fail when under heavy pressure;

    b.    Failing to observe dangerous and recurring problems with highly flammable gaseous compounds and instituting risky cementing and drilling procedures hours before *Deepwater Horizon* explosion;

    c.    Failing to institute common industry measures necessary to detect the buildup of highly flammable, gaseous compounds before and during the cementing process;

    d.    Accelerating drilling operations in an effort to save money and pressuring

employees hours before the *Deepwater Horizon* explosion to drill and penetrate the continental shelf faster while ignoring risks associated with dangerous gaseous compounds in the shelf's crust;

e.    Using an improperly designed cement mixture (slurry) and failing to properly conduct or review lab tests of the slurry;

f.    Failing to deploy a casing hanger lockdown sleeve;

g.    Displacing mud in the well with less dense sea water before cementing fully set;

h.    Using non-standard spacer fluid mixture and volume;

i.    Continuing to operate the Macondo well after the well failed pressure test;

j.    Continuing to operate the Macondo well without repairing the blowout preventer annular after chunks of the annular had broken off and floated to the surface, thereby significantly decreasing the blowout preventers protective measures against a blow out;

k.    Failing to disclose or correct the fact that the battery on the BOP was weak and one of its control pods was broken;

l.    Consciously electing not to install an acoustically activated remote-control shutoff valve;

m.    Ordering drillers to extract drilling mud from the well before all of the concrete plugs were put in place in order to speed up the drilling process thereby creating high pressure instability in the well;

n.    Failing to install a deep water valve placed nearly 200 feet under the seafloor;

o.      Failing to recognize that pressure and flow data from the well were
        warning signs of a blowout;

p.      Failing to develop sufficient well control procedures for vessel workers to
        handle larger influxes into the well for a hydrocarbon influx as large as
        occurred, flow should have been diverted overboard, not to mud gas
        separator;

q.      Failing to properly design, install or maintain power supply to the BOP,
        including without limitations the use of only one blind shear ram, faulty
        maintenance, faulty post-market modifications and other issues;

r.      Failing to properly design, install or maintain connections from the BOP's
        control panel to the BOP;

s.      Failing to properly maintain and repair the BOP: drilling defendant
        officials were aware of the faulty solenoid valve, poor battery
        maintenance, hydraulic fluid leaks and aftermarket modifications on the
        *Deepwater Horizon's* BOP long before the April 20, 2010 oil spill, but no
        action was ever taken to address the problems. In addition to posing a
        significant safety risk drilling defendants' choice to continue drilling with a
        faulty hydraulic system violated federal regulations, which require
        companies to report problems to the MMS and stop drilling if either of a
        BOPs two control systems are not working properly; and

t.      Failing to equip the vessel with significant safety equipment including
        operational gas sensors and a gas alarm system.

77. The drilling defendants all knew, or should have known, of the acts and omissions outlined

above, and were negligent, wanton, and reckless in continuing to drill in the face of these acts and omissions.

78. In sum, defendants knew of the dangers associated with deep water drilling, and they knew of unique problems and shortcomings in the Macondo Well and *Deepwater Horizon* vessel. Yet, defendants failed to take appropriate measures to prevent damage to the Plaintiffs.

### *Defendants' Conduct After the Explosion*

79. Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

80. Defendants' conduct after the explosion was insufficient to minimize damage, and was in some cases just as negligent, wanton, and reckless as the conduct that led to the explosion.

81. Defendants failed to institute proper oil disaster response plans to contain the catastrophic oil release resulting from the *Deepwater Horizon* explosion, and they misrepresented their capability to safely conduct offshore drilling operations and contain oil releases that might occur in connection with such operations.

82. Defendants attempted to downplay and conceal the severity of the oil spill after the explosion. Defendants' leak estimate of 5,000 barrels per day was found by government investigators to be a fraction of the current official leak estimate of 60,000 barrels of oil per day. In addition, the worst case scenario estimate of 100,000 barrels of oil per day is over 100 times BP's initial estimate of 1,000 barrels per day.

83. Defendants were also slow and incomplete in their announcements and warnings to residents about the severity, forecast, and trajectory of the Oil Spill.

