UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deep Water Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 |
| | * | SECTION: "J" (1) |
| This Document Applies to: | * * | |
| No 12-970, Bon Secour Fisheries, Inc., et al v. BP Exploration & Production, Inc., et al | * * * | JUDGE CARL J. BARBIER |
| | * | MAG. JUDGE S. SHUSHAN |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR AN ORDER LIFTING STAY OF ANDRY LERNER CLIENTS' CLAIMS PROCESSING**

I. **INTRODUCTION**

The law firm of Andry Lerner, LLC ("AL") has filed ▓▓▓ BP oil spill claims on behalf of approximately ▓▓▓ clients with the Deepwater Horizon Economic & Property Damage Claims Center ("DHECC"). On July 12, 2013, AL learned that all of its claims had been stayed and were not being processed. AL also learned that final award of ▓▓▓ to its client ▓▓▓ ▓▓▓ that was due to be paid on ▓▓▓ was not going to be paid. Claims Administrator Pat Juneau has informed AL that the Court instructed him to suspend the processing and payment of awards of all AL clients. No explanation has been given to AL for the reason for these two actions.

By this *Motion For An Order Lifting Stay Of Andry Lerner Clients' Claims Processing*, AL request that the Court immediately lift the stay of the adjudication of AL clients' claims and the award of final payments. No justification has been given to AL for the reasons for this

drastic action that jeopardizes the timely award of money to these BP oil spill victims who have suffered significant economic losses and are entitled to compensation. Likewise, AL is suffering irreparable harm to its reputation and viability from the loss of existing and future clients.

The decision to stay AL clients' cases is improper for at least three reasons.

First, there is no express or implied statutory or other authorization for a wholesale freezing of the adjudication of claims of one law firm's clients.

Second, AL clients and AL have not been afforded even a modicum of elementary procedural due process—notice of specific allegations and a meaningful opportunity to defend—*before* being deprived of valuable benefits and property rights. *See Goldberg v. Kelly*, 397 U.S. 254 (1970). In fact, there is no evidence justifying the wholesale suspension of ▮ claims: neither the claimants nor AL have been charged with, much less found to have engaged in, any conduct that would debar them from participating in the claims process. The proper procedure to stay the AL claims was a noticed motion, opportunity to respond, and a hearing—the very procedure that BP has initiated in its desperate effort to stay *all* of the pending claims in the Court Supervised Settlement Program that it fully endorsed at the time of settlement approval.

Third, AL's clients and AL have been discriminated against as a class in violation of their equal protection rights. The blanket classification of all of one law firm's clients as a class and the law firm itself as unfit for claims processing bears no "fair relationship to a legitimate public purpose." *Pylyer v. Doe*, 457 U.S. 202, 216 (1982). Given the lack of any evidence remotely justifying this draconian action, there is no rational basis to sustain this rank discrimination.

For these reasons, the decision to stay the normal processing of AL clients' claims and ▮ final award should be vacated, and the Claims Administrator should be instructed to resume processing the AL clients' claims and pay the final award to ▮

2

## II.    SUMMARY OF FACTS

### A.    ▓▓▓Andry Lerner Clients' Claims Have Been Stayed Without Any Notice, Statement of Reasons, or Opportunity to be Heard

The Settlement Agreement of this historic case established procedures for processing and formulas for adjudicating BP oil spill claims by the Deepwater Horizon Economic & Property Damage Claims Center ("DHECC"). Those procedures and formulas have resulted in the payment of nearly three billion dollars to claimants. The Court supervised program is processing claims expeditiously. *See* Order and Reasons (12/12/12) at pp. 80-81.

Expeditious adjudication should also have been the case for ▓▓▓ clients represented by the Andry Lerner firm. On some unknown date, however, this Court made an oral order in chambers to stay all of their clients' cases and withhold a final, non-appealable award of ▓▓▓▓▓ to its client ▓▓▓▓▓▓▓. This extraordinary decision behind closed doors was made without notice to or the participation of Andry Lerner, but representatives of the Plaintiffs' Steering Committee ("PSC") and BP were present and apparently supported the decision.[1] No one evidently objected to this undisclosed session or extraordinary sanction against one particular group of claimants. AL and its clients were totally unrepresented since the PSC could not represent claimants who had retained their own counsel. In addition, no notice, formal or informal, from the Court or PSC was given to AL or its' clients before or after the order was made.

