**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **In Re:  Oil Spill by the Oil Rig "Deepwater** | * | MDL NO. 2179 |
| **Horizon" in the Gulf of Mexico, on** | * | |
| **April 20, 2010** | * | SECTION J |
| | * | |
| **This document relates to all actions.** | * | |
| | * | Honorable CARL J. BARBIER |
| | * | |
| | * | Magistrate Judge SHUSHAN |
| | * | |
| | * | |
| | * | |

**BP'S MEMORANDUM IN SUPPORT OF ITS RENEWED MOTION**
**FOR A PRELIMINARY INJUNCTION TO SUSPEND PAYMENTS**
**FROM THE COURT SUPERVISED SETTLEMENT PROGRAM**
**PENDING JUDGE FREEH'S INVESTIGATION AND REPORT**

*COUNSEL FOR SUBMITTING PARTIES ARE LISTED AT END OF MEMORANDUM*

## <u>TABLE OF CONTENTS</u>

**Page**

I.   Introduction ..................................................................................................................1

II.  The Appeals Process Has Been Compromised. ...........................................................3

     A.   Appeals Process In The Economic And Property Damages Settlement
           Agreement. ........................................................................................................3

     B.   BP Has Discovered That Two CSSP Appeal Panelists Were Members Of
           Law Firms That Submitted Claims For Clients And On Behalf Of The
           Law Firms Themselves. .....................................................................................5

     C.   The CSSP Appeal Panelists' Apparent Conflicts Of Interest Are
           Inconsistent With Applicable Ethical Standards ...............................................7

III. Alleged Fraud in the Mobile Claims Center. .............................................................11

IV.  There Is A Systemic Failure By The CSSP To Supervise And Monitor Personnel
     To Prevent Misconduct. ..............................................................................................13

V.   The Recent Events Show That A Preliminary Injunction To Temporarily Suspend
     CSSP Payments Should Be Issued Pending The Conclusion Of Judge Freeh's
     Investigation ................................................................................................................15

     A.   The New Evidence Establishes A Lack Of Internal Controls At The CSSP
           And Requires Issuance Of A Preliminary Injunction. ....................................15

     B.   BP Has Established The Elements Of Preliminary Injunctive Relief. .............18

## TABLE OF AUTHORITIES

**Cases**

*Brady v. Capital Grp., Inc.*,
No. 91-3873, 1992 WL 46337 (E.D. La. Mar. 4, 1992)............................................. 16

*Green v. Adm'rs of Tulane Educ. Fund*,
CIV.A. 97-1869, 1998 WL 24424 (E.D. La. Jan. 23, 1998) ...................................... 7

*In re Dresser Indus., Inc.*,
972 F.2d 540 (5th Cir. 1992)....................................................................................... 7

*In re Guirard*,
11 So. 3d 1017 (La. 2009)............................................................................................ 9

*In re Kensington International Ltd.*,
368 F.3d 289 (3d Cir. 2004) ................................................................................. 10, 11

*In re Nettles*,
394 F.3d 1001 (7th Cir. 2005).................................................................................... 11

*In re Pardue*,
814 So. 2d 1269 (La. 2002)......................................................................................... 7

*Janvey v. Alguire*,
647 F.3d 585 (5th Cir. 2011)...................................................................................... 19

*Jenkins v. Starns*,
85 So. 3d 612 (La. 2012)............................................................................................ 14

*Jenkins v. Sterlacci*,
849 F.2d 627 (D.C. Cir. 1988) ................................................................................ 8, 9

*Lopez Dominguez v. Gulf Coast Marine & Assocs., Inc.*,
607 F.3d 1066 (5th Cir. 2010).................................................................................... 10

*Novelaire Techs., L.L.C. v. Harrison*,
994 So. 2d 57 (La. Ct. App. 2008) ............................................................................ 14

*Pendergest-Holt v. Certain Underwriters at Lloyd's of London*,
600 F.3d 562 (5th Cir. 2010)...................................................................................... 17

*Plaquemines Parish Comm'n Council v. Delta Dev. Co., Inc.*,
502 So.2d 1034 (La. 1987).......................................................................................... 14

*Riggs Nat'l Bank v. Zimmer*,
No. 3886, 1977 WL 5316 (Del. Ch. Nov. 30, 1977)................................................. 16

*United States v. Dockens*,
   No. 00-40277, 2001 WL 498794 (5th Cir. Apr. 19, 2001) ....................................... 8

*United States v. Werner*,
   916 F.2d 175 (4th Cir. 1990) ..................................................................................... 8

**Statutes**

DEL. CODE ANN. tit. 12, § 3302(a) ....................................................................................... 16

DEL. CODE ANN. tit. 12, § 3581(b)........................................................................................ 17

LA. REV. STAT. ANN. § 9:5605................................................................................................ 14

**Rules**

LA. RULE OF PROF'L CONDUCT 1.7 .......................................................................................... 7

LA. RULE OF PROF'L CONDUCT 1.10 ...................................................................................... 13

**Other Authorities**

CHARLES A. WRIGHT & ARTHUR R. MILLER, ET AL.,
   FEDERAL PRACTICE & PROCEDURE § 3546 (3d ed.).................................................. 9

