**KIRKLAND & ELLIS LLP**
AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Robert R. Gasaway
To Call Writer Directly:
(202) 879-5175
robert.gasaway@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

July 18, 2013

**By Electronic Mail**

The Honorable Sally Shushan
United States District Court
Eastern District of Louisiana
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

Re:   MDL 2179 — BP Motion to Strike Impermissible Phase 1 Opinions in Halliburton Expert Dr. Stevick's Phase 2 Reports

Dear Judge Shushan:

BP writes to respectfully request that the Court strike untimely and impermissible Phase 1 opinions set forth in Halliburton expert Dr. Glen Stevick's Phase 2 Opening and Rebuttal Reports (collectively, "Dr. Stevick's Phase 2 Reports").

Dr. Stevick's Phase 2 Reports offer a number of opinions that should have been presented (if at all) in Phase 1, such as opinions concerning the float collar conversion; operation and design of the *Deepwater Horizon*'s diverter system; operation, maintenance, and configuration of the *Deepwater Horizon* blowout preventer; and the foreseeability and occurrence of drill pipe buckling during the blowout.

These impermissible Phase 1 opinions are separate from and in addition to Dr. Stevick's casing breach opinion, which the Court has already stricken because it should have been presented in Phase 1. As you recall, on July 17, 2013, the Court granted BP's motion to exclude Halliburton's attempt to offer its casing breach theory, explicitly striking Part II(b)(i) of Dr. Stevick's Rebuttal Report. (*See* Order, MDL No. 2179 (July 17, 2013) (Rec. Doc. 10767).) While that earlier BP motion was narrowly tailored to address Drs. Ravi's and Stevick's casing breach theory, the present motion addresses other impermissible Phase 1 opinions offered by Dr. Stevick in his Phase 2 Reports.

Indeed, not only is Halliburton attempting to shoehorn Phase 1 opinions into Phase 2 via Dr. Stevick, but Dr. Stevick is offering opinions that he already offered during Phase 1 (for example, opinions regarding the design and operation of the diverter), or that he offered but then

**KIRKLAND & ELLIS LLP**

The Honorable Sally Shushan
July 18, 2013
Page 2

expressly withdrew in Phase 1 (for example, drill pipe buckling calculations), or that he was expressly precluded by the Court from offering at trial (for example, various BOP-related opinions). Halliburton's attempt to use Dr. Stevick's Phase 2 Reports as a vehicle for rehashing, expanding upon, and at times resurrecting a host of Phase 1 issues, is nothing more than an effort to re-litigate these issues and fill in perceived gaps in the record created by Halliburton's untimely Phase 1 disclosures. As you know, however, Phase 1 is now complete, and the record for Phase 1 is closed. (5/17/2013 Working Grp. Conf. Tr. 26:24-25.)

## Background

Dr. Stevick submitted Phase 1 opening and rebuttal reports concerning the design of the blowout preventer ("BOP") used on the *Deepwater Horizon* and the BOP's contribution to the well blowout and spill on April 20, 2010 (TREX 61123 (Stevick Phase 1 Amended Expert Report (attached as Exhibit A)) and TREX 61124 (Stevick Phase 1 Amended Rebuttal Expert Report (attached as Exhibit B)).) Dr. Stevick attached his drill pipe buckling opinion as an appendix to his Phase 1 report, but having failed to timely disclose the computations and analysis supporting his opinion, he subsequently withdrew it.[1]

During the Phase 1 trial, Dr. Stevick testified concerning the suitability of the *Deepwater Horizon* BOP for deepwater drilling and its failure to secure the Macondo Well, the operation of the diverter, and on cross examination, drill pipe buckling based on his observation of the physical evidence. (*See, e.g.*, Trial Tr. 6883-88; 6945-60; 7037-38).

Dr. Stevick was precluded, however, from offering many BOP-related opinions that he had failed to disclose in his expert reports. (*See, e.g.*, Trial Tr. 6887, 6893-94 (precluding Dr. Stevick from testifying about the alleged degradation of the upper annular resulting from an April 2010 stripping incident and the conversion of the lower variable bore ram to a test ram).) Consistent with the Court's prior orders, the Court limited Dr. Stevick's trial testimony to the "four corners" of his expert reports. *See* Order at 2, MDL No. 2179 (Jan. 25, 2013) (Rec. Doc.

---

[1] *See* Appendix C of Stevick Phase 1 Expert Report (attached as Exhibit C) (appending his drill pipe buckling analysis to his Phase 1 expert report); Stevick Dep. 498-501, 509 (producing at the deposition "the calculations that [Stevick] did to arrive at the opinions that are expressed in Appendix C" of his expert report); Order at 2, MDL No. 2179 (October 17, 2011) (Rec. Doc. 4301) (requiring parties to "disclose in a readily understandable form: (1) any mathematical calculations upon which a testifying expert relies in forming his opinions to be expressed"); Exhibit A (withdrawing Appendix C "Drill String Buckling"); Trial Tr. 7002-7003 (Stevick) (testifying that he had withdrawn his calculations and analyses regarding the forces required to buckle the drill string).

