**KIRKLAND & ELLIS LLP**
AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Robert R. Gasaway
To Call Writer Directly:
(202) 879-5175
robert.gasaway@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

July 30, 2013

**By Electronic Mail**

The Honorable Sally Shushan
United States District Court
Eastern District of Louisiana
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

Re: MDL 2179 — BP's Reply to Halliburton's Response to BP's Motion to Strike Impermissible Phase 1 Opinions in Halliburton Expert Dr. Stevick's Phase 2 Reports

Dear Judge Shushan:

BP respectfully submits this Reply to Halliburton's Response to BP's Motion to Strike Impermissible Phase 1 Opinions in Halliburton Expert Dr. Stevick's Phase 2 Reports.[1]

Although BP had initially thought a reply would be unnecessary, BP writes to apprise the Court of relevant occurrences from the two-day deposition of Dr. Stevick completed last Friday. Dr. Stevick's deposition testimony underscores Halliburton's attempts to re-litigate Phase 1 issues through its Phase 2 expert reports. Moreover, Dr. Stevick's deposition revealed that at least one of the "Aligned Parties"—Transocean—objects to these re-litigation attempts. In particular, Transocean objected to certain of Dr. Stevick's deposition testimony on grounds that the testimony sought to offer opinions on Phase 1 issues.

For example, when counsel for BP questioned Dr. Stevick about his opinions on the diverter system, Transocean repeatedly and consistently objected on the basis that they were Phase 1 issues. (*See* Stevick Dep. 7/26/13 (included as Attachment A) at 425-428).[2] In addition,

---

[1] BP preserves its right to move to exclude Dr. Stevick's opinions on other bases, including through a *Daubert* motion, consistent with the schedule and framework set by the Court.

[2] Mr. Casazza represented Transocean during Dr. Stevick's deposition. The court reporter erroneously transcribed Mr. Casazza's objections as relating to "Page 1" instead of "Phase 1." BP intends to raise this transcription error with the court reporter.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
July 30, 2013
Page 2

counsel for Transocean acknowledged and objected to Dr. Stevick's impermissible Phase 1 opinions with an objection on the record:

> "Before we get started, Transocean objects to Dr. Stevick's reports, his testimony and any questions from his deposition to the extent they concern phase 1 issues.  Transocean may address any such opinions in this deposition in order to preserve the record but reserves all rights to challenge the inclusion of phase 1 material in the phase 2 trial." (*Id*. at 527:10-18).

One of the Aligned Parties thus concurs with BP's view that Dr. Stevick's Phase 2 Reports contain objectionable Phase 1 opinions.

Dr. Stevick's deposition testimony confirms that he intends, if permitted to do so, to replay issues from Phase 1 and offer never-before-offered opinions concerning causation and responsibility for the blowout and explosions.  Specifically, Dr. Stevick testified at his Phase 2 deposition that the BP "Company Man onboard is supposed to set the [diverter] policy." (*Id*. at 429:14-430:5).  Notably, no expert who testified during Phase 1 offered this opinion, thereby forcing the parties to re-litigate the origin and wisdom of the policies and procedures in place for the diverter system on April 20, 2010.  Further, Dr. Stevick testified at his Phase 2 deposition that the failure to divert overboard was a contributing factor to the explosions on the rig on April 20th, and that once the explosions occurred, there was probably no ability to use the diverter to respond to or manage the Macondo Incident.  (*Id*. at 421:3-23).  By Dr. Stevick's own admission, the diverter system concerns the causes of the blowout and explosions, which were extensively explored during the Phase 1 trial.

Finally, BP would like to address certain erroneous contentions made by Halliburton in its Response.  ***First***, Halliburton asserts that Dr. Stevick's opinions directly rebut those of Mr. Burch concerning process safety management and thus constitute permissible Phase 2 opinions.  (*See* Halliburton Response at 3).  Yet Dr. Stevick issued his opening report—replete with opinions on Phase 1 issues—ten days before Mr. Burch issued his Phase 2 report, undermining Halliburton's contention.  (Dr. Stevick issued his opening report on May 1, 2013, whereas Mr. Burch submitted his Phase 2 report on May 10, 2013.)

***Second***, Halliburton wrongly and inexplicably contends that the determination of whether "something unknown was blown up downhole" is relevant to Phase 2 source control, citing TREX 2584 for support.  (*See* Halliburton Response at 3).  Even if this were a Phase 2 issue (and it is unclear what Halliburton is referencing), Dr. Stevick does not offer any opinions about this

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
July 30, 2013
Page 3

in his Phase 2 Reports, nor is TREX 2584 on his list of materials considered. Regardless of the outcome of this motion, Dr. Stevick is thus precluded from testifying about this issue at trial.

