## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig | ) | MDL No.:  2179 |
| "Deepwater Horizon" in the | ) | |
| Gulf of Mexico, on April 20, 2010 | ) | Section:  J |
| | ) | |
| This document relates to:  13-CV-01870 | ) | Judge Barbier |
| | ) | Mag. Judge Shushan |

## PLAINTIFFS-INTERVENORS' COMPLAINT FOR DAMAGES

COMES NOW PLAINTIFFS-INTERVENORS, Steve V. Pemberton and Fast Flow, LLC d/b/a Fast Flow Pumps, by and through undersigned counsel, and state as follows:

Plaintiffs-Intervenors file this intervention Complaint in Case number 13-CV-01870 filed in the Eastern District of Louisiana as *Citrin et al. v. BP Exploration & Production, Inc., et al.* Plaintiffs-Intervenors adopt all of the allegations in the underlying Complaint.

Plaintiffs-Intervenors have suffered damages and injuries to their financial and personal interests, damage to their economic livelihood, and lost profits and/or impairment in their earning capacity as a result of the oil spill by the oil rig, Deepwater Horizon in the Gulf of Mexico, beginning on April 20, 2010.  Plaintiffs-Intervenors and/or businesses have occupations and abilities to perform their chosen occupations, which were destroyed and/or adversely and detrimentally affected on April 20, 2010 and therefore until December, 2010, and beyond, when the Deepwater Horizon exploded, burned and subsequently sank in the Gulf of Mexico.

Plaintiffs-Intervenors made a Presentment Claim on the responsible party pursuant to the Oil Pollution Act of 1990, satisfying the presentment requirements of 33 U.S.C. §§ 2713(a) and (b).  Ninety (90) days have passed, from the Presentment, except as allowable and/or otherwise shown, without the Plaintiffs-Intervenors receiving any payment on their claims, pursuant to 33 U.S.C. §2713(c) (2), and they have satisfied the mandatory condition precedent to file this suit.

Plaintiffs-Intervenors hereby adopt and incorporate, as if fully restated herein, the Presentment Letter, BP Claim Form, Short Form Joinder, and Supporting Documentation, submitted to the responsible party (the Presentment Letter, BP Claim Form, Short Form Joinder and Supporting Documentation are sometimes referred herein as "Presentment").

Plaintiffs-Intervenors have opted-out or are in an excluded class and thus are not members of the class as defined in the Economic and Property Damages Settlement Agreement (In re: *Oil Spill by the Oil Rig "Deepwater horizon" in the Gulf of Mexico, on April 20, 2010, MDL No. 2179*).  Plaintiffs-Intervenors' Complaint against Defendants adopts the allegations set forth in the Complaint previously filed by Plaintiffs in Civil Case No.: 2:13-CV-01870, as follows:

## Nature of the Action

1.      On or about April 20, 2010, the *Deepwater Horizon* drilling platform exploded and sank, causing a spill of over 200 million gallons of crude oil from the Macondo Well, MC-252, and resulting in the worst maritime environmental disaster in United States history (the "Oil Spill").

2.      Plaintiffs-Intervenors have suffered large economic injuries, damages and/or losses in Alabama and Mississippi as a result of the Oil Spill.

## THE PARTIES, JURISDICTION AND VENUE

3.      Plaintiffs-Intervenor, Steve V. Pemberton, is a resident citizen of Jackson County, Mississippi.  Plaintiff-Intervenor, Fast Flow, LLC d/b/a Fast Flow Pumps, is a Limited Liability Company in good standing, registered in the State of Mississippi, and whose principal place of business is located in Jackson County, Alabama.  Plaintiffs-Intervenors, individually and jointly, operate businesses on the Gulf Coast in and around the navigable waters of Alabama and

Mississippi, which include, but are not limited to, providing hydraulic submersible pump systems for oil field operations, construction, agriculture, and other industries and emergency bilge pumps for large boats.

4.       Plaintiffs-Intervenors, Steve V. Pemberton, and Fast Flow, LLC d/b/a Fast Flow Pumps, timely Opted-Out on all economic losses, individually or jointly owned with each other, and/or fall under an Excluded Class.  They have made a BP Presentment and filed a Short Form Joinder, with supplements sent, and are residents of Jackson County, Mississippi, also doing business in the Gulf Coast of Alabama.  All economic losses at issue on their claims are located on the Gulf Coast.

