# Attachment B

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL        ) MDL NO. 2179
BY THE OIL RIG          )
"DEEPWATER HORIZON" IN  ) SECTION "J"
THE GULF OF MEXICO, ON  )
APRIL 20, 2010          ) JUDGE BARBIER
                        ) MAG. JUDGE SHUSHAN

*****************
VOLUME 1
*****************

Deposition of ANDREAS MOMBER, taken at Pan-American Building, 601 Poydras Street, 11th Floor, New Orleans, Louisiana, 70130, on the 1st day of July, 2013.

## Page 2

A P P E A R A N C E S

APPEARING FOR THE PLAINTIFFS' STEERING COMMITTEE:
 Mr. Anthony Irpino
 IRPINO LAW FIRM
 2216 Magazine Street
 New Orleans, Louisiana 70130

APPEARING FOR BP, INC.:
 Mr. Ryan D. Houck
 KIRKLAND & ELLIS
 333 South Hope Street
 Los Angeles, California 90071
 Mr. John A. Eisenberg
 KIRKLAND & ELLIS
 655 Fifteenth Street, NW
 Washington, D.C. 20005-5793

APPEARING FOR TRANSOCEAN:
 Mr. Paul C. Thibodeaux
 Mr. James R. Parish
 FRILOT
 1100 Poydras Street, Suite 3600
 New Orleans, Louisiana 70163

APPEARING FOR ANADARKO PETROLEUM COMPANY:
 Ms. Jordan Ray
 BINGHAM MCCUTCHEN
 355 South Grand Avenue, Suite 4400
 Los Angeles, California 90071-3106

APPEARING FOR HALLIBURTON:
 Mr. Gavin Hill
 Mr. Timothy Alford
 Mr. Christopher B. Wood
 GODWIN LEWIS
 1201 Elm Street, Suite 1700
 Dallas, Texas 75270-2041

## Page 3

A P P E A R A N C E S (Continued)

APPEARING FOR THE UNITED STATES:
 Mr. Scott Cernich
 Ms. Erica Pencak
 U.S. DEPARTMENT OF JUSTICE
 601 D Street, N.W.
 Washington, D. C. 20004

APPEARING FOR THE STATE OF LOUISIANA:
 Mr. Douglas R. Kraus
 Attorneys for Louisiana Attorney General
 KANNER & WHITELEY
 701 Camp Street
 New Orleans, Louisiana 70130-3504

ALSO PRESENT:
 Mr. Peter Jennings, Videographer
 Mr. Ray Aguirre, Case Manager

## Page 4

INDEX
VIDEOTAPED ORAL DEPOSITION OF
ANDREAS MOMBER
JULY 1, 2013
VOLUME 1

                                    PAGE
Appearances .............. 2

Examination by Mr. Cernich ....... 5

Signature and changes ......... 325
Reporter's Certificate ......... 327

EXHIBITS

                                    PAGE
EXHIBIT NO. 11644 ........... 7
   Expert report of Andreas Momber, dated
   May 1, 2013, 50 pages

EXHIBIT NO. 11645 ........... 232
   Excerpt from Applied Petroleum
   Reservoir Engineering, Second Edition,
   eight pages
(Exhibits referenced.)
EXHIBIT NO. 1 ............. 196
EXHIBIT NO. 2477 ............ 218
EXHIBIT NO. 2702 ............ 284
EXHIBIT NO. 6192 ............ 322
EXHIBIT NO. 7442 ............ 307
EXHIBIT NO. 7722 ............ 90
EXHIBIT NO. 22761 ............ 307

53

1  A. Your consideration is the list
2  at the end of my report?
3  Q. That's correct.
4  A. No.
5  Q. Okay. Have you read the expert
6  report of David Calvert?
7  A. David Calvert? No.
8  Q. He's also known as Jerry
9  Calvert. He was an expert who originally was
10 retained by Weatherford in this case and
11 later was adopted by BP. Have you reviewed
12 his expert report?
13 A. No.
14 Q. Okay. Did you review his
15 testimony at trial?
16 A. No.
17 Q. Okay. Have you reviewed the
18 expert report of Glen Benge?
19     MR. EISENBERG: Object to form.
20 Q. (BY MR. CERNICH) I'm sorry, let
21 me clarify that. Have you read -- have you
22 reviewed the Phase 1 expert report of Glen
23 Benge?
24 A. No.
25 Q. Okay. Have you reviewed the

54

1  rebuttal report that Mr. Benge submitted in
2  this case?
3  A. Yes, I did.
4  Q. Okay. Have you reviewed the
5  expert reports of any of the Phase 1 experts
6  retained by Halliburton in this case?
7  A. I don't think so.
8  Q. Okay. Sam Lewis?
9  A. No, I haven't talked to him.
10 Q. Okay. David Bolado?
11 A. No.
12 Q. Okay. Kris Ravi?
13 A. His rebuttal report I have seen.
14 Q. That's the only report by
15 Dr. Ravi that you've seen?
16 A. Yes.
17     THE VIDEOGRAPHER: Two minutes.
18     MR. CERNICH: We'll go ahead and take a
19 break.
20     THE VIDEOGRAPHER: Time is 9:32 a.m.
21 We're off the record, ending tape 1.
22     (Recess from 9:32 a.m. to 9:48 a.m.)
23     THE VIDEOGRAPHER: Time is 9:48 a.m.
24 We're back on the record, beginning tape 2.
25 Q. (BY MR. CERNICH) Dr. Momber,

55

1  when we left off I was talking a bit about
2  the Phase 1 expert reports, and I wanted to
3  know, also, had you read the expert report by
4  Halliburton's expert Mister or Doctor, I
5  don't recall offhand, Hewitt in this matter?
6  A. No.
7  Q. Okay. Do you know Erick
8  Cunningham?
9  A. No, I don't know him.
10 Q. Do you know that -- whether or
11 not he's a in-house cement expert at BP?
12 A. I don't know that, no.
13 Q. Okay. Have you ever had any
14 conversations with Mr. Cunningham?
15 A. No, never.
16 Q. Okay.
17     THE VIDEOGRAPHER: Excuse me. Doctor,
18 could you raise your mike up a little bit,
19 please.
20 A. (Continuing) No, never.
21     THE VIDEOGRAPHER: Thank you.
22 Q. (BY MR. CERNICH) Do you know
23 Daryl Kellingray?
24 A. No, I don't know him.
25 Q. Okay. Do you know if -- did you

56

1  speak at any time with any of BP's in-house
2  cement experts?
3  A. No, I didn't speak to them.
4  Q. Okay. Have you spoken with any
5  BP employees in developing your opinions in
6  this case?
7  A. No.
8  Q. Okay. So you didn't rely on any
9  expertise in oilfield cement by anyone
10 from -- from BP?
11     MR. EISENBERG: Object to form.
12 A. No, I did not.
13 Q. (BY MR. CERNICH) Okay. Did you
14 consult anyone at all with more expertise in
15 oilfield cementing than yourself in the
16 preparation of your opinions in this case?
17     MR. EISENBERG: Object to form.
18 A. No, I did not.
19 Q. (BY MR. CERNICH) Now, aside
20 from the -- from the report you identified
21 this morning in your consideration materials
22 in your expert report, it appears that the
23 only Phase 1 expert report that you reviewed
24 was that of Mr. Emilsen from Ad Energy; is
25 that correct?

