# KIRKLAND & ELLIS LLP
### AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Robert R. Gasaway
To Call Writer Directly:
(202) 879-5175
robert.gasaway@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

August 8, 2013

**By Electronic Mail**

The Honorable Sally Shushan
United States District Court
Eastern District of Louisiana
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

Re:     MDL 2179 — United States' Motion to Strike Dr. Momber's Report

Dear Judge Shushan:

BP writes in response to the United States' letter of Thursday, August 1, 2013, seeking to strike the report of BP and Anadarko's Quantification expert on cement erosion, Dr. Andreas Momber. Although Dr. Momber assumes Phase 1 facts for purposes of his analysis (without trying to prove these facts), Dr. Momber's erosion-rate opinions fall squarely within Phase 2. The United States' motion should therefore be denied.

### Background and Overview

Dr. Momber is perhaps the world's leading expert in erosion of mineral-based materials such as cement and concrete. Dr. Momber's report seeks to evaluate the effect of possible erosion of the down-hole well cement in the shoe track on the rate of oil flow from the well during the 87-day oil spill. The issue of well cement erosion is central to Phase 2 because, although the United States claims flow decreased during the spill period, the best science available demonstrates the opposite — that barriers to flow existed that eroded over time causing the flow rate to increase, not decrease, over the course of the spill.

Specifically, United States expert Dr. Stewart Griffiths stated in his report that well-cement erosion occurred following the blowout and that, "[a]ssuming the cement remained reasonably intact," this well-cement erosion happened rapidly — in less than nine hours. (Griffiths Rpt 4, 11-12 & n.11; *see also* Dykhuizen Rpt 10 (asserting that no significant impact from erosion occurred after the second day of the blowout).) As Dr. Momber explains in his report, he also assumes for purposes of his erosion analysis, and on the basis of Phase 1 evidence regarding the performance of the well cement, that the well cement was "intact" — specifically,

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 8, 2013
Page 2

that the well cement in the shoe track was set.  Based on this assumption, Dr. Momber then concludes that the well cement would have imposed a barrier to flow for a much longer timeframe than the timeframes asserted by United States experts Dr. Griffiths and Dr. Dykhuizen in their reports.

The United States' motion to strike Dr. Momber's report contains three fundamental errors.  *First*, the United States mistakenly claims that, by *assuming* that the down-hole well cement set, Dr. Momber is offering a Phase 1 opinion.  But Dr. Momber does not seek to adduce evidence to *prove* that the well cement set.  Rather, he merely assumes that the well cement set (Momber Dep. Tr. 71:17-72:13), and then based on this assumption, Dr. Momber compares Dr. Griffiths's and Dr. Dykhuizen's asserted well-cement erosion rates to known erosion rates for concrete — a comparable material (Momber Rpt 11-13).  Significantly, Dr. Griffiths also assumes in his report for the United States that the well cement set (Griffiths Rpt 12 n. 11), and such an assumption is perfectly within the bounds of an appropriate Phase 2 quantification analysis.  Indeed, this Court, at the United States' prompting, has already explained to the parties the sound principle (fully applicable here) that an expert like Dr. Momber does not offer a Phase 1 opinion merely by "relying on the facts they believe existed in order to formulate their opinion with regard to either source control or quantification." (July 26, 2013 WGC Tr. 56:24-57:1; *see also* 56:13-58:6 (discussion among the Court, Ms. Himmelhoch, and Mr. Miller).)

*Second*, the United States' letter contends that neither Dr. Griffiths nor Dr. Dykhuizen offer "erosion rates" in their reports.  (Letter 4.)  In fact, both United States experts assert that any erosion would have occurred very quickly — within nine hours and two days, respectively — after the blowout.  (Griffiths Rpt 12 n.11; Dkyhuizen Rpt 10.)  Dr. Momber's report properly responds to these unfounded, unscientific assertions by demonstrating that, if Drs. Griffiths and Dykhuizen were correct about the duration of this erosion, the erosion rate of the well cement in the shoe track would be many times greater than any erosion rate reported in the extensive literature devoted to concrete erosion.  (Momber Rpt 12.)

