```
                    UNITED STATES DISTRICT COURT

                   THE EASTERN DISTRICT OF LOUISIANA

                           AT NEW ORLEANS


 IN RE:  OIL SPILL BY THE OIL RIG      *    10-MD-2179 "J"
            DEEPWATER HORIZON IN THE   *
         GULF OF MEXICO ON             *
         APRIL 20, 2010                *    July 26, 2013
                                       *
                                       *
 Applies to:   All Cases               *    9:30 a.m.
 ****************************************



                   DISCOVERY STATUS CONFERENCE

                BEFORE THE HONORABLE SALLY SHUSHAN

                   UNITED STATES MAGISTRATE JUDGE








 SUSAN A. ZIELIE, RMR, FCRR
 Official Court Reporter
 HB 406
 500 Poydras Street
 New Orleans, Louisiana 70130
 susan_zielie@laed.uscourts.gov
 504.589.7781


 Proceedings Recorded by Computer-aided Stenography Transcription
 Software.
```

1  government before it was publically filed, and the United States
2  declined to join in it.
3         MR. LYLE: Yeah, that happened. The *Dillon* complaint
4  did go to the federal government before it was unsealed, and
5  they passed. But of course they always reserve the right to get
6  involved subsequently if they decide they want to. Which is
7  exactly the posture we're in.
8         THE COURT: Okay. But now at least I understand the
9  problem. Which I guess is helpful.
10        MS. GODLEY: Your Honor, Tammy Godley for Transocean.
11        MR. LYLE: Thank you, Your Honor, for your time. And,
12  again, I apologize for interrupting.
13        THE COURT: No problem. That wasn't an interruption.
14  It was helpful.
15        MR. MILLER: Your Honor, it's Kerry Miller.
16            And, before we leave this topic, I'd like to ask a
17  brief question.
18        THE COURT: Sure.
19        MR. MILLER: The letter that I wrote that you
20  referenced earlier in terms of Transocean not being bound by
21  findings as it relates to Count 1 of the United States' Clean
22  Water Act complaint, we also requested I think something a
23  little bit more modest and consistent with what I had talked
24  about the last time we met in person a couple weeks ago, which
25  was to the extent that the quantification gets into -- to the

1   extent that Transocean is not involved in quantification, that
2   it not be prejudiced by the litigation of BOP issues in
3   quantification or surface discharge issues in quantification.
4           THE COURT:  Right.
5           MR. MILLER:  That was also in my letter.
6           THE COURT:  Right.  It was.
7               And my reaction to that, Kerry, was that certainly
8   with regard to BOP issues, I don't think any of the parties in
9   Phase Two are going to get into BOP issues.  That would come as
10  a shock to me.
11              And I'm looking specifically at the attorneys for
12  the United States.
13          MS. HEMMELHOCH:  Your Honor, I think we are not -- none
14  of the experts, as I understand it, are getting into the cause
15  of the explosion.
16              But I will say that the BOP figures into analyses
17  that many of the experts have done in terms of the resistance
18  that the BOP presented to flow, the position of the drill pipe
19  within the BOP as it affects flow.
20              But they're not offering opinions, as I understand
21  it, on how the drill pipe came to be in whatever position that
22  expert has assumed for any --
23          THE COURT:  Nor any criticisms of the BOP or otherwise.
24              They're just relying on the facts they believe
25  existed in order to formulate their opinion with regard to

1  either source control or quantification.  10:44:4

2  MS. HEMMELHOCH: Yes.  10:44:5

3  And, for purposes of quantification, which is the  10:44:5
4  case I'm familiar with, certainly the BOP is mentioned often.  10:44:5
5  But it is not having to do with any of the issues that were  10:44:5
6  raised in Phase One, with the exception of I think some reports  10:44:5
7  that are now out of contention.  10:45:0

8  THE COURT: Out of play.  10:45:0

9  MR. MILLER: Our concern is the corollary of what Sarah  10:45:0
10  pointed out. So I'm not sure I feel better after Sarah's  10:45:1
11  comment or worse.  10:45:1

