UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | * * * * * | MDL NO. 2179<br><br>SECTION: J |
| THIS DOCUMENT RELATES TO ALL CASES | * | JUDGE BARBIER<br>MAGISTRATE JUDGE SHUSHAN |

**BP'S MEMORANDUM REGARDING
HALLIBURTON'S POST-TRIAL GUILTY PLEA AGREEMENT**

Halliburton's recent Cooperation Guilty Plea Agreement not only confirms that Halliburton intentionally destroyed critical evidence concerning the performance of its cement on April 20, 2010, it provides new evidence showing the extent of Halliburton's spoliation and the resulting prejudice to the Court, BP, and the other parties. As confirmed by the U.S. Government's admissions regarding the results of the destroyed evidence, Halliburton's pattern of destruction and spoliation has deprived the Court and BP of key evidence that would have refuted claims by the Government and Halliburton that the number of centralizers used on the Macondo well production casing allegedly contributed to the blowout.

**Background**

On July 25, 2013, Halliburton agreed to plead guilty to destroying evidence relating to its internal examination of the *Deepwater Horizon* accident. Halliburton admits that on separate occasions after the accident, its Cementing Technology Director directed two Halliburton employees (identified as "Program Manager" and "Employee 1") to run Displace 3D computer simulations to compare alternative predictions of the performance of Halliburton's cement job. (Ex. 1, Guilty Plea Agreement, at Ex. A ¶¶ 8-10.) After the employees showed their simulations to Halliburton managers, they were instructed to delete the results, which they did. (*Id.* at ¶ 9.)

In pretrial briefing, Halliburton identified the employees involved in the 3D modeling: "Anthony Badalamenti and Tommy Roth requested 3D-Modeling of the cement job on the production casing in the Macondo well," which "was performed by David Bedford and Mark Savery," and "[t]he results were shown to Badalamenti and Roth." (Rec. Doc. 4961 at 9.) Badalamenti was the Cementing Technology Director. (Tr. 3012:13-17 (Probert); 6813:22-6814:4 (Gagliano).) Although Bedford and Savery performed the modeling, the Plea Agreement does not specify which of the two is "Program Manager" and which is "Employee 1."

1

The Government's press release announcing the Plea Agreement explains that Halliburton conducted the computer simulations "to compare the impact of using six versus 21 centralizers" in the final production casing.  (Ex. 2, Press Release, Dep't of Justice (July 25, 2013), at 1.)  The first two simulations, run by the Program Manager in May 2010, "indicated that there was little difference between using six and 21 centralizers."  (*Id.*)  In June 2010, Halliburton's Cementing Technology Director (Badalamenti) asked Employee 1, who was more experienced at running Displace 3D simulations, to run two additional simulations, again comparing six versus 21 centralizers. (*Id.*)  According to the Government, "Employee 1 reached the same conclusion and, like Program Manager before him, was then directed to 'get rid of' the simulations."  (*Id.* at 1-2)

### The Significance Of The New Evidence

In its recent Post-Trial Reply Brief (filed just thirteen days before it signed the Guilty Plea Agreement), Halliburton stated:  "There is *no evidence* that HESI or its employees concealed or destroyed evidence."  (Rec. Doc. 10724 at 17 (emphasis in original).)  That representation is not accurate.  In fact, Halliburton's destruction of Displace 3D modeling was the subject of BP's pre-trial motion for sanctions (Rec. Doc. 4799) and is discussed in the sanctions motion BP filed during the Phase 1 trial after Halliburton announced that it had "discovered" a cement sample taken from the *Deepwater Horizon* (Rec. Doc. 8977).  Now, additional evidence has come to light bearing on BP's sanctions motion and on the litigation positions taken by Halliburton and the Government.

**A.      Halliburton Repeatedly And Deliberately Destroyed Relevant Results.**

In response to BP's first sanctions motion, Halliburton was not forthcoming with respect to the number of Displace 3D simulations it destroyed, the timing of the destruction, and how it occurred.  (*See* Rec. Doc. 4961 at 9.)  In subsequent briefing, HESI acknowledged that forensic

2

testing or recreation of the models would be necessary to recover the destroyed results (Rec. Doc. 5082 at 9-10) but again failed to inform BP and the Court of the extent and timing of the destruction.  As noted in the Plea Agreement, subsequent efforts to forensically recover the deleted computer simulations were unsuccessful.  (Ex. 1, at Ex. A ¶ 11.)  Halliburton's pretrial briefs even dismissed the relevancy of the deleted computer simulations, telling the Court that "any modeling that utilized Displace 3D software after the Incident is *completely irrelevant* to this litigation."[1]  (Rec. Doc. 6447 at 2, n.1 (emphasis added).)

       Halliburton has now revealed that four simulations were deleted—two by the Program Manager and two by Employee 1—and that those employees deleted their results at different times pursuant to separate instructions.  And contrary to its pretrial argument that the modeling was "completely irrelevant," Halliburton now admits that the post-incident modeling was done in order to "compare alternative predictions of the cement job in the production casing," and that it was under a legal obligation to preserve the evidence.  (Ex. 1, at Ex. A ¶¶ 7-8.)

