UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig | * | CIVIL NO: |
| "Deep Water Horizon" in the | * | |
| Gulf of Mexico, on April 20, 2010 | * | |
| | * | |
| | * | SECTION: "J" (1) |
| This Document Applies to: | * | |
| No 12-970, Bon Secour Fisheries, Inc., et | * | JUDGE CARL BARBIER |
| al. v. BP Exploration & Production, Inc., | * | |
| et. al. | * | |
| | * | MAG. JUDGE SALLY SHUSHAN |

-----------------------------------------------------------------------------------------------

**MEMORANDUM IN SUPPORT OF ANDRY LERNER, LLC'S SECOND
MOTON FOR AN ORDER LIFTING STAY OF ANDRY LERNER
CLIENTS' CLAIMS PROCESSING**

I.      **INTRODUCTION**

On July 18, 2013, Andry Lerner LLC ("Andry Lerner") requested that this Court

lift a stay imposed in mid-June on the processing of 709 BP oil spill claims of 489 of its

clients pending an investigation of allegations that Lionel Sutton, a staff attorney with

Deepwater Horizon Economic & Property Claims Center ("DHEEC"), may have

improperly influenced the handling of those claims.  In the motion, Andry Lerner argued

that the stay had been unilaterally imposed without any due process protections such as

notice of the allegations and an opportunity to refute them.  In this pleading, movants re-

urge their request to have this Court lift the stay on all of the claims by the claimants that

Andry Lerner represents with the exception of Client A.

While Andry Lerner's initial request to lift the stay was not granted, at a hearing on July 19th, the Court indicated that it wanted to wait for the report of the Special Master Louis Freeh before making its determination. At the hearing, this Court specifically mentioned that, out of concern for the prejudicial impact on innocent claimants, it asked the Special Master to expedite the aspect of his investigation relating to the Andry Lerner clients' claims. After discussing the potential receipt of a referral fee, the Court, because of the extreme prejudice to the innocent clients, stated that:

> Because of that (the prejudice to the clients) I've asked Freeh to expedite his investigation, that part of his investigation in terms of what happened and whether there's any evidence beyond what we know now. Transcript of Proceedings, July 19, 2013, p37:17-22.

It is important for this Court to be cognizant of the fact that the constitutional deprivation outlined in the original Motion to Lift the Stay still exists and that such lack of due process, consistent with the arguments contained in movants original memorandum, warrants the lifting of the stay.

Andry Lerner submits that the additional facts discovered to date also warrant the lifting of the stay. It has been approximately three weeks since the hearing, during which time Andry Lerner has fully cooperated with Judge Freeh in his investigation. At this juncture, the record is devoid of any factual predicate upon which such a stay, vis-à-vis the Andry Lerner clients, can be grounded. Moreover, since the Freeh Group did not ask a single solitary question about any other claim other than Client A, there has not been and there will not be any evidence developed in the future about any issues associated with any of the other approximately 709 claims.

The current record clearly and unequivocally indicates that there is no evidence that any of the claims represented and submitted by Andry Lerner were improperly influenced. Pursuant to this Court's directive, a comprehensive review by three independent firms has conclusively established that there is no evidence that any of the law firm's clients' claims were processed or adjudicated based on anything other than the relevant policies and formulas consistently applied by DHEEC accountants and analysts under the Court's interpretation of the Settlement Agreement. These claims were subjected to such exhaustive review pursuant to this Court's instruction and the results were that -- two plus two equaled four – EVERY TIME. Similarly, the outside reviewers determined that there were no polices unduly influenced by Sutton or drafted by Sutton applicable to the Andry Lerner claims.

Judge Freeh's investigation has not focused on the Andry Lerner clients other than Client A claim. Undersigned counsel has attended the Special Master and his staff's interviews with several witnesses, including Jonathan Andry and three Andry Lerner employees. In those interviews, the questions did not refer to any other Andry Lerner clients other than Client A. Likewise the documents requested of various entities has only related to the Client A matter.  The Client A claim was evaluated and re-reviewed, as outlined in the Supplemental Juneau Report, and was independently verified as correct. Consequently, the Freeh investigation will not add any new evidence about the other clients of Andry Lerner.

