# ATTACHMENT 2

**1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL      )  MDL NO. 2179
BY THE OIL RIG        )
"DEEPWATER HORIZON" IN )  SECTION "J"
THE GULF OF MEXICO, ON )
APRIL 20, 2010       )  JUDGE BARBIER
                     )  MAG. JUDGE SHUSHAN

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
VOLUME 1
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Deposition of Adrian Johnson, Ph.D.,
taken at the Pan-American Building, 601 Poydras
Street, 11th Floor, New Orleans, Louisiana,
70130, on the 19th day of July, 2013.

**2**

A P P E A R A N C E S

APPEARING FOR THE PLAINTIFFS STEERING COMMITTEE:
   Mr. Michael R. Robinson
   IRPINO LAW FIRM
   2216 Magazine Street
   New Orleans, Louisiana  70130

APPEARING FOR BP, INC.:
   Mr. Granta Y. Nakayama
   KIRKLAND & ELLIS
   655 Fifteenth Street, NW
   Washington, D.C.  20005-5793

   Ms. Catherine E. Stahl
   KIRKLAND & ELLIS
   300 North LaSalle
   Chicago, Illinois  60654

APPEARING FOR TRANSOCEAN:
   Ms. Tamerlin J. Godley
   MUNGER TOLLES & OLSON
   355 South Grand Avenue, 35th Floor
   Los Angeles, California  90071-1560

APPEARING FOR ANADARKO PETROLEUM CORPORATION:
   Mr. Warren Anthony Fitch
   Mr. Duke K. McCall, III
   BINGHAM MCCUTCHEN
   2020 K Street, Northwest
   Washington, D.C. 20006-1806

APPEARING FOR HALLIBURTON:
   Mr. Sean W. Fleming
   Ms. Erika Toledo
   GODWIN LEWIS
   Renaissance Tower
   1201 Elm Street, Suite 1700
   Dallas, Texas 75270-2041

**3**

APPEARING FOR THE UNITED STATES:
   Mr. Thomas A. Benson
   Mr. A. Nathaniel Chakeres
   U.S. DEPARTMENT OF JUSTICE
   ENVIRONMENT & NATURAL RESOURCES DIVISION
   Ben Franklin Station
   Post Office Box 7611
   Washington, D.C.  20044-7611
   601 D Street, N.W.
   Washington, D.C.  20004

ALSO PRESENT:
   Mr. Peter Jennings, Videographer
   Mr. Phil Gonzales, Case Manager

**4**

INDEX
VIDEOTAPED ORAL DEPOSITION OF
ADRIAN JOHNSON, PH.D.
JULY 19, 2013
VOLUME 1

Appearances....................................... 2

Direct Examination-Mr. Benson................. 6

Changes and Signature....................... 386
Reporter's Certificate...................... 388

EXHIBIT INDEX

Ex. No.      Description           Marked

11561  Document titled FEESA Consultancy
       Services with Maximus; four pages    69

11562  Diagrams titled high drillpipe,
       low drillpipe, and no drillpipe;
       three pages                         259

11563  CD containing three Excel
       spreadsheets titled Johnson
       Maximus Outputs Drillpipe high
       July 15, Johnson Maximus Outputs
       Drillpipe high May 8,
       XAJX002-10-10                       267

11564  Excel spreadsheets depicting
       series of solution messages from
       Maximus model                       300

11565  Sperry-Sun Datalog; Excerpt of
       Exhibit TREX-63059; 51 pages        330

Worldwide Court Reporters, Inc.
PURSUANT TO CONFIDENTIALITY ORDER

5

1  11566  Printout of spreadsheet created
2         by Dr. Johnson to repeat
          Dr. Dykhuizen's calculation; four
          pages                    371
3
4
5         PREVIOUS EXHIBITS REFERENCED
6
          Ex. No.   Description        Page
7
8  7265  Appendix W., Report-Dynamic
         Simulations Deepwater Horizon
9        Incident BP; 60 pages         349
10 9361  Sandia Report DOE-NNSA Flow
         Analysis Studies Associated with
11       the Oil Release following the
         Deepwater Horizon Accident; Bates
12       Nos. DSE031-001794 - DSE031-001883   225
13 11488  Technical Review of US Government
          Expert Witness Reports on Flow
14        Rates from the MC252 Macondo Well,
          Expert Report of A.E. Johnson,
15        PhD, CEng, MIMechE dated May 1,
          2013; 130 pages               8
16
17
18
19
20
21
22
23
24
25

