# Excerpts from the Deposition Transcript of Robert Bea

# Taken July 22, 2013

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL           ) MDL NO. 2179
BY THE OIL RIG             )
"DEEPWATER HORIZON" IN     ) SECTION "J"
THE GULF OF MEXICO, ON     )
APRIL 20, 2010             ) JUDGE BARBIER
                           ) MAG. JUDGE SHUSHAN

Deposition of ROBERT GLENN BEA,
Ph.D., P.E., taken at Pan-American Building,
601 Poydras Street, 11th Floor, New Orleans,
Louisiana, 70130, on the 22nd day of July,
2013.

## Page 2

APPEARANCES

APPEARING FOR THE PLAINTIFFS' STEERING COMMITTEE:
 Mr. Brian Barr
 LEVIN PAPANTONIO THOMAS MITCHELL
 RAFFERTY & PROCTOR, P.A.
 316 South Baylen Street, Suite 600
 Pensacola, Florida 32502
 Ms. Robin Greenwald
 WEITZ & LUXENBERG, P.C.
 700 Broadway
 New York, New York 11215

APPEARING FOR BP, INC.:
 Mr. Scott W. Fowkes
 KIRKLAND & ELLIS
 333 South Hope Street
 Los Angeles, California 90071
 Mr. Lee Philip Rudofsky
 Mr. Derek Bentsen
 KIRKLAND & ELLIS
 655 Fifteenth Street, NW
 Washington, D.C. 20005-5793
 Ms. Jessica Sklarsky
 KIRKLAND & ELLIS
 601 Lexington Avenue
 New York, New York 10022

APPEARING FOR TRANSOCEAN:
 Mr. Kyle A. Casazza
 Ms. Tamerlin J. Godly
 MUNGER TOLLES & OLSON
 355 South Grand Avenue, 35th Floor
 Los Angeles, California 90071-1560

## Page 3

A P P E A R A N C E S (Continued)

APPEARING FOR ANADARKO PETROLEUM CORPORATION:
 Ms. Sarah E. Iiams
 KUCHLER POLK SCHELL WEINER & RICHESON
 1615 Poydras Street, Suite 1300
 New Orleans, Louisiana 70112

APPEARING FOR HALLIBURTON:
 Ms. Jenny L. Martinez
 Mr. Sean W. Fleming
 Ms. Erika Toledo
 GODWIN LEWIS
 1201 Elm Street, Suite 1700
 Dallas, Texas 75270-2041

APPEARING FOR THE STATE OF LOUISIANA:
 Mr. Douglas R. Kraus
 Attorneys for Louisiana Attorney General
 KANNER & WHITELEY
 701 Camp Street
 New Orleans, Louisiana 70130-3504

ALSO PRESENT:
 Mr. Ray Aguirre, Case Manager
 Mr. James Deel, Videographer
 Mr. Robert Deel

## Page 4

INDEX
VIDEOTAPED ORAL DEPOSITION OF
ROBERT GLENN BEA, Ph.D., P.E.
JULY 22, 2013

                                                PAGE
Appearances . . . . . . . . . . . . . .  2
Examination by Mr. Bentsen . . . . . .   7
Examination by Mr. Fowkes . . . . . . 176

Signature and changes . . . . . . . . 244
Reporter's Certificate . . . . . . . . 246

EXHIBITS

                                                PAGE
EXHIBIT NO. 11750 . . . . . . . . . .    9
 Rule 26 Report on BP's Deepwater
 Horizon Macondo Blowout, Phase 2
 Expert Opinions by Dr. Bea,
 dated April 5, 2013, 37 pages

EXHIBIT NO. 11751 . . . . . . . . . .    9
 Rule 26 Rebuttal Report on BP's
 Deepwater Horizon Macondo Blowout,
 Phase 2 Expert Rebuttal Report Source
 Control, by Dr. Bea, dated June 10,
 2013, 12 pages

EXHIBIT NO. 11752 . . . . . . . . . .   82
 Absence of fatalities in blowouts
 encouraging in MMS study of OCS
 incidents 1992-2006,
 BP-HZN-2179MDL04952163 -
 BP-HZN-2179MDL04952166

EXHIBIT NO. 11753 . . . . . . . . . .   94
 United States Department of the
 Interior Minerals Management Service
 Gulf of Mexico OCS Region, NTL
 No. 2006-G21, Effective Date:
 October 26, 2006, 29 pages

1 (Pages 1 to 4)

37

1  "QUESTION: Another A plus?
2  "ANSWER: Yes, another A plus."
3   And that was your testimony?
4  A. Yes.
5  Q. All right.
6  A. There is an important, I think,
7  section in test- --
8  Q. Well, actually, Dr. Bea, if
9  they'd like to ask you questions about
10 things, they are free to do so.
11 A. Okay.
12 Q. And the way that this works --
13 A. Sorry.
14 Q. No problem. We just have
15 limited time. So I'll ask you questions, and
16 if they -- if your lawyers have questions
17 they want to follow up on, they're free to do
18 so.
19 A. Well, the point is my statements
20 were being conditioned by a time period.
21 Q. Well, if they are -- they're
22 free to ask you the questions.
23 A. Okay.
24 Q. On Page 33 of your report, and
25 you can -- it's Tab 1 in that binder, if you

