# Excerpts from the Deposition Transcript of Edward Ziegler

# Taken July 24, 2013

**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL      )  MDL NO. 2179
BY THE OIL RIG         )
"DEEPWATER HORIZON" IN )  SECTION "J"
THE GULF OF MEXICO, ON )
APRIL 20, 2010        )  JUDGE BARBIER
                       )  MAG. JUDGE SHUSHAN

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
VOLUME 1
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Deposition of Edward Ray Ziegler, taken
at the Pan-American Building, 601 Poydras Street,
11th Floor, New Orleans, Louisiana, 70130, on the
24th day of July, 2013.

**Page 2**

A P P E A R A N C E S

APPEARING FOR THE PLAINTIFFS STEERING COMMITTEE:
  Ms. Robin L. Greenwald
  WEITZ & LUXENBERG
  700 Broadway
  New York, New York  10003
  Mr. Matthew E. Lundy
  LUNDY, LUNDY, SOLLEAU & SOUTH, LLP
  501 Broad Street
  Lake Charles, Louisiana  70601

APPEARING FOR BP, INC.:
  Ms. Maureen F. Browne
  COVINGTON & BURLING
  1201 Pennsylvania Avenue, Northwest
  Washington, D.C.  20004-2401

  Mr. Lee Rudofsky
  KIRKLAND & ELLIS
  655 Fifteenth Street, NW
  Washington, D.C.  20005-5793
  Ms. Karen K. Gase
  Managing Attorney
  BP AMERICA INC.
  501 Westlake Park Boulevard
  Houston, Texas  77079

APPEARING FOR TRANSOCEAN:
  Ms. Amelia L. B. Sargent
  Ms. Tamerlin J. Godley
  MUNGER TOLLES & OLSON
  355 South Grand Avenue, 35th Floor
  Los Angeles, California  90071-1560

**Page 3**

APPEARING FOR ANADARKO PETROLEUM CORPORATION:
  Mr. David H. Hardwicke
  KUCHLER POLK SCHELL WEINER & RICHESON
  1715 Northpark Drive, Suite A
  Kingwood, Texas 77339

APPEARING FOR HALLIBURTON:
  Ms. Gwen E. Richard
  GODWIN LEWIS
  1331 Lamar, Suite 1665
  Houston, Texas  77010-3133
  Mr. Prescott W. Smith
  Ms. Joni J. Ogle
  GODWIN LEWIS
  Renaissance Tower
  1201 Elm Street, Suite 1700
  Dallas, Texas 75270-2041

ALSO PRESENT:
  Mr. Peter Jennings, Videographer
  Mr. Ray Aguirre, Case Manager

**Page 4**

INDEX
VIDEOTAPED ORAL DEPOSITION OF
EDWARD RAY ZIEGLER
JULY 24, 2013
VOLUME 1

Appearances.................................... 2

Direct Examination-Ms. Browne................ 11
Examination-Ms. Sargent...................... 295

Changes and Signature........................ 299
Reporter's Certificate....................... 301

EXHIBIT INDEX

| Ex. No. | Description | Marked |
|---|---|---|
| 11578 | Phase II Report - Source Control, Edward R. Ziegler, P.E., C.S.P., dated May 1, 2013, marked as CONFIDENTIAL; 143 pages | 14 |
| 11579 | Phase II Report - Source Control, Rebuttal Report, Edward R. Ziegler, P.E., C.S.P., dated June 10, 2013; 50 pages | 14 |
| 11580 | LexisNexis Report titled Dave Barrett; Clean Harbors Environmental Services, Inc., Plaintiffs - Appellants, v. Rhodia, Inc., Defendant - Appellee dated April 12, 2010; nine pages | 26 |

97

1    A. But they're -- they're --
2    Q. And --
3    A. They have MMS permits.
4    Q. Right. And --
5    A. And they're in Federal waters.
6    Q. And on --
7    A. The -- at least the bottom of the wells
8    are in Federal waters.
9    Q. -- Page 695, third paragraph, "Well
10   capping is both compatible and feasible with all
11   drilling operations..."
12   A. I'm sorry. Where are you looking at?
13   Q. 695. We're still on Exhibit 9828 at
14   Tab 14.
15          MS. RICHARD: What -- are you -- I'm
16   sorry. I'm not seeing the page number.
17   A. I don't -- I don't see any page numbers.
18   Q. (By Ms. Browne) It's the -- it's the
19   Production number. 695.
20   A. Oh, the Bates number.
21          MS. RICHARD: Okay.
22   A. Bates number.
23   Q. (By Ms. Browne) Do you see that?
24   A. I -- I -- I will -- I will -- I'll get
25   there in a minute. 695. Got it. Thank you.

98

1    Q. The first sentence of the third
2    paragraph: "Well capping is both compatible and
3    feasible with all drilling operations as the
4    technology is applied at surface."
5          Did I read that correctly?
6    A. Yeah.
7    Q. Okay. And then at the page ending in
8    698, two pages away or so, there's a table,
9    "TABLE 4-21." Do you see that?
10   A. Yes.
11   Q. And -- and down next to "COMPATIBILITY,"
12   which is second from the bottom, there's a column
13   for "CURRENT METHOD: WELL CAPPING." Do you see
14   that?
15          Do you see that?
16   A. Yes, I see it.
17   Q. Okay. And it reads: "Technology is
18   compatible and applied at surface (no sensitivity
19   to well type)." Do you see that?
20   A. Right. And under "FEASIBILITY" in the
21   second column it says: "Prior proven success in
22   offshore environments."
23   Q. Yeah. Okay. My --
24   A. "Demonstrated success" --
25   Q. My question, sir, was: Do you see in

99

1    that -- in that column where it says:
2    "Technology is compatible and applied at surface
3    (no sensitivity to well type)." Do you see that?
4    That's my question.
5    A. Yeah, I do see that, and then down below
6    it says "offshore."
7    Q. And offshore doesn't mean subsea, does
8    it?
9    A. No, it -- offshore -- they -- they for
10   their database in here they use the all --
11   offshore Gulf of Mexico and the offshore North
12   Sea databases. They're -- they're studying all
13   kinds of wells. I agree with you it's for all
14   wells.
15   Q. Is --
16   A. It's -- it's the capping methodology. It
17   doesn't matter what kind of well it is. It's for
18   all wells.
19   Q. Yeah. Is it your opinion that something
20   that had never been used or even tested in deep
21   water prior to the DEEPWATER HORIZON incident
22   could have been considered Best Available and
23   Safest Technology?
24          MS. RICHARD: Objection, form.
25   A. Well, first of all, it had been used.

