UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig | : | MDL NO. 2179 |
| "Deepwater Horizon" in the Gulf | : | |
| of Mexico, on April 20, 2010 | : | SECTION: J |
| | : | |
| This Document Relates to: | : | JUDGE BARBIER |
| | : | |
| *All Cases* | : | MAG. JUDGE SHUSHAN |

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

MEMORANDUM IN SUPPORT OF MOTION *IN LIMINE* TO EXCLUDE THE
EXPERT TESTIMONY OF MICHAEL ZALDIVAR

I.  INTRODUCTION

Dr. Michael Zaldivar has submitted an expert report purporting to calculate flow rates from data and observations of the riser between May 13-20, 2010. Dr. Zaldivar's calculations should be excluded because they are inconsistent with the position BP has taken in this litigation and in previous public statements that it was impossible to use computational hydraulic modeling to reliably calculate flow rates using data available in May 2010. Dr. Zaldivar's report directly contradicts BP's Source Control rebuttal expert, Dr. Adam Ballard, who has submitted a report opining that it was impossible for BP to use data from May 2010 to credibly calculate the flow rate using hydraulic modeling techniques.  The modeling that Dr. Ballard says cannot be done is precisely the type of modeling employed by Dr. Zaldivar.  What is more, the evidence in the case clearly shows that BP was performing this type of modeling in May of 2010.  If this modeling really is capable of generating a reliable flow rate estimate, then Dr. Ballard's report, as well as all of BP's public statements regarding BP's ability to calculate flow rate in May 2010, are false. If this method is incapable of generating a reliable flow rate estimate, as posited by Dr. Ballard, then Dr. Zaldivar's report should be excluded as unhelpful to the trier of fact under Fed. R. Evid. 702.  As the Court has repeatedly made clear, both the Source Control and Quantification tracks

of Phase 2 are part of a single, overarching trial.  BP is attempting to take different positions in each track, arguing on one side that it was impossible to calculate flow rate in May 2010, and presenting on the other a flow rate estimate based on data and methods available in May 2010.  It should not be permitted to engage in such gamesmanship.

## II.  BACKGROUND AND RELEVANT FACTS

Dr. Michael Zaldivar purports to calculate a flow rate using data from the May 13-20, 2010 time period.  He observes that there was "slug flow" from the end of the riser during this period.  Attachment 1 (Zaldivar Rpt.) at 15-16.   "Slug flow" is a type of multiphase flow that is characterized by alternating periods of predominant gas flow and oil flow.  *Id.* at 13.  Dr. Zaldivar claims that he can identify this slug flow behavior from ROV videotape of the end of the riser showing periods of alternating light and dark fluids emanating from the end of the riser.  *Id.* at 15-16.

Dr. Zaldivar also observes that a portion of the riser was oscillating during this same period, and concludes that the slug flow and oscillation of the riser are linked.  *Id*. at 17.  He then goes a step further and uses a hydraulic fluid modeling program, LedaFlow, to model flow through the riser to see the flow rates at which slug flow would likely occur.  *Id.* at 29-30.  Those modeled flow rates exhibiting slug behavior constitute Dr. Zaldivar's best estimate for the actual flow rates during this period.  *Id.*  LedaFlow is a multiphase transient hydraulic simulator similar to OLGA.  *Id.* at B-1.  In fact, Dr. Zaldivar "benchmarks" his LedaFlow results by comparing the LedaFlow model to an OLGA model.  *Id.*  Crucially, the data relied upon by Dr. Zaldivar regarding the motion of the riser, the shape of the riser, and the periodicity of the slug flow was generated by BP or its contractors in May 2010, and was thus available at that time for BP's use in performing hydraulic modeling.  *See* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

One of BP's engineers, Dr. Tim Lockett, developed flow rate estimates in May 2010 using the slug tracking feature in OLGA.  ███████████████████████  Attachment 4 (Lockett Dep.) at 135, 190-91.  Dr. Lockett attempted to see whether slug behavior might cause backflow at the riser kink holes, and also attempted to determine whether the observed slug behavior from the riser end corresponded with a particular range of flow rates.  ████████ ████████████  Attachment 4 (Lockett Dep.) at 135, 190-91.  He testified, however, that he did not believe his May estimates were truly "best estimates" because they had not been corroborated or validated using other methods: "I'm going to … use the word 'best estimate' to refer only to places where we have corroboration."  Attachment 4 (Lockett Dep.) at 196.  He explained that "[s]lugging is one of the aspects of multiphase flow that we understand least about."  *Id.*. at 135.[1]

Dr. Adam Ballard is BP's rebuttal expert to Dr. John Wilson, one of Transocean's Source Control experts.[2]  Dr. Ballard, who was also a 30(b)(6) witness on behalf of BP, claims to be an expert on "hydraulic modeling," which he broadly defines as "the use of mathematical or physical techniques to simulate the behavior of fluids in systems, and to make projections about

---

[1] Dr. Lockett was not so skeptical about all flow rates modeled using hydraulic techniques – he believed the flow rate estimates calculated using the Capping Stack data were reasonable because they employed the "best defined" fluid and flow path.  Attachment 4 (Lockett Dep.) at 241.

