# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater | : | MDL No. 2179 |
| Horizon" in the Gulf of Mexico, on | : | |
| April 20, 2010 | : | SECTION: J |
| | : | |
| This Document Relates To: All Actions | : | JUDGE BARBIER |
| | : | MAGISTRATE          JUDGE |
| …………………………………………….... | : | SHUSHAN |

## BP'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF DRS. DYKHUISEN AND GRIFFITHS

Neither Dr. Ronald Dykhuizen nor Dr. Stewart Griffiths, the United States' quantification experts employing "hydraulic" methods to generate estimates of the total volume of oil discharged, should be permitted to provide expert testimony regarding their cumulative flow estimates at trial, nor should Dr. Dykhuizen be permitted to offer his flow estimate for July 14-15, 2010 (just before the well was shut in).[1]

Federal Rule of Evidence 702 requires experts to offer opinions on the basis of ***scientific, technical, or other specialized knowledge*** and the application of ***reliable methodology*** to facts or data.  The work of both Drs. Dykhuizen and Griffiths falls short of this threshold because each of them applied a "custom" methodology (*i.e.*, one that did not exist for this purpose prior to the blowout on April 20, 2010) derived solely from their experience in fields other than the oil and gas industry.  Moreover, both Dykhuizen and Griffiths acknowledged levels of uncertainty in their proposed cumulative estimates that confirm the unreliable nature of their *ad hoc* methodologies and highlight the inadmissibility of their speculative estimates.  Given their admittedly inadequate inputs and the degrees of uncertainty in each of their methodologies and

---

[1]  Anadarko has asked BP to represent that it joins in this motion.

conclusions, Drs. Dykhuizen and Griffiths should both be precluded from providing expert testimony at trial.

## LEGAL BACKGROUND

Federal Rule of Evidence 702 requires that a purported expert's opinions must be both relevant and reliable to be admissible. *Daubert v. Merrell Dow. Pharm., Inc.*, 509 U.S. 579, 591-92 (1993). To determine reliability courts "ordinarily should consider" such factors as "the known or potential rate of error" and "widespread acceptance within a relevant scientific community." *Id.* at 594. Further, for an expert's methodology to be reliable, there must be some "objective, independent" validation of it. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 279 (5th Cir. 1998). In other words, an expert's own assurance that his methodology is scientific or generally accepted within his field is insufficient. *Id.* Accordingly, an expert must "independently establish the necessary physical and mathematical bases for [his] opinion." *Rosado v. Deters*, 5 F.3d 119, 124 (5th Cir. 1993); *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 992-993 (5th Cir. 1997) (holding that experts should perform calculations to demonstrate that their methodology is reliable).

The Fifth Circuit consistently excludes as unreliable expert testimony that relies on speculation or is not supported by record evidence. For example, in *Guillory v. Domtar Industries, Inc.*, 95 F.3d 1320, 1330-31 (5th Cir. 1996), the Fifth Circuit excluded the testimony of an expert as unreliable because it was "not based upon the facts in the record but on altered facts and speculation designed to bolster [the] position [of the defendant]." Similarly, in *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007), the Fifth Circuit excluded the affidavit of an expert, holding that his opinions depended "on the furtive inclusion of a number of supposed facts not in the record ... [and his] testimony therefore has neither the sufficient facts nor the reliable methodology that would warrant its inclusion as evidence." *See also Manton v.*

*Strain*, No. 09- 0339, 2010 WL 4364480, at *2 (E.D. La. Oct. 21, 2010) (excluding testimony based, in part, on "supposed facts" and "specuat[ion]").

## ARGUMENT

### I.     Given His Admittedly High Uncertainty Levels, Dr. Dykhuizen's Spill Estimates Are Speculative and Cannot Be Relied Upon.

