# Excerpts from the Deposition Transcript of Ronald Dykhuizen

# Taken June 19-20, 2013

**1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL      )  MDL NO. 2179
BY THE OIL RIG        )
"DEEPWATER HORIZON" IN )  SECTION "J"
THE GULF OF MEXICO, ON )
APRIL 20, 2010      )  JUDGE BARBIER
                    )  MAG. JUDGE SHUSHAN

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
VOLUME 1
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Deposition of Ronald Copeland Dykhuizen,
Ph.D., taken at the Pan-American Building, 601
Poydras Street, 11th Floor, New Orleans,
Louisiana, 70130, on the 19th day of June, 2013.

**2**

1       A P P E A R A N C E S
2
3
4   APPEARING FOR BP, INC :
        Mr  Matthew T  Regan
5   KIRKLAND & ELLIS
        300 North LaSalle
6   Chicago, Illinois  60654
7   Ms  Bridget K  O'Connor
        KIRKLAND & ELLIS
8   655 Fifteenth Street, NW
        Washington, D C   20005-5793
9
10  APPEARING FOR TRANSOCEAN:
        Mr  Paul C  Thibodeaux
11  Ms  Mary K  Klinefelter
        FRILOT
12  1100 Poydras Street, Suite 3600
        New Orleans, Louisiana  70163
13
14  APPEARING FOR ANADARKO PETROLEUM COMPANY:
        Mr  Warren Anthony Fitch
15  BINGHAM MCCUTCHEN
        2020 K Street, Northwest
16  Washington, D C  20006-1806
17
18  APPEARING FOR HALLIBURTON:
        Ms  Gwen E  Richard
        GODWIN LEWIS
19  1331 Lamar, Suite 1665
        Houston, Texas  77010-3133
20
        Mr  Prescott W  Smith
21  Ms  Kali Thomson
        GODWIN LEWIS
22  Renaissance Tower
        1201 Elm Street, Suite 1700
23  Dallas, Texas 75270-2041
24
25

**3**

1   APPEARING FOR THE UNITED STATES:
        Mr  Scott Cernich
2   U S  DEPARTMENT OF JUSTICE
        601 D Street, N W
3   Washington, D C   20004
4   Mr  David L  McIlwain
        U S  DEPARTMENT OF JUSTICE
5   ENVIRONMENT & NATURAL RESOURCES DIVISION
        Ben Franklin Station
6   Post Office Box 7611
        Washington, D C   20044-7611
7   601 D Street, N W
        Washington, D C  20004
8
        Mr  Gordon Speights Young
9   U S  DEPARTMENT OF JUSTICE
        ENVIRONMENT & NATURAL RESOURCES DIVISION
10  Post Office Box 7611
        Ben Franklin Station
11  Washington, D C  20044-7611
        ENRD Mailroom
12  601 D Street, N W
        Washington, D C  20004
13
14  APPEARING FOR THE STATE OF LOUISIANA:
        Mr  Douglas R  Kraus
15  Attorney for Louisiana Attorney General
        KANNER & WHITELEY
16  701 Camp Street
        New Orleans, Louisiana  70130-3504
17
18  ALSO PRESENT:
        Mr  Peter Jennings, Videographer
19  Mr  Ray Aguirre, Case Manager
20
21
22
23
24
25

**4**

1               INDEX
2       VIDEOTAPED ORAL DEPOSITION OF
        RONALD COPELAND DYKHUIZEN, PH D
3               JUNE 19, 2013
                VOLUME 1
4
5
6   Appearances                          2
7
        Direct Examination-Mr  Regan          7
8
        Changes and Signature          396
9   Reporter's Certificate          398
10
11
12          EXHIBIT INDEX
13
14  Ex  No       Description       Marked
15
16  11452   Expert Report, U S  v  BP
            Exploration & Production, Inc , et
17          al, Flow Rates from the Macondo
            MC252 Well, Submitted on Behalf of
18          the United States, Prepared by
            Ronald C  Dykhuizen, Ph D , dated
19          March 22, 2013, marked as
            CONFIDENTIAL PER BP; Bates Nos
20          BP-HZN-2179MDL04799584 -
            BP-HZN-2179MDL04799589,
21          BP-HZN-2179MDL07265901,
            BP-HZN-2179MDL04908488 -
22          BP-HZN-2179MDL04908507,
            BP-HZN-2179MDL06144176 -
23          BP-HZN-2179MDL06144184,
            BP-HZN-2179MDL04897017,
24          BP-HZN-2179MDL00412974,
            SNL020-009194 - SNL020-009222
25          and total of 46 pages without
            Bates numbers          8

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

9

1    A. No, I do not.
2    Q. Okay.
3       MR. CERNICH:  Tim [sic], I'll just
4    note that we did send around a notice of the item
5    that was inadvertently left off of the
6    "Considered" materials list.
7       MR. REGAN:  Okay.
8    Q. (By Mr. Regan) There's one -- one matter
9    that was not on the "Considered" materials list
10   that was submitted today.  So other than the
11   addition of a "Considered" materials item, do you
12   have any other corrections or amendments or
13   changes to your original Expert Report, 11452?
14   A. No, I do not.
15   Q. Okay.  Now, if -- I'll have you turn to
16   Tab 30.
17      MR. REGAN:  If we could mark that as
18   11453.
19      (Exhibit No. 11453 marked.)
20      MR. REGAN:  Thank you, sir.
21      THE WITNESS:  (Complying.)
22   Q. (By Mr. Regan) Do you recognize 11453 as
23   a copy of your Rebuttal Report inclusive of the
24   corrections on pages, I believe, 6 and 9?
25   A. I -- I think it's 7 and 9.

10

1    Q. Okay.
2    A. But, yes, these corrections are here.
3    This is my corrected Report, yes.
4    Q. Okay.  So other than the corrections that
5    are evidenced in the exhibit, do you have any
6    other corrections, changes, or amendments to the
7    Rebuttal Report that we've marked as 11453?
8    A. No, I do not.
9    Q. Okay.  And, Dr. Dykhuizen, do
10   Exhibits 11452, your original Report, and
11   Exhibit 11453, your Amended Rebuttal Report,
12   contain all of the expert opinions that you
13   intend to express in this matter?
14   A. Yes, they do.
15   Q. Okay.  Have you ever testified as an
16   expert in any matter before?
17   A. Only previously on this matter.
18   Q. Okay.  You -- you -- you gave a
19   deposition previously in this matter, correct?
20   A. Yes.
21   Q. And that was in January of this year,
22   correct?
23   A. Yes.
24   Q. Okay.  Outside of your January
25   deposition, have you ever served as a Testifying

11

1    Expert in any litigation in any context?
2    A. No, I have not.
3    Q. Okay.  And have you come today to your
4    deposition -- your expert deposition prepared to
5    testify about the opinions that you intend to
6    express before Judge Barbier in September?
7    A. Yes, I have.
8    Q. Okay.  How would you define the expertise
9    that you are bringing Judge Barbier in your role
10   as a Testifying Expert?
11   A. I did some research and have worked in
12   multiphase flow, and, therefore, I can represent
13   a lot of issues that deal with multiphase flow.
14   Also, I was present in Houston for many of the
15   days and also consulting over the phone for many
16   of the days during the incident.
17   Q. Okay.  So would you represent yourself to
18   be an expert in multiphase flow?
19   A. Yes.
20   Q. Okay.  Any other expertise that you would
21   say you are applying in conjunction with your
22   expert work or your expert opinions in this case,
23   outside of multiphase flow expertise?
24      MR. CERNICH:  Object to form.
25   A. I have lots of experience in doing

12

1    engineering work, doing accident investigations
2    at Sandia, where I work.
3    Q. (By Mr. Regan) M-h'm.
4    A. I have experience in geothermal wells.
5    Some of that is directly applicable to the flows
6    here.  In general, my -- I am considered a
7    General Engineer at Sandia.
8    Q. Your -- your -- the last thing you said,
9    you are considered a General Engineer at Sandia?
10   A. Yes.  I quite often are given jobs that
11   don't really have a defined expertise and try to
12   determine a correct answer or the correct
13   procedures to -- where to continue.
14   Q. Okay.  And is that what you would
15   represent to Judge Barbier is the expertise
16   you're -- you're providing to him in this matter,
17   the expertise of general engineering, or
18   something more specific?
19      MR. CERNICH:  Object to form.
20   A. I think I have mentioned both general
21   engineering and multiphase flow.
22   Q. (By Mr. Regan) Okay.  You said earlier
23   that you did have factual involvement.  You were
24   directly involved in various events with respect
25   to the Macondo Well starting in May of 2010,

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

13

1   correct?
2        MR. CERNICH:  Object to form.
3     A. Yes.
4     Q. (By Mr. Regan) You gave a deposition in
5   January of 2013 where you were asked a series of
6   questions about your work during that period of
7   time.
8      You recall that, right?
9     A. Yes.
10    Q. You understood that your deposition in
11  January was under oath?
12    A. Yes.
13    Q. You've had an opportunity to review that
14  transcript after it was produced, after it was
15  completed and provided to you, correct?
16    A. Yes.
17    Q. And you submitted errata sheets as
18  changes to some of the answers that you gave in
19  your January deposition, correct?
20    A. Yes, I did.
21    Q. Okay.  I may, undoubtedly, go over some
22  areas that were covered in January 2013, but I'm
23  going to endeavor, where I can, to stick to some
24  new things today.  That's a promise I'll make and
25  probably break in about two minutes.  All right.

