# Exhibit A

# Excerpts from the Deposition Transcript of Gregg Perkin

# Taken June 24-25, 2013

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL             ) MDL NO. 2179
BY THE OIL RIG               )
"DEEPWATER HORIZON" IN ) SECTION "J"
THE GULF OF MEXICO, ON       )
APRIL 20, 2010               ) JUDGE BARBIER
                             ) MAG. JUDGE SHUSHAN

*****************
VOLUME 1
*****************

Deposition of Gregg Steven Perkin, P.E., taken at the Pan-American Building, 601 Poydras Street, 11th Floor, New Orleans, Louisiana, 70130, on the 24th day of June, 2013.

## Page 2

APPEARANCES

APPEARING FOR THE PLAINTIFFS STEERING COMMITTEE:
  Mr Matthew E Lundy
  Mr Nicholas J Kohrs
  LUNDY, LUNDY, SOLLEAU & SOUTH, LLP
  501 Broad Street
  Lake Charles, Louisiana 70601

  Mr Frank M Petosa
  MORGAN & MORGAN
  6824 Griffin Road
  Davie, Florida 33314
  Mr Jimmy Williamson
  WILLIAMSON & RUSNAK
  4310 Yoakum Boulevard
  Houston, Texas 77006-5818

APPEARING FOR BP, INC :
  Mr Paul D Collier
  Ms Emily Dempsey
  KIRKLAND & ELLIS
  300 North LaSalle
  Chicago, Illinois 60654

APPEARING FOR TRANSOCEAN:
  Mr Carter L Williams
  Mr Thomas G Appleman
  SUTHERLAND ASBILL & BRENNAN
  1001 Fannin, Suite 3700
  Houston, Texas 77002-6760

APPEARING FOR ANADARKO PETROLEUM COMPANY:
  Mr Robert E Guidry
  KUCHLER POLK SCHELL WEINER & RICHESON
  1615 Poydras Street, Suite 1300
  New Orleans, Louisiana 70112

## Page 3

APPEARING FOR HALLIBURTON:
  Mr Jerry C von Sternberg
  Ms Gwen E Richard
  Mr Colby S Hodges
  Mr Jason Sharp
  GODWIN LEWIS
  1331 Lamar, Suite 1665
  Houston, Texas 77010-3133

APPEARING FOR THE UNITED STATES:
  Ms Laura D Mayberry
  U S DEPARTMENT OF JUSTICE
  TORT BRANCH, CIVIL DIVISION
  1425 New York Avenue, N W
  Suite 10100
  Washington, D C 20005
  Post Office Box 14271
  Washington, D C 20044-4271
  Ms Esperanza Anderson
  U S DEPARTMENT OF JUSTICE
  ENVIRONMENT & NATURAL RESOURCES DIVISION
  Ben Franklin Station
  Post Office Box 7611
  Washington, D C 20044-7611
  601 D Street, N W
  Washington, D C 20004

APPEARING FOR THE STATE OF LOUISIANA:
  Mr Douglas R Kraus
  Attorney for Louisiana Attorney General
  KANNER & WHITELEY
  701 Camp Street
  New Orleans, Louisiana 70130-3504

ALSO PRESENT:
  Mr Peter Jennings, Videographer
  Mr Ray Aguirre, Case Manager
  Mr James Deel, Logistics
  Ms Michele Hale

## Page 4

INDEX
VIDEOTAPED ORAL DEPOSITION OF
GREGG STEVEN PERKIN, P E
JUNE 24, 2013
VOLUME 1

Appearances                                    2

Direct Examination-Mr Collier                  9

Changes and Signature                        375
Reporter's Certificate                       377

EXHIBIT INDEX

Ex No    Description                        Marked

11464   Expert Report - Macondo Phase II,
        Gregg S Perkin, P E , Engineering
        Partners International, March 22,
        2013; 33 pages                         13

11465   Expert Rebuttal Report - Macondo
        Phase II, Gregg S Perkin, P E ,
        Engineering Partners
        International, June 10, 2013;
        seven pages                            13

11466   Curriculum Vitae of Gregg S
        Perkin, P E , Engineering Partners
        International (EPI), January 9,
        2012; three pages                      26

11467   BP Master Services Agreement
        Emergency Well Services, Contract
        Number: BPM-04-00806, marked as
        HIGHLY CONFIDENTIAL; Bates Nos
        WW-MDL-00141419 - WW-MDL-00141634     112

9

1  MR. COLLIER: I'm ready when you
2 are.
3  THE VIDEOGRAPHER: All set? Please
4 stand by.
5  Today is June 24th, 2013. This is the
6 deposition of Gregg Perkin regarding the oil
7 spill of the Oil Rig DEEPWATER HORIZON on April
8 20th, 2010.
9  The time is 8:35 a m. We are on the
10 record.
11  GREGG STEVEN PERKIN, P.E.
12 was called as a witness by BP, Inc., and, being
13 first duly sworn, testified as follows:
14  DIRECT EXAMINATION
15 QUESTIONS BY MR. COLLIER:
16  Q. Good morning, Mr. Perkin.
17  A. Good morning.
18  Q. My name is Paul Collier. I'll be asking
19 questions today on behalf of BP. Can you please
20 state your full name.
21  A. Gregg Steven Perkin, Steven with a "v."
22  Q. And who are you currently employed by?
23  A. Engineering Partners, International.
24  Q. And what is your role with Engineering
25 Partners?

