# Excerpts from the Deposition Transcript of Andrew Inglis

# Taken July 21, 2011

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL           ) MDL NO. 2179
BY THE OIL RIG             )
"DEEPWATER HORIZON" IN     ) SECTION "J"
THE GULF OF MEXICO, ON     )
APRIL 20, 2010             ) JUDGE BARBIER
                           ) MAG. JUDGE SHUSHAN

*****************
VOLUME 1
*****************

Deposition of ANDREW GEORGE INGLIS, taken at Kirkland & Ellis International, 30 St. Mary Axe, 22nd Floor, London EC3A 8AF, England, United Kingdom, on the 21st day of July, 2011.

## Page 2

APPEARANCES

APPEARING FOR THE PLAINTIFFS' STEERING COMMITTEE:
Mr. John W. deGravelles
Mr. Neale deGravelles
DEGRAVELLES, PALMINTIER, HOLTHAUS & FRUGÉ
618 Main Street
Baton Rouge, Louisiana 70801-1910

APPEARING FOR SECURITIES PLAINTIFFS, MDL 2185:
Mr. John Sifton
COHEN MILSTEIN SELLERS & TOLL
1100 New York Avenue, Suite 800
Washington, D.C., 20005

APPEARING FOR BP, INC.:
Mr. Richard C. Godfrey
KIRKLAND & ELLIS
300 North LaSalle
Chicago, Illinois 60654

APPEARING FOR DEFENDANTS, MDL NO. 2185:
Mr. Richard C. Pepperman, II
SULLIVAN & CROMWELL
125 Broad Street
New York, New York 10004-2498

APPEARING FOR ANDREW GEORGE INGLIS:
Mr. Stephen C. Neal
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130

Ms. Kathleen H. Goodhart
COOLEY LLP
101 California Street, 5th Floor
San Francisco, California 94111-5800

## Page 3

APPEARANCES (Continued)

APPEARING FOR TRANSOCEAN:
Mr. Steven L. Roberts
Mr. Matthew Gatewood
SUTHERLAND ASBILL & BRENNAN
1001 Fannin, Suite 3700
Houston, Texas 77002-6760

APPEARING FOR ANADARKO PETROLEUM COMPANY:
Ms. Diane C. Hertz
BINGHAM MCCUTCHEN
399 Park Avenue
New York, New York 10022-4689

APPEARING FOR MOEX:
Mr. Vince Morgan
PILLSBURY WINTHROP SHAW PITTMAN
2 Houston Center
909 Fannin, Suite 2000
Houston, Texas 77010-1018

APPEARING FOR CAMERON INTERNATIONAL CORPORATION:
Mr. Joe W. Redden, Jr.
BECK, REDDEN & SECREST
One Houston Center
1221 McKinney Street, Suite 4500
Houston, Texas 77010-2010

APPEARING FOR DRIL-QUIP, INC.:
Mr. Don Jackson
WARE, JACKSON, LEE & CHAMBERS
America Tower, 42nd Floor
2929 Allen Parkway
Houston, Texas 77019-7101

APPEARING FOR M-I SWACO:
Mr. Hugh E. Tanner
MORGAN, LEWIS & BOCKIUS, LLP
1000 Louisiana Street, Suite 4200
Houston, Texas 77002-5006

## Page 4

APPEARANCES (Continued)

APPEARING FOR HALLIBURTON:
Mr. Donald E. Godwin
Ms. Stefanie K. Major
Mr. James E. Johanns
GODWIN RONQUILLO
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041

APPEARING FOR THE UNITED STATES:
Mr. Steven O'Rourke
U.S. DEPARTMENT OF JUSTICE
ENVIRONMENTAL & NATURAL RESOURCES DIVISION
601 D Street, N.W.
Washington, D.C. 20004

APPEARING FOR THE STATE OF LOUISIANA:
Mr. Henry Dart
510 North Jefferson Street
Covington, Louisiana 70433

APPEARING FOR THE LOUISIANA DEPARTMENT OF JUSTICE:
Ms. Phyllis Glazer
Mr. Michael Keller
ASSISTANT ATTORNEY GENERAL
Louisiana Department of Justice
Litigation Division
400 Poydras Street, Suite 1600
New Orleans, Louisiana 70130

APPEARING FOR NALCO CO.:
Ms. Mary Rose Alexander
LATHAM & WATKINS
233 South Wacker Drive, Suite 5800
Chicago, Illinois 60606

ALSO PRESENT:
Mr. Peter Jennings, Videographer
Mr. Jesse Haycraft, Logistics Supervisor
Ms. Lilia Garcia
Ms. Sherry Lassere

