**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater | : | MDL No. 2179 |
| Horizon" in the Gulf of Mexico, on | : | |
| April 20, 2010 | : | SECTION: J |
| | : | |
| This Document Relates To: All Actions | : | JUDGE BARBIER |
| | : | MAGISTRATE JUDGE |
| …………………………………………………... | : | SHUSHAN |

**BP'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE CERTAIN
OPINIONS AND TESTIMONY OF DR. MOHAN KELKAR**

**INTRODUCTION**

United States quantification expert Dr. Mohan Kelkar purports to calculate cumulative flow from the Macondo well using a technique known as material balance. One of the critical (and most contested) inputs to Dr. Kelkar's material balance calculation is a value called "rock compressibility." Rock compressibility is a numeric measurement of the extent of the compaction of the reservoir rocks containing oil in their pore spaces as the oil was released into the Gulf during the oil spill.

According to Dr. Kelkar, the correct value of rock compressibility to use for purposes of calculating cumulative flow is 12 microsips (microsips being the standard unit used for measuring rock compressibility in the oil industry). This value of 12 microsips is, however, approximately double the compressibility value obtained from measurements performed on actual Macondo rock samples, and it is double the value used by BP expert Dr. Martin Blunt in his material balance calculation. The consequence of Dr. Kelkar's choice to calculate cumulative flow using 12 rather than 6 microsips is great. This difference standing alone accounts by far for the biggest part of the difference between Dr. Kelkar's estimated cumulative flow and the estimates of BP's experts. *See* Kelkar Initial Report at 45 (calculating 3.4 MM

stock tank barrels of cumulative flow if rock compressibility is input at measured value of 6 miscrosips).

Despite the significance of choosing to calculate cumulative flow using a rock compressibility value that is double the measured value, Dr. Kelkar offers no scientific or technical analysis to justify using 12 rather than 6 microsips in his material balance calculation. As an initial matter, Dr. Kelkar concedes that he lacks the expertise required to independently evaluate rock compressibility. Moreover, Dr. Kelkar conceded at his deposition that 12 microsips is simply a "best guess" as to the correct rock compressibility value. His expert report cites a single piece of evidence to support a doubling of the measured value, a BP PowerPoint analyzing the potential risks of shutting in the well, showing alternative cases of predicted pressure buildup based on varying compressibility inputs. In his deposition, Dr. Kelkar belatedly tried to pad the factual basis for his number, saying it was also based on his review of a handful of BP e-mails, which Dr. Kelkar contends show a BP consensus to use 12 microsips.

As demonstrated below, Dr. Kelkar's selection of 12 rather than 6 microsips lacks both the necessary evidentiary support and requisite scientific reliability to merit admission as expert opinion at trial. Accordingly, for the reasons explained below, Dr. Kelkar should not be permitted to submit "expert" opinions concerning the cumulative flow from the Macondo well that are derived from using an inherently unreliable rock compressibility value as an input parameter.

## BACKGROUND

**Weatherford's Independent Measurements of Rock Compressibility**

In late April 2010, Weatherford Laboratory performed independent testing that measured rock compressibility on three cores taken from the Macondo reservoir prior to the incident. The results of those tests — according to both United States and BP experts who have analyzed the data — indicate an average rock compressibility of approximately 6 microsips. *See* Pooladi-Darvish Initial Report, Appendix III, Slide 8 (showing a base case of 6 microsips); Ex. 1, Dep. Ex. 9859 (Kelkar's FRTG Report) at 19 (showing average rock compressibility of 5.61 microsips); Zimmerman Expert Report at 6 (calculating average rock compressibility of 6.35 microsips); Blunt Expert Report at 60 (calculating average rock compressibility of 7.41, 3.74 and 5.32 microsips). (Some documents — including Dr. Kelkar's expert report — refer to this property as "formation compressibility;" it is also sometimes called "uniaxial pore-volume compressibility" or "UPVC.")

