# ATTACHMENT A

## 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL      )  MDL NO. 2179
BY THE OIL RIG         )
"DEEPWATER HORIZON" IN )  SECTION "J"
THE GULF OF MEXICO, ON )
APRIL 20, 2010       )  JUDGE BARBIER
                     )  MAG. JUDGE SHUSHAN

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
VOLUME 1
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Deposition of Adrian Johnson, Ph.D.,
taken at the Pan-American Building, 601 Poydras
Street, 11th Floor, New Orleans, Louisiana,
70130, on the 19th day of July, 2013.

## 2

1   A P P E A R A N C E S
2
3
4   APPEARING FOR THE PLAINTIFFS STEERING COMMITTEE:
        Mr. Michael R. Robinson
5       IRPINO LAW FIRM
        2216 Magazine Street
6       New Orleans, Louisiana  70130
7
    APPEARING FOR BP, INC.:
8       Mr. Granta Y. Nakayama
        KIRKLAND & ELLIS
9       655 Fifteenth Street, NW
        Washington, D.C.  20005-5793
10
        Ms. Catherine E. Stahl
11      KIRKLAND & ELLIS
        300 North LaSalle
12      Chicago, Illinois  60654
13
    APPEARING FOR TRANSOCEAN:
14      Ms. Tamerlin J. Godley
        MUNGER TOLLES & OLSON
15      355 South Grand Avenue, 35th Floor
        Los Angeles, California  90071-1560
16
17  APPEARING FOR ANADARKO PETROLEUM CORPORATION:
        Mr. Warren Anthony Fitch
18      Mr. Duke K. McCall, III
        BINGHAM MCCUTCHEN
19      2020 K Street, Northwest
        Washington, D.C. 20006-1806
20
21  APPEARING FOR HALLIBURTON:
        Mr. Sean W. Fleming
22      Ms. Erika Toledo
        GODWIN LEWIS
23      Renaissance Tower
        1201 Elm Street, Suite 1700
24      Dallas, Texas 75270-2041
25

## 3

1   APPEARING FOR THE UNITED STATES:
        Mr. Thomas A. Benson
2       Mr. A. Nathaniel Chakeres
        U.S. DEPARTMENT OF JUSTICE
3       ENVIRONMENT & NATURAL RESOURCES DIVISION
        Ben Franklin Station
4       Post Office Box 7611
        Washington, D.C.  20044-7611
5       601 D Street, N.W.
        Washington, D.C.  20004
6
7   ALSO PRESENT:
        Mr. Peter Jennings, Videographer
8       Mr. Phil Gonzales, Case Manager
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## 4

1               INDEX
2   VIDEOTAPED ORAL DEPOSITION OF
        ADRIAN JOHNSON, PH.D.
3           JULY 19, 2013
            VOLUME 1
4
5   Appearances.................................... 2
6
    Direct Examination-Mr. Benson................. 6
7
8   Changes and Signature........................ 386
    Reporter's Certificate....................... 388
9
10
11          EXHIBIT INDEX
12
    Ex. No.      Description        Marked
13
14  11561  Document titled FEESA Consultancy
            Services with Maximus; four pages   69
15
16  11562  Diagrams titled high drillpipe,
            low drillpipe, and no drillpipe;
            three pages                        259
17
18  11563  CD containing three Excel
            spreadsheets titled Johnson
19          Maximus Outputs Drillpipe high
            July 15, Johnson Maximus Outputs
20          Drillpipe high May 8,
            XAJX002-10-10                      267
21  11564  Excel spreadsheets depicting
            series of solution messages from
22          Maximus model                      300
23  11565  Sperry-Sun Datalog; Excerpt of
            Exhibit TREX-63059; 51 pages       330
24
25

