UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010<br><br>This Document Relates to:<br><br>2:12-cv-1045-CJB-JCW | MDL No. 2179<br><br>SECTION: J<br><br>Judge Barbier<br>Mag. Judge Wilkinson |

**DEFENDANT O'BRIEN'S RESPONSE MANAGEMENT, L.L.C.'s
MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR
<u>CONDITIONAL CERTIFICATION AND COURT-AUTHORIZED NOTICE</u>**

O'Brien's Response Management, L.L.C. ("O'Brien's") respectfully submits this

Memorandum of Law in Opposition to Plaintiff's Motion for Conditional Certification and

Court-Authorized Notice ("Pl.'s Mot." or "Plaintiff's Motion").  (Rec. Doc. 6930.[1])

**PRELIMINARY STATEMENT**

In response to the Deepwater Horizon ("DWH") spill, an unprecedented national and

environmental emergency and the first oil spill to be declared a Spill of National Significance,

O'Brien's was called upon to aid in the clean-up effort and staff skilled personnel into a myriad

of response positions.  Contrary to Plaintiff's characterization of O'Brien's as controlling the

work conditions of its contractors, the DWH spill response was organized pursuant to a

comprehensive federal response structure which, as discussed *infra*, dictated, among other

things, daily schedules, reporting protocol, and the creation and elimination of positions for those

working on the response.

---

[1] All references to docket filings, unless indicated otherwise, are to the docket in *In re Oil Spill*, MDL No. 2179-CJB-JCW-SS (E.D. La.).

Plaintiff now asks this Court to conditionally certify a class of workers who, *inter alia*, performed "duties tracking oil spill response personnel and/or equipment, and/or assisted in managing and/or tracking the resources used in the response."  But this sweepingly broad and vague language would cover virtually anyone who worked on the DWH spill response – whether for the government, O'Brien's, BP, or another contractor; whether in response strategy, planning, operations, finance, or in any other capacity – as each of them likely "assisted in managing and/or tracking the resources used in the response."  The proposed class definition thus covers a wide swathe of the personnel staffed by O'Brien's into more than 50 distinct work classifications: individuals who performed vastly different duties in positions involving differing levels of control, requiring different skill levels, and resulting in dissimilar work experiences in various locations throughout the five Gulf Coast states

While the conditional certification standard in FLSA collective actions is lenient, Plaintiff still must show that the putative class members are "similarly situated."  Plaintiff's choice to cast a wide net rather than identify a single job classification (or small group of related classifications) for inclusion in a class, fails to provide the specificity required to discern whether putative class members are actually "similarly situated" or whether collective adjudication of their independent contractor status is remotely feasible.

However, Declarations submitted by opt-in plaintiffs in support of Plaintiff's Motion, among other evidence, confirms that putative class members are **not** "Similarly Situated", as they testified to working in the following different positions: "Contract Manager", "Operations Section Chief", "tar-ball removal instructor", "Alabama OSRO Manager", "environmental observer", and "Shoreline Treatment Recommendation (STR) Manager."  Those positions performed such dissimilar duties as "instructed…beach cleanup crews on the correct procedure

for removal of tar from the beaches" (tar-ball removal instructor); making "sure cleanup crews followed environmental protection guidelines" (environmental observer) and the "administration of contracts" and "analyz[ed], project[ed] and compar[ed] rates for onshore and near-shore activities" ("Contract Manager)."   Adjudicating the classification of these disparate positions would require completely separate analysis.

Given this substantial variation, Plaintiff attempts to argue that he need only allege a "single" policy or "blanket" practice applied uniformly to the class - which Plaintiff contends was the classification of putative class members as independent contractors.  But Plaintiff misstates the governing law, which **_also_** requires establishing that class members are similarly situated in reference to their job duties.  In misclassification cases where, as here, there is material variation among the job duties of putative class members, conditional certification must be denied.

As alternative relief, Defendant requests that the Court limit Plaintiff's proposed class to individuals who performed the positions of staging area manager, yard supervisor, and/or equipment supervisor and/or those who performed substantially similar job duties, as further described *infra*.

## I. SUMMARY OF RELEVANT FACTS

A.      <u>Background</u>

O'Brien's provides emergency preparedness and response management services to its clients, including staffing skilled professionals into a variety of short-term emergency response assignments.  Ex. 2, ¶ 4. Following the incident aboard the DWH rig on April 20, 2010, BP

contacted O'Brien's for assistance and O'Brien's immediately mobilized.  *Id.* ¶ 5.[2]  Although

O'Brien's served as a contractor to BP, O'Brien's was subject to the ultimate authority and

direction of the federal government throughout the DWH spill response.  *Id.* ¶ 6.

 The Incident Command System ("ICS") was the command and control organizational

structure and management process used by the federal government to execute the spill response

efforts.  *Id.* ¶ 7.  The Unified Area Command ("UAC") operated as the headquarters for the

response effort, per NCP requirements, under the leadership and direction of the Federal On-

Scene Coordinator ("FOSC"), the federal official designated by the United States Coast Guard

("USCG") to oversee the response.  *Id.* ¶ 7.  Incident Command Posts ("ICPs") were also

established by the USCG.  *Id.* ¶ 7.[3]

 The ICS organizational structure contained numerous and various response positions.  *Id.*

¶ 9.  Pursuant to its agreement with BP, O'Brien's staffed contractors into a wide range of ICS

positions in five different states at both the ICPs and field locations, which constituted the vast

majority of the personnel that O'Brien's supplied to the DWH spill response.  *Id.* ¶ 9.  In serving

in their positions within the ICS structure, these individuals were subject to the ultimate authority

and direction of the UAC.  *Id.* ¶ 9.

 B. <u>O'Brien's Contractors Held a Wide Variety of Positions and Performed
Dissimilar Job Duties.</u>

 O'Brien's entered into independent contractor agreements, called teaming agreements,

with certain individuals, who provided services on the DWH spill response ("Contractors").  *Id.*

---

[2] Pursuant to the National Contingency Plan ("NCP"), the federal government's blueprint for responding to oil spills, BP was deemed the Responsible Party ("RP") for the DWH oil spill.  *Id.* ¶ 6.  As the RP, BP played a role in funding and participating in the oil spill clean-up efforts.  *Id.* ¶ 6.

