# EXHIBIT 3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | * * * * | MDL NO. 02179 |
| | * | SECTION: J |
| This Document Relates to: | * * | |
| 2:12-cv-01045 | * * | JUDGE BARBIER MAG. JUDGE WILKINSON |

* * * * * * * * * * * * * * * * * * * * * * * * * *

## 28 USC §1746 DECLARATION OF CHARLIE MACLAY

I, Charlie Maclay, declare as follows:

1.  The facts contained within this declaration are within my personal knowledge and are true and correct.

2.  On July 1, 2010, I contracted with O'Brien's Response Management Inc. to provide service on the Deepwater Horizon ("DWH") oil spill response, by signing a contractor agreement, called a Teaming Agreement, which is attached. I was told by O'Brien's up front that I would not be considered a regular employee. I understood my relationship to be temporary and on an independent contractor basis. I believed the project would last only a couple of months, depending upon the extent of the spill.

3.  Prior to this project, I had decades of experience with my company Maclay Construction, Inc. In that job, I contracted for and managed all facets of dozens of construction contracts each year. These contracts covered everything from clearing land, to construction, to sale of finished property. I coordinated the work of various subcontractors while also conducting

quality assurance functions. I also acted as coordinator of daily activities such as purchasing of materials and scheduling of times for tasks. I also developed strong expertise in managing project compliance issues related to permitting and licensing.

4. When I contracted with O'Brien's, my first assignment was as Supervisor in Mechanical Operations in Pensacola, Florida. This assignment was run out of the incident command post in Mobile, Alabama ("ICP Mobile"), one of several posts established by the United States Coast Guard ("USCG") pursuant to the Incident Command System ("ICS"), the organizational structure used by the federal government to execute the oil spill response efforts. In this assignment, I supervised the use of mechanical equipment to clear the beach of oil. Each day we would be assigned a specific area of the beach to clean from the ICS. We then used a machine known as the "beach tech", which was not provided by O'Brien's, to gather the oil.

5. The beach tech was operated by a team of non-O'Brien's affiliated contractors. The machine sifted sand and, in doing so, separated oil from it. Each team also included safety officers and environmental compliance personnel. My experiences in the operation of different types of heavy equipment and in its use on large-scale projects enabled me to effectively manage the quality and safety of similar operations on the DWH oil spill response.

6. In this assignment, I often contacted ICP Mobile to report on daily activities. ICS gave me assignments with instructions indicating when and where certain activities were to be conducted. Although I performed my work in conformity with all instructions given, out in the field, I then had the freedom to determine how best to accomplish the assigned task without consistent monitoring. Each day, there would be a meeting among ICS staffers from O'Brien's, BP and various contractors. At the meeting, persons from each entity would provide details on

2

what happened in the prior shift. This included information such as the amount of oil collected or a discussion of any injuries.

7. After completing this work in Pensacola, I believed my contract would end. However, the assignment continued, as the beach unit was a mobile one that then moved to various other beaches in the region. These included areas such as Destin, Perdido Key, and Fort Walton Beach, in Florida. We received daily assignments from the ICS.

8. When my unit worked in areas such as Eglund AFB or Perdido State park, in addition to performing the tasks assigned by the ICS, we needed to comply with some directives from federal and/or state governmental authorities. Much as I had ensured compliance with licenses in my construction job, on this assignment I ensured compliance with the directives of federal and/or state officials. I also worked with these authorities to iron out certain compliance issues experienced by other contractor companies. By way of example, when at Eglund, certain areas would be considered off limits or require specialized work rules because they took place on a military base.

9. The clean-up equipment we used was provided to us by BP. That is, BP owned the equipment or rented it. When at Eglund, one of the other contractors developed an improved oil sifter that became known as the Sand Shark. The Sand Shark could go deeper into the sand for cleaning oil.

10 The Sand Shark was later used for the DWH oil spill clean-up. Ultimately, BP, operating on behalf of the ICS and subject to the ultimate authority, direction, and control of the federal government, ordered approximately eight of these machines for deeper cleaning. When they arrived, I worked on the teams testing the new machines to work out any mechanical

3

problems. Once again, my skills and experience with all types of heavy machinery enabled me to effectively troubleshoot on this assignment.

