# EXHIBIT 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | * * * * | MDL NO. 02179 |
| | * | SECTION: J |
| This Document Relates to: | * * | |
| 2:12-cv-01045 | * * | JUDGE BARBIER MAG. JUDGE WILKINSON |

## 28 USC §1746 DECLARATION OF WILLIAM COLEMAN

I, William Coleman, declare as follows:

1. The facts contained within this declaration are within my personal knowledge and are true and correct.

2. In July 2010, I contracted with O'Brien's Response Management Inc. to provide services on the Deepwater Horizon ("DWH") oil spill response. I signed a contractor agreement, called a Teaming Agreement, at that time, which is attached. I understood my relationship to be temporary and on an independent contractor basis. When I started on this project, I believed the work on the DWH oil spill response would last a few months.

3. I began work at O'Brien's through solicitation by Duane Miller. Mr. Miller was aware of my extensive experience and expertise handling environmental compliance issues and managing teams of employees.

4. Prior to contracting with O'Brien's, I was retired. Prior to that, I worked for Monsanto in a variety of positions over a forty-year period. My job there began in the lab tech

position in Florida. Ultimately, I was promoted to foreman and supervisor. By 1985, I had become Night Manager at the plant. In this job, I supervised and directed approximately 400 employees.

5. In 1991, I began working in the environmental department at Monsanto. Among other duties, my job included overseeing day-to-day environmental compliance in operations. I also worked with crews conducting clean-up and proper disposal of hazardous materials in the event of chemical spills or fires. As part of this job, I twice attended specialized training courses on environmental remediation at Texas A&M. These week long courses focused on matters such as fire training and hazardous waste remediation.

6. In my job at Monsanto, I developed specialized skills in supervising and managing labor intensive projects as well as maintaining compliance with environmental standards. I used these skills frequently in my day-to-day operations on the DWH oil spill clean-up effort.

7. After I contracted with O'Brien's, my first assignment on the DWH oil spill response was acting as Oil Spill Response Organization ("OSRO") Manager in Mississippi, which was run out of the incident command post in Mobile, Alabama ("ICP Mobile"), one of several posts established by the United States Coast Guard ("USCG") pursuant to the Incident Command System ("ICS"), the organizational structure used by the federal government to execute the oil spill response efforts. On this assignment, I was responsible for managing the vast majority of contractors in the Mississippi area. I acted as go-between between these contractors and the ICS. When direction or supervision was provided over me, it came most often from Area Managers, each of whom was a BP employee but worked within the ICS organizational structure subject to the ultimate authority, direction, control and supervision of the

2

federal government. I was issued ICS assignments by my superiors, or by federal officials like the USCG, and performed my work in conformity with all instructions given, but out in the field, I was not monitored while carrying out these assignments and relied on my own skill and experience to complete them. I worked on this assignment throughout 2010.

8. As OSRO Manager in Mississippi, I also had contact with O'Brien's workers Calvin "Bud" Kline and Doug Parton, who were above me in the ICS command structure, on an as needed basis. Neither provided me much, if any, direction in how to perform my day-to-day activities. On a daily basis, assignments were generated by the ICS and communicated to me by BP workers, who were also ICS staffers. The assignments would generally describe certain goals for the day in a particular area. The tasks being performed would differ depending upon the area in which the work was being done. I decided how best to achieve these goals with little, if any, input from O'Brien's, subject to the ICS instructions given to me by my superiors, or by federal officials like the USCG, and I performed my work in conformity with all instructions given.

10. In the beginning, I worked mostly in an ICS office, fielding questions about the clean-up process from other contractors in the field. Within a few weeks, the focus of my work shifted to the field, and I then worked, on most days, in locations throughout Mississippi. For example, if I were working in Gulfport, Mississippi, I might receive a call from a contractor having an issue with someone from the state park service elsewhere. In that event, I would decide whether I could handle the issue remotely or if I needed to travel to the work location to address this issue directly with the parks service personnel.

