# EXHIBIT 5

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | * * * * | MDL NO. 02179 |
| | * | SECTION: J |
| This Document Relates to: | * * | |
| 2:12-cv-01045 | * * | JUDGE BARBIER MAG. JUDGE WILKINSON |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

# 28 USC §1746 DECLARATION OF GREG GUERREIRO

I, Greg Guerreiro, declare as follows:

1. The facts contained within this declaration are within my personal knowledge and are true and correct.

2. On or around the second quarter of 2007, I contracted with O'Brien Oil Pollution Services, Inc. and its parent, the O'Brien's Group, Inc. – which companies merged and were renamed O'Brien's Response Management Inc. ("O'Brien's") in 2008 – to provide services on an independent contractor basis. Attached is a true and correct copy of the contractor agreement, called a Teaming Agreement, that I signed at that time.

3. Before contracting with O'Brien's in 2007, I was an employee of the Royal Dutch Shell Company. I worked for Shell for 30 years before retiring in 2007. For the last fifteen years of my career at Shell, I worked for the crisis and oil spill response team, responding to emergencies and oil spills. In this position, I gained valuable experience and skills that proved directly applicable to responding to the DWH oil spill.

4. On or about June of 2010, I began working on the Deepwater Horizon ("DWH") oil spill response as an independent contractor for O'Brien's. O'Brien's compensated me at a rate of $700 per day. At the end of 2010, I received a Form-1099 for tax purposes. .

5. I have my own company, GKG Consulting. I am paid directly by O'Brien's for my work as an independent contractor, but I file taxes through my company. I have never received any employment benefits from O'Brien's.

6. For the time period from June 2010 to January 1, 2011, I understood my relationship to O'Brien's to be temporary and on an independent contractor basis.

7. Prior to starting my work on the DWH oil spill response, I attended a HAZWOPER (safety) training course. A BP contractor, who was not an O'Brien's employee, ran the course. This course did not include any specific training on O'Brien's employment policies. Nor did I ever receive an employee handbook from O'Brien's, or any other similar documents, detailing employment-type policies. BP had a set of policies in place that many workers followed, including contractors such as myself.

8. After the training, I began to work immediately at the incident command post in Mobile, Alabama ("ICP Mobile"), one of several posts established by the United States Coast Guard ("USCG") pursuant to the Incident Command System ("ICS"), the organizational structure used by the federal government to execute the oil spill response efforts.

9. My work in 2010 was with ICP Mobile's operations section for Florida. At one point, I served as the Deputy Operations Section Chief for ICP Mobile's operations in that state. In that role, I supported ICP Mobile's Operations Chief, who was responsible for operations in Alabama, Florida, and Mississippi.

10. Through the ICS, Incident Action Plans ("IAPs") were prepared that contained instructions concerning the response activities that were to occur during each operating period, and therefore provided objectives for the day to me and my counterparts. The IAPs were reviewed, signed, and approved by the federal government. The assignments contained within the IAPs were communicated to the different branches of operations and then to the clean-up workers in the field, such as the people that mopped the beach and did the surveys. As part of my duties, I was a conduit to ensure that IAP instructions were properly communicated from ICP Mobile to the other contractors conducting the clean-up operations in the field. I also reported news of the executed actions, issues, and concerns back to the command post. I did this for onshore operations only.

11. During 2010, I reported to the Deputy Operations Section Chief for Florida at ICP Mobile. The person who filled that role changed over time, but it was always a BP employee or contractor, who would receive instruction from the ICS and was subject to the ultimate authority and direction of the federal government.

12. The equipment on the ground in Florida used to conduct the clean-up was provided by contractors other than O'Brien's. BP paid these contractors a daily rate for items such as ATV's or beach cleaners.

13. I was given no instruction by O'Brien's on how to perform my work during the DWH oil spill. I relied, instead, on my own skill and experiences to perform the work and engage in dialogue to solve problems, make decisions and coordinate action, subject to the ICS instructions given to me by my superiors, or by federal officials like the USCG, and I performed my work in conformity with all instructions given. Given my fifteen years of oil spill experience, when a task arose, ICS staff at ICP Mobile would consult with me on the best

3

methods for reaching objectives. I relied on this experience in communicating recommendations as well as when making day-to-day judgment calls in the field, subject to the instructions relayed in the IAPs and otherwise provided by the federal government.

