# EXHIBIT 8

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | * MDL NO. 02179 * * * * SECTION: J |
| This Document Relates to: | * * |
| 2:12-cv-01045 | * JUDGE BARBIER * MAG. JUDGE WILKINSON |

* * * * * * * * * * * * * * * * * * * * * * * *

## 28 USC §1746 DECLARATION OF BENNETT SIMAR

I, Bennett Simar, declare as follows:

1. The facts contained within this declaration are within my personal knowledge and are true and correct.

2. In 2008, I contracted with O'Brien Oil Pollution Services, Inc. and its parent, the O'Brien's Group, Inc. – which companies merged and were renamed O'Brien's Response Management Inc. ("O'Brien's") in that same year – to provide services on an independent contractor basis. Attached is a true and correct copy of the contractor agreement, called a Teaming Agreement, that I signed at that time. Around May of 2010, I started providing services on the Deepwater Horizon ("DWH") oil spill response. O'Brien's compensated me for the time that I worked on the DWH response at a rate of $600 per day. I have never received any employment benefits from O'Brien's.

3. Up until January 1, 2011, I always understood my relationship to O'Brien's to be temporary and on an independent contractor basis. Given the long term nature of the DWH oil spill response assignment, O'Brien's converted me into a temporary employee in January 2011.

4. I always understood that I was free to work as an independent contractor for other companies during and after my time working with O'Brien's.

5. Prior to contracting with O'Brien's to work on the DWH oil spill response, I spent 43 years working for oil and recovery contractors. I have extensive experience responding to oil spills and environmental emergencies. For the past five years, I have sporadically provided service for O'Brien's as an independent contractor on short term assignments for approximately the two years before the DWH oil spill response, and also after the DWH spill response. I would consult on oil spill and coal ash clean up efforts, including consulting about the best method and equipment for spill responses and the number of people needed. These projects including post-Katrina clean-up, offshore response, and coal ash clean-up in Tennessee.

6. I already had HAZWOPER certification prior to starting my work on the DWH oil spill response. I was not given any training in preparation for my work. Nor did I ever receive an employee handbook from O'Brien's, or any other similar documents, detailing employment-type policies.

7. I began working on the DWH oil spill response in Houma, Louisiana, completing air reconnaissance fly-overs. My position was run out of the incident command post in Houma, Louisiana ("ICP Houma"), one of several posts established by the United States Coast Guard ("USCG") pursuant to the Incident Command System ("ICS"), the organizational structure used by the federal government to execute the oil spill response efforts. In that role, I did not supervise anyone. I worked with members of the USCG, other contractors, and BP, to monitor oil movement and clean-up efforts, subject to the ICS instructions.

8. Around June of 2010, I went to Port Fourchon, Louisiana, to oversee the decontamination of equipment, including barges, vessels, skimmers, and boats, a position also

run out of ICP Houma. I knew the industry standards for decontamination based on my previous experience, and I oversaw the implementation of those standards, subject to the ICS instructions given to me by my superiors. In that role, I also served as the "eyes and ears" of the ICS on the ground. I confirmed that documented equipment was there, that it had been properly cleaned, that it had been certified clean by the USCG, and that it had been returned to the correct contractor. Because BP was renting the equipment from contractors, I would also keep track of the owner of the equipment being used. I created written reports that detailed every piece of equipment and foot of boom decontaminated.

9. Around August of 2010, I became the SCAT ("Shoreline Clean-up Assessment Team") Operations Liaison for Port Fourchon. These operations were also run out of ICP Houma. SCAT teams developed STRs, formal work plans detailing the method and area of clean-up efforts. The plans were put together by USCG workers, BP workers, biologists, and environmental specialists, and would need to be reviewed and approved by the USCG. My assignment was to ensure that STRs were followed to the fullest extent practicable, and I oversaw work in the field. When responders were unable to follow a STR, I brought that back to the Operations Section and worked with them to develop a new plan.

10. I was given no instruction by O'Brien's on how to perform my work during the DWH oil spill response and relied on my own skill and experiences to perform the work. The ICS gave me assignments and told me where and when to accomplish them, but I was given the freedom to determine how to accomplish the assigned task, subject to the ICS instructions given to me by my superiors, or by federal officials like the USCG, and I performed my work in conformity with all instructions given.

11.     I brought my own computer equipment, mobile phone, camera and vehicle to the DWH oil spill response job after contracting with O'Brien's. I never received any equipment from O'Brien's to conduct my job.

12.     I took a random drug test during my time working on the DWH oil spill response, which was required by BP.

I declare under penalty of perjury that the foregoing is true and correct. I have given this statement voluntarily and of my own free will.

Executed on the 11th day of March 2013.

_____
Bennett Simar

FROM : KIM & JOANN RICHARD          FAX NO. : 337 886 6819          Mar. 28 2008 08:44AM P2

# RESPONSE MANAGEMENT
# TEAMING AGREEMENT

This Agreement is between O'Brien Oil Pollution Service, Inc. (OOPS) and its parent, The O'BRIEN'S Group, Inc., (referred to collectively as Company), and Bennett Simar (referred to as Contractor). In consideration of the mutual benefits derived herefrom, the parties, intending to be legally bound, covenant and agree as follows.

Company is principally engaged in the business of providing emergency preparedness and response management services to its clients. Company wishes to utilize Contractor to assist Company in providing these services, and Contractor agrees to support the Company, under the terms and conditions herein provided. Such services include, but are not limited to, staffing of Incident Command System positions at selected emergency events, conducting training courses, participating in and/or facilitating exercises and other similar consulting services as mutually agreed to by both parties. Contractor understands that Company is not obligated to request Contractor's services and Company understands that Contractor may refuse Company's request for services, if Contractor is not available.

Remuneration for services rendered as part of this Agreement will be at a rate of $500.00 per day for consulting plus reasonable out-of-pocket expenses, and/or $600.00 per day for responses plus reasonable out of pocket expenses and $250.00 per MMS Drill plus reasonable out of pocket expenses when applicable. Rates may be changed annually upon 30 days written notice. Contractor will invoice Company within 10 days of project completion and will include receipts for all expenses in excess of $25.00. Company will provide all billing to the client and distribute to Contractor upon receipt of fees and expenses from the client. Company will provide general liability insurance as required by the client and Contractor will provide workers compensation insurance for its employees. Contractor will be responsible for all wages, salaries and benefits of its employees.

Contractor agrees that any proprietary and confidential information that results from all work covered by this agreement will be held in strict confidence for at least five years beyond the termination of this Agreement and may not be used for any purpose other than fulfillment of Contractor's responsibilities. Contractor also agrees not to solicit or sell services substantially similar to that provided by Company to Company's clients for the term of this agreement and for a period of one year thereafter.

This Agreement is a continuing (evergreen) commitment with no set termination. It does not bind either party to a joint venture, partnership, or any other type of formal business entity. It also does not make either party an employee of the other. For the sake of good order, Contractor will keep Company apprised of information needed for maintaining Contractor's Statement of Qualifications. Either party may terminate this Agreement with at least 60 days prior written notice to the other party.

COMPANY:
By: _(signature)_
Name: K. Tim Perkins
Title: CEO
Company: The O'BRIEN'S Group Inc.
Date: 3/28/08

CONTRACTOR:
By: _(signature)_
Name: BENNETT K SIMAR
Title: Consultant
Company: _____
Date: 3/28/08

Teaming Agreement                                                                 May 2004