UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | | |
|---|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater | : | MDL No. 2179 |
|          Horizon" in the Gulf of Mexico, on | : | |
|          April 20, 2010 | : | SECTION: J |
| | : | |
| This Document Relates To: All Actions | : | JUDGE BARBIER |
| | : | MAGISTRATE JUDGE |
| ……………………………………………... | : | SHUSHAN |

**BP'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF DR. NATHAN BUSHNELL**

Dr. Nathan Bushnell, the United States' expert in Computational Fluid Dynamics ("CFD"), should not be permitted to serve as a relied-upon non-testifying expert in this litigation. Not only does Dr. Bushnell lack expertise in CFD modeling of multiphase hydrocarbons, but he also made critical errors in the construction of his CFD model that render his opinions irrelevant, unreliable, and inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

**PROCEDURAL BACKGROUND**

This *Daubert* motion to exclude the opinions and testimony of Dr. Bushnell — filed one week after the United States disclosed that its experts would seek to rely on his testimony at trial — is timely.

Though Dr. Bushnell will not testify live at trial, the United States one week ago designated Dr. Bushnell as a non-testifying reliance expert. *See* August 16, 2013 email from S. Cernich identifying Dr. Bushnell as a relied-upon witness for the deposition bundle list); *see* Order Regarding Presentation of Evidence in Phase 2 Trial, at ¶ 3(i) (Rec. Doc. 11087, at 7) (attached as Exhibit 1).  BP has separately challenged the propriety of this designation as no United States expert has, in fact, relied upon Dr. Bushnell's opinions in forming or supporting

their own respective opinions or conclusions.  *See* Letter from R. Gasaway to Judge Shushan (August 23, 2013).  The United States has improperly characterized that motion as a "late motion *in limine*."  Comments from S. Himmelhoch at Working Group Conference (Aug. 23, 2013) (transcript not yet available).  On the contrary, BP's August 23, 2013 letter raised an issue regarding deposition bundle designations for which there is no deadline for raising objections.

*This motion* is our "motion *in limine*" regarding Dr. Bushnell, and it is timely.  The Court established a staggered schedule for filing *Daubert* motions.  Due last Monday, August 19, 2013, were *Daubert* motions for experts disclosed by the parties by August 10, 2013.  Due last Wednesday, August 21, 2013, were *Daubert* motions for experts disclosed by the United States (or the Aligned Parties) on Wednesday, August 14, 2013.  Working Group Conference Tr., at 38-39 (Aug. 9, 2013) (Attached as Exhibit 2).  The Court's schedule thus provided at least a week between disclosure of an expert witness and the due date for any *Daubert* motions related to that expert.

On August 14, all parties disclosed their deposition bundle selections.  As the Court knows, relied-upon non-testifying experts must have their depositions designated.  Order Regarding Presentation of Evidence in Phase 2 Trial, at ¶ 3(i) (Rec. Doc. 11087, at 7) ("[T]he presenting party must designate the relied-upon experts' deposition as one of its 20 allotted deposition bundle submissions.")  Accordingly, BP and Anadarko identified each of its three relied-upon non-testifying experts by name.

The United States did not disclose Dr. Bushnell on August 14 as part of its deposition designations, however.  The United States argued that it was not yet obligated (and still argues it is not yet obligated) to disclose any relied-upon non-testifying experts — although the United States has not stated when that disclosure, in its view, should occur.  The Court disagreed with

the United States, and on Friday, August 16, 2013, at 3 pm Central time, the United States — as directed by the Court — disclosed Dr. Bushnell as a relied-upon non-testifying expert. Ex. 1.

Under the Court's staggered schedule for filing *Daubert* motions, BP files this motion to exclude Dr. Bushnell's testimony under *Daubert* exactly one week after the United States disclosed that its testifying experts would seek to rely at trial on Dr. Bushnell's opinions. The United States' decision to transgress the agreed disclosure schedule by two days does not effectively shorten the opportunity to challenge the reliability of Dr. Bushnell's opinions.

Further, by the United States' own argument, it is not required even to have disclosed Dr. Bushnell at this point. The United States cannot logically claim that BP's motion to exclude Dr. Bushnell's unreliable opinions is untimely under a constrictive (and incorrect) interpretation of the Court's deadlines, which the United States has transgressed and with which it does not agree.

