IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 SECTION J |
| This document relates to Civil Action No. 12-970 | * * * | HONORABLE CARL J. BARBIER |
| | * * | MAGISTRATE JUDGE SHUSHAN |
| | * * * | |

**RESPONSE OF PATRICK A. JUNEAU, IN HIS CAPACITY AS CLAIMS ADMINISTRATOR AND TRUSTEE, AND THE DEEPWATER HORIZON COURT SUPERVISED SETTLEMENT PROGRAM TO BP'S RENEWED MOTION FOR AN EMERGENCY PRELIMINARY INJUNCTION TO SUSPEND PAYMENTS FROM THE COURT SUPERVISED SETTLEMENT PROGRAM PENDING SPECIAL MASTER FREEH'S INVESTIGATION AND REPORT**

Phillip A. Wittmann, 13625
John M. Landis, 7958
Maggie A. Broussard, 33033
        Of
STONE PIGMAN WALTHER
        WITTMANN LLC
546 Carondelet Street
New Orleans, Louisiana  70130
Telephone:  (504) 581-3200
Facsimile:  (504) 581-3361

Richard C. Stanley, 8487
Jennifer L. Thornton, 27019
Gina M. Palermo, 33307
Patrick H. Fourroux, 34550
        Of
 STANLEY, REUTER, ROSS
   THORNTON & ALFORD, LLC
 909 Poydras Street, Suite 2500
 New Orleans, Louisiana 70112
 Telephone:  (504) 523-1580
 Facsimile:  (504) 524-0069

*Attorneys for Deepwater Horizon Court Supervised Settlement Program
and Patrick A. Juneau, in his capacity as Claims Administrator and Trustee*

Patrick Juneau, as Claims Administrator and Trustee, and the Deepwater Horizon Settlement Program, through their undersigned counsel, respectfully submit this response to BP's renewed motion for a preliminary injunction.

## I.      Introduction

BP once again asks the Court to take the extraordinary measure of temporarily stopping all payments to all claimants from the Settlement Program, despite that it, once again, has failed to submit evidence that would even arguably justify the granting of such an overbroad request. Rather, much as it did in its previous motion requesting the suspension of all payments, BP makes spurious allegations of breaches of duty by Mr. Juneau and broad, unfounded criticisms of the Program's internal controls and fraud detection processes.  Yet, it points out only a few discreet instances of *potential* issues within specific parts of the Settlement Program, before leaping to the conclusion that the Program necessarily has made, or will make in the future, payments on illegitimate or improperly-influenced claims.  But BP fails to establish, specifically, that the Program has made *any* invalid payments as a result of the issues raised in its motion, and, generally, that it is being irreparably harmed as a result of some imagined systemic problem in the processing and payment of claims made pursuant to the Settlement Agreement.

Moreover, as detailed below, the Claims Administrator's Office ("CAO") and the Program react quickly to investigate and address allegations of improper conduct by anyone affiliated with the CAO or the Settlement Program.  Specifically with respect to BP's most recent motion, the Court, and not the CAO, oversees the Appeals Panel.  The CAO has assisted the Court, however, to ensure that the appeals process remains neutral and impartial.  Regarding the allegations of misconduct of an employee in the Mobile Claims Assistance Center ("CAC"), the CAO quickly stopped payment on any potentially affected claims processed by or related to the

employee and investigated the issue extensively, but ultimately concluded that the allegations were uncorroborated and that there was no evidence of internal fraud with respect to any of those claims.  Moreover, the increase in the filing of Mobile-area Subsistence claims was reported to the CAO and acted upon long before BP's current motion was filed.

Accordingly, the CAO and the Court already have acted to prevent potential harm to BP or to the Program, such that the renewed motion is, again, unnecessary and moot.  Like its predecessor, the renewed motion is also premised on speculation and uncorroborated inferences, which clearly do not satisfy BP's burden of proof and do not warrant the extreme step of halting payments to thousands of claimants.  Finally, BP's global aspersions on the CAO's internal controls and fraud detection systems and processes are uninformed and baseless, and its repeated attacks on Mr. Juneau and his office are not only specious but appear to have a purpose of interfering with Mr. Juneau's ability to perform his court-appointed duties.  The Court should deny BP's motions for all of these reasons, as further outlined below, and put an end to this strategy by BP to disrupt and obstruct the CAO's work and the Settlement Program's operations.

## II.    The Claims Process was Carefully Designed both to Prevent Fraudulent Claims and to Detect Activity that May Require Further Review.

BP's continued sensational allegations that the CAO has failed to establish and implement adequate internal procedures and controls to detect and prevent fraud in the Court Supervised Settlement Program ("CSSP") are completely unfounded.[1]  In fact, the CAO has worked closely with BrownGreer PLC ("BrownGreer"), a third-party vendor and consultant appointed by the Court, to establish comprehensive, multi-step claims handling and fraud detection processes and controls.  Indeed, as explained in more detail below, the CAO and

---

[1] As BP is aware, the CAO has engaged the international accounting firm, CliftonLarsonAllen LLP ("CLA"), to audit its internal claims processing controls on an ongoing basis.  CLA's first audit report, covering the period from June 4, 2012 to March 31, 2013, is attached as Exhibit A to the Declaration of Patrick Juneau (hereinafter Juneau Declaration)(Exhibit I).

BrownGreer have implemented processes and controls that have enhanced the already robust controls employed by the Gulf Coast Claims Facility ("GCCF").

### A. The Program's Detailed Claims Handling Protocols Minimize the Potential for Error and External Fraud.

The Program employs stringent protocols at each step of the claims process, beginning with the initial claim intake. Once a claim is entered into the Program's Review System, it is subjected to several pre-review processes to screen out ineligible claims and to identify attributes of the claimant that may affect the value of the claim under Program criteria.[2] These processes include screens for exclusions under the Settlement Agreement,[3] opt-outs from the Program,[4] Moratoria Losses,[5] claims involving potential identity theft,[6] and claims that overlap with GCCF payments.[7] Depending on the claim type, the attributes identified for a claimant may include its NAICS Code, industry classification and Eligibility Zone.[8] Finally, all documents submitted with a claim are identified and the relevant data from the documents are entered into the Program's Review System.[9]

The actual review of a claim varies according to the category and type of loss assigned to the claim under the Settlement Agreement.[10] Each Economic Loss Claim is reviewed initially to determine whether it is supported by adequate documentation and, if it is not, additional

---

[2] A claimant may submit his or her claim in writing, through a secure portal or at a CAC with the assistance of a CAC representative. Declaration of Orran L. Brown (hereinafter Brown Declaration) (Exhibit II), Ex. A, at ¶ 1.

