**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| In re:  Oil Spill by the Oil Rig | **MDL NO. 2179** |
| "Deepwater Horizon" in the Gulf | |
| of Mexico, on April 20, 2012 | **SECTION J** |
| | |
| Applies to: *All Cases* | **JUDGE BARBIER** |
| | **MAGISTRATE JUDGE SHUSHAN** |

<u>**DECLARATION OF ORRAN L. BROWN**</u>

**1.**      ***Personal Information.***  My name is Orran L. Brown.  I am the Chairman and a founding partner of BrownGreer PLC ("BrownGreer"), located at 250 Rocketts Way, Richmond, Virginia.

**2.**      ***Personal Knowledge.***  The matters set forth in this Declaration are based upon my personal knowledge, experience, and training, as well as facts related to me in my capacity as supervising partner for BrownGreer's work on the Deepwater Horizon Economic and Property Damages Settlement Agreement ("Program").

**3.**      ***General Description of BrownGreer.***  BrownGreer is a firm experienced in the legal and administrative aspects of the design, approval, and implementation of claims facilities to provide damages payments, medical monitoring, or other benefits for the resolution of mass claims through class action settlement, bankruptcy reorganization, voluntary agreement, or other aggregation vehicle.

**4.**      ***Role in the Deepwater Horizon Program.***  BrownGreer provides services to Patrick Juneau, the Claims Administrator of the Court Supervised Settlement Program ("CSSP") established under the Program.  Among other services, BrownGreer created the process for the review of claims received by the Program, procured and trained staff needed to process the claims, and procured and trained the staff in the 18 Claimant Assistance Centers ("CAC") used in the Program.  Attached to this Declaration as Exhibit A is an overview of the claims processing system.

### A. <u>BP Hotline Caller's Accusation Against the Program's Employees</u>

**5.**      ***BP's Hotline.***  According to BP's July 15, 2013, Press Release, *BP Launches Gulf Claims Fraud Hotline*, attached to this Declaration as Exhibit B, BP opened the "Gulf Claims Fraud Hotline" on July 15, 2013, encouraging people – in exchange for a potential monetary award – to report "any fraudulent or corrupt activity" regarding the Program.

**EXHIBIT II**

**6.**     ***Content of Informant's Allegations.***  On Thursday, July 18, 2013, I received a copy of a letter from Keith Moskowitz, an attorney who represents BP, which was written to David Welker, the Program's Director of Fraud, Waste, & Abuse.  Mr. Moskowitz's letter described and forwarded an accusation by a caller ("BP Hotline Informant") against a specific employee of the Program ("Employee A"), as well as the CAC in which Employee A worked, located in Mobile, Alabama ("Mobile CAC").  Specifically, Mr. Moskowitz indicated that, on July 15, 2013, BP received an allegation through its anti-fraud hotline that Employee A had "assist[ed] individuals in submitting fraudulent subsistence claims to the CSSP in exchange for payment of a portion of settlement awards that may be paid to these individual claimants."  Mr. Moskowitz indicated that the fraud hotline intake report "[wa]s the only record that BP possess[ed] related to the reported tip."  He also noted that "the person who reported the tip does not know the name of the CSSP employee" and that "BP cannot comment on the veracity of the information reported[.]"

Mr. Moskowitz's letter then attached the statement taken from the BP Hotline Informant.  In this statement, the informant stated that she worked with Employee A's mother and that, through the mother, she learned that Employee A (a) recruits people to file claims in exchange for a percentage of the claim's award and (b) had actually filed fraudulent claims for her mother, uncle, and other family members in which she advised her family on ways to maximize claim value while evading fraud detection.  The BP Hotline Informant also alleged that other employees in the Mobile CAC participated in similar activity.

**7.**     ***The Program's Claimant Assistance Centers.***  The "claims center" referred to by the BP Hotline Informant refers to one of the 18 CACs located across the Gulf.  The CACs are customer service centers, staffed with trained professionals who assist primarily unrepresented claimants interested in participating in the Program or who have questions about claims already filed with the Program.  The Program has CACs in Alabama, Florida, Louisiana, Mississippi, and Texas.  The specific CAC referenced in the BP Hotline Informant's statement is located in Mobile, Alabama.

**8.**     ***Roles of CACs and Their Personnel.***  The Program primarily charges a CAC employee with the responsibility of giving each claimant or potential claimant he encounters the tools and knowledge needed to make the most informed decisions possible for each claim he may file.  Necessarily, CAC employees – after verifying a claimant's identity and representation status – must initiate claims, search for claims, and speak to claimants about their claims.  The employees answer general Program questions and concerns, review documentation for completeness, explain notices, deadlines, and correspondence in an understandable and approachable way, and perform outreach to claimants with incomplete claims.  Most commonly, individuals visit CACs for assistance with:

(a)  Registering or Filing a Claim Form;

(b)  Checking the Status of a Claim; or

(c)  Submitting New Documents.

9.      ***Response to Keith Moskowitz's Letter and BP Hotline Informant's Statement.***
After BrownGreer received a copy of Mr. Moskowitz's letter, we participated in a conference
call with Mr. Welker and other members of the Claims Administrator's Office. We learned that
the independent third-party vendor retained by the Program to investigate allegations of fraud,
HUB Enterprises, Inc. ("HUB"), would be conducting an investigation into the BP Hotline
Informant's Statement. HUB also indicated that it planned to interview the specific target of the
accusation, Employee A, as well as all members of the Mobile CAC the next day, Friday, July
19, 2013. We helped facilitate the investigation by deploying our head of Human Resources
from New Orleans to the Mobile CAC on the morning of the interviews to be available to assist
HUB in whatever manner necessary.

10.     ***Actions Taken by BrownGreer on July 19, 2013, Following HUB's Interviews.***
During HUB's interviews, questions arose about whether Employee A knew that her mother and
brother had a claim with the Program. The Program's Code of Conduct Policy requires
employees to disclose any family member with a claim. During HUB's interviews, questions
arose about whether two other employees were in complete compliance with BrownGreer's
Conflict of Interest Policy and Computer Use Policy. Because the investigation had just begun
and out of an abundance of caution pending its outcome, BrownGreer suspended the
employment of Employee A and the other two employees. These suspensions were not because
we suspected them to have engaged in fraud; rather, as there was some question that they may
have violated employment policies, we thought it was prudent to await the outcome of HUB's
investigation before making a final determination about their employment.

11.     ***Continued HUB Investigation.***   On August 7, 2013, HUB again visited the
Mobile CAC for follow-up interviews of certain employees and to interview employees who
had been absent during the initial interviews on July 19, 2013. BrownGreer learned that
HUB planned to interview Employee A's mother later that evening and Employee A's
brother the next day, on August 8, 2013. Later, we learned that Employee A's mother did
not keep her appointment with HUB.

12.     ***Discussion with Employee A's Mother.***   On August 8, 2013, Ron Nowicki at
HUB informed Roma Petkauskas of BrownGreer that Employee A's mother wished to
withdraw her Subsistence claim from the Program and did not want to talk with HUB about
it. Ms. Petkauskas informed Mr. Nowicki that we intended to contact Employee A ourselves.

13.     ***Content of Conversations with Employee A's Mother.***   On August 8, 2013, I
called Employee A's mother at the phone number she had listed in the Registration Form she had
submitted in the Program, but did not receive an answer. When I tried the same number again
later in the afternoon, I asked to speak with Employee A's mother and the person who had
answered identified herself as the same. I gave her my name and informed her that I was with
BrownGreer and worked for Claims Administrator Patrick Juneau in the Program. I then asked
if we could discuss her claim. She readily agreed to do so. She informed me of the following:

(a) She instructed me to mark her Subsistence claim as withdrawn by claimant and close
it.

(b) She had decided to withdraw her claim because she "no longer wants to fool with it." It "just doesn't matter to me," she said. She does not know if it is a payable claim or not. She does know that she had to stop fishing because of the Spill and thought that meant she could file a claim. She is not afraid of getting in trouble or getting her daughter, Employee A, in trouble relating her claim. She knows of no reason she would be in trouble as a result of her claim.

(c) She filed her Subsistence claim online on her own, using a laptop. She did not talk with Employee A or anyone else before she did so. She filed it because the Spill prevented her from fishing. Neither Employee A nor anyone else told her what to put in her Claim Form. She did not tell Employee A that she had filed a claim. As far as she knew, Employee A did not know that she had filed a claim. It is "none of her business what I do," she said.

(d) She does not have a close relationship with Employee A because she went into debt trying to take care of Employee A. They "had a falling out" some time ago.

(e) She enjoys eating fish. She took up fishing in 2004, after another daughter and her mother both died. Her daughter died on April 9, 2004, and her mother died on June 29, 2004. She feels that she still has "not gotten over it."

(f) She fishes mostly with a cane pole, and she says she knows what bait to use. She named the types of fish she catches, which matched the types in her Subsistence Claim Form.

(g) She fishes mostly at Cedar Point Pier in Mobile or at the Mobile causeway. On some occasions, she goes to Gulf Shores or Pensacola with her son to fish.

(h) To derive the pounds she put in her Subsistence Claim Form, she just estimated. She used the size of her cooler and how much it holds, and what "things weigh in the store."

(i) She identified the family members she named in the Subsistence Claim Form, listed in this Declaration as Family Member 1, Family Member 2, and Family Member 3. Family Member 1 is her daughter, whom she adopted after her other daughter's death. Family Member 2 is her father, who has had several mini-strokes and is in poor health. Family Member 3 is her brother. All three persons live with her full time except Family Member 3, who lives with her "off and on, but more than off," meaning more with her than anywhere else. She cooked fish that she caught and fed it to these people.

(j) She never asked Employee A for help on her claim or to look it up and tell her where it was in the system. Employee A never talked with her about her claim or where it was in the system. She did not want Employee A to know she had filed a claim and sees it as "none of her business."

      (k) She never talked with Employee A about sharing any proceeds of her claim.  If she had been paid on it, she would not have shared any part of her claim with Employee A.

I then concluded the call.  After reviewing my notes of the call, I called her back about an hour later, and she again answered the phone.  I asked her whether she had ever told anyone anywhere that her daughter, Employee A, was helping relatives file claims, or was getting money from other persons' claims, or that others in the office where her daughter Employee A worked knew how to game the system and were doing any of those things.  She said "absolutely not."  She said that she "would not do anything like that" and "would not be a part of anything like that" or talk about anything like that with anyone.  She said that, "I pretty much keep to myself."  I then concluded the call and have not talked with her since that call.

## B.  <u>Employee A's Job Description and Performance</u>

     **14.**  *Research into Employee A's Actions.*  Simultaneous with HUB's investigation, BrownGreer conducted research into Employee A's activities.  Members of my staff conducted this research by analyzing Employee A's activities in the DWH Claims Review System ("Review System"), the online mechanism through which claims evaluation occurs.  Every time an employee accesses the Review System to create a claim, review a claim, or look up information, we permanently record that action in the Review System.  We are able to see specifically what action an employee took and when, down to the hour, minute, and second.

     **15.**  *Employee A's Duties.*  On May 9, 2012, Employee A began working as a Claimant Assistant, assigned to assist claimants with filing claims, intake of documents and answering program related questions.  On September 20, 2012, she received training to perform Data Capture and Document Categorization reviews.   After passing her Document Categorization and Data Capture proficiency tests, Employee A began those functions on October 3, 2012.  On December 10, 2012, the Subsistence Team Leads from Orange Beach, Alabama, trained her to perform Subsistence reviews.  She began performing Initial Reviews on Subsistence claims on January 12, 2013.  On February 6, 2013, she progressed to performing Quality Assurance ("QA") reviews on Subsistence claims.  She was removed from QA on February 26, 2013, for retraining and to gain more experience, and she requalified to conduct QA Subsistence reviews on March 18, 2013.

     **16.**  *Initiation of Claims by Employee A.*  As a CAC employee, Employee A was charged with all of the responsibilities identified in Paragraph 8 above, so her job required her to initiate claims for claimants visiting the Mobile CAC.  Based on our research, we learned that Employee A had created 135 claims and 124 claimants in the system.  She did not create the Subsistence claims of her mother or her brother.  There is no claim in the Review System for her ex-husband or for her uncle.

     **17.**  *Employee A's Referral of Claims to the Special Investigations Team.*  Over the course of her employment, Employee A referred 32 claimants to the Program's Special Investigations Team ("SIT"), the unit charged with detecting and preventing fraud, honoring her commitment to the Program to flag any questionable or suspicious claim and escalate it for SIT

review.  Twenty-two of the claimants she referred to the SIT had filed claims in the Mobile CAC.

    C. **Subsistence Claims Filed by BP Hotline Informant, Employee A's Mother, and Employee A's Brother**

    **18.**    *Research into Subsistence Claims Filed by BP Hotline Informant, Employee A's Mother and Employee A's Brother.*  We researched the Subsistence claims filed by the BP Hotline Informant, Employee A's mother, and Employee A's brother.  The following table provides a comparison among these three claims.

| Comparison of Subsistence Claims | | | | |
|---|---|---|---|---|
| | **Claim Information** | **BP Hotline Informant** | **Employee A's Mother** | **Employee A's Brother** |
| 1. | Date Filed | 6/19/13 | 5/4/13 | 1/17/13 |
| 2. | How Filed? | In Mobile CAC | Online | Online |
| 3. | Fishing Locations | Cedar Point Pier | Cedar Point Pier; Pensacola Pier; Mobile Causeway | Cedar Point Pier; Pensacola Pier |
| 4. | Catch Type | | | |
| | (a) Mullet | 75 lbs | 200 lbs | 450 lbs |
| | (b) Flounder | 100 lbs | N/A | 450 lbs |
| | (c) Trout | 100 lbs | N/A | 250 lbs |
| | (d) Crab | 100 lbs | N/A | N/A |
| | (e) Sheepshead | 75 lbs | N/A | 450 lbs |
| | (f) Drum | 50 lbs | N/A | N/A |
| | (g) Croaker | 100 lbs | 200 lbs | 300 lbs |
| | (h) Catfish | N/A | 320 lbs | 200 lbs |
| | (i) Grouper | N/A | N/A | 300 lbs |
| | (j) Flounder | 100 lbs | N/A | 450 lbs |
| 5. | Consumption % | 100% | 100% | 100% |
| 6. | Diet % | 40% | 45% | 30% |
| 7. | Dependents | 0 | 3 | 5 |
| 8. | Value | $2,898.48 | $4,376.22 | $13,500.18 |

    **19.**    *No Payments to the BP Hotline Informant, Employee A's Mother, or Employee A's Brother.*  The Program has not paid the claims of the BP Hotline Informant, Employee A's mother, or Employee A's brother.

