**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010** | **MDL No. 2179** |
| | **SECTION J** |
| **This Document Relates to:** | **JUDGE BARBIER** |
| **2:13-cv-05365 (***Sunshine Enterprises of Jacksonville, Inc., and Krishna Enterprises of Alachua, Inc. v. BP Exploration & Production, Inc.; BP America Production Company; et al.***)** | **MAGISTRATE SHUSHAN** |

## SECOND AMENDED COMPLAINT

NOW INTO COURT, through undersigned counsel, comes Plaintiffs, who each in their own right bring this Second Amended Complaint for Damages, and respectfully avers as follows:

Each of these Plaintiffs has suffered economic damage and injuries, damage to economic livelihood, lost profits and / or impairment in earning capacity, as a result of the oil spill that began on April 20, 2010 following the explosion and sinking of the Deepwater oil rig, and as result of the Defendants' misrepresentations and negligence thereafter. Plaintiffs are businesses whose revenue stream was adversely affected and in some cases destroyed as a result of the Spill and its detrimental impact on tourism.

Each Plaintiff who brings claims under the Oil Pollution Act of 1990 against BP has satisfied its obligations there-under by informing the responsible party in writing of the nature and extent of their damages, providing supporting documentation, and requesting a specified amount of compensation for its injuries pursuant to 33 U.S.C. §§ 2713(a) and (b). For each of these Plaintiffs, ninety (90) days have passed since their presentment, without any Plaintiff

receiving a payment or offer of settlement to its claim pursuant to 33 U.S.C. §2713(c)(2).[1] Each such Plaintiff has satisfied all conditions precedent to filing this suit.

Each Plaintiff is entitled to bring this action because a) it has opted-out, and thus is not a member of the class as defined in the Economic and Property Damages Settlement Agreement (hereafter "the Settlement"), or b) it is by definition of the class excluded from and therefore not a member of said class based upon its geographic location, the nature of its business, or both. *See  In re: Oil Spill by the Oil Rig "Deepwater horizon" in the Gulf of Mexico, on April 20, 2010, MDL No. 2179*.

Each Plaintiff avers as follows:

## NATURE OF ACTION

1.      On April 20, 2010, a blowout, explosion, and multiple fires occurred aboard the mobile offshore drilling rig *Deepwater Horizon,* resulting in the sinking of the *Deepwater Horizon* and an oil spill in the Gulf of Mexico (sometimes hereinafter "the Spill") that has caused, is causing, and will continue to cause, damage to the Plaintiff.  This is an action for damages, penalties, and other relief by the Plaintiffs against the parties known to be responsible for the Spill. The Defendants named in this lawsuit collectively and individually engaged in grossly negligent, wanton, and reckless conduct in the drilling and operation of the Macondo well, the operation of the *Deepwater Horizon,* and the containment of the Spill.

2.      Defendants' actions resulted in the blowout of the Macondo well, caused the explosion, burning, and sinking of the *Deepwater Horizon* rig, and directly resulted in

---

[1]      Plaintiffs expressly adopt and incorporates as if fully re-stated herein the factual allegations, causes of action and prayer for relief, raised in the Amended B 1 Master Complaint, Doc. No. 1128 filed in the MDL No. 2179, In re Oil Spill by the Oil Rig, "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 (the "MDL Complaint").

2

the release of crude oil and other pollutants into the waters of the Gulf of Mexico. These pollutants and the foreseeable consequences of their release, have damaged, are damaging, and will continue to damage e a c h Plaintiffs' economic livelihood.

3.      The discharge of oil into the Gulf resulted in a widespread array of negative consequences that severely damaged each of the Plaintiff's businesses. The Spill directly limited the availability and accessibility of the natural resources of the Gulf, and thereby caused injury to Plaintiff's businesses dependent on those resources.

4.      For example, the closure of Gulf waters to commercial fishing, shrimping, and oystering due to oil in the water, caused seafood prices to increase by as much as four hundred percent (400%).

5.      The Spill caused tremendous losses to Plaintiffs in the real estate industry who buy, sell, or rent land, buildings or housing along the Gulf Coast. The health and vitality of the Gulf of Mexico waters is critical to the image and attractiveness of these entities. The Spill caused a diminution in the value of real estate and an accompanying decline in the number of sales, leases, rentals, loan applications, loan approvals, and of course a corresponding decline in associated fees for real estate companies and their employees. Indeed, the real estate industry is directly related to the tourism industry, as the actual and perceived contamination of the Gulf, along with its long-term risks to health, caused fewer real estate transactions for lower prices than had the Spill not occurred.

6.      The Spill also carried acute, severe, and far reaching damage to Florida's tourism industry, with incumbent damage to the plethora of Plaintiff's businesses that earned revenue from those tourists. At or about the time of the spill domestic and international media followed the tragedy closely, broadcasting round the clock stories and

breaking news alerts of the unsuccessful efforts to stop the Spill.  A world audience was treated to a daily and sometimes hourly barrage of the omnipresent images of the Macondo Well pouring crude oil beneath the waters.  The media detailed the devastation of marine life from areas where the oil had actually made contact with the coastline.  But the media also carried stories and experts rampant with speculation as to whether the well would ever be capped, the unknown and possible long-term health consequences of the Spill on areas neighboring but as of yet untouched directly by oil, and even the potentially threatening contents of the chemicals being used in the clean up.  Beginning April 20, and extending many months after the well was finally capped in September 2010, the media engaged in a feeding frenzy that fueled legitimate concerns while also planting and nurturing new fears and concerns.

7.      Whether or not oil was literally on the beaches of tourist and vacation destinations throughout the Gulf, and regardless of whether certain sea-food and marine life was or was not actually contaminated, tourists, would-be-vacationers, and other travelers, reasonably perceived destinations throughout the Gulf Coast states to be an unwise choice -- a risk.  Actual and would-be-travelers and tourists acted accordingly; people who had travel and vacation plans cancelled them or elected to go elsewhere.

8.      Gas retailers and distributors suffered substantial economic damages as a direct result of the oil spill.  Plaintiffs in this industry derive a significant portion of their revenue from the sale of gasoline to domestic and international tourists, as well as boaters. The Spill reduced the volume of gasoline purchasers and thereby caused businesses to suffer economic loss.  BP branded gas stations fared even worse suffering a backlash in the form of protests and boycotts by would be purchasers who refused to purchase gas from stores flying the BP brand.

9.      Media reports regarding the potential health risks associated with the consumption of seafood from the Gulf of Mexico caused a decline in the customer base the volume of sales to drop drastically.  This drop in the demand of seafood for consumption left fishermen with little to no work because consumers did not trust seafood from the Gulf. Furthermore, the closure of Gulf waters to commercial fishing, shrimping, and oystering due to oil in the water put the fishermen out of work for an extended period of time. There was a clear decrease in commercial fishing due to the decrease in demand for seafood from the Gulf of Mexico due directly to the oil spill. There was general consumer distrust of seafood from the Gulf which decreased the demand. Fishermen were also finding sick fish that were exhibiting skin lesions and missing eyes that they could not market for consumption. Also, due to the damage the oil spill had on the environment, fishermen were experiencing a drastic decrease in catches.

10.      The Hospitality Industry, which is directly tied to tourism, suffered a dramatic loss of revenue as a result of both leisure and business travelers cancelling reservations and simply declining to travel to areas they otherwise would have had it not been for the Spill. The oil spill caused tremendous detriment to the Gulf of Mexico's tourism and hospitality industry; industries which the region's overall economic vitality is dependent upon. Hotels that previously housed rig workers in areas such as Texas lost big contracts when the moratorium was instituted and all workers were transferred out of the area. Business travelers that typically traveled to the Gulf Coast for major business conferences did not come because of a change in conference venue due to the oil spill. Hotels also lost other travelers such as those visiting the Gulf for weddings, sporting tournaments such as golf tournaments, snowbirds that typically come down for the summer from the northern states,

etc. that would normally drive the hotels' revenue in addition to the tourists that travel to the area.

11.     Similarly, eating establishments of all sorts in areas throughout the Gulf suffered a decline in revenue due to the Spill.  As noted, seafood restaurants were affected the greatest after the oil spill, as both local customers and tourists did not believe that seafood was safe to eat.  However, the Gulf wide decline in travelers and tourists directly lowered the volume of business restaurants of all stripe did along the Gulf Coast.  Business travelers and domestic and international vacationers who would have purchased food during their stay, were absent and thus did not buy breakfast at their hotel, lunch at a fast-food restaurant, or dinner at a higher end restaurant.

12.     The Plaintiffs suffered substantial economic damages as a result of the oil spill.  The tremendous impact of the Oil Spill caused a tremendous ripple effect, on not just the seafood and tourism industry, but the entire Gulf Coast's economy as a whole.  As business owners struggled to maintain their businesses, banks and financial services were forced to deny a multitude of loan applications for new businesses, while foreclosing on old businesses in order to recuperate their losses and break even.

13.     The oil spill caused tremendous detriment to the Gulf of Mexico's tourism and hospitality industry; industries which the region's overall economic vitality is dependent upon. Decreased tourism in the area heavily impacted local businesses and residents who, experiencing a significant decrease in profits and income, were unwilling and unable spend their money on discretionary products. The retail industry's revenue is based exclusively upon the selling of products to these residents and tourists. The oil spill prevented the

residents of the areas affected by the spill from accessing purchasing the goods sold by retailers which, in turn, directly decreased their revenue share.

14.     Each of the Plaintiffs owned and operated businesses or business ventures located in the state of Florida at the time the *Deepwater Horizon* oil rig exploded and sank. Businesses and industries of each type operated by Plaintiffs in this suit were adversely affected by the Spill and lost revenue as a result of the Spill.  The image and attractiveness of each Plaintiff's business has suffered, is suffering, and will continue to suffer because of the unknown impact of the Spill on the Gulf of Mexico, and its natural resources.  Each of the owners worked diligently to keep their enterprises profitable and afloat, but each suffered substantial losses directly attributable to the Spill.  Some Plaintiffs lost their business as a result of the Spill through bankruptcy or foreclosure.

15.     The Florida Plaintiffs, by and through its attorneys, brings this action for a declaratory judgment, to recover fines and penalties to which each Plaintiff is entitled, as well as for compensatory, punitive, and other damages, to the fullest extent allowed by federal law.

16.     Investigation of other potential claims, assessment of damage amounts, and additional removal and remediation actions continue.  Therefore, the Plaintiff reserves its rights in full to amend this Complaint by, among other things, adding new allegations, new claims, and new defendants.

## PARTIES

17.     Plaintiff, Sunshine Enterprises of Jacksonville, Inc., is a Florida Corporation doing business as Sunshine Inn with its principal place of business in Jacksonville, Florida.

18.     Plaintiff, Krishna Enterprises of Alachua, Inc., is a Florida Corporation doing business as Americas Best Value Inn with its principal place of business in Gainesville, Florida.

19.     Plaintiff, Barkaj, Inc., is a Florida Corporation doing business as Best Western with its principal place of business in Palm Coast, Florida.

20.     Plaintiff, JKND, Inc., is a Florida Corporation doing business as Microtel Inn & Suites with its principal place of business in Bushnell, Florida.

21.     Plaintiff, JJB, Inc. of Ocala, is a Florida Corporation doing business as Red Roof Inn with its principal place of business in Ocala, Florida.

22.     Plaintiff, Stirling Hospitality, LLC, is a Florida Limited Liability Corporation doing business as Hampton Inn & Suites with its principal place of business in Hollywood, Florida.

23.     Plaintiff, Parshwanath Inc., is a Florida Corporation doing business as Fabulous Beauty Salon with its principal place of business in Lakeland, Florida.

24.     Plaintiff, Saba Oil, Inc., is a Florida Corporation doing business as Midway Shell with its principal place of business in Bradenton, Florida.

25.     Plaintiff, Dev Krupa, Inc., is a Florida Corporation doing business as La Quinta Inn & Suites with its principal place of business in Tampa, Florida.

26.     Plaintiff, P&P Naran, Inc., is a Florida Corporation doing business as Budget Inn Winter Haven with its principal place of business in Winterhaven, Florida.

27.     Plaintiff, ASAP Holdings, Inc., is a Florida Corporation doing business as Cypress Inn with its principal place of business in Winterhaven, Florida.

28.     Plaintiff, Prabhu Krupa, Inc., is a Florida Corporation doing business as Camelia Motel with its principal place of business in Winterhaven, Florida.

29.     Plaintiff, Caribbean Delites Island Grill, Inc., is a Florida Corporation doing business as Caribbean Delites Island Grill with its principal place of business in Tampa, Florida.

30.     Plaintiff, Inisfree Pub, LLC., is a Florida Limited Liability Corporation doing business as O'Toole's Irish Bar with its principal place of business in Brandon, Florida.

31.     Plaintiff, Purav Hospitality, LLC, is a Florida Limited Liability Corporation doing business as Bella Oasis Hotel with its principal place of business in Homosassa, Florida.

32.     Plaintiff, Naidip Hospitality-II, LLC, is a Florida Limited Liability Corporation doing business as Green Iguana with its principal place of business in Tampa, Florida.

33.     Plaintiff, Bernini of Ybor, Inc., is a Florida Corporation doing business as Bernini of Ybor with its principal place of business in Tampa, Florida.

34.     Plaintiff, Castillo Foods, Inc., is a Florida Corporation doing business as Castillo Foods with its principal place of business in Tampa, Florida.

35.     Plaintiff, The French Baguette LLC, is a Florida Limited Liability Corporation with its principal place of business in Naples, Florida.

36.     Plaintiff, Radhey, Inc., is a Florida Corporation doing business as Tamiami Motel with its principal place of business in Naples, Florida.

37.     Plaintiff, JMKVN LLC, is a Florida Limited Liability Corporation doing business as Budget Inn of St. Petersburg with its principal place of business in St. Petersburg, Florida.

38.     Plaintiff, South Florida Motel Corporation, is a Florida Corporation doing business as Fairway Inn with its principal place of business in Florida City, Florida.

39.     Plaintiff, Massage Studio, LLC, is a Florida Limited Liability Corporation doing business as Massage Studio with its principal place of business in Tampa, Florida.

40.     Plaintiff, Gilbert Associates Inc., is a Massachusetts Corporation doing business as Urban Realty Solutions with its principal place of business in Tampa, Florida.

41.     Plaintiff, Suraj Properties, Inc., is a Florida Corporation doing business as El Jon Motel with its principal place of business in Bartow, Florida.

42.     Plaintiff, Deep Corporation of Central Florida, is a Florida Corporation doing business as Florida Discount Beverage with its principal place of business in Bartow, Florida.

43.     Plaintiff, SaiBaba LLC, is a Florida Limited Liability Corporation doing business as Subway #46725 with its principal place of business in Ft. Myers, Florida.

44.     Plaintiff, Shri Laxmi1 LLC, is a Florida Limited Liability Corporation doing business as Subway #34644 with its principal place of business in Ft. Myers, Florida.

45.     Plaintiff, Suraj Investments, Inc, is a Florida Corporation doing business as Budget Inn with its principal place of business in Bartow, Florida.

46.     Plaintiff, PJP, Alachua County, LLC, is a Florida Limited Liability Corporation doing business as Howard Johnson Express Inn with its principal place of business in Gainesville, Florida.

47.     Plaintiff, Anand Real Estate Investment, L.L.C., is a Florida Limited Liability Corporation doing business as Sunoco Gas Station with its principal place of business in Brooksville, Florida.

48.     Plaintiff, Somnath, L.L.C., is a Florida Limited Liability Corporation doing business as Jenning House Inn "Scottish Inns" with its principal place of business in Jennings, Florida.

49.     Plaintiff, Krishna Investment, Inc., is a Florida Corporation doing business as Microtel Inn & Suites with its principal place of business in Ocala, Florida.

50.     Plaintiff, Nish Hospitality, LLC, is a Florida Limited Liability Corporation doing business as Inn On The Green with its principal place of business in Tavares, Florida.

51.     Plaintiff, Sun Vista Hotels, Inc., is a Florida Corporation doing business as Quality Inn North with its principal place of business in Altamonte Springs, Florida.

52.     Plaintiff, Kamla, L.L.C., is a Florida Limited Liability Corporation doing business as Holiday Inn Express Hotels & Suites with its principal place of business in Live Oak, Florida.

53.     Plaintiff, Roberts Hotels Tampa, LLC, is a Missouri Limited Liability Corporation doing business as The Roberts Comfort Inn & Conference Center with its principal place of business in Tampa, Florida.

54.     Plaintiff, Shree Laxmi LLC, is a Florida Limited Liability Corporation doing business as Subway with its principal place of business in Naples, Florida.

55.     Plaintiff, Global Shipping International LLC, is a Florida Limited Liability Corporation doing business as Global Shipping with its principal place of business in Tampa, Florida.

56.     Plaintiff, 19 Country, L.C., is a Florida Limited Corporation doing business as Oasis with its principal place of business in Clearwater, Florida.

57.     Plaintiff, CSPS Hotel, Inc., is a Florida Corporation doing business as Rodeway Inn with its principal place of business in Tampa, Florida.

58.     Plaintiff, Sai Baba 2, LLC, is a Florida Limited Liability Corporation doing business as Subway #23358 with its principal place of business in Cape Coral, Florida.

59.     Plaintiff, Shriji 11 LLC, is a Florida Limited Liability Corporation doing business as Subway #24574 with its principal place of business in Estero, Florida.

60.     Plaintiff, Ceviche Tapas Beach Drive, LLC, is a Florida Limited Liability Corporation doing business as Ceviche Tapas Beach Drive with its principal place of business in St. Petersburg, Florida.

61.     Plaintiff, Ceviche Tapas Bayshore, LLC, is a Florida Limited Liability Corporation doing business as Ceviche Tapas Bayshore with its principal place of business in Tampa, Florida.

62.     Plaintiff, Lynchberg Travel Inn, LLC, is a Florida Limited Liability Corporation doing business as Super 8 with its principal place of business in Florida City, Florida.

63.     Plaintiff, KVN, Inc., is a Florida Corporation doing business as Relax Inn with its principal place of business in St. Petersburg, Florida.

64.     Plaintiff, D.R.U.H., Incorporated, is a Florida Corporation doing business as Budget Host Inn with its principal place of business in Ocala, Florida.

65.     Plaintiff, Shree Sai, LLC, is a Florida Limited Liability Corporation doing business as Quality Inn & Suites with its principal place of business in Zephyrhills, Florida.

66.     Plaintiff, Alabama Jack's, Inc., is a Florida Corporation doing business as Alabama Jacks with its principal place of business in Key Largo, Florida.

67.     Plaintiff, Mezrah Family Enterprises, Ltd, is a Florida Limited Partnership with its principal place of business in Indian Rocks Beach, Florida.

68.     Plaintiff, Summerfield Qwik King Food Store, LLC, is a Florida Limited Liability Corporation doing business as Summerfield Qwik King Food Store with its principal place of business in Summerfield, Florida.

69.     Plaintiff, Kedareshwar of Sarasota, LLC, is a Florida Limited Liability Corporation doing business as Regency Inn and Suites with its principal place of business in Sarasota, Florida.

70.     Plaintiff, Trishul, Inc., is a Florida Corporation doing business as Howard Johnson Express Inn with its principal place of business in Midway, Florida.

71.     Plaintiff, Jai Laxminarayan LLC, is a Florida Limited Liability Corporation doing business as Days Inn Central with its principal place of business in St. Petersburg, Florida.

72.     Plaintiff, Bravo Brothers IV Inc., is a Florida Corporation doing business as Bravo Brothers IV with its principal place of business in Tampa, Florida.

73.     Plaintiff, Somras LLC, is a Florida Limited Liability Corporation doing business as Pic Pac Liquors with its principal place of business in St. Petersburg, Florida.

74.     Plaintiff, Royal Motel, LLC, is a Florida Limited Liability Corporation doing business as Royal Motel with its principal place of business in Bradenton, Florida.

75.     Plaintiff, Ujash Corporation, is a Florida Corporation doing business as Driftwood Inn with its principal place of business in Lake City, Florida.

76.     Plaintiff, Spring Hill Hospitality, LLC, is a Florida Limited Liability Corporation doing business as Quality Inn with its principal place of business in Spring Hill, Florida.

77.     Plaintiff, XTC Supercenter, Inc., is a Florida Corporation with its principal place of business in Tampa, Florida.

78.     Plaintiff, Sree Inc., is a Florida Corporation doing business as Bloomingdale Liquors with its principal place of business in Brandon, Florida.

79.     Plaintiff, Suhag, Inc., is a Florida Corporation doing business as Scottish Inn with its principal place of business in Lake City, Florida.

13

80.     Plaintiff, Shares Hospitality, LLC, is a Florida Limited Liability Corporation doing business as Comfort Inn with its principal place of business in Plant City, Florida.

81.     Plaintiff, Gulf Shore Hospitality, LLC, is a Florida Limited Liability Corporation doing business as Country Inn & Suites with its principal place of business in Sarasota, Florida.

82.     Plaintiff, Veda, LLC, is a Florida Limited Liability Corporation doing business as La Quinta Inn & Suites Port Charlotte with its principal place of business in Port Charlotte, Florida.

83.     Plaintiff, Martin Qwik King Food Store, LLC, is a Florida Limited Liability Corporation doing business as Martin Qwik King Food Store with its principal place of business in Ocala, Florida.

84.     Plaintiff, Baps Krupa Inc., is a Florida Corporation doing business as Amoco with its principal place of business in Bartow, Florida.

85.     Plaintiff, Hotel Management Group, LLC, is a Florida Limited Liability Corporation doing business as Holiday Inn Express Hotels & Suites with its principal place of business in Perry, Florida.

86.     Plaintiff, Conkedie, LLC, is a Florida Limited Liability Corporation doing business as Horse and Jockey Pub with its principal place of business in S. Pasadena, Florida.

87.     Plaintiff, Shrinath LLC, is a Florida Limited Liability Corporation doing business as Subway #29419 with its principal place of business in Ft. Myers, Florida.

88.     Plaintiff, Bay View One, LLC, is a Florida Limited Liability Corporation doing business as Hampton Inn with its principal place of business in Tampa, Florida.

89.     Plaintiff, Shriram LLC, is a Florida Limited Liability Corporation doing business as Subway #4716 with its principal place of business in Ft. Myers, Florida.

90.     Plaintiff, Vaidik, Inc., is a Florida Corporation doing business as Clarion Hotel with its principal place of business in Ft. Myers, Florida.

91.     Plaintiff, Jay Shree Hari Krishna Inc., is a Florida Corporation doing business as Withlacoochee Motel with its principal place of business in Inglis, Florida.

92.     Plaintiff, Shriji LLC, is a Florida Limited Liability Corporation doing business as Subway #11192 with its principal place of business in Ft. Myers, Florida.

93.     Plaintiff, D&U Food Mart Inc., is a Florida Corporation doing business as D&U Food Mart with its principal place of business in Lake Panasoffee, Florida.

94.     Plaintiff, OHM LLC, is a Florida Limited Liability Corporation doing business as Subway #24083 with its principal place of business in Ft. Myers, Florida.

95.     Plaintiff, Laxmi of Naples, LLC, is a Florida Limited Liability Corporation doing business as Super 8 with its principal place of business in Naples, Florida.

96.     Plaintiff, Shivnit, Inc., is a Florida Corporation doing business as The Dunedin Cove Motel with its principal place of business in Dunedin, Florida.

97.     Plaintiff, Tri Murti Hospitality, Inc., is a Florida Corporation doing business as Rodeway Inn with its principal place of business in St. Petersburgh, Florida.

98.     Plaintiff, Krishna Foods Inc., is a Florida Corporation doing business as Subway with its principal place of business in Venice, Florida.

99.     Plaintiff, Surya Hospitality, LLC, is a Florida Limited Liability Corporation doing business as Best Western All Suites with its principal place of business in Tampa, Florida.

100.     Plaintiff, Auburndale Hotel LLC, is a Florida Limited Liability Corporation doing business as Best Western with its principal place of business in Auburndale, Florida.

101.    Plaintiff, Sunny Enterprises of Florida LLC, is a Florida Limited Liability Corporation doing business as Quality Inn with its principal place of business in Sarasota, Florida.

102.    Plaintiff, Impact Properties II, LLC, is a Florida Limited Liability Corporation doing business as Westin Tampa Bay with its principal place of business in Tampa, Florida.

103.    Plaintiff, Fort Myers Venture LLC, is a Florida Limited Liability Corporation doing business as Clarion Steakhouse with its principal place of business in Ft. Myers, Florida.

104.    Plaintiff, Sun Shine Inn & Suites, LLC, is a Florida Limited Liability Corporation doing business as Sunshine Inn & Suites with its principal place of business in Sarasota, Florida.

105.    Plaintiff, Dhruvanjali Inc., is a Florida Corporation doing business as Comfort Inn & Suites with its principal place of business in St. Petersburg, Florida.

106.    Plaintiff, Nobel Hospitality of Tampa, LLC, is a Florida Limited Liability Corporation doing business as Country Inn & Suites with its principal place of business in Tampa, Florida.

107.    Plaintiff, Golfview Motel, Inc., is a Florida Corporation doing business as Golf View Motel with its principal place of business in Ft. Myers, Florida.

108.    Plaintiff, Laxmi-Patel Enterprises, Inc. is a Florida Corporation doing business as Subway #7638 with its principal place of business in Punta Gorda, Florida.

109.    Plaintiff, Caragiulo Inc., is a Florida Corporation doing business as Caragiulo's Italian Restaurant with its principal place of business in Sarasota, Florida.

110.    Plaintiff, Nakul, LLC., is a Florida Limited Liability Corporation doing business as Best Western with its principal place of business in Bradenton, Florida.

16

111.     Plaintiff, Florida Hospitality Resorts, Inc. is a Florida Corporation doing business as Hampton Inn with its principal place of business in Fort Myers, Florida.

112.     Plaintiff, KGV Restaurant, Inc., is a Florida Corporation doing business as Lazy Lobster with its principal place of business in Sarasota, Florida.

113.     Plaintiff, Laxmi Austrian Hotel, Ltd., is a Florida Limited Partnership doing business as Residence Inn Orlando with its principal place of business in Orlando, Florida.

114.     Plaintiff, ATM Solution Investments, LLC, is a Florida Limited Liability Corporation with its principal place of business in Jacksonville, Florida.

115.     Plaintiff, Shazia Creamery, L.L.C, is a Florida Limited Liability Corporation doing business as Super Discount Store with its principal place of business in Bartow, Florida.

116.     Plaintiff, Swamibapa 108 Inc., is a Florida Corporation doing business as Morrison Buffet with its principal place of business in Winterhaven, Florida.

117.     Plaintiff, Southtrail Auto Center Inc., is a Florida Corporation doing business as Southtrail BP with its principal place of business in Ft. Myers, Florida.

118.     Plaintiff, Pavansut, LLC, is a Florida Limited Liability Corporation doing business as Lil' Sammy's Food Mart with its principal place of business in Deland, Florida.

119.     Plaintiff, Royal Atlantic Resort, LLC, is a Florida Limited Liability Corporation doing business as Royal Atlantic Resort with its principal place of business in Daytona Beach, Florida.

120.     Plaintiff, Diwa, Inc., is a Florida Corporation doing business as America's Best Value Inn & Suites with its principal place of business in West Melbourne, Florida.

121.    Plaintiff, Laxmi Augusta National Hotel III, Ltd., is a Florida Limited Partnership doing business as Residence Inn Orlando Airport with its principal place of business in Orlando, Florida.

122.    Plaintiff, Coral Gables Downtown Hotel, Ltd., is a Florida Limited Partnership doing business as Courtyard Coral Gables with its principal place of business in Coral Gables, Florida.

123.    Plaintiff, Plantation MM LLC, is a Florida Limited Liability Corporation doing business as Quality Inn Sawgrass with its principal place of business in Plantation, Florida.

124.    Plaintiff, Big-J Media, LLC, is a Florida Limited Liability Corporation doing business as Theater X with its principal place of business in Orange Heights, Florida.

125.    Plaintiff, Harinam, Inc., is a Florida Corporation doing business as Lantern Motel with its principal place of business in Lake Wales, Florida.

126.    Plaintiff, Amarti, LLC., is a Florida Limited Liability Corporation doing business as Everglades Motel with its principal place of business in Homestead, Florida.

127.    Plaintiff, Shri Ranchod, Inc., is a Florida Corporation doing business as Ranch House Inn with its principal place of business in Winterhaven, Florida.

128.    Plaintiff, Natasha Hospitality LLC., is a Florida Limited Liability Corporation doing business as Howard Johnson with its principal place of business in Winterhaven, Florida.

129.    Plaintiff, MDP Hospitality, Inc., is a Florida Corporation doing business as Quality Inn with its principal place of business in Ocala, Florida.

130.    Plaintiff, Calflo, Inc., is a Florida Corporation doing business as Comfort Suites and Days Inn with its principal place of business in Ocala, Florida.

131.    Plaintiff, EVS Investments, Inc., is a Florida Corporation doing business as X-Mart Adult Supercenter with its principal place of business in Gainesville, Florida.

132.    Plaintiff, 75 Retail Enterprises, Inc., is a Florida Corporation doing business as X-Mart Adult Supercenter with its principal place of business in Wildwood, Florida.

133.    Plaintiff, Columbia Hospitality, Inc., is a Maryland Corporation doing business as Hampton Inn & Suites with its principal place of business in Lakeland, Florida.

134.    Plaintiff, MIA Hospitality, LLC, is a Florida Limited Liability Corporation doing business as Fairfield Inn & Suites with its principal place of business in Miami, Florida.

135.    Plaintiff, Integrated ATM Service, LLC, is a Florida Limited Liability Corporation with its principal place of business in Jacksonville, Florida.

136.    Plaintiff, V.D.S., Inc., is a Florida Corporation doing business as Anhinga Motel with its principal place of business in Homestead, Florida.

137.    Plaintiff, Lalji, Inc., is a Florida Corporation doing business as Crown Inn with its principal place of business in Fort Lauderdale, Florida.

138.    Plaintiff, Lauderdale Waterfront Associates, LLC, is a Delaware Limited Liability Corporation doing business as Waterfront Inn with its principal place of business in Fort Lauderdale, Florida.

139.    Plaintiff, Tropic Cay Merrimac Beach Hotel Inc., is a Florida Corporation doing business as Tropic Cay Beach Resort Hotel with its principal place of business in Fort Lauderdale, Florida.

140.    Plaintiff, Sarai, Inc., is a Florida Corporation doing business as Hampton Inn with its principal place of business in Mount Dora, Florida.

141.    Plaintiff, Reema Hospitality, Inc., is a Florida Corporation doing business as Hampton Inn with its principal place of business in Melbourne, Florida.

142.    Plaintiff, Punta G Liquor Inc., is a Florida Corporation doing business as PGI Liquors with its principal place of business in Punta Gorda, Florida.

143.    Plaintiff, Hospitality Resorts of Orlando, LLC, is a Florida Limited Liability Corporation doing business as Budget Motel with its principal place of business in Orlando, Florida.

144.    Plaintiff, H & N Hospitality, LLLP, is a Florida Limited Liability Partnership doing business as America's Best Value Inn with its principal place of business in Yulee, Florida.

145.    Plaintiff, Bini & Rema, Inc., is a Florida Corporation doing business as Super 8 with its principal place of business in Titusville, Florida.

146.    Plaintiff, Sagar Hotels and Resorts, LLC, is a Florida Limited Liability Corporation doing business as Microtel Inn & Suites with its principal place of business in Leesburg, Florida.

147.    Plaintiff, Kedar Investments, Inc., is a Virginia Corporation doing business as Springhill Suites by Marriott with its principal place of business in Jacksonville, Florida.

148.    Plaintiff, Sarai Sanford, LLC, is a Florida Limited Liability Corporation doing business as Holiday Inn Express with its principal place of business in Sanford, Florida.

149.    Plaintiff, Sunshine Hospitality, LLC, is a Florida Limited Liability Corporation doing business as Holiday Inn Express with its principal place of business in Miami, Florida.

150.    Plaintiff, Beaches Hospitality LLC, is a Florida Limited Liability Corporation doing business as Hampton Inn with its principal place of business in Jacksonville, Florida.

151.    Plaintiff, AACSA Partners, LLC, is a Florida Limited Liability Corporation doing business as AACSA Partners LLC with its principal place of business in Tampa, Florida.

152.    Plaintiff, OHM, Inc., is a Florida Corporation doing business as Lil' Sammy's Minimart with its principal place of business in Sanford, Florida.

153.    Plaintiff, Kanha, Inc., is a Florida Corporation doing business as Lil' Sammy's Food Mart with its principal place of business in Deltona, Florida.

154.    Plaintiff, Lil' Sammy's, LLC, is a Florida Limited Liability Corporation doing business as Lil' Sammy's Food Mart with its principal place of business in Orange City, Florida.

155.    Plaintiff, Big Sammy, L.L.C., is a Florida Limited Liability Corporation doing business as Seven Circle Food Mart with its principal place of business in Sanford, Florida.

156.    Plaintiff, AGMT L.L.C, is a Florida Limited Liability Corporation doing business as Econo Inn with its principal place of business in Ormond Beach, Florida.

157.    Plaintiff, Coconut Court Motel, Inc., is a Florida Corporation doing business as Relax Inn with its principal place of business in Fort Lauderdale, Florida.

158.    Plaintiff, Mayport Properties, LLC, is a Florida Limited Liability Corporation doing business as Best Western with its principal place of business in Atlantic Beach, Florida.

159.    Plaintiff, Cecil Property Management LLC, is a Florida Limited Liability Corporation doing business as Best Western Cecil Field Inn & Suites with its principal place of business in Jacksonville, Florida.

160.    Plaintiff, Air-Vac Connection, Inc., is a Florida Corporation doing business as Air-Vac Connection with its principal place of business in Tampa, Florida.

161.     Plaintiff, Snug Harbor Village, LLC, is a Florida Limited Liability Corporation doing business as San Martin Village with its principal place of business in St. Petersburg, Florida.

162.     Plaintiff, J. Peaceful, L.C., is a Florida Limited Corporation doing business as Town Market BP with its principal place of business in Naples, Florida.

163.     Plaintiff, Links of Lake Bernadette, Inc., is a Florida Corporation doing business as Links of Lake Bernadette with its principal place of business in Zephyrhills, Florida.

164.     Plaintiff, Laxmi Augusta National Hotel II, Ltd., is a Florida Limited Partnership doing business as Springhill Suites Orlando Airport with its principal place of business in Orlando, Florida.

165.     Plaintiff, Shivam Associates, Inc., is a Florida Corporation doing business as Safar Inn with its principal place of business in Orlando, Florida.

166.     Plaintiff, Laxmi Republic Hotel, Ltd., is a Florida Limited Partnership doing business as Springhill Suites Convention Center with its principal place of business in Orlando, Florida.

167.     Plaintiff, Sun Vista Hotels, LLC, is a Florida Limited Liability Corporation doing business as Best Western International Drive with its principal place of business in Orlando, Florida.

168.     Plaintiff, JHM Orlando Hotel Associates Limited Partnership,, is a South Carolina Limited Partnership doing business as Hampton Inn with its principal place of business in Orlando, Florida.

169.     Plaintiff, JHM Lake Buena Vista Hotel, Ltd, is Florida Limited Partnership doing business as a Country Inn & Suites with its principal place of business in Orlando, Florida.

22

170. Plaintiff, Trident Hospitality (Florida), Inc., is a Florida Corporation doing business as Days Inn with its principal place of business in Orlando, Florida.

171. Plaintiff, Forbes Place Hotel, LLC, is a Florida Limited Liability Corporation doing business as Renaissance Orlando Airport with its principal place of business in Orlando, Florida.

172. Plaintiff, Blue Lagoon Hospitality, LLC, is a Florida Limited Liability Corporation doing business as Springhill Suites with its principal place of business in Miami, Florida.

173. Plaintiff, Laxmi Augusta National Hotel, Ltd, is a Florida Limited Partnership doing business as Hilton Garden Inn with its principal place of business in Orlando, Florida.

174. Plaintiff, JHM Lee Vista Hotel, Ltd, is a Florida Limited Partnership doing business as Fairfield Inn Orlando Airport with its principal place of business in Orlando, Florida.

175. Plaintiff, Laxmi Sand Lake Hotel, Ltd., is a Florida Limited Partnership doing business as Comfort Inn Sand Lake with its principal place of business in Orlando, Florida.

176. Plaintiff, Doral Hospitality, Inc., is a Florida Corporation doing business as Fairfield Inn with its principal place of business in Miami, Florida.

177. Plaintiff, Pratts Electric, Inc., is a Florida Corporation doing business as Pratts Electric

178. with its principal place of business in Tampa, Florida.

179. Plaintiff, Krishna of Daytona, Inc., is a Florida Corporation doing business as Host Inn with its principal place of business in Daytona Beach, Florida.

180. Plaintiff, Cheston MM LLC., is a Florida Limited Liability Corporation doing business as Cheston House with its principal place of business in Fort Lauderdale, Florida.

181.    Plaintiff, Kendall International Investment Group, LLC., is a Florida Limited Liability Corporation doing business as Country Inn with its principal place of business in Miami, Florida.

182.    Plaintiff, Hare Krishna, LLC, is a Florida Limited Liability Corporation doing business as Best Dry Cleaner with its principal place of business in Palmetto, Florida.

183.    Plaintiff, OHM, LLC, is a Florida Limited Liability Corporation doing business as Discount Cleaners with its principal place of business in Sarasota, Florida.

184.    Plaintiff, Shiv Hotels LLC, is a Florida Limited Liability Corporation doing business as Travelers Inn with its principal place of business in Dundee, Florida.

185.    Plaintiff, All Locks Locksmith Services, LLC, is a Florida Limited Liability Corporation doing business as All Locks Locksmith Services with its principal place of business in Naples, Florida.

186.    Plaintiff, Desoto Shell, Inc., is a Florida Corporation doing business as Bayshore Shell with its principal place of business in Bradenton, Florida.

187.    Plaintiff, Rawbar LLC, is a Florida Limited Liability Corporation doing business as Raw Bar Sushi with its principal place of business in Tampa, Florida.

188.    Plaintiff, The Laughing Cat, Inc., is a Florida Corporation doing business as The Laughing Cat with its principal place of business in Tampa, Florida.

189.    Plaintiff, Central Financial Holdings, Inc., is a Florida Corporation doing business as Central Bank with its principal place of business in Tampa, Florida.

190.    Plaintiff, Jay Jalaram Ormond, Inc., is a Florida Corporation doing business as Vanguard Motel with its principal place of business in Ormond Beach, Florida.

191.    Plaintiff, OM of Holly Hill, Inc., is a Florida Corporation doing business as Indian Palms Motel with its principal place of business in Holly Hill, Florida.

192.    Plaintiff, Shubh Shakti, Inc., is a Florida Corporation doing business as Fountain Inn with its principal place of business in Holly Hill, Florida.

193.    Plaintiff, Gainesville Lodge, LLC, is a Florida Limited Liability Corporation doing business as Gainesville Lodge with its principal place of business in Gainesville, Florida.

194.    Plaintiff, Aum Hospitality LLC., is a Florida Limited Liability Corporation doing business as La Quinta Inn & Suites with its principal place of business in St. Augustine, Florida.

195.    Plaintiff, West Palm Motel Corporation, is a Florida Corporation doing business as Knights Inn with its principal place of business in Jacksonville, Florida.

196.    Plaintiff, Miami Hotel, LLC, is a Delaware Limited Liability Corporation doing business as Hampton Inn with its principal place of business in Miami, Florida.

197.    Plaintiff, Shree Krishna, LLC, is a Nevada Limited Liability Corporation doing business as Comfort Suites with its principal place of business in Ormond Beach, Florida.

198.    Plaintiff, Meadors Qwik King Food Store, LLC, is a Florida Limited Liability Corporation doing business as Meadors Qwik King Food Store with its principal place of business in Ocklawaha, Florida.

199.    Plaintiff, Ray Qwik King Food Store, LLC, is a Florida Limited Liability Corporation doing business as Ray Qwik King Food Store with its principal place of business in Ocklawaha, Florida.

200.    Plaintiff, Lynn Qwik King Food Store, LLC, is a Florida Limited Liability Corporation doing business as Lynn Qwik King Food Store with its principal place of business in Silversprings, Florida.

25

201.    Plaintiff, Ocklawaha Qwik King Food Store, LLC, is a Florida Limited Liability Corporation doing business as Ocklawaha Qwik King Food Store with its principal place of business in Ocklawaha, Florida.

202.    Plaintiff, College Qwik King Food Store, LLC, is a Florida Limited Liability Corporation doing business as College Qwik King Food Store with its principal place of business in Ocala, Florida.

203.    Plaintiff, Oak Road Qwik King Food Store, LLC, is a Florida Limited Liability Corporation doing business as Oak Road Qwik King Food Store with its principal place of business in Ocala, Florida.

204.    Plaintiff, ShriSitaram, Inc., is a Florida Corporation doing business as Lakmar Motel with its principal place of business in Winterhaven, Florida.

205.    Plaintiff, Tudja & Kaival, LLC, is a Florida Limited Liability Corporation doing business as Heritage Inn with its principal place of business in Daytona Beach, Florida.

206.    Plaintiff, Goodfellows of Pasco County, Inc., is a Florida Corporation doing business as Brass Flamingo with its principal place of business in Port Richey, Florida.

207.    Plaintiff, Kush Hospitality, LLC, is a Florida Limited Liability Corporation doing business as Best Western Inn & Suites with its principal place of business in Bowling Green, Florida.

208.    Plaintiff, Waterfront Inn, LLC, is a Florida Limited Liability Corporation doing business as Waterfront Inn with its principal place of business in The Villages, Florida.

209.    Plaintiff, Spanish Springs, LTD., is a Florida Limited Partnership doing business as TownePlace Suites with its principal place of business in Ladylake, Florida.

210.    Plaintiff, Baba, Inc., is a Florida Corporation doing business as Super 8 Ocala with its principal place of business in Ocala, Florida.

211.    Plaintiff, Ceviche Tapas Clearwater, LLC, is a Florida Limited Liability Corporation doing business as Ceviche Tapas Clearwater with its principal place of business in Clearwater, Florida.

212.    Plaintiff, S. Garcia Trucking Corp., is a Florida Corporation doing business as S Garcia Trucking with its principal place of business in Apollo Beach, Florida.

213.    Plaintiff, Siri Sakti LLC, is a Florida Limited Liability Corporation doing business as Lil' Sammy's Food Mart with its principal place of business in DeBary, Florida.

214.    Plaintiff, Navnish Corp., is a Florida Corporation doing business as Econolodge and The Package Store with its principal place of business in Lake City, Florida.

215.    Plaintiff, Dadima Inc., is a Florida Corporation doing business as Scoreboard Bar & Grille and Tampa Diner with its principal place of business in Ft. Myers, Florida.

216.    Plaintiff, Lake Harris Spirits, Inc., is a Florida Corporation doing business as Lake Harris Spirits and Liquor & Tobacco Outlet with its principal place of business in Leesburg, Florida.

217.    Plaintiff, International Enterprises, Inc., is a Florida Corporation doing business as Coin Laundry, Mulburry Street Coin Laundry, Dexter Coin Laundry, Dundee Ridge Coin Laundry, Casey's Laundromat, and Valrico Coin Laundry with its principal place of business in Bradenton, Florida.

218.    Plaintiff, Nabi Investment Corporation, is a Florida Corporation doing business as Rainbow Food Mart and Rainbow Laundry with its principal place of business in Tampa, Florida.

27

219.     Plaintiff, Sleep Center U.S.A., Inc., is a Florida Corporation doing business as Sleep Center and Mattress Liquidation Center with its principal place of business in Ocala, Florida.

220.     Plaintiff, Miami Airport Complex II Lessee LLC, is a Delaware Limited Liability Company doing business as Miami Airport Courtyard South, Residence Inn, and Miami Airport Marriott with its principal place of business in Annapolis, Maryland.

221.     Plaintiff, The Radiant Group, LLC, is a Florida Limited Liability Company doing business as Shell, Marathon, Gas Kwick, Mobil, Texaco, and British Petroleum gas stations with its principal place of business in Tampa, Florida.

222.     Plaintiff, C.H.A. Oil Company, Inc., is a Florida Corporation doing business as Port Richey BP with its principal place of business in Port Richey, Florida.

223.     Plaintiff, Pourav Corporation, is a Florida Corporation doing business as Country Hutch with its principal place of business in Winterhaven, Florida.

224.     Plaintiff, Moonlight Sky, Inc., is a Florida Corporation doing business as Silver River Inn with its principal place of business in Silver Springs, Florida.

225.     Plaintiff, Madhav, Inc., is a Florida Corporation doing business as Holiday Palm Inn with its principal place of business in Lakeland, Florida.

226.     Plaintiff, Shiv Crupa, Inc., is a Florida Corporation doing business as Best Western Starke with its principal place of business in Starke, Florida.

227.     Plaintiff, Tri-State Hospitality, Inc., is a Florida Corporation doing business as Sleep Inn with its principal place of business in Orlando, Florida.

228.     Plaintiff, THI IV Miami Lessee LLC, is a Delaware Limited Liability Corporation doing business as Sheraton Miami Airport Hotel with its principal place of business in Miami, Florida.

229.     Plaintiff, AK Resorts Group, LLC, is a Florida Limited Liability Corporation doing business as Budget Inn with its principal place of business in West Melbourne, Florida.

230.     Plaintiff, Silver Lining Ventures, Inc., is a Florida Corporation doing business as Holiday Inn Express Hotel & Suites with its principal place of business in Palm Coast, Florida.

231.     Plaintiff, Aum Sai Inc., is a Florida Corporation doing business as Ramada Limited with its principal place of business in Lake City, Florida.

232.     Plaintiff, Gayatri Devi, L.L.C., is a Florida Limited Liability Corporation doing business as Executive Inn with its principal place of business in Lake City, Florida.

233.     Plaintiff, Aurum, L.L.C., is a Florida Limited Liability Corporation doing business as Holiday Inn Hotel & Suites with its principal place of business in Lake City, Florida.

234.     Plaintiff, DSM Property Management LLC, is a Florida Limited Liability Corporation doing business as Best Western Ocala Park Center with its principal place of business in Ocala, Florida.

235.     Plaintiff, Ramadev Inc., is a Florida Corporation doing business as Travelodge with its principal place of business in Lake City, Florida.

236.     Plaintiff, Temple Hill, Inc., is a Florida Corporation doing business as Quality Inn with its principal place of business in Alachua, Florida.

237.     Plaintiff, Natha Govan Inc., is a Florida Corporation doing business as Quality Inn University with its principal place of business in Gainesville, Florida.

238.    Plaintiff, H & B Motel Inc., is a Florida Corporation doing business as Safar Inn with its principal place of business in Lakeland, Florida.

239.    Plaintiff, OHM Teerth, Inc., is a Florida Corporation doing business as 7 Eleven with its principal place of business in Sarasota, Florida.

240.    Plaintiff, Shivam of Silver Springs, Inc., is a Florida Corporation doing business as Tobacco Shop with its principal place of business in Ocala, Florida.

241.    Plaintiff, Gopal Krishna, Inc., is a Florida Corporation doing business as Ecom Lodge with its principal place of business in Mount Dora, Florida.

242.    Plaintiff, OHM Parth, Inc., is a Florida Corporation doing business as Raceway #756 with its principal place of business in Ellenton, Florida.

243.    Plaintiff, Urika Oil, Inc. is a Florida Corporation doing business as Randall Center with its principal place of business in Naples, Florida.

244.    Plaintiff, Urika II, Inc., is a Florida Corporation doing business as University BP with its principal place of business in Estero, Florida.

245.    Plaintiff, DSM Group LLC, is a Florida Limited Liability Corporation doing business Ramada Inn & Conference Center with its principal place of business in Ocala, Florida.

246.    Plaintiff, J & J Bodalia, L.L.C., is a Florida Limited Liability Corporation doing business as Cadillac Motel with its principal place of business in Fanning Spring, Florida.

247.    Plaintiff, Urika III, Inc., is a Florida Corporation doing business as City Gate BP with its principal place of business in Naples, Florida.

248.    Plaintiff, Shivani, Inc., is a Florida Corporation doing business as Travel Inn with its principal place of business in Ft. Myers, Florida.

249.    Plaintiff, Kimco Construction, Inc., is a Florida Corporation doing business as Kim Co. Construction with its principal place of business in Englewood, Florida.

250.    Plaintiff, Magnum Construction and A/C Inc., is a Florida Corporation with its principal place of business in Miami, Florida.

251.    Plaintiff, Elite Nail of Ocala Inc., is a Florida Corporation doing business as Elite Nails with its principal place of business in Ocala, Florida.

252.    Plaintiff, North East Investments, LLC, is a Florida Limited Liability Corporation doing business doing business as Holiday Inn with its principal place of business in Daytona Beach, Florida.

253.    Plaintiff, Laxmi Realty, Inc., is a Florida Corporation doing business as Super 8 Motel with its principal place of business in Dania Beach, Florida

254.    Plaintiff, Motel86.com, LLC, is a Florida Limited Liability Corporation doing business as Lakmar Apts with its principal place of business in Auburndale, Florida.

255.    Plaintiff, Psion, Inc., is a Florida Corporation doing business as Haines City BP with its principal place of business in Haines City, Florida.

256.    Plaintiff, Laxmi, Inc. of Palm Bay, is a Florida Corporation doing business as Comfort Inn & Suites with its principal place of business in Palm Bay, Florida.

257.    Plaintiff, Jay Krupa Inc., is a Florida Corporation doing business as Sunshine Inn with its principal place of business in Daytona Beach, Florida.

258.    Plaintiff, Swami Investments, Inc., is a Florida Corporation doing business as Roadway Inn with its principal place of business in Lake City, Florida.

259.    Plaintiff, Jai Hanumaan, LLC, is a Florida Limited Liability Corporation doing business as Topaz Hotel with its principal place of business in Flagler Beach, Florida.

260.    Plaintiff, Jay Hotel Investments, LLC, is a Florida Limited Liability Corporation doing business as Super 8 with its principal place of business in St. Augustine, Florida.

261.    Plaintiff, Hampton Place Development Group, LLLP, is a Florida Limited Partnership with its principal place of business in Tampa, Florida.

262.    Plaintiff, Coachman Club Development Group, LLLP, is a Florida Limited Partnership with its principal place of business in Clearwater, Florida.

263.    Plaintiff, Pancham, LLC, is a Florida Limited Liability Corporation doing business as Pancham LLC with its principal place of business in Ocklawaha, Florida.

264.    Plaintiff, Gopi Vallabh, Inc., is a Florida Corporation doing business as AM Eagle Tax Service with its principal place of business in Ocala, Florida.

265.    Plaintiff, Mariner Choice, Inc., is a Florida Corporation doing business as Mariner Mobil with its principal place of business in Springhill, Florida.

266.    Plaintiff, Topaz Aquatic LLC, is a Florida Limited Liability Corporation with its principal place of business in Ormond Beach, Florida.

267.    Plaintiff, Keshav II, LLC, is a Florida Limited Liability Corporation doing business as Days Inn with its principal place of business in Orange Park, Florida.

268.    Plaintiff, Sai Shiv, LLC is a Florida Limited Liability Corporation doing business as St. Augustine Island Inn with its principal place of business in St. Augustine Beach, Florida.

269.    Plaintiff, Deeparti, Inc., is a Florida Corporation doing business as Comfort Inn with its principal place of business in St. Augustine, Florida.

270.    Plaintiff, Jai Khodiyar Ma, Inc., is a Florida Corporation doing business as La Florecita Inn & Suites with its principal place of business in St. Augustine, Florida.

271.    Plaintiff, Jalaram Sai Inc., is a Florida Corporation doing business as Budget Inn with its principal place of business in St. Augustine, Florida.

272.    Plaintiff, Balaji of Daytona, LLC, is a Florida Limited Liability Corporation doing business as La Quinta Inn & Suites with its principal place of business in Daytona Beach, Florida.

273.    Plaintiff, A.B.N. Corporation, is a Florida Corporation doing business as Super Motel 8 with its principal place of business in Riviera Beach, Florida.

274.    Plaintiff, THI IV PGB Lessee LLC, is a Florida Limited Liability Corporation doing business as Doubletree Palm Beach Gardens with its principal place of business in Palm Beach Gardens, Florida.

275.    Plaintiff, Ray & Raj, Inc., is a Florida Corporation doing business as Meridian Hotel & Suites with its principal place of business in Clermont, Florida.

276.    Plaintiff, Shantoshi, Inc., is a Florida Corporation doing business as Days Inn/Scottish Inn with its principal place of business in Ormond Beach, Florida.

277.    Plaintiff, 5 Star Motel Investment, Inc., is a Florida Corporation doing business as Best Western with its principal place of business in Vero Beach, Florida.

278.    Plaintiff, Clewiston Marina, Inc., is a Florida Corporation doing business as Roland Martin Marina & Resort with its principal place of business in Clewiston, Florida.

279.    Plaintiff, Amerin, Corporation, is a Florida Corporation doing business as Super Motel 8 with its principal place of business in Pompano Beach, Florida.

280.    Plaintiff, Accord Hotels, Inc., is a Florida Corporation doing business as Quality Inn with its principal place of business in Vero Beach, Florida.

281.     Plaintiff, Indian River Merchant Services LLC, is a Florida Limited Liability Corporation with its principal place of business in Clearwater, Florida.

282.     Plaintiff, Platinum Inn(s) Inc., is a Florida Corporation doing business as Hampton Inn with its principal place of business in St. Augustine, Florida.

283.     Plaintiff, Sai Jal, LLC, is a Florida Limited Liability Corporation doing business as Red Carpet Inn with its principal place of business in Orlando, Florida.

284.     Plaintiff, Bella, LLC, is a Florida Limited Liability Company doing business as Howard Johnson Inn with its principal place of business in Deland, Florida.

285.     Plaintiff, Shree Vithalji, Inc., is a Florida Profit Corporation doing business as Comfort Suites with its principal place of business in St. Augustine, Florida.

286.     Plaintiff, RS & RS, Inc., is a Florida Profit Corporation doing business as Quality Inn with its principal place of business in Elkton, Florida.

287.     Plaintiff, Vali Hospitality, L.L.C., is a Florida Limited Liability Company doing business as Days Inn Altamonte Springs with its principal place of business in Altamonte Springs, Florida.

288.     Plaintiff, SARP, Inc., is a Florida Profit Corporation doing business as Ramada Limited with its principal place of business in St. Augustine, Florida.

289.     Plaintiff, JHM Eagle Watch Hotel Ltd, is a Florida Limited Corporation doing business as Hampton Inn with its principal place of business in Orlando, Florida.

290.     Plaintiff, Ceviche Tapas Church Street, LLC, is a Florida Limited Liability Corporation doing business as Ceviche Tapas Church Street with its principal place of business in Orlando, Florida.

291.    Plaintiff, Asaramji Inc., is a Florida Corporation doing business as Holiday Motel with its principal place of business in Hollywood, Florida.

292.    Plaintiff, Ved Hotels Inc., is a Florida Profit Corporation doing business as Ramada Inn & Suites with its principal place of business in Titusville, Florida.

293.    Plaintiff, Gray Star Investment, Inc., is a Florida Corporation doing business as Holiday Inn Express with its principal place of business in Tavares, Florida.

294.    Plaintiff, Caiman Management, Inc., is a Florida Corporation doing business as Caiman Management with its principal place of business in St. Augustine, Florida.

295.    Plaintiff, OHM Teerth Investments & Consulting, LLC., is a Florida Limited Liability Company doing business as OHM Teerth Investment & Consulting, LLC with its principal place of business in Bradenton, Florida.

296.    Plaintiff, Paradise Restaurant Group, LLC, is a Florida Limited Liability Company doing business as Cheeseburger in Paradise with its principal place of business in Miramar, Florida.

297.    Plaintiff, Nehal Investment, Inc., is a Florida Corporation doing business as Motel 8 with its principal place of business in Lake City, Florida.

298.    Plaintiff, Orlando Belair, Inc., is a Florida Profit Corporation doing business as Rodeway Inn with its principal place of business in Orlando, Florida.

299.    Plaintiff, Merks LLC, is a Florida Limited Liability Corporation doing business as Holiday Inn Express Hotel & Suites with its principal place of business in Jacksonville, Florida.

300.    Plaintiff, SAS Ventures, LLC, is a Florida Limited Liability Company doing business as Hampton Inn with its principal place of business in Palm Coast, Florida.

301.    Plaintiff, DSM Lake City, LLC, is a Florida Limited Liability Corporation doing business as Best Western Lake City Inn with its principal place of business in Lake City, Florida.

302.    Plaintiff, Balaji of Hardee County, L.L.C., is a Florida Limited Liability Corporation doing business as Stay Inn & Suites with its principal place of business in Bartow, Florida.

303.    Plaintiff, Spectre Sportfish, Inc., is a Florida Profit Corporation doing business as Spectre Sportfish with its principal place of business in Pinella's Park, Florida.

304.    Plaintiff, Nanvish Corp., is Florida Corporation doing business Econolodge and The Package Store with its principal place of business in Lake City, Florida.

305.    Plaintiff, Kevin, Incorporated, is a Florida Corporation doing business as Sammy's Food Mart and Lil' Sammy's Food Mart with its principal place of business in Sanford, Florida.

306.    Plaintiff, Jayanti Patel & Pravin Patel is a Florida Sole Proprietorship doing business as Friendship Inn with its principal place of business in Ocala, Florida.

307.    Plaintiffs, Jayantilal Patel and Bakulaben Patel, are Florida sole proprietors doing business as Budget Inn with its principal place of business in Lakeland, Florida.

308.    Plaintiff, Ramilaben Patel, is a Florida Sole Proprietorship doing business as Bradley Motel with its principal place of business in Lakeland, Florida.

309.    Plaintiff, Jayanti & Lali Patel, is a Florida Sole Proprietorship doing business as Silver Princess Motel with its principal place of business in Ocala, Florida.

310.    Plaintiff, Jayanti Patel, is a Florida Sole Proprietorship doing business as Friendship Inn with its principal place of business in Ocala, Florida.

311.    Plaintiff, Mayur Patel, is a Florida sole proprietor doing business as Presco Food Store #15 with its principal place of business in Plant City, Florida.

312.    Plaintiff, Vasantlal Patel, is a Florida Sole Proprietorship doing business as Budget Inn of Orlando with its principal place of business in Orlando, Florida.

313.    Plaintiff, Wanda Shakir, is a Florida sole proprietor doing business as Nervista's by NV Styles with its principal place of business in Pensacola, Florida.

314.    Plaintiff, Sahil Hospitality, Inc, is a Florida Corporation doing business as Coral Roc with its principal place of business in Florida City, Florida.

315.    Plaintiff, Prasad Inc of Tampa, is a Florida Profit Corporation doing business as Howard Johnson Inn with its principal place of business in Tampa, Florida.

316.    Plaintiff, Leesburg Motel Investment, Inc., is a Florida Profit Corporation doing business as Travelodge with its principal place of business in Ocala, Florida.

317.    Plaintiff, Stirling Hotel Dania Beach Ltd., is a Florida Limited Partnership doing business as Springhill Suites Ft. Lauderdale with its principal place of business in Dania Beach, Florida.

318.    Plaintiff, Park Motel, Inc., is a Florida Profit Corporation doing business as Quality Inn with its principal place of business in Homestead, Florida.

319.    Plaintiff, Walnick Pierre, is a Florida sole proprietor doing business as Nicky's Cleaning Services with its principal place of business in Fort Myers, Florida.

320.    Plaintiff, Kashyap Desai, is a Florida Sole Proprietorship doing business as Desoto Motel with its principal place of business in Arcadia, Florida.

321.    Plaintiff, Harry Goodrich, is a Florida Sole Proprietorship doing business as a travel agency with its principal place of business in Deltona, Florida.

322. Plaintiff, EFX Corp., is a Delaware Corporation doing business as EFX Financial Services with its principal place of business in Clearwater, Florida.

323. Plaintiff, Yogeshwar Inc of Daytona, is a Florida Profit Corporation doing business as Royal Inn with its principal place of business in Daytona Beach, Florida.

324. Plaintiff, Bharat Patel, doing business as Budget Inn Ocean Resort, is a Florida Sole Proprietorship with its principal place of business in Pompano Beach, Florida.

325. Plaintiff, Rashiklal Patel, is a sole proprietor doing business as Spring Side Motel with its principal place of business in Silver Springs, Florida.

326. Plaintiff, Suresh Patel, is a sole proprietor doing business as Cozy Court Motel with its principal place of business in Lakeland, Florida.

327. Plaintiff, Vinod Patel, is a sole proprietor doing business as Helen Apartment's & Motel with its principal place of business in West Palm Beach, Florida.

328. Plaintiff, A&J Partnership, is a Florida Limited Partnership doing business as Howard Johnson Inn with its principal place of business in Vero Beach, Florida.

329. Plaintiff, Mahendra Patel, is a sole proprietor doing business as Economy Inn & RV Park with its principal place of business in Palatka, Florida.

330. Plaintiff, Bhikhu Patel, is a Sole Proprietor doing business as Sunland Motel with its principal place of business in Belle Glade, Florida.

331. Plaintiff, Shri Raam Management Co, Inc, is a Florida Corporation doing business as Bambi Motel and Gator Lodge with its principal place of business in Gainesville, Florida.

332. Plaintiff, Milagro of Ybor Corporation, is a Florida Corporation doing business as King Corona Cigar Factory with its principal place of business in Tampa, Florida.

333.    Plaintiff, Kissimmee River Kayak, LLC, is a Florida Limited Liability Company doing business as Kissimmee River Kayak with its principal place of business in St. Cloud, Florida.

334.    Plaintiff, True Friends, L.L.C., is a Florida Limited Liability Company doing business as Holiday Trav-L Park with its principal place of business in Ocala, Florida.

335.    Plaintiff, Spileon, Inc., is a Florida Corporation doing business as CZAR with its principal place of business in Tampa, Florida.

336.    Plaintiff, Fusiontekplus Inc., is a Corporation with its principal place of business in Lutz, Florida.

337.    Plaintiff, Panchratna, LLC, is a Florida Limited Liability Company doing business as Panchratna LLC with its principal place of business in Ocklawaha, Florida.

338.    All parties in this complaint share common issues of law and fact.  At material times, each resided or did business in Florida.  Each was damaged and injured as a result of the Spill and negligence and misrepresentations of Defendants during and with respect to the remediation of the Spill.

339.    Defendant, BP EXPLORATION & PRODUCTION, INC. ("BP Exploration") is a Delaware corporation with its principal place of business in Warrenville, Illinois.  BP Exploration was a lease holder and the designated operator in the lease granted by the former Minerals Management Service[2] ("MMS") allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Spill originated.  BP Exploration is designated as the "Responsible Party"

---

[2] The MMS, a federal entity that divides the Gulf of Mexico's seafloor into rectangular "blocks," and then auctions the rights to drill for oil and gas beneath those blocks of seafloor, was reorganized as the Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE) on June 18, 2010.  It shall, however, be referred to as the MMS throughout this Complaint.

by the U.S. Coast Guard under the Oil Pollution Act of 1990, 33 U.S.C. § 2714.   . BP Exploration's principle business establishment and registered business office in Florida is 1200 South Pine Island Road, Plantation, FL 33324 and whose agent of service for process is C.T. Corporation, System, 1200 South Pine Island Road, Plantation, FL 33324.   This Court has personal jurisdiction over BP Exploration, because BP Exploration is registered to do business in Florida, does business in Florida, and has a registered agent in Florida.

340.     Defendant, BP AMERICA PRODUCTION COMPANY ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas, and at all pertinent times was doing business in the State of Florida.  BP America was the party to the Drilling Contract with Transocean Ltd. for the drilling of the Macondo well by the *Deepwater Horizon* vessel.   BP America's principle business establishment and registered business office in Florida is 1200 South Pine Island Road, Plantation, FL 33324 and whose agent of service for process is C.T. Corporation, System, 1200 South Pine Island Road, Plantation, FL 33324.  This Court has personal jurisdiction over BP America, because BP America is registered to do business in Florida, does business in Florida, and has a registered agent in Florida.

341.     Defendant, BP P.L.C. is a British public limited company with its corporate headquarters in London, England.   BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo.   BP p.l.c. operates its various business divisions, such as the "Exploration and Production" division in which BP Exploration and BP America fall, through vertical business arrangements aligned by product or service groups.   Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c.   Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Florida and the U.S. more generally.   BP

p.l.c. has acknowledged that it is subject to jurisdiction in the United States.  Defendant BP p.l.c. maintains a corporate office in the United States at 501 Westlake Park Boulevard, Houston, Texas, and at all pertinent times was doing business in the State of Florida. Furthermore, personal jurisdiction over BP p.l.c. is proper under one or more provisions of Fla. Stat. § 48.193 because BP p.l.c. has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs in Florida.

342.   Alternatively, if BP p.l.c. contests that it is subject to jurisdiction under Florida's long-arm jurisdiction statute (Fla. Stat. § 48.193), then this Court may exercise personal jurisdiction over BP p.l.c. pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure, the federal long-arm jurisdiction provision, because claims in this action arise under federal law, the exercise of jurisdiction over BP p.l.c. is consistent with the United States Constitution and laws," and BP p.l.c. is being served with a summons in individual complaints that are the subject of this Complaint. Service of process on BP p.l.c. is proper through the means authorized by the Hague Convention On the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.

343.   BP p.l.c.'s direct, joint and/or assumed responsibility and/or liability for safety and well control, both before and/or after the explosions and blowout on April 20, 2010, is further evidenced by the announcement of the Macondo Project on the BP website hosted and copyrighted by BP p.l.c., the publication of information concerning the casualty and spill on the BP website hosted and copyrighted by BP, the express and/or implied acceptance of responsibility for the safety of BP operations in North America and the Gulf of Mexico in statements by officers of BP p.l.c., the presence (upon information and belief) of a BP p.l.c. officer or employee on the Deepwater Horizon for the celebration that

41

occurred shortly before the explosions and fire, the direct participation of BP p.l.c. employees in the post-casualty investigation, the direct participation of BP p.l.c. officers and employees in the Governmental post-casualty investigations, the direct participation of BP p.l.c. officers and employees in the post-casualty well-control efforts, and the direct participation of BP p.l.c. in the establishment and/or funding of the Escrow Fund and/or Gulf Coast Claims Facility.

344.    BP EXPLORATION, BP AMERICA, and BP P.L.C. generally are referred to herein collectively as "BP."  As lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations.

345.    Defendant, TRANSOCEAN LTD., ("Transocean Ltd.") is a Swiss corporation that maintains substantial U.S. offices in Houston, Texas.  Transocean Ltd. was an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.  . Personal jurisdiction over Transocean Ltd. is proper under one or more provisions of Fla. Stat. § 48.193 because Transocean Ltd. has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs in Florida.

346.    Defendant, TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC. ("Transocean Offshore"), is a Delaware corporation with its principal place of business in Houston, Texas.   Transocean Offshore is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.  Transocean Offshore has been designated as a Responsible Party.  Personal jurisdiction over Transocean Offshore is proper under one or more provisions of Fla. Stat. § 48.193 because Transocean

Offshore has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs in Florida.

347.     Defendant, TRANSOCEAN DEEPWATER, INC. ("Transocean Deepwater"), is a Delaware corporation with its principal place of business in Houston, Texas.  Transocean Deepwater is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.  Transocean Deepwater has been designated as a Responsible Party.  Personal jurisdiction over Transocean Deepwater is proper under one or more provisions of Fla. Stat. § 48.193 because Transocean Deepwater has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs in Florida.

348.     Defendant, TRANSOCEAN HOLDINGS, LLC ("Transocean Holdings"), is a Delaware corporation with its principal place of business in Houston, Texas.  Transocean Holdings is affiliated with Transocean Ltd. and is a wholly-owned subsidiary of Transocean Offshore.  Transocean Holdings is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon* and participated in the *Deepwater Horizon's* offshore oil drilling operations at the Macondo prospect, where the Spill originated.  Transocean Holdings is party to the contract with BP regarding the lease of the *Deepwater Horizon* for drilling operations in the Gulf of Mexico.  On April 28, 2010, the U.S. Coast Guard named Transocean Holdings as a "Responsible Party" under the Oil Pollution Act for the surface oil spill resulting from the blowout by the *Deepwater Horizon*.  Personal jurisdiction over Transocean Holdings is proper under one or more provisions of Fla. Stat. § 48.193 because Transocean Holdings has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs in Florida.

349.    Defendant, TRITON ASSET LEASING GMBH ("Triton"), is a Swiss limited liability company with its principal place of business in Zug, Switzerland.  Triton is affiliated with Transocean Ltd. and is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.  The Coast Guard has designated Triton as a "Responsible Party" under the Oil Pollution Act.  Personal jurisdiction over Triton is proper under one or more provisions of Fla. Stat. § 48.193 because Triton has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs in Florida.

350.   Defendants,   TRANSOCEAN   LTD.,   TRANSOCEAN   DEEPWATER, TRANSOCEAN OFFSHORE, TRANSOCEAN HOLDINGS, and TRITON, are sometimes hereinafter referred to collectively as "Transocean."  At the Macondo site, Transocean provided the *Deepwater Horizon* vessel and personnel to operate it.  At all times relevant to the Spill, Transocean, subject to BP's inspection and approval, was responsible for maintaining well control equipment, such as the blowout preventer and its control systems.  Transocean also provided operational support for drilling-related activities on board the *Deepwater Horizon*, as well as onshore supervision and support for those drilling activities at all times relevant to the Spill.

351.   Defendant HALLIBURTON ENERGY SERVICES, INC. is a Delaware corporation with its principal place of business in Houston, Texas.  Halliburton does business in the State of Florida.  Halliburton's principal principle business establishment and registered business office in Florida is 1200 Plantation Road, Plantation, FL 33324 and whose agent of service for process is C.T. Corporation System, 1200 Plantation Road, Plantation, FL 33324. Halliburton provided engineering services, materials, testing, mixing, and pumping for cementing operations on board the *Deepwater Horizon*, as well as onshore engineering support

for those operations.  Halliburton was responsible for the provision of technical advice about the design, modeling, placement, and testing of the cement that was used in the Macondo well.  At and before the time of the blowout, Halliburton was engaged in cementing operations to isolate the hydrocarbon reservoirs and seal the bottom of the well against the influx of hydrocarbons like gas and oil.

352.    Halliburton division Sperry Drilling Services (formerly Sperry Sun Drilling Services) was responsible for mudlogging personnel and equipment on the *Deepwater Horizon*, including downhole drilling tools.  Sperry mudlogging personnel were partially responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, and pressure fluctuations.  Throughout this Complaint, "Halliburton" shall sometimes herein after refer to both Halliburton Energy Services, Inc. and its Sperry division.

353.    BP, Transocean, and Halliburton, are sometimes collectively referred to hereinafter as the "Drilling Defendants," as they were all involved in the drilling, cementing, and/or other temporary well abandonment activities of the *Deepwater Horizon*, and thus their actions caused and/or contributed to the Spill.  BP, Transocean, and Halliburton, are jointly, severally, and solidarily liable under various principles of federal, maritime, and/or other applicable law, and/or under the Oil Pollution Act.

354.    Drilling Defendants are jointly, severally, and solidarily liable under various principles of federal, maritime, and/or applicable State law, and under the Oil Pollution Act.

## **JURISDICTION**

355.    Plaintiffs incorporate by reference, verbatim, the allegations contained in paragraphs 1 through 365.

356.    The claims presented in sub-Section I of this Complaint are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Jurisdiction exists pursuant to Article III, Section 2 of the United States Constitution, which empowers the federal judiciary to hear "all Cases of admiralty and maritime jurisdiction."  Jurisdiction also exists pursuant to the Admiralty Extension Act, 46 U.S.C. § 30101, which extends the admiralty and maritime jurisdiction of the United States to cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land.

357.    The claims presented in sub-Section II invoke the Court's jurisdiction under the Oil Pollution Act, 33 U.S.C. § 2717 (b) (the "OPA").  *See* 28 U.S.C. § 1331.

358.    The claims presented in sub-Section III invoke the Court's supplemental jurisdiction.  *See* 28 U.S.C. § 1367.

359.    This Court also has jurisdiction under 28 U.S.C. § 1332, in that the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and the matter in controversy is between citizens of different states

## VENUE

360.    Venue is proper in the United States District Court for the Eastern District of Florida pursuant to 28 U.S.C. § 1391(b).

361.    The Plaintiff reserves its right to seek a transfer of any and all issues and claims not resolved in the proceedings before the MDL Court back to the Southern District of Florida for a jury trial, as discussed in more detail *infra at ¶¶ 367-370.*

## GENERAL ALLEGATIONS

### The Macondo Lease, and BP's Exploration Plan and Drilling Permit

362.    On June 1, 2008, BP acquired a ten-year lease from the MMS to search for and exploit hydrocarbon reservoirs at the Macondo prospect site in Mississippi Canyon Block 252, a location on the Outer Continental Shelf forty eight (48) miles off the coast of Louisiana.

363.    In the process of obtaining its lease, BP represented that it had planned and prepared to conduct its proposed activities in a manner that was safe, conformed to applicable regulations and sound conservation practices, and would not cause undue or serious harm or damage to human or marine health, or the coastal environment.

364.    BP represented that it was unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities.  In the event that a spill did occur, BP predicted a worst case discharge scenario of 162,000 gallons of oil per day, an amount to which it assured the MMS that it was prepared to respond.  BP also claimed the well's distance from the nearest shoreline would preclude any significant adverse impacts from a spill.

365.    Based on these assurances, the MMS approved BP's Initial Exploration Plan ("EP") for the Macondo prospect on April 6, 2009, including the approval of a "categorical exclusion" from the full environmental analysis normally required under the National Environmental Policy Act.

366.    After its EP was approved, BP sought a permit from the MMS authorizing it to drill up to a total depth of 19,650 feet at the Macondo site.

### The Deepwater Horizon's Poor Safety and Maintenance Record

367.    The Deepwater Horizon was a dynamically-positioned, semi-submersible deepwater drilling vessel built for Transocean and put into service in February 2001.

368.    At all times relevant herein, the *Deepwater Horizon* was owned by Transocean and leased to BP for drilling exploratory wells at the Macondo prospect site, pursuant to the

December 9, 1998, Drilling Contract between Vastar Resources, Inc. and R&B Falcon Drilling Co. for RBS-8D *Deepwater Horizon* ("Drilling Contract"), and later amendments to that agreement.

369.     Prior to the Spill, Drilling Defendants had actual and/or constructive knowledge that their safety performance during offshore drilling operations was poor.  Drilling Defendants also had actual and/or constructive knowledge of significant problems related to the *Deepwater Horizon's* equipment and maintenance, including problems with the vessel's BOP, electronic alarm systems, ballast systems used to stabilize the vessel in the water, and other significant deficiencies that could lead to loss of life, serious injury, or environmental damage as a result of inadequate use and/or failure of equipment.

### The Macondo Well

370.     The Macondo prospect site is in the Northern Gulf of Mexico, an area known in the industry for high temperature, high pressure, highly gaseous hydrocarbon reservoirs trapped in weak, brittle rock formations.  At the Macondo site, the *Deepwater Horizon* was conducting drilling operations in excess of 18,000 feet deep.  Drilling Defendants knew or should have known that the threat of blowouts increases as drilling depths increase, especially in an area with such troublesome geology as the Northern Gulf of Mexico.

371.     Drilling Defendants struggled with the Macondo well before the events of April 20, 2010.  The problems included varying pressures, varying strengths of formation layers, brittle rock formations, and kicks of natural gas bursting into the well.

372.     As the drilling schedule fell farther behind due to these and other problems, Drilling Defendants—BP in particular—increased the pressure on the Deepwater Horizon's crew to speed up the drilling effort at Macondo in an effort to reduce costs.  Drilling Defendants

repeatedly chose to violate industry guidelines and government regulations and ignore warnings from their own employees and contractors on the Deepwater Horizon to reduce costs and save time on the behind-schedule and over-budget Macondo well.

### *Conduct Leading up to the Explosion*

373.    By April 9, 2010, Drilling Defendants had finished drilling the last part of the well bore, after which only casing and cementing the final open-hole section remained.  In their rush to complete the well, Drilling Defendants made reckless decisions about well design, cementing, and well integrity testing that prioritized speed and cost-savings over safety and industry best practices.

374.    Drilling Defendants chose a "long string" design for the Macondo well with fewer barriers against the risk of hydrocarbon blowouts because the safer "liner/tieback" option  (which had been part of their original well design and was recommended by their contractors) would have taken longer to complete and would have added several million dollars in cost.

375.    Drilling Defendants used inferior metal well casings for the casing pipe material itself, in violation of BP's own safety policies and design standards.

376.    Drilling Defendants knowingly used too few centralizers on one or more pieces of casing pipe, with the knowledge or acquiescence of other Defendants.

377.    Drilling Defendants failed to fully circulate the drilling mud through the entire length of the well before beginning the cementing job, thus failing to properly clean the well bore and prepare the annular space for cementing, and thus failing to take action that could have revealed other problems that contributed to the weaknesses of the Macondo well.

378.    Defendants knew the cementing work the *Deepwater Horizon* was performing was especially risky.  BP's mid-April plan review predicted cement failure, stating "[c]ement

simulations indicated it is unlikely to be a successful cement job due to formation breakdown." Yet, Defendants made minimal efforts to contain the added risk. To save time and money, Defendants chose not to run a 9 to 12-hour procedure called a cement bond log to assess the integrity of the cement seal. Defendants also failed to secure the wellhead with a lockdown sleeve, a critical apparatus that locks the wellhead and the casing in the seal assembly at the seafloor, before allowing pressure on the seal from below.

379.   Based on testing performed before the final cement job at the Macondo well, Halliburton knew that its cement slurry design was unstable. In addition, Halliburton and BP had results in March 2010 showing that a very similar foam slurry design to the one actually pumped at the Macondo well would be unstable, but neither acted upon that data.

380.   In addition to increasing the risk of blowouts, deep-sea drilling also increases the failure risk of the chief blowout safety mechanisms, the BOPs. Defendants were aware of the risk of BOPs failing at greater depths, yet did not install a backup BOP activation system or backup BOPs. Drilling Defendants were also aware that the industry and government had major concerns about the reliability of BOPs like the one installed on the *Deepwater Horizon*.

381.   Drilling Defendants failed to ensure that the BOP present on the Deepwater Horizon possessed reasonably safe, adequate, functional technology to prevent blowouts.

382.   Drilling Defendants failed to ensure that the *Deepwater Horizon's* BOP had sufficient, functional, built in redundancy to eliminate single-point failure modes.

383.   Drilling Defendants failed to ensure that all foreseeable repairs (if any) and foreseeable modifications (if any) to the Deepwater Horizon's BOP were performed, completed, and tested with the drilling vessel's operations shut down and the well secured.

384.    Drilling Defendants failed to ensure that the testing of the *Deepwater Horizon's* BOP was comprehensive, reviewed, and verified, and further failed to check and verify the BOP's entire operating and control system, including but not limited to, checking for leaks at ROV (remotely operated vehicle) connection points, and verifying the functionality of the automated mode function and/or autoshear.

385.    Drilling Defendants could have ensured that a BOP and/or back-up BOP with sufficient strength and reliability for deepwater drilling was present and available on the *Deepwater Horizon*, but did not do so.

386.    Drilling Defendants could have installed a back-up acoustic trigger to activate the *Deepwater Horizon's* BOP in the event that the main trigger failed to activate.

387.    While some testing has been completed, the investigation of the BOP retrieved from the seafloor, and other matters related to the disaster at the Macondo well, is still ongoing. Thus, the Plaintiff reserves the right to amend this Complaint once further information from that and any other future investigations becomes available.

388.    Transocean, the vessel's owner, had a history of postponing and ignoring needed maintenance on the *Deepwater Horizon*.  In the weeks before the blowout, the *Deepwater Horizon* suffered power outages, computer glitches, and a balky propulsion system.  In some cases, Transocean officials purposely overrode or disabled vital safety mechanisms and alarms. These events contributed to the cause of the disaster, or made it worse.

389.    The other Drilling Defendants were all aware of Transocean's poor maintenance of the *Deepwater Horizon* and its practice of disabling or bypassing vital safety systems and alarms, but they continued to operate the vessel and did not report the inadequacies.

390.    Upon information and belief, in addition to the examples set forth above, other non-exclusive examples of Defendants' misconduct, negligence and/or wantonness include:

a.    Utilizing a defective well casing that was prone to fail when under heavy pressure;

b.    Failing to observe dangerous and recurring problems with highly flammable gaseous compounds, and instituting risky cementing and drilling procedures hours before the *Deepwater Horizon* explosion;

c.    Failing to institute common industry protective measures necessary to detect the buildup of highly flammable gaseous compounds before and during the cementing process;

d.    Accelerating drilling operations in an effort to save money and pressuring employees hours before the *Deepwater Horizon* explosion to drill and penetrate the continental shelf faster while ignoring risks associated with dangerous gaseous compounds in the shelf s crust;

e.    Using an improperly designed cement mixture ("slurry"), and failing to properly conduct and/or review the results of laboratory testing of the slurry;

f.    Failing to deploy a casing hanger lockdown sleeve;

g.    Displacing mud in the well with less-dense seawater before cementing had fully set;

h.    Using non-standard spacer fluid mixture and volume;

i.    Continuing to operate the Macondo Well after the well failed pressure tests;

j.    Continuing to operate the Macondo Well without repairing the blowout preventer's annular after chunks of the annular had broken off and floated to the surface, thereby significantly decreasing the blowout preventers' protective measures against a blowout;

k.    Failing to disclose or correct the fact that the battery on the blowout preventer was weak and one of its control pods was broken;

l.    Consciously electing not to install an acoustically activated remote-control shutoff valve;

m.    Ordering drillers to extract drilling mud from the well before all of the concrete plugs were put into place in order to speed up the drilling process thereby creating high pressure instability in the well;

n.    Failing to install a deepwater valve to be placed nearly 200 feet under the sea floor;

o.    Failing to recognize that pressure and flow data from the well were warning signs of a blowout;

p.    Failing to develop sufficient well control procedures for vessel workers to handle larger influxes into the well – for a hydrocarbon influx as large as occurred, flow should have been diverted overboard, not to the mud-gas separator;

q.    Failing to properly design, install, or maintain power supply to the blow-out preventer ("BOP"), including without limitation the use of only one blind shear ram, faulty maintenance, faulty post-market modifications, and other issues;

r.    Failing to properly design, install, or maintain connections from the blow-out preventer's control panel to the blow-out preventer;

s.    Failing to maintain properly and repair the BOP: Drilling Defendant officials were aware of the faulty solenoid valve, poor battery maintenance, hydraulic fluid leaks, and aftermarket modifications on the Deepwater Horizon's BOP long before the April 20, 2010, but no action was ever taken to address the problems.  In addition to posing a significant safety risk, Drilling Defendants' choice to continue drilling with a faulty hydraulic system violated federal regulations, which require companies to disclose problems to the MMS and to stop drilling if either of a BOP's two control systems is not working properly; and,

t.    Failing to equip the vessel with sufficient safety equipment, including operational gas sensors and a gas alarm system.

391.    The Drilling Defendants all knew, or should have known, of the acts and omissions outlined above, and were negligent, wanton, and reckless in continuing to drill in the face of these acts and omissions.

392.    In sum, Defendants knew of the dangers associated with deep water drilling, and they knew of unique problems and shortcomings in the Macondo Well and *Deepwater Horizon* vessel.  Yet, Defendants failed to take appropriate measures to prevent damage to the Plaintiffs, its natural resources, and thousands of its citizens who are dependent upon the Gulf of Mexico and Plaintiff' coast to make a living.

***Post-Explosion Conduct***

393.    Defendants' conduct after the explosion was insufficient to minimize damage, and was in some cases just as negligent, wanton, and reckless as the conduct that led to the explosion.

394.    Defendants failed to institute proper oil disaster response plans to contain the catastrophic oil release resulting from the *Deepwater Horizon* explosion, and they misrepresented their capability to conduct offshore drilling operations safely and contain oil releases that might occur in connection with such operations.

395.    Defendants attempted to downplay and conceal the severity of the oil spill after the explosion.  Defendants' leak estimate of 5,000 barrels per day was found by government investigators to be a fraction of the current official leak estimate of 60,000 barrels of oil per day. In addition, the worst case scenario estimate of 100,000 barrels of oil per day is over 100 times BP's initial estimate of 1,000 barrels per day.

396.    Defendants were also slow and incomplete in their announcements and warnings to residents and businesspeople such as the Plaintiffs about the severity, forecast, and trajectory of the Spill.

397.    Furthermore, the chemical dispersants used by Defendants to accelerate the dispersal of the oil has significant side-effects as well.  Corexit EC9500A and Corexit EC9527A were the principal dispersants used.  These dispersants are composed of several chemicals, including 2-Butoxy Ethanol, which was identified as a causal agent in the health problems experienced by cleanup workers after the 1989 *Exxon Valdez* oil spill.  In addition, the Hazardous Substance Fact Sheet for 2-Butoxy Ethanol warns that it may be a carcinogen in humans and that "[t]here may be <u>no</u> safe level of exposure to a carcinogen, so all contact should be reduced to the lowest possible level."  Further, the OSHA-required Material Safety Data

Sheets ("MSDS") for both versions of Corexit used indicate they may have a potential to bio-accumulate in the tissues of fish or other organisms. Additionally, the MSDSs state that if the product becomes a waste, "it could meet the criteria of a hazardous waste as defined by the Resource Conservation and Recovery Act (RCRA) 40 CFR 261."

398. Corexit EC9500A and Corexit EC9527A are more toxic and less effective than at least twelve other EPA-approved dispersants and are banned from use on oil spills in the United Kingdom. Defendants stated that they chose to use Corexit because it was available the week of the rig explosion.

399. More than 1.84 million gallons of chemical dispersants were used by July 30, 2010, and additional dispersant use was reported by fishermen in mid-August. Dispersant use continued well after the Spill at the wellhead was stopped. The dispersants were employed both on the surface and at the wellhead 5,000 feet below the surface. Mixing the dispersants with the oil at the wellhead added toxicity to the spill and kept much of the oil below the surface, exposing organisms to widespread concentrations of oil.

400. Oil, dispersants, and other pollutants released by Defendants remain in Gulf waters, the Gulf floor, Florida waters, and land owned and/or within the state of Florida, and continue to cause damage. Oil, dispersants, and other pollutants have settled into the sediment on the Gulf floor and the bed underlying waters of Florida, where it has killed, is killing, and will continue to kill marine life and will continually discharge into, and cause damage to, the water, land, property, and resources.

401. The Spill has caused or contributed to, and will continue to cause or contribute to, injuries and damages to the Plaintiffs.

402.    The oil released during the Spill contains benzene, toluene, polyaromatic hydrocarbons, and other compounds (collectively referred to as Total Petroleum Hydrocarbons, or "TPH"), all of which are known carcinogens. Discharge of the toxic pollutants, as identified in 40 C.F.R. § 401.15, likely includes, but is not limited to, benzene, toluene, naphthalene, polynuclear aromatic hydrocarbons (including, but not limited to, phenanthrene, benzanthracenes, benzophyrenes, benzofloranthene, chrysenes, dibenzanthracenes, and idenopyrenes), fluoranthene, arsenic, cadmium, cooper, mercy, and nickel, all of which are hazardous to the health of humans and marine life.

403.    Moreover, the chemical dispersants used by BP during the Spill response is harmful to the health of humans and marine life.

404.    As a direct result of the Spill, coastal and non-coastal counties in Florida, have suffered past, present, and future harm to, and contamination of, their waters, property estuaries, seabeds, animals, plaintiffs, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources, which in turn causes economic damages to Plaintiffs.

405.    The Spill caused the National Oceanographic and Atmospheric Administration ("NOAA") to restrict commercial and recreational fishing across large areas of the Gulf of Mexico, causing damage to the livelihoods of many Florida businesses and individuals, which in turn causes economic damages to Plaintiffs.

406.    There are a wide variety of commercially valuable fish species in the Gulf of Mexico that have been and will continue to be harmed by the Spill, including, but not limited to, shrimp, crabs, oysters, menhaden, tuna, and pelagic fish. As sunken and dispersed oil resurfaces, additional harm to marine ecosystems will occur and continue, which in turn will cause economic damages to Plaintiffs.

*Economic Damages*

407.   The Spill and resulting contamination of the Gulf of Mexico and bays have caused, are causing, and will continue to cause economic damages to each of the Plaintiffs.

408.   Moreover, the Florida counties within which each Plaintiff operates has seen and is continuing to see, a dramatic drop in Gulf-related travel and tourism as a result of the Spill. This decrease in tourism has, is, and will continue to result in a loss of profits and/or impairment of earning capacity for each Plaintiff.

409.   Plaintiffs seek both compensatory and punitive damages in this action. As discussed generally above, Plaintiffs' compensatory damages as a result of Defendants' acts and omissions include, but are not limited to the following:

a.   Past, present, and future economic losses resulting from the Spill; and,

b.   Past, present, and future loss and impairment of income, profits, and earning capacity.

c.   All other damages or relief to which the Plaintiffs are entitled when additional information regarding the full extent of the Plaintiffs' damages becomes available.

410.   This list is by no means exhaustive. There are many other forms of harm or damage from the spill that may be unknown, and the Plaintiffs reserve the right to amend this Complaint as additional information becomes available.

## CAUSES OF ACTION

## I.    CLAIMS UNDER GENERAL MARITIME LAW

### (Asserted by All Plaintiffs)

**A.    *Negligence***

411.   Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated here.

412.     At all times material hereto, Drilling Defendants were participating in drilling operations onboard the *Deepwater Horizon* in the Gulf of Mexico.

413.     At all times material hereto, Drilling Defendants owed and breached duties of ordinary and reasonable care to the Plaintiff in connection with the drilling operations of the *Deepwater Horizon* and the maintenance of the vessel, its appurtenances and equipment, and additionally owed and breached duties to the Plaintiffs to guard against and/or prevent the risk of an oil spill.

414.     The existence and breach of these legal duties are established under the general maritime law and state law as deemed applicable herein.

415.     The blowout and explosions on the *Deepwater Horizon*, its sinking, and the resulting Spill were caused by the joint and concurrent negligence of Defendants which renders them jointly, severally, and solidarily liable to the Plaintiffs.

416.     Defendants knew of the dangers associated with deepwater drilling and failed to take appropriate measures to prevent damage to the Plaintiff.

417.     Defendants were under a duty to exercise reasonable care while participating in drilling operations on the *Deepwater Horizon* to ensure that a blowout and subsequent oil spill did not occur as a result of such operations.

418.     Defendants were under a duty to exercise reasonable care to ensure that if crude oil discharged in the event of a blowout, that it would be contained, captured, and/or stopped within the immediate vicinity of the *Deepwater Horizon* in an expeditious manner.

419.     Defendants knew or should have known that the acts and omissions described herein could result in damage to the Plaintiffs.

420. Defendants, respectively and collectively, failed to exercise reasonable care to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill into the waters of the Gulf of Mexico, and thereby breached duties they owed to the Plaintiffs.

421. The conduct of Defendants with regard to the maintenance and/or operation of drilling operations and oil rigs such as the *Deepwater Horizon* and its appurtenances and equipment is governed by numerous state and federal laws and permits issued under the authority of these laws. These laws and permits create statutory standards that are intended to protect and benefit the Plaintiffs. One or more of the Drilling Defendants violated these statutory standards. The violations of these statutory standards constitute negligence per se under the law of Florida and the general maritime law, including (but not limited to) the Clean Water Act, 33 U.S.C. § 1311.

422. At all times material hereto, the *Deepwater Horizon* was owned, navigated, manned, possessed, and managed by Transocean.

423. As the owner and manager of the *Deepwater Horizon*, Transocean owed duties of care to the Plaintiffs to, *inter alia*, man, possess, manage, control, navigate, maintain and operate the *Deepwater Horizon* with reasonable and ordinary care.

424. Transocean breached its duties to the Plaintiffs by, *inter alia*, failing to manage, control, maintain and operate the *Deepwater Horizon* and its safety equipment properly, including, but not limited to, the gas sensors, air intake valves, emergency shut down systems, and BOP, and in disabling vital alarm systems on the *Deepwater Horizon* before the blowout.

425. Transocean also breached its duties to the Plaintiffs by making and/or acquiescing to a series of reckless decisions concerning, *inter alia*, well design, the use of centralizers,

mudding operations, cementing, integrity testing, deployment of the casing hanger lockdown sleeve, spacer material, and simultaneous operations causing worker confusion and loss of focus.

426.    Defendants also violated the International Safety and Management Code ("ISM"), as adopted by the International Convention for the Safety at Life at Sea ("SOLAS"), which provides rules and standards to ensure that ships are constructed, equipped, and manned to safeguard life at sea, by failing to properly maintain the vessel, train personnel, and perform appropriate risk assessment analyses.  *See* 46 USC §§ 3201-3205 and 33 CFR §§ 96.230 and 96.250.

427.    At all times material hereto, the *Deepwater Horizon* was leased and operated pursuant to a contract between Transocean and BP.  Together, Transocean and BP and other Drilling Defendants were responsible for well design and control.

428.    BP owed duties to the Plaintiffs to, *inter alia*, exercise reasonable care to design, create, manage and control the well and the flow of hydrocarbons therefrom in a safe and prudent manner and to conduct its drilling operations with reasonable and ordinary care.

429.    BP breached its duties to the Plaintiffs by, *inter alia*:

    a.  choosing and implementing a less expensive and less time-consuming long string well design, which had few barriers against a gas blowout, instead of a safer liner/tieback design which would have provided additional barriers to gas blowout, despite its knowledge that the liner/tieback design was a safer option;

    b.  using pipe material that it knew, and which it recognized before the blowout, might collapse under high pressure;

    c.  using too few centralizers to ensure that the casing was centered into the wellbore;

    d.  failing to implement a full "bottoms up" circulation of mud between the running of the casing and the beginning of the cement job in violation of industry standards;

e.  failing to require comprehensive lab testing to ensure the density of the cement, and failing to heed the ominous results of negative pressure testing which indicated that the cement job was defective;

f.  cancelling the cement bond log test that would have determined the integrity of the cement job;

g.  failing to deploy the casing hanger lockdown sleeve to prevent the wellhead seal from being blown out by pressure from below;

h.  using an abnormally large quantity of mixed and untested spacer fluid;

i.  failing to train drilling vessel workers and/or onshore employees and to hire personnel qualified in risk assessment and management of complex systems like that found on the Deepwater Horizon; and,

j.  requiring simultaneous operations in an effort to expedite the project, making it difficult for workers to track fluid volumes in the wellbore.

430.  All of the foregoing acts and/or omissions by BP proximately caused and/or contributed to the Plaintiffs' injuries and damages.

431.  At all times material hereto, Halliburton was responsible for cementing the well that was the subject of the Spill, and further was engaged in testing, analysis, and monitoring of the aforementioned well.

432.  At all times material hereto, Halliburton owed duties to the Plaintiffs to, *inter alia*, exercise reasonable care in conducting its cementing, testing, analysis and monitoring of the *Deepwater Horizon's* well.

433.  Halliburton breached its duties to the Plaintiffs by, *inter alia*, failing to exercise reasonable care in conducting its cementing, testing, analysis, and monitoring of the *Deepwater Horizon's* well.  In addition, Halliburton was negligent by, *inter alia*:

a.  failing to use a full "bottoms up" circulation of mud between the running of the casing and the beginning of the cement job in violation of industry standards;

b.      failing to require comprehensive lab testing to ensure the density of the cement, and failing to heed the ominous results of negative pressure testing which indicated that the cement job was defective;

c.      cancelling, or acquiescing in the cancellation of, the cement bond log test that would have determined the integrity of the cement job; and,

d.      failing to deploy, or acquiescing in the decision not to deploy, the casing hanger lockdown sleeve to prevent the wellhead seal from being blown out by pressure from below, all of which proximately caused and/or contributed to the Plaintiffs' damages.

434.    Engineers knowledgeable about blowout responses told BP how to kill the well as early as June 2010, but BP chose to ignore the engineers' well-kill procedure because BP did not want to damage the well or its chance to make a profit on Macondo.  Because BP hoped to retap the Macondo Well and the large, valuable reservoirs beneath it, they ignored expert well-kill information that could have stopped the Spill many weeks earlier.

435.    In addition to the negligent actions described herein, and in the alternative thereto, the injuries and damages suffered by the Plaintiffs were caused by the acts and/or omissions of Defendants that are beyond proof by the Plaintiffs, but which were within the knowledge and control of the Defendants, there being no other possible conclusion than that the blowout, explosions, fire, sinking, and Spill resulted from the negligence of Defendants.  The blowout, explosions, fire, sinking, and the resulting Spill would not have occurred had the Defendants satisfied the duty of care imposed on them, and the Plaintiffs, therefore, pleads the doctrine of *res ipsa loquitur*.

436.    In addition to the foregoing acts of negligence, the Plaintiffs aver that the blowout, explosions, fire, and resulting Spill were caused by the joint, several, and solidary negligence and fault of Defendants in the following non-exclusive particulars:

a.      Failing to properly operate the *Deepwater Horizon*;

b. Operating the Deepwater Horizon in such a manner that a fire and explosions occurred onboard, causing it to sink and resulting in the Spill;

c. Failing to properly inspect the *Deepwater Horizon* to assure that its equipment and personnel were fit for their intended purpose;

d. Acting in a careless and negligent manner without due regard for the safety of others;

e. Failing to promulgate, implement and enforce rules and regulations pertaining to the safe operations of the *Deepwater Horizon* which, if they had been so promulgated, implemented and enforced, would have averted the blowout, explosions, fire, sinking, and Spill;

f. Operating the *Deepwater Horizon* with untrained and unlicensed personnel;

g. Negligently hiring, retaining and/or training personnel;

h. Accelerating drilling operations in an effort to save money and pressuring employees to work with undue haste in the hours before the blowout, while ignoring or failing to acknowledge the warning signs of the impending disaster;

i. Failing to take appropriate action to avoid or mitigate the accident;

j. Negligently implementing or failing to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

k. Failing to observe dangerous and recurring problems with hydrocarbons in the well, and instituting risky cementing and drilling procedures hours before the blowout;

l. Failing to disclose or correct the fact that the battery on the BOP was weak and one of its control pods was broken;

m. Consciously electing not to install an acoustically activated remote-control shut-off valve;

n. Failing to institute common industry protective measures necessary to detect the buildup of hydrocarbons in the well before and during the cementing process;

o. Using a defective well casing that was prone to failure under heavy pressure;

p. Failing to ascertain that the *Deepwater Horizon* and its equipment were free from defects and/or in proper working order;

q. Failing to warn in a timely manner;

r. Failing to timely bring the oil release under control;

      s.   Failing to provide appropriate accident prevention equipment;

      t.   Failing to observe and read gauges that would have indicated excessive pressures in the well;

      u.   Failing to react to danger signs; and,

      v.   Such other acts of negligence and omissions as will be shown at the trial of this matter; all of which acts are in violation of the general maritime law.

437.    The Plaintiffs are entitled to a judgment finding Defendants liable, jointly, severally, and solidarily to the Plaintiffs for damages suffered as a result of Defendants' negligence and awarding the Plaintiffs adequate compensation in amounts determined by the trier of fact.

438.    The injuries to the Plaintiffs were also caused by and/or aggravated by the fact that Defendants failed to take necessary actions to mitigate the danger associated with their operations.

439.    As a direct and proximate result of Defendants' acts and/or omissions, the Plaintiffs have incurred damages, including, but not limited to, the following:

      a.   Past, present, and future economic losses resulting from oil spill;

      b.   Past, present, and future loss and impairment of income, profits, and earning capacity; and,

      c.   All other damages or relief to which the Plaintiffs are entitled when additional information regarding the full extent of the Plaintiffs' damages becomes available.

**B.**    ***Gross Negligence and Willful Misconduct***

440.    The Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated here.

441.    Drilling Defendants owed and breached duties of ordinary and reasonable care to the Plaintiffs in connection with the maintenance of, and drilling operation on, the Deepwater

Horizon, and additionally owed and breached duties to the Plaintiffs to guard against and/or prevent the risk of the Spill.  The existence and breach of these legal duties are established under the general maritime law and state law as deemed applicable herein.

442.    Drilling Defendants breached their legal duty to the Plaintiffs and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard in the negligent manufacture, maintenance, and/or operation of the *Deepwater Horizon*.

443.    Drilling Defendants knew or should have known that their wanton, willful, and reckless misconduct would result in a disastrous blowout and oil spill, causing damage to those affected by the Spill.

444.    Transocean acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and the Plaintiffs by, *inter alia*, disabling the gas alarm system aboard the *Deepwater Horizon*.

445.    BP and Transocean acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and the Plaintiffs by, *inter alia*, failing to use a sufficient number of "centralizers" to prevent channeling during the cement process; failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job; disregarding proper drilling, casing, mudding, and cementing procedures; failing to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

446.    BP, Transocean, and Halliburton acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment by, *inter alia*, using an inappropriate cement mixture for the well; failing to appropriately test that cement mixture prior to using it in the well; failing to run a cement bond log to evaluate the integrity of

the cement job; and failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

447.    BP and Transocean acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment by, *inter alia*, using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

448.    BP and Transocean acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and the Plaintiffs by, *inter alia*, defectively designing, recklessly maintaining and altering, and/or wantonly operating and/or using the BOP appurtenant to the *Deepwater Horizon*.

449.    Engineers knowledgeable about blowout responses told BP how to kill the well as early as June 2010, but BP chose to ignore the engineers' well-kill procedure because BP did not want to damage the well or its chance to make a profit on Macondo.  Because BP hoped to retap the Macondo Well and the large, valuable reservoirs beneath it, they ignored expert well-kill information that could have stopped the Spill many weeks earlier.  This reckless disregard of the experts' opinions amounts to gross negligence.

450.    The foregoing acts of gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment on the part of the Drilling Defendants directly and proximately caused damage to the Plaintiffs, including, but not limited to, economic losses resulting from damages to the coastal waters surrounding Plaintiffs' business, Loss of profits or impairment of earning capacity  due to the injury, destruction, or loss of real property, or personal property, for all of which the Plaintiffs are entitled to compensatory and punitive damages.

## II.    THE OIL POLLUTION ACT

### BP and Transocean

### (Plaintiffs at ¶¶17 --339)

451.    The Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated here.

452.    Under the Oil Pollution Act, 33 U.S.C. §2701, *et seq* ("OPA"), "each responsible party for a vessel or facility…from which oil is discharged…is liable for removal costs and damages", including "the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."  33 U.S.C. §2702.

453.    The Coast Guard has named BP as the responsible party for the downhole release of oil and Transocean as the responsible party for the release of diesel on the surface.

454.    BP and Transocean are responsible parties under the OPA, and they are strictly liable pursuant to Section 2702 of the OPA for all the damages resulting from the Spill.

455.    Defendants BP and Transocean are not entitled to limit their liability under Section 2704(a) of the OPA because the Spill was proximately caused by their gross negligence, willful misconduct, or violation of applicable safety, construction or operating regulations. 33 U.S.C. § 2704(c).

456.    In its "Statement Of BP Exploration & Production Inc. Re Applicability Of Limitation Of Liability Under Oil Pollution Act of 1990" filed on October 19, 2010, BP waived the statutory limitation on liability under the OPA.

457.    As a result of the Spill and the resulting damages to the natural resources in the Gulf of Mexico, the surrounding bodies of water, and adjoining shorelines, Plaintiffs have

sustained and will continue to sustain a loss of profits and/or impairment of earning capacity, as alleged above.

458.    As a result of the oil spill and the result of the oil spill and the resulting damage to the marine environment in the Gulf of Mexico, surrounding bodies of water, and adjoining shorelines, Plaintiffs are entitled to damages pursuant to OPA, §2702(b)(2)(E), which allows for "[D]amages equal to loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."

459.    It was foreseeable that a massive oil spill in the Gulf of Mexico would cause economic harm to Plaintiffs

460.    The Plaintiffs have satisfied the presentment requirements of 33 U.S.C. §§ 2713(a) and (b) with respect to BP.  Ninety (90) days have passed, from the presentment, without the Plaintiffs receiving any payment on its claim pursuant to 33 U.S.C. § 2713(c)(2) from BP.

461.    Plaintiffs have satisfied their presentment requirements against Transocean through their filing of Short Form Joinders.  If necessary, Plaintiffs will file additional presentments against Transocean.

462.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and the OPA, 33 U.S.C. § 2717(f)(2), the Plaintiffs seek a declaratory judgment that is binding in this action and any subsequent action or actions against Defendants, jointly and severally and without limitation, that said Defendants are liable for removal costs and damages in this action and in any subsequent action or actions.

463.    The Plaintiffs further seek all damages available to it pursuant to the OPA.

## III.     STATE LAW CLAIMS FOR RELIEF

### (All Plaintiffs)

A.     *Public Nuisance (Drilling Defendants)*

464.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated here.

465.     The negligence of Drilling Defendants caused and/or contributed to the blowout and subsequent Spill that invaded and polluted the public waters of the Plaintiffs, damaging all persons who came within the sphere of its operation, resulting in a devastating economic and ecological disaster that has interfered, is interfering, and will continue to interfere with the Plaintiffs' interests and the use and enjoyment of waters, property, estuaries, seabeds, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources of , which constitutes a public nuisance pursuant to Fla. Stat. § 823.05, *et. seq.* and/or common law.  This public nuisance has caused special damages to Plaintiffs.

466.     Drilling Defendants acted in an unreasonable manner in creating the nuisance described herein.

467.     As a direct and proximate result of the creation and continuing creation of a public nuisance, the Plaintiffs have suffered past, present, and future damages, including, but not limited to, inconvenience, loss of income, loss of enjoyment and use of natural resources.

468.     Drilling Defendants were under a duty to take positive action to prevent or abate the interference, including determining the nature and extent of the past, present, and future harm to human, animal, and plant life, and other natural resources caused by the Spill, and appropriate measures needed to abate such harm and threat of harm to the Plaintiffs, but failed to do so.

469.     As a direct and proximate result of the creation of a public nuisance by Drilling Defendants, and their failure to perform their duties and obligations, the Plaintiffs have suffered and will continue to suffer losses, for which the Plaintiffs are entitled to be compensated.

470.     Drilling Defendants are liable to the Plaintiffs, jointly and severally, to take all appropriate actions to remedy and abate the harm to the environment and public health caused by the public nuisance they created, and any other relief the Court deems just and appropriate.

**B.**     *Private Nuisance (Drilling Defendants)*

471.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated here.

472.     The negligence of Drilling Defendants caused and/or contributed to the blowout and subsequent Spill which directly and proximately caused an invasion that has interfered with the use and enjoyment of the waters, property, estuaries, seabeds, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources, and have materially diminished and continue to diminish the value thereof, constituting a private nuisance pursuant to Florida law.

473.     Drilling Defendants were under a duty to take positive action to prevent or abate the interference, but failed to do so.

474.     The creation of the private nuisance by Drilling Defendants proximately caused past, present, and future damages to the Plaintiffs by allowing oil, chemical dispersants, and other materials and substances to contaminate the environment.

475.     As a direct and proximate result of the creation of the private nuisance, the Plaintiffs have suffered past, present, and future damages, including, but not limited to,

inconvenience, loss of income, loss of beneficial use,  and enjoyment, for which the Plaintiffs are entitled to compensation.

476.    Drilling Defendants are liable to the Plaintiffs for actual and compensatory damages sustained as the direct and proximate result of the private nuisance alleged herein.

**C.**    ***Fraudulent Concealment & Negligent Misrepresentation of Material Facts (BP, Halliburton, and Transocean)***

477.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully reinstated here.

478.    The Plaintiffs are entitled to recovery against Defendants BP, Halliburton and Transocean for their fraudulent concealment or suppression of material facts concerning the Spill, their safety procedures and capacity to manage an oil spill, the safety and condition of their respective materials and equipment, and the severity of the Spill and their capacity to address the Spill for months following the Deepwater Horizon explosion, under Florida law or general maritime law, and/or equity.

479.    After the Spill, Defendant BP attempted to downplay and conceal the severity of the Spill.  BP's initial leak estimate of 1,000 barrels per day was found by government investigators to be a fraction of the actual leakage amount of 50,000 barrels of oil per day.

480.    Moreover, in the aftermath of the explosions, BP did not provide complete and timely announcements and warnings about the severity, forecast and trajectory of the Spill.

481.    In addition, BP misrepresented its capabilities to respond to the Spill.  BP overstated its ability to a handle a blowout in its Exploration Plan, wherein it claimed that in the event of a blowout resulting in an oil spill, it was "unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses."

482.     In fact, BP did not have proven equipment and technology to respond to the Spill; instead, as stated in the letter to Attorney General Eric Holder by Members of Congress on May 17, 2010, it did not "in any way appear that there was 'proven equipment and technology' to respond to the spill, which could have tragic consequences for local economies and the natural resources of the Gulf of Mexico."  As noted further in that letter, "much of the response and implementation of spill control technologies appear[ed] to be taking place on an ad hoc basis."

483.     BP admitted on May 10, 2010 that "[a]ll of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before."

484.     Despite its inability to respond and to control the Spill, BP resisted requests from scientists to use sophisticated instruments at the ocean floor that would have provided a more accurate picture of the amount of oil that was gushing from the well.

485.     The severity, forecast, and trajectory of the Spill, and BP's ability to respond to the Spill, were material facts that BP had a duty to communicate because of the dire circumstances of this case and the risks attendant with the failure to disclose.

486.     In addition, Defendant Halliburton misrepresented and concealed the stability of the cement used at the Macondo well, despite having performed three tests before the blowout, all of which demonstrated that the foam cement used at Macondo was unstable.

487.     The instability of the cement used at the Macondo well and the results of the testing performed before the blowout were material facts that Halliburton had a duty to disclose because of the dire consequences of these facts and the risks attendant with the failure to disclose.

488.    Moreover, BP was aware, before the blowout, that Halliburton's testing had revealed that the concrete foam was unstable, yet it concealed this material fact.

489.    For its part, Transocean misrepresented, concealed, and suppressed the condition of the *Deepwater Horizon* and the known hazards associated with the disabling of, and/or failure to maintain, its safety features and appurtenances, including, *inter alia,* its BOP. Transocean misrepresented, suppressed, and concealed the condition of the BOP rams and failsafe valves, which had not been fully inspected for ten years before the blowout, and at least thirty six (36) components and systems on the vessel that were in "bad" or "poor" condition, and which it was aware might lead to loss of life, serious injury, or environmental damage.

490.    Transocean also misrepresented and concealed the safety record of the vessel, which was based on false data supplied by its personnel.

491.    The foregoing known hazards, poor condition, and maintenance and safety issues associated with the *Deepwater Horizon* and its appurtenances and equipment were material facts that Transocean had a duty to communicate because of the dire circumstances of this case and the risks attendant with the failure to disclose.

492.    Defendants Halliburton, BP, and Transocean failed to disclose, suppressed and/or concealed the foregoing material facts, and their failure to do so induced the Plaintiffs to act or to refrain from acting to protect Plaintiffs livelihood and economic wellbeing.

493.    As a direct and proximate result of the fraudulent concealment of the foregoing material facts by Halliburton, BP, and Transocean, the Plaintiffs have and will continue to incur damage, including, but not limited to, loss of income, loss of profits and/or impairment of earning capacity, all other damages or relief to which the Plaintiff is entitled when additional information regarding the full extent of the Plaintiff's damages becomes available.

494.     Moreover, the conscious or deliberate acts of misrepresentation, suppression, and concealment of the foregoing material facts by Halliburton, BP, and Transocean were willful, wanton, and/or in callous disregard for the safety of others and, accordingly, the Plaintiff is entitled to an award of compensatory and punitive damages.

**D.     Strict Liability Pursuant to the Florida Pollutant Discharge Prevention and Control Act Fla. Stat. § 376.011 et seq. (All Defendants)**

495.     Plaintiffs incorporate and re-allege each and every allegation set forth above herein by reference.

496.     At all relevant times, BP and Transocean owned, leased, operated, and/or maintained the Deepwater Horizon and the Macondo well. Following the April 20, 2010 explosions, fire, and ultimate sinking of the Deepwater Horizon, the Macondo well began spewing crude oil into the Gulf of Mexico.

497.     At all relevant times, Defendants had a statutory duty to Plaintiffs to maintain and operate the Deepwater Horizon and the Macondo well so as to not create or sustain hazardous conditions due to the discharge of pollutants as defined by the Florida Pollutant Discharge Prevention and Control Act (the "Florida Act"), Fla. Stat. § 376.031.

498.     At all relevant times, Defendants breached their statutory duty to the Plaintiffs by discharging, or allowing to be discharged, crude oil into the Gulf of Mexico and allowing the massive oil spill to migrate into Florida's marine and coastal areas, in violation of the Act, Fla. Stat. §§ 376.011 - 376.21. Those affected waters and shores are the location of certain Plaintiffs' properties.

499.     Defendants are strictly liable to Plaintiffs under the Act, § 376.205, which provides in pertinent part:

… any person may bring a cause of action against a responsible party in a court of competent jurisdiction for damages, as defined in § 376.031, resulting from a discharge or other condition of pollution covered by §§ 376.011-376.21. In any such suit, it shall not be necessary for the person to plead or prove negligence in any form or manner. Such person need only plead and prove the fact of the prohibited discharge or other pollutive condition and that it occurred.

500.    The Florida Act creates a private cause of action. See Fla. Stat. § 376.205. The Florida Act provides that "[e]ach responsible party is liable to any affected person for all damages as defined in s. 376.031, excluding natural resource damages, suffered by that person as a result of the discharge." Fla. Stat. § 376.12(5).

501.    The Coast Guard has named BP as the responsible party for the downhole release of oil, and Transocean as the responsible party for the release of diesel on the surface. Therefore, BP and Transocean are liable under the Florida Act for all damages, as defined by the Florida Act, that result from the Spill.

502.    The private cause of action under the Florida Act is a strict liability cause of action. The Plaintiffs "need only plead and prove the fact of the prohibited discharge or other pollutive condition and that it occurred." Fla. Stat. § 376.205. The Spill constitutes a prohibited discharge within the meaning of the Florida Act and it has occurred.

503.    The immediate discharge from the Spill occurred into waters outside the territorial limits of Florida; however, lands and waters within the territorial limits of Florida have been directly affected by the discharge and are reasonably expected to continue to be so affected.

504.    As a result of the Spill, certain Plaintiffs have sustained damage to their personal property and economic livelihoods as a result of the post-Spill clean-up activity, and they are entitled to recover from Defendants for such damages in amounts to be determined by the trier of fact.

505.    Plaintiffs are entitled to such damages pursuant to Fla. Stat. § 376.031(5), which defines "damages" as "the documented extent of any destruction to or loss of any real or personal property, or the documented extent, pursuant to § 376.121, of any destruction of the environment and natural resources, including all living things except human beings, as the direct result of the discharge of a pollutant."

506.    As the direct and proximate result of Defendants' breach of statutory duty to Plaintiffs, the oil spill originating from the Macondo well has resulted in detrimental effects upon Plaintiffs' property.

507.    By reason of the foregoing, Plaintiffs have incurred damages in an amount to be determined at trial, and are entitled to compensatory and punitive damages.

**E.**    *Negligence*

508.    Plaintiffs incorporate and re-allege each and every allegation set forth above herein by reference.

509.    The fire, explosion and resulting oil spill was caused by the concurrent negligence (including gross negligence and/or willful misconduct) of the Defendants.

510.    Defendants owed a duty to the Plaintiffs to exercise reasonable care with respect to the construction, operation, inspection, training of personnel, repair, and maintenance of the *Deepwater Horizon* and Macondo Well; with respect to the disaster's containment and prevention planning prior to the disaster; and with respect to the containment and prevention efforts following the initial oil disaster.

511.    Defendants had a heightened duty of care to the Plaintiffs because of the great danger and environmental concerns associated with deepwater drilling for oil in the Gulf.

512.     Defendants, directly or through agents, breached their legal duties to the Plaintiffs by failing to exercise reasonable care and were negligent in their construction, operation, inspection, training of personnel, repair, and maintenance of the *Deepwater Horizon* and the Macondo Well, and in planning and implementing oil containment and prevention activities before and after the oil disaster.

513.     Upon information and belief, the Plaintiffs aver that the fire, explosion, resulting oil disaster, and damages were caused by the Defendants' negligence in the following non-exclusive particulars:

a.     Failing to properly operate the *Deepwater Horizon,* the apparatuses associated therewith, and Macondo Well;

b.     Failing to install a remote control acoustic switch to prevent the discharge of crude oil into the Gulf of Mexico;

c.     Failing to properly inspect the *Deepwater Horizon* and Macondo Well to assure that its equipment and personnel were fit for their intended purposes;

d.     Acting in a careless and negligent manner without due regard for the safety of others;

e.     Failing to promulgate, implement, follow, and enforce procedures, rules, and regulations pertaining to the safe operations of the *Deepwater Horizon* and Macondo Well which, if they had been so promulgated, implemented, followed, and enforced, would have averted the fire, explosion, sinking and oil disaster;

f.     Operating the *Deepwater Horizon* and Macondo Well with untrained and/or unlicensed personnel;

g.     Inadequately and negligently training and/or hiring personnel;

h.     Failing to take appropriate action to avoid and/or mitigate the accident;

i.     Negligently implementing policies and/or procedures to safely conduct offshore operations in the Gulf of Mexico;

j.     Failing to ascertain that the *Deepwater Horizon* and Macondo Well and associated equipment were free from defects and/or in proper working order;

k.      Failing to take reasonable precautions to prevent and timely warn of the failure of the Macondo Well or drilling rig;

1.      Failing to timely bring the oil release under control;

m.      Failing to provide appropriate accident prevention equipment;

n.      Failing to undertake required tests and measurements of the Macondo Well and to observe or respond to measuring devices that indicated excessive pressures in the Macondo Well;

o.      Failing to react to danger signs of catastrophic Macondo Well or drilling rig failure;

p.      Using defective BOPs that were improperly installed, maintained, and/or operated;

q.      Conducting well and well cap cementing operations improperly;

r.      Failing to assure that, once well control initially was lost, well control was regained by proper and adequate well control response;

s.      Failing to assure that, once well control initially was lost, well control was regained by proper and adequate surface containment and overboard discharge and diversion of hydrocarbons;

t.      Failing to prepare an adequate oil disaster response plan;

u.      Failing to marshal sufficient resources to adequately respond to the oil disaster and protect the waters, property, estuaries, seabed, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources of the Plaintiffs;

v.      Failing to use BOPs appropriate for this drilling operation, and failure to test the BOPs that were used;

w.      Failing to follow plans and specifications applicable to the design and construction of the Macondo Well and its components;

x.      Failing to use safety devices adequate to arrest the flow of oil in the event of catastrophic failure of the Macondo Well or drilling rig;

y.      Failing to properly design the *Deepwater Horizon* and Macondo Well;

z.      Concealing or misrepresenting the nature, size and extent of the oil disaster;

aa.     Using dangerous chemical dispersants of an incorrect nature, type, and amount;

bb.     Acting in a manner that justifies imposition of punitive damages;

78

cc.   The knowing use of dangerous dispersants; and,

dd.   Such other acts of negligence, gross negligence, and omissions as will be shown at the trial of this matter.

514.   The Defendants were also negligent in their attempts and omissions in trying to plug the Macondo Well, contain the oil, and clean-up the oil disaster on Plaintiffs' waters and shores.

515.   In addition, and in the alternative, the fire, explosion, and sinking of the Deepwater Horizon and resulting oil spill were caused or aggravated by defective equipment, including the BOP, which were in the care, custody, and control of Defendants, and over which the Defendants had garde. Defendants knew or should have known of these defects and Defendants are, therefore, liable for them.

516.   Defendants knew or should have known that their negligent conduct would result in the oil disaster, causing past, present, and future damages to the waters, property, estuaries, seabed, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources of the Plaintiffs.

517.   The past, present, and future injuries to the Plaintiffs were also caused by or aggravated by the fact that Defendants failed to take necessary actions to mitigate the danger associated with their operations.

518.   In addition, the circumstances surrounding the fire, explosion, and sinking of the *Deepwater Horizon*, and the resulting Spill are such that, according to common knowledge and the experience of mankind, the accident could not have occurred had the Defendants exercised the high degree of care imposed on them.  Moreover, the Defendants had full management and control of the instrumentalities that caused the oil spill.  The Plaintiffs, therefore, plead the doctrine of *res ipsa loquitur*.

519.    As a direct and proximate result of the combining and concurring negligence of all Defendants, the Plaintiffs have and will continue to be damaged, including but not limited to, loss of income, loss of profits and/or earning capacity, and all other damages or relief to which the Plaintiffs are entitled when additional information regarding the full extent of the Plaintiffs' damages becomes available.

520.    The Plaintiffs demand judgment against all Defendants, jointly and severally, for compensatory damages in an amount to be determined by a jury.

**F.**    ***Wantonness***

521.    Plaintiffs incorporate and re-allege each and every allegation set forth above herein by reference.

522.    Defendants, directly or through agents, breached their legal duties to the Plaintiffs by failing to exercise reasonable care and acted with reckless, willful, and wanton disregard for the Plaintiffs in the construction, operation, inspection, training of personnel, repair, and maintenance of the *Deepwater Horizon* and the Macondo Well, and in planning and implementing oil containment and prevention activities before and after the oil disaster.

523.    Upon information and belief, the Plaintiffs aver that the fire explosion and sinking of the *Deepwater Horizon*, resulting Spill, and damages were caused by the Defendants' reckless, willful, and wanton conduct as more fully set forth above.

524.    Defendants knew or should have known that their willful, wanton, and/or reckless conduct would result in the oil disaster, causing past, present, and future damages to the waters, estuaries, seabed, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources.

525.     As a direct and proximate result of the combining and concurring wantonness of all Defendants, the Plaintiffs have and will continue to be damaged, including but not limited to, loss of income, loss of profits and/or earning capacity, and all other damages or relief to which the Plaintiff is entitled when additional information regarding the full extent of the Plaintiffs' damages becomes available..

526.     The Defendants consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the Plaintiffs.

527.     The Plaintiffs demand judgment against all Defendants, jointly and severally, for compensatory and punitive damages in an amount to be determined by a jury.

## IV.     PUNITIVE DAMAGES

528.     Plaintiffs incorporate and re-allege each and every allegation set forth above herein by reference.

529.     Defendants BP, Transocean, and Halliburton engaged in conduct so reckless, willful, wanton, and in such utter and flagrant disregard for the safety and health of the public and the environment in their activities leading up to and/or during the blowout, explosions, fire, and Spill, as alleged herein, that an award of punitive damages against them at the highest possible level is warranted and necessary to impose effective and optimal punishment and deterrence.  The Plaintiffs, society as a whole, and the environment cannot afford and should never be exposed to the risks of another disaster of the magnitude caused by Defendants' misconduct herein.

530.     BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by performing a critical well pressure test with untrained and unqualified personnel and by callously ignoring and/or misinterpreting abnormal "red flag" pressure test results.

531.     BP's corporate culture caused and allowed it to disregard the lessons it should have learned and applied from previous incidents at its facilities that resulted in extensive damage and loss of life; instead, it continued to place others at risk in the interests of cost-cutting, time-saving, and financial gain.

532.     Transocean callously and with reckless disregard for human life disabled the flammable gas alarm system aboard the *Deepwater Horizon* and prevented said system from operating properly and preventing or containing the explosions, fire, and loss of life.

533.     BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by using a long string well design with too few barriers to gas flow.

534.     BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by failing to use a sufficient number of "centralizers" to prevent channeling during the cement process.

535.     BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job.

536.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by using an inappropriate cement mixture for the type of rock formation surrounding the well, and by failing to appropriately test that cement mixture prior to using it in the well.

537.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by failing to run a cement bond log test to evaluate the integrity of the cement job.

538.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

539.    BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

540.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by ignoring and/or misinterpreting abnormal, "red flag" pressure test results.

541.   BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill by their grossly inadequate maintenance, and reckless and improper operation and use of the BOP appurtenant to the *Deepwater Horizon*.

542.   BP and Transocean recklessly, willfully and/or wantonly failed to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout.

543.   BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill through their collective and respective disregard for proper drilling, casing, mudding, and cementing procedures.

544.   BP and Transocean willfully and/or wantonly failed to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

545.   BP recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico, and thus the economic wellbeing of the Plaintiffs.

546.   In addition, after the blowout and before the well was finally sealed, BP was aware of procedures that would immediately block the flow of oil into the Gulf, yet it delayed the implementation of any such procedures, and limited its efforts to plug the well to options that would salvage the well for future use, instead of selecting procedures that would stop the flow of oil as soon as possible regardless of the well's continued functionality.  As such, BP increased the magnitude of, and damage caused by, the Spill by willfully and/or wantonly and recklessly

choosing its profits over the lives of the workers on the vessel, the safety of the environment, and

the health, welfare, and value of the people, businesses, and wellbeing of the Plaintiffs.

547.    The conduct of BP, Transocean, and Halliburton was oppressive, wanton,

malicious, reckless, or grossly negligent because they:

> a.    failed to maintain and/or operate the *Deepwater Horizon* properly;
>
> b.    operated the *Deepwater Horizon* in such a manner that the safety and integrity of the vessel and the well were disregarded to save time and money;
>
> c.    ignored warnings that the integrity of the well, the cementing job, and the vessel were in jeopardy;
>
> d.    failed to promulgate, implement, and enforce proper rules and regulations to ensure the safe operations of the *Deepwater Horizon*;
>
> e.    violated MMS regulations for the safe design and operation of oil wells and drilling rigs in the Gulf of Mexico;
>
> f.    failed to take appropriate action to avoid or mitigate the accident;
>
> g.    failed to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;
>
> h.    failed to ensure that the *Deepwater Horizon* and its equipment were free from defects, properly maintained and/or in proper working order;
>
> i.    failed to provide appropriate disaster prevention equipment; and,
>
> j.    failed to have an appropriate emergency spill response plan or readily available spill response equipment.

548.    The conduct of BP, Transocean, and Halliburton, as described more fully

hereinabove, is at the highest level of reprehensibility, warranting and necessitating the

imposition of punitive damages at the highest level, because their conduct was motivated by

financial gain; because it injured and endangered human and environmental health and safety;

because it caused devastating damage and loss to the livelihoods, businesses, and economic

wellbeing of the plaintiff; because it was not isolated or accidental, but part of a culture and

ongoing pattern of conduct that consistently and repeatedly ignored risks to others in favor of

their financial gain; and because it has accordingly caused societal harm, moral outrage and condemnation, and the need to punish them and deter further repetition by them or others.

549.    The Defendants consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the Plaintiffs and its citizens.

550.    Accordingly, the Plaintiffs are entitled to an award of punitive damages in an amount to be determined at trial.

**The BP Exploration and Transocean Deepwater Plea Agreements**

551.    Defendant, BP Exploration, has entered into a Guilty Plea Agreement with the U.S. Department of Justice in connection with the Oil Spill.   In an exhibit to this Plea Agreement, BP Exploration admitted that if its case were to proceed to trial, the federal government could prove, beyond a reasonable doubt, that BP Exploration's negligence proximately caused the deaths of eleven men on board the *Deepwater Horizon* on April 20, 2010, and also proximately caused the discharge of large and harmful quantities of oil into the Gulf of Mexico, as well as a number of related facts overlapping with those alleged in and/or relevant to the allegations of this Complaint.   *See* Exhibit A to Guilty Plea Agreement, Record Document 2-1 in Case Number 2:12-cr-00292 (E.D.La. Nov. 15, 2012).  The Court has accepted this Guilty Plea Agreement.   *See* Reasons for Accepting Plea Agreement, Record Document 65 in Case No. 2:12-cr-00292 (E.D.La. Jan. 30, 2013).

552.    Defendant, Transocean Deepwater has entered into a Plea Agreement with the U.S. Department of Justice in connection with the Oil Spill.   In an exhibit to this Plea Agreement, Transocean Deepwater admitted that if its case were to proceed to trial, the federal government could prove that Transocean Deepwater, together with others, negligently discharged, or caused to be discharged, oil into the Gulf of Mexico, as well as a number of

related facts overlapping with those alleged in and/or relevant to the allegations of this Complaint.  *See* Exhibit A to Cooperation Guilty Plea Agreement, Record Document 3-2 in Case Number 2:13-cr-00001 (E.D.La. Jan. 3, 2013).  The Court has entered a judgment based on this Plea Agreement.  *See* Judgment, Record Document 31 in Case No. 2:13-cr-00001 (E.D.La. Feb. 14, 2013).

## RESERVATION OF RIGHTS

### *Right to a Trial by Jury*

553.    The Plaintiffs demand a jury trial for any and all claims pleaded herein in which a jury trial is available by law.

554.    The Plaintiffs recognize that, as part of its duty to efficiently manage the thousands of claims arising from the *Deepwater Horizon* explosion and resulting Spill, the MDL Court has set a trial to decide common issues of limitation and liability.

555.    Neither the Plaintiffs' pleading of general maritime claims, nor its participation in any bench trial(s) on limitation and liability issues common to the MDL amounts to a waiver of the Plaintiff's right to a jury trial.  The Plaintiffs cannot be forced into a Hobson's Choice.  Once the MDL Court determines the common factual and legal issues regarding limitation and liability, the Plaintiffs reserve their right to seek a remand of all remaining issues and claims that uniquely apply to the Plaintiff including, but not limited to, the quantification of the Plaintiffs' damages - to the Middle District of Florida, for a trial by jury.

### *Right to File Amendments*

556.    The full extent of the Plaintiffs' damages are yet unknown. The Plaintiffs reserves the right to amend this complaint and/or file additional complaints to supplement the Plaintiffs' present claims or assert additional claims against the Defendants named herein and/or against any additional

parties.   The Plaintiffs also reserve the right to make or alter an election to proceed in admiralty under Rule 9(h).  *See* FRCP 15(a)(2).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request judgment against Defendants, jointly, severally, and solidarily, as follows:

1.      declaratory and injunctive relief;

2.      economic and compensatory damages in amounts to be determined at trial;

3.      punitive damages;

4.      pre-judgment and post-judgment interest at the maximum rate allowable by law;

5.      attorneys' fees and costs of litigation; and,

6.      such other and further relief available under all applicable state and federal laws and any relief the Court deems just and appropriate.


Date: August 26, 2013

/s/ Wesley J. Farrell

FARRELL & PATEL, ATTORNEYS AT LAW

Wesley J. Farrell, Esq.
Fl. Bar No. 71783
WesFarrell@floridaattorney.com

Terry A. C. Gray, Esq.
Fl. Bar No. 100732
terrygray@floridaattorney.com

113 Almeria Ave.
Coral Gables, Fl.
Tel: 424-OIL-SPILL
Fax:  800-946-6711

Sarah E. Spigener, Esq.
LA Bar No. 31975
SSpigener@farrellpatel.com

1515 Poydras St., Suite 1400

New Orleans, LA 70112
Office:  504-233-8585

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 26, 2013, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing is being served this day upon all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Sarah E.  Spigener, Esq.