**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179<br><br>SECTION: J |
| This Document Relates To: All Actions | : : | JUDGE BARBIER<br>MAGISTRATE JUDGE |
| …………………………………………………... | : | SHUSHAN |

**BP AND ANADARKO'S MEMORANDUM IN OPPOSITION TO
THE UNITED STATES' MOTION TO EXCLUDE
THE TESTIMONY OF DR. SRDJAN NESIC**

The United States' motion to exclude testimony by BP's metal erosion expert, Dr. Srdjan Nesic, is a transparent effort to preclude evidence on a critical issue for which the United States has no comparable expert and no good answer. Dr. Nesic's analysis establishes that components of the blowout preventer (BOP) and the kinked riser eroded gradually after the April 20, 2010 blowout at the Macondo well, resulting in the flow rate across each of these flow restrictions increasing until erosion ended — no earlier than the end of May.

The United States' experts, by contrast, have conducted no rigorous evaluation of metal erosion and instead simply assume that erosion was complete within a matter of at most two days. Their quantification estimates rely on this unsupported and flawed premise — that the flow path through the Macondo well remained essentially unchanged throughout the incident — and ignores indisputable physical evidence that this was not, and could not, have been the case. (For example, as even the United States' experts concede, erosion caused a third hole to appear in the kinked riser on May 19, a month after the explosion. *See, e.g.*, Ex. 1, Davis Dep. at 142:3-7.)

Intent to avoid exposing the flawed premise on which its quantification theories rely, the United States' motion misrepresents Dr. Nesic's procedures and conclusions and makes unfounded assertions about the data on which he relies and the materials he produced. The United States' meritless motion to disqualify Dr. Nesic should be denied.

## BACKGROUND

Dr. Nesic is one of the world's leading scholars in the fields of metal erosion and computational fluid dynamics, the methodology he applied in this case to simulate flow and erosion through the eroded and non-eroded (or "virgin") BOP components and kinked riser. Dr. Nesic is a professor of chemical engineering at Ohio University and director of one of the largest erosion/corrosion laboratories in the world. He has published more than 70 peer-reviewed papers in leading international journals and monographs on erosion and corrosion, and he has more than 20 years of relevant experience.

Dr. Nesic's analysis of the effects of metal erosion on the flow rate at the Macondo well draws directly on his work, research, and expertise. Specifically, in a 41-page report (and 17-page appendix detailing the calibration of his models), Dr. Nesic analyzes the effects on flow rate of erosion of the kinked riser and of three separate BOP components — the blind shear rams (BSRs), the casing shear rams (CSRs), and the upper annular preventer (UAP).[1] Dr. Nesic concludes that, as a result of erosion of these components, the flow rate almost doubled from between the date of the explosion and May 27, 2010, the date on which he conservatively estimates that erosion ended based on evidence of production of erosion-causing sand. Nesic Report at 5, 37.

---

[1] Dr. Nesic's report is Attachment 1 to the United States' Memorandum in Support and is not re-attached to this Memorandum in Opposition.

The United States has not submitted any reports of experts who have attempted to analyze or quantify erosion that occurred in the aftermath of the blowout.  Rather, the US has responded to Dr. Nesic's analysis with a series of scattershot would-be critiques by four disparate witnesses, *none* of whom professes to be an expert in metal erosion.[2]

## ARGUMENT

### I.   Dr. Nesic's Opinions Are Reliable.

An expert's testimony is reliable when it is "grounded in the methods and procedures of science" and "more than subjective belief or unsupported speculation."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993); *see also Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388-89 (5th Cir. 2009).  Reliability is assessed by considering whether an expert's methodology (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community.  *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002).  Dr. Nesic's analysis clearly satisfies this test.

The United States' first argument — that Dr. Nesic's conclusions are based on unreliable data — is itself based entirely on a fundamental misunderstanding of his analysis.  Although the United States contends that Dr. Nesic relies on a model "that could not complete a run as

---

[2] Notwithstanding their lack of expertise, the following witnesses for the United States comment on Dr. Nesic's report in rebuttal reports: Dr. Nathan Bushnell, Dr. Ronald Dykhuizen, Dr. Stewart Griffiths, and Dr. Rory Davis.  *See* Ex. 2, Bushnell Dep. at 83:10-16 ("I wouldn't consider myself an expert on the actual erosion part of it"); Ex. 3, Dykhuizen Dep. at 40:14-16 ("Q: You're not an expert in erosion, are you, Dr. Dykhuizen? A: No, I am not"); Ex. 4, Griffiths Dep. at 33:22-34:1 (conceding that he is "not sure" if he is an expert in erosion); Ex. 1, Davis Dep. at 29:1-3, 30:25-30:3 (admitting that he has no specific skills related to "evaluating metal erosion" and has never generated a model evaluating erosion).

expected," U.S. Mem. at 3, it ignores the limited purpose for which that model was run and its place within the larger context of Dr. Nesic's report.

The United States does not question the straightforward scientific premise underlying Dr. Nesic's analysis: As erosion enlarges the size of a restriction to flow, it increases the flow rate and changes the pressure before and after the flow restriction. If the difference in pressure across the restriction decreases over time, it means that the restriction is eroding and that flow rate across that restriction is increasing. In other words, change in pressure drop across a restriction reflects change in flow rate across the same restriction. *See, e.g.*, Nesic Report at 33. Dr. Nesic therefore analyzed the effect of erosion on flow rate by modeling change in pressure drop across the BOP components and kinked riser over time.

Dr. Nesic analyzed this effect in three steps, only the last of which is challenged by the United States. In the first two steps, Dr. Nesic modeled the non-eroded components in their "virgin" state to determine pressure drop as flow passed through each restriction. *Id*. at 13, 15-17, 20-22, 26-28. Next, Dr. Nesic modeled the final, eroded components.[3] *Id*. at 13, 18-20, 22-23, 29-30. Once these two steps were completed, Dr. Nesic knew pressure drop before erosion and pressure drop after erosion across all four geometries — the three BOP components and the kinked riser. *See id*. at 35. The United States' motion has nothing to say about these first two steps in Dr. Nesic's analysis.

Dr. Nesic's third and final step was to determine the progression of pressure drop change between the pre-erosion and post-erosion fixed points. To do this, Dr. Nesic used "transient" simulations — computer simulations that model continuously varying geometries — to

---

[3] Dr. Nesic used laser scans of the actual eroded components produced during discovery in this case. Nesic Report at 18, 22.

determine changes in pressure drop, that is, the shape of the line connecting the two fixed points. *Id.* at 31-32.

Although the United States' motion appears to acknowledge the reliability of this modeling technique, the United States contends that the model produced reliable results for the transient simulations only for the first 10-12 days and not for the entire 35-day erosion period examined by Dr. Nesic. According to the United States, Dr. Nesic's opinions are unreliable because it is not appropriate "to base . . . conclusions on data derived from a model that he was only able to run for a third of the period he claimed to investigate and for which he provides opinions." U.S. Mem. at 4.

The United States, however, ignores that the purpose of Dr. Nesic's transient modeling was to determine the *trend* of changes in pressure drop over time. Contrary to the government's suggestion, Dr. Nesic's analysis does not require transient simulation data points for each component on every day of the erosion period to draw conclusions about pressure drop trend. As Dr. Nesic explained at deposition:

> In my report I have used the transient analysis only to identify the nature; that is, that means the character of the pressure drop change over time. And I argued to you just a second ago that that is a linear trend. That is the only thing I took from the transient simulations into the body of my report. Now, I did not need to take anything else, any absolute numbers from the transient simulations and transfer them into my report, and we should remember why. I knew the beginning and I knew the end state of most of the elements. . . .

Ex. 5, Nesic Dep. at 318:6-19. In other words, once Dr. Nesic had 10 to 12 days of valid data, he was able to identify a trend that he could apply across the full erosion period. Determining a trend based on a defined set of finite data is a common scientific technique in the field of erosion analysis, and, as Dr. Nesic explained at deposition, it is consistent with standard industry practice. *Id.* at 364:19-365:1.

Dr. Nesic's conclusions are supported by indisputable physical evidence.  Most notably, ROV video taken at the time shows clearly that oil and gas began to flow into the Gulf through a newly-eroded hole in the kinked riser on May 19, the 29th day of the spill.  Against this backdrop, suggestions by the United States that Dr. Nesic's erosion model is somehow unreliable cannot be credited because, in fact, the model predicts — accurately — continuing erosion beyond Day 10 or Day 12 of the *Deepwater Horizon* spill.

Finally, the United States' contention that Dr. Nesic's analysis is unreliable because, based on his transient simulations, he chose a linear trend rather than an exponential trend for the pressure drop change does not provide a basis to exclude his testimony.  To the extent that the United States has any valid criticism of Dr. Nesic's selection of a linear fit over the entire erosion period (and it does not), this point, at most, goes to the weight to be given to his analysis and is a matter for cross-examination.

It also bears mention that to support its contention, the United States misleadingly relies on an excerpt from Dr. Nesic's deposition that supposedly indicates that an exponential fit is a better fit for the data obtained than the linear fit chosen by Dr. Nesic.  U.S. Mem. at 3.  But as Dr. Nesic explained in the same deposition, a straight line, or linear fit, is the most accurate representation of the data because:

> When I have multiple fits like . . . exponential and linear, in my judgment, in thinking about that this really means pressure drop, that it's not just a bunch of numbers, I have two fits which are both good enough, sufficiently accurate for the purpose I need them; and if I have two fits, one simple and one complicated, the standard engineering and scientific practice is to accept the simpler one.  There is no need to accept a more complicated function.  There is a very, very pragmatic reason why people do that, because that works best, and even logically you can think there could be any number of more complicated functions that will be an even better fit.
>
> So there is an endless choice.  One never has an ability to decide. The simplest one, A, is most often right, and, B, is sufficient. Indeed, that's what I did in this case.

*Id.* at 314:20-315:16.  Later in the deposition, Dr. Nesic conclusively states: "I firmly believe that the straight line is the better approximation of this particular set of simulations . . . we got as close as one would expect to a linear trend."  Nesic Dep. at 495:19-25; *see also id.* at 493:11-25.

## II.     Dr. Nesic Complied with All Production Obligations.

The United States' remaining argument — that Dr. Nesic "failed to preserve and produce all of the modeling runs that he relied on in forming his opinions," U.S. Mem. at 4 — is likewise without merit.

Sand particle size was a relevant factor only when Dr. Nesic was attempting to calculate an erosion rate — it was *not* a relevant factor in the pressure drop analysis described in the preceding section that he ultimately used.  *See, e.g.*, Nesic Dep. at 486:17-487:4.  Indeed, Dr. Nesic did not complete the erosion rate analysis after he decided to conduct the pressure drop analysis.  *Id.*  Therefore, Dr. Nesic did not rely on the modeling runs that are the subject of this motion, which used a different average sand particle size (500 microns) than in the runs Dr. Nesic produced (150 microns); they were irrelevant to his pressure drop analysis.  *Id.*  As Dr. Nesic repeatedly explained in his deposition, his results and opinions are completely unaffected by changes in average particle size:

> Because we have not relied on prediction of erosion rates to reach our main conclusions, and sand particle size would inform those erosion rates.  That would be the main connection between sand particle size and anything we conclude.  Since we didn't go down that path, there was no effect of sand particle size and erosion rate on the conclusions we reached.

Nesic Dep. at 486:21-487:4.

Moreover, although Dr. Nesic also testified in the first hour of the first day of his deposition that he re-ran simulations using a 500 micron particle size after reviewing the United States' rebuttal reports, *see, e.g.*, Ex. 6, Bushnell Rebuttal Report at 24; *see also* Davis Dep. at 122:25-123:7, he did so only to confirm that using a 500 micron particle size makes no

7

difference to his analysis, *see* Nesic Dep. at 21:24-22:7, 23:25-24:6 ("We redid them, and they came up with . . . the same answers."). Rather than asking for the recreated modeling runs at the deposition, the United States pocketed its complaint and now brings a belated motion seeking to exclude Dr. Nesic's testimony in its entirety on the basis of this non-issue. In this circumstance, it is clear that the United States' purpose is to manufacture an issue and thereby distract the Court from the substance of Dr. Nesic's analysis.

The bottom line is that Dr. Nesic produced all the modeling runs on which he relied in preparing a detailed metal erosion report that fully sets forth his opinions and the bases for those opinions, consistent with Rule 26(a)(2) and this Court's Order Regarding Phase Two Expert Document Production, at 3-4 (Mar. 15, 2013) (Rec. Doc. 8907). *See* Nesic Dep. at 506:13-20. Because Dr. Nesic did not rely on the modeling runs that assumed an average sand particle size of 500 microns (or any other size),[4] he was under no obligation to produce them. *See* Fed. R. Civ. Pro. 26(a)(2)(A)(i), (ii); Order, at 3-4 (Rec. Doc. 8907).

Finally, Dr. Nesic testified that it is "common engineering practice" not to retain runs "which produce[] no effect." Nesic Dep. at 506:13-20. There is a good reason for that industry practice — as a practical matter, the sheer size of Dr. Nesic's modeling runs made it virtually impossible for him to store and transfer all discarded modeling runs, as the United States now requests. Nesic Dep. at 22:11-23:22 (describing each file as "hundreds of megabytes, if not gigabytes").

More broadly, the United States improperly seeks to shift the burden of proof by arguing that it has "no way of evaluating" Dr. Nesic's assertion that his model is insensitive to

---

[4] *See* Nesic Dep. at 486:17-19 ("Q: Was sand particle size ultimately a factor in your analysis? A: No, it was not.").

parameters such as particle size, fluid density, and fluid viscosity. U.S. Mem. at 4. But the United States' experts have access to Dr. Nesic's input files and the computational fluid dynamics program he used, and they had ample opportunity to advance an affirmative erosion theory of their own or to investigate the sensitivity of Dr. Nesic's models to inputs by conducting additional modeling runs. Their failure to conduct such analyses — or at least their failure to report the results of any such analyses — is telling.

## CONCLUSION

For the foregoing reasons, BP and Anadarko respectfully request that the Court deny the United States' motion to exclude the testimony of Dr. Nesic.

September 3, 2013                                    Respectfully submitted,

                                                     By: /s/ Don K. Haycraft

Warren Anthony Fitch                                 Don K. Haycraft (Bar #14361)
(tony.fitch@bingham.com)                             R. Keith Jarrett (Bar #16984)
Ky E. Kirby                                          LISKOW & LEWIS
(ky.kirby@bingham.com                                One Shell Square
BINGHAM MCCUTCHEN LLP                                701 Poydras Street, Suite 5000
2020 K Street NW                                     New Orleans, Louisiana 70139-5099
Washington, DC 20006                                 Telephone: (504) 581-7979
Telephone: (202) 373-6000                            Facsimile:  (504) 556-4108

James J. Dragna                                      Richard C. Godfrey, P.C.
(jim.dragna@bingham.com)                             (richard.godfrey@kirkland.com)
BINGHAM MCCUTCHEN LLP                                J. Andrew Langan, P.C.
355 S. Grand Avenue, Suite 4400                      (andrew.langan@kirkland.com)
Los Angeles, California 90071                        Timothy A. Duffy, P.C.
Telephone: (213) 680-6400                            (tim.duffy@kirkland.com
                                                     KIRKLAND & ELLIS LLP
                                                     300 North LaSalle Street
                                                     Chicago, Illinois  60654
                                                     Telephone: (312) 862-2000

| | |
|---|---|
| Deborah D. Kuchler, T.A. (Bar #17013) | Robert C. "Mike" Brock |
| KUCHLER POLK SCHELL | (mbrock@cov.com) |
| WEINER & RICHESON, LLC | COVINGTON & BURLING LLP |
| 1615 Poydras Street, Suite 1300 | 1201 Pennsylvania Avenue, NW |
| New Orleans, Louisiana 70112 | Washington, DC 20004-2401 |
| Telephone: (504) 592-0691 | Telephone: (202) 662-5985 |
| *Attorneys for Anadarko Petroleum Corporation* | *Attorneys for BP Exploration & Production Inc. & BP America Production Company* |

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 3rd day of September, 2013.

/s/ Don K. Haycraft