## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In re:  Oil Spill by the Oil Rig "Deepwater  :  MDL No. 2179
Horizon" in the Gulf of Mexico, on  :
April 20, 2010  :  SECTION: J
  :
This Document Relates To: All Actions  :  JUDGE BARBIER
  :  MAGISTRATE JUDGE
………………………………………...  :  SHUSHAN

### BP AND ANADARKO'S MEMORANDUM IN OPPOSITION TO
### THE UNITED STATES' MOTION TO EXCLUDE
### CERTAIN OPINIONS AND TESTIMONY OF DR. ADRIAN JOHNSON

Dr. Johnson offers three opinions in his report regarding Dr. Dykhuizen's flow estimate from the Top Hat's "skirt."  The estimate is (i) too high, (ii) subject to significant uncertainties due to the Top Hat's geometry, and (iii) significantly sensitive to errors of pressure measurement.  Ex. 1, Johnson Report at 41-42.  The United States seeks to exclude all three of Dr. Johnson's opinions for the sole apparent reason that the first of these opinions contained a calculation error that Dr. Johnson *corrected* before being deposed and on which he was questioned at his deposition.[1]  Ex. 2 (Dep. Ex. 11566); Ex. 3, Dep. Tr. at 11:20-12:13, 371:11-385:15, 521:10-16.

The United States significantly overreaches, and its motion should be denied for two reasons.  *First*, it would be inconsistent with established practice in this litigation to redact Dr. Johnson's expert report because of a calculation error.  United States experts have acknowledged errors in their reports and sought to correct them without redacting or revising any report containing an error.  *Second*, redaction is not necessary because, as Dr. Johnson testified at his

---

[1]  The United States filed a motion on August 30, 2013 with Magistrate Judge Shushan seeking the same relief.  BP and Anadarko also responded to that motion today, September 3, 2013.  BP incorporates here its arguments from that response.

deposition, the correction did not change his overall opinion — namely, that Dr. Dykhuizen's estimate of flow from the Top Hat's skirt is highly inaccurate.

## BACKGROUND

Dr. Adrian Johnson holds a Ph.D. in mechanical engineering and, for the past twenty years, has specialized in understanding, analyzing, and modeling the hydraulic behavior of oil and gas production and pipeline systems. BP and Anadarko retained Dr. Johnson to perform a technical review of Dr. Stewart Griffiths's and Dr. Ronald Dykhuizen's estimates of the volume of oil discharged from the Macondo Well.

This dispute concerns his review of Dr. Dykhuizen's calculation of flow from the "skirt" at the base of the "Top Hat." The Top Hat was one of several similar collection devices fabricated in parallel during the response, each with different identifying numbers. LMRP Top Hat #4 ("the Top Hat") was the one eventually selected to collect hydrocarbons from the wellhead and was in use from June 3 through July 10, 2010. *See* Stipulated Facts Concerning Source Control Events, at ¶¶ 91, 121 (Rec. Doc. 7076).

The Top Hat is a hollow cylinder, approximately six feet in diameter and six feet tall, with a large opening at the bottom surrounded by a skirt — an angled portion similar to the brim of a top hat — that forms an intentionally imperfect seal on the wellhead to avoid building up excess pressure that might dislodge the Top Hat. When the Top Hat was in place over the wellhead, hydrocarbons could flow through the Top Hat in three flow paths: (1) through a connected riser to a surface collection vessel, (2) through the vents at the top of the Top Hat to the Gulf of Mexico, (3) or around the skirt at the bottom of the Top Hat and into the Gulf of Mexico.

The geometry of the Top Hat's skirt was particularly complex given that the skirt seal was damaged during installation and given that the Top Hat was not centered on the riser and

riser flange.  Ex. 1, Johnson Report at 41.  These uncertainties in geometry made flow from the skirt difficult to calculate.  *See* Ex. 4, Dykhuizen Initial Report at 16.   Dr. Dykhuizen nevertheless contends in his report that he has performed a reliable calculation of the flow rate from the skirt and into the Gulf of Mexico.  *Id.* at 15-18.

As part of his analysis, Dr. Johnson determined that Dr. Dykhuizen's calculation of flow from the skirt is subject to significant uncertainties, primarily regarding the skirt's geometry and certain pressure data.  Ex. 1, Report at 41.  After his review of Dr. Dykhuizen's rebuttal report, Dr. Johnson corrected a calculation error that Dr. Dykhuizen identified regarding one aspect of Dr. Johnson's critique of his flow estimate from the Top Hat's skirt.  Ex. 2 (Dep. Ex. 11566). Consistent with prior practice in this litigation, Dr. Johnson's error correction was promptly provided to all parties, including the United States, and Dr. Johnson was questioned at his deposition about this correction.  Ex. 3, Johnson Dep. Tr. at 371:11-385:15, 521:10-16.  This correction, described further below, did not affect Dr. Johnson's opinion that Dr. Dykhuizen's skirt flow rate calculation is significantly inflated.

## ARGUMENT

**I.**     **The United States' Requested Redaction of Dr. Johnson's Report Is Neither Necessary nor Appropriate and Would Be Inconsistent with Prior Practice in This Litigation.**

The United States' requested redaction of Dr. Johnson's report draws no support from established practice in this litigation.  Redactions to expert reports are required "to eliminate duplicative opinions, opinions not being offered, and testimony stricken by the Court."  Order Regarding Presentation of Evidence in Phase Two Trial, at 5, 8 (Aug. 22, 2013) (Rec. Doc. 11087).  None of these three situations apply to Dr. Johnson's expert report.

Throughout Phase Two, United States experts have routinely issued corrections to errors identified in their original reports.  The parties have made such corrections available in advance

of or during an expert's deposition to allow an opportunity for cross examination.  For example,
Dr. Mehran Pooladi-Darvish in his rebuttal expert report acknowledged a "systemic" problem
and attempted to correct for it:

> In study of the What-if cases presented in my initial report I realized a problem
> with the VLP tables. Subsequent to the submission of my primary report, I
> identified the source of the problem. ***This problem was systemic***, and resulted in a
> too restrictive wellbore ….

Ex. 5, Pooladi Darvish Rebuttal Report at 8-9 n.3 (emphasis added).  Later in the report Dr.
Pooladi-Darvish explained another error in his initial and his decision not to revise that report:

> Some experts have pointed out that I used some incorrect input values (such as the
> value for oil compressibility) in my analytical model. Those values were corrected
> in my numerical model, and thus their use in my analytical model does not affect
> my results.  ***I chose not to go back and recreate my analytical model because
> doing so would not necessarily provide additional insight into the problem*** – the
> choice of such input parameters such as compressibility had little impact on my
> answers from the first phase of my study, and I had already been able to
> determine the most significant input parameters for my numerical sensitivity
> studies.

*Id.* at 33 n.41 (emphasis added).  Should Dr. Pooladi-Darvish testify during the Quantification
segment of the Phase 2 trial, his initial report will be submitted without any redaction for his
admitted errors.

In another example, United States expert Dr. Aaron Zick acknowledged in his rebuttal
report that he has abandoned the "four-stage separation" methodology employed in his initial
report in favor of an oceanic separation method.  Ex. 6, Zick Rebuttal Report at 12 ("In light of
the calculations presented in this section, my current recommendation is to use my oceanic
separation process to make the conversions.").  This Court acknowledged this abandonment in its
Order striking certain United States rebuttal reports as improper.  Order at 10 (June 24, 2013)
(Rec. Doc. 10477).  Despite this abandonment, the United States has not returned to Dr. Zick's
initial report and redacted the initial — now discarded — four-stage separation methodology

from his initial report.  Should Dr. Zick testify during the Quantification segment of the Phase 2 trial this abandoned methodology would also come into evidence.

Further, the United States provided corrections to two reports of experts who will not be testifying live in the Phase 2 trial and, again, did not redact or revised those reports.  In advance of Dr. Nathan Bushnell's deposition, the United States served two pages titled "Dr. Nathan Bushnell Revision to Rebuttal Report."  Ex. 7 (Exhibit 11707).  In these two pages, Dr. Bushnell explained, "On reflection, I believe that the droplet breakup modeling I document in my rebuttal report … could be modeled with more accuracy….  Additionally I changed the drag model …. The difference in results for the droplet breakup is negligible."  *Id.*  The United States did not redact Dr. Bushnell's report to account for this "reflection" on his rebuttal report.  In addition, in advance of Dr. John Martinez's deposition, the United States corrected certain values he used in his estimates.  Ex. 8 (Dep. Ex. 11910).  Yet, the United States did not revise Dr. Martinez's report to accommodate this amendment.

Because the United States did not "redact" these admitted errors from its original reports,[2] it would be an unfair and unprecedented departure from the established practice in this litigation to redact Dr. Johnson's entire opinion from his expert report because of a mere calculation error that Dr. Johnson has corrected and on which he was questioned at his deposition.  Accordingly, the established practice of this case is not to *strike* opinions that contain errors, but simply to correct them.  That is what Dr. Johnson did here, and his corrected opinion — or any other opinions — should not be excluded.

---

[2] BP sees no reason to depart from the established practice regarding redactions.  In the event the United States motion were to be granted, however, BP reserves the right to seek the same relief regarding the many opinions of United States expert witnesses that have been corrected.

II.     **Dr. Johnson's Correction of a Calculation Error in One Aspect of His Analysis Does Not Change His Opinions Regarding Dr. Dykhuizen's Top-Hat-Skirt Flow Estimate.**

Dr. Johnson's three opinions on Dr. Dykhuizen's Top Hat skirt flow estimate should not be excluded for the further reason that his corrected opinion — that Dr. Dykhuizen's calculation is inflated — has not changed.  As an initial matter, and contrary to the United States' claim that Dr. Johnson's corrected calculation is "foundational," U.S. Mem. at 4, Dr. Johnson also analyzes the uncertainties introduced into Dr. Dykhuizen's calculation by top-hat-skirt geometry[3] and by the estimate's significant sensitivity to errors of pressure measurement.  *See* Ex. 1, Johnson Report at 41-42.  Both of these analyses are independent from the loss coefficient analysis that initially contained the error.  *See id.*

Regarding his corrected opinion, Dr. Johnson analyzed Dr. Dykhuizen's estimate by performing a calculation using, initially, a loss coefficient consistent with the upstream velocity in the body of the Top Hat.  (A loss coefficient is a numerical constant that represents the proportionality between a pressure drop and the square of a rate of flow.  *See* Ex. 1, Johnson Report at A-4.)  When Dr. Johnson performed his initial calculation, he did not understand based solely on Dr. Dykhuizen's rebuttal report that Dr. Dykhuizen had taken the unusual approach (which introduced additional uncertainty into Dr. Dykhuizen's calculation) of using a loss coefficient consistent with the velocity at the *exit* of the Top Hat's skirt, as opposed to the more typical approach in the oil and gas industry of using a loss coefficient consistent with the upstream velocity (the velocity of the hydrocarbons in the body of, as opposed to while exiting,

---

[3] Notably, at deposition, Dr. Dykhuizen acknowledged the significant uncertainties regarding the geometry of the top hat skirt.  *See* Ex. 9, Dykhuizen Jan. 31, 2013 Dep. Tr. at 488:23-24 ("The flow out of the skirt was troubling because the geometry was unknown."); 502:19-20 ("[W]e were very uncertain about the geometry of the skirt.")

the Top Hat).  *See* Ex. 3, Johnson Dep. Tr. at 372:18-374:18.   In his rebuttal report, Dr. Dykhuizen identified this calculation error.

Following the filing of Dr. Dykhuizen's rebuttal report, Dr. Johnson promptly corrected the asserted error regarding his loss co-efficient analysis and circulated corrected calculations. Ex. 2 (Dep. Ex. 11566).  Dr. Johnson's original analysis and conclusions — that Dr. Dykhuizen overestimates flow from the Top Hat's skirt and that his calculation is subject to significant uncertainty — did not change with Dr. Johnson's revised calculation.  *See* Ex. 3, Johnson Dep. Tr. at 12:6-8 (the revised calculation "didn't change my general conclusion for that skirt calculation"); *id.* at 378:17-379:2 ("And that's still true of the revised calculation that I presented after the Rebuttal Report").

Even after this loss-coefficient correction, the results of Dr. Johnson's updated calculations remain significantly lower (approximately 22 to 38%) than Dr. Dykhuizen's flow rate estimate from the Top Hat's skirt.  *See* Ex. 2 (Dep. Ex. 11566).  More significantly, Dr. Dykhuizen agrees with Dr. Johnson that the data from the Top Hat's skirt cannot be used to generate reliable flow rate estimates.  *See* Ex. 9, Dykhuizen Jan. 31, 2013 Dep. Tr. at 417:12-15 ("This led to a very large error bar in our total because we could not estimate accurately what was coming out of the skirt."); Ex. 10, Dykhuizen June 20, 2013 Dep. Tr. at 458:14-17 (Q: Okay. You would agree that any estimate that you have that includes a calculation of flow out of the skirt ***is a very inaccurate method***? A: ***Yes***." (emphasis added)); *id.* at 473:25 ("All of my estimates are inaccurate.")

In such circumstances, "it would be odd indeed if the law prevented an expert from taking on board the suggestions for refinements put forward by another expert commenting on his opinion." *Cason-Merenda v. Detroit Med. Ctr.*, No. 06-15601, 2013 WL 1721651, at *8 n.9

(E.D. Mich. Apr. 22, 2013) (internal quotation marks omitted). "There is no stigma attached to such error correction, nor should there be." *Crowley v. Chait*, 322 F. Supp. 2d 530, 540 (D.N.J. 2004). "If anything, it strengthens the quality of the expert report." *Id.* (emphasis added). Indeed, the authority on this point is abundantly clear. *See, e.g.*, *United States v. Prime*, 431 F.3d 1149, 1153 (9th Cir. 2005) ("As long as the process is generally reliable, any potential error can be brought to the attention of the jury through cross-examination and the testimony of other experts."); *I.B.E.W. Local Union 380 Pension Fund v. Buck Consultants*, No. 03-4932, 2008 WL 2265269, at *2 (E.D. Pa. June 3, 2008) (where expert "never retracted or revised his general conclusions . . . the admitted factual errors noted by defendants are properly the subject of cross-examination but are not flaws large enough that Lipkin lacks good grounds for his general conclusion"); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 675 (S.D.N.Y. 2007) ("Yet this possible oversight does not justify exclusion of Dr. Cornell's testimony at trial. . . . At [trial], his assessment can be challenged as Daubert envisions, by cross-examination and argument to the fact-finder . . . ."); *Voilas v. Gen. Motors Corp.*, 73 F. Supp. 2d 452, 455 (D.N.J. 1999) ("[T]he expert here had ample opportunity at his deposition to explain, and even correct, certain deficiencies GM brought to his attention.").

In sum, there is no basis to preclude Dr. Johnson from testifying at trial about any aspect of Dr. Dykhuizen's estimate of flow from the Top Hat's skirt.

## **CONCLUSION**

For the foregoing reasons, BP and Anadarko respectfully request that the Court deny the United States' motion *in limine* to exclude a portion of Dr. Johnson's opinions regarding Dr. Dykhuizen's estimate of flow from the Top Hat's skirt.

September 3, 2013

Respectfully submitted,

By: /s/ Don K. Haycraft

Warren Anthony Fitch
(tony.fitch@bingham.com)
Ky E. Kirby
(ky.kirby@bingham.com
BINGHAM MCCUTCHEN LLP
2020 K Street NW
Washington, DC 20006
Telephone: (202) 373-6000

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile:  (504) 556-4108

James J. Dragna
(jim.dragna@bingham.com)
BINGHAM MCCUTCHEN LLP
355 S. Grand Avenue, Suite 4400
Los Angeles, California 90071
Telephone: (213) 680-6400

Richard C. Godfrey, P.C.
(richard.godfrey@kirkland.com)
J. Andrew Langan, P.C.
(andrew.langan@kirkland.com)
Timothy A. Duffy, P.C.
(tim.duffy@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois  60654
Telephone: (312) 862-2000

Deborah D. Kuchler, T.A. (Bar #17013)
KUCHLER POLK SCHELL
WEINER & RICHESON, LLC
1615 Poydras Street, Suite 1300
New Orleans, Louisiana 70112
Telephone: (504) 592-0691

Robert C. "Mike" Brock
(mbrock@cov.com)
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for Anadarko Petroleum Corporation*

*Attorneys for BP Exploration & Production Inc. & BP America Production Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 3rd day of September, 2013.

<u>/s/  Don K. Haycraft</u>