UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig | : | MDL NO.  2179 |
| "Deepwater Horizon" in the Gulf | : | |
| of Mexico, on April 20, 2010 | : | SECTION:  J |
| | : | |
| This Document Relates to: | : | JUDGE BARBIER |
| | : | |
| Civ. No. 10-4536 | : | MAG. JUDGE SHUSHAN |

. .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . . . . . .

### UNITED STATES' MEMORANDUM IN OPPOSITION TO BP'S MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF DR. MOHAN KELKAR

### I. INTRODUCTION

BP seeks to exclude certain opinions and testimony of Dr. Mohan Kelkar, an expert with more than of 30 years experience as a petroleum reservoir engineer, in an effort to hide and conceal its own internal consensus regarding the pore volume compressibility ("PVC") of the Macondo reservoir.  In the critical days in July 2010 leading up to the capping and shut-in of the Macondo well, BP personnel engaged in a considered decision-making process in which they concluded that the "most likely" PVC value of the Macondo reservoir was 12 microsips.  BP, at a time when it was desperate to prove that it was safe to shut in the well, represented to the United States that 12 microsips was the most likely value.  Now, over three years after sealing the well, BP seeks to disavow yet another critical representation it made to the United States in a cynical attempt to limit its liability for civil penalties and avoid paying compensation for the damages it caused to the natural resources of the Gulf of Mexico.

BP seeks to preclude Dr. Kelkar from relying on the value of 12 microsips as an input to the material balance method he used to calculate the cumulative flow of oil from the Macondo well, despite the fact that this value was reasonably relied on by BP's own reservoir engineering experts in the field at a critical juncture in BP's effort to seal its Macondo well in July of 2010.

BP will have the opportunity to cross-examine Dr. Kelkar at trial regarding his decision to use the PVC value recommended by BP personnel before the well was shut-in.

The United States' experts have used four separate scientific methods which corroborate, validate, and confirm their conclusions regarding the cumulative flow from the Macondo well. BP's primary testifying expert, Dr. Blunt, however, has used only the material balance method to calculate the cumulative flow of oil from the reservoir. Thus, this is not a classic situation under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), where one party claims that another party's expert has relied on a methodology that is not commonly accepted in the relevant scientific or industrial community. BP concedes that the material balance methodology used by Dr. Kelkar is reliable. BP Brief at 14. Both Dr. Kelkar and Dr. Blunt rely on a similar material balance method, but they reach different conclusion as to the cumulative oil flow based on different inputs in the material balance equation. One substantive difference between Drs. Kelkar and Blunt is their PVC number. Dr. Kelkar uses the value that BP itself derived during the response and used in its reservoir modeling during the period just before the well was shut-in. By contrast, Dr. Blunt uses a value that BP's own engineers rejected during the response. At bottom, this is simply a difference of opinion between petroleum reservoir engineering experts – the proper subject for cross examination, not for the exclusion of a United States expert.

## II. BACKGROUND

### A. Weatherford's Measurement of Pore Volume Compressibility Was Unreliable

In April 2010, Weatherford Laboratories tested the pore volume compressibility of only three rotary sidewall core samples taken from the Macondo reservoir before the blowout.

The United States' rebuttal experts on compressibility, Dr. Jean-Claude Roegiers and Dr. Alan Huffman, will testify at trial that the Weatherford PVC testing results are unreliable and not

likely representative of the compressibility of the Macondo reservoir for a number of reasons. As Drs. Roegiers and Huffman have indicated in their expert reports and at their depositions, and BP's internal geomechanics expert has recognized,[1] sidewall cores tests such as those conducted on the Macondo cores tend to underestimate compressibility because they are conducted on samples oriented horizontally rather than vertically. In addition, the United States' experts will testify that the Weatherford sample results are unreliable and not likely representative because, *inter alia,* of the "paucity" of samples used;[2] the few that were used were extracted from the disturbed zone of stress near the well; the dimensions of the samples used in the testing were inadequate; the samples were not saturated to mimic in-situ reservoir conditions; the tests were conducted at ambient, as opposed to reservoir, temperature conditions; and the loading rate (pressure build-up) during testing did not resemble conditions in the reservoir.[3]

### B. BP's Internal Estimate that the Most Likely PVC Value Was 12 Microsips During the Well Integrity Testing Period Was Reasonable

When it mattered most, BP relied on a value of 12 microsips. BP concedes that in early July 2010, "BP scientists decided to perform modeling using higher rock compressibility values of 12 and 18 microsips (in addition to 6 microsips) to enable them to assess the risks of shutting-in the Macondo well. BP Brief at 4. See Ex. 4 ( Dep. Ex. 10841). The evidence does not support BP's contention that BP scientists used higher compressibility values merely to "bracket worst-case scenarios." BP Brief at 6.

---

[1] *See* Ex. 1 (Dep. Ex. 11505, "Isabela Pore Volume Compressibility Evaluation, Stephen Willson, Oct. 11, 2007).
[2] *See* Ex. 2 (Dep. Ex. 3533, "Post-Well Subsurface Description of Macondo well," July 26, 2010). BP repeatedly characterized the number of samples obtained as inadequate.
[3] *See* Ex. 3 (Redacted Expert Rebuttal Report of Jean-Claude Roegiers, June 10, 2013); Ex. 4 (Excerpts from Redacted Expert Rebuttal Report of Dr. Alan Huffman, at 1, 36-39, June 10, 2013).

Based on the Weatherford rotary sidewall core tests, BP had initially concluded that the compressibility of the reservoir was most likely 6 microsips.  However, during the well-integrity testing period, BP reservoir engineer Kelly McAughan recommended that Robert Merrill, then BP's Senior Advisor for Reservoir Engineering Community of Practice,[4] use a new "most likely" compressibility of 12 microsips as an input to the modeling.  Dr. Merrill agreed with and implemented this recommendation in a number of the simulations that he supervised or performed throughout July 2010.[5]  Ms. McAughan also told Dr. Paul Hsieh, a U.S Geological Survey hydrologist, who was critically involved in assessing well integrity for the United States, that BP had concluded that the compressibility of the reservoir was most likely 12 microsips.[6]

Indeed, in key simulations leading up to the shut-in of the well on July 15, BP used 12 microsips as the base case in its reservoir modeling simulations to predict the pressure response that would indicate an underground well leak.  *See* Ex. 7 (Dep. Ex. 9324 at 17).  On July 15, BP used the 12 microsips value in its OLGA simulations to model the integrity of the well after shut-in.  *See* Ex.8 (Dep. Ex. 9320 at BP-HZN-2179MDL07117802, 807).  And on July 16, BP listed 12 microsips as its "base case" for reviewing well integrity.  *See* Ex. 10 (Dep. Ex. 10845 at

---

[4] *See* Ex. 5 (Dep. of Robert Merrill, January 15, 2013, at 1, 34-44).
[5] *See* Ex. 6 (Dep. Ex. 10841 (Reservoir Pressure Response) BP-HZN-2179MDL07033640-642); Ex. 7 (Dep. 9324 (Shut the Well in a Paper Benefits and Risks, at 17-18 (Bob Merrill July 9 presentation on Reservoir depletion, using 12 microsips as base case assumption for compressibility); Ex. 8 (Dep. Ex. 9320 (emails attaching Pressure Measurement Network Architecture, July 15, 2010, BP-HZN-2179MDL07117793, 7802, 7807); Ex. 9 (Dep. Ex. 10845(Well Integrity Test Data Review, July 16, 2010); Ex. 10 (Dep. Ex. 10853 (Well Integrity Test Data Review, July 26, 2010, BP-HZN-2179MDL02180635, -80656).
[6] *See* Ex. 20 (Deposition of Mohan Kelkar, at 245:3-245:16, 275:7-281:18); Ex. 23 (Deposition of Paul Hsieh, at 264-266, Sept. 11, 2012).

IMV154-006646). These simulations were presented to United States officials, including Dr. Hsieh, who relied on these models in making decisions concerning the protocol for the shut-in.[7]

BP's decision to use a compressibility of 12 microsips is well documented in a number of communications between July 6 and July 8, 2010, among various BP employees, including Stephen Willson, David Schott, Robert Merrill, and Kelly McAughan. *See* Exs. 11-17 (Dep. Exs. 8769-8777). Although BP had the Weatherford results indicating a compressibility of 6 microsips, it did not consider the results sufficiently reliable for reservoir modeling purposes. Rather, the prior experience of BP's reservoir engineers, including at the nearby Gulf of Mexico wells Santa Cruz and Isabela, suggested that PVC values determined from sidewall cores were artificially lower than PVC values based on whole core samples, and so it was prudent to make an upward adjustment to the compressibility value. On July 6, Ms. McAughan asked "what the measured compressibility of Santa Cruz rock (or any core in Galapagos) was versus what you are using." She stated, "[s]o if you went from 10 [microsips] to 20 [microsips] then I will increase Macondo's **by a factor of 2**." *See* Ex. 11 (Dep. Ex. 8769) (emphasis added). BP reservoir engineer Jessica Kurtz responded by sending the PVC results for the Isabela Prospect. *See* Ex. 12 (Dep. Ex. 8770). Ms. Kurtz then forwarded additional data including a Santa Cruz Formation Compressibility Calculator. *See* Ex. 13 (Dep. Ex. 8772).

On July 6, Mr. Schott wrote that "[i]f you think the Macondo rocks are lower compressibility, you might use a similar upgrade going from sidewall to whole core as what we found going from the sidewall in SC [Santa Cruz] and Isabela to whole core in SC [Santa Cruz]." *See* Ex. 14 (Dep. Ex. 8772). In response to a comment from BP's rock mechanics expert Mr.

---

[7] As Dr. Hsieh stated at his deposition, "12 is the number that I used, and I obtained that number from my meeting with Kelly McAughan and from Bob Merrill's presentation." *See* Ex. 23 (Deposition of Paul Hsieh, at 264-266, (264:24-265:2) Sept. 11, 2012).

Willson, who initially reported a compressibility value of 6 microsips based on the Weatherford results of the sidewall cores, Mr. Schott wrote "[n]ot honoring the sidewall data is the point isn't it. Because, *we know from Santa Cruz data and intuitively that sidewall core data is conservative just from the way the grains are aligned. . . we shouldn't be strictly confined to the sidewall data at Macondo or anywhere*." *See* Ex. 15 (Dep. Ex. 8774) (emphasis added).  Mr. Willson agreed saying, "I have spoken with Bob Merrill and have more context now around the question being asked . . . The initial response was more to do with what we measured on the Macondo [rotary sidewall cores] *which as you correctly point out have some inherent biases.*" Accordingly, Mr. Willson agreed to "revise the predictions of compressibility" for Macondo. *See* Ex. 15 (Dep. Ex. 8774) (emphasis added).

On July 7, 2010, Stephen Willson sent an email attaching a Macondo rotary sidewall core PVC comparison with other Gulf of Mexico and similar sands. He stated that "[a]n Isabela/Santa Cruz comparison would put you at 15 microsips or so. So 15 could be a reasonable compromise if you wish, with 20 as an upside and 5 microsips as a downside?"  *See* Ex. 16 (Dep. Ex. 8775. Ms. McAughan replied: "How about we use 6-12-18." Mr. Willson replied: "That sounds very reasonable to me Kelly." Dr. Merrill followed by stating: "Me too." *See* Ex. 17 (Dep. Ex. 8776).

BP mischaracterizes Dr. Merrill's testimony at his January 2013 deposition.  In context, Dr. Merrill did not express the view that BP chose to use 12 microsips as the most likely PVC value only as a worst case scenario.  Rather, Dr. Merrill testified that BP determined that it was "prudent" to use a compressibility value of 12 instead of 6 microsips as the recommended input for modeling purposes after an internal discussion at which Mr. Schott, one of BP's reservoir engineers, presented evidence based on his experience with the Macondo analog Isabela and Santa Cruz wells, that "pore volume compressibility determined from sidewall cores was lower

6

than pore volume compressibility based on whole core."[8] Nor following shut-in on July 15 did Dr. Merrill resume "using exclusively 6 microsips in his modeling." BP Brief at 6. For instance, at his deposition, Dr. Merrill admitted that the three alternatives that he modeled in his July 26 well integrity test data review, including one with parameters using a PVC value of 14 microsips resulting in a discharge of 50,000 barrels of oil per day, all "gave a reasonable match to the pressure transient data."[9]

Based on these facts, it was certainly reasonable for Dr. Kelkar to conclude that as of July 8, 2010, the date of Dr. Merrill's power point presentation which contained modeling presented to the United States on July 9, BP had reached a consensus that 12 microsips was the mostly likely pore volume compressibility for the Macondo well.

### C. Dr. Kelkar Made a Preliminary Estimate of PVC Before BP Applied a Correction Factor to the Unreliable Weatherford Test Results

BP directs the Court to a preliminary report submitted by Dr. Kelkar on behalf of the governmental Flow Rate Technical Group in June 2010, before Dr. Kelkar was aware that in early July 2010 BP itself had applied a correction factor to the unreliable and non-representative Weatherford sidewall core test results. In that preliminary report, based on the "available [Weatherford] data," Dr. Kelkar assumed an average PVC of 5.61 microsips – not the 12 microsips used in Dr. Kelkar's Phase Two expert report. *See* BP Brief, Ex. 1 (Dep. Ex. 9859, 17, 19). This difference should be the subject of cross examination, not an exclusion order. When Dr. Kelkar wrote his preliminary report in June 2010, only the flawed Weatherford data was available.[10] BP had not engaged in its July 2010 internal discussion and analysis in which it

---

[8] *See* Ex. 5 (Merrill dep. at 212-214, 394-395, 479, 486-487).
[9] See Ex. 5 (Merrill Dep. at 367:2-381:24, 381:25-382:10, 389:8-389:16).
[10] *See* Ex. 18 (Email from Dr. Kelkar attaching Preliminary Report, June 27, 2010, at 17).

7

concluded that the Weatherford rotary sidewall core data was likely to underestimate the PVC at Macondo by a factor of two. At the time of Dr. Kelkar's preliminary analysis, BP's internal experts also had not recommended to the United States' scientists and engineers working on the response that a PVC of 12 microsips be used to determine the integrity of the well. In contrast, when Dr. Kelkar wrote his Phase Two expert report, he was aware of and relied on BP's internal discussions and representations to the United States that 12 microsips was the best scientific estimate of pore volume compressibility for the Macondo reservoir.[11]

### D. Dr. Kelkar's Expert Report and Rebuttal Expert Report

On March 22, 2013, Dr. Kelkar submitted his expert report regarding oil flow rate prediction from the Macondo well. In his report, Dr. Kelkar concluded that, using the material balance method, his "best estimate of the total amount of oil discharged from the Macondo reservoir over the approximately 86 days when oil flowed into the Gulf of Mexico [was] between 4.5 and 5.5 million STB."[12] In his report, Dr. Kelkar relied on Dr. Merrill's July 8, 2010 presentation, where Dr. Merrill indicated results from a "most likely" reservoir with a compressibility of 12 microsips; and BP's presentations to the United States, including Dr. Hsieh.[13]

### E. Dr. Kelkar's Deposition Testimony

At his deposition, BP questioned Dr. Kelkar regarding the basis of his opinion that 12 microsips is the appropriate value for pore volume compressibility. In response, Dr. Kelkar testified:

> I think the PowerPoint is a culmination of a certain E-mail traffic which -- which is going on between Dr. Merrill and some of the other DU -- BP people like Schott and

---

[11] *See* Ex. 19 (Expert Report of Dr. Kelkar, March 22, 2013, at 28).
[12] *See* Ex. 19 (Id., at 7-8).
[13] *See* Ex. 19 (Id., at 28, n. 40 (Merrill, R.: Powerpoint Presentation, Reservoir Response, 8_july-2010 (BP-HZN-179MDL07033641), at 45, n. 58 (same); Appendix F (considered materials), Deposition of Paul Hsieh, at 264-266, Sept. 11, 2012).

8

> Kelly McAughan. . . . you could see that there is a lot of discussion which is going on prior to this particular presentation as to what is the most appropriate value of formation compressibility. And what that discussion centers around is that if you take the sidewall core samples versus the core samples in the wellbore, you would expect to see differences because BP had observed those differences in some other analog wells. And then eventually that discussion concludes with an E-mail from Kelly to everybody else saying that, okay, so we have decided that we should use these ranges of compressibility: 6, 12, and 18; and it's -- there's an affirmative E-mail from Dr. Merrill and -- and someone else saying, okay, I agree with this information. . . And subsequent to that, obviously, that -- we have Expert Reports from both Huffman and -- and Roegiers, actually, who do say that -- that the sidewall core samples are not as reliable as the vertical core samples; and so, the compressibility should be -- compressibility, what you measure based on the sidewall cores may not be as reliable.[14]

Dr. Kelkar explained that "the logical conclusion which [he] drew" after reading the emails was that BP's scientists had "an unvarnished discussion, which is what I would expect in any oil company, that people will openly debate the issues, they will discuss the merits of different types of data, and they will engage with each other and they will finally come to some type of consensus." They "had an honest discussion about what value should be used, and they reached a consensus based on the analog data, based on their own expertise, what's the most likely value which is to be used, and they picked 12 microsips."[15]

---

[14] *See* Ex. 20 (Deposition of Mohan Kelkar, at 240:25-242:12, 243:1-250:2); Ex. 19 (Expert Report of Dr. Kelkar, Appendix F, listing among others, the Deposition of Graham Pinky Vinson and all exhibits and errata (Sep. 18-19, 2012). Deposition exhibits 8769-8777 to the Vinson deposition are the email correspondence and attachments among various BP employees regarding the appropriate input to use for pore volume compressibility for purposes of determining whether the Macondo well has integrity after installation of the capping stack.

[15] *See* Ex. 20 (Deposition of Kelkar, at 258:17-258:25; 279:24-280:24). Dr. Kelkar further explained that "I don't need to interpret the emails at all. I mean, email are laid out, basically, the reasoning about why those values were selected. And I'm just following that reasoning to use 12 microsips as the most likely value." *See* Ex. 20 (Deposition of Kelkar, at 281:13-281:18. When opposing counsel referred Dr. Kelkar to an out of context quotation from the January 2013 deposition of Mr. Merrill, and implied that Mr. Merrill had used 12 microsips as the "most likely" value for pore volume compressibility merely as a worst case scenario, Dr. Kelkar responded "if you look at the email exchanges, which – I mean, obviously, email exchanges took place before this – they don't refer to any of those pressure values. They only talk about the rotary – rotary core samples." *See* Ex. 20 (Deposition of Kelkar, at 252:5-252:17, 252:18-263:16). Dr. Kelkar also pointed out that BP has not claimed that its scientists selected other key material balance input parameters, such as oil-in-place, during the well integrity period merely to be "overly conservative." *See* Ex. 20 (Deposition of Kelkar, at 260:2-260:25).

### III. ARGUMENT

#### A. Applicable Legal Standard

Rule 702 of the Federal Rule of Evidence governs the admissibility of expert witness testimony. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 588; *United States v. Hitt*, 473 F.3d 146, 158 (5th Cir. 2006). Before expert testimony can be admitted under this rule, the court must make a preliminary examination to ensure that the testimony is both relevant and reliable. *See Kumbo Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147-151, 153 (1999).[16] Notwithstanding *Daubert* and its progeny, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Comm.'s Note (2000). Courts generally should avoid resolving disputed issues of fact at the *Daubert* stage. Fed. R. Evid. 702, Advisory Comm.'s Note (2000). *See Micro Chem., Inc. v. Lextron, Inc.,* 317 F.3d 1387, 1392 (Fed. Cir. 2003); *In re Katrina Canal Breaches Consol. Litig.,* Nos. 05-4182, 10-866, 2012 WL 4328354, at *1 (E.D.La. Sept. 20, 2012) (Duval, J.); *In re Matter of Cudd Pressure Control, Inc.,* No. 98-585, 1999 WL 756439 (E.D.La. Sept. 24, 1999) (Barbier, J.).

This Court has issued many rulings over the years denying *Daubert* motions to exclude expert testimony in bench trials.[17] As this Court held in *Thompson v. Rowan Cos., Inc.*, No. 06-3218, 2007 WL 724646 *1 (E.D. La. Mar. 6, 2007) (Barbier, J.):

---

[16] *See Runnels v. Tex. Children's Hosp. Select Plan*, 167 Fed. Appx. 377, 381 (5th Cir. 2006); *Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 194 (5th Cir. 2006); *Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002)*; Curtis v. M&S Petroleum, Inc.* 174 F.3d 661, 672 (5th Cir. 1999); *Schmidt v. MTD Prod., Inc.*, No. 04-3412, 2006 WL 5127539, at *2 (E.D. La., July 5, 2006) (Barbier, J.).

[17]*See e.g. Young v. BP Exploration & Prod., Inc. et al,* No. 11-1003, 2012 WL 2087405 (E.D.La. June 8, 2012) (Barbier, J.); *United States Marine, Inc. v. United States,* No. 08-2571, 2009 WL 3480979 (E.D.La. Oct. 26, 2009) (Barbier, J.); *Poiencot v. Globalsantefe Drilling Co. et al.,* No. 06-10793, 2008 WL 5429645 (E.D.La. Aug. 6, 2008) (Barbier, J.); *Wilson v. American Sec. Ins. Co.,* No. 07-5984, 2008 WL 2704522 (E.D.La. July 3, 2008) (Barbier, J.); *Matheny v. Tetra Techs., Inc.,* No. 07-1556, 2008 WL 2178091 (E.D.La. May 22, 2008) (Barbier, J.); and *School Bd. Of the Parish of St. Charles v. Shell Oil Co.,*No. 04-2511, 2007 WL 756458 (E.D.La. March 8, 2007) (Barbier, J.).

... the purpose of [a] *Daubert* motion is "to ensure that only reliable and relevant expert testimony is presented to the jury." *Rushing v. Kansas City Southern Ry. Co.*, 185 F.3d 496, 506 (5th Cir. 1999) (superseded by rule on other grounds), *citing Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590–93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Thus, "[m]ost of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury." *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000). "*Daubert* requires a binary choice – admit or exclude – and a judge in a bench trial should have discretion to admit questionable technical evidence, though of course he must not give it more weight than it deserves." *SmithKline Beecham Corp. v. Apotex Corps.*, 247 F. Supp. 2d 1011, 1042 (N.D.Ill. 2003).

In Phase One of this trial, this Court considered *Daubert* motions filed by BP to exclude testimony from a number of expert witnesses and appropriately denied each of them. For instance, on day two of the trial, with respect to BP's motion to exclude the expert testimony of Dr. Bea, the Court stated:

> I've looked at those *Daubert* motions. I have those right in front of me. I am going to overrule the *Daubert* motions, with the explanation that since this is a bench trial, it's a somewhat different situation than if we were trying to avoid prejudicing a jury with something that may ultimately turn out to be not admissible or not relevant. Since I am the fact finder and also the person who has to decide whether something is relevant or admissible, I have to see it and consider it in any event, whether I do now or do that later.[18]

Similarly, the Court appropriately denied BP's motions to exclude expert testimony from a number of other experts. *See* Appendix A (Summary of *Daubert* denied in Phase One).

Given that Phase Two of "this case is a bench trial, and thus that the objectives of *Daubert,* upon which BP's motion" is premised, "are no longer implicated, the Court" should find that "the motion [in limine] to exclude expert testimony should be denied." *Deville v. Comar Marine Corp.*, No. 08-4104, 2009 WL 1870896, at *1 (E.D. La. June 25, 2009) (Barbier,

---

[18] *See* Ex. 21 (Excerpt from Phase One Trial Transcript, Feb. 26, 2013, at 259, 270-272).

J.), (quoting *Daubert*, 509 U.S. at 596; *United States v. 14.38 Acres of Land, More or Less Situated in Leflore County, State of Miss.,* 80 F.3d 1074, 1078 (5th Cir. 1996)).

### B. Dr. Kelkar's Opinion Regarding Pore Volume Compressibility Is Reliable and Will Be Helpful to the Court

BP erroneously contends that Dr. Kelkar "reached his conclusions regarding the Macondo pore volume compressibility without performing any scientific analysis." BP tries to create a standard that does not exist. The question is not whether Dr. Kelkar is an expert in rock mechanics or rock physics who performed independent engineering calculations. The issue is whether the underlying bases of Dr. Kelkar's opinions are of a type reasonably relied on by experts in the field. *See* FRE 703; *e.g. Mendes-Silva v. U.S.*, 980 F.2d 1482, 1485–1486 (D.C. Cir. 1993); *Groobert v. Pres.t & Dirs. & Georgetown Coll.,* 219 F.Supp. 2d 1 (D.D.C. 2002).

Dr. Kelkar, like BP's expert Dr. Blunt, is an expert in petroleum reservoir engineering. Dr. Kelkar currently serves as the Chairman of the McDougall School of Petroleum Engineering at the University of Tulsa, where he specializes in reservoir characterization, reservoir performance, production optimization, reservoir modeling, and risk analysis.[19] Similarly, Dr. Blunt is a professor of petroleum engineering at the Imperial College in London, England.

Neither Dr. Kelkar nor Dr. Blunt made an independent experimental analysis of pore volume compressibility. Each admitted at his deposition that he is not an expert in geology, rock mechanics, or petrophysics. Instead, as petroleum reservoir engineers, they did what petroleum

---

[19]For the past 30 years, Dr. Kelkar has taught undergraduate courses in petroleum engineering, reservoir characterization, production design and optimization, and petroleum economics. He also is the Director of the University of Tulsa Center for Reservoir Studies, which was created in 1999 to conduct research on reservoir description and optimization. He has authored or co-authored two books in the fields of petroleum and reservoir engineering, more than 50 refereed journal publications, technical reports, and have given more than two hundred technical presentations. He is currently serving a three year term on the Society of Petroleum Engineers (SPE) International Board of Directors. He became a distinguished member of SPE in 2010. *See* Ex. 19 (Expert Report of Dr. Kelkar, App. D).

reservoir engineers typically do in the field; they reasonably relied on pore volume compressibility and other data provided by specialists, such as rock mechanics, to petroleum reservoir engineers.  Both analyzed "the measured data, looking at that data, critiquing that data, and look[ed] at the data in the light of the full body of scientific evidence, and then [used that data] in reservoir engineering calculations."[20]  As Dr. Kelkar testified at his deposition:

> I just picked a value which – which seemed to be the consensus at that time, because, clearly, when you have a crisis situation like this, you are going to come up with the best possible estimate you can, because you don't want to make a mistake in making any suggestions.[21]

Dr. Blunt used a pore volume compressibility of 6 microsips as one of the key inputs to his material calculation based on the unreliable and non-representative results from the three rotary sidewall cores analyzed by the Weatherford laboratories.  In contrast, Dr. Kelkar used a pore volume compressibility of 12 microsips based on BP's considered recommendation to apply a correction factor and double the Weatherford test results given the inherent bias of sidewall cores in underestimating compressibility, BP's own experience at nearby wells, and an evaluation of the data from those wells.

As Judge Duval explained in *Katrina Canal Breaches,* 2012 WL 4328354 *1:

> These *Daubert* motions are predominantly based on attacks concerning the underlying facts upon which each opinion was based. That approach is not contemplated under a *Daubert* challenge. "[T]he reliability of data underlying an expert's opinion goes to the weight of this evidence, but should not serve as a basis for its exclusion. *See Tyler v. Union Oil Co. of Cal.,* 304 F.3d 379, 392–93 (5th Cir. 2002)." *General Electric Capital Business Asset funding Corp. v. S.A.S.E. Military Ltd.,* 2004 WL 5495590, *4 (W.D.Tex. Oct. 21, 2004).

The jury case cited by BP, *Interplan Architechs, Inc. v. C.L. Thomas, Inc.* No. 4:08-CV-03181, 2010 WL 4065465, at *18-19 (S.D. Tex. Oct. 9, 2010), is inapposite.  Although the court

---

[20] *See* Ex. 22 (Deposition of Martin Blunt, July 25, 2013, at 19:4-22:2).
[21] *See* Ex. 20 (Deposition of Mohan Kelkar, at 259:2-259:8).

excluded the testimony of plaintiff's damages expert who arrived at his conclusion without describing any data relied on, the court admitted the testimony of another of damages expert who relied on one set of data rather than that preferred by the defendant.

Second, BP complains that "Dr. Kelkar [allegedly] did not consider contrary evidence." BP Brief at 10.  As this Court noted in *In Cudd Pressure Control,* 1999 WL 756439 *1:

> Unlike the usual "Daubert motion" which questions the qualifications of a particular expert, or the reliability of the opinions offered by the expert, [defendant's] motion in this case raises the issue of whether the various experts' testimony is relevant or whether the opinions are supported by credible evidence.

There, as here, the defendant argued that the plaintiff's experts either relied upon evidence which is not credible or, in some instances, "selectively reviewed" certain documents and testimony.  As here, the defendant contended that the "experts relied on evidence that supports their opinions, but ignored other evidence which might contradict their opinions," and that "the conclusory statements by claimants' experts invaded the province of the trier of fact." *Id.* *2.  However, after reviewing FRE 401, 402, 703, and 704, this Court appropriately concluded that the "objections go more to the weight of these experts' opinions rather than the admissibility of such opinions. Such questions are typically grist for the mill of cross examination." *Id.*  BP will have the opportunity to cross-examine Dr. Kelkar regarding any relevant evidence that he allegedly disregarded at trial.  An alleged failure to consider contrary evidence is not grounds for the exclusion of expert witness testimony.

Third, BP incorrectly contends that "Dr. Kelkar's opinion concerning Macondo rock compressibility is based solely on his review of a single BP presentation and a handful of BP emails."  BP Brief at 11.  Rather, Dr. Kelkar has applied his more than 30 years of experience as

14

a reservoir engineer to his analysis of BP scientists' own conclusions as to the compressibility of the Macondo reservoir, and BP's representation of such conclusions to the United States.

The three jury cases relied on by BP are inapplicable. *See e.g. Thompson v. Rowan Cos.*, 2007 WL 724646 *1. *In re Rezulin Prods. Liab. Litig.*, 309 F.Supp. 2d 531, 546, 554 (S.D.N.Y. 2004), is inapposite because there the plaintiffs sought to offer expert opinion evidence regarding the alleged motive, intent or state of mind of defendants based in part on in-house documents, memos and emails. Similarly, *Tassin v. Sears, Roebuck & Co.,* 946 F. Supp. 1241, 1252-53 (M.D.La. 1996) is inapplicable. Because the expert in that case was attempting to divine a corrupt motive to conspire based on email correspondence. In contrast, here, Dr. Kelkar does not seek to testify as to the alleged motives of BP, but rather to reasonably rely on BP's considered judgment regarding pore volume compressibility as an input to his material balance calculation, a type of input reasonably relied on by petroleum reservoir engineers in the field.

Finally, BP's reliance on *Investments v. Rothstein*, No. 10-60786-Civ., 2011 WL 4949191, at *5 (S.D. Fla. Oct. 18, 2011). is misplaced. In *Investments,* the court allowed the expert at issue to testify as to a number of issues based on her more than 25 years experience in the banking industry, but precluded her opinions on other matters based almost entirely of a summary of evidence such as emails, deposition testimony, and plea agreements. As in *Investments,* Dr. Kelkar's opinions, including those on compressibility, are not merely based on a few emails, but are informed by the totality of the circumstances, including his more than 30 years of experience as a petroleum reservoir engineer, and should not be excluded.

## IV. CONCLUSION

For the foregoing reasons, BP's Motion to Exclude Certain Opinions and Testimony of Dr. Kelkar should be denied.

Respectfully submitted,

/s/ Steven O'Rourke
STEVEN O'ROURKE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone: 202-514-2779
Facsimile: 202-514-2583
E-mail: steve.o'rourke@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

Date:  September 3, 2013                                  /s/ Steven O'Rourke
                                                          Steven O'Rourke