# Exhibit 4

# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA

# IN RE: OIL SPILL BY THE OIL RIG MDL NO. 2179 "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010

## EXPERT REPORT OF DR. ALAN R. HUFFMAN SUBMITTED ON BEHALF OF THE THE UNITED STATES

This report discusses the expert findings of Dr. Alan R. Huffman relating to the estimation of the size of the M56 reservoir, and the compaction history and geomechanical properties of the M56 reservoirs penetrated by BP Mississippi Canyon 252 #1 well (Macondo prospect).

DATED: June 10, 2013

*[signature]*

Signature: Dr. Alan R. Huffman

Highly Confidential Per BP

# IV. ANALYSIS OF THE REPORT OF DR. ROBERT ZIMMERMAN

**Basic Methodology and Data Inputs**

Dr. Robert Zimmerman was hired by BP to determine how much the Macondo M56 reservoirs compacted (or consolidated) during the rapid decrease in pore pressure and increase in the effective stress on the reservoirs during the Macondo blow out event by using the results of a series of tests performed by Weatherford Laboratories on a selected set of side well cores from the Macondo well. Dr. Zimmerman concluded from these tests that the compressibility of the M56 reservoirs is 6.35 microsips. I have serious concerns about Dr. Zimmerman's use of and interpretation of the Weatherford core tests based on my expertise in experimental rock mechanics, and also based on my previous analysis of the well log and pressure data in the Macondo well from Phase I of this Trial.

**Opinion Regarding The Actual UPVC For The M56 Reservoir**

In summary, it is my expert opinion based on all of the issues discussed above that the core tests performed by Weatherford cannot be used to assign a reliable UPVC value to the M56D or M56E reservoirs. Since no tests were done for any other zones, those zones also cannot be assessed. As such, this raises serious doubts about the results of Dr. Zimmerman's work because he bases his conclusions about the UPVC value on the Weatherford tests.

It is my expert opinion that BP's original approach after the blowout where they relied on a value of 12 microsips as the most likely correct value to use as an average UPVC number for the M56 reservoirs (Ex. 8776) is a more reasonable estimate. It is possible that the actual UPVC value is even higher in some subzones of the reservoir section, but there are likely also lower value zones so that an average property of 12 microsips is the best choice for determining reservoir performance during the blow out.

**Concerns About The Weatherford Laboratory Tests**

The importance reservoir compressibility under changing pressure conditions is well known in the industry (Yale et al, 1993 and Steve Willson, 2008). The purpose of the UPVC test is to determine the geomechanical properties of the reservoir that are needed to compute the amount of porosity change from compaction that will occur as a reservoir is depressurized. This topic is covered at length in the United States' rebuttal expert report of Dr. J.C. Roegiers.

The three tests that were done on the Macondo cores relied on by Dr. Zimmerman are described in detail in the reports of Weatherford's Dr. Ohmyoung Kwon (WFT-MDL-00130933; WFT-MDL-00129171; WFT-MDL-00082902). The goal of the tests was to determine the critical parameters needed to derive the Uniaxial Pore Volume Compressibility (UPVC) of the M56D and M56E reservoirs based on a set of 8 specific Rotary Sidewall Cores (RSWC) that were taken from the Macondo well. While the general principles of these tests are well understood, there are several critical issues that raise serious concerns about whether the tests are valid for estimating properly the UPCV values for the reservoirs in question.

**Sampling Issues**

One of the basic tenets of experimental rock mechanics is that when you are trying to determine the mechanical properties of a rock formation, getting a statistically valid sample of the rocks is a very important factor in the success of using those measurements to predict the behavior of a much larger volume of rock. In the case of the RSWC data from Macondo, a large number of cores were attempted in the well, with numerous failures to retrieve samples and numerous samples being crumbled, broken or otherwise damaged so that they there unsuitable for lab testing. The 8 samples selected for the experimental work were all from the M56D and M56E sand bodies. I have correlated the sample depths with the log analysis that was performed during my Phase I trial analysis, and all of the samples appear to be from the cleaner sandy portion of the reservoir except for sample 3-6R which is from a depth of 18074.9 ft in a silty-sand interval based on the log responses.

A careful study of the data from these cores reveals that the three samples used in the pore volume compression tests (samples 3-6R from M56D sand, and 3-16R and 3-22R from the M56E sand) had measured porosities of 21.7%, 20.6% and 21.4% respectively. In contrast, the 3 samples used for the stair-step compression tests (samples 3-8R from the M56D sand, and 3-21R and 3-25R from the M56E sand) had higher porosities of 23.4%, 23.4% and 23.7% respectively. There were also other differences in the specimens as described by Dr. Roegiers in his expert report. By comparison, the log analysis on the two reservoirs shows that the total porosity of the M56D sand ranges from 20-23% while the porosity of the M56E (excluding the silt/shale stringer at 18,135 ft) sand ranges from 23 to 25%. The bias in the cores is toward the middle to lower end of the porosity range for the M56E sand.

These basic observations, along with the fact that many of the cores were unrecovered or unsuitable for testing, raises serious doubts about whether the samples used are truly representative of the reservoirs for the intended purposes of the tests. In fact, there is a high probability that the most competent samples with the lowest porosity and the greatest cohesion will be the ones that are most suitable for the tests that were conducted. If this is indeed the case, then the results of the experiments will be biased toward lower UPVC values because of the sampling bias introduced by the nature of the core collection and selection for testing.

**Core Orientation**

One critical issue is the effect of the orientation of the sidewall cores on the compressibility measurements. It is well documented that the orientation of cores can significantly impact the results of rock mechanics testing, especially in the case where highly anisotropic materials such as shales and channelized sand deposits are involved. Taking horizontal sidewall cores results in samples that have a long axis oriented parallel to bedding planes. If the sample is a clean sandstone with no shale lamina or silty streaks, the sandstone may behave isotropically and the measurements will not be as sensitive to core orientation. If the core samples contain shale streaks or silty materials that are horizontal in orientation, the result can be a significant increase in stiffness of the sample relative to what would be experienced in a vertical core. This is analogous to models used in electrical and mechanical studies for springs connected in parallel versus in series. Two rock layers connected in parallel will be dominated by the stronger (stiffer)

rock, in this case the shales and silty zones. Rock layers stacked in series will be dominated by the weaker layer. This means that the results of the compressibility tests are going to be very sensitive to the lithologic contents of the core plug and the character of the fine layering in the core plug. This observation is also consistent with the large amount of literature available on the effects of seismic anisotropy that is observed in seismic and acoustic logging data and which impact all aspects of geophysics from seismic processing to pore pressure prediction (Huffman, 2002, AAPG Memoir 76). At this point, I defer to the expert report of Dr. J.C. Roegiers who has done a more thorough analysis of this issue. See Appendix B of Dr. Roegiers' report. I would note that my analysis concurs wholly with his expert findings.

**Temperature Effects on the Tests**

It has long been recognized and accepted that elevated temperatures affect the strength of rocks and minerals under a wide range of pressure and saturation conditions. The effect of temperature on quartz crystals and on quartz-rich rocks (Blacic et al, 1981, Karner et al, 2008) has been well known and heavily studied for decades.

The crucial issue regarding the Weatherford tests is that they were not done at reservoir temperature but were done instead at ambient (room temperature) conditions. The failure to perform the tests under the proper conditions of 100 to 110 degrees C at 18,000 ft in the M56D and M56E reservoirs has significant implications for the validity of the tests. The thermal regime plays a very significant role in how stiff the rocks will behave, and had the tests been done at the correct temperature, it is my opinion that the samples would have exhibited much higher compressibility than the Weatherford tests indicate. In fact, BP's disclosure containing a very brief summary of the opinions of its non-retained expert, Dr. Ann Marchand suggests that her belief is that the temperature conditions of the M56 reservoirs are such that other thermally-activated processes will also start to occur at these depths, confirming to me that BP clearly understands that temperature plays a role in both mechanical and chemical compaction processes. Why BP requested test conditions that did not replicate the downhole temperature conditions of the M56 reservoirs is therefore a question that needs to be addressed.

**The Effect of Saturation on the Tests**

It is a well-documented fact from nearly 50 years of lab experiments that the presence of water in quartz-rich rocks causes a significant reduction in the strength of quartz under significant loads (Linker and Kirby, 1981, Kekulawala et al, 1981, Hobbs, 1985, Mackwell and Paterson, 1985, Ord and Hobbs, 1986, Chester et al, 2007). Unfortunately, the uniaxial compression tests on the Macondo RSWCs were done using kerosene as a saturating fluid after the samples had dried out and not with water as a partial saturating fluid. See Ex. 9053. No attempt was made to re-saturate the samples with brine before they were flushed with kerosene or other fluid similar to the Macondo oil. From the standpoint of experimental rock mechanics, the proper procedure to recreate the reservoir saturating conditions in the tests would be to begin by saturating the sample with brine under vacuum followed by placing the sample in the jacket for the test, and then flowing several volumes of brine through the sample to assure complete saturation. Following this sample saturation preparation, the sample should have then been flushed with oil similar to the Macondo oil until the oil coming out of the sample assembly showed no evidence

Highly Confidential Per BP

of brine flushing.  This would result in an oil saturated sand sample with residual water saturation along the grains, which is the condition of the M56D and M56E reservoirs that were being tested in the lab.  The use of kerosene as a saturating fluid on extracted cores (that is cores without any liquid in them) is absolutely the wrong way to perform these tests if the intent is to get a valid estimate of the pore volume compressibility under conditions close to the in-situ reservoir state.

The stair step compression tests and the ultrasonic velocity measurements were done on dry extracted cores with no saturating fluid at all.   This approach will always result in a compressibility that is based on a dry frame modulus and Poisson's Ratio that are not valid for compaction of real rocks that are always partially saturated by water and that are at higher temperatures of 100 C and higher.  My analysis of the Macondo in-situ reservoir dynamic properties from the well log data (Appendix 1, Huffman Phase I Rebuttal Report) shows clearly that these reservoirs are "wetted", i.e., that the sands were originally 100% brine-saturated and are still brine saturated along the grains even though oil saturation are 90% or higher at present.  The log measurements show definitively that the residual brine saturation in the oil-bearing sands results in a Poisson's Ratio that is significantly higher than the values obtained in the dry tests.  The in-situ Poisson's Ratio values for the wet portion of the M56E reservoir and the shales are 0.3-0.35, and the values for the oil-saturated reservoirs is 0.25.   The Poisson's Ratio values of 0.13 to 0.18 obtained from the ultrasonic tests are clearly wrong for the purpose and do not represent the values that exist at in-situ reservoir conditions.

