# Exhibit 5

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL           )   MDL NO. 2179
BY THE OIL RIG              )
"DEEPWATER HORIZON" IN      )   SECTION "J"
THE GULF OF MEXICO, ON      )
APRIL 20, 2010              )   JUDGE BARBIER
                            )   MAG. JUDGE SHUSHAN

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VOLUME 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Deposition of ROBERT C.
MERRILL, JR., taken at Pan-American Building,
601 Poydras Street, 11th Floor, New Orleans,
Louisiana, 70130, on the 15th day of January,
2013.

1          THE VIDEOGRAPHER:  This is the

2     deposition of Bob Merrill in regard to the

3     oil spill of the oil rig Deepwater Horizon in

4     the Gulf of Mexico on April 20th, 2010.

08:35   5     Today's date is January 15th, 2013.  The time

6     is 8:35 a.m.  We are now on the record.

7               ROBERT C. MERRILL JR.,

8     having been first duly sworn, testified as

9     follows:

08:35  10               E X A M I N A T I O N

11     BY MR. GLADSTEIN:

12          Q.     Thank you.  Good morning.  My

13     name's Richard Gladstein.  I represent the

14     United States in this case, and with me is

08:35  15     Anna Cross today.

16          MR. GLADSTEIN:  So, Counsel, I assume

17     we'll do usual stipulations, objections as to

18     form should be raised now.  And I think the

19     style in this case is just to say object as

08:35  20     to form.  If you feel some extreme need to

21     give me a basis, you can do that, but that's

22     my understanding.

23          MR. RIDGE:  Understood.

24          MR. GLADSTEIN:  Thank you.

08:36  25          Q.     (BY MR. GLADSTEIN)  So,

1    proposed that we would use the Horner plot

2    which does not require rate to put it into

3    superposition time, so that you can actually

4    linearize the data.

09:06 5              And once we had a way that you

6    could -- and engineers and scientists like to

7    work with linearized data because then

8    deviations from a straight line can be -- can

9    indicate deviations from ideal behavior, if

09:06 10   you -- if -- it's not quite ideal behavior,

11   but that's in layman's term what we're

12   talking about.  And those deviations could

13   indicate something that wasn't expected.

14              And in this particular case, we

09:06 15   were trying to -- to identify whether we

16   could identify crossflow, which would be the

17   flow from one subsurface interval to another

18   subsurface interval with very limited data

19   interrogation ability, in this case the gauge

09:06 20   at the top of the capping stack.

21        Q.    All right.  And then you say you

22   presented BP's reservoir understanding,

23   including the PTA technique, to the U.S.

24   government science team:  The U.S.G.S.,

09:07 25   U.S.C.G., DOE, NOAA and cabinet secretaries.

|   | |
|---|---|
| 1 | Okay.  In what form did that presentation |
| 2 | take place? |
| 3 | MR. RIDGE:  Object to the form. |
| 4 | A.    It wasn't a single presentation. |
| 09:07 5 | It was a number of presentations.  And when |
| 6 | we actually under -- were in the wellbore |
| 7 | integrity test, from I believe about July |
| 8 | 15th onwards, we were meeting at first every |
| 9 | six hours, I think it was, and then they -- |
| 09:07 10 | as we got better and better data -- |
| 11 | Q.    (BY MR. GLADSTEIN)  Right. |
| 12 | A.    -- we lengthened the time |
| 13 | between presentations.  But primarily I -- I |
| 14 | would go and talk to the government |
| 09:08 15 | scientists from these organizations and -- |
| 16 | and then make presentations during these -- |
| 17 | these meetings to -- about the reservoir |
| 18 | behavior we were observing in these Horner |
| 19 | plots. |
| 09:08 20 | Q.    Okay.  And do you remember a |
| 21 | particular scientist that you interacted |
| 22 | with? |
| 23 | A.    I remember there were a number |
| 24 | of scientists I -- I -- I interacted with. |
| 09:08 25 | I'm -- I'm quite poor on names and faces. |

1        Q.      Okay.

2        A.      I do recognize that Paul Hseih,

3    one of these scientists, is in the room right

4    now.

09:08    5        Q.      Okay.  And anybody else come to

6    mind besides Mr. Hseih?

7        A.      There was a fellow named Art, I

8    believe.

9        Q.      Uh-huh, Mr. Ratzel?

09:08   10        A.      Mr. Ratzel.  And then I remember

11   quite clearly a fellow named Dick who was on

12   the phone, but it was when we were

13   presenting.  But a lot of the names have

14   escaped me.  It's been several years.

09:09   15        Q.      Yeah.  Then you say in you --

16   your next bullet, it says, Liaised With

17   Science Team, and I -- and now you're

18   referring to the government science team; is

19   that right?

09:09   20        A.      Yes, sir.

21        Q.      Okay.  -- on a daily basis, and

22   successfully convinced them of the merits of

23   pressure monitoring as the primary means of

24   assessing Wellbore Integrity during the

09:09   25   fitting of the stacking cap.

|   |   |
|---|---|
| 1 | What -- what -- what does that |
| 2 | mean there?  What's that? |
| 3 | A.    This refers back to the pressure |
| 4 | transient analysis -- |
| 09:09 5 | Q.    Right. |
| 6 | A.    -- and the Horner plot -- |
| 7 | Q.    Yeah. |
| 8 | A.    -- and how that we could |
| 9 | actually use the data from the -- from the |
| 09:09 10 | pressure gauge to indicate whether we had |
| 11 | significant crossflow in the course of this |
| 12 | wellbore integrity test. |
| 13 | Q.    Okay.  What was the importance |
| 14 | of that modeling, that exercise?  It was |
| 09:09 15 | basically to make sure that the -- the well |
| 16 | had integrity, right? |
| 17 | A.    Yes, sir.  Specifically to -- |
| 18 | with respect to these blowout disks. |
| 19 | Q.    Yeah.  And why did people care |
| 09:10 20 | about that? |
| 21 | MR. BEFFA:  Object to the form. |
| 22 | A.    There was a concern amongst |
| 23 | the -- the team that if you had significant |
| 24 | crossflow into these shallower sands, you |
| 09:10 25 | could set up this subsurface blowout or |

1    subsea blowout, as mentioned earlier in

2    this -- in this document.

3         Q.    (BY MR. GLADSTEIN)  So there was

4    going to be more flow to the surface, more

09:10  5    oil released to the ocean and -- and the

6    environment in that situation, right?

7         MR. BEFFA:  Object to the form.

8         A.    I -- I couldn't say about

9    quantity, but certainly if you had a subsea

09:10  10   blowout through rock fractures or something

11   of that nature, it would be less controllable

12   than coming up through a -- a -- a wellbore.

13        Q.    (BY MR. GLADSTEIN)  And so you

14   had an incentive to make your predictions as

09:11  15   accurate as possible; is that right?

16        MR. BEFFA:  Object to the form.

17        A.    Would you repeat the question.

18        Q.    (BY MR. GLADSTEIN)  Sure.

19        A.    I'm not -- I'm not sure I follow

09:11  20   it.

21        Q.    So you -- you had an interest

22   in -- in making your predictions using the

23   pressure transient analysis as accurate as

24   possible; isn't that right?

09:11  25        MR. BEFFA:  Object to the form.

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

        A.    Well, in this situation -- one
always strives for accuracy.  In this
situation, without knowing the flow rate and
given the large uncertainties on the other
09:11  5  reservoir parameters, we -- we did our best
to be accurate.
        Q.    (BY MR. GLADSTEIN)  Okay.
        A.    One always strives to be
accurate.
09:12  10        Q.    Now, you say -- you presented --
going back a step.  You presented BP's
reservoir understanding, including the PTA
technique, to the team and cabinet
secretaries.
09:12  15            Were -- were there any cabinet
secretaries that you presented the PTA
technique to?
        A.    In person to Secretary Chu.
        Q.    Okay.
09:12  20        A.    I believe Sal- --
Secretary Salazar was in one of the phone
conversations which I was giving
presentations on the technique to in one of
these evening meetings.
09:12  25        Q.    Right.  And -- and with

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

1    Secretary Chu, that would have been in mid

2    July; is that right?

3         A.    I believe so.  It was in the

4    time leading up to the top kill.  Not the top

09:12  5    kill, I'm sorry.  The wellbore integrity

6    test.

7         Q.    Right.  Okay.  And then it says

8    toward the bottom, you provided convincing

9    evidence to senior government officials and

09:13  10    science team which was instrumental in

11    gaining permission to attempt the static

12    kill.  Okay.

13              What did you mean by that?  How

14    is the -- the evidence that you provided, do

09:13  15    you believe, instrumental in gaining

16    permission to attempt the static kill?

17         A.    I'm not exactly sure what I

18    meant by this -- this -- this bullet point.

19    Clearly it's the amount -- it refers to the

09:13  20    preceding bullet points in terms of the data

21    and the data analysis -- data analysis

22    techniques which were being used to monitor

23    the wellbore integrity.  And we were con- --

24    you know, there was -- we really wanted to

09:14  25    ensure that the wellbore had integrity

01
02
03
04
09:14 05
06
07
08
09
09:14 10
11
12
13
14
09:14 15
16
17
18
19
09:15 20
21
22
23
24
09:15 25

1   because we did not want there to be a

2   possibility of a -- of a subsea blowout, and

3   so it was instrumental data to actually come

4   to that conclusion.

5        Q.    Now, what would have happened if

6   the government team wasn't convinced that --

7   that the well had integrity?

8        MR. RIDGE:  Objection to form.

9        MR. BEFFA:  Object to the form.

10       A.    I -- I can't say for sure what

11  would have happened if they were not

12  convinced of the integrity of the -- of

13  the -- of the wellbore.  There was concern

14  that we'd be asked to open the -- the well up

15  again to flow into the environment.

16       Q.    (BY MR. GLADSTEIN)  Right.  Was

17  there concern that you'd have to wait until

18  the relief well came in order to finally shut

19  down the well?

20       A.    I don't know if that's concern.

21  I think that if the well was still flowing to

22  the ocean, that is the ultimate -- you know,

23  the ultimate way to kill the well would have

24  been that.

25       Q.    Okay.  And then it says at the

1    bottom of the page, you "Continued

2    contributions to legal defense by

3    coordinating sub-surface facets of flow rate

4    determination."

09:15   5               Okay.  So I think that might get

6    into some privileged areas, so I don't need

7    to ask about that.

8               All right.  Then let's look at

9    the next page, which is -- has the last

09:15  10    digits 6652548.  Under year-end -- okay.  So

11    under mid-year performance con- --

12    conversation, "Agreed that this effort took

13    precedence over all other tasks."

14               When you say "this effort," are

09:16  15    you referring to the Macondo incident

16    response?  Is that what you're referring to

17    there?

18         A.    Yes.

19         Q.    So -- so during the -- the

09:16  20    Macondo incident from, you know, the blowout

21    of approximately April 20th to the shut-in,

22    was that the -- was that what -- the primary

23    work that you were involved in on behalf of

24    BP?

09:16  25               MR. RIDGE:  Object to the form.

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

43

          1          A.     Would you repeat the question,

          2    please.

          3          Q.     (BY MR. GLADSTEIN)  For the

          4    period of -- of the blowout, starting

09:16     5    approximately April 20th through the

          6    completion of the well integrity testing

          7    in -- in the end of July, was your primary

          8    work for BP on the Macondo incident?

          9          MR. RIDGE:  Same objection.

09:16    10          MR. BEFFA:  Objection; form.

         11          A.     I'm sorry, I was actually

         12    reading the document here, see what I

         13    actually said --

         14          Q.     (BY MR. GLADSTEIN)  Oh, okay.

09:17    15          A.     -- because I hadn't read my

         16    year-end assessment of myself here.  So could

         17    you repeat the question?

         18          Q.     Okay.  So most of the work you

         19    were doing in April through July that you

09:17    20    were doing for BP was related to the Macondo

         21    incident; isn't that right?

         22          MR. RIDGE:  Same objection.

         23          A.     A large proportion of my time

         24    from May, actually mid May through to the end

09:17    25    of July was -- was related to the -- the

1    Macondo incident.

2         Q.    (BY MS. GLADSTEIN)  Okay.  All

3    right.  So -- so let's go to what you were

4    looking at.  Let's look at the first sentence

09:17  5    of -- of your year-end assessment.

6              You say, "I am proud of the work

7    which I performed for Paul Tooms' engineering

8    team."

9              You mentioned that Mr. Tooms was

09:17 10    in -- was he in charge of the engineering,

11    the GoM engineering group?

12         A.    No, sir, he was in charge of the

13    responses engineering group.

14         Q.    Okay, I'm sorry.  Okay.  Where

09:18 15    you worked with -- where I worked with Kate

16    Baker, who liaise -- who led the liaison

17    efforts with the government's science team

18    and SETAs/senior advisers in a variety of

19    disciplines.

09:18 20              That's what we referred to

21    before, you worked with Kate Baker.  And what

22    does the acronym SETAs stand for?

23         A.    Segment technical authority.

24         Q.    Is that within BP?

09:18 25         A.    That's within BP.

        1          A.     There were other fixed
        2     parameters in the model.
        3          Q.     Yeah.
        4          A.     And this is one of -- one of the
02:48   5     ones that was particularly important for this
        6     set of rods.
        7          Q.     Yeah, that was not varied?
        8          A.     That is correct.
        9          Q.     Yeah.  That -- yeah.  Now, on
02:48  10     the other hand, there are some sensitivity
       11     parameters, and what I take it from here is
       12     these -- these were inputs that were varied;
       13     is that right?
       14          A.     Yes, sir.
02:48  15          Q.     Okay.  So you got the aquifer,
       16     we had already talked about that.  We got
       17     some different possible aquifer sizes, right?
       18          A.     Yes, sir.
       19          Q.     And then you got the -- the Cr,
02:48  20     and that's the rock compressibility, right?
       21          A.     Yes, sir.
       22          Q.     Okay.  And then you've got three
       23     entries there, 6, 12 in bold, and
       24     18 microsips; is that correct?
02:48  25          A.     Yes, sir, that is correct.

1      Q.     And then on the aquifer size,

2  you got 3.8 times X in bold.  Why did you

3  bold the -- the 3.8 and the 12?

4      A.     The bold values were going to be

02:49  5  used as a reference case so that all the

6  sensitivities would be referenced to that

7  case.

8      Q.     Okay.  What does a reference

9  case mean?

02:49  10      A.     Case against which you reference

11  the sensitivities.

12      Q.     Uh-huh.  Okay.  Does -- now --

13  now, 12 is midway between 6 and 18; is that

14  right?

02:49  15      A.     That is correct.

16      Q.     Did you talk with anybody -- I

17  mean, you didn't come up with these rock

18  compressibilities on your own, right?

19      A.     No, sir, I did not.

02:49  20      Q.     Okay.  So who gave you these

21  numbers?

22      A.     The value 6, which is the value

23  that I used for all of the reservoir modeling

24  previous to this point, was given to me by I

02:50  25  think it was Steve Willson, who was our

1      geomechanical expert.  It might have been

2      Kelly McAughan.  It was someone familiar with

3      the -- the rock mechanic reports from the --

4      from the -- from the cores that had been

02:50  5      taken in the -- in the -- in the -- in the

6      course of the -- of the coring of the -- of

7      the well prior to the incident.

8                12 and 18, I recall, were values

9      that were -- we were asked to evaluate

02:50  10     because we wanted to be sure that we captured

11     the highest possible pressures that you would

12     actually possibly see in this buildup, and

13     the reason we were concerned about the

14     highest pressures that you might see is

02:51  15     because there was this concern about the

16     burst disks.  And with a higher pressure,

17     either you could put the burst disks at risk

18     or with a higher pressure you would also have

19     a higher -- a larger driving force for this

02:51  20     flow into a shallower horizon.

21                But the experimental

22     measurements upon the -- from the well were

23     actually 6 microsips.

24          Q.    Okay.  But why -- why would the

02:51  25     rock compressibility have a bearing on how

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL          )   MDL NO. 2179

BY THE OIL RIG             )

"DEEPWATER HORIZON" IN  )   SECTION "J"

THE GULF OF MEXICO, ON  )

APRIL 20, 2010             )   JUDGE BARBIER

                           )   MAG. JUDGE SHUSHAN

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

VOLUME 2

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Deposition of ROBERT C.

MERRILL, JR., taken at Pan-American Building,

601 Poydras Street, 11th Floor, New Orleans,

Louisiana, 70130, on the 16th day of January,

2013.

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

1    an exhibit number?

2         A.    Tab 55 will be 10853.

3         Q.    Okay, thank you.  And the title

4    of Exhibit 10853 is Well Integrity Test

09:24  5    Review Data, and it's dated at 1100 hours,

6    July 26th, 2010.  I'd like you to review this

7    document, please.  There is two versions of

8    it.  One is the Bates numbered version, and

9    then behind it is a native format version

09:24 10    that is easier to read.

11         A.    Yes, sir.

12         Q.    Okay.  And let's -- let's review

13    your draft PIE matches of 25 July, which is

14    part of Exhibit 10853.  Can you turn to --

09:26 15    to -- to that -- that page, the page that's

16    entitled "Draft:  PIE matches of 25-July"?

17         A.    Would this be the page number --

18    well, there's no page number on that titled

19    slide, but the following page number is 18.

09:26 20         Q.    Yes.  Yes.  Okay.  And that --

21         A.    Rectangular model, no aquifer,

22    45 mbd.

23         Q.    Yes.  And let -- let's compare

24    those to the -- the 45 mbd case in

09:26 25    Exhibit 9318 and Exhibit 10825.

```
 1            A.     At the same time?

 2            Q.     Well, we can -- we can do --

 3     let's com- -- compare the 45 mbd case in

 4     Exhibit 10853 to the 45 mbd case in

09:27  5     Exhibit 9318 first.

 6            A.     Okay.

 7            MR. BEFFA:  Object to the form.

 8            Q.     (BY MR. GLADSTEIN)  Okay.  And

 9     I'd ask you when you look at these two slides

09:27 10     together from these two exhibits, do the --

11     do the inputs and the outputs and the other

12     information on these slides appear to be the

13     same?

14            MR. RIDGE:  Object to the form.

09:27 15            MR. BEFFA:  Object to the form.

16            A.     The values in the yellow boxes

17     for this -- for this -- these two cases

18     appear to be the same.

19            Q.     (BY MR. GLADSTEIN)  Okay.  Same

09:28 20     question for the next scenario, which was

21     the -- the 30 mbd case, which is on

22     Exhibit 10853 on Page 20.  And ask you

23     whether the inputs and the outputs and other

24     information on Page 20 of Exhibit 10853

09:28 25     appear to be the same as the inputs and the
```

1    outputs and the other information on page --

2    on -- in 30 mbd case on Exhibit 9318.

3         MR. BEFFA:  Object to the form.

4         A.    The figures in the yellow box

09:29  5    appear to be the same.

6         Q.    (BY MR. GLADSTEIN)  Okay.  As

7    well as the other information; isn't that

8    correct?

9         MR. BEFFA:  Object to the form.

09:29  10        A.    What other information?

11        Q.    (BY MR. GLADSTEIN)  Any other --

12    like, the rectangular drawing, in terms of

13    the dimensions, for instance?

14        MR. BEFFA:  Object to the form.

09:29  15        A.    The rectangular drawing appears

16    to be the same in both case -- the fonts have

17    changed.

18        Q.    (BY MR. GLADSTEIN)  Yeah.

19        A.    The fonts have changed.

09:29  20        Q.    Okay.  And then the last case is

21    the -- is the 50 mbd case, and I ask you the

22    same question.  Do the inputs and the outputs

23    on Page 22 of Exhibit 10853 appear to be the

24    same as the inputs and the outputs on Page 6

09:30  25    of Exhibit 9318?

1          MR. BEFFA:  Object to the form.

2          A.     The values appear to be the

3    same.  The observation that fonts have

4    changed is still valid.

09:31  5          Q.     (BY MR. GLADSTEIN)  Okay.  So --

6    so going back to the first page of -- of

7    Exhibit 10853, that's entitled "Well

8    Integrity Test Data Review," 1100 hours,

9    July 26, 2010, is it your understanding

09:31  10   that -- that the information contained in

11   this data review was -- was presented to --

12   to the government science team?

13          A.     That is my understanding.

14   Actually, I'm not sure -- I'm not entirely

09:31  15   sure if this is solely the work of BP or a

16   joint effort.  So it might be incorrect to

17   say it was presented to the government

18   science team, but it was -- I believe it was

19   certainly presented at a meeting or discussed

09:32  20   at a meeting.

21          Q.     Okay.  And you believe that this

22   was the meeting that was the July 26th?

23          A.     I couldn't state a date.  I

24   will --

09:32  25          Q.     Okay.

1         A.    I'll admit the dates as

2 July 26th, but there were lots of meetings.

3         Q.    Okay.  All right.  So I'd ask

4 you to take a look at Page 3 of -- of the

09:32  5 Exhibit 10853.  What is Page 3?

6         A.    Page --

7     MR. BEFFA:  Object to the form.

8         A.    (Continuing)  Page 3 has a

9 figure on it with a title that says Horner

09:32 10 Plot - Data to 5:58, 26 of July, and on this

11 Horner plot, there is a slope drawn in to

12 show the linear portion of the Horner plot.

13 There is a -- the data shows clear deviation

14 above this line after a certain time.  There

09:33 15 is a P star annotation, which is the

16 intersection of that line to the Y axis, and

17 then there are two annotations to this slot,

18 to this figure, which says the pressure

19 increases approximately 9 to 14 psi in

09:33 20 24 hours and that the behavior of the Horner

21 plot is consistent with reservoir boundaries.

22         Q.    (BY MR. GLADSTEIN)  Okay.  And

23 did you have anything to do with the

24 presentation of this slide?

09:33 25         A.    I probably made this Horner plot

         1    and this slide.  Again, I can't be a hundred

         2    percent sure that I actually made the Horner

         3    plot because I had people assisting me.  But

         4    if this is the 26th of July, it was most

09:33    5    likely my own efforts.

         6             Q.     Okay.  And this was in the

         7    course of your work on the incident, correct?

         8             A.     Yes, sir.

         9             Q.     Okay.  Can you identify on

09:34   10    the -- the -- the -- the Y axis where the

        11    shut-in occurred, approximately?

        12             MR. BEFFA:  Object to the form.

        13             A.     On the Y axis?

        14             Q.     (BY MR. GLADSTEIN)  Did I say

09:34   15    that wrong?  On the X axis?  The X -- which

        16    axis shows time?

        17             A.     The X axis shows time.

        18             Q.     Okay, I apologize.  The X axis.

        19    Can you tell where -- approximately the

09:34   20    shut-in occurred?

        21             MR. BEFFA:  Object to the form.

        22             A.     I cannot tell you approximately

        23    because the scale has been enlarged on this

        24    plot and it excludes the flowing and the

09:34   25    shut-in behavior.  You see the vestige of the

         1    shut-in behavior at approximately 10 to the 3

         2    on the --

         3              Q.    (BY MR. GLADSTEIN)   Yeah.

         4              A.    -- on the slide, but that's not

09:35    5    the -- when the shut-in started.

         6              Q.    Yeah.

         7              A.    We removed that part of the

         8    slide -- of the -- of the data in order to

         9    concentrate on the character of the buildup

09:35   10    itself.

        11              Q.    Okay.  And so why does at some

        12    point the -- why do the -- the measured data,

        13    which is reflected by the pluses at some

        14    point match the -- the slope and then at a

09:35   15    certain point, approximately in the middle of

        16    the -- of the graph deviate above the slope?

        17              MR. RIDGE:  Object to the form.

        18              MR. BEFFA:  Object to the form.

        19              A.    In a Horner -- in pressure

09:35   20    transient analysis, such behavior is

        21    interpreted and is -- and is consistent with

        22    the pressure -- the -- the -- the test

        23    encountering a -- a reservoir boundary, and

        24    that is how -- what -- how we interpreted it

09:36   25    at this time.

374

Q.     (BY MR. GLADSTEIN)  And what
does the P star 6889 reflect?

A.     6889 is the P star, which is the
intersection of the straight line -- the
09:36 extension of the straight line to infinite --
infinite time, which is when the X axis is
equal to 1.  It has no physical meaning.  It
can be used quantitatively in some -- in some
applications, but --

09:36 Q.     Okay.

A.     -- it's just the extrapolation
of the line to 1.

Q.     Was there a concern on the part
of the -- either the government team or the
09:37 BP team as to why the slope deviated from the
straight line?

MR. RIDGE:  Object to the form.

A.     On the 26th of July, I do not
believe that there were any concerns
09:37 expressed.  However, previously -- and that
was a wide question you asked me, and you
didn't restrict it to this date.

Q.     (BY MR. GLADSTEIN)  Yeah.

A.     Previously, many people in the
09:37 government team were unfamiliar with the

       1    mechanistic -- the mechanisms of pressure

       2    transient analysis and when they were looking

       3    at this -- this -- at this plot and -- and

       4    interpreting it somewhat naively, they

09:38  5    expressed concern that it was deviating and

       6    not -- not going to a straight line value or

       7    an intersection value.

       8         Q.     Okay.  And when you say the

       9    reservoir boundaries, are you talking about

09:38  10   the dimensions of the reservoir?

       11        MR. BEFFA:  Object to the form.

       12        A.     Not necessarily.  I am talking

       13   about when the pressure wave in the test that

       14   you're actually interrogating the test for

09:38  15   encounters some sort of barrier or baffle.

       16   It doesn't have to be a no-flow boundary,

       17   although it commonly is.

       18             And in this case -- well, in the

       19   models that are presented in this

09:38  20   presentation --

       21        Q.     (BY MR. GLADSTEIN)  Yeah.

       22        A.     -- they were treated as no-flow

       23   boundaries, but that's not always the case.

       24        Q.     (BY MR. GLADSTEIN)  Okay.  And

09:39  25   so this -- this -- the measured data is

1    consistent with the rectangular shape that's

2    shown in those three scenarios; is that

3    correct?

4         MR. RIDGE:  Object to the form.

09:39  5         A.     The rectangular shapes that were

6    shown in those -- in those -- in those -- in

7    that presentation are from Slides 20 onwards

8    in this present- -- I think it's 20 onwards,

9    in this presentation are -- were created to

09:39 10    match the pressure buildup data.

11         Q.     (BY MR. GLADSTEIN)  That's

12    re- -- that was reflected in these -- in the

13    Horner plot?

14         A.     Well, it's the same data.

09:39 15         Q.     Yeah.

16         A.     It's just a different way of

17    analyzing the data.

18         Q.     Just a picture of the data?

19    MR. BEFFA:  Object to the form.

09:39 20         A.     No.

21         Q.     (BY MR. GLADSTEIN)  No.

22         A.     It's not just a picture of the

23    data.  It's a different technique for

24    analyzing the data.  Horner plots -- Horner

09:39 25    plots are -- are -- do not require any

1    modeling, and all of these models from

2    Page 20 onwards are actual flow models that

3    have been developed to -- to match the data

4    points that were observed.

09:40   5        Q.     Thank you.

6             MR. GLADSTEIN:  Okay.  And I think

7    we'll change the tape.

8             THE VIDEOGRAPHER:  The time is

9    9:40 a.m., and we're off the record.

09:40   10        (Recess from 9:40 a.m. to 9:57 a.m.)

11            THE VIDEOGRAPHER:  The time is

12    9:57 a.m., and we're back on the record.

13            Q.     (BY MR. GLADSTEIN)  Back on the

14    record, Dr. Merrill.  Okay.  Looking at

09:58   15    Exhibit 10853, please.

16            A.     Yes, sir.

17            Q.     The part --

18            MR. BEFFA:  So which tab is 10853?

19            MR. GLADSTEIN:  We're off tabs now.

09:58   20            MR. BEFFA:  Well, I put my back.

21            THE REPORTER:  55.

22            Q.     (BY MR. GLADSTEIN)  Okay.  So

23    Tab 55, 10853.  Okay.  The segment of the

24    exhibit called draft pie matches of 25 July.

09:58   25    And your understanding, Dr. Merrill, is this

 1    information, these scenarios, these three
 2    different scenarios were presented to the
 3    government team on July 26th; is that
 4    correct?
09:59  5         MR. RIDGE:  Object to the form.
 6         MR. BEFFA:  Object to the form.
 7         A.    These -- these -- this portion
 8    of the presentation was presented, I'm not
 9    exactly sure the day because it's a blur, but
09:59 10    the 26th of July is when they were date --
11    well, they're dated the 25th of July, but I
12    believe they were actually presented the
13    following day.
14         Q.    (BY MR. GLADSTEIN)  Yes.  And
09:59 15    did you do these -- this presentation
16    yourself?
17         MR. BEFFA:  Object to the form.
18         A.    I believe that I was presenting
19    the material.
09:59 20         Q.    (BY MR. GLADSTEIN)  Okay.
21         A.    I presented a lot of material.
22         Q.    Yeah.
23         A.    And this is sim- -- very similar
24    to the material that I did present throughout
09:59 25    the course of these meetings.

       1          Q.     Okay.  Now, looking at the --
       2    the page -- Page 18 of the exhibit with the
       3    title Rectangular Model - No Aquifer, 45,000
       4    barrels a day.  The -- the 45,000 mbd, that's
10:00  5    an input to the model; is that correct?
       6          MR. BEFFA:  Object to the form.
       7          A.     For the purpose of this modeling
       8    we -- in each of these cases we input a flow
       9    rate assumption.  We also input other
10:00 10    physical parameter assumptions as well.
      11          Q.     (BY MR. GLADSTEIN)  Okay.  Now,
      12    normally with pressure transient analysis a
      13    flow rate is -- is either calculated or
      14    measured; is that correct?
10:01 15          MR. BEFFA:  Object to the form.
      16          A.     What do you mean by "normally"?
      17          Q.     (BY MR. GLADSTEIN)  When is the
      18    pressure transient analysis usually used?
      19          MR. BEFFA:  Object to the form.
10:01 20          A.     What do you mean by "usually"?
      21          Q.     (BY MR. GLADSTEIN)  Well, what
      22    does it mean to you?  Typically in the
      23    industry, does that help at all?
      24          A.     That helps.  In the industry the
10:01 25    pressure transient analysis is used to

1    interrogate the reservoir near the well,

2    flowing wells or injection wells where the

3    flow rate is known.

4         Q.    So it's usually a measured

10:01  5    quantity; is that correct?

6         MR. BEFFA:  Object to the form.

7         A.     In pressure transient analysis

8    the -- the -- the formal way that it's

9    described is you know the flow rate when you

10:02 10   are doing the pressure transient analysis.

11        Q.    (BY MR. GLADSTEIN)  Okay.  And

12   you are aware in -- in this period of

13   July 25-July 26 that there were members of

14   the BP flow assurance team who were

10:02 15   calculating the flow rate, correct?

16        A.     No, I was not actually aware of

17   that.  I was being given -- I -- it never

18   occurred to me.  It wasn't within my -- my --

19   my -- my area.  I'm unaware of ever being

10:02 20   aware of that at that time.

21        Q.    Now, you -- you interacted with

22   Ms. Saidi --

23        A.     I did.

24        Q.     -- often on a daily basis,

10:02 25   right?

```
 1          A.     I did.
 2          Q.     And did you have any idea of the
 3   kind of work that she was doing related to
 4   the incident?
 5          A.     I did not have a complete
 6   knowledge of that work.
 7          Q.     Okay.  What was your incomplete
 8   knowledge?
 9          MR. BEFFA:  Object to the form.
10          A.     Incomplete knowledge, it was
11   various.  We spoke.  We talked about the
12   possible configuration of the wellbore flow
13   path.  I am unaware of any documents passing
14   my -- through my -- you know, my possession
15   at the time of the incident which referred to
16   calculating flow rate.
17          Q.     (BY MR. GLADSTEIN)  Okay.  Do
18   you believe that you could have had more
19   accurate information if you had had a
20   calculated flow rate as opposed to an assumed
21   flow rate for purposes of -- of these three
22   scenarios?
23          MR. RIDGE:  Object to the form.
24          MR. BEFFA:  Form.
25          A.     For the purposes of these three
```

1    scenarios, which was in the context of the

2    well integrity test, the purpose of the

3    scenario was to show for a variety of flow

4    rate assumptions and for input parameters

10:04    5    it's possible to come up with very reasonable

6    matches.

7         Q.     (BY MR. GLADSTEIN)  Okay.  So

8    you're saying that --

9         A.     All of these matches are

10:04    10    reasonable.

11         Q.     Right.

12         A.     And none of them need to invoke

13    a integrity failure in the well.

14         Q.     So -- so -- so a scenario with a

10:04    15    45 mbd was reasonable as far as you were

16    concerned?

17         MR. BEFFA:  Object to the form.

18         MR. RIDGE:  Object to the form.

19         A.     These three scenarios show that

10:04    20    depending on your choice of other parameters

21    the -- the -- the -- you can match the

22    pressure transient -- the pressure data

23    collected with a number of flow rate and rock

24    assumptions.

10:04    25         Q.     (BY MR. GLADSTEIN)  So you

1    Aquifer; 30 mbd" reasonably matched the

2    observed pressure data; isn't that right?

3           MR. BEFFA:  Object to the form.

4           MR. RIDGE:  Object to the form.

10:12  5           A.    The 30 mbd case presented here

6    gives a reasonable match to the pressure

7    data.

8           Q.    (BY MR. GLADSTEIN)  And the

9    third scenario, "USGS Parameters - Increased

10:12 10   Cr, 50 mbd" reasonably matched the observed

11   pressure data; isn't that correct?

12          MR. BEFFA:  Object to the form.

13          MR. RIDGE:  Object to the form.

14          A.    Yes.  The -- the USGS parameters

10:12 15   also gave a reasonable match to the pressure

16   transient data.

17          Q.    (BY MR. GLADSTEIN)  Thank you.

18   Okay.  So I want to ask you about something

19   we talked about before, which is the rock

10:12 20   compressibility.

21          A.    Should I put this back?

22          Q.    No, I think it'll still help to

23   have this.

24          A.    Okay.

10:13 25          Q.    On the first -- the first

1    here.  Data for Qo equals 60 mbd; Cr 12,

2    microsips; aquifer, 3.8X.  So you're saying

3    you don't know why they're using 12 on this

4    scenario, also, correct?

10:19  5         MR. BEFFA:  Object to the form.

6         A.    I didn't say I don't know why

7    they are using 12.

8         Q.    (BY MR. GLADSTEIN)  Uh-huh,

9    okay.

10:19  10         A.    We had said prior to the well

11   integrity test that we were going to move to

12   12 from 6 for the purposes of the well

13   integrity test to ensure that we were

14   capturing the -- the upper end of the -- you

10:19  15   know, the -- a reasonable range of pressures

16   response expected in the well.

17         Q.    Okay.

18         A.    And I -- again, I don't know

19   whose numbers these are.

10:19  20         Q.    Okay.  Did you get the -- the 12

21   infor- -- information from Kelly McAughan?

22         A.    No.

23         Q.    Who did you get that from?

24         A.    As the result of a BP internal

10:19  25   meeting, there was a discussion about whether

         1   sidewall cores might be -- give different
         2   weight results than full core and -- and a
         3   reservoir engineer in this meeting said,
         4   well, why don't we double the
10:20    5   compressibilities, or words along those --
         6   along that line, and we decided it was
         7   prudent to do so.
         8            In fact, we also used a
         9   compressibility of 18 microsips at one point
10:20   10   as a -- an upside scenario.
        11       Q.    Okay.  Do you remember who the
        12   reservoir engineer was?
        13       A.    I believe -- I -- there were
        14   several, but I believe -- the name that
10:20   15   sticks in my mind was Dave Schott.
        16       Q.    Dave Schott?
        17       A.    S-c-h-o-double t.
        18       Q.    Okay.  And you said something
        19   about sidewall cores versus some other kind
10:20   20   of cores; is that what you said?  Did I
        21   understand?
        22       MR. BEFFA:  Object to the form.
        23       MR. GLADSTEIN:  Okay, I guess I could
        24   look in here.
10:21   25       MR. BEFFA:  Object to the question.

1    one of our other fields in the Gulf of Mexico

2    for which there was data on a number of

3    wells.

4         Q.     During the incident did you ever

12:45 5    analyze whether that anecdotal evidence was

6    accurate or not?

7         A.     No, I did not.

8         Q.     Did you during the incident ever

9    reach any conclusions about whether the

12:45 10   measured pore volume compressibility was an

11   accurate representation of the Macondo

12   reservoir?

13        MR. GLADSTEIN:  Objection as to form.

14        A.     Would you repeat the question?

12:45 15        Q.     (BY MR. BEFFA)  Sure.  During

16   the incident did you reach any conclusions

17   about whether the measured pore volume

18   compressibility was an accurate

19   representation of the Macondo reservoir?

12:45 20        MR. GLADSTEIN:  Same -- same objection.

21        A.     I don't believe I came to a

22   conclusion.  I'd never used 12 after the

23   lead-up to the -- the wellbore integrity test

24   because it wasn't necessary to match the data

12:46 25   that was being -- being collected during the

```
 1    the head that would -- was in the well.
 2         Q.    And I guess specifically I'm
 3    interested in whether you were talking about
 4    a modeled pressure or an observed pressure
 5    from a gauge.
 6         A.    I was referring to the observed
 7    pressure in the gauge.
 8         MR. BEFFA:  I have no further
 9    questions.
10         MR. GLADSTEIN:  And the United States
11    has some follow-up.
12         THE VIDEOGRAPHER:  The time is
13    12:55 p.m., and we're off the record.
14         (Recess from 12:55 p.m. to 12:58 p.m.)
15         THE VIDEOGRAPHER:  The time is
16    12:58 p.m.  We're back on the record.
17       F U R T H E R   E X A M I N A T I O N
18    BY MR. GLADSTEIN:
19         Q.    Good afternoon, Dr. Merrill.  As
20    I said, we're going to get you out of here
21    pretty soon.  I want to go back to the line
22    of questioning on rock compressibility,
23    12 microsips versus 6 microsips.  I believe
24    that you indicated in your testimony there
25    was a discussion about the value of -- of
```

12:54  5
12:55 10
12:58 15
12:58 20
12:59 25

1    6 microsips and anecdotal evidence was

2    presented.  What anecdotal evidence were you

3    referring to?

4          A.    I was referring to the -- to a

12:59  5    discussion we had in this internal meeting

6    where one of the reservoir engineers said

7    that he thought that the sidewall -- sidewall

8    core pore volume level -- well, I was

9    referring to the anecdotal evidence from --

12:59 10   presented by a reservoir engineer in this

11   meeting where he said that core volume

12   compressibility determined from sidewall

13   cores was lower than pore volume

14   compressibility based on whole core.

12:59 15         Q.    Yeah, and that was, I think you

16   said, from some other fields, in his

17   experience; is that right?

18         A.    That is correct.

19         Q.    Do you remember what particular

12:59 20   fields he was referring to?

21         A.    I do not remember the exact

22   fields that he was referring to.  I believe

23   they were in the Galapagos field.

24         Q.    And the -- the side volume cores

01:00 25   that you were referring to, you had indicated

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL          )   MDL NO. 2179
BY THE OIL RIG             )
"DEEPWATER HORIZON" IN     )   SECTION "J"
THE GULF OF MEXICO, ON     )
APRIL 20, 2010             )   JUDGE BARBIER
                           )   MAG. JUDGE SHUSHAN

* * * * * * * * * * * * * * * * * *
VOLUME 1
* * * * * * * * * * * * * * * * * *

Deposition of ROBERT C.
MERRILL, JR., taken at Pan-American Building,
601 Poydras Street, 11th Floor, New Orleans,
Louisiana, 70130, on the 15th day of January,
2013.

```
 1   THE STATE OF LOUISIANA :
     PARISH    OF    ORLEANS :
 2
     I, PHYLLIS WALTZ, a Certified Court Reporter,
 3   Registered Professional Reporter, and
     Certified Realtime Reporter in and for the
 4   State of Louisiana, do hereby certify that
     the facts as stated by me in the caption
 5   hereto are true; that the above and foregoing
     answers of the witness, ROBERT C. MERRILL,
 6   JR., to the interrogatories as indicated were
     made before me by the said witness after
 7   being first duly sworn to testify the truth,
     and same were reduced to typewriting under my
 8   direction; that the above and foregoing
     deposition as set forth in typewriting is a
 9   full, true, and correct transcript of the
     proceedings had at the time of taking of said
10   deposition.
11   I further certify that I am not, in any
     capacity, a regular employee of the party in
12   whose behalf this deposition is taken, nor in
     the regular employ of his attorney; and I
13   certify that I am not interested in the
     cause, nor of kin or counsel to either of the
14   parties.
15   GIVEN UNDER MY HAND AND SEAL OF OFFICE, on
     this, the 15TH day of JANUARY, 2013.
16
17
                      Phyllis Waltz
18        PHYLLIS WALTZ, RPR, CRR
          TEXAS CSR, TCRR NO. 6813
19        Expiration Date: 12/31/13
          LOUISIANA CCR NO. 2011010
20        Expiration Date: 12/31/12
          NEW MEXICO CCR NO. 610
21        Expiration Date: 12/31/12
22
     Worldwide Court Reporters, Inc.
23   Firm Certification No. 223
     3000 Weslayan, Suite 235
24   Houston, Texas  77027
     (713) 572-2000
25
```

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

328

1          I, ROBERT C. MERRILL, JR., have
read the foregoing deposition and hereby
2    affix my signature that same is true and
correct, except as noted above.

3

4          _____

5          ROBERT C. MERRILL, JR., VOLUME 1

6

STATE OF LOUISIANA      )
7    PARISH OF _____  )

8

          Before me, _____,
9    on this day personally appeared ROBERT C.
MERRILL, JR., known to me, or proved to me
10   under oath or through _____)
(description of identity card or other
11   document)), to be the person whose name is
subscribed to the foregoing instrument and
12   acknowledged to me that they executed the
same for the purposes and consideration
13   therein expressed.

14          Given under my hand and seal of
office on this, the _____ day of _____,
15   _____.

16

17

          _____
18   NOTARY PUBLIC IN AND FOR THE
STATE OF LOUISIANA
19

My Commission Expires:  _____
20

21

22

23

24

25

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

327

```
1          WITNESS CORRECTIONS AND SIGNATURE
2    ROBERT C. MERRILL, JR.          JANUARY 15, 2013
3        Please indicate changes on this sheet of
     paper, giving the change, page number, line
4    number and reason for the change.  Please
     sign each page of changes.
5
     PAGE/LINE        CORRECTION      REASON FOR CHANGE
6
     16/15-18 "secunded"->"seconded"     spelling
7    20/16    "IT and thats" => "IT and S"  misheard
8
     23/12   "Burstic" => "Burst Disk"       misheard
9    44/13   "responses" => "response's"     misheard
10
     77/4    "encorpus" => "encompass"       misheard
11   123/22 "note" should be "roles"        sense

12   152/1   "prominence" => "provenance"   misheard
13
     166/16 "annuluses" => "annuli"         mis-spoken?
14   177/19 "Horizon" => "horizon"   sense (geological, not incident)
15
     212/6   "rods" => "runs"               misheard
16   215/22 "volumes" => "volume"           misheard
17
     268/3   "bore day" => "Bourdet"        a surname
18
     268/20 "bore day" => "Bourdet"         a surname
19   274/17 "date" => "data"                misheard
20
21
22
23
24                                          2/27/13
25         ROBERT C. MERRILL, JR., VOLUME 1
```

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

**WITNESS NAME:   Robert C. Merrill, Jr.**

**DATE TAKEN:       January 15-16, 2013**

**IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010**

### <u>GENERAL CORRECTIONS:</u>

| | | |
|---|---|---|
| **PAGE:** 16 | **LINE:** 15 | **CHANGE:** "secunded" to "seconded" (wrong word) |
| **PAGE:** 16 | **LINE:** 18 | **CHANGE:** "secunded" to "seconded" (wrong word) |
| **PAGE:** 20 | **LINE:** 16 | **CHANGE:** "IT and that's" to "IT and S" (wrong word) |
| **PAGE:** 23 | **LINE:** 12 | **CHANGE:** "burstic" to "burst disk" (wrong word) |
| **PAGE:** 44 | **LINE:** 13 | **CHANGE:** "response" to "response's" (wrong word) |
| **PAGE:** 77 | **LINE:** 4 | **CHANGE:** "encorpus" to "encompass" (wrong word) |
| **PAGE:** 123 | **LINE:** 22 | **CHANGE:** "note" to "roles" (wrong word) |
| **PAGE:** 152 | **LINE:** 1 | **CHANGE:** "prominence" to "provenance" (wrong word) |
| **PAGE:** 212 | **LINE:** 6 | **CHANGE:** "rods" to "runs" (wrong word) |
| **PAGE:** 268 | **LINE:** 3 | **CHANGE:** "bore day" to "Bourdet" (wrong word) |
| **PAGE:** 268 | **LINE:** 20 | **CHANGE:** "bore day" to "Bourdet" (wrong word) |
| **PAGE:** 274 | **LINE:** 17 | **CHANGE:** "date" to "data" (wrong word) |
| **PAGE:** 386 | **LINE:** 16 | **CHANGE:** "withdraw" to "oil withdrawn" (missing word) |
| **PAGE:** 392 | **LINE:** 10 | **CHANGE:** "prominence" to "provenance" (wrong word) |
| **PAGE:** 392 | **LINE:** 11 | **CHANGE:** "providence" to "provenance" (wrong word) |
| **PAGE:** 406 | **LINE:** 10 | **CHANGE:** "providence" to "provenance" (wrong word) |
| **PAGE:** 421 | **LINE:** 12 | **CHANGE:** "dependent" to "depended" (wrong word) |
| **PAGE:** 442 | **LINE:** 25 | **CHANGE:** "mean" to "need" (wrong word) |
| **PAGE:** 461 | **LINE:** 13 | **CHANGE:** "Aerially" to "Areally" (wrong word) |
| **PAGE:** 480 | **LINE:** 24 | **CHANGE:** "completion" to "depletion" (wrong word) |
| **PAGE:** 487 | **LINE:** 11 | **CHANGE:** "core" to "pore" (wrong word) |

SIGNED: _____     DATE: _2/27/2013_____

330

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL          )   MDL NO. 2179
BY THE OIL RIG             )
"DEEPWATER HORIZON" IN     )   SECTION "J"
THE GULF OF MEXICO, ON     )
APRIL 20, 2010             )   JUDGE BARBIER
                           )   MAG. JUDGE SHUSHAN

* * * * * * * * * * * * * * * * *

VOLUME 2

* * * * * * * * * * * * * * * * *

Deposition of ROBERT C.
MERRILL, JR., taken at Pan-American Building,
601 Poydras Street, 11th Floor, New Orleans,
Louisiana, 70130, on the 16th day of January,
2013.

1  THE STATE OF LOUISIANA :
   PARISH   OF    ORLEANS :
2
   I, PHYLLIS WALTZ, a Certified Court Reporter,
3  Registered Professional Reporter, and
   Certified Realtime Reporter in and for the
4  State of Louisiana, do hereby certify that
   the facts as stated by me in the caption
5  hereto are true; that the above and foregoing
   answers of the witness, ROBERT C. MERRILL,
6  JR., to the interrogatories as indicated were
   made before me by the said witness after
7  being first duly sworn to testify the truth,
   and same were reduced to typewriting under my
8  direction; that the above and foregoing
   deposition as set forth in typewriting is a
9  full, true, and correct transcript of the
   proceedings had at the time of taking of said
10 deposition.
11 I further certify that I am not, in any
   capacity, a regular employee of the party in
12 whose behalf this deposition is taken, nor in
   the regular employ of his attorney; and I
13 certify that I am not interested in the
   cause, nor of kin or counsel to either of the
14 parties.
15 GIVEN UNDER MY HAND AND SEAL OF OFFICE, on
   this, the 16TH day of JANUARY, 2013.
16
17
                     _Phyllis Waltz_
18                   PHYLLIS WALTZ, RPR, CRR
                     TEXAS CSR, TCRR NO. 6813
19                   Expiration Date:  12/31/13
                     LOUISIANA CCR NO. 2011010
20                   Expiration Date:  12/31/12
21
   Worldwide Court Reporters, Inc.
22 Firm Certification No. 223
   3000 Weslayan, Suite 235
23 Houston, Texas  77027
   (713) 572-2000
24
25

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

501

```
1       WITNESS CORRECTIONS AND SIGNATURE
2    ROBERT C. MERRILL, JR.        JANUARY 16, 2013
3       Please indicate changes on this sheet of
     paper, giving the change, page number, line
4    number and reason for the change.  Please
     sign each page of changes.
5
     PAGE/LINE       CORRECTION      REASON FOR CHANGE
6
     386/14-16 "support--withdraw" => "support,
7              oil withdrawn" Mr. Gladstein was talking over me and
               the court reporter missed my statement.
8    386/17  "is the flow rate" => "is the flow rate,"    misheard
9    387/22  "connective" => "connected"     misheard
10
     392/10  "prominence" => "provenance"    misheard
11   393/10  "providence" => "provenance"    misheard

12   406/10  "providence" => "provenance"    misheard
13
     421/12  "dependent" =>  "depended"      misheard
14   442/25  "mean" => "need"                misheard(?)/sense
15
     461/16  "Aerially" => "Areally" (with respect to area, not air)
16   480/24  "completion" => "depletion"     misheard
17
     487/11  "core" => "pore"            misheard
18
19
20
21
22
23
24
                                          2/22/13
25   ROBERT C. MERRILL, JR., VOLUME 2
```

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

**WITNESS NAME:**   **Robert C. Merrill, Jr.**

**DATE TAKEN:**      **January 15-16, 2013**

**IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010**

## GENERAL CORRECTIONS:

| | | |
|---|---|---|
| **PAGE:** 16 | **LINE:** 15 | **CHANGE:** "secunded" to "seconded" (wrong word) |
| **PAGE:** 16 | **LINE:** 18 | **CHANGE:** "secunded" to "seconded" (wrong word) |
| **PAGE:** 20 | **LINE:** 16 | **CHANGE:** "IT and that's" to "IT and S" (wrong word) |
| **PAGE:** 23 | **LINE:** 12 | **CHANGE:** "burstic" to "burst disk" (wrong word) |
| **PAGE:** 44 | **LINE:** 13 | **CHANGE:** "response" to "response's" (wrong word) |
| **PAGE:** 77 | **LINE:** 4 | **CHANGE:** "encorpus" to "encompass" (wrong word) |
| **PAGE:** 123 | **LINE:** 22 | **CHANGE:** "note" to "roles" (wrong word) |
| **PAGE:** 152 | **LINE:** 1 | **CHANGE:** "prominence" to "provenance" (wrong word) |
| **PAGE:** 212 | **LINE:** 6 | **CHANGE:** "rods" to "runs" (wrong word) |
| **PAGE:** 268 | **LINE:** 3 | **CHANGE:** "bore day" to "Bourdet" (wrong word) |
| **PAGE:** 268 | **LINE:** 20 | **CHANGE:** "bore day" to "Bourdet" (wrong word) |
| **PAGE:** 274 | **LINE:** 17 | **CHANGE:** "date" to "data" (wrong word) |
| **PAGE:** 386 | **LINE:** 16 | **CHANGE:** "withdraw" to "oil withdrawn" (missing word) |
| **PAGE:** 392 | **LINE:** 10 | **CHANGE:** "prominence" to "provenance" (wrong word) |
| **PAGE:** 392 | **LINE:** 11 | **CHANGE:** "providence" to "provenance" (wrong word) |
| **PAGE:** 406 | **LINE:** 10 | **CHANGE:** "providence" to "provenance" (wrong word) |
| **PAGE:** 421 | **LINE:** 12 | **CHANGE:** "dependent" to "depended" (wrong word) |
| **PAGE:** 442 | **LINE:** 25 | **CHANGE:** "mean" to "need" (wrong word) |
| **PAGE:** 461 | **LINE:** 13 | **CHANGE:** "Aerially" to "Areally" (wrong word) |
| **PAGE:** 480 | **LINE:** 24 | **CHANGE:** "completion" to "depletion" (wrong word) |
| **PAGE:** 487 | **LINE:** 11 | **CHANGE:** "core" to "pore" (wrong word) |

SIGNED: _[signature]_                    DATE: _2/27/2013_

502

```
 1            I, ROBERT C. MERRILL, JR., have
      read the foregoing deposition and hereby
 2    affix my signature that same is true and
      correct, except as noted above.
 3

 4            _____
 5            ROBERT C. MERRILL, JR., VOLUME 2
 6
      STATE OF LOUISIANA       )
 7    PARISH OF _____   )
 8
              Before me, _____,
 9    on this day personally appeared ROBERT C.
      MERRILL, JR., known to me, or proved to me
10    under oath or through _____)
      (description of identity card or other
11    document)), to be the person whose name is
      subscribed to the foregoing instrument and
12    acknowledged to me that they executed the
      same for the purposes and consideration
13    therein expressed.
14            Given under my hand and seal of
      office on this, the _____ day of _____,
15    _____.
16

17
              _____
18            NOTARY PUBLIC IN AND FOR THE
              STATE OF LOUISIANA
19
      My Commission Expires:  _____
20
21
22
23
24
25
```