UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010<br><br>This Document Relates to: *All Cases*<br><br>(Including No. 10-2771) | MDL No. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAGISTRATE SHUSHAN |

### ALIGNED PARTIES' OPPOSITION TO BP'S MOTION *IN LIMINE* TO PRECLUDE GREGG PERKIN FROM OFFERING ALLEGEDLY NEW AND UNTIMELY OPINIONS

Plaintiffs, including the States of Alabama and Louisiana, together with the Transcoean Defendants and Halliburton, (collectively the "Aligned Parties"), respectfully submit the following memorandum in opposition to BP's Motion *in Limine* to Limit and Exclude Perkin Testimony [Doc 11062]:

**MAY IT PLEASE THE COURT:**

BP contends that expert witness Gregg S. Perkin, P.E. (Perkin) plans to offer opinions at trial not disclosed in his expert reports, pointing to his deposition testimony. BP's Mot. *in Limine*, 11062-1, p. 1 (Aug. 19, 2013).  The Aligned Parties do not intend to question Perkin regarding opinions extraneous to his Phase II report.  As acknowledged by BP in its Motion, the Aligned Parties are bound by the Court's prior Orders restricting testimony or opinions not contained within the "four corners" of the expert's report.  To the extent the complained of opinions are contained within the "four corners" of the report, they are admissible.  To the extent

1

BP believes that testimony elicited at trial is beyond the "four corners" of the expert's report, BP is free to lodge an objection at the time the actual testimony is presented.  As discussed further below, the opinions referenced by BP are either contained within Perkin's reports or were elicited by BP during the deposition.  In any event, BP's Motion *in Limine* to preclude testimony or opinions not contained within the "four corners" of Perkin's reports is unwarranted and unnecessary, and should be denied.

**I.     Perkin's Opinions Concerning Well Integrity**

BP asserts that Perkin should be precluded from testifying regarding two opinions allegedly not included in his Phase II reports concerning well integrity:

1. Whether adequate procedures were in place to manage certain well integrity risks associated with elements of the Junk Shot procedure.

2. Whether adequate procedures were in place to manage well integrity issues during ROV intervention efforts.

BP Mot. *in Limine*, 11062-1, p. 2 (Aug. 19, 2013).

As to BP's first contention, BP incorrectly asserts that Perkin's testimony regarding well integrity risks and the Junk Shot procedure "is not offered in his reports[.]"  BP Mot. *in Limine*, 11-0621, p. 2 (Aug. 19, 2013).

On this issue, Perkin actually testified:

> One has to do with the -- the rupture disks and how the Top Kill was proceeding with the junk shot. I -- I know there was issues relative to trying to maintain pressure on the well without rupturing the disks and creating an underground blowout.  I am -- I've not seen anything that would indicate to me one way or the other that, during the junk shot, if the junk had actually plugged off the well, in other words, it shut the well in, how British Petroleum was going to mitigate or control that pressure.  In other words, if the pressure started to spike during the junk shot, how they would have -- how they would have mitigated exceeding a certain pressure. I don't think I go into that in my Rebuttal Report in detail, but it's – it is a concern and an opinion that I have.

Exh. A, Dep. of Gregg S. Perkin, P.E., p. 15.  Asked to clarify, Perkin went on to state:

2

> If the junk shot had suddenly bridged the flow, and the pressure spiked, how BP was going to mitigate that pressure and protect the rupture disks. I have not seen anything that would suggest that they had con -- contemplated that or considered that.
>
> So that's one -- one opinion that may not be in my Rebuttal Report, but I'm trying to explain it to you now.

Exh. A, Dep. of Gregg S. Perkin, P.E., p. 16.  Thus, Perkin expressed in his deposition the opinion that BP did not appropriately consider how to protect the rupture disks if the Junk Shot shut the well in during the Top Kill.

While Perkin questioned in his Phase 2 deposition whether this information was contained in his *supplemental* report, Perkin's *original* report does contain the relevant information, as Perkin later acknowledged in his deposition.  *See* Exh. B, Expert Report of Gregg S. Perkin, pp. 7-8, 17-20 (Aug. 19, 2013); Exh. A., Dep. of Gregg. S. Perkin, P.E., p. 460.

Perkin's original report describes the Junk Shot procedure at length, the risks associated with the Junk Shot, and BP's lack of consideration of these risks, including the risk of bursting the rupture disks.  *See* Exh. B, Expert Report of Gregg S. Perkin, P.E., pp. 8, 17-20, 30-31.  For example, at page 8 of his original report, Perkin states that the success of the Junk Shot was risky "because many parameters pertaining to the uncontrolled flow from their Well was unknown, not well understood, and/or withheld by BP." *Id.* at 8.  Such parameters included risks and hazards such as "[b]ursting rupture disks in the 16" OD Casing." *Id.*

Therefore, contrary to BP's contention, Perkin's original Phase II Report opines regarding the management of well integrity risks during the junk shot procedure.  Any such testimony at trial will be within the "four corners" rule.  As a result, BP's Motion *in Limine* to exclude Perkin from offering testimony regarding the management of well integrity risks during the junk shot procedure is erroneous and should be denied.

Second, BP seeks to exclude testimony it speculates that Perkin "intend[s] to offer" at trial regarding "adequate procedures in place to manage well integrity issues during ROV intervention efforts." BP Mot. *in Limine*, 11-0621, p. 2 (Aug. 19, 2013). While Perkin did discuss this topic in his deposition in response to questioning by BP, this opinion is not contained within the "four corners" of his reports and the Aligned Parties do not intend to present expert testimony from Perkin on this issue.

Should the Aligned Parties attempt to elicit testimony or opinions from Perkin at trial on this issue or any others that fall outside of the "four corners" of his report, then the proper procedure is for BP to timely object during trial. BP's Motion *in Limine* to exclude testimony or opinions from Perkin about "procedures in place to manage well integrity issues during ROV intervention efforts" is premature and should be denied.

## II.   Perkin's Opinions Concerning Flow Rate

BP also claims that Perkin intends to offer new opinions at trial not included in his reports concerning certain flow rate calculations. BP asserts that Perkin calculated his own flow rate, used it to form his opinions, and introduced the same during his deposition testimony.

Actually, in response to BP's question to Perkin regarding whether he was offering any opinions related to quantification, he responded, "No. I'm—I'd—I've done a rough calculation, but I—you know, there's more sophisticated calculations that have been done, I'm sure." Exh. A, Dep. of Gregg S. Perkin, P.E., p. 11. He later testified:

> Q. (By Ms. Richard)  All right.  Yesterday you mentioned Richard Vargo from Halliburton, correct?
>
> A. Yeah, I think I did. I don't remember his last name. I think it was Vargo or something like that.
>
> Q. Did you read -- did you review Richard Vargo's deposition in connection with your opinions?

4

> A. I think I did.
>
> Q. Okay. And yesterday you referred to his testimony regarding the -- the flow -- the flow rate in connection with the Top Kill, right?
>
> A. Right.
>
> Q. And you understand that that flow rate was an input that Halliburton used in its WellCat modeling, correct?
>
> A. Yes.
>
> Q. Okay. And you understand that Halliburton didn't perform any actual flow rate calculations in connection with – with the Macondo Well, right?
>
> A. I -- that's -- I believe that's true.
>
> Q. Okay. You do understand that Halliburton used various inputs, including potential flow rate, in the WellCat modeling for the Top Kill, though, right?
>
> A. I'm sure they did.
>
> Q. Okay. And Just to clarify, yesterday I think you had said that you thought that Mr. Vargo had mentioned 39,000 as a -- as a figure with regard to that modeling; is that correct?
>
> A. It was either 29,000 or 39,000.
>
> Q. Okay.
>
> A. I don't remember exactly which one I used.
>
> Q. Okay. That -- and that was going to be my question. If the -- the evidence, the testimony, and the documentation shows that the input was actually around 30,000, you wouldn't have any reason to disagree with that, would you?
>
> A. No. I think I testified yesterday that I did a simple calculation, and my number was around 30,000.

Exh. A, Dep. of Gregg S. Perkin, P.E., p. 469–70

When Perkin was asked if he intended to offer that calculation at trial, he responded "not unless I'm asked." *Id.* at 11. Asked later if he was going to offer an opinion as to flow rate,

5

Perkin responded "[i]'m only going to opine on what I was asked earlier. I know that the—I believe the flow rates were much higher than represented by BP, as I've said many times." Exh. A, Dep. of Gregg S. Perkin, P.E., pp. 475-476.

The Aligned Parties do not intend to offer testimony or opinions from Perkin at trial that he calculated his own flow rates or what the flow rate was as calculated by Perkin. Perkin's deposition testimony, as well as his Phase 2 reports, illustrate that he is only offering opinions and testimony based on the flow rates as calculated *by BP* during the Macondo response. For example, Perkin will offer testimony as to *BP's* flow rate calculation as it pertains to the success of the Top Kill and how BP's misrepresentations of those rates delayed the capping of the well. Exh. B, Expert Report of Gregg S. Perkin, P.E., pp. 8, 20-21.[1]

Of course, should BP ask Perkin questions about his own flow rate calculations, it will have opened the door for Perkin to answer such questions.

Again, BP's Motion *in Limine* to exclude hypothetical opinions from Perkin as to his own flow rate calculations is premature and should be denied.

---

[1] Perkin states in his report: "For example, instead of informing the Unified Command of the true reason(s) for the Top Kill's downfall, i.e., high flow rate and the actual size of the opening(s) inside the BOP from where the flow was discharging, BP misrepresented that the Top Kill failure was caused by the bursting of the rupture disks in 16" OD Casing."

## CONCLUSION

For the reasons stated herein, BP's Motion *in Limine* to Exclude the anticipated testimony of Gregg S. Perkin, P.E., should be denied.

Dated: September 3, 2013

Respectfully submitted,

| | |
|---|---|
| /s/   Stephen J. Herman | /s/ James Parkerson Roy |
| **Stephen J. Herman**, La. Bar No. 23129 | **James Parkerson Roy**, La. Bar No.11511 |
| **HERMAN HERMAN & KATZ LLC** | **DOMENGEAUX WRIGHT ROY & EDWARDS LLC** |
| 820 O'Keefe Avenue | 556 Jefferson Street, Suite 500 |
| New Orleans, Louisiana 70113 | Lafayette, Louisiana 70501 |
| Telephone: (504) 581-4892 | Telephone: (337) 233-3033 |
| Fax No. (504) 569-6024 | Fax No. (337) 233-2796 |
| E-Mail: sherman@hhklawfirm.com | E-Mail: jimr@wrightroy.com |
| *Plaintiffs Liaison Counsel* | *Plaintiffs Liaison Counsel* |

**ON BEHALF OF THE ALIGNED PARTIES.**


## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that the above and foregoing Memorandum will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pre-Trial Order No. 12, and that the foregoing will be electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, this 3rd day of September, 2013.

/s/ James Parkerson Roy and Stephen J. Herman

2266757 v1-24010/0002 PLEADINGS