UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010<br><br>This Document Relates to: *All Cases*<br><br>(Including No. 10-2771) | MDL No. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAGISTRATE SHUSHAN |

**ALIGNED PARTIES' OPPOSITION TO BP'S MOTION *IN LIMINE* TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF DR. ROBERT BEA**

Plaintiffs, Transocean, Halliburton and the States (hereinafter the "Aligned Parties") respectfully respond to BP's Motion *in Limine* to Exclude Certain Opinions and Testimony of Dr. Robert Bea [Doc. 11054]:

**MAY IT PLEASE THE COURT:**

This Court already accepted the testimony of Dr. Robert Bea as a Process Safety Management expert in the Phase One trial. For BP to argue now that Dr. Bea is not qualified to testify on Process Safety Management source control failures (as opposed to the testimony he proffered on blowout prevention failures in Phase One) is meritless. As the Court well knows, Dr. Bea's Phase One testimony addressed process safety management intended to reduce the likelihood of a blowout; as the Court will hear, his Phase Two testimony will address process safety management intended to mitigate the consequences of a blowout once a failure occurs. Exclusion of Dr. Bea's expert testimony on *Daubert* grounds is inappropriate for the above reasons and for the additional reason that this is a bench trial where the Court need not act as the gatekeeper for a jury. Further, to the extent BP disagrees with Dr. Bea's As Low As Reasonably Practicable ("ALARP") analysis, it will have the opportunity to cross-examine him at trial.

BP moves to exclude Dr. Bea's testimony on three grounds: (1) that certain of his methods are unreliable; (2) to the extent he includes improper legal conclusions; and (3) to the extent his opinions are duplicative of Phase 1. BP is wrong on all three counts. First, BP's critique of Dr. Bea's methods should be a subject for cross-examination and is not a basis for exclusion, particularly in this bench trial. As this Court has long recognized, such *Daubert* motions are inappropriate for a bench trial where there is no need to protect a jury with the *Daubert* gatekeeping mechanisms. BP's complaints go only to weight and not admissibility. Second, Dr. Bea's testimony relating to regulations is admissible as set out in the Aligned Parties' concurrently filed opposition to BP's motion to exclude legal opinions. Moreover, as also explained in the concurrently filed opposition to BP's motion to exclude legal opinions, Dr. Bea's references to BP's "reckless" conduct were not intended as legal opinions. Third, Dr. Bea's Phase 2 opinions relate solely to BP's inadequate planning for *source control* in the event of a major well blowout—the very subject of the Phase 2 trial. These opinions are not duplicative of Phase 1.

**I.     Dr. Bea's ALARP Analysis Is Based on Acceptable and Sound  Methodology**

Process safety management is comprised of two component parts: prevention and mitigation. *See* Phase 2 Expert Opinions of Dr. Robert G. Bea, dated April 5, 2013 ("Report") at 7. Mitigation or source control, *the* issue to be adjudicated in the first part of Phase Two, focuses on assessment and management of the **consequences** of a major system failure. *Id.; see also* Figure 1. It answers the question: How safe is safe enough when preparing to respond to the possibility of a major well blowout? The ALARP process is one of several frameworks in which process safety management has addressed the answer to this question.

BP contends that Dr. Bea's ALARP analysis is flawed for three reasons: (1) he did not opine about the exact type of post-blowout source control technology BP should have had prior to April 20, 2010; (2) he did not include an industry standard in his analysis; and (3) he did not perform a cost-benefit analysis. BP is wrong as to all three but, moreover, these critiques are properly the subject of cross-examination not the basis for exclusion. .

### A. Process Safety Management Instructs that Determining the Appropriate Source Control Technology to Minimize the Consequences of a Blowout was the Responsibility of BP, not Dr. Bea

That BP believes Dr. Bea's analysis had to include an opinion about the specific source control technology BP should have had available on April 20, 2010, to satisfy *Daubert* merely highlights BP's misunderstanding of the mitigation planning analysis. Process safety management teaches that the operator must plan for source control measures in the event of a blowout and determine appropriate and safe source control technology. Within the framework of ALARP, an entity should define acceptable risks to the company, to the public, to environmental stakeholders, and others, and then develop systems that will achieve those identified, acceptable risks in the event of a well blowout. Here, BP as the operator had the responsibility for making such assessments and developing adequate source control systems prior to any blowout occurring. It failed to do so. This is the opinion Dr. Bea proffers.

BP further inaccurately characterizes Dr. Bea's testimony regarding capping stacks and ALARP. Dr. Bea specifically discusses in his Report the adequacy of capping devices under the ALARP standard: "BP Management knew, as early as 2001, that 'capping stacks' existed and were, according to BP, the Best Available Technology (preferable to a relief well) for a blowout in other environments." Report at 33. His deposition testimony was consistent, *see, e.g.* Deposition Testimony of Dr. Robert Bea, dated July 22, 2013, at 127:18-130:13, 158:20-159:3,

173:19-175:20, and BP's out-of-context deposition reference should be ignored.

### B. Dr. Bea's Analysis Properly Did Not Rely on "Industry Standard"

As Dr. Bea explains and as set forth above, different approaches may be used to define whether an entity is operating within an ALARP region: (1) a cost-benefit analysis; (2) an historical precedent analysis; and (3) a standard of care analysis. Report at 9. Dr. Bea used the first approach for his ALARP analysis here. Such an analysis, however, may be either (1) generic, in which the costs associated with a major operational failure are compared with the probability of that failure to identify operations that are within the "acceptable" region,[1] or (2) based on best practices within the industry.

For the latter analysis, industry standard considerations are necessary, as Dr. Bea testified at his deposition. For the former analysis, no such industry standard analysis is required.

Both methodologies are appropriate to define ALARP. Report at 9, note 34. As explained in section I.C below, Dr. Bea employed the generic, cost-benefit method here to conclude that BP's source control plan was not operating within ALARP as of April 20, 2010.[2] He explains that an analysis should include "quantified expressions of 'acceptable' combinations of the likelihoods (annual probabilities) and consequences (expressed in 2011 U.S. dollars excluding costs for losses of human life) of risks associated with a variety of offshore and onshore hazardous systems." Report at 10. If BP believes Dr. Bea should have used an industry standard rather than a generic cost-benefit analysis, that is an inquiry appropriate for cross-examination at trial, not support for exclusion of Dr. Bea's opinions under *Daubert*.

---

[1] See Report at 9, note 34.

[2] That Dr. Bea uses the generic approach makes sense. As a preliminary matter, Dr. Bea is not an expert in deepwater drilling source control technology, he did not have access to source control technology analyses of other Gulf of Mexico deepwater drilling operators; and BP's "do nothing" source control standard could not form the basis of an industry standard analysis.

### C. Dr. Bea's Report Contains a Cost-Benefit Analysis.

BP is just wrong that Dr. Bea did not perform a cost-benefit analysis. As explained above, Dr. Bea's ALARP analysis is based on a generic cost-benefit analysis that is fully developed in his report. *See, e.g.*, Report at 10-12, 17-22. For example, using BP's estimate of costs in excess of $10 billion associated with a deepwater blowout, Dr. Bea opines that "the 'acceptable' (As Low As Reasonably Practicable) annual probability of such events are indicated to be less than $1 \times 10^{-6}$ (1/1 million) per year." Report at 11. Dr. Bea explains that this risk analysis is based in part on the fact that deepwater wells are capable of producing substantially greater discharges – in the range of 100,000 to 300,000 barrels of oil per day – than are shallower wells, and that a relief well designed to stem such flow could take between 100 and 150 days to successfully drill. Report at 11. Dr. Bea concludes that "[t]he higher consequences of an uncontrolled deepwater blowout therefore require substantially lower likelihoods to be deemed an acceptable risk." *Id.* Again, if BP believes Dr. Bea did not perform the analysis adequately or should have applied a different cost-benefit analysis to the circumstances here, it may cross-examine him on those issues at trial. But it does not render Dr. Bea's opinions inadmissible under *Daubert.*

## II.   Dr. Bea Does Not Proffer Legal Conclusions in his Report

These issues are briefed in the Aligned Parties' Opposition to BP's Motion *In Limine* to Bar Fact or Opinion Testimony on Issues of Law from Phase II [Doc. 11205], and are respectfully incorporated herein.

## III.   Dr. Bea's Phase 2 Opinions Do Not Overlap His Phase 1 Opinions.

Finally, there is no duplication of opinions in Dr. Bea's Phase 2 and Phase 1 reports. BP's argument to the contrary reflects a fundamental misunderstanding of the analysis

underlying ALARP.

As explained above, process safety management has two connected parts: prevention (management of likelihoods of failure) and mitigation (management of consequences of failure). Phase 1 addressed prevention. Phase 2 addresses mitigation. In developing ALARP's acceptable risk analysis for *mitigation*, Dr. Bea necessarily must include a component for "likelihood of failure" to evaluate an acceptable level of "consequences of failure." By way of example, when the likelihhood of failure is reduced, a higher failure consequence could be tolerated to remain within ALARP. Conversely, when the likelihood of failure increases, a lower failure consequence would be necessary to stay within ALARP. Thus, Dr. Bea's reference to a risk of failure is solely in regard to his assessments as to what BP was required to do to prepare for mitigation of a major blowout at the Macondo Well—the subject matter of Phase 2—and is not related to Phase 1 matters.

BP also cites to Dr. Bea's reference to the Ixtoc I oil spill in 1979 as duplicative of his Phase One opinions. But Dr. Bea references the Ixtoc I spill in his Phase Two report as evidence of BP's knowledge of the consequences of a systems failure, including the length of time it takes between the event that triggers an oil spill and the successful drilling and interception of a relief well. That is not duplicative of Phase One. BP's motion to exclude Dr. Bea's opinions as overlapping should be denied.

### Conclusion

For the above and foregoing reasons, BP's motion to *in limine* to exclude certain opinions and testimony of Dr. Robert Bea should be denied.

Dated: September 3, 2013

Respectfully submitted,

| | |
|---|---|
| /s/   Stephen J. Herman | /s/ James Parkerson Roy |
| **Stephen J. Herman**, La. Bar No. 23129 | **James Parkerson Roy**, La. Bar No.11511 |
| **HERMAN HERMAN & KATZ LLC** | **DOMENGEAUX WRIGHT ROY & EDWARDS LLC** |
| 820 O'Keefe Avenue | 556 Jefferson Street, Suite 500 |
| New Orleans, Louisiana 70113 | Lafayette, Louisiana 70501 |
| Telephone: (504) 581-4892 | Telephone: (337) 233-3033 |
| Fax No. (504) 569-6024 | Fax No. (337) 233-2796 |
| E-Mail: sherman@hhklawfirm.com | E-Mail: jimr@wrightroy.com |
| *Plaintiffs Liaison Counsel* | *Plaintiffs Liaison Counsel* |

**ON BEHALF OF THE ALIGNED PARTIES.**

### CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that the above and foregoing Memorandum will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pre-Trial Order No. 12, and that the foregoing will be electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, this 3rd day of September, 2013.

/s/ James Parkerson Roy and Stephen J. Herman