01-42989
PW/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | ) ) ) ) ) ) ) | MDL NO. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAG. JUDGE SHUSHAN |

# *CONFIDENTIAL*

## *WorldwideVIEW*™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Robert Glenn Bea, Ph.D.

JULY 22, 2013

# *COPY*



*Systems Technology for the Litigation World*

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing

**For U.S. & International Services
800 - 745 - 1101**

|       |    |                                                           |
|-------|----|-----------------------------------------------------------|
|       | 1  | narrow focus is likely to disappoint in                   |
|       | 2  | future situations.  The probability of any                |
|       | 3  | future deepwater event being similar in terms             |
|       | 4  | of tactical intervention procedures and                   |
| 11:44 | 5  | equipment is extremely small -- equipment                 |
|       | 6  | selection is extremely small.                             |
|       | 7  | Did I read that correctly?                                |
|       | 8  | A.   Yes.                                                 |
|       | 9  | Q.   Is it your understanding that                        |
| 11:44 | 10 | Wild Well Control specialists believe that                |
|       | 11 | they have to evaluate a particular situation              |
|       | 12 | and custom build equipment to it?                         |
|       | 13 | MS. GREENWALD:  Objection; form.                          |
|       | 14 | A.   No.                                                  |
| 11:45 | 15 | Q.   (BY MR. BENTSEN)  That is not                        |
|       | 16 | your understanding?                                       |
|       | 17 | A.   That's correct.                                      |
|       | 18 | Q.   Okay.  You had indicated that                        |
|       | 19 | someone at BP could have needed a capping                 |
| 11:45 | 20 | stack or an alternative BOP to be ALARP in                |
|       | 21 | this case, correct?                                       |
|       | 22 | MS. GREENWALD:  Objection; form.                          |
|       | 23 | A.   That's only one component in a                       |
|       | 24 | system to be ALARP.                                       |
| 11:45 | 25 | Q.   (BY MR. BENTSEN)  Okay.  And you                     |

```
11:45   1    didn't under- -- you didn't undertake any
        2    review of blowouts to determine the
        3    likelihood that the wells would be
        4    sufficiently vertical for any capping
        5    solutions, correct?
        6         MS. GREENWALD:  Objection; form.
        7         A.    No, I did not.  Your answer is
        8    your statement is correct.
        9         Q.    (BY MR. BENTSEN)  Okay.  And
11:45  10    according to Mr. Campbell, Historical
       11    experience with subsea well control events
       12    (the body of examples is statistically small)
       13    reveals the likelihood of being able to use
       14    the processes and equipment being compiled
11:46  15    most -- post-Macondo is unlikely, at best.
       16              Do you see that?
       17         A.    I see the sentence you just read
       18    correctly.
       19         Q.    Do you have any way to disagree
11:46  20    with Mr. Campbell?
       21         MS. GREENWALD:  Objection; form.
       22         A.    And your question is, do I have
       23    any way to disagree?
       24         Q.    (BY MR. BENTSEN)  I'll -- I'll
11:47  25    rephrase that, I'm sorry, because I think
```

|       |    |                                              |
|-------|----|----------------------------------------------|
|       | 1  | that was a poor question.                    |
|       | 2  | Do you have any basis on which               |
|       | 3  | to disagree with Mr. Campbell's assertion?   |
|       | 4  | A.    Yes.                                   |
| 11:47 | 5  | Q.    What is that?                          |
|       | 6  | A.    Well, here in the United States,       |
|       | 7  | we've mobilized industry-wide efforts, parts |
|       | 8  | of the system based on capping stack, parts  |
|       | 9  | of the system based on effective control     |
| 11:47 | 10 | equipment, parts of the system based on      |
|       | 11 | organizational, operational elements that are|
|       | 12 | provided to industry to rapidly abate an     |
|       | 13 | uncontrolled blowout, much like a fire       |
|       | 14 | station, fire engine is provided to a        |
| 11:48 | 15 | community to rapidly abate a fire in the     |
|       | 16 | community.                                   |
|       | 17 | And the industry group in the                |
|       | 18 | United Kingdom North Sea sector have done a  |
|       | 19 | similar thing.  And the industry in the      |
| 11:48 | 20 | Norwegian sector also has done a similar     |
|       | 21 | thing.                                       |
|       | 22 | So I'm finding these statements              |
|       | 23 | to be in direct conflict with the actions    |
|       | 24 | taken by industry groups in the sectors I    |
| 11:48 | 25 | cited.                                       |

```
         1           Q.      Okay.  So you're taking the fact
         2    that people built a capping stack to indicate
         3    that it will work in the future?
         4           MS. GREENWALD:  Objection; form.
11:48    5           A.      That it could work in the
         6    future.  That's -- that's a reason why the
         7    planning effort has to have multiple tools,
         8    approaches to handle the next unique
         9    condition.  So the breadth of the
11:49   10    preparations, extents of the preparations
        11    have to be broad enough to be able to address
        12    the breadth of the problem or problems they
        13    would see potentially in the future.
        14           Q.      (BY MR. BENTSEN)  Okay.  Let's
11:49   15    go to Tab 32.  This is the testimony of David
        16    Barnett of Wild Well Control.  Can you go to
        17    Page 333, please.  And I'll start at Line 17.
        18                   "Okay.  Okay.  Is this a view of
        19    Wild Well Control that each individual
11:50   20    blowout is likely to present different
        21    circumstances that would require a different
        22    response?
        23                   "ANSWER:  That's a general sense
        24    at Wild Well Control, yes.
11:50   25                   "Okay.
```

|  |  |
|---|---|
|  | 1 activating the BOP that is currently there, |
|  | 2 is there any other source control operation |
|  | 3 that could immediately contain the flow? |
|  | 4          MS. GREENWALD:  Objection; form. |
| 01:49 | 5          A.     The -- my difficulty in |
|  | 6 answering that question is the interpretation |
|  | 7 meaning of the word "immediately," meaning |
|  | 8 they want it fast and they want the best |
|  | 9 available and safest technology to be |
| 01:50 | 10 available to meet that requirement. |
|  | 11          Q.     (BY MR. BENTSEN)  So it's |
|  | 12 essentially as quick as possible; is that |
|  | 13 fair? |
|  | 14          MS. GREENWALD:  Objection; form. |
| 01:50 | 15          A.     That's a reasonable way to put |
|  | 16 it, with the introduction of the word |
|  | 17 "reasonably possible."  That's essentially |
|  | 18 what the ALARP process is attempting to |
|  | 19 define as being fit for purpose. |
| 01:50 | 20          Q.     (BY MR. BENTSEN)  Okay.  So, for |
|  | 21 example, if we had decided -- and I know that |
|  | 22 you haven't -- that a capping stack was what |
|  | 23 was going to be ALARP, even if that took |
|  | 24 several weeks to be installed, that would fit |
| 01:51 | 25 the -- the definitions and requirements that |

```
            1    we're talking about; is that fair?
            2         MS. GREENWALD:  Objection; form.
            3         A.    Potentially, yes.
            4         Q.    (BY MR. BENTSEN)  Okay.  Have
01:51       5    you read the Oil Pollution Act?
            6         A.    No.
            7         Q.    Okay.  Have you read the Outer
            8    Continental Shelf Leasing Act?
            9         A.    I don't recall.
01:51      10         Q.    Have you read 33 USC 1321?
           11         A.    I don't recall.
           12         Q.    Okay.  How about 30 CFR 250 in
           13    its entirety?
           14         A.    Yes.
01:51      15         Q.    Okay.  And 350 CFR 254?
           16         A.    Yes.
           17         Q.    Okay.  And I think we talked
           18    about this a little bit ago, but you agree
           19    that the MMS approved BP's Oil Spill Response
01:52      20    Plan as conforming with the appropriate
           21    regulations, correct?
           22         MS. GREENWALD:  Objection; form.
           23         A.    I'm only knowledgeable that the
           24    MMS representative approved the plan.
01:52      25         Q.    (BY MR. BENTSEN)  And are you
```

```
         1    have failed and that all dynamic and
         2    mechanical attempts to regain primary or
         3    secondary well control have been
         4    ineffective."
02:07    5             Did I read that correctly?
         6        MS. GREENWALD:  I think the witness is
         7    confused where you're reading from.
         8        MR. BENTSEN:  Sure.  I'm --
         9        MS. GREENWALD:  I'm just going to show
02:07   10    him.
        11        MR. BENTSEN:  I'm happy to read it
        12    again while you guys follow along.
        13        MS. GREENWALD:  He doesn't know where
        14    it is.  It's the third sentence in that first
02:07   15    paragraph.  I think he wants to read the
        16    first two before you read it out loud.
        17        MR. BENTSEN:  That's fair.
        18        A.    You read that correctly.
        19        Q.    (BY MR. BENTSEN)  So this is --
02:08   20    to the extent that it's a reliable document
        21    is indicating for surface capping and BP
        22    Alaska that capping is the best available
        23    technology after several other options have
        24    been ineffective?
02:08   25        A.    Yes.
```

```
                1          Q.    Okay.  And if you go to the very
                2    last sentence on that page.  Whenever you're
                3    ready.
                4          It says, The materials required
02:08           5    to execute typical -- typical mechanical
                6    control responses (junk shots, hot tapping,
                7    freezing, or crimping) are small enough that
                8    they can be quickly made available to remote
                9    locations, even by helicopter, if necessary.
02:09          10          Did I read that correctly?
               11          A.    Yes, sir.
               12          Q.    And since it identifies, for
               13    example, junk shots as a typical mechanical
               14    response, that would be a preferred option
02:09          15    over capping, according to this document?
               16          MS. GREENWALD:  Objection; form.
               17          A.    I can't conclude that from this
               18    sentence.
               19          Q.    (BY MR. BENTSEN)  The sentence
02:09          20    we just read said that inherent in the
               21    conclusion that capping was best available
               22    was that all other mechanical and dynamic
               23    options had failed.
               24          A.    Including capping; is that
02:09          25    correct?
```

|  |  |
|---|---|
| | 1   Q.   So as I read the sentence is |
| | 2   that they -- the document concludes capping |
| | 3   is a best available technology if the other |
| | 4   options have proved ineffective.  That's the |
| 02:09 | 5   last sentence we read. |
| | 6       MS. GREENWALD:  Are you asking a |
| | 7   question? |
| | 8       MR. BENTSEN:  You know what, we'll just |
| | 9   leave it.  The document will speak for |
| 02:09 | 10  itself. |
| | 11  Q.   (BY MR. BENTSEN)  Are you aware |
| | 12  that the capping stacks identified in this |
| | 13  document were not to be owned by BP, but by |
| | 14  service providers? |
| 02:09 | 15  A.   No, but I would conclude that |
| | 16  would be so because that's a normal practice. |
| | 17  Q.   So it's a standard industry |
| | 18  practice that a capping device would be |
| | 19  sourced from a service provider? |
| 02:10 | 20  A.   Correct. |
| | 21      MR. BENTSEN:  I think we can take a |
| | 22  break and we'll switch off and go from there. |
| | 23      MR. FOWKES:  I may ask some questions. |
| | 24      MS. GREENWALD:  Okay. |
| 02:10 | 25      MR. FOWKES:  We can move our binders |