UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig *Deepwater Horizon* in the Gulf of Mexico, on April 20, 2010 | MDL NO. 2179<br><br>SECTION J |
| This document applies to: *ALL CASES* | JUDGE BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

### THE ALIGNED PARTIES' OPPOSITION TO BP'S MOTION TO EXCLUDE CERTAIN OPINIONS OF DR. JOHN L. WILSON

A key issue in the Phase II source control trial is whether BP's lies about the flow rate – i.e., its repeated claims that the flow rate was just 5,000 BOPD – delayed the capping of the well. Dr. John Wilson, a Professor of Hydrology and former Chairman of the Department of Earth and Environmental Science at the New Mexico Institute of Mining and Technology, analyzed the internal modeling efforts of BP engineers during the Macondo response.

Dr. Wilson concluded that BP engineers generated a series of modeled flow rates, a significant majority of which were far higher than BP's public estimates of (at most) 5,000 BOPD, and that BP's models provided no basis for its claims that 5,000 BOPD was a "Most Likely Model" of the flow rate. Moreover, Dr. Wilson found that a BP contractor had modeled that a strategy recommended by BP known as the Top Kill would fail if the flow rate exceeded 15,000 BOPD, that a significant majority of BP's modeled flow rates were above 15,000 BOPD, and that real-time and post-Top Kill analysis by BP engineers and contractors found that the Top Kill indeed did fail because of the flow rate.

BP now seeks to exclude some of Dr. Wilson's opinions under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), arguing that they are irrelevant and unreliable. BP's motion should be denied for three reasons.

*First*, as this Court has repeatedly found, exclusion of expert testimony on *Daubert* grounds is inappropriate in a bench trial, where there is no jury for whom the trial judge must act as a gatekeeper.

*Second*, Dr. Wilson's technical analysis of documents reflecting BP engineers' reservoir and hydraulic modeling efforts is highly relevant and reflects far more than a simple "digest of documents and deposition transcripts." BP's Motion to Exclude Certain Opinions of Dr. John L. Wilson ("BP Mot.") at 3. Dr. Wilson describes the capabilities of BP's modelers, the inputs and parameters that were used in BP's modeling, and the results of those efforts. This is expert testimony, and his opinions will assist the Court in evaluating at least two key issues: (1) whether BP misrepresented and concealed material flow rate ranges; and (2) the impact of BP's flow rate modeling on the chances of success of BP's Top Kill source control strategy. BP itself has put the meaning, reliability, and importance of its internal flow rate modeling squarely at issue by submitting a flow rate modeling expert report of its own that purports to explain away the activities of BP's modelers.

*Third*, Dr. Wilson's opinions about BP's non-disclosures are reliable. BP's claims that Dr. Wilson did not examine all data exchanged between BP and the Government and that he speculates about BP's state of mind mischaracterize Dr. Wilson's views and, in any event, are properly the subject of cross-examination at trial and not a basis for exclusion. Dr. Wilson explains how and why what BP indisputably *did* say to the government – its public flow rate estimate of up to 5,000 BOPD – lacked a scientific basis. This is quintessential expert testimony.

2

BP's *Daubert* motion should be denied.

## I. *Daubert* Challenges Are Inappropriate for Bench Trials

BP's motion challenges Dr. Wilson's opinions based on the relevance and reliability requirements articulated by the Supreme Court in *Daubert*. That case established a "gatekeeping obligation" for the trial judge with regard to expert testimony, requiring the judge "to decide whether [a] particular expert ha[s] sufficient specialized knowledge *to assist the jurors* in deciding the particular issues in the case." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999) (emphasis added and citation omitted).

Because the purpose of *Daubert* challenges is so closely tied to the separate roles of judge and jury, the Fifth Circuit has observed that the gatekeeping obligation is not as necessary when a judge, not a jury, is making the factual findings in a case. *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) ("Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in the place of a jury.").

This Court has agreed. *See Deville v. Comar Marine Corp.*, Civil Action No. 08-4104, 2009 WL 1870896 (E.D. La. June 25, 2009) (Barbier, J.) ("Given that this case is a bench trial, and thus that the objectives of *Daubert*, upon which Defendants' motion to exclude is premised, are no longer implicated, the Court finds that the motion to exclude expert testimony should be denied at this time."); *Thompson v. Rowan Companies, Inc.*, Civil Action No. 06-3218, 2007 WL 724646, *1 (E.D. La. Mar. 6, 2007) (Barbier, J.) (same); *Jordan v. Dixie Pump and Supply, Inc.*, Civil Action No. 05-4027, 2006 WL 3241366 (E.D. La. Nov. 7, 2006) (Barbier, J.) (same); *Albarado v. Chouest Offshore, LLC*, No. Civ. A. 02-3504, 2003 WL 22204538 (E.D. La. Sep. 5, 2003) (Barbier, J.) (same).

The Court should not resolve disputes about the soundness of Dr. Wilson's opinions in a *Daubert* proceeding. As the Supreme Court in *Daubert* observed, challenges to the validity of an

3

expert's opinion should generally take the form of "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." 509 U.S. at 596. This is especially true here, where BP is not arguing that Dr. Wilson is unqualified or that his testimony is misleading in ways that cannot be demonstrated during trial.

In short, the Court should permit Dr. Wilson to offer his opinions, allow BP to cross-examine him with any contrary evidence, and determine the relevance and reliability of those opinions at trial.

**II.     Dr. Wilson's Opinions Are Relevant**

To begin with, BP's motion concedes that it is not challenging the admissibility of Dr. Wilson's opinion that BP had the ability to model flow rates from the Macondo well. BP Mot. at 1 n.1.[1] In support of this admittedly admissible opinion, Dr. Wilson describes evidence that BP *in fact* was modeling flow rates during the time it now claims it lacked the ability to do so. That BP *in fact* was generating such flow rate estimates during this time period is compelling evidence that it had *the ability* to do so, as Dr. Wilson opines. Dr. Wilson is not only entitled to rely on such "facts and data" as the basis of his opinion, but Rule 26 of the Federal Rules *requires* him to describe that basis in his report. Fed. R. Civ. P. 26(a)(2)(B) ("report must contain: (i) a complete statement of all opinions the witness will express *and the basis and reasons for them*; [and] (ii) *the facts or data* considered by the witness in forming them …" (emphasis added)). For this reason alone, BP's motion should be denied.

---

[1] In fact, Dr. Wilson does not express the opinion that "BP had sufficient information about the Macondo Well and other data to estimate the actual daily flow rate from the Well," as BP states, but rather that BP had sufficient information and available tools to come up with scientifically sound *estimates* of the flow rate. Wilson Rpt. at 11.

4

Moreover, contrary to BP's "relevance" argument, Dr. Wilson's opinions are highly relevant to numerous issues in dispute and should aid the Court's evaluation of BP's internal modeling efforts during the response. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and … the fact is of consequence in determining the action." Fed. R. Evid. 401. Dr. Wilson's expert opinions easily satisfy this test for relevance and "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

One of the key issues for the Source Control segment of the trial is whether – as Transocean alleges in its Second Amended Answer – "BP's acts of fraud, misrepresentation, omission, and its crimes in connection with efforts to estimate the flow rate and control the source of the flow . . . were a superseding and intervening cause of the alleged harms." Rec. Doc. 8803, at ¶ 20. In support of this defense, Transocean specifically plead the following facts, all of which are the subjects of Dr. Wilson's expert opinions:

- BP also knew that its [flow rate] misrepresentations involved information that was material, indeed critical, to source control decision-making," *id.* ¶ 98;

- "BP's April 28-30, 2010 representations that its range of flow rate estimates was between 1,000 and 5,000 bopd was false and misleading and omitted material information within BP's possession," *id.* ¶ 29;

- "When BP represented to Admiral Landry, Admiral Allen, and Herbst on May 10 that 5,000 bopd was BP's "Most Likely Model" and was the "currently estimated rate," BP was aware of, but failed to disclose the flow rate information … that BP had in its possession by the end of April 2010 … and that it had obtained between May 1 and May 10, 2010," *id.* ¶ 48;

- "BP knew . . . that the top kill's chances of success were poor or nonexistent," *id.* ¶ 114; and

- "BP knew that excessive flow rate was a plausible explanation for the top kill's failure because, as explained above, BP was well aware going into the top kill that the dynamic kill could not succeed if flow rates were above 15,000 barrels of oil per day and flow rates likely were above 15,000 barrels per day." *id.* ¶ 146.

5

Similarly, HESI alleges that "critical time was wasted employing techniques, such as … the Top Kill, that were doomed to fail if the flow rates were significantly higher than was represented by BP."[2]

Dr. Wilson's opinions bear directly upon each of the above facts.  For example, Dr. Wilson's testimony that "[a] significant majority of modeled flow rates were much greater than … the 5,000 BOPD mentioned in their May 10, 2010 letter to Admiral Landry" tends to increase the likelihood that BP possessed flow rate estimates that were greater than BP's public estimate of 5,000 BOPD.  *See* Expert Report of Dr. John L. Wilson ("Wilson Rpt.") at 3 (May 1, 2013).  Similarly, Dr. Wilson's opinion that modeling performed by BP contractor Add Energy "demonstrated that for well flow rates at 15,000 BOPD or higher, the dynamic kill would fail" makes it more likely that BP knew that the dynamic kill would not succeed if the flow rate was above 15,000 BOPD.  *See* Wilson Rpt. at 33.  Finally, Dr. Wilson's finding that "the 15,000 BOPD threshold was below a significant majority of well flow rates modeled by BP engineers and contractors" is evidence that BP knew the Top Kill was likely to fail.  *See* Wilson Rpt. at 34.

The fact that BP has offered its own 30(b)(6) witness and expert on flow rates, Dr. Adam Ballard, further confirms that Dr. Wilson's opinions go to facts that are in dispute and of consequence in this action.

Dr. Ballard and Dr. Wilson offer diametrically opposed opinions regarding the nature and significance of BP's modeling efforts.  Although BP has pled guilty to having "multiple internal documents with flow rate estimates that were significantly greater than 5,000 BOPD that it did not share with the Unified Command" (TREX-52673.17), Dr. Ballard has testified that BP

---

[2] Halliburton Energy Services, Inc.'s Omnibus Supplemental Answer Asserting Affirmative Defense Of Superseding Cause, Rec. Doc. 8809, at ¶ 6.

6

actually did not perform *any* hydraulic modeling to generate flow rate estimates between April 28 and May 27, 2010. *See, e.g.*, Ballard 30(b)(6) Dep. at 488:17-489:5; Ballard Expert Dep. at 237:20-238:14. Dr. Wilson's report details how BP did in fact conduct such hydraulic modeling, and that it yielded a range of possible flow rates as high as 96,000 BOPD, consistent with BP's guilty plea. Wilson Rpt. at 22; TREX-52673.17 (Plea Agreement: "BP … withheld information and documents relating to multiple flow-rate estimates prepared by BP engineers that showed flow rates far higher than 5,000 BOPD, including as high as 96,000 BOPD").

In another example, Dr. Wilson analyzes a BP engineer's email with the subject line, "Best estimate," containing a model that correlated a 1" diameter hole in the BOP with flow rates of over 20,000 BOPD. Dr. Wilson opines that "by triangulating [pressure, temperature, and velocity], . . . a 'best estimate' of flow rate could be obtained." Wilson Rpt. at 20. Ballard's rebuttal report, in turn, attempts to minimize the importance of this modeling effort by insisting that "[c]ontrary to Dr. Wilson's suggestion" these results are not a "reliable prediction of flow from the Well" because they showed no "corroboration between the different methods of estimating flow." Rebuttal Expert Report of Adam L. Ballard ("Ballard Rpt.") at 15 n.32.

That these two experts have radically different perspectives on the nature and purpose of BP's modeling, and the conclusions that could be drawn from it, demonstrates both that Dr. Wilson's opinions go to an issue in dispute and that expert opinion testimony will assist the Court in determining what BP knew about flow rates and when BP knew it.

BP's motion vastly understates the expertise that Dr. Wilson brought to bear in analyzing BP's modeling efforts. Dr. Wilson drew on his 40 years of engineering and flow modeling experience to analyze documents describing BP's modeling and concluded:

1. BP modeled the flow rate from the Macondo Well throughout spill response efforts using "conventional petroleum reservoir and well modeling software

7

packages" and "proprietary data" and inputs such as "reservoir and fluid properties, reservoir extent, thickness and/or productivity index ..., well and reservoir connectivity …, well/BOP/LMRP/riser architecture, and obstructions to flow or chokes in the BOP and riser";

2. BP's models yielded flow rate ranges, a significant majority of which exceeded BP's public estimate of 5,000 BOPD;

3. A significant majority of BP's modeled flow rate ranges also exceeded the 15,000 BOPD threshold for a successful dynamic kill; and

4. BP's models suggested that a high flow rate explained the Top Kill's failure.

It is well settled that expert analysis of technical documents related to an alleged fraud, like that performed by Dr. Wilson, is a proper subject for expert opinion testimony. *See, e.g.*, *United States v. Yoon*, 128 F.3d 515, 528 (7th Cir. 1997) (holding that it was permissible for an expert witness to examine bank records and offer the opinion that they revealed a fraudulent check-kiting scheme); *Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 141, 144 (S.D.N.Y. 2003) (authorizing testimony of a "forensic accountant" who rendered an opinion in support of a fraudulent conveyance claim over an argument that "the trier of fact does not need [the witness's] testimony to understand the accounts receivable at issue"); *ProtoComm Corp. v. Novell Advanced Servs., Inc.*, 171 F. Supp. 2d 473, 478-79 (E.D. Pa. 2001) (allowing testimony of public accountant who analyzed records to conclude that a transaction was fraudulent).

Here, Dr. Wilson is essentially acting as a "forensic accountant" of BP's internal technical communications to show that BP defrauded the government. BP may argue that Dr. Wilson relied on "the wrong documents," but that is an issue for trial, not a *Daubert* motion. *See Wechsler*, 381 F. Supp. 2d at 144.

BP's legal authorities are inapposite. BP relies heavily on *Tassin v. Sears, Roebuck & Co.*, 946 F. Supp. 1241, 1252-53 (M.D. La. 1996), in which a court held that an expert's review of a particular set of documents that were "not technical and do not require expert engineering

8

testimony to make them comprehensible to a jury" was not the subject of proper expert opinion testimony. Nothing in *Tassin* purports to bar experts from analyzing documents where, as here, the documents are technical in nature and the expert's education and background will "help the trier of fact to understand the evidence." Fed. R. Evid. 702(a).

In contrast to the expert testimony rejected in *Tassin*, Dr. Wilson's report here analyzes highly technical modeling efforts and explains, among other things, the software packages BP used and their respective capabilities, Wilson Rpt. at 6-8; the parameters and inputs they used, *id.* at 10; and the ranges of flow rate estimates generated by the resulting models, *id.* at 11-12.

In sum, Dr. Wilson's opinions are relevant to multiple issues in this case, will assist the Court's understanding of BP's internal modeling efforts, and should be admitted in full.

### III. Dr. Wilson's Opinions Are Reliable

#### A. Dr. Wilson's Opinions Regarding The Contrast Between BP's Public Estimate Of 5,000 BOPD And Its Internal Models Are Reliable.

BP asserts that Dr. Wilson "cannot opine with any reliability on the question of what information BP provided to whom, and when," because he "acknowledged in his deposition that he only reviewed certain BP documents and some deposition testimony," and that he "did not look at what *data* BP shared with the government . . . ." BP Mot. at 4 (emphasis added).

BP's argument is a red herring that deliberately conflates two separate issues. Dr. Wilson's report focuses on *BP's internal flow rate estimates*, and whether those *estimates* were provided to Government officials. BP's counter-argument, proffered by its rebuttal expert Dr. Ballard, is that BP provided to the Government "data" – such as pressure gauge readings, temperature readings, and fluid property testing results – that BP contends the Government could have used to model its own flow rate estimates. *See* Ballard Rpt. at 10.

9

In arguing that Dr. Wilson did not examine the *data* that BP shared with the Government, BP misses the point of Dr. Wilson's report. Dr. Wilson does not opine on what "information" or "data" was provided to government officials; he opines on the nature, type, and significance of flow rate *estimates* that BP has admitted (in its guilty plea) it failed to disclose.

Regardless, the claim that an expert failed to review all relevant evidence is not a sufficient basis for exclusion on *Daubert* grounds. *See SEC v. Johnson*, 525 F. Supp. 2d 70, 76 (D.D.C. 2007) ("Failing to review all relevant evidence is not a ground for excluding [expert] testimony; rather, it provides subject matter for cross-examination."). The reason is straightforward – BP is free to cross-examine Dr. Wilson at trial by introducing documents that it believes are relevant to his analysis. *See Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility."); *see also United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996) ("[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.").

Contrary to BP's claims, Dr. Wilson's opinions regarding the differences between BP's internal modeling results and its public flow rate estimate are highly reliable. Dr. Wilson compares representations that BP indisputably made to government officials – representations that defended and reinforced BP's estimate of up to 5,000 BOPD – with the flow rate modeling results that BP was generating at the time.

For example, Dr. Wilson concludes that, at the time BP presented 5,000 BOPD to the top federal response official as the "Most Likely Model" (TREX-09155), BP in fact had "no scientific basis for representing 5,000 BOPD as the 'most likely model.'" Wilson Rpt. at 28. In support of this conclusion, Dr. Wilson references evidence that BP concealed flow rate

10

information, such as BP Vice President Richard Lynch's warning that "we remain in a position where no flow related information can be released internally or externally." *See* Wilson Rpt. at 31 (quoting TREX-09475). Lynch's directive and others like it add support to Dr. Wilson's finding that there was a stark difference between BP's internal modeling and BP's external representations.

### B. Dr. Wilson's Opinions Regarding What Results BP's Flow Rate Modeling Generated Also Are Reliable.

BP also argues that Dr. Wilson's opinions constitute "unreliable speculation" because, in BP's view, Dr. Wilson is attempting to opine on what BP's state of mind was at the time. BP Mot. at 7-8 (characterizing Dr. Wilson's opinion as being that "BP 'knew' the flow rate was higher than 15,000 barrels of oil per day before the Top Kill procedure").

BP's argument once again mischaracterizes Dr. Wilson's opinion. Dr. Wilson employs his significant expertise in modeling and analysis to opine on what inferences about the flow rate were reasonable to draw in light of BP's modeling results. Dr. Wilson's opinion in this regard is that "5,000 BOPD did not represent a reasonable estimate of flow to use in planning source control operations." Wilson Rpt. at 26. This is an expert opinion based on Dr. Wilson's expertise in hydraulic modeling, and it is plainly proper. *See* Fed. R. Evid. 702(a) (allowing "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue.").

With respect to the Top Kill source control operation specifically, Dr. Wilson also opined that "[t]he 15,000 BOPD threshold [for a successful Top Kill] was below a significant majority of well flow rates modeled by BP engineers and contractors." Wilson Rpt. at 34. Taken together with evidence that Halliburton employees, only a few days before the Top Kill, informed BP that that their own modeling based on a *measured* temperature could not support flow rates of *below*

11

*30,000 BOPD*, Dr. Wilson concludes that "BP knew or should have known that the flow rate from the well was higher than a 15,000 BOPD threshold above which the dynamic kill was likely to fail." Wilson Rpt. at 34.  This opinion relies not on a conclusion of what BP's state of mind was, but instead on Dr. Wilson's analysis of the results of BP's technical modeling efforts and what BP *should have known* based on that data.

BP argues that courts generally exclude opinions that "purport to opine on a corporation or its employees' state of mind" and that Dr. Wilson attempts to opine on what BP "knew" at the time.  BP Mot. at 8 (citing cases).  But BP's quotation omits a critical phrase from Dr. Wilson's opinion.  What Dr. Wilson in fact opines is not that BP knew, but that BP "knew *or should have known*" of flow rates above 5,000 BOPD and 15,000 BOPD and that the dynamic kill would likely fail.  *See, e.g.* Wilson Rpt. at 3, 4, 33, 34 (emphasis added).  This is not speculation, but a fair summary of Dr. Wilson's opinions that the modeling performed by BP engineers and contractors had found flow rates above BP's public estimate and the threshold for a successful dynamic kill.

## IV.   Conclusion

For the reasons above, the Aligned Parties respectfully request that the Court DENY BP's Motion to Exclude Certain Opinions of Dr. John L. Wilson.

DATED:  September 3, 2013

By: /s/ Brad D. Brian
Brad D. Brian
Michael R. Doyen
Daniel B. Levin
Susan E. Nash
MUNGER TOLLES & OLSEN, LLP
355 So. Grand Avenue, 35th Floor
Los Angeles, CA  90071
Tel: (213) 683-9100

Respectfully submitted,

By: /s/ Steven L. Roberts
Steven L. Roberts
Rachel Giesber Clingman
Sean Jordan
SUTHERLAND ASBILL & BRENNAN LLP
1001 Fannin Street, Suite 3700
Houston, TX  77002
Tel: (713) 4710-6100
Fax: (713) 354-1301

| | |
|---|---|
| Fax: (213) 683-5180<br>Email:  brad.brian@mto.com<br>        michael.doyen@mto.com<br>        daniel.levin@mto.com<br>        susan.nash@mto.com | Email:  steven.roberts@sutherland.com<br>        rachel.clingman@sutherland.com<br>        sean.jordan@sutherland.com |
| John M. Elsley<br>ROYSTON, RAYZOR, VICKERY & WILLIAMS LLP<br>711 Louisiana Street, Suite 500<br>Houston, TX  77002<br>Tel: (713) 224-8380 | By: /s/ Kerry J. Miller<br>Kerry J. Miller<br>FRILOT, LLC<br>1100 Poydras Street, Suite 3800<br>New Orleans, LA  70163<br>Tel: (504) 599-8194<br>Fax: (504) 599-8154<br>Email:  kmiller@frilot.com |

**Counsel for Defendants Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH.**

| | |
|---|---|
| Donald E. Godwin<br>*Attorney-in-charge*<br>State Bar No. 08056500<br>Don.Godwin@GodwinLewis.com<br>Renaissance Tower<br>1201 Elm, Suite 1700<br>Dallas, Texas 75270-2041<br>Telephone: (214) 939-4400<br>Facsimile: (214) 760-7332 | Bruce W. Bowman, Jr.<br>State Bar No. 02752000<br>Bruce.Bowman@GodwinLewis.com<br>Renaissance Tower<br>1201 Elm, Suite 1700<br>Dallas, Texas 75270-2041<br>Telephone: (214) 939-4400<br>Facsimile: (214) 760-7332 |
| Jenny L. Martinez<br>State Bar No. 24013109<br>Jenny.Martinez@GodwinLewis.com<br>Renaissance Tower<br>1201 Elm, Suite 1700<br>Dallas, Texas 75270-2041<br>Telephone: (214) 939-4400<br>Facsimile: (214) 760-7332 | Floyd R. Hartley, Jr.<br>State Bar No. 00798242<br>Floyd.Hartley@GodwinLewis.com<br>Renaissance Tower<br>1201 Elm, Suite 1700<br>Dallas, Texas 75270-2041<br>Telephone: (214) 939-4400<br>Facsimile: (214) 760-7332 |
| Gavin E. Hill<br>State Bar No. 00796756<br>Gavin.Hill@GodwinLewis.com<br>Renaissance Tower<br>1201 Elm, Suite 1700<br>Dallas, Texas 75270-2041<br>Telephone: (214) 939-4400<br>Facsimile: (214) 760-7332 | R. Alan York<br>State Bar No. 22167500<br>Alan.York@GodwinLewis.com<br>1331 Lamar, Suite 1665<br>Houston, Texas 77010<br>Telephone: 713.595.8300<br>Facsimile: 713.425.7594 |

| | |
|---|---|
| Jerry C. von Sternberg<br>State Bar No. 20618150<br>Jerry.VonSternberg@GodwinLewis.com<br>1331 Lamar, Suite 1665<br>Houston, Texas 77010<br>Telephone: 713.595.8300<br>Facsimile: 713.425.7594 | Misty Hataway-Cone<br>State Bar No. 24032277<br>Misty.Cone@GodwinLewis.com<br>1331 Lamar, Suite 1665<br>Houston, Texas 77010<br>Telephone: 713.595.8300<br>Facsimile: 713.425.7594 |

**Attorneys for Defendant Halliburton Energy Services, Inc.**

| | |
|---|---|
| Stephen J. Herman, La. Bar No. 23129<br>HERMAN HERMAN & KATZ LLC<br>820 O'Keefe Avenue<br>New Orleans, Louisiana 70113<br>Telephone: (504) 581-4892<br>Fax. No. (504) 569-6024<br>Email: sherman@hhklawfirm.com | James Parkerson Roy, La. Bar No.11511<br>DOMENGEAUX WRIGHT ROY<br>& EDWARDS, LLC<br>556 Jefferson Street, Suite 500<br>Lafayette, Louisiana 70501<br>Telephone: (337) 233-3033<br>Fax No. (337) 233-2796<br>E-Mail: jimr@wrightroy.com |

**Plaintiffs Liaison Counsel**

LUTHER J. STRANGE
*Attorney General*
COREY L. MAZE
*Special Deputy Attorney General*
WINFIELD J. SINCLAIR
*Assistant Attorney General*
Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36130
Phone:  (334) 242-7300
Fax:  (334) 242-4891
Email: lstrange@ago.state.al.us
cmaze@ago.state.al.us
wsinclair@ago.state.al.us

**Attorneys for the State of Alabama**

| | |
|---|---|
| James D. "Buddy" Caldwell<br>*Louisiana Attorney General*<br>James Trey Phillips | Allan Kanner<br>Elizabeth B. Petersen<br>Douglas R. Kraus |

14

| | |
|---|---|
| *First Assistant Attorney General* | Kanner & Whiteley, L.L.C. |
| Megan K. Terrell | 701 Camp Street |
| *Assistant Attorney General* | New Orleans, LA 70130 |
| 1885 N. Third Street | Telephone: (504) 524-5777 |
| Baton Rouge, LA 70802 | Facsimile: (504) 524-5763 |
| Telephone: (225) 326-6079 | E-Mail: a.kanner@kanner-law.com |

**Attorneys for the State of Louisiana**

**CERTIFICATE OF SERVICE**

I hereby certify that on September 3, 2013, I electronically filed a PDF version of this document with the Court's CM/ECF system and service on all counsel of record by using the LexisNexis File & Serve, in accordance with Pretrial Order No. 12 which will send a notice of filing to all counsel accepting electronic notice.

                                                         /s/ Kerry J. Miller_____
                                                         Kerry J. Miller