UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179<br><br>SECTION: J |
| This Document Relates To: All Actions | : : | JUDGE BARBIER<br>MAGISTRATE JUDGE |
| ……………………………………………... | : | SHUSHAN |

**BP AND ANADARKO'S MEMORANDUM IN OPPOSITION TO
THE UNITED STATES' MOTION TO EXCLUDE CERTAIN TESTIMONY OF
DR. CURTIS WHITSON AS TO PURE QUESTION OF LAW**

Dr. Curtis Whitson, BP's fluid phase behavior expert, is prepared to opine on the fluid properties of the Macondo reservoir hydrocarbons. As part of his testimony, Dr. Whitson will provide scientific opinions on issues related to converting volumes of oil released from the reservoir (at high temperatures and pressures) to equivalent volumes at the "stock tank" conditions (of approximately sea-level pressure and 60 degrees Fahrenheit) used for purposes of computing a Clean Water Act penalty. Dr. Whitson does not offer a legal opinion on the meaning of a "barrel" of oil for purposes of the Clean Water Act at any point in his testimony.

With this motion, the United States attempts selectively to exclude science that poses problems for its case — namely, any science producing a calculation of barrels spilled that is not to its liking. Most importantly, the United States mischaracterizes Dr. Whitson's "ocean separator" model. The United States claims Dr. Whitson's model presents computations and predictions about the solubility "dissolved *oil*," U.S. Mem. *passim* (emphasis added), when in fact the dissolved hydrocarbons described by the model are not oil, but the gaseous components of the hydrocarbon fluid mixture discharged into the Gulf. The United States' motion inexplicably presupposes that the Court will include these light, gaseous hydrocarbons in its

calculation of the number of stock tank barrels *of oil* for purposes of establishing a Clean Water Act penalty.

At the end of the day, the United States may choose to contend, after all evidence is in, that the Court ought to ignore the solubility of gaseous portion of the hydrocarbon discharge or other evidence presented at trial. But a *Daubert* motion is not a vehicle for truncating scientific discussion. Dr. Whitson appropriately offers scientific opinions on what conditions the spilled fluid did and did not encounter in the Gulf of Mexico. Those opinions are scientific, not legal, in character. It will be up to the Court to determine the legal importance of the opinions (if any) after trial.

## BACKGROUND

The parties in the case agree that a barrel of oil for purposes of establishing Clean Water Act penalties should be measured at so-called stock tank conditions of approximately sea-level pressure and 60 degrees Fahrenheit. *See* 33 U.S.C. § 1321(a)(13) (CWA § 311). The volume of spilled oil for purposes of the Quantification trial segment will therefore be measured in stock tank barrels of oil ("STB") — that is, barrels of liquid oil at stock tank conditions. U.S. Mem. at 2 ("[S]tock tank barrels (STB) [is] the unit by which civil penalties are assessed under the Clean Water Act.").

### A.   Stock Tank Oil Depends on the Separation Process.

It is equally undisputed that the mixture of hydrocarbons released into the Gulf during the Macondo spill experienced significant changes in volume in going from the high temperature and high pressure conditions in the Macondo reservoir to stock tank conditions. As a result of the high temperatures and pressures in the Macondo reservoir, the hydrocarbon fluid mixture in the reservoir consists of components that exist as gas, as well as other components that exist as

liquid, at stock tank conditions. Accordingly, as the temperature and pressure of the hydrocarbon fluid mixture decrease, distinct oil and gas phases emerge.

For any given amount of fluid in the underground reservoir, less liquid oil will exist at stock tank conditions. This "shrinkage" occurs primarily because gas evolves out from liquid oil. Here, for instance, the relevant change in temperature and pressure conditions involves cooling the fluid mixture from its reservoir temperature of approximately 240 degrees Fahrenheit to stock tank conditions of 60 degrees, as well as a drop in the pressure from the reservoir conditions in the range of approximately 10,400 to 11,800 psi all the way down to stock tank conditions of approximately 15 psi found at sea level.

Importantly, the ultimate number of stock tank barrels left depends on the specific "separation process" — the thermodynamic temperature and pressure "path" taken as the fluid both cools and becomes subject to lower pressures. Science has established — conclusively, but somewhat unexpectedly — that the amount of the hydrocarbon mixture that remains as liquid oil after the fluid reaches stock tank conditions depends critically on the temperature and pressure points at which the gas separates from the liquid oil. *E.g.*, Ex. 1, Zick Initial Report at 16; Ex. 2, Whitson Report at 16. The amount of shrinkage that occurs for a given mixture of oil and gas thus depends on the "stages" at which gas and liquid oil separate from one another.

BP/Anadarko and United States experts have analyzed the effect of using several different separation processes on the final number of stock tank barrels. These separation processes include the following:

- the "single-stage flash" method, in which the gas and liquid oil are separated from one another ("by flashing") only once at the final stage (namely, stock tank conditions);

- two "ocean separator" methods — one modeled by Dr. Whitson and the other by United States expert Dr. Aaron Zick — that attempt to model the actual historical separation of the spilled oil and gas as the hydrocarbon fluid mixture rose through the Gulf of Mexico; and

3

- a "four-stage flash" method, discussed and later abandoned by United States expert Dr. Zick, in which gas and liquid oil are separated at four defined (and hypothetical) stages that could have been used in a (hypothetical) oil production process if the oil had been produced in the ordinary course of business instead of being spilled into the Gulf.

- a "differential liberation" process that is similar to the four-stage flash, but with different separation conditions.

BP/Anadarko and United States experts offer opinions about the effect on the ultimate volume of oil at stock tank conditions of applying analytical methods based on each of these processes.

### B. Single-Stage Flash Separation is the Right CWA Separation Process.

The BP/Anadarko experts who present opinions that express a quantity of oil in stock tank barrels use an industry-standard single-stage flash separator process. *E.g.*, Ex. 3, Blunt Report at 27. As noted above, the "single-stage flash" method assumes that the gas and liquid oil mixture stay in contact with one another until the gas is separated ("flashed") at the final, stock tank conditions. Because it is the only unambiguous thermodynamic path between the reservoir and stock tank conditions, Ex. 4, Blunt Dep. Tr. at 282:5–13, even the United States' expert has agreed that this is the simplest conversion method that can be used. Ex. 1 (Zick Initial Report at 2, 4); Ex. 5 (Zick Rebuttal Report at 14); Ex. 6 (Zick Dep. Tr. at 235:16–20). The single-stage flash method does not depend on arbitrary or imprecise decisions about additional separation stages. It does not depend on, or produce varying results based on, the sea depth or temperature of the exit point where oil was spilled. A single-stage flash instead calculates an amount of oil by assuming that the relevant hydrocarbon mixture remained together until the gas was separated all at once in a single "flash" at stock tank conditions. Importantly, volumes calculated using the single-stage flash separation process happen to be the same as those calculated using a Dr. Whitson's ocean-separator method. Ex. 2, Whitson Report at 10, 18, 31-32; *see also infra* Section D.

This Court will ultimately determine which conversion method is appropriate. BP and Anadarko will show at the appropriate time that a simple, industry-standard, single-stage flash separator process is the best stock-tank-barrel counting method for purposes of computing Clean Water Act penalties.

C. **United States Flow Estimates Employ Other Conversion Methods.**

Notwithstanding that an industry-standard single-stage conversion calculation should be used to calculate stock tank barrels in this case, United States experts have attempted to inject other conversion methods into the discussion for purposes of inflating (artificially) the size of the spill.

As noted above, United States expert Dr. Zick's initial expert report discussed a "four-stage flash" method, one he later abandoned, in which gas and liquid oil are separated from one another at four defined (purely hypothetical) stages that might have been used in a (hypothetical) oil production process if this oil had been produced in the ordinary course, not spilled into the Gulf. BP/Anadarko expert Dr. Whitson responded with an "ocean separator" model. The point of this model was to account for the actual historical separation process of spilled hydrocarbons under the conditions experienced by the hydrocarbon fluid mixture as it rose through the Gulf of Mexico. With this model, Dr. Whitson demonstrated that using a (historically accurate) separation method tends to give a very similar conversion result as using a single-stage flash method. Ex. 2, Whitson Report at 9-10, 18, 31-32; *see infra* Section D.

Accordingly, Dr. Whitson's analysis confirms that whatever legal approach the Court chooses, the end result of converting to stock tank barrels of oil under the CWA should yield the same results. Notably, however, after Dr. Whitson developed the ocean-separator process in his responsive report, the United States' Dr. Zick in his rebuttal report jettisoned the four-stage flash

5

method and developed his own ocean-separator model.  In contrast to Dr. Whitson's model, Dr. Zick's ocean-separator process yields a significantly higher estimate of stock tank barrels of oil, but it only does so because it is less scientifically realistic.

### D. Dr. Whitson's Ocean-Separator Model Accurately Accounts for Solubility of Gaseous Components.

Dr. Whitson's process attempts to model, as accurately as practicable, the actual thermodynamic path the spilled hydrocarbons took as they made contact with and rose through the Gulf of Mexico waters.  Part of that process, relevant here, is the solubility effect the seawater had on the hydrocarbons:  "When oil (or gas) comes into contact with seawater, some hydrocarbon components dissolve (solubilize) into the seawater."  Ex. 2, Whitson Report at 10.  In fact, "most of the light hydrocarbons and some lighter aromatics dissolve in seawater during ascension to the surface through 5,000 ft of seawater ...."  *Id.* at 18.

The United States has mischaracterized Dr. Whitson's ocean-separator process in its brief, claiming that the solubility process involves "dissolved *oil*."  U.S. Mem. *passim* (emphasis added).  In fact, however, the dissolved hydrocarbons are not oil; they are the gaseous components of the hydrocarbon fluid.  It is the "light hydrocarbons" — methane, ethane, and propane — that dissolve.  *e.g.*, Ex. 7, Whitson Dep. Tr. 399:17–400:1.  And these particular hydrocarbons, as their familiar names confirm, exist in a gaseous state at stock tank conditions.  Ex. 6., Zick Dep. Tr. 98:6–99:3.  Inexplicably, the United States' motion presupposes that the Court will include these light, gaseous elements in its calculation of the number of stock tank barrels of oil that will be used for purposes of establishing a CWA penalty.

## ARGUMENT

The United States' distracting motion seeks to exclude one small, and admittedly realistic, aspect of Dr. Whitson's ocean-separator model.  *See* Ex. 5, Zick Rebuttal Report at 2.

But these opinions of Dr. Whitson about the realism and magnitude of the solubility of certain gaseous hydrocarbons are quintessentially scientific — not legal — opinions.  By trying to exclude this scientific testimony, the United States attempts to truncate a discussion about a real-world effect that its own expert acknowledges occurs, and for which it has no response.  *See id.*  Specifically, the United States suggests that the Court (in the event it were to reject a conversion based on the industry-standard single-stage flash) should consider those portions of an alternative process that might *increase* the amount of stock tank oil but disregard portions of the alternative process, such as solubility, that would *decrease* the stock-tank-barrel amount.

BP and Anadarko agree that experts on both sides should be precluded from offering legal opinions in the guise of scientific expertise.  But Dr. Whitson's opinions are purely scientific; he does not purport to tell the Court what separation process the CWA requires.  *See infra* Section I.  In reality, it is the United States' Dr. Aaron Zick who impermissibly crosses the boundary into offering legal conclusions about CWA requirements.  *See infra* Section II.  In the end it is this Court, guided by relevant scientific evidence, who will have to determine which conversion method should be used.  *See infra* Section III.

## I. Dr. Whitson Does Not Opine on What the Court "Should" or "Should Not" Do.

The United States mischaracterizes Dr. Whitson's report and deposition.  The United States claims, inaccurately and without any identifying citations, that Dr. Whitson offers opinions on what "should be ignored for purposes of calculating the total volume of oil discharged." U.S. Mem. at 1; *see id.* at 2, 4.

In fact, Dr. Whitson offers no such opinions.  Dr. Whitson instead opines on "the actual physical process of Macondo reservoir fluid traveling from the seabed of the Gulf of Mexico to surface conditions, through a 5,000-ft column of seawater." Ex. 2, Whitson Report at 9.  Dr. Whitson does not purport in his report or in his deposition to dictate what separation process the

7

law requires.  Dr. Whitson's opinions are thus quite limited.  He opines as a scientist that the thermodynamic interaction between hydrocarbons and water is a valid and real effect of the process experienced by the spilled hydrocarbons in the Gulf of Mexico, and he quantifies that effect.  Indeed, even United States expert Dr. Zick agrees that the effect occurs.  Ex. 5, Zick Rebuttal Report at 2 (agreeing that "[t]here's no denying that some of the spilled hydrocarbons would have dissolved in the water," and failing to question Dr. Whitson's quantification of the magnitude of the effect).  Accordingly, if the Court were to decide to go beyond a simple, industry-standard, single-stage flash analysis and consider the physical processes encountered by the spilled hydrocarbons in the Gulf, Dr. Whitson offers important (and undisputed) scientific testimony relevant to this alternative approach.

Tellingly, Dr. Zick fills more than nine pages of his 32-page rebuttal report opining on the same topic, "the definition of stock tank oil."  Ex. 5, Zick Rebuttal Report at 4–12.  It is simply indisputable that scientific testimony of this sort could potentially aid the Court in converting spilled oil into CWA stock tank barrels.

## II. Dr. Zick *Does* Opine on What the Court Should Do.

Remarkably, it is the United States' expert, Dr. Aaron Zick, who does expressly seek to opine on what the Clean Water Act requires.  In stark contrast to Dr. Whitson's complete silence on the ultimate question of which separator process the Court should use, Dr. Zick repeatedly tries to opine on that ultimate question of law:

- "My report also analyzes *the appropriate* conversion of the flow from the Macondo well to units of stock tank barrels."  Zick Initial Report at 3 (emphasis added).

- "[I]t is my professional opinion that any estimate of the stock tank barrels of oil discharged from the Macondo well *should be* based on the assumption of a multistage separation process to define stock tank oil.  *Id.* (emphasis added).

- "I also offered my professional opinion on *the most appropriate* calculation methods to convert any such estimates of the total mass of spilled hydrocarbons into volumetric units of stock tank barrels." Zick Rebuttal Report at 1 (emphasis added).

- "In my original report, I *argued that the most appropriate* conversion from reservoir fluid mass to stock tank oil volume would be through the most efficient separation process that might have been available to BP ...." *Id.* (emphasis added).)

- "I *recommended* that the multistage process be used to calculate the amount of spilled stock tank oil." *Id.* at 2 (emphasis added).

- "In my opinion, [water solubility] is *irrelevant*. There's no denying that some of the spilled hydrocarbons would have dissolved in the water. . . . Ultimately, however, whether such oil counts for purposes of this case is a legal question." *Id.* at 2-3 (emphasis added).

- "In my opinion, an oil spill *should be* measured by what goes into the water, not by what remains there after nature has taken its course for some period of time." Id. at 2-3 (emphasis added).

- "*My recommendation* has always been to perform the conversion with the most efficient process available . . . ." *Id.* at 11 (emphasis added).

- "*[M]y current recommendation* is to use my oceanic separation process to make the conversions." *Id.* at 12 (emphasis added).

Moreover, Dr. Zick admits that the question of which separation process the Court "should" use to convert the oil released subsea to stock tank barrels is a legal one for the Court to make. Ex. 6, Zick Dep. Tr. at 241:11–15 ("Q: But you agree it's a legal decision which separation process is used in this case? A: Yes, I understand that."). Yet only Dr. Zick, not Dr. Whitson, attempts to offer legal opinions about what the CWA should and should not be interpreted to require. It is the opinions of the United States' own Dr. Zick that should be excluded from the case.

### III. The Court's Legal Determination Should Be Guided by Appropriate Expert Scientific Testimony.

If, for purposes of trial, the Court were to consider conversion methods other than a simple, industry-standard, single-stage-flash, Dr. Whitson should be allowed to testify about the real-world processes experienced by spilled hydrocarbons as they rose through the Gulf. If the

9

Court determines that it wants to go beyond single-stage-flash, it should understand the actual occurrences in the Gulf, as spilled hydrocarbons progressed from exit points above the BOP and in the riser to atmospheric conditions. Dr. Whitson merely seeks to present such scientific testimony.

## CONCLUSION

For the foregoing reasons, BP and Anadarko respectfully request the Court deny the United States' motion to exclude certain opinions and testimony of Dr. Whitson.

September 3, 2013                                                       Respectfully submitted,

By: /s/ Don K. Haycraft

| | |
|---|---|
| Warren Anthony Fitch | Don K. Haycraft (Bar #14361) |
| (tony.fitch@bingham.com) | R. Keith Jarrett (Bar #16984) |
| Ky E. Kirby | LISKOW & LEWIS |
| (ky.kirby@bingham.com | One Shell Square |
| BINGHAM MCCUTCHEN LLP | 701 Poydras Street, Suite 5000 |
| 2020 K Street NW | New Orleans, Louisiana 70139-5099 |
| Washington, DC 20006 | Telephone: (504) 581-7979 |
| Telephone: (202) 373-6000 | Facsimile: (504) 556-4108 |
| | |
| James J. Dragna | Richard C. Godfrey, P.C. |
| (jim.dragna@bingham.com) | (richard.godfrey@kirkland.com) |
| BINGHAM MCCUTCHEN LLP | J. Andrew Langan, P.C. |
| 355 S. Grand Avenue, Suite 4400 | (andrew.langan@kirkland.com) |
| Los Angeles, California 90071 | Timothy A. Duffy, P.C. |
| Telephone: (213) 680-6400 | (tim.duffy@kirkland.com |
| | KIRKLAND & ELLIS LLP |
| | 300 North LaSalle Street |
| | Chicago, Illinois 60654 |
| | Telephone: (312) 862-2000 |
| | |
| Deborah D. Kuchler, T.A. (Bar #17013) | Robert C. "Mike" Brock |
| KUCHLER POLK SCHELL | (mbrock@cov.com) |
| WEINER & RICHESON, LLC | COVINGTON & BURLING LLP |
| 1615 Poydras Street, Suite 1300 | 1201 Pennsylvania Avenue, NW |
| New Orleans, Louisiana 70112 | Washington, DC 20004-2401 |
| Telephone: (504) 592-0691 | Telephone: (202) 662-5985 |
| | |
| *Attorneys for Anadarko Petroleum Corporation* | *Attorneys for BP Exploration & Production Inc. & BP America Production Company* |

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 3rd day of September, 2013.

/s/  Don K. Haycraft