UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | : : : : | MDL NO. 2179 SECTION J |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | : : | JUDGE BARBIER |
| 2:10-CV-02771 | : | MAGISTRATE JUDGE SHUSHAN |

**UNITED STATES' MEMORANDUM IN OPPOSITION TO BP'S MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF DRS. DYKHUIZEN AND GRIFFITHS**

BP[1] has moved to exclude the opinions and testimony of two experienced Ph.D. engineers from the Sandia National Laboratories ("Sandia").[2] Specifically, BP complains that Dr. Ronald Dykhuizen and Dr. Stewart Griffiths, who have been entrusted with, *inter alia*, ensuring the safety of nuclear weapons tests and helping avert disaster at Three Mile Island, lack relevant experience, applied "custom" methodology, acknowledge uncertainty in their analysis, and use inadequate inputs. BP's attacks in no way demonstrate that the work of Drs. Dykhuizen and Griffiths fails to meet the standard set forth by Federal Rule of Evidence 702 and *Daubert*. On the contrary, Drs. Dykhuizen's and Griffiths' experience is extensive, and their opinions are relevant and reliable. Indeed, unlike BP's made-for-litigation analyses, Dr. Dykhuizen's work was largely performed *during* the response and published in 2011, while Dr. Griffiths' analysis

---

[1] BP and Anadarko are aligned parties, and Anadarko has joined BP's motion; however, for the sake of brevity only "BP" will be used here to refer to both defendants.

[2] Sandia is one of the Department of Energy (DOE) National Nuclear Security Administration (NNSA) National Laboratories and focuses on the strategic areas of nuclear weapons, defense systems and assessments, energy, climate, and infrastructure security, and international, homeland and nuclear security. About Sandia, http://www.sandia.gov/about (*last visited* 9/3/2013).

1

was submitted for publication in a peer-reviewed journal *before* he began work as an expert witness for the United States in this litigation, and was published in 2012.

### STANDARD

The relevant standards for determining whether expert testimony is admissible in a bench trial are well known to the Court and will be stated here only briefly.[3]  Pursuant to Federal Rule of Evidence 702, the court must make a preliminary inquiry to ensure the testimony is both relevant and reliable.  Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 588 (1993); *United States v. Hitt*, 473 F.3d 146, 158 (5th Cir. 2006).  The purpose of *Daubert* motions is to ensure that only reliable and relevant expert testimony is presented to the jury, and the *Daubert* safeguards are not as essential in a case where the factfinder is the district court judge and not a jury.  *Thompson v. Rowan Companies, Inc.*, No. 06-3218, 2007 WL 724646, at *1 (E.D. La. March 6, 2007) (Barbier, J.)

### BACKGROUND

#### I. *Dr. Dykhuizen's Experience*

In Dr. Dykhuizen's nearly three-decade career as a General Engineer and Principal Member of the Sandia Technical Staff, Dr. Dykhuizen's work has focused on multiphase fluid flow, including generating models and conducting experiments.  Attachment 1 (Report of United States Expert Ronald C. Dykhuizen, Ph.D., Mar. 22, 2013) at 1.  His expertise also extends to estimating multiphase flow in the context of complex accident investigations and responses. Attachment 1 at 1, 19; Attachment 2 (Excerpts of the Deposition of Ronald Copeland Dykhuizen, June 19-20, 2013) at 11:8-12:20; 462:18-465:9.  During the 1979 Three Mile Island

---

[3] The United States also incorporates herein by reference the legal discussion in the United States' Memorandum In Opposition to BP's Motion to Exclude Certain Opinions and Testimony of Dr. Mohan Kelkar, filed concurrently with this Opposition.

accident, Dr. Dykhuizen modeled the multiphase flow of water and steam through the reactor, supporting efforts to avoid a core meltdown.  Attachment 2 at 463:15-464:13.

Dr. Dykhuizen "is often sought out for problems that are difficult."  Attachment 2 at 615:4-5.  In fact, it was for that very reason, and his "ability to examine difficult problems and try to extract as much information as possible from a situation that was very limited in the amount of data," that he was assigned to the team of National Laboratories scientists and engineers (referred to as the Tri-Lab Team) that was chartered by the Secretary of Energy and tasked with estimating the flow rate from the Macondo well.  Attachment 2 at 615:2-10; Attachment 3 (Sandia Report: DOE-NNSA Flow Analysis Studies Associated with the Oil Release following the Deepwater Horizon Accident ("Sandia Report"), Exhibit No. 9361) at 3-4.

Even Dr. Dykhuizen's education focused on the field from which he now offers opinions and testimony: his Ph.D. thesis "examined multiphase flow of different fluids through complex systems from both modeling and experimental viewpoints."  Attachment 1 at 1; Attachment 2 at 614:19-615:1.

## II. *Dr. Griffiths' Experience*

In Dr. Griffiths' three-decade career at Sandia, he was responsible for theoretical, computational, and experimental research in areas including fluid dynamics, multiphase flow, and analysis of data through development and application of physically-based models, and he worked extensively with pressure measurements – the exact areas of expertise he brought to bear in forming his opinions in this case.  Attachment 4 (Report of United States Expert Stewart K. Griffiths, Mar. 22, 2013 at 3); Attachment 5 (Excerpts of the Deposition of Stewart K. Griffiths, Ph.D., June 26-27, 2013) at 618:7-619:10, 621:9-21.  His experience in building models, such as the one he built to estimate the flow from the Macondo well in this case, is what led to his

appointment as a "Senior Scientist" at Sandia, a special title at Sandia representing the top 1 percent of the Lab's technical staff.  Attachment 5 at 618:11-19; 614:24-616:9-14.

As a Senior Scientist, Dr. Griffiths, "served as a technical resource for the laboratory and was asked on numerous occasions to address urgent, highly challenging problems across multiple disciplines, including fluid dynamics."  Attachment 4 at 3.  His work included areas such as underground nuclear test containment, counterterrorism, and design of nuclear weapons components.  Attachment 5 at 616-617.  Dr. Griffiths' modesty, *see* Attachment 5 at 13:14-18 ("I'm not comfortable with self-proclaimed Experts … I'm not comfortable with the … notion of saying, 'I am an Expert.'"), hardly disqualifies him from testifying as an expert in this matter.[4]

## DISCUSSION

### I.  *BP's Attacks on the Experience of a Sandia Engineer and Scientist with Nearly 60 Years of Experience are Meritless.*

There is no merit to BP's claims that a lack of experience in the oil and gas industry disqualifies either Dr. Griffiths[5] or Dr. Dykhuizen from offering opinions in this matter.  *See, e.g.*, *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 881 (5th Cir. 2013)(holding that a

---

[4] Indeed, Dr. Griffiths' personal definition of an "expert" is so narrow and specific that none of the testifying experts in this case (or most any case) could qualify.  *See* Attachment 5 at 12:5-22 (experts are those that work in a "very, very narrow field" for "30 to 40 years").

[5] BP specifically disparages Dr. Griffiths' multiphase modeling experience as being related to "nuclear applications," since "the actual physical properties of oil and gas can be different from that of water and steam," Dkt. 11061-1 at 6.  But one of BP's own experts (whose modeling experience is also nuclear-related), acknowledged that principles developed in the nuclear industry can be pertinent to oil and gas projects.  Attachment 6 (Excerpts of the Deposition of Simon Lo, July 29, 2103) at 25:8-26:15.  He further explained that both fields are "governed by the same law of physics … the same set of equations … [a]nd there are many similarities, obviously, in terms of theory, in terms of the modeling approach that we use."  Attachment 6 at 26:3-10.  And a scientist of Dr. Griffiths' caliber, who as BP points out, is aware of the differences in the physical properties of oil and gas versus water and steam, Dkt. 11061-1 at 6, is certainly capable of taking those differences into account in his modeling.

software expert was qualified to testify regarding whether the plaintiff's complex-services procurement software, developed for the oil and gas industry, was a trade secret and whether a competitor's software "matched" the plaintiff's, despite objection to the expert's lack of experience in the oil and gas industry).  Moreover, in Phase One of this very matter, BP objected to the testimony of the United States' expert Dr. Rory Davis, a mechanical engineer with over 25 years of experience in "analyzing and evaluating mechanical and structural systems," based on the fact that he had "no prior experience with respect to BOPs."  Attachment 7 (Excerpt from Phase One Trial Transcript, Mar. 7, 2013) at 2639:16-2640:1; 2643:4-9.  The Court overruled BP's objection, and allowed Dr. Davis to testify, noting that:

> I think he clearly has great expertise as a mechanical engineer and a lot of experience.  I don't think the fact that he's not previously worked on a blowout preventer, on this particular device, means he can't give expert testimony about it from a mechanical engineering standpoint.

*Id.* at 2644:18-23.

BP's decision to call into question the experience of an engineer and a scientist from the National Laboratories is ironic, given that during the spill, ***BP asked for assistance from the National Laboratories in performing flow modeling through the Macondo well***. *See, e.g.*, Attachment 8 (May 17, 2010 Email from Paul Tooms, BP, to Tom Hunter and Marjorie Tatro, DOE, Subject: Questions for National Labs, Exhibit No. 9916) at 4-6.  BP's Vice President of Base Production at the time of the spill, Mike Mason, described the engineers from the National Laboratories as "a terrific group of people … trying to support [BP]," who BP could call on, even if BP "needed to talk to them at 10:00 o'clock at night."  Attachment 9 (Excerpts of the Deposition of Clifton Michael Mason, Jan. 24, 2013) at 92:15-93:4.  Indeed, BP specifically asked members of the Tri-Lab Team to perform flow rate calculations to confirm the results of

5

BP's calculations.  Attachment 9 at 87:1-88:4  ("The meeting with some of the nations top scientists this morning was great.  Tomorrow I am having a meeting with two scientists to see what they come up with for flow rate calcs at different conditions . . . ."); *see also* Attachment 10 (May 13, 2010 Email from Mike Mason, BP, to Jasper Peijs, BP, Subject: Flow Rate Calcs, Exhibit No. 9326).

BP's calculations had been conducted with PROSPER, commercially-available software that they were using in a way "they had never done before," and which "was not designed" to model what BP was trying to model.  Attachment 9 at 88: 7-24.  The modeling conducted by the Tri-Labs Team gave BP more confidence its own modeling.  Attachment 9 at 90:6-91:9.

## II. Use of a "Custom" Methodology Is Not Improper and in Fact Is Fitting in a Unique Situation Such as Estimating the Flow Rate from the Blown-out Macondo Well.

BP criticizes both Dr. Dykhuizen and Dr. Griffiths for using a "custom" methodology: Dr. Dykhuizen for not using commercially available modeling software, Dkt. 11061-1 at 3, and Dr. Griffiths for "not employing methodologies used previously in the oil and gas industry, *id.* at 7.  BP's criticism of a "custom" methodology is odd considering that modeling the flow rate from a blown out well is a "custom" problem, as even BP's experts acknowledge. *See e.g.*, Attachment 11 (Excerpts of the Deposition of Adrian Johnson, Ph.D., July 19-20, 2013)  at 418:5-8 ("I've never done and I'm not aware – I don't think I know anyone, to my knowledge anyway, who's done an analysis of a – an oil well in this way that's gone through a blowout.").[6] Moreover, one of BP's own experts spent 20 years consulting on flow assurance in the oil and

---

[6] *See also*, Attachment 12 at 25:11-14 ("Q. So this is the first time that you have attempted to estimate the flow rate of hydrocarbons from an actual blown-out well?  A. That's correct."); Attachment 13 (Excerpts of the Deposition of Robert Wayne Zimmerman, Ph.D., July 2, 2013) at 34:25-35:3 ("Q. Okay.  Have you ever estimated compressibility, other than in this case, where there has been a – a blowout of a reservoir? A. No.").

gas industry for clients, including BP, without using commercially available software such as OLGA or Maximus, and instead relying on spreadsheet calculations and custom models. Attachment 11 at 62:1-13; 413:15-19; 414:9-18; Attachment 14 (Excerpts of the Expert Report of A.E. Johnson PhD CEng MIMechE, May 1, 2013) at 8-9.  BP's experts have also admitted that commercially-available software cannot fully model a system as unique as the blown out Macondo well.  *See e.g.*, Attachment 11 260:7-261:23 (commercial model used approximated drill pipe inside annulus as two separate pipes in parallel); Attachment 12 (Excerpts of the Deposition of Michael Zaldivar, Ph.D., July 15, 2013) at 197:21-23 ("Q. were you able to use OLGA to model the moving riser? A. I was not."); Attachment 15 (Excerpts of the Deposition of Srdjan Nesic, Ph.D., July 23, 2013) at 300:20-302:-11(transient simulations in ANSYS FLUENT "exploded" after simulating 10-12 days of the 35-day period Dr. Nesic was investigating).

BP's attack on the use of "custom" methodology is especially misplaced given the *Daubert* Court's abandonment of the "general acceptance" test in favor of a "flexible" inquiry pursuant to Federal Rule of Evidence 702 into the reliability and relevance of expert testimony. *Daubert* at 587, 590, 594.  Instead of applying a rigid "general acceptance test," the court is to consider factors such as whether the expert's opinions are "derived by the scientific method … and supported by appropriate validation" and whether the expert's methods have been subject to peer review. *Id.* at 590, 593.  The Advisory Committee reiterated that the *Daubert* factors are neither exclusive or dispositive, and that in addition to the factors laid out in *Daubert*, a factor relevant to the determination of the reliability of expert testimony under Rule 702 is whether "experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions

expressly for the purposes of testifying." Fed. R. Evid. 702 Advisory Committee Note on 2000 Amendment.

While BP has not proffered any expert witnesses who were involved in efforts to estimate the flow from the Macondo well during the response, the opinions now offered by Dr. Dykhuizen and Dr. Griffiths grew "naturally and directly" out of their pre-litigation work to estimate the flow rate as part of the Tri-Lab Team. Attachment 4 at 3; Attachment 1 at 2-3. The methodologies employed by Dr. Dykhuizen during the response are documented in the Sandia Report, and are the same methodologies he used to develop the expert opinions he now offers. *Id.* Meanwhile, Dr. Griffiths developed his method during the response and published it in a peer-reviewed journal. Attachment 16 ("Oil Release from Macondo Well MC252 Following the Deepwater Horizon Accident," S.K. Griffiths, Environ. Sci. Technol., 46 (10), 5616-5622, 2012, Exhibit No. 10031). As is called for by the scientific method, both Dr. Griffiths and Dr. Dykhuizen were able to update and refine their conclusions based on data that became available after their initial efforts and based on additional analysis. *See* Attachment 4 at 3; Attachment 1 at 2, 6, 8. The methodologies employed by Dr. Dykhuizen and Dr. Griffiths meet the standard set forth in *Daubert* and Rule 702.

### A. Dr. Dykhuizen's methodology is relevant and reliable and his results are consistent with BP's flow rate estimates during the response and with estimates conducted with commercially available software.

Dr. Dykhuizen conducted several calculations to determine a flow rate from the Macondo well and a cumulative total release from the well, including: (1) calculating the flow rate on the final days before the well was shut in, based on the "accurate geometry and measured pressures" of the capping stack; (2) analyzing the known pump rates of the mud that was pumped into the Macondo well during Top Kill, and the corresponding BOP pressure readings during that period;

and (3) calculating the flow rate through the Top Hat vents, based on pressure measurements and known geometry of the vents.  Attachment 1 at 3-18.  Elements of Dr. Dykhuizen's work have been subject to peer review.  The GEM code that he wrote and adapted to conduct his analysis of the flow rate from the Macondo well "was given to other Engineers to use and critique … [t]hat's general practice to share your codes with other people."  Attachment 2 at 39:7-20.  Dr. Dykhuizen's GEM code was also used in generating peer-reviewed conference and journal articles.  *Id.* at 38:23-39:6.

     Dr. Dykhuizen also evaluated his results by comparing them to those of BP and other United States experts in order to validate his results.  For instance, Dr. Dykhuizen's Top Kill calculation results indicate a flow rate of over 60,000 stock tank barrels per day (bopd) and a lower limit of 43,000 bopd, which is consistent with BP engineer Tim Lockett's Top Kill modeling during the response, which indicated that "the flowrate from the well is now probably in the range of 44000 -77000 sbbl/d [stock tank barrels per day]."  Attachment 1 at 15; Attachment 17 (June 29, 2010 Email From Tim Lockett, BP, to Trevor Hill, BP, Subject: Top kill simulation cases, Exhibit No. 9452 (also found at Appendix A.3 of Attachment 1 (Report of United States Expert Ronald C. Dykhuizen, Ph.D., Mar. 22, 2013)) at 8).  Dr. Dykhuizen also found that his results were consistent with calculations BP contractor ADD Energy conducted during the response using OLGA-Well-Kill, commercially available modeling software. Attachment 1 at 15; Attachment 18 (July 14, 2010 Email from Ole Rygg, ADD Energy Group, to John Darner et al. Subject: MC252 Dynamic kill, Exhibit No. 9254) at 5, 51.  Dr. Dykhuizen also was able to conclude that his calculations were robust by comparing them to Dr. Bushnell's ANSYS FLUENT CFD multiphase modeling results.  Attachment 1 at 6, 7.

9

> **B. Dr. Griffiths' methodology is relevant and reliable and his results are consistent with BP's flow rate estimates during the response and with estimates conducted with commercially available software.**

Dr. Griffiths quantified the flow rate from the Macondo well and calculated a cumulative discharge of oil from the well by developing a model that describes the relationship between pressure drops (i.e., the difference in pressures measured at two different points within the system, in this case, the reservoir and the BOP) and flow rate. Attachment 4 at 4-5. He published that analysis in a peer reviewed journal. *See* Attachment 16*;* Attachment 4 at 3.

Dr. Griffiths also validated his model in a number of ways. First, he compared his results with calculations conducted by BP and parameter values chosen by BP and found that his results were indeed comparable with BP's. Attachment 4 at 12-15. Of particular note, given BP's attack here on methods that do not use commercially available software, Dr. Griffiths compared flow rates computed using his methodology with flow rates computed by BP using PROSPER and found that over the full range of flow rates BP computed with PROSPER, the results produced by Dr. Griffiths' model were within 1.3% of the flow rates produced by BP's PROSPER modeling. Attachment 4 at 13. Dr. Griffiths also compared his results to those generated by United States Expert Dr. Nathan Bushnell using ANSYS CFX, a commercially-available computational fluid dynamics (CFD) software model and found that the discharge coefficients produced by Dr. Griffiths' model were within 0.39% of the discharge coefficients produced by Dr. Bushnell's ANSYS CFX modeling. Attachment 19 (Redacted Rebuttal Report of United States Expert Stewart K. Griffiths, June 10, 2013) at 9.

Furthermore, Dr. Griffiths conducted two sets of "alternate calculations" that validate his results (i.e., his "best estimate calculation") and the assumptions he relied upon in reaching those results. Attachment 4 at 10-12; Attachment 19 at 11-13. Dr. Griffiths' best estimate calculation

10

relied upon the pressure drop between the reservoir pressure and BOP pressures, but in his alternate calculations, he instead used: 1) the pressure drop between the reservoir pressure and ambient seafloor pressure and 2) the pressure drop between the BOP pressures and ambient seafloor pressure.  Attachment 4 at 10.  If Dr. Griffiths had been incorrect about his assumptions regarding erosion or the change in wellbore discharge coefficient or productivity index over time, his results would have varied significantly when calculated in these three ways.[7]  However, Dr. Griffiths found that when calculated in these three different ways, his results (a cumulative discharge of 5.0 million barrels based on his best estimate calculation and a cumulative discharge of 5.1 million barrels based on each of his two alternate calculations) are within 2% of each other.  Attachment 4 at 10-11.

### III. Any Uncertainty With Respect to Dr. Dykhuizen's Results Is the Proper Basis for Cross-Examination, Not Exclusion of His Testimony.

BP attacks the uncertainty associated with Dr. Dykhuizen's results, cherry-picking phrases from his deposition without providing necessary context.  For instance, BP claims that "[u]ltimately, Dr. Dykhuizen conceded that '*all of my estimates are inaccurate*.'"  Dkt. 11061-1 at 5.  But Dr. Dykhuizen also clarified what he meant by that statement:

> What I wanted to say was all models are inaccurate… [i]f you had a model that was 99.9 percent accurate, it could still be considered inaccurate, because it doesn't represent everything that is possible.  Models of every system are

---

[7] Specifically, if Dr. Griffiths had been incorrect about his assumptions regarding erosion, that is, if erosion within the BOP did not have a limited effect on flow rate after the first few days after the blowout, his alternative calculation based on the difference between reservoir and ambient seafloor pressures would have resulted in a much higher flow rate than his best estimate calculation.  Attachment 4 at 10-11.  *See also* Attachment 5 at 95:8-96:11.  Similarly, if Dr. Griffiths had been incorrect about his assumptions regarding the change in wellbore discharge coefficient and productivity index over time, that is, if those values had increased over time, his alternative calculation based on the difference between BOP and ambient seafloor pressures would have resulted in a much higher flow rate than his best estimate calculation.  *Id.* at 11-12.

11

> inaccurate. I, in no way, mean to imply that my model was wrong or my model was not reliable. My model is accurate, and I state the accuracy of my results within my testimony and Reports.

Attachment 2 at 614:5-15. Moreover, when Dr. Dykhuizen refers to "uncertainty" in terms of "plus or minus" a certain percent, others might simply refer to a range or an upper and lower bound. *See* Attachment 2 at 621:19-25. For instance, to Dr. Dykhuizen, an estimate of 53,000 bopd with an uncertainty of plus or minus 20 percent means that there would be no uncertainty for a range of 43,000 to 63,000 bopd. *Id.* All of BP's experts who offer flow rate estimates present their findings in terms of ranges or uncertainties. Attachment 20 (Excerpt of Expert Report of Alain Gringarten, May, 1, 2013) at 6; Attachment 21 (Excerpt of Expert Report of Michael Zaldivar, PhD, May 1, 2013) at 10; Attachment 22 (Excerpt of Expert Report of Martin J. Blunt, May 1, 2013) at 50. These ranges and uncertainties are the proper subject for cross examination, not for the exclusion of testimony.

### IV. Dr. Griffiths Relied on Adequate and Reliable Inputs

Finally, BP disparages Dr. Griffiths for "declin[ing] to consider" information about previously unknown aspects of the geometry of the well, such as physical components that were recovered from the seafloor, which became available after his initial analysis. Dkt. 11061-1 at 7. This claim is patently untrue. Dr. Griffiths visited the NASA Michoud Assembly Facility to inspect components of the BOP, and considered substantial information about the original and recovered geometry of the BOP, including information provided by the 2011 report of BP Expert Earl Shanks on BOP Design and Det Norske Veritas' 2011 Forensic Examination of the Deepwater Horizon Blowout Preventer, as summarized in Appendix I of Dr. Griffiths' report. Attachment 4 at 46-49. Dr. Griffiths ultimately concluded that the results of his model were consistent with this information. *Id.*

12

Furthermore, as BP itself admits, Dr. Griffiths' methodology "allowed him to generate an estimate" without knowing "all of the inputs for the geometry of the well." Dkt. 11061-1 at 7. This is not a flaw; it is a strength. Even after the recovery and analysis of the BOP components, substantial uncertainty remains regarding the geometry of the BOP during the flow period, as the recovered components only provide evidence of the state of the components at the time they were recovered. *See* Attachment 23 (Excerpts of the Deposition of Thomas Knox, Oct. 11, 2012) at 91:19-93:18. By relying on pressure measurements instead of the physical geometry of the BOP to determine a flow rate, Dr. Griffiths is able to avoid relying on an input with considerable uncertainty. Moreover, Dr. Alain Gringarten, one of BP's own experts, admitted that the pressure measurements Dr. Griffiths relied upon in calculating his flow rate are reliable enough to be used for that purpose and that Dr. Gringarten himself used those same measurements. Attachment 24 (Excerpts of the Deposition of Alain C. Gringarten, Ph.D., July 22, 2013) at 192:13-21.

## CONCLUSION

None of BP's arguments establish that the testimony of Drs. Dykhuizen and Griffiths is not relevant and reliable; accordingly, BP's Motion to Exclude their opinions and testimony should be denied.

Respectfully submitted,

| | |
|---|---|
| BRIAN HAUCK | ROBERT G. DREHER |
| Deputy Assistant Attorney General | Acting Assistant Attorney General |
| Civil Division | Environment & Natural Resources Division |
| | |
| PETER FROST | SARAH HIMMELHOCH |
| Directory, Torts Branch, Civil Division | Senior Litigation Counsel |
| Admiralty and Aviation | NANCY FLICKINGER |
| STEPHEN G. FLYNN | SCOTT CERNICH |
| Assistant Director | RICHARD GLADSTEIN |
| MICHELLE DELEMARRE | THOMAS BENSON |
| SHARON SHUTLER | Senior Attorneys |
| JESSICA SULLIVAN | A. NATHANIEL CHAKERES |
| JESSICA MCCLELLAN | ANNA CROSS |
| MALINDA LAWRENCE | BETHANY ENGEL |
| Trial Attorneys | JUDY HARVEY |
| | RACHEL KING |
| | ERICA PENCAK |
| | Trial Attorneys |
| | |
| s/ R. Michael Underhill | /s/ Sarah Himmelhoch |
| R. MICHAEL UNDERHILL, T.A. | STEVEN O'ROURKE |
| Attorney in Charge, West Coast Office | Senior Attorney |
| Torts Branch, Civil Division | Environmental Enforcement Section |
| U.S. Department of Justice | U.S. Department of Justice |
| 7-5395 Federal Bldg., Box 36028 | P.O. Box 7611 |
| 450 Golden Gate Avenue | Washington, D.C. 20044 |
| San Francisco, CA 94102-3463 | Telephone: 202-514-2779 |
| Telephone: 415-436-6648 | Facsimile: 202-514-2583 |
| Facsimile: 415-436-6632 | E-mail: steve.o'rourke@usdoj.gov |
| E-mail: mike.underhill@usdoj.gov | |
| | DANA J. BOENTE |
| | United States Attorney |
| | Eastern District of Louisiana |
| | |
| | SHARON D. SMITH |
| | Assistant United States Attorney |
| | Eastern District of Louisiana |
| | 650 Poydras Street, Suite 1600 |
| | New Orleans, LA 70130 |
| | Telephone: (504) 680-3000 |
| | Facsimile: (504) 680-3184 |
| | E-mail: sharon.d.smith@usdoj.gov |

Attorneys for the United States of America

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing document has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12.

Dated:  September 3, 2013

*/s/ Sarah Himmelhoch*