# Attachment 02

01-42946
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | ) | MDL NO. 2179 |
| | ) | SECTION: J |
| | ) | JUDGE BARBIER |
| | ) | MAG. JUDGE SHUSHAN |

***CONFIDENTIAL***

***WorldwideVIEW™***

**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:

# RONALD COPELAND DYKHUIZEN, Ph.D.

JUNE 19, 2013

***COPY***

*Systems Technology for the Litigation World*

Litigation Group•Court Reporting•Video Production•Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

08:36

08:37

08:37

08:37

08:37

**Expert in any litigation in any context?**

A. No, I have not.

**Q. Okay. And have you come today to your deposition -- your expert deposition prepared to testify about the opinions that you intend to express before Judge Barbier in September?**

A. Yes, I have.

**Q. Okay. How would you define the expertise that you are bringing Judge Barbier in your role as a Testifying Expert?**

A. I did some research and have worked in multiphase flow, and, therefore, I can represent a lot of issues that deal with multiphase flow. Also, I was present in Houston for many of the days and also consulting over the phone for many of the days during the incident.

**Q. Okay. So would you represent yourself to be an expert in multiphase flow?**

A. Yes.

**Q. Okay. Any other expertise that you would say you are applying in conjunction with your expert work or your expert opinions in this case, outside of multiphase flow expertise?**

MR. CERNICH: Object to form.

A. I have lots of experience in doing

engineering work, doing accident investigations at Sandia, where I work.

**Q. (By Mr. Regan) M-h'm.**

A. I have experience in geothermal wells. Some of that is directly applicable to the flows here. In general, my -- I am considered a General Engineer at Sandia.

**Q. Your -- your -- the last thing you said, you are considered a General Engineer at Sandia?**

A. Yes. I quite often are given jobs that don't really have a defined expertise and try to determine a correct answer or the correct procedures to -- where to continue.

**Q. Okay. And is that what you would represent to Judge Barbier is the expertise you're -- you're providing to him in this matter, the expertise of general engineering, or something more specific?**

MR. CERNICH: Object to form.

A. I think I have mentioned both general engineering and multiphase flow.

**Q. (By Mr. Regan) Okay. You said earlier that you did have factual involvement. You were directly involved in various events with respect to the Macondo Well starting in May of 2010,**

**over to Macondo, all of those -- all of that code work was work that had never been put out commercially prior to May of 2010, or even after, correct?**

MR. CERNICH: Object to form.

A. That is correct.

**Q. (By Mr. Regan) Okay. And with respect to commercially available codes -- that is, thing -- codes that were available to the scientific community and the business community in May of 2010 -- you personally did not use any commercially available codes with respect to the work that you performed on Macondo --**

MR. CERNICH: Objection.

**Q. (By Mr. Regan) -- is that correct?**

A. That is correct.

**Q. We've used the phrase "put out commercially." I want to ask it in a slightly different way now -- I don't mean to confuse it -- but you're familiar with the concept of peer review?**

A. Yes.

**Q. Okay. The subroutines and -- well, the -- the GEM code, did you say that had been subject to peer review?**

A. It has been a subject of -- it was used in generating conference and journal articles.

**Q. Okay.**

A. So the conference and journal articles were subject to peer review, but that peer review did not involve looking over lines of code.

**Q. Okay. And with that last answer, let me ask it that way: Any of the codes that you used -- and I'm going to include full codes, subroutines, all of the code work that you used in Macondo -- had any of it been subject to a peer review specifically about the quality of the code?**

MR. CERNICH: Objection, form.

A. The GEM code was given to other Engineers to use and critique. They had access to the code. They modified parts of the code to make sure that it was doing what they liked. That's general practice to share your codes with other people.

**Q. (By Mr. Regan) Okay. Outside of the general sharing of codes Engineer to Engineer, was there ever any formal peer review -- that is, publication in a journal or -- or a presentation at a conference -- where the specific codes that**

01-42947
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | ) | MDL NO. 2179 |
| | ) | SECTION: J |
| | ) | JUDGE BARBIER |
| | ) | MAG. JUDGE SHUSHAN |

**CONFIDENTIAL**

***WorldwideVIEW™***
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# RONALD COPELAND DYKHUIZEN, Ph.D.

**Volume 2**

JUNE 20, 2013

***COPY***




*Systems Technology for the Litigation World*

Litigation Group•Court Reporting•Video Production•Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

THE VIDEOGRAPHER: All set?

The time is 9:42 a.m. We're back on the record, beginning Tape 11.

**Q. (By Mr. Regan) Dr. Dykhuizen, part of your 60,000 barrel --**

09:43 MR. CERNICH: I'm sorry. Before we start, you had asked Dr. Dykhuizen yesterday about other instances of calculating flows, and another one came to mind.

09:43 MR. REGAN: Okay.

MR. CERNICH: And you had asked whether he would --

MR. REGAN: Sure.

MR. CERNICH: -- tell you if any others came to mind.

09:43 **Q. (By Mr. Regan) Let me ask a question so we can put it formally.**

**Dr. Dykhuizen, yesterday we were talking about your prior experience in estimating multiphase flows.** 09:43 **And you indicated, I think, two that I recall specifically, and the record will speak for itself, but a lithium accident and a swimming -- the swimming pool reactor.**

**Have you recalled another project?**

09:43 A. There were a number of projects.

However, one that matches this as closely as possible: In 1979, there was a Three Mile Island accident. This was a multiphase accident with steam and water. That accident went -- carried on for weeks, and we had to calculate flows for weeks, estimating based on the instrumentation that was available.

I thought of that last night, and thought I would suggest that -- or add that to the record.

**Q. Okay. You worked directly on the investigation of that accident?**

A. Yes, I did. I was working for Battelle Columbus at the time.

**Q. Okay. And what specifically was your role?**

A. My role was to run computer codes to simulate the transient flows through the reactor. This reactor had a leak in the pressurizer, and was -- had flow constantly exiting the reactor. During that time they were trying to put cold water into the reactor to try to keep the reactor cool. They were only partially successful with that, and then ended up with a reactor meltdown.

**Q. Okay. Were you trying to -- were you**

**asked to determine how much of any particular fluid had flowed over a period of time?**

A. Yes. The inventory of water within the reactor was very important. We obviously had an initial inventory of water, a lot of water leaving that was not well known, and an injection rate of water.

**Q. M-h'm.**

A. And not only determining the inventory of water, but where that water would exist and where steam would exist. We were most concerned with uncovering the core and having poor cooling and a core meltdown.

**Q. So you were trying to determine what phases might exist in given -- in particular geometries in that reactor?**

MR. CERNICH: Object to form.

A. Yes.

**Q. (By Mr. Regan) So did you assume a homogeneous fluid for the multiphase phase flow in that instance?**

A. No, I did not.

**Q. Did you try to determine the flow regime that was present in the geometries that you were examining?**

A. Yes.

**Q. And why did you want to know the flow regime?**

A. The flow regime was very important in that analysis, because, as we mentioned before, things like flooding was a concern on how we could make sure that we had water entering the core region. Without knowing the flow regime, you could not calculate things like flooding.

**Q. Okay. Thank you for that.**

**Other than that additional example, any other specifically come to mind?**

A. No.

**Q. Okay. We were asking you about your Top Hat 4 Flow Rate Estimate. It is true that for your 60,000 barrel per day Top Hat 4 estimate, you include a volume attributed to flow outside of the Top Hat skirt, correct?**

A. I include a flow that went through the top -- through the skirt, yes.

**Q. Okay. All right. You -- you based that estimate on visual observation, correct?**

A. That was --

MR. CERNICH: Object to form.

A. That was the best I could do, because the

**the effect of "All my flow rates are inaccurate." What did you mean by that statement?**

A. The statement is true as it's stated but may be misleading.

02:34 What I wanted to say was all models are inaccurate of -- they are -- represents -- representations of the real world physics. If you had a model that was 99.9 percent accurate, it could still be considered inaccurate, because

02:35 it doesn't represent everything that is possible. Models of every system are inaccurate.

I, in no way, mean to imply that my model was wrong or my model was not reliable. My model is accurate, and I state the accuracy of my

02:35 results within my testimony and Reports.

**Q. Thank you. Now, could you briefly describe the expertise and experience you brought to your work on the response to the Macondo Well?**

A. I was -- I have a Ph.D. in Mechanical

02:35 Engineering, did my thesis work on the stability of multiphase flows. So I've generated models of multiphase flow for my thesis work and helped with some experiments.

I've done a number of multiphase

02:36 experiments and models at Sandia Laboratories

where I work.

I have been involved in accident investigations a number of times where -- we have discussed here. My work is often sought out for problems that are difficult; and that was one of the reasons that I was initially assigned to work with BP, was my ability to examine difficult problems and try to extract as much information as possible from a situation that was very limited in the amount of data that was available.

**Q. And did you share that expertise and experience with Representatives from BP during the response?**

A. Yes. I shared my results, all of my calculations with representatives of BP during the response, not only the calculations that are represented in the Ratzel Report but many other sets of calculations that I did during the response.

**Q. And is that expertise and experience you've described the same expertise and experience you've used in forming your Expert opinions in this case?**

A. Yes. I have -- I have used my talents in this exact way in forming my calculations for the

**understand that you are providing expert testimony to the Court, correct?**

A. That is correct.

**Q. And are you providing that testimony to a reasonable degree of engineering certainty?**

A. I am defining my uncertainty. Whether it's a reasonable degree or not is -- can be accepted by --

**Q. Okay.**

A. -- everybody else. In scientific terms, it's just good to give your estimate -- best estimate and define an uncertainty about it.

**Q. So if the Court were to try to determine how inaccurate your models were or how inaccurate your flow rates were, understanding that all models are inaccurate, what's the best way to describe how inaccurate your models are?**

MR. CERNICH: Object to form.

A. In this example, one calculation says 53,000, plus or minus 20 percent. 20 percent of 53,000 is approximately 10,000, so that would be 43,000 to 63,000, well, might be a way of describing my accuracy. It depends on the sophistication of the audience. Both of those are equivalent to me.