**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179<br><br>SECTION: J |
| This Document Relates To: All Actions | : : | JUDGE BARBIER<br>MAGISTRATE JUDGE SHUSHAN |
| …………………………………………………... | : | |

**BP'S MEMORANDUM IN OPPOSITION TO THE UNITED STATES' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DR. MICHAEL ZALDIVAR**

**INTRODUCTION**

The federal government's effort to exclude the expert opinions of Dr. Michael Zaldivar is simply not supported by the facts or law. Dr. Zaldivar analyzes "slug flow" through the *Deepwater Horizon*'s riser to calculate a daily oil flow rate for mid-May 2010. "Slug flow," which refers to a pattern of alternating oil and gas flows, is a well-known phenomenon that is commonly studied and evaluated in the design and operation of oil and gas pipelines. After confirming the existence of slug flow from May 13-20, 2010, and identifying the characteristics of that flow, Dr. Zaldivar developed a computer model to fully reproduce the *Deepwater Horizon*'s moving riser, ran numerous simulations at various flow rates, determined which flow rates produced simulations that matched the unique pattern of slug flow observed in the field, and performed model validation and sensitivity studies to further confirm his results. In the end, Dr. Zaldivar concluded that the best estimate of oil flow from the Macondo well for May 13-20 was approximately 30,000 stock tank barrels per day — nearly half the government's assumed flow rate for this period.

The United States argues that Dr. Zaldivar's analysis is based on an "unreliable" methodology and so should be excluded as "unhelpful to the trier of fact." *See* Rec. Doc. 11057-

2, at 1. But the government's argument is founded on mischaracterizations of Dr. Zaldivar's analysis — not on true legal principles. To be sure, the government makes a passing reference to Federal Rule of Evidence 702; however, it simply does not — and cannot — demonstrate that Dr. Zaldivar's testimony is unreliable, irrelevant, or based on insufficient evidence. *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 (1993). To the contrary, Dr. Zaldivar's calculations are based on standard methodologies to estimate flow rates through pipelines using the existence and characteristics of slug flow. Even the government's own experts acknowledge that Dr. Zaldivar's analysis and simulations can be used to estimate flow rates. Further, contrary to the government's suggestions, Dr. Zaldivar extensively calibrated and validated his model to ensure the reliability of his flow rate calculations.

The government also claims the Court should exclude Dr. Zaldivar's opinions because they are supposedly "inconsistent" with the opinions of other BP witnesses or BP's previous out-of-court statements. *See* Rec. Doc. 11057-2 at 1, 9. Even if Dr. Zaldivar's opinions were inconsistent with BP's statements on flow rates — which they are not — that is not a legal basis to exclude the opinions. The presence of any inconsistency goes to the weight the fact-finder should accord the expert testimony, not its admissibility. Equally important, no such inconsistency even exists. The government claims BP previously has acknowledged that hydraulic modeling based on data from April or May 2010 cannot yield reliable flow rate estimates. In truth, BP's position is simply that reliable estimates based on hydraulic analysis could not be generated ***during April or May 2010***, given the lack of tools, data, and available time. Dr. Zaldivar's analysis — which included determining the specific characteristics of the observed slug flow, developing a model of the moving riser, performing numerous simulation runs, and validating his calculations — took nearly five months to complete and relied on a flow

simulation program that did not become commercially available until nearly a year after the well was sealed.

Put simply, the United States has not presented a sufficient legal or factual basis to warrant the exclusion of Dr. Zaldivar's expert opinions.

## BACKGROUND

Hydrocarbon reservoirs contain fluid that is a mixture of various compounds. In the reservoir, the fluid is under high pressure and temperature, but the pressure and temperature decreases as the fluid moves to the surface. Eventually, as the fluid flows through the well system, it begins to separate into multiple phases (e.g., oil and gas). This is called multiphase flow. *See* Ex. 1, Expert Report of Michael Zaldivar, at 11 (hereinafter "Zaldivar Report"). There are various multiphase flow patterns for horizontal and vertical pipes. One such pattern consists of alternating gas-dominated and oil-dominated flows and is called "slug flow." *Id.* at 11-13. Slug flow is a well-known phenomenon in the oil and gas industry. Engineers have extensively studied this type of flow pattern for many years in order to predict and mitigate its effects in production risers, pipelines, and facilities.[1] Flow assurance engineers use the existence and characteristics of slug flow to estimate flow rates through pipelines. *See id.* at 13; Ex. 2, Deposition of Michael Zaldivar, Vol. 1, July 15, 2013, at 25:15-26:7, 33:11-34:21 (hereinafter "Zaldivar Deposition").[2]

The existence of slug flow from the Macondo well in mid-May 2010 is undisputed. The government's rebuttal experts to Dr. Zaldivar have acknowledged slug flow from the *Deepwater*

---

[1] *See id.* at 13 (citing literature on slug flow dating to the 1950s).

[2] "Flow assurance" is a multidisciplinary science involving production chemistry, production engineering, and production operability. *See* Ex. 2, Zaldivar Deposition, at 12:9-16. Flow assurance engineers focus on the operational efficiency of oil and gas production systems.

3

*Horizon* riser end during May 13-20, 2010, at which point the oil and gas were flowing from the end of the riser as well as from holes in the riser.[3] Moreover, scientists from the government's Flow Rate Technical Group Plume Calculation Team analyzed the hydrocarbon plumes for the same time period and concluded that the observed alternating pattern of gas-dominated and oil-dominated flow "confirms the 'slug flow' regime."[4]

Dr. Zaldivar is a flow assurance expert who has studied many types of slug flow phenomena, investigated slug flow in numerous pipeline systems around the world, and designed models and intelligent systems to predict slugging. *See* Ex. 1, Zaldivar Report, at 6. Dr. Zaldivar testified that he has performed slug flow modeling on prior occasions to estimate flow rate. *See* Ex. 2, Zaldivar Deposition, at 25:15-26:7. In this matter, Dr. Zaldivar's analysis addressed three general questions:

(1) Did slug flow actually occur from May 13-20, 2010?

(2) If so, what were the specific characteristics of the slug flow?

(3) What flow rates would have produced the type of slugging that was observed during this time period?

Dr. Zaldivar worked full-time for nearly five months to answer these questions. *See id.* at 15:14-16:2. Based on independent evaluation of more than 300 videos of oil and gas plumes emanating from the end of the *Deepwater Horizon* riser, he concluded there was "clear evidence of slug flow" from May 13-20. *See* Ex. 1, Zaldivar Report, at 9, 15.

---

[3] *See* Ex. 3, Expert Deposition of Ronald Dykhuizen, Vol. 1, June 19, 2013, at 157:25-158:18, 381:10-18 (hereinafter "Dykhuizen Deposition"); Ex. 4, Deposition of John Martinez, at 105:6-12 (hereinafter "Martinez Deposition").

[4] *See* Ex. 5 (Dep. Ex. 9183), at 150; *see also id.* at 10, 66, 68, 110, 135, 140, 145, 146, 150. Further, several government officials also corroborated or confirmed the existence of slug flow. *See* Ex. 1, Zaldivar Report, at 9 (citing Ex. 6, Deposition of Lars Herbst, Vol. 1, Oct. 10, 2012, at 208:20-211:11; Ex. 7, Deposition of Adm. Thad Allen, Vol. 1, Sept. 24, 2012, at 330:23-333:10).

Dr. Zaldivar was also able to link the slug flow to a part of the riser that was moving up and down (i.e., oscillating between an arched position and resting on the seafloor) at the same time the slug flow was occurring; Dr. Zaldivar referred to this moving riser section as the "buoyant loop."[5] In fact, following extensive review, Dr. Zaldivar was able to determine that "[t]he signature of the slug flow, riser motion, and the flow through the riser [were] intricately linked." *See id.* at 9.

Dr. Zaldivar then constructed a comprehensive model of the *Deepwater Horizon* riser system using LedaFlow, a commercially available transient multiphase flow simulator used in the oil and gas industry to model multiphase hydrocarbon flow in pipelines and risers. LedaFlow, which became commercially available in June 2011, was developed during more than 10 years of collaboration between ConocoPhillips, Total, and SINTEF. *See id.* at 14, C-2. Dr. Zaldivar, who is an expert in the use of LedaFlow,[6] was able to accurately model the riser flow system geometry, including — most critically — the movement of the riser. The ability to incorporate the vertical oscillating movement of the buoyant loop is a key advantage of the LedaFlow software.[7]

Dr. Zaldivar's LedaFlow simulations involved reproducing the precise vertical motion of the buoyant loop and varying the simulated flow rate through the model of the *Deepwater*

---

[5] For instance, on May 16, the buoyant loop and the slug flow at the end of the riser were being simultaneously monitored by remotely operated vehicles ("ROVs"), which showed that both the riser motion and the observed slugging occurred in cycles of approximately 183 seconds. *See* Ex. 1, Zaldivar Report, at 9.

[6] Kongsberg Oil & Gas Technology markets LedaFlow. Dr. Zaldivar formerly worked at Kongsberg, where he managed the Americas operation of the LedaFlow business unit. *Id.* at 6. Part of Dr. Zaldivar's experience involved helping users of LedaFlow develop models for slugging studies. *Id.*

[7] Dynamic riser motion is a common phenomenon that occurs in production risers that are attached to vessels, as they are subject to motion due to tides and other meteorological phenomena. *See id.* at F-5-3. Dr. Zaldivar used video footage and three-dimensional navigation data from the ROV surveying the riser joints to model the precise geometry and motion of the riser. *Id.* at 8, 9, 29, F-1-1.

*Horizon* riser until the predicted/simulated slug flow characteristics matched the observed slug flow in the field. *See id.* at 26, 29. Stated differently, Dr. Zaldivar ensured that his LedaFlow model was consistent with the available evidence. *See* Ex. 2, Zaldivar Deposition, at 222:8-12. Dr. Zaldivar calculated the possible flow rates through the riser end and the kink holes separately, and then combined the two flow rate estimates to arrive at a daily flow rate for the period May 13-20, 2010. Dr. Zaldivar concluded that the maximum daily flow rate through the *Deepwater Horizon* riser for May 13-20 was between 24,900 and 35,900 stock tank barrels per day, with a best estimate of 30,000 stock tank barrels per day. *See* Ex. 1, Zaldivar Report, at 10, 32.

To further ensure the reliability of his model and calculations, Dr. Zaldivar "benchmarked," or validated, his LedaFlow model against OLGA, a different commercially available multiphase simulator. Dr. Zaldivar used LedaFlow as his primary simulator because OLGA cannot mimic a moving pipe or riser. *See id.* at 14. Therefore, as Dr. Zaldivar's report makes clear, he only used OLGA as a "point of comparison" to LedaFlow. *Id.* Finally, Dr. Zaldivar performed "sensitivity studies" to determine the sensitivity of his flow rate calculations to changes in key model parameters, including temperature, heat transfer, riser end depth, and pipe roughness. These sensitivity studies allowed Dr. Zaldivar to quantify the degree of uncertainty involved in his calculations, thereby further confirming their accuracy and reliability.

## ARGUMENT

**I.     Dr. Zaldivar's Modeling and Analysis Is Based on Standard Methodologies and Is Validated Against Observed Field Data from the *Deepwater Horizon* Riser.**

The United States apparently takes the position that Dr. Zaldivar's analysis of slug flow from the *Deepwater Horizon*'s riser is not based on reliable methodology or sufficient evidence, and that this type of analysis cannot produce reliable flow rate estimates for the Macondo well.

*See* Rec. Doc. 11057-2, at 1-2, 5. But the government does not engage in any real discussion of the general methodology itself and its application to similar problems in the oil and gas industry. Instead, the United States simply mischaracterizes and misrepresents Dr. Zaldivar's methodology in an attempt to discredit it. The United States makes these arguments even though its own experts suggest that such a method can be used to estimate flow rates.

### A.    The Government Mischaracterizes Dr. Zaldivar's Modeling and Analysis.

The government's motion contains two key mischaracterizations of Dr. Zaldivar's analysis and modeling. First, the United States focuses its criticism on OLGA, not LedaFlow. For instance, the United States cites to BP statements referencing OLGA's "slug tracking" feature to suggest that BP has alleged that the flow rate cannot be modeled using a flow simulator. In light of the government's repeated references to OLGA, it bears repeating that Dr. Zaldivar's flow rate calculations were developed using LedaFlow. The government claims that LedaFlow and OLGA are "similar" but ignores the key distinctions between the two programs. The most critical distinction is that LedaFlow can fully reproduce the movement of the riser's buoyant loop; this unique advantage allows LedaFlow to accurately model the *Deepwater Horizon* flow system. OLGA, on the other hand, does not have this capability. Further, "slug tracking" is the name of a specific feature in OLGA; it is not a generic term for the analysis or modeling of slug flow, and does not refer to slug flow modeling by other multiphase simulators, such as LedaFlow.[8]

Second, and perhaps more important, the government claims that "Dr. Zaldivar never compares, validates, corroborates, or otherwise checks his flow rate results against actual flow or

---

[8]    Thus, for example, statements by Dr. Adam Ballard, a BP Source Control expert, about the limitations of "slug tracking" refer specifically to OLGA, *see* Rec. Doc. 11057-2, at 4; they do not mean that slug flow analysis cannot be performed through other methods or using other programs.

pressure measurements" and that Dr. Zaldivar "never checks" his flow modeling results "using any other measurement or estimate." Rec. Doc. 11057-2, at 7, 8. This claim is both false and misleading. Putting aside that no "flow measurements" existed — the flow rate was, after all, what was being calculated — Dr. Zaldivar *did*, in fact, compare, validate, corroborate, and check his LedaFlow modeling results against observed field data. As previously discussed, Dr. Zaldivar carefully analyzed and documented the unique characteristics of the slug flow coming from the *Deepwater Horizon*'s riser, including the duration and frequency of the slugs. He compared his various LedaFlow model simulations (using different flow rates) with the actual observed flow behavior from the riser. To obtain estimated flow rates from the well, he identified those LedaFlow model runs whose simulated flows matched the observed flow behavior from the end of the riser. *See* Ex. 1, Zaldivar Report, at 29. Dr. Zaldivar also "benchmarked" his LedaFlow model against OLGA to confirm its validity, and performed sensitivity studies to quantify the uncertainty and to verify the accuracy of his input parameters and calculations.[9]

### B.     The Government's Own Expert Acknowledges Dr. Zaldivar's Methodology Can Be Used to Calculate Flow Rate.

The government's argument that Dr. Zaldivar's methodology and analysis do not satisfy Federal Rule of Evidence 702 is plainly contradicted by the testimony of its own witnesses who submitted rebuttal opinions. Dr. Ronald Dykhuizen, who put forward hydraulics-related flow rate estimates, testified that the presence of slug flow can provide information about the flow rate through a system. *See* Ex. 3, Dykhuizen Deposition, at 143:8-144:16.

---

[9]  The United States also cherry-picks statements by Dr. Ballard to suggest that reliable estimates of flow can "only be derived when there is corroboration between the different *methods* of estimating flow." Rec. Doc. 11057-2, at 7. The thrust of Dr. Ballard's argument — and, more importantly, the essence of reliable scientific analysis — is the need to validate or check results using other methodologies *or data*. *See* Ex. 8, Expert Report of Adam Ballard, at 15 n.32 (hereinafter "Ballard Report"). Dr. Zaldivar did precisely this.

John Martinez, a flow assurance engineer who submitted a rebuttal report responding to Dr. Zaldivar's analysis, went even further. Mr. Martinez endorsed using transient multiphase simulators like OLGA and LedaFlow to model slug flow and estimate flow rates. *See* Ex. 4, Martinez Deposition, at 34:16-35:7, 145:10-13, 375:24-376:4.[10] Mr. Martinez further testified that an accepted method of validating multiphase flow models based on programs such as LedaFlow and OLGA is to calibrate these models using observed evidence from the field, such as data from ROV videos. *See id.* at 310:1-312:6. Claiming he had the requisite expertise, Mr. Martinez even noted that he "would liked [sic] to have had [the] opportunity" to calibrate modeling results using field data, like Dr. Zaldivar did, but that he "didn't have time to do that."[11] *See id.* at 311:20-25, 312:22-313:4. In the end, Dr. Zaldivar developed models in both LedaFlow and OLGA that matched the observed field data. This is compelling evidence of the reliability of those models — and Mr. Martinez admitted as much:

> **Q. (By Mr. Fields) Have you ever seen a situation where both a LedaFlow simulation and an OLGA simulation both matched the observed flow behavior in the field, but both models were deemed to be wrong?**
>
> A. Well, if they're matching the observed flow behavior in the field, we don't deem them to be wrong.

*Id.* at 415:3-11 (objection omitted).

### II. Dr. Zaldivar's Modeling and Analysis Is Not "Inconsistent" with BP Documents and Statements.

The government puts forward two related, but incorrect, arguments that the Court should exclude Dr. Zaldivar's opinions because they are "inconsistent" with statements by BP experts

---

[10] The government has opted not to call Mr. Martinez as an expert witness during the Phase 2 trial.

[11] Even though Mr. Martinez acknowledged that programs like OLGA and LedaFlow could predict the flow rate based on observations of slug flow from the *Deepwater Horizon* riser, Mr. Martinez admitted that he did not even make an effort to open or review Dr. Zaldivar's LedaFlow modeling files. *See id.* at 35, 66, 147.

9

and witnesses. First, the United States claims that "Dr. Zaldivar's calculations . . . are inconsistent with the position BP has taken in this litigation and in previous public statements that it was impossible to use computational hydraulic modeling to reliably calculate flow rates using data available in May 2010." Rec. Doc. 11057-2, at 1. Second, the government claims that Zaldivar's modeling is "strikingly similar" to analyses performed by BP engineers during the response, analyses the government argues BP purportedly disclaimed as unreliable. *Id.* at 6. The facts and law support neither argument.

### A. Any Purported Inconsistencies with the Views of Other BP Witnesses Is Not a Legal Basis to Exclude the Opinions.

As demonstrated below, neither Dr. Zaldivar's analysis nor his opinions are inconsistent with BP's previously expressed views. But even if an inconsistency existed, this would not provide a basis for excluding Dr. Zaldivar's opinions. Any purported inconsistency would go to the weight the fact-finder accords the expert testimony, not its admissibility. *See United States v. 14.38 Acres of Land, More or Less Situated in Leflore County, State of Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (holding that "in determining the admissibility of expert testimony," proper deference should be accorded to the fact-finder's role "as the arbiter of disputes between conflicting opinions," and that "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility"); *see also Aspex Eyewear, Inc. v. E'Lite Optik, Inc.*, 2002 WL 1751381, at *31 (N.D. Tex. 2002) ("If an expert witness' opinion is otherwise reliable, it is not rendered unreliable under *Daubert* merely because another expert for the same party holds an opinion that can be viewed as inconsistent with that conclusion.").

10

### B. Dr. Zaldivar's Analysis and Modeling Required Adequate Tools, Data, and Time Not Available to BP in April or May 2010.

The government wrongly claims that BP has acknowledged that the flow rate cannot be accurately modeled using *data from April and May 2010*. Rec. Doc. 11057-2, at 1. In reality, BP has only stated that the flow rate could not be accurately calculated *during April and May 2010* — and only because BP did not have at its disposal the tools, data, or time needed to perform such comprehensive modeling. Even the government's expert has acknowledged that Dr. Zaldivar's analysis takes months, if not longer, to carry out.

The government cites statements by Dr. Adam Ballard, one of BP's Source Control experts, who opined that it was not possible to accurately model the flow rate from the Macondo well during the response because "neither BP nor any other party had the 'tools' in April and May 2010 necessary to reliably estimate daily discharge rates from the Well using hydraulic models." Rec. Doc. 11057-2, at 4 (citing Ex. 8, Ballard Report, at i). As made clear in the report and in his deposition, Dr. Ballard was referring to BP's inability to perform *contemporaneous* flow rate estimates in 2010; he did not suggest that data from April or May 2010 is useless for performing flow rate calculations.[12] Furthermore, the "tool" Ballard refers to is OLGA, a hydraulic modeling software that was available in May 2010. As explained previously and in Dr. Zaldivar's expert report, OLGA is incapable of accurately modeling the slug flow from the moving riser. *See* Ex. 1, Zaldivar Report, at 14. This is why Dr. Zaldivar used LedaFlow, which

---

[12] *See, e.g.*, Ex. 9, Expert Deposition of Adam Ballard, July 29, 2013, at 125:3-15 (noting, in response to a question expressly limited to contemporaneous estimates, that "during the April through the end of May timeframe, there were insufficiently known inputs to where a most likely estimate of the flow rate could not be generated"). Indeed, this clear reading of Dr. Ballard's testimony and BP's public statements is corroborated by the testimony of other BP engineers cited in the United States' motion. *See* Rec. Doc. 11057-2, at 5 n.4 (citing testimony by, among others, BP vice president Mike Mason, who correctly noted that *during April and May 2010* his team of engineers "realized fairly quickly that we couldn't predict the flow rate. We couldn't determine the flow rate.").

11

became commercially available in June 2011, as his primary tool to develop model simulations and estimate flow rates. *See id.* at 14, C-2.

The government also claims that "[c]rucially, the data relied upon by Dr. Zaldivar regarding the motion of the riser, the shape of the riser, and the periodicity of the slug flow was generated by BP or its contractors in May 2010, and was thus available at that time for BP's use in performing hydraulic modeling." Rec. Doc. 11057-2, at 2. But the government knows that it is wrong to suggest that simply because the data "was available" during the response, the company could have then easily calculated flow rate using the same methodology employed by Dr. Zaldivar. As acknowledged by Mr. Martinez, it is not possible to complete reliable slug flow modeling using transient multiphase simulators like LedaFlow in as little as a few weeks. *See* Ex. 4, Martinez Deposition, at 87:10-14 (noting that it would take him "many years" to develop a multiphase model like Dr. Zaldivar's to evaluate flow rate from the Macondo well for May 13-20, 2010); *see also id.* at 14:6-14, 21:15-20, 40:7-41:1, 127:20-128:17 (noting that he did not have enough time to perform comparable simulations over his nearly month-long retention period, and acknowledging that he "would have liked" to have performed transient modeling similar to Dr. Zaldivar's, had he had "unlimited time" to do so). Thus, the United States is fully aware that BP could not have performed this modeling "on the fly" during the response, particularly given the time needed to develop, run, and validate such models.

      **C.**      **Dr. Zaldivar's Modeling Is Not Comparable to the Analysis Performed by BP During the Response.**

The government also claims that Dr. Zaldivar's analysis is "strikingly similar" to the analysis performed by Dr. Tim Lockett and referenced by Dr. Ballard. *See* Rec. Doc. 11057-2, at 6. As an initial matter, whether Dr. Zaldivar's analysis is similar to earlier work by BP is not relevant to deciding to the admissibility of his opinions. Thus, it would be of no moment even if

12

"BP [had] taken the position that slug-tracking in May 2010 was not a credible methodology for accurately estimating flow rate." Rec. Doc. 11057-2, at 5.

More importantly, the type of modeling Dr. Ballard purportedly says "cannot be done," *see id.* at 1, is not at all similar to the analysis performed by Dr. Zaldivar. First, Dr. Lockett's analysis was performed in OLGA, not LedaFlow. Second, Dr. Lockett's analysis involved a simple hydraulic calculation focused solely on the holes in the riser and did not involve comprehensive modeling of the complete flow system (including the moving riser).[13] Third, Dr. Lockett did not validate his simple model against observed field data. Fourth, and finally, Dr. Lockett performed his analysis during a crisis, without the benefit of certain tools and time needed to complete accurate flow modeling. Put simply, Dr. Lockett's analysis is fundamentally different from Dr. Zaldivar's analysis, and it is disingenuous at best to suggest that any statement purportedly critiquing Dr. Lockett's analysis can be fairly applied to Dr. Zaldivar's analysis.

## CONCLUSION

For the foregoing reasons, BP respectfully requests that the Court should deny the United States' motion *in limine* to exclude the expert opinions offered by Dr. Michael Zaldivar.

---

[13] It is likewise disingenuous for the United States to suggest that because other engineers performing hydraulics calculations were admittedly unable to determine the flow rate with any accuracy during the early response period, BP is somehow contradicting itself by putting forward Dr. Zaldivar's LedaFlow modeling. None of these engineers modeled the riser motion using a transient multiphase flow simulator to analyze slug flow, and none was able to validate or corroborate their methodologies using observed data from the field.

September 3, 2013                                  Respectfully submitted,

                                                                                            By: /s/ Don K. Haycraft

                                                                                            Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile:  (504) 556-4108

Richard C. Godfrey, P.C.
(richard.godfrey@kirkland.com)
J. Andrew Langan, P.C.
(andrew.langan@kirkland.com)
Barry E Fields, P.C.
(barry.fields@kirkland.com)
Hariklia ("Carrie") Karis, P.C.
(hariklia.karis@kirkland.com)
Matthew T. Regan, P.C.
(matthew.regan@kirkland.com)
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois  60654
Telephone: (312) 862-2000

Robert C. "Mike" Brock
(mbrock@cov.com)
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for BP Exploration & Production Inc. & BP America Production Company*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to LexisNexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 3rd day of September, 2013.

/s/ Don K. Haycraft