UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig | : | MDL NO.  2179 |
| "Deepwater Horizon" in the Gulf | : | |
| of Mexico, on April 20, 2010 | : | SECTION:  J |
| | : | |
| This Document Relates to: | : | JUDGE BARBIER |
| | : | |
| *Civ. No.* 10-4536 | : | MAG. JUDGE SHUSHAN |

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**UNITED STATES' MEMORANDUM IN OPPOSITION TO BP'S MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF DR. NATHAN BUSHNELL**

BP[1] has moved to exclude the opinions and testimony of Dr. Nathan Bushnell, the US expert in computational fluid dynamics, or "CFD."  Citing Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993),  BP complains that Dr. Bushnell lacks the requisite expertise, and that his CFD analysis is flawed and unreliable on various grounds.

BP's Motion *in Limine* need not detain the Court long.  CFD modeling is widely accepted in the oil and gas industry and in many other industries and BP used CFD modeling during the response.  Indeed, BP originally designated its own CFD expert, Dr. Simon Lo, who performed his own CFD modeling and arrived at essentially the same result as Dr. Bushnell.  BP, perhaps for that reason, did not designate Dr. Lo as a testifying expert.  Not only do the points raised by BP in its Motion merely go to the weight of the evidence, but also Dr. Lo's report and testimony contradict the points that BP raises in its Motion *in Limine.*

Morover, Dr. Bushnell appears before the Court only as a "relied-upon" expert pursuant to Paragraph 4.i of the Court Order for Phase II, and therefore only portions of his deposition that pertain to matters relied upon by testifying experts for the United States will come into the

---

[1]  BP and Anadarko are aligned parties but for brevity only "BP" will be used here to refer to both defendants.

record.  The Court has not authorized Motions *in Limine* as to the "relied-upon" experts nor should it now.

## BACKGROUND

*Calculation of flow through the capping stack on July 14 and 15*.  Dr. Bushnell and many of the experts in Phase II look to two days of the response action, July 14 and 15, for an estimate of the flow rate from the Macondo Well at that time.  BP had inserted the capping stack over the well and during those two days immediately before the well was closed, the flow was going through a known geometry, and data for the pressure drop[2] through the capping stack was reliable.  Thus engineers and scientists could use basic principles of fluid dynamics to estimate the flow from the well.  At the time, the United States calculated the flow to be 53,000 bopd, and shared its estimate with BP[3] and, subsequently, with the public.[4]  BP did not make any estimates available to the public, but discovery in this litigation revealed that at the time of the capping stack closure, BP calculated the flow through the capping stack to be 56,000 bopd.  Ex. 3 (Lynch Dep. at 372).[5]  BP engineer and Phase II expert, Adam Ballard, calculated it to be approximately 60,000 bopd, and BP engineer Farah Saidi calculated it to be 51,500 bopd.[6]  As a retained expert in this case, Dr. Bushnell performed CFD modeling of the flow through the kill line of the capping stack and calculated the flow to be 54,100 stbopd.  Ex. 5 (Bushnell Report pg. 3-4).

---

[2]  Pressure drop refers to the decrease in pressure as the fluid moves from a higher pressure at the base of the capping stack, to a lower pressure at the exit to the sea.  Pressures are higher at lower depths.

[3] Ex. 1 (Saidi Tr. at 56).

[4] Ex. 2 (August 2, 2010 press release, dep. ex. 8809).

[5] Ex. 3 (Lynch Tr. at 372)

[6]  Ex. 4 (Ballard Tr. at  170-173); Ex. 1 (Saidi Tr. at 191-192).

*Broad Acceptance of CFD Modeling in the industry.* CFD is used in all industries that involve fluids, including the nuclear industry and aviation, where the risks to human health and safety from a poor design are high and re-design is expensive. Ex. 5 (Bushnell Report at 9-10); Ex. 8 (Lo Report at 2). BP used CFD modeling during the response.[7] The contractor who performed CFD modeling during the response, Stress Engineering, testified that CFD modeling is a widely used and accepted modeling technique. Ex. 10 (Matice Tr. at 24). Thus, BP in its Motion does not argue that CFD modeling itself is an unreliable or unproven methodology.

*Dr. Bushnell's Background and CFD Model:* Dr. Bushnell has a Phd in Chemical Process Engineering, specializing in CFD modeling, and for his thesis he performed CFD modeling using the Ansys CFX computer program. Ex. 5 (Bushnell Report at 34).[8] He works for SimuTech Group, the largest channel partner for Ansys, the largest CFD company in the world, and is one of their experienced CFD consultants. Ex. 6 (Bushnell Tr. at 39). He has devoted his career to CFD modeling and worked on more than 40 projects, most of which involve modeling of multi-phase fluids and all of which involve the basic principles of fluid dynamics at issue in this case. Ex. 5 (Bushnell Report at 3 and 32-34); Ex. 6 (Bushnell Tr. at 54-56). Modeling the flow of fluids through the Macondo capping stack is well within his area of expertise, due to his specialized experience and training.

Dr. Bushnell, like Dr. Lo, originally approached his CFD modeling on the assumption that a "slip" model, which assumes the oil and gas phase will travel at different speeds through the turns and elbows in the capping stack – i.e., "slip" past each other – would govern. Ex. 6

---

[7] Ex. 10 (Matice Tr. at 27-29); Ex. 11 (Depo Ex. 10087).

[8] His thesis topics were 1) Separation of droplets inside of an integrated separator (Ansys CFX, Steady and Unsteady flow, Turbulence, Film Atomization and Multiphase); and 2) Wetting of milk products on the distribution plate of a falling film evaporator (Ansys CFX, Steady and Unsteady flow, Multiphase and Laminar).

(Bushnell Tr. at 123-125).  The "slip" model also is referred to as a "Eulerian-Eulerian" model, or as heterogeneous or multi-phase model.  Dr. Bushnell eventually concluded that a "homogeneous" model would be appropriate for his baseline case.  *Id.*  Dr. Bushnell selected the homogeneous model for a number of justifiable reasons:

- The flow through the capping stack was at an extremely high velocity and highly turbulent such that the bubbles of gas contained in the liquid (or, alternatively, the droplet of oil contained in the gas) would inevitably break up and become very small, Ex. 5 (Bushnell Report at 16-17);

- Given the small bubbles (or, alternatively, droplets) the flow would behave more like a homogeneous flow, with the bubbles of gas moving at relatively the same speed as the oil, *id.*;

- The homogeneous model is more elegant and simple to use to model the flow through the capping stack, because it did not require that the modeler select a flow regime or select a specific size for the bubbles or droplets, Ex. 7 (Bushnell Rebuttal at 11,15) each of which are unknown and untestable variables; and

- The homogeneous model was preferable because it includes a calculation or adjustment for gas evolution (i.e., the separation of the gas from the oil due to decreasing pressures as the liquid rises through the capping stack),[9] whereas the Ansys CFX Model required creation of a special computer code that in turn required assumptions about unknown values.[10]

Dr. Bushnell, however, retained his "slip" model, also known as a Eulerian-Eulerian model, in his report.  Ex. 5 (Bushnell Report, Appx VI (Multiphase Slip) at 55-59).   His Eulerian-Eulerian model arrived at a slightly higher mass flow rate, 55,400 stbopd, than his

---

[9] Ex. 7 (Bushnell Rebuttal at 12 (indicating homogeneous include gas evolution)); Ex. 6 (Bushnell Tr. at 125).

[10] Ex. 6 (Bushnell Tr. at 371-374).

homogeneous model. *Id.* at 70-71. Although he no longer used the "slip" model as his baseline case, Dr. Bushnell also rigorously performed sensitivity tests on some of the key inputs to the "slip" model, including flow regimes of bubbles versus droplets, the diameters of both bubbles and droplets, the geometry of the capping stack, and a number of other parameters. Ex. 5 (Bushnell Report, Appx. VII, at 70-73). As set forth in Dr. Bushnell's Report, none of those variables had a significant impact.

*Dr. Lo's Background and CFD Model.* BP also offered its own CFD modeler, Dr. Lo, to testify concerning CFD modeling.[11] Dr. Lo also is a highly qualified CFD modeler. He works for the other of the two major CFD company in the world, CD-adapco, and is widely published and experienced in the field. He was deposed under oath. Although BP retained him in 2011, Dr. Lo would only testify to the work appearing in his Report that he performed in April 2013, after he received Dr. Bushnell's expert report. Ex. 9 (Lo Tr. at 31-32; 38-41). Similar to Dr. Bushnell, Dr. Lo began from the assumption that the "slip" model was appropriate. He expressed his results in mass flow rate, or kilograms per second, the units produced by the CFD model, as well as in stock tank barrels of oil, to neutralize the effect of the conversion from kg/s to stbopd. Ex. 8 (Lo Report at 6).[12] Dr. Lo claimed to have identified "deficiencies" in Dr. Bushnell's modeling but his mass flow rate results – once the variables of temperature and fluids were removed – were nearly identical to Dr. Bushnell's: Lo calculated 119.8 kg/s and Bushnell

---

[11] Although not designated as a testifying expert, use of Dr. Lo's report and testimony is appropriate for purposes of this *Daubert* briefing. *See* Section I.A *infra.*

[12] The United States' concerns with BP's conversion factors are set forth elsewhere. *See*, US Motion *in Limine* to Preclude Opinion Testimony of BP/Anadarko Witness Curtis Whitson as to Pure Question of Law (Rec. doc. 11056); US Motion for Partial Summary Judgment (Rec. Doc.10756).

calculated 119.9 kg/s, well within the accuracy of either model.[13]  The deficiencies he found track BP's arguments in its Motion.[14]

Significantly, Dr. Lo states in his Report and agreed in his deposition that, if the bubble or droplet size is sufficiently small, the homogeneous model used by Dr. Bushnell in his baseline case is appropriate.  Ex. 8 (Lo Report at 29-30) ("For small droplet diameters [of 20 microns or less], the drag force becomes larger and the relative velocity between the oil and gas becomes smaller.  The resulting flow rate approaches the homogeneous mixture model."); Ex. 9 (Lo Tr. at 168-172).

BP has not designated Dr. Lo as a testifying expert, nor even as a "relied-upon" non-testifying expert, which they could have done.[15]  Indeed, one of BP's arguments is that the complex mixture of oil and gas requires multi-phase modeling and the US experts' models are too simplistic – but  BP has offered no witness of its own to show that multi-phase modeling would arrive at a different result, and (except for this briefing) Dr. Lo is entirely absent from both BP's Motion *in Limine* and from the Phase II trial. [16]

---

[13] *See*, Ex. 25 (Lo. Dep. Ex. 12010); Ex. 9 (Lo Tr. at 62-81; 173-174).  Compare Ex. 8, Lo Report, Table  3.5 (Lo multi-phase model with gas evolution and sea plenum provides 119.8 kg/s) to pg. 6 (Bushnell baseline case provides 119.9 kg/s).  Ex. 7 (Bushnell Rebuttal Report at 1-9).

[14] Specifically,  Dr. Lo alleged that deficiencies he saw in Dr. Bushnell's work included (1) his use of an input of 200°F versus 220°F; (2) Dr. Bushnell's treatment of exit loss, i.e. the effect of pressure loss as the oil and gas enter the seawater;  (3) Dr. Bushnell's decision to use a homogeneous model instead of a Eulerian-Eulerian model; (4) Dr. Bushnell's selection of flow regime and his choice of bubble diameter; and (5) Dr. Bushnell's use of US expert Dr. Zick's fluid properties as an input to his model instead of BP expert's Dr.Whitson's. Ex. 8 (Lo Report at Executive Summary i-ii).

[15]  For example, BP's expert Dr. Gringarten relied upon Dr. Lo for certain inputs but can no longer do so.  Ex. 12 (Gringarten Expert Report at 36, 49).

[16]  Ironically, BP represented to the Magistrate Judge that it almost certainly would call Dr. Lo and two other experts putting forth flow estimates to testify at trial, to persuade the Court to put aside the United States' Motion for Partial Summary Judgment as to the minimum amount of oil discharged from the Macondo well, based on BP's party admissions.  BP wrote:

*Procedural Context.*   The Court's Order Regarding the Presentation of Evidence in the Phase II Trial (Rec. Doc. 11078) (Phase II Order"), limits each side to eight Quantification experts, in addition to limiting the amount of time allocated to Plaintiffs and Defendants.  BP proposed the provision concerning "relied upon" experts,[17] ultimately adopted by the Court in Paragraph 4.i of its Phase II Order, which provides that, when a testifying expert relies upon another expert for a matter identified in the testifying expert's report, the redacted deposition transcript of the "relied-upon" non-testifying expert may be admitted into evidence.[18]  BP designated three of its experts as reliance experts under this provision, which had the effect of allowing into evidence virtually all of BP's experts,[19]  whereas the United States dropped four of its experts due to the 8-

---

> The United States' alleged concern is that BP and Anadarko will fail to call to testify during the Phase 2 Quantification trial any of its experts Drs. Martin Blunt, Alain Gringarten, or Simon Lo. (Memo, Rec. Doc. 10756-11, at 7-8.) But it is hard to see a scenario in which BP and Anadarko would exclude all three of these experts from their roster of experts who will testify live at trial. Should this unlikely scenario unfold, it might be worth taking a second look at the motion at that hypothetical time.

Exhibit 13 (July 18, 2013 Letter from Robert Gasaway to Hon. Sally Shushan).

[17]  Ex. 14 (July 1, 2013 Email from Robert Gasaway to counsel re: Phase Two Motions, pre-filing consultation).

[18]  Phase II Order, Paragraph 4.i provides in full:

> <u>Experts Relying on Other Experts.</u>  Either side may allow its testifying epxerts to rely on the calculations or analysis of another of its experts (as set forth in the testifying expert's report) without calling the relied-upon expert to testify at trial.  In doing so, however, the  presenting party must designate the relied-upon experts' deposition as one of its 20 allotted deposition bundle submissions.  Only portions of the direct and cross-examination relating to the relied upon calculations or analysis will be submitted to the Court.

[19] BP had a number of experts on which other experts relied, including Dr. Lo., and has designated three experts to come in under this provision. Ex. 15 (August 14, 2013 Letter from Robert Gasaway to Judge Shushan re: BP and Anadarko Side" *in Camera* List of Phase 2 Deposition Designations).   Thus, of BP's original list of experts, eight are designated as testifying experts, three as "relied upon" non-testifying experts, one was dropped before his deposition, and  BP elected not to designate Dr. Lo either as a testifying expert or a "relied upon" expert.

expert limitation and has designated only one expert under this provision, Dr. Bushnell.[20] Even though references to Dr. Bushnell appears only in this very limited fashion, BP – apparently amazed that another party availed itself of the "relied upon" expert provision -- has filed *two* motions to preclude *any* references to Dr. Bushnell's CFD modeling.[21]

BP's determination to eradicate from the record *any* reference to Dr. Bushnell's work, and its decision not to call Dr. Lo as either a testifying or "relied upon" expert, is striking: many of BP's criticisms of the US flow rate estimates[22] can be evaluated and rebutted through the use of CFD modeling which, in fact, generally shows that the different methodologies advocated by BP have little effect.

## ARGUMENT

I.  Dr. Bushnell's Expert Opinion and Testimony are Reliable and Readily Satisfy the *Daubert* Standards.

    A.  The Relevant *Daubert* Standards.

---

[20] Ex. 16 (August 16, 2013 Email from Scott Cernich to counsel: US In Camera Submission of Deposition Bundle Lists).

[21] In addition to this Motion *in Limine*, BP has requested that the Magistrate Judge both strike Dr. Bushnell's redacted deposition transcript *and* order the US to refrain from any reference to his work. BP's argument is that the reliance of the other federal experts on Dr. Bushnell "does not correspond to proper uses of Phase 2 relied-on non-testifiers" -- despite a clear record of their reliance.

[22] BP's criticisms include arguments that federal experts should have used computer models such as CFD for multi-phase fluids, that their use of "K" factors was inappropriate for the complex geometry of the capping stack, and that their use of constant discharge coefficients was inappropriate. *See,* Ex. 17 (BP's Preliminary Response to the Flow Rate and Volume Estimates contained in Staff Working Paper No. 3, at 1-4; 9-10 (Dep. Ex. 10338); and Ex. 18 (Johnson Expert Report Section 4.3.4, at 26).

The relevant standards for determining whether expert testimony is admissible in a bench trial are well known to the Court and will be stated here only briefly.[23]  Pursuant to Fed. R. Evid. 702, the court must make a preliminary inquiry to ensure the testimony is both relevant and reliable.  Fed. R. Evid. 702;  *Daubert*, 509 U.S. at 588; *United States v. Hitt*, 473 F.3d 146, 158 (5th Cir. 2006).   The purpose of the *Daubert* Motion is to ensure that only reliable and relevant expert testimony is presented to the jury, and the *Daubert* safeguards are not as essential in a case where the factfinder is the district court judge and not a jury.  *Thompson v. Rowan Companies, Inc.*, No. 06-3218, 2007 WL 724646 (E.D. La. March 6, 2007) (Barbier, J.)   Here, Dr. Bushnell's methodologies are of a type reasonably relied on by experts in the field – indeed, BP used CFD modeling during the response – and the United States' testifying experts should be permitted to refer to their reliance on his modeling pursuant to the Court's Order concerning the presentation of evidence in Phase II.  *See* Fed. Rule Evid. 703.  Where, as here, the opposing party's objections go more to the weight of the experts' opinions than to the admissibility of such opinions, the questions  should be addressed through cross-examination (in this instance, live examination of the testifying experts and BP's cross-examination  of Dr. Bushnell through his deposition) and the adversarial process.  *In Cudd Pressure Control,* No. 98-585, 1999 WL 756439, at *1 (E.D. La. Sept. 24, 1991).

The United States' reference to Dr. Lo's expert report and testimony in this brief is not controversial, even though BP did not designate him as a testifying expert.  BP contends that Dr. Bushnell's CFD modeling should be excluded from the case because it is "so flawed and unreliable as to be of no assistance to the Court".  BP Motion at 5.  Dr. Bushnell's opinion is

---

[23] The United States also incorporates herein by reference the legal discussion in the United States' Memorandum In Opposition to BP's Motion to Exclude Certain Opinions and Testimony of Dr. Mohan Kelkar, filed concurrently with this Opposition.

9

reliable, however, and will assist the factfinder.  The fact that other experts use a similar computer modeling technique, and their sworn testimony regarding the basic principles and application of that technique, are highly probative to this *Daubert* Motion.   References to Dr. Lo's work in this Opposition are *solely* to oppose the pending BP Motion to Preclude Dr. Bushnell's Opinion and Testimony from the case.   Even though Dr. Lo's expert opinion will not be part of the factual evidence presented to the Court -- in fact, all references to Dr. Lo's work must be redacted from BP's expert reports -- it is nonetheless entirely appropriate to explore Dr. Lo's expert work and sworn testimony concerning CFD modeling for the limited purpose of demonstrating the admissibility of Dr. Bushnell's opinion.

    B.  <u>Dr. Bushnell has the Requisite Experience to Render his Expert Opinion</u>.

As summarized above, Dr. Bushnell has the necessary credentials and training, coupled with experience with CFD modeling, to be qualified to render the opinion on which the US testifying experts rely.  BP glosses over the fact that Dr. Bushnell earned his doctorate degree in CFD modeling, and trivializes any work he did on projects that did not involve hydrocarbons. The basic principles and equations pertaining to all multi-phase fluids, including water and steam used in nuclear reactors and other similar fluids, are the same.  Again, Dr. Lo's work is instructive:  he freely cited to articles from projects on nuclear reactors and experiments with other fluids to support his opinions, Ex. 8 (Lo Report Appx. 10, at 85-87 (References)) and testified that fluid mechanics are all governed by the same law of physics so that principles developed in other industries can be pertinent to the oil and gas industry.  Ex. 9 (Lo Tr. 25-26).

      C.      <u>The Issues Raised by BP's Motion Merely Go to the Weight of the Evidence and Should be Addressed Through Cross-Examination of the Testifying Experts.</u>

BP's differences with Dr. Bushnell's CFD modeling should be handled through the normal adversarial process rather than by preclusion of any reference to Dr. Bushnell's work. In essence, BP's motion *in limine* is a reprise of Dr. Lo's report, demonstrating that the relatively minor differences between the two experts' analyses are the stuff of cross examination, not motions practice to exclude opinions.

      1.      <u>Temperature</u>:  BP moves to strike Dr. Bushnell's opinion "that the temperature of the flow is 200°F at the wellhead." BP Motion at 8. However, Dr. Bushnell's opinion concerning temperature is more limited: assuming certain facts provided to him, he concluded that using a temperature of 200°F was reasonable.[24] He concededly did not perform an independent investigation of the voluminous record and will not be a fact witness for temperature.

During the response, BP frequently used a temperature of 200°F in its modeling and therefore the US experts were provided with that data.[25] In fact, the *only* data supporting a higher number is a single measurement collected on June 21, 2010 by Woods Hole Institute, which is not documented in contemporaneous records but only in an article concerning the constituents of the Macondo fluid.[26] Prior to serving its expert reports, BP had not indicated to

---

[24] The CFD model uses temperature as an input. Higher temperatures result in a lower mass flow rate, and lower temperatures increase the mass flow rate.

[25] Ex 19 (dep. ex. 10369); Ex. 20 (dep. ex 10374); Ex. 21 (dep. ex. 10385); Ex. 22 (dep. ex 9459).

[26] Ex. 23 (dep. ex. 9012).

11

the United States that the 200°F was controversial and in fact cited to that temperature in its only public statement on flow rate estimates prior to the litigation.[27]

Both Dr. Lo and Dr. Bushnell were supplied with temperature data by counsel since it is an input to their model and, given the voluminous record in the case, neither performed an independent investigation.[28]  Ex. 9 (Lo Tr. at 94-106).  Dr. Bushnell merely testified that, given a range of temperatures from 180° to 220°F, he believed that it was reasonable to use the point in the middle of the range of 200°F.  Ex. 7 (Bushnell Rebuttal Report at 9); Ex. 6 (Bushnell Tr. at 266).  Indeed, both Dr. Lo and Dr. Bushnell found the difference temperature made minimal difference in the mass flow rate, reducing the flow by only 1 or 2%.[29]  Dr. Bushnell's use of a reasonable input should not be a basis for precluding his expert opinions.

       2.       Gas Evolution:  BP also attempts to preclude Dr. Bushnell's CFD modeling on grounds that he did not incorporate gas evolution into his Eulerian-Eulerian model.  One of the reasons Dr. Bushnell selected the homogeneous model was that it automatically adjusted for gas evolution – i.e. it incorporated the separation of the gas from the oil phase at each pressure as the fluid flowed upward through the capping stack.  The Eulerian-Eulerian Model, however, requires addition of another computer code, which in turn required unavailable thermal information – CPs, thermal conductivities and heat transfer information.  Ex. 6 (Bushnell Tr. at 371-374).

---

[27] Ex. 17 (BP's Preliminary Response to the Flow Rate and Volume Estimates contained in Staff Working Paper No. 3, pp. 1-4; 9-10  (dep. ex. 10338)

[28] Obviously, experts routinely rely upon other experts for inputs, as witnessed by BP's designation of three "relied upon" experts.

[29] *See*, Ex. 8 (Dr. Lo Report, Table 3.1, at 7 (-1.7%)); Ex. 7 (Dr. Bushnell Rebuttal Report, Appx. 5, Table 8, at 46-47 (-2.1%)).

The impact of gas evolution is extremely minor. Dr. Lo's work concluded that incorporation of gas evolution to his "slip" model accounted only for a negligible difference of 0.3 percent. Ex. 8 (Lo Report, Table 3.5, at 19); *see also,* Ex. 9 (Lo Tr. at 202-203 (mass flow rate is not sensitive to gas evolution calculation).

And, given the absence of information necessary to model gas evolution, it is unclear that Dr. Lo's additional code was any more accurate than Dr. Bushnell's. Review of Dr. Lo's calculations regarding gas evolution reflects that, given the absence of information, he basically assumed the problem away.[30]

3. <u>Flow Regime and Flow Regime Maps</u>: BP argues that identifying the "flow regime" is a key aspect of multi-phase CFD modeling and further argues that because Dr. Bushnell made errors in his application of a flow regime map in his rebuttal report, testimony concerning Dr. Bushnell's CFD modeling should be precluded.[31] BP Motion at 9. Of course, one reason Dr. Bushnell selected the homogeneous model for his baseline case is that it does not require selection of a flow regime or use of flow regime maps, which are fraught with problems and inconsistent with each other. Ex. 7 (Bushnell Rebuttal Report, at 12-15). A leading

---

[30] Dr. Lo wrote:

The gas evolution process is generally very fast and it is common practice to assume local equilibrium such that the oil and gas volume fractions reach their equilibrium values for the given pressure and temperature instantaneously….*The major advantage of the local equilibrium assumption is that detailed knowledge of the mass transfer coefficient is not required*. Instead *any value* that is larger than the flow time scale can be used to represent the fast mass transfer process.

[Emphasis supplied]. Ex. 8 (Lo Report, Appx. 4, at 50). Dr. Lo then calculates a number but multiplies it by 10 (apparently a randomly selected number) for his gas evolution calculation.

[31] Flow regime maps are based on experiments where flow is forced through extended pipes, sometimes with photography, which the scientist then attempts to record on the "maps" described in BP's Motion. Although sometimes the experiments are performed with oil and gas, fluids more typically are water and steam.

13

authority on flow regime maps, Dr. Hewitt, in an article relied upon by Dr. Lo[32], expressed a caveat with respect to flow regime maps:

> It should be emphasized from the outset that this flow pattern map should be regarded as a first approximation. Clearly, very much more extensive data would be needed before any definite conclusions could be drawn. It is most unlikely that the simple parameters of momentum flux will describe the flow patterns in widely differing fluids to any degree of accuracy. Clearly, the physical properties of the fluids and the characteristics of the channel would have to be taken into account.

Ex. 24 (Dep. Ex. 11710, at 6). Dr. Lo clearly understood the limitations and inconsistencies of flow regime maps and rapidly disavowed much reliance on them. *See*, Ex. 9 (Lo Dep. Tr. at 124) (well, that's why I base my flow determination by a number of factors; flow regime maps provide one piece of the confirmation that I need but I use other factors to determine the flow regimes in this case); pg. 131 (well, this is the reason why I don't just rely on one methods; in the context of CFD we have another methods and approach because we need localized information; flow regime maps give a global indication of a flow but at the end of the day when we do CFD calculation, we are doing localized calculation and we need localized information).

The CFD modelers using the Eulerian-Eulerian models can only input a bubbly or a droplet regime or "morphology". Dr. Bushnell's selection of a bubbly flow regime for his "slip" model is justified given the highly turbulent flow and velocity through the capping stack. Ex. 5 (Bushnell Report at 16-17); Ex. 7 (Bushnell Rebuttal Report at 15-16). Dr. Bushnell nonetheless performed sensitivity tests and ran his baseline model for a droplet flow regime and found it did not significantly affect the flow rate. Ex. 5 (Bushnell Report Appx VII, at 70-72).

---

[32] G.F. Hewitt and D.N. Roberts, "Study of Two-Phase flow Patterns by simultaneous X-ray and flash photography," Atomic Energy research Establishment Harwell, AERE-M, 2159, February 1969, cited in Ex. 8, Lo Report at 12-13 & 86, reference number 18.

For the foregoing reasons, Dr. Bushnell's opinion and deposition testimony are reliable and helpful to the trier of fact in this bench trial. His deposition bundle should be admitted in to evidence and the United States' testifying experts should be able to cite to and explain their reliance on his work.

II.     Dr. Bushnell's  Testimony and Opinions Related to Erosion are No Longer Relevant.

No US testifying expert will rely on Dr. Bushnell's opinion concerning the CFD modeling of Dr. Nesic and therefore that portion of his deposition testimony will not be submitted to the Court and there is no need to respond to BP's contentions.   The United States' concerns with Dr. Nesic's CFD modeling are set forth elsewhere.  *See*, US Motion *in Limine* to Exclude the Testimony of Srdjan Nesic (Rec. Doc. 11058).

III.    The Court Should Not Allow Motions *in Limine* as to the "Relied-Upon Experts" Whose Testimony Comes in Under Paragraph 4.i of Its Order.

The Court should not entertain Motions *in Limine* as to the non-testifying experts.  At trial, BP will have an opportunity to cross-examine the testifying experts concerning their reliance on Dr. Bushnell's CFD modeling, and BP's cross-examination of Dr. Bushnell will come into evidence through his deposition transcript.  BP also could have designated Dr. Lo as a non-testifying expert, since Dr. Gringarten relied upon his flow rates, but elected not to do so. Here, having proposed these procedures, BP invites the Court go even further afield from normal procedures and the federal rules, by trying to strike *non-testifying* experts.  BP's invitation should not be accepted.

## CONCLUSION

BP's Motion to exclude the Opinions and Testimony of Dr. Nathan Bushnell should be denied.

        Respectfully submitted,

        <u>/s/ Steven O'Rourke</u>
        STEVEN O'ROURKE
        Senior Attorney
        Environmental Enforcement Section
        U.S. Department of Justice
        P.O. Box 7611
        Washington, D.C. 20044
        Telephone: 202-514-2779
        Facsimile: 202-514-2583
        E-mail: steve.o'rourke@usdoj.gov

## CERTIFICATE OF SERVICE

      I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

Date:  September 3, 2013                        /s/ Steven O'Rourke
                                                              Steven O'Rourke

**EXHIBIT LIST**

| Exhibit # | Title/ Pages |
|---|---|
| 1. | Farah Saidi, Depo. Tr. at 56, 191-192. |
| 2. | Depo. Ex. 8809 (Press Release, August 2, 2010). |
| 3. | Richard Lynch, Jr., May 19, 2011 Depo Tr. at 372. |
| 4. | Adam Ballard, May 6, 2013 Depo. Tr. at 170-173 |
| 5. | Dr. Nathan Bushnell Expert Report, pps. 1-34; Appendix VI pps 55-59; Appendix VII pps. 70-73. |
| 6. | Dr. Bushnell Depo. Tr. at 39, 54-56, 123-25, 266, 371-374 |
| 7. | Dr. Bushnell Rebuttal Report, pps. 1-21; Appendix 5 pps. 46-47. |
| 8. | Dr. Simon Lo Report at i-ii (executive summary); 2, 6, 7 (table 3.1), 12-13, 19 (table 3.5), 29-30, 50, 85-87, |
| 9. | Dr. Simon Lo Depo. Tr. at 25-26, 31-32, 38-41, 62-81, 94 - 106, 124, 131, 168-172, 173-174, 202-203 |
| 10. | Christopher Matice, Depo. Tr. at 24, 27-29 - November 28, 2012 |
| 11. | Depo. Ex. 10087 |
| 12. | Dr. Alain C. Gringarten, Expert Report pps. 36 and 49 |
| 13. | July 18, 2013 Letter from Robert Gasaway to Hon. Sally Shushan re: Motion to Postpone Indefinitely the Response Deadline for Phase 2 "Dispositive" Motions Filed on July 15, 2013 |
| 14. | July1, 2013 Email from Robert Gasaway to counsel re: Phase Two Motions, pre-filing consultation. |
| 15. | August 14, 2013 Letter from Robert Gasaway to Judge Shushan re: BP and Anadarko Side" *in Camera* List of Phase 2 Deposition Designations. |
| 16. | August 16, 2013 Email from Scott Cernich to counsel MDL 2179: US in Camera Submission of Deposition bundle Lists. |

17. BP's Preliminary Response to the Flow Rate and Volume Estimates contained in Staff Working Paper No. 3, pp. 1-4; 9-10 (Dep. Ex. 10338) (*Confidential*)

18. Johnson Expert Report Section 4.3.4, p. 26

19. Depo. Ex. 10369 (April 30, 2010 email from Trevor Hill to Leith McDonald re: temperature profile of MC 252 riser)

20. Depo. Ex 10374 (email thread with June 2, 2010 email from Tim Lockett to Trevor Hill and others re: Action: Need predicted/measured BOP temperatures for Q4000 design)

21. Depo. Ex. 10385 (email thread with July 12, 2010 email from Paul Anderson to Marcus Rose and others re: Temp Readings)

22. Depo. Ex. 9459 (email thread with July 2, 2010 email from Gordon Birrell to Trevor Hill Re: Temperature measurement)

23. Depo. Ex. 9012 (article entitled "composition and fate of gas and oil released to the water column during the *Deepwater Horison* oil spill," June 2010)

24. Depo. Ex. 11710 (*Studies of Two-Phase Flow Patterns by Simultaneous X-Ray and Flash Photography*, G.F. Hewitt et al, at pg 6 )

25. Depo. Ex. 12010 (Table from Lo deposition).