# Exhibit 1

| | |
|---|---|
| **From:** | Himmelhoch, Sarah (ENRD) [Sarah.Himmelhoch@usdoj.gov] |
| **Sent:** | Friday, August 23, 2013 1:33 PM |
| **To:** | Phase2BP@liskow.com; States' Distribution LIst; *mary.rose.alexander@lw.com; Barr, Brian; *dennisbarrow@warejackson.com; Beck, David J.; Berman, Lisa (ENRD); Colby, Paul; *deepwater.horizon@usdoj.gov; Defendants' Mailbox; *connie.delgado@bingham.com; Edwards, Thomas; Eisert, Joseph A.; *edward.flanders@pillsburylaw.com; *jfunderburk@morganlewis.com; Gallinghouse, Tracy; Gasaway, Robert R.; *dgodwin@godwinronquillo.com; Hanger, Robin L. (CIV); *dkhaycraft@liskow.com; Hebert, Joshua; Henry, Camile; Henry, Camille (CIV); *sherman@hhkc.com; *deepwater.horizon@usdoj.gov; *airpino@irpinolaw.com; Kent, Russell; Kirby, Ky E.; Kuchler, Deborah D.; Langan, Andrew; LeBouef, Susan ; Leith, Cheryl; *mlemoine@joneswalker.com; Lerner, Daryl; Levine, Randall; Lyle, Michael J.; Hormozi, Erin; *CMaze@ago.state.al.us; McCulley, Catherine; Miller, Kerry J.; *PMills@ago.state.al.us; Nelson, Thomas; Ng, Patrick; Niermann, Jon; Nomellini, Mark J.; *sean.obrien@sutherland.com; Peterson, Lili; Petrino, Michael A.; Phillips, Trey; Pixton, Allan; Plaintiffs' Centralized Mailbox; Pritzlaff, Craig; Raines, Carolyn; Ray, Jordan; Roy, James; Russell, Joseph M.; Salaj, Steve; *psavoy@brsfirm.com; *aschexneider@joneswalker.com; Scofield, Denise; Simson, Sylvia; Strange, Luther; Tambling, Richard; Tanner, Hugh; Terrell, Megan; Tommy Thomassie; Vide, Cynthia A.; Weigel, Alan M.; Wood, M. |
| **Cc:** | Aguilar, Cecilia (CIV); Anderson, Esperanza (ENRD); Anderson, Sandi (CIV); Andre, Abigail (ENRD); Benson, Thomas (ENRD); Bowen, Jennifer (CIV); Cernich, Scott (ENRD); Chakeres, Aristide (ENRD); Chang, Deanna (ENRD); Cross, Anna (ENRD); Delemarre, Michelle (CIV); Dobranski, Walter; Dobranski, Walter (CIV); Engel, Bethany (ENRD); Fisherow, Walter Benjamin (ENRD); Flickinger, Nancy (ENRD); Flynn, Stephen (CIV); Fremerman, Gary - OGC; Frost, Peter (CIV); Gladstein, Richard (ENRD); Gomez, Ruben (ENRD); Goodhue, Benjamin R (CIV); Greif, Michele (CIV); Hankey, Rachel (ENRD); Harvey, Judy (ENRD); *Sarah.Himmelhoch@usdoj.gov; Ingersoll, Andrew (ENRD); Jackson, Wagner (CIV); King, Rachel (ENRD); Kinley, Jo; Kinley, Jo (CIV); Lawrence, Malinda R. (CIV); Legore, Camille; Legore, Camille (CIV); Li, Bonnie (CIV); Liu, Emily (CIV); Mariani, Tom (ENRD); Mayberry, Laura D. (CIV); McAuliffe, John (CIV); McClellan, Jessica L. (CIV); McIlwain, David (ENRD); McNulty, Michael (ENRD); Morton, Tracy L. (CIV); Nicoll, James (ENRD); Olinde, Sandra (CIV); O'Rourke, Steve (ENRD); Palugod, Paulo (ENRD); Pencak, Erica (ENRD); Pirich, Andrew (CIV); Robers, Brandon (ENRD); Rosa, Jill (CIV); Salaj, Steve (CIV); Schnitzler, Gilbert; Schnitzler, Gilbert (CIV); Seidel, Karyn (ENRD); Shutler, Sharon (CIV); Sullivan, Jessica (CIV); Sullivan, Sean (CIV); Swank, Colin (CIV); Thode, Anna (ENRD); Tsipouras, Eleni (CIV); *Mike.Underhill@usdoj.gov; Vo, Michael M. (CIV); Walmsley, Tammy (CIV); Young, Gordon (ENRD) |
| **Subject:** | MDL 2179:  Redacted Rebuttal Reports for the US |

Counsel –

Later this evening we will upload to the FTP site the redacted reports of the United States' rebuttal witnesses.  We will also serve these reports in PTO 16 fashion as soon as practicable.

Sarah D. Himmelhoch
Senior Litigation Counsel for E-Discovery
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
202-514-0180 (phone)

# Exhibit 2

| | |
|---|---|
| **From:** | Himmelhoch, Sarah (ENRD) [Sarah.Himmelhoch@usdoj.gov] |
| **Sent:** | Friday, June 21, 2013 3:52 PM |
| **To:** | Gasaway, Robert R.; Sally_Shushan@laed.uscourts.gov |
| **Cc:** | Andre, Abigail (ENRD); Chakeres, Aristide (ENRD); bbarr@levinlaw.com; ben_allums@laed.uscourts.gov; Engel, Bethany (ENRD); *CMaze@ago.state.al.us; *deepwater.horizon@usdoj.gov; dsc2179@liskow.com; d.pote@kanner-law.com; Pencak, Erica (ENRD); grant.davis-denny@mto.com; jimmy@jimmywilliamson.com; jimr@wrightroy.com; luther.strange@ago.state.al.us; *Mike.Underhill@usdoj.gov; mike_o'keefe@laed.uscourts.gov; King, Rachel (ENRD); Hanger, Robin L. (CIV); Cernich, Scott (ENRD); *sherman@hhkc.com; Flynn, Stephen (CIV); O'Rourke, Steve (ENRD); Godley, Tamerlin; TDemetriou@mithofflaw.com; terrellm@ag.state.la.us; Benson, Thomas (ENRD); treyphillipsdwh@ag.state.la.us; WStradley@mithofflaw.com |
| **Subject:** | RE: MDL 2179 - Phase Two - Follow-up Telephone Conference re Motion to Strike |

Dear Judge Shushan –

Remember my reference to Lucy and the football of this morning? BP is saying it wants the redacted report AND the opportunity to depose Dr. Kelkar on the entire report AND the right to depose Dr. Raghavan should it feel it necessary once it has deposed Dr. Kelkar. This is what BP wants and what the United States offered as an alternative and what the United States has already rejected. In essence, BP is seeking to punish the United States for heeding the Court's advice to reduce the number of quantification experts and streamline the Phase 2 expert discovery and trial process by eliminating one element of the United States' proof without any concomitant benefit to the United States. To quote Mr. Gasaway, "that's just crazy."

That said, here's where I think there may be a reasonable solution:

(1)  Dr. Kelkar may be deposed on the entirety of the report
(2)  BP may move to exclude any opinions contained in the entirety of the report which it believes are without foundation after deposing Dr. Kelkar and/or the United States may withdraw certain opinions set forth in the report
(3)  Both parties reserve the right to disagree about the use of any deposition testimony regarding portions of the report that may be withdrawn or excluded as a result of actions pursuant to item 2

If my proposed solution is not acceptable, the United States will not withdraw Dr. Raghavan, his deposition will need to be scheduled, and the United States will retain its right to call Dr. Raghavan (or not) at trial as it determines is appropriate after the deposition process has concluded.

Sarah D. Himmelhoch
Senior Litigation Counsel for E-Discovery
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
202-514-0180 (phone)

---

**From:** Cayco, Marie V. [mailto:mcayco@kirkland.com] **On Behalf Of** Gasaway, Robert R.
**Sent:** Friday, June 21, 2013 3:32 PM
**To:** Sally_Shushan@laed.uscourts.gov; Himmelhoch, Sarah (ENRD)
**Cc:** Andre, Abigail (ENRD); Chakeres, Aristide (ENRD); bbarr@levinlaw.com; ben_allums@laed.uscourts.gov; Engel, Bethany (ENRD); *CMaze@ago.state.al.us; Horizon, Deepwater; dsc2179@liskow.com; d.pote@kanner-law.com; Pencak, Erica (ENRD); grant.davis-denny@mto.com; jimmy@jimmywilliamson.com; jimr@wrightroy.com;

luther.strange@ago.state.al.us; Underhill, Mike (CIV); mike_o'keefe@laed.uscourts.gov; King, Rachel (ENRD); Hanger, Robin L. (CIV); Cernich, Scott (ENRD); *sherman@hhkc.com; Flynn, Stephen (CIV); O'Rourke, Steve (ENRD); Godley, Tamerlin; TDemetriou@mithofflaw.com; terrellm@ag.state.la.us; Benson, Thomas (ENRD); treyphillipsdwh@ag.state.la.us; WStradley@mithofflaw.com
**Subject:** RE: MDL 2179 - Phase Two - Follow-up Telephone Conference re Motion to Strike

Dear Judge Shushan,

In light of Sarah's email and your follow on inquiry coming out of this morning's conference call (see below), here is where we think we stand re Dr. Raghavan's deposition.

*First*, as explained on this morning's conference call, the United States has gone beyond the precedent it cites. As you see from the attached, BP's withdrawal of Phase 1 expert Lockhart made non-substantive changes to his joint report with Richard Lee and Lief Colson and BP simultaneously provided the amended report to all parties.

(See attached amended expert report and 12/30/11 transmittal from Andy Langan to the Court and parties.)

In contrast, we learned this morning that the United States is proposing to remove substantive charts from the jointly-authored Kelkar-Raghavan report and that the United States is willing (thus far) to share the report as it stands after these redactions only with the Court *in camera* and not with the parties.

*Second*, despite the United States' going beyond the Lockhart precedent it cites, BP is eager to move this process along.

Accordingly, BP agrees to allow the United States to withdraw Raghavan and make substantive changes to the joint Kelkar-Raghavan report.  We therefore ask that the Court (or the United States) immediately provide all parties with the redacted report the United States has lodged with it.

But BP reserves the right to depose Dr. Raghavan should Dr. Kelkar prove unable to answer questions about the un-redacted portions of the report -- just as the United States reserved its rights to depose Mr. Lockhart after he was withdrawn.  (*See* Attached, 2012.01.03 Lockhart Precedent (The Court ruled, "The U.S. or any other party may raise the issue of Lockard's deposition after January 13."))

*Third*, we appreciate the United States' acknowledgment that Kelkar can be deposed on the totality of his report, including the substantive testimony the United States has withdrawn.

In regard to the issue raised by the United States regarding use at trial of Dr. Kelkar's testimony of the excised, substantive portions of the report, we note that the United States' position may well be inconsistent with paragraph 3, page 3 of Rec. Doc. 5560 -- the order its cites.  (Attached.)  But, the Court need not resolve this question now.

*Finally*, we note this withdrawal of Dr. Raghavan is occurring in a context that involves the withdrawal of one of multiple authors on a jointly-authored report.

The principles and practices appropriate in this context accordingly will not necessarily apply in other contexts.

Respectfully submitted,

**Robert R. Gasaway**
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.

Washington, D.C. 20005
202-879-5175 (Direct Line) | 202-879-5200 (Fax)


-----Original Message-----
From: Sally_Shushan@laed.uscourts.gov [mailto:Sally_Shushan@laed.uscourts.gov]
Sent: Friday, June 21, 2013 2:06 PM
To: *Sarah.Himmelhoch@usdoj.gov
Cc: Andre, Abigail (ENRD); Chakeres, Aristide (ENRD); bbarr@levinlaw.com;
ben_allums@laed.uscourts.gov; Engel, Bethany (ENRD); *CMaze@ago.state.al.us;
*deepwater.horizon@usdoj.gov; dsc2179@liskow.com; d.pote@kanner-law.com; Pencak, Erica
(ENRD); grant.davis-denny@mto.com; jimmy@jimmywilliamson.com; jimr@wrightroy.com;
luther.strange@ago.state.al.us; *Mike.Underhill@usdoj.gov; mike_o'keefe@laed.uscourts.gov;
King, Rachel (ENRD); Hanger, Robin L. (CIV); Cernich, Scott (ENRD); *sherman@hhkc.com; Flynn,
Stephen (CIV); O'Rourke, Steve (ENRD); Godley, Tamerlin; TDemetriou@mithofflaw.com;
terrellm@ag.state.la.us; Benson, Thomas (ENRD); treyphillipsdwh@ag.state.la.us;
WStradley@mithofflaw.com
Subject: RE: MDL 2179 - Phase Two - Follow-up Telephone Conference re Motion to Strike

Thanks Sarah.  Rob, does that moot it out?



_____
Sally Shushan
504 589 7620 work
504 881 9861 cell



From: "Himmelhoch, Sarah (ENRD)" <Sarah.Himmelhoch@usdoj.gov>
To:    "Himmelhoch, Sarah (ENRD)" <Sarah.Himmelhoch@usdoj.gov>,
       "Sally_Shushan@laed.uscourts.gov"
       <Sally_Shushan@laed.uscourts.gov>, "sherman@hhkc.com"
       <sherman@hhkc.com>, "jimr@wrightroy.com" <jimr@wrightroy.com>,
       "bbarr@levinlaw.com" <bbarr@levinlaw.com>,
       "jimmy@jimmywilliamson.com" <jimmy@jimmywilliamson.com>,
       "dsc2179@liskow.com" <dsc2179@liskow.com>, "Andre, Abigail
       (ENRD)" <Abigail.Andre@usdoj.gov>, "Benson, Thomas (ENRD)"
       <Thomas.Benson@usdoj.gov>, "Cernich, Scott (ENRD)"
       <Scott.Cernich@usdoj.gov>, "Horizon, Deepwater"
       <Deepwater.Horizon@usdoj.gov>, "Engel, Bethany (ENRD)"
       <Bethany.Engel@usdoj.gov>, "Flynn, Stephen (CIV)"
       <Stephen.Flynn@usdoj.gov>, "King, Rachel (ENRD)"
       <Rachel.King@usdoj.gov>, "Pencak, Erica (ENRD)"
       <Erica.Pencak@usdoj.gov>, "Underhill, Mike (CIV)"
       <Mike.Underhill@usdoj.gov>, "cmaze@ago.state.al.us"
       <cmaze@ago.state.al.us>, "luther.strange@ago.state.al.us"
       <luther.strange@ago.state.al.us>, "terrellm@ag.state.la.us"
       <terrellm@ag.state.la.us>, "treyphillipsdwh@ag.state.la.us"
       <treyphillipsdwh@ag.state.la.us>, "d.pote@kanner-law.com"
       <d.pote@kanner-law.com>, "Hanger, Robin L. (CIV)"
       <Robin.L.Hanger@usdoj.gov>, "WStradley@mithofflaw.com"
       <WStradley@mithofflaw.com>, "TDemetriou@mithofflaw.com"
       <TDemetriou@mithofflaw.com>, "grant.davis-denny@mto.com"
       <grant.davis-denny@mto.com>, "Chakeres, Aristide (ENRD)"

3

```
              <Aristide.Chakeres@usdoj.gov>, "O'Rourke, Steve (ENRD)"
              <Steve.O'Rourke@usdoj.gov>, "Godley, Tamerlin"
              <Tamerlin.Godley@mto.com>
Cc:   "mike_o'keefe@laed.uscourts.gov"
              <mike_o'keefe@laed.uscourts.gov>,
              "ben_allums@laed.uscourts.gov" <ben_allums@laed.uscourts.gov>
Date: 06/21/2013 10:42 AM
Subject:    RE: MDL 2179 - Phase Two - Follow-up Telephone Conference re
            Motion to Strike
```

Dear Judge Shushan, Mike, and counsel:

After consultation with my colleagues, the United States is willing to
agree that, if BP/Anadarko withdraw their request to depose Dr. Raghavan,
Dr. Kelkar may be questioned in his deposition regarding the full report.
We reserve the right to later object to the use of such deposition
testimony to the extent permitted by Docket No. 5560.

Sarah D. Himmelhoch
Senior Litigation Counsel for E-Discovery
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
202-514-0180 (phone)


-----Original Message-----
From: Himmelhoch, Sarah (ENRD)
Sent: Friday, June 21, 2013 11:06 AM
To: Himmelhoch, Sarah (ENRD); Sally_Shushan@laed.uscourts.gov;
sherman@hhkc.com; jimr@wrightroy.com; bbarr@levinlaw.com;
jimmy@jimmywilliamson.com; dsc2179@liskow.com; Andre, Abigail (ENRD);
Benson, Thomas (ENRD); Cernich, Scott (ENRD); Horizon, Deepwater; Engel,
Bethany (ENRD); Flynn, Stephen (CIV); King, Rachel (ENRD); Pencak, Erica
(ENRD); Underhill, Mike (CIV); cmaze@ago.state.al.us;
luther.strange@ago.state.al.us; terrellm@ag.state.la.us;
treyphillipsdwh@ag.state.la.us; d.pote@kanner-law.com; Hanger, Robin L.
(CIV); WStradley@mithofflaw.com; TDemetriou@mithofflaw.com;
grant.davis-denny@mto.com; Chakeres, Aristide (ENRD); O'Rourke, Steve
(ENRD); Godley, Tamerlin
Cc: mike_o'keefe@laed.uscourts.gov; ben_allums@laed.uscourts.gov
Subject: RE: MDL 2179 - Phase Two - Follow-up Telephone Conference re
Motion to Strike

Counsel --

The attached updated schedule reflects that we can now confirm Dr. Roegiers
for July 24-25.  We continue to look at dates for Mr. Benge and await
BP/Anadarko's choice on Dr. Bushnell's deposition.

Sarah D. Himmelhoch
Senior Litigation Counsel for E-Discovery
Environment & Natural Resources Division
U.S. Department of Justice

P.O. Box 7611
Washington, DC 20044-7611
202-514-0180 (phone)


-----Original Message-----
From: Himmelhoch, Sarah (ENRD)
Sent: Friday, June 21, 2013 10:02 AM
To: 'Sally_Shushan@laed.uscourts.gov'; sherman@hhkc.com;
jimr@wrightroy.com; bbarr@levinlaw.com; jimmy@jimmywilliamson.com;
dsc2179@liskow.com; Andre, Abigail (ENRD); Benson, Thomas (ENRD); Cernich,
Scott (ENRD); Horizon, Deepwater; Engel, Bethany (ENRD); Flynn, Stephen
(CIV); King, Rachel (ENRD); Pencak, Erica (ENRD); Underhill, Mike (CIV);
cmaze@ago.state.al.us; luther.strange@ago.state.al.us;
terrellm@ag.state.la.us; treyphillipsdwh@ag.state.la.us;
d.pote@kanner-law.com; Hanger, Robin L. (CIV); WStradley@mithofflaw.com;
TDemetriou@mithofflaw.com; grant.davis-denny@mto.com; Chakeres, Aristide
(ENRD); O'Rourke, Steve (ENRD)
Cc: mike_o'keefe@laed.uscourts.gov; ben_allums@laed.uscourts.gov
Subject: RE: MDL 2179 - Phase Two - Follow-up Telephone Conference re
Motion to Strike

Dear Judge Shushan & Mike:

Here is the current draft of the expert deposition schedule.  There remain
a few dates still in play and, of course, there is still the question of
Dr. Raghavan's deposition (which would need to be reschedule in the
unlikely event it were to occur at all).

Sarah D. Himmelhoch
Senior Litigation Counsel for E-Discovery
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
202-514-0180 (phone)


-----Original Message-----
From: Sally_Shushan@laed.uscourts.gov [
mailto:Sally_Shushan@laed.uscourts.gov]
Sent: Thursday, June 20, 2013 9:25 AM
To: sherman@hhkc.com; jimr@wrightroy.com; bbarr@levinlaw.com;
jimmy@jimmywilliamson.com; dsc2179@liskow.com; Andre, Abigail (ENRD);
Benson, Thomas (ENRD); Cernich, Scott (ENRD); Horizon, Deepwater; Engel,
Bethany (ENRD); Flynn, Stephen (CIV); Himmelhoch, Sarah (ENRD); King,
Rachel (ENRD); Pencak, Erica (ENRD); Underhill, Mike (CIV);
cmaze@ago.state.al.us; luther.strange@ago.state.al.us;
terrellm@ag.state.la.us; treyphillipsdwh@ag.state.la.us;
d.pote@kanner-law.com; Hanger, Robin L. (CIV); WStradley@mithofflaw.com;
TDemetriou@mithofflaw.com; grant.davis-denny@mto.com; Chakeres, Aristide
(ENRD); O'Rourke, Steve (ENRD)
Cc: mike_o'keefe@laed.uscourts.gov; ben_allums@laed.uscourts.gov
Subject: MDL 2179 - Phase Two - Follow-up Telephone Conference re Motion to
Strike

The follow-up telephone conference was scheduled for today at 8:30 a.m.
(CDT).  However, we will begin the conference at 8:45 a.m.

Please Dial: 888-684-8852, access: 6331546,  security: 61713

Thanks very much,
_____
Sally Shushan
U.S. Magistrate Judge
504 589 7620 work
504 881 9861 cell




*********************************************************
IRS Circular 230 Disclosure:
To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return e-mail or by e-mail to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.
*********************************************************

# Exhibit 3

**1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL      )  MDL NO. 2179
BY THE OIL RIG         )
"DEEPWATER HORIZON" IN )  SECTION "J"
THE GULF OF MEXICO, ON )
APRIL 20, 2010      )  JUDGE BARBIER
                    )  MAG. JUDGE SHUSHAN

*****************
VOLUME 1
*****************

Deposition of Mohan Kelkar, Ph.D., taken
at the Pan-American Building, 601 Poydras Street,
11th Floor, New Orleans, Louisiana, 70130, on the
17th day of July, 2013.

**2**

A P P E A R A N C E S

APPEARING FOR BP, INC.:
   Mr. Martin R. Boles
   Mr. Logan MacCuish
   KIRKLAND & ELLIS
   333 South Hope Street
   Los Angeles, California  90071

   Mr. Frank A. Monago
   Senior Attorney
   BP AMERICA INC.
   501 Westlake Park Boulevard
   Houston, Texas  77079

APPEARING FOR TRANSOCEAN:
   Mr. Patrick J. Cafferty, Jr.
   MUNGER TOLLES & OLSON
   560 Mission Street, 27th Floor
   San Francisco, California  94105-2907

   Mr. Ray S. Seilie
   MUNGER TOLLES & OLSON
   355 South Grand Avenue, 35th Floor
   Los Angeles, California  90071-1560

APPEARING FOR ANADARKO PETROLEUM CORPORATION:
   Ms. Ky E. Kirby
   BINGHAM MCCUTCHEN
   2020 K Street, Northwest
   Washington, D.C. 20006-1806

APPEARING FOR HALLIBURTON:
   Mr. Prescott W. Smith
   Mr. Daniel A. Ortega
   GODWIN LEWIS
   Renaissance Tower
   1201 Elm Street, Suite 1700
   Dallas, Texas 75270-2041

**3**

   Ms. Gwen E. Richard
   GODWIN LEWIS
   1331 Lamar, Suite 1665
   Houston, Texas  77010-3133

APPEARING FOR THE UNITED STATES:
   Ms. Bethany Engel
   U.S. DEPARTMENT OF JUSTICE
   ENVIRONMENT & NATURAL RESOURCES DIVISION
   Ben Franklin Station
   Post Office Box 7611
   Washington, D.C.  20044-7611
   601 D Street, N.W.
   Washington, D.C.  20004

   Mr. Scott Cernich
   U.S. DEPARTMENT OF JUSTICE
   601 D Street, N.W.
   Washington, D.C.  20004

APPEARING FOR THE STATE OF LOUISIANA:
   Mr. Grady J. Flattmann
   HENRY DART ATTORNEYS AT LAW
   510 North Jefferson Street
   Covington, Louisiana  70433

ALSO PRESENT:
   Mr. Peter Jennings, Videographer
   Mr. Ray Aguirre, Case Manager

**4**

INDEX
VIDEOTAPED ORAL DEPOSITION OF
MOHAN KELKAR, PH.D.
JULY 17, 2013
VOLUME 1

Appearances.................................... 2

Direct Examination-Mr. Boles.................. 7

Changes and Signature........................ 362
Reporter's Certificate....................... 364

EXHIBIT INDEX

Ex. No.      Description        Marked

11549   Expert Report, Rate Prediction
        from the Macondo Well, Prepared
        on Behalf of the United States,
        Prepared by Mohan Kelkar, March
        22, 2013 marked as CONFIDENTIAL;
        109 pages                    8

11550   Rebuttal Expert Report, Rate
        Prediction from the Macondo Well,
        Prepared on Behalf of the United
        States, Prepared by Mohan Kelkar,
        June 10, 2013 marked as
        CONFIDENTIAL; 46 pages       60

11551   BP Macondo Technical Note titled
        Depleted Pressure for Well
        Control Planning issued by Bob
        Merrill dated July 22, 2010,
        Version: C-DRAFT, marked as
        CONFIDENTIAL; Bates Nos.
        BP-HZN-2179MDL06099720 -
        BP-HZN-2179MDL06099723    263

169

1   uncertainty with respect to the rate information
2   for this particular well, so there is no point in
3   using -- okay, I'm -- I'm going to call this
4   "conventional well test analysis," where you
5   actually try to determine various reservoir
6   properties as part of your well test analysis;
7   instead, use a methodology which is simply
8   independent of the rate information which was
9   missing for -- for this well.
10      **Q. (By Mr. Boles) And as -- as contrasted**
11   **with a conventional well test analysis, as you've**
12   **just described it, would you describe what you**
13   **did in terms of well test analysis as being an**
14   **empirical approach?**
15      MS. ENGEL:  Object to form.
16      A. It's not strictly empirical.  I mean, if
17   you go back and read the Mead's paper, I think
18   you will find that there is some theoretical
19   justification for why the process was developed
20   and why it provides us with reliable average
21   pressure information.
22      But the nice thing about that method is
23   that it is independent of the rate knowledge.
24      **Q. (By Mr. Boles) That's the Mead method?**
25      A. That is correct.

170

1      **Q. And which is the mean method you used?**
2      A. That is right.
3      **Q. Now, I see a reference on Page 25 at the**
4   **top to, three other methods, the Muskat method,**
5   **the Arps-Muskat method, and the Kuchuck method.**
6      MR. BOLES:  That's M-u-s-k-a-t --
7      A. Yeah.
8      MR. BOLES -- A-r-p-s, hyphen,
9   M-u-s-k-a-t, and K-u-c-h-u-c-k.
10      THE COURT REPORTER:  Thank you.
11      **Q. (By Mr. Boles) And you used those, as**
12   **well?**
13      A. I did not use those methods, actually.
14   This is -- the work was done by Dr. Raghavan.
15      **Q. Well, did droc -- Dr. Raghavan also do**
16   **the work with respect to the Mead method?**
17      A. He would -- I mean, we sat together, and
18   we did Mead's analysis, but I think subsequently
19   I have done the work independently.
20      But for those three mentors, I have not
21   done the analysis myself.
22      **Q. Do you have an opinion, as you sit here**
23   **now, as to whether the Muskat method, the**
24   **Arps-Muskat method, and the Kuchuck method**
25   **provide support for the reliability of your**

171

1   **pressure analysis using the Mead method?**
2      MS. ENGEL:  Object to form.
3      A. I don't have an opinion.
4      **Q. (By Mr. Boles) But in any event, in your**
5   **Report you have written -- or you and**
6   **Dr. Raghavan have written that:  "To validate our**
7   **average pressure calculation, we also use other**
8   **methods to calculate average reservoir pressure,**
9   **including the Muskat method, the Arps-Muskat**
10   **method, and the Kuchuck method."  Correct?**
11      A. M-h'm.
12      **Q. Correct?**
13      A. Yes.
14      **Q. So your Report, in any event, is**
15   **presenting the opinion that these other three**
16   **methods listed here at the top of Page 25**
17   **validate your final average of reservoir pressure**
18   **calculation.  Correct?**
19      A. (Reviewing document.)  Where -- where did
20   you read that evaluation?
21      **Q. The top of Page 25.**
22      A. Oh, "To validate...we also use other
23   methods to calculate average reservoir pressure,"
24   yes.  And -- yeah, but as -- as I said before,
25   that I did not use any of those three methods

172

1   myself.
2      **Q. Do you still stand behind this sentence**
3   **at the top of Page 25, that these three methods**
4   **validate your estimation of final reservoir**
5   **pressure?**
6      MS. ENGEL:  Object to form.
7      A. I really don't have any opinion on it.
8      **Q. (By Mr. Boles) Are you an Expert in the**
9   **use of the Mead method for well test analysis?**
10      MS. ENGEL:  Object to form.
11      A. Actually, the method itself is quite
12   simple, and it just takes the pressure data from
13   the buildup and uses a -- a simple rectangular
14   hyperbola and fits the pressure data with that
15   rectangular hyperbola and determines the pressure
16   value at infinite time.
17      So I'm not sure about what -- what you
18   mean by "expertise," because it's -- it's a
19   fairly simple method to use.
20      **Q. (By Mr. Boles) Okay.  What I meant was:**
21   **Do you consider yourself an Expert in the**
22   **scientific judgment to decide whether the Mead**
23   **method is reliable to use in analyzing the**
24   **Macondo buildup?**
25      MS. ENGEL:  Object to form.

43 (Pages 169 to 172)

366

```
          UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF LOUISIANA


IN RE:  OIL SPILL     )  MDL NO. 2179
BY THE OIL RIG        )
"DEEPWATER HORIZON" IN )  SECTION "J"
THE GULF OF MEXICO, ON )
APRIL 20, 2010        )  JUDGE BARBIER
                      )  MAG. JUDGE SHUSHAN




          ******************
              VOLUME 2
          ******************

     Continuation of the deposition of Mohan
Kelkar, Ph.D., taken at the Pan-American
Building, 601 Poydras Street, 11th Floor, New
Orleans, Louisiana, 70130, on the 18th day of
July, 2013.
```

367

```
 1            A P P E A R A N C E S
 2
 3
 4   APPEARING FOR BP, INC.:
 5     Mr. Martin R. Boles
       Mr. Logan MacCuish
       KIRKLAND & ELLIS
 6     333 South Hope Street
       Los Angeles, California  90071
 7
 8   APPEARING FOR TRANSOCEAN:
       Mr. Ray S. Seilie
 9     MUNGER TOLLES & OLSON
       355 South Grand Avenue, 35th Floor
10     Los Angeles, California  90071-1560
11
12   APPEARING FOR ANADARKO PETROLEUM CORPORATION:
       Ms. Ky E. Kirby
13     BINGHAM MCCUTCHEN
       2020 K Street, Northwest
14     Washington, D.C. 20006-1806
15   APPEARING FOR HALLIBURTON:
       Mr. Prescott W. Smith
16     Mr. Daniel A. Ortega
       GODWIN LEWIS
17     Renaissance Tower
       1201 Elm Street, Suite 1700
18     Dallas, Texas 75270-2041
19
20   APPEARING FOR THE UNITED STATES:
       Ms. Bethany Engel
21     U.S. DEPARTMENT OF JUSTICE
       ENVIRONMENT & NATURAL RESOURCES DIVISION
       Ben Franklin Station
22     Post Office Box 7611
       Washington, D.C.  20044-7611
23     601 D Street, N.W.
       Washington, D.C.  20004
24
25
```

368

```
 1     Mr. Scott Cernich
       U.S. DEPARTMENT OF JUSTICE
 2     601 D Street, N.W.
       Washington, D.C.  20004
 3
 4   APPEARING FOR THE STATE OF LOUISIANA:
       Mr. Grady J. Flattmann
 5     HENRY DART ATTORNEYS AT LAW
       510 North Jefferson Street
 6     Covington, Louisiana  70433
 7
     ALSO PRESENT:
 8     Mr. Peter Jennings, Videographer
       Mr. Ray Aguirre, Case Manager
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

369

```
 1              INDEX
 2   VIDEOTAPED ORAL DEPOSITION OF
            MOHAN KELKAR, PH.D.
 3        JULY 18, 2013
             VOLUME 2
 4
 5   Appearances................................ 367
 6   Continued Direct Examination-Mr. Boles....... 372
 7   Examination-Ms. Kirby...................... 357
     Examination-Ms. Engel...................... 552
 8   Redirect Examination-Mr. Boles............. 555

     Changes and Signature...................... 561
 9   Reporter's Certificate..................... 563
10
11          EXHIBIT INDEX
12
     Ex. No.      Description       Marked
13
14   11555  July 15 and 16, 2010 E-mail string
                 among Kelly McAughan, Bryan
15               Ritchie, Sean Cavalero and others,
                 Subjects: GoM aquifer sizes and
16               Emailing: Macondo_M56_for_Cindy
                 .ppt, marked as CONFIDENTIAL;
17               Bates Nos. BP-HZN-2179MDL07159477
                 - BP-HZN-2179MDL07159478       372
18
19   11556  BP document titled Shut the Well
                 in on Paper, Benefits and Risks,
                 Paul Tooms, 9 July, 2010, marked
20               as CONFIDENTIAL; Bates Nos.
                 BP-HZN-2179MDL06931444 -
21               BP-HZN-2179MDL06931533       380
22   11557  July 6, 2010 E-mail string among
                 Kelly McAughan, Stephen Wilson,
23               David Schott and others, Subject:
                 Macondo PVC, marked as
24               CONFIDENTIAL; Bates Nos.
                 BP-HZN-2179MDL06985709 -
25               BP-HZN-2179MDL06985710       398
```

                    1 (Pages 366 to 369)

494

1  compressibilities. I mean, you could see that as
2  part of the E-mail exchange.
3  Q. (By Ms. Kirby) Now, yesterday, you told
4  us about some work and opinions that were
5  mentioned in your initial and Rebuttal Expert
6  Reports that are Dr. Raghavan's work and
7  opinions. Right?
8  A. Yes.
9  Q. Okay. And in some cases, you did the
10  same work, and you reached -- reached the same
11  conclusions as Dr. Raghavan. Right?
12         MS. ENGEL: Object to form.
13  A. We did some work together.
14  Q. (By Ms. Kirby) Okay. For instance, you
15  said you did the Mead's analysis --
16  A. Yes.
17  Q. -- work together, right?
18  A. Yes. Yes.
19  Q. Okay. But only Dr. Raghavan performed
20  some of the work and reached some of the
21  conclusions that are in the Report, right?
22         MS. ENGEL: Object --
23  Q. (By Ms. Kirby) There's somewhere -- it's
24  him alone, right?
25         MS. ENGEL: Object to form.

495

1  A. Yes.
2  Q. (By Ms. Kirby) Okay. For instance,
3  the -- the Arps-Muskat method that was used to
4  perform an estimation, that was Dr. Raghavan's
5  work only. Right?
6         MS. ENGEL: Object to form.
7  A. Yes.
8  Q. (By Ms. Kirby) Okay. Same with the use
9  of the Kuchuck method that's discussed in your
10  initial Report, that was Dr. Raghavan's work
11  only. Right?
12         MS. ENGEL: The same objection.
13  A. Yes.
14  Q. (By Ms. Kirby) That was a "Yes." Right?
15  A. Yes.
16  Q. Okay. And the Arps-Muskat method, that
17  also -- using that method also was Dr. Raghavan's
18  work only. Correct?
19  A. Yes.
20         MS. ENGEL: The same objection.
21  Asked and answered.
22  Q. (By Ms. Kirby) You didn't try to
23  replicate that work, right?
24  A. I did not.
25  Q. You didn't try to reach the same

496

1  opinions, whatever they were, that Dr. Raghavan
2  reached. Right?
3         MS. ENGEL: Object to form.
4  A. That is right.
5  Q. (By Ms. Kirby) Okay. So -- and that's
6  because doing that work and reaching those
7  opinions wasn't necessary to your ultimate
8  conclusion under the material balance analysis.
9  Right?
10         MS. ENGEL: Object to form.
11  A. Say that again.
12  Q. (By Ms. Kirby) I said you didn't need to
13  replicate that work and -- and try to reach those
14  same conclusions for purposes of your material
15  balance analysis, did you?
16  A. I mean --
17         MS. ENGEL: The same objection --
18  A. -- that information was an input in the
19  material balance calculation.
20  Q. (By Ms. Kirby) It was? So it was his
21  work, but you -- from the -- from the -- I'm not
22  talking about those -- the results of the Mead's
23  method. Okay? I'm talking about the results
24  from the Arps-Muskat method.
25  A. Yes.

497

1  Q. Was that an input into material balance?
2  A. It was.
3  Q. All right. And so the Kuchuck -- the
4  results from the Kuchuck method also were an
5  input into the material balance analysis?
6  A. Yes.
7         MS. ENGEL: Object to form.
8  Q. (By Ms. Kirby) And the results from the
9  Muskat only method, those were an input into the
10  material balance analysis?
11  A. They were --
12         MS. ENGEL: Object to form.
13  A. They were part of the uncertainty
14  analysis in the average pressure calculations,
15  including the Mead's method.
16  Q. (By Ms. Kirby) Okay. By the way, I got
17  a little bit confused yesterday when you were
18  testifying about -- or I was trying to follow the
19  discussion regarding how you accounted for well
20  cooling. So maybe you can help me out here.
21  A. Okay.
22  Q. I think I heard you say yesterday that
23  the software you were using was able to somehow
24  account for that; is that true?
25  A. No.

498

1    Q. Okay. Did you do something in particular
2  to account for that?
3    A. I did not.
4        MS. ENGEL: Object to form.
5    Q. (By Ms. Kirby) You did not?
6        MS. ENGEL: Give me an opportunity
7  to object, please. Thank you.
8    Q. (By Ms. Kirby) Here you input some
9  temperatures into some software, didn't you?
10    A. So which temperature are you referring
11  to?
12    Q. Well, I -- I recall hearing a temperature
13  of 180.
14    A. Yes.
15    Q. All right. And what software did you
16  input that into?
17    A. Ecrin.
18    Q. Ecrin. That's the --
19    A. E-c-r-i-n.
20    Q. Okay. That's the well test software?
21    A. Yes.
22    Q. And you did that personally?
23    A. Yes.
24    Q. All right. By the way, how often have
25  you used that well test software?

499

1        MS. ENGEL: Object to form.
2    A. It's a -- just a standard well test
3  software. We use this in our school, the
4  software, I mean, like for classes, like teaching
5  classes, so --
6    Q. (By Ms. Kirby) So you've used it to teach
7  classes?
8    A. Yeah.
9    Q. Okay. Have you used it in analyzing
10  actual reservoirs in the field?
11        MS. ENGEL: Object to form.
12    A. I have.
13    Q. (By Ms. Kirby) All right. How many
14  times?
15    A. A lot.
16    Q. A lot. Can you tell me what reservoirs?
17        MS. ENGEL: Object to form.
18    A. Recently, I have used it for evaluating
19  some well tests in unconventional reservoirs.
20    Q. (By Ms. Kirby) What does that mean,
21  "unconventional reservoirs"?
22    A. Like shale, shale reservoirs.
23    Q. Okay. Now, I -- I thought I heard you
24  say yesterday that you and Dr. Raghavan decided
25  early on that performing a conventional well test

500

1  analysis wasn't something you could really do
2  well here, right?
3    A. Yes.
4    Q. Okay. So when you use the well test
5  software here, this Ecrin, what did you use it
6  for?
7        MS. ENGEL: Object to form.
8    A. Okay. So what we did is we actually
9  input -- because the software requires certain
10  amount of rate information and the pressure
11  information, so we calculated the bottomhole
12  pressures using the information which is provided
13  at the BOP, and PT-3K-2, so we calculated the
14  bottomhole pressures and the rates, we input that
15  information. And if you look at our Report, we
16  calculated what is called as an unconvolved
17  derivative which is an output from Ecrin
18  software.
19        And the difference between unconvolved
20  derivative and a convolved derivative, is that in
21  unconvolved derivative we just don't worry about
22  the rates, we just use the pressure values
23  directly and the derivatives are calculated based
24  on those pressure values.
25    Q. (By Ms. Kirby) So you used the Ecrin

501

1  software not to perform a conventional well test
2  analysis, correct?
3    A. We just used the pressure buildup and
4  calculated the unconvolved derivative because of
5  rate uncertainties.
6    Q. Okay. And why was it that you and
7  Dr. Raghavan decided that you couldn't really
8  perform a conventional well test analysis here?
9        MS. ENGEL: Object to form.
10    A. I think that I have laid out the reasons
11  yesterday, but let me just repeat that again.
12  That if you look at the way the conventional well
13  testing is done, I think there are a lot of
14  pieces of information which is required as an
15  input in the model to actually do a proper well
16  test analysis.
17        And if you look at typical Gulf of Mexico
18  well, which is -- there is a well test, you'll
19  find that a lot of times you're going to measure
20  the bottomhole pressure rather than the surface
21  pressure. Here we only measured the surface
22  pressure rather than bottomhole pressure. We
23  normally will shut the well after a certain fixed
24  amount of rate, and then we'll monitor the
25  bottomhole pressure.

34 (Pages 498 to 501)

530

1   opinions that are Dr. Raghavan's alone?
2       A. Yes.
3       Q. All right. Now, the next paragraph that
4   begins with "The results obtained," anything in
5   there that is Dr. Raghavan's alone?
6       A. (Reviewing document.) Only the last
7   statement: "Our understanding of such a step,
8   even if correct, would require the skin factor to
9   be zero."
10      Q. Only that statement is Dr. Raghavan's
11  alone?
12      A. I mean, I -- I don't have a good
13  understanding of that statement, so --
14      Q. Okay. So is that really the case for all
15  of the things you've identified as Dr. Raghavan's
16  alone, those are the things that --
17      A. I mean, if he did the work by himself,
18  then I don't have a good understanding of it,
19  so --
20      Q. Okay.
21      A. The Report was written jointly. And,
22  obviously, he wrote certain statements, and if I
23  don't know how they're arrived at, that's --
24  that's his work, so --
25      Q. Okay. Fair enough.

531

1           The final paragraph on Page 22.
2       A. (Reviewing document.) I think you can
3   start with: "Second, by tacking on the
4   deconvolved responses to the early-time
5   derivative he implicitly asserts that" the
6   "derivative curve represents all that took place
7   since April 20..."
8       Q. Okay.
9       A. And through all the way to the end.
10      Q. All right. That's all Dr. Raghavan's
11  opinion, correct?
12      A. Yes.
13      Q. Okay. And now Page 23.
14      A. (Reviewing document.) So the first two
15  paragraphs are fine.
16      Q. Okay. Third paragraph?
17      A. (Reviewing document.) So if you look at
18  the "We found four methods that do not depend on
19  a rate schedule and these were considered in our
20  initial report." And, obviously, we -- three of
21  the methods that we talked about in the first
22  Report were done by Dr. Raghavan, so that
23  statement is not quite true.
24      Q. So in your own stand-alone Report, you'd
25  write "We found one method"?

532

1       A. That's right.
2       Q. Okay. So you'd change that.
3           Okay. And anything else in that
4   paragraph?
5       A. (Reviewing document.) I think there's
6   almost like a reproduction of a line, but that's
7   kind of a problem with the Report itself. I
8   don't think it has anything to do with
9   Dr. Raghavan's, but --
10      Q. Yes.
11      A. -- I see the statement being repeated,
12  but --
13      Q. But that is not just Dr. Raghavan's work,
14  right?
15      A. No. No. I mean, that's just a --
16      Q. Okay.
17      A. -- mistake in the Report, but I think --
18  no, I think that statement is fine.
19      Q. Okay. Let's go jump forward to
20  Appendix A, which is after Page 27 of your
21  Report.
22      A. Okay.
23      Q. Anything in the section of "RESPONSE TO
24  CRITIQUES OF CHOKE CALCULATION" that is
25  Dr. Raghavan's alone?

533

1       A. No.
2       Q. Okay. I'm going to skip Appendix B and
3   go, I think, forward to Page B -- well, I'm not
4   going to skip Appendix B.
5           Apparently -- h'm, let's look at Page
6   B-5.
7       A. B-5?
8       Q. Right.
9       A. Okay.
10      Q. This sentence that begins "We also
11  compared our results with Dr. Johnson," this --
12  this paragraph --
13      A. Okay.
14      Q. -- is that joint work, or is that --
15      A. I did it.
16      Q. Okay. Okay. Now, we can skip. Let's
17  see. And we can skip -- we are done with that
18  entire exercise. Right? Thank goodness.
19          Are you aware that the Government has
20  represented it's going to withdraw Dr. Raghavan
21  as an Expert?
22          MS. ENGEL: Object to form.
23      A. I am.
24      Q. (By Ms. Kirby) All right. Do you intend
25  to produce a report that omits anything that is

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

# Exhibit 4

| From: | Gasaway, Robert R. [rgasaway@kirkland.com] |
|---|---|
| Sent: | Friday, July 26, 2013 10:18 AM |
| To: | 'Steve.O'Rourke@usdoj.gov'; *Sarah.Himmelhoch@usdoj.gov'; 'Sally_Shushan@laed.uscourts.gov'; *sherman@hhkc.com; 'jimr@wrightroy.com'; 'BBarr@levinlaw.com'; 'jimmy@jimmywilliamson.com'; 'dsc2179@liskow.com'; 'Abigail.Andre@usdoj.gov'; 'Thomas.Benson@usdoj.gov'; 'Scott.Cernich@usdoj.gov'; *deepwater.horizon@usdoj.gov; 'Bethany.Engel@usdoj.gov'; 'Stephen.Flynn@usdoj.gov'; 'Rachel.King@usdoj.gov'; 'Erica.Pencak@usdoj.gov'; *Mike.Underhill@usdoj.gov; 'Sharon.Shutler@usdoj.gov'; 'WStradley@mithofflaw.com'; 'TDemetriou@mithofflaw.com'; 'Grant.Davis-Denny@mto.com'; 'aristide.chakeres@usdoj.gov'; 'godleytj@mto.com'; 'mdl2179states@ago.state.al.us' |
| Cc: | 'mike_o'keefe@laed.uscourts.gov'; 'Ben_Allums@laed.uscourts.gov' |
| Subject: | Re: MDL 2179 - Phase Two Quantification Depositions |

Dear Steve,

Yes.  BP and Anadarko's experts will not be relying on Dr. Torres-Verdin.

Also, the United States experts should no longer be rebutting him (under the Court's ruling after we withdrew Dr. Marchand). Accordingly, any discussions in expert reports offered by United States experts responding to Dr. Torres-Verdin's opinions should be withdrawn.

This would include at a minimum the following portions of Dr. Huffman's rebuttal expert report:  parts of pages 11 and 12 related to Dr. Torres-Verdin; all of pages 13-35 comprising Part III of Dr. Huffman's report entitled "Analysis of the Report of Dr. Carlos Torres-Verdin;" and parts of pages 41, 42, and 75 related to Dr. Torres-Verdin.

Please confirm that you will work with us to make the appropriate report redactions in light of Dr. Torres-Verdin's withdrawal.

Best regards,
/ROB

----- Original Message -----
From: O'Rourke, Steve (ENRD) [mailto:Steve.O'Rourke@usdoj.gov]
Sent: Thursday, July 25, 2013 07:51 PM
To: Gasaway, Robert R.; *Sarah.Himmelhoch@usdoj.gov; 'Sally_Shushan@laed.uscourts.gov' <Sally_Shushan@laed.uscourts.gov>; *sherman@hhkc.com; 'jimr@wrightroy.com' <jimr@wrightroy.com>; 'bbarr@levinlaw.com' <bbarr@levinlaw.com>; 'jimmy@jimmywilliamson.com' <jimmy@jimmywilliamson.com>; 'dsc2179@liskow.com' <dsc2179@liskow.com>; Andre, Abigail (ENRD) <Abigail.Andre@usdoj.gov>; Benson, Thomas (ENRD) <Thomas.Benson@usdoj.gov>; Cernich, Scott (ENRD) <Scott.Cernich@usdoj.gov>; *deepwater.horizon@usdoj.gov; Engel, Bethany (ENRD) <Bethany.Engel@usdoj.gov>; Flynn, Stephen (CIV) <Stephen.Flynn@usdoj.gov>; King, Rachel (ENRD) <Rachel.King@usdoj.gov>; Pencak, Erica (ENRD) <Erica.Pencak@usdoj.gov>; *Mike.Underhill@usdoj.gov; Shutler, Sharon (CIV) <Sharon.Shutler@usdoj.gov>; 'WStradley@mithofflaw.com' <WStradley@mithofflaw.com>; 'TDemetriou@mithofflaw.com' <TDemetriou@mithofflaw.com>; 'grant.davis-denny@mto.com' <grant.davis-denny@mto.com>; Chakeres, Aristide (ENRD) <Aristide.Chakeres@usdoj.gov>; 'godleytj@mto.com' <godleytj@mto.com>; 'mdl2179states@ago.state.al.us' <mdl2179states@ago.state.al.us>
Cc: 'mike_o'keefe@laed.uscourts.gov' <mike_o'keefe@laed.uscourts.gov>; 'ben_allums@laed.uscourts.gov' <ben_allums@laed.uscourts.gov>
Subject: RE: MDL 2179 - Phase Two Quantification Depositions

Rob:

Because you pulled Dr. Torres-Verdin down before his deposition, we assume that he will not fit into the category of "experts relying on other experts" from the draft Phase Two trial planning order. Please let us know if that is wrong, and if BP plans to have any testifying expert rely on any information from Dr. T-V's report.

Thanks.
Steve


-----Original Message-----
From: Gasaway, Robert R. [mailto:rgasaway@kirkland.com]
Sent: Wednesday, July 24, 2013 10:39 AM
To: Himmelhoch, Sarah (ENRD); 'Sally_Shushan@laed.uscourts.gov'; *sherman@hhkc.com; 'jimr@wrightroy.com'; 'bbarr@levinlaw.com'; 'jimmy@jimmywilliamson.com'; 'dsc2179@liskow.com'; Andre, Abigail (ENRD); Benson, Thomas (ENRD); Cernich, Scott (ENRD); Horizon, Deepwater; Engel, Bethany (ENRD); Flynn, Stephen (CIV); King, Rachel (ENRD); Pencak, Erica (ENRD); Underhill, Mike (CIV); Shutler, Sharon (CIV); 'WStradley@mithofflaw.com'; 'TDemetriou@mithofflaw.com'; 'grant.davis-denny@mto.com'; Chakeres, Aristide (ENRD); O'Rourke, Steve (ENRD); 'godleytj@mto.com'; 'mdl2179states@ago.state.al.us'
Cc: 'mike_o'keefe@laed.uscourts.gov'; 'ben_allums@laed.uscourts.gov'
Subject: MDL 2179 - Phase Two Quantification Depositions

Dear Judge Shushan and counsel,

BP and Anadarko have decided to pull down the report of Dr. Carlos Torres-Verdin, a Quantification expert.

Accordingly, Dr. Torres-Verdin's deposition (scheduled July 30-31 on the attachment to Sarah's email below) is canceled.

Best regards,
/Rob Gasaway

-----Original Message-----
From: Himmelhoch, Sarah (ENRD) [mailto:Sarah.Himmelhoch@usdoj.gov]
Sent: Friday, July 12, 2013 6:10 PM
To: Sally_Shushan@laed.uscourts.gov; *sherman@hhkc.com; jimr@wrightroy.com; bbarr@levinlaw.com; jimmy@jimmywilliamson.com; dsc2179@liskow.com; Andre, Abigail (ENRD); Benson, Thomas (ENRD); Cernich, Scott (ENRD); *deepwater.horizon@usdoj.gov; Engel, Bethany (ENRD); Flynn, Stephen (CIV); King, Rachel (ENRD); Pencak, Erica (ENRD); *Mike.Underhill@usdoj.gov; Shutler, Sharon (CIV); WStradley@mithofflaw.com; TDemetriou@mithofflaw.com; grant.davis-denny@mto.com; Chakeres, Aristide (ENRD); O'Rourke, Steve (ENRD); godleytj@mto.com; mdl2179states@ago.state.al.us
Cc: mike_o'keefe@laed.uscourts.gov; ben_allums@laed.uscourts.gov
Subject: RE: MDL 2179 - Phase Two Quantification Depositions

Dear Judge Shushan:

Apologies for the multiple emails.  Attached is an updated schedule that removes Sundaresan, Pollard, and Strickland from the schedule and corrects the Benge deposition to August 1-2.

I think I've filled my quota of stupid mistakes on the order and its now ready to go final.  Appreciate your patience.

-----Original Message-----
From: Sally_Shushan@laed.uscourts.gov [mailto:Sally_Shushan@laed.uscourts.gov]

Sent: Friday, July 12, 2013 4:49 PM
To: sherman@hhkc.com; jimr@wrightroy.com; bbarr@levinlaw.com; jimmy@jimmywilliamson.com; dsc2179@liskow.com; Andre, Abigail (ENRD); Benson, Thomas (ENRD); Cernich, Scott (ENRD); Horizon, Deepwater; Engel, Bethany (ENRD); Flynn, Stephen (CIV); Himmelhoch, Sarah (ENRD); King, Rachel (ENRD); Pencak, Erica (ENRD); Underhill, Mike (CIV); Shutler, Sharon (CIV); WStradley@mithofflaw.com; TDemetriou@mithofflaw.com; grant.davis-denny@mto.com; Chakeres, Aristide (ENRD); O'Rourke, Steve (ENRD); godleytj@mto.com; mdl2179states@ago.state.al.us
Cc: mike_o'keefe@laed.uscourts.gov; ben_allums@laed.uscourts.gov
Subject: MDL 2179 - Phase Two Quantification Depositions


Counsel:

I just spoke with Judge Barbier and he does not intend to allow TO or HESI to call quantification witnesses at trial.  He wants the parties to cancel those depositions unless they are expressing opinions on source control.  I believe those witnesses are Strickland, Pollard, and Sundaresan.   Thanks and have a good weekend,


_____

Sally Shushan
504 589 7620 work
504 881 9861 cell


*************************************************************
IRS Circular 230 Disclosure:
To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return e-mail or by e-mail postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.
*************************************************************

*************************************************************
IRS Circular 230 Disclosure:
To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly

prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return e-mail or by e-mail to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.
**************************************************************

# Exhibit 5

**In re: Oil Spill by the Oil Rig "Deepwater Horizon" in
the Gulf of Mexico, on April 20, 2010**
United States District Court
Eastern District of Louisiana
MDL No. 2179, Section J
Judge Barbier; Magistrate Judge Shushan

**Expert Report of
Dr. Carlos Torres-Verdín**

May 1, 2013



**CONFIDENTIAL**

I.    **INTRODUCTION**

A.    **Scope of Work and Overview of Report**

My name is Dr. Carlos Torres-Verdín, and I am currently the Zarrow Centennial

Professor in Petroleum Engineering at the University of Texas at Austin and Program Director of

the University's Formation Evaluation Joint Industry Research Consortium.  I have been asked

by BP to interpret 3D seismic amplitude data acquired over the Macondo well for the purpose of

estimating the size and spatial continuity of the Macondo reservoir.  I understand my work is

relevant to the analysis of Professor Martin Blunt, another expert in this case, who is calculating

the cumulative volume of oil flowing from the Macondo well during the incident.

This report provides my independent estimate of the net rock volume potentially

connected to the Macondo well.  Net rock volume is used to calculate original oil in place

("OOIP"), which is an input into the calculation by Professor Blunt of cumulative oil flow from

the Macondo well.  As explained below, my analysis of the seismic data suggests that the field

drained by the Macondo well was somewhat smaller than the field predicted by BP's

geophysicist pre-drill.  In particular, my best estimate of net rock volume is approximately

64,876 acre-feet less than BP's pre-drill prediction, which I understand Professor Blunt is

currently using for his analysis.

The rest of this report describes the seismic interpretation technique I used to estimate the

volume of the Macondo reservoir and the conclusions I reached from the study.  The report is

divided into five parts.  Part I is an introductory section in which I summarize the opinions I have

reached and briefly describe my professional and academic qualifications to testify as a seismic

interpretation expert.  Part II contains my understanding of the Macondo geological environment,

which informs certain of my conclusions regarding the Macondo rock volume.  Part III explains

at top level the general theory and key technical concepts involved in interpreting seismic data in

order to provide context for the discussion of seismic inversion that follows.  Part IV describes the seismic inversion technique I used to interpret Macondo MC-252 seismic data and the results obtained from that process.  Finally, Part V describes my opinions regarding the net rock volume potentially connected to the Macondo well and the technical considerations that support them.

### B.    Executive Summary

In order to estimate the size and spatial continuity of the Macondo reservoir, I collaborated with a leading seismic software and services company called Fugro-Jason to conduct deterministic simultaneous pre-stack seismic inversion of 3D seismic data acquired over the Macondo well.  Based on the results of the seismic inversion and on my analysis of Macondo MC-252 seismic data and well logs, and considering the interpreted Macondo geological environment, I have reached the following opinions and conclusions:

Three estimates of possible Macondo rock volume were produced from seismic inversion:  (1) a high case estimate of 191,712 acre-feet; (2) a mid-case estimate of 174,685 acre-feet; and (3) a low case estimate of 132,323 acre-feet.  These estimates are based on my interpretation and analysis of "impedance volumes" (i.e., seismically-derived rock properties) in the Macondo project.  Of these estimates, I believe the low case estimate of 132,323 acre-feet represents the closest approximation of net rock volume potentially connected to the Macondo well, with the mid-case estimate of 174,685 acre-feet constituting a reasonable, conservative alternative.  Because the seismic data do not have the capability to detect small-scale faults or thin inter-bedded shales (both of which can act as barriers to flow), I cannot determine from the seismic data the degree to which the sandstone units that comprise the reservoir are "connected," i.e., the degree to which there is internal hydraulic communication between units such that oil can flow from one to another.  However, based on the observations of experts who have studied the type of geology believed to be present at Macondo and on my general familiarity with it, I

2

# Exhibit 6

In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in
The Gulf of Mexico, on April 20, 2010

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
MDL NO. 2179, SECTION J
JUDGE BARBIER; MAGISTRATE JUDGE SHUSHAN

# Modelling Macondo

## A calculation of the volume of oil released during the *Deepwater Horizon* incident

Prepared on Behalf of BP Exploration & Production Inc. and Anadarko

Prepared by:

**Martin J. Blunt**

Department of Earth Science and Engineering
Imperial College, London SW7 2AZ, UK
May 1st, 2013



**CONFIDENTIAL**

M J Blunt Expert Report

*compartmentalized*." Limited connectivity has hampered production in channelled turbidites in the Schiehallion field West of Shetlands, the Bittern Field in the North Sea, and the Ram Powell field in the Gulf of Mexico.[39]

**4.1.5 Government experts deduce smaller reservoir areas without reducing connected volume**. Later in this report we will discuss how both the Government experts and I use measurements of the pressure build-up after well shut-in to deduce the size and shape of the Macondo reservoir (*see* Section 4.3). Every expert found that the connected reservoir has a smaller area (and width) than determined from BP's seismic analysis in Figure 4.5.[40] BP likewise used pressure analysis after choke closure and also presented a model with a smaller area.[41]  This suggests that the well-known geological phenomenon of compartmentalization of turbidite systems has indeed limited the connectivity of the greater Macondo reservoir shown by BP's seismic analysis.   Yet the Government experts omit the next step of proportionately reducing their connected volume of initial oil.  "*The primary job of a reservoir engineer*," Drs. Kelkar & Raghavan tell us, "*is to obtain a production forecast . . . after addressing three primary questions: . . . (3) how much of the available quantity of fluid may be produced*."[42]  Yet they did not assess what percentage of the Macondo field could be produced by the single Macondo well.

Finding a smaller area from a pressure analysis does not alone prove poor connectivity: the geology has to be considered carefully to determine if it is plausible that the whole field can drain to the well in the times indicated by the pressure analysis: I suggest that this is not possible for the BP seismic interpretation (*see* Section 5).  It is unreasonable to suggest that oil located far beyond the boundaries detected by the pressure analysis can reside within these confines.

**4.1.6 My method for assessing connectivity and connected oil volume.** I use the area I compute from the pressure analysis.  I take the largest plausible permeability value, which gives the largest area. I assume that the oil outside this area is not connected to the well, but that the reservoir thickness is only 10 ft in these regions: the purple areas shown in Figure 4.5. 10 ft is the limit of the seismic interpretation,[43] so this is a lower bound on the disconnected volume, or an upper bound on connectivity. This is the most optimistic assessment of connectivity that is consistent with the pressure analysis, the seismic interpretation and calculations of permeability.  The details are given in Section 5: dependent on the fluid and rock properties assumed, the connectivity is 87-90%. From Figure 4.5, this is evidently a very generous interpretation, placing the vast majority of the oil in the yellow, red and orange channels while making the lilac channels very thin in comparison.  This approach will give a plausible upper bound on oil released.

---

[39] Govan *et al.* (2006), Alpak *et al.* (2010), Alpak *et al.* (2013).
[40] IGS642-00215 (Hsieh's draft report, page 12, Table 2 (1,958 acres: 22,270 ft length times 3,830 ft width) [11]; Pooladi-Darvish report [PD], Appendix V, slides 4 and 5 (between 1,686 and 2,228 acres, using the quoted widths and lengths); BP's mid-range area is 4,482 acres.  BP-HZN-2179MDL05173765 (BP gross rock volume assessment) [30].
[41] *See* Dr. Levitan's deposition [56], page 141, lines 14 and 15 (2,185 acres).
[42] *See* Kelkar & Raghavan report, [KR], page 31.
[43] *See* BP-HZN-2179MDL05173765 (BP's gross rock volume assessment) [30], slide 1, most likely case: "*10 ft cutoff footprint (noise background).*"

M J Blunt Expert Report

I contrast my approach with that of the other Government investigators in Table 4.1 below.  I allow a larger connected area than all the other experts, but this is still smaller than inferred by BP in their seismic interpretation (4,482 acres).  In brief, the Government investigators squeezed too much oil into their models of the reservoir.

**4.1.7 Oil volume underground.** Table 4.1 also shows the total oil volume in the reservoir.  Having calculated the extent of the rock containing oil, we need to determine how much oil is in this rock.  This is done using logs of down-hole measurements of porosity (the fraction of the rock that is void space) and saturation (the fraction of the void space that contains oil – the rest contains water).  I follow the same approach here as Dr. Kelkar & Raghavan and find virtually identical numbers; Dr. Pooladi-Darvish and Dr. Hsieh also used values that correspond to mine.  Since there is no disagreement on this part of the analysis – either in terms of the method or the conclusions – and since it is standard in any oil industry assessment, I leave the details to Appendix A.2.  Bear in mind, however, that while we agree on translating reservoir rock volume to reservoir oil volume, the similar numbers mask the issue discussed in the preceding sections: the Government numbers do not account for the geological evidence of incomplete connectivity.

| Expert | Reservoir area from pressure analysis (acres) | Connectivity | Reservoir volume (MM reservoir barrels) | Surface volume (MMstb) |
|---|---|---|---|---|
| *My analysis*[44] | 1,931-2,590 | 87-90% | 258 | 109-114 (112 mid range) |
| Drs. Kelkar & Raghavan[45] | Not stated | Assumed to be 100% | 293 | 110-137 (124 mid range) |
| Dr. Hsieh[46] | 1,958 | Assumed to be 100% | 259 | 110 |
| Dr. Pooladi-Darvish[47] | 2,167 | Assumed to be 100% | 296 | 137 |

Table 4.1.  Areas and oil volumes connected to the well proposed by me and the Government experts.

**4.1.8 Conversion of oil volume to surface conditions**.  Our focus now switches from the rock to the fluids contained within them.  Macondo oil samples were collected using down-hole tools before the accident.  Three laboratories – Schlumberger, Intertek (Westport Labs) and Core Labs (Pencor)[48] –

---

[44] I show the full range of connected areas and connectivity, the mid-range determination of reservoir volume and the range of surface volumes using the mid-range rock compressibility.  *See* Section 5 and Appendix D.1.6 for further details.

[45] From Kelkar & Raghavan report [KR], page 27.  Also considers 110 MMstb, ([KR], page 28) so the mid-range oil volume is 124 MMstb quoted in the summary table in Section 2 and Table 4.1.

[46] Values computed from values in Dr. Hsieh's draft report [11], Tables 1 and 2.

[47] Dr. Pooladi-Darvish base case [PD], values from Appendix IV, slide 10.  Surface volumes found using $B_{oi}$ = 2.15306 in his simulation input files.

[48] I have taken data directly from their reports:  BP-HZN-2179MDL04440732 (Intertek fluid property report) [18], BP-HZN-2179MDL00063016 (Core Labs fluid property report) [19]; BP-HZN-2179MDL00063084 (Core Labs fluid property report with cover page) [20]; BP-HZN-2179MDL01608973 (Schlumberger Fluid Analysis on Macondo samples) [34]; BP-HZN-2179MDL01872218 (Core Labs fluid properties report) [35]; see Appendix A.1 for further details.

M J Blunt Expert Report

# Appendix A.        Data analysis details

## A.1.    Introduction and data sources

Table A.1 shows the data that I have used with a brief justification of the choice.

| Quantity | Symbol | Data source | Value | Unit | Comments |
|---|---|---|---|---|---|
| Connected Oil Volume, *N*: 107-116 MMstb | | | | | |
| Gross rock volume | $V$ | BP seismic interpretation [9] | 1,530 | rb | Assess 87-90% connectivity |
| Porosity | $\phi$ | Log analysis [6] | 0.217 | | Thickness-weighted average over 93 ft |
| Oil saturation | $S_o$ | Log analysis [6] | 0.878 | | Thickness-weighted average |
| Initial oil formation volume factor | $B_{oi}$ | Service laboratory reports [18,20,32,34] | 2.2708-2.3595 | rb/stb | Use values from three laboratories |
| Compressibility, *c*: 18.7-24.5 microsips | | | | | |
| Oil compressibility | $c_o$ | Service company reports [18,20,32,34] | 13.70; 13.90; 14.82 | microsips | Track exact change in volume for calculated pressure drop for three sets of service company data |
| Pore volume compressibility | $c_f$ | Weatherford measurements [24,26] and Dr. Zimmerman [Z] | 4.34; 6.35; 8.57 | microsips | Range based on measured data to match change in pore volume |
| Water compressibility | $c_w$ | Literature value, Osif (1988) | 3 | microsips | Has negligible impact on the calculation |
| Pressure Drop, *Δp*: 1,325; 1,354; 1,423 psi | | | | | |
| Densities for conversion from capping stack to reservoir | $\rho$ | Whitson tables [W] and Core Labs measurements [20] | Varies | kgm$^{-3}$ | The Whitson tables provide a consistent extrapolation for temperatures lower than studied experimentally.  Retain direct data for Core Labs to provide an experimentally-based lower bound. |
| Temperatures for density values | $T$ | Solution of heat transport equations, Appendix B | 40-243 | °F | Take literature values of thermal properties.  At late time, behaviour insensitive to values used. |
| Pressure difference between capping stack and reservoir | $p_w$-$p_{cs}$ | Calculation of head, Appendix B | 3,210-3,435 | psi | Computed for three sets of fluid properties.  Conversion tabulated as a function of capping stack pressure and time since choke closure. |
| Pressure readings | $P_{cs}(t)$ | Trusler report [T] | Varies | psi | Capping stack pressures after choke closure |
| Final reservoir pressure | $p_f$ | Section 4.3, Appendices C and D | 10,433-10,531 | psi | From fit to analytical linear flow model |
| Times to reach reservoir boundaries | $\tau$ | Section 4.3, Appendices C and D | Varies | s | Using analytical linear and rectangular flow models |
| Subsidiary variables used in the consistency check, Section 5 | | | | | |
| Permeability | $K$ | Gringarten report [ACG], core measurements [1,23] and pressure analysis, Section 4.3, Appendix E | 170-329 | mD | From Gringarten expert report including upper range |
| Viscosity | $\mu$ | Whitson table [W] for Core Labs sample 19 at 9,800 psi and 10,500 psi | 0.205, 0.2197 | mPa.s | Measured data inconsistent between labs. Use well-bore pressure in radial flow period, final pressure for reservoir boundaries. |

**Table A.1.  Summary of the data used in my calculations.**

M J Blunt Expert Report

| Layer | Layer thickness (ft) | Porosity | Permeability (mD) | Oil saturation |
|---|---|---|---|---|
| Top (M56D) | 22 | 0.2067 | 86.53 | 0.8283 |
| Middle (M56E) | 64.5 | 0.2208 | 275.22 | 0.903 |
| Bottom (M56F) | 6.5 | 0.2108 | 110.39 | 0.7815 |
| Average (total) | 93 (total) | 0.217 | 219 | 0.878 |

**Table A.3. The properties of the three oil-bearing sandstone layers penetrated by the Macondo well.[142] I have computed the average porosity, permeability and oil saturation using a pore-volume weighted average. The permeability is shown for reference: it is the geometric average of the permeability calculated within each layer, corrected for oil flow and the presence of water.**

**A.2.4 Steps to find the initial oil in place.** BP analyzed the seismic data to calculate the initial oil in place *before* the Macondo well was drilled. There are four steps in the calculation: determining the volume of rock that contains oil; correcting for the fact that most of the rock is solid; correcting for the percentage of pore space containing water; and converting the reservoir volume of oil to surface volume. I will describe each step in turn: this is the standard approach used universally in the industry. I also arrive at essentially the same number found in the Kelkar & Raghavan report.[143]

BP determined the total horizontal area, $A$ (4,482 acres) over which it expected to encounter oil and the average height of permeable oil-bearing sandstone over this area, $h$ (44 ft).[144] The volume of oil-bearing rock is therefore $Ah$. This is called the gross rock volume.

The reservoir rock is composed of solid grains fused together, with pore space in between containing oil and water. We are only interested in the oil volume. To find that oil volume, $Ah$ is multiplied by the porosity $\phi$, the fraction of the rock volume that is pore space. The result is the volume of void space in the reservoir rock – the space that can be filled with fluid. This is called the pore volume.

We then multiply the void space of the reservoir by the oil saturation, $S_o$ – the fraction of the void space that contains oil. This is less than 1, as there is always some water present in reservoir rock: the rock was originally saturated with water, and oil migrated into the reservoir, forcing out most – but not all – the water. This gives us $Ah\phi S_o$, which is the oil volume in the reservoir.

Then the oil volume at the surface, called the stock tank oil initially in place, STOIIP, is given by:

$$STOIIP = Ah\phi S_o/B_{oi}$$

(A.4)

**A.2.5 Summary of fluid properties.** The three sets of measured data are broadly consistent. I will use all three in my calculations. Table A.4 below compares values of oil formation volume factor with those

---

[142] BP-HZN-BLY00120160 (BP summary of permeability, porosity and saturation) [16]; *see also* BP-HZN-2179MDL04440691 (BP summary of log analysis) [15], slide 25.

[143] While the reservoir oil volume is similar in the Kelkar & Raghavan report, they not use a measured value to convert this to a surface volume (*see* Section 4.1), and assumed full connectivity.

[144] BP-HZN-2179MDL05173765 (BP gross rock volume assessment, slide 1) [30], for the most likely case. *See also* BP-HZN-2179MDL06566208 (BP Pre-Drill Review) [31], slide 15; and BP-HZN-2179MDL04440267 (Macondo OOIP, row 12) [8] for height $h$ (44ft), and row 26 for area $A$ (4,482 acres).

M J Blunt Expert Report

from the BP fluid property tables (see the discussion below).[145]  As a basis of comparison, I show here the calculated properties at the initial reservoir pressure ($p_i$=11,856 psi)[146] and at the final pressure (determined from the pressure analysis, Section 4.3).  For the calculation of initial oil in place, I need to know only the initial $B_{oi}$, but the final-pressure $B_{of}$ will be used later for the calculation of compressibility. Table A.5 shows the oil compressibilities (Section 4.2).

The three sets of measured data give consistent values of $B_o$ and $c_o$: the discrepancy in values is around 5%.  These are difficult measurements made on a complex fluid at high temperatures and pressures.

| Property | Core Labs | Schlumberger | Intertek | BP tables |
|----------|-----------|--------------|----------|-----------|
| $B_{oi}$ | 2.3595 | 2.3031 | 2.2708 | 2.1431 |
| $B_{of}$ | 2.4093 | 2.3455 | 2.3129 | 2.1841 |
| $p_f$ (psi) | 10,433 | 10,531 | 10,502 | 10,502 |

Table A.4.  Comparison of fluid data used in the analysis.  The subscript *i* refers to initial conditions (pressure of 11,856 psi) and *f* to final reservoir conditions.  $B_o$ is the oil formation volume factor.  $p_f$ is the predicted final pressure from an analysis of the capping stack pressure build-up presented in Section 4.3: I find different values dependent on which set of fluid data is used.  The final pressure is not calculated for the BP tables: the Intertek value is used to determine properties for comparison only.

| Property | Core Labs | Schlumberger | Intertek |
|----------|-----------|--------------|----------|
| $c_o$ (microsips; $\times 10^{-6}$ psi$^{-1}$) | 14.819 | 13.899 | 13.703 |

Table A.5.  Comparison of measured oil compressibility.  This is one component of the total or effective compressibility used in the material balance calculation.

**A.2.6 BP fluid property tables, and the value of $B_o$ used by the Government, have a bias.**  BP created tables of oil properties for Macondo.[147]  These use thermodynamic correlations[148] tuned to match the data to construct a convenient tabulation of properties for use in further analysis, including simulation tools.  As seen in Table A.4, there is a significant discrepancy between the oil formation volume factor in the BP table used by the Government and the appropriate value of formation volume factor for this problem.[149]  Any conversion from reservoir to surface volumes is inversely proportional to the value of $B_o$ used.  Use of these BP tables leads to approximately a 6-10% increase in calculated oil volume released, dependent on what measurement it is compared to.  Since these BP tables are not reports of direct measurements, and because we do not know the purpose or origin of these tables, I conclude that they should not be used for this analysis.

---

[145] Viscosity was also measured by Core Labs and Intertek (see Appendix A.1 and BP-HZN-2179MDL00063016 (Core Labs fluid property report) [19];BP-HZN-2179MDL04440732 (Intertek fluid property report) [18];  For reference, the Core Labs data gives values of 0.2026 and 0.1876 mPa.s for initial and final reservoir conditions respectively, while the Intertek measurements give 0.2610 and 0.2462 mPa.s for initial and final conditions respectively.  I do note that the difference in these measurements may be the result of different experimental techniques.  I will use the viscosities computed using an equation of state in the Whitson report in this analysis.

[146] See Appendix A for a justification of this value.

[147] BP-HZN-2179MDL04578104 (BP fluid property tables) [5]. In the oil industry these are called "black oil" tables. While crude oil is indeed black in colour, this is a technical term referring to the characterization of the oil as being liquid (stock tank oil) containing gas that is dissolved in the oil at reservoir conditions.

[148] Technically these correlations are called equations of state.

[149] It is not clear if the BP Tables record single-stage or multistage separation values, which could explain the discrepancy.  In any event, my approach is to stick to the measured data.

M J Blunt Expert Report

However, the value of $B_o$ in one BP table was also used in both the Kelkar & Raghavan and Pooladi-Darvish reports.  This is the principal reason for their over-statement of oil volume.  This value was also used in the Griffiths report, again introducing a bias. [150]

**A.2.7 Data summary**.  For reference Table A.6 shows the information I will use to find oil in place.  It helps illustrate the sequence of multiplications to find the reservoir volume of oil.  Then I divide by the values of $B_{oi}$ in Table A.4 to find the initial oil in place.

| Area, $A$ (acres) | Average height, $h$ (ft) | Gross rock volume, $Ah$ (MMrb) | Porosity, $\phi$ | Oil saturation, $S_o$ | Reservoir oil volume, $Ah\phi S_o$ (MMstb) | Connectivity % | Connected oil volume Mid case (MMrb) |
|---|---|---|---|---|---|---|---|
| 4,482 | 44 | 1,530 | 0.217 | 0.878 | 291 | 87-90 | 258 |

Table A.6.  Compilation of data used to find the reservoir volume of oil in the Macondo reservoir.  I assume that 87-90% of the oil is connected to the well.  I then divide by $B_{oi}$ to find the connected oil volume measured at surface conditions: Table A.4.

**A.2.8 Gas/oil ratios.**  In addition to the comparison of properties presented in Table A.4, I have also compared the measured gas/oil ratios: this is the ratio of gas volume to oil volume measured at stock tank conditions for a single-stage flash.  Table A.7 shows numbers that are broadly consistent across the three laboratories.  Here the BP tables are almost exactly the same as the Intertek data.

The gas/oil ratio has been used to convert a total flow of oil and gas in the ocean determined from *in situ* observations, to an effective oil flow rate at the surface.

| Property | Core Labs | Schlumberger | Intertek | Average of the measurements | BP tables |
|---|---|---|---|---|---|
| $R_s$ (scf/stb) | 2,906 | 2,945 | 2,831 | 2,894 | 2,833 |

Table A.7.  Comparison of measured gas/oil ratios $R_s$.  scf is a standard cubic foot and stb is a stock tank barrel. [151]

**A.2.9 Definition of oil formation volume factor.**  Oil is more valuable than gas, and so fields are operated to collect as much oil as possible.  The heavier gas components – propane and butane – can, with judicious chemical engineering, be dissolved in the oil phase, leaving a lower volume of a so-called lean composed almost entirely of methane and ethane.  You can increase the amount of oil recovered by preferentially separating out the gas at higher pressures (and temperatures) and then letting the depleted oil reach equilibrium with the remaining dissolved gas.  This can happen naturally in the reservoir below the bubble point (the saturation pressure), if gas is preferentially produced: this is called differential liberation (of gas).  The amount of oil collected can also be maximized through multistage separators at the surface that are designed to collect as much liquid (oil) as possible.  I note that much of the fluid property data concerns measurements of differential liberation and multistage separator

---

[150] *See* Section 4.1 and Appendix F for more details.

[151] BP-HZN-2179MDL00063084 (Core Labs fluid property report, "Res. Fluid Summary" tab, cell B48 for single-phase flash) [20]; BP-HZN-2179MDL01608973 (Schlumberger Fluid Analysis on Macondo Samples, , zero flash value) [34] , page 4; and BP-HZN-2179MDL04440977 (Intertek multi-state separator tests and compositions) value from "Summary" tab, cell C28 (for single-stage separator test) [32].  The Whitson [W] table values are the average of the values provided based on the samples analyzed by the different laboratories.

# Exhibit 7

**1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL        )  MDL NO. 2179
BY THE OIL RIG           )
"DEEPWATER HORIZON" IN   )  SECTION "J"
THE GULF OF MEXICO, ON   )
APRIL 20, 2010        )  JUDGE BARBIER
                      )  MAG. JUDGE SHUSHAN

HIGHLY CONFIDENTIAL

****************
VOLUME 1 of 2
****************

Deposition of ALAN R. HUFFMAN,
Ph.D., taken at Pan-American Building, 601
Poydras Street, 11th Floor, New Orleans,
Louisiana, 70130, on July 17, 2013.

**2**

1   A P P E A R A N C E S
2
3   APPEARING FOR BP, INC.:
        Ms. Xanath McKeever
        Mr. Ryan Houck
4       KIRKLAND & ELLIS
        333 South Hope Street
5       Los Angeles, California  90071
6       Ms. Hariklia "Carrie" Karis
        KIRKLAND & ELLIS
7       300 North LaSalle
        Chicago, Illinois  60654
8
9   APPEARING FOR THE UNITED STATES:
        Ms. Rachel King
10      Mr. Tom Benson
        Mr. Richard Gladstein
11      U.S. DEPARTMENT OF JUSTICE
        ENVIRONMENTAL & NATURAL
12      RESOURCES DIVISION
        601 D Street, N.W.
13      Washington, D.C.  20004
14
15  APPEARING FOR HALLIBURTON:
        Mr. Jerry C. von Sternberg
        Mr. Colby S. Hodges
16      GODWIN & LEWIS
        1331 Lamar, Suite 1665
17      Houston, Texas  77010-3133
18      Mr. James E. Johanns
        GODWIN & LEWIS
19      1201 Elm Street, Suite 1700
        Dallas, Texas  75270-2041
20
21  APPEARING FOR ANADARKO PETROLEUM CORPORATION:
        Mr. Warren Anthony Fitch
22      BINGHAM MCCUTCHEN
        2020 K Street, Northwest
23      Washington, D.C.  20006-1806
24
25

**3**

1   APPEARING FOR TRANSOCEAN:
        Mr. Joshua C. McDaniel
2       MUNGER TOLLES & OLSON
        355 South Grand Avenue, 35th Floor
3       Los Angeles, California  90071-1560
4
    ALSO PRESENT:
5       Mr. Mark Hendrix, Videographer
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**4**

1                    INDEX
2   VIDEOTAPED ORAL DEPOSITION OF
        ALAN R. HUFFMAN, Ph.D.
3       JULY 17, 2013
        VOLUME 1 of 2
4
5
6                              Page
    APPEARANCES........................  2
7
8   BY MS. McKEEVER....................  6
9
    REPORTER'S CERTIFICATE.............  338
10
11
            EXHIBIT INDEX
12
13  Exhibit No. 11687..............  7
        Expert Report of Dr. Alan
14  R. Huffman submitted on behalf of
    the United States dated June 10,
15  2013
    (no Bates - 95 pages)
16
    Exhibit No. 11688..............  56
17      Excerpt from Expert Report
    of Dr. Alan R. Huffman dated
18  6/10/2013 showing M56D and M56E (no
    Bates - 2 pages)
19
    Exhibit No. 11689..............  71
20      Well log analysis
    (no Bates - 1 page)
21
    Exhibit No. 11690..............  111
22      Kirkland_Macondo
    Feasibility Study dated June 1, 2012
23  (BP-HZN-2179MDL07793710 -
    BP-HZN-2179MDL07793773)
24
25

1 (Pages 1 to 4)

161

1   ThinMAN volume.  They can do their own
2   interpretation.  And I'll be happy, if permitted,
3   to share that interpretation.  That's not a
4   problem for me.  I mean, you know, as a person
5   doing technical work, I can provide the
6   information if requested.
7        Q.  So the ThinMAN volume that you say that
8   BP has, since you provided that to -- to BP, have
9   you done any further modeling runs or analysis to
10  actually derive these numbers that you just
11  testified to?
12       A.  When we delivered the data on -- on the
13  June 10th deadline, I had already interpreted a
14  grid -- a -- a -- what I call a course grid, say,
15  every 100 meters or, every, you know, 50-meter
16  spacing of interpretation on the reservoirs.  I
17  had not gone in and infilled them in every line
18  on the seismic data so that I could then go in
19  and do a complete extraction of the area and
20  compute the average thickness.
21       So I knew what the bodies looked like
22  in the ThinMAN, but I had not completed because
23  of time constraints the complete mapping of all
24  three reservoirs.  That was done after June 10th.
25  It took several weeks.

162

1        Q.  So had you done -- before June 10th had
2   you done the depth conversion process that you
3   would need to do in order to translate from the
4   time domain to the depth domain the thicknesses
5   that you just testified?
6        A.  We've done this two different ways, and
7   this is one of the concerns as I voiced to my
8   report with the way I believe, again, the
9   information was not that clear in
10  Dr. Torres-Verdin's report as to how he did his
11  depth conversion.  My inference is that he did it
12  with a seismic velocity volumes.
13       But in our approach we took the depth
14  migrated data, which are in depth domains, and
15  they've already been converted with the
16  velocities used for the seismic imaging.  We
17  convert those back to time domain, do the
18  analysis of ThinMAN, which is done in time
19  domain.  I then map the events in the time domain
20  data, and instead of converting back to depth
21  with the seismic velocities, which I discuss are
22  not appropriate for this purpose, I convert them
23  using what's called an isochron to isopach
24  methodology, where I take the time thickness of
25  the reservoir, use the log velocities that I

163

1   believe are representative for doing the actual
2   depth conversion so that it will agree with the
3   well, not with seismic data, and then I convert
4   that isochron to what's called an isopach or a --
5   a iso thickness layer, and I then get my volumes
6   from that.
7        So the -- the -- one of the big
8   differences I have in -- in terms of how you get
9   the volumes is that if you use the seismic
10  velocity volume, that you have to go from depth
11  to time and from time back to depth.
12       Dr. Torres-Verdin's depth thing, if
13  it's done based on those velocities, are going to
14  stunned estimate the reservoir size by 10 to
15  25 percent.
16       Q.  Let me stop you there because I -- I --
17  I actually want to stick with what you did --
18       A.  Okay.
19       Q.  -- and what you did before June 10th --
20       A.  Okay.
21       Q.  So --
22       A.  Fair enough.
23       Q.  -- had you already done the depth
24  conversion process that you would need to do for
25  your ThinMAN inversion results to derive these

164

1   average thickness numbers that you just
2   testified?
3        MS. KING:  Objection, form.
4        A.  As -- as I noted earlier, this is kind
5   of -- I want to be clear, the lines -- inlines
6   and crosslines in the seismic that I had already
7   mapped, those could be extracted.  I already knew
8   the velocities.  I actually looked at them at the
9   well to make sure they were reasonable, that I
10  wasn't getting ThinMAN data that were violated by
11  the well knowledge, and that was fine.
12       And at that time I went through and
13  visually said, okay, if this is 20-milliseconds
14  thick, for example, I know that that
15  20 milliseconds -- if I have a 12,000-foot
16  velocity, that 20 seconds of two -- milliseconds
17  of 2 wave time needs to be multiplied by 6,000
18  half velocity to get to the thickness.  So I can
19  do those in my head as I'm looking through the
20  data, and that's normally what I do.
21       I already knew what the velocities were
22  for the D, the E, and the F.  And so I used those
23  just visually by inspection to understand what I
24  believed the reservoir was doing in three
25  dimensions.

41  (Pages 161 to 164)

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

165

1      I then did that quantitatively in terms
2  of extracting a polygon of data with an iso --
3  with an isochron converting that to an isopach,
4  loading that into an Excel file, and then
5  computing the average thickness based on all of
6  those points within the channel that I had mapped
7  in each zone.  So there's a whole series of steps
8  I go through in that process.
9      Q.  (BY MS. McKEEVER)  Okay.  And had you
10  done the isopach series of steps before
11  June 10th?
12      A.  No, that came afterward.  I did not
13  have enough of a grid picked yet to do a full
14  three-dimensional analysis at that point.  I just
15  had a course grid.
16      Q.  Okay.
17      A.  So the isopaching came after June 10th,
18  correct.
19      Q.  Okay.  And so in terms at least of
20  evaluating whether you did the isopaching
21  correctly, that is something that BP has not had
22  the materials provided by you yet to do that
23  analysis --
24      A.  They --
25      Q.  -- since you haven't done it yet?

166

1      A.  They know -- I believe they know how to
2  do this.  They do it as part of their normal
3  work.  So if they have the ThinMAN volumes and
4  they can interpret those volumes as I did, and
5  they know the log velocities of the sands, they
6  can do the same computation.  This is -- this
7  is -- this is one thing that as we jokingly say
8  is not rocket science, it's actually
9  straightforward to do to do those computations.
10      Q.  Okay.  But in terms of the isopaching
11  series of steps, you've not provided thus far yet
12  the work that you did in that part of the
13  process?
14      A.  In --
15      MS. KING:  Objection, form.
16      A.  In terms of actual maps or digits,
17  that's correct.  They're contained in ThinMAN,
18  but you have to interpret the ThinMAN to get to
19  them.
20      Q.  (BY MS. McKEEVER)  Okay.  And is there
21  a reason why you did not in your rebuttal expert
22  report actually go ahead and provide these
23  average thickness and channel area estimates?
24      A.  No time.  I did not have the time to do
25  the mapping.  And I did all of that mapping

167

1  myself because I wanted to make sure I was
2  comfortable with the numbers because of the
3  impact they'll have in the case if they're -- if
4  they're used.
5      So I spent the time to map all those
6  zones myself, and it took several weeks after
7  June 10th to get the maps that I needed to do
8  that -- to come up with the numbers I just quoted
9  to you.  That's why they weren't ready.  If they
10  were ready, I would have put them in the report.
11      Q.  And so the work that you -- that you
12  had to do that took several weeks in order to get
13  to these numbers, all that material is material
14  that BP has not seen?
15      A.  Except for the ThinMAN volume that it's
16  based on, yes, that is true.
17      Q.  Okay.
18      A.  We've got about two minutes left.
19      Q.  Actually 11:57.
20      And have you completed your ThinMAN
21  inversion?  I -- I believe you said you still are
22  working on it.  But can you elaborate?
23      A.  Yes, I will elaborate.  What I said
24  earlier is that the near stack ThinMAN for the
25  architecture has been done for quite a while

168

1  before June 10.
2      We are currently doing a ThinMAN
3  inversion on the far angle stacks so that we can
4  compare that to the resolution limits that
5  Dr. Torres-Verdin was dealing with in the
6  original data so we can then have a comparison at
7  far offsets because of the oil -- the oil impact
8  on the gathers.
9      We are also doing an elastic inversion
10  that will give us, based on the full gather
11  response, what you would expect to see.  And
12  there is a subtle difference.  If you look at
13  Dr. Torres-Verdin's work, he used six partial
14  stacks.  We are able to now use the entire
15  gather.  So it's a more continuous type of
16  analysis as opposed to using partial stacks in
17  six lumps, if you will.
18      The result should be similar within the
19  resolution of the data, but we have a little bit
20  different approach for doing it, and we're
21  following through with that for completeness.
22      Q.  Okay.  But in terms of the work that
23  you did over the -- the -- the weeks that you
24  testified that it took to -- to get these numbers
25  in terms of the average thickness of the M56D, E,

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

169

1   and F sands, is that work completed?
2       A. That is completed, yes.
3       Q. And when was that work completed?
4       A. That was completed, let me think,
5   probably about a week and a half ago. So it
6   probably took a full month after June 10th
7   because of 4th of July and other things getting
8   in the way.
9       Q. And why have -- why has the work
10  product that you generated to -- in the course of
11  completing that work, why has that work product
12  not been provided to BP?
13      A. I will be happy to provide it if
14  requested. That's not a problem.
15      Q. And are you intending as you sit here
16  today to testify at trial with respect to the
17  work that you did to estimate these average
18  thicknesses for the M56D, E, and F?
19      A. If I am asked a question and the Court
20  permits me to answer, I will answer truthfully.
21      Q. Do you expect to be asked those
22  questions?
23      A. I have no idea, Counselor, at this
24  point.
25      Q. Okay. Let's take a break for lunch --

170

1       A. Okay.
2       Q. -- and we'll come back in an hour.
3       A. Okay. Sounds good. Thank you.
4       THE VIDEOGRAPHER: We're off the record
5   at 11:59, end Tape 3.
6       (Lunch recess.)
7       THE VIDEOGRAPHER: We're on the record
8   at 1:09, start Tape 4.
9       MR. FITCH: Before we resume, allow me,
10  please, to note my objection to and reserve
11  Anadarko's rights in all respects with respect to
12  and move to strike the testimony by Dr. Huffman
13  beginning at approximately page 117, line 6 -- 6
14  of the rough transcript consisting of his
15  self-initiated testimony regarding volumes of
16  rock, total reservoir volume and rock thicknesses
17  or sand thicknesses.
18      Counsel examining at the time had asked
19  a question about unresolved sand. The witness
20  responded as I summarized just a moment or so.
21  Examining counsel attempted again to ask about
22  unresolved sands. The same thing happened again.
23      And examining counsel eventually had no
24  choice but to initiate inquiry into those new
25  areas just on the off chance that that kind of

171

1   new opinion might be admitted in the trial of
2   this case. It is certainly possible that, for
3   self-protective reasons, additional such
4   examination may be needed, and that also will be
5   done if it's done with all reservation of rights.
6       MR. VON STERNBERG: As long as
7   Mr. Fitch has already talked about an objection,
8   let me just say for the record that both
9   Transocean and Halliburton are going to make
10  objection on the record in reference to their
11  inability to question the witness, and when our
12  time comes, we will make those full objections.
13      MS. KING: We can read into the -- we
14  can read into the record at that time the e-mail
15  from the Court saying that Transocean and
16  Halliburton don't have the right to ask
17  questions, so --
18      MR. VON STERNBERG: That's fine, but
19  we're still going to make our objections. So --
20      MS. KING: You're welcome to do so.
21  Yeah, absolutely.
22      MR. VON STERNBERG: Do you want us to
23  do it now, or we can do it when our time comes
24  up? I think it will probably be more appropriate
25  that we wait until BP rests and passes the

172

1   witness, and then we'll both do it. I think
2   Transocean is in agreement with me.
3       MR. McDANIEL: We are.
4       MS. MCKEEVER: And before we begin, I'd
5   like to designate this transcript, this
6   deposition, as highly confidential because it
7   involves the display and -- and discussion of
8   seismic -- TGS seismic data that's subject to the
9   court's order to be designated highly
10  confidential.
11      Q. (BY MS. McKEEVER) Dr. Huffman, before
12  we broke, we were discussing the results from the
13  ThinMAN inversion that you performed after
14  June 10th, 2013, to estimate the volume of the
15  Macondo M56 reservoir system.
16      Can you tell me what the total volume
17  estimated from your ThinMAN analysis is for the
18  Macondo M56 reservoir system?
19      A. It would be the sum of the area in
20  acres times the average thickness in feet for
21  each of the three reservoirs. So M56 D thickness
22  times area, plus M56E thickness times area, plus
23  M56F thickness times area. And that's the gross
24  rock volume within the areas that I mapped, which
25  is, I believe, what you asked for.

43 (Pages 169 to 172)

A. Okay. I think you may have just reversed them again. The E here exhibits a higher oil saturation -- therefore, a lower water saturation -- than --

Q. (BY MS. McKEEVER) Did I say "oil"?

A. -- D, and I think you said it backwards again. The E was less than the D for pore water -- for water pore volume. So, again, we're flipping them.

And as a general principle, if you take it on the whole volume, the dirtier sand -- which in this case, I believe is the D. So it has more of the laminations and heterogeneity that was spoken of. That sand will have a lower total oil pore volume and a higher water pore volume than the E sand because of the nature of the rocks, even though they are in communication with each other. Because the -- the saturation of oil is not just a function of whether they talk to each other or not; it's a function of the structure of the material in each of the two sands. So it's more complicated than what we're -- what you're describing.

Q. Okay. But did I understand you correctly then: But for the fact that the --

that M56D, as you describe it, is a "dirtier" sand, that, otherwise, you would expect the M56E to have greater pore -- greater water pore volume if the two were hydraulically communicating?

A. No, you're still saying it backwards. The E has less water than the D.

Q. The E has less water?

A. Right.

Q. No, but I'm asking you to assume the opposite: If the E has more water than the D -- so assume that for purposes of this question, the E has more water than the D --

A. Okay.

Q. -- is that consistent with the two units being hydraulically in communication?

MS. KING: Objection, form.

A. Given what I know about these two reservoirs, I would not expect that to be the case. I would expect the E, as a generally cleaner sand --

Q. (BY MS. McKEEVER) Uh-huh.

A. -- with less laminations in it, to have a -- because of its difference in effective porosity -- okay. So, again, it's tied to those other properties -- you can conceivably have a

higher total -- a higher total oil saturation -- lower water saturation. Not the other way around.

I'm not sure if I --

Q. Yes.

A. -- answered your question or if we're still backwards.

Q. I think I understand what you're saying.

A. Okay.

Q. And maybe we can come back to that on another time.

Okay. Now --

A. Can I fold this back over, Counselor, or --

Q. Yes, you can.

A. Are you done with it?

Q. You know, actually, I'm sorry. Since we have it open, let me just ask a few questions on the porosity curves --

A. Okay.

Q. -- that are contained there.

A. Okay.

Q. Okay. Let me make sure I find it. Okay.

I believe in -- in your rebuttal report on page 37 --

A. This is the Phase II rebuttal.

Q. This is Phase II.

A. Okay.

Q. Yes, this is your Phase II rebuttal report.

On page 37, you provide some porosity estimates for the M56D and M56E sand, and in particular, I'm looking at the -- the second paragraph, second-to-last sentence on that page. And I believe you say: "By comparison, the log analysis on the two reservoirs shows that the total porosity of the M56D sand ranges from 20 to 23 percent, while the porosity of the M56E (excluding the silt shale stringer at 18,135 feet) sand ranges from 23 to 25 percent."

And what I want to ask you is: How did you derive those porosity percentages from the well log analysis?

A. Okay. If you look at the same track that we mentioned a minute ago, the label Phinde and Phintd, those calculations are the porosities estimated from the log data, and there is an "effective" and a "total" porosity. The total

261

1  porosity is all porosity including connate water,
2  trapped porosity.  The effective porosity is
3  the -- the best way to describe it is the amount
4  of porosity that allows fluid to move.  Okay, so
5  it's porosity that's connected to allow flow.
6       Now, you'll notice that both of the
7  reservoirs, the D and the E, the two curves are
8  very close to each other with a few exceptions.
9  The stringer that I -- that we mention here at --
10  what was the depth that I quoted in the report?
11  Where was it?
12       Q.  18,135 feet?
13       A.  Yes.
14       -- is this stringer right here and you
15  will notice that the -- the phi sub T, the total
16  porosity, is the -- is the orange, but the
17  effective porosity is dramatically lower.  The
18  green curve has excursions to the right because
19  there is a high shale content there.  So the
20  amount of porosity that's available for flow, for
21  connected flow, is actually lower at that point.
22       And so that also affects the water
23  saturation in the SW track.  It's lower -- it's
24  higher, more water, less oil.  Okay?
25       So even within the E, you can have

262

1  stringers.  Even though it's a cleaner sand, that
2  little stringer in there shows lower -- a
3  different saturation than the rest of the sand.
4       Now, where I get these numbers from
5  is -- what I -- what I do in my analysis is --
6  and this is something I do routinely in my work.
7  It's called scaling from the core to the logs to
8  the seismic.  Okay?  And this is something that
9  people like myself and Dr. Torres-Verdin would
10  do, but other people in the case might not
11  normally do and other experts might not do in
12  their work.
13       I have to look at the core and I have
14  to recognize that that core sample is a 1-inch
15  core.  It represents a small sample of a much
16  larger reservoir.  This porosity log actually has
17  a averaging effect as it goes up the well --
18  normally, they pull the tool up the hole when
19  they're doing the logging -- and it is averaging
20  over about 12 to 15 inches.  So it is seeing an
21  averaged value.  And then I can take that
22  averaged value and come up with a total average
23  porosity for the entire sand.  We call that
24  "upscaling."  So we're taking the core, matching
25  it to the log, recognizing that the log has an

263

1  average of all the zones around it, and then
2  averaging that average to the full sand.  Okay?
3       So what I'm doing here is basically
4  looking at the cores that were -- that the
5  measurements were based on.  And the numbers that
6  I've quoted here in this section are wherever --
7  wherever possible, the porosities that
8  Dr. Zimmerman cited in his report that were at
9  initial reservoir confining conditions.  So they
10  are not -- they are not surface conditions.  I've
11  tried to keep everything consistent here to be
12  apples-to-apples.
13       Even with those corrections, the core
14  porosities that we have are still lower than the
15  average porosity in the reservoir.  So there
16  is -- there is an upscaling that's required.  If
17  I have a measurement from a core that's X at
18  21 percent porosity in the core but my reservoir
19  as a whole has a porosity of 24 percent -- just
20  to take two numbers -- I have to correct for the
21  fact that the core is not representative of the
22  reservoir as a whole because it's a very small
23  sample.
24       Q.  Okay.
25       A.  And so there's a -- what this upscaling

264

1  issue -- and this is something that both I, as a
2  geophysicist, and the reservoir engineers and the
3  petrophysicists will usually get together in --
4  in a project and talk about and say, Okay, what
5  do we use to go from core to log to full
6  reservoir properties?  Because it's the full
7  reservoir that I want to use -- the average value
8  of that reservoir that I want to use to do the
9  big calculations like the volumetrics and the
10  flow rates and things like that.
11       Q.  Okay.  And did you -- did you do a
12  calculation to estimate the -- the weighted
13  average porosity of the M56 reservoir system?
14       A.  What I did is zone by zone.  So I
15  treated the -- the D and the E and the F as
16  separate zones, and I actually calculated the
17  average porosities -- and I lost my place here.
18  It was page 37, correct?
19       Q.  Correct.
20       A.  Yeah, I turned over a page by accident.
21       The -- the porosities that I quoted
22  there, the 20 to 23 for the M56D and the 23 to
23  25 percent for the M56E, are the range of values.
24  And I also came up with an average of the whole
25  reservoir.  And the average for the M56D was just

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

265

1  below 22 percent. It was -- it was, like, I
2  think 21.7 or something close to that.
3       For the E, it was much higher. It was
4  in the 23 to 24 percent range. So the two
5  reservoirs, even though they may be hydraulically
6  connected, they have slightly different
7  porosities. And because of their lithologic
8  overprint, how much silt or shale is mixed in,
9  they have different effective porosities, which
10 then leads to the saturation discussion that we
11 had earlier.
12      The saturations -- even though they're
13 in communication -- can be different. And even
14 within a single sand, if you look at the
15 saturation in -- in the -- the E or the D by
16 themselves, there are variations in the oil
17 saturation that are related to the rock itself.
18 Even though it may be in communication with
19 itself, you can actually have variations in the
20 oil and water saturations. That's very commonly
21 observed.
22      **Q. Okay. Let me ask -- though, going back**
23 **to my question of: Did you do a calculation to**
24 **estimate the weighted average porosity of the M56**
25 **reservoir system. I'm still not clear. I think**

266

1  **you said you did zone by zone.**
2       A. Zone by zone. I did not do an average
3  for the whole thing because I was looking -- in
4  the case of the cores, I was comparing the cores
5  in the D that Dr. Zimmerman, for example, used
6  with the D.
7       I was comparing the E with the E
8  because I was concerned at -- in that calculation
9  with what the scaling of each zone should be. I
10 could easily go in and do the average of the
11 whole thing with the log data that I have. I
12 just didn't do that number --
13      Q. Okay.
14      A. -- so I just didn't report that number.
15      **Q. Well, do you have an opinion as to what**
16 **the weighted average porosity of the M56**
17 **reservoir system should be?**
18      A. I would prefer to not do that without
19 doing the calculations. Again, I -- I didn't do
20 had a for the whole system. You know, I've
21 stated here I believe they are for the D and
22 the E as an average.
23      **Q. And can you say what it is that you**
24 **would do to -- to come up with a calculation for**
25 **the weighted average of the M56 reservoir system?**

267

1       **If you were going to do that now, what**
2  **is it that you would do?**
3       MS. KING: Objection, form.
4       A. Well, in -- in -- in a simple -- in a
5  simple explanation, I would take each of the
6  sands, I would choose a cutoff for the V shale,
7  for the volume of shale that I want to use for
8  that sand. I would then exclude all of those
9  points. I would then take the remaining
10 porosities of all of the rest of the logs, and I
11 would do a weighted average of those values.
12      **Q. (BY MS. McKEEVER) Okay.**
13      A. Okay?
14      **Q. Okay.**
15      A. Can I fold this up now?
16      **Q. Yes, you can. Now, we could take a**
17 **break because it's 3:15.**
18      A. That's fine.
19      **Q. It's been over an hour, or we can keep**
20 **going. It's up to you.**
21      A. That's fine. I kind of could use a bio
22 break for --
23      **Q. Sure.**
24      A. Okay.
25      THE VIDEOGRAPHER: We're off the record

268

1  at 3:11, end of Tape 5.
2       (Short recess.)
3       THE VIDEOGRAPHER: We're on the record
4  at 3:20, start Tape 6.
5       **Q. (BY MS. McKEEVER) Dr. Huffman, which**
6  **do you contend, based on your analysis of the**
7  **well logs, has the higher water saturation, the**
8  **M56D or the M56E reservoir?**
9       A. Based on the data that I have, it -- it
10 would be my expectation from what I see that the
11 D should actually be -- especially because of
12 illustration connate water, should have a higher
13 water saturation than the E does as a general
14 matter.
15      As I noted earlier, there are zones in
16 the E that are low -- that are lower sat -- lower
17 oil, higher water saturation because of the --
18 the stringer that's in the E, also. So again, it
19 depends on the lithologic makeup of the rock.
20      **Q. And can you tell us again why did you**
21 **not do a weighted average for porosity across the**
22 **M56 reservoir system?**
23      MS. KING: Objection, form.
24      A. It wasn't needed for my work.
25      **Q. (BY MS. McKEEVER) And when you say**

67 (Pages 265 to 268)

340

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL        )  MDL NO. 2179
BY THE OIL RIG          )
"DEEPWATER HORIZON" IN  )  SECTION "J"
THE GULF OF MEXICO, ON  )
APRIL 20, 2010          )  JUDGE BARBIER
                        )  MAG. JUDGE SHUSHAN

HIGHLY CONFIDENTIAL

*****************
VOLUME 2 of 2
*****************

Deposition of ALAN R. HUFFMAN, Ph.D.,
taken at Pan-American Building, 601 Poydras
Street, 11th Floor, New Orleans, Louisiana,
70130, on July 18, 2013.

---

341

1   A P P E A R A N C E S
2
3   APPEARING FOR BP, INC.:
        Ms. Xanath McKeever
4       Mr. Ryan Houck
        Mr. Martin Boles
        Mr. Logan MacCuish
5       KIRKLAND & ELLIS
        333 South Hope Street
6       Los Angeles, California 90071
7       Ms. Hariklia "Carrie" Karis
        KIRKLAND & ELLIS
8       300 North LaSalle
        Chicago, Illinois 60654
9
10  APPEARING FOR THE UNITED STATES:
        Ms. Rachel King
11      Mr. Richard Gladstein
        U.S. DEPARTMENT OF JUSTICE
12      ENVIRONMENTAL & NATURAL
        RESOURCES DIVISION
13      601 D Street, N.W.
        Washington, D.C. 20004
14
15  APPEARING FOR HALLIBURTON:
        Mr. Jerry C. von Sternberg
16      Mr. Colby S. Hodges
        GODWIN & LEWIS
17      1331 Lamar, Suite 1665
        Houston, Texas 77010-3133
18
        Mr. James E. Johanns
19      GODWIN & LEWIS
        1201 Elm Street, Suite 1700
20      Dallas, Texas 75270-2041
21
        APPEARING FOR ANADARKO PETROLEUM CORPORATION:
22      Mr. Warren Anthony Fitch
        Ms. Ky Kirby
23      BINGHAM MCCUTCHEN
        2020 K Street, Northwest
24      Washington, D.C. 20006-1806
25

---

342

1   APPEARING FOR TRANSOCEAN:
        Mr. Joshua C. McDaniel
2       MUNGER TOLLES & OLSON
        355 South Grand Avenue, 35th Floor
3       Los Angeles, California 90071-1560
4
    ALSO PRESENT:
5       Mr. Mark Hendrix, Videographer
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

343

1           INDEX
    VIDEOTAPED ORAL DEPOSITION OF
2       ALAN R. HUFFMAN, Ph.D.
        JULY 18, 2013
3       VOLUME 2 of 2
4
5
6                          Page
    APPEARANCES......................  341
7
8   BY MS. McKEEVER....................  354
9   BY MR. FITCH.......................  463
10  BY MS. KING........................  495
11  BY MS. McKEEVER....................  502
12
13
14          EXHIBIT INDEX
15                         Page
    Exhibit No. 11692...................  365
16      Study entitled Subcritical
    creep compaction of quartz sand at
17  diagenetic conditions: Effects of
    water and grain size written by F.M.
18  Chester, et al., published in the
    Journal of Geophysical Research Vol.
19  112
    (No Bates – 15 pages)
20
        Exhibit No. 11693...................  426
21      Article entitled
    Application of Variable Formation
22  Compressibility for Improved
    Reservoir Analysis written by Yale,
23  et al
    (no Bates - 16 pages)
24
25

376

```
1    150 centigrade.  So they were done at slightly
2    hotter temperatures, slightly higher than the
3    Macondo reservoir, okay?
4           So the combination of Dr. Chester's
5    work and the work of Heap, et al, 2009
6    demonstrates clearly that it's that role of water
7    and the role of temperature together are both
8    going to significantly increase the degree of
9    both creep and part -- and there's two pieces of
10   creep here.  There's -- there's different types
11   of creep.
12          There is stress corrosion cracking
13   and there is deformation creep of -- of -- of --
14   of the grains, okay.  So there -- you can be
15   very -- we can be very esoteric here and get into
16   a lot of different areas.
17          But the corrosion cracking is
18   dramatically accelerated by temperature and in
19   the presence of water.  So these two effects in
20   my -- and the reason I raise them in my rebuttal
21   are so critical to the rate that that material
22   will compact and, in fact, Heap, et al, which is
23   the one that Dr. Zimmerman cited, states very
24   clearly in his paper that he believes at -- at
25   depth, where we are in Macondo, the role of
```

377

```
1    temperature is prob -- the effect of temperature
2    is probably the most important effect of the
3    things he was trying to study in his experiments.
4        Q.   (BY MS. McKEEVER)  Do you contend
5    that the stress state in which the reservoir was,
6    was such that creep could have occurred?
7        A.   Over 86 days?  Yes.  And, in fact,
8    if you -- if we refer back to Yale 1993 that I
9    referred to yesterday, cited in my pap -- in my
10   report, and Dr. Zimmerman, I believe, also cited
11   him.
12          Yale states very clearly, and if we
13   have a copy of it I can show you where it is -- I
14   don't have it in front of me unless it's in your
15   book.  But he states on the third page of his
16   paper very clearly that the UPVC tests on
17   unconsolidated and friable rocks -- so these are
18   rocks that the creep process is going to be more,
19   important compared to a fully consolidated
20   low-porosity rock that's a lot stronger --
21       Q.   Uh-huh.
22       A.   -- in those unconsolidated and
23   friable materials, the effect of creep is
24   underestimated in the UPVC tests, and he
25   recommends that the testing periods be longer and
```

378

```
1    the pressure decline steps, how fast you lower
2    the pore pressure in those tests, be stretched
3    out much longer to try and account to some extent
4    for the creep processes that are occurring in the
5    reservoirs in the real world.
6           I hope that's clear.
7        Q.   You refer to friable rock material
8    and to consolidated and unconsolidated.
9        A.   Yes.
10       Q.   And I believe you testified
11   yesterday that you -- you would put Macondo as
12   weakly cemented friable in the -- in that
13   category.  You can correct me if I'm wrong.
14       A.   I said weakly consolidated --
15       Q.   Weakly --
16       A.   -- friable.
17       Q.   -- consolidated.
18       A.   Yes, weakly consolidated.  Correct.
19          But I -- I do not believe that it
20   falls under the class consolidated.  I think the
21   rock is not that -- that consolidated, compacted
22   yet to call it a consolidated material.
23       Q.   Do you call it a friable material?
24       A.   I believe it's on the border between
25   unconsolidated and friable.
```

379

```
1        Q.   And can you give me your technical
2    basis for believing it's on the border between
3    friable and unconsolidated?
4        A.   Based on the porosity data that I
5    have seen, based on the log-computed moduli that
6    we looked at in my log display yesterday, based
7    on the unconfined compressive strength that was
8    computed by Weatherford from the multistage
9    compression tests that showed that these
10   materials are very, very weak materials.  And
11   what else?
12          Those are probably the best examples
13   of why I believe it.
14       Q.   Okay.  Give me one second to make
15   sure I digest this.
16          Okay.  With respect to the porosity,
17   the data, can you tell me specifically what it is
18   about the porosity data that indicates to you
19   that this is on the border between friable and
20   unconsolidated?
21       A.   The porosities as we've talked about
22   are in the mid to low 20 percent range, so the
23   average number that I came up with in my report
24   for the -- for the D was about 21 and .8 to
25   22 percent roughly.
```

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

380

1          In the E, in the M56E reservoir, the
2   average porosity's in the 23 to 24 percent range.
3   Those porosities are at the just -- just ab --
4   just at the lower edge of what I would call --
5   use for unconsolidated and right in the midrange
6   of what I would call for friable.
7          So they're kind of right on the
8   boundary where you transition from unconsolidated
9   to friable.  And, in fact, the Crawford paper
10  that we talked about yesterday, his Figure 4
11  shows that very well with the data of Neuman,
12  which Dr. Zimmerman cited in his report and I
13  reviewed as part of my report preparation.
14         So I considered all of that
15  information in doing my report.  And the Crawford
16  diagram, if we -- if we do get to that today, I
17  can show you on that diagram why I make that
18  assertion.
19     Q.   Okay.  Now --
20     MS. KING:  I'm sorry, Counsel.  I need to
21  take a break.  I'm just -- I just have --
22  choking.
23     MS. McKEEVER:  No problem.  Let's go --
24     THE VIDEOGRAPHER:  We're off the record at
25  9:36.

381

1          (Short recess.)
2     THE VIDEOGRAPHER:  We're on the record at
3   9:47.
4     Q.   (BY MS. McKEEVER) Dr. Huffman, we
5   were discussing your basis for believing that
6   Macondo is on the border between friable and
7   unconsolidated right before the break.
8     A.   Correct.
9     Q.   I want to continue discussing that,
10  but I need to go back actually to the discussion
11  that we were having about creep.
12     A.   Okay.
13     Q.   What pressure do you contend is
14  necessary for creep to occur in 86 days?
15     A.   That -- that's not a question that I
16  can answer without considering the material and
17  the other things we've talked about.  The water
18  saturation, the temperature, all those factors
19  come into play.
20         The activation of creep is the way
21  we use the term, when is it activated or started,
22  is -- is different in different materials.  And
23  in a unconsolidated material where it's
24  water-wetted and at high temperature, things like
25  stress corrosion cracking, which will contribute

382

1   to the creep, can actually start fairly early.
2          I'm aware Dr. Zimmerman cited a
3   different number in his deposition.  I would not
4   agree with that number for unconsolidated and
5   friable rocks.  For consolidated rocks, I would
6   argue that that probably is a good number.
7     Q.   Do you dispute that what matters for
8   creep is pressure drop in time?
9     MS. KING:  Objection, form.
10     A.   I -- I -- I would -- I would -- my
11  answer to that would be the -- there's a lot of
12  factors involved.  There is the change in
13  differential or -- or deviatoric stress as we
14  call it, the change in confining pressure, the
15  change in temperature, the change in loading
16  rate, all of those factors -- and the saturant --
17  the saturant that you're dealing with -- can
18  affect the creep rates in materials.  They're all
19  part of the equation here.  You can't -- you
20  can't isolate one and say what's it going to do
21  unless you go do an experiment that actually
22  isolates that effect, which is what a lot of the
23  literature tries to do is to try and isolate just
24  the temperature effect or just the water effect
25  to try and quantify those effects by themselves.

383

1     Q.   (BY MS. McKEEVER) So, then, would
2   you dispute that the two key factors for purposes
3   of creep is pressure drop in time?
4     A.   I believe that that -- I believe you
5   also have to add temperature into that equation.
6     Q.   Okay.
7     A.   So -- so delta pressure, temperature
8   that the test is conducted.  So if you raise it
9   or lower it, that will change it.  And the -- the
10  load -- the loading duration time is -- I'm
11  assuming what you're referring to by the word
12  "time."  The duration of loading, as I cited from
13  Yale earlier, will also affect the result that
14  you get.
15     Q.   Okay.  So at least we can agree that
16  the three key factors for creep are the time,
17  the -- as you --
18     A.   The loading duration.
19     Q.   The loading duration?
20     A.   Right.
21     Q.   The pressure drop and in your view
22  also the temperature?
23     A.   And I would also, as I said earlier,
24  the water sat -- the -- the fluid that you're
25  saturating it with.  If it's not water, that will

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

404

1     **Q.   Uh-huh.**
2     A.   -- like we did for the averaged
3  porosity.  You know, I can go through that
4  exercise easily enough with the digital data that
5  I have, but I haven't gone in and looked at that.
6  I could do it visually from the plots and give
7  you a rough number that if that's of value.
8     **Q.   Actually, I -- what do you contend**
9  **would be indicative of a consolidated sandstone**
10 **in terms of its dynamic moduli?**
11    A.   I'm not sure I can answer that
12 question the way it's posed, Counselor.  I -- I
13 don't have at my fingertips a plot of the dynamic
14 moduli versus the porosity or other data that
15 would allow me to scale that, for example, to
16 Crawford's plot that we talked about earlier.
17 I'd have to go build that plot and look at those
18 moduli and see where they fall.
19     **Q.   Okay.**
20    A.   Okay?  So I haven't done that
21 specific exercise of just plotting the dynamic
22 moduli as a function of the other properties.
23        The -- the most critical
24 parameter -- and I mentioned this a little
25 earlier -- is the Poisson's ratio.

405

1     **Q.   Okay.  So the plotting that you just**
2 **described, that's not in -- that's not something**
3 **that you've done in your expert report?**
4    A.   I have not used the dynamic moduli
5 per se to come up with a separate assessment of
6 state of unconsolidation based on just the
7 Young's modulus or the shear modulus or the bulk
8 modulus, no.
9        Those are part of the thinking, but
10 by themselves, I haven't analyzed those as a
11 separate analysis.
12     **Q.   Okay.  Moving to Poisson's ratio,**
13 **can you tell us what about Poisson's ratio for**
14 **Macondo indicates to you that Macondo's on the**
15 **border between friable and unconsolidated?**
16    A.   Sure.  If you look at the way rocks
17 compact -- and I'm speaking now from when you put
18 them down on the bottom of the ocean and they
19 have no -- they're essentially completely
20 unconsolidated, loose grains -- and you
21 progressively bury that material, which is part
22 of what I do in my pore pressure work, was
23 understanding that geologic process of
24 compaction, cementation, some of the things that
25 we've talked about, some of which have been

406

1  stricken in this case -- that process starts from
2 a Poisson's ratio of .5, completely
3 unconsolidated.
4        So you literally have grains
5 floating in water, and the Poisson's ratio is
6 actually not even defined then because you can't
7 deform the material.  It's --
8     **Q.   Uh-huh.**
9    A.   -- a slurry, okay?
10       As that material is buried more
11 deeply, the Poisson's ratio gradually comes down,
12 okay?  And this would be for static Poisson's
13 ratio or dynamic.  They both will do the same
14 thing.
15        And so as you bury that material, it
16 will go from .5 to .4 to .2, all the way
17 down to the very low end, and it can actually
18 approach between .1 and zero in the most extreme
19 case.  Like the quartzite that I talked about.
20 You can get very low Poisson's ratios there.
21       The -- the number, the dynamic
22 Poisson's ratio that I have for my well log data
23 is point -- is roughly -- for the wet sands.
24 These are not the oil sands -- .33 to .35 is the
25 Poisson's ratio from the logs.

407

1       Now, you have to be careful here
2 because, when you put oil in the sands, as we
3 have in the D and the E and the F, the Poisson's
4 ratio that you detect changes, okay, so it lowers
5 it.  So the oil sand Poisson's ratios are about
6 .26 to .27.
7       If you were to put gas in that
8 reservoir, and there's actually zones with gas in
9 the well that would show this in the well logs,
10 the number drop -- the Poisson's ratio drops to
11 about .15 to .2, which is in the range
12 Dr. Zimmerman was quoting when he made his
13 adjustment.
14       So when I look at the wet reservoirs
15 here and the oil reservoirs, those Poisson's
16 ratios, the .33 to .35, is not possible to be
17 tied in my view to a fully consolidated material.
18 It is what I expect for a weakly consolidated to
19 friable rock, and that's something that's a
20 totally independent estimate, okay?  This is
21 completely different measurement.
22       When you take that Poisson's ratio
23 and you compare it, you combine it with the
24 porosity information that we've talked about,
25 when you look at the unconfined compressive

17 (Pages 404 to 407)

408

1   strength, all these different factors, I can't
2   get that material to be classified as a
3   consolidated rock.  It just doesn't work.
4         And, you know, I realize that some
5   experts in the case are -- are -- have -- their
6   careers have been focused on consolidated, so
7   they know the consolidated world.  And I believe
8   Dr. Zimmerman is -- is knowledgeable in the
9   consolidated rocks.  The deepwater unconsolidated
10  rocks are different creatures than the
11  consolidated materials, and all the data that I
12  have tells me that these rocks are weakly con --
13  weakly, say, unconsolidated to friable, as we
14  said, on that boundary between unconsolidated and
15  friable.
16        Q.   Do you contend that the consolidated
17  or unconsolidated nature of the -- of the rocks
18  has a direct impact on understanding UPVC
19  testing?
20        A.   Yes.  In fact, Yale, et al, 1993,
21  made specific reference to this problem, that
22  their experience was that the UPVC tests on
23  unconsolidated and friable materials, because of
24  the -- the way the tests were done, and this is
25  loading rates in particular they were talking

409

1   about, will always underestimate the
2   compressibility of the reservoir.
3         And they recommend on their page 3
4   that the -- the pressure decline that should be
5   used in tests on those materials be decreased so
6   that, instead of a half a psi per second, slow it
7   down so that the test duration goes from hours to
8   days so that you can start to see those effects
9   that are critical to getting a more accurate UPVC
10  measurement.
11        And if you have the paper, I can
12  show you the exact location where he says that.
13        Q.   Okay.
14        MS. McKEEVER:  I suggest that we go ahead
15  and take our break now a little bit early.
16        THE VIDEOGRAPHER:  We're off the record at
17  10:22, end Tape 1.
18        (Short recess.)
19        THE VIDEOGRAPHER:  We're on the record at
20  10:46, start Tape 2.
21        Q.   (BY MS. McKEEVER)  Dr. Huffman, we
22  were discussing your concerns with
23  Dr. Zimmerman's background in consolidated
24  sandstones in terms of its relevance for Macondo.
25  And you mentioned that the Yale publication,

410

1   which we're still waiting to receive --
2         A.   Uh-huh.
3         Q.   -- provides some support for your
4   view that it makes a difference to have
5   experience in unconsolidated sandstones when it
6   comes to UPVC testing; is that correct?
7         A.   Actually, I believe what I said is
8   that the Yale paper talks about the fact that
9   UPVC tests on unconsolidated and friable rocks
10  will often underestimate the compressibility of
11  those materials because of the duration the rates
12  at which the tests are being done.
13        And I believe we have them now.
14        Q.   Does the Yale article -- the Yale
15  publication state that for purposes of UPVC
16  testing, it's important to have experience with
17  unconsolidated sandstones?
18        MS. KING:  Objection, form.
19        A.   That's not what I said, I don't
20  believe, earlier.  It doesn't say that.  What it
21  says is that the way the tests are conducted, the
22  rates at which the loading is -- is -- is
23  performed can give you compressibilities, UPVCs,
24  that are too low for friable and unconsolidated
25  rocks.  That's what it says.

411

1         Q.   (BY MS. McKEEVER)  Okay.  And that
2   publication is the basis for your concern with
3   Dr. Zimmerman's background?
4         A.   No, it has nothing to do with
5   Dr. Zimmerman's background.  I was referring to
6   the testing procedures themselves, okay.  What I
7   stated about Dr. Zimmerman's background in
8   looking through his publications and what I could
9   find, because I've never worked with him, he has
10  a lot of experience in more consolidated
11  materials, but I didn't see lot of experience
12  in unconsolidated.  And he -- his own admission
13  in his deposition, he didn't -- he didn't have
14  any experience in the Gulf of Mexico.  So I -- I
15  just am trying to make it clear here that the
16  experience in consolidated materials can actually
17  train your mind to think a certain way.  And I
18  know from my own experience, having been in the
19  industry from essentially the inception of
20  deepwater drilling in the ear -- late Eighties,
21  early Nineties, that most of our -- our thinking
22  about deepwater was completely wrong.
23        We began drilling wells in the
24  deep -- in the true deep water Gulf in
25  Mississippi Canyon, for example, in the

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

# Exhibit 8

# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA

# IN RE: OIL SPILL BY THE OIL RIG MDL NO. 2179 "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010

## EXPERT REPORT OF DR. ALAN R. HUFFMAN SUBMITTED ON BEHALF OF THE THE UNITED STATES

This report discusses the expert findings of Dr. Alan R. Huffman relating to the estimation of the size of the M56 reservoir, and the compaction history and geomechanical properties of the M56 reservoirs penetrated by BP Mississippi Canyon 252 #1 well (Macondo prospect).

DATED:  June 10, 2013

_Alan R. Huffman_
Signature: Dr. Alan R. Huffman

Highly Confidential Per BP

The conclusion of my analysis of Dr. Torres-Verdín's work is that it cannot be used to determine accurately the size of the M56 interval reservoirs, and that the total reservoir volume available for flow of hydrocarbons during the blowout is much larger than Dr. Torres-Verdín's results would indicate. It is my further opinion that in the absence of any new data or evidence to the contrary, that the BP reservoir size from their pre-drill estimates are a better estimate of the reservoir size than are the results of Dr. Torres-Verdín's work.

**Rock and Fluid Properties at Macondo – Log Analysis from Phase I Trial**

In my rebuttal report in Phase I of the Deepwater Horizon Litigation, I presented well-log analysis work that was performed to determine the elastic rock properties for the entire last interval drilled in the Macondo well below the 9 7/8" casing shoe in the depth range from 17,150 ft to the bottom of the well at about 18,285 ft. These results were provided in Appendix I to that rebuttal report. The analysis provided therein showed log calculations that included the total and effective porosity, the volume of sandstone and shale, the saturation levels of water and hydrocarbons, and other critical properties including the Young's Modulus, Bulk Modulus, Shear Modulus, Poisson's Ratio ("PR"), and other important rock properties. These properties, along with the measured log properties including gamma ray, resistivity, neutron porosity, bulk density, P-wave sonic velocity, S-wave velocity and caliper among others were used to assess the pore pressure conditions and fracture strength of the rocks to compare to the drilling parameters from the well.

Those same rock properties are also very valuable for doing forward models where the logs are used to generate a synthetic seismic model for the layers of rock measured in the Macondo well, and are also suitable for use as a calibration data set for the seismic inversion method that was employed in this case. Dr. Torres-Verdín did extensive testing of the well data and seismic data in what he refers to as a feasibility study before embarking on the full 3D inversion project. This is a process that I have also used many times in such projects.

As part of my assessment of Dr. Torres-Verdín's analysis in this case, I undertook to perform forward models using the Macondo well log data to determine what the seismic response of the rock properties should be at Macondo. To perform this work, I used the Hampson and Russell AVO modeling software which is very similar to the Fugro-Jason software employed by Dr. Torres-Verdín and is also widely used by both oil and service companies in the industry along with the Fugro-Jason Workbench. The results of this forward modeling included estimating a wavelet from the seismic data to assure that the models have a similar frequency content and bandwidth compared to the seismic data. Using the well logs and the extracted wavelet, a synthetic seismic model was generated for the Macondo well to determine the seismic response of the reservoirs of interest (figure 1) and compare the synthetic trace to the near and far stacks from CGG. The synthetic models were initially constructed using the wavelet extracted directly from the seismic data so that the models will match as closely as possible the wavelet characteristics of the seismic.

Highly Confidential Per BP

**Independent Assessment of Macondo Reservoirs Using More Advanced Technologies**

I undertook an independent assessment of the seismic data using the raw depth-migrated seismic gathers, the AVO gathers, the partial-stack and full stack data and seismic migration velocities provided by the Department of Justice.  The goal of this analysis was to confirm the limitations of the seismic data that were reported by Dr. Torres-Verdin and then perform a separate seismic inversion study using a proprietary technology available from my company that can in some cases overcome the wavelet and resolution limitations discussed above.  To prepare the data for this analysis, the depth-migrated gathers and stacks were converted back to time domain to compare to the results of Dr. Torres-Verdin.  The synthetic seismogram was generated from the Macondo well logs and the synthetic was compared to the seismic near and far stack data as discussed earlier.  The seismic gathers in time domain were conditioned using an approach similar to that employed by Dr. Torres-Verdin with a combination of Sigma[3] proprietary technology and Hampson-Russell commercial software. BP provided me with both the raw depth-migrated gathers and the same AVO gathers that Dr. Torres-Verdin used for his work. This allows me to make a careful comparison of Dr. Torres-Verdin's data conditioning flow using the raw gathers and the AVO gathers with a separate data conditioning workflow (see figure 5).  Such an exercise is very constructive for understanding the nature of the seismic data. The differences in the gathers displayed in Dr. Torres-Verdin's report and the gathers from my analysis emphasize the point that the variations observed in the gathers are sufficient to cause problems with the elastic inversion scheme being used.

Once the gathers were conditioned, and first step was to plot the AVO response of the amplitudes on the gathers from the M56D-E primary seismic event at about 5.65 seconds two-way-time for the AVO gathers, the conditioned PSDM gathers and the conditioned gathers with a long-gate automatic gain control ("AGC").  The result of this AVO plot for the top and base of the sand package (figure 6) for each set of gathers provides significant insight into the problems that plagued Dr. Torres-Verdin's analysis.  The top reflection of the sand package (blue data points) and the base reflection (red data points)  and the curve fits to these events (blue and red curves) show clearly that the AVO response with angle is not smoothly varying in the AVO gathers, but instead shows amplitude swings that confirm that the events are tuning at certain offsets (higher amplitudes), creating instability in the elastic response of the reservoir on the seismic data that will clearly affect the 6 partial stacks that were generated by Dr. Torres-Verdin for his work.  The data conditioning applied by Sigma[3] to the depth-migrated gathers improves the stability of the AVO response to some degree, but the reality is that every process applied to the data modifies the offset-dependent behavior to some degree.   This observation reinforces the notion that the elastic inversion process was being hampered significantly by the limitations of the seismic data.

Another basic quality control step was performed on the near-angle stack and far-angle stack from CGG to confirm that the AVO response of the M56D and M56E package was present in the CGG data and also assess the frequency content of the two angle stacks.  A comparison of the two stacks and their amplitude spectra (Figure 7) shows clearly that the far-angle stack has a much stronger amplitude response due to the hydrocarbon presence within the resolution limits of the seismic data.  In particular, the near-angle stack contains significantly higher frequencies

                                                    Highly Confidential Per BP

# Exhibit 9

<u>Pre-decisional and Confidential</u> Draft – October 22, 2010

# Computer Simulation of Reservoir Depletion and Oil Flow from the Macondo Well Following the Deepwater Horizon Blowout

By Paul A. Hsieh

Open-File Report 2010–xxxx

**U.S. Department of the Interior**
**U.S. Geological Survey**



8615

Exhibit No. _____
Worldwide Court
Reporters, Inc.

Pre-decisional and Confidential Draft – October 22, 2010

**Table 1.** Reservoir and fluid properties used in the reservoir simulation model. Property values are not given in this report due to their proprietary nature.

| Reservoir or Fluid Property | Value Used in Reservoir Model |
|---|---|
| Original oil in place | $1.1 \times 10^{-8}$ stock tank barrels |
| Formation volume factor, $B$ | 2.35 |
| Porosity, $\phi$ | 0.21 |
| Effective formation (or pore) compressibility, $c_f$ | $1.2 \times 10^{-5}$ psi$^{-1}$ |
| Oil viscosity, $\mu$ | 0.168 cp |
| Oil compressibility, $c_o$ | $1.46 \times 10^{-5}$ psi$^{-1}$ |
| Oil density, $\rho_o$ | 4.74 ppg |
| Water saturation, $S_w$ | 0.1 |
| Water compressibility, $c_w$ | $3.0 \times 10^{-6}$ psi$^{-1}$ |

# Exhibit 10

**EXPERT REPORT**
**U.S v. BP Exploration & Production, Inc., et al.**

# Estimate of Cumulative Volume of Oil Released from the MC252 Macondo Well

Prepared on Behalf of the United States

Prepared by:
**Mehran Pooladi-Darvish**
Fekete Associates, Inc.
Suite 2000
540 5th Avenue SW
Calgary, AB
Canada
T2P 0M2





CONFIDENTIAL

| Primary Parameter | Secondary Parameters | | Overall Characteristics | | | Average Error, % | Cum Oil Released (after matching shut-in pressures), MMSTB |
|---|---|---|---|---|---|---|---|
| | K, mD | Skin | OOIP, MMSTB | PI, stb/d/psi | q July 15, stb/d | | |
| BOP ID=2 in (Case-13) | 315 | 9.5 | 90.5 | 19 | 34,100 | 0.03 | 3.32 (Bad) |
| Skin=50 (Case-07) | 450 | 50.0 | 91.8 | 10 | 34,800 | 0.03 | 3.39 (Bad) |
| K=170 mD (Case-01) | 170 | 5.0 | 126.6 | 15 | 42,900 | 0.3 | 4.14 (Bad) |
| h=25 ft (Case-04) | 1300 | 16 | 117.2 | 17 | 44,400 | 0.05 | 4.3 (Bad) |
| k=360 mD (Case-02) | 360 | 12 | 127.4 | 20 | 46,900 | 0.05 | 4.53 (Bad-Med.) |
| Roughness=0.02 in (Case-17) | 470 | 5 | 129.9 | 34 | 48,700 | 0.04 | 4.70 (Med.) |
| Upper Bound Hydrostatic Error (Case-23) | 575 | 16 | 147.0 | 26 | 50,700 | 0.03 | 4.85 (Med.) |
| h=50 ft (Case-05) | 980 | 11.5 | 134.5 | 29 | 51,100 | 0.03 | 4.93 (Med.-Good) |
| Lower Bound CS Error (Case-18) | 510 | 9 | 134.9 | 31 | 51,600 | 0.04 | 4.99 (Good) |
| Porosity (Case 24) | 530 | 9.5 | 136.8 | 31 | 51800 | 0.03 | 5.00 (Good) |
| Upper Bound CS Error (Case-19) | 560 | 10 | 140.3 | 32 | 52,200 | 0.04 | 5.03 (Good) |
| Base Case (Case-00) | 550 | 9.5 | 137.4 | 32 | 52,400 | 0.04 | 5.03 (Good) |
| Lower Bound BOP Error (Case-20) | 550 | 9.5 | 137.4 | 32 | 52,400 | 0.04 | 5.03 (Good) |
| Upper Bound BOP Error (Case-21) | 550 | 9.5 | 137.4 | 32 | 52,400 | 0.04 | 5.03 (Good) |
| High Viso at Low Pressures (Case-10) | 550 | 9.5 | 138.3 | 32 | 52,400 | 0.05 | 5.05 (Good) |
| k=850 mD (Case-03) | 850 | 18 | 137.1 | 33 | 52,500 | 0.04 | 5.07 (Good) |
| Visc=0.16 cp (Case-09) | 360 | 6 | 141.3 | 36 | 53,300 | 0.03 | 5.13 (Good) |
| Aquifer (Case-08) | 530 | 6.5 | 117.8 | 36 | 53,300 | 0.03 | 5.14 (Good) |
| Cf=12E-6 1/psi (Case-11) | 650 | 9.5 | 106.9 | 36 | 53,400 | 0.04 | 5.15 (Good) |
| Lower Bound Hydrostatic Error (Case-22) | 530 | 2.5 | 132.2 | 44 | 54,200 | 0.06 | 5.27 (Good) |
| Layered (Case-12) | 284 565 1585 | 4.0 | 146.3 | 46 | 55,400 | 0.05 | 5.33 (Good-Med.) |
| BOP ID=3.5 in (Case-14) | 530 | 17 | 148.5 | 24 | 56,000 | 0.04 | 5.40 (Good-Med.) |
| Skin=0 (Case-06) | 540 | 0.0 | 150.2 | 52 | 56,300 | 0.03 | 5.44 (Med.) |
| BOP ID=4.0 in (Case-15) | 520 | 16 | 155.1 | 24 | 58,100 | 0.04 | 5.59 (Med.) |
| Roughness=0.0006 in (Case-16) | 550 | 22 | 158.0 | 22 | 59,800 | 0.05 | 5.76 (Bad) |

**Table 1:** Summary of results for the cases that show a good, mediocre and bad match of the measurements during the integrity test and the corresponding cumulative volumes of oil released.



## Section IV: The Base Model

In this section I use a numerical simulator to represent the reservoir/wellbore/BOP model with details presented in Appendix IV. The Software I used is called IMEX from the Computer Modelling Group (CMG), and is one of a few commercially available numerical simulators that have widespread acceptance and use in the industry. Figure 6 represents the reservoir in the simulator, demonstrating the grids over which the equations of flow are solved.



Figure 6: Reservoir Description and properties of the base model in the numerical simulator

One particular aspect of the model shown here is its simplicity of shape and uniformity of the properties such as thickness.  Geological formations which make up petroleum reservoirs are often much more complex. There are several reasons for this simple representation. First, determination of the cumulative volume of oil released is primarily a function of the average characteristics of the system, and is not affected, to any large degree, by details about geometry and heterogeneity. Second, the measurements that are used for history-matching are insufficient to distinguish details about geometry or heterogeneity. Third, like all other exploration plays, uncertainties related to the Macondo well are large and many. This simple representation allows a systematic examination of uncertainties over a wide range of parameters. For the problem of estimating cumulative volume of oil released from the Macondo well, simplicity offers strength and clarity.  This approach is consistent with what I do in my other reservoir studies at Fekete.  In the studies that I have done over the past year or two at least half of the reservoirs have been modelled with uniform properties and simple geometry.

Among the advantages of using the numerical model are that it allows a seamless coupling between the reservoir and wellbore model used. This is because the combined wellbore and BOP model is incorporated directly into the numerical model, and equality of bottomhole pressure between the reservoir and the wellbore model is ensured at all times. Other advantages that the numerical method offers over the analytical method are outlined in Appendix IV.

One difference between the way I use the numerical model in this section with the way the analytical model was used in Section II is that here, I start with a specification of the properties of the reservoir,



# List of Uncertain Parameters-IPR

A list of parameters affecting the IPR curve is provided in the following table. For each parameter a range of uncertainty is assumed. The range of values are generally taken form various measurements or reported data.

| Parameter | Low Estimate | Base Estimate | High Estimate | References |
|---|---|---|---|---|
| Permeability, mD | 170 | 550 | 850 | TREX-003533 at p. 13:  k=250-500 mD<br>TREX-003533 at p. 19:  k=355-444 mD<br>Core Analysis: k=max ~800 mD |
| Skin | 0 | 9.5 | 50 | TREX-009325 |
| Net Pay, ft | 25 | 90 | | TREX-003533 at p. 13: h~90 ft; 22' M56D and 64.5' M56E. The low estimate assumes a case were not all the sands are connected to the wellbore |
| Porosity, % | 17 | 23 | 28 | Minimum and maximum values are from TREX-004775 |
| $c_f$, 1/psi | 2E-06 | 6E-06 | 12E-06 | Base and high estimates are taken from uniaxial strain pore volume compressibility test conducted by Weatherford (BP-HZN-2179MDL02394184). The minimum value is arbitrary. |
| OOIP, MMSTB | 75 | 137 | 200 | BP reported a STOIIP range of 138-239 MMbls with a mean value of 185 MMbls in TREX-004775 |
| $c_o$, 1/psi | 6.0E-06 | 12.3E-06 | 32.3E-06 | Minimum and maximum values are from Intertek (at Pi) and Pencor (at Pb), respectively. See the PVT Section in this Appendix. |
| Oil Visco @ Initial Condition, cp | 0.16 | 0.23 | 0.26 | Minimum and maximum values are taken from Pencor and Intertek (at Pi). See the PVT Section in this Appendix |
| Bo @ Initial Condition, rbl/stb | 2.0 | 2.1 | 2.35 | Minimum and maximum values are from Schlumberger (CCE and Separator Test) and Intertek (CCE and Separator Test) respectively. Base Value is from Pencor. See the PVT Section in this Appendix |



CONFIDENTIAL

8

# Exhibit 11

Rebuttal Expert Report
United States v. BP Exploration & Production, et al.
MDL 2179 (E.D. La.)

# Analyses of MDT Pressure-Transient Data

Prepared by:

**Leif Larsen**
**Myklabergstien 15**
**N4052 Royneberg**
**Norway**

**June 10, 2013**

range based on possible upper and lower limits.  In my analyses I took the basic parameters of net thickness, porosity, viscosity and total compressibility from Dr. Gringarten's report. These have negligible impact on my analyses of MDT data in the sense that realistic changes will not have a significant impact on my results, if any.

Using these parameters, I get the results listed in Table 1, with my best single-value permeability estimate 500 md for the M56D sand, 150 md for the Upper M56E sand and 500 md for the Lower M56E sand. These results are consistent with core and log-based data described in a BP Technical Memorandum dated July 26, 2010.[6] The same estimates (P50) presented by Gringarten[7] are 116 md (M56D), 117 md (Upper M56E) and 285 md (Lower M56E). See Table 2.   Although our estimates for the Upper M56E are in general agreement, I believe that Gringarten substantially underestimates the permeability of the M56D and Lower M56E sands.

| Table 1 – Input and derived parameters from the MDT data. | | | |
|---|---|---|---|
| Sand unit | M56D | Upper M56E | Lower M56E |
| Data file | F144 | F143 | F147 |
| Net thickness, ft | 22 | 15.4 | 49.1 |
| Porosity | 0.207 | 0.221 | 0.221 |
| Viscosity, cp | 0.243 | 0.243 | 0.243 |
| Total compressibility, 1/psi | 17.8E-6 | 18.6E-6 | 18.6E-6 |
| Horizontal permeability, md [1] | 500 | 150 | 500 |
| Vertical permeability, md [2] | 50 | 15 | 50 |
| Total cumulative flow, bbls | 1.07 | 0.92 | 1.23 |
| Radius of investigation, ft [3] | 137 | 68 | 120 |
| Formation pressure, psia | 11841.09 | 11850.58 | 11855.77 |
| Probe depth, ft MD | 18085.97 | 18123.93 | 18142.00 |

1) The values listed are my best single-value permeability estimates
2) The results do not depend strongly on the vertical permeability, but low horizontal permeability tend to require a higher $k_V/k_H$ ratio, which can be unrealistic
3) Horizontal distance listed from the longest buildups

The thickness-based average permeability of the three sands will be 438 md. In my view this is a conservative (low) estimate. The value reported by Gringarten is 238 md.[8]  That number substantially underestimates the effective permeability of the reservoir.

---

[6] BP-HZN-BLY00082874.
[7] Expert report of A. Gringarten, pages 30 and 31.
[8] Expert report of A. Gringarten, page 25.