# ATTACHMENT 1

# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Robert R. Gasaway
To Call Writer Directly:
(202) 879-5175
robert.gasaway@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

August 27, 2013

**By Electronic Mail**

Sarah D. Himmelhoch
Thomas A. Benson
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044

      Re:    MDL 2179 — Redactions to United States Expert Reports

Dear Sarah and Tom:

BP has now reviewed all of the United States' redacted expert reports, including those served last Friday. This letter addresses the United States' redactions of (or failure to redact) certain portions of its expert reports and responds to the United States' letter of Thursday, August 22, 2013.

<u>UNITED STATES' EXPERT REPORTS</u>

We have attached the reports at issue with the text that should be further redacted highlighted in yellow. The following reports should be further redacted as specifically described below.

**Dr. Dykhuizen's Rebuttal Report**

As a general matter, the redactions to Dr. Dykhuizen's rebuttal report are currently black highlights that can be deleted from the .pdf version of the report. The United States should use Adobe's redaction tool — as it has with its other redacted reports — so that redacted text is not recoverable.

Additionally, the following three portions of Dr. Dykhuizen's rebuttal report should be redacted.

- Page 7, Section C.1 (First paragraph and n.4). Here the United States discusses the work of Dr. Lo. As the United States knows, Dr. Lo is neither testifying live nor appearing by deposition. In fact, the United States' August 22 letter

## KIRKLAND & ELLIS LLP

Sarah D. Himmelhoch
Thomas A. Benson
August 27, 2013
Page 2

>   complains of BP's failure to redact from a BP report the mere mention of a number appearing in Dr. Lo's report. Accordingly, this substantive discussion of Dr. Lo should be redacted as annotated in the attached copy of the report.
>
> - Page 8-10, Section C.2.a-b. This three-page section is a response to Dr. Lo that is now superfluous and improper, given that Dr. Lo is neither appearing live nor by deposition. Accordingly, this portion should be redacted as annotated in the attached copy of the report.
>
> - Page 18. Two words were not redacted in the midst of a redacted passage. Perhaps this is a typo. Please confirm and correct accordingly.

**Dr. Griffiths's Rebuttal Report**

Two items in Dr. Griffiths's rebuttal report relate to experts not appearing live or by deposition should be redacted.

> - Page 15 and n.21. The discussion of Dr. Benge's findings and the citation to his report should be redacted. Dr. Benge is not testifying for the US either live or by deposition. Dr. Griffiths therefore cannot rely on his testimony. Accordingly, this portion should be redacted as annotated in the attached copy of the report.
>
> - Page 20. The reference to Dr. Lo should be redacted as indicated in the attached copy of the report.

**Dr. Huffman's Report**

As you know, we have two current points of disagreement on the redactions to the Huffman report. Assuming that your position remains fixed, these will be governed by the briefing schedule suggested below. *See* Letter from R. Gasaway (Aug. 20, 2013); Email from M. Petrino (Aug. 5, 2013); Email from Rachel King (Aug. 6, 2013).

You have our argument, and we plan to raise this with the Court in addition to any other expert report redaction issues that we cannot resolve.

**Dr. Kelkar's Reports**

The United States should redact additional portions from Dr. Kelkar's initial and rebuttal reports as identified by the highlighted portions of the attached reports.

# KIRKLAND & ELLIS LLP

Sarah D. Himmelhoch
Thomas A. Benson
August 27, 2013
Page 3

     ***Dr. Kelkar's Initial Report***.  Page 25, notes 28-30 and page 28.  The United States did not remove all references to the three methods of analyzing final pressure (Arps-Muskat, Muskat, and Kuchuk) that Kelkar, at his deposition, disclaimed as the work of Dr. Raghavan, *see* Kelkar Dep. at 170:3-14; 495:2-497:6, whom the United States long ago de-designated as an expert, *see* S. Himmelhoch email to Court and others (June 20, 2013).  The non-redacted portions appear to be an oversight because references to these methods were removed on page 46.  Therefore, BP requests that the United States remove all references to these methods as annotated in the attached.

     ***Dr. Kelkar's Rebuttal Report***.  BP has identified five portions of Dr. Kelkar's rebuttal report that should be redacted.

- Page 15.  This page references Dr. Huffman's seismic analysis as supportive of the fact that the BP's seismic survey was more reasonable than that of withdrawn expert Dr. Torres-Verdin.  The reference to Dr. Torres-Verdin was removed from the sentence, but not the reference to Dr. Huffman's analysis.  Given the fact that the sentence is directly responsive to Dr. Torres-Verdin, BP requests that the entirety of the sentence be redacted.

- Pages 15 and 16.  These pages discuss Dr. Kelkar's use of 12 microsips for rock compressibility.  The Court's June 24 Order struck this paragraph in its entirety. *See* 6/24/13 Order Regarding BP/Anadarko's Motion to Strike Rebuttal Experts for the U.S. at 6 (Rec. Doc. 10477) (finding that "the fourth paragraph on p. 15 carried over through p. 16 will be struck").  BP requests that this be paragraph be redacted.

- Page 23.  This page references the four methods of analyzing final pressure, including the three Dr. Kelkar disclaimed as Dr. Ragavan's work.  Dr. Kelkar acknowledged that this sentence was incorrect and that it should say he himself considered only one method for analyzing final pressure.  *See* Kelkar Dep. at 531:16-532:1.  Unlike a calculation error, this admission demonstrates that this work was done by Dr. Ragavan and not by Dr. Kelkar.  Therefore, BP requests that the United States redact this sentence.

- Page C-1.  This page still has a discussion regarding Dr. Kelkar's assumption of an aquifer.  The Court's June 24 Order stated clearly that "[a]ssumptions and analysis regarding the existence of an aquifer is not proper rebuttal opinion when no expert on behalf of BP/Anadarko has opined regarding the affirmative

## KIRKLAND & ELLIS LLP

Sarah D. Himmelhoch
Thomas A. Benson
August 27, 2013
Page 4

       existence of an aquifer." *See* 6/24/13 Order Regarding BP/Anadarko's Motion to Strike Rebuttal Experts for the U.S.at 9 (Rec. Doc 10477). The unredacted sentence at issue states that "[t]he presence of an aquifer in most Gulf of Mexico reservoirs is not uncommon, so it is common practice to investigate the impact of aquifer." *See* Kelkar Report at C-1. This statement has no support, and it interjects a new argument not addressed in Dr. Kelkar's initial report. Therefore, BP requests that the United States redact this entire paragraph as annotated in the attached.

- All references to withdrawn BP expert Dr. Lo that are interspersed throughout the report should be redacted.

**Dr. Pooladi-Darvish's Rebuttal Report**

       A few references remain in Dr. Pooladi-Darvish's rebuttal report that should be redacted, as annotated in the attached.

- On Page 19, Dr. Pooladi-Darvishes references Dr. Torres-Verdin. BP requests that this be redacted.

- Dr. Pooladi-Darvish's list of consideration materials includes the reports of Strickland, Torres-Verdin, Sundaresan, and Pollard. BP requests that references to these reports be redacted.

**Dr. Roegiers's Rebuttal Report**

       As with Dr. Huffman's report, you have our argument regarding Dr. Roegiers's report on pages 12 through the end of Section 2 on page 14. *See* Email between J. Eisert and Judy Harvey (July 19-23.) Assuming that parties' positions remain unchanged, this dispute would be re-raised with the Court, if at all, according to the schedule proposed below.

### UNITED STATES' AUGUST 22, 2013 LETTER

       The United States' August 22, 2013 letter raises or re-raises issues with the reports of two BP experts.

       ***Dr. Gringarten***. The United States points to two sentences in Dr. Gringarten's report that the United States claims are improper references to Dr. Lo because the flow rates asserted in

# KIRKLAND & ELLIS LLP

Sarah D. Himmelhoch
Thomas A. Benson
August 27, 2013
Page 5

those two sentences, the United States alleges, "no longer have any evidentiary basis." (Letter at 2.)

The notion that Dr. Gringarten somehow "relies on" Dr. Lo misconstrues Dr. Gringarten's analysis. Dr. Gringarten uses two initial rate assumptions simply to generate a range of plausible rate histories. He then scales these plausible rate histories to match his permeability value. Dr. Gringarten never "relies on" Dr. Lo for a determination of the flow rate.

*Dr. Johnson*. The United States continues to assert that BP should redact an admitted error from Dr. Johnson's report even though United States' experts have not redacted admitted errors from their reports.

The United States has filed a motion *in limine* asserting this argument (Rec. Doc. 11052), and BP will respond to that motion.

\*   \*   \*

As you know, expert reports are due to Judge Barbier on September 5, 2013. BP proposes that (with the Court's consent) the parties simultaneously raise any unresolved issues with each others' expert reports in writing on Friday, August 30, with responses due on Tuesday, September 3.

Sincerely,

Robert R. Gasaway

Attachments

cc (by electronic mail):
United States' MDL Counsel

# ATTACHMENT 2

**In re: Oil Spill by the Oil Rig "Deepwater Horizon" in
the Gulf of Mexico, on April 20, 2010**
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
MDL NO. 2179, SECTION J
JUDGE BARBIER: MAGISTRATE JUDGE SHUSHAN

**Well-Test Analysis**

Expert Report of Alain Gringarten

May 1, 2013

**CONFIDENTIAL**

### 5.1 Estimate Flow-Rate Trend Based on Wellhead Pressure

My first step was to estimate the rate history based on the wellhead pressure using deconvolution. The basic principle is that changes in pressure reflect changes in the flow rate. Deconvolution can take the pressure data we have and convert it to a flow-rate trend reflecting that pressure data. To begin this process, I must first assume a flow-rate history as a starting point. Deconvolution will correct these rates, albeit with some uncertainty. Since I want to determine the actual flow-rate history, I use two different history assumptions to start the process:

- First, I assume that the well flowed at a constant rate of 45,000 stb/d for the entire incident ("Option 1");
- Second, I also deconvolved using a starting rate assumption of 30,000 stb/d for April 20 to May 31 and 45,000 stb/d for June 1 until shut-in ("Option 2").

Later, I will discuss the differences between the rate histories I obtained. I selected these two rate histories because there is evidence that the flow rate was between 38,829 stb/d and 48,201 stb/d before shut-in started[24]; and that the rate was between 26,200 and 34,400 stb/d between May 13 and May 23, 2010.[25]

The flow rates that resulted from applying deconvolution to the wellhead pressure data for both cases are depicted in Figure 5.2 below. As we do not have pressure data prior to May 8, I have assumed that the pressure decreases linearly between the initial pressure and the first pressure measurement on May 8, 2010. As it turns out, these two initially corrected rate histories are similar, so they will give similar results for the analysis of PT-3K-2 pressures. They will give different downhole-converted pressures, however. I therefore analysed both Options. The discussion, however, focuses primarily on Option 1, since the process is the same for Option 2. I report the results for both.

---

[24] Expert Report of S. Lo.
[25] Expert Report of M. Zaldivar.

| Parameter | P10 | P50 | P90 | Unit |
|---|---|---|---|---|
| (pav)i | 11856 | 11856 | 11856 | psia |
| (pav)f | 10364 | 10364 | 10364 | psia |
| pwf | 9662.2 | 9662.2 | 9662.2 | psia |
| kh | 30597 | 22131 | 15808 | mD.ft |
| k | 329 | 238 | 170 | mD |
| C | 0.097 | 0.070 | 0.050 | bbl/psi |
| S | 0.0 | 0.2 | 0.3 | |
| d1 | 3517 | 2991 | 2528 | ft |
| d2 | 2409 | 2049 | 1731 | ft |
| d3 | 1270 | 1080 | 913 | ft |
| d4 | 14412 | 12257 | 10359 | ft |
| A | 8.05E+07 | 5.82E+07 | 4.16E+07 | ft2 |
| | | | | |
| PM | 0.6692 | 0.6692 | 0.6692 | 1/psi |
| TM | 440.1 | 440.1 | 440.1 | 1/hr |
| Log CDe2S | 3.25 | 3.25 | 3.25 | |
| (A)D | 3.55E+05 | 3.55E+05 | 3.55E+05 | |
| xe/ye | 0.2846 | 0.2846 | 0.2846 | |
| xw/xe | -0.4695 | -0.4695 | -0.4695 | |
| yw/ye | 0.7136 | 0.7136 | 0.7136 | |

**Figure 5.12: Reservoir parameters for P10, P50 and P90 permeabilities in the case of Option 1, Drill Pipe High**

### 5.6.5   Cumulative flow can be determined from the scaled flow rate histories.

Having determined the rate multipliers for the P10, P50 and P90 permeabilities, I can then calculate the P10, P50 and P90 cumulative productions.  The P50 is the best estimate of total volume of all the oil that left the reservoir, converted to a volume at surface (stock tank) conditions of 60°F and 1 atmosphere pressure.  It includes any oil burnt or collected, for example. Results are shown in Figures 5.13 and 5.14.  The results also include rates scaled to the mean permeability and the permeability corresponding to a flow rate just before shut-in of approximately 45,000 stb/d in accordance with Dr. Lo's determination of the likely rate at that time.  The P10 and P90 cases set the upper and lower bounds respectively though.

# ATTACHMENT 3

### 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL      ) MDL NO. 2179
BY THE OIL RIG        )
"DEEPWATER HORIZON" IN ) SECTION "J"
THE GULF OF MEXICO, ON )
APRIL 20, 2010        ) JUDGE BARBIER
                      ) MAG. JUDGE SHUSHAN

****************
VOLUME 1 of 2
****************

Deposition of ALAIN C. GRINGARTEN, Ph.D., taken at Pan-American Building, 601 Poydras Street, 11th Floor, New Orleans, Louisiana, 70130, on July 22, 2013.

### 2

APPEARANCES

APPEARING FOR THE UNITED STATES:
    Ms. Sarah Himmelhoch
    Mr. Steven O'Rourke
    U.S. DEPARTMENT OF JUSTICE
    ENVIRONMENTAL & NATURAL
    RESOURCES DIVISION
    601 D Street, N.W.
    Washington, D.C. 20004

APPEARING FOR BP, INC.:
    Mr. John Eisenberg
    KIRKLAND & ELLIS
    655 Fifteenth Street, NW
    Washington, D.C. 20005-5793

    Mr. Daniel Jonathan
    KIRKLAND & ELLIS
    333 South Hope Street
    Los Angeles, California 90071

APPEARING FOR THE STATE OF LOUISIANA:
    Mr. Michael Keller
    LOUISIANA DEPARTMENT OF JUSTICE
    400 Poydras Street, Suite 1600
    New Orleans, Louisiana 70130-3220

APPEARING FOR TRANSOCEAN:
    Mr. Patrick J. Cafferty, Jr.
    MUNGER TOLLES & OLSON
    560 Mission Street, 27th Floor
    San Francisco, California 94105-2907

APPEARING FOR HALLIBURTON:
    Mr. Gavin Hill
    Mr. Tim Alford
    Mr. Christopher Wood
    Ms. Jennifer Martinez
    GODWIN & LEWIS
    1201 Elm Street, Suite 1700
    Dallas, Texas 75270-2041

### 3

APPEARING FOR ANADARKO PETROLEUM CORPORATION:
    Mr. David Yamin
    BINGHAM MCCUTCHEN
    One Federal Street
    Boston, Massachusetts 02110-1726

ALSO PRESENT:
    Dr. Leif Larsen
    Mr. Mark Hendrix, Videographer

### 4

INDEX
VIDEOTAPED ORAL DEPOSITION OF
ALAIN C. GRINGARTEN, Ph.D.
JULY 22, 2013
VOLUME 1 of 2

                Page
APPEARANCES.......................... 2

BY MS. HIMMELHOCH.................... 6

REPORTER'S CERTIFICATION............. 282

EXHIBIT INDEX

                Page
Exhibit No. 11696.................... 6
    Well-Test Analysis Expert
Report of Alain Gringarten dated May
1, 2013
(no Bates - 255 pages)

Exhibit No. 11697.................... 49
    Publication entitled SPE
84086 Will Wireline Formation Tests
Replace Well Tests? Authored by
Whittle, et al,
(no Bates - 12 pages)

    PREVIOUSLY MARKED EXHIBITS
Exhibit No. 7265..................... 124
    Appendix W. Report -
Dynamic Simulations Deepwater
Horizon Incident BP (from ae add
energy) dated 8/29/2010
(no Bates - 60 pages)

Exhibit No. 10475.................... 46
    Schlumberger Modular

Worldwide Court Reporters, Inc.
**PURSUANT TO CONFIDENTIALITY ORDER**

```
                                        5                                              6
 1   date 5/9/2010                            1       (Exhibit No. 11696 marked for
     (BP-HZN-2179MDL03742328 -                2   identification.)
 2   BP-HZN-2179MDL03742435)                  3       THE VIDEOGRAPHER:  This is the
 3                                            4   deposition of Alain Gringarten regarding the oil
 4                                            5   spill of the oil rig DEEPWATER HORIZON in the
 5                                            6   Gulf of Mexico on April 20th, 2010.
 6                                            7       Today's date is July 22nd, 2013, and
 7                                            8   the time is 8:32 a.m.  We are now on the record.
 8                                            9       ALAIN C. GRINGARTEN, PH.D.,
 9                                           10   having been duly sworn, testified as follows:
10                                           11           EXAMINATION
11                                           12   BY MS. HIMMELHOCH:
12                                           13     Q.  Okay.  Good morning, Dr. Gringarten.
13                                           14   My name is Sarah Himmelhoch.  I work for the US
14                                           15   Department of Justice, and I'm here representing
15                                           16   the United States in this matter.
16                                           17       Sitting next to me is a gentleman I
17                                           18   understand you already know, Dr. Leif Larsen, and
18                                           19   next to him is my colleague, Mr. O'Roark.
19                                           20       Please state your full name for the
20                                           21   record.
21                                           22     A.  Alain Gringarten.
22                                           23     Q.  No middle name?
23                                           24     A.  C.
24                                           25     Q.  And what's your date of birth?
25
```

```
                                        7                                              8
 1     A.  26 August 1945.                      1     Q.  And similarly, will you please try to
 2     Q.  And what is your current business    2   make sure I finish the question before you begin
 3   address?                                   3   to answer?
 4     A.  33 Mellon Court, Onslow Crescent,    4     A.  Yes.
 5   London, SW7 3 JQ UK.                       5     Q.  And if I ask a question you don't
 6     Q.  Dr. Gringarten, you understand that  6   understand -- I talk very fast, so if it flies
 7   you're testifying under oath today, do you not? 7 past you, just let me know and I'll rephrase it.
 8     A.  Yes, I do.                           8       Will you do that?
 9     Q.  And you understand that that's the same 9   A.  Yes.
10   oath you would take if you were testifying in 10    Q.  If you go ahead and answer the
11   court, correct?                           11   question, I will assume you understood it.
12     A.  I do.                               12       Do you agree with that?
13     Q.  And in addition to the video, we're 13     A.  Yes.
14   trying to make a written record of what's 14        MR. EISENBERG:  Object to the form.
15   happening here today.  So please make sure as to 15  Q.  (BY MS. HIMMELHOCH) Dr. Gringarten, is
16   answer the questions with words rather than with 16 there any reason why you couldn't testify
17   gestures, such as a nod or a point.       17   truthfully today?
18       Will you agree to do that?            18     A.  No.
19     A.  Yes.                                19     Q.  Are you on any medication or having any
20     Q.  And I will strive very hard not to cut 20 illnesses today that would prevent you from fully
21   you off, but if I do, please let me know that 21 understanding and answering the questions that I
22   I've cut you off so that you can finish your 22 pose?
23   answer.                                   23     A.  No.
24       Will you do that?                     24     Q.  I want to agree on one term just so
25     A.  Sure.                               25   that we have a common understanding of how I'm
```

Worldwide Court Reporters, Inc.
PURSUANT TO CONFIDENTIALITY ORDER

1      A. In the process of correcting them, yes.
2      Q. (BY MS. HIMMELHOCH) How many times
3  before the work that you did in this case did you
4  have no estimate of flow rate --
5      MR. EISENBERG: Objection.
6      Q. (BY MS. HIMMELHOCH) -- and cal -- and
7  calculated -- strike that.
8      How many times have you, outside of
9  this work that you did for this case, calculated
10 reservoir parameters when you had no measured
11 flow rates from the well?
12     MR. EISENBERG: Objection, form.
13     A. Okay. I never had no flow rate, but I
14 have had, you know, many times rate that were,
15 you know, essentially wrong which, you know, as I
16 said, is about equivalent.
17     THE REPORTER: Is what?
18     THE WITNESS: About equivalent.
19     Q. (BY MS. HIMMELHOCH) Now, we've been
20 talking as if there are no measured flow rates in
21 this -- for the Macondo well. But, in fact,
22 there is data regarding collection from the well
23 for a short period prior to shut-in. Isn't that
24 correct?
25     A. Yes.

1      Q. Did you evaluate that collection data
2  in estimating your reservoir parameters?
3      A. No, because the -- you know, I was
4  interested in everything that is produced to the
5  well and what is collected -- what was collected,
6  you know, small fraction of what was produced.
7      Q. And in your opinion, that data provided
8  no information regarding the total flow rate from
9  the well?
10     MR. EISENBERG: Object to form.
11     A. For my analysis, no.
12     Q. (BY MS. HIMMELHOCH) And you did not
13 use that collection data in any way to determine
14 your confidence in your results?
15     A. No. What I used were the estimates
16 from Dr. Lo and Dr. Zaldivar.
17     Q. Dr. Lo is L-o?
18     A. Yes.
19     Q. Did you -- you obtained these -- these
20 flow rate estimates from Dr. Lo.
21     Did you take any steps to evaluate the
22 accuracy of those flow rates?
23     MR. EISENBERG: Object to form.
24     A. No. Dr. Lo and Dr. Zaldivar provided
25 ranges, and they are the experts. So I have no

1  reason to, you know, second-guess them.
2      Q. (BY MS. HIMMELHOCH) So you -- you
3  relied on them and did not go back and confirm
4  their accuracy?
5      MR. EISENBERG: Object to form.
6      A. That's correct.
7      Q. (BY MS. HIMMELHOCH) Okay. I'd like to
8  turn now to your -- the steps that you took to
9  estimate the cumulative volume of oil released.
10 And I'd like to start with what you identify as
11 Step 1 on page 36 of your report, Exhibit 11696.
12     A. Could you repeat the page. Sorry.
13     Q. Sure. It is page 36 of --
14     A. Okay.
15     Q. -- your main report?
16     A. Uh-huh.
17     Q. And as I understand it, Step 1 consists
18 of assuming a flow rate history; is that correct?
19     A. Yes.
20     Q. And then you say -- continue on that
21 page and say, "Deconvolution will correct these
22 rates, albeit with some uncertainty."
23     Did I read that correctly?
24     A. Yes.
25     Q. What is the uncertainty that you're

1  referring to there?
2      MR. EISENBERG: Object to form.
3      A. Well, there is some uncertainty due to
4  the uncertainty on the pressure measurements.
5      Q. (BY MS. HIMMELHOCH) Any other
6  uncertainties that you were referencing there
7  when you say "albeit with some uncertainty"?
8      A. No. Deconvolution requires pressure
9  and -- you know, and rates, so we have -- you
10 know, we assume the rate in that case, and the
11 initial pressure which we know. So the only
12 uncertainty is really uncertainty on the pressure
13 measurements.
14     Q. And in -- on page 36 of your report,
15 your reference to the flow before shut-in started
16 on -- what time period do you mean by "before
17 shut-in started"?
18     MR. EISENBERG: Where are you, Counsel?
19     MS. HIMMELHOCH: Page 36.
20     A. If I recall, that's on the 15th of
21 July, and actually that's just before -- a few
22 hours before the collection.
23     Do I finish my sentence or --
24     Q. (BY MS. HIMMELHOCH) Go ahead.
25     A. A few hours, you know, the -- a few

Worldwide Court Reporters, Inc.
PURSUANT TO CONFIDENTIALITY ORDER