**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010 | MDL NO. 2179 |
| | SECTION J |
| This Document Relates To: | JUDGE BARBIER |
| Civil Action No. 2:13-cv-02602-CJB-SS *John Michaels v. BP Exploration & Production, Inc., BP America Production Company, BP p.l.c., Halliburton Energy Services, Inc., and Transocean Ltd.* | MAGISTRATE JUDGE SHUSHAN |

## AMENDED COMPLAINT FOR DAMAGES[1]

**NOW COMES PLAINTIFF,** John Michaels, through undersigned counsel, who does allege, aver and represent as follows:

### Nature of the Action

1.      On April 20, 2010, a blowout, explosion, and multiple fires occurred aboard the mobile offshore drilling rig *Deepwater Horizon,* resulting in the sinking of the *Deepwater Horizon* and an oil spill in the Gulf of Mexico (sometimes hereinafter "the Oil Spill") that has caused, is causing, and will continue to cause, damage to the Plaintiff. This is an action for damages, penalties, and other relief by the Plaintiff against the parties known to be responsible for the Spill. The Defendants named in this lawsuit collectively and individually engaged in grossly negligent, wanton, and reckless conduct in the drilling and operation of the Macondo well, the operation of the *Deepwater Horizon,* and the containment of the Spill.

2.      Plaintiff(s) has/have suffered economic injury, damage and/or losses as a result of the oil spill.

---

[1] Amended to add Halliburton Energy Services, Inc. as a Defendant.

## THE PARTIES

3.      Plaintiff, John Michaels (hereinafter "Plaintiff"), is an individual who is a resident of the age of majority of the State of Mississippi.

4.      Plaintiff(s) bring(s) these claims pursuant to Federal General Maritime Law including/and/or the Oil Pollution Act of 1990, 33 USC § 2701, *et seq.*

5.      Defendant BP Exploration & Production, Inc. ("BP Exploration") is a Delaware corporation with its principal place of business in Warrenville, Illinois.  BP Exploration was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution of 1990, 33 U.S.C. §2714.  This Court has personal jurisdiction over BP Exploration, because BP Exploration does business in Mississippi, and has a registered agent in Mississippi.

6.      Defendant BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas.   This Court has personal jurisdiction over BP America, because BP America does business in Mississippi, and has a registered agent in Mississippi.

7.      Defendant BP p.l.c. is a British public limited company with its corporate headquarters in London, England.   BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo.  BP p.l.c. operates its various business divisions, such as the "Exploration and Production" division within BP Exploration and BP America, through vertical business arrangements aligned by product or service groups.  BP p.l.c.'s operations are worldwide, including in the United States.

8.      Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Mississippi  and  the  U.S. more generally.

9.      BP Exploration, BP America, and BP p.l.c. are generally referred to herein collectively as the "BP Defendants" or "BP."

10.     As lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations.

11.     Defendant Halliburton Energy Services, Inc. ("Halliburton"), a Delaware corporation with its principal place of business in Houston, Texas.  Halliburton is registered to do and does business in the State of Louisiana.  Halliburton provided engineering services, materials, design, testing, mixing, and pumping for cementing operations on board the Deepwater Horizon, as well as onshore engineering support for those operations. Halliburton was contractually responsible for the provision of technical advice about the design, modeling, testing, and placement of the cement that was used in the Macondo well.   At Macondo, Halliburton was engaged in cementing operations to isolate the hydrocarbon reservoir zones and seal the bottom of the well against the influx of hydrocarbons.

12.     Halliburton, a division of Sperry Drilling Services (formerly Sperry Sun Drilling Services) was responsible for mudlogging personnel and equipment on the Deepwater Horizon, including downhole drilling tools.   Sperry mudlogging personnel were responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, and wellbore pressure fluctuations.  Throughout this Complaint, "Halliburton" shall refer to both Halliburton Energy Services, Inc. and its Sperry division.

13.     Defendant Transocean Ltd. ("Transocean Ltd."), a Swiss corporation that maintains substantial U.S. offices in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district.  At all material times, Transocean Ltd. was a party to the contract with BP America for the drilling of the Macondo well and was  an owner, managing owner, owner pro hac vice, and/or operator of the Deepwater Horizon

14.     The Plaintiff herein adopt and incorporate the reservation of all rights, claims, and causes of action against Defendants Transocean Ltd. and Halliburton Energy Services, Inc., as stated in ¶¶ 23-25 of the Amended Economic Loss Class Complaint.

## JURISDICTION

15.     Jurisdiction exists before this Court pursuant to Article III, Section 2 of the United States Constitution, which empowers the federal judiciary to hear "all Cases of admiralty and maritime jurisdiction."

16.     Jurisdiction also exists before this Court pursuant to the Oil Pollution Act of 1990, 33 U.S.C. § 2717(b) (the "OPA").

## VENUE

17.     Venue is proper in this United States District Court pursuant to 28 U.S.C. § 1391(b).

18.     Venue is proper in this jurisdiction because Defendants' actions, inactions, and failures directly and proximately caused the damage and harm to the Plaintiff in this jurisdiction.

19.     Plaintiffs further adopt and incorporate by reference all jurisdictional allegations against BP p.l.c. set forth in Paragraphs 212-218 of the Amended B1 Master Complaint, Document No. 1128 filed in MDL No. 2179, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*.

## GENERAL ALLEGATIONS

20.     Plaintiff(s) adopt(s) and incorporate(s) as if fully restated herein the factual allegations, causes of action, and prayer for relief, raised in the Amended B1 Master Complaint, Document No. 1128 filed in MDL No. 2179, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010* (the "MDL Complaint").

*The Macondo Lease, and BP's Exploration Plan and Drilling Permit*

21.     On June 1, 2008, BP acquired a ten-year lease from the federal Minerals Management Service ("MMS") to search for and exploit hydrocarbon reservoirs at the Macondo prospect site in Mississippi Canyon Block 252, a location on the Outer Continental Shelf 48 miles off the coast of Louisiana.

22.     In the process of obtaining its lease, BP represented that it had planned and prepared to conduct its proposed activities in a manner that was safe, conformed to applicable regulations and sound conservation practices, and would not cause undue or serious harm or damage to human or marine health, or the coastal environment.

23.     BP represented that it was unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities.  In the event that a spill did occur, BP predicted a worst case discharge scenario of 162,000 gallons of oil per day, an amount to which it assured the MMS that it was prepared to respond.  BP also claimed the well's distance from the nearest shoreline would preclude any significant adverse impacts from a spill.

24.     Based on these assurances, the MMS approved BP's Initial Exploration Plan ("EP") for the Macondo prospect on April 6, 2009, including the approval of a "categorical exclusion" from the full environmental analysis normally required under the National Environmental Policy Act.

### *The Deepwater Horizon's Poor Safety and Maintenance Record*

25.     The *Deepwater Horizon* was a dynamically-positioned, semi-submersible deepwater drilling vessel built for Transocean and put into service in February 2001.

26.     At all times relevant herein, the *Deepwater Horizon* was owned by Transocean and leased to BP for drilling exploratory wells at the Macondo prospect site, pursuant to the December 9, 1998, Drilling Contract between Vastar Resources, Inc. and R&B Falcon Drilling Co. for RBS-8D *Deepwater Horizon*, and later amendments to that agreement.

*The Macondo Well*

27.     The Macondo prospect site is in the Northern Gulf of Mexico, an area known in the industry for high temperature, high pressure, highly gaseous hydrocarbon reservoirs trapped in weak, brittle rock formations.  At the Macondo site, the *Deepwater Horizon* was conducting drilling operations in excess of 18,000 feet deep.  BP knew or should have known that the threat of blowouts increases as drilling depths increase, especially in an area with such troublesome geology as the Northern Gulf of Mexico.

28.      BP struggled with the Macondo well before the events of April 20, 2010.  The problems included varying pressures, varying strengths of formation layers, brittle rock formations, and kicks of natural gas bursting into the well.

29.     As the drilling schedule fell farther behind due to these and other problems, BP increased the pressure on the *Deepwater Horizon*'s crew to speed up the drilling effort at Macondo in an effort to reduce costs.  BP repeatedly chose to violate industry guidelines and government regulations and ignore warnings from their own employees and contractors on the *Deepwater Horizon* to reduce costs and save time on the behind-schedule and over-budget Macondo well.

### Conduct Leading up to the Explosion

30.     By April 9, 2010, BP had finished drilling the last part of the well bore, after which only casing and cementing the final open-hole section remained.  In their rush to complete the well, BP made reckless decisions about well design, cementing, and well integrity testing that prioritized speed and cost-savings over safety and industry best practices.

31.     BP chose a "long string" design for the Macondo well with fewer barriers against the risk of hydrocarbon blowouts because the safer "liner/tieback" option (which had been part of their original well design and was recommended by their contractors) would have taken longer to complete and would have added several million dollars in cost.

32.     BP used inferior metal well casings for the casing pipe material itself, in violation of BP's own safety policies and design standards.

33.     BP knowingly used too few centralizers on one or more pieces of casing pipe.

34.     BP failed to fully circulate the drilling mud through the entire length of the well before beginning the cementing job, thus failing to properly clean the well bore and prepare the annular space for cementing, and thus failing to take action that could have revealed other problems that contributed to the weaknesses of the Macondo well.

35.      Defendants knew the cementing work the *Deepwater Horizon* was performing was especially risky.  BP's mid-April plan review predicted cement failure, stating "[c]ement simulations indicated it is unlikely to be a successful cement job due to formation breakdown." Yet, Defendants made minimal efforts to contain the added risk.  To save time and money, Defendants chose not to run a 9- to 12-hour procedure called a cement bond log to assess the integrity of the cement seal.  Defendants also failed to secure the wellhead with a lockdown sleeve, a critical apparatus that locks the wellhead and the casing in the seal assembly at the seafloor, before allowing pressure on the seal from below.

36.     Based on testing performed before the final cement job at the Macondo well, Halliburton knew that its cement slurry design was unstable.  In addition, Halliburton and BP had results in March 2010 showing that a very similar foam slurry design to the one actually pumped at the Macondo well would be unstable, but neither acted upon that data.

37.     In addition to increasing the risk of blowouts, deep-sea drilling also increases the failure risk of the chief blowout safety mechanisms ("BOP").  Defendants were aware of the risk of BOPs failing at greater depths, yet did not install a backup BOP activation system or backup BOPs. Defendants were also aware that the industry and government had major concerns about the reliability of BOPs like the one installed on the *Deepwater Horizon*.

38.     Defendants failed to ensure that the BOP present on the *Deepwater Horizon* possessed reasonably safe, adequate, functional technology to prevent blowouts.

39.     Defendants failed to ensure that the *Deepwater Horizon's* BOP had sufficient, functional, built in redundancy to eliminate single-point failure modes.

40.     Defendants failed to ensure that all foreseeable repairs (if any) and foreseeable modifications (if any) to the *Deepwater Horizon*'s BOP were performed, completed, and tested with the drilling vessel's operations shut down and the well secured.

41.     Defendants failed to ensure that the testing of the *Deepwater Horizon's* BOP was comprehensive, reviewed, and verified, and further failed to check and verify the BOP's entire operating and control system, including but not limited to, checking for leaks at ROV (remotely operated vehicle) connection points, and verifying the functionality of the automated mode function and/or autoshear.

42.     Defendants could have ensured that a BOP and/or back-up BOP with sufficient strength and reliability for deepwater drilling was present and available on the *Deepwater Horizon*, but did not do so.

43.     Defendants could have installed a back-up acoustic trigger to activate the *Deepwater Horizon's* BOP in the event that the main trigger failed to activate.

44.     While some testing has been completed, the investigation of the BOP retrieved from the seafloor, and other matters related to the disaster at the Macondo well, is still ongoing. Thus, the Plaintiff reserves the right to amend this Complaint once further information from that and any other future investigations becomes available.

45.     BP was aware of Transocean's poor maintenance of the *Deepwater Horizon* and its practice of disabling or bypassing vital safety systems and alarms, but they continued to operate the vessel and did not report the inadequacies.

46.     Upon information and belief, in addition to the examples set forth above, other non-exclusive examples of BP's misconduct, negligence and/or wantonness include:

> a.     Utilizing a defective well casing that was prone to fail when under heavy pressure;

b.      Failing to observe dangerous and recurring problems with highly flammable gaseous compounds, and instituting risky cementing and drilling procedures hours before the *Deepwater Horizon* explosion;

c.      Failing to institute common industry protective measures necessary to detect the buildup of highly flammable gaseous compounds before and during the cementing process;

d.      Accelerating drilling operations in an effort to save money and pressuring employees hours before the *Deepwater Horizon* explosion to drill and penetrate the continental shelf faster while ignoring risks associated with dangerous gaseous compounds in the shelf s crust;

e.      Using an improperly designed cement mixture ("slurry"), and failing to properly conduct and/or review the results of laboratory testing of the slurry;

f.      Failing to deploy a casing hanger lockdown sleeve;

g.      Displacing mud in the well with less-dense seawater before cementing had fully set;

h.      Using non-standard spacer fluid mixture and volume;

i.      Continuing to operate the Macondo Well after the well failed pressure tests;

j.      Continuing to operate the Macondo Well without repairing the blowout preventer's annular after chunks of the annular had broken off and floated to the surface, thereby significantly decreasing the blowout preventers' protective measures against a blowout;

k.      Failing to disclose or correct the fact that the battery on the blowout preventer was weak and one of its control pods was broken;

l.      Consciously electing not to install an acoustically activated remote-control shutoff valve;

m.      Ordering drillers to extract drilling mud from the well before all of the concrete plugs were put into place in order to speed up the drilling process thereby creating high pressure instability in the well;

n.      Failing to install a deepwater valve to be placed nearly 200 feet under the sea floor;

o.      Failing to recognize that pressure and flow data from the well were warning signs of a blowout;

p.      Failing to develop sufficient well control procedures for vessel workers to handle larger influxes into the well – for a hydrocarbon influx as large as occurred, flow should have been diverted overboard, not to the mud-gas separator;

q.   Failing to properly design, install, or maintain power supply to the blow-out preventer ("BOP"), including without limitation the use of only one blind shear ram, faulty maintenance, faulty post-market modifications, and other issues;

r.   Failing to properly design, install, or maintain connections from the blow-out preventer's control panel to the blow-out preventer;

s.   Failing to maintain properly and repair the BOP: BP officials were aware of the faulty solenoid valve, poor battery maintenance, hydraulic fluid leaks, and aftermarket modifications on the Deepwater Horizon's BOP long before the April 20, 2010, but no action was ever taken to address the problems.  In addition to posing a significant safety risk, BP's choice to continue drilling with a faulty hydraulic system violated federal regulations, which require companies to disclose problems to the MMS and to stop drilling if either of a BOP's two control systems is not working properly; and,

t.   Failing to equip the vessel with sufficient safety equipment, including operational gas sensors and a gas alarm system.

47.   BP knew, or should have known, of the acts and omissions outlined above, and were negligent, wanton, and reckless in continuing to drill in the face of these acts and omissions.

48.   In sum, Defendants knew of the dangers associated with deep water drilling, and they knew of unique problems and shortcomings in the Macondo Well and *Deepwater Horizon* vessel.  Yet, Defendants failed to take appropriate measures to prevent damage to the Plaintiff, and thousands of citizens who are dependent upon the Gulf of Mexico and Plaintiff's coast to make a living.

### *Post-Explosion Conduct*

49.   Defendants' conduct after the explosion was insufficient to minimize damage, and was in some cases just as negligent, wanton, and reckless as the conduct that led to the explosion.

50.   BP failed to institute proper oil disaster response plans to contain the catastrophic oil release resulting from the *Deepwater Horizon* explosion, and they misrepresented their capability to conduct offshore drilling operations safely and contain oil releases that might occur in connection with such operations.

51.     BP attempted to downplay and conceal the severity of the oil spill after the explosion.  Defendants' leak estimate of 5,000 barrels per day was found by government investigators to be a fraction of the current official leak estimate of 60,000 barrels of oil per day.  In addition, the worst case scenario estimate of 100,000 barrels of oil per day is over 100 times BP's initial estimate of 1,000 barrels per day.

52.     Defendants were also slow and incomplete in their announcements and warnings to residents and businesspeople such as the Plaintiff about the severity, forecast, and trajectory of the Oil Spill.

53.     Furthermore, the chemical dispersants used by Defendants to accelerate the dispersal of the oil has significant side-effects as well.  Corexit EC9500A and Corexit EC9527A were the principal dispersants used.  These dispersants are composed of several chemicals, including 2-Butoxy Ethanol, which was identified as a causal agent in the health problems experienced by cleanup workers after the 1989 *Exxon Valdez* oil spill.  In addition, the Hazardous Substance Fact Sheet for 2-Butoxy Ethanol warns that it may be a carcinogen in humans and that "[t]here may be no safe level of exposure to a carcinogen, so all contact should be reduced to the lowest possible level."  Further, the OSHA-required Material Safety Data Sheets ("MSDS") for both versions of Corexit used indicate they may have a potential to bio-accumulate in the tissues of fish or other organisms.  Additionally, the MSDSs state that if the product becomes a waste, "it could meet the criteria of a hazardous waste as defined by the Resource Conservation and Recovery Act (RCRA) 40 CFR 261."

54.     Corexit EC9500A and Corexit EC9527A are more toxic and less effective than at least twelve other EPA-approved dispersants and are banned from use on oil spills in the United Kingdom.  Defendants stated that they chose to use Corexit because it was available the week of the rig explosion.

55.     More than 1.84 million gallons of chemical dispersants were used by July 30, 2010, and additional dispersant use was reported by fishermen in mid-August.  Dispersant use

continued well after the Oil Spill at the wellhead was stopped.  The dispersants were employed both on the surface and at the wellhead 5,000 feet below the surface.  Mixing the dispersants with the oil at the wellhead added toxicity to the spill and kept much of the oil below the surface, exposing organisms to widespread concentrations of oil.

56.     Plaintiff(s) further adopt(s) and incorporate(s) as if restated herein all factual allegations information contained in any short form joinders and/or presentment previously filed or served by Plaintiff(s) as well as any Plaintiff Profile Form and/or Complaint previously filed by Plaintiff(s) relating to this matter.

57.     Plaintiff(s) further adopt(s) and incorporate(s) as  if  fully  restated  herein Plaintiffs' Supplemental and Amended Responses to Phase One Written Discovery Requests, dated October 8, 2011; Amended Response to Phase One Request for Admission No. 76, dated December 27, 2011; and Supplemental and Amended Responses to Phase One Interrogatories Nos. 6, 7, and 17, dated December 14, 2012.

## FACTUAL ALLEGATIONS

58.     Plaintiff(s), out of an abundance of caution, made and/or re-made "presentment" of a claim on the responsible party in compliance with 33 U.S.C. §§ 2702(b) and 2713, by submitting a description of the claim with a "sum certain" and supporting documentation to BP as the  "responsible party" under the OPA, on or about January 15, 2013 (the "Presentment").

59.     The factual allegations of damage, injury, and harm suffered by Plaintiff as a result of the Oil Spill are more specifically set out in the Presentment, which is incorporated herein by reference and attached hereto as Exhibit "A", and the Plaintiff's Direct Filing Short Form, which is also incorporated herein by reference.

60.     BP either denied the claims or otherwise failed to respond within ninety (90) days of presentment.

61.     Plaintiff(s) has/have satisfied the mandatory condition precedent to file this suit.

Plaintiff(s) hereby adopt(s) and incorporate(s) as if fully restated herein the Presentment,

Plaintiff's Direct Filing Short Form, BP Claim Form, and/or supporting documentation

submitted to the responsible party, attached hereto as Exhibit "A."

## CLAIMS FOR RELIEF

62.     Plaintiff(s) re-allege(s) each and every allegation set forth in all preceding

paragraphs as if fully restated here.

63.     Plaintiff(s) adopt(s) and incorporate(s) as if restated herein, all claims for relief

raised in the MDL Complaints and Gulf Coast Claims Facility filing, against the Defendants as

responsible parties under the OPA, which holds responsible parties liable to plaintiffs for

removal costs and damages arising out of the following:

    a.     Loss of Natural Resources;

    b.     Loss or Damage to Real or Personal Property;

    c.     Subsistence Use;

    d.     Loss of Revenues;

    e.     Loss of Profits and/or Earning Capacity; and

    f.     Loss of Public Services.

64.     Under the OPA, "each responsible party for a vessel or a facility from which oil is

discharged…is liable for removal costs and damages", including "damages equal to the loss of

profits or impairment of earning capacity due to the injury, destruction, or loss of real property,

personal property, or natural resources, which shall be recoverable by any claimant."  33 U.S.C.

§ 2702.

65.     Following the Oil Spill, the United States Coast Guard designated BP Exploration

as the "Responsible Party," thus making BP strictly liable under Section 2702 of the OPA for all

damages resulting from the Oil Spill.

66.     BP is not entitled to limit their liability under Section 2704(a) of the OPA because the Oil Spill was proximately caused by Defendants' gross negligence, willful misconduct, or violation of applicable safety, construction or operating regulations. 33 U.S.C. § 2704(c).

67.     Additionally, in its "Statement Of BP Exploration & Production Inc. Re Applicability Of Limitation Of Liability Under Oil Pollution Act of 1990" filed on October 19, 2010, BP waived the statutory limitation on liability under the OPA.

68.     As a result of the Oil Spill and the resulting damages to the natural resources in the Gulf of Mexico, the surrounding bodies of water, and adjoining shorelines, Plaintiff(s) has/have sustained and will continue to sustain a loss of profits and/or impairment of earning capacity, as alleged above.

69.     As a result of the Oil Spill and the resulting damage to the marine environment in the Gulf of Mexico, surrounding bodies of water, and adjoining shorelines, Plaintiff(s) is/are entitled to damages pursuant to the OPA, 33 U.S.C. § 2702(b)(2)(E), which allows for "damages equal to loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."

70.      It was foreseeable that a massive oil spill in the Gulf of Mexico would cause economic harm to Plaintiff(s).

71.     Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and the OPA, 33 U.S.C. § 2717(f)(2), Plaintiff(s) seek(s) a declaratory judgment that is binding in this action and any subsequent action or actions against Defendants, jointly and severally and without limitation, that said Defendants are liable for removal costs and damages in this action and in any subsequent action or actions.

72.     Plaintiff(s) further seek(s) all damages available to his/her/it/them pursuant to the OPA.

14

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff(s) John Michaels's demand(s) judgment against

Defendants, jointly, severally, and *in solido,* as follows:

a.  Economic and compensatory damages in amounts to be determined at trial;

b.  Pre-judgment and post-judgment interest at the maximum rate allowable by law;

c.  Reasonable claims preparation expenses;

d.  Attorneys' fees;

e.  Costs of litigation; and

f.  Such other and further relief available under all applicable state and federal laws and any relief the Court deems just and appropriate.

## REQUEST FOR TRIAL BY JURY

Plaintiff(s) John Michaels request(s) that the above and foregoing be heard at trial by a jury of peers.

Date: <u>September 5, 2013</u>                     Respectfully submitted,

<u>/s/ Brian J. McCormick, Jr.</u>
Brian J. McCormick, Jr.
PA Bar No.: 81437
Sheller, P.C.
1528 Walnut Street
4th Floor
Philadelphia, PA 19102
Phone: (215) 790-7325
Facsimile: (215) 546-0942
E-mail: bjmccormick@sheller.com
*Plaintiff's counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Amended Complaint has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 5th day of September, 2013.

Respectfully submitted,

/s/ Brian J. McCormick, Jr.
Brian J. McCormick, Jr.
PA Bar No.: 81437
Sheller, P.C.
1528 Walnut Street
4th Floor
Philadelphia, PA 19102
Phone: (215) 790-7325
Facsimile: (215) 546-0942
E-mail: bjmccormick@sheller.com
*Plaintiff's counsel*