UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | : : : : | MDL NO. 2179<br><br>SECTION J |
| THIS DOCUMENT RELATES TO:<br><br>10-4536 | : : : | JUDGE BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

**UNITED STATES OF AMERICA'S PRE-TRIAL STATEMENT FOR PHASE TWO:**

**NUMBER OF BARRELS OF OIL DISCHARGED**

**and**

**BP'S STATEMENTS AND ACTIONS RELATED TO
QUANTIFICATION AND SOURCE CONTROL**

**Table of Contents**

I.   Introduction ................................................................................................................... 1

II.  How Source Control and Quantification Relate to the Claims of the United States ......... 2

III. Based on Multiple Different Analytical Approaches, Approximately 5 Million Barrels
     of Oil Were Released from the Macondo Well ................................................................ 3

     A.   The Capping Stack Allowed for Accurate Measuring of the Flow Rate
          on July 15:  Over 53,000 BOPD ................................................................................ 3

     B.   Estimating the Total Quantity of Flow: Days Preceding July 15 Had
          Higher Flow Rates, with a Total Cumulative Flow of 5 Million Barrels ............... 5

     C.   Defendants' Litigation Experts Are Not Reliable ...................................................... 7

          1.   Defendants' Experts Both Ignore the Capping Stack Data and
               Disavow the Numbers that BP Provided During Source Control ............... 7

          2.   Erosion Happened Quickly ........................................................................... 9

IV.  Conclusion ................................................................................................................... 10

**I.     Introduction.**

On July 15, 2010 the Macondo well was finally sealed with the Capping Stack. BP and the Unified Command closely monitored the pressure buildup inside the Stack to see whether the well could safely remain shut. If the pressure did not build up sufficiently, it would be a sign of potential new disaster: the well could be leaking into the surrounding formation and might result in a blowout across miles of ocean floor. Thus the data and inputs used in performing the modeling of the pressure response had to be as accurate as possible. BP provided data to the United States, pressure models were run with that data, and the Unified Command relied on the model results in allowing the Capping Stack to stay sealed. At trial, the U.S. experts will continue to rely on that same data and information, the best information available then or now.

The Capping Stack did more than stop the flow. Equipped with a pressure gauge (at the request of the U.S.), it also provided the best set of data about the flow from the well, data that both BP and government engineers used to estimate the flow rates. Working in secret, BP's in-house engineers calculated that the daily flow rate coming from Macondo on July 15, 2010 exceeded 50,000 Stock Tank (or Standard) Barrels of Oil per Day ("BOPD"), and ranged up to 60,000 BOPD. U.S. expert Dr. Dykhuizen contemporaneously used information obtained from BP and calculated strikingly similar flow rates (about 53,000 to 54,000 BOPD).

With the final daily rate known, the cumulative discharge could be estimated by extrapolating back. U.S. experts (*e.g.*, Dr. Hsieh at the time) have determined the cumulative oil volume as approximately 5 million barrels.[1] In August 2010, the U.S. announced an estimate of 4.9 million barrels, which was subsequently published. Dr. Stewart Griffiths of Sandia National

---

[1] Of which 4.2 million barrels were discharged to the ocean. The parties agree that 0.81 million barrels of the oil that came from Macondo was collected without touching the water, and thus will be deducted from the total cumulative amount that came from the well for purposes of setting the maximum penalty. [Doc. 8620]. This brief will refer to the total amounts from Macondo because the experts do so.

- 1 -

Laboratories later published the results of his own separate analysis (5 million barrels) in a peer-reviewed journal. At trial, these same people (*inter alia*) who were engaged at the time of the response and who published their results, will present these same public estimates.

Meanwhile, BP had publicly estimated the flow rate as 1,000 or 5,000 BOPD, but BP now admits that it lied about those estimates. *See* Plea Agreement. By the fall of 2010, BP wrote to the (now-disbanded) Oil Spill Commission stating, "BP fully intends to present its own estimate as soon as the information is available to get the science right," TREX 6192 at 2, and "we will share it with the Commission." *Id.* at 9. But it never did so. That same year, BP told its investors (per SEC requirements) that "3.2 million barrels of oil discharged to the Gulf of Mexico" was BP's "current best estimate," meaning a total of 4 million barrels flowed from Macondo (factoring in the 0.8 million barrels collected). BP repeated that "best estimate" to its shareholders through 2012, while simultaneously working up secret estimates not announced until 2013 when expert reports were due in this lawsuit. The Defendants now offer a suite of litigation experts who seek to reject the 4 million barrel estimate and to repudiate the information that BP supplied to the government during the Capping Stack shut-in modeling efforts.

## II. How Source Control and Quantification Relate to the Claims of the United States.

The First Claim for Relief in *United States v. BP & Anadarko*, 10-4536, seeks civil penalties under the Clean Water Act ("CWA"). The maximum available civil penalty is based on the number of barrels of oil discharged. 33 U.S.C. § 1321(b)(7)(A) and (D). The Court will hold an (as-yet unscheduled) "Penalty Phase" trial to take evidence on the penalty factors set out at 33 U.S.C. § 1321(b)(8), and select the actual dollar amount of civil penalty for each defendant. Thus, while the main issue in the Quantification Segment is the actual number of barrels of oil discharged, the evidence in Phase Two may also relate to the Court's evaluation of the penalty

factors during the Penalty Phase. For example, if the Court finds that BP did not adequately prepare for Source Control, such evidence may relate to the penalty assessment.[2]

Other important matters (not before the Court in Phase Two) may also turn in part on the quantity of oil released, such as the nature and extent of injuries to natural resources (*i.e.*, "NRD"). As BP stated, knowing the quantity discharged "is crucial to understanding the environmental impact [and] shaping appropriate remediation plans. . . ." TREX 6192 at 1.

### III. Based on Multiple Different Analytical Approaches, Approximately 5 Million Barrels of Oil Were Released from the Macondo Well.

#### A. The Capping Stack Allowed for Accurate Measuring of the Flow Rate on July 15: Over 53,000 BOPD.

The Capping Stack successfully stopped the flow when it was closed on July 15, 2010 (as will be shown in Source Control segment). For purposes of Quantification, the Capping Stack is significant in two other ways.

**First**, BP equipped the Capping Stack with a pressure gauge that allowed BP and U.S. engineers to estimate the oil flow rate. Experts for the U.S. will testify (and BP engineers have admitted) that, using commonly accepted principles of fluid mechanics, flow rate can be calculated using measured changes in pressure ("pressure drop") combined with oil collection rates and/or pipe resistances ("K factors"). BP also supplied the U.S. oil collection rates from pipes on the BOP to topside ships in the days and hours before the Capping Stack was shut. BP's officers and engineers knew at the time that flow rates could be calculated for the Capping Stack, and BP's Flow Assurance Technical Authority Trevor Hill was even tasked with flow rate estimation and provided the U.S. with inputs such as pressure measurements, K factors, and

---

[2] For a general discussion of the CWA statutory structure, *see* this Court's Order on summary judgment, [Doc. 5809]; U.S. Motion for Summary Judgment [4820-5] and U.S. Phase One Post-Trial Brief [10461]. While the United States will not actively present evidence at the Source Control segment, any evidence from that segment, and findings of fact arising from that segment, can be used in the Penalty Phase. The United States will not present evidence in Phase Two related to Anadarko's culpability.

- 3 -

collection rates. Using those basic engineering principles and BP's data and information, BP's engineers in secret, and the U.S. experts in public, reached the same conclusion: on the last day of the spill, flow rates through the Capping Stack were between 51,000 and 60,000 BOPD.[3] At trial, the U.S. will call Dr. Dykhuizen to testify regarding his calculation of 53,000 BOPD. U.S. Expert Dr. Kelkar (Chair of Petroleum Engineering at the Univ. of Tulsa) will testify that he generated similar results using common oilfield commercial software. Notably, none of the reports of the Defendants' testifying experts offer any calculations showing that the flow rate on the final day was lower than 53,000 BOPD.

**Second**, while the Capping Stack stopped the flow out of the BOP, it also raised concerns that the blowout might simply continue as an underground blowout (through pressure relief "burst discs" in the well casing), which may have been impossible to stop. Therefore, after the well was shut in, BP and the U.S. monitored the pressure response very carefully because lower than expected pressure readings could mean that the well lacked integrity and would have to be reopened.[4] At this crucial time, BP needed to prove well integrity, and accurate data and information were imperative. BP provided the U.S. with the information, and Dr. Paul Hsieh of the U.S. Geological Survey was able to use that information to match the measured pressure data with a model showing well integrity. BP and the U.S. relied on Dr. Hsieh's model to conclude that it was safe to leave the well shut in.[5]

---

[3] These rates were consistent with the 53,000 BOPD rate that BP's CEO Doug Suttles had provided to Admiral Watson (the FOSC) on July 6, 2010, when planning how much dispersant to use. TREX 2420.

[4] Alternatively, lower measured pressures could mean the subsurface oil reservoir had been depleted more than expected which would allow the Capping Stack to stay closed but would also mean that flow rates had been high.

[5] Dr. Hsieh subsequently used his model to back-calculate a total cumulative flow of 4.9 million barrels, and his report is part of the Flow Rate Technical Group's ("FRTG") final report. TREX 8804. During the months-long discharge, the FRTG, comprised of government, academic, and private engineers and scientists, tried to estimate the flow rate. During the flow period, several methods were tried to estimate

- 4 -

The pressure data, collection rates, and geometry of the Capping Stack are by far the most accurate and reliable sources of information on flow rate, and were recognized as such by all parties at the time. Therefore, cumulative or "total" flow estimates cannot ignore these data. But Defendants' litigation experts Blunt and Gringarten ignore this same information.

B. **Estimating the Total Quantity of Flow: Days Preceding July 15 Had Higher Flow Rates, with a Total Cumulative Flow of 5 Million Barrels.**

Having established a flow rate of about 53,000 BOPD for the day of the Capping Stack shut in, one can estimate a cumulative total flow for the entire period of discharge simply by adding up the preceding days of discharge. A "flat assumption" of 53,000 BOPD for 85 days (April 22 through July 15) yields a cumulative total of 4.5 million barrels. The question thus becomes whether the preceding days' daily rates were higher, lower, or the same as the last day.

Basic principles of oil production hold that reservoir pressure depletes and flow rates wane over time. The U.S. experts opine that the Macondo Well did just that, *i.e.*, daily flow rates started higher (over 62,000 BOPD in April) and declined to over 53,000 BOPD just before the well was sealed. Moreover, certain of the Source Control interventions implemented prior to the Capping Stack provided data that allow for additional confirmatory analysis. Using several different methods, the U.S. experts all estimate that approximately 5 million barrels of oil came out of the Macondo well. In other words, the experts for the U.S. estimate that the total is about 10% higher than the "flat assumption" number. Thus, different methods yield similar results, and estimates for several different points along the timeline of discharge confirm the trend.[6]

---

flow, but in the end the FRTG report essentially rested its conclusions on the modeling based on the Capping Stack data. TREX 8804.

[6] Some of the U.S. experts rely on Dr. Zick who will testify about the "shrinkage" of oil, which is important for defining a "barrel" under the CWA. 33 U.S.C. § 1321(a)(13). The Macondo oil discharged at the sea floor at higher temperatures and pressures than at the Gulf's surface. Liquid oil "shrinks" as it moves to lower temperatures and pressures as gas entrained in the liquid oil separates out. Dr. Zick will

*Reservoir Simulation*. Starting with the final daily July 15 rate of about 53,000 BOPD, Dr. Pooladi-Darvish will testify that a cumulative total in the 5 to 5.3 million barrel range accurately accounts for the actual measured pressure data and collection rates, and that other cumulative totals do not match those crucial real-world data.

*Information from BOP Pressure Gauge*. Beginning on May 8, 2010, BP collected pressure data from the bottom of the BOP. U.S. expert Dr. Griffiths used those data to show a steady decline in BOP pressure consistent with a corresponding decline in reservoir pressure, demonstrating that any changes in the internal workings of the wellbore or BOP did not materially change the flow rate over time (other than the June 3 removal of the Riser and the installation of the Capping Stack).

*Information from the Top Kill (May 28)*. The Court will hear about the Top Kill during the Source Control Segment, focusing on information that BP withheld related to how flow rates could impact the success of the Top Kill. During the Quantification Segment, U.S. expert Dr. Dykhuizen will testify that the flow rate around the time of Top Kill was 60,000 BOPD.

*Information from Top Hat #4 (June 3 – July 11)*. After the Riser was removed, the Top Hat covered the BOP from June 3 until July 11, 2010, and it sent oil to surface ships. Daily collection rates were reliably measured. However, much of the oil escaped through the Top Hat vents and skirt into the water. Using this information, Dr. Dykhuizen will testify that Macondo was disgorging about 60,000 BOPD over those 38 days (some of which was collected).

---

testify that in the industry, as oil is intentionally produced from reservoir to sea level conditions, oil producers remove the gas in multiple "stages" designed to off-gas the least amount possible and maximize the amount that stays in liquid oil form. Defendants' experts Dr. Blunt and Whitson agree that this is the industry standard process. Dr. Zick provides two methods to approximate this multi-stage shrinkage – one that tracks the multi-stage process discussed in contemporaneous BP documents, and one that simulates the path the spilled oil and gas followed in the Gulf. Defendants' expert Dr. Whitson also calculated "shrinkage" using these two methods and got strikingly similar results to those of Dr. Zick, if one ignores Dr. Whitson's unfounded belief that hydrocarbons dissolved in the Gulf should not count toward the total amount of oil spilled.

*Material Balance.* Dr. Kelkar will testify that his "Material Balance" calculations yield a cumulative estimate of 4.5 to 5.5 million barrels. This method (similar to that used by Defendants' expert Dr. Blunt) depends on estimates of "compressibility" of the reservoir rock, and Dr. Kelkar's estimate is consistent with the mid-range value for that number, based on the data that everyone relied upon during the response.[7] Unlike Dr. Blunt, Dr. Kelkar also "ground truths" his material balance result by independently calculating the flow rate for the Capping Stack as 53 to 54,000 BOPD, which validates his total flow estimate.

Thus, when adding up the days of discharge prior to the Capping Stack, the evidence shows that daily rates started higher and declined down to 53,000 BOPD, and that the total amount disgorged from Macondo was about 5 million barrels.

### C. Defendants' Litigation Experts Are Not Reliable

As discussed, BP's own engineers agreed at the time that the Capping Stack calculations put the July 14 to 15 flow rate at 50,000 to 60,000 BOPD, and a simple calculation of 85 days times 53,000 BOPD yields 4.5 million barrels. But BP's litigation experts now opine that cumulative discharge is far less, based on the theory that flow rates increased over time. How do the Defendants justify such low numbers? By abandoning the data from the response actions and contradicting evidence from Phase One.

#### 1. Defendants' Experts Both Ignore the Capping Stack Data and Disavow the Numbers that BP Provided During Source Control.

Defendants present two experts who offer total cumulative estimates: Dr. Blunt (3.26 million) and Dr. Gringarten (2.4 to 3 million). Significantly, neither expert ground-truths his model results by matching the measured Capping Stack pressures and collection rates. Dr.

---

[7] Dr. Kelkar uses BP's "most likely" compressibility of 12 microsips, from the range of 6 to 18 provided by BP at the time of the Capping Stack shut-in/ Well Integrity Test). For Defendants' material balance analysis, Dr. Blunt uses a compressibility number of 6, the low end used by BP during the response.

- 7 -

Gringarten does not even use 53,000 BOPD as his starting point for back-calculating the total flow, instead baselessly assuming contrary rates (30,000 or 45,000 BOPD). Thus, both ignore the single most important and reliable source of contemporaneous data.

Moreover, these low estimates depend on reservoir parameters that contradict those used by BP in making drilling decisions and during the response. While drilling the well, BP and Anadarko used existing information about reservoir properties to make decisions about whether and how to proceed with drilling. During the response, when the Defendants needed the government's permission to keep the Capping Stack closed, BP provided the U.S. with estimates as to the relevant parameters. Now that BP's interests have changed, their parameters have too.

*Permeability*. Permeability is measured in "millidarcies" ("mD"). By the time the Capping Stack was shut in, BP had information, and provided some of it to the U.S., showing that permeability could range from 250-800 mD. Dr. Emilsen, BP's own Phase One testifying expert (and Bly investigation team member), determined the permeability was 300 mD. Now that it is time for the "Quantification" trial, one of Defendants' experts (Dr. Gringarten) has decided that the permeability was 238 mD, below anything that anyone used during the crucial decisions about keeping the Capping Stack closed. Dr. Larsen, rebuttal expert for the U.S., will testify that Dr. Gringarten's estimates are wrong and that numbers consistent with the original data are right. Notably, Dr. Gringarten admits that his estimate of the cumulative volume of oil is entirely dependent on permeability, such that doubling permeability doubles his total volume. Defendants' expert Dr. Blunt admits the same.

*Compressibility*. Rock compressibility is measured in "microsips." At the time of the Capping Stack shut in, BP's Kelly McAughan told USGS's Dr. Hsieh that 12 microsips was BP's estimate of compressibility, which he used for his modeling, yielding model results that

allowed the Capping Stack to stay closed. BP's Senior Advisor for Reservoir Engineering Community of Practice, Robert Merrill, concurred with the decision to use 12 microsips for modeling, and used a range from 6 to 18 microsips for his own efforts at that time. Moreover, while laboratory values from "sidewall" core testing ranged from 4 to 9 microsips, BP's experience from other Gulf of Mexico wells suggested that such sidewall core testing underestimates compressibility by at least a factor of two. Once again, now that BP's interest in the outcome of the models has changed, Defendants' expert on compressibility (Dr. Zimmerman) has recast the 12 microsips estimate as a "worst case" figure, and determined that 6 is the correct number (ignoring that 18 was the high-end number used by BP at the time of the shut in). U.S. rebuttal experts Drs. Huffman and Roegiers will testify that Dr. Zimmerman's estimates are wrong. Notably, Dr. Blunt (the Defendants' "principal" expert) bases his estimate of total quantity of oil on 6 microsips, and if he used 12 microsips his estimate increases substantially.

### 2. Erosion Happened Quickly.

Defendants' theory -- that cement in the wellbore and closed BOP rams were impediments to flow that eroded very slowly, thus allowing the flow to increase over time -- is largely offered by Drs. Nesic (metal erosion) and Momber (cement erosion). That theory directly contradicts the evidence from Phase One, including testimony of BP's own experts. BP's expert on Bly Report modeling (Emilsen) showed that there were rapid changes in downhole conditions during the blowout that lasted only a matter of minutes. All Phase One experts, including BP's own BOP expert (Earl Shanks), agreed that the metal drill pipe had been entirely eroded before the rig even sank. BP's cement expert Mr. Calvert, BP's Wells Team Leader John Guide, and the U.S. cement expert Mr. Benge all agreed that the cement was not set, which directly contradicts Momber's theory that set cement was an impediment to flow that eroded slowly over time.

Meanwhile, the U.S. experts' conclusions that erosion occurred rapidly over a period of days, not weeks, are wholly consistent with the Phase One evidence.

Moreover, BP's erosion experts should be accorded little weight. For example, Dr. Nesic's opinion is entirely dependent on an unstable model which, in his own words, "exploded" before it could run a complete result. *See*, Rec. Doc. 11058. Dr. Momber's qualifications, theories and calculations all relate to construction concrete, not oilfield cement.

Finally, even if the Defendants' experts on "slow erosion" are to be believed, the total flow reduces by a maximum of 0.5 million barrels. BP's expert (Gringarten) and the U.S. expert (Griffiths) agree that BOP pressures were reliable and remained consistent from May 8, 2010 to the time of the Capping Stack shut in. The most likely explanation for this steady trend is that the restrictions in the BOP and well did not significantly change after May 8, so the erosion happened prior to May 8.[8] For the period before May 8, the difference between the estimates of the two sides is about one-half of a million barrels.

## IV. Conclusion.

The flow rate began at about 62,000 BOPD, and declined to about 53,000 BOPD by July 15, 2010. The total quantity of oil from Macondo was approximately 5 million barrels, of which 4.2 million barrels were discharged to the water.

//

//

//

//

//

//

---

[8] There is no BOP data before May 8 because BP could not get data from its pressure gauge before then.

Respectfully submitted,

BRIAN HAUCK  
Deputy Assistant Attorney General  
Civil Division

ROBERT G. DREHER  
Acting Assistant Attorney General  
Environment & Natural Resources Division

PETER FROST  
Directory, Torts Branch, Civil Division  
Admiralty and Aviation  
STEPHEN G. FLYNN  
Assistant Director  
SHARON SHUTLER  
LAURA MAYBERRY  
MALINDA LAWRENCE  
Trial Attorneys

SARAH HIMMELHOCH  
Senior Litigation Counsel  
NANCY FLICKINGER  
SCOTT CERNICH  
RICHARD GLADSTEIN  
THOMAS BENSON  
Senior Attorneys  
A. NATHANIEL CHAKERES  
ANNA CROSS  
BETHANY ENGEL  
JUDY HARVEY  
RACHEL KING  
ERICA PENCAK  
Trial Attorneys

/s/ R. Michael Underhill  
R. MICHAEL UNDERHILL, T.A.  
Attorney in Charge, West Coast Office  
Torts Branch, Civil Division  
U.S. Department of Justice  
7-5395 Federal Bldg., Box 36028  
450 Golden Gate Avenue  
San Francisco, CA 94102-3463  
Telephone: 415-436-6648  
Facsimile: 415-436-6632  
E-mail: mike.underhill@usdoj.gov

/s/ Steven O'Rourke  
STEVEN O'ROURKE  
Senior Attorney  
Environmental Enforcement Section  
U.S. Department of Justice  
P.O. Box 7611  
Washington, D.C. 20044  
Telephone: 202-514-2779  
Facsimile: 202-514-2583  
E-mail: steve.o'rourke@usdoj.gov

DANA J. BOENTE  
United States Attorney  
Eastern District of Louisiana  
SHARON D. SMITH  
Assistant United States Attorney  
Eastern District of Louisiana  
650 Poydras Street, Suite 1600  
New Orleans, LA 70130  
Telephone: (504) 680-3000  
Facsimile: (504) 680-3184  
E-mail: sharon.d.smith@usdoj.gov

Attorneys for the UNITED STATES OF AMERICA

- 12 -

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

Date: September 5, 2013.                                                   /s/ Steven O'Rourke
                                                                                            U.S. Department of Justice