IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * | MDL No. 2179 SECTION: J |
| This Document Relates To: *All Cases* | * * * * | Judge Barbier Magistrate Judge Shushan |

## BP AND ANADARKO'S PHASE 2 PRE-TRIAL MEMORANDUM
## QUANTIFICATION SEGMENT

Warren Anthony Fitch
Ky E. Kirby
BINGHAM MCCUTCHEN LLP
2020 K Street NW
Washington, DC 20006
Telephone: (202) 373-6000

James J. Dragna
BINGHAM MCCUTCHEN LLP
355 S. Grand Avenue, Suite 4400
Los Angeles, California 90071
Telephone: (213) 680-6400

Deborah D. Kuchler, T.A. (Bar No. 17013)
KUCHLER POLK SCHELL
WEINER & RICHESON, LLC
1615 Poydras Street, Suite 1300
New Orleans, Louisiana 70112
Telephone: (504) 592-0691

*Attorneys for Anadarko Petroleum Corporation*

Don K. Haycraft (Bar No. 14361)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Barry E. Fields, P.C.
Hariklia ("Carrie") Karis, P.C.
Matthew T. Regan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for BP Exploration & Production Inc. and BP America Production Company*

Through innovative engineering approaches and unprecedented efforts, the flow of oil from the Macondo reservoir that began on April 20, 2010 was permanently ended on July 15, 2010. Estimating the amount of flow during those 86 days proved no less challenging than the attempts to stop it, given the dynamic nature of the flow and events affecting it. Starting as a liquid, the reservoir fluid transitioned into multiple "phases"—a mix of oil and gas—as it encountered changing pressures and temperatures up the wellbore. This flow traveled through and eroded various restrictions, including the downhole cement, the casing, the drillpipe, the blowout preventer, and the marine riser, which first bent, then developed a series of erosion holes before it was removed. Until the flow was stopped in mid-July through a custom "capping stack," multiple interventions and collection measures had been attempted, each of which had the potential to alter the relevant restrictions, geometries (piping configurations) and flow conditions. The blowout preventer was subsequently recovered and other forensic information was developed, confirming that significant erosion had occurred.

Now, three years after those efforts to stop the flow of oil and the collection of evidence about that flow, the Quantification segment of the Phase 2 trial will determine the amount of oil that was discharged. The evidence on this question at trial will come almost entirely from experts—with a total of 16 experts, spanning numerous technical disciplines, slated to testify about their assessments. To answer this question reliably, the methodology must account for the available evidence and the uncertainty of the flow conditions during the spill. That is where the distinction among the experts is clear: BP and Anadarko's experts honor the available data and determine the cumulative discharge using a proven methodology that that does not require simplistic and unverified assumptions about flow conditions. In contrast, the United States'

experts employ unproven methods that require significant assumptions and extrapolations in lieu of, and even directly inconsistent with, the available data and other evidence.

BP and Anadarko estimate that **3.26 million stock tank barrels** (MMstb) of oil were released from the reservoir. This estimate is grounded in industry-standard reservoir engineering work performed by one of the world's foremost reservoir engineers, Dr. Martin Blunt. Dr. Blunt's "material balance" analysis draws upon industry-recognized principles and techniques, and relies on actual measured data about the reservoir itself, including the amount of oil available to be discharged, the compressibility of the rock in the reservoir, and the pressures before and after the spill. This method does not require day-by-day calculations of flow through the wellbore and its restrictions, or suffer the inherent uncertainties in such methods. Using Dr. Blunt's material balance calculation of 3.26 MMstb and subtracting the 810,000 collected barrels (*see* Rec. Doc. 8620), **2.45 MMstb** of oil were spilled into the Gulf of Mexico.

In contrast, the United States alleges a cumulative discharge of 4.9 MMstb (or 4.09 MMstb excluding the 810,000 collected barrels). This is essentially the same figure the Government first published on August 2, 2010.[1] That original estimate was generated over a single weekend by combining (i) flow calculations for a single day (July 15), and (ii) an assumption that no significant geometry changes took place in the outflow paths over the prior 85 days—an admittedly "fictional state." Three years have since passed, but the United States still advances its original figure as a valid estimate, relying upon the same flawed approach of the scientist that generated it. In addition, the United States offers testimony from experts employing different methodologies that, remarkably, arrive at almost exactly the original 2010 estimate. This alignment of results can be traced to the U.S. experts' inputs: Each U.S. expert relies upon one or more faulty assumptions that increase his estimates. When actual evidence

---

[1] *See* TREX 8809. TREX 9376.

from the well is substituted for those assumptions (or where the experts' uncertainty ranges are expanded to properly account for the absence of such evidence from their analyses), the U.S. estimates all decrease to levels at or near Dr. Blunt's 3.26 MMstb calculation.

BP and Anadarko highlight here three foundational issues that will be the focus of the Quantification case.  *First*, the flow situation at Macondo in the summer of 2010 was complex and changing over time, and pertinent data was unavailable during much of the 86-day period. *Second*, the Government's techniques for estimating cumulative flow at the time, and today, are not reliable because they lack and/or ignore critical data needed for those techniques.  *Third*—in contrast—the material balance analysis conducted by Dr. Blunt is well-suited to determining cumulative flow at Macondo because this well-established method and Dr. Blunt's application of that method rely upon measured pressure and other data from the reservoir.

## I. The Circumstances at Macondo Were Complex and Changing Over Time.

The flow conditions at Macondo were anything but static during the 86-day flow period. Several of the U.S. experts were involved in attempts to estimate flow using "hydraulics" methods during the summer of 2010.  At that time, those scientists acknowledged the deficiencies in their efforts to estimate flow given the methods they were using and the uncertain conditions and inadequate available data.  For example, in his internal June 29, 2010 "Flow Uncertainty Position" paper, U.S. expert Dr. Ronald Dykhuizen summarized the difficulties in calculating flow at Macondo using hydraulics methods, including that "the geometry of the flow is…unknown" and "[a]ny model has to not only assume various flow paths and resistances; it has to account for potential erosion during the long flowing time."[2]  Dr. Dykhuizen explained at his deposition that "without two pressures and a known geometry, it was impossible to calculate

---

[2]   TREX 9388/9389.

a flow rate. ... We have lots of resistances we don't know…"[3] These resistances, or impediments to flow, are now known, and include restrictions at the base of the well, from drill pipe, in the BOP and the kinked riser, and these restrictions were impacted by erosion over time.

What Dr. Dykhuizen termed "potential erosion," is now known to have occurred in a number of points in the flow path. During the spill, holes appeared in the kinked riser over time, including one as late as May 19, 2010. These holes were produced by, and are visual evidence of, active continual erosion. Video evidence from May 2010 also demonstrates the presence of alternating gas and oil flow, called "slug" flow, which occurs only at certain flow rate ranges. This video evidence of the appearance of slug flow, indicates that the flow must have been within a known range during the period that slug flow was observed. Moreover, after the BOP was recovered in the fall of 2010, dramatic evidence of erosion was found on its steel rams and cavities. This evidence of actual erosion cannot be ignored: Whatever resistances existed to constrain the flow of hydrocarbons changed as they eroded, resulting in an increasing—not, as the current U.S. estimates posit, decreasing—flow over time.

As Dr. Dykhuizen also conceded, hydraulics methodologies depend on measured pressure differences for a known fluid across a known geometry. But it was not until the final three days of the 86-day flow period, when a capping stack with known geometry and reliable pressure instrumentation was installed, that estimating flow using hydraulics methods was even possible. Even then, the capping stack data provided reliable information only for those final days in July; the capping stack provided no information about the restrictions, geometry, or erosion changes that predated its installation.

---

[3] 1/30/2013 Dykhuizen Dep. Tr. at 279:25-280:9.

## II.     The Government's Hydraulics Flow Estimates Lack Critical Data.

The United States' 4.9 MMstb estimates gloss over the complexities of the evidence through the use of simplistic—and, in several cases, admittedly erroneous—assumptions. The hydraulics assessments performed by U.S. experts Drs. Dykhuizen, Griffiths and Pooladi-Darvish each suffer from critical gaps in the availability of data necessary as inputs for their models and from faulty assumptions made in the face of evidence of erosion, multiphase fluid behavior and other factors.

Dr. Dykhuizen's estimate is based on measurements taken on the very last days of flow, July 14 and July 15, to then arrive at an estimate for July 15, which is then "extrapolated back" to every prior day. To do this, Dr. Dykhuizen *assumes that there were no changes in the restrictions present in the well*, including that there was no erosion of any of those restrictions over the 85 days prior to July 15. As Dr. Dykhuizen wrote, this approach "describes a fictional state since the model implicitly assumed that well geometry does not change during the 86 days of flowing this well. *In fact many geometry changes occurred*."[4] Nevertheless, despite his acknowledgement at the time of the "fictional state" of such an assumption, the United States still presents Dr. Dykhuizen's analysis, which rests upon an approach that expressly ignores restrictions in the flow path during the April-May time period. Consequently, Dr. Dykhuizen's calculations result in overall estimates of decreasing flow over time, *i.e.*, that flow rate was highest immediately after the accident and gradually decreased. This result cannot be reconciled with the evidence of significant erosion, which establishes that the opposite is true, *i.e.*, the flow increased over time. Tellingly, the United States has no erosion experts designated to testify regarding the rates of likely erosion of wellbore cement, BOP rams or other outflow obstacles.

---

[4]     TREX 9376.

When the Government first released its 4.9 MMstb estimate on August 2, 2010, its scientists had been given just days to derive that estimate in response to demands from the Administration for a number with which to respond to claims of "missing oil." The team of scientists recognized the lack of rigor in such an approach at the time, but determined that "for US Gov neg[otations] with BP this is good enough."[5] Three years later, and for a very different purpose, the Government presents the same methodology and the same number, notwithstanding the manner in which they were generated or the forensic evidence acquired since that time which exposes the flaws in the assumptions used to generate that number. Indeed, Dr. Dykhuizen has now conceded that his 4.9 MMstb estimate is subject to a massive error range because of his methodology, admitting at his deposition that his error bound is ***plus or minus 30%***, with the real number more likely on the ***lower end*** of that range (or **3.5 MMstb**).[6]

Dr. Griffiths's work similarly relies on a small sample of measurements taken over four hours from July 14 and 15. Dr. Griffiths also assumes no material changes in restrictions over time and speculates that all erosion must have taken place in less than half a day on April 20-21. Dr. Griffiths's method depends on assumptions about the effect of changes in pressures measured by a gauge located at the bottom of the BOP, the "PT-B" gauge. Dr. Griffiths conceded that determining what a change in the PT-B pressure data reflected requires information beyond the PT-B data: "You can't just look at PT-B alone and -- and learn very much about anything."[7]

Dr. Mehran Poolardi-Darvish, another U.S. expert, also relies upon data from July 14 and 15, and also assumes no material changes in restrictions to attempt to extrapolate from that

---

[5] TREX 8628.
[6] 6/20/2013 Dykhuizen Dep. Tr. at 511:14-21, 513:24-514:15.
[7] 6/26/2013 Griffiths Dep. Tr. at 233:7-236:14.

6

limited data to derive flow estimates for the entire spill period. Critically, as with Drs. Dykhuizen and Griffiths's methods, Dr. Pooladi-Darvish's estimate of approximately 5.0 MMstb cumulative flow is not reflective of the data; it is instead predetermined by his extrapolation of the July 15 data backwards with the assumption of unchanging flow restrictions over time.

BP/APC's experts address the errors in the U.S. scientists' work. **Dr. Adrian Johnson** uses industry-standard modeling software to demonstrate the errors in the U.S. hydraulics experts' flow analysis. **Dr. Srdjan Nesic**, a world-recognized expert on metal erosion, analyzes the evidence of erosion of the BOP and riser and explains how the metal in those components eroded gradually over time, causing flow to increase (not decrease) over time. **Dr. Andreas Momber**, a leading expert on cement erosion, demonstrates that the rapid erosion rate of cement over nine hours posited by Dr. Griffiths cannot be reconciled with decades of scientific research on cement erosion, and is off by orders of magnitude. Finally, **Dr. Zaldivar** reviewed a significant amount of video evidence to confirm the existence of slug flow, developed a computer model of the *Deepwater Horizon's* moving riser, and ran numerous computer simulations to calculate the maximum possible daily flow from May 13 to 20, 2010, at 35,900 stb/day—or about 40% lower than the U.S. experts' extrapolated estimates for that period. The U.S. experts cannot reconcile their flow estimates with the clear visual evidence of slug flow.

In sum, the Government hydraulics experts' use of faulty assumptions as a work-around for the complexity and uncertainty of the Macondo flow conditions results in unreliable cumulative flow estimates. A different methodology is required—one that honors the data and does not require the daily flow assessments required for hydraulics methods.

7

### III. The Material Balance Methodology Employed By Dr. Blunt Provides The Best Estimate of Cumulative Discharge.

The most reliable way to estimate the size of this spill is the material balance method employed by Dr. Martin Blunt, Professor and Chairman Emeritus of petroleum engineering at Imperial College, London and one of the most respected reservoir engineers in the world. Dr. Blunt's analysis focuses on the the pre-spill estimate of the reservoir's size, its pressures before and after the spill, and the compressibility of the reservoir rocks—thereby avoiding the need to determine precise flow conditions at any given time over the course of the spill. Through the use of measured inputs and the industry-standard material balance formula, Dr. Blunt directly calculates the size of the spill. Using the full range of measured rock and fluid data, Dr. Blunt calculates a range of **2.9-3.7 MMstb** and estimates that **3.26 MMstb** of oil were released.

Dr. Blunt's analysis honors the data available on reservoir size, pressure depletion, and measured fluid and rock properties and demonstrates that any estimate of released oil greater than 3.7 MMstb must rely upon assumptions about the reservoir that conflict with direct measurements. In assessing the data, Dr. Blunt uses a conservative lens.[8] Dr. Blunt accounts for fundamental geological facts and principles of physics acknowledged by United States experts but omitted in their flow calculations. For example:

**Reservoir connectivity:** The type of rock formation housing the Macondo reservoir consists of sinuous channels of sandstone containing the oil and gas separated by impermeable shale rock capable of blocking flow between the sandstone channels. Oil could flow into the Macondo well only from the channels connected to the well or to another connected channel. Thus, flow estimates dependent on the assumed volume of oil should not only analyze the

---

[8] The conservatism of Dr. Blunt's estimate is confirmed by **Dr. Alain Gringarten**. A world-respected expert in petroleum engineering, Dr. Gringarten uses industry-standard methods for estimating flow rate history based on the reservoir permeability and pressure changes to calculate a cumulative flow of **2.4 to 3.0 MMstb**, with a base case of approximately **2.5 MMstb** (1.7 MMstb, excluding collected amounts).

8

volume of oil in the entire reservoir, but should also determine the reservoir connectivity. A more connected reservoir means a greater share of the total oil in place can flow. U.S. experts assume 100% connectivity without geological analysis. Dr. Blunt deduces the largest plausible reservoir area, then assumes a greater reservoir thickness inside the connected zone than outside it. Although connectivity could therefore conceivably be far lower, Dr. Blunt's approach arrives at estimated connectivity of 89%.

**Compressibility:** While the compressibility assessment includes rock, oil and water, rock compressibility is the most disputed part of the compressibility variable in Dr. Blunt's material balance work. Higher inputs for rock compressibility yield a larger spill estimate. Rock compressibility for the Macondo reservoir was measured by Weatherford Laboratories according to industry standards using rock samples taken deep in the well in routine operations before the spill. BP/APC expert **Dr. Robert Zimmerman**, the world's leading expert on the compressibility of sandstones like those at Macondo, confirms that these independent tests by Weatherford yield a reliable estimate of approximately 6 microsips. Dr. Blunt uses this number. The United States uses a number that is about twice the average measured value.

**Pressure depletion:** All experts estimate the final reservoir pressure using measurements from a gauge on the capping stack which was separated from the reservoir by more than 13,000 feet of wellbore oil. U.S. experts neglected to account for pressure differences as the wellbore fluids cooled and became more dense, and thereby overestimated depletion.

In contrast to Dr. Blunt, U.S. experts Kelkar and Pooladi-Darvish ignore the problem of connectivity, overstate pressure depletion by overlooking wellbore cooling, and fail to honor the data such as the rock compressibility measurements. Dr. Mohan Kelkar presents a material balance analysis, but his abbreviated analysis arrives at an estimate of 4.5 to 5.5 MMstb by: (1)

9

wrongly assuming a fully 100% connected reservoir; (2) ignoring wellbore cooling, thereby overstating reservoir pressure depletion; and (3) most importantly, incorrectly *doubling* the rock compressibility value without a scientific basis.  While working on the spill response as a U.S. consultant in 2010, Dr. Kelkar analyzed Weatherford's rock testing and set compressibility at 5.61 microsips.  But now, Dr. Kelkar has doubled the input to 12 microsips, driving his spill estimate to as high as 5.5 MMstb.  Dr. Kelkar acknowledges that if he uses 6 microsips, his estimate becomes **3.4 MMstb**.

Dr. Kelkar performed no scientific analysis to support doubling his compressibility value, instead basing his use of 12 microsips on out-of-context references in draft documents.  During the response, BP scientists, concerned that pressure building up inside the reservoir might damage the integrity of the well after shut-in, ran calculations with high compressibility values, including 12 microsips and higher, to model possible worst-case scenarios.[9]  After shut-in, BP's engineers resumed using the measured 6 microsips value.  Dr. Kelkar admitted that he was unaware of this history.[10]

Dr. Pooladi-Darvish arrives at a 5 MMstb estimate using inputs that are inconsistent with available evidence and other experts.  For example, in his "Base Case," Dr. Pooladi-Darvish uses a permeability of 550 "millidarcies" ("mD") despite the evidence that the correct value is much lower: BP scientists typically used approximately 300 mD; Dr. Kelkar also used 300 mD; BP/APC expert Dr. Gringarten uses 238 mD; and Dr. Blunt uses an upper bound of 329 mD.

## Conclusion

For the reasons set forth above, the Court should find that **3.26 MMstb** of oil were released from the reservoir, less 810,000 barrels of collected oil.

---

[9] Vinson Dep. Tr. at 409:8-18, 441:21-442:5, 460:7-462:21; Merrill Dep. Tr. at 477:16-478:7.
[10] Kelkar Dep. Tr. at 267:7-17, 282:14-24.

| | |
|---|---|
| September 5, 2013 | Respectfully submitted, |
| | By: /s/ Don K. Haycraft |
| Warren Anthony Fitch<br>Ky E. Kirby<br>BINGHAM MCCUTCHEN LLP<br>2020 K Street NW<br>Washington, DC 20006<br>Telephone: (202) 373-6000 | Don K. Haycraft (Bar No. 14361)<br>LISKOW & LEWIS<br>One Shell Square<br>701 Poydras Street, Suite 5000<br>New Orleans, Louisiana 70139-5099<br>Telephone: (504) 581-7979<br>Facsimile: (504) 556-4108 |
| James J. Dragna<br>BINGHAM MCCUTCHEN LLP<br>355 S. Grand Avenue, Suite 4400<br>Los Angeles, California 90071<br>Telephone: (213) 680-6400 | Richard C. Godfrey, P.C.<br>J. Andrew Langan, P.C.<br>Barry E. Fields, P.C.<br>Hariklia ("Carrie") Karis, P.C.<br>Matthew T. Regan, P.C.<br>KIRKLAND & ELLIS LLP<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone: (312) 862-2000 |
| Deborah D. Kuchler, T.A. (Bar No. 17013)<br>KUCHLER POLK SCHELL<br>WEINER & RICHESON, LLC<br>1615 Poydras Street, Suite 1300<br>New Orleans, Louisiana 70112<br>Telephone: (504) 592-0691 | Robert C. "Mike" Brock<br>COVINGTON & BURLING LLP<br>1201 Pennsylvania Avenue, NW<br>Washington, DC 20004-2401<br>Telephone: (202) 662-5985 |
| *Attorneys for Anadarko Petroleum Corporation* | *Attorneys for BP Exploration & Production Inc. and BP America Production Company* |

## **CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 5th day of September, 2013.

/s/  Don K. Haycraft