IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **In Re: Oil Spill by the Oil Rig** | * | **MDL No. 2179** |
| **"Deepwater Horizon" in the Gulf of** | * | |
| **Mexico, on April 20, 2010** | * | **SECTION: J** |
| | * | |
| | * | |
| | * | **Judge Barbier** |
| **This Document Relates To:** *All Cases* | * | |
| | * | **Magistrate Judge Shushan** |
| | * | |

## BP'S PHASE 2 PRETRIAL MEMORANDUM—SOURCE CONTROL

Don K. Haycraft (Bar No. 14361)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Barry E. Fields, P.C.
Hariklia ("Carrie") Karis, P.C.
Matthew T. Regan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for BP Exploration & Production Inc.
and BP America Production Company*

Immediately following the *Deepwater Horizon* incident, BP dedicated tremendous resources, sparing no expense, to secure the Macondo well.  Throughout the response, BP's engineers and specialist contractors worked collaboratively with the federal government, including dozens of scientists and engineers from the National Laboratories, the Minerals Management Service, and the United States Coast Guard, as well as the industry, to respond to a complex and unprecedented blowout.  On July 15, 2010, after 86 days of diligent analysis and engineering, the well was shut in with a capping stack—a device specifically built for this incident's unique challenges.  The challenges to shut in the Macondo well were extraordinary, and so too were BP's efforts in responding.

The evidence presented during the Phase 2 Source Control trial will show the following:

• BP was prepared to respond to a deepwater blowout, having complied with all government requirements and industry standards for spill preparedness.  MMS approved BP's spill response plan and verified its compliance with federal regulations.  Neither MMS regulations nor industry standards required a capping device when responding to a deepwater blowout, and no deepwater blowout had been secured with such a device previously.  Admiral Thad Allen, the response's National Incident Commander, has testified that is impossible to predict whether access to a pre-built capping stack would have shortened the time needed to close the Macondo well.[1]

• BP and the federal government worked together closely to secure the well under the supervision of the Unified Command ("UC"), the government-led organization that oversaw and approved source control strategies and decisions.  Although all who worked on the response wanted to shut in the well as soon as possible (and none more so than BP), the blowout presented unforeseen challenges.  With these uncertain and unique conditions, one overarching principle

---

[1]   Allen Dep. Tr. 60:7-61:7 ("I don't think there's any way to estimate" the time needed to close the well if BP had a pre-built capping stack).

governed the team's work: "*Don't make it worse.*"  Every source control option thus required careful study to avoid making the situation worse, especially to minimize the risk of causing an underground blowout.  The care required to engineer and to execute source control strategies under the "don't make it worse" principle accounted for the time required to shut in the Macondo well.

- BP's engineers shared an abundant amount of data with government representatives, including holding daily meetings at which they shared material information regarding the source control strategies being developed.  Further, the UC did not blindly approve the strategies that BP presented, but engaged a group of scientists, known as the Federal Science Team, whose members performed their own independent analyses and evaluations, including their own flow rate estimates. Those federal scientists were embedded in the UC's Houston Incident Command Post with BP engineers and managers, and BP provided them access to the same data from the well that BP had.[2]

## I.       MMS Approved BP's Source Control Plan, Which Met Industry Standards.

Prior to the *Deepwater Horizon* incident, no deepwater well in the United States had experienced a sustained loss of well control.  Despite the low probability of a deepwater blowout, BP and other operators in the Gulf had developed plans to respond to such an event, disclosing, among other things, how they would try to stop the flow at the source.  Every major operator in the Gulf submitted and received approval from MMS of a response plan that was virtually identical to BP's plan.  And for Macondo, MMS reviewed and approved BP's spill response plan as compliant with the federal requirement to "demonstrate that [the Operator] can respond quickly and effectively whenever oil is discharged from [its] facility."[3]

The industry consensus was that if a blowout preventer ("BOP") failed, an operator should initiate two actions: (1) drill a relief well to intersect with the wellbore close to the

---

[2]    Hunter 10/30/2012 Dep. Tr. 18:17-24, 28:2-10, 56:6-15; Rebuttal Expert Report of Adam Ballard 10-12.
[3]    30 CFR § 254.1.

reservoir and kill the well; and (2) stand up a team of source control experts to assess the specific conditions of the blowout and then attempt to develop a strategy for stopping the blowout in less time than a relief well.  Because no source control plan could possibly anticipate all factors affecting the strategy for responding to a deepwater blowout, the plans that BP and other operators submitted, and that MMS approved, did not detail any specific source control actions to take beyond drilling a relief well.  Rather, their spill response plans provided for the formation of a team of source control experts who would evaluate the blowout and implement a tailored source control strategy.  Similarly, because the industry believed every blowout would present unique circumstances, no operator or drilling contractor prior to the incident had access to a pre-built capping stack for responding to a deepwater blowout.  MMS agreed with the industry, and before the *Deepwater Horizon* incident did not require either a plan with specific source control strategies beyond drilling a relief well or access to a pre-built deepwater capping stack.[4]

## II.    BP Implemented Its MMS-Approved Source Control Plan under Federal Government Supervision.

Within hours of the incident, BP began to implement its MMS-approved source control plan, assembling its team of source control experts, including well control specialists with whom BP had pre-existing contracts to provide expertise and equipment in response to a blowout, and commencing the work to drill two relief wells.

BP's source control team worked under the UC, established for the response under the Oil Pollution Act of 1990. While the UC represented numerous participants, the final decision-maker was always a Federal On-Scene Coordinator ("FOSC").  During most of the response, the FOSC

---

[4]    Any assertion that any entity had a pre-built deepwater capping stack or considered it the preferred method for responding to a deepwater blowout misinterprets the evidence.  For example, the Aligned Parties point to a 2001 draft BP Alaska document to claim that a capping stack was "Best Available Technology" for a deepwater blowout.  BP Alaska, however, has no deepwater wells, and this document only discusses *surface* capping stacks for *surface* well blowouts.  Responding to a deepwater well blowout presents very different engineering challenges that necessitate different equipment, procedures, and variables than responding to a surface well blowout.

was a Coast Guard officer who worked closely with Admiral Allen.  Once the Federal Science Team was put in place, before approving implementation of a source control strategy, Admiral Allen and his team would obtain their independent advice.  The Federal Science Team constantly communicated with the UC, and its leadership had workspace at the Houston command center alongside BP engineers and managers.

BP spent more than $1.6 billion on the source control effort, including the costs of not one, but two, relief wells.[5]  Putting to one side the level of effort and cost of the source control response, why did it take 86 days to cap the Macondo well, and could the well have been closed earlier if BP and the industry had a pre-built capping stack?  During the key stages of the source control effort, the responders faced a complex set of unknowns critical to making decisions.  For example: (a) What was the flow path for the hydrocarbons exiting the reservoir?; (b) What was the condition of the wellbore after the explosions on April 20?; (c) What were the restrictions to flow in the BOP, the wellbore and within the collapsed riser, and how much of a restriction did each provide?; (d) Why had the BOP's lower marine riser package (LMRP) failed to release when the rig was lost?; (e) If the LMRP could not be removed safely, where could a capping device be connected to the BOP?; and, (f)  What was the condition and location of the drill pipe within the BOP?  Those complex questions, and many others, remained without a definitive answer while source control decisions were being made.  BP, the Federal Science Team, and the UC were dealing with unprecedented challenges that were unrelated to whether a capping stack was ready to deploy.[6]

Admiral Allen has testified that he could not predict whether the Macondo well could have been shut in sooner if a prebuilt deepwater capping stack was available.  According to Admiral

---

[5]    Expert Report of Iain Adams at 4.

[6]    If a pre-built capping stack existed—it did not—it would have required major modifications to adapt it for use with the particular characteristics of the *Deepwater Horizon* blowout, including engineering, manufacturing and testing the tools and equipment to attach it to the LMRP flex joint and the equipment necessary to mitigate the unique well integrity concerns that the blowout presented.  *See* Expert Report of Iain Adams 16-17, 20-28.

Allen, the "overarching concern" was that when the *Deepwater Horizon* lost control of the well, the wellbore might have been severely damaged.[7]  If oil could flow from a damaged wellbore into the surrounding formation, it might escape from the seabed through one or more fractures.  Instead of attempting to shut in the Macondo well from a single point (at the existing wellhead), the response team would be faced with a virtually uncontrollable situation—oil flowing into the Gulf from multiple sources until a relief well could intersect the wellbore.  Throughout the response, as Admiral Allen testified, "we did not know whether or not there was a breach of the formation."[8]  The objective remained "[don't] make the situation worse."[9]

### III.    "Top Kill" Was A Viable Solution and Was Properly Attempted.

By May 2010, while several containment and collection solutions were being developed in parallel, the source control team had identified at least two source control methods for stopping the *Deepwater Horizon* blowout beyond drilling relief wells—either to cap the well or to stop the flow of oil using a strategy known as "Top Kill."  To cap the well, the primary option initially was to land a second BOP on the lower portion of the failed *Deepwater Horizon* BOP—the "BOP-on-BOP" strategy.  The second option, Top Kill, involved pumping drilling mud and other material into the *Deepwater Horizon*'s BOP and comprised two elements:  (1) injecting various solid materials to increase restrictions to flow within the BOP and thus to create additional backpressure within the (still unknown) flow path, called the "Junk Shot" procedure, and (2) immediately pumping mud into the well through the BOP to overcome the upward hydrocarbon flow, called "Momentum Kill."  If the Top Kill procedure using both of its elements could overcome and push back the upward flow of oil, cement could be injected into the well to stop the flow permanently.

Both the Top Kill and BOP-on-BOP options required risk mitigation measures to protect

---

[7]    Allen Dep. Tr. 54:22-55:9.

[8]    Allen Dep. Tr. 157:7-14.

[9]    Inglis Dep. Tr. 167:6-168:7; *see also* Allen Dep. Tr. 69:23-70:14.

against the possibility of a subsea broach, which would make the situation worse.  An adequately risk-mitigated Top Kill was ready by the last week of May 2010, supporting in part the decision to proceed with it first.  An additional factor weighing in favor of performing Top Kill first was that if it did not succeed, it would *not* preclude attempting other source control strategies, such as BOP-on-BOP.  If BOP-on-BOP failed, on the other hand, it would impact the ability to attempt other source control strategies because, among other things, it required removal of the LMRP.

BP engineers and the Federal Science Team met and discussed the Top Kill strategy generally, and specifically limitations of Momentum Kill without the Junk Shot element, including a flow rate limitation.[10]  Because Top Kill was ready, could work, and had been adequately risk-mitigated, Unified Command, with independent analysis and guidance from the Federal Science Team, authorized it on May 25.  Top Kill commenced the next day for three consecutive days.

IV.     **BOP-on-BOP Was Not a Viable Solution Because of the Risk of a Subsea Broach Making the Situation Worse.**

Despite the best efforts of BP and its contractors, Top Kill was not successful and the procedure was discontinued on May 28.  BP and the Federal Science Team independently assessed the possible reasons why Top Kill did not work, reviewing data from the procedure.  The teams reached an alarming conclusion:  it was possible that, at the time of the *Deepwater Horizon* explosions, one or more pathways from the wellbore into the formation had opened through the 16" rupture disks in the casing, and that further attempts to cap the well could cause a subsea broach. Dr. Marcia McNutt, the Director of the U.S. Geological Survey who was a science adviser to Interior Secretary Salazar, reported on May 29 that further efforts to cap the well "strongly risk(s) over pressuring deep formations with the hydrocarbons and causing an uncontainable blowout to

---

[10] TREX 9245 (notes from the May 17 BP briefing for Federal Science Team); TREX 9135 (account of the KWOP meeting by Curt Ammerman of Los Alamos National Laboratory); Stipulated Facts Concerning Source Control Events (Doc. No. 7076) ¶¶ 76-77.

the seafloor."[11]   Secretary Salazar subsequently confirmed the decision of the UC and Admiral

Allen to defer efforts to cap the well, including BOP-on-BOP.

**V.      The Capping Stack That Closed the Well Was Specifically Designed to Protect Against a Subsea Broach.**

After the post-Top Kill data analysis raised new concerns about a subsea broach from

capping the well, the source control team's focus shifted to emphasizing collection of

hydrocarbons at the source until the relief wells could kill the well.  From mid- May until the time

of Top Kill, BP had collected oil from the riser end, using an innovative technology called the

"riser insertion tube tool" ("RITT") that diverted some of the hydrocarbon flow to a vessel.  But

after Top Kill, the effort to collect oil expanded with new collection strategies being implemented.

Additionally, a team of engineers from BP, Transocean, Cameron, and Wild Well Control

had been developing a capping stack in parallel with BOP-on-BOP and Top Kill, but now

reconfigured it to function also as a collection device, allowing hydrocarbons to be diverted to a

vessel on the surface through subsea chokes and an off-take point at the top of the capping stack.

Unlike BOP-on-BOP, the deepwater capping stack was also designed to land on and attach

to the well system above *Deepwater Horizon* BOP's LMRP.  To avoid the risks associated with

removing the LMRP, the team had to design, manufacture, and test equipment and tooling to

connect the deepwater capping stack to the LMRP's flex joint.  None of this equipment and

tooling necessary for attaching a deepwater capping device to a flex joint had been envisioned,

much less designed or manufactured, before the *Deepwater Horizon* incident.

Given the unprecedented challenges that the deepwater capping stack posed, as well as

ongoing concerns regarding well integrity, procedures for its installation were developed, tested,

---

[11]   TREX 11478; *see also* TREX 9146 (email from C. Browner, White House Science Advisor, on May 29 stating, "Our scientists have determined that the risks are too great to shut the well in from the top.").

and retested.[12]   On July 9, the FOSC approved the procedure to land the capping stack, and on

July 12, it was successfully attached to the flex joint atop the *Deepwater Horizon's* LMRP .

After landing the capping stack, BP's engineers and the Federal Science Team closely

monitored the pressure data, which provided the most accurate information about the well

conditions since the explosions.  Admiral Allen had tentatively approved plans for a trial shut in,

which involved shutting in the well with the capping stack and conducting a pressure test to

evaluate well integrity.  Because concerns about well integrity lingered, Energy Secretary Chu

delayed the trial shut-in until July 15 to allow further evaluation.  Once Secretary Chu was satisfied

that the trial shut-in could proceed, the well was shut in and oil ceased flowing into the Gulf.

In the end, the source control response was a "revolutionary,"[13] collaborative effort among

BP, the government and the industry to shut in the well quickly under exceptionally difficult

circumstances.  FOSC Rear Admiral Mary Landry perhaps best summarized the response efforts:

> [I]f you could think of how many people are involved in this and the scale
> and the scope and the effort it's taken to meet this challenge that we have
> associated with this – what I would call a novel spill response and a novel
> response to a incident of a well that they're trying to repair 5,000 feet below
> the surface, I think this is quite extraordinary…. I know people are frustrated
> and they say, how come you haven't been able to solve this?  But I really
> want you to understand that it's not just the industry that's here. It's the
> federal government, the labs that were mentioned, it's the best minds across
> the country, the whole Cabinet, all these agencies, whether they're career
> people or they're new to the agencies. There's a tremendous amount of
> support and attention that we have had.  So that's what kind of inspires us
> and keeps us going. *We're very motivated to see this through; we're very
> motivated and we feel very supported by everybody who's involved in this.*[14]

**VI.    The Aligned Parties' Criticism of the Source Control Efforts Are Unwarranted**.

The Aligned Parties likely will contend that (1) BP was unprepared to respond to a

---

[12]    Allen Dep, Tr. 206:21-207:22.
[13]    *See also* TREX 9689; Hunter 10/30/2012 Dep. Tr. 58:6-25 ("But if we stress nothing else, the fact that there was a problem that had no solution, ideas were proposed, technology was developed, tried out, put together, implemented with procedures that made it happen, it is almost a revolutionary event in today's times.").
[14]    5/19/2010   UC   Press   Conference,   http://www restorethegulf.gov/release/2010/05/21/transcript-May-19-teleconference (emphasis added).

deepwater blowout, (2) BP made misrepresentations and withheld material information during the response, and (3) BP delayed or failed to recommend source control strategies that would have successfully sealed the well before the capping stack did so.  None of those contentions has merit.

Regarding preparedness, the evidence at trial will show that before the incident, BP had met all government requirements and industry standards to be prepared for a deepwater blowout.  Now, with the benefit of hindsight, it is understood that a capping stack like the one used at Macondo may have the ability to contain certain deepwater blowouts.  Prior to the *Deepwater Horizon* incident, however, the consensus in the industry (which MMS accepted in its regulatory work) was that a pre-built deepwater capping stack was not equipment that operators needed and would likely not be a successful solution to a deepwater blowout. As an independent industry expert explained, "each scenario . . . requires custom-made equipment" to address "unique challenges," and "a large part of the reason why nothing ever developed out of the discussions for deepwater intervention is because the scenarios are so varied and the small changes from one scenario to the other makes certain things that are applicable [to one situation] completely inapplicable [to another]."[15]

Regarding the response itself, the evidence will show that BP's engineers and contractors, including highly-accomplished blowout response specialists, worked tirelessly in close collaboration with the federal government. No source control strategy could be implemented without approval by the FOSC, and BP's engineers made every effort to provide the Federal Science Team with access to the same data from the well that BP had.  And the federal scientists made important use of the data, providing the FOSC independent advice regarding the source control strategies.  Prior to Top Kill, for example, federal scientists had generated their own range of flow rate estimates.

The Aligned Parties will point to the plea BP entered with the Department of Justice to

---

[15]    Barnett Dep. Tr. 332:19-334:17.

support their allegations that BP's source control actions were grossly negligent.  Leaving aside the factual flaws in such an assertion, under maritime law a defendant's "fault in the abstract does not give rise to liability.  Instead, the fault must be a contributory and proximate cause of the damages sustained."  *In re Mid-South Towing Co.*, 418 F.3d 526, 534 (5th Cir. 2005) (footnote omitted); *see also American River Transp. Co. v. Kavo Kaliakra SS*, 148 F.3d 446, 450 (5th Cir. 1998) (same).  Here, the actions that form the basis of the plea had no impact on the source control decisions made by UC.  Because of numerous uncertainties about the condition of the wellbore and equipment, including what was the flow path, what restrictions existed, what was the condition of the formation, cement, BOP, drill pipe and the like, in April and May 2010, while various source control decisions were being made, no one knew the flow rate from the Macondo well.  Admiral Allen and the federal leadership correctly and prudently assumed at every critical step in the source control effort that the actual flow rate from the Macondo well was unknown.  As Dr. McNutt stated in May 2010, flow rate estimates were "highly uncertain."[16]  While some BP employees modeled well conditions using various assumptions and flow rates, the purpose of that modeling was to evaluate the robustness of source control options, not to estimate daily flow rates, as the government has recognized and the Aligned Parties' expert conceded.[17]

## Conclusion

BP's spill response plans complied with government regulations and industry standards.  But the *Deepwater Horizon* blowout was a "large, complex, anomalous and unprecedented event."[18]  When put in the proper context, the response was "quite extraordinary," warranting recognition, not condemnation.

---

[16]   TREX 9642; McNutt Dep. Tr. 112:21-113:9.
[17]   Wilson Dep. Tr. 54:6-18, 173:24-25; *see also* TREX 9687 (Tom Hunter noted, "BP never made a flow estimate").
[18]   Allen Dep. Tr. 72:9-16.

September 5, 2013

Respectfully submitted,

By: /s/ Don K. Haycraft

Don K. Haycraft (Bar No. 14361)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Barry E. Fields, P.C.
Hariklia ("Carrie") Karis, P.C.
Matthew T. Regan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for BP Exploration & Production Inc.*
*and BP America Production Company*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 5th day of September, 2013.

/s/  Don K. Haycraft