## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **In re: Oil Spill by the Oil Rig** | * | **MDL No. 2179** |
| **"Deepwater Horizon in the Gulf** | * | |
| **of Mexico, on April 20, 2010** | * | **SECTION: J(1)** |
| | * | |
| **Applies to:** | * | **JUDGE BARBIER** |
| *Nos. 10-4239, 10-4240, 10-4241* | * | |
| | * | **MAG. JUDGE SHUSHAN** |

## ORDER & REASONS
### [As to the Cross Motions for Summary Judgment regarding the claims by the Mexican States]

Before the Court are cross motions for summary judgment by the Mexican States of Veracruz, Tamaulipas, and Quintana Roo (collectively, "the Mexican States") and BP, Transocean, Halliburton, and Cameron (collectively, "Defendants").[1]  Generally stated, these motions raise the issue of whether the Mexican States held a "proprietary interest" in certain property allegedly damaged by discharged oil, such that their tort claims may proceed under general maritime law. For the reasons set forth below, the Court finds the Mexican States do not meet this threshold. Accordingly, the Court will grant the Defendants' motions and deny the Mexican States' motion.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

On April 20, 2010, a blowout, explosion, and fire occurred aboard the mobile offshore drilling unit DEEPWATER HORIZON as it was preparing to temporarily abandon a well, known

---

[1]  The motions are located at record documents 8169 (Cameron), 8176 (BP), 8178 & 8186 (Mexican States), and 8179 (Transocean & Halliburton).  Oppositions and replies are located at 8350/8430 (BP), 8363/8435 (Cameron), 8366-68/8449 (Mexican States), and 8370/8450-51 (Transocean & Halliburton).  Additional filings are located at 8167 (Defs.' Joint Submission of Exchanged Material on Mexican Law), 8361 (Defs.' Joint Stmt. under Local Rule 56.2), 8424 (Defs.' Joint Mot. to Strike Certain Exhibits), 8514 (Cameron's Mot. for Leave to Sur-Reply), 8527 (Mexican States' Opp'n to Mot. to Strike Certain Exhibits), 8702 (Mexican States' Opp'n re Cameron's Sur-Reply).

as Macondo, that it had drilled on the outer continental shelf approximately fifty miles south of the Louisiana coast.  After burning for two days, the HORIZON sank, fracturing the marine riser that had connected it to the Macondo Well.  Consequently, millions of gallons of oil discharged into the Gulf of Mexico before the well could be successfully capped on July 15, 2010.

Cases arising from these events eventually were consolidated before this Court pursuant to 28 U.S.C. § 1407 as Multidistrict Litigation 2179 ("MDL 2179").  In September of 2010, the Mexican States each filed substantially similar complaints in the Western District of Texas against BP (the well owner and operator and block lessee), Transocean (owner of the DEEPWATER HORIZON), Halliburton (cement contractor), Anadarko (co-owner and co-lessee with BP), and Cameron (manufacturer of the HORIZON's blowout preventer) for damages they allegedly incurred or would incur as a result of the oil spill.  These damages included the costs of monitoring and preparing to respond to the oil spill; contamination and injury to the waters, estuaries, seabed, animals, plants, beaches, shorelines, etc., of the Mexican States; lost taxes, fees, etc., due to reduced fishing activity and fishing-related industries; lost taxes, etc., due to diminished tourism; and the net costs of providing increased public services.  (*See* Veracruz Am. Compl. ¶ 55).  The Mexican States' cases were transferred to this Court and consolidated with MDL 2179.  (*See State of Veracruz v. BP, PLC, et al.*, No. 10-4239; *State of Tamaulipas, v. BP, PLC, et al.,* No. 10-4240; *State of Quintana Roo v. BP, PLC, et al.*, No. 10-4241).

In 2011, the Defendants moved to dismiss the Mexican States' complaints under Federal Rule of Civil Procedure 12(b)(6).  On December 9, 2011, the Court partially granted these motions and dismissed the Mexican States' claims under the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq., as well as their claims of nuisance and negligence per se.  (Order p.12, Rec. Doc. 4848, 835

F. Supp. 2d 175, 182 (E.D. La. 2011)).[2]  The Mexican States' claims of negligence and gross negligence were preserved, but only to the extent oil caused a physical injury to the Mexican States' proprietary interests.  *Id.*  The "physical injury to a proprietary interest" requirement stems from the Supreme Court's decision in *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927), as interpreted by the Fifth Circuit Court of Appeals in *Louisiana ex rel. Guste v. M/V Testbank*, 752 F.2d 1019 (5th Cir. 1985) (en banc).

The Court subsequently established a schedule for the parties to conduct limited discovery and file motions on the issue of whether the Mexican States hold the requisite proprietary interest in the property allegedly damaged by oil.  (Rec. Doc. 7367).  Those motions have been fully briefed, argued, and submitted for decision.  Defendants urge that, assuming oil in fact damaged Mexican waters, shores, wildlife, and other natural resources,[3] the Mexican States do not possess a proprietary interest in these things and their claims should be dismissed.  The Mexican States argue that *Robins Dry Dock* does not apply to their claims, and, alternatively, that they hold the requisite proprietary interests.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing former Fed. R. Civ. P.  56(c), now Fed. R. Civ. P. 56(a)); *Little v. Liquid Air*

---

[2]  The Court also dismissed all claims against Anadarko.  Hence, Anadarko has not filed a motion for summary judgment.

[3]  The Court notes that the Defendants dispute whether oil actually entered or damaged Mexican waters.  Nevertheless, the Court will assume, solely for the purpose of deciding these motions, that Mexican waters and adjacent shores were damaged by oil, as well as the wildlife, plants, natural resources, etc., existing therein.

*Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994).  When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'"  *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th Cir .1991) (citation omitted).  The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party."  *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists.  *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g.*, *id.* at 325; *Little*, 37 F.3d at 1075.

## III.  DISCUSSION

### A.      Preliminary Motions

At the outset, several motions incidental to the instant cross motions for summary judgment must be resolved.  The Court **GRANTS** the Defendants' Motion to Strike Certain of the Mexican States' Summary Judgment Exhibits (Rec. Doc. 8424) for essentially the reasons provided by the Defendants.  The Court notes, however, that it reviewed all of the exhibits (provided they were in English, many of which were not) and concludes that none would have changed the Court's resolution of the cross motions for summary judgment.

The Court also **GRANTS** both Cameron's Motion for Leave to File Summary Judgment Sur-Reply (Rec. Doc. 8514) and the Mexican States' Motion for Leave to File Amended Response to same (Rec. Doc. 8702).

### B.      The Mexican States' Claims Are Subject to *Robins Dry Dock*

The Fifth Circuit's en banc decision in *Louisiana ex rel. Guste v. M/V Testbank* "reviewed and reaffirmed the 'prevailing' maritime rule that 'denie[s] a plaintiff recovery for economic loss if that loss resulted from physical damage to property in which he had no proprietary interest.'" *In re Bertucci Contracting Co.*, 712 F.3d 245, 246 (5th Cir. 2013) (quoting *Testbank*, 752 F.2d at 1022).  Stated another way, the rule of *Robins Dry Dock* bars "recovery of purely economic claims absent physical injury to a proprietary interest in a maritime negligence suit." *Id.* at 247 (quotations and citations omitted).  The physical injury requirement imposes a "pragmatic limitation on the doctrine of foreseeability" that enables it to function as a rule of law. *Testbank*, 752 F.2d at 1021. Its purpose is "to limit the consequences of negligence and exclude indirect economic repercussions, which can be widespread and open-ended." *Catalyst Old River Hydroelectric Ltd. P'ship v. Ingram*

5

*Barge Co.*, 639 F.3d 207, 210 (5th Cir. 2011); *see also Amoco Transport Co. v. S/S Mason Lykes*, 768 F.2d 659, 668-69 (5th Cir. 1985) ("The spectre of runaway recovery lies at the heart of the *Robins Dry Dock* rubric.").

The Mexican States initially argue that the *Robins Dry Dock* rule does not apply because BP pleaded guilty to various criminal violations related to the DEEPWATER HORIZON incident. The Mexican States are correct that *Testbank*'s holding was limited to cases of unintentional maritime tort. *See Testbank*, 752 F.2d at 1020 & n.1 ("We do not address intentional tort or ultrahazardous activity, such as blasting."); *Bertucci Contracting Co.*, 712 F.3d at 247 (stating that the rule of *Robins Dry Dock* applies "in a maritime negligence suit"). However, the Court is not persuaded that BP's guilty pleas take the Mexican States' claims outside the scope of *Robins*. Only one count of BP's plea—obstruction of Congress, 18 U.S.C. § 1505—involved intentional conduct. *See United States v. BP Exploration & Prod., Inc.*, No. 12-cr-00292, Rec. Docs. 2 & 66 (E.D. La.). BP admitted that it "did corruptly, that is, with an improper purpose, endeavor to influence, obstruct, and impede" an investigation by a Congressional committee in May of 2010 when it knowingly misrepresented the amount of oil then discharging from the well. The Mexican States fail to explain, however, how this intent is causally related to the blowout, the oil spill, or the alleged harm to the Mexican States. BP's other guilty pleas merely sound in negligence.[4] The Court also notes that the Mexican States' complaints do not allege anything other than unintentional torts. Accordingly, the *Robins Dry Dock* rule applies to the Mexican States' claims.

---

[4] Counts 1-11, Seaman's Manslaughter/Misconduct or Neglect of Ship Officers, 18 U.S.C. § 1115; count 12, negligent violation of Clean Water Act, 33 U.S.C. §§ 1319(c)(1)(A), 1321(b)(3); count 13, misdemeanor violation of the Migratory Bird Act, 16 U.S.C. §§ 703, 707(a).

**C.      Reference to Mexican Law Is Appropriate to Determine Whether the Mexican States Hold a "Proprietary Interest"**

The Defendants rely primarily on Mexican law to support their position that the Mexican States do not hold the requisite proprietary interests.   The Mexican States argue that reference to Mexican law is inappropriate; rather, the Court should only apply the standards found in general maritime law.  The Fifth Circuit has stated that "the requirements for proprietary interest are actual possession or control, responsibility for repair and responsibility for maintenance." *IMTT-Gretna v. Robert E. Lee SS*, 993 F.2d 1193, 1195 (5th Cir. 1993) (citing *Texas E. Transmission Corp. v. McMoRan Offshore Exploraiton Co.*, 877 F.2d 1214, 1225 (5th Cir. 1989).   However, the Fifth Circuit has never stated that these are the exclusive criteria for determining proprietary interest.   In fact, the Fifth Circuit's decision in *Louisville & Nashville Railroad Co. v. M/V Bayou Lacombe*, 597 F.2d 469, 473-74 (5th Cir. 1979) (discussed below), included a substantial discussion of Alabama law when the court analyzed whether plaintiff held a proprietary interest.

The Fifth Circuit has explained that the critical factor in applying *Robins* is "the character of the interest harmed." *Id.* at 473 (internal quotations and citations omitted).   The Mexican States are creatures of Mexican law, and the contours of their rights with respect to the property and natural resources at issue are delineated by Mexican law.   Consequently, Mexican law is relevant to determining the character of the interests allegedly harmed.   Notably, the Mexican States themselves rely on elements of Mexican law to show that they meet the *Robins Dry Dock* standard.   Thus, while the Court acknowledges there are non-binding cases supporting a contrary position,[5] under the circumstances it is entirely appropriate to consider Mexican law.

_____

[5] *See New Orleans Steamboat Co. v. M/V James E. Wright*, Nos. 87-4437, 88-1236, 1990 U.S. Dist. LEXIS 11447, at *24 (Aug.23, 1990) (citing *Holt Hauling & Warehousing Systems, Inc. v. M/V Ming Joy*, 614 F. Supp. 890, 900 (E.D. Penn. 1985) ("Federal common law is used to determine a party's property interest in a wharf.").

**D.**    **The Mexican States' Claims are Barred by *Robins Dry Dock***

Briefly stated, the Mexican States claim oil from BP's well damaged the Mexican States' waters (offshore and coastal), seabeds, shores and beaches, and all wildlife and plant life located therein.[6]

Article 27 of the Political Constitution of the United Mexican States ("Mexican Constitution") states:

> [Paragraph 1:] ***Ownership*** of the ***lands and waters*** within the boundaries of the national territory is vested originally in the ***Nation***, which has had, and has, the right to transmit title thereof to private persons, thereby constituting private property. . . .
>
> [Paragraph 4:] In the ***Nation*** is vested the direct ***ownership*** of all natural resources of the continental shelf and the submarine shelf of the islands . . . .
>
> [Paragraph 5:] In the ***Nation*** is vested the ***ownership*** of the ***waters of the territorial seas***, within the limits and terms fixed by international law; ***inland marine waters***; those of ***lagoons and estuaries permanently or intermittently connected with the sea***, those of natural, inland lakes which are directly connected with streams having a constant flow; those of ***rivers*** and their direct or indirect tributaries from the point in their source . . . ***to their mouth in the sea, or a lake, lagoon, or estuary forming a part of the public domain*** . . . those of springs that issue from beaches, ***maritime areas***, the beds, basins, or shores of lakes, lagoons, or estuaries in the national domain . . . .
>
> [Paragraph 8] The Nation shall exercise its sovereign rights and jurisdictions, as determined by Congress, in an exclusive economic zone located outside the

---

[6] During discovery the Mexican States were asked to "[i]dentify with specificity the proprietary interests that you allege were physically damaged due to the Deepwater Horizon Incident and how and when such alleged damage occurred." The Mexican States responded, in pertinent part:

> Plaintiffs have dominion over and own, control, manage, maintain, tax, economically exploit and develop, restore and conduct reparations, regulate, use, and police their shores, waterways, lagoons, bays, water ways, estuaries, beaches, reefs, sea beds, and waters extending into and comprising the Mexican Exclusive Economic Zone, including, but not limited to, the marine life, fish, fauna, flora, amphibians including (all turtle species), birds, mammals, wildlife, plankton, ichthyoplankton, zooplankton and all plankton species, micro-organisms, and living species that inhabit, feed, reproduce, traverse, and are otherwise found in the foregoing areas, locations, and geological features."

(Mexican States' Resp. to Interrog. No. 1, Rec. Doc. 8176-1). The response goes on to state that oil entered these areas and damaged these things.

territorial sea.

(Defs.' Joint Submission of Exchanged Materials on Mexican Law, Ex. 8 pp. 2-4, Rec. Doc. 8167-8 [hereinafter Joint Submission] (emphasis added).[7]  Article 27 further states:

> In those cases to which [paragraphs 4 and 5] refer, ***ownership by the Nation is inalienable and imprescriptible***, and the exploitation, use, or appropriation of the resources concerned, by private persons or by companies organized according to Mexican laws, may not be undertaken except through concessions granted by the Federal Executive, in accordance with rules and conditions established by law. . . .

(Joint Submission, Ex. 8 p.3, Rec. Doc. 8167-8) (emphasis added).

These provisions indicate that the federal government of Mexico, not the Mexican States, owns the water, property, natural resources, etc., at issue.  Several of Mexico's federal statutes further this proposition.  For example, Mexico's General Law on National Assests ("GLNA") provides that "[a]ssets subject to the ***public domain regime*** of the Federal Government shall be ***exclusively under the jurisdiction of the Federal Powers***"  and are "***inalienable, imprescriptible and unseizable*** and shall not be subject to any recovery or temporary or permanent possession actions, or any other by third parties."  GLNA arts. 9, 13 (Joint Submission, Ex. 8 pp. 28-29, Rec. Doc. 8167-8) (emphasis added).  Public domain regime assets include: (1) the assets referred to in paragraphs four, five, and eight of Article 27 of the Mexican Constitution, quoted above; (2) "assets of common use," defined below; (3) insular shelves; (4) the seabed and subsoil of the territorial sea and of the inland marine waters; and (5) the lands gained naturally or artificially from the sea, rivers, streams, lakes, lagoons or estuaries of national property.[8]  GLNA art. 6 (Joint Submission, Ex. 8

---

[7]  Prior to filing their cross motions for summary judgment, the parties exchanged translated Mexican legal authorities upon which they relied.  These materials were compiled into a single document and filed it into the record. (Rec. Doc. 8167).

[8]  Furthermore, Mexico's Ports Law, Article 14, states that lands and waters forming part of the port area are public domain assets of the Mexican federal government.  (Joint Submission, Ex. 9 p.9, Rec. Doc. 8167-9).  Likewise,

p.27, Rec. Doc. 8167-8).   The "assets of common use" include the inland marine waters; the territorial sea; the maritime beaches;[9] the federal maritime-terrestrial zone;[10] the channels of the flows and the vessels of the lakes, lagoons, and estuaries of national property; and the banks and the flows of the federal zones.   GLNA art. 7 (Joint Submission, Ex. 5 pp.7-8, Rec. Doc. 8167-5).

In a similar vein, Mexico's Federal Law of the Sea states:

[Article 1] This Law is regulatory for Paragraphs Four, Five, Six and Eight of Article 27 of the [Mexican Constitution], in relation to the Mexican marine zones.

[Article 2] This Law is of federal jurisdiction, governs in the marine zones[11] which form part of the national territory and, as applicable, beyond the latter in marine zones where the Nation exercises sovereignty rights, jurisdictions and other rights.
. . .
[Article 4] In the [marine zones], the Nation shall exercise the powers, rights, jurisdictions and authorities established by this Law, in accordance with the [Mexican Constitution] and with international law.
. . .
[Article 6] The Nation's sovereignty and its sovereignty rights, jurisdictions and authorities within the boundaries of the respective marine zones, pursuant to this Law, shall be exercised . . . regarding:

I. Marine works, artificial islands, facilities and structures;

---

Mexico's Regulations for the Use and Enjoyment of the Territorial Sea, Waterways, Beaches, Federal Maritime Terrestrial Zone and Lands Gained from the Sea, Article 5, states that "[t]he beaches, the federal maritime terrestrial zone and the lands gained from the sea or any other deposit created by maritime waters, *are assets of the public domain of the Federation, inalienable and imprescriptible* . . . .", thus, "[i]t corresponds to the Ministry [of Environment and Natural Resources] to possess, administrate, control and watch over [these] assets . . . ." (Joint Submission, Ex. 5 pp. 12-13, Rec. Doc. 8167-5).

[9] Maritime beaches are defined as "the parts of the land which by virtue of the tide are covered and uncovered by the water, from the boundaries of the lowest annual ebb to the boundaries of the highest annual flood."

[10] The federal maritime-terrestrial zone (or maritime-land zone, as some have translated it) is defined as "the band of twenty meters wide of firm land, passable and contiguous to beaches or, when applicable, to riverbanks, from their mouth in the sea to one hundred meters upstream."   Mexican Official Standard, "NORMA OFICIAL MEXICANA NOM-146-SEMARNAT-2005," issued by the Department of Environment and Natural Resources in 2005 (Joint Submitssion, Ex. 9 p.18, Rec. Doc. 8167-9).

[11] The Mexican marine zones include the territorial sea, internal marine waters, the contiguous zone, the exclusive economic zone, the continental shelf, and the insular shelves.   Federal Law of the Sea, Art. 3 (Joint Submission, Ex. 8 p.30, Rec. Doc. 8167-8).

II. The regime applicable to living marine resources, even their conservation and utilization;

III. The regime applicable to the non-living marine resources, even their conservation and utilization;

IV. Economic exploitation of the sea, even utilization of minerals dissolved in its waters, production of electric or thermal energy derived from them, from the currents and from the wind, solar energy capture in the sea, development of the coastal zone, mariculture and establishment of fishing communities;

V. The protection and preservation of the marine environment, even preventing its pollution; and

VI. Performance of marine scientific research activities.

[Article 7] The Federal Executive Branch is in charge of the application of [the Federal Law of the Sea], through the different agencies of the Federal Government . . .

[Article 15] The Nation has exclusive jurisdiction on artificial islands, facilities and structures in the Exclusive Economic Zone and in the Continental Shelf and in the Insular Shelves, including jurisdiction in matters of customs, fiscal, sanitary, safety and immigration regulations.
. . .

[Article 21]  In exercise of the powers, rights, jurisdiction and authorities of the Nation within Mexican marine zones, the Federal Law of Environmental Protection, the General Health Act, and their respective regulations, the Federal Waters Law and other applicable laws and regulations in force or that are adopted, including this Law, its regulations and the relevant standards of international law to prevent, reduce and control pollution of the marine environment, shall be applied.
. . .

(Joint Submission, Ex. 8 pp.30-32, Rec. Doc. 8167-8).[12]

---

[12]  The Mexican Supreme Court of Justice has similarly held that "[e]nforcement and control of the waters of federal jurisdiction are in charge, exclusively, of the Executive of the Union, and ownership of said waters is inalienable and imprescriptible." *Federal Waters*, 5th Era; Plenary; S.J.F.; XIV; Pag. 157 (Record 285270) (Joint Submission, Ex. 8 p.45, Rec. Doc. 8167-8).  On a related note, that Court also has explained that:

[The Law of Waters Owned by the Nation] recognizes, in agreement with Article 27 of the Constitution, that the ***nation*** has had and does have ***full ownership*** of the waters, streams or basins, riverbeds or adjacent federal zone, thus it is entitled to the ***sovereignty and ownership*** of those assets and the right to regulate their utilization, ***through the Federal Executive Branch***, ***excluding any other political or private entity*** . . . ."

*Waters Owned by the Nation, Law of, Matters it Regulates Are of Transcendental Importance for the National Interest*, 7th Era; Ancillary Chamber; S.J.F.; 23 pt. 7; Pag. 74 (Record 246262) (Joint Submission, Ex. 10 p.44, Rec. Doc. 8167-10).

With respect to wildlife, the Defendants' experts on Mexican law assert that under Mexican law, wildlife may not be owned by any sovereign, an assertion that the Mexican States do not directly challenge.[13]   (Joint Submission, Ex. 7 p.9, Ex. 10 ¶ 25, Rec. Docs. 8167-7,8167 -10). Nevertheless, under Mexico's General Law of Wildlife, Article 9(VI):

> The *Federal Government* is in charge of . . . [a]ttending to matters related to the conservation and sustainable utilization of national wildlife, *in cases of acts caused in the territory* or zones subject to the sovereign and jurisdiction *of other countries*, or in zones beyond the jurisdiction of any country, which might affect the national wildlife.

(Joint Submission, Ex. 9 p.12, Rec. Doc. 8167-9).  Moreover, Article 107 of that statute states that the Mexican federal government, through the Federal Attorney General's Office for Environmental Protection, "shall exercise in an *exclusive manner* the action for liability for damage caused to wildlife and its habitat . . . ."  (Joint Submission, Ex. 9 p.13, Rec. Doc. 8167-9); *see also* Federal Law of the Sea, Arts. 6(II) & (V) (quoted above).

The Mexican States argue that "the Nation," as it is used in the Constitution, includes the Mexican States; therefore, they do own the allegedly-oiled water, shores, wildlife, etc.  However, the Mexican States also state that "the Mexican Nation" includes the Mexican people and municipalities. (*See* Mexican States' Memo. in Supp. p. 11, Rec. Doc. 8178-1).  This, of course, would lead to the untenable conclusion that each Mexican citizen owns the property at issue, in addition to the federal government and the States, and it would also run afoul of one of the purposes of the *Robins Dry Dock* rule: limiting the threat of runaway recovery.  *See S/S Mason Lykes*, 768

---

[13]  Instead, the Mexican States assert that Article 7 of the General Statue on Wildlife gives them a proprietary interest in wildlife because that statute "provides for concurrency on all matters pertaining to wildlife among the Municipalities, State, Federal District, and Federal governments."  (Mexican States' Opp'n pp.17-18, Rec. Doc. 8368). The Court rejects this argument based on articles 9(VI) and 107 of the General Statute on Wildlife, quoted in the main text.

F.2d at 668 ("The spectre of runaway recovery lies at the heart of the *Robins Dry Dock* rubric.");
*Testbank*, 752 F.2d at 1028 (discussing how *Robins Dry Dock* prevents "wave upon wave of
successive economic consequences").  Moreover, the Mexican States' interpretation conflicts with
the GLNA, among other statutes, where it states that certain assets (e.g., the waters of the territorial
sea, inland marine waters, maritime beaches) are "exclusively under the jurisdiction of the Federal
Powers" and are "inalienable, imprescriptible and unseizable."  Finally, the Mexican States' position
is inconsistent with the Mexican Supreme Court when it stated, "The nation cannot be mistaken for
a state, and consequently, State officials are not the ones who represent it because it is unique and
represented by its federal agencies, pursuant to Article 41 of the Federal Constitution.")  *Nation,
Representation of the*, [TA]; 5a. Epoca; 2a. Sala; S.J.F.; LII; Pag. 72 (Record 332930) (Joint
Submission, Ex. 10 p.45, Rec. Doc. 8167-10).[14]

 Accordingly, the Court finds that the Mexican federal government, not the Mexican States,

---

[14] The Mexican States contend that this case is not binding under Mexican law because the holding has not been
repeated five times; therefore, it should be disregarded.  The Court notes that Mexico is a civil law jurisdiction. *See, e.g.,
Curley v. AMR Corp.*, 153 F.3d 5, 14 (2d Cir. 1997); *see also* Veracruz Am. Compl. ¶ 31 (citing the "Roman Code of
law applicable . . . in Mexico").  In light of this, it appears that the Mexican States' argument invokes a species of
*jurisprudence constante*, a civil law concept of which this Court—given its location in a state with civilian roots—is
familiar.  As explained by Professor Yiannopoulos in one of his many publications on the civil law:

 According to traditional civilian theory, judicial precedents do not constitute a source of law . . . .
 [However, a] long line of decisions on a certain subject may thus be taken to establish rules of
 customary law.  This is the doctrine of *jurisprudence constante*.  Courts must follow this jurisprudence
 as customary law rather than as merely precedents.

*See* A.N. Yiannopoulos, *Civil Law System, Louisiana and Comparative Law* § 96 (2d ed. 1999).  However, even if an
opinion is not binding, it is still a persuasive authority.  *See id.* § 97 ("But the judge may, and should, follow prior
decisions as an interpretation of legislative or customary law.  Thus, . . . it would be accurate to adopt the view that
jurisprudence, though not an authoritative source, [is] in fact a persuasive or subsidiary source of law.").  Notably, the
Mexican States provide no principled reason why the cited case should be disregarded outside of the fact that its holding
has not been repeated five times.

 Counsel for the Mexican States also argued that Halliburton's expert misinterpreted the cited opinion, but
conceded that Transocean's expert's translation was accurate. (Tr. p. 64:20-:23, Rec. Doc. 10562).  The Court notes that
it has quoted the translation provided by Transocean.

owns the water, seafloor, shores, etc., at issue.  With respect to wildlife, although not owned by any Mexican political entity, only Mexico's federal government has a right of action to sue for damage to wildlife.

This does not end the matter, however.  Although the Fifth Circuit has referred to *Robins Dry Dock* as establishing a "requirement of ownership,"[15] strict ownership is not necessarily required to meet the proprietary interest threshold.  For example, the Fifth Circuit found that a bareboat charterer satisfied *Robins Dry Dock* despite not owning the damaged vessel.  *See Bosnor, S.A. de C.V v. Tug L.A. Barrios*, 796 F.2d 776, 783 (5th Cir. 1986).[16]  And as noted above, the Fifth Circuit has stated that the requirements for proprietary interest are actual possession or control, responsibility for repair, and responsibility for maintenance.  *Robert E. Lee SS*, 993 F.2d at1195. Other sections of this court have concluded that *Testbank* "clearly defines the term 'proprietary interest' to mean that a party must have control over the property ***tantamount to full ownership***." *Naviera Maersk Espana, S.A. v. Cho-Me Towing, Inc.*, 782 F. Supp. 317, 320 (E.D. La. 1992) (emphasis added).  On the other hand, the Fifth Circuit has explained that "the distinction between recovery by an owner when his property was damaged and recovery by others . . . was 'meaningful, real and dispositive.'" *Testbank*, 752 F.2d at 1024 (quoting *Vicksburg Towing Co. v. Mississippi Marine Transport Co.*, 609 F.2d 176 (5th cir. 1980)).  Consequently, the Court considers the Mexican States' remaining arguments.

---

[15]  *See IMTT-Gretna v. Robert E. Lee SS*, 993 F.2d 1193, 1194 (5th Cir. 1993).

[16]  *See also S/S Mason Lykes*, 768 F.2d at 668-69 (holding that a non-owner may recover its pure economic losses when those losses typically would be recoverable by the owner of the damaged property, but are contractually shifted to the non-owner, avoiding any threat of multiple recoveries).

14

The Mexican States contend that they hold certain concurrent powers with the federal government, which gives them the requisite proprietary interest.  They cite to Article 73, section XXIX-G, of the Mexican Constitution, which states:

> Congress shall have the following powers . . . To enact laws establishing the concurrence of the Federal Government, the States and the municipalities, within their respective jurisdictions, on matters concerning environmental protection and preservation and restoration of ecological balance.

(Joint Submission, Ex. 1 p.5814, Rec. Doc. 8167-1).  According to the Mexican States, this law expresses that "the Federal Government, the governments of each State, and the Municipalities in each State must and should intervene and act in conjunction when protecting, preserving and resoring the environment and ecological balance of the Gulf of Mexico."  (Mexican States' Mem. in Supp. p.13, Rec. Doc. 8178-1).  The Mexican States read too much into Article 73.  Contrary to their interpretation, Article 73 merely authorizes the Mexican federal government to enact laws establishing concurrent jurisdiction, thereby allowing the federal government to determine the precise balance of federal and state authority.  As explained by the Mexican Supreme Court:

> [T]he Constitution Amending Organism decided, in different precepts, the *possibility* for the Congress of the Union to establish a distribution of jurisdiction, called "concurrent jurisdictions," . . . in certain matters, such as . . . environmental . . . . That is, in the Mexican legal system concurrent powers allow for the States, even the Federal District, the Municipalities, and the Federation to act with respect to one same matter, *but it shall be the Congress of the Union the one to determine the manner and terms of participation by said entities* through a general law.

*Concurrent Powers in the Mexican Legal System. Their General Characteristics*, 9th Era; Plenary; S.J.F.; XV; Pag. 1042 (Record 187982) (Joint Submission, Ex. 10 at 45, Rec. Doc. 8167-10).  Furthermore, a treatise on Mexican law explains:

> To say that power is shared between the state and local governments would give a mistaken impression, however. In most areas, it is the federal government that determines the precise balance of state and federal authority in cases of concurrent

15

> jurisdiction, through the passage of enabling legislation (leyes generales). By itself determining the balance, the Federal Congress has tended to endow the federal government with the bulk of legislative power and executive authority.
> . . .
> [E]nvironmental protection remains almost exclusively a federal matter.

Stephen Zamora, et al., *Mexican Law* 112, 122 (2004), *quoted in* Decl. of Halliburton's Expert (Joint Submission, Ex. 11 p.5, Rec. Doc. 8167-11).  Absent further enactments, Article 73 conveys no power to the Mexican States, and certainly not the proprietary interest required by *Robins Dry Dock* and *Testbank*.

Article 7(XII) of Mexico's General Law of Ecological Balance and Environmental Protection ("GLEBEP") does provide that "[p]articipation in environmental emergencies and contingencies, subject to the policies and programs of civil protection established for that purpose" corresponds to the Mexican States.  (Mexican States' Opp'n, Ex. X p.25, Rec. Doc. 8367-12).[17]  The Mexican States claim that this provision "grant[s] [the] States *exclusive* control of environmental emergencies."  (Mexican States' Opp'n p.16, Rec. Doc. 8367 (bold type and capital letters omitted; emphasis added)).  This characterization is flatly contradicted by Article 5(VII) of that statute, which gives the federal government the power of "[p]articipation in the prevention and control of environmental emergencies and contingencies."  (Mexican States' Opp'n, Ex. X p.19, Rec. Doc. 8367-12).  Furthermore, Article 5(III) states that the federal government has power over matters "affecting the ecological balance in the country or in areas subject to the sovereignty and jurisdiction of nation" when those matters originate in another nation.  (*Id.*).  In light of these provisions, as well as the other laws cited in this opinion, the Court finds that Mexican States' power to participate in an environmental emergency under the GLEBEP does not give them a proprietary interest in the

_____

[17] The Court notes that the statutes cited in this paragraph were not subject to the Defendants' motion to strike.

16

allegedly damaged property at issue for purposes of *Robins Dry Dock*.

Additionally and/or in the alternative, the Mexican States contend that Mexico's federal government transferred certain coastal lands and/or rights pertaining to such lands to the Mexican States. Specifically, the Mexican States claim that various "administrative agreements" "grant [certain] federal land zones and lands reclaimed from the sea to" the States of Tamaulipas and Quintana Roo. (Mexican States' Mem. in Supp. p.15, Rec. Doc. 8178-1). As a result of these administrative agreements, Tamaulipas and Quintana Roo "are legally responsible for the preservation, maintenance, vigilance, use, benefit, control, and exploitation of the federal lands granted to them," claim the Mexican States. (*Id.*) The Mexican States also cite to a decree issued by the Mexican Ministry of the Environment and Natural Resources ("Ministry") and urge that it similarly "granted the land identified [a region known as the Laguna Madre and Delta of the Rio Bravo] . . . to the State of Tamaulipas, along with the authority to possess, control, and manage such areas, as well as the obligation to maintain, restore, and repair these lands out of the State's own funds." (*Id.*) Finally, the States urge that certain "coordination agreements" "identify areas of federal lands de-incorporated and transferred, granted, and or conveyed in favor of the States." (*Id.* at 16).

First, the Mexican States exaggerate, if not misrepresent, the language in these documents. As BP's expert points out, many of these documents do not even concern the Mexican States; rather, the agreements are between the federal government and private parties or municipalities. (*See* Joint Submission, Ex. 7 pp. 12-17, Rec. Doc. 8167-7). Any alleged conveyances to these parties are

irrelevant as they are not represented by the Mexican States.[18]  Turning to a document that actually

concerns one of the States, the decree regarding Laguna Madre and Delta of the Rio Bravo did not,

as the Mexican States assert, "grant[] the land identified . . . to the State of Tamaulipas," nor is it

"further and unique proof of the Mexican Republic's transfer of federal lands . . . ."  (Mexican

States' Mem. in Supp. p.15, Rec. Doc. 8178-1).  Rather, article one of that decree merely declared

the area "to be a natural protected area, with special consideration for plants and wildlife."  (Rec.

Doc. 8178-8 at 3).  Article two then states, "The [Ministry] [a *federal* entity] shall be charged with

preserving, managing and administering the ecosystems of the area and their elements, as well as

supervising preservation, protection and supervision tasks of the Laguna Madre and Rio Grande

Delta flora and fauna area." (Trans./Halliburton Opp'n p.11, Rec. Doc. 8370) (emphasis added).[19]

In a similar vein, article sixteen states, "The inspection and vigilance of the zone of protection for

flora and fauna of the Laguna Madre y Delta del Rio Bravo shall be charged to the [Ministry], with

the corresponding participation of other Federal agencies, the State and the municipalities with

competence thereto." (Rec. Doc. 8178-8 at 7).  While the latter clause of article sixteen may evince

some shared participation between the federal government, Tamaulipas, and some municipalities;

this hardly meets the description proffered by the Mexican States.  Article five of the decree appears

to provide the greatest support to the Mexican States; however, that article merely required the

---

[18]  For similar reasons, the documents cited by the Mexican States that purport to de-incorporate certain federal lands and sell them to private individuals or businesses are also irrelevant.  In an apparent attempt to manufacture significance in these documents, the Mexican States contend in their reply brief that they assert claims on behalf of their citizens under the doctrine of *parens patria*.  (Rec. Doc. 8449 at 4).  Assuming without deciding that the Mexican States could bring a *parens partria* action, *but see Estados Unidos Mexicanos v. DeCoster*, 229 F.3d 332 (1st Cir. 2000); *Arias v. Dyncorp*, 738 F. Supp. 2d 46, 54 (D.D.C. 2010), the Mexican States' fail to plead such claims in their amended complaints.  The passing references to their residents are insufficient to give notice of these claims.

[19]  The Mexican States excised article two from the copy of the decree they provided with their motion for summary judgment.  (*See* Rec. Doc. 8178-8).  Consequently, the Court has quoted the provision as it appears in Transocean and Halliburton's joint opposition brief.  The Mexican States have not disputed the accuracy of this quote.

Ministry to enter into coordination agreements with Tamaulipas and certain municipalities regarding "management of the protection zone for flora and fauna" and certain other matters.[20]  The Court has not been provided with these agreements.

Moreover, under articles 16 and 70 of the GLNA, the documents cited by the Mexican States do not transmit ownership of any lands, nor do they transfer any "real rights"  (discussed below) in those lands; they only grant the right to use, utilize, or exploit the assets:

> ARTICLE 16.  Concessions, permits and authorizations on assets subject to the public domain regimen of the Federal Government ***do not create [real] rights***; they

---

[20]  Article five states:

The [Ministry] shall enter into coordination agreements with the Government of the State of Tamaulipas, including, in due case, the municipalities of Matamoros, San Fernando, and Soto La Marina, as well as consensual agreements with social and private sectors, in order to comply with the provisions of this Decree.  Such instruments shall include, at least, the following:

I. The manner in which the Government of the State, the municipalities and the private and social sectors shall take part in the management of the protection zone for flora and fauna;
II. The coordination of applicable federal policies in matters pertaining to the protection of flora and fauna, with those of the State and the municipalities;
III. The determination of actions for the compliance with applicable territorial regulations in ecological matters as per the protection of flora and fauna;
IV. The drafting of the management program for the protection zone, with the creation of specific commitments to be executed;
V. The origin and destination of the financial resources intended for the administration of the protection zone, when applicable;
VI. The coordination mechanisms for the drafting of municipal development plans, in order to ensure congruency with the management program for the protection zone;
VII. The manner in which all investigations, experimentation and monitoring shall be performed within the flora and fauna protection zone, pursuant with all applicable legal provisions;
VIII. The performance of inspection and vigilance actions;
IX. The actions needed in order to contribute to the socio-economic development of the region, by means of the sustainable exploitation of the natural resources in the flora and fauna protection zone;
X. The participation schemes for the community and other social, scientific and academic groups;
XI. The development of counseling programs for the sustainable exploitation of the natural resources in the region; and
XII. The development of actions, works and investments as needed for the compliance of the protection, conservation and monitoring objectives in the zone, particularly those intended to prevent pollution or contamination of the surface water, aquifers and soil, as well as to maintain the hydrodynamic regime of all bodies of water.

(Rec. Doc. 8178-8 at 6).

simply grant, before the administration and without prejudice to third parties, the right to make use, utilization or exploitation, in accordance with the rules and conditions set forth by the laws and the corresponding title of concession, permit or authorization.

ARTICLE 70. The destination only grants the user institution the right to use the real property destined for the authorized use, but ***does not transmit ownership*** thereof, ***nor does it grant any real rights thereon***.

(Joint Submission, Ex. 9 p.6, Rec. Doc. 8167-9) (emphasis added).[21]  Notably, the Mexican States' expert explains that each administrative agreement cited was made under the authority of Article 70 of the GLNA, among other laws.  An accompanying footnote then explains:

This clause provides administrative agreements granting the benefit upon federal assets only transfer the right to use them but do not transfer the property on the same or create any other real rights on such assets and hence cannot be transferred to anyone else.

(*See, e.g.*, Joint Submission, Ex. 2 p.98 n.395, Rec. Doc. 8167-2).  The coordination agreements similarly reference Article 16 of the GLNA.  (*See, e.g.*, Joint Submission, Ex. 2 p.207, Rec. Doc. 8167-2).

In civil law jurisdictions, "real right" is a term of legal significance, distinguishable from a "personal right."[22]

According to the traditional definition, real rights involve the subjection of a thing, in whole or in part, to the authority of a person by virtue of a direct

---

[21]  *See also* Regulation for the Use and Enjoyment of the Territorial Sea, Navigable Waterways, Beaches, Federal Maritime-Land Zone and Land Reclaimed from the Sea, art. 35 (Joint Submission, Ex. 9 p.15, Rec. Doc. 8167-9) ("Concessions, destinations or permits do not create [real] rights in favor of their holders, but only grant the right to use, utilize or exploit the federal maritime-land zone, land reclaimed from the sea or any other deposit of maritime waters, in terms of the Law and this Regulation.").  The parties variously translate the phrase "derechos reales," as "real rights," "in rem rights," and "proprietary rights."  The Court believes "real rights" is the most accurate translation of "derechos reales," and has substituted this term for the other translations appearing Defendant's materials.  The Court notes, however, that its definition of "real rights" provided below is very similar to the definition of "in rem right" provided by one of the Defendants' experts.  (*See* Joint Submission, Ex. 9 p.19, Rec. Doc. 8167-9).

[22]  As noted above, Mexico is a civil law jurisdiction, and this Court has some experience with civil law matters.  *See supra* note 14.

20

> relationship that can be asserted against the world. . . .  By contrast, personal rights
> involve relations between persons, the creditor being an active subject and the debtor
> a passive subject.
>
> . . . According to modern doctrine, . . . [p]ersonal rights always involve a limited and
> determined number of obligors while real rights involve an unlimited and
> undetermined number of obligors.  Personal rights are thus relative; real rights are
> absolute. . . .
> . . .
> [T]he personal right is effective only between the parties and, in principle, cannot be
> asserted against third parties. . . .  In contrast, *as rights in things*, *real rights* may be
> asserted against the world; every one must respect existing real rights of other
> persons and must refrain from any unauthorized interference.

Yiannopoulos, *supra* note 14, § 233 (emphasis added).

That the administrative agreements, etc., do not transfer any real rights to the Mexican States

becomes a significant point when considered with the Fifth Circuit's decision in *Louisville &*

*Nashville Railroad Co. v. M/V Bayou Lacombe*, 597 F.2d 469 (5th Cir. 1979).  That case concerned

an allision between a tug boat and a railroad bridge.  The plaintiff did not own the bridge, but did

have a contract permitting it to use the bridge.  The plaintiff argued that *Robins Dry Dock* did not

bar it from recovering its economic losses resulting from the loss of use of the bridge because the

contract created an easement in the bridge under Alabama law, thereby giving it an interest in real

property.   The opinion indicates that if the plaintiff held an easement, then it would be able to

recover because the allision would have deprived the plaintiff of tangible property, as opposed to

only a contractual right.  *See id.* at 473.  The court concluded, however, that the contract did not

grant an easement.  The plaintiff alternatively asserted that the contract gave it a "right of user in the

nature of an easement" and that this right constitutes "a form a property interest" under Alabama

law.  The court rejected this argument as well.  It first reasoned  that "a right of user in the nature

of an easement" was akin to an "irrevocable license," which, under Alabama law conveyed only a

"***personal right*** created by contract and not an interest which attaches to or runs with the land." *Id.* (emphasis added).  Apparently uncertain of this conclusion, however, the court further explained that, "[e]ven if the Alabama courts would classify the plaintiff's rights in the bridge as a form of property interest created by virtue of its contract with the owner, that interest would form too slender a reed upon which to base a right of recovery despite Robins." *Id.*  To reach this conclusion, the court compared the plaintiff's contract with a demise charter and found that the former bore none of the "incidents of ownership" attributable to the latter. *Id.* at 474.

Although *Bayou Lacombe* dealt with common law terminology, the "personal right" described by the court as it addressed the plaintiff's alternative argument appears analogous to the civilian concept of the same name, discussed above.[23]  It also appears that, had the *Bayou Lacombe* court ***definitively*** determined that, under Alabama law, the plaintiff's contract conveyed only a personal right, then that determination would have resolved entirely the proprietary interest issue; i.e., there would have been no need for the court to compare the plaintiff's contract with a demise charter.  Therefore, because it is clear in this case that, under Mexican law, the administrative agreements, etc., only transferred personal rights, not real rights, to the Mexican States, *Bayou Lacombe* strongly suggests, if not requires, the immediate conclusion—without having to compare the documents to a demise charter—that these documents did not give the Mexican States a proprietary interest for purposes of *Robins Dry Dock*.[24]

---

[23] *See also* 2 A.N. Yiannopoulos, *Louisiana Civil Law Treatise* § 207 (4th ed. 2012) ("Analytical jurists in England and the United States . . . have drawn a widely accepted distinction between rights *in rem* and rights *in personam*.  The terms derive from Roman sources and correspond roughly to the civil concepts of real and personal rights.").

[24] It is perhaps also significant that the Louisiana Supreme Court has stated that "the term 'real right' under civil law is synonymous with ***proprietary interest***, both of which refer to a species of ownership." *Reagan v. Murphy*, 105 So. 2d 210, 214 (La. 1958) (emphasis added).

In a similar vein, the absence of real rights shows that the Mexican States did not hold an interest that was "tantamount to full ownership," *Naviera Maersk Espana, S.A.*, 782 F. Supp. at 320, particularly when considered with many of the other statutes cited in this order. *E.g.*, GLNA art. 9 ("Assets subject to the public domain regime of the Federal Government shall be exclusively under the jurisdiction of the Federal Powers."). At best, the documents cited by the Mexican States hold some limited rights concerning some of the property at issue, but these are insufficient to create a proprietary interest.

Furthermore, as mentioned above and discussed below, Mexican laws authorize the federal government to bring an action in pollution cases such as this. In fact, at oral argument it was brought to the Court's attention that the Mexican nation has filed an action with this Court asserting claims similar to those of the Mexican States. *See United Mexican States (Estados Unidos Mexicanos) v. BP Exploration & Production Inc.*, No. 13-1441. This provides another reason why the Mexican States' claims should be denied. *Cf. Testbank*, 752 F.2d at 1028 (discussing how *Robins Dry Dock* prevents "wave upon wave of successive economic consequences"); *S/S Mason Lykes*, 768 F.2d 659, 668-69 (5th Cir. 1985) (noting that "[t]he spectre of runaway recovery lies at the heart of the *Robins Dry Dock* rubric," but permitting non-owners to recover where—unlike this case—their claims were in the nature of an equitable subrogation and, consequently, there was no chance of "double recovery, much less runaway recovery."); *Holt Hauling & Warehousing Sys., Inc. v. M/V Ming Joy*, 614 F. Supp. 890, 900 (E.D. Penn. 1985) ("*Bayou Lacombe* plainly stands for the proposition that a joint user of property cannot recover for negligently inflicted damage to it when effective ownership of the property is vested in another.").

**E.     Standing.**

Several of Mexico's laws cast serious doubt on whether the Mexican States have standing

to bring the instant actions.  As mentioned above, the General Law of Wildlife, Article 107, gives

the Federal Attorney General for Environmental Protection the ***exclusive*** power to bring an action

for damage caused to wildlife covered by the statute.  Mexico's General Law of Ecological Balance

and Environmental Protection ("GLEBEP"), Article 4, states that

> The Federal Government, the States, the Federal District and the Municipalities shall
> exercise their powers in matters of ecological balance preservation and restoration
> and environmental protection, ***pursuant to the distribution of authority provided for***
> ***in this Law*** and in other laws.

(Joint Submission, Ex. 8 p.23, Rec. Doc. 8167-8) (emphasis added).  Article 5 of the GLEBEP then

states:

> The ***Federal Government*** is empowered with:
> . . .
> III.  Attending to matters affecting the ecological balance in the national territory or
> in the areas subject to the nation's sovereignty and jurisdiction, ***originating*** in the
> territory or areas subject to ***other States'*** sovereignty and jurisdiction, or ***in areas***
> ***beyond the jurisdiction of any State***;
> . . .
> XX.  Attending to matters affecting the ecological balance of two or more states.
> . . .

(Joint Submission, Ex. 8 pp. 23-24, Rec. Doc. 8167-8) (emphasis added).[25]  Given the context, the

---

[25] Article 5 of the GLEBEP further provides that Mexico's federal government is empowered with:

> V.  Enacting official Mexican laws and their enforcement in matters provided for by this Law;
> . . .
> VII.  Participating in prevention and control of environmental emergencies and contingencies, in
> accordance with the civil protection policies and programs established for this effect;
> VIII.  Establishing, regulating, managing and supervision of protected natural areas of federal
> jurisdiction.
> . . .

(Joint Submission, Ex. 8 pp.23-24, Rec. Doc. 8167-8).

24

Court interprets " other States" and "any State" as used here as meaning "other nations" and "any nation."  Under Article 202 of GLEBEP:

> The **Federal** Attorney General's Office for Environmental Protection, in the scope of its powers, ***is empowered to initiate actions*** with merits, with the competent authorities, when being aware of acts, events or omissions constituting a violation to the administrative or criminal legislation.

> When acts, events or omissions are made in violation of the rights and interests ***of a community***, the **Federal** Attorney General's Office for Environmental Protection, as well as any other authorized party referred to by Article 585 of the Federal Code of Civil Procedure, ***may file a class action*** in accordance with the terms of Book Five of said Code.

> The above shall also be applicable with respect to acts, events or omissions violating the states' environmental legislation.

(Joint Submission, Ex. 8 p.25, Rec. Doc. 8167-8) (emphasis added).[26]  Halliburton's expert further explains:

> In the [GLEBEP], the Mexican Congress granted only limited powers to the States. For example, the statute permits states to assist in the enforcement of federal environmental laws through local prosecutors/agencies using administrative sanctions (*sanciones*) but not through civil lawsuits.  *See, e.g.*, GLEBEP, Chap. IV (titled "Administrative Sanctions").  Pursuant to Article 188 of the GLEBEP, states can establish administrative sanctions for violations of local environmental law. GLEBEP, Art. 188. However, Mexican law grants only to the Federal Attorney General for Environmental Protection the governmental power to initiate actions for violations of federal environmental law.  GLEBEP, Art. 202; Internal Regulation of the Department of the Environment and Natural Resources (*Reglamento Interior de la Secretaría de Medio Ambiente y Recursos Naturales*), Art. 118; *see also* National Waters Law (*Ley de Aguas Nacionales*), Art. 14 bis 4(IV).

(Joint Submission, Ex. 11 ¶ 6.5, Rec. Doc. 8167-11).

The Mexican States' arguments that they have standing to bring the instant suits are not convincing.  Notably, their retort begins by simply dismissing the issue as not justiciable:

---

[26] *See also* GLEBEP art. 6 (Joint Submission, Ex. 6 p.11, Rec. Doc. 8167-6) ("The attributions that this Law grants to the Federation, will be exerted by the Federal Executive Branch through the Ministry . . . .").

> Plaintiffs submit that the issue of whether the Plaintiff States have the authority to bring suit is a "red herring."  At best it is a political issue to be resolved among the various entities (and people) of Mexico and one in which this United States federal court should not interject itself. In other words, it is a matter that should be determined politically in Mexico.  Certainly, these lawsuits are public information and the federal government is aware of their existence because the States and the Federal Government have joint "Deepwater Horizon" scientific workgroups and shared science.

(Mexican States' Opp'n pp. 18-19, Rec. Doc. 8367).  However, the statutes cited by the Defendants indicate that, through the enactments of the Mexican Congress, the various entities and people of Mexico have resolved this issue.  As previously mentioned, the Mexican States are creatures of Mexican law.  If Mexican law determines that only the Mexican federal government may bring the sort of action the Mexican States assert here, then neither the Mexican States nor this Court may ignore this.

Alternatively, the Mexican States contend that their respective state constitutions give them standing. The Mexican States cannot read their laws in a vacuum, however.  Mexican federal laws are supreme over the Mexican state laws.  *See* Mexican Const. art. 133 (Joint Submission, Ex. 8 p.11, Rec. Doc. 8167-8) ("This Constitution, the laws from the Congress of the Union emanating thereof and all Treaties in agreement therewith, executed and to be executed by the President of the Republic, with the Senate's approval, shall be the Federal Constitution for the whole Union. The judges from each State shall be bound by said Constitution, laws and treaties, notwithstanding conflicting provisions that might exist in State Constitutions or laws.").  Therefore, these state laws are irrelevant where they conflict with Mexican federal law.

The laws cited by the Defendants indicate that the Mexican federal government has the exclusive power to bring the type of claims asserted by the Mexican States.  Consequently, it appears that the Mexican States lack legal standing to bring these claims.  Even if this is not the

case, these provisions lend further support to the conclusion that the Mexican States do not hold the requisite proprietary interest in the waters, shores, wildlife, etc., that was allegedly damaged by oil.

## IV. CONCLUSION

For the reasons set forth above, the Court finds as a matter of law that the Mexican States' claims are barred by *Robins Dry Dock* and *Testbank*. Accordingly,

**IT IS ORDERED** that the Defendants' Motions for Summary Judgment (Rec. Docs. 8169, 8176, 8179) are **GRANTED** and the Mexican States' Motion for Summary Judgment (Rec. Doc. 8178) is **DENIED**.

**IT IS FURTHER ORDERED** that all remaining claims by the Mexican States' are **DISMISSED WITH PREJUDICE**.

Signed in New Orleans, Louisiana, this 6th day of September, 2013.

_____
United States District Judge

27