IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010<br><br>This document relates to all actions. | * * * * * * * * * * | MDL NO. 2179<br><br>SECTION J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |
| Bon Secour Fisheries, Inc., et al., individually and on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BP Exploration & Production, Inc.; BP America Production Company, BP p.l.c.,<br><br>Defendants. | * * * * * * * * * * * * | Civil Action No. 12-970<br><br>SECTION J<br><br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

### Declaration of Erica Benton

I, Erica Benton, hereby declare and state as follows:

1. I am over the age of 21 years and a resident of the State of Illinois. Unless otherwise stated, I have personal knowledge of the facts set forth herein and, if called to do so, could testify truthfully thereto.

2. I received a B.A. in Economics and Mathematics from Columbia University in 1997, and I received a Ph.D. in Economics from the University of Chicago in 2005. I am a Vice-President of Compass Lexecon where I have worked since 2007. Prior to that, I was an economist with LEAF Group LCC and a post-doctoral fellow at the University of Chicago. I assisted BP in negotiation of Exhibit 16 of the Settlement Agreement that addresses claims for

non-excluded businesses and individuals that provide support services to the oil and gas industry in the Gulf of Mexico. Since that time, I have assisted BP in evaluating proposals for determining compensation for losses resulting from business interruptions due to the Deepwater Horizon (DWH) spill. My curriculum vita is attached as Exhibit 1 to this Declaration.

3. I have been asked by BP to comment on CSSP's March 2013 draft Moratoria Loss analysis. The draft approach is outlined in CSSP's March 13, 2013 document entitled "Deepwater Horizon, Moratoria Loss Analysis, Offshore Business Claim Calculation."[1] This document, and a second presentation entitled "Moratoria Loss Analysis", were presented at a meeting in New Orleans on March 13, 2013.[2] A copy of both documents is attached as Exhibits 2a and 2b to this declaration.

4. I also have been asked to address Class Counsel's October 11, 2012 comments to the Claims Administrator regarding the treatment of potential Moratoria Losses. Finally, I have been asked to comment on the potential consequences of the implementation of a compensation framework for claims subject to review pursuant to Exhibit 16 that fails to properly distinguish losses due to spill-related business interruptions from Moratoria Losses or declines in variable profits due to other changes in industry conditions unrelated to the DWH spill and subsequent government actions.

5. My principal conclusions are as follows:

- CSSP's draft compensation formula fails to properly distinguish between: (i) losses attributable to spill-related business interruptions; (ii) "Moratoria Losses"

---

1. Hereafter, "CSSP Moratoria Offshore Loss Presentation".
2. This meeting was attended by representatives of the Office of the Claims Administrator (Patrick Juneau, Tiger Sutton, Christine Reitano, and others), PwC, Postlethwaite & Netterville, Brown Greer (Orran Brown), BP (myself, Mark Holstein, and Martin Martos), and Class Counsel (Steve Herman, Jim Roy and others).

as defined in the Settlement Agreement; and (iii) declines in variable profits due to changes in business conditions unrelated to the DWH spill. The CSSP's draft compensation formula is based on arbitrary and unsupported assumptions, and as a general matter, would result in compensation that exceeds the actual businesses interruption losses suffered by claimants as a result of the DWH spill.

- Class Counsel's October 11, 2012 comments attempt to provide general guidance for evaluating losses due to spill-related business interruptions and Moratoria Losses, but do not provide a framework that can be applied by the Claims Administrator for compensating claimants for losses due to spill-related business interruptions.

- Implementation of a compensation framework that fails to properly exclude Moratoria Losses and declines in variable profits due to other industry factors unrelated to the DWH spill can result in compensation to claimants far in excess of losses due to spill-related business interruptions. Available data indicate that the presence of oil in the water in the Gulf of Mexico that could have resulted in spill-related business interruption losses was limited in time and covered a limited geographic area. At the same time, available data also indicate that government actions affected offshore drilling activity throughout the Gulf for a more extended period of time, and thus had an important potential effect on those businesses participating in the offshore oil and gas industry. Similarly, available data indicate that offshore drilling activity expected in the Gulf of Mexico in 2010 in the absence of the spill would be lower than in prior years. This is due to the decline in drilling activity resulting from the decline in natural gas prices and oil prices from 2008 levels, which are unrelated to the DWH spill. A compensation

3

framework that fails to adequately account for these non-spill related factors would result in compensation significantly in excess of spill-related losses suffered by claimants.

A. **Background**

6. The Settlement Agreement establishes that certain business claimants that suffered losses due to business interruptions resulting from the DWH Spill are entitled to compensation for such losses. While Exhibit 16 of the Settlement Agreement sets forth general requirements for the evaluation of such claims, the specific method that was to be applied for determining compensation was not specified in the Settlement Agreement and was left to be agreed upon by BP and the PSC.[3]

7. Determination of spill-related business interruptions requires the exclusion of "Moratoria Losses" and economic losses due to changes in business conditions. Moratoria Losses are defined in Exhibit 16 of the Settlement Agreement as "any loss whatsoever caused by or resulting from federal regulatory action or inaction directed at offshore oil industry activity – including shallow water and deepwater activity – that occurred after May 28, 2010, including the federal moratoria on offshore permitting and drilling activities imposed on May 28, 2010 and July 12, 2010 and new or revised safety rules, regulations, inspections, or permitting practices."[4]

8. The Claims Administrator and vendors working with him proposed the following draft approach for compensating claimants eligible for obtaining compensation for losses due to spill-related business interruptions and for excluding Moratoria Losses:

---

3. Settlement Agreement, Exhibit 16, pp. 3-4.
4. Settlement Agreement, Exhibit 16, p. 1.

(i) CSSP would first attempt to allocate a claimant's ▮▮▮ from ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮, based on the claimant's ▮▮▮▮▮.[5] ▮▮▮▮▮▮▮▮▮▮ would be identified, and ▮▮▮ would then be allocated for ▮▮▮▮▮▮▮▮▮▮▮ based on ▮▮▮▮▮, if available, or in the alternative, ▮▮ based on the claimant's estimates ▮▮▮▮▮▮▮▮▮▮.[6]

(ii) The presumptive estimates of the claimant's ▮▮▮▮ and ▮▮▮ would be evaluated using the ▮▮▮▮▮▮▮, effectively treating the claimant's ▮▮▮▮▮▮▮▮ ▮.[7]

(iii) Compensation for the claimant's ▮▮▮ would proceed based on the CSSP's presumptive estimates of ▮▮▮ and ▮▮▮ as follows:

- The CSSP's draft proposal would calculate a claimant's ▮▮▮▮ ▮▮ as the difference in the ▮▮▮▮▮▮ and the ▮▮▮▮▮▮▮▮▮▮▮.

The CSSP would then presume that ▮▮▮▮▮▮▮▮▮

---

5. This is referred to as ▮▮▮▮▮▮▮▮▮▮▮, CSSP Moratoria Offshore Loss Presentation, pp. 15-16. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ CSSP Moratoria Offshore Loss Presentation, p. 16.
6. This is referred to as ▮▮▮▮▮▮▮▮▮. CSSP Moratoria Offshore Loss Presentation, pp. 15, 17-18.
7. CSSP Moratoria Offshore Loss Presentation, pp. 10, 29.

- ███████████████ and ████████████████████

   ████████████████.[8]

- Compensation for the claimant's ████████████████

   ██████████ would be based on estimates of the ████████████

   ████████████████████████████████████████████████

   ████████████████████████████. That is, ████████████

   ████████████████████████████████

   ████████████████████████████████████████████

   ████████████████████████████████████████████

   ████████████████████████████████████████████

   ████████████████.[9]

- For ████████████████, CSSP's proposed calculation would

   ████████████████████████████████████████

   ████████████████████████████████.[10]  That is, the

   CSSP draft proposal presumes that ████████████████████

   ████████████████████████████████████████████

   ████████████████████████████████████████

   ████████████████████████████████████████████

   ██.

- After this calculation of the ████████████████████████, the

   CSSP draft calculation would ████████████████████████

---

8.  CSSP Moratoria Offshore Loss Presentation, p. 20.
9.  CSSP Moratoria Offshore Loss Presentation, p. 20.
10. CSSP Moratoria Offshore Loss Presentation, p. 20.

███████████████████████████████████████████████
███████████████████████████.[11]

9. Example 1 in Exhibit 3 presents a simplified example of the CSSP's proposed calculation for a claimant that selects 2009 as the benchmark period.[12] As the example indicates,

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████
█████████

**B. The CSSP's draft proposal fails to adequately determine spill-related business interruption losses and would over-compensate claimants.**

10. The CSSP's draft proposal is subject to numerous fundamental shortcomings and as a general matter would result in compensation for claimants in excess of the losses they incurred due to spill-related business interruptions. This section briefly summarizes some key problems with the CSSP's proposed framework.

(i) The CSSP's proposed framework imposes an arbitrary division between the claimant's ████████████████████████. For claimants that typically do not maintain business records based on this distinction, the proposed construction of financial statements is inconsistent with the manner in which claimant's evaluate their own financial performance and can result in arbitrary and misleading measures of the performance of claimants' ████████ ███████████. Moreover, the CSSP proposal to ████████████

---

11. CSSP Moratoria Offshore Loss Presentation, pp. 20-25.
12. For simplicity, the example does not account for the ██████████ and the ████████, each of which is incorporated into CSSP's draft proposal.

7

███████████████████████████████ ██████ [13] provides an incentive for claimants to retroactively assign revenue inaccurately in order to maximize their potential award without regard for actual losses incurred.

(ii) CSSP's proposal to ███████████████████████████ ████████ would overstate compensation by eliminating the potential for offsetting gains from one line of business against losses in the other line of business. That is, artificial segregation of ████████████████████████ would preclude using ████████████ to offset ██████████ In other words, if a claimant was able to mitigate losses during the spill by shifting resources to ████████████████ these mitigating gains would not be considered in CSSP's proposal.

(iii) CSSP's proposal to compensate the claimant's artificially-constructed ████ ████████ business using the Business Economic Loss (BEL) framework does not propose to remedy the recognized problems in CSSP's interpretation and implementation of the BEL framework, including, among other problems, CSSP's reliance on claimant financial data that do not identify when revenue was earned or when expenses were incurred. In addition and independently of the proper interpretation of the BEL compensation framework of the Settlement, the proposed use of BEL for determining compensation for ████████████ is inconsistent with the Settlement Agreement's express language stating that

---

13. CSSP Moratoria Offshore Loss Presentation, p. 16.

compensation for business claims subject to moratoria review will not be based on the BEL compensation framework.[14]

(iv) CSSP's draft calculation presumes that any decline in ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ is attributable to business interruptions resulting from the DWH spill. The CSSP has not provided any support for this assumption. As discussed below, the assumption is inconsistent with available data indicating that, prior to the DWH spill, drilling activity in 2010 had already decreased relative to prior years as the result of changes in business conditions unrelated to the DWH spill, including a dramatic decline in natural gas prices which resulted in a decline in drilling activity. For example, the number of active drilling days reported in January through March of 2008 was 3,805 as compared to 2,587 for the same months in 2010, a decline of 32 percent. (See discussion in Section D below and Exhibit 5c.) This decline in drilling activity, in turn, would be expected to result in declines in variable profit that are unrelated to the DWH spill among firms that supply the offshore oil and gas industry. That is, the changes in business conditions in the offshore oil and gas industry imply that the variable profits expected by many claimants in the absence of the DWH spill would be below the variable profit earned by the claimant in the benchmark years. Additionally, to the extent that the decline in a claimant's ▓ variable profit is due to the deterioration in business conditions and not to spill-related business interruptions, application of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ to approximate spill-related business interruption losses ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

14. Settlement Agreement, Exhibit 16, pp. 3-4.

(v) Critically, CSSP's draft calculation would create compensation for spill-related business interruption losses even for claimants that actually suffered no decline in variable profits. As explained above, a claimant's "loss" in each month from June through October 2010 is calculated by ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Thus, by construction, this calculation would generate artificial "losses" even when the claimant experienced <u>no</u> reduction in variable profit for any of these months in 2010 relative to the benchmark period. That is, the calculation of loss is generated purely by assumption even when the claimant's variable profits increased in 2010 relative to the benchmark period. Example 2 in Exhibit 3 modifies Example 1 to reflect a hypothetical claimant that suffered no decline in variable profit for June through December of 2010 relative to the benchmark period. However, as the example shows, CSSP's proposed calculation would generate an award based on non-existent "losses" in these months. As a result, the award under CSSP's proposal exceeds the decline in variable profit experienced by this claimant and can result in substantial payments to claimants that suffered no loss after May 2010.

(vi) CSSP's draft calculation provides awards based on ████████████████████████████████████████████████████████████████████████████. That is, CSSP's draft calculation is based on the

10

presumption that 100 percent of any loss during ▮▮▮▮▮▮▮▮▮▮ is attributable to business interruptions resulting from the DWH spill and does not reflect Moratoria Losses or declines in variable profit related to changes in business conditions unrelated to the DWH spill.  The CSSP does not provide any support for this assumption.  As discussed further below, CSSP's presumption that 100 percent of declines in variable profits in ▮▮▮▮▮▮▮▮▮▮ are attributed to spill-related business interruptions is inconsistent with available data indicating the presence of oil in the water resulting from the DWH spill was limited both in time and geographic area, while government actions had a longer and more widespread impact on drilling activity in the Gulf of Mexico.  To the extent that all or part of a claimant's reduction in variable profits in November and December 2010 relative to the same months of the benchmark period are either Moratoria Losses or due to changes in business conditions unrelated to the DWH spill, the CSSP's draft compensation approach would result in awards to claimants that suffered no spill-related loss, suffered only Moratoria Losses, or would otherwise overcompensate claimants for spill-related losses actually incurred.

11.  In sum, the CSSP draft proposal would as a general matter result in awards that exceed claimants' losses due to spill-related business interruptions, and could result in awards to claimants that suffered no losses due to the DWH spill as well as awards to claimants that only suffered Moratoria Losses.  This result is (perhaps unintentionally) highlighted in CSSP's March 13 presentation materials, which presents a detailed example of CSSP's proposed calculation.  In that example, a hypothetical claimant experienced a decline ▮▮▮▮▮▮▮▮▮▮

██████████████████████████████████████████████ One might expect that the CSSP's proposed method -- which, in principle attempts to distinguish compensable spill-related business interruption losses from non-compensable Moratoria Losses – would yield an estimate of spill-related business interruption losses that would be some fraction, for example 50%, of this total decline in variable profit. However, because of the flaws discussed above, the CSSP's exemplar calculation yields an estimate of lost variable profit attributable to business interruptions from the DWH spill of ████████████████████████████████ – an amount even greater than the claimant's overall actual decline in variable profit.[15] Thus, the hypothetical example presented by CSSP yields a base award in excess of the claimant's actual decline in variable profit over the May-December period. In this example, CSSP's proposed approach perversely implies that government actions lowered the hypothetical claimant's loss.

C.    **Class Counsel's proposed criteria would overcompensate claimants for losses related to spill-related business interruptions.**

12. On October 11, 2012, Class Counsel submitted comments to the Claims Administrator that laid out general criteria for compensating claimants that suffered spill-related business interruption losses as the result of the DWH spill. Class counsel identified "four explicit guiding principles".[16]

13. The first of Class Counsel's guiding principles is that ████████████████

████████████████████████████████████████"[17] However, as discussed above, calculation of losses prior to May 28, 2010 (when the first federal drilling moratoria was imposed) based only on a simple comparison of a claimant's ███████████████ with its

---

15. CSSP Moratoria Offshore Loss Presentation, p. 20 The dollar impact of these flaws can be substantial for claimants with revenue above the low levels assumed in CSSP's exemplar calculation..

16. Memorandum from Class Counsel to Patrick A. Juneau, Esq., Re: October 9th Request for Positions on Policy Issues, October 11, 2012, p. 2. (Hereafter "Class Counsel October Memo")

17. Class Counsel October Memo, p. 2.

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ would be likely to overstate a claimant's losses due to or resulting from the DWH spill by failing to account for the general deterioration in the offshore oil and gas industry unrelated to the spill. As discussed in more detail below, drilling activity in 2010 prior to the DWH spill was below the activity observed in prior years due in part to declines in natural gas and oil prices. The decline in drilling activity, in turn, reduces the variable profits that claimants, which supply these offshore operations, would expect to earn in 2010 in the absence of the DWH spill.

14.     Class Counsel's second guiding principle is that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉.[18] This principle is recognized in the Settlement Agreement.[19] However, if losses in the ▉▉▉▉▉▉▉ period are calculated by reference to the losses calculated for the ▉▉▉▉▉ period, then the failure to account for the deterioration in business conditions in the offshore oil and gas industry in the Gulf of Mexico unrelated to the DWH spill would also contaminate estimates of the continuation of any spill-related business interruption losses. Class Counsel does not suggest or present a methodology for determining the length of time that spill-related business interruption losses would have continued in the absence of the Moratoria. As discussed further below, by August 2010, NOAA no longer reported any anomaly area in the Gulf of Mexico.[20]

15.     Class Counsel's third guiding principle is that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

---

18. Class Counsel October Memo, p. 2.
19. Settlement Agreement, Exhibit 16, p. 4.
20. NOAA reports areas of "anomalies" in satellite imaging in tracking the effects of the DWH spill. For current purposes these anomalies are interpreted to reflect areas affected by oil from the DWH spill.

███"[21] The observation, however, does not imply that all losses for claimants performing work unaffected by federal government actions should be attributed to spill-related business interruptions. To the contrary, any framework for compensating claimants for spill-related business interruption losses due to the DWH spill must account for changes in the profits expected by the claimant that resulted from any deterioration in business conditions unrelated to the DWH spill and Moratoria.

### D. Available data do not support the assumptions that underlie CSSP's proposed framework for determining spill-related business interruption losses.

16. As discussed above, CSSP's proposed approach incorporates the implicit assumptions that (i) ███████████████████████████████████████████████████████████████████████████████████████████; and (ii) ████████████████████████████████████████████████████████████████████████████████████████████████████.

17. This section briefly evaluates these two key assumptions, neither of which are supported by available data. First, I review available data which indicate that business conditions in the offshore oil and gas industry deteriorated between the benchmark years proposed by CSSP and 2010 for reasons unrelated to the DWH spill. As a result, this review indicates that CSSP's proposed use of ███ as potential benchmark years without attempting to account for changes in business conditions would overstate the loss in variable profit attributable to business interruptions due to the DWH spill. Second, I review available data on the geographic and temporal scope of potential business interruptions due to the DWH spill as

---

21. Class Counsel October Memo, p. 2.

well as information about the scope of drilling activity affected by government-related actions. This review indicates that a limited number of drilling rigs in the Gulf of Mexico were in the NOAA anomaly area and that there was no NOAA-reported anomaly area in Gulf waters after July 2010. However, available data also indicate that government-related actions had longer-lasting and wider spread impacts. These data do not support the CSSP's assumption that █████ ████████████████████████████████████████████████████████ ██.

18. Available data on business conditions indicate that prior to the DWH Spill, the Gulf of Mexico oil and gas industry was experiencing a decline since its peak activity in 2008 due to the decline in natural gas and oil prices:

(i) Natural gas prices peaked during June 2008 at over $12/MMBtu and experienced a continued and dramatic decline until late 2009 to prices of less than $4/MMBtu. Prices have fluctuated around these lows since late 2009 and have not rebounded. Similarly, crude oil prices also experienced a peak in mid-2008 at over $130/barrel and experienced a continual decline until early 2009 with prices at less than $40/barrel. During 2010, prices rose to between $70-$75 dollars, but did not approach the 2008 peak. (See Exhibits 4a and 4b.)

(ii) Due in part to declining gas and oil prices, the number of active rigs in the Gulf of Mexico, and thus drilling activity, declined in 2009. At the beginning of 2009, there were 94 active rigs in the Gulf of Mexico and by the end of 2009, this number had dropped to 64.[22]

---

22. Workboat's "The Workboat Offshore Service Vessel Report: Six Year Analysis: 2005-2010", p. 14. ("OSV Report").

15

(iii) The number of drilling permit applications also declined prior to the DWH spill. In 2008, 96 shallow-water exploratory well drilling permits were submitted while in 2009, only 38 exploratory well drilling permits were submitted for approval.[23]

(iv) The decline in offshore drilling activity starting in 2008 also reduced demand for support services, as reflected in the change in utilization and day rates for the offshore supply vessels. During 2009, utilization of the smaller supply vessels fell from 90% in January to 66% by December, accompanied by vessel rates that were 60% of their previous level. Day rates for large supply vessels fell by more than 50% during 2009, with utilization declines from 98% in the beginning of 2009 to 89% by the end of 2009.[24]

19. Available data also indicate that the geographic and temporal scope of oil in the water due to the DWH spill was more geographically localized and shorter in duration than the impact of the government-related actions:

(i) The location of active or potentially active shallow-water and deepwater rigs overlaid with NOAA's data on the location of an anomaly in the water indicate that most rigs and platforms spent little or no time in oiled waters.[25] (See Exhibits 5a and 5b.) In June and July 2010, less than 9% of active deepwater rig days were in the NOAA anomaly area. Over the same period, less than 1% active shallow-water rig locations were in the NOAA anomaly area. No rigs were in a NOAA anomaly area after July 2010. (See Exhibit 5c .)

---

23. Calculation based on data from Bureau of Safety and Environmental Enforcement (BSEE).

24. OSV Report, p. 14.

25. Exhibits 5a and 5c present maps generated from data provided by the National Oceanic and Atmospheric Administration (NOAA). As noted above the data reports the location of the "anomaly" detected on the surface of the water in the Gulf of Mexico after the DWH spill and for present purposes are interpreted to reflect areas affected by oil from the DWH spill.

(ii) Deepwater drilling activity declined dramatically during the moratoria and did not reach pre-DWH spill levels until the beginning of 2012. (See Exhibit 5c.)

(iii) The time for approval for permitting on both shallow-water and deepwater drilling projects increased since the imposition of the first Federal Moratoria. The first deepwater drilling permit after the DWH spill was not issued until February 28, 2011. Deepwater permits for exploratory wells applied for in the first quarter of 2010 took an average of 12 days for approval. After the DWH spill, deepwater exploratory permits applied for in the last six months of 2010 averaged 155 days for approval. Shallow-water permits also have experienced longer delays in approvals, with an average of almost 10 days in the early part of 2010 and an average of over 30 days for the later part of 2010.[26]

20. In sum, this review indicates that CSSP's proposed use of ▬▬▬ as potential benchmark years (without attempting to account for changes in business conditions) would overstate the loss in variable profit, or create an artificial loss, attributable to spill-related business interruptions. Instead, CSSP's method would in whole or part compensate claimants for declines in variable profits due to deteriorating business conditions unrelated to the DWH spill. Further, these data are inconsistent with CSSP's presumption that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ and instead suggest that a substantial portion of declines in variable profits during this period would be Moratoria Losses, or due to deteriorating business conditions unrelated to the DWH spill as described above. As a result, CSSP's draft proposal for calculating compensation for claimants subject to Exhibit 16 would compensate some claimants who suffered no spill-related business interruptions or only

---

26. Calculation based on data from Bureau of Safety and Environmental Enforcement.

17

suffered Moratoria Losses and would overcompensate some claimants that in fact suffered spill-related business interruption losses.

I declare under penalty of perjury that the foregoing is a true and correct statement of my analysis and opinions.

*Erica Benton*

_____
Erica Benton