**KIRKLAND & ELLIS LLP**
AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Robert R. Gasaway
To Call Writer Directly:
(202) 879-5175
robert.gasaway@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

September 4, 2013

**By Electronic Mail**

The Honorable Sally Shushan
United States District Court
Eastern District of Louisiana
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

      Re:    MDL 2179 — BP's Letter re Insufficiency of Aligned Parties' Redactions of Source Control Expert Reports

Dear Judge Shushan:

      BP respectfully submits this letter concerning the overlapping and duplicative opinions offered by the Aligned Parties in their redacted source control expert reports ("Redacted Expert Reports"). Despite the Court's directive to eliminate duplicative opinions from the reports, the Aligned Parties served redacted expert reports that are replete with overlapping—and in many instances, identical—opinions on material issues. The redactions are insufficient to streamline the presentation of evidence and reduce the burden on the Court. For the reasons set forth below, BP respectfully requests that the Court direct the Aligned Parties to comply with the Order dated August 22, 2013, and "make redactions of their expert reports in order to *eliminate duplicative opinions* [and] opinions not being offered." (*See* Order at 5, MDL No. 2179 (Aug. 22, 2013) (Rec. Doc. 11087) (emphasis added).)

      Well established Fifth Circuit law makes clear that duplicative expert opinions are subject to exclusion by trial courts. *See Leefe v. Air Logistics, Inc.*, 876 F.2d 409, 411 (5th Cir. 1989) (noting that the exclusion of cumulative expert testimony seeks to "discourage attorneys from parading additional experts before the court in the hope that the added testimony will improve on some element of the testimony by the principal expert"); *Lachute v. Ochsner Clinic Foundation*, No. 11-CA-2783, 2012 WL 5818149 (E.D. La. Nov. 15, 2012) (Vance, J.) (excluding in part as "unduly cumulative" expert testimony where both reports gave "similar reasoning and conclusions"). This Court accordingly has made clear that it expects parties to "make redactions of their expert reports in order to eliminate duplicative opinions [and] opinions not being offered." (*See* Order at 5, MDL No. 2179 (Aug. 22, 2013) (Rec. Doc. 11087).)

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
September 4, 2013
Page 2

In accordance with this Court's directive, the Aligned Parties provided Redacted Expert Reports on August 16, 2013, but the redacted reports disclose overlapping opinions on material issues. BP promptly objected to the continuing overlaps in the Aligned Parties' experts' opinions. But even after meeting and conferring with BP, the Aligned Parties declined to make any additional redactions to their experts' reports.

The Aligned Parties' recent reluctance to eliminate duplicative opinions contrasts with their previous statements to the Court. Early in the Court's trial structuring discussion, the Aligned Parties acknowledged the duplicative opinions set forth in their unredacted expert reports and assured the Court they would pare back the overlap, thus reducing the burden on Judge Barbier. (*See* WGC Tr. 7/12/13 at 78 (Mr. Miller representing that "the point of the redaction is to reduce the amount of reading material for Judge Barbier because when these expert reports went in, we did not have this alignment. So there is some overlap and it would pare that down.").)

Now, however, despite these assurances and the Court's unequivocal directive, the Aligned Parties have served Redacted Expert Reports of Drs. Bea and Wilson and Messrs. Perkin and Ziegler—all of which contain duplicative opinions on material issues.

Permitting the admission of duplicative expert opinions would be deeply prejudicial to BP. While the Aligned Parties may not sponsor all of these opinions during their experts' exams, once an expert testifies at trial, his entire written report becomes part of the trial record. Precisely because the expert's report is admitted into the record, BP would be compelled to conduct a cross examination on all opinions sponsored by an expert. Given the time constraints on BP's presentation of evidence (15 hours to present BP's entire case, including opening statements and expert cross examinations), BP will be hard-pressed to conduct meaningful cross examinations of four experts where their lengthy reports contain extensive areas of overlap and duplication.

Further, BP will be forced to cross examine multiple experts on the same opinions. And, Judge Barbier will be compelled to compare and contrast multiple, aligned experts' views of the same evidence in order to find relevant facts and reach appropriate conclusions. In contrast, if the Aligned Parties redact the duplicative opinions from their reports, then BP will need to cross examine only one expert on each opinion, thus ensuring fairness to BP and a more streamlined trial for Judge Barbier.

The following examples illustrate the overlapping opinions offered by the Aligned Party experts on core issues that will be tried in the Phase 2 Source Control segment:

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
September 4, 2013
Page 3

1. BP was not adequately prepared for an oil spill. (*See* Bea Report (attached as Exhibit A) at 2, 4, 32-33 (alleging that "BP planned no Fit-For-Purpose mitigation controls to intervene and bring a deepwater blowout immediately under control"); Bea Rebuttal Report (attached as Exhibit B) at 2 (alleging that "BP ignored properly preparing for post blowout source control . . . and failed to make meaningful proactive provisions to either determine plans and processes for intervening in a deepwater blowout or to have adequate well control equipment staged and ready to rapidly deploy in the event of loss of well control and an ensuing blowout"); Perkin Report (attached as Exhibit C) at 11-12 (alleging that at the time of the *Deepwater Horizon* blowout, BP had not taken "steps to achieve the capability to effectively and quickly respond" to a deepwater well blowout); Ziegler Report (attached as Exhibit D) at 13-14, 22 (alleging that "BP did not have a Source Control plan" and that "BP knew that deepwater-capable dressed and staged Source Control equipment or plans . . . was not in place for the BP Macondo well").)

2. BP should not have relied upon ROV intervention as a source control strategy because it is not a reliable and appropriate technique to activate a blowout preventer. (*See* Bea Report at 31-32 (alleging "BP Management also relied on ROV intervention as a post-blowout source control response . . . [but] BP knew such a procedure was wholly unreliable"); Perkin Report at 9 (claiming "BP Management knew or should have known that ROV intervention was not a timely and reliable intervention technique to actuate a BOP subjected to dynamic flow conditions"); Ziegler Report at 13 (alleging that "BP knew that . . . ROV intervention, BP's only intervention means other than drilling relief wells, would not be effective Source Control.").)

3. BP should have had a capping solution available prior to drilling the Macondo well. (*See* Perkin Report at 9 (alleging that "[b]efore Macondo's drilling operations began, BP Management should have had a deepwater Capping solution, including a back-up BOP readily available"); Ziegler Report at 41 (alleging that "BP should have had, as part of its safety management and drilling plan, a capping stack with proper connector(s) . . . designed, built, dressed, and staged before drilling began at Macondo").)

4. The Macondo well could have been promptly capped if a pre-fabricated deepwater capping stack had existed at the time of the Incident. (*See* Perkin Report at 7 (alleging that had "a properly designed and assembled Capping Stack

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
September 4, 2013
Page 4

> been available for BP's Macondo Well prior to this incident, the uncontrolled flow of hydrocarbons could have been arrested in a matter of weeks"); Ziegler Report at 5, 10, 14, 37 (contending that "capping plans and equipment should have been pre-planned, and Macondo ideally capped in about a week" and "with proper planning and decisions, the well ideally could be capped in as little as one week").)

5. BP could have capped the well sooner than July 15, 2010, and specifically, BP could have capped the well by early- or mid-May utilizing the BOP-on-BOP option. (*See* Perkin Report at 17-18, 31 (asserting that "BP had been in a position in early May, 2010 . . . to deploy a BOP-on-BOP solution"); Ziegler Report at 27; 30-31; 40 (alleging that "[e]ven if BP did not have a pre-planned cap, using another cap (BOP-on-BOP or assembling a cap), BP had done HAZIDs and planning for capping, and should have been able to cap/vent the well by about mid-May 2010").)

6. BP failed to properly prioritize intervention strategies during the spill response and in particular, BP should have prioritized the BOP-on-BOP option. (*See* Perkin Report at 17 (alleging that "[d]espite the advantages of the BOP-on-BOP solution, BP failed to give proper priority to preparing this procedure for implementation"); Ziegler Report at 35 (contending that the BOP-on-BOP option "could have been modified long before the capping stack installed in mid-July 2010 was ready to install").)

7. BP knew or should have known that Top Kill would not succeed. (*See* Perkin Report at 21 (alleging that "BP was fully aware that its Top Kill would not be successful"); Wilson Report (attached as Exhibit E) at 4 (alleging that "BP knew or should have known that the flow rate from the well was higher than a 15,000 BOPD threshold at or above which the top kill was likely to fail").)

8. Proceeding with Top Kill delayed or led to the discontinuation of other source control measures that may have had a greater likelihood of success. (*See* Perkin Report at 8, 24 (claiming that "BP's lack of candor regarding the failure of the Top Kill directly led to the removal of the BOP-on-BOP solution and . . . BP's misrepresentations directly caused a delay in the installation of a 3-Ram Capping Stack solution"); Ziegler Report at 28, FN 114 (asserting that "going ahead with Top Kill effectively took the quickest capping option (BOP-on-BOP) off the table and delayed and impeded Source Control"); Wilson Report at 34 (alleging that

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
September 4, 2013
Page 5

> "[p]roceeding with the top kill under these conditions delayed other source control measures that may have had a greater likelihood of success").)

9. BP withheld data gathered during Top Kill from the government and public. (*See* Perkin Report at 22 (alleging that "[e]ven before the Top Kill project was halted, BP was moving to stop the spread of information regarding why it failed" and "BP withheld data from the post-Top Kill analysis from the U.S. Government"); Wilson Report at 32-33 (claiming that "BP's lack of transparency extended to the top kill failures" and that BP did not share top kill data "outside the circle of trust").)

10. BP withheld the results of flow rate estimates from the government or public. (*See* Perkin Report at 29-30 (alleging that "BP's [sic] failed to disclose material information regarding the existence of data, estimates, and calculations showing a higher flow rate than publicly announced"); Wilson Report at 3 (opining that "a significant majority of modeled flow rates were much greater than the rates expressed by BP management to the government, the press and the public"); Ziegler Report at 15, 27 (contending that "BP fooled the public, its contractors, and in some cases itself with its [flow rate] misrepresentations, and raised confusion and doubt, leading to BP attempting other procedures instead of just proceeding to quickly prepare and cap/vent the well").)

During the recent meet-and-confer discussions, the Aligned Parties asserted that the opinions set forth above were merely foundational statements for the expert's opinions, but in fact they are not. Rather, they are duplicative opinions on fundamental issues to be tried to the Court. The cumulative opinions all address BP's conduct or omissions when trying to collect, control, or halt the flow of hydrocarbons and BP's alleged lack of preparedness for a spill.

As such, they go directly to the ultimate issues at stake in the Phase 2 Source Control segment. (*See* Order at 2-3, MDL No. 2179 (May 30, 2012) (Rec. Doc. 6592) (disclosing that the Source Control issues to be tried during Phase II pertain to the "conduct or omissions of BP, Transocean, or other relevant parties regarding stopping the release of hydrocarbons stemming from the Incident . . . including the alleged failure by BP and Transocean to prepare for a blow-out and spill prior to April 20, 2010"); Order at 2, MDL No. 2179 (Aug. 22, 2013) (Rec. Doc. 11087 (stating that "source control" issues shall pertain to "efforts to collect, control, or halt the flow of hydrocarbons using subsea systems and technologies").)

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
September 4, 2013
Page 6

      For the reasons set forth above, BP respectfully requests that the Court direct the Aligned Parties to comply with the Order dated August 22, 2013, and "make redactions of their expert reports in order to eliminate duplicative opinions [and] opinions not being offered." (See Order at 5, MDL No. 2179 (Aug. 22, 2013) (Rec. Doc. 11087) (emphasis added).))

                                         Respectfully submitted,

                                         Robert R. Gasaway

Attachments

cc (by electronic mail):
United States' MDL Counsel
Plaintiffs' Liaison Counsel
State and Local Government Liaison Counsel
Defense Liaison Counsel