# EXHIBIT A

GRACE, SHURSEN, MOORE & ASSOCIATES (GSM, INC.)

# Rebuttal Expert Report

*In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010 (MDL 2179)*

## Submitted on Behalf of BP Exploration & Production Inc.

6/10/2013



a Robert D. Grace Company

**Richard S. Carden**

## Table of Contents

1   Introduction .................................................................................................. 1

2   Response to the Ziegler, Stevick, and Foutz Reports ................................. 1

   2.1   Deepwater Capping Stacks ...................................................... 1

   2.2   Spill Preparedness ................................................................... 7

3   Conclusion ................................................................................................. 15

Appendix A .................................................................................................. 16



# 1   Introduction

Following submission of my initial Expert Report on May 10, 2013 (Carden Report), I reviewed the Source Control Reports submitted by Mr. Edward Ziegler (Ziegler Report) and Dr. Glen Stevick (Stevick Report) on behalf of Halliburton Energy Services, Inc. (Halliburton), as well as the Report submitted by Mr. Tyson Foutz (Foutz Report) on behalf of Transocean Offshore Deepwater Drilling, Inc. (Transocean). These Reports do not change my initial conclusions that (1) BP was prudently prepared for a deepwater blowout prior to April 20, 2010; (2) BP met the industry standards and practices in preparing for a deepwater blowout; and (3) no entity in the industry had or used a deepwater capping stack for blowout response, and having such a device was not a prerequisite to proper blowout preparation.[1]  I respond below to opinions set forth in the Reports of Mr. Ziegler, Dr. Stevick, and Mr. Foutz.[2]

# 2   Response to the Ziegler, Stevick, and Foutz Reports

My response addresses two related topics discussed in the Reports submitted by Mr. Ziegler, Dr. Stevick, and Mr. Foutz: (1) whether BP needed to have a pre-built, pre-tested, and pre-staged deepwater capping stack (plus all potentially necessary connections and tools) in order to be considered prudently prepared for a deepwater blowout prior to April 20, 2010; and (2) whether BP's preparation for a deepwater blowout prior to April 20, 2010 was adequate.

## 2.1   Deepwater Capping Stacks

The Ziegler Report claims that "BP was not a prudent and good and workmanlike oil and gas operator" with respect to spill response preparedness because BP failed to have a pre-built, pre-tested, and pre-staged deepwater capping stack.[3]  The Stevick Report also claims that the lack of a deepwater capping stack was a failure of BP's pre-spill planning.[4]  Both Reports support these claims by suggesting that (1) BP itself and the industry as a whole had determined prior to April 20, 2010 that a pre-built deepwater

---

[1] Carden Report, p 2-4.
[2] My response is based on my review of the Ziegler, Stevick, and Foutz Reports and the documents discussed in those Reports, my own knowledge and expertise in well control and blowout response, and documents and interviews listed in my initial Expert Report and this Rebuttal Expert Report.  My response to the Foutz Report is limited to correcting the Report's brief historical discussion of capping.
[3] Ziegler Report, p 5, 21-22, 24.
[4] Stevick Report, p 4.



capping stack was a necessary piece of source control equipment;[5] and (2) deepwater capping stacks existed in, and had been used by, the industry prior to April 20, 2010.[6] This is incorrect.  No Operator or other entity in the industry had or had access to a pre-built (let alone pre-tested or pre-staged) deepwater capping stack prior to April 20, 2010.  Neither BP nor the rest of the industry suggested that a deepwater capping stack would be necessary or appropriate to shut in a blown out deepwater well.[7]

A.    BP's "Own Historical Determination"[8]

The Ziegler Report suggests that "BP had determined years before Macondo that the proper source control steps for intervention in a flowing well were (a) capping the well with preplanned equipment while (b) drilling relief well(s)."[9]  The Ziegler Report cites a 2001 draft document from BP Alaska discussing capping stacks.[10]  The Stevick Report discusses the same document, and concludes that "there was no excuse for BP's failure to build a GoM capping stack prior to April 20, 2010 . . . ."[11]  The document cited discusses capping **_surface_** wells — not subsea or deepwater wells.  The document notes that the capping stacks discussed are "applied at the surface."[12]  Although the document does reference land and offshore wells, it does not discuss subsea or deepwater wells.  The offshore wells it is referencing are on islands (Endicott and Northstar Islands).[13]  Mr. Lars Herbst, Gulf of Mexico Operations Regional Director of the Minerals Management Service during the *Deepwater Horizon* response,[14] stated in his deposition that the BP Alaska document was discussing surface capping stacks and surface wells only.[15]

The Stevick Report claims that a separate BP document (a BP Alaska "Wells Overview" presentation) describes capping stacks as Best Available and Safest

---

[5] Stevick Report, p 4, 18-25; Ziegler Report, p 5, 21-22, 24, 37.
[6] Stevick Report, p 22; Ziegler Report, p 37-38.
[7] Carden Report, p 21-26.  Mr. Foutz specifically acknowledges that no Oil & Gas entity had a pre-built capping stack for subsea use. Foutz Report, p 7.
[8] Ziegler Report, p 5-6.
[9] Ziegler Report, p 5, 38.
[10] TREX 9828 & 9346.
[11] Stevick Report, p 19-21.
[12] TREX 9828 & 9346, p BP-HZN-2179MDL03126695, Table 4-21.
[13] TREX 9828 & 9346, p BP-HZN-2179MDL03126694, 03126696, 03126709, 03126713, 03126714.
[14] Mr. Herbst was the United States' representative on multiple source control and preparedness topics.
[15] Deposition of Lars Herbst, p 393:2-7.



Technology (BAST).[16]  The document is dated November 2010 (*after* the *Deepwater Horizon* response),[17] does not state that capping stacks are BAST, and discusses *surface* capping and *surface* wells — not deepwater capping or deepwater wells.[18] Surface capping stacks have been available and used in the industry for a long time, but deepwater capping stacks are an entirely different matter.  Deepwater capping stacks were neither available nor used in the industry prior to April 20, 2010.[19]  Deepwater capping stacks could not possibly have been BAST prior to April 20, 2010, as they did not exist and had never been used.

      B.    Industry Documents

The Ziegler and Stevick Reports claim that industry documents show that "BP should have . . . had a deep water well cap and tooling package available for immediate deployment . . . ."[20]  The two documents cited — a 1991 study (DEA 63) and the 1998 International Association of Drilling Contractors (IADC) Deepwater Well Control Guidelines — do not support this claim.

The Ziegler Report suggests that the DEA 63 is a definitive guide to deepwater well control.[21]  This is not accurate.  DEA 63 was a study commissioned by the Drilling Engineering Association to investigate problems or operational requirements that an Operator might face if a blowout should occur in up to 3,500 feet of water.[22]  The study was essentially a theoretical brainstorming exercise to come up with potential solutions to a subsea blowout; it was not assumed that all the theoretical solutions would be practical, or could or should be implemented.[23]

DEA 63 looked at several possible solutions for a subsea blowout, most of which require inserting tools through the wellhead or BOP to kill the well from the inside using mud or other materials.[24]  There are several different configurations for a capping stack depending on the condition of the well, wellhead, and existing subsea BOP.[25]  Every blowout is different and the well has to be evaluated before a solution can be

---

[16] Stevick Report, p 23.
[17] BP-HZN-2179MDL07607607-07607623, p 1.
[18] Interview with Louis Romo.
[19] Carden Report, p 17-26.
[20] Stevick Report, p 18; Ziegler Report, p 21, 47.
[21] Ziegler Report, p 21, 47.
[22] TREX 6299, p 6; DEA 63, p 2.1, 3.3, 3.12, 3.16-3.17, 6.2-6.3, 6.33-6.35, 7.1-7.3, 7.13, 7.27-7.28, 9.2.
[23] *Id.*
[24] *Id.*, Sections 4, 6, & 7.
[25] *Id.*, Section 7.



developed.[26]   In Section 7.8.2 of DEA 63, author Neal Adams noted that "[m]ost planning during vertical intervention procedures is based on conditions and should be done on site.  It is difficult to develop 'cook book' procedures that can handle vertical intervention efforts for every conceivable set of circumstances and conditions that could be encountered."[27]   DEA 63 never recommended having a pre-built capping stack available for any subsea well control problem.  In fact, DEA 63 recommended against developing new equipment and procedures for such incidents, recognizing the low probability of deepwater blowouts.[28]

The Ziegler and Stevick Reports note that the 1998 IADC Deepwater Well Control Guidelines (Section 4.3.12) used a figure from DEA 63 as a hypothetical deepwater blowout scenario.[29]   The Ziegler and Stevick Reports suggest that the picture and description of the hypothetical deepwater blowout are similar to the conditions of the actual *Deepwater Horizon* blowout.  Regardless of the asserted similarity, the IADC document never recommended a deepwater capping stack for that scenario.  Certainly, the IADC document did not suggest a pre-built deepwater capping stack for the scenario.[30]

C.   Depositions and Other Case Documents

The Ziegler Report cites[31] Mr. David McWhorter's deposition testimony for the proposition that "[t]he use of capping stacks has long been established in the industry as a successful and viable method of Source Control."[32]   The Stevick Report cites to the same testimony for the same proposition.[33]   Mr. McWhorter was discussing *surface* capping stacks in this part of his testimony.[34]   No deepwater capping stacks had been used or were available in the industry prior to April 20, 2010.[35]

---

[26] *Id.*, p 7.27-7.28.
[27] *Id.*, p 7.28.
[28] *Id.*, p 9.2 ("Initiation of Phase II of this study is not recommended at this time. . . .  [T]here is little urgency to develop new equipment and procedures for such incidents recognizing the low probabilities of their occurring. . . .  Continuing into Phase II is not warranted at this time . . . .").
[29] TREX 7353, p 4-35.
[30]  The importance of the IADC guidelines is its discussion of the right way to respond to a blowout.  The IADC guidelines recommend forming a team of experts to evaluate the blowout and determine the best way to get the well under control.  This is what BP did.  *Id.*, p 4-38.
[31] Ziegler Report, p 25.
[32] Deposition of David McWhorter, p 178.
[33] Stevick Report, p 22.
[34] Deposition of David McWhorter, p 178.
[35] Although Mr. McWhorter did testify that he recalled a drawing for a subsea capping stack in the 1980s, he did not know whether the drawing was ever developed into actual equipment, and



The Foutz Report states that capping "is a tested and proven approach to stopping flow from a blown out well."[36]  But the Foutz Report only points to examples of *surface* capping.  He does not (and could not) present an example of a deepwater well that was capped.  With respect to Bob Grace's book (to which I was a contributing author and which Mr. Foutz cites),[37] all the wells in Kuwait were surface wells.[38]  The Foutz Report also mischaracterizes Lars Herbst's testimony concerning capping stacks.[39]  Mr. Herbst testified that surface capping stacks were a proven technology, not that deepwater capping stacks were a proven technology.[40]

The Ziegler Report states that "*[r]eportedly* Shell and Senta [sic] Drilling, working in the deepwater offshore Brazil, had capping devices."[41]  The Stevick Report relies on the same point.[42]  Shell and Stena did not have capping devices for deepwater blowouts.  The Ziegler and Stevick Reports are referring to a "subsea disconnect system," described (second-hand) in an April 30, 2010 email from the Apache Corporation to Elizabeth Birnbaum of the Minerals Management Service.[43]  This "subsea disconnect system" was never intended as a capping stack for a response to a blowout, as is made clear by an industry technical paper describing the system.[44]  The "subsea disconnect system" is a device used during normal drilling operations.[45]  It allows deepwater drilling — which is typically done with a *subsea* BOP — to be done from vessels that only have *surface* BOP systems.[46]  The "subsea disconnect system" is an emergency release system that sits on the wellhead at the sea floor and allows the

---

he did not know the water depth of the well with which the drawing was associated.  Deposition of David McWhorter deposition, p 175-177.
[36] Foutz Report, p 26.
[37] Blowout and Well Control Handbook, Robert D. Grace, Gulf Professional Publishing 2003, Chapter 11.
[38] Of the 690 wells that had blown out in Kuwait, only 94 wells were capped using capping stacks.  Even though most of the wells in Kuwait were ideal for capping, less than 14% of the wells were actually capped with a capping stack.  Blowout and Well Control Handbook, p 432.
[39] Foutz Report, p 26-27.
[40] Deposition of Lars Herbst, p 392:13-393:7, 112:7-113:14.
[41] Ziegler Report, p 37 (emphasis added).
[42] Stevick Report, 22.
[43] IMT030-028761.
[44] IADC/SPE 87113, 2004, "Drilling in Brazil in 2887m Water Depth using a Surface BOP system and a DP Vessel," G. Brander, E. Magne, T. Newman, T. Taklo, and C. Mitchell, p 3.
[45] *Id.*
[46] *Id.*



vessel (and surface BOP) to disconnect from the well without the release of hydrocarbons.[47]

The Stevick Report claims (without any support) that Chevron had subsea BOPs for use during normal operations that were "designed to effectively provide a built-in capping stack."[48]  But the device Dr. Stevick is referencing — the Chevron/Cameron Alternative Well Kill BOP — was neither in use nor available prior to April 20, 2010.[49]

D.    Summary

In summary, as discussed in my initial Expert Report, and as Mr. Foutz acknowledges in his Report submitted on behalf of Transocean, "no operator, source control specialist or drilling contractor in the oil and gas industry had a pre-built capping stack for subsea use prior to Macondo."[50]  The Ziegler and Stevick Reports' position that a capping stack was, prior to April 20, 2010, the essential element of source control preparedness is nothing more than Monday-morning quarterbacking.

This is most apparent in the Ziegler and Stevick Reports' suggestion that BP was required not only to have a pre-built and pre-tested deepwater capping stack, but also to have all the various connections and tools (pre-tested) that were eventually used in connecting the capping stack to the flex joint during the actual *Deepwater Horizon* response.[51]  Such a standard was completely unrealistic prior to April 20, 2010.  No one foresaw or should have foreseen the need to attach a capping stack to the riser connection above the flex joint (as opposed to removing the LMRP or the whole BOP stack).  Even the industry documents that the Ziegler and Stevick Reports cite about the

---

[47] *Id.*  Two additional points are worth noting about this subsea disconnect system.  The subsea disconnect system has a 13 5/8" internal diameter, which is smaller than the 18 3/4" *Deepwater Horizon* Blowout Preventer (BOP).  Restricting the inside diameter is never a good idea during capping operations.  Also, the system only works if the LMRP is pulled, which was not done during the *Deepwater Horizon* Response because of the particular circumstances of the blowout.  IMT030-028761.

[48] Stevick Report at 29 (discussing the "Chevron/Cameron Alternative Well Kill BOP," also referred to as the "Chevron/Cameron Alternative Well Kill System" or AWKS).

[49] Proceedings of the Standing Senate Committee on Energy, the Environment, and Natural Resources, Parliament of Canada, Issue 8, June 10, 2010, p 8 (Chevron/Cameron Alternative Well Kill System was in testing as of June 2010; it would take an additional 18 months to know whether the design was commercially viable); Chevron Slide Presentation, An Approach to Oil Spill Containment for Floating Drilling Operations in Canadian Beaufort Sea Pack Ice Conditions, December 2, 2010, p 9 (Chevron/Cameron Alternative Well Kill System was still under development in December of 2010 and was not yet proven or approved by regulators).

[50] Foutz Report, p 7.

[51] Stevick Report, p 4, 6, 22, 23; Ziegler Report, p 26, 35-37, 40-41.



potential success of a capping stack do not discuss attaching the capping stack to the flex joint flange.[52]

## 2.2   Spill Preparedness

The Ziegler and Stevick Reports both claim that BP had no source control plan. The Stevick Report points to BP's Initial Exploration Plan and concludes that "BP simply had no plan to kill a blown out well . . . ."[53]   The Ziegler Report points to BP's Gulf of Mexico (GoM) Oil Spill Response Plan (OSRP) and concludes that "BP did not have a source control plan."[54]   Both Reports suggest that BP's lack of planning violated industry standards and MMS regulations.[55]   They are incorrect.

BP's plan, as set forth in a combination of documents (BP's Government-approved Initial Exploration Plan,[56] BP's Government-approved GoM OSRP,[57] BP's internal Deepwater Well Control Response Guide,[58] B 's Crisis & Continuity Management Plan,[59] and BP's internal training materials[60]) was an industry standard plan — drilling a relief well, attempting BOP closure by way of ROV intervention, and standing up a team of experts (including pre-contracted well control response companies) to analyze the particular characteristics of a blowout, recommend early intervention techniques based on their analysis, and assist in sourcing the necessary resources for such techniques.   In addition to meeting industry standards and practices, this plan was approved by the Government as meeting the applicable regulations.[61]

A.   BP's Initial Exploration Plan and GoM OSRP

The Stevick Report states that "BP failed to develop an adequate source control plan."[62]   The Report relies on the absence of a source control discussion (other than planning for relief wells) in BP's Initial Exploration Plan.   The Report notes that the Initial Exploration Plan did not discuss ROV activation of Blowout Preventer (BOP) elements

---

[52] DEA 63; TREX 7353; IMT030-028761.
[53] Stevick Report, p 8-9.
[54] Ziegler Report, p 22.
[55] Ziegler Report, p 20, 44-45; Stevick Report, p 8-9.
[56] TREX 7351.
[57] TREX 769.
[58] BP-HZN-2179MDL01616217; TREX 2386; TREX 2520.
[59] TREX 3251, Tab 2.
[60] BP-HZN-2179MDL02497644.
[61] 30 CFR 250.233(b)(1); 30 CFR 254.1(a), 254.2(a), 254.5(a)&(b); Deposition of Michael Saucier, p 214:12-215:2.
[62] Stevick Report, p 8.



or other intervention techniques.[63]  The Ziegler Report claims that "[t]he BP Oil Spill Response Plan ('OSRP') simply and factually contains no Source Control plan (other than drilling a relief well) once the BOP system fails to stop the flow."[64]  Specifically, the Ziegler Report states that the OSRP only contains "two or three short entries"[65] about source control.  To the contrary and as noted in my initial Expert Report, BP had a prudent source control plan in place prior to April 20, 2010.[66]  The Ziegler and Stevick Reports both appear to misunderstand the requirements of BP's Initial Exploration Plan and GoM OSRP, as well as the purpose and meaning of both documents.

The most important thing to recognize about both documents is that the United States Government approved them as consistent with governing statutes and regulations.[67]  The Government could not have approved either the Initial Exploration Plan or the GoM OSRP unless those plans complied with all applicable regulations, including those concerning spill response and source control.[68]  BP's source control plan (relief well drilling, ROV intervention, and standing up a team of well control experts) was made plain in the GoM OSRP and Initial Exploration Plan.  That means the Government approved such plans as consistent with applicable regulations and did not believe more was required under the regulations.

The Stevick Report's discussion of BP's Initial Exploration Plan (and the absence of a discussion of ROV intervention or other early intervention techniques) is irrelevant.  BP was entitled to rely on the plans set forth in its GoM OSRP.  BP was not required to have such a discussion in its Initial Exploration Plan because Macondo's worst case discharge figure was lower than the worst case discharge figure in BP's GoM OSRP.[69]  BP (like other Operators) could rely on the plan provided in their OSRP to respond to a worst case discharge.  I have reviewed several pre-incident Initial Exploration Plans of other Operators for deepwater wells with worst case discharge figures less than the worst case discharge figures discussed in the Operators' regional Oil Spill Response Plans.[70]  The source control information provided by those Operators in their Initial

---

[63] Stevick Report, p 9.

[64] Ziegler Report, p 6.

[65] Ziegler Report, p 22.

[66] Carden Report, p 17-21.

[67] Deposition of Michael Saucier, p 213:14-16; TREX 8957.

[68] Deposition of Michael Saucier, p 214:12-215:2; 30 CFR 250.233(b)(1); 30 CFR 254.1(a), 254.2(a), 254.5(a)&(b).

[69] NTL No. 2008-G04, p 17, 19; 30 CFR 254.3.

[70] I have examined Initial Exploration Plans available from produced documents in this case, including Initial Exploration Plans from Chevron, Kerr McGee, Marathon, and Shell.  ZAN042-042573; ZAN047-103681; ZAN019-022775; ZAN005-020874.



Exploration Plans is similar to the information provided by BP in the Macondo (MC252) Initial Exploration Plan.  BP's conduct was consistent with the industry standard.

The Stevick Report suggests that BP's Initial Exploration Plan (and/or GoM OSRP) "implied" that BP had "the ability to stop a 162,000 bopd blowout within 24 hours."[71]  It is unclear where this assertion comes from or how it is justified.  Both the Government and industry clearly knew that blowouts could go on for significant periods of time.  No well control responder would think that it is possible to fully deploy assets and stop the flow from a blown out deepwater well within 24 hours.  The Government was also aware of this.  Indeed, this is precisely why an Operator must plan for at least 30 days of worst case discharge in its Oil Spill Response Plan — because even a well-prepared and appropriate response can take time to implement.[72]

The Ziegler Report's description of the source control plan laid out in BP's GoM OSRP is neither comprehensive nor accurate.[73]  The Ziegler Report does not acknowledge that BP's GoM OSRP discussed standing up a team of well control experts (including well control response companies) to analyze the particular circumstances of a particular blowout, recommend potential intervention techniques based on that analysis, and assist in sourcing equipment.[74]  The Ziegler Report also overlooks Section 4 of the GoM OSRP, in which the duties and responsibilities of the Source Control team and Source Control branch director are set forth.[75]

The Ziegler Report suggests that BP's complete and full source control plan is supposed to be entirely and minutely described in its GoM OSRP.  This is wrong.  BP's GoM OSRP is intended only as a "brief description" of the source control plan.  NTL 2006-G21 specifically asked for a "brief description"[76] of the source control plan.  In this regard, BP's GoM OSRP was consistent with industry standard and practice, as discussed in my initial Expert Report at pages 7-17.

The Stevick and Ziegler Reports take BP deposition testimony out of context or misquote it to suggest that BP had no source control plan.  For example, the Stevick Report quotes James Wellings as testifying at his deposition that "When a BP well plan is put together for an exploration well, there was no planning for a response to shut-in a

---

[71] Stevick Report, p 9.
[72] TREX 769, Appendix H.
[73] Ziegler Report, p 6, 22.  Contrary to the Ziegler Report's suggestion, the GoM OSRP does not contain a plan to drill relief wells.  Relief well drilling is discussed in BP's Initial Exploration Plan.
[74] TREX 769, Section 6(c).
[75] TREX 769, Figures 4-1, 4-2.
[76] NTL No. 2006-G21 p 8.


a Robert D. Grace Company

well during a blowout."[77]   However, this quote appears nowhere in Mr. Wellings's deposition testimony.  What Mr. Wellings does say is that blowout response planning was not part of *his* job in planning to drill particular exploratory wells offshore (in Colombia).[78]  That of course does not mean blowout response planning was left undone by others.[79]

BP had a robust process in place for source control.  In addition to the GoM OSRP and the Initial Exploration Plan, BP's Well Control Response Guide[80] had a process in place for dealing with source control.  BP had also trained an Incident Management Team, including a source control branch that stood up when the blowout occurred.  BP had master service contracts with well control response companies in place, and was able to call the well control experts out immediately after the blowout.[81] BP also had a plan to immediately commence drilling a relief well.[82]  Prior to April 20, 2010, this constituted an industry standard response during a blowout, and was considered the response of a prepared Operator by MMS.[83]  Assembling a team of experts to figure out the proper way to respond to the blowout is vital, since all blowouts are different and the response will be situation specific.  Even Mr. Foutz in his Report acknowledges that Operators may "retain source control contractors" in order to "be prepared for" efforts to control the blowout.[84]  In sum, the Ziegler Report is off the mark when it alleges that "BP simply responded by 'starting from scratch' once the Source Control event occurred."[85]

B.   ROV Intervention

The Ziegler Report downplays the fact that BP ensured quick access to ROVs. The Ziegler Report misrepresents the intention of a West Engineering (West) Report[86] by stating that the West Report indicates that "ROVs should not be used at all on a

---

[77] Stevick Report, p 4, 9.
[78] Deposition of James Wellings, p 16-18.
[79] The Ziegler Report mischaracterized the same portion of Mr. Wellings's testimony.  The Ziegler Report described the testimony as saying "if the well blew out, no plan for response." Ziegler Report, p 12.  This is not what Mr. Wellings suggested, as discussed above.
[80] BP-HZN-2179MDL01616217; TREX 2386; TREX 2520.
[81] Mazzella Interview.
[82] For these same reasons, the Ziegler Report is incorrect when it suggests that BP had no source control plan regarding what to do if the BOP is not effective.  Ziegler Report, p 22.
[83] Carden Report at 7-17; Deposition of Lars Herbst, p 284:10-284:16, 301:13-301:23, 303:9-304:22.
[84] Foutz Report, p 5.
[85] Ziegler Report, p 19.
[86] TREX 3624, p 82.



flowing well."[87]  The West Report says only that ROVs (which the Report acknowledges as an industry standard blowout response tool) should not be used as the *sole* secondary intervention method.[88]  In the *Deepwater Horizon* blowout, ROVs were not the secondary intervention method available, let alone *sole* secondary intervention method available.

The secondary intervention system was the BOP's own automatic emergency closure systems, such as the autoshear or deadman system.  ROVs were used as a tertiary method to close the BOP.  If the BOP did not initially stop the flow and secondary intervention methods did not work, it is only logical to try and close the BOP with ROV intervention.  Even if it does not completely seal the well, such intervention may help restrict the flow from the well.  Moreover, as was done at Macondo, ROVs can be used in ways not affected by their pump capacities (the concern cited in the West Report), such as activating the autoshear by cutting the trigger pin to simulate a release of the LMRP.[89]  Access to ROVs is an industry standard aspect of preparedness.

The Ziegler Report also cites a BP email discussing flow-related limitations of ROV intervention for a hypothetical training exercise on another well.[90]  The email suggests ROV intervention will not work at flow rates of 100,000 barrels of oil per day (bopd) or above.  The fact that some types of ROV intervention may have trouble working at flow rates over 100,000 bopd is not relevant to whether ROVs are generally a useful tool.  Blowouts commonly occur with flow rates less than 100,000 bopd.

### C.   Specific Plans or Decision Trees Governing Specific Procedures

The Stevick Report, on pages 12-17, appears to fault BP for not having, prior to the incident, adequate contingency plans (with decision trees) concerning whether and how to implement ROV intervention, a cofferdam, momentum kill, a junk shot, and a capping option.  It appears that the Stevick Report is suggesting that BP should have had a minutely detailed plan (including decision trees) for every possible intervention method that might be used and every possible scenario that might occur.  It is not possible to anticipate every scenario in a blowout and have a contingency plan and decision tree for all possible circumstances.  The reason for assembling a team of experts (including pre-contracted well control response companies) is to develop plans based on the actual condition of the blowout, after analysis and taking into account the potential advantages and disadvantages of each scenario.  In my opinion, BP had the

---

[87] Ziegler Report, p 13.
[88] TREX 3624, p 65-66.
[89] TREX 9675, p 7-8.
[90] TREX 4423.



best well control contingency plans of any company that I have worked with in my 35-year career.

D.      "Paralysis by Analysis"[91]

The Ziegler and Stevick Reports claim that a lack of preplanning caused "paralysis by analysis."[92]  All well control situations are unique and must be analyzed to determine the best course of action.  There will always be some debate between experts as to how to proceed.  This is especially true in a complex, novel, and unprecedented blowout such as occurred here.  With Government direction in source control decision-making during a response, as well as the importance of on-the-ground analysis to develop and choose between intervention techniques, significant and cautious analysis should be presumed and welcomed as part of the appropriate process.

The Reports of Dr. Stevick and Mr. Ziegler appear to require that an Operator have a "pre-determined and decisive"[93] source control intervention technique that the Operator is intent on implementing from the start of the blowout.  This could cause issues far worse than the cautious analysis discussed above.  Bias in favor of a pre-determined intervention technique, without analyzing the blowout and exploring potential consequences of the technique or alternative options, could lead to dangerous decisions being taken that risk the integrity of the well simply because the particular technique at issue was planned in advance.  This bias could also decrease the degree of healthy analysis and creative thinking that is done, and limit the ability to find the right solution (fastest safe solution) in a particular situation.

E.      Capture of Subsea Source Discharge

The Ziegler Report states that "BP should and could have had a plan and logistics choreographed for containment and surface collection."[94]  BP did have a plan.  It was the approved 2009 OSRP.  The equipment listed in the GoM OSRP is essentially the same equipment listed in other Operators' pre-Macondo OSRPs.[95]  The Oil Spill

---

[91] Ziegler Report, p 5, 23; Stevick Report, p 32.
[92] Ziegler Report, p 5, 23; Stevick Report, p 32.
[93] Ziegler Report, p 23.
[94] Ziegler Report, p 40-42.
[95] TREX 769 (BP); BP-HZN-2179MDL007793553 (Exxon); BP-HZN-2179MDL07796875 (Anadarko); BP-HZN-2179MDL07794870, BP-HZN-2179MDL07797962 (Chevron); BP-HZN-2179MDL07793411 (ConocoPhillips); BP-HZN-2179MDL07797628 (BHP Billiton); BP-HZN-2179MDL07797141 (Hess); BP-HZN-2179MDL07798279 (Shell); BP-HZN-2179MDL07794334 (Eni U.S. Operating Company).



Recovery Organizations (OSROs) contracted by BP were also the ones used in the industry. These expert groups had or could obtain access to necessary containment vessels. Mr. Ziegler points to no other Operator who had a different "plan and logistics" that would satisfy his requirements.[96]

The Stevick Report states that "[a]lthough BP is aware of the benefits of forward contracting, it does not appear to have had robust contractual arrangements for critical systems in place in its GoM operations . . . ."[97] BP did in fact have forward contracts with well control companies and other services companies that would be used for source control in the event of a blowout.[98] For example, Dr. Stevick points to a BP Alaska draft document (that discusses contracting with various specialist groups) to suggest BP should have made similar arrangements in the Gulf of Mexico.[99] In fact, BP did have forward arrangements with the same companies (individually) as in the BP Alaska draft document.[100]

F.    MMS Regulations and API Recommended Practices

The Ziegler and Stevick Reports claim that the failure to have a pre-built and pre-tested capping stack (plus all required connectors and tools) and/or the failure to have adequate plans violated numerous MMS source control standards and API Recommended Practices.[101]

The Ziegler and Stevick Reports claim BP violated various regulations requiring BP to "control the well," citing portions of 30 CFR 250.[102] The sections Mr. Ziegler cites refer to controlling the well prior to a blowout, not source control after a blowout. The BP plea agreement[103] that the Ziegler Report cites (regarding these sections) concerns controlling the well prior to a blowout, not source control after a blowout. The Ziegler Report commits the same error when citing API RP 53, API RP 59 and API RP 75.[104]

---

[96] In terms of Floating, Production, Storage and Offloading (FPSO) ships, mentioned in the Ziegler Report on page 42, they are used instead of platforms to produce subsea fields and are purpose built for a particular field. To imagine that an FPSO would be quickly available for surface collection on a blowout is simply not reasonable. An Operator or other entity cannot simply shut in a field, disconnect an FPSO, and bring it to a blowout.
[97] Stevick Report, p 24.
[98] Carden Report, p 7, 13.
[99] Stevick Report, p 24-25.
[100] Carden Report, p 7, 13.
[101] Ziegler Report, p 20, 44-45 & note 205; Stevick Report, p 8-9.
[102] Id.
[103] TREX 63211.
[104] Ziegler Report, p. 29, 44-45 & note 205.



These recommended practices do not address equipment or tactics for source control after a blowout occurs.  They are recommended practices for drilling and production operations.

The Ziegler and Stevick Reports claim that BP violated the above regulations in part because those regulations require BP to use BAST to control the well.  As noted, these regulations requiring BAST do not govern source control.  Additionally, a deepwater capping stack is not BAST because it did not exist and had never been used prior to April 20, 2010.  BP did use BAST by immediately commencing drilling a relief well, attempting to manually and remotely activate the BOP, and quickly standing up a team of experts to propose and assist in the development of additional early intervention techniques based on the particular characteristics of the blowout.  Indeed, MMS regulations note that "[i]n general, we consider your compliance with [MMS] regulations to be the use of BAST."[105]  BP's OSRP and Initial Exploration plan were approved by MMS as meeting applicable regulations, among other things, spill preparedness.[106]

If the Ziegler and Stevick Reports were correct regarding the level of preparedness required by the regulations, every Operator in the Gulf of Mexico would have been guilty of violating MMS regulations.  This shows that the Ziegler and Stevick Reports' analysis is incorrect.

G.    Rig Change-out

The Ziegler Report claims that BP had "overall less time to plan or implement Source Control"[107] because it changed rigs (from the *Marianas* to the *Deepwater Horizon*) while drilling the Macondo well.  I disagree.  Changing the rig had nothing to do with source control preparedness, especially because the *Deepwater Horizon* rig was lost.  In either case, BP would have been dealing with a blowout from the subsea BOP.  The Ziegler Report also states that the drilling program "had changes at the last and critical part of the well."[108]  Drilling programs for exploratory wells must be flexible because conditions in the well can be different than anticipated.  If the formation pressures are different than expected, things such as the casing setting depths and mud weights have to change.  Changing the rig had nothing to do with source control preparedness, which is not rig specific.

---

[105] 30 CFR 250.107(c).
[106] See Section 2.2(A) above.
[107] Ziegler Report, p 12.
[108] *Id.*



## 3   Conclusion

The Ziegler and Stevick Reports (and in some instances the Foutz Report) are based on factual inaccuracies and a misunderstanding of the industry prior to April 20, 2010.  The opinions presented in those Reports do not change the conclusions set forth in my initial Expert Report.

The opinions I have expressed in this Rebuttal Expert Report are held to a reasonable degree of certainty.  My credentials, area of expertise, and compensation arrangement have not changed since my initial Expert Report.

Signed this 10th day of June, 2013

Richard S. Carden

# EXHIBIT B

In re: Oil Spill by the Oil Rig *"Deepwater Horizon"* in
the Gulf of Mexico, on April 20, 2010

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

MDL NO. 2179, SECTION J

JUDGE BARBIER; MAGISTRATE JUDGE SHUSHAN

Rebuttal Expert Report of Adam L. Ballard, Ph.D.

June 10, 2013

[This page intentionally left blank]

**Summary of the Rebuttal Expert Report of Adam L. Ballard, Ph.D.**

I am an engineer with training and expertise in the use and application of models to assess the properties of oil and gas when flowing through subsea and subsurface systems, such as deepwater wells and pipelines, including the use of such models to estimate fluid pressures and the rates at which oil and gas flow through subsea systems.

I have been asked by my employer, BP, to respond to portions of two reports filed on behalf of Transocean Offshore Deepwater Drilling, Inc. ("Transocean") and dated May 1, 2013. One report was written by Dr. John L. Wilson. The other report was written by Mr. Tyson Foutz. Dr. Wilson and Mr. Foutz offer the following opinions, among others, in their reports for Transocean:

• According to Dr. Wilson and Mr. Foutz, in April and May 2010 BP hid from U.S. government officials working on the *Deepwater Horizon* response various types of information necessary to estimate flow rates from the Macondo Well ("the Well") using hydraulic models. Dr. Wilson and Mr. Foutz claim that BP's supposed concealment of that information impeded efforts to contain oil from and to shut in the Well.

• Dr. Wilson also claims that BP engineers and contractors had sufficient data and "tools" (referring to hydraulic models) in April and May 2010 in order to estimate the daily rates of discharge of oil and gas from the Well.

My qualifications to respond to the foregoing claims by Dr. Wilson and Mr. Foutz are summarized in Part I of this report. My resume is included in Appendix A. The sources that I have used to prepare my opinions and conclusions are listed in Appendix B.

A summary of my conclusions concerning the claims by Dr. Wilson and Mr. Foutz recited above are as follows:

1. Hydraulic modeling of flow from the Well required, among other things: (i) reliable data from subsea pressure instruments and (ii) an accurate understanding of the flow path for oil from the reservoir into the waters of the Gulf of Mexico (see pp. 3-8 below). In April and May 2010, in my opinion, no one, including anyone at BP, knew with certainty the flow path of oil from the reservoir to the surface. Contrary to the claim by Dr. Wilson, neither BP nor any other party had the "tools" in April and May 2010 necessary to reliably estimate daily discharge rates from the Well using hydraulic models.

i

2.     BP and its contractors used hydraulic models and the available inputs for those models in April and May 2010 for primarily two purposes. One purpose was to understand how different source control options might affect discharge rates from the Well. The other purpose was to ensure that source control equipment could process the flow from the Well and eventually shut in the Well in a safe and efficient manner (see pp. 16-23 below).

3.     In directing the response to the *Deepwater Horizon* blowout in April and May 2010, the *Deepwater Horizon* Unified Command relied on an estimate of the so-called "worst case discharge" for the Well that had been provided by BP at the time when the U.S. Minerals Management Service ("MMS") gave BP permission to drill the Well in 2009 (see pp. 17-18 below). That worst case discharge estimate was 162,000 bopd. Such a worst case discharge calculation is prepared before a well has been spudded, and per the regulations, it assumes extreme conditions, including the absence of any restriction by a blowout preventer ("BOP") or a riser, with no drill string in place, and with no sand bridging in the wellbore.

None of the hydraulic modeling performed by BP and its contractors in April and May 2010 produced daily discharge rates greater than 162,000 bopd. Even according to experts retained by the U.S. government (and whose conclusions BP and Transocean dispute), the highest daily discharge rate from the Well was 63,600 bopd (see United States' Phase Two Expert Witness Disclosure (March 22, 2013); Ex. 8615 at p. 1 (estimate by Dr. Paul Hseih)). Dr. Wilson and Mr. Foutz do not explain how a response to a subsea blowout, based on an assumption that a blown-out well could produce 162,000 bopd, could have been impeded by lack of access to modeling outputs that show less than 162,000 bopd. This is especially true when the highest flow rate currently attributed to that Well is 63,600 bopd.

Part II of this report explains the conclusions that I have presented above. Part II also presents my opinions on certain claims made by Mr. Foutz concerning the Top Kill procedure that can be addressed using hydraulic theory.

## TABLE OF CONTENTS

Summary. ...............................................................................................................................i

I.   Qualifications ...............................................................................................................1

II.   Opinions .....................................................................................................................2

      A.   Background -- Hydraulic Modeling of Oil and Gas Systems ...................................3

      B.   Overview of Hydraulic Modeling during the *Deepwater Horizon* Response........................................................................................................8

      C.   Review of Specific Hydraulic Workstreams in the *Deepwater Horizon* Response ...............................................................................................16

      D.   Applications of Hydraulic Modeling to Top Kill ...................................................23

III.   Conclusion...............................................................................................................24

[This page intentionally left blank]

## Rebuttal Expert Report of Adam L. Ballard, Ph.D.

**I.      Qualifications**

I am a chemical engineer specializing in fluid flow and flow assurance.[1] I have approximately 15 years of experience in the oil and gas industry. I hold a Bachelor of Science in Mathematics from Willamette University (1996) and a Ph.D. in Chemical Engineering from the Colorado School of Mines (2002). My doctoral work focused on applied mathematics, hydrates, and multi-phase fluid equilibrium (PVT).[2]

I am a current member of the Society of Petroleum Engineers and the Institution of Chemical Engineers, and am a past member of the American Chemical Society, the American Institute of Chemical Engineers, and the National Association of Corrosion Engineers. For the past six years, I have been an Article Reviewer for the *Journal of Petroleum Science and Engineering*. From 2008 through 2010, I served as the Chairman for the Deepstar Flow Assurance Committee.[3] I have authored or co-authored 18 peer-reviewed publications and 11 non-peer-reviewed publications in the field of flow assurance, which are listed in Appendix A.

I have worked at BP for 11 years. During that time, most of my work has involved flow assurance. From January 2008 until May 2009, I served as the Lead Flow Assurance Engineer on BP's Thunder Horse platform, which is the oil industry's largest offshore production platform in the Gulf of Mexico. In May 2009, I became the Engineering Manager on Thunder Horse. As the Engineering Manager for

---

[1]    "Flow assurance" refers to a sub-discipline within engineering that involves the successful, economical, and safe flow of hydrocarbons from a reservoir to an intended location, such as a production facility.

[2]    PVT is a shorthand term for pressure, volume, and temperature dependencies of fluid properties.

[3]    "Deepstar" is a multi-company project focused on advancing deepwater petroleum technology. See http://www.deepstar.org/AboutDeepStar (last visited June 6, 2013). The project provides "a forum to execute deepwater technology development projects and leverage the financial and technical resources of the deepwater industry." The Flow Assurance Committee's goal is to assure reliable and economic production in deepwater.

1

Thunder Horse I was responsible for all process safety, operability, and compliance in the Thunder Horse field, as well as delivering and maintaining operational philosophy, strategy, and procedures. I held the Engineering Manager position until January 2013. While at BP, I have participated in numerous flow assurance presentations and have served as a coordinator and instructor for the Gulf of Mexico Flow Assurance Course. In 2009 I was awarded the BP Tallow Chandler Award for Excellence in the Innovation and Application of Technology.

At the time of the *Deepwater Horizon* blowout on April 20, 2010, I was serving as the Engineering Manager on Thunder Horse. I became involved in the *Deepwater Horizon* response shortly after the blowout and worked on the response until August 2010. Until the middle of May 2010, I remained the Engineering Manager on Thunder Horse, while also serving as a technical consultant for various source control efforts under way at the Houston Incident Command Post ("ICP") of the *Deepwater Horizon* Unified Command. In the middle of May 2010, I left my position on Thunder Horse and began working on the Unified Command's Containment and Disposal Project (the "CDP"). As a member of the CDP, I focused on the design of subsea infrastructure and system operations intended to capture and dispose of oil from the Macondo blowout. Like many other engineers at the Houston ICP, my typical work hours were 6 a.m. through 9 p.m. seven days a week.

In October 2012, I testified in this case as BP's corporate representative with regard to the methods used by BP and by BP's contractors to predict, estimate, characterize, or measure the daily amount of hydrocarbons flowing from the Well during the response using subsea pressure and temperature data. I also testified during my deposition about my own work on the response. I have provided no other depositions nor offered trial testimony in any other proceeding. I am not receiving compensation for my work and expenses as an expert for the Company in this litigation separate from my compensation as a BP employee.

## II. Opinions

This part of my report, which explains the basis for my opinions related to the reports by Dr. Wilson and Mr. Foutz, is divided into four sections. Section A provides background on hydraulic modeling necessary to evaluate the positions taken by Dr. Wilson and Mr. Foutz in their expert reports (see pp. 3-8 below). Section B provides an overview of the hydraulic modeling undertaken by BP and consultants working with BP during the *Deepwater Horizon* response (see pp. 8-16 below). Section C reviews specific claims presented by Dr. Wilson regarding the "four different workgroups" described on pages 7 to 25 of his report (see pp. 16-23

below). Section D briefly addresses certain portions of Mr. Foutz's report on the Top Kill procedure that involve hydraulic principles (see pp. 23-24 below and Foutz Report, pp. 11-26).

### A.     Background -- Hydraulic Modeling of Oil and Gas Systems

Although Dr. Wilson has a background in hydraulics, and comments on hydraulic modeling performed by BP and others, he offers no general description of hydraulic modeling. Used in a broad sense, hydraulic modeling covers the use of mathematical or physical techniques to simulate the behavior of fluids in systems, and to make projections about those systems.[4] Hydraulic modeling can be used to understand, for example, (1) air flow in a commercial ventilation system, (2) groundwater flow through sediments in an aquifer, (3) water flow for a sprinkler system, and (4) oil and gas flow in reservoirs, wells, and pipelines. The focus here is on the last application for hydraulic modeling, and more specifically on oil and gas flow in the Macondo Well system.

A hydraulic model can convert a given set of inputs (such as the geometry of the system containing a fluid) into an output or set of outputs (such as flow rates for a fluid or pressures within the system containing the fluid).[5] Generally, hydraulic modeling can take two forms. One form involves numerical modeling, in which a simulation is performed on a computer. The other form involves physical modeling, in which the physical flow geometry is modeled in a laboratory.[6] In this report I use the term "hydraulic modeling" to describe the former type of modeling -- numerical modeling in which a simulation is performed on a computer.

Reliable hydraulic modeling must start with a definition of a "system," meaning, for example, the "vessel" that contains the fluid and through which the fluid will flow, such as a pipeline. Once there is a clearly defined system and fluid, a user of a hydraulic model can typically specify two of three basic hydraulic variables

---

[4]   Novak et. al., <u>Hydraulic Modeling – An Introduction: Principles, Methods and Applications</u>, pp. 1-3 (2010).

[5]   Novak et. al., <u>Hydraulic Modeling – An Introduction: Principles, Methods and Applications</u>, p. 2 (2010).

[6]   See http://www.aldenlab.com/about/hydraulic_modeling_summary (last visited June 6, 2013); Novak et. al., <u>Hydraulic Modeling – An Introduction: Principles, Methods and Applications</u>, pp. 2-3 (2010).

in order to solve for the remaining, third variable. Those three basic hydraulic variables are (i) inlet pressure, (ii) outlet pressure, and (iii) flow rate through the system.

The basic principles for hydraulic modeling are illustrated by Figure 1 below. Figure 1 shows a simple pipe, having length (L), height (H), internal diameter (ID), and roughness (ε), and for a fluid (F). In this simple example based on a pipe, those basic properties are essential to a clear definition of the system of flow. If the inlet pressure ($P_1$) and the outlet pressure ($P_2$) are known, then the flow rate (Q) can be calculated using simple hydraulic theory. For a system that is not clearly defined, however — and if, for example, one or more of the parameters that describe the system are not sufficiently known — it is impossible to solve for flow rate, given the inlet and outlet pressures, in a reliable manner.



Figure 1 -- Simple Hydraulic Pipe System.

Several additional introductory points should be noted before turning to hydraulic modeling in the *Deepwater Horizon* response.

First, the example above illustrates how a simple hydraulic model might work. The hydraulic models that BP and other parties attempted to use in the *Deepwater Horizon* response also accounted for other factors, such as heat transfer, which adds another set of variables that must be known in order to solve.

Second, Dr. Wilson's report identifies a number of hydraulic models used during the response, but they all have the same three general features and requirements in order to produce credible and reliable results (which Dr. Wilson does not clearly explain). Those three essential features or requirements for credible and reliable model performance are as follows:

4

- The models must use a computational method to arrive at a numerical prediction of flow or pressure, or some other output of interest;

- The models must have sufficiently accurate inputs taken from calibrated instruments, such as pressure measurements, that can be used as inputs in the model; and

- The models must have a clearly defined system through which the fluids of interest — typically liquid oil, gas, and water — will flow.

Hydraulic modeling during the *Deepwater Horizon* response sometimes involved the entire Well system, extending for example from the "pay sands" of the reservoir to the breaches in the sunken riser that released oil into the ocean. To appreciate the complexity of hydraulic modeling in the response, it is therefore important to add a brief description of a hypothetical well system, in which a well is flowing from the reservoir to the surface.

Such a well system has four basic parts, as shown in Figure 2: (1) the reservoir, (2) the near well-bore region, (3) the well, and (4) the surface.



**Figure 2 – Hypothetical Well System with Flow to the Surface**

Each part of such a well system must have sufficient inputs to perform a hydraulic analysis, if the goal is to estimate flow from the reservoir to the surface.[7] It is helpful to consider the list of the major inputs needed from the well system in order to try to model a complete well system; those major inputs are presented below.

Reservoir Inputs – Simplistically, the reservoir can be thought of as a large box with one or more openings that is initially filled with fluid. Pressure exerted on the fluid inside the box causes fluid to escape through the opening(s). The loss of fluid reduces pressure inside the box, which in turn reduces the rate at which the box expels fluid. In the case of a reservoir, it is important to know the *initial reservoir pressure* of a well, which is the pressure in the reservoir before a single drop of oil has been produced. It is also important to understand the *actual reservoir pressure,* which changes over time as the reservoir produces oil. Actual reservoir pressure depends greatly on *reservoir volume* and *aquifer support*.[8] Other important characteristics of the reservoir include the *number of hydrocarbon-bearing rock layers in the reservoir* and the *thickness* of each such layer, along with the *permeability* (the resistance to flow through the rock layer), the *porosity* (the void space between sand grains for each layer), and the **water saturation** (the amount of water in the void space) of each layer.

Near-Wellbore Inputs – Other important features of the well system describe or relate to the interface between the rock of the reservoir and other parts of the well system. Those near-wellbore inputs include the *productivity index*, or "PI," which is a measure of how many barrels of oil will leave the reservoir for each increment of pressure loss in the reservoir. The PI is usually expressed in barrels of oil per day per pounds per square inch ("psi") of pressure drop. The PI reflects the path taken by the oil from the reservoir to the wellbore as well as other factors.[9]

---

[7]   If a system is not very well defined, a common methodology in hydraulic modeling is to separate the system into sub-parts which are clearly defined in order to properly model a portion of the well system.

[8]   Reservoir volume is the amount of oil and gas reserves for a producing reservoir. An aquifer is a deep groundwater system that is usually connected to a much larger volume of water when compared to the oil reservoir. For a large, connected aquifer the actual reservoir pressure does not decline much when oil is produced, because oil is supplemented with water.

[9]   The upper limit of PI sometimes is calculated using a subset of reservoir parameters.

Engineers also consider the *skin factor*, or simply "skin," at the near-wellbore portion of the well system. Skin represents damage caused by a variety of factors when drilling and completing a well. A high skin factor results in less productivity from the reservoir.

Well Inputs – Well inputs include *total depth* (the planned end of the well, measured by the length of pipe required to reach the bottom) and *measured depth*. The measured depth of a well is the actual length of t ie wellbore; unless the well was drilled completely vertical, that measurement will differ from the true vertical depth of the well. Other well inputs include *pipe internal diameters*, *pipe roughness* (usually a measurement of the average height of peaks producing roughness on the internal surface of pipes), and *pipe ovality* (referring to the cross-sectional aspect of a pipe compared to perfect circularity). The *flow path* of the fluid from the near-wellbore region to the surface is also an important input.

Surface Inputs – Downstream of the wellhead are various surface facilities. In the case of the Well, they included the blowout preventer (the "BOP") and the riser. Similar to the inputs for the well, the *flow path, length, pipe internal diameters, pipe roughness,* and *pipe ovality* are important to understand in order to define the surface system. In addition, components such as valves and chokes are typically in the flow path, and a full understanding of the pressure drop versus flow rate correlation is needed for these components.

Environmental Inputs – A description of the environment around the system is important when accounting for heat transfer and flow to the seafloor (as was the case with the Well system). A description of the *ambient temperature profile* from the seafloor to the reservoir is necessary to properly describe the system. Other variables important when including heat transfer into the modeling are the *heat capacity* and *thermal conductivity* of all equipment and sediments. Flow through a well system that is open at one end to the surface is also affected by *ambient pressure* (referring to the pressure where the system enters the external environment, which at most points during the *Deepwater Horizon* response was near the seafloor).

Fluid Inputs – Fluid inputs include a fluid's *detailed composition*,[10] *watercut* (the ratio of water produced compared to the volume of total liquids produced),

_____

[10]   Detailed composition is a listing of all hydrocarbon and non-hydrocarbon molecules that comprise the fluid in its reservoir state. With a composition, fluid models can then be used to describe parameters or the fluid over a wide range of pressures and temperatures.

**bubble point** (the pressure at which gas first separates from the oil), the **gas-oil ratio** (or "GOR"),[11] **compressibility,**[12] and **density** (the mass per unit of volume), among other inputs.

To understand the issues in controversy here, it is not necessary to examine each of the above inputs -- the key point, illustrated by the number of different inputs shown above, is that hydraulic theory applied to a real system is complex, and becomes even more complex as the system is enlarged and tries to take account of conditions from the reservoir to the exit of fluids from the complete system.[13] In addition, owing to the nature of the equations used in hydraulic modeling, relatively accurate inputs are needed in order to get accurate outputs. Due to the nature of the equations involved, the error bands on many input parameters will result in a larger error band in the output of the model. For example, referring back to Figure 1, if the internal diameter ("ID") of the pipe is unknown by up to 10 percent, the resulting flow rate calculation can have an error band greater than 25 percent. This emphasizes the importance of having a clearly defined system in order to produce useful hydraulic modeling results.

## B.   Overview of Hydraulic Modeling during the *Deepwater Horizon* Response

The first important observation about BP's efforts to use hydraulic modeling during the *Deepwater Horizon* response, which is based on my personal experience, is that the main focus for all involved was to stop the flow from the Well as quickly as possible, while managing risks to human life and the environment.

Consistent with industry contingency planning, the ultimate method of killing the Well was recognized to be a relief well. To achieve the goal of shutting in the Well as quickly as possible, and due to the timeline for drilling a relief well, federal officials, BP, and others undertook several efforts to stop or contain the flow from the Well until a relief well could be completed. The overarching remit

---

[11]   GOR is the ratio of the volume of gas to the volume of oil for a reservoir sample of hydrocarbon that is brought to the surface.

[12]   Compressibility describes the pressure-volume relationship of a fluid (both gas and oil) and describes the expansion of fluid as pressure drops.

[13]   The list in the text above is by no means a complete list of all factors and inputs used in hydraulic modeling of oil and gas systems.

8

was that any effort to stop or contain the flow from the original Well should not make the situation worse.

Of course, any attempt to stop or contain the flow had potential downsides, such as potentially increasing the flow from the Well, or preventing other source control options from being effective. One of the many ways in which the downsides of different source control options were evaluated during the *Deepwater Horizon* response was through hydraulic modeling.

In that respect, Dr. Wilson is correct in quoting my colleague, Mr. Simon Bishop, as saying that modeling was used "to assess the robustness of a number of operations associated with source control."[14] However, Dr. Wilson's report presents an incomplete picture of how the hydraulic modeling work during the response proceeded.

First, Dr. Wilson's report asserts that "BP engineers and their contractors doing the modeling appear to have had access to almost unlimited resources, except for the urgency of time."[15] In fact, very few engineers at BP or in the industry had the ability to work with the more complex hydraulic models that were used during the *Deepwater Horizon* response.[16] Those who could do the work frequently lacked the time to fully document their assumptions and the purposes of the modeling they performed.

Second, Dr. Wilson's report suggests an imbalance in access to data useful in hydraulic modeling. Dr. Wilson's report states that "BP engineers and their contactors had access to proprietary data regarding the reservoir and the engineered infrastructure of [the Well]," and that "BP engineers knew or had high-quality estimates of the reservoir, fluid properties and the engineered

---

[14] Bishop Tr. at 95:7-9 (quoted in Wilson Report, p. 5, note 7). In general, the models to which Dr. Wilson's report refers (Wilson Report, p. 6-8) can be grouped into four categories: (1) steady-state multi-phase hydraulic simulators (such as PipeSim and PROSPER), (2) transient multi-phase hydraulic simulators (such as OLGA, OLGA-ABC, OLGA Well Kill, and WELLCAT), (3) general hydraulic simulators called computational fluid dynamic (or "CFD") models, and (4) the material balance reservoir simulator called MBAL.

[15] Wilson Report, p. 6.

[16] Tooms Tr. at 244:5-246:15.

infrastructure."[17] Dr. Wilson's report does not acknowledge BP's effort to provide the federal responders with the data needed to perform hydraulic modeling. BP provided pressure data from the same instrument at the base of the BOP, called "PT-B," that its engineers used.[18] BP also shared other data useful in hydraulic modeling with the scientists and engineers representing the government at the Houston ICP.[19]

---

[17]   Wilson Report, p. 6.

[18]   For example, Dr. Wilson's report states that "BP engineers and their contractors had estimates and/or measurements" of pressure. (Wilson Report, p. 8.) But Dr. Wilson's report does not state that the record shows BP shared estimates and/or measurements of pressure with United States government personnel during the *Deepwater Horizon* response. See, for example, LAL137-015769 (May 8, 2010 e-mail from Federal Science team member A. Slocum noting availability of pressure measurements from the subsea PT-B instrument); IES009-015948 (May 9, 2010 e-mail from B. Domangue of MMS forwarded to Secretary Salazar containing PT-B pressure gauge readings); SNL115-005716 (May 12, 2010 e-mail transmitting PT-B pressure reading to government scientists); SNL066-012412 (May 13, 2010 e-mail transmitting PT-B pressure reading to government scientists); DSE029-000834 (May 16, 2010 email correspondence among government scientists listing current PT-B pressure readings); SNL116-006885 (May 17, 2010 e-mail attaching PT-B data summary from May 8 to May 16 and an overview of the pressure measurement system); DSE029-001309 (May 23, 2010 e-mail discussion among government scientists regarding PT-B pressures); DSE031-002643 (May 28, 2010 e-mail among government scientists attaching Top Kill diagnostics including PT-B pressures).

[19]   In addition to the pressure data provided to the federal responders (see note 18 above), other data that BP provided to government personnel during the response and shared with government personnel included temperature measurements and fluid properties information. See, for example, Hughes Tr. at 277:13-25 (explaining the ability to view live video feed of temperature measurements taken by ROVs in the HIVE (the ROV control room)) and Hunter Tr. at 74:14-75:17 (discussing government personnel's access to live ROV footage during the response); S2S006-000802 (April 30, 2010 e-mail providing fluid properties data to NOAA); Ex. 9636 (May 1, 2010 e-mail reflecting MMS knowledge of reservoir characteristics); Ex. 8995 (same); BP-HZN-2179MDL04394208 (May 1, 2010 e-mail providing reservoir characteristics to MMS); BP-HZN-2179MDL03313230 (May 6, 2010 e-mail transmitting rotary core

Third, Dr. Wilson's report suggests that BP had "high-quality estimates" concerning the "engineered infrastructure" of the Well useful in hydraulic modeling after the blowout. Such a view is incorrect, if the relevant timeframe is April and May 2010. Until the original Well was intercepted by a relief well in August 2010, important features of the wellbore, including the flow path of oil from the reservoir to the BOP and out the riser on top of the BOP, were unknown.

Dr. Wilson's report states that the accident on the *Deepwater Horizon* "*could have* damaged [the] architecture" of the Well;[20] but there is no legitimate dispute that the explosion and later collapse of the rig did in fact damage what Dr. Wilson's report calls the "engineered infrastructure" of the Well. Dr. Wilson's report concedes "some uncertainty" about the relevant condition of the Well.[21] Mr.

---

analysis and PVT information to MMS); LNL083-000351 (May 6, 2010 e-mail transmitting fluid properties information to National Labs); IMT911-014001 (May 7, 2010 e-mail discussion of MMS analysis of reservoir properties from analog wells in the Gulf of Mexico); LAL013-021351 (May 10, 2010 e-mail sending GOR and bubble point information to National Labs); SNL008-018879 (May 11, 2010 e-mail discussion among government scientists regarding plume temperature measurement); LAL019-000583 (May 12, 2010 e-mail transmitting temperature estimate of 150-200F to government scientists); BP-HZN-2179MDL01951916 (C. Cecil notes summarizing transmission of data, including PVT properties, to scientists from National Labs between May 13 and May 18, 2010); LAL013-012807 (May 14, 2010 e-mail acknowledging National Lab scientists received PVT data); LAL013-013023 (May 16, 2010 e-mail among National Labs scientists discussing black oil tables); IMT911-014188 (May 18, 2010 e-mail transmitting Pencor PVT data to MMS); LAL013-020344 (May 24, 2010 e-mail transmitting fluid properties data and EOS to National Labs); ORL001-000271 (May 24, 2010 e-mail transmitting Pencor PVT data and a sidewall core report to MMS and National Labs scientists); NOA016-001452 (May 25, 2010 e-mail transmitting Pencor PVT data to NOAA); PNL001-032329 (May 27, 2010 circulation of Pencor PVT data among National Labs scientists); IMW028-020971 (May 28, 2010 e-mail noting MMS access to Pencor and Schlumberger PVT data); ORL003-006587 (May 28, 2010 e-mail distributing reservoir data to government scientists); PNL001-032991 (May 28, 2010 e-mail noting National Labs scientists use of Schlumberger PVT data).

[20]   Wilson Report, p. 6 (emphasis added).

[21]   Wilson Report, p. 6.

Kerry Pollard, also retained by Transocean, is more forthright. As Mr. Pollard stated, with respect to the condition of the Well in the summer of 2010:

> "**The path from the reservoir to the wellbore was unknown. The status and location of drill pipe, fluid entry and casing/cement damage were unknown**. Therefore assumptions had to be made in order to model it. ... **Several parameters regarding the wellhead, its internal configuration and flow through it were unknown, and there were multiple possible flow configurations.** For example, the series of BOPs, drill pipe, riser and chokes at various positions and conditions, as well as Top Hat, Capping Stack and other containment setups all contributed to the complexity and uniqueness of the fluid of flow over time."

Report of Kerry A Pollard, P.E., May 1, 2013, p. 6 (emphasis added).

When Dr. Wilson's report refers to "typical inputs" and "typical outputs" of various "conventional" hydraulic models, his report should have also acknowledged that nothing was "typical" about the system being modeled during the *Deepwater Horizon* response.[22] None of the "conventional" models to which Dr. Wilson's report refers were designed or validated for use with a system as insufficiently defined as the Macondo Well following the blowout on April 20, 2010.[23] Dr. Ole Rygg, an expert in hydraulic modeling who had access to what Dr. Wilson's report calls a "capable software package specifically programmed to model difficult ... flow situations" stated that there were too many unknowns to precisely estimate the simulation of flow rates.[24]

---

[22] Wilson Report, pp. 6, 7.

[23] For example, many of the "conventional" models had to represent an important feature of the Well system -- the system's restrictions on flow -- as circular "orifices" of various sizes. See Appendix C.

[24] At his deposition last fall, Dr. Rygg testified as follows in response to questions from the Plaintiffs' Steering Committee: "I -- in -- in -- in all my calculations and modeling, I found there was too many unknowns to -- to precisely estimate from the simulations any flow rates;" "I believe I don't have enough information on the flow configuration and -- and input to estimate from the modeling the

Finally, it is noteworthy that the federal responders, with their own access to hydraulic models (as well as data for use in such modeling (see notes 18 and 19 above)), did not offer any single-point estimate or range of estimates of daily discharge from the Well using hydraulic modeling during April or May 2010. The first report of the U.S. government's Flow Rate Technical Group ("FRTG"), released on May 27, 2010, presented daily flow rate estimates ranging from 12,000 to 19,000 bopd, but none of those estimates used any of the "conventional" hydraulic models identified in Dr. Wilson's report, or any other type of hydraulic modeling.[25]

Given the unknown features of the Macondo Well system in April and May 2010, what was the purpose of the hydraulic modeling performed by BP and its contractors in that timeframe? Broadly stated, the hydraulic modeling by BP and its contractors had two main purposes:

1. One purpose of the hydraulic modeling was to determine how a given event or source control strategy could potentially increase the flow of oil from the Well. One example of such modeling is the hydraulic modeling performed to determine, on a rough percentage basis, how much the cutting of the riser from the top of the BOP would temporarily increase discharge from the Well[26] -- a step deemed appropriate by the Unified Command in order to permit the installation of the Top Hat oil collection system.[27] A different example of such modeling, used to evaluate risks to the overall source control effort, is illustrated in Figure 1 of Dr. Wilson's report.[28] There, Dr. Rygg modeled potential discharge rates from the Well as if there were no BOP on top of the wellhead.[29]

---

flow rate." Rygg Tr. at 190:20-192:3.

[25] See Flow Rate Group Provides Preliminary Best Estimate Of Oil Flowing from BP Oil Well; available at http://www.restorethegulf.gov/release/2010/05/27/flow-rate-group-provides-preliminary-best-estimate-oil-flowing-bp-oil-well   (last visited June 6, 2013).

[26] Ballard Tr. at 61:23-63:4.

[27] Ex. 9675, Stipulations ¶¶ 90-92.

[28] Wilson Report, p. 9.

[29] Figure 1 presents six different "oil rates" -- three with a "back pressure" of 3800 psi (consistent with the pressure measured at the bottom of the BOP in early

2. Another purpose of the hydraulic modeling performed by BP and its contractors during the *Deepwater Horizon* response was, as Mr. Bishop stated (see p. 9 above), to evaluate the "robustness" of a given source control strategy against a variety of possible discharge rates, pressures, or temperatures. Dr. Rygg, for example, was retained to use his hydraulic models to determine the highest possible flow rates that a relief well might encounter, in order to assess whether the systems available to perform a "bottom kill" through the relief well could accommodate those flow rates.[30] Similarly, in my work on the CDP project, I had to determine whether the risers that would be used to collect oil from the Well to the containment vessels were designed properly to handle the flow rates and pressures they might encounter.[31]

Given the purposes of the hydraulic modeling performed by BP and its contractors, the calculation methodology employed during the April-May 2010 period was usually applied in one of three different ways, outlined below.

_____

May 2010) and three with "back pressure" of 2244 (consistent with the pressure that would be exerted on the wellhead if the BOP were absent). While the precise scenario of concern is not spelled out in Figure 1 or explained in the record, Dr. Rygg's results would have been useful in showing what would happen if, for example, the *Deepwater Horizon* BOP had to be removed from the wellhead for some reason, or if the BOP fell from the wellhead as a result of a catastrophic event such as a subsea broach. Concerning the risks of subsea broach, see Expert Report of Mr. Dan Gibson, May 10, 2010, pp. 1, 25, 28, 32. It is important to note that none of the rates contained in Figure 1 were, according to Dr. Rygg's testimony quoted above, reliable estimates of daily flow rates from the Well. (See note 24 above.)

[30] Rygg Tr. at 53:1-54:9; 83:5-20 (describing "bottom kill"). A "Dynamic Kill Technical File Note" describes Dr. Rygg's modeling results of 43,000 bopd, 63,000 bopd, and 87,000 bopd as the result of simulations "for worst case dynamic kill requirements, which means no restrictions in the flow path (i.e., downhole gravel pack, the effects of the wash string, flow choking across the subsea BOP rams, etc.) and no underground blowout. Ex. 10603 at WW-MDL-00143673-74.

[31] Ballard Tr. at 306:14-307:22.

14

- **"Sensitivity" calculations** presented discharge rates essentially as functions of some other condition or feature of the well system. The goal of this calculation was to assess the sensitivity of flow rate to various input parameters. The results were often shown in Cartesian plots in which a discharge rate was shown as a variable (one of many unknown variables in the relevant time period) versus another variable.[32] By definition, such calculations were not intended to estimate daily discharge rates from the Well, and they implicitly recognized that conditions were too uncertain to estimate such rates in a reliable manner.

- **Relative impact calculations** were performed to understand how the discharge rate might change based on the change of another variable. Parametric studies (the sampling of inputs into models) were typically performed under a given set of conditions and then, with a single input parameter changed, the parametric study was re-run. This type of analysis provided an understanding of relative change in flow rate from the well under certain conditions. Examples of such calculations are shown in Figures 1 and 10-12 of Dr. Wilson's report in which the modelers posit removal of the *Deepwater Horizon* BOP from the wellhead.[33]

- **Assumed studies** used a given flow rate in order to determine a key feature or characteristic of a flowing system (relevant to a source control

---

[32]  An example of such work is Ex. 9446, in which my colleague, Dr. Tim Lockett, depicted discharge rates as functions of temperatures, pressures, and velocities in the well. As Dr. Lockett testified at his deposition, his work was intended to explore how data concerning fluid, velocity, temperature, and pressure could potentially be linked in order to estimate flow rates from the Well. Lockett Tr. at 155:5-20; Ballard Tr. at 118:4-20.

Contrary to Dr. Wilson's suggestion (Wilson Report, p. 20), in using the term "best estimate" to describe the work reflected in Ex. 9446, Dr. Lockett was not denoting his results as a reliable prediction of flow from the Well. As Dr. Lockett testified, a best estimate of flow could only be derived when there is corroboration between the different methods of estimating flow. Lockett Tr. 156:3-16. Dr. Lockett's work shown in Ex. 9446 showed no such corroboration.

[33]  See note 29 above.

15

effort) using a hydraulic model. An example of such an assumed study would be an evaluation of the pressures that would be encountered in a system that was "producing" oil from the blowout to a vessel on the surface that would collect the oil for transshipment and disposal, which was one type of analysis that I performed at the Houston ICP. Another example of such an assumed study, to which Dr. Wilson's report refers, was the project assigned to a BP contractor called Stress Engineering, which used hydraulics-based models in May 2010 to assess the upward force of a plume of oil coming from the top of the *Deepwater Horizon* BOP if a portion of the BOP were removed.[34]

## C.  Review of Specific Hydraulic Workstreams in the *Deepwater Horizon* Response

I accept for purposes of this section of my report the delineation of "four different workgroups within BP" that, according to Dr. Wilson, were using hydraulic modeling in the April-May 2010 timeframe.[35] I review each of Dr. Wilson's comments on those four workgroups below.

### 1. Reservoir Team

I disagree with the statement in Dr. Wilson's report that "BP began modeling the flow from the Well immediately following the blowout."[36] To the

---

[34]  Contrary to the claim in Dr. Wilson's report (see Wilson Report, pp. 11-12), 70,000 bopd is not a "best estimate" of the daily discharge from the Well. Holt. Tr. at 266:2-270:22. The initial plan was for Stress Engineering to run sensitivity studies for assumed flow rates of 5,000, 10,000, 20,000, 40,000, 80,000, and 160,000 bopd. Given the significant length of time (10-12 hours) required to complete each modeling run, a case of 70,000 bopd, a number near the midpoint of the range of assumed flow rates, was selected as the first case. Stress Engineering was then asked to run cases of 35,000 and 17,500 bopd, reducing the total number of cases to be run (and computation time) by half. Ex. 9629. The results of the Stress Engineering modeling were shared with a group that included personnel from Transocean, Cameron, Oceaneering, and Wild Well Control. TRN-MDL-02950206-07.

[35]  Wilson Report, p. 7.

[36]  Wilson Report, p. 13.

16

contrary, BP engineers modeled potential discharge rates from the Well long before the blowout, in 2009, when the Company filed its Exploration Plan ("EP") for the Macondo Well. BP reservoir engineers used PROSPER, one of the hydraulics models listed in Dr. Wilson's report, to estimate what the governing federal regulations call a "worst case discharge" (or "WCD") for the Well they intended to drill at the Macondo prospect.[37] That model produced a worst case estimated discharge of 162,000 bopd.

The worst case discharge estimate for the Well prepared by the BP reservoir team assumed a blowout at the sea floor in the absence of any restriction by a BOP or a riser, with no drill string in place, and with no sand bridging in the wellbore.[38] The only restriction to flow used in BP's WCD estimate for the Well was "hydrostatic pressure," referring to the downward pressure of seawater over the wellbore and which was assumed to be 2270 psi.[39]

An estimate of a daily discharge rate prepared before a well has been spudded, and that assumes truly extreme conditions like those used to calculate a regulatory worst case discharge scenario, is not an estimate of the actual flow rate for the Macondo blowout.[40] As Admiral Allen, the National Incident Commander for the *Deepwater Horizon* response, stated at his deposition, he "would...differentiate ...worst case discharge from flow rate."[41]

---

[37]   30 CFR § 254.47(b) (2012); BP-HZN-2179MDL00001000.

[38]   Gansert Tr. at 56:10-58:18; 217:3-13.

[39]   Ex. 10007 at BP-HZN-2179MDL05729013.

[40]   The Wilson Report may instead intend to support its claim that the reservoir group "began modeling the flow from the Well immediately following the blowout" (Wilson Report, p. 13) by reference to the update of the pre-drilling WCD estimate of 162,000 bopd prepared on April 21, 2010. If so, Dr. Wilson's report is still incorrect, because there was no identifiable flow from the Well on April 21, insofar as the rig remained on the surface with the riser intact. The *Deepwater Horizon* did not sink until April 22, at which time oil was found to be flowing from the sunken riser. Ex. 9675, Stipulations ¶¶ 26-27. The same may be true of the open hole flowing calculation attributed to Alistair Johnston, performed on or before April 22, 2010. Ex. 8656; see Wilson Report, p. 32.

[41]   Allen Tr. at 685:3-4.

A key fact about the reservoir team's worst case discharge estimate, which Dr. Wilson and Mr. Foutz ignore, is that the WCD estimate became the daily discharge rate used by the federal government in the *Deepwater Horizon* response. As Admiral Allen testified, he was "skeptical" about the early numerical discharge estimates after the *Deepwater Horizon* sank.[42] Referring to the WCD value of 162,000 bopd in the 2009 Macondo EP, along with an even higher WCD estimate contained in BP's 2009 Regional Oil Spill Response Plan,[43] Admiral Allen testified:

> "And, frankly, I told my people to -- to focus on the response, getting the equipment out there, assuming the worst case scenario, and the numbers would take care of themselves. And ultimately, I told them it would be decided in Court."[44]

Neither the actual flow from the Well, nor any of what Dr. Wilson calls "modeled flow rates" in April or May 2010, exceeded the worst case discharge estimate prepared by the BP reservoir team in 2009. I therefore do not agree with Transocean's experts that any failure by BP to publish lower discharge estimates could have had any impact on the overall conduct of the *Deepwater Horizon* response.

### 2. Flow Assurance Team

I also disagree with Dr. Wilson's review of hydraulic modeling by BP flow assurance engineers[45] whose work consisted mainly of the types of "sensitivity calculations" that I have previously outlined (see p. 15 above). None of that work was intended to estimate a single-point daily discharge rate or a range of such rates.

Dr. Wilson's opinions about the work of the flow assurance team (in which I was to some extent personally involved) are confusing and incorrect, because he either does not understand or does not explain some of the basic features of the

---

[42]   Allen Tr. at 210:9.

[43]   Ex. 769.

[44]   Allen Tr. at 210:20-25.

[45]   Wilson Report, pp. 18-21.

relevant modeling. For example, his analysis would lead a reader to believe that, when hydraulic modelers refer to "orifices" that are depicted as fractions of an inch or as a very small number of inches in size, the real-world system they are modeling has restrictions that are actually the same size as the modeled orifices. That is incorrect: an "orifice" in a hydraulic model is not intended to depict the area of an opening in the actual system, but is intended to be used as an input to indicate restriction to flow.[46] What Dr. Wilson calls "small" orifices were included in the modeling in order to simulate a number of features in the well system that were creating resistance to flow, not to depict the actual area of a restriction in the well system through which oil could reach the sea.

---

[46] To understand Dr. Wilson's error, one can start with a specific example in his report. In discussing some work that he attributes to the reservoir team, Dr. Wilson states as follows:

> "[T]he restrictions necessary at the wellhead to generate flow rates of only 5,000 or 10,000 BOPD were quite severe for modeled conditions. The shallow choke required an orifice with a diameter of only 0.355 and 0.52 inches, respectively. Given that the riser was approximately 19 inches in diameter, and its internal pipe was approximately six inches in diameter . . . even when kinked over, such a small orifice is unlikely."

Wilson Report p. 16.  Dr. Wilson's statement suggests that, in the work he is describing, the modelers intended to simulate flow through a "real" orifice (or restriction) having an area of only 0.355 to 0.52 inches. That is not correct, as Dr. Wilson should know if he understands the hydraulic models that he is discussing in his report. As explained in Appendix C of this report, the "orifice" in the relevant models is a theoretical opening in the system (a perfect circle) used to create resistance to flow. The *circumference* of the circular opening in the model, and not its area, is critical, because the circumference of an opening (among other variables) in a fluid system determines the resistance to flow through the opening. (See Appendix C.) Dr. Wilson's references to orifices with very small area are meaningless at best, and could mislead a reader into believing that BP engineers assumed unrealistic conditions in the well system.

Dr. Wilson also demonstrates a lack of understanding of specific features of at least one model he discusses, the OLGA model. Dr. Wilson assumes that when Dr. Lockett (one of the senior members of the flow assurance group) reported on May 14, 2010, that some of Dr. Lockett's modeling was showing "values [that] are not credible" when compared with visual observations, Dr. Lockett is stating that specific flow rates for the Well were unrealistically low.[47] Dr. Lockett was not, however, reporting on a continuous discharge rate from the Well; he was commenting on whether his visual observations were consistent with the instantaneous momentum of fluids that could be predicted by a specific option in the OLGA model called "slug-tracking." Based on my knowledge of OLGA, the OLGA model was likely producing results that seemed not credible because the slug-tracking option was not accurately depicting the instantaneous momentum of fluids in an unconventional system like the Well that Dr. Lockett visually observed in the oil plume.

Finally, with respect to the May 3, 2010 "best estimate" work by Dr. Lockett, Dr. Wilson's report presents a significantly inaccurate account of Dr. Lockett's work.[48] Dr. Lockett was examined at great length on his use of hydraulic models at his deposition in 2012. As he explained, through May 2010, BP had limited information from which it could model flow from the Well.[49] For example, Dr. Lockett testified that information was not available on the flow path, inflow performance of the well, restrictions in the BOP stack, the degree of restriction posed by the kink, and whether there had been any collapse of the formation.[50]

---

[47]  Wilson Report, p. 21.

[48]  See note 32 above.

[49]  Lockett Tr. at 84:9-85:8.

[50]  Lockett Tr. at 84:9-85:8. Dr. Wilson's report also does not deal accurately with Dr. Lockett's testimony in other respects. Wilson Report, pp. 29-30 (discussing Dr. Lockett's skepticism about Dr. Rygg's use of a 5,000 bopd discharge estimate in pre-Top Kill modeling). As Dr. Lockett explained at his deposition, when he initially reviewed Dr. Rygg's pre-top kill modeling, Dr. Lockett incorrectly believed that Dr. Rygg had only conducted simulations using the 5,000 bopd case. Lockett Tr. at 269:14-25. Dr. Lockett did not know the origin of the 5,000 bopd estimate which, as he testified, was why he was skeptical of the estimate. Lockett Tr. at 269:14-25. Dr. Lockett also testified that a 5,000 bopd estimate could have been valid based on another estimation method. Lockett Tr. at 270:17-271:23. Based on my review of the relevant materials, I have concluded

20

Neither Dr. Lockett nor any other member of the flow assurance team believed that they could reliably estimate daily discharge rates from the Well using hydraulic models in April and May 2010.[51]

    3. Production Engineering Team

        Dr. Wilson's excerpts from the work of another group of engineers that he calls the "Production Engineering Modeling" team[52] demonstrates the point that in April and May 2010, hydraulic modeling could not reliably estimate the flow rate from the Well. For example, Figure 11 in the Wilson Report is taken from a large parametric study that varied several different potential (and unknown) conditions in the Well system in a scenario in which the restriction on flow attributed to the BOP and riser in early May 2010 would be lost.[53] The outputs from this single excerpt from the parametric study range from 21,000 to 82,000 bopd when the BOP is present, and from 24,000 to 96,000 bopd when the BOP is not present. The only claim that the modelers could make from their outputs is, not surprisingly, that a loss of the BOP and the restrictions on flow that it and the riser created would increase flow from the Well.[54] Dr. Wilson reads another document that he

_____

    that the estimate of 5,000 bopd, announced earlier in the Macondo response at the Unified Area Command ("UAC") headquarters in Louisiana, was not based on hydraulic modeling. For that reason it is not surprising that Dr. Lockett, a hydraulic modeler based at BP's offices in Sunbury in the United Kingdom, was unfamiliar with the origins of the 5,000 bopd estimate announced at UAC headquarters. Dr. Lockett's concern was that Top Kill should be modeled against a broader range of flow rates than just 5,000 bopd -- which is what Dr. Rygg did. Lockett Tr. at 272:3-11; AE-HZN-2179MDL00132194.

[51]  Tooms Tr. at 319:4-9 (no attempt by flow assurance team headed by Mr. Tooms to estimate daily discharge rates until July 2010).

[52]  Wilson Report, p. 21.

[53]  The presentation by the Production Engineering Team is contained in Exhibit 9156. As explained above, (see note 29), the modelers may have been asked to assume that a particular source control option would have required removal of the BOP and riser, or that the BOP and riser would otherwise separate from the wellhead.

[54]  The intent of the study that Dr. Wilson is discussing was to try to predict the percentage increase in flow if the wellhead experienced a significant drop in

attributes to the "Production Engineering Modeling" team in a manner intended to discredit what he considers low estimates of flow from the Well. Referring to Figure 13 of his report, Dr. Wilson asserts that a 5,000 bopd estimate could be produced by the Production Engineering Modeling team only by using hydraulic models that posited what Dr. Wilson calls "low" permeability, a "minimal" reservoir thickness, and a "large skin."[55] Dr. Wilson's background is in hydrology. He asserts no expertise in reservoir engineering. I am unaware of any opinion offered by Transocean that conclude the conditions depicted in Figure 13 of Dr. Wilson's report were unrealistic at the time when the modeling was performed. Based on my review, Dr. Wilson does not appear qualified to determine "minimal" reservoir thickness, "large" skin, or any other feature of the well system to which he would apply a qualitative value in the absence of relevant data.

### 4. Hydraulic Modeling by Other Parties

Dr. Wilson's review of hydraulic modeling by BP contractors warrants a brief response. Dr. Wilson devotes attention to the hydraulic modeling performed using the OLGA suite of models, which he claims in one scenario to have "yielded a flow rate of 146,000 BOPD," while another (according to his report) resulted in a "blowout rate" of 37,000 to 87,000 bopd.[56] But Dr. Wilson does not address the testimony by Dr. Rygg, the individual who was performing the OLGA modeling, stating that it was impossible for Dr. Rygg to reliably predict or estimate the flow rate for the Well with the information available to him during the response.[57]

---

pressure. This is made clear on one slide in Exhibit 9156 that Dr. Wilson omits. See Ex. 9156, BP-HZN-2179MDL04808634 ("Flow increases by 13-31% when wellhead pressure drops from 3800 psi to 2270 psi.").

[55] Wilson Report, p. 13. The 37,000 to 87,000 bopd range was generated from simulations for "worst case dynamic kill requirements." (See note 30 above.)

[56] Wilson Report, p. 17.

[57] Rygg Tr. at 191:16-19 ("[I]n all my calculations and modeling, I found that there was too many unknowns to -- to precisely estimate from the simulations any flow rate."); 211:23-212:8 (" . . . But there was -- there were too many unknowns, that the model could give me any exact numbers on flow rates."). As elsewhere in his report (see note 46 above) Dr. Wilson does not explain the meaning of the orifice sizes in hydraulic modeling, in this case making it appear that Dr. Rygg used an unrealistically "small 0.73 orifice" in his modeling with a version of the OLGA hydraulic model.

Dr. Wilson's other references to specific modeling by third parties are merely illustrations of what I term above "assumed studies" (see p. 16). Stress Engineering[58] assumed a specific set of discharge rates and did not calculate a flow rate.[59] Dr. Wilson's discussion of Halliburton's use of a proprietary hydraulic model[60] only shows that BP did not interfere with Halliburton's decision to use an assumed flow rate of 30,000 bopd, in cement work that was never undertaken.[61]

### D.      Applications of Hydraulic Modeling to Top Kill

Mr. Foutz claims that Top Kill could not have possibly succeeded, given conditions in the Well and on the premise that the flow rate was too high for the Top Kill procedure to overcome.[62] Another expert testifying for BP has already addressed the general issue raised by Mr. Foutz.[63] In addition to that other expert's analysis, it is worth noting that the hydraulic modeling performed by Dr. Rygg, which indicated that momentum kill would not work at conditions that Dr. Rygg translated to 15,000 bopd, assumed near worst case conditions in the Well system for purposes of the momentum kill. Specifically, Dr. Rygg chose a deep choke and annular flow, both of which would have made it more difficult for momentum kill to overcome pressures in the Well system.[64] This worst case condition approach is consistent with many other modeling exercises during the response.

Mr. Foutz also claims that an analysis by Dr. Lockett indicates that Top Kill likely increased erosion in the BOP.[65] While the physical evidence from the BOP

---

58      Wilson Report, pp. 11-12.

59      See note 34 above.

60      Wilson Report, pp. 25-26.

61      Wilson Report, pp. 25-26; Expert Report of Iain Adams, May 10, 2010 pp. 8-9 (explaining that the addition of the junk shot portion of the Top Kill procedure increased the likelihood of success at potential flow rates in excess of 15,000 bopd).

62      Foutz Report, pp. 2, 14-16.

63      Expert Report of Iain Adams, May 10, 2010, pp. 7-10.

64      Ex. 8537.

65      Foutz Report, pp. 20-21.

acquired after the response certainly shows erosion in the Well system,[66] I believe that Mr. Foutz has not fully scrutinized the data on which Dr. Lockett based his analysis. The OLGA modeling results shown in Dr. Lockett's relevant presentation predict pressures in the BOP before and after Top Kill that are essentially the same as the measured BOP pressure data. Because OLGA cannot model erosion, the cause for the drop in pressure after the Top Kill attempt must have another explanation, other than erosion.

### III.    Conclusion

The opinions that I have expressed in this report are based on my education, training, and experience, and my review of materials in connection with this proceeding. While I have done my best to review materials in this matter as they have become available, I reserve the right to supplement my opinions based on my review of additional information or reports.

Adam L. Ballard, Ph.D.

---

[66]    Ex. 9773 (photograph of eroded blind shear ram blocks); Ex. 9775 (photograph of eroded casing shear ram blocks).

# EXHIBIT C



# In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
MDL NO. 2179, SECTION J

## JUDGE BARBIER; MAGISTRATE JUDGE SHUSHAN

## Rebuttal Expert Report of Iain Adams

## Submitted on behalf of BP Exploration & Production Inc.

## June 2013

CONFIDENTIAL



**This page intentionally left blank**



**Table of Contents**

PURPOSE OF REPORT; QUALIFICATIONS ............................................................ 1

CONCLUSIONS ...................................................................................................... 1

DISCUSSION .......................................................................................................... 1

1.0   THE BOP-ON-BOP OPTION AND THE CAPPING STACK OPTION WERE NOT READY TO DEPLOY IN MAY 2010 IN A MANNER THAT SUFFICIENTLY MITIGATED RISK ............................................. 1

    1.1   THE BOP STACKS TO BE USED FOR THE BOP-ON-BOP OPTION COULD NOT HAVE BEEN LANDED ON THE DEEPWATER HORIZON BOP IN MID-MAY. ............................ 2

    1.2   BOP-ON-BOP VENTING AND PRESSURE MANAGEMENT WAS NECESSARY TO MANAGE RISK .................................. 3

    1.3   USE OF A BOP'S CHOKE AND KILL LINES IS NOT A VIABLE VENTING OPTION ........................................................ 6

    1.4   TOP KILL DID NOT DELAY A CAPPING SOLUTION ............. 6

    1.5   BOP-ON-BOP DID NOT ENHANCE COLLECTION ABILITIES ............................................................................. 7

    1.6   THE SUCCESS OF THE CAPPING STACK IS NOT APPLICABLE TO DIFFERENT OPTIONS ............................... 8

2.0   TOP KILL WAS REASONABLE AND DID NOT DAMAGE THE WELL OR LIMIT FUTURE OPTIONS ................................................... 9

3.0   CAPPING STACK TIMELINES ARE NOT DETERMINABLE IN ADVANCE ..................................................................................... 10

4.0   DR. STEVICK'S SUGGESTED BOP INTERVENTION SEQUENCE WAS NOT AVAILABLE .................................................................. 10

5.0   ADDITIONAL ERRORS AND ISSUES IN MR. ZIEGLER'S REPORT ......................................................................................... 11

6.0   COLLECTION EFFORTS ESTABLISHED FLOW RATES ................. 12

CONCLUSION ....................................................................................................... 13



## PURPOSE OF REPORT; QUALIFICATIONS

My name is Iain Adams. BP Exploration and Production Company retained me to provide an expert opinion regarding BP's participation in the Unified Area Command's ("UAC") Response ("the Response") to the loss of well control at the MC 252 Well ("the Well") on April 20, 2010, and to review and consider reports filed by the Plaintiffs' Steering Committee ("PSC") as they related to those efforts. Subsequent to filing a report in response to the PSC reports on May 10, 2013, I was asked to review and consider reports filed by Transocean and Halliburton. Those reports were written by Mr. Tyson Foutz, Mr. Greg Childs, Mr. Edward R. Ziegler, and Drs. Glenn Stevick and John L. Wilson.

My qualifications and resume are included in the report that I filed on May 10, 2013. This report presents my opinion concerning the reports of Messrs. Foutz, Childs, Ziegler and Dr. Stevick.

## CONCLUSIONS

The reports prepared by Messrs. Foutz, Childs, Ziegler and Drs. Stevick and Wilson do not change the conclusions I reached in my May 10 report. It is my opinion that the engineering recommendations made by BP to the Unified Area Command were prudent and recognized the risks and benefits of each source control option and the availability of alternative options. In particular, I believe undertaking the risk-mitigated Top Kill procedure in May 2010 was a reasonable decision in light of its potential benefits and the availability of alternative source control methods at that time. When Top Kill was attempted, engineering work to ensure a safe and viable capping option was still underway. With the risk mitigation work for the capping options ongoing in May 2010, and given other challenges faced by BP and the Unified Area Command, neither the "BOP-on-BOP" option nor a capping stack was ready to deploy prior to the Top Kill operation.

## DISCUSSION

### 1.0   THE BOP-ON-BOP OPTION AND THE CAPPING STACK OPTION WERE NOT READY TO DEPLOY IN MAY 2010 IN A MANNER THAT SUFFICIENTLY MITIGATED RISK

Transocean's Messrs. Foutz and Childs and Halliburton's Mr. Ziegler all claim that BP could have and should have capped the Macondo Well in May 2010 by either landing a second BOP on the *Deepwater Horizon*'s BOP ("BOP-on-BOP"), or a two-ram Capping Stack on the *Horizon* BOP.[1]   Neither solution was ready to safely

---

[1]   Report of Tyson Foutz at 26-38 (May 1, 2013) ("Foutz Report"); Report of Greg Childs at 12 (May 1, 2013) ("Childs Report"); Report of Edward Ziegler at 27 (May 1, 2013) ("Ziegler Report").



deploy in May 2010.

The condition of the Macondo Well, and the Well's ability to maintain integrity if the Well were shut in by means of a second BOP or a capping stack, were unknown in May 2010. If the Well lost integrity, a shallow subsea broach would have presented significant risk to the environment and to the Response itself. To mitigate the risk presented by the capping options, the source control team at the Houston Incident Command Post ("ICP") needed to develop and validate a method of regulating pressure for the capping options.

The solutions to the risks presented by the capping options were not ready for deployment in May 2010. Given the identified risk of subsea broaching, in my opinion the correct solution was to be able to regulate pressure in a capping option, and without such an ability capping was not a viable option.

## 1.1 THE BOP STACKS TO BE USED FOR THE BOP-ON-BOP OPTION COULD NOT HAVE BEEN LANDED ON THE DEEPWATER HORIZON BOP IN MID-MAY

As explained below, the primary consideration for when a viable risk-mitigated BOP-on-BOP was available was the development of a subsea choke and vent system to manage pressure within the Well. However, as Mr. Foutz discusses options without that system, I will initially discuss issues relating to the availability of a second BOP that was to be used as a capping BOP.

Initial planning for the BOP-on-BOP option at the Houston ICP involved the potential use of the BOP from the *Discoverer Enterprise*. The *Enterprise* was also the only vessel in the Gulf of Mexico capable of collecting hydrocarbons from the Macondo Well.[2] Planning therefore shifted on May 11 to the use of the *Development Driller II* ("*DDII*") BOP as the capping BOP, as that vessel was preparing to join the Response.[3] At the time of the shift in planning on May 11, necessary work on the *Enterprise* BOP was still ongoing. A third-party inspection by West Engineering had identified necessary work to be completed on the *Enterprise* BOP stack that had not yet been completed on May 16, when the West representatives left to begin their inspection of the *DDII* BOP.[4]

The *DDII* BOP had previously undergone pressure testing and a third-party inspection by West Engineering in March 2010.[5] With such a recent inspection, only a few days of testing and maintenance of the BOP would reasonably be expected. However, during testing in May 2010, several leaks and other maintenance issues were found that required Transocean personnel to undertake repairs to the Transocean-owned and maintained *DDII* BOP.[6] This work took until May 29 to be

---

[2]   Deposition of Richard Lynch at 231.

[3]   IIG013-066363.

[4]   BP-HZN-2179MDL07807382.

[5]   BP-HZN-2179MDL04371343.

[6]   BP-HZN-2179MDL06026132.



completed.[7] Not until Transocean had its BOP ready could it have been deployed as part of a BOP-on-BOP solution. The scope of this work could not reasonably have been anticipated by BP or the Unified Area Command.

### 1.2 BOP-ON-BOP VENTING AND PRESSURE MANAGEMENT WAS NECESSARY TO MANAGE RISK

As part of the necessary and prudent work to identify and mitigate risks in developing capping solutions, the BOP-on-BOP solution called for the inclusion of a subsea choke connected to a vent manifold that would allow the venting of hydrocarbons.[8] The design, sourcing, installation, and testing of such a system is not an insignificant undertaking, and a Transocean engineer estimated on May 18 that a solution would take ten to fourteen days.[9] In my experience that is a reasonable, if optimistic, estimate. Inclusion of such a choke and a vent manifold was critical in two different respects.

First, inclusion of the choke was necessary to ensure the engineering team could control the shut in process and avoid potential problems in the Well. Some background is necessary to appreciate this first point. When a well is shut in with a blind shear ram, the well flow is rapidly stopped due to the short time (less than 45 seconds) used to close the ram. The rapid change in flow can produce a pressure surge in the well called the "water hammer" effect, which can expose the wellbore to higher pressures than it would otherwise have to withstand. The well will then be subject to the full shut in wellhead pressure. The nature of the rams is that they are either open or closed, there is no incremental step. After the incident on April 20, 2010, the condition of the wellbore at Macondo was unknown, and there was legitimate concern around how much pressure any source control activity could safely exert on the wellbore. The risk of exposing the Well to potentially unsafe pressures could not be ignored.

In contrast, a choke system allows what is called a "soft" shut in. Using a choke system, the well can be slowly shut in by incremental closure of the choke's orifice. This incremental approach allows an engineer controlling the process to ensure that pressures increase slowly while he monitors those pressure increases. This avoids the "water hammer" pressure surge. The shut in process can be stopped or reversed if the pressures approach an unsafe level. Providing an alternative flow path via the choke also protects the blind shear rams from potential erosion of sealing surfaces during closure. The capping stack that was ultimately used to shut in the Well did so over a period of approximately two hours by slowly closing its choke system while pressures were closely monitored.[10]

Second, in the event that the Well is shut in and ongoing monitoring indicates a need to reopen the Well, a choke system allows an engineer to reopen the choke

---

[7]  *Id.*

[8]  BP-HZN-2179MDL02405680.

[9]  TRN-MDL-05012663.

[10]  TREX 9577.

Deepwater Horizon
Source Control Review



under controlled conditions.  Large differential pressure across a blind shear ram can prevent it from opening.[11]  For example, if the shut in wellhead pressure is 9000 psi and the ambient pressure at depth is 2500 psi, the 6500 psi pressure differential may prevent the rams from opening up again.  And, in my opinion, attempting to open a blind shear ram against pressure may damage it and prevent further usage.  In normal operations, the pressure differential is limited by maintaining a column of mud in the riser from the vessel above the ram.  The planned choke system addressed the special problems presented by Macondo, enabled the engineering team to reopen the Well even with a substantial pressure differential, and provided confidence that the Well could be reopened if necessary.

A subsea choke and venting ability is not typically part of a subsea BOP stack. The need for inclusion of a subsea choke and vent manifold became apparent during the ongoing work to identify and mitigate risk undertaken as part of the development of various source control options in parallel. With the identified risk of overpressuring the Well, the inclusion of subsea chokes to manage pressure was a prudent and appropriate action to take.

In his report, Mr. Foutz discusses capping options he believes would have been available in mid-May.[12]  However, the options that Mr. Foutz discusses did not have the ability to manage pressure in the Well via a choke and vent system, and maintenance work was continuing on the *Discoverer Enterprise* and *DDII* BOPs in mid-May.  The options Mr. Foutz identifies would only be able to attempt to shut in the Well in an uncontrolled manner.  Transocean had engineers on staff who understood the difference between the type of system that Mr. Foutz appears to support and the safer alternative.  This is apparent from a June 10, 2010, Transocean document that lists various "Capping Strategies" as of June 10.[13]  It shows that the venting system to manage pressure was neither part of the basic BOP-on-BOP option using the *Discoverer Enterprise,* nor the two-ram capping stack.

---

[11] Deposition of Andrew Frazelle at 699-700.

[12] Foutz Report at 26-38.

[13] TREX 11226.

Deepwater Horizon
Source Control Review





TREX 11226.  As the Transocean presentation shows, the capping strategies with "venting options" were distinct from other capping strategies.

In light of the ongoing work being done by the *Deepwater Horizon* engineering team to address the integrity of the Well and the risks posed by the capping options, I believe it was prudent to ensure that the ability to effectively manage pressure was included on any capping option.  Mr. Foutz may believe that it would have been appropriate to attempt to cap the Well without the ability to manage pressure, despite issues involving potential shut in pressures and the ability of the Well to handle those pressures. I disagree and believe such a course of action to be unwise.

As noted above, on May 18, a Transocean engineer working on capping options estimated that the choke system would be available in ten to fourteen days.[14] This estimated timeframe is consistent with planning documents from both BP and Transocean that indicate that work on the development of a necessary system for relieving pressure was still ongoing.  According to the BP planning chart of May 28, 2010, work on the venting manifold for the BOP-on-BOP option was still under way with manufacturing not anticipated to conclude until June 1, and installation not anticipated until June 4.[15] This is consistent with Transocean planning charts as of May 28, which show work continuing on the choke system and the BOP estimated to

[14]  TRN-MDL-05012663.

[15]  BP-HZN-2179MDL00332385



be ready on June 2.[16]

Similarly, May 30 emails from Cameron employees indicate work was still in progress on the BOP pressure relief manifold.[17] Wild Well Control also identified the venting option as well as the guide frame to assist in landing the BOP as the "critical path" on May 28.[18] The pressure relief system, and thus a viable BOP-on-BOP procedure, were not available when Top Kill was undertaken.

## 1.3   USE OF A BOP'S CHOKE AND KILL LINES IS NOT A VIABLE VENTING OPTION

Messrs. Foutz, Ziegler, and Childs contend that venting could have been accomplished via the choke and kill lines that are part of the capping BOP that would have been landed on the *Deepwater Horizon* BOP.  Those lines run back to the vessel attached to the capping BOP stack, and could not in their standard configuration be used to vent hydrocarbons safely at anything close to the rates that could be expected from the Macondo Well.  It is theoretically possible that these lines could be modified to vent hydrocarbons, but they would first need to be severed from their connection to the vessel.  This may potentially allow for venting, but by removing those connections the ability to circulate fluids, such as methanol, into the BOP stack, which was a critical hydrate mitigation portion of the BOP-on-BOP procedure, would be lost.[19] Additionally, the control systems on the "second" BOP's LMRP are needed to operate the choke and kill lines. If the vessel running the BOP-on-BOP option had to move away from the Macondo site due to weather or a system failure, it would disconnect the LMRP from the lower BOP stack, causing the choke and kill lines to close thereby unintentionally shutting in the Well.

Additionally, when the *Deepwater Horizon* LMRP was removed in advance of the BOP-on-BOP procedure, which would have been necessary in order to install the capping BOP, access to the *Deepwater Horizon's* BOP choke and kill lines would have been lost.[20] In contrast, the subsea choke was to be installed in the lower BOP cavity of the second BOP so that venting of pressure could continue in the event the vessel had to move off-site and remove its LMRP.  The subsea choke and venting system would have been a preferable option.

## 1.4   TOP KILL DID NOT DELAY A CAPPING SOLUTION

Mr. Foutz contends that, had the BOP-on-BOP option been on the "critical

---

[16]  TRN-MDL-07820789.

[17]  TREX 10154.

[18]  WW-MDL-00144027.

[19]  BP-HZN-2179MDL02405680.

[20]  The choke and kill lines were not able to be used in any capacity until they were cut and had jumper hoses attached to them on May 17, 2010 and the control system was repaired and replaced on May 18, 2010.  Deposition Exhibit 9675, Stipulated Facts Concerning Source Control Events, 10-md-2179-CJB-SS (Rec. Doc. 7076 (Aug. 9, 2012)) ("Stipulations") ¶¶ 71, 72.



path," it would have been available sooner than the dates in early June that are shown in the BP and Transocean planning documents.[21] Mr. Foutz identifies no documents or testimony demonstrating that work on the Capping Stack or BOP-on-BOP solutions would have moved more quickly if Top Kill had not been implemented, nor have I seen any such indication. The projects were being handled by separate teams and the final decision to implement Top Kill was not made until May 26.[22] As explained above, work schedules prepared at the time of Top Kill predicted that the BOP-on-BOP option would not be available until June. The three days during which Top Kill was being executed would have offered no reason for slowing work on the BOP-on-BOP option, and I have seen no evidence of such a slow down. As a Wild Well Control witness has testified, Top Kill did not in "any way delay the ability to cap the Well."[23]

## 1.5 BOP-ON-BOP DID NOT ENHANCE COLLECTION ABILITIES

As explained in the expert report of Mr. Dan Gibson filed on May 10, 2013, prior to Top Kill, the engineering team focused on preventing pressure increases that could cause one or more burst disks to rupture outward.[24] That issue was managed during Top Kill by keeping wellhead pressures below a predefined safe limit during pumping operations. It might have been adequately managed using a subsea venting system for the capping options. However, as shown in Mr. Gibson's report, continuing analysis and data from the Top Kill raised the concern that one or more collapse disks might have ruptured inward at the time of the explosion.[25] That meant that there could already be an open path for hydrocarbons to breach the casing, which could ultimately result in a broach to the seabed, with potentially catastrophic consequences for the Response.

Managing the risk of open collapse disks to prevent a broach required the Unified Command to keep the shut-in wellhead pressure below 4,900 psi.[26] The pressures already seen at the BOP combined with concerns about the Well's condition after analysis of Top Kill data indicated that only a limited amount of additional backpressure could be safely applied.[27] The BOP-on-BOP option was a procedure designed to shut in the Well. It did not enhance the Unified Command's ability to collect hydrocarbons which was the preferred path in light of the identified risk of subsea broach. Undertaking BOP-on-BOP would have included all of its installation risks with no corresponding upside.[28] And indeed, the BOP-on-BOP

---

[21] Foutz Report at 28-32.

[22] TREX 10682.

[23] Deposition of Patrick Campbell at Vol. 2 p. 12.

[24] *See* Report of Dan Gibson at 16 (May 10, 2013).

[25] Gibson Report at 16, 24.

[26] Gibson Report at 26.

[27] For his part, Secretary Chu appears to have concerns that excessive backpressure could be caused by the efforts to cut the riser. TREX 10687.

[28] Report of Iain Adams at 14, 17-19 (May 10, 2013) ("Adams Report").



option would have removed the ability to collect hydrocarbons from the *Deepwater Horizon*'s choke and kill lines which was successfully undertaken.

There were options to collect oil without taking these risks, namely, the Top Hat collection system, and collection from the *Deepwater Horizon* BOP's choke and kill lines.[29]  Under the circumstances, it was prudent at the end of May and the beginning of June to not move forward with the BOP-on-BOP option and instead continue work on a second relief well and enhanced collection methods, while the well integrity issue was being further examined and potential mitigations investigated.

## 1.6     THE SUCCESS OF THE CAPPING STACK IS NOT APPLICABLE TO DIFFERENT OPTIONS

The success of the capping stack in shutting in the Well in mid-July does not prove, as is implied in the reports of Messrs. Foutz and Childs, that the BOP-on-BOP option would have been successful in mid-May (which, in any event, was not possible at that time due to ongoing work on the "second" BOP).[30]  The BOP-on-BOP procedure had its own set of risks, which Mr. Foutz's analysis does not address.

Mr. Foutz asserts that the same ram that was used in the capping stack to shut in the Well would have been available for the 2-ram capping stack, and was the same type of ram that was on the *Discoverer Enterprise* BOP.[31]  Mr. Foutz is correct that the same type of ram could have been used in the 2-ram capping stack and was part of the *Enterprise* BOP.  Mr. Foutz is incorrect, however, in apparently assuming that accomplishing the shut in process with the capping stack is a simple matter of closing the blind shear ram.

The 3-ram capping stack that was deployed in July 2010 and that successfully shut in the Well had a subsea choke system that was used to close the Well gradually (the "soft" shut-in, see p. 3 above) and manage pressure.[32]  In addition to allowing pressure management, the use of the subsea choke also provides protection for the blind shear ram that is closing.  As the blind shear ram is closed, the velocity of hydrocarbons flowing past it would have increased and potentially eroded the sealing elements of the ram.  By having an additional flowpath for hydrocarbons out a subsea choke, the blind shear ram will see less erosional forces because the velocities across the sealing edge of the ram will be lower.  The specific features of the 3-ram capping stack, all working together, produced its success.  Its success certainly does not prove that a differently configured, higher risk capping device would have been successful at an earlier point in time.

---

[29] The Top Hat was a dome like device that collected hydrocarbons exiting the *Deepwater Horizon* BOP after the riser was cut.  Stipulations at 3.  Using the piping set up for the Top Kill efforts, the *Q4000* and *Helix Producer 1* collected hydrocarbons from the *Deepwater Horizon*'s choke and kill lines.  Stipulations at ¶¶ 132.

[30] Foutz Report at 32-35; Childs Report at 11.

[31] Foutz Report at 32-34.

[32] BP-HZN-2179MDL01518848.



## 2.0 TOP KILL WAS REASONABLE AND DID NOT DAMAGE THE WELL OR LIMIT FUTURE OPTIONS

Mr. Foutz asserts that the junk shot portion of Top Kill was flow rate dependent. To the contrary, flow rate was not critical to Top Kill -- pressures in the flowing system and the size and location of chokes in the flow path (unknown in May 2010) were critical.

The main driver of whether injected material will initially form a bridge is the relationship between the size of the material and the size of the orifice that it encounters. Mr. Foutz is correct to note that velocity can have an impact on whether material successfully bridges. However, the primary issue there is still the relative size differential between the injected material and the orifice. In addition, velocity as it would affect distortion of bridging material is not directly related to overall flow from the Well, but is dictated by the particular pressure and flow path geometry it encounters.

Mr. Foutz also misses the fact that pressure, not flow rate, determines whether bridging material can hold a bridge, once the bridge has been established. Pressure is inversely related to flow rate. As bridging occurs the flow rate decreases, but pressure increases due to the newly restricted flowpath. The risk of pressure increasing to an unsafe level was an identified risk that the Top Kill team was able to mitigate, in part by injecting only a measured amount of materials at a time.[33]

The major risks of Top Kill were identified and mitigated.[34] While Top Kill was not successful in killing the Well, it did not create any of the potentially adverse outcomes identified (except perhaps some erosion within the BOP). A fundamental problem with the engineering judgment of the reports submitted on behalf of Transocean and Halliburton is that they consider risk asymmetrically. For example, the risks identified and mitigated for the Top Kill procedure are highlighted by the Transocean and Halliburton reports as a reason to not attempt that operation, while the risks identified and mitigated for the BOP-on-BOP option are ignored.[35] The BOP-on-BOP option had its own risks, and a proper comparison of the BOP-on-BOP option and Top Kill should include an evaluation of the risks and mitigations of both, the availability of both, and the impact of either procedure on future options if unsuccessful. It is certainly true that the engineering team working on BOP-on-BOP

---

[33] Deposition of Charles Holt at 539-540. Mr. Foutz also states that Mr. Tom Knox misrepresented that junk shot was not under consideration in a May 25, 2010, email. Foutz Report at 17. Mr. Knox has testified that he was not suggesting that junk shot was not still under consideration for future use, but that for "the immediate future, that is, the next session of intervention, the junk shot was not being considered." Deposition of Tom Knox at 70:3-9. Indeed, at that time the imminent stages of Top Kill did not include the junk shot. The final Top Kill procedures approved by the Unified Command did include the junk shot portion of Top Kill, so the Unified Command was plainly aware that bridging materials were to be used.

[34] Adams Report at 9-10.

[35] Foutz Report at 13-21; Ziegler Report at 33; Report of Glen Stevick at 15-16 (May 1, 2013) ("Stevick Report").



believed it to be a feasible procedure and was working to be able to implement it. But risks being evaluated by different teams, namely risks involving the integrity of the Well, were not part of the remit of the BOP-on-BOP engineering team. The risks presented by well integrity concerns properly prevented implementation of the BOP-on-BOP option at the end of May 2010.[36]

## 3.0    CAPPING STACK TIMELINES ARE NOT DETERMINABLE IN ADVANCE

The assertion put forward by Mr. Ziegler and Dr. Stevick that a capping stack could have been installed in seven or eight days is implausible.[37] Surface wells, where capping techniques have a long history, routinely take much longer than eight days to cap. Intervention teams responding a land well blowout are able to roll equipment on trucks into close proximity with the wellhead. The Macondo Well was 5,000 feet below the surface of the Gulf of Mexico. Given the location of the Macondo Well, intervention was far more complex than what would be required for a surface blowout. Mr. Ziegler and Dr. Stevick base their seven- to eight-day timeline on comments presented at a conference after the Macondo event. At that conference, one speaker offered an opinion that because removal of the debris took what he estimated to be five days, and the actual deployment of the 3-ram Capping Stack took three days, shut-in of the Well could be accomplished in eight days. The eight-day timeframe ignores key aspects of the capping stack's installation, such as the straightening of the flexjoint with which the conference speaker may not have been familiar.[38] The eight-day timeframe also ignores the substantial time needed to evaluate concerns about the integrity of the Well, as well as other the peer reviews, safety evaluations, and risk mitigation activities necessary to shut in the Macondo Well. As I stated in my May 10 report, no one can predict with a reasonable degree of engineering certainty how long it would have taken to shut in the Macondo Well, even if a capping stack had been prebuilt.[39]

## 4.0    DR. STEVICK'S SUGGESTED BOP INTERVENTION SEQUENCE WAS NOT AVAILABLE

In discussing how remotely operated vehicles ("ROVs") should have tried to actuate the BOP, Dr. Stevick claims that annular preventers and the casing shear ram should have been closed before attempting to close the blind shear ram.[40] Setting aside whether that would be a preferable sequence, it was not one available on the *Deepwater Horizon* BOP. The ROV panel on the *Deepwater Horizon* BOP had hot stab ports for the blind shear ram and for what was thought to be the middle pipe ram. Thus, there was no readily accessible way of functioning the annular

---

[36] TREX 10505 (noting that peer review was limited to "installation risks").

[37] Ziegler Report at 36-38; Stevick Report at 7, 18.

[38] Adams Report at 22.

[39] *Id.* at 23-27.

[40] Stevick Report at 6, 13-14.



preventers and the casing shear ram.[41]  Eventually efforts were undertaken to plumb into other rams, such as the casing shear ram, but such options were not available without substantial engineering work and additional time.[42]

Dr. Stevick also asserts that the BOP should have had the "most up to date" control system.[43]  However, new technology is not inherently better just because it is new.  Each new technology needs to be evaluated on its own merits and compared to existing systems and not merely adopted because it is new or has a different feature.  New, untested, technology has its own risks that need to be evaluated.  Dr. Stevick does not do so.

## 5.0    ADDITIONAL ERRORS AND ISSUES IN MR. ZIEGLER'S REPORT

In addition to the points noted above, Mr. Ziegler's report contains other assertions that are not consistent with my engineering judgment and understanding of the available information.

•    Mr. Ziegler asserts that the Top Hat failed.[44]  That is incorrect.  Top Hat #4 was installed on June 3 and successfully collected hydrocarbons to the *Discoverer Enterprise* with limited interruptions before being removed for the installation of the 3-ram capping stack.[45]

•    Mr. Ziegler implies that the *Deepwater Horizon* LMRP was removed subsea in support of his argument that BOP-on-BOP was feasible at Macondo.[46]  The *Deepwater Horizon* BOP stack was, in fact, recovered as a single unit by the *Q4000*, which is standard practice for stack recovery.[47]  The LMRP was removed on the deck of the *Q4000*, which is a vastly different operation than removing it in 5000 feet of water in dynamic well conditions.[48]  The source of Mr. Ziegler's assertion, a deposition of a Cameron representative, does not contradict these facts.

•    Mr. Ziegler asserts that BP was "paralyzed" because it lacked a flow rate estimate.[49]  This is incorrect.  Admiral Allen has testified that flow rate did not direct the Response.[50]    Multiple workstreams were moving forward as quickly as practicable and possible, and decisions were being made and vetted by the Unified Command as options became available.

[41]  TRN-INV-01295992.

[42]  Interview with Harry Thierens.

[43]  Stevick Report at 6, 30-31.

[44]  Ziegler Report at 35.

[45]  Stipulations ¶¶ 91, 92, and 121.

[46]  Ziegler Report at 40.

[47]  IMS018-002899.

[48]  *Id.*

[49]  Ziegler Report at 27.

[50]  Deposition of Admiral Allen at 210-12.

Deepwater Horizon
Source Control Review


## 6.0      COLLECTION EFFORTS ESTABLISHED FLOW RATES

The reports filed by Transocean and Halliburton either state outright or imply that BP made recommendations to avoid disclosing or suggesting a flow rate above 15,000 bpd could be responsible for the failure of Top Kill.  In addition to having seen no actual evidence of this theory presented, it is implausible.  As explained in the report of Dan Gibson, the ongoing analysis of well integrity and data from Top Kill suggested a potential issue with rupture disks that might have allowed a subsea broach to occur if the Well was capped.  That possibility led the Unified Command to pursue collection efforts that would not add excessive pressure to the Well.  While the Unified Command was moving to its collections strategy, BP made a presentation to Secretary of the Interior Salazar that explained the concerns about the integrity of the Well and the planned containment options.  One of the risks identified for the Top Hat was flow "Exceeding Enterprise Capacity."[51]  The *Enterprise* had the capacity to collect approximately 15,000 bpd, which was discussed at this presentation and, as shown below, noted by a government participant.



OSE109-003484.

BP's proposed plan after the Top Kill data was analyzed was to implement a containment  system -- the Top Hat -- which, if implemented, would  prove the Well was  flowing  at  greater  than  15,000  barrels  per  day,  if  discharge  from  the  Well

---

[51]  OSE109-033473.



exceeded the capacity of the *Enterprise*. On the fourth day of collection with the Top Hat, almost 15,000 barrels were collected.[51] On the fifth day of collection, more than 15,000 barrels were collected.[52]

In early June, BP was also preparing to flow hydrocarbons to the *Q4000*, which could process approximately 8000 bpd. The *Q4000* began operation on June 16, which gave approximately 23,000 barrels of processing capacity between it and the *Enterprise*. With this combined collection rate, it was confirmed that the Well was in fact flowing at a rate above 23,000 bpd in June.[53] And additional capacity was under development. There is no reason to pursue these collection methods, which prove a flow rate upwards of 23,000 bpd, to avoid the conclusion that Top Kill failed due to a flow rate exceeding 15,000 bpd.

In summary, if there was a desire to avoid a conclusion that flow from the Well was greater than 15,000 barrels per day, and there were not concerns about well integrity, the obvious answer would have been to simply attempt to cap the Well. It would not have been in either the public interest or the interest of BP to shift to the collection strategy.

## CONCLUSION

My review of the reports by Messrs. Foutz and Ziegler and Drs. Stevick and Wilson does not change my conclusion that BP's participation in the Unified Area Command's Response to the *Deepwater Horizon* blowout demonstrated sound engineering judgment, gave appropriate attention to the safety of workers engaged in the Response, and enabled the Unified Command to close the Well as expeditiously as practicable, taking due account of uncertainties about the condition of the Well and the need to minimize the risk of subsea broaching while mitigating environmental damage to the extent possible.

Prepared by:   Iain Adams                    Date

Signed                                        June 10, 2013

---

[51]  TREX 9490

[52]  *Id.*

[53]  *Id.*

**Deepwater Horizon
Source Control Review**



## RETENTION FOR THIS MATTER

In 2012, BP retained me to work on this litigation.  For my services in this matter, I am being compensated at my customary hourly rate of 400 GBP per hour. My compensation does not depend in any way on the outcome of this litigation or the conclusions that I reached.