# Excerpts from Dr. Robert Bea Deposition Transcript

# Taken July 22, 2013

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL      ) MDL NO. 2179
BY THE OIL RIG        )
"DEEPWATER HORIZON" IN ) SECTION "J"
THE GULF OF MEXICO, ON )
APRIL 20, 2010        ) JUDGE BARBIER
                      ) MAG. JUDGE SHUSHAN

Deposition of ROBERT GLENN BEA, Ph.D., P.E., taken at Pan-American Building, 601 Poydras Street, 11th Floor, New Orleans, Louisiana, 70130, on the 22nd day of July, 2013.

## Page 2

APPEARANCES

APPEARING FOR THE PLAINTIFFS' STEERING COMMITTEE:
  Mr. Brian Barr
  LEVIN PAPANTONIO THOMAS MITCHELL RAFFERTY & PROCTOR, P.A.
  316 South Baylen Street, Suite 600
  Pensacola, Florida 32502
  Ms. Robin Greenwald
  WEITZ & LUXENBERG, P.C.
  700 Broadway
  New York, New York 11215

APPEARING FOR BP, INC.:
  Mr. Scott W. Fowkes
  KIRKLAND & ELLIS
  333 South Hope Street
  Los Angeles, California 90071
  Mr. Lee Philip Rudofsky
  Mr. Derek Bentsen
  KIRKLAND & ELLIS
  655 Fifteenth Street, NW
  Washington, D.C. 20005-5793
  Ms. Jessica Sklarsky
  KIRKLAND & ELLIS
  601 Lexington Avenue
  New York, New York 10022

APPEARING FOR TRANSOCEAN:
  Mr. Kyle A. Casazza
  Ms. Tamerlin J. Godly
  MUNGER TOLLES & OLSON
  355 South Grand Avenue, 35th Floor
  Los Angeles, California 90071-1560

## Page 3

A P P E A R A N C E S (Continued)

APPEARING FOR ANADARKO PETROLEUM CORPORATION:
  Ms. Sarah E. Iiams
  KUCHLER POLK SCHELL WEINER & RICHESON
  1615 Poydras Street, Suite 1300
  New Orleans, Louisiana 70112

APPEARING FOR HALLIBURTON:
  Ms. Jenny L. Martinez
  Mr. Sean W. Fleming
  Ms. Erika Toledo
  GODWIN LEWIS
  1201 Elm Street, Suite 1700
  Dallas, Texas 75270-2041

APPEARING FOR THE STATE OF LOUISIANA:
  Mr. Douglas R. Kraus
  Attorneys for Louisiana Attorney General
  KANNER & WHITELEY
  701 Camp Street
  New Orleans, Louisiana 70130-3504

ALSO PRESENT:
  Mr. Ray Aguirre, Case Manager
  Mr. James Deel, Videographer
  Mr. Robert Deel

## Page 4

INDEX
VIDEOTAPED ORAL DEPOSITION OF
ROBERT GLENN BEA, Ph.D., P.E.
JULY 22, 2013

|  | PAGE |
|---|---|
| Appearances | 2 |
| Examination by Mr. Bentsen | 7 |
| Examination by Mr. Fowkes | 176 |
| Signature and changes | 244 |
| Reporter's Certificate | 246 |

EXHIBITS

|  | PAGE |
|---|---|
| EXHIBIT NO. 11750 | 9 |
| Rule 26 Report on BP's Deepwater Horizon Macondo Blowout, Phase 2 Expert Opinions by Dr. Bea, dated April 5, 2013, 37 pages | |
| EXHIBIT NO. 11751 | 9 |
| Rule 26 Rebuttal Report on BP's Deepwater Horizon Macondo Blowout, Phase 2 Expert Rebuttal Report Source Control, by Dr. Bea, dated June 10, 2013, 12 pages | |
| EXHIBIT NO. 11752 | 82 |
| Absence of fatalities in blowouts encouraging in MMS study of OCS incidents 1992-2006, BP-HZN-2179MDL04952163 - BP-HZN-2179MDL04952166 | |
| EXHIBIT NO. 11753 | 94 |
| United States Department of the Interior Minerals Management Service Gulf of Mexico OCS Region, NTL No. 2006-G21, Effective Date: October 26, 2006, 29 pages | |

57

1   on specific requirements for a BOP to be a
2   sufficient mitigation in the sense of meeting
3   process safety requirements for as low as
4   reasonably practicable or the U.S. Minerals
5   Management Service requirements and for rapid
6   abatement of the source because of the
7   limitations in my expertise.
8       Q.   (BY MR. BENTSEN) Okay. So, in
9   essence, is your opinion that BP should have
10  had something, but sitting here today, you
11  can't define what BP should have had?
12      MS. GREENWALD: Objection; form.
13      A.   In terms of the details of the
14  post-blowout source control system, that
15  statement is correct.
16      Q.   (BY MR. BENTSEN) Okay. So --
17      A.   Those are the kinds of studies
18  that need to be conducted prior to a blowout
19  to assure the owner/operator that we have
20  configured a system that is as low as
21  reasonably practicable.
22      Q.   Okay. So the ALARP analysis
23  you've done does not identify what, if
24  anything, BP needed to have available to be
25  ALARP?

58

1       MS. GREENWALD: Objection; form.
2       A.   That's not correct. It does not
3   specify specifics in the system, but, rather,
4   specifies that such planning of such a system
5   needed to be conducted before the well was
6   spudded, the system operation initiated to
7   have assured the owner/operator, BP, and the
8   regulator, United States Minerals Management
9   Service, that the system was ALARP and
10  represented the best available and safest
11  technology.
12      Q.   (BY MR. BENTSEN) But you
13  haven't identified technology that was
14  required to be ALARP?
15      A.   That's correct.
16      Q.   Okay. So you just think
17  something needed to be there, but can't
18  specify what?
19      A.   Correct.
20      Q.   Okay. I believe, as you
21  state -- and if you want to go to Page 9 of
22  your report -- there are three general
23  approaches used to define ALARP?
24      A.   Yes, sir.
25      Q.   Okay. And the first one is

59

1   "Cost-Benefit economic analyses," correct?
2       A.   Correct.
3       Q.   If you haven't identified the
4   equipment that would be the cost, how can you
5   do a cost/benefit analysis?
6       MS. GREENWALD: Objection; form.
7       A.   You can't. And that's -- that's
8   a critical aspect. The cost/benefit analysis
9   of a particular system needs to be conducted
10  before you implement the system. Because no
11  coherent system was developed prior to the
12  blowout for blowout source con- -- blowout
13  source control, a definitive cost/benefit
14  analysis of a system could not, was not, to
15  my knowledge, performed before the blowout.
16      Q.   (BY MR. BENTSEN) Okay. And you
17  didn't undertake a cost/benefit analysis,
18  correct?
19      MS. GREENWALD: Objection; form.
20      A.   That's correct.
21      Q.   (BY MR. BENTSEN) Okay. So on
22  the face of the report you could not say that
23  any particular device would pass a cost
24  benefit economic analysis, correct?
25      A.   That's correct.

60

1       Q.   The second is "Historic
2   Precedents analyses." Is that essentially
3   looking at what's happened in the past to
4   guide us in the future?
5       A.   Yes.
6       Q.   Okay. And no prior incident in
7   the oil and gas industry called for a
8   deepwater capping stack, correct?
9       A.   I -- I don't --
10      MS. GREENWALD: Objection; form.
11  Sorry.
12      A.   I don't know what the entire
13  industry called for. The scope of my
14  knowledge and work does not address the
15  entire industry.
16      Q.   (BY MR. BENTSEN) Okay. So,
17  again, if Patrick Campbell and David Barnett
18  of Wild Well indicated it had never been used
19  in deepwater, you would have no way to object
20  to that?
21      A.   That's correct.
22      MS. GREENWALD: Objection; form.
23      Q.   (BY MR. BENTSEN) Okay. What
24  historic precedence did you use in looking at
25  your analysis?

15 (Pages 57 to 60)

121

1    another vessel.
2        Q.   Okay.  And BP had other BOPs on
3    different vessels in the Gulf of Mexico,
4    correct?
5        MR. KRAUS:  Objection; form.
6        A.   I'm not sure that's correct, but
7    Transocean did.
8        Q.   (BY MR. BENTSEN)  Certainly.
9    Transocean vessels that were contracted to
10   BP, correct?
11       A.   Correct.
12       Q.   Okay.  So the state of the
13   industry as of April 20th, 2010, was to have
14   a BOP on a different vessel available; is
15   that your testimony?
16       MS. GREENWALD:  Objection; form.
17       A.   For some operators.
18       Q.   (BY MR. BENTSEN)  Can you name
19   any operators that had anything other than
20   BOPs on different vessels?
21       A.   No.
22       Q.   Okay.  And that would apply to
23   several companies that you indicated
24   previously had excellent process safety
25   management prior to this incident, correct?

122

1        MS. GREENWALD:  Objection; form.
2        A.   Well, since I haven't reviewed
3    those companies' plans specifically for wells
4    of the category of Macondo, that statement is
5    correct.  I focused solely on the Macondo
6    conditions and BP's preparation for
7    post-blowout source control.
8        Q.   (BY MR. BENTSEN)  Okay.  And
9    from what we've seen and from the testimony
10   of people in the well control industry, BP's
11   preparation was in line with everyone else in
12   the industry, correct?
13       MS. GREENWALD:  Objection; form.
14       MR. KRAUS:  Objection; form.
15       A.   I'm afraid I can't answer
16   affirmatively or negatively to that statement
17   because of the limitations in my knowledge.
18       Q.   (BY MR. BENTSEN)  But you would
19   agree that industry standard is part of the
20   ALARP analysis, correct?
21       MS. GREENWALD:  Objection; form.
22       A.   Well, again, I can't comment on,
23   quote, the industry standard for ALARP.  Some
24   companies in the industry do.  Other
25   companies with the -- in the industry don't.

123

1        Q.   (BY MR. BENTSEN)  No, no, my
2    question is, if you're doing an ALARP
3    analysis, industry standards form part of
4    that analysis, correct?
5        A.   Yes, sir.
6        Q.   Okay.  But you just said that
7    you didn't undertake any review to determine
8    what the industry standards were in
9    responding to a potential blowout in the Gulf
10   of Mexico?
11       MS. GREENWALD:  Objection; form.
12       A.   For this category of well,
13   that's correct.
14       Q.   (BY MR. BENTSEN)  Okay.  Did you
15   undertake any analysis to determine industry
16   standards to respond to a blowout in the Gulf
17   of Mexico on a different category of wells?
18       A.   No.
19       Q.   Okay.  So you didn't take
20   analysis to determine the industry standard
21   to respond to a blowout in the Gulf of Mexico
22   on any kind of well, correct?
23       A.   Correct.
24       Q.   Okay.  And that -- I assume you
25   didn't take any analysis to determine the

124

1    industry standard to respond to a blowout in
2    deepwater anywhere in the world?
3        MS. GREENWALD:  Objection; form.
4        Q.   (BY MR. BENTSEN)  I'll rephrase
5    the question for you.  So we've just said --
6    we've just determined that your analysis
7    didn't -- didn't determine the industry
8    standard to respond to a blowout -- blowout
9    in the Gulf of Mexico on any kind of well?
10       A.   Correct.
11       Q.   Did you undertake any analysis
12   to determine the industry standard in
13   responding to a blowout in other
14   jurisdictions, for example, the North Sea?
15       MS. GREENWALD:  Objection; form.
16       A.   Well, I made inquiries during
17   the course of my investigations as to
18   preparations made by other companies in other
19   areas, such as the Beaufort Sea, United
20   States Arctic, such as the Norwegian sector
21   of the North Sea, similarly for the U.K.
22   sector of the North Sea.
23       Q.   (BY MR. BENTSEN)  And what did
24   you determine the industry standards there to
25   be?

Worldwide Court Reporters, Inc.
PURSUANT TO CONFIDENTIALITY ORDER

149

1  A.  No.
2  Q.  (BY MR. BENTSEN)  Can you find
3  one operator in the world that has any of the
4  equipment necessary to respond to a deepwater
5  blowout in the manner you suggest?
6      MS. GREENWALD:  Objection; form.
7      MR. KRAUS:  Objection; form.
8  A.  I would have to perform such an
9  effort to be able to respond to your
10 question, but -- or, yeah, to your question.
11 As I previously stated, I made no worldwide
12 survey of their response to Macondo-like
13 system conditions relative to process safety
14 management ALARP principles.  I focused
15 solely on BP Macondo.
16 Q.  (BY MR. BENTSEN)  And so if a
17 company that you had previously testified had
18 A plus safety management had the same plan as
19 BP for a deepwater Gulf of Mexico oil spill,
20 would that change your opinion?
21     MS. GREENWALD:  Objection; form.
22 A.  No.
23 Q.  (BY MR. BENTSEN)  So if every
24 oil and gas operator in the -- in deepwater
25 Gulf of Mexico had the same plan, your view

150

1  is that the entire industry is out of ALARP?
2      MS. GREENWALD:  Objection; form.
3      MR. KRAUS:  Objection; form.
4      MS. IIAMS:  Form.
5  A.  The same plan for a Macondo type
6  of well?
7  Q.  (BY MR. BENTSEN)  Yes.
8      MS. GREENWALD:  Objection; form.
9  A.  And that plan was founded upon
10 solely on drilling a relief well to stop the
11 flow after a blowout?
12 Q.  (BY MR. BENTSEN)  Well, you
13 understand that BP's plan was to backstop its
14 efforts with a relief well and then organize
15 a team of efforts to develop procedures and
16 equipment that may intervene more quickly,
17 right?
18     MS. GREENWALD:  Objection; form.
19 A.  Well, based on the plan that I
20 could see from BP, your statement here is
21 correct.  However, that plan would not enable
22 you to be ALARP unless the original planning
23 encompassed rapid source control.
24 Q.  (BY MR. BENTSEN)  Okay.  So if,
25 for example, Shell was operating in the

151

1  deepwater Gulf of Mexico with a plan to drill
2  a relief well in the event of a blowout and
3  staff up a team of experts to try to
4  intervene more quickly, they would be not in
5  conformance with ALARP, in your opinion?
6      MS. GREENWALD:  Objection; form.
7  A.  Well, that's given the premise
8  that they had no other elements within their
9  plan to effect early source control.  Given
10 they did not have those components, or they
11 could not, would not be ALARP.
12 Q.  (BY MR. BENTSEN)  Okay.  So the
13 same answer would be true for Exxon, correct?
14     MS. GREENWALD:  Same objection.
15 A.  Correct.
16 Q.  (BY MR. BENTSEN)  And Chevron?
17     MS. GREENWALD:  Same objection.
18 A.  Correct.
19 Q.  (BY MR. BENTSEN)  And those
20 companies, in your prior testimony, had
21 excellent process safety management, correct?
22     MS. GREENWALD:  Objection.
23 A.  Prior to the 1990s.
24 Q.  (BY MR. BENTSEN)  Well, you
25 didn't say that in your prior testimony,

152

1  correct?
2      MS. GREENWALD:  Objection; form.
3  A.  I tried to.  But it was on the
4  line following the lines that you had read
5  that I agreed with.
6  Q.  (BY MR. BENTSEN)  Okay.  I
7  recall that you time-limited your Exxon
8  testimony.  Is it your testimony here today
9  that you had no knowledge of Shell or
10 Chevron's process safety management after
11 1990?
12     MS. GREENWALD:  Objection; form.
13 A.  After the 1990s, so not into the
14 2000 period.
15     MR. BENTSEN:  It is 12:30.  Should we
16 break for lunch?
17     MS. GREENWALD:  Sure.  Thank you.
18     THE VIDEOGRAPHER:  Time is 12:31 p m.,
19 and we're off the record.
20     (Recess from 12:31 p.m. to 1:42 p.m.)
21     THE VIDEOGRAPHER:  The time is
22 1:42 p.m.  We're back on the record.
23 Q.  (BY MR. BENTSEN)  Good
24 afternoon, Dr. Bea.
25 A.  Good afternoon.