84. Furthermore, the chemical dispersants used by defendants to accelerate the dispersal of the oil has significant side-effects as well. Corexit EC9500A and Corexit EC9527A were the

principal dispersants used. These dispersants are composed of several chemicals, including 2-Butoxy Ethanol, which was identified as a causal agent in the health problems experienced by cleanup workers after the 1989 *Exxon Valdez* oil spill. In addition, the Hazardous Substance Fact Sheet for 2-Butoxy Ethanol warns that it may be a carcinogen in humans and that "[t]here may be no safe level of exposure to a carcinogen, so all contact should be reduced to the lowest possible level." Further, the OSHA-required Material Safety Data Sheets ("MSDS") for both versions of Corexit used indicate they may have a potential to cause bioaccumulation in the tissues of fish or other organisms. Additionally, the MSDSs state that if the product becomes a waste, "it could meet the criteria of a hazardous waste as defined by the Resource Conservation and Recovery Act (RCRA) 40 CFR 261."

85. Corexit EC9500A and Corexit EC9527A are more toxic and less effective than at least twelve other EPA-approved dispersants and are banned from use on oil spills in the United Kingdom. Defendants stated that they chose to use Corexit because it was available the week of the rig explosion.

86. More than 1.84 million gallons of chemical dispersants were used by July 30, 2010, and additional dispersant use was reported by fishermen in mid-August. Dispersant use continued well after the Oil Spill at the wellhead was stopped. The dispersants were employed both on the surface and at the wellhead 5,000 feet below the surface. Mixing the dispersants with the oil at the wellhead added toxicity to the spill and kept much of the oil below the surface, exposing organisms to widespread concentrations of oil.

87. Oil, dispersants, and other pollutants released by defendants remain in Gulf waters, the Gulf floor, Louisiana waters, and land owned and/or within the jurisdiction of the Plaintiffs and continue to cause damage. Oil, dispersants and other pollutants have settled into the sediment

on the Gulf floor and the bed underlying waters of Louisiana, where it has killed, is killing, and will continue to kill marine life and will continually discharge into, and cause damage to, the water and land.

### The *Deepwater Horizon Catastrophe*

88. Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

89. The *Deepwater Horizon* was an ultra-deepwater dynamic positioned semi-submersible oil vessel built in 2001.  It was leased to BP through September 2013.  It was one of the largest vessels of its kind.

90. BP leased the *Deepwater Horizon* to drill exploratory wells at the Macondo prospect site in Mississippi Canyon Block 252, a location on the Outer Continental Shelf off the coast of Louisiana.

91. On April 20, 2010, workers on the *Deepwater Horizon* oil rig lost control of the Macondo well just after the final cementing work was completed.  During the course of the cementing work, an explosion occurred on the *Deepwater Horizon* and it caught fire.

92. The explosion and fire caused the deaths of 11 people and injuries of many other workers on the vessel.  After burning for two days, the vessel sank to the ocean floor.

93. The *Deepwater Horizon* had been connected to the wellhead at the seafloor by a 5,000-foot pipe called a riser.  As the *Deepwater Horizon* sank to the seafloor, it pulled the riser down with it, bending and breaking the pipe before finally tearing away from it completely.  The riser, bent into a crooked shape under water, extended 1,500 feet above the sea bed and then buckled back down.  Oil flowed out from the open end of the riser, as well as through two breaks along its length.

94. While crude oil was believed to be discharged before the *Deepwater Horizon* finally sank on April 22, 2010, the rate of discharge is believed to have increased once the *Deepwater Horizon* sank to the ocean floor.

95. After the explosions, BP attempted to downplay and conceal the severity of the Oil Spill. Its initial leak estimate of 1,000 barrels per day was found by government investigators to be a fraction of its measured leakage amount of 50,000 barrels per day.  Moreover, following the Oil Spill, BP did not provide complete and timely announcements and warnings about the severity, forecast, and trajectory of the Oil Spill.

96. On or about June 20, 2010, Congressman Edward Markey released an internal BP document showing that the company's own analysis had actually revealed that the rate of oil spillage could reach 100,000 barrels, or 4,200,000 gallons per day.

97. The flow of oil continued unabated, and the ever-expanding oil slick made landfall on April 30, 2010, and will continue to affect greater areas of the Gulf Coastline

98. After the Oil Spill, an oil slick with a range of thousands of miles had formed and could be seen from outer space.  Additionally, thick, voluminous plumes of oil were identified in deep waters within the Gulf of Mexico.  The Oil Spill caused this slick and these plumes to form.  Oil washed and is washing ashore in the Gulf of Mexico, posing significant environmental and public health risks.

99. As the oil made landfall along the Gulf Coast, it infiltrated and will continue to infiltrate the delicate wetlands and intertidal zones that line the coast of Louisiana, Mississippi, Alabama, Texas and Florida, requiring clean up.

100. For 86 days, oil spewed into the Gulf of Mexico from the damaged well, dumping an estimated 200 million gallons of crude oil into sensitive ecosystems.

101. On July 15, 2010, almost four months after the explosion and fire on the *Deepwater Horizon*, BP finally capped the well.

102. The OPA imposes liability upon a "responsible party for a … facility from which oil is discharged … into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs.  33 U.S.C. § 2702.

103. After the Oil Spill, the Coast Guard formally and/or informally designated, *inter alia*, defendants BP Exploration, Transocean Offshore, Transocean Deepwater, Transocean Holdings, Anadarko E&P and MOEX Offshore as "responsible parties" under the OPA.

104. The crude oil carried with it significant public health risks.  Crude oil has many highly toxic chemical ingredients that can damage every system in the body.

### The Response Effort and the Use of Chemical Dispersants

105. Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

106. In the wake of the disaster, and pursuant to its duties as a responsible party under the OPA, BP began implementing a program to attempt to prevent the gushing oil from reaching the shores of the Gulf States.  This disaster response plan had three primary components: offshore containment; shoreline protection; and subsea response.

107. As part of its offshore containment response program, BP directed the use of vessels to recover oil coming to the surface of the Gulf of Mexico; the use of vessels to skim oil from the surface of the water; the use of vessels to conduct *in situ* burning of oil that reached the surface of the water; and the use of Vessels of Opportunity ("VoO").

108. In addition, BP's response plan included the use of chemical dispersants that were intended to break down the oil into finely dispersed droplets.

109. Upon information and belief, immediately after the *Deepwater Horizon* disaster, on or about April 23, 2010, BP began subsea and aerial application of chemical dispersants manufactured by Nalco to the resulting oil slicks and sheens on the surface of the Gulf.

110. On or about May 19, 2010, the U.S. Environmental Protection Agency ("EPA") Administrator directed BP within 24 hours of issuance to identify and to change to chemical dispersants that are less toxic than Nalco's Corexit dispersants BP had been using.

111. On May 20, 2010, BP objected to changing dispersants and notified the EPA that it would  continue using Nalco's Corexit.

112. BP's use of chemical dispersants skyrocketed:  on May 22, 2010, BP used 45,000 gallons and on May 23, 2010, it used 70,000 gallons.

113. On May 26, 2010, the EPA directed BP to reduce overall use of Nalco's Corexit by 75%.  The May 26, 2010 EPA directive also required BP to eliminate use of chemical dispersants on the surface except in rare cases where an exemption is sought in writing from and approved by the On Site Coordinator.  Since the May 26, 2010 EPA directive, BP has sought more than 40 exemption requests to use chemical dispersants on the surface of the Gulf of Mexico.

114. Since the May 26, 2010 EPA directive, BP has sought more than 40 exemption requests to use chemical dispersants on the surface of the Gulf of Mexico.

115. According to the Aerial Dispersants Operations – Houma Status Report, as of June 26, 2010, BP has applied 933,023 gallons by aerial application.  BP ordered the application by 386 flights, or sorties, as of that same date.  BP has covered approximately 291 square miles of the Gulf with dispersant.  As of June 26, 2010, 718,454 gallons of

Nalco's Corexit 9500 have been sprayed on the Gulf and 214,569 gallons of Nalco's Corexit 9527.

82. Upon information and belief, immediately after the *Deepwater Horizon* disaster, on or about April 23, 2010, BP began authorizing the application of chemical dispersants manufactured by other companies to contaminated vessels, containment equipment and near-shore and onshore areas to disperse the oil and clean vessels and equipment.

116. The dispersants used by BP are known to cause, *inter alia*, headaches; nausea; vomiting; diarrhea; abdominal pains; dizziness; chest pains and tightness; irritation of the skin, eyes,   nose, throat and lung; breathing difficulties and respiratory system damage; asthma attacks; hypertension; damage to the liver and kidneys; central nervous system depression; neurotoxic effects; damage to red blood cells; genetic damage and mutations; reproductive and developmental damage; immune system damage; cardiac arrhythmia; cardiovascular damage;  and increased severity of chronic obstructive pulmonary disease.

117. To date, BP and its contractors have used more than 1.8 million gallons of chemical dispersants in the Gulf of Mexico in connection with the Oil Spill.

### *Willful and Wanton Conduct of Defendants*

118. Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

119. Defendants focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* and during the subsequent attempt to clean the Oil Spill. As demonstrated by examples herein, and by the provided factual allegations, defendants' conduct evinced an

ongoing willful, wanton, or reckless disregard for and indifference toward the safety of the people in the Gulf States and the environment of the Gulf of Mexico by, among other things:

a. performing a critical well pressure test with untrained and unqualified personnel and callously ignoring and/or misinterpreting abnormal "red flag" pressure test results;

b. using a well design with too few barriers to gas flow;

c. failing to use a sufficient number of "centralizers" to prevent channeling during the cement process;

d. failing to run a bottoms-up circulation of the drilling mud prior to beginning the cement job;

e. failing to run a cement bond log to evaluate the integrity of the cement job;

f. failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well;

g. using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two (2) separate spacer substances as hazardous wastes;

h. grossly inadequate maintenance, and reckless and improper operation and use of the blowout preventers appurtenant to the *Deepwater Horizon;*

i. failing to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout;

j. failing to ensure that adequate safeguards, protocols, procedures and resources

31

would be readily available to prevent and/or mitigate the effects of an

uncontrolled oil spill; and

k. failing to use reasonable safe dispersant chemicals in the attempt to respond to

the Oil Spill.

120. Defendants willfully and/or wantonly failed to ensure that oil would expeditiously and

adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the

event of the blowout.

121. Defendants recklessly, willfully and/or wantonly failed to use reasonable safe dispersant

chemicals or other chemicals in their attempts to respond to the Oil Spill, and thereby

exacerbated the pollution of the Gulf of Mexico and injury to Plaintiffs.

122. Defendants, by their conscious and/or deliberate unreasonable acts and/or omissions

complained of herein, and/or as the evidence may show, displayed gross negligence,

reckless indifference, willfulness and/or wantonness.

### *Defendants' Knowledge of the Risks*

123. Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if

fully restated herein.

124. The United States Occupational Safety and Health Administration ("OSHA"),which

promulgates regulations to protect worker safety in certain context, including hazardous

waste activities and emergency responses, alerted the Coast Guard about its concerns

over significant deficiencies in the BP's Oil Spill response operations related to worker

safety. OSHA repeatedly raised these concerns with BP as early as May 2010, but

remained frustrated that BP did not address the most serious problems.

125. Defendants, aware of the risks that Plaintiffs would face, ignored worker safety

concerns, even in the face of OSHA warnings and notification by the Department of

Health and Human Services that cleanup workers were complaining of illness after being

exposed to oil and dispersants.

126. At all times relevant to this litigation, defendants knew or should have known that:

      a. Crude oil contains chemicals hazardous to human health and to the

      environment and ecosystems;

      b. Chemical dispersants contain chemicals hazardous to human health and to the

      environment and ecosystems;

      c. Plaintiffs should have been adequately and timely warned of the harmful effects

      of crude oil and chemical dispersants, and the hazardous substances which they

      contain, which were being released into the environment; and

      d. Plaintiff(s) should wear proper and protective clothing and respirators.

127. The Oil Spill and the resulting contamination and use of chemical dispersants have

caused and will continue to cause harm to people living and working in the Gulf States

and the Gulf of Mexico.

### *Plaintiffs' Exposure to Oil and Harmful Chemicals and Their Resulting Injuries and Damages*

128. Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if

fully restated herein.

129. Subsequent to the *Deepwater Horizon Explosion,* Plaintiff, Sergio Alvarado, was hired

by BP, or BP's clean up and response contractors through Ameri-Force Craft Services,

Inc. in the clean up effort. Prior to the *Deepwater Horizon Explosion,* Plaintiff was

employed for approximately three (3) years as a carpenter by Classic Hardwood Floors,

LLC, located in the City of New Orleans, Parish of Orleans. Subsequent to the *Deepwater Horizon Explosion*, Plaintiff was laid-off, due to the Oil Spill. Based upon information and belief, Classic Hardwood Floors, LLC would not rehire Plaintiff and he was unemployed until he was able to gain employment by Safeway Services, wherein, he then obtained employment from Brocks Services, Ltd. Hence, Plaintiff has suffered a variety of lost wages as a result of defendants' conduct.

130. As already stated herein, Plaintiff, Sergio Alvarado, was hired by BP, or BP's clean up and response contractors through Ameri-Force Craft Services, Inc. As hired by BP or BP's clean up and response contractors, Plaintiff engaged in oil spill cleanup activities subsequent to the Oil Spill and was injured as a result of exposure to oil and/or oil dispersing chemicals and/or decontaminants by virtue of his employment as a clean-up and/or response worker.

131. Upon information and belief, Sergio Alvarado, Plaintiff, was working on various boat(s) and/or vessel(s) and was responsible for handling booms and oil mops to absorb the oil, or hauling in oil saturated booms, among other activities. In this capacity, Plaintiff was exposed to crude oil, oil and dispersants and/or other harmful chemicals by inhalation, ingestion, dermal (skin) absorption, and through contact with the eyes.

132. Upon information and belief, Plaintiff was also required to clean vessel(s) and/or boat(s) that came into contact with oil and dispersants and other harmful chemicals resulting from the Oil Spill and the application of dispersants. In this capacity, Plaintiff was exposed to crude oil and dispersants and other harmful chemicals by inhalation, ingestion, dermal exposure, and through contact with the eyes from spray mist.

133. Upon information and belief, Plaintiff was not outfitted with proper safety and/or

protective equipment including, but not limited to respirators and/or equivalent safety devices.

134.  Plaintiff suffered and/or continues to suffer at all relevant times herein from a variety of injuries, including but not limited to weakness, fatigue, anxiety, forgetfulness, chronic coughing, difficulty breathing, chest congestion, pain, hormone dysfunction, metal toxicity, GI dysfunction and petroleum toxicity, among other adverse health effects associated with exposure to crude oil and dispersants and other harmful chemicals in the environment resulting from the Oil Spill.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

## <u>Negligence Under General Maritime Law</u>

135. Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

136. At all times material hereto, defendants were participating in drilling operations onboard the *Deepwater Horizon* in the Gulf of Mexico.

137. At all times material hereto, defendants owed and breached duties of ordinary and reasonable care to Plaintiff in connection with the drilling operations of the *Deepwater Horizon* and the maintenance of the vessel, its appurtenances and equipment, and additionally owed and breached duties to Plaintiffs to guard against and/or prevent the risk of an oil spill.

138. Additionally, defendants owed and breached a duty to Plaintiffs, as well as to all persons who might foreseeably be harmed, to exercise due care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery

measures.

139. The existence and breach of these legal duties are established under the General Maritime Law. The blowout and explosions on the *Deepwater Horizon,* its sinking and the resulting Spill were caused by the joint and concurrent negligence of defendants.

140. Plaintiffs suffered injury as a direct and proximate result of defendants' negligent breach of their aforementioned duties and, therefore, Plaintiffs are entitled to recover actual and punitive damages.

141. The existence and breach of defendants' legal duties are reflected in general maritime law.

142. At all times material hereto, defendants owed duties of ordinary and reasonable care to Plaintiffs in connection with the drilling operations and maintenance of the *Deepwater Horizon*, including its appurtenances and equipment. Defendants additionally owed duties to guard against and/or prevent the risk of an oil spill and to mitigate the harm if an oil spill did occur.

143. Further, defendants owed a duty to Plaintiffs to exercise due care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.

144. Defendants had a heightened duty of care to Plaintiffs because of the great danger associated with exposure to oil, dispersants and/or other hazardous chemicals.

145. The risk of injury and loss to Plaintiffs was reasonably foreseeable and defendants knew of the dangers associated with deep water drilling. Specifically, at all times relevant to this litigation, defendants knew or should have known that:

      a. crude oil contains chemicals hazardous to human health;

36

b. chemical dispersants contain chemicals hazardous to human health;

c. Plaintiffs should have been adequately and timely warned of the harmful effects of crude oil and chemical dispersants, and the hazardous substances that they contain; and

d. failure to exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures would result in harm to Plaintiffs.

146. Defendants breached their duty of care to Plaintiffs in the following non-exclusive manner:

a. failing to prevent the explosion on board the *Deepwater Horizon;*

b. failing to cap the Macondo well in a timely manner;

c. failing to warn Plaintiffs, public officials and government agencies of the harmful effects of crude oil, chemical dispersants and any mixture thereof, and the hazardous chemicals they contain;

d. failing to conform to the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and shallow waters;

e. failing to coordinate and conduct aerial spraying sorties in a manner so as to eliminate the risk of vessels and crew members being exposed to aerial chemical dispersants; and

f. failing to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.

147. Defendants breach of their duties posed and unreasonable risk of harm to Plaintiffs.

148. Plaintiffs suffered injury, loss and damages as a direct and proximate result of defendants' willful, wanton, reckless, and/or grossly negligent breach of their duties and therefore, Plaintiffs is are entitled to recover actual and punitive damages.

### SECOND CLAIM FOR RELIEF
### Gross Negligence Under General Maritime Law

149. Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

150. Defendants owed and breached duties of ordinary and reasonable care to Plaintiffs in connection with the manufacture, maintenance and operation of the *Deepwater Horizon*, and additionally owed and breached duties to Plaintiffs to guard against and/or prevent the risk of the Oil Spill which occurred herein.  The existence and breach of these legal duties are established under the General Maritime Law.

151. Defendants have taken control and responsibility for all aspects of the recovery and relief effort to attempt to contain the Oil Spill, prevent oil from damaging the Gulf of Mexico and the shoreline, and to clean up the damage caused to date, including the use of Nalco's chemical dispersants.  Defendants owed and breached a duty to Plaintiffs, as well as to all persons who might foreseeably be harmed, to exercise due care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.   The existence and breach of these legal duties are established under the General Maritime Law.

152. Defendants had a heightened duty of care to Plaintiffs because of the great danger associated with exposure to oil, dispersants, and/or other hazardous chemicals.

153. Defendants breached their legal duty to Plaintiffs and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard in the negligent failure to contain the Oil Spill.

154. Defendants knew or should have known that their wanton or reckless conduct would foreseeably cause Plaintiffs' injuries.

155. As a direct and proximate cause of defendants' wanton or reckless acts, Plaintiffs have suffered a variety of physical injuries.

156. Defendants' wanton or reckless conduct, as described herein, entitles Plaintiffs to punitive damages.  The amount of punitive damages recoverable by Plaintiffs is not lawfully limited to the amount of their compensatory damages, but rather should be a multiplier of same sufficient to both punish defendants and deter similar wrongdoing in the future.

**THIRD CLAIM FOR RELIEF**

**Negligence Per Se Under General Maritime Law and Federal Law**

157. Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

158. Defendants have taken control and responsibility for all aspects of the manufacture, maintenance and/or operation of the *Deepwater Horizon*.

159. The conduct of defendants with regard to the manufacture, maintenance and/or operation of drilling operations and oil rigs such as *the Deepwater Horizon* and its appurtenances and equipment is governed by numerous state and federal laws and permits issued under the authority of these laws. These laws and permits create statutory standards that are intended to protect and benefit the Plaintiffs. One or more of the

drilling defendants violated these statutory standards. The violations of these statutory standards constitute negligence per se under the law of Louisiana and the general maritime law, including (but not limited to) the Clean Water Act, 33 U.S.C. § 1311.

160. The defendants have taken control and responsibility for all aspects of the recovery and relief effort to attempt to contain the Oil Spill, prevent oil from damaging the Gulf of Mexico and the shoreline, and to clean up the damage caused to date, including the use of chemical dispersants.

161. There are federal laws and regulations regarding the responsible party's duty to protect workers' safety in certain contexts, including hazardous waste activities and emergency responses.

162. These laws create statutory and regulatory standards that are intended to protect and to benefit Plaintiffs, including, but not limited to, those set forth in 29 C.F.R. 1910.120 and 40 C.F.R. § 300.150.

163. Defendants violated these statutory and/or regulatory standards.

164. As a direct and proximate cause of defendants' violation of statutory and/or regulatory standards, the Plaintiffs have suffered injuries and are entitled to actual and punitive damages.

165. As stated herein, the defendants' conduct with regard to the manufacture, maintenance and/or operation of oil-drilling vessels such as the *Deepwater Horizon*, the release of hazardous and toxic chemicals into the environment, and the application of dispersants and other hazardous chemicals is governed by federal laws and permits issued under the authority of these laws. Said laws and permits create statutory and regulatory standards that are intended to protect and to benefit Plaintiffs, including but not limited to, those

that govern the National Oil and Hazardous Substances Contingency Plan, *see, e.g.,* 40 C.F.R. §300.150. Defendants failed to adhere to the requirements for response actions established by the National Contingency Plan, 29 C.F.R. §1910.120. Defendants therefore breached their responsibilities under this regulatory provision.

166. In addition, the federal Bureau of Safety and Environmental Enforcement ("BSEE") found that defendants violated the following federal regulations:

a. Defendants failed to protect health, safety and environment by failing to perform all operations in a safe and workmanlike manner, in violation of 30 C.F.R. §250.107(a)(1);

b. Defendants did not take measures to prevent unauthorized discharge of pollutants into offshore waters, in violation of 30 C.F.R. §250.300;

c. Defendants failed to take necessary precautions to keep the well under control at all times, in violation of 30 C.F.R. §250.401(a);

d. Defendants did not cement the well in a manner that would properly control formation pressures and fluids and prevent the direct or indirect release of fluids from any stratum through the wellbore into offshore waters, in violation of 30 C.F.R. §§250.420(a)(1) and (2);

e. Defendants failed to conduct an accurate pressure integrity test, in violation of 30 C.F.R. §250.427;

f. Defendants failed to maintain the *Deepwater Horizon's* BOP system in accordance with the American Petroleum Institute's Recommended Procedure 53 section 18.10.3, in violation of 30 C.F.R. §250.446(a);

g. Defendants failed to obtain approval of the Temporary Abandonment

41

procedures it actually used at the Macondo well, in violation of 30 C.F.R. §250.1721(a);

h. Defendants failed to conduct an accurate pressure integrity test at the 13-5/8" liner shoe, in violation of 30 C.F.R. §250.427 *et. seq.*; and

i. Defendants failed to suspend drilling operations at the Macondo well when the safe drilling margin identified in the approval application for the permit to drill was not maintained, in four (4) separate violations of C.F.R. §250.427.

167. Defendants' violations of these statutory and/or regulatory standards constitute negligence per se under federal law, as well as general maritime law.

168. Defendants had actual and/or constructive knowledge of the facts and circumstances leading to and causing the incidents described herein, which in turn caused the injuries suffered by Plaintiffs alleged herein and thereby, defendants' actions and inactions were grossly negligent, reckless, willful and/or wanton.

169. As a direct and proximate cause of defendants' violations of statutory and/or regulatory standards, the Plaintiffs have suffered injuries and are entitled to actual and punitive damages.

## FOURTH CLAIM FOR RELIEF

### General Maritime

*(Medical Monitoring As An Element Of Damages for Sergio Alvarado)*

170. Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

171. The oil, dispersants, and/or other hazardous chemicals used for or resulting from the Oil Spill are proven hazardous, dangerous, or toxic substances, to which Plaintiff, Sergio

Alvarado,  has been exposed.

172. Plaintiff's exposure may lead to serious health problems, diseases, and medical conditions that may be prevented by timely diagnosis and treatment.

173. The method and means for diagnosing the Plaintiff's potential medical problems are well-accepted in the medical and scientific community and will be of great benefit to Plaintiff by preventing or minimizing health problems that Plaintiff may encounter as a result of the Oil Spill and from dispersants used to attempt to clean the Oil Spill.

174. As a proximate results of Plaintiff's exposure to oil, dispersants, and/or other hazardous chemicals used for or resulting from the Oil Spill, Plaintiff has developed a significantly increased risk of contracting a serious latent disease.

175. The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

### FIFTH CLAIM FOR RELIEF
### <u>The Oil Pollution Act</u>

176. Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated here.

177. The Oil Pollution Act, 33 U.S.C. § 2701, et seq. (the "OPA"), imposes liability upon a "responsible party for a... vessel or a facility from which oil is discharged...into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs. 33 U.S.C. § 2702.

178. The Coast Guard has named BP as the responsible party for the downhole release of oil and Transocean as the responsible party for the release of diesel on the surface. Therefore, BP and Transocean are strictly liable pursuant to Section 2702 of the OPA for all the damages resulting from the Spill.

179. Defendants Anadarko and MOEX held a leasehold interest in a lease granted by the MMS for Block 252, Mississippi Canyon (the Macondo lease"), an oil lease on lands beneath the navigable waters, before and/or at the time of the spill.  As such, they were lessees of the area within which the well (an "offshore facility") was located at the time of the Spill and are responsible parties pursuant to Section 2701 (16) and (32) of the OPA.  As such, they are strictly liable pursuant to Section 2702 of the OPA for all damages resulting from the Spill.

180. Defendants BP and Transocean are not entitled to limit their liability under Section 2704(a) of the OPA because the Spill was proximately caused by their gross negligence, willful misconduct, or violation of applicable safety, construction or operating regulations.  33 U.S.C. § 2704(c).

181. Moreover, in its "Statement of BP Exploration & Production Inc. Re Applicability of Limitation of Liability Under Oil Pollution Act of 1990," filed on October 19, 2010, BP waived the statutory limitation on liability under the OPA.

182. As a result of the Spill, Plaintiffs have not been able to use natural resources (air and water, and potentially wetlands and other areas and spaces that have and/or may become contaminated by the spilled oil), and they are entitled to recover from BP, Transocean, Anadarko, MOEX and MOECO for such damages in amounts to be determined by the trier of fact, in addition to the damages as set forth below.

183. As a result of the Spill, Plaintiffs are entitled to damages pursuant to Section 2702(b)(2)(B), which provides for recovery of damages to real and personal property, including "[d]amages for injury to, or economic losses resulting from destruction of, real

or personal property, which shall be recoverable by a claimant who owns or leases that property, including diminution in the value of their property."

184. As a result of the Spill, Plaintiffs are entitled to damages pursuant to Section 2702(b)(2)(C), which provides for recovery for "[d]amages for the loss of subsistence use of natural resources, which shall be recoverable by any claimant who so uses natural resources which have been injured, destroyed, or lost, without regard to ownership or management of the resources."

185. As a result of the Spill, Plaintiffs are entitled to damages pursuant to Section 2702(b)(2)(E), which provides for "[d]amages equal to the loss of profits or impairment of earning capacity due to injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."

186. To the extent required by law, and/or by consent or stipulation by BP, Plaintiffs have satisfied, or will have satisfied, all of the administrative requirements of 33 U.S.C. §§ 2713(a) and (b), as to each and all defendants, by the submission of their claims to the Gulf Coast Claims Facility (the "GCCF") and/or BP and/or its agents or designees.

## SIXTH CLAIM

### *Loss of Consortium*

187. Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

188. Plaintiff, Sergio Alvarado, was at all relevant times hereto the spouse of Plaintiff, Eileen Gonzalez, and lived and cohabitated with her.

189. As a result of the foregoing acts and omissions, and the resulting injuries, including but not limited to personal injuries, medical expenses, and pain and suffering sustained by

Plaintiff, Sergio Alvarado, Plaintiff, Eileen Gonzalez, has suffered and continues to suffer various losses, including but not limited to the loss of companionship, society, services and consortium of her husband.

## PRAYER FOR RELIEF

Plaintiff(s) experienced the following damages:

      a.      Medical expenses, (Past, present and future);

      b.      Medical monitoring, (Past, present and future);

      c.      Loss of wages, (Past, present and future);

      d.      Emotional distress, (Past, present and future);

      e.      Mental anguish, (Past, present and future);

      f.      Physical pain and suffering, (Past, present and future);

      g.      Loss of life's pleasures and enjoyment, (Past, present and future);

      h.      Loss of personal services, (Past, present and future);

      i.      Intangible losses, (Past, present and future);

      j.      Punitive damages;

      k.      Compensatory damages in amounts to be determined a trial;

      l.      Pre-judgment and post-judgment interest at the maximum rate allowable by law;

      m.      Attorneys' fees and costs of litigation;

      n.      Any and all other damages which may become known prior to the trial.

## REQUEST FOR TRIAL BY JURY

Plaintiffs request that the above and foregoing be heard at trial by a jury of peers.

July 26, 2013

                                     Respectfully Submitted,


                                     /s/ Douglas M. Schmidt
                                     _____
                                     Douglas M. Schmidt (Bar No. 11789)
                                     Douglas M. Schmidt, APLC
                                     335 City Park Avenue
                                     New Orleans, LA 70116
                                     Telephone No.: (504) 482-5711
                                     Facsimile No.:  (504) 482-5755
                                     *Attorneys for Plaintiffs, Sergio Alvarado & Eileen
                                     Gonzalez*


                         **CERTIFICATE OF SERVICE**

        I hereby certify that the above and foregoing pleading has been served on All Counsel by

electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order

No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United

States District Court for the Eastern District of Louisiana by using the CM/ECF System, which

will send a notice of electronic filing in accordance with the procedures established in

MDL2179, on this 26th day of July, 2013.



                                     /s/ Douglas M. Schmidt
                                     _____

47