No written order has been filed, and no transcript of this meeting is available. Andry Lerner learned of the stay (but not how or why it happened) only by inquiring of a DHECC staff member who responded in an email that "[t]he Claims Administrator has instructed [DHECC

---

[1] The PSC obviously was not representing the AL clients who had retained their own counsel to represent them in the claims process.

3

staff] to place all claims by claimants you represent on hold." Declaration of Christine Mancuso ("Mancuso Declaration") at ¶ 6.

On June 26, 2013, George Recile, counsel for AL, spoke with the Claims Administrator about the status of processing AL clients' claims. Mr. Juneau stated that those claims had been put on hold pursuant to a directive from Judge Carl Barbier. *Id.* at ¶ 8. On June 28, 2013 and on July 1, 2013, Mr. Recile called Judge Barbier's office requesting a meeting to discuss the stay of the AL clients' claims. To date, he has not received a response. *Id.* at ¶ 9.

On July 3, 2013, Mr. Recile and Julian Murray sent a letter to Special Master Louis Freeh concerning the stay of the AL clients' claims. To date, no response has been received. *Id.* at ¶ 10 and Exhibit "A."

On July 12, 2013, in response to Mr. Recile's letter (*Id*, ¶ 11 Exhibit "B.") DHECC Special Counsel Michael Juneau informed Andry Lerner for the very first time that the processing of their clients' claims and payment of awards had been frozen. In particular, the firm's counsel was told the following:

> "1. The claims of claimants represented by Mr. Andry have been placed on 'hold' status such that payments will not be issued unless and until authorized by the Court.
>
> 2. These claims have been placed on 'hold' status after consultation with the Parties and the Court and pursuant to the direction of Judge Barbier. This is all in the context of allegations that have resulted in Judge Barbier's appointment of Louis Freeh as Special Master to conduct an independent investigation.
>
> 3. The 'hold' status will be removed if and when we receive such direction from the Court. The timing of that is within the Court's control. If you believe you need and are entitled to more specific information in that regard, any further inquiry is probably best directed to Judge Barbier."

*Id.* at ¶ 17.

Neither this email nor any other communication has informed Andry Lerner about the reasons why all of its clients' claims have been put on hold, the evidence that purportedly

4

justified this action, and the process by which this undisclosed determination was made. The law firm is literally in the dark about how such a monumental, unprecedented, and wholesale treatment of 709 claims en masse could have happened. *Id.* at ¶ 18.

    **B.**    **The Stay Has Halted Payment of A Final, Non-Appeable Award of ▆▆▆ to Andry Lerner Client ▆▆▆**

AL is a New Orleans law firm that has approximately ▆▆ clients who have filed claims on file with the Deepwater Horizon Economic & Property Damage Claims Center ("DHECC") as of the end of June 2013. *Id.* at ¶ 3. As of the end of June 2013, on ▆▆ f the AL client claims that had been finally processed. These were primarily claims for shrimpers, oysters fisherman and Vessel of Opportunity (VoO) claims. AL has received payment on approximately ▆▆ Business Economic Loss (BEL) claims. All but three BEL claims resulted in an award equal to or lower than the amount requested. These three claims received awards slightly higher than the original claim amount. The difference was based on some mathematical miscalculations in the Economic Expert Report submitted with the initial claim filings. AL clients have been paid a total of ▆▆▆ *Id.* at ¶ 4.

One of AL's fully processed claims was filed on behalf of ▆▆▆ ▆▆▆ September 26, 2012, seeking compensation of ▆▆▆ in amount calculated by the client's financial experts. *Id.* at ¶ 5 (a). On February 15, 2013, the DHECC issued an Eligibility Notice, finding that Motivation was entitled to an award in the amount of ▆▆▆ The offer was accepted. BP appealed that award, arguing that:

> "As the basis for the appeal, BP submits that the Award Amount was incorrectly calculated. The determination misclassified certain variable expenses as fixed expenses. The determination should be revised to correct these errors. Additionally, BP states that it appears that there are significant inconsistencies and anomalies in the financial data provided by the claimant. BP request that the inconsistencies be resolved and the claim re-evaluated. In addition, there are a number of questions and issues regarding trends and financial data that impact the calculation and require resolution."

*Id.* at ¶ 5 (b) and Exhibit "C".

On June 10, 2013, the DHECC Appeal Panel upheld the initial compensation finding. A Post-Appeal Eligibility Notice was issued on ▮▮▮▮▮ which awarded ▮▮▮▮▮ ▮▮▮▮▮ inclusive of the 5% penalty awarded to a prevailing claimant. *Id.* at ¶ 5 (c), Exhibit "E". The Appeal Panel stated:

> "The Appeal Panel's decision will stand as the Settlement Program's final determination on this claim. The three issues BP raises, to-wit: (1) Claimant's relationship to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, are all satisfactorily accounted for and explained by the various submissions from Claimant and its accountants, and the Claims Administrator acted within the discretion accorded to him by the Settlement Agreement in resolving those issues in favor of Claimant and awarding the compensation amount in question."

*Id.*

BP did not seek judicial review of the appellate panel's decision. Under the applicable procedures, the award has been confirmed as a Final Award, is non-appealable, and became due and payable on ▮▮▮▮▮ *Id.* at ¶ 5 (d).[2] To date, the claim has not been paid. *Id. at* ¶ 5 (e).

### C. There Is No Evidence of Improprieties In The Processing of Andry Lerner Clients' Claims

The handling of the ▮▮▮▮▮ claim typifies the scrupulous, arms' length processing of AL clients' claims by the DHECC professionals. *Id.* at ¶ 5 (c). The firm's adjudicated claims have been determined on the merits according to the Claims Administrator's procedures and the Settlement Agreement's objective criteria as interpreted by the Court. For the most part, the processing is an accounting exercise. *Id.* at 16.[3]

---

[2] ▮▮▮▮▮ had also signed the release required for payment. *Id.* at ¶ 5(d).
[3] All of AL's claims were handled based on a specific protocol and in a specific workbook. The claims are processed by DHEEC staff members who are analysts, accountants, and specialists in evaluating

6

There has never been any suggestion (nor is there a shred of evidence) that these claims—including ▮▮▮ claim—were inappropriately adjudicated or improperly influenced by any DHECC staff member. Nor is there any evidence that any of the pending ▮▮▮ AL clients' claims have been improperly influenced by any DHECC staff member. Nothing distinguishes the AL claims from the rest of those under review except the identity of the law firm representing the claimants.

The only conceivable basis for halting processing of all the AL clients' claims is the allegations in the Associated Press articles concerning Lionel Sutton, a former DHECC staff attorney, who reportedly received a payment from the Andry Lerner law firm in connection with an award to one of its clients – ▮▮▮ As a staff attorney at DHECC, Mr. Sutton had no involvement whatsoever with, or ability to influence, ▮▮▮ claim at any point. Mr. Juneau can readily confirm this fact.

The ▮▮▮ claim was processed in the normal manner according to the applicable procedures and policies. Accountants and financial analysts, not lawyers like Mr. Sutton, made the DHECC award decision. Indeed, AL's client was awarded less than its initial request. *Id.* at ¶ 19.[4] Again, Mr. Juneau can confirm this fact.

### D. AL's ▮▮▮ Clients and The Firm Itself Are Suffering and Will Suffer Even Greater Irreparable Harm If The Stay Is Not Immediately Lifted.

Apparently, the Court has indicated that the freeze of the AL clients' claims will continue until the completion of the Special Master's investigation. *Id.* at ¶ 17 and Exhibit "B". Right now, the amount of time that the Special Master will take for his investigation, preparation of his

---

financial information along with forensic accountants from firms working on behalf of DHECC. *Id.* at ¶ 16. ▮▮▮ claim was reviewed at least twice—the initial and the appellate decisions.
[4] ▮▮▮ owns a seafood related business that suffered losses as a result of the BP oil spill. Andry Lerner ▮▮▮ claims on his behalf, and, thus far, he has been awarded approximately ▮▮▮ of the ▮▮▮ sought. *Id.* at ¶ 20.

7

report, and submission of the report to the Court is unknown. Undoubtedly, Mr. Freeh, as he did in the Penn State matter, will do a comprehensive and thorough probe.

Unfortunately, with each passing day, AL's ▓▓▓ clients and the law firm itself are being irreparably injured and will be even more irreparably injured in the future. The AL clients are being harmed by the failure to have their claims processed in the normal course of business at the DHECC. They are effectively being put at the back of the line as all the other cases move forward. *Id.* at ¶ 13 (a).[5]

The continued cessation of processing of AL clients' processing will result in delayed awards of tens of millions of dollars to deserving BP oil spill victims, many of whom urgently need their awards to rebuild their lives, homes, and businesses. These claimants justifiably expect that their claims would be expeditiously processed like all other claims. The injury that they are suffering is severe and inexplicable. *Id.* at ¶ 13 (b).

Moreover, AL is also being seriously harmed by its inability to explain to clients the reason for the stay or when the hold will be lifted and the processing of their claims will resume. *Id.* at ¶ 13 (d). The stay, if not immediately lifted, will result in AL losing clients who understandably become disaffected and want their claims to be processed in the same manner as all other claimants. *Id.* at ¶ 13 (e).

Over the past three years, the AL principals have invested several million dollars in establishing and operating its BP oil spill claims practice. The prospects of this investment being recouped diminish the longer the stay remains in effect. Likewise, any return on their investment will be lost. *Id.* at ¶ 13 (f).

---

[5] In a number of cases, the DHECC staff has requested further information or notices of incompleteness have been issued to which responses must be filed within a prescribed time period. AL is uncertain how the hold affects these matters, and it is concerned that it not default on the processing of its clients' claims. *Id. at* ¶ 13 (a).

8

The reputation of AL and its principals Jonathan B. Andry and Glen Lerner will be irreparably damaged if the processing of their clients' claims is not immediately resumed. This tarnishing of their reputations will adversely affect their ability to attract new clients. The plaintiffs' bar is crowded and highly competitive. The fact of a long term stay of the AL cases and speculation about the reasons will undoubtedly be used by their competitors to lure away existing clients and to compete against AL and its principals for new business. *Id.* at ¶ 13 (g).

In short, the *ex parte* imposition of an across-the-board suspension of the normal processing of AL clients' claims is causing and will continue to cause irreparable harm. The only antidote is the immediate resumption of claims processing.

### III. ARGUMENT

The undisclosed informal decision to suspend processing of the AL clients' claims and effective debarment of AL from having its clients' claims processed is not authorized by any statute, rule, Settlement Agreement, or otherwise and violates fundamental constitutional guarantees of due process and equal protection that protect citizens from arbitrary decision-making in the determination of valuable benefits. Incredibly, to this very day, AL does not know how or why this devastating decision was made. Nor does it know what information was given to the Court or by whom before it ordered a cessation of processing the ▇L clients' claims. The whole matter has been shrouded in secrecy. Indeed, it is difficult to imagine a more irregular procedure for inflicting such irreparable harm on innocent claimants and their lawyers who have not been charged with, much less found to have committed, any improper conduct

#### A. The Court's Unilateral Action Is Not Authorized By Any Statute, Rule, or Settlement Agreement

At the threshold, the stay decision is not a judicial procedure authorized by and statute, rule, or the Settlement Agreement. Neither a federal law nor any of the Rules of Civil Procedure

9

authorizes a court to exercise its powers unilaterally and without any due process to close its doors to a litigant. While a court can stay litigation for various reasons (and by analogy settlement claims processing that it is supervising), that decision can be made only after notice, briefing, and most likely a hearing.

Rule 27 clearly requires a written motion that "must state with particularity the grounds for the motion, the relief sought, and the legal argument necessary to support it." Rule 27 (a) (2) (A). The opposing party has the right to file a written response. Rule 27 (a) (3) (A). While a hearing is not required, the request to stay a case would ordinarily not be decided without oral argument. Indeed, while movant believes that the BP's breathtaking motion to enjoin/stay the processing of *all* the pending claims is not meritorious, it is pursuing the proper procedure by filing a noticed motion with an opportunity for opposition and a hearing—the essential due process rights that AL's clients were denied.

The Settlement Agreement does not contain any provisions addressing the authority of the Court to stay the processing of claims. Nor has the Claims Administrator issued any procedures on this issue. While the Settlement Agreement explicitly grants the Court continuing and exclusive jurisdiction over the settlement program, that authority does not extend to dispensing with customary due process safeguards. A court has no inherent or implied authority to act in disregard constitutional guarantees.[6] *See Taylor v. Hayes,* 418 U.S. 488 (1974) (trial court violated trial lawyer's due process rights to notice of the specific charges and a hearing by convicting him of criminal contempt for obstreperous conduct during a trial, sentencing him to

---

[6] The concept of implied or inherent powers for government action contrary to express constitutional limitations has been rightly rejected as anathema to individual rights and liberties. "The purpose a Constitution is to specify and confine governmental powers to protect individual rights and liberties. That objective is undermined by claims of open-ended authorities that are not easily defined or circumscribed. The assertion of 'inherent' powers ushers in a range of vague and abstruse sources." Louis Fisher, "Invoking Inherent Powers: A Primer," *Presidential Studies Quarterly* (March 2007) at p. 2.

10

four and one-half years, and barring him from practicing in that court).

Nor was there any exigency or necessity demanding unilateral action without notice of the specific concerns and an opportunity to respond. The AL cases would not be completely adjudicated for many months. There was not a scintilla of evidence of systemic corruption across the array of AL cases such that they needed to be excised from the claims system. And there was no evidence that AL or its principals were engaging in unethical conduct warranting their removal as claims' advocates.

Summary dispositions invariably offend due process.

> "*Sacher* noted that '[s]ummary punishment always, and rightly, is regarded with disfavor . . . .' 343 U.S., at 8. '*[W]e have stated time and again that reasonable notice of a charge and an opportunity to be heard in defense before punishment is imposed are "basic in our system of jurisprudence."*' *Groppi v. Leslie*, 404 U.S. 496, 502 (1972), quoting *In re Oliver*, 333 U.S. 257, 273 (1948). Even where summary punishment for contempt is imposed during trial, 'the contemnor has normally been given an opportunity to speak in his own behalf in the nature of a right of allocation.' *Groppi v. Leslie, supra,* at 504 (and cases cited therein)."

*Taylor v. Hayes*, 418 U.S. at 498 (footnote omitted; emphasis added).

If the Court felt a need to act promptly, it nonetheless was obligated to provide notice and opportunity to be heard. Like with the use of the criminal contempt power, due process procedures are all the more essential "in view of the heightened potential for abuse" of summary disposition of substantial rights with no process at all.

> "The provision of fundamental due process protections for [the moving parties here] accords with our historic notions of elementary fairness. While we have no desire 'to imprison the discretion of judges within rigid mechanical rules,' *Offut v. United States*, 348 U.S., at 15, we remain unpersuaded that "the additional time and expense possibly involved . . . will seriously handicap the effective functioning of the courts.' *Bloom v. Illinois, supra,* at 208-209. *Due process cannot be measured in minutes and hours or dollars and cents.*"

*Taylor v. Hayes*, 418 U.S. at 500 (emphasis added).

11

### B. The Moving Parties Were Denied Due Process

The moving parties received no notice of this proposed action, no public record of the reasons for the decision can be found, no hearing was held, and no written decision based on a factual record has been issued. They only found out about the stay when their counsel inquired about why the ▮▮▮ award had not been paid. This entire astonishing turn of events is all the more Orwellian since there is not a scintilla of evidence justifying the wholesale suspension of ▮ claims.

The ▮AL clients were deprived of their Fifth Amendment guarantee of procedural and substantive due process. The hallmarks of a due process deprivation are starkly present here: the lack of a public record of such a monumental decision, the failure to give any notice to the affected parties of the reasons for what constitutionally could be only a proposed suspension, the lack of any forum with procedural safeguards for accurate determination of the facts, a written decision based on findings supported by a written record, and the absence of any evidence warranting this Draconian action. Indeed, the moving parties have not been afforded not a single aspect of the due process procedures required *before* infliction of the extreme penalty of an indefinite delay of the valuable right to seek and receive speedy just compensation.

The funds created by the BP settlement are available for qualifying parties injured by the BP oil spill to recover their economic damages. An applicant meeting the requisite criteria under the DHEEC policies and formulas for her category of damages is entitled to an award. While the amount of the award is discretionary, the ability to participate in the expedited process on the same terms as other applicants is not discretionary. Under the settlement agreement and the established procedures, every applicant is entitled to have her claim adjudicated in the same fashion and same time period as all other applicants. A suspension of processing claims cannot

occur without affording procedural due process to the persons facing this detriment.

In the landmark case of *Goldberg v. Kelly*, 397 U.S. 254 (1970), the Supreme Court held a state that terminates public assistance payments to a particular recipient without affording him notice and the opportunity for an evidentiary hearing prior to termination denies the recipient procedural due process in violation of the Due Process Clause of the Fourteenth Amendment. Welfare benefits are a statutorily created entitlement and thus a protected property interest. *Id.* at 261-62 & n. 8. *Goldberg* built on the foundation of *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) where **the Supreme Court held that** *"[i]n our democratic society,* *"an elementary and fundamental requirement of due process . . . is notice reasonably calculated . . . to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."* 339 U.S. at 314 (emphasis added).

Thus, in circumstances where an adverse action depriving a citizen of benefits and property is contemplated, "'[t]he fundamental requisite of due process of law is the opportunity to be heard'" at "'a meaningful time and in a meaningful manner'" *before* any adverse decision is rendered. *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) (quoting *Grannis v. Ordeau*, 234 U.S. 385, 394 (1914) and *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). *The individual losing benefits is entitled to a hearing before an impartial decision-maker, the right to confront and cross-examine witnesses and offer evidence, and the right to a written opinion setting out the evidence relied upon and the legal basis for the decision. Goldberg v. Kelly*, 397 U.S. at 267.

*Goldberg* has been applied to a variety of contexts where a citizen seeks to obtain or faces the loss of a benefit, right, or entitlement. *See* Albert H. Meyerhoff and Jeffrey A. Mishkin, *Application of Goldberg v. Kelly Hearing Requirements To Termination of Welfare Benefits*, 26 Stan. L. Rev. 549, note 2 (1973-74) (collecting cases). The consistent holding of

13

these cases is that a citizen's paramount right in an ordered society of laws to be unburdened by arbitrary decision-making can be preserved only by requiring scrupulous observance of *Goldberg before* any deprivation of her benefits or property.

In a situation directly analogous to what has happened here, an undisclosed decision made without due process to bar or suspend a contractor from bidding on federal contracts—even if supposedly temporary—has been found to be unlawful. Under established precedent, someone seeking benefits or a contract with a government agency is entitled to fundamental due process before that right can be revoked or suspended. Due process entails notice of the reasons for proposed denial or exclusion and a hearing to refute the charges by presenting evidence and cross-examining adverse witnesses, all culminating in findings and conclusions based upon the record.

Thus, "due process generally requires that [federal government] "contractors [be afforded] written notice of and an opportunity for a hearing regarding proposed debarments." Kate M. Manuel, *Debarment and Suspension of Government Contractors: An Overview of the Law Including Recently Enacted and Proposed Amendments* (Congressional Research Service, January 6, 2012) at pp. 4-5 (footnote omitted). In the landmark decision of *Gonzalez v. Freeman*, 334 F.2d 570 (D.C. Cir 1964), future Chief Justice Warren Burger held that while contractors may not have a right to government contracts, "that cannot mean that the government can act arbitrarily, either substantively or procedurally, against a person or that *such a person is not entitled to challenge the processes and the evidence before he is officially declared ineligible for government contracts.*" 334 F.3d at 574 (emphasis added); *see also Horne Brothers, Inc. v. Laird*, 463 F.2d 1268, 1271 (D.C. Cir. 1972) (Suspension of a contractor where it "may dangle in suspension" requires that the government "to insure fundamental fairness to the contractor whose

14

economic life may depend on his ability to bid on government contracts.")

*De facto* debarment is likewise prohibited without a modicum of procedural due process. Thus, like the situation here, a government directive to hold all the awards to a contractor "in abeyance" due to concerns about the contractor's integrity, without providing notice and an opportunity to be heard, constituted *de facto* debarment and deprived the contractor of procedural due process." *Peter Kiewet Sons' Co. v. U.S. Army Corps of Engineers*, 534 F.Supp. 1139 (D.D.C. 1982), *rev'd on other grounds*, 714 F.2d 163 (D.C. 1983). Of course, the situation of the AL clients and AL is starkly more compelling because they have not been accused of any improprieties that would warrant suspension of their claims processing, much less been afforded notice and an opportunity to be heard.

Due process is also violated when a government agency issues an undisclosed internal directive to hold awards to a contractor "in abeyance" for an indefinite period. Thus, in *Conset Corp. v. Cmty. Servs. Admin.*, 655 F.2d 1291 (D.C. Cir. 1981), circulation of a an undisclosed memorandum alleging that a grant recipient had a conflict of interest, coupled with a subsequent refusal to approve the firm for a grant, violated due process because no notice of this proposed action was given and a hearing was not held.

The violation of the moving parties' due process rights here is heightened in light of the utter lack of transparency in which the stay decision was made. These claimants are totally in the dark about the reasons for this draconian action. There has been no notice of allegations or a hearing where accusers can be confronted. Nor has any public order staying the cases been issued. Indeed, the moving parties are in the anomalous position of shadow boxing unknown charges—the epitome of the lack of any meaningful opportunity to defend themselves.[7]

---

[7] The moving parties respectfully request that they be furnished with any information submitted to the Court when it decided to order the stay. This information should at least include the unredacted version of

15

A sweeping decision to strip ▮ claimants of their right to fair treatment in prosecuting their damages claims cannot be shrouded in secrecy. Open government with transparent decision-making is a key hallmark of democracy. The moving parties here were not present nor invited nor represented by their counsel whenever and however the decision was made to freeze their cases. They were effectively tried *in absentia*. *Cf. Crosby v. United States*, 506 U.S. 255, 262 (1993) (Federal law "prohibits the trial in absentia of a defendant who is not present at the beginning of trial.")

The undisclosed decision to stay processing of all AL clients' claims is also directly contrary to the constitutional guarantee to open judicial proceedings where the fate of a party who might lose valuable property and benefits is exposed to public scrutiny. This is a civil proceeding that does not present the policy considerations of grand jury proceedings, proceedings involving minors, or classified national security information. That such a stunning decision could be made behind closed doors explains Justice Louis Brandeis' famous observation that "sunlight is said to be the best of disinfectants." Louis Brandeis, *Other People's Money-- and How Bankers Use It* (1914).

In light of the fact that the moving parties were afforded no due process rights before their claims were derailed, the stay is improper and must be lifted.

### C.  The Moving Parties Were Denied Equal Protection

An entire class of claimants has been subjected to different treatment than all other claimants: if you are represented by AL, your case has been put on indefinite hold. There is no known rationale for this discrimination solely based on the identity of your counsel. Indeed, is difficult to imagine any reason for banning an entire group of ▮ claimants' cases from the right

---

the Juneau Report, the unredacted version of the Welker Report and the unredacted version of all emails mentioned in such reports.

16

to have their claims timely processed. This glaringly disparate treatment deprives these ▓ applicants of equal protection of the law.

A fundamental guarantee for all citizens is equal protection. Persons similarly situated must be treated the same, and disparate treatment is unconstitutional absent an articulated rational basis for discrimination. *See United States v. Windsor*, __U.S.__ (June 26, 2013) (slip opinion) at p. 25 (equal protection guarantee prohibits "singl[ing] out a class of persons" and "impos[ing] a disability on the class" . . . "for no legitimate purpose") (DOMA found to be unconstitutional). The blanket classification of all of one law firm's clients as a class unfit for claims processing bears no "fair relationship to a legitimate public purpose." *Pylyer v. Doe*, 457 U.S. 202, 216 (1982).[8] Since no basis has been stated, much less a rational one, the AL clients have been effectively relegated to the forbidden status of second class citizens.

The Supreme Court has held that government cannot impose different requirements on a citizen than those required of others when seeking to obtain the identical public benefit. In *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000), the city imposed the requirement of a 33 foot easement for the property owner to connect her property to a municipal water supply while all other applicants were allowed to have only a 15 foot easement. The Supreme Court unanimously found an equal protection violation in this disparate treatment that lacked any rational basis. "Our cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others

---

[8] Assuming for the sake of argument that something inappropriate occurred in the processing of AL client ▓ claim (which we now know did not occur), that fact alone would not be a basis for finding that all ▓ other claims were similarly compromised. This conspicuous form of guilt by association offends every notion of equal protection and due process. Moreover, if the ▓ settlement award is at issue, the wholesale suspension of claims processing for AL's other ▓ clients is overkill. **The Court can fashion less harsh remedies to deal with that discrete situation. When vital constitutional rights are at stake, the Government "must use a scalpel, not an ax" in undertaking even discretionary actions.** *Bursey v. United States*, 466 F.2d 1059, 1088 (9th Cir. 1972).

similarly situated and that there is no rational basis for the difference in treatment." *Id.* at 564. A citizen is denied equal protection under such circumstances regardless of whether the discrimination results from a statute or its application through public officials. *Id.*

It is indisputable here that the ▆▆ AL clients are being subjected to different, unique, and prejudicial treatment compared to others similarly situated. Every other applicant's claim is proceeding in an orderly and deliberate fashion with no delays due to extraneous factors. The AL client class, however, is being treated starkly dissimilarly. The processing of their claims has ground to a halt, and no one knows when, if at all, the processing will resume. It is the paradigm of denial of equal protection "when a decision maker with a high level of discretion fails to consider certain applications at all." Virginia T. Vance, *Application for Benefits: Due Process, Equal Protection, and the Right To Be Free from Arbitrary Procedures,* 61 Wash & Lee L. Rev. 883, 913 (2004). Since no reason, much less a rational one, has been advanced for this rank discriminatory and arbitrary treatment of AL clients, they have established a violation of their equal protection rights.

## IV. CONCLUSION

For the foregoing reasons, the stay of the processing of the ▓▓▓AL clients' claims should be immediately lifted and the Claims Administrator should be instructed to resume processing them and paying the ▓▓▓▓▓▓ award.

Dated: July 18th, 2013

Respectfully submitted,

By: /s/ James A. Cobb

James A. Cobb, Jr.  (La. Bar No. 4213)
Attorney & Counselor-at-Law
900 Emerald Street
New Orleans, Louisiana   70124
Telephone:   (504) 289-7830
Telefax:     (504) 582-2310
E-mail:      jimcobb@jimcobblaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on **July 18th 2013**, I served the foregoing Motion and supporting pleadings via e-mail to all counsel of record.

/s/ James A. Cobb, Jr.