RESTATEMENT (SECOND) OF TRUSTS § 173, cmt. d (1959)........................................... 14

I.    **Introduction**

After learning of allegations of improper referral fees involving two senior attorneys for the Court Supervised Settlement Program ("CSSP"), BP moved for preliminary injunctive relief on July 16, 2013.  BP's motion requested a temporary pause in CSSP payments pending the outcome of the investigation currently being conducted by former FBI Director and former federal judge Louis Freeh.  Although BP presented evidence of both wrongdoing by the senior CSSP attorneys and a lack of sufficient CSSP internal controls, the Court denied BP's motion. The Court based its ruling in part on representations by the CSSP regarding layers of approvals required for payment of any particular claim (including, in particular, the existence of an appeals process), *see* July 19, 2013 Hr'g Tr. at 9:9-10:8; 50:1-3, and on what was perceived to be a lack of specific evidence at that time that any claims actually had been improperly calculated and paid, *see id.* 10:13-17; 12:24-13:2; 51:15-18.

Since the July 19 hearing, however, BP has learned of new evidence of more widespread and potentially systemic improprieties in the CSSP.  In addition to further calling the CSSP's internal controls into question, this new evidence specifically addresses two key factual predicates underlying the Court's July 19 denial of the relief BP requested.  ***First***, while the Court relied on the claims review and appeal process within the CSSP (reasoning that layers of review would prevent improper payments), BP now has discovered problems and insufficient controls within the appeals process itself.  In particular, at least two Appeal Panelists had apparent conflicts of interest—specifically, their law firms were representing claimants and submitting claims on their firms' own behalf while the Appeal Panelists were issuing rulings over disputed claims.  Thus, the appeals process can no longer be counted on to provide the necessary safeguards against the risk of improper payments.

***Second***, while the Court also denied BP's motion because of a perceived lack of specific evidence that the misconduct actually impacted the calculation or payment of any claims, BP now has learned of evidence that individual CSSP employees (who allegedly received "referral" fees similar to those at issue in BP's prior motion) in fact may have been able to cause the CSSP to approve and pay improper claims. Specifically, BP learned through its fraud hotline of allegations that a CSSP employee in the Mobile, Alabama claims center assisted claimants in submitting fraudulent subsistence claims in exchange for payment of a portion of settlement awards for those claims. After BP promptly referred this matter to the CSSP, the CSSP suspended two employees. *See* July 19, 2013 Welker Ltr (attached hereto as Exhibit 1) at 2. Moreover, a review of the claims approved by the CSSP's Mobile claims center indicates that the reported scheme may be more extensive than the CSSP has acknowledged or even recognized thus far, as the office's overall claims approval rate is three times the average of the other offices. Like the allegations involving the two senior CSSP attorneys, these alleged improprieties raise serious questions about the existence and adequacy of the CSSP's internal controls, including controls related to the hiring and oversight of CSSP personnel.

These new incidents also show that a "grand conspiracy" is not required to cause improper claim determinations and payments. July 19, 2013 Hr'g Tr. at 10:4–8. Rather, all that is required is a lack of adequate oversight or appropriate internal controls. Each of the incidents that BP now has brought to the Court's attention appears to be a direct product of deficient oversight and internal controls, which make it likely that additional incidents either have occurred or will occur. The CSSP did not identify the issues involving the two senior CSSP attorneys or the Mobile claims center. Instead, it was BP that identified them from the outside looking in with only limited information. If there were proper internal oversight and controls,

these incidents should not have occurred.  Nor should the Appeal Panelist conflicts of interest—which the CSSP apparently did identify after they occurred but failed to disclose to BP—have arisen.  In sum, there is now new, additional evidence to show a substantial likelihood of a breach of fiduciary duty based on the lack of sufficient controls within the CSSP.  In light of this additional evidence of apparent conflicts, likely improper payments, and lack of proper oversight, BP submits that the prudent course is to briefly pause CSSP payments (but not claims processing) until Judge Freeh completes his court-ordered "evaluati[on of] the internal compliance program and anti-corruption controls within the CSSP, and mak[es] any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices."  7/2/13 Order (Dkt. No. 10564) at 2.  Given the evidence of a lack of effective controls, until that investigation is complete the parties and the public can no longer have confidence that improper claims are not being paid.  In the meantime, BP should not have to face the substantial risk of irreparable harm from improper payments—a risk that is heightened by the fact that the CSSP is currently making payments of $93 million per week.  Declaration of Hal Sider ("Sider Decl.") (attached hereto as Exhibit 2) ¶ 4.  BP therefore respectfully renews its request for a preliminary injunction to temporarily pause CSSP payments until Judge Freeh completes his investigation and issues his final report.  This is modest relief; it will at most slightly delay the payment of certain claims, but it will preserve this Court's ability to take remedial steps to the extent that Judge Freeh finds that such steps are necessary.

## II.   The Appeals Process Has Been Compromised.

### A.   Appeals Process In The Economic And Property Damages Settlement Agreement.

The claims appeals process is intended to be a critical safeguard within the CSSP framework that serves to "assure accuracy, transparency, independence, and adherence by the

Settlement Program to the terms of [the] Agreement."   Economic and Property Damages

Agreement (Dkt. No. 6430) ("EPD Agreement") § 6.1.   To further these goals, the EPD

Agreement created a pool of between 10 and 20 "Appeal Panelists."   *Id*. § 6.1.2.2.2.   The pool

was filled by the Court from nominations submitted by the parties, and service as a panelist is

subject to the continued oversight and jurisdiction of the Court.   6/26/12 Order (Dkt. No. 6796)

at 1–2.   Panelists receive compensation based on a program devised by the Claims Administrator

and approved by the Court.   EPD Agreement § 6.9.

　　　　Either a Claimant or BP may appeal from a final determination of a claim by the CSSP.

The appeals are heard either by a single panelist to be selected at random (for claims under

$1,000,000) or three panelists to be selected at random (for claims over $1,000,000).   *Id*.

§§ 6.1.2.1.1.,   6.1.2.2.1.,   6.1.2.2.5.1.,   6.1.2.2.5.2,   6.1.2.4.   Panelists must issue written

determinations[1] that are available to other panelists to read.   *Id*. § 6.7.   The CSSP manages the

operation of the appeals process, including conducting the panelist assignments, issuing rules on

the operation of the appeals process, and handling all billing and compensation for panel

members.   Declaration of Keith Moskowitz ("Moskowitz Decl.") (attached hereto as Exhibit 3)

¶ 4.   The CSSP also employs a full time Appeals Coordinator "to coordinate the appeals

process."   EPD Agreement, Exhibit 25, ¶ 1.

　　　　At the inception of the program, the CSSP recognized the necessity that panelists adhere

to standards of neutrality: "Panelists must remain neutral. [The] Appeals Coordinator [is]

available to assist Appeal Panel to facilitate processing of Appeals while maintaining the

integrity of neutral Appeals Panel Process."   CSSP PowerPoint of 8/20/2012 for Appeals Panel

---

[1] The Court "maintains the discretionary right to review any Appeal determination to consider whether the determination was in compliance with the Agreement."   EPD Agreement § 6.6.   The Court reviews the determination as if it were a recommendation by a Magistrate Judge.   *Id*.

Training, Deepwater Horizon Economic Settlement (attached hereto as Exhibit 4) at 133.  The

Claims Administrator also adopted a policy that provides that appeal panelists issue their

opinions anonymously.  Ex. 3, Moskowitz Decl. ¶ 4.  As a result, the Claims Administrator is the

only relevant actor with complete visibility into the appeals process and thus is also the only one

positioned to develop effective conflict controls and processes.

As of July 29, 2013, nearly 3,000 appeals of CSSP claim determinations had been filed.

These appeals involve every type of claim—including Seafood, Vessels of Opportunity ("VoO"),

Vessel Damage, Real Property Sales, Coastal Real Property, Wetlands Real Property, Individual

Economic Loss, and Business Economic Loss—and cover a wide range of topics.  The

approximate value of payments made pursuant to these appeals is $768 million.  Ex. 2, Sider

Decl. ¶ 5.

>   **B.    BP Has Discovered That Two CSSP Appeal Panelists Were Members Of Law Firms That Submitted Claims For Clients And On Behalf Of The Law Firms Themselves.**

BP recently learned—within the last week—that two Appeal Panelists operated with

apparent conflicts of interest that arose after they were appointed.  These two Appeal Panelists

were appointed in June 2012 and were partners at Louisiana law firms.  6/26/12 Order (Dkt. No.

6796) at 1.  Since being appointed, they have billed time to the CSSP through their law firms for

their work hearing claims appeals.  *See* Ex. 3, Moskowitz Decl. ¶ 4.  At the very same time, their

law firms represented claimants before the CSSP.  *Id.*  In fact, one of the law firms represented at

least five claimants who submitted Business Economic Loss claims to the CSSP between

October 2012 and April 2013, while its partner was serving in the panelist pool.  Ex. 2, Sider

Decl. ¶ 7, Appendix A.  The other law firm represented at least nine Business Economic Loss

claimants between April and June 2013, again while its partner was an Appeal Panelist.  *Id.*  In

addition to representing claimants seeking recovery through the CSSP, each firm also filed a

Business Economic Loss claim with the CSSP seeking recovery on its own behalf—one in October 2012 and the other in February 2013.  *Id.*

BP raised these concerns with the CSSP on August 2.  Ex. 3, Moskowitz Decl. ¶ 5. According to the Claims Administrator, the CSSP learned of one of the conflicts months ago, but BP was never informed.  *Id.* ¶ 6.  The Claims Administrator informed BP that he told the Magistrate Judge of the situation and the panel lawyer left the law firm and opened his own practice, where he continues to serve as an Appeal Panelist.  *Id.* ¶ 6.  Because BP was never informed, it had no opportunity to comment on or even to consider whether to waive the conflict of interest and consent to the arrangement or to evaluate whether to seek to set aside the Appeal Panelist's prior rulings due to the conflict of interests.  BP is not aware of any CSSP action taken at that time to determine if there were any other panelists with similar conflicts.  But, on August 2, the CSSP also told BP that it recently had learned of the second Appeal Panelist conflict mentioned above.  *Id.* ¶ 7.  Finally, the CSSP informed BP on August 2 that it likewise recently had identified (but not disclosed to BP) a third apparent conflict with yet another Appeal Panelist.  *Id.* ¶ 8.  The Claims Administrator informed BP that this third Appeal Panelist has since resigned from the Appeal Panelist pool.  *Id.* ¶ 8.

The Claims Administrator also told BP that he had told the Magistrate Judge about these other apparent conflicts as well, *id.* ¶¶ 6–8, but the CSSP did not alert BP to any of these conflicts.  Instead, BP only learned of them recently through its own initiative—by reviewing the identity of counsel representing claimants before the CSSP, and then raising the issue with the Claims Administrator on August 2.  *Id.* ¶¶ 4–5.

### C.    The CSSP Appeal Panelists' Apparent Conflicts Of Interest Are Inconsistent With Applicable Ethical Standards.

The Appeal Panelists are bound by well-established ethical standards in their capacity as lawyers.  Moreover, since the Claims Administrator consistently has maintained that he is protected by judicial immunity, the CSSP would be bound to apply standards applicable to quasi-judicial actors to the conduct of the Appeal Panelists.[2]

As a starting point, the Appeal Panelists are bound as attorneys by the Louisiana Rules of Professional Conduct, which prohibit (among other things) conflicts of interest.  A conflict exists if "(1) the representation of one client will be directly adverse to another client; or (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer."  LA. RULE OF PROF'L CONDUCT 1.7; *see also In re Dresser Indus., Inc.*, 972 F.2d 540, 545 (5th Cir. 1992) ("Unquestionably, the national standards of attorney conduct forbid a lawyer from bringing a suit against a current client without the consent of both clients."); *In re Pardue*, 814 So. 2d 1269, 1272 (La. 2002) (approving suspension of an attorney who represented a trust and simultaneously filed pleadings on behalf of the trust heirs in opposition to the trust administratrix).  Conflicts may be waived only after full advance disclosure and informed consent.  LA. RULE OF PROF'L CONDUCT 1.7(a).[3]  *See also United States v. Dockens*, No. 00-40277, 2001 WL 498794, at *2 (5th Cir. Apr. 19, 2001) ("The rules provide

---

[2]    *See* Brief of Appellees, in In re: Deepwater Horizon, No. 13-30315, Fifth Cir. Doc. # 00512252933 at 40 (May 24, 2013) ("Mr. Juneau is entitled to quasi-judicial immunity").  BP consistently has denied that the Claims Administrator is subject to judicial immunity.  Unlike the Claims Administrator, however, the Appeal Panelists serve as adjudicators resolving disputes over the calculation of damages in individual appeals, which are reviewable by this Court on the same basis as a Magistrate Judge's rulings.

[3]    BP does not know if any screens were put in place at the panelists' law firms, or whether screens would have been effective in any event.  *Green v. Adm'rs of Tulane Educ. Fund*, CIV.A. 97-1869, 1998 WL 24424, at *3 (E.D. La. Jan. 23, 1998) ("The Fifth Circuit has never recognized the possibility of a 'Chinese Wall.'").

that if a lawyer is prohibited from representing a particular client based on a conflict of interest, such prohibition is generally imputed to all lawyers associated with that lawyer.").

Moreover, having sought (and continuing to seek before the Fifth Circuit) to avail himself of judicial immunity because of his purported quasi-judicial role, the Claims Administrator also was bound to apply the Code of Conduct for United States Judges (the "Code") to the Appeal Panelists. The Code governs the official conduct of "anyone who is an officer of the federal judicial system authorized to perform judicial functions." Code, Preamble; *see United States v. Werner*, 916 F.2d 175, 178 (4th Cir. 1990) (applying the Code of Judicial Conduct to a quasi-judicial land commissioner); *Jenkins v. Sterlacci*, 849 F.2d 627, 632–35 (D.C. Cir. 1988) (examining the application of the Code of Judicial conduct to special masters).

Once applied, the Code broadly prohibits judicial conduct raising the appearance of impropriety or that would cause a member of the public to reasonably question the fairness and objectivity of judicial proceedings. For example, the Code requires judges to "maintain and enforce high standards of conduct and . . . personally observe those standards, so that the integrity and independence of the judiciary may be preserved." Code, Canon 1. Judges must also "avoid impropriety and the appearance of impropriety in all activities." Code, Canon 2. And judges must "perform the duties of the office fairly, impartially[,] and diligently." Code, Canon 3.

By practicing law in a firm that was itself a claimant and that represented claimants before the CSSP, the Appeal Panelists appear to have acted inconsistently with their duties. First, the claims activities of the Appeal Panelists' law firms raise a conflict of interest that should have been disclosed. It is beyond dispute that a panelist could not decide appeals brought by or against claimants represented by his own law firm. But even short of that extreme

example, any law firm representing claimants is adverse to BP, which is a party to each appeal and funds the trust that finances the CSSP.  Simply put, an Appeal Panelist cannot adjudicate BP disputes while his or her firm (and therefore he or she) is adverse to BP, without first obtaining an informed waiver.  *See In re Pardue*, 814 So. 2d at 1272 (approving suspension of an attorney who represented a trust and simultaneously filed pleadings on behalf of the trust heirs in opposition to the trust administratrix); *see also Jenkins*, 849 F.2d at 630–32 (noting that there was an appearance of impropriety when a special master failed to disclose that the law firm representing the appellant also opposed the special master in his role as counsel in an unrelated action).  This type of conflict creates an appearance of impropriety that is exacerbated by the fact that a panelist's rulings may influence rulings by other panelists.  As a result of these conflicts, BP was unknowingly in the unenviable position of having disputes with claimants decided by attorneys who, at the same time, were adverse to BP and essentially *suing* BP.  Because of the appearance of impropriety created, the ethics rules prohibit exactly these types of conflicts regardless of any actual harm.  *In re Guirard*, 11 So. 3d 1017, 1025–27 (La. 2009) (approving disciplinary board's finding that law firm's policy, which created "an overwhelming motive to settle a claim at any price," violated Rule 1.7, even though "no actual harm was proven" because "the potential for harm" caused by this and other practices of the law firm was "immeasurable").

Moreover, under these circumstances, the strict standards of the Code leave no room for deviations.  *See Jenkins*, 849 F.2d at 633 (special master created appearance of impropriety by failing to disclose that the law firm representing the appellant also opposed the special master in his role as counsel in an unrelated action); *see also* CHARLES A. WRIGHT & ARTHUR R. MILLER, ET AL., FEDERAL PRACTICE & PROCEDURE § 3546 (3d ed.) ("[I]f a judge, or other person within the statutory language, has *any* financial interest, as that term is defined, however small, in a

party or in the subject matter in controversy, *the judge must recuse.   There is no room for discretion*." (citing 28 USC § 455(b)(4) (emphasis added)); *Lopez Dominguez v. Gulf Coast Marine & Assocs., Inc.*, 607 F.3d 1066, 1075 (5th Cir. 2010) (explaining judge's ownership of stock in parent company of the defendant could create the appearance of impropriety warranting recusal, even if the judge lacked knowledge of his ownership at the time).   At the very least, the two Appeal Panelists failed to "avoid . . . the appearance of impropriety in all activities."   Code, Canon 2.

Where applicable, the federal courts have enforced these rules stringently, even in cases presenting conflicts far more attenuated than those present here.   For example, in *In re Kensington International Ltd.*, 368 F.3d 289, 294 (3d Cir. 2004), the Third Circuit disqualified a District Judge from presiding over an asbestos bankruptcy where legal advisors he hired to assist him simultaneously represented future asbestos claimants in a separate proceeding.   Although the future claimants were at the time unknown, there was a "substantial likelihood" that the cases would involve some of the same claimants, and they certainly dealt with many of the same creditors and legal issues.   *Id.* at 299, 308–09.   Accordingly, the Third Circuit found that a conflict of interest existed between the advising attorneys' neutral role as advisor to the District Judge and their adversarial role as representative of future claimants in a similar proceeding.   *Id.* at 304–06.   And, even though the Third Circuit noted that the Judge himself had not engaged in improper or unethical conduct, the court concluded that disqualification was required.   *Id*. at 306–07; *see also In re Nettles*, 394 F.3d 1001, 1003 (7th Cir. 2005) (Posner, J.) (issuing a writ of mandamus requiring recusal even though the Court did not "suggest that [the Judge] would in fact be prejudiced against [the defendant]. The issue is appearances.").

Perhaps most importantly, despite the position he took in this Court and continues to take in the Fifth Circuit that he is entitled to quasi-judicial immunity as a matter of federal law, BP is not aware of any contemporaneous evidence that the Claims Administrator put in place a system of any kind to ensure that Appeals Panelists are complying with judicial and ethical duties inherent in the Claims Administrator's assertion that he and the CSSP operate under color of judicial immunity.   Nor is BP aware of any contemporaneous evidence that the Claims Administrator took adequate steps to police continuing compliance with the applicable judicial or attorney ethics rules.  These are precisely the type of prudent controls absent from the operations of the CSSP.

Here, the Appeal Panelists' law firms represented claimants in the current CSSP proceedings.  The Appeal Panelists' firms' roles as zealous advocates for CSSP claimants—a relationship imputed to the Appeal Panelists—impermissibly conflicts with the Appeal Panelists' roles as neutral arbiters for the Court in the appeals process.  *Kensington Int'l*, 368 F.3d at 308 ("[S]urely [the advisors] were under a duty to maintain at least the degree of neutrality normally required of law clerks or court-appointed experts.").  These apparent conflicts and the failure to put in place appropriate controls call into serious question the integrity of the CSSP appeals process.

## III.    Alleged Fraud In The Mobile Claims Center.

BP also recently learned of new allegations of fraud in the CSSP's Mobile, Alabama claims center.  On July 15, 2013, BP received information through its anti-fraud hotline—just one day after it opened—that an employee in the Azalea Road Claim Center in Mobile, Alabama was allegedly engaging in a fraudulent scheme.  July 18, 2013 Moskowitz Letter (attached hereto as Exhibit 5) at 1.  According to the tip, the employee was assisting individuals, including family members, in submitting fraudulent subsistence claims to the CSSP in exchange for payment of a

portion of settlement awards that may be paid to these individual claimants. *Id*.; Hotline Intake Report (attached hereto as Exhibit 6) at 3. The employee allegedly recruited individuals to submit fraudulent claims, provided advice regarding what claim details would yield the maximum claim possible, and received a portion of the awards. Ex. 6, Hotline Intake Report at 3. The tipster described this behavior as "rampant in the claims center." *Id*.

BP reported the allegation to the CSSP on July 18, 2013. Ex. 5, July 18, 2013 Moskowitz Letter. After investigation, the CSSP concluded that the employee's mother had filed a claim, and that the employee indeed had "initiated" other subsistence claims, one of which already had been approved. Ex. 1, July 19, 2013 Welker Letter at 1–2. The claims were placed on hold and the employee was suspended pending investigation. *Id*. at 2. In addition, a second employee at the Mobile facility was suspended for violating security protocol by accessing claims data at the request of the first employee, suggesting the possibility of more widespread misconduct at the Mobile facility. *Id*.

A review of simple claims metrics reveals that this disturbing pattern of behavior may extend beyond these two employees, and suggests that such malfeasance indeed may be "rampant," at least in the Mobile claims center. *First,* that claims center has taken in more than twice as many claims as any other center in the entire CSSP program. In fact, the Mobile office has originated more than 7,400 claims, while the office with the next highest intake rate has originated just over 3,000 claims. *See* Public Statistics for the Deepwater Horizon Economic and Property Damages Settlement (August 2, 2013) (attached hereto as Exhibit 7) at 2, chart 3.[4] *Second,* the approval rate for subsistence claims at the Mobile office is more than *three times* the average of the other claims centers: 86% of finalized subsistence claims from the Mobile

---

[4]    The data in Exhibit 7 is also available on the CSSP's website at http://www.deepwaterhorizoneconomic settlement.com/docs/statistics.pdf.

Claimant Center receive offers while 27% of finalized subsistence claims from other claim centers receive offers.  Ex. 2, Sider Decl. ¶ 6.  The CSSP's own data, graphically represented in Exhibit 7, should have been a red flag that the CSSP could not ignore.  Yet, once again, these problems were detected initially by BP—through its recently established fraud hotline—and not by CSSP internal processes.  *See* Ex. 5, July 18, 2013 Moskowitz Letter; Ex. 1, July 19, 2013 Welker Letter.

## IV.   There Is A Systemic Failure By The CSSP To Supervise And Monitor Personnel To Prevent Misconduct.

In its July 16 Motion, BP explained how the CSSP "failed to institute any meaningful prophylactic measures, or to expend sufficient resources, to detect and combat fraud and corruption within the CSSP."  Memo in Supp. of Mot. for Emer. Prelim. Inj. (Dkt. No. 10761-1) at 12.  The additional allegations of apparent impropriety described above are further evidence of inadequate supervision by the Claims Administrator, a lack of sufficient internal controls, and a failure to fulfill fiduciary obligations.  Just as the CSSP failed to independently uncover or prevent the activities of two of its senior counsel, it failed to uncover alleged misconduct at the Mobile claims center.  Instead, it only came to light because of the fraud hotline that *BP* created.

The CSSP at least learned of the apparent Appeal Panelists' conflicts, but only months after they arose.  Putting aside the fact that the CSSP's discovery of the conflicts was too late, its response was also inadequate.  After learning of the first conflict, it appears the CSSP did nothing to review claims decided by the conflicted Appeal Panelist.  Instead, the Panelist left his former law firm, but that arrangement could not cure the law firm's conflict without informed consent by BP.  LA. RULES OF PROF'L CONDUCT 1.10(b)(1).  At a minimum, the necessary course

was to inform BP of the conflicts and take appropriate remedial action.  If anything, this incident only highlights the CSSP's lack of oversight and appropriate controls.[5]

Not surprisingly, these new events are directly within the scope of the investigation currently ongoing by Judge Freeh.  As the Court is aware, Judge Freeh was appointed in response to the whistleblower allegations of wrongdoing by the two CSSP attorneys.  7/2/13 Order (Dkt No. 10564) at 1.  But the Court empowered Judge Freeh to investigate "any other possible ethical violations or other misconduct within the CSSP" and "examin[e] and evaluat[e] the internal compliance program and anti-corruption controls within the CSSP."  *Id*. at 2.  The two new incidents are precisely the type of "ethical violations or other misconduct" that Judge Freeh is already investigating.  And, at the conclusion of that investigation, Judge Freeh will make "necessary recommendations to design and to implement additional . . . controls, policies, procedures, and practices" to prevent the recent examples of improprieties.  *Id*.  But, while that investigation is ongoing, the CSSP continues to make payments to claimants.  Indeed, since the appointment of Judge Freeh on July 2 through July 29, the CSSP has made more than $325 million in claims payments, and it is averaging $93 million in weekly payments over the last three weeks.  Ex. 2, Sider Decl. ¶ 4.  There is no reason that BP should continue to face irreparable harm due to weekly payments of this magnitude when the Freeh investigation is examining these very issues.

---

[5]   The Claims Administrator, as trustee of the Settlement Trust, also had a fiduciary duty to inform BP of the conflicts. RESTATEMENT (SECOND) OF TRUSTS § 173, cmt. d (1959) ("[A trustee] is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection."); *Novelaire Techs., L.L.C. v. Harrison*, 994 So. 2d 57, 63 (La. Ct. App. 2008) (quoting *Plaquemines Parish Comm'n Council v. Delta Dev. Co., Inc.*, 502 So.2d 1034, 1040 (La. 1987), superseded by statute on other grounds, LA. REV. STAT. ANN. § 9:5605, as recognized in *Jenkins v. Starns*, 85 So. 3d 612 (La. 2012) (a fiduciary duty includes "the obligation to render a full and fair disclosure to the beneficiary of all facts which materially affect his rights and interests. . . . [T]he fiduciary's duty to disclose has been held paramount to the beneficiary's duty to investigate possible conflicts of interest.").

**V.     The Recent Events Show That A Preliminary Injunction To Temporarily Suspend CSSP Payments Should Be Issued Pending The Conclusion Of Judge Freeh's Investigation.**

BP renews its request for a temporary pause in CSSP payments until Judge Freeh completes his investigation and issues his final report.  In denying BP's prior request, the Court held that it would not temporarily suspend CSSP payments "without some substantial evidence of a systemic or widespread problem within the Court Supervised Settlement Program."[6]  July 19, 2013 Hr'g Tr. at 58:23–25.   The new evidence of wrongdoing is precisely that type of evidence and entitles BP to the relief it seeks. Moreover, BP should not be the one uncovering such evidence; the CSSP should be, at least if it had effective working controls.  And the fact that BP, with no internal access to the CSSP, has now found three sets of problems only underscores the risk to BP, as well as to the CSSP itself.

**A.     The New Evidence Establishes A Lack Of Internal Controls At The CSSP And Requires Issuance Of A Preliminary Injunction.**

Based on the new information uncovered to date, BP has a substantial likelihood of prevailing on the merits of a breach of fiduciary duty claim.[7]   In fact, the diversity of circumstances presented by these situations demonstrates that controls over CSSP personnel are deficient in multiple areas.  *First,* the alleged misconduct in Mobile could have been detected by basic monitoring of claims metrics—the type of controls a fiduciary has an obligation to implement.  For example, monitoring claim approval or offer rates would have revealed that subsistence claims were being approved in the Mobile claims center at a far higher rate than anywhere else in the CSSP.  While the unusual approval rates alone are not conclusive evidence

---

[6]    BP respectfully asserts that, as stated in its original motion, BP is only required to show a likelihood of success on the merits of a breach of fiduciary duty claim.  Memo in Supp. of Mot. for Emer. Prelim. Inj. (Dkt. No. 10761-1) at 8–13.  Put differently, the Court should grant BP's motion even with evidence of misconduct short of a "systemic or widespread problem."

[7]    As noted in BP's original motion, it also has a substantial likelihood of prevailing on a breach of fiduciary duty claim against former CSSP senior counsel, which independently entitles it to the relief it seeks.

of fraud, they are clear red flags that demand further managerial review and investigation.  And, if the CSSP had undertaken further managerial review in this circumstance, it may have uncovered the alleged fraud reported by the hotline tipster and reported it to BP, instead of the other way around.

**Second,** the CSSP did not prevent the Appeal Panelists' conflicts or uncover them in a timely manner.  Upon discovering them, the CSSP likewise failed to disclose them to BP, which is further evidence of the CSSP's lack of sufficient controls and failure to fulfill its fiduciary responsibilities.  Had the CSSP maintained processes preventing and monitoring potential conflicts, it could have identified the conflicts involving the Appeal Panelists earlier.  Instead, in both cases discussed above, the CSSP only identified the conflicts *months* after they arose.  Ex. 3, Moskowitz Decl. ¶¶ 6–8.  Identifying claimant and claimant counsel connections to CSSP personnel is a straightforward and necessary process to maintain the integrity of the program.  Nor is it difficult; it likely could have been instituted through automatic electronic review.  If the CSSP had appropriate procedures in place for dealing with conflicts like these, it would have immediately informed BP.  Instead, BP, with its limited access to CSSP data and operational records, had to identify the conflicts on its own.

By not instituting these simple prophylactic measures or controls, and by failing to appropriately respond to the incidents, the CSSP, and the Claims Administrator, have failed to act with the "care, skill, prudence and diligence" of a "prudent person" and therefore breached their fiduciary duties to BP.  DEL. CODE ANN. tit. 12, § 3302(a); *see Riggs Nat'l Bank v. Zimmer*, No. 3886, 1977 WL 5316, at *14–15 (Del. Ch. Nov. 30, 1977); *Brady v. Capital Grp., Inc.*, No. 91-3873, 1992 WL 46337, at *2 (E.D. La. Mar. 4, 1992).

Previously, the Court expressed concern that BP had not presented any evidence that the alleged improprieties involved more than the two isolated employees or actually had resulted in improper payments.  That is no longer the case.  When these new incidents are examined together with the existing "serious problem" involving the now terminated senior counsel, July 19, 2013 Hr'g Tr. at 9:1–3, they paint a picture of a systemic failure of necessary controls leading to widespread and varied incidents of alleged impropriety.  Three distinct operations in the CSSP suffered a breakdown in prudent management, which demonstrates a "systemic or widespread problem." *Id*. at 58:20–25.

Moreover, the latest two incidents involve the processing and appeals of claims.  In ruling on BP's prior motion, the Court repeatedly asked for evidence of fraud in the calculation or payment of claims.  *Id*. at 9:1–11:5.  Respectfully, to prevail here, BP need only show a likelihood of success on the merits of a breach of fiduciary duty claim against CSSP managers. *Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, 600 F.3d 562, 568−69 (5th Cir. 2010) (citation omitted); Memo in Supp. of Mot. for Emer. Prelim. Inj. (Dkt. No. 10761-1) at 8– 13.[8]  Controls are designed to be prophylactic and no prudent fiduciary can operate without putting them in place on an *ex ante* basis—especially not a fiduciary managing the enormous amounts of money flowing through the CSSP on a weekly basis.  Reacting after the fact on a case-by-case basis to problems that necessary and prudent controls would have avoided as a structural matter is not enough.  Given the prophylactic purpose of controls, the number of incidents of misconduct that have so far come to light is not the point.  *Cf.* July 19, 2013 Hr'g Tr. at 9:1–11:5.  Rather, it is the failure to put appropriate controls in place that is a breach of

---

[8]    Upon a breach of fiduciary duty, BP is entitled to equitable relief, including "[c]ompelling the trustee to redress a breach of trust by paying money, restoring property, or other means . . .; [o]rdering a trustee to account; . . . [and] imposing a lien or a constructive trust on trust property or tracing trust property wrongfully disposed of and recover the property or its proceeds." DEL. CODE ANN. tit. 12, § 3581(b).

fiduciary duties. That breach was further exacerbated when the CSSP failed to disclose the conflicts to BP after it belatedly discovered them.

The evidence now directly substantiates a breach of fiduciary duty resulting from the failures to properly manage the work of the CSSP and to disclose conflicts of interest.  But, even if something more was required, the Court now has evidence of the type it was seeking previously—the incident in the Mobile claims center is an example of alleged fraud in the *payment* of claims.  Nor should it be painted as isolated in nature, given the out-of the-ordinary approval rate for subsistence claims from the Mobile claims center.  *See* § III, *supra*.  And the Appeal Panelist conflicts undercut reliance on the existence of multiple layers of review within the CSSP to catch improper claims.

Put simply, assurances were provided to the Court by the CSSP in connection with the July 19 hearing, and those assurances have proven inaccurate, undermining both of the factual bases upon which the Court relied in denying BP's motion.  The incident in Alabama indicates that a single CSSP employee, when tempted by improper fees, can improperly affect the calculation and payment of individual claims.  And, the Appeal Panelist conflicts of interest eliminate any comfort BP and the Court might seek from the appeals process itself.  For these reasons, BP submits that it has demonstrated a substantial likelihood of prevailing on the merits.

**B.    BP Has Established The Elements Of Preliminary Injunctive Relief.**

For the reasons stated in BP's prior motion, the evidence continues to support each of the other requirements of a preliminary injunction.  Memo in Supp. of Mot. for Emer. Prelim. Inj. (Dkt. No. 10761-1) at 13–19.  Any short delay in CSSP payments is outweighed by the potential harm to BP if fraudulent payments are made.  The temporary pause will not "disserve the public interest;" preventing even the *risk* of fraudulent payments is in the public's interest and sends a clear message to future litigants that misconduct in settlement programs will not be tolerated.

And, finally, BP has a substantial likelihood of irreparable harm because it will be difficult, if not impossible, for BP to recover any improper payments made by the CSSP. *See Janvey v. Alguire*, 647 F.3d 585, 599–600 (5th Cir. 2011) (rejecting the argument that "difficulty securing economic damages is insufficient to demonstrate irreparable harm"). With three separate incidents of potential misconduct at the CSSP, each of which has the potential to affect future claims, the prudent course to prevent any further fraudulent payments is to pause CSSP payments until issuance of Judge Freeh's final report.

*          *          *

For these reasons, as well as those set forth in BP's Memorandum in Support of its Motion for Emergency Preliminary Injunction (Dkt. No. 10761-1), BP respectfully requests that the Court temporarily pause CSSP payments until Judge Freeh completes his investigation and issues his final report.

August 5, 2013

James J. Neath
Mark Holstein
BP AMERICA INC.
501 Westlake Park Boulevard
Houston, TX 77079
Telephone: (281) 366-2000
Telefax: (312) 862-2200

Daniel A. Cantor
Andrew T. Karron
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone: (202) 942-5000
Telefax: (202) 942-5999

Jeffrey Lennard
Keith Moskowitz
DENTONS US LLP
233 South Wacker Drive
Suite 7800
Chicago, IL 60606
Telephone: (312) 876-8000
Telefax: (312) 876-7934

**OF COUNSEL**

Respectfully submitted,

   _/s/ Richard C. Godfrey, P.C._
Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
David J. Zott, P.C.
Jeffrey J. Zeiger
Wendy L. Bloom
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Telefax: (312) 862-2200

Jeffrey Bossert Clark
Steven A. Myers
Dominic E. Draye
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000
Telefax: (202) 879-5200

   _/s/ Don K. Haycraft_
S. Gene Fendler (Bar #05510)
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
Telephone: (504) 581-7979
Telefax: (504) 556-4108

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 662-5985
Telefax: (202) 662-6291

**ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.
AND BP AMERICA PRODUCTION COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 5th day of August, 2013.

/s/ Don K. Haycraft
Don K. Haycraft