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
July 18, 2013
Page 3

8347); Order at 2, MDL No. 2179 (Jan. 31, 2012) (Rec. Doc. 5505); Order at 5, MDL No. 2179 (Nov. 7, 2011) (Rec. Doc. 4486); Order at 5, MDL No. 2179 (Nov. 22, 2011) (Rec. Doc. 4690).

Halliburton now seeks to reoffer through Dr. Stevick's Phase 2 Reports the same opinions that Dr. Stevick and other Halliburton experts offered during the Phase 1 trial and, to the extent Dr. Stevick's Phase 1 opinions were withdrawn or excluded due to his untimely disclosures, to remedy those failures.  BP respectfully requests all such impermissible Phase 1 opinions be stricken from Dr. Stevick's Phase 2 Reports.

In advance of filing this motion, BP requested through meet-and-confer discussions that Halliburton withdraw portions of Dr. Stevick's Phase 2 Reports on the basis that they were Phase 1 opinions and thus had been improperly included in Dr. Stevick's Phase 2 report. Unfortunately, Halliburton declined to withdraw the portions of Dr. Stevick's Reports challenged by BP, with the exception of Dr. Stevick's opinions concerning the negative pressure test; hence, this motion is being presented to the Court.

(To assist and guide the Court in identifying the challenged passages in Dr. Stevick's Reports, those passages have been designated with yellow highlighting in Exhibits F and G to this letter.  In Exhibits F and G, the opinions that Halliburton agreed to withdraw during the meet-and-confer process leading up to this motion, as well as the casing breach opinions excluded by the Court's July 17, 2013, order are redacted in black. (*See* Order, MDL No. 2179 (July 17, 2013) (Rec. Doc. 10767).) The impermissible Phase 1 opinions that BP seeks to exclude through this motion are highlighted in yellow.)

The impermissible Phase 1 opinions that should now be stricken from Dr. Stevick's Phase 2 Reports fall into the following broad categories:

- **Float Collar Conversion**:  Dr. Stevick provides an assessment of the alleged anomalies identified during the float collar conversion of April 20, 2010, and asserts that these anomalies should have triggered an engineering review and a directive given to the crew to use an additional mechanical plug barrier.  (Stevick Phase 2 Rebuttal Report (attached as Exhibit E) at 5-6, 8, 11-15).

- **Operation and Design of the Diverter System**:  Dr. Stevick opines that improper operation and design of the diverter system contributed to the loss of well control on the day of the Incident.  (*See, e.g.*, Stevick Phase 2 Opening Report (attached as Exhibit D) at 7, 11, 26 (alleging that the diverter system was improperly operated); Exhibit E at 4, 6, 9 (opining that "automation and/or default

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
July 18, 2013
Page 4

> configuring of the diverter to overboard would have resulted in an immediate closure of the well within minutes of the blowout starting").)
>
> - **Maintenance, Operation, and Configuration of the BOP**: Dr. Stevick's Phase 2 Reports describe how he believes that each BOP element—the Upper and Lower Annulars, the Blind Shear Ram, Casing Shear Ram, and Variable Bore Rams—was allegedly degraded or modified before the Incident and impacted the BOP's ability to act as an effective barrier to a blowout. Further, he opines on maintenance issues associated with the Upper Annular and the configuration of the AMF/deadman system. (*See, e.g.*, Exhibit D at 27-29 (opining on the stripping incident of April 5-6, 2010, the conversion of the lower annular to a stripping annular in 2006, and the conversion of the lower variable bore ram to a test ram in 2005); Exhibit E at 6, 18).
>
> - **Drill Pipe Buckling**: Dr. Stevick attaches to his report a "Drill String Buckling Analysis" and buckling computations, which purportedly address whether the drill pipe in the BOP was buckled or bowed following the blowout. (*See* Exhibit D at Appendix B).

### Discussion

Expert opinions about purely Phase 1 issues, that is, opinions regarding the causes of and allocation of fault for the blowout, are improper in the course of the Phase 2 proceeding, and should be struck as such. (*Cf.* Rec. Doc. 5407 (granting BP's Phase 1 *motion in limine* to exclude Phase 2 evidence).) As the Court has observed, Phase 2 expert discovery is a significant undertaking involving a great number of experts. Accordingly, improper expert opinions should be stricken, at a minimum, to streamline the expansive presentation of expert testimony expected in the Phase 2 trial. Dr. Stevick's Phase 2 Reports present expert testimony on Phase 1 issues that have been well vetted, and will serve only to bog down the Phase 2 trial.

The impermissible opinions set forth in Dr. Stevick's reports address *which barriers failed during*, and which party is *at fault for*, the April 20, 2010, blowout—plainly Phase 1 issues. Dr. Stevick purports to have evaluated BP's blowout prevention barriers, including its well control procedures and BOP equipment, and presents his conclusions. (*See, e.g.*, Exhibit D at 11-12, 26-27, 29 ("Clearly BP did not utilize highly reliable operational barriers to *prevent* a blowout (emphasis in original)" and "BP failed to implement adequate operational and equipment prevention barriers.").) Dr. Stevick further opines that if certain barriers had not been breached, the fire and explosion would not have occurred. (*See, e.g.*, Exhibit D at 26 ("Post

**KIRKLAND & ELLIS LLP**

The Honorable Sally Shushan
July 18, 2013
Page 5

incident modeling by BP and BEAR indicates there would have been no fire, no explosion, no fatalities, no sunk rig, no significant pollution of the GoM, etc. *if the diverter was set to go overboard* as is the policy of at least one operator, Chevron.").)  Opinions concerning the causes of the blowout and explosions and the parties at fault were the mainstay of the Phase 1 trial. These opinions should have been offered during Phase 1, if at all, and are not relevant to the material issues of Phase 2.

The Phase 1 opinions that Dr. Stevick offers in his Phase 2 Reports generally fall into one of two categories: (1) opinions that Dr. Stevick or other Halliburton experts offered during the Phase 1 trial, rendering them untimely and duplicative at this stage of litigation; or (2) opinions that would have been relevant during Phase 1 if they were timely disclosed, but they were not.

### Halliburton Has Already Offered Expert Testimony on Issues Raised in Dr. Stevick's Phase 2 Reports

Not surprisingly, Halliburton, through its experts, presented extensive evidence at the Phase 1 trial on the causation-related issues that Dr. Stevick now seeks to re-introduce through his Phase 2 Reports.  (*Compare* Exhibit E at 14-15 (opining on the anomalies identified during the float collar conversion) *with* Trial Tr. 7106-23 (Beck) (Halliburton's expert testified about the float collar conversion).)  Most notably, Dr. Stevick seeks to elaborate on and rehash Phase 1 opinions that he has already offered to the Court:

- *Compare* Exhibit E at 6 ("Automation and/or default configuring of the diverter to overboard would have resulted in an immediate closure of the well within minutes of the blowout starting") *with* Trial Tr. 7037-38 (Stevick) (criticizing Transocean for the configuration of the diverter and testifying that there would "have been no fire and explosion on the rig" if the diverter were properly configured);[2]

- Exhibit D at 28 ("The BOP elements and how they were downgraded over time are shown schematically in Figure 7 below") *with* Trial Tr. 6883-88 (Stevick) (explaining how "right down the stack, every [BOP] element was degraded" and that it was "very unlikely to work in an emergency");

---

[2] Notably, Dr. Stevick criticized Transocean for its handling of the diverter configuration during Phase 1, (Trial Trial Tr. 7037 (Stevick)), but now reverses course in Phase 2 to blame BP for the configuration and operation of the diverter.  (Exhibit D at 26).  In other words, not only is Dr. Stevick offering Phase 1 opinions in Phase 2, but he is using it as an opportunity to modify opinions that he offered during Phase 1.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
July 18, 2013
Page 6

- Exhibit E at 6 (opining that the BOP should have had "a more robust configuration of the AMF/deadman, *i.e.*, the CSR activating first, followed by the BSR (with DVS rams)" *with* Trial Tr. 6889 (Stevick) (testifying that "in the deadman system, the CSR is not activated, so this component is effectively not there in an emergency");

- Exhibit E at 6, 26 (opining that the BOP should have used DVS model rams for the Blind Shear Rams) *with* Exhibit B at 10-11 (asserting in his Phase 1 expert report that the Blind Shear Rams should have been replaced with CDVS or DVS rams); and

- Exhibit D at Appendix B (presenting a drill string buckling analysis and buckling calculations) to Trial Tr. 6921-32, 6945-60 (Stevick) (testifying about the cause and timing of drill pipe buckling).

One striking visual example of Dr. Stevick's Phase 2 Reports being used to revisit plainly Phase 1 issues is Figure 7 of Dr. Stevick's Phase 2 Report. When compared to a demonstrative that Halliburton disclosed for use in the Phase 1 trial, it is difficult to avoid a conclusion that Halliburton is using Dr. Stevick's Phase 2 Reports to seek to re-litigate Phase 1 issues:

**Figure 7 of Dr. Stevick's Phase 2 Report:**



Figure 7. Systematic degradation of the DWH BOP.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
July 18, 2013
Page 7

**Demonstrative D-8171 exchanged by Halliburton during Phase 1 trial:**



Halliburton has already presented to the Court the same opinions—or slight variations on them—that it now seeks to reintroduce and expand upon through Dr. Stevick's Phase 2 Reports.[3] Given the burden associated with Phase 2 expert discovery and the Court's instruction to streamline the presentation of expert testimony, Dr. Stevick's Phase 2 Reports are ripe for striking.

### Dr. Stevick Attempts to Offer Opinions in his Phase 2 Reports That Were Withdrawn or Excluded From the Phase 1 Trial Because They Were Untimely Disclosed

The other two categories of impermissible opinions that Dr. Stevick seeks to offer in Phase 2 are those that he either (i) withdrew during Phase 1 or (ii) was precluded from offering at trial on the basis that he failed to timely disclose them.

---

[3] Although Halliburton's proposed demonstrative D-8171 disclosed criticisms of the test ram and April 2010 stripping incident, Dr. Stevick was precluded from offering opinions about these issues at trial because they were not within the "four corners" of his Phase 1 reports. (*See* Trial Tr. 6887, 6893-94 (Stevick)).

**KIRKLAND & ELLIS LLP**

The Honorable Sally Shushan
July 18, 2013
Page 8

      The first category—opinions that Dr. Stevick withdrew during Phase 1 and now seeks to belatedly reintroduce—includes Dr. Stevick's drill pipe buckling opinion and associated computations. (*See* Exhibit A (withdrawing buckling analysis set forth in Appendix C); Trial Tr. 7002-7003 (Stevick) (testifying that he had withdrawn his calculations and analyses regarding the forces required to buckle the drill string).) Issues associated with drill pipe buckling, including whether it was foreseeable and the forces required to buckle the pipe, were explored in-depth during Phase 1 by various experts. (Trial Tr. 2771-81 (Davis); 5480-5503 (Childs); 9038-64, 9072-93 (Shanks).) Dr. Stevick understood that analyses and calculations associated with drill pipe buckling were relevant to Phase 1 and even opined at trial on pipe buckling based on the physical evidence. He acknowledged that he had previously withdrawn the analysis and calculations supporting his opinion, presumably because they were not produced until his deposition. (Trial Tr. 7002-7003 (Stevick); Stevick Dep. 498-501). Now, however, Dr. Stevick blatantly seeks to introduce a pipe buckling analysis and computations into the record, attaching his "Drill String Buckling Analysis" to his Phase 2 report (*See* Appendix B "Drill String Buckling Analysis" of Exhibit D).

      The second category—opinions that Dr. Stevick was precluded from testifying about during the Phase 1 trial for failure to timely disclose—includes certain opinions concerning the BOP configuration and maintenance. Specifically, Dr. Stevick was precluded from offering opinions about the alleged damage to the Upper Annular resulting from an April 2010 stripping incident and the conversion of the Lower Variable Bore Ram to a test ram because they were not within the "four corners" of his Phase 1 reports. (*See* Trial Tr. 6887, 6893-94 (Stevick)). In his Phase 2 reports, Dr. Stevick nonetheless resurrects these Phase 1 opinions. *See, e.g.*, Exhibit D at 29 ("The lower VBR was converted to a test ram in late 2004/early 2005 to save operational costs of plugging the well for pressure testing" and "Operationally, the Upper Annular was stripped through on April 5th and 6th, leaving it with a pressure containment capacity of approximately 2,500 psi. Thus, it too was useless in containing significant pressure relative [to] the mudline Maximum Anticipated Surface Pressure (MASP, 8,404 psi.") Halliburton seeks to impermissibly remedy its failure to timely disclose these opinions during Phase 1 by reinserting them into Phase 2, where they are untimely and irrelevant.

*   *   *

      This Court has made clear that the Phase 1 trial record is closed and finalized. Nonetheless, Dr. Stevick's Phase 2 Reports are replete with opinions that are within the purview of Phase 1; that were addressed at length in the Phase 1 trial; and that in many instances were addressed at length by Dr. Stevick himself. Halliburton should not now be permitted to reopen the Phase 1 record, particularly not for purposes of remedying failures to timely disclose certain

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
July 18, 2013
Page 9

opinions and or for elaborating on others.  Given this Court's repeated requests that the parties narrow rather than broaden the scope of Phase 2 experts testimony, Dr. Stevick's untimely Phase 1 expert presentation (even as slightly repackaged for Phase 2) should not be permitted.

      For the reasons stated above, BP respectfully requests that the Court strike the untimely Phase 1 opinions of Dr. Stevick's Phase 2 Reports, as identified in Exhibits F and G to this letter.

                                                                    Respectfully submitted,

                                                                    Robert R. Gasaway

Attachments

cc (by electronic mail):

United States' MDL Counsel
Plaintiffs' Liaison Counsel
Defense Liaison Counsel
Joel M. Gross