**Third**, Halliburton's proposed redactions and substitutions to Dr. Stevick's Phase 2 Reports do not resolve BP's concerns. (*See* Halliburton's Response at 2 (proposing to insert "The proper use of the diverter system and the BOP, as presented in Phase One trial, effects (sic) Source Control.").) This opinion still provides Halliburton a platform to re-litigate the "proper" use of the diverter system and BOP during Phase 2, even those these issues belong solely in Phase 1.

For the reasons stated in BP's letter motion dated July 18, 2013, as well as those above, BP respectfully requests that the Court strike the untimely Phase 1 opinions of Dr. Stevick's Phase 2 Reports, as identified in Exhibits F and G to BP's motion.

Respectfully submitted,

Robert R. Gasaway

Attachment

cc (by electronic mail):
United States' MDL Counsel
Plaintiffs' Liaison Counsel
Defense Liaison Counsel
Joel M. Gross

# ATTACHMENT

01-43416
TB/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG ) MDL NO. 2179
"DEEPWATER HORIZON" in the )
GULF OF MEXICO, on ) SECTION: J
APRIL 20, 2010 )
) JUDGE BARBIER
)
) MAG. JUDGE SHUSHAN

## *CONFIDENTIAL*

### *WorldwideVIEW* ™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



## Glen Stevick
**Volume 2**

**JULY 26, 2013**

## *COPY*



*Systems Technology for the Litigation World*

Litigation Group ♦ Court Reporting ♦ Video Production ♦ Videoconferencing

**For U.S. & International Services
800 - 745 - 1101**

```
 1    the diverter, how fast they get on kicks, a
 2    whole bunch of things.
 3          Q.    Now, let's talk about the
 4    diverter.  We talked yesterday about the
 5    diverter system.
 6                Now, whether you contend there
 7    are policy issues or operational issues, the
 8    failure of the diverter to divert overboard
 9    was a contributing factor to the explosions
10    on the rig on April 20th?
11          MR. VON STERNBERG:  Object to form.
12          Q.    Correct?
13          A.    Post-blowout, that's a
14    consequence, yes.
15          Q.    Now, once the explosions on the
16    rig occurred, there was no ability to use the
17    diverter in any further operations to respond
18    or manage to the Macondo incident, correct?
19          MR. CASAZZA:  Objection, form.
20          A.    Probably not.  You're down --
21    oh, sorry.
22                Probably not.  You're downstream
23    of that option.
24          Q.    Now, you're aware that on
25    April 20th during the incident, that that gas
```

1   testimony.  This is testimony from the
2   phase 1 trial.
3          A.     Sure.
4          Q.     And if you go to page 4431,
5   lines 2 through 10.  And, actually, we can
6   just focus on lines 2 through 5.
7          A.     Sure.
8          Q.     The question is, Transocean is
9   responsible for the operation of the diverter
10  system to address hydrocarbons once they
11  enter the riser?
12              And the answer is, they are.
13              Do you see that?
14         A.     Sure.
15         Q.     Now, Mr. Barnhill also testified
16  that the -- sorry.
17              Mr. Test -- Mr. Barnhill also
18  testified about the training of the
19  Transocean drill crew.
20              Do you understand that?
21        MR. VON STERNBERG:  Object to form.
22        MR. CASAZZA:  Objection, form.
23         A.     He may very well have.
24         Q.     And you understand that
25  Mr. Barnhill testified that the Transocean

```
 1    drill crew was trained consistent with
 2    industry standards?
 3         MR. CASAZZA:  Objection, form.  That's
 4    not on page 1.
 5         A.    Okay.
 6         Q.    And so you understand that
 7    Transocean had trained its drill crew in
 8    responding to operation of the diverter
 9    during a --
10         MR. VON STERNBERG:  Object --
11         MR. CASAZZA:  Same objection.
12         MR. VON STERNBERG:  -- to form.
13         Q.    -- well control incident?
14         A.    I'm sure they have.
15         Q.    And if you can go to page 4431
16    of the excerpts from Mr. Barnhill's
17    testimony.  If you go to line 11.
18              Do you see that, Dr. Stevick?
19         A.    Sure.
20         Q.    And Mr. Barnhill was asked the
21    question, and you testified at some length
22    about the training of the Transocean drill
23    crew, and I think you said that it's your
24    view that they were trained consistent with
25    industry standards?
```

```
 1              And Mr. Barnhill's answer was,
 2   it is.
 3              Correct?
 4       A.     Yes.
 5       Q.     And then Mr. Barnhill was asked
 6   the question, On April 20th, 2010, they did
 7   not respond consistent with the industry
 8   standard in there training, did they?
 9              Correct?
10       MR. VON STERNBERG:  Object to form.
11       MR. CASAZZA:  Same objection with
12   regard to page 1.
13       Q.     And the answer is, they would
14   not?
15       A.     Correct.
16       Q.     And this would indicate that
17   Mr. Barnhill found that Transocean drill crew
18   were trained to use the diverter, correct?
19       A.     Sure.
20       MR. VON STERNBERG:  Object to form.
21       MR. CASAZZA:  Same objection.
22       Q.     And that Transocean's drill crew
23   were trained consistent with industry
24   standards, correct?
25       MR. VON STERNBERG:  Object to form.
```

```
 1            MR. CASAZZA:  Same objection.
 2       A.    That's what it says.
 3       Q.    And do you have any reason to
 4   dispute Mr. Barnhill's testimony on that
 5   point?
 6            MR. CASAZZA:  Same objection.
 7       A.    No.
 8       Q.    Now, Mr. Barnhill's testimony
 9   was also that the Transocean drill crew did
10   not respond consistently with the industry
11   standards in their training, correct?
12            MR. VON STERNBERG:  Same objection.
13            MR. CASAZZA:  Objection, form.
14       Q.    That was his testimony, correct?
15       A.    That's his testimony.
16            MR. CASAZZA:  Same objection.
17       Q.    Now, you also agree that
18   Transocean's well-control handbook identifies
19   how to deal -- or how to use a diverter
20   during a well-control incident, correct?
21            MR. VON STERNBERG:  Object to form.
22            MR. CASAZZA:  Objection, form.
23       A.    I'm sure it does.
24       Q.    And you understand that
25   Transocean's well-control manual identifies
```

1    that at any time, if there is a rapid
2    expansion of gas in the riser, the diverter
3    must be closed, if not already, and the flow
4    diverted overboard?
5         MR. VON STERNBERG:  Object to form.
6         MR. CASAZZA:  Objection, form.
7         Q.    Do you understand that?
8         A.    Well, if it says that, it does.
9               So in other words, there would
10   have to be some unusual intervention to cause
11   them to do something different, like
12   instructions from the operator.  We don't
13   want synthetic fluids in the Gulf.
14        Q.    And let's talk about that.
15              What documents or testimony have
16   you seen that shows that BP told Transocean
17   or Transocean's DEEPWATER HORIZON drill crew
18   that it should divert to the mud gas
19   separator and not overboard during a
20   well-control event?
21        A.    I can't point to a specific
22   document.  I know there were e-mails that
23   this was a big concern.  And then we had the
24   drill crew divert to the mud gas separator.
25   So I'm going by the evidence and, again, the

1   operator is the person -- the company man
2   onboard is supposed to set the policy.  And
3   we have a deviation here that I think is only
4   explained by some type of intervention from
5   the operator.
6        Q.   Now, you said that this was an
7   unusual deviation, correct, to divert to the
8   mud gas separator as opposed to the --
9   diverting overboard?
10       A.   I think -- yes.  I think there's
11  something different about this.
12       Q.   And if that were a directive
13  that was given by BP, you would expect that
14  there would be clear direction that that was
15  the instruction that should be followed by
16  Transocean's drill crew, correct?
17       A.   No.
18       Q.   What are the e-mails that you
19  were referencing that indicate that BP gave a
20  direction to Transocean's drill crew to
21  divert to the mud gas separator as opposed to
22  overboard?
23       A.   The e-mails do not say that.
24  They said there was a concern over synthetic
25  mud in the Gulf.

```
 1            MR. VON STERNBERG:  32 minutes?
 2            MR. COLLIER:  I reserve the remainder
 3    of my time and I pass the witness.
 4            VIDEOGRAPHER:  Time now is 11:39 a.m.
 5    and we are off the record.
 6                  (Off the record.)
 7            VIDEOGRAPHER:  This begins disc 11 of
 8    today's deposition.  Time now is 11:37 a.m.
 9    We are back on the record.
10            MR. CASAZZA:  Before we get started,
11    Transocean objects to Dr. Stevick's reports,
12    his testimony and any questions from his
13    deposition to the extent they concern phase 1
14    issues.  Transocean may address any such
15    opinions in this deposition in order to
16    preserve the record but reserves all rights
17    to challenge the inclusion of phase 1
18    material in the phase 2 trial.
19            MR. VON STERNBERG:  Let me just -- let
20    me just respond to that, to the fact that BP
21    has actually filed a motion in reference
22    those issues.  It's before the Court.  We
23    filed a response.  The Court has not ruled at
24    this point.  We accept Transocean's objection
25    to that extent.
```