5.       Plaintiffs-Intervenors bring these claims pursuant to Federal General Maritime Law including/and/or the Oil Pollution Act of 1990 ("OPA"), 33 USC §2701, *et seq.*

6.       Jurisdiction exists before this Court, pursuant to Article III, Section 2 of the United States Constitution, which empowers the federal judiciary to hear "all Cases of admiralty and maritime jurisdiction."

7.       Jurisdiction also exists before this Court, pursuant to the Oil Pollution Act, 33 U.S.C. § 2717(b) (the "OPA").

8.       Defendant, BP Exploration & Production, Inc. ("BP Exploration"), is a Delaware corporation with its principal place of business in Warrenville, Illinois.  BP Exploration was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution of 1990, 33 U.S.C. § 2714.  This Court has personal jurisdiction over BP Exploration, because BP Exploration is registered to do business in Alabama and Mississippi, does business in Alabama and Mississippi, and whose registered agent is CT Corporation Systems at 645 Lakeland East Drive, Suite 101, Flowood, Mississippi, 39232.

9.      Defendant, BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas.  This Court has personal jurisdiction over BP America, because BP America is registered to do business in Alabama and Mississippi, does business in Alabama and Mississippi, and whose registered agent is CT Corporation Systems at 645 Lakeland East Drive, Suite 101, Flowood, Mississippi, 39232.

10.     Defendant BP p.l.c. is a British public limited company with its corporate headquarters in London, England.  BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo.  BP p.l.c. operates its various business divisions, such as the "Exploration and Production" division within BP Exploration and BP America, through vertical business arrangements aligned by product or service groups.  BP p.l.c.'s operations are worldwide, including in the United States.  Defendants, BP Exploration and BP America, are wholly-owned subsidiaries of BP p.l.c., and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Mississippi and the U.S. more generally.  Plaintiffs-Intervenors further adopt and incorporate by reference all jurisdictional allegations against BP p.l.c. set forth in Paragraphs 212-218 of the Amended B1 Master Complaint, Document No. 1128 filed in MDL No. 2179, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010.*

11.     BP Exploration, BP America, and BP p.l.c. are generally referred to herein collectively as the "BP Defendants" or "BP."

12.     Defendant, Transocean Ltd. ("Transocean Ltd.") is a Swiss corporation that maintains substantial offices in the United States in Houston, Texas, and that at all pertinent times was doing business in Alabama and Mississippi and within this district.  According to its Complaint and Petition for Exoneration from or Limitation of Liability in the MDL, Transocean

Ltd. was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

13.     Defendant, Transocean Offshore Deepwater Drilling, Inc. ("Transocean Offshore") is a Delaware corporation with its principal place of business in Houston, Texas, and at all pertinent times was doing business in the State of Mississippi and within this district. Transocean Offshore is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

14.     Defendant, Transocean Deepwater, Inc. ("Transocean Deepwater"), is a Delaware corporation with its principal place of business in Houston, Texas, and at all pertinent times was doing business in Alabama and Mississippi and within this district.  Transocean Deepwater is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

15.     Defendant, Transocean Holdings, LLC ("Transocean Holdings") is a Delaware corporation with its principal place of business in Houston, Texas, and at all pertinent times was doing business in Alabama and Mississippi and within this district, and whose registered agent is Capitol Corporate Services, Inc., at 248 East Capitol Street, Suite 840, Jackson, Mississippi, 39207.  Transocean Holdings is affiliated with Transocean Ltd. and is a wholly-owned subsidiary of Transocean Offshore.  Transocean Holdings and party to the contract with BP regarding the lease of the Deepwater Horizon for drilling operations in the Gulf of Mexico.  On April 28, 2010, the U.S. Coast Guard named Transocean Holdings as a "Responsible Party" under the Oil Pollution Act for the surface oil spill resulting from the blowout by the Deepwater Horizon.

16.     Defendant, Triton Asset Leasing GmbH ("Triton") is a Swiss limited liability company with its principal place of business in Zug, Switzerland.  Triton is affiliated with Transocean Ltd. and is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

17.     Defendants, Transocean Ltd., Transocean Deepwater, Transocean Offshore, Transocean Holdings, and Triton are hereinafter referred to collectively as "Transocean."

18.     Defendant, Halliburton Energy Services, Inc. is a Delaware corporation with its principal place of business in Houston, Texas.  Halliburton is registered to do and does business in Alabama and Mississippi, and whose registered agent is CT Corp Systems at 645 Lakeland East Drive, Suite 101, Flowood, Mississippi, 39232.  Halliburton provided engineering services, materials, testing, mixing, and pumping for cementing operations on board the Deepwater Horizon, as well as onshore engineering support for those operations.

19.     Halliburton division Sperry Drilling Services (formerly Sperry Sun Drilling Services and hereinafter referred to as "Sperry") was responsible for mud-logging personnel and equipment on the Deepwater Horizon, including down-hole drilling tools.  Sperry mud-logging personnel were partially responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, and pressure fluctuations.  "Halliburton" shall refer to both Halliburton Energy Services, Inc. and its Sperry division.

20.     Venue is proper in this jurisdiction because the Defendants' actions, inactions, and failures directly and proximately caused the damage to Plaintiffs in this jurisdiction.

### Factual Background

21.     Plaintiffs-Intervenors adopt and incorporate as if fully restated herein the factual allegations, causes of action, and prayer for relief, raised in the Amended B1 Master Complaint,

Document No. 1128 filed in MDL No. 2179, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010* (the "MDL Complaint").

22.     Plaintiffs-Intervenors further adopt and incorporate as if restated herein all factual allegations information contained in the Direct Filing Short Form/Short Form Joinders, filed by Plaintiffs into No. 10-8888.

23.     Plaintiffs-Intervenors further adopt and incorporate as if fully restated herein Plaintiffs Supplemental and Amended Responses to Phase One Written Discovery Requests, dated October 8, 2011; Amended Response to Phase One Request for Admission No. 76, dated December 27, 2011, and; Supplemental and Amended Responses to Phase One Interrogatories Nos. 6, 7, and 17, dated December 14, 2012.

## Causation

24.     The Oil Spill caused monetary loss, loss of use, loss of rentals, loss of sales, loss of tourism, and loss of value because of the withdrawal of economic development funds and a fear of investing, buying, renting, living, and vacationing along the Gulf Coast,

25.     When the Oil Spill occurred, it had a great economic effect on many businesses around the area and business transactions stopped.  Representative inquiries have shown a drop as low as 66% in property values for investments, which also deterred new business to the area.

26.     Plaintiffs-Intervenors provide emergency bilge pumps for large boats and hydraulic submersible pump systems for oil field operations, construction, agriculture, and other industries and provide these services to customers using the navigable waters of the Gulf Coast.

27.     Plaintiff's-Intervenors' industry and livelihood basically came to a grinding halt as a direct result of the Oil Spill.  There was little boating and no off-shore drilling, and all related business, including the pump rental business, shut down in the aftermath of the Oil Spill.

28.    Plaintiffs-Intervenors suffered large economic losses to their businesses as a result of the Oil Spill, in excess of $600,000.00.

## For Each Claim

29.    Plaintiffs-Intervenors incorporate by reference all of the evidence and documentation and legal theories concerning damages, causation, liability or otherwise developed in the underlying case:  In the United States District Court for the Eastern District of Louisiana, *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, MDL No. 2179, Bon Secour Fisheries, Inc., et al., on behalf of themselves and all others similarly situated, *Plaintiffs, v. BP Exploration & Production Inc.; BP America Production Company; BP p.l.c., Defendants*, Civil Action No. 12-970.

30.    Causation is being asserted under the OPA and other applicable laws.  The use of descriptions is exemplary, it being impossible to write out all of information developed during the litigation incorporated by reference in the forms provided, and additional supplements being unnecessary in light of the adoption of that information which is already shared with the Defendants.  This event was not a single year event, but has had far reaching consequences, which are still being felt.  The instant Complaint adopts all arguments made for damages or enhanced damages in the related settlement and in the litigation, and in all other claims filed either under the GCCF or under the OPA presentment.

31.    Plaintiffs-Intervenors' claims for economic losses are based in whole or in part on the potential sales lost, in addition to other methodologies.

32.    Use of the navigable waters in and around the Gulf Coast slowed down and/or ceased.  House Values on the Gulf Coast dropped immediately 10% to 45% after the Oil Spill.  Condominium values dropped 25% to 65% include after the Oil Spill.   Revenue dropped

immediately after the spill and it has taken several years to even partially recover. Investments in projects ceased, tourism slowed down, there was a widespread fear that the area was contaminated, and the recovery period has not completely reached these properties and rentals. The effect on liquidity and income losses are directly related to damages arising from the Oil Spill and Clean-Up attempts, and are foreseeable consequences and within the scope of the claims made.

33.     Consumers largely quit borrowing and spending money as a result of the problems arising from the Oil Spill, and due to the restricted credit requirements imposed by banks and other financial institutions. People have been unable to borrow money because of property value decline and lost income. New business declined and existing business dried up.

34.     Plaintiffs-Intervenors, out of an abundance of caution, timely "Opted-Out" on their economic claims, and made and/or re-made "presentment" of a Claim in accord with 33 USC §§ 2702(b) and 2713, by submitting descriptions of their claims with a "sum certain," and supporting documentation, to BP as the "responsible party" under the OPA, via email via ShareFile (a filing sharing service), via U.S. Mail and/or via Fax, and the same is incorporated herein.

35.     Plaintiffs-Intervenors previously began the process of asserting claims against the responsible parties through the Gulf Coast Claims Facility ("GCCF") before that Claims Program was discontinued. Plaintiffs' Presentments made on or about June 15, 2013, were done (and/or re-done) out of an abundance of caution.

36.     BP has begun asking for more documents on the claims, has denied the claims and/or has otherwise failed to respond within 90 days of the Presentments.

### A. The *Deepwater Horizon* Catastrophe

37.     The *Deepwater Horizon* was an ultra-deepwater dynamic positioned semi-submersible oil vessel built in 2001.  It was one of the largest vessels of its kind.

38.     BP leased the *Deepwater Horizon* through September 2013 to drill exploratory wells at Macondo prospect site in Mississippi Canyon Block 252, a location on the Outer Continental Shelf off the coast of Louisiana.

39.     On April 20, 2010, the workers on the *Deepwater Horizon* oil rig lost control of the Macondo well just after the final cementing work was completed.  During the course of the cementing work, an explosion occurred on the *Deepwater Horizon* and it caught fire.

40.     The explosion and fire caused the deaths of eleven (11) people and injures of many other workers on the vessel.  After burning for two (2) days, the vessel sank to the ocean floor.

41.     The *Deepwater Horizon* has been connected to the wellhead at the seafloor by a 5,000-foot pipe called a riser.  As the *Deepwater Horizon* tipped into the sea, it pulled the riser down with it, bending and breaking the pipe.  Oil flowed from the now-open end of the riser, as well as through two breaks along its length.  An emergency valve, installed on the wellhead for just such a disaster, failed to seal the wellhead as it should have, causing the blown-out well to spew oil into the Gulf waters (the "Oil Spill").

### **Factual Background**

42.     Crude oil was discharged before the *Deepwater Horizon* finally sank on April 22, 2010, and the rate of discharge increased once the *Deepwater Horizon* sank to the ocean floor.

43.     After the explosions, BP attempted to downplay and conceal the severity of the Oil Spill. Government investigators have found BP's initial leak estimate of 1,000 barrels per

day to be a fraction of its measured leakage amount, which in fact exceeded 50,000 barrels per day. Additionally, an internal BP document from around the time of the spill shows that BP's own analysis had actually estimated that the rate of oil spillage could reach 100,000 barrels, or 4,200,000 gallons per day.

44.     Each day during the course of the Oil Spill, tens of thousands of barrels of crude oil gushed from the wellhead and broken riser, bubbling up to the surface and flattening out into a widening slick of oil, as well as spreading out in vast subsurface plumes.  On the surface, the shifting mass was large enough to be visible from outer space, at times covering tens of thousands of square miles, and spreading with the wind and currents towards the Gulf States coastlines.

45.     Beginning on or about April 30, 2010, oil made landfall along the Gulf Coast on white sand beaches, leased and privately owned subsurface areas, and in ecologically sensitive marshes and estuaries.  Under water, immense plumes of oil and dispersant chemicals swirled through the entire water column, damaging ecosystems throughout the Gulf of Mexico.

46.     The oil spewed from the well for over twelve (12) weeks until BP finally capped the well on July 15, 2010.  Ultimately, almost five million barrels (210 million gallons) of crude oil spilled in the Gulf of Mexico.

47.     The crude oil carried with it significant public health risks. Crude oil has many highly toxic chemical ingredients that can damage every system in the body.

### B.  The Response Effort, the Use of Chemical Dispersants and the Impact on the Public Perception that the Area is Contaminated

48.     In the wake of the disaster, and pursuant to its duties BP began implementing a program to attempt to prevent the gushing oil from reaching the shores of the Gulf Coast.  This disaster response plan had three primary components: offshore containment; shoreline

protection, and; subsea response.

49.     As part of its offshore containment response program, BP directed the use of vessels to, *inter alia,* recover oil coming to the surface of the Gulf of Mexico; skim oil from the surface of the water; and conduct in-*situ* burning of oil that had reached the surface of the water. BP also employed vessels to tow and deploy booms-floating barriers intended to contain, deflect, or hold back oil floating in the water's surface.

50.     In addition, BP's response plan included the use of chemical dispersants that were intended to break down the oil into finely dispersed droplets.

51.     The dispersants used by BP are known to cause, *inter alia,* headaches; nausea; vomiting; diarrhea; abdominal pains; dizziness; chest pains and tightness; irritation to the skin, eyes, nose, throat and lung; breathing difficulties and respiratory system damage; asthma attacks; hypertension; damage to the liver and kidneys; central nervous system depression; neurotoxic effects; damage to red blood cells; genetic damage and mutations; reproductive and development damage; immune system damage; cardiac arrhythmia; cardiovascular damage; and increased severity of chronic obstructive pulmonary disease.   The perception that exposure to the dispersants used in Clean-Up attempts after the Oil Spill had a further tremendous negative impact on property values, sales, rentals, tourism, bank financing, bank re-financing, enjoyment of the properties, use of the properties, and other related areas of property ownership.

52.     To date, BP and its contractors have used more than 1.8 million gallons of chemical dispersants in the Gulf of Mexico in connection with the Oil Spill.

53.     The public and private perceptions, based on both actual and perceived contamination of properties in the Gulf Coast region in Alabama and Mississippi, caused property values to drop thereby preventing sales, re-financings, exchanges, and reduced the

number of home and condominium rentals.  Likewise, property owners were prevented from enjoying their properties, were unable to use or rent out their properties, and they have otherwise suffered economic losses and damages.

### C. BP's Willful and Wanton Conduct

54.   BP focused primarily on profit and disregarded public and environmental health and safety while undertaking ultra-hazardous activities on the *Deepwater Horizon* by, among other things:

a.   failing to perform a critical well pressure test with trained and qualified personnel and callously ignoring and/or misinterpreting abnormal "red flag" pressure test results;

b.   failing to use a well design with enough barriers for gas flow;

c.   failing to use a sufficient number of "centralizers" to prevent channeling during the cement process;

d.   failing to run a bottoms-up circulation of the drilling mud prior to beginning the cement job;

e.   failing to run a cement bond log to evaluate the integrity of the cement job;

f.   failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well;

g.   using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate space substances as hazardous wastes;

h.   grossly inadequate maintenance, and reckless and improper operation and use of the blowout preventers appurtenant to the *Deepwater Horizon*;

i.   failing to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout;

j.      failing to ensure the adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill, and;

k.      failing to use reasonably safe dispersant chemicals in response to the Oil Spill.

55.      BP's corporate culture caused and allowed it to disregard the lessons it should have learned and applied from previous incidents at its facilities that resulted in extensive damage and loss of life; instead, it continued to place others at risk in the interests of cost-cutting and financial gain.

56.      In addition, after the blowout and before the well was finally sealed, BP was aware of procedures that would immediately block the flow of oil into the Gulf, yet it delayed the implementation of any such procedures, and limited its efforts to plug the well to options that would salvage the well for future use, instead of selecting procedures that would stop the flow of the oil as soon as possible regardless of the well's continued functionality.  As such, BP increased the magnitude of, and the damage caused by, the spill by willfully, wantonly, and/or recklessly choosing its profits over the lives of the workers on the vessel, the safety of the environment, and the health, welfare, and value of the people, businesses, and property of the Gulf states.

57.      BP, by its conscious and/or deliberate unreasonable acts and/or omissions complained of herein, displayed gross negligence, reckless indifference, willfulness, and/or wantonness.

## GENERAL ALLEGATIONS

58.      Plaintiffs-Intervenors re-allege each and every allegation set forth in all preceding paragraphs as if fully stated herein.

59.      The existence and breach of Defendant BP's legal duties are established under

general maritime law.

60.     At all times material hereto, BP owed duties of ordinary and reasonable care to Plaintiffs-Intervenors in connection with the drilling operations and maintenance of the *Deepwater Horizon*, including it appurtenances and equipment.  BP additionally owed duties to guard against and/or prevent the risk of an oil spill and to mitigate the harm if an oil spill did occur.

61.     Further, BP owed duty to Plaintiffs-Intervenors to exercise due care in the operation, maintenance, handling, design, implementation, and execution of the relief and recovery measures.

62.     BP had a heightened duty of care to Plaintiffs-Intervenors because of the great danger associated with exposure to oil, dispersants and/other hazardous chemicals.

63.     The risk of injury and loss to Plaintiffs-Intervenors were reasonably foreseeable, and BP knew of the dangers associated with deep water drilling.  Specifically, at all times relevant to this litigation, BP knew or should have known that:

a.     crude oil contains chemicals hazardous to human health, and are perceived as such;

b.     chemical dispersants contain chemicals hazardous to human health and are perceived as such, and;

c.     its failure to exercise reasonable care in the operation, maintenance, handling, design, implementation, and execute relief and recovery measures in a manner that would not result in perceived harm to Plaintiffs-Intervenors and their properties.

51.     BP breached its duty of care to Plaintiffs-Intervenors in the following non-exclusive respects:

a.     failing to prevent the explosion on board the *Deepwater Horizon*;

b.      failing to cap the Macondo well in a timely manner;

c.      failing to warn Plaintiffs-Intervenors, public officials, and government agencies of the harmful effects of crude oil, chemical dispersants and any mixture thereof, and the hazardous chemicals they contain, thereby creating a perception of danger that diminished property values, affected tourism and prevented Plaintiffs-Intervenors from enjoying the use of their properties;

d.      failing to conform to the provision of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and shallow waters;

e.      failing to coordinate and conduct aerial spraying sorties in a manner so as to eliminate the risk of business owners and residents being exposed to aerial chemical dispersants, and the perception therof, and;

f.      failing to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.

64.    Defendants' breach of their duties posed an unreasonable risk of harm to Plaintiffs-Intervenors.

65.    Plaintiffs-Intervenors suffered economic losses and damages as a direct and proximate result of Defendants' willful, wanton, reckless, and/or grossly negligent breach of their aforementioned duties and, therefore, Plaintiffs-Intervenors are entitled to recover actual and punitive damages.

66.    BP had a heightened duty of care to Plaintiffs-Intervenors because of the great danger associated with exposure to oil dispersants, and/or hazardous chemicals.

67.    BP breached their legal duty to Plaintiffs-Intervenors and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard in their negligent failure to prevent and contain the Oil Spill.

68.   BP knew or should have known that their willful, wanton, and reckless conduct would cause injury to Plaintiff.

69.   Plaintiffs-Intervernors injury and damages were caused by Defendants' willful, wanton, and reckless, and/or grossly negligent conduct and, therefore, Plaintiffs-Intervenors are entitled to recover actual and punitive damages.

70.   BP's conduct with regard to the manufacture, maintenance and/or operation of oil-drilling vessels such as the *Deepwater Horizon*, the release of hazardous and toxic chemicals into the environment, and the application of dispersants and other hazardous chemicals is governed by federal laws and permits issued under the authority of these laws. These laws and permits create statutory and regulatory standards that are intended to protect and to benefit Plaintiffs-Intervenors, including, but not limited to, those that govern the National Oil and Hazardous Substances Contingency Plan, *see, e.g.,* 40 C.F.R. § 300.150. BP failed to adhere to the requirements for response actions established by the National Contingency Plan, 29 C.F.R. § 1910.20. BP therefore breached its responsibilities under this regulatory provision.

71.   In addition, the federal Bureau of Safety and Environmental Enforcement ("BSEE") found that BP violated the following federal regulations:

a.   BP failed to protect health, safety, property, and the environment by failing to perform all operations in a safe and workmanlike manner, in violation of 30 C.F.R. § 250.107(a)(1);

b.   BP did not take measures to prevent unauthorized discharge of pollutants into offshore waters, in violation of 30 C.F.R. § 250.300;

c.   BP failed to take necessary precautions to keep the well under control at all times, in violation of 30 C.F.R. § 250.401(a);

d.    BP did not cement the well in a manner that would properly control formation pressures and fluids and prevent the direct or indirect release of fluids from any stratum through the wellbore into offshore waters, in violation fo 30 C.F.R. §§ 250.420(a)(1) and (2);

e.    BP failed to conduct an accurate pressure integrity test, in violation of 30 C.F.R. § 250.427;

f.    BP failed to maintain the *Deepwater Horizon's* BOP system in accordance with the American Petroleum Institute's Recommended Procedure 53 section 18.10.3, in violation of 30 C.F.R. § 250.446(a);

g.    BP failed to obtain approval of the Temporary Abandonment procedures it actually used at the Macondo well, in violation of 30 C.F.R. § 250.1721(1); h. BP failed to conduct an accurate pressure integrity test at the 13-5/8" liner shoe, in violation of 30 C.F.R. § 250.427; and

i.    BP failed to suspend drilling operations at the Macondo well when the safe drilling margin identified in the approval application for the permit to drill was not maintained, in four separate violations of 30 C.F.R. § 250.427(b).

72.    BP's violations of these statutory and/or regulatory standards constitute negligence *per se* under federal law, as well as general maritime law.

73.    BP had actual and/or constructive knowledge of the facts and circumstances leading to and causing the incidents described herein, which in turn caused Plaintiffs-Intervenors' damages, and their actions and inactions were grossly negligent, reckless, willful and/or wanton.

74.    As a direct and proximate cause of BP's violation of statutory and/or regulatory standards, Plaintiffs-Intervenors have suffered damages and are entitled to actual and punitive damages.

## CLAIMS FOR RELIEF

Plaintiffs-Intervenors adopt and incorporate as if restated herein, all claims for relief raised in the MDL Complaints and the Short Form Joinders against the Defendants as responsible parties under the Oil Pollution Act, 33 USC §2701, *et seq*., which holds responsible parties liable to Plaintiffs-Intervenors for removal costs and damages arising out of the following:

      a.      Loss of Natural Resources;

      b.      Loss or Damage to Real or Personal Property;

      c.      Subsistence Use;

      d.      Loss of Revenues;

      e.      Loss of Profits and/or Earning Capacity; and

      f.      Loss of Public Services.

Plaintiffs-Intervenors adopt and incorporate as if restated herein, all claims for relief raised in the MDL Complaints and the Short Form Joinders against all Defendants identifying General Maritime Law causes of action and claims for relief relating to the following:

      a.      Negligence, and;

      b.      Gross Negligence and Willful Misconduct.

Plaintiffs-Intervenors adopt and incorporate, as if restated herein, all claims for relief raised in the MDL Complaints and the Short Form Joinders, against all Defendants for punitive damages arising out of willful and wanton misconduct and/or gross negligence as alleged and described in the MDL Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs-Intervenors demand judgment against Defendants, jointly,

severally, and *in solido,* as follows:

    a.    Economic and compensatory damages in amounts to be determined at trial;

    b.    Punitive Damages;

    c.    Pre-judgment and post-judgment interest at the maximum rate allowable by law;

    d.    Reasonable claims preparation expenses;

    e.    Attorneys' fees;

    f.    Costs of litigation, and;

    g.    Such other and further relief available under all applicable state and federal laws

and any relief the Court deems just and appropriate.

## REQUEST FOR TRIAL BY JURY

Respectfully re-submitted this the 9rd day of August, 2013, and timely filed initially on

August 3, 3013.

(FOR PLAINTIFFS-INTERVENORS)

**BY:**    */s/Elizabeth A. Citrin*
        **ELIZABETH A. CITRIN, ESQ.**

ELIZABETH A. CITRIN, ESQ. (MS BAR NO.:  101368)
ELIZABETH A. CITRIN, P.C.
28080 HIGHWAY 98, SUITE G
DAPHNE, ALABAMA  36526
PHONE:  251-626-8808
FAX:  251-626-8868
CELL;  251-591-6330
EMAIL:  elizabeth@elizabethcitrin.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing PLAINTIFFS-INTERVENORS' COMPLAINT FOR DAMAGES has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedure established in MDL 2179, on this the 9th day of August, 2013, pursuant to the Notice dated August 5, 2013, allowing for additional time to timely resubmit this document with the caption in compliance with Pretrial Order No. 1 regarding case caption/header.

/s/ Elizabeth A. Citrin _____
ELIZABETH A. CITRIN