85

1  report.
2     Q.   Okay.  Well, you've -- you rely
3  pretty heavily on Mr. Emilsen's work in your
4  report; do you not?
5     MR. EISENBERG:  Object to form.
6     A.   What do you mean with "heavily"?
7     Q.   (BY MR. CERNICH)  Well, you cite
8  his -- you cite his work multiple times in
9  your -- in your expert report; is that
10 correct?
11    A.   That is correct, yes.
12    Q.   Okay.  And so wouldn't it have
13 been useful -- well, do you -- sitting here
14 today, you can't recall whether or not you
15 read his deposition transcript before or
16 after you submitted your expert report?
17    A.   I think I read it afterwards.
18    Q.   Okay.  Well, wouldn't it have
19 been helpful to you to better understand his
20 work had you read his deposition transcript
21 prior to submitting your report?
22    MR. EISENBERG:  Object to form.
23    A.   The case of Emilsen's work that
24 plays a role in my report and as well in
25 Dr. Griffiths' report, the Case No. 7, I

86

1  mean, it was a rather small part of his -- of
2  his report.  And I used -- generally, I used
3  his PI numbers in the same way as or
4  similarly as Dr. Griffiths' referring to --
5  to Mr. Emilsen's work.  And so I felt
6  confident it was the information that was
7  provided in his report.
8     Q.   (BY MR. CERNICH)  Okay.  So you
9  don't -- do you know whether any of the
10 statements in your expert report are
11 contradicted by Mr. Emilsen's testimony?
12    MR. EISENBERG:  Object to form.
13    A.   I don't know it.
14    Q.   (BY MR. CERNICH)  Okay.  Did you
15 read his trial testimony before
16 Judge Barbier?
17    A.   No, I don't think so.
18    Q.   Okay.  But you didn't rely on --
19 you didn't rely on any of Mr. Emilsen's
20 testimony, deposition testimony, in forming
21 your opinions in this report?
22    MR. EISENBERG:  Object to form.
23    A.   Well, I did not use it from --
24 I -- I hadn't read them before I issued my
25 report, so I wouldn't rely on anything.

87

1     Q.   (BY MR. CERNICH)  Okay.  Did you
2  review both of his deposition transcripts in
3  this case?
4     A.   I remember there was a Volume 1
5  and a Volume 2.  Is that what you're
6  referring to?
7     Q.   Well, actually, there was a
8  Volume 1 and a Volume 2 from a deposition
9  that he gave in June of 2011 and then an
10 expert deposition similar to the one we're
11 doing here in I believe it was November of
12 2011.  So there would have been three
13 volumes.  Did you read all three of those?
14    A.   I know at least that I reviewed
15 his Volumes 1 and 2.  I'm not sure about his
16 third one.
17    Q.   Okay.  You -- you list
18 Dr. Pooladi-Darvish's report in your
19 considered materials.  You are not responding
20 in your report, in any way, though, to
21 Dr. Pooladi-Darvish's work; is that correct?
22    MR. EISENBERG:  Object to form.
23    A.   Can you repeat it, please, the
24 question?
25    Q.   (BY MR. CERNICH)  Yes.  In your

88

1  "Consideration Materials," you note that you
2  read the expert report of
3  Dr. Pooladi-Darvish; is that right?
4     A.   Yes.
5     Q.   Okay.  But you're not actually
6  responding to anything from
7  Dr. Pooladi-Darvish's report in your expert
8  report in this case?
9     MR. EISENBERG:  Same objection.
10    A.   I -- no, I -- Dr. Pooladi did
11 not develop any ideas about erosion in -- in
12 the -- in the cement column, so I did not
13 reply to him.
14    Q.   (BY MR. CERNICH)  And you didn't
15 review the report of Dr. Kelkar?
16    A.   No.
17    Q.   Dr. Zick?
18    A.   No.
19    Q.   Dr. Bushnell?
20    A.   No.
21    Q.   Okay.  And then as far as the
22 U.S. rebuttal reports, did you read the U.S.
23 rebuttal -- I'm sorry, the rebuttal report of
24 Dr. Griffiths?
25    A.   Yes.

22 (Pages 85 to 88)

109

1  you -- you did not calculate an erosion rate
2  based on a water to cement ratio for the
3  Macondo cement, correct?
4        MR. EISENBERG: Object to form.
5        A.    I did not calculate an erosion
6  rate based on that.
7        Q.    (BY MR. CERNICH) Okay. In
8  fact, you didn't calculate any erosion rate
9  for the Macondo cement, correct?
10       MR. EISENBERG: Object to form.
11       A.    No, I calculated one based on
12 the information provided by Dr. Griffiths.
13       Q.    (BY MR. CERNICH) Okay. And
14 that erosion rate that you calculated simply
15 assumed unfoamed cement in the shoe track
16 with essentially a cylin- -- an open cylinder
17 through the center of that cement, correct?
18       MR. EISENBERG: Object to form.
19       A.    I would like you to ask -- to
20 rephrase or re-ask that question.
21       Q.    (BY MR. CERNICH) Okay. When
22 you say you calculated an erosion rate based
23 on the information provided by Dr. Griffiths,
24 what you calculated was a rate of erosion for
25 unset cement in the Macondo well shoe

110

1  track -- I'm sorry. I'm sorry.
2        When you say you calculated an
3  erosion rate based on the information
4  provided by Dr. Griffiths, what you actually
5  did was you calculated an erosion rate for
6  unfoamed cement in the shoe track of the
7  Macondo well with a cylinder, an open
8  cylinder through the center of that cement,
9  correct?
10       MR. EISENBERG: Object to form.
11       A.    So what do you mean with open
12 cylinder?
13       Q.    (BY MR. CERNICH) So you
14 essentially -- you essentially determined
15 what diameter of pipe or what diameter of
16 flow area you needed through the center of
17 the Macondo shoe track in order to pass a
18 certain amount of flow through the -- through
19 the shoe track, correct?
20       MR. EISENBERG: Object to form.
21       A.    I don't think that this is
22 completely correct. The -- what I calculated
23 in terms of erosion rate was the cement
24 cylinder, this is right as a volume which
25 comes from the dimensions minus a -- minus

111

1  material -- I'm going to say minus -- yeah,
2  minus a flow channel that was already
3  existing at the time in question. Maybe this
4  is what you meant with an open cylinder.
5        Q.    (BY MR. CERNICH) Correct. What
6  was the cause of the formation of that flow
7  channel?
8        MR. EISENBERG: Object to form.
9        Q.    (BY MR. CERNICH) The flow
10 channel you used for your calculations.
11       MR. EISENBERG: Same objection.
12       A.    Maybe I can clarify something.
13 Talking a flow channel, which would not mean
14 that we are talking about an individual
15 "capillare" of pipe-like channel in the
16 material. It would not -- but, we're rather
17 talking about a cross-section as it is made
18 available to the flow that consists of a
19 number of open cylinders. I want to make --
20 just make that clear in advance. And so
21 this -- the cross-section that was already
22 existing could come from -- from different
23 sources. Could con- -- could consist of a
24 number of, I'm going to say inconsist- --
25 incon- -- maybe my English is not good enough

112

1  to say that -- let's, in simple words, as a
2  number or a -- number of weak parts in that
3  cement structure, voids, cracks, flaws,
4  pores, things like this.
5        Q.    (BY MR. CERNICH) Dr. Griffiths
6  doesn't contend anywhere in his report that
7  there is actually a cylindrical flow path
8  through the center of the shoe track, does
9  he?
10       MR. EISENBERG: Object to form.
11       A.    I need to -- I need to hear the
12 question again, please.
13       Q.    (BY MR. CERNICH) Dr. Griffiths
14 doesn't contend in his expert report that
15 there is actually a cylindrical flow path
16 through the center of the shoe track, does
17 he?
18       MR. EISENBERG: Same objection.
19       A.    Well, he's -- he assumed, and I
20 think as I said, there was a flow -- well,
21 he's mentioning -- he's mentioning that there
22 was flow through, let's call it the system,
23 which would include the cement columns, as
24 part of the system, and was several times
25 clearly mentioning the cement column as one

141

1  Q.  Okay. But your report only
2 addresses the cement that -- the actual
3 cement that's in the shoe track; is that
4 correct?
5     MR. EISENBERG: Object to form.
6  A.  In terms of erosion and erosion
7 resistance, that -- the report is actually
8 addressing all those in a conservative way.
9 I'm not sure whether I made it clear or not.
10    Q.  (BY MR. CERNICH) Okay. So --
11 so now are you offering opinions regarding
12 the erosion of the float collar as well?
13    MR. EISENBERG: Object to form.
14   A.  No, not opinion, but, again, as
15 a conservative statement, erosion rate
16 calculated based on just on the cement column
17 is a conservative statement, and it contains
18 the other restrictions in a way that the
19 erosion rate of that system we have just
20 discussed would even be higher.
21    Q.  (BY MR. CERNICH) Okay. But in
22 your -- in your report the -- the
23 restriction -- you -- you are representing
24 all of the restrictions by that cement in the
25 shoe track, correct?

142

1  A.  In the -- in my Appendix A.
2  Q.  Correct.
3  A.  This is correct, yes.
4  Q.  Okay. And I don't -- I don't
5 see anywhere in your report where you discuss
6 erosion rates of -- of metal; is that
7 correct?
8  A.  This is correct, I did not see a
9 need for doing this. I must, again, refer to
10 Dr. Griffiths' report. He's also mentioning
11 the four elements of the -- of what we just
12 discussed, and, actually, the only element of
13 this he's spending a focus on in terms of
14 trying to explain how it could fail is the
15 cement that was -- this was -- I am focusing
16 on the cement. I didn't see any other
17 recourse, not just -- not from Dr. Griffiths,
18 but from other experts where the erosion of
19 the reamer shoe you mentioned, I guess, was
20 treated as a -- as a critical issue. It's
21 only the cement being treated, from my
22 understanding, as a critical issue.
23    Q.  Okay. On Page 5 of your report.
24 At the bottom of Page 5 in Section 4, you
25 write, "The conditions of the cement in the

143

1 shoe track and annulus are not known with
2 certainty. But the fact that others have
3 concluded that oil flowed up the casing
4 suggests that the cement structure was
5 disturbed."
6     Did I read that correctly?
7  A.  Yes, you did.
8  Q.  Okay. You say that: The
9 conditions of the cement in the shoe track
10 and the annulus are not known with certainty.
11    In your opinion, are the
12 conditions of the cement in the shoe track
13 and the annulus known at all?
14    MR. EISENBERG: Object to form.
15   A.  "Known at all," what -- what
16 does it mean?
17    Q.  (BY MR. CERNICH) Well, you say
18 that they're not known with certainty.
19   A.  With certainty.
20   Q.  Okay.
21   A.  That is what I said, yes.
22   Q.  Okay. Do we know anything about
23 the condition of the cement in the shoe track
24 and the annulus?
25    MR. EISENBERG: Object to form.

144

1  A.  What -- according to my
2 assumption, making an assumption, I know that
3 it was set, so that is what I know, what I
4 assumed for my -- for the purpose of my
5 treatment.
6  Q.  (BY MR. CERNICH) Okay. So --
7 so you don't know at all what the condition
8 of the cement in the shoe track and the
9 annulus were?
10    MR. EISENBERG: Object to form.
11   A.  I -- I just -- yeah, I just --
12 in -- what -- well, I just assumed it was --
13 it was being set, as I already said, where
14 there is evidence for this in the other
15 reports. So -- but this is an assumption.
16 Yes, I do not know that, but this is an
17 assumption that I did for my work.
18    Q.  (BY MR. CERNICH) Okay. And
19 what evi- -- evidence is there in the other
20 reports? What -- what other reports are you
21 referring to?
22   A.  Referring to my assumption that
23 the cement was set. Yeah, this is -- we just
24 went through the -- I mean, we mentioned the
25 Chevron report. There were evidence of this

145

in Jesse Gagliano, in his testimony that we were talking about in the morning was mentioning that the cement would have set under the conditions provided under the Macondo well.

Q. Okay. But you don't know what the actual conditions in the Macondo well were?

MR. EISENBERG: Object to form.

A. I -- no, I did not know what the actual conditions were, but for the purpose of my -- of my report, I made that assumption.

Q. (BY MR. CERNICH) And if the oil flowed up the casing, it could also mean that there was no cement in the casing, correct?

MR. EISENBERG: Object to form.

A. Can you please repeat it?

Q. (BY MR. CERNICH) Yes. You -- you write that "the fact that others have concluded that oil flowed up the casing suggests that the cement structure was disturbed."

And my question was, if the oil flowed up the casing, it could also mean that

146

there was no cement in the casing, correct?

MR. EISENBERG: Object to form.

A. I need to hear it again, sorry.

Q. (BY MR. CERNICH) You made an assumption that there was set cement in the casing, correct?

A. Yes.

Q. Okay. The fact that there was oil that flowed up the casing could also mean that there was no cement in the casing?

MR. EISENBERG: Object to form.

A. Might be -- maybe as a possibility, but, again, this is nothing I was -- I was dealing with, and it would not refer to the information I got from Dr. Griffiths' report because I was dealing with -- not the possibility, but does not affect my report at all.

Q. (BY MR. CERNICH) I'm just -- I just want to be clear, though, that if oil flowed up the casing, it could mean that there was no cement in the casing?

MR. EISENBERG: Object to form.

A. It could -- it could be a possibility.

147

Q. (BY MR. CERNICH) All right. In Section 4.1 of your report, on the next page, you discuss flow channels. Can you define for me what you mean by flow channels?

A. Yes, I can do that. Actually, I provide definitions with the three bullet points underneath that -- that sentence. These are just possible, possible flow channel geometries. As you see, I mean, an individual, comparatively large flow channel; a number of parallel capillaries; a net of cracks, pores, and flaws, which exactly mirrors the discussion we had already.

Q. Okay. So the -- but there are other types of flow channels as well?

MR. EISENBERG: Object to form.

A. There might be other types of flow channels which I did not consider here.

Q. (BY MR. CERNICH) And you said that you don't understand or you're not familiar with the concept of channeling in well cementing?

MR. EISENBERG: Object to form.

A. I'm not familiar. I don't know what channeling precisely means.

148

Q. (BY MR. CERNICH) Okay. And do you know what would have caused these positive flow channels to form?

A. Well, this -- they will exist if the -- the cement is being set, but not in -- in any -- in an ideal manner, that there is -- the cement structure is somehow disturbed. And reasons could be the formation, of course; reason could be interface issues between the cement and the small aggregates; reasons could be insufficient mixing in of the aggregates; reasons could be cracks; unfinished hydration. This would be some of the reasons I could imagine.

Q. But it -- it's not your contention that you have any opinions as to whether any of those reasons that you just described were the reasons for there to be flow channels on the Macondo well?

MR. EISENBERG: Object to form.

A. Yeah, it was a long question again. Maybe break it down or repeat it or rephrase it to me.

Q. (BY MR. CERNICH) You -- you,

37 (Pages 145 to 148)

157

Q. Okay. And what is the basis for your statement that the nitrogen migration could lead to voids filled with gas?
A. This is evidence from the Chief Council's report. It's been described there as a very likely scenario. It is even one of the key findings, if I remember right, of the Bly report. So that sounds reasonable to me. So that's why I considered this as a possible source.
Q. So you're relying on the Chief Council's report and the Bly report for your conclusions?
MR. EISENBERG: Object to form.
A. These are the major sources. There were others, as I just mentioned. As I said, it sounded reasonable that's being described there, and, yes, I considered it.
Q. (BY MR. CERNICH) So it sounded reasonable, so you included it in your report?
MR. EISENBERG: Object to form.
A. It is a reasonable assumption that I finally made.
Q. (BY MR. CERNICH) It's an

158

assumption that you made or an assumption that the authors of the Bly report and the Chief Council's report made?
A. That I made.
Q. Okay. Despite having no experience, no expertise in oilfield cementing?
MR. EISENBERG: Object to form.
A. Well, those -- those reports were well written by experts, and I didn't see a reason why I should not accept the conclusions they draw from their work.
Q. (BY MR. CERNICH) Okay. What experts wrote the Chief Council's report?
A. I don't know in particular.
Q. Okay. What experts wrote the Bly report?
A. Well, it was a team of -- a team of -- I think they called themself independent expert team, if I'm right, so, but I don't know the particular names.
Q. Have you ever met with any of the -- of that team that wrote the Bly report?
A. No, I haven't.

159

Q. Have you ever spoken with any of the individuals who wrote the Bly report?
A. No, I haven't.
Q. Do you know whether any of the individuals who were involved in writing the report were experts in oilfield cementing?
A. I don't know that. I would -- I would think so.
Q. You would -- you would want BP to have someone who's a -- an expert in oilfield cementing contribute as an author to the Bly report, wouldn't you?
MR. EISENBERG: Object to form.
A. No, I did not get your question.
Q. (BY MR. CERNICH) Well, you would -- you would expect that the authors of the Bly report or the team that wrote the Bly report would have included an oilfield cementing expert on that team, correct?
MR. EISENBERG: Same objection.
A. I would assume that the expert would have made the analysis based on experience, based on, you know, engineering metrics, based on the state of art, analysis of problems. So, yes, I -- I think that is

160

done in the -- in the frame of know-how of -- of current know-how of how to investigate engineering problems.
Q. (BY MR. CERNICH) Okay. But this is a specific engineering problem related to well cementing, correct?
MR. EISENBERG: Object to form.
A. It is, but this would not exclude that state of art metrics are being used, that engineering concepts have been used.
Q. (BY MR. CERNICH) Okay.
A. Because this is all done to the best -- according to the best known metrics and engineering and things like this.
Q. So is it your opinion that the Bly report was done according to the best known metrics and engineering?
MR. EISENBERG: Object to form.
A. This is what I think, yes.
Q. (BY MR. CERNICH) That's what you think. And what's the basis of your -- of your opinion?
A. There is, for example, critical work -- or how do I say that is -- I think

181

1  that period of time, the flow rate, according
2  to Mr. Emilsen's modeling, more than doubled?
3        MR. EISENBERG:  Object to form.
4     A.   Yes.
5     Q.   (BY MR. CERNICH)  Okay.  And so
6  that's a -- you would agree that that's a --
7  a fast process, that's a short time for the
8  flow rate to more than double?
9        MR. EISENBERG:  Object to form.
10    A.   Well, I wouldn't necessarily say
11 that it is a fast process.
12    Q.   (BY MR. CERNICH)  Okay.
13    A.   Why would you know what --
14    Q.   Okay.  But some -- but it
15 demonstrates -- well, I'm not sure.  You said
16 you had read Mr. Emilsen's deposition, at
17 least one of his depositions, sometime after
18 you wrote -- wrote your expert report, and
19 you understand that what -- Mr. Emilsen's
20 modeling there is a reduction and a
21 restriction at that point in time, correct?
22    A.   Yes.
23    Q.   Okay.  And are you aware that
24 Mr. Emilsen is not an expert in cement?
25       MR. EISENBERG:  Object to form.

182

1     A.   I don't know that.
2     Q.   (BY MR. CERNICH)  Okay.  Are you
3  aware that Mr. Emilsen testified that his
4  OLGA program cannot model cement?
5        MR. EISENBERG:  Object to form.
6     A.   I think he was more -- how can I
7  say?  I think he made "distinguishments."
8  Probably he -- what he meant, as I understood
9  it, is that you -- that his model does not
10 include a -- a cement column as a physical
11 body, but he -- you could very well, as I
12 understood it, model a cement with a
13 particular capacity of holding flow back or
14 leaving flow through and then changing in
15 terms of the modeling the flow path damage.
16 I think he said it in his deposition, other
17 thing that he said, that some process of he
18 called it wash-out, I interpreted as erosion,
19 could very well explain some of the changes
20 he -- in the flow rate without violating his
21 model.
22    Q.   (BY MR. CERNICH)  So you
23 interpreted Mr. Emilsen's testimony?
24       MR. EISENBERG:  Object to form.
25    A.   I repeat what I have read what

183

1  he said --
2     Q.   (BY MR. CERNICH)  And --
3     A.   -- as -- as far as I remember
4  it.
5     Q.   Okay.  Well, actually, no.
6  You -- you also said that you interpreted his
7  testimony.
8        MR. EISENBERG:  Object to form.
9     A.   I'm not sure if I said -- the --
10 what he called wash-out, yes, that I
11 interpreted as an erosion process.
12    Q.   (BY MR. CERNICH)  Okay.  But you
13 also understand that -- that Mr. Emilsen was
14 modeling a reduction in restriction that
15 wasn't necessarily a reduction in restriction
16 from cement; he also testified that it also
17 could have been a reduction in restriction
18 from the float collar, correct?
19    A.   I can't remember -- I can't
20 remember what I was focusing on what he was
21 saying about cement.
22    Q.   Okay.  Which was that his model
23 doesn't actually model the reduction in
24 restriction from cement; it models the
25 reduction in all of the downhole restrictions

184

1  or any of the downhole restrictions, correct?
2     A.   This is -- this is correct, yes.
3  It does not exclude cement -- cement at all.
4  What he was telling about wash-out effects, I
5  think it was solely being related to -- to
6  the cement.
7     Q.   Okay.  So it's your testimony
8  that he testified regarding wash-out during
9  his deposition?
10       MR. EISENBERG:  Object to form.
11    A.   It was, as I remember right, a
12 term he used, yes.
13    Q.   (BY MR. CERNICH)  Okay.  On
14 Page 6 of your report, Section 4.2, you also
15 identify inadequate testing of cement as a
16 condition that could lead to the formation of
17 channels.
18         Can you explain to me how
19 inadequate testing of the cement would lead
20 to the formation of channels in the cement?
21    A.   Well, the statement must surely
22 be read in a very similar way as the one on
23 top of it.  As I understood the discussions
24 in the reports and also Jessie Gagliano's
25 testimony that this -- the testing whether

265

1   have provided a change in the flow path over
2   time, correct? You could have had hydraulic
3   fracturing of the concrete that held the
4   float collar into the casing, correct?
5       A.   Can you repeat it again, please?
6       Q.   Yes. You could have had
7   hydraulic fracturing of the concrete that
8   held the float collar inside the casing?
9       MR. EISENBERG: Object to form.
10      A.   I don't understand the question.
11      Q.   (BY MR. CERNICH) Well, you
12  offered an opinion that there was hydraulic
13  fragmentation of the Macondo shoe track
14  cement, correct?
15      A.   Yes.
16      Q.   And there was a concrete
17  substance that held the float collar, the
18  metal parts of the float collar inside of the
19  Macondo production casing. You could have
20  had hydraulic fracturing of that concrete as
21  well, correct?
22      MR. EISENBERG: Object to form.
23      A.   I'm not sure. I don't know
24  whether this one is connected to the -- to
25  the -- just to the -- to the wall of the

266

1   tube.
2       Q.   (BY MR. CERNICH) Yeah, it's in
3   the flow path --
4       MR. EISENBERG: Object to form.
5       Q.   (BY MR. CERNICH) -- of the
6   Macondo production casing.
7       A.   No, I don't think that this
8   could happen.
9       Q.   Okay.
10      A.   No, I know that couldn't have.
11      Q.   Okay. And why is that?
12      A.   Well, hydraulic fragmentation,
13  some of the basics is that you would need --
14  really need a space like a combination of
15  pores, whatever, where the leak under
16  pressure is penetrating in very, very
17  quickly, and it cannot be mentioned that such
18  a situation would happen and that must be
19  around something like a ring, the cement --
20  the cement fixture of the float collar you
21  mentioned, difficult to -- for me, it's
22  difficult to understand.
23      Q.   But you didn't look at that?
24  You didn't consider that?
25      A.   I did not look at this, no.

267

1       Q.   So we were talking about a net
2   of cracks and then there is a number of
3   capillaries. And how have you shown the
4   possibility that there were a number of
5   capillaries?
6       A.   Well, it's -- it's -- what is
7   written here is a -- a summary of possible
8   substantial flaws, flaws that are in the
9   cement column before the hydraulic
10  fragmentation are cured. It's flaws and weak
11  zones that I could imagine happened in -- in
12  the cement.
13      Q.   Okay. So you -- you could
14  imagine them, but you have no technical basis
15  for determining whether or not there was a
16  net of cracks, a number of capillaries, or a
17  net of voids separated by cement bridges?
18      MR. EISENBERG: Object to form.
19      A.   Well, I might again refer to the
20  basic question. There was a -- there was a
21  hydrocarbon inflow into the system. So weak
22  zones must have been there. The other thing
23  is that we -- I think we discussed this
24  morning was the -- the nitrogen migration
25  into the shoe track cement that would have

268

1   formed voids, net of voids.
2       Q.   (BY MR. CERNICH) Okay. And you
3   take that possible nitrogen migration into
4   the shoe track cement from the Bly report,
5   correct?
6       A.   It's from the Bly report and
7   from the Chief Council's report, yes.
8       Q.   Okay. So it's your contention
9   that the Chief Council's report says that
10  there was nitrogen break-out that penetrated
11  into the shoe track cement?
12      A.   Yes.
13      Q.   But these are all just -- just
14  possibilities that you list here, correct?
15      MR. EISENBERG: Object to form.
16      Q.   (BY MR. CERNICH) You can't tell
17  Judge Barbier that any of these, whether it
18  be a net of cracks, a number of capillaries,
19  or a net of voids separated by cement bridges
20  is actually what occurred on the Macondo
21  well, correct?
22      MR. EISENBERG: Object form.
23      A.   Well, I -- well, I could tell
24  him integration of voids is very -- a very
25  possible scenario due to the nitrogen

**269**

migration. I --
Q. (BY MR. CERNICH) What experience do you have with nitrogen foam cement? None, correct?
A. I don't have experience with that, no.
Q. Okay. And so if you have no experience in it, obviously you're not an expert in nitrogen foam cement, correct?
MR. EISENBERG: Object to form.
A. This is correct. I'm referring to the information I got.
Q. (BY MR. CERNICH) Okay.
A. But I did not finish my answer, I guess. I also could answer crack, network cracks, that is a -- a scenario I have been observing in my career as an engineer and as a researcher all the time. There is no cement, there is not concrete. This is free of cracks. This is just not possible. There is no concrete and no cement free of voids in terms of pores, whether it's capillary pores, whether it's gel pores. They are all related to the cement. We have cement in the Macondo well. So I could tell him this is very, very

**270**

suitable, is the right word, scenario that we can all happen.
Q. Okay. So would you tell him that all cement -- all oilfield well cement jobs have cracks and capillaries and pores that are going to allow the flow of hydrocarbons through there?
MR. EISENBERG: Object to form.
A. No, I wouldn't say that they all allow the flow of hydrocarbons through them, but, yes, I could tell him there is no -- there is no ideal cement that is free of pores and of cracks. It just doesn't -- the porosity of a cement can be as high as 70 percent.
Q. (BY MR. CERNICH) Okay. What was the porosity of the Macondo cement?
MR. EISENBERG: Object to form.
A. I don't know it, but I simply can -- I can very reliably just relate to the porosity of a standard cement.
Q. (BY MR. CERNICH) You don't know the porosity of the Macondo cement? You didn't investigate the porosity of the Macondo cement, correct?

**271**

MR. EISENBERG: Object to form.
A. I did not do that, but it's a cement hardened due to the addition of water. So this is a process that would notably create pores. Any cement has capillary pores. Any cement has also gale pores. And for water/cement ratio of about 0.4, which is a rather high one, I could ex- -- I really expect to be there a pore system.
Q. (BY MR. CERNICH) Okay. And do you expect that pore system to allow flow?
A. If there is a process introduced that would lead to the interconnection of those pores, yes.
Q. Okay. So you -- you also mention here for the first time "a net of voids separated by cement bridges."
MR. EISENBERG: Object to form.
Q. (BY MR. CERNICH) What is "a net of voids separated by cement bridges"?
MR. EISENBERG: Object to form.
A. Well, if you have two rather large pores in a very close distance, so they are separated by a, I think the word is ligament, ligament of cement between them.

**272**

Q. (BY MR. CERNICH) Okay. And what leads you to the -- conclude that there was a possibility of a net of voids separated by cement bridges on the Macondo well?
A. What I was referring again to the possibility of the nitrogen migration that would form such a structure.
Q. Okay. But you've never observed nitrogen migration in any other cements or concretes you've investigated, correct?
A. This is correct, yes.
Q. I'm looking at Figure 7.1 on Page 15 of the report. Did you create this figure?
A. This was provided to me.
Q. Provided to you by counsel?
A. Yes.
Q. Okay. Did you ask counsel to -- to prepare this for you?
MR. EISENBERG: I'll direct you not to answer about any of our conversations.
Q. (BY MR. CERNICH) Are you aware that this image or an image much like it was circulated to the parties as a demonstrative for the Phase 1 trial?

305

1 special ingredients, but generally I covered
2 a very wide range of these different
3 cementitious materials. And we are still
4 talking about the unfoamed cement, I guess?
5   Q.   Yeah.
6   A.   Okay.
7   Q.   Viscosifiers, I asked you that.
8 Did you -- you never tested any cements that
9 included a viscosifier?
10   MR. EISENBERG: Object to form.
11   A.   No.
12   Q.   (BY MR. CERNICH) Okay. Have
13 you ever tested cements that include a
14 surfactant?
15   A.   I did not, but what I know is
16 the surfactor is related to the foam cement,
17 so I would like to mention that my point of
18 view in dealing with Dr. Griffiths, for
19 example, my point of view was the unfoamed
20 cement, which would not contain such
21 substances; and, therefore, I think the
22 materials I tested in the past are quite
23 comparable to an unfoamed cement, well
24 cement.
25   Q.   Okay. You do understand that

306

1 the shoe track cement contains surfactant?
2   MR. EISENBERG: Object to form.
3   A.   I don't know.
4   Q.   (BY MR. CERNICH) You don't know
5 that?
6   A.   I mean, I -- I was not assuming
7 that. I know it from the unfoamed cement.
8 From the foamed cement, sorry, I know it from
9 the foamed cement.
10   Q.   Right. Right. And the shoe
11 track cement also contains surfactant?
12   MR. EISENBERG: Object to form.
13   Q.   (BY MR. CERNICH) You didn't
14 know that?
15   MR. EISENBERG: Object to form.
16   A.   I was not aware of it.
17   Q.   (BY MR. CERNICH) Okay. And you
18 did not know that the unfoamed cement also
19 included a defoamer?
20   MR. EISENBERG: Object to form.
21   A.   No.
22   Q.   (BY MR. CERNICH) Okay. Could
23 you flip to Tab 21 in your binder, please?
24 This is the expert report of BP's cement
25 expert from Phase 1, Ron -- Ronald Crook.

307

1 This was previously marked as Exhibit 7442.
2 Is this the expert report of Mr. Crook that
3 you looked at?
4   A.   Just briefly, yes.
5   Q.   Okay. And having the report in
6 front of you, do you -- does that refresh
7 your recollection as to what portions of the
8 report you actually reviewed?
9   A.   No, it doesn't.
10   Q.   You did not review that report
11 until after you had submitted your expert
12 report in this case, correct?
13   A.   Sorry, can you please repeat it?
14   Q.   Yes. Mr. Crook's report, you
15 did not review that prior to submitting your
16 expert report?
17   A.   No, I didn't.
18   Q.   All right. If you could turn to
19 Tab 10, please. This is the expert report of
20 David Calvert. It's previously been marked
21 as Exhibit 22761. This is dated October 4th,
22 2011. Have you ever reviewed this report
23 before?
24   A.   Although briefly, I know it's
25 about the -- the float collar, I guess.

308

1   Q.   Okay. And do you understand
2 that Mr. Calvert testified as a cement expert
3 for BP at the Phase 1 trial?
4   MR. EISENBERG: Object to form.
5   MR. HILL: Object to form.
6   A.   I don't know. I didn't know
7 that, no.
8   Q.   (BY MR. CERNICH) If you could
9 turn to Tab 15 in this report -- I mean,
10 Page 15 in this report. Actually, if we look
11 at -- on the page prior, Page 14, do you see
12 that Section E, "POTENTIAL HYDROCARBON
13 FLOWPATHS"?
14   A.   Yes.
15   Q.   Okay. If we could look at --
16 then look over at Page 15, do you see the
17 section, "Reduced Hydrostatic Head During
18 Cement Transition"?
19   A.   Yes.
20   Q.   Okay. And Mr. Calvert writes,
21 "As cement transitions from a liquid to a
22 solid, it loses measurable hydrostatic head."
23        Did I read that correctly?
24   A.   Yes.
25   Q.   Okay. Can you explain that

**Page 328**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL           ) MDL NO. 2179
BY THE OIL RIG             )
"DEEPWATER HORIZON" IN     ) SECTION "J"
THE GULF OF MEXICO, ON     )
APRIL 20, 2010             ) JUDGE BARBIER
                           ) MAG. JUDGE SHUSHAN

*****************
VOLUME 2
*****************

Deposition of ANDREAS MOMBER, taken at Pan-American Building, 601 Poydras Street, 11th Floor, New Orleans, Louisiana, 70130, on the 2nd day of July, 2013.

**Page 329**

APPEARANCES

APPEARING FOR THE PLAINTIFFS' STEERING COMMITTEE:
  Mr. Anthony Irpino
  IRPINO LAW FIRM
  2216 Magazine Street
  New Orleans, Louisiana 70130

APPEARING FOR BP, INC.:
  Mr. Ryan D. Houck
  KIRKLAND & ELLIS
  333 South Hope Street
  Los Angeles, California 90071
  Mr. John A. Eisenberg
  KIRKLAND & ELLIS
  655 Fifteenth Street, NW
  Washington, D.C. 20005-5793

APPEARING FOR TRANSOCEAN:
  Mr. Paul C. Thibodeaux
  Mr. James R. Parish
  FRILOT
  1100 Poydras Street, Suite 3600
  New Orleans, Louisiana 70163

APPEARING FOR ANADARKO PETROLEUM COMPANY:
  Ms. Jordan Ray
  BINGHAM MCCUTCHEN
  355 South Grand Avenue, Suite 4400
  Los Angeles, California 90071-3106

APPEARING FOR HALLIBURTON:
  Mr. Gavin Hill
  Mr. Timothy Alford
  Mr. Christopher B. Wood
  Mr. Prescott W. Smith
  GODWIN LEWIS
  1201 Elm Street, Suite 1700
  Dallas, Texas 75270-2041

**Page 330**

A P P E A R A N C E S (Continued)

APPEARING FOR HALLIBURTON LAW DEPARTMENT:
  Mr. Christopher J. Bellotti
  HALLIBURTON LAW DEPARTMENT
  2107 City West Boulevard
  Building 2
  Houston, Texas 77042-3051

APPEARING FOR THE UNITED STATES:
  Mr. Scott Cernich
  Ms. Erica Pencak
  U.S. DEPARTMENT OF JUSTICE
  601 D Street, N.W.
  Washington, D. C. 20004

APPEARING FOR THE STATE OF LOUISIANA:
  Mr. Douglas R. Kraus
  Attorneys for Louisiana Attorney General
  KANNER & WHITELEY
  701 Camp Street
  New Orleans, Louisiana 70130-3504

ALSO PRESENT:
  Mr. Peter Jennings, Videographer
  Mr. Ray Aguirre, Case Manager

**Page 331**

INDEX
VIDEOTAPED ORAL DEPOSITION OF
ANDREAS MOMBER
JULY 2, 2013
VOLUME 2

                                              PAGE
Appearances . . . . . . . . . . . . . 328

Examination Continued by Mr. Cernich . . 333
Examination by Mr. Thibodeaux . . . . . 477
Examination by Mr. Hill . . . . . . . . 505
Examination by Mr. Eisenberg . . . . . . 537
Further Examination by Mr. Cernich . . . 556

Signature and changes . . . . . . . . . 601
Reporter's Certificate . . . . . . . . . 603

EXHIBITS

                                              PAGE
EXHIBIT NO. 11646 . . . . . . . . . . . 438
  Fracture of brittle multiphase
  materials by high energy water jets,
  Pages 1081 - 1085
EXHIBIT NO. 11647 . . . . . . . . . . . 442
  Effect of crushed ceramic and
  basaltic pumice as fine aggregates on
  concrete mortars properties,
  Pages 1191 - 1197
EXHIBIT NO. 11648 . . . . . . . . . . . 450
  Hydraulic Erosion of Concrete by a
  Submerged Jet, Pages 256 - 261
EXHIBIT NO. 11649 . . . . . . . . . . . 458
  Abrasion erosion of concrete by
  water-borne sand, Pages 1814 - 1820
EXHIBIT NO. 11650 . . . . . . . . . . . 544
  Rebuttal Report of Glen Benge,, dated
  June 7, 2013, 22 pages

1 (Pages 328 to 331)

472

1  A. I don't know.
2  Q. Okay. Do you know what
3  pre-cement job circulation is?
4  A. No.
5  Q. Okay. Do you know what
6  permeability of -- of cement -- strike that.
7       Do you know what the
8  permeability of the cement in the shoe track
9  would have had to have been in order to flow
10 12 stock tank barrels per minute through that
11 cement?
12     MR. EISENBERG: Object to form.
13 A. I have not performed such an
14 investigation.
15 Q. (BY MR. CERNICH) Okay. Could
16 you do that calculation?
17     MR. EISENBERG: Object to form.
18 A. I could do the calcula- -- I
19 could do a calculation.
20 Q. (BY MR. CERNICH) But you
21 haven't investigated that?
22     MR. EISENBERG: Object to form.
23 A. Sorry?
24 Q. (BY MR. CERNICH) But you
25 haven't investigated that?

473

1  MR. EISENBERG: Same objection.
2  Q. (BY MR. CERNICH) What the
3  permeability of the Macondo cement in the
4  shoe track would had to have been in order to
5  flow 12 stock tank barrels per minute through
6  it?
7       MR. EISENBERG: Object to form.
8  A. I haven't performed such an --
9  such an investigation.
10 Q. (BY MR. CERNICH) Okay. You're
11 not offering any opinions, are you, on what
12 the actual flow rates from the Macondo well
13 were, correct?
14 A. This is correct, it was outside
15 the scope of -- of my report.
16 Q. And the scope of your report was
17 simply to respond to the reports of
18 Dr. Griffiths and Dr. Dykhuizen, correct?
19     MR. EISENBERG: Object to form.
20 A. To the parts of the report,
21 particularly the part of Dr. Griffiths'
22 report that is concerned to erosion of
23 concrete in the well.
24 Q. (BY MR. CERNICH) Okay. Now,
25 is -- is it your understanding that

474

1  Dr. Griffiths actually calculated cement
2  erosion rates?
3  A. No, he did not calculate cement
4  erosion rates, but he provided information
5  that could be used to calculate cement
6  erosion rates.
7  Q. Okay. But Dr. Griffiths' report
8  recognizes that the change in restriction in
9  the bottom of the hole could have been
10 related to cement or the float collar or some
11 other reduction and restriction at the bottom
12 of the hole, correct?
13     MR. EISENBERG: Object to form.
14 A. It was, again, a long question.
15 Q. (BY MR. CERNICH) Sure.
16 A. Can you please rephrase it?
17 Q. Dr. Griffiths considered all the
18 potential restrictions at the bottom of the
19 hole, not just cement, correct?
20     MR. EISENBERG: Object to form.
21 A. He considered the other
22 restrictions as well, yes, but he spent
23 particular attention to the barrier
24 properties of cement in the bottom hole.
25 He's mentioning this in his executive summary

475

1  where he's particularly mentioning the
2  cement, not mentioning the other downhole
3  restrictions you just talked about, and he is
4  developing in one of his footnotes something
5  like a -- a scenario how cement in the well
6  could be eroded.
7  Q. (BY MR. CERNICH) In addition to
8  the Ashby analysis that we discussed earlier,
9  were there any other sorts of similar
10 analyses that you used in order to formulate
11 your opinions in this case?
12     MR. EISENBERG: Object to form.
13 A. Yeah, what similar analysis is
14 in your -- in your mind?
15 Q. (BY MR. CERNICH) Well, are
16 there any other analyses besides the Ashby
17 analysis that you used to form the opinions
18 that are contained in your expert report?
19 A. Well, as for an example,
20 analysis of the flow path dimensions.
21 Q. Well, I just -- I just want to
22 know, because the Ashby analysis wasn't cited
23 in your report, and I want to know if there
24 are any other Ashby -- or any other analyses
25 that you use that aren't explicitly cited

492

1  opinions in your report are valid, correct?
2       MR. HILL: Object to form.
3       MR. EISENBERG: Object to form.
4       A.   No, I don't think so.
5       Q.   (BY MR. THIBODEAUX) Well, all
6  of your opinion -- or all of your opinions
7  depend on the assumption that the shoe track
8  cement was set, correct?
9       MR. EISENBERG: Object to form.
10      A.   Well, I made an assumption that
11 the shoe track cement was set in order to
12 address Dr. Griffiths' scenario, who said
13 that the cement in the shoe track -- he
14 assumed the cement in the shoe track was in
15 a -- how did he say it -- something like a
16 fair -- fairly good condition, something like
17 this.
18      Q.   (BY MR. THIBODEAUX) Are you
19 done with your answer?
20      A.   Yes.
21      Q.   Okay. Well, I'm trying to
22 understand if -- if your assumption is wrong
23 and that the shoe track cement was not set,
24 which of your -- of your opinions still
25 apply?

493

1       MR. EISENBERG: Object to form.
2       A.   Well, the -- Dr. Griffiths
3  assumed that the cement was in a, I'm not
4  sure, but fairly good condition, something
5  like this, which is an assumption needed to
6  be made in order to introduce an erosion
7  process, that was not cement in a fairly good
8  condition in the shoe track, an erosion
9  process would probably not occur.
10      Q.   (BY MR. THIBODEAUX) So if the
11 cement was not set, then an erosion process
12 would not occur --
13      MR. EISENBERG: Object to form.
14      Q.   (BY MR. THIBODEAUX) -- is that
15 what you're saying?
16      MR. EISENBERG: Object to form.
17      A.   An erosion process as -- as
18 described by Dr. Griffiths, performed by
19 Dr. Griffiths and would probably not have
20 occurred.
21      Q.   (BY MR. THIBODEAUX) And that
22 would apply to the opinions you offer with
23 respect to erosion processes as well,
24 correct?
25      MR. EISENBERG: Object to form.

494

1       A.   Well, the cement would not have
2  been set, an erosion process as I analyzed
3  would -- would have -- would be probably not
4  have occurred.
5       Q.   (BY MR. THIBODEAUX) Do you know
6  who John Guide is?
7       A.   No.
8       Q.   You never heard of John Guide?
9       A.   No.
10      Q.   Okay. He was the operations
11 engineer assigned -- the BP operations
12 engineer assigned to the Deepwater Horizon.
13 Are you familiar with that?
14      A.   No.
15      MR. EISENBERG: Object to form.
16      Q.   (BY MR. THIBODEAUX) You've
17 never -- you never spoke with Mr. Guide in
18 preparation of your report and your opinions
19 in this case?
20      A.   No, I haven't.
21      Q.   You didn't read his trial
22 testimony?
23      A.   No, I didn't.
24      Q.   Are you aware that Mr. Guide
25 testified at the Phase 1 trial that the

495

1  cement, quote, obviously did not set up,
2  close quote?
3       MR. EISENBERG: Object to form.
4       A.   No.
5       Q.   (BY MR. THIBODEAUX) Had you
6  been aware of Mr. Guide's testimony, would
7  you still be comfortable making the
8  assumption that the cement in the shoe track
9  was set?
10      MR. EISENBERG: Object to form.
11      A.   I would -- yeah, I would still
12 make this assumption.
13      Q.   (BY MR. THIBODEAUX) Even if the
14 BP operations engineer in charge of
15 overseeing the cement operation said that the
16 cement was not set?
17      MR. HILL: Object to form.
18      MR. EISENBERG: Object to form.
19      A.   Yes, I mean, there's evidence
20 from the -- from the Chevron report that
21 cement might have set. There is the
22 testimony of Jesse Gagliano. So there is
23 evidence available that the cement has set,
24 as well I still assumed it.
25      Q.   (BY MR. THIBODEAUX) And the

42 (Pages 492 to 495)

496

1  evidence you're relying on is the OTC/Chevron
2  testing, and the Gagliano testimony; is that
3  right?
4      MR. EISENBERG: Object -- object to
5  form.
6      MR. HILL: Object to form.
7      A.   What is the OTC?
8      MR. THIBODEAUX: What was OTC called?
9      MR. PARISH: Oilfield Testing
10 Consultants.
11     Q.   (BY MR. THIBODEAUX) Oilfield
12 Testing Consultants Report.
13     MR. EISENBERG: Object to form.
14     A.   With the Chevron report and
15 Jesse Gagliano's testimony, yes.
16     Q.   (BY MR. THIBODEAUX) Okay. In
17 formulating your opinions, were you provided
18 with any evidence indicating that the cement
19 had not set?
20     MR. EISENBERG: Object to form.
21     A.   No.
22     Q.   (BY MR. THIBODEAUX) That was a
23 "no"?
24     A.   Sorry?
25     Q.   That was a "no"?

497

1      A.   That was a no, yes.
2      Q.   Was the only evidence that
3  you've seen -- or is the only evidence that
4  you've seen regarding the cement being set
5  the Chevron testing and the Gagliano
6  testimony?
7      MR. EISENBERG: Object to form.
8      A.   Yeah, I think so.
9      Q.   (BY MR. THIBODEAUX) Okay. Look
10 at Page 5 of your report, please. At the
11 bottom of the page, you write, "The
12 conditions of the cement in the shoe track
13 and annulus are not known with certainty."
14      Do you see that?
15     A.   Yes.
16     Q.   That is an acknowledgment that
17 the condition of the Macondo cement was
18 uncertain, correct?
19     MR. EISENBERG: Object to form.
20     A.   No, I would say so. The -- they
21 are not known with certainty.
22     Q.   (BY MR. THIBODEAUX) They are
23 not known with certainty?
24     A.   Yes.
25     Q.   You just don't -- you don't know

498

1  what the condition of the Macondo cement was,
2  correct?
3      MR. EISENBERG: Object to form.
4      A.   Not with certainty, yes.
5      Q.   (BY MR. THIBODEAUX) What we do
6  know is that the Macondo cement failed to
7  provide zonal isolation, correct?
8      A.   Yes.
9      Q.   That's all we know with
10 certainty, correct?
11     MR. EISENBERG: Object to form.
12     A.   No, we also know -- what I also
13 knew and adopted was the experimental results
14 from, as I already said, from Chevron.
15     Q.   (BY MR. THIBODEAUX) But those
16 are experimental results only, correct?
17     MR. EISENBERG: Object to form.
18     A.   Experimental results, yes, but
19 they're formed on a cement equal to that used
20 in the Macondo well.
21     Q.   (BY MR. THIBODEAUX) But that
22 doesn't tell you anything about what actually
23 happened in the Macondo well, does it?
24     MR. EISENBERG: Object to form.
25     A.   Well, the testing conditions

499

1  were close to the conditions in the Macondo
2  well, so it is like a good representative of
3  the condition of the cement in the Macondo
4  well.
5      Q.   (BY MR. THIBODEAUX) But it
6  still doesn't tell you whether or not the
7  cement in the well set up, does it?
8      MR. EISENBERG: Object to form.
9      A.   Well, it give an indication that
10 the cement can have set.
11     Q.   (BY MR. THIBODEAUX) It may give
12 you an indication that it could set up,
13 right?
14     A.   Yes.
15     MR. EISENBERG: Object to form.
16     Q.   (BY MR. THIBODEAUX) It doesn't
17 say that it did, though, does it?
18     MR. EISENBERG: Object to form.
19     A.   It gives me strong -- it
20 provides strong evidence that the cement did
21 set.
22     Q.   (BY MR. THIBODEAUX) Can you
23 quantify the degree to which the shoe track
24 cement set up?
25     MR. EISENBERG: Object to form.

43 (Pages 496 to 499)

596

1  calculate an erosion rate of -- of the cement
2  at the bottom of the Macondo well, you
3  wouldn't have anything to respond to with
4  your expert report, correct?
5       MR. EISENBERG: Object to form.
6       A.   Please rephrase the question.
7  This was too quick.
8       Q.   (BY MR. CERNICH) Your work is
9  responding, your expert report is responding
10 to Dr. Griffiths, correct?
11      MR. EISENBERG: Object to form.
12      A.   It's primarily responding to
13 Dr. Griffiths, yes.
14      Q.   (BY MR. CERNICH) Okay. And
15 it's responding only to Dr. Griffiths and
16 Dr. Dykhuizen, correct?
17      A.   Yes.
18      Q.   Okay. And so if -- and it's
19 responding to what you interpret as
20 Dr. Griffiths' calculations of erosion rates
21 of cement in the Macondo well, correct?
22      MR. EISENBERG: Object to form.
23      A.   I need -- I need to read the
24 question.
25      Q.   (BY MR. CERNICH) Okay.

597

1       A.   I -- I think it's better if you
2  rephrase the question to me.
3       Q.   Okay.
4       A.   Went somewhat out of context
5  now, I think.
6       Q.   Okay. You understand -- it's
7  your understanding that Dr. Griffiths was
8  calculating cement erosion rates in his
9  expert report?
10      MR. EISENBERG: Object to form.
11      A.   Oh, he -- he was giving -- he's
12 providing a time period that could -- yeah,
13 that -- yes, in -- in connection with some --
14 how can I say? Some -- some discussion about
15 cement erosion in his footnote, and so, yes,
16 actually, that can be interpreted as a
17 erosion rate.
18      Q.   (BY MR. CERNICH) Okay. So
19 you're interpreting Dr. Griffiths' report as
20 providing a cement erosion rate, correct?
21      MR. EISENBERG: Object to form.
22      A.   Based on the information
23 provided in Dr. Griffiths' expert report, an
24 erosion rate in the cement shoe track can be
25 calculated, yes.

598

1       Q.   (BY MR. CERNICH) Okay. But
2  was -- strike that.
3            Is it your interpretation that
4  Dr. Griffiths was, in fact, calculating a
5  cement erosion rate?
6       A.   No. What I said is his
7  information, the numbers he provided in his
8  report can be used to calculate a cement
9  erosion rate.
10      Q.   Okay. So he was not, in fact,
11 calculating a cement erosion rate?
12      MR. EISENBERG: Object to form.
13      A.   It was not his purpose to
14 calculate a cement erosion rate.
15      Q.   (BY MR. CERNICH) And is there
16 anywhere in Dr. Dykhuizen's expert report
17 where he calculates a cement erosion rate?
18      A.   It was the same situation. He
19 provided a number which can be used to
20 calculate cement erosion rates.
21      Q.   Okay. Assuming that the -- the
22 restriction discussed in Dr. Dykhuizen's
23 report is, in fact, the cement?
24      A.   Yes.
25      Q.   As opposed to another

599

1  restriction, whether it be the reamer shoe or
2  the float collar or some other downhole
3  restriction?
4       MR. EISENBERG: Object to form.
5       A.   Yes.
6       Q.   (BY MR. CERNICH) Earlier in
7  your testimony, you said a couple of times
8  that Dr. Griffiths said that the cement in
9  the shoe track was in fairly good condition;
10 do you recall that?
11      A.   I recall that, having said that,
12 yes.
13      Q.   Okay.
14      MR. EISENBERG: Object to form. Sorry.
15      Q.   (BY MR. CERNICH) But you
16 wouldn't argue with me if I told you that
17 that phrase "fairly good condition" doesn't
18 actually appear in Dr. Griffiths' report?
19      A.   Well, he might have used
20 different words, but I think the meaning
21 would be the same. Maybe we can take a look
22 at his report to really look.
23      Q.   Well, we can let the report
24 speak for -- for itself. Are you comfortable
25 with letting the report speak for itself?