*Finally*, even if Drs. Griffiths and Dykhuizen had nothing to say about down-hole erosion in their initial reports — which they clearly do — Dr. Momber's initial and only expert report is not bounded by the scope of the United States' initial reports.  Dr. Momber's comparison of rates of concrete erosion over time to critique the implausible erosion rates asserted by Drs. Griffiths and Dykhuizen constitute appropriate, affirmative Phase 2 quantification-related opinions.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 8, 2013
Page 3

### Analysis

The United States' motion comes too late to be credible.  Dr. Momber's report was filed over three months ago, on May 1, 2013.  His deposition concluded over a month ago on July 1, 2013.  Rather than move promptly to strike Dr. Momber's report — as BP and Anadarko moved promptly to strike improper portions of the United States' rebuttal expert reports — the United States filed this motion only after the August 1 conclusion of the deposition of a United States expert, Dr. Glen Benge, that the United States had hoped might effectively rebut Dr. Momber. Any reactions the United States may have to Dr. Benge's deposition testimony is no excuse for the timing of this filing, which seeks to strike a BP expert report filed three months earlier on May 1.  In any event, as demonstrated below, the United States' motion is unconvincing.

## I.      Dr. Momber Has Not Offered A Phase One Opinion.

Dr. Momber does not seek to offer a Phase 1 opinion any more than United States experts Griffiths and Dykhuizen seek to offer Phase 1 opinions.

Instead, both sides merely take the physical configuration of the well as a starting assumption for purposes of framing their quantification-related analysis.  As the Court has explained, at the United States' prompting, Phase 2 experts are perfectly at liberty to assume Phase 1 facts for purposes of providing a quantification or quantification-related opinion:

MS. H[I]MMELHOCH: Your Honor, I think we are not -- none of the experts, as I understand it, are getting into the cause of the explosion. But I will say that the BOP figures into analyses that many of the experts have done in terms of the resistance that the BOP presented to flow, the position of the drill pipe within the BOP as it affects flow. But they're not offering opinions, as I understand it, on how the drill pipe came to be in whatever position that expert has assumed for any --

THE COURT: Nor any criticisms of the BOP or otherwise. They're just relying on the facts they believe existed in order to formulate their opinion with regard to either source control or quantification.

MS. H[I]MMELHOCH: Yes.

***

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 8, 2013
Page 4

> MS. H[I]MMELHOCH: I mean, there's no question that BP's experts have
> offered opinions on assumptions regarding the location of the drill pipe. That, for
> instance, Dr. Gringarten testified earlier this week about he has several options for
> the way he calculated, and one is drill-pipe-high and one is drill-pipe-low. And
> that definitely is part of the evidence of quantification. I don't think, however, that
> that means that we're talking about Phase One issues.

> THE COURT: I agree with that.

(July 26, 2013 WGC Tr. 56:13-58:6 (discussion among the Court, Ms. Himmelhoch, and Mr.
Miller).)  This discussion concerned quantification opinions that assume a certain configuration
of the BOP and is equally applicable to the issue of well-cement erosion presented in the United
States' motion.  Nothing about Dr. Momber's report asserts any new opinions or theories about
the performance of the well cement before or during the initial blowout and explosion.  (*See
generally* Momber Rpt 5-10.)

## II. Dr. Momber's Report Addresses Unfounded Assertions About Erosion In The Reports Of Drs. Griffiths And Dykhuizen.

The United States' motion mischaracterizes what the reports of its own experts, Drs.
Griffiths and Dykhuizen, do and do not assert about erosion and what Dr. Momber's report does
and does not assert in response.

### A. Drs. Griffiths and Dykhuizen Address Down-Hole Well-Cement Erosion.

Contrary to the United States' assertions (Letter 2, 4-5), the Griffiths and Dykhuizen
reports both offer an "erosion rate."  Dr. Griffiths asserts in his report that — if the cement was
set — down-hole erosion, including well-cement erosion, occurred within 9 hours.  (Griffiths Rpt
12 n.11; *see also* Griffiths Expert Dep. Tr.  425:10-426:5.)  Similarly, Dr. Dykhuizen claims that
he does "not believe that erosion had a significant effect on overall flow from the well past the
second day of the blowout."  (Dykhuizen Rpt 10; *see also* Dkyhuizen Expert Dep. Tr. 176:22-
177:1.)  That Dr. Griffiths and Dr. Dykhuizen did not state these conclusions with units of mass
over time or volume over time — and instead only estimated the time taken for erosion while
ignoring the quantity of material eroded — does not mean that neither report offers an erosion
rate.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 8, 2013
Page 5

*Dr. Griffiths claims all well-cement erosion occurred within 9 hours*.  On page 4 of his initial report, Dr. Griffiths posits as one of his three "related key findings" that any well-cement barrier in the shoe track eroded rapidly:

> Any significant erosion of the BOP, rams, pipe, riser *and cement barrier in the bottom of the well occurred rapidly over the first few days following blowout*. Subsequent erosion had little impact on flow rates or the cumulative discharge.

(Emphasis added.)  Building on this "key finding" about cement erosion, Dr. Griffiths later claims on pages 11 to 12 of his initial report, that any down-hole restriction (including well cement) would have ceased providing any resistance to flow in less than 9 hours:

> This indicates that *whatever down-hole restriction existed at the time was failing rapidly*, regardless of whether this restriction resided in wellbore debris, the float collar, or *cement barrier*.  For continued failure at this rate, I estimate that the productivity index would further increase to my best-estimate value *in less than 9 hours*.[11]  At this point, the *cement barrier or other impediments would provide no significant restriction to flow* from the reservoir to the casing.  Subsequent erosion in this region therefore could not have influenced later flow rates.

(Emphasis added).  With respect to this alleged 9 hour rate of down-hole erosion, Dr. Griffiths states at footnote 11 on page 12 of his report that the cement "remained reasonably intact" — in other words, that it set — and that erosion occurred at most within 9 hours.  Moreover, Dr. Griffiths opines about the mechanism that would have caused increased erosion — small channels opening in the well cement:

> *Assuming that the cement remained reasonably intact*, the likely mechanism for progressive failure is erosion.  In this case, the rate of failure would not remain constant but would instead increase rapidly *as small channels opened and fluid velocities increased*.  The 9 hour estimate thus very likely represents an upper bound on the time to complete elimination of any resistance to flow by the cement or other down-hole restriction.

(Emphasis added).  *Dr. Dykhuizen's report asserts that erosion, including down-hole erosion, had little-to-no effect past day two of the blowout.*  Although, Dr. Dykhuizen says less about erosion, he acknowledges, on page 10 of his report, that his cumulative flow estimate depends on, among other things, his belief that erosion had no significant effect on flow past the second day of the blowout.  His report states, specifically, "I do not believe that erosion had a significant

KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 8, 2013
Page 6

effect on overall flow from the well past the second day of the blowout."  (Dykhuizen Rpt 10; *see also* Dykhuizen Expert Dep. Tr. 176:22-171:1.)

     **B.**     **Dr. Momber's Report Properly Rebuts The Griffiths And Dykhuizen Opinions About Down-Hole Well-Cement Erosion.**

     Dr. Momber evaluates the feasibility of the positions taken by Drs. Griffiths and Dykhuizen that all of the cement eroded within nine hours (Griffiths) or two days (Dykhuizen). As Dr. Momber explains on the very first page of his report:

> The few reports that discuss cement erosion simply assume that all of the bottomhole cement was essentially completely and almost immediately eliminated within a very short time after the blowout (taking only 9 hours to 2 days). In my opinion, this type of rapid and complete erosion of well cement is inconsistent with what is known about the cement erosional processes. In fact, for the government experts' assumptions to be true, it would require one to believe that erosion rates at Macondo were many times greater than the highest reported rates for the erosion of cement mixtures.

(Momber Rpt i.)  Dr. Momber does not affirmatively seek to prove (or even to argue) that the cement was set.  Instead, as his report states, he *assumes*, on the basis of Phase 1 evidence regarding cement, that the cement was set and caused an impediment to flow.  (Momber Rpt 11 ("One can assume that the total volume of cement in the well column needs to erode….").)

     Accordingly, Dr. Momber explained during his deposition that he assumed the presence of cement in the shoe track because Dr. Griffiths made the same assumption:

> Q. (BY MR. CERNICH) It's your testimony that Dr. Griffiths' report said that there was set cement in the shoe track  in reasonably good condition?
>
> MR. EISENBERG: Same objection.
>
> A.     No, there was cement in -- in a reasonably good condition, similar like this, that is what he assumed in that section of  his report where he is talking about erosion.  So this is an assumption he made, as I understood that. And in order to deal with this erosion scenario, which is really the -- the focus of my report, I made the same assumption.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 8, 2013
Page 7

> Q. (BY MR. CERNICH) Okay. So if -- strike that. So you simply attempted to make the same assumption as Dr. Griffiths?
>
> MR. EISENBERG: Object to form.
>
> A.      From -- for this particular issue I made the same assumption he made, yes.

(Member Dep. Tr. 71:17-72:13.)  Notwithstanding this overwhelming record, the United States' motion claims that Dr. Member testified that he *knew* the cement was set.  (Letter 3 (citing Member Dep. Tr. 143:22-145:5).)   In support of this contention, the United States mischaracterized the testimony of Dr. Member by selectively quoting only the text underlined below.

As the Court can see from reading the underlined snippet in context, Dr. Member in fact testified that he *assumed* that the cement was present in the shoe track:

> Q:      Okay.  Do we know anything about the condition of the cement in the shoe track and the annulus?
>
> A:      What -- according to *my assumption*, *making an assumption*, <u>I know that it was set</u>, so that is what I know, *what I assumed* for my -- for the purpose of my treatment.

(Member Dep. Tr. 143:22-145:5 (emphasis added).)  Having mirrored Dr. Griffiths's assumption that the cement was set, Dr. Member's report analyzes the various means by which the cement *could have* eroded after the blowout to allow an unrestricted path of flow.  (Member Rpt 4-10, 14-17.)  Because Dr. Griffiths speculates that the well cement failure mechanism consisted of the proliferation of small channels that, in turn, caused a very rapid erosion rate (Griffiths Rpt 12 n.11), Dr. Member also considers various failure mechanisms of the well cement for purposes of analyzing rates of erosion.

The United States cites these various failure mechanisms in its motion — channeling, nitrogen breakout, permeability, nets of cracks, capillaries, and nets of voids separated by cement bridges.  (Letter 2.)  But the United States mischaracterizes this analysis as directed to the *cause* of cement failure.  Instead, Dr. Member conducts this analysis to show that even if the cement failed through any of these various *potential* failure mechanisms, the erosion timeframes asserted by Drs. Griffiths and Dykhuizen are still highly implausible.  (Member Rpt 4-10.)  As Dr. Member explains, the nine-hour and two-day erosion rates asserted by Drs. Griffiths and

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 8, 2013
Page 8

Dykhuizen, respectively, are "10,000 to 100,000 times greater than any reported in the extensive literature devoted to concrete erosion." (*Id.* 12.)

In light of the implausible erosion rates asserted by Drs. Griffiths and Dykhuizen, Dr. Momber then considers the possibility of a different rapid well-cement degradation process — hydraulic fragmentation — that might explain the rapid change in net pay around 930pm on April 20, 2010 identified in the Phase 1 expert Report of Morten Emilsen (and in Appendix W to the BP Internal Investigation Report) that Dr. Griffiths purports to rely upon to arrive at his erosion rates. (Momber Rpt 14-16; Griffiths Rpt 11 n.10.) Although Dr. Momber does not reach the same conclusion regarding erosion that Dr. Griffiths reaches from Mr. Emilsen's work, he accepts Dr. Griffiths's assertions on this point for the purposes of the analysis of hydraulic fragmentation in his report. (Momber Rpt, at 3-4; *see also* 8-9, 15-16 (discussing Mr. Emilsen's work)).)

As Dr. Momber explains, this alternative process of hydraulic fragmentation, which also assumes the well cement set, would have resulted in substantial barriers to flow for a much longer period than the 9-48 hours postulated by Drs. Griffiths and Dykuizen. (Momber Rpt 14-16.)

Dr. Momber's hydraulic fragmentation theory does not go to causation, as the United States incorrectly claims. (Letter 2-3.) Rather, the theory demonstrates that the only plausible well-cement degradation theory that matches the data on which Drs. Griffiths and Dykhuizen rely would *still* have provided a long-lasting barrier to flow that cannot be ignored in cumulative flow estimates (as Drs. Griffiths and Dykhuizen have done for their cumulative flow estimates).

## III.   The United States' Motion Misapplies The Standard For Excluding Second Opinions To Dr. Momber's Initial Opinions.

The United States argues that Dr. Momber's initial expert report is improper because it is outside the scope of Dr. Griffiths's and Dr. Dykhuizen's reports, which do not — the United States claims — offer "erosion rates." (Letter 2, 4-5.) By citing the Court's June 24, 2013 Order (Rec. Doc. 10477) striking certain United States' *rebuttal* opinions (Letter 2), the United States demonstrates that it is misapplying the standard applicable to second opportunities to offer expert reports to BP/Anadarko's initial (and only) opportunity to offer experts reports.

Simply put, Dr. Momber is not confined in his initial (and only) report to merely responding to United States experts. For example, even if Drs. Griffiths and Dykhuizen offered quantification opinions completely devoid of any discussion of down-hole erosion, it would be

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 8, 2013
Page 9

entirely appropriate for Dr. Momber to offer his own opinion of down-hole barriers to flow as a Phase 2 quantification-related analysis.

In short, Dr. Momber's *initial* report cannot be an improper *rebuttal* report, and the Court should reject the United States' request to strike the report on this basis.

*        *        *

For the foregoing reasons, the United States' request to strike Dr. Momber's report should be denied.

Respectfully Submitted,

Robert R. Gasaway

Attachments

cc (by electronic mail):

United States' MDL Counsel
Plaintiffs' Liaison Counsel
State and Local Liaison Counsel
Defense Liaison Counsel
Joel M. Gross