12  The concern we have is that how the flow rate  10:45:1
13  evidence impacted the positioning of the drill pipe insofar as  10:45:2
14  that relates to the functioning of the BOP. That is, how flow  10:45:2
15  rate between April 20th -- 9:47 on April 20th up until April  10:45:3
16  22nd, and how that flow rate impacted the positioning of the  10:45:4
17  drill pipe. Because that relates to how BOP functioned and  10:45:4
18  closed over certain portions of the drill pipe that might have  10:45:4
19  been crooked or off-center, so on and so forth. So there was  10:45:5
20  voluminous evidence put into the record in Phase One on that  10:45:5
21  issue.  10:45:5

22  MS. HEMMELHOCH: I mean, there's no question that BP's  10:46:0
23  experts have offered opinions on assumptions regarding the  10:46:0
24  location of the drill pipe. That, for instance, Dr. Gringarten  10:46:1
25  testified earlier this week about he has several options for the  10:46:1

1  way he calculated, and one is drill-pipe-high and one is
2  drill-pipe-low.  And that definitely is part of the evidence of
3  quantification.
4              I don't think, however, that that means that we're
5  talking about Phase One issues.
6          THE COURT:  I agree with that.
7              And, Kerry, maybe next week, you and I can have an
8  off-line discussion with Sarah and perhaps Rob about your
9  concern.
10         MR. MILLER:  That would be great.  We just don't want
11  to be prejudiced as it relates to the Phase One evidence that
12  went on in on flow rate and how it impacted the movement of the
13  drill pipe as it relates to Phase One issues.  Which is
14  Transocean's liability, potential liability.  Because of BOP,
15  it's pertinent.
16         THE COURT:  Rob?
17         MR. GASAWAY:  Your Honor, you're right.  Just like
18  we're not going to try our source control case in
19  quantification, we're not going to retry our Phase One case.
20             But Sarah's right, too.  We've got Dr. Nesic, who
21  talks about the impediment that the BOP would have interposed to
22  the flow.  We do have Dr. Gringarten who has drill-pipe-high and
23  drill-pipe-low as a scenario.  And we cannot be limited in our
24  ability to present evidence of quantification that concerns the
25  BOP, which was there during the entire flow.

1   THE COURT:  But I think -- and maybe we are just 10:47:4
2   cross-speaking, I don't know -- but all of this is inter-related 10:47:4
3   evidence.  But none of the evidence, as I understand what you 10:47:5
4   all are preparing for in Phase Two, is directed at the 10:47:5
5   functioning, the proper functioning or nonfunctioning, of the 10:48:0
6   BOP.  It is after the fact what happened. 10:48:0
7   MR. GASAWAY:  Exactly, Your Honor. 10:48:1
8   THE COURT:  And how that impacts source control and how 10:48:1
9   that impacts quantification. 10:48:1
10  MR. GASAWAY:  Right. 10:48:1
11  We've been the most zealous party in trying to 10:48:2
12  exclude additions to the Phase One evidence in Phase Two; and, 10:48:2
13  certainly, we're not trying to do that ourselves. 10:48:2
14  THE COURT:  Well, let me ask you all this question. 10:48:2
15  And, Kerry, I'm going to come back to you in a minute. 10:48:3
16  MR. MILLER:  Okay. 10:48:3
17  THE COURT:  We had been talking about further Phase Two 10:48:3
18  stipulations.  Is this the basis for something we can stipulate 10:48:3
19  to? 10:48:4
20  MR. GASAWAY:  Well, I was going to -- I thought you 10:48:4
21  were going to go a different direction, Your Honor. 10:48:4
22  THE COURT:  What other different direction did you 10:48:4
23  think I was going to go? 10:48:5
24  MR. GASAWAY:  I thought you were going to say the 10:48:5
25  following.  I thought you were going to say -- we'd talked about 10:48:5