       The Plea Agreement also reveals that Halliburton's spoliation was more deliberate than previously acknowledged.  In late 2011, when BP first asked Halliburton for the modeling, Halliburton responded simply that it was "gone."  (Rec. Doc. 4799-12.)  Then, in response to BP's first sanctions motion, Halliburton stated only that files "were deleted."  (Rec. Doc. 4961 at 9.)  During trial, in response to the Court's questioning, Halliburton's counsel acknowledged only that the modeling "was not preserved."  (Tr. 3171:17-19.)  Now, Halliburton admits that after its Cementing Technology Director (Badalamenti) "and possibly one other HESI senior manager" (presumably Roth, *see* Rec. Doc. 4961 at 9) saw the results of the first two

---

[1] Likewise, Halliburton first represented that the cement sample from the *Deepwater Horizon* it "discovered" during the Phase 1 trial had "nothing to do with this trial" (Tr. 3862:11-13), and then contended that the sample was "largely irrelevant" (Rec. Doc. 9022 at 9).

3

simulations, the Cementing Technology Director (Badalamenti) expressly directed the Program Manager to delete the results and the Program Manager did so despite being "uncomfortable." (Ex. 1, at Ex. A ¶ 9.)  Later, after Employee 1 showed the results of two other simulations to the Cementing Technology Director and "another manager" (again, presumably Roth), Employee 1 was instructed to delete those results, which Employee 1 did despite also feeling "uncomfortable."  (*Id.* at Ex. A ¶ 10.)  When the Program Manager later acknowledged his deletion to Employee 1, the Program Manager stated:  "I did what I was told." (*Id.* at Ex. A ¶ 9.)

The Plea Agreement confirms that Halliburton's spoliation of the modeling results was not isolated, accidental or irrelevant; rather, the destruction was done deliberately and intentionally, pursuant to instructions given after Halliburton managers had seen the modeling results, and with full awareness by all involved that it was wrong to delete the results.

**B.     The Results Refute The Allegations Of The Government And Halliburton.**

Throughout this litigation, the Government and Halliburton have criticized BP for installing six instead of 21 centralizers on the production casing.  For example, in his opening statement, Halliburton's counsel contended that BP rejected Jesse Gagliano's recommendation to use 21 centralizers and instead used six because BP was "trying to save time and money."  (Tr. 176:24-177:11.)  During trial, the Government's cement expert, Glen Benge, testified that BP's decision to use six instead of 21 centralizers on the Macondo well production casing "was going to result in a suboptimal cement job" and caused the cement to channel.  (*E.g.*, Tr. 2254:12-2255:12, 2305:9-2306:5; *see also* TREX 05990 (Benge Report) at 3, 16-19.)  In their post-trial proposed findings, the Government and Halliburton relied extensively upon Mr. Benge's testimony and expert report in contending that BP's centralizer decisions increased the risk of channeling and a blowout.  (*See, e.g.*, Rec. Doc. 10460-1 (U.S.) at ¶¶ 92, 103-06, ¶ 352; Rec. Doc. 10468 (Halliburton) at ¶¶ 156-89.)

4

The Government did not reveal the results of the destroyed models before the completion of the Phase 1 post-trial briefing, but it has revealed the results now. With respect to the two simulations run by the Program Manager, the Government has admitted that "[t]hese simulations indicated that there was little difference between using six and 21 centralizers." (Ex. 2 at 1.) Employee 1 ran two additional simulations and "reached the same conclusion," according to the Government. (*Id.*) This admission is consistent with evidence presented by BP at trial: an email from Halliburton's Vice-President of Cementing Tommy Roth, dated July 25, 2010, states that "[s]ubsequent testing with 3D" confirmed that, with six centralizers, "[s]pacer volume was sufficient to sweep entire anulus [sic] volume" of mud. (*See* Ex. 3, TREX 4352.)

## Conclusion

The Plea Agreement and press release reaffirm and magnify the prejudice to BP and the Court resulting from Halliburton's discovery conduct, and refute the litigation positions taken by the Government and Halliburton in this proceeding. This provides further support for an appropriate sanction, including an order finding that: (i) Halliburton's final cement design was unstable and a cause of hydrocarbons entering the wellbore, as requested in BP's pending sanctions motion (Rec. Doc. 9041 at 5); and (ii) the number of centralizers used on the Macondo well production casing did not cause the blowout of the well, as requested in BP's proposed findings of fact (Rec. Doc. 10467 at ¶¶ 1444-1453).

August 13, 2013                                    Respectfully submitted,

                                                /s/ Don K. Haycraft
Don K. Haycraft (Bar#14361)
R. Keith Jarrett (Bar#16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

J. Andrew Langan, P.C.
Matthew T. Regan, P.C.
Hariklia Karis, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
312-862-2000 (Tel)
312-862-2200 (Fax)

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
202-662-5985

*Attorneys for Defendants BP Exploration & Production Inc. and BP America Production Company*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 13th day of August, 2013.

/s/ Don K. Haycraft
Don K. Haycraft