The severe and irreparable prejudice to Andry Lerner clients and the law firm itself mounts with each passing day. Awards that should have been paid to deserving claimants are needed for them to run their business and pay off loans.  During the period the stay has been in effect, a number of other Andry Lerner client's claims would have been processed to final award.  The stay's continuation will only exacerbate the delay damages done to claimants who have nothing whatsoever to do with the investigation nor have they done anything wrong.

This financial devastation must be immediately halted.  It is has been more than eight weeks since the stay was imposed, in whole or in part, and more than three weeks since the Court instructed the Special Master to accelerate the investigation of the Andry Lerner claims.  More than sufficient time has elapsed to validate Andry Lerner's consistent contention that there is no evidence of a corrupt *quid pro quo* by which Sutton was paid any money to influence the law firm's clients' claims.

Pursuant to this Court's directive, Mr. Juneau had all of the Andry Lerner claims re-evaluated by several independent reviewers which revealed that all of the claims were properly processed and that there was no evidence of any impropriety or issue with any of the claims. The reason there is no such evidence is because the law firm, its principals, and its employees did not participate with Sutton, Reitano and/or anyone to improperly influence any claims. The firm has consistently pursued and handled these claims in a professional and ethical manner and, as such, it and the clients that it represents are 100% innocent of all of the allegations by the confidential informant and BP.

In light of the total lack of any evidence that the Andry Lerner clients' claims have been improperly processed and the grave, escalating damage to these clients and

their lawyers, supports the conclusion that this Court should lift the stay immediately. Such a conclusion is consistent with the fact that the unprecedented stay was imposed with no due process of law to Andry Lerner or the clients that it represents. Moreover, considering the fact that these claims were stayed, in whole or in part, for all or part of the past two months, Andry Lerner respectfully requests that all of these claims should be processed on an expedited schedule and that the claims that were or have become exigible should be paid immediately.

## II.     FACTS

The relevant facts are set forth in Andry Lerner's original moving papers and are incorporated here by reference. In a nutshell, the following facts are undisputed.

### A.     Procedural History

Sometime around June 20, 2013, this Court, without any notice or hearing, imposed a stay on all of the 709 claims filed by 489 clients represented by Andry Lerner. The stay was reportedly based on hearsay information provided by a confidential source to the DHEEC Administrator Patrick Juneau. In essence, the confidential informant claimed that a DHEEC staff attorney, Lionel Sutton, was receiving "kickbacks" for referring claims to the Andry Law Firm and/or Andry Law Group and/or Andry Lerner[1].

On July 2nd, the Court appointed Judge Freeh to conduct a thorough investigation of the entire DHEEC administration and in particular the handling of Andry Lerner clients' claims. On July18th, Andry Lerner moved to lift the stay on the basis that its

---

[1] The only information about the "Confidential Informant" and what he/she said is contained in the Welker Report. The version of the Welker Report that we have is redacted so we cannot discern which firm the informant implicated. Contrary to the informant's statements there was never a payment of any kind to Lionel Sutton by Andry Lerner or by John Andry.

clients had been denied due process and equal protection by the imposition of the stay, and no evidence justified such drastic action.

On July 19th, at the hearing on BP's emergency motion to stay processing of all claims, the Court declined to lift the stay on Andry Lerner clients' claims. Recognizing the significant damage to innocent claimants, the Court nonetheless indicated that it had instructed Judge Freeh "to expedite his investigation" of the handling of the Andry Lerner clients' claims. "I don't intend for this to be a lengthy hold or anything. In fact, I expect that fairly shortly, hopefully, we will get something from Mr. Freeh on that." Transcript of Proceedings, July 19, 2013, p, 37:19-23, 38:7-10. To Andry Lerner's knowledge, Judge Freeh has not yet given any report to the Court on stay of its clients' claims.

B.    **There Is No Evidence Of Improper Influencing of Andry Lerner Clients' Claims**

At the hearing, the Court summarized the state of the record as to the allegations that Sutton or his wife Christine Reitano did anything to influence claims' awards:

> "The internal investigation has not found any evidence that either of the two [staff attorneys] played any part in the actual processing of claims or that they improperly influenced the computation of claims. In fact, as the Court has noted, the claims are analyzed and computed by multiple layers of review and quality control within the program by different layers of analysts and accountants. And as the Court understands the process, it would be highly unlikely, if not impossible, that any single person would be able to falsely inflate or corrupt the processing of the claims at the Settlement Program.
>
>     "At the Court's request, Mr. Juneau's office has also performed an internal review of its policies which does not reveal . . . any improper influence by either of the two attorneys. . . .[There is a] lack of evidence of any improper influence to date on the actual calculation of claims . . . ."

Transcript of Proceedings, July 19, 2013, pp. 49:19-50:6, 50:17-18.

The Court's summary of the evidence was based on two reports filed by the Claims Administrator.

### 1.    Initial Juneau Report

The results of the Claims Administrator's internal investigation were summarized in the initial Juneau Report, dated July 2, 2013, and attached as Exhibit 5 of the PSC's opposition to BP's emergency motion.  In that report, Mr. Juneau informed the Court that three firms—PriceWaterhouse, Postlethwaite & Netterville, and BrownGreer—had independently reviewed processing of the award to the Andry Lerner clients.  A team of independent experts was also in the process of reviewing 141 Andry Lerner clients' claims for which Eligibility Notices had been issued.  *Id.*

In addition, the independent team reviewed 62 decisions appealed on the basis of a finding of "incompleteness" for which Reitano served as the documentation reviewer. In the four cases in which the initial decision was reversed, the evaluators "found no indication of wrongdoing in those instances." *Id.* at p. 4.

### 2.    Supplemental Juneau Report

On July 17, 2013, the Claims Administrator filed a supplemental report of his internal investigation of the Andry Lerner clients' claims.  *See* Exhibit B-1 (Document 10774-5, filed July 18, 2093).   The independent review team (PriceWaterhouse, Postlethwaite & Netterville, and BrownGreer) evaluated 18 BEL claims which had received eligibility notices, all of which were found to be correct.  *Id.* at pp. 2-3. BrownGreer reviewed 123 non-BEL claims receiving eligibility notices.  All but two were found in order, and the two exceptions did not relate to Sutton or Reitano.  *Id.* at p. 3. As for other numerous claims that are still being processed, all of them were found to

be in order with one exception not related to Sutton or Reitano. Finally, it was noted that Reitano's decision to reverse four denials based on incompleteness (referenced in the Initial Juneau Report) were not Andry Lerner clients. *Id.* at p. 5. Importantly, for the purposes of this renewed motion, all of Client A's claims, necessarily included in one or both of these groups, was processed correctly and without influence. Moreover, a review of tourism and real estate developer determinations "found no indication of wrongdoing" and concluded that "the individual decisions were appropriate and well founded in each instance." *Id.* at p. 6.

The Settlement Program Policies were comprehensively reviewed by a team consisting of PriceWaterhouse, Postlethwaite & Netterville, BrownGreer, and a Claims Administrator's Office representative. Focusing on the 203 policies which BP did not accept, the team concluded that they "are appropriate and are free of any undue or improper influence of Ms. Reitano or Mr. Sutton." *Id.* at p. 4.

The upshot of the two Juneau reports is the following:

(a)  the 146 BEL and non-BEL Andry Lerner clients' claims that received eligibility notices were correctly decided;

(b)  the law firm client's other claims being processed were found to be in order;

(c)  no wrongdoing was found with respect to tourism and Real Estate Developer determinations; and,

(d)  there was no evidence of any improper or undue influence by Sutton or Reitano as to program polices to which BP had objected.

Based on the elaborate internal and external checks and balances in place, it is inconceivable that any DHEEC staff member could affect the granting or amount of any award. As explained by Mr. Juneau's counsel at the July 19th hearing:

"There are multiple layers of professional vendors working in different locations under different supervisors that have to look at each claim. The claims are calculated for cause in one location and then for amount, if they qualify, in another.

"Once the eligibility notice goes out, all of the backup documentation is submitted to both parties to review . . . . It is intended to be an open process.

"And I think your Honor's observation is correct that in order to have that kind of impact on the calculation, you would literally need to have a conspiracy among professional vendors from PriceWaterhouse, Postlethwaite & Netterville, BrownGreer, in addition to others who are quality control checking all of this information. . . .

"We think that it is highly unlikely that that occurred. . . . But we have not been able to find any evidence that your Honor has asked about, that there is any impact on any particular calculation."

Transcript of Proceedings, July 19, 2013, at 22:1-21, 24-25, 23: 1.

### 3.     A Hold on Cases Not The Focus Of The Investigation Is Unwarranted

At the hearing, the Court noted that the Special Master's investigation as to claims processing was primarily focused on the Client A's award and whether there was any improper influence affecting its processing. *Id.* at 36:13-25. In other words, the propriety of the Claims Administrator's handling of 709 claims filed by 409 Andry Lerner clients was not the focus of the Judge Freeh's investigation.

The interviews of Mr. Andry and Andry Lerner personal conducted by the Freeh Group did not cover any of the Andry Lerner claims on hold other than the claims of Client A. These interviews were only focused on the facts surrounding and making up Client A's claims and whether there was any improper involvement of Sutton or Reitano. Likewise, the subsequent requests for documents were limited to the claims of Client A. The Special Master's laser beam concentration on the Client A matter makes eminent

9

good sense given the clean bill of health that the comprehensive reviews by three independent experts gave to all the other Andry Lerner clients' claims.

In light of these facts, there is no conceivable factual justification to continue to hold up processing of all the other Andry Lerner clients' claims and payment of final awards, while the Special Master's probe finalizes its inquiry into the Client A case and perhaps other matters. The predicate for any potential for a stay—questionable handling and/or alleged manipulation of any of the stayed claims—is utterly missing. In short, the anonymous allegation that Andry Lerner cases were tainted by a corrupt *quid pro quo* is conclusively refuted by true facts which conclusively establish that there was not any *quid, i.e.,* incorrect determinations or treatment of any Andry Lerner clients' claims.

Conspicuously, nor is there any evidence of an impermissible *quo, i.e.,* an "illegitimate" payment to Mr. Sutton. The payments made to Mr. Sutton were a referral fee for the Client A case which Mr. Sutton and Ms. Reitano handled before being employed by the Claims Administrator. This fee was not paid by Mr. Andry, Andry Lerner, The Andry Law Group and/or The Andry Law Firm. Instead, the payment was part of a separate obligation between Mr. Lerner and Mr. Sutton. Mr. Lerner felt compelled to pay after numerous representations by Mr. Sutton there was no issue because Mr. Sutton had disclosed to the Claims Administrator the fact that he was receiving the payments.

The payment of referral fees to referral attorneys are not "kickbacks", but instead are standard, customary, and lawful fees paid to the referral attorney. Referral fees are commonly paid as long as the referral attorney rendered meaningful legal services on the particular case. In the case of Client A, the facts indicate that the firm of Sutton Reitano

performed extensive and meaningful legal services on behalf of Client A prior to the time that Mr. Sutton and/or Ms. Reitano went to work at the facility. Accordingly, there was no illicit or illegitimate purpose or issue associated with Mr. Lerner's payment to Mr. Sutton of a referral fee on Client A's case.

Whether Mr. Sutton violated the Code of Conduct or his Employment Contract in accepting the fee, does not alter the fact that the reason for the undisputed payment was for past legal services preserved by the referral fee and not for the purpose of influencing any claim or award. In making these statements about such payment, undersigned is merely setting out the facts. The propriety and/or ramifications of such payment is an issue within the province of this Court which may be decided at a later date. At this juncture, these issues are totally irrelevant to all the other unquestioned Andry Lerner clients' claims.

4.     **Perpetuation Of The Stay Will Cause Further Irreparable Harm To Innocent Claimants and Their Attorneys**

In the original motion, Andry Lerner demonstrated that its clients and the law firm itself were suffering irreparable harm by imposition of the stay.

> "Unfortunately, with each passing day, AL's 439 clients and the law firm itself are being irreparably injured and will be even more irreparably injured in the future. The AL clients are being harmed by the failure to have their claims processed in the normal course of business at the DHECC. *They are effectively being put at the back of the line as all the other cases move forward. Id.* [Declaration of Christin Mancuso] at ¶ 13 (a).

> "The continued cessation of processing of AL clients' processing will result in delayed awards of tens of millions of dollars to deserving BP oil spill victims, *many of whom urgently need their awards to rebuild their lives, homes, and businesses.* These claimants justifiably expected that their claims would be expeditiously processed like all other claims. The injury that they are suffering is severe and inexplicable. *Id.* at ¶ 13 (b).

11

"In short, the *ex parte* imposition of an across-the-board suspension of the normal processing of AL clients' claims is causing and will continue to cause irreparable harm. The only antidote is the immediate resumption of claims processing."

Plaintiff's Memorandum In Support of Motion For An Order Lifting the Stay Of Andry Lerner Clients' Claims Processing, dated July 18, 2013, at pp. 11-12 (emphasis added).

With the passage of another three weeks, the harm to the Andry Lerner clients and the law firm has significantly worsened. For example, Client B should have been paid its award of $1,689,000 on June 25, 2013—more than six weeks ago. It would have and should have netted approximately $1,209,000. That money is critical to its business. There is no claim, much less evidence, that the handling of its award was anything but routine.

Client B is hardly the only innocent victim. According to the Claims Administrator, 141 claims receiving Eligibility Notices have been stayed. *See* Juneau Report, Attachment 6, dated July 2, 2013 (Document 10761-6). As of the date of this filing, Andry Lerner has approximately 3 million dollars that it has not received on behalf of its totally innocent clients. These clients and others on a daily basis are suffering irreparable harm. *Id.,* Paragraph 4.

Since the stay was imposed almost two months ago, the law firm has lost several clients who terminated the firm's services due to their claims being stayed. For example, only a few days ago, a client informed Andry Lerner that it was changing counsel because of the hold on its $3 million claim. This client had been with Andry Lerner since the days of the GCCF. The client stated that it was forced to change counsel because it could not afford for the stay imposed on its claim continue indefinitely.

All this massive irreparable harm in the future to 409 innocent clients and their lawyers who have done nothing improper in handling their cases can be prevented by lifting the stay.

**III.   ARGUMENT**

> "It never has been doubted . . . that notice and hearing . . . constitute basic elements of the constitutional requirement of due process of law. . . . **[T]he necessity of due notice and an opportunity of being heard is described as among the 'immutable principles of justice which inhere in the very idea of free government which no member of the Union may disregard.'** . . . [N]o one shall be personally bound until he has had his day in court was as old as the law, and it meant that he must be cited to appear and afforded an opportunity to be heard." *Powell v. State of Alabama*, 287 U.S. 45, 68 (1932) (citations omitted).

As discussed in Andry Lerner's original Motion to Lift the Stay, the imposition of the stay violated both procedural and substantive due process as well as the equal protection guarantee.  Any one of these constitutional deprivations mandates lifting the stay.

The initial motion to lift the stay demonstrated that the unprecedented action of staying 709 claims without notice or opportunity to be heard offended basic notions of due process and equal protection.  In our democratic society, "[t]he fundamental requisite of due process of law is the opportunity to be heard'" at "'a meaningful time and in a meaningful manner'" *before* any adverse decision is rendered. *Goldberg v. Kelly,* 397 U.S. 254, 267 (1970) (quoting *Grannis v. Ordeau,* 234 U.S. 385, 394 (1914) and *Armstrong v. Manzo,* 380 U.S. 545, 552 (1965) (emphasis added). **The individual losing benefits is entitled to a hearing before an impartial decision-maker, the right to confront and cross-examine witnesses and offer evidence, and the right to a written opinion setting out the evidence relied upon and the legal basis for the decision.** *Goldberg v. Kelly,* 397 U.S. at 267.  This jurisprudence dictates that Andry

Lerner and its clients *must* have been given notice and an opportunity to be heard and present evidence prior to this Court's imposition of the stay.

Not only was the process preceding the stay constitutionally infirm, the stay is also repugnant to the traditional cornerstone notions of "fair play and substantial justice." *Milliken v. Meyer,* 311 U.S. 457, 311 U.S. 463 . It is axiomatic that a government decision based on *no evidence* violates the substantive due process guarantee. *See, e.g., Thompson v. Louisville,* 362 U.S 199 (1960) (a conviction based on no evidence is a denial of due process). **The right to specific charges and a meaningful opportunity to defend** ***"presumes as well that a total want of evidence to support a charge will conclude the case in favor of the accused."*** *Jackson v. Virginia,* 444 U.S. 890, 901 (1971). The "no evidence" rule protects citizens from a "wholly arbitrary deprivation" of life, liberty, and property. *Id.*

In this case, it has been conclusively determined that there is no evidence establishing that any of the 709 Andry Lerner claims were improperly influenced. Indeed, an independent review by three firms found no irregularities or incorrect decisions, much less any tampering. Nor were any policies governing claims processing improperly influenced by Mr. Sutton or Ms. Reitano. Whatever the state of the record may have been when the stay was imposed, it is undisputed that the distinguished forensic investigators "have not been able to find any evidence that your Honor has asked about, that there is any impact on any particular calculation." Transcript of Proceedings, July 19, 2013, at 22:24-25, 23: 1. Accordingly, the stay should be immediately lifted.

## IV.   CONCLUSION

The record of this proceeding indicates that this Court imposed a stay on all of the claims being handled by the Andry Lerner firm. This Court imposed this stay in the form of a summary disposition without any notice and an opportunity to be heard afforded to Andry Lerner or its clients. The aforementioned jurisprudence indicates that such action is repugnant to the due process guarantees found in the United States Constitution.

It has been nearly a month since this Court made those statements and nearly a month since Mr. Freeh began his investigation. In that month, Andry Lerner has fully cooperated with the Special Master. The members of Andry Lerner and its personnel had to constantly adjust and move schedules and even brought a paralegal/claims handler back from maternity leave for an interview on a Saturday morning with her 21 day old baby. As discussed at length above, the Special Master has limited his investigation to the circumstances associated with the Client A case and has not even asked a single solitary question about the substance of the other claims being handled by Andry Lerner. Indeed, the Supplemental Juneau Report indicates that all of the Andry Lerner's claims have been extensively re-reviewed by independent investigators and that there was no error in Andry Lerner's calculation of any of these claims. These conclusions indicate that there is no evidence to justify the continued imposition of the unprecedented stay.

When the fact that there is "no evidence" is combined with the fact that Andry Lerner and its clients were not given any constitutionally guaranteed due process, the inescapable conclusion mandates that the stay of Andry Lerner's claims, except for Client A, should be lifted immediately. Accordingly, movants request that this Court lift the stay on all of the claims of claimants represented by Andry Lerner. Andry Lerner further requests that this Court order that all such claims that have been stayed, in whole or in

part, for the past month be processed on an expedited basis, and requests that the claims,

such as Client 2, that are exigible be paid forthwith.

Dated:  August 15, 2013

Respectfully submitted,

By: _____

James A. Cobb, Jr.  (La. Bar No. 4213)
Attorney & Counselor-at-Law
900 Emerald Street
New Orleans, Louisiana    70124
Telephone:       (504) 289-7830
Telefax:            (504) 582-2310
 E-mail:            jimcobb@jimcobblaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on **August 15, 2013,** I served the foregoing Renewed Motion

and supporting pleadings via e-mail to all counsel of record.

_____
James A. Cobb, Jr.