6

1         MR. BENSON:  I'm ready.
2         THE VIDEOGRAPHER:  All set?
3     Today is July 19th, 2013.  This is the
4  deposition of Dr. Adrian Johnson regarding the
5  oil spill of the Oil Rig DEEPWATER HORIZON in the
6  Gulf of Mexico on April 20th, 2010.
7     The time is 8:32 a.m.  We're on the
8  record.
9         ADRIAN JOHNSON, PH.D.,
10 was called as a witness by the United States and,
11 being first duly sworn, testified as follows:
12         DIRECT EXAMINATION
13 QUESTIONS BY MR. BENSON:
14     Q.  All right.  Thank you.
15        Hi, Dr. Johnson.  We met a moment ago off
16 the record.  Just for the record, my name is Tom
17 Benson.  I'll be asking questions on behalf of
18 the United States.  With me today is Nate
19 Chakeres.  We appreciate your time.
20     A.  (Nodding.)
21     Q.  Do you understand that you're under oath
22 this morning?
23     A.  I do.
24     Q.  Okay.  And the court reporter is going to
25 be taking down everything we say, so we both have

7

1  to speak clearly, and you have to answer --
2         THE COURT REPORTER:  Hold it.  Hold
3  it.
4     Peter, go fix that.  There's an echo.
5     Sorry, Tom.  She was turning up the
6  sound, and there was an echo.
7         MR. BENSON:  Yeah, I started hearing
8  it.
9     (Discussion off the record.)
10        THE VIDEOGRAPHER:  Are we off the
11 record.
12        MR. BENSON:  I think so.
13    (Loud noise.)
14        MR. BENSON:  Maybe not.
15        THE COURT REPORTER:  Go ahead.
16        MR. BENSON:  Okay.
17        THE WITNESS:  Should this be
18 reflecting what I'm saying?
19        THE COURT REPORTER:  Yes, sir.
20    (Discussion off the record.)
21    Q.  (By Mr. Benson) Okay.  Ready?
22    A.  Yeah.
23    Q.  (By Mr. Benson) So as I was saying, just
24 be careful to speak clearly, and you have to
25 answer in words.  You can't nod or say "M-h'm" or

8

1  anything like that.
2     A.  Okay.
3     Q.  Does that make sense?
4     A.  Yeah.
5     Q.  Thank you.
6     A.  I'll try to wherever I can.
7     Q.  Thank you.
8        If you don't understand a question that
9  I'm asking, just let me know, and I'll rephrase
10 it.  If you do answer the question, I'll assume
11 that you understood it.
12        Does that make sense?
13    A.  It does.
14    Q.  Okay.  Have you ever been deposed before?
15    A.  No.
16    Q.  Okay.  If you open your binder to Tab, 1
17 Volume 1, the first exhibit there, and it's been
18 previously marked as 11488.
19        Do you see that?
20    A.  I do.
21    Q.  And is that a copy of your Expert Report
22 in this case?
23    A.  (Reviewing document.)  Yes, it does
24 appear to be.
25    Q.  And does your Expert Report that's

2 (Pages 5 to 8)

9

1   Exhibit 11488 set forth all the opinions that you
2   have in this case?
3       A. Yes.  Yes.  I am awaiting some
4   information from Dr. Pooladi-Darvish, some models
5   that we asked for, and when I receive those,
6   obviously, I might have some -- put some views on
7   those that might form some opinion.
8       I also have, of course, some views on
9   Rebuttal Reports I received after the submission
10  of -- of this Report.
11      Q. Okay.  And so putting aside those two
12  things that you mentioned, any views you might
13  have on Rebuttal Reports that you received after
14  your Expert Report, and the information that you
15  are awaiting from Dr. Pooladi-Darvish, you don't
16  have any other opinions associated with this case
17  other than what's in your Expert Report?
18      A. I don't believe --
19          MR. NAKAYAMA:  Objection, form.
20      A. I don't believe so, no.
21      Q. (By Mr. Benson) Okay.  What's the
22  information you're awaiting from
23  Dr. Pooladi-Darvish?
24      A. He used the Maximus software, the FEESA
25  Maximus software, used one -- one of -- at least

10

1   one of the models we sent him as a result of
2   doing the work in this Report to generate some
3   reservoir hydraulic tables.
4       There's a facility in the software to
5   specifically generate tables that are useful to
6   Reservoir Engineers in producing model -- doing
7   modeling for the reservoir, and they need Lookup
8   Tables of all the system downstream of the
9   reservoir basically.  And Maximus has the
10  facility to produce those tables for the
11  Reservoir Engineers, and he used that facility.
12  That's evident from his Rebuttal Report.
13      And we wanted to look at those files and
14  look at the input because there's some aspects of
15  what he's done in his Rebuttal Report that,
16  without the input, we don't know quite what he's
17  done, so we just wanted to get to the bottom of
18  that.
19      Q. Okay.  And getting that information would
20  inform any opinions you might have about
21  Dr. Pooladi-Darvish's Rebuttal Report; is that
22  fair?
23      A. It could have an impact on it, yes.
24      Q. Okay.  And you mentioned that you might
25  have some opinions about other Rebuttal Reports

11

1   that were served after your Expert Report; is
2   that right?
3           MR. MCCALL:  Objection, form.
4           MR. NAKAYAMA:  Objection, form.
5       A. I have some views on the Rebuttal
6   Reports.
7       Q. (By Mr. Benson) Okay.  Whose Rebuttal
8   Reports in this case have you read?
9       A. I've read Dr. Griffiths' Rebuttal Report,
10  Dr. Dykhuizen's Rebuttal Report.  I've read the
11  relevant bits of Dr. Pooladi-Darvish's Rebuttal
12  Report, not all of it.  I think that's it.
13      Q. Okay.  And we may get into that a little
14  bit later.
15      A. Sure.
16      Q. If there's -- if there's pieces that --
17  of your opinion that have come after your Report,
18  just let me know, as we talk about this.
19      A. (Nodding.)
20      Q. Do you have any corrections that you
21  would like to make to your Report at this time?
22      A. H'm.  They -- well, in reading the
23  Report, I -- I see there are a -- few typos in
24  there.
25      I -- Dr. Dykhuizen, in his Rebuttal

12

1   Report, pointed out the -- that I used a velocity
2   in the Top Hat skirt calculation which was the
3   wrong velocity for the -- the K value.  It wasn't
4   consistent with the K value that I was using.  I
5   have, however, submitted a -- a revised
6   calculation there, and -- and -- and that -- that
7   didn't change my -- my general conclusion for
8   that calcu -- for that skirt calculation.
9       Q. Okay.
10      A. Other than that, no, I don't believe so.
11      Q. Okay.  And we'll talk about that Top Hat
12  calculation a little bit later on.
13      A. Okay.
14      Q. Are you able to summarize your opinions?
15  You've -- you've made a lot of criticisms in your
16  Report about the work of Dr. Griffiths and
17  Dr. Dykhuizen.  Are you able to summarize your
18  opinion regarding Dr. Griffiths?
19          MR. NAKAYAMA:  Objection to form.
20      A. On what sort of points do you want me to
21  concentrate on?  I mean, I could go on for a --
22  probably a long time.
23      Q. (By Mr. Benson) And -- and, obviously, we
24  have the whole Report.
25      A. Yeah.

3 (Pages 9 to 12)

365

1        MR. NAKAYAMA: Objection, form.
2      A. I think I understand your question.
3    You're asking have I run any sensitivities to
4    assess the uncertainty in PT-B and the effect of
5    that on Dr. Griffiths' calculation. Is that what
6    you're asking?
7      Q. (By Mr. Benson) Sure. That's a good way
8    to say it.
9      A. Okay. Then the answer is "No," I haven't
10   run any sensitivities of the effects of PT-B on
11   Dr. Griffiths' results, but it could easily be
12   done, and it would have an effect, and should
13   have been done as part of the -- the analysis of
14   the range of uncertainty.
15     Q. Okay. Let's turn to Dr. Dykhuizen's work
16   for a moment. You're aware that he did a
17   calculation of the flow rate based on the Top
18   Hat, correct?
19     A. Correct.
20     Q. Okay. And during the Top Hat period,
21   there were three sources of flow, the vents, the
22   skirt, and what was being collected. Is that
23   accurate?
24     A. There were three -- in -- in our
25   terminology they're more sinks of flow than

366

1    sources of flow. The source of flow is -- is the
2    reservoir --
3      Q. Okay.
4      A. -- of course.
5      Q. So there were three different places that
6    flow was going. Is that a fair way to say it?
7      A. Yeah.
8      Q. And those are those three ways. Okay.
9        And you -- you haven't put -- you haven't
10   raised any criticism of Dr. Dykhuizen's
11   calculation of the vent flow, have you? There's
12   none of that in your Report?
13     A. I repeated Dr. Dykhuizen's vent flow
14   using Dr. Dykhuizen's assumptions, and for those
15   assumptions, I get pretty much the same number he
16   did. Of course, we can vary those assumptions,
17   such as we could -- one of the assumptions is
18   that the -- the vents were open all of that time,
19   and that is an assumption that's not -- not a
20   certainty.
21       So we could vary that flow rate based on
22   closing some of the vents for part of the time,
23   and it would, obviously, change the flow rate.
24     Q. Okay. But the opinions that you've
25   expressed in your Report, you haven't raised any

367

1    concerns about Dr. Dykhuizen's vent flow
2    calculation. Correct?
3      A. Given the assumptions that Dr. Dykhuizen
4    has used, I agree with his vent flow for those
5    assumptions, but, obviously, we can have -- we
6    can vary those assumptions, such as the
7    uncertainty of whether the vents were open all
8    the way through that period.
9      Q. Okay. But you don't discuss those
10   assumptions in your Report, do you?
11     A. The change in opening or closing of the
12   vents?
13     Q. Correct.
14     A. No, I don't believe I do.
15     Q. Okay.
16       (Discussion off the record.)
17     Q. (By Mr. Benson) And are there -- are you
18   aware of whether there are logs of what the ROVs
19   are doing at the time?
20     A. Am I aware of where -- whether there are
21   logs of what the ROVs are doing at the time, at
22   the time of?
23     Q. The Top Hat.
24     A. The Top Hat. I'm aware that there are
25   logs of what the ROVs are doing, and I'm aware

368

1    that there's video footage from ROVs, yes.
2      Q. Okay. And have you reviewed those logs
3    and that video footage?
4      A. I've looked at various logs. I've looked
5    at various footage, yes.
6      Q. Okay.
7        (Discussion off the record.)
8      Q. (By Mr. Benson) And do you have any -- do
9    you have any reason to believe that the vents
10   were, in fact, closed for any particular period
11   of the Top Hat?
12     A. I believe there's uncertainty on whether
13   all the vent -- all -- all the three vents were
14   open throughout the whole period.
15     Q. Okay.
16     A. But I don't -- I don't know the details.
17     Q. Okay. So that's -- that's not something
18   you're opining about here?
19     A. I'm not giving an opinion on whether
20   vents were open or closed. I've just simply
21   repeated Dr. Dykhuizen's calculation to check his
22   calculation based on his assumptions.
23     Q. Okay. And then we talked about
24   collection. The collection numbers that
25   Dr. Dykhuizen used were reported by BP, correct?

92 (Pages 365 to 368)

369

1    MR. NAKAYAMA:  Objection to form.
2    A.  Yes.  Yes, I believe so.
3    **Q.  (By Mr. Benson)  Okay.**
4    A.  Well, I -- the Reports, I'm not sure if
5    they came directly from BP, but they were
6    reported, yes, the collection numbers.
7    **Q.  Okay.  And so you're not challenging the**
8    **correct -- the collection numbers that**
9    **Dr. Dykhuizen used?**
10    MR. NAKAYAMA:  Objection, form.
11    A.  The numbers he used, I think, pretty much
12    matched the numbers I've seen from documents I've
13    reviewed.
14    **Q.  (By Mr. Benson)  Okay.  So that -- that's**
15    **a "No," you're not challenging?**
16    A.  I don't think I'm making any challenge of
17    that, no.
18    **Q.  Okay.**
19    A.  No.
20    **Q.  And you would agree that there was flow**
21    **through the skirt throughout the time that the**
22    **Top Hat was in place, correct?**
23    MR. NAKAYAMA:  Objection, form.
24    A.  Well, I've not reviewed all the video of
25    the Top Hat skirt throughout the whole period

370

1    that it was on.  It was quite a considerable
2    period.  So I can't -- I don't know if
3    Dr. Dykhuizen reviewed all that.  I've got a
4    feeling he said in his deposition that he'd only
5    reviewed a small portion of the video.
6    So without reviewing all that video, it's
7    not possible to say whether there was flow out of
8    the skirt throughout that period or not.
9    **Q.  And let me ask it this way:  You're not**
10    **aware of any period in which there was no flow**
11    **out the skirt?**
12    A.  Like I say, without reviewing all of the
13    video evidence for the Top Hat skirt, I wouldn't
14    be able to say whether there was flow out of that
15    skirt throughout that period or not.
16    **Q.  Okay.  And based on the review you did**
17    **do, you have no evidence that there was ever a**
18    **time when there was no flow, correct?**
19    MR. MCCALL:  Objection, form.
20    MR. NAKAYAMA:  Objection, form.
21    A.  Repeat my previous answer.
22    **Q.  (By Mr. Benson)  Okay.  In reviewing the**
23    **video that you did review, did you notice any**
24    **differences in the skirt flow, depending on**
25    **collection?**

371

1    A.  I've not looked at the skirt flow video
2    to try and assess that, so I -- I wouldn't be
3    able to comment on that.
4    **Q.  Okay.  Let me ask you to look at**
5    **exhibit -- I'm sorry, Tab 12, which is in your**
6    **second binder.**
7    A.  Tab 12.  Okay.
8    **Q.  And if we could, mark this as our next**
9    **exhibit.**
10    **(Exhibit No. 11566 marked.)**
11    THE COURT REPORTER:  11566.
12    MR. BENSON:  Thank you.
13    **Q.  (By Mr. Benson)  And do you recognize this**
14    **document, Dr. Johnson?**
15    A.  Yes.  This looks like a printout of the
16    spreadsheet I created to repeat Dr. Dykhuizen's
17    calculation, and a number of calculations behind
18    that.
19    **Q.  Okay.  And just to walk through it**
20    **quickly, the first page is your replication of**
21    **Dr. Dykhuizen's vent flow calculation.  Correct?**
22    A.  Yes, I believe so.
23    **Q.  And then the next three pages are skirt**
24    **flow calculations with varying assumptions.  Is**
25    **that right?**

372

1    A.  Yes, I believe so.
2    **Q.  Okay.  And this document was produced**
3    **after your Expert Report, correct?**
4    A.  I think these are printouts of the
5    document that was produced after the Expert
6    Report, yes.
7    **Q.  Okay.  And it came after Dr. Dykhuizen's**
8    **Expert Report?**
9    A.  Obviously, it came after Dr. Dykhuizen's
10    Expert Report, because my work was based on --
11    **Q.  True.**
12    A.  -- looking at his Expert --
13    **Q.  It came --**
14    A.  -- Report.
15    **Q.  Sorry.  It came after Dr. Dykhuizen's**
16    **Rebuttal Report?**
17    A.  Correct.
18    **Q.  Okay.  And so why did you do this new**
19    **analysis, after seeing Dr. Dykhuizen's Rebuttal**
20    **Report?**
21    MR. MCCALL:  Objection, form.
22    A.  Dr. Dykhuizen pointed out -- I think I
23    mentioned it earlier in the day --
24    **Q.  M-h'm.**
25    A.  -- when you were asking about any

93  (Pages 369 to 372)

373

```
 1   corrections to the Report, my Report,
 2   Dr. Dykhuizen pointed out that I'd used a K value
 3   that was consistent with the upstream velocity,
 4   whereas, he'd been using K values consistent with
 5   the velocity at the exit of the skirt.  And so
 6   I'd used the velocity at the exit of the skirt
 7   with my K value, and those two were inconsistent.
 8        This is a repeat of my calculation, but
 9   using the velocity upstream, instead of velocity
10   at the exit of the skirt.
11        Q.  Okay.  And so did you agree with
12   Dr. Dyk -- the point that Dr. Dykhuizen made,
13   that you had used the wrong K value, or the K
14   value you used was inconsistent with the velocity
15   you were using?
16           MR. NAKAYAMA:  Objection, form.
17        A.  I think, by virtue of the fact that I'd
18   repeated the calculation, I think, yes, I --
19        Q.  (By Mr. Benson) Okay.
20        A.  -- I agree -- I agree with that.  Yes.
21   Yeah.  I would normally use a K value -- I think
22   it's very unusual to use a K value at the
23   restriction of a point like this, you know, so
24   the -- the -- the -- the narrow exit, because
25   there's -- there's often great uncertainty around
```

374

```
 1   that, especially in this -- the cases we're
 2   looking at for the Macondo Well, where we're
 3   looking at varying restrictions that --
 4   restrictions that vary with time, because of
 5   erosion, because of damage, et cetera.
 6        So to use a velocity at an exit is quite
 7   unusual.  To use a velocity in the upstream
 8   section, which is usually a pipe or, in this
 9   case, the body of the Top Hat, is -- is more
10   normal, because you would -- you would be able to
11   measure the flow at that point, and be able to
12   know what the flow is at that point, in some
13   system where, you know, you -- you can actually
14   measure it.
15        So I think that's where the confusion
16   arose, that it's not a normal thing to do, to use
17   the velocity at the -- at the mouth of something
18   like this.
19        Q.  Okay.  And then can -- so walk me through
20   the three pages we have here of skirt
21   calculations.  Which is the corrected
22   calculation?
23        A.  I think they're all the corrected
24   calculation.
25        Q.  Okay.  So you have three different
```

375

```
 1   calculations, and then, in the upper left, as you
 2   read it, on each page, there's a little note in
 3   red.  Is that correct?
 4        A.  Yes.
 5        Q.  Okay.  And that is -- that talks about
 6   the different skirt you would use -- the
 7   different K value you would use in each of those
 8   instances?
 9        A.  Different K value, and based on a
10   different -- the different velocity, whether it's
11   upstream or at the -- at the opening.
12        Q.  Okay.  And when you do those
13   calculations, you have a range of total skirt
14   flow from 38 -- I'm sorry, 34,852, if the K value
15   is 2 -- well, let me -- let me walk this through
16   differently.
17        So the first is K value equals 2 at the
18   skirt opening velo -- and the skirt opening
19   velocity, correct?
20        A.  Correct.
21        Q.  And the -- the flow rate that you cre --
22   you calculated was 34,852, correct?
23        A.  Correct.
24        Q.  Okay.  The second skirt calculation has a
25   K of 700 and an upstream velocity.  Is that
```

376

```
 1   correct?
 2        A.  Correct.
 3        Q.  And the flow calculation there is 27,751,
 4   correct?
 5        A.  Correct.
 6        Q.  And then the third calculation has a K
 7   of 3, at the opening, and the opening velocity,
 8   and the calculation is 28,456.  Correct?
 9        A.  Correct.
10        Q.  Okay.  Do you have an opinion about which
11   of those is the most accurate analysis?
12           MR. NAKAYAMA:  Objection, form.
13        A.  What I'm aiming to do here is look at
14   some of -- again, look at some of the range of
15   uncertainty, and I mention in my Report that this
16   is a very uncertain calculation.
17        I wouldn't -- as an Engineer, I wouldn't
18   have presented this calculation in a Technical
19   Report like this, because of the huge range of
20   uncertainty on it.
21        We've got very low pressure differences
22   from the inside of the Top Hat to the outside.
23   We've got huge uncertainty around the geometry of
24   the flow path going out of the Top Hat through
25   the skirt.  We've got huge uncertainty around the
```

94 (Pages 373 to 376)

377

1  opening of the skirt.  We don't know how much of
2  the -- the seal that was -- that was put around
3  the edge -- the bottom of the skirt is intact,
4  and we know -- at the end of the incident, when
5  the Top Hat is retrieved, we know that it's not
6  all intact, but some of it's there.
7       So there are enormous uncertainties in
8  this calculation.  And I think I mention in my
9  Report that simply changing the pressure by half
10 a psi, you can halve the flow rate out of that
11 skirt, the calculation flow rate out of that
12 skirt.
13      And what these three calculations are
14 doing is basically looking at a few of those
15 variations of K value, not variations of pressure
16 in this case.
17      But even doing -- doing that, the
18 variation of K value, you can see that there are
19 variations in the -- the number that's
20 calculated.
21      And this is used as some lower bound
22 calculation, but I think -- I don't -- I don't
23 think this -- these numbers that Dr. Dykhuizen
24 has calculated here, flow rate out to the skirt,
25 are at all reliable, because of the huge range of

378

1  uncertainty.
2       Q.  Well, you say there's a huge range of
3  uncertainty.  Have you done anything to quantify
4  that range of uncertainty?
5       A.  I think I've said I -- didn't I just say
6  I have, to some degree?
7       Q.  You may have.
8       A.  I mean, I've not looked at the full
9  range, but I've demonstrated that there is a huge
10 range of uncertainty.
11      Q.  Well, so the range of uncertainty that
12 you've quantified through the skirt is from
13 34,852 to 27,751?
14      A.  No.
15           MR. NAKAYAMA:  Objection, form.
16      A.  No, no.
17      Q.  (By Mr. Benson) Okay.  Well, explain to
18 me what you did.
19      A.  Well, as I say, if I reduce the pressure
20 by half a psi, and bear in mind, half a psi is --
21 is a very, very small change in pressure, and
22 that can vary the skirt flow -- that can halve
23 the skirt flow in this calculation, and I mention
24 that in the Report.
25      And that's still true of the -- the

379

1  revised calculation that I presented after the
2  Rebut -- Rebuttal Report.
3       Q.  Okay.  So other than saying that a change
4  in the psi could halve the flow rate -- I mean,
5  you say a change in the psi.  We're talking about
6  just the flow rate from the skirt, correct?
7       A.  Yes.
8       Q.  Okay.
9       A.  Correct.  And that's only one of the
10 uncertainties, of course.  The pressure, that
11 has a big effect.
12      Another uncertainty that I didn't -- I
13 didn't try to vary, but would have an enormous
14 effect, as well, is changing the open area of the
15 skirt.  As I say, we don't know the geometry, we
16 don't know the -- the actual open area of that
17 skirt.  So what Dr. Dykhuizen has done is made
18 some assessment of that, but there's, again, a
19 range of uncertainty around that assessment, and
20 that needs to be tested out.
21      So we could -- I think you could pretty
22 much end up with whatever number you wanted
23 coming out of that skirt, by varying these
24 various factors, pressure, open area of the
25 skirt, and assumptions on geometry of the skirt,

380

1  as the flow goes out, and the effect that might
2  have on K values, for example.
3       Q.  Okay.  But, as you say, other than the
4  pressure, you didn't do anything to quantify the
5  uncertainty from those other characteristics that
6  you mention?
7       A.  I think this is such an unreliable
8  calculation, that I didn't spend a huge amount of
9  time trying to -- trying to do that.  I could
10 have gone into doing all sorts of variations of
11 these various factors that I've already
12 mentioned, and would have come out with a very
13 large range of flow rates out of that skirt.  So
14 I -- I don't find it a reliable calculation.  I
15 don't believe Dr. Du -- Dykhuizen believes it's
16 a reli -- reliable calculation, either.
17      Q.  Why don't you believe that?
18      A.  Well, I think it's -- I think they said
19 that earlier on in -- during the response, that
20 they didn't believe the skirt flow rate to be a
21 reliable calculation.
22      Q.  You would agree with Dr. Dykhuizen,
23 however, that there's some flow coming out of the
24 skirt, correct?  It's not zero?
25           MR. NAKAYAMA:  Objection, form.

95 (Pages 377 to 380)

381

1     A.  There is video evidence that there is
2  flow coming out of the skirt.
3     Q.  (By Mr. Benson) And let me -- so turning
4  back to your Expert Report, on Page 42, you would
5  agree that BP, for about, it looks like two
6  weeks, collected 25,000 barrels -- I'm sorry.
7     A.  Just a moment.
8     Q.  I apologize.
9     A.  That's okay.  I'm going in.  All right.
10    Q.  I'm looking at your Figure 14 on Page 42.
11    A.  Page 42, Figure 14.  Yes, okay.
12    Q.  Okay.  So you would agree -- and,
13 actually, it says here, right under the Figure,
14 it says: "...the collection...rate from both
15 vessels reaches 25,000" barrels per day "only for
16 approximately the last 2 weeks of the Top Hat
17 being in place..."
18    Do you see that?
19    A.  Yes.
20    Q.  Okay.  And do you -- do you you have any
21 reason to believe that the col -- that the
22 overall flow rate was increasing -- yeah, strike
23 that.
24    A.  I'll answer it, if you want.
25    Yes, I do.

382

1     (Laughter.)
2     Q.  (By Mr. Benson) Okay.  Let me ask you to
3  look at Figure 14, which I think you're already
4  looking at.  And you see there's some bouncing
5  around in the collection data, largely for the
6  DISCOVERER ENTERPRISE.  Is that right?  From
7  roughly July 1st to June 16th?
8        MR. NAKAYAMA:  Objection, form.
9     Q.  (By Mr. Benson) Do you see that on the
10 chart?
11    A.  Yes, yes.  Correct, yes.
12    Q.  Okay.  And do you think that reflects
13 changes in the day-to-day flow rate?
14    A.  Do I think -- sorry.
15       MR. NAKAYAMA:  Objection, form.
16    A.  Can you clarify what you mean there?
17    Q.  (By Mr. Benson) Right.  So if -- if the
18 total flow rate has -- I'm sorry, the total
19 collection rate is 25,000 one day, and 16,000 the
20 next, and 23,000 the day after that, do you think
21 that's because the total flow rate is changing in
22 that proportion, or is that a function of getting
23 the kinks ironed out of the collection process?
24       MR. NAKAYAMA:  Objection, form.
25    A.  The "kink," are you referring to the

383

1  "kink"?
2     Q.  I'm sorry.  I'm not referring to --
3  getting the kinks out in a colloquial sense,
4  not a --
5     A.  Right, not in the riser --
6     Q.  -- petroleum sense.
7     A.  -- bent riser sense?
8     Q.  Exactly.
9     A.  Okay.  Sorry.  I've lost track of what
10 your question was now.  Can you repeat it,
11 please?
12    (Laughter.)
13    Q.  (By Mr. Benson) I think we all have.
14    To the extent that there are these big
15 fluctuations day-to-day in what's collected, is
16 that -- do you believe that's a result of
17 corresponding proportionate changes in the total
18 flow rate, or is that a result of getting the
19 process ironed out for collection?
20       MR. NAKAYAMA:  Objection, form.
21    A.  They -- it could be a bit of either, and
22 both.
23    Q.  (By Mr. Benson) Okay.  So you're not
24 sure?
25    A.  No.

384

1     Q.  Okay.  Did you ever consider modeling the
2  Top Hat in Maximus?
3     A.  The only modeling of the Top Hat we did
4  for this work was the repeat of Dr. Dykhuizen's
5  calculation.  We could model the Top Hat in
6  Maximus to some degree.  Does that answer your
7  question?
8     Q.  You're saying it could be done, but you
9  didn't do it here?
10       MR. MCCALL:  Objection, form.
11    A.  We didn't do it here.
12    Q.  (By Mr. Benson) Okay.  And why not?
13    A.  Because it wasn't part of what we were
14 trying to do.
15    Q.  Okay.  Why wasn't it part of what you
16 were trying to do?
17    A.  Because it wasn't part of what we were
18 trying to do.
19    Q.  Well, I mean, I guess you've said that a
20 number of times over the course of the day.  Why
21 wasn't getting flow rate part of what you were
22 trying to do?
23       MR. MCCALL:  Objection, form.
24       MR. NAKAYAMA:  Objection, form.
25    A.  It wasn't within the scope of what we

385

1  were asked to do.
2      **Q. (By Mr. Benson) Okay.  And if someone had**
3  **asked you to do that, you could have done it?**
4      MR. NAKAYAMA:  Objection, form.
5      A.  If someone had asked us to do what?
6      **Q. (By Mr. Benson) Well, in this case, to**
7  **model the -- model the flow from the Top Hat**
8  **during that period.**
9      A.  If someone had asked us to do it, I'm
10  sure we would have -- we would have done it, yes.
11      **Q.  Okay.  Do you think that's something you**
12  **could have done accurately in Maximus?**
13      A.  We could have done it in -- in Maximus at
14  least as accurately as spreadsheet calculations,
15  and I would suggest far more accurately.
16      (Discussion off the record.)
17      MR. BENSON:  Let's go off the record
18  and come back tomorrow.
19      THE WITNESS:  Okay.  I'm happy to do
20  that.
21      THE VIDEOGRAPHER:  It's 6:15 p.m.
22  We're going off the record, ending Tape 8.
23      (Deposition recessed at 6:15 p.m.,
24  resuming on Saturday, July 20, 2013, at
25  8:30 a.m.)

386

1      CHANGES AND SIGNATURE
2  WITNESS NAME:  ADRIAN JOHNSON, PH.D.
3  DATE OF DEPOSITION:  JULY 19, 2013
4  PAGE LINE      CHANGE          REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

387

1
2      I, ADRIAN JOHNSON, PH.D., have read the
3  foregoing deposition and hereby affix my
4  signature that same is true and correct, except
5  as noted on the attached Amendment Sheet.
6
7      ADRIAN JOHNSON, PH.D.
8
9
10  THE STATE OF _____)
   COUNTY OF _____)
11
      Before me, _____, on
12  this day personally appeared ADRIAN JOHNSON,
   PH.D., known to me (or proved to me under oath or
13  through _____) to be the
   person whose name is subscribed to the foregoing
14  instrument and acknowledged to me that they
   executed the same for the purposes and
15  consideration therein expressed.
      Given under my hand and seal of office this
16  _____ day of _____, 2013.
17
18
19      _____
   NOTARY PUBLIC IN AND FOR
20  THE STATE OF _____
   COMMISSION EXPIRES: _____
21
22
23
24
25

388

1      UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF LOUISIANA
2
3  IN RE: OIL SPILL    ) MDL NO. 2179
   BY THE OIL RIG      )
4  "DEEPWATER HORIZON" IN ) SECTION "J"
   THE GULF OF MEXICO, ON )
5  APRIL 20, 2010      ) JUDGE BARBIER
               ) MAG. JUDGE SHUSHAN
6
7
8
9      REPORTER'S CERTIFICATION
   TO THE ORAL AND VIDEOTAPED DEPOSITION OF
10      ADRIAN JOHNSON, PH.D.
         JULY 19, 2013
11         VOLUME 1
12
13
14      I, Emanuel A. Fontana, Jr., Certified
   Shorthand Reporter in and for the State of Texas,
15  hereby certify to the following:
16      That the witness, ADRIAN JOHNSON, PH.D., was
   duly sworn by the officer and that the transcript
17  of the oral deposition is a true record of the
   testimony given by the witness;
18
      That the deposition transcript was submitted
19  on      , 2013, to the witness or to
   Attorney _____ for the witness to
20  examine, sign, and return to Worldwide Court
   Reporters, Inc., by        , 2013.
21
      That the amount of time used by each party
22  at the deposition is as follows:
23      Mr. Benson - 7 Hours, 34 Minutes
24
25

97 (Pages 385 to 388)