38

1  care to refer to it. 33. That is the last
2  sentence of the first paragraph on there, and
3  it reads, "Because BP Management failed to
4  provide a Fit-For-Purpose Mitigation Barrier,
5  it failed its Process Safety Management
6  obligations and was operating outside of the
7  As Low As Reasonably Practicable
8  requirements."
9   Did I read that correctly, sir?
10 A. Yes, sir.
11 Q. What fit for purpose mitigation
12 barriers were required?
13 MS. GREENWALD: Objection; form.
14 A. The fit for purpose mitigation
15 barrier applies to the proactive, reactive,
16 interactive processes required to -- rapidly
17 control of the source of the blowout, so that
18 the consequences of concern in Phase 2 of
19 this trial could be brought to be within the
20 fit for purpose risk of blowout for the
21 Macondo well.
22 Q. (BY MR. BENTSEN) So what exact
23 barriers did BP need to have to be ALARP, in
24 your opinion?
25 A. The ALARP requirements apply to

39

1  risk. The risk has two important components.
2  The first component extensively addressed in
3  Phase 1 pertains to the likelihood of an
4  uncontrolled blowout.
5   The second important component
6  being addressed in Phase 2 pertains to the
7  consequences of an uncontrolled blowout.
8  Q. Okay.
9  A. To be as low as reasonably
10 practicable, both the likelihood and the
11 consequences have -- are required to be
12 relied as low as reasonably practicable.
13 Q. Okay. So that's not my
14 question. You've indicated that BP did not
15 have sufficient fit for purpose barriers to
16 be ALARP. What barriers did they need to
17 have in place to be fit for purpose
18 mitigation barriers to comply with ALARP?
19 MS. GREENWALD: Objection; form.
20 A. The first category of elements
21 re- -- apply to the likelihood of an
22 uncontrolled blowout. There are things that
23 have been implemented, developed in the
24 aftermath of the Macondo blowout that
25 characterize these barriers. They include a

40

1  realtime data consultation center 24 hours a
2  day, seven days a week. They include the
3  implementation of a life cycle safety,
4  environmental management program to address
5  the life cycle risk. These are all focused
6  on that likelihood of failure, Phase 1.
7   Phase 2 are sets of equipment,
8  hardware, people trained to deploy this
9  equipment and hardware. They address
10 containment and second tier, second level
11 blowout controls or remote operated vehicle
12 interventions affected, but interventions and
13 capping stack interventions.
14  It is the culmination of these
15 two things that have to be assessed and
16 managed to be fit for purpose. It is that
17 combination that I'm referring to in this
18 sentence.
19 Q. (BY MR. BENTSEN) Okay. So is
20 your opinion that BP was required to have a
21 capping stack prior to this incident?
22 MS. GREENWALD: Objection; form.
23 A. No. The opinion is that
24 something of that order of effective
25 intervention and control is -- was needed.

**41**

1  That's what is a major impact in Phase 2
2  concerning the source control and the
3  rapidity with which it is achieved.
4         An alternative to capping stack
5  would be a second blowout preventer aligned
6  and connected to the hardware for the failed
7  blowout preventer.  So there is -- there is
8  different things that can be used to effect
9  early source control.
10        Q.   (BY MR. BENTSEN)  Okay.  So if
11 BP had a second blowout preventer, it would
12 have been ALARP, in your opinion?
13        MS. GREENWALD:  Objection; form.
14        A.   If the second blowout preventer
15 was appropriately configured for deployment
16 and if we had trained personnel available to
17 properly deploy that equipment.
18        Q.   (BY MR. BENTSEN)  What, in your
19 view, would be appropriately configured?
20        MS. GREENWALD:  Objection; form.
21        A.   Appropriately configured would
22 be, for example, configurations that were in
23 sequence identified by industry contained in
24 the Drilling Engineers Association report,
25 DEA, I can't recall the last number, maybe

**42**

1  it's 63 or 60 --
2        Q.   (BY MR. BENTSEN)  I believe 63
3  is correct.
4        A.   Okay, 63, that pertains to
5  deployment of a second BOP, blowout
6  preventer, stack.  It is that sort of
7  implementation that's an example.
8        Q.   Okay.  Anything else that BP
9  would be required to have to be ALARP?
10       MS. GREENWALD:  Objection; form.
11       A.   I attempted to answer that
12 question as I talked about the things
13 necessary to reduce the likelihood of an
14 uncontrolled blowout and the assembly of
15 things necessary to witnessing what the
16 consequences of blowout.
17       Q.   (BY MR. BENTSEN)  Okay.  And
18 then -- I apologize, but for every question
19 I'm going to ask today, we're just talking
20 about mitigation after blowout has occurred.
21 I'm not -- Phase 1 has happened.  It's in the
22 books.  We're just talking about the
23 mitigation barriers to be put in place
24 post-blowout or to be -- that you view needed
25 to be in place at the time of the blowout.

**43**

1         And, so, so far you've mentioned
2  a capping stack or alternatively a second BOP
3  would be required to be ALARP for the
4  mitigation side.  Any other equipment
5  necessary for the mitigation side of a
6  blowout, in your view?
7        MS. GREENWALD:  Objection; form.
8            (Coughing.)
9        MS. GREENWALD:  Bless you.
10       THE WITNESS:  Pardon me.
11       Q.   (BY MR. BENTSEN)  I'll just
12 re-ask the question so it's clean on the
13 screen.  So far for mitigation barriers to be
14 post-blowout mitigations, you've mentioned a
15 capping stack or alternatively a second BOP
16 would be required, in your opinion, to be
17 ALARP.  Any other equipment necessary for
18 blowout mitigation, in your view, for a
19 operator to be ALARP?
20       MS. GREENWALD:  Objection; form.
21       A.   Well, I can cite an example.
22 The basic design of the well needs to be --
23 which is a Phase 1 topic, needs to be
24 conditioned to allow implementation of
25 effective Phase 2 early source control

**44**

1  mitigations.
2         So here's one of those
3  connections that is difficult for me to break
4  between preventative and response
5  mitigations.  It's also one of the reasons I
6  need to explain to you the frustration of my
7  inability to separate likelihoods of failure,
8  Phase 1, from consequences of failure, Phase
9  2, because both have to be managed to achieve
10 a system that is ALARP.
11       Q.   (BY MR. BENTSEN)  I understand,
12 but the conclusion from your report was that
13 BP failed to have a fit for purpose
14 mitigation barrier.  So I'm trying to figure
15 out what fit for purpose mitigation barriers
16 are required, in your opinion.  And so far
17 we've said a capping stack or a second BOP.
18 Anything else?
19       MS. GREENWALD:  Objection; form.
20       A.   For example, a well string
21 system that could take full blowout pressures
22 given the successful closure of a second
23 blowout preventer.
24       MR. BENTSEN:  I think the tape is
25 almost out, so we might as well take a break.

## Page 57

1  on specific requirements for a BOP to be a
2  sufficient mitigation in the sense of meeting
3  process safety requirements for as low as
4  reasonably practicable or the U.S. Minerals
5  Management Service requirements and for rapid
6  abatement of the source because of the
7  limitations in my expertise.
8      Q.   (BY MR. BENTSEN) Okay. So, in
9  essence, is your opinion that BP should have
10 had something, but sitting here today, you
11 can't define what BP should have had?
12      MS. GREENWALD: Objection; form.
13      A.   In terms of the details of the
14 post-blowout source control system, that
15 statement is correct.
16      Q.   (BY MR. BENTSEN) Okay. So --
17      A.   Those are the kinds of studies
18 that need to be conducted prior to a blowout
19 to assure the owner/operator that we have
20 configured a system that is as low as
21 reasonably practicable.
22      Q.   Okay. So the ALARP analysis
23 you've done does not identify what, if
24 anything, BP needed to have available to be
25 ALARP?

## Page 58

1      MS. GREENWALD: Objection; form.
2      A.   That's not correct. It does not
3  specify specifics in the system, but, rather,
4  specifies that such planning of such a system
5  needed to be conducted before the well was
6  spudded, the system operation initiated to
7  have assured the owner/operator, BP, and the
8  regulator, United States Minerals Management
9  Service, that the system was ALARP and
10 represented the best available and safest
11 technology.
12      Q.   (BY MR. BENTSEN) But you
13 haven't identified technology that was
14 required to be ALARP?
15      A.   That's correct.
16      Q.   Okay. So you just think
17 something needed to be there, but can't
18 specify what?
19      A.   Correct.
20      Q.   Okay. I believe, as you
21 state -- and if you want to go to Page 9 of
22 your report -- there are three general
23 approaches used to define ALARP?
24      A.   Yes, sir.
25      Q.   Okay. And the first one is

## Page 59

1  "Cost-Benefit economic analyses," correct?
2      A.   Correct.
3      Q.   If you haven't identified the
4  equipment that would be the cost, how can you
5  do a cost/benefit analysis?
6      MS. GREENWALD: Objection; form.
7      A.   You can't. And that's -- that's
8  a critical aspect. The cost/benefit analysis
9  of a particular system needs to be conducted
10 before you implement the system. Because no
11 coherent system was developed prior to the
12 blowout for blowout source con- -- blowout
13 source control, a definitive cost/benefit
14 analysis of a system could not, was not, to
15 my knowledge, performed before the blowout.
16      Q.   (BY MR. BENTSEN) Okay. And you
17 didn't undertake a cost/benefit analysis,
18 correct?
19      MS. GREENWALD: Objection; form.
20      A.   That's correct.
21      Q.   (BY MR. BENTSEN) Okay. So on
22 the face of the report you could not say that
23 any particular device would pass a cost
24 benefit economic analysis, correct?
25      A.   That's correct.

## Page 60

1      Q.   The second is "Historic
2  Precedents analyses." Is that essentially
3  looking at what's happened in the past to
4  guide us in the future?
5      A.   Yes.
6      Q.   Okay. And no prior incident in
7  the oil and gas industry called for a
8  deepwater capping stack, correct?
9      A.   I -- I don't --
10     MS. GREENWALD: Objection; form.
11 Sorry.
12     A.   I don't know what the entire
13 industry called for. The scope of my
14 knowledge and work does not address the
15 entire industry.
16     Q.   (BY MR. BENTSEN) Okay. So,
17 again, if Patrick Campbell and David Barnett
18 of Wild Well indicated it had never been used
19 in deepwater, you would have no way to object
20 to that?
21     A.   That's correct.
22     MS. GREENWALD: Objection; form.
23     Q.   (BY MR. BENTSEN) Okay. What
24 historic precedence did you use in looking at
25 your analysis?

61

1  A.  Well, for example, it's shown on
2  Figure 4, Page 10 of my report.
3  Q.  Okay.  This figure doesn't
4  include any indication of how a blowout was
5  brought under control, correct?
6  A.  That's correct.
7  Q.  Could you describe what this
8  figure is?
9  A.  The figure's vertical scale is
10  the annual frequency, likelihood of a
11  particular event.  In the context of this
12  current work, litigation, the vertical scale
13  is applying to the things that impact the
14  likelihood of an uncontrolled blowout,
15  chiefly termed Phase 1 factors and
16  considerations.  The horizontal scale are the
17  costs of a particular event.  In this case
18  the costs is being expressed in monetary
19  terms, United States dollars, and the costs
20  do not include cost for a loss of life.
21      The areas, different colored,
22  that are shown there are actuarial, meaning
23  they've actually occurred in the past,
24  failures that on a frequency basis identify
25  the annual frequency of a particular category

62

1  event and on the horizontal scale identified
2  the costs, range of costs that are associated
3  with that category of event.
4  Q.  What is the source of this
5  figure?
6  A.  This figure comes from a current
7  study being supported by the Federal
8  Government and industry known as the Blowout
9  Risk Assessment Research Project, BORA, BO --
10  research assessment, BORA project.  The base
11  figure comes from the publication of -- that
12  summarizes the work being done by the
13  research project.  On that figure I imposed
14  the three colored diagonal lines that outline
15  the as low as reasonably practicable
16  demarcation as well as showed two red arrows
17  at the bottom of the illustration in helping
18  orient the reader to cost of event of
19  $10 billion and ALARP, annual likelihood of
20  an event being 1 times 10 to the minus 6 per
21  year.
22  Q.  Is it your testimony that this
23  figure was generated by the blowout risk
24  assessment?
25  A.  The base figure, yes.

63

1  Q.  Okay.  Why don't we go to tab --
2  Tab 40 in Volume 2.  If you can go to Page 8
3  of that when you're ready.  And if you want
4  to a moment to familiarize yourself with the
5  figure.
6  A.  Yes.
7  Q.  Okay.  Do you recognize that
8  figure?
9  A.  Yes.
10  Q.  Now, if you'll read the -- the
11  last sentence above the figure, it says
12  Figure 3, which is the figure that you've
13  used, is an expert from -- an excerpt from
14  the OTC presented on the CRA completed as
15  part of the ABSC MODU Mooring Reliability
16  joint industry project, correct?
17  MS. GREENWALD:  Objection; form.
18  A.  Correct.
19  Q.  (BY MR. BENTSEN)  So this --
20  A.  You -- correct.
21  Q.  So this is actually not
22  generated by the blowout risk assessment
23  joint industry project; is that correct?
24  A.  I have not made a comparison
25  between the figure in the OTC paper and this

64

1  figure, so can't respond to your question,
2  but the figure that we're looking at
3  identified as Figure 3 is the source of the
4  figure in my report.
5  Q.  Okay.  And the caption to
6  Figure 3 describes it as an "Example Whitman
7  Plot CRA Results from ABSC MODU Mooring
8  Reliability Joint Industry Project," correct?
9  A.  Yes, sir.
10  Q.  Okay.  Do you have any idea what
11  the MODU Mooring Reliability Project was
12  looking into?
13  A.  Yes.
14  Q.  What were they looking into?
15  A.  The reliability requirements for
16  mooring on floating mobile offshore drilling
17  units.
18  Q.  Okay.  So that wasn't a blowout
19  risk assessment?
20  A.  That's correct.
21  Q.  Okay.  And you have no idea how
22  they calculated the numbers on this chart; is
23  that correct?
24  MS. GREENWALD:  Objection; form.
25  A.  That is not correct.

16 (Pages 61 to 64)

89

1  contained 10 months after the blowout with a
2  relief well.
3      Q.   (BY MR. BENTSEN) Okay.  So in
4  evaluating these -- in evaluating the
5  frequency of a blowout, shallow water wells
6  should be used because they could flow for
7  just as long, correct?
8      MS. GREENWALD:  Objection; form.
9      A.   That's -- that's not correct.
10     Q.   (BY MR. BENTSEN) Okay.  So you
11 said that a deepwater blowout could -- or
12 relief well would be there in hundred to 150
13 days, correct?
14     A.   That was the estimate I
15 provided, I recall, by several sources,
16 including BP.
17     Q.   Okay.  You rely on Ixtoc, which
18 took 10 months, correct?
19     MS. GREENWALD:  Objection; form.
20     A.   No.  I relied on -- I took a
21 hundred to 150 days for a successful relief
22 well to control the source, and during that
23 time period used the 162,000 barrels of oil
24 per day as the flow rate to estimate the
25 total outflow of approximately 16 to 24

90

1  million barrels.
2      Q.   (BY MR. BENTSEN) Okay.  But in
3  estimating the likelihood that that would
4  happen, you didn't look at any other wells,
5  correct?
6      MS. GREENWALD:  Objection; form.
7      A.   No, that's not correct.
8      Q.   (BY MR. BENTSEN) Okay.  What
9  wells did you look at in evaluating that
10 likelihood?
11     A.   First, I used the data of those
12 43 wells I described that we identified
13 during the Deepwater Horizon study group
14 and -- to condition the difficulty associated
15 with the Macondo location supplemented with
16 the SINTEF data we've discussed and health
17 and safety executive data, and then I
18 corroborated at a duration with evaluations
19 performed by BP Gulf of Mexico strategic
20 performance unit, my recollection is January
21 2010 to evaluate both likelihood and
22 consequences.  So I triangulate and
23 corroborate to get a reasonable estimate of
24 where the system would be if I relied on
25 earlier BOP intervention to appropriately

91

1  mitigate the source control part of the
2  challenge.
3      Q.   Okay.  And essentially all of
4  your calculations were to look at the SINTEF
5  data or the BP data on frequency and simply
6  multiply that by worst-case discharge for a
7  relief well?
8      MS. GREENWALD:  Objection; form.
9      A.   Well, in a -- an evaluation like
10 this, many experts have learned never to
11 multiply the likelihood of failure times the
12 consequence of failure to get a single
13 number.  You can do so, and that gives you,
14 quote, the expected outcome.  Now, the reason
15 we avoid that is we know there are
16 uncertainties in the likelihood, generally a
17 factor of 10, meaning it could be one chance
18 in a thousand or one chance in 10,000.  And
19 the consequences of failure have a similar
20 wide range of potential outcomes.  So we
21 avoid using single valued point assessments
22 of the system's fitness for purpose.
23          In the case of the consequences
24 of -- of failure, those generally range over
25 a factor of at least 100.

92

1      Q.   (BY MR. BENTSEN) Okay.  Did you
2  do calculations to develop any of your
3  conclusions for your Phase 2 opinions?
4      MS. GREENWALD:  Objection; form.
5      A.   Yes.
6      Q.   (BY MR. BENTSEN) Okay.  Did you
7  produce those?
8      A.   During Phase 1.  Those are in my
9  quantitative analysis of what I call the
10 failure trajectory for the Macondo system.
11 So I tracked it in terms of likelihood and
12 consequences leading to April 10th.  And
13 then, of course, tracked the consequence
14 development until the well was shut-in.  So
15 that was done quantitatively.
16     Q.   Okay.  And those analyses did
17 not include other possibilities of the
18 well-being shut-in prior to a relief well,
19 including natural bridging, correct?
20     MS. GREENWALD:  Objection; form.
21     A.   That's correct.  A further
22 explanation --
23     Q.   (BY MR. BENTSEN) If your --
24 Doctor, if your lawyers want to ask you
25 questions?

```
                                                   105                                                        106
 1   the plan was to remotely operate -- activate         1   a team of outside and inside experts to
 2   emergency equipment?                                 2   develop a plan to respond to a particular
 3      A.   We could go back, refer to --                3   incident under consideration?
 4      Q.   Okay, we can do that.                        4       MS. GREENWALD:  Objection; form.
 5      A.   -- this section.                             5      A.   Yes.
 6      Q.   Let's do that.                               6      Q.   (BY MR. BENTSEN)  Okay.
 7      A.   No problem.  For the record.                 7      A.   A portion of this figure is
 8      Q.   This is going to be back at                  8   included in my expert report.
 9   Tab 15.                                              9      Q.   Yeah, exactly.  And you would
10       MS. GREENWALD:  Tab 15.                         10   agree that MMS approved this OSRP, correct?
11      Q.   (BY MR. BENTSEN)  And it will be            11      A.   Yes.
12   Bates No. 423 on the bottom.  All right.            12      Q.   Okay.  And did you review the
13   Does that look familiar?                            13   testimony of Lars Herbst from MMS?
14      A.   Yes, sir.                                   14      A.   Yes.
15      Q.   Okay.  And so the first bullet              15      Q.   And you would agree that his
16   point is essentially activating emergency           16   testimony indicated that this was his
17   equipment, correct?                                 17   understanding of the plan?
18      A.   Correct.                                    18       MS. GREENWALD:  Objection; form.
19      Q.   And the second bullet point is              19       MR. BENTSEN:  Actually, I -- I'll
20   attempting to remotely activate emergency           20   rephrase that.
21   equipment?                                          21      Q.   (BY MR. BENTSEN)  That it was --
22      A.   Correct.                                    22   he understood the plan to be activation of
23       MS. GREENWALD:  Objection; form.                23   emergency equipment, remote activation of
24      Q.   (BY MR. BENTSEN)  And then the              24   emergency equipment, and then staffing up a
25   third bullet point is essentially staffing up       25   team of experts to respond?

                                                   107                                                        108
 1       MS. GREENWALD:  Objection; form.                 1      Q.   Yes.
 2      A.   I recall that, correct.                      2      A.   No, I did not.
 3      Q.   (BY MR. BENTSEN)  And he                     3      Q.   Okay.
 4   indicated that that was consistent with MMS          4      A.   Solely focused on BP's OSRP.
 5   regulations, correct?                                5      Q.   Okay.  Let's turn to Tab 16, and
 6       MS. GREENWALD:  Objection; form.                 6   I think these are all pre-marked.  There's
 7      A.   Well, he also made other                     7   going to be color copies behind that are
 8   indications concerning, for example, if the          8   going to be a little bit easier to read.  The
 9   technology were available to arrest the              9   initial one is TREX 142243.001, which is
10   source quickly, abate the source                    10   Exxon's Oil Spill Gulf of Mexico Regional
11   expeditiously, that that technology, even           11   Response Plan; do you see that?
12   though not contained in its approved plan,          12      A.   Yes, sir.
13   should be in the operational tool kit of the        13      Q.   Okay.  And if you go to
14   duty holder.                                        14   Section 6c of that, which will be the last
15      Q.   (BY MR. BENTSEN)  He                        15   page.
16   understood -- he also testified that every          16       MR. BARR:  Are you going to mark this?
17   blowout is unique and will require different        17       MR. BENTSEN:  Since it's already a
18   tools, correct?                                     18   TREX -- does that make sense?
19       MS. GREENWALD:  Objection; form.                19       MR. BARR:  Yeah.
20      A.   Yes.                                        20      Q.   (BY MR. BENTSEN)  And in
21      Q.   (BY MR. BENTSEN)  Okay.  Did you            21   reviewing that plan, you would agree that it
22   review other OSRPs in preparing your opinion        22   is consistent with BP's plan, correct?
23   in this case?                                       23       MS. GREENWALD:  Objection; form.
24      A.   Do you mean by that other                   24      A.   I'd have to review the --
25   companies?                                          25      Q.   (BY MR. BENTSEN)  Okay.  Take
```

Worldwide Court Reporters, Inc.
**PURSUANT TO CONFIDENTIALITY ORDER**

**117**

1  A.  Yes, you read that correct.
2  Q.  So in Shell's source control
3  portion of their Regional Oil Spill Response
4  Plan, they don't have any specific source
5  control procedures, correct?
6      MS. GREENWALD:  Objection; form.
7  A.  That is correct.
8  Q.  (BY MR. BENTSEN)  And, indeed,
9  their plan as stated is to contact well
10 control specialists or divers, correct?
11     MS. GREENWALD:  Objection; form.
12 A.  That's what this reads.
13 Q.  (BY MR. BENTSEN)  Okay.  And you
14 didn't look at any of this prior to forming
15 your opinion in this case, correct?
16     MS. GREENWALD:  Objection; form.
17 A.  That is correct.
18 Q.  (BY MR. BENTSEN)  So the
19 industry standard in responding to the loss
20 of a well control in the Gulf of Mexico is to
21 staff up a team and have -- including well
22 control specialists and develop a plan of
23 action, correct?
24     MS. GREENWALD:  Objection; form.
25     MR. KRAUS:  Objection; form.

**118**

1  A.  Well, I can't answer that
2  question because I have no detailed knowledge
3  of what the industry standard in well control
4  is.
5  Q.  (BY MR. BENTSEN)  Responding to
6  well control, responding to a blowout, in
7  fact?
8  A.  That is correct.
9  Q.  Okay.  So you have no idea what
10 the industry standard as of April 20, 2010,
11 was in responding to a blowout in the Gulf of
12 Mexico?
13     MS. GREENWALD:  Objection; form.
14 A.  Well, I haven't reviewed any
15 other oil spill response plans.  So I can't
16 opine that it was or was not an industry
17 standard.
18 Q.  (BY MR. BENTSEN)  Okay. Let's
19 go to Tab 33.  And we're going to go to
20 Page 340.  I will -- I'll warn you that this
21 is one of the depositions that they
22 renumbered on the second day, so there is a
23 couple of early pages way in the back.
24     Okay.  Down at the bottom of
25 340 -- and this is the deposition of Patrick

**119**

1  Campbell, who we talked about, okay?
2  A.  Yes, sir.
3  Q.  QUESTION:  Now, in terms of well
4  control response capabilities as of April 20,
5  2010, would you agree that BP was following
6  industry practices by having companies like
7  Wild Well Control on retainer and available
8  to assist in the event of a catastrophe and
9  also the capability of drilling a relief
10 well?
11     The answer is, "Yes."
12     Did you review Mr. Campbell's
13 testimony?
14 A.  Yes.
15 Q.  And I read his testimony
16 correctly?
17 A.  That's correct.
18 Q.  Okay.  So Mr. Campbell who
19 operates in the well control industry agreed
20 that it was industry standard to rely on well
21 control companies and attempt to drill a
22 relief well, correct?
23     MS. GREENWALD:  Objection; form.
24 A.  Well, I'm not -- I'm not sure
25 that was an industry standard on -- for

**120**

1  drilling wells of the category of Macondo.
2  Q.  (BY MR. BENTSEN)  Sitting here
3  today, can you indicate anyone in the world
4  that had any different response capabilities?
5      MS. GREENWALD:  Objection; form.
6  A.  I can't, but post-blowout source
7  control experts can, have; and I referred to
8  that earlier as part of the Presidential
9  report -- appointed committee that was
10 assembled soon after Macondo to address the
11 interim safety committee -- or interim safety
12 measures.  Those experts, in particular the
13 expert assigned it, opined that some
14 operators had spare BOPs, quote, on board,
15 ready to be mobilized in the event of the
16 failure of the primary BOP.
17 Q.  (BY MR. BENTSEN)  Okay.  So let
18 me ask you this question:  If there had been
19 a second BOP on the Deepwater Horizon, would
20 it have been much use after the rig exploded?
21 A.  Well, with the rig --
22     MR. KRAUS:  Objection; form.
23 A.  -- sitting on the seafloor, no.
24 Q.  (BY MR. BENTSEN)  Okay.
25 A.  The BOP would have to be on

121

1   another vessel.
2       Q.   Okay.  And BP had other BOPs on
3   different vessels in the Gulf of Mexico,
4   correct?
5       MR. KRAUS:  Objection; form.
6       A.   I'm not sure that's correct, but
7   Transocean did.
8       Q.   (BY MR. BENTSEN)  Certainly.
9   Transocean vessels that were contracted to
10  BP, correct?
11      A.   Correct.
12      Q.   Okay.  So the state of the
13  industry as of April 20th, 2010, was to have
14  a BOP on a different vessel available; is
15  that your testimony?
16      MS. GREENWALD:  Objection; form.
17      A.   For some operators.
18      Q.   (BY MR. BENTSEN)  Can you name
19  any operators that had anything other than
20  BOPs on different vessels?
21      A.   No.
22      Q.   Okay.  And that would apply to
23  several companies that you indicated
24  previously had excellent process safety
25  management prior to this incident, correct?

122

1       MS. GREENWALD:  Objection; form.
2       A.   Well, since I haven't reviewed
3   those companies' plans specifically for wells
4   of the category of Macondo, that statement is
5   correct.  I focused solely on the Macondo
6   conditions and BP's preparation for
7   post-blowout source control.
8       Q.   (BY MR. BENTSEN)  Okay.  And
9   from what we've seen and from the testimony
10  of people in the well control industry, BP's
11  preparation was in line with everyone else in
12  the industry, correct?
13      MS. GREENWALD:  Objection; form.
14      MR. KRAUS:  Objection; form.
15      A.   I'm afraid I can't answer
16  affirmatively or negatively to that statement
17  because of the limitations in my knowledge.
18      Q.   (BY MR. BENTSEN)  But you would
19  agree that industry standard is part of the
20  ALARP analysis, correct?
21      MS. GREENWALD:  Objection; form.
22      A.   Well, again, I can't comment on,
23  quote, the industry standard for ALARP.  Some
24  companies in the industry do.  Other
25  companies with the -- in the industry don't.

123

1       Q.   (BY MR. BENTSEN)  No, no, my
2   question is, if you're doing an ALARP
3   analysis, industry standards form part of
4   that analysis, correct?
5       A.   Yes, sir.
6       Q.   Okay.  But you just said that
7   you didn't undertake any review to determine
8   what the industry standards were in
9   responding to a potential blowout in the Gulf
10  of Mexico?
11      MS. GREENWALD:  Objection; form.
12      A.   For this category of well,
13  that's correct.
14      Q.   (BY MR. BENTSEN)  Okay.  Did you
15  undertake any analysis to determine industry
16  standards to respond to a blowout in the Gulf
17  of Mexico on a different category of wells?
18      A.   No.
19      Q.   Okay.  So you didn't take
20  analysis to determine the industry standard
21  to respond to a blowout in the Gulf of Mexico
22  on any kind of well, correct?
23      A.   Correct.
24      Q.   Okay.  And that -- I assume you
25  didn't take any analysis to determine the

124

1   industry standard to respond to a blowout in
2   deepwater anywhere in the world?
3       MS. GREENWALD:  Objection; form.
4       Q.   (BY MR. BENTSEN)  I'll rephrase
5   the question for you.  So we've just said --
6   we've just determined that your analysis
7   didn't -- didn't determine the industry
8   standard to respond to a blowout -- blowout
9   in the Gulf of Mexico on any kind of well?
10      A.   Correct.
11      Q.   Did you undertake any analysis
12  to determine the industry standard in
13  responding to a blowout in other
14  jurisdictions, for example, the North Sea?
15      MS. GREENWALD:  Objection; form.
16      A.   Well, I made inquiries during
17  the course of my investigations as to
18  preparations made by other companies in other
19  areas, such as the Beaufort Sea, United
20  States Arctic, such as the Norwegian sector
21  of the North Sea, similarly for the U.K.
22  sector of the North Sea.
23      Q.   (BY MR. BENTSEN)  And what did
24  you determine the industry standards there to
25  be?

133

1  characteristics. Certainly, the well will
2  have unique characteristics, and one of the
3  critical parts of the planning which we call
4  the AR risk planning is to develop within the
5  system enough diversity to accommodate the
6  highly likely variable -- variabilities that
7  you will encounter in that system's lifetime,
8  in this case including the post-blowout
9  source control.
10     Q.   (BY MR. BENTSEN) Okay. So
11 Mr. Barnett testified that you would need an
12 enormous amount of equipment to cover a
13 reasonable amount of scenarios. Do you have
14 any basis to disagree with that?
15     A.   No. In fact, I agree with it.
16     Q.   Okay. And you haven't
17 identified what that enormous amount of
18 equipment would -- would be composed of,
19 correct?
20     MS. GREENWALD: Objection; form.
21     A.   Basically, that is correct.
22     Q.   (BY MR. BENTSEN) Okay. And so
23 you haven't done any analysis based on the
24 equipment that you haven't identified?
25     A.   Correct.

134

1     Q.   Okay. Do you recall relying on
2  a 1998 International Association of
3  drillers -- I'm missing the C.
4     A.   Contractor.
5     Q.   Contractor. Drilling
6  Contractors, thank you, report about well
7  control?
8     A.   Yes.
9     Q.   All right. Were you aware that
10 Mr. Barnett was one of the authors of that?
11    A.   I don't think I was.
12    Q.   Okay. If we go to Tab 11, I
13 can... So this is, for the record, what has
14 been previously marked as 7353, and this is,
15 again, just an excerpt of the entire
16 document.
17    MR. BENTSEN: So I suppose, Brian,
18 would you like me to mark it separately?
19    MR. BARR: No, no.
20    Q.   (BY MR. BENTSEN) Okay. If you
21 go to Bates number ending in 946. Do you see
22 the subcommittee for emergency response?
23    A.   Yes.
24    Q.   And the second individual down
25 was David Barnett from Wild Well Control?

135

1     A.   Correct.
2     Q.   All right. And so even though
3  he was involved in these industry plans, his
4  testimony was that you would need an enormous
5  amount of equipment to cover a reasonable
6  amount of scenarios?
7     A.   Correct.
8     MS. GREENWALD: Objection; form.
9     Q.   (BY MR. BENTSEN) And you
10 ultimately agree that you would need an
11 enormous amount of equipment?
12    A.   Correct.
13    Q.   If you go to Bates No. 961. And
14 the first paragraph at the top of the page,
15 it says, "The key to a sound, effective
16 BCP" -- which I believe stands for blowout
17 contingency plan?
18    A.   Correct.
19    Q.   -- "is to designate and properly
20 organize a team of individuals with the right
21 combination of technical and operational
22 capabilities," correct?
23    A.   Correct.
24    Q.   All right. And that was the
25 plans that we've seen in all of the oil spill

136

1  response plans, correct?
2     MS. GREENWALD: Objection; form.
3     A.   Well, the key, I guess, word we
4  didn't discuss in any of the documents we
5  read was that word properly.
6     Q.   (BY MR. BENTSEN) Okay,
7  that's -- that's fair. Speaking of properly,
8  if we can go to -- actually, we'll come back
9  to that later. Let's go to Tab 10. And
10 while we're going, let me ask -- once you get
11 there, I'm going to ask one more question.
12 Do you have any indication that the team
13 responding to the Macondo blowout was not
14 properly organized?
15    MS. GREENWALD: Objection; form.
16    MR. BENTSEN: Okay, I'll rephrase it.
17    Q.   (BY MR. BENTSEN) Do you have
18 any basis to disagree that the team
19 responding to the Macondo blowout was
20 properly organized?
21    A.   Yes.
22    Q.   What is that?
23    A.   Documentation, testimony
24 provided by Marsha McNutt. Documentation,
25 testimony provided by Thad Allen as part of

Worldwide Court Reporters, Inc.
PURSUANT TO CONFIDENTIALITY ORDER

221

1  Mr. Jassal. And just so it's clear, you're
2  not suggesting that Mr. Jassal said that BP
3  was engaged in hubris or preoccupation with
4  costs?
5      MS. GREENWALD: Objection; form.
6      A.   That is correct.
7      Q.   (BY MR. FOWKES) In fact,
8  Mr. Jassal would have testified to the
9  opposite?
10     A.   Right.
11     MS. GREENWALD: Objection; form.
12     Q.   (BY MR. FOWKES) And Mr. Jassal,
13 as you know from reading his deposition, he
14 actually testified that cost and safety go
15 hand in hand, that was at least Mr. Jassal's
16 testimony, correct?
17     A.   Yes.
18     Q.   Now, you didn't -- you didn't
19 cite that testimony from Mr. Jassal in your
20 report, did you, Dr. Bea?
21     A.   I don't think so.
22     Q.   All right. And, in fact, there
23 are other fact witnesses at BP who likewise
24 testified that safety was important at BP and
25 that safety was never sacrificed for cost?

222

1  There is lots of citations in the record to
2  support that statement on behalf -- made by
3  BP witnesses, at least, correct?
4      MS. GREENWALD: Objection -- objection;
5  form.
6      A.   I've seen those statements, and
7  they have bothered me greatly.
8      Q.   (BY MR. FOWKES) You didn't
9  point those statements out to the Court in
10 your report, though, did you?
11     A.   No, I did not. I focused
12 specifically on the Phase 2 post blowout
13 source control issues. The statements that
14 concerned me so much happened principally
15 during the Phase 1 trial.
16     Q.   But -- so you did cite
17 Mr. Jassal's testimony is from a Phase 1
18 deposition, correct?
19     A.   Yes.
20     Q.   All right. And other witnesses
21 testified that they never at BP put cost
22 ahead of safety, and you didn't cite any of
23 that testimony in your report, did you?
24     MR. KRAUS: Objection; form.
25     A.   Correct.

223

1      Q.   (BY MR. FOWKES) For instance,
2  Mr. Guide, Mr. Sepulvado, Mr. Lambert, we
3  don't need to go through that all today, but
4  you're familiar generally with their
5  testimony on -- on this issue of safety,
6  aren't you?
7      MS. GREENWALD: Objection -- objection;
8  form.
9      A.   Well, yes, and it was those
10 statements that concerned me so much in the
11 context of the discipline and technology of
12 process safety. The reason for that is the
13 term "safety" has many -- safe has been used
14 many times inappropriately and incorrectly
15 because the person that was making the
16 statement was making it based on subjective
17 experience based judgments, beliefs.
18          And the process safety
19 management technology requires more for that
20 very reason, because subjective judgments and
21 belief are an insufficient basis on which to
22 judge safety or fitness for purpose; and,
23 hence, the concerns for the loose use of that
24 term, well, safety wasn't compromised.
25     Q.   (BY MR. FOWKES) All right.

224

1  Let's switch --
2      A.   Thank you for the opportunity to
3  explain.
4      Q.   You're welcome.
5          Let's switch gears and turn to
6  Exhibit -- back to Tab 41 of Volume 2, which
7  is the study by the MMS. Do you recall being
8  asked about this document earlier today,
9  Dr. Bea?
10     A.   Yes, sir.
11     Q.   And this is Exhibit 11752,
12 which, just for the record, was previously
13 marked as an Exhibit 45056, but we'll use
14 11752 for today. And I believe you testified
15 that you know Mr. Danenberger, who is one of
16 the authors of this article?
17     A.   Yes.
18     Q.   And you hold Mr. Danenberger in
19 high regard?
20     A.   Very high regard.
21     Q.   He's a -- he's a very reliable
22 person?
23     A.   Yes.
24     Q.   Trustworthy and honest?
25     A.   Very.

56 (Pages 221 to 224)