100

1    I -- I --
2    Q. (By Ms. Browne) That's not my question,
3    sir.
4          MS. RICHARD: Objection.
5    Q. (By Ms. Browne) My question is --
6    A. H'm.
7    Q. I just want you to answer my question.
8          MS. RICHARD: If your -- if your
9    question is saying something that isn't true,
10   then he doesn't have to agree to your question,
11   and you've -- you -- in setting out before the
12   deposition started you said --
13          MS. BROWNE: Right. And he can --
14          MS. RICHARD: -- make you understand
15   and agree with my question.
16          MS. BROWNE: No, I didn't say agree
17   with my question. He can say "No." If the
18   answer to my question is "No," he can say "No."
19          MS. RICHARD: No, that's -- he's not
20   agreeing with the premise in your question.
21   That's my objection. Objection, form.
22          You can answer the question.
23   Q. (By Ms. Browne) Is it your opinion that a
24   capping stack that's never been used or even
25   tested in deep water prior to the DEEPWATER

25 (Pages 97 to 100)

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

101

1  HORIZON incident could have been considered the
2  Best Available and Safest Technology?
3       MS. RICHARD:  Objection, form.
4       A.  Well, I can't under -- I can't answer
5  that question, because it's my belief that based
6  on at least the JIM CUNNINGHAM incident in the
7  Mediterranean Sea that capping devices had been
8  applied in deep water, but even if we throw out
9  that one event, yes, we're talking about the
10  technology of the capping device, and as you
11  pointed out earlier, in a document, plain vanilla
12  BOPs were used as capping devices on hundreds of
13  wells in Kuwait.  So the technology for using
14  capping devices was -- it's -- it's not even
15  BAST -- it's not even the Best Available
16  Technology, it's common technology in the oil
17  industry.
18       Q.  (By Ms. Browne) You -- you claim an
19  Operator needs to have BAST source control
20  equipment based on 30 CFR 250.107(c).  Is that
21  right?
22       A.  Well, do you want to refer me to where
23  I'm saying that so I can look at it, which page?
24       Q.  Do you know that -- that that is your
25  opinion or not?

102

1       A.  Well, it could be my opinion, but since
2  I'm not -- don't know where you're looking, I
3  don't know what you're looking at, but if -- if
4  that's the right section, that could be my
5  opinion.
6       Q.  Well, is there a different section that
7  covers BAST technology in the MMS Regulations?
8       A.  Well, there's three or four; and in the
9  Outer Continental Shelf Lands Act, there's
10  several sections that talk about BAST.
11       Q.  Right.  Well, I'm talking about the MMS
12  Regulations.  I'm wondering -- is the -- the
13  agreement for an Operator-used BAST technology,
14  is that in any other section other than 250?
15       MS. RICHARD:  Objection, form.  If
16  you need to review your Report, you're -- you're
17  entitled to do that.
18       THE WITNESS:  Yeah.
19       A.  Where is that in my Report?
20       Q.  (By Ms. Browne) I'm just asking
21  generally.
22       A.  Oh.  Can you show me where it is in my
23  Report so I can look at it?
24       Q.  Well, I'm not asking about your Report
25  right now.  I just want to know, generally:  Do

103

1  you have an understanding that BAST is used in a
2  subsection other than 250?
3       MS. RICHARD:  Objection, form.
4       A.  I -- I -- as I'm sitting here right now,
5  I don't know.
6       Q.  (By Ms. Browne) Okay.  Do you understand
7  that -- that 30 CFR 250 applies to drilling and
8  incidents prior to a blowout?
9       MS. RICHARD:  Objection, form.
10       A.  That's not correct.
11       Q.  (By Ms. Browne) Okay.
12       A.  Because if -- otherwise, if that's what
13  it applied to, the Oil Spill Response Plan --
14  let's say, even for something like a skimmer --
15  would not -- would not be even talked about in
16  this case.
17       Q.  Do you have an understanding that Section
18  254 of 30 CFR 254 applies to Source Control
19  events?
20       A.  254?
21       Q.  Yes, sir.
22       A.  Yeah.  254.5(c) specifically says that
23  doesn't matter what you put in your Oil Spill
24  Response Plan, you have to abate a Source Control
25  as soon as possible.  So that -- that certainly

104

1  applies is to Source Control.
2       Q.  Yeah.  What is -- what is the definition
3  of "BAST," as you understand it?
4       A.  Well, I've -- I've read a number of
5  papers on BAST, et cetera; but it's Best
6  Available and Safest Technology.  So it applies
7  to procedures, it applies to equipment; but
8  it's -- it -- it's what's available.
9       For example, the plain-vanilla Cameron
10  BOPs would be BAST or sub-BAST, not even to the
11  level of BAST.
12       Q.  Sure, but what -- what's the definition
13  of "BAST"?  I know you've given an example of the
14  plain-vanilla Cameron BOPs.  I'm asking what your
15  definition of BAST is.
16       MS. RICHARD:  Objection, form.
17       A.  Well, it's a feasible and usable existing
18  technology that is at the limits of technological
19  innovation.  That's why I say in my Report that
20  BOPs and capping devices are sub-BAST.  They're
21  not -- you don't even have to argue about what
22  BAST is.  They're routine devices that have been
23  used in the industry for years and -- and in --
24  in hundreds, if not thousands, of applications.
25  So they're not even at the level of BAST where

26 (Pages 101 to 104)

105

1   you'd have to argue about it.
2       Q.  Did you consult the MMS Regulations to --
3   to come up with your determination of the
4   definition of BAST?
5       A.  Yes.  Well, I don't know.
6       Q.  You don't -- you don't know if you did?
7       A.  For this case, I don't know.
8       Q.  Well --
9       A.  I've -- I've looked at it for this case
10  but -- but the -- but to -- when you say "come up
11  with" my definition, I don't know.  I've read a
12  lot of papers and things about BAST.
13      Q.  Have you ever consulted the Regulations
14  for the purpose of having an understanding of the
15  definition of "BAST"?
16          MS. RICHARD:  Objection, form.
17      A.  Yes.  I looked at it for this case.
18      Q.  (By Ms. Browne) Okay.  You -- you
19  understand, then, that it's the MMS Director who
20  determines the definition of BAST or determines
21  what is BAST?
22          MS. RICHARD:  Objection, form.
23      A.  No.
24      Q.  (By Ms. Browne) "No"?
25      A.  Well, thank -- thank you for reminding

106

1   me, because the answer to that is "No."  I have a
2   specific paragraph in my Report about that
3   issue --
4       Q.  Okay.
5       A.  -- that -- that a -- that the Director
6   can determine what BAST is; but if he doesn't
7   make a determination on a particular subject,
8   then is simply -- hasn't addressed that.
9           I have -- I have a paragraph about the
10  two Secretaries that are involved in that
11  decision.  I -- I explain it in my Report.
12      Q.  All right.  Let's take a look at Tab 15,
13  then.  That's TREX-51497.
14          MS. RICHARD:  I think we have a --
15  we need to get a different notebook.
16          MS. BROWNE:  Oh, right.  This is --
17          MS. RICHARD:  It's in the next --
18          MS. BROWNE:  Volume 2.
19          MS. RICHARD:  -- notebook.
20          MS. BROWNE:  Correct.  Volume 2,
21  thank you.
22          MS. RICHARD:  Here.  See if --
23          THE WITNESS:  And I -- and I -- and
24  I also am going to go to my Report to a paragraph
25  where I discuss this -- this exact issue.

107

1           (Discussion off the record.)
2       Q.  (By Ms. Browne) Yeah.  If you turn to
3   250, Section 105, which is a few pages in.
4           THE COURT REPORTER:  This is Tab
5   15 --
6       Q.  (By Ms. Browne) There's --
7           THE COURT REPORTER:  -- correct?
8           MS. BROWNE:  Yes.
9           MS. RICHARD:  Yes.  Is it marked as
10  an exhibit?
11          MS. BROWNE:  It is.  It's a TREX.
12  It's already previously --
13          MS. RICHARD:  Already marked.
14          MS. BROWNE:  -- marked TREX-51497.
15          MS. RICHARD:  Thank you.
16      Q.  (By Ms. Browne) So just about ten pages
17  in, Mr. Ziegler.
18          MS. RICHARD:  And it's 250 what?
19  I'm sorry.
20          MS. BROWNE:  250-105, "Definitions."
21      Q.  (By Ms. Browne) And "Best available and
22  safest technology," there's a definition.
23          Are you there, sir?
24      A.  Yeah.  I think the definition's in 105.
25  That's what I --

108

1       Q.  Right --
2       A.  That's what I cite in --
3       Q.  -- 105.
4       A.  That's what I cite in my Report.
5       Q.  Okay.  "Best available and safest
6   technology (BAST) means the best available and
7   safest technologies that the BSEE Director
8   determines to be economically feasible wherever
9   failure of equipment would have a significant
10  effect on safety, health, or the environment."
11          Did I read that correctly?
12      A.  I haven't found it yet.
13      Q.  Okay.
14      A.  Okay.  Let me look at it.
15          (Reviewing document.)
16          MS. RICHARD:  There's not a -- a --
17  I'd tell you a page number.
18          THE WITNESS:  I found it.
19          MS. BROWNE:  No, it's not a --
20          MS. RICHARD:  Okay.
21          MS. BROWNE:  They're not page
22  numbered.
23          MS. RICHARD:  All right.  We're on
24  the right page now.  Sorry.
25      Q.  (By Ms. Browne) So I read that correctly,

27 (Pages 105 to 108)

173

1      **Q. Okay.  So why don't you turn to 1487?**
2      MS. BROWNE:  I'm going to move to
3 strike what you just said as nonresponsive.
4      **Q. (By Ms. Browne) Section 6, "Well Control**
5 **Incident Response."  In that first paragraph**
6 **under 6, the second sentence:  "In the event of a**
7 **well control incident CONTRACTOR will assist**
8 **COMPANY in evaluation of the situation and**
9 **mobilization of materials, personnel and services**
10 **required in fire fighting, recovery, capping and**
11 **relief well operations.  Following mobilization**
12 **the CONTRACTOR will advise and assist COMPANY**
13 **with onsite fire fighting, well capping, relief**
14 **well and recovery operations."**
15      **Did I read that correctly?**
16      A. Yes.
17      **Q. And then 6.1 is "Well Control Services."**
18      **"CONTRACTOR shall provide or have access**
19 **to, as well as identify personnel, to provide but**
20 **not limit itself to:  Fire fighting, surface**
21 **blow-out control, capping on fire capabilities,**
22 **sub-surface blow-out control, engineering**
23 **response and prevention capability, relief well**
24 **design and intervention and explosive expertise."**
25      **Did I read that correctly?**

174

1      A. Yes.
2      **Q. And 6.1.1, "Blow-out Control."**
3      **"CONTRACTOR shall provide personnel and**
4 **equipment necessary for blow-out control**
5 **activities including, but not limited, well**
6 **capping, pressure control, fire-fighting,**
7 **equipment operation, engineering, HSE as well as**
8 **monitoring capacity, and well restoration**
9 **capabilities."**
10      **Did I read that correctly?**
11      A. Yes.
12      **Q. And then 6.1.3 reads:  "Sub sea Well**
13 **Intervention."**
14      **"CONTRACTOR shall provide or have access**
15 **to sub sea well intervention services that**
16 **provide but are not limited to the following:**
17 **Diving and ROV services, spill recovery and**
18 **modelling, sub sea wellhead availability, dynamic**
19 **positioning derrick barge contractors, wire line**
20 **and downhole surveying contractors and**
21 **capabilities."**
22      **Did I read that correctly?**
23      A. Yes, but that's my point.  Wild Well
24 Control did not have that capability.  Wild Well
25 Control, in the -- in the deposition testimony

175

1 that you -- that you and I looked at a couple of
2 hours ago, said that there was no equipment
3 available and they couldn't make it ahead of
4 time.
5      So they did not, when they signed this
6 contract and when BP renewed it, have -- have or
7 have access to something that BP and Wild Well
8 Control says didn't exist.
9      So BP then makes a representation in the
10 OSRP to the MMS that they had these services
11 available.  The people they say they're going to
12 call don't have that equipment, as -- as the
13 deposition we read pointed out.
14      So it -- it's a misrepresentation to the
15 MMS in the OSRP.  They don't have that
16 capability.
17      **Q. On Page 23 of your Rebuttal Report, you**
18 **state --**
19      MS. RICHARD:  Rebuttal?
20      THE COURT REPORTER:  Tab 2, Exhibit
21 11579.
22      **Q. (By Ms. Browne) -- you state that "BP**
23 **made decisions and the government did not have to**
24 **'sign off' on any procedures..."**
25      A. Where -- where is this?

176

1      **Q. On Page 23 of your Report, your Rebuttal**
2 **Report.**
3      A. Okay.
4      (Discussion off the record.)
5      MS. RICHARD:  What number?
6      MS. BROWNE:  Paragraph 3.
7      MS. RICHARD:  Thank you.
8      A. Okay.
9      **Q. (By Ms. Browne) You see that, "BP made**
10 **decisions and the government did not have to**
11 **'sign off' on any procedures..."?**
12      A. Yes.
13      **Q. Okay.  You're -- you're familiar with the**
14 **Unified Command Structure; is that right?**
15      A. Yes.  And I've -- I've cited elsewhere in
16 my Report, for example, Dr. McNutt's testimony on
17 this issue.
18      **Q. You agree that Unified -- the Unified**
19 **Command Structure governed the DEEPWATER HORIZON**
20 **incident?**
21      MS. RICHARD:  Objection --
22      A. No --
23      MS. RICHARD:  -- form.
24      A. -- I I --
25      **Q. (By Ms. Browne) You don't agree with**

44 (Pages 173 to 176)

177

1 that?
2      A. No, did not govern. Did not govern. It
3 was applicable because it was set up and it was
4 put into effect, but "governed," to me, implies
5 decision-making processes.
6      Q. Well, the --
7      A. And in -- and in the -- for example, in
8 the stipulated facts document, I think it's TREX
9 9139 we use in this case -- says right down at
10 the bottom that there's no agreement that anybody
11 had certain decision-making authority, and it
12 talks about specifically the UIC and other people
13 in that document.
14      So when you say "governed," I would agree
15 that the UIC structure under the Oil Pollution
16 Act and, perhaps, other places can be put into
17 effect; but I would not use the term "govern."
18 That's not correct.
19      Q. You understand the Oil Pollution Act
20 requires the President or his designee to direct
21 the response to an oil spill like the Macondo
22 spill, right?
23          MS. RICHARD: Objection, form.
24      A. That sounds like a legal opinion. I've
25 not been hired to give legal opinions.

178

1      Q. (By Ms. Browne) You're -- you're a
2 lawyer, though, right?
3      A. I have -- you --
4          MS. RICHARD: Objection, form. He's
5 not giving legal opinions in this case.
6          MS. BROWNE: I'm just asking him --
7      Q. (By Ms. Browne) You're --
8          MS. BROWNE: He's a lawyer, right?
9      A. I'm a member of State Bar of Texas, yes.
10      Q. (By Ms. Browne) Okay. Well, you're
11 just -- you just recited to me the meaning of a
12 stipulation, so let's -- let's take a look at
13 what's behind Tab 26.
14          MS. RICHARD: Objection, form.
15 Objection to the sidebar comments.
16      A. I didn't say a meaning of the
17 stipulation. I was telling you what the
18 documents says.
19      Q. (By Ms. Browne) Right. And specifically,
20 Section 1321, this is Title 33. So 33 USC 1321.
21 And if you could look at sub -- Subsection
22 (c)(2)(A), please.
23      A. (Reviewing document.)
24      Q. That appears on Page 423, if you note at
25 the top of the page, top left, there are page

179

1 numbers.
2      A. M-h'm.
3      Q. And that reads: "Discharge posing
4 substantial threat to public health and welfare."
5      "If a discharge, or a substantial threat
6 of a discharge, of oil or a hazardous substantial
7 from a vessel, offshore facility, or onshore
8 facility is of such a size or character as to be
9 a substantial threat to the public health or
10 welfare of the United States (including but not
11 limited to fish, shellfish, wildlife, other
12 natural resources, and the public and private
13 beaches and shorelines of the United States), the
14 President shall direct all Federal, State, and
15 private actions to remove the discharge or to
16 mitigate or prevent the threat of the discharge."
17      Did I read that correctly?
18      A. You did read it correctly.
19      Q. This -- this was an oil spill of such
20 size and character to be a substantial threat to
21 the public health or welfare of the United
22 States, right?
23          MS. RICHARD: Objection, form.
24      A. I -- I don't think so.
25      Q. (By Ms. Browne) Well, it was designated

180

1 as a spill of National significance, right?
2          MS. RICHARD: Objection, form.
3      A. I -- I'm not -- I mean, I don't recall
4 that specifically. I'd have -- I've looked at
5 the documents, but I don't know where that term
6 was used.
7      Q. (By Ms. Browne) You said, in response to
8 an earlier question, that you're -- you're not
9 giving legal opinions. I -- I asked you if you
10 understand what the Oil Pollution Act requires.
11      A. Yes.
12      Q. And you said, "It sounds like a legal
13 opinion. I'm not hired to give legal opinions."
14 Right?
15      A. Yes.
16      Q. You -- you are, though, giving opinions
17 on the meaning of Regulations in this case,
18 aren't you?
19      A. Sure --
20          MS. RICHARD: Objection, form.
21      A. Sure, because oil and gas companies have
22 to comply with the Regulations, so if the
23 Regulations are written so people in the industry
24 can't understand them or comply with them, they'd
25 be meaningless. So people in the industry have

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

249

```
 1    from Charlie Holt's deposition, and I would
 2    direct your attention to Page 399, beginning at
 3    Line 14:
 4         "QUESTION:"  -- by Mr. Baay -- "Okay.  So
 5    if that's true and if you're telling us that the
 6    BOP on BOP was abandoned because of the fear of
 7    pressure buildup, my question is wasn't that a
 8    mistake given the fact that you had ways to deal,
 9    options to deal with pressure buildup when you
10    examined the BOP-on-BOP option?"
11         "MR. DRAKE:  Objection; form and scope.
12         "ANSWER:  Yes, sir, those were
13    identified.  However, in our analysis the top
14    kill actually would impose lower pressures onto
15    the system, if successful."
16         Did I read that correctly?
17    A.  Yes.
18    Q.  You understand at this point that no one
19    knew what the state of the BOP in the well was
20    really like the -- at the time of the Top Kill,
21    right?
22    A.  If the what of the BOP?
23    Q.  The state of the BOP was.
24         MR. SMITH:  Objection, form.
25         MS. SARGENT:  Objection, form.
```

250

```
 1    A.  I have no idea what that means.
 2    Q.  (By Ms. Browne) All righty.  You -- you
 3    do understand that Top Kill was authorized by the
 4    MMS and the Coast Guard, right?
 5    A.  Among --
 6         MR. SMITH:  Objection, form.
 7    A.  -- others, yes.
 8    Q.  (By Ms. Browne) Okay.
 9    A.  And auth -- and the term "authorize,"
10    again, I disagree with that whole concept, but --
11    of -- of who had authority.  BP is the
12    Responsible Party and always was the Responsible
13    Party under the Oil Pollution Act and under the
14    MMS Regulations 30 C.F.R. 254.5 C, not the MMS
15    standards relieves your responsibility to
16    immediately abate source flow --
17         MS. BROWNE:  Right.
18    A.  -- without auth --
19         MS. BROWNE:  I'll remove -- I'll
20    move to strike as nonresponsive.  I'll --
21         MR. SMITH:  Were you finished with
22    your answer?
23         THE WITNESS:  Yes, I was.  Thank
24    you.
25    Q.  (By Ms. Browne) Let's turn to Tab 57.
```

251

```
 1    Tab 57 is a series of E-mails between and among
 2    Rod O'Connor from the Department of Energy, Carol
 3    Browner, from the Executive Office of the
 4    President, various others from the Executive
 5    Office of the President, Department of Homeland
 6    Security, Marcia McNutt, and David Hayes of the
 7    Department of the Interior, and --
 8    A.  So -- so you're telling me that's who
 9    they're -- who these people are?
10         THE COURT REPORTER:  Previously
11    marked?
12         MS. BROWNE:  Yes, sir.  It's
13    previously marked as Exhibit 9130.
14         THE COURT REPORTER:  Thank you.
15    Q.  (By Ms. Browne) If you look at the bottom
16    of the page.
17    A.  Well, I'm -- I'm -- I wanted a
18    clarification.  Is that who you're telling me who
19    these people are?
20    Q.  Well, if you take a look at the top
21    E-mail, "Carol_M._Browner@who.eop.gov."  Do you
22    see that?
23    A.  Yes, I see it up there.  I was looking
24    down below where you referred me to.  Okay.
25    Q.  Okay.  If you -- if you look down at the
```

252

```
 1    bottom E-mail, the first line, and this is from
 2    May 26, 11:34 a.m., "Chu and POTUS spoke 20
 3    minutes ago.  They agreed to talk again if there
 4    was a disagreement between our team and BP-there
 5    is not."
 6         Did I read that correctly?
 7    A.  Yes.
 8    Q.  Do you understand that "POTUS" is an
 9    abbreviation for President of the United States?
10    A.  Yes, I do.
11    Q.  Okay.  If you look at the E-mail that's
12    second from the top from Carol M. Browner, do
13    you -- do you know who Carol Browner is?
14    A.  Yes, I know.
15    Q.  All right.
16    A.  I -- I worked for her once on a -- a
17    case.
18    Q.  All right.  And she -- she notes:  "This
19    has been put on hold for 15 minutes - CHU is
20    rethinking the pipe issue."
21         Did I read that correctly?
22    A.  Yes.
23    Q.  And then right above that, from
24    Mr. O'Connor, it reads:  "The question has been
25    resolved.  We are good to go."
```

63 (Pages 249 to 252)

269

1  Team said the same thing, right?
2      A. Well, they're not oil field people, so --
3      Q. That wasn't my question. Do you have an
4  understanding that the Unified Source Control
5  Team noted the concerns about --
6      A. Well --
7      Q. -- the -- the release of the LMRP?
8      A. Well, I -- I -- I disagree with you.
9      Q. Okay.
10     A. Because -- because throughout this whole
11 process, BP says something -- we've seen it in
12 some of the E-mails you read here today. BP says
13 something, and the Government people who are
14 smart people and doing their best but they're not
15 oil field people say, "Yeah, we heard what BP
16 said. They're really thought -- thoughtful
17 people, and so this must be true."
18     Q. Right.
19     A. So -- so we get this continual back and
20 forth with BP sometimes disputing and sometimes
21 wanting to rely on that line of authority for
22 other people hopefully to BP being responsible,
23 but then we have them -- them mirroring and
24 echoing each other back and forth. But
25 ultimately, the Regulations say BP's is

270

1  responsible.
2      MS. BROWNE: Yeah. Move to strike
3  as nonresponsive.
4      Q. (By Ms. Browne) You -- one of your
5  opinions is that BP could have moved the -- the
6  rig off the location, right? Quick -- moved it,
7  well, more quickly, right?
8      MR. SMITH: Objection, form.
9      A. Could have more quickly moved the rig off
10 location? Well, they sunk it, so I'm not sure
11 what you're asking me. BP sunk --
12     Q. (By Ms. Browne) Yeah. That's a good --
13     A. -- the rig.
14     Q. Right. So take a look -- take a look at
15 Page 30 of your Report.
16     A. Yes, where?
17     Q. You note at Paragraph c: "BP failed to
18 release the riser and move the rig off location
19 to leave the well in a" contition -- "condition
20 to cap/vent."
21     Did I read that correctly?
22     A. Yes, ma'am, you did. And --
23     Q. And --
24     A. And -- and this --
25     Q. And you know that the --

271

1      A. -- this -- this is --
2      Q. You -- you answered my question, sir.
3      A. I'm -- I'm answering my question.
4      Q. No, you did. You said I read it
5  correctly.
6      A. This is a list -- this is a --
7      Q. And my --
8      A. -- list of options, where if BP does
9  certain things, they preserve the rig. And then
10 for Source Control, as part of that process, you
11 can simply vent overboard instead of burning up
12 the rig and burning up people, until you get to
13 the point where you could perhaps release the
14 riser and get off the location.
15     Q. So the rig -- the rig was --
16     A. Or if the rig --
17     Q. -- was burning, right?
18     A. Or if -- the rig is not burning if you
19 don't divert the -- the well fluids to the rig
20 itself instead of through the overboard diverter
21 systems. You can preserve the rig, and you can
22 move the rig off location after you release the
23 riser.
24     Q. (Discussion off the record.)
25     MS. SARGENT: I'll object to this

272

1  line of questioning insofar as it's getting into
2  Phase I testimony regarding the cause of the
3  blowout.
4      THE REPORTER: That's -- yeah,
5  that's not going to work.
6      (Discussion off the record.)
7      MS. SARGENT: Insofar as getting
8  into Phase I issues regarding the causes of the
9  blowout.
10     THE COURT REPORTER: Thank you.
11     (Discussion off the record.)
12     MR. SMITH: Were you finished with
13 your answer?
14     THE WITNESS: Well, no, I wasn't.
15     A. The -- these are all alternatives. So on
16 this list of things I have of what BP failed to
17 do, I say up above that -- that you have to
18 preserve the rig. If the rig sinks, you --
19 there's certain things you can't do.
20     However, if the rig doesn't sink, then
21 the proper procedure is to release the riser and
22 move the rig off the location.
23     Q. (By Ms. Browne) All right. Turn to
24 Tab --
25     A. So you preserve -- you preserve the rig,

68 (Pages 269 to 272)

273

1    you can use it for well intervention purposes,
2    and also then you can -- you have a clear
3    wellhead to set a cap on.
4              MS. BROWNE:  Okay.  I'll move to
5    strike as nonresponsive and beyond the scope.
6         Q.  (By Ms. Browne) Tab 6, please turn to
7    Tab 6, Line -- or Page 12, it's the deposition of
8    Mr. Campbell from Wild Well.
9         A.  Yes.
10        Q.  Okay.  Oh, you know, I beg your pardon.
11   It was at line --
12             MS. BROWNE:  Is this right?
13             MR. RUDOFSKY:  Do you want to take a
14   break?
15             MS. BROWNE:  Yeah, we can take a
16   break for a second?
17             THE VIDEOGRAPHER:  The time is
18   3:26 p.m.  We're off the record.
19             (Recess from 3:26 p.m. to 3:42 p.m.)
20             MS. BROWNE:  Ready?
21             THE COURT REPORTER:  Yes, ma'am.
22             THE VIDEOGRAPHER:  All set?
23        The time is 3:42 p.m.  We're back on the
24   record, beginning Tape 6.
25        Q.  (By Ms. Browne) Mr. Ziegler, could you

274

1    turn to Page 37 of your initial Report, please,
2    Paragraph 8.
3         A.  Okay.
4         Q.  In Paragraph 8, in the -- the second
5    sentence, you note:  "In other words, BP may have
6    intentionally progressed with various Source
7    Control procedures, possibly hoping that the well
8    would bridge on its own in the meantime, without
9    having optimal data collection capability for
10   anyone to use to calculate actual flow rates."
11             Did I read that correctly?
12        A.  Yes.
13        Q.  What -- what do you mean when you use the
14   words "may have intentionally"?
15        A.  Well, I can see that an entity who had a
16   well flowing out of control would hope, every
17   day, that the well would bridge over, because
18   they know, that once the well was capped and
19   shut-in, or capped and flowed in a controlled
20   manner with data such as pressures and
21   temperatures being collected, that a quite
22   precise engineering calculation could be made of
23   what the flow rate was.
24             So if you -- if you hope the well bridges
25   over, and you don't have to go to that final

275

1    step, you're eliminating data that someone could
2    use later, to make calculations of what the
3    actual flow rate was, so then you can -- as
4    you -- as you pointed out, the flow rate is
5    disputed.
6         So it would be less disputed if you had
7    really good pressure data.  And, in fact, I
8    think, to a large extent, that act -- actually
9    happened.
10        Q.  So are you saying BP was trying to delay
11   shutting in the well, so maybe the well would
12   bridge?
13        A.  Well, I'm not saying that they were
14   trying to, because I don't know what was in their
15   minds.  I'm just saying that they would have,
16   from a technical viewpoint, would have an
17   incentive to hope that the well would bridge
18   before you shut it in, as I just described.
19        Q.  But you don't have any factual basis
20   for -- for the notion that BP was trying to delay
21   shutting in the well.  Right?
22             MR. SMITH:  Objection, form.
23        A.  Well, I think that's not correct.  The
24   factual basis, based on my opinions, is that
25   there was a lot of wasted time with these other

276

1    procedures, so that's the factual basis.
2         So, looking at it, at least in the
3    alternative, there are more than one reasons why
4    BP might want to delay capping and shutting in
5    the well, and I've set forth all of the -- what
6    those other operations were and what I thought
7    about them in my Report.
8         Q.  Page 20 of your Report, Paragraph 8 --
9         A.  Okay.
10        Q.  -- you note, in the middle of the page:
11   "BP was required to be able to control and to
12   maintain well control at all times, to perform
13   all operations in a good and workmanlike manner."
14             What do you mean by "good and" workman --
15   "workmanlike manner"?
16        A.  Well, to do things prudently and do
17   things carefully and properly, and in a good
18   industry progression, use -- using standards and
19   practices to follow Regulations.
20        Q.  Anything else?
21        A.  No.
22        Q.  In the next phrase you note "...to stop
23   spills immediately..."  Do you see that?
24        A.  Yes.
25        Q.  What's your definition of "immediately"

277

1  as used in this Report?
2      A.  Well, to not wait for weeks and months,
3  while you do other activities.  When you had
4  determined, for example, in the BP Alaska
5  materials, that capping was the well control
6  technology that would -- was most feasible and
7  should be used, so anything that delayed capping
8  the well and shutting it in.
9      Q.  Your definition of "immediately" is
10 anything that delayed capping the well and
11 shutting it in?
12         MR. SMITH:  Objection, form.
13     A.  Well, I gave you about a 50-word answer,
14 and that was kind of my summary at the end.  That
15 wasn't everything I said.
16     Q.  (By Ms. Browne) Right, you did, but my
17 question was:  What was -- what's the definition
18 of "immediately" as used here?  I got your 50
19 words.  I'm asking you the definition of
20 "immediately."
21     A.  Well, it's in the fif --
22         MR. SMITH:  Objection, form.
23     A.  It's in the 50 words.
24     Q.  (By Ms. Browne) Well, I'm asking you,
25 again, to tell me what your definition of

278

1  "immediately" is, as used in this paragraph?
2      A.  Well, it's the same thing that I just
3  said.  And then I would add things, such as, "in
4  the Regulations," for example, at 30 C.F.R.
5  250.254.5(c), where it says:  "Do everything" --
6  well, I guess we could pull it out and read.
7  I -- I don't think I have it here, though.
8      But where it says to do everything that
9  is required to abate the flow as soon as
10 possible.  So I equate "immediately" with such
11 terms as "as soon as possible," or equivalent
12 terms in Regulations such as the one I cited.
13     Q.  Okay.
14     A.  And I -- and I've cited that Regulation
15 several times today.
16     Q.  Okay.
17     A.  I think that's the correct number, but
18 it's -- it's in the section that says "What" --
19 "What is an Oil Spill Response Plan required," or
20 something like that.  I think that's the correct
21 number.
22     Q.  Okay.  At Page 4 of your Rebuttal
23 Report --
24         THE COURT REPORTER:  Tab 2.
25     A.  Okay.

279

1      Q.  -- you note, in the middle of Paragraph
2  A.: "Instead of a performance standard to do what
3  is necessary for Source Control, BP followed a
4  risk-based process safety system..."
5      Do you see that?
6      A.  Yes.
7      Q.  What's the difference between a
8  performance standard and a risk-based process
9  safety system, as stated here in Paragraph A. of
10 your Report?
11     A.  Oh, they're completely different things.
12 A -- a performance standard is to do what is
13 necessary to an accomplish a certain requirement.
14 A risk-based process safety system, as BP applied
15 it, was to do such things as to, instead of
16 developing equipment or procedures to stop flow
17 as soon as possible, or immediately, as I've
18 defined it, is to do something like to do a -- a
19 probability analysis of what is the chance you
20 will have an oil well, so in -- and -- and
21 Mr. Burch talks about this a lot, but in -- in
22 the U.K. Regulatory system, and this is where BP
23 goes wrong.  In the U.K. Regulatory system, it is
24 risk-based, like with -- with ALARP, to have
25 risks as low as reasonably possible, which even

280

1  Mr. Bur -- Mr. Burch says does not apply in the
2  Gulf of Mexico.
3      So in the Gulf of Mexico, you don't look
4  at risk and say:  What is the chance we have a
5  blowout?  What's the chance this will happen?
6  What's the chance that this particular well will
7  blow out?
8      The Requirements in the Gulf of Mexico
9  are Performance Standards.  It says:  "You shall
10 be able to control the well at all times.  You
11 have to have the ability to shut the well off as
12 soon as possible."
13     So there are Performance Standards that
14 tell you things you have to do.  And then you, as
15 the Oil Operator, or Responsible Party, have to
16 figure out how to do it.  You don't risk it and
17 say: "Oh, well, we're going to ignore the MMS
18 Standard that says we have to be able to do
19 certain things, or we have to do certain things,
20 and we're just going to look at the risk of
21 something happening, and if the risk is low
22 enough for BP, where all it costs BP is dollars,
23 then we may not do it."
24     So that's the difference.
25     Q.  On Page 13 of your Report, it's the

70 (Pages 277 to 280)

285

1   up in the middle of Montana doesn't mean that he
2   has anything to do with BP's operations in the
3   Gulf of Mexico where they're a Responsible Party
4   under the MMS Regulations and under their
5   permits.
6       Q.  You'd agree that it's foreseeable to
7   Halliburton that BP didn't own a prebuilt,
8   deepwater, dressed, and staged capping stack,
9   right?
10      MR. SMITH:  Objection, form.
11      A.  Well, I -- I don't know if they -- if
12  Halliburton would have any reason to ask.  I
13  don't think BP told them that, because BP
14  didn't -- didn't think about it.
15      But I -- I'm really not sure what that
16  means.
17      Q.  (By Ms. Browne) So you -- you don't have
18  an opinion as to whether or not it was
19  foreseeable to Halliburton that BP would not have
20  available a prebuilt, dressed, and staged capping
21  stack?
22      MR. SMITH:  Objection, form.
23      A.  Well, that's -- that's really a good
24  question, so I'm going to answer it this way:
25  Factual foreseeability might be one thing.  In

286

1   other words, is it possible, knowing all the
2   facts that BP knew and what their
3   responsibilities are and that sort of thing,
4   could somebody outside of BO -- BP, whoever it
5   is, think about that issue?  So that's a factual
6   foreseeability, the answer to that could be
7   "Yes."
8       However, there's a -- there's -- there's
9   what I think you would have to call a practical
10  or realistic foreseeability.  Someone who's not
11  responsible, not involved, or doesn't deal with
12  those issues would not foresee it in the -- the
13  way I would define "foreseeability."
14      "Foreseeability" has to mean that you
15  have some level of knowledge and understanding,
16  and then with that knowledge and understanding,
17  or responsibility or Regulatory responsibility,
18  that then you might be able to understand or look
19  at the issue.
20      I don't think that anyone outside of --
21  of BP is in that position.
22      Q.  (By Ms. Browne) You don't say anywhere in
23  your -- your Reports, either one of them, that it
24  was unforeseeable to Halliburton that BP would
25  not have a prebuilt, dressed, and staged capping

287

1   stack available, right?
2       MR. SMITH:  Objection, form.
3       A.  No, I don't think it's foreseeable or
4   unforeseeable, as I defined it, to Halliburton,
5   as a practical matter, and in the real world,
6   anything about BP's well control
7   responsibilities.
8       Q.  (By Ms. Browne) Right.  So -- and you
9   don't say anywhere that BP's Source Control Plan
10  was unforeseeable to Halliburton, right?
11      MR. SMITH:  Objection, form.
12      A.  The same answer.  In the -- in the --
13      Q.  (By Ms. Browne) Okay.
14      A.  -- what I call "real, practical
15  foreseeability," where you have some knowledge,
16  understanding, or responsibility and put all
17  those things together, I don't think it would be
18  reasonable for anyone outside BP to consider
19  those issues.
20      They're the Responsible Party.  It's
21  their well.  It's their Well Plan.  They decide
22  where to drill the well, how to drill the well,
23  the casing, the burst disk, all of those things
24  are BP's call and responsibility.  Other people
25  don't have all of that information, and no reason

288

1   to think about any of those things.
2       Q.  How does one access "The Ziegler Report"
3   newsletter that's noted in your Rule 26 material?
4       A.  Well, you would have to -- if you ask me
5   for a copy, I'll be glad to send them all to you.
6   There's -- it's no -- there's no -- I'm pretty
7   old, so I don't have things like that on a
8   website, that sort of thing, but I'd be glad to
9   send you copies.
10      Q.  Well, is it a subscription?  I mean,
11  how -- how would someone in the general public
12  obtain access to "The Ziegler Report"?
13      A.  Oh, well, there's two ways.  First, if I
14  run across someone that is in the industry, or is
15  a client or a customer, I would probably send
16  them one, or -- or if someone asks me to send it
17  to them, I'd put them on my -- my mailing list.
18  So if you would like to be on my mailing list,
19  I'll add you to -- add you to the mailing list.
20      Q.  Okay.  What is "First Safety Consultants
21  United"?
22      A.  That's a Texas corporation, and it could
23  have two businesses running through it as
24  d/b/a's, Safety United, and Ziegler-Peru,
25  Incorporated, and I'm not sure of the second one.

72 (Pages 285 to 288)

289

1    No, Ziegler-Peru is a separate company.
2         So -- so it probably operates the bus --
3    the business Safety United as a d/b/a, and then
4    it probably, in the past, had "Consulting
5    Resources Group" as a d/b/a under it.
6         Q. Who owns First Safety Consultants United?
7         A. I believe my wife owns it.
8         Q. What is City Best Magazine Publishers,
9    Inc.?
10        A. Well, that's a corporation that my wife
11   and I had set up for us, probably at least ten
12   years ago, where we were planning, with a -- with
13   another group, to start a magazine in Houston,
14   but we never did it.
15        Q. Okay.
16        A. It's a -- it's a dormant, inactive
17   corporation.
18        Q. FIGURE 4 to your initial Report --
19        A. Yes.
20        Q. -- has -- bears the title "BOP EQUIPMENT
21   USED ON THE MODU DEEPWATER HORIZON," and at the
22   bottom, it says "Drawing Source:  Turley, J.A.,
23   The Simple Truth (2012)."
24        Right?
25        A. Yes.

290

1         Q. And according to the Amazon website, "The
2    Simple Truth" is a novel that dramatizes the
3    drilling and demise of the MC252 at the hands of
4    fictional characters.  Is that your understanding
5    of what the simple truth is?
6         A. Yes.  Yeah, my -- John Turley is a Ph.D.,
7    Petroleum Engineer or Oce -- maybe an Ocean
8    Engineer, I'm not sure exactly.  He and I worked
9    together as Drilling Engineers at Marathon Oil
10   Company, and I got a cop -- he gave me a copy of
11   his book, and had some really good drawings in
12   the back, so I put one in here.
13        Q. You -- you -- you couldn't find a better
14   drawing than the one from this gentleman's novel?
15        A. Well, he's a Ph.D. Engineer.  It's a very
16   good drawing.
17        Q. Is that a "No"?
18        A. I don't know -- I don't --
19            MR. SMITH:  Objection, form.
20        A. I don't know what you mean by "better."
21   My -- my purpose of putting the figure in is to
22   show the information that's labeled on the
23   drawing.  I mean, if BP is offended, they'd like
24   to use one of their drawings, I'd be glad to
25   stick one in my Report.

291

1            (Discussion off the record.)
2         Q. (By Ms. Browne) What -- what is the
3    subject of "The Ziegler Reports"?  Are they
4    gen -- generally?
5         A. Oh, they're -- they're newsletters that
6    have information about new OSHA standards, and
7    oil field safety, and different safety materials.
8         Q. How often are they published?
9         A. Random.  In -- in 20 years, I've
10   published maybe 32 of them, some -- that --
11   that's just an estimate.  So I've published them
12   as often as four times a couple of years, and I
13   think in the last three or four years, I've
14   published one or two.
15        Q. Okay.
16            (Discussion off the record.)
17        Q. (By Ms. Browne) FIGURE 1 of your
18   Report --
19        A. Yes.
20        Q. -- lists the "WELL LOSS OF CONTROL
21   SCENARIOS," right?
22        A. Yes.
23        Q. The Copyright at the bottom is 2012?
24        A. Yes.
25        Q. When -- when did you generate this --

292

1    this "WELL LOSS OF CONTROL SCENARIOS," FIGURE 1?
2         A. Sometime near the end of the Year 2012.
3         Q. Why -- why did you generate it?
4         A. To make a list of kind of chronolo --
5    chron -- in a chronology in a couple of these
6    figures or just a list of all of the events that
7    could occur once -- whatever is at the top of the
8    page says.
9         Q. Is FIGURE 1 specific to Macondo?
10        A. H'm.  No.
11        Q. Okay.  Number -- No. 5 says the "Fifth
12   Method of Source Control" is:  "Cap, replace BOP,
13   add or repair features - redundant..." --
14        A. Wait, wait.  I -- I don't see it.  You
15   said No. 4?  No. 5?
16        Q. I'm sorry, FIGURE 2, I'm sorry.
17        A. Okay.  I'm sorry.  Plea -- please start
18   over.
19        Q. I beg your pardon.
20            So FIGURE 2 is "METHODS FOR SOURCE
21   CONTROL."  And there's no mention in here about
22   Top Kill, right?
23        A. Let me look.
24        Q. Okay.
25        A. Well, I would -- I would put Top Kill

73 (Pages 289 to 292)