[2] Transocean has taken the position in this litigation that BP knew or should have known in May 2010 that the flow rate from the well was too high for Top Kill to work.  In support of this position, Transocean (in alignment with the PSC, Halliburton, and the States) has put forward the expert report of Dr. John Wilson in the Source Control track of Phase Two.  Dr. Wilson catalogues a number of flow estimation "workstreams" that took place among BP and its contractors in April and May 2010.  Among the "workstreams" identified by Dr. Wilson is some of the modeling work performed by Dr. Lockett, including some of his slug tracking work.  Attachment 5 (Wilson Rpt.) at 20-21.

those systems." Attachment 6 (Ballard Rpt.) at 3. He opines without qualification that: "[c]ontrary to the claim by Dr. Wilson, neither BP nor any other party had the 'tools' in April and May 2010 necessary to reliably estimate daily discharge rates from the Well using hydraulic models." *Id.* at i. Dr. Ballard repeated this opinion at his expert deposition, testifying *repeatedly* that he believed it was not possible to reliably estimate the flow rate using hydraulic modeling given what was known in May 2010. Attachment 16 (Ballard Expert Dep.) at 27, 30, 125-26, 131-32, 157-58). Dr. Ballard responds to Dr. Wilson's identification of the slug-tracking modeling by Dr. Lockett as follows:

> Dr. Lockett was not, however, reporting on a continuous discharge rate from the Well; he was commenting on whether his visual observations were consistent with the instantaneous momentum of fluids that could be predicted by a specific option in the OLGA model called "slug-tracking." Based on my knowledge of OLGA, the OLGA model was likely producing results that seemed not credible because the slug-tracking option was not accurately depicting the instantaneous momentum of fluids in an unconventional system like the Well that Dr. Lockett visually observed in the oil plume.

Attachment 6 (Ballard Rpt.) at 20. Thus, Dr. Ballard does not believe that slug-tracking alone can provide a reliable estimate of the flow rate in an "unconventional" system such as this one. Dr. Ballard also adopts Dr. Lockett's position that May 2010 flow rate estimates could only be deemed "best estimates" if they were corroborated using other methods or data. *Id.* at 15 n.32. In his expert deposition, Dr. Ballard reiterated multiple times that it was not possible

Dr. Ballard's opinion is straightforward and consistent with the testimony of Dr. Lockett: it was impossible to reliably calculate the flow rate using "slug-tracking" and data available from May 2010. BP, through Dr. Ballard, has taken the position in this litigation that there was insufficient information in May 2010 to arrive at a credible flow rate estimate.

### III. LEGAL STANDARD

Under Fed. R. Evid. 702(b)–(d), expert testimony must be "based on sufficient facts or data," it must be "the product of reliable principles and methods," and the expert must have "reliably applied the principles and methods to the facts of the case."

### IV. ARGUMENT

1. **BP has taken the position that slug-tracking in May 2010 was not a credible methodology for accurately estimating flow rate. Based on this standard, Dr. Zaldivar's estimate should be excluded.**

For over three years, BP has sounded a consistent theme: flow rates calculated using data available early in the response were very uncertain. BP took that position while the well was flowing.[3] It repeated that position in public statements after the well finally ceased flowing. In discovery in this case, after BP's witnesses were deposed regarding modeling that was performed during that time period, BP's witnesses (primarily engineers who performed modeling on behalf of BP during the response) uniformly testified that they were not able to employ hydraulic modeling to arrive at a reliable flow rate estimate in May of 2010.[4] And in the Source Control

---

[3] *See, e.g.,* ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Attachment 9 (Ex. 1644 – BP media talking points for July 12, 2010) at 7 ("[a]ny estimate has a great deal of uncertainty…"); Attachment 10 (Ex. 6192 – October 21, 2010 submission by BP to the President's Oil Spill Commission regarding flow rate) at 1 ("a reliable estimate cannot yet be developed because several key pieces of information have been and remain unavailable….").

[4] Attachment 11 (Ballard 30(b)(6) Dep.) at 118 ("what Mr. Lockett was doing was proposing three methodologies to estimate flow assuming you had sufficient inputs and…data that you had some reliability – or had some confidence in."); Attachment 12 (Simon Bishop 30(b)(6) Dep.) at 479-80 ("We just didn't go there because it was not possible, not practical, not even possible for

track of this litigation, BP has repeated this theme through its Source Control rebuttal expert, Dr. Ballard, who has opined that it would be impossible for anyone to accurately calculate flow rates using hydraulic techniques during May 2010.

In stark contrast, Dr. Zaldivar employs hydraulic modeling techniques to analyze data that BP had available in May 2010 – namely, the position of the riser, the shape of the riser, and the periodicity of slugs emanating from the riser. Zaldivar's technique, as described above, is strikingly similar to an exercise performed by Dr. Lockett during the response and specifically dismissed by Dr. Ballard as unreliable due to the fact that the system modeled by Dr. Lockett was "unconventional." Attachment 6 (Ballard Rpt.) at 20. Dr. Lockett, in distancing himself from the method, explained that slug formation is one of the least well-understood aspects of multiphase flow. Attachment 4 (Lockett Dep.) at 135. Of course, BP employees are entitled to their own opinions without binding the company to their position. However, having presented the Ballard expert report in rebuttal to Dr. Wilson (after having putting forth Dr. Ballard as a 30(b)(6) witness), BP has bound itself to the positions advanced by Dr. Ballard, including the clear opinion that multiphase transient simulation of slugs in the riser could not be used to calculate a reliable flow rate from the riser in May 2010. BP should not be entitled to assert that it was impossible to calculate flow rate in May 2010 while simultaneously putting forward a flow rate estimate based on a methodology that BP could have employed, and in fact *actually did employ*, in May 2010.

---

us to do."); Attachment 13 (Mike Mason Dep.) at 46 ("we realized fairly quickly that we couldn't predict the flow rate. We couldn't determine the flow rate.").

- 6 -

**2. BP has taken the position that hydraulic flow rate estimates performed in May 2010 must be corroborated with other data or techniques in order to be considered reliable.  Because Dr. Zaldivar performed no such corroboration, his expert opinion should be excluded.**

Even aside from Dr. Ballard's assertion that slug tracking cannot yield accurate flow rate estimates here given uncertainty in the input parameters, Dr. Ballard goes further and adopts Dr. Lockett's position (taken in deposition) that a reliable estimate of flow can "only be derived when there is corroboration between the different methods of estimating flow."  Attachment 6 (Ballard Rpt.) at 15 n.32; Attachment 4 (Lockett Dep.) at 196.  Of course, Dr. Zaldivar does nothing to corroborate his estimate with any alternative methodology.  In fact, Dr. Zaldivar's estimate for the period is considerably lower than one of the estimates for the same period provided by Dr. Alain Gringarten, BP/Anadarko's only other expert to put forward an estimate for the flow rate during the May 13-20 period.[5]  Dr. Ballard further asserts that "conventional" hydraulic models such as OLGA were neither "designed or validated for use with a system as insufficiently defined as the Macondo Well following the blowout on April 20, 2010."  Attachment 6 (Ballard Rpt.) at 12.

This problem raised by Dr. Ballard is significant.  Dr. Zaldivar never compares, validates, corroborates, or otherwise checks his flow rate results against actual flow or pressure measurements.  He performs "benchmarking" between LedaFlow and OLGA, two transient

---

[5] For his "Option 2 – Drill Pipe High" case, Dr. Gringarten arrives at a rate history for the May 13-20 time that is at all times higher that Dr. Zaldivar's "maximum" rate of 35,900 stb/day for the period.  Attachment 14 (Gringarten Rpt.) at 53.  It is worth noting that the cumulative discharge corresponding to this estimate of Dr. Gringarten (3.0 million stock-tank barrels) is the only Gringarten estimate that falls within the range of likely cumulative discharges propounded by the last of the three BP/Anadarko experts who provides a quantitative flow rate estimate, Dr. Blunt.  Dr. Gringarten's other cases (which both yield approximately 2.5 million stock tank barrels) fall outside of the range of Dr. Blunt's estimate (2.9 to 3.7 million barrels).  So Dr. Gringarten can corroborate either Dr. Zaldivar or Dr. Blunt, but not both.

multiphase simulation programs, to ensure that they both provide similar answers given similar inputs and assumptions.  Yet he never checks the results of either by using any other measurement or estimate.  This is especially critical given that Dr. Zaldivar modeled what Dr. Ballard called an "unconventional" system – the annular flow path and oscillating motion of the riser distinguish this system from the types of flow systems against which LedaFlow and OLGA were calibrated.

When limited validation against other techniques is available, Dr. Zaldivar ignores it (perhaps because it does not support his estimates).  For example, Dr. Zaldivar's estimates of flow through the riser kink are much lower than estimates made by Dr. Lockett using similar data during the response.  ██████████████████████████████████████████████████████████████████████████████████████ which is far above the "maximum" rate estimated by Dr. Zaldivar of 4900 stb/day.  ████████████████████████  Attachment 1 (Zaldivar Rpt.) at 30.

Dr. Zaldivar's modeling work falls short of the standard propounded by Dr. Ballard that any hydraulic modeling of this "unconventional" system should be validated by comparison to other methodologies.  Dr. Zaldivar himself has failed to make any such comparisons.  Where such comparisons are available, including comparisons with Dr. Gringarten's rate schedule and modeling performed by BP during the response, those other methodologies do not corroborate Dr. Zaldivar's conclusions.

## V.  CONCLUSION

BP has taken the clear position in this litigation that it is impossible to calculate the flow rate from the Macondo well applying hydraulic modeling techniques to data available in May 2010.  It distances itself from actual flow rate estimates it calculated in May 2010 by stating that

the system could not be adequately defined based on the data available, and that any estimates from that period would need to be validated against estimates from other methodologies. Dr. Zaldivar's expert report on behalf of BP and Anadarko uses data available in May 2010 to calculate a flow rate for that period, and fails to corroborate his model by comparing it to estimates using other techniques. Dr. Zaldivar's estimate is, therefore, unreliable by BP's own standards, and should be excluded on that basis. BP should not be permitted to say a certain type of modeling is unreliable when defending itself in the Source Control track, only to turn around and embrace that modeling in the Quantification track.

Respectfully submitted,

| | |
|---|---|
| BRIAN HAUCK | ROBERT G. DREHER |
| Deputy Assistant Attorney General | Acting Assistant Attorney General |
| Civil Division | Environment & Natural Resources Division |
| PETER FROST | SARAH HIMMELHOCH |
| Directory, Torts Branch, Civil Division | Senior Litigation Counsel |
| Admiralty and Aviation | NANCY FLICKINGER |
| STEPHEN G. FLYNN | SCOTT CERNICH |
| Assistant Director | THOMAS BENSON |
| MICHELLE DELEMARRE | RICHARD GLADSTEIN |
| SHARON SHUTLER | Senior Attorneys |
| JESSICA SULLIVAN | A. NATHANIEL CHAKERES |
| JESSICA MCCLELLAN | ANNA CROSS |
| MALINDA LAWRENCE | BETHANY ENGEL |
| Trial Attorneys | JUDY HARVEY |
| | RACHEL KING |
| | ERICA PENCAK |
| | |
| | Trial Attorneys |
| /s/ R. Michael Underhill | /s/ Steven O'Rourke |
| R. MICHAEL UNDERHILL, T.A. | STEVEN O'ROURKE |
| Attorney in Charge, West Coast Office | Senior Attorney |
| Torts Branch, Civil Division | Environmental Enforcement Section |
| U.S. Department of Justice | U.S. Department of Justice |
| 7-5395 Federal Bldg., Box 36028 | P.O. Box 7611 |
| 450 Golden Gate Avenue | Washington, D.C. 20044 |
| San Francisco, CA 94102-3463 | Telephone: 202-514-2779 |

Telephone:  415-436-6648  
Facsimile:  415-436-6632  
E-mail:  mike.underhill@usdoj.gov

Facsimile:  202-514-2583  
E-mail:  steve.o'rourke@usdoj.gov

DANA J. BOENTE  
United States Attorney  
Eastern District of Louisiana  
SHARON D. SMITH  
Assistant United States Attorney  
Eastern District of Louisiana  
650 Poydras Street, Suite 1600  
New Orleans, LA  70130  
Telephone:  (504) 680-3000  
Facsimile:  (504) 680-3184  
E-mail:  sharon.d.smith@usdoj.gov

Attorneys for the UNITED STATES OF AMERICA

## CERTIFICATE OF SERVICE

      I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

Date: August 19, 2013.  /s/ Steven O'Rourke
                                                                  U.S. Department of Justice