Dr. Dykhuisen is a General Engineer at Sandia National Laboratories, Dykhuizen June 19-20, 2013 Dep. 12:14-21, and explained at his deposition that he had no experience in multiphase flow in oil and gas wells, or any other experience of any kind in petroleum engineering, before beginning work in this matter in May 2010, *id.* at 28:7-25.  Dr. Dykhuizen also testified that, notwithstanding his lack of experience in any oil and gas industry applications and his awareness of the existence of multiphase modeling software used to examine multiphase flow in oil and gas wells, he himself did not use any of these products in undertaking — or, importantly, in validating — his analysis. *Id.* at 30:21-32:11.

As a member of the U.S. Department of Energy's Tri-Labs Flow Rate Team during the summer of 2010, Dr. Dykhuizen worked with other scientists from the National Laboratories as well as other Government flow rate teams comprised of individuals from other backgrounds to develop methodologies to attempt to quantify the amount of oil being discharged from the Macondo well.  In late July 2010, the various Government flow rate teams, including the DOE Tri-Labs Flow Rate Team, agreed upon a single figure of 53,000 stock tank barrels per day as of July 15, 2010, a cumulative release amount of 4.9 million barrels over the course of the 86-day spill period, and an uncertainty estimate (or "error bar") of 10 percent as to both of these figures. Dykhuizen June 19-20, 2013 Dep. at 225:11-20.  Those estimates were released publicly by the United States in an August 2, 2010 press release. *Id.*  Dr. Dykhuizen has conceded that the bulk of the work leading to the August 2, 2010 press release number was done in the two-week period

between July 15 and July 31, 2010. *Id.* at 225:21-226:11. Dr. Dykhuizen's expert report in this matter presents these same figures, is derived from the same work, and uses the same methodology as that used in late July 2010 for the August 2, 2010 press release number.

Dr. Dykhuizen testified at his June 19-20, 2013 deposition that, at the time the figure was generated and released, he "strongly disagreed" with the 10 percent uncertainty figure provided with the August 2, 2010 press release number, because he "was ***not willing to stand behind any error bar whatsoever*** on the five million at that particular time." Dykhuizen June 19-20, 2013 Dep. at 171:4-172:11 (emphasis added). Indeed, he went on to explain that "[t]he error bar, at the time that we were writing the Report, was so large that there was no way to justify an error on the five million barrels a day." *Id.* at 173:9-16; *see also id.* at 196:6-21 ("I thought it then. I think it now.").

Even with the benefit of three additional years of time to examine the problem and available evidence, and his express reliance on other United States experts, Dr. Dykhuizen concedes that his cumulative estimate still "has a significant error to it," which he now puts at ***plus or minus 30 percent***. Dykhuizen June 19-20, 2013 Dep. at 511:14-21. Dr. Dykhuizen further concedes that the error in his estimate is much more likely to result in a lower cumulative estimate than a higher cumulative estimate. *Id.* at 513:24-514:15 ("3.5 million barrels a day, the 30 percent lower, has more likelihood than 30 percent higher."). Putting this degree of uncertainty in context, Dr. Dykhuizen testified that he could not think of any instance when he had ever published calculations that had error bars larger than 30 percent; in fact, Dr. Dykhuizen confirmed that "usually calculations that have an error bar of 30 percent aren't considered of academic interest; and, therefore, I would not have tried to publish any of those." *Id.* at 625:20-628:19. Despite all of the above, and notwithstanding its enormous inherent error, the United

States offers Dr. Dykhuizen's work for this Court's consideration to be relied upon in quantifying the spill from the Macondo well.  *See Daubert*, 509 U.S. at 592-94 (identifying "the known or potential rate of error" as a factor for assessing the reliability of an expert's opinion).

Finally, even with respect to the single-day flow estimate of 53,000 barrels per day on July 15, 2010, Dr. Dykhuizen testified that he believed the error bar on that figure should be plus or minus 20 percent and not the 10 percent uncertainty figure that was publically announced by the government at the time the estimate was first released.  Dykhuizen June 19-20, 2013 Dep. at 172:3-15, 502:9-16.  Notably, Dr. Dykhuizen's admission that he placed a plus or minus 20 percent uncertainty bound on his July 15 figure contradicts even with his own, more recent expert report, in which stated his belief that the uncertainty was lower than 20 percent. Dykhuizen Initial Report at 6 ("At the time, I personally thought that the uncertainty bound should be +/- 20% for the flow rates during the last days.  It is now my opinion that the uncertainty bound is smaller based on review of additional studies that obtained similar flows.").

Dr. Dykhuizen also conceded that the uncertainty on his cumulative estimate would be separate from, and in addition to, the plus or minus 20 percent uncertainty associated with his July 15 estimate.  Dykhuizen June 19-20, 2013 Dep. at 498:6-500:12.  And he testified that he was most confident in his July 15 estimate and that the farther back in time one looks from that July 15, the lower his confidence would be.  *Id.*  Thus, Dr. Dykhuizen is the ***least certain*** of his work on the days when his estimates assume the highest rates of flow, and where the impact of errors on those dates would have the ***greatest effect*** on his cumulative estimates.

Ultimately, Dr. Dykhuizen conceded that "***all of my estimates are inaccurate***." Dykhuizen June 19-20, 2013 Dep. at 473:22-474:4 (emphasis added).  As confirmed by the

fatally high margin of error, Dr. Dykuizen's opinions are not reliable and thus should be excluded.

**II.**      **Dr. Griffiths's Expert Opinions Should Be Excluded Because They Are Based on Untested Methods and Unsupportable Assumptions.**

Like Dr. Dykhuizen, Dr. Stewart Griffiths has no prior experience in the petroleum industry, in reservoir engineering, or in estimating flow from a well.  Griffiths June 26-27, 2013 Dep. at 15:11-16.  Although Dr. Griffiths emphasized his experience in multiphase modeling generally, he conceded that the actual physical properties of oil and gas can be different from that of water and steam in nuclear applications (where his actual experience is centered), and that those differences "could and [] do" influence the multiphase behavior.  *Id.* at 17:24-18:7.

This absence of relevant experience is hard even for Dr. Griffiths to reconcile with the United States' request that this Court rely upon his work.   Dr. Griffiths testified that he "struggled" with the concept of whether he was an expert, defining an expert as a "very high bar," and one that he did not know if he would reach.  Griffiths June 26-27, 2013 Dep. at 10:21-11:7.  Although Dr. Griffiths explained his understanding that a true expert is someone with a lot of experience in a very specific field, he indicated he believed he was an "expert witness" in numerous areas for ***legal purposes***, which he believed to be a lower bar than his own more demanding definition of an expert.  *Id.* at 11:8-12:4.  For example, Dr. Griffiths testified that he does not believe he is an expert in multiphase flow under his own definition of "expert witness," but that he believes he is an expert in that area under the legal definition of expert witness.  *Id.* at 14:18-23.

Like Dr. Dykhuizen's work in this case, Dr. Griffiths's methodology is based in hydraulic analysis principles, and the work he presents in his expert report is based in large part on the work he originally performed in the summer of 2010.  Dr. Griffiths explained at his deposition

that, rather than employing methodologies used previously in the oil and gas industry for this purpose, his is a "general purpose, theoretical model," Griffiths June 26-27, 2013 Dep. at 89:22-25, "custom-made" to measure flow from this well, *id.* at 627:22-628:22, and therefore never used or tested on any other well or in any other case.

Dr. Griffiths testified further that he chose this particular method because there was so much uncertainty at the time regarding all of the inputs for the geometry of the well, and — according to Dr. Griffiths — his chosen method allowed him to generate an estimate without that information. Griffiths June 26-27, 2013 Dep. at 95:8-96:11. Even though a significant amount of information about these unknown aspects of the geometry of the well became known after Dr. Griffiths had initially performed his analysis (as, for example, when additional physical evidence was recovered from the well and analyzed), he declined to consider much of that evidence to either test or confirm the accuracy of his work. Indeed, Griffiths testified that, rather than actually including the new evidence in his calculations to see what difference the addition of that new information might make, he instead "was informed about the issues here by thinking about the problem." *Id.* at 115:23-116:25. For example, rather than actually calculating the effect of the geometries of the actual recovered BOP equipment on his model and results, Dr. Griffiths testified that he "***formed a mental picture*** of -- of what these apertures would look like." *Id.* at 446:3-17 (emphasis added).)

The fundamental component of Dr. Griffiths's estimate with respect to the late April/early May time period, which he bases solely on extrapolation from a later period, is the unsupported assumption that any significant down-hole erosion of or changes to the flow path had to have occurred within nine and 36 hours after the blowout. Yet, despite this fundamental assumption upon which his work is predicated, Dr. Griffiths admitted at his deposition that ***his***

7

*uncertainty figures do not even account for the possibility that his assumption that all erosion occurred within 36 hours was incorrect*.  *Id.* at 326:2-329:3.  Dr. Griffiths admits that, if he is wrong in his rapid erosion assumption, his uncertainty bound would have to be higher than the uncertainty bound listed in his report; Dr. Griffiths refused in his deposition to say how much higher the uncertainty would actually be.  *Id.*  Like Dr. Dykhuizen, Dr. Griffiths admitted that his greatest uncertainty is during the earliest period of his analysis, April 20 to May 8, 2010, during which time he lacked a key type of input data required for his chosen flow estimation method.  *Id.* at 297:3-16.  Thus, like Dr. Dykhuizen, Dr. Griffiths is the *least certain* of his work on the days when his estimates assume the highest rates of flow, and where the impact of errors on those dates would have the *greatest effect* on his cumulative estimates.

Simply put, Dr. Griffiths's approach to his analysis — using untested, artificially simplified methods based on unsupported assumptions and resulting in estimates for which there are no accurate uncertainty bounds — is incompatible with the requirements for reliability and scientific rigor in the applicable Rules of Evidence governing the use of expert testimony at trial.

## <u>CONCLUSION</u>

BP respectfully requests that the Court enter an order precluding both Drs. Dykhuizen and Dr. Griffiths from rendering unreliable expert opinions regarding the cumulative flow from the well, and precluding Dr. Dykhuizen from rendering an unreliable expert opinion the July 14-15, 2010 flow rate.  As described above, these opinions are based on *ipse dixit* analysis and lack the scientific methodology and rigor required to survive the Court's scrutiny as gate keeper for the evidence to be presented at trial.

Dated: August 19, 2013                           Respectfully submitted,


                                                 /s / Don K. Haycraft

                                                 Don K. Haycraft (Bar #14361)
                                                 R. Keith Jarrett (Bar #16984)
                                                 LISKOW & LEWIS
                                                 One Shell Square
                                                 701 Poydras Street, Suite 5000
                                                 New Orleans, Louisiana 70139-5099
                                                 Telephone: (504) 581-7979
                                                 Facsimile: (504) 556-4108

                                                 Richard C. Godfrey, P.C.
                                                 (richard.godfrey@kirkland.com)
                                                 J. Andrew Langan, P.C.
                                                 (andrew.langan@kirkland.com)
                                                 Timothy A. Duffy, P.C.
                                                 (tim.duffy@kirkland.com)
                                                 Kirkland & Ellis LLP
                                                 300 North LaSalle Street
                                                 Chicago, IL 60654
                                                 Telephone: (312) 862-2000
                                                 Facsimile: (312) 862-2200

                                                 Robert C. "Mike" Brock
                                                 (mbrock@cov.com)
                                                 Covington & Burling LLP
                                                 1201 Pennsylvania Avenue, NW
                                                 Washington, DC 20004-2401
                                                 Telephone: (202) 662-5985

                                                 *Attorneys for the BP Exploration &*
                                                 *Production Inc. & BP America Production*
                                                 *Company*

9

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 19th day of August, 2013.

<u>/s/  Don K. Haycraft</u>