14

1      In your factual deposition, you made
2  reference to the fact that you were doing
3  privileged work for the Department of Justice.
4      Do you recall giving answers to that
5  regard?
6    A. Yes.
7    Q. And your privileged work for the
8  Department of Justice started in approximately
9  November of 2010, correct?
10    A. Yes.
11    Q. The purpose of this privileged work that
12  you were doing was connected to claims the United
13  States of America was making against BP and
14  others, correct?
15      MR. CERNICH:  Object to form.
16      I'll instruct the witness not to disclose
17  any work product or communications with Counsel.
18    Q. (By Mr. Regan) Can you tell me about
19  the -- the -- what you understood the purpose of
20  the privileged work that you were doing?  Not the
21  specifics of what you were doing, but what was
22  the general -- general purpose of what you were
23  doing?
24    A. I was hired by the Department of Justice
25  to help them interpret flow and events that

15

1  happened during the incident.  And it just seemed
2  natural, since most Engineers don't have a whole
3  lot of engineering background.
4    Q. I'm -- you -- I think you meant most
5  lawyers haven't a --
6    A. Yes, that is correct.
7    Q. That may be true for several Engineers,
8  too.
9      (Laughter.)
10    A. I -- most lawyers do not have engineering
11  background.  Thank you for correcting me.
12    Q. (By Mr. Regan) Okay.  No -- no problem at
13  all.
14      And I should say, consistent with your
15  first deposition, as I believe Mr. Nakayama
16  instructed you, if there's a question that I ask
17  you today that you don't understand, please let
18  me know, and I'll rephrase it.  Okay?
19    A. Thank you.
20    Q. And if at any point you want to correct
21  an answer, like we just did, feel free to let me
22  know, and -- and I'll give you an opportunity to
23  correct it.  Okay?
24    A. Thank you.
25    Q. So with respect to this privileged work,

16

1  you understood, though, that the reason you were
2  being asked to perform this privileged work was
3  because the United States of America was making
4  claims, monetary claims against BP and others,
5  for purp -- in litigation, correct?
6      MR. CERNICH:  Object --
7    A. Yes.
8    Q. (By Mr. Regan) Okay.  And you understood
9  that from the moment you started doing work for
10  them in November of 2010 through today, correct?
11      MR. CERNICH:  Objection.
12    Instruct the witness not to disclose any
13  communications with Counsel.
14    A. I always thought that my position was to
15  advise the U.S. Government on engineering
16  matters.
17    Q. (By Mr. Regan) Okay.  Is there any
18  privileged work that you were performing for DOJ
19  that is outside of what we see now in your
20  Exhibit 11452 and 11453, the Expert Reports that
21  you have provided in this case?
22      MR. CERNICH:  Object to form.
23    I'll instruct the witness not to answer.
24    It's protected work product.
25    Q. (By Mr. Regan) Are you going to not

4  (Pages 13 to 16)

25

1 did you have any meetings with other testifying
2 experts for the Department of Justice?
3     A.  No.
4     Q.  Okay.  All right.  Do you have a separate
5 Retention Agreement with the Department of
6 Justice for purposes of your expert work?
7     A.  Department of Justice is negotiated with
8 my employer to pay my time, so I just get my
9 normal salary.
10     Q.  Okay.  From -- from your perspective,
11 it -- it -- you're receiving the same salary or
12 income that you would have received if you were
13 simply still doing your normal job pre-Macondo?
14     A.  Yes.
15     Q.  Okay.  And you were not personally
16 involved in negotiating any terms of any
17 retention for purposes of serving as an expert in
18 the case?
19     A.  No, I was not.
20     MR. CERNICH:  Object to form.
21     Q.  (By Mr. Regan) Okay.  Dr. Dykhuizen, do
22 you view yourself as being an advocate for the
23 Government in this matter?
24     MR. CERNICH:  Object to form.
25     A.  No.

26

1     Q.  (By Mr. Regan) Okay.  Do you believe that
2 the opinions expressed in your two Expert Reports
3 are based on an independent analysis?
4     MR. CERNICH:  Object to form.
5     A.  Yes.
6     Q.  (By Mr. Regan) Did you reach your expert
7 opinions independent of the impact those opinions
8 would have on the Government's litigation
9 position?
10     A.  Yes.
11     Q.  You would not express opinions solely
12 because they would benefit the Government's
13 litigation position, correct?
14     MR. CERNICH:  Object to form.
15     A.  That is correct.
16     Q.  (By Mr. Regan) And you would not express
17 opinions solely because the Government asked you
18 to express those opinions if they were conflicted
19 with your engineering judgment, correct?
20     MR. CERNICH:  Object to form.
21     A.  That is correct.
22     Q.  (By Mr. Regan) You would not change, or
23 did not change any opinions that you had reached
24 solely because the Government had asked you to
25 change those opinions, correct?

27

1     MR. CERNICH:  Object to form.
2     A.  That is correct.
3     Q.  (By Mr. Regan) All right.  And it -- is
4 it your intention to provide testimony as an
5 expert to the Court based on your independent
6 assessment of the facts and your personal
7 judgment?
8     MR. CERNICH:  Object to form.
9     A.  I agree with that statement.
10     Q.  (By Mr. Regan) Okay.  And I think we've
11 covered it, but just to make sure, it's true
12 there are no opinions that you've expressed in
13 what we've marked as Exhibit 11452 and 11453 that
14 you'd like to change before we start?
15     A.  That is correct.
16     Q.  Okay.  Now, you're a Mechanical
17 Engineering -- Engineer with a specialty in
18 multiphase flow, correct?
19     A.  Yes.
20     Q.  You have a Ph.D. in Mechanical
21 Engineering, correct?
22     A.  Yes.
23     Q.  You expressed you had a thesis on
24 multiphase flow, correct?
25     A.  Yes, I did.

28

1     Q.  Okay.  And at Sandia, you've been engaged
2 in multiphase fluid flow work in connection with
3 geothermal wells, nuclear reactors, CO2 fire
4 suppression systems, and numerous cooling
5 systems, correct?
6     A.  That is correct.
7     Q.  Prior to May of 2010, did you have any
8 experience in working on multiphase fluid flow
9 from oil and gas wells?
10     A.  No, I did not.
11     THE COURT REPORTER:  Matt, would you
12 move your microphone up, please.
13     MR. REGAN:  Am I touching it?
14     THE COURT REPORTER:  Yes.
15     MR. REGAN:  I'm sorry.
16     Q.  (By Mr. Regan) You do not have a
17 specialized background in Petroleum Engineering,
18 correct?
19     A.  That is correct.
20     Q.  Okay.  Are you a Reservoir Engineer?
21     A.  No, I am not.
22     Q.  Had you ever worked in any capacity,
23 Dr. Dykhuizen, with respect to an oil and gas
24 well prior to May of 2010?
25     A.  No, I have not.

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

29

1    Q.  Had you ever performed any study in any
2    capacity from an oil and gas well prior to the
3    work you started on Macondo in May of 2010?
4    A.  Well, that's a little broad.  Some
5    geothermal applications are coupled to oil and
6    gas wells.
7    Q.  Okay.
8    A.  And so we would be considering oil flows
9    that had a lot of water content, and when the
10   water was extracted, we try to generate
11   electricity from the water.
12   Q.  Okay.  With respect -- let me see if I
13   can ask it slightly narrower, if we can solve
14   the -- solve the ques -- problem with my
15   question.  Prior to May of 2010, had you ever
16   performed any study of what the flow of oil was
17   from an oil and gas well, prior to Macondo?
18   A.  No, I have not.
19   Q.  Prior to May of 2010, had you ever
20   performed any study of the flow of oil or gas in
21   a pipeline or transport system?
22       MR. CERNICH:  Object to form.
23   A.  No, I have not.
24   Q.  (By Mr. Regan) Have you ever in your --
25   in your career, Dr. Dykhuizen, used software or

30

1    models that were developed in the oil and gas
2    industry for the study of multiphase flow in oil
3    and gas wells or pipeline systems?
4        MR. CERNICH:  Object to form.
5    A.  I've -- in multiphase flow, there are a
6    number of correlations for flow and a pressure
7    drop.  I assume some of those were developed for
8    the Oil & Gas Association.  But, I mean, I've
9    looked at hundreds of correlations.  So I -- that
10   may be too broad a statement.  Obviously, there's
11   some work from oil and gas that has moved over
12   into multiphase flow that --
13   Q.  (By Mr. Regan) Okay.
14   A.  -- is accepted to use in other fluids.
15   Q.  Okay.  So it is possible, then, in the
16   work that you've performed outside of the oil and
17   gas area you have used multiphase correlations
18   that may have been developed in the oil and gas
19   area.  Fair?
20   A.  That's a good summary of my answer, yes.
21   Q.  Okay.  But specifically, have you ever
22   used any specific software or modeling programs
23   that have been developed in the oil and gas
24   industry for the specific purpose of looking at
25   multiphase flow in oil and gas pipelines or

31

1    wells?
2        MR. CERNICH:  Object to form.
3    A.  No, I have not.
4    Q.  (By Mr. Regan) Okay.  And same question,
5    but have you ever used software or models
6    developed in the oil and gas industry for the
7    study of multiphase flow in drilling or well
8    control applications?
9        MR. CERNICH:  Object to form.
10   A.  No, I have not.
11   Q.  (By Mr. Regan) In respect to the work
12   that you performed from May 2010 through today,
13   did you use any commercially available multiphase
14   flow software?
15   A.  No, I have not.
16   Q.  Okay.  Do you have experience with such
17   software?
18       MR. CERNICH:  Object to form.
19   Q.  (By Mr. Regan) Are you -- well, let me
20   ask a better question:  Are you aware that such
21   software exists?
22       MR. CERNICH:  Object to form.
23   A.  Yes.
24   Q.  (By Mr. Regan) Okay.  Could you describe
25   the type of commercially available software, that

32

1    at least you have personal awareness of, that can
2    be used in analyzing multiphase flow?
3    A.  Obviously, BP at the time was using OLGA,
4    Prosper, GAP, a number of codes that I've
5    now become aware of by working with BP during the
6    incident.
7    Q.  Okay.
8    A.  Other codes that have been tried to apply
9    are FLUENT, which is a commercial code that is
10   widely available.  There are a number of codes of
11   that sort.
12   Q.  Okay.  And in the work that you've done
13   not in the oil and gas area, like for geothermal
14   wells or looking at multiphase flow in nuclear
15   reactors or in fire suppression systems, is there
16   a commercially available software that you've
17   used personally to examine the impact of
18   multiphase flow in those -- in those contexts?
19       MR. CERNICH:  Object to form.
20   A.  My job responsibilities typically do not
21   get me to use commercial codes.  I've been
22   assigned a number of times where I write -- write
23   codes; and, therefore, I've written many codes to
24   do this calculations.
25   Q.  (By Mr. Regan) Okay.

8 (Pages 29 to 32)

33

```
 1      A.  If a job can be done with a commercial
 2  code, it is usually given to a more junior
 3  Engineer.
 4      Q.  Okay.  So you have had experience at
 5  Sandia prior to May of 2010 of writing codes to
 6  do multiphase flow calculations?
 7      A.  Yes.
 8      Q.  Okay.  In the work you performed at
 9  Macondo, did you use any prior code work that you
10  had done at Sandia?
11          MR. CERNICH:  Object to the form.
12      A.  I've adapted codes to do calculations up
13  the wellbore and --
14      Q.  (By Mr. Regan)  Okay.
15      A.  -- different geometries, yes.
16      Q.  But just to be precise, was there any
17  code that you had previously written for a
18  previous application that you simply brought over
19  whole cloth and applied to Macondo?
20          MR. CERNICH:  Object to form.
21      A.  There's a computer code that I wrote
22  called GEM -- I want to say Geothermal Energy
23  Management, or whatever -- that we used to
24  calculate temperatures of geothermal flows.  I
25  brought that over, did some scoping calculations
```

34

```
 1  to try to predict temperature of the oil as it
 2  flows through the Macondo Well.
 3      Q.  (By Mr. Regan)  Okay.  And did you rely on
 4  that work in reaching the opinions that are
 5  expressed in your Expert Reports?
 6          MR. CERNICH:  Object to form.
 7      A.  That work informed my opinions.  I did
 8  not --
 9      Q.  (By Mr. Regan)  Okay.
10      A.  -- believe that the work was something
11  that had enough integrity to present; however, I
12  used it to check other Experts on what they were
13  calculating as temperature to see if they were
14  reasonable temperatures based on flow rates.
15      Q.  Why did you -- could you explain to me,
16  why did you believe that the work you did using
17  your code, the geothermal energy model code,
18  lacked enough -- lacked integrity such that it
19  should not be presented?
20          MR. CERNICH:  Object to form.
21      A.  The code was used by a number of
22  individuals.  It was used in presenting results
23  in a few journal articles, but it was never put
24  out commercially.  I thought that it was -- would
25  be something that would generate controversy in
```

35

```
 1  trying to defend the results.  If it just shows
 2  that results of others seem to be reasonable,
 3  then it would help me accept results of others.
 4      Therefore, I just used the code to form
 5  opinions on whether temperatures that were being
 6  presented seemed reasonable.  Temperature of the
 7  flow was always a question during the incident.
 8      Q.  (By Mr. Regan)  It's still a question in
 9  your mind, correct?
10          MR. CERNICH:  Object to form.
11      Q.  (By Mr. Regan)  The temperature of the
12  flow is still a question in your mind?
13      A.  Yes.
14          MR. CERNICH:  Object to form.
15      Q.  (By Mr. Regan)  (Indicating.)
16      A.  Yes, it is still a question --
17      Q.  Okay.
18      A.  -- of -- of accuracy.
19      Q.  Okay.
20      A.  One can assume that the temperature was
21  not 40 degrees, one knows the temperature is not
22  240 degrees.  So we do have some idea of what the
23  temperature is.
24      Q.  We have a range of the potential
25  temperature?
```

36

```
 1          MR. CERNICH:  Object to the form.
 2      Q.  (By Mr. Regan)  Fair?
 3      A.  That is fair.
 4      Q.  And to that range, we, then, have a
 5  potential uncertainty about where we might land
 6  in that range.  Fair?
 7          MR. CERNICH:  Objection.
 8      A.  I agree with that statement.
 9      Q.  (By Mr. Regan)  Okay.  Was there any code
10  that you wrote with respect to your Macondo work
11  that you have put out commercially?
12      A.  No, there is not.
13      Q.  So in that respect, the code you've
14  worked for Macondo is similar to the code -- this
15  GEM code.  It's one that you were involved in
16  preparing that has not been put out commercially,
17  correct?
18          MR. CERNICH:  Objection, form.
19      Q.  (By Mr. Regan)  Is that correct?
20      A.  That is correct.
21      Q.  Okay.  Outside of this GEM code, any
22  other codes that you had used or developed prior
23  to May of 2010 in your work at Sandia that you
24  brought over and adapted for your work at
25  Macondo?
```

9 (Pages 33 to 36)

169

1  answer your criticisms of his work in 2010?
2       MR. CERNICH: Object to form. I'll
3  instruct the witness not to reveal any
4  communications with Dr. Griffiths or with
5  Counsel.
6       A. I'll respect my Counsel's advice.
7       Q. (By Mr. Regan) Well, I'm not asking you
8  about communications with Counsel. I'm just
9  asking you: Did you work with Dr. Griffiths with
10  respect to his litigation report to respond to
11  your criticisms of the work he had done in 2010?
12       MR. CERNICH: Object to form.
13       And I'll instruct the witness not to
14  reveal any communications with other Experts in
15  this case.
16       MR. REGAN: I'm sorry. You're --
17  you're instructing not to reveal communications
18  with our Experts, testifying Experts?
19       MR. CERNICH: That's also protected
20  by the Court's Orders.
21       MR. REGAN: Communications between
22  testifying Experts?
23       MR. CERNICH: Yes.
24       MR. REGAN: Okay.
25       MR. THIBODEAUX: Where is that?

170

1       MR. REGAN: Yeah, let's -- I
2  respect -- with respect to communications with
3  Counsel. No -- no question at all. But
4  communications amongst testifying Experts about
5  what the Reports are going to say I think goes
6  directly to bias, and I don't think that's in the
7  Order, but I'll -- I'll -- with respect to this,
8  let's just take a look. I don't want to probe in
9  something that's against the Order.
10       MR. CERNICH: Okay. Do you want to
11  do that now?
12       MR. REGAN: Well, we can take a
13  look -- we can take a look at a break. I'll keep
14  going.
15       Q. (By Mr. Regan) Were you -- were -- did
16  you use Dr. Griffiths' work in 2010 in preparing
17  the DOE-NNS Report?
18       A. No. My Report was finished, as far as I
19  was concerned, well before I saw Dr. Griffiths'
20  work.
21       Q. All right.
22       A. And none of that input went into the DOE
23  Report.
24       Q. All right. So you had already reached a
25  conclusion on the cumulative flow estimate of

171

1  five million barrels without relying on
2  Dr. Griffiths, correct?
3       A. Yes.
4       Q. Okay. So independent of Dr. Griffiths,
5  which you're looking at now, what gave you
6  confidence that restrictions in the well did not
7  change to allow you to make the conclusion in
8  your August 2010 findings, as confirmed in a
9  DOE-NNS Report, that the cumulative flow was
10  five million barrels?
11       A. The five million barrel calculation is
12  fairly straightforward and presented in the
13  Report.
14       It is represented in the Report as being
15  plus or minus 10 percent.
16       Q. M-h'm.
17       A. I stringent -- strongly disagreed with
18  that part of the Report. I was not the Lead
19  Author on that Report. I disagreed with the plus
20  or minus 10 percent on the 53,000.
21       I said that we could not apply any error
22  bar on the five million, although the
23  five million was a useful exercise to present.
24       But I was not willing to stand behind any
25  error bar whatsoever on the five million at that

172

1  particular time.
2       THE COURT REPORTER: Two minutes.
3       Q. (By Mr. Regan) Okay. So in incorporating
4  that DOE-NNS Report in your Expert work, you
5  disagree with its statement of a plus or minus
6  10 percent error bar on a 53,000 barrel-per-day
7  flow on June 15 -- July 15th, correct?
8       A. I disagreed with it then. I still
9  disagree with it now. It seems a little more
10  reasonable now, but I still think it's probably
11  larger than 10 percent.
12       Q. Your testimony to Judge Barbier, as you
13  testified earlier today, is that error bar should
14  be plus or minus 20 percent, right?
15       A. Correct.
16       MR. CERNICH: Object to form.
17       Q. (By Mr. Regan) Right? So we should
18  get flow rates from the mid-forties, to, you
19  know, something over 6,000 -- 60,000 in terms of
20  what you say is the true error bar of that 53,000
21  estimate for that one day?
22       MR. CERNICH: Object to form.
23       A. Yes.
24       Q. (By Mr. Regan) And it's your testimony
25  that even though the Ratzel Report incorporated

43 (Pages 169 to 172)

173

1    in your Expert Report also applies that
2    10 percent error bar to the cumulative flow of
3    five million, it's your opinion that there should
4    have been no error bar applied to that
5    five million.
6         Is that what you just said?
7         MR. CERNICH:  Object to form.
8    A.  That's what I said, yes.
9    Q.  (By Mr. Regan) And the reason you believe
10   there should be no error bar is because the error
11   bar is so large?
12        MR. CERNICH:  Object to form.
13   A.  The error bar, at the time that we were
14   writing the Report, was so large that there was
15   no way to justify an error on the five million
16   barrels a day.
17        Q.  (By Mr. Regan) And as an Expert before
18   Judge Barbier, is it your opinion that Judge
19   Barbier should rely on the five million barrel
20   per day figure that's set forth in the Ratzel
21   Report?
22        MR. CERNICH:  Object to form.
23   A.  I think that we should rely on the
24   five million barrels a day as being a best
25   estimate, as I state in my Expert Report.

174

1         Q.  Okay.
2         MR. REGAN:  All right.  Let's take a
3    break.
4         THE VIDEOGRAPHER:  The time is
5    12:06 p.m.  We're off the record, ending Tape 4.
6         (Recess from 12:06 p.m. to 12:18 p.m.)
7         MR. REGAN:  I'm ready.
8         THE COURT REPORTER:  Yes, sir.
9    (Discussion off the record.)
10        THE VIDEOGRAPHER:  All set?  The
11   time is 12:18 p.m.  We're on the record,
12   beginning Tape 5.
13        MR. REGAN:  Okay.
14        Q.  (By Mr. Regan) All right.
15   Dr. Dykhuizen, in preparing your Expert Report in
16   this case, you had discussions with
17   Dr. Griffiths, correct?
18   A.  At one meeting, Dr. Griffiths presented
19   his Report, and I presented my Report.
20        Q.  Okay.
21   A.  Those could be considered discussions
22   between the two of us, yes.
23        Q.  Okay.  Well, and -- and in your Report,
24   you then say you're relying on Dr. Griffiths'
25   work to support your opinions, correct?

175

1    A.  Yes.
2         MR. CERNICH:  Object to form.
3         Q.  (By Mr. Regan) Right.  And my question
4    is:  Did you specifically discuss with
5    Dr. Griffiths any changes he should make to his
6    Report to respond to criticisms that you had
7    written to him in 2010 concerning his work?
8    A.  No.
9         THE COURT REPORTER:  Doctor, would
10   you put your microphone on, please.
11        THE WITNESS:  (Complying.)
12        THE COURT REPORTER:  Thank you, sir.
13        Q.  (By Mr. Regan) With respect to
14   Dr. Griffiths, you're aware -- I asked you before
15   the break that he was using a constant PI of 50.
16   Well, I -- I mean, you understand that he uses a
17   PI that grows very quickly from a low number to
18   about 47 point something shortly after the
19   accident.  Do you recall that -- Do you -- you
20   understand that?
21   A.  Yes.
22        Q.  Okay.  Do you disagree with his use of a
23   constant PI of that 47 number from that period of
24   eight hours after the accident all the way to
25   July 15th?

176

1         MR. CERNICH:  Object to form.
2    A.  I do not disagree with his value of high
3    40s.  I personally might question whether it
4    starts at eight hours.  In my analysis I start
5    flows at two days.  So if he was going to be
6    consistent with me, I would think that he should
7    start at two days.
8         Q.  (By Mr. Regan) Dr. Griffiths assumes that
9    everything that erodes or that could erode, in
10   terms of a restriction, all takes place in a
11   period of -- of eight hours, correct?
12   A.  Yes, he does.
13        MR. CERNICH:  Object to form.
14        Q.  (By Mr. Regan) Okay.  You in your -- in
15   the Sandia Report, the DOE-NSS [sic] Report use a
16   period of two days that you testified in your
17   earlier deposition was your wave to erosion.
18        MR. CERNICH:  Object to form.
19        Q.  (By Mr. Regan) Correct?
20   A.  That was a good paraphrase of what I
21   said, yes.
22        Q.  Okay.  So you don't have flow for the
23   first two days, and you use that as a proxy to
24   account for erosion that would take place,
25   correct?

44  (Pages 173 to 176)

193

1  were calculating cumulative flow?
2       MR. CERNICH: Objection, form.
3       Q. (By Mr. Regan) It would not impact
4  resistance one way or the other?
5       A. Yes. So the implied assumption was that,
6  A, it didn't move, or, B, if it did move, it
7  didn't make a big impact.
8       Q. All right.
9       A. And Stewart Griffiths' work demonstrating
10  from BOP demonstrates to me that there was not a
11  significant change in resistance.
12       Q. Okay. I don't want to ask about
13  Dr. Griffiths' work, because we get to ask him
14  questions about that. I want to ask about your
15  work in particular, Dr. Dykhuizen.
16       Did you ever go and rerun any model of
17  your own where you changed your assumption that
18  now knowing they found drill pipe in the well,
19  there could be an impact of its resistance on
20  your cumulative flow rate?
21       MR. CERNICH: Object.
22       Q. (By Mr. Regan) If you -- if you follow my
23  question.
24       MR. CERNICH: Objection, form.
25       A. I follow your question.

194

1       The problem with doing that calculation
2  is you need to know when the drill pipe was
3  attached, what fraction of the flow goes through
4  the drill pipe and what fraction of the flow goes
5  through the annulus.
6       Without knowing that, it is difficult to
7  perform the calculation that you ask.
8       Q. (By Mr. Regan) Okay. Why would you have
9  to determine which fraction of the flow went
10  through the drill pipe and which fraction went
11  through the annulus? Why would that be important
12  to understand?
13       A. Because the pressure drop from the
14  location at the bottom of the drill pipe to the
15  bottom of the BOP is going to depend on your
16  assumption of what fraction goes through each.
17       Q. Okay.
18       A. And, therefore, I could get -- and it
19  also depends on your assumption of how much
20  resistance there is to get from the annulus into
21  the -- past the test ram.
22       Q. Okay.
23       A. And you have to make assumptions how it
24  gets past the bottom Variable Bore Ram. You
25  would have to make a series of assumptions, and,

195

1  therefore, makes that problem intractable because
2  we would not be able to defend in a set of those
3  assumptions.
4       Q. Okay. So we know as a matter of physical
5  evidence, forensic evidence, that at some point
6  we have drill pipe falling in the well, correct?
7       A. That is correct. We know the drill pipe
8  was attached at least before the incident.
9       Q. M-h'm.
10       A. And at the -- when we pulled the BOP, it
11  was not.
12       Q. Right. And from your scientific
13  perspective, the challenge of trying to develop a
14  model that would account for what could happen to
15  flows, depending on where that drill pipe was and
16  when it moved, was too difficult to solve. I
17  think "intractable" was the word that you just
18  used.
19       MR. CERNICH: Objection, form.
20       A. Yes. What you need to do to take -- make
21  a calculation is you need boundary conditions,
22  typically thought of as pressure boundary
23  conditions, and you need geometry.
24       Q. (By Mr. Regan) M-h'm.
25       A. We did not have the geometry, and,

196

1  therefore, before Top Hat, we had no ability to
2  calculate the flow rate --
3       Q. Okay.
4       A. -- or to calculate any reasonable
5  estimate of the flow rate.
6       Q. And the fact that the drill pipe was
7  found to be deeper in the well, forensically, did
8  that confirm to you in the Fall of 2010, that
9  your opinion that there could be no boundary, no
10  error bar on the five million barrel cumulative
11  flow, because of all of the uncertainty, did that
12  confirm to you that you were correct?
13       MR. CERNICH: Objection, form.
14       A. I --
15       Q. (By Mr. Regan) Was the --
16       A. I still think with the information
17  available when the Ratzel Report was written,
18  there was no way to assign an error bar to five
19  million barrels a day.
20       Q. Okay.
21       A. I thought it then. I think it now.
22       Q. Okay. All right. In the document that's
23  in front of you -- just a few questions, and then
24  we can break for lunch -- Exhibit 9692, page --
25  it looks like Page 9, is a page on "Flow

49 (Pages 193 to 196)

197

1  Conditions with Drill string intact."
2      Do you see that?
3  A. Yes.
4  Q. Did you prepare this slide?
5  A. Yes.
6  Q. All right. And in this slide, you say:
7  "Gas exists above the end of the drill string
8  since at steady state both gas and liquid needs
9  to enter the drill string."
10  A. Yes.
11  Q. What does that mean?
12  A. Ah, it's vague, and was something written
13  in -- in a hurry.
14      And this particular example is one that
15  we discussed earlier. We have flow coming up the
16  central production string --
17  Q. M-h'm.
18  A. -- and I have no exit out the top of the
19  annular. I was told that's what to assume.
20  Q. You have a fixed casing hanger seals?
21      MR. CERNICH: Object to form.
22  A. No, that has no impact of my calculation,
23  whatsoever. The casing hanger seals seals the
24  annulus outside of the production string.
25  Q. (By Mr. Regan) Okay.

198

1  A. I'm talking about the annulus outside of
2  the drill string.
3  Q. Okay. This is -- fair point. Thank you
4  for that clarification.
5  A. The -- I was told to assume that the test
6  ram was sealing, so that annulus would not flow.
7  Q. Okay.
8  A. And so I have a steady state flow. It
9  seemed like a reasonable assumption to make that
10  the flow was steady state, because by this time
11  it's been flowing for two weeks --
12  Q. M-h'm.
13  A. -- or longer. So I have steady state
14  flow a quasi-steady state flow, maybe the rate is
15  changing slowly with time, of gas and liquid
16  coming up the production string.
17      The only way for the gas and liquid to
18  exit was through the drill pipe.
19  Q. M-h'm.
20  A. So all of that gas and liquid had to
21  continue through the drill pipe with my
22  assumptions.
23  Q. Okay.
24  A. And here, I was demonstrating to BP that
25  this annular space would be full of gas only,

199

1  because every once in a while, a gas bubble would
2  miss the drill pipe, go up in that annulus, and
3  there was no mechanism to bring it back down.
4      So every gas bubble I put up in that
5  annulus would drive liquid out of that annulus
6  until I had no liquid in that annulus.
7  Q. M-h'm.
8  A. And then I would have something as
9  pictured in this diagram where the blue, light
10  blue region represents homogeneous multiphase
11  flow up the center pipe, up the center production
12  string, up the drill string, and gas in that
13  annulus.
14  Q. Okay.
15  A. This was a difference between what I was
16  calculating and what BP was calculating. BP had
17  two-phase material stagnant in that annulus.
18  Q. Okay.
19  A. And I was demonstrating that an improper
20  use of a code would give an improper result.
21  Q. Okay. And you were trying to determine
22  which phases would be present at which locations
23  in a given geometry?
24  A. And it was important --
25  Q. Corr -- is that correct?

200

1  A. -- because they were trying to calculate
2  an elevation head. So I needed to know the
3  density of the fluid in that annulus to properly
4  calculate an elevation head.
5  Q. Yeah. So to properly calculate the
6  elevation head, you needed to know the density of
7  the fluids. That's Step 1, correct?
8  A. Yes.
9  Q. And because it's two-phase flow -- flow,
10  you needed to know how those phases were dist --
11  distributed in that location, correct?
12  A. Yes.
13  Q. Okay. For purposes of your cumulative
14  flow rate, did you do any similar analysis to
15  determine what the distribution was of two-phase
16  fluid in the wellbore in calculation elevat -- in
17  calculating elevation head?
18      MR. CERNICH: Objection, form.
19  A. This calculation proved to be moot. It
20  was an interesting academic exercise, however, we
21  knew by the time I performed my calculations that
22  this annulus was not full of gas because this was
23  not a dead-end space.
24      The test ram was emitting fluid past it.
25  We knew that, from the examinations during the

50 (Pages 197 to 200)

221

1 anything about the geometry upstream of the
2 capping stack, that is, down to the BOP and down
3 to the reservoir?
4     A. No.
5     Q. And did the capping stack estimates tell
6 you anything about the multiphase flow effects
7 that may be present in that geometry upstream of
8 the capping stack?
9         MR. CERNICH: Object to form.
10    A. No.
11    Q. (By Mr. Regan) You state on Page 4 of
12 your Expert Report: "By focusing on flow within
13 the Capping Stack components, specifically the
14 choke and kill lines..., issues and uncertainties
15 for the upstream flow conditions could be
16 avoided."
17        Do you see that?
18    A. Yes.
19    Q. What issues and uncertainties were you
20 referring to?
21    A. I was constantly asked with this BOP
22 pressure, with the reservoir pressure, with the
23 bottom of the sea pressure -- you have three
24 pressures -- "Can you back out a flow for me?"
25        And I would reply, "No. I need two

222

1 pressures and a known geometry," which I didn't
2 have, or as it turns out, you could use a method
3 similar to Dr. Griffiths, which was similar to my
4 alternate method. If you can get some pressures
5 and some measured flow rates, as in collected
6 flow rates, you could also estimate a flow.
7     Q. But, again, in the work you were doing in
8 2010, if someone asked you, "Can I calculate a
9 flow rate with this BOP pressure, with the
10 reservoir pressure, with the bottom of the sea
11 pressure," your answer was, "No. I need two
12 pressures and a known geometry." Correct?
13        MR. CERNICH: Object to form.
14    A. That is correct. But as we found out
15 later, I could have two pressures and a known
16 measured collection flow and able to calculate,
17 or with top kill, two pressures and a known mud
18 flow rate --
19    Q. (By Mr. Regan) Okay.
20    A. -- and I could calculate flow.
21    Q. So, again, in this sentence in Page 4 of
22 your Report, "issues and uncertainties
23 for...upstream flow conditions could be avoided,"
24 what issues and uncertainties were you referring
25 to?

223

1     A. Specifically I was referring to I do not
2 need to assign a K factor for the BOP.
3     Q. Anything else?
4     A. No. Essentially that was it.
5     Q. Okay. Now, if we -- Page 5 of your
6 Report, you have a picture of the capping stack
7 that's actually a figure that seems to be taken
8 from the Ratzel Report.
9     A. Yes, it is.
10    Q. All right. And there's some very precise
11 measurements of the various component parts of
12 the capping stack, correct?
13    A. Yes.
14    Q. Why was that level of precision and
15 measurements required for the approach of
16 estimating flow from the capping stack?
17        MR. CERNICH: Objection, form.
18    A. These measurements are to a centimeter.
19 If you want to define those as very precise,
20 that's fine. I need to know elevation heads; I
21 need to know length of pipes, so I can calculate
22 frictional losses in pipes; I need to know
23 changes in areas, so I can calculate K factors at
24 expansion points and contraction points. Those
25 were all required to estimate the flow.

224

1     Q. (By Mr. Regan) Okay. And if you did not
2 have this level of precision, be it to the
3 centimeter, of the geometry, could you do the
4 calculation that you used to determine the flow
5 from the capping stack?
6     A. I could --
7         MR. CERNICH: Object to form.
8     A. -- use the alternate method without any
9 of these numbers.
10    Q. (By Mr. Regan) Okay. Your primary method
11 required these numbers, correct?
12    A. That is correct.
13    Q. And even with this known geometry, the
14 three different National Labs calculated
15 different resistance factors, or K factors, for
16 the same known geometry, correct?
17    A. Yes.
18    Q. How is that possible?
19    A. They used different references.
20    Q. Okay.
21    A. They -- they got different results.
22    Q. Okay. So even if we do have a known
23 geometry, we could have three different groups of
24 scientists look at the exact same pipe system and
25 come up with different resistance coefficients?

56 (Pages 221 to 224)

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

225

1      MR. CERNICH: Object to form.
2      A. If different means -- yes.
3      Q. (By Mr. Regan) Okay. And the validity of
4  those resistance coefficients, or K factors, the
5  fact that there could be a -- a single known
6  potential K factors for a single known geometry,
7  that's a source of uncertainty in the estimate of
8  53,000 taken from the -- taken from the capping
9  stack, correct?
10     A. Yes.
11     Q. Okay. All right. Now, the opinion you
12 intend to express to Judge Barbier is that the
13 flow rate on July 15th was 53,000 barrels per
14 day, correct?
15     A. Yes.
16     Q. You have no change to the number that was
17 set forth in an August 2nd, 2010 press release
18 issued by the Administration, correct?
19     MR. CERNICH: Object to form.
20     A. No, I have no change.
21     Q. (By Mr. Regan) All right. Now, you agree
22 that the bulk of the work that was done to arrive
23 at the 53,000 barrels per day flow rate estimate
24 included in the August 2nd, 2010 press release,
25 the bulk of that work was performed over a

226

1  two-week period, from July 15th through July
2  31st, correct?
3      A. Yes.
4      Q. All right. And so that 53,000 flow rate
5  estimate that was first issued on August 2nd,
6  2010, that was based upon work that you had
7  performed over that two-week period, correct?
8      A. Yes.
9      Q. And it was based on a model that you were
10 using during that two-week period, correct?
11     A. Yes.
12     MR. CERNICH: Object to form.
13     Q. (By Mr. Regan) And that model that you
14 were using in that two-week period to arrive at a
15 53,000 per day flow rate estimate was titled the
16 "WednesdayNightRush" model, correct?
17     MR. CERNICH: Object to form.
18     A. That was a name of a file where some data
19 was stored and calculated, yes.
20     Q. (By Mr. Regan) Well, it was -- that was
21 the model that you were using to arrive at your
22 capping stack flow rate numbers, correct?
23     MR. CERNICH: Object to form.
24     Q. (By Mr. Regan) The
25 "WednesdayNightRush.xls" model, correct?

227

1      MR. CERNICH: Objection.
2      A. That was a name of a file, yes.
3      Q. (By Mr. Regan) That -- that file was the
4  model that you were using to arrive at your
5  estimate of flow from the capping stack, correct?
6      MR. CERNICH: Object to form.
7      A. Yes.
8      Q. (By Mr. Regan) And why was it titled
9  "WednesdayNightRush"?
10     A. Because the last modification of that
11 file was done on a Wednesday.
12     Q. Okay. Well, what was the "Rush" part of
13 it?
14     A. What was the "Rush" part of it?
15     Q. Yes. Why did you name the file
16 "WednesdayNightRush" in arriving at the 53,000
17 barrel per day flow rate estimate that you also
18 are offering to Judge Barbier now?
19     A. I did not name that file. Charlie Morrow
20 named that file.
21     Q. Okay. Do you know why Mr. Morrow named
22 it "WednesdayNightRush"?
23     A. I assume he's attempting some humor.
24     Q. Okay. In fact, it was a very rushed
25 period of time for you in calculating flow rate,

228

1  correct?
2      MR. CERNICH: Object to form.
3      A. "Very" is a vague term; but, yes, we
4  tried to get it done --
5      Q. (By Mr. Regan) Okay.
6      A. -- in a timely fashion.
7      Q. Did -- were you asked how much time you
8  needed to arrive at a scientifically accurate
9  flow rate? Was that how the August 2nd, 2010
10 date was picked for releasing a flow rate
11 estimate?
12     MR. CERNICH: Objection.
13     Q. (By Mr. Regan) Did someone asked you,
14 "How much time do you need to come to an
15 estimate?"
16     A. Tom Hunter knows me very well. He knows
17 that if he asked me for an estimate on August
18 2nd, I could provide one. If he asked me for an
19 ex -- estimate on August 1st, I could provide
20 one. The shorter the time, the less effort I'm
21 allowed to put into it, and I can get an
22 estimate.
23     Q. Right.
24     A. I have since checked these numbers over
25 the multiple years and found that maybe I should

57 (Pages 225 to 228)

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

400

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL      )  MDL NO. 2179
BY THE OIL RIG        )
"DEEPWATER HORIZON" IN )  SECTION "J"
THE GULF OF MEXICO, ON )
APRIL 20, 2010        )  JUDGE BARBIER
                      )  MAG. JUDGE SHUSHAN

*******************
VOLUME 2
*******************

Continuation of the deposition of Ronald
Copeland Dykhuizen, Ph.D., taken at the
Pan-American Building, 601 Poydras Street, 11th
Floor, New Orleans, Louisiana, 70130, on the 20th
day of June, 2013.

---

401

1   A P P E A R A N C E S
2
3
4   APPEARING FOR BP, INC :
       Mr  Matthew T  Regan
5   KIRKLAND & ELLIS
       300 North LaSalle
6   Chicago, Illinois  60654
7   Ms  Bridget K  O'Connor
    KIRKLAND & ELLIS
8   655 Fifteenth Street, NW
       Washington, D C  20005-5793
9
10  APPEARING FOR TRANSOCEAN:
       Mr  Paul C  Thibodeaux
11     Ms  Mary K  Klinefelter
    FRILOT
12  1100 Poydras Street, Suite 3600
       New Orleans, Louisiana  70163
13
14  APPEARING FOR ANADARKO PETROLEUM COMPANY:
       Mr  Warren Anthony Fitch
15  BINGHAM MCCUTCHEN
       2020 K Street, Northwest
16  Washington, D C  20006-1806
17
18  APPEARING FOR HALLIBURTON:
       Ms  Gwen E  Richard
    GODWIN LEWIS
19  1331 Lamar, Suite 1665
       Houston, Texas  77010-3133
20
       Mr  Prescott W  Smith
21  Ms  Kali Thomson
    GODWIN LEWIS
22  Renaissance Tower
       1201 Elm Street, Suite 1700
23  Dallas, Texas  75270-2041
24
25

---

402

1   APPEARING FOR THE UNITED STATES:
       Mr  Scott Cernich
2   U S  DEPARTMENT OF JUSTICE
       601 D Street, N W
3   Washington, D C  20004
4   Mr  David L  McIlwain
    U S  DEPARTMENT OF JUSTICE
5   ENVIRONMENT & NATURAL RESOURCES DIVISION
    Ben Franklin Station
6   Post Office Box 7611
       Washington, D C  20044-7611
7   601 D Street, N W
       Washington, D C  20004
8
       Mr  Gordon Speights Young
9   U S  DEPARTMENT OF JUSTICE
    ENVIRONMENT & NATURAL RESOURCES DIVISION
10  Post Office Box 7611
    Ben Franklin Station
11  Washington, D C  20044-7611
    ENRD Mailroom
12  601 D Street, N W
       Washington, D C  20004
13
14  APPEARING FOR THE STATE OF LOUISIANA:
       Mr  Douglas R  Kraus
15  Attorney for Louisiana Attorney General
    KANNER & WHITELEY
16  701 Camp Street
       New Orleans, Louisiana  70130-3504
17
18  ALSO PRESENT:
       Mr  Peter Jennings, Videographer
19  Mr  Ray Aguirre, Case Manager
    Mr  James Deel, Logistics
20  Mr  Nicholas Jones
    Mr  Christopher Whelen
21
22
23
24
25

---

403

1   INDEX
2   VIDEOTAPED ORAL DEPOSITION OF
    RONALD COPELAND DYKHUIZEN, PH D
3   JUNE 20, 2013
    VOLUME 2
4
5
6   Appearances            401
7
8   Continued Direct Examination-Mr  Regan    406
    Examination-Mr  Fitch            515
9   Examination-Mr  Thibodeaux        563
    Examination-Mr  Smith            588
10  Examination-Mr  Cernich            612
    Redirect Examination-Mr  Regan    618
11
    Changes and Signature            665
12  Reporter's Certificate            667
13
14      EXHIBIT INDEX
15
16  Ex  No      Description        Marked
17  11459  CD labeled BP-HZN-2179MDL05742359;
18     Native, containing Excel
       spreadsheets, the last of which
       contains Observations        427
19
20  11460  Convective Boiling and
       Condensation, John G  Collier,
       Table of Contents, Preface and
21     Pages 65 through 105; 47 pages    530
22  11461  Expert Report of Dr  Sankaran
       Sundaresan, Estimates of Flow Rate
23     Preceding Shut-In on July 14-15,
       2010, Submitted by Transocean
24     Offshore Deepwater Drilling, Inc ,
       marked as CONFIDENTIAL; 28 pages    535
25

1 (Pages 400 to 403)

472

1  purposes of your flow rate opinion about Top
2  Hat 4?
3           MR. CERNICH:  Object to form.
4     A.  In a -- in a sense, yes.  There was some
5  Reports that -- where the -- Dr. Ratzel presented
6  that we saw little difference in the flow.  I've
7  reviewed those Reports and related that
8  information.
9     Q.  (By Mr. Regan) So is it Dr. Ratzel's
10  opinion, then, based on his visual observation of
11  the flow, that there was little change of flow
12  out the skirt when collection rates changed in
13  June of 2010?
14           MR. CERNICH:  Object to form.
15     A.  That -- that was his opinion, and I
16  collor -- corrob -- I also reached the same
17  conclusion.
18     Q.  (By Mr. Regan) Okay.
19     A.  I do not base my estimates of the flow,
20  the minimum flow at the Top Hat period, based on
21  any flow out the skirt.
22     Q.  You expressly base your 60,000 barrel per
23  day estimate from Top Hat 4 on including flow out
24  the skirt, correct?
25           MR. CERNICH:  Object to form.

473

1     A.  That's correct.
2     Q.  (By Mr. Regan) You have no confidence, to
3  be fair, in the validity of your estimate of flow
4  out that skirt, other than you know something
5  came out of it, correct?
6           MR. CERNICH:  Object to form.
7     A.  I know that a significant flow was coming
8  out.  You and I and anybody could watch that and
9  see that it was significant.
10     Q.  (By Mr. Regan) How much video would we
11  need to watch to determine the difference of
12  10,000 barrels per day out the skirt?
13           MR. CERNICH:  Object to form.
14     A.  It was a very judgmental evaluation.
15     Q.  (By Mr. Regan) Okay.  So if --
16     A.  And I don't present it as an accurate
17  valuation.
18     Q.  Well, if you don't present it as an
19  accurate valuation, you agree that it is part of
20  your 60,000 barrel per day estimate, correct?
21     A.  That is correct.
22     Q.  And so, by definition, your 60,000 barrel
23  per day estimate is inaccurate, correct?
24           MR. CERNICH:  Object to form.
25     A.  All of my estimates are inaccurate.  That

474

1  particular one is especially inaccurate.
2     Q.  (By Mr. Regan) All of your Flow Rate
3  Estimates are inaccurate, Dr. Dykhuizen?
4     A.  That is correct.
5           MR. CERNICH:  Object to form.
6     Q.  (By Mr. Regan) Okay.  With respect to a
7  10,000 barrel per day flow rate, if we watched an
8  hour of video to see a difference of 10,000
9  barrels per day of flow, how many barrels a -- an
10  hour would be would we be looking for as a
11  change --
12           MR. CERNICH:  Object to form.
13     Q.  (By Mr. Regan) -- visually?
14           MR. CERNICH:  Objection.
15     Q.  (By Mr. Regan) About 400 barrels an hour,
16  right?
17           MR. CERNICH:  Object to form.
18     A.  Correct.
19     Q.  (By Mr. Regan) Simple math.  So we -- if
20  we looked an hour --
21           MR. CERNICH:  Please -- please let
22  the witness answer the question before
23  continuing.
24           MR. REGAN:  I think he was finished.
25  I'm -- I'm looking right at him.

475

1     Q.  (By Mr. Regan) You were finished,
2  correct?
3     A.  400 is an approximate number, yes.
4     Q.  Okay.  All right.  So if we looked at an
5  hour of video, of A, video when there was 10,000
6  barrels being collected and, B, video when there
7  was 20,000 barrels being collected per day, we'd
8  be trying to visually distinguish between 400
9  barrels difference on the screen of that one
10  hour, correct?
11           MR. CERNICH:  Object to form.
12     A.  That is correct.
13     Q.  (By Mr. Regan) And if we just looked at a
14  minute of video of those two screens, we'd be
15  trying to look at the difference of seven barrels
16  visually?
17     A.  That's incorrect.
18     Q.  Okay.  How much --
19     A.  We're looking at a rate.  We are not
20  looking at individual barrels.
21     Q.  Well, the rate is driven by the number of
22  barrels, correct?
23           MR. CERNICH:  Object to form.
24     A.  The rate is a number of barrels per unit
25  of time.

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

496

1  A. -- it is.
2  Q. What do -- just for clarity, what do you
3  mean by "intercept"?
4  A. Okay. We have a point at Day 87 that the
5  Y value is 53,000 --
6  Q. Okay.
7  A. -- and the X value is 87. If I can find
8  another point, I can draw a straight line between
9  them. So the other point is Day 1, and I need to
10 know -- so that gives me the X value --
11 Q. Right.
12 A. -- but I need to know the Y value.
13     So the equations I developed that are
14 presented in the Ratzel Report on how to
15 extrapolate backwards determines that intercept.
16 That intercept is a function of what you assume
17 the final pressure in the reservoir is.
18 Q. M-h'm.
19 A. And, therefore, if we want to rerun the
20 model based on somebody else's estimate of the
21 final reservoir pressure, it can be easily done
22 without running Paul Hsieh's very complex model.
23 Q. Okay. These -- these are the estimates
24 that are presented in the Ratzel Report where
25 you're assuming there's no riser at all, you're

497

1  trying to find the -- the maximum possible flow
2  based on your equations, correct?
3     MR. CERNICH: Object to form.
4  Q. (By Mr. Regan) I think it's Page 40 of
5  the Ratzel Report, thereabouts.
6  A. That doesn't -- yes. Those -- those were
7  presented in a -- a confusing way. I wished I
8  had not used this hypothetical point of no riser
9  at Day Zero, but that was the logic that I went
10 through. However, that intercept does eventually
11 account for the fact that there is a riser on
12 Day 1.
13 Q. And your equations, likewise, require you
14 to input a final reservoir pressure, correct?
15 A. Yes.
16 Q. And your equations require you to have a
17 figure for Day 87, July 15th, correct?
18 A. I think it's been adjust -- readjusted to
19 have to 86 days because it's 87 and a half; but,
20 yes --
21 Q. Okay.
22 A. -- we need to have a figure for Day 86
23 and a half.
24 Q. Okay. All right. The slope of the line,
25 then, the -- the idea of a decrease in flow from

498

1  Day Zero or 1 to Day 87, is that a function of
2  the starting and ending reservoir pressures?
3  A. Yes.
4     MR. CERNICH: Object to form.
5  A. Exactly.
6  Q. (By Mr. Regan) And that's the slope of
7  the line, then, is independent of what you
8  calculated as a flow rate on July 15th for
9  capping stack, correct?
10 A. That is correct.
11 Q. So whatever uncertainty there is about
12 the slope of the line is independent of whatever
13 uncertainty there may about -- uncertainty there
14 may be about the actual flow rate calculation for
15 July 15th standing alone, correct?
16     MR. CERNICH: Objection, form.
17 A. That is correct.
18 Q. (By Mr. Regan) The cumulative flow
19 amount, though, requires you to put both the
20 slope of the line and your July 15th numbers
21 together, correct?
22 A. That is correct.
23 Q. So the uncertainty of cumulative flow
24 would require you to combine the uncertainty of
25 the assumed decrease in flow from reservoir

499

1  depletion and the uncertainty of the number
2  you've picked for July 15th, correct?
3     MR. CERNICH: Object to form.
4  A. That is correct.
5  Q. (By Mr. Regan) Okay. And with respect
6  to -- as you look at this area of cumulative --
7  calculated for cumulative flow, would it be fair
8  to say that your confidence in the flow rates
9  that are derived here is -- is highest for the
10 days that are the closest to July 15th?
11 A. That is correct.
12     MR. CERNICH: Object to form.
13 Q. (By Mr. Regan) And the reason your
14 confidence is the highest for the days closest to
15 July 15th is because you have an assumption of no
16 change in restrictions other than the two
17 4 percent changes set forth in your chart,
18 correct?
19 A. That is my assumption. There is a basis
20 for that assumption. It's not a assumption that
21 is made blindly.
22 Q. Right. Whatever the validity is of the
23 assumption, you would agree that, having used it,
24 the further you get away from July 15th, the less
25 confidence that you would have in the actual

25 (Pages 496 to 499)

500

1    calculation of a given flow rate for a given day
2    in the preceding 86 days?
3        MR. CERNICH: Object to form.
4    A. That is correct.
5    Q. (By Mr. Regan) So, in relative terms, if
6    we were just to compare the flow rates that are
7    calculated for your cumulative flow rate number,
8    you would have the least confidence in the
9    calculation of the flow rates of late April and
10   the most confidence in the flow rates that are
11   calculated for mid-July?
12   A. That is correct.
13   Q. All right. If you have chosen 53,000 as
14   your starting point for July 15th and used this
15   linear reservoir depletion slope to calculate
16   cumulative flow, can you explain to me how the
17   five million barrel number that's derived from
18   there -- with the two adjustments of -- of riser
19   cut and capping stack, how does that represent
20   anything other than an upper bound --
21       MR. CERNICH: Object to form.
22   Q. (By Mr. Regan) -- for cumulative flow?
23   A. That is an interesting question that we
24   have tried to look at. The 53,000, it is not an
25   upper bound.

501

1    Q. Okay.
2    A. And, therefore, uncertainty in the 53,000
3    could drive the integral up or down.
4    Q. Okay.
5    A. The integral is approximately
6    proportional to 53,000.
7        This slope could be lower, because I have
8    incorrect final pressure; but the slope could
9    also be higher, because I have an incorrect final
10   pressure.
11       That final pressure is not known; and so,
12   if the slope is higher, I would get a higher
13   integral than five million barrels a day. If the
14   slope is lower, I would get a lower integral than
15   five million barrels a day.
16       So if that slope can change either way
17   because the final pressure can change either way,
18   then my integral can change either way, even
19   fixing it at 53,000.
20   Q. Okay. So with respect to how the
21   five million barrel could be something other than
22   an upper bound, one way is if your 53,000
23   barrel-per-day estimate for July 15th is too low?
24   A. That is correct.
25   Q. Because the slope simply is a function of

502

1    whatever number you're going to put in for
2    July 15th?
3        MR. CERNICH: Object to --
4    Q. (By Mr. Regan) The cumulative flow, I
5    should say, calculation starts with whatever
6    number you're going to put in for July 15th?
7    A. Yes.
8        MR. CERNICH: Object to form.
9    Q. (By Mr. Regan) Okay. All right.
10   Independent of that number, understanding that
11   the 53,000 has a plus or minus 20 -- let me ask
12   it: The 53,000 barrel-per-day estimate in your
13   Expert Report and in your work in 2010, to you,
14   has a plus or minus 20 percent error bound,
15   correct?
16   A. Yes.
17   Q. Okay. So let's remove that potential
18   error bound as something that could increase
19   cumulative flow.
20       The second way the five million barrel
21   calculation could be too low is if you've
22   incorrectly calculated the final reservoir
23   pressure?
24   A. That is correct.
25   Q. Meaning you've got too high of a final

503

1    reservoir pressure, correct?
2    A. Yes. That is the --
3    Q. Okay.
4    A. -- direction it would go.
5    Q. What is the error bound on the
6    calculation of final reservoir pressure that was
7    used to calculate the five million barrel
8    cumulative flow?
9    A. I don't think they established an error
10   bound on the final reservoir pressure.
11   Q. Ha -- have you ever heard anyone suggest
12   that the final reservoir pressure of 10,050,
13   which was used by you and others to calculate
14   five million barrels of flow, was too high?
15   A. Since people have started recalculating
16   that number, almost everybody wants -- everybody
17   that I'm aware of wants to increase that number.
18   Q. Right. So, based on all of the empirical
19   information that you have from the work of people
20   that have looked at that reservoir pressure
21   number, the final reservoir pressure, you're not
22   aware of anyone suggesting that 10,050, the
23   number used to calculate this five million
24   cumulative flow, was too high?
25   A. No.

26 (Pages 500 to 503)

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

508

1  the well had less resistance than what you've
2  assumed in reaching your five million cumulative
3  flow number?
4        MR. CERNICH:  Object to form.
5     Q.  (By Mr. Regan) That is, less resistance
6  and then a period of time of, perhaps, more
7  resistance, the example you just gave.
8        MR. CERNICH:  Objection.
9     A.  It is my opinion that Top Kill didn't
10  affect resistance.
11        However, when we were discussing Top
12  Kill, you wanted to propose that Top Kill did
13  affect resistance to negate that calculation, and
14  now you want to accept my conclusion that Top
15  Kill didn't affect resistance, so we can
16  cherry-pick as we want and go.
17        But with my assumption, I'm making
18  consistent assumptions in my Top Kill Analysis as
19  we're making here.
20     Q.  M-h'm.
21     A.  There was no change in resistance due to
22  Top Kill; and, therefore, I'm trying to support
23  this.
24     Q.  M-h'm.
25     A.  But that was not the question you asked.

509

1  You said:  Are there any assumptions I could
2  make --
3     Q.  M-h'm.
4     A.  -- that would make the five million
5  barrels a day not a maximum?
6        And so I suggested that.  That was not
7  what I assumed.  It's not what I believe.
8     Q.  M-h'm.
9     A.  But I suggest that to answer your
10  question.
11     Q.  Do you view someone asking you questions
12  about your assumptions as being "cherry picking"?
13        MR. CERNICH:  Object to form.
14     A.  You just want me to make general assum --
15  agreements with your statements, and your
16  statements are self-contradictory now than they
17  were before.  And you're trying to have me reduce
18  my integral of flow with every assumption you're
19  making, and that seems to me as -- as cherry
20  picking.
21     Q.  (By Mr. Regan) I'm asking you questions,
22  one at a time, and asking for your truthful
23  answers under oath.  That's what I'm doing.
24     A.  Okay.
25     Q.  All right.

510

1        MR. CERNICH:  And the witness has
2  given you truthful answers.
3     Q.  (By Mr. Regan) Right.  I'll -- so I'm not
4  cherry picking.  I'm just asking you about your
5  work, and I'm going to ask you about your work
6  for about another hour and eight minutes.  Okay?
7     A.  Okay.
8     Q.  Do you have assumptions in your work?
9     A.  Yes.
10     Q.  Is it fair for me to ask you about your
11  assumptions?
12     A.  Yes, it is.
13     Q.  Okay.  Do you assume that the
14  restrictions didn't change over 87 days other
15  than a cut in the riser and the installation of
16  the capping stack?
17     A.  Yes, I do.
18     Q.  Does that assumption have uncertainty?
19     A.  Yes.
20     Q.  Is it possible that there were greater
21  restrictions?
22        MR. CERNICH:  Object to form.
23     A.  It is possible that they are different
24  restrictions.  They could be greater, and they
25  could be less.

511

1     Q.  (By Mr. Regan) So is it possible there
2  were greater restrictions?
3     A.  Yes.
4     Q.  Is it possible there were less
5  restrictions?
6     A.  Yes.
7     Q.  And is that one of the reasons that your
8  estimate of five million barrels could be
9  inaccurate?
10        MR. CERNICH:  Object to form.
11     A.  That is definitely true, that my estimate
12  of five million barrels has a significant error
13  to it.
14     Q.  (By Mr. Regan)  All right.  And the
15  "significant error" is on -- as you testified
16  yesterday, on the order of plus or minus
17  30 percent, correct?
18     A.  That is correct.
19     Q.  And I'm trying to explore the basis for
20  the greater 30 percent.
21     A.  Okay.
22     Q.  Okay?  So --
23     A.  Let me volunteer something.
24     Q.  Now, let me ask you a question.
25     A.  Okay.

28  (Pages 508 to 511)

512

1    Q.  The question is --
2         MR. CERNICH:  Can he -- the witness
3  can finish --
4         MR. REGAN:  I --
5         MR. CERNICH:  -- answering your
6  question.
7         MR. REGAN:  He -- he had finished
8  answering his question.  He wants to --
9         MR. CERNICH:  No, he --
10        MR. REGAN:  -- volunteer
11 information.  He's not going to volunteer
12 information.
13        MR. CERNICH:  In response to your
14 question.
15        MR. REGAN:  No, he's not.  No, he's
16 not.
17        MR. CERNICH:  In response to your
18 question --
19        MR. REGAN:  Read the question.
20        MR. CERNICH:  -- he was answering a
21 question.
22        MR. REGAN:  I hadn't even asked a
23 question yet.
24     I'm going to try to explore the basis for
25 the greater 30 percent.  Let me ask the

513

1  questions.
2         MR. CERNICH:  And you said, okay --
3         MR. REGAN:  The question --
4         MR. CERNICH:  -- question mark.
5         MR. REGAN:  I said, "The question
6  is --"
7         MR. CERNICH:  You said, okay,
8  question mark.
9         MR. REGAN:  I said, "The
10 question is," Scott.  I said, "The question
11 is --"
12        MR. CERNICH:  You said, okay,
13 question mark.
14        MR. REGAN:  Here we go.
15    Q.  (By Mr. Regan) Dr. Dykhuizen --
16    A.  Yes.
17    Q.  -- have you seen any basis, from the
18 empirical evidence that you looked at, that there
19 was an absence of restrictions that would support
20 a flow rate of 6.5 million barrels out of Macondo
21 in 87 days?
22        MR. CERNICH:  Object to form.
23    A.  Could you repeat the question, please?
24    Q.  (By Mr. Regan) Dr. Dykhuizen, have you
25 seen any basis, from the empirical evidence that

514

1  you looked at, that there was an absence of
2  restrictions that would support a flow rate of
3  6.5 million barrels out of Macondo in 87 days?
4     A.  I see that previously you asked me my
5  error bar on the five million barrels a day, and
6  I said the error bar was as much as 30 percent.
7     Q.  M-h'm.
8     A.  I will admit that they are much more
9  likely to be a lower value than a higher value.
10 I think 6.5 million barrels a day is much -- very
11 unlikely.
12        3.5 million barrels a day, the 30 percent
13 lower, has more likelihood than 30 percent
14 higher.  I tried to volunteer this, but you cut
15 me off.
16    Q.  Okay.
17        MR. REGAN:  Those are the questions
18 I have now.  I'll reserve the rest of my time.
19        And with respect to that,
20 Dr. Dykhuizen, I didn't mean to cut you off.  I
21 don't believe that I have, but it's all written
22 down.  So we can -- we can judge it for
23 ourselves.
24        I'll -- I'll reserve the last hour.
25        MR. CERNICH:  Okay.

515

1         THE VIDEOGRAPHER:  The time is
2  10:37 a.m.  We're off the record, ending Tape 11.
3      (Recess from 10:37 a.m. to 11:49 a.m.)
4         MR. FITCH:  I think we can start
5  when you're ready.
6         THE COURT REPORTER:  Yes, sir.
7         THE VIDEOGRAPHER:  All set?
8      The time is 10:49 a.m.  We're back on the
9  record, beginning Tape 12.
10        EXAMINATION
11 QUESTIONS BY MR. FITCH:
12    Q.  Doctor, as I mentioned a moment ago, I'm
13 Tony Fitch.  I represent another Defendant in
14 this action, Anadarko Petroleum Company.
15        When the -- you refer to the 2010 DOE
16 Report sometimes as the Ratzel Report, correct?
17    A.  Yes.
18    Q.  Okay.  And what is your view of what your
19 role in the work leading up to that Report and
20 issuing that Report consists of?
21    A.  Technically, my role was I wrote the
22 first draft, and then Dr. Ratzel decided that he
23 would take over the analysis of that, so he
24 performed the collection of information from the
25 three National Laboratories.  And at that point,

29 (Pages 512 to 515)

624

1         MR. CERNICH:  Objection, form.
2     A.  The calculations where I estimate K
3  values and given an inlet and an outlet pressure,
4  an estimate of flow is very standard.  The other
5  calculations, where I try to infer a K, may not
6  be nearly as standard but is not difficult to
7  understand.
8     **Q.  (By Mr. Regan) M-h'm.**
9     A.  Any Engineer should be able to understand
10  that work.  If any Engineer can understand that
11  work, I guess we can call it "standard."  There
12  isn't a definition of what "standard" is.
13     **Q.  Right.  Did you use standardized software**
14  **or commercially available programs to arrive at**
15  **the opinions that you're expressing in this case?**
16         MR. CERNICH:  Object to form.
17     A.  I did not use commercially available
18  software for anything.  I used Excel for quite a
19  bit of it.  The fact that I used Excel and -- and
20  equations does -- is quite standard for Engineers
21  to do.
22     **Q.  (By Mr. Regan) Okay.**
23     A.  It's -- it's not unheard of to do these
24  sorts of calculations.
25         Matter of fact, I don't know of a code

625

1  where you can put in a string of Ks and back out
2  a flow rate.  It's such a simple thing, that if
3  somebody developed such a code, he might have a
4  difficult time selling it.
5     **Q.  Okay.  You testified that you used the**
6  **same principles and methods from your day-to-day**
7  **work to arrive at your flow rate estimates here,**
8  **but often you have a lot more sensors and a lot**
9  **more data.  Is that fair?**
10     A.  That is correct.
11     **Q.  Okay.  In any of your past work, did you**
12  **arrive at conclusions that had error bars larger**
13  **than the error bars you've testified to about the**
14  **flow rate estimates in your Expert Report?**
15         MR. CERNICH:  Objection, form.
16     A.  I would assume, yes.  I mean, I've been
17  working in the field for 30 years.  I -- I assume
18  that I had sometimes error bars larger than 30
19  percent, but I can't think of one right now.
20     **Q.  (By Mr. Regan) Okay.  Just to clarify, or**
21  **to confirm, as you sit here today, can you think**
22  **of a single project that you've done in the past**
23  **where you've published an estimate of flow that**
24  **had larger error bars than the error bars you're**
25  **applying to the flow at Macondo in your Expert**

626

1  **testimony?**
2         MR. CERNICH:  Objection, form.
3     A.  Usually calculations that have an error
4  bar of 30 percent aren't considered of academic
5  interest; and, therefore, I would not have tried
6  to publish any of those.  But there's been many
7  times when I've had to perform calculations.  I
8  can give an example.
9         Airplanes have a -- quite often,
10  magnesium parts.  Magnesium parts have a
11  potential of catching fire.  If this airplane was
12  parked over a vault that contained a nuclear
13  weapon underneath the lid of a vault, this
14  airplane catching fire would be a real problem if
15  we penetrated the vault with that hot fire.
16         I perform a calculation on how long will
17  that vault lid last when exposed to that fire.
18  That calculation tells me -- then I can form a
19  calculation on how long that plane might remain
20  in -- aflame, compare those two, and determine
21  that the vault integrity is good.
22         It's a very typical safety calculation
23  that I might perform.  That safety calculation
24  might have an error bar of significant amounts
25  more than 30 percent, but as long as I can show

627

1  that the vault lid will outlast the fire, my boss
2  is happy.  He will accept my calculation.  I will
3  try to do it in a conservative manner to make
4  sure that I'm positive that the vault lid will
5  withstand that fire.
6         Those sorts of calculations are done all
7  the time.  They have large uncertainties, and
8  they are not necessarily publishable because that
9  is not of an academic interest.
10     **Q.  (By Mr. Regan) Okay.  It -- it's your**
11  **experience, Dr. Dykhuizen, that usually**
12  **calculations that have an error bar of 30 percent**
13  **or -- or more aren't considered of academic**
14  **interest, correct?**
15         MR. CERNICH:  Object to form.
16     A.  Academic interest.  And what I meant
17  there is most journals would not think that they
18  want to publish such an article.
19     **Q.  (By Mr. Regan) And why would most**
20  **journals in your experience not want to publish**
21  **an article about a calculation that has an error**
22  **bar of 30 percent or more?**
23     A.  Because it is not a cutting-edge method.
24  It is more of a -- the best we can do.  If you're
25  publishing in a journal, you would like to show

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

628

1 that you match data.  You would like to show that
2 your calculations are accurate to degrees better
3 than previous calculations done on the same
4 geometry.
5       A standard calculation is flow of a
6 liquid over a backward step and trying to
7 calculate how big a recirculation zone as you
8 flow over a step.  That's studied over and over
9 and over again.  Doesn't have much of any
10 purpose, except for academic interest of
11 demonstrating how well your code does or how well
12 your model does in performing that.
13       And if you can get it to 99.9 percent
14 accurate instead of 99.7 percent accurate, it
15 would be of academic interest.
16    **Q.  Have you ever published a flow rate**
17 **estimate of a multiphase flow that involved an**
18 **error of 30 percent or greater?**
19    A. Never.
20    **Q.  Have you made any attempt to publish the**
21 **work that you performed at Macondo where you**
22 **arrived at flow rates that in your view had error**
23 **bars up to 30 percent or greater?**
24       MR. CERNICH:  Object to form.
25    A. No, I have not tried to publish my work

629

1 here.
2    **Q.  (By Mr. Regan)  Okay.  Do you think that**
3 **your work that you did at Macondo would be**
4 **accepted by an academic journal, given the fact**
5 **that you have a 20 percent error bar on your**
6 **point estimate of 53,000, and a 30 percent error**
7 **bar relying on other people, with respect to the**
8 **cumulative flow of 5,000 -- five million barrels?**
9       MR. CERNICH:  Objection, form.
10    A. I do not see where an academic journal
11 would be interested in publishing a paper that
12 uses standard methods and does not advance the
13 art into something that is unique.
14       I am trying to use standard methods that
15 are well-accepted to estimate the flow from the
16 Macondo Well.  I would like to have a calculation
17 that's more accurate, but based on the data that
18 I have, I'm stating the accuracy as best I can.
19    **Q.  (By Mr. Regan) Is it your testimony,**
20 **Dr. Dykhuizen, that the work you performed both**
21 **in 2010, and as reflected in your Expert Reports,**
22 **was not unique?**
23       MR. CERNICH:  Object to form.
24    A. Nobody has performed the calculations
25 like the set in my Expert Report.  So in that

630

1 way, it is unique.  But I'm using standard
2 methods and, therefore, it is not unique in -- in
3 that sense.  I'm using methods that are --
4 essentially could be accomplished by an
5 undergraduate being directed to do these
6 calculations.
7    **Q.  (By Mr. Regan) Okay.  Is it a standard**
8 **method, in your scientific field, to publish a**
9 **result in multiphase flow simulation that has**
10 **error bars of 30 percent or greater?**
11       MR. CERNICH:  Objection, form.
12    A. I do not know of any published results
13 that have error bars of 30 percent or greater.
14 There may be existing ones.  I do not know of
15 any.  I doubt there are any out there.  But
16 that's a possibility.
17    **Q.  (By Mr. Regan) You testified, I believe,**
18 **in response to Transocean questions that you had**
19 **not reviewed other Expert Reports in arriving at**
20 **your opening Report.  Do you recall giving an**
21 **answer to that effect?  I think your quote was**
22 **"My Report was issued before I saw anybody else's**
23 **Expert Report."**
24    A. In my understanding, that is true.  The
25 only -- the -- I've seen the journal article that

631

1 Stewart Griffiths put together, and I referenced
2 that in my Expert Report.
3       But I don't think I reference any other
4 Expert Reports.  It's possible, now that I think
5 about it, that maybe I referenced Nathan
6 Bushnell, to justify K values that I used for
7 elements in rapid succession, and possibly I
8 referenced Bushnell in -- in his multiphase flow
9 calculations, and justifying me using a
10 homogeneous method.
11       So I stand corrected, and I thank you for
12 that; however, I did not change my calculations
13 based on any review of other Expert Reports --
14    **Q.  Okay.**
15    A. -- so I need to refine that to be much
16 more accurate.
17    **Q.  Okay.  So did you review other Expert**
18 **Reports that have been issued by the Department**
19 **of Justice before you finalized your opening**
20 **Expert Report?**
21       MR. CERNICH:  Object to form.
22    A. The answer is "Yes."  I asked -- I -- I
23 did review that Bushnell Report.  There may be
24 some others that I am missing at this particular
25 time, but I did not change my numerical values or

58 (Pages 628 to 631)