10

1  A. I am a -- one of the principal Engineers
2 of Engineering Partners, International. I'm also
3 the owner of Engineering Partners, International.
4  Q. Now, I understand that you've been
5 deposed before, correct?
6  A. I have.
7  Q. And once with re -- with respect to this
8 particular matter; is that right?
9  A. That's correct.
10  Q. And -- and so I'll very briefly just go
11 over a couple of ground rules. If at any time
12 you do not hear a question that I ask, will you
13 agree to let me know?
14  A. Of course.
15  Q. And if at any point in time you do not
16 understand a question that I ask, will you agree
17 to let me know?
18  A. Of course.
19  Q. Now, you have been retained by the
20 Plaintiffs Steering Committee to provide opinions
21 relating to Phase II issues? Is that correct?
22  A. I have.
23  Q. And you understand that generally, Phase
24 II relates to issues of responding to the Macondo
25 blowout, correct?

11

1  A. Correct.
2  Q. And also relating to quantification
3 relating to the amount of oil that spilled into
4 the Gulf of Mexico, correct?
5  A. I believe that's true.
6  Q. And I -- as I understand it, your
7 opinions relating to Phase II relates to source
8 control; is that correct?
9  A. Yes.
10  Q. And you're not offering any opinions as
11 it relates to the quantification of the amount of
12 oil that spilled into the Gulf of Mexico?
13  A. Only what's been referred to in the
14 documents as the quantification of the oil that's
15 been spilled.
16  Q. And -- and so are you offering any
17 opinions as it relates to quantification?
18  A. No. I'm -- I'd -- I've done a rough
19 calculation, but I -- you know, there's more
20 sophisticat -- sophisticated calculations that
21 have been done, I'm sure.
22  Q. When it comes to trial, are you intending
23 to offer any opinion as it relates to
24 quantification?
25  A. Only if asked. Like I said, I did a

12

1 rough calculation based on a simple engineering
2 calculation, but it's just a rough calculation.
3  Q. And as it stands right now, you're not
4 intending to offer that calculation?
5  A. Not unless I'm asked.
6  Q. Now, you have prepared two Expert Reports
7 relating to your opinions for Phase II, correct?
8  A. I prepared a Report, a first Report, I
9 believe, and I prepared a Rebuttal Report.
10  Q. And if you can open that binder that's in
11 front of you, Mr. Perkin, and specifically, if
12 you can go to Tab 1, please.
13  A. All right.
14  Q. And do you recognize Tab 1 as being your
15 opening Expert Report as it relates to Phase II?
16  A. Correct. It appears to be the redacted
17 version, as I -- as I see it, yes.
18  Q. And -- and just for the record, we
19 received, over the weekend, a redacted version of
20 your opening Expert Report, correct?
21  A. I think that's true, yes.
22  Q. Okay. And if you can go ahead and mark
23 that version for me, it's going to be Exhibit
24 No. 11464, please.
25  A. Okay. So I'm the official exhibit

**Page 13**

1  marker?
2      Q. If you don't mind.
3         (Exhibit No. 11464 marked.)
4         THE WITNESS: And I'll put them on
5  straight, Kym.
6         THE COURT REPORTER: Thank you.
7         THE WITNESS: All right.
8         THE COURT REPORTER: Well done.
9         THE WITNESS: Thank you.
10     Q. (By Mr. Collier) And if you can go ahead
11 and turn to Tab 2 of the binder in front of you.
12 And do you recognize that as the Rebuttal Expert
13 Report that you submitted relating to Phase II
14 issues?
15     A. Yes, sir.
16     Q. And if you can go ahead and mark that
17 with Exhibit No. 11465, please.
18        (Exhibit No. 11465 marked.)
19     A. (Complying.)
20     Q. (By Mr. Collier) And apart from these two
21 Expert Reports, Exhibits No. 11464 and 11465,
22 you've not prepared any other Reports,
23 Appendices, or materials relating to Phase II,
24 correct?
25     A. I have not.

**Page 14**

1      Q. Is it correct that Exhibits 11464 and
2  11465 contain all of your opinions relating to
3  Phase II?
4      A. That I've got in my Reports, yes. But if
5  I'm asked about something in this deposition or
6  trial that I have an opinion about, I certainly
7  will respond.
8      Q. As it stands right now, based on what you
9  understand to be your opinions relating to Phase
10 II, do Exhibits 11464 and 11465 contain all your
11 opinions?
12     A. Pretty much.
13     Q. Is there any opinions that you currently
14 have relating to Phase II that are not contained
15 in those Reports?
16     A. I think it would depend upon the
17 question, but I don't believe I have any
18 additional opinions. But, again, as I say,
19 I've -- if I get asked a question at deposition
20 or trial that I have an opinion on that's not
21 expressed in my Report, I will probably answer
22 it.
23     Q. Are there any opinions that you intend to
24 offer relating to Phase II that are not included
25 in Exhibits 11464 and 11465?

**Page 15**

1      A. There may be two opinions that I have
2  relative to my Rebuttal Report.
3      Q. Okay.
4      A. That may not be necessarily divulged or
5  explained in my Rebuttal Report.
6      Q. Okay. Can you identify what these two
7  opinions are?
8      A. One has to do with the -- the rupture
9  disks and how the Top Kill was proceeding with
10 the junk shot. I -- I know there was issues
11 relative to trying to maintain pressure on the
12 well without rupturing the disks and creating an
13 underground blowout.
14        I am -- I've not seen anything that would
15 indicate to me one way or the other that, during
16 the junk shot, if the junk had actually plugged
17 off the well, in other words, it shut the well
18 in, how British Petroleum was going to mitigate
19 or control that pressure.
20        In other words, if the pressure started
21 to spike during the junk shot, how they would
22 have -- how they would have mitigated exceeding a
23 certain pressure. I don't think I go into that
24 in my Rebuttal Report in detail, but it's -- it
25 is a concern and an opinion that I have.

**Page 16**

1      Q. And -- and just to clarify, it -- it --
2  it's your opinion that, during the junk shot
3  source control intervention method, there was not
4  a BP mitigation process to address the situation
5  if the junk shot had bridged --
6      A. If --
7      Q. -- the BOP?
8      A. If the junk shot had suddenly bridged the
9  flow, and the pressure spiked, how BP was going
10 to mitigate that pressure and protect the rupture
11 disks. I have not seen anything that would
12 suggest that they had con -- contemplated that or
13 considered that.
14        So that's one -- one opinion that may not
15 be in my Rebuttal Report, but I'm trying to
16 explain it to you now.
17     Q. Okay. And then you identified that there
18 was a second opinion, correct?
19     A. I do have a second opinion. And that is,
20 during the -- the efforts initially to shut in
21 the -- shut in the well, with ROVs, had -- with
22 the well flowing, you know, to shut the well
23 in -- if they were successful in shutting the
24 well in, and the pressure spiked, I'm not sure
25 how BP would have dealt with that, if the

Worldwide Court Reporters, Inc.
PURSUANT TO CONFIDENTIALITY ORDER

17

1  pressure spiked and created an underground
2  blowout, i.e., ruptured the disks.
3      Q. So is it correct that both of your
4  opinions that are not contained in your Rebuttal
5  Report relate to mitigation methods if the well
6  was shut-in to protect the rupture disks?
7      A. Correct. I know that there was many
8  initial attempts to try to shut the well in
9  during -- right after the -- right after the
10 blowout. Had they been successful, to the extent
11 that they were successful and the what -- and the
12 flow had stopped, what that would have done to
13 the rupture disks. I think that should have been
14 a consideration.
15     And the other thing was in the Top Kill.
16     So those are the two -- those are the two
17 that I don't necessarily have fully explained in
18 my Report, but it's -- it is a concern.
19     Q. And you were aware that the Court's
20 instruction was that all the opinions you intend
21 to offer relating to Phase II should be included
22 in your Expert Reports, correct?
23     A. Correct.
24     Q. And -- and is there a reason why these
25 two opinions were not included in your Expert

18

1  Reports?
2      A. My Rebuttal Report was done on the fly,
3  literally. I had just been informed that a
4  Rebuttal Report was -- was due, and I was
5  returning from the Middle East, and I did it on
6  the fly --
7      Q. Okay.
8      A. -- so --
9      Q. I take it that means you did it on an
10 airplane; is that right?
11     A. I did it on an airplane, yes, I did.
12     Q. And how -- how much time did you spend
13 putting together your Rebuttal Report?
14     A. The flight was about sixteen and a half
15 hours. So about half of that.
16     Q. Now, with respect to these two additional
17 opinions, you agree that well integrity was a
18 concern that any source control intervention
19 method had to address, correct?
20     A. I believe that BP, being the Operator of
21 the well, if that was their concern, they
22 had a -- they had the responsibility and
23 obligation to manage it, yes.
24     Q. Was well integrity a legitimate concern
25 with respect to implementing the source control

19

1  methods on the --
2          MR. LUNDY: Ob --
3      Q. (By Mr. Collier) -- Macondo blowout?
4          MR. LUNDY: Object to form.
5      A. Well integrity is something that is
6  important on every well.
7      Q. (By Mr. Collier) Was well integrity with
8  respect to the Macondo blowout a legitimate
9  concern with respect to implementing the source
10 control methods?
11     A. It --
12         MR. LUNDY: Objection --
13     A. -- is a --
14         MR. LUNDY: -- form.
15     A. -- it is a concern, and it is a concern
16 on every well that's drilled offshore, and
17 onshore.
18     Q. (By Mr. Collier) And certainly was a
19 concern in this particular case, correct?
20     A. Evidently it was.
21     Q. Now, since you've submitted these
22 Reports, Exhibits 11464 and 11465, have you gone
23 back and reviewed your Reports?
24     A. I have.
25     Q. And have you found any errors or mistakes

20

1  in these Reports?
2      A. I don't think so. I didn't -- I didn't
3  even see a typo, so that's -- that's encouraging.
4      Q. That's good to hear.
5          And you're the only author for both of
6  these Reports, Exhibits 11464 and 11465, correct?
7      A. I am.
8      Q. And did anyone con -- else other than
9  yourself contribute to these Reports?
10     A. I have assistants in my office, and I
11 have them review my Reports, and I also have them
12 provide me with information for my Reports, but
13 the ultimate end product is mine.
14     Q. And who are the assistants that were
15 assisting you with respect to these Reports?
16     A. Michele Hale, who's in back of the room,
17 and my son Gregory.
18     Q. Were they providing any technical support
19 with respect to the opinions that you're
20 offering?
21     A. No.
22     Q. How many hours total have you spent
23 forming the Expert Reports -- sorry.
24         How many hours total have you spent
25 forming the expert opinions that are contained in

297

1   Q. You understand that the U.S. Government
2   put together a Team of scientists and researchers
3   to help with the Macondo response effort,
4   correct?
5   A. I think that's true.
6   Q. And this is a Team that we talked about
7   earlier that was headed by Secretary Chu?
8   A. Yes.
9      MS. MAYBERRY: Object to form.
10  Q. (By Mr. Collier) Based on the review of
11  the evidence and the testimony that you've
12  conducted, do you understand that Secretary Chu
13  and the Federal Science Team were actively
14  involved in analyzing the Top Kill operation in
15  advance of its implementation?
16  A. I think they were relying on what BP told
17  them.
18  Q. You're not aware of the Federal Science
19  Team conducting their own independent analysis
20  and evaluation of the Top Kill procedure?
21  A. I'm not aware of the details of the work
22  that they were conducting, but I believe they
23  were monitoring -- monitoring -- they were
24  relying on what BP told them. And what their
25  modeling tell -- told them that was happening.

298

1   Q. Are -- are you familiar with the Kill
2   Well on Paper Meeting and Discussion?
3   A. I am.
4   Q. And what is a Kill Well on Paper --
5   A. It's --
6   Q. -- Discussion?
7   A. -- basically a hand calculation, or a --
8   you know, it's a -- it's an evaluation on paper
9   of what -- what's going to take place.
10  Q. And do you agree, as an Engineer, that
11  that's a good process to go through before
12  implementing a source control technique, correct?
13  A. Well, I did it -- I did a technique real
14  simple. You asked me earlier if I did any
15  calculations, and there's a very simple
16  calculation where discharge equals velocity times
17  area. And if you just do that, based upon an
18  observed or perceived discharge velocity of 1
19  foot per second, times the area of the -- the
20  bore through the BOP, you come up with a lot of
21  discharge from that well.
22      MR. COLLIER: Well, move to strike
23  as nonresponsive.
24  Q. (By Mr. Collier) My question was: As an
25  Engineer, do you agree that conducting an

299

1   assessment of the success or potential success of
2   the Top Kill procedure was a good step to have
3   conducted?
4   A. It was one of the steps.
5   Q. And have you reviewed any of the
6   materials related to the Kill -- Kill the Well on
7   Paper Discussion Meeting?
8   A. I'm aware that it took place, but I'm not
9   aware of the details that were involved.
10  Q. And if you can turn to Tab 46 of the
11  binder in front of you, please.
12  A. (Complying.)
13  Q. And behind Tab 46 is Exhibit No. 9245.
14  And, Mr. Perkin, I'll represent to you that
15  Exhibit No. 9245 was not identified on your
16  considerations materials.
17  A. Okay.
18  Q. And --
19  A. You're right, I don't think I've seen
20  this before.
21  Q. And if you can look at the -- the cover
22  E-mail on that document, the first page, do you
23  see that's an E-mail from Kate Baker? Do you see
24  that?
25  A. I do.

300

1   Q. And it's dated May 18th, 2010, correct?
2   A. Yes.
3   Q. And that's eight days before the Top Kill
4   procedure was performed; is that right?
5   A. Correct. The Top Kill procedure
6   initiated on May 26th.
7   Q. And then if you look at the -- the "To"
8   section there, Do you see that there are names
9   and E-mail addresses provided that correspond
10  with Government scientists who were working on
11  the response effort?
12  A. Yeah, I see a Lawrence Livermore, Sandia,
13  Berkeley, yes. NASA.
14  Q. And there is an a -- attachment to this
15  E-mail, correct?
16  A. There is.
17  Q. And it's "KWOP Notes from Discussion"?
18  Do you see that?
19  A. I do.
20  Q. And -- and "KWOP" meaning Kill the Well
21  on Paper, correct?
22  A. I believe that would be the acronym.
23  Q. And the first line of the E-mail reads:
24  "Attached for your comment." Do you see that?
25  A. I do.

Worldwide Court Reporters, Inc.
PURSUANT TO CONFIDENTIALITY ORDER

### 379

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL           ) MDL NO. 2179
BY THE OIL RIG             )
"DEEPWATER HORIZON" IN ) SECTION "J"
THE GULF OF MEXICO, ON )
APRIL 20, 2010             ) JUDGE BARBIER
                           ) MAG. JUDGE SHUSHAN

*****************
VOLUME 2
*****************

Continuation of the deposition of Gregg Steven Perkin, P.E., taken at the Pan-American Building, 601 Poydras Street, 11th Floor, New Orleans, Louisiana, 70130, on the 25th day of June, 2013.

### 380

```
 1            A P P E A R A N C E S
 2
 3
 4   APPEARING FOR THE PLAINTIFFS STEERING COMMITTEE:
       Mr Matthew E Lundy
 5     Mr Nicholas J Kohrs
       LUNDY, LUNDY, SOLLEAU & SOUTH, LLP
 6     501 Broad Street
       Lake Charles, Louisiana  70601
 7
       Mr Frank M Petosa
 8     MORGAN & MORGAN
       6824 Griffin Road
 9     Davie, Florida  33314
       Mr Jimmy Williamson
10     WILLIAMSON & RUSNAK
11     4310 Yoakum Boulevard
       Houston, Texas  77006-5818
12
13   APPEARING FOR BP, INC :
       Mr Paul D Collier
14     Ms Emily Dempsey
       KIRKLAND & ELLIS
15     300 North LaSalle
       Chicago, Illinois  60654
16
17   APPEARING FOR TRANSOCEAN:
       Mr Carter L Williams
18     Mr Thomas G Appleman
       SUTHERLAND ASBILL & BRENNAN
19     1001 Fannin, Suite 3700
       Houston, Texas  77002-6760
20
21   APPEARING FOR ANADARKO PETROLEUM COMPANY:
       Mr Robert E Guidry
22     KUCHLER POLK SCHELL WEINER & RICHESON
       1615 Poydras Street, Suite 1300
23     New Orleans, Louisiana 70112
24
25
```

### 381

```
 1   APPEARING FOR HALLIBURTON:
       Ms Gwen E Richard
 2     Mr Jerry C von Sternberg
       Mr Colby S Hodges
 3     Mr Jason Sharp
       GODWIN LEWIS
 4     1331 Lamar, Suite 1665
       Houston, Texas  77010-3133
 5
 6   APPEARING FOR THE UNITED STATES:
       Ms Laura D Mayberry
 7     U S DEPARTMENT OF JUSTICE
       TORT BRANCH, CIVIL DIVISION
 8     1425 New York Avenue, N W
       Suite 10100
 9     Washington, D C  20005
       Post Office Box 14271
10     Washington, D C  20044-4271
11     Ms Esperanza Anderson
       U S DEPARTMENT OF JUSTICE
12     ENVIRONMENT & NATURAL RESOURCES DIVISION
       Ben Franklin Station
13     Post Office Box 7611
       Washington, D C  20044-7611
14     601 D Street, N W
       Washington, D C  20004
15
16   APPEARING FOR THE STATE OF LOUISIANA:
       Mr Douglas R Kraus
17     Attorney for Louisiana Attorney General
       KANNER & WHITELEY
18     701 Camp Street
       New Orleans, Louisiana  70130-3504
19
20   ALSO PRESENT:
       Mr Peter Jennings, Videographer
21     Mr Ray Aguirre, Case Manager
       Mr James Deel, Logistics
22     Ms Michele Hale
23
24
25
```

### 382

```
 1                    I N D E X
 2         VIDEOTAPED ORAL DEPOSITION OF
             GREGG STEVEN PERKIN, P E
 3              JUNE 25, 2013
                  VOLUME 2
 4
 5   Appearances                             380
 6   Continued Direct Examination-Mr Collier 384
     Examination-Mr Williams                 444
 7   Examination-Ms Richard                  459
     Examination-Mr Guidry                   472
 8   Examination-Ms Mayberry                 475
     Examination-Mr Kraus                    476
 9   Redirect Examination-Mr Collier         487
10   changes and Signature                   500
     Reporter's Certificate                  502
11
12           EXHIBIT INDEX
13
     Ex No      Description            Marked
14
15   11481  May 30, 2010 E-mail from Anthony
            Onorato to Stuart Nelson, Subject:
16          BP Horizon - BOP Pressure Relief
            Manifold, with Attachments,
17          marked as CONFIDENTIAL; Bates No
            CAM_CIV_0558470                  385
18
     11482  June 3, 2010 E-mail from Nancy
19          Seiler to Jim Hackett, Subject:
            Comments; Bates Nos
20          ANA-MDL-000230538 -
            ANA-MDL-000230539                415
21
     11483  Document depicting modeling of
22          flow pathways; four pages        459
23   11484  SPE 9697 Article titled IXTOC No
            1, Blowout and Control Operation,
24          marked as CONFIDENTIAL; Bates Nos
            BP-HZN-2179MDL00645991 -
25          BP-HZN-2179MDL00646000           476
```

1 (Pages 379 to 382)

387

1  manifold?
2      A. No, there were other --
3          MR. LUNDY: Objection to form.
4      A. There were documents. I believe there's
5  a Wild Well document. Again, I'd have to go --
6  you know, the witness never has a computer. But
7  I'd have to go look for it.
8      Q. (By Mr. Collier) And with respect to
9  those other documents you're referencing, do you
10 recall the timeframe as to when Wild Well Control
11 had issued -- issued a directive to stand down on
12 the venting manifold?
13     A. Not without looking at the document.
14         MR. LUNDY: Objection. Asked and
15 answered.
16     Q. (By Mr. Collier) Now, the -- the venting
17 manifold that was being developed for the DDII,
18 would that have been able to have been used also
19 with respect to the DISCOVERER ENTERPRISE for the
20 BOP-on-BOP solution?
21     A. I don't know.
22     Q. Is that something that you've not
23 investigated?
24     A. I would have to look at the details of
25 the design to compare if they would be -- be

388

1  compatible with either -- either/or both BOP --
2      Q. Okay.
3      A. -- and/or its connection to the HORIZON
4  BOP.
5      Q. Have you looked at the details of the
6  design for either of those BOPs?
7      A. I have seen references to drawings. I
8  have not seen the drawings. But I'd have to --
9  and I have a number of drawings of the HORIZON
10 BOP. But to the extent that Wild Well was in
11 control of this effort, I would expect them to
12 know what they're doing.
13     Q. Now, yesterday we talked about Top Kill,
14 and in your Report you identify the risks
15 associated with the Top Kill Procedure, correct?
16     A. I think I did.
17     Q. And it's correct that all intervention
18 methods have risks and hazards associated with
19 implementing them, correct?
20         MR. LUNDY: Objection to form.
21     A. We talked about that yesterday.
22     Q. (By Mr. Collier) And that's a correct
23 proposition, correct?
24     A. There's a --
25         MR. LUNDY: Objection, form.

389

1      A. -- number of -- there's a number of
2  things that can influence the effectiveness of a
3  Top Kill.
4      Q. (By Mr. Collier) And also, there are
5  risks and hazards associated with any
6  intervention method, correct?
7      A. In terms of a -- a Top Kill
8  intervention --
9      Q. Or an- --
10     A. -- or an- --
11     Q. -- any intervention method relating to
12 source control.
13         MR. LUNDY: Objection, form.
14     A. I'm not sure what you're talking about
15 when you say "any intervention method." I
16 thought we were focusing on Top Kill.
17     Q. (By Mr. Collier) Sure. So other
18 intervention methods like capping or containment,
19 there are risks and hazards associated with
20 implementing those types of intervention methods.
21     A. Well, there are risks and hazards. If
22 you do a proper Risk Analysis, a proper Hazard
23 Analysis, you identify how you can control or
24 mitigate them, then you are -- you are doing what
25 you're supposed to do in terms of helping you

390

1  make the best decision.
2      Q. Now, in your Report you claim that BP
3  ignored the risks associated with Top Kill,
4  correct?
5      A. I think there was a number of variables
6  that they ignored with regard to Top Kill.
7      Q. And in -- specifically in your Report you
8  identify that BP ignored the risks associated
9  with it?
10     A. I think they did.
11     Q. Now, one of the risks that you identified
12 with respect to Top Kill was the risk of
13 shutting-in the well and bursting the 16-inch
14 casing rupture disks, correct?
15     A. I think that was a -- an additional
16 opinion that you asked me about yesterday, and if
17 the Top Kill was to actually seal the well
18 suddenly, and the pressure spiked, it could
19 potentially rupture the disks.
20     Q. Now, and that's one of the -- one of the
21 risks you identified in your Report, correct,
22 with respect to Top --
23     A. I don't know if I specifically identified
24 it in my Report. You asked me, as I recall, if I
25 had any additional re -- opinions that I had not

3 (Pages 387 to 390)

391

1  expressed in my Report. I don't think I
2  addressed the Top Kill being a -- an effective --
3  if it was effective and it did shut the well in
4  suddenly, that you'd have a -- you'd potentially
5  have a pressure spike, given all the
6  considerations, and if that pressure spike
7  occurred, would it rupture the disks. I'm not
8  sure that BP considered that.
9     Q. You would agree that that is a risk that
10 would have been considered with respect to the
11 Top Kill Procedure?
12    A. I don't know that they --
13       MR. LUNDY: Objection. Asked and
14 answered.
15    A. I don't if they con -- I don't know if
16 they considered that. I have not seen anything
17 that would suggest to me that they had considered
18 that.
19    Q. (By Mr. Collier) Now, you would agree
20 that the risk of rupturing the burst disk would
21 be a risk with capping solutions, as well,
22 correct?
23    A. If you vent the well properly, you can
24 mitigate that risk.
25    Q. Now, for the Top Kill Procedure -- well,

392

1  let me take a step back. You reviewed the Top
2  Kill Procedures that were approved by Unified
3  Command?
4     A. I reviewed the Top Kill Procedures as --
5  as best I could, yes.
6     Q. And one of the mitigations for the
7  concern relating to the burst disks that was
8  implemented was monitoring of the pressures and
9  controlling the pumping rates to avoid a
10 predetermined pressure limit during the Top Kill
11 Procedure?
12    A. You had to -- I mean, in -- in so many
13 words, you had to pump -- you had to overcome
14 whatever pressure existed in the well to get the
15 16.4-gallon -- pound-per-gallon mud into the
16 wellbore, and then you had to -- you had to
17 basically control that pressure to continue to
18 deliver that mud to the wellbore to attempt the
19 Top Kill or the junk shot, either one.
20       So there would have to be some pressure
21 monitoring of the -- of the wellbore to -- to
22 assure that you were -- weren't doing something
23 out of the ordinary.
24    Q. Now, you agree that the Top Kill
25 Procedure for Macondo included monitoring the

393

1  pressures during the procedure, correct?
2     A. Oh, they could monitor pump pressures,
3  yes.
4     Q. Now, the Top Kill Procedure for Macondo
5  also included a predetermined pressure limit that
6  was not to be exceeded, correct?
7     A. I think that's true.
8     Q. And would you agree that that is one
9  method that was implemented in order to mitigate
10 the risk of bursting the burst disks?
11    A. That's what you say, but that's not true.
12    Q. Okay.
13    A. It's not true, because if -- if the pr --
14 if during the junk shot, as we discussed
15 yesterday, the junk shot was to inadvertently and
16 suddenly seal the well, the pressure could go
17 beyond anything that they control. And I think I
18 asked you the question -- I know I'm not supposed
19 to ask questions, but I -- I put forth the
20 proposition: Was there some relief -- I didn't
21 see anything in the -- in the materials that I
22 reviewed -- that they would be able to dump that
23 pressure or control that pressure after they --
24 after that occurred?
25       So, you know, that was something that, in

394

1  terms of a Top Kill or a junk shot, that I would
2  certainly consider.
3     Q. In -- in your opinion, setting a
4  predetermined pressure limit that would not be
5  exceeded, and monitoring the pressures, that
6  would not be something that would mitigate the
7  risk of an unintentional shut-in of the well
8  through bridging?
9     A. If the well was to suddenly bridge and
10 the pressures exceeded the pressures expected, I
11 didn't see anything that would suggest they had
12 any way to dump that pressure or to mitigate that
13 pressure.
14    Q. In the Top Kill Procedure that was
15 approved by Unified Command, was it correct that
16 they pumped the bridging materials in measured
17 quantities in order to avoid any unintentional
18 sealing --
19    A. I --
20    Q. -- of the well?
21    A. I don't see how you can do that. I
22 really don't. I mean, you can introduce these
23 bridging materials, these platelets, however you
24 want -- whatever you want to call them, but you
25 have such -- you have such turbulent flow, and

4 (Pages 391 to 394)

```
                                                               467
 1   No. 11476, on Page 6, and the "Conclusion" reads
 2   for Scenario #1: "Possible but not Plausible."
 3      Q.  Right.  On Exhibit 11483, that scenario
 4   is described by BP as: "Plausible, but not
 5   credible."
 6          Correct?
 7      A.  Correct.
 8      Q.  And with regard to Scenario No. 2, on
 9   Exhibit 11483, it's described as: "Plausible"
10   but "suggest reconciliation with Investigation
11   report to check credibility."
12          Correct?
13      A.  Hang on a second.  (Reviewing document.)
14          I'm looking on page -- these aren't
15   numbered but Page 2 of 11483, very top row:
16   "Comments," Plaus -- "Plausible, suggest
17   reconciliation with Investigation report to check
18   credibility"
19      Q.  Okay.
20      A.  Right.
21      Q.  And on Exhibit 11476, how is Scenario
22   No. 2 described?
23      A.  Poss --
24      Q.  And I'll point to you Page 8.
25      A.  Page 8?  Page 8 says: "Possible but not
```

```
                                                               468
 1   Plausible."
 2      Q.  Okay.  And finally, with regard to
 3   Scenario #3, on Exhibit 11483, is it described
 4   as: "Plausible, and credible"?
 5      A.  Yes.
 6      Q.  Okay.  And --
 7      A.  Plaus -- at the very bottom of column to
 8   the far right, under Comm -- "Comments," the last
 9   comment is: "Plausible, and credible.
10      Q.  And how, on Exhibit 11476, is Scenario 3
11   described?
12      A.  "Possible and Plausible."
13      Q.  Okay.  I'm going ask you to go back to
14   Exhibit No. 11483, and go to the next page where
15   Scenarios 4 and 4A are shown.
16      A.  Okay.
17      Q.  And those were both described as:
18   "Plausible, and credible."
19          Correct?
20      A.  They are.
21      Q.  But they were not disclosed to the U.S.
22   by BP, correct?
23      A.  Correct.
24          MR. COLLIER:  Objection, form.
25          (Discussion off the record.)
```

```
                                                               469
 1      Q.  (By Ms. Richard) All right.  Yesterday
 2   you mentioned Richard Vargo from Halliburton,
 3   correct?
 4      A.  Yeah, I think I did.  I don't remember
 5   his last name.  I think it was Vargo or something
 6   like that.
 7      Q.  Did you read -- did you review Richard
 8   Vargo's deposition in connection with your
 9   opinions?
10      A.  I think I did.
11      Q.  Okay.  And yesterday you referred to his
12   testimony regarding the -- the flow -- the flow
13   rate in connection with the Top Kill, right?
14      A.  Right.
15      Q.  And you understand that that flow rate
16   was an input that Halliburton used in its WellCat
17   modeling, correct?
18      A.  Yes.
19      Q.  Okay.  And you understand that
20   Halliburton didn't perform any actual flow rate
21   calculations in connection with -- with the
22   Macondo Well, right?
23      A.  I -- that's -- I believe that's true.
24      Q.  Okay.  You do understand that Halliburton
25   used various inputs, including potential flow
```

```
                                                               470
 1   rate, in the WellCat modeling for the Top Kill,
 2   though, right?
 3      A.  I'm sure they did.
 4      Q.  Okay.  And just to clarify, yesterday I
 5   think you had said that you thought that
 6   Mr. Vargo had mentioned 39,000 as a -- as a
 7   figure with regard to that modeling; is that
 8   correct?
 9      A.  It was either 29,000 or 39,000.
10      Q.  Okay.
11      A.  I don't remember exactly which one I
12   used.
13      Q.  Okay.  That -- and that was going to be
14   my question.  If the -- the evidence, the
15   testimony, and the documentation shows that the
16   input was actually around 30,000, you wouldn't
17   have any reason to disagree with that, would you?
18      A.  No.  I think I testified yesterday that I
19   did a simple calculation, and my number was
20   around 30,000.
21      Q.  Okay. All right.  I just wanted to
22   clarify that.
23          (Discussion off the record.)
24          THE WITNESS:  Come on, Jerry, ask a
25   question.
```

471

1  MR. VON STERNBERG: (Nodding.) I
2 have no questions.
3  Q. (By Ms. Richard) I think if we -- we may
4 have -- oh, yesterday you were also shown a
5 document that was Exhibit 9148, and I have a -- I
6 have a copy here for you. That's Tab 33 in the
7 BP documents.
8  A. Okay.
9  Q. And just to -- to clarify something very
10 quickly on the very front of this, it
11 indicates -- there -- there are some signatures
12 that are shown, correct?
13  A. Yeah. I -- I think we -- I saw this
14 yesterday, as a matter of fact.
15  Q. Right. And the -- it looks like both
16 under the MMS and at the U.S. Coast Guard
17 signatures, they have made notations "Reviewed,"
18 correct?
19  A. I see "Reviewed," yes, in handwriting.
20  Q. Okay.
21  A. Or "Review."
22  Q. All right.
23   (Discussion off the record.)
24  MS. RICHARD: I have no further
25 questions for you. Neither does Mr. Von

472

1 Sternberg, sir.
2  MR. VON STERNBERG: Have I told you
3 about my friend Nigel?
4  (Laughter.)
5  THE VIDEOGRAPHER: The time is
6 10:19 a.m. We're off the record.
7  (Recess from 10:19 a.m. to 10:22 a.m.)
8  MR. GUIDRY: I'm ready if the
9 Internet is.
10  THE VIDEOGRAPHER: All set?
11 The time is 10:22 a.m. We're back on the
12 record beginning Tape 11.
13  EXAMINATION
14 QUESTIONS BY MR. GUIDRY:
15  Q. Mr. Perkin, my name is Robert Guidry. I
16 represent Anadarko and I necessarily have just a
17 few questions for you.
18  Earlier you were asked questions about
19 BP's Tab 31, which is, for the record, Exhibit
20 11482. That was the E-mail from Mrs. Seiler.
21  A. I recognize that --
22  Q. Okay.
23  A. -- or remember that.
24  Q. Counsel from BP suggested that the BOP
25 solution was not passed on to Unified Command or

473

1 to BP by Anadarko. Do you recall that?
2  A. I do.
3  Q. Do you understand that BP did not
4 consider the BOP-on-BOP solution prior to June
5 3rd?
6  A. No. They understood the
7 BOP-on-BOP solution -- BOP-on-BOP solution before
8 then. They were working on it.
9  Q. In your review of materials related to
10 the Source Control Effort, did you find any
11 information or evidence that Anadarko had any
12 ultimate authority to make decisions during the
13 relief efforts?
14  A. I'm not aware of any.
15  Q. You reviewed no information that Anadarko
16 personnel made decisions as to the priority or
17 nature of relief efforts to be taken. Correct?
18  A. I'm not aware of any.
19  Q. You saw no information Anadarko was
20 directing any relief well efforts, either, did
21 you?
22  A. I don't recall seeing any.
23  Q. Did you see any information that Anadarko
24 was involved in the formal Command structure for
25 the relief efforts?

474

1  A. I'm not aware that they were.
2  Q. Did you see any evidence or information
3 that Anadarko employees or Representatives were
4 ever Team Leaders in connection with the relief
5 efforts?
6  A. I don't recall Anadarko being a Team
7 Leader in any capacity.
8  Q. And as you suggested earlier, many
9 entities in the industry provided assistance or
10 support in the well control efforts, correct?
11  A. Certainly, and all -- all BP had to do
12 was ask.
13  Q. And do you understand that Anadarko was
14 one of those in the industry providing assistance
15 or support in the relief efforts?
16  A. Sure, they were -- if -- if BP wanted to
17 know, all they had to do is ask.
18  Q. Would it be fair to say that Anadarko was
19 acting in support of BP in the U.S. Unified
20 Command in those efforts?
21  A. I would think they would be.
22  MR. GUIDRY: Thank you. No other
23 questions.
24  THE VIDEOGRAPHER: The time is
25 10:25 a m. We're off the record, ending Tape 11.

24 (Pages 471 to 474)

475

1 (Recess from 10:25 a.m. to 10:28 a.m.)
2 MS. MAYBERRY: I'm ready.
3 THE VIDEOGRAPHER: The time is
4 10:28 a m. We're back on the record, beginning
5 Tape 12.
6 EXAMINATION
7 QUESTIONS BY MS. MAYBERRY:
8 Q. Good morning, Mr. Perkin. My name is
9 Laura Mayberry, and this is Espe Anderson from
10 the Department of Justice.
11 Several times today in this deposition,
12 you have stated that you did some rough
13 calculations on flow rate, but your work in this
14 case was not to calculate flow rate. Correct.
15 A. Correct.
16 Q. And you're not representing yourself as a
17 Flow Rate Expert, correct?
18 A. Well, I know about flow rates, but I
19 didn't -- I wasn't asked to calculate or model
20 flow rates.
21 Q. And have you looked at any of the Reports
22 on quantification in this case?
23 A. Well, I looked at what was alleged to
24 have been flowing out of the well.
25 Q. Okay. Are you going to offer opinions as

476

1 to the flow rate at trial in this matter?
2 A. I'm only going to opine on what I was
3 asked earlier. I know that the -- I believe the
4 flow rates were much higher than represented by
5 BP, as I've said many times.
6 Q. Okay.
7 (Discussion off the record.)
8 MS. MAYBERRY: We do not have any
9 further questions for you, Mr. Perkin. Thank
10 you.
11 A. You're welcome.
12 THE VIDEOGRAPHER: The time is
13 10:29 a m., ending Tape 12. We're off the
14 record.
15 (Recess from 10:29 a.m. to 10:32 a m.)
16 (Exhibit No. 11484 marked.)
17 MR. KRAUS: I'm ready, Kym, when you
18 are.
19 THE VIDEOGRAPHER: All set?
20 The time is 10:32 a.m. We're back on the
21 record, beginning Tape 13.
22 EXAMINATION
23 QUESTIONS BY MR. KRAUS:
24 Q. Mr. Perkin, I just introduced myself. My
25 name is Doug Kraus. I'm here on behalf of -- on

477

1 behalf of the State of Louisiana. I'll be very
2 brief.
3 I know yesterday you spoke to Counsel for
4 BP regarding Brinker Bridging Platelets.
5 A. Yeah.
6 Q. Were you familiar with that product prior
7 to yesterday?
8 A. I have not physically held the product in
9 my hand or seen it.
10 Q. Do you have any understanding as to what
11 it is?
12 A. It's platelets.
13 Q. Okay.
14 A. I would assume like blood platelets.
15 Q. And it's used as a mitigation technique
16 in junk shot bridging attempts. Is that correct?
17 A. Well, evidently, it's a -- it's a
18 material that will provide either a -- a moderate
19 bridge or a permanent bridge. I just -- it
20 depends upon how it's used, I guess.
21 Q. Okay. Do you have any understanding on
22 how many attempts -- well, strike that.
23 Do you know how many attempts BP used
24 with junk shot, with bridging material, related
25 to -- to Top Kill at Macondo?

478

1 A. Well, I think they did it over a -- a
2 two-day period, or two days or --
3 Q. Okay.
4 A. -- two times.
5 Q. If you could look at what has previously
6 been marked as Trial Exhibit 10071, it is a
7 four-page E-mail chain, with CDR076-016257 on the
8 first page. And we're going to start at the --
9 all the way at the back, so on Page 4 of the
10 document.
11 A. All the way to the back?
12 Q. Yes. The first E-mail is from Glenn
13 Chiasson to Don King, and I'll represent to you
14 that these are Cameron --
15 A. Okay.
16 Q. -- employees, and that this chain of
17 E-mails is among Cameron individuals.
18 And you'll note that the date is May 26,
19 2010, which is the date of Top Kill, the date
20 that the Top Kill was first performed.
21 Mr. Chiasson writes to Mr. King: "Looks
22 like a white out."
23 Then Mr. King responds to that E-mail:
24 "That was the balls hitting in the kink!!!
25 "It obviously stopped the flow suddenly

25 (Pages 475 to 478)