301

1  Gulf of Mexico or worldwide, how could we
2  bring the whole of the industry's capability
3  to bear.
4       So that's the role that I
5  played. I wasn't part of the formal
6  structure, but I was there supporting the
7  team.
8       Q.   Okay. From BP's point -- point
9  of view, Suttles was on the official unified
10 command under the source control prong. Were
11 you in charge?
12      A.   No, I wasn't, no. Again, we
13 had -- you know, there was a reporting
14 structure up through -- so the unified -- it
15 wouldn't -- you know, there wasn't a -- the
16 structure worked through -- from Doug through
17 the -- the structure that worked in Robert.
18 There were key individuals working key
19 elements of the response. There was a person
20 involved on the operational elements of it
21 each day. They had daily phone calls
22 reported up. I did sit in on some of those
23 phone calls, but not in an official role
24 through the structure of the unified command.
25 I was still running the upstream business at

302

1  the time.
2       Q.   Okay. Now, the Gulf of Mexico
3  SPU stopped all their other drilling during
4  the time of the response; is that true?
5       A.   That's correct.
6       Q.   What about the rest of the
7  upstream business, was there still drilling
8  going on in other parts of the world?
9       A.   There was drilling going on in
10 other parts of the world, that's correct.
11      Q.   Was there any reduction in the
12 other -- in the non-Gulf of Mexico SPUs in
13 the amount of drilling going on during the
14 response?
15      A.   There was.
16      Q.   What percentage?
17      A.   A -- particularly focus at the
18 offshore -- offshore deepwater drilling. I'm
19 trying to recollect. I don't believe there
20 was any deepwater drilling going on at the
21 time, any other deepwater drilling going on
22 at the time. And, for instance, there was an
23 exploration program that -- that could have
24 started up in -- in Libya. It didn't start
25 up.

303

1       Q.   Okay.
2       A.   For instance --
3       Q.   It wasn't a reduction then. It
4  was a --
5       A.   It was a -- well, it was an
6  intention --
7       Q.   Okay.
8       A.   -- not to -- not to commence
9  that activity. So choices were made to
10 reduce activity across the -- the globe, you
11 know, one, to make sure that we had the
12 lessons learned from -- from Macondo. The
13 second was obviously managing all of the
14 risks associated with an organization that
15 was strongly focused on the response in the
16 Gulf of Mexico.
17      Q.   Did you ever speak to -- well,
18 were you involved -- are you familiar with
19 the flow assessment team?
20      A.   That's the -- the -- the
21 government's flow raters -- I've forgotten
22 what it's actually called now -- but do you
23 mean what its official title was?
24      Q.   The official title of the
25 governmental one was the Flow Rate Technical

304

1  Group?
2       A.   Yeah.
3       Q.   I've heard of an internal BP
4  flow assessment team.
5       A.   No, I'm not familiar with that,
6  no.
7       Q.   Okay. Do you know any people
8  working for BP who were involved in trying to
9  determine how much oil was coming out of
10 Macondo?
11      A.   There was -- there were people
12 as part of, you know, unified command. There
13 were people working in Robert on that as part
14 of the unified command structure. There were
15 people in -- in Houston that worked on
16 questions that were raised, in particular
17 questions -- some of the questions raised
18 by -- by Secretary Salazar. So there was
19 work, you know, going on to support the
20 unified command, and there was work that was
21 done in response to -- to questions that did
22 come out directly from -- from government.
23      One of the other roles that I
24 performed in Houston was -- it was actually
25 Salazar requested it, because he did have a

76 (Pages 301 to 304)

PURSUANT TO CONFIDENTIALITY ORDER

305

daily conversation with -- you know, with BP, with a senior representative of BP. So I -- I undertook that role, and occasionally questions would come from him.

Q. Okay. Did you also have a -- the duties of speaking to Admiral Allen?

A. If -- it was more the reverse, is that if Admiral Allen was with Secretary Salazar, they would talk. A question might come from their conversation. When Admiral Allen was the federal on-scene commander, his direct line was in to Doug -- in to Doug, you know, through the -- through the unified command structure. Admiral Allen did visit Houston. When he was in Houston, I did talk to him.

Q. What about Landry?

A. Again, I -- if I recall correctly, Admiral Landry was the federal on-scene commander before Admiral Allen. So the same would apply. And, actually, he was working as the head of the unified command and it was through -- through Doug.

Q. Are you planning to come and testify at the trial on this matter next

306

spring in New Orleans?

A. I have no plans.

Q. Okay. Has BP asked you to come testify?

A. BP has not asked me to come and testify.

Q. Okay. You said you met with your attorney, Mr. Neal, for two days --

A. That's correct.

Q. -- to prepare for this?

A. Well, to prepare -- as I said this morning, I haven't been involved in BP since the -- really, in a -- in a management sense from the beginning of the fourth quarter. So I haven't been involved actually in any of the information we've been talking about today since -- since then.

So I had a couple of days with -- with -- with Steve and -- and just updating me on the case, what had happened.

Q. Yeah. Don't tell me what you talked about.

MR. NEAL: Yeah, don't talk about our conversations.

Q. (BY MR. O'ROURKE) And you also

307

met with lawyers from Kirkland & Ellis?

A. That's correct.

Q. At the same time?

A. Sort of separately. They were on different days.

Q. Okay. Mr. Godfrey?

A. Mr. Godfrey and his team, yes.

Q. Okay. And did they show you documents to prepare for the deposition?

A. They did.

Q. Okay. And what did you discuss with BP's attorneys in preparation for the deposition?

MR. NEAL: Objection; instruct you not to answer on the grounds of privilege.

MR. O'ROURKE: What's the privilege between you and him?

MR. GODFREY: Mr. Neal, join, too, in the defense.

MR. NEAL: Yeah.

A. Sorry, I didn't ex- -- sorry. The question went pretty quick. Mr. Neal was in the room in all of those occasions.

MR. DART: So what? There was a third party.

308

MR. NEAL: You're wrong, Henry.

MR. DART: What?

MR. NEAL: You're wrong.

MR. DART: Well --

MR. NEAL: He's instructed not to answer.

MR. DART: Well, Louisiana objects to that instruction.

Q. (BY MR. O'ROURKE) And do you consider Kirkland & Ellis to be your lawyers?

A. No, Mr. Neal is my lawyer.

MR. O'ROURKE: And -- and your theory is you have a joint defense privilege -- a non-waiver because it's a joint defense?

MR. NEAL: That's one of them, but ask your questions.

Q. (BY MR. O'ROURKE) Okay. Do you remember what exhibits you were shown by Kirk & Ellis' attorneys, what documents you were shown?

A. I can remember being shown as we went through this morning, we went through some e-mails, went through some PowerPoint presentations.

Q. Okay. Do you remember any

**PURSUANT TO CONFIDENTIALITY ORDER**

413

1    A.   Good evening.
2    Q.   My name is Mary Rose Alexander,
3 and I represent Nalco Company. I understand
4 you've been at this all day, so I will try to
5 be brief, but if you don't understand any of
6 my questions, let me know and I'll try to
7 rephrase.
8    A.   Okay, thank you.
9    Q.   Are you familiar with Nalco
10 Company?
11    A.   Only to the extent that I know
12 they manufacture chemicals.
13    Q.   And you're aware, sir, that they
14 manufactured the dispersants that were
15 procured by BP Exploration & Production in
16 response to this spill?
17    A.   Again, I'm not directly aware of
18 that. I'm not sure whether dispersants --
19 dispersants were procured from there. That
20 wasn't something I was involved in.
21    Q.   Well, let me assure you that
22 Nalco is the company that provided
23 dispersants to BP Exploration & Production in
24 response to the spill and my questions this
25 evening do relate to the spill response. I

414

1 understand from your testimony today that you
2 were involved generally in the spill response
3 efforts including daily meetings with
4 Secretary Salazar, communications with
5 Mr. Suttles, and your general support role;
6 is that correct?
7    A.   I was in a general support role
8 of the team that was looking after the -- the
9 source control. I wasn't involved in the
10 operations that were part of unified command
11 being run out of Robert.
12    Q.   Were you generally aware of the
13 operations of the unified command in
14 connection with the response to the spill?
15    A.   Just in a in a general sense.
16 There was so much going on at the time that
17 my only focus was on supporting the team that
18 were doing the -- the source control. I
19 wasn't doing anything else other than the
20 role of ensuring there was good communication
21 between BP and the -- and the government.
22    Q.   Were you aware that dispersants
23 were used in response to the spill pursuant
24 to the direction of unified command?
25    A.   I was aware that as part of the

415

1 operations around containment dispersants
2 were -- were sprayed, I think, at times when
3 the level of hydrocarbons had built up around
4 the vessels. Dispersants were also deployed
5 as part of the source control in the -- at
6 the subsea.
7    Q.   And, sir, to the best of your
8 knowledge was Nalco involved in any decisions
9 to use dispersants subsea?
10    A.   Again, I wasn't involved in any
11 of those conversations. To the best of my
12 knowledge, no.
13    Q.   And also to the best of my
14 knowledge -- and all of my questions of
15 course are to the best of my knowledge -- was
16 Nalco involved in decisions to use
17 dispersants at all?
18    A.   Again, that wasn't an area I was
19 involved in. To the best of my knowledge,
20 no.
21    Q.   And along the same lines to the
22 best of your knowledge was Nalco involved in
23 where to sprays dispersants in the Gulf of
24 Mexico?
25    A.   Again, to the best of my

416

1 knowledge, given that I wasn't involved in
2 the unified command structure that was based
3 in Robert that was looking after the -- the
4 surface areas, again, I have no knowledge of
5 that.
6    Q.   And, likewise, to the best of
7 your knowledge Nalco was not involved in the
8 manner the dispersants were applied in the
9 Gulf of Mexico?
10    A.   The answer would be the same as
11 the one I just gave you, that I think all the
12 decisions around how dispersants were used
13 were done through unified command that was
14 based in -- in Robert. So I had -- I wasn't
15 part of that -- that unified command
16 structure.
17    Q.   But to the best of your
18 knowledge all the decisions relating to the
19 use of dispersants, where they were used,
20 whether they were used, the amounts that were
21 used, the length of time they were used were
22 made by the unified command?
23    A.   I have no -- I have no reason
24 to -- to know otherwise.
25    Q.   Okay. And, sir, would you rely

**PURSUANT TO CONFIDENTIALITY ORDER**