**Dr. Kelkar Uses 6 Microsips in His Non-Litigation Analysis**

Dr. Kelkar himself derived a rock compressibility of 6 microsips when he analyzed the Weatherford data in June 2010 for the U.S. Flow Rate Technical Group. *See* Ex. 1, Dep. Ex. 9859 (Kelkar's FRTG Report) at 19 (showing average rock compressibility of 5.61 microsips). The U.S. 30(b)(6) witness regarding the reservoir engineering analyses by Flow Rate Technical Group consultants testified that he did not disagree with the selection of 6 microsips. *See* Ex. 2, Maclay Dep. at 396:16-25. BP sought to depose Dr. Kelkar as a fact witness on this issue, but counsel for the U.S. protested that this deposition would improperly burden a scientist who was volunteering his expertise for the public good. *See* 11/15/12 Letter Brief from A. Nathaniel Chakeres at 2-3 (Rec. Doc. 7893). The U.S. 30(b)(6) witness regarding this analysis testified

that he did not know precisely why Dr. Kelkar chose to use a rock compressibility of 5.61 microsips.  *See* Ex. 2, Maclay Dep. at 395:21-396:15.

**BP's Use of Higher Rock Compressibility Values to Assess Risks of Shut-In**

BP likewise calculated a rock compressibility value of approximately 6 microsips based on the Weatherford data (*see* Ex. 3, Dep. Ex. 5242; Ex. 4, Vinson Dep. at 409:19-25) and used that value to analyze, describe, and model the Macondo reservoir throughout the Response.  *See*, *e.g.*, Ex. 5 (Dep. Ex. 10919); Ex. 6, (TREX-140945); Ex. 7 (TREX-141028, at BP-HZN-2179MDL05036461); Ex. 8 (Dep. Ex. 10933); Ex. 9 (Dep. Ex. 10859); Ex. 10 (Dep. Ex. 10860); Ex. 11 (Dep. Ex. 10839).

However, for a one-week period in early July 2010, BP scientists decided to perform modeling using higher rock compressibility values of 12 and 18 microsips (in addition to 6 microsips) to enable them to assess the risks of shutting-in the Macondo well.  *See* Ex. 4, Vinson Dep. at 409:8-18; 441:21-442:5; 460:7-462:21; Ex. 12, Merrill Dep. at 477:16-478:7.  As BP reservoir engineer Dr. Robert Merrill explained, BP was concerned that pressures within the well during shut-in could cause hydrocarbons to leak into shallower horizons.  Ex. 12, Merrill Dep. at 480:2-16.  Accordingly, BP sought to capture the highest range of potential shut-in pressures that the well could experience by (among other things) using higher rock compressibility values.  *See* Ex. *Id.* at 214:8-23; Ex. 4, Vinson Dep. at 445:21-446:5 (testifying that 12 and 18 microsips were assumptions used to assess risks to shut-in, not estimates of Macondo rock compressibility).

In considering the range of rock compressibility values to use to assess shut-in risks, BP reservoir engineer David Schott expressed his view based on his experience with another well that rotary sidewall cores can under certain circumstances produce lower rock compressibility values.  Ex. 13 (Dep. Ex. 8774).  At the time, Mr. Schott had not analyzed Macondo rotary

sidewall cores or the detailed procedures under which Macondo rotary sidewall cores had been tested to determine whether or not his concerns were applicable to Macondo. Ex. 4, Vinson Dep. at 458:14-459:19. According to BP petrophysicist Graham Vinson, the BP scientists who had analyzed the data (including Steve Willson, BP's expert in the field of "geomechanics," which encompasses rock compressibility) believed then and now that 6 microsips was the most likely rock compressibility for the Macondo reservoir notwithstanding Mr. Schott's concerns. *See id.* at 435:18-436:18 (testifying that BP geomechanic expert Steve Willson believes "then and now . . . based on his analysis of all the data that the compressibility of the Macondo reservoir is 5 to 6 microsips" notwithstanding issues raised by Mr. Schott); *id.* at 422:24-425:3 (disagreeing with view expressed by Mr. Schott in July 2010 e-mail that Macondo rotary sidewall cores potentially understated rock compressibility).

During this period, Dr. Merrill created a BP presentation dated July 8, 2010 that identified the modeling inputs he was using to assess the risks of shut-in. Dr. Merrill's July 8 presentation included a reference to 12 microsips as "most likely." At his deposition, Dr. Merrill testified that he did not intend this language to mean that BP considered 12 microsips to be, in fact, a most likely number. *See* Ex. 12, Merrill Dep. at 219:8-17. Rather, Dr. Merrill testified that he placed the words "most likely" in quotation marks to indicate that BP was using 12 microsips as the new middle-level "reference case" rather than in the customary context in which a middle value is the most likely. In other words, the quotation marks indicate the opposite of what the United States is now trying to draw from this snippet of a document. *See id.* at 219:3-220:12.

The following day, Dr. Merrill presented a revised version of his draft July 8 presentation to United States scientists. Ex. 14 (Dep. Ex. 9324) (BP Presentation regarding Benefits and

Risks of Shut-In).  Like his July 8 presentation, Dr. Merrill's July 9 presentation assessed the "benefits and risks" of shut-in based on modeling conducted using rock compressibility values of 6, 12, and 18 microsips.  *See id.*  However, unlike the July 8 presentation, Dr. Merrill's July 9 presentation deleted any reference to 12 microsips as being a "most likely" value.  *See id*. at 15.

Following shut-in on July 15, 2010, BP no longer had the same need to assess pressure build-up using higher alternative rock compressibility inputs to bracket worst-case scenarios.  *See* Ex. 12, Merrill Dep. at 484:23-485:6; 485:15-486:7.  Therefore, Dr. Merrill resumed using exclusively 6 microsips in his modeling.  For example, he used 6 microsips for rock compressibility in his modeling runs to plan the relief well.  *See id*. at 482:6-14; 479:21-480:1; 483:6-484:2; Ex. 15 (Dep. Ex. 11551).

**Dr. Kelkar's Expert Report**

On March 22, 2013, Dr. Kelkar submitted his expert report in this matter.  In his report, Dr. Kelkar offered no engineering calculations or scientific analysis of the proper rock compressibility.  *See generally* Kelkar Initial Report at 28.  Nor did Dr. Kelkar refer to, or otherwise rely upon, the engineering calculations or scientific analysis of any other United States expert concerning the proper rock compressibility value for the Macondo reservoir.  *See id*.  This is because no scientific analysis of rock compressibility had then been done by any United States expert, including Dr. Pooladi-Darvish, who noted in his report that he used a value of 6 microsips because he "did not have other quantitative values with which to begin [his] analysis." *See* Pooladi-Darvish Rebuttal Report at 27-28.  Disregarding the evidence indicating a value of 6 microsips, Dr. Kelkar instead cited only Dr. Merrill's draft July 8, 2010 presentation for the proposition that, "according to BP," 12 microsips was considered the "most likely" value for

6

Macondo rock compressibility.  *See* Kelkar Initial Report at 28 n.41.[2]  Dr. Kelkar offered nothing else to justify his use of 12 microsips to calculate cumulative flow.

**Dr. Kelkar's Deposition Testimony**

At his deposition, Dr. Kelkar conceded that 12 microsips is simply a "best guess" of the correct rock compressibility for Macondo and that he lacked the expertise necessary to enable him to independently assess Macondo rock compressibility:

> Q. Do you have an opinion that the formation compressibility for the Macondo Reservoir is 12 microsips?
>
> A. That's my best guess.
>
> . . .
>
> Q. Are you an Expert in Geomechanics?
>
> A. No.
>
> Q. [S]o you -- you don't have the independent expertise to evaluate the [] formation compressibility of Macondo Reservoir?
>
> A. I do not have independent expertise to evaluate formation compressibility.

Ex. 16, Kelkar Dep. at 240:4-11 and 240:12-19.

Although Dr. Kelkar's expert report cited only the July 8 presentation as the sole basis for his conclusion that 12 microsips is the correct rock compressibility, during his deposition Dr. Kelkar claimed to have also relied on a series of BP e-mails, which he testified "culminated" in a purported BP "consensus" to use 12 microsips reflected in the draft July 8 presentation.  *See id.* at 240:20-242:4; 245:22-246:9.  However, in the course of deposition questioning, Dr. Kelkar

---

[2]  Dr. Kelkar also cited the same July 8, 2010 presentation as the sole support for opining that Macondo rock compressibility ranges between 6 and 18 microsips.  Kelkar Initial Report at 45.

admitted that he lacked context for assessing BP emails and that he had not considered evidence showing that BP did *not* believe 12 microsips was a correct rock compressibility value for the Macondo reservoir. Specifically, Dr. Kelkar testified that:

- He was unaware Dr. Merrill had ever revised his July 8 presentation or that the July 9 version actually presented to the U.S. did not include a reference to 12 microsips as a "most likely" number. Ex. 16, Kelkar Dep. at 249:4-250:12.

- He did not know if the July 8 presentation had ever been provided to the Government. *Id.* at 385:19-386:2.

- He acknowledged that a middle-level "reference case" need not be the "most likely," but testified that he lacked sufficient knowledge to say why the middle-case presented in Dr. Merrill's July 8 presentation would be different than the most likely value. *Id.* at 395:15-396:4.

- He did not know the context for e-mails he was relying upon to conclude that BP had reached a "consensus" as of July 8 to consider 12 microsips the most likely rock compressibility for Macondo. *Id.* at 400:1-21 (testifying he did not know what discussion or "context" was being referred to in Steve Willson's July 6 e-mail to David Schott).

- He himself had not analyzed any rotary sidewall core data to assess the reliability of the Macondo rotary sidewall cores. *Id.* at 268:7-11. Nor had he ever previously heard that rotary sidewall cores can purportedly produce unreliable rock compressibility measurements. *Id.* at 270:14-20.

- He had not previously seen or considered documents showing that BP used 6 microsips (not 12) to model the Macondo reservoir following shut-in, including for purposes of planning the relief well, *id.* at 264:22-265:2, and admitted one would need an accurate rock compressibility value for purposes of planning the relief well, *id.* at 267:7-17.

Thus, Dr. Kelkar's opinion that 12 microsips is an appropriate value to use for calculating cumulative flow from the Macondo well fails to constitute reliable or relevant expert testimony under applicable legal standards.

**ARGUMENT**

In order to determine the admissibility of expert testimony, a district court must consider whether: (1) the expert is qualified to testify competently as to the subject matter; (2) the method employed by the expert is sufficiently reliable; and (3) the testimony assists the trier of fact to comprehend the evidence through the application of the witness's expertise. *Quiet Tech. DC–8, Inc. v. Hurel–Dubois U.K. Ltd.*, 326 F.3d 1333, 1340–41 (11th Cir. 2003). Dr. Kelkar's proposed testimony fails each of these requirements.

**I.     Dr. Kelkar's Opinion Regarding Rock Compressibility is Unreliable.**

When evaluating the reliability of an expert's opinion, courts may consider various factors, including (among others) whether the expert's theory or technique "is generally accepted in the relevant scientific community." *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (citing *Daubert*, 509 U.S. at 593-94). The "reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 354-55 (5th Cir. 2007) (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999)). The expert's opinion, including the underlying facts of the opinion, must be reliable at every step, or else the opinion is inadmissible. *Id*. Here, Dr. Kelkar's testimony is so unreliable as to merit exclusion for at least three compelling reasons.

*First*, Dr. Kelkar reached his conclusion regarding Macondo rock compressibility without performing *any* scientific analysis. Indeed, his report fails to include engineering calculations or technical explanation to warrant his conclusion that 12 microsips is the correct rock compressibility value. Nor did Dr. Kelkar rely on the engineering calculations or technical analysis of any other United States expert to justify that conclusion, since no United States expert

9

analyzed Macondo rock compressibility as part of the United States' case-in-chief. (After BP submitted an expert report from the world's preeminent expert on rock compressibility, Dr. Robert Zimmerman, the United States submitted belated "rebuttal" reports from Drs. Roegiers and Huffman discussing compressibility. Judge Shushan struck as untimely their attempts to calculate a new number for compressibility other than 6. *See* 6/24/2013 Order Regarding BP/Anadarko's Motion to Strike Rebuttal Experts for the U.S. (Rec. Doc. 10450). In any event, these expert reports did not exist when Dr. Kelkar formulated his opinions and hence his expert work did not rely on them.) Because Dr. Kelkar offers a conclusory opinion without explaining the scientific or technical principles that purportedly support it, that opinion lacks the requisite evidentiary reliability for admissible expert testimony. *See Interplan Architects, Inc. v. C.L. Thomas, Inc.*, No. 4:08-CV-03181, 2010 WL 4065465, at *18 (S.D. Tex. Oct. 9, 2010) (excluding expert testimony consisting of conclusory opinion unsupported by technical or scientific explanation).

***Second***, Dr. Kelkar did not consider contrary evidence in the form of documents, testimony, and laboratory measurements that indicate 6 microsips (not 12) is the correct rock compressibility. *See* supra at 6. For example, in his initial report, Dr. Kelkar ignored Weatherford laboratory measurements that have been interpreted by experts on both sides (including Dr. Kelkar himself in his pre-litigation work for the U.S. Flow Rate Technical Group) to indicate a rock compressibility value of approximately 6 microsips. *See supra* at 3. Dr. Kelkar admitted that he had not seen (and thus not considered) documentary evidence showing that BP used 6 microsips (not 12) after the supposed BP "consensus" to use the higher compressibility value. For example, Dr. Kelkar admitted never having seen BP's July 22, 2010 technical memorandum showing BP used 6 microsips (not 12) to model the relief well, which

Dr. Kelkar said would show some change in consensus.  *See*, *e.g.*, Ex. 16, Kelkar Dep. at 264:22-265:2; 265:19-266:12; 282:14-238:1.  Dr. Kelkar disregarded testimony by BP witnesses that the reason 12 microsips was briefly used in modeling was in order to capture worst-case scenarios for purposes of assessing the risks of shut-in, not because BP considered 12 microsips to be the correct measurement.  *See supra* at 6.

*Third*, Dr. Kelkar's opinion concerning Macondo rock compressibility is based ***solely*** on his review of a single BP presentation and a handful of BP e-mails from a one-week period of time.  Reviewing documents to draw subjective conclusions about what BP scientists may have thought about rock compressibility is not an accepted scientific method for determining rock compressibility, nor does this exercise involve the application of scientific principles.  *See*, *e.g.*, *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004) (expert testimony based solely on expert's review of "in-house documents, memos and e-mails" not reliable); *Tassin v. Sears, Roebuck & Co.*, 946 F. Supp. 1241, 1252-53 (M.D. La. 1996) (expert testimony consisting of expert's interpretation of defendants' correspondence not reliable).[3]

For example, in *Tassin*, the United States District Court for the Middle District of Louisiana excluded the testimony of Stephen Killingsworth, a professional mechanical engineer, regarding an alleged conspiracy in the power tool industry.  *Tassin*, 946 F. Supp. at 1252-53.  Defendants challenged the admission of Mr. Killingsworth's opinion concerning their motivation for not incorporating certain safety devices on their power tools, arguing that it was based solely

---

[3] *See also Pharmastem Therapeutics, Inc. v. Viacell, Inc.*, 491 F.3d 1342, 1354 (Fed. Cir. 2007) (affirming order striking expert testimony consisting "almost entirely of [expert] quoting from the promotional information and other materials in which the defendants described their business operations . . . and drawing inferences from those materials").

on Mr. Killingsworth's review of documents. *Id*. at 1252. In granting defendants' motion, the court held that:

> [R]eviewing correspondence and minutes from meetings to reach conclusions is not a mechanical engineering issue. Documents of this type are not technical and do not require expert engineering testimony to make them comprehensible to a jury. For this reason, Mr. Killingsworth's testimony about these documents is not necessary to assist the trier of fact to understand a fact in issue. Nor was it ever demonstrated that summaries of meetings and correspondence were the types of documents typically relied on by an engineer to determine the adequacy of a particular design of a particular product. For these reasons, Mr. Killingsworth may not testify about the conclusions he reached based on his review of these documents.

*Id*. at 1252-53.

Here, Dr. Kelkar's opinion that 12 microsips constitutes the correct rock compressibility value for the Macondo reservoir is based solely on his subjective interpretation of select BP documents. As in *Tassin*, these documents do not require expert engineering interpretation to make them comprehensible to the fact finder. Nor can it be credibly claimed that experts in the field typically rely on draft presentations or isolated e-mail communications to determine the correct rock compressibility.

In short, "reviewing correspondence . . . to reach conclusions" is not a valid exercise in sound scientific principles. *See Tassin*¸ 949 F. Supp. at 1252. Dr. Kelkar essentially conceded as much at his deposition when he admitted that 12 microsips was just a "best guess." *See* Kelkar Dep. at 240:4-11. On this basis alone, Dr. Kelkar should not be allowed to offer opinions regarding rock compressibility that amount to mere speculation presented in the guise of expert testimony.

**II.    Dr. Kelkar's Opinions Regarding Compressibility Fail the Criterion of Helpfulness to the Trier of Fact Through Application of Expertise.**

In addition to being unreliable, Dr. Kelkar's opinions fail the *Daubert* requirement of helpfulness to the trier of fact to understand the evidence or determine any fact in issue.

12

*Daubert*, 509 U.S. at 591 (relevance requires expert opinion to "assist[] the trier of fact to understand the evidence or to determine a fact in issue"). In particular, "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *See United States v. Frazier*, 387 F.3d 1244, 1262-63 (11th Cir. 2004). Accordingly, several courts have excluded as unhelpful (and unreliable) expert testimony that consists of drawing inferences based on documents that do not require scientific explanation to render them comprehensible. *See*, *e.g.*, *Investments v. Rothstein*, No. 10-60786-Civ, 2011 WL 4949191, at *5 (S.D. Fla. Oct. 18, 2011) (expert opinion consisting of a summary of e-mail and other evidence is unhelpful because jurors can read and understand witness testimony and documentary evidence for themselves); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 554 (expert opinion based on review of company documents and e-mails pertains to "lay matters which a jury is capable of understanding and deciding without the expert's help"). In the words of one of those courts, such testimony amounts to "no more than 'arguments and conclusory statements about questions of fact masquerading behind a veneer of technical language.'" *See id.*

Here, none of the documents upon which Dr. Kelkar bases his opinion concerning Macondo rock compressibility require scientific expert explanation to render them comprehensible. Although factual context is necessary to understand their significance in light of the complete evidentiary record, the documents themselves are not so laden with technical terminology that they require an expert to translate them for the benefit of the trier of fact. Accordingly, Dr. Kelkar's testimony about these documents is unnecessary to assist the trier of fact to understand the evidence or determine any fact in issue. *See In re Rezulin*, 309 F. Supp. 2d

at 554 (expert opinion unhelpful where it is based on review of documents that do not require expert interpretation).

### III. Dr. Kelkar Is Unqualified to Opine on Either the Correct Value of Rock Compressibility or the Proper Interpretation of BP Documents.

"An expert who . . . lacks personal knowledge, may 'only testify about the underlying facts if he [is] actually bringing to bear his scientific expertise.'" *In re Rezulin*, 309 F. Supp. 2d at 554. Dr. Kelkar has no first-hand knowledge of the circumstances surrounding BP's use of the alternative compressibility cases including 12 microsips, and he brings no scientific or other technical expertise to bear on his testimony.

To the contrary, Dr. Kelkar admits that he lacks the expertise necessary to independently evaluate Macondo rock compressibility. Ex. 16, Kelkar Dep. at 240:18-19 ("I do not have independent expertise to evaluate formation compressibility."); *id*. at 270:7-20 (admitting that he has no expertise in either geomechanics or rock mechanics). Nor does Dr. Kelkar have special expertise in reviewing documents and discerning from them what a company's position is on a particular issue. Indeed, nothing about Dr. Kelkar's education or training suggests that he has unique ability to review isolated e-mail communications and draw conclusions from them about underlying factual matters. Dr. Kelkar therefore should not be permitted to provide opinions on such matters.

### CONCLUSION

As demonstrated above, Dr. Kelkar's opinion concerning the value of Macondo rock compressibility is manifestly unreliable. Even when an underlying methodology is reliable (in this case, the material balance method used by Dr. Kelkar), courts will still exclude an expert's calculations under the "garbage in, garbage out" rationale if a key input is speculative and chosen in a way that is not scientifically reliable. *See Kay v. First Continental Trading, Inc.*, 976 F.

Supp. 772, 776 (N.D. Ill. 1997) (even though underlying method of regression analysis is scientifically valid, the court rejected expert's calculations as speculative because they incorporated "speculative numbers without having tempered them in any way to account for their 'iffy' nature.  Those deficiencies involve a fundamental flaw that causes the overall Moffitt opinion to be the Rule 702 equivalent of what in early computer vocabulary bore the label 'GIGO' ('garbage in, garbage out.').")

Dr. Kelkar's opinion on the rock compressibility input of 12 microsips amounts to unsupported speculation and subjective belief.  Accordingly, BP respectfully requests an order prohibiting Dr. Kelkar from offering any "expert opinion" concerning the cumulative flow from the Macondo well that is derived from using an inherently unreliable rock compressibility value as an input parameter.

Dated: August 19, 2013

Respectfully submitted,

By: /s/ Don K. Haycraft

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile:  (504) 556-4108

Richard C. Godfrey, P.C.
(richard.godfrey@kirkland.com)
J. Andrew Langan, P.C.
(andrew.langan@kirkland.com)
Timothy A. Duffy, P.C.
(tim.duffy@kirkland.com)
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois  60654
Telephone: (312) 862-2000

Robert C. "Mike" Brock
(mbrock@cov.com)
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for BP Exploration & Production Inc. & BP America Production Company*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 19th day of August, 2013.

/s/ Don K. Haycraft