Worldwide Court Reporters, Inc.
PURSUANT TO CONFIDENTIALITY ORDER

5

```
 1    11566  Printout of spreadsheet created
 2           by Dr. Johnson to repeat
             Dr. Dykhuizen's calculation; four
 3           pages                     371
 4
 5           PREVIOUS EXHIBITS REFERENCED
 6
       Ex. No.      Description          Page
 7
 8    7265   Appendix W., Report-Dynamic
             Simulations Deepwater Horizon
 9           Incident BP; 60 pages        349
10    9361   Sandia Report DOE-NNSA Flow
             Analysis Studies Associated with
11           the Oil Release following the
             Deepwater Horizon Accident; Bates
12           Nos. DSE031-001794 - DSE031-001883  225
13    11488  Technical Review of US Government
             Expert Witness Reports on Flow
14           Rates from the MC252 Macondo Well,
             Expert Report of A.E. Johnson,
15           PhD, CEng, MIMechE dated May 1,
             2013; 130 pages               8
16
17
18
19
20
21
22
23
24
25
```

6

```
 1         MR. BENSON:  I'm ready.
 2         THE VIDEOGRAPHER:  All set?
 3     Today is July 19th, 2013.  This is the
 4  deposition of Dr. Adrian Johnson regarding the
 5  oil spill of the Oil Rig DEEPWATER HORIZON in the
 6  Gulf of Mexico on April 20th, 2010.
 7         The time is 8:32 a.m.  We're on the
 8  record.
 9         ADRIAN JOHNSON, PH.D.,
10  was called as a witness by the United States and,
11  being first duly sworn, testified as follows:
12         DIRECT EXAMINATION
13  QUESTIONS BY MR. BENSON:
14     Q.  All right.  Thank you.
15       Hi, Dr. Johnson.  We met a moment ago off
16  the record.  Just for the record, my name is Tom
17  Benson.  I'll be asking questions on behalf of
18  the United States.  With me today is Nate
19  Chakeres.  We appreciate your time.
20     A.  (Nodding.)
21     Q.  Do you understand that you're under oath
22  this morning?
23     A.  I do.
24     Q.  Okay.  And the court reporter is going to
25  be taking down everything we say, so we both have
```

7

```
 1  to speak clearly, and you have to answer --
 2         THE COURT REPORTER:  Hold it.  Hold
 3  it.
 4       Peter, go fix that.  There's an echo.
 5       Sorry, Tom.  She was turning up the
 6  sound, and there was an echo.
 7         MR. BENSON:  Yeah, I started hearing
 8  it.
 9     (Discussion off the record.)
10         THE VIDEOGRAPHER:  Are we off the
11  record.
12         MR. BENSON:  I think so.
13     (Loud noise.)
14         MR. BENSON:  Maybe not.
15         THE COURT REPORTER:  Go ahead.
16         MR. BENSON:  Okay.
17         THE WITNESS:  Should this be
18  reflecting what I'm saying?
19         THE COURT REPORTER:  Yes, sir.
20     (Discussion off the record.)
21     Q.  (By Mr. Benson) Okay.  Ready?
22     A.  Yeah.
23     Q.  (By Mr. Benson) So as I was saying, just
24  be careful to speak clearly, and you have to
25  answer in words.  You can't nod or say "M-h'm" or
```

8

```
 1  anything like that.
 2     A.  Okay.
 3     Q.  Does that make sense?
 4     A.  Yeah.
 5     Q.  Thank you.
 6     A.  I'll try to wherever I can.
 7     Q.  Thank you.
 8       If you don't understand a question that
 9  I'm asking, just let me know, and I'll rephrase
10  it.  If you do answer the question, I'll assume
11  that you understood it.
12       Does that make sense?
13     A.  It does.
14     Q.  Okay.  Have you ever been deposed before?
15     A.  No.
16     Q.  Okay.  If you open your binder to Tab, 1
17  Volume 1, the first exhibit there, and it's been
18  previously marked as 11488.
19       Do you see that?
20     A.  I do.
21     Q.  And is that a copy of your Expert Report
22  in this case?
23     A.  (Reviewing document.)  Yes, it does
24  appear to be.
25     Q.  And does your Expert Report that's
```

2 (Pages 5 to 8)

9

1  **Exhibit 11488 set forth all the opinions that you**
2  **have in this case?**
3      A.  Yes.  Yes.  I am awaiting some
4  information from Dr. Pooladi-Darvish, some models
5  that we asked for, and when I receive those,
6  obviously, I might have some -- put some views on
7  those that might form some opinion.
8      I also have, of course, some views on
9  Rebuttal Reports I received after the submission
10 of -- of this Report.
11     **Q.  Okay.  And so putting aside those two**
12 **things that you mentioned, any views you might**
13 **have on Rebuttal Reports that you received after**
14 **your Expert Report, and the information that you**
15 **are awaiting from Dr. Pooladi-Darvish, you don't**
16 **have any other opinions associated with this case**
17 **other than what's in your Expert Report?**
18     A.  I don't believe --
19         MR. NAKAYAMA:  Objection, form.
20     A.  I don't believe so, no.
21     **Q.  (By Mr. Benson) Okay.  What's the**
22 **information you're awaiting from**
23 **Dr. Pooladi-Darvish?**
24     A.  He used the Maximus software, the FEESA
25 Maximus software, used one -- one of -- at least

10

1  one of the models we sent him as a result of
2  doing the work in this Report to generate some
3  reservoir hydraulic tables.
4      There's a facility in the software to
5  specifically generate tables that are useful to
6  Reservoir Engineers in producing model -- doing
7  modeling for the reservoir, and they need Lookup
8  Tables of all the system downstream of the
9  reservoir basically.  And Maximus has the
10 facility to produce those tables for the
11 Reservoir Engineers, and he used that facility.
12 That's evident from his Rebuttal Report.
13     And we wanted to look at those files and
14 look at the input because there's some aspects of
15 what he's done in his Rebuttal Report that,
16 without the input, we don't know quite what he's
17 done, so we just wanted to get to the bottom of
18 that.
19     **Q.  Okay.  And getting that information would**
20 **inform any opinions you might have about**
21 **Dr. Pooladi-Darvish's Rebuttal Report; is that**
22 **fair?**
23     A.  It could have an impact on it, yes.
24     **Q.  Okay.  And you mentioned that you might**
25 **have some opinions about other Rebuttal Reports**

11

1  **that were served after your Expert Report; is**
2  **that right?**
3          MR. MCCALL:  Objection, form.
4          MR. NAKAYAMA:  Objection, form.
5      A.  I have some views on the Rebuttal
6  Reports.
7      **Q.  (By Mr. Benson) Okay.  Whose Rebuttal**
8  **Reports in this case have you read?**
9      A.  I've read Dr. Griffiths' Rebuttal Report,
10 Dr. Dykhuizen's Rebuttal Report.  I've read the
11 relevant bits of Dr. Pooladi-Darvish's Rebuttal
12 Report, not all of it.  I think that's it.
13     **Q.  Okay.  And we may get into that a little**
14 **bit later.**
15     A.  Sure.
16     **Q.  If there's -- if there's pieces that --**
17 **of your opinion that have come after your Report,**
18 **just let me know, as we talk about this.**
19     A.  (Nodding.)
20     **Q.  Do you have any corrections that you**
21 **would like to make to your Report at this time?**
22     A.  H'm.  They -- well, in reading the
23 Report, I -- I see there are a -- a few typos in
24 there.
25     I -- Dr. Dykhuizen, in his Rebuttal

12

1  Report, pointed out the -- that I used a velocity
2  in the Top Hat skirt calculation which was the
3  wrong velocity for the -- the K value.  It wasn't
4  consistent with the K value that I was using.  I
5  have, however, submitted a -- a revised
6  calculation there, and -- and -- and that -- that
7  didn't change my -- my general conclusion for
8  that calcu -- for that skirt calculation.
9      **Q.  Okay.**
10     A.  Other than that, no, I don't believe so.
11     **Q.  Okay.  And we'll talk about that Top Hat**
12 **calculation a little bit later on.**
13     A.  Okay.
14     **Q.  Are you able to summarize your opinions?**
15 **You've -- you've made a lot of criticisms in your**
16 **Report about the work of Dr. Griffiths and**
17 **Dr. Dykhuizen.  Are you able to summarize your**
18 **opinion regarding Dr. Griffiths?**
19         MR. NAKAYAMA:  Objection to form.
20     A.  On what sort of points do you want me to
21 concentrate on?  I mean, I could go on for a --
22 probably a long time.
23     **Q.  (By Mr. Benson) And -- and, obviously, we**
24 **have the whole Report.**
25     A.  Yeah.

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

369

1    MR. NAKAYAMA:  Objection to form.
2    A.  Yes.  Yes, I believe so.
3    **Q.  (By Mr. Benson) Okay.**
4    A.  Well, I -- the Reports, I'm not sure if
5    they came directly from BP, but they were
6    reported, yes, the collection numbers.
7    **Q.  Okay.  And so you're not challenging the**
8    **correct -- the collection numbers that**
9    **Dr. Dykhuizen used?**
10    MR. NAKAYAMA:  Objection, form.
11    A.  The numbers he used, I think, pretty much
12    matched the numbers I've seen from documents I've
13    reviewed.
14    **Q.  (By Mr. Benson) Okay.  So that -- that's**
15    **a "No," you're not challenging?**
16    A.  I don't think I'm making any challenge of
17    that, no.
18    **Q.  Okay.**
19    A.  No.
20    **Q.  And you would agree that there was flow**
21    **through the skirt throughout the time that the**
22    **Top Hat was in place, correct?**
23    MR. NAKAYAMA:  Objection, form.
24    A.  Well, I've not reviewed all the video of
25    the Top Hat skirt throughout the whole period

370

1    that it was on.  It was quite a considerable
2    period.  So I can't -- I don't know if
3    Dr. Dykhuizen reviewed all that.  I've got a
4    feeling he said in his deposition that he'd only
5    reviewed a small portion of the video.
6    So without reviewing all that video, it's
7    not possible to say whether there was flow out of
8    the skirt throughout that period or not.
9    **Q.  And let me ask it this way:  You're not**
10    **aware of any period in which there was no flow**
11    **out the skirt?**
12    A.  Like I say, without reviewing all of the
13    video evidence for the Top Hat skirt, I wouldn't
14    be able to say whether there was flow out of that
15    skirt throughout that period or not.
16    **Q.  Okay.  And based on the review you did**
17    **do, you have no evidence that there was ever a**
18    **time when there was no flow, correct?**
19    MR. MCCALL:  Objection, form.
20    MR. NAKAYAMA:  Objection, form.
21    A.  Repeat my previous answer.
22    **Q.  (By Mr. Benson) Okay.  In reviewing the**
23    **video that you did review, did you notice any**
24    **differences in the skirt flow, depending on**
25    **collection?**

371

1    A.  I've not looked at the skirt flow video
2    to try and assess that, so I -- I wouldn't be
3    able to comment on that.
4    **Q.  Okay.  Let me ask you to look at**
5    **exhibit -- I'm sorry, Tab 12, which is in your**
6    **second binder.**
7    A.  Tab 12.  Okay.
8    **Q.  And if we could, mark this as our next**
9    **exhibit.**
10    **(Exhibit No. 11566 marked.)**
11    THE COURT REPORTER:  11566.
12    MR. BENSON:  Thank you.
13    **Q.  (By Mr. Benson) And do you recognize this**
14    **document, Dr. Johnson?**
15    A.  Yes.  This looks like a printout of the
16    spreadsheet I created to repeat Dr. Dykhuizen's
17    calculation, and a number of calculations behind
18    that.
19    **Q.  Okay.  And just to walk through it**
20    **quickly, the first page is your replication of**
21    **Dr. Dykhuizen's vent flow calculation.  Correct?**
22    A.  Yes, I believe so.
23    **Q.  And then the next three pages are skirt**
24    **flow calculations with varying assumptions.  Is**
25    **that right?**

372

1    A.  Yes, I believe so.
2    **Q.  Okay.  And this document was produced**
3    **after your Expert Report, correct?**
4    A.  I think these are printouts of the
5    document that was produced after the Expert
6    Report, yes.
7    **Q.  Okay.  And it came after Dr. Dykhuizen's**
8    **Expert Report?**
9    A.  Obviously, it came after Dr. Dykhuizen's
10    Expert Report, because my work was based on --
11    **Q.  True.**
12    A.  -- looking at his Expert --
13    **Q.  It came --**
14    A.  -- Report.
15    **Q.  Sorry.  It came after Dr. Dykhuizen's**
16    **Rebuttal Report?**
17    A.  Correct.
18    **Q.  Okay.  And so why did you do this new**
19    **analysis, after seeing Dr. Dykhuizen's Rebuttal**
20    **Report?**
21    MR. MCCALL:  Objection, form.
22    A.  Dr. Dykhuizen pointed out -- I think I
23    mentioned it earlier in the day --
24    **Q.  M-h'm.**
25    A.  -- when you were asking about any

93 (Pages 369 to 372)

373

1  corrections to the Report, my Report,
2  Dr. Dykhuizen pointed out that I'd used a K value
3  that was consistent with the upstream velocity,
4  whereas, he'd been using K values consistent with
5  the velocity at the exit of the skirt.  And so
6  I'd used the velocity at the exit of the skirt
7  with my K value, and those two were inconsistent.
8       This is a repeat of my calculation, but
9  using the velocity upstream, instead of velocity
10  at the exit of the skirt.
11       **Q. Okay.  And so did you agree with**
12  **Dr. Dyk -- the point that Dr. Dykhuizen made,**
13  **that you had used the wrong K value, or the K**
14  **value you used was inconsistent with the velocity**
15  **you were using?**
16       MR. NAKAYAMA:  Objection, form.
17       A. I think, by virtue of the fact that I'd
18  repeated the calculation, I think, yes, I --
19       **Q. (By Mr. Benson) Okay.**
20       A. -- I agree -- I agree with that.  Yes.
21  Yeah.  I would normally use a K value -- I think
22  it's very unusual to use a K value at the
23  restriction of a point like this, you know, so
24  the -- the -- the -- the narrow exit, because
25  there's -- there's often great uncertainty around

374

1  that, especially in this -- the cases we're
2  looking at for the Macondo Well, where we're
3  looking at varying restrictions that --
4  restrictions that vary with time, because of
5  erosion, because of damage, et cetera.
6       So to use a velocity at an exit is quite
7  unusual.  To use a velocity in the upstream
8  section, which is usually a pipe or, in this
9  case, the body of the Top Hat, is -- is more
10  normal, because you would -- you would be able to
11  measure the flow at that point, and be able to
12  know what the flow is at that point, in some
13  system where, you know, you -- you can actually
14  measure it.
15       So I think that's where the confusion
16  arose, that it's not a normal thing to do, to use
17  the velocity at the -- at the mouth of something
18  like this.
19       **Q. Okay.  And then can -- so walk me through**
20  **the three pages we have here of skirt**
21  **calculations.  Which is the corrected**
22  **calculation?**
23       A. I think they're all the corrected
24  calculation.
25       **Q. Okay.  So you have three different**

375

1  **calculations, and then, in the upper left, as you**
2  **read it, on each page, there's a little note in**
3  **red.  Is that correct?**
4       A. Yes.
5       **Q. Okay.  And that is is -- that talks about**
6  **the different skirt you would use -- the**
7  **different K value you would use in each of those**
8  **instances?**
9       A. Different K value, and based on a
10  different -- the different velocity, whether it's
11  upstream or at the -- at the opening.
12       **Q. Okay.  And when you do those**
13  **calculations, you have a range of total skirt**
14  **flow from 38 -- I'm sorry, 34,852, if the K value**
15  **is 2 -- well, let me -- let me walk this through**
16  **differently.**
17       **So the first is K value equals 2 at the**
18  **skirt opening velo -- and the skirt opening**
19  **velocity, correct?**
20       A. Correct.
21       **Q. And the -- the flow rate that you cre --**
22  **you calculated was 34,852, correct?**
23       A. Correct.
24       **Q. Okay.  The second skirt calculation has a**
25  **K of 700 and an upstream velocity.  Is that**

376

1  correct?
2       A. Correct.
3       **Q. And the flow calculation there is 27,751,**
4  **correct?**
5       A. Correct.
6       **Q. And then the third calculation has a K**
7  **of 3, at the opening, and the opening velocity,**
8  **and the calculation is 28,456.  Correct?**
9       A. Correct.
10       **Q. Okay.  Do you have an opinion about which**
11  **of those is the most accurate analysis?**
12       MR. NAKAYAMA:  Objection, form.
13       A. What I'm aiming to do here is look at
14  some of -- again, look at some of the range of
15  uncertainty, and I mention in my Report that this
16  is a very uncertain calculation.
17       I wouldn't -- as an Engineer, I wouldn't
18  have presented this calculation in a Technical
19  Report like this, because of the huge range of
20  uncertainty on it.
21       We've got very low pressure differences
22  from the inside of the Top Hat to the outside.
23  We've got huge uncertainty around the geometry of
24  the flow path going out of the Top Hat through
25  the skirt.  We've got huge uncertainty around the

94 (Pages 373 to 376)

377

1  opening of the skirt.  We don't know how much of
2  the -- the seal that was -- that was put around
3  the edge -- the bottom of the skirt is intact,
4  and we know -- at the end of the incident, when
5  the Top Hat is retrieved, we know that it's not
6  all intact, but some of it's there.
7          So there are enormous uncertainties in
8  this calculation.  And I think I mention in my
9  Report that simply changing the pressure by half
10 a psi, you can halve the flow rate out of that
11 skirt, the calculation flow rate out of that
12 skirt.
13         And what these three calculations are
14 doing is basically looking at a few of those
15 variations of K value, not variations of pressure
16 in this case.
17         But even doing -- doing that, the
18 variation of K value, you can see that there are
19 variations in the -- the number that's
20 calculated.
21         And this is used as some lower bound
22 calculation, but I think -- I don't -- I don't
23 think this -- these numbers that Dr. Dykhuizen
24 has calculated here, flow rate out to the skirt,
25 are at all reliable, because of the huge range of

378

1  uncertainty.
2         Q.  Well, you say there's a huge range of
3  uncertainty.  Have you done anything to quantify
4  that range of uncertainty?
5         A.  I think I've said I -- didn't I just say
6  I have, to some degree?
7         Q.  You may have.
8         A.  I mean, I've not looked at the full
9  range, but I've demonstrated that there is a huge
10 range of uncertainty.
11        Q.  Well, so the range of uncertainty that
12 you've quantified through the skirt is from
13 34,852 to 27,751?
14        A.  No.
15             MR. NAKAYAMA:  Objection, form.
16        A.  No, no.
17        Q.  (By Mr. Benson) Okay.  Well, explain to
18 me what you did.
19        A.  Well, as I say, if I reduce the pressure
20 by half a psi, and bear in mind, half a psi is --
21 is a very, very small change in pressure, and
22 that can vary the skirt flow -- that can halve
23 the skirt flow in this calculation, and I mention
24 that in the Report.
25        And that's still true of the -- the

379

1  revised calculation that I presented after the
2  Rebut -- Rebuttal Report.
3         Q.  Okay.  So other than saying that a change
4  in the psi could halve the flow rate -- I mean,
5  you say a change in the psi.  We're talking about
6  just about the flow rate from the skirt, correct?
7         A.  Yes.
8         Q.  Okay.
9         A.  Correct.  And that's only one of the
10 uncertainties, of course.  The pressure, that
11 has a big effect.
12        Another uncertainty that I didn't -- I
13 didn't try to vary, but would have an enormous
14 effect, as well, is changing the open area of the
15 skirt.  As I say, we don't know the geometry, we
16 don't know the -- the actual open area of that
17 skirt.  So what Dr. Dykhuizen has done is made
18 some assessment of that, but there's, again, a
19 range of uncertainty around that assessment, and
20 that needs to be tested out.
21        So we could -- I think you could pretty
22 much end up with whatever number you wanted
23 coming out of that skirt, by varying these
24 various factors, pressure, open area of the
25 skirt, and assumptions on geometry of the skirt,

380

1  as the flow goes out, and the effect that might
2  have on K values, for example.
3         Q.  Okay.  But, as you say, other than the
4  pressure, you didn't do anything to quantify the
5  uncertainty from those other characteristics that
6  you mention?
7         A.  I think this is such an unreliable
8  calculation, that I didn't spend a huge amount of
9  time trying to -- trying to do that.  I could
10 have gone into doing all sorts of variations of
11 these various factors that I've already
12 mentioned, and would have come out with a very
13 large range of flow rates out of that skirt.  So
14 I -- I don't find it a reliable calculation.  I
15 don't believe Dr. Du -- Dykhuizen believes it's
16 a reli -- reliable calculation, either.
17        Q.  Why don't you believe that?
18        A.  Well, I think it's -- I think they said
19 that earlier on in -- during the response, that
20 they didn't believe the skirt flow rate to be a
21 reliable calculation.
22        Q.  You would agree with Dr. Dykhuizen,
23 however, that there's some flow coming out of the
24 skirt, correct?  It's not zero?
25             MR. NAKAYAMA:  Objection, form.

95 (Pages 377 to 380)

381

1    A.  There is video evidence that there is
2  flow coming out of the skirt.
3    Q.  (By Mr. Benson) And let me -- so turning
4  back to your Expert Report, on Page 42, you would
5  agree that BP, for about, it looks like two
6  weeks, collected 25,000 barrels -- I'm sorry.
7    A.  Just a moment.
8    Q.  I apologize.
9    A.  That's okay.  I'm going in.  All right.
10    Q.  I'm looking at your Figure 14 on Page 42.
11    A.  Page 42, Figure 14.  Yes, okay.
12    Q.  Okay.  So you would agree -- and,
13  actually, it says here, right under the Figure,
14  it says: "...the collection...rate from both
15  vessels reaches 25,000" barrels per day "only for
16  approximately the last 2 weeks of the Top Hat
17  being in place..."
18    Do you see that?
19    A.  Yes.
20    Q.  Okay.  And do you -- do you you have any
21  reason to believe that the col -- that the
22  overall flow rate was increasing -- yeah, strike
23  that.
24    A.  I'll answer it, if you want.
25    Yes, I do.

382

1    (Laughter.)
2    Q.  (By Mr. Benson) Okay.  Let me ask you to
3  look at Figure 14, which I think you're already
4  looking at.  And you see there's some bouncing
5  around in the collection data, largely for the
6  DISCOVERER ENTERPRISE.  Is that right?  From
7  roughly July 1st to June 16th?
8    MR. NAKAYAMA:  Objection, form.
9    Q.  (By Mr. Benson) Do you see that on the
10  chart?
11    A.  Yes, yes.  Correct, yes.
12    Q.  Okay.  And do you think that reflects
13  changes in the day-to-day flow rate?
14    A.  Do I think -- sorry.
15    MR. NAKAYAMA:  Objection, form.
16    A.  Can you clarify what you mean there?
17    Q.  (By Mr. Benson) Right.  So if -- if the
18  total flow rate has -- I'm sorry, the total
19  collection rate is 25,000 one day, and 16,000 the
20  next, and 23,000 the day after that, do you think
21  that's because the total flow rate is changing in
22  that proportion, or is that a function of getting
23  the kinks ironed out of the collection process?
24    MR. NAKAYAMA:  Objection, form.
25    A.  The "kink," are you referring to the

383

1  "kink"?
2    Q.  I'm sorry.  I'm not referring to --
3  getting the kinks out in a colloquial sense,
4  not a --
5    A.  Right, not in the riser --
6    Q.  -- petroleum sense.
7    A.  -- bent riser sense?
8    Q.  Exactly.
9    A.  Okay.  Sorry.  I've lost track of what
10  your question was now.  Can you repeat it,
11  please?
12    (Laughter.)
13    Q.  (By Mr. Benson) I think we all have.
14    To the extent that there are these big
15  fluctuations day-to-day in what's collected, is
16  that -- do you believe that's a result of
17  corresponding proportionate changes in the total
18  flow rate, or is that a result of getting the
19  process ironed out for collection?
20    MR. NAKAYAMA:  Objection, form.
21    A.  They -- it could be a bit of either, and
22  both.
23    Q.  (By Mr. Benson) Okay.  So you're not
24  sure?
25    A.  No.

384

1    Q.  Okay.  Did you ever consider modeling the
2  Top Hat in Maximus?
3    A.  The only modeling of the Top Hat we did
4  for this work was the repeat of Dr. Dykhuizen's
5  calculation.  We could model the Top Hat in
6  Maximus to some degree.  Does that answer your
7  question?
8    Q.  You're saying it could be done, but you
9  didn't do it here?
10    MR. MCCALL:  Objection, form.
11    A.  We didn't do it here.
12    Q.  (By Mr. Benson) Okay.  And why not?
13    A.  Because it wasn't part of what we were
14  trying to do.
15    Q.  Okay.  Why wasn't it part of what you
16  were trying to do?
17    A.  Because it wasn't part of what we were
18  trying to do.
19    Q.  Well, I mean, I guess you've said that a
20  number of times over the course of the day.  Why
21  wasn't getting flow rate part of what you were
22  trying to do?
23    MR. MCCALL:  Objection, form.
24    MR. NAKAYAMA:  Objection, form.
25    A.  It wasn't within the scope of what we

96 (Pages 381 to 384)

385

1  were asked to do.
2     **Q. (By Mr. Benson) Okay.  And if someone had**
3  **asked you to do that, you could have done it?**
4        MR. NAKAYAMA:  Objection, form.
5     A.  If someone had asked us to do what?
6     **Q. (By Mr. Benson) Well, in this case, to**
7  **model the -- model the flow from the Top Hat**
8  **during that period.**
9     A.  If someone had asked us to do it, I'm
10  sure we would have -- we would have done it, yes.
11     **Q.  Okay.  Do you think that's something you**
12  **could have done accurately in Maximus?**
13     A.  We could have done it in -- in Maximus at
14  least as accurately as spreadsheet calculations,
15  and I would suggest far more accurately.
16     (Discussion off the record.)
17        MR. BENSON:  Let's go off the record
18  and come back tomorrow.
19        THE WITNESS:  Okay.  I'm happy to do
20  that.
21        THE VIDEOGRAPHER:  It's 6:15 p.m.
22  We're going off the record, ending Tape 8.
23     (Deposition recessed at 6:15 p.m.,
24  resuming on Saturday, July 20, 2013, at
25  8:30 a.m.)

386

1  CHANGES AND SIGNATURE
2  WITNESS NAME:  ADRIAN JOHNSON, PH.D.
3  DATE OF DEPOSITION:  JULY 19, 2013
4  PAGE LINE     CHANGE        REASON

387

1
2     I, ADRIAN JOHNSON, PH.D., have read the
3  foregoing deposition and hereby affix my
4  signature that same is true and correct, except
5  as noted on the attached Amendment Sheet.
6
7        ADRIAN JOHNSON, PH.D.
8
9
10  THE STATE OF _____
    COUNTY OF _____
11
        Before me, _____, on
12  this day personally appeared ADRIAN JOHNSON,
    PH.D., known to me (or proved to me under oath or
13  through _____) to be the
    person whose name is subscribed to the foregoing
14  instrument and acknowledged to me that they
    executed the same for the purposes and
15  consideration therein expressed.
        Given under my hand and seal of office this
16  _____ day of _____, 2013.
17
18
19     _____
    NOTARY PUBLIC IN AND FOR
20  THE STATE OF _____
    COMMISSION EXPIRES: _____
21
22
23
24
25

388

1  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF LOUISIANA
2
3  IN RE: OIL SPILL    )  MDL NO. 2179
   BY THE OIL RIG      )
4  "DEEPWATER HORIZON" IN )  SECTION "J"
   THE GULF OF MEXICO, ON )
5  APRIL 20, 2010      )  JUDGE BARBIER
                       )  MAG. JUDGE SHUSHAN
6
7
8
9     REPORTER'S CERTIFICATION
   TO THE ORAL AND VIDEOTAPED DEPOSITION OF
10        ADRIAN JOHNSON, PH.D.
        JULY 19, 2013
11        VOLUME 1
12
13
14     I, Emanuel A. Fontana, Jr., Certified
   Shorthand Reporter in and for the State of Texas,
15  hereby certify to the following:
16     That the witness, ADRIAN JOHNSON, PH.D., was
   duly sworn by the officer and that the transcript
17  of the oral deposition is a true record of the
   testimony given by the witness;
18
        That the deposition transcript was submitted
19  on        , 2013, to the witness or to
   Attorney _____ for the witness to
20  examine, sign, and return to Worldwide Court
   Reporters, Inc., by        , 2013.
21
        That the amount of time used by each party
22  at the deposition is as follows:
23     Mr. Benson - 7 Hours, 34 Minutes
24
25

97 (Pages 385 to 388)