[3] Incident Action Plans ("IAPs") were prepared that contained detailed instructions concerning the response activities that were to occur during each operating period.  *Id.* ¶ 8.  Each IAP was reviewed, signed, and approved by the FOSC and/or the FOSC's representatives ("FOSCRs") and then delivered to the ICPs for execution and dissemination into the field.  *Id.* ¶ 8.

¶ 10.  These Contractors held more than 50 different positions within the DWH spill response, including[4]:

- "Supervisor in Mechanical Operations";
- "Oil Spill Response Organization ('OSRO') Manager";
- "Deputy Operations Section Chief";
- "Planning Section Chief";
- "Shoreline Assessment";
- "Beach Cleaning Trainer";
- "Operations Liaison";

- "Control Burn Air Operations Technical Advisor";
- "Radio operator/dispatcher";
- "Deputy Environmental Unit Leader";
- "VOO Boat Inspector"; and
- "Protection and Recovery Technical Specialist".

These positions performed completely different job duties.  To take a few examples: a Shoreline Assessment worker analyzed affected areas and provided in-depth assessments on clean-up methods; a Planning Section Chief crafted spill response strategies; an Operations Liaison communicated with local officials to coordinate response efforts and obtain approvals and licenses; and a Beach Cleaning Trainer instructed spill workers on best practices.  *Id.* ¶ 11.  Other duties of specific positions included: "train[ing] contractors and clean-up workers with respect to what they should be doing in the field", "completing air reconnaissance fly-overs", and "updat[ing] the computer software" at decontamination sites.[5]

Opt-in plaintiffs submitted declarations in which they testified to prominent differences in their positions and duties.  Their positions included: "Contract Manager", "Operations Section Chief", "tar-ball removal instructor", "Alabama OSRO Manager", "environmental observer", and "Shoreline Treatment Recommendation (STR) Manager".[6]  Those positions performed such differing duties as "instructed and supervised beach cleanup crews on the correct procedure for

---

[4] Ex. 3, ¶ 4; Ex. 4, ¶ 7; Ex. 5, ¶ 9; Ex. 6, ¶ 6; Ex. 2, ¶ 10.

[5] Ex. 7, ¶ 6; Ex. 8, ¶ 7; Ex. 9, ¶ 11.

[6] Pl.'s Mot. Ex. 9, ¶ 5; Pl.'s Mot. Ex. 13, ¶ 5; Pl.'s Mot. Ex. 14, ¶ 5; Pl.'s Mot. Ex. 17, ¶ 5; Pl.'s Mot. Ex. 21, ¶ 2; Pl.'s Mot. Ex. 22, ¶ 2.

removal of tar from the beaches" (tar-ball removal instructor); making "sure cleanup crews followed environmental protection guidelines" (environmental observer); and the "administration of contracts" and "analyz[ed], project[ed] and compar[ed] rates for onshore and near-shore activities" (Contract Manager).  Pl.'s Mot. Ex. 14, ¶ 5; Pl.'s Mot. Ex. 21, ¶ 3; Pl.'s Mot. Ex. 9, ¶ 5.

The time sheets Contractors filled in contained a space titled "Location/Activity" and opt-in plaintiffs recorded activities that varied dramatically by position, including as follows:

- "Air Ops";
- "Contract Mgt.";
- "[R]apid assessment of Gulf oil spill response operations";
- "OSRO manager training";
- "Large Vessel Demobilization";
- "Mechanical Operations";
- "Monitor lakes / gulf inlets";

- "Boom Removal";
- "[O]versaw beach cleaning operation";
- "Contractor Observation";
- "Forward Staging Recon"; and
- "Performed all daily duties as dock master/supervisor".

*See* Ex. 1, ¶ 2, Ex. A.

C.      Contractors Applied Their Wide Range of Skills and Experience To Their Work on the DWH Spill Response.

The skills and experience of Contractors varied depending on their specific positions within the ICS structure.  Some Contractors had "extensive experience responding to oil spills and environmental emergencies" or had performed work for "crisis and oil spill response" teams. Ex. 8, ¶ 5; Ex. 5, ¶ 3.  Other Contractors had advanced skills and experience in industries as diverse as environmental compliance and inland marine transportation.  Ex. 4, ¶ 5; Ex. 9, ¶ 4.   In addition, while each Contractor signed a "teaming agreement" stating he was a contractor and not an employee, some opt-in plaintiffs had sufficient experience to form companies through which they contracted with O'Brien's.  *See* Ex. 1, ¶¶ 4-5, Ex. C-D.

Contractors used these skills in their DWH response assignments.  One opt-in plaintiff stated that his work as an operations manager required him to "draw[] on past experience."  Pl.'s Mot. Ex. 18, ¶ 31.  Another Contractor stated that his experience on the oil spill response team of the Royal Dutch Shell Company "proved directly applicable to responding to the DWH oil spill."  Ex. 5, ¶ 3.  Another stated that he used his "specialized skills in . . . maintaining compliance with environmental standards" as he was required to ensure that "contractors and other ICS personnel were aware of . . . environmental obligations."  Ex. 4, ¶¶ 6, 11.  Another Contractor explained that he successfully implemented "industry standards for decontamination" because of his "extensive experience responding to oil spills and environmental emergencies" from his "43 years working for oil and recovery contractors."  Ex. 8, ¶¶ 5, 8.

The job applications and resumes submitted by the opt-in plaintiffs when they applied for DWH response positions reflect a variety of skills and experience specific to the oil and emergency response industries and/or demonstrating technical expertise in other fields.  Opt-in plaintiffs identified previous experiences such as: "safety inspector & boom deployment trainer", serving on "offshore rigs / platforms", "oil company consulting", "safety training", and "VOO vessel inspector".  Ex. 1, ¶ 3, Ex. B.  Other opt-in plaintiffs had previously "[d]esigned/[i]mplemented [an] engineering course for 200 engineering apprentices", worked for "20+ years [in] marine construction & ship repair", served as a "Coast Guard supervisor with 22 y[ea]rs of honorable service", and been charged with "[r]ecogni[zing] and respon[ding] to chemical, biological, and radiological agents."  *Id.* ¶ 3, Ex. B.  Several opt-in plaintiffs worked previously with O'Brien's.  Pl.'s Mot. Ex. 6, ¶ 30; Pl.'s Mot. Ex. 16, ¶ 30.

D.    The Limited Control That O'Brien's Exerted Varied From Contractor to Contractor Based on the Staffing of the ICS' Immense Organizational Structure.

As described above, the DWH spill response was directed by federal officials who implemented spill response activities through the ICS structure.  O'Brien's thus exerted little control over Contractors staffed into ICS positions.  However, the level of interface and supervision with O'Brien's and with others in the ICS varied considerably as to each Contractor.

For instance, Contractors received instructions and assignments from individuals who functioned as their superiors within the ICS but who were associated with different entities.  Ex. 2, ¶ 13.  These instructions may have been given by USCG officers, BP personnel, other O'Brien's contractors, and/or other contractors, all of whom were acting per their positions within the ICS structure.  Ex. 2, ¶ 13; *see also* Ex. 9, ¶ 9; Ex. 4, ¶ 7.  Some Contractors reported to "a worker from BP."  Ex. 7, ¶ 7; *see also* Ex. 6, ¶ 7; Ex. 4, ¶ 7.  Some reported to workers who had been staffed by O'Brien's.  *See, e.g.*, Pl.'s Mot. Ex. 11, ¶ 16.  Another contractor "reported to various persons in the ICS, some of whom were with O'Brien's personnel, and some of whom were not."  Ex. 3, ¶ 12.  Still other Contractors stated that they were given instructions during regular meetings with "O'Brien's personnel, BP personnel, and local, state and federal officials including Coast Guard personnel."  Pl.'s Mot. Ex. 10, ¶ 17; Pl.'s Mot. Ex. 13, ¶ 17.

Contractors typically determined "how best to achieve the goals" outlined in the IAPs and other assignments that the UAC or federal officials generated "with little, if any, input from O'Brien's."  Ex. 4, ¶ 8; *see also* Ex. 3, ¶ 6.  "Out in the field" they had sufficient freedom and autonomy to make "day-to-day judgment calls" based on the instructions relayed in the IAPs and any other directives from the federal government.  Ex. 4, ¶ 7; Ex. 5, ¶¶ 10, 13.  However, some Contractors were entrusted with greater discretion because they had significant relevant experience, their supervisors lacked such experience, they supervised other response workers, or

8

they determined how to delegate tasks associated with their daily assignments.  *See* Ex. 6, ¶ 7;

Ex. 5, ¶ 13; Ex. 9, ¶ 11; Ex. 3, ¶ 11.  Thus levels of autonomy in performing job duties varied

among the Contractors.[7]

       1.      Plaintiff's Assertions Regarding O'Brien's Purported Policies and
            Procedures, Teaming Agreements, and Hiring and Firing Are Erroneous.

        Plaintiff asserts that O'Brien's required Contractors staffed in ICS positions to follow

policies and procedures directing, *inter alia*, who they reported to, how they behaved on job

sites, what they were permitted to wear, how they performed their work, how they handled

documents, and that they submit to random drug and alcohol testing.  (Plaintiff's Memorandum

in Support for Conditional Certification and Court-Authorized Notice ("Pl.'s Memo"), Rec. Doc.

6930-1, at 6.)  However, these policies and/or practices, to the extent they existed, were not

maintained by O'Brien's.  Ex. 2, ¶ 14.  Contractors never received employee handbooks or any

similar employment-type policies from O'Brien's.  Ex. 7, ¶ 5; Ex. 8, ¶ 6; Ex. 6, ¶ 5.  Practices

that Contractors were, in fact, required to follow were generally mandated by the UAC and/or

explained in the IAPs.  Ex. 2, ¶ 15.  For example, daily schedules and working hours were

determined by the UAC.  *Id.* ¶ 15.  In addition, the chain of command, and thus the individuals to

whom Contractors reported, was dictated by the ICS organizational structure.  *Id.* ¶ 15.  And if

Contractors were asked to submit to random drug testing, such was mandated by entities other

than O'Brien's.  Ex. 8, ¶ 12; Ex. 5, ¶ 18.  Plaintiff also alleges that O'Brien's had the authority to

hire and fire putative class members.  Pl.'s Memo, at 6.  But the UAC, ***and not O'Brien's,*** made

and/or authorized the decisions to eliminate or create positions within the ICS and, once such

---

[7] Additionally, the opt-in plaintiffs' testimony regarding the level of training they received directly from O'Brien's varied.  Many opt-in plaintiffs' testified to receiving no training from O'Brien's prior to commencing their DWH spill response assignments (*See* Pl.'s Mot. Ex. 11, ¶ 30; Pl.'s Mot. Ex. 14, ¶ 30; Pl.'s Mot. Ex. 17, ¶ 30), however, some testified that they received short training sessions.  *See* Pl.'s Mot. Ex. 19, ¶ 26; Pl.'s Mot. Ex. 21, ¶ 27.

decisions were made, would request O'Brien's to staff these new positions or instruct O'Brien's to inform Contractors they would be demobilized.  Ex. 2, ¶ 16.

Plaintiff also contends that the teaming agreements with O'Brien's prohibited Contractors "from working for other oil spill companies" while working for O'Brien's "and for one year afterwards."  Pl.'s Memo, at 6.  But the plain language of the teaming agreements required Contractors to refrain from soliciting or selling "services substantially similar to that provided by [O'Brien's] ***to [O'Brien's] clients*** for the term" of the agreements "and for a period of one year thereafter."  Ex. 1, ¶ 4, Ex. C (emphasis added).  Thus, contrary to Plaintiff's assertion, they only prohibited Contractors from working directly for O'Brien's clients, not its competitors, and Contractors understood that they remained "free to work" as independent contractors "for other companies during and after" the term of their work for O'Brien's.  Ex. 7, ¶ 3; *see also* Ex. 9, ¶ 3; Ex. 6, ¶ 4.

E.      The Relative Investment of O'Brien's and Its Contractors Varied From Contractor to Contractor.

O'Brien's provided virtually none of the equipment or office space utilized on the DWH response.  Ex. 2, ¶ 17; Ex. 7, ¶ 10; Ex. 4, ¶ 14; Ex. 5, ¶ 16.  Instead, BP and other contractors, acting in accordance with their positions within the ICS, owned, rented, ordered and/or supplied equipment and office space used during the DWH response.  Ex. 2, ¶ 17; Ex. 3, ¶¶ 9-10; *see also* Ex. 4, ¶ 14.  One opt-in Plaintiff testified that Contractors were informed that equipment "would be supplied to us through BP."  Pl.'s Mot. Ex. 11, ¶ 29.

Many Contractors, in contrast, furnished much of their own equipment, including computers and mobile telephones.  Ex. 7, ¶ 10; Ex. 6, ¶ 9.  Some Contractors also brought the steel toe boots, hard hats, cameras, and vehicles that were required to perform their job duties.  Ex. 4, ¶ 14; Ex. 8, ¶ 11; Pl.'s Mot. Ex. 11, ¶ 29.  Other Contractors asserted that they "were

provided with all the equipment and tools [they] used."  Pl.'s Mot. Ex. 8, ¶ 29; *see also* Pl.'s

Mot. Ex. 15, ¶ 29.

## II. ARGUMENT

A.    <u>Conditional Certification Is Not Automatic</u>

Section 216(b) of the FLSA authorizes "any one or more employees" to maintain a suit

"for and in behalf of himself or themselves and other employees similarly situated."  29 U.S.C. §

216(b).  Although the Fifth Circuit has declined to adopt a specific test to determine when a court

should certify a class or grant notice in a § 216(b) action, most federal courts have adopted the

two-step process set forth in *Lusardi v. Xerox Corp*, 118 F.R.D. 351 (D.N.J. 1987).  *See Mooney*

*v. Aramco Servs. Co.*, 54 F.3d 1207, 1214 (5th Cir. 1995); *Xavier v. Belfor USA Group, Inc.*, 585

F. Supp. 2d 873, 876 (E.D. La. 2008).  In the first step, called the "notice" or "conditional

certification" stage, the court decides whether to certify the collective action conditionally and

give notice to potential collective action members.  *See id.* at 876-877.

"While the standard at the notice stage is not particularly stringent, it is by no means

automatic."  *Id.* at 878.  District courts have discretion to authorize notice to similarly situated

employees, but: "[the] relevant inquiry then is not whether the Court has discretion to facilitate

notice, but whether this is an appropriate case in which to exercise discretion."  *Hall v. Burk*, No.

3:01-CV-2487H, 2002 WL 413901, at *2 (N.D. Tex. Mar. 11, 2002).  In deciding whether to

conditionally certify, a court "has a responsibility to refrain from stirring up unwarranted

litigation."  *Xavier*, 585 F. Supp. 2d at 878.  "Further, employers should not be unduly burdened

by a frivolous fishing expedition conducted by the plaintiffs at the defendant's expense."  *Id.*

"[A]n action dominated by issues particular to individual plaintiffs cannot be administered

efficiently because individual issues predominate over collective concerns."  *Green v. Plantation*

*of Louisiana, LLC*, No. 2:10-0364, 2010 WL 5256354, at *6 (W.D. La. Nov. 24, 2010).

B.    Putative Class Members Are Not Similarly Situated Because of Significant Variation in Job Duties

To conditionally certify an FLSA collective action, a court must find that "there is a reasonable basis for crediting the assertion that aggrieved individuals exist" and that "those aggrieved individuals are similarly situated to the plaintiff in relevant respects given the claims and defenses asserted." *Villarreal v. St. Luke's Episcopal Hosp.*, 751 F. Supp. 2d 902, 915 (S.D. Tex. 2010). Among other things, putative class members must be "similarly situated" regarding their job duties for conditional certification to be appropriate. *See, e.g.*, *Xavier*, 585 F. Supp. 2d at 877 ("[w]hether employees are 'similarly situated' for purposes of the FLSA is determined in reference to their 'job requirements'"). Finally, it is well settled that "if the job duties among potential members of the class vary significantly, then class certification should not be granted." *Green*, 2010 WL 5256354, at *4; *see Villarreal*, 751 F. Supp. 2d at 918.

Courts in the Fifth Circuit regularly deny conditional certification because of variation in job duties, or variation in other work conditions, as illustrated by the below decisions:

- In *Bodle v. TXL Mortgage Corp.*, the court denied conditional certification of a class of "current and former loan officers, account managers, loan processors, closing managers and credit repair specialists" because their "job duties varied by job classification." No. H-12-1515, 2012 WL 5828616, at *1, *10 (S.D. Tex. Oct. 2, 2012).

- In *Xavier*, the court denied conditional certification of a class of manual laborers who performed post-Katrina-disaster-response work because plaintiffs "do not describe the specific job at each job site" and because "the facts of this case would require too particularized and individualized an analysis of each worker's situation." 585 F. Supp. 2d at 880.

- *In Green*, the court declined to conditionally certify a class of exotic dancers, "shot girls", waitresses, bartenders, and bouncers (although it conditionally certified a class of one of those positions on its own initiative) because "individualized legal determinations specific to each of the plaintiffs' job classifications predominate over collective concerns." 2010 WL 5256354, at *4, *8.

- In, *Theriault v. WM & B, LLC*, the court denied conditional certification of a class of "wood craftsmen, carpenters helpers, trim carpenters, trim men, mill wrights, and general laborers" because "[i]n light of these differences—in job duties, wages, project

12

assignments, geographic location, and supervision—Plaintiff's affidavit and Complaint do not demonstrate the existence of similarly situated employees." No. H-06-00206, 2006 WL 6584399, at *2-3 (S.D. Tex. Aug. 18, 2006).

Conditional certification should be denied here given the substantial variation among the job duties of putative class members. *See* Section I.B., *supra*. Contractors were staffed into more than 50 different positions in the DWH response, performing varying duties such as analyzing affected areas and providing in-depth assessments on clean-up methods (shoreline assessment) or liaising with local officials to coordinate spill response efforts and obtain approvals and licenses (Operations Liaison), as just two examples. *Id.* The opt-in plaintiffs confirm the variation in job duties, as they specifically testified to performing such dissimilar duties as "instructed and supervised beach cleanup crews on the correct procedure for removal of tar from the beaches" (tar-ball removal instructor); making "sure cleanup crews followed environmental protection guidelines" (environmental observer); and the "administration of contracts" and "analyz[ed], project[ed] and compar[ed] rates for onshore and near-shore activities" (Contract Manager). *Id.*[8]

The Court should thus decline to conditionally certify Plaintiff's unwieldy class. *See Bodle,* 2012 WL 5828616, at *10 (even though the putative class members all "worked toward the end of servicing and processing residential mortgage loans" the Court denied conditional certification because their job duties still "varied by job classification").

C.   Putative Class Members Are Not Similarly Situated With Respect to Their Independent Contractor Classification

Because Plaintiff seeks to conditionally certify a class premised on allegations of independent contractor misclassification, the Court must consider whether putative class

---

[8]  A more detailed discussion of the positions held and duties performed by putative class members is contained in Section I.B.

members are "similarly situated" as it relates to determining the lawfulness of each classification. *See Andel v. Patterson-UTI Drilling Co.*, No. V-10-36, 280 F.R.D. 287, 289 (S.D. Tex. Feb. 15, 2012) ("[w]hen considering a motion for conditional certification of a collective action based on allegations of independent contractor misclassification, a court must analyze whether the [putative collective action members] are similarly situated with respect to the analysis it would engage in to determine whether the workers are employees or independent contractors."). Contrary to Plaintiff's contention that the Court need only consider whether O'Brien's had a policy of classifying putative class members as independent contractors, "[t]he Court cannot only look to [Defendant's] uniform classification of the workers . . . . Instead, it must determine whether the proof to demonstrate that the workers are 'employees' or 'independent contractors' can be applied to the class as a whole." *See Bamgbose v. Delta-T Group, Inc.*, 684 F. Supp. 2d 660, 668-69 (E.D. Pa. 2010).

Here, the substantive law underlying the court's analysis is whether Plaintiffs are employees or independent contractors under the FLSA, which is a legal and not purely factual determination. *See Lindsley v. BellSouth Telecomms. Inc.*, 401 F. App'x 944, 945 (5th Cir. 2010). "The determination of whether an individual is an employee or independent contractor is highly dependent on the particular situation presented." *Thibault v. Bellsouth Telecomms., Inc.*, 612 F.3d 843, 848 (5th Cir. 2010).

The five non-exhaustive factors most often considered by the courts are: (1) the degree of control exercised by the alleged employer; (2) the skill and initiative required in performing the job; (3) the extent of the relative investments of the worker and the alleged employer; (4) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; and (5) the permanency of the relationship. *Id.* at 846.

O'Brien's affirms that it classified each putative class member correctly.  However, if the case proceeds collectively, the Court would have to engage in an individualized analysis of the above factors for each class member, who are thus not similarly situated with respect to this analysis given the factual variations described previously and summarized below.

1.      The Degree of Control Exercised by the Alleged Employer

The DWH spill response was controlled by federal officials who implemented response activities through the ICS.  *See* Section I.A., *supra*.  Not only were Contractors staffed into positions within the ICS structure not under the direct control of O'Brien's, but the level of interface, supervision and control varied considerably.[9]  *See* Section I.D., *supra*.

For instance, Contractors received instructions and assignments from individuals who functioned as their superiors within the ICS but who were associated with different entities.  *Id.* These instructions may have been given by USCG officers, BP personnel, other O'Brien's contractors, and/or other contractors, all of whom were acting in accordance with their positions within the ICS structure.  *Id.*  Many Contractors reported to "a worker from BP."  *Id.*  Some Contractors stated they were supervised by workers staffed by O'Brien's, while others reported to various persons in the ICS, some with O'Brien's and some not.  *Id.*  Still other Contractors were given instructions during meetings with "O'Brien's personnel, BP personnel, and local, state and federal officials including Coast Guard personnel."  *Id.*

The level of supervision and autonomy also varied, as Contractors typically determined "how best to achieve the goals" outlined in the IAPs and other assignments that the UAC or federal officials generated, and some were entrusted with greater discretion because they had

---

[9] The level of supervision an individual is subject to is highly relevant to the "control" prong of the economic realities test.  *See, e.g.*, *Thibault*, 612 F.3d at 847 (finding that plaintiffs were independent contractors when their supervisors only came by occasionally); *Gate Guard Servs. L.P. v. Solis*, No. V-10-91, 2013 WL 593418, at *5 (S.D. Tex. Feb. 13, 2013).

relevant experience or for other reasons.  *Id.*  Those located "out in the field" generally were "not monitored" and had freedom and autonomy to make "day-to-day judgment calls" on how to carry out the instructions relayed in the IAPs and any other directives from the federal government.  *Id.*  Also, some opt-in plaintiff's testified to receiving no training from O'Brien's, but others testified to receiving a short training from O'Brien's before commencing work.[10] Also, opt-in plaintiffs allege being subjected to various policies and procedures that they ascribe to O'Brien's, but the applicable policies and practices, such as work practices, daily schedules, reporting protocol, and the creation and elimination of positions for those working on the response, were dictated by the UAC and/or explained in the IAPs.[11]  *Id.*

2. The Skill and Initiative Required in Performing the Job Varied

As described in Section I.B. and I.C., the putative class members worked in numerous different positions, with widely varying job duties, requiring different skill levels as reflected in their varying prior work experiences.  Many putative class members had extensive experience in oil spill response work and other fields, including: the oil spill response team of the Royal Dutch Shell Company; "responding to oil spills and environmental emergencies", working for O'Brien's, "safety inspector & boom deployment trainer", "oil company consulting", "VOO vessel inspector", and "[r]ecogni[zing] and respon[ding] to chemical, biological, and radiological agents."  *Id.*  The utilization of the above skills depended on position staffed in and duties performed.  *Id.*  In addition, while each Contractor signed a "teaming agreement" stating he was

---

[10] A lack of training evidences a lack of "control" by the purported employer.  *See, e.g., Solis*, 2013 WL 593418, at *4 (found "gate attendant[s]" to be independent contractors where "they receive no training or instruction on how to do their work"); *Thibault,* 612 F. 3d at 847.

[11] Where a customer or the government, instead of the purported employer, mandates job requirements, the control prong favors a finding of independent contractor status.  *See, e.g., Mack v. Talasek*, No. V-09-53, 2012 WL 1067398, at *2 (S.D. Tex. Mar. 28, 2012); *see Carrell v. Sunland Constr. Inc*, 998 F.2d 330, 332 (5th Cir. 1993) (control favored independent contractor status where customers, not purported employer, dictated how welders did their jobs).

a contractor and not an employee, some opt-in plaintiffs had sufficient experience to contract

with O'Brien's through their own companies.  *See* Ex. 1, ¶¶ 4-5, Exs. C-D.

        3.     The Extent of the Relative Investments of the Worker and the Alleged
              Employer Varied

BP and other third-party contractors, acting in accordance with their positions within the

ICS structure, owned, rented, ordered and/or supplied the vast majority of equipment and office

space utilized.  *See* Section I.E., *supra*.  The amount of equipment furnished by putative class

members varied.  Some brought the steel toe boots, hard hats, cameras, and vehicles that were

required to perform their job duties.  *Id.*  Other Contractors asserted they "were provided with all

the equipment and tools [they] used."  *Id.*

        4.     The Permanency of the Relationship Varied

Some Contractors testified to previously performing emergency response work for

O'Brien's that was project based and of a short duration.[12]  *See* Pl.'s Mot. Ex. 6, ¶ 30; Ex. 9, ¶ 2.

Many other Contractors testified that they had no relationship with O'Brien's prior to the DWH

spill response.[13]

Therefore, given the wide differences among putative class members with respect to their

job duties, skills, control, relative investment, "permanency", etc., the facts of this case require

too particularized and individualized an analysis of each worker's classification to warrant

conditional certification.  *Xavier*, 585 F. Supp. 2d at 880 (denied conditional certification of a

class of manual laborers because "the facts of this case would require too particularized and

---

[12] Work that is project based weighs in favor of independent contractor classification.  *Solis*, 2013 WL 593418, at *10 ("Where a relationship can be characterized as temporary, project-by-project, or on-again, off-again, it will weigh in favor of an independent contractor determination.");  *Mack*, 2012 WL 1067398, at *5 (relationship not "permanent" where services performed for approximately nine to twenty months).

[13] Pl.'s Mot. Ex. 7, ¶ 30; Pl.'s Mot. Ex. 13, ¶ 30; Pl.'s Mot. Ex. 8, ¶ 30; Pl.'s Mot. Ex. 10, ¶ 30; Pl.'s Mot. Ex. 11, ¶ 30; Pl.'s Mot. Ex. 14, ¶ 30; Pl.'s Mot. Ex. 15, ¶ 30; Pl.'s Mot. Ex. 17, ¶ 30.

individualized an analysis of each worker's situation"); *Andel*, 280 F.R.D. at 289 (conditional certification denied because "the proof necessary to determine whether the putative plaintiffs are employees or independent contractors cannot be applied to the class as a whole").

> D.    No Case Law Supports Plaintiff's Contention that Classification of Putative Class Members as Independent Contractors Is Sufficient, Without More, to Warrant Conditional Certification

Plaintiff contends he can show that the putative class members are similarly situated merely by establishing that they all "were classified as independent contractors," "received a day rate" and "worked more than forty hours" in a week without receiving overtime pay, and that "[t]his policy applied to all the [putative class members] in the same way."  Pl.'s Memo, at 11. Plaintiff states that "[n]othing more is necessary."  *Id.*  Plaintiff completely misstates the relevant standard, citing *dicta* in several cases stating plaintiffs can satisfy their initial burden by showing a single or blanket policy or "generally applicable rule, policy, or practice" across the class.  *Id.*

But Plaintiff's contention is contrary to Fifth Circuit jurisprudence, which ***also*** requires establishing that class members are similarly situated in reference to their job duties.  *See, e.g.*, *Green*, 2010 WL 5256354, at *4; *Xavier*, 585 F. Supp. 2d at 876; *Villarreal*, 751 F. Supp. 2d at 918.  *See* Section II.B., *supra* for additional relevant authority.  In misclassification cases where, as here, there is material variation among the job duties of putative class members, conditional certification must be denied, even if a "single" policy applied uniformly.  *Id.*

Tellingly, ***none*** of the decisions Plaintiff cites within the Fifth Circuit support conditional certification of a misclassification case where the job duties of putative class members meaningfully vary, as they do here.  Instead, the Fifth Circuit cases Plaintiff cites each undermine Plaintiff's stated position for one or more of the four following reasons: (1) the court ***actually denied conditional certification***; (2) the court dramatically narrowed the class because of the disparate nature of the proposed class; (3) all class members in the conditionally certified

class were within the same job classification or performed virtually the same duties; or (4) the

case involved a merits issue that did not require any analysis of putative class members' job

duties to resolve, as distinguished from a misclassification claim like the case here.[14]

     For the Court's reference, see the below brief descriptions of those cases, organized by

the reasons they do not support Plaintiff's position:

- **The Court Actually *Denied Conditional Certification*:**

  - *Botello v. COI Telecom, L.L.C.*, No. SA-10-cv-305-XR, 2010 WL 5464824, at *7 (W.D. Tex. Dec. 30, 2010) (court denied conditional certification because workers in some locations were treated differently than workers in other locations[15]); *Xavier*, 585 F. Supp. 2d at 880-81 (denied conditional certification of class of manual laborers who performed post-Katrina-disaster-response work because, *inter alia*, plaintiffs "do not describe the specific job at each job site"); *Basco v. Wal-Mart Stores, Inc.*, No. 00-3184, 2004 WL 1497709, at *7 (E.D. La. July 2, 2004) (denied conditional certification, holding: "[i]t is obvious from the discovery presented that this 'policy' and its effects are neither homogeneous nor lend themselves to collective inquiry").

- **Court Narrowed the Size of the Class:**

  - *Tolentino v. C & J Spec–Rent Servs. Inc.*, 716 F. Supp. 2d 642, 652 (S.D. Tex. 2010) (excluded anyone other than non-supervisory coil tubing division workers from class); *Villarreal*, 751 F. Supp. 2d at 906, 919 (narrowed class to include only employees within the "Technology Service Center" who performed mostly help-desk duties, excluding those in four other IT departments).

- **Class Members All in Same Job Classification or Performed Same Duties:**

  - *Brewer v. BP P.L.C.*, No. 2:11-cv-401-JCW (E.D. La. filed Feb. 17, 2011) (putative class members all utilized software to inventory equipment, check equipment in and out and scan workers in and out)[16]; *Albanil v. Coast 2 Coast,*

---

[14] In commenting on cases cited by Plaintiff, Defendant in this Section II.D. specifically refers to all decisions within the Fifth Circuit (and also cases outside the Fifth Circuit in footnote 4 of Pl.'s Memo) cited in the sections of Pl.'s Memo titled "The Spill Workers Are Similarly Situated With Respect to Their FLSA Claim" and "The Spill Workers Are Similarly Situated With Respect to Their Independent Contractor Classification."

[15] Plaintiff incorrectly stated that the court in *Botello* was "certifying FLSA collective of workers alleging misclassification as independent contractors." Pl.'s Memo, at 12.

[16] Case 2:11-cv-00401-JCW, Second Am. Compl. 12/6/2011 (Dkt. No. 295), ¶ 141 (alleging that class members "made name badges for response workers scanned workers in and out, checked equipment in and out, took inventory of equipment, and entered inventory data into a software program"); Answer to Second Am. Compl., 1/3/2012 (Dkt.

*Inc.*, No. H-08-486, 2008 WL 4937565, at *1, *6 (S.D. Tex. Nov. 17, 2008) (class of "chippers" conditionally certified where the "Defendants admit[ted] that all of their chippers perform[ed] the same or similar duties as the named plaintiffs"); *Foraker v. Highpoint Sw., Servs., L.P.*, No. H-06-1856, 2006 WL 2585047, at *1, *4 (S.D. Tex. Sept. 7, 2006) (class members were all "Field Merchandising Representatives" and court found defendant "itself deems all Merchandisers to be in a single job category"); *Kuperman v. ICF Int'l*, No. 08-565, 2008 WL 4809167, at *6 (E.D. La. Nov. 3, 2008) (court held that the "fact that the defendants in this case have admitted that Plaintiffs' jobs are similar should defeat any argument to the contrary"); *Lima v. Int'l Catastrophe Solutions, Inc.*, 493 F. Supp. 2d 793, 800 (E.D. La. 2007) (class of persons "performing manual labor" conditionally certified where defendant made no argument that class members had disparate job duties); *Prater v. Commerce Equities Mgmt. Co.*, No. H-07-2349, 2007 WL 4146714, at *6-7 (S.D. Tex. Nov. 19, 2007) (putative class members were all supervised by the same person and all performed "essentially the same" "leasing staff" job duties).[17]

- **Case Involved Legal Issue Requiring No Analysis of Job Duties:**

  o *Donohue v. Francis Servs., Inc.*, No. A. 04-170, 2004 WL 1161366, at *2 (E.D. La. May 24, 2004) (certified claim that base pay rates used for determining overtime pay were calculated incorrectly; no allegation this issue varied by job or required analysis of job duties); *McKnight v. D. Houston, Inc.*, 756 F. Supp. 2d 794, 804 (S.D. Tex. 2010) (certified conditional class "of other bartenders and servers who were part of the tip-pooling arrangement" and tip-pooling issue did not require analysis of duties); *Crain v. Helmerich and Payne Int'l Drilling Co.*, No. 92-0043, 1992 WL 91946, at *2-3 (E.D. La. Apr. 16, 1992) (pre-*Mooney* case involving whether certain training sessions, meetings and study time were compensable).

In sum, none of the cases Plaintiff cites support conditional certification in a

misclassification case where the putative class members had meaningful differences in their job

duties.  The record evidence—including opt-in plaintiffs' declarations and the descriptions of

their duties on their time sheets—demonstrate beyond doubt that putative class members

---

No. 300), ¶ 141 (admitting that putative class members' duties "included those listed in the second sentence of Paragraph 141 of the Second Amended Complaint").

[17] Additionally, in footnote 4 of Pl.'s Memo, Plaintiff cites ten decisions (all from outside the Fifth Circuit) conditionally certifying classes alleging independent contractor misclassification.  However, the members of each such class all held precisely the same job, which were, per the descriptions in Pl.'s Memo: "current and former dancers"; "loan officers"; "U.P.S. Drivers"; "nurses"; "housing inspectors"; "janitorial workers"; "house painters"; and "carpet installation mechanics."

performed exceedingly different job duties, under different work conditions, and were subject to different levels of supervision within the ICS by persons associated with different entities. *See* Sections I.B., I.D., *supra.* Conditional certification must therefore be denied.

E.     Alternative Request to Certify a Narrower Class

Based on the law and facts discussed above, Defendant submits that Plaintiff's Motion should be denied in its entirety. To the extent the Court determines otherwise, Defendant requests as alternative relief that the Court limit the conditionally certified class to only those individuals who: (a) performed the positions of staging area manager, yard supervisor, and/or equipment supervisor and/or performed substantially similar job duties; (b) contracted with O'Brien's to work on the DWH response from April 21, 2010 to January 1, 2011; (c) were classified as Independent Contractors; (d) were paid a day rate; and (e) and worked over forty hours in at least one workweek without receiving overtime pay. *See* Order Denying Plaintiff's Motion for Conditional Certification and Court-Authorized Notice But Conditionally Certifying an Alternate Class ("Defendant's Proposed Order").

Courts within the Fifth Circuit can exercise their discretionary power at the conditional certification stage to narrow an overly broad proposed class. *Green*, 2010 WL 5256354, at *10 (narrowed proposed class of exotic dancers, "shot girls", waitresses, and bartenders to just exotic dancers); *Tolentino*, 716 F. Supp. 2d at 645, 652 (narrowed conditional class to exclude anyone other than non-supervisory coil tubing division workers).

In *Villarreal*, the court declined to conditionally certify a class of IT workers who all "help the users of computers and computer related equipment . . . to get the most performance from their computers and to overcome problems or obstacles" because the "generic quality of the statement creates a far broader categorization than that permitted under the 'similarly-situated' analysis." 751 F. Supp. 2d at 906, 919. Rather, the court instead narrowed the class to only

21

those within one department who performed mostly help-desk duties, excluding workers in four other departments who performed different IT duties.  *Id.*

As alternative relief, this Court, following the rationale in *Villarreal*, should reject Plaintiff's generic definition, and limit the class to just the positions of staging area manager, yard supervisor, and equipment supervisor and/or those who performed substantially similar job duties.  Individuals in these positions supervised the "yards" or "warehouses" located in "staging areas" at which spill response workers in the field typically mobilized each day.  Ex. 2, ¶¶ 18-20. They checked equipment into the staging areas, ensured that newly received equipment was properly tagged, stored, and ready for deployment, checked equipment out of the staging areas when it was deployed, and processed the paperwork that provided ICS authorization for the transfer or deployment of equipment.  *Id.* ¶ 19.  Those individuals are similarly situated in respect to their job duties to each other and to the named Plaintiff, who performed the job of Yard Supervisor for the majority of the class period (Ex. 1, ¶ 6, Ex. E), and are thus unlike the remainder of the putative class, who performed wholly different work duties.

### III. NOTICE

A.     <u>The Proposed Notice Should Be Modified.</u>

The U.S. Supreme Court has stated that class notice must be drafted in neutral, clear, and objective language, and should be "accurate, and informative."  *Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 172-174 (1989).  Plaintiff's proposed notice, however, is misleading and highly biased in Plaintiff's favor.  (*See* Notice of Lawsuit for Unpaid Wages ("Plaintiff's Proposed Notice"), Rec. Doc. 6930-3.)  For example:

- The notice implies O'Brien's violated the law, noting "Defendant's failure to pay Oil Spill Workers overtime compensation for all hours worked over forty in a workweek," even though the Court has not found that overtime was owed.  *Id* at ¶ 5.

- It does not set forth O'Brien's view that it classified and paid individuals properly.

- It solicits retaliation claims in an aggressive and non-neutral manner, asking in reference to retaliation, if "you have experienced such illegal treatment, contact Plaintiff's lawyers immediately." *Id.* at ¶ 10.

- It instructs recipients to "[p]lease disregard any previous communications you may have received from O'Brien's describing this lawsuit or your rights with respect to it." *Id.* at ¶ 2.  But Plaintiff cites no law requiring individuals to disregard previous statements by O'Brien's.

- It mischaracterizes the class by creating a term "Oil Spill Workers" to cover everyone who was "hired by [O'Brien's] to work on the Gulf Coast oil spill response cleanup efforts," "who worked for the Defendant at any time" from three years prior to issuance of notice.  But Plaintiff's proposed class only includes individuals who had specific duties and worked during a narrower time period.

- It fails to explain that those who join may be required to participate in discovery, produce their financial records, appear for a deposition, or appear at trial, while repeating over and over that those who join may be entitled to receive an award.

If this Court grants conditional certification, the Court should provide the parties time to discuss the above issues and submit to the Court a joint notice.  *See e.g.*, *Davis v. Mostyn Law Firm, P.C.*, No. 4:11-cv-1087, 2012 WL 163941, at *11 (S.D. Tex. Jan. 19, 2012) (ordering parties to meet and confer regarding content of the notice and consent form and submit a joint proposed form); *Lackey v. SDT Waste & Debris Servs., L.L.C.,* No. 11-1087, 2011 WL 6329909, at *4 (E.D. La. Dec. 19, 2011) (same); *White v. Integrated Elec. Section Techs., Inc.*, No. 11-2186, 2013 WL 2903070, at *9 (E.D. La. June 13, 2013).

      B.    <u>O'Brien's Should Not Be Required to Produce Information Plaintiff Can Obtain in Discovery or Personal Information</u>**.**

      Plaintiff requests that Defendant produce, within 10 days from an order of conditional certification: the last-known mailing addresses, email addresses, last-known telephone numbers, work locations and dates of employment for all putative class members.  (Order and Reasons, Rec. Doc. 6930-2.)

First, Defendant should be provided 30 rather than 10 days to provide the requested class information.  Second, Plaintiff's attempt to circumvent the discovery process by requesting work locations and dates of employment – information irrelevant to issuing notice – must not be permitted.  Moreover, determining the different locations at which each Contractor provided service during the DWH spill response would be an extremely burdensome task as such information is not readily available.  Ex. 2, ¶ 12.  Third, O'Brien's should not be required to produce the phone numbers or email addresses of putative class members (a) because notice would be issued by mail –  not email or via phone notification – and there is no reason to conclude that notice by mail would be inadequate, and (b) because of privacy concerns implicit in the requested information.  *See Humphries v. Stream Int'l, Inc.*, 2004 U.S. Dist. LEXIS 20465, at *12 (N.D. Tex. Feb. 13, 2004) (not forcing defendants to give phone numbers because "there is no apparent reason to conclude that sending a letter to the person's last known address will be inadequate"); *Torres v. CSK Auto, Inc.*, No. EP-03-CA-113(KC), 2003 WL 24330020, at *3 (W.D. Tex. Dec. 17, 2003) (denying request for telephone numbers to "avoid the promulgation of confidential information"); *Aguilar v. Complete Landsculpture, Inc.*, No. 3:04-cv-0776-D, 2004 WL 2293842, at *5 (N.D. Tex. Oct. 7, 2004) (same).

## CONCLUSION

For the foregoing reasons, O'Brien's respectfully requests that the Court deny Plaintiff's Motion for Conditional Certification and Court-Authorized Notice in its entirety, or, in the alternative, conditionally certify an alternate class as set forth in Defendant's Proposed Order.

Respectfully submitted, this 22nd day of August, 2013.


/s/Keith M. Pyburn, Jr.
KEITH M. PYBURN, JR.
Louisiana Bar No. 10914
LARRY SOROHAN
Louisiana Bar No. 26120

**FISHER & PHILLIPS LLP**
201 St. Charles Avenue, Suite 3710
New Orleans, Louisiana  70170
Telephone:  (504) 522-3303
Facsimile:  (504) 529-3850
Email: kpyburn@laborlawyers.com
        lsorohan@laborlawyers.com

JEFFREY S. KLEIN
JONATHAN SOKOTCH
ARYEH ZUBER

**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email: jeffrey.klein@weil.com
        jonathan.sokotch@weil.com
        aryeh.zuber@weil.com


**Attorneys for Defendant O'Brien's
Response Management, L.L.C.**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010<br><br>This Document Relates to:<br><br>2:12-cv-1045-CJB-JCW | MDL No. 2179<br><br>SECTION: J<br><br>Judge Barbier<br>Mag. Judge Wilkinson |

## **CERTIFICATE OF SERVICE**

    I hereby certify that the above and foregoing Defendant O'Brien's Response Management, L.L.C.'s Opposition to Plaintiff's Motion for Conditional Certification and Court-Authorized Notice has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 22nd day of August, 2013.

                              */s/Keith M. Pyburn, Jr.*
                              KEITH M. PYBURN, JR.