11.     At approximately Thanksgiving 2010, the ICS determined that my focus would shift to deep cleaning on the beaches. On this assignment, the ICS divided the beaches into segments with an area of 600 feet by 200 feet. Excavators on these areas were asked to dump sand into dump trucks. The sand was then sifted and cleaned of oil. On this assignment, specialized personal protective equipment such as goggles was provided by BP on behalf of the ICS. I was responsible for delegating the various tasks associated with this assignment. I was not trained in this by O'Brien's, but rather, had the freedom to determine how best to accomplish the assignment, subject to ICS direction and oversight. I worked with the contractor companies (who provided the crew) on the DWH spill response in the same manner as I would manage contractors on construction projects.

12.     Throughout 2010, I reported to various persons in the ICS, some of whom were with O'Brien's personnel, and some of whom were not. In general, my assignments would be given at the periodic meetings with the federal government, BP and O'Brien's personnel as discussed above, all of whom were working within the ICS organizational structure subject to the ultimate authority, direction, control and supervision of the federal government. For day-to-day operations issues, I relied on my own initiative and experience in completing the assignment, subject to the ICS instructions given to me by my superiors, or by federal officials like the USCG, and I performed my work in conformity with all instructions given.

13.     Given the long term nature of the DWH oil spill response assignment, O'Brien's converted me into a temporary employee in January 2011.

4

14. My accommodations were paid for by BP. In short, I would contact a hotel and tell them that I worked for BP on the spill clean-up. They would then give me a room for two weeks at a time on a BP account. On behalf of the ICS, BP also paid for on-site meals for me and the crews of workers.

I declare under penalty of perjury that the foregoing is true and correct. I have given this statement voluntarily and of my own free will.

Executed on the 6 day of March 2013.

Charlie Maclay

## RESPONSE MANAGEMENT
## TEAMING AGREEMENT

This Agreement is between O'Brien's Response Management Inc. (O'Brien'sRM) (referred to collectively as Company), and <u>Charlie Maclay</u> (referred to as Contractor). In consideration of the mutual benefits derived herefrom, the parties, intending to be legally bound, covenant and agree as follows.

Company is principally engaged in the business of providing emergency preparedness and response management services to its clients. Company wishes to utilize Contractor to assist Company in providing these services, and Contractor agrees to support the Company, under the terms and conditions herein provided. Such services include, but are not limited to, staffing of Incident Command System positions at selected emergency events, conducting training courses, participating in and/or facilitating exercises and other similar consulting services as mutually agreed to by both parties. Contractor understands that Company is not obligated to request Contractor's services and Company understands that Contractor may refuse Company's request for services, if Contractor is not available.

Remuneration for services rendered as part of this Agreement will be at a rate of <u>$ TBD</u> per hour/day for consulting plus reasonable out-of-pocket expenses, and/or <u>$500</u> per day for responses plus reasonable out of pocket expenses. Rates may be changed annually upon 30 days written notice. Contractor will invoice Company within 10 days of project completion and will include receipts for all expenses. Company will provide all billing to the client and distribute to Contractor upon receipt of fees and expenses from the client. Company will provide general liability insurance as required by the client and Contractor will provide workers compensation insurance for its employees. Contractor will be responsible for all wages, salaries and benefits of its employees.

Contractor agrees that any proprietary and confidential information that results from all work covered by this agreement will be held in strict confidence for at least five years beyond the termination of this Agreement and may not be used for any purpose other than fulfillment of Contractor's responsibilities. Contractor also agrees not to solicit or sell services substantially similar to that provided by Company to Company's clients for the term of this agreement and for a period of one year thereafter.

This Agreement is a continuing (evergreen) commitment with no set termination. It does not bind either party to a joint venture, partnership, or any other type of formal business entity. It also does not make either party an employee of the other. For the sake of good order, Contractor will keep Company apprised of information needed for maintaining Contractor's Statement of Qualifications. Either party may terminate this Agreement with at least 60 days prior written notice to the other party.

COMPANY:
By: _____
Name: K. Tim Perkins
Title: C.E.O.
Company: O'Brien's Response Management Inc.
Date: 7/23/10

CONTRACTOR:
By: _____
Name: Charles A. Maclay
Title: _____
Company: _____
Date: July 1st 2010

Teaming Agreement

March 2009