11. Mississippi included three main staging areas: (1) Pacagoula in Jackson County; (2) Canal Road in Harrison County; and (3) Hancock County. Each area had its own unique set

of geographic features. For instance, Harrison County consists mostly of beach area. Jackson County included a great deal of marsh. With this unique geography came unique sets of environmental standards and requirements. I needed to ensure that contractors and other ICS personnel were aware of these environmental obligations and complied with them. By way of example, on the islands off the coast, digging could only be done to five inches. There were also Indian burial grounds on Ship Island that required particular care. My skills in management and environmental compliance prior to the spill aided me in overseeing compliance in these areas.

12. At the end of a day, I would fill out reports. These reports contained information requested by the ICS such as the amount of oil removed from an area or any particular events that occurred that may be out of the ordinary. The reports were submitted to and requested by BP personnel, who were working within the ICS structure and subject to the control of the federal government.

13. When I began this job, I never received any specialized training or policies from O'Brien's. Like other contractors, I received HAZWOPER (emergency response safety) training when I began work under my teaming agreement. This training did not involve instruction on any particular means by which I was to complete my assignments on a day-to-day basis.

14. Other than an identification badge for access to the site, I never received any equipment from O'Brien's. Prior to coming on the job, I was told I would need to furnish my own computer equipment. I also purchased other items for my work on the DWH spill response. For instance, I bought my own steel toe boots as required for the work. Any other necessary equipment, such as use of ATV's, were supplied by BP on behalf of the ICS.

16. For 2010, O'Brien's paid me and issued me a Form-1099 for tax purposes. The company did not subtract payroll taxes from my checks in 2010.

4

I declare under penalty of perjury that the foregoing is true and correct. I have given this statement voluntarily and of my own free will.

Executed on the 6th day of March 2013.

_William Coleman_
William Coleman

# RESPONSE MANAGEMENT
# TEAMING AGREEMENT

This Agreement is between **O'Brien's Response Management Inc.** (O'Brien'sRM) (referred to collectively as Company), and <u>Bill Coleman</u> (referred to as Contractor). In consideration of the mutual benefits derived herefrom, the parties, intending to be legally bound, covenant and agree as follows.

Company is principally engaged in the business of providing emergency preparedness and response management services to its clients. Company wishes to utilize Contractor to assist Company in providing these services, and Contractor agrees to support the Company, under the terms and conditions herein provided. Such services include, but are not limited to, staffing of Incident Command System positions at selected emergency events, conducting training courses, participating in and/or facilitating exercises and other similar consulting services as mutually agreed to by both parties. Contractor understands that Company is not obligated to request Contractor's services and Company understands that Contractor may refuse Company's request for services, if Contractor is not available.

Remuneration for services rendered as part of this Agreement will be at a rate of $ <u>TBD</u> per hour/day for **consulting** plus reasonable out-of-pocket expenses, and/or <u>$500</u> per day for **responses** plus reasonable out of pocket expenses. Rates may be changed annually upon 30 days written notice. Contractor will invoice Company within 10 days of project completion and will include receipts for all expenses. Company will provide all billing to the client and distribute to Contractor upon receipt of fees and expenses from the client. Company will provide general liability insurance as required by the client and Contractor will provide workers compensation insurance for its employees. Contractor will be responsible for all wages, salaries and benefits of its employees.

Contractor agrees that any proprietary and confidential information that results from all work covered by this agreement will be held in strict confidence for at least five years beyond the termination of this Agreement and may not be used for any purpose other than fulfillment of Contractor's responsibilities. Contractor also agrees not to solicit or sell services substantially similar to that provided by Company to Company's clients for the term of this agreement and for a period of one year thereafter.

This Agreement is a continuing (evergreen) commitment with no set termination. It does not bind either party to a joint venture, partnership, or any other type of formal business entity. It also does not make either party an employee of the other. For the sake of good order, Contractor will keep Company apprised of information needed for maintaining Contractor's Statement of Qualifications. Either party may terminate this Agreement with at least 60 days prior written notice to the other party.

COMPANY:

By: _____

Name:   K. Tim Perkins

Title:     C.E.O.

Company: O'Brien's Response Management Inc.

Date: _____

CONTRACTOR:

By: _____

Name: _William E. Coleman_

Title: _Owner / Contractor_

Company: _William E Coleman_

Date: _7/6/10_

Teaming Agreement                                                                                                                March 2009