14. In September 2010, I left Mobile to continue similar duties in operations in Pensacola, Florida, a position also managed by ICP Mobile. I worked in operations there until October 2010.

15. I worked on the DWH oil spill response again from February to March of 2011. For eight weeks, I worked as the Deputy Planning Section Chief in Biloxi, Mississippi. I worked with the group that, on a daily basis, developed the IAPs for the field crews to execute, and was able to perform these duties because of my skill and experience in the field of spill response work. The Planning Section Chief was my supervisor. Two different people served in that role during this period; my best recollection is that neither of these people worked for O'Brien's.

16. I never received any equipment from O'Brien's to conduct my work on the DWH oil spill response.

17. During my work in Mobile, Alabama, I stayed at the Homewood Suites hotel. BP paid for my stay directly. During my time in Pensacola, I stayed at the Hilton Garden Inn. I believe BP paid directly for that stay as well– O'Brien's did not pay for it.

18. I do not recall submitting to a drug test during my time working on the DWH oil spill response. My understanding was that I was subject to BP's drug policy, which could include a random drug test.

I declare under penalty of perjury that the foregoing is true and correct. I have given this statement voluntarily and of my own free will.

Executed on the ____ day of March 2013.

_____
Greg Guerreiro

5

# RESPONSE MANAGEMENT
# TEAMING AGREEMENT

This Agreement is between **O'Brien Oil Pollution Service, Inc.** (OOPS) and its parent, **The O'BRIEN'S Group, Inc.**, (referred to collectively as Company), and _GREGORY K. GUERRERO_ (referred to as Contractor). In consideration of the mutual benefits derived herefrom, the parties, intending to be legally bound, covenant and agree as follows.

Company is principally engaged in the business of providing emergency preparedness and response management services to its clients. Company wishes to utilize Contractor to assist Company in providing these services, and Contractor agrees to support the Company, under the terms and conditions herein provided. Such services include, but are not limited to, staffing of Incident Command System positions at selected emergency events, conducting training courses, participating in and/or facilitating exercises and other similar consulting services as mutually agreed to by both parties. Contractor understands that Company is not obligated to request Contractor's services and Company understands that Contractor may refuse Company's request for services, if Contractor is not available.

Remuneration for services rendered as part of this Agreement will be at a rate of $ _600_ per hour/day for **consulting** plus reasonable out-of-pocket expenses, and/or $ _700_ per day for **responses** plus reasonable out of pocket expenses. Rates may be changed annually upon 30 days written notice. Contractor will invoice Company within 10 days of project completion and will include receipts for all expenses in excess of $25.00. Company will provide all billing to the client and distribute to Contractor upon receipt of fees and expenses from the client. Company will provide general liability insurance as required by the client and Contractor will provide workers compensation insurance for its employees. Contractor will be responsible for all wages, salaries and benefits of its employees.

Contractor agrees that any proprietary and confidential information that results from all work covered by this agreement will be held in strict confidence for at least five years beyond the termination of this Agreement and may not be used for any purpose other than fulfillment of Contractor's responsibilities. Contractor also agrees not to solicit or sell services substantially similar to that provided by Company to Company's clients for the term of this agreement and for a period of one year thereafter.

This Agreement is a continuing (evergreen) commitment with no set termination. It does not bind either party to a joint venture, partnership, or any other type of formal business entity. It also does not make either party an employee of the other. For the sake of good order, Contractor will keep Company apprised of information needed for maintaining Contractor's Statement of Qualifications. Either party may terminate this Agreement with at least 60 days prior written notice to the other party.

| COMPANY: | CONTRACTOR: |
|---|---|
| By: _/s/_ | By: _/s/_ |
| Name: K. Tim Perkins | Name: G. K. GUERRERO |
| Title: CEO | Title: |
| Company: The O'BRIEN'S Group Inc. | Company: |
| Date: 2/20/07 | Date: 2/20/07 |