## FACTUAL BACKGROUND

Dr. Bushnell has offered Quantification-related opinions using computational fluid dynamics ("CFD"). CFD is a branch of fluid mechanics that uses numerical techniques to solve equations describing the motion of fluids. *See* Initial Report of Dr. Nathan Bushnell (March 22, 2013) at 9 (attached as Exhibit 3). The equations are derived from fundamental laws of physics, namely the conservation laws of mass, momentum, and energy. *Id*. The CFD model solves these equations using a three-dimensional space that represents the physical geometry of the system in which the fluid flow occurs. *Id*. at 10, 11, 12.

A CFD model can accurately calculate the flow rate of the liquid oil and gas through the Capping Stack, but only if the building blocks of the model are correct. Because the gas and oil

3

that flowed in the Capping Stack are two distinct "phases," it is crucial to make four key modeling decisions.

*First*, the modeler must decide whether to model a gas/liquid multiphase fluid as a homogenous mixture (meaning that the oil and gas phases move together) or as a heterogeneous mixture (meaning that the oil and gas move at different velocities, which allows for what is referred to as "slip"). *See id.* at 16. Slip between the phases can effect, and in fact reduce, the flow rate. *See* Bushnell Dep. ("Dep.") (attached as Exhibit 4) at 206:18-207:4.

*Second*, if a modeler chooses to use a heterogeneous mixture (for instance, in order to assess the slip velocity of the phases), another decision, in turn, is to determine the "flow regime" for the fluid. For purposes of a heterogeneous multiphase CFD model, the flow regime means that the liquid and gas flowing through the Capping Stack is either "droplet flow" (meaning oil droplets suspended in gas) or a "bubbly flow" (meaning gas bubbles suspended in oil). *See* Report at 55, 71; Dep. at 358:11-359:20, 359:21-360:2. The choice of flow regime — droplets or bubbles — is a crucial analytical decision that can affect the flow rate, as the underlying physics of the fluid flow will be different. *See* Dep. at 362:12-363:11, 358:22-360:2. Additionally, the modeler must then select the correct size of the droplets or bubbles to model. Larger droplets will tend to reduce the rate of flow; smaller droplets will tend to increase the rate of flow. *See* Rebuttal Report of Dr. Bushnell (June 10, 2013), at 18 ("which would reduce the droplet size and result in an increased oil flow rate") (Attached as Exhibit 5); Dep. at 362:12-363:11.

*Third*, the modeler must prepare a model that accounts for "gas evolution," meaning the process by which gas dissolved in the oil comes out of solution as the pressure decreases. *See*

Report at 17.  Failing to allow for gas evolution will artificially increase the flow rate of oil.  *See, e.g.*, Dep. at 249:10-15.

***Finally***, to accurately model the flow rate of a multiphase fluid, it is important to use the correct fluid temperature.  *See id*. at 267:12-15, 273:1-13.  As temperature increases, flow rate decreases, because the dissolved gas will evolve from the oil — thereby reducing the relative amount of oil.

In summary, to prepare a correct CFD model for a "multiphase fluid" — like the gas and oil mixture that flowed in and out of the Capping Stack — the modeler must:  (1) use a heterogeneous model in order to calculate the effect of slip on the flow rate, (2) determine the correct flow regime of the fluid (droplets or bubbles) for that heterogeneous model, (3) prepare a heterogeneous model that allows the gas to evolve out of the oil, and (4) select a temperature that reflects the conditions being modeled.

## ARGUMENT

Dr. Bushnell is not an expert in the area of multiphase computational fluid dynamics ("CFD") for hydrocarbons, and he has failed to prepare a model to correctly address *any* of the four crucial components of a multiphase heterogeneous model discussed above.  Yet, each and every one of these four components is essential to creating a CFD model that can reliably predict the behavior and rate of the two-phase oil and gas flow in the Capping Stack.  Dr. Bushnell's analysis is so flawed and unreliable as to be of no assistance to the Court.  Accordingly, the Court should neither rely on his opinions nor the statements by other United States experts referencing Dr. Bushnell in alleged support of their own respective opinions.

As the proponent of the expert testimony at issue, the United States bears the burden to establish the admissibility of Dr. Bushnell's proffered opinions regarding the character and

amount of the flow from the Capping Stack, as modeled using CFD.  *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).  Expert testimony may only be admitted into evidence if it survives a trilogy of restrictions.  ***First***, the expert must be qualified to testify regarding the matters he or she intends to address.  A qualified expert possesses "specialized knowledge," the basis of which can be "skill, experience, training, or education."  *United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009).  ***Second***, the expert's testimony must be reliable; that is, it "must be 'ground[ed] in the methods and procedures of science' and 'more than subjective belief or unsupported speculation.'"  *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 389 (5th Cir. 2009).  ***Finally***, the expert's testimony must fit the case at hand by providing relevant information that will assist the court in making its decision.  *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352-355 (5th Cir. 2007).

## I.     Dr. Bushnell Lacks Expertise in CFD Modeling of Multiphase Hydrocarbons.

Dr. Bushnell's deposition testimony demonstrates that he is a novice in the application of CFD to multiphase hydrocarbon flows.  Nothing about Dr. Bushnell's education or professional experience qualifies him as a CFD expert in the subject at issue here — the two-phase flow of oil and gas through complex geometries like the Capping Stack.  As a graduate student, Dr. Bushnell barely scratched the surface of CFD, taking only one course which addressed CFD theory, primarily as applied to inapplicable single-phase flow (*id.* at 64:21-25), and one course which, only in part, addressed multiphase flow (*id.* at 62:24-63:20).  Notably, Dr. Bushnell never took a course that specifically addressed multiphase oil and gas or the application of CFD modeling to the behavior of such fluids.  *Id.* at 65:14-16.

Nor has Dr. Bushnell gained any significant knowledge or experience regarding how to model multiphase hydrocarbons as a CFD consultant at SimuTech.  In the six years he has been employed at SimuTech, Dr. Bushnell has worked on ***only four*** projects related to the oil and gas

industry, and *only two* which involved modeling multiphase hydrocarbon flow. *Id*. at 58:14-19, 410:3-414:11 (the other two of these four projects involved nuclear sludge and wastewater from a fracking operation).

Indeed, Dr. Bushnell's lack of experience in modeling multiphase hydrocarbons is clear from his expert report and testimony in this case. Before this case, Dr. Bushnell had never before identified a flow regime (droplet or bubbly flow) using a common technique for identifying the flow regime called "flow regime maps" *(id.* at 119:24-120:5), though he admitted that flow regime maps are a "standard way" of determining the flow regime *(id.* at 115:10-12).

Determining the particle size is critical to accurately modeling the flow in a heterogeneous model, but Dr. Bushnell has only calculated bubble sizes twice before *(id.* at 86:16-87:2) and droplet sizes only once before — for thesis work involving milk evaporation *(id*. at 86:16-87:9). Finally, Dr. Bushnell admitted that he could not model the important phenomenon of gas evolution, discussed above, in a heterogeneous CFD model. *See id.* at 371:2-21. These deficits in Dr. Bushnell's experience and understanding resulted in serious methodological errors that render his opinions unreliable.

**II.     Dr. Bushnell's CFD Analysis Is Critically Flawed and Unreliable.**

Having no expertise to draw upon, Dr. Bushnell committed multiple errors in his CFD analysis. Under *Daubert*, "the expert's testimony must be reliable at each and every step or else it is inadmissible." *Knight*, 482 F.3d at 354-55. "[A]ny step that renders the analysis unreliable ... renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Moore*, 151 F.3d at 279 n.10 (emphasis in original); *Paz*, 555 F.3d at 388.

7

### A.     Dr. Bushnell Cannot Support His Opinion That the Temperature of the Flow Is 200ºF.

As discussed above, one of the key inputs for a CFD model of a multiphase flow is temperature. Dep. at 428:7-15. Use of a value that is lower than the actual temperature of the flow will under-predict the amount of gas released from the liquid oil, and thus will over-predict the flow rate. *See* Dep. at 273:1-13. Despite the existence of actual measurements of a higher temperature taken during the response, Dr. Bushnell *selected* a temperature of 200ºF provided by counsel for the United States. *Id.* at 270:4-9 ("I needed temperature as an input, so I was informed [by counsel] that 200 was a reasonable number.").

Dr. Bushnell did nothing to independently confirm the reasonableness of this temperature value. By his own admissions, Dr. Bushnell is not qualified to opine regarding what is, or is not, a reasonable temperature for the flow from the well. Dep. at 100:20-22, 255:19-22, 257:20-22. To Dr. Bushnell, temperature is merely an input that he accepts from other sources, without question, *id.* at 257:15-16, 435:11-23, and has "[no] way to evaluate whether [200ºF] would be too high or too low," *id.* at 433:18-434:9.

Even after Dr. Bushnell became aware of actual temperature measurements, he did not take these measurements into account — although he admits that he could have, and should have, done so. *See id.* at 281:9-282:4. In fact, there is no scientific basis for Dr. Bushnell's opinion that 200ºF is a "reasonable" temperature. Dr. Bushnell's selection of 200ºF affects every aspect of his flow rate analyses, as temperature is an input to his model, and thus taints the reliability of all of his output calculations.

### B.     Dr. Bushnell Was Unable to Model Two Key Aspects of Multi-Phase CFD at the Same Time.

As discussed above, pressure loss due to the friction (the "slip") between the oil and gas phases and the evolution of gas from the oil are two key aspects of multiphase CFD. Dr.

8

Bushnell selected a simplified "homogeneous" model — where oil and gas move at the same velocity — that failed to capture the pressure loss due to the friction (the "slip") between the oil and gas phases. *Id.* at 206:2-17. Dr. Bushnell chose this simplified model because, according to him, his CFD computer modeling program, ANSYS CFX, did not allow him to include mass transfer (that is, gas evolution) while at the same time using a heterogeneous model to analyze slip. *Id.* at 370:19-371:21; Report at 17, 55.

Dr. Bushnell admitted, however, that the computer program he used is capable of modeling gas evolution and slip simultaneously, but the modeler must have sufficient knowledge of the program to create custom computer code — something Dr. Bushnell could not confirm he is capable of doing. *See id.* at 371:12-21; *see also id.* at 247:10-12, 375:3-18. This lack of proficiency in CFX demonstrates that Dr. Bushnell is by no means an expert in modeling multiphase flow. Dr. Bushnell's failure to employ the "intellectual rigor" necessary to build a model that accounts for *both* of the important elements of gas evolution and slip renders his opinions irrelevant and unreliable. *Knight*, 482 F.3d at 352-55; *see also Kumho Tire*, 526 U.S. at 152.

### C. Dr. Bushnell Committed Critical Errors in Identifying the Flow Regime.

As discussed above, identifying the "flow regime" is a key aspect of multi-phase CFD modeling. Dr. Bushnell committed three critical errors in his attempt to identify the proper flow regime. These errors involve the application of something called a "flow regime map." A flow regime map is a tool that helps determine what the flow regime is (bubbly or droplet). These "maps" are an X-Y axis with properties of the fluid plotted on the different axes — usually the gas phase on one axis and the liquid phase on the other. *See, e.g.*, Rebuttal Report at 37-43. These maps are used to assist the modeler in selecting an appropriate flow regime (bubbly or droplet) for the flow.

9

Dr. Bushnell made three key errors using flow regime maps.  ***First***, Dr. Bushnell wrongly applied a series of flow regime maps, leading to his erroneous conclusion that the flow regime was "bubbly" instead of "droplet" flow.  He made this error by applying so-called "correction factors."  He applied these so-called corrections in an attempt to adjust the published flow regime maps to account for the physical properties of the Macondo reservoir fluid.  *See* Dep. at 134:3-15.  But the correction factors he employed were only developed for *horizontal* pipe, while the flow regime maps he was using were developed for *vertical* pipes (like those comprising part of the Capping Stack).  *See e.g.*, *id.* at 136:4-6 (Hewitt & Roberts map), 163:25-164:2 (Brennan map), 171:20-22 (Griffith map), 179:24-180:2 (Taitel et al. map).

Dr. Bushnell acknowledged in his Rebuttal Report that the correction factors he used apply to horizontal pipes — not vertical pipes like those in part of the Capping Stack.  *See* Rebuttal Report at 37.  And at his deposition, Dr. Bushnell did not identify any source in the literature to support his application of these horizontal-pipe correction factors to any of the vertical pipe flow regime maps he prepared in his initial and rebuttal reports.  Tellingly, Dr. Bushnell admitted that the specific literature he reviewed in this case, and which makes him an "expert," did not recommend applying the correction factors to these pipes.  *See e.g.*, *id.* at 86:5:-11; 114:15-18; 144:18-144:22; 163:5-15; 181:25-182:3.

***Second***, Dr. Bushnell admitted that he erroneously calculated a term in his application of another flow regime map that he prepared, called the "Fair" map.  *See id.* at 292:16-293:11.  One of the terms used in plotting on the Fair flow regime map is viscosity, but Dr. Bushnell raised the viscosity value to an incorrect power.  *Id.*  When plotted with the correct power for the viscosity term, the Fair flow regime map did not predict bubbly flow.  *Id.* at 162:20-25.

10

***Third***, Dr. Bushnell used the flow regime maps from Taitel, Barnea, and Dukler (referred to herein as "Taitel") without having read the paper describing how to apply their flow regime maps.  *Id.* at 186:6-187:7.  Had he actually read the paper, Dr. Bushnell would have understood that he could not just arbitrarily select a flow regime map from the paper and use it, which is, in fact, what he did.  *Id.* at 186:17-186:19 ("Q. Did you read the [Taitel] paper before you prepared the flow regime map? A. Not fully, no."); 186:23-186:25 ("Q. Is it possible that what you did was just pick a flow regime map and then use it? A. Yes.").  Rather, the paper describes equations that must be solved in order to prepare the flow regime maps, and in particular, the transition to a droplet flow regime referred to as "annular flow."  *See id* at 193:12-19.  But Dr. Bushnell testified that he never read the portion of the paper describing the need to solve these equations.  *Id.* at 182:13-21.

In sum, because of his improper application of flow regime maps Dr. Bushnell could not have correctly identified the flow regime for the Macondo fluid flowing through the Capping Stack, rendering his analysis unreliable.

## III.     Dr. Bushnell Is Not Qualified to Opine on Matters Relating to Erosion.

In his Rebuttal Report, Dr. Bushnell critiques certain aspects of the CFD modeling performed by BP erosion expert Dr. Srdjan Nesic.  In particular, Dr. Bushnell contends that Dr. Nesic used a diameter for the sand particles in his model that was too small.  Rebuttal Report at 24. According to Dr. Bushnell, "smaller diameter particles typically hit walls at slower speeds and, for a given mass flow rate, increase the number of particles."  *Id*.  Dr. Bushnell further concludes that "[b]oth [these] factors [*i.e*., slower particle speed and greater number of particles] will change the erosion rate.  The incorrect particle diameter is likely to invalidate any erosion prediction, as the particle diameter is critical to any erosion calculations."  *Id*.

11

Dr. Bushnell claims he "ha[s] expertise ... on the way particles move and would contact [the metal]," but he freely admits that he has never calculated the erosion of any metal parts, nor does he consider himself an expert in modeling erosion. *Id.* at 83:10-84:6, 296:21-297:15. Consequently, Dr. Bushnell is not qualified to opine on the effect of particle size on erosion rates, and his opinions on this subject should be excluded.

## **CONCLUSION**

For the foregoing reasons, BP respectfully requests that the Court exclude Dr. Bushnell's expert reports and his deposition testimony from use during the Phase 2 trial or in post-trial briefing.

Dated: August 23, 2013								Respectfully submitted,

/s / Don K. Haycraft

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

Richard C. Godfrey, P.C.
(richard.godfrey@kirkland.com)
J. Andrew Langan, P.C.
(andrew.langan@kirkland.com)
Timothy A. Duffy, P.C.
(tim.duffy@kirkland.com)
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Robert C. "Mike" Brock
(mbrock@cov.com)
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for the BP Exploration & Production Inc. & BP America Production Company*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 23rd day of August, 2013.

/s/  Don K. Haycraft