[3] Brown Declaration (Exhibit II), Ex. A, at ¶ 2(a).

[4] *Id.* at ¶ 2(b).

[5] *Id.* at ¶ 2(c).

[6] *Id.* at ¶ 2(d), (f).

[7] *Id.* at ¶ 2(e).

[8] *Id.* at ¶ 2(g).

[9] *Id.* at ¶¶ 3-4.

[10] Economic Loss Claims include BEL claims, IEL Claims, SCP claims and IPV/FV claims. Non-Economic Loss Claims include Wetlands Real Property claims, Coastal Real Property claims, Real Property Sales claims, VoO Charter Payment claims, Vessel Physical Damage claims and Subsistence claims. *See id.* at ¶¶ 5-6.

documentation is requested from the claimant.[11]  A determination is then made as to whether the claim is entitled to a causation presumption or otherwise satisfies the causation criteria under the Settlement Agreement.[12]  Finally, the value of the claim is calculated in accordance with the formulas set forth in the Settlement Agreement.[13]  Similar processes are utilized for Non-Economic Loss Claims.[14]

Once the amount of a claim is determined in accordance with the terms of the Settlement Agreement, the claim is then subjected to additional analysis designed to avoid errors and overpayments.  First, on a daily basis, hundreds of automated data metrics and analytic processes are performed to detect anomalies in claims reviewed in the prior 24 hours.[15]  If an anomaly is detected, the claim is segregated for additional quality review and correction as needed.[16]  Next, data for each claim, including payment records from the GCCF and the CSSP, are reviewed to ensure that payment of the claim will not duplicate a payment already made and that all appropriate offsets or third-party claims are deducted.[17]  Once it obtains the release from a claimant required under the Settlement Agreement,[18] the Program conducts a final check-list analysis to confirm that all prerequisites for payment are satisfied.[19]  Finally, before a claim is approved for payment, the Program's Special Investigation Team ("SIT") confirms the correctness of the claimant's Taxpayer Identification Number.  The Program will not issue payment on a claim until the claimant's Taxpayer Identification Number is verified.[20]

---

[11] *Id.* at ¶ 5(b).
[12] Brown Declaration (Exhibit II), Ex. A, at ¶ 5(c).
[13] *Id.* at ¶ 5(d).
[14] *Id.* at ¶ 6.
[15] *Id.* at ¶ 7.
[16] *Id.*
[17] *Id.* at ¶¶ 10-11, 16.
[18] *Id.* at ¶ 14.
[19] *Id.* at ¶ 15.
[20] Brown Declaration (Exhibit II), Ex. D, at ¶ 4.

All claims handlers are trained and encouraged to identify claims evidencing problems and discrepancies that might indicate potential fraud, and to refer these claims to SIT for further scrutiny.[21]   A claim typically will be referred to SIT where: (i) the claim is supported by suspicious or altered materials, (ii) the claimant's name, date of birth or TIN shown on the claim form is different from those shown on the supporting materials, and (iii) the claim involves a transaction that does not appear to be arms-length.[22]   SIT also receives and investigates tips regarding suspected fraud from the DOJ, BP and Class Counsel.[23]   Based on its review of suspicious claims, SIT maintains a list of documents and entities that it has determined to be suspect or fraudulent, and claims handlers are directed to refer to SIT any claim involving a listed document or entity.[24]

In addition to its investigation of claims through referrals, SIT proactively utilizes a number of protocols to identify and investigate suspicious or fraudulent conduct.  Perhaps most importantly, SIT continually analyzes data in the claims database to identify trends indicating potential fraud, including for example: (i) claimants who share the same or similar physical address, IP address, email address or payment information; (ii) claims that appear to be related and may overlap; and (iii) unusual variations in a claimant's revenue or expenses.[25]   This analysis also enables SIT to identify and monitor suspicious patterns involving multiple claimants that may indicate fraud.[26]

The appropriate type and level of anti-fraud measures normally will vary between different settlement programs.  In this case, the CAO and BrownGreer started with a baseline

---

[21] *Id.* at ¶ 5(a).
[22] *Id.*
[23] *Id.* at ¶¶ 5(f), (g) and (h).
[24] *Id.* at ¶ 5(a).
[25] *Id.* at ¶ 5(d).   SIT also tracks and monitors all address change requests by claimants for indications of potential fraud.  *Id.* at ¶ 5(c).
[26] *Id.* at ¶ 5(e).

developed from years of administering other programs, including the GCCF.[27]   They also took advantage of the institutional knowledge learned by former GCCF management members from service in that program.[28]   Further, the Program requires far more documentation and utilizes more complex review procedures than did the GCCF, which allows the Program to track and analyze significantly more information.[29]   BrownGreer also has developed enhanced, "in-house" investigative techniques to identify fraud, which permits the Program to avoid an expensive and time-consuming in-person investigation of all potentially fraudulent claims.[30]

In sum, the Program's protocols and policies provide for an efficient, yet effective, claims handling process, which minimizes the potential for error and external fraud.  BP's assertions to the contrary are unsupported and baseless.

**B.** **The Program Employs Stringent Employment, Training and Oversight Protocols To Minimize the Potential for Internal Fraud.**

To maximize the effectiveness of the Review System, the Program also pays particular attention to the selection, training and supervision of the employees who actually handle the processing of claims.  The receipt and input of claims into the CSSP, and the subsequent processing and review of those claims, are handled by the CAO's support consultants and vendors:  BrownGreer, PricewaterhouseCoopers, Postlewaite & Netterville and the Garden City Group, each of which is required to comply with the Program's staffing requirements.  For example, BrownGreer's employees and contractors are hired only after extensive background checks and screenings.[31]   Before making a hiring decision, BrownGreer evaluates the candidate's professional and educational background to assure that the candidate is qualified, and conducts

---

[27] Brown Declaration (Exhibit II), Ex. D at ¶ 1.
[28] *Id.* at ¶ 3.
[29] *Id.* at ¶ 3(a).
[30] *Id.* at ¶ 3(c).
[31] Brown Declaration (Exhibit II), at ¶¶ 38-40.

background checks to verify the information provided by the candidate and to detect any criminal history.  Any candidate who has been convicted of a misdemeanor or felony within the prior seven years, or who has provided false information to BrownGreer, is disqualified from employment.  To detect potential conflicts, candidates also are required to disclose whether any immediate family member or domestic partner has filed a claim with the CSSP, which also is a disqualifying factor.[32]  Businesses in which a candidate has a financial interest also are screened for potential conflicts.[33]  In sum, BrownGreer does everything reasonably within its power to ensure that candidates employed by the Program are qualified and conflict-free.

BrownGreer also has established extensive protocols to train, supervise and monitor Review System workers, which protocols are designed to prevent and detect potential fraud. Each new employee goes through an extensive orientation, during which confidentiality, ethics, honesty and the avoidance of conflicts of interest are emphasized.[34]  These same attributes are re-emphasized in the BrownGreer Employee Handbook and other codes of conduct, which each new employee must read and agree to comply with in writing.[35]  Before a new employee can access the Program database, he or she receives extensive technical training regarding all aspects of the Program, including the detection and reporting of suspected fraud.[36]  During the course of each employee's tenure with the company, BrownGreer continues to monitor possible conflicts of interest by periodically requiring each employee to execute a new declaration certifying that the employee has not filed a claim with the program and is not aware that any close relative has done so.[37]  BrownGreer also checks the Social Security Numbers of all employees against the

---

[32] *Id.* at ¶ 41.
[33] *Id.* at ¶ 42.
[34] *Id.* at ¶ 43.
[35] *Id.* at ¶ 44.
[36] *Id.* at ¶¶ 45-47.
[37] *Id.* at ¶¶ 48-49.

Social Security Numbers of Program claimants on a daily basis to ensure that no employee has filed a claim.[38]

BrownGreer monitors the performance of all CAC employees on an ongoing basis through direct observations by CAC supervisors and on-site audits conducted by management teams.[39] CAC supervisors are trained to recognize and report suspicious behaviors by CAC employees, and they receive on a weekly basis quality assurance performance reports, which allow the supervisors to spot employee outliers and take remedial action as necessary. BrownGreer management audit teams frequently visit each CAC on both an announced and an unannounced basis to assess and address any performance and security concerns.

In addition to this substantial human supervision and oversight, the Program employs a number of computer security protocols that also are designed to prevent and detect internal fraud. For example, the Program has recently phased in restrictions that prevent claims reviewers from being able to pull and review claims on demand. Instead, reviewers may now access only the next available claim in the claims queue and they have no knowledge as to what claims are in line for review.[40] Claims reviewers also are now blocked from accessing the status of any claim unless their primary job function requires it.[41] As a practical matter, these measures prevent most claims reviewers from accessing a claim more than once. To monitor those employees who do have the ability to access any claim, BrownGreer routinely analyzes system usage data to identify and investigate any unusual search patterns or histories.[42]

---

[38] *Id.* at ¶67.

[39] *Id.* at ¶¶ 50-51.

[40] Brown Declaration (Exhibit II), at ¶ 65. In addition, the Program currently is assessing whether to implement a redundant, programmatic feature that will block claims reviewers working in the CACs from reviewing any claim that was filed in person at any CAC. *Id.* at ¶ 73.

[41] *Id.* at ¶ 64.

[42] *Id.* at ¶¶ 57, 64.

BrownGreer also employs a number of hardware security measures to protect the integrity of the system.  For example, Program system users may access the system only from pre-approved IP addresses, which prevents the viewing or manipulation of claims data from unauthorized locations.[43]   System users also are blocked from access to any unauthorized external internet sites to prevent unauthorized access to or corruption of the system.[44]  Within each CAC, all computers are username and password protected, and they are programed to lock after 15 minutes of inactivity.[45]

BP's conclusory contentions regarding supposed failings and inadequacies of the Program's internal monitoring and fraud-protection systems, processes, and procedures are unsupported and erroneous.  As detailed below, its specific allegations of supposed misconduct and improprieties fare no better.

**III.    There is no Evidence of Internal Fraud in the Mobile Claims Assistance Center, and the Program Works Diligently to Detect and Prevent Potential External Fraud with Respect to Mobile-Area Subsistence Claims.**

BP makes three unsupported allegations with respect to alleged potential fraud in the Mobile CAC: (1) that a July 15, 2013 fraud hotline complaint received by BP "indicates that a single CSSP employee, when tempted by improper fees, can improperly affect the calculation and payment of individual claims;" (2) that a review of the claims metrics suggests that malfeasance may be "rampant" in the Mobile CAC because the Mobile CAC originates and approves many more subsistence claims than any other CAC; and (3) that the CAO ignored "red flags" of potential fraud in the Mobile CAC.  BP's Memorandum at pp. 12, 13, 18.  These specific allegations are as off-base as BP's general assertions about the lack of effective controls and processes.

---

[43] *Id.* at ¶58.
[44] *Id.* at ¶60.
[45] *Id.* at ¶59.

A. **The Relatively Simple Standards for Subsistence Claims were Agreed to by the Parties and are Part of the Settlement Agreement that the CAO is Bound to Administer as Written.**

The Subsistence claim is available for Gulf Coast individuals "who fish or hunt to harvest, catch, barter, consume, or trade Gulf of Mexico natural resources, including seafood and game, in a traditional or customary manner, to sustain their basic personal or family dietary, economic, security, shelter, tool, or clothing needs, and who relied upon Subsistence resources that were diminished or restricted in the geographic region used by the claimant due to or resulting from the Deepwater Horizon Incident."[46]   To receive compensation, a claimant must submit a Subsistence claim form (available online), or a sworn written statement signed under penalty of perjury verifying the (1) location of the claimant's fishing and/or hunting grounds; (2) equipment used to fish and/or hunt; (3) number of people in the family unit who rely on natural resources caught by the claimant; (4) specific species and amounts of natural resources relied upon; and (5) percentage of subsistence resources relied on pre-Spill that came from areas that were closed or impaired due to or resulting from the Spill.[47]   Other than the completed claim form or sworn statement, the only other documentation that a Subsistence claimant is required to submit pursuant to the Settlement Agreement is a copy of the claimant's state and/or federal commercial or recreational fishing or hunting license(s) valid before and at the start of the loss period and a W-9 form.[48]   Importantly, "[d]eckhands or others that are not required to possess a fishing license are excused from this requirement."[49]   As with all aspects of the Settlement Agreement, BP and the PSC negotiated, reviewed, and agreed upon the Subsistence framework,

---

[46] Settlement Agreement § 1.3.1.3.
[47] *See* Exhibit 9 to Settlement Agreement; *see also* Instructions for Completing the Subsistence Claim Form (Exhibit III), at § 4.
[48] *See* Exhibit 9 to Settlement Agreement, at § C.5.
[49] *Id.*

as outlined in Exhibit 9 to the Settlement Agreement, and the Claims Administrator implemented the Subsistence Program with significant involvement from the Parties.

### B. The Recent "Hotline" Report Highlighted by BP has not been Corroborated.

On or about July 15, 2013, BP launched the "Gulf Claims Fraud Hotline" and encouraged people – in exchange for a potential monetary award – to report "any fraudulent or corrupt activity" regarding the Program.[50]   On July 18, 2013, BP notified the CAO of a complaint received by the anti-fraud hotline regarding alleged misconduct by an employee of the Mobile CAC with respect to Subsistence claims.[51]   The complainant ("BP Hotline Informant") alleged that an employee at the Mobile CAC (whom the BP Hotline Informant could not identify by name) had assisted family members by filing claims fraudulently in exchange for payment of a portion of the settlement awards paid to those individual claimants.[52]   The BP Hotline Informant further stated that "[t]his behavior is rampant in the claims center."[53]

The CAO took the allegations in the complaint seriously and reacted quickly.  On the day it received the complaint, HUB Enterprises, Inc. (a third-party vendor retained by the Program to investigate allegations of fraud) ("HUB") contacted and interviewed the BP Hotline Informant and determined Employee A's identity by doing database searches.[54]   The CAO identified and placed a "hold" on Subsistence claims filed by Employee A's mother and brother, as well as on the claims of 124 claimants that Employee A had been assisted during the course of her

---

[50] *See* Brown Declaration (Exhibit II), at ¶ 5, and Ex. B to Brown Declaration.
[51] *See* BP's Exhibit 5.
[52] *See* BP's Exhibit 6.  Specifically, the BP Hotline Informant stated that Employee A had assisted her uncle and mother in filing claims, that she "is receiving a payoff amount of $10,000.00 for the claim that she filed for her uncle," and that she "will file a claim for [her] ex-husband."  *Id.* at p. 3.
[53] *Id.*
[54] *See* Exhibit IV, August 22, 2013 Letter from David Welker, and Juneau Declaration (Exhibit I), Ex. B, HUB Enterprises Investigative Report ("HUB Report") at pp. 1-2.

employment with the Program.[55]   HUB investigators interviewed Employee A and all other employees of the Mobile CAC.[56]   Employee A denied the allegations, and further investigation revealed that Employee A *did not* initiate the claim of her mother or her brother or any other family member, and that neither her uncle nor her ex-husband has filed a claim in the Program (such that the Informant's allegation that Employee A would receive a $10,000 payment relating to an uncle's claim was entirely uncorroborated).[57]   Furthermore, the investigation revealed no wrong-doing with respect to Employee A's handling of any of the claims that she had initiated as part of her normal job responsibilities.[58]

The investigation did reveal that Employee A had not disclosed that she had immediate family members who had filed a claim.[59]   During HUB's interviews, questions also arose about whether two other Mobile CAC employees were in complete compliance with the CAO's Computer Use Policy.[60]   Pending the outcome of the investigation, Employee A and the other two employees were suspended.[61]   These suspensions, however, were the result of the employees' violation of employment policies, and not because there was evidence that they were engaged in fraudulent activities.[62]   In fact, to date, the CAO's investigation has uncovered no evidence that supports or corroborates the allegations that Employee A or any other Mobile CAC

---

[55] *Id.* at pp. 2-3.

[56] *Id.* at p. 4.

[57] Brown Declaration (Exhibit II)  at ¶ 16; to Juneau Declaration (Exhibit I), Ex. B, HUB Report at pp. 5-6.

[58] Brown Declaration (Exhibit II) at ¶ 17; Juneau Declaration (Exhibit I), Ex. B, HUB Report at p. 3.  In fact, Employee A has referred 32 claimants to the SIT.  *Id.*

[59] Juneau Declaration (Exhibit I), Ex. B, HUB Report at p. 5.

[60] Brown Declaration (Exhibit II)  at ¶ 10.

[61] *Id.*

[62] *Id.*

employee engaged in any fraudulent activity, and the employees that violated employment policies have been identified and disciplined.[63]

### C.   The "Spike" in Subsistence Claims Filed in the Mobile CAC was Promptly Detected by the Program and Investigated.

BP's suggestion that the Program "ignored" the alleged "red flag" of the high number of subsistence claims being filed in the Mobile CAC could not be further from the truth.[64]   In January 2013, employees of the Mobile CAC alerted the CAO of a sudden increase in subsistence claims submitted in the Mobile area.[65]   The CAO's SIT, in coordination with HUB, immediately began investigating the cause of the sudden spike and took steps to identify potentially fraudulent claims.[66]   The investigation quickly revealed that a private claims preparation firm in Mobile ("Claims Preparation A"), which is entirely unaffiliated with the Program, had begun soliciting claimants in the Mobile area and encouraging them to file Subsistence claims in exchange for a portion of the award obtained.[67]   SIT immediately informed claims reviewers to place a hold on all claims that mentioned or originated from Claims

---

[63] Juneau Declaration (Exhibit I), Ex. B, pp. 4-6.  On the other hand, the CAO has discovered that the BP Hotline Informant has been inconsistent in her claims to investigators.  Although the BP Hotline Informant indicated in her complaint that she was not a claimant, she had, in fact, filed a Subsistence claim in the Program.  Additionally, she provided inconsistent information to investigators regarding whether and to what degree she had been in contact with the Alabama Attorney's General Office. *See id.* at p. 6.

[64] BP initially and correctly notes in its Memorandum that the Mobile CAC has originated more claims in the Program than any other CAC.  Brown Declaration (Exhibit II), at ¶ 24. What BP fails to mention is that the Mobile CAC also experiences a higher volume of visitors than any other CAC, and that since the inception of the Program in June 2012, BP has had access to data and has received weekly reports from the CAO which have consistently identified the Mobile CAC as one of the busiest CACs in terms of both visitors and claims filed.  *Id.* at ¶¶ 22-23. Moreover, the statistics establish that, while the Mobile CAC has received the highest number of Subsistence claims of any CAC (4,462), the filing of other claim types in the Mobile CAC is consistent with that of other CACs.  *Id.* at ¶ 24.

[65] *Id.* at ¶ 26.

[66] *Id.  See also* Ex. C to Brown Declaration (Exhibit II).

[67] Brown Declaration (Exhibit II), at ¶ 27; Ex. C to Brown Declaration (Exhibit II), at p 1.

Preparation A pending further review into their legitimacy.[68]   To date, the CAO has determined that Claims Preparation A and other private claims preparation firms in the Mobile area have collectively generated more than 2,000 subsistence claims, accounting for approximately 28% of all subsistence claims from the Mobile area, all of which have been identified as potentially suspect by SIT and remain on a fraud-hold as HUB and SIT continue to investigate them.[69]

Also in January 2013, the CAO observed a high number of Subsistence claims filed from the Mobile area (both from claims prepared by Claims Preparation A and also in the Mobile CAC, online, and by mail) identifying Cedar Point Pier as the fishing location.[70]   Importantly, the Cedar Point Pier is a public pier that *does not* require a fishing license, thereby exempting claimants who allegedly fish there from the requirement to produce a valid fishing license to support a Subsistence claim.[71]   Again, the CAO immediately responded by instructing claims reviewers to place a hold on all claims mentioning Cedar Point Pier.[72]

SIT, HUB, and the CAO's Field Visit Team also have interviewed Mobile claimants who filed suspect Subsistence claims, conducted field visits to claimants' homes, conducted field visits and interviews at alleged fishing locations, and sent undercover agents to Claims Preparation A.[73]   Numerous other suspicious Subsistence claims patterns from the Mobile area have been identified by SIT and placed on hold for further investigation and review.[74]   SIT and HUB continue to work to identify methods by which the legitimacy of these claims can be

---

[68] Ex. C to Brown Declaration (Exhibit II), at pp. 1-2.

[69] Brown Declaration (Exhibit II), at ¶ 27.  Furthermore, multiple claimants visiting the Mobile CAC informed staff that the advertising by those private firms prompted them to file subsistence claims in the Mobile CAC, online or by mail.  *Id.*

[70] Ex. C to Brown Declaration (Exhibit II), at p. 1.

[71] Brown Declaration (Exhibit II), at ¶¶ 31-32; *see also* Ex. C to Brown Declaration (Exhibit II), at p. 1.

[72] *Id.* at pp. 1-2.

[73] *Id.* at p. 3-4.

[74] *Id.* at p. 6.

verified, but it must be noted that all suspicious patterns that SIT has identified with respect to Subsistence claims filed in the Mobile area have been external in nature and do not involve any Program employees.[75]

### D.   The Mobile CAC Does Not "Approve" a Significantly Higher Number of Subsistence Claims than Any Other CAC, such that BP's Allegations of Potentially Systemic Abuse are Completely Meritless.

BP also insinuates potential internal fraud in the Mobile CAC by alleging that the "approval rate" for Subsistence claims "at the Mobile office" is more than three times the average of the other claims centers.  BP's Memorandum at 12-13.  This allegation and the statistics BP uses to support it are highly misleading. *First*, the Mobile CAC (or its employees) do not and cannot "approve" subsistence claims for payment.[76]  The Mobile CAC is one of 18 CACs across the Gulf Coast that serves primarily as a customer service center staffed to assist mostly unrepresented claimants *to register or file* a claim form, check the status of a claim, or submit new documentation.[77]  Some employees in the Mobile CAC and other CACs have been cross-trained on aspects of claims review so that they could remain fully occupied even when claimant traffic in the CACs waned.  Of the 527 Subsistence claims with Eligibility Notices that originated in the Mobile CAC, 159 (30%) were reviewed and/or evaluated in any respect in the Mobile CAC.[78]  However, before issuing the Notice on these claims, Review System metrics automatically search for predefined claim characteristics and a team of evaluators, none of whom is in Mobile, check all claims and approve the issuance of Eligibility Notices.[79]  Thus, BP's insinuation that a single Mobile CAC employee can effectuate payment of a claim is wholly inaccurate, as each claim passes through several layers of review, including external review.

---

[75] Ex. C to Brown Declaration (Exhibit II), generally.
[76] Brown Declaration (Exhibit II), at ¶ 36.
[77] *Id*. at ¶¶ 7, 8.
[78] *Id*. at ¶ 36.
[79] *Id*.

*Second*, BP's calculations portray a skewed depiction of Subsistence claims data because they (1) do not account for Subsistence claims filed online or by mail, (2) include data on claims that have been "excluded" from the Program, and (3) do not include data on "incomplete" claims.[80]   When calculated appropriately, of the Subsistence claims submitted in the Mobile CAC and not excluded from the Program, 32% are payable and 63% are incomplete.[81]   By comparison, among all Subsistence claims filed in the Program regardless of origin, 23% are payable and 69% are incomplete.[82]   The Mobile CAC's 32% payable rate as compared to the overall 23% payable rate of all Subsistence claims can be explained in large part because of the exemption from the fishing license requirement for Cedar Point Pier in Mobile.[83]   That exemption leads to a higher rate of curing the incompleteness (32%) of Mobile-area claims as compared with claims filed in other CACs that generally require a fishing license (17%).[84]

Accordingly, there is *no evidence* that suggests that the Mobile CAC is engaged in any systemic fraudulent activity.   Nor is there any merit to the contention that the CAO and BrownGreer have not been vigilant in their monitoring and investigating of any questionable information or potential misconduct.   BP's assertion that it has demonstrated a breach of duty by the CAO and/or its vendors is completely undermined by the actual *facts* of the investigation.

## IV.   The Appeals Process Has Been and Continues to be Neutral and Impartial.

BP also contends in its renewed motion that the appeals process established in the Settlement Agreement has been "compromised" because it learned that two appeals panelists were partners in law firms that represented claimants seeking payment from the Settlement

---

[80] *Id.* at ¶¶ 34-36.
[81] *Id*. at ¶ 35.
[82] *Id*. at ¶ 34.
[83] *Id*.
[84] *Id*.

Program and/or filed their own BEL claims.[85]  Critically though, there is absolutely no evidence that those panelists were involved in an appeal in which their firms were counsel or that involved their firms' BEL claims.   In other words, there is no evidence whatsoever of any actual impropriety or impartiality with respect to any appeal in which one of those panelists was assigned, or otherwise for that matter.   Further, any perceived bias was remedied by one of the panelist's withdrawal from his firm and the suspension of assignments to the second panelist while he and the Court determine if he can continue serving as a panelist.   Finally, it is the Court and not the CAO who appoints the appeal panelists and retains jurisdiction over their service on the Appeals Panel:   "The appointment to and service on the Appeals Panel is subject to the oversight of the Court, which shall retain jurisdiction over Appeal Panels."[86]   Further, "[t]he continued service on the Appeal Panels is within the *sole discretion of the Court*…."[87]

## A.      All of the appeal panelists were selected by the Court.

As BP knows, it and the PSC nominated individuals for the Appeal Panelist Pool, and the Court selected the individuals to be included in the pool.[88]   BP's contention that the CAO somehow breached a fiduciary duty with respect to the selection of appeal panelists and the vetting of any potential conflicts or appearances of improprieties, thus, cannot be made in good faith.   Regardless, the allegation that steps were not taken to check for potential conflicts is simply wrong.   Indeed, when the Court notified the selected individuals of their appointment, it was explicitly explained that the appointment was contingent upon the person's satisfying the

---

[85] BP also complains about recently learning that a third panelist resigned from the Appeal Panel Pool as a result of a perceived conflict.  In that case, the CAO was advised, after the fact, by the Magistrate Judge that "Panelist C" had learned that his wife's law firm filed a claim.  Panelist C, therefore, resigned from the pool.  *See* Declaration of Patrick A Juneau (Exhibit I), at ¶ 5.
[86] Settlement Agreement, § 6.1.2.2.5.
[87] *Id.* at § 6.1.2.2.5.4 (emphasis added).
[88] *See* June 26, 2012 Order, appointing 21 people as the Appeal Panelist Pool (Exhibit V). Notably, although the Court initially appointed 21 individuals, only 15 were included in the pool based on their ability to meet the necessary criteria.

requirements of the position, which included that the person be a lawyer in good standing with the bars to which he or she is admitted and that the individual not have any conflicts of interest.[89] The notification to each panelist required the individual to confirm that he or she meets all of the criteria and agrees to the be bound by the Settlement Agreement and to be responsible for ensuring that "there is no conflict of interest nor any appearance of a conflict with regard to any specific claim whose appeal he may consider."[90]

Each of the panelists was, therefore, required to confirm for the Court that he or she met all of the Court's criteria, including that the person (1) was not an employee or affiliated with BP, (2) had not filed nor would file a claim with the Settlement Program, and (3) had not represented nor would represent claimants in the Settlement Program.[91]   The Court was reasonable in relying on these assurances from attorneys in good standing, all of whom are officers of the Court and subject to their respective state's Rules of Professional Conduct.

### B.   All questions and issues regarding a panelists' ability to continue to serve on the panel are referred to the Court for resolution.

Because the Court appointed the panelists and expressly retains jurisdiction over the Appeals Panel, questions or concerns regarding an individuals' ability to continue to serve as a panelist are referred to the Magistrate Judge, *not* resolved by the Claims Administrator.  The Claims Administrator does not have the authority to appoint or to remove a panelist from the pool.  Only the Court has that authority, which is why, when any questions have arisen as to an individual's serving as a panelist, including whether there are any conflicts or appearances of a conflict, the CAO and or the Appeal Coordinator (also appointed by the Court), has turned those issues over to the Magistrate Judge.  It is the CAO's understanding that Judge Shushan has been

---

[89] *See*, *e.g.*, Correspondence from Judge Shushan to appeal panelist (Exhibit VI) (redacted).
[90] *Id.* at § 2.
[91] *Id.*

involved in determining whether any conflict exists and, if so, whether it can be remedied, with respect to all three panelists referenced in BP's motion.

As BP states in its memorandum, when it was learned a few months ago that one of the panelists ("Panelist A") was a partner in a law firm ("Law Firm A") that had filed a BEL claim and in which other attorneys represented claimants in the Settlement Program, the panelist withdrew from his law firm to remove any appearance that he was not impartial.[92]   Notably, Panelist A did not personally represent any claimants and was never assigned to an appeal over a claim in which his firm was involved, either as counsel or as a claimant.[93]

The CAO subsequently learned that two other panelists were in similar situations.[94]  The CAO understands that one of those panelists ("Panelist B") is exploring, with the Magistrate Judge's involvement, whether he can withdraw from any financial interest in his law firm ("Law Firm B") and still serve on the panel.[95]  Panelist B is not receiving any appeal assignments while he and the Magistrate Judge work through these issues.[96]  The third panelist mentioned by BP ("Panelist C") resigned from serving as a panelist after learning that his wife's law firm had filed a claim.[97]

Finally, Judge Shushan also recently asked all of the panelists in the pool to revisit whether they, or any entity in which they have an ownership or financial interest, have filed a

---

[92] *See* Juneau Declaration (Exhibit I), at ¶ 3.  This particular panelist approached the Claims Administrator and advised him that he had just learned that his firm, *unknown to him*, had filed its own BEL claim.  *Id*.  Mr. Juneau told the panelist to report the information to the Court.  *Id.* The panelist did so and, with the Court's knowledge, withdrew from his firm to avoid any appearance of impropriety.  This took place well before the motion was filed.
[93] *Id.*
[94] *Id.* at ¶ 3.
[95] Juneau Declaration (Exhibit I), at ¶¶ 4 and 5.
[96] *Id.* at ¶ 4.
[97] *Id.* at ¶ 5.

claim with the Settlement Program so that she can determine how best to address any other potential issues.[98]

### C. There has been no showing of any impropriety with respect to a particular claim on appeal.

Apart from the fact that the Claims Administrator does not appoint, oversee, or remove panelists from the Appeal Panel Pool, rendering BP's complaints misdirected from the start, BP has not produced a shred of evidence that any claim was improperly decided or influenced on appeal as a result of some bias or perceived conflict by any appeal panelist.[99]  Indeed, although Law Firm A represented 16 claimants who submitted BEL claims and Law Firm B represented at least nine BEL claimants, a review of BP's own exhibits demonstrates that *none* of those claims has been approved or denied.[100]  It is, thus, axiomatic, that none have been appealed, such that it is an *impossibility* that the panelists affiliated with those law firms decided any claim involving their firms.

---

[98] June 26, 2013 Correspondence (Exhibit VII).

[99] BP's multiple references to Louisiana Rule of Professional Conduct 1.7 (Conflict of Interest: Current Clients) is also misdirected.  Rule 1.7 addresses a lawyer's conflict of interest in the situation where (1) he or she represents two or more ***clients*** who are directly adverse to one another, or (2) the lawyer's representation of a client will be materially limited by the lawyer's responsibilities to another client, third person, or by a personal interest.  Here, the panelists were acting in a quasi-judicial capacity and not as attorneys representing clients in the Settlement Program.   In fact, the individual panelists did not represent claimants in the Settlement Program (even if other lawyers in their firms did so), and BP is obviously not a "client" of any of the panelists.  In other words, Rule 1.7 does not apply, as the individual panelists did not represent anyone, let alone adverse parties, in the Settlement Program.  For those same reasons, BP's discussion of its right to waive any such conflict is likewise misplaced.

[100] Appendix A to Mr. Sider's Declaration, attached as Exhibit 2 to BP's Memorandum.  To date, Law Firm A has filed 16 BEL claims (as counsel for claimants and on its own behalf), none of which have been approved or paid.  Juneau Declaration (Exhibit I), at ¶ 6.  Similarly, Law Firm B has filed 13 BEL claims (also as counsel for nine claimants and on its own behalf), none of which have been approved or paid.  *Id.*  Law Firm A also represents five Coastal Real Property claimants and four Wetlands Real Property claimants.  *Id.*  The five Coastal Real Property claims have been paid and the four Wetlands Real Property claims are under review.  However, those five claims were below the threshold amount for an appeal to be taken, and are thus irrelevant to this analysis.

Nevertheless, BP postulates that it has had claimants' appeals decided by attorneys who were adverse and "essentially *suing* BP." BP Memorandum, at 9. But, the statement simply is not true. The panelists at issue did not personally represent any claimants in the Settlement Program and did not file any claims on their own behalves. And there is no evidence of any actual bias, partiality, or impropriety with respect to any panelist or any claim decided on appeal. Moreover, any potential bias due to their firm relationships are under active review by the Court.

BP certainly has not demonstrated any breach of any duty by the Claims Administrator or the Settlement Program with respect to the selection of appeal panelists or the appeal process. Nor has it produced any evidence showing that the Program has paid any claim that was improperly decided or influenced on appeal. The idea that all other claimants should have their legitimate claims and payments stopped indiscriminately based on the fact that there *may* have been an appearance of impropriety with respect to three panelists, which has been, or is being, cured, must be rejected.

## V.    BP's Spurious Breach of Trust Claims Against Mr. Juneau are Legally Unfounded in Addition to Being Factually Unsupported.

### A.    BP Improperly Attempts to Conflate Mr. Juneau's Duties as Trustee and His Duties as Claims Administrator.

The sole legal basis for the injunctive relief sought by BP in the renewed motion is an alleged breach of duty by a trustee to the beneficiary of a trust.[101] The renewed motion, however, does not allege that Mr. Juneau has breached any duty imposed on him by the *Trust Agreement*. Instead, it cites only acts (or alleged omissions) by Mr. Juneau in his role as the

---

[101] *See* R. Doc. 10937-1, at pp. 14-17 (citing various statutes and cases regarding the breach of fiduciary duty by the trustee of a trust); *see also* R. Doc. 1037, at p. 2, ¶ 3 (alleging that the CSSP and the Claims Administrator have breached their fiduciary duties to BP).

Claims Administrator of the Settlement Program.[102]  The reason why BP would like to conflate the two agreements is obvious – it hopes to mislead the Court into applying the law and standards regarding a trustee's duties to trust beneficiaries to the responsibilities and obligations that Mr. Juneau undertook as the court-appointed Claims Administrator with respect to BP, as one of the contracting parties to the Settlement Agreement.

Section 5.12 of the Settlement Agreement provides for the creation of the Settlement Trust solely as a vehicle to achieve "qualified settlement fund" status for purposes of § 468B(d)(2) of the Internal Revenue Code and Treasury Regulation § 1.468B-1.  The primary purpose of this qualification is to permit BP to treat immediately its trust contributions as deductible expenses before the funds are actually distributed to the trust beneficiaries, *i.e., the class members*.  Thus, virtually all of Mr. Juneau's contractual and Court-imposed duties, including any duties owed to BP, arise not under the Trust Agreement, but under the Settlement Agreement.  The only practical duties imposed on Mr. Juneau under the Trust Agreement are ministerial in nature – to receive, invest and disburse funds in accordance with the Settlement Agreement.  BP's renewed motion attempts to disregard the distinction between the two agreements by charging Mr. Juneau with supposed state-law breaches of trust (owed to trust beneficiaries) for his alleged failure to fulfill his duties under the Settlement Agreement.

BP cannot so easily ignore the distinction between the two agreements.  Mr. Juneau has been charged with two distinct roles related to the Settlement Program.  Pursuant to the Settlement Agreement, he has been appointed Claims Administrator of the Program; pursuant to the Trust Agreement, he has been appointed trustee of the Trust.  The two instruments grant

---

[102] *See* R. Doc. 10937-1, at pp. 13-16 (citing "breaches of duty" by the Claims Administrator and the Court Supervised Settlement Program).

Mr. Juneau differing powers and duties, and are governed by different laws.[103]  Section 7.3 of the Settlement Agreement and the third WHEREAS clause of the Trust Agreement both further provide that "in the case of any conflict between such agreements, the SETTLEMENT AGREEMENT shall control."  BP cannot establish a *breach of trust* by alleging a *breach of responsibilities under the Settlement Agreement*.  And of course, even if it could, there is *no evidence* of any breach of duty by Mr. Juneau, the CAO, or the Settlement Program.

### B. Mr. Juneau's Duties do Not Run Solely to BP.

BP's renewed motion implies that the duties owed by Mr. Juneau under both the Settlement Agreement and the Trust Agreement run exclusively in favor of BP.  But that is not what the agreements themselves say.  To the contrary, they support that Mr. Juneau's duties are owed to the class members, the Court, and BP.  Indeed, Section 4.3.1 of the Settlement Agreement directs Mr. Juneau to "faithfully implement and administer the Settlement, according to its terms, *for the benefit of the Economic Class*."  Emphasis added.  Section 4.3.8 of the Settlement Agreement further provides that claims are to be processed "to produce the greatest ECONOMIC DAMAGE COMPENSATION AMOUNT that such information and supporting documentation allows." Section 2.1 of the Trust agreement charges Mr. Juneau to administer the Trust in accordance with the controlling Settlement Agreement.  But BP would have Mr. Juneau ignore those explicit provisions in the documents that it helped write and act solely to protect BP from *imagined* harms to the detriment of the Economic Class.  That, ironically, would be contrary to the Settlement Agreement, the Trust, and the Court's directions to Mr. Juneau.

Regardless, as demonstrated herein and in previous pleadings, Mr. Juneau, in his roles as Claims Administrator and Trustee, has not breached any duty to BP, but rather has always acted

---

[103] The Trust Agreement provides in Section 7.8 that it is to be governed by Delaware law, while Section 36.1 of the Settlement Agreement provides that it is to be governed by maritime law.

in a transparent and vigilant manner to implement the Settlement Agreement and Trust as written (and interpreted by the Court) for the benefit of *all* the parties.  BP's continued attacks on him are not in good faith and, if anything, seem to have the thinly-disguised purpose of impeding his ability to perform the services for which the Court appointed him.

  **C.**  **Mr. Juneau Administers the Program as A Court-Appointed and Court-Directed Independent Administrator.**

  BP's Motion also ignores  that Mr. Juneau works at the pleasure of the Court, not of BP. It is the Court, not BP, that has the discretion to supervise the Settlement Program and direct Mr. Juneau to alter any current operations as it sees fit.  Mr. Juneau consistently has followed the directives of the Court, and for BP to allege that his administration or he individually have breached any duty is spurious, unfounded, and inappropriate.  BP's attempt to usurp the Court's authority in the administration of the Program is unwarranted, and the renewed motion should be denied on that basis.

**VI.**  **BP is not entitled to the relief it seeks.**

  As demonstrated, BP has not met its burden of proof to obtain a preliminary injunction, as it has not shown likelihood of success on the merits of any breach of fiduciary duty claim it has attempted to manufacture against the Claims Administrator or the Settlement Program.  As important, and as a practical matter, the CAO has ensured that all claims submitted by or related to the Mobile CAC employee were held and thoroughly investigated, and any perceived appearance of impropriety in the appeals process is being cured with no actual harm to BP.  In other words, a preliminary injunction – even one reasonably tailored to the issues raised by BP in its renewed motion – is unnecessary to protect BP or the Settlement Program.  Mr. Juneau and the CAO have already acted to do so, in the furtherance of their responsibilities and obligations to the Court, the class members, *and* BP.

## VII.    <u>Conclusion</u>

The response to every allegation or indicia of suspicious activity cannot, as BP apparently wants, result in a shut-down of the entire Settlement Program.   Nor should every such issue or potential problem lead to another round of unfounded attacks on the Claims Administrator, his office, and the other court-appointed professionals working to implement the Settlement Program.   The CAO researched, developed, and implemented strong and effective fraud-detection systems and processes described herein to identify, investigate, and address the types of issues discussed in BP's motion.   The CAO's Fraud Protection Program should be allowed to continue working, and the Court should put a stop to BP's repeated attempts to halt the implementation of the Settlement Agreement.

Ultimately, BP asks the Court to safeguard it from imagined harm at the expense of the settlement claimants without submitting any evidence that it has paid or will have to pay any improper claim as a result of the issues raised in its renewed motion.   Moreover, there has been no showing by BP of any breach of any duty by the Claims Administrator, his office, or others involved in the Programs' operations.   BP's motion is, therefore, improper, unsupported, overbroad, and should be denied.

Respectfully submitted,

Phillip A. Wittmann, 13625
John M. Landis, 7958
Maggie A. Broussard, 33033
    Of
STONE PIGMAN WALTHER
  WITTMANN LLC
546 Carondelet Street
New Orleans, Louisiana  70130
Telephone:  (504) 581-3200
Facsimile:  (504) 581-3361

Richard C. Stanley, 8487
Jennifer L. Thornton, 27019
Gina M. Palermo, 33307
Patrick H. Fourroux, 34550
    Of
STANLEY, REUTER, ROSS
  THORNTON & ALFORD, LLC
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone:  (504) 523-1580
Facsimile:  (504) 524-0069

By:  /s/ Gina M. Palermo

*Attorneys for Deepwater Horizon Court Supervised Settlement Program and Patrick A. Juneau, in his capacity as Claims Administrator and Trustee*

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of August, 2013, I electronically filed the foregoing Response with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Gina M. Palermo