    D. **Analysis of Subsistence Claims Filed in the Mobile CAC and in the Mobile Area**

    **20.**    *Program Reporting.*  The Claims Administrator's Office directed BrownGreer to establish and maintain daily, public reports providing details about the operation of the Program, such as the report cited in BP's Renewed Motion for Preliminary Injunction filed on August 5, 2013 ("Motion").  Furthermore, at the inception of the Program, the Claims Administrator's

Office directed us to develop an online portal ("the Portal") through which representatives of Class Counsel and BP, including BP's general counsel, could access information about the Program. This Portal provides 23 reports to the Parties, the majority of which are updated daily.

21.     *Weekly Data Feed.*  In addition to the reports posted publically and those made available to BP through its Portal, members of my staff provide the Parties a weekly data feed with additional details, including information about the origin of all claims in the Review System.     Each week, members of my staff participate in telephone conferences with representatives from BP to explain the data retained by the Program and answer any questions from the BP analysts charged with evaluating that data.

22.     *Reports on Activity in Claimant Assistance Centers.*  On June 14, 2012, the Program posted the first daily report showing statistics of claims filed at each CAC. That report showed that 16% of all claims filed through a CAC came from the Mobile CAC. At the time, fewer than two weeks after the start of the Program, this represented the second highest volume of claims submitted at any of the CACs. Since October 2012, BrownGreer has provided reports to BP through its Portal and the weekly data feed displaying the number of claims filed in each CAC location, the type of claim filed, and the number of claimants visiting each CAC on a daily and weekly basis. These reports have consistently identified the Mobile CAC as one of the busiest CACs in terms of both visitors and claims filed since the beginning of the Program in June 2012. Further, since January 2013, these reports have reflected an increase in the volume of traffic at the Mobile CAC, as well as an increase in the number of Subsistence claims submitted across the Mobile region.

23.     *Activity in the Mobile Claimant Assistance Center.*  The Mobile CAC experiences a higher volume of visitors than all other CACs. As of August 21, 2013, the Mobile CAC has had 19,361 visitors. The Mobile CAC has been the most visited CAC since the first week of the Program when 668 visitors went to the CAC, the most of any CAC during that week. The Mobile CAC has been the most visited for 46 out of the 64 weeks during the Program. Since November 19, 2012, the Mobile CAC has been the most visited CAC 39 out of 40 weeks. BP has had access to this information both through the reports referenced above and the weekly data feed.

24.     *Filings in the Mobile Claimant Assistance Center.*  Claimants have submitted 7,478 claims from the Mobile CAC, of which 4,462 are Subsistence claims.  Additionally, claimants have filed approximately 1,667 IEL claims, 656 BEL claims, 610 Real Property claims, and fewer than 100 Seafood, VoO, and Vessel Physical Damage claims at the Mobile CAC. While the Mobile CAC has received the highest number of Subsistence claims of any CAC, the filing of other claim types in the Mobile CAC is consistent with that of other CACs.

25.     *Filings of Subsistence Claims.*  Of the 26,223 total Subsistence claims filed with the Program so far, 19,379 have been filed online or by hard copy mail and not in any CAC. This means that 17% of all Subsistence claims (4,462 out of 26,223) were filed in the Mobile CAC and 83% were not. A total of 7,309 claims, or 28% of all Subsistence claims, originated from the Mobile area, of which 4,462 were filed in the Mobile CAC. The other 2,847 claims were submitted online or by mail from claimants listing Mobile, Alabama, as the city of

residence of their Claim Form.  The prevalence of Subsistence claims from Mobile residents has caused the Mobile CAC to have the highest number of Subsistence claims filed in a CAC.

26.     ***Increase in Subsistence Filings in Mobile.***  In January 2013, BrownGreer identified an increase in claims filed at the Mobile CAC and an increase in the number of claims submitted by Mobile residents generally.  The majority of the claims submitted during this time were Subsistence claims.  Employees at the Mobile CAC were the first to recognize the increase in Subsistence claim filings from Mobile and immediately brought that information to the attention of the CAC management staff and the SIT.  Immediately following the spike in Subsistence claim filing and continuing until today, the Program has taken steps to identify potentially fraudulent claims related to that spike.  Attached to this Declaration as Exhibits C and D are an overview of the analysis of Subsistence claims in the Mobile area and the SIT's fraud detection and prevention procedures.

27.     ***Claims Preparation Firms.***  The Program's claim filing statistics, fraud prevention investigations, and anecdotal evidence provided by claimants visiting CACs indicate that multiple claims preparation firms solicited claimants in the Mobile area.  Statistical evidence indicates that these claims preparation firms encouraged claimants in Mobile to file Subsistence claims.  Attached to this Declaration as Exhibit E is a graph that shows a spike in Subsistence claim filings shortly after the Program first learned about the involvement of these firms.  Collectively, these claims preparation firms have generated more than 2,079 Subsistence claims from the Mobile area, accounting for approximately 28% of all Subsistence claims from the Mobile area.  Multiple claimants visiting the Mobile CAC have informed our staff that these claims preparation firms prompted them to file Subsistence claims in the Mobile CAC, online, or by mail, even if they declined to register with a claims preparation firm.  The 2,079 Subsistence claims from the Mobile area have been placed on hold while the SIT continues its investigations.

28.     ***Referral of Subsistence Claims from Mobile to the Special Investigations Team.***  Over the course of the Program, we have referred a higher number of Subsistence claims from the Mobile CAC and the overall Mobile area to the SIT than any other CAC.  We have referred for SIT review 46% of Subsistence claims filed at the Mobile CAC and 83% of claims filed by Mobile residents online or by mail.  In comparison, we have referred for SIT review 14% of Subsistence claims filed elsewhere.

29.     ***Attorney Representation.***  Law firms represent 67% of all Subsistence claims filed by claimants outside of Mobile.  However, attorneys represent only 6% of claims submitted by Mobile residents.

30.     ***BP and GCCF Claims from Mobile.***  Though not all were Subsistence claims, BP received and paid hundreds of claims from Mobile residents in the months before the Gulf Coast Claims Facility ("GCCF") was operational.  After the opening of the GCCF, Mobile residents continued to file and receive payment on thousands of Emergency Advanced Payment, Interim Payment, and Final Payment claims.

31.     ***Fishing License Requirement.***  Section C.5 of the Subsistence Framework in Exhibit 9 to the Settlement Agreement requires that Subsistence claimants submit a copy of their

fishing license but then states that, "Deckhands or others that are not required to possess a fishing license are excused from this requirement."

32. ***Cedar Point Pier.*** The Cedar Point Pier, a major recreational fishing area in Mobile, does not require persons fishing there to have a fishing license. Subsistence claimants who indicate in their Claim Form or supporting documents that they fish at the Cedar Point Pier are exempt from the fishing license requirement described in Paragraph 31. This document exemption is known to the public. Claimants who filed at the Mobile CAC more commonly referenced the Cedar Point Pier in their submissions than claimants who filed in any other CAC. Claimants qualifying for this exemption are more likely to be payable. Therefore, the data suggests that Subsistence claims filed in the Mobile CAC have a higher payment percentage than those filed in other CACs because of the presence of the Cedar Point Pier in Mobile.

33. ***GCCF Releases from Claimants Filing Subsistence Claims at the Mobile CAC.*** To date, the Program has issued Notices for 1,673 Subsistence claims that were filed in the Mobile CAC, of which 26 (2%) were denied because the claimant had signed a GCCF Release. The Program has issued Notices to an average of 52 Subsistence claims filed in other CACs and denied an average of 10, or 19%, of those claims because the claimant signed a GCCF Release. Thus, a lower percentage of claimants who filed a Subsistence claim at the Mobile CAC have been excluded from participation in the Program because of a signed release, as compared to claimants who have filed at other CACs. In its Motion, specifically the accompanying Declaration of Hal Sider, BP includes excluded claims in its calculation of payable claims rates at Mobile and other CACs. The Program does not complete a substantive review of claims excluded from the Program and thus makes no decision on the merits of the claim to determine whether it is payable or not. After confirming that the claimant is excluded, the Program issues a Denial Notice without further review. Therefore, it is not appropriate to include such claims when comparing the payable rate between Mobile and other CACs because the other CACs have a significantly higher number of claimants who signed GCCF Releases and are excluded from this Program than do claimants filing at the Mobile CAC. Including these numbers artificially increases the gap between the payable rates by increasing the population of non-Mobile CAC claims that, by definition, can never be found payable.

34. ***Incomplete Claim Cure Rate.*** Of the Subsistence claims filed in the Mobile CAC, 63% are incomplete. Of Subsistence claims filed in other CACs, 75% are incomplete. Of the claims filed in the Mobile CAC that were initially determined to be incomplete for the license requirement, more claimants have cured this incompleteness reason by qualifying for an exemption than by satisfying the license requirement. The data suggest that the exemption from the fishing license requirement for Cedar Point Pier in Mobile contributes to Subsistence claims filed in the Mobile CAC having a higher incompleteness cure rate (32%) than those filed in other CACs (17%). In its Motion, BP does not include incomplete claims in its calculation of payable claims rates. By not including these claims, BP lowers the base population of claims and thus increases the payable rate.

35. ***Outcomes of Subsistence Claims Filed in the Mobile CAC.*** Though BP calculates a payable claims rate at the Mobile CAC of 86%, this figure excludes claims with incomplete outcomes and includes claims from claimants who are not eligible to participate in

the Program because of a signed GCCF Release.  Considering these factors, of the Subsistence claims submitted in the Mobile CAC, 32% are payable, 3% have been denied, 63% are incomplete, and 2% have been withdrawn or closed.  BP compares the Mobile CAC payable claims rate to the payable claims rate at all other CACs, which it calculates as 27%.  These figures do not consider the 19,379 claims filed online or through the mail.  Among all Subsistence claims filed, regardless of origin, 23% are payable, 3% have been denied, 69% are incomplete, and 4% have been withdrawn or closed.  Payable claims are claims receiving an Eligibility Notice with an award offer greater than $0.  Denied claims are claims that fail to meet the eligibility requirements set forth in the Settlement Agreement for Subsistence claims and claims that fail to provide the required documentation after a minimum of two Incompleteness Notices.  Denied claims in these statistics do not count claimants excluded from the Program. Incomplete claims are claims that fail to provide the required documentation, but have not yet exhausted all opportunities to respond with additional documents.

36.     ***Claim Approval Process.***  The Mobile CAC does not approve Subsistence claims for payment.  No Subsistence claim is finally approved for payment by anyone in the Mobile CAC.  Of the 527 Subsistence claims with Eligibility Notices thus far that were filed in the Mobile CAC, 159 (30%) were evaluated by an Initial or QA reviewer in the Mobile CAC. However, before generating any Notice on these claims, a team of evaluators – none of whom is in Mobile – checked all the claims and approved issuance of the Eligibility Notices.

## E. Description of the Program's Internal Controls

37.     ***BP's Assertions About Lack of Program Controls.***  Having read its Motion, I am familiar with BP's contention that, "There is a systemic failure by the CSSP to supervise and monitor personnel to prevent misconduct."  From the outset of our work on the Program, BrownGreer has implemented a wide range of meaningful internal controls, each of which is carefully designed to protect the integrity of the Program.  BrownGreer is continually calibrating existing controls to maximize their effectiveness while evaluating whether to implement new measures.  Consequently, our internal controls evolve over time as we add metrics in response to new developments and deactivate measures that we have determined are no longer necessary.

38.     ***BrownGreer Employment.***  BrownGreer has expansive protocols in place to ensure that candidates for hire are qualified to work for the Claims Administrator, do not have a current claim in the Program, and do not have other conflicts that would disqualify them from employment with the Claims Administrator.

39.     ***Hiring Criteria.***  Each candidate for employment with BrownGreer must fill out an application and background questionnaire.  Candidates for employment as claims reviewers, managers of claims reviewers, or assistants in the CACs must meet certain established professional and educational criteria to be eligible for hire.

40.     ***Employee Background Checks.***  BrownGreer conducts background checks on candidates for employment through LexisNexis to detect federal and state felony and misdemeanor convictions, education, former employment, present employment, and to verify Social Security Number information provided by candidates.  BrownGreer does not hire anyone

who has been convicted of a misdemeanor or felony in the past seven years or who provides false information on an application to work for BrownGreer.

**41.    *Required Family Disclosures*.**   Since July 2012, the Claims Administrator's Office has required that vendor employees working on the Program disclose if they have a parent, spouse, or child who has a claim with the Program.   Consequently, BrownGreer asked our employees and contractors to provide the name, alias, and address information for each individual that BrownGreer defines as an immediate family member.   Beginning on July 20, 2013, BrownGreer also asks about any other individual that cohabitates with the employee or contractor, such as another relative, a fiancé, a boyfriend, or a girlfriend.   BrownGreer does not hire anyone who discloses that he or she has a claim in the Program or that a parent, spouse, or child has a claim in the Program.   BrownGreer discloses to the Claims Administrator's Office all possible conflicts of interest that we identify and takes administrative action as necessary.

**42.    *Required Business Disclosures*.**   Beginning on July 20, 2013, BrownGreer also requested that our employees and contractors provide information about any business in which that worker has a financial interest or is an owner or part owner of as well as information about any business partners or co-owners that the worker has in such business.   We use this information to perform additional searches of the Review System to locate any claims that may pose a potential conflict of interest for an employee or contractor.   BrownGreer discloses to the Claims Administrator's Office all possible conflicts of interest that we identify and takes administrative action as necessary.

**43.    *New Hire Orientation*.**   BrownGreer conducts a new hire orientation for every new worker.   Our new hire orientation includes an explanation of the confidential nature of claimant information, the Program's Code of Conduct Policy, ethics and honesty, and the requirement to be free of all actual or apparent conflicts of interest.   BrownGreer explains that the worker cannot have or file a claim in the Program and that employees must disclose any claim activity by a business partner, a close personal friend, a cohabitating individual, or members of their immediate family.   BrownGreer conducts this training before employees or contractors are given access to the Review System.

**44.    *BrownGreer Employee Handbook*.**   All BrownGreer employees or contractors working on the Program receive and are required to read and agree to the BrownGreer Employee Handbook.   The Employee Handbook covers Conflicts of Interest, Confidentiality, and Professional Conduct.   All new hires also complete these additional Compliance Documents:

    **(a) BrownGreer Confidentiality Agreement:**   All workers must complete a Confidentiality Agreement with BrownGreer acknowledging that they must maintain the confidentiality of all information related to their work at BrownGreer during their employment and after they leave BrownGreer.

    **(b) Declaration for DWH Settlement Program:**   All workers must review the Program's Code of Conduct Policy and certify that they will not take any actions that could lead to a conflict of interest.

(c) **DWH Order Regarding Confidentiality:**   All workers must review the Confidentiality Order issued by the Court for the protection of Claims Information submitted to the Program and must execute a Certification indicating that they have read and agree to abide by the terms of the Order.

(d) **DHECC Security Policy Quick Reference:**  This document provides a summary of the full security policies implemented by the Claims Administrator for the protection of Program data.

(e) **DHECC Data Protection Plan:**  This is the Claims Administrator's Policy on how to identify and protect personal data.

(f) **Policy on Property and Information Use:**   This outlines the acceptable use of BrownGreer property and information.

45.  *Employee Training and BrownGreer Culture Building***.**  Before any employee or contractor begins work on any project at BrownGreer, we conduct extensive training on (a) BrownGreer; (b) our expectations regarding performance, behavior, and confidentiality; and (c) the specific tasks the worker will perform.  We cultivate in each worker a sense of pride in our organization and the work we do.  We find that this introduction into our firm culture promotes greater loyalty and adherence to standards of ethics and honesty required to work at our firm.

46.  *Settlement Code of Conduct Training***.**  Before any employee or contractor begins work on the Program, we conduct extensive training on the Program and on expectations regarding the Program's Code of Conduct and conflicts of interest.  All BrownGreer workers assigned to the Program must review the Program's Code of Conduct Policy and certify that they will not take any actions that could lead to a conflict of interest.

47.  *Fraud Training.*  All BrownGreer reviewers working on the Program receive training on the Program's fraud processes and how to contact the SIT to report fraud.  Every BrownGreer reviewer has the ability to identify a claim as potentially fraudulent, which automatically triggers a review of the claim by the SIT.  BrownGreer also provides workers with email addresses for the SIT to report instances of potential fraud and directs employees to contact their supervisors or BrownGreer Human Resources to report instances of potential fraud.  In addition, BrownGreer provides training specific to fraudulent claims to employees in CACs.

48.  *BrownGreer Employee Declarations***.**  BrownGreer requires all workers to affirm in a Declaration that they are unaware of any conflicts and imposes on the declarant an on-going duty to notify the declarant's supervisor(s) if the declarant becomes aware of a conflict.  To keep the Declaration current with Program standards, BrownGreer periodically revises the Declaration and requires every BrownGreer employee or Program contractor to sign the revised version of the Declaration.  BrownGreer has revised the Declaration four times:

(a) *April 19, 2012, Declaration.*   BrownGreer posted the initial version of the Declaration on its internal data collection site and instructed all employees and contractors on April 19, 2012, to sign this Declaration.  This version asked (1) if a

declarant or declarant's "spouse and/or child" ever worked for BP; (2) if applicable, for their date of separation from BP; and (3) if applicable, for a description of the nature of their employment with BP.

**(b)** *June 8, 2012, Declaration*.  BrownGreer posted the First Revised Declaration on its internal data collection site and required employees in the New Orleans office to read and sign it.  BrownGreer instructed employees and contractors on June 8, 2012, to sign this Declaration.  This version asked the declarant "are you a spouse or child of a person or have a child who has filed a claim" and required the declarant to agree to immediately notify their supervisor if a parent, spouse, or child files a claim with the Program.

**(c)** *July 13, 2012, Declaration*.  BrownGreer posted the Second Revised Declaration on its internal data collection site and required all employees to read and sign it, including those who had signed the First Revised Declaration.  BrownGreer instructed employees on July 13, 2012, to sign this Declaration.  This version asked the declarant if a "parent, spouse, or child" filed a DWH claim and continued to require the declarant to agree to notify immediately their supervisor if a parent, spouse, or child files a claim with the Program.

**(d)** *June 24, 2013, Declaration.*  BrownGreer posted the Revised Declaration for DWH Settlement Program on its internal data collection site and required all employees to read and sign it to comply with the provisions of the Program's Code of Conduct Policy.  This version required all employees and contractors to affirm that neither they nor any immediate family members have submitted any claim to the Program or taken other actions that would create a conflict of interest.  BrownGreer instructed employees and contractors on June 24, 2013, to sign this Declaration.

**49.**   ***Declaration Renewal.***   Periodically during the course of the Program, BrownGreer requires employees and contractors to renew their Declarations confirming that they do not have a conflict of interest by reading and signing a new Declaration and disclosing any events that have changed since the prior Declaration by the worker.  BrownGreer also conducts frequent refresher trainings to reinforce the messages delivered during initial training.

**50.**   ***Supervisor Responsibility.***   BrownGreer managers and supervisors, including CAC managers, observe their teams daily and watch for any unusual conversations, behavior, or associations with visitors.  The Quality Assurance Team ("QA Team") produces weekly reports by claim type, which provide reviewer performance statistics.  These statistics include the rates of errors, changes in claim results, and percentage of claims found payable by each reviewer.  The QA Team sends these reports to supervisors, who analyze them for outliers in performance statistics and take remedial action when they detect an issue with reviewer performance.

**51.**   ***CAC Oversight.***   BrownGreer managers make frequent visits to the CACs, both announced and unannounced.  These are led by members of the BrownGreer Gulf Oversight Team, CAC Executive Team, Human Resources, Facilities, and Training Team.  The CACs also

undergo periodic IT audits from the Claims Administrator's Office.  During the visits, members of the Gulf Oversight Team and CAC Executive Team ensure compliance with all BrownGreer and Program policies, and talk with managers and staff to gather any comments or concerns they have, which would include any concerns about internal fraud.  All potential concerns identified during these visits receive immediate corrective attention.

52.     ***CAC IT Security Audits***.   Representatives from the Claims Administrator's Office visit the CACs to conduct IT Security Audits.  These audits include inquiries to managers and staff about common practices, including the use of IT assets.  The audits check for removable media, personal devices connected to the network, and visibility of computer monitors from outside-secured areas.  The auditors also check to ensure that all automated IT security protocols are operational.  From June 4, 2012, through August 8, 2013, the Claims Administrator's Office performed 37 IT Security Audits.

53.     ***Passwords, User Roles, and Review System Security***.  No individual can access the Review System unless that person is an authorized user with an approved user name and password.  That password is issued only to that specific user.  Separate from inherent tasks such as logging in, logging out, and changing passwords, we assign every user a defined role in the Review System tailored to permit that person to perform only the job assigned to the person and no other task.  The user role defines the capabilities and functions that an individual user can perform or access within the Review System.  To access a feature or function, an individual user must be assigned the specific governing role.  For example, it is impossible for a reviewer assigned solely to the role of Initial Review to perform a Quality Assurance review.  Currently, there are 151 roles in the Review System.

In addition to passwords and user roles, we also employ system security procedures.  The Review System uses algorithms to restrict further access.  For example, a reviewer who performs an Initial Review cannot perform the QA review on the same claim.  Following the claim evaluation, we employ a detailed Notice QA process before we issue any Eligibility Notice.  On Subsistence claims, an experienced reviewer or supervisor evaluates the substance of every payable determination for accuracy before we issue the Eligibility Notice.  None of the individuals who perform this function works in the Mobile CAC.  Therefore, it is not possible for anyone in the Mobile CAC to approve a payable notice.

54.     ***Portal Log-In Requirements***.   BrownGreer has a DWH Access Team that oversees the creation of user accounts and removal of system access for the areas of the Review System for which BrownGreer is responsible.  BrownGreer has established system protocols that monitor Portal user activity to assure that the user accounts are being actively used.  Each day, a system query checks user accounts for recent activity, and disables a user account if the user did not successfully log in to the account within the last 14 days.

55.     ***Portal Time-Out***.  If a user does not actively use the Portal for four hours, the system generates a message informing the user that the session will time out because of inactivity.  If the user does not request to continue using the Portal within five minutes, the Portal session ends.  The user is then required to log in to the Portal again to start a new session**.**

**56.**   ***Pop-Up Warning and Agreement to Start Each Session.***   Each time a worker logs on to the BrownGreer network, he receives the following warning:

By using this computer:

• I acknowledge my duty to preserve the confidentiality of all claims-related information, to use the information solely for the purpose for which I have access to it, and to disclose the information only to those persons necessary to assist with the performance of my authorized purpose.

• I will comply with BrownGreer's Policy on Computer Use and Internet Access and represent that I will use the computer only for acceptable uses and that I will not engage in unauthorized uses such as connecting non-BrownGreer devices to the computer, listening to or viewing personal CD and DVDs, accessing any personal email accounts, engaging any illegal activities under state or Federal law or reproducing any confidential claims-related information for conveyance outside of BrownGreer.

**57.**   ***Portal User Audits.***   The BrownGreer DWH Access Team, in coordination with each team and the Claims Administrator's Office, performs periodic audits of all user access.

**58.**   ***IP Address Security.***   On June 28, 2012, we implemented a process to limit access to the Review System only from pre-approved IP addresses.  Certain users are permitted to access the Review System from any computer, but access is limited.  As a result, most users cannot access the Review System to view or manipulate claims data from unapproved locations. At all times during the Subsistence review process, BrownGreer Subsistence reviewers could access the Review System only from pre-approved IP addresses.

**59.**   ***Workstation Security.***   The workstations used by all BrownGreer workers automatically lock after 15 minutes of inactivity.  Workers may unlock the station only by using a valid username and password.

**60.**   ***Internet Security.***   BrownGreer blocks worker access to various external internet sites.  Exceptions to this rule are evaluated and reviewed by IT and by CAC management, if required.  Examples of these exceptions include sites containing public records, court sites, government sites, and Google Maps (for researching location/address information), all of which we use in the processing of claims.

**61.**   ***Hardware Security.***   BrownGreer has disabled the functioning of the USB ports on each workstation, which prevents workers from placing information found in the Portal on a removable drive.  This restriction applies to all BrownGreer workstations in the New Orleans office, all CACs, and the Paragon Place office in Richmond, Virginia.

**62.**   ***Multiple Reviewer Requirement.***   The Review System prevents a QA reviewer from reviewing a claim that he or she previously reviewed in Initial Review.  This ensures that a different person reviews any claim flagged for QA.

63.     *Results Search Access*.  Results Search is a function that allows users to view only the status of a claim and its associated documents.  Users cannot perform system reviews, modify claimant profiles, or submit determinations into the Review System through Results Search.  On August 12, 2013, BrownGreer removed access to the Results Search function from reviewers who do not use the Results Search function to perform their primary job duties.  Reviewers who do not have access to the Results Search function are unable to look up claims in the system.

64.     *Results Search Monitoring*.  On July 23, 2013, BrownGreer began analyzing data from Portal Users with higher than normal Results Search usage.  We identified workers with outlier claimant searches, evaluated the data associated with those claimant searches, and completed interviews with these workers to understand the circumstances that led to these searches.  If, after reviewing the results of our ongoing internal investigation, we determine that a BrownGreer worker was conducting claimant searches for reasons outside the scope of a project assignment, we will take appropriate disciplinary action.

65.     *Claim Review Access*.  Since August 5, 2013, BrownGreer reviewers have been unable to pull and review claims on demand from the Initial and QA queues.  Instead, the system selects the next available claim when prompted to do so by the Initial Reviewer, who has no knowledge of the claims in line for review.  Only a small group of supervisors may assign a claim to a reviewer outside that assigned queue order, and, in doing so, the supervisor places the claim directly into the reviewer's personal queue.  Consequently, no reviewer can simply pick a particular claim for review.

66.     *Safeguarding Hard Copy Materials*.  BrownGreer provides reviewers with personal notebooks for keeping notes from trainings and as they perform reviews.  Reviewers are prohibited from removing notebooks from the premises and are instructed to keep the notebook secure while in the office.  Notebooks are collected for retention/shredding after they are no longer in use.

67.     *BrownGreer Employee SSN Audits*.  Starting in July 2012, BrownGreer began checking the Social Security Numbers of our employees and contractors against the Social Security Numbers associated with DWH claims to ensure that no BrownGreer worker has filed a claim of his or her own.  Beginning on July 22, 2013, BrownGreer changed the frequency of this check so that it is performed on a daily basis.

68.     *Quality Assurance Metrics*.  Each day, BrownGreer runs a total of 264 automated data metrics and analytic processes to detect anomalies in claims with all types of results.

69.     *Payment and Notice Review*.  Each day, BrownGreer identifies all claims or claimants that are ready for a Notice or payment.  BrownGreer reviews each payable Notice and potential payment before issuance to confirm that the Notice or payment is appropriate and correct.  This payable Notice review confirms that there is no evidence of fraud related to the claims that will receive a Notice.  Additionally, before payment, we verify the claimant's identity and reaffirm that there is no evidence of fraud related to the claim that will be paid.

70.     ***BrownGreer E-Hotline***.  Beginning on July 24, 2012, BrownGreer implemented an e-Hotline for use by workers in the New Orleans office and in the CACs to alert us of situations that are a potential cause for concern.  BrownGreer has also asked workers to reach out to our Human Resources department to report any concerns that a worker may have, including instances where a worker suspects a co-worker of misconduct.

71.     ***Call Center Comment Line***.  On March 15, 2013, BrownGreer implemented a Call Center Comment Line for use by claimants or other individuals to report concerns about their experiences with the Program.  Callers may supply these comments anonymously if they wish to do so.  Since establishing this hotline, BrownGreer has not received any calls reporting potential fraud or suspicious behavior.

72.     ***Special Investigations Team.***  In addition to the internal controls over our workers' actions, the Program also maintains the Special Investigations Team, described above, that works closely with members of the Claims Administrator's Office, particularly David Welker, HUB, and the Department of Justice.  Exhibit D to this Declaration contains details about this team.

73.     ***Additional Protections.***  BrownGreer continually evaluates the need for additional internal controls.  For example, BrownGreer is implementing a system control in which reviewers at the CACs are not permitted to evaluate a claim that was filed in person at any CAC. We continually assess the installation of new protections and the effectiveness of current procedures.  We will continue to enact new measures whenever necessary over the remainder of the Program.

I, Orran L. Brown, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.  Executed on this 26th day of August, 2013.

_____
Orran L. Brown

17

---

**DEEPWATER HORIZON ECONOMIC SETTLEMENT PROGRAM CLAIMS REVIEW PROCESS**

---

1.     *Claim Intake.*   The Deepwater Horizon Economic and Property Damages Settlement Program ("Program") has developed the Claim Intake process to address the needs of both *Pro Se* and represented claimants.  To assist in the submission and tracking of claims, the Program has developed these processes:

(a) Submitting a Claim.  The Program allows *Pro Se* claimants to submit claims in one of two ways.  First, claimants may submit claims by filling out a hardcopy Claim Form.  Claimants can mail, fax, or email these Claim Forms to the Program.  The Garden City Group processes these hardcopy claim forms and enters the claims in the Program's Review System.  Additionally, claimants may submit claims through a secure online portal.  Claimants can submit claims using the portal on their own or they may visit a Claimant Assistance Center ("CAC") to receive assistance from a CAC representative in submitting a claim.

(b) Portals.  The Program created secure web-based portals to allow claimants and attorneys to submit, access, and edit information needed to process claims for the Program.  The portals allow claimants and attorneys the ability to exchange information with the Program instantly and provide one central location to track deadlines, review notices and view claim statuses.

2.     *Pre-Review Processes.*   The Program performs several pre-review processes before a claim enters the substantive review process.

(a) Exclusions. The Program conducts reviews of claims and claimants to determine if they should be excluded under the Settlement Agreement.

(1) GCCF Release Review.  The Program reviews claimants to confirm that claimants who are filing for claims other than Vessels of Opportunity ("VoO") or Vessel Physical Damage claims have not submitted a Gulf Coast Claims Facility ("GCCF") Release.  Approximately 80% of the Exclusion Denials are GCCF Release Exclusions.

(2) Self-Reported Exclusions on the Registration Form Review.  The Program reviews claimants' Registration Forms to determine whether or not the claimants accurately self-reported Exclusions.

(3) Exclusions based on Substantive Business Activity. The Program identifies Exclusions based on an Entity's NAICS Code or Substantive Business Activity through the Employer/Entity Verification Review ("EVR") Process described below.

**EXHIBIT II(A)**

(4) The Program reviews for all Exclusions listed in Sections 2 and 3 of the Settlement Agreement.

(b) Opt-Outs.   An individual or business representative who submitted a personally signed letter, postmarked by November 1, 2012, stating that he/she/it chooses not to be a part of the Program has opted out of the Program.   Such Opt-Out claimants cannot submit claims in the Program.   The Program reviews all claimants to determine if the claimant opted out of the Program.

Opt-Out claimants could revoke the decision to opt out prior to December 15, 2012. Any revocations postmarked later than December 15, 2012, must receive permission from BP or the court for the revocation to be granted.   The Program reviews all attempts to revoke an Opt-Out, if the revocation requests are postmarked before the deadline.   The Program presents revocation requests submitted after the deadline to BP or the court for consideration.

(c) Moratoria Review.  The Program analyzes each Entity that the EVR Team determines to have an Exhibit 19 NAICS code and determines whether the Entity fits the Exhibit 16 criteria requiring further scrutiny for potential Moratoria Losses.   Moratoria Losses are any losses whatsoever caused by or resulting from federal regulatory action or inaction directed at offshore oil industry activity – including shallow water and deepwater activity – that occurred after May, 28, 2010, including the federal moratoria on offshore permitting and drilling activities imposed on May 28, 2010, and July 12, 2010, and new or revised safety rules, regulations, inspections or permitting practices.   Economic Loss Claims arising out of Entities that meet these criteria are automatically routed to Moratoria Losses Review.   Economic Loss Claims arising out of Entities that do not meet these criteria generally proceed under normal processing pursuant to the Business Economic Loss ("BEL") Frameworks and the Individual Economic Loss ("IEL") Framework, without further analysis for Moratoria Losses.   However, if the Program identifies indicia of potential Moratoria Losses, it will review the claim and related Entity and refer it to the Claims Administrator for approval before continuing to process the claim.   The Claims Administrator analyzes these claims on a case-by-case basis, examining the particular circumstances of the Entity, to determine whether the claim requires further review for Moratoria Losses or should continue normal processing under the BEL Frameworks or IEL Framework.   Because the Moratoria Losses Review framework has not been finalized, the Program is not currently reviewing claims identified as requiring Moratoria Losses Review. The Claims Administrator has met with BP and Class Counsel on numerous occasions to discuss the implementation of the Moratoria Losses exclusion and has requested that the Parties furnish the agreed-upon guidance and parameters that the Claims Administrator is to apply.   While the Claims Administrator has received submissions from both BP and Class Counsel setting out their respective provisions, there is no agreement between the Parties on any of the essential aspects the Moratoria Losses exclusion.

2

(d) Identity Verification.  The Program conducts searches based on the claimant's Social Security Number ("SSN"), Individual Taxpayer Identification Number ("ITIN") or Employer Identification Number ("EIN") to ensure the legitimacy of the claim being submitted and to confirm that the SSN/ITIN/EIN belongs to the corresponding claimant.  This protects against payment of claims that are fraudulent and that may involve identity theft.  The Program verifies these taxpayer identification numbers using one or more of the following services:  LexisNexis, the Social Security Administration's Consent Based Social Security Verification process, Dun & Bradstreet, Accurint.com, or Florida Sunbiz.  If the Program cannot verify the taxpayer identification number through its research, it will issue an Identity Verification Notice requesting additional documentation from the claimant.

(e) Overlapping/Duplicate Claimants.  The Program performs this review to prevent claimants from filing with the Program more than once and to link Program claimants properly to GCCF claimants.  It is essential that the Program link claimants properly so that it can accurately: (1) offset prior GCCF payments; (2) identify claimants who signed a Release in the GCCF program; and (3) transfer documentation to the Program's Review System.

(f) Signature Review Process.  The Signature Review process addresses the need of the Program to ensure that the Registration Form, Claim Form(s) and Challenge Form(s) have valid signatures.  If the claimant is represented by an attorney, the claimant may sign the Form(s) personally or the attorney can sign the Form(s) for the claimant if there is a Power of Attorney agreement signed by the claimant that provides the attorney the ability to represent the claimant in the Program.  If the claimant is *Pro Se*, the Program requires that the Form(s) be signed personally unless the claimant is deceased, minor or incompetent.  If the claimant is deceased, minor or incompetent, the Program requires the signature of an authorized personal representative of the claimant.

(g) EVR.  For BEL, IEL, and Seafood Crew claims, the EVR process ensures that each Employer/Entity and its employees are treated uniformly for purposes of all designations that will affect the eligibility and value of a claim.  To accomplish this uniformity, the Program identifies each unique Employer/Entity associated with or making any claim and assigns attributes to the unique Employer/Entity that have a substantive effect on the outcome of claims.  The characteristics assigned to each unique Employer/Entity are:  NAICS Codes, Industry classification, and Eligibility Zones.  These attributes, when associated with a particular claim, determine exclusions based on the Employer/Entity's substantive business activities, documentation requirements, causation requirements and Risk Transfer Premiums ("RTP").

    **3.**    ***Document Categorization.***  This is the first step in the substantive claims review process.  During this part of the review, the Program identifies the type and location of each page of documentation in the claimant's file.  This step is the foundation for the rest of the claims review process because the Program will perform Data Capture of certain financial and

causation-related data based on the Document Types identified during this process. During this part of the review, the reviewer will identify all relevant financial documents from which data will need to be entered into the system for use in calculating the value of the Economic Loss claim.

    **4.**    ***Data Capture.***  The Program recognizes four categories of "Economic Loss" claims: (1) Business Economic Loss (including Failed Business Economic Loss and Start-Up Business Economic Loss); (2) Individual Economic Loss; (3) Seafood Compensation Program; and (4) Individual Periodic Vendor. Data Capture is the building block for the Economic Loss claims review. The Program performs Data Capture on financial documents and on certain other documents, such as Sworn Written Statements. The Program then uses the data to perform both causation analysis and compensation calculations for Economic Loss claims.

    (a) For IEL claims, the most common documents entered during the Data Capture process are paychecks or payroll records. As part of Data Capture, the Program captures several data points from these records, including Start and End Dates, Gross Earnings, and Year-to-Date Earnings. Once this data is collected, the Program uses it to compare Benchmark and Compensation Period earnings.

    (b) For BEL claims, the most common documents entered during the Data Capture process are profit and loss statements. As part of Data Capture, the Program captures several data points from these records, including Start and End Dates, Total Revenue, the presence of expenses and any one-time revenue that must be excluded from the claimant's monthly revenue. Once this data is corrected, the Program uses it to perform both the causation and compensation analysis.

    (c) For Seafood Compensation Program ("SCP") claims, the three most common documents entered during the Data Capture process are trip tickets, vessel registration forms, and commercial fishing licenses. As part of Data Capture, the Program records several data points from these documents. For trip tickets, this includes the date of the trip ticket, the vessel listed on the trip ticket, the gross revenue associated with each catch type, and the landing location where the trip ticket was issued. For vessel registration forms, the Program captures the registration type, Federal or State, the vessel registration number, vessel owner, and the expiration date of the registration. For commercial fishing licenses, the Program captures the name of the license holder, the license expiration date, the issuing state, and the catch type covered by the license.

    **5.**    ***Economic Loss Claims Review.***  After the Document Categorization and Data Capture[1] steps, the Economic Loss Claim Types have similar review steps:

    (a) Claim Identification. Each Economic Loss Claim Type requires the identification of the claim that the claimant is asserting.

---

[1] The Program does not perform Data Capture on IPV/FV claims.

(1) BEL.  The Program must identify the Facility that represents the physical location of the business entity for which the claimant is asserting a claim.

(2) IEL.  The Program must identify the job or jobs for which the IEL claimant is claiming losses as a result of the Spill.

(3) SCP.  The Program must identify the claimant's specific employer(s) or vessel(s) associated with a particular claim. The Program records any applicable partial ownership interest in vessels, Oyster Leaseholds, or Individual Fishing Quotas ("IFQs") to allocate offers between multiple owners, if any, during the compensation calculations.

(4) Individual Periodic Vendor or Festival Vendor ("IPV/FV").  The Program must identify the sales item(s) and location(s) for which the claimant is claiming losses as a result of the Spill.

(b)  Document Requirements:

(1) BEL.  The Program must confirm that a BEL claimant has submitted financial records, documents demonstrating ownership and business structure and documents proving the effect of the Spill on the claimant's business.  The Program may require additional documentation if the claimant is submitting a Multi-Facility, Failed or Start-Up BEL claim.

(2) IEL.  The Program must confirm that an IEL claimant has submitted all required supporting documentation for the Program to calculate a claimant's Spill-related losses, such as financial documents, including tax and pay period documents and documents proving causation if the claimant does not have the benefit of a causation presumption or an Eligible Employer.  If a claimant is claiming additional losses for Reimbursable Job Search Costs, Reimbursable Training Costs, One Time Non-Recurring Losses, or Employer-Related Benefits Losses, the Program must determine if the claimant provided additional documentation to demonstrate the cause and the amount of those losses.

(3) SCP.  Each claim type in the SCP has unique documentation requirements based on the specific compensation plan.  The Program must confirm that that claimant has provided the documents required for its compensation plan, such as licenses, financial records, proof of vessel ownership and proof oyster leaseholds.

(4) IPV/FV.  The Program must confirm that an IPV/FV claimant has submitted documents sufficient for the Program to determine that the claimant made sales before 4/20/10, required sworn written statements for an IPV and/or FV that provide details on the items sold, the locations or Festivals where the claimant sold the items, and third-party verification of such sales, and total earned income documentation for IPV sales from May – December 2009 and 2010 and/or total earned income made at each eligible Festival in May - December 2009 and

2010.  The Program may require additional documentation if the claimant made sales in Zone C or employed another individual to help make the sales.

(c) Eligibility/Causation:

   (1) BEL.  The Program will determine if the claimant has satisfied a causation presumption as outlined in the Settlement Agreement.  If the claimant has not satisfied a causation presumption, the Program performs a causation analysis to determine if the claimant's financial performance satisfies the revenue pattern tests that the Settlement Agreement requires according to the claimant's Zone and Industry Designation.  If the claimant has submitted insufficient documentation to determine if the claim passes causation, the Program will seek additional documents from the claimant such as:  objective Third-Party documentation describing the reason that the claimant's revenue did not recover in 2011, proof of a cancelled contract or reservation and documents showing the addresses of the claimant's customers and dates of the sales to these customers.

   (2) IEL.  The Settlement Agreement outlines two groups of IEL claimants who do not need to provide documentation to prove that their losses were caused by the Spill (1) Claimants whose employers received final payment in either the GCCF or the Program; and (2) claimants whose employers are presumed to have passed causation based on the requirements of the Settlement Agreement. The Program performs causation analysis on all other IEL claimants to determine if a claimant's losses were caused by the Spill.

   (3) SCP.  The Program performs the causation analysis outlined in the Settlement Agreement on Seafood Crew Claims.  However, causation is presumed if the claimant satisfies the documentation requirements for each specific Crew Claim Type.  Causation Analysis is not required on any other claim type in the SCP.

   (4) IPV/FV.  If the claimant made sales in Zones A or B, the Program presumes causation.  If the claimant made sales in Zone C, the Program must determine if the claimant submitted sufficient documents to verify that the claimant made the sales to non-local consumers and that the claimant experienced a 5% decline in sales for three or more months from 2009 to the same months in 2010 or the Festival was cancelled or experienced a loss of attendance.

(d) Compensation Calculation.

   (1) BEL.  The Program compares the actual profit of a business during a defined post-Spill period in 2010 to the profit that the business might have expected to earn in the comparable post-Spill period of 2010.  The compensation calculation is divided into two steps.  The Program determines Step 1 Net Compensation by calculating the difference in Variable Profit between the Optimum Step 1 Compensation Period and the Variable Profit over the comparable months of the Optimum Benchmark Period.  The Step 1 Compensation Period must include

three or more consecutive months between May and December 2010.  The Program determines by multiplying the claimant's monthly revenues from the Optimum Benchmark Period by the sum of its Claimant-Specific Factor and the General Adjustment Factor to yield Incremental Revenue.  The Program then multiplies the Incremental Revenue by a Variable Margin Percentage to determine Step 2 Variable Lost Profit.  Total Compensation is calculated by adding Step 1 Compensation and Step 2 Compensation, applying the appropriate RTP based on the claimant's Industry Designation and Economic Loss Zone, and subtracting any applicable payments that it received from BP or the GCCF pursuant to BP's OPA claims process, as well as any VoO Settlement Payment Offset and VoO Earned Income Offset.

(2) IEL.  The Program compares the income that the claimant was expected to earn in the Compensation Period to the income that the claimant actually earned during that period.  The Program also applies an award multiplier based on the claimant's job industry and geographic location.  In addition to the base calculation, the Program allows some IEL claimants to claim certain additional expenses caused by the Spill, such as Reimbursable Job Search Costs, Reimbursable Training Costs, One Time Non-Recurring Losses, or Employer-Related Benefits Losses.

(3) SCP.  In the SCP, for Vessel Owner, Vessel Lessee, Boat Captain, and Seafood Crew claims the compensation calculations are based on eligible Benchmark Revenue.[2]  The Program determines the Final Claimant Compensation by calculating Benchmark Revenue from data entered during Data Capture, or from Accountant Workbooks, and applying the specific formulas for each SCP claim type fixed by Exhibit 10.  The compensation for IFQ claims is based on IFQ share percentages owned as of 4/20/10.  Oyster Leaseholder compensation is based on leasehold acreage located in three Oyster Leasehold Compensation Zones.

(4) IPV/FV.  The Program calculates compensation for IPV/FV claims by comparing earned income made in 2009 to earned income made in the same months or specific Festivals in 2010.  The Total Compensation Amount is equal to that amount or $12,000, whichever is lower, and applying a RTP of one.

**6.    *Non- Economic Loss Claims Review.*** The Program recognizes four types of Non- Economic Loss claims:

(a) Wetlands Real Property.  The Program conducts Wetlands reviews for individuals or businesses that prove ownership of a Parcel located in the Wetlands Real Property Claim Zone at any time between April 20, 2010, and April 18, 2012.  The Program confirms the location of the claimed Parcel and determines whether the Parcel is located in the Wetlands Real Property Claim Zone according to the Wetlands Claims

---

[2] Aside from Seafood Crew Claims, the Benchmark Revenue is based on annual income earned during the Benchmark Period.  The Benchmark Period, for Vessel Owner, Vessel Lessees and Boat Captains is 2007-2009, 2008-2009, or 2009, with two exceptions.  For Oyster claims the Benchmark Period is fixed as 2007-2009 and for Seafood Crew Claims the Benchmark Period is April 20th through December 31st, for each of the Base Years.

Administrator's Database.  If a Parcel is not located in the Wetlands Real Property Claim Zone, the claim is sent to the mapping experts to determine if the Parcel should be added to the Wetlands Real Property Claim Zone.  If the Parcel is located in the Wetlands Real Property Claim Zone, or is added to the Wetlands Real Property Claim Zone after review by the Program's mapping experts, the Program determines whether the claimant has submitted an official copy of the deed or other documentation proving ownership of the Parcel or an official copy of the 2010 Property Tax Assessment.  If there is a complex ownership issue, a Louisiana property attorney reviews the ownership documents and determines the claimant's ownership percentage.  After the claimant's ownership has been confirmed, the Program assigns the Parcel a Compensation Amount based on the Parcel's Compensation Category.  The Program also evaluates whether the claimant submitted sufficient documentation to recover repair or replacement costs for physical damage to real or personal property located on the Eligible Parcel for damage that occurred as a result of the Spill or Spill Response Clean-Up operations.  If the claimant has proven physical damage, the claimant is compensated for reasonable repair or replacement costs in addition to the Parcel's Compensation Amount.

(b) Coastal Real Property.  The Program reviews Coastal Real Property Parcels or Deeded Boat Slips ("Parcels") to determine whether a Parcel is in the Coastal Real Property Claim Zone and whether the claimant owned or leased all or part of the Parcel during the Eligibility Period, April 20, 2010, to December 31, 2010.  If the Parcel is not in the Claim Zone, the Program sends the claim to the Program's mapping experts to review the deed and real property tax assessment to determine whether to add the Parcel to the Claim Zone.  If a Parcel is located in the Claim Zone, or added by the mapping experts, the Program reviews the submitted Deed or Lease Agreement to determine the claimant's period and percentage of ownership or leasehold interest in the Parcel.  If all necessary documentation is available for review, the Program confirms the claimant owned or leased the Parcel between April 20, 2010 and December 31, 2010, and the claimant's ownership or leasehold interest during the time period.  The Program then values the claim by multiplying the 2010 Appraised Value of the Parcel by 1.18% and then by the Compensation Category percentage (40/45/30/35) of the Compensation Category of the Parcel to determine the Coastal Compensation Amount.  The Program then multiples the Coastal Compensation Amount by the RTP and adds the two numbers together to reach the Total Compensation Amount.  The Program then evaluates whether the claimant asserted, and is compensable for, physical damage to real or personal property on the Parcel as a result of the *Deepwater Horizon* ("DWH") Spill or Spill Response Clean-Up Operations.  If the claimant provided all necessary documentation to prove physical damage, the claimant is compensated for the lesser of the reasonable repair or replacement costs in addition to the Coastal Compensation Amount.

(c) Real Property Sales.  The Program conducts Real Property Sales reviews for individuals or businesses who sold an eligible parcel between April 21, 2010, and December 31, 2010.  The Program first reviews the parcel's eligibility, to determine if it has a residential classification and is located in the Real Property Sales

Compensation Zone ("Zone").  If the parcel is not classified as residential or located outside the Zone the Program sends the claim to the Program's mapping experts to determine if it should be added to the Zone.  If the parcel is classified as residential and is located in the Compensation Zone, or the mapping experts add it to the Zone, the Program then reviews the supporting documentation to determine if the claim is eligible.  During the review steps, the Program determines whether a claimant submitted sufficient information to demonstrate: (1) that the claimant owned the Parcel as of April 20, 2010; (2) that the claimant sold the Parcel in the time period April 21, 2010, to December 31, 2010; (3) when the claimant executed a contract for the sale of the Parcel; (4) the final sale price of the Parcel; and (5) that the sale of the Parcel was not made as part of the foreclosure process.

(d)  VoO Charter Payment.  The Program conducts VoO Charter Payment reviews for individuals or businesses who participated in BP's VoO program.  During the review steps, the Program determines whether a claimant submitted sufficient information to demonstrate: (1) that the claimant participated with the claimed vessel in the VoO program, as evidenced through a signed Master Vessel Charter Agreement ("MVCA") listing the claimed vessel; (2) that the claimant personally signed the MVCA; (3) the length of the claimed vessel; and (4) that the claimant performed work with the vessel or did not perform work, but attended the initial VoO training program.  The Program determines whether some or all of this information is available in the BP-provided VoO data and, if so, the Program does not require that the claimant re-submit that information to the Program.  If the claim is eligible, the Program determines the Compensation Amount based on the length of the vessel and whether the vessel performed work in the VoO program.

(e)  Vessel Physical Damage.  The Program conducts Vessel Physical Damage reviews for individuals or businesses whose vessel sustained physical damage because of the DWH Spill or DWH Spill response cleanup operations, including the VoO program.   During the review steps, the  Program determines whether a claimant submitted sufficient information to demonstrate:  (1) whether the claimant is the owner of the claimed vessel; (2) whether there is a signed Receipt and Release Letter Agreement in connection with the VoO program for the vessel, which would exclude the vessel from receiving compensation under the Program; (3) whether the physical damages sustained by the vessel was caused by the DWH Spill or DWH Spill response cleanup operations; and (4) the costs to repair or replace the vessel.

(f)  Subsistence.  The Program conducts Subsistence reviews for individuals who fished or hunted to sustain personal or family dietary, shelter, tool or other basic needs.  During the review steps, the Program determines whether a claimant submitted sufficient information to demonstrate:  (1) that the claimant satisfies the Subsistence Claimant definition provided in the Settlement Agreement and, (2) the quantity of Seafood and Game the claimant could not harvest as a result of the Spill during the time period of April 20, 2010, to December 31, 2011.  The Program will issue Eligibility Notices on Subsistence claims that are payable for $10,000 or less before the application of the RTP.  The Program will conduct Field Visits for

9

Subsistence claims that are payable for more than $10,000 before application of the RTP in order for the Program to determine whether the claimant is eligible for payment.

**7.** ***Quality Assurance Process and Metrics.*** The Quality Assurance ("QA") process addresses three fundamental needs of the Program: (a) to ensure that all claims are reviewed in accordance with the policies of the Settlement Agreement by targeting anomalous claims results through data metrics analysis; (b) to provide a mechanism to monitor reviewer performance and the necessary tools efficiently and effectively to provide feedback to reviewers; and (c) to identify areas of review resulting in high error rates that require retraining or refined review procedures and data validations. To meet these needs, the Program runs a total of 264 automated data metrics and analytic processes to detect anomalies in claims reviewed in the previous 24 hours and moves identified claims to QA Review for review and, if necessary, correction. Examples of automated data metrics include: (a) for IEL claims, claims where more than 90% of the claimant's paychecks have hours entered, but some hours are missing; (b) for Seafood claims, claims where the claimant submitted financial documents from an entity that primarily fishes and/or processes Menhaden; and (c) for Coastal claims, claims where the reviewer did not identify a Deed in the document data entry screen, but there is a Deed in the document data list. Examples of analytic processes include the forwarding of Exclusions and possible Double Payment issues to experts in those areas for review, as well as analysis of financial data entered for IEL and BEL claims reviewed in the past 24 hours to identify data anomalies associated with potential errors.

Table 1 lists the number of data metrics and analytic processes the QA Team runs for each Claim Type.

| Table 1 | QUALITY ASSURANCE DATA METRICS AND PROCESSES | | | |
|---|---|---|---|---|
| | **Claim Type** | **Metrics** | **QA Processes** | **Total** |
| **1.** | Business Economic Loss | 6 | 12 | 18 |
| **2.** | Coastal Real Property | 32 | 6 | 38 |
| **3.** | Individual Economic Loss | 29 | 25 | 54 |
| **4.** | Real Property Sales | 11 | 3 | 14 |
| **5.** | Seafood Compensation | 44 | 14 | 58 |
| **6.** | Subsistence | 28 | 2 | 30 |
| **7.** | Vessels of Opportunity | 18 | 1 | 19 |
| **8.** | Vessel Physical Damage | 15 | 1 | 16 |
| **9.** | Wetlands Real Property | 14 | 3 | 17 |
| **10.** | **Total** | **197** | **67** | **264** |

If any of these automated metrics or analytic processes flag a claim, we move the claim to the QA Queue with a QA Metric that identifies the issue and instructs the QA Reviewer on what to look for in the review. The QA Reviewer completes the review, focusing on the identified issue and making any necessary corrections. The QA Reviewer also completes a series of QA Summary questions that describe any identified errors in the review. After the QA

Review is complete, the QA Team analyzes the results of QA Reviews completed the day before to identify errors that caused the review result to change from Initial Review to QA Review. The QA Team sends the results of that analysis to the Claim Type Team Leads and supervisors to follow up with reviewers who made errors and to address areas of review that may require re-training or improvement in the claims review process. The QA Team monitors the remedial actions and follows up with the Claim Type teams as necessary.

       **8.**    ***Incompleteness Process.***  A claim is incomplete if the claimant has not provided all documents required by the Settlement Agreement. The Program may issue an Incompleteness Notice, may call the claimant or the claimant's attorney, or both in order to notify a claimant that a claim lacks required documents. If the claimant fails to submit sufficient documents after receiving an Incompleteness Notice, the Program issues a Follow-Up Incompleteness Notice. The Program denies the claim for insufficient documents and issues an Incompleteness Denial Notice if the claimant does not provide required documents after receiving a Follow-Up Incompleteness Notice. The Incompleteness Denial Notice provides the claimant with 30 days to request Reconsideration, or the Program closes the claim. If the claimant requests Reconsideration and the claim still lacks sufficient documents, the Program issues a Post-Reconsideration Incompleteness Denial Notice. The Post-Reconsideration Incompleteness Denial Notice provides the claimant with 20 days to request an appeal of the denial for insufficient documents to the Documentation Reviewer ("Incompleteness Appeal"). The Program closes the claim if the claimant does nothing in response to the Post-Reconsideration Incompleteness Denial Notice. If the Documentation Reviewer overturns the denial, he sends the claim back to the Program for further review, and the Program issues a notice based on the result of the review. However, if the Documentation Reviewer upholds the denial, the Program sends a Post-Appeal Incompleteness Denial Notice to inform the claimant that the Program will close the claim. The claimant may re-file the claim subject to Program deadlines if the Program closes the claim for this reason or because the claimant did not exercise the Reconsideration or appeal rights described above.

       **9.**    ***Re-Review and Reconsideration.***  Claimants who receive an Eligibility or Denial Notice and who do not wish to accept the result may submit a Request for Re-Review or Reconsideration. The Program determines whether the claimant submitted a request for Re-Review or Reconsideration within the deadline established by the Settlement Agreement (30 days after an eligibility or denial notice). After a claimant requests a Re-Review or Reconsideration, the Program performs a full review of the claim using any additional information submitted by the claimant. Once the review is complete and submitted, the Program generates a Post Re-Review or Post-Reconsideration Notice that informs the claimant of the result of the review. The Program monitors claimant response to the Notice to determine whether the claimant accepts the award, requests Reconsideration after a Re-Review, or submits an Appeal.

       **10.**    ***Double Payment.***  The Program prevents double recovery for compensation of owners or officers of business entities. Business owners and officers cannot recover for lost individual wages in an IEL claim when the business filed a separate BEL claim with the Program or signed a Release as part of the GCCF. The Program analyzes the Claim Form, correspondence from the claimant and employer, the tax records, and any other documentation in

the file to determine a possible double payment situation. A double payment reviewer determines whether the claimant is actually an owner or an officer of the business by verifying the information in the file and through available online resources. If the claimant is an owner or an officer of the business and the business signed a Release and received payment from the GCCF or the Program, the Program denies the owner/officer claim. In situations where the business has a BEL claim that has not progressed to payment, the Program processes the IEL claim and applies a Prior Payment Offset on the BEL claim to offset the losses compensated to the owner or officer.

11.   ***Prior Payment Offsets.***   The Program deducts prior payments made by BP, the Real Estate Fund, or the Gulf Coast Claims Facility from the corresponding Program claim through the Prior Payment Offset review process. The Program performs this review to determine if prior payments have been made to a claimant. If prior payments have been made, the prior payment offset reviewer allocates the prior payments to be deducted from the appropriate claim type for any future payments to the claimant.

12.   ***Claimant Accounting Support.***   The Program will reimburse a claimant for the cost of preparing IEL, BEL, or SCP claims, if the claimant submits documents proving the cost of the claims preparation. If a claimant has not submitted the proper documentation to receive the reimbursement, the claimant receives an Eligibility Notice with an explanation of what he/she must provide to receive reimbursement. He/she may then submit additional documents, and the Program will re-review the claim, in whole or in part. If the claimant has already used his/her Re-Review request, he/she may ask for Reconsideration of the entire claim or Reconsideration focused only on the Claimant Accounting Support.

13.   ***Notice Process.***   The Program provides written communication in the form of Notices that are either posted to the Portal or mailed to the claimant. The Program will send a Notice in several situations, such as (1) when it determines an outcome for a specific claim; or (2) when it discovers a specific issue that it needs to address with the claimant in order to process his or her claim fully. The Program generates and sends Notices daily for all claimants that require a Notice. The Program also reviews the generated Notices each day to confirm that Notice populated with the correct information and language for the outcome calculated for that particular claimant.

14.   ***Release.***   The Settlement Agreement requires each claimant to submit a "Full and Final Release, Settlement, and Covenant not to Sue" ("Release") to receive payment on a claim. The Program requires one Release per claimant and this Release will cover all of the claimant's claims in the Program. The Release Review process verifies that the claimant submitted a valid signed and original hard copy Release before the Program will issue payment on all eligible claim(s).

15.   ***Payments.***   The Program runs programmatic checks to make sure a claim is ready for payment. The Program reviews all payable claims with an Eligibility Notice and confirms the following before processing a claim for payment:

(a) The claimant has a signed Release;

12

    (b) The claimant has accepted the offer or has not requested Re-Review or Reconsideration.  This means:

        (1) The claimant has accepted the Eligibility Notice;

        (2) The 30-day window has expired and the claimant has not requested Reconsideration/Re-Review; or,

        (3) If the claimant did request Reconsideration/Re-Review, the claimant has withdrawn that request.

    (c) The Appeal Period has expired and neither party has requested an appeal (or the requesting party has withdrawn the appeal);

    (d) There are no Holds that apply to the claim or claimant;

    (e) The ID Team has verified the claimant's ID;

    (f) The claimant or his/her attorney has properly signed the Registration and Claim Forms;

    (g) The Garden City Group has accepted the claimant's Payment Documents (as well as the firm's, if the claim is represented); and

    (h) The claim or claimant is not under review.

If a claim passes these checks, the claim is then sent to the Program's Paying Agent along with information necessary to facilitate the payment.  This information includes wiring instructions and/or check payee names and addresses.  As an additional level of security, the Paying Agent performs another round of internal audits to verify the claim is ready for payment and that the payment information is up to date.  Once the Paying Agent confirms the claim is ready for payment, it issues the payment in the method selected by the claimant (and his attorney, if represented).

    **16.**   *Liens.*   The Program receives Third Party Claims and/or liens ("TPCs") from attorneys, state and federal agencies, claims preparation and accounting firms, creditors, and other third parties asserting a claim against payments to be made to Program claimants.  The Program has established documentation requirements to ensure that it protect claimants from frivolous assertions while honoring documented obligations.  The Lien Team reviews all documentation submitted by Third Party Claimants to determine if it satisfies these requirements, binds the specific claimant against whom the TPC was asserted, and that the Third Party Claimant provided us with a Program Claimant ID, GCCF ID, or Taxpayer ID to ensure that we are placing a lien hold against the correct claimant's Settlement Payment(s).  We advise claimants of all Enforced (fully documented) and Valid (documented and payable, since one or more Program claims is payable) TPCs, provide copies of all enforcement documentation, and provide claimants with an opportunity to object.  If the claimant notifies us of an objection

within the deadline provided and the TPC amount is fixed, we withhold the disputed TPC amount and issue payment to the claimant of any remaining Settlement Payment balance. We advise all parties that they must resolve disputes by agreement, with the relevant agency, or through the Third Party Claims Dispute Resolution Process, if the dispute is over an eligible fee lien dispute.

     **17.**    ***Appeals.*** After a Post-Reconsideration Eligibility or Denial Notice, the claimant shall choose to accept the result or submit an Appeal to the Appeal Panel. The Program allows claimants to file an appeal through the online portal or by submitting the Request for Appeal Form within 30 days after a Post-Reconsideration Notice. BP has the option of filing an appeal through the online portal on Eligibility Notices and Post-Reconsideration Eligibility Notices with Compensation Amounts over $25,000. The deadline for BP appeals varies depending on the Compensation Amount. For claims less than or equal to $1,000,000, a single Panelist will review the claim. For claims greater than $1,000,000, three Panelists will review the claim. After the appeal is resolved, the Program issues a Post-Appeal Eligibility Notice or Denial Notice. Appeals based on a Compensation Amount are processed using the "Baseball Process." The "Baseball Process" involves the exchange of Initial and Final Proposals by the claimant and BP. The claimant or BP may accept the other party's Initial or Final Proposal or reach an independent compromise, which will end the Appeal Process. If the claimant and BP do not reach an agreement, the Appeal Panel will review the claim and select either one of the Final Proposals, but no other amount. The decision of the Appeal Panel shall be final. Appeals of Denials are processed according to the "Non-Baseball Process." The "Non-Baseball Process" involves the exchange of memoranda between BP and the claimant. A single Appeal Panelist will review the claim and all memoranda submitted by the parties and then issue a decision as to whether the Panelist has upheld or overturned the Denial. If the Denial is overturned, the claim will return to the claims review process for a determination of the appropriate Compensation Amount by the Program.



< Press

# BP Launches Gulf Claims Fraud Hotline

Release date: **15 July 2013**

## Launch Comes as Allegations of Fraud and Corruption Continue to Surface; Court Supervised Settlement Program Spends Less for Fraud Detection than the GCCF

BP today launched the Gulf Claims Fraud Hotline to help protect the integrity of the claims processes relating to the Deepwater Horizon oil spill.

The Fraud Hotline is a reliable resource for people who want to do the right thing and report fraud or corruption. Reports should be made of any fraudulent or corrupt activity, no matter where in the claims process it occurs – whether in the solicitation of the claim by attorneys, accountants or other claims preparation services, the preparation of the financial records and claim application, or the processing of the claim – and no matter whether the claim was filed with BP, the Gulf Coast Claims Facility (GCCF), or the Court Supervised Settlement Program (CSSP).

The launch of the hotline comes as federal law enforcement officials are clamping down on cases of fraud and other abuses in the claims process. In recent months, U.S. attorneys in Florida, Alabama and Louisiana have secured guilty pleas and convictions against multiple individuals for attempting to defraud the claims process and take money to which they are not entitled under the law.

What's more, in the face of troubling allegations of unethical and potentially criminal corrupt behavior within the CSSP itself, the Court has appointed Louis Freeh, former federal judge and Director of the FBI, as Special Master. Judge Freeh is leading an independent investigation of the CSSP with wide latitude to look for "possible ethical violations or misconduct."

The launch of the Gulf Claims Fraud Hotline is particularly timely because the CSSP spends substantially less than the GCCF spent to combat fraud. This seems inappropriate given that the GCCF's fraud detection program enabled it to identify more than 7,000 claims as "multi-claimant scams or even efforts at criminal fraud." The GCCF referred more than half of these to the U.S. Department of Justice for criminal investigation.

Anyone with knowledge of fraud or corruption should report it by dialing, toll-free, 1-855-NO-2-FRAUD (1-855-662-3728). All reports can be made anonymously.

Tips received through the Hotline will be reviewed and referred for further evaluation, if warranted, to fraud investigators at the CSSP, the National Center for Disaster Fraud, or other law enforcement agencies. Tips that lead directly to an indictment, a recovery of money paid, or the denial of a claim because of fraud or corruption may entitle the reporter to a reward.

While BP continues to take steps to stamp out fraud and corruption and assure the integrity of the claims process, the company remains committed to the Gulf and to the payment of legitimate claims for real losses. So far, BP has spent $14 billion on response and cleanup to help restore the environment. The company has also paid more than 300,000 claims totaling over $11 billion to help restore the Gulf economy.

## Further Information:

Name: BP US Press Office
Phone: (281) 366-4463
Email: uspress@bp.com

**EXHIBIT II(B)**

BP Press Releases, "BP Launches Gulf Claims Fraud Hotline," (Aug. 13, 2013, 5:35 PM), http://www.bp.com/en/global/corporate/press/press-releases/bp-launches-gulf-claims-fraud-hotline.html

---

**OVERVIEW OF THE ANALYSIS OF SUBSISTENCE CLAIMS FROM THE MOBILE AREA**

---

1. **1/12/13:**    The Deepwater Horizon Economic and Property Settlement Program ("the Program") began reviewing Subsistence claims.

2. **1/22/13:**    Tim Touchton, the Manager of the Claimant Assistance Center ("CAC") in Mobile, AL ("Mobile CAC"), alerted the CAC Executive Team to (a) a sudden increase in Subsistence claim filings in the Mobile CAC and (b) a claims preparation firm ("Claims Preparation A") that may be inappropriately coaching claimants in the filing of their Subsistence Claim Forms.  Claims Preparation A was allegedly soliciting claimants and guaranteeing payment to its patrons in exchange for 25% of any payment made on a claim.

   The CAC Executive Team notified BrownGreer's Special Investigations Team ("SIT").  In coordination with the Claims Administrator's office and the Claims Administrator's independent investigation group, HUB Enterprises, Inc. ("HUB"), the SIT began analyzing the claims as a potentially fraudulent multi-claimant pattern ("Claims Preparation A Pattern").  As of 8/13/13, the SIT has confirmed 2,559 participants in the Claims Preparation A Pattern.

3. **1/24/13:**    The Mobile CAC informed the SIT and the CAC Executive Team about a possible television commercial or ad by Claims Preparation A to solicit claimants.

4. **1/25/13:**    The SIT updated the list it maintains of suspect entities (the "Be On The Look Out" list) and notified all reviewers to propose for SIT review any claim that contains documents indicating that the claim was prepared by Claims Preparation A.

5. **1/30/13:**    The BrownGreer Subsistence Team had observed a high number of Subsistence claims filed from the Mobile, AL area in which claimants asserted claims related to subsistence fishing at Cedar Point Pier, where no fishing license is required. Claimants submitted these claims through a mix of online Portal submissions, paper mailed submissions, and Mobile CAC submissions.  The BrownGreer Subsistence Team Lead, Bethany Anderson, instructed the Court-Appointed Distribution Agent ("CADA") team and supervisors to propose any Subsistence claimant who alleged fishing at Cedar Point Pier for SIT review.

**EXHIBIT II(C)**

**6. 2/8/13:**  BrownGreer's Claims Preparation A Pattern SIT Case Manager ("CM") observed significant similarities between confirmed Claims Preparation A Pattern filings and other Mobile-area Subsistence filings that did not identify Claims Preparation A as the claims preparer.   The similarities included Mobile area residence, use of the Cedar Point Pier as a fishing location, and the submission of similar maps showing Cedar Point Pier as a fishing location.  Accordingly, the SIT identified Subsistence claims with these characteristics as potentially part of a multi-claimant fraudulent pattern ("Mobile, AL Resident Pattern").  The SIT instructed SIT reviewers to place claims with these characteristics on hold pending further investigation into their legitimacy.

**7. 2/12/13:**  The BrownGreer Subsistence Team notified the SIT that it had received a claim from an individual claiming to be exempt from licensing requirements because she fished off of the Dauphin Island Pier.  Dauphin Island Pier is landlocked and is, therefore, an unlikely Subsistence fishing location.  BrownGreer's SIT assigned a CM to determine if there were additional Subsistence claims that asserted losses from fishing at the Dauphin Island Pier and to analyze these claim submissions for potential fraud, based on the claimants' assertions that he or she fished at a landlocked pier.  In coordination with the Claims Administrator's office and HUB, the SIT started analyzing these claims as a potentially fraudulent multi-claimant pattern ("Dauphin Island Pier Pattern").  As of 8/13/13, the SIT confirmed 152 participants in the Dauphin Island Pier pattern.

**8. 2/13/13:**  Employee A, a Subsistence Claim Quality Assurance Reviewer in the Mobile CAC, sent an email to Ms. Anderson advising her to "be on the look out for [Claims Preparation B] … in Mobile, AL.  It is not certain, but they are operating similar to [Claims Preparation A].  They are electronically filing the Registration and submitting scan[ned] copies of the [C]laim [F]orm and Interview Form."   In coordination with the Claims Administrator's office and HUB, the SIT started analyzing the Claims Preparation B claims as a potentially fraudulent multi-claimant pattern ("Claims Preparation B Pattern").  As of 8/13/13, the SIT confirmed 173 participants in the Claims Preparation B Pattern.

**9. 2/21/13:**  The SIT provided SIT reviewers and CMs further instructions on how to treat and classify Subsistence claimants from the Mobile, AL area.  The instructions were:

(a) If the Claim Form or Registration Form, or any of the documentation lists [Claims Preparation A], select the claimant for pattern review under [Claims Preparation A].

(b) If the Claim Form or any of the documentation lists Dauphin Island Pier as a fishing location, select the claimant for pattern review under Dauphin Island Pier Subsistence Claims.

(c) If the Subsistence claim lists Cedar Point Fishing pier and/or lacks any substantive documentation or seems generally suspicious, and is located in or around Mobile, AL (but [Claims Preparation A] cannot be found), select the claimant for pattern review under Subsistence Claims – Mobile, AL.

(d) If the Subsistence claim overlaps with or conflicts with another similar, suspicious Subsistence claim from a family member or another individual, select the claimants for pattern review under New Pattern – Family/Household Fraud.

**10. 2/26/13:**   HUB sent an undercover investigator into Claims Preparation A.  David Welker, the Program's Director of Fraud, Abuse, and Waste, had previously requested that HUB conduct an undercover investigation of the activities at Claims Preparation A.  HUB intended to determine whether Claims Preparation A was counseling claimants to provide false information in claims filed with the Program.  HUB was unable to confirm the allegations regarding Claims Preparation A's actions through its undercover visit to the business.

**11. 3/4/13:**   Ms. Anderson emailed the CADA team and supervisors reminding them to propose any claimant listing Cedar Point Pier and/or Dauphin Island Pier as a fishing location for SIT review.

**12. 3/7/13:**   The SIT referred 62 claimants identified as potential participants in the Mobile, AL Resident Pattern to HUB for verification.  The SIT asked HUB to verify the alleged Subsistence activities and the alleged Subsistence losses for each of the claimants.  During the course of its investigations of these claimants, HUB conducted interviews with the claimants to confirm their asserted Subsistence activities.

**13. 3/13/13:**   As part of routine analysis of all known multi-claimant patterns, a BrownGreer SIT CM analyzed reports of the potential resurgence of a pattern originally identified on 2/4/11 during the operation of the Gulf Coast Claims Facility ("GCCF").  The pattern (the "T.W. Pattern") centered on an individual ("T.W.") who submitted suspect documents in support of her own purported businesses and prepared and notarized suspect documents for other claimants.  Guidepost Solutions, LLC ("Guidepost"), the GCCF's independent investigative firm, confirmed that the claimed businesses did not exist and that the documentation

was fabricated.  At the end of the GCCF, the T.W. Pattern involved 12 claimants, all of whom Guidepost formally identified as fraudulent.  Several of the participants confirmed that T.W. prepared their documents.  On 3/13/13, when reviewing new reports for the pattern, a SIT CM observed that T.W. had started assisting claimants in the Program with filing Subsistence claims.  The SIT, in coordination with the Claims Administrator's office and HUB, started analyzing other T.W.-prepared claims as a part of a potentially fraudulent multi-claimant pattern.  As of 8/13/13, the T.W. Pattern had seven confirmed participants, five of whom filed Subsistence claims.

**14. 3/25/13:**   The CADA, Christina Hendrick, informed the Subsistence Team Leads by email that the Program should continue to require licenses from those claimants who list Dauphin Island Pier as a fishing location and to propose such claimants for SIT review.  The SIT maintained holds on all Mobile area Subsistence claims that reviewers had previously proposed for SIT review while attempting to verify the legitimacy of these claims.

**15. 3/27/13:**   A SIT CM prepared a list of 22 Subsistence claims from the Mobile, AL area with the highest reported catch amounts, and asked the Subsistence Team for guidance regarding what catch amounts warrant suspicion.  The Subsistence Team Leads referred these claims to the CADA on 4/1/13 for analysis.  The CADA asked the Field Visit Team, the team appointed by the CADA to travel to claimants' homes, dock locations, and other applicable areas to interview claimants and evaluate their Subsistence claims, to also provide analysis on the claims.  On 5/29/13, the Field Visit Team returned their observations about the claimants' filings and allegations.  The Field Visit Team did not interview these Subsistence claimants but offered expert opinions about the legitimacy of the claim filings.  The Field Visit Team's findings were generally inconclusive.  After reviewing the reports, the SIT notified the CADA that these Field Visit Team reports were not sufficient to provide or formulate general guidelines for the SIT on how to identify potentially suspect Subsistence claims.  The SIT continued to maintain holds on generally all Mobile area Subsistence claims that were proposed for SIT review and exhibited potential fraud concerns, while attempting to identify other methods to verify legitimacy of these claims.

**16. 3/28/13**:

(a) The CADA instructed the Subsistence Team Leads to release SIT holds on claims from claimants that fished at the Cedar Point Pier, unless (1) they were implicated in the

Claims Preparation A Pattern, or (2) there were other indications of potential fraud beyond simply alleging fishing at the Cedar Point Pier.

(b) The SIT instructed a Mobile Pattern CM and SIT reviewers to analyze the 428 claimants held under the Mobile, AL Resident Pattern to determine if there were issues that would warrant a hold aside from the claimant's assertion that he or she fished at the Cedar Point Pier.

**17. 4/29/13:** The SIT terminated review of the Mobile, AL Resident Pattern after completing thorough reviews of all 428 claimants on SIT hold.  The SIT did not find indicia of fraud in 83 claimants' filings, but the SIT found that the remaining 345 claimants were potential participants in a new pattern or a previously identified pattern, or displayed other potential fraud concerns.  The SIT released its holds on the 83 cleared claimants.

**18. 6/5/13:** When analyzing a group of claimants associated with the Claims Preparation A Pattern, a SIT CM noted that a licensed CPA ("C.W."), who is herself a claimant in the Program, had submitted several SWS-38 Accountant Sworn Written Statements in support of other claimants' Subsistence claims.  The CM also noticed that C.W.'s fee agreements limited the scope of her services to preparation of Subsistence claims only.  The claims packages appeared to be template claims that asserted the same fishing locations, equipment, and species. The CM also determined that all of these claimants list Cedar Point Pier, Dauphin Island Pier, Bayou La Batre, Alabama Point Pier, and the Mobile Causeway as their fishing locations, followed by a statement indicating that they purchased a temporary pier permit to fish at all locations.  Of all these locations, Cedar Point Pier is the only location that allows one to fish for a fee with no license.  In coordination with the Claims Administrator's office and HUB, the SIT started analyzing these claims as a potentially fraudulent multi-claimant pattern ("C.W. Pattern").  As of 8/13/13, the SIT had confirmed 263 participants in the C.W. Pattern.

**19. 6/7/13:** A SIT reviewer identified a new potentially fraudulent pattern involving Alabama and Louisiana Fishing Licenses during his review of a Subsistence claimant.  A Subsistence Claim Reviewer in the Mobile CAC identified this claim for SIT review, indicating that the claimant's submitted fishing licenses had several anomalies in the font and formatting of the text of the license as compared to official, state-issued fishing licenses.

The SIT reviewer confirmed that the claimant's 2010 licenses contained incorrect information about the date that the license was supposedly issued. When analyzing the data, the SIT reviewer discovered approximately 69 other claimants with suspect licenses, many of whom submitted similar, suspicious licenses. The SIT reviewer escalated his findings to the SIT supervisors. The SIT determined that the licenses were most likely fabricated. Given these findings, and the numerous other claimants who submitted licenses with similar inconsistencies, the SIT assigned the issue to a CM for pattern review ("Alabama and Louisiana License Pattern"). As of 8/13/13, the SIT confirmed 79 participants in the Alabama and Louisiana License Pattern.

20. 7/8/13:     A Subsistence Claim Reviewer at the Pensacola, FL CAC proposed a Subsistence claimant for SIT review because she noted assertions of excessive catch. A SIT reviewer analyzing the claimant identified a potential new pattern, in which several claimants had filed similarly suspect claims that were faxed from a number registered to the same individual ("N.P."). The SIT reviewer noted that all claimants listed a fishing location at Dauphin Island Pier or Cedar Point Pier and that none of the claimants submitted fishing licenses. In coordination with the Claims Administrator's office and HUB, the SIT began analyzing the claims as a potentially fraudulent multi-claimant pattern ("N.P. Pattern"). As of 8/13/13, the SIT had confirmed 18 participants in the N.P. Pattern.

21.  3/1/13 – 8/12/13:

In addition to the seven multi-claimant patterns discussed in the timeline with a total of 3,270 participants, the SIT has identified another 50 Family Household Fraud patterns with an additional 111 participants. Finally, as of 8/13/13, there are an additional 347 individual Subsistence claims from the Mobile, AL area that are under SIT review for various other reasons. The SIT continues to review and investigate these claimants and other Subsistence filings that present potential indicia of fraud.

---

**SPECIAL INVESTIGATIONS TEAM'S FRAUD DETECTION AND PREVENTION PROCESS**

---

1. **Introduction.** Settlement programs become the target of some degree of attempted fraud. While the appropriate level and type of anti-fraud measures necessarily vary from program to program, every settlement program establishes as a core objective detecting and preventing fraud. We implement tailored anti-fraud measures commensurate with those demanded by the circumstances of each case and with guidance from the Court, the Settlement Agreement, and law enforcement and other government agencies. Typically, no two programs are identical. We start with a baseline developed from our experience administering other programs, and we assess initially what to deploy in addition to that baseline. We then continually reassess those needs throughout the maturation of the program in consultation, when appropriate, with the parties, the Court, government agencies, and occasionally private third-party investigative services firms.

2. **The Gulf Coast Claims Facility.** Before the Program's launch, BrownGreer assisted Kenneth Feinberg in developing and implementing the fraud detection and prevention program for the Gulf Coast Claims Facility ("GCCF"). The GCCF successfully used anti-fraud measures appropriate for the tenor and time of that program. Of particular note, Mr. Feinberg decided to refer all claimants identified by BrownGreer as suspect to Guidepost Solutions, LLC ("Guidepost"), an investigative services firm, for investigation and determination of the presence of fraud. In other words, BrownGreer's Audit Team identified, while Guidepost confirmed, that these claims were potentially fraudulent.

3. **Comparison of the GCCF to the Program.** Since the beginning of the Transition Process from the GCCF to the Program, the Claims Administrator's Office ("CAO") coordinated with BrownGreer's GCCF Audit Team to develop a more robust, efficient, and otherwise improved Fraud Detection Program, tailored to the requirements of the Deepwater Horizon Settlement Program ("the Program"). BrownGreer and the Program use the experience of the same key personnel who directed the GCCF's fraud detection efforts to leverage the institutional knowledge developed over the course of the GCCF program. To help coordinate the process, the CAO engaged David Welker, a former Special Agent in charge of the FBI's New Orleans Division, to serve as the Claims Administrator's Fraud, Waste, and Abuse Director. The CAO replaced Guidepost with HUB Enterprises, Inc. ("HUB") as the Program's outside investigative firm. BrownGreer set up the Special Investigation Team ("SIT") comprised of lawyers, accountants, Case Managers ("CM"s), analysts, and reviewers located primarily in Richmond, VA, offices, that are managed by members of the former GCCF Audit Team. In addition, Mr. Welker and Roma Petkauskas, the head of the BrownGreer SIT, have been meeting regularly with representatives from the National Center for Disaster Fraud ("NCDF") to: (1) review and coordinate the Program's Fraud Detection and Prevention Processes; and (2) receive updates from the NCDF on the status of investigations. Bringing the expertise from the GCCF experience, the SIT helped develop a process that has not only resulted in significant cost savings when compared with the GCCF, but also has improved upon the GCCF's process in several ways.

**EXHIBIT II(D)**

**(a) Fraud Detection.**  The GCCF developed and implemented effective processes to detect and prevent fraud, but the processes were necessarily limited because the claims resolution protocols included far fewer documentation requirements to prove losses, thereby limiting the amount and type of data available for analysis.  In the Program, the Settlement Agreement requires extensive and specific documents for each Claim Type, and these documents must be present and sufficient before a claim may qualify for compensation under the Settlement Agreement.   Consequently, during the claims review process, we are able to track significantly more information in the Program.  The SIT leverages the Program's Claims database and has improved precision of database queries and trends analyses, thereby enhancing efficiency in detecting fraud.  These queries permit the SIT to analyze and detect fraudulent patterns from, for example, (1) profit and loss statements and sales tax variances for BEL claims, (2) correlations between business claimants and individual claimants claiming losses from working for those businesses, and (3) correlations of Seafood crew claimants to a claimed vessel.  The SIT's reviewers and CMs have access to various reports, including reports that identify claimants sharing the same IP filing address, physical address, and email that they review both to identify suspect claimant groups as well as to identify overlaps with any suspect claims.  The SIT automatically identifies claimants with overlapping addresses with claimants previously found fraudulent and identifies them for SIT review if the same or another claimant living at that address files a claim in the Program.  Such queries were cumbersome or not available under the GCCF because data fields and metrics to track the activity were not available for analysis.

The SIT further improved upon the processes in the GCCF by developing specialized education of the SIT's staff and conducting enhanced periodic training for Claims Reviewers, accountants reviewing claims, and intake and call center personnel (collectively referred to as "Claims Handlers").   The SIT also updates and provides reviewers with a "be on the look out" ("BOLO") list that currently contains 442 businesses, employers, notaries, and tax preparers, all of whose involvement or preparation of claims is suspect.  These improved measures result in higher ratios of suspect claims referred to the SIT that ultimately lead to a finding of fraud.  As an example of this awareness, the CACs alert the SIT about unusual claim activities in their communities, such as increased Subsistence claim filings in the Mobile area and the suspect patterns of Claims Preparation A, a claims preparation group discussed in further detail in Exhibit C.  With the improved precision of fraud detection queries and improved Claim Handler referrals, the Program has reviewed, proportionally to overall claim filing, more claims for potential fraud than during the GCCF.

**(b) Multi-Claimant Pattern Management.**  Bringing the experience and knowledge from the GCCF, the SIT also programmatically identifies claims filed in the Program that were found to be potentially fraudulent in the GCCF as well as participants of any of the approximately 780 multi-claimant patterns we detected in the GCCF.  The SIT CMs actively monitor the multi-claimant patterns identified in the GCCF and have detected the same or new claimants establishing Claimant IDs from over 300 known GCCF multi-claimant activities.  For example, a SIT CM determined that a ringleader of a GCCF pattern the SIT identified on 2/4/11 and who was known to

assist claimants in filing economic loss claims with documents from non-existing businesses had started assisting claimants in filing Subsistence claims in the Program.

In addition to monitoring actively the resurgence of re-filings from the fraud detected in the GCCF, the SIT CMs also identify and develop approximately seven new potentially fraudulent multi-claimant patterns weekly, with a total of over 600 patterns having been detected in the Program consisting of over 5,100 potential participants.  The SIT CMs routinely develop reports based on the unique characteristics of the multi-claimant pattern as they monitor its progression.  Frequently, the SIT CMs design reports to define the characteristics of the pattern and refine the reports as the pattern evolves.  Since the inception of the Program, the SIT CMs have run over 4,300 specially designed pattern reports to develop new patterns or find additional participants in the existing patterns.

(c) **Investigative Steps.**  The Program realized, and explained to BP in meetings on June 26, 2012, August 7, 2012, January 16, 2013, and again on June 18, 2013, that the GCCF incurred significant costs from its requirement that every potentially fraudulent claim be referred to Guidepost for a full external investigation.  Without compromising effectiveness, the SIT helped the Claims Administrator implement "in-house" investigative processes to review suspect claims to make findings of fraud at a substantially reduced cost and in less time when compared with the processes of the GCCF.  The SIT established direct access services with the IRS to verify tax and other financial documents, developed standardized authorization forms to obtain information from other third party sources, increased efforts in contacting employers and other witnesses, and retained a forensic accountant.  Over 4,100 claimants have been the subject of these "in-house" investigations, and the Program has handled approximately two-thirds of all fraud findings internally, which has significantly reduced the cost to the Program.  Even so, the in-house team has still referred close to 800 claimants to HUB for a full investigation in instances where an on-site interview, inspection, or search of public records are the most efficient and reliable methods of investigation.  These adjustments have resulted in a more effective and efficient fraud detection process.

4.     **Tax Identification Number ("TIN") Verification.**  The first and fundamental step in the SIT's processes is verifying each claimant's tax identification number.  Although the Program will review the claimant's claim, the Program will not pay a claimant until the SIT has verified that the claimant's tax identification number is valid and belongs to the claimant.  The Settlement Program asks every claimant to provide a Social Security number ("SSN"), Individual Taxpayer Identification Number ("ITIN"), or Employer Identification Number ("EIN") on the Registration Form.  The SIT uses that number as a unique identifier to keep claimants separate in the Program. When the Program receives a Registration Form, the SIT verifies the accuracy of the SSN, ITIN, or EIN provided by the claimant, to make sure we have the right number and that the number exists and does not belong to anyone else.  We perform this verification step for several reasons:

(a) The SSN, ITIN or EIN is the only way to give each claimant a unique identifier, which is necessary for tracking, processing and payment purposes.

(b)  It enables the Program to link a Deepwater Horizon claimant to a previous GCCF claim, copy existing documents to the new claim and account for any previous offers or payments.

(c)  Further, the Program needs accurate and genuine taxpayer numbers to prevent issuing payments to fictitious taxpayers or paying the same claim more than once.

The SIT verifies the claimant's Tax Payer Identification number by following these steps:

**(e)  SSN Verification:** Specially trained SIT reviewers access a custom built database module that permits the SIT to identify and submit the claimant's SSN and name to be verified and matched through independent third party sources.  If the SIT cannot verify the SSN or if the SSN and name cannot be matched to the claimant through these queries, SIT reviewers analyze the files and correct typographical errors in the name and/or number.  If the SIT cannot confirm that the claimant's name and SSN match the independent sources, the SIT issues a Notice to the claimant, asking the claimant to identify potential typographical errors in the SSN number and/or name, as well as to identify any name changes.  The claimant is also given an option to verify the SSN with the Social Security Administration's ("SSA") Consent Based Social Security Verification Program by submitting a properly executed authorization.  If the claimant does not respond to the Notice or if the documents the claimant submits are not sufficient to verify the claimant's SSN, the SIT issues a Follow-Up Notice explaining the next steps to complete the verification.

**(f)  EIN Verification:** Specially trained SIT reviewers access a custom built database module that allows the SIT to confirm that the claimant's EIN and the business name can be verified and matched through various independent third party sources.  If the SIT cannot verify the EIN or if the EIN and the business name cannot be matched to the claimant, and if there are no apparent typographical errors in the name and/or number, the SIT issues a Notice to the claimant, asking the claimant to identify potential typographical errors in the EIN number and/or the business name, as well as to identify changes to the business's name.  The Notice also explains the documents that the claimant can submit to help verify the EIN.  If the claimant does not respond to the Notice or if the documents the claimant submits are not sufficient to verify the claimant's EIN, the SIT issues a Follow-Up Notice explaining the next steps to complete the verification.

To date, SIT has started the verification process for 146,970 claimants.  Of those, we matched the TIN and claimant's name to public records databases and verified tax identification numbers for 81,674 (56%) claimants from the initial queries through the independent third-party sources.  Initially, 65,296 (44%) claimants' information could not be matched to the public records databases and we reviewed these claims to determine if we can identify name changes or typographical errors and re-queried these claims through public searches to resolve 51,302 claimants' records.  After this initial review, 13,994 (9.5%) claimants' data still did not match independent third-party source

information and issued Notices to claimants asking for official documentation from the Internal Revenue Service ("IRS") or SSA that confirms the claimant's TIN.  Of these, 11,875 claimants have submitted information/documents that helped confirm the claimants' information and verify their tax identification numbers.  As of today, 2,119 (1.4%) claimants' tax identification numbers have not yet been verified.  Claimant tax identification number verification and duplicate claimant review efforts also resulted in detection and merging of 5,745 claimant IDs such that 3,562 claimant IDs were found to be duplicative and marked inactive.

    **5.**       **Sources of Claim Selection for SIT Review.**  SIT reviewers analyze all claims that are identified for a SIT review.  Referrals to the SIT team come from a variety of sources:

    **(a) Specific Claims Identified During Claim Intake and Review:**  The SIT has developed and periodically updates instructions and training materials for all Claims Handlers on certain problems or discrepancies that might indicate potential fraud, deception, or dishonesty.  Claims Handlers have the functionality to identify for SIT review any claim that might indicate a potential problem.  Alternatively, Claims Handlers can email the SIT by using a dedicated email box that is publicized in the trainings.  In general, the areas that the SIT highlights in trainings and asks the Claims Handlers to identify for SIT review include: (1) claims with suspicious or altered claim materials; (2) claims where the claimant's date of birth, name, and/or TIN asserted on the Claim Form differ from the documents submitted in support of the claim; (3) claims that rely on suspect employment verification letters; and (4) claims involving non-arms-length transactions, such as claims where on the face of the documents it appears that there is a family or other personal relationship between the claimant and a person who authenticated or produced documents in support of the claim, and other sources cannot substantiate the information provided in those documents.  In addition, the SIT maintains and periodically updates lists of documents and entities that previous investigations and findings have determined to be suspect or fraudulent.  The Claims Handlers identify for SIT review any claim that is supported by documentation appearing on that list.

    **(b) Specific Claims Identified Through Database Queries:**  The SIT uses the Claims Database of all claimants to help spot and identify for SIT review specific claims that may be problematic.  The areas of focus and analysis include but are not limited to: (1) detection of overlapping claims by the same claimant to prevent payments on duplicate claims through standardized reports; (2) automated identification for SIT review of all claims filed by claimants that were found fraudulent in the GCCF; (3) detection of claimants with characteristics similar to claimants previously found fraudulent through address, and various other data matches.

    **(c) Change of Address Requests:** The Program instructs and requires claimants to inform the Claims Administrator if the claimant's address changes at any time during the administration of the Program.  To update an address, a claimant must submit a written request to the Program to change the address in the database. The SIT tracks all completed address change requests to monitor such requests for indications of

potential fraud, such as (1) changing an address to one associated with a known multi-claimant pattern; (2) suddenly changing an address immediately following the filing of a claim with the Program; (3) requesting a change of address from a physical address to a P.O. Box, especially soon after the filing of a claim; or (4) requesting a change of address to one that cannot be verified as being related to the claimant.

(d) **Statistical Trends Analysis:**  The SIT analyzes data in the Claims Database to monitor and identify trends of potential fraud, deception, or dishonesty and identifies for SIT review claims from the suspect populations.  The SIT monitors and analyzes various trends that include but are not limited to: (1) analysis of claimants that share the same or similar physical addresses, IP addresses, or email addresses to confirm that each claimant's documentation is unique and for a presence of a multi-claimant pattern; (2) analysis of outliers within the claimant populations that include, for example, correlations of employees to the businesses and Seafood crew to vessels; (3) analysis of trends in variance in income and revenue based on, for example, patterns in the profit & loss statements, sales and use taxes, and patterns of an individual's earnings.

(e) **Multi-Claimant Pattern Participants:**  The SIT classifies a pattern as a group of claims exhibiting indicia of fraud that are linked by common factors suggesting deliberate collusion or coordination.  Examples of patterns include: (1) the mass production and sale of falsified payroll documents; (2) the mass forging of employment verification letters; (3) routing payment for a large number of spurious claims to a single bank account; and (4) the systematic filing of documents for a series of similar fictitious businesses.  The SIT classifies patterns into two categories: general patterns and family/household fraud.  The SIT's dedicated group of CMs and reviewers manage already existing patterns and develop and detect new patterns.  CMs develop and analyze reports to define characteristics of a new potential pattern and refine criteria as they monitor the multi-claimant pattern development through analysis of overlapping or similar characteristics, including physical address, employer, type of documentation submitted, payment instructions, and any other assertions on the Claims Form(s) as claimants in any known multi-claimant patterns.  CMs run periodic reports based on the known characteristics and analyze trends for development of new characteristics to identify new participants in the existing patterns.  The SIT currently monitors over 600 active patterns of potentially fraudulent conduct, with over 5,100 potential participants.  The SIT identifies approximately seven new patterns weekly and weekly identifies additional participants in already known patterns.  The SIT's CMs have designed over 4,300 reports to identify new patterns or find additional participants in existing patterns.

(f) **Alerts from the Department of Justice:**  The NCDF hotline (877-623-3423) receives calls from the public with alerts of potential fraud.  The Department of Justice provides to the Program a summary of the tips that it receives and to date has sent the Program over 720 individual tips.  The SIT reviews the tips and matches the information to claimants in the Program and identifies these claims for SIT review.  If the SIT review results in no indicia of fraud, the SIT releases the hold.  If the SIT

determines indicia of fraud exist, it refers the claim to the Department of Justice for potential investigation.  The SIT produces claimant files to the NCDF for all tips that match a claimant in the Program or the GCCF databases.

**(g) Letters of Introduction and Stand Down Orders:**  The Department of Justice sends Letters of Introduction to inform the Program about claimants on which the Department of Justice has an ongoing investigation or has a strong interest in investigating.  The SIT reviews all the claimants identified based on these tips for indicia of fraud, deception, or dishonesty, but will stop any field investigative activity on claims if the Department of Justice issues a Stand Down Order requesting that the Program cease an investigation.

**(h) BP/Class Counsel:** If BP and/or Class Counsel believe that any indicia of deception, dishonesty, or fraud relating to any claim or to the Program exist in any way, BP or Class Counsel may refer such matter for SIT review.  On 7/15/13, BP launched a Gulf Claims Fraud hotline to receive calls from the public to report potential fraud, with a promise of a potential award to the reporter.  BP provides to the Program a summary of the information that it receives.  The SIT reviews the tips and matches the information to claimants in the Program and identifies these claims for SIT review.

**(i) Random Claim Selection.**   The SIT team identifies pending claims for random selection for SIT review.

**6.       SIT Review Process.**  The SIT performs review of the claimants as follows:

**(a) SIT Initial Review.**  The initial SIT reviewer analyzes all forms and documents submitted by the claimant to substantiate the reason why the claim was identified for SIT review and also to validate all the information by specifically focusing on varying information, alterations, redactions, or otherwise suspicious documents.  The reviewer assesses potential non-arms-length transactions and verifies existence of businesses, properties and ownership as well as licenses through general records searches.  The reviewer also assesses potential double payment and identity theft issues.  Finally, the reviewer analyzes the claim for the presence of a multi-claimant pattern by analyzing various overlapping reports to determine if the claimant shares any characteristics with other claimants in the Program.  The initial reviewer documents the review process and provides a summary comment of the review and makes one of the following findings: (1) select the claimant for review by a CM, by selecting one of the existing patterns or a new pattern; (2) select the claimant for Further Investigation ("FI") review; (3) select the claimant for Final Determination, meaning that the reviewer determined there is indicia of fraud; or (4) release the claimant from SIT review, if the reviewer finds no indicia of fraud.

**(b) Multi-Claimant Pattern Reviews.**  If the initial reviewer selects the claimant for review by a CM, the CM evaluates the documents for already known pattern characteristics, analyzes claimant overlaps, and develops and reviews reports to determine if the claimant is a participant of an already existing pattern or for the

development of a new pattern.  At the end of his or her review, the CM: (1) confirms that the claimant is a participant of a pattern; (2) requests FI steps to confirm pattern association; or (3) does not find pattern association and either releases the claim or makes a finding for that particular claimant.

(c) **Further Investigation Reviews.**  If the initial reviewer or a CM selects a claim for FI steps, he or she will have to specify which FI step is the most appropriate.  To date, over 4,800 claimants have been selected for various FI reviews that are handled by specialized teams.  At the end of each FI review, the FI reviewer makes a finding of fraud or no fraud, or sends the claimant to another of the following FI steps:

(1) **Third Party Contact.**  Verify information through a call/fax to a third party, including but not limited to contacting a claimant's employer to verify employment and employer letters, contacting departments of Wildlife & Fisheries to verify vessel and fishing licenses, contacting churches and local governments to verify letters from officials, contacting local business licensing offices to verify the existence of a business, contacting neighboring businesses to verify the existence of a business, and contacting businesses to verify receipts/expenses submitted by a claimant. The SIT has performed over 1,200 verification calls to third parties to verify information submitted by claimants.

(2) **Verifications Pursuant to Authorizations.**  Verify information by requesting that a claimant submit an authorization to (a) obtain records from the SSA for self-employed claimants who report income for social security purposes, but otherwise have no supporting financials or earnings statements like W-2s or 1099s, (b) obtain the claimant's tax transcripts and/or wage and income transcripts directly from the IRS for claimants who have conflicting tax information, suspicious wage statements, or conflicting financial information, or (c) obtain educational records to confirm that a claimant incurred expenses from job-training class. The SIT has issued over 2,240 notices to claimants to request authorization to obtain financial, employment or education records from third parties to verify claimant documents.

(3) **Forensic Accountant Review.**  Utilize a forensic accountant to review claims where it is appropriate to use normal accounting methods to solve an unresolved financial discrepancy in the claimant's submitted documentation. The SIT's forensic accountant has reviewed over 275 claimants to determine whether normal accounting methods can resolve potential discrepancies in the claimants' submitted financial documents.

(4) **Request for Information from the Claimant.**  Request information from a claimant if the claimant is in the best position to explain discrepancies or to locate proof to substantiate his or her claim.  The SIT has issued over 175 notices to claimants to request specific documents or corroborating information to support their claims.

**(5) Referrals to HUB.** Refer a claimant to HUB for on-site investigation when other methods of in-house investigation listed above are not sufficient to make a fraud determination or if on-site investigation appears to be the most appropriate method to resolve the potential fraud concern. To date, the Program has referred close to 800 claimants to HUB for the investigation.

**7.** **SIT Review Results:** At the end of its review, the SIT makes one of the following determinations:

**(a) Clear Finding of Fraud**. In determining whether a clear indication of fraud exists, the Claims Administrator's Office ("CAO") evaluates materiality of the falsified records and considers any prior payments as compensation for losses related to the Deepwater Horizon Oil Spill. The SIT prepares recommendations to the CAO to refer the claimant to the Department of Justice ("DOJ") for appropriate review and relief. Upon notification to the Department of Justice of the potential deception, dishonesty, or fraud, all such claimants' claims submitted in the Program are suspended indefinitely. The CAO has referred over 590 claimants to the DOJ for investigation.

**(b) No Indication of Fraud**. If the SIT finds no indicia of fraud relating to the claim after the Special Investigation Review, the SIT releases the claim for payment. The SIT does not notify any party of this determination. To date, SIT reviewers have evaluated and found no indication of fraud for over 3,500 claimants that were identified for SIT review.

**(c) Inconclusive Finding of Fraud.** The SIT or HUB may not have enough information to make a conclusive finding of fraud, typically due to lack of a claimant's cooperation. The Program will suspend such claimant's claims and review claims on a claim-by-claim basis to determine if there is sufficient evidence of fraud to refer the claim to the Department of Justice.

**8.** **Reporting.** The SIT tracks all claims, outcomes, and issues relating to any SIT claim review and finding. The SIT develops reports to implement fraud detection processes, team management reports, and provides reports showing review progress and status as determined necessary by SIT management and the CAO.

**9.** **Special Investigation Holds on Claims Processing.** The Program does not issue payments or Eligibility Notices to a claimant while the claim is the subject of a SIT review. However, the SIT performs reviews for potential fraud claims on all claims, regardless of whether the claimant has already received a payment.

**10.** **Notifications on Claims Subject to Special Investigation Review**. The SIT places internal hold codes to indicate that the claim is subject to Special Investigation Review in the Claims Database. The SIT issues Notices to claimants under SIT review when the claimant is selected for FI steps or when there is a finding of fraud. In addition, the SIT issues Notices to claimants to complete TIN verification steps.

    **11.**     **File Production and Trial Assistance.**  The SIT responds to file production requests from the NCDF and other Law Enforcement Agencies and to date has produced information in response to over 4,100 requests for claimant information.  The SIT also assists U.S. Attorneys in preparing for trials and, if determined necessary, provides witnesses.



## Subsistence Claims Submitted at Claimant Assistance Centers

— Mobile   — All other CACs

**1/22/13:** Mobile CAC Manager first identifies possible improper claimant coaching